

April 29, 2021

Dear Lake County ADAMHS Board Members,

Please accept this request for proposal for FY 2022. Windsor Laurelwood Center for Behavioral Medicine is requesting the following:

- A total of 350 bed days for inpatient mental health services (adult, child and adolescent) at a rate of $625 per day.
- A total of 725 bed days for SUD medically monitored inpatient withdrawal management related to the Opiate Recovery Transition Program at $580 per day.

The increases in rate are related to significant increases in professional service costs and direct care employee wages and health insurance costs for employees, .

Windsor Laurelwood values the long and mutually beneficial relationship with the Lake County ADAMHS Board and would like to continue providing care at our facility. In order to maintain our high level of quality care, we respectfully submit this proposal for your consideration.

Sincerely,

*Shelley Zimmerman*

Shelley Zimmerman

Chief Executive Officer

Windsor Laurelwood Center for Behavioral Medicine

35900 Euclid Avenue, Willoughby, Ohio 44094   www.windsorlaurelwood.com   Phone: 440-953-3000

CONFIDENTIAL

DEF-MDL-14396.00001

ADAMHS000029545



DEF-MDL-14396

## Provider Profile FY2022

| Agency Name | Windsor Laurelwood Center For Behavioral Medicine |
|---|---|
| Street Address | 35900 Euclid Avenue |
| City/State/Zip | Willoughby, Ohio 44094 |
| DUNS # | N/A |
| Number of Sites | One |
| Address(es) Where All Services Will Be Provided | 35900 Euclid Avenue Willoughby, Ohio 44094 |
| Phone | (440) 953-3000 |
| Fax | (440) 953-3344 |
| e-mail | Barbara.Moran@uhsinc.com |
| Website | https://windsorlaurelwood.com |
| Executive Director/CEO | Shelley Zimmerman |
| Date Services Commenced | 1898 |
| Board Chair | Shelley Zimmerman |

### Board Composition:

| # Board Members | 8 | | |
|---|---|---|---|
| # Self-identified Primary Consumers | 0 | % of total board members | 0 |
| # Self-identified Secondary Consumers (family embers) | 0 | % of total board members | 0 |

### The Proposer Is (Check One):

| | Individual or Individually Owned | Owner: |
|---|---|---|
| | Partnership of the State of: | Partners: |
| X | Corporation in the State of: PA | Name: Universal Health Services |
| No | Non for Profit | |
| | Other, Indicate Type: | Name: |

Mission statement: To provide high quality treatment for all individuals with behavioral health/SUD disorders in the communities of Northeast Ohio. We are dedicated to improving the quality of life based on the fundamental principles of trust, respect, integrity and excellence in all areas of service.

Agency description: 159 bed behavioral health facility providing in-patient and out-patient services to children, adolescents and adults.

Primary areas of focus in the next 24-month period: We will be focusing on inpatient treatment, specifically tailoring treatment for varied levels of care from the most acute to dual diagnosed patients and those struggling with mental health alone. We will provide this specialized treatment through our Therapy Plaza that is designed to meet their needs based on their diagnosis. It involves a multidisciplinary approach which we will be expanding as COVID allows this upcoming year. The other area of focus for our inpatient population will be in substance abuse and helping those who need support with opioid and alcohol detox and rehabilitation. We will be developing a Therapy Plaza form of treatment for this population as well to help individualize treatment using a multidisciplinary approach. We would like to consider expanding outpatient services to potentially

CONFIDENTIAL

DEF-MDL-14396.00002

include a Medicated Assisted Treatment (MAT) program. These areas of focus will involve developing both inpatient and outpatient models of care and contracting with the MCO's and State Medicaid population.

iggest challenge in the next 12-month period: Our biggest challenge continues to be the management of volume of Medicaid patients we see. This started a few years ago with the elimination of the federal IMD rule and has significantly increase over the past year due to the pandemic and the loss of jobs. These challenges, for our patient population, requires us to be masterful at collaborating with step-down services to ensure effective treatment post inpatient stay and upon discharge. Assisting our patients with addressing the pervasive hurdles they face, such as homelessness, job loss, etc. through improved contracts with MCO's and advocating for better reimbursement for our patients with increasing needs and acuity.

Administrative Strengths: Windsor Laurelwood's leadership team is well rooted in the community and is actively advocating for our patient population with the help of our community partners. We are committed to meeting the challenges and needs of the mental health and substance abuse patients in our community. Our leadership team is proactive and committed to partnering with various community partners as well as laser focused to quickly and effectively help meet the needs of the patients we serve.

Clinical Strengths: Windsor Laurelwood has been helping to serve our community for the past 100 years and we are committed to serving our patients for the next 100 years. We have an impressive committed and multidisciplinary clinical team that focuses on quality outcomes and maintaining the highest standards.

We regularly review and report data and outcomes adjusting our delivery of services to ensure the highest objectives are met.

How has your agency "done more with less" over the past 12 months: While we have seen an crease in the need for our services through the pandemic and a decrease in coverage, we continue to live our mission, "To provide high quality treatment for all individuals with behavioral health/SUD disorders in the communities of Northeast Ohio. We are dedicated to improving the quality of life based on the fundamental principles of trust, respect, integrity and excellence in all areas of service.", regardless of changes in reimbursement related to job loss, impacts of the pandemic and overall changes in landscape of reimbursement. Our commitment remains solid.

| Certifications/Licensures/Accreditations | Year of Expiration |
|---|---|
| The Joint Commission Hospital Accreditation | December 2021 |
| The Joint Commission Behavioral Healthcare Accreditation | December 2021 |
| Ohio MHAS Alcohol and Drug Addiction Program (Detoxification) | 2021 |
| Ohio MHAS Alcohol and Drug Addiction Program (Outpatient) | 2021 |
| Ohio MHAS Alcohol and Drug Addiction Program (Residential) | 2021 |
| Ohio MHAS Private Psychiatric Hospital License | 2021 |
| Agency Programs & Services: | Target Population |
| In-patient Mental Health – Adults | 18+ |
| In-patient Withdrawal Management | 18+ |
| In-patient Mental Health – Child and Adolescent | 6 – 17 |
| -patient SUD Rehabilitation | 18+ |
| ⌐artial Hospitalization (Adult Mental Health, SUD) | 18+ |
| Partial Hospitalization (Adolescent Mental Health) | 13 - 17 |
| Intensive Out-patient (Adult Mental Health and SUD) | 18+ |

CONFIDENTIAL

DEF-MDL-14396.00003

ADAMHS000029547

## Consumers Served FY2021 (annualize):

| Unduplicated Current Clinical Active Caseload | 1591 |
| --- | --- |
| # Female | 3192 |
| #Male | 2220 |
| # of consumers between the ages of 0 – 12 | 356 |
| # of consumers between the ages of 13 – 17 | 1480 |
| # of consumers between the ages of 18 – 64 | 4152 |
| # of consumers 65 and over | 176 |
| # of consumers receiving Medicaid services only | 3488 |
| # of consumers receiving non-Medicaid services only | 2676 |
| # of consumers receiving both Medicaid & non-Medicaid services | 812 |
| Estimated # of persons receiving prevention only services | 0 |

## Current fiscal year overview (not what is being proposed for the coming year):

| Total Agency SFY 21 Expense Budget | | |
| --- | --- | --- |
| | Amount | % of Budget |
| SFY 21 total LCADAMHS budgeted contracts (non-Mcd, IDTF, Title XX Match) | $639,250 | 1.8% |
| Administrative Overhead | $1,270,200 | 3.6% |
| Support Costs | $10,468,555 | 30% |
| Budgeted SFY 21 Revenues | $34,773,245 | |

| Current Fund Balance in Reserve (months) | N/A | Do you have a policy? | Y/N |
| --- | --- | --- | --- |
| Current Total # of Full Time Staff | 197 | | |
| Current Total # of Part Time Staff | 64 | | |
| Current # of Direct Service Staff | 203 | % of total staff = | 79% |

## ADAMHS Quality Improvement Contract Compliance Review (all current year compliance reviews are not complete, report on previous year):

| Outcome of SFY20 Review (Full/Partial/Non Compliance) | F/P/N Full | Date of last review: | 11/2020 |
| --- | --- | --- | --- |

## Enrollment Compliance:

| # of Enrollees (GOSH): | N/A | % of total current caseload: | |
| --- | --- | --- | --- |
| OBHIS Submission Level (%): | | | |

CONFIDENTIAL

DEF-MDL-14396.00004

ADAMHS000029548

**Lake County RFP FY 2022**
**Windsor Laurelwood Center for Behavioral Medicine**

## Organizational Overview

1) Organizational Structure
    a. History: Windsor Laurelwood Center for Behavioral Medicine has
       been serving the community since 1898.  It is the largest freestanding
       psychiatric facility in the state of Ohio.  The current facility resulted
       from the merger of two facilities, Windsor Hospital and Laurelwood
       Hospital.  This merger was a direct result of Psychiatric Solutions
       (Windsor Hospital's parent company) acquisition of Horizon Health
       Care Services (Laurelwood Hospital's parent company) on June 1,
       2007.  The consolidation of services at the Willoughby campus was
       completed on September 1, 2007.  Windsor Laurelwood's current
       parent company is Universal Health Services.  UHS acquired the
       facility in November 2010.
    b. Structure:  Windsor Laurelwood is a for profit subsidiary of Universal
       Health Services Incorporated, a corporation of the state of
       Pennsylvania.  The hospital has a Board of Governors.  The Board
       meets quarterly to review the operations of the facility.  The facilities
       Board of Governors is listed in Appendix II.
    c. Table of Organization: Revised Table of Organization is listed as
       Attachment I.
    d. Areas of Expertise: Windsor Laurelwood is the largest freestanding
       psychiatric facility in the state of Ohio.  The facility specializes in
       inpatient and outpatient behavioral healthcare for adults,
       adolescents and children.  Windsor Laurelwood operates the
       following distinct mental health and substance use disorder services:
           • Adult Psychiatric Intensive Care Unit
           • Adult Mood Disorder Unit
           • Adult Dual Diagnosis Unit
           • Child Mental Health Unit (ages 6 – 12)
           • Adolescent Mental Health Unit (ages 13 – 17)
           • Adult Substance Use Disorder Unit (withdrawal management
             and SUD rehabilitation)

ADAMHS000029549

- Full array of Partial Hospitalization, Intensive Outpatient Mental Health and Substance Use Disorder Services

2) <u>State Equal Employment Opportunity Regulations:</u> Windsor Laurelwood is compliant with all state EEO regulations. EEO is reviewed upon hire and is also reviewed in the employee handbook. EEO policy is provided as Attachment II.

3) <u>Health Equity:</u> Windsor Laurelwood provides high quality, person-centered care that is appropriate and responsive to all patients seeking services. The care does not vary in quality because of personal characteristics such as ability and disability, age, gender, ethnicity, educational level, geographic location, race, religion, sexual orientation, socio-economic status and/or values. Windsor Laurelwood provides diversity training to all employees.

4) <u>Certification, Accreditation, Licenses, Affiliations:</u> Windsor Laurelwood is licensed by the Ohio Mental Health and Addiction Services (Ohio MHAS) and the Ohio Department of Health. It is accredited by the Joint Commission. The Hospital holds certifications with Ohio MHAS and the Centers for Medicare and Medicaid Services (CMS). The Hospital is also a member of NAMI, the Ohio Hospital Association and the National Association of Psychiatric Hospitals. See Attachment III.

5) <u>Insurance:</u> Current insurance is listed as Attachment IV.

6) <u>Key Contacts:</u> Key contacts are listed in Attachment V.

7) <u>Capital Planning:</u> Windsor Laurelwood is owned and operated by a publicly held corporation that has the ability to support facility improvements and capital needs. The organization is financially secure and controlled by the many laws and regulations that govern publicly held corporations.

8) <u>Physical Operations:</u> Efficiencies in physical operations are monitored and discussed weekly in senior leadership meetings. The facility consistently works toward improving efficiencies regarding internal and external communication and balancing staffing needs to meet demand and regulatory requirements.

CONFIDENTIAL

## Administrative Operations

9) Operations
   a. Notice of Privacy Practice: New patients are provided with an admission packet which includes the Notice of Privacy Practice. This is signed by the patient and a Windsor Laurelwood staff member at the time of intake.
   b. ADAMHS Board Information: The Lake County ADAMHS Board information is provided to all clients at the time of intake.
   c. Staff Retention:
      - Turnover Rate – The turnover rate is 33.49%. This rate includes staff who have moved from full or part-time to PRN status. Windsor Laurelwood has hired 85 staff over the last year.
      - Exit Interview Policy – All staff who are leaving are offered and encouraged to take the opportunity to have an exit interview with the Human Resources staff. Human Resources has conducted four face to face exit interviews in the last eight months (both members of the HR department started eight months ago).
      - Outcomes
         1. Implemented a structured onboarding process for all managers to follow with a 30-60-90 employee check in
         2. Departmental wage adjustments
         3. Restructured orientation training
   d. Continuing Education: In fiscal year 2020, the facility provided four hours of continuing education for Social Work, Professional Counselors and Chemical Dependency Counselors. The advent of the Coronavirus pandemic precluded any further in-person education sessions from being conducted during 2020. Windsor Laurelwood plans to restart education sessions in 2021.
   e. Marketing and Public Relations: Windsor Laurelwood will display the ADAMHS Board logo at hospital events and provide a link to the www.HelpThatWorks.us website.

**<u>Fiscal Guidance</u>**

10)  Fiscal

a. <u>Administrative Overhead:</u> Administrative and support costs comprise 33.75% of the hospital's total budget.  This percentage does not include expenses related to the corporate structure.  It consists of the supervision of operations and direct care services, administrative support, business/financial operations, business development, human resources and utilization review.  Administrative overhead is reviewed annually during the budgeting process.

b. <u>Audit:</u> See Appendix III

c. <u>Fee Schedule:</u> See Appendix IV

d. <u>Uniform Cost Report Budget:</u> See Appendix V

e. <u>Grant Revenue and Grant Expense:</u> See Appendix VI

f. <u>Purchase of Service:</u> See Appendix VII

CONFIDENTIAL

DEF-MDL-14396.00008

**Clinical/Quality Guidance**

11)     Compliance With Clinical and Quality Indicators

    a. <u>ADAMHS Board Strategies and Goals:</u> Windsor Laurelwood is dedicated to continually improving services. In alignment with the Lake County ADAMHS Board Strategic Plan, Windsor Laurelwood is continuing to work on the following:

- Outreach – We are utilizing social media to improve knowledge and access to services via our Facebook page and Spotify programming.
- Substance Abuse Detox Services – Windsor Laurelwood continues to explore ways to improve services to this population. We are working on expanding preferred provider agreements to better serve the needs of these patients (aftercare).
- Integration of Physical and Behavioral Health – We currently have a medical internist team working daily at Windsor Laurelwood to address both the physical and mental health needs of our patients. Our Clinical Liaisons also reach out to multiple primary care providers for education about behavioral health needs and services provided at Windsor Laurelwood.
- Technology – With the advent of the Coronavirus pandemic, Windsor Laurelwood implemented telehealth services. The telehealth services can be utilized for intake assessments, group therapy, PHP, and IOP services.
- Youth – Windsor Laurelwood continues to maintain excellent working relationships with the middle and high schools to provide education and reach out services for staff and the children. Many educational resources have been provided to help the children and staff deal with the stress and anxiety related to the Coronavirus pandemic.

    b. <u>Recovery Oriented Systems of Care and Coordinated Centers of Excellence:</u> Windsor Laurelwood is dedicated to the evidenced based concepts of Recovery Oriented Systems of Care. We are dedicated to thinking about service delivery for individuals living with mental illness and/or addictions that focuses first and foremost on patients and family members. We deliver services that are culturally

CONFIDENTIAL

DEF-MDL-14396.00009

ADAMHS000029553

appropriate and delivered in an accountable, effective and efficient manner. Windsor Laurelwood has and will continue to do this as follows:

- Fully involving patients and their families in their care
- All patients will be engaged in needed mental health and addiction treatment in a timely manner with sustained recovery management.
- We will continue to strengthen a culture of partnership and collaboration with local providers, businesses, law enforcement, criminal justice, faith-based and veteran's organizations, schools, child welfare, public health, and healthcare systems to provide community education and prevention, reduce stigma, and allow for greater opportunity for individuals and families to achieve wellness and thrive in their communities.
- Continue to maintain the effective and efficient use of resources
- Provide a holistic model of care and wellness that integrates physical and mental health and addiction services with the social and emotional supports necessary to achieve and maintain recovery.

c. Priority Populations: Windsor Laurelwood will be focusing on inpatient treatment specifically tailoring treatment for varied levels of care from the most acute to dual diagnosed patients and those struggling with mental health alone. We will have this specialized treatment through our Therapy Plaza Program that is designed to meet their needs based on their diagnosis. It involves a multidisciplinary approach which we will be expanding as COVID allows this upcoming year. The other area of focus for our inpatient population will be in substance abuse and helping those who need support with opioid and alcohol detox and rehabilitation. We will be developing a Therapy Plaza form of treatment for this population as well to help individualize treatment and using a multidisciplinary approach. We would like to consider expanding outpatient services to potentially include a Medicated Assisted Treatment (MAT) program. These areas of focus will involve developing both inpatient

and outpatient models of care and contracting with the MCO's and State Medicaid population.

d. <u>Compass Line:</u> Windsor Laurelwood complies with all Compass Line procedures as applicable.

e. <u>Quality Improvement:</u> Windsor Laurelwood's quality improvement plan is congruent with the ADAMHS Board's quality improvement plan.

12)   Provider Continuing Quality Improvement

a. <u>Quality Improvement Plan:</u> Current Quality Improvement Plan is listed as Attachment VI.

b. <u>Responsible Staff Member:</u> Elwood Walters is the Director of Risk Management and Quality Improvement for Windsor Laurelwood.  He will be responsible for the development, implementation, coordination and oversight of the Quality Improvement Program.

c. <u>Quality Improvement Reporting:</u> Windsor Laurelwood will maintain timely annual compliance with all required quality improvement reporting.

13)   Wait Times

a. Wait time from first contact to schedule intake/diagnostic assessment until actual intake appointment – Our intake department is open 24/7/365.  The average response time to referral sources requesting placement for a client is 18 minutes.  For the first quarter of 2021 it has improved to 17 minutes.

b. Wait time from first contact to schedule first Evaluation and Management service until actual appointment – Our policy is for clients to have a psychiatric evaluation within 24 hours of admission. Our compliance rate is at 96.15%.

c. Wait time from first contact to schedule first counseling appointment until actual appointment – Our policy is for a psychosocial evaluation completed within 72 hours of admission.  Our compliance rate is at 98.46%.

d. Wait time from first contact to schedule first Community Psychiatric Supportive Treatment appointment until actual appointment – Our policy is for clients to begin their continuing care plan upon first meeting their therapist/social worker.  These are updated throughout their stay.  Follow up appointments vary greatly based on the facility they are referred to for outpatient care.  Some clients see

CONFIDENTIAL

DEF-MDL-14396.00011

their outpatient provider in the community a day after discharge and some are weeks out.  Clients are all discharged with scheduled follow up within 30 days.  If the client's follow up is with Windsor Laurelwood, they are seen the next day.

    e. Other –

14)    Crisis Intervention Service: Windsor Laurelwood provides crisis interventions intervention services.

15)    Health Officers – Not applicable.

CONFIDENTIAL

DEF-MDL-14396.00012

**Lake County ADAMHS Board**
**FY2022 Request For Proposals**
**COVER PAGE**

## PROGRAM CATEGORY

- MENTAL HEALTH ONLY TREATMENT SERVICES
- SUBSTANCE USE DISORDER ONLY TREATMENT SERVICES
- MENTAL HEALTH AND SUBSTANCE USE DISORDER TREATMENT SERVICES
- CRISIS SERVICES
- PREVENTION
- INTERVENTION/SUPPORT/ADVOCACY
- CARE COORDINATION
- WELLNESS
- HOUSING
- CRIMINAL JUSTICE
- PEER SERVICES

## TARGET POPULATION

- ADULTS
- YOUTH
- BOTH

## MODE

- INDIVIDUAL
- GROUP
- BOTH
- CLINICAL
- NON-CLINICAL

## FUNDING REQUEST

- PURCHASE OF SERVICE
- GRANT
- OTHER (EPISODE, ETC.): SPECIFY _____

**OMHAS CERTIFICATION:** 07-8007 _____

**PROGRAM NAME:** ___ Windsor Laurelwood _____

CONFIDENTIAL

DEF-MDL-14396.00013

**Program Narratives**

16)     Service Proposals
     a.  Mental Health Proposal:

Windsor Laurelwood is in compliance with all OhioMHAS, CMS and Joint Commission certification standards.

Windsor Laurelwood operates assessment and referral services 24 hours a day, 7 days per week.

Determination of inpatient admission is coordinated with Lake Health System staff, Windsor Laurelwood Assessment and Referral Department staff and the staff on-call Psychiatrist.  After acceptance of the patient, an attending physician is assigned to the case from admission to discharge.

Windsor Laurelwood will provide a bed assignment to the most appropriate unit based on the clinical presentation of the patient.

Windsor Laurelwood is locally accessible with public transportation options available.

Windsor Laurelwood provides interdisciplinary care including:
- Assessment of mental and physical condition of client is conducted within 24 hours of admission - an intake and referral assessment is completed upon admission, nursing assessment is completed upon admission, a Psychiatry assessment and history and physical are completed within 24 hours of admission.
- Bio-psycho-social assessment is completed by the hospital primary therapist.  In addition, there is an assessment by the art and recreation therapy department.
- Clinical and supportive treatment during hospitalization is provided by a combination of didactic and process groups conducted by Master level clinicians, nurses, mental health technicians, pharmacists and dieticians.

CONFIDENTIAL

DEF-MDL-14396.00014

ADAMHS000029558

- Family meetings are encouraged.
- Discharge planning is conducted in coordination with local community agencies on a regular basis with a goal of aftercare appointments being scheduled within seven days of discharge.

Windsor Laurelwood provides cooperation and assistance in coordination with appropriate interagency/health provider linkages including primary care physicians.

Windsor Laurelwood has collaborative arrangements with service providers. The Hospital maintains contact with the current provider on patient's condition (with appropriate release of information) and development of aftercare plans.

Consumers, CPST workers, families and other community providers are involved in the determination of inpatient services based on the information provided to the hospital when someone is seeking inpatient care. Diagnostic and treatment services are provided to patients twenty-four hours a day, seven days a week. Direct care is provided by physicians, nurses, case managers, milieu therapists, chemical dependency counselors, mental health workers and activities therapists. The primary focus of inpatient mental health services is to provide a comprehensive assessment of each patient from which a treatment plan is developed and implemented to help patients effectively manage their psychiatric illnesses enabling them to return to the community. Patients, family members and CPS workers are actively involved in treatment planning when appropriate.

Inpatient utilization is monitored by Windsor Laurelwood's Director of Utilization Review and the designated Lake County agency staff person. Ongoing clinical data and discharge plans are discussed as well as daily updated Lake ADAMHS patient rosters outlining day of admission and discharge.

A wide range of programming is designed utilizing cognitive behavioral therapies to meet individual needs and allow progression to a less restricted setting. The therapeutic milieu provides for learning and

CONFIDENTIAL

development of interpersonal skills.  Psycho-educational and supportive group therapies are provided.

Aftercare plans are developed jointly with patients, family members and CPS providers.  Windsor Laurelwood case management staff coordinates all aftercare appointments.

Inpatient admissions are approved by Lake Health crisis intervention. Windsor Laurelwood will initiate contact with the outpatient provider within 48 hours of admission.  In addition, the utilization review department maintains regular contact with the hospital liaison.

Windsor Laurelwood will provide all requested information upon request of the Lake County ADAMHS Board.

CONFIDENTIAL

Attachment 2

**Lake County ADAMHS Board**
**SFY2022 Request for Proposals**

**Program Summary – Complete One Form For Every Program Provided**

| | |
|---|---|
| **Agency Name** | Windsor Laurelwood Center for Behavioral Medicine |
| **Program Title** | Inpatient Hospitalization |
| **Target Population** | Adults, Adolescents, Children |
| **Total Number of Consumers Served FY2020 with ADAMHS Dollars** | 7 |
| **Total Number of Units Produced FY2021 with ADAMHS Dollars** | 8 Bed Days YTD April 2021 Calendar Year |
| **Total Projected Number of Consumers Served with ADAMHS Dollars FY2021** | 3 |
| **Total Projected Number of Units/Episodes Produced FY2021 with ADAMHS Dollars** | 24 Bed Days |
| **Total Projected Number of Consumers Served FY2022 with ADAMHS Dollars** | 50 |
| **Total Projected Number of Units/Episodes Produced FY2022 with ADAMHS Dollars** | 350 Bed Days |
| **Number of Direct Service Staff Dedicated to Program** | 102.9 |
| **Number of Indirect Service (Support) Staff Dedicated to Program** | 92.8 |
| **Total anticipated program cost** | $21,492,531 |
| **Total program funding request from ADAMHS Board** | $218,750 |
| **ADAMHS as % of total program funding** | 0.63% |
| **Wait time for SFY21** | Patients can be seen by a Masters prepared clinician in Windsor Laurelwood's Assessment and Referral Department for level of care |

1

CONFIDENTIAL

ADAMHS000029561

DEF-MDL-14396.00017

| | evaluations on the same day (24/7/365). All outpatient programs have same day access. At times, inpatient beds may be at capacity. Windsor Laurelwood works with area ED's on updating bed availability.  Wait times when beds are at capacity is less than 24 hours. |
|---|---|
| **Projected wait time for SFY22** | Same as above |

**Brief Program Description (300 words or less)**

Windsor Laurelwood is licensed for 118 mental health beds through OhioMHAS for the purpose of acute stabilization of mental health symptoms.  Direct care is provided by a comprehensive multidisciplinary team.  The primary focus is to provide a comprehensive assessment of each patient from which a treatment plan is developed and implemented to help patients effectively manage their psychiatric illnesses and return to a level of functioning which would enable them to return to the community.  A wide range of programming is designed utilizing cognitive behavioral therapies to meet individual needs and allow for progression to a less restrictive setting.

The therapeutic milieu provides for learning and the development of interpersonal skills.  The interdisciplinary treatment team which consists of physicians, registered nurses, primary therapists, registered dietician, mental health technicians and activities therapists develop and provide the treatment planning process that facilitates the early recovery needs of the patient.

**Top 3-5 Measurable Goals for Program in SFY2021**

1. Implementation of evidenced based programming
2. Expansion of MAT services
3. Options for outpatient expansion

**Describe Achievement of SFY2021 Goals/Barriers to Success**

1. Expansion of Cognitive Behavioral Therapy treatment.  Therapy staff completed 10 additional hours of CBT and trauma focused CBT training.  BBT training also completed by therapy staff.
2. Staff provided additional education to SUD and dual diagnosed patients on the benefits of MAT.  Protocols are in place for suboxone and vivitrol.
3. Additional flexibility has been added to the SUD outpatient services time schedules.

**Top 3-5 Measurable Goals for Program in SFY2022**

1. Completion of suicide risk assessment
2. HBIPS outcomes data
3. Assessment and referral disposition times

**Procedure Code(s) and Modifier(s) combination(s) to be billed in GOSH for this**

2

| program |
| --- |
| Not Applicable |

CONFIDENTIAL

ADAMHS000029563

DEF-MDL-14396.00019

Attachment 2

**Lake County ADAMHS Board**
**SFY2022 Request for Proposals**

**Program Summary – Complete One Form For Every Program Provided**

| Agency Name | Windsor Laurelwood Center for Behavioral Medicine |
|---|---|
| Program Title | Withdrawal Management |
| Target Population | Adults with severe opioid use disorder and/or alcohol use disorder |
| Total Number of Consumers Served FY2020 with ADAMHS Dollars | 174 |
| Total Number of Units Produced FY2021 with ADAMHS Dollars | 182 Bed Days YTD April 2021 Calendar Year |
| Total Projected Number of Consumers Served with ADAMHS Dollars FY2021 | 93 |
| Total Projected Number of Units/Episodes Produced FY2021 with ADAMHS Dollars | 546 Bed Days |
| Total Projected Number of Consumers Served FY2022 with ADAMHS Dollars | 103 |
| Total Projected Number of Units/Episodes Produced FY2022 with ADAMHS Dollars | 725 Bed Days |
| Number of Direct Service Staff Dedicated to Program | 25.1 |
| Number of Indirect Service (Support) Staff Dedicated to Program | 22.6 |
| Total anticipated program cost | $5,367,126 |
| Total program funding request from ADAMHS Board | $420,500 |
| ADAMHS as % of total program funding | 1.21% |
| Wait time for SFY21 | Patients can be seen by a Masters prepared clinician in Windsor Laurelwood's |

1

CONFIDENTIAL

| | Assessment and Referral Department for level of care evaluations on the same day (24/7/365).All outpatient programs have same day access. At times, inpatient beds may be at capacity. Windsor Laurelwood works with area ED's on updating bed availability.  Wait times when beds are at capacity is less than 24 hours. |
|---|---|
| **Projected wait time for SFY22** | Same as above. |

**Brief Program Description (300 words or less)**

Diagnostic and treatment services are provided to adults, 18 years of age or older, 24 hours a day, 7 days a week.  Services are provided to individuals with substance use disorder.  Inpatient treatment includes medical management of detoxification.

The primary focus of the program is to medically transition patients through detoxification with peer support and group therapy, successful coping skills, individual treatment planning and goals.  Group and individual counseling and patient and family psychoeducation are provided.

An interdisciplinary team comprised of an addictionologist, psychiatrist, registered nurses, registered dietician, discharge planners, certified chemical dependency counselors, activities therapists, social workers and mental health workers provide assessment and treatment planning for each patient.  In the program's peer support environment, patients are encouraged to take active, responsible roles in their recovery.

**Top 3-5 Measurable Goals for Program in SFY2021**
1. Implementation of evidenced based programming
2. Expansion of MAT services
3. Options for outpatient expansion

**Describe Achievement of SFY2021 Goals/Barriers to Success**
1. Expansion of Cognitive Behavioral Therapy treatment.  Therapy staff completed 10 additional hours of CBT and trauma focused CBT training.  BBT training also completed by therapy staff.
2. Staff provided additional education to SUD and dual diagnosed patients on the benefits of MAT.  Protocols are in place for suboxone and vivitrol.
3. Additional flexibility has been added to the SUD outpatient services time schedules.

**Top 3-5 Measurable Goals for Program in SFY2022**
1. Completion of suicide risk assessment
2. HBIPS outcomes data
3. Assessment and referral disposition times

2

CONFIDENTIAL

DEF-MDL-14396.00021

ADAMHS000029565

**Lake County ADAMHS Board**
**FY2022 Request For Proposals**
**COVER PAGE**

## PROGRAM CATEGORY
- MENTAL HEALTH ONLY TREATMENT SERVICES
- SUBSTANCE USE DISORDER ONLY TREATMENT SERVICES
- MENTAL HEALTH AND SUBSTANCE USE DISORDER TREATMENT SERVICES
- CRISIS SERVICES
- PREVENTION
- INTERVENTION/SUPPORT/ADVOCACY
- CARE COORDINATION
- WELLNESS
- HOUSING
- CRIMINAL JUSTICE
- PEER SERVICES

## TARGET POPULATION
- ADULTS
- YOUTH
- BOTH

## MODE
- INDIVIDUAL
- GROUP
- BOTH
- CLINICAL
- NON-CLINICAL

## FUNDING REQUEST
- PURCHASE OF SERVICE
- GRANT
- OTHER (EPISODE, ETC.): SPECIFY _____

OMHAS CERTIFICATION: 01-0549 _____

PROGRAM NAME: Windsor Laurelwood _____

CONFIDENTIAL

ADAMHS000029566

b. Withdrawal Management and Inpatient Substance Use Disorders
   Proposal:

Windsor Laurelwood provides ASAM Level-4 Medically Managed
Intensive Inpatient Services.

Hospital staffing consists of licensed professionals which are provided
on a 24/7 basis. An interdisciplinary team comprised of
psychiatrists/addictionologists, registered nurses, art and activities
therapists, licensed therapists/chemical dependency counselors and
mental health technicians provide assessment and treatment planning
for each patient. All patients are seen daily by a physician or mid-level
provider for management of withdrawal symptoms.

The application of CINA/CIWA/COWS assessment tools are utilized in
determining the accurate measure of withdrawal symptoms for each
individual patient. In addition, a psychiatric consultation is conducted
for each individual to address any co-morbid psychiatric issues. Nursing
services are provided 24/7 on a 1:4 ratio.

Cognitive behavioral therapy focused programming is led by Masters
prepared therapists as well as certified chemical dependency
counselors. Additional services include substance use disorder
education groups, art and recreation therapy, introduction to self-help
groups (AA, NA), by attendance at facility based programs and family
day programming.

Goals for the patients during withdrawal management are
individualized. The clinician and patient formulate these goals
collaboratively at the time of initial assessment and update them during
the course of treatment. A broad set of goals for recovery patients
include:
  • To provide comprehensive treatment for patients presenting with
    substance use disorders.
  • To educate patients about the disease process and the process of
    recovery.

CONFIDENTIAL

- To develop individual treatment plans that empower the patient, promote successful coping and stress reducing skills, enhance self-esteem, and teach relapse prevention.
- To educate family members about the effects of substance use disorders and involve families in the treatment process.
- To assist patients in making a smooth transition from inpatient withdrawal management to a community setting.
- To increase the patient's motivation to continue with and participate in treatment.

Discharge plan coordination contains discharge orders, medication reconciliation, all follow up appointments and crisis safety plans. Information is sent to the next level of care the same day or within 24 hours of discharge depending on appointments.

CONFIDENTIAL

DEF-MDL-14396.00024

| **Procedure Code(s) and Modifier(s) combination(s) to be billed in GOSH for this program** |
|---|
| Not applicable |

3

CONFIDENTIAL

DEF-MDL-14396.00025

ADAMHS000029569



**Interagency Agreements**
**FY2021**

The agencies or organizations listed below are committed to assisting potential active and former clients in accessing and utilizing the entire system of care including mental health and alcohol and drug addiction services with respect for client's rights, decision-making, needs and confidentiality.

Organizations:

Beacon Health
Big Brothers Big Sisters
Bridges: Mental Health Consumer Empowerment
Catholic Charities
Cleveland Rape Crisis Center
Crossroads/New Directions
Extended Housing – CPST
Family Planning Association
Forbes House
Lake County Sheriff's Office
Lake Geauga Recovery Centers
Lake Health Crisis
Lifeline
NAMI Lake County
Northcoast Behavioral Healthcare
Signature Health
Western Reserve Counseling
Windsor Laurelwood Hospital
Womensafe

CONFIDENTIAL

DEF-MDL-14396.00026

ADAMHS000029570



## Windsor Laurelwood Center for Behavioral Medicine

**Board of Governors**

Joe Sheehy: Regional Vice President, Universal Health Services
116 South Lombard, Suite 102
Mahomet, Illinois 61853

Shelley Zimmerman: CEO, Windsor Laurelwood
35900 Euclid Avenue
Willoughby, Ohio 44094

Dr. Alf Bergman: CMO, Windsor Laurelwood
35900 Euclid Avenue
Willoughby, Ohio 44094

Leanne Smith: CFO, Windsor Laurelwood
35900 Euclid Avenue
Willoughby, Ohio 44094

Barb Moran: CNO, Windsor Laurelwood
35900 Euclid Avenue
Willoughby, Ohio 44094

Rachel Terzak: Director, Business Development, Windsor Laurelwood
35900 Euclid Avenue
Willoughby, Ohio 44094

Robert Trasz: CFO, Lake Health
36000 Euclid Avenue
Willoughby, Ohio 44094

Katie Jenkins: Executive Director, NAMI
1 Victoria Square, Suite 100
Painesville, Ohio 44077

CONFIDENTIAL                                                                                    ADAMHS000029571

DEF-MDL-14396.00027



ANNUAL REPORT 2019

Honoring Our Past

Investing In Our Future

UHS

UNIVERSAL HEALTH SERVICES, INC.

CONFIDENTIAL

DEF-MDL-14396.00028

ADAMHS000029572



**Honoring Our Past • Investing in Our Future**

*Since our founding 40 years ago, Universal Health Services has grown from six employees with a single hospital management contract to 90,000 employees across an expansive international network.*

*Through a combination of strategic acquisitions, new construction in attractive markets, expansions at existing facilities and joint-venture partnerships, the company has steadily grown through the years to boast a diversified set of assets delivering value to all stakeholders.*

*We remain as committed today as we were in 1979 to providing superior quality care and being the preferred provider in all of the markets we serve.*

CONFIDENTIAL

ADAMHS000029573

DEF-MDL-14396.00029

# UNIVERSAL HEALTH SERVICES'
# PURPOSE-DRIVEN MISSION

In the late 1970's, Alan B. Miller had a vision for a healthcare company that would provide superior quality healthcare services that patients recommend to family and friends, physicians prefer for their patients, purchasers select for their clients, employees are proud of and investors seek for long-term returns. That vision stands as the Mission Statement of UHS. Repeatedly praised by industry experts for being honest and authentic, the Mission Statement identifies value offered to all key stakeholders.

## OUR MISSION

To provide superior quality healthcare services that:
**Patients** recommend to family and friends,
**Physicians** prefer for their patients,
**Purchasers** select for their clients,
**Employees** are proud of, and
**Investors** seek for long-term returns.

The UHS operating philosophy is as effective today as it was 40 years ago: Develop high quality hospitals in growing markets and invest in the people and equipment needed to allow each facility to become the leading healthcare provider in each and every community we serve. UHS owes its success to a responsive management style and to a philosophy that is based on integrity, competence and compassion. Believing in the power of people and strong leadership, we seek the best talent in the industry to instill excellence in all we do.

UHS today is one of the nation's largest and most respected providers of hospital and healthcare services. Through its subsidiaries, the company currently operates approximately 400 facilities all across the United States, Puerto Rico and the United Kingdom.

We look forward to continuing to successfully deliver upon our Mission for decades to come.

CONFIDENTIAL

## 2019 BY THE NUMBERS

# 3.5 MILLION
**PATIENTS SERVED**

# 90,000
EMPLOYEES, GLOBALLY

# 22,000
NURSES

## 1,200+ PROVIDERS OF PHYSICIAN SERVICES

# $634 MILLION
**INVESTMENT IN EQUIPMENT, FACILITY EXPANSIONS AND RENOVATIONS**

# 21
**JOINT VENTURE PARTNERSHIPS**

### ACUTE CARE

1.4 million ER visits

33,000 births

243,000 surgeries

7 Accountable Care Organizations (ACOs)

### BEHAVIORAL HEALTH

328 inpatient facilities

488,000 inpatients served

256,000 outpatients served

25 facilities offering Patriot Support Programs

# 10
**YEARS ON THE FORTUNE WORLD'S MOST ADMIRED COMPANIES LIST**

# 16
**YEARS ON THE FORTUNE 500**

# 17
**YEARS OUR CEO HAS BEEN NAMED TO THE MODERN HEALTHCARE "MOST INFLUENTIAL" LIST**

CONFIDENTIAL

ADAMHS000029575

DEF-MDL-14396.00031

# LETTER TO OUR SHAREHOLDERS



*Dear Valued Shareholders,*

*40 years is a milestone of which I personally am very proud: 40 years of growth, innovation and care delivery. Over the past four decades, we have worked hard to deliver upon our mission, care for patients in the most effective manner, grow strategically and turn challenges into golden opportunities.*

Our company anniversary is the perfect time to acknowledge and review our accomplishments – and to look ahead to a future of continued success. On this very special occasion, please accept my sincere thanks for your significant contributions to our Company's success.

UHS today is one of the nation's largest and most respected providers of hospital and healthcare services, with a strong and diverse portfolio of hospital-based care, ambulatory care, behavioral health, an insurance offering, a physician network and various related services. With 90,000 employees, we currently operate approximately 400 facilities across the United States, Puerto Rico and the United Kingdom.

In 2019, we delivered care to 3.5 million patients across inpatient and outpatient access points. UHS generated net revenues of approximately $11.4 billion, an increase of 5.6% over 2018. On a same facility basis, adjusted admissions increased 4.8% across the Acute Care Division, and 1.2% within the Behavioral Health Division.

Highlights in Acute Care include expansions and renovations at a number of our hospitals, as well as addition of new service lines and

acquisition of innovative technologies to support the advancement of care. We continue to invest in access points across the integrated delivery of care continuum – including six new Freestanding Emergency Departments – as well as engage in strategic partnerships that will enable patients to access the right level of care at the right location. In October, we broke ground on Northern Nevada Sierra Medical Center, which, when open in 2022, will be the first new full-service hospital in the growing Reno market in 100 years. Our seven Accountable Care Organizations across the country, covering 130,000 Medicare lives, drove physician alignment through value-based care initiatives, yielding over $65 million Medicare cost savings and earning $30 million for the 3,000 participating physicians.

Our significant achievements in Behavioral Health during the year include the announcement of five de novo facilities currently under construction across the U.S. that are new joint ventures with established and highly respected not-for-profit health systems, and two de novo fully owned facilities in markets identified to us by referral entities as currently



**1979**
Alan B. Miller founds UHS; acquires Valley Hospital Medical Center in Las Vegas

**1981**
UHS issues its Initial Public Offering (IPO) of stock; acquires 5 hospitals

**1983**
Acquisition of Qualicare, Inc. doubles UHS in size and marks entry into the Behavioral Health field

**1984**
UHS operates 41 facilities with 4,545 beds

**1989**
UHS employs over 8,000 clinical and support staff

**1997**
UHS acquires majority ownership of The George Washington University Hospital (opens replacement hospital in 2002)

**1998**
UHS is named to the Wall Street Journal Shareholder Honor Roll

**2002**
UHS is listed on the Fortune 1000 as #1 in total return to investors from 1992-2002

**2003**
UHS reports revenues of $3.6 billion with 100 facilities across U.S.; attains ranking on Fortune 500; Alan B. Miller first named among 100 Most Influential People by Modern Healthcare

underserved markets. Our quality of care data continues to exceed the national average, with strong patient satisfaction and outcomes metrics. In the United Kingdom, Cygnet Health Care celebrated its 30th anniversary with the successful integration of 25 facilities recently acquired from The Danshell Group, further establishing Cygnet as one of the largest providers of mental health services in the U.K. We delivered highly favorable outcomes for individuals in our care, with 85% of our U.K. services rated as 'Outstanding' or 'Good' by regulatory agencies.

I am proud of the reputation we have earned as a leader in the healthcare industry. For the tenth consecutive year, UHS was recognized among 'World's Most Admired Companies' by Fortune magazine.

We are currently ranked #293 on the Fortune 500 list, and our employees and facilities continue to be honored by national, state and local organizations for delivering high quality care, for pioneering innovation, for their thought leadership and for their commitment to serving their local communities.

We look ahead with great optimism. 2020 will be a year of continued growth and expansion, operational excellence and achievement of new milestones. Thank you for your continuing interest and investment in UHS.

Sincerely,

Alan B. Miller
Founder, Chairman of the Board
and Chief Executive Officer



Alan B. Miller received the Admiral Charles LeMoyne Distinguished Civilian Award on December 13, 2019, presented by The Ben Franklin Global Forum in recognition of his leadership and accomplishments in providing superior behavioral healthcare to active duty military, veterans and their families.
(l to r) Rear Admiral Frank Mitchell Bradley, Assistant Commander – Navy, Joint Special Operations Command; Bob Daniels, Chairman, Ben Franklin Global Forum; Alan B. Miller, Founder, Chairman and CEO, Universal Health Services; and Major General Xavier T. Brunson, Commanding General, 7th Infantry Division



In recognition of the Company's 40th anniversary, the UHS Board of Directors and Corporate Officers were invited to ring the Closing Bell at the New York Stock Exchange on April 30, 2019.

| *2004* | *2010* | *2014* | *2015* | *2016* | *2017* | *2018* | *2019* |
|---|---|---|---|---|---|---|---|
| Over 35,000 people are employed by UHS | UHS acquires Psychiatric Solutions Inc. (PSI) adding 105 facilities to the Behavioral Health Division | UHS is added to the S&P 500 index; acquires Cygnet Health Care (UK); acquires Prominence Health Plan, entering healthcare insurance industry; rings the NYSE Closing Bell in recognition of its 35th anniversary | UHS is named as one of the 30 Most Meaningful Companies to Work for in America by Business Insider Magazine | Henderson Hospital opens in Henderson, NV | UHS acquires Cambian Adult Services Division (UK) | UHS acquires The Danshell Group, expanding UK presence into Scotland and Wales | UHS is named to Fortune's list of World's Most Admired Companies for the 9th consecutive year; UHS breaks ground on Northern Nevada Sierra Medical Center, the first new full-service hospital to be built in Reno in 100 years |
| *2005* | *2012* | | | | | | |
| UHS Foundation is established | UHS establishes Independence Physician Management (IPM) | | | | | | |

CONFIDENTIAL

○ Acute Care Hospitals
● Ambulatory Centers
Behavioral Health Facilities
Freestanding Emergency Departments
Universal Health Services, Inc.
Corporate Headquarters

For a full state-by-state list of facilities,
visit **www.uhsinc.com**

UHS is a registered trade-mark of UHS of Delaware, Inc., the management company for Universal Health Services, Inc. and a wholly owned subsidiary of Universal Health Services. Universal Health Services, Inc. is a holding company and operates through its subsidiaries including its management company, UHS of Delaware, Inc. All healthcare and management operations are conducted by subsidiaries of Universal Health Services, Inc. Any reference to "UHS or UHS facilities" including any statements, articles or other publications contained herein which relates to healthcare or management operations is referring to Universal Health Services' subsidiaries including UHS of Delaware. Further, the terms "we," "us," "our" or "the company" in such context similarly refer to the operations of Universal Health Services' subsidiaries including UHS of Delaware. Any reference to employment at UHS or employees of UHS refers to employment with one of the subsidiaries of Universal Health Services, Inc., including its management company, UHS of Delaware, Inc.

"UHS Facilities" refers to subsidiaries of Universal Health Services, Inc.

INDEX

Acute Care Division
**10-17**

Behavioral Health
Division
**18-23**

Form 10K
10K: **1-137**

Corporate Information/
Officers and Senior
Management
**138**

Board of Directors
**Inside Back Cover**

CONFIDENTIAL

ADAMHS000029579

DEF-MDL-14396.00035



# UHS **ACUTE CARE** DIVISION

*We deliver superior quality care, striving to be the preferred provider in the markets we serve.*

2019 was a year of solid performance and continued growth for the Acute Care Division. We delivered superior quality care to approximately 2.7 million patients, expanded our geographic reach and service lines, earned distinguished accolades from accrediting bodies, signed new partnerships and expanded our ACO offerings and delivered solid financial results.

Our dedication to delivering clinical excellence to our communities sets us apart and has driven sustainable growth. In 2019, adjusted admissions were up 5%; surgeries were up 3% and ER visits were up 8%.

CONFIDENTIAL

DEF-MDL-14396.00036

ADAMHS000029580



Our division has the clinical leadership and expertise to raise the bar in quality and patient experience, and ensure that UHS acute care services are at the center of the healthcare delivery model.

As a division, we are well positioned to continue to grow, expand our integrated networks and deliver the continuum of care to millions of patients across the communities we serve.

## GROWTH AND EXPANSION

In 2019, we completed a number of significant expansions – increasing bed capacity, adding new service lines, installing innovative medical technologies – to better meet the healthcare needs of the communities we serve.

An historic milestone for **The George Washington University Hospital (GW Hospital)** and the Washington, D.C., community was achieved in November with the opening of a helipad, expanding access to lifesaving care in the region. In addition, we also opened 42 additional beds for trauma care and neurology care.

In Florida, at **Manatee Memorial Hospital**, we opened a new bi-plane neuro-interventional catheterization suite. At **Lakewood Ranch Medical Center**, we added two new operating rooms and a new radiology unit including new CT and MRI. At **Texoma Medical Center**, we opened the 4th floor of the new patient tower adding 36 new medical-surgical beds. We completed a two-floor vertical expansion with shell space to allow for future beds on the 5th and 6th floors.

**Above:** When minutes matter, airlifting trauma patients can mean the difference between life and death, especially in mass casualty situations. The GW Hospital team officially dedicated the new helipad in November 2019. Left to right: Vincent Gray, D.C. Councilmember and Chairperson on the Committee on Health; LaQuandra Nesbitt, MD, Director, D.C. Department of Health; Jonathan Reiner, MD, Director of the Cardiac Catheterization Laboratory, GW Hospital; Babak Sarani, MD, Director of Trauma and Acute Care Surgery, GW Hospital; Kimberly Russo, Chief Executive Officer, GW Hospital; Robert Kelly, MD, Former Chief Executive Officer, The GW Medical Faculty Associates; Jeffrey Akman, MD, Former Vice President for Health Affairs and Former Dean, GW School of Medicine and Health Sciences.

CONFIDENTIAL

DEF-MDL-14396.00037

ADAMHS000029581

UHS ACUTE CARE DIVISION

# DELIVERING LIFE-SAVING CARE

The Stroke Center at **Valley Hospital Medical Center** in Las Vegas provides comprehensive care that helps patients address a number of physical, emotional and lifestyle issues. Our stroke response team is deployed to evaluate and treat stroke emergencies.

Meet Marlene Boersma, patient, and Dr. Paul Janda, D.O., J.D., Director of Neurology Residency Program at Valley Hospital, part of The Valley Health System in Las Vegas. Marlene was airlifted to Valley Hospital for treatment of stroke symptoms. According to Dr. Janda, Marlene presented in a critical condition, yet, due to the prompt medical care delivered by the Valley Hospital team, she stabilized and today is doing outstanding.





# HEALING HEARTS IN WASHINGTON, D.C.

Heart disease is the leading cause of death in the U.S., according to the CDC. At GW Hospital, advanced technology and medical expertise come together to provide patients with a comprehensive program for advanced treatment of heart disease and vascular disorders, available in one convenient location. The goal is to help each patient live a long life with a healthy heart.

Meet Bonita Bell. Bonita had a large blood clot in her lungs (pulmonary embolism). Doctors placed her on an ECMO machine and removed large volumes of clot from her arteries. Bonita comments that, were it not for the care she received, she would not be here today.

Cardiologists, cardiac surgeons and other heart specialists at GW Hospital provide advanced detection, diagnosis and treatment of a wide range of diseases and conditions, including heart attack, heart failure, heart rhythm disorders, deep vein thrombosis, peripheral arterial disease and more.

CONFIDENTIAL

ADAMHS000029582

DEF-MDL-14396.00038

At **South Texas Health System McAllen**, we converted a nursing unit into an inpatient rehabilitation unit with 18 beds, a physical therapy gym and activity room. And at **South Texas Health System Edinburg**, we have begun planning for a new bed tower, which will add more beds in the ER, ICU, inpatient rehab and medical-surgical areas.

In Nevada, at **Henderson Hospital** in Las Vegas, we completed the build-out of two new operating rooms. We have also begun the planning for a new bed tower.

**Centennial Hills Hospital Medical Center** in Las Vegas announced a master plan project that begins with the build-out of a new $95 million five-story patient tower. Phase one will add 56 new beds, increasing the total to 318. This addition will provide increased capacity in the NICU, ICU, intermediate unit and medical-surgical units across the hospital.

At **Northern Nevada Medical Center** in Sparks, Nevada, we added 16 new medical-surgical beds. Additionally, we opened a new orthopedic surgery room and a new pharmacy.

## INTEGRATED DELIVERY NETWORKS

A key strategy for the division is to further expand our integrated delivery networks – providing patients with improved access to a full range of healthcare services. The hospital serves as the hub, with affiliated outpatient and ancillary services conveniently located across the local geography. The expansion of ambulatory service offerings – whether owned or aligned through partnerships – keeps patients in-network and provides a coordinated care experience.

We announced a partnership with Regent Surgical Health to build and operate Ambulatory Surgery Centers in key markets. These will provide patients with convenient access to more outpatient surgical services, and physician practices with more efficient outpatient locations to perform appropriate procedures.

We announced a partnership with Vera Whole Health to add advanced primary care services to UHS' clinically integrated delivery network, boosting access, improving member experience and generating better health outcomes.

Finally, we expanded our Accountable Care Organizations (ACOs) to seven across the country, covering 130,000 Medicare lives; 12,500 lives in Nevada and Texas; and 30,000 commercial lives in Nevada.

Prominence Health Plan announced the results of its ACOs showing a continued trend of increased cost savings and improved quality. In 2018, the ACOs saved Medicare $65.2 million, earning $30 million for its 3,000 participating physicians. Since the establishment of the first UHS ACO in 2014, the entities have saved more than $113 million and averaged a 96% quality score.



**Expansion of Centennial Hills Hospital in Las Vegas:**
As Northwest Las Vegas, North Las Vegas and the outlying communities continue to grow, our goal is to meet the demand for expanded services. When all five floors of the new patient tower are completely built out, the hospital's capacity will reach 390 beds. This continued expansion aligns with our commitment to meet our community's requests and keep care close to home.

CONFIDENTIAL

DEF-MDL-14396.00039

ADAMHS000029583

UHS ACUTE CARE DIVISION

## OPERATIONAL EFFICIENCIES YIELD RESULTS

At our Acute Care hospitals, we are committed to continuous improvement – driving clinical outcomes, enhancing the patient experience, streamlining operations and supporting staff satisfaction.

The effort to reduce reliance on registry continued in 2019, despite the pressure on staffing due to strong census growth. Registry nursing contract expenses decreased by 8.3%, saving $3.68 million versus 2018.

Our process improvement efforts yielded a 23% reduction in the patient's length of stay in the Emergency Department (ED). In part, this was achieved by streamlining the time it takes to move a patient from the ED to an inpatient bed and deploying capacity management software in half of our facilities. As a result, patients are more likely to be placed in an inpatient bed within 30 minutes of bed assignment and bed assignments are occurring within 45 minutes of the admission order. ED holding hours across the division have declined by 17% from the previous year. In 2019, ED patients discharged from the ED had an average length of stay of 2.5 hours, representing a 10% decrease from 2018.

Patients are discharged earlier in the day across the division by 62 minutes and a third of our facilities have executed the discharge of a patient within two hours versus waiting in excess of three hours. This was achieved in part by streamlining the discharge process by targeting 50% of all discharges to depart the facility by 2:00 p.m. and deploying capacity management software in a third of our facilities, allowing for transparency of eligible discharges and admissions from the ED and Operating Room (OR).

**14** UNIVERSAL HEALTH SERVICES, INC.

## QUALITY DISTINCTIONS

*We are honored to receive industry accolades that recognize the care and services we provide.*

U.S. News & World Report recognized The George Washington University Hospital as a Best Regional Hospital, ranking it among the top 10% of hospitals in the Washington, D.C. metropolitan area.

**BEST REGIONAL HOSPITALS**
U.S.News & WORLD REPORT
WASHINGTON, D.C.
RECOGNIZED IN 5 TYPES OF CARE
2019-20

CONFIDENTIAL

ADAMHS000029584

DEF-MDL-14396.00040

In 2019, nine UHS Acute Care hospitals earned an "A" safety grade from The Leapfrog Group, recognizing our commitment to protect patients from harm and meet the highest safety standards. In addition, two UHS Acute Care hospitals – **Henderson Hospital and Northern Nevada Medical Center** – were named Top General Hospitals by The Leapfrog Group.

**Aiken Regional Medical Centers** was named a Top Teaching Hospital. Performance across many areas of hospital care are considered in establishing the qualifications for the award including infection rates, practices for safer surgery, maternity care, and the hospital's capacity to prevent medication errors.

## *Award-winning care*

**UHS Hospitals Recognized with an "A" Safety Grade from Leapfrog in 2019**



Aiken Regional
Medical Centers



Henderson
Hospital



Lakewood Ranch
Medical Center



Northern Nevada
Medical Center



South Texas Health
System Edinburg



South Texas Health
System Heart



South Texas Health
System McAllen



St. Mary's Regional
Medical Center



Wellington Regional
Medical Center



UHS ACUTE CARE DIVISION

Process improvement efforts in MRI continue across the division with 18 facilities completing work to reduce patient turnaround time by 50% for routine inpatient and observation patients.

The Acute Inpatient Rehabilitation Units saw an improvement in their Program Evaluation Model (PEM) through October, with 8 out of 13 units ranking in the top 10% of the country. One 18-bed Rehabilitation Unit was opened in 2019 in McAllen, Texas. More than 80% of all of the rehab patients in the 14 units were discharged to the community. Marketing efforts that included updated marketing materials and operational improvements resulted in a $7.2 million increase over 2018.

Outpatient Rehabilitation Services came together in 2019 with an emphasis on same store growth and operational efficiencies. Growth included the addition of two new locations in 2019 for a total of 20 Outpatient Rehabilitation Services locations. With a focus on volume growth and operational efficiencies, the outpatient revenue grew $13.9 million over 2018. To provide consistent management oversight and outcome data, an Outpatient EMR was selected for 2020 implementation.

We continue to make improvements in our OR efficiency with year-over-year gains in prime time utilization and block utilization.

**One Patient's Story:** Maine's U.S. Senator Angus King completed his last day of radiation treatment at GW Hospital in Washington, D.C., thanking the medical team as well as his family, friends and his staff for their compassion and support.



CONFIDENTIAL

DEF-MDL-14396.00042

ADAMHS000029586



**Northern Nevada Sierra**
MEDICAL CENTER

# NEW HOSPITAL UNDER CONSTRUCTION IN RENO

*In October, we broke ground on **Northern Nevada Sierra Medical Center**, the first new full-service hospital to be built in Reno in 100 years.*

Expected to open in 2022, Sierra Medical Center will join a comprehensive continuum of care in this region, including Northern Nevada Medical Center, Northern Nevada Medical Group, Quail Surgical and Pain Management and a Freestanding Emergency Department, ER at McCarran NW.

Upon completion of the initial phase of the project, the hospital campus is projected to include 350,000 square feet of hospital and medical office space. The new hospital will feature nearly 200 private patient rooms. Our expansion in this region will improve access to healthcare, offer more choices for patients and serve as an extension of the quality care already offered in the greater Reno area.

Sierra Medical Center will introduce comprehensive services including emergency care, orthopedics, surgery, labor and delivery, neonatal intensive care, oncology, cardiovascular care and neurosurgery. In addition, the campus will be home to medical office buildings that will provide outpatient services.



2019 ANNUAL REPORT **17**

CONFIDENTIAL

ADAMHS000029587



# UHS **BEHAVIORAL HEALTH** DIVISION

*We provide compassionate care that transforms lives and families.*

The Behavioral Health Division recorded another year of industry-leading clinical outcomes for patients, good financial performance and continued growth in the U.S. and the U.K.

In 2019, our dedicated clinicians and staff delivered compassionate care to over 700,000 patients, providing hope and healing to patients and families who struggle with mental health challenges.

**18** UNIVERSAL HEALTH SERVICES, INC.

CONFIDENTIAL

DEF-MDL-14396.00044

ADAMHS000029588



Through a continuum of inpatient, partial hospitalization and outpatient programs, we provide a broad range of behavioral health services. Additionally, our specialty programs provide treatment for eating disorders and substance use.

As we continue to increase awareness and change the conversation about mental health and addiction issues, we remain committed to our top priority of taking care of patients – providing superior quality care – treating individuals with respect and operating with integrity. This is the philosophy that has powered past accomplishments and will continue to fuel our success into the future.

## GROWTH AND EXPANSION TO SERVE MORE PATIENTS

We continued to expand the delivery of care, providing more services to more patients. In response to the need for more acute inpatient psychiatric capacity in the U.S., we added a total of 178 acute psychiatric beds in existing facilities during the year.

We also added programs and services at a number of our facilities, working closely with our referral sources to anticipate and meet demand in our served communities.

**Above:** Universal Health Services has a long-standing commitment to serving the behavioral health needs of the military, including active duty service members, veterans and their families. In 2019, we served over 7,500 service members through our Patriot Support Programs. We are proud to work with Herschel Walker, former professional NFL player and mental health advocate. Walker has made over 300 visits to military installations across the U.S. and abroad, since partnering with the UHS Patriot Support Program in 2008. He has engaged with thousands of members of the military, sharing his message of hope and resilience, and inspiring others to seek care. Pictured above: Herschel Walker (center) with U.S. troops in Germany.

CONFIDENTIAL

DEF-MDL-14396.00045

ADAMHS000029589

UHS BEHAVIORAL HEALTH DIVISION

## AN EMPHASIS ON QUALITY MEASURES

Quality of care and patient satisfaction continue to be our most important metrics. UHS is one of few behavioral health providers voluntarily measuring clinical outcomes. Examining a variety of metrics, we are able to quantify changes in patients' conditions from admission to discharge.

A subsidiary of UHS, Mental Health Outcomes (MHO), is a leading consultancy specializing in the design and implementation of custom outcomes measurement, aggregating patient satisfaction surveys and outcomes. In CMS' Inpatient Psychiatric Facility Quality Reporting requirements, our facilities are compared to approximately 1,500 other psychiatric providers across the country. Our results exceed the national averages in 11 out of 14 indicators.

Patient satisfaction is a key indicator of the effectiveness of our treatment programs. In 2019, our patients rated their overall care as 4.5 on a 5-point scale in our patient satisfaction surveys. More than 91% indicated they felt better following care at one of our facilities; 90% were satisfied with their treatment; and 86% would refer a friend or family member in need of care.

Patient responses to our aftercare survey indicate that the vast majority of patients sustain the improvements made during treatment, with 89% reporting no re-hospitalization and 73% reporting a positive quality of life.

# THE VOICE OF OUR PATIENTS

## Quality is our passion, improving lives is our reward.

*Every day, at each of our facilities, care providers are making a difference in the lives of patients. It is evident in the expertise, quality of care and time they provide. It is shown by their compassion, kindness and patience. It is documented in the tangible improvement patients make from admission to discharge. But the biggest testament is hearing from patients following their stay – being told that we made a lasting impact, that they now live healthier, happier, more productive lives. Pictured here just three of the thousands of testimonials received each year from patients we have been privileged to serve.*



**90%** were satisfied with their treatment.

**91%** feel better at discharge than when admitted

**86%** would recommend the facility to someone needing treatment.

Quality patient care is the cornerstone of UHS' Mission. The Behavioral Health team delivers industry-leading outcomes and patient satisfaction as illustrated here.

CONFIDENTIAL

DEF-MDL-14396.00046

ADAMHS000029590

### Roman R.

Roman R. was a patient at Laurel Ridge Treatment Center receiving treatment for PTSD and other post-deployment issues. A retired sergeant first class in the Special Forces, Roman served in the U.S. Army for 13.5 years. *"You do what you have to do and then you put it all back into a mental box,"* said Roman. *"That worked. Until it didn't."* Roman completed treatment at Laurel Ridge (6-week stay). *"Once I really stepped into the process and got on-board with treatment, the panic attacks stopped. Getting help doesn't keep you from your job, it makes you better at your job."*





Chris D. (red shirt) with his loving and supportive family.

### Chris D.

Chris D. was a patient at Fuller Hospital at the age of 17 struggling with Anxiety and Obsessive-Compulsive Disorder. Two years later, the Fuller team had the opportunity to meet Chris...again; this time as a visitor on his way home from college where he is studying criminal justice. It was a special reunion moment for both Chris and the Fuller staff.

*"If I could talk to my 17 year-old self I would let him know that he is never alone. Just be truthful. The safety and security I felt at Fuller I had not felt for a long time. I would tell myself not to be scared, and to be willing to make necessary changes, for it would only benefit my health and well-being."* – Chris D.

*"The happy ending to our story is that after being discharged, Chris did extremely well. He is under the care of both a psychologist and a psychiatrist, and he is flourishing at college in his freshman year. There aren't enough words to describe our level of gratitude for all the work the Fuller team gave our son. They perform God's work every day and help to de-stigmatize the mental health maladies that many people, like our son, are facing."* – Chris' parents Joe & Paula D.

### Bo Brown

Bo was treated at Michael's House in Palm Springs, California in 2014. He recently reached out to share his continued progress. Testimonials from patients years after treatment attest to the sustainability of their life-changing treatment. *"One of the things I learned about myself is not to waste another moment of my life. I spent a lot of years in the shadows, isolating myself, drinking myself to death and avoiding contact with people. Now I look forward to days. I enjoy waking up in the morning. I enjoy new adventures and doing things that I would never expect to do in my life."*



CONFIDENTIAL

DEF-MDL-14396.00047

ADAMHS000029591

UHS BEHAVIORAL HEALTH DIVISION

**Cygnet Health Care** is a leading provider in the U.K. offering a full spectrum of behavioral health services and treatment. During the year, Cygnet Health Care celebrated its 30th anniversary with the successful integration of 25 newly acquired Danshell facilities, further establishing Cygnet as one of the largest providers of mental health services in the U.K. With a presence across England, Scotland and Wales, Cygnet Health Care is the provider of choice for the National Health Service (NHS). We have built a reputation for delivering pioneering services and outstanding outcomes for the individuals in our care. We have invested significantly in our portfolio and we are proud to offer the safest therapeutic environments for behavioral health across the country, with 85% of our U.K. services rated as 'Outstanding' or 'Good' by regulatory agencies.

## SPECIALIZED PROGRAMS

### EATING DISORDERS

We believe that eating disorders are rooted in and driven by anxiety and a profound disruption to the sufferers' sense of self. Our goal is to create a culture that nurtures the integration of body and mind by normalizing eating behaviors and attitudes toward food and one's body; and challenging and replacing maladaptive thoughts and behaviors.

### EDUCATIONAL SERVICES

Our residential treatment facilities provide innovative programs for adolescents enabling them to continue their education and pursue academic success while in treatment. In 2019, 211 youth receiving mental health treatment in our facilities earned their high school diploma or GED.

### SUICIDE PREVENTION

As a strategic partner to the National Action Alliance for Suicide Prevention, UHS collaborated in delivering groundbreaking best practices to support care transitions following inpatient services. This new research will continue to be showcased in 2020. As providers, we must do all we can to support patients during this vulnerable time in their care journey.



Celebrating 30 years, Cygnet has expanded to provide more support at specialist behavioral facilities across the UK. Kewstoke's beachside location overlooking the Bristol Channel provides a peaceful and therapeutic setting for patients in our care.

CONFIDENTIAL

ADAMHS000029592

DEF-MDL-14396.00048



Des Moines, Iowa

Cape Girardeau, Missouri

Dearborn, Michigan

West Allis, Wisconsin

Scottsdale, Arizona

Madera, California

Temple, Texas

# PARTNER OF CHOICE

Integration of behavioral health and physical healthcare services can decrease unnecessary emergency department visits, reduce unnecessary inpatient admissions and enhance compliance with treatment, leading to better clinical outcomes and increased patient satisfaction.

We currently have over 40 active partnerships and integrations underway. Joint-venture projects announced with these leading Healthcare Systems are currently under construction:

- Beaumont Health
- HonorHealth
- MercyOne
- SoutheastHEALTH
- Valley Children's Healthcare

And new facilities are being built following needs assessments driven by local referral source partners:

- Mental Health Division of Milwaukee County
- Baylor Scott & White Health

CONFIDENTIAL

DEF-MDL-14396.00049

ADAMHS000029593



# CORPORATE
# SOCIAL
# RESPONSIBILITY

*A shared commitment*

UHS recognizes the need to protect the natural environment as well as serve patients and the communities in which we operate. Keeping our surroundings clean and minimizing pollution is of benefit to all. We are committed to following best practices when managing our energy usage and consumption, and disposing of waste. Stewardship continues to play an important role in our commitment to a clean environment and strong communities.

CONFIDENTIAL

DEF-MDL-14396.00050

ADAMHS000029594



## ENERGY STAR® CERTIFICATION

We continued work on the UHS Corporate Energy Efficiency Initiative, which was launched in 2017. UHS invested $10.6 million toward LED lighting upgrades and optimization of our large HVAC systems during the year. The projects implemented during 2019 are projected to save 18.38 million kWh of electricity and 138,000 therms of natural gas annually, resulting in 14,010 metric tons of $CO_2$ emission reduction. This equates to:

- 2,975 passenger vehicles removed from the road or 34.76 million miles driven by an average passenger vehicle, or
- 15.4 million pounds of coal burned, or
- 2,372 homes' electricity use for one year.

UHS installed and successfully implemented smart analytics fault detection and diagnostics systems in some of our large HVAC systems. This technology will help UHS to proactively identify, prioritize and address critical HVAC system components' failure and faults, per their energy savings potential. In October 2019, The Smart Energy Analytics Campaign arranged by U.S. Department of Energy's Better Buildings Initiative recognized and awarded UHS for New Installation of a Fault Detection & Diagnostics System in the Healthcare Category.

CONFIDENTIAL

DEF-MDL-14396.00051

ADAMHS000029595

## LEED / GREEN GLOBES CERTIFICATION

In addition to obtaining verification for Leadership in Energy and Environmental Design (LEED) in five of our six Las Vegas area hospitals, we have applied for certification under the science-based Green Globes rating system, which traces its origin to the European green building standard, Building Research Establishment Environmental Assessment Methodology (BREEAM). This action supports our focus on systematic annual increases in overall energy efficiency while improving our activities in the operation and maintenance for our facilities.

Furthermore, the Green Globes system includes wellness elements which further demonstrates our commitment to not only operate sustainable buildings but also provide enhanced environments for our patients and their families, physicians and employees. As of the end of 2019, four Green Globes certifications were earned and a fifth is in progress.

## CULINARY AND NUTRITION

The Culinary and Nutrition team is comprised of Licensed Registered Dietitians and Chefs, and resides as part of Supply Chain. This structure allows us to look at ingredients first. With every menu developed, or product sourced, we keep in mind the wholesomeness and nutritional content of the ingredients required. We also look at creating value: how the best foods, at the best price can be prepared for the best customer satisfaction.

We refer to this as a focus on Food as Fuel. If a patient receives the foods of their personal choice, and enjoys them, they will have the fuel and nutrients to heal. But food preferences are complicated and vary greatly. Therefore, we use an integrated approach.

Our team began implementing the new International Standards for Dysphagia before most health systems in the U.S. This addresses patient safety and the presentation of patient meals, while also focusing on careful selection of food items for all diet types. Partnering with our best facility-level Chefs, we continue to develop and test recipes and menus. We recently completed UHS' own set of Cafeteria Retail Concepts. These were newly developed sets of recipes, marketing, signage and presentation standards competitive with quick service restaurants. Although this project was important for Retail Cafeterias, we chose to also use it as a testing mechanism for many Patient Menu Cycle items.

Our team worked on 37 kitchen design projects this past year. Each of these utilized new contracts secured with specific companies to ensure safe, dependable and affordable tools for our Culinary Departments. From energy-efficient dishwashing machines to customer-facing reusable items such as melamine plates to reduce paper goods usage, these projects leverage industry best-practice solutions.

CONFIDENTIAL

DEF-MDL-14396.00052

ADAMHS000029596

Lastly, we expanded the digitalized Diet Offices and Food Production systems to safely expedite patient choices more creatively within dietary restrictions.

By taking these actions, we also saw a reduction in waste. In concert with our continued management of partnered contracts and order guides, the result is that food and supply costs remained stable year over year, while allowing an investment in quality.

## ENVIRONMENTAL SERVICES (EVS)

During 2019, UHS Environmental Services continued to improve and innovate the manner in which we clean and provide safe environments for our patients, staff and visitors. With consistent training of our staff, we are ensuring our teams understand the critical part which we play in our healthcare environments. In moving our EVS departments in-house, we have improved visibility and influence on our departments, allowing for consistent process improvement. During the year we launched Adenosine Triphosphate (ATP) testing in patient and sterile areas to significantly improve the depth of inspections beyond visual. We have additionally expanded use of UV treatment (over 7,500 treatments) in all areas of the hospitals as an additional enhanced cleaning process.

## RESPONSIBLE PHARMACEUTICAL WASTE MANAGEMENT

The United States Environmental Protection Agency (EPA) enforced new regulations this past year pertaining to the disposal of hazardous waste pharmaceuticals by healthcare facilities. The new rule provides streamlined processes for the safe management of pharmaceutical waste and prohibits the practice of draining hazardous pharmaceutical waste in sewer systems.

Proper disposal of pharmaceutical waste and ensuring regulatory compliance are essential components of the UHS Pharmaceutical Waste Management Program. The program incorporates the use of special disposal containers designed for both hazardous and nonhazardous pharmaceutical waste. The containers provide an environmentally friendly method for disposal of pharmaceutical waste and prevent the presence of residual medications in our environment.

Proper disposal of controlled substance waste is another important component of the UHS Pharmaceutical Waste Management Program that ensures alignment with the Drug Enforcement Administration (DEA) and EPA regulations surrounding proper disposal of controlled substances.

The program features the use of an innovative controlled substance waste disposal container designed to prevent diversion of controlled substances and prevent pharmaceutical waste from entering our environment.

Responsible management of pharmaceutical and controlled substance waste generated at our hospitals provides an added degree of safety for our patients, communities and the environment.

CONFIDENTIAL

DEF-MDL-14396.00053

ADAMHS000029597

## REPROCESSING AND WASTE DIVERSION

Through reprocessing and remanufacturing efforts with our business partners, UHS is able to minimize its environmental impact utilizing key sustainability programs. UHS Acute Care facilities work with vendors to collect identified products and participate in sustainable and environmentally friendly practices resulting in diversion of waste. These vendors break down collected products into recyclable components keeping them out of the waste stream. In 2019, our Acute Care division was able to divert 145,717 pounds of waste through collection of 390,855 individual items. UHS has been participating in reprocessing and remanufacturing programs for over 16 years.

## UNCOMPENSATED CARE (CHARITY CARE AND UNINSURED DISCOUNTS)

Our commitment to corporate social responsibility is evident across the company in a number of ways, including the care that we provide to patients and their families, regardless of their ability to pay.

UHS Acute Care hospitals have recorded increasing uncompensated care, based on charges at established rates, for the years ended December 31, 2019, 2018 and 2017:

Generally, patients treated at our hospitals for non-elective services, who have gross income of various amounts dependent upon the state, ranging from 200% to 400% of the federal poverty guidelines, are deemed eligible for charity care. The federal poverty guidelines are established by the federal government and are based on income and family size.

| | 2019 | | 2018 | | 2017 | |
|---|---|---|---|---|---|---|
| | Amount | % | Amount | % | Amount | % |
| Charity care | $672,326 | 31% | $761,783 | 40% | $887,136 | 50% |
| Uninsured discounts | $1,511,738 | 69% | $1,132,811 | 60% | $881,265 | 50% |
| Total uncompensated care | $2,184,064 | 100% | $1,894,594 | 100% | $1,768,401 | 100% |

(dollar amounts in thousands)

28  UNIVERSAL HEALTH SERVICES, INC.

CONFIDENTIAL

ADAMHS000029598

DEF-MDL-14396.00054

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

(MARK ONE)

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File No. 1-10765

# UNIVERSAL HEALTH SERVICES, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 23-2077891 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |

UNIVERSAL CORPORATE CENTER
367 South Gulph Road
P.O. Box 61558
King of Prussia, Pennsylvania — 19406-0958
(Address of principal executive offices) — (Zip Code)

Registrant's telephone number, including area code: (610) 768-3300

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Class B Common Stock, $0.01 par value | UHS | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:

**Class D Common Stock, $.01 par value**
(Title of each Class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Exchange Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of voting stock held by non-affiliates at June 30, 2019 was $10.3 billion. (For the purpose of this calculation, it was assumed that Class A, Class C, and Class D Common Stock, which are not traded but are convertible share-for-share into Class B Common Stock, have the same market value as Class B Common Stock. Also, for purposes of this calculation only, all directors are deemed to be affiliates.)

The number of shares of the registrant's Class A Common Stock, $.01 par value, Class B Common Stock, $.01 par value, Class C Common Stock, $.01 par value, and Class D Common Stock, $.01 par value, outstanding as of January 31, 2020, were 6,577,100; 79,473,042; 661,688 and 18,411, respectively.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the registrant's definitive proxy statement for our 2020 Annual Meeting of Stockholders, which will be filed with the Securities and Exchange Commission within 120 days after December 31, 2019 (incorporated by reference under Part III).

CONFIDENTIAL

ADAMHS000029599

# UNIVERSAL HEALTH SERVICES, INC.
## 2019 FORM 10-K ANNUAL REPORT

### TABLE OF CONTENTS

#### PART I

| | | |
|---|---|---|
| Item 1 | Business | 1 |
| Item 1A | Risk Factors | 12 |
| Item 1B | Unresolved Staff Comments | 25 |
| Item 2 | Properties | 25 |
| Item 3 | Legal Proceedings | 34 |
| Item 4 | Mine Safety Disclosure | 38 |

#### PART II

| | | |
|---|---|---|
| Item 5 | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 39 |
| Item 6 | Selected Financial Data | 42 |
| Item 7 | Management's Discussion and Analysis of Financial Condition and Results of Operations | 43 |
| Item 7A | Quantitative and Qualitative Disclosures About Market Risk | 81 |
| Item 8 | Financial Statements and Supplementary Data | 82 |
| Item 9 | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 82 |
| Item 9A | Controls and Procedures | 82 |
| Item 9B | Other Information | 83 |

#### PART III

| | | |
|---|---|---|
| Item 10 | Directors, Executive Officers and Corporate Governance | 84 |
| Item 11 | Executive Compensation | 84 |
| Item 12 | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 84 |
| Item 13 | Certain Relationships and Related Transactions, and Director Independence | 84 |
| Item 14 | Principal Accountant Fees and Services | 84 |

#### PART IV

| | | |
|---|---|---|
| Item 15 | Exhibits and Financial Statement Schedules | 85 |
| Item 16 | Form 10-K Summary | 89 |

| | |
|---|---|
| SIGNATURES | 90 |

This Annual Report on Form 10-K is for the year ended December 31, 2019. This Annual Report modifies and supersedes documents filed prior to this Annual Report. Information that we file with the Securities and Exchange Commission (the "SEC") in the future will automatically update and supersede information contained in this Annual Report.

In this Annual Report, "we," "us," "our" "UHS" and the "Company" refer to Universal Health Services, Inc. and its subsidiaries. UHS is a registered trademark of UHS of Delaware, Inc., the management company for, and a wholly-owned subsidiary of Universal Health Services, Inc. Universal Health Services, Inc. is a holding company and operates through its subsidiaries including its management company, UHS of Delaware, Inc. All healthcare and management operations are conducted by subsidiaries of Universal Health Services, Inc. To the extent any reference to "UHS" or "UHS facilities" in this report including letters, narratives or other forms contained herein relates to our healthcare or management operations it is referring to Universal Health Services, Inc.'s subsidiaries including UHS of Delaware, Inc. Further, the terms "we," "us," "our" or the "Company" in such context similarly refer to the operations of Universal Health Services Inc.'s subsidiaries including UHS of Delaware, Inc. Any reference to employees or employment contained herein refers to employment with or employees of the subsidiaries of Universal Health Services, Inc. including UHS of Delaware, Inc.

CONFIDENTIAL

DEF-MDL-14396.00056

## PART I

**ITEM 1.** *Business*

Our principal business is owning and operating, through our subsidiaries, acute care hospitals and outpatient facilities and behavioral health care facilities.

As of February 26, 2020, we owned and/or operated 354 inpatient facilities and 42 outpatient and other facilities including the following located in 37 states, Washington, D.C., the United Kingdom and Puerto Rico:

*Acute care facilities located in the U.S.:*

- 26 inpatient acute care hospitals;
- 14 free-standing emergency departments, and;
- 6 outpatient centers & 1 surgical hospital.

*Behavioral health care facilities (328 inpatient facilities and 21 outpatient facilities):*

*Located in the U.S.:*

- 185 inpatient behavioral health care facilities, and;
- 19 outpatient behavioral health care facilities.

*Located in the U.K.:*

- 140 inpatient behavioral health care facilities, and;
- 2 outpatient behavioral health care facilities.

*Located in Puerto Rico:*

- 3 inpatient behavioral health care facilities.

As a percentage of our consolidated net revenues, net revenues from our acute care hospitals, outpatient facilities and commercial health insurer accounted for 54% during 2019 and 53% during each of 2018 and 2017. Net revenues from our behavioral health care facilities and commercial health insurer accounted for 46% of our consolidated net revenues during 2019 and 47% during each of 2018 and 2017.

Our behavioral health care facilities located in the U.K. generated net revenues of approximately $554 million in 2019, $505 million in 2018 and $429 million in 2017. Total assets at our U.K. behavioral health care facilities were approximately $1.270 billion as of December 31, 2019, $1.224 billion as of December 31, 2018 and $1.098 billion as of December 31, 2017.

Services provided by our hospitals include general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services and/or behavioral health services. We provide capital resources as well as a variety of management services to our facilities, including central purchasing, information services, finance and control systems, facilities planning, physician recruitment services, administrative personnel management, marketing and public relations.

*Available Information*

We are a Delaware corporation that was organized in 1979. Our principal executive offices are located at Universal Corporate Center, 367 South Gulph Road, P.O. Box 61558, King of Prussia, PA 19406. Our telephone number is (610) 768-3300.

Our website is located at http://www.uhsinc.com. Copies of our annual, quarterly and current reports that we file with the SEC, and any amendments to those reports, are available free of charge on our website. Our filings are also available to the public at the website maintained by the SEC, www.sec.gov. The information posted on our website is not incorporated into this Annual Report. Our Board of Directors' committee charters (Audit Committee, Compensation Committee and Nominating & Governance Committee), Code of Business Conduct and Corporate Standards applicable to all employees, Code of Ethics for Senior Financial Officers, Corporate Governance Guidelines and our Code of Conduct, Corporate Compliance Manual and Compliance Policies and Procedures are available free of charge on our website. Copies of such reports and charters are available in print to any stockholder who makes a request. Such requests should be made to our Secretary at our King of Prussia, PA corporate headquarters. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K relating to amendments to or waivers of any provision of our Code of Ethics for Senior Financial Officers by promptly posting this information on our website.

1

CONFIDENTIAL

ADAMHS000029601

DEF-MDL-14396.00057

In accordance with Section 303A.12(a) of the New York Stock Exchange Listed Company Manual, we submitted our CEO's certification to the New York Stock Exchange in 2019. Additionally, contained in Exhibits 31.1 and 31.2 of this Annual Report on Form 10-K, are our CEO's and CFO's certifications regarding the quality of our public disclosures under Section 302 of the Sarbanes-Oxley Act of 2002.

### Our Mission

Our company mission is:

To provide superior quality healthcare services that

PATIENTS recommend to families and friends,

PHYSICIANS prefer for their patients,

PURCHASERS select for their clients,

EMPLOYEES are proud of, and

INVESTORS seek for long-term returns.

To achieve this, we have a commitment to:

- service excellence
- continuous improvement in measurable ways
- employee development
- ethical and fair treatment of all
- teamwork
- compassion
- innovation in service delivery

### Business Strategy

We believe community-based hospitals will remain the focal point of the healthcare delivery network and we are committed to a philosophy of self-determination for both the company and our hospitals.

**Acquisition of Additional Hospitals.** We selectively seek opportunities to expand our base of operations by acquiring, constructing or leasing additional hospital facilities. We are committed to a program of rational growth around our core businesses, while retaining the missions of the hospitals we manage and the communities we serve. Such expansion may provide us with access to new markets and new healthcare delivery capabilities. We also continue to examine our facilities and consider divestiture of those facilities that we believe do not have the potential to contribute to our growth or operating strategy. In recent years our behavioral health services segment has been focused on efforts to partner with non-UHS acute care hospitals to help operate their behavioral health services. These arrangements include hospital purchases, leased beds and joint venture operating agreements.

**Improvement of Operations of Existing Hospitals and Services.** We also seek to increase the operating revenues and profitability of owned hospitals by the introduction of new services, improvement of existing services, physician recruitment and the application of financial and operational controls.

We are involved in continual development activities for the benefit of our existing facilities. From time to time applications are filed with state health planning agencies to add new services in existing hospitals in states which require certificates of need, or CONs. Although we expect that some of these applications will result in the addition of new facilities or services to our operations, no assurances can be made for ultimate success by us in these efforts.

**Quality and Efficiency of Services.** Pressures to contain healthcare costs and technological developments allowing more procedures to be performed on an outpatient basis have led payers to demand a shift to ambulatory or outpatient care wherever possible. We are responding to this trend by emphasizing the expansion of outpatient services. In addition, in response to cost containment pressures, we continue to implement programs at our facilities designed to improve financial performance and efficiency while continuing to provide quality care, including more efficient use of professional and paraprofessional staff, monitoring and adjusting staffing levels and equipment usage, improving patient management and reporting procedures and implementing more

CONFIDENTIAL

DEF-MDL-14396.00058

ADAMHS000029602

efficient billing and collection procedures. In addition, we will continue to emphasize innovation in our response to the rapid changes in regulatory trends and market conditions while fulfilling our commitment to patients, physicians, employees, communities and our stockholders.

In addition, our aggressive recruiting of highly qualified physicians and developing provider networks help to establish our facilities as an important source of quality healthcare in their respective communities.

*Hospital Utilization*

We believe that the most important factors relating to the overall utilization of a hospital include the quality and market position of the hospital and the number, quality and specialties of physicians providing patient care within the facility. Generally, we believe that the ability of a hospital to meet the health care needs of its community is determined by its breadth of services, level of technology, emphasis on quality of care and convenience for patients and physicians. Other factors that affect utilization include general and local economic conditions, market penetration of managed care programs, the degree of outpatient use, the availability of reimbursement programs such as Medicare and Medicaid, and demographic changes such as the growth in local populations. Utilization across the industry also is being affected by improvements in clinical practice, medical technology and pharmacology. Current industry trends in utilization and occupancy have been significantly affected by changes in reimbursement policies of third party payers. We are also unable to predict the extent to which these industry trends will continue or accelerate. In addition, our acute care services business is typically subject to certain seasonal fluctuations, such as higher patient volumes and net patient service revenues in the first and fourth quarters of the year.

The following table sets forth certain operating statistics for hospitals operated by us for the years indicated. Accordingly, information related to hospitals acquired during the five-year period has been included from the respective dates of acquisition, and information related to hospitals divested during the five year period has been included up to the respective dates of divestiture.

| | 2019 | 2018 | 2017 | 2016 | 2015 |
|---|---|---|---|---|---|
| Average Licensed Beds: | | | | | |
| Acute Care Hospitals | 6,379 | 6,232 | 6,127 | 5,934 | 5,832 |
| Behavioral Health Centers | 23,812 | 23,509 | 23,151 | 21,829 | 21,202 |
| Average Available Beds (1): | | | | | |
| Acute Care Hospitals | 6,205 | 6,056 | 5,954 | 5,759 | 5,656 |
| Behavioral Health Centers | 23,711 | 23,425 | 23,068 | 21,744 | 21,116 |
| Admissions: | | | | | |
| Acute Care Hospitals | 317,983 | 303,985 | 297,390 | 274,074 | 261,727 |
| Behavioral Health Centers | 488,367 | 482,658 | 467,822 | 456,052 | 447,007 |
| Average Length of Stay (Days): | | | | | |
| Acute Care Hospitals | 4.6 | 4.5 | 4.4 | 4.6 | 4.7 |
| Behavioral Health Centers | 13.3 | 13.3 | 13.6 | 13.2 | 13.1 |
| Patient Days (2): | | | | | |
| Acute Care Hospitals (1) | 1,451,847 | 1,376,988 | 1,312,265 | 1,251,511 | 1,218,969 |
| Behavioral Health Centers | 6,487,707 | 6,418,334 | 6,381,756 | 6,004,066 | 5,835,194 |
| Occupancy Rate-Licensed Beds (3): | | | | | |
| Acute Care Hospitals | 62% | 61% | 59% | 58% | 57% |
| Behavioral Health Centers | 75% | 75% | 76% | 75% | 75% |
| Occupancy Rate-Available Beds (3): | | | | | |
| Acute Care Hospitals | 64% | 62% | 60% | 59% | 59% |
| Behavioral Health Centers | 75% | 75% | 76% | 75% | 76% |

(1) "Average Available Beds" is the number of beds which are actually in service at any given time for immediate patient use with the necessary equipment and staff available for patient care. A hospital may have appropriate licenses for more beds than are in service for a number of reasons, including lack of demand, incomplete construction, and anticipation of future needs.

(2) "Patient Days" is the sum of all patients for the number of days that hospital care is provided to each patient.

(3) "Occupancy Rate" is calculated by dividing average patient days (total patient days divided by the total number of days in the period) by the number of average beds, either available or licensed.

*Sources of Revenue*

We receive payments for services rendered from private insurers, including managed care plans, the federal government under the Medicare program, state governments under their respective Medicaid programs and directly from patients. See *Item 7.*

CONFIDENTIAL

DEF-MDL-14396.00059

ADAMHS000029603

*Management's Discussion and Analysis of Financial Condition and Results of Operations—Sources of Revenue* for additional disclosure. Other information related to our revenues, income and other operating information for each reporting segment of our business is provided in Note 12 to our Consolidated Financial Statements, *Segment Reporting.*

### Regulation and Other Factors

**Overview:** The healthcare industry is subject to numerous laws, regulations and rules including, among others, those related to government healthcare participation requirements, various licensure and accreditations, reimbursement for patient services, health information privacy and security rules, and Medicare and Medicaid fraud and abuse provisions (including, but not limited to, federal statutes and regulations prohibiting kickbacks and other illegal inducements to potential referral sources, false claims submitted to federal or state health care programs and self-referrals by physicians). Providers that are found to have violated any of these laws and regulations may be excluded from participating in government healthcare programs, subjected to significant fines or penalties and/or required to repay amounts received from the government for previously billed patient services. Although we believe our policies, procedures and practices comply with governmental regulations, no assurance can be given that we will not be subjected to additional governmental inquiries or actions, or that we would not be faced with sanctions, fines or penalties if so subjected. Even if we were to ultimately prevail, a significant governmental inquiry or action under one of the above laws, regulations or rules could have a material adverse impact on us.

**Licensing, Certification and Accreditation:** All of our U.S. hospitals are subject to compliance with various federal, state and local statutes and regulations in the U.S. and receive periodic inspection by state licensing agencies to review standards of medical care, equipment and cleanliness. Our hospitals must also comply with the conditions of participation and licensing requirements of federal, state and local health agencies, as well as the requirements of municipal building codes, health codes and local fire departments. Various other licenses and permits are also required in order to dispense narcotics, operate pharmacies, handle radioactive materials and operate certain equipment. Our facilities in the United Kingdom are also subject to various laws and regulations.

All of our eligible hospitals have been accredited by The Joint Commission. All of our acute care hospitals and most of our behavioral health centers in the U.S. are certified as providers of Medicare and Medicaid services by the appropriate governmental authorities.

If any of our facilities were to lose its Joint Commission accreditation or otherwise lose its certification under the Medicare and Medicaid programs, the facility may be unable to receive reimbursement from the Medicare and Medicaid programs and other payers. We believe our facilities are in substantial compliance with current applicable federal, state, local and independent review body regulations and standards. The requirements for licensure, certification and accreditation are subject to change and, in order to remain qualified, it may become necessary for us to make changes in our facilities, equipment, personnel and services in the future, which could have a material adverse impact on operations.

**Certificates of Need:** Many of the states in which we operate hospitals have enacted certificates of need ("CON") laws as a condition prior to hospital capital expenditures, construction, expansion, modernization or initiation of major new services. Failure to obtain necessary state approval can result in our inability to complete an acquisition, expansion or replacement, the imposition of civil or, in some cases, criminal sanctions, the inability to receive Medicare or Medicaid reimbursement or the revocation of a facility's license, which could harm our business. In addition, significant CON reforms have been proposed in a number of states that would increase the capital spending thresholds and provide exemptions of various services from review requirements. In the past, we have not experienced any material adverse effects from those requirements, but we cannot predict the impact of these changes upon our operations.

**Conversion Legislation:** Many states have enacted or are considering enacting laws affecting the conversion or sale of not-for-profit hospitals to for-profit entities. These laws generally require prior approval from the attorney general, advance notification and community involvement. In addition, attorneys general in states without specific conversion legislation may exercise discretionary authority over these transactions. Although the level of government involvement varies from state to state, the trend is to provide for increased governmental review and, in some cases, approval of a transaction in which a not-for-profit entity sells a health care facility to a for-profit entity. The adoption of new or expanded conversion legislation and the increased review of not-for-profit hospital conversions may limit our ability to grow through acquisitions of not-for-profit hospitals.

**Utilization Review:** Federal regulations require that admissions and utilization of facilities by Medicare and Medicaid patients must be reviewed in order to ensure efficient utilization of facilities and services. The law and regulations require Peer Review Organizations ("PROs") to review the appropriateness of Medicare and Medicaid patient admissions and discharges, the quality of care provided, the validity of diagnosis related group ("DRG") classifications and the appropriateness of cases of extraordinary length of stay. PROs may deny payment for services provided, assess fines and also have the authority to recommend to the Department of Health and Human Services ("HHS") that a provider that is in substantial non-compliance with the standards of the PRO be excluded

4

CONFIDENTIAL

ADAMHS000029604

from participating in the Medicare program. We have contracted with PROs in each state where we do business to perform the required reviews.

**Audits:** Most hospitals are subject to federal audits to validate the accuracy of Medicare and Medicaid program submitted claims. If these audits identify overpayments, we could be required to pay a substantial rebate of prior years' payments subject to various administrative appeal rights. The federal government contracts with third-party "recovery audit contractors" ("RACs") and "Medicaid integrity contractors" ("MICs"), on a contingent fee basis, to audit the propriety of payments to Medicare and Medicaid providers. Similarly, Medicare zone program integrity contractors ("ZPICs") target claims for potential fraud and abuse. Additionally, Medicare administrative contractors ("MACs") must ensure they pay the right amount for covered and correctly coded services rendered to eligible beneficiaries by legitimate providers. The Centers for Medicare and Medicaid Services ("CMS") announced its intent to consolidate many of these Medicare and Medicaid program integrity functions into new unified program integrity contractors ("UPICs"), though it remains unclear what effect, if any, this consolidation may have. We have undergone claims audits related to our receipt of federal healthcare payments during the last three years, the results of which have not required material adjustments to our consolidated results of operations. However, potential liability from future federal or state audits could ultimately exceed established reserves, and any excess could potentially be substantial. Further, Medicare and Medicaid regulations also provide for withholding Medicare and Medicaid overpayments in certain circumstances, which could adversely affect our cash flow.

### Self-Referral and Anti-Kickback Legislation

**The Stark Law:** The Social Security Act includes a provision commonly known as the "Stark Law." This law prohibits physicians from referring Medicare and Medicaid patients to entities with which they or any of their immediate family members have a financial relationship, unless an exception is met. These types of referrals are known as "self-referrals." Sanctions for violating the Stark Law include civil penalties up to $25,820 for each violation, and up to $172,137 for sham arrangements. There are a number of exceptions to the self-referral prohibition, including an exception for a physician's ownership interest in an entire hospital as opposed to an ownership interest in a hospital department unit, service or subpart. However, federal laws and regulations now limit the ability of hospitals relying on this exception to expand aggregate physician ownership interest or to expand certain hospital facilities. This regulation also places a number of compliance requirements on physician-owned hospitals related to reporting of ownership interest. There are also exceptions for many of the customary financial arrangements between physicians and providers, including employment contracts, leases and recruitment agreements that adhere to certain enumerated requirements.

We monitor all aspects of our business and have developed a comprehensive ethics and compliance program that is designed to meet or exceed applicable federal guidelines and industry standards. Nonetheless, because the law in this area is complex and constantly evolving, there can be no assurance that federal regulatory authorities will not determine that any of our arrangements with physicians violate the Stark Law.

**Anti-kickback Statute:** A provision of the Social Security Act known as the "anti-kickback statute" prohibits healthcare providers and others from directly or indirectly soliciting, receiving, offering or paying money or other remuneration to other individuals and entities in return for using, referring, ordering, recommending or arranging for such referrals or orders of services or other items covered by a federal or state health care program. However, changes to the anti-kickback statute have reduced the intent required for violation; one is no longer required to have actual knowledge or specific intent to commit a violation of the anti-kickback statute in order to be found in violation of such law.

The anti-kickback statute contains certain exceptions, and the Office of the Inspector General of the Department of Health and Human Services ("OIG") has issued regulations that provide for "safe harbors," from the federal anti-kickback statute for various activities. These activities, which must meet certain requirements, include (but are not limited to) the following: investment interests, space rental, equipment rental, practitioner recruitment, personnel services and management contracts, sale of practice, referral services, warranties, discounts, employees, group purchasing organizations, waiver of beneficiary coinsurance and deductible amounts, managed care arrangements, obstetrical malpractice insurance subsidies, investments in group practices, freestanding surgery centers, donation of technology for electronic health records and referral agreements for specialty services. The fact that conduct or a business arrangement does not fall within a safe harbor or exception does not automatically render the conduct or business arrangement illegal under the anti-kickback statute. However, such conduct and business arrangements may lead to increased scrutiny by government enforcement authorities.

Although we believe that our arrangements with physicians and other referral sources have been structured to comply with current law and available interpretations, there can be no assurance that all arrangements comply with an available safe harbor or that regulatory authorities enforcing these laws will determine these financial arrangements do not violate the anti-kickback statute or other applicable laws. Violations of the anti-kickback statute may be punished by a criminal fine of up to $100,000 for each violation or imprisonment, however, under 18 U.S.C. Section 3571, this fine may be increased to $250,000 for individuals and $500,000 for organizations. Civil money penalties may include fines of up to $102,522 per violation and damages of up to three times the total amount of the remuneration and/or exclusion from participation in Medicare and Medicaid.

5

CONFIDENTIAL

DEF-MDL-14396.00061

ADAMHS000029605

**Similar State Laws:** Many of the states in which we operate have adopted laws that prohibit payments to physicians in exchange for referrals similar to the anti-kickback statute and the Stark Law, some of which apply regardless of the source of payment for care. These statutes typically provide criminal and civil penalties as well as loss of licensure. In many instances, the state statutes provide that any arrangement falling in a federal safe harbor will be immune from scrutiny under the state statutes. However, in most cases, little precedent exists for the interpretation or enforcement of these state laws.

These laws and regulations are extremely complex and, in many cases, we don't have the benefit of regulatory or judicial interpretation. It is possible that different interpretations or enforcement of these laws and regulations could subject our current or past practices to allegations of impropriety or illegality or could require us to make changes in our facilities, equipment, personnel, services, capital expenditure programs and operating expenses. A determination that we have violated one or more of these laws, or the public announcement that we are being investigated for possible violations of one or more of these laws (see Item 3. Legal Proceedings), could have a material adverse effect on our business, financial condition or results of operations and our business reputation could suffer significantly. In addition, we cannot predict whether other legislation or regulations at the federal or state level will be adopted, what form such legislation or regulations may take or what their impact on us may be.

If we are deemed to have failed to comply with the anti-kickback statute, the Stark Law or other applicable laws and regulations, we could be subjected to liabilities, including criminal penalties, civil penalties (including the loss of our licenses to operate one or more facilities), and exclusion of one or more facilities from participation in the Medicare, Medicaid and other federal and state health care programs. The imposition of such penalties could have a material adverse effect on our business, financial condition or results of operations.

**Federal False Claims Act and Similar State Regulations:** A current trend affecting the health care industry is the increased use of the federal False Claims Act, and, in particular, actions being brought by individuals on the government's behalf under the False Claims Act's qui tam, or whistleblower, provisions. Whistleblower provisions allow private individuals to bring actions on behalf of the government by alleging that the defendant has defrauded the Federal government.

When a defendant is determined by a court of law to have violated the False Claims Act, the defendant may be liable for up to three times the actual damages sustained by the government, plus mandatory civil penalties of between $11,463 to $22,927 for each separate false claim. There are many potential bases for liability under the False Claims Act. Liability often arises when an entity knowingly submits a false claim for reimbursement to the federal government. The Fraud Enforcement and Recovery Act of 2009 ("FERA") amended and expanded the number of actions for which liability may attach under the False Claims Act, eliminating requirements that false claims be presented to federal officials or directly involve federal funds. FERA also clarifies that a false claim violation occurs upon the knowing retention, as well as the receipt, of overpayments. In addition, recent changes to the anti-kickback statute have made violations of that law punishable under the civil False Claims Act. Further, a number of states have adopted their own false claims provisions as well as their own whistleblower provisions whereby a private party may file a civil lawsuit on behalf of the state in state court. The False Claims Act require that federal healthcare program overpayments be returned within 60 days from the date the overpayment was identified, or by the date any corresponding cost report was due, whichever is later. Failure to return an overpayment within this period may result in additional civil False Claims Act liability.

**Other Fraud and Abuse Provisions:** The Social Security Act also imposes criminal and civil penalties for submitting false claims to Medicare and Medicaid. False claims include, but are not limited to, billing for services not rendered, billing for services without prescribed documentation, misrepresenting actual services rendered in order to obtain higher reimbursement and cost report fraud. Like the anti-kickback statute, these provisions are very broad.

Further, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") broadened the scope of the fraud and abuse laws by adding several criminal provisions for health care fraud offenses that apply to all health benefit programs, whether or not payments under such programs are paid pursuant to federal programs. HIPAA also introduced enforcement mechanisms to prevent fraud and abuse in Medicare. There are civil penalties for prohibited conduct, including, but not limited to billing for medically unnecessary products or services.

**HIPAA Administrative Simplification and Privacy Requirements:** The administrative simplification provisions of HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH"), require the use of uniform electronic data transmission standards for health care claims and payment transactions submitted or received electronically. These provisions are intended to encourage electronic commerce in the health care industry. HIPAA also established federal rules protecting the privacy and security of personal health information. The privacy and security regulations address the use and disclosure of individual health care information and the rights of patients to understand and control how such information is used and disclosed. Violations of HIPAA can result in both criminal and civil fines and penalties.

We believe that we are in material compliance with the privacy regulations of HIPAA, as we continue to develop training and revise procedures to address ongoing compliance. The HIPAA security regulations require health care providers to implement

6

administrative, physical and technical safeguards to protect the confidentiality, integrity and availability of patient information. HITECH has since strengthened certain HIPAA rules regarding the use and disclosure of protected health information, extended certain HIPAA provisions to business associates, and created new security breach notification requirements. HITECH has also extended the ability to impose civil money penalties on providers not knowing that a HIPAA violation has occurred. We believe that we have been in substantial compliance with HIPAA and HITECH requirements to date. Recent changes to the HIPAA regulations may result in greater compliance requirements for healthcare providers, including expanded obligations to report breaches of unsecured patient data, as well as create new liabilities for the actions of parties acting as business associates on our behalf.

**Red Flags Rule:** In addition, the Federal Trade Commission ("FTC") Red Flags Rule requires financial institutions and businesses maintaining accounts to address the risk of identity theft. The Red Flag Program Clarification Act of 2010, signed on December 18, 2010, appears to exclude certain healthcare providers from the Red Flags Rule, but permits the FTC or relevant agencies to designate additional creditors subject to the Red Flags Rule through future rulemaking if the agencies determine that the person in question maintains accounts subject to foreseeable risk of identity theft. Compliance with any such future rulemaking may require additional expenditures in the future.

**Patient Safety and Quality Improvement Act of 2005:** On July 29, 2005, the Patient Safety and Quality Improvement Act of 2005 was enacted, which has the goal of reducing medical errors and increasing patient safety. This legislation establishes a confidential reporting structure in which providers can voluntarily report "Patient Safety Work Product" ("PSWP") to "Patient Safety Organizations" ("PSOs"). Under the system, PSWP is made privileged, confidential and legally protected from disclosure. PSWP does not include medical, discharge or billing records or any other original patient or provider records but does include information gathered specifically in connection with the reporting of medical errors and improving patient safety. This legislation does not preempt state or federal mandatory disclosure laws concerning information that does not constitute PSWP. PSOs are certified by the Secretary of the HHS for three-year periods and analyze PSWP, provide feedback to providers and may report non-identifiable PSWP to a database. In addition, PSOs are expected to generate patient safety improvement strategies.

**Environmental Regulations:** Our healthcare operations generate medical waste that must be disposed of in compliance with federal, state and local environmental laws, rules and regulations. Infectious waste generators, including hospitals, face substantial penalties for improper disposal of medical waste, including civil penalties of up to $25,000 per day of noncompliance, criminal penalties of up to $50,000 per day, imprisonment, and remedial costs. In addition, our operations, as well as our purchases and sales of facilities are subject to various other environmental laws, rules and regulations. We believe that our disposal of such wastes is in material compliance with all state and federal laws.

**Corporate Practice of Medicine:** Several states, including Florida, Nevada, California and Texas, have laws and/or regulations that prohibit corporations and other entities from employing physicians and practicing medicine for a profit or that prohibit certain direct and indirect payments or fee-splitting arrangements between health care providers that are designed to induce or encourage the referral of patients to, or the recommendation of, particular providers for medical products and services. Possible sanctions for violation of these restrictions include loss of license and civil and criminal penalties. In addition, agreements between the corporation and the physician may be considered void and unenforceable. These statutes and/or regulations vary from state to state, are often vague and have seldom been interpreted by the courts or regulatory agencies. We do not expect these state corporate practice of medicine proscriptions to significantly affect our operations. Many states have laws and regulations which prohibit payments for referral of patients and fee-splitting with physicians. We do not make any such payments or have any such arrangements.

**EMTALA:** All of our hospitals are subject to the Emergency Medical Treatment and Active Labor Act ("EMTALA"). This federal law generally requires hospitals with an emergency department that are certified providers under Medicare to conduct a medical screening examination of every person who visits the hospital's emergency room for treatment and, if the patient is suffering from a medical emergency, to either stabilize the patient's condition or transfer the patient to a facility that can better handle the condition. Our obligation to screen and stabilize emergency medical conditions exists regardless of a patient's ability to pay for treatment. There are severe penalties under EMTALA if a hospital fails to screen or appropriately stabilize or transfer a patient or if the hospital delays appropriate treatment in order to first inquire about the patient's ability to pay. Penalties for violations of EMTALA include civil monetary penalties and exclusion from participation in the Medicare program. In addition to any liabilities that a hospital may incur under EMTALA, an injured patient, the patient's family or a medical facility that suffers a financial loss as a direct result of another hospital's violation of the law can bring a civil suit against the hospital unrelated to the rights granted under that statute.

The federal government broadly interprets EMTALA to cover situations in which patients do not actually present to a hospital's emergency room, but present for emergency examination or treatment to the hospital's campus, generally, or to a hospital-based clinic that treats emergency medical conditions or are transported in a hospital-owned ambulance, subject to certain exceptions. EMTALA does not generally apply to patients admitted for inpatient services; however, CMS has sought industry comments on the potential applicability of EMTALA to hospital inpatients and the responsibilities of hospitals with specialized capabilities, respectively. CMS has not yet issued regulations or guidance in response to that request for comments. The government also has expressed its intent to

7

ADAMHS000029607

investigate and enforce EMTALA violations actively in the future. We believe that we operate in substantial compliance with EMTALA.

**Health Care Industry Investigations:** We are subject to claims and suits in the ordinary course of business, including those arising from care and treatment afforded by our hospitals and are party to various government investigations and litigation. Please see *Item 3. Legal Proceedings* included herein for additional disclosure. In addition, currently, and from time to time, some of our facilities are subjected to inquiries and/or actions and receive notices of potential non-compliance of laws and regulations from various federal and state agencies. Providers that are found to have violated these laws and regulations may be excluded from participating in government healthcare programs, subjected to potential licensure, certification, and/or accreditation revocation, subjected to fines or penalties or required to repay amounts received from the government for previously billed patient services.

We monitor all aspects of our business and have developed a comprehensive ethics and compliance program that is designed to meet or exceed applicable federal guidelines and industry standards. Because the law in this area is complex and constantly evolving, governmental investigation or litigation may result in interpretations that are inconsistent with industry practices, including ours. Although we believe our policies, procedures and practices comply with governmental regulations, no assurance can be given that we will not be subjected to inquiries or actions, or that we will not be faced with sanctions, fines or penalties in connection with the investigations. Even if we were to ultimately prevail, the government's inquiry and/or action in connection with these matters could have a material adverse effect on our future operating results.

Our substantial Medicare, Medicaid and other governmental billings may result in heightened scrutiny of our operations. It is possible that governmental entities could initiate additional investigations or litigation in the future and that such matters could result in significant penalties as well as adverse publicity. It is also possible that our executives and/or managers could be included as targets or witnesses in governmental investigations or litigation and/or named as defendants in private litigation.

**Revenue Rulings 98-15 and 2004-51:** In March 1998 and May 2004, the IRS issued guidance regarding the tax consequences of joint ventures between for-profit and not-for-profit hospitals. As a result of the tax rulings, the IRS has proposed, and may in the future propose, to revoke the tax-exempt or public charity status of certain not-for-profit entities which participate in such joint ventures or to treat joint venture income as unrelated business taxable income to them. The tax rulings have limited development of joint ventures and any adverse determination by the IRS or the courts regarding the tax-exempt or public charity status of a not-for-profit partner or the characterization of joint venture income as unrelated business taxable income could further limit joint venture development with not-for-profit hospitals, and/or require the restructuring of certain existing joint ventures with not-for-profits.

**State Rate Review:** Some states where we operate hospitals have adopted legislation mandating rate or budget review for hospitals or have adopted taxes on hospital revenues, assessments or licensure fees to fund indigent health care within the state. In the aggregate, state rate reviews and indigent tax provisions have not materially, adversely affected our results of operations.

**Medical Malpractice Tort Law Reform:** Medical malpractice tort law has historically been maintained at the state level. All states have laws governing medical liability lawsuits. Over half of the states have limits on damages awards. Almost all states have eliminated joint and several liability in malpractice lawsuits, and many states have established limits on attorney fees. Many states had bills introduced in their legislative sessions to address medical malpractice tort reform. Proposed solutions include enacting limits on non-economic damages, malpractice insurance reform, and gathering lawsuit claims data from malpractice insurance companies and the courts for the purpose of assessing the connection between malpractice settlements and premium rates. Reform legislation has also been proposed, but not adopted, at the federal level that could preempt additional state legislation in this area.

**Compliance Program:** Our company-wide compliance program has been in place since 1998. Currently, the program's elements include a Code of Conduct, risk area specific policies and procedures, employee education and training, an internal system for reporting concerns, auditing and monitoring programs, and a means for enforcing the program's policies.

Since its initial adoption, the compliance program continues to be expanded and developed to meet the industry's expectations and our needs. Specific written policies, procedures, training and educational materials and programs, as well as auditing and monitoring activities have been prepared and implemented to address the functional and operational aspects of our business. Specific areas identified through regulatory interpretation and enforcement activities have also been addressed in our program. Claims preparation and submission, including coding, billing, and cost reports, comprise the bulk of these areas. Financial arrangements with physicians and other referral sources, including compliance with anti-kickback and Stark laws and emergency department treatment and transfer requirements are also the focus of policy and training, standardized documentation requirements, and review and audit.

**United Kingdom Regulation:** Our operations in the United Kingdom are also subject to a high level of regulation relating to registration and licensing requirements, employee regulation, clinical standards, environmental rules as well as other areas. We are also subject to a highly regulated business environment, and failure to comply with the various laws and regulations applicable to us could lead to substantial penalties and other adverse effects on our business.

CONFIDENTIAL

ADAMHS000029608

DEF-MDL-14396.00064

*Employees and Medical Staff*

Our facilities located in the U.S. had approximately 80,800 employees as of December 31, 2019, of whom approximately 58,100 were employed full-time. In addition, our facilities located in the U.K. had approximately 9,600 employees as of December 31, 2019. Our hospitals are staffed by licensed physicians who have been admitted to the medical staff of individual hospitals. In a number of our markets, physicians may have admitting privileges at other hospitals in addition to ours. Within our acute care division, approximately 270 physicians are employed by physician practice management subsidiaries of ours either directly or through contracts with affiliated group practices structured as 501A corporations. Members of the medical staffs of our hospitals also serve on the medical staffs of hospitals not owned by us and may terminate their affiliation with our hospitals at any time. In addition, within our behavioral health division, approximately 475 psychiatrists are employed by subsidiaries of ours either directly or through contracts with affiliated group practices structured as 501A corporations. Each of our hospitals is managed on a day-to-day basis by a managing director employed by a subsidiary of ours. In addition, a Board of Governors, including members of the hospital's medical staff, governs the medical, professional and ethical practices at each hospital. We believe that our relations with our employees are satisfactory.

Approximately 1,800 of our employees at five of our hospitals are unionized. At Valley Hospital Medical Center, housekeeping and dietary employees are represented by the Culinary Workers and Bartenders Union, engineers are represented by the International Union of Operating Engineers and Registered Nurses are represented by the Service Employees International Union ("SEIU"). Engineers at Desert Springs Hospital are represented by the International Union of Operating Engineers and Registered Nurses and Technical employees are represented by the SEIU. At the Psychiatric Institute of Washington, clinical, clerical, support and maintenance employees are represented by the Communication Workers of America (AFL-CIO). Registered Nurses, Licensed Practical Nurses, certain technicians and therapists and some clerical employees at HRI Hospital in Boston are represented by the Service Employees International Union. At Brooke Glen Behavioral Hospital, unionized employees are represented by the Teamsters and the Northwestern Nurses Association/Pennsylvania Association of Staff Nurses and Allied Professionals.

On January 30, 2020, the National Labor Relations Board issued a decision regarding the 2017 withdrawals of recognition of the SEIU for three bargaining units at Valley Hospital Medical Center (registered nurses) and Desert Springs Hospital (registered nurses and Technical employees) located in Las Vegas, Nevada. The National Labor Relations Board held that the evidence supporting the withdrawals was not sufficient. The Valley Hospital Medical Center and Desert Springs Hospital have chosen not to appeal this decision and have, instead, recognized the union and are resuming negotiations.

*Competition*

The health care industry is highly competitive. In recent years, competition among healthcare providers for patients has intensified in the United States due to, among other things, regulatory and technological changes, increasing use of managed care payment systems, cost containment pressures and a shift toward outpatient treatment. In all of the geographical areas in which we operate, there are other hospitals that provide services comparable to those offered by our hospitals. In addition, some of our competitors include hospitals that are owned by tax-supported governmental agencies or by nonprofit corporations and may be supported by endowments and charitable contributions and exempt from property, sale and income taxes. Such exemptions and support are not available to us.

In some markets, certain of our competitors may have greater financial resources, be better equipped and offer a broader range of services than us. Certain hospitals that are located in the areas served by our facilities are specialty or large hospitals that provide medical, surgical and behavioral health services, facilities and equipment that are not available at our hospitals. The increase in outpatient treatment and diagnostic facilities, outpatient surgical centers and freestanding ambulatory surgical also increases competition for us. In addition, some of our hospitals face competition from hospitals or surgery centers that are physician owned.

The number and quality of the physicians on a hospital's staff are important factors in determining a hospital's success and competitive advantage. Typically, physicians are responsible for making hospital admissions decisions and for directing the course of patient treatment. We believe that physicians refer patients to a hospital primarily on the basis of the patient's needs, the quality of other physicians on the medical staff, the location of the hospital and the breadth and scope of services offered at the hospital's facilities. We strive to retain and attract qualified doctors by maintaining high ethical and professional standards and providing adequate support personnel, technologically advanced equipment and facilities that meet the needs of those physicians.

In addition, we depend on the efforts, abilities, and experience of our medical support personnel, including our nurses, pharmacists and lab technicians and other health care professionals. We compete with other health care providers in recruiting and retaining qualified hospital management, nurses and other medical personnel. Our acute care and behavioral health care facilities are experiencing the effects of a shortage of skilled nursing staff nationwide, which has caused and may continue to cause an increase in salaries, wages and benefits expense in excess of the inflation rate. In addition, in some markets like California, there are requirements

9

to maintain specified nurse-staffing levels. To the extent we cannot meet those levels, we may be required to limit the healthcare services provided in these markets which would have a corresponding adverse effect on our net operating revenues.

Many states in which we operate hospitals have CON laws. The application process for approval of additional covered services, new facilities, changes in operations and capital expenditures is, therefore, highly competitive in these states. In those states that do not have CON laws or which set relatively high levels of expenditures before they become reviewable by state authorities, competition in the form of new services, facilities and capital spending is more prevalent. See "Regulation and Other Factors."

Our ability to negotiate favorable service contracts with purchasers of group health care services also affects our competitive position and significantly affects the revenues and operating results of our hospitals. Managed care plans attempt to direct and control the use of hospital services and to demand that we accept lower rates of payment. In addition, employers and traditional health insurers are increasingly interested in containing costs through negotiations with hospitals for managed care programs and discounts from established charges. In return, hospitals secure commitments for a larger number of potential patients. Generally, hospitals compete for service contracts with group health care service purchasers on the basis of price, market reputation, geographic location, quality and range of services, quality of the medical staff and convenience. The importance of obtaining contracts with managed care organizations varies from market to market depending on the market strength of such organizations.

A key element of our growth strategy is expansion through the acquisition of additional hospitals in select markets. The competition to acquire hospitals is significant. We face competition for acquisition candidates primarily from other for-profit health care companies, as well as from not-for-profit entities. Some of our competitors have greater resources than we do. We intend to selectively seek opportunities to expand our base of operations by adhering to our disciplined program of rational growth, but may not be successful in accomplishing acquisitions on favorable terms.

*Relationship with Universal Health Realty Income Trust*

At December 31, 2019, we held approximately 5.7% of the outstanding shares of Universal Health Realty Income Trust (the "Trust"). We serve as Advisor to the Trust under an annually renewable advisory agreement, which is scheduled to expire on December 31st of each year, pursuant to the terms of which we conduct the Trust's day-to-day affairs, provide administrative services and present investment opportunities. The advisory agreement was Amended and Restated effective January 1, 2019. Among other things, the Amended and Restated Advisory Agreement (the "Agreement") eliminated the 20% annual incentive fee clause which we were previously entitled to under certain conditions (the incentive fee requirements have never been achieved). The advisory agreement was renewed by the Trust for 2020 at the same rate as the prior three years, providing for an advisory computation at 0.70% of the Trust's average invested real estate assets. We earned an advisory fee from the Trust, which is included in net revenues in the accompanying consolidated statements of income, of approximately $4.0 million during 2019, $3.8 million during 2018 and $3.6 million during 2017.

In addition, certain of our officers and directors are also officers and/or directors of the Trust. Management believes that it has the ability to exercise significant influence over the Trust, therefore we account for our investment in the Trust using the equity method of accounting.

Our pre-tax share of income from the Trust was $1.1 million and $1.4 million during 2019 and 2018, respectively, which are included in other income, net, on the accompanying consolidated statements of income for each year. Our pre-tax share of income from the Trust was $2.6 million during 2017, which is included in net revenues in the accompanying consolidated statements of income. Included in our share of the Trust's income for 2017 was a gain realized by the Trust in connection with a divestiture of property that was completed during the first quarter of 2017, as well as gain recorded in connection with hurricane-related insurance proceeds. We received dividends from the Trust amounting to $2.1 million during each of 2019, 2018 and 2017.

The carrying value of our investment in the Trust was $6.4 million and $7.5 million at December 31, 2019 and 2018, respectively, and is included in other assets in the accompanying consolidated balance sheets. The market value of our investment in the Trust was $92.4 million at December 31, 2019 and $48.3 million at December 31, 2018, based on the closing price of the Trust's stock on the respective dates.

The Trust commenced operations in 1986 by purchasing certain hospital properties from us and immediately leasing the properties back to our respective subsidiaries. Most of the leases were entered into at the time the Trust commenced operations and provided for initial terms of 13 to 15 years with up to six additional 5-year renewal terms. Each lease also provided for additional or bonus rental, as discussed below. The base rents are paid monthly and the bonus rents are computed and paid on a quarterly basis, based upon a computation that compares current quarter revenue to a corresponding quarter in the base year. The leases with those subsidiaries are unconditionally guaranteed by us and are cross-defaulted with one another.

10

CONFIDENTIAL

ADAMHS000029610

DEF-MDL-14396.00066

Total rent expense under the operating leases on the three hospital facilities with the Trust was $16.4 million during 2019 and $16.0 million during each of 2018 and 2017. Pursuant to the terms of the three hospital leases with the Trust, we have the option to renew the leases at the lease terms described above by providing notice to the Trust at least 90 days prior to the termination of the then current term. We also have the right to purchase the respective leased hospitals at the end of the lease terms or any renewal terms at their appraised fair market value as well as purchase any or all of the three leased hospital properties at the appraised fair market value upon one month's notice should a change of control of the Trust occur. In addition, we have rights of first refusal to: (i) purchase the respective leased facilities during and for 180 days after the lease terms at the same price, terms and conditions of any third-party offer, or; (ii) renew the lease on the respective leased facility at the end of, and for 180 days after, the lease term at the same terms and conditions pursuant to any third-party offer.

The table below details the renewal options and terms for each of our three acute care hospital facilities leased from the Trust:

| Hospital Name | Annual Minimum Rent | End of Lease Term | Renewal Term (years) | |
|---|---|---|---|---|
| McAllen Medical Center | $ 5,485,000 | December, 2026 | 5 | (a) |
| Wellington Regional Medical Center | $ 3,030,000 | December, 2021 | 10 | (b) |
| Southwest Healthcare System, Inland Valley Campus | $ 2,648,000 | December, 2021 | 10 | (b) |

(a) We have one 5-year renewal option at existing lease rates (through 2031).
(b) We have two 5-year renewal options at fair market value lease rates (2022 through 2031).

In addition, certain of our subsidiaries are tenants in various medical office buildings and two free-standing emergency departments owned by the Trust or by limited liability companies in which the Trust holds 95% to 100% of the ownership interest.

During the third quarter of 2019, the Trust commenced construction on a new 75,000 rentable square feet MOB that will be located on the campus of Texoma Medical Center, a hospital that is owned and operated by one of our subsidiaries. In connection with this MOB, a master flex lease has been executed between a wholly-owned subsidiary of ours and a Trust limited partnership that owns the MOB. Pursuant to the terms of this master flex lease, our subsidiary will master lease approximately 50% of the rentable square feet of the MOB, which could be reduced during the term if certain conditions are met, for a ten-year term at an initial minimum annual rent of $644,000.

During the third quarter of 2019, a joint-venture agreement between us and a non-related third-party was finalized in connection with the development of a newly constructed behavioral health care facility located in Clive, Iowa. Pursuant to the terms of the agreement, we hold a majority ownership interest in the venture and will act as manager of the facility when completed and opened. This joint-venture also entered into an agreement with the Trust whereby a wholly-owned subsidiary of the Trust will construct the 108-bed behavioral health care hospital and, upon completion and issuance of the certificate of occupancy, the joint venture will lease the facility from the Trust pursuant to a 20-year, triple net lease with five, 10-year renewal options. Construction of the approximately 80,000 square foot hospital, for which a wholly-owned subsidiary of ours will act as project manager for an aggregate fee of approximately $750,000, is expected to be completed in late 2020. The approximate cost of the project is estimated at $37.5 million and the initial annual rent is estimated at approximately $2.7 million.

### Executive Officers of the Registrant

The executive officers, whose terms will expire at such time as their successors are elected, are as follows:

| Name and Age | Present Position with the Company |
|---|---|
| Alan B. Miller (82) | Chairman of the Board and Chief Executive Officer |
| Marc D. Miller (49) | President and Director |
| Steve G. Filton (62) | Executive Vice President, Chief Financial Officer and Secretary |
| Marvin G. Pember (66) | Executive Vice President, President of Acute Care Division |
| Matthew J. Peterson (50) | Executive Vice President, President of Behavioral Health Division |

Mr. Alan B. Miller has been Chairman of the Board and Chief Executive Officer since inception and also served as President from inception until May, 2009. Prior thereto, he was President, Chairman of the Board and Chief Executive Officer of American Medicorp, Inc. He currently serves as Chairman of the Board, Chief Executive Officer and President of Universal Health Realty Income Trust. He is the father of Marc D. Miller, our President and Director.

Mr. Marc D. Miller was elected President in May, 2009 and prior thereto served as Senior Vice President and co-head of our Acute Care Hospitals since 2007. He was elected a Director in May, 2006 and Vice President in 2005. He has served in various

11

CONFIDENTIAL

DEF-MDL-14396.00067

capacities related to our acute care division since 2000. He was elected to the Board of Trustees of Universal Health Realty Income Trust in December, 2008. In August, 2015, he was appointed to the Board of Directors of Premier, Inc., a publicly traded healthcare performance improvement alliance. See Note 9 to the Consolidated Financial Statements-*Relationship with Universal Health Realty Income Trust and Other Related Party Transactions* for additional disclosure regarding the Company's group purchasing organization agreement with Premier, Inc. Marc D. Miller is the son of Alan B. Miller, our Chairman of the Board and Chief Executive Officer.

Mr. Filton was elected Executive Vice President in 2017 and continues to serve as Chief Financial Officer since his appointment in 2003. He has also served as Secretary since 1999. He had served as Senior Vice President since 2003, as Vice President and Controller since 1991, and as Director of Corporate Accounting since 1985.

Mr. Pember was elected Executive Vice President in 2017 and continues to serve as President of our Acute Care Division since commencement of his employment with us in 2011. He had served as Senior Vice President since 2011. He was formerly employed for 12 years at Indiana University Health, Inc. (formerly known as Clarian Health Partners, Inc.), a nonprofit hospital system that operates multiple facilities in Indiana, where he served as Executive Vice President and Chief Financial Officer.

Mr. Peterson's employment with us commenced in September, 2019 as Executive Vice President and President of our Behavioral Health Division. He was formerly employed at UnitedHealth Group for 11 years serving in various capacities including Chief Operating Officer for OptumGovernment, a health services and technology company, as well as various other Senior Vice President/Vice President roles. In addition to his civilian business career, Mr. Peterson has served for nearly 30 years as a member of the United States Military, currently a Colonel and hospital/healthcare administrator in the Air National Guard.

**ITEM 1A.** *Risk Factors*

We are subject to numerous known and unknown risks, many of which are described below and elsewhere in this Annual Report. Any of the events described below could have a material adverse effect on our business, financial condition and results of operations. Additional risks and uncertainties that we are not aware of, or that we currently deem to be immaterial, could also impact our business and results of operations.

### *A significant portion of our revenue is produced by facilities located in Texas, Nevada and California.*

**Texas:** We own 7 inpatient acute care hospitals and 22 inpatient behavioral healthcare facilities as listed in *Item 2. Properties*. On a combined basis, these facilities contributed 16% of our consolidated net revenues during each of 2019 and 2018 and 15% in 2017. On a combined basis, after deducting an allocation for corporate overhead expense, these facilities generated 14% in 2019, 12% in 2018 and 11% in 2017, of our income from operations after net income attributable to noncontrolling interest.

**Nevada:** We own 8 inpatient acute care hospitals and 4 inpatient behavioral healthcare facilities as listed in *Item 2. Properties*. On a combined basis, these facilities contributed 18% of our consolidated net revenues during 2019 and 17% during each of 2018 and 2017. On a combined basis, after deducting an allocation for corporate overhead expense, these facilities generated 23% in 2019, 24% in 2018 and 20% in 2017, of our income from operations after net income attributable to noncontrolling interest.

**California:** We own 5 inpatient acute care hospitals and 8 inpatient behavioral healthcare facilities as listed in *Item 2. Properties*. On a combined basis, these facilities contributed 11% of our consolidated net revenues during each of 2019, 2018 and 2017. On a combined basis, after deducting an allocation for corporate overhead expense, these facilities generated 17% in 2019, 16% in 2018 and 13% in 2017 of our income from operations after net income attributable to noncontrolling interest.

The significant portion of our revenues and earnings derived from these facilities makes us particularly sensitive to legislative, regulatory, economic, environmental and competition changes in Texas, Nevada and California. Any material change in the current payment programs or regulatory, economic, environmental or competitive conditions in these states could have a disproportionate effect on our overall business results.

### *Our revenues and results of operations are significantly affected by payments received from the government and other third party payers.*

We derive a significant portion of our revenue from third-party payers, including the Medicare and Medicaid programs. Changes in these government programs in recent years have resulted in limitations on reimbursement and, in some cases, reduced levels of reimbursement for healthcare services. Payments from federal and state government programs are subject to statutory and regulatory changes, administrative rulings, interpretations and determinations, requirements for utilization review, and federal and state funding restrictions, all of which could materially increase or decrease program payments, as well as affect the cost of providing service to patients and the timing of payments to facilities. We are unable to predict the effect of recent and future policy changes on

12

ADAMHS000029612

our operations. In addition, the uncertainty and fiscal pressures placed upon federal and state governments as a result of, among other things, deterioration in general economic conditions and the funding requirements from the federal healthcare reform legislation, may affect the availability of taxpayer funds for Medicare and Medicaid programs. In addition, the vast majority of the net revenues generated at our behavioral health facilities located in the United Kingdom are derived from governmental payers. If the rates paid or the scope of services covered by governmental payers in the United States or United Kingdom are reduced, there could be a material adverse effect on our business, financial position and results of operations.

We receive Medicaid revenues in excess of $100 million annually from each of California, Texas, Nevada, Washington, D.C., Pennsylvania and Illinois, making us particularly sensitive to reductions in Medicaid and other state based revenue programs as well as regulatory, economic, environmental and competitive changes in those states.

In addition to changes in government reimbursement programs, our ability to negotiate favorable contracts with private payers, including managed care organizations, significantly affects the revenues and operating results of our hospitals. Private payers, including managed care organizations, increasingly are demanding that we accept lower rates of payment.

We expect continued third-party efforts to aggressively manage reimbursement levels and cost controls. Reductions in reimbursement amounts received from third-party payers could have a material adverse effect on our financial position and our results of operations.

### *Reductions or changes in Medicare and Medicaid funding could have a material adverse effect on our future results of operations.*

The Budget Control Act of 2011 (the "*Budget Control Act*") mandated significant reductions in federal spending for fiscal years 2012-2021, including a reduction of 2% on all Medicare payments during this period. Subsequent legislation enacted by Congress extended these reductions through 2029. There is a substantial risk that Congress could act to extend or increase these across-the-board reductions. The proposed 2020 federal budget calls for an $845 billion reduction in Medicare spending and a $1.5 trillion reduction in Medicaid spending over the next decade. It is impossible to predict what portion, if any, of these proposed federal health care spending reductions will be included in a Congressionally approved budget. Please see *Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations, Sources of Revenue-Medicare*, for additional disclosure.

Beginning in 2020 and continuing through 2025, the Medicaid disproportionate share hospital ("DSH") allotment to the states from federal funds will be reduced. Such reductions have been delayed several times, most recently under the Further Consolidated Appropriations Act, 2020, which further delays the DSH through May 23, 2020. Commencing in 2020 and continuing through 2025, a state's Medicaid DSH allotment from federal funds will be reduced. Initially, DSH payments will be reduced by $4 billion in 2020, and then $8 billion per year between 2021 and 2025. Reductions are imposed on states based on percentage of uninsured individuals, Medicaid utilization, and uncompensated care.

### *We are subject to uncertainties regarding health care reform.*

On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act (the "Legislation"). Two primary goals of the Legislation are to provide for increased access to coverage for healthcare and to reduce healthcare-related expenses.

Although it was expected that as a result of the Legislation there would be a reduction in uninsured patients, which would reduce our expense from uncollectible accounts receivable, the Legislation makes a number of other changes to Medicare and Medicaid which we believe may have an adverse impact on us. It has been projected that the Legislation will result in a net reduction in Medicare and Medicaid payments to hospitals totaling $155 billion over 10 years. The Legislation revises reimbursement under the Medicare and Medicaid programs to emphasize the efficient delivery of high quality care and contains a number of incentives and penalties under these programs to achieve these goals. The Legislation implements a value-based purchasing program, which will reward the delivery of efficient care. Conversely, certain facilities will receive reduced reimbursement for failing to meet quality parameters; such hospitals will include those with excessive readmission or hospital-acquired condition rates. It remains unclear what portions of that legislation may remain, or what any replacement or alternative programs may be created by future legislation.

A 2012 U.S. Supreme Court ruling limited the federal government's ability to expand health insurance coverage by holding unconstitutional sections of the Legislation that sought to withdraw federal funding for state noncompliance with certain Medicaid coverage requirements. Pursuant to that decision, the federal government may not penalize states that choose not to participate in the Medicaid expansion program by reducing their existing Medicaid funding. Therefore, states can choose to accept or not to participate without risking the loss of federal Medicaid funding. As a result, many states, including Texas, have not expanded their Medicaid programs without the threat of loss of federal funding. CMS has granted, and is expected to grant additional, section 1115

13

ADAMHS000029613

demonstration waivers providing for work and community engagement requirements for certain Medicaid eligible individuals. CMS has also released guidance to states interested in receiving their Medicaid funding through a block grant mechanism. It is anticipated this will lead to reductions in coverage, and likely increases in uncompensated care, in states where these demonstration waivers are granted.

The various provisions in the Legislation that directly or indirectly affect Medicare and Medicaid reimbursement are scheduled to take effect over a number of years. The impact of the Legislation on healthcare providers will be subject to implementing regulations, interpretive guidance and possible future legislation or legal challenges. Certain Legislation provisions, such as that creating the Medicare Shared Savings Program creates uncertainty in how healthcare may be reimbursed by federal programs in the future. Thus, we cannot predict the impact of the Legislation on our future reimbursement at this time and we can provide no assurance that the Legislation will not have a material adverse effect on our future results of operations.

The Legislation also contained provisions aimed at reducing fraud and abuse in healthcare. The Legislation amends several existing laws, including the federal Anti-Kickback Statute and the False Claims Act, making it easier for government agencies and private plaintiffs to prevail in lawsuits brought against healthcare providers. While Congress had previously revised the intent requirement of the Anti-Kickback Statute to provide that a person is not required to "have actual knowledge or specific intent to commit a violation of" the Anti-Kickback Statute in order to be found in violation of such law, the Legislation also provides that any claims for items or services that violate the Anti-Kickback Statute are also considered false claims for purposes of the federal civil False Claims Act. The Legislation provides that a healthcare provider that retains an overpayment in excess of 60 days is subject to the federal civil False Claims Act, although certain final regulations implementing this statutory requirement remain pending. The Legislation also expands the Recovery Audit Contractor program to Medicaid. These amendments also make it easier for severe fines and penalties to be imposed on healthcare providers that violate applicable laws and regulations.

We have partnered with local physicians in the ownership of certain of our facilities. These investments have been permitted under an exception to the physician self-referral law. The Legislation permits existing physician investments in a hospital to continue under a "grandfather" clause if the arrangement satisfies certain requirements and restrictions, but physicians are prohibited from increasing the aggregate percentage of their ownership in the hospital. The Legislation also imposes certain compliance and disclosure requirements upon existing physician-owned hospitals and restricts the ability of physician-owned hospitals to expand the capacity of their facilities. As discussed below, should the Legislation be repealed in its entirety, this aspect of the Legislation would also be repealed restoring physician ownership of hospitals and expansion right to its position and practice as it existed prior to the Legislation.

The impact of the Legislation on each of our hospitals may vary. Because Legislation provisions are effective at various times over the next several years, we anticipate that many of the provisions in the Legislation may be subject to further revision. Initiatives to repeal the Legislation, in whole or in part, to delay elements of implementation or funding, and to offer amendments or supplements to modify its provisions have been persistent. The ultimate outcomes of legislative attempts to repeal or amend the Legislation and legal challenges to the Legislation are unknown. Legislation has already been enacted that has eliminated the penalty for failing to maintain health coverage that was part of the original Legislation. In addition, Congress has considered legislation that would, if enacted, in material part: (i) eliminate the large employer mandate to obtain or provide health insurance coverage, respectively; (ii) permit insurers to impose a surcharge up to 30 percent on individuals who go uninsured for more than two months and then purchase coverage; (iii) provide tax credits towards the purchase of health insurance, with a phase-out of tax credits accordingly to income level; (iv) expand health savings accounts; (v) impose a per capita cap on federal funding of state Medicaid programs, or, if elected by a state, transition federal funding to block grants, and; (vi) permit states to seek a waiver of certain federal requirements that would allow such state to define essential health benefits differently from federal standards and that would allow certain commercial health plans to take health status, including pre-existing conditions, into account in setting premiums.

In addition to legislative changes, the Legislation can be significantly impacted by executive branch actions. In relevant part, President Trump has already taken executive actions: (i) requiring all federal agencies with authorities and responsibilities under the Legislation to "exercise all authority and discretion available to them to waiver, defer, grant exemptions from, or delay" parts of the Legislation that place "unwarranted economic and regulatory burdens" on states, individuals or health care providers; (ii) the issuance of a final rule in June, 2018 by the Department of Labor to enable the formation of association health plans that would be exempt from certain Legislation requirements such as the provision of essential health benefits; (iii) the issuance of a final rule in August, 2018 by the Department of Labor, Treasury, and Health and Human Services to expand the availability of short-term, limited duration health insurance, (iv) eliminating cost-sharing reduction payments to insurers that would otherwise offset deductibles and other out-of-pocket expenses for health plan enrollees at or below 250 percent of the federal poverty level; (v) relaxing requirements for state innovation waivers that could reduce enrollment in the individual and small group markets and lead to additional enrollment in short-term, limited duration insurance and association health plans; and (vi) the issuance of a final rule by the Department of Labor, Treasury, and Health and Human Services that would incentivize the use of health reimbursement accounts by employers to permit employees to purchase health insurance in the individual market. The uncertainty resulting from these Executive Branch policies has led to reduced Exchange

14

CONFIDENTIAL

DEF-MDL-14396.00070

enrollment in 2018, 2019 and 2020 is expected to further worsen the individual and small group market risk pools in future years. It is also anticipated that these and future policies may create additional cost and reimbursement pressures on hospitals.

It remains unclear what portions of the Legislation may remain, or whether any replacement or alternative programs may be created by any future legislation. Any such future repeal or replacement may have significant impact on the reimbursement for healthcare services generally, and may create reimbursement for services competing with the services offered by our hospitals. Accordingly, there can be no assurance that the adoption of any future federal or state healthcare reform legislation will not have a negative financial impact on our hospitals, including their ability to compete with alternative healthcare services funded by such potential legislation, or for our hospitals to receive payment for services.

While attempts to repeal the entirety of the Legislation have not been successful to date, a key provision of the Legislation was repealed as part of the Tax Cuts and Jobs Act and, on December 14, 2018, a federal U.S. District Court judge in Texas ruled the entire Legislation is unconstitutional. The court concluded that the individual mandate is no longer permissible under Congress's taxing power as a result of the Tax Cut and Jobs Act of 2017 reducing the individual mandate's tax to $0 (i.e., it no longer produces revenue, which is an essential feature of a tax), rendering the Legislation unconstitutional. The court also held that because the individual mandate is "essential" to the Legislation and is inseverable from the rest of the law, the entire Legislation is unconstitutional. Because the court issued a declaratory judgment and did not enjoin the law, the Legislation remains in place pending its appeal. The District Court for the Northern District of Texas ruling was appealed to the U.S. Court of Appeals for the Fifth Circuit. On December 18, 2019, the 5th Circuit Court of Appeals' three-judge panel voted 2-1 to strike down the Legislation individual mandate as unconstitutional. The 5th Circuit Court also sent the case back to the Texas district court to determine which Legislation provisions should be stricken with the mandate or whether the entire law is unconstitutional without the individual mandate. It is likely this matter will ultimately be appealed to the United States Supreme Court. These rulings have caused greater uncertainty regarding the future status of the Legislation. If all or any parts of the Legislation are found to be unconstitutional, it could have a material adverse effect on hospitals. If rates paid or the scope of services covered by government payers are reduced, there could be a material adverse effect on our business, financial position and results of operations.

*We are required to treat patients with emergency medical conditions regardless of ability to pay.*

In accordance with our internal policies and procedures, as well as the Emergency Medical Treatment and Active Labor Act, or EMTALA, we provide a medical screening examination to any individual who comes to one of our hospitals while in active labor and/or seeking medical treatment (whether or not such individual is eligible for insurance benefits and regardless of ability to pay) to determine if such individual has an emergency medical condition. If it is determined that such person has an emergency medical condition, we provide such further medical examination and treatment as is required to stabilize the patient's medical condition, within the facility's capability, or arrange for transfer of such individual to another medical facility in accordance with applicable law and the treating hospital's written procedures. Our obligations under EMTALA may increase substantially going forward; CMS has sought stakeholder comments concerning the potential applicability of EMTALA to hospital inpatients and the responsibilities of hospitals with specialized capabilities, respectively, but has yet to issue further guidance in response to that request. If the number of indigent and charity care patients with emergency medical conditions we treat increases significantly, or if regulations expanding our obligations to inpatients under EMTALA is proposed and adopted, our results of operations will be harmed.

*If we are not able to provide high quality medical care at a reasonable price, patients may choose to receive their health care from our competitors.*

In recent years, the number of quality measures that hospitals are required to report publicly has increased. CMS publishes performance data related to quality measures and data on patient satisfaction surveys that hospitals submit in connection with the Medicare program. Federal law provides for the future expansion of the number of quality measures that must be reported. Additionally, the Legislation requires all hospitals to annually establish, update and make public a list of their standard charges for products and services. If any of our hospitals achieve poor results on the quality measures or patient satisfaction surveys (or results that are lower than our competitors) or if our standard charges are higher than our competitors, our patient volume could decline because patients may elect to use competing hospitals or other health care providers that have better metrics and pricing. This circumstance could harm our business and results of operations.

*An increase in uninsured and underinsured patients in our acute care facilities or the deterioration in the collectability of the accounts of such patients could harm our results of operations.*

Collection of receivables from third-party payers and patients is our primary source of cash and is critical to our operating performance. Our primary collection risks relate to uninsured patients and the portion of the bill that is the patient's responsibility, which primarily includes co-payments and deductibles. However, we also have substantial receivables due to us from certain state-based funding programs. We estimate our provisions for doubtful accounts based on general factors such as payer mix, the agings of the receivables, historical collection experience and assessment of probability of future collections. We routinely review accounts

15

ADAMHS000029615

receivable balances in conjunction with these factors and other economic conditions that might ultimately affect the collectability of the patient accounts and make adjustments to our allowances as warranted. Significant changes in business office operations, payer mix, economic conditions or trends in federal and state governmental health coverage could affect our collection of accounts receivable, cash flow and results of operations. If we experience unexpected increases in the growth of uninsured and underinsured patients or in bad debt expenses, our results of operations will be harmed.

*Our hospitals face competition for patients from other hospitals and health care providers.*

The healthcare industry is highly competitive, and competition among hospitals, and other healthcare providers for patients and physicians has intensified in recent years. In all of the geographical areas in which we operate, there are other hospitals that provide services comparable to those offered by our hospitals. Some of our competitors include hospitals that are owned by tax-supported governmental agencies or by nonprofit corporations and may be supported by endowments and charitable contributions and exempt from property, sales and income taxes. Such exemptions and support are not available to us.

In some markets, certain of our competitors may have greater financial resources, be better equipped and offer a broader range of services than we offer. The number of inpatient facilities, as well as outpatient surgical and diagnostic centers, many of which are fully or partially owned by physicians, in the geographic areas in which we operate has increased significantly. As a result, most of our hospitals operate in an increasingly competitive environment.

We also operate health care facilities in the United Kingdom where the National Health Service (the "NHS") is the principal provider of healthcare services. In addition to the NHS, we face competition in the United Kingdom from independent sector providers and other publicly funded entities for patients.

If our competitors are better able to attract patients, recruit physicians and other healthcare professionals, expand services or obtain favorable managed care contracts at their facilities, we may experience a decline in patient volume and our business may be harmed.

*Our performance depends on our ability to recruit and retain quality physicians.*

Typically, physicians are responsible for making hospital admissions decisions and for directing the course of patient treatment. As a result, the success and competitive advantage of our hospitals depends, in part, on the number and quality of the physicians on the medical staffs of our hospitals, the admitting practices of those physicians and our maintenance of good relations with those physicians. Physicians generally are not employees of our hospitals, and, in a number of our markets, physicians have admitting privileges at other hospitals in addition to our hospitals. They may terminate their affiliation with us at any time. If we are unable to provide high ethical and professional standards, adequate support personnel and technologically advanced equipment and facilities that meet the needs of those physicians, they may be discouraged from referring patients to our facilities and our results of operations may decline.

It may become difficult for us to attract and retain an adequate number of physicians to practice in certain of the non-urban communities in which our hospitals are located. Our failure to recruit physicians to these communities or the loss of physicians in these communities could make it more difficult to attract patients to our hospitals and thereby may have a material adverse effect on our business, financial condition and results of operations.

Generally, the top ten attending physicians within each of our facilities represent a large share of our inpatient revenues and admissions. The loss of one or more of these physicians, even if temporary, could cause a material reduction in our revenues, which could take significant time to replace given the difficulty and cost associated with recruiting and retaining physicians.

*If we do not continually enhance our hospitals with the most recent technological advances in diagnostic and surgical equipment, our ability to maintain and expand our markets will be adversely affected.*

The technology used in medical equipment and related devices is constantly evolving and, as a result, manufacturers and distributors continue to offer new and upgraded products to health care providers. To compete effectively, we must continually assess our equipment needs and upgrade when significant technological advances occur. If our facilities do not stay current with technological advances in the health care industry, patients may seek treatment from other providers and/or physicians may refer their patients to alternate sources, which could adversely affect our results of operations and harm our business.

16

ADAMHS000029616

*If we fail to continue to meet the promoting interoperability criteria related to electronic health record systems ("EHR"), our operations could be harmed.*

Pursuant to HITECH regulations, hospitals that did not qualify as a meaningful user of EHR by 2015 were subject to a reduced market basket update to the inpatient prospective payment system ("IPPS") standardized amount in 2015 and each subsequent fiscal year. In the 2019 IPPS final rule, CMS re-named the meaningful use program to "promoting interoperability". We believe that all of our acute care hospitals have met the applicable promoting interoperability criteria and therefore are not subject to a reduced market basked update to the IPPS standardized amount. However, under the HITECH Act, hospitals must continue to meet the applicable criteria in each fiscal year or they will be subject to a market basket update reduction in a subsequent fiscal year. Failure of our acute care hospitals to continue to meet the applicable meaningful use criteria would have an adverse effect on our future net revenues and results of operations.

*Our performance depends on our ability to attract and retain qualified nurses and medical support staff and we face competition for staffing that may increase our labor costs and harm our results of operations.*

We depend on the efforts, abilities, and experience of our medical support personnel, including our nurses, pharmacists and lab technicians and other healthcare professionals. We compete with other healthcare providers in recruiting and retaining qualified hospital management, nurses and other medical personnel.

The nationwide shortage of nurses and other medical support personnel has been a significant operating issue facing us and other healthcare providers. This shortage may require us to enhance wages and benefits to recruit and retain nurses and other medical support personnel or require us to hire expensive temporary personnel. In addition, in some markets like California, there are requirements to maintain specified nurse-staffing levels. To the extent we cannot meet those levels, we may be required to limit the healthcare services provided in these markets, which would have a corresponding adverse effect on our net operating revenues.

We cannot predict the degree to which we will be affected by the future availability or cost of attracting and retaining talented medical support staff. If our general labor and related expenses increase, we may not be able to raise our rates correspondingly. Our failure to either recruit and retain qualified hospital management, nurses and other medical support personnel or control our labor costs could harm our results of operations.

Increased labor union activity is another factor that could adversely affect our labor costs. Union organizing activities and certain potential changes in federal labor laws and regulations could increase the likelihood of employee unionization in the future, to the extent a greater portion of our employee base unionized, it is possible our labor costs could increase materially.

*If we fail to comply with extensive laws and government regulations, we could suffer civil or criminal penalties or be required to make significant changes to our operations that could reduce our revenue and profitability.*

The healthcare industry is required to comply with extensive and complex laws and regulations at the federal, state and local government levels relating to, among other things: hospital billing practices and prices for services; relationships with physicians and other referral sources; adequacy of medical care and quality of medical equipment and services; ownership of facilities; qualifications of medical and support personnel; confidentiality, maintenance, privacy and security issues associated with health-related information and patient medical records; the screening, stabilization and transfer of patients who have emergency medical conditions; certification, licensure and accreditation of our facilities; operating policies and procedures, and; construction or expansion of facilities and services.

Among these laws are the federal False Claims Act, the Health Insurance Portability and Accountability Act of 1996, ("HIPAA"), the federal anti-kickback statute and the provision of the Social Security Act commonly known as the "Stark Law." These laws, and particularly the anti-kickback statute and the Stark Law, impact the relationships that we may have with physicians and other referral sources. We have a variety of financial relationships with physicians who refer patients to our facilities, including employment contracts, leases and professional service agreements. We also provide financial incentives, including minimum revenue guarantees, to recruit physicians into communities served by our hospitals. The Office of the Inspector General of the Department of Health and Human Services, or OIG, has enacted safe harbor regulations that outline practices that are deemed protected from prosecution under the anti-kickback statute. A number of our current arrangements, including financial relationships with physicians and other referral sources, may not qualify for safe harbor protection under the anti-kickback statute. Failure to meet a safe harbor does not mean that the arrangement necessarily violates the anti-kickback statute, but may subject the arrangement to greater scrutiny. We cannot assure that practices that are outside of a safe harbor will not be found to violate the anti-kickback statute. CMS published a Medicare self-referral disclosure protocol, which is intended to allow providers to self-disclose actual or potential violations of the Stark law. Because there are only a few judicial decisions interpreting the Stark law, there can be no assurance that our hospitals will not be found in violation of the Stark Law or that self-disclosure of a potential violation would result in reduced penalties.

CONFIDENTIAL

DEF-MDL-14396.00073

ADAMHS000029617

Federal regulations issued under HIPAA contain provisions that require us to implement and, in the future, may require us to implement additional costly electronic media security systems and to adopt new business practices designed to protect the privacy and security of each of our patient's health and related financial information. Such privacy and security regulations impose extensive administrative, physical and technical requirements on us, restrict our use and disclosure of certain patient health and financial information, provide patients with rights with respect to their health information and require us to enter into contracts extending many of the privacy and security regulatory requirements to third parties that perform duties on our behalf. Additionally, recent changes to HIPAA regulations may result in greater compliance requirements, including obligations to report breaches of unsecured patient data, as well as create new liabilities for the actions of parties acting as business associates on our behalf.

These laws and regulations are extremely complex, and, in many cases, we do not have the benefit of regulatory or judicial interpretation. In the future, it is possible that different interpretations or enforcement of these laws and regulations could subject our current or past practices to allegations of impropriety or illegality or could require us to make changes in our facilities, equipment, personnel, services, capital expenditure programs and operating expenses. A determination that we have violated one or more of these laws (see *Item 3—Legal Proceedings*), or the public announcement that we are being investigated for possible violations of one or more of these laws, could have a material adverse effect on our business, financial condition or results of operations and our business reputation could suffer significantly. In addition, we cannot predict whether other legislation or regulations at the federal or state level will be adopted, what form such legislation or regulations may take or what their impact on us may be. See *Item 1 Business—Self-Referral and Anti-Kickback Legislation*.

If we are deemed to have failed to comply with the anti-kickback statute, the Stark Law or other applicable laws and regulations, we could be subjected to liabilities, including criminal penalties, civil penalties (including the loss of our licenses to operate one or more facilities), and exclusion of one or more facilities from participation in the Medicare, Medicaid and other federal and state healthcare programs. The imposition of such penalties could have a material adverse effect on our business, financial condition or results of operations.

We also operate health care facilities in the United Kingdom and have operations and commercial relationships with companies in other foreign jurisdictions and, as a result, are subject to certain U.S. and foreign laws applicable to businesses generally, including anti-corruption laws. The Foreign Corrupt Practices Act regulates U.S. companies in their dealings with foreign officials, prohibiting bribes and similar practices, and requires that they maintain records that fairly and accurately reflect transactions and appropriate internal accounting controls. In addition, the United Kingdom Bribery Act has wide jurisdiction over certain activities that affect the United Kingdom.

Our operations in the United Kingdom are also subject to a high level of regulation relating to registration and licensing requirements employee regulation, clinical standards, environmental rules as well as other areas. We are also subject to a highly regulated business environment, and failure to comply with the various laws and regulations, applicable to us could lead to substantial penalties, and other adverse effects on our business.

### *We are subject to occupational health, safety and other similar regulations and failure to comply with such regulations could harm our business and results of operations.*

We are subject to a wide variety of federal, state and local occupational health and safety laws and regulations. Regulatory requirements affecting us include, but are not limited to, those covering: (i) air and water quality control; (ii) occupational health and safety (e.g., standards regarding blood-borne pathogens and ergonomics, etc.); (iii) waste management; (iv) the handling of asbestos, polychlorinated biphenyls and radioactive substances; and (v) other hazardous materials. If we fail to comply with those standards, we may be subject to sanctions and penalties that could harm our business and results of operations.

### *We may be subject to liabilities from claims brought against our facilities.*

We are subject to medical malpractice lawsuits, product liability lawsuits, class action lawsuits and other legal actions in the ordinary course of business. Some of these actions may involve large claims, as well as significant defense costs. We cannot predict the outcome of these lawsuits or the effect that findings in such lawsuits may have on us. In an effort to resolve one or more of these matters, we may choose to negotiate a settlement. Amounts we pay to settle any of these matters may be material. All professional and general liability insurance we purchase is subject to policy limitations. We believe that, based on our past experience and actuarial estimates, our insurance coverage is adequate considering the claims arising from the operations of our hospitals. While we continuously monitor our coverage, our ultimate liability for professional and general liability claims could change materially from our current estimates. If such policy limitations should be partially or fully exhausted in the future, or payments of claims exceed our estimates or are not covered by our insurance, it could have a material adverse effect on our operations.

18

CONFIDENTIAL

ADAMHS000029618

DEF-MDL-14396.00074

*We may be subject to governmental investigations, regulatory actions and whistleblower lawsuits.*

The federal False Claims Act permits private parties to bring qui tam, or whistleblower, lawsuits against companies. Whistleblower provisions allow private individuals to bring actions on behalf of the government alleging that the defendant has defrauded the federal government. These private parties are entitled to share in any amounts recovered by the government, and, as a result, the number of whistleblower lawsuits that have been filed against providers has increased significantly in recent years. Because qui tam lawsuits are filed under seal, we could be named in one or more such lawsuits of which we are not aware. Please see *Item 3. Legal Proceedings* for disclosure of current related matters.

*The failure of certain employers, or the closure of certain facilities, could have a disproportionate impact on our hospitals.*

The economics in the communities in which our hospitals operate are often dependent on a small number of large employers. Those employers often provide income and health insurance for a disproportionately large number of community residents who may depend on our hospitals and other health care facilities for their care. The failure of one or more large employer or the closure or substantial reduction in the number of individuals employed at facilities located in or near the communities where our hospitals operate, could cause affected employees to move elsewhere to seek employment or lose insurance coverage that was otherwise available to them. The occurrence of these events could adversely affect our revenue and results of operations, thereby harming our business.

*If any of our existing health care facilities lose their accreditation or any of our new facilities fail to receive accreditation, such facilities could become ineligible to receive reimbursement under Medicare or Medicaid.*

The construction and operation of healthcare facilities are subject to extensive federal, state and local regulation relating to, among other things, the adequacy of medical care, equipment, personnel, operating policies and procedures, fire prevention, rate-setting and compliance with building codes and environmental protection. Additionally, such facilities are subject to periodic inspection by government authorities to assure their continued compliance with these various standards.

All of our hospitals are deemed certified, meaning that they are accredited, properly licensed under the relevant state laws and regulations and certified under the Medicare program. The effect of maintaining certified facilities is to allow such facilities to participate in the Medicare and Medicaid programs. We believe that all of our healthcare facilities are in material compliance with applicable federal, state, local and other relevant regulations and standards. However, should any of our healthcare facilities lose their deemed certified status and thereby lose certification under the Medicare or Medicaid programs, such facilities would be unable to receive reimbursement from either of those programs and our business could be materially adversely effected.

*Our growth strategy depends, in part, on acquisitions, and we may not be able to continue to make acquisitions that meet our target criteria. We may also have difficulties acquiring hospitals from not-for-profit entities due to regulatory scrutiny.*

Acquisitions in select markets are a key element of our growth strategy. We face competition for acquisition candidates primarily from other for-profit healthcare companies, as well as from not-for-profit entities. Some of our competitors have greater resources than we do. Also, suitable acquisitions may not be accomplished due to unfavorable terms.

In addition, many states have enacted, or are considering enacting, laws that affect the conversion or sale of not-for-profit hospitals to for-profit entities. These laws generally require prior approval from the state attorney general, advance notification and community involvement. In addition, attorneys general in states without specific conversion legislation may exercise discretionary authority over such transactions. Although the level of government involvement varies from state to state, the trend is to provide for increased governmental review and, in some cases, approval of a transaction in which a not-for-profit entity sells a healthcare facility to a for-profit entity. The adoption of new or expanded conversion legislation, increased review of not-for-profit hospital conversions or our inability to effectively compete against other potential purchasers could make it more difficult for us to acquire additional hospitals, increase our acquisition costs or make it difficult for us to acquire hospitals that meet our target acquisition criteria, any of which could adversely affect our growth strategy and results of operations.

Further, an acquisition could result in a dilutive effect on our results of operations, depending on various factors, including the amount paid for the acquisition, the acquired properties results of operations, allocation of the purchase price, effects of subsequent legislation and limits on rate increases.

*We may fail to improve or integrate the operations of the assets we acquire, which could harm our results of operations and adversely affect our growth strategy.*

We may be unable to timely and effectively integrate the assets or entities that we acquire with our ongoing operations. We may experience delays in implementing operating procedures and systems in newly acquired operations. Integrating an acquisition could be

19

ADAMHS000029619

expensive and time consuming and could disrupt our ongoing business, negatively affect cash flow and distract management and other key personnel. In addition, acquisition activity requires transitions from, and the integration of, operations and, usually, information systems that are used by acquired operations. In addition, some of the acquisitions we have made had significantly lower operating margins than the assets we operated prior to the time of our acquisition. If we fail to improve the operating margins of the operations we acquire, operate such assets profitably or effectively integrate the acquired operations, our results of operations could be harmed.

*The trend toward value-based purchasing may negatively impact our revenues.*

We believe that value-based purchasing initiatives of both governmental and private payers tying financial incentives to quality and efficiency of care will increasingly affect the results of operations of our hospitals and other healthcare facilities and may negatively impact our revenues if we are unable to meet expected quality standards. The Legislation contains a number of provisions intended to promote value-based purchasing in federal healthcare programs. Medicare now requires providers to report certain quality measures in order to receive full reimbursement increases for inpatient and outpatient procedures that were previously awarded automatically. In addition, hospitals that meet or exceed certain quality performance standards will receive increased reimbursement payments, and hospitals that have "excess readmissions" for specified conditions will receive reduced reimbursement. Furthermore, Medicare no longer pays hospitals additional amounts for the treatment of certain hospital-acquired conditions unless the conditions were present at admission. Beginning in federal fiscal year 2015, hospitals that rank in the worst 25% of all hospitals nationally for hospital acquired conditions in the previous year were subject to reduced Medicare reimbursements. The Legislation also prohibits the use of federal funds under the Medicaid program to reimburse providers for treating certain provider-preventable conditions.

There is a trend among private payers toward value-based purchasing of healthcare services, as well. Many large commercial payers require hospitals to report quality data, and several of these payers will not reimburse hospitals for certain preventable adverse events. We expect value-based purchasing programs, including programs that condition reimbursement on patient outcome measures, to become more common and to involve a higher percentage of reimbursement amounts. We are unable at this time to predict how this trend will affect our results of operations, but it could negatively impact our revenues if we are unable to meet quality standards established by both governmental and private payers.

*If we acquire assets or entities with unknown or contingent liabilities, we could become liable for material obligations.*

Assets or entities that we acquire may have unknown or contingent liabilities, including, but not limited to, liabilities for failure to comply with applicable laws and regulations. Although we typically attempt to exclude significant liabilities from our acquisition transactions and seek indemnification from the sellers for these matters, we could experience difficulty enforcing those obligations or we could incur material liabilities for the past activities of assets or entities we acquire. Such liabilities and related legal or other costs and/or resulting damage to an acquired asset's or entities' reputation could harm our business.

*We are subject to pending legal actions, purported stockholder class actions, governmental investigations and regulatory actions.*

We, our subsidiaries, PSI, and its subsidiaries, are subject to pending legal actions, governmental investigations and regulatory actions (see *Item 3-Legal Proceedings*).

Defending ourselves against the allegations in the lawsuits and governmental investigations, or similar matters and any related publicity, could potentially entail significant costs and could require significant attention from our management and our reputation could suffer significantly. We are unable to predict the outcome of these matters or to reasonably estimate the amount or range of any such loss; however, these lawsuits and the related publicity and news articles that have been published concerning these matters could have a material adverse effect on our business, financial condition, results of operations and/or cash flows which in turn could cause a decline in our stock price.

We are and may become subject to other loss contingencies, both known and unknown, which may relate to past, present and future facts, events, circumstances and occurrences. Should an unfavorable outcome occur in some or all of our legal proceedings or other loss contingencies, or if successful claims and other actions are brought against us in the future, there could be a material adverse impact on our financial position, results of operations and liquidity.

In particular, government investigations, as well as qui tam and stockholder lawsuits, may lead to material fines, penalties, damages payments or other sanctions, including exclusion from government healthcare programs. Settlements of lawsuits involving Medicare and Medicaid issues routinely require both monetary payments and corporate integrity agreements, each of which could have a material adverse effect on our business, financial condition, results of operations and/or cash flows.

20

*State efforts to regulate the construction or expansion of health care facilities could impair our ability to expand.*

Many of the states in which we operate hospitals have enacted Certificates of Need, or ("CON"), laws as a condition prior to hospital capital expenditures, construction, expansion, modernization or initiation of major new services. Our failure to obtain necessary state approval could result in our inability to complete a particular hospital acquisition, expansion or replacement, make a facility ineligible to receive reimbursement under the Medicare or Medicaid programs, result in the revocation of a facility's license or impose civil or criminal penalties on us, any of which could harm our business.

In addition, significant CON reforms have been proposed in a number of states that would increase the capital spending thresholds and provide exemptions of various services from review requirements. In the past, we have not experienced any material adverse effects from those requirements, but we cannot predict the impact of these changes upon our operations.

*Controls designed to reduce inpatient services and increasing rates of "denials" may reduce our revenues.*

Controls imposed by third-party payers designed to reduce admissions and lengths of stay, commonly referred to as "utilization review," have affected and are expected to continue to affect our facilities. Utilization review entails the review of the admission and course of treatment of a patient by managed care plans. Inpatient utilization, average lengths of stay and occupancy rates continue to be negatively affected by payer-required preadmission authorization and utilization review and by payer pressure to maximize outpatient and alternative healthcare delivery services for less acutely ill patients. Efforts to impose more stringent cost controls are expected to continue. In addition, we have been experiencing increasing rates of denied claims ("denials") from managed care payers which have reduced our net revenues and increased our operating costs as we devote additional resources to enhanced documentation and collection efforts. Although we cannot predict the effect these factors will have on our operations, significant limits on the scope of services reimbursed, and reimbursements withheld due to denials, could have a material adverse effect on our business, financial position and results of operations.

*Our revenues and volume trends may be adversely affected by certain factors over which we have no control.*

Our revenues and volume trends are dependent on many factors, including physicians' clinical decisions and availability, payer programs shifting to a more outpatient-based environment, whether or not certain services are offered, seasonal and severe weather conditions, including the effects of extreme low temperatures, hurricanes and tornados, earthquakes, climate change, current local economic and demographic changes. In addition, technological developments and pharmaceutical improvements may reduce the demand for healthcare services or the profitability of the services we offer.

*A pandemic, epidemic or outbreak of a contagious disease in the markets in which we operate or that otherwise impacts our facilities could adversely impact our business.*

If a pandemic or other public health crisis were to affect our markets, such as a major breakout of the Coronavirus in the United States or the United Kingdom, our business could be adversely affected. Such a crisis could diminish the public trust in healthcare facilities, especially hospitals that fail to accurately or timely diagnose, or that are treating (or have treated) patients affected by contagious diseases. If any of our facilities were involved in treating patients for such a contagious disease, other patients might cancel elective procedures or fail to seek needed care at our facilities. Further, a pandemic might adversely impact our business by causing a temporary shutdown or diversion of patients, by disrupting or delaying production and delivery of materials and products in the supply chain or by causing staffing shortages in our facilities. Although we have disaster plans in place and operate pursuant to infectious disease protocols, the potential impact of a pandemic, epidemic or outbreak of a contagious disease with respect to our markets or our facilities is difficult to predict and could adversely impact our business.

*A worsening of economic and employment conditions in the United States could materially affect our business and future results of operations.*

Our patient volumes, revenues and financial results depend significantly on the universe of patients with health insurance, which to a large extent is dependent on the employment status of individuals in our markets. Worsening of economic conditions may result in a higher unemployment rate which may increase the number of individuals without health insurance. As a result, our facilities may experience a decrease in patient volumes, particularly in less intense, more elective service lines, or an increase in services provided to uninsured patients. These factors could have a material unfavorable impact on our future patient volumes, revenues and operating results.

In addition, as of December 31, 2019, we had approximately $3.9 billion of goodwill recorded on our consolidated balance sheet. Should the revenues and financial results of our acute care and/or behavioral health care facilities be materially, unfavorably impacted due to, among other things, a worsening of the economic and employment conditions in the United States that could negatively impact our patient volumes and reimbursement rates, a continued rise in the unemployment rate and continued increases in

21

the number of uninsured patients treated at our facilities, we may incur future charges to recognize impairment in the carrying value of our goodwill and other intangible assets, which could have a material adverse effect on our financial results.

*Legal uncertainty or a worsening of the economic conditions in the United Kingdom could materially affect our business and future results of operations.*

On June 23, 2016, the United Kingdom affirmatively voted in a non-binding referendum in favor of the exit of the United Kingdom from the European Union (the "Brexit") and it was approved by vote of the British legislature. On March 29, 2017, the United Kingdom triggered Article 50 of the Lisbon Treaty, formally starting negotiations regarding its exit from the European Union. On January 31, 2020 the United Kingdom formally exited the European Union. The United Kingdom and European Union will now enter into a transition period in which the terms of the future relationship must be negotiated. The outcome of these negotiations is uncertain, and we do not know to what extent Brexit will ultimately impact the business and regulatory environment in the United Kingdom, the European Union, or other countries. The United Kingdom will continue to follow European Union rules through at least December 31, 2020 (the "Transition Period"). The Transition Period may be extended through December 31, 2022.

In the absence of a future trade deal, following the expiration of the Transition Period, the United Kingdom's trade with the European Union and the rest of the world would be subject to tariffs and duties set by the World Trade Organization. These changes to the trading relationship between the United Kingdom and the European Union would likely result in increased cost of goods imported into the United Kingdom. Additional currency volatility could result in a weaker British pound, which may decrease the profitability of our operations in the United Kingdom. A weaker British pound versus the U.S. Dollar also causes local currency results of our United Kingdom operations to be translated into fewer U.S. Dollars during a reporting period.

Brexit could lead to legal and regulatory uncertainty as the United Kingdom determines which European Union laws to replace or replicate. Brexit could also lead to increased legal and regulatory complexity as national laws and regulations in the United Kingdom start to diverge from European Union laws and regulations. The exit of the United Kingdom from the European Union could also create future economic uncertainty, both in the United Kingdom and globally and could cause disruptions to and create uncertainty surrounding our business. Any of these effects of Brexit, and others we cannot anticipate, could harm our business, financial condition or results of operations.

*Fluctuations in our operating results, quarter to quarter earnings and other factors may result in decreases in the price of our common stock.*

The stock markets have experienced volatility that has often been unrelated to operating performance. These broad market fluctuations may adversely affect the trading price of our common stock and, as a result, there may be significant volatility in the market price of our common stock. If we are unable to operate our hospitals as profitably as we have in the past or as our stockholders expect us to in the future, the market price of our common stock will likely decline as stockholders could sell shares of our common stock when it becomes apparent that the market expectations may not be realized.

In addition to our operating results, many economic and seasonal factors outside of our control could have an adverse effect on the price of our common stock and increase fluctuations in our quarterly earnings. These factors include certain of the risks discussed herein, demographic changes, operating results of other hospital companies, changes in our financial estimates or recommendations of securities analysts, speculation in the press or investment community, the possible effects of war, terrorist and other hostilities, adverse weather conditions (whether caused by climate change or otherwise), the level of seasonal illnesses, managed care contract negotiations and terminations, changes in general conditions in the economy or the financial markets, or other developments affecting the health care industry.

*Our financial results may be adversely affected by fluctuations in foreign currency exchange rates.*

We are exposed to currency exchange risk with respect to the U.S. Dollar in relation to the Pound sterling, because a portion of our revenue and expenses are denominated in Pounds. We monitor changes in our exposure to exchange rate risk. While we may elect to enter into hedging arrangements to protect our business against certain currency fluctuations, these hedging arrangements do not provide comprehensive protection, and our results of operations could be adversely affected by foreign exchange fluctuations.

*We are subject to significant corporate regulation as a public company and failure to comply with all applicable regulations could subject us to liability or negatively affect our stock price.*

As a publicly traded company, we are subject to a significant body of regulation, including the Sarbanes-Oxley Act of 2002. While we have developed and instituted a corporate compliance program based on what we believe are the current best practices in corporate governance and continue to update this program in response to newly implemented or changing regulatory requirements, we

22

ADAMHS000029622

cannot provide assurance that we are or will be in compliance with all potentially applicable corporate regulations. For example, we cannot provide assurance that, in the future, our management will not find a material weakness in connection with its annual review of our internal control over financial reporting pursuant to Section 404 of the Sarbanes-Oxley Act. We also cannot provide assurance that we could correct any such weakness to allow our management to assess the effectiveness of our internal control over financial reporting as of the end of our fiscal year in time to enable our independent registered public accounting firm to state that such assessment will have been fairly stated in our Annual Report on Form 10-K or state that we have maintained effective internal control over financial reporting as of the end of our fiscal year. If we fail to comply with any of these regulations, we could be subject to a range of regulatory actions, fines or other sanctions or litigation. If we must disclose any material weakness in our internal control over financial reporting, our stock price could decline.

*A cyber security incident could cause a violation of HIPAA, breach of member privacy, or other negative impacts.*

We rely extensively on our information technology ("IT") systems to manage clinical and financial data, communicate with our patients, payers, vendors and other third parties and summarize and analyze operating results. In addition, we have made significant investments in technology to adopt and utilize electronic health records and to become meaningful users of health information technology pursuant to the American Recovery and Reinvestment Act of 2009. A cyber-attack that bypasses our IT security systems causing an IT security breach, loss of protected health information or other data subject to privacy laws, loss of proprietary business information, or a material disruption of our IT business systems, could have a material adverse impact on our business and result of operations. In addition, our future results of operations, as well as our reputation, could be adversely impacted by theft, destruction, loss, or misappropriation of public health information, other confidential data or proprietary business information.

*Different interpretations of accounting principles could have a material adverse effect on our results of operations or financial condition.*

Generally accepted accounting principles are complex, continually evolving and may be subject to varied interpretation by us, our independent registered public accounting firm and the SEC. Such varied interpretations could result from differing views related to specific facts and circumstances. Differences in interpretation of generally accepted accounting principles could have a material adverse effect on our financial position or results of operations.

*We continue to see rising costs in construction materials and labor. Such increased costs could have an adverse effect on the cash flow return on investment relating to our capital projects.*

The cost of construction materials and labor has significantly increased. As we continue to invest in modern technologies, emergency rooms and operating room expansions, the construction of medical office buildings for physician expansion and reconfiguring the flow of patient care, we spend large amounts of money generated from our operating cash flow or borrowed funds. Although we evaluate the financial feasibility of such projects by determining whether the projected cash flow return on investment exceeds our cost of capital, such returns may not be achieved if the cost of construction continues to rise significantly or the expected patient volumes are not attained.

*The deterioration of credit and capital markets may adversely affect our access to sources of funding and we cannot be certain of the availability and terms of capital to fund the growth of our business when needed.*

We require substantial capital resources to fund our acquisition growth strategy and our ongoing capital expenditure programs for renovation, expansion, construction and addition of medical equipment and technology. We believe that our capital expenditure program is adequate to expand, improve and equip our existing hospitals. We cannot predict, however, whether financing for our growth plans and capital expenditure programs will be available to us on satisfactory terms when needed, which could harm our business.

To fund all or a portion of our future financing needs, we rely on borrowings from various sources including fixed rate, long-term debt as well as borrowings pursuant to our revolving credit facility and accounts receivable securitization program. If any of the lenders were unable to fulfill their future commitments, our liquidity could be impacted, which could have a material unfavorable impact our results of operations and financial condition.

In addition, global capital markets have experienced volatility that has tightened access to capital markets and other sources of funding. In the event we need to access the capital markets or other sources of financing, there can be no assurance that we will be able to obtain financing on acceptable terms or within an acceptable time. Our inability to obtain financing on terms acceptable to us could have a material unfavorable impact on our results of operations, financial condition and liquidity.

*The LIBOR calculation method may change and LIBOR is expected to be phased out after 2021.*

23

ADAMHS000029623

Our Credit Agreement permits interest on borrowings to be calculated based on LIBOR, and in the past, we have had interest rate swaps that were based on LIBOR. On July 27, 2017, the United Kingdom Financial Conduct Authority (the "FCA") announced that it will no longer require banks to submit rates for the calculation of LIBOR after 2021. The phase-out of LIBOR may result in the establishment of one or more alternative benchmark rates, but at this time it is uncertain what alternative benchmark rates would replace LIBOR. In the meantime, actions by the FCA, other regulators, or law enforcement agencies may result in changes to the method by which LIBOR is calculated. At this time, it is not possible to predict the effect of any such changes or any other reforms to LIBOR that may be enacted in the United Kingdom or elsewhere.

*We depend heavily on key management personnel and the departure of one or more of our key executives or a significant portion of our local hospital management personnel could harm our business.*

The expertise and efforts of our senior executives and key members of our local hospital management personnel are critical to the success of our business. The loss of the services of one or more of our senior executives or of a significant portion of our local hospital management personnel could significantly undermine our management expertise and our ability to provide efficient, quality healthcare services at our facilities, which could harm our business.

*The number of outstanding shares of our Class B Common Stock is subject to potential increases or decreases.*

At December 31, 2019, 20.6 million shares of Class B Common Stock were reserved for issuance upon conversion of shares of Class A, C and D Common Stock outstanding, for issuance upon exercise of options to purchase Class B Common Stock and for issuance of stock under other incentive plans. Class A, C and D Common Stock are convertible on a share for share basis into Class B Common Stock. To the extent that these shares were converted into or exercised for shares of Class B Common Stock, the number of shares of Class B Common Stock available for trading in the public market place would increase substantially and the current holders of Class B Common Stock would own a smaller percentage of that class.

In addition, from time-to-time our Board of Directors approve stock repurchase programs authorizing us to purchase shares of our Class B Common Stock on the open market at prevailing market prices or in negotiated transactions off the market. Such repurchases decrease the number of outstanding shares of our Class B Common Stock. Conversely, as a potential means of generating additional funds to operate and expand our business, we may from time-to-time issue equity through the sale of stock which would increase the number of outstanding shares of our Class B Common Stock. Based upon factors such as, but not limited to, the market price of our stock, interest rate on borrowings and uses or potential uses for cash, repurchase or issuance of our stock could have a dilutive effect on our future basic and diluted earnings per share.

*The right to elect the majority of our Board of Directors and the majority of the general shareholder voting power resides with the holders of Class A and C Common Stock, the majority of which is owned by Alan B. Miller, our Chief Executive Officer and Chairman of our Board of Directors.*

Our Restated Certificate of Incorporation provides that, with respect to the election of directors, holders of Class A Common Stock vote as a class with the holders of Class C Common Stock, and holders of Class B Common Stock vote as a class with holders of Class D Common Stock, with holders of all classes of our Common Stock entitled to one vote per share.

As of March 19, 2019, the shares of Class A and Class C Common Stock constituted 7.9% of the aggregate outstanding shares of our Common Stock, had the right to elect five members of the Board of Directors and constituted 87.2% of our general voting power as of that date. As of March 19, 2019, the shares of Class B and Class D Common Stock (excluding shares issuable upon exercise of options) constituted 92.1% of the outstanding shares of our Common Stock, had the right to elect two members of the Board of Directors and constituted 12.8% of our general voting power as of that date.

As to matters other than the election of directors, our Restated Certificate of Incorporation provides that holders of Class A, Class B, Class C and Class D Common Stock all vote together as a single class, except as otherwise provided by law.

Each share of Class A Common Stock entitles the holder thereof to one vote; each share of Class B Common Stock entitles the holder thereof to one-tenth of a vote; each share of Class C Common Stock entitles the holder thereof to 100 votes (provided the holder of Class C Common Stock holds a number of shares of Class A Common Stock equal to ten times the number of shares of Class C Common Stock that holder holds); and each share of Class D Common Stock entitles the holder thereof to ten votes (provided the holder of Class D Common Stock holds a number of shares of Class B Common Stock equal to ten times the number of shares of Class D Common Stock that holder holds).

In the event a holder of Class C or Class D Common Stock holds a number of shares of Class A or Class B Common Stock, respectively, less than ten times the number of shares of Class C or Class D Common Stock that holder holds, then that holder will be

CONFIDENTIAL

ADAMHS000029624

DEF-MDL-14396.00080

entitled to only one vote for every share of Class C Common Stock, or one-tenth of a vote for every share of Class D Common Stock, which that holder holds in excess of one-tenth the number of shares of Class A or Class B Common Stock, respectively, held by that holder. The Board of Directors, in its discretion, may require beneficial owners to provide satisfactory evidence that such owner holds ten times as many shares of Class A or Class B Common Stock as Class C or Class D Common Stock, respectively, if such facts are not apparent from our stock records.

Since a substantial majority of the Class A shares and Class C shares are controlled by Mr. Alan B. Miller and members of his family, one of whom (Marc D. Miller) is also a director and officer of our company, and they can elect a majority of our company's directors and effect or reject most actions requiring approval by stockholders without the vote of any other stockholders, there are potential conflicts of interest in overseeing the management of our company.

In addition, because this concentrated control could discourage others from initiating any potential merger, takeover or other change of control transaction that may otherwise be beneficial to our businesses, our business and prospects and the trading price of our securities could be adversely affected.

**ITEM 1B.** *Unresolved Staff Comments*

None.

**ITEM 2.** *Properties*

*Executive and Administrative Offices and Commercial Health Insurer*

We own various office buildings in King of Prussia and Wayne, Pennsylvania, Brentwood, Tennessee, Denton, Texas and Reno, Nevada.

*Facilities*

The following tables set forth the name, location, type of facility and, for acute care hospitals and behavioral health care facilities, the number of licensed beds:

**Acute Care Hospitals**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Aiken Regional Medical Centers | Aiken, South Carolina | 211 | Owned |
| Aurora Pavilion | Aiken, South Carolina | 62 | Owned |
| Centennial Hills Hospital Medical Center | Las Vegas, Nevada | 262 | Owned |
| Corona Regional Medical Center | Corona, California | 238 | Owned |
| Desert Springs Hospital | Las Vegas, Nevada | 293 | Owned |
| Desert View Hospital | Pahrump, Nevada | 25 | Owned |
| Doctors' Hospital of Laredo (7) | Laredo, Texas | 183 | Owned |
| Doctor's Hospital ER South | Laredo, Texas | — | Leased |
| Doctor's Hospital Emergency Room Saunders | Laredo, Texas | — | Owned |
| Fort Duncan Regional Medical Center | Eagle Pass, Texas | 101 | Owned |
| The George Washington University Hospital (1) | Washington, D.C. | 395 | Leased |
| Henderson Hospital | Henderson, Nevada | 170 | Owned |
| ER at Green Valley Ranch | Henderson, Nevada | — | Owned |
| Lakewood Ranch Medical Center | Bradenton, Florida | 120 | Owned |
| Manatee Memorial Hospital | Bradenton, Florida | 295 | Owned |
| Northern Nevada Medical Center | Sparks, Nevada | 124 | Owned |
| Northwest Texas Healthcare System | Amarillo, Texas | 405 | Owned |
| The Pavilion at Northwest Texas Healthcare System | Amarillo, Texas | 90 | Owned |
| NWTH FED | Amarillo, Texas | — | Owned |
| NWTX Georgia FED | Amarillo, Texas | — | Owned |
| Palmdale Regional Medical Center | Palmdale, California | 184 | Owned |

25

CONFIDENTIAL

DEF-MDL-14396.00081

ADAMHS000029625

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| South Texas Health System (3) | | | |
| Edinburg Regional Medical Center/Children's Hospital | Edinburg, Texas | 235 | Owned |
| McAllen Medical Center (2) | McAllen, Texas | 441 | Leased |
| McAllen Heart Hospital | McAllen, Texas | 60 | Owned |
| South Texas Behavioral Health Center | McAllen, Texas | 134 | Owned |
| STHS ER at Alamo | Alamo, Texas | — | Owned |
| STHS ER at McColl | Edinburg, Texas | — | Owned |
| STHS ER at Mission (2) | Mission, Texas | — | Leased |
| STHS ER at Monte Cristo | Edinburg, Texas | — | Owned |
| STHS ER at Ware Road | McAllen, Texas | — | Owned |
| STHS ER at Weslaco (2) | Weslaco, Texas | — | Leased |
| Southwest Healthcare System | | | |
| Inland Valley Campus (2) | Wildomar, California | 130 | Leased |
| Rancho Springs Campus | Murrieta, California | 120 | Owned |
| Spring Valley Hospital Medical Center | Las Vegas, Nevada | 364 | Owned |
| Spring Valley FED | Las Vegas, Nevada | — | Owned |
| St. Mary's Regional Medical Center | Enid, Oklahoma | 229 | Owned |
| Summerlin Hospital Medical Center | Las Vegas, Nevada | 485 | Owned |
| Temecula Valley Hospital | Temecula, California | 140 | Owned |
| Texoma Medical Center | Denison, Texas | 354 | Owned |
| TMC Behavioral Health Center | Denison, Texas | 60 | Owned |
| Texoma Sherman ER | Sherman, Texas | — | Owned |
| Valley Hospital Medical Center | Las Vegas, Nevada | 306 | Owned |
| Wellington Regional Medical Center (2) | West Palm Beach, Florida | 235 | Leased |
| Westlake FED | West Palm Beach, Florida | — | Leased |

### Inpatient Behavioral Health Care Facilities

**United States:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Alabama Clinical Schools | Birmingham, Alabama | 80 | Owned |
| Alhambra Hospital | Rosemead, California | 115 | Owned |
| Alliance Health Center | Meridian, Mississippi | 214 | Owned |
| The Arbour Hospital | Boston, Massachusetts | 136 | Owned |
| Arbour-Fuller Hospital | South Attleboro, Massachusetts | 102 | Owned |
| Arbour-HRI Hospital | Brookline, Massachusetts | 62 | Owned |
| Arrowhead Behavioral Health | Maumee, Ohio | 48 | Owned |
| Austin Lakes Hospital | Austin, Texas | 58 | Leased |
| Austin Oaks Hospitals | Austin, Texas | 80 | Owned |
| Behavioral Hospital of Bellaire | Houston, Texas | 124 | Leased |
| Belmont Pines Hospital | Youngstown, Ohio | 102 | Owned |
| Benchmark Behavioral Health System | Woods Cross, Utah | 94 | Owned |
| Black Bear Treatment Center | Sautee, Georgia | 115 | Owned |
| Bloomington Meadows Hospital | Bloomington, Indiana | 78 | Owned |
| Boulder Creek Academy | Bonners Ferry, Idaho | 105 | Owned |
| Brentwood Behavioral Health of Mississippi | Flowood, Mississippi | 121 | Owned |
| Brentwood Hospital | Shreveport, Louisiana | 260 | Owned |
| The Bridgeway | North Little Rock, Arkansas | 127 | Owned |
| Brook Hospital—Dupont | Louisville, Kentucky | 88 | Owned |
| Brook Hospital—KMI | Louisville, Kentucky | 110 | Owned |

26

ADAMHS000029626

United States:

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Brooke Glen Behavioral Hospital | Fort Washington, Pennsylvania | 146 | Owned |
| Brynn Marr Hospital | Jacksonville, North Carolina | 102 | Owned |
| Calvary Addiction Recovery Center | Phoenix, Arizona | 68 | Owned |
| Canyon Ridge Hospital | Chino, California | 106 | Owned |
| The Carolina Center for Behavioral Health | Greer, South Carolina | 138 | Owned |
| Cedar Creek | St. Johns, Michigan | 54 | Owned |
| Cedar Grove Residential Treatment Center | Murfreesboro, Tennessee | 40 | Owned |
| Cedar Hills Hospital (8) | Beaverton, Oregon | 98 | Owned |
| Cedar Ridge | Oklahoma City, Oklahoma | 60 | Owned |
| Cedar Ridge Residential Treatment Center | Oklahoma City, Oklahoma | 56 | Owned |
| Cedar Ridge Bethany | Bethany, Oklahoma | 56 | Owned |
| Cedar Springs Behavioral Health | Colorado Springs, Colorado | 110 | Owned |
| Centennial Peaks | Louisville, Colorado | 104 | Owned |
| Center for Change | Orem, Utah | 58 | Owned |
| Central Florida Behavioral Hospital | Orlando, Florida | 174 | Owned |
| Chicago Children's Center for Behavioral Health | Chicago, Illinois | 40 | Leased |
| Chris Kyle Patriots Hospital | Anchorage, Alaska | 36 | Owned |
| Clarion Psychiatric Center | Clarion, Pennsylvania | 112 | Owned |
| Coastal Behavioral Health | Savannah, Georgia | 50 | Owned |
| Coastal Harbor Treatment Center | Savannah, Georgia | 141 | Owned |
| Columbus Behavioral Center for Children and Adolescents | Columbus, Indiana | 57 | Owned |
| Compass Intervention Center | Memphis, Tennessee | 108 | Owned |
| Copper Hills Youth Center | West Jordan, Utah | 197 | Owned |
| Coral Shores | Stuart, Florida | 80 | Owned |
| Cumberland Hall | Hopkinsville, Kentucky | 97 | Owned |
| Cumberland Hospital | New Kent, Virginia | 110 | Owned |
| Cypress Creek Hospital | Houston, Texas | 128 | Owned |
| Del Amo Hospital | Torrance, California | 166 | Owned |
| Diamond Grove Center | Louisville, Mississippi | 55 | Owned |
| Dover Behavioral Health | Dover, Delaware | 104 | Owned |
| El Paso Behavioral Health System | El Paso, Texas | 166 | Owned |
| Emerald Coast Behavioral Hospital | Panama City, Florida | 86 | Owned |
| Fairmount Behavioral Health System | Philadelphia, Pennsylvania | 239 | Owned |
| Fairfax | | | |
| Fairfax Hospital | Kirkland, Washington | 157 | Owned |
| Fairfax Hospital—Everett | Everett, Washington | 30 | Leased |
| Fairfax Hospital—Monroe | Monroe, Washington | 34 | Leased |
| Forest View Hospital | Grand Rapids, Michigan | 108 | Owned |
| Fort Lauderdale Hospital | Fort Lauderdale, Florida | 182 | Owned |
| Foundations Behavioral Health | Doylestown, Pennsylvania | 108 | Leased |
| Foundations for Living | Mansfield, Ohio | 84 | Owned |
| Fox Run Hospital | St. Clairsville, Ohio | 100 | Owned |
| Fremont Hospital | Fremont, California | 148 | Owned |
| Friends Hospital | Philadelphia, Pennsylvania | 219 | Owned |
| Garfield Park Hospital | Chicago, Illinois | 88 | Owned |
| Garland Behavioral Health | Garland, Texas | 72 | Leased |
| Glen Oaks Hospital | Greenville, Texas | 54 | Owned |
| Gulf Coast Youth Services | Fort Walton Beach, Florida | 28 | Owned |
| Gulfport Behavioral Health System | Gulfport, Mississippi | 109 | Owned |
| Hampton Behavioral Health Center | Westhampton, New Jersey | 120 | Owned |
| Harbour Point (Pines) | Portsmouth, Virginia | 186 | Owned |

CONFIDENTIAL

ADAMHS000029627

DEF-MDL-14396.00083

United States:

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Hartgrove Hospital | Chicago, Illinois | 160 | Owned |
| Havenwyck Hospital | Auburn Hills, Michigan | 243 | Owned |
| Heartland Behavioral Health Services | Nevada, Missouri | 151 | Owned |
| Hermitage Hall | Nashville, Tennessee | 111 | Owned |
| Heritage Oaks Hospital | Sacramento, California | 125 | Owned |
| Hickory Trail Hospital | DeSoto, Texas | 86 | Owned |
| Highlands Behavioral Health System | Highlands Ranch, Colorado | 86 | Owned |
| Hill Crest Behavioral Health Services | Birmingham, Alabama | 219 | Owned |
| Holly Hill Hospital | Raleigh, North Carolina | 285 | Owned |
| The Horsham Clinic | Ambler, Pennsylvania | 206 | Owned |
| Hughes Center | Danville, Virginia | 64 | Owned |
| Inland Northwest Behavioral Health (10) | Spokane, Washington | 100 | Owned |
| Intermountain Hospital | Boise, Idaho | 155 | Owned |
| Kempsville Center of Behavioral Health | Norfolk, Virginia | 82 | Owned |
| KeyStone Center | Wallingford, Pennsylvania | 153 | Owned |
| Kingwood Pines Hospital | Kingwood, Texas | 116 | Owned |
| La Amistad Behavioral Health Services | Maitland, Florida | 85 | Owned |
| Lakeside Behavioral Health System | Memphis, Tennessee | 345 | Owned |
| Lancaster Behavioral Health Hospital (9) | Lancaster, Pennsylvania | 126 | Owned |
| Laurel Heights Hospital | Atlanta, Georgia | 124 | Owned |
| Laurel Oaks Behavioral Health Center | Dothan, Alabama | 124 | Owned |
| Laurel Ridge Treatment Center | San Antonio, Texas | 250 | Owned |
| Liberty Point Behavioral Health | Staunton, Virginia | 56 | Owned |
| Lighthouse Care Center of Augusta | Augusta, Georgia | 68 | Owned |
| Lighthouse Care Center of Conway | Conway, South Carolina | 105 | Owned |
| Lincoln Prairie Behavioral Health Center | Springfield, Illinois | 97 | Owned |
| Lincoln Trail Behavioral Health System | Radcliff, Kentucky | 140 | Owned |
| Mayhill Hospital | Denton, Texas | 59 | Leased |
| McDowell Center for Children | Dyersburg, Tennessee | 32 | Owned |
| The Meadows Psychiatric Center | Centre Hall, Pennsylvania | 117 | Owned |
| Meridell Achievement Center | Austin, Texas | 134 | Owned |
| Mesilla Valley Hospital | Las Cruces, New Mexico | 119 | Owned |
| Michael's House | Palm Springs, California | 120 | Owned |
| Michiana Behavioral Health Center | Plymouth, Indiana | 80 | Owned |
| Midwest Center for Youth and Families | Kouts, Indiana | 74 | Owned |
| Millwood Hospital | Arlington, Texas | 134 | Leased |
| Mountain Youth Academy | Mountain City, Tennessee | 90 | Owned |
| Natchez Trace Youth Academy | Waverly, Tennessee | 115 | Owned |
| Newport News Behavioral Health Center | Newport News, Virginia | 132 | Owned |
| North Spring Behavioral Healthcare | Leesburg, Virginia | 103 | Leased |
| North Star Hospital | Anchorage, Alaska | 74 | Owned |
| North Star Bragaw | Anchorage, Alaska | 30 | Owned |
| North Star DeBarr Residential Treatment Center | Anchorage, Alaska | 30 | Owned |
| North Star Palmer Residential Treatment Center | Palmer, Alaska | 30 | Owned |
| Oak Plains Academy | Ashland City, Tennessee | 98 | Owned |
| The Oaks Treatment Center | Memphis, Tennessee | 71 | Owned |
| Okaloosa Youth Academy | Crestview, Florida | 75 | Leased |
| Old Vineyard Behavioral Health | Winston-Salem, North Carolina | 164 | Owned |
| Palmetto Lowcountry Behavioral Health | North Charleston, South Carolina | 108 | Owned |
| Palmetto Summerville | Summerville, South Carolina | 64 | Leased |
| Palm Point Behavioral | Titusville, FL | 74 | Owned |

28

ADAMHS000029628

**United States:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Palm Shores Behavioral Health Center | Bradenton, Florida | 64 | Owned |
| Palo Verde Behavioral Health | Tucson, Arizona | 84 | Leased |
| Parkwood Behavioral Health System | Olive Branch, Mississippi | 148 | Owned |
| The Pavilion | Champaign, Illinois | 106 | Owned |
| Peachford Behavioral Health System of Atlanta | Atlanta, Georgia | 246 | Owned |
| Pembroke Hospital | Pembroke, Massachusetts | 120 | Owned |
| Pinnacle Pointe Hospital | Little Rock, Arkansas | 127 | Owned |
| Poplar Springs Hospital | Petersburg, Virginia | 208 | Owned |
| Prairie St John's | Fargo, North Dakota | 158 | Owned |
| Pride Institute | Eden Prairie, Minnesota | 42 | Owned |
| Provo Canyon School | Provo, Utah | 274 | Owned |
| Provo Canyon Behavioral Hospital | Orem, Utah | 80 | Owned |
| Psychiatric Institute of Washington | Washington, D.C. | 130 | Owned |
| Quail Run Behavioral Health | Phoenix, Arizona | 102 | Owned |
| The Recovery Center | Wichita Falls, Texas | 34 | Leased |
| The Ridge Behavioral Health System | Lexington, Kentucky | 110 | Owned |
| Rivendell Behavioral Health Services of Arkansas | Benton, Arkansas | 80 | Owned |
| Rivendell Behavioral Health Services of Kentucky | Bowling Green, Kentucky | 125 | Owned |
| River Crest Hospital | San Angelo, Texas | 80 | Owned |
| Riveredge Hospital | Forest Park, Illinois | 210 | Owned |
| River Oaks Hospital | New Orleans, Louisiana | 126 | Owned |
| River Park Hospital | Huntington, West Virginia | 187 | Owned |
| River Point Behavioral Health | Jacksonville, Florida | 84 | Owned |
| Rockford Center | Newark, Delaware | 138 | Owned |
| Rolling Hills Hospital | Franklin, Tennessee | 130 | Owned |
| Roxbury | Shippensburg, Pennsylvania | 112 | Owned |
| Salt Lake Behavioral Health | Salt Lake City, Utah | 118 | Leased |
| San Marcos Treatment Center | San Marcos, Texas | 265 | Owned |
| Sandy Pines Hospital | Tequesta, Florida | 149 | Owned |
| Schick Shadel Hospital | Burien, Washington | 60 | Owned |
| Sierra Vista Hospital | Sacramento, California | 171 | Owned |
| Southern Crescent Behavioral Health Anchor Hospital | Atlanta, Georgia | 122 | Owned |
| St. Simons by the Sea | St. Simons, Georgia | 101 | Owned |
| Skywood Recovery | Augusta, Michigan | 100 | Owned |
| Spring Mountain Sahara | Las Vegas, Nevada | 30 | Owned |
| Spring Mountain Treatment Center | Las Vegas, Nevada | 110 | Owned |
| Springwoods | Fayetteville, Arkansas | 80 | Owned |
| Stonington Institute | North Stonington, Connecticut | 64 | Owned |
| Streamwood Behavioral Health | Streamwood, Illinois | 178 | Owned |
| Summit Oaks Hospital | Summit, New Jersey | 126 | Owned |
| SummitRidge | Lawrenceville, Georgia | 96 | Owned |
| Suncoast Behavioral Health Center | Bradenton, Florida | 60 | Owned |
| Texas NeuroRehab Center | Austin, Texas | 151 | Owned |
| Three Rivers Behavioral Health | West Columbia, South Carolina | 122 | Owned |
| Three Rivers Residential Treatment-Midlands Campus | West Columbia, South Carolina | 64 | Owned |
| Turning Point Hospital | Moultrie, Georgia | 69 | Owned |
| University Behavioral Center | Orlando, Florida | 112 | Owned |
| University Behavioral Health of Denton | Denton, Texas | 104 | Owned |
| Valle Vista Hospital | Greenwood, Indiana | 132 | Owned |
| Valley Hospital | Phoenix, Arizona | 122 | Owned |

29

CONFIDENTIAL

DEF-MDL-14396.00085

ADAMHS000029629

**United States:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| The Vines Hospital | Ocala, Florida | 98 | Owned |
| Virginia Beach Psychiatric Center | Virginia Beach, Virginia | 100 | Owned |
| Wekiva Springs | Jacksonville, Florida | 120 | Owned |
| Wellstone Regional Hospital | Jeffersonville, Indiana | 100 | Owned |
| West Hills Hospital | Reno, Nevada | 95 | Owned |
| West Oaks Hospital | Houston, Texas | 176 | Owned |
| Willow Springs Center | Reno, Nevada | 116 | Owned |
| Windmoor Healthcare | Clearwater, Florida | 144 | Owned |
| Windsor—Laurelwood Center | Willoughby, Ohio | 160 | Leased |
| Wyoming Behavioral Institute | Casper, Wyoming | 129 | Owned |

**United Kingdom:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Acer Clinic | Chesterfield, UK | 14 | Owned |
| Acer Clinic 2 | Chesterfield, UK | 14 | Owned |
| Albert Ward | Darlington, UK | 25 | Owned |
| Amberwood Lodge | Dorset, UK | 9 | Owned |
| Ashfield House | Huddersfield, UK | 6 | Owned |
| Aspen House | South Yorkshire, UK | 20 | Owned |
| Aspen Lodge | Rotherham, UK | 16 | Owned |
| Beacon Lower | Bradford, UK | 8 | Owned |
| Beacon Upper | Bradford, UK | 8 | Owned |
| Beckly House | Halifax, UK | 12 | Owned |
| Bostall House | London, UK | 6 | Owned |
| Bury Hospital | Bury, UK | 167 | Owned |
| Broughton House | Lincolnshire, UK | 34 | Owned |
| Broughton Lodge | Cheshire, UK | 20 | Owned |
| Cambian Alders | Gloucester, UK | 20 | Owned |
| Cambian Ansel Clinic | Nottingham, UK | 24 | Owned |
| Cambian Appletree | Durham, UK | 26 | Owned |
| Cambian Beeches | Nottinghamshire, UK | 12 | Owned |
| Cambian Birches | Notts, UK | 6 | Owned |
| Cambian Cedars | Birmingham, UK | 24 | Owned |
| Cambian Churchill | London, UK | 57 | Owned |
| Cambian Conifers | Derby, UK | 7 | Owned |
| Cambian Elms | Birmingham, UK | 10 | Owned |
| Cambian Grange | Nottinghamshire, UK | 8 | Owned |
| Cambian Heathers | West Bromwich, UK | 20 | Owned |
| Cambian Lodge | Nottinghamshire, UK | 8 | Owned |
| Cambian Manor | Central Drive, UK | 20 | Owned |
| Cambian Nightingale | Dorset, UK | 10 | Owned |
| Cambian Oaks | Barnsley, UK | 36 | Owned |
| Cambian Pines | Woodhouse, UK | 7 | Owned |
| Cambian Views | Matlock, UK | 10 | Owned |
| Cambian Woodside | Bradford, UK | 9 | Owned |
| CAS Brunel | Henbury, UK | 32 | Owned |
| Cedar Vale | Nottinghamshire, UK | 14 | Owned |
| Chaseways | Sawbridgeworth, UK | 6 | Owned |

30

CONFIDENTIAL

DEF-MDL-14396.00086

ADAMHS000029630

**United Kingdom:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Chesterholme | Northumberland, UK | 16 | Owned |
| Coulby Lodge | North Yorkshire, UK | 8 | Owned |
| Coventry | Coventry, UK | 56 | Owned |
| Cygnet Hospital—Beckton | Beckton, UK | 62 | Owned |
| Cygnet Hospital—Bierley | Bierley, UK | 63 | Owned |
| Cygnet Wing—Blackheath | Blackheath, UK | 32 | Leased |
| Cygnet Lodge—Brighouse | Brighouse, UK | 25 | Owned |
| Cygnet Hospital—Derby | Derby, UK | 50 | Owned |
| Cygnet Hospital—Ealing | Ealing, UK | 26 | Owned |
| Cygnet Hospital—Godden Green | Godden Green, UK | 39 | Owned |
| Cygnet Hospital—Harrogate | Harrogate, UK | 36 | Owned |
| Cygnet Hospital—Harrow | Harrow, UK | 61 | Owned |
| Cygnet Hospital—Kewstoke | Kewstoke, UK | 72 | Owned |
| Cygnet Lodge—Lewisham | Lewisham, UK | 17 | Owned |
| Cygnet Lodge – Salford | Manchester, UK | 24 | Owned |
| Cygnet Hospital—Stevenage | Stevenage, UK | 88 | Owned |
| Cygnet Hospital—Taunton | Taunton, UK | 55 | Owned |
| Cygnet Lodge – Kenton | Westlands, UK | 15 | Owned |
| Cygnet Hospital—Wyke | Wyke, UK | 52 | Owned |
| Cygnet Lodge – Woking | Knaphill, UK | 31 | Owned |
| Delfryn House | Flintshire, UK | 28 | Owned |
| Delfryn Lodge | Flintshire, UK | 24 | Owned |
| Dene Brook | Dalton Parva, UK | 13 | Owned |
| Devon Lodge | Southampton, UK | 12 | Owned |
| Dove Valley | Wombwell, UK | 10 | Owned |
| Ducks Halt | Essex, UK | 5 | Owned |
| Eleni House | Essex, UK | 8 | Owned |
| Ellen Mhor | Dundee, UK | 12 | Owned |
| Elston House | Nottinghamshire, UK | 8 | Owned |
| Fairways | Suffolk, UK | 8 | Owned |
| Farm Lodge | Rainham, UK | 5 | Owned |
| The Fields | Sheffield, UK | 54 | Owned |
| Highwoods | Colchester, UK | 20 | Owned |
| The Fountains | Blackburn, UK | 32 | Owned |
| The Gables | Essex, UK | 7 | Owned |
| Gledcliffe Road | Huddersfield, UK | 6 | Owned |
| Gledholt | Huddersfield, UK | 9 | Owned |
| Hawkstone | Utley, UK | 10 | Owned |
| Hollyhurst | County Durham, UK | 19 | Owned |
| Hope House | County Durham, UK | 11 | Owned |
| Kirkside House | Leeds, UK | 7 | Owned |
| Kirkside Lodge | Leeds, UK | 8 | Owned |
| Langdale House | Huddersfield, UK | 8 | Owned |
| Langdale Coach House | Huddersfield, UK | 3 | Owned |
| Larch Court | Essex, UK | 4 | Owned |
| Limes Houses | Nottinghamshire, UK | 6 | Owned |
| Lindsay House | Dundee, UK | 2 | Owned |
| Longfield House | Bradford, UK | 9 | Owned |
| Lowry House | Hyde, UK | 12 | Owned |
| Maidstone | Maidstone, UK | 65 | Owned |
| Marion House | Derby, UK | 5 | Owned |

31

CONFIDENTIAL

DEF-MDL-14396.00087

ADAMHS000029631

**United Kingdom:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Meadows Mews | Tipton, UK | 10 | Owned |
| Morgan House | Stoke on Trent, UK | 5 | Owned |
| Newbus Grange | County Durham, UK | 17 | Owned |
| Norcott House | Liversedge, UK | 11 | Owned |
| Norcott Lodge | Liversedge, UK | 9 | Owned |
| Oak Court | Essex, UK | 12 | Owned |
| Oakhurst Lodge | Hampshire, UK | 8 | Owned |
| Oaklands | Northumberland, UK | 19 | Owned |
| Oakwood Gardens (SL) | Wolverhampton, UK | 9 | Leased |
| Old Leigh House | Essex, UK | 7 | Leased |
| The Orchards | Essex, UK | 5 | Owned |
| The Outwood | Leeds, UK | 10 | Owned |
| Oxley Lodge | Huddersfield, UK | 4 | Owned |
| Oxley Woodhouse | Huddersfield, UK | 13 | Owned |
| Portland Road 45 | Edgbaston, UK | 4 | Leased |
| Raglan House | West Midlands, UK | 25 | Owned |
| Ramsey | Colchester, UK | 21 | Owned |
| Ranaich House | Stirling, UK | 14 | Owned |
| Redlands | County Durham, UK | 5 | Owned |
| Rhyd Alyn | Flintshire, UK | 6 | Owned |
| Rufford Lodge | Mansfield, UK | 2 | Owned |
| Sedgley House | Wolverhampton, UK | 20 | Owned |
| Sedgley Lodge | Wolverhampton, UK | 14 | Owned |
| Shear Meadow | Hemel Hempstead, UK | 4 | Owned |
| Sheffield Hospital | Sheffield, UK | 57 | Owned |
| Sherwood House | Mansfield, UK | 30 | Owned |
| Sherwood Lodge | Mansfield, UK | 17 | Owned |
| Sherwood Lodge Step Down | Mansfield, UK | 9 | Owned |
| The Squirrels | Hampshire, UK | 9 | Owned |
| St. Augustine's | Stoke on Trent, UK | 32 | Owned |
| St. Teilo House | Gwent, UK | 23 | Owned |
| St. Williams | Darlington, UK | 12 | Owned |
| Storthfields | Derby, UK | 22 | Owned |
| The Sycamores | Derbyshire, UK | 6 | Owned |
| The Sycamores No 4 & 5 | Derbyshire, UK | 4 | Owned |
| Tabley Nursing Home—Tabley | Tabley, UK | 51 | Leased |
| Thistle Care Home | Dundee, UK | 10 | Owned |
| Thornfield Grange | County Durham, UK | 9 | Owned |
| Thornfield House | Bradford, UK | 7 | Owned |
| Thors Park | Essex, UK | 14 | Owned |
| Toller Road | Leicestershire, UK | 8 | Owned |
| Trinity House | Galloway, UK | 13 | Owned |
| Tupwood Gate Nursing Home | Caterham, UK | 33 | Owned |
| River View | County Durham, UK | 6 | Owned |
| Vincent Court | Lancashire, UK | 5 | Owned |
| Walkern Lodge | Stevenage, UK | 4 | Owned |
| Wallace Hospital | Dundee, UK | 10 | Owned |
| Wast Hills | West Midlands, UK | 26 | Owned |
| Whorlton Hall | County Durham, UK | 17 | Owned |
| Willow House | West Midlands, UK | 8 | Owned |
| Woking Hospital | Woking, UK | 60 | Owned |

32

CONFIDENTIAL

DEF-MDL-14396.00088

ADAMHS000029632

**United Kingdom:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| Woodcross Street | Wolverhampton, UK | 8 | Owned |
| Woodrow House | Stockport, UK | 9 | Owned |
| Yew Trees | Essex, UK | 10 | Owned |

**Puerto Rico:**

| Name of Facility | Location | Number of Beds | Real Property Ownership Interest |
|---|---|---|---|
| First Hospital Panamericano—Cidra | Cidra, Puerto Rico | 165 | Owned |
| First Hospital Panamericano—San Juan | San Juan, Puerto Rico | 45 | Owned |
| First Hospital Panamericano—Ponce | Ponce, Puerto Rico | 30 | Owned |

## Outpatient Behavioral Health Care Facilities

**United States:**

| Name of Facility | Location | Real Property Ownership Interest |
|---|---|---|
| Arbour Counseling Services | Rockland, Massachusetts | Owned |
| Arbour Senior Care | Rockland, Massachusetts | Owned |
| Behavioral Educational Services | Riverdale, Florida | Leased |
| The Canyon at Santa Monica | Santa Monica, California | Leased |
| First Home Care (VA) | Portsmouth, Virginia | Leased |
| Foundations Atlanta | Atlanta, Georgia | Leased |
| Foundations Chicago | Chicago, Illinois | Leased |
| Foundations Detroit | Bingham Farms, Michigan | Leased |
| Foundations Los Angeles | Los Angeles, California | Leased |
| Foundations Memphis | Memphis, Tennessee | Leased |
| Foundations Nashville | Nashville, Tennessee | Leased |
| Foundations Roswell | Roswell, Georgia | Leased |
| Foundations San Diego | San Diego, California | Leased |
| Foundations San Francisco | San Francisco, California | Leased |
| Good Samaritan Counseling Center | Anchorage, Alaska | Owned |
| Michael's House Outpatient | Palm Springs, California | Leased |
| The Pointe | Little Rock, Arkansas | Leased |
| St. Louis Behavioral Medicine Institute | St. Louis, Missouri | Owned |
| Talbott Recovery | Atlanta, Georgia | Owned |

**United Kingdom:**

| Name of Facility | Location | Real Property Ownership Interest |
|---|---|---|
| Long Eaton Day Services | Nottingham, UK | Owned |
| Sheffield Day Services | Sheffield, UK | Owned |

## Outpatient Centers and Surgical Hospital

33

CONFIDENTIAL

DEF-MDL-14396.00089

ADAMHS000029633

| Name of Facility | Location | Real Property Ownership Interest |
|---|---|---|
| Aiken Surgery Center | Aiken, South Carolina | Owned |
| Cancer Care Institute of Carolina | Aiken, South Carolina | Owned |
| Cornerstone Regional Hospital (4) | Edinburg, Texas | Leased |
| Manatee Diagnostic Center | Bradenton, Florida | Leased |
| Palms Westside Clinic ASC (6) | Royal Palm Beach, Florida | Leased |
| Quail Surgical and Pain Management Center (11) | Reno, Nevada | Leased |
| Temecula Valley Day Surgery and Pain Therapy Center (5) | Murrieta, California | Leased |

(1) We hold an 80% ownership interest in this facility through a general partnership interest in a limited partnership. The remaining 20% ownership interest is held by an unaffiliated third party which leases the property to the partnership for nominal rent. The term of the partnership is scheduled to expire in July, 2047, and we have five, five-year extension options. The term of the lease is coterminous with the partnership term with a fair market value rental of the property during the extension term.
(2) Real property leased from Universal Health Realty Income Trust.
(3) Edinburg Regional Medical Center/Children's Hospital, McAllen Medical Center, McAllen Heart Hospital, South Texas Behavioral Health Center, STHS ER at Mission and STHS ER at Weslaco are consolidated under one license operating as the South Texas Health System.
(4) We manage and own a noncontrolling interest of approximately 50% in the entity that operates this facility.
(5) We manage and own a minority interest in an LLC that owns and operates this center.
(6) We own a noncontrolling ownership interest of approximately 50% in the entity that operates this facility that is managed by a third-party.
(7) We hold an 89% ownership interest in this facility through both general and limited partnership interests. The remaining 11% ownership interest is held by unaffiliated third parties.
(8) Land of this facility is leased.
(9) We manage and own a noncontrolling interest of 50% in this facility. The remaining 50% ownership interest is held by an unaffiliated third party. Land of this facility is leased from the unaffiliated third party member.
(10) We manage and hold an 80% ownership interest in this facility. The remaining 20% ownership interest is held by an unaffiliated third party.
(11) We hold a 51% ownership interest in this facility. The remaining 49% ownership interest is held by unaffiliated third parties.

We own or lease medical office buildings adjoining some of our hospitals. We believe that the leases on the facilities, medical office buildings and other real estate leased or owned by us do not impose any material limitation on our operations. The aggregate lease payments on facilities leased by us were $82 million in 2019, $81 million in 2018 and $80 million in 2017.

## ITEM 3.   *Legal Proceedings*

We operate in a highly regulated and litigious industry which subjects us to various claims and lawsuits in the ordinary course of business as well as regulatory proceedings and government investigations. These claims or suits include claims for damages for personal injuries, medical malpractice, commercial/contractual disputes, wrongful restriction of, or interference with, physicians' staff privileges, and employment related claims. In addition, health care companies are subject to investigations and/or actions by various state and federal governmental agencies or those bringing claims on their behalf. Government action has increased with respect to investigations and/or allegations against healthcare providers concerning possible violations of fraud and abuse and false claims statutes as well as compliance with clinical and operational regulations. Currently, and from time to time, we and some of our facilities are subjected to inquiries in the form of subpoenas, Civil Investigative Demands, audits and other document requests from various federal and state agencies. These inquiries can lead to notices and/or actions including repayment obligations from state and federal government agencies associated with potential non-compliance with laws and regulations. Further, the federal False Claims Act allows private individuals to bring lawsuits (qui tam actions) against healthcare providers that submit claims for payments to the government. Various states have also adopted similar statutes. When such a claim is filed, the government will investigate the matter and decide if they are going to intervene in the pending case. These qui tam lawsuits are placed under seal by the court to comply with the False Claims Act's requirements. If the government chooses not to intervene, the private individual(s) can proceed independently on behalf of the government. Health care providers that are found to violate the False Claims Act may be subject to substantial monetary fines/penalties as well as face potential exclusion from participating in government health care programs or be required to comply with Corporate Integrity Agreements as a condition of a settlement of a False Claims Act matter. In September 2014, the Criminal Division of the Department of Justice ("DOJ") announced that all qui tam cases will be shared with their Division to determine if a parallel criminal investigation should be opened. The DOJ has also announced an intention to pursue civil and criminal actions against individuals within a company as well as the corporate entity or entities. In addition, health care facilities are subject to monitoring by state and federal surveyors to ensure compliance with program Conditions of Participation. In the event a facility is found to be out of

34

compliance with a Condition of Participation and unable to remedy the alleged deficiency(s), the facility faces termination from the Medicare and Medicaid programs or compliance with a System Improvement Agreement to remedy deficiencies and ensure compliance.

The laws and regulations governing the healthcare industry are complex covering, among other things, government healthcare participation requirements, licensure, certification and accreditation, privacy of patient information, reimbursement for patient services as well as fraud and abuse compliance. These laws and regulations are constantly evolving and expanding. Further, the Legislation has added additional obligations on healthcare providers to report and refund overpayments by government healthcare programs and authorizes the suspension of Medicare and Medicaid payments "pending an investigation of a credible allegation of fraud." We monitor our business and have developed an ethics and compliance program with respect to these complex laws, rules and regulations. Although we believe our policies, procedures and practices comply with government regulations, there is no assurance that we will not be faced with the sanctions referenced above which include fines, penalties and/or substantial damages, repayment obligations, payment suspensions, licensure revocation, and expulsion from government healthcare programs. Even if we were to ultimately prevail in any action brought against us or our facilities or in responding to any inquiry, such action or inquiry could have a material adverse effect on us.

Certain legal matters are described below:

*Government Investigations:*

*UHS Behavioral Health*

In February, 2013, the Office of Inspector General for the United States Department of Health and Human Services ("OIG") served a subpoena requesting various documents from January, 2008 to the date of the subpoena directed at Universal Health Services, Inc. ("UHS") concerning it and UHS of Delaware, Inc., and certain UHS owned behavioral health facilities including: Keys of Carolina, Old Vineyard Behavioral Health, The Meadows Psychiatric Center, Streamwood Behavioral Health, Hartgrove Hospital, Rock River Academy and Residential Treatment Center, Roxbury Treatment Center, Harbor Point Behavioral Health Center, f/k/a The Pines Residential Treatment Center, including the Crawford, Brighton and Kempsville campuses, Wekiva Springs Center and River Point Behavioral Health. Prior to receipt of this subpoena, some of these facilities had received independent subpoenas from state or federal agencies. Subsequent to the February 2013 subpoenas, some of the facilities above have received additional, specific subpoenas or other document and information requests. In addition to the OIG, the DOJ and various U.S. Attorneys' and state Attorneys' General Offices are also involved in this matter. Since February 2013, additional facilities have also received subpoenas and/or document and information requests or we have been notified are included in the omnibus investigation. Those facilities include: National Deaf Academy, Arbour-HRI Hospital, Behavioral Hospital of Bellaire, St. Simons By the Sea, Turning Point Care Center, Salt Lake Behavioral Health, Central Florida Behavioral Hospital, University Behavioral Center, Arbour Hospital, Arbour-Fuller Hospital, Pembroke Hospital, Westwood Lodge, Coastal Harbor Health System, Shadow Mountain Behavioral Health, Cedar Hills Hospital, Mayhill Hospital, Southern Crescent Behavioral Health (Anchor Hospital and Crescent Pines campuses), Valley Hospital (AZ), Peachford Behavioral Health System of Atlanta, University Behavioral Health of Denton, El Paso Behavioral Health System, Newport News Behavioral Health Center, The Hughes Center, Forest View Hospital and Havenwyck Hospital.

In October, 2013, we were advised that the DOJ's Criminal Frauds Section had opened an investigation of River Point Behavioral Health and Wekiva Springs Center. We were subsequently notified that the Criminal Frauds section had opened investigations of National Deaf Academy, Hartgrove Hospital and UHS as a corporate entity. In April 2017, the DOJ's Criminal Division issued a subpoena requesting documentation from Shadow Mountain Behavioral Health. In August 2017, Kempsville Center of Behavioral Health (a part of Harbor Point Behavioral Health previously identified above) received a subpoena requesting documentation. We have recently been advised that the investigations being conducted by the DOJ's Criminal Frauds Section and corresponding U.S. Attorneys' Offices, of UHS and the above referenced facilities, have been closed.

In April, 2014, the Centers for Medicare and Medicaid Services ("CMS") instituted a Medicare payment suspension at River Point Behavioral Health in accordance with federal regulations regarding suspension of payments during certain investigations. The Florida Agency for Health Care Administration ("AHCA") subsequently issued a Medicaid payment suspension for the facility. River Point Behavioral Health submitted a rebuttal statement disputing the basis of the suspension and requesting revocation of the suspension. Notwithstanding, CMS continued the payment suspension. River Point Behavioral Health provided additional information to CMS in an effort to obtain relief from the payment suspension but the Medicare suspension remains in effect. In June 2017, AHCA advised that while they were maintaining the suspension for dual eligible and cross-over Medicare beneficiaries, the Medicaid payment suspension was lifted effective June 27, 2017. From inception through December 31, 2019, the aggregate funds withheld from us in connection with the River Point Behavioral Health payment suspension amounted to approximately $8.6 million. We anticipate a resolution of the payment suspension will be part of the overall settlement agreement(s) to be drafted and finalized. Although the operating results of River Point Behavioral Health did not have a material impact on our consolidated results of operations during 2019, 2018 or 2017, the payment suspension has had a material adverse effect on the facility's results of operations and financial condition.

The DOJ has advised us that the civil aspect of the coordinated investigation referenced above is a False Claims Act investigation focused on billings submitted to government payers in relation to services provided at those facilities. While there have

CONFIDENTIAL

ADAMHS000029635

DEF-MDL-14396.00091

been various matters raised by DOJ during the pendency of this investigation, DOJ Civil has advised that the focus of their investigation is on medical necessity issues and billing for services not eligible for payment due to non-compliance with regulatory requirements relating to, among other things, admission eligibility, discharge decisions, length of stay and patient care issues. It is our understanding that the DOJ Criminal Fraud Section was investigating similar issues prior to the closure of their investigation. UHS denies any fraudulent billings were submitted to government payers.

In July 2019, we reached an agreement in principle with the DOJ's Civil Division, and on behalf of various states' attorneys general offices, to resolve the civil aspects of the government's investigation of our behavioral health care facilities for $127 million subject to requisite approvals and preparation and execution of definitive settlement and related agreements. We are also negotiating a corporate integrity agreement with the Office of Inspector General for the United States Department of Health and Human Services ("OIG") which we expect will be part of the overall settlement of this matter.

In connection with this agreement in principle, during 2019, we recorded a pre-tax increase of approximately $11 million to the reserve established in connection with the civil aspects of these matters ("DOJ Reserve"), which includes related fees and costs due to or on behalf of third-parties. The aggregate pre-tax DOJ Reserve amounted to $134 million as of December 31, 2019 and $123 million as of December 31, 2018 (including $102 million recorded during 2018).

In late August, 2019, we received the initial draft of the settlement agreement from the DOJ's Civil Division. Negotiations regarding the terms and conditions of the settlement agreement continue. Based upon the terms and provisions included in the draft settlement agreement, and related subsequent discussions, our 2019 financial statements include an unfavorable provision for income taxes of approximately $6 million resulting from the net estimated federal and state income taxes due on the portion of the pre-tax DOJ Reserve that is estimated to be non-deductible for income tax purposes.

Since the agreement in principle with the DOJ's Civil Division is subject to certain required approvals and negotiation and execution of definitive settlement agreements, as well as negotiation and execution of a corporate integrity agreement with the OIG, we can provide no assurance that definitive agreements will ultimately be finalized. We therefore can provide no assurance that final amounts paid in settlement or otherwise, or associated costs, or the income tax deductibility of such payments, will not differ materially from our established reserve and assumptions related to income tax deductibility.

*DOJ investigation of Turning Point Hospital.*

During the fourth quarter of 2018, we were notified that the DOJ Civil Division in conjunction with the U.S. Attorney's Office for the Northern District of Georgia and the Georgia Attorney General's Office opened an investigation of Turning Point Hospital in Moultrie, GA. The DOJ Civil Division has advised us that they are primarily investigating transportation and housing financial assistance provided to patients receiving treatment at the facility. The DOJ issued a civil investigative demand to the facility requesting various documents and other information. In September, 2019, we reached a settlement in principle of this matter pending negotiation, finalization and execution of definitive settlement agreements. As of December 31, 2019, our financial statements include an estimated reserve in connection with the potential settlement of this matter, which did not have material impact on our results of operations and financial condition.

*Litigation:*

*U.S. ex rel Escobar v. Universal Health Services, Inc. et.al.*

This is a False Claims Act case filed against Universal Health Services, Inc., UHS of Delaware, Inc. and HRI Clinics, Inc. d/b/a Arbour Counseling Services in U.S. District Court for the District of Massachusetts. This qui tam action primarily alleges that Arbour Counseling Services failed to appropriately supervise certain clinical providers in contravention of regulatory requirements and the submission of claims to Medicaid were subsequently improper. Relators make other claims of improper billing to Medicaid associated with alleged failures of Arbour Counseling to comply with state regulations. The U.S. Attorney's Office and the Massachusetts Attorney General's Office initially declined to intervene. UHS filed a motion to dismiss and the trial court originally granted the motion dismissing the case. The First Circuit Court of Appeals ("First Circuit") reversed the trial court's dismissal of the case. The United States Supreme Court subsequently vacated the First Circuit's opinion and remanded the case for further consideration under the new legal standards established by the Supreme Court for False Claims Act cases. During the 4th quarter of 2016, the First Circuit issued a revised opinion upholding their reversal of the trial court's dismissal. The case was then remanded to the trial court for further proceedings. In January 2017, the U.S. Attorney's Office and Massachusetts Attorney General's Office advised of the potential for intervention in the case. The Massachusetts Attorney General's Office subsequently filed its motion to intervene which was granted and, in April 2017, filed their Complaint in Intervention. We have defended this case vigorously. This matter is included in the above-mentioned agreement in principle reached with the DOJ's Civil Division, and on behalf of various states' attorneys general offices, to resolve the civil aspects of the government's investigation of our behavioral health care facilities, subject to requisite approvals and preparation and execution of definitive settlement and related agreements.

*Shareholder Class Action*

In December 2016 a purported shareholder class action lawsuit was filed in U.S. District Court for the Central District of California against UHS and certain UHS officers alleging violations of the federal securities laws. The case was originally filed as

36

CONFIDENTIAL

ADAMHS000029636

DEF-MDL-14396.00092

Heed v. Universal Health Services, Inc. et. al. (Case No. 2:16-CV-09499-PSG-JC). The court subsequently appointed Teamsters Local 456 Pension Fund and Teamsters Local 456 Annuity Fund to serve as lead plaintiffs. The case has been transferred to the U.S. District Court for the Eastern District of Pennsylvania and the style of the case has been changed to Teamsters Local 456 Pension Fund, et. al. v. Universal Health Services, Inc. et. al. (Case No. 2:17-CV-02817-LS). In September, 2017, Teamsters Local 456 Pension Fund filed an amended complaint. The amended class action complaint alleges violations of federal securities laws relating to disclosures made in public filings associated with alleged practices and operations at our behavioral health facilities. Plaintiffs seek monetary damages for shareholders during the defined class period as a result of the decrease in share price following various public disclosures or reports. In December, 2017, we filed a motion to dismiss the amended complaint. In August, 2019, the court granted our motion to dismiss. Plaintiffs have filed a motion with the court seeking leave to file a second amended complaint. Should the court deny plaintiffs' motion, we anticipate an appeal of the dismissal of the case. We deny liability and intend to defend ourselves vigorously. At this time, we are uncertain as to potential liability or financial exposure, if any, which may be associated with this matter.

*Shareholder Derivative Cases*

In March 2017, a shareholder derivative suit was filed by plaintiff David Heed in the Court of Common Pleas of Philadelphia County. A notice of removal to the United States District Court for the Eastern District of Pennsylvania was filed (Case No. 2:17-cv-01476-LS). Plaintiff filed a motion to remand. In December 2017, the Court denied plaintiff's motion to remand and has retained the case in federal court. In May, June and July 2017, additional shareholder derivative suits were filed in the United States District Court for the Eastern District of Pennsylvania. The plaintiffs in those cases are: Central Laborers' Pension Fund (Case No. 17-cv-02187-LS), Firemen's Retirement System of St. Louis (Case No. 17—cv-02317-LS); Waterford Township Police & Fire Retirement System (Case No. 17-cv-02595-LS); and Amalgamated Bank Longview Funds (Case No. 17-cv-03404-LS). The Fireman's Retirement System case has since been voluntarily dismissed. The federal court has consolidated all of the cases pending in the Eastern District of Pennsylvania and has appointed co-lead plaintiffs and co-lead counsel. Lead Plaintiffs have filed a consolidated, amended complaint. We have filed a motion to dismiss the amended complaint. In addition, a shareholder derivative case was filed in Chancery Court in Delaware by the Delaware County Employees' Retirement Fund (Case No. 2017-0475-JTL). In December 2017, the Chancery Court stayed this case pending resolution of other contemporaneous matters. Each of these cases have named certain current and former members of the Board of Directors individually and certain officers of Universal Health Services, Inc. as defendants. UHS has also been named as a nominal defendant in these cases. The derivative cases make substantially similar allegations and claims as the shareholder class action relating to practices at our behavioral health facilities and board and corporate oversight of these facilities as well as claims relating to the stock trading by the individual defendants and company repurchase of shares during the relevant time period. The cases make claims of breaches of fiduciary duties by the named board members and officers; alleged violations of federal securities laws; and common law causes of action against the individual defendants including unjust enrichment, corporate waste, abuse of control, constructive fraud and gross mismanagement. The cases seek monetary damages allegedly incurred by the company; restitution and disgorgement of profits, benefits and other compensation from the individual defendants and various forms of equitable relief relating to corporate governance matters. In August, 2019, the court granted our motion to dismiss. Plaintiffs have filed a motion with the court seeking leave to file a second amended complaint. Should the court deny plaintiffs' motion, we anticipate an appeal of the dismissal of the case. The defendants deny liability and intend to defend these cases vigorously. At this time, we are uncertain as to potential liability or financial exposure, if any, which may be associated with these matters.

*The George Washington University v. Universal Health Services, Inc., et. al.*

In December 2019, The George Washington University ("University") filed a lawsuit in the Superior Court for the District of Columbia against Universal Health Services, Inc. as well as certain subsidiaries and individuals associated with the ownership and management of The George Washington University Hospital ("GW Hospital") in Washington, D.C. (case No. 2019 CA 008019 B). The lawsuit claims that UHS failed to provide sufficient financial compensation to the University under the terms of various agreements entered into in 1997 between the University and UHS for the joint venture ownership of GW Hospital. The lawsuit includes claims for breach of contract, breach of fiduciary duty, and unjust enrichment. We deny liability and intend to defend this matter vigorously. At this time, we are uncertain as to potential liability or financial exposure, if any, which may be associated with this matter.

*Disproportionate Share Hospital Payment Matter:*

In late September, 2015, many hospitals in Pennsylvania, including certain of our behavioral health care hospitals located in the state, received letters from the Pennsylvania Department of Human Services (the "Department") demanding repayment of allegedly excess Medicaid Disproportionate Share Hospital payments ("DSH"), primarily consisting of managed care payments characterized as DSH payments, for the federal fiscal year ("FFY") 2011 amounting to approximately $4 million in the aggregate. Since that time, certain of our behavioral health care hospitals in Pennsylvania have received similar requests for repayment for alleged DSH overpayments for FFYs 2012 through 2015. For FFY 2012, the claimed overpayment amounts to approximately $4 million. For FFY 2013, the claimed overpayments were initially approximately $7 million but have since been reduced to approximately $2 million due to a change in the Department's calculations of the hospital specific DSH upper payment limit. For FFY 2014, the claimed overpayments were approximately $7 million and for FFY 2015, the claimed overpayments were approximately $5 million. We filed administrative appeals for all of our facilities contesting the recoupment efforts for FFYs 2011 through 2015 as we believe the Department's calculation methodology is inaccurate and conflicts with applicable federal and state laws and regulations. The

37

Department has agreed to postpone the recoupment of the state's share of the DSH payments until all hospital appeals are resolved but started recoupment of the federal share. We understand that starting in FFY 2016, the first full fiscal year after the January 1, 2015 effective date of Medicaid expansion in Pennsylvania, the Department will no longer characterize managed care payments received by the hospitals as DSH payments. We can provide no assurance that we will ultimately be successful in our legal and administrative appeals related to the Department's repayment demands.  If our legal and administrative appeals are unsuccessful, our future consolidated results of operations and financial condition could be adversely impacted by these repayments.

*Other Matters:*

Various other suits, claims and investigations, including government subpoenas, arising against, or issued to, us are pending and additional such matters may arise in the future. Management will consider additional disclosure from time to time to the extent it believes such matters may be or become material. The outcome of any current or future litigation or governmental or internal investigations, including the matters described above, cannot be accurately predicted, nor can we predict any resulting penalties, fines or other sanctions that may be imposed at the discretion of federal or state regulatory authorities. We record accruals for such contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. No estimate of the possible loss or range of loss in excess of amounts accrued, if any, can be made at this time regarding the matters described above or that are otherwise pending because the inherently unpredictable nature of legal proceedings may be exacerbated by various factors, including, but not limited to: (i) the damages sought in the proceedings are unsubstantiated or indeterminate; (ii) discovery is not complete; (iii) the matter is in its early stages; (iv) the matters present legal uncertainties; (v) there are significant facts in dispute; (vi) there are a large number of parties, or; (vii) there is a wide range of potential outcomes. It is possible that the outcome of these matters could have a material adverse impact on our future results of operations, financial position, cash flows and, potentially, our reputation.

**ITEM 4.**     *Mine Safety Disclosures*

Not applicable.

38

## PART II

**ITEM 5.    Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

Our Class B Common Stock is traded on the New York Stock Exchange under the symbol UHS. Shares of our Class A, Class C and Class D Common Stock are not traded in any public market, but are each convertible into shares of our Class B Common Stock on a share-for-share basis.

The number of stockholders of record as of January 31, 2020, were as follows:

| | |
|---|---|
| Class A Common | 17 |
| Class B Common | 818 |
| Class C Common | 1 |
| Class D Common | 95 |

### Stock Repurchase Programs

In July, 2019, our Board of Directors authorized a $1.0 billion increase to our stock repurchase program, which increased the aggregate authorization to $2.7 billion from the previous $1.7 billion authorization approved in various increments since 2014. Pursuant to this program, which had an aggregate available repurchase authorization of $756.1 million as of December 31, 2019, shares of our Class B Common Stock may be repurchased, from time to time as conditions allow, on the open market or in negotiated private transactions. There is no expiration date for our stock repurchase programs.

As reflected below, during the three-month period ended December 31, 2019, we have repurchased approximately 1.3 million shares at an aggregate cost of approximately $181.2 million (approximately $141 per share) pursuant to the terms of our stock repurchase program. In addition, 9,377 shares were repurchased in connection with income tax withholding obligations resulting from the exercise of stock options and the vesting of restricted stock grants.

During the period of October 1, 2019 through December 31, 2019, we repurchased the following shares:

| | Additional Dollars Authorized For Repurchase (in thousands) | Total number of shares purchased | Total number of shares cancelled | Average price paid per share for forfeited restricted shares | Total Number of shares purchased as part of publicly announced programs | Average price paid per share for shares purchased as part of publicly announced program | Aggregate purchase price paid (in thousands) | Maximum number of dollars that may yet be purchased under the program (in thousands) |
|---|---|---|---|---|---|---|---|---|
| October, 2019 | — | 400,469 | 3,589 | $ 0.01 | 400,000 | $ 138.38 | $ 55,353 | $ 881,949 |
| November, 2019 | — | 338,970 | 863 | $ 0.01 | 337,521 | $ 139.90 | 47,220 | $ 834,729 |
| December, 2019 | — | 557,459 | 1,535 | $ 0.01 | 550,000 | $ 142.92 | 78,606 | $ 756,123 |
| Total October through December | $  - | 1,296,898 | 5,987 | $ 0.01 | 1,287,521 | $ 140.72 | $ 181,179 | |

### Dividends

We have a history of paying quarterly cash dividends to our shareholders and it is our intention at this time to pay comparable dividends in the future. Our Credit Agreement contains covenants that include limitations on, among other things, dividends and stock repurchases (see below in *Capital Resources-Credit Facilities and Outstanding Debt Securities*).

### Equity Compensation

Refer to Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters, of this report for information regarding securities authorized for issuance under our equity compensation plans.

### Stock Price Performance Graph

The following graph compares the cumulative total stockholder return on our common stock with the cumulative total return on the stock included in the Standard & Poor's 500 Index and a Peer Group Index during the five year period ended December 31, 2019.

39

CONFIDENTIAL

DEF-MDL-14396.00095

The graph assumes an investment of $100 made in our common stock and each Index as of January 1, 2015 and has been weighted based on market capitalization. Note that our common stock price performance shown below should not be viewed as being indicative of future performance.

Companies in the peer group, which consist of companies in the S&P 500 Index or S&P MidCap 400 Index are as follows: Acadia Healthcare Company, Inc., Community Health Systems, Inc., HCA Healthcare, Inc., LifePoint Health, Inc. (included until November, 2018, when it was acquired by Apollo Management) and Tenet Healthcare Corporation.



40

CONFIDENTIAL

ADAMHS000029640

DEF-MDL-14396.00096

| Company Name / Index | 2014 Base | | 2015 | | 2016 | | 2017 | | 2018 | | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Universal Health Services, Inc. | $ | 100.00 | $ | 107.74 | $ | 96.24 | $ | 102.90 | $ | 106.16 | $ | 131.23 |
| S&P 500 Index | $ | 100.00 | $ | 101.38 | $ | 113.51 | $ | 138.29 | $ | 132.23 | $ | 173.86 |
| Peer Group | $ | 100.00 | $ | 84.91 | $ | 76.50 | $ | 86.85 | $ | 117.80 | $ | 146.47 |

41

CONFIDENTIAL

ADAMHS000029641

DEF-MDL-14396.00097

**ITEM 6.** **Selected Financial Data**

The following table contains our selected financial data for, or as of the end of, each of the five years ended December 31, 2019. You should read this table in conjunction with the consolidated financial statements and related notes included elsewhere in this report and in Part II, *Item 7, Management's Discussion and Analysis of Financial Condition and Results of Operations.*

| | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2019** | **2018** | **2017** | **2016** | **2015** |
| **Summary of Operations** (in thousands) | | | | | |
| Net revenues | $11,378,259 | $10,772,278 | $10,409,865 | $ 9,766,210 | $9,043,451 |
| Income before income taxes | $ 1,066,337 | $ 1,034,525 | $ 1,135,009 | $ 1,156,358 | $1,145,901 |
| Net income attributable to UHS | $ 814,854 | $ 779,705 | $ 752,303 | $ 702,409 | $ 680,528 |
| Net margin | 7.2% | 7.2% | 7.2% | 7.2% | 7.5% |
| Return on average equity | 15.0% | 14.6% | 15.5% | 16.0% | 16.6% |
| **Financial Data** (in thousands) | | | | | |
| Cash provided by operating activities | $ 1,438,469 | $ 1,274,742 | $ 1,247,585 | $ 1,254,509 | $1,045,310 |
| Capital expenditures, net (1) | $ 634,095 | $ 664,962 | $ 557,506 | $ 519,939 | $ 379,321 |
| Total assets | $11,668,250 | $11,265,480 | $10,761,828 | $10,317,802 | $9,615,444 |
| Current maturities of long-term debt | $ 87,550 | $ 63,446 | $ 545,619 | $ 105,895 | $ 62,722 |
| Long-term debt | $ 3,896,577 | $ 3,935,187 | $ 3,494,390 | $ 4,030,230 | $3,368,634 |
| UHS's common stockholders' equity | $ 5,504,105 | $ 5,389,262 | $ 4,989,514 | $ 4,533,220 | $4,249,647 |
| Percentage of total debt to total capitalization | 42% | 43% | 45% | 48% | 45% |
| **Operating Data—Acute Care Hospitals (2)** | | | | | |
| Average licensed beds | 6,379 | 6,232 | 6,127 | 5,934 | 5,832 |
| Average available beds | 6,205 | 6,056 | 5,954 | 5,759 | 5,656 |
| Inpatient admissions | 317,983 | 303,985 | 297,390 | 274,074 | 261,727 |
| Average length of patient stay | 4.6 | 4.5 | 4.4 | 4.6 | 4.7 |
| Patient days | 1,451,847 | 1,376,988 | 1,312,265 | 1,251,511 | 1,218,969 |
| Occupancy rate for licensed beds | 62% | 61% | 59% | 58% | 57% |
| Occupancy rate for available beds | 64% | 62% | 60% | 59% | 59% |
| **Operating Data—Behavioral Health Facilities (2)** | | | | | |
| Average licensed beds | 23,812 | 23,509 | 23,151 | 21,829 | 21,202 |
| Average available beds | 23,711 | 23,425 | 23,068 | 21,744 | 21,116 |
| Inpatient admissions | 488,367 | 482,658 | 467,822 | 456,052 | 447,007 |
| Average length of patient stay | 13.3 | 13.3 | 13.6 | 13.2 | 13.1 |
| Patient days | 6,487,707 | 6,418,334 | 6,381,756 | 6,004,066 | 5,835,134 |
| Occupancy rate for licensed beds | 75% | 75% | 76% | 75% | 75% |
| Occupancy rate for available beds | 75% | 75% | 76% | 75% | 76% |
| **Per Share Data** | | | | | |
| Net income attributable to UHS—basic | $ 9.16 | $ 8.35 | $ 7.86 | $ 7.22 | $ 6.89 |
| Net income attributable to UHS—diluted | $ 9.13 | $ 8.31 | $ 7.81 | $ 7.14 | $ 6.76 |
| Dividends declared | $ 0.60 | $ 0.40 | $ 0.40 | $ 0.40 | $ 0.40 |
| **Other Information** (in thousands) | | | | | |
| Weighted average number of shares outstanding—basic | 88,762 | 93,276 | 95,652 | 97,208 | 98,797 |
| Weighted average number of shares and share equivalents outstanding—diluted | 89,040 | 93,750 | 96,325 | 98,380 | 100,694 |

(1) Amounts exclude non-cash capital lease obligations, if any.
(2) Excludes statistical information related to divested facilities.

42

**ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*Overview*

Our principal business is owning and operating, through our subsidiaries, acute care hospitals and outpatient facilities and behavioral health care facilities.

As of February 26, 2020, we owned and/or operated 354 inpatient facilities and 42 outpatient and other facilities including the following located in 37 states, Washington, D.C., the United Kingdom and Puerto Rico:

*Acute care facilities located in the U.S.:*

- 26 inpatient acute care hospitals;
- 14 free-standing emergency departments, and;
- 6 outpatient centers & 1 surgical hospital.

*Behavioral health care facilities (328 inpatient facilities and 21 outpatient facilities):*

*Located in the U.S.:*

- 185 inpatient behavioral health care facilities, and;
- 19 outpatient behavioral health care facilities.

*Located in the U.K.:*

- 140 inpatient behavioral health care facilities, and;
- 2 outpatient behavioral health care facilities.

*Located in Puerto Rico:*

- 3 inpatient behavioral health care facilities.

As a percentage of our consolidated net revenues, net revenues from our acute care hospitals, outpatient facilities and commercial health insurer accounted for 54% during 2019 and 53% during each of 2018 and 2017. Net revenues from our behavioral health care facilities and commercial health insurer accounted for 46% of our consolidated net revenues during 2019 and 47% during each of 2018 and 2017.

Our behavioral health care facilities located in the U.K. generated net revenues of approximately $554 million in 2019, $505 million in 2018 and $429 million in 2017. Total assets at our U.K. behavioral health care facilities were approximately $1.270 billion as of December 31, 2019, $1.224 billion as of December 31, 2018 and $1.098 billion as of December 31, 2017.

Services provided by our hospitals include general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services and/or behavioral health services. We provide capital resources as well as a variety of management services to our facilities, including central purchasing, information services, finance and control systems, facilities planning, physician recruitment services, administrative personnel management, marketing and public relations.

*Forward-Looking Statements and Risk Factors*

You should carefully review the information contained in this Annual Report, and should particularly consider any risk factors that we set forth in this Annual Report and in other reports or documents that we file from time to time with the Securities and Exchange Commission (the "SEC"). In this Annual Report, we state our beliefs of future events and of our future financial performance. This Annual Report contains "forward-looking statements" that reflect our current estimates, expectations and projections about our future results, performance, prospects and opportunities. Forward-looking statements include, among other things, the information concerning our possible future results of operations, business and growth strategies, financing plans, expectations that regulatory developments or other matters will not have a material adverse effect on our business or financial condition, our competitive position and the effects of competition, the projected growth of the industry in which we operate, and the benefits and synergies to be obtained from our completed and any future acquisitions, and statements of our goals and objectives, and other similar expressions concerning matters that are not historical facts. Words such as "may," "will," "should," "could," "would," "predicts," "potential," "continue," "expects," "anticipates," "future," "intends," "plans," "believes," "estimates," "appears," "projects" and similar expressions, as well as statements in future tense, identify forward-looking statements. In evaluating those statements, you should specifically consider various factors, including the risks related to healthcare industry trends and those set forth herein in *Item 1A. Risk Factors.* Those factors may cause our actual results to differ materially from any of our forward-looking statements.

43

ADAMHS000029643

Forward-looking statements should not be read as a guarantee of future performance or results, and will not necessarily be accurate indications of the times at, or by which, such performance or results will be achieved. Forward-looking information is based on information available at the time and/or our good faith belief with respect to future events, and is subject to risks and uncertainties that could cause actual performance or results to differ materially from those expressed in the statements. Such factors include, among other things, the following:

- our ability to comply with the existing laws and government regulations, and/or changes in laws and government regulations;

- an increasing number of legislative initiatives have been passed into law that may result in major changes in the health care delivery system on a national or state level. Legislation has already been enacted that has eliminated the penalty for failing to maintain health coverage that was part of the original Patient Protection and Affordable Care Act (the "Legislation"). President Trump has already taken executive actions: (i) requiring all federal agencies with authorities and responsibilities under the Legislation to "exercise all authority and discretion available to them to waiver, defer, grant exemptions from, or delay" parts of the Legislation that place "unwarranted economic and regulatory burdens" on states, individuals or health care providers; (ii) the issuance of a final rule in June, 2018 by the Department of Labor to enable the formation of association health plans that would be exempt from certain Legislation requirements such as the provision of essential health benefits; (iii) the issuance of a final rule in August, 2018 by the Department of Labor, Treasury, and Health and Human Services to expand the availability of short-term, limited duration health insurance, (iv) eliminating cost-sharing reduction payments to insurers that would otherwise offset deductibles and other out-of-pocket expenses for health plan enrollees at or below 250 percent of the federal poverty level; (v) relaxing requirements for state innovation waivers that could reduce enrollment in the individual and small group markets and lead to additional enrollment in short-term, limited duration insurance and association health plans; (vi) the issuance of a final rule in June, 2019 by the Departments of Labor, Treasury, and Health and Human Services that would incentivize the use of health reimbursement arrangements by employers to permit employees to purchase health insurance in the individual market, and; (vii) directing the issuance of federal rulemaking by executive agencies to increase transparency of healthcare price and quality information. The uncertainty resulting from these Executive Branch policies has led to reduced Exchange enrollment in 2018, 2019 and 2020 and is expected to further worsen the individual and small group market risk pools in future years. It is also anticipated that these and future policies may create additional cost and reimbursement pressures on hospitals, including ours. In addition, while attempts to repeal the entirety of the Legislation have not been successful to date, a key provision of the Legislation was repealed as part of the Tax Cuts and Jobs Act and on December 14, 2018, a federal U.S. District Court Judge in Texas ruled the entire Legislation is unconstitutional.  That ruling was stayed and has been appealed.  On December 18, 2019, the 5th Circuit Court of Appeals voted 2-1 to strike down the Legislation individual mandate as unconstitutional and sent the case back to the U.S. District Court in Texas to determine which Legislation provisions should be stricken with the mandate or whether the entire law is unconstitutional without the individual mandate. It is likely this matter will ultimately be appealed to the U.S. Supreme Court.  We are unable to predict the final outcome of this matter which has caused greater uncertainty regarding the future status of the Legislation. If all or any parts of the Legislation are ultimately found to be unconstitutional, it could have a material adverse effect on our business, financial condition and results of operations. See below in *Sources of Revenue and Health Care Reform* for additional disclosure;

- possible unfavorable changes in the levels and terms of reimbursement for our charges by third party payers or government based payers, including Medicare or Medicaid in the United States, and government based payers in the United Kingdom;

- our ability to enter into managed care provider agreements on acceptable terms and the ability of our competitors to do the same, including contracts with United/Sierra Healthcare in Las Vegas, Nevada.  Effective January, 2020, United/Sierra Healthcare in Las Vegas, entered into an agreement with a competitor health system that was previously excluded from their contractual network in the area. As a result, we believe that our 6 acute care hospitals in the Las Vegas, Nevada market, will likely experience a decrease in patient volumes.  However, we have entered into an amended agreement with United/Sierra Healthcare related to our hospitals in the Las Vegas market that provide for various rate increases beginning in January, 2020. Although we estimate that the unfavorable impact of the projected decreases in patient volumes should be largely offset by the favorable impact of the increased rates, we can provide no assurance that these developments will not have a material adverse impact on our future results of operations;

- the outcome of known and unknown litigation, government investigations, false claims act allegations, and liabilities and other claims asserted against us and other matters as disclosed in *Item 3. Legal Proceedings,* and the effects of adverse publicity relating to such matters;

- the potential unfavorable impact on our business of deterioration in national, regional and local economic and business conditions, including a worsening of unfavorable credit market conditions;

- competition from other healthcare providers (including physician owned facilities) in certain markets;

44

- technological and pharmaceutical improvements that increase the cost of providing, or reduce the demand for healthcare;

- our ability to attract and retain qualified personnel, nurses, physicians and other healthcare professionals and the impact on our labor expenses resulting from a shortage of nurses and other healthcare professionals;

- demographic changes;

- the availability of suitable acquisition and divestiture opportunities and our ability to successfully integrate and improve our acquisitions since failure to achieve expected revenue benefits from certain of our prior or future acquisitions could result in impairment charges for goodwill and purchased intangibles;

- the impact of severe weather conditions, including the effects of hurricanes and climate change;

- as discussed below in *Sources of Revenue*, we receive revenues from various state and county based programs, including Medicaid in all the states in which we operate (we receive Medicaid revenues in excess of $100 million annually from each of California, Texas, Nevada, Washington, D.C., Pennsylvania and Illinois); CMS-approved Medicaid supplemental programs in certain states including Texas, Mississippi, Illinois, Oklahoma, Nevada, Arkansas, California and Indiana, and; state Medicaid disproportionate share hospital payments in certain states including Texas and South Carolina. We are therefore particularly sensitive to potential reductions in Medicaid and other state based revenue programs as well as regulatory, economic, environmental and competitive changes in these states. We can provide no assurance that reductions to revenues earned pursuant to these programs, particularly in the above-mentioned states, will not have a material adverse effect on our future results of operations;

- our ability to continue to obtain capital on acceptable terms, including borrowed funds, to fund the future growth of our business;

- our inpatient acute care and behavioral health care facilities may experience decreasing admission and length of stay trends;

- our financial statements reflect large amounts due from various commercial and private payers and there can be no assurance that failure of the payers to remit amounts due to us will not have a material adverse effect on our future results of operations;

- in August, 2011, the Budget Control Act of 2011 (the "2011 Act") was enacted into law. The 2011 Act imposed annual spending limits for most federal agencies and programs aimed at reducing budget deficits by $917 billion between 2012 and 2021, according to a report released by the Congressional Budget Office. Among its other provisions, the law established a bipartisan Congressional committee, known as the Joint Select Committee on Deficit Reduction (the "Joint Committee"), which was tasked with making recommendations aimed at reducing future federal budget deficits by an additional $1.5 trillion over 10 years. The Joint Committee was unable to reach an agreement by the November 23, 2011 deadline and, as a result, across-the-board cuts to discretionary, national defense and Medicare spending were implemented on March 1, 2013 resulting in Medicare payment reductions of up to 2% per fiscal year with a uniform percentage reduction across all Medicare programs. The Bipartisan Budget Act of 2015, enacted on November 2, 2015, continued the 2% reductions to Medicare reimbursement imposed under the 2011 Act. Subsequent legislation enacted by Congress extended reductions through 2029. We cannot predict whether Congress will restructure the implemented Medicare payment reductions or what other federal budget deficit reduction initiatives may be proposed by Congress going forward;

- uninsured and self-pay patients treated at our acute care facilities unfavorably impact our ability to satisfactorily and timely collect our self-pay patient accounts;

- changes in our business strategies or development plans;

- in June, 2016, the United Kingdom affirmatively voted in a non-binding referendum in favor of the exit of the United Kingdom ("U.K.")from the European Union (the "Brexit") and it was approved by vote of the British legislature. On March 29, 2017, the United Kingdom triggered Article 50 of the Lisbon Treaty, formally starting negotiations regarding its exit from the European Union. On January 31, 2020, the U.K. formally exited the European Union. The U.K. and the European Union will now enter into a transition period in which the terms of the future relationship must be negotiated. The outcome of these negotiations is uncertain, and we do not know to what extent Brexit will ultimately impact the business and regulatory environment in the U.K., the European Union, or other countries. The U.K. will continue to follow European Union rules through at least December 31, 2020 (the "Transition Period"). The Transition Period may be extended through December 31, 2022. Any of these effects of Brexit, and others we cannot anticipate, could harm our business, financial condition and results of operations;

- fluctuations in the value of our common stock, and;

- other factors referenced herein or in our other filings with the Securities and Exchange Commission.

45

ADAMHS000029645

Given these uncertainties, risks and assumptions, as outlined above, you are cautioned not to place undue reliance on such forward-looking statements. Our actual results and financial condition could differ materially from those expressed in, or implied by, the forward-looking statements. Forward-looking statements speak only as of the date the statements are made. We assume no obligation to publicly update any forward-looking statements to reflect actual results, changes in assumptions or changes in other factors affecting forward-looking information, except as may be required by law. All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by this cautionary statement.

### *Critical Accounting Policies and Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires us to make estimates and assumptions that affect the amounts reported in our consolidated financial statements and accompanying notes.

A summary of our significant accounting policies is outlined in Note 1 to the financial statements. We consider our critical accounting policies to be those that require us to make significant judgments and estimates when we prepare our financial statements, including the following:

**Revenue Recognition:** On January 1, 2018, we adopted, using the modified retrospective approach, ASU 2014-09 and ASU 2016-08, "Revenue from Contracts with Customers (Topic 606)" and "Revenue from Contracts with Customers: Principal versus Agent Considerations (Reporting Revenue Gross versus Net)", respectively, which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The most significant change from the adoption of the new standard relates to our estimation for the allowance for doubtful accounts. Under the previous standards, our estimate for amounts not expected to be collected based upon our historical experience, were reflected as provision for doubtful accounts, included within net revenue. Under the new standard, our estimate for amounts not expected to be collected based on historical experience will continue to be recognized as a reduction to net revenue, however, not reflected separately as provision for doubtful accounts. Under the new standard, subsequent changes in estimate of collectability due to a change in the financial status of a payer, for example a bankruptcy, will be recognized as bad debt expense in operating charges. The adoption of this ASU in 2018, and amounts recognized as bad debt expense and included in other operating expenses, did not have a material impact on our consolidated financial statements.

See *Note 10 to the Consolidated Financial Statements-Revenue Recognition,* for additional disclosure related to our revenues including a disaggregation of our consolidated net revenues by major source for each of the periods presented herein.

We report net patient service revenue at the estimated net realizable amounts from patients and third-party payers and others for services rendered. We have agreements with third-party payers that provide for payments to us at amounts different from our established rates. Payment arrangements include rates per discharge, reimbursed costs, discounted charges and per diem payments. Estimates of contractual allowances, which represent explicit price concessions under ASC 606, under managed care plans are based upon the payment terms specified in the related contractual agreements. We closely monitor our historical collection rates, as well as changes in applicable laws, rules and regulations and contract terms, to assure that provisions are made using the most accurate information available. However, due to the complexities involved in these estimations, actual payments from payers may be different from the amounts we estimate and record.

We estimate our Medicare and Medicaid revenues using the latest available financial information, patient utilization data, government provided data and in accordance with applicable Medicare and Medicaid payment rules and regulations. The laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation and as a result, there is at least a reasonable possibility that recorded estimates will change by material amounts in the near term. Certain types of payments by the Medicare program and state Medicaid programs (e.g. Medicare Disproportionate Share Hospital, Medicare Allowable Bad Debts and Inpatient Psychiatric Services) are subject to retroactive adjustment in future periods as a result of administrative review and audit and our estimates may vary from the final settlements. Such amounts are included in accounts receivable, net, on our Consolidated Balance Sheets. The funding of both federal Medicare and state Medicaid programs are subject to legislative and regulatory changes. As such, we cannot provide any assurance that future legislation and regulations, if enacted, will not have a material impact on our future Medicare and Medicaid reimbursements. Adjustments related to the final settlement of these retrospectively determined amounts did not materially impact our results in 2019, 2018 or 2017. If it were to occur, each 1% adjustment to our estimated net Medicare revenues that are subject to retrospective review and settlement as of December 31, 2019, would change our after-tax net income by approximately $1 million.

**Charity Care, Uninsured Discounts and Other Adjustments to Revenue:** Collection of receivables from third-party payers and patients is our primary source of cash and is critical to our operating performance. Our primary collection risks relate to uninsured patients and the portion of the bill which is the patient's responsibility, primarily co-payments and deductibles. We estimate our

46

revenue adjustments for implicit price concessions based on general factors such as payer mix, the aging of the receivables and historical collection experience, consistent with our estimates for provisions for doubtful accounts under ASC 605. We routinely review accounts receivable balances in conjunction with these factors and other economic conditions which might ultimately affect the collectability of the patient accounts and make adjustments to our allowances as warranted. At our acute care hospitals, third party liability accounts are pursued until all payment and adjustments are posted to the patient account. For those accounts with a patient balance after third party liability is finalized or accounts for uninsured patients, the patient receives statements and collection letters.

Under ASC 605, our hospitals established a partial reserve for self-pay accounts in the allowance for doubtful accounts for both unbilled balances and those that had been billed and were under 90 days old. All self-pay accounts were fully reserved at 90 days from the date of discharge. Third party liability accounts were fully reserved in the allowance for doubtful accounts when the balance aged past 180 days from the date of discharge. Patients that express an inability to pay were reviewed for potential sources of financial assistance including our charity care policy. If the patient was deemed unwilling to pay, the account was written-off as bad debt and transferred to an outside collection agency for additional collection effort. Under ASC 606, while similar processes and methodologies are considered, these revenue adjustments are considered at the time the services are provided in determination of the transaction price.

Historically, a significant portion of the patients treated throughout our portfolio of acute care hospitals are uninsured patients which, in part, has resulted from patients who are employed but do not have health insurance or who have policies with relatively high deductibles. Patients treated at our hospitals for non-elective services, who have gross income of various amounts, dependent upon the state, ranging from 200% to 400% of the federal poverty guidelines, are deemed eligible for charity care. The federal poverty guidelines are established by the federal government and are based on income and family size. Because we do not pursue collection of amounts that qualify as charity care, the transaction price is fully adjusted and there is no impact in our net revenues or in our accounts receivable, net.

A portion of the accounts receivable at our acute care facilities are comprised of Medicaid accounts that are pending approval from third-party payers but we also have smaller amounts due from other miscellaneous payers such as county indigent programs in certain states. Our patient registration process includes an interview of the patient or the patient's responsible party at the time of registration. At that time, an insurance eligibility determination is made and an insurance plan code is assigned. There are various pre-established insurance profiles in our patient accounting system which determine the expected insurance reimbursement for each patient based on the insurance plan code assigned and the services rendered. Certain patients may be classified as Medicaid pending at registration based upon a screening evaluation if we are unable to definitively determine if they are currently Medicaid eligible. When a patient is registered as Medicaid eligible or Medicaid pending, our patient accounting system records net revenues for services provided to that patient based upon the established Medicaid reimbursement rates, subject to the ultimate disposition of the patient's Medicaid eligibility. When the patient's ultimate eligibility is determined, reclassifications may occur which impacts net revenues in future periods. Although the patient's ultimate eligibility determination may result in adjustments to net revenues, these adjustments do not have a material impact on our results of operations in 2019, 2018 or 2017 since our facilities make estimates at each financial reporting period to adjust revenue based on historical collections. Under ASC 605, these estimates were reported in the provision for doubtful accounts.

We also provide discounts to uninsured patients (included in "uninsured discounts" amounts below) who do not qualify for Medicaid or charity care. Because we do not pursue collection of amounts classified as uninsured discounts, the transaction price is fully adjusted and there is no impact in our net revenues or in our accounts receivable. In implementing the discount policy, we first attempt to qualify uninsured patients for governmental programs, charity care or any other discount program. If an uninsured patient does not qualify for these programs, the uninsured discount is applied.

*Uncompensated care (charity care and uninsured discounts):*

The following table shows the amounts recorded at our acute care hospitals for charity care and uninsured discounts, based on charges at established rates, for the years ended December 31, 2019, 2018 and 2017:

| | | | (dollar amounts in thousands) | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| | Amount | % | Amount | % | Amount | % |
| Charity care | $ 672,326 | 31% | $ 761,783 | 40% | $ 887,136 | 50% |
| Uninsured discounts | 1,511,738 | 69% | 1,132,811 | 60% | 881,265 | 50% |
| Total uncompensated care | $2,184,064 | 100% | $1,894,594 | 100% | $1,768,401 | 100% |

47

ADAMHS000029647

*The estimated cost of providing uncompensated care:*

The estimated cost of providing uncompensated care, as reflected below, were based on a calculation which multiplied the percentage of operating expenses for our acute care hospitals to gross charges for those hospitals by the above-mentioned total uncompensated care amounts. The percentage of cost to gross charges is calculated based on the total operating expenses for our acute care facilities divided by gross patient service revenue for those facilities. An increase in the level of uninsured patients to our facilities and the resulting adverse trends in the adjustments to net revenues and uncompensated care provided could have a material unfavorable impact on our future operating results.

| | (amounts in thousands) | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Estimated cost of providing charity care | $ 77,886 | $ 94,088 | $ 120,208 |
| Estimated cost of providing uninsured discounts related care | 175,128 | 139,913 | 119,412 |
| Estimated cost of providing uncompensated care | $ 253,014 | $ 234,001 | $ 239,620 |

**Self-Insured/Other Insurance Risks:** We provide for self-insured risks including general and professional liability claims, workers' compensation claims and healthcare and dental claims. Our estimated liability for self-insured professional and general liability claims is based on a number of factors including, among other things, the number of asserted claims and reported incidents, estimates of losses for these claims based on recent and historical settlement amounts, estimate of incurred but not reported claims based on historical experience, and estimates of amounts recoverable under our commercial insurance policies. All relevant information, including our own historical experience is used in estimating the expected amount of claims. While we continuously monitor these factors, our ultimate liability for professional and general liability claims could change materially from our current estimates due to inherent uncertainties involved in making this estimate. Our estimated self-insured reserves are reviewed and changed, if necessary, at each reporting date and changes are recognized currently as additional expense or as a reduction of expense. In addition, we also: (i) own commercial health insurers headquartered in Reno, Nevada, and Puerto Rico and; (ii) maintain self-insured employee benefits programs for employee healthcare and dental claims. The ultimate costs related to these programs/operations include expenses for claims incurred and paid in addition to an accrual for the estimated expenses incurred in connection with claims incurred but not yet reported. Given our significant insurance-related exposure, there can be no assurance that a sharp increase in the number and/or severity of claims asserted against us will not have a material adverse effect on our future results of operations.

See *Note 8 to the Consolidated Financial Statements-Commitments and Contingencies*, for additional disclosure related to our professional and general liability, workers' compensation liability and property insurance.

**Long-Lived Assets:** We review our long-lived assets for impairment whenever events or circumstances indicate that the carrying value of these assets may not be recoverable. The assessment of possible impairment is based on our ability to recover the carrying value of our asset based on our estimate of its undiscounted future cash flow. If the analysis indicates that the carrying value is not recoverable from future cash flows, the asset is written down to its estimated fair value and an impairment loss is recognized. Fair values are determined based on estimated future cash flows using appropriate discount rates.

**Goodwill and Intangible Assets:** Goodwill and indefinite-lived intangible assets are reviewed for impairment at the reporting unit level on an annual basis or sooner if the indicators of impairment arise. Our judgments regarding the existence of impairment indicators are based on market conditions and operational performance of each reporting unit. We have designated October 1st as our annual impairment assessment date for our goodwill and indefinite-lived intangible assets.

We performed an impairment assessment as of October 1, 2019 which indicated no impairment of goodwill. There were also no goodwill impairments during 2018 or 2017.

Our 2019 and 2018 financial results included aggregate pre-tax provisions for asset impairments of $98 million and $49 million, respectively, recorded in connection with Foundations Recovery Network, L.L.C. ("Foundations"), which was acquired by us in 2015. These pre-tax provisions for asset impairments include: (i) a $124 million impairment provision to write-off the carrying value of the Foundations' tradename intangible asset ($75 million recorded during 2019 and $49 million recorded during 2018), and; (ii) a $23 million impairment provision recorded during 2019 to reduce the carrying value of real property assets of certain Foundations' facilities. Please see below in *Provision for Asset Impairment-Foundations Recovery Network* for additional information.

Future changes in the estimates used to conduct the impairment review, including profitability and market value projections, could indicate impairment in future periods potentially resulting in a write-off of a portion or all of our goodwill or indefinite-lived intangible assets.

**Income Taxes:** Deferred tax assets and liabilities are recognized for the amount of taxes payable or deductible in future years as a result of differences between the tax basis of assets and liabilities and their reported amounts in the financial statements. We

48

CONFIDENTIAL

DEF-MDL-14396.00104

ADAMHS000029648

believe that future income will enable us to realize our deferred tax assets net of recorded valuation allowances relating to state and foreign net operating loss carry-forwards, foreign tax credits, and interest deduction limitations.

On December 22, 2017, the President of the United States signed into law comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act of 2017 (the "TCJA-17"). The TCJA-17 made broad and complex changes to the U.S. tax code, including, but not limited to, (1) reducing the U.S. federal corporate tax rate from 35 percent to 21 percent; (2) requiring companies to pay a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries; (3) generally eliminating U.S. federal income taxes on dividends from foreign subsidiaries; (4) requiring current inclusion in U.S. federal taxable income of certain earnings of controlled foreign corporations through the implementation of a territorial tax system; (5) creating a new limitation on deductible interest expense, and; (6) limiting certain other deductions. We provided a provisional estimate of the effects of the TCJA-17 in the fourth quarter of 2017 financial statements. In the fourth quarter of 2018, we completed our analysis to determine the effects of the TCJA-17 in accordance with Staff Accounting Bulletin No. 118 as follows:

*Reduction of U.S. federal corporate tax rate:* The TCJA-17 reduces the corporate tax rate to 21 percent, effective January 1, 2018. Deferred income taxes are based on the estimated future tax effects of differences between the financial statement carrying amounts and the tax basis of assets and liabilities under the provisions of the enacted laws. For certain of our deferred tax assets and deferred tax liabilities, we recorded a provisional decrease of $97 million and $127 million, respectively, with a corresponding net adjustment to deferred tax benefit of $30 million for the year ended December 31, 2017. Upon completion of our 2017 U.S. Corporate Income Tax Return, an increase of $1 million attributable to certain deferred tax assets and a decrease of $5 million attributable to certain deferred tax liabilities was recorded resulting in an additional net deferred tax benefit of $6 million.

*Deemed Repatriation Transition Tax:* The Deemed Repatriation Transition Tax ("Transition Tax") is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of certain of our foreign subsidiaries. The one-time Transition Tax is based upon the amount of post-1986 E&P of the relevant subsidiaries, the amount of non-U.S. income tax paid on such earnings, as well as other factors. We originally estimated and recorded a provisional Transition Tax obligation of $11.3 million. Upon completion of our 2017 U.S. Corporate Income Tax Return, the final Transition Tax increased by $100,000 for a total of $11.4 million.

We operate in multiple jurisdictions with varying tax laws. We are subject to audits by any of these taxing authorities. Our tax returns have been examined by the Internal Revenue Service through the year ended December 31, 2006. We believe that adequate accruals have been provided for federal, foreign and state taxes.

See *Provision for Income Taxes and Effective Tax Rates* below for discussion of our effective tax rates during each of the last three years.

**Recent Accounting Pronouncements:** For a summary of recent accounting pronouncements, please see *Note 1 to the Consolidated Financial Statements-Accounting Standards* as included in this Report on Form 10-K for the year ended December 31, 2019.

49

CONFIDENTIAL

*Results of Operations*

The following table summarizes our results of operations, and is used in the discussion below, for the years ended December 31, 2019, 2018 and 2017 (dollar amounts in thousands):

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| | Amount | % of Net Revenues | Amount | % of Net Revenues | Amount | % of Net Revenues |
| Net revenues before provision for doubtful accounts | | | | | $11,278,942 | |
| Less: Provision for doubtful accounts | | | | | 869,077 | |
| Net revenues | $11,378,259 | 100.0% | $10,772,278 | 100.0% | 10,409,865 | 100.0% |
| Operating charges: | | | | | | |
| Salaries, wages and benefits | 5,588,893 | 49.1% | 5,254,536 | 48.8% | 4,980,637 | 47.8% |
| Other operating expenses | 2,723,911 | 23.9% | 2,614,687 | 24.3% | 2,493,062 | 23.9% |
| Supplies expense | 1,251,346 | 11.0% | 1,168,654 | 10.8% | 1,105,096 | 10.6% |
| Depreciation and amortization | 490,392 | 4.3% | 453,045 | 4.2% | 447,765 | 4.3% |
| Lease and rental expense | 107,809 | 0.9% | 106,094 | 1.0% | 103,127 | 1.0% |
| Subtotal-operating expenses | 10,162,351 | 89.3% | 9,597,016 | 89.1% | 9,129,687 | 87.7% |
| Income from operations | 1,215,908 | 10.7% | 1,175,262 | 10.9% | 1,280,178 | 12.3% |
| Interest expense, net | 162,733 | 1.4% | 154,956 | 1.4% | 145,169 | 1.4% |
| Other (income) expense, net | (13,162) | -0.1% | (14,219) | -0.1% | 0 | 0.0% |
| Income before income taxes | 1,066,337 | 9.4% | 1,034,525 | 9.6% | 1,135,009 | 10.9% |
| Provision for income taxes | 238,794 | 2.1% | 236,642 | 2.2% | 363,697 | 3.5% |
| Net income | 827,543 | 7.3% | 797,883 | 7.4% | 771,312 | 7.4% |
| Less: Net income attributable to noncontrolling interests | 12,689 | 0.1% | 18,178 | 0.2% | 19,009 | 0.2% |
| Net income attributable to UHS | $ 814,854 | 7.2% | $ 779,705 | 7.2% | $ 752,303 | 7.2% |

*Year Ended December 31, 2019 as compared to the Year Ended December 31, 2018:*

Net revenues increased 5.6%, or $606 million, to $11.38 billion during 2019 as compared to $10.77 billion during 2018. The increase was primarily attributable to:

- a $583 million or 5.5% increase in net revenues generated from our acute care and behavioral health care operations owned during both periods (which we refer to as "same facility"), and;

- $23 million of other combined net revenue increases due primarily to the revenues generated at 25 behavioral health facilities located in the U.K. acquired during the third quarter of 2018 in connection with our acquisition of The Danshell Group.

Income before income taxes increased $32 million to $1.07 billion during 2019 as compared to $1.03 billion during 2018. The net increase in our income before income taxes during 2019, as compared to 2018, was due to the following:

- an increase of $5 million as discussed below in Acute Care Hospital Services;

- an increase of $34 million as discussed below in Behavioral Health Services, excluding the asset impairment charges recorded during 2019 and 2018 related to Foundations Recovery Network, LLC, as discussed below;

- a net increase of $91 million due to a favorable change in the pre-tax increases recorded during 2019 and 2018 to the reserve established in connection with the civil aspects of the government's investigation of certain of our behavioral health care facilities ($11 million pre-tax reserve increase recorded during 2019 as compared to a $102 million pre-tax increase recorded during 2018), see *Item 3 – Legal Proceedings* for additional disclosure;

- a net decrease of $49 million from an increase in the asset impairment charges recorded during 2019 ($98 million) and 2018 ($49 million) in connection with Foundations Recovery Network, LLC which was acquired by us during 2015 (see *Other Operating Results-Provision for Asset Impairment-Foundations Recovery Network* below for additional disclosure);

- a decrease of $8 million resulting from an increase in interest expense, as discussed below in *Other Operating Results-Interest Expense*, and;

50

CONFIDENTIAL

- $41 million of other combined net decreases.

Net income attributable to UHS increased $35 million to $815 million during 2019 as compared to $780 million during 2018.

The increase consisted of:

- an increase of $32 million in income before income taxes, as discussed above;

- an increase of $5 million due to a decrease in the income attributable to noncontrolling interests, and;

- a decrease of $2 million resulting from a net increase in the provision for income taxes resulting primarily from: (i) an increase in the provision for income taxes due to the $32 million increase in pre-tax income; (ii) a $6 million increase in the provision for income taxes recorded during 2019 resulting from the net estimated federal and state income taxes due on the portion of the reserve established in connection with the civil aspects of the government's investigation of certain of our behavioral health care facilities that is estimated to be non-deductible for income tax purposes, partially offset by; (iii) a decrease in the provision for income taxes of $11 million resulting from our adoption of ASU 2016-09 which decreased our provision for income taxes by approximately $12 million during 2019, as compared to a decrease of approximately $1 million during 2018.  Please see additional disclosure below in *Other Operating Results-Provision for Income Taxes and Effective Tax Rates.*

### *Year Ended December 31, 2018 as compared to the Year Ended December 31, 2017:*

Net revenues increased 3.5% or $362 million to $10.77 billion during 2018 as compared to $10.41 billion during 2017. The increase was primarily attributable to:

- a $369 million or 3.6% increase in net revenues generated from our acute care and behavioral health care operations on a same facility basis, and;

- $7 million of other combined net revenue decreases.

Income before income taxes decreased $100 million to $1.03 billion during 2018 as compared to $1.14 billion during 2017. The net decrease in our income before income taxes during 2018, as compared to 2017, was due to the following:

- an increase of $67 million as discussed below in Acute Care Hospital Services;

- a decrease of $4 million as discussed below in Behavioral Health Services (excluding the $49 million intangible asset impairment charge recorded during 2018, as discussed below);

- a decrease of $102 million due to an increase recorded during 2018 to the reserve established in connection with the civil aspects of the government's investigation of certain of our behavioral health care facilities (please see *Item 3 – Legal Proceedings* for additional disclosure);

- a decrease of $49 million from an intangible asset (tradename) impairment charge recorded during 2018 in connection with Foundations Recovery Network, LLC which was acquired by us during 2015 (see additional disclosure below in *Other Operating Results-Provision for Asset Impairment-Foundations Recovery Network*);

- a decrease of $10 million resulting from an increase in interest expense, as discussed below in *Other Operating Results-Interest Expense*, and;

- $2 million of other combined net decreases.

Net income attributable to UHS increased $27 million to $780 million during 2018 as compared to $752 million during 2017.

The increase consisted of:

- a decrease of $100 million in income before income taxes, as discussed above;

- an increase of $1 million due to a decrease in the income attributable to noncontrolling interests, and;

- an increase of $127 million resulting from a net decrease in the provision for income taxes resulting primarily from: (i) a decrease in the provision for income taxes resulting from the $99 million decrease in pre-tax income; (ii) a decrease in the provision for income taxes during 2018 resulting from the Tax Cuts and Jobs Act of 2017 which, among other things, reduced the U.S. federal corporate tax rate from 35% to 21%; (iii) a decrease resulting from an $11 million increase in the provision for income taxes recorded during 2017 due to the repatriation tax incurred pursuant to the Tax Cuts and Jobs Act of 2017 (in connection with our behavioral health care facilities located in the U.K), partially offset by; (iv) an increase resulting from a $30 million decrease in the provision for income taxes recorded during 2017 due to a reduction

51

in our net deferred income tax liability resulting from a lower federal income tax rate beginning January 1, 2018 pursuant to the Tax Cuts and Jobs Act of 2017, and; (v) a $21 million increase to our provision for income taxes due to an unfavorable change resulting from our January 1, 2017 adoption of ASU 2016-09, which decreased our provision for income taxes by $1 million during 2018 as compared to $22 million during 2017.

*Acute Care Hospital Services*

*Year Ended December 31, 2019 as compared to the Year Ended December 31, 2018:*

**Acute Care Hospital Services-Same Facility Basis**

We believe that providing our results on a "Same Facility" basis (which is a non-GAAP measure), which includes the operating results for facilities and businesses operated in both the current year and prior year periods, is helpful to our investors as a measure of our operating performance. Our Same Facility results also neutralize (if applicable) the effect of items that are non-operational in nature including items such as, but not limited to, gains/losses on sales of assets and businesses, impacts of settlements, legal judgments and lawsuits, impairments of long-lived and intangible assets and other amounts that may be reflected in the current or prior year financial statements that relate to prior periods.

Our Same Facility basis results reflected on the tables below also exclude from net revenues and other operating expenses, provider tax assessments incurred in each period as discussed below *Sources of Revenue-Various State Medicaid Supplemental Payment Programs.* However, these provider tax assessments are included in net revenues and other operating expenses as reflected in the table below under *All Acute Care Hospital Services.* The provider tax assessments had no impact on the income before income taxes as reflected on the tables below since the amounts offset between net revenues and other operating expenses. To obtain a complete understanding of our financial performance, the Same Facility results should be examined in connection with our net income as determined in accordance with GAAP and as presented in the condensed consolidated financial statements and notes thereto as contained in this Annual Report on Form 10-K.

The following table summarizes the results of operations for our acute care hospital services on a same facility basis and is used in the discussions below for the years ended December 31, 2019 and 2018 (dollar amounts in thousands):

| | Year Ended December 31, 2019 | | Year Ended December 31, 2018 | |
|---|---|---|---|---|
| | Amount | % of Net Revenues | Amount | % of Net Revenues |
| Net revenues | $ 6,053,228 | 100.0% | $ 5,621,338 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,556,383 | 42.2% | 2,366,985 | 42.1% |
| Other operating expenses | 1,364,735 | 22.5% | 1,242,521 | 22.1% |
| Supplies expense | 1,048,639 | 17.3% | 968,067 | 17.2% |
| Depreciation and amortization | 304,206 | 5.0% | 278,661 | 5.0% |
| Lease and rental expense | 60,324 | 1.0% | 57,235 | 1.0% |
| Subtotal-operating expenses | 5,334,287 | 88.1% | 4,913,469 | 87.4% |
| Income from operations | 718,941 | 11.9% | 707,869 | 12.6% |
| Interest expense, net | 1,330 | 0.0% | 1,658 | 0.0% |
| Other (income) expense, net | (32) | 0.0% | (2,498) | 0.0% |
| Income before income taxes | $ 717,643 | 11.9% | $ 708,709 | 12.6% |

On a same facility basis during 2019, as compared to 2018, net revenues from our acute care services increased $432 million or 7.7%. Income before income taxes increased $9 million or 1% to $718 million or 11.9% of net revenues during 2019 as compared to $709 million or 12.6% of net revenues during 2018.

Inpatient admissions to our acute care hospitals owned during both years increased 4.6% during 2019, as compared to 2018, while patient days increased 5.4%. Adjusted admissions (adjusted for outpatient activity) increased 4.8% and adjusted patient days increased 5.7% during 2019, as compared to 2018. The average length of inpatient stay at these facilities was 4.6 days during 2019 and 4.5 days during 2018. The occupancy rate, based on the average available beds at these facilities, was 64% during 2019 and 62% during 2018. On a same facility basis, net revenue per adjusted admission at these facilities increased 2.5% during 2019, as compared to 2018, and net revenue per adjusted patient day increased 1.7% during 2019, as compared to 2018.

52

CONFIDENTIAL

DEF-MDL-14396.00108

**All Acute Care Hospital Services**

The following table summarizes the results of operations for all our acute care operations during 2019 and 2018. These amounts include: (i) our acute care results on a same facility basis, as indicated above; (ii) the impact of provider tax assessments which increased net revenues and other operating expenses but had no impact on income before income taxes, and; (iii) certain other amounts including, if applicable, the results of recently acquired/opened ancillary businesses. Dollar amounts below are reflected in thousands.

| | Year Ended December 31, 2019 | | Year Ended December 31, 2018 | |
|---|---|---|---|---|
| | Amount | % of Net Revenues | Amount | % of Net Revenues |
| Net revenues | $ 6,164,560 | 100.0% | $ 5,719,905 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,559,682 | 41.5% | 2,367,014 | 41.4% |
| Other operating expenses | 1,474,674 | 23.9% | 1,341,088 | 23.4% |
| Supplies expense | 1,049,747 | 17.0% | 968,067 | 16.9% |
| Depreciation and amortization | 305,264 | 5.0% | 278,661 | 4.9% |
| Lease and rental expense | 60,485 | 1.0% | 57,235 | 1.0% |
| Subtotal-operating expenses | 5,449,852 | 88.4% | 5,012,065 | 87.6% |
| Income from operations | 714,708 | 11.6% | 707,840 | 12.4% |
| Interest expense, net | 1,330 | 0.0% | 1,658 | 0.0% |
| Other (income) expense, net | (32) | 0.0% | (2,498) | 0.0% |
| Income before income taxes | $ 713,410 | 11.6% | $ 708,680 | 12.4% |

During 2019, as compared to 2018, net revenues generated from our acute care hospital services increased $445 million or 7.8% to $6.16 billion due primarily to: (i) a $432 million, or 7.7%, increase same facility revenues, as discussed above, and; (ii) other combined net increase of $13 million due primarily to increased provider tax assessments incurred during 2019 as compared to 2018.

Income before income taxes increased $5 million to $713 million or 11.6% of net revenues during 2019 as compared to $709 million or 12.4% of net revenues during 2018. The increase resulted from the $9 million increase in income before income taxes from our acute care hospital services, on a same facility basis, as discussed above, partially offset by $4 million of other combined net unfavorable changes.

*Year Ended December 31, 2018 as compared to the Year Ended December 31, 2017:*

**Acute Care Hospital Services–Same Facility Basis**

The following table summarizes the results of operations for our acute care hospital services on a same facility basis and is used in the discussions below for the years ended December 31, 2018 and 2017 (dollar amounts in thousands):

| | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | |
|---|---|---|---|---|
| | Amount | % of Net Revenues | Amount | % of Net Revenues |
| Net revenues before provision for doubtful accounts | | | $ 6,128,103 | |
| Less: Provision for doubtful accounts | | | 755,615 | |
| Net revenues | $ 5,618,428 | 100.0% | 5,372,488 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,366,078 | 42.1% | 2,241,127 | 41.7% |
| Other operating expenses | 1,238,787 | 22.0% | 1,244,186 | 23.2% |
| Supplies expense | 967,833 | 17.2% | 905,164 | 16.8% |
| Depreciation and amortization | 278,558 | 5.0% | 262,950 | 4.9% |
| Lease and rental expense | 57,229 | 1.0% | 57,208 | 1.1% |
| Subtotal-operating expenses | 4,908,485 | 87.4% | 4,710,635 | 87.7% |
| Income from operations | 709,943 | 12.6% | 661,853 | 12.3% |
| Interest expense, net | 1,658 | 0.0% | 2,684 | 0.0% |
| Other (income) expense, net | (2,498) | 0.0% | 0 | 0.0% |
| Income before income taxes | $ 710,783 | 12.7% | $ 659,169 | 12.3% |

53

ADAMHS000029653

On a same facility basis during 2018, as compared to 2017, net revenues from our acute care services increased $246 million or 4.6%. Income before income taxes increased $52 million or 8% to $711 million or 12.7% of net revenues during 2018 as compared to $659 million or 12.3% of net revenues during 2017.

Inpatient admissions to our acute care hospitals owned during both years increased 2.2% during 2018, as compared to 2017, while patient days increased 4.9%. Adjusted admissions (adjusted for outpatient activity) increased 2.1% and adjusted patient days increased 4.8% during 2018, as compared to 2017. The average length of inpatient stay at these facilities was 4.5 days during 2018 and 4.4 days during 2017. The occupancy rate, based on the average available beds at these facilities, was 62% during 2018 and 60% during 2017. On a same facility basis, net revenue per adjusted admission at these facilities increased 4.1% during 2018, as compared to 2017, and net revenue per adjusted patient day increased 1.4% during 2018, as compared to 2017.

### All Acute Care Hospital Services

The following table summarizes the results of operations for all our acute care operations during 2018 and 2017. These amounts include: (i) our acute care results on a same facility basis, as indicated above; (ii) the impact of the implementation of EHR applications at our acute care hospitals (beginning in 2018, the EHR impact is included in our same facility results as well as all acute care hospitals); (iii) the impact of provider tax assessments which increased net revenues and other operating expenses but had no impact on income before income taxes, and; (iv) certain other amounts that were included in our results of operations that relate to prior years, as discussed below. Dollar amounts below are reflected in thousands.

| | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | |
| | Amount | % of Net Revenues | Amount | % of Net Revenues |
|---|---|---|---|---|
| Net revenues before provision for doubtful accounts | | | $ 6,240,302 | |
| Less: Provision for doubtful accounts | | | 755,619 | |
| Net revenues | $ 5,719,905 | 100.0% | 5,484,683 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,367,014 | 41.4% | 2,241,527 | 40.9% |
| Other operating expenses | 1,341,088 | 23.4% | 1,350,741 | 24.6% |
| Supplies expense | 968,067 | 16.9% | 905,165 | 16.5% |
| Depreciation and amortization | 278,661 | 4.9% | 285,501 | 5.2% |
| Lease and rental expense | 57,235 | 1.0% | 57,208 | 1.0% |
| Subtotal-operating expenses | 5,012,065 | 87.6% | 4,840,142 | 88.2% |
| Income from operations | 707,840 | 12.4% | 644,541 | 11.8% |
| Interest expense, net | 1,658 | 0.0% | 2,684 | 0.0% |
| Other (income) expense, net | (2,498) | 0.0% | 0 | 0.0% |
| Income before income taxes | $ 708,680 | 12.4% | $ 641,857 | 11.7% |

During 2018, as compared to 2017, net revenues generated from our acute care hospital services increased $235 million or 4.3% to $5.72 billion due primarily to: (i) a $246 million, or 4.6%, increase same facility revenues, as discussed above, and; (ii) other combined net decrease of $11 million due primarily to $15 million of revenues received during 2017 in connection with Medicaid settlements related to prior years.

Income before income taxes increased $67 million to $709 million or 12.4% of net revenues during 2018 as compared to $642 million or 11.7% of net revenues during 2017.

Included in these results are the following:

- the $52 million increase in income before income taxes from our acute care hospital services, on a same facility basis, as discussed above, and;

- other combined net increase of $15 million resulting primarily from: (i) the unfavorable change caused by the income recorded during 2017 in connection with Medicaid settlements relating to prior years ($15 million), offset by the following favorable changes; (ii) the depreciation and amortization expense incurred in connection with the implementation of EHR applications at our acute care hospitals (this expense, which amounted to approximately $22 million during 2017, was excluded from our same facility basis results prior to January 1, 2018, however, the impact is included in our same facility basis results thereafter since the amount no longer materially impacts our results of operations), and; (iii) increased

54

CONFIDENTIAL

ADAMHS000029654

professional and general liability expense relating to prior years that was recorded during 2017, based upon a reserve analysis ($9 million).

*Behavioral Health Care Services*

*Year Ended December 31, 2019 as compared to the Year Ended December 31, 2018*

### Behavioral Health Care Services-Same Facility Basis

Our Same Facility basis results (which is a non-GAAP measure), which include the operating results for facilities and businesses operated in both the current year and prior year period, neutralize (if applicable) the effect of items that are non-operational in nature including items such as, but not limited to, gains/losses on sales of assets and businesses, impact of the reserve established in connection with the civil aspects of the government's investigation of certain of our behavioral health care facilities, impacts of settlements, legal judgments and lawsuits, impairments of long-lived and intangible assets and other amounts that may be reflected in the current or prior year financial statements that relate to prior periods. Our Same Facility basis reflected on the table below also excludes from net revenues and other operating expenses, provider tax assessments incurred in each period as discussed below *Sources of Revenue-Various State Medicaid Supplemental Payment Programs.* However, these provider tax assessments are included in net revenues and other operating expenses as reflected in the table below under *All Behavioral Health Care Services.* The provider tax assessments had no impact on the income before income taxes as reflected on the tables below since the amounts offset between net revenues and other operating expenses. To obtain a complete understanding of our financial performance, the Same Facility results should be examined in connection with our net income as determined in accordance with GAAP and as presented in the condensed consolidated financial statements and notes thereto as contained in this Annual Report on Form 10-K.

The following table summarizes the results of operations for our behavioral health care services, on a same facility basis, and is used in the discussions below for the years ended December 31, 2019 and 2018 (dollar amounts in thousands):

|  | Year Ended December 31, 2019 | | Year Ended December 31, 2018 | |
|  | Amount | % of Net Revenues | Amount | % of Net Revenues |
|---|---|---|---|---|
| Net revenues | $ 5,058,199 | 100.0% | $ 4,907,002 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,687,677 | 53.1% | 2,577,411 | 52.5% |
| Other operating expenses | 947,073 | 18.7% | 939,220 | 19.1% |
| Supplies expense | 199,578 | 3.9% | 197,243 | 4.0% |
| Depreciation and amortization | 163,963 | 3.2% | 155,652 | 3.2% |
| Lease and rental expense | 44,123 | 0.9% | 45,673 | 0.9% |
| Subtotal-operating expenses | 4,042,414 | 79.9% | 3,915,199 | 79.8% |
| Income from operations | 1,015,785 | 20.1% | 991,803 | 20.2% |
| Interest expense, net | 1,460 | 0.0% | 1,597 | 0.0% |
| Other (income) expense, net | (380) | 0.0% | 2,530 | 0.1% |
| Income before income taxes | $ 1,014,705 | 20.1% | $ 987,676 | 20.1% |

On a same facility basis during 2019, as compared to 2018, net revenues generated from our behavioral health care services increased $151 million or 3.1% to $5.06 billion during 2019 as compared to $4.91 billion during 2018. Income before income taxes increased $27 million or 3% to $1.01 billion or 20.1% of net revenues during 2019 as compared to $988 million or 20.1% of net revenues during 2018.

Inpatient admissions to our behavioral health care facilities owned during both years increased 1.1% during 2019, as compared to 2018, while patient days increased 0.5%. Adjusted admissions increased 1.2% and adjusted patient days increased 0.6% during 2019, as compared to 2018. The average length of inpatient stay at these facilities were 13.1 days and 13.2 days during 2019 and 2018, respectively. The occupancy rate, based on the average available beds at these facilities, were 76% during each of 2019 and 2018. On a same facility basis, net revenue per adjusted admission at these facilities increased 2.2% during 2019, as compared to 2018, and net revenue per adjusted patient day increased 2.7% during 2019, as compared to 2018.

During 2019, as compared to longer term historical trends, admission growth slowed, in part, due to labor shortages in selected geographies which reduced our ability to fully meet the demand of patients eligible for admission.

CONFIDENTIAL

ADAMHS000029655

DEF-MDL-14396.00111

**All Behavioral Health Care Services**

The following table summarizes the results of operations for all our behavioral health care services during 2019 and 2018. These amounts include: (i) our behavioral health care results on a same facility basis, as indicated above; (ii) the impact of provider tax assessments which increased net revenues and other operating expenses but had no impact on income before income taxes; (iii) provision for asset impairments recorded during 2019 and 2018 in connection with Foundations Recovery Network, L.L.C., and; (iv) certain other amounts including the results of facilities acquired or opened during the past year as well as the results of certain facilities that were closed or restructured during the past year. Dollar amounts below are reflected in thousands.

| | Year Ended December 31, 2019 | | Year Ended December 31, 2018 | |
| | Amount | % of Net Revenues | Amount | % of Net Revenues |
|---|---|---|---|---|
| Net revenues | $ 5,210,063 | 100.0% | $ 5,038,874 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,739,871 | 52.6% | 2,617,337 | 51.9% |
| Other operating expenses | 1,152,733 | 22.1% | 1,091,102 | 21.7% |
| Supplies expense | 201,114 | 3.9% | 200,008 | 4.0% |
| Depreciation and amortization | 172,697 | 3.3% | 163,155 | 3.2% |
| Lease and rental expense | 46,799 | 0.9% | 48,316 | 1.0% |
| Subtotal-operating expenses | 4,313,214 | 82.8% | 4,119,918 | 81.8% |
| Income from operations | 896,849 | 17.2% | 918,956 | 18.2% |
| Interest expense, net | 1,460 | 0.0% | 1,597 | 0.0% |
| Other (income) expense, net | (5,576) | -0.1% | 1,842 | 0.0% |
| Income before income taxes | $   900,965 | 17.3% | $   915,517 | 18.2% |

During 2019, as compared to 2018, net revenues generated from our behavioral health care services increased $171 million, or 3.4%, to $5.21 billion during 2019 as compared to $5.04 billion during 2018. The increase in net revenues was attributable to: (i) $151 million or 3.1% increase in same facility revenues, as discussed above, and; (ii) a $20 million other combined net increase consisting primarily of the revenues generated at the 25 behavioral health facilities acquired in the U.K. acquired during the third quarter of 2018 in connection with our acquisition of The Danshell Group.

Income before income taxes decreased $15 million or 2% to $901 million or 17.3% of net revenues during 2019 as compared to $916 billion or 18.2% of net revenues during 2018. The decrease in income before income taxes at our behavioral health facilities was attributable to:

- a $27 million increase at our behavioral health facilities on a same facility basis, as discussed above;

- a net decrease of $49 million from the asset impairment charges recorded during 2019 ($98 million) and 2018 ($49 million) in connection with Foundations Recovery Network, LLC which was acquired by us during 2015 (see *Other Operating Results-Provision for Asset Impairment-Foundations Recovery Network* below for additional disclosure), and;

- other combined net increase of $7 million including a $6 million gain on asset disposal recording during 2019.

CONFIDENTIAL

DEF-MDL-14396.00112

ADAMHS000029656

*Year Ended December 31, 2018 as compared to the Year Ended December 31, 2017*

### Behavioral Health Care Services-Same Facility Basis

The following table summarizes the results of operations for our behavioral health care services, on a same facility basis, and is used in the discussions below for the years ended December 31, 2018 and 2017 (dollar amounts in thousands):

| | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | |
| --- | --- | --- | --- | --- |
| | Amount | % of Net Revenues | Amount | % of Net Revenues |
| Net revenues before provision for doubtful accounts | | | $ 4,878,039 | |
| Less: Provision for doubtful accounts | | | 110,030 | |
| Net revenues | $ 4,891,178 | 100.0% | 4,768,009 | 100.0% |
| Operating charges: | | | | |
| Salaries, wages and benefits | 2,558,296 | 52.3% | 2,437,495 | 51.1% |
| Other operating expenses | 935,562 | 19.1% | 935,750 | 19.6% |
| Supplies expense | 197,305 | 4.0% | 195,813 | 4.1% |
| Depreciation and amortization | 153,924 | 3.1% | 145,707 | 3.1% |
| Lease and rental expense | 46,942 | 1.0% | 43,825 | 0.9% |
| Subtotal-operating expenses | 3,892,029 | 79.6% | 3,758,590 | 78.8% |
| Income from operations | 999,149 | 20.4% | 1,009,419 | 21.2% |
| Interest expense, net | 1,597 | 0.0% | 2,005 | 0.0% |
| Other (income) expense, net | 0 | 0.0% | 0 | 0.0% |
| Income before income taxes | $ 997,552 | 20.4% | $ 1,007,414 | 21.1% |

On a same facility basis during 2018, as compared to 2017, net revenues generated from our behavioral health care services increased $123 million or 2.6% to $4.89 billion during 2018 as compared to $4.77 billion during 2017. Income before income taxes decreased $10 million or 1% to $998 million or 20.4% of net revenues during 2018 as compared to $1.01 billion or 21.1% of net revenues during 2017.

Inpatient admissions to our behavioral health care facilities owned during both years increased 3.3% during 2018, as compared to 2017, while patient days increased 0.8%. Adjusted admissions increased 3.0% and adjusted patient days increased 0.5% during 2018, as compared to 2017. The average length of inpatient stay at these facilities were 13.2 days and 13.5 days during 2018 and 2017, respectively. The occupancy rate, based on the average available beds at these facilities, were 76% and 77% during 2018 and 2017, respectively. On a same facility basis, net revenue per adjusted admission at these facilities was unchanged during 2018, as compared to 2017, and net revenue per adjusted patient day increased 2.5% during 2018, as compared to 2017.

### All Behavioral Health Care Services

The following table summarizes the results of operations for all our behavioral health care services during 2018 and 2017. These amounts include: (i) our behavioral health care results on a same facility basis, as indicated above; (ii) the impact of provider tax assessments which increased net revenues and other operating expenses but had no impact on income before income taxes; (iii) an intangible asset impairment charge recorded during 2018 in connection with Foundations Recovery Network, L.L.C., and; (iv) certain other amounts including the results of facilities acquired or opened during the past year as well as the results of certain facilities that were closed or restructured during the past year. Dollar amounts below are reflected in thousands.

57

CONFIDENTIAL

ADAMHS000029657

DEF-MDL-14396.00113

|  | Year Ended December 31, 2018 | | Year Ended December 31, 2017 | |
| --- | --- | --- | --- | --- |
|  | Amount | % of Net Revenues | Amount | % of Net Revenues |
| Net revenues before provision for doubtful accounts |  |  | $ 5,020,177 |  |
| Less: Provision for doubtful accounts |  |  | 113,458 |  |
| Net revenues | $ 5,038,874 | 100.0% | 4,906,719 | 100.0% |
| Operating charges: |  |  |  |  |
| Salaries, wages and benefits | 2,617,337 | 51.9% | 2,496,236 | 50.9% |
| Other operating expenses | 1,091,102 | 21.7% | 1,042,056 | 21.2% |
| Supplies expense | 200,008 | 4.0% | 199,936 | 4.1% |
| Depreciation and amortization | 163,155 | 3.2% | 152,067 | 3.1% |
| Lease and rental expense | 48,316 | 1.0% | 45,445 | 0.9% |
| Subtotal-operating expenses | 4,119,918 | 81.8% | 3,935,740 | 80.2% |
| Income from operations | 918,956 | 18.2% | 970,979 | 19.8% |
| Interest expense, net | 1,597 | 0.0% | 2,005 | 0.0% |
| Other (income) expense, net | 1,842 | 0.0% | 0 | 0.0% |
| Income before income taxes | $  915,517 | 18.2% | $  968,974 | 19.7% |

During 2018, as compared to 2017, net revenues generated from our behavioral health care services increased $132 million, or 2.7%, to $5.04 billion during 2018 as compared to $4.91 billion during 2017. The increase in net revenues was attributable to: (i) $123 million or 2.6% increase in same facility revenues, as discussed above, and; (ii) an $9 million other combined net increase consisting primarily of the revenues generated at the 25 behavioral health facilities acquired in the U.K. in connection with our acquisition of The Danshell Group (acquired during the third quarter of 2018) and the revenues generated from the acquisition of a 109-bed behavioral health care facility located in Gulfport, Mississippi (acquired during the first quarter of 2018), partially offset by a decrease to net revenues resulting from the closure or restructuring of certain behavioral health care facilities.

Income before income taxes decreased $53 million or 6% to $916 million or 18.2% of net revenues during 2018 as compared to $969 billion or 19.7% of net revenues during 2017. The decrease in income before income taxes at our behavioral health facilities was attributable to:

- a $10 million decrease at our behavioral health facilities on a same facility basis, as discussed above;

- a decrease of $49 million from an intangible asset (tradename) impairment charge recorded during 2018 in connection with Foundations Recovery Network, LLC which was acquired by us during 2015;

- a $13 million increase due to the following unfavorable amounts recorded during 2017: (i) a prior year Medicaid disproportionate shares hospital revenue adjustment related to a certain state ($7 million), and; (ii) increased professional and general liability expense related to prior years, based upon a reserve analysis ($6 million), and;

- other combined net decrease of $7 million consisting primarily of the losses incurred at certain behavioral health care facilities that have restructured or closed during the past year.

*Sources of Revenue*

**Overview:** We receive payments for services rendered from private insurers, including managed care plans, the federal government under the Medicare program, state governments under their respective Medicaid programs and directly from patients.

Hospital revenues depend upon inpatient occupancy levels, the medical and ancillary services and therapy programs ordered by physicians and provided to patients, the volume of outpatient procedures and the charges or negotiated payment rates for such services. Charges and reimbursement rates for inpatient routine services vary depending on the type of services provided (e.g., medical/surgical, intensive care or behavioral health) and the geographic location of the hospital. Inpatient occupancy levels fluctuate for various reasons, many of which are beyond our control. The percentage of patient service revenue attributable to outpatient services has generally increased in recent years, primarily as a result of advances in medical technology that allow more services to be provided on an outpatient basis, as well as increased pressure from Medicare, Medicaid and private insurers to reduce hospital stays and provide services, where possible, on a less expensive outpatient basis. We believe that our experience with respect to our increased outpatient levels mirrors the general trend occurring in the health care industry and we are unable to predict the rate of growth and resulting impact on our future revenues.

CONFIDENTIAL

ADAMHS000029658

DEF-MDL-14396.00114

Patients are generally not responsible for any difference between customary hospital charges and amounts reimbursed for such services under Medicare, Medicaid, some private insurance plans, and managed care plans, but are responsible for services not covered by such plans, exclusions, deductibles or co-insurance features of their coverage. The amount of such exclusions, deductibles and co-insurance has generally been increasing each year. Indications from recent federal and state legislation are that this trend will continue. Collection of amounts due from individuals is typically more difficult than from governmental or business payers which unfavorably impacts the collectability of our patient accounts.

**Sources of Revenues and Health Care Reform:** Given increasing budget deficits, the federal government and many states are currently considering additional ways to limit increases in levels of Medicare and Medicaid funding, which could also adversely affect future payments received by our hospitals. In addition, the uncertainty and fiscal pressures placed upon the federal government as a result of, among other things, economic recovery stimulus packages, responses to natural disasters, and the federal budget deficit in general may affect the availability of federal funds to provide additional relief in the future. We are unable to predict the effect of future policy changes on our operations.

On March 23, 2010, President Obama signed into law the Patient Protection and Affordable Care Act (the "Legislation"). The Healthcare and Education Reconciliation Act of 2010 (the "Reconciliation Act"), which contains a number of amendments to the Legislation, was signed into law on March 30, 2010. Two primary goals of the Legislation, combined with the Reconciliation Act (collectively referred to as the "Legislation"), are to provide for increased access to coverage for healthcare and to reduce healthcare-related expenses.

The Legislation revises reimbursement under the Medicare and Medicaid programs to emphasize the efficient delivery of high quality care and contains a number of incentives and penalties under these programs to achieve these goals. The Legislation provides for decreases in the annual market basket update for federal fiscal years 2010 through 2019, a productivity offset to the market basket update beginning October 1, 2011 for Medicare Part B reimbursable items and services and beginning October 1, 2012 for Medicare inpatient hospital services. The Legislation and subsequent revisions provide for reductions to both Medicare DSH and Medicaid DSH payments. The Medicare DSH reductions began in October, 2013 while the Medicaid DSH reductions are scheduled to begin in 2020. The Legislation implements a value-based purchasing program, which will reward the delivery of efficient care. Conversely, certain facilities will receive reduced reimbursement for failing to meet quality parameters; such hospitals will include those with excessive readmission or hospital-acquired condition rates.

A 2012 U.S. Supreme Court ruling limited the federal government's ability to expand health insurance coverage by holding unconstitutional sections of the Legislation that sought to withdraw federal funding for state noncompliance with certain Medicaid coverage requirements. Pursuant to that decision, the federal government may not penalize states that choose not to participate in the Medicaid expansion by reducing their existing Medicaid funding. Therefore, states can choose to expand or not to expand their Medicaid program without risking the loss of federal Medicaid funding. As a result, many states, including Texas, have not expanded their Medicaid programs without the threat of loss of federal funding. CMS has granted, and is expected to grant additional, section 1115 demonstration waivers providing for work and community engagement requirements for certain Medicaid eligible individuals. CMS has also released guidance to states interested in receiving their Medicaid funding through a block grant mechanism. It is anticipated this will lead to reductions in coverage, and likely increases in uncompensated care, in states where these demonstration waivers are granted.

On December 14, 2018, a Texas Federal District Court deemed the Legislation to be unconstitutional in its entirety. The Court concluded that the Individual Mandate is no longer permissible under Congress's taxing power as a result of the Tax Cut and Jobs Act of 2017 ("TCJA") reducing the individual mandate's tax to $0 (i.e., it no longer produces revenue, which is an essential feature of a tax), rendering the Legislation unconstitutional. The court also held that because the individual mandate is "essential" to the Legislation and is inseverable from the rest of the law, the entire Legislation is unconstitutional. Because the court issued a declaratory judgment and did not enjoin the law, the Legislation remains in place pending its appeal. The District Court for the Northern District of Texas ruling was appealed to the U.S. Court of Appeals for the Fifth Circuit. On December 18, 2019, the 5th Circuit Court of Appeals' three-judge panel voted 2-1 to strike down the Legislation individual mandate as unconstitutional. The 5th Circuit Court also sent the case back to the Texas district court to determine which Legislation provisions should be stricken with the mandate or whether the entire Legislation is unconstitutional. It is likely this matter will ultimately be appealed to the United States Supreme Court. We are unable to predict the final outcome of this legal challenge and its financial impact on our future results of operation.

The various provisions in the Legislation that directly or indirectly affect Medicare and Medicaid reimbursement are scheduled to take effect over a number of years. The impact of the Legislation on healthcare providers will be subject to implementing regulations, interpretive guidance and possible future legislation or legal challenges. Certain Legislation provisions, such as that creating the Medicare Shared Savings Program creates uncertainty in how healthcare may be reimbursed by federal programs in the

59

ADAMHS000029659

future. Thus, we cannot predict the impact of the Legislation on our future reimbursement at this time and we can provide no assurance that the Legislation will not have a material adverse effect on our future results of operations.

The Legislation also contained provisions aimed at reducing fraud and abuse in healthcare. The Legislation amends several existing laws, including the federal Anti-Kickback Statute and the False Claims Act, making it easier for government agencies and private plaintiffs to prevail in lawsuits brought against healthcare providers. While Congress had previously revised the intent requirement of the Anti-Kickback Statute to provide that a person is not required to "have actual knowledge or specific intent to commit a violation of" the Anti-Kickback Statute in order to be found in violation of such law, the Legislation also provides that any claims for items or services that violate the Anti-Kickback Statute are also considered false claims for purposes of the federal civil False Claims Act. The Legislation provides that a healthcare provider that retains an overpayment in excess of 60 days is subject to the federal civil False Claims Act. The Legislation also expands the Recovery Audit Contractor program to Medicaid. These amendments also make it easier for severe fines and penalties to be imposed on healthcare providers that violate applicable laws and regulations.

We have partnered with local physicians in the ownership of certain of our facilities. These investments have been permitted under an exception to the physician self-referral law. The Legislation permits existing physician investments in a hospital to continue under a "grandfather" clause if the arrangement satisfies certain requirements and restrictions, but physicians are prohibited from increasing the aggregate percentage of their ownership in the hospital. The Legislation also imposes certain compliance and disclosure requirements upon existing physician-owned hospitals and restricts the ability of physician-owned hospitals to expand the capacity of their facilities. As discussed below, should the Legislation be repealed in its entirety, this aspect of the Legislation would also be repealed restoring physician ownership of hospitals and expansion right to its position and practice as it existed prior to the Legislation.

The impact of the Legislation on each of our hospitals may vary. Because Legislation provisions are effective at various times over the next several years, we anticipate that many of the provisions in the Legislation may be subject to further revision. Initiatives to repeal the Legislation, in whole or in part, to delay elements of implementation or funding, and to offer amendments or supplements to modify its provisions have been persistent. The ultimate outcomes of legislative attempts to repeal or amend the Legislation and legal challenges to the Legislation are unknown. Legislation has already been enacted that eliminated the individual mandate penalty, effective January 1, 2019, related to the individual mandate to obtain health insurance that was part of the original Legislation. In addition, Congress previously considered legislation that would, in material part: (i) eliminate the large employer mandate to offer health insurance coverage to full-time employees; (ii) permit insurers to impose a surcharge up to 30 percent on individuals who go uninsured for more than two months and then purchase coverage; (iii) provide tax credits towards the purchase of health insurance, with a phase-out of tax credits accordingly to income level; (iv) expand health savings accounts; (v) impose a per capita cap on federal funding of state Medicaid programs, or, if elected by a state, transition federal funding to block grants, and; (vi) permit states to seek a waiver of certain federal requirements that would allow such state to define essential health benefits differently from federal standards and that would allow certain commercial health plans to take health status, including pre-existing conditions, into account in setting premiums.

In addition to legislative changes, the Legislation can be significantly impacted by executive branch actions. In relevant part, President Trump has already taken executive actions: (i) requiring all federal agencies with authorities and responsibilities under the Legislation to "exercise all authority and discretion available to them to waive, defer, grant exemptions from, or delay" parts of the Legislation that place "unwarranted economic and regulatory burdens" on states, individuals or health care providers; (ii) the issuance of a final rule in June, 2018 by the Department of Labor to enable the formation of health plans that would be exempt from certain Legislation essential health benefits requirements; (iii) the issuance of a final rule in August, 2018 by the Department of Labor, Treasury, and Health and Human Services to expand the availability of short-term, limited duration health insurance; (iv) eliminating cost-sharing reduction payments to insurers that would otherwise offset deductibles and other out-of-pocket expenses for health plan enrollees at or below 250 percent of the federal poverty level, (v) relaxing requirements for state innovation waivers that could reduce enrollment in the individual and small group markets and lead to additional enrollment in short-term, limited duration insurance and association health plans; (vi) the issuance of a final rule in June, 2019 by the Departments of Labor, Treasury, and Health and Human Services that would incentivize the use of health reimbursement arrangements by employers to permit employees to purchase health insurance in the individual market, and; (vii) directing the issuance of federal rulemaking by executive agencies to increase transparency of healthcare price and quality information. The uncertainty resulting from these Executive Branch policies led to reduced Exchange enrollment in 2018, 2019 and 2020 and may otherwise worsen the individual and small group market risk pools in future years. In May, 2019, the Congressional Budget Office projected that 32 million people will be uninsured in 2020. It is also anticipated that these and future policies may create additional cost and reimbursement pressures on hospitals.

It remains unclear what portions of the Legislation may remain, or whether any replacement or alternative programs may be created by any future legislation. Any such future repeal or replacement may have significant impact on the reimbursement for healthcare services generally, and may create reimbursement for services competing with the services offered by our hospitals. Accordingly, there can be no assurance that the adoption of any future federal or state healthcare reform legislation will not

60

CONFIDENTIAL

ADAMHS000029660

DEF-MDL-14396.00116

have a negative financial impact on our hospitals, including their ability to compete with alternative healthcare services funded by such potential legislation, or for our hospitals to receive payment for services.

For additional disclosure related to our revenues including a disaggregation of our consolidated net revenues by major source for each of the periods presented herein, please see *Note 12 to the Consolidated Financial Statements-Revenue*.

**Medicare:** Medicare is a federal program that provides certain hospital and medical insurance benefits to persons aged 65 and over, some disabled persons and persons with end-stage renal disease. All of our acute care hospitals and many of our behavioral health centers are certified as providers of Medicare services by the appropriate governmental authorities. Amounts received under the Medicare program are generally significantly less than a hospital's customary charges for services provided. Since a substantial portion of our revenues will come from patients under the Medicare program, our ability to operate our business successfully in the future will depend in large measure on our ability to adapt to changes in this program.

Under the Medicare program, for inpatient services, our general acute care hospitals receive reimbursement under the inpatient prospective payment system ("IPPS"). Under the IPPS, hospitals are paid a predetermined fixed payment amount for each hospital discharge. The fixed payment amount is based upon each patient's Medicare severity diagnosis related group ("MS-DRG"). Every MS-DRG is assigned a payment rate based upon the estimated intensity of hospital resources necessary to treat the average patient with that particular diagnosis. The MS-DRG payment rates are based upon historical national average costs and do not consider the actual costs incurred by a hospital in providing care. This MS-DRG assignment also affects the predetermined capital rate paid with each MS-DRG. The MS-DRG and capital payment rates are adjusted annually by the predetermined geographic adjustment factor for the geographic region in which a particular hospital is located and are weighted based upon a statistically normal distribution of severity. While we generally will not receive payment from Medicare for inpatient services, other than the MS-DRG payment, a hospital may qualify for an "outlier" payment if a particular patient's treatment costs are extraordinarily high and exceed a specified threshold. MS-DRG rates are adjusted by an update factor each federal fiscal year, which begins on October 1. The index used to adjust the MS-DRG rates, known as the "hospital market basket index," gives consideration to the inflation experienced by hospitals in purchasing goods and services. Generally, however, the percentage increases in the MS-DRG payments have been lower than the projected increase in the cost of goods and services purchased by hospitals.

In August, 2019, CMS published its IPPS 2020 final payment rule which provides for a 3.0% market basket increase to the base Medicare MS-DRG blended rate. When statutorily mandated budget neutrality factors, annual geographic wage index updates, documenting and coding adjustments, and adjustments mandated by the Affordable Care Act ("ACA") are considered, without consideration for the required Medicare DSH payments changes and increase to the Medicare Outlier threshold, the overall increase in IPPS payments is approximately 2.8%. Including DSH payments and certain other adjustments, we estimate our overall increase from the final IPPS 2020 rule (covering the period of October 1, 2019 through September 30, 2020) will approximate 2.1%. This projected impact from the IPPS 2020 final rule includes an increase of approximately 0.5% to partially restore rate cuts made as a result of the American Taxpayer Relief Act of 2012 ("ATRA"), as required by the 21st Century Cures Act but excludes the impact of the sequestration reductions related to the Budget Control Act of 2011, Bipartisan Budget Act of 2015, and Bipartisan Budget Act of 2018, as discussed below. CMS completed its full phase-in to use uncompensated care data from the 2015 Worksheet S-10 hospital cost reports to allocate approximately $8.5 billion in the DSH Uncompensated Care Pool.

In June, 2019, the Supreme Court of the United States issued a decision favorable to hospitals impacting prior year Medicare DSH payments (*Azar v. Allina Health Services*, No. 17-1484 (U.S. Jun. 3, 2019)). In *Allina*, the hospitals challenged the Medicare DSH adjustments for federal fiscal year 2012, specifically challenging CMS's decision to include inpatient hospital days attributable to Medicare Part C enrollee patients in the numerator and denominator of the Medicare/SSI fraction used to calculate a hospital's DSH payments. This ruling addresses CMS's attempts to impose the policy espoused in its vacated 2004 rulemaking to a fiscal year in the 2004–2013 time period without using notice-and-comment rulemaking. This decision should require CMS to recalculate hospitals' DSH Medicare/SSI fractions, with Medicare Part C days excluded, for at least federal fiscal year 2012, but likely federal fiscal years 2005 through 2013. Although we can provide no assurance that we will ultimately receive additional funds, we estimate that the favorable impact of this court ruling on certain prior year hospital Medicare DSH payments could range between $18 million to $28 million in the aggregate.

In August, 2018, CMS published its IPPS 2019 final payment rule which provides for a 2.9% market basket increase to the base Medicare MS-DRG blended rate. When statutorily mandated budget neutrality factors, annual geographic wage index updates, documenting and coding adjustments ACA-mandated adjustments are considered, without consideration for the decreases related to the required Medicare DSH payment changes and decrease to the Medicare Outlier threshold, the overall increase in IPPS payments is approximately 0.5%. Including the estimated increase to our DSH payments (approximating 2.1%) and certain other adjustments, we estimate our overall increase from the final IPPS 2019 rule (covering the period of October 1, 2018 through September 30, 2019) will approximate 2.7%. This projected impact from the IPPS 2019 final rule includes an increase of approximately 0.5% to partially restore

61

CONFIDENTIAL

cuts made as a result of the ATRA, as required by the 21st Century Cures Act but excludes the impact of the sequestration reductions related to the Budget Control Act of 2011, Bipartisan Budget Act of 2015, and Bipartisan Budget Act of 2018, as discussed below. CMS continued to phase-in the use of uncompensated care data from both the 2014 and 2015 Worksheet S-10 hospital cost reports, two-third weighting as part of the proxy methodology to allocate approximately $8 billion in the DSH Uncompensated Care Pool.

In August, 2017, CMS published its IPPS 2018 final payment rule which provides for a 2.9% market basket increase to the base Medicare MS-DRG blended rate. When statutorily mandated budget neutrality factors, annual geographic wage index updates, documenting and coding adjustments and ACA-mandated adjustments are considered, without consideration for the decreases related to the required Medicare DSH payment changes and increase to the Medicare Outlier threshold, the overall increase in IPPS payments would approximate 2.3%. Including the estimated decrease to our DSH payments (approximately 0.1%) and certain other adjustments, we estimate our overall increase from the final IPPS 2018 rule (covering the period of October 1, 2017 through September 30, 2018) will approximate 1.8%. This projected impact from the IPPS 2018 final rule includes an increase of approximately 0.5% to partially restore cuts made as a result of the ATRA, as required by the 21st Century Cures Act but excludes the impact of the sequestration reductions related to the Budget Control Act of 2011, Bipartisan Budget Act of 2015, and Bipartisan Budget Act of 2018, as discussed below. CMS began using uncompensated care data from the 2014 hospital cost report Worksheet S-10, one-third weighting as part of the proxy methodology to allocate approximately $7 billion in the DSH Uncompensated Care Pool. This final rule change resulted in wide variations among all hospitals nationwide in the distribution of these DSH funds compared to previous years.

In August, 2011, the Budget Control Act of 2011 (the "2011 Act") was enacted into law. Included in this law are the imposition of annual spending limits for most federal agencies and programs aimed at reducing budget deficits by $917 billion between 2012 and 2021, according to a report released by the Congressional Budget Office. Among its other provisions, the law established a bipartisan Congressional committee, known as the Joint Committee, which was responsible for developing recommendations aimed at reducing future federal budget deficits by an additional $1.5 trillion over 10 years. The Joint Committee was unable to reach an agreement by the November 23, 2011 deadline and, as a result, across-the-board cuts to discretionary, national defense and Medicare spending were implemented on March 1, 2013 resulting in Medicare payment reductions of up to 2% per fiscal year. The Bipartisan Budget Act of 2015, enacted on November 2, 2015, and the Bipartisan Budget Act of 2019, enacted on August 2, 2019, continued the 2% reductions to Medicare reimbursement imposed under the 2011 Act through 2029.

Inpatient services furnished by psychiatric hospitals under the Medicare program are paid under a Psychiatric Prospective Payment System ("Psych PPS"). Medicare payments to psychiatric hospitals are based on a prospective per diem rate with adjustments to account for certain facility and patient characteristics. The Psych PPS also contains provisions for outlier payments and an adjustment to a psychiatric hospital's base payment if it maintains a full-service emergency department.

In July, 2019, CMS published its Psych PPS final rule for the federal fiscal year 2020. Under this final rule, payments to our psychiatric hospitals and units are estimated to increase by 1.7% compared to federal fiscal year 2019. This amount includes the effect of the 2.9% market basket update less a 0.75% adjustment as required by the ACA and a 0.4% productivity adjustment.

In August, 2018, CMS published its Psych PPS final rule for the federal fiscal year 2019. Under this final rule, payments to our psychiatric hospitals and units are estimated to increase by 1.35% compared to federal fiscal year 2018. This amount includes the effect of the 2.90% market basket update less a 0.75% adjustment as required by the ACA and a 0.8% productivity adjustment.

In August, 2017, CMS published its Psych PPS final rule for the federal fiscal year 2018. Under this final rule, payments to our psychiatric hospitals and units are estimated to increase by 1.25% compared to federal fiscal year 2017. This amount includes the effect of the 2.6% market basket update less a 0.75% adjustment as required by the ACA and a 0.6% productivity adjustment.

In December, 2018, the U.S. District Court for the District of Columbia ruled that the U.S. Department of Health and Human Services ("HHS") did not have statutory authority to implement the 2018 Medicare OPPS rate reduction related to hospitals that qualify for drug discounts under the federal 340B Drug Discount Program and granted a permanent injunction against the payment reduction. In May, 2019, the U.S. District Court for the District of Columbia directed CMS to determine a remedy as well as provide a status report on this remedy by early August, 2019 for this Medicare OPPS payment matter. However, recognizing both the complexity of the OPPS payment system as well as its budget neutral rate setting system, the Court refrained from imposing a remedy. Instead the Judge in the case called for additional briefing from the Plaintiffs and Defendants on the proper scope and implementation for relief. The case has been appealed by HHS. In the 2020 OPPS final rule, CMS retained the rate reduction in dispute, but indicated their intent to potentially use the results of a future 340B hospital survey to collect drug acquisition cost data for CY 2018 and 2019 when crafting a remedy. In the event this 340B hospital survey data is not used to devise a remedy, CMS also indicated that it intends to consider the public input to inform of the steps they would take to propose a remedy for CY 2018 and 2019

62

DEF-MDL-14396.00118

in the CY 2021 rulemaking. We are unable to predict the ultimate outcome of any appeal and the type of relief that may be ordered by the Courts. We estimate that the CMS 2018 change in the 340B payment policy increased our 2018 Medicare OPPS payments by approximately $8 million, which has been fully reserved in our results of operations for the year, and estimate that a comparable amount was scheduled to be earned during 2019.

In November, 2019, CMS published its OPPS final rule for 2020. The hospital market basket increase is 3.0%. The Medicare statute requires a productivity adjustment reduction of 0.4% to the 2020 OPPS market basket resulting in a 2020 update to OPPS payment rates by 2.6%. When other statutorily required adjustments and hospital patient service mix are considered, we estimate that our overall Medicare OPPS update for 2020 will aggregate to a net increase of 2.7% which includes a 7.7% increase to behavioral health division partial hospitalization rates. When the behavioral health division's partial hospitalization rate impact is excluded, we estimate that our Medicare OPPS payments will result in a 1.9% increase in payment levels for our acute care division, as compared to 2019. For CY 2020, CMS will use the FY 2020 hospital IPPS post-reclassified wage index for urban and rural areas as the wage index for the OPPS to determine the wage adjustments for both the OPPS payment rate and the copayment standardized amount.

On November 15, 2019, CMS finalized its Hospital Price Transparency rule that implements certain Price Transparency rules required by the June 24, 2019 Presidential Executive Order related to Improving Price and Quality Transparency in American Healthcare to Put Patients First. Under this final rule, effective January 1, 2021, CMS will require: (1) hospitals make public their standard changes (both gross charges and payer-specific negotiated charges) for all items and services online in a machine-readable format, and; (2) hospitals to make public standard charge data for a limited set of "shoppable services" the hospital provides in a form and manner that is more consumer friendly. A lawsuit has been filed by several hospital associations, health systems, and hospitals in the U.S. District court for the District of Columbia challenging the legal authority of HHS to implement the final rule. We are unable to predict the ultimate outcome of this legal challenge and the type of relief that may be ordered by the courts. The deadline for compliance with the final rule is January 1, 2021. We are unable to determine the impact, if any, this final rule will have on our future results of operations.

In November, 2018, CMS published its OPPS final rule for 2019. The hospital market basket increase is 2.9%. The Medicare statute requires a productivity adjustment reduction of 0.8% and 0.75% reduction to the 2019 OPPS market basket resulting in a 2019 update to OPPS payment rates by 1.35%. When other statutorily required adjustments and hospital patient service mix are considered, we estimate that our overall Medicare OPPS update for 2019 will aggregate to a net increase of 1.1% which includes a 5.7% increase to behavioral health division partial hospitalization rates. When the behavioral health division's partial hospitalization rate impact is excluded, we estimate that our Medicare 2019 OPPS payments will result in a 0.4% increase in payment levels for our acute care hospitals, as compared to 2018.

In November, 2017, CMS published its OPPS final rule for 2018. The hospital market basket increase is 2.7%. The Medicare statute requires a productivity adjustment reduction of 0.6% and 0.75% reduction to the 2018 OPPS market basket update at 1.35%. When other statutorily required adjustments and hospital patient service mix are considered, we estimate that our overall Medicare OPPS update for 2018 will aggregate to a net increase of 4.2% which includes a 0.8% increase to behavioral health division partial hospitalization rates. When the behavioral health division's partial hospitalization rate impact is excluded, we estimate that our Medicare 2018 OPPS payments will result in a 4.8% increase in payment levels for our acute care division, as compared to 2017. Additionally, the Medicare inpatient-only (IPO) list includes procedures that are only paid under the Hospital Inpatient Prospective Payment System. Each year, CMS uses established criteria to review the IPO list and determine whether or not any procedures should be removed from the list. CMS removed total knee arthroplasty (TKA) from the IPO list effective January 1, 2018. Additionally, CMS redistributed $1.6 billion in cost savings within the OPPS system attributable to changes in the federal 340B hospital drug pricing payment methodology in 2018 but, as discussed above, this 340B-related payment methodology is currently under legal challenge. The impact of these IPO and 340B changes are reflected in the above noted estimated acute care division percentage change in OPPS reimbursement.

In November, 2016, CMS published its OPPS final rule for 2017. The hospital market basket increase is 2.7%. The Medicare statute requires a productivity adjustment reduction of 0.3% and 0.75% reduction to the 2017 OPPS market basket resulting in a 2017 OPPS market basket update at 1.65%. When other statutorily required adjustments and hospital patient service mix are considered, we estimate that our overall Medicare OPPS update for 2017 resulted in a net increase of 1.5% which included a -1.3% decrease to behavioral health division partial hospitalization rates. When the behavioral health division's partial hospitalization rate impact is excluded, we estimate that our Medicare 2017 OPPS payments resulted in a 2.1% increase in payment levels for our acute care division, as compared to 2016.

CONFIDENTIAL

DEF-MDL-14396.00119

ADAMHS000029663

**Medicaid:** Medicaid is a joint federal-state funded health care benefit program that is administered by the states to provide benefits to qualifying individuals. Most state Medicaid payments are made under a PPS-like system, or under programs that negotiate payment levels with individual hospitals. Amounts received under the Medicaid program are generally significantly less than a hospital's customary charges for services provided. In addition to revenues received pursuant to the Medicare program, we receive a large portion of our revenues either directly from Medicaid programs or from managed care companies managing Medicaid. All of our acute care hospitals and most of our behavioral health centers are certified as providers of Medicaid services by the appropriate governmental authorities.

We receive revenues from various state and county based programs, including Medicaid in all the states in which we operate (we receive Medicaid revenues in excess of $100 million annually from each of California, Texas, Nevada, Washington, D.C., Pennsylvania and Illinois); CMS-approved Medicaid supplemental programs in certain states including Texas, Mississippi, Illinois, Oklahoma, Nevada, Arkansas, California and Indiana, and; state Medicaid disproportionate share hospital payments in certain states including Texas and South Carolina. We are therefore particularly sensitive to potential reductions in Medicaid and other state based revenue programs as well as regulatory, economic, environmental and competitive changes in those states. We can provide no assurance that reductions to revenues earned pursuant to these programs, particularly in the above-mentioned states, will not have a material adverse effect on our future results of operations.

The Legislation substantially increases the federally and state-funded Medicaid insurance program, and authorizes states to establish federally subsidized non-Medicaid health plans for low-income residents not eligible for Medicaid starting in 2014. However, the Supreme Court has struck down portions of the Legislation requiring states to expand their Medicaid programs in exchange for increased federal funding. Accordingly, many states in which we operate have not expanded Medicaid coverage to individuals at 133% of the federal poverty level. Facilities in states not opting to expand Medicaid coverage under the Legislation may be additionally penalized by corresponding reductions to Medicaid disproportionate share hospital payments beginning in 2020, as discussed below. We can provide no assurance that further reductions to Medicaid revenues, particularly in the above-mentioned states, will not have a material adverse effect on our future results of operations.

On November 12, 2019, CMS issued the proposed Medicaid Fiscal Accountability Rule ("MFAR") for which CMS believes will strengthen the fiscal integrity of the Medicaid program and help ensure that state supplemental payments and financing arrangements are transparent and value-driven.

This rule proposes to establish regulations to:
- Improve Reporting on Medicaid Supplemental Payments.
- Clarify Medicaid Financing Definitions.
- Reduce what CMS considers "Questionable Financing Mechanisms" by states.
- Clarifies the Definition of Permissible Health Care-Related Taxes and Donations.
- Implement certain Medicaid Disproportionate Share Hospital (DSH) Payment related changes.

The MFAR proposed rule, if implemented, could have a significant impact on the means by which states finance the non-federal share of their Medicaid programs. Under the proposal, CMS would have the ability to strike down common financing arrangements such as provider taxes, intergovernmental transfers and donations. These changes could have detrimental impacts on state Medicaid programs. If finalized as proposed, the rule could potentially force states to raise taxes or cut their Medicaid budgets. In subsequent years, it could have an unfavorable impact on Medicaid beneficiaries by likely limiting access to providers and requiring states to consider reductions to their Medicaid programs.

As disclosed in this annual report, we receive a significant amount of Medicaid and Medicaid managed care revenue from both base payments and supplemental payments. Although we are unable to estimate the impact of MFAR on our future results of operations, if implemented as proposed, MFAR related changes could have a material adverse impact on our future results of operations.

In January, 2020, CMS announced a new opportunity to support states with greater flexibility to improve the health of their Medicaid populations. The new 1115 Waiver Block Grant Type Demonstration program, titled Healthy Adult Opportunity ("HAO"), emphasizes the concept of value-based care while granting states extensive flexibility to administer and design their programs within a defined budget. CMS believes this state opportunity will enhance the Medicaid program's integrity through its focus on accountability for results and quality improvement, making the Medicaid program stronger for states and beneficiaries.

The HAO program will include:
- Beneficiary Protections.
- Flexibility in the Administration of Benefits.
- Transparency.
- Financing and Program Integrity

64

- o States participating in HAO demonstrations will need to agree to operate their program within a defined budget target, set on either a total expenses or per-enrollee basis, in a manner similar to that used in other section 1115 demonstrations.
  - o To the extent states achieve savings and demonstrate no declines in access or quality, CMS will share back a portion of the federal savings for reinvestment into Medicaid.
- Limited Medicaid Population
  - o The population includes adults under age 65 who are not eligible for Medicaid on the basis of disability or on their need for long term care services and supports, and who are not eligible under a state plan.
- Benefit Design and Drug Coverage
  - o States have the opportunity to design a benefit package that aligns with private coverage.
  - o Provide states with greater negotiating power to lower drug spending and promote value in the program.
- Managed Care and Delivery Systems
  - o States will be able to use any combination of fee-for-service and managed care delivery systems and will have flexibility to alter these arrangements over the course of the demonstration
- Streamlined Application Process Transitioning 1115 Demonstrations
- Quality Strategy and Performance Assessment
  - o States will be held to a high standard of accountability for producing positive health outcomes and will be subject to regular and thorough monitoring and evaluation

We are unable to predict whether any states will opt to apply for participation in the HAO demonstration or the impact on our future results of operations.

*Various State Medicaid Supplemental Payment Programs:*

We incur health-care related taxes ("Provider Taxes") imposed by states in the form of a licensing fee, assessment or other mandatory payment which are related to: (i) healthcare items or services; (ii) the provision of, or the authority to provide, the health care items or services, or; (iii) the payment for the health care items or services. Such Provider Taxes are subject to various federal regulations that limit the scope and amount of the taxes that can be levied by states in order to secure federal matching funds as part of their respective state Medicaid programs. As outlined below, we derive a related Medicaid reimbursement benefit from assessed Provider Taxes in the form of Medicaid claims based payment increases and/or lump sum Medicaid supplemental payments.

Included in these Provider Tax programs are reimbursements received in connection with the Texas Uncompensated Care/Upper Payment Limit program ("UC/UPL") and Texas Delivery System Reform Incentive Payments program ("DSRIP"). Additional disclosure related to the Texas UC/UPL and DSRIP programs is provided below.

*Texas Uncompensated Care/Upper Payment Limit Payments:*

Certain of our acute care hospitals located in various counties of Texas (Grayson, Hidalgo, Maverick, Potter and Webb) participate in Medicaid supplemental payment Section 1115 Waiver indigent care programs. Section 1115 Waiver Uncompensated Care ("UC") payments replace the former Upper Payment Limit ("UPL") payments. These hospitals also have affiliation agreements with third-party hospitals to provide free hospital and physician care to qualifying indigent residents of these counties. Our hospitals receive both supplemental payments from the Medicaid program and indigent care payments from third-party, affiliated hospitals. The supplemental payments are contingent on the county or hospital district making an Inter-Governmental Transfer ("IGT") to the state Medicaid program while the indigent care payment is contingent on a transfer of funds from the applicable affiliated hospitals. However, the county or hospital district is prohibited from entering into an agreement to condition any IGT on the amount of any private hospital's indigent care obligation.

For state fiscal year 2017, Texas Medicaid continued to operate under a CMS-approved Section 1115 five-year Medicaid waiver demonstration program extended by CMS for fifteen months to December 31, 2017. During the first five years of this program that started in state fiscal year 2012, the THHSC transitioned away from UPL payments to new waiver incentive payment programs, UC and DSRIP payments. During demonstration periods ending December 31, 2017, THHSC continued to, make incentive payments under the program after certain qualifying criteria were met by hospitals. Supplemental payments are also subject to aggregate statewide caps based on CMS approved Medicaid waiver amounts.

On December 21, 2017, CMS approved the 1115 Waiver for the period January 1, 2018 to September 30, 2022. The Waiver continued to include UC and DSRIP payment pools with modifications and new state specific reporting deadlines that if not met by THHSC will result in material decreases in the size of the UC and DSRIP pools. For UC during the initial two years of this renewal, the UC program will remain relatively the same in size and allocation methodology. For year three of this waiver renewal, FFY 2020, and through FFY 2022, the size and distribution of the UC pool will be determined based on charity care costs reported to HHSC in

65

accordance with Medicare cost report Worksheet S-10 principles. In September 2019, CMS approved the annual UC pool size in the amount of $3.9 billion for demonstration years ("DYs") 9, 10 and 11 (October 1, 2019 to September 30, 2022). We estimate the impact on of these UC program changes could result in a 5% to 10% increase to UC payments in DYs 9 to 11 as compared to our DY 8 UC payments.

Effective April 1, 2018, certain of our acute care hospitals located in Texas began to receive Medicaid managed care rate enhancements under the Uniform Hospital Rate Increase Program ("UHRIP"). The non-federal share component of these UHRIP rate enhancements are financed by Provider Taxes. The Texas 1115 Waiver rules require UHRIP rate enhancements be considered in the Texas UC payment methodology which results in a reduction to our UC payments. The UC amounts reported in the State Medicaid Supplemental Payment Program Table below reflect the impact of this new UHRIP program. In February, 2020, THHSC announced the UHRIP pool for the state's 2021 fiscal year will increase to $3.0 billion from its current funding level of $1.6 billion. We estimate that this change, if approved by CMS, will favorably impact our annual results of operations by approximately $12 million during that period, of which approximately $4 million relates to the year ended December 31, 2020.

On November 16, 2018, THHSC published a final rule effective in federal fiscal years 2018 and 2019 that changes the definition of a rural hospital for the purposes of determining Texas UC payments and the applicable UC payment reduction. The application of UC payment reduction allows the THHSC to comply with the overall statewide UC payment cap required under the special terms and condition of the approved 1115 Waiver. Two of our acute care hospitals, which have been designated as a Rural Referral Center by CMS and which are located in an urban Metropolitan Statistical Area, recorded: (i) increased UC payments/revenue for the federal fiscal year ending September 30, 2018, and; (ii) decreased UC payments/revenue for the federal fiscal year beginning October 1, 2018. The net impact of these changes had a favorable impact on our 2018 results of operations and are included in the amounts reflected below in the *State Medicaid Supplemental Payment Program* table.

*Texas Delivery System Reform Incentive Payments:*

In addition, the Texas Medicaid Section 1115 Waiver includes a DSRIP pool to incentivize hospitals and other providers to transform their service delivery practices to improve quality, health status, patient experience, coordination, and cost-effectiveness. DSRIP pool payments are incentive payments to hospitals and other providers that develop programs or strategies to enhance access to health care, increase the quality of care, the cost-effectiveness of care provided and the health of the patients and families served. In May, 2014, CMS formally approved specific DSRIP projects for certain of our hospitals for demonstration years 3 to 5 (our facilities did not materially participate in the DSRIP pool during demonstration years 1 or 2). DSRIP payments are contingent on the hospital meeting certain pre-determined milestones, metrics and clinical outcomes. Additionally, DSRIP payments are contingent on a governmental entity providing an IGT for the non-federal share component of the DSRIP payment. THHSC generally approves DSRIP reported metrics, milestones and clinical outcomes on a semi-annual basis in June and December. Under the CMS approval noted above, the Waiver renewal requires the transition of the DSRIP program to one focused on "health system performance measurement and improvement." THHSC must submit a transition plan describing "how it will further develop its delivery system reforms without DSRIP funding and/or phase out DSRIP funded activities and meet mutually agreeable milestones to demonstrate its ongoing progress." The size of the DSRIP pool will remain unchanged for the initial two years of the waiver renewal with unspecified decreases in years three and four of the renewal, FFY 2020 and 2021, respectively. In FFY 2022, DSRIP funding under the waiver is eliminated. For FFY 2020 and 2021, we estimate these changes will result in a $3 million and $4 million decrease in DSRIP payments, respectively. For FFY 2022, we will no longer receive DSRIP funds due to the elimination of this funding source by CMS in the Waiver renewal. In September 2019, HHSC submitted a DSRIP Transition Plan to CMS as required by the 1115 Waiver Special Terms and Conditions #37 that outlines a transition from the current DSRIP program to a Value-Based Purchasing ("VBP") type payment model. The draft plan will be finalized with CMS by March 31, 2020. The effective date of the new VBP payment model (if approved by CMS) is not yet known. Similarly, details of the VBP model are still under development. As a result, we are unable to estimate the financial impact of this payment change.

*Summary of Amounts Related To The Above-Mentioned Various State Medicaid Supplemental Payment Programs:*

The following table summarizes the revenues, Provider Taxes and net benefit related to each of the above-mentioned Medicaid supplemental programs for the years ended December 31, 2019, 2018 and 2017. The Provider Taxes are recorded in other operating expenses on the Condensed Consolidated Statements of Income as included herein.

66

CONFIDENTIAL

| | (amounts in millions) | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| **Texas UC/UPL:** | | | |
| Revenues | $ 123 | $ 135 | $ 88 |
| Provider Taxes | (47) | (51) | (25) |
| Net benefit | $ 76 | $ 84 | $ 63 |
| **Texas DSRIP:** | | | |
| Revenues | $ 35 | $ 29 | $ 46 |
| Provider Taxes | (12) | (9) | (19) |
| Net benefit | $ 23 | $ 20 | $ 27 |
| **Various other state programs:** | | | |
| Revenues | $ 261 | $ 223 | $ 223 |
| Provider Taxes | (135) | (119) | (127) |
| Net benefit | $ 126 | $ 104 | $ 96 |
| **Total all Provider Tax programs:** | | | |
| Revenues | $ 419 | $ 387 | $ 357 |
| Provider Taxes | (194) | (179) | (171) |
| Net benefit | $ 225 | $ 208 | $ 186 |

Included in the 2019 Texas UC/UPL amounts reflected above was approximately $12 million received during the third quarter of 2019 (approximately $3 million of which relates to prior years).

We estimate that our aggregate net benefit from the Texas and various other state Medicaid supplemental payment programs will approximate $214 million (net of Provider Taxes of $207 million) during the year ending December 31, 2020. This estimate is based upon various terms and conditions that are out of our control including, but not limited to, the states'/CMS's continued approval of the programs and the applicable hospital district or county making IGTs consistent with 2019 levels. Future changes to these terms and conditions could materially reduce our net benefit derived from the programs which could have a material adverse impact on our future consolidated results of operations. In addition, Provider Taxes are governed by both federal and state laws and are subject to future legislative changes that, if reduced from current rates in several states, could have a material adverse impact on our future consolidated results of operations.

*Texas and South Carolina Medicaid Disproportionate Share Hospital Payments:*

Hospitals that have an unusually large number of low-income patients (i.e., those with a Medicaid utilization rate of at least one standard deviation above the mean Medicaid utilization, or having a low income patient utilization rate exceeding 25%) are eligible to receive a DSH adjustment. Congress established a national limit on DSH adjustments. Although this legislation and the resulting state broad-based provider taxes have affected the payments we receive under the Medicaid program, to date the net impact has not been materially adverse.

Upon meeting certain conditions and serving a disproportionately high share of Texas' and South Carolina's low income patients, five of our facilities located in Texas and one facility located in South Carolina received additional reimbursement from each state's DSH fund. The South Carolina and Texas DSH programs were renewed for each state's 2020 DSH fiscal year (covering the period of October 1, 2019 through September 30, 2020).

In connection with these DSH programs, included in our financial results was an aggregate of approximately $50 million during 2019, $38 million during 2018 and $34 million during 2017. We expect the aggregate reimbursements to our hospitals pursuant to the Texas and South Carolina 2020 fiscal year programs to be approximately $32 million.

The Legislation and subsequent federal legislation provides for a significant reduction in Medicaid disproportionate share payments beginning in federal fiscal year 2020 (see below in *Sources of Revenues and Health Care Reform-Medicaid Revisions* for additional disclosure related to the delay of these DSH reductions). The U.S. Department of Health and Human Services is to determine the amount of Medicaid DSH payment cuts imposed on each state based on a defined methodology. As Medicaid DSH payments to states will be cut, consequently, payments to Medicaid-participating providers, including our hospitals in Texas and South Carolina, will be reduced in the coming years. Based on the CMS final rule published in September, 2019, beginning in fiscal year 2020, annual Medicaid DSH payments in South Carolina and Texas could be reduced by approximately 32% and 23%, respectively, from 2019 DSH payment levels.

CONFIDENTIAL

DEF-MDL-14396.00123

ADAMHS000029667

Our behavioral health care facilities in Texas have been receiving Medicaid DSH payments since FFY 2016. As with all Medicaid DSH payments, hospitals are subject to state audits that typically occur up to three years after their receipt. DSH payments are subject to a federal Hospital Specific Limit ("HSL") and are not fully known until the DSH audit results are concluded. In general, freestanding psychiatric hospitals tend to provide significantly less charity care than acute care hospitals and therefore are at more risk for retroactive recoupment of prior year DSH payments in excess of their respective HSL. In light of the retroactive HSL audit risk for freestanding psychiatric hospitals, we have established DSH reserves for our facilities that have been receiving funds since FFY 2016. These DSH reserves are also impacted by the resolution of federal DSH litigation related to Children's Hospital Association of Texas v. Azar ("CHAT"), No. 17-cv-844 (D.D.C. March 2, 2018), appeal docketed, No. 18-5135 (D.C. Cir. May 9, 2018) where the calculation of HSL was being challenged. In August, 2019, DC Circuit Court of Appeals issued a unanimous decision in CHAT and reversed the judgment of the district court in favor of CMS and ordered that CMS's "2017 Rule" (regarding Medicaid DSH Payments—Treatment of Third Party Payers in Calculating Uncompensated Care Costs) be reinstated. CMS has not issued any additional guidance post the ruling and it is unclear if the plaintiffs in the case will appeal the decision to the Supreme Court of the United States. Separate legal challenges on this same issue are pending in circuit courts in the Fifth and Sixth Circuits. Additionally, on November 4, 2019, the United States Court of Appeals for the Eighth Circuit issued an opinion upholding the 2017 Rule. Missouri Hosp. Ass'n v. Azar, No. 18-1778 (8th Cir. Nov. 4, 2019) (i.e. reversing a district court order enjoining the 2017 rule). This legal activity may impact CMS's guidance on the 2017 Rule regarding the federal HSL. The cumulative Medicaid DSH and UC reimbursements related to our behavioral health hospitals located in Texas, that have been reserved for in our financial statements related to these matters, amounted to $34 million and $19 million as of December 31, 2019 and 2018, respectively.

*Nevada SPA:*

In Nevada, CMS approved a state plan amendment ("SPA") in August, 2014 that implemented a hospital supplemental payment program retroactive to January 1, 2014. This SPA has been approved for additional state fiscal years including the 2020 fiscal year covering the period of July 1, 2019 through June 30, 2020.

In connection with this program, included in our financial results was approximately $28 million during 2019, $26 million during 2018 and $21 million during 2017. We estimate that our reimbursements pursuant to this program will approximate $28 million during the year ended December 31, 2020.

*California SPA:*

In California, CMS issued formal approval of the 2017-19 Hospital Fee Program in December, 2017 retroactive to January 1, 2017 through June 30, 2019. This approval included the Medicaid inpatient and outpatient fee-for-service supplemental payments and the overall provider tax structure but did not yet include the approval of the managed care payment component. Upon approval by CMS, the managed care payment component will consist of two categories of payments, "pass-through" payments and "directed" payments. The pass-through payments will be similar in nature to the prior Hospital Fee Program payment method whereas the directed payment method will be based on actual concurrent hospital Medicaid managed care in-network patient volume. CMS has approved the "directed" payment component methodology for the period of July 1, 2017 through June 30, 2019. The timing of CMS's approval of the "pass through" component is uncertain. In September, 2019, the state submitted a request to renew the Hospital Fee Program for the period July 1, 2019 to December 31, 2021. The timing of CMS's approval of this new program is uncertain. In connection with the existing program, included in our financial results was approximately $29 million during 2019, $25 million during 2018 and $14 million during 2017. We estimate that our reimbursements pursuant to this program will approximate $29 million during the year ended December 31, 2020. The aggregate impact of the California supplemental payment program, as outlined above, is included in the above *State Medicaid Supplemental Payment Program* table.

*Risk Factors Related To State Supplemental Medicaid Payments:*

As outlined above, we receive substantial reimbursement from multiple states in connection with various supplemental Medicaid payment programs. The states include, but are not limited to, Texas, Mississippi, Illinois, Nevada, Arkansas, California and Indiana. Failure to renew these programs beyond their scheduled termination dates, failure of the public hospitals to provide the necessary IGTs for the states' share of the DSH programs, failure of our hospitals that currently receive supplemental Medicaid revenues to qualify for future funds under these programs, or reductions in reimbursements, could have a material adverse effect on our future results of operations.

In April, 2016, CMS published its final Medicaid Managed Care Rule which explicitly permits but phases out the use of pass-through payments (including supplemental payments) by Medicaid Managed Care Organizations ("MCO") to hospitals over ten years but allows for a transition of the pass-through payments into value-based payment structures, delivery system reform initiatives or payments tied to services under a MCO contract. Since we are unable to determine the financial impact of this aspect of the final rule, we can provide no assurance that the final rule will not have a material adverse effect on our future results of operations. In

68

CONFIDENTIAL

DEF-MDL-14396.00124

ADAMHS000029668

November, 2018, CMS issued a proposed rule that would permit pass-through supplemental provider payments during a time-limited period when states transition populations or services from fee-for-service Medicaid to managed care.

**HITECH Act:** In July 2010, the Department of Health and Human Services ("HHS") published final regulations implementing the health information technology ("HIT") provisions of the American Recovery and Reinvestment Act (referred to as the "HITECH Act"). The final regulation defines the "meaningful use" of Electronic Health Records ("EHR") and establishes the requirements for the Medicare and Medicaid EHR payment incentive programs. The final rule established an initial set of standards and certification criteria. The implementation period for these new Medicare and Medicaid incentive payments started in federal fiscal year 2011 and can end as late as 2016 for Medicare and 2021 for the state Medicaid programs. State Medicaid program participation in this federally funded incentive program is voluntary but all of the states in which our eligible hospitals operate have chosen to participate. Our acute care hospitals qualified for these EHR incentive payments upon implementation of the EHR application assuming they meet the "meaningful use" criteria. The government's ultimate goal is to promote more effective (quality) and efficient healthcare delivery through the use of technology to reduce the total cost of healthcare for all Americans and utilizing the cost savings to expand access to the healthcare system.

Pursuant to HITECH Act regulations, hospitals that do not qualify as a meaningful user of EHR by 2015 are subject to a reduced market basket update to the IPPS standardized amount in 2015 and each subsequent fiscal year. We believe that all of our acute care hospitals have met the applicable meaningful use criteria and therefore are not subject to a reduced market basked update to the IPPS standardized amount in federal fiscal year 2015. However, under the HITECH Act, hospitals must continue to meet the applicable meaningful use criteria in each fiscal year or they will be subject to a market basket update reduction in a subsequent fiscal year. Failure of our acute care hospitals to continue to meet the applicable meaningful use criteria would have an adverse effect on our future net revenues and results of operations.

Federal regulations require that Medicare EHR incentive payments be computed based on the Medicare cost report that begins in the federal fiscal period in which a hospital meets the applicable "meaningful use" requirements. Since the annual Medicare cost report periods for each of our acute care hospitals ends on December 31st, we will recognize Medicare EHR incentive income for each hospital during the fourth quarter of the year in which the facility meets the "meaningful use" criteria and during the fourth quarter of each applicable subsequent year.

In the 2019 IPPS final rule, CMS overhauled the Medicare and Medicaid EHR Incentive Program to focus on interoperability, improve flexibility, relieve burden and place emphasis on measures that require the electronic exchange of health information between providers and patients. We can provide no assurance that the changes will not have a material adverse effect on our future results of operations.

**Managed Care:** A significant portion of our net patient revenues are generated from managed care companies, which include health maintenance organizations, preferred provider organizations and managed Medicare (referred to as Medicare Part C or Medicare Advantage) and Medicaid programs. In general, we expect the percentage of our business from managed care programs to continue to grow. The consequent growth in managed care networks and the resulting impact of these networks on the operating results of our facilities vary among the markets in which we operate. Typically, we receive lower payments per patient from managed care payers than we do from traditional indemnity insurers, however, during the past few years we have secured price increases from many of our commercial payers including managed care companies.

**Commercial Insurance:** Our hospitals also provide services to individuals covered by private health care insurance. Private insurance carriers typically make direct payments to hospitals or, in some cases, reimburse their policy holders, based upon the particular hospital's established charges and the particular coverage provided in the insurance policy. Private insurance reimbursement varies among payers and states and is generally based on contracts negotiated between the hospital and the payer.

Commercial insurers are continuing efforts to limit the payments for hospital services by adopting discounted payment mechanisms, including predetermined payment or DRG-based payment systems, for more inpatient and outpatient services. To the extent that such efforts are successful and reduce the insurers' reimbursement to hospitals and the costs of providing services to their beneficiaries, such reduced levels of reimbursement may have a negative impact on the operating results of our hospitals.

**Other Sources:** Our hospitals provide services to individuals that do not have any form of health care coverage. Such patients are evaluated, at the time of service or shortly thereafter, for their ability to pay based upon federal and state poverty guidelines, qualifications for Medicaid or other state assistance programs, as well as our local hospitals' indigent and charity care policy. Patients without health care coverage who do not qualify for Medicaid or indigent care write-offs are offered substantial discounts in an effort to settle their outstanding account balances.

69

**Health Care Reform:** Listed below are the Medicare, Medicaid and other health care industry changes which have been, or are scheduled to be, implemented as a result of the Legislation.

*Implemented Medicare Reductions and Reforms:*

- The Reconciliation Act reduced the market basket update for inpatient and outpatient hospitals and inpatient behavioral health facilities by 0.25% in each of 2010 and 2011, by 0.10% in each of 2012 and 2013, 0.30% in 2014, 0.20% in each of 2015 and 2016 and 0.75% in each of 2017, 2018 and 2019.

- The Legislation implemented certain reforms to Medicare Advantage payments, effective in 2011.

- A Medicare shared savings program, effective in 2012.

- A hospital readmissions reduction program, effective in 2012.

- A value-based purchasing program for hospitals, effective in 2012.

- A national pilot program on payment bundling, effective in 2013.

- Reduction to Medicare DSH payments, effective in 2014, as discussed above.

*Medicaid Revisions:*

- Expanded Medicaid eligibility and related special federal payments, effective in 2014.

- The Legislation (as amended by subsequent federal legislation) requires annual aggregate reductions in federal DSH funding from federal fiscal year ("FFY") 2020 through FFY 2025. The aggregate annual reduction amounts are $4.0 billion for FFY 2020 and $8.0 billion for FFY 2021 through FFY 2025. In December, 2019, federal legislation was enacted which delays the reduction in the Medicaid DSH allotment through May 22, 2020.

*Health Insurance Revisions:*

- Large employer insurance reforms, effective in 2015.

- Individual insurance mandate and related federal subsidies, effective in 2014. As noted above in *Health Care Reform,* the Tax Cuts and Jobs Act enacted into law in December, 2017 eliminated the individual insurance federal mandate penalty after December 31, 2018.

- Federally mandated insurance coverage reforms, effective in 2010 and forward.

The Legislation seeks to increase competition among private health insurers by providing for transparent federal and state insurance exchanges. The Legislation also prohibits private insurers from adjusting insurance premiums based on health status, gender, or other specified factors. We cannot provide assurance that these provisions will not adversely affect the ability of private insurers to pay for services provided to insured patients, or that these changes will not have a negative material impact on our results of operations going forward.

*Value-Based Purchasing:*

There is a trend in the healthcare industry toward value-based purchasing of healthcare services. These value-based purchasing programs include both public reporting of quality data and preventable adverse events tied to the quality and efficiency of care provided by facilities. Governmental programs including Medicare and Medicaid currently require hospitals to report certain quality data to receive full reimbursement updates. In addition, Medicare does not reimburse for care related to certain preventable adverse events. Many large commercial payers currently require hospitals to report quality data, and several commercial payers do not reimburse hospitals for certain preventable adverse events.

The Legislation required HHS to implement a value-based purchasing program for inpatient hospital services which became effective on October 1, 2012. The Legislation requires HHS to reduce inpatient hospital payments for all discharges by a percentage beginning at 1% in FFY 2013 and increasing by 0.25% each fiscal year up to 2% in FFY 2017 and subsequent years. HHS will pool the amount collected from these reductions to fund payments to reward hospitals that meet or exceed certain quality performance standards established by HHS. HHS will determine the amount each hospital that meets or exceeds the quality performance standards will receive from the pool of dollars created by these payment reductions. In its fiscal year 2016 IPPS final rule, CMS funded the

70

value-based purchasing program by reducing base operating DRG payment amounts to participating hospitals by 1.75%. For FFY 2017 and subsequent years, this reduction was increased to its maximum of 2%.

*Hospital Acquired Conditions:*

The Legislation prohibits the use of federal funds under the Medicaid program to reimburse providers for medical assistance provided to treat hospital acquired conditions ("HAC"). Beginning in FFY 2015, hospitals that fall into the top 25% of national risk-adjusted HAC rates for all hospitals in the previous year will receive a 1% reduction in their total Medicare payments.

*Readmission Reduction Program:*

In the Legislation, Congress also mandated implementation of the hospital readmission reduction program ("HRRP"). Hospitals with excessive readmissions for conditions designated by HHS will receive reduced payments for all inpatient discharges, not just discharges relating to the conditions subject to the excessive readmission standard. The HRRP currently assesses penalties on hospitals having excess readmission rates for heart failure, myocardial infarction, pneumonia, acute exacerbation of chronic obstructive pulmonary disease (COPD) and elective total hip arthroplasty (THA) and/or total knee arthroplasty (TKA), excluding planned readmissions, when compared to expected rates. In the fiscal year 2015 IPPS final rule, CMS added readmissions for coronary artery bypass graft (CABG) surgical procedures beginning in fiscal year 2017. To account for excess readmissions, an applicable hospital's base operating DRG payment amount is adjusted for each discharge occurring during the fiscal year. Readmissions payment adjustment factors can be no more than a 3 percent reduction.

*Accountable Care Organizations:*

The Legislation requires HHS to establish a Medicare Shared Savings Program that promotes accountability and coordination of care through the creation of accountable care organizations ("ACOs"). The ACO program allows providers (including hospitals), physicians and other designated professionals and suppliers to voluntarily work together to invest in infrastructure and redesign delivery processes to achieve high quality and efficient delivery of services. The program is intended to produce savings as a result of improved quality and operational efficiency. ACOs that achieve quality performance standards established by HHS will be eligible to share in a portion of the amounts saved by the Medicare program. CMS is also developing and implementing more advanced ACO payment models, such as the Next Generation ACO Model, which require ACOs to assume greater risk for attributed beneficiaries. On December 21, 2018, CMS published a final rule that, in general, requires ACO participants to take on additional risk associated with participation in the program. It remains unclear to what extent providers will pursue federal ACO status or whether the required investment would be warranted by increased payment.

*Bundled Payments for Care Improvement Advanced:*

The Center for Medicare & Medicaid Innovation ("CMMI") is responsible for establishing demonstration projects and other initiatives aimed to develop, test and encourage the adoption of new methods for delivery and payment for health care that create savings under the Federal Medicare and state Medicaid programs while improving quality of care. For example, providers participating in bundled payment initiatives agree to receive one payment for services provided to Medicare beneficiaries for certain medical conditions or episodes of care, accepting accountability for costs and quality of care across the continuum of care. By rewarding providers for increasing quality and reducing costs, and penalizing providers if costs exceed a set amount, these models are intended to lead to higher quality and more coordinated care at a lower cost to the Medicare beneficiary and overall program. The CMMI has previously implemented a voluntary bundled payment program known as the Bundled Payment for Care Improvement ("BPCI"). Substantially all of our acute care hospitals were participants in the BPCI program, which ended September 30, 2018.

CMMI implemented a new, second generation voluntary episode payment model, Bundled Payments for Care Improvement Advanced (BPCI-Advanced or the Program), with the first performance period beginning October 1, 2018. BPCI-Advanced is designed to test a new iteration of bundled payments for 32 Clinical Episodes (29 inpatient and 3 outpatient) with an aim to align incentives among participating health care providers to reduce expenditures and improve quality of care for traditional Medicare beneficiaries. The first cohort of participants entered BPCI-Advanced on October 1, 2018, and agreed to an initial performance period that will run through December 31, 2023. We initially elected to participate in BPCI-Advanced at seventeen (17) of our acute care hospitals across almost two hundred (200) clinical episodes in collaboration with a third-party convener which has extensive experience and success in BPCI. A second BPCI-Advanced cohort started January 1, 2020 where our participation in the program increased to twenty-two (22) acute care hospitals with over three hundred (300) clinical episodes. The ultimate success and financial impact of the BPCI-Advanced program is contingent on multiple variables so we are unable to estimate the impact. However, given the breadth and scope of participation of our acute care hospitals in BPCI-Advanced, the impact could be significant (either favorably or unfavorably) depending on actual program results.

In addition to statutory and regulatory changes to the Medicare and each of the state Medicaid programs, our operations and reimbursement may be affected by administrative rulings, new or novel interpretations and determinations of existing laws and regulations, post-payment audits, requirements for utilization review and new governmental funding restrictions, all of which may

71

materially increase or decrease program payments as well as affect the cost of providing services and the timing of payments to our facilities. The final determination of amounts we receive under the Medicare and Medicaid programs often takes many years, because of audits by the program representatives, providers' rights of appeal and the application of numerous technical reimbursement provisions. We believe that we have made adequate provisions for such potential adjustments. Nevertheless, until final adjustments are made, certain issues remain unresolved and previously determined allowances could become either inadequate or more than ultimately required.

Finally, we expect continued third-party efforts to aggressively manage reimbursement levels and cost controls. Reductions in reimbursement amounts received from third-party payers could have a material adverse effect on our financial position and our results.

### Other Operating Results

#### Interest Expense

Reflected below are the components of our interest expense which amounted to $163 million during 2019, $155 million during 2018 and $145 million during 2017 (amounts in thousands):

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Revolving credit & demand notes (a.) | $ 3,066 | $ 12,240 | $ 10,933 |
| $300 million, 3.75% Senior Notes due 2019 (b.) | — | 10,156 | 11,250 |
| $700 million, 4.75% Senior Notes due 2022 (c.) | 32,280 | 32,280 | 32,280 |
| $400 million, 5.00% Senior Notes due 2026 (d.) | 20,000 | 20,000 | 20,000 |
| Term loan facility A (a.) | 73,005 | 63,021 | 47,745 |
| Term loan facility B (a.) | 20,274 | 3,511 | — |
| Accounts receivable securitization program (e.) | 12,471 | 11,785 | 7,987 |
| Subtotal-revolving credit, demand notes, Senior Notes, term loan facility and accounts receivable securitization program | 161,096 | 152,993 | 130,195 |
| Interest rate swap (income)/expense, net | (3,400) | (6,726) | 2,403 |
| Amortization of financing fees | 5,118 | 9,143 | 8,932 |
| Other combined interest expense | 3,754 | 3,343 | 4,740 |
| Capitalized interest on major projects | (3,366) | (2,266) | (1,020) |
| Interest income | (469) | (1,531) | (81) |
| Interest expense, net | $ 162,733 | $ 154,956 | $ 145,169 |

CONFIDENTIAL

ADAMHS000029672

DEF-MDL-14396.00128

(a.) In October, 2018, we entered into a sixth amendment to our credit agreement dated November 15, 2010 to, among other things: (i.) increase the aggregate amount of the revolving commitments by $200 million to $1 billion; (ii) increase the aggregate amount of the term loan facility A by approximately $290 million to $2 billion, and; (iii) extend the maturity date of the credit agreement from August 7, 2019 to October 23, 2023. On October 31, 2018, we added a seven-year, Tranche B term loan facility, which matures on October 31, 2025, in the aggregate amount of $495 million pursuant to our credit agreement.

The credit agreement, as amended in October, 2018, consists of: (i) an $1 billion revolving credit facility (there are no outstanding borrowings under the revolving credit facility as of December 31, 2019); (ii) a term loan A facility with $2.0 billion of outstanding borrowings as of December 31, 2019, and; (iii) a term loan B facility with $500 million of outstanding borrowings as of December 31, 2019.

(b.) On November 26, 2018 we redeemed the $300 million aggregate principal, 3.75% Senior Notes due 2019. The 2019 Notes were redeemed for an aggregate price equal to 100.485% of the principal amount (premium of approximately $1 million) plus accrued interest to the redemption date.

(c.) In June, 2016, we completed the offering of an additional $400 million aggregate principal amount of 4.75% Senior Notes due in 2022 (issued at a yield of 4.35%), the terms of which were identical to the terms of our $300 million aggregate principal amount of 4.75% Senior Notes due in 2022, issued in August, 2014. These Senior Notes, combined, are referred to as $700 million, 4.75% Senior Notes due in 2022.

(d.) In June, 2016, we completed the offering of $400 million aggregate principal amount of 5.00% Senior Notes due in 2026.

(e.) In April, 2018, we amended our accounts receivable securitization program, which was scheduled to expire in December, 2018. Pursuant to the amendment, the term has been extended through April 26, 2021, and the borrowing limit has been increased to $450 million from $440 million ($400 million outstanding as of December 31, 2019).

Interest expense increased $8 million during 2019 to $163 million as compared to $155 million during 2018. The increase was due primarily to an increase in our aggregate average cost of borrowings pursuant to our revolving credit, demand notes, senior notes, term loan A and B facilities and accounts receivable securitization program facilities. The average cost of borrowings on these facilities increased to 4.0% during 2019, as compared to 3.8% during 2018, on average outstanding borrowings of approximately $4.0 billion during each year.

Interest expense increased $10 million during 2018 to $155 million as compared to $145 million during 2017. The increase was due primarily to: (i) a net increase of $23 million in aggregate interest expense on our revolving credit, demand notes, senior notes, term loan A and B facilities and accounts receivable securitization program resulting from an increase in our aggregate average cost of borrowings pursuant to these facilities (3.8% during 2018, as compared to 3.2% during 2017, on average outstanding borrowings of approximately $4.0 billion during each year), partially offset by; (ii) a $9 million decrease in the interest rate swap expense; (iii) a $3 million combined increase in capitalized interest and interest income, and; (iv) $1 million of other combined net decreases.

The aggregate average effective interest rate, including amortization of deferred financing costs, original issue discounts and designated interest rate swap expense, on borrowings outstanding under our revolving credit, demand notes, senior notes, term loan A and B facilities and accounts receivable securitization program (which amounted to approximately $4.0 billion during each of 2019, 2018 and 2017), were 4.0% during 2019, 3.8% during 2018 and 3.5% during 2017.

### Costs Related to Early Extinguishment of Debt

In connection with various financing transaction completed during the year, as discussed below in *Capital Resources-Credit Agreements and Outstanding Debt Securities*, our 2018 results of operations include a $4 million pre-tax charge incurred for the costs related to the extinguishment of debt. This charge, which was included in other operating expenses, consisted of the write-off of deferred charges ($3 million) as well as the make-whole premium paid ($1 million) on the early redemption of the $300 million, 3.75% senior notes which were scheduled to mature in 2019.

### Provision for Asset Impairment-Foundations Recovery Network:

Our financial results for the years ended December 31, 2019 and 2018 include pre-tax provisions for asset impairments of approximately $98 million and $49 million, respectively, recorded in connection with Foundations Recovery Network, L.L.C. ("Foundations"), which was acquired by us in 2015.

73

ADAMHS000029673

The pre-tax provision for asset impairment recording during 2019 includes: (i) a $75 million impairment provision to write-off the carrying value of the Foundations' tradename intangible asset, and; (ii) a $23 million impairment provision to reduce the carrying value of real property assets of certain Foundations' facilities. The $49 million pre-tax provision for asset impairment recorded during 2018 reduced the carrying value of a tradename intangible asset to approximately $75 million from its original value of approximately $124 million.

The provision for asset impairment recorded during 2019, which is included in other operating expenses in our consolidated statements of income, was recorded after evaluation of the estimated fair value of the Foundations' tradename as well as certain related real property assets. The provision for asset impairment was impacted by the following: (i) decisions made by management during 2019 to cancel the opening of future planned de novo facilities; (ii) reductions in projected future patient volumes, revenues and cash flows resulting from continued operating trends and financial results experienced by existing facilities that significantly lagged expectations, and; (iii) competitive pressures experienced in certain markets that were deemed to be permanent.

The provision for asset impairment recorded during 2018, which is also included in other operating expenses, was recorded after an evaluation, at that time, of the estimated fair value of the Foundations' tradename for its existing facilities, consisting of 4 inpatient and 12 outpatient facilities as of December 31, 2018, as well as estimated planned de novos. The 2018 asset impairment charge was impacted by the following: (i) the lost future revenue and cash flows resulting from the permanent closure of a Foundations' inpatient facility located in Malibu, California that was severely damaged in the California wildfires during the fourth quarter of 2018; (ii) reduction in growth rates of projected future patient volumes, revenues and operating cash flows based upon pressures on reimbursement rates experienced from certain payers and competitive pressures experienced in certain markets, and; (iii) revisions made to the number and timing of planned de novo facilities.

*Provision for Income Taxes and Effective Tax Rates*

The effective tax rates, as calculated by dividing the provision for income taxes by income before income taxes, were as follows for each of the years ended December 31, 2019, 2018 and 2017 (dollar amounts in thousands):

|                              | 2019 | 2018 | 2017 |
|------------------------------|------|------|------|
| Provision for income taxes   | $ 238,794 | $ 236,642 | $ 363,697 |
| Income before income taxes   | 1,066,337 | 1,034,525 | 1,135,009 |
| Effective tax rate           | 22.4% | 22.9% | 32.0% |

The provision for income taxes increased $2 million and the effective tax rate decreased 0.5% during 2019, as compared 2018, due primarily to: (i) an increase resulting from the provision for income taxes recorded on the $32 million increase in pre-tax income, as discussed above in *Results of Operations*; (ii) a decrease of $11 million resulting from our adoption of ASU 2016-09 which decreased our provision for income taxes by approximately $12 million during 2019, as compared to a decrease of approximately $1 million during 2018; (iii) a $4 million decrease resulting from a favorable adjustment recorded during 2019 related to a change in state tax law, partially offset by; (iv) a $6 million increase recorded during 2019 resulting from the above-mentioned net estimated federal and state income taxes due on the portion of the DOJ Reserve that is estimated to be non-deductible for income tax purposes.

The decrease in the effective tax rate during 2018, as compared to 2017, was due primarily to the following:

* a decrease in the provision for income taxes during 2018 resulting from the Tax Cuts and Jobs Act of 2017 ("TCJA-17") which, among other things, reduced the U.S. federal corporate tax rate from 35% to 21% effective January 1, 2018, partially offset by;

* a net increase of $13 million in the provision for income taxes during 2018, as compared to 2017, due to the following that decreased or increased our provision for income taxes during 2018 and/or 2017: (i) decreases of $6 million and $30 million recorded during 2018 and 2017, respectively, resulting from a reduction in our net deferred income tax liability recorded in connection with the TCJA-17 which reduced the U.S. federal corporate tax rate to 21% from 35%, effective January 1, 2018, partially offset by; (ii) an increase of $11 million recorded during 2017 due to a one-time repatriation tax incurred pursuant to the TCJA-17 (in connection with our behavioral health care facilities located in the U.K. and Puerto Rico), and;

* a $21 million increase in our provision for income taxes during 2018, as compared to 2017, due to an unfavorable change resulting from our January 1, 2017 adoption of ASU 2016-09, which decreased our provision for income taxes by $1 million during 2018 as compared to $22 million during 2017.

74

ADAMHS000029674

*Effects of Inflation and Seasonality*

**Seasonality** —Our acute care services business is typically seasonal, with higher patient volumes and net patient service revenue in the first and fourth quarters of the year. This seasonality occurs because, generally, more people become ill during the winter months, which results in significant increases in the number of patients treated in our hospitals during those months.

**Inflation** —Inflation has not had a material impact on our results of operations over the last three years. However, since the healthcare industry is very labor intensive and salaries and benefits are subject to inflationary pressures, as are supply and other costs, we cannot predict the impact that future economic conditions may have on our ability to contain future expense increases. Our ability to pass on increased costs associated with providing healthcare to Medicare and Medicaid patients is limited due to various federal, state and local laws which have been enacted that, in certain cases, limit our ability to increase prices. We believe, however, that through adherence to cost containment policies, labor management and reasonable price increases, the effects of inflation on future operating margins should be manageable.

*Liquidity*

*Year ended December 31, 2019 as compared to December 31, 2018:*

*Net cash provided by operating activities*

Net cash provided by operating activities was $1.438 billion during 2019 as compared to $1.275 billion during 2018. The net increase of $164 million was primarily attributable to the following:

- a favorable change of $110 million resulting from an increase in net income plus/minus depreciation and amortization expense, stock-based compensation, provision for asset impairment, net gains on sales of assets and costs related to extinguishment of debt;

- a favorable change of $29 million in accrued and deferred income taxes, and;

- $25 million of other combined net favorable changes.

*Days sales outstanding ("DSO"):* Our DSO are calculated by dividing our net revenue by the number of days in the year. The result is divided into the accounts receivable balance the end of the year. Our DSO were 50 days at December 31, 2019, 51 days at December 31, 2018 and 53 days at December 31, 2017.

Our accounts receivable as of December 31, 2019 and December 31, 2018 include amounts due from Illinois of approximately $36 million and $32 million, respectively. Collection of the outstanding receivables continues to be delayed due to state budgetary and funding pressures. Approximately $18 million as of each of December 31, 2019 and 2018, of the receivables due from Illinois were outstanding in excess of 60 days, as of each respective date. Although the accounts receivable due from Illinois could remain outstanding for the foreseeable future, since we expect to eventually collect all amounts due to us, no related reserves have been established in our consolidated financial statements. However, we can provide no assurance that we will eventually collect all amounts due to us from Illinois. Failure to ultimately collect all outstanding amounts due to us from Illinois would have an adverse impact on our future consolidated results of operations and cash flows.

*Net cash used in investing activities*

Net cash used in investing activities was $688 million during 2019 and $747 million during 2018.

*2019:*

The $688 million of net cash used in investing activities during 2019 consisted of:

- $634 million spent on capital expenditures including capital expenditures for equipment, renovations and new projects at various existing facilities;

- $21 million spent on the purchase and implementation of information technology applications;

- $20 million spent in connection with net cash outflows from forward exchange contracts that hedge our investment in the U.K. against movements in exchange rates;

- $15 million spent to fund investments in various joint-ventures;

- $9 million of proceeds received from sales of assets and businesses, and;

75

CONFIDENTIAL

DEF-MDL-14396.00131

- $8 million spent to acquire businesses and property.

*2018:*

The $747 million of net cash used in investing activities during 2018 consisted of:

- $665 million spent on capital expenditures including capital expenditures for equipment, renovations and new projects at various existing facilities;

- $110 million spent to acquire businesses and property consisting primarily of the acquisition of: (i) The Danshell Group, consisting of 25 behavioral health facilities located in the U.K. (acquired during the third quarter of 2018), and; (ii) a 109-bed behavioral health care facility located in Gulfport, Mississippi (acquired during the first quarter of 2018);

- $66 million received in connection with net cash inflows from forward exchange contracts that hedge our investment in the U.K. against movements in exchange rates;

- $36 million spent on the purchase and implementation of information technology applications;

- $15 million spent to fund construction costs of a new behavioral health care facility, that is jointly owned by us and a third-party, that was completed and opened during the third quarter of 2018, and;

- $13 million received in connection with the sale of a business and property including The Limes, an 18-bed facility located in the U.K.

*Net cash used in financing activities*

Net cash used in financing activities was $845 million during 2019 and $492 million during 2018.

*2019:*

The $845 million of net cash used in financing activities during 2019 consisted of the following:

- spent $57 million on net repayment of debt as follows: (i) $50 million related to our term loan A facility; (ii) $5 million related to our term loan B facility, and; (iii) $2 million related to other debt facilities;

- generated $39 million of proceeds related to new borrowings as follows: (i) $25 million pursuant to a short-term, on-demand credit facility; (ii) $10 million pursuant to our accounts receivable securitization program, and; (iii) $4 million related to other debt facilities.

- spent $771 million to repurchase shares of our Class B Common Stock in connection with: (i) open market purchases pursuant to our $2.7 billion stock repurchase program ($723 million), and; (ii) income tax withholding obligations related to stock-based compensation programs ($48 million);

- spent $53 million to pay quarterly cash dividends of $.20 per share in each of September and December, 2019 and $.10 per share in each of March and June, 2019;

- spent $16 million to pay profit distributions related to noncontrolling interests in majority owned businesses;

- generated $11 million from the issuance of shares of our Class B Common Stock pursuant to the terms of employee stock purchase plans, and;

- received $1 million in capital contributions from minority members in majority owned businesses.

*2018:*

The $492 million of net cash used in financing activities during 2018 consisted of the following:

- spent $830 million on net repayment of debt as follows: (i) $67 million related to our term loan A facility; (ii) $403 million related to our revolving credit facility; (iii) $300 million related to the early redemption of our 3.75% bonds that were scheduled to mature in 2019; (iv) $29 million related to our accounts receivable securitization program; (v) $29 million related to our short-term, on-demand credit facility, and; (vi) $2 million related to other debt facilities;

- generated $791 million of proceeds related to new borrowings pursuant to our term loan A facility ($291 million) and our term loan B facility ($500 million);

76

ADAMHS000029676

- spent $397 million to repurchase shares of our Class B Common Stock in connection with: (i) open market purchases pursuant to our stock repurchase program ($384 million), and; (ii) income tax withholding obligations related to stock-based compensation programs ($13 million);

- spent $37 million to pay quarterly cash dividends of $.10 per share;

- spent $14 million in financing costs;

- spent $15 million to pay profit distributions related to noncontrolling interests in majority owned businesses, and;

- generated $10 million from the issuance of shares of our Class B Common Stock pursuant to the terms of employee stock purchase plans.

*Year ended December 31, 2018 as compared to December 31, 2017:*

*Net cash provided by operating activities*

Net cash provided by operating activities was $1.275 billion during 2018 as compared to $1.248 billion during 2017. The net increase of $27 million was primarily attributable to the following:

- a favorable change of $91 million due to an increase in net income plus/minus depreciation and amortization expense, stock-based compensation, a net gain on sales of assets, and provision for intangible asset impairment;

- an unfavorable change of $48 million in accrued and deferred income taxes;

- a favorable change of $40 million in other working capital accounts resulting primarily from changes in accrued expenses and due to timing of disbursements;

- an unfavorable change of $18 million in accounts receivable;

- an unfavorable change of $7 million in accrued insurance expense, net of commercial premiums paid, and;

- $30 million of other combined net unfavorable changes.

*Net cash used in investing activities*

Net cash used in investing activities was $747 million during 2018 and $685 million during 2017. The factors contributing to the $747 million of net cash used in investing activities during 2018 are detailed above.

*2017:*

The $685 million of net cash used in investing activities during 2017 consisted of:

- $557 million spent on capital expenditures including capital expenditures for equipment, renovations and new projects at various existing facilities;

- $64 million spent in connection with net cash outflows from forward exchange contracts that hedge our investment in the U.K. against movements in exchange rates;

- $29 million spent on the purchase and implementation of information technology applications;

- $23 million spent to acquire businesses and property;

- $8 million spent to fund construction costs of a new, jointly owned behavioral health care facility, and;

- $3 million spent to increase the statutorily required capital reserves of our commercial insurance subsidiary.

*Net cash used in financing activities*

Net cash used in financing activities was $492 million during 2018 and $519 million during 2017. The factors contributing to the $492 million of net cash used in financing activities during 2018 are detailed above.

*2017:*

The $519 million of net cash used in financing activities during 2017 consisted of the following:

- spent $143 million on net repayment of debt as follows: (i) $89 million related to our term loan A facility; (ii) $52 million related to our revolving credit facility, and; (iii) $2 million related to other debt facilities;

77

ADAMHS000029677

- generated $41 million of proceeds related to new borrowings pursuant to our accounts receivable securitization program ($21 million) and short-term, on-demand credit facility ($20 million);

- spent $364 million to repurchase shares of our Class B Common Stock in connection with: (i) open market purchases pursuant to our stock repurchase program ($330 million), and; (ii) income tax withholding obligations related to stock-based compensation programs ($34 million);

- spent $38 million to pay quarterly cash dividends of $.10 per share;

- spent $25 million to pay profit distributions related to noncontrolling interests in majority owned businesses, and;

- generated $10 million from the issuance of shares of our Class B Common Stock pursuant to the terms of employee stock purchase plans.

*2020 Expected Capital Expenditures:*

During 2020, we expect to spend approximately $775 million to $825 million on capital expenditures which includes expenditures for capital equipment, renovations and new projects at existing hospitals. Approximately $250 million of our 2020 expected capital expenditures relates to completion of projects that are in progress as of December 31, 2019. We believe that our capital expenditure program is adequate to expand, improve and equip our existing hospitals. We expect to finance all capital expenditures and acquisitions with internally generated funds and/or additional funds, as discussed below.

*Capital Resources*

*Credit Facilities and Outstanding Debt Securities*

On October 23, 2018, we entered into a Sixth Amendment (the "Sixth Amendment") to our credit agreement dated as of November 15, 2010, as amended on March 15, 2011, September 21, 2012, May 16, 2013, August 7, 2014 and June 7, 2016, among UHS, as borrower, the several banks and other financial institutions from time to time parties thereto, as lenders, JPMorgan Chase Bank, N.A., as administrative agent, and the other parties agents thereto (the "Senior Credit Agreement"). The Sixth Amendment became effective on October 23, 2018.

The Sixth Amendment amended the Senior Credit Agreement to, among other things: (i) increase the aggregate amount of the revolving credit facility to $1 billion (increase of $200 million over the $800 million previous commitment); (ii) increase the aggregate amount of the tranche A term loan commitments to $2 billion (increase of approximately $290 million over the $1.71 billion of outstanding borrowings prior to the amendment), and; (iii) extended the maturity date of the revolving credit and tranche A term loan facilities to October 23, 2023 from August 7, 2019.

On October 31, 2018, we added a seven-year tranche B term loan facility in the aggregate principal amount of $500 million pursuant to the Senior Credit Agreement. The tranche B term loan matures on October 31, 2025. We used the proceeds to repay borrowings under the revolving credit facility, the Securitization (as defined below), to redeem our $300 million, 3.75% Senior Notes that were scheduled to mature in 2019 and for general corporate purposes.

As of December 31, 2019, we had no borrowings outstanding pursuant to our $1 billion revolving credit facility and we had $967 million of available borrowing capacity net of $2 million of outstanding letters of credit and $31 million of outstanding borrowings pursuant to a short-term credit facility.

Pursuant to the terms of the Sixth Amendment, the tranche A term loan, which had $1.950 billion of borrowings outstanding as of December 31, 2019, provides for eight installment payments of $12.5 million per quarter which commenced in March of 2019 and are scheduled to continue through December of 2020. Thereafter, payments of $25 million per quarter are scheduled, commencing in March of 2021 until maturity in October of 2023, when all outstanding amounts will be due.

The tranche B term loan, which had $495 million of borrowings outstanding as of December 31, 2019, provides for installment payments of $1.25 million per quarter, which commenced on March 31, 2019 and are scheduled to continue until maturity in October of 2025, when all outstanding amounts will be due.

Borrowings under the Senior Credit Agreement bear interest at our election at either (1) the ABR rate which is defined as the rate per annum equal to the greatest of (a) the lender's prime rate, (b) the weighted average of the federal funds rate, plus 0.5% and (c) one month LIBOR rate plus 1%, in each case, plus an applicable margin based upon our consolidated leverage ratio at the end of each quarter ranging from 0.375% to 0.625% for revolving credit and term loan A borrowings and 0.75% for tranche B borrowings, or (2) the one, two, three or six month LIBOR rate (at our election), plus an applicable margin based upon our consolidated leverage ratio at the end of each quarter ranging from 1.375% to 1.625% for revolving credit and term loan A borrowings and 1.75% for the tranche B term loan. As of December 31, 2019, the applicable margins were 0.375% for ABR-based loans and 1.375% for LIBOR-based loans under the revolving credit and term loan A facilities. The revolving credit facility includes a $125 million sub-limit for letters of credit. The Senior Credit Agreement is secured by certain assets of the Company and our material subsidiaries (which generally

78

excludes asset classes such as substantially all of the patient-related accounts receivable of our acute care hospitals, and certain real estate assets and assets held in joint-ventures with third parties) and is guaranteed by our material subsidiaries.

The Senior Credit Agreement includes a material adverse change clause that must be represented at each draw. The Senior Credit Agreement contains covenants that include a limitation on sales of assets, mergers, change of ownership, liens and indebtedness, transactions with affiliates, dividends and stock repurchases; and requires compliance with financial covenants including maximum leverage. We are in compliance with all required covenants as of December 31, 2019 and December 31, 2018.

In late April, 2018, we entered into the sixth amendment to our accounts receivable securitization program ("Securitization") dated as of October 27, 2010 with a group of conduit lenders, liquidity banks, and PNC Bank, National Association, as administrative agent, which provides for borrowings outstanding from time to time by certain of our subsidiaries in exchange for undivided security interests in their respective accounts receivable. The sixth amendment, among other things, extended the term of the Securitization program through April 26, 2021 and increased the borrowing capacity to $450 million (from $440 million previously). Although the program fee and certain other fees were adjusted in connection with the sixth amendment, substantially all other provisions of the Securitization program remained unchanged. Pursuant to the terms of our Securitization program, substantially all of the patient-related accounts receivable of our acute care hospitals ("Receivables") serve as collateral for the outstanding borrowings. We have accounted for this Securitization as borrowings. We maintain effective control over the Receivables since, pursuant to the terms of the Securitization, the Receivables are sold from certain of our subsidiaries to special purpose entities that are wholly-owned by us. The Receivables, however, are owned by the special purpose entities, can be used only to satisfy the debts of the wholly-owned special purpose entities, and thus are not available to us except through our ownership interest in the special purpose entities. The wholly-owned special purpose entities use the Receivables to collateralize the loans obtained from the group of third-party conduit lenders and liquidity banks. The group of third-party conduit lenders and liquidity banks do not have recourse to us beyond the assets of the wholly-owned special purpose entities that securitize the loans. At December 31, 2019, we had $400 million of outstanding borrowings pursuant to the terms of the Securitization and $50 million of available borrowing capacity.

As of December 31, 2019, we had combined aggregate principal of $1.1 billion from the following senior secured notes:

- $700 million aggregate principal amount of 4.75% senior secured notes due in August, 2022 ("2022 Notes") which were issued as follows:
    - $300 million aggregate principal amount issued on August 7, 2014 at par.
    - $400 million aggregate principal amount issued on June 3, 2016 at 101.5% to yield 4.35%.

- $400 million aggregate principal amount of 5.00% senior secured notes due in June, 2026 ("2026 Notes") which were issued on June 3, 2016.

Interest on the 2022 Notes is payable on February 1 and August 1 of each year until the maturity date of August 1, 2022. Interest on the 2026 Notes is payable on June 1 and December 1 until the maturity date of June 1, 2026. The 2022 Notes and 2026 Notes were offered only to qualified institutional buyers under Rule 144A and to non-U.S. persons outside the United States in reliance on Regulation S under the Securities Act of 1933, as amended (the "Securities Act"). The 2022 Notes and 2026 Notes have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

On November 26, 2018 we redeemed the $300 million aggregate principal, 3.75% Senior Notes due in 2019. The 2019 Notes were redeemed for an aggregate price equal to 100.485% of the principal amount, resulting in a premium paid of approximately $1 million, plus accrued interest to the redemption date.

At each of December 31, 2019 and 2018, the carrying value and fair value of our debt were each approximately $4.0 billion. The fair value of our debt was computed based upon quotes received from financial institutions. We consider these to be "level 2" in the fair value hierarchy as outlined in the authoritative guidance for disclosures in connection with debt instruments.

Our total debt as a percentage of total capitalization was approximately 42% at December 31, 2019 and 43% at December 31, 2018.

During 2015, we entered into nine forward starting interest rate swaps whereby we paid a fixed rate on a total notional amount of $1.0 billion and received one-month LIBOR. The average fixed rate payable on these swaps, all of which matured on April 15, 2019, was 1.31%. Although we can provide no assurance that we will ultimately do so, we are currently monitoring the interest rate environment and evaluating the terms of potential replacement interest rate swaps that we may enter into for a large portion, or potentially all, of the $1 billion total notional amount that expired on April 15, 2019.

79

ADAMHS000029679

We expect to finance all capital expenditures and acquisitions, pay dividends and potentially repurchase shares of our common stock utilizing internally generated and additional funds. Additional funds may be obtained through: (i) borrowings under our existing revolving credit facility or through refinancing the existing Senior Credit Agreement; (ii) the issuance of other long-term debt, and/or; (iii) the issuance of equity. We believe that our operating cash flows, cash and cash equivalents, as well as access to the capital markets, provide us with sufficient capital resources to fund our operating, investing and financing requirements for the next twelve months, including the refinancing of our above-mentioned Senior Credit Agreement that is scheduled to mature in October, 2023. However, in the event we need to access the capital markets or other sources of financing, there can be no assurance that we will be able to obtain financing on acceptable terms or within an acceptable time. Our inability to obtain financing on terms acceptable to us could have a material unfavorable impact on our results of operations, financial condition and liquidity.

*Contractual Obligations and Off-Balance Sheet Arrangements*

As of December 31, 2019 we were party to certain off balance sheet arrangements consisting of standby letters of credit and surety bonds which totaled $112 million consisting of: (i) $108 million related to our self-insurance programs, and; (ii) $4 million of other debt and public utility guarantees.

Obligations under operating leases for real property, real property master leases and equipment amount to $418 million as of December 31, 2019. The real property master leases are leases for buildings on or near hospital property for which we guarantee a certain level of rental income. We sublease space in these buildings and any amounts received from these subleases are offset against the expense. In addition, we lease three hospital facilities from Universal Health Realty Trust (the "Trust") with two hospital terms expiring in 2021 and the third in 2026. These leases contain up to two 5-year renewal options. We also lease two free-standing emergency departments and space in certain medical office buildings which are owned by the Trust. In addition, we lease the real property of certain other facilities from non-related parties as indicated in *Item 2. Properties*, as included herein.

The following represents the scheduled maturities of our contractual obligations as of December 31, 2019:

| | | Payments Due by Period (dollars in thousands) | | | |
| | Total | Less than 1 year | 2-3 years | 4-5 years | After 5 years |
|---|---|---|---|---|---|
| Long-term debt obligations (a) | $ 3,984,127 | $ 87,550 | $ 1,261,621 | $ 1,761,448 | $ 873,508 |
| Estimated future interest payments on debt outstanding as of December 31, 2018 (b) | 598,118 | 164,419 | 256,880 | 128,358 | 48,461 |
| Construction commitments (c) | 124,993 | 77,811 | 47,182 | 0 | 0 |
| Purchase and other obligations (d) | 293,231 | 57,025 | 107,485 | 70,221 | 58,500 |
| Operating leases (e) | 417,651 | 68,703 | 113,195 | 86,825 | 148,928 |
| Estimated future payments for defined benefit pension plan, and other retirement plan (f) | 189,349 | 15,567 | 15,928 | 18,011 | 139,843 |
| Health and dental unpaid claims (g) | 87,115 | 87,115 | 0 | 0 | 0 |
| Total contractual cash obligations | $ 5,694,584 | $ 558,190 | $ 1,802,291 | $ 2,064,863 | $ 1,269,240 |

(a) Reflects borrowings outstanding, after unamortized financing costs, as of December 31, 2019 as discussed in *Note 4 to the Consolidated Financial Statements*.

(b) Assumes that all debt outstanding as of December 31, 2019, including borrowings under our Credit Agreement, demand note and accounts receivable securitization program, remain outstanding until the final maturity of the debt agreements at the same interest rates (some of which are floating) which were in effect as of December 31, 2019. We have the right to repay borrowings upon short notice and without penalty, pursuant to the terms of the Credit Agreement, demand note and accounts receivable securitization program.

(c) Our share of the remaining estimated construction cost of five behavioral health care facilities that are under construction and scheduled to be completed at various times in 2020, 2021 and 2022. We are required to build these facilities pursuant to joint-venture agreements with third parties. In addition, we had various other projects under construction as of December 31, 2019. Because we can terminate substantially all of the construction contracts related to the various other projects at any time without paying a termination fee, these costs are excluded from the table above.

(d) Consists of: (i) $37 million related to long-term contracts with third-parties consisting primarily of certain revenue cycle data processing services for our acute care facilities; (ii) $219 million related to the future expected costs to be paid to a third-party vendor in connection with the ongoing operation of an electronic health records application and purchase and implementation of a revenue cycle and other applications for our acute care facilities, and; (iii) and $37 million for other software applications.

(e) Reflects our future minimum operating lease payment obligations related to our operating lease agreements outstanding as of December 31, 2019 as discussed in *Note 7 to the Consolidated Financial Statements*. Some of the lease agreements provide us with the option to renew the lease and our future lease obligations would change if we exercised these renewal options. In

80

CONFIDENTIAL

connection with these operating lease commitments, our consolidated balance sheet as of December 31, 2019 includes right of use assets amounting to $326 million and aggregate operating lease liabilities of $326 million ($56 million included in current liabilities and $270 million included in noncurrent liabilities).

(f)    Consists of $169 million of estimated future payments related to our non-contributory, defined benefit pension plan (estimated through 2079), as disclosed in *Note 8 to the Consolidated Financial Statements*, and $20 million of estimated future payments related to other retirement plan liabilities ($17 million of liabilities recorded in other non-current liabilities as of December 31, 2019 in connection with these retirement plans).

(g)    Consists of accrued and unpaid estimated claims expense incurred in connection with our commercial health insurers and self-insured employee benefit plans.

As of December 31, 2019, the total accrual for our professional and general liability claims was $242 million, of which $42 million is included in other current liabilities and $200 million is included in other non-current liabilities. We exclude the $242 million for professional and general liability claims from the contractual obligations table because there are no significant contractual obligations associated with these liabilities and because of the uncertainty of the dollar amounts to be ultimately paid as well as the timing of such payments. Please see *Self-Insured/Other Insurance Risks* above for additional disclosure related to our professional and general liability claims and reserves.

**ITEM 7A.    Quantitative and Qualitative Disclosures About Market Risk**

We manage our ratio of fixed and floating rate debt with the objective of achieving a mix that management believes is appropriate. To manage this risk in a cost-effective manner, we, from time to time, enter into interest rate swap agreements in which we agree to exchange various combinations of fixed and/or variable interest rates based on agreed upon notional amounts. We account for our derivative and hedging activities using the Financial Accounting Standard Board's guidance which requires all derivative instruments, including certain derivative instruments embedded in other contracts, to be carried at fair value on the balance sheet. For derivative transactions designated as hedges, we formally document all relationships between the hedging instrument and the related hedged item, as well as its risk-management objective and strategy for undertaking each hedge transaction.

Derivative instruments designated in a hedge relationship to mitigate exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Cash flow hedges are accounted for by recording the fair value of the derivative instrument on the balance sheet as either an asset or liability, with a corresponding amount recorded in accumulated other comprehensive income ("AOCI") within shareholders' equity. Amounts are reclassified from AOCI to the income statement in the period or periods the hedged transaction affects earnings. From time to time, we use interest rate derivatives in our cash flow hedge transactions. Such derivatives are designed to be highly effective in offsetting changes in the cash flows related to the hedged liability.

For hedge transactions that do not qualify for the short-cut method, at the hedge's inception and on a regular basis thereafter, a formal assessment is performed to determine whether changes in the fair values or cash flows of the derivative instruments have been highly effective in offsetting changes in cash flows of the hedged items and whether they are expected to be highly effective in the future.

The fair value of interest rate swap agreements approximates the amount at which they could be settled, based on estimates obtained from the counterparties. We assess the effectiveness of our hedge instruments on a quarterly basis. We performed periodic assessments of the cash flow hedge instruments during 2019 and 2018 and determined the hedges to be highly effective. Although we do not anticipate nonperformance by our counterparties to interest rate swap agreements, the counterparties expose us to credit risk in the event of nonperformance. We do not hold or issue derivative financial instruments for trading purposes.

During 2015, we entered into nine forward starting interest rate swaps whereby we paid a fixed rate on a total notional amount of $1.0 billion and received one-month LIBOR. The average fixed rate payable on these swaps, all of which matured on April 15, 2019, was 1.31%.

Although we can provide no assurance that we will ultimately do so, we are currently monitoring the interest rate environment and evaluating the terms of potential replacement interest rate swaps that we may enter into for a large portion, or potentially all, of the $1 billion total notional amount that expired on April 15, 2019.

81

The table below presents information about our long-term financial instruments that are sensitive to changes in interest rates as of December 31, 2019. For debt obligations, the table presents principal cash flows and related weighted-average interest rates by contractual maturity dates.

### Maturity Date, Fiscal Year Ending December 31

#### (dollar amounts in thousands)

| | 2020 | 2021 | 2022 | 2023 | 2024 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
| **Long-term debt:** | | | | | | | |
| Fixed rate: | | | | | | | |
| Debt | $ 1,650 | $ 1,696 | $700,266 | $ 2,475 | $ 2,823 | $ 408,005 | $1,116,915 |
| Average interest rates | 4.9% | 4.9% | 4.9% | 5.2% | 5.1% | 4.7% | 5.0% |
| Variable rate: | | | | | | | |
| Debt | $ 85,900 | $454,659 | 105,000 | 1,751,150 | 5,000 | 465,503 | $2,867,212 |
| Average interest rates | 3.2% | 3.2% | 3.2% | 3.2% | 3.6% | 3.6% | 3.3% |

As calculated based upon our variable rate debt outstanding as of December 31, 2019 that is subject to interest rate fluctuations, each 1% change in interest rates would impact our pre-tax income by approximately $29 million.

### ITEM 8. *Financial Statements and Supplementary Data*

Our Consolidated Balance Sheets, Consolidated Statements of Income, Consolidated Statements of Changes in Equity, Consolidated Statements of Cash Flows and Consolidated Statements of Comprehensive Income, together with the reports of PricewaterhouseCoopers LLP, independent registered public accounting firm, are included elsewhere herein. Reference is made to the "Index to Financial Statements and Financial Statement Schedule."

### ITEM 9. *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure*

None.

### ITEM 9A. *Controls and Procedures.*

As of December 31, 2019, under the supervision and with the participation of our management, including our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), we performed an evaluation of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15(c) or Rule 15d-15(c) of the Securities Exchange Act of 1934, as amended. Based on this evaluation, the CEO and CFO have concluded that our disclosure controls and procedures are effective to ensure that material information is recorded, processed, summarized and reported by management on a timely basis in order to comply with our disclosure obligations under the Securities Exchange Act of 1934, as amended, and the SEC rules thereunder.

#### *Changes in Internal Control Over Financial Reporting*

On January 1, 2019, we adopted ASC 842. In connection with our adoption of ASC 842 we did implement changes to our internal controls relating to leases. These changes included the development of new policies, enhanced contract review requirements and other ongoing monitoring activities. These controls were designed to provide assurance at a reasonable level of the fair presentation of our condensed consolidated financial statements and related disclosures.

There have been no other changes in our internal control over financial reporting or in other factors during the fourth quarter of 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

#### *Management's Report on Internal Control Over Financial Reporting*

Management is responsible for establishing and maintaining an adequate system of internal control over our financial reporting. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria on *Internal Control—Integrated Framework (2013)*, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation and fair presentation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections

CONFIDENTIAL

DEF-MDL-14396.00138

ADAMHS000029682

of any evaluation of effectiveness of internal control over financial reporting to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Based on its assessment, management has concluded that we maintained effective internal control over financial reporting as of December 31, 2019, based on criteria in *Internal Control—Integrated Framework (2013)*, issued by the COSO. The effectiveness of the Company's internal control over financial reporting as of December 31, 2019 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm as stated in its report which appears herein.

**ITEM 9B** *Other Information*

None.

CONFIDENTIAL

DEF-MDL-14396.00139

ADAMHS000029683

## PART III

**ITEM 10.**   *Directors, Executive Officers and Corporate Governance*

There is hereby incorporated by reference the information to appear under the captions "Election of Directors", "Section 16(a) Beneficial Ownership Reporting Compliance" and "Corporate Governance" in our Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after December 31, 2019. See also "Executive Officers of the Registrant" appearing in Item 1 hereof.

**ITEM 11.**   *Executive Compensation*

There is hereby incorporated by reference the information to appear under the caption "Executive Compensation" in our Proxy Statement to be filed with the Securities and Exchange Commission within 120 days after December 31, 2019.

**ITEM 12.**   *Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters*

There is hereby incorporated by reference the information to appear under the caption "Security Ownership of Certain Beneficial Owners and Management" and "Executive Compensation" in our Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after December 31, 2019.

**ITEM 13.**   *Certain Relationships and Related Transactions, and Director Independence*

There is hereby incorporated by reference the information to appear under the captions "Certain Relationships and Related Transactions" and "Corporate Governance" in our Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after December 31, 2019.

**ITEM 14.**   *Principal Accountant Fees and Services.*

There is hereby incorporated by reference the information to appear under the caption "Relationship with Independent Auditors" in our Proxy Statement, to be filed with the Securities and Exchange Commission within 120 days after December 31, 2019.

CONFIDENTIAL

DEF-MDL-14396.00140

ADAMHS000029684

## PART IV

**ITEM 15.**   *Exhibits and Financial Statement Schedules*

   *(a) Documents filed as part of this report:*

   *(1) Financial Statements:*

      See "Index to Financial Statements and Financial Statement Schedule."

   *(2) Financial Statement Schedules:*

      See "Index to Financial Statements and Financial Statement Schedule."

   *(3) Exhibits:*

| No. | Description |
|---|---|
| 3.1 | Registrant's Restated Certificate of Incorporation, and Amendments thereto, previously filed as Exhibit 3.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997, are incorporated herein by reference (P). |
| 3.2 | Bylaws of Registrant, as amended, previously filed as Exhibit 3.2 to the Company's Annual Report on Form 10-K for the year ended December 31, 1987, is incorporated herein by reference (P). |
| 3.3 | Amendment to the Registrant's Restated Certificate of Incorporation previously filed as Exhibit 3.1 to the Company's Current Report on Form 8-K dated July 3, 2001 is incorporated herein by reference. |
| 4.1 | Indenture, dated as of August 7, 2014, among Universal Health Services, Inc., its subsidiaries specified therein, MUFG Union Bank, N.A., as Trustee, JPMorgan Chase Bank, N.A., as Collateral Agent (including forms of the 3.750% Senior Secured Notes due 2019 and the 4.750% Senior Secured Notes due 2022), previously filed as Exhibit 4.1 to the Company's Current Report on Form 8-K dated August 12, 2014, is incorporated herein by reference. |
| 4.2 | Supplemental Indenture, dated as of June 3, 2016, to Indenture, dated as of August 7, 2014, by and among the Company, the subsidiary guarantors party thereto, MUFG Union Bank, N.A., as trustee, and JPMorgan Chase Bank, N.A., as collateral agent, previously filed as Exhibit 4.1 to the Company's Current Report on Form 8-K dated June 8, 2016, is incorporated herein by reference. |
| 4.3 | Indenture, dated as of June 3, 2016, between the Company, the subsidiary guarantors party thereto, MUFG Union Bank, N.A., as trustee, and JPMorgan Chase Bank, N.A., as collateral agent, previously filed as Exhibit 4.2 to the Company's Current Report on Form 8-K dated June 8, 2016, is incorporated herein by reference. |
| 4.4 | Additional Authorized Representative Joinder Agreement, dated as of June 3, 2016, among the Company, the subsidiary guarantors party thereto and JPMorgan Chase Bank, N.A., as collateral agent, previously filed as Exhibit 4.3 to the Company's Current Report on Form 8-K dated June 8, 2016, is incorporated herein by reference. |
| 4.5 | Description of Securities of the Registrant. |
| 10.1* | Employment Agreement, dated as of July 24, 2013, by and between Universal Health Services, Inc. and Alan B. Miller, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated July 26, 2013, is incorporated herein by reference. |
| 10.2* | Amendment dated as of November 5, 2018 to the Employment Agreement, dated as July 24, 2013, by and between Universal Health Services, Inc. and Alan B. Miller, previously filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2018, is incorporated herein by reference. |
| 10.3 | Advisory Agreement dated as of December 24, 1986, and amended and restated effective as of January 1, 2019 between Universal Health Realty Income Trust and UHS of Delaware, Inc. |
| 10.4 | Agreement, dated as of December 4, 2019, to renew Advisory Agreement, dated as of December 24, 1986, and amended and restated effective as of January 1, 2019 between Universal Health Realty Income Trust and UHS of Delaware, Inc., previously filed as Exhibit 10.3 to the Company's Annual Report on Form 10-K for the year ended December 31, 2018, is incorporated herein by reference. |

CONFIDENTIAL

ADAMHS000029685

DEF-MDL-14396.00141

| No. | Description |
|---|---|

10.5     Form of Leases, including Form of Master Lease Document for Leases, between certain subsidiaries of the Company and Universal Health Realty Income Trust, filed as Exhibit 10.3 to Amendment No. 3 of the Registration Statement on Form S-11 and Form S-2 of Registrant and Universal Health Realty Income Trust (Registration No. 33-7872), is incorporated herein by reference (P).

10.6     Corporate Guaranty of Obligations of Subsidiaries Pursuant to Leases and Contract of Acquisition, dated December 24, 1986, issued by the Company in favor of Universal Health Realty Income Trust, previously filed as Exhibit 10.5 to the Company's Current Report on Form 8-K dated December 24, 1986, is incorporated herein by reference (P).

10.7     Universal Health Services, Inc. Executive Retirement Income Plan dated January 1, 1993, previously filed as Exhibit 10.7 to the Company's Annual Report on Form 10-K for the year ended December 31, 2002, is incorporated herein by reference.

10.8     Universal Health Services, Inc. Supplemental Executive Retirement Income Plan effective as of June 1, 2018, dated as of June 18, 2018, previously filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2019, is incorporated herein by reference.

10.9     Asset Purchase Agreement dated as of February 6, 1996, among Amarillo Hospital District, UHS of Amarillo, Inc. and Universal Health Services, Inc., previously filed as Exhibit 10.28 to the Company's Annual Report on Form 10-K for the year ended December 31, 1995, is incorporated herein by reference (P).

10.10    Agreement of Limited Partnership of District Hospital Partners, L.P. (a District of Columbia limited partnership) by and among UHS of D.C., Inc. and The George Washington University, previously filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q for the quarters ended March 30, 1997, and June 30, 1997, is incorporated herein by reference (P).

10.11    Contribution Agreement between The George Washington University (a congressionally chartered institution in the District of Columbia) and District Hospital Partners, L.P. (a District of Columbia limited partnership), previously filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 1997, is incorporated herein by reference (P).

10.12*    Amended and Restated Universal Health Services, Inc. Supplemental Deferred Compensation Plan dated as of January 1, 2002, previously filed as Exhibit 10.29 to the Company's Annual Report on Form 10-K for the year ended December 31, 2002, is incorporated herein by reference.

10.13*    Universal Health Services, Inc. Employee Stock Purchase Plan, previously filed as Exhibit 4.1 to the Company's Registration Statement on Form S-8 (File No. 333-122188), dated January 21, 2005 is incorporated herein by reference.

10.14*    Universal Health Services, Inc. Third Amended and Restated 2005 Stock Incentive Plan as Amended, previously filed as Exhibit 99.1 to the Company's Registration Statement on Form S-8 (File No. 333-218359), dated May 31, 2017, is incorporated herein by reference.

10.15*    Form of Stock Option Agreement, previously filed as Exhibit 10.4 to the Company's Current Report on Form 8-K, dated June 8, 2005, is incorporated herein by reference.

10.16*    Form of Stock Option Agreement for Non-Employee Directors, previously filed as Exhibit 10.2 to the Company's Current Report on Form 8-K, dated October 3, 2005, is incorporated herein by reference.

10.17    Amendment No. 1 to the Master Lease Document, between certain subsidiaries of Universal Health Services, Inc. and Universal Health Realty Income Trust, dated April 24, 2006, previously filed as Exhibit 10.29 to the Company's Annual Report on Form 10-K for the year ended December 31, 2006, is incorporated herein by reference.

10.18*    Amended and Restated Universal Health Services, Inc. 2010 Employees' Restricted Stock Purchase Plan, previously filed as Exhibit 10.2 to the Company's Quarterly Report on Form 10-Q filed on August 7, 2015, is incorporated herein by reference.

10.19*    Universal Health Services, Inc. 2010 Executive Incentive Plan, previously filed as Exhibit 10.3 to the Company's Quarterly Report on Form 10-Q filed on August 7, 2015, is incorporated herein by reference.

CONFIDENTIAL

ADAMHS000029686

DEF-MDL-14396.00142

| No. | Description |
|-----|-------------|
| 10.20 | Omnibus Amendment to Receivables Sale Agreements, dated as of October 27, 2010, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated November 2, 2010, is incorporated herein by reference. |
| 10.21 | Amended and Restated Credit and Security Agreement, dated as of October 27, 2010, previously filed as Exhibit 10.2 to the Company's Current Report on Form 8-K dated November 2, 2010, is incorporated herein by reference. |
| 10.22 | Second Amendment to Amended and Restated Credit and Security Agreement, dated as of October 25, 2013, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated October 30, 2013, is incorporated herein by reference. |
| 10.23 | Third Amendment to Amended and Restated Credit and Security Agreement, dated as of August 1, 2014, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated August 4, 2014, is incorporated herein by reference. |
| 10.24 | Fourth Amendment to Amended and Restated Credit and Security Agreement, dated as of December 22, 2015, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated December 22, 2015, is incorporated herein by reference. |
| 10.25 | Fifth Amendment to Amended and Restated Credit and Security Agreement, dated as of July 7, 2017, previously filed as Exhibit 10.1 to the Company's Quarterly Report on Form 10-Q filed on August 7, 2017, is incorporated herein by reference. |
| 10.26 | Sixth Amendment to Amended and Restated Credit and Security Agreement, dated as of April 26, 2018, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated April 27, 2018, is incorporated herein by reference. |
| 10.27 | Assignment and Assumption Agreement, dated as of October 27, 2010, previously filed as Exhibit 10.3 to the Company's Current Report on Form 8-K dated November 2, 2010, is incorporated herein by reference. |
| 10.28 | Credit Agreement, dated as of November 15, 2010, by and among Universal Health Services, Inc., JPMorgan Chase Bank, N.A. and the various financial institutions as are or may become parties thereto, as Lenders, SunTrust Bank, The Royal Bank of Scotland, Plc, Bank of Tokyo-Mitsubishi UFJ Trust Company and Credit Agricole Corporate and Investment Bank, as co-documentation agents, Deutsche Bank Securities Inc. and Bank of America N.A. as co-syndication agents, and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders and as collateral agent for the secured parties, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated November 17, 2010, is incorporated herein by reference. |
| 10.29 | First Amendment, dated as of March 15, 2011, to the Credit Agreement, dated as of November 15, 2010, by and among Universal Health Services, Inc., JPMorgan Chase Bank, N.A. and the various financial institutions as are or may become parties thereto, as Lenders, certain banks as co-documentation agents, and as co-syndication agents, and JPMorgan Chase Bank, N.A., as administrative agent for the Lenders and as collateral agent for the secured parties, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated March 15, 2011, is incorporated herein by reference. |
| 10.30 | Credit Agreement, dated as of November 15, 2010 and amended and restated as of September 21, 2012, by and among Universal Health Services, Inc. (the borrower), the several lenders from time to time parties thereto, Credit Agricole Corporate and Investment Bank, Mizuho Corporate Bank LTD., Royal Bank of Canada and The Royal Bank of Scotland PLC (as co-documentation agents), Bank of Tokyo-Mitsubishi UFJ Trust Company, Bank of America N.A. and SunTrust Bank (as co-syndication agents), and JPMorgan Chase Bank, N.A. (as administrative agent), previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated September 26, 2012, is incorporated herein by reference. |
| 10.31 | Second Amendment, dated as of September 21, 2012, to the Credit Agreement, dated as of November 15, 2010 (as amended from time to time), among Universal Health Services, Inc., a Delaware corporation, the several banks and other financial institutions from time to time parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and the other agents party thereto, previously filed as Exhibit 10.2 to the Company's Current Report on Form 8-K dated September 26, 2012, is incorporated herein by reference. |
| 10.32 | Third Amendment, dated as of May 16, 2013, to the Credit Agreement, dated as of November 15, 2010, as amended |

CONFIDENTIAL

ADAMHS000029687

DEF-MDL-14396.00143

| No. | Description |
|---|---|
| | from time to time, among Universal Health Services, Inc., a Delaware corporation, the several banks and other financial institutions from time to time parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and the other agents party thereto, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated May 17, 2013, is incorporated herein by reference. |
| 10.33 | Fourth Amendment, dated as of August 7, 2014, to the Credit Agreement, dated as of November 15, 2010, as previously amended from time to time, by and among Universal Health Services, Inc., the several banks and other financial institutions from time to time parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and the other agents party thereto, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated August 12, 2014, is incorporated herein by reference. |
| 10.34 | Fifth Amendment to the Credit Agreement, dated as of November 15, 2010, as amended on March 15, 2011, September 21, 2012, May 16, 2013 and August 7, 2014, among the Company, as borrower, the several banks and other financial institutions from time to time parties thereto, as lenders, JPMorgan Chase Bank, N.A., as administrative agent, and the other agents party thereto, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated June 8, 2016, is incorporated herein by reference. |
| 10.35 | Sixth Amendment, dated as of October 23, 2018, to the Credit Agreement, dated as of November 15, 2010, as amended on March 15, 2011, September 21, 2012, May 16, 2013, August 7, 2014 and June 7, 2016, among the Company, as borrower, the several banks and other financial institutions from time to time parties thereto, as lenders, JPMorgan Chase Bank, N.A., as administrative agent, and the other agents party thereto, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated October 24, 2018, is incorporated herein by reference. |
| 10.36 | Increased Facility Activation Notice ~ Incremental Term Loans, dated as of October 31, 2018, to the Credit Agreement, dated as of November 15, 2010, as amended on March 15, 2011, September 21, 2012, May 16, 2013, August 7, 2014, June 7, 2016 and October 23, 2018, among the Company, as borrower, the several banks and other financial institutions from time to time parties thereto, as lenders, JPMorgan Chase Bank, N.A., as administrative agent, and the other agents party thereto, previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated November 2, 2018, is incorporated herein by reference. |
| 10.37 | Credit Agreement, dated as of November 15, 2010 and amended and restated as of August 7, 2014, by and among Universal Health Services, Inc., the several banks and other financial institutions from time to time parties thereto, JPMorgan Chase Bank, N.A., as administrative agent and the other agents party thereto, previously filed as Exhibit 10.2 to the Company's Current Report on Form 8-K dated August 12, 2014, is incorporated herein by reference. |
| 10.38* | Form of Supplemental Life Insurance Plan and Agreement Part A: Alan B. Miller 1998 Dual Life Insurance Trust (effective December 9, 2010, by and between Universal Health Services, Inc., a Delaware corporation (the "Company"), and Anthony Pantaleoni as Trustee), previously filed as Exhibit 10.1 to the Company's Current Report on Form 8-K dated December 10, 2010, is incorporated herein by reference. |
| 10.39* | Form of Supplemental Life Insurance Plan and Agreement Part B: Alan B. Miller 2002 Trust (effective December 9, 2010, by and between Universal Health Services, Inc., a Delaware corporation (the "Company"), and Anthony Pantaleoni as Trustee), previously filed as Exhibit 10.2 to the Company's Current Report on Form 8-K dated December 10, 2010, is incorporated herein by reference. |
| 10.40* | Universal Health Services, Inc. Termination, Assignment and Release Agreement (effective December 9, 2010, by and between Universal Health Services, Inc., a Delaware corporation (the "Company"), Anthony Pantaleoni as Trustee of the Alan B. Miller 1998 Dual Life Insurance Trust, and Alan B. Miller, Executive), previously filed as Exhibit 10.3 to the Company's Current Report on Form 8-K dated December 10, 2010, is incorporated herein by reference. |
| 10.41* | Universal Health Services, Inc. Termination, Assignment and Release Agreement (effective December 9, 2010, by and between Universal Health Services, Inc., a Delaware corporation (the "Company"), Anthony Pantaleoni as Trustee of the Alan B. Miller 2002 Trust, and Alan B. Miller, Executive), previously filed as Exhibit 10.4 to the Company's Current Report on Form 8-K dated December 10, 2010, is incorporated herein by reference. |
| 10.42 | Collateral Agreement, dated as of August 7, 2014, among Universal Health Services, Inc., the subsidiary guarantors party thereto, MUFG Union Bank, N.A., as 2014 Trustee, The Bank of New York Mellon Trust Company, N.A., as 2006 Trustee, and JPMorgan Chase Bank, N.A., as collateral agent, previously filed as Exhibit 10.4 to the Company's Current Report on Form 8-K dated August 12, 2014, is incorporated herein by reference. |

88

ADAMHS000029688

| No. | Description |
|-----|-------------|
| 11 | Statement regarding computation of per share earnings is set forth in Note 1 of the Notes to the Consolidated Financial Statements. |
| 21 | Subsidiaries of Registrant. |
| 23.1 | Consent of Independent Registered Public Accounting Firm-PricewaterhouseCoopers LLP. |
| 31.1 | Certification from the Company's Chief Executive Officer Pursuant to Rule 13a-14(a)/15(d)-14(a) of the Securities Exchange Act of 1934. |
| 31.2 | Certification from the Company's Chief Financial Officer Pursuant to Rule 13a-14(a)/15(d)-14(a) of the Securities Exchange Act of 1934. |
| 32.1 | Certification from the Company's Chief Executive Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2 | Certification from the Company's Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | Inline XBRL Instance Document (the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document) |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) |
| * | Management contract or compensatory plan or arrangement. |

Exhibits, other than those incorporated by reference, have been included in copies of this Annual Report filed with the Securities and Exchange Commission. Stockholders of the Company will be provided with copies of those exhibits upon written request to the Company.

**ITEM 16.** *Form 10-K Summary*

None.

89

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

UNIVERSAL HEALTH SERVICES, INC.

By:        /s/ ALAN B. MILLER
                        Alan B. Miller
                        Chairman of the Board
                        and Chief Executive Officer

February 26, 2020

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signatures | Title | Date |
|---|---|---|
| /s/ ALAN B. MILLER<br>**Alan B. Miller** | Chairman of the Board and Chief Executive Officer<br>(Principal Executive Officer) | February 26, 2020 |
| /s/ MARC D. MILLER<br>**Marc D. Miller** | Director and President | February 26, 2020 |
| /s/ LAWRENCE S. GIBBS<br>**Lawrence S. Gibbs** | Director | February 26, 2020 |
| /s/ ROBERT H. HOTZ<br>**Robert H. Hotz** | Director | February 26, 2020 |
| /s/ EILEEN C. MCDONNELL<br>**Eileen C. McDonnell** | Director | February 26, 2020 |
| /s/ WARREN J. NIMETZ<br>**Warren J. Nimetz** | Director | February 26, 2020 |
| /s/ ELLIOTT J. SUSSMAN M.D.<br>**Elliot J. Sussman M.D.** | Director | February 26, 2020 |
| /s/ STEVE FILTON<br>**Steve Filton** | Executive Vice President, Chief Financial Officer and Secretary<br>(Principal Financial and Accounting Officer) | February 26, 2020 |

90

CONFIDENTIAL

DEF-MDL-14396.00146

ADAMHS000029690

**UNIVERSAL HEALTH SERVICES, INC.**

**INDEX TO FINANCIAL STATEMENTS
AND FINANCIAL STATEMENT SCHEDULE**

Consolidated Financial Statements:

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 92 |
| Consolidated Statements of Income for December 31, 2019, 2018, and 2017 | 94 |
| Consolidated Statements of Comprehensive Income for December 31, 2019, 2018, and 2017 | 95 |
| Consolidated Balance Sheets as of December 31, 2019 and 2018 | 96 |
| Consolidated Statements of Changes in Equity for December 31, 2019, 2018 and 2017 | 97 |
| Consolidated Statements of Cash Flows for December 31, 2019, 2018 and 2017 | 100 |
| Notes to Consolidated Financial Statements | 101 |
| Supplemental Financial Statement Schedule II: Valuation and Qualifying Accounts as of and for December 31, 2019, 2018, and 2017 | 137 |

91

CONFIDENTIAL

ADAMHS000029691

DEF-MDL-14396.00147

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders of Universal Health Services, Inc.

*Opinions on the Financial Statements and Internal Control over Financial Reporting*

We have audited the consolidated financial statements, including the related notes and financial statement schedule, of Universal Health Services, Inc. and its subsidiaries (the "Company") as listed in the accompanying index (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

*Change in Accounting Principle*

As discussed in Note 7 to the consolidated financial statements, the Company changed the manner in which it accounts for leases in 2019.

*Basis for Opinions*

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*Definition and Limitations of Internal Control over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

CONFIDENTIAL

ADAMHS000029692

DEF-MDL-14396.00148

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

*Critical Audit Matters*

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Valuation of accounts receivable*

As described in Notes 1 and 10 to the consolidated financial statements, the Company reports net patient service revenue at the estimated net realizable amounts from patients and third-party payers and others for services rendered. The Company has agreements with third-party payers that provide for payments to the Company at amounts different from established rates. Payment arrangements include rates per discharge, reimbursed costs, discounted charges and per diem payments. Estimates of contractual allowances, which represent explicit price concessions, under managed care plans are based upon the payment terms specified in the related contractual agreements. Management estimates Medicare and Medicaid revenues using the latest available financial information, patient utilization data, government provided data and in accordance with applicable Medicare and Medicaid payment rules and regulations. Management monitors the historical collection rates, as well as changes in applicable laws, rules and regulations and contract terms, to assure that provisions are made using the most accurate information available. In addition to explicit price concessions, management estimates revenue adjustments for implicit price concessions based on general factors such as payer mix, the aging of the receivables and historical collection experience. Management routinely reviews accounts receivable balances in conjunction with these factors and other economic conditions which might ultimately affect the collectability of the patient accounts and make adjustments to the allowances as warranted. As of December 31, 2019, accounts receivable, net was $1.56 billion.

The principal considerations for our determination that performing procedures relating to the valuation of accounts receivable is a critical audit matter are there was significant judgment by management in estimating net accounts receivable, specifically as it relates to the estimation of implicit price concessions.

This in turn led to significant auditor judgment and effort to assess the audit evidence obtained related to the estimation of implicit price concessions.

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to the valuation of accounts receivable, including controls over management's valuation approach, assumptions and data used to estimate the explicit and implicit price concessions. These procedures also included, among others, i) evaluating management's process for developing the estimate for implicit price concessions, as well as the relevance and use of the historical billing and collection data as an input to the valuation approach, ii) testing the accuracy of a sample of revenue transactions and a sample of cash collections from the historical billing data and historical collection data used in management's estimation of implicit price concessions, and iii) evaluating the historical accuracy of management's process for developing the estimate of the amount which will ultimately be collected by comparing actual cash collections to the previously recorded accounts receivable.


/s/ PricewaterhouseCoopers LLP
Philadelphia, Pennsylvania
February 26, 2020
We have served as the Company's auditor since 2007.

CONFIDENTIAL

DEF-MDL-14396.00149

ADAMHS000029693

UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES
CONSOLIDATED STATEMENTS OF INCOME

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (in thousands, except per share data) | | |
| Net revenues before provision for doubtful accounts | | | $ 11,278,942 |
| Less: Provision for doubtful accounts | | | 869,077 |
| Net revenues | 11,378,259 | 10,772,278 | 10,409,865 |
| Operating charges: | | | |
| Salaries, wages and benefits | 5,588,893 | 5,254,536 | 4,980,637 |
| Other operating expenses | 2,723,911 | 2,614,687 | 2,493,062 |
| Supplies expense | 1,251,346 | 1,168,654 | 1,105,096 |
| Depreciation and amortization | 490,392 | 453,045 | 447,765 |
| Lease and rental expense | 107,809 | 106,094 | 103,127 |
| | 10,162,351 | 9,597,016 | 9,129,687 |
| Income from operations | 1,215,908 | 1,175,262 | 1,280,178 |
| Interest expense, net | 162,733 | 154,956 | 145,169 |
| Other (income) expense, net | (13,162) | (14,219) | 0 |
| Income before income taxes | 1,066,337 | 1,034,525 | 1,135,009 |
| Provision for income taxes | 238,794 | 236,642 | 363,697 |
| Net income | 827,543 | 797,883 | 771,312 |
| Less: Net income attributable to noncontrolling interests | 12,689 | 18,178 | 19,009 |
| Net income attributable to UHS | $ 814,854 | $ 779,705 | $ 752,303 |
| Basic earnings per share attributable to UHS | $ 9.16 | $ 8.35 | $ 7.86 |
| Diluted earnings per share attributable to UHS | $ 9.13 | $ 8.31 | $ 7.81 |
| Weighted average number of common shares—basic | 88,762 | 93,276 | 95,652 |
| Add: Other share equivalents | 278 | 474 | 673 |
| Weighted average number of common shares and equivalents—diluted | 89,040 | 93,750 | 96,325 |

The accompanying notes are an integral part of these consolidated financial statements.

94

CONFIDENTIAL

DEF-MDL-14396.00150

ADAMHS000029694

**UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME**

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (Dollar amounts in thousands) | | |
| Net income | $ 827,543 | $ 797,883 | $ 771,312 |
| Other comprehensive income (loss): | | | |
| Unrealized derivative gains on cash flow hedges | (3,925) | (2,805) | 6,679 |
| Minimum pension liability | 8,503 | (6,892) | 4,070 |
| Foreign currency translation adjustment | 27,886 | 9,718 | (2,169) |
| Other | 0 | 4,398 | 26,678 |
| Other comprehensive income before tax | 32,464 | 4,419 | 35,258 |
| Income tax expense related to items of other comprehensive income | 4,813 | 8,905 | 2,664 |
| Total other comprehensive income (loss), net of tax | 27,651 | (4,486) | 32,594 |
| Comprehensive income | 855,194 | 793,397 | 803,906 |
| Less: Comprehensive income attributable to noncontrolling interests | 12,689 | 18,178 | 19,009 |
| Comprehensive income attributable to UHS | $ 842,505 | $ 775,219 | $ 784,897 |

The accompanying notes are an integral part of these consolidated financial statements.

CONFIDENTIAL

DEF-MDL-14396.00151

ADAMHS000029695

UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES
CONSOLIDATED BALANCE SHEETS

| | December 31, | |
| | 2019 | 2018 |
| | (Dollar amounts in thousands) | |

**Assets**

| | | |
|---|---|---|
| **Current assets:** | | |
| Cash and cash equivalents | $ 61,268 | $ 105,220 |
| Accounts receivable, net | 1,560,847 | 1,509,909 |
| Supplies | 159,889 | 148,206 |
| Other current assets | 133,930 | 174,467 |
| Total current assets | 1,915,934 | 1,937,802 |
| **Property and Equipment** | | |
| Land | 613,842 | 565,607 |
| Buildings and improvements | 5,646,508 | 5,387,646 |
| Equipment | 2,430,463 | 2,251,822 |
| Property under capital lease | 38,582 | 44,020 |
| | 8,729,395 | 8,249,095 |
| Accumulated depreciation | (4,089,679) | (3,715,515) |
| | 4,639,716 | 4,533,580 |
| Construction-in-progress | 376,982 | 314,360 |
| | 5,016,698 | 4,847,940 |
| **Other assets:** | | |
| Goodwill | 3,869,760 | 3,844,628 |
| Deferred income taxes | 16,189 | 5,280 |
| Right of use assets-operating leases | 326,518 | 0 |
| Deferred charges | 6,373 | 8,772 |
| Other | 516,778 | 621,058 |
| | 4,735,618 | 4,479,738 |
| **Total Assets** | $ 11,668,250 | $ 11,265,480 |

**Liabilities and Stockholders' Equity**

| | | |
|---|---|---|
| **Current liabilities:** | | |
| Current maturities of long-term debt | $ 87,550 | $ 63,446 |
| Accounts payable | 446,957 | 445,652 |
| Accrued liabilities | | |
| Compensation and related benefits | 380,117 | 343,384 |
| Interest | 19,486 | 19,277 |
| Taxes other than income | 71,605 | 56,218 |
| Legal reserves | 144,509 | 129,150 |
| Operating lease liabilities | 56,442 | 0 |
| Other | 354,209 | 389,183 |
| Current federal and state income taxes | 2,515 | 2,428 |
| Total current liabilities | 1,563,390 | 1,448,738 |
| Other noncurrent liabilities | 329,932 | 361,809 |
| Operating lease liabilities noncurrent | 270,076 | 0 |
| Long-term debt | 3,896,577 | 3,935,187 |
| Deferred income taxes | 25,071 | 49,661 |
| Commitments and contingencies (Note 8) | | |
| Redeemable noncontrolling interest | 4,333 | 4,292 |
| **Equity:** | | |
| Class A Common Stock, voting, $.01 par value; authorized 12,000,000 shares; issued and outstanding 6,577,100 shares in 2019 and 6,577,100 shares in 2018 | 66 | 66 |
| Class B Common Stock, limited voting, $.01 par value; authorized 150,000,000 shares: issued and outstanding 79,449,349 shares in 2019 and 84,092,304 shares in 2018 | 794 | 841 |
| Class C Common Stock, voting, $.01 par value; authorized 1,200,000 shares: issued and outstanding 661,688 shares in 2019 and 661,688 shares in 2018 | 7 | 7 |
| Class D Common Stock, limited voting, $.01 par value, authorized 5,000,000 shares: issued and outstanding 18,491 shares in 2019 and 18,653 shares in 2018 | 0 | 0 |
| Cumulative dividends | (462,159) | (409,156) |
| Retained earnings | 5,933,504 | 5,793,262 |
| Accumulated other comprehensive income | 31,893 | 4,242 |
| Universal Health Services, Inc. common stockholders' equity | 5,504,105 | 5,389,262 |
| Noncontrolling interest | 74,766 | 76,531 |
| Total Equity | 5,578,871 | 5,465,793 |
| **Total Liabilities and Stockholders' Equity** | $ 11,668,250 | $ 11,265,480 |

The accompanying notes are an integral part of these consolidated financial statements.

96

CONFIDENTIAL

DEF-MDL-14396.00152

ADAMHS000029696

CONFIDENTIAL
DEF-MDL-14396.00153

ADAMHS000029697

97

## UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY
### For the Years Ended December 31, 2019, 2018 and 2017
### (in thousands)

| | Redeemable Noncontrolling Interest | Class A Common | Class B Common | Class C Common | Class D Common | Cumulative Dividends | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | UHS Common Stockholders' Equity | Noncontrolling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Balance, January 1, 2017 | $ 9,319 | $ 66 | $ 893 | $ 7 | $ 0 | $ (333,603) | $4,891,274 | $ (25,417) | $ 4,533,220 | $ 64,374 | $4,597,594 |
| Common Stock | | | | | | | | | | | |
| Issued/(converted) including tax benefits from exercise of stock options | — | — | 9 | — | — | — | 10,370 | — | 10,379 | — | 10,379 |
| Repurchased | — | — | (33) | — | — | — | (356,380) | — | (356,413) | — | (356,413) |
| Restricted share-based compensation expense | — | — | — | — | — | — | 1,377 | — | 1,377 | — | 1,377 |
| Dividends paid | — | — | — | — | — | (38,211) | — | — | (38,211) | — | (38,211) |
| Stock option expense | — | — | — | — | — | — | 54,265 | — | 54,265 | — | 54,265 |
| Distributions to noncontrolling interests | (1,781) | — | — | — | — | — | — | — | — | (22,932) | (22,932) |
| Other | — | — | — | — | — | — | — | — | — | 635 | 635 |
| Comprehensive income: | | | | | | | | | | | |
| Net income to UHS / noncontrolling interests | (836) | — | — | — | — | — | 752,303 | — | 752,303 | 19,845 | 772,148 |
| Foreign currency translation adjustments | — | — | — | — | — | — | — | 26,678 | 26,678 | — | 26,678 |
| Unrealized loss on marketable security (net of income tax effect of $809) | — | — | — | — | — | — | — | (1,360) | (1,360) | — | (1,360) |
| Unrealized derivative gains on cash flow hedges (net of income tax effect of $2,490) | — | — | — | — | — | — | — | 4,189 | 4,189 | — | 4,189 |
| Minimum pension liability (net of income tax effect of $983) | — | — | — | — | — | — | — | 3,087 | 3,087 | — | 3,087 |
| Subtotal - comprehensive income | (836) | — | — | — | — | — | 752,303 | 32,594 | 784,897 | 19,845 | 804,742 |
| Balance, December 31, 2017 | $ 6,702 | $ 66 | $ 869 | $ 7 | $ — | $ (371,814) | $5,353,209 | $ 7,177 | $ 4,989,514 | $ 61,922 | $5,051,436 |

CONFIDENTIAL
DEF-MDL-14396.00154

ADAMHS000029698

**UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY—(Continued)**
**For the Years Ended December 31, 2019, 2018 and 2017**
**(in thousands)**

| | Redeemable Noncontrolling Interest | Class A Common | Class B Common | Class C Common | Class D Common | Cumulative Dividends | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | UHS Common Stockholders' Equity | Noncontrolling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative-effect adjustment due to adoption of ASU 2016-01 (net of income tax effect of $1,045) | — | | | | | | (3,353) | 3,353 | — | | — |
| Common Stock | | | | | | | | | | | |
| Issued/(converted) including tax benefits from exercise of stock options | — | — | 6 | — | — | — | 11,882 | — | 11,888 | — | 11,888 |
| Repurchased | — | — | (34) | — | — | — | (413,968) | — | (414,002) | — | (414,002) |
| Restricted share-based compensation expense | — | — | — | — | — | — | 2,924 | — | 2,924 | — | 2,924 |
| Dividends paid | — | — | — | — | — | (37,342) | — | — | (37,342) | — | (37,342) |
| Stock option expense | — | — | — | — | — | — | 61,061 | — | 61,061 | — | 61,061 |
| Distributions to noncontrolling interests | (2,500) | — | — | — | — | — | — | — | — | (12,095) | (12,095) |
| Other | — | — | — | — | — | — | — | — | — | 8,616 | 8,616 |
| Comprehensive income: | | | | | | | | | | | |
| Net income to UHS / noncontrolling interests | 90 | — | — | — | — | — | 779,705 | — | 779,705 | 18,088 | 797,793 |
| Reclassification due to adoption of ASU 2018-02 | — | — | — | — | — | — | 1,802 | (1,802) | — | | — |
| Foreign currency translation adjustments (net of income tax effect of $6,824) | — | — | — | — | — | — | — | 2,894 | 2,894 | — | 2,894 |
| Unrealized derivative gains on cash flow hedges (net of income tax effect of $667) | — | — | — | — | — | — | — | (2,138) | (2,138) | — | (2,138) |
| Minimum pension liability (net of income tax effect of $1,650) | — | — | — | — | — | — | — | (5,242) | (5,242) | — | (5,242) |
| Subtotal - comprehensive income | 90 | — | — | — | — | — | 778,154 | (2,935) | 775,219 | 18,088 | 793,307 |
| Balance, December 31, 2018 | $ 4,292 | $ 66 | $ 841 | $ 7 | $ — | $ (409,156) | $5,793,262 | $ 4,242 | $ 5,389,262 | $ 76,531 | $5,465,793 |

98

DEF-MDL-14396.00155

CONFIDENTIAL

ADAMHS000029699

## UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CHANGES IN EQUITY—(Continued)
### For the Years Ended December 31, 2019, 2018 and 2017
### (in thousands)

| | Redeemable Noncontrolling Interest | Class A Common | Class B Common | Class C Common | Class D Common | Cumulative Dividends | Retained Earnings | Accumulated Other Comprehensive Income (Loss) | UHS Common Stockholders' Equity | Noncontrolling Interest | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Common Stock: | | | | | | | | | | | |
| Issued/(converted) including tax benefits from exercise of stock options | — | — | 10 | — | — | — | 10,930 | — | 10,940 | — | 10,940 |
| Repurchased | — | — | (57) | — | — | — | (753,870) | — | (753,927) | — | (753,927) |
| Restricted share-based compensation expense | — | — | — | — | — | — | 8,222 | — | 8,222 | — | 8,222 |
| Dividends paid | — | — | — | — | — | (53,003) | — | — | (53,003) | — | (53,003) |
| Stock option expense | — | — | — | — | — | — | 60,106 | — | 60,106 | — | 60,106 |
| Distributions to noncontrolling interests | (500) | — | — | — | — | — | — | — | — | (15,359) | (15,359) |
| Other | — | — | — | — | — | — | — | — | — | 1,446 | 1,446 |
| Comprehensive income: | | | | | | | | | | | |
| Net income to UHS / noncontrolling interests | 541 | — | — | — | — | — | 814,854 | — | 814,854 | 12,148 | 827,002 |
| Foreign currency translation adjustments (net of income tax effect of $3,693) | — | — | — | — | — | — | — | 24,193 | 24,193 | — | 24,193 |
| Unrealized derivative gains on cash flow hedges (net of income tax effect of $928) | — | — | — | — | — | — | — | (2,997) | (2,997) | — | (2,997) |
| Minimum pension liability (net of income tax effect of $2,048) | — | — | — | — | — | — | — | 6,455 | 6,455 | — | 6,455 |
| Subtotal - comprehensive income | 541 | — | — | — | — | — | 814,854 | 27,651 | 842,505 | 12,148 | 854,653 |
| Balance, December 31, 2019 | $ 4,333 | $ 66 | $ 794 | $ 7 | $ 0 | $ (462,159) | $5,933,504 | $ 31,893 | $ 5,504,105 | $ 74,766 | $5,578,871 |

The accompanying notes are an integral part of these consolidated financial statements.

99

## UNIVERSAL HEALTH SERVICES, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| | (Amounts in thousands) | | |
| **Cash Flows from Operating Activities:** | | | |
| Net income | $ 827,543 | $ 797,883 | $ 771,312 |
| *Adjustments to reconcile net income to net cash provided by operating activities:* | | | |
| Depreciation & amortization | 490,392 | 453,076 | 447,883 |
| Gains on sales of assets and businesses, net of losses | (7,540) | (2,513) | 0 |
| Stock-based compensation expense | 69,431 | 66,581 | 56,738 |
| Costs related to extinguishment of debt | 0 | 2,727 | 0 |
| Provision for asset impairment | 97,631 | 49,310 | 0 |
| *Changes in assets & liabilities, net of effects from acquisitions and dispositions:* | | | |
| Accounts receivable | (42,056) | (42,239) | (24,719) |
| Accrued interest | 209 | (4,478) | 705 |
| Accrued and deferred income taxes | (25,194) | (54,052) | (6,405) |
| Other working capital accounts | 39,664 | 24,696 | (15,165) |
| Other assets and deferred charges | (27,205) | (31,429) | (27,936) |
| Other | 7,703 | (1,536) | 21,769 |
| Accrued insurance expense, net of commercial premiums paid | 105,672 | 92,863 | 102,595 |
| Payments made in settlement of self-insurance claims | (97,781) | (76,147) | (79,192) |
| Net cash provided by operating activities | 1,438,469 | 1,274,742 | 1,247,585 |
| **Cash Flows from Investing Activities:** | | | |
| Property and equipment additions, net of disposals | (634,095) | (664,962) | (557,506) |
| Acquisition of property and businesses | (8,005) | (110,464) | (22,878) |
| (Outflows) Inflows from foreign exchange contracts that hedge our net U.K. investment | (19,763) | 66,151 | (64,333) |
| Proceeds received from sales of assets and businesses | 9,450 | 13,502 | 108 |
| Costs incurred for purchase and implementation of information technology applications | (21,418) | (36,243) | (29,047) |
| Decrease (Increase) in capital reserves of commercial insurance subsidiary | 0 | 100 | (3,100) |
| Investment in, and advances to, joint venture and other | (14,579) | (15,331) | (7,976) |
| Net cash used in investing activities | (688,410) | (747,247) | (684,732) |
| **Cash Flows from Financing Activities:** | | | |
| Reduction of long-term debt | (57,142) | (830,496) | (143,106) |
| Additional borrowings | 39,220 | 791,247 | 41,100 |
| Financing costs | 0 | (13,787) | (76) |
| Repurchase of common shares | (770,504) | (397,425) | (364,401) |
| Dividends paid | (53,003) | (37,342) | (38,211) |
| Issuance of common stock | 10,806 | 10,196 | 10,254 |
| Profit distributions to noncontrolling interests | (15,859) | (14,595) | (24,713) |
| Capital contributions from minority members | 1,446 | 0 | 0 |
| Net cash used in financing activities | (845,036) | (492,202) | (519,153) |
| Effect of exchange rate changes on cash and cash equivalents | 959 | (2,905) | 1,647 |
| (Decrease) Increase in cash and cash equivalents | (94,018) | 32,388 | 45,347 |
| Cash, cash equivalents and restricted cash, beginning of period | 199,685 | 167,297 | 121,950 |
| Cash, cash equivalents and restricted cash, end of period | $ 105,667 | $ 199,685 | $ 167,297 |
| **Supplemental Disclosures of Cash Flow Information:** | | | |
| Interest paid | $ 157,406 | $ 150,293 | $ 135,533 |
| Income taxes paid, net of refunds | $ 260,622 | $ 293,837 | $ 370,855 |
| Noncash purchases of property and equipment | $ 63,514 | $ 77,674 | $ 82,496 |
| Right-of-use assets obtained in exchange for lease obligations | $ 383,857 | $ 0 | $ 0 |

The accompanying notes are an integral part of these consolidated financial statements.

CONFIDENTIAL

ADAMHS000029700

DEF-MDL-14396.00156

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

### 1) BUSINESS AND SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Services provided by our hospitals, all of which are operated by subsidiaries of ours, include general and specialty surgery, internal medicine, obstetrics, emergency room care, radiology, oncology, diagnostic care, coronary care, pediatric services, pharmacy services and/or behavioral health services. We, through our subsidiaries, provide capital resources as well as a variety of management services to our facilities, including central purchasing, information services, finance and control systems, facilities planning, physician recruitment services, administrative personnel management, marketing and public relations.

The more significant accounting policies follow:

**A) Principles of Consolidation:** The consolidated financial statements include the accounts of our majority-owned subsidiaries and partnerships controlled by us or our subsidiaries as the managing general partner. All intercompany accounts and transactions have been eliminated.

**B) Revenue Recognition:** On January 1, 2018, we adopted, using the modified retrospective approach, ASU 2014-09 and ASU 2016-08, "Revenue from Contracts with Customers (Topic 606)" and "Revenue from Contracts with Customers: Principal versus Agent Considerations (Reporting Revenue Gross versus Net)", respectively, which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. The most significant change from the adoption of the new standard relates to our estimation for the allowance for doubtful accounts. Under the previous standards, our estimate for amounts not expected to be collected based upon our historical experience, were reflected as provision for doubtful accounts, included within net revenue. Under the new standard, our estimate for amounts not expected to be collected based on historical experience will continue to be recognized as a reduction to net revenue, however, not reflected separately as provision for doubtful accounts. Under the new standard, subsequent changes in estimate of collectability due to a change in the financial status of a payer, for example a bankruptcy, will be recognized as bad debt expense in operating charges. The adoption of this ASU in 2018, and amounts recognized as bad debt expense and included in other operating expenses, did not have a material impact on our consolidated financial statements.

See Note 10-*Revenue Recognition*, for additional disclosure related to our revenues including a disaggregation of our consolidated net revenues by major source for each of the periods presented herein.

We report net patient service revenue at the estimated net realizable amounts from patients and third-party payers and others for services rendered. We have agreements with third-party payers that provide for payments to us at amounts different from our established rates. Payment arrangements include rates per discharge, reimbursed costs, discounted charges and per diem payments. Estimates of contractual allowances, which represent explicit price concessions under ASC 606, under managed care plans are based upon the payment terms specified in the related contractual agreements. We closely monitor our historical collection rates, as well as changes in applicable laws, rules and regulations and contract terms, to assure that provisions are made using the most accurate information available. However, due to the complexities involved in these estimations, actual payments from payers may be different from the amounts we estimate and record.

We estimate our Medicare and Medicaid revenues using the latest available financial information, patient utilization data, government provided data and in accordance with applicable Medicare and Medicaid payment rules and regulations. The laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation and as a result, there is at least a reasonable possibility that recorded estimates will change by material amounts in the near term. Certain types of payments by the Medicare program and state Medicaid programs (e.g. Medicare Disproportionate Share Hospital, Medicare Allowable Bad Debts and Inpatient Psychiatric Services) are subject to retroactive adjustment in future periods as a result of administrative review and audit and our estimates may vary from the final settlements. Such amounts are included in accounts receivable, net, on our Consolidated Balance Sheets. The funding of both federal Medicare and state Medicaid programs are subject to legislative and regulatory changes. As such, we cannot provide any assurance that future legislation and regulations, if enacted, will not have a material impact on our future Medicare and Medicaid reimbursements. Adjustments related to the final settlement of these retrospectively determined amounts did not materially impact our results in 2019, 2018 or 2017. If it were to occur, each 1% adjustment to our estimated net Medicare revenues that are subject to retrospective review and settlement as of December 31, 2019, would change our after-tax net income by approximately $1 million.

**C) Charity Care, Uninsured Discounts and Other Adjustments to Revenue:** Collection of receivables from third-party payers and patients is our primary source of cash and is critical to our operating performance. Our primary collection risks relate to uninsured patients and the portion of the bill which is the patient's responsibility, primarily co-payments and deductibles. We estimate

101

ADAMHS000029701

our revenue adjustments for implicit price concessions based on general factors such as payer mix, the aging of the receivables and historical collection experience, consistent with our estimates for provision for doubtful accounts under ASC 605. We routinely review accounts receivable balances in conjunction with these factors and other economic conditions which might ultimately affect the collectability of the patient accounts and make adjustments to our allowances as warranted. At our acute care hospitals, third party liability accounts are pursued until all payment and adjustments are posted to the patient account. For those accounts with a patient balance after third party liability is finalized or accounts for uninsured patients, the patient receives statements and collection letters.

Under ASC 605, our hospitals established a partial reserve for self-pay accounts in the allowance for doubtful accounts for both unbilled balances and those that have been billed and were under 90 days old. All self-pay accounts were fully reserved at 90 days from the date of discharge. Third party liability accounts were fully reserved in the allowance for doubtful accounts when the balance aged past 180 days from the date of discharge. Patients that express an inability to pay were reviewed for potential sources of financial assistance including our charity care policy. If the patient was deemed unwilling to pay, the account was written-off as bad debt and transferred to an outside collection agency for additional collection effort. Under ASC 606, while similar processes are considered, these revenue adjustments are considered at the time the services are provided in determination of the transaction price.

Historically, a significant portion of the patients treated throughout our portfolio of acute care hospitals are uninsured patients which, in part, has resulted from patients who are employed but do not have health insurance or who have policies with relatively high deductibles. Patients treated at our hospitals for non-elective services, who have gross income of various amounts, dependent upon the state, ranging from 200% to 400% of the federal poverty guidelines, are deemed eligible for charity care. The federal poverty guidelines are established by the federal government and are based on income and family size. Because we do not pursue collection of amounts that qualify as charity care, the transaction price is fully adjusted and there is no impact in our net revenues or in our accounts receivable, net.

A portion of the accounts receivable at our acute care facilities are comprised of Medicaid accounts that are pending approval from third-party payers but we also have smaller amounts due from other miscellaneous payers such as county indigent programs in certain states. Our patient registration process includes an interview of the patient or the patient's responsible party at the time of registration. At that time, an insurance eligibility determination is made and an insurance plan code is assigned. There are various pre-established insurance profiles in our patient accounting system which determine the expected insurance reimbursement for each patient based on the insurance plan code assigned and the services rendered. Certain patients may be classified as Medicaid pending at registration based upon a screening evaluation if we are unable to definitively determine if they are currently Medicaid eligible. When a patient is registered as Medicaid eligible or Medicaid pending, our patient accounting system records net revenues for services provided to that patient based upon the established Medicaid reimbursement rates, subject to the ultimate disposition of the patient's Medicaid eligibility. When the patient's ultimate eligibility is determined, reclassifications may occur which impacts net revenues in future periods. Although the patient's ultimate eligibility determination may result in adjustments to net revenues, these adjustments do not have a material impact on our results of operations in 2019, 2018 or 2017 since our facilities make estimates at each financial reporting period to adjust revenue based on historical collections. Under ASC 605, these estimates were reported in the provision for doubtful accounts.

We also provide discounts to uninsured patients (included in "uninsured discounts" amounts below) who do not qualify for Medicaid or charity care. Because we do not pursue collection of amounts classified as uninsured discounts, the transaction price is fully adjusted and there is no impact in our net revenues or in our net accounts receivable. In implementing the discount policy, we first attempt to qualify uninsured patients for governmental programs, charity care or any other discount program. If an uninsured patient does not qualify for these programs, the uninsured discount is applied.

*Uncompensated care (charity care and uninsured discounts):*

The following table shows the amounts recorded at our acute care hospitals for charity care and uninsured discounts, based on charges at established rates, for the years ended December 31, 2019, 2018 and 2017:

| | (dollar amounts in thousands) | | | | | |
| | 2019 | | 2018 | | 2017 | |
| | Amount | % | Amount | % | Amount | % |
|---|---|---|---|---|---|---|
| Charity care | $ 672,326 | 31% | $ 761,783 | 40% | $ 887,136 | 50% |
| Uninsured discounts | 1,511,738 | 69% | 1,132,811 | 60% | 881,265 | 50% |
| Total uncompensated care | $2,184,064 | 100% | $1,894,594 | 100% | $1,768,401 | 100% |

102

*The estimated cost of providing uncompensated care:*

The estimated cost of providing uncompensated care, as reflected below, were based on a calculation which multiplied the percentage of operating expenses for our acute care hospitals to gross charges for those hospitals by the above-mentioned total uncompensated care amounts. The percentage of cost to gross charges is calculated based on the total operating expenses for our acute care facilities divided by gross patient service revenue for those facilities. An increase in the level of uninsured patients to our facilities and the resulting adverse trends in the adjustments to net revenues and uncompensated care provided could have a material unfavorable impact on our future operating results.

|  | (amounts in thousands) | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Estimated cost of providing charity care | $ 77,886 | $ 94,088 | $ 120,208 |
| Estimated cost of providing uninsured discounts related care | 175,128 | 139,913 | 119,412 |
| Estimated cost of providing uncompensated care | $ 253,014 | $ 234,001 | $ 239,620 |

Our accounts receivable as of December 31, 2019 and December 31, 2018 include amounts due from Illinois of approximately $36 million and $32 million, respectively. Collection of the outstanding receivables continues to be delayed due to state budgetary and funding pressures. Approximately $18 million as of each of December 31, 2019 and 2018, of the receivables due from Illinois were outstanding in excess of 60 days, as of each respective date. Although the accounts receivable due from Illinois could remain outstanding for the foreseeable future, since we expect to eventually collect all amounts due to us, no related reserves have been established in our consolidated financial statements. However, we can provide no assurance that we will eventually collect all amounts due to us from Illinois. Failure to ultimately collect all outstanding amounts due to us from Illinois would have an adverse impact on our future consolidated results of operations and cash flows.

**D) Concentration of Revenues:** Our six acute care hospitals in the Las Vegas, Nevada market contributed, on a combined basis, 16% in 2019, 15% in 2018 and 15% in 2017 of our consolidated net revenues.

**E) Cash, Cash Equivalents and Restricted Cash:** We consider all highly liquid investments purchased with maturities of three months or less to be cash equivalents.

Cash, cash equivalents, and restricted cash as reported in the consolidated statements of cash flows are presented separately on our consolidated balance sheets as follow:

|  | (amounts in thousands) | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Cash and cash equivalents | $ 61,268 | $ 105,220 | $ 74,423 |
| Restricted cash (a) | 44,399 | 94,465 | 92,874 |
| Total cash, cash equivalents and restricted cash | $ 105,667 | $ 199,685 | $ 167,297 |

(a)  Restricted cash is included in other assets on the accompanying consolidated balance sheet and consists of statutorily required capital reserves related to our commercial insurance subsidiary.

The fair value of our restricted cash was computed based upon quotes received from financial institutions. We consider these to be "level 1" in the fair value hierarchy as outlined in the authoritative guidance for disclosures in connection with financial securities.

**F) Property and Equipment:** Property and equipment are stated at cost. Expenditures for renewals and improvements are charged to the property accounts. Replacements, maintenance and repairs which do not improve or extend the life of the respective asset are expensed as incurred. We remove the cost and the related accumulated depreciation from the accounts for assets sold or retired and the resulting gains or losses are included in the results of operations. Construction-in-progress includes both construction projects and equipment not yet placed into service.

See *Provision for Asset Impairment-Foundations Recovery Network,* in *I) Other Assets and Intangible Assets* below, for additional disclosure related to a provision for asset impairment recorded during 2019 to reduce the carrying value of real property assets of certain Foundations Recovery Network, L.L.C. facilities.

While in progress, we capitalized interest on major construction projects and the development and implementation of information technology applications amounting to $3.4 million during 2019, $2.3 million during 2018 and $1.0 million during 2017.

Depreciation is provided on the straight-line method over the estimated useful lives of buildings and improvements (twenty to forty years) and equipment (three to fifteen years). Depreciation expense was $455.6 million during 2019, $410.0 million during 2018 and $388.4 million during 2017.

103

CONFIDENTIAL

ADAMHS000029703

DEF-MDL-14396.00159

**G) Long-Lived Assets:**  We review our long-lived assets, including intangible assets, for impairment whenever events or circumstances indicate that the carrying value of these assets may not be recoverable. The assessment of possible impairment is based on our ability to recover the carrying value of our asset based on our estimate of its undiscounted future cash flow. If the analysis indicates that the carrying value is not recoverable from future cash flows, the asset is written down to its estimated fair value and an impairment loss is recognized. Fair values are determined based on estimated future cash flows using appropriate discount rates.

**H) Goodwill:**  Goodwill is reviewed for impairment at the reporting unit level on an annual basis or sooner if the indicators of impairment arise. Our judgments regarding the existence of impairment indicators are based on market conditions and operational performance of each reporting unit.  We have designated October 1st as our annual impairment assessment date and performed quantitative impairment assessments as of October 1, 2019 which indicated no impairment of goodwill.  There were also no goodwill impairments during 2018 or 2017.  Future changes in the estimates used to conduct the impairment reviews, including profitability and market value projections, could indicate impairment in future periods potentially resulting in a write-off of a portion or all of our goodwill.

Changes in the carrying amount of goodwill for the two years ended December 31, 2019 were as follows (in thousands):

|  | Acute Care Services | Behavioral Health Services | Total Consolidated |
|---|---|---|---|
| Balance, January 1, 2018 | $   441,511 | $  3,383,646 | $  3,825,157 |
| Goodwill acquired during the period | 917 | 44,173 | 45,090 |
| Goodwill divested during the period | --- | (2,135) | (2,135) |
| Adjustments to goodwill (a) | 34 | (23,518) | (23,484) |
| Balance, December 31, 2018 | 442,462 | 3,402,166 | 3,844,628 |
| Goodwill acquired during the period | 5,926 | - | 5,926 |
| Goodwill divested during the period | - | - | - |
| Adjustments to goodwill (a) | 27 | 19,179 | 19,206 |
| Balance, December 31, 2019 | $   448,415 | $  3,421,345 | $  3,869,760 |

(a)   The increase/(decrease) in the Behavioral Health Services' goodwill consists primarily of foreign currency translation adjustments.

**I) Other Assets and Intangible Assets:**  Other assets consist primarily of amounts related to: (i) intangible assets acquired in connection with our acquisitions of Cambian Group, PLC's adult services' division, Foundations Recovery Network, L.L.C. ("Foundations") during 2015, Ascend Health Corporation during 2012 and Psychiatric Solutions, Inc. during 2010; (ii) prepaid fees for various software and other applications used by our hospitals; (iii) costs incurred in connection with the purchase and implementation of an electronic health records application for each of our acute care facilities; (iv) statutorily required capital reserves related to our commercial insurance subsidiary ($62 million as of December 31, 2019); (v) deposits; (vi) investments in various businesses, including Universal Health Realty Income Trust ($6 million as of December 31, 2019) and Premier, Inc. ($70 million as of December 31, 2019); (vii) the invested assets related to a deferred compensation plan that is held by an independent trustee in a rabbi-trust and that has a related payable included in other noncurrent liabilities, and; (viii) other miscellaneous assets.

Intangible assets are reviewed for impairment on an annual basis or sooner if the indicators of impairment arise. Our judgments regarding the existence of impairment indicators are based on market conditions and operational performance of each asset.  We have designated October 1st as our annual impairment assessment date and performed impairment assessments as of October 1, 2019. During 2019 and 2018, we recorded provisions for asset impairments related to Foundations Recovery Network, L.L.C., as discussed below. There were no impairments recorded during 2017.

*Provision for Asset Impairment-Foundations Recovery Network:*
Our financial results for the years ended December 31, 2019 and 2018 include pre-tax provisions for asset impairments of approximately $98 million and $49 million, respectively, recorded in connection with Foundations Recovery Network, L.L.C. ("Foundations"), which was acquired by us in 2015.

The pre-tax provision for asset impairment recording during 2019 includes: (i) a $75 million impairment provision to write-off the carrying value of the Foundations' tradename intangible asset, and; (ii) a $23 million impairment provision to reduce the carrying value of real property assets of certain Foundations' facilities. The $49 million pre-tax provision for asset impairment recorded during 2018 reduced the carrying value of a tradename intangible asset to approximately $75 million from its original value of approximately $124 million.

The provision for asset impairment recorded during 2019, which is included in other operating expenses in our consolidated statements of income, was recorded after evaluation of the estimated fair value of the Foundations' tradename as well as certain

104

related real property assets. The provision for asset impairment was impacted by the following: (i) decisions made by management during 2019 to cancel the opening of future planned de novo facilities; (ii) reductions in projected future patient volumes, revenues and cash flows resulting from continued operating trends and financial results experienced by existing facilities that significantly lagged expectations; and, (iii) competitive pressures experienced in certain markets that were deemed to be permanent.

The provision for asset impairment recorded during 2018, which is also included in other operating expenses, was recorded after an evaluation, at that time, of the estimated fair value of the Foundations' tradename for its existing facilities, consisting of 4 inpatient and 12 outpatient facilities as of December 31, 2018, as well as estimated planned de novos. The 2018 asset impairment charge was impacted by the following: (i) the lost future revenue and cash flows resulting from the permanent closure of a Foundations' inpatient facility located in Malibu, California that was severely damaged in the California wildfires during the fourth quarter of 2018; (ii) reduction in growth rates of projected future patient volumes, revenues and operating cash flows based upon pressures on reimbursement rates experienced from certain payers and competitive pressures experienced in certain markets; and, (iii) revisions made to the number and timing of planned de novo facilities.

The following table shows the amounts recorded as net intangible assets for the years ended December 31, 2019 and 2018:

| | | 2019 | | 2018 |
|---|---|---|---|---|
| | | (amounts in thousands) | | |
| Tradenames | $ | — | $ | 74,903 |
| Medicare licenses | | 57,226 | | 57,226 |
| Certificates of need | | 8,267 | | 21,101 |
| Contract relationships and other (net of $50,273 and $48,705 of accumulated amortization for 2019 and 2018, respectively) | | 18,164 | | 19,732 |
| Net Intangible Assets | $ | 83,657 | $ | 172,962 |

J) **Supplies:** Supplies, which consist primarily of medical supplies, are stated at the lower of cost (first-in, first-out basis) or market.

K) **Self-Insured/Other Insurance Risks:** We provide for self-insured risks, primarily general and professional liability claims and workers' compensation claims. Our estimated liability for self-insured professional and general liability claims is based on a number of factors including, among other things, the number of asserted claims and reported incidents, estimates of losses for these claims based on recent and historical settlement amounts, estimate of incurred but not yet reported claims based on historical experience, and estimates of amounts recoverable under our commercial insurance policies. All relevant information, including our own historical experience is used in estimating the expected amount of claims. While we continuously monitor these factors, our ultimate liability for professional and general liability claims could change materially from our current estimates due to inherent uncertainties involved in making this estimate. Our estimated self-insured reserves are reviewed and changed, if necessary, at each reporting date and changes are recognized currently as additional expense or as a reduction of expense. See Note 8 - *Commitments and Contingencies* for discussion of adjustments to our prior year reserves for claims related to our self-insured general and professional liability and workers' compensation liability.

In addition, we also: (i) own commercial health insurers headquartered in Nevada and Puerto Rico; and, (ii) maintain self-insured employee benefits programs for employee healthcare and dental claims. The ultimate costs related to these programs/operations include expenses for claims incurred and paid in addition to an accrual for the estimated expenses incurred in connection with claims incurred but not yet reported. Given our significant insurance-related exposure, there can be no assurance that a sharp increase in the number and/or severity of claims asserted against us will not have a material adverse effect on our future results of operations.

L) **Income Taxes:** Deferred tax assets and liabilities are recognized for the amount of taxes payable or deductible in future years as a result of differences between the tax bases of assets and liabilities and their reported amounts in the financial statements. We believe that future income will enable us to realize our deferred tax assets net of recorded valuation allowances relating to state net operating loss carry-forwards.

We operate in multiple jurisdictions with varying tax laws. We are subject to audits by any of these taxing authorities. Our tax returns have been examined by the Internal Revenue Service ("IRS") through the year ended December 31, 2006. We believe that adequate accruals have been provided for federal, foreign and state taxes. See Note 6 - *Income Taxes*, for additional disclosure.

M) **Other Noncurrent Liabilities:** Other noncurrent liabilities include the long-term portion of our professional and general liability, workers' compensation reserves, pension and deferred compensation liabilities, and liabilities incurred in connection with split-dollar life insurance agreements on the lives of our chief executive officer and his wife.

CONFIDENTIAL

DEF-MDL-14396.00161

ADAMHS000029705

**N) Redeemable Noncontrolling Interests and Noncontrolling Interest:** As of December 31, 2019, outside owners held noncontrolling, minority ownership interests of: (i) 20% in an acute care facility located in Washington, D.C.; (ii) approximately 11% in an acute care facility located in Texas; (iii) 20%, 30% and 20% in three behavioral health care facilities located in Pennsylvania, Ohio and Washington, respectively; and, (iv) approximately 5% in an acute care facility located in Nevada. The noncontrolling interest and redeemable noncontrolling interest balances of $75 million and $4 million, respectively, as of December 31, 2019, consist primarily of the third-party ownership interests in these hospitals.

In connection with the two behavioral health care facilities located in Pennsylvania and Ohio, the minority ownership interests of which are reflected as redeemable noncontrolling interests on our Consolidated Balance Sheet, the outside owners have "put options" to put their entire ownership interest to us at any time. If exercised, the put option requires us to purchase the minority member's interest at fair market value.

**O) Accumulated Other Comprehensive Income:** The accumulated other comprehensive income ("AOCI") component of stockholders' equity includes: net unrealized gains and losses on effective cash flow hedges, foreign currency translation adjustments and the net minimum pension liability of a non-contributory defined benefit pension plan which covers employees at one of our subsidiaries. See Note 11 - *Pension Plan* for additional disclosure regarding the defined benefit pension plan.

The amounts recognized in AOCI for the two years ended December 31, 2019 were as follows (in thousands):

| | Net Unrealized Gains (Losses) on Effective Cash Flow Hedges | Foreign Currency Translation Adjustment | Unrealized loss on marketable security | Minimum Pension Liability | Total AOCI |
|---|---|---|---|---|---|
| Balance, January 1, 2018, net of income tax | $ 4,208 | $ 12,481 | $ (2,758) | $ (6,754) | $ 7,177 |
| 2018 activity: | | | | | |
| Pretax amount | (2,805) | 9,718 | 4,398 | (6,892) | 4,419 |
| Income tax effect, net of adoption of ASU 2018-02 | 1,577 | (6,824) | (1,640) | (467) | (7,354) |
| Change, net of income tax | (1,228) | 2,894 | 2,758 | (7,359) | (2,935) |
| Balance, January 1, 2019, net of income tax | 2,980 | 15,375 | – | (14,113) | 4,242 |
| 2019 activity: | | | | | |
| Pretax amount | (3,925) | 27,886 | – | 8,503 | 32,464 |
| Income tax effect | 928 | (3,693) | – | (2,048) | (4,813) |
| Change, net of income tax | (2,997) | 24,193 | – | 6,455 | 27,651 |
| Balance, December 31, 2019, net of income tax | $ (17) | $ 39,568 | – | $ (7,658) | $ 31,893 |

**P) Accounting for Derivative Financial Investments and Hedging Activities and Foreign Currency Forward Exchange Contracts:** We manage our ratio of fixed and floating rate debt with the objective of achieving a mix that management believes is appropriate. To manage this risk in a cost-effective manner, we, from time to time, enter into interest rate swap agreements in which we agree to exchange various combinations of fixed and/or variable interest rates based on agreed upon notional amounts. We account for our derivative and hedging activities using the Financial Accounting Standard Board's ("FASB") guidance which requires all derivative instruments, including certain derivative instruments embedded in other contracts, to be carried at fair value on the balance sheet. For derivative transactions designated as hedges, we formally document all relationships between the hedging instrument and the related hedged item, as well as its risk-management objective and strategy for undertaking each hedge transaction.

Derivative instruments designated in a hedge relationship to mitigate exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Cash flow hedges are accounted for by recording the fair value of the derivative instrument on the balance sheet as either an asset or liability, with a corresponding amount recorded in accumulated other comprehensive income ("AOCI") within shareholders' equity. Amounts are reclassified from AOCI to the income statement in the period or periods the hedged transaction affects earnings. From time to time, we use interest rate derivatives in our cash flow hedge transactions. Such derivatives are designed to be highly effective in offsetting changes in the cash flows related to the hedged liability.

For hedge transactions that do not qualify for the short-cut method, at the hedge's inception and on a regular basis thereafter, a formal assessment is performed to determine whether changes in the fair values or cash flows of the derivative instruments have been highly effective in offsetting changes in cash flows of the hedged items and whether they are expected to be highly effective in the future.

In August 2017, the FASB issued new guidance on hedge accounting (ASU 2017-12) that is intended to more closely align hedge accounting with companies' risk management strategies, simplify the application of hedge accounting, and increase

106

CONFIDENTIAL

DEF-MDL-14396.00162

ADAMHS000029706

transparency as to the scope and results of hedging programs. The new guidance amends the presentation and disclosure requirements, and changes how companies assess effectiveness. We adopted this guidance as of January 1, 2019 and applied to all existing hedges as of the adoption date.

We use forward exchange contracts to hedge our net investment in foreign operations against movements in exchange rates. The effective portion of the unrealized gains or losses on these contracts is recorded in foreign currency translation adjustment within accumulated other comprehensive income and remains there until either the sale or liquidation of the subsidiary. In conjunction with the January 1, 2019 adoption of ASU 2017-12, "Targeted Improvements to Accounting for Hedging Activities", we reclassified our presentation of the net cash inflows or outflows, which were received or paid in connection with foreign exchange contracts that hedge our net investment in foreign operations against movements in exchange rates, to investing cash flows on the consolidated statements of cash flows.

**Q) Stock-Based Compensation:** At December 31, 2019, we have a number of stock-based employee compensation plans. Pursuant to the FASB's guidance, we expense the grant-date fair value of stock options and other equity-based compensation pursuant to the straight-line method over the stated vesting period of the award using the Black-Scholes option-pricing model. The expense associated with share-based compensation arrangements is a non-cash charge. In the Consolidated Statements of Cash Flows, share-based compensation expense is an adjustment to reconcile net income to cash provided by operating activities.

**R) Earnings per Share:** Basic earnings per share are based on the weighted average number of common shares outstanding during the year. Diluted earnings per share are based on the weighted average number of common shares outstanding during the year adjusted to give effect to common stock equivalents.

The following table sets forth the computation of basic and diluted earnings per share, for the periods indicated:

| | Twelve Months Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Basic and diluted: | | | |
| Net Income | $ 827,543 | $ 797,883 | $ 771,312 |
| Less: Net income attributable to noncontrolling interest | (12,689) | (18,178) | (19,009) |
| Less: Net income attributable to unvested restricted share grants | (2,028) | (1,091) | (362) |
| Net income attributable to UHS—basic and diluted | $ 812,826 | $ 778,614 | $ 751,941 |
| Basic earnings per share attributable to UHS: | | | |
| Weighted average number of common shares—basic | 88,762 | 93,276 | 95,652 |
| Total basic earnings per share | $ 9.16 | $ 8.35 | $ 7.86 |
| Diluted earnings per share attributable to UHS: | | | |
| Weighted average number of common shares | 88,762 | 93,276 | 95,652 |
| Net effect of dilutive stock options and grants based on the treasury stock method | 278 | 474 | 673 |
| Weighted average number of common shares and equivalents—diluted | 89,040 | 93,750 | 96,325 |
| Total diluted earnings per share | $ 9.13 | $ 8.31 | $ 7.81 |

The "Net effect of dilutive stock options and grants based on the treasury stock method", for all years presented above, excludes certain outstanding stock options applicable to each year since the effect would have been anti-dilutive. The excluded weighted-average stock options totaled approximately 5.5 million during 2019, 7.9 million during 2018 and 6.2 million during 2017.

**S) Fair Value of Financial Instruments:** The fair values of our debt and investments are based on quoted market prices. The fair values of other long-term debt, including capital lease obligations, are estimated by discounting cash flows using period-end interest rates and market conditions for instruments with similar maturities and credit quality. The carrying amounts reported in the balance sheet for cash, accounts receivable, accounts payable, and short-term borrowings approximates their fair values due to the short-term nature of these instruments. Accordingly, these items have been excluded from the fair value disclosures included elsewhere in these notes to consolidated financial statements.

**T) Use of Estimates:** The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

CONFIDENTIAL

DEF-MDL-14396.00163

ADAMHS000029707

**U) Mergers and Acquisitions:** The acquisition method of accounting for business combinations requires that the assets acquired and liabilities assumed be recorded at the date of acquisition at their respective fair values with limited exceptions. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Any excess of the purchase price (consideration transferred) over the estimated fair values of net assets acquired is recorded as goodwill. Transaction costs and costs to restructure the acquired company are expensed as incurred. The fair value of intangible assets, including Medicare licenses, certificates of need, tradenames and certain contracts, is based on significant judgments made by our management, and accordingly, for significant items we typically obtain assistance from third party valuation specialists.

**V) GPO Agreement/Minority Ownership Interest:** During 2013, we entered into a new group purchasing organization agreement ("GPO") with Premier, Inc. ("Premier"), a healthcare performance improvement alliance, and acquired a minority interest in the GPO for a nominal amount. During the fourth quarter of 2013, in connection with the completion of an initial public offering of the stock of Premier, we received cash proceeds for the sale of a portion of our ownership interest in the GPO, which were recorded as deferred income, on a pro rata basis, as a reduction to our supplies expense over the initial expected life of the GPO agreement. Also in connection with this GPO agreement, we received shares of restricted stock in Premier which vest ratably over a seven-year period (2014 through 2020), contingent upon our continued participation and minority ownership interest in the GPO. We recognize the fair value of this restricted stock, as a reduction to our supplies expense, in our consolidated statements of income, on a pro rata basis, over the vesting period. We have elected to retain a portion of the previously vested shares of Premier, the value of which is included in other assets on our consolidated balance sheet. Based upon the closing price of Premier's stock on each respective date, the market value of our shares of Premier on which the restrictions have lapsed was $70 million and $56 million as of December 31, 2019 and 2018, respectively. The $14 million increase in market value at December 31, 2019, as compared to December 31, 2018, consists of $10 million of additional vested shares and $4 million of increased market value. In connection with our 2018 adoption of ASU 2016-01, "Recognition and Measurement of Financial Assets and Financial Liabilities", since our vested shares of Premier are held for investment and classified as available for sale, the change in market value of these shares are recorded as an unrealized gain and included in "Other (income) expense, net" on our consolidated statements of income. Prior to 2018, changes in the market value of our vested Premier stock were recorded to other comprehensive income/loss on our consolidated balance sheet.

**W) Provider Taxes:** We incur health-care related taxes ("Provider Taxes") imposed by states in the form of a licensing fee, assessment or other mandatory payment which are related to: (i) healthcare items or services; (ii) the provision of, or the authority to provide, the health care items or services, or; (iii) the payment for the health care items or services. Such Provider Taxes are subject to various federal regulations that limit the scope and amount of the taxes that can be levied by states in order to secure federal matching funds as part of their respective state Medicaid programs. We derive a related Medicaid reimbursement benefit from assessed Provider Taxes in the form of Medicaid claims based payment increases and/or lump sum Medicaid supplemental payments.

Under these programs, including the impact of the Texas Uncompensated Care and Upper Payment Limit program, the Texas Delivery System Reform Incentive program, and various other state programs, we earned revenues (before Provider Taxes) of approximately $419 million during 2019, $387 million during 2018 and $357 million during 2017. These revenues were offset by Provider Taxes of approximately $194 million during 2019, $179 million during 2018 and $171 million during 2017, which are recorded in other operating expenses on the Consolidated Statements of Income as included herein. The aggregate net benefit from these programs was $225 million during 2019, $208 million during 2018 and $186 million during 2017. The aggregate net benefit pursuant to these programs is earned from multiple states and therefore no particular state's portion is individually material to our consolidated financial statements. In addition, under various disproportionate share hospital payment programs and the Nevada state plan amendment program, we earned revenues of $78 million in 2019, $64 million in 2018 and $55 million in 2017.

**X) Recent Accounting Standards:** In June 2016, the FASB issued ASU 2016-13, "Financial Instruments - Credit Losses," which introduced new guidance for an approach based on expected losses to estimate credit losses on certain types of financial instruments. Instruments in scope include loans, held-to-maturity debt securities, and net investments in leases as well as reinsurance and trade receivables. In November 2018, the FASB issued ASU 2018-19, which clarifies that operating lease receivables are outside the scope of the new standard. The standard will be effective for us in fiscal years beginning after December 15, 2019. We are currently evaluating the impact that the adoption of the new standard will have on our consolidated financial statements.

In January, 2017, the FASB issued ASU No. 2017-04, "Intangibles-Goodwill and Other (Topic 350): Simplifying the Accounting for Goodwill Impairment" ("ASU 2017-04"), which removes the requirement to perform a hypothetical purchase price allocation to measure goodwill impairment. A goodwill impairment will now be the amount by which a reporting unit's carrying value exceeds its fair value, not to exceed the carrying amount of goodwill. ASU 2017-04 is effective for the annual and interim periods beginning January 1, 2020 with early adoption permitted, and applied prospectively. We do not expect ASU 2017-04 to have a material impact on our financial statements.

In August 2017, the FASB issued ASU No. 2017-12, "Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities" and subsequent related updates. The amendments in this update expand and refine hedge accounting for both non-financial and financial risk components and aligns the recognition and presentation of the effects of the

108

hedging instrument and the hedged item in the financial statements. The ASU amends the presentation and disclosure requirements and changes how entities assess effectiveness. The ASU eliminates the requirement to separately measure and report hedge ineffectiveness and requires all items that affect earnings be presented in the same income statement line as the hedged items. The amendments in this guidance permit the use of the Overnight Index Swap rate based on Secured Overnight Financing Rate (SOFR) as a U.S. benchmark interest rate for hedge accounting purposes to facilitate the LIBOR to SOFR transition. This guidance was effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years, and we adopted effective January 1, 2019. The amended presentation and disclosure guidance was required only prospectively. The adoption of this guidance did not have a material impact on our consolidated financial statements.

From time to time, new accounting guidance is issued by the FASB or other standard setting bodies that is adopted by the Company as of the effective date or, in some cases where early adoption is permitted, in advance of the effective date. The Company has assessed the recently issued guidance that is not yet effective and, unless otherwise indicated above, believes the new guidance will not have a material impact on our results of operations, cash flows or financial position.

**Y) Foreign Currency Translation:** Assets and liabilities of our U.K. subsidiaries are denominated in pound sterling and translated into U.S. dollars at: (i) the rates of exchange at the balance sheet date, and; (ii) average rates of exchange prevailing during the year for revenues and expenses. The currency translation adjustments are reported as a component of accumulated other comprehensive income. See Note 3 - *Financial Instruments, Foreign Currency Forward Exchange Contracts* for additional disclosure.

## 2) ACQUISITIONS AND DIVESTITURES

*Year ended December 31, 2019:*

*2019 Acquisitions of Assets and Businesses:*

During 2019, we spent $8 million to acquire various businesses and properties.

*2019 Divestiture of Assets:*

During 2019, we received $9 million from the sales of various assets.

*Year ended December 31, 2018:*

*2018 Acquisitions of Assets and Businesses:*

During 2018 we spent $110 million primarily to acquire:

- The Danshell Group, consisting of 25 behavioral health facilities located in the U.K. (acquired during the third quarter of 2018), and;
- a 109-bed behavioral health care facility located in Gulfport, Mississippi (acquired during the first quarter of 2018).

The aggregate net purchase price of the facilities, which were acquired to enhance and expand our existing operations in the U.S. and the U.K., was allocated to assets and liabilities based on their preliminary estimated fair values as follows:

|  | Amount (000s) |
|---|---|
| Working capital, net | $ (3,988) |
| Property & equipment | 59,520 |
| Goodwill | 45,090 |
| Other assets | 8,409 |
| Income tax assets, net of deferred tax liabilities | 1,749 |
| Other | (316) |
| Cash paid in 2018 for acquisitions | $ 110,464 |

Goodwill of the facilities acquired during each of the last 3 years is computed, pursuant to the residual method, by deducting the fair value of the acquired assets and liabilities from the total purchase price. The factors that contribute to the recognition of goodwill, which may also influence the purchase price, include the following for each of the acquired facilities: (i) the historical cash flows and income levels; (ii) the reputations in their respective markets; (iii) the nature of the respective operations, and; (iv) the future cash flows and income growth projections. The vast majority of the goodwill resulting from these transactions is not deductible for federal income tax purposes (see Note 6 - *Income Taxes*).

109

CONFIDENTIAL

DEF-MDL-14396.00165

*2018 Divestiture of Assets and Businesses:*

During 2018, we received $13 million in connection with the sale of a business and property including The Limes, an 18-bed facility located in the UK.

### Year ended December 31, 2017:

*2017 Acquisitions of Assets and Businesses:*

During 2017 we spent $23 million to acquire businesses and property.

*2017 Divestiture of Assets and Businesses:*

There were no significant divestitures during 2017.

## 3) FINANCIAL INSTRUMENTS AND FAIR VALUE MEASUREMENT

### Fair Value Hedges:

During 2019, 2018 and 2017, we had no fair value hedges outstanding.

### Cash Flow Hedges:

We manage our ratio of fixed and floating rate debt with the objective of achieving a mix that management believes is appropriate. To manage this risk in a cost-effective manner, we, from time to time, enter into interest rate swap agreements in which we agree to exchange various combinations of fixed and/or variable interest rates based on agreed upon notional amounts. We account for our derivative and hedging activities using the Financial Accounting Standard Board's guidance which requires all derivative instruments, including certain derivative instruments embedded in other contracts, to be carried at fair value on the balance sheet. For derivative transactions designated as hedges, we formally document all relationships between the hedging instrument and the related hedged item, as well as its risk-management objective and strategy for undertaking each hedge transaction.

Derivative instruments designated in a hedge relationship to mitigate exposure to variability in expected future cash flows, or other types of forecasted transactions, are considered cash flow hedges. Cash flow hedges are accounted for by recording the fair value of the derivative instrument on the balance sheet as either an asset or liability, with a corresponding amount recorded in accumulated other comprehensive income ("AOCI") within shareholders' equity. Amounts are reclassified from AOCI to the income statement in the period or periods the hedged transaction affects earnings. From time to time, we use interest rate derivatives in our cash flow hedge transactions. Such derivatives are designed to be highly effective in offsetting changes in the cash flows related to the hedged liability.

For hedge transactions that do not qualify for the short-cut method, at the hedge's inception and on a regular basis thereafter, a formal assessment is performed to determine whether changes in the fair values or cash flows of the derivative instruments have been highly effective in offsetting changes in cash flows of the hedged items and whether they are expected to be highly effective in the future.

The fair value of interest rate swap agreements approximates the amount at which they could be settled, based on estimates obtained from the counterparties. We assess the effectiveness of our hedge instruments on a quarterly basis. We performed periodic assessments of the cash flow hedge instruments during the first nine months of 2019 and the full year of 2018 and determined the hedges to be highly effective. Although we do not anticipate nonperformance by our counterparties to interest rate swap agreements, the counterparties expose us to credit risk in the event of nonperformance. We do not hold or issue derivative financial instruments for trading purposes.

During 2015, we entered into nine forward starting interest rate swaps whereby we paid a fixed rate on a total notional amount of $1.0 billion and received one-month LIBOR. The average fixed rate payable on these swaps, all of which matured on April 15, 2019, was 1.31%.

When applicable, we measure our interest rate swaps at fair value on a recurring basis. The fair value of our interest rate swaps is based on quotes from our counterparties. We consider those inputs to be "level 2" in the fair value hierarchy as outlined in the authoritative guidance for disclosures in connection with derivative instruments and hedging activities. At December 31, 2018, the fair value of our interest rate swaps was a net asset of $4 million which is included in net accounts receivable on the accompanying balance sheet.

110

CONFIDENTIAL

DEF-MDL-14396.00166

ADAMHS000029710

*Foreign Currency Forward Exchange Contracts:*

In August 2017, the FASB issued new guidance on hedge accounting (ASU 2017-12) that is intended to more closely align hedge accounting with companies' risk management strategies, simplify the application of hedge accounting, and increase transparency as to the scope and results of hedging programs. The new guidance amends the presentation and disclosure requirements, and changes how companies assess effectiveness. We adopted this guidance as of January 1, 2019 and applied to all existing hedges as of the adoption date.

We use forward exchange contracts to hedge our net investment in foreign operations against movements in exchange rates. The effective portion of the unrealized gains or losses on these contracts is recorded in foreign currency translation adjustment within accumulated other comprehensive income and remains there until either the sale or liquidation of the subsidiary. In conjunction with the January 1, 2019 adoption of ASU 2017-12, "Targeted Improvements to Accounting for Hedging Activities", we reclassified our presentation of the net cash inflows or outflows, which were received or paid in connection with foreign exchange contracts that hedge our net investment in foreign operations against movements in exchange rates, to investing cash flows on the consolidated statements of cash flows. As previously disclosed within our footnotes, these cash flows were formerly reported as operating activities. Prior period amounts have been reclassified from net cash provided by operating activities to net cash used in investing activities to conform with the current year presentation on the consolidated statements of cash flows. In connection with these forward exchange contracts, we recorded net cash outflows of $20 million during 2019, net cash inflows of $66 million during 2018 and net cash outflows of $64 million during 2017.

*Derivatives Hedging Relationships:*

The following table presents the effects of our interest rate swap agreements and our foreign currency foreign exchange contracts on our results of operations for the three years ended December 31 (in thousands):

| | Gain/(Loss) recognized in AOCI | | | | |
|---|---|---|---|---|---|
| | December 31, 2019 | | December 31, 2018 | | December 31, 2017 |
| **Cash Flow Hedge relationships** | | | | | |
| Interest rate swap agreements (a) | $ (3,925) | $ | (2,805) | $ | 6,679 |
| | | | | | |
| **Net Investment Hedge relationships** | | | | | |
| Foreign currency foreign exchange contracts | $ (18,328) | $ | 75,059 | $ | (64,333) |

(a) The amount of gain (loss) reclassified out of AOCI into interest expense, net was $3.4 million, $6.7 million and $(2.4) million during 2019, 2018 and 2017, respectively.

No other gains or losses were recognized in income related to derivatives in Subtopic 815-20.

*Fair Value Measurement*

Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. The following fair value hierarchy classifies the inputs to valuation techniques used to measure fair value into one of three levels:

- Level 1: Unadjusted quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than quoted prices that are observable for the asset or liability, either directly or indirectly. These included quoted prices for similar assets or liabilities in active markets and quoted prices for identical or similar assets or liabilities in markets that are not active.
- Level 3: Unobservable inputs that reflect the reporting entity's own assumptions.

111

CONFIDENTIAL

ADAMHS000029711

DEF-MDL-14396.00167

The following tables present the assets and liabilities recorded at fair value on a recurring basis:

| (in thousands) | Balance at December 31, 2019 | | Balance Sheet Location | Basis of Fair Value Measurement | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Level 1 | Level 2 | Level 3 |
| Assets: | | | | | | |
| Money market mutual funds | $ | 60,175 | Other assets | 60,175 | | |
| Certificates of deposit | | 2,200 | Other assets | 2,200 | | |
| Available for sale securities | | 70,478 | Other assets | 70,478 | | |
| Deferred compensation assets | | 35,510 | Other assets | 35,510 | | |
| Interest rate swap agreements | | - | Accounts Receivable, net | | - | |
| Foreign currency exchange contracts | | 10,343 | Other current assets | | 10,343 | |
| | $ | 178,706 | | 168,363 | 10,343 | - |
| Liabilities: | | | | | | |
| Deferred compensation liability | | 35,510 | Other noncurrent liabilities | 35,510 | | |
| | $ | 35,510 | | 35,510 | - | - |

| (in thousands) | Balance at December 31, 2018 | | Balance Sheet Location | Basis of Fair Value Measurement | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | Level 1 | Level 2 | Level 3 |
| Assets: | | | | | | |
| Money market mutual funds | $ | 106,530 | Other assets | 106,530 | | |
| Certificates of deposit | | 5,415 | Other assets | 5,415 | | |
| Available for sale securities | | 55,594 | Other assets | 55,594 | | |
| Deferred compensation assets | | 32,998 | Other assets | 32,998 | | |
| Interest rate swap agreements | | 3,925 | Accounts Receivable, net | | 3,925 | |
| Foreign currency exchange contracts | | 8,908 | Other current assets | | 8,908 | |
| | $ | 213,370 | | 200,537 | 12,833 | - |
| Liabilities: | | | | | | |
| Deferred compensation liability | $ | 32,998 | Other noncurrent liabilities | 32,998 | | |
| | $ | 32,998 | | 32,998 | - | - |

The fair value of our money market mutual funds, certificates of deposit and available for sale securities are computed based upon quoted market prices in active market. The fair value of deferred compensation assets and offsetting liability are computed based on market prices in an active market held in a rabbi trust. The fair value of our interest rate swaps are based on quotes from our counter parties. The fair value of our foreign currency exchange contracts is valued using quoted forward exchange rates and spot rates at the reporting date.

112

CONFIDENTIAL

DEF-MDL-14396.00168

ADAMHS000029712

## 4) LONG-TERM DEBT

A summary of long-term debt follows:

| | December 31, | | |
|---|---|---|---|
| | 2019 | | 2018 |
| | (amounts in thousands) | | |
| Long-term debt: | | | |
| Notes payable and Mortgages payable (including obligations under capitalized leases of $17,818 in 2019 and $19,941 in 2018) and term loans with varying maturities through 2044; weighted average interest rates of 8.0% in 2019 and 9.5% in 2018 (see Note 7 regarding capitalized leases) | $ 22,634 | $ | 20,159 |
| Revolving credit and on-demand credit facility | 30,900 | | 6,300 |
| Term Loan A | 1,950,000 | | 2,000,000 |
| Term Loan B | 495,000 | | 500,000 |
| Accounts receivable securitization program | 400,000 | | 390,000 |
| 4.75% Senior Secured Notes due 2022, including unamortized premium of $2,490 in 2019 and $3,460 in 2018 and net of unamortized discount of $70 in 2019 and $97 in 2018 | 702,420 | | 703,363 |
| 5.00% Senior Secured Notes due 2026 | 400,000 | | 400,000 |
| Total debt before unamortized financing costs | 4,000,954 | | 4,019,822 |
| Less-Unamortized financing costs | (16,827) | | (21,189) |
| Total debt after unamortized financing costs | 3,984,127 | | 3,998,633 |
| Less-Amounts due within one year (net of unamortized financing costs) | (87,550) | | (63,446) |
| Long-term debt | $ 3,896,577 | $ | 3,935,187 |

### Credit Facilities and Outstanding Debt Securities

On October 23, 2018, we entered into a Sixth Amendment (the "Sixth Amendment") to our credit agreement dated as of November 15, 2010, as amended on March 15, 2011, September 21, 2012, May 16, 2013, August 7, 2014 and June 7, 2016, among UHS, as borrower, the several banks and other financial institutions from time to time parties thereto, as lenders, JPMorgan Chase Bank, N.A., as administrative agent, and the other agents party thereto (the "Senior Credit Agreement"). The Sixth Amendment became effective on October 23, 2018.

The Sixth Amendment amended the Senior Credit Agreement to, among other things: (i) increase the aggregate amount of the revolving credit facility to $1 billion (increase of $200 million over the $800 million previous commitment); (ii) increase the aggregate amount of the tranche A term loan commitments to $2 billion (increase of approximately $290 million over the $1.71 billion of outstanding borrowings prior to the amendment); and; (iii) extended the maturity date of the revolving credit and tranche A term loan facilities to October 23, 2023 from August 7, 2019.

On October 31, 2018, we added a seven-year tranche B term loan facility in the aggregate principal amount of $500 million pursuant to the Senior Credit Agreement. The tranche B term loan matures on October 31, 2025. We used the proceeds to repay borrowings under the revolving credit facility, the Securitization (as defined below), to redeem our $300 million, 3.75% Senior Notes that were scheduled to mature in 2019 and for general corporate purposes.

As of December 31, 2019, we had no borrowings outstanding pursuant to our $1 billion revolving credit facility and we had $967 million of available borrowing capacity net of $2 million of outstanding letters of credit and $31 million of outstanding borrowings pursuant to a short-term credit facility.

Pursuant to the terms of the Sixth Amendment, the tranche A term loan, which had $1.950 billion of borrowings outstanding as of December 31, 2019, provides for eight installment payments of $12.5 million per quarter which commenced in March of 2019 and are scheduled to continue through December of 2020. Thereafter, payments of $25 million per quarter are scheduled, commencing in March of 2021 until maturity in October of 2023, when all outstanding amounts will be due.

The tranche B term loan, which had $495 million of borrowings outstanding as of December 31, 2019, provides for installment payments of $1.25 million per quarter, which commenced on March 31, 2019 and are scheduled to continue until maturity in October of 2025, when all outstanding amounts will be due.

Borrowings under the Senior Credit Agreement bear interest at our election at either (1) the ABR rate which is defined as the rate per annum equal to the greatest of (a) the lender's prime rate, (b) the weighted average of the federal funds rate, plus 0.5% and (c) one month LIBOR rate plus 1%, in each case, plus an applicable margin based upon our consolidated leverage ratio at the end of each quarter ranging from 0.375% to 0.625% for revolving credit and term loan A borrowings and 0.75% for tranche B borrowings, or

113

(2) the one, two, three or six month LIBOR rate (at our election), plus an applicable margin based upon our consolidated leverage ratio at the end of each quarter ranging from 1.375% to 1.625% for revolving credit and term loan A borrowings and 1.75% for the tranche B term loan. As of December 31, 2019, the applicable margins were 0.375% for ABR-based loans and 1.375% for LIBOR-based loans under the revolving credit and term loan A facilities. The revolving credit facility includes a $125 million sub-limit for letters of credit. The Senior Credit Agreement is secured by certain assets of the Company and our material subsidiaries (which generally excludes asset classes such as substantially all of the patient-related accounts receivable of our acute care hospitals, and certain real estate assets and assets held in joint-ventures with third parties) and is guaranteed by our material subsidiaries.

The Senior Credit Agreement includes a material adverse change clause that must be represented at each draw. The Senior Credit Agreement contains covenants that include a limitation on sales of assets, mergers, change of ownership, liens and indebtedness, transactions with affiliates, dividends and stock repurchases; and requires compliance with financial covenants including maximum leverage. We are in compliance with all required covenants as of December 31, 2019 and December 31, 2018.

In late April, 2018, we entered into the sixth amendment to our accounts receivable securitization program ("Securitization") dated as of October 27, 2010 with a group of conduit lenders, liquidity banks, and PNC Bank, National Association, as administrative agent, which provides for borrowings outstanding from time to time by certain of our subsidiaries in exchange for undivided security interests in their respective accounts receivable. The sixth amendment, among other things, extended the term of the Securitization program through April 26, 2021 and increased the borrowing capacity to $450 million (from $440 million previously). Although the program fee and certain other fees were adjusted in connection with the sixth amendment, substantially all other provisions of the Securitization program remained unchanged. Pursuant to the terms of our Securitization program, substantially all of the patient-related accounts receivable of our acute care hospitals ("Receivables") serve as collateral for the outstanding borrowings. We have accounted for this Securitization as borrowings. We maintain effective control over the Receivables since, pursuant to the terms of the Securitization, the Receivables are sold from certain of our subsidiaries to special purpose entities that are wholly-owned by us. The Receivables, however, are owned by the special purpose entities, can be used only to satisfy the debts of the wholly-owned special purpose entities, and thus are not available to us except through our ownership interest in the special purpose entities. The wholly-owned special purpose entities use the Receivables to collateralize the loans obtained from the group of third-party conduit lenders and liquidity banks. The group of third-party conduit lenders and liquidity banks do not have recourse to us beyond the assets of the wholly-owned special purpose entities that securitize the loans. At December 31, 2019, we had $400 million of outstanding borrowings pursuant to the terms of the Securitization and $50 million of available borrowing capacity.

As of December 31, 2019, we had combined aggregate principal of $1.1 billion from the following senior secured notes:

- $700 million aggregate principal amount of 4.75% senior secured notes due in August, 2022 ("2022 Notes") which were issued as follows:
    - $300 million aggregate principal amount issued on August 7, 2014 at par.
    - $400 million aggregate principal amount issued on June 3, 2016 at 101.5% to yield 4.35%.

- $400 million aggregate principal amount of 5.00% senior secured notes due in June, 2026 ("2026 Notes") which were issued on June 3, 2016.

Interest on the 2022 Notes is payable on February 1 and August 1 of each year until the maturity date of August 1, 2022. Interest on the 2026 Notes is payable on June 1 and December 1 until the maturity date of June 1, 2026. The 2022 Notes and 2026 Notes were offered only to qualified institutional buyers under Rule 144A and to non-U.S. persons outside the United States in reliance on Regulation S under the Securities Act of 1933, as amended (the "Securities Act"). The 2022 Notes and 2026 Notes have not been registered under the Securities Act and may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements.

On November 26, 2018 we redeemed the $300 million aggregate principal, 3.75% Senior Notes due in 2019. The 2019 Notes were redeemed for an aggregate price equal to 100.485% of the principal amount, resulting in a premium paid of approximately $1 million, plus accrued interest to the redemption date.

At each of December 31, 2019 and 2018, the carrying value and fair value of our debt were each approximately $4.0 billion. The fair value of our debt was computed based upon quotes received from financial institutions. We consider these to be "level 2" in the fair value hierarchy as outlined in the authoritative guidance for disclosures in connection with debt instruments.

114

ADAMHS000029714

The aggregate scheduled maturities of our total debt outstanding as of December 31, 2019 are as follows:

|  | (000s) |
|---|---|
| 2020 | $ 87,550 |
| 2021 | 456,697 |
| 2022 | 809,583 |
| 2023 | 1,757,475 |
| 2024 | 7,823 |
| Later | 881,826 |
| Total maturities before unamortized financing costs | 4,000,954 |
| Less-Unamortized financing costs | (16,827) |
| Total | $ 3,984,127 |

## 5) COMMON STOCK

### Dividends

In July, 2019, our Board of Directors authorized a $.10 per share increase in our quarterly cash dividend to $.20 per share effective with the dividend for the third quarter of 2019. Cash dividends of $0.60 per share ($53.0 million in the aggregate) were declared and paid during 2019, $0.40 per share ($37.3 million in the aggregate) were declared and paid during 2018 and $0.40 per share ($38.2 million in the aggregate) were declared and paid during 2017. All classes of our common stock have similar economic rights.

### Stock Repurchase Programs

In July, 2019, our Board of Directors authorized a $1.0 billion increase to our stock repurchase program, which increased the aggregate authorization to $2.7 billion from the previous $1.7 billion authorization approved in various increments since 2014. Pursuant to this program, which had an aggregate available repurchase authorization of $756.1 million as of December 31, 2019, shares of our Class B Common Stock may be repurchased, from time to time as conditions allow, on the open market or in negotiated private transactions. There is no expiration date for our stock repurchase programs.

The following schedule provides information related to our stock repurchase program for each of the three years ended December 31, 2019. During 2019, 5,397,753 shares ($706.2 million) were repurchased pursuant to the terms of our stock repurchase program and 336,943 shares ($47.7 million in the aggregate) were repurchased in connection with the income tax withholding obligations resulting from stock-based compensation programs. During 2018, 3,321,968 shares ($401.3 million) were repurchased pursuant to the terms of our stock repurchase program and 102,800 shares ($12.7 million in the aggregate) were repurchased in connection with the income tax withholding obligations resulting from stock-based compensation programs. During 2017, 2,960,843 shares ($322.2 million) were repurchased pursuant to the terms of our stock repurchase program and 305,278 shares ($34.2 million in the aggregate) were repurchased in connection with the income tax withholding obligations resulting from stock-based compensation programs.

CONFIDENTIAL

DEF-MDL-14396.00171

ADAMHS000029715

| | Additional dollars authorized for repurchase (in thousands) | Total number of shares purchased (a.) | Total number of shares cancelled | Average price paid per share for forfeited restricted shares | Total number of shares purchased as part of publicly announced programs | Average price paid per share for shares purchased as part of publicly announced program | Aggregate purchase price paid (in thousands) | Aggregate purchase price paid for shares purchased as part of publicly announced program | Maximum number of dollars that may yet be purchased under the program (in thousands) |
|---|---|---|---|---|---|---|---|---|---|
| Balance as of January 1, 2017 | | | | | | | | | $285,891 |
| 2017 | $ 400,000 | 3,266,121 | 10,791 | $ 0.01 | 2,960,843 | $ 108.83 | $ 356,413 | $ 322,231 | $363,660 |
| 2018 | $ 500,000 | 3,435,992 | 11,224 | $ 0.01 | 3,321,968 | $ 120.81 | $ 414,002 | $ 401,316 | $462,344 |
| 2019 | $1,000,000 | 5,762,409 | 27,713 | $ 0.01 | 5,397,753 | $ 130.84 | $ 753,928 | $ 706,221 | $756,123 |
| Total for three year period ended December 31, 2019 | $1,900,000 | 12,464,522 | 49,728 | $ 0.01 | 11,680,564 | $ 122.41 | $1,524,343 | $1,429,768 | |

(a.) Includes 27,713, 11,224 and 10,791 of restricted shares that were forfeited by former employees pursuant to the terms of our restricted stock purchase plan during 2019, 2018 and 2017, respectively.

*Stock-based Compensation Plans*

At December 31, 2019, we have a number of stock-based employee compensation plans. Pursuant to the FASB's guidance, we expense the grant-date fair value of stock options and other equity-based compensation pursuant to the straight-line method over the stated vesting period of the award using the Black-Scholes option-pricing model.

Pre-tax share-based compensation costs of $60.1 million during 2019, $61.1 million during 2018 and $54.3 million during 2017 were recognized related to outstanding stock options. In addition, pre-tax compensation costs of $9.3 million during 2019, $5.5 million during 2018 and $2.5 million during 2017 were recognized related to amortization of restricted stock and discounts provided in connection with shares purchased pursuant to our 2005 Employee Stock Purchase Plan. As of December 31, 2019, there was approximately $122.8 million of unrecognized compensation cost related to unvested stock options and restricted stock which is expected to be recognized over the remaining average vesting period of 2.6 years.

The expense associated with stock-based compensation arrangements is a non-cash charge. In the Consolidated Statements of Cash Flows, stock-based compensation expense is an adjustment to reconcile net income to cash provided by operating activities and aggregated to $69.4 million in 2019, $66.6 million in 2018 and $56.7 million in 2017. In connection with our January 1, 2017 adoption of ASU 2016-09, "Compensation-Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting", our provision for income taxes and our net income attributable to UHS were favorably impacted by $12.2 million during 2019, $1.2 million during 2018 and $22.1 million during 2017.

In 2005, we adopted the 2005 Stock Incentive Plan which was amended in 2008, 2010, 2015 and 2017 (the "Stock Incentive Plan"). An aggregate of 35.6 million shares of Class B Common Stock has been reserved under the Stock Incentive Plan. During 2019, 2018 and 2017, stock options, net of cancellations, of approximately 2.3 million, 2.2 million and 2.5 million, respectively, were granted. Stock options to purchase Class B Common Stock have been granted to our officers, key employees and members of our Board of Directors. Commencing in 2018, our key employees and non-executive officers began receiving a portion of their stock-based compensation in the form of restricted stock (as discussed below) in addition to receiving options to purchase Class B Common Stock.

The per option weighted-average grant-date fair value of options granted during 2019, 2018 and 2017 was $30.40, $28.19 and $27.05, respectively. All stock options were granted with an exercise price equal to the fair market value on the date of the grant. The majority of options are exercisable ratably over a four-year period beginning one year after the date of the grant. All outstanding options expire five years after the date of the grant. As of December 31, 2019, approximately 4.3 million shares of Class B Common Stock remain available for issuance pursuant to the Stock Incentive Plan.

The fair value of each option grant was estimated on the date of grant using the Black-Scholes option-pricing model. The following weighted average assumptions were derived from averaging the number of options granted during the most recent five-year period. The weighted-average assumptions reflected below were based upon twenty-nine option grants for the five-year period ending

116

CONFIDENTIAL

ADAMHS000029716

DEF-MDL-14396.00172

December 31, 2019, twenty-seven option grants for the five-year period ending December 31, 2018 and twenty-seven option grants for the five-year period ending December 31, 2017.

| Year Ended December 31, | 2019 | 2018 | 2017 |
|---|---|---|---|
| Expected volatility | 27% | 27% | 28% |
| Risk free Interest rate | 2% | 1% | 1% |
| Expected life (years) | 3.4 | 3.4 | 3.4 |
| Forfeiture rate | 9% | 13% | 10% |
| Dividend yield | 0.3% | 0.3% | 0.4% |

The risk-free rate is based on the U.S. Treasury zero coupon four year yield curve in effect at the time of grant. The expected life of the stock options granted was estimated using the historical behavior of employees. Expected volatility was based on historical volatility for a period equal to the stock option's expected life. Expected dividend yield is based on our dividend yield at the time of grant. The forfeiture rate is based upon the actual historical forfeitures utilizing the 5-year term of the option.

The table below summarizes our stock option activity during the year ended December 31, 2019:

| Outstanding Options | Number of Shares | | Weighted Average Exercise Price |
|---|---|---|---|
| Balance, January 1, 2019 | 9,674,791 | $ | 115.39 |
| Granted | 2,460,015 | $ | 134.39 |
| Exercised | (3,474,496) | $ | 106.01 |
| Cancelled | (527,134) | $ | 125.05 |
| Balance, December 31, 2019 | 8,133,176 | $ | 124.52 |
| Outstanding options vested and exercisable as of December 31, 2019 | 2,551,267 | $ | 119.86 |

The following table provides information about unvested options for the year ended December 31, 2019:

| | Shares | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested options as of January 1, 2019 | 5,950,612 | $ | 26.34 |
| Granted | 2,460,015 | $ | 30.40 |
| Vested | (2,310,396) | $ | 25.17 |
| Cancelled | (518,322) | $ | 28.07 |
| Unvested options as of December 31, 2019 | 5,581,909 | $ | 28.45 |

The following table provides information regarding all options outstanding at December 31, 2019:

| | Options Outstanding | Options Exercisable |
|---|---|---|
| Number of options outstanding | 8,133,176 | 2,551,267 |
| Weighted average exercise price | $ 124.52 | $ 119.86 |
| Aggregate intrinsic value as of December 31, 2019 | $154,591,751 | $60,222,515 |
| Weighted average remaining contractual life | 2.7 | 1.4 |

The total in-the-money value of all stock options exercised during the years ended December 31, 2019, 2018 and 2017 were $126.7 million, $39.9 million and $85.5 million, respectively.

117

CONFIDENTIAL

DEF-MDL-14396.00173

ADAMHS000029717

The weighted average remaining contractual life for options outstanding and weighted average exercise price per share for exercisable options at December 31, 2017, 2018 and 2019 were as follows:

| Year Ended: | Options Outstanding Shares | Weighted Average Exercise Price Per Share | Weighted Average Remaining Contractual Life (in Years) | Exercisable Options Shares | Weighted Average Exercise Price Per Share | Expected to Vest Options Shares | Weighted Average Exercise Price Per Share |
|---|---|---|---|---|---|---|---|
| 2017 | 9,639,949 | $ 112.40 | 2.9 | 2,869,346 | $ 100.51 | 5,031,122 | $ 118.17 |
| 2018 | 9,674,791 | 115.39 | 2.6 | 3,724,179 | 106.77 | 4,414,324 | 120.82 |
| 2019 | 8,133,176 | 124.52 | 2.7 | 2,551,267 | 119.86 | 5,073,423 | 126.62 |

Under our Amended and Restated 2010 Employees' Restricted Stock Purchase Plan (the "Restricted Stock Plan"), which allows eligible participants to purchase shares of Class B Common Stock at par value, subject to certain restrictions, 600,000 shares of Class B Common Stock have been reserved. During 2019, 2018 and 2017, restricted shares, net of cancellations, of approximately 117,467, 136,571, and 23,557, respectively, were granted and issued, with various ratable vesting periods ranging up to five years from the date of grant. The weighted-average grant-date fair value of the restricted shares granted during 2019, 2018 and 2017 was $133.98, $119.51 and $118.14, respectively. The fair value of each restricted stock grant was determined as the closing UHS market price on the date of grant. Restricted shares of Class B Common Stock have been granted to our officers and key employees.

In addition to the Stock Incentive Plan and the Restricted Stock Plan, we have our 2005 Employee Stock Purchase Plan (the "Employee Stock Plan") which allows eligible employees to purchase shares of Class B Common Stock at a ten percent discount. There were 82,449, 87,051 and 86,693 shares issued pursuant to the Employee Stock Purchase Plan during 2019, 2018 and 2017, respectively.

In connection with the Restricted Stock Plan and the Employee Stock Plan, we have reserved 2.6 million shares of Class B Common Stock for issuance and have issued approximately 1.8 million shares, net of cancellations, as of December 31, 2019. As of December 31, 2019, approximately 837,000 shares of Class B Common Stock remain available for issuance pursuant to these plans.

At December 31, 2019, 20,552,363 shares of Class B Common Stock were reserved for issuance upon conversion of shares of Class A, C and D Common Stock outstanding, for issuance upon exercise of options to purchase Class B Common Stock and for issuance of stock under other incentive plans. Class A, C and D Common Stock are convertible on a share for share basis into Class B Common Stock.

## 6) INCOME TAXES

Components of income tax expense/(benefit) are as follows (amounts in thousands):

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Current | | | |
| Federal | $ 225,663 | $ 195,862 | $ 352,433 |
| Foreign | 9,284 | 13,699 | 10,625 |
| State | 40,152 | 37,555 | 37,421 |
| | 275,099 | 247,116 | 400,479 |
| Deferred | | | |
| Federal | (27,073) | (6,216) | (36,998) |
| Foreign | 1,874 | (666) | 24 |
| State | (11,106) | (3,592) | 192 |
| | (36,305) | (10,474) | (36,782) |
| Total | $ 238,794 | $ 236,642 | $ 363,697 |

On December 22, 2017, the President of the United States signed into law comprehensive tax legislation commonly referred to as the Tax Cuts and Jobs Act of 2017 (the "TCJA-17"). The TCJA-17 made broad and complex changes to the U.S. tax code, including, but not limited to, (1) reducing the U.S. federal corporate tax rate from 35 percent to 21 percent; (2) requiring companies to pay a one-time transition tax on certain unrepatriated earnings of foreign subsidiaries; (3) generally eliminating U.S. federal income

118

taxes on dividends from foreign subsidiaries; (4) requiring a current inclusion in U.S. federal taxable income of certain earnings of controlled foreign corporations through the implementation of a territorial tax system; (5) creating a new limitation on deductible interest expense; and (6) limiting certain other deductions. We provided a provisional estimate of the effects of the TCJA-17 in the fourth quarter of 2017 financial statements. In the fourth quarter of 2018, we completed our analysis to determine the effects of the TCJA-17 in accordance with Staff Accounting Bulletin No. 118 ("SAB 118") as follows:

*Reduction of U.S. federal corporate tax rate:* The TCJA-17 reduces the corporate tax rate to 21 percent, effective January 1, 2018. Deferred income taxes are based on the estimated future tax effects of differences between the financial statement carrying amounts and the tax bases of assets and liabilities under the provisions of the enacted tax laws. For certain of our deferred tax assets and deferred tax liabilities, we recorded a provisional decrease of $97 million and $127 million, respectively, with a corresponding net adjustment to deferred tax benefit of $30 million for the year ended December 31, 2017. Upon completion of our 2017 U.S. Corporate Income Tax Return in the fourth quarter, an increase of $1 million attributable to certain deferred tax assets and a decrease of $5 million attributable to certain deferred tax liabilities was recorded resulting in an additional net deferred tax benefit of $6 million.

*Deemed Repatriation Transition Tax:* The Deemed Repatriation Transition Tax ("Transition Tax") is a tax on previously untaxed accumulated and current earnings and profits ("E&P") of certain of our foreign subsidiaries. The one-time Transition Tax is based upon the amount of post-1986 E&P of the relevant subsidiaries, the amount of non-U.S. income tax paid on such earnings, as well as other factors. We originally estimated and recorded a provisional Transition Tax obligation of $11.3 million. Upon completion of our 2017 U.S. Corporate Income Tax Return, the final Transition Tax increased by $100,000 for a total of $11.4 million.

The TCJA-17 contains two new anti-base erosion tax provisions, (1) the global intangible low-taxed income ("GILTI") provisions and (2) the base erosion and anti-abuse tax ("BEAT") provisions:

*GILTI:* The GILTI provisions require the inclusion of the earnings of certain foreign subsidiaries in excess of an acceptable rate of return on certain assets of the respective subsidiaries in our U.S. tax return for tax years beginning after December 31, 2017. An accounting policy election was made during 2018 to treat taxes related to GILTI as a period cost when the tax is incurred. We recorded a GILTI tax provision of zero and less than $1 million for the year ended December 31, 2019 and 2018, respectively.

*BEAT:* The BEAT provisions limit the deduction for U.S. tax base erosion related payments made by U.S. operations to related foreign affiliates. We were not subject to BEAT for the years ended December 31, 2019 and 2018.

The foreign provision for income taxes is based on foreign pre-tax earnings of $69 million in 2019, $84 million in 2018 and $70 million in 2017. Prior to the TCJA-17, no deferred taxes were provided related to unremitted earnings from foreign subsidiaries. As a result of the mandatory repatriation tax provisions of the Transition Tax included in the TCJA-17, all undistributed earnings from foreign subsidiaries as of December 31, 2017, were subject to tax. Going forward, we anticipate repatriating only previously taxed foreign earnings subjected to the mandatory repatriation tax as well as any future earnings that would qualify for a full dividend received deduction permitted under the TCJA-17 for distributions post-December 31, 2017. As of December 31, 2019, the amount of previously taxed earnings and earnings that would qualify for a full dividend received deduction total $113 million. At this time, there are no material tax effects related to future cash repatriation of undistributed foreign earnings. As such, we have not recognized a deferred tax liability related to existing undistributed earnings.

Our provision for income taxes for the year ended December 31, 2019, 2018 and 2017 included tax benefits of $12 million, $1 million and $22 million, respectively, related to the adoption of ASU 2016-09, which changes how companies account for certain aspects of share-based payments to employees. Under ASU 2016-09, excess tax benefits (when the deductible amount related to the settlement of employee equity awards for tax purposes exceeds the cumulative compensation cost recognized for financial reporting purposes) and deficiencies, if applicable, are recorded as a component of our tax provision.

A reconciliation between the federal statutory rate and the effective tax rate is as follows:

| | Year Ended December 31, | | |
| | 2019 | 2018 | 2017 |
|---|---|---|---|
| Federal statutory rate | 21.0% | 21.0% | 35.0% |
| State taxes, net of federal income tax benefit | 2.2% | 2.6% | 2.2% |
| Tax effects of foreign operations | -0.3% | -0.5% | -1.2% |
| Tax benefit from settlement of employee equity awards | -1.0% | -0.1% | -1.9% |
| Enactment of the TCJA-17 | 0.0% | -0.6% | -1.7% |
| Other items | 0.8% | 0.9% | 0.2% |
| Impact of income attributable to noncontrolling interests | -0.3% | -0.4% | -0.6% |
| Effective tax rate | 22.4% | 22.9% | 32.0% |

119

Our effective tax rates were 22.4%, 22.9% and 32.0% for the years ended December 31, 2019, 2018 and 2017, respectively. The decrease in our effective tax rate for the year ended December 31, 2019 as compared to 2018 is due primarily to tax benefits from employee share-based payments of $12 million and $1 million during the year ended December 2019 and 2018, respectively. The decrease in our effective tax rate for the year ended December 31, 2018 as compared to 2017 is due primarily to the net favorable impact of the enactment of the TCJA-17, as discussed above, partially offset by a $21 million unfavorable change in the tax benefit resulting from our January 1, 2017 adoption of ASU 2016-09.

Included in "Other current assets" on our Consolidated Balance Sheet are prepaid federal and state income taxes amounting to approximately $8 million and $24 million as of December 31, 2019 and 2018, respectively.

The components of deferred taxes are as follows (amounts in thousands):

| | Year Ended December 31, | | | | |
| | 2019 | | | 2018 | |
| | Assets | Liabilities | | Assets | Liabilities |
|---|---|---|---|---|---|
| Self-insurance reserves | $ 69,217 | $ | | $ 68,402 | $ |
| Compensation accruals | 70,680 | | | 74,124 | |
| Doubtful accounts and other reserves | 77,665 | | | 27,184 | |
| Other currently non-deductible accrued liabilities | 36,500 | | | 35,253 | |
| Depreciable and amortizable assets | | 275,901 | | | 257,896 |
| Operating lease liabilities | 76,164 | | | | |
| Right of use assets-operating leases | | 76,164 | | | |
| State and foreign net operating loss carryforwards and other state and foreign deferred tax assets | 87,662 | | | 86,315 | |
| Net pension liabilities – OCI only | 2,427 | | | 4,475 | |
| Other combined items – OCI only | | 0 | | | 929 |
| Other liabilities | | 1,855 | | | 2,045 |
| | $ 420,315 | $ 353,920 | | $ 295,753 | $ 260,870 |
| Valuation Allowance | (75,277) | 0 | | (79,264) | 0 |
| Total deferred income taxes | $ 345,038 | $ 353,920 | | $ 216,489 | $ 260,870 |

At December 31, 2019, state net operating loss carryforwards (losses originating in tax years beginning prior to January 1, 2018, expiring in years 2020 through 2038), and credit carryforwards available to offset future taxable income approximated $1.06 billion representing approximately $75 million in deferred state tax benefit (net of the federal benefit); and state related interest expense carryforwards approximated $116 million representing approximately $5 million in deferred state tax benefit (net of the federal benefit). At December 31, 2019, there were foreign net operating losses and credit carryforwards of approximately $36 million, most of which are carried forward indefinitely, representing approximately $8 million in deferred foreign tax benefit.

A valuation allowance is required when it is more likely than not that some portion of the deferred tax assets will not be realized. Based on available evidence, it is more likely than not that certain of our state tax benefits will not be realized. Therefore, valuation allowances of approximately $71 million and $75 million have been reflected as of December 31, 2019 and 2018, respectively. During 2019, the valuation allowance on these state tax benefits decreased by $4 million related to a change in state tax law. In addition, valuation allowances of approximately $4 million have been reflected as of December 31, 2019 and 2018 related to foreign net operating losses and credit carryforwards.

During 2019 and 2018, the estimated liabilities for uncertain tax positions (including accrued interest and penalties) were increased less than $1 million due to tax positions taken in the current and prior years. The balance at each of December 31, 2019 and 2018, if subsequently recognized, that would favorably affect the effective tax rate and the provision for income taxes is approximately $2 million and $1 million respectively.

We recognize accrued interest and penalties associated with uncertain tax positions as part of the tax provision. As of December 31, 2019 and 2018, we have accrued interest and penalties of less than $1 million as of each date. The U.S. federal statute of limitations remains open for the 2016 and subsequent years. Foreign and U.S. state and local jurisdictions have statutes of limitations generally ranging for 3 to 4 years. The statute of limitations on certain jurisdictions could expire within the next twelve months. It is reasonably possible that the amount of unrecognized tax benefits will change during the next 12 months, however, it is anticipated that any such change, if it were to occur, would not have a material impact on our results of operations.

120

The tabular reconciliation of unrecognized tax benefits for the years ended December 31, 2019, 2018 and 2017 is as follows (amounts in thousands):

|  | As of December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Balance at January 1, | $ 1,553 | $ 1,096 | $ 1,259 |
| Additions based on tax positions related to the current year | 500 | 500 | 500 |
| Additions for tax positions of prior years | 113 | 62 | 47 |
| Reductions for tax positions of prior years | 0 | 0 | 0 |
| Settlements | (2) | (105) | (710) |
| Balance at December 31, | $ 2,164 | $ 1,553 | $ 1,096 |

## 7) LEASE COMMITMENTS

In February 2016, the FASB issued ASU 2016-02 (Topic 842) "Leases." Topic 842 supersedes the lease requirements in Accounting Standards Codification Topic 840, "Leases." Under Topic 842, lessees are required to recognize assets and liabilities on the balance sheet for most leases and provide enhanced disclosures. Leases will be classified as either finance or operating.

We adopted Topic 842 effective January 1, 2019. We applied Topic 842 to all leases as of January 1, 2019 with comparative periods continuing to be reported under Topic 840. We have elected the practical expedient package to not reassess at adoption (i) expired or existing contracts for whether they are or contain a lease, (ii) the lease classification of any existing leases or (iii) initial indirect costs for existing leases. We have also elected the policy exemption that allows lessees to choose to not separate lease and non-lease components by class of underlying asset and are applying this expedient to all relevant asset classes.

We determine if an arrangement is or contains a lease at inception of the contract. Our right-of-use assets represent our right to use the underlying assets for the lease term and our lease liabilities represent our obligation to make lease payments arising from the leases. Right-of-use assets and lease liabilities are recognized at commencement date based on the present value of lease payments over the lease term. We use the implicit rate noted within the contract. If not readily available, we use our estimated incremental borrowing rate, which is derived using a collateralized borrowing rate for the same currency and term as the associated lease. A right-of-use asset and lease liability is not recognized for leases with an initial term of 12 months or less and we recognize lease expense for these leases on a straight-line basis over the lease term within lease and rental expense.

Our operating leases are primarily for real estate, including certain acute care facilities, off-campus outpatient facilities, medical office buildings, and corporate and other administrative offices. Our real estate lease agreements typically have initial terms of five to 10 years. These real estate leases may include one or more options to renew, with renewals that can extend the lease term from five to 10 years. The exercise of lease renewal options is at our sole discretion. When determining the lease term, we included options to extend or terminate the lease when it is reasonably certain that we will exercise that option.

Three of our hospital facilities are held under operating leases with Universal Health Realty Income Trust with two hospital terms expiring in 2021 and the third expiring in 2026 (see Note 9 for additional disclosure). We are also the lease of the real property of certain facilities (see Item 2. Properties for additional disclosure).

The components of lease expense for the year ended December 31, 2019 are as follows (in thousands):

|  | Twelve months ended December 31, |
|  | 2019 |
|---|---|
| Operating lease cost | $ 72,098 |
| Variable and short term lease cost (a) | 35,711 |
| Total lease and rental expense | $ 107,809 |
|  |  |
| Finance lease cost: |  |
| Amortization of property under capital lease | $ 1,877 |
| Interest on debt of property under capital lease | 1,876 |
| Total finance lease cost | $ 3,753 |

(a) Includes equipment, month-to-month and leases with a maturity of less than 12 months.

Supplemental cash flow information related to leases for the year ended December 31, 2019 are as follows (in thousands):

121

CONFIDENTIAL

DEF-MDL-14396.00177

ADAMHS000029721

|  | | Twelve months ended December 31, 2019 |
|---|---|---|
| Cash paid for amounts included in the measurement of lease liabilities: | | |
| Operating cash flows from operating leases | $ | 107,239 |
| Operating cash flows from finance leases | $ | 2,078 |
| Financing cash flows from finance leases | $ | 1,959 |
| Right-of-use assets obtained in exchange for lease obligations: | | |
| Operating leases | $ | 383,857 |
| Finance leases | | 0 |

Included in the $383.9 million of right-of-use assets obtained in exchange for operating lease obligations is $29.3 million of new and modified operating leases entered into during the year ended December 31, 2019.

Supplemental balance sheet information related to leases as of December 31, 2019 are as follows (in thousands):

|  | | December 31, 2019 |
|---|---|---|
| **Operating Leases** | | |
| Right of use assets-operating leases | $ | 326,518 |
| | | |
| Operating lease liabilities | $ | 56,442 |
| Operating lease liabilities noncurrent | | 270,076 |
| Total operating lease liabilities | $ | 326,518 |
| | | |
| **Finance Leases** | | |
| Property and equipment | $ | 38,582 |
| Accumulated depreciation | | (26,610) |
| Property and equipment, net | $ | 11,972 |
| | | |
| Current maturities of long-term debt | $ | 1,650 |
| Long-term debt | | 16,359 |
| Total finance lease liabilities | $ | 18,009 |
| | | |
| Weighted Average remaining lease term, years | | |
| Operating leases | | 9.7 |
| Finance leases | | 6.9 |
| | | |
| Weighted Average discount rate | | |
| Operating leases | | 4.7% |
| Finance leases | | 9.8% |

Future maturities of lease liabilities as of December 31, 2019 are as follows (in thousands):

|  | Operating Leases | | Finance Leases | |
|---|---|---|---|---|
| Year ending December 31, | | | | |
| 2020 | $ | 68,703 | $ | 3,375 |
| 2021 | | 62,017 | | 3,257 |
| 2022 | | 51,178 | | 3,559 |
| 2023 | | 46,327 | | 3,654 |
| 2024 | | 40,498 | | 3,752 |
| Later years | | 148,928 | | 8,380 |
| Total lease payments | | 417,651 | | 25,977 |
| less imputed interest | | (91,133) | | (7,968) |
| Total | $ | 326,518 | $ | 18,009 |

122

CONFIDENTIAL

DEF-MDL-14396.00178

ADAMHS000029722

We assumed no finance leases in 2019.

Future minimum rental payments under lease commitments with a term of more than one year as of December 31, 2018, prior to our adoption of ASC 842 are as follows (amounts in thousands):

| Year | Capital Leases | | Operating Leases | |
|---|---|---|---|---|
| 2019 | $ | 3,996 | $ | 72,353 |
| 2020 | | 3,345 | | 59,492 |
| 2021 | | 3,227 | | 48,891 |
| 2022 | | 3,508 | | 35,233 |
| 2023 | | 3,624 | | 28,839 |
| Later years | | 12,070 | | 123,039 |
| Total minimum rental | $ | 29,770 | $ | 367,847 |
| Less: Amount representing interest | | (9,829) | | |
| Present value of minimum rental commitments | | 19,941 | | |
| Less: Current portion of capital lease obligations | | (2,128) | | |
| Long-term portion of capital lease obligations | $ | 17,813 | | |

We assumed no capital lease obligations in 2018.  In the ordinary course of business, our facilities routinely lease equipment pursuant to new lease arrangements that will likely result in future lease and rental expense in excess of amounts indicated above.

## 8) COMMITMENTS AND CONTINGENCIES

### *Professional and General Liability, Workers' Compensation Liability*

The vast majority of our subsidiaries are self-insured for professional and general liability exposure up to: (i) $10 million and $3 million per occurrence, respectively, effective January, 2020 (professional liability claims are also subject to an additional annual aggregate self-insured retention of $2.5 million for claims in excess of $10 million); (ii) $5 million and $3 million per occurrence, respectively, during 2019, 2018 and 2017, and; (iii) $10 million and $3 million per occurrence, respectively, prior to 2017. These subsidiaries are provided with several excess policies through commercial insurance carriers which provide for coverage in excess of the applicable per occurrence self-insured retention or underlying policy limits up to $250 million per occurrence and in the aggregate for claims incurred after 2013 and up to $200 million per occurrence and in the aggregate for claims incurred from 2011 through 2013. We remain liable for 10%, up to an annual aggregate limitation of $5 million ($8.5 million for facilities located in the U.K.), of the claims paid pursuant to the commercially insured excess coverage. In addition, from time to time based upon marketplace conditions, we may elect to purchase additional commercial coverage for certain of our facilities or businesses. Our behavioral health care facilities located in the U.K. have policies through a commercial insurance carrier located in the U.K. that provides for £10 million of professional liability coverage and £25 million of general liability coverage.

As of December 31, 2019, the total accrual for our professional and general liability claims was $242 million, of which $42 million was included in current liabilities. As of December 31, 2018, the total accrual for our professional and general liability claims was $243 million, of which $42 million was included in current liabilities. As of December 31, 2017, the total accrual for our professional and general liability claims was $229 million, of which $54 million was included in current liabilities. Our consolidated results of operations during 2019 and 2018 were not materially impacted by adjustments to our prior year reserves for professional and general liability claims. During 2017, based upon a reserve analysis of our estimated future claims payments, we recorded an increase to our professional and general liability self-insurance reserves (relating to prior years) of $15 million.

As of December 31, 2019, the total accrual for our workers' compensation liability claims was $81 million, of which $40 million was included in current liabilities. As of December 31, 2018, the total accrual for our workers' compensation liability claims was $72 million, of which $40 million was included in current liabilities. As of December 31, 2017, the total accrual for our workers' compensation liability claims was $70 million, of which $35 million was included in current liabilities. Our consolidated results of operations during 2019, 2018 and 2017 were not materially impacted by adjustments to our prior year reserves for workers' compensation claims.

Below is a schedule showing the changes in our general and professional liability and workers' compensation reserves during the three years ended December 31, 2019 (amount in thousands):

123

CONFIDENTIAL

DEF-MDL-14396.00179

ADAMHS000029723

| | General and Professional Liability | Workers' Compensation | Total |
|---|---|---|---|
| Balance at January 1, 2017 | $ 207,459 | $ 67,356 | $ 274,815 |
| Plus: Accrued insurance expense, net of commercial premiums paid | 65,049 | 37,546 | 102,595 |
| Less: Payments made in settlement of self-insured claims | (43,817) | (35,371) | (79,188) |
| Balance at January 1, 2018 | 228,691 | 69,531 | 298,222 |
| Plus: Accrued insurance expense, net of commercial premiums paid | 54,387 | 38,476 | 92,863 |
| Less: Payments made in settlement of self-insured claims | (40,027) | (36,117) | (76,144) |
| Balance at January 1, 2019 | 243,051 | 71,890 | 314,941 |
| Plus: Accrued insurance expense, net of commercial premiums paid | 56,452 | 49,220 | 105,672 |
| Less: Payments made in settlement of self-insured claims | (57,683) | (40,106) | (97,789) |
| Balance at December 31, 2019 | $ 241,820 | $ 81,004 | $ 322,824 |

Our estimated liability for self-insured professional and general liability claims is based on a number of factors including, among other things, the number of asserted claims and reported incidents, estimates of losses for these claims based on recent and historical settlement amounts, estimates of incurred but not reported claims based on historical experience, and estimates of amounts recoverable under our commercial insurance policies. While we continuously monitor these factors, our ultimate liability for professional and general liability claims could change materially from our current estimates due to inherent uncertainties involved in making this estimate. Given our significant self-insured exposure for professional and general liability claims, there can be no assurance that a sharp increase in the number and/or severity of claims asserted against us will not have a material adverse effect on our future results of operations. Although we are unable to predict whether or not our future financial statements will include adjustments to our prior year reserves for self-insured general and professional and workers' compensation claims, given the relatively unpredictable nature of the these potential liabilities and the factors impacting these reserves, as discussed above, it is reasonably likely that our future financial results may include material adjustments to prior period reserves.

*Property Insurance:*

We have commercial property insurance policies for our properties covering catastrophic losses, including windstorm damage, up to a $1 billion policy limit, subject to a deductible ranging from $50,000 to $250,000 per occurrence. Losses resulting from named windstorms are subject to deductibles between 3% and 5% of the total insurable value of the property. In addition, we have commercial property insurance policies covering catastrophic losses resulting from earthquake and flood damage, each subject to aggregated loss limits (as opposed to per occurrence losses). Commercially insured earthquake coverage for our facilities is subject to various deductibles and limitations including: (i) $500 million limitation for our facilities located in Nevada; (ii) $130 million limitation for our facilities located in California; (iii) $100 million limitation for our facilities located in fault zones within the United States; (iv) $40 million limitation for our facilities located in Puerto Rico, and; (v) $250 million limitation for many of our facilities located in other states. Our commercially insured flood coverage has a limit of $100 million annually. There is also a $10 million sublimit for one of our facilities located in Houston, Texas, and a $1 million sublimit for our facilities located in Puerto Rico. Deductibles for flood losses vary in amount, up to a maximum of $500,000, based upon location of the facility. Since certain of our facilities have been designated by our insurer as flood prone, we have elected to purchase policies from The National Flood Insurance Program. Property insurance for our behavioral health facilities located in the U.K. are provided on an all risk basis up to a £1.29 billion policy limit, with coverage caps per location, that includes coverage for real and personal property as well as business interruption losses.

*Other Contractual Commitments:*

In addition to our long-term debt obligations as discussed in Note 4 - *Long-Term Debt* and our operating lease obligations as discussed in Note 7 - *Lease Commitments*, we have various other contractual commitments outstanding as of December 31, 2019 as follows: (i) other combined estimated future purchase obligations of $293 million related to a long-term contract with third-parties consisting primarily of certain revenue cycle data processing services for our acute care facilities ($37 million), expected future costs to be paid to a third-party vendor in connection with the ongoing operation of an electronic health records application and purchase implementation of a revenue cycle and other applications for our acute care facilities ($219 million), and other software applications ($37 million); (ii) estimated construction commitment of $125 million representing our share of the construction costs of five behavioral health care facilities, that we are required to build pursuant to joint-venture agreements with third-parties, that are under construction and scheduled to be completed at various times in 2020, 2021 and 2022; (iii) combined estimated future payments of $189 million related to our non-contributory, defined benefit pension plan ($169 million consisting of estimated payments through

124

CONFIDENTIAL

ADAMHS000029724

DEF-MDL-14396.00180

2079) and other retirement plan liabilities ($20 million), and; (iv) accrued and unpaid estimated claims expense incurred in connection with our commercial health insurers and self-insured employee benefit plans ($87 million).

*Legal Proceedings*

We operate in a highly regulated and litigious industry which subjects us to various claims and lawsuits in the ordinary course of business as well as regulatory proceedings and government investigations. These claims or suits include claims for damages for personal injuries, medical malpractice, commercial/contractual disputes, wrongful restriction of, or interference with, physicians' staff privileges, and employment related claims. In addition, health care companies are subject to investigations and/or actions by various state and federal governmental agencies or those bringing claims on their behalf. Government action has increased with respect to investigations and/or allegations against healthcare providers concerning possible violations of fraud and abuse and false claims statutes as well as compliance with clinical and operational regulations. Currently, and from time to time, we and some of our facilities are subjected to inquiries in the form of subpoenas, Civil Investigative Demands, audits and other document requests from various federal and state agencies. These inquiries can lead to notices and/or actions including repayment obligations from state and federal government agencies associated with potential non-compliance with laws and regulations. Further, the federal False Claims Act allows private individuals to bring lawsuits (qui tam actions) against healthcare providers that submit claims for payments to the government. Various states have also adopted similar statutes. When such a claim is filed, the government will investigate the matter and decide if they are going to intervene in the pending case. These qui tam lawsuits are placed under seal by the court to comply with the False Claims Act's requirements. If the government chooses not to intervene, the private individual(s) can proceed independently on behalf of the government. Health care providers that are found to violate the False Claims Act may be subject to substantial monetary fines/penalties as well as face potential exclusion from participating in government health care programs or be required to comply with Corporate Integrity Agreements as a condition of a settlement of a False Claims Act matter. In September 2014, the Criminal Division of the Department of Justice ("DOJ") announced that all qui tam cases will be shared with their Division to determine if a parallel criminal investigation should be opened. The DOJ has also announced an intention to pursue civil and criminal actions against individuals within a company as well as the corporate entity or entities. In addition, health care facilities are subject to monitoring by state and federal surveyors to ensure compliance with program Conditions of Participation. In the event a facility is found to be out of compliance with a Condition of Participation and unable to remedy the alleged deficiency(s), the facility faces termination from the Medicare and Medicaid programs or compliance with a System Improvement Agreement to remedy deficiencies and ensure compliance.

The laws and regulations governing the healthcare industry are complex covering, among other things, government healthcare participation requirements, licensure, certification and accreditation, privacy of patient information, reimbursement for patient services as well as fraud and abuse compliance. These laws and regulations are constantly evolving and expanding. Further, the Legislation has added additional obligations on healthcare providers to report and refund overpayments by government healthcare programs and authorizes the suspension of Medicare and Medicaid payments "pending an investigation of a credible allegation of fraud." We monitor our business and have developed an ethics and compliance program with respect to these complex laws, rules and regulations. Although we believe our policies, procedures and practices comply with government regulations, there is no assurance that we will not be faced with the sanctions referenced above which include fines, penalties and/or substantial damages, repayment obligations, payment suspensions, licensure revocation, and expulsion from government healthcare programs. Even if we were to ultimately prevail in any action brought against us or our facilities or in responding to any inquiry, such action or inquiry could have a material adverse effect on us.

Certain legal matters are described below:

*Government Investigations:*

*UHS Behavioral Health*

In February, 2013, the Office of Inspector General for the United States Department of Health and Human Services ("OIG") served a subpoena requesting various documents from January, 2008 to the date of the subpoena directed at Universal Health Services, Inc. ("UHS") concerning it and UHS of Delaware, Inc., and certain UHS owned behavioral health facilities including: Keys of Carolina, Old Vineyard Behavioral Health, The Meadows Psychiatric Center, Streamwood Behavioral Health, Hartgrove Hospital, Rock River Academy and Residential Treatment Center, Roxbury Treatment Center, Harbor Point Behavioral Health Center, f/k/a The Pines Residential Treatment Center, including the Crawford, Brighton and Kempsville campuses, Wekiva Springs Center and River Point Behavioral Health.  Prior to receipt of this subpoena, some of these facilities had received independent subpoenas from state or federal agencies. Subsequent to the February 2013 subpoenas, some of the facilities above have received additional, specific subpoenas or other document and information requests. In addition to the OIG, the DOJ and various U.S. Attorneys' and state Attorneys' General Offices are also involved in this matter. Since February 2013, additional facilities have also received subpoenas and/or document and information requests or we have been notified are included in the omnibus investigation.  Those facilities include: National Deaf Academy, Arbour-HRI Hospital, Behavioral Hospital of Bellaire, St. Simons By the Sea, Turning Point Care Center, Salt Lake Behavioral Health, Central Florida Behavioral Hospital, University Behavioral Center, Arbour Hospital, Arbour-Fuller Hospital, Pembroke Hospital, Westwood Lodge, Coastal Harbor Health System, Shadow Mountain Behavioral Health, Cedar

125

ADAMHS000029725

Hills Hospital, Mayhill Hospital, Southern Crescent Behavioral Health (Anchor Hospital and Crescent Pines campuses), Valley Hospital (AZ), Peachford Behavioral Health System of Atlanta, University Behavioral Health of Denton, El Paso Behavioral Health System, Newport News Behavioral Health Center, The Hughes Center, Forest View Hospital and Havenwyck Hospital.

In October, 2013, we were advised that the DOJ's Criminal Frauds Section had opened an investigation of River Point Behavioral Health and Wekiva Springs Center. We were subsequently notified that the Criminal Frauds section had opened investigations of National Deaf Academy, Hartgrove Hospital and UHS as a corporate entity. In April 2017, the DOJ's Criminal Division issued a subpoena requesting documentation from Shadow Mountain Behavioral Health. In August 2017, Kempsville Center of Behavioral Health (a part of Harbor Point Behavioral Health previously identified above) received a subpoena requesting documentation. We have recently been advised that the investigations being conducted by the DOJ's Criminal Frauds Section and corresponding U.S. Attorneys' Offices, and of UHS and the above referenced facilities, have been closed.

In April, 2014, the Centers for Medicare and Medicaid Services ("CMS") instituted a Medicare payment suspension at River Point Behavioral Health in accordance with federal regulations regarding suspension of payments during certain investigations. The Florida Agency for Health Care Administration ("AHCA") subsequently issued a Medicaid payment suspension for the facility. River Point Behavioral Health submitted a rebuttal statement disputing the basis of the suspension and requesting revocation of the suspension. Notwithstanding, CMS continued the payment suspension. River Point Behavioral Health provided additional information to CMS in an effort to obtain relief from the payment suspension but the Medicare suspension remains in effect. In June 2017, AHCA advised that while they were maintaining the suspension for dual eligible and cross-over Medicare beneficiaries, the Medicaid payment suspension was lifted effective June 27, 2017. From inception through December 31, 2019, the aggregate funds withheld from us in connection with the River Point Behavioral Health payment suspension amounted to approximately $8.6 million. We anticipate a resolution of the payment suspension will be part of the overall settlement agreement(s) to be drafted and finalized. Although the operating results of River Point Behavioral Health did not have a material impact on our consolidated results of operations during 2019, 2018 or 2017, the payment suspension has had a material adverse effect on the facility's results of operations and financial condition.

The DOJ has advised us that the civil aspect of the coordinated investigation referenced above is a False Claims Act investigation focused on billings submitted to government payers in relation to services provided at those facilities. While there have been various matters raised by DOJ during the pendency of this investigation, DOJ Civil has advised that the focus of their investigation is on medical necessity issues and billing for services not eligible for payment due to non-compliance with regulatory requirements relating to, among other things, admission eligibility, discharge decisions, length of stay and patient care issues. It is our understanding that the DOJ Criminal Fraud Section was investigating similar issues prior to the closure of their investigation. UHS denies any fraudulent billings were submitted to government payers.

In July 2019, we reached an agreement in principle with the DOJ's Civil Division, and on behalf of various states' attorneys general offices, to resolve the civil aspects of the government's investigation of our behavioral health care facilities for $127 million subject to requisite approvals and preparation and execution of definitive settlement and related agreements. We are also negotiating a corporate integrity agreement with the Office of Inspector General for the United States Department of Health and Human Services ("OIG") which we expect will be part of the overall settlement of this matter.

In connection with this agreement in principle, during 2019, we recorded a pre-tax increase of approximately $11 million to the reserve established in connection with the civil aspects of these matters ("DOJ Reserve"), which includes related fees and costs due to or on behalf of third-parties. The aggregate pre-tax DOJ Reserve amounted to $134 million as of December 31, 2019 and $123 million as of December 31, 2018 (including $102 million recorded during 2018).

In late August, 2019, we received the initial draft of the settlement agreement from the DOJ's Civil Division. Negotiations regarding the terms and conditions of the settlement agreement continue. Based upon the terms and provisions included in the draft settlement agreement, and related subsequent discussions, our 2019 financial statements include an unfavorable provision for income taxes of approximately $6 million resulting from the net estimated federal and state income taxes due on the portion of the pre-tax DOJ Reserve that is estimated to be non-deductible for income tax purposes.

Since the agreement in principle with the DOJ's Civil Division is subject to certain required approvals and negotiation and execution of definitive settlement agreements, as well as negotiation and execution of a corporate integrity agreement with the OIG, we can provide no assurance that definitive agreements will ultimately be finalized. We therefore can provide no assurance that final amounts paid in settlement or otherwise, or associated costs, or the income tax deductibility of such payments, will not differ materially from our established reserve and assumptions related to income tax deductibility.

*DOJ investigation of Turning Point Hospital.*

During the fourth quarter of 2018, we were notified that the DOJ Civil Division in conjunction with the U.S. Attorney's Office for the Northern District of Georgia and the Georgia Attorney General's Office opened an investigation of Turning Point Hospital in Moultrie, GA. The DOJ Civil Division has advised us that they are primarily investigating transportation and housing financial assistance provided to patients receiving treatment at the facility. The DOJ issued a civil investigative demand to the facility requesting various documents and other information. In September, 2019, we reached a settlement in principle of this matter pending

126

negotiation, finalization and execution of definitive settlement agreements. As of December 31, 2019, our financial statements include an estimated reserve in connection with the potential settlement of this matter, which did not have material impact on our results of operations and financial condition.

*Litigation:*

*U.S. ex rel Escobar v. Universal Health Services, Inc. et.al.*

This is a False Claims Act case filed against Universal Health Services, Inc., UHS of Delaware, Inc. and HRI Clinics, Inc. d/b/a Arbour Counseling Services in U.S. District Court for the District of Massachusetts. This qui tam action primarily alleges that Arbour Counseling Services failed to appropriately supervise certain clinical providers in contravention of regulatory requirements and the submission of claims to Medicaid were subsequently improper. Relators make other claims of improper billing to Medicaid associated with alleged failures of Arbour Counseling to comply with state regulations. The U.S. Attorney's Office and the Massachusetts Attorney General's Office initially declined to intervene. UHS filed a motion to dismiss and the trial court originally granted the motion dismissing the case. The First Circuit Court of Appeals ("First Circuit") reversed the trial court's dismissal of the case. The United States Supreme Court subsequently vacated the First Circuit's opinion and remanded the case for further consideration under the new legal standards established by the Supreme Court for False Claims Act cases. During the 4th quarter of 2016, the First Circuit issued a revised opinion upholding their reversal of the trial court's dismissal. The case was then remanded to the trial court for further proceedings. In January 2017, the U.S. Attorney's Office and Massachusetts Attorney General's Office advised of the potential for intervention in the case. The Massachusetts Attorney General's Office subsequently filed its motion to intervene which was granted and, in April 2017, filed their Complaint in Intervention. We have defended this case vigorously. This matter is included in the above-mentioned agreement in principle reached with the DOJ's Civil Division, and on behalf of various states' attorneys general offices, to resolve the civil aspects of the government's investigation of our behavioral health care facilities, subject to requisite approvals and preparation and execution of definitive settlement and related agreements.

*Shareholder Class Action*

In December 2016 a purported shareholder class action lawsuit was filed in U.S. District Court for the Central District of California against UHS and certain UHS officers alleging violations of the federal securities laws. The case was originally filed as Heed v. Universal Health Services, Inc. et. al. (Case No. 2:16-CV-09499-PSG-JC). The court subsequently appointed Teamsters Local 456 Pension Fund and Teamsters Local 456 Annuity Fund to serve as lead plaintiffs. The case has been transferred to the U.S. District Court for the Eastern District of Pennsylvania and the style of the case has been changed to Teamsters Local 456 Pension Fund, et. al. v. Universal Health Services, Inc. et. al. (Case No. 2:17-CV-02817-LS). In September, 2017, Teamsters Local 456 Pension Fund filed an amended complaint. The amended class action complaint alleges violations of federal securities laws relating to disclosures made in public filings associated with alleged practices and operations at our behavioral health facilities. Plaintiffs seek monetary damages for shareholders during the defined class period as a result of the decrease in share price following various public disclosures or reports. In December, 2017, we filed a motion to dismiss the amended complaint. In August, 2019, the court granted our motion to dismiss. Plaintiffs have filed a motion with the court seeking leave to file a second amended complaint. Should the court deny plaintiffs' motion, we anticipate an appeal of the dismissal of the case. We deny liability and intend to defend ourselves vigorously. At this time, we are uncertain as to potential liability or financial exposure, if any, which may be associated with this matter.

*Shareholder Derivative Cases*

In March 2017, a shareholder derivative suit was filed by plaintiff David Heed in the Court of Common Pleas of Philadelphia County. A notice of removal to the United States District Court for the Eastern District of Pennsylvania was filed (Case No. 2:17-cv-01476-LS). Plaintiff filed a motion to remand. In December 2017, the Court denied plaintiff's motion to remand and has retained the case in federal court. In May, June and July 2017, additional shareholder derivative suits were filed in the United States District Court for the Eastern District of Pennsylvania. The plaintiffs in those cases are: Central Laborers' Pension Fund (Case No. 17-cv-02187-LS); Firemen's Retirement System of St. Louis (Case No. 17—cv-02317-LS); Waterford Township Police & Fire Retirement System (Case No. 17-cv-02595-LS); and Amalgamated Bank Longview Funds (Case No. 17-cv-03404-LS). The Fireman's Retirement System case has since been voluntarily dismissed. The federal court has consolidated all of the cases pending in the Eastern District of Pennsylvania and has appointed co-lead plaintiffs and co-lead counsel. Lead Plaintiffs have filed a consolidated, amended complaint. We have filed a motion to dismiss the amended complaint. In addition, a shareholder derivative case was filed in Chancery Court in Delaware by the Delaware County Employees' Retirement Fund (Case No. 2017-0475-JTL). In December 2017, the Chancery Court stayed this case pending resolution of other contemporaneous matters. Each of these cases have named certain current and former members of the Board of Directors individually and certain officers of Universal Health Services, Inc. as defendants. UHS has also been named as a nominal defendant in these cases. The derivative cases make substantially similar allegations and claims as the shareholder class action relating to practices at our behavioral health facilities and board and corporate oversight of these facilities as well as claims relating to the stock trading by the individual defendants and company repurchase of shares during the relevant time period. The cases make claims of breaches of fiduciary duties by the named board members and officers; alleged violations of federal securities laws; and common law causes of action against the individual defendants including unjust enrichment, corporate waste, abuse of control, constructive fraud and gross mismanagement. The cases seek monetary damages allegedly incurred by the company; restitution and disgorgement of profits, benefits and other compensation from the individual defendants and various forms of equitable

127

ADAMHS000029727

relief relating to corporate governance matters. In August, 2019, the court granted our motion to dismiss. Plaintiffs have filed a motion with the court seeking leave to file a second amended complaint. Should the court deny plaintiffs' motion, we anticipate an appeal of the dismissal of the case. The defendants deny liability and intend to defend these cases vigorously. At this time, we are uncertain as to potential liability or financial exposure, if any, which may be associated with these matters.

*The George Washington University v. Universal Health Services, Inc., et. al.*

In December 2019, The George Washington University ("University") filed a lawsuit in the Superior Court for the District of Columbia against Universal Health Services, Inc. as well as certain subsidiaries and individuals associated with the ownership and management of The George Washington University Hospital ("GW Hospital") in Washington, D.C. (case No. 2019 CA 008019 B). The lawsuit claims that UHS failed to provide sufficient financial compensation to the University under the terms of various agreements entered into in 1997 between the University and UHS for the joint venture ownership of GW Hospital. The lawsuit includes claims for breach of contract, breach of fiduciary duty, and unjust enrichment. We deny liability and intend to defend this matter vigorously. At this time, we are uncertain as to potential liability or financial exposure, if any, which may be associated with this matter.

*Disproportionate Share Hospital Payment Matter:*

In late September, 2015, many hospitals in Pennsylvania, including certain of our behavioral health care hospitals located in the state, received letters from the Pennsylvania Department of Human Services (the "Department") demanding repayment of allegedly excess Medicaid Disproportionate Share Hospital payments ("DSH"), primarily consisting of managed care payments characterized as DSH payments, for the federal fiscal year ("FFY") 2011 amounting to approximately $4 million in the aggregate. Since that time, certain of our behavioral health care hospitals in Pennsylvania have received similar requests for repayment for alleged DSH overpayments for FFYs 2012 through 2015. For FFY 2012, the claimed overpayment amounts to approximately $4 million. For FFY 2013, the claimed overpayments were initially approximately $7 million but have since been reduced to approximately $2 million due to a change in the Department's calculations of the hospital specific DSH upper payment limit. For FFY 2014, the claimed overpayments were approximately $7 million and for FFY 2015, the claimed overpayments were approximately $5 million. We filed administrative appeals for all of our facilities contesting the recoupment efforts for FFYs 2011 through 2015 as we believe the Department's calculation methodology is inaccurate and conflicts with applicable federal and state laws and regulations. The Department has agreed to postpone the recoupment of the state's share of the DSH payments until all hospital appeals are resolved but started recoupment of the federal share. We understand that starting in FFY 2016, the first full fiscal year after the January 1, 2015 effective date of Medicaid expansion in Pennsylvania, the Department will no longer characterize managed care payments received by the hospitals as DSH payments. We can provide no assurance that we will ultimately be successful in our legal and administrative appeals related to the Department's repayment demands. If our legal and administrative appeals are unsuccessful, our future consolidated results of operations and financial condition could be adversely impacted by these repayments.

*Other Matters:*

Various other suits, claims and investigations, including government subpoenas, arising against, or issued to, us are pending and additional such matters may arise in the future. Management will consider additional disclosure from time to time to the extent it believes such matters may be or become material. The outcome of any current or future litigation or governmental or internal investigations, including the matters described above, cannot be accurately predicted, nor can we predict any resulting penalties, fines or other sanctions that may be imposed at the discretion of federal or state regulatory authorities. We record accruals for such contingencies to the extent that we conclude it is probable that a liability has been incurred and the amount of the loss can be reasonably estimated. No estimate of the possible loss or range of loss in excess of amounts accrued, if any, can be made at this time regarding the matters described above or that are otherwise pending because the inherently unpredictable nature of legal proceedings may be exacerbated by various factors, including, but not limited to: (i) the damages sought in the proceedings are unsubstantiated or indeterminate; (ii) discovery is not complete; (iii) the matter is in its early stages; (iv) the matters present legal uncertainties; (v) there are significant facts in dispute; (vi) there are a large number of parties, or; (vii) there is a wide range of potential outcomes. It is possible that the outcome of these matters could have a material adverse impact on our future results of operations, financial position, cash flows and, potentially, our reputation.

## 9) RELATIONSHIP WITH UNIVERSAL HEALTH REALTY INCOME TRUST AND OTHER RELATED PARTY TRANSACTIONS

*Relationship with Universal Health Realty Income Trust:*

At December 31, 2019, we held approximately 5.7% of the outstanding shares of Universal Health Realty Income Trust (the "Trust"). We serve as Advisor to the Trust under an annually renewable advisory agreement, which is scheduled to expire on December 31st of each year, pursuant to the terms of which we conduct the Trust's day-to-day affairs, provide administrative services and present investment opportunities. The advisory agreement was Amended and Restated effective January 1, 2019. Among other things, the Amended and Restated Advisory Agreement (the "Agreement") eliminated the 20% annual incentive fee clause which we were previously entitled to under certain conditions (the incentive fee requirements have never been achieved). The advisory agreement was renewed by the Trust for 2020 at the same rate as the prior three years, providing for an advisory computation at 0.70%

128

ADAMHS000029728

of the Trust's average invested real estate assets. We earned an advisory fee from the Trust, which is included in net revenues in the accompanying consolidated statements of income, of approximately $4.0 million during 2019, $3.8 million during 2018 and $3.6 million during 2017.

In addition, certain of our officers and directors are also officers and/or directors of the Trust. Management believes that it has the ability to exercise significant influence over the Trust, therefore we account for our investment in the Trust using the equity method of accounting.

Our pre-tax share of income from the Trust was $1.1 million and $1.4 million during 2019 and 2018, respectively, which are included in other income, net, on the accompanying consolidated statements of income for each year. Our pre-tax share of income from the Trust was $2.6 million during 2017, which is included in net revenues in the accompanying consolidated statements of income. Included in our share of the Trust's income for 2017 was a gain realized by the Trust in connection with a divestiture of property that was completed during the first quarter of 2017, as well as gain recorded in connection with hurricane-related insurance proceeds. We received dividends from the Trust amounting to $2.1 million during each of 2019, 2018 and 2017.

The carrying value of our investment in the Trust was $6.4 million and $7.5 million at December 31, 2019 and 2018, respectively, and is included in other assets in the accompanying consolidated balance sheets. The market value of our investment in the Trust was $92.4 million at December 31, 2019 and $48.3 million at December 31, 2018, based on the closing price of the Trust's stock on the respective dates.

The Trust commenced operations in 1986 by purchasing certain hospital properties from us and immediately leasing the properties back to our respective subsidiaries. Most of the leases were entered into at the time the Trust commenced operations and provided for initial terms of 13 to 15 years with up to six additional 5-year renewal terms. Each lease also provided for additional or bonus rental, as discussed below. The base rents are paid monthly and the bonus rents are computed and paid on a quarterly basis, based upon a computation that compares current quarter revenue to a corresponding quarter in the base year. The leases with those subsidiaries are unconditionally guaranteed by us and are cross-defaulted with one another.

Total rent expense under the operating leases on the three hospital facilities with the Trust was $16.4 million during 2019 and $16.0 million during each of 2018 and 2017. Pursuant to the terms of the three hospital leases with the Trust, we have the option to renew the leases at the lease terms described above by providing notice to the Trust at least 90 days prior to the termination of the then current term. We also have the right to purchase the respective leased hospitals at the end of the lease terms or any renewal terms at their appraised fair market value as well as purchase any or all of the three leased hospital properties at the appraised fair market value upon one month's notice should a change of control of the Trust occur. In addition, we have rights of first refusal to: (i) purchase the respective leased facilities during and for 180 days after the lease terms at the same price, terms and conditions of any third-party offer, or; (ii) renew the lease on the respective leased facility at the end of, and for 180 days after, the lease term at the same terms and conditions pursuant to any third-party offer.

The table below details the renewal options and terms for each of our three acute care hospital facilities leased from the Trust:

| Hospital Name | Annual Minimum Rent | End of Lease Term | Renewal Term (years) |
|---|---|---|---|
| McAllen Medical Center | $ 5,485,000 | December, 2026 | 5 (a) |
| Wellington Regional Medical Center | $ 3,030,000 | December, 2021 | 10 (b) |
| Southwest Healthcare System, Inland Valley Campus | $ 2,648,000 | December, 2021 | 10 (b) |

(a) We have one 5-year renewal option at existing lease rates (through 2031).
(b) We have two 5-year renewal options at fair market value lease rates (2022 through 2031).

In addition, certain of our subsidiaries are tenants in several medical office buildings ("MOBs") and two free-standing emergency departments owned by the Trust or by limited liability companies in which the Trust holds 95% to 100% of the ownership interest.

During the third quarter of 2019, the Trust commenced construction on a new 75,000 rentable square feet MOB that will be located on the campus of Texoma Medical Center, a hospital that is owned and operated by one of our subsidiaries. In connection with this MOB, a master flex lease has been executed between a wholly-owned subsidiary of ours and a Trust limited partnership that owns the MOB. Pursuant to the terms of this master flex lease, our subsidiary will master lease approximately 50% of the rentable square feet of the MOB, which could be reduced during the term if certain conditions are met, for a ten-year term at an initial minimum annual rent of $644,000.

129

ADAMHS000029729

During the third quarter of 2019, a joint-venture agreement between us and a non-related third-party was finalized in connection with the development of a newly constructed behavioral health care facility located in Clive, Iowa. Pursuant to the terms of the agreement, we hold a majority ownership interest in the venture and will act as manager of the facility when completed and opened. This joint-venture also entered into an agreement with the Trust whereby a wholly-owned subsidiary of the Trust will construct the 108-bed behavioral health care hospital and, upon completion and issuance of the certificate of occupancy, the joint venture will lease the facility from the Trust pursuant to a 20-year, triple net lease with five, 10-year renewal options. Construction of the approximately 80,000 square foot hospital, for which a wholly-owned subsidiary of ours will act as project manager for an aggregate fee of approximately $750,000, is expected to be completed in late 2020. The approximate cost of the project is estimated at $37.5 million and the initial annual rent is estimated at approximately $2.7 million.

*Other Related Party Transactions:*

In December, 2010, our Board of Directors approved the Company's entering into supplemental life insurance plans and agreements on the lives of our chief executive officer ("CEO") and his wife. As a result of these agreements, as amended in October, 2016, based on actuarial tables and other assumptions, during the life expectancies of the insureds, we would pay approximately $28 million in premiums, and certain trusts owned by our CEO, would pay approximately $9 million in premiums. Based on the projected premiums mentioned above, and assuming the policies remain in effect until the death of the insureds, we will be entitled to receive death benefit proceeds of no less than approximately $37 million representing the $28 million of aggregate premiums paid by us as well as the $9 million of aggregate premiums paid by the trusts. In connection with these policies, we paid approximately $1.1 million, net, in premium payments during each of 2019 and 2018 and $1.2 million during 2017.

In August, 2015, Marc D. Miller, our President and member of our Board of Directors, was appointed to the Board of Directors of Premier, Inc. ("Premier"), a healthcare performance improvement alliance. During 2013, we entered into a new group purchasing organization agreement ("GPO") with Premier. In conjunction with the GPO agreement, we acquired a minority interest in Premier for a nominal amount. During the fourth quarter of 2013, in connection with the completion of an initial public offering of the stock of Premier, we received cash proceeds for the sale of a portion of our ownership interest in the GPO. Also in connection with this GPO agreement, we received shares of restricted stock of Premier which vest ratably over a seven-year period (2014 through 2020), contingent upon our continued participation and minority ownership interest in the GPO. We have elected to retain a portion of the previously vested shares of Premier, the market value of which is included in other assets on our consolidated balance sheet. Based upon the closing price of Premier's stock on each respective date, the market value of our shares of Premier on which the restrictions have lapsed was $70 million as of December 31, 2019 and $56 million as of December 31, 2018. The $14 million increase in market value at December 31, 2019, as compared to December 31, 2018, is the result of $10 million of additional vested shares and $4 million of increased market value. In connection with our 2018 adoption of ASU 2016-01, "Recognition and Measurement of Financial Assets and Financial Liabilities", since our vested shares of Premier are held for investment and classified as available for sale, the increase in market value of these shares during 2019 and 2018 was recorded as an unrealized gain and included in "Other (income) expense, net" on our condensed consolidated statements of income. Prior to 2018, changes in the market value of our vested Premier stock were recorded to other comprehensive income/loss on our consolidated balance sheet.

A member of our Board of Directors and member of the Executive Committee and Finance Committee is a partner in Norton Rose Fulbright US LLP, a law firm engaged by us for a variety of legal services. The Board member and his law firm also provide personal legal services to our CEO and acts as trustee of certain trusts for the benefit of our CEO and his family.

## 10) REVENUE RECOGNITION

In May 2014 and March 2016, the FASB issued ASU 2014-09 and ASU 2016-08, "Revenue from Contracts with Customers (Topic 606)" and "Revenue from Contracts with Customers: Principal versus Agent Considerations (Reporting Revenue Gross versus Net)", respectively, which provides guidance for revenue recognition. The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. Under the new standards, our estimate for amounts not expected to be collected based on historical experience will continue to be recognized as a reduction to net revenue. However, subsequent changes in estimate of collectability due to a change in the financial status of a payer, for example a bankruptcy, will be recognized as bad debt expense in operating charges.

The performance obligation is separately identifiable from other promises in the customer contract. As the performance obligations are met (i.e.: room, board, ancillary services, level of care), revenue is recognized based upon allocated transaction price. The transaction price is allocated to separate performance obligations based upon the relative standalone selling price. In instances where we determine there are multiple performance obligations across multiple months, the transaction price will be allocated by applying an estimated implicit and explicit rate to gross charges based on the separate performance obligations.

In assessing collectability, we have elected the portfolio approach. This portfolio approach is being used as we have large volume of similar contracts with similar classes of customers. We reasonably expect that the effect of applying a portfolio approach to

130

CONFIDENTIAL

ADAMHS000029730

a group of contracts would not differ materially from considering each contract separately. Management's judgment to group the contracts by portfolio is based on the payment behavior expected in each portfolio category. As a result, aggregating all of the contracts (which are at the patient level) by the particular payer or group of payers, will result in the recognition of the same amount of revenue as applying the analysis at the individual patient level.

We group our revenues into categories based on payment behaviors. Each component has its own reimbursement structure which allows us to disaggregate the revenue into categories that share the nature and timing of payments. The other patient revenue consists primarily of self-pay, government-funded non-Medicaid, and other.

The following table disaggregates our revenue by major source for the years ended December 31, 2019, 2018 and 2017 (in thousands):

| | For the year ended December 31, 2019 | | | | | | | |
| | Acute Care | | Behavioral Health | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| Medicare | $ 1,336,200 | 22% | $ 553,045 | 11% | | | $ 1,889,245 | 17% |
| Managed Medicare | 827,216 | 13% | 220,543 | 4% | | | 1,047,759 | 9% |
| Medicaid | 519,508 | 8% | 688,141 | 13% | | | 1,207,649 | 11% |
| Managed Medicaid | 560,029 | 9% | 1,118,612 | 21% | | | 1,678,641 | 15% |
| Managed Care (HMO and PPOs) | 2,271,002 | 37% | 1,363,815 | 26% | | | 3,634,817 | 32% |
| UK Revenue | 0 | 0% | 553,831 | 11% | | | 553,831 | 5% |
| Other patient revenue and adjustments, net | 191,422 | 3% | 505,144 | 10% | | | 696,566 | 6% |
| Other non-patient revenue | 459,183 | 7% | 206,932 | 4% | 3,636 | | 669,751 | 6% |
| Total Net Revenue | $ 6,164,560 | 100% | $ 5,210,063 | 100% | $ 3,636 | | 11,378,259 | 100% |

| | For the year ended December 31, 2018 | | | | | | | |
| | Acute Care | | Behavioral Health | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| Medicare | $ 1,296,152 | 23% | $ 579,723 | 12% | | | $ 1,875,875 | 17% |
| Managed Medicare | 730,387 | 13% | 199,003 | 4% | | | 929,390 | 9% |
| Medicaid | 487,197 | 9% | 696,421 | 14% | | | 1,183,618 | 11% |
| Managed Medicaid | 554,438 | 10% | 975,567 | 19% | | | 1,530,005 | 14% |
| Managed Care (HMO and PPOs) | 2,093,890 | 37% | 1,395,980 | 28% | | | 3,489,870 | 32% |
| UK Revenue | 0 | 0% | 504,721 | 10% | | | 504,721 | 5% |
| Other patient revenue and adjustments, net | 167,570 | 3% | 483,417 | 10% | | | 650,987 | 6% |
| Other non-patient revenue | 390,271 | 7% | 204,042 | 4% | 13,499 | | 607,812 | 6% |
| Total Net Revenue | $ 5,719,905 | 100% | $ 5,038,874 | 100% | $ 13,499 | | 10,772,278 | 100% |

| | For the year ended December 31, 2017 | | | | | | | |
| | Acute Care | | Behavioral Health | | Other | | Total | |
|---|---|---|---|---|---|---|---|---|
| Medicare | $ 1,223,150 | 22% | $ 593,690 | 12% | | | $ 1,816,840 | 17% |
| Managed Medicare | 630,083 | 11% | 161,320 | 3% | | | 791,403 | 8% |
| Medicaid | 482,820 | 9% | 723,544 | 15% | | | 1,206,364 | 12% |
| Managed Medicaid | 511,844 | 9% | 876,907 | 18% | | | 1,388,751 | 13% |
| Managed Care (HMO and PPOs) | 1,949,435 | 36% | 1,412,086 | 29% | | | 3,361,521 | 32% |
| UK Revenue | 0 | 0% | 426,575 | 9% | | | 426,575 | 4% |
| Other patient revenue and adjustments, net | 219,056 | 4% | 498,915 | 10% | | | 717,971 | 7% |
| Other non-patient revenue | 468,295 | 9% | 213,682 | 4% | 18,463 | | 700,440 | 7% |
| Total Net Revenue | $ 5,484,683 | 100% | $ 4,906,719 | 100% | $ 18,463 | | 10,409,865 | 100% |

## 11) PENSION PLAN

We maintain contributory and non-contributory retirement plans for eligible employees. Our contributions to the contributory plan amounted to $56.3 million, $56.6 million and $50.1 million in 2019, 2018 and 2017, respectively. The non-contributory plan is a defined benefit pension plan which covers employees of one of our subsidiaries. The benefits are based on years of service and the employee's highest compensation for any five years of employment. Our funding policy is to contribute annually at least the minimum amount that should be funded in accordance with the provisions of ERISA.

For defined benefit pension plans, the benefit obligation is the "projected benefit obligation", the actuarial present value, as of December 31 measurement date, of all benefits attributed by the pension benefit formula to employee service rendered to that date. The amount of benefit to be paid depends on a number of future events incorporated into the pension benefit formula, including estimates of the average life of employees/survivors and average years of service rendered. It is measured based on assumptions

131

ADAMHS000029731

concerning future interest rates and future compensation levels. The following table shows the reconciliation of the defined benefit pension plan as of December 31, 2019 and 2018:

| | 2019 | 2018 |
|---|---|---|
| | (000s) | |
| **Change in plan assets:** | | |
| Fair value of plan assets at beginning of year | $ 104,591 | $ 118,667 |
| Actual return (loss) on plan assets | 22,331 | (7,522) |
| Benefits paid | (6,168) | (6,031) |
| Administrative expenses | (467) | (523) |
| Fair value of plan assets at end of year | $ 120,287 | $ 104,591 |
| **Change in benefit obligation:** | | |
| Benefit obligation at beginning of year | $ 108,428 | $ 116,056 |
| Service cost | $ 725 | 689 |
| Interest cost | $ 4,237 | 4,063 |
| Benefits paid | $ (6,168) | (6,031) |
| Actuarial (gain) loss | $ 10,334 | (6,349) |
| Benefit obligation at end of year | $ 117,556 | $ 108,428 |
| **Amounts recognized in the Consolidated Balance Sheet:** | | |
| Other non-current assets | 2,731 | — |
| Other non-current liabilities | — | 3,836 |
| Total amounts recognized at end of year | $ 2,731 | $ 3,836 |

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| | | (000s) | |
| **Components of net periodic cost (benefit)** | | | |
| Service cost | $ 725 | $ 689 | $ 721 |
| Interest cost | 4,237 | 4,063 | 4,465 |
| Expected return on plan assets | (4,558) | (5,197) | (5,862) |
| Amortization of actuarial loss | 1,533 | — | 863 |
| Net periodic cost | $ 1,937 | $ (445) | $ 187 |

| | 2019 | 2018 |
|---|---|---|
| **Measurement Dates** | | |
| Benefit obligations | 12/31/2019 | 12/31/2018 |
| Fair value of plan assets | 12/31/2019 | 12/31/2018 |

| | 2019 | 2018 |
|---|---|---|
| **Weighted average assumptions as of December 31** | | |
| Discount rate | 2.94% | 4.03% |
| Rate of compensation increase | 4.00% | 4.00% |

| | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Weighted-average assumptions for net periodic benefit cost calculations** | | | |
| Discount rate | 4.03% | 3.60% | 4.14% |
| Expected long-term rate of return on plan assets | 4.50% | 4.50% | 5.50% |
| Rate of compensation increase | 4.00% | 4.00% | 4.00% |

The "accumulated benefit obligation" for our pension plan represents the actuarial present value of benefits based on employee service and compensation as of a certain date and does not include an assumption about future compensation levels. The accumulated benefit obligation for our plan was $117.5 million and $108.3 million as of December 31, 2019 and 2018, respectively. As of December 31, 2019, the fair value of plan assets exceeded the accumulated benefit obligation by $2.7 million. As of December 31, 2018, the accumulated benefit obligation exceeded the a fair value of plan assets by $3.7 million.

132

ADAMHS000029732

We estimate that there will be no net loss or prior service cost amortized from accumulated other comprehensive income during 2019.

The market values of our pension plan assets at December 31, 2019 and December 31, 2018, reported using net asset value as a practical expedient, by asset category are as follows:

|  | 2019 | 2018 |
|---|---|---|
| Equities: | | |
| U.S. Large Cap | $ 9,867 | $ 7,711 |
| U.S. Mid Cap | $ 3,054 | 2,309 |
| U.S. Small Cap | $ 3,160 | 2,094 |
| International Developed | $ 7,317 | 5,710 |
| Emerging Markets | $ 4,957 | 4,137 |
| Fixed income: | | |
| Core Fixed Income | $ 25,390 | 24,617 |
| Long Duration Fixed Income | $ 63,515 | 55,318 |
| Real Estate: | | |
| REIT Fund | $ 2,372 | 2,037 |
| Cash/Currency: | | |
| Cash Equivalents | $ 655 | 658 |
| **Total market value** | $ 120,287 | $ 104,591 |

To develop the expected long-term rate of return on plan assets assumption, we considered the historical returns and the future expectations for returns for each asset class, as well as the target asset allocation of the pension portfolio.

The following table shows expected benefit payments for the years 2020 through 2029 for our defined pension plan. There will be benefit payments under this plan beyond 2029.

| **Estimated Future Benefit Payments (000s)** | |
|---|---|
| 2020 | $ 6,752 |
| 2021 | 6,868 |
| 2022 | 6,926 |
| 2023 | 6,945 |
| 2024 | 6,939 |
| 2025-2029 | 33,889 |
| Total | $ 68,319 |

| | 2019 | 2018 |
|---|---|---|
| **Plan Assets** | | |
| Asset Category | | |
| Equity securities | 24% | 21% |
| Fixed income securities | 74% | 76% |
| Other | 2% | 3% |
| Total | 100% | 100% |

Investment Policy, Guidelines and Objectives have been established for the defined benefit pension plan. The investment policy is in keeping with the fiduciary requirements under existing federal laws and managed in accordance with the Prudent Investor Rule. Total portfolio risk is regularly evaluated and compared to that of the plan's policy target allocation and judged on a relative basis over a market cycle. The following asset allocation policy and ranges have been established in accordance with the overall risk and return objectives of the portfolio:

| | As of 12/31/2019 | Permitted Range |
|---|---|---|
| Total Equity | 24% | 10-30% |
| Total Fixed Income | 74% | 70-90% |
| Other | 2% | 0-10% |

133

CONFIDENTIAL

ADAMHS000029733

In accordance with the investment policy, the portfolio will invest in high quality, large and small capitalization companies traded on national exchanges, and investment grade securities. The investment managers will not write or buy options for speculative purposes; securities may not be margined or sold short. The manager may employ futures or options for the purpose of hedging exposure, and will not purchase unregistered sectors, private placements, partnerships or commodities.

## 12) SEGMENT REPORTING

Our reportable operating segments consist of acute care hospital services and behavioral health care services. The "Other" segment column below includes centralized services including, but not limited to, information technology, purchasing, reimbursement, accounting and finance, taxation, legal, advertising and design and construction. The chief operating decision making group for our acute care services and behavioral health care services is comprised of our Chief Executive Officer, the President and the Presidents of each operating segment. The Presidents for each operating segment also manage the profitability of each respective segment's various facilities. The operating segments are managed separately because each operating segment represents a business unit that offers different types of healthcare services or operates in different healthcare environments. The accounting policies of the operating segments are the same as those described in the summary of significant accounting policies included in this Annual Report on Form 10-K for the year ended December 31, 2019. The corporate overhead allocations, as reflected below, are utilized for internal reporting purposes and are comprised of each period's projected corporate-level operating expenses (excluding interest expense). The overhead expenses are captured and allocated directly to each segment, to the extent possible, based upon each segment's respective percentage of total operating expenses.

| 2019 | Acute Care Hospital Services | Behavioral Health Services (a.) | Other | Total Consolidated |
|---|---|---|---|---|
| | | (Dollar amounts in thousands) | | |
| Gross inpatient revenues | $ 28,430,922 | $ 10,100,903 | $ — | $ 38,531,825 |
| Gross outpatient revenues | $ 17,666,629 | $ 1,066,704 | $ — | $ 18,733,333 |
| Total net revenues | $ 6,164,560 | $ 5,210,063 | $ 3,636 | $ 11,378,259 |
| Income (loss) before allocation of corporate overhead and income taxes | $ 713,410 | $ 900,965 | $ (548,038) | $ 1,066,337 |
| Allocation of corporate overhead | $ (230,166) | $ (166,571) | $ 396,737 | $ 0 |
| Income (loss) after allocation of corporate overhead and before income taxes | $ 483,244 | $ 734,394 | $ (151,301) | $ 1,066,337 |
| Total assets | $ 4,405,643 | $ 6,910,790 | $ 351,817 | $ 11,668,250 |

| 2018 | Acute Care Hospital Services | Behavioral Health Services (a.) | Other | Total Consolidated |
|---|---|---|---|---|
| | | (Dollar amounts in thousands) | | |
| Gross inpatient revenues | $ 24,814,959 | $ 9,735,521 | $ — | $ 34,550,480 |
| Gross outpatient revenues | $ 14,967,313 | $ 1,025,721 | $ — | $ 15,993,034 |
| Total net revenues | $ 5,719,905 | $ 5,038,874 | $ 13,499 | $ 10,772,278 |
| Income (loss) before allocation of corporate overhead and income taxes | $ 708,680 | $ 915,517 | $ (589,672) | $ 1,034,525 |
| Allocation of corporate overhead | $ (199,823) | $ (161,282) | $ 361,105 | $ 0 |
| Income (loss) after allocation of corporate overhead and before income taxes | $ 508,857 | $ 754,235 | $ (228,567) | $ 1,034,525 |
| Total assets | $ 4,094,537 | $ 6,786,369 | $ 384,574 | $ 11,265,480 |

134

CONFIDENTIAL

ADAMHS000029734

DEF-MDL-14396.00190

| 2017 | Acute Care Hospital Services | Behavioral Health Services (a.) | Other | Total Consolidated |
|---|---|---|---|---|
| | | (Dollar amounts in thousands) | | |
| Gross inpatient revenues | $21,888,207 | $ 8,949,984 | $ — | $30,838,191 |
| Gross outpatient revenues | $13,115,881 | $ 993,409 | $ — | $14,109,290 |
| Total net revenues | $ 5,484,683 | $ 4,906,719 | $ 18,463 | $10,409,865 |
| Income (loss) before allocation of corporate overhead and income taxes | $ 641,857 | $ 968,974 | $ (475,822) | $ 1,135,009 |
| Allocation of corporate overhead | $ (182,713) | $ (158,735) | $ 341,448 | $ 0 |
| Income (loss) after allocation of corporate overhead and before income taxes | $ 459,144 | $ 810,239 | $ (134,374) | $ 1,135,009 |
| Total assets | $ 3,849,214 | $ 6,648,818 | $ 263,796 | $10,761,828 |

(a.) Includes net revenues generated from our behavioral health care facilities located in the U.K. amounting to approximately $554 million in 2019, $505 million in 2018 and $429 million in 2017. Total assets at our U.K. behavioral health care facilities were approximately $1.270 billion as of December 31, 2019, $1.224 billion as of December 31, 2018 and $1.098 billion as of December 31, 2017. In addition, included in our 2019 Behavioral Health Services operating segment Income (loss) before allocation of corporate overhead and income taxes is a pre-tax $98 million provision for asset impairment to reduce the carrying value of a tradename intangible asset and real property assets. Included in our 2018 Behavioral Health Services operating segment Income (loss) before allocation of corporate overhead and income taxes is a pre-tax $49 million provision for asset impairment to reduce the carrying value of a tradename intangible asset.

## 13) QUARTERLY RESULTS (unaudited)

The quarterly financial data is prepared on the same basis as the audited annual financial statements, and include all adjustments, which include only normal recurring adjustments, necessary for the fair statement of our results of operations for these periods. The following tables summarize the quarterly financial data for the two years ended December 31, 2019 and 2018:

| 2019 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total |
|---|---|---|---|---|---|
| | (amounts in thousands, except per share amounts) | | | | |
| Net revenues | $ 2,804,391 | $ 2,855,168 | $ 2,822,453 | $ 2,896,247 | $11,378,259 |
| Net income | $ 237,398 | $ 241,265 | $ 100,870 | $ 248,010 | $ 827,543 |
| Less: Net income attributable to noncontrolling interests | $ 3,230 | $ 2,945 | $ 3,680 | $ 2,834 | $ 12,689 |
| Net income attributable to UHS | $ 234,168 | $ 238,320 | $ 97,190 | $ 245,176 | $ 814,854 |
| Earnings per share attributable to UHS-Basic: | | | | | |
| Total basic earnings per share | $ 2.57 | $ 2.67 | $ 1.10 | $ 2.81 | $ 9.16 |
| Earnings per share attributable to UHS-Diluted: | | | | | |
| Total diluted earnings per share | $ 2.57 | $ 2.66 | $ 1.10 | $ 2.79 | $ 9.13 |

The 2019 quarterly financial data presented above includes the following:

*First Quarter:*

- a favorable after-tax impact of $10.9 million, or $.12 per diluted share, resulting from our January 1, 2017 adoption of ASU 2016-09, "Compensation – Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting" ("ASU 2016-09").

*Second Quarter:*

- an unfavorable $11.0 million pre-tax impact ($8.4 million, or $.09 per diluted share, net of taxes) increase in the reserve established in connection with the discussions with the Department of Justice related to the civil aspects of the government's investigation of certain of our behavioral health care facilities (" DOJ Reserve");

- a favorable after-tax impact of $509,000, or $.01 per diluted share, resulting from our January 1, 2017 adoption of ASU 2016-09.

135

CONFIDENTIAL

*Third Quarter:*

- an unfavorable $6.2 million after-tax impact, or $.07 per diluted share recorded to provide income taxes on the portion of the DOJ reserve that is deemed non-deductible;

- an unfavorable $97.6 million pre-tax impact ($74.6 million, or $.84 per diluted share, net of taxes) recorded in connection with provision for asset impairment.

- a favorable after-tax impact of $1.7 million, or $.02 per diluted share, resulting from our January 1, 2017 adoption of ASU 2016-09.

| 2018 | First Quarter | Second Quarter | Third Quarter | Fourth Quarter | Total |
|---|---|---|---|---|---|
| | | | (amounts in thousands, except per share amounts) | | |
| Net revenues | $ 2,687,516 | $ 2,681,353 | $ 2,648,913 | $ 2,754,496 | $10,772,278 |
| Net income | $ 228,669 | $ 230,711 | $ 174,881 | $ 163,622 | $ 797,883 |
| Less: Net income attributable to noncontrolling interests | $ 4,837 | $ 4,659 | $ 3,135 | $ 5,547 | $ 18,178 |
| Net income attributable to UHS | $ 223,832 | $ 226,052 | $ 171,746 | $ 158,075 | $ 779,705 |
| Earnings per share attributable to UHS-Basic: | | | | | |
| Total basic earnings per share | $ 2.37 | $ 2.40 | $ 1.85 | $ 1.71 | $ 8.35 |
| Earnings per share attributable to UHS-Diluted: | | | | | |
| Total diluted earnings per share | $ 2.36 | $ 2.39 | $ 1.84 | $ 1.70 | $ 8.31 |

The 2018 quarterly financial data presented above includes the following:

*First Quarter:*

- an unfavorable $13.0 million pre-tax impact ($9.9 million, or $.11 per diluted share, net of taxes) increase in DOJ Reserve;

- a favorable after-tax impact of $1.6 million, or $.02 per diluted share, resulting from our January 1, 2017 adoption of ASU 2016-09.

*Second Quarter:*

- an unfavorable $9.5 million pre-tax impact ($7.2 million, or $.08 per diluted share, net of taxes) increase in the DOJ Reserve.

*Third Quarter:*

- an unfavorable $48.0 million pre-tax impact ($36.6 million, or $.39 per diluted share, net of taxes) increase in the DOJ Reserve.

*Fourth Quarter:*

- an unfavorable $31.9 million pre-tax impact ($24.5 million, or $.26 per diluted share, net of taxes) increase in the DOJ Reserve;

- an unfavorable $49.3 million pre-tax impact ($37.7 million, or $.41 per diluted share, net of taxes) recorded in connection with provision for intangible asset impairment.

136

CONFIDENTIAL

ADAMHS000029736

DEF-MDL-14396.00192

## SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS
(amounts in thousands)

| Valuation Allowance for Deferred Tax Assets: | Balance at beginning of period | Charges to costs and expenses | Acquisitions of business | Write-off of uncollectible accounts | Balance at end of period |
|---|---|---|---|---|---|
| Year ended December 31, 2019 | $ 79,264 | $ (3,987) | $ - | $ - | $ 75,277 |
| Year ended December 31, 2018 | $ 70,227 | $ 9,037 | $ - | $ - | $ 79,264 |
| Year ended December 31, 2017 | $ 56,333 | $ 13,894 | $ - | $ - | $ 70,227 |

| Allowance for Doubtful Accounts Receivable: | Balance at beginning of period | Charges to costs and expenses | Acquisitions of business | Write-offs | Balance at end of period |
|---|---|---|---|---|---|
| Year ended December 31, 2017 (a) | $ 410,374 | $ 869,077 | $ - | $ (799,162) | $ 480,289 |

(a) Effective January 1, 2018, the Company adopted ASC 606 using a modified retrospective approach.  This schedule discloses allowance for doubtful accounts receivable for periods reported under ASC 605 only.

CONFIDENTIAL

DEF-MDL-14396.00193

ADAMHS000029737

# CORPORATE INFORMATION

**EXECUTIVE OFFICES**

Universal Corporate Center
367 South Gulph Road
King of Prussia, PA 19406
(610) 768-3300

**ANNUAL MEETING**

May 20, 2020, 10:00 a.m.
Universal Corporate Center
367 South Gulph Road
King of Prussia, PA 19406

**COMPANY COUNSEL**

Norton Rose Fulbright
New York, New York

**AUDITORS**

PricewaterhouseCoopers LLP
Philadelphia, Pennsylvania

**TRANSFER AGENT AND REGISTRAR**

Computershare
462 South 4th Street, Suite 1600
Louisville, KY 40202
1-800-851-9677

Shareholder website:
www.computershare.com/investor

Shareholder online inquiries:

https://www-us.computershare.com/
investor/Contact

TDD: Hearing Impaired # 1-800-231-5469

Please contact Computershare for prompt
assistance on address changes, lost
certificates, consolidation of duplicate
accounts or related matters.

**INTERNET ADDRESS**

The Company can be accessed online
at www.uhsinc.com.

**LISTING**

Class B Common Stock: New York Stock
Exchange under the symbol UHS

**PUBLICATIONS**

For copies of the Company's Annual Report,
Form 10-K, Form 10-Q, quarterly earnings
releases, and proxy statements, please call
1-800-874-5819, or write

Investor Relations
Universal Health Services, Inc.
Universal Corporate Center
367 South Gulph Road
King of Prussia, PA 19406

**FINANCIAL COMMUNITY INQUIRIES**

The Company welcomes inquiries from
members of the financial community seeking
information on the Company. These should be
directed to Steve Filton, Chief Financial Officer.

**DISCLOSURE UNDER 303A.12(a)**

In accordance with Section 303A.12(a) of The
New York Stock Exchange Listed Company
Manual, we submitted our CEO's Certification
to the New York Stock Exchange in 2019.
Additionally, contained in Exhibits 31.1 and 31.2
of our Annual Report on Form 10-K filed with
the Securities and Exchange Commission on
February 26, 2020, are our CEO's and CFO's
Certifications regarding the quality of our
public disclosure under Section 302 of the
Sarbanes-Oxley Act of 2002.

UHS of Delaware, Inc. is the management company for, and a wholly owned subsidiary of Universal Health Services, Inc. All of our
"Corporate Officers" listed on the next page are employees of UHS of Delaware, Inc.

CONFIDENTIAL

DEF-MDL-14396.00194

ADAMHS000029738

# BOARD OF DIRECTORS



**Alan B. Miller**[3,4*]
Chairman of the Board
Chief Executive Officer



**Marc D. Miller**[3,4]
President



**Lawrence S. Gibbs**[1,2,6]
Product Manager at
AIG, Artificial Intelligence
Platform. Previously served
in various roles at Erdos
Capital, Ramius, LLC
and JPMorgan Chase
Bank N.A.



**Eileen C. McDonnell**[1*,2*,3,6]
Chairman and Chief Executive
Officer of The Penn Mutual
Life Insurance Company.
Served as President of New
England Financial, a wholly
owned subsidiary of MetLife,
and Senior Vice President of
the Guardian Life Insurance
Company. Member of The
Penn Mutual Board of
Trustees.



**Warren J. Nimetz**[3,4]
Partner, Norton
Rose Fulbright US LLP,
New York, NY



**Maria Singer**[1,4,5]
Chief Operating Officer –
Corporate Finance at
Houlihan Lokey. Previously
served as Managing Director
and COO of Blackstone
Advisory Partners.



**Elliot J. Sussman, M.D.**[1,2,5*]
Chairman of The Villages
Health. Previously served
as President and Chief
Executive Officer of
Lehigh Valley Hospital and
Health Network. Member,
Board of Directors of
iCAD, Inc.

Committees of the Board: [1]Audit Committee, [2]Compensation Committee,
[3]Executive Committee, [4]Finance Committee, [5]Nominating/Corporate
Governance Committee, [6]Lead Director, [*]Committee Chairperson

# CORPORATE OFFICERS

**Alan B. Miller**
Chairman of the Board
and Chief Executive Officer

**Marc D. Miller**
President

**Steve G. Filton**
Executive Vice President
and Chief Financial Officer

**Marvin G. Pember**
Executive Vice President
and President
Acute Care Division

**Matthew J. Peterson**
Executive Vice President
and President
Behavioral Health Division

**Charles F. Boyle**
Senior Vice President
and Controller

**Geraldine Johnson Geckle**
Senior Vice President
Human Resources

**Matthew D. Klein**
Senior Vice President
and General Counsel

**Michael S. Nelson**
Senior Vice President
Strategic Services

**Victor J. Radina**
Senior Vice President
Corporate Development

**Cheryl K. Ramagano**
Senior Vice President
and Treasurer

## FACILITY LOCATIONS

### UNITED STATES

Alabama | Alaska | Arizona

Arkansas | California

Colorado | Connecticut

Delaware | District of Columbia

Florida | Georgia

Idaho | Illinois | Indiana

Kentucky | Louisiana

Massachusetts | Michigan

Minnesota | Mississippi

Missouri | Nevada

New Jersey | New Mexico

North Carolina | North Dakota

Ohio | Oklahoma | Oregon

Pennsylvania | South Carolina

Tennessee | Texas

Utah | Virginia | Washington

West Virginia | Wyoming

### PUERTO RICO

### UNITED KINGDOM

**England**

Bristol | Cheshire

County Durham | Derbyshire

Dorset | Essex

Gloucestershire | Hampshire

Hertfordshire | Kent

Lancashire | Leicestershire

Lincolnshire | London

Greater Manchester | North Yorkshire

Northumberland | Nottinghamshire

Somerset | South Yorkshire

Staffordshire | Suffolk | Surrey

West Midlands | West Yorkshire

**Scotland**

Angus | Dumfries and Galloway

Stirling

**Wales**

Flintshire | Gwent



## UNIVERSAL HEALTH SERVICES, INC.

Corporate Center
367 South Gulph Road
King of Prussia, PA 19406
www.uhsinc.com

Cygnet Health Care
Third Floor - 4 Millbank
SW1P 3JA London
United Kingdom

CONFIDENTIAL

DEF-MDL-14396.00196

ADAMHS000029740



## Fee Schedule

### Effective 1/1/2021

| Service | Full Charges | Self-Pay Schedule |
|---|---|---|
| IP ACUTE MH/DD/Adult/Child | $2000 | $775 per day |
| Detox | $2000 | $775 per day |
| CMR | $2000 | $675 per day |
| PHP | $1167 per session | $400 per session 6 hours a day/5 days a week |
| IOP | $699 per session | $275 per session 3 hours a day/3 days a week for 6 weeks |
| Mental Health Assessments | No Charge | No Charge |
| Court Ordered CD Assessments | $400 | $260 |

CONFIDENTIAL

ADAMHS000029741

DEF-MDL-14396.00197

CONFIDENTIAL

DEF-MDL-14396.00198

ADAMHS000029742

**AGENCY REVENUE REPORT**

Modified FIS-052

_____ 2021 Budget _____ Actual

Page _____ of _____

AGENCY NUMBER:
UPI: **Macsis UP138663541 NPI 12342**

AGENCY NAME: __Windsor Laurelwood Hospital

EXECUTIVE DIRECTOR: _____Shelley Zimmerman

REPORTING PERIOD: Calendar 2021 Budget
AGENCY TELEPHONE NUMBER:

AGENCY ADDRESS: 35900 Euclid Avenue, Willoughby Ohio 64094

| 1. Revenue Source | 2. Type of Service | | | | | | 3. $ Amount |
|---|---|---|---|---|---|---|---|
| | A. Hospital | B. | C. | D. | E. | F. | |
| Medicare includes Managed Medicare | $8,346,236 | | | | | | $8,346,236 |
| Federal Medicaid includes Managed Medicaid | $14,493,330 | | | | | | $14,493,330 |
| Safe Drug Free Schools and Communities | | | | | | | $0 |
| Other Federal | | | | | | | $0 |
| State Funds Total | | | | | | | $0 |
| Board Levy | $639,250 | | | | | | $639,250 |
| Other Board Funds | $440,516 | | | | | | $440,516 |
| Agency First/Third Party Fees | | | | | | | $0 |
| Self pay | $159,494 | | | | | | $159,494 |
| Insurance | $10,694,419 | | | | | | $10,694,419 |
| Other | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| | | | | | | | $0 |
| Total Revenues | $34,773,245 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $34,773,245 |

Form A-I Uniform Cost Report
FIS-047 Modified

Reporting Period Budget :

Agency Name : Windsor Laurelwood Center
AGENCY ADDRESS: 35900 Euclid Avenue, Willoughby Ohio 44094

Agency Telephone No:_____

Owner Federal Tax I.D. Number:_____

CONFIDENTIAL

DEF-MDL-14396 00199

ADAMHS000029743

| Type of Service | HCPCS / Procedure Code | Unit Definition | No. of Units | No. FTE Assigned Direct Service (A) | Support Service (B) | Personnel Costs Direct Service (A) | Support Service (B) | Non-Personnel Costs | Service Total Costs | $ Allocation of Admin. Overhead | Total Costs | Cost/ Unit | Un-Allowable Costs | Total Allowable Cost | Allowable Cost/Unit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MH Evaluation & Management | | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Assessment Evaluation & Testing without Medical | 90791 | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Psychotherapy for Crisis Services | | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Psychotherapy Individual | | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Psychotherapy Group | | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Psychotherapy Family Therapy | | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Community Services - Coordination & Support Services Individual | | 15 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Community Services - Coordination & Support Services Group | | 15 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Day Treatment Inpatient | | Per Diem | 34151 | 102.90 | 92.76 | $8,732,385 | $7,162,879 | $3,976,021 | $20,561,285 | $951,248 | $21,492,531 | $629.34 | | $21,492,531 | $629.34 |
| Behavioral Health Hotline Service | H0030 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Peer Run Organizations/Consumer Operated Service | M1420 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Peer Recovery Support | H0038 | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Employment Services | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Housing - Residential Care | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Housing - Residential Treatment Room & Board | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Housing - Permanent | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Housing - Time Limited/Temporary | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Housing Retention Activities | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Assessment Evaluation & Testing | H0001 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Peer Recovery Support | A0038 | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Individual Counseling & Therapy Services | H0004 | 15 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Group Counseling & Therapy Services | H0005 | 15 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Case Management | H0006 | 15 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Urine Drug Screen | H0048 | Encounter | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD RN/LPN Services | | 15 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Intensive Outpatient Level of Care Group Counseling | H0015 | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Partial Hospitalization (PH) Level of Care Group Counseling | H0015 | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Withdrawal Management with Expanded On-Site Monitoring | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Clinically Managed Low-Intensity Residential Treatment | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Clinically Managed Residential Withdrawal Management | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Clinically Managed Population-Specific High Intensity Residential Treatment | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Clinically Managed High Intensity Residential Treatment | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Medically Monitored Intensive Inpatient Treatment (Adults) | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Medically Monitored Intensive Inpatient Treatment (Adolescent) | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Medically Monitored Inpatient Withdrawal Management | | Per Diem | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Ambulatory Detox and MAT | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Sub-Acute Detox Services Inpatient | | | 9192 | 25.10 | 22.62 | $2,127,447 | $1,917,962 | $1,070,758 | $5,116,337 | $250,789 | $5,367,126 | $583.57 | | $5,367,326 | $583.57 |
| SUD Residential - Excluding Sub-Acute Detoxification | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Sub-Acute Detoxification - Residential Program | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Housing - Residential Care | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Housing - Residential Treatment Room & Board | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Housing - Permanent | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Housing - Time Limited/Temporary | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Housing Retention Activities | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Assertive Community Treatment (Clinical Activities) | H0040 | Covered day | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Assertive Community Treatment (Non-Clinical Activities) | M1910 | Covered day | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Intensive Home Based Treatment (Clinical Activities) | H2016 | Covered day | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Intensive Home Based Treatment (Non-Clinical Activities) | M1810 | Covered day | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Prevention - Alternatives | M0660 | 60 Min | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Prevention - Community Based Process | M0630 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Prevention - Education | M0620 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Prevention - Environmental | M0640 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Prevention - Information Dissemination | M0610 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| MH Prevention - Problem Identification and Referral | M0650 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Prevention - Alternatives | A0660 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Prevention - Community Based Process | A0630 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Prevention - Education | A0620 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Prevention - Environmental | A0640 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Prevention - Information Dissemination | A0610 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| SUD Prevention - Problem Identification and Referral | A0650 | 60 Min. | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Supplemental BH Services | | Agy. Defined | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Supplemental BH Services | | Agy. Defined | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Supplemental BH Services | | Agy. Defined | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Supplemental BH Services | | | 10730 | 9.00 | 8.11 | $762,891 | $687,715 | $576,418 | $3,873,604 | $88,163 | $1,915,188 | $178.49 | | $1,915,188 | $178.49 |
| Forensic Evaluation I | ** | 60 Min. | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Inpatient Psychiatric service | ** | 24 Hours | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Outpatient BH SUD/Psychiatric services | | | 0 | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Total Services | | | | 137.00 | 123.50 | $11,612,892 | $10,468,555 | $5,423,198 | $27,504,645 | $1,290,200 | $28,774,845 | | $0 | $28,774,845 | |
| Other Non-Medicaid Health MHAS Services | | | | | | | | | $0 | | $0 | #DIV/0! | | $0 | #DIV/0! |
| Total Agency Service Total | | | | 137.00 | 123.50 | $11,612,892 | $10,468,555 | $5,423,198 | $27,504,645 | | $28,774,845 | | | $28,774,845 | |
| Administrative Overhead | | | | | | | | | | $1,270,200 | $28,774,845 | | | | |
| AGENCY TOTAL | | | | 137.00 | 123.50 | $11,612,892 | $10,468,555 | $5,423,198 | $27,504,645 | | | | $0 | $28,774,845 | |

GRANT LINE ITEM BUDGET QUARTERLY EXPENDITURE REPORT

AGENCY: Windsor Laurelwood Center

GRANT: Lake County Request for proposal

| LINE ITEMS | | CURRENT FY Budget 2021 |
|---|---|---|
| 0.1 Salaries | | 18,787,329.00 |
| 0.2 Contracts & Services | | - |
| WAGES SUBTOTAL | | 18,787,329.00 |
| | | |
| 1.1 Employer's Share PERS (FICA) | | 1,252,132.00 |
| 1.2 Life Insurance | | 67,736.00 |
| 1.3 Health Insurance | | 1,352,712.00 |
| 1.4 Workman's Compensation | | 163,532.00 |
| 1.5 Unemployment Compensation | | 59,231.00 |
| 1.6 Other Fringe | | 398,775.00 |
| FRINGE BENEFITS SUBTOTAL | | 3,294,118.00 |
| | | |
| 2.1 Housekeeping | | 273,681.00 |
| 2.2 Educational/Recreational | | 30,243.00 |
| 2.3 Drugs | | 845,058.00 |
| 2.4 Medical, Lab & Therapeutic | | 563,977.00 |
| 2.5 Food | | 557,973.00 |
| 2.6 Personal Hygiene | | - |
| OPERATING SUPPLIES SUBTOTAL | | 2,270,932.00 |
| | | |
| 3.1 Publications, Pamphlets, etc. | | - |
| 3.2 Printing | | - |
| 3.3 Dues & Registration | | 25,308.00 |
| 3.4 Equipment Repairs | | - |
| 3.5 Recruitment & Advertising | | 65,727.00 |
| OPERATING EXPENSES SUBTOTAL | | 91,035.00 |
| | | |
| 4.1 Telephone | | 64,734.00 |
| 4.2 Postage | | 3,266.00 |
| 4.3 Office Supplies | | 167,087.00 |
| 4.4 Equipment Rentals | | 191,461.00 |
| OFFICE EXPENSES SUBTOTAL | | 426,548.00 |
| | | |
| 5.1 Auto Repair, Maint, Ins, Etc. | | 16,011.00 |
| 5.2 In-State Travel | | 55,442.00 |
| 5.3 Out-Of-State Travel | | 3,868.00 |
| TRAVEL EXPENSES SUBTOTAL | | 75,321.00 |
| | | |
| 6.1 Building Repairs, Maint | | 437,678.00 |
| 6.2 Utilities | | 212,537.00 |
| 6.3 Rent (include in-kind) | | 980,648.00 |
| 6.4 Insurance | | 215,320.00 |
| BUILDING EXPENSES SUBTOTAL | | 1,846,183.00 |
| | | |
| 7.1 Office Equipment | | |
| 7.2 Building Improvements | | |
| 7.3 Program Equipment | | |
| 7.4 Furnishings | | |
| EQUIPMENT & IMPROV. SUBTOTAL | | - |
| | | |
| 8.1 Audit | | |
| 8.2 Legal | | 24,797.00 |
| 8.3 Liability Insurance | | |
| 8.4 Tuition Reimburse/Training | | |
| 8.5 Other | | 1,958,582.00 |
| OTHER EXPENSES SUBTOTAL | | 1,983,379.00 |
| | | |
| TOTAL EXPENSES | | 28,774,845.00 |

ADAMHS000029744

GRANT LINE ITEM BUDGET     REVENUE BY SOURCE

AGENCY:     Windsor Laurelwood Windsor Laurelwood     SFY     Budget 2021

GRANT NAME:  Lake County Request for Proposal

| REVENUE SOURCE | 2019 BUDGETED Request | BUDGETED THIS FY2021 |
|---|---|---|
| **A. FEDERAL-** TITLE XX (MH Contract) | | |
| Title XX (Direct) | | |
| Lake County Title XIX (Medicaid - MH) | | |
| Other County Title XIX (Medicaid - MH) | | |
| Other County Title XIX (Medicaid - AD) | | |
| Other:  State Medicaid and Managed Medic | 13,830,696 | 14,493,330 |
| Other:  Medicare and Managed Medicare | 10,825,842 | 8,346,236 |
| **B. FEES** Client - Direct Pay | 346,622 | 159,494 |
| Insurance | 8,547,833 | 10,694,419 |
| Consultation & Education | | |
| Other: | | |
| Other: | | |
| **C. STATE FUNDS not through Board** Specify Source: | | |
| **D. FUNDING FROM LCADAMHS BOARD** Grant RFP | 802,000 | 639,250 |
| Purchase of Service | | |
| Other: | | |
| **E. FUNDING FROM OTHER ADAS/MH/ADAMHS BOARDS** | 485,650 | 440,516 |
| Grant/Purchase of Service | | |
| **F. United Way (Lake)** United Way Services | | |
| **G. DONATIONS** | | |
| **H. FUND RAISING ACTIVITY** FUND RAISING ACTIVITY | | |
| **I. FOUNDATION GRANT** | | |
| **J. CASH TRANSFER OF INTERFUND LOAN** | | |
| **K. REFUNDS & REIMBURSEMENTS** | | |
| **L. MISCELLANEOUS** MISCELLANEOUS | | |
| **M OTHER** | | |
| TOTALS: | $34,638,643 | $34,773,245 |

GRANTREV.xls

CONFIDENTIAL

ADAMHS000029745

DEF-MDL-14396.00201

DEF-MDL-14396.00202

CONFIDENTIAL

ADAMHS000029746

**SECTION I**

## SFY22 PROPOSAL FORM

DATE: ___26-Apr-21___

TO: Lake County Alcohol, Drug Addiction and Mental Health Services Board

FROM: ___Windsor Laurelwood Center For Behavioral Medicine___
Name of Proposer

BY: ___Barb Moran___
Person Submitting Proposal

ADDRESS: ___35900 Euclid Ave.___
___Willoughby, Ohio 44094___

Having examined the specifications for the type(s) of service(s) for which this Proposal is submitted, and also having read the Instructions to Proposers and Fiscal Specifications, and having examined the proposed contract, the undersigned hereby proposes to furnish the following service(s) at the cost noted:

**NON-Medicaid Grant Contract Service Proposal**

| | Service | Contract Rate | Projected # of Units | Non-Med Grant cost to Board | Change from previous fiscal year | Populations to be Served |
|---|---|---|---|---|---|---|
| 1. | Evaluation and Management * | | | | | |
| 2 | MH Psyc. Diag. Eval. w/o Medical | | | | | |
| 3. | Psychotherapy for Crisis | | | | | |
| 4. | Psychotherapy Services ** | | | | | |
| 5. | Community Services *** | | | | | |
| 6. | Mental Health Day Treatment | | | | | |
| 7. | Inpatient Psychiatric Service | $625 | 350 | $218,750 | $27,000 | Acute Inpatient services for adults and children |
| 8. | SUD Psyc. Diag. Eval. w/o Medical | | | | | |
| 9. | SUD Peer Recovery Support | | | | | |
| 10. | SUD Individual Counseling | | | | | |
| 11. | SUD Group Counseling | | | | | |
| 12. | SUD Case Management | | | | | |
| 13. | SUD Urine Drug Screen | | | | | |
| 14. | SUD RN/LPN Services | | | | | |
| 15. | SUD Intensive Outpatient Level of Care Group Counseling | | | | | |

* **Evaluation and Management incorpoates: Office Visits, Home Visits, Prolonged Visits/Add Ons, Psychiatric Diagnostic Evaluations/including Interactive Complexity, Medications Administered by Medical Professionals**
** **Psychotherapy Services incorporates: Individual Psychotherapy, Family Psychotherapy, Group Psychotherapy**
*** **Community Services incorporates: Therapeutic Behavioral Services (TBS), RN/LPN Nursing Services, Psychosocial Rehabilitation (PSR), Community Psychiatric Supportive Treatment**

DEF-MDL-14396.00203 CONFIDENTIAL

ADAMHS00002747

**NON-Medicaid Grant Contract Service Proposal**

| | Service | Contract Rate | Projected # of Units | Non-Med Grant cost to Board | Change from previous fiscal year | Populations to be Served |
|---|---|---|---|---|---|---|
| 16. | SUD Partial Hospitalization (PH) Level of Care Group Counseling | | | | | |
| 17. | SUD Withdrawal Management with Extended On Site Monitoring | | | | | |
| 18. | SUD Clinically Managed Low-Intensity Residential Treatment | | | | | |
| 19. | SUD Clinically Managed Residential Withdrawal Management | | | | | |
| 20 | SUD Clinically Managed Population-Specific High Intensity Residential Treatment | | | | | |
| 21. | SUD Clinically Managed High Intensity Residential Treatment | | | | | |
| 22. | SUD Medically Monitored Intensive Impatient Treatment (Adults) | | | | | |
| 23. | SUD Medically Monitored Intensive Impatient Treatment (Adolescents) | | | | | |
| 24. | SUD Medically Monitored Inpatient Withdrawal Management | $580 | 725 | $420,500 | $10,875 | Opiate Recovery Transition Program and ETOH Detox |
| 25. | SUD Ambulatory Detox and MAT | | | | | |
| 26. | SUD Sub-Acute Detox Services | | | | | |
| 27. | BH Hotline Services | | | | | |
| 28. | Information and Referral | | | | | |
| 29. | Housing Subsidies | | | | | |
| 30. | Emergency Housing Vouchers | | | | | |

CONFIDENTIAL

DEF-MDL-14396.00204

ADAMHS000029748

NON-Medicaid Grant Contract Service Proposal (continued)

| | Service | Contract Rate | Projected # of Units | Non-Med Grant cost to Board | Change from previous fiscal year | Populations to be Served |
|---|---|---|---|---|---|---|
| 31. | Housing Support Worker | | | | | |
| 32. | Proj Assist in Trans from Homeless (PATH) | | | | | |
| 33. | Shelter Plus Care | | | | | |
| 34. | Property Acquisition and Management | | | | | |
| 35. | Residential Care | | | | | |
| 36. | Peer Services | | | | | |
| 37. | Transportation Service | | | | | |
| 38. | Employment | | | | | |
| 39. | **Criminal Justice** | | | | | |
| | Forensic Services | | | | | |
| | Jail Treatment | | | | | |
| | Juvenile Justice | | | | | |

DEF-MDL-14396.00205

CONFIDENTIAL

ADAMHS00000029749

**NON-Medicaid Grant Contract Service Proposal (continued)**

| Service | Contract Rate | Projected # of Units | Non-Med Grant cost to Board | Change from previous fiscal year | Populations to be Served |
|---|---|---|---|---|---|
| **40.** **MH Prevention:** | | | | | |
| Alternatives | | | | | |
| Community Based Process | | | | | |
| Education | | | | | |
| Environmental | | | | | |
| Information Dissemination | | | | | |
| Problem Identification and Referral | | | | | |
| | | | | | |
| | | | | | |
| total non-Medicaid grant request for Mental Health Prevention services | | | | | |
| **41.** **SUD Prevention:** | | | | | |
| Alternatives | | | | | |
| Community Based Process | | | | | |
| Education | | | | | |
| Environmental | | | | | |
| Information Dissemination | | | | | |
| Problem Identification and Referral | | | | | |
| | | | | | |
| | | | | | |
| total non-Medicaid grant request for Substance Use Disorder Prevention services | | | | | |
| **42.** Resp & Ther Foster Care for SEDC/A and Fam | | | | | |
| **CARE COORDINATION** | | | | | |
| **43.** Behavioral Health Liaison Program | | | | | |
| **44** SUD Liaison Program | | | | | |
| **45** Transition Age Youth | | | | | |
| **46** Other Care Coordination | | | | | |
| **INTERVENTION/SUPPORT/ADVOCACY** | | | | | |
| **47.** Supplemental BH Services | | | | | |
| **48.** Supplemental BH Services | | | | | |
| **49.** Supplemental BH Services | | | | | |
| **50.** Supplemental BH Services | | | | | |
| **51.** Supplemental BH Services | | | | | |
| **TOTALS** | | | 639,250.00 | 37,875.00 | |

DEF-MDL-14396.00206

CONFIDENTIAL

In addition to the above non-Medicaid service grant proposals above, please project the following:

TOTAL AMOUNT OF INDIGENT DRIVER TREATMENT FUND REVENUE:

TOTAL AMOUNT OF TITLE XX MATCH REQUIRED:

Signature: _____

Type/Print Name Here: _____ Shelley Zimmerman

Capacity of Signer: _____ CEO

NOTE: Each person who signs a contract on behalf of a successful Proposal shall indicate below his/her name, the capacity by which he/she purports to bind the successful Proposer. If the successful Proposer is an individually-owned firm and the signer is other than the owner, or if the successful Proposer is a partnership and the signer is other than a partner, or if the successful Proposer is a corporation and the signer is other than the Chief Executive Officer, then the successful Proposer shall furnish to the Board a power of attorney authorizing the signer to bind the Proposer. If the Proposer is a corporation, in place of a power of attorney, there may be substituted a certified copy of the minutes of the Board of Directors' meeting wherein the signer was authorized to bind the corporation to such a contract.

ADAMHS000029750

## Windsor Laurelwood Center for Behavioral Medicine

| | | |
|---|---|---|
| **Equal Opportunity** | Policy Manual: | Human Resources |
| | Policy No.: | 4.0 |
| | Original Policy Date: | 6/05 |
| | Last Revision Date: | 7/10 |
| | Last Review Date: | 1/16, 1/17, 1/18, 1/19, 1/20 |
| | Policy Approval: | Pam Connell |
| | | Shelley Zimmerman |

**POLICY STATEMENT**: It is the policy of Windsor Laurelwood Center that all persons (applicants, employees, and volunteers) are entitled to equal employment opportunity regardless of race, color, religion, sex, national origin, age, disability, ethnicity, sexual orientation, or any other status or trait protected by state, federal, or local law. The equal opportunity is provided not only in recruitment or selection, but also with any promotion, evaluation or retention of employees or volunteers.

Additionally, it is Windsor Laurelwood Center's policy to provide promotion and advancement opportunities in a nondiscriminatory fashion.

The Company does not and will not permit employees to engage in unlawful discriminatory practices or harassment of any kind involving fellow employees or visitors to the company. In addition, Windsor Laurelwood gives assurance of non-discrimination against any person or group of persons on the basis of race, ethnicity, age, color, religion, sex, national origin, sexual orientation or disability in the recruitment, selection, promotion, evaluation or retention of employees or volunteers and/or promotion, discipline or termination of employment per OAC 3793:2-1-02 (O) (1) & (5), nor in the employment, recruitment/selection process per OAC 3793:2-2-02 (O) (4).

**SCOPE:** All employees.

**DEFINITION:** Sexual Harassment: Sexual harassment does not refer to behavior or occasional compliments of a socially acceptable nature. It refers to behavior that is not welcome, that is personally offensive, that fails to respect the rights of others, and therefore, interferes with our work effectiveness.

**EQUIPMENT:** N/A

**GENERAL INFORMATION:** *Sexual Harassment*: It is the policy of Windsor Laurelwood Center that its employees and their work environments shall be free from all forms of sexual harassment and intimidation. Verbal and physical conduct of a sexual nature by any employee, supervisor or manager, including sexual advances, requests for sexual favors or other such conduct which tends to create an intimidating, hostile or offensive work environment is strictly prohibited.

Sexual harassment may be overt or subtle. Whatever form it takes, verbal, non-verbal, or physical, sexual harassment is insulting and demeaning to the recipient and will not be tolerated in the workplace. Sexual

CONFIDENTIAL

DEF-MDL-14396.00207

ADAMHS000029751

harassment directed toward any Windsor Laurelwood Center employee by a co-worker, manager, supervisor or other individual (whether employed by the company or not) will not be tolerated.

Reporting an Incident: Managers and supervisors should be aware that, as management, their actions bind the facility. Should a manager or supervisor engage in or condone sexual harassment, or any other type of harassment, the facility and the manager or supervisor can be held liable.

Employees who believe they are being subjected to sexual harassment by a co-worker, manager, supervisor or other individual (whether employed by the company or not), or who believes their employment is being adversely affected by such conduct, should report the alleged act immediately to the department supervisor or Human Resources.

It is imperative that all employees be aware of the avenues for reporting harassment available to them. Any supervisor or manager who learns of sexual harassment, or any other type of harassment, or of possible harassment, whether through observation, report, or rumor, must immediately report it to Human Resources.

Investigation: All complaints should be handled in a timely and confidential manner. In no event should information concerning a complaint be provided or released to third parties or to anyone within the Company who is not involved with the investigation, nor should anyone involved be permitted to discuss the subject outside of the investigation process. The purpose of this provision is to protect the confidentiality of the employee who files a complaint in order to encourage the reporting of any incidents of sexual harassment and to protect the reputation of any employee wrongfully charged with sexual harassment.

Investigation of a complaint should normally include conferring with the parties involved and any named or apparent witnesses. Employees should be protected from coercion, intimidation, retaliation, interference or discrimination for filing a complaint or assisting in an investigation.

If the investigation reveals that the complaint is valid, corrective and disciplinary action should be promptly taken designed to stop the harassment immediately, and to prevent its recurrence.

Disciplinary Action: At the discretion of management, the results of the investigation, (without divulging confidential information) even if inconclusive, should be reported to complainant with assurances that no retaliation will be taken as a result of his or her filing the complaint.

All employees, managers and supervisors are expected to comply with this policy and take appropriate measures to ensure that such conduct does not occur. Based on the seriousness of the offense, appropriate disciplinary actions should be taken against any employee who violates this policy against sexual harassment, up to and including termination.

This investigative procedure should apply in the event of any internal investigation and is not limited to the investigation of sexual harassment only.

Americans with Disabilities Act: Where reasonably possible or legally required, Windsor Laurelwood Center will make reasonable accommodations for qualified applicants or employees with a disability.

Managers and supervisors should never question whether an applicant or employee has a disability. Rather, applicants should be asked only whether they can perform the essential functions of the job, with or without an accommodation

CONFIDENTIAL                                                                                              ADAMHS000029752

DEF-MDL-14396.00208

Reasonable Accommodation: As required by law, Windsor Laurelwood Center will provide reasonable accommodation for a known disability of an applicant or employee, unless the accommodation would cause an "undue hardship" on the operation of its business or the accommodation would not allow the applicant or employee to perform the essential functions of the job.

It is the obligation of the applicant or employee to request an accommodation, and a manager or supervisor should not raise the issue before the applicant or employee has requested an accommodation. If an applicant or employee has an obvious disability which would apparently affect his/her ability to perform a given job duty, the individual may be asked to describe how he/she will perform the duty.

What constitutes a "reasonable accommodation" for a disability is determined by the circumstances. Managers and supervisors who are uncertain whether a reasonable accommodation can be made for an employee or applicant with a disability should contact Human Resources for assistance.

Management Responsibility: All managers are responsible for carrying out all aspects of ADA compliance in the management of their areas, including all aspects of employment, training, or other on-going employment decisions, and in structuring work, equipment and resources.

Provisions: Windsor Laurelwood Center will not:
- Unlawfully limit, segregate or classify an applicant or employee in a way that adversely affects employment opportunities because of disability;
- Participate in a contractual or other arrangement or relationship that subjects a qualified applicant or employee with a disability to discrimination;
- Deny employment opportunities to a qualified individual because he/she has a relationship or association with a person with a disability;
- Use qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability unless it is job-related and necessary for the business;
- Use employment tests that do not effectively measure actual abilities;
- Discriminate against an individual because he/she filed a complaint, testified, assisted, or participated in an investigation or other action to enforce the provisions of the ADA.

Documentation: All documentation regarding disabled individuals and the reasonable accommodations made or not made will be separately maintained by Human Resources and will be confidential.

Any action affecting the employment of an applicant or employee with a known disability should be documented and reviewed by Human Resources before implementation.

**REFERENCES:** 3793:2-1-02 (O) (1)

CONFIDENTIAL                                                                                     ADAMHS000029753

DEF-MDL-14396.00209

# HHC Ohio Inc.
## Windsor Laurelwood Center for Behavioral Medicine

### Willoughby, OH

has been Accredited by



## The Joint Commission

Which has surveyed this organization and found it to meet the requirements for the

Hospital Accreditation Program

December 15, 2018

Accreditation is customarily valid for up to 36 months.

Craig W. Jones, FACHE
Chair, Board of Commissioners

ID #3003
Print Report Date: 04-16-2019

Mark R. Chassin, MD, FACP, MPP, MPH
President

The Joint Commission is an independent, not-for-profit national body that oversees the safety and quality of health care and other services provided in accredited organizations. Information about accredited organizations may be provided directly to The Joint Commission at 1-800-994-6610. Information regarding accreditation and the accreditation performance of individual organizations can be obtained through The Joint Commission's web site at www.jointcommission.org

CONFIDENTIAL

DEF-MDL-14396.00210

ADAMHS000029754

# HHC Ohio Inc.
## Windsor Laurelwood Center for Behavioral Medicine

### Willoughby, OH

has been Accredited by



## The Joint Commission

Which has surveyed this organization and found it to meet the requirements for the

### Behavioral Health Care Accreditation Program

### December 12, 2018
Accreditation is customarily valid for up to 36 months.

Craig A. Jones, FACHE
Chair, Board of Commissioners

ID #3093
Print/Reprint Date: 04/16/2019

Mark R. Chassin, MD, FACP, MPP, MPH
President

The Joint Commission is an independent, not-for-profit national body that oversees the safety and quality of health care and other services provided in accredited organizations. Information about accredited organizations may be provided directly to The Joint Commission at 1-800-994-6610. Information regarding accreditation and the accreditation performance of individual organizations can be obtained through The Joint Commission's web site at www.jointcommission.org.

CONFIDENTIAL
DEF-MDL-14396.00211

ADAMHS000029755

DEF-MDL-14396.00212

CONFIDENTIAL

ADAMHS000029756



**Ohio MHAS**
*Promoting wellness and recovery*
Mike DeWine, Governor
Lori Criss, Director

# License to Operate a Private Psychiatric Hospital

This Facility is hereby issued this license to operate the number of beds shown below in accordance with sections 5119.33 of the Ohio Revised Code, and standards prescribed by the State of Ohio, Department of Mental Health and Addiction Services.

Name of Facility:  **Windsor-Laurelwood Center for Behavioral Medicine**

Address:  **35900 Euclid Avenue, Willoughby, OH 44095**

County:  **Lake**

CEO of Hospital:  **Shelley Zimmerman**

Psychiatrist in Charge: Dr.  **Alf  Bergman, MD**

Date Issued:  **10/8/2020**          Date Expires:  **10/7/2021**

License Number:  **07-8007**          Total Licensed Beds:  **118**          Licensed to Admit:  **Children  Adolescents**
                                                                                                    **Adults**

Term of License: **Full**

*Lori Criss*

**Director, Ohio Department of Mental Health and Addiction Services**



Promoting wellness and recovery

Mike DeWine, Governor • Lori Criss, Director • 30 E. Broad St. • Columbus, OH 43215 • (614) 466-2596 • mha.ohio.gov

**Corrected Cover Letter: 05/04/2020**

DATE:       May 1, 2020

TO:          Shelley Zimmerman, CEO
             HHC Ohio, Inc.

FROM:       OhioMHAS Bureau of Licensure and Certification

RE:          **CERTIFICATION APPROVAL**
             **Agency Certification Number 01-0549**

Dear Provider:

The Department of Mental Health and Addiction Services has completed your agency's renewal application review.  Based on our review, your agency is certified to provide the following Behavioral Health Service(s):

> **General Services**
> **Mental Health Day Treatment Servie**
> **Residential, Withdrawal Management, Inpatient SUD**

**HHC Ohio, Inc. dba Windsor-Laurelwood Center for Behavioral Medicine** is certified to provide the service(s) listed at the site(s) indicated on the attached certificate(s) effective **December 22, 2019 to December 21, 2022.  Please note that your agency is authorized to utilize seclusion and restraint.**

This certificate is not transferable to any other location, provider site, building, corporation or other entity.

If you have questions, please contact your surveyor, **Sheila Clark at 419-392-9205.**

Enclosure:  Certificate(s)

pc:    Kim Fraser, Exec. Director, Lake County ADAMHS Board
       Susan Sekely, MBA, Supervisor, Bureau of Licensure and Certification, OhioMHAS
       Sheila Clark, MSCJ, LCDCIII, OCPC, Behavioral Health Standards Surveyor, OhioMHAS
       File

ADAMHS000029757



**Ohio | MHAS**
Promoting wellness and recovery
Mike DeWine, Governor
Lori Criss, Director

---

# Behavioral Health Certification

## CERTIFICATE OF SERVICES

### for

## HHC Ohio, Inc. dba Windsor-Laurelwood
## Center for Behavioral Medicine
### Certification Number:  01-0549

**Issued:  December 22, 2019**          **Expires:   December 21, 2022**

In accordance with Section 5119.36 of the Ohio Revised Code, this agency meets minimum standards and is hereby certified to provide behavioral health services and activities at the location(s) specified:

   Residential, Withdrawal Management, Inpatient SUD

---

**Director, Ohio Department of Mental Health and Addiction Services**

CONFIDENTIAL

DEF-MDL-14396.00214

ADAMHS000029758

# Agency Site Location(s)

### 35900 Euclid Avenue
### Willoughby, OH 44094

| Adult Res | Child Res | Adult WM | Child WM |
|-----------|-----------|----------|----------|
| 17 | 0 | 24 | 0 |

CONFIDENTIAL

DEF-MDL-14396.00215



**Ohio MHAS**

Promoting wellness and recovery

Mike DeWine, Governor
Lori Criss, Director

# Behavioral Health Certification

## CERTIFICATE OF SERVICES
### for
### HHC Ohio, Inc. dba Windsor-Laurelwood
### Center for Behavioral Medicine
### Certification Number:  01-0549

**Issued:  December 22, 2019**          **Expires:  December 21, 2022**

**In accordance with Section 5119.36 of the Ohio Revised Code, this agency meets minimum standards and is hereby certified to provide behavioral health services and activities at the location(s) specified:**

**Residential, Withdrawal Management, Inpatient SUD**

_____

**Director, Ohio Department of Mental Health and Addiction Services**

CONFIDENTIAL

DEF-MDL-14396.00216

ADAMHS000029760

# Agency Site Location(s)

### 35900 Euclid Avenue
### Willoughby, OH 44094

| Adult Res | Child Res | Adult WM | Child WM |
|-----------|-----------|----------|----------|
| 17 | 0 | 24 | 0 |

CONFIDENTIAL

DEF-MDL-14396.00217

ADAMHS000029761



**Ohio MHAS**
Promoting wellness and recovery
Mike DeWine, Governor
Lori Criss, Director

# Behavioral Health Certification

## CERTIFICATE OF SERVICES
### for
### HHC Ohio, Inc. dba Windsor-Laurelwood
### Center for Behavioral Medicine
### Certification Number:  01-0549

**Issued:  December 22, 2019**          **Expires:  December 21, 2022**

In accordance with Section 5119.36 of the Ohio Revised Code, this agency meets minimum standards and is hereby certified to provide behavioral health services and activities at the location(s) specified:

**General Services**
**Mental Health Day Treatment Service**

_Lori Criss_

_____

**Director, Ohio Department of Mental Health and Addiction Services**

CONFIDENTIAL                                                                                    ADAMHS000029762

DEF-MDL-14396.00218

**Certification Number: 01-0549**

# Agency Site Location(s)

| 35900 Euclid Avenue<br>Willoughby, OH 44094 |
| --- |

CONFIDENTIAL

ADAMHS000029763

DEF-MDL-14396.00219

CONFIDENTIAL

DEF-MDL-14396.00220

ADAMHS000029764

## Lake County ADAMHS Board
## Non-Medicaid Service Provider
## Continuous Quality Improvement Report Reviewing FY 20

Agency:    **Windsor Laurelwood**    Date:    **September 2020**

| | | | | |
|---|---|---|---|---|
| Quality Improvement Committee | Goal: To provide guidance for the Performance Improvement Program. The members work together to develop a systematic coordinated and continuous approach to measure, assess and improve the performance of those function and processes determined to be most directly related to safe and high quality care. | Identify opportunities for improvement, created checklist to assist with identifying areas for improvement and rating each PI process. | Monthly Committee meetings are held to monitor outcomes from all departments responsible for reporting quality improvement and accreditation results.  Gap Analysis is required from any area not meeting goals. | Ongoing |
| | Maintain The Joint Commission Accreditation. | Most recent survey was December 2018 | Prep team meets monthly to review new/revised standards; mock surveys/readiness tools utilized | Ongoing |

CONFIDENTIAL

DEF-MDL-14396.00221

ADAMHS000029765

|  | | | | |
|---|---|---|---|---|
|  | Perform FMEA review and implementation of necessary training and or process change. | FMEA: Therapy Plaza— individualization of treatment | Therapy Plaza is designed to increase individualization for treatment based on diagnosis for our patients | Creating therapy plaza space for each population, patients are assigned track schedules based on their diagnosis |
|  | ORYX Data Submission and Analysis for quality of care. | | Ongoing during monthly quality council | Ongoing |
| Clients Rights/ Grievances | Monthly monitoring of client right grievances and active participation in local board consumer advocate group. | Evaluation of aggregated data is performed monthly | No trends identified | Continue to monitor |
|  | Newly appointed Patient Advocate | Utilizing Communication Forms to bring to treatment team members and resolve communication issues and/or complaints prior to discharge | Monitoring for trends; identified new process of tracking communication, complaints, and grievances with new appointed Patient Advocate | Monitoring and Reviewing is ongoing in Quality Council |
|  | | | | |

DEF-MDL-14396.00222

CONFIDENTIAL

ADAMH-S000029766

| Safety Drills/ Reviews | Fire system supervisory signal testing quarterly. | Supervisor signal testing completed quarterly. | Supervisory signal testing completed and reported to Safety Committee for oversight. | Facility Director to maintain quarterly testing logs. |
|---|---|---|---|---|
| | Fire Pump testing monthly. | Fire pump testing completed monthly. | Pump testing compliant. | Maintain monthly test and log of pump testing. |
| | Emergency generator testing monthly. | Generator testing completed monthly. | Generator testing compliant. Annual testing for rental generator scheduled for 2nd week of September 2020. | Maintain monthly generator testing and log. |
| | Fire drills completed one fire drill per shift per quarter. | Fire drills to be scheduled for remainder of the year. | Fire drill testing compliant. | Maintain fire drill testing schedule. |
| | Safety Survey completed on each unit annually. | All identified issues are written up on a corrective action plan and forwarded to the appropriate individuals for rectification of deficiencies/issues noted in annual survey. | Unit inspection scheduled monthly. All potential hazardous reported. | Maintain log of all units/areas inspected and initiate corrective action plan to be initiated for any issue identified in the safety survey. |

DEF-MDL-14396.00223

CONFIDENTIAL

ADAMHS00000029767

| | | Safety Officer and Unit Managers conduct Environment of Care rounds to ensure issues were identified. | | |
|---|---|---|---|---|
| | Smoke and fire wall penetrations assessed annually. | Smoke/fire wall penetrations sealed according to code. | Assessment to be completed Q4 2020. | Maintain smoke and fire wall according to life safety code. |
| Major Unusual Incidents | All reportable incidents continue to be thoroughly investigated and immediately reported to the appropriate local board and ODMHAS | Upon notification, all incidents are followed up immediately and actions implemented. | All reportable incidents are reported to the Patient Safety Council and evaluation and analysis of corrective actions. | Corrective Actions, if necessary, are implemented immediately.  The Chief Executive Officer, Chief Nursing Officer, Director of Risk Management/PI, Human Resource Director, Chief Medical Officer, Director of Clinical Services confer as appropriate based on the type of incident and implement a corrective action as necessary. |
| Minor Incidents | The Safety Committee at Laurelwood is responsible for reviewing information | The Safety Committee identified boundary violations as an area for improvement even | Get smart program being considered to be implemented which would involve leaders to | Ongoing monthly monitoring to allow for immediate action employee education for |

CONFIDENTIAL

DEF-MDL-14396.00224

ADAMHS000029768

|  | | | | |
|---|---|---|---|---|
|  | gather from incidents reports, seclusion and restraint data and employee injuries. | though rates been somewhat low, the facility wishes to reduce even lower and respond more effectively. Employee education on boundary violations and maladaptive behaviors to be provided to direct patient care staff. | track status and reporting rates for the program. | any adverse trending. |
| Consumer Satisfaction Surveys | Satisfaction Results are reviewed monthly. The Quality Council reviews actions of the Safety Committee and makes recommendations for improvement and/ or changes as needed. | Satisfaction Results are reviewed and analyzed monthly.<br><br>PI committee to include discharge information, educate on discharge plan. | Outpatient programs started to submit Patient Satisfaction Surveys online due to increased use of Telehealth services; increased snack variations for units; leadership also rounds weekly on each unit to increase communication with about programming and needs for the patients on each of the units.<br><br>Continued progress has occurred the educational piece of discharge plans and improved aftercare plans for patients. | Outpatient was in UHS top 10 for Q1 and Q2.<br><br>Efforts will focus on increasing employee involvement in patient and family satisfaction by obtaining feedback to increase rate of return surveys.<br><br>Continue with Satisfaction Survey review and analysis monthly.<br><br>The external data company is behind with inputting data for review, working with staff to increase completion rate and discussing using dynamic forms |
|  | CQI change scores, trends, and completion | Various scales have been implemented | Outcomes have been positive with certain | |

DEF-MDL-14396.00225

CONFIDENTIAL

ADAMHS000029769

| | | | | |
|---|---|---|---|---|
| | rates are reviewed monthly with Quality Council Committee. | across the facility using PHQ-9/9A, Brief Substance Craving Scale, and Brief Psychiatric Rating Scale- C-9. Incorporating outcomes within patient treatment plans. | programs and continue review/analyze outcomes in Quality Council. CQIs started to be submitted directly online for 24 hour turnaround time for review.  This will help aid the DCS to monitor treatment and patient symptoms responses to treatment. | (electronic based inputting) |
| Satisfaction Surveys with Referral Source (certified alcohol and drug addiction programs only) | Surveys are conducted in twice a year. Topics are cover coordination of care, ease of referral process/timely disposition and professionalism of staff. | ER response times has improved and working towards goal of being under 15 min acceptance times. | Improved patient flow times to accepting patients from ERs and then flowing patients through intake process to the units under 2 hours | Implementing—monitor for trends |
| Special Tx/Safety Measures | Therapy Plaza started in January 2020 for adult units to received programming based on diagnosis vs unit.  This has increased patient and staff morale for therapy. | Each patient is assigned a color based on diagnosis (mood, thought disorder, trauma or dual).  Each patient is given a schedule to follow for programming for the day. | Patients may change tracks throughout their stay based on patient needs and functioning. | Continue to monitor progress and patient satisfaction improvements.  Plan for Recovery/Detox and Child/Adolescent Services to have version of Therapy Plaza |

DEF-MDL-14396.00226

CONFIDENTIAL

ADAMHS000029770

| | | | | |
|---|---|---|---|---|
| Waiting List Reviews | Utilizing an active waiting list to service customers who are seeking treatment at our facility. | Early notification when beds become available. | PI committee started to track patient flow times to reduce wait times | Will continue to monitor—the patient flow data has decreased with new processes and forms |
| | | Creating electronic bed board to review availability easier to place incoming patients and utilize direct assessments when patients come from an ED | Direct assessment helps streamline process when receiving patient from ED to reduce wait times in intake lobby. | Trends with referral sources, acceptance times, patient disposition is identified and Business |
| | | Director of A&R complies call log for previous 24 hours | Review 100% of calls during morning flash | Development helps to address any issues within the community |
| In Services/ Continuing Education | Annual education is a mandatory requirement. | The annual employee education week "Safety Fair" is continually evolving to provide greater educational opportunities for all RN/MHTs. | The 2020 Safety Fair will be held in November. | Continue to require all employees to complete annual training. |
| | HealthSteam Trainings are uploaded throughout the year for education | Ongoing | Ongoing | Ongoing |
| | Conducting weekly CPI and CPR refreshers in Q4 for staff due COVID restrictions on in person/hands on training | Staff educator working to offer classes at various times | New Staff Educator | Continue to require all employees to complete annual training. |

DEF-MDL-14396.00227

CONFIDENTIAL

ADAMHS00002977 1

| Utilization Reviews | The goal of the Utilization Review Department is to confer with all necessary external sources for approvals and pre-certifications necessary to assist patients with understanding their financial liability. | CMO, CEO, CFO, and Director of Business Development with input from the Director of UR continue working on contract negotiations with third party payers to decrease the amount of required reviews and inappropriate denials. Working with new Telehealth Services to get approved through COVID | The length of stay and denial rate is monitored monthly at the Utilization Review Committee. Denials and reviews are also discussed in morning flash. | New Utilization Review Plan to assist with monitoring insurance companies responses to patient care needs while in treatment, monitoring continued need for patients 11+days, notifying patient if still in hours insurance may have denied admission. |
|---|---|---|---|---|
| | Secondly monitoring denial rates and lengths of stay are roles of the Utilization Review. | The utilization review department has increased physician reviews with insurance companies to reduce denied days for medical necessity | The Utilization Review Committee reports to the Medical Executive Committee of denials for the year as quarterly report. | Continue to monitor for denial rates and length of stay. |
| | The utilization review department is review 100% of Medicare charts for certifications signed and medical necessity documented | Each physician is assigned a UR staff to assist with the flow of the chart and adhering to necessary standards | The UR staff notify the physician for certification, status of cases, and involved in all treatment teams. | Process has seen reduction of missed physician reviews, less denied days, and 100% Medicare Certification Signed |
| Clinical Record | CMO, CEO and Director of Business Development continue working on contract | The length of stay and denial rate is monitored monthly at the Utilization Review | The Chief Executive Officer has taken on the oversight of the Utilization Review | CMO, CEO and Director of Business Development continue working on contract |

CONFIDENTIAL

DEF-MDL-14396.00228

ADAMHS000029772

| Reviews (certified alcohol and drug addiction programs only) – quarterly) | negotiations with third party payers to decrease the amount of required reviews and inappropriate denials. | Committee. Awareness of increase opioid population, added components to substance abuse screening tool and visual cue sheets. UR and intake staff completed ASAM training. | Department. Auditing for compliance of utilizing substance abuse screening tools. | negotiations with third party payers to decrease the amount of required reviews and inappropriate denials. |
|---|---|---|---|---|
| Peer Reviews (certified alcohol and drug addiction programs only) – quarterly) | Physicians meet monthly conducting peer reviews. | If an actionable item arises an action plan is immediately compiled and correction implementation occurs. | Significant Events with patients, those cases will be submitted through peer review | On going—CMO to identify issues and incorporate peer review findings for OPPE |
| Independent Peer Reviews (certified alcohol and drug addiction programs only) | All near misses and unfavorable events are peer reviewed & completed within thirty days of the incident with the purpose of analyzing, evaluating and improving the quality and appropriateness of care provided. | If an actionable item is identified a plan is prepared and implemented to amend the item. | Thorough monitoring including open & closed chart audits are completed monthly determining the effectiveness of the change and or education. | On going |
| | | | | |

DEF-MDL-14396.00229

CONFIDENTIAL

ADAMHS00002977 3

| Minority Reviews | We are an equal opportunity treatment provider and serve all in the community with the same standard of excellence. | | Ongoing | Ongoing |
|---|---|---|---|---|
| Outcomes | CQI outcomes measurements system: A clinical database that surveys patients on admission and discharge assessing symptom improvement, treatment plan & responsibilities for follow-up care. | Outpatient programs started electronically submitted CQIs for 24 hour turnaround to review the patient progress.<br><br>Inpatient began electronic submitted in September. | Data reported in Quality Council and monitoring for trends.<br><br>The external data company continues to be behind with inputting results | Ongoing<br><br>New process to monitor efficiency of direct submission |
| | Telehealth services offered during COVID | Outpatient started conducting hybrid groups for in-person groups and include others unable to attend in person, joined via zoom. Forms including outcomes utilize Adobe sign for completion | Positive patient response for services provided | New process—in evaluation and monitor for trends/changes |

DEF-MDL-14396.00230

CONFIDENTIAL

| Outcomes (certified alcohol and drug addiction programs only) | We are completing this behavioral health outcomes measurement on our Adult Mental Health and Dual Diagnosis units. | New oversight for clinical outcomes on Recovery/Detox units with clinical manager. Attending psychiatrist oversees program with assistance from new medical team started in July 2020. | Data reported in Quality Council and monitoring for trends. | Ongoing |
|---|---|---|---|---|
| Level of Care Review (certified alcohol and drug addiction programs only) | Access and Referral complete a level of care review on all individuals seeking treatment to determine proper treatment intensity. | Tools are utilized to assist with appropriate level of care screening to place patient's in appropriate level of care. | Director of Intake monitors for completion of form and appropriate level of care. Each admission for inpatient and outpatient needs physician acceptance for appropriate level of care. If patient is referred for outpatient, a crisis safety plan and follow-up is still completed and provided to the patient. | Monthly monitoring through chart audits are conducted for appropriateness of action and/or further modification. During morning flash all calls are reviewed and deferrals are discussed if the patient could have been admitted when reviewed with CEO, CNO and CMO. |

Conclusions, analysis of overall trends, patterns, gaps, etc.

ADAMHS000029774

DEF-MDL-14396.00231

CONFIDENTIAL

ADAMHS000029775

## Lake County Provider Agency Quality Improvement and Utilization Review Covering FY 19 and 20

### Section I

| Agency Name | Windsor Laurelwood Center for Behavioral Medicine | | | | |
|---|---|---|---|---|---|
| Location | 35900 Euclid Avenue, Willoughby, OH 44094 | | | | |
| Date Services Commenced | 1898 | | | | |
| Mission Statement | To provide High quality treatment for all individuals with behavioral and addictive disorders in the communities of Northeastern Ohio. We are dedicated to improving the quality of life based on the fundamental principles of trust, respect, integrity and excellence in all areas of service. | | | | |
| Licenses/Certifications/Dates | Joint Commission- Last survey 2018, due for resurvey in 2021; ODMHAS- Last survey November 7, 2019 | | | | |
| Target Population | Children and Adolescents with Mental health disorders, Adults with mental health and/or substance use disorders | | | | |
| Total Budget | Total budgeted SFY 2020 revenue is $32,526,000 | | | | |
| Total # of Staff | Total | | FT | PT | PRN |
| | 328 | | 218 | 19 | 91 |
| Total # of Staff Providing Direct Service | Total | | FT | PT | PRN |
| | 243 | | 158 | 15 | 70 |

| Credentials/Salary ranges for Direct Service Staff | | CREDENTIALS | | FTE | PRN |
|---|---|---|---|---|---|
| | Mental health Technician: | HS DIPLOMA/GED | | 14.50 – 18.93 hr. | 14.50 hr. |
| | Mental Health Specialist | Master's Degree in one of the following areas: Social Work, Psychology, Activity/Art Therapy | | 18.00- 24.54 hr. | 22.00 hr. |

1

DEF-MDL-14396.00232

CONFIDENTIAL

ADAMHS00002776

| RN | Graduate from an accredited program of professional nursing required; Bachelor's degree is preferred. Current, unrestricted licensed to practice by the Ohio State Board of Nursing. | 25.00 – 34.98 hr. | 30.00 hr. |
|---|---|---|---|
| Primary Therapist | Master's Degree from an accredited college or university in social work or a clinical related mental health field. | 21.00-27.88 hr. | 23.00 hr. |
| Activity Therapist | Minimum Bachelor's Degree in Therapeutic Recreation, Music Therapy, Art Therapy or graduate of an accredited Occupational Therapy program. Must be certified by profession's credentialing board (either art, music, recreational or occupational therapy). | 18.00-23.95 hr. | 20-22 hr. |
| CD Counselor | Bachelor's Degree.  Master's Degree strongly preferred. Current mental health licensure with training, experience, or scope of practice in treating chemical dependency OR current licensure through Ohio Chemical Dependency Credentialing Board is required. | 19.00-27.88 hr. | 21-23 hr. |
| A/R Counselor | Master's degree from an accredited college or university in social work, psychology, mental health or a related field, or a bachelor's degree or diploma from an accredited school of professional nursing. | 21.00-29.60 hr. | 22.00 hr. |
| Dietary Staff | none | 11.00-13.56 hr. | 11.50-12.00 hr. |
| Dietician | Bachelor's Degree in nutrition or related field required. Current R.D. registration in the state of Ohio. | 23.00-26.00 hr. | 20.00 hr. |
| Psychiatrist | A current, unrestricted license to practice in the State in which the Facility is located and provide documentation of their background; qualifications; professional experience; worthy character; education; relevant training; clinical judgment; physical, mental, and emotional capability as related to the performance of the Privileges requested; | 200,593 – 215,000 salary | |

2

DEF-MDL-14396.00233

CONFIDENTIAL

ADAMHS000029777

| | | ability to provide, with reasonable, necessary accommodation, safe and competent care; and demonstrated current competence; | | |
|---|---|---|---|---|

## Section II

| For Each Program Receiving ADAMHS Board Funding, Please Provide the Following Information: | | |
|---|---|---|
| | **FY2019** | **FY2020** |
| **Name of Service** | **Inpatient Mental Health  Hospitalization** | **Inpatient Mental Health  Hospitalization** |
| **Total # of Staff Providing Direct Service** | 234 | 234 |
| **Average % of Direct Service Time** | Inpatient staff provides 100% direct service time.  MD's are not included in this percentage. | Inpatient staff provides 100% direct service time.  MD's are not included in this percentage. |
| **Total # of Consumers Served (Annual)** | 4466 Adult and Child/Adolescent Mental Health.<br>Lake County Funded: 3 Adult MH<br>     8 Child and Adol. | 4695 Adult and Child/Adolescent Mental Health.<br>Lake County Funded: 2 Adult MH<br>     5 Child and Adol |
| **Hours of Programming** | 24 hours per day/7 days per week | 24 hours per day/7 days per week |
| **Average Duration of Consumer Involvement in Service** | 6.75 for Child and Adolescent (Lake County Funded)<br>10.7 Adult Mental Health (lake County Funded) | 11.8 for Child and Adolescent (Lake County funded). This number is inflated due to 1 patient who was admitted for 32 days. |

DEF-MDL-14396.00234

CONFIDENTIAL

| | | 5.5 days Adult Mental Health (Lake County funded) |
|---|---|---|
| **% of Recidivism/Reasons for Recidivism** | Based on the 11 Lake ADAMHS admitted: 0 patients were readmitted within 30 days of discharge. | Based on the 7 Lake ADAMHS patients admitted: 0 patients were readmitted within 30 days of discharge. |
| **% of Consumers who Successfully Complete/Attain Goals** | Information based on facility AMA rate: Lake ADAMHS MH board beds had 0 AMA discharges. | Information based on facility AMA rate: Lake ADAMHS MH board beds had 0 AMA discharges. |
| **Outcome Goals for Program** | Inpatient program goals are based on stabilization of symptoms and a safe discharge plan | Inpatient program goals are based on stabilization of symptoms and a safe discharge plan |
| **Average Duration of Waiting List** | N/A | N/A |
| **For Emergency Services, Average Response Time** | N/A | N/A |
| **Are These Within Contract Specifications for Time Fame?** | Yes | Yes |
| **Total Program Budget** | $615,000 total funding from Lake County, 230,000 for Inpatient MH Services | $601,375 to total Lake County funding $191.750 for Inpatient Mental Health Services |
| **% of Budget Received From ADAMHS Board** | Less than 1% | Less than 1% |

ADAMHS000029778

DEF-MDL-14396.00235

CONFIDENTIAL

ADAMHS00002779

## Section II

| | For Each Program Receiving ADAMHS Board Funding, Please Provide the Following Information: | |
|---|---|---|
| | **FY2019** | **FY2020** |
| **Name of Service** | Withdrawal Management | Withdrawal Management |
| **Total # of Staff Providing Direct Service** | 234 | 234 |
| **Average % of Direct Service Time** | Inpatient staff provides 100% direct service time. MD's are not included in this percentage. | Inpatient staff provides 100% direct service time. MD's are not included in this percentage. |
| **Total # of Consumers Served (Annual)** | 1792 Inpatient SUD Services<br>Lake County Funded: 145 | 1515 Inpatient SUD services<br>Lake County funded: 231 |
| **Hours of Programming** | 24 hours per day/7 days per week | 24 hours per day/7 days per week |
| **Average Duration of Consumer Involvement in Service** | 5.5 days (Lake County ORTP) | 5.2 days (Lake County ORTP) |
| **% of Recidivism/Reasons for Recidivism** | Based on the 145 Lake ADAMHS admitted: 1 patient was readmitted within 30 days of discharge | Based on the 231 Lake ADAMHS ORTP admissions 7 patients were re-admitted within 30 days of discharge. |
| **% of Consumers who Successfully Complete/Attain Goals** | Information based on facility AMA rate: Lake ADAMHS MH board beds had 9 AMA discharges. | Information based on facility AMA rate: Lake ADAMHS MH board beds had 9 AMA discharges. |

DEF-MDL-14396.00236

CONFIDENTIAL

| | | |
|---|---|---|
| **Outcome Goals for Program** | Inpatient program goals are based on stabilization of symptoms and a safe discharge plan | Inpatient program goals are based on stabilization of symptoms and a safe discharge plan |
| **Average Duration of Waiting List** | N/A | N/A |
| **For Emergency Services, Average Response Time** | N/A | N/A |
| **Are These Within Contract Specifications for Time Fame?** | Yes | Yes |
| **Total Program Budget** | $615,000 total funding from Lake County, $385,000 for Inpatient Withdrawal Management services | $601,375 total funding from Lake County. $409,625 for Withdrawal Management |
| **% of Budget Received From ADAMHS Board** | Less than 1% | Less than 1% |

ADAMHS000029780

DEF-MDL-14396.0237

CONFIDENTIAL

## Section III

**Identify Service Delivery Problems and Resolutions**

The hospital has had difficulties sustaining census since COVID-19 and the state of emergency "stay at home" order in Ohio. As a resolution we have implemented the following:

- We have been following all local health department/CDC guidelines during this pandemic
- Offering TeleHealth assessments in admissions and IOP level of care groups
- Physician appointments, family meetings and probate hearings are offered on Zoom
- Facilitating hybrid in-person and telehealth groups for PHP and IOP to meet needs for all patients
- No smoking facility since December 2, 2019 to promote overall health and wellbeing
- Therapy Plaza for adult units to further individualize treatment based on diagnosis and in a different treatment space other than the units
- Restructured Recovery Unit with Attending Psychiatrist and new medical group

**Identify Service Coordination Problems and Resolutions**

Phone calls have been made to referral sources for feedback about admission, treatment, and discharge processes. The Chief Medical Officer conducted interviews for news channels to promote Telehealth services and advocate to seek mental health crisis services. The Business Development Staff continues to have outreach within the community which include the NAMIWalks Lake County and Project Hope.

**Identify Funding Problems and Resolutions**

Current Ohio payment methodology is challenging and different Medicaid HMOs are not authorization level of care similar to CareSource stance in the beginning of 2019. In addition, we have seen the managed Medicaid plans tighten ASAM criteria for Opioid treatment for the 4.0 level of care. The Utilization Review Department works to obtain single case agreements case by case basis with an increase of physician reviews with HMO companies to support necessary level of care.

**Identify any significant (>20%) increases or decreases in service provision in specific behavioral health programs**

Not Applicable

**Identify future changes to be made based on results from your Quality Improvement Program**

We continue to utilize and complete Continuous Quality Improvement (CQI) scales to assess for patient's symptoms at admission and discharge. The outpatient department started using an electronic platform (dynamic forms) to complete the CQIs and Patient Satisfaction Surveys due to transitioning to TeleHealth. Therapy plaza has made positive impact with the adult population, the plaza will expand in different locations of the hospital for our Recovery/Detox and Child/Adolescent populations.

7

ADAMHS00002781

DEF-MDL-14396.00238

CONFIDENTIAL

ADAMHS000029782

**Describe how your agency maintains compliance with SAPT Block Grant requirements**

Not Applicable

**Describe any special populations your agency serves**

The hospital provides acute stabilization services for children, adolescents and adults. Services are provided on 7 distinct separate units. Units include child (ages 6-13), adolescent (ages 14-17), General Adult, Adult Psychiatric Intensive, Adult Dual Diagnosis, Detoxification and Chemical Dependency Rehabilitation.

**Describe how your agency distributes, collects and utilizes satisfaction surveys**

Satisfaction surveys are attempted to be completed with all of our inpatient and outpatient patients at discharge. When the patient is discharged the survey is sent to an external survey company to compile data. Results are compared to UHS mean score to determine potential areas for improvement through Quality Council. The overall results and patient comments are distributed to managers to provide to staff for review and areas are identified for improvement.

**Describe how your agency maintains compliance with National Accreditation requirements**

Windsor Laurelwood's Board of Governors meets quarterly. The Medical Executive Committee meets monthly. Senior Leadership meets weekly and is responsible for ensuring that any new standard, corrective action plans, or annual patient safety initiatives. Windsor Laurelwood is currently fully accredited by the Joint commission, most recent survey from Joint Commission was December 2018. Monitoring of compliance is conducted through Quality Council Committee.

**Describe how your agency measures Consumer Outcomes**

The facility utilizes CQI outcomes measurement system in all populations. The completed scales are sent to an external company to compile the data to measure symptom improvement from admission to discharge. The data and change scores are review in Quality Council Committee.

**Describe how your agency complies with the business continuity plan requirements (disaster preparedness)**

Windsor Laurelwood evaluates the Emergency Management Plan (EMP) annually following a Hazard Vulnerability Analysis (HVA). Updates to the EMP based on the HVA analysis are incorporated as necessary. Senior management has been educated on the EMP and all employees will be trained on this during the annual education fair.

**Describe where your agency fits into the continuum of care. For example, where do you get referrals from, what agencies do you refer clients to, what specific initiatives/programs are you working on in collaboration with ADAMHS agencies and other community agencies?**

Within the Lake County ADAMHS Board system, Windsor Laurelwood is a provider of acute psychiatric services. We receive referrals from the Lake Health system as well as schools, other ADAMHS agencies, primary care physicians, and many private organizations.

# 2020 ANNUAL REVIEW OF PREFORMANCE IMPROVEMENT PROGRAM

Windsor Laurelwood

Lauren Prokop, MSSA, LISW-S, Director of Risk Management and Performance Improvement
Cari Lucas, RN, Quality Specialist

CONFIDENTIAL

ADAMHS000029783

DEF-MDL-14396.00239

<u>**Annual Review of Performance Improvement Program**</u>

<u>**2020**</u>

Windsor Laurelwood's Performance Improvement (PI) Plan will be evaluated on an annual basis for effectiveness in achieving the goal of assuring that safe, quality care was provided to our patients. A summary of activities, improvements made, patient care processes modified, PI projects in progress, goals for the coming year and recommendations for changes to this PI Plan, will be compiled and forwarded to the Medical Executive Committee and Governing Board for review and recommendation.

## 2020 Overview

The Performance Improvement Program (PI) at Windsor Laurelwood has had several changes and challenges throughout the year. Windsor Laurelwood has had multiple changes in leadership and staff in 2020. In spring, a new Chief Nursing Officer was appointed. In July, the Quality Manager transitioned to the Director of Risk Management and PI director and a new Quality Specialist joined the team.  In August a new Human Resource Director and Senior Human Resource Coordinator were appointed. A new medical team joined Windsor Laurelwood in July shortly after the interim Chief Medical Officer joined the team as permanent Chief Medical Officer. There were also several changes in nursing management throughout 2020.

2020 has also come with many challenges at Windsor Laurelwood. Covid- 19 has greatly impacted day to day operations, staffing, census and many other aspects at Windsor Laurelwood. New policies and procedures were put into place during the pandemic with changes being made along the way with CDC recommendation and guideline changes. The Covid-19 pandemic affected our day to day operations with having to limit patient movement throughout the hospital to limit exposure and to maintain safety our staff and patients. On September 27th there was a companywide computer outage that affected Windsor Laurelwood in many ways such as, collection of data and reports, accessing many programs used in daily operations at Windsor Laurelwood, submission of data to MHO and many other areas of operations. The greatest impact of the computer outage was from the end of September to the start of November with some programs gradually being reintroduced.

In 2020, Windsor Laurelwood also implemented a rebranding of the facility. A fresh, new modern logo was established along with updates to signage. The recovery unit was renamed the Recovery Center for Hope. The recovery unit has also had changes in leadership, day to day operations and continues to be assessed for improvements to help our patients succeed and thrive.

CONFIDENTIAL

## Performance Improvement Activities

| Team/Department | PI | Metrics | Summary |
|---|---|---|---|
| Human Resources | Employee Engagement | Department action plan completion | The Human Resource department had many change overs in 2020 resulting in limited data collection. PI to be revamped for 2021. |
| Pharmacy | Appropriate justification with discharges on multiple antipsychotics | Appropriate justification of discharging on multiple antipsychotics on discharge orders | Progress noted throughout the year. In quarter 4 each month was 89% of discharges with appropriate justification. Goal is 100%. PI will continue for 2021. |
| Nursing | Falls | - # of falls<br>- Fall precaution prior to fall<br>- Comfort rounds initiated<br>-Documentation in chart<br>-Updated treatment plans<br>-Medical follow up completed<br>-Fall precaution added post fall if applicable | Metric of this PI had areas that were both successful and areas that struggled.  Areas of improvement needed, PI to continue for 2021 with changes to metrics. |
| Nursing | SAO/Boundary Violations | -# of HPRs<br>-Goal for HPRs: 15% of bed count<br>- Precautions identified at admission<br>- Precautions  initiated after incident<br>-Treatment plan update<br>-Precautions continued throughout treatment<br>-Assault Checklist | Metric continue to require improvement and re-education. PI to continue for 2021 with changes to the metrics. |
| Dietary | Identification of patients with special dietary needs | Identifying patients in cafeteria that require special diets | PI was on hold majority of the year due to Covid- 19, PI to continue for 2021. |

ADAMHS000029785

| Medical Records | Completeness of discharge orders, discharge summaries and obtaining medical consent. | -Discharge orders<br>-Medical Consent<br>-Discharge Note | Medical consent was closed due to 4 months of trending above the goal of 90%. Discharge notes were also trending above 90%. PI closed for 2021 due to reporting in Med exec. and new PI to begin for 2021. |
| Clinical Services | CQI completion rates | CQI in treatment plans for all service codes | Although many times some service codes were at the goal of 100%, metrics varied throughout the year. PI to continue for 2021 with re-education and addition of dynamic forms that began in 2020. |
| Clinical Services | Patient Satisfaction Survey Return Rate for Outpatient department | Patient Satisfaction Survey Return Rate | PI to be closed as it is monitored in other areas of Quality and change in leadership for 2021. Continues to be an area that needs improvement. |
| Risk Management | Columbia Severity Suicide Rating Scales | -Initial Suicide Risk assessment<br>- Assessment of patients on precautions<br>-Assessment of patients not on precautions<br>-Treatment Plans<br>- Discharge risk assessment<br>-Crisis safety plan<br>-Discharge Summary<br>-Overall Score | Areas vary in success and challenges. PI to continue in 2021, with re-education to staff. |

CONFIDENTIAL

# Department Performance Improvement

| Department | Metrics | Department | Metrics |
|---|---|---|---|
| Admissions and Referrals | ■ Monitoring of Intake process<br>■ Patient Flow monitoring | Clinical Staff | ■ CQI-Change Scores<br>■ Assessment Compliance<br>■ Documentation Compliance<br>■ Treatment Plan Completion/Compliance<br>■ Discharge Planning Compliance |
| Dietary | ■ Temperature Logs<br>■ Cleaning and Maintenance of Kitchen<br>■ Recalls<br>■ Special Diet Management | Dietician | ■ High Risk Patient Monitoring<br>■ Nutritional Interventions |
| Employee Education | ■ Orientation Programming<br>■ Code Blue/White Drills | Employee Health | ■ TB Screening<br>■ Hepatitis B Vaccination Screening<br>■ Influenza Vaccinations<br>■ Blood Borne Pathogen Exposure Monitoring |
| Environment of Care | ■ Fire Drills<br>■ Safety Management<br>■ Security Management<br>■ Medical Equipment Maintenance<br>■ Building Maintenance<br>■ Utility Management<br>■ Emergency Management<br>■ Overall cleanliness of hospital | Human Resources | ■ Turnover Rates<br>■ Complaints/Investigations<br>■ Training/Onboarding<br>■ Department Orientation Checklists<br>■ 90 Day Evaluations<br>■ Employee Surveys/Suggestions<br>■ Employee Injury Management |
| Infection Control | ■ HAI monitoring<br>■ Hand Hygiene<br>■ Medical Equipment Logs<br>■ Infection Control Rounds | Laboratory | ■ LabCorp Quality Controls |
| Medical Records | ■ Privacy and Compliance Overview<br>■ Medical Record Maintenance and Overview | Medical Staff | ■ Physician B-Tag Compliance<br>■ TJC Compliance Audits |
| Nursing | ■ Nursing Groups Compliance<br>■ MHT/MHS Groups Compliance<br>■ Treatment Plan Compliance<br>■ Medication Reconciliation<br>■ Admission/Discharge Tobacco Screening | Patient Rights | ■ Monitoring and reporting of patient communications, complaints and grievances |

CONFIDENTIAL

ADAMHS000029787

DEF-MDL-14396.00243

| | | | |
|---|---|---|---|
| | ▪ Nursing Documentation<br>▪ Pain Management<br>▪ Medication Errors<br>▪ Seclusion and Restraint Monitoring<br>▪ Critical Lab Monitoring | | |
| Pharmacy | ▪ Adverse Drug Reactions<br>▪ Medication Errors Monitoring<br>▪ Override Monitoring<br>▪ Recalls | Risk Management | ▪ AER Scorecard: falls, deaths, complaints, assaults<br>▪ Incident Trends<br>▪ Senior Leadership Rounds<br>▪ Camera Rounds |
| Quality | ▪ CORE measures<br>▪ Patient Satisfaction Scores | | |

## Restraint & Seclusion

| | Physical Hold Rate | Seclusion Rate | Mechanical Rate | Hold Duration | Seclusion Duration | Chemical Rate |
|---|---|---|---|---|---|---|
| UHS Rate | 7.67 | 2.17 | 0.14 | 0.07 | 0.09 | 3.72 |
| Windsor Laurelwood | 3.06 | 4.58 | 0.11 | 0.05 | 0.66 | 0 |

Windsor Laurelwood was below the UHS rates related to physical holds, mechanical restraint, and hold duration. Windsor Laurelwood's seclusion rate and duration was greatly affected by a patient admitted on 9/22/20. This patient was placed in seclusion on 9/22/20 and remained in seclusion until 10/18/20 and was on 1:1 for this period of time. Seclusion Policy/Procedures were followed including the completion of 'yellow packets' and debriefings every 4 hours. (54 yellow packets completed in September and 82 packets in October. This patient was eventually brought out of seclusion and on to regular floor with an eventual discharge.)

## FMEA

The area under analysis for 2020 was the introduction to therapy plaza. Therapy plaza was well accepted by patients and many aspects of success were noted. In the short time therapy plaza was open it received good feedback from patients and staff. An incline was noted in patient satisfaction surveys to the question, "Therapy groups were helpful to me," from a grand mean of 4.22 in January to 4.34 in February and 4.36 in March. Unfortunately with Covid-19, Therapy plaza was on hold for much of 2020 and a gradual decline in grand mean of "therapy groups were helpful to me," was noted with a 4.29 in April and 4.27 in May. The Recovery unit and child and adolescent units were not initiated in therapy plaza due to Covid-19. Therapy plaza is scheduled to reopen on February 15th, 2021 for our adult mental health and dual diagnosis populations. Adolescents and children will begin after adults on a date to be determined followed by recovery patients.

CONFIDENTIAL

## Patient Safety

**PsychSafe** 

PsychSafe Dashboard
Windsor-Laurelwood

Acute

Patient Safety Work Product

| Facility | Timeframe | Mechanical Restraints | Seclusion | Holds | Critical (Sample 20%) | Patient Injuries from R/S | Patient Aggression w/ Injury | Patient Aggression w/o Injury | Elopements | Falls | Medication Variances | One-to-One Sitis | Inpatient Satisfaction | Satisfaction Return Rate | Net Promoter Score (January and July) | 7-Day Readmissions | 14-Day Readmissions | 30-Day Readmissions |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benchmark | 2020 | | | | | | | | | | | 31.48 | 4.44 | 66.95 | 35.04 | | | |
| Division Average | December-2020 | 40 | 334 | 1805 | 1220 | 8 | 1631 | 379 | 44 | 723 | 343 | | | | | 379 | 2767 | |
| | | 0.13 | 1.78 | 6.39 | 4.17 | 0.03 | 8.44 | 1.26 | 0.16 | 3.41 | 1.41 | | | | | 1.12 | 9.11 | |
| Windsor-Laurelwood | YTD | 4 | 169 | 184 | 0 | 0 | 71 | 19 | 12 | 86 | 33 | 52.56 | 4.37 | 75.48 | 23.58 | 72 | 519 | |
| | | 0.11 | 4.58 | 3.06 | 0 | 0.06 | 3 | 0.53 | 0.37 | 3.42 | 1.29 | | | | | 1.3 | 9.29 | |
| Windsor-Laurelwood | December-2020 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 0 | 3 | 0 | 76.20 | 4.40 | 72.51 | 19.61 | 5 | 40 | |
| | | 0 | 0 | 0.16 | 0 | 0 | 0.24 | 0.26 | 0 | 1.14 | 1.25 | | | | | 1.21 | 10.47 | |
| Windsor-Laurelwood | November-2020 | 0 | 26 | 16 | 0 | 0 | 13 | 6 | 0 | 5 | 5 | 50.89 | 4.33 | 73.73 | 16.14 | 2 | 34 | |
| | | 0 | 0.73 | 1.28 | 0 | 0 | 4.73 | 0.56 | 0 | 1.82 | 1.25 | | | | | 0.5 | 8.5 | |
| Windsor-Laurelwood | October-2020 | 1 | 89 | 11 | 0 | 2 | 12 | 5 | 3 | 16 | 4 | 46.35 | 4.42 | 72.52 | 32.58 | 10 | 50 | |
| | | 0.3 | 26.86 | 3.32 | 0 | 0.6 | 3.47 | 1.51 | 0.3 | 4.82 | 2.89 | | | | | 1.21 | 10.57 | |
| Windsor-Laurelwood | September-2020 | 0 | 47 | 12 | 0 | 0 | 5 | 1 | 0 | 5 | 6 | 72.00 | 4.34 | 78.28 | 15.16 | 7 | 43 | |
| | | 0 | 15.54 | 3.92 | 0 | 0 | 0.94 | 0 | 0.33 | 2.64 | 6 | | | | | 1.51 | 9.25 | |
| Windsor-Laurelwood | August-2020 | 0 | 3 | 5 | 0 | 0 | 9 | 0 | 6 | 6 | 2 | 53.81 | 4.35 | 77.09 | 33.19 | 3 | 41 | |
| | | 0.39 | 0.97 | 1.61 | 0 | 0 | 2.25 | 0 | 1.99 | 1.93 | 0.83 | | | | | 1.02 | 8.76 | |
| Windsor-Laurelwood | July-2020 | 1 | 3 | 6 | 0 | 1 | 41 | 1 | 9 | 6 | 5 | 48.10 | 4.22 | 84.03 | 8.43 | 0 | 59 | |
| | | 0 | 1 | 1.41 | 0 | 0.32 | 3.55 | 0.32 | 0.65 | 1.94 | 1.19 | | | | | 1.6 | 11.78 | |
| Windsor-Laurelwood | June-2020 | 0 | 5 | 6 | 0 | 0 | 6 | 4 | 0 | 9 | 5 | 66.33 | 4.35 | 69.18 | 31.72 | 1 | 40 | |
| | | 0 | 1.45 | 1.45 | 0 | 0 | 2.18 | 1.45 | 0 | 2.54 | 1.93 | | | | | 3.21 | 5.41 | |
| Windsor-Laurelwood | May-2020 | 0 | 2 | 6 | 0 | 0 | 3 | 3 | 1 | 9 | 3 | 76.01 | 4.37 | 80.23 | 20.34 | 5 | 40 | |
| | | 0 | 0.79 | 2.38 | 0 | 0 | 0.39 | 1.38 | 0.39 | 3.56 | 0.31 | | | | | 1.15 | 9.3 | |
| Windsor-Laurelwood | April-2020 | 0 | 8 | 5 | 0 | 0 | 1 | 1 | 2 | 5 | 4 | 28.04 | 4.42 | 73.48 | 31.76 | 3 | 19 | |
| | | 0 | 3.27 | 2.11 | 0 | 0 | 0.42 | 0.42 | 0.42 | 2.98 | 1.24 | | | | | 3.02 | 12.37 | |
| Windsor-Laurelwood | March-2020 | 2 | 21 | 23 | 0 | 0 | 8 | 0 | 0 | 10 | 11 | 34.06 | 4.41 | 78.19 | * | 4 | 50 | |
| | | 0.67 | 3.36 | 7.73 | 0 | 0 | 1.90 | 0.54 | 0 | 3.29 | 0.69 | | | | | 1.74 | 3.79 | |
| Windsor-Laurelwood | February-2020 | 0 | 8 | 5 | 0 | 0 | 1 | 1 | 1 | 4 | 7 | 37.68 | 4.30 | 77.26 | * | 7 | 42 | |
| | | 0 | 0 | 2.76 | 0 | 0 | 0.31 | 0.31 | 0.31 | 1.32 | 2.45 | | | | | 1.35 | 8.09 | |
| Windsor-Laurelwood | January-2020 | 0 | 4 | 17 | 0 | 0 | 9 | 0 | 2 | 5 | 6 | 34.58 | 4.38 | 74.91 | * | 5 | 40 | |
| | | 0 | 1.07 | 4.55 | 0 | 0 | 2.41 | 0 | 0.53 | 1.34 | 1.71 | | | | | 0.89 | 8.07 | |

Patient and staff safety is of upmost priority at Windsor Laurelwood. Our PsychSafe dashboard shows both areas that we excel at and areas of struggle for Windsor Laurelwood. Areas that we have excelled at in 2020 are holds, mechanical restraints, patient injuries in holds/restraints, patient aggression with injuries, and medication variances. All of these categories were at or below benchmark for at least three fourths of the year. Elopements, inpatient satisfaction, and net promoter score are the areas that need improvement. We continue to review this data, re-educate staff, and review and update processes in these areas.

## PATIENT SATISFACTION RESULTS-INPATIENT

**UHS** Universal Health Services, Inc.

Windsor-Laurelwood Inpatient Satisfaction Survey
January 2020 - December 2020
Level of Care: All
Age: All
Unit: All Units

| Survey Count | Total Surveys | Discharges | Rate of Return |
|---|---|---|---|
| 4186 | 4186 | 5543 | 75.52 |

| Score Legend | |
|---|---|
| 5 - Strongly Agree | 4 - Agree |
| 3 - No Opinion | |
| 2 - Disagree | 1 - Strongly Disagree |

Net Promoter Score
(Click for UHS Details)
23.74 (n: 2700)

| Question | Facility Score | UHS Score |
|---|---|---|
| I was encouraged to help myself and ask others to help me. | 4.41 | 4.50 |
| I was informed of my rights. | 4.20 | 4.37 |
| I felt safe while I was here. | 4.49 | 4.42 |
| The environment was clean and comfortable. | 4.20 | 4.30 |
| Staff were sensitive to my language, cultural, and spiritual needs. | 4.37 | 4.43 |
| I was satisfied with the food. | 3.70 | 4.09 |
| The therapy groups were helpful to me. | 4.31 | 4.39 |
| I had input into my treatment plan goals. | 4.35 | 4.44 |
| I was satisfied with the unit/program staff. | 4.40 | 4.46 |
| I was satisfied with my physician. | 4.41 | 4.48 |
| I was treated with dignity and respect. | 4.45 | 4.45 |
| (New as of April 2020) My treatment goals and needs were met. | 4.42 | 4.4R |
| I feel better now than when I was admitted. | 4.57 | 4.55 |
| I understand what my medications do and why/how I should take them. | 4.56 | 4.58 |
| I understand the importance of following my discharge plan. | 4.62 | 4.66 |
| Overall I was very satisfied with my treatment. | 4.42 | 4.49 |
| (Discontinued after March 2020) I would recommend this facility to someone needing treatment. | 4.38 | 4.40 |
| | **Grand Mean: 4.37** | **4.44** |

|  | Facility Score | UHS Rate |
|---|---|---|
| 2020 Patient Satisfaction Grand Mean | 4.37 | 4.46 |
| 2020 Patient Satisfaction Return Rate | 76% | 67% |
| 2020 Net Promoter Score | 23.74 | 34.97 |

In 2020, "I felt safe while I was here," was the only question to meet benchmark, which is a significant decrease from 2019, in which 9 questions meet benchmark. The many challenges Windsor Laurelwood faced in 2020, such as Covid-19 and having to limit movement throughout the hospital due to Covid-19, staff change over, and the company wide computer outages may have contributed to this overall decrease in results. Staff re-education and process changes were complete to improve scores in 2021.



# PATIENT SATISFACTION RESULTS-OUTPATIENT



**UHS** Universal Health Services, Inc.  **Windsor-Laurelwood Outpatient Satisfaction Survey**
January 2020 - December 2020
Level of Care: All
Age: All
Unit: All Units

| Score Legend | |
|---|---|
| 5 - Strongly Agree | 4 - Agree |
| 3 - No Opinion | |
| 2 - Disagree | 1 - Strongly Disagree |

| Survey Count | Total Surveys | Discharges | Rate of Return |
|---|---|---|---|
| 404 | 404 | 1011 | 39.96 |

| Net Promoter Score [Click for NPS Details] |
|---|
| 84.34 (n: 249) |

| Question | Facility Score | UHS Score |
|---|---|---|
| I was encouraged to help myself and ask others to help me. | 4.85 | 4.66 |
| I was informed of my rights. | 4.82 | 4.61 |
| I felt safe while I was here. | 4.91 | 4.71 |
| The environment was clean and comfortable. | 4.84 | 4.59 |
| Staff were sensitive to my language, cultural, and spiritual needs. | 4.90 | 4.69 |
| My therapist responded to and addressed my needs. | 4.89 | 4.72 |
| The therapy groups were helpful to me. | 4.80 | 4.63 |
| I had input into my treatment plan goals. | 4.84 | 4.64 |
| I was treated with dignity and respect. | 4.93 | 4.75 |
| (New as of April 2020) My treatment goals and needs were met. | 4.75 | 4.58 |
| I feel better now than when I was admitted. | 4.79 | 4.60 |
| The information and education provided by the program addressed my needs. | 4.77 | 4.61 |
| I understand the importance of following my discharge plan. | 4.88 | 4.71 |
| Overall I was very satisfied with my treatment. | 4.84 | 4.66 |
| (Discontinued after March 2020) I would recommend this facility to someone needing treatment. | 4.91 | 4.67 |
| **Grand Mean:** | **4.85** | **4.66** |

| | Facility Score | UHS Rate |
|---|---|---|
| 2020 Patient Satisfaction Grand Mean | 4.85 | 4.66 |
| 2020 Patient Satisfaction Return Rate | 40% | 40% |
| 2020 Net Promoter Score | 84.34 | N/A |

In 2020, all questions for outpatient patient satisfaction scores were above benchmark. This is consistent with results from 2019. Outpatient grand mean score is above benchmark as well. Overall return rate for outpatient surveys continues to an area that needs improvement. Staff re-education and process changes, have been made to improve return rate for 2021.  Patient satisfaction returns were affected greatly in 2020 by COVID-19, telehealth and paper discharges due to COVID-19.



**UHS** Universal Health Services, Inc.  **Grand Mean Trend (Outpatient)**
Windsor-Laurelwood
All LOC

### 12 Month Patient Satisfaction Score Grand Mean Trend



| | Jan-2020 | Feb-2020 | Mar-2020 | April-2020 | May-2020 | June-2020 | July-2020 | Aug-2020 | Sept-2020 | Oct-2020 | Nov-2020 | Dec-2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4.82 | 4.93 | 4.90 | 4.86 | 4.90 | 4.81 | 4.87 | 4.85 | 4.76 | 4.82 | 4.51 | 4.82 |

CONFIDENTIAL

ADAMHS000029791



## 2020 HBIPS/IPFQR Results

2020 HBIPS/IPFQR results show areas of strength and areas in need of improvement at Windsor Laurelwood. HBIPS 1 scores are generally at or near benchmark while HBIPS 5 is an area that needs improving with scores generally below benchmark. Sub 2 scores excel in areas such as providing brief intervention counseling. All areas of Sub 2 scores are often above or near benchmark. Tob 2 scores vary depending on metric scored. Providing or offering tobacco treatment is an area that needs improving while tobacco use treatment provided is an area generally above benchmark. Metabolic screening and transition records are areas that need improvement, process changes, or evaluations. Immunizations are generally above benchmark. Core measure fall out issues and monitoring is currently under review and process changes are currently being made to track areas that need improving and where education is needed.

### Discharge Measures (Goal: Higher rate)

*HBIPS-1 Admission screening for violence risk, substance use, psychological trauma history and patient strengths completed*



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 98.61 | 100.00 | 92.23 | 97.37 | 99.09 | 98.26 | 97.32 | 100.00 | 98.89 | 97.22 | * | * |
| Corporate | 97.40 | 97.55 | 97.21 | 97.53 | 97.49 | 96.92 | 96.07 | 96.71 | 96.98 | 97.29 | * | * |

CONFIDENTIAL

DEF-MDL-14396.00248

ADAMHS000029792

*HBIPS-5 Patients discharged on multiple antipsychotic medications with appropriate justification*



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 100.00 | 100.00 | 100.00 | 0.00 | 100.00 | 0.00 | 100.00 | 100.00 | 66.67 | 0.00 | * | * |
| Corporate | 72.39 | 74.93 | 75.63 | 78.72 | 72.45 | 67.62 | 58.64 | 70.89 | 65.34 | 65.71 | * | * |



*SUB-2 Alcohol use brief intervention provided or offered*



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 80.95 | 92.31 | 80.77 | 76.92 | 65.22 | 81.82 | 69.56 | 83.33 | 66.67 | 64.71 | * | * |
| Corporate | 86.00 | 86.90 | 84.89 | 74.68 | 78.23 | 75.06 | 66.69 | 71.27 | 70.02 | 79.03 | * | * |

CONFIDENTIAL

ADAMHS000029793

DEF-MDL-14396.00249

**SUB-2a Alcohol use brief intervention provided**



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 76.19 | 92.31 | 80.77 | 93.75 | 88.23 | 90.00 | 78.95 | 93.75 | 88.89 | 84.61 | * | * |
| Corporate | 76.90 | 78.24 | 75.30 | 77.34 | 79.84 | 77.23 | 72.21 | 77.70 | 73.81 | 82.77 | * | * |

**SUB-3 Alcohol and other drug use disorder treatment provided or offered at discharge**



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 61.36 | 79.59 | 79.17 | 89.36 | 74.19 | 89.29 | 92.31 | 86.67 | 66.67 | 78.57 | * | * |
| Corporate | 72.46 | 74.99 | 75.92 | 75.46 | 75.92 | 74.97 | 74.29 | 77.33 | 75.23 | 72.83 | * | * |

CONFIDENTIAL

DEF-MDL-14396.00250

**SUB-3a Alcohol and other drug use disorder treatment at discharge**



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 61.36 | 79.59 | 72.92 | 87.23 | 74.19 | 89.29 | 84.61 | 86.67 | 66.67 | 78.57 | * | * |
| Corporate | 59.44 | 58.58 | 58.63 | 61.41 | 60.19 | 59.71 | 59.44 | 62.08 | 60.51 | 61.87 | * | * |

**TOB-2 Tobacco use treatment provided or offered**



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 90.00 | 78.38 | 83.72 | 76.47 | 90.63 | 83.33 | 92.31 | 82.14 | 82.14 | 88.23 | * | * |
| Corporate | 89.76 | 88.74 | 88.36 | 86.47 | 86.09 | 85.06 | 83.43 | 85.59 | 85.56 | 79.47 | * | * |

CONFIDENTIAL

**TOB-2a Tobacco use treatment provided**



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 47.50 | 43.24 | 48.84 | 37.26 | 43.75 | 53.33 | 38.46 | 34.62 | 44.44 | 35.29 | * | * |
| Corporate | 34.56 | 35.54 | 36.65 | 37.36 | 37.59 | 36.86 | 35.54 | 38.61 | 36.27 | 33.05 | * | * |

**TOB-3 Tobacco use treatment provided or offered at discharge**



|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 70.00 | 67.57 | 76.74 | 72.92 | 58.06 | 58.62 | 62.50 | 65.39 | 56.52 | 81.25 | * | * |
| Corporate | 71.93 | 72.62 | 72.38 | 73.64 | 72.28 | 73.89 | 71.35 | 75.04 | 73.38 | 75.41 | * | * |

ADAMHS000029796



**TOB-3a Tobacco use treatment provided at discharge**

|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 0.00 | 0.00 | 2.33 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | * | * |
| Corporate | 6.39 | 6.95 | 6.64 | 7.35 | 8.22 | 7.17 | 7.69 | 7.93 | 8.54 | 7.26 | * | * |



**MetScrn Patients discharged on 1+ antipsychotic medications with a metabolic screening**

|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 84.61 | 93.33 | 87.50 | 64.15 | 60.78 | 54.90 | 44.68 | 44.44 | 44.19 | 43.75 | * | * |
| Corporate | 82.86 | 84.72 | 83.38 | 84.21 | 83.48 | 82.14 | 73.62 | 79.33 | 81.93 | 84.69 | * | * |

CONFIDENTIAL

*TransRec-Pt Transition record with specified elements received by discharged patients*



| | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 51.85 | 44.56 | 30.44 | 48.52 | 52.17 | 63.44 | 51.04 | 56.98 | 56.10 | 53.85 | * | * |
| Corporate | 83.15 | 82.96 | 83.47 | 84.82 | 86.25 | 85.59 | 79.61 | 84.62 | 83.78 | 85.01 | * | * |

*TranRecProv Timely transmission of transition record to next provider upon discharge*



| | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 43.21 | 35.87 | 26.09 | 41.58 | 43.48 | 55.91 | 46.88 | 47.67 | 46.34 | 43.59 | * | * |
| Corporate | 72.51 | 71.10 | 73.72 | 73.62 | 76.51 | 74.05 | 66.72 | 71.92 | 71.04 | 76.27 | * | * |

CONFIDENTIAL

ADAMHS000029798
DEF-MDL-14396.00254



**IMM-2 Influenza immunization**

| | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | * | * | * | * | * | * | 37.90 | 74.42 | 83.75 | 92.11 | * | * |
| Corporate | * | * | * | * | * | * | 59.68 | 73.88 | 78.29 | 77.19 | * | * |

## Event Measures (Goal: Lower rate)

**HBIPS-2 Hours of physical restraint use**

| | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 0.230 | 0.014 | 0.007 | 0.013 | 0.009 | 0.025 | 0.031 | 0.037 | 0.002 | + | + | + |
| Corporate | 0.079 | 0.068 | 0.078 | 0.074 | 0.064 | 0.058 | 0.057 | 0.065 | 0.064 | 0.207 | 0.000 | 0.000 |

ADAMHS000029799



**HBIPS-3 Hours of seclusion use**

|  | Apr 2020 | May 2020 | Jun 2020 | Jul 2020 | Aug 2020 | Sep 2020 | Oct 2020 | Nov 2020 | Dec 2020 | Jan 2021 | Feb 2021 | Mar 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Facility | 0.042 | 0.017 | 0.190 | 0.040 | 0.089 | 2.060 | 4.146 | 0.121 | 0.000 | + | + | + |
| Corporate | 0.140 | 0.073 | 0.081 | 0.084 | 0.080 | 0.093 | 0.115 | 0.083 | 0.091 | 0.056 | 0.000 | 0.000 |

| Indicator | Facility Q1 results | Facility Q2 results | Facility Q3 results | Facility Q4 results | State Rate (from IPFQR hospital compare report) will be out in January | UHS 2020 results |
|---|---|---|---|---|---|---|
| HBIPS 1 | 100% | 97% | 98% | 99% | N/A | 97% |
| HBIPS 2 | 0.06 | 0.08 | 0.02 | 0.02 | 0.16 | 15.81 |
| HBIPS 3 | 0.03 | 0.09 | 0.72 | 1.61 | 0.35 | 0.62 |
| HBIPS 5 | 50% | 100% | 33% | 86% | 58% | 73% |
| SUB -2 | 89% | 85% | 75% | 72% | 83% | 80% |
| SUB -3 | 74% | 85% | 82% | 85% | 67% | 75% |
| TOB-2 | 88% | 84% | 82% | 85% | 84% | 87% |
| TOB-3 | 72% | 72% | 65% | 62% | 52% | 73% |
| Metabolic Screening | 88% | 89% | 60% | 44% | N/A | 82% |
| Transition Record To Pt | 53% | 42% | 55% | 55% | 61% | 84% |
| Transition Record to Next Provider | 36% | 35% | 47% | 47% | 53% | 72% |

CONFIDENTIAL

ADAMHS000029800

## CONTINUOUS QUALITY IMPROVEMENT (CQI) SCALES

### CLINICAL OUTCOMES - 2020

Continuous quality improvement (CQI) scales are utilized across each level of care throughout Windsor Laurelwood, both inpatient and outpatient. Adult inpatient units utilize Patient Health Questionnaires (PHQ-9), child and adolescent units use Brief Psychiatric Rating Scale Clinician-9 (BPRS) and Brief Substance Craving Scale (BSBC) is utilized for detox and recovery patients. Outpatient utilizes PHQ-9 for adult patients and PHQ-9A for adolescent patients. Regardless of the scale type utilized, the focus remains to use the scales to focus individualized treatment plans goals for patients. All service code CQI reports are completed monthly and reported at Quality Council, where progress, improvement suggests and changes can be discussed.

### OUTCOMES SCORES/ANALYSIS



> ➢ Adult mental health change score trend report shows that the average change score for adult mental health has almost consistently been above UHS benchmark. The end of 2020 shows a significant increase in change score.



> ➤ Adult dual diagnosis change score trend report also shows that the average change score for dual diagnosis patients is also almost consistently been above the UHS benchmark in 2020. It too shows a significant increase at the end of 2020.



> ➤ Adult detox and recovery change score trend report shows a consistent struggle to meet UHS benchmarks. Many interventions have been put in place by the end of 2020 improve patient satisfaction and change score of the detox and recovery unit, including but not limited to, a recent change in management, rebranding of the recovery unit, and use of dynamic forms to submit BSCS scales.



> Throughout 2020, the Adolescent change scores were mostly consistent with UHS benchmark until decrease noted in the end of 2020. As with all units at Windsor Laurelwood this trend is being monitored and evaluated for change. New leadership of the Adolescent unit occurred in the summer of 2020. The adolescent population also seems to struggle with the restrictions of Covid-19 that may overall affect their outcomes and perspectives.



> Children's program change scores were mostly above UHS benchmark for 2020 with an occasional drop below benchmark. New leadership of the Children's unit also occurred in the summer of 2020 and they also seems to struggle with the restrictions of Covid-19 that may overall affect their outcomes and perspective

CONFIDENTIAL

ADAMHS000029803

DEF-MDL-14396.00259



> Substance Abuse Adult IOP scores are an area that needs improvement. They are consistently under UHS benchmark. Again, Covid-19 had a great impact on outpatient programming as face to face treatment was halted for a period of time and telehealth was put in place for safety of patients and staff. New leadership changes were recently made. As the new Director of Clinical Services and clinical manager adjust to their new positions the processes will be monitored, evaluated and changed as needed.



> Adult IOP programming change scores are much like the adult substance abuse IOP programming, with large variances in change score. It too was affected by Covid-19 and is undergoing a leadership change in hopes to see improvement in programming overall.



> As with all outpatient programming the change scores in Adolescent PHP struggle and are under observation for change and improvement.

➢ Substance Use Adult PHP did have periods of time in which change scores were well above bench mark. Again, processes and improvements are being reviewed with new leadership.



6012- ADULT PHP

**PHQ-9 Trend Report**
**Average Change Score for Patients Discharged in Jan 2020 - Jan 2021**

➢ Adult PHP programming has the most variance noted with change scores. As with all programming there has been many challenges in 2020 that have affected patients and staff alike. New leadership is hoped to bring a fresh look to programming and ways to improve overall.

## 2021 GOALS/PI PROJECTS

As described above, 2020 has been filled with a lot of change and challenges. It has brought a chance to excel and a chance to improve. With 2021, Windsor Laurelwood hopes to use these changes and challenges to its advantage to continue to improve and make changes to overall performance and patient care and satisfaction. Below is a chart with the 2021 PI projects, teams and metrics.

| Team/Department | PI | Metrics |
|---|---|---|
| Human Resources | Employee Engagement | TBD based off Corporate engagement program |
| Pharmacy | Appropriate justification with discharges on multiple antipsychotics | Appropriate justification of discharging on multiple antipsychotics on discharge orders |
| Nursing | Falls | - # of falls<br>- Of patients who fell, # of patients assessed to be high risk on admission<br>- Of those high risk patients, # placed on fall precautions<br>- Fall precautions on treatment plan |

CONFIDENTIAL

| | | - # of patients who fell, not assessed as high risk on admission<br>- Treatment plan updates post fall |
|---|---|---|
| Nursing | SAO/Boundary Violations | -# of HPRs for Boundary Violation/SAO<br>-Sample Size Audit #<br>- Of patients with SAO incident. # identified upon admission with SAO<br>- Of the patients identified with SAO upon admission, # placed on SAO precautions<br>- SAO precautions on treatment plan<br>-Precautions implemented or changed post SAO incident<br>-Treatment plan update post SAO incident |
| Dietary | Identification of patients with special dietary needs | Identifying patients in cafeteria that require special diets |
| Medical Records | Completeness outpatient charts | - Correct discharge dates<br>- Correct/completed forms |
| Clinical Services | CQI completion rates | CQI in treatment plans for all service codes |
| Clinical Services | Outpatient Aftercare and Support | - Outpatient provider established<br>- Contact established with patient supports<br>- Aftercare faxed post discharge |
| Risk Management | Columbia Severity Suicide Rating Scales | -Initial Suicide Risk assessment<br>- Assessment of patients on precautions<br>-Assessment of patients not on precautions<br>-Treatment Plans<br>- Discharge risk assessment<br>-Crisis safety plan<br>-Discharge Summary<br>-Overall Score |

CONFIDENTIAL

DEF-MDL-14396.00264

CONFIDENTIAL

ADAMHS000029808

# Windsor Laurelwood Center for Behavioral Medicine

## Performance Improvement Project Inventory

*use template to track PIP progress and if changes need to be made to individual PIPs*

**Date of Review:** _____     **Project Name:** _____

| State Date | Current Phase | Purpose | Change(s) Initiated | Indicators/Measures | Status |
|---|---|---|---|---|---|
| | initiation, planning, implementation, monitoring, closing | reason for conducting project | actions that have been put into place | data are being tracked to show improvement | Compared to indicators/measures? Unintended consequences/issues? How you they being addressed? |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |



| TE:<br>,/10/2004 | DOCUMENT ID<br>200431500050 | DESCRIPTION<br>DOMESTIC ARTICLES/FOR PROFIT<br>(ARF) | FILING<br>125.00 | EXPED<br>100.00 | PENALTY<br>.00 | CERT<br>.00 | COPY<br>.00 |

### Receipt
This is not a bill. Please do not remit payment.

C.T. CORPORATION SYSTEM
17 S. HIGH STREET
COLUMBUS, OH 43215

---

# STATE OF OHIO
## CERTIFICATE
### Ohio Secretary of State, J. Kenneth Blackwell

**1499568**

It is hereby certified that the Secretary of State of Ohio has custody of the business records for

**HHC OHIO, INC.**

and, that said business records show the filing and recording of:

| Document(s) | Document No(s): |
|---|---|
| **DOMESTIC ARTICLES/FOR PROFIT** | **200431500050** |



United States of America
State of Ohio
Office of the Secretary of State

Witness my hand and the seal of
the Secretary of State at Columbus,
Ohio this 9th day of November,
A.D. 2004.

*J. Kenneth Blackwell*

Ohio Secretary of State

---

CONFIDENTIAL

ADAMHS000029809

DEF-MDL-14396.00265



NOV-09-2004  13:26

P.02/04



Prescribed by **J. Kenneth Blackwell**

Ohio Secretary of State

Central Ohio: (614) 466-3910

Toll Free: 1-877-SOS-FILE (1-877-767-3453)

www.state.oh.us/sos

e-mail: busserv@sos.state.oh.us

| Expedite this Form: (Select One) |
|---|
| **Mail Form to one of the following:** |
| ⊛ Yes   PO Box 1390  Columbus, OH 43216  *** Requires an additional fee of $100 *** |
| ○ No.   PO Box 670  Columbus, OH 43216 |

## INITIAL ARTICLES OF INCORPORATION
*(For Domestic Profit or Non-Profit)*
Filing Fee $125.00

THE UNDERSIGNED HEREBY STATES THE FOLLOWING:

*(CHECK ONLY ONE (1) BOX)*

| (1) ☒ Articles of Incorporation Profit  (113-ARF)  ORC 1701 | (2) ☐ Articles of Incorporation Non-Profit  (114-ARN)  ORC 1702 | (3) ☐ Articles of Incorporation Professional  (170-ARP)  Profession _____  ORC 1785 |
|---|---|---|

**Complete the general information in this section for the box checked above.**

FIRST:   Name of Corporation   **HHC OHIO, INC.**

SECOND:   Location   <u>WILLOUGHBY</u>   <u>LAKE</u>
                                    (City)                              (County)

Effective Date  (Optional)  _____   Date specified can be no more than 90 days after date of filing. If a date is specified,
                                   (mm/dd/yyyy)      the date must be a date on or after the date of filing.

☐ **Check here if additional provisions are attached**

**Complete the information in this section if box (2) or (3) is checked. Completing this section is optional if box (1) is checked.**

THIRD:   Purpose for which corporation is formed

Any lawful acts or activities for which corporations may be incorporated under the laws of the State of

Ohio, including, but not limited to, mental health services

_____

_____

**Complete the information in this section if box (1) or (3) is checked.**

FOURTH:   The number of shares which the corporation is authorized to have outstanding (Please state if shares are common or preferred and their par value if any)   <u>1,000</u>   <u>Common</u>   <u>1.00</u>
                                                                                          (No. of Shares)   (Type)              (Par Value)

(Refer to instructions if needed)

CONFIDENTIAL

DEF-MDL-14396.00266

ADAMHS000029810

NOV-09-2004  13:26                                                                P.03/04

| Completing the information in this section is optional |
|---|

**FIFTH:** The following are the names and addresses of the individuals who are to serve as initial Directors.

David K. White
*(Name)*
1500 Waters Ridge Drive
*(Street)*                    NOTE: P.O. Box Addresses are NOT acceptable.

Lewisville                   TX                              75057
*(City)*                     *(State)*                       *(Zip Code)*

John E. Pitts
*(Name)*
1500 Waters Ridge Drive
*(Street)*                    NOTE: P.O. Box Addresses are NOT acceptable.

Lewisville                   TX                              75057
*(City)*                     *(State)*                       *(Zip Code)*

David K. Meyercord
*(Name)*
1500 Waters Ridge Drive
*(Street)*                    NOTE: P.O. Box Addresses are NOT acceptable.

Lewisville                   TX                              75057
*(City)*                     *(State)*                       *(Zip Code)*

**REQUIRED**
Must be authenticated
**[signed]** by an authorized
representative
**(See Instructions)**

X  *David K Meyercord*                          10-18-04
Authorized Representative                        Date

DAVID K. MEYERCORD
Print Name

_____                 _____
Authorized Representative                        Date

_____
Print Name

_____                 _____
Authorized Representative                        Date

_____
Print Name

532      CM301 - 04/15/2001 C T System Online            Page 2 of 5            Last Revised:  May 2002

CONFIDENTIAL

DEF-MDL-14396.00267                                              ADAMHS000029811



| **Bureau of Workers'** | 30 W. Spring St. |
| **Compensation** | Columbus, OH 43215 |

## Certificate of Ohio Workers' Compensation

This certifies that the employer listed below participates in the Ohio State Insurance Fund as required by law. Therefore, the employer is entitled to the rights and benefits of the fund for the period specified. This certificate is only valid if premiums and assessments, including installments, are paid by the applicable due date. To verify coverage, visit www.bwc.ohio.gov, or call 1-800-644-6292.

This certificate must be conspicuously posted.

Policy number and employer
01039566

HHC OHIO INC
Windsor Laurelwood Center
35900 EUCLID AVE
WILLOUGHBY, OH 44094-4623

www.bwc.ohio.gov
Issued by: BWC

Period Specified Below
07/01/2021 to 07/01/2022



Interim Administrator/CEO

You can reproduce this certificate as needed.

---

## Ohio Bureau of Workers' Compensation

### Required Posting

Section 4123.54 of the Ohio Revised Code requires notice of rebuttable presumption. Rebuttable presumption means an employee may dispute or prove untrue the presumption (or belief) that alcohol, marihuana or a controlled substance not prescribed by the employee's physician is the proximate cause (main reason) of the work-related injury.

The burden of proof is on the employee to prove the presence of alcohol, marihuana or a controlled substance was not the proximate cause of the work-related injury. An employee who tests positive or refuses to submit to chemical testing may be disqualified for compensation and benefits under the Workers' Compensation Act.



| **Bureau of Workers'** |
| **Compensation** | You must post this language with the Certificate of Ohio Workers' Compensation. |

**DP-29** BWC-1629 (Rev. Jan. 10, 2019)

CONFIDENTIAL

DEF-MDL-14396.00268

ADAMHS000029812

 **Ohio** | **Bureau of Workers' Compensation**

30 W. Spring St.
Columbus, OH 43215

## Certificate of Ohio Workers' Compensation

This certifies that the employer listed below participates in the Ohio State Insurance Fund as required by law. Therefore, the employer is entitled to the rights and benefits of the fund for the period specified. This certificate is only valid if premiums and assessments, including installments, are paid by the applicable due date. To verify coverage, visit www.bwc.ohio.gov, or call 1-800-644-6292.

This certificate must be conspicuously posted.

Policy number and employer
01039566

HHC OHIO INC
Windsor Laurelwood Center
35900 EUCLID AVE
WILLOUGHBY, OH 44094-4623

Period Specified Below
07/01/2020 to 07/01/2021



www.bwc.ohio.gov
Issued by: BWC

*Stephanie McCloud*

Administrator/CEO

You can reproduce this certificate as needed.

---

## Ohio Bureau of Workers' Compensation

## Required Posting

Section 4123.54 of the Ohio Revised Code requires notice of rebuttable presumption. Rebuttable presumption means an employee may dispute or prove untrue the presumption (or belief) that alcohol, marihuana or a controlled substance not prescribed by the employee's physician is the proximate cause (main reason) of the work-related injury.

The burden of proof is on the employee to prove the presence of alcohol, marihuana or a controlled substance was not the proximate cause of the work-related injury. An employee who tests positive or refuses to submit to chemical testing may be disqualified for compensation and benefits under the Workers' Compensation Act.

 **Ohio** | **Bureau of Workers' Compensation**

You must post this language with the Certificate of Ohio Workers' Compensation.

**DP-29** BWC-1629 (Rev. Jan 10, 2019)

CONFIDENTIAL
DEF-MDL-14396.00269

ADAMHS000029813

## Windsor Laurelwood Center for Behavioral Medicine

| | | |
|---|---|---|
| | Policy Manual: | Human Resources |
| | Policy No.: | 66.0 |
| | Original Policy Date: | 3/12 |
| **Dispute Resolution** | Last Revision Date: | 9/17 |
| | Last Review Date: | 1/17, 9/17, 1/18, 1/19, 1/20 |
| | Policy Approval: | Pam Connell |
| | | Shelley Zimmerman |

**PURPOSE:**  To provide an internal process which ensures fair and equitable treatment for all employees in the fair and orderly resolution of disagreements. The Dispute Resolution Process is recognition that differences of opinion are normal and even beneficial for an organization. The process is meant to support the respectful expression of these disagreements and provide a constructive methodology to address and resolve these differences.

**SCOPE:** Windsor Laurelwood Center employees unless otherwise specifically provided in a collective bargaining agreement.

**POLICY:** Windsor Laurelwood Center recognizes that in any organization employees may have concerns or problems. The Windsor Laurelwood Center's Dispute Resolution Process has two internal avenues which employees may pursue, depending upon the nature of the concern (see Procedure sections below):

1. Problem Solving Procedure, or
2. Corporate Compliance Procedures

It is the policy of Windsor Laurelwood Center that all employees are permitted to ask that a concern(s) or problem(s) be reviewed in a prompt and professional manner. Windsor Laurelwood Center shall not allow retaliation, intimidation, coercion, or discrimination against any employee for filing a complaint, including disclosures made by whistleblowers, those assisting in an investigation, or those opposing an unlawful practice.

**Problem Solving Procedure:**
Employees may utilize this procedure in an effort to resolve a problem or in the event a problem has not been resolved to the employee's satisfaction. The following are examples of when an employee or former employee may access the Problem Solving Procedure (not an all-inclusive list):

> ► Conflicts with co-worker, supervisor and/or management or vendor
> ► Harassment (e.g., sexual harassment, race, gender, pregnancy, etc.)
> ► Discrimination
> ► Wage dispute
> ► Retaliation
> ► Unfair treatment
> ► Safety concern

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　ADAMHS000029814

DEF-MDL-14396.00270

▶ Regulatory concern
▶ Policy concern

Supervisors, Department Directors, Human Resources, and/or Senior Management who are involved in the Problem Solving Procedure shall treat the employee who raises the concern both professionally and fairly. If the employee does not obtain a satisfactory resolution at the first step, it is his/her option to request further review at the next highest level. Employees requesting to access the Problem Solving Procedure are asked to document their concerns in writing at each step in the process.

STEP 1    Preferably within thirty (30) days of the incident or problem given rise to your complaint(s), discuss the problems with your immediate supervisor and then document your specific concerns in writing (see attached form). In most instances, a discussion with your supervisor may solve the problem to your satisfaction. Your supervisor shall investigate your concerns and provide you with an answer <u>as soon as possible</u> following the meeting or notify you if additional time is needed to effectively complete the investigation. In the event that your problem is related to your supervisor, you may initiate this process at Step #2 of this policy.

STEP 2    If the problem is not resolved at Step 1, an employee may arrange an appointment to meet with the Department Director or next higher level of management in order to reach a satisfactory solution. A request for such a meeting should be made after the employee receives a response from Step 1. Your Department Director shall investigate your concerns and provide you with an answer <u>as soon as possible</u> following the meeting or notify you if additional time is needed to effectively complete the investigation.

STEP 3    If, for any reason, an employee is dissatisfied with the decision of the Department Director, the employee may file a written complaint with Windsor Laurelwood Center's Director of Human Resources (HRD) or designee following the outcome of the meeting with the Department Director. A meeting shall be scheduled promptly in an attempt to resolve the problem. The HRD shall investigate your concerns and provide you with an answer <u>as soon as possible</u> following the meeting or notify you if additional time is needed to effectively complete the investigation.

STEP 4    If an employee is dissatisfied after receiving the decision of the HRD, the employee may file a written complaint with the CEO/Managing Director (CEO) or designee following the outcome of the meeting with the HRD. The complaint shall be reviewed and further investigated by the CEO or designee. The CEO shall investigate your concerns and provide you with an answer <u>as soon as possible</u> following the meeting or notify you if additional time is needed to effectively complete the investigation.

STEP 5    If the problem is not resolved by Step 4, the employee may file a written complaint with Windsor Laurelwood Center's corporate Human Resources department. Such complaints are to be reviewed by the corporate Human Resources Operations Support function or designee. The employee shall provide a copy of the initial complaint filed by the employee at Step 1 and, also, provide a summary of what has transpired in Steps 1 through 4. The corporate Human Resources department shall investigate his/her concerns and provide him/her with an answer <u>as soon as possible</u> following the meeting or notify him/her if additional time is needed to effectively complete the investigation.

CONFIDENTIAL

DEF-MDL-14396.00271

ADAMHS000029815

Since it is in everyone's best interest to resolve complaints promptly, each person involved is expected to take action called for in a timely manner. Following the completion of the investigation, the employee should receive feedback regarding the review, including the outcome of the investigation.

**Corporate Compliance Procedure**
Corporate compliance establishes standards, policies, and procedures regarding compliance with applicable laws governing relationships among hospitals; other institutional health providers, physicians, employees, etc. The following are examples of when an employee or a former employee should access the Corporate Compliance Procedures (not an all-inclusive list):

- ► Ethical concern
- ► Fraud
- ► Patient abuse and/or neglect
- ► Financial impropriety
- ► Unlawful action and/or conduct
- ► STARK/anti-kickback/healthcare fraud and abuse violations

Any individual may contact their local Compliance Officer or the Corporate Compliance post office box and/or toll free 800 hot line number which provides staff a confidential way to raise concerns. The Corporate Compliance contact information is:

**Corporate Compliance Officer**
**Universal Health Services, Inc.**
**PO BOX 61823**
**King of Prussia, PA 19406-8823**
**Hotline: 1-800-852-3449**

For more details regarding the Corporate Compliance program, please refer to the Corporate Compliance brochure. Copies are available at your local Human Resources office or by contacting the post office box or 800 number listed above.

If a matter is received through the Corporate Compliance program and it is determined to be more appropriate for the Problem Solving Procedure (see above), then the complaint will be routed back through the Problem Solving Procedure.

Windsor Laurelwood Center has a program for resolution of workplace disputes, known as Alternative Resolution of Conflicts (ARC). ARC is an agreement to arbitrate disputes in the workplace. ARC is a contract between the employee and Windsor Laurelwood Center. ARC does not change any other terms and conditions of employment; it is a contract where the employee and employer agree to resolve any covered legal disputes through mandatory arbitration instead of by way of court or jury trial. Employees are entitled to receive a copy of the ARC Agreement upon request.

**Communication Requirements**
Each company facility shall post both the Problem Solving Procedure and the Corporate Compliance procedures. Additionally, a local facility management employee, which would exclude the CEO/Managing Director, shall be designated as a point of contact to review internal disputes/complaints.

Each company facility shall communicate the similarities and differences between the Problem Solving and Corporate Compliance Procedures during new employee orientation and periodically thereafter. Additionally, employees may receive additional materials during orientation.

CONFIDENTIAL

DEF-MDL-14396.00272

ADAMHS000029816

**Windsor Laurelwood Center for Behavioral Medicine**

## DISPUTE RESOLUTION FORM

Employee Name: _____     Date: _____

Department: _____     Supervisor's Name: _____

1. Nature of Complaint:

2. Please describe the specific complaint with details (e.g., date of incident, what was said, when it occurred, what happened, where it happened, and anyone else who may have seen or heard the incident):

3. In your opinion, how might this matter be resolved?

_____     _____
Signature                                                    Date

***Please return this signed form to the Human Resources Department as soon as possible.***
Windsor Laurelwood Center for Behavioral Medicine is an Equal Opportunity Employer

HR 66.0 Dispute Resolution                                                               Page 4

CONFIDENTIAL
ADAMHS000029817

DEF-MDL-14396.00273



**WINDSOR LAURELWOOD**

| | | |
|---|---|---|
| **Patient Rights: Grievances & the Client Rights Officer Role** | Policy Manual: | ADMINISTRATION |
| | Policy No. | ADM-15.1 |
| | Original Policy Date: | 3/08 |
| | Last Revision Date: | 11/16, 3/18, 7/18, 5/19, 9/19, 1/20 |
| | Last Review Date: | 3/18, 7/18, 1/19, 5/19, 9/19, 1/20 |
| | Policy Approval: | Shelley Zimmerman |

**PURPOSE:** The purpose of this policy is to protect and promote the rights of all persons receiving services from Windsor Laurelwood Center for Behavioral Medicine and to insure timely investigation of complaints and fair resolution of grievances.

**POLICY:** It is the policy of Windsor Laurelwood Center for Behavioral Medicine to insure that all client complaints, including those alleging abuse or neglect, are investigated and resolved in a proper and timely manner in accordance with ODMHAS and CMS 482.13(a)(2), as well as all other applicable federal, state, and local statutes.

**DEFINITIONS:**

1. "Client" or "Patient" means an individual applying for or receiving mental health services from a board or mental health agency.

2. "Client's Rights Officer" means the individual designated by a mental health agency or board with responsibility for assuring compliance with the client rights and grievance procedure rule as implemented within each agency or board. For these purposes the individual holds the specific title of *Client's Rights Officer (CRO).*

3. "Communication" means a verbal concern brought forth by patient which is addressed directly with patient treatment team.

4. "Complaint" means a verbal complaint about patient care that is resolved immediately.

5. "Contract agency" means a public or private service provider with which a community mental health board enters into a contract for the delivery of mental health services. A board which is itself providing mental health services is subject to the same requirements and standards which are applicable to contract agencies, as specified in rule 5122:2-1-05 of the Administrative Code.

6. "Grievance" means a written complaint initiated either verbally or in writing by a client or by any other person or agency on behalf of a client regarding denial or abuse of any client's rights.

7. "Reasonable" means a standard for what is fair and appropriate under usual and ordinary circumstances.

8. "Services" means the complete array of professional interventions designed to help a person achieve improvements in mental health such as counseling, individual or group therapy, education, community psychiatric supportive treatment, assessment, diagnosis, treatment planning and goal setting, clinical review, psychopharmacology, discharge planning, professionally-led support, etc.

CONFIDENTIAL       ADAMHS000029818
DEF-MDL-14396.00274

**ROLE & RESPONSIBILITY OF THE CLIENT'S RIGHTS OFFICER (CRO):**

1. The responsibility for the grievance process is delegated to the Client's Rights Officer (CRO) by the Governing Board. The Client's Rights Officer can be reached at (440) 953-3000 ext. 3237. Front desk assistance and voicemail services are available when the Client's Rights Officer is not in the office.

2. The Client's Rights Officer is accessible in person Monday-Friday 8:00 a.m. to 4:30 p.m. During evenings, weekends, holidays, and vacations, a designated staff member will be available as needed. The contact information is available at all times for the patient, patient's legal guardian, family member, and/or significant other as needed.

3. The Client's Rights Officer oversees the process of interpreting patient rights and responsibilities and responds to grievances filed by a patient or other person or agency on behalf of a patient. The Client's Rights Officer is supervised by The Director of Outpatient to advise and oversee the process. The supervisor meets with the CRO on a regular basis and presents CRO report in the Quality Council Committee.

4. The Client's Rights Officer ensures that the patient and as appropriate the patient's family members, significant others, and/or legal guardian, are informed about patient rights and responsibilities in understandable terms upon admission to the hospital and throughout the hospital stay, and are provided a written statement of patient rights and responsibilities. This does not preclude treatment staff from working therapeutically with patients to assist them in understanding and exercising patient rights and responsibilities.

   ➢ A **Patient Rights and Responsibilities** Handbook that includes patient rights and responsibilities, the grievance process, and contact information for the Client's Rights Officer is provided to all patients upon admission to the hospital. The content of the handbook is reviewed with all patients by the Admissions Department personnel. The patient rights and responsibilities and the grievance procedures are posted on each inpatient unit and in the outpatient department.

5. The Client's Rights Officer ensures all allegations of denial of patient rights as identified by patients, their family members, significant others or other persons are recorded in a grievance file available for review by the Ohio Department of Mental Health & Addiction Services (ODMHAS), the CMS, and/or Joint Commission.

6. The Client's Rights Officer is appropriately trained and knowledgeable in the fundamental human, civil, constitutional, and statutory rights of psychiatric patients, including the role of the Disability Rights Ohio.

7. The Client's Rights Officer assists and supports patients, their family members, and significant others in filing and investigating grievances and in exercising their legal rights and representing themselves to resolve complaints, including assisting with the hospital's grievance procedure.

8. The Client's Rights Officer provides assistance in obtaining services of the Disability Rights Ohio and in obtaining access to services of outside agencies or resources at the patient's request.

9. The Client's Rights Officer is not a member of the patient's treatment team and does not have clinical management or other care responsibilities for the patient for whom he/she is acting as the Client's Rights Officer.

10. A staff member will be designated as the interim Client's Rights Officer when the Client's Rights Officer is absent due to vacations, holidays, etc.

    (a) CRO is to complete an out-of-office notification, assigning CRO duties to interim CRO.
    (b) CRO is to set up coverage with interim CRO.

CONFIDENTIAL                                                              ADAMHS000029819
DEF-MDL-14396.00275

11. All Windsor Laurelwood staff are trained in understanding patient rights and responsibilities. Staff members should be able to refer to patient rights and responsibilities and the grievance procedures to patients, upon request.

12. The nursing supervisor may be contacted at (440) 346-0989 for issues that require immediate attention.

## GRIEVANCE PROCEDURES:

1. The Governing Board designates the Quality Council as the committee responsible for the effective operation of the grievance process and for the review and resolution of grievances. The Governing Board also designates a Client's Rights Officer, who will act as a liaison between the Hospital and the Patient in order to facilitate problem-solving actions when necessary.

2. Patients and their family members are informed of the patient's rights and responsibilities upon admission, and the process by which they can voice any concerns related to their rights and/or treatment. *(See also Policy ADM-15.0: Patient Rights and Responsibilities).*

3. The Grievance process includes the procedure by which a patient can submit a communication or formal grievance (including the name of the Client's Rights Officer, how to access to the CRO, the time frame for review of the grievance, and the provision of a written response to the patient within that time frame).

4. The Grievance Procedure is posted on every inpatient and outpatient unit which also includes information on how to file a grievance with external agencies.

5. The facility staff member should express concern and empathy for the patient's condition and assure him/her that immediate attention will be given to the problem. If the complaint cannot be resolved by the staff member, he/she should instruct the patient to complete a Complaint Form, or assist the patient in completing the form, and assist the patient in contacting the Client's Rights Officer(s) at: Ian D. #3237.

6. **The Communication Form** is made available to patients or others acting on behalf of the patient to address a concern that can be resolved promptly by staff or directly to their treatment team. The staff member receiving a verbal grievance should instruct the patient to fill out the **Communication Form,** assist the patient in completing the form or leave a voicemail for the Client's Rights Officer.

   (a) CRO mailboxes are available on all units for patients to be able to submit communications to the Client's Rights Officer.

   (b) Communication forms are available for patients to submit in the CRO mailboxes on all units

   (c) CRO mailboxes are checked by the CRO Monday-Friday at 8 a.m. and nursing supervisors check the CRO mailboxes Saturday, Sunday and designated holidays at 8:00 a.m.

   (d) A verbal complaint will be addressed by staff/CRO and will only escalate to a grievance if there is a rights violation, if it is submitted in the patient's writing, or if the complaint occurs after discharge.

   (e) Upon receipt of a suspected infringement of patient rights, the Nursing Supervisor will take the communication form. If the nursing supervisor is unable to resolve the issue, the communication form will then be brought to the attention of the CRO for further investigation.

   (f) The Nursing Supervisor is to complete logs for rounds and forms in CRO's mailbox. The logs are secured in the nursing supervisor's office to track daily review of the mailboxes.

CONFIDENTIAL   ADAMHS000029820

DEF-MDL-14396.00276

7. Submitted communication forms will be kept in a log separate from the log used to track complaints and grievances.

8. Each complaint/grievance will be entered into MIDAS.

9. The staff member responding to the complaint/grievance should speak with the patient or patient's representative within 24 hours of the receipt of the notification of complaint to investigate, clarify the issues, and inform the patient of the time frame for the complaint/grievance process.
   - If the situation places the patient in immediate danger, such as neglect or abuse, the initial response should be immediate.

10. Time frame for completion of the investigation is 72 hours after the receipt of the notification of complaint, with written response within 7 business days. If there are extenuating circumstances, the patient or patient's representative will be notified of the need for an extended time frame and an agreement made as to when follow-up will occur.

11. Documentation of each step in the investigation will be recorded by the Client's Rights Officer.

12. Once the issue has been resolved, the Client's Rights Officer will provide a written response within 7 business days of the grievance/complaint being received. The response will include:
    - The name of the contact person,
    - The steps taken to investigate the grievance on behalf of the patient,
    - The results of the grievance process, how the grievance was resolved;
    - The date of completion of the investigation.
    - The process to follow if the patient/complainant is not satisfied with the response.

13. Any notes of steps taken to investigate the complaint/grievance should is completed by the Client's Rights Officer along with the signed response letter.

    a) Written responses to patients and/or family members will be reviewed by the Client's Rights Officer and the Director of Outpatient prior to being mailed or given to the patient or patient's representative.

    b) Staff must not forward or share any patient confidential information with a third party without appropriate written consent. DO NOT forward other privileged and/or confidential information (such as occurrence reports).

14. Complaint/Grievance information will be forwarded to the Director of RM for integration into the Risk Management Program.

15. The Client Rights report will be presented to the Quality Council to include a summary of complaints and grievances received. A monthly report and annual summary is prepared and submitted to the Lake County ADAMHS Board as well as an annual summary to the Cuyahoga County Community Mental Health Board, deleting the patient/client name to preserve confidentiality. A grievance file is available for licensing body review with the information maintained for a two-year period.

16. The Director of Outpatient presents a summary report of complaints and grievances received to the Quality Council Medical Executive Committee and the Governing Board for review and further action as needed. Trends will be identified and addressed as needed.

17. Cases may be referred by the Client's Rights Officer, Director of RM, or the Quality Council to Peer Review or the Utilization Review Committee when concerns relate to quality of care or premature discharge issues. Concerns related to compliance issues should be reported to the Compliance Officer.

ADM-15.1 Patient Rights-Grievances

CONFIDENTIAL

DEF-MDL-14396.00277

ADAMHS000029821

18. The Governing Board shall have final authority and responsibility for resolving complaints/grievances that are not resolve through the Grievance process.

19. If a complaint/grievance is received from legal counsel or a regulatory authority it will be forwarded directly to the CEO and Director of RM, who will delegate investigation to the appropriate staff members. It will also be referred to the Corporate Risk Manager and the UHS Legal Department for appropriate action as necessary.

20. All records of patient complaints/grievances will be maintained for at least 2 years from the date of the resolution. This will include a copy of the complaint/grievance; documentation reflecting process used; resolution of complaint/grievance; and the documentation, if applicable, of the circumstances for extending the time period in resolving the complaint/grievance beyond 7 calendar days.

21. The patient has the option at any time to file grievance with an outside organization such as:

| Ohio Department of Mental Health & Addiction Services 200 Civic Center Drive, #300 Columbus, OH  43215 (614) 466-7264 | Disability Rights Ohio 200 Civic Center Dr., Suite 300 Columbus, OH  43215 (614) 466-7264 / (800) 282-9181 TTY (800) 858-3542 | Lake County Board of Alcohol, Drug Addiction, and Mental Health Services One Victoria Place, Suite 205 Painesville, OH  44077 440-350-2197 / 800-899-5253 ext. 3117 |
|---|---|---|
| Board of Cuyahoga County Alcohol, Drug Addiction & Mental Health Services 2012 West 25th Street, 6th Floor Cleveland, OH  44113 (216) 241-3400 | U.S. Department of Health & Human Services Office of Civil Rights Independence Ave., SW Washington, DC  20201 (877) 696-6775 | Attorney General's Office Health Care Fraud Unit 150 East Gay Street, 17th Floor Columbus, OH  43215-3192 (614) 466-0722 |
| Counselor & Social Worker Board 50 West Broad Street, Suite 1075 Columbus, OH  43215-5919 (614) 466-0912 | State Medical Board of Ohio 30 East Broad Street, 3rd Floor Columbus, OH  43215-6127 (614) 466-3934 / (800) 554-7717 | Ohio Board of Nursing 17 South High Street, Suite 400 Columbus, OH  43215-7410 (614) 466-8808 |
| State Board of Psychology 77 South High Street, Suite 1830 Columbus, OH  43215-6108 (614) 466-8808 / (877) 779-7446 | Ohio Department of Mental Health & Addiction Services Client Advocacy Coordinator 30 East Broad Street, 8th Floor Columbus, OH  43215-3430 (877) 275-6364 | Joint Commission on Accreditation of Healthcare Organizations Office of Quality Monitoring One Renaissance Blvd. Oakbrook Terrace, IL  60181 (800) 994-6610 Email: complaint@jointcommission.org |

**REFERENCES:**
1) ODMHAS
2) CMS 482.13(a)(2)

**ORIGINATING DEPARTMENT:** Administration

**CONTRIBUTING DEPARTMENT:** Performance Improvement/Quality

**ATTACHMENTS:**
1) Grievance Procedure Poster
2) Patient Rights and Responsibilities Poster
3) Patient Rights Poster
4) The Complaint Form

CONFIDENTIAL

ADAMHS000029822

DEF-MDL-14396.00278



## WINDSOR LAURELWOOD

# *Grievance Procedure*

Ohio state regulations for mental health and chemical dependency require that there be a grievance procedure and client's rights advocate in each facility. The following outlines the grievance procedure of Windsor Laurelwood Center for Behavioral Medicine. (A copy of the complete grievance policy and procedure may be obtained upon request.)

To initiate the grievance process, a written complaint must be filed with the Client's Rights Officer (CRO) Ian D. is available from 8:00 a.m – 4:30 p.m. Monday through Friday. In his absence, a supervisor is available for assistance. You may reach the CRO in the following manner.

The CRO is located at 35900 Euclid Avenue, Willoughby, Ohio 44094, (440) 953-3000 ext. 3237
- A grievance may be initiated by a patient or someone on behalf of a patient.
- If the CRO is the subject of the grievance, or if the complainant is dissatisfied with the resolution, an alternate impartial individual is identified to investigate the complaint

Complaints must include:
- Date
- Approximate time
- Description of the incident/situation
- Name(s) of individual(s) involved

The patient files the grievance with the CRO who then meets with the patient or the person who initiated the complaint to collect relevant information and documents in the grievance file for follow up. The follow up information to include:
- Date grievance was received
- Summary of grievance
- Overview of grievance investigation
- Timetable for completion of investigation and notification of resolution
- Treatment provider contact name, address, and telephone number

The CRO investigates the complaint and takes the necessary steps to resolve it. The complaint must be resolved within seven (7) calendar days of the receipt of the grievance. Any extenuating circumstances indicating that this time period will need to be extended must be documented in the grievance file and written notification given to the patient. A written notification and explanation of the resolution will be provided to others upon request with written permission from the patient.

### *The patient has the option at any time to file a grievance with an outside organization, such as:*

**Ohio Department of Mental Health &**
**Addiction Services**
200 Civic Center Drive, Suite 300
Columbus, OH 43215
(614) 466-7264

**Attorney General's Office**
Health Care Fraud Unit
150 East Gay Street, 17th Floor
Columbus, OH 43215-3192
(614) 466-0722

**Disability Rights Ohio**
200 Civic Center Drive, Suite 300
Columbus, OH 43215
(614) 466-7264 / (800) 282-9181
TTY (800) 858-3542

**State Board of Psychology**
77 South High Street, Suite 1830
Columbus, OH 43215-6108
(614) 466-8808 / (877) 779-7446

**U.S. Dept of Health & Human Services**
Office of Civil Rights
Independence Ave., SW
Washington, DC 20201
(877) 696-6775

**Ohio Board of Nursing**
17 South High Street, Suite 400
Columbus, OH 43215-7410
(614) 466-8808

**State Medical Board of Ohio**
30 East Broad Street, 3rd Floor
Columbus, OH 43215-6127
(614) 466-3934 / (800) 554-7717

**Counselor & Social Worker Board**
50 West Broad Street, Suite 1075
Columbus, OH 43215-5919
(614) 466-0912
Email. cswmft.info@cswb.state.oh.us

**Lake County Board of Alcohol, Drug**
**Addiction, and Mental Health Services**
One Victoria Place, Suite 205
Painesville, OH 44077
440-350-2197 / 800-899-5253
Fax 440-350-2568

**Cuyahoga County Board of Alcohol, Drug**
**Addiction & Mental Health Services**
2012 West 25th Street, 6th Floor
Cleveland, OH 44113
(216) 241-3400

**Joint Commission on Accreditation of**
**Healthcare Organizations**
Office of Quality Monitoring
One Renaissance Blvd
Oakbrook Terrace, IL 60181
(800) 994-6610
Email: complaint@jointcommission.org
*All complaints must be in writing either by mail or email*

Rev 11/2019

ADAMHS000029823



WINDSOR LAURELWOOD

# — Patient Rights, —
# Participation and Education

(A) In addition to the definitions appearing in rule 5122-14-01 of the Administrative Code, the following definitions apply to this rule:

(1) "Client rights specialist" means the individual designated by the inpatient psychiatric service provider with responsibility for assuring compliance with the patient rights and grievance procedure rule.

(2) "Grievance" means a written complaint initiated either verbally or in writing by a patient or by any other person or agency on behalf of a patient regarding denial or abuse of any patient's rights.

(3) "Reasonable" means a standard for what is fair and appropriate under usual and ordinary circumstances.

(4) "Services" means the complete array of professional interventions designed to help a person achieve improvements in mental health such as counseling, individual or group therapy, education, community psychiatric supportive treatment, assessment, diagnosis, treatment planning and goal setting, clinical review, psychopharmacology, discharge planning, professionally-led support, etc.

(B) Each patient shall have the following rights, as well as the additional rights listed in paragraph (C) of this rule:

(1) Each person who accesses mental health services is informed of these rights:
(a) The right to be informed within twenty-four hours of admission of the rights described in this rule, and to request a written copy of these rights;
(b) The right to receive information in language and terms appropriate for the patient's understanding; and
(c) The right to request to speak to a financial counselor.

(2) Services are appropriate and respectful of personal liberty:
(a) The right to be treated in a safe treatment environment, with respect for personal dignity, autonomy and privacy, in accordance with existing federal, state and local laws and regulations;
(b) The right to receive humane services;
(c) The right to participate in any appropriate and available service that is consistent with an individual service/treatment plan, regardless of the refusal of any other service, unless that service is a necessity for clear treatment reasons and requires the person's participation;
(d) The right to reasonable assistance, in the least restrictive setting; and
(e) The right to reasonable protection from physical, sexual, or emotional abuse or harassment.

(3) Development of service/treatment plans:
(a) The right to a current individualized treatment plan ( ITP) that addresses the needs and responsibilities of an individual that specifies the provision of appropriate and adequate services, as available, either directly or by referral; and
(b) The right to actively participate in periodic ITP reviews with the staff including services necessary upon discharge.

(4) Declining or consenting to services:
The right to give full informed consent to services prior to commencement and the right to decline services absent an emergency.

(5) Restraint or seclusion.
The right to be free from restraint or seclusion unless there is imminent risk of physical harm to self or others.

(6) Privacy:
(a) The right to reasonable privacy and freedom from excessive intrusion by visitors, guests and non-hospital surveyors, contractors, construction crews or others; and
(b) The right to be advised of and refuse observation by techniques such as one-way vision mirrors, tape recorders, televisions, movies, or photographs, or other audio and visual recording technology. This right does not prohibit a hospital from using closed-circuit monitoring to observe seclusion rooms or common areas, but closed circuit monitoring shall not be utilized in patient bedrooms and bathrooms.

(7) Confidentiality:
(a) The right to confidentiality unless a release or exchange of information is authorized and the right to request to restrict treatment information being shared; and
(b) The right to be informed of the circumstances under which the hospital is authorized or intends to release, or has released,

confidential information without written consent for the purposes of continuity of care as permitted by division (A)(7) of section 5122.31 of the Revised Code.

(8) Grievances:
The right to have the grievance procedure explained orally and in writing; the right to file a grievance with assistance if requested; and the right to have a grievance reviewed through the grievance process, including the right to appeal a decision.

(9) Non-discrimination:
The right to receive services and participate in activities free of discrimination on the basis of race, ethnicity, age, color, religion, gender, national origin, sexual orientation, physical or mental handicap, developmental disability, genetic information, human immunodeficiency virus status, or in any manner prohibited by local, state or federal laws.

(10) No reprisal for exercising rights:
The right to exercise rights without reprisal in any form including the ability to continue services with uncompromised access. No right extends so far as to supersede health and safety considerations.

(11) Outside opinions:
The right to have the opportunity to consult with independent specialists or legal counsel, at one's own expense.

(12) No conflicts of interest:
No inpatient psychiatric service provider employee may be a person's guardian or representative if the person is currently receiving services from said provider.

(13) The right to have access to one's own psychiatric, medical or other treatment records, unless access to particular identified items of information is specifically restricted for that individual patient for clear treatment reasons in the patient's treatment plan. If access is restricted, the treatment plan shall also include a goal to remove the restriction,

(14) The right to be informed in advance of the reason (s) for discontinuance of service provision, and to be involved in planning for the consequences of that event.

(15) The right to receive an explanation of the reasons for denial of service.

(C) In addition to the rights listed in paragraph (D) of this rule, each consumer residing in an inpatient psychiatric hospital shall have the following sixteen rights:

(1) Each consumer of mental health services are informed of these rights:
(a) The right to receive humane services in a comfortable, welcoming, stable and supportive environment; and
(b) The right to retain personal property and possessions, including a reasonable sum of money, consistent with the person's health, safety, service/treatment plan and developmental age.

(2) Development of service/treatment plans:
The right to formulate advance directives, submit them to hospital staff, and rely on practitioners to follow them when within the parameters of the law.

(3) Labor of patients:
The right to not be compelled to perform labor which involves the operation, support, or maintenance of the hospital or for which the hospital is under contract with an outside organization. Privileges or release from the hospital shall not be conditional upon the performance of such labor.

(4) Declining or consenting to services:
(a) The right to consent to or refuse the provision of any individual personal care activity and/or mental health services/treatment interventions; and
(b) The right, when on voluntary admission status, to decline medication, unless there is imminent risk of physical harm to self or others; or
(c) The right when hospitalized by order of a probate or criminal court to decline medication unless there is imminent risk of harm to self or others, or through an order by the committing court, except that involuntary medication is not permitted, unless there is imminent risk of harm to self or others, for persons admitted for a competency

ADAMHS000029824



WINDSOR LAURELWOOD

# Patient Rights,
# Participation and Education

evaluation under division (G)(3) of section 2945.371 of the Revised Code or admitted for sanity evaluation under division (G)(4) of section 2945.371 of the Revised Code. The inpatient psychiatric service provider shall provide the opportunity for informed consent.

(5) Privacy, dignity, free exercise of worship and social interaction: The right to enjoy freedom of thought, conscience, and religion; including religious worship within the hospital, and services or sacred texts that are within the reasonable capacity of the hospital to supply, provided that no patient shall be coerced into engaging in any religious activities.

(6) Private conversation, and access to phone, mail and visitors:
(a) The right to communicate freely with and be visited at reasonable times by private counsel or personnel of the legal rights service and, unless prior court restriction has been obtained, to communicate freely with and be visited at reasonable times by a personal physician or psychologist;
(b) The right to communicate freely with others, unless specifically restricted in the patient's service/treatment plan for reasons that advance the person's goals, including, without limitation, the following:
(i) The right of an adult to reasonable privacy and freedom to meet with visitors, guests, or surveyors, and make and/or receive phone calls; or the right of a minor to meet with inspectors, and the right to communicate with family, guardian, custodian, friends and significant others outside the hospital in accordance with the minor's individualized service/treatment plan;
(ii) The right to have reasonable access to telephones to make and receive confidential calls, including a reasonable number of free calls if unable to pay for them and assistance in calling if requested and needed. The right of a minor to make phone calls shall be in accordance with the minor's individualized service/treatment plan; and
(c) The right to have ready access to letter-writing materials, including a reasonable number of stamps without cost if unable to pay for them, and to mail and receive unopened correspondence and assistance in writing if requested and needed subject to the hospital's rules regarding contraband. The right of a minor to send or receive mail shall also be subject to directives from the parent or legal custodian when such directives do not conflict with federal postal regulations.

(7) Notification to family or physician:
The right to have a physician, family member or representative of the person's choice notified promptly upon admission to a hospital.

(D) Each inpatient psychiatric service provider shall provide a patient right advocate to safeguard patient rights. The client rights specialist or a designee shall:

(1) Be appropriately trained and knowledgeable in the fundamental human, civil, constitutional and statutory rights of psychiatric patients including the role of the Ohio protection and advocacy system (disability rights Ohio);

(2) Ensure that the patient, and as appropriate, the patient's family members, significant others, and the patient's legal guardian, are informed about patient rights, in understandable terms, upon admission, and throughout the hospital stay. Treatment staff shall also work with patient to assist them in understanding and exercising patient rights. For any person who is involuntarily detained, the inpatient psychiatric service provider shall, immediately upon being taken into custody, inform the person orally and in writing of their rights described in division (C) of section 5122.05 of the Revised Code;

(3) Be accessible in person during normal business hours, and during evenings, weekends, and holidays as needed for advocacy issues. The name, title, location, hours of availability, and telephone number of the client rights specialist along with a copy of the client rights and grievance procedure as set forth in this rule shall be posted in an area available to the patient, and made available to the patient's legal guardian if any, and the patient's family and significant others, upon request at all times;

(4) Assist and support patients, their family members, and significant others in exercising their legal rights and representing themselves in

receiving complaints. This shall include providing copies of the inpatient psychiatric service provider's policies and procedures relevant to patient rights and grievances upon request, and assistance with the grievance procedure. This shall also include assistance in obtaining services of the Ohio protection and advocacy system (disability rights Ohio) in accordance with sections 5123.60 to 5123.601 of the Revised Code, and assistance in obtaining access to or services of outside agencies or resources upon request;

(5) Not be a member of the patient's treatment team and not have clinical management or care responsibility for the patient for whom he or she is acting as the patient rights advocate; and

(6) Maintain a log available for department review of patient grievances, including all allegations of denial of patient rights as identified by patients, family members of patients, significant others or other persons.

(E) Each inpatient psychiatric service provider shall ensure that its staff members are knowledgeable about patient rights and referral of patients to the patient rights advocate.

(F) Each inpatient psychiatric service provider shall ensure that patients and families of patients participate in an advisory capacity related to programming and relevant policies and procedures.

(G) Each inpatient psychiatric service provider shall ensure that patient and family education is an interdisciplinary and coordinated process, as appropriate to the patient's treatment plan, consistent with patient confidentiality and documented in the medical record. Education shall incorporate appropriate members of the treatment team, types of materials, methods of teaching, community educational resources, and special devices, interpreters, or other aids to meet specialized needs.

(H) Each inpatient psychiatric service provider shall obtain the informed consent of a patient or when appropriate, a guardian, for all prescribed medications that have been ordered, except in an emergency, and for those medical interventions as referenced in and in accordance with division (A) of section 5122.271 of the Revised Code.

(1) Each inpatient psychiatric service provider shall ensure that the patient and legal guardian, when legally appropriate, receives written and/or oral information in a language and format that may be standardized and that is understandable to the person receiving it.
(a) Information shall include the anticipated benefits and side effects of the intervention, including the anticipated results of not receiving the intervention, and of alternatives to the intervention.
(b) Persons served shall be given the opportunity to ask questions, seek additional information and provide input before the intervention or medication is administered/dispensed.
(c) Documentation shall be kept in the patient's medical record regarding the patient's participation in this process, including the patient's response, objections, and decisions regarding the medication or medical intervention. Such documentation may be accomplished through a notation from an appropriate professional staff person, signature of the patient or guardian, or other mechanism.

(2) For purposes of informed consent specific to medication, each psychiatric inpatient service provider shall ensure that the patient and parent or legal guardian when legally appropriate receives written and/or oral information from a physician, registered nurse, or registered pharmacist.

Effective: 2/17/2017
Five Year Review (FYR) Dates: 11/29/2016 and 02/17/2022
Promulgated Under: 119.03
Statutory Authority: 5119.33
Rule Amplifies: 5119.33
Prior Effective Dates: 10/12/1976, 1/1/1991, 1/1/2000, 3/1/2012

CONFIDENTIAL

ADAMHS000029825

DEF-MDL-14396.00281

 

**WINDSOR LAURELWOOD**
*Center for Behavioral Medicine*

Client's Rights Officer
Ian DeWalt

## **Complaint Form**

- If the complaint cannot be resolved by hospital staff or Supervisor, please follow the next steps:
  - ○ Complete Complaint Form and place in the designated Client's Rights' Box on the unit
  - ○ Hospital Staff or Supervisor/Manager will acknowledge complaint within 24 hours

**Patient Name:** _____  **Unit:** _____

**Date:** _____  **Time:** _____

**Complaint:** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Patient Signature:** _____  **Date:** _____  **Time:** _____

**'taff Signature:** _____  **Date:** _____  **Time:** _____

CONFIDENTIAL

DEF-MDL-14396.00282

ADAMHS000029826





**Client's Rights Officer**
**Ian DeWalt**

**Resolutions Notes**

CONFIDENTIAL

ADAMHS000029827



# WINDSOR LAURELWOOD

|  |  |  |
|---|---|---|
| **Patient Rights and Responsibilities** | Policy Manual: | ADMINISTRATION |
|  | Policy No. | ADM-15.0 |
|  | Original Policy Date: 3/08 |  |
|  | Last Revision Date: |  |
|  | Last Review Date: | 1/15, 1/16, 1/17, 1/18, 1/19, 1/20 |
|  | Policy Approval: | Shelley Zimmerman |

**POLICY STATEMENT:** It is the policy of Windsor Laurelwood Center for Behavioral Medicine to respect all patients without regard to race, religious creed, color, ancestry, national origin, sex, disability, marital status, familial status, or sexual orientation. Windsor Laurelwood shall support and protect the fundamental human, civil, constitutional and statutory rights of the individual patient and recognize and respect personal dignity of the patient at all times. Rights are restricted only in accordance with applicable law and regulation.

**PROCEDURE**

**I.  Notification of Rights**

    A.    At the time of admission, <u>all patients</u> including voluntary/involuntary patients or the parent/legal guardian of minor patients shall be provided with a Patient Rights and Responsibilities Handbook which includes detailed information pertaining to Patient Rights in accordance with CMS, ODMH, ODADAS, and JC regulations.

    B.    At the time of admission, each patient shall be given a Patient Handbook which includes the following information:

        1.  A description of the facility, its services, and its costs;
        2.  Information as to how to seek conditional release or discharge;
        3.  A statement of patient rights; and
        4.  A description of a patient grievance procedure.

    C.    If the patient does not understand English or is hearing impaired, the A&R Dept. and/or Therapist will contact an interpreter to explain the Patient's Bill of Rights in the patient's primary language *(See also Policy ADM-13.0 – Interpreter Services)*

    D.    Staff will ask the Patient/Parent/Guardian to sign and date/time the ***Admission Agreement Form*** which also includes a brief summary relating to Patient/Client Rights and Responsibilities. This is completed prior to admission to acknowledge notification of those rights and responsibilities. The original will be filed in the patient's medical record.  If the patient is unable or unwilling to sign the *Admission Agreement* a brief explanation of the reason will be noted on the form.

    E.    Patient's Bill of Rights is displayed prominently throughout the facility including reception areas, units, and other areas frequented by persons receiving services.

    F.    Patients who are Medicare or Tricare beneficiaries receive information about their discharge rights. Medicare patients receive the ***An Important Message from Medicare about Your Rights notification form (CMS-R-193)*** and Tricare patients receive the ***An Important Message from Tricare form*** <u>at the time of admission or no later than two (2) days after admission.</u>

CONFIDENTIAL

DEF-MDL-14396.00284

ADAMHS000029828

1. Admissions staff will give the Medicare/Tricare Form to Medicare/Tricare patients. The patient will be asked to sign and date/time the form. The original Medicare/Tricare form is placed in the patient's chart and a copy is provided to the patient/guardian.

2. If the patient refuses to sign the Medicare/Tricare Form, Admission staff will annotate the refusal and the date/time of refusal on the form. The date of refusal is considered the date of receipt of the notice [42 CFR 405.1205(4)].

3. For patients who have a guardian, a copy of the Medicare/Tricare Form is provided to the guardian.

4. Two (2) days prior to a planned discharge, the Social Worker will inform the patient about his/her discharge rights and give another copy of the *An Important Message From Medicare About Your Rights notification form (CMS-R-193) or Tricare Form* to the patient/guardian.

   ➤ The Social Worker will note on the bottom of the form (back page) that a copy of the form was given to patient/guardian. The staff will sign, date, and time the form on the bottom to validate that the information and form was given to the patient/guardian prior to discharge.

   ➤ NOTE: the 2nd notice will be given to the patient/guardian no more than <u>2 days</u> prior to discharge and no less than <u>4 hours</u> prior to discharge.

   ➤ NOTE: in the event that a Social Worker is unavailable to provide the 2nd notice (i.e., Detox Unit, CMR), a nurse will give a copy of the form to the patient.

5. If a patient disagrees with the discharge decision, it is his/her right to appeal the discharge decision. If the patient exercises his/her right to contact the local Quality Improvement Organization (QIO) reviewer, the Social Work and/or Nursing staff shall immediately contact the physician to rescind the discharge order until the QIO reviewer makes a determination to uphold the treatment team's discharge decision or suspend the discharge.

   ➤ NOTE: the appeal procedures are noted on the Medicare/Tricare Form.

G. Patients/Family/Guardian has the right to be informed about treatment expectations, progress and outcomes. It is the policy of Windsor Laurelwood to fully disclose to the patient and/or family/guardian outcomes of care including errors, adverse occurrences and outcomes that differ significantly from expectations. The attending physician shall keep the patient and/or family/guardian informed of treatment expectations, progress and outcomes of care during the course of hospitalization. The physician/designee shall promptly inform the patient and/or family/guardian when an error, adverse occurrence or outcome of care that differs significantly from expectations occurs.

H. The hospital provides written notice to all patients at the beginning of an inpatient stay or outpatient visit that there is no doctor of medicine or osteopathy present in the hospital 24 hours per day, 7 days per week in order to assist the patient in making an informed decision about his/her care. The notice explains how the hospital meets the medical needs of patients who develop an emergency medical condition at a time when no physician is present in the hospital.

> *CMS 42 CFR 489.20(w) mandates that all hospitals provide written notice to all patients at the beginning of an inpatient stay or outpatient visit if there is no doctor of medicine or doctor of osteopathy present in the hospital 24 hours per day, seven days per week, in order to assist the patient in making an informed decision about his/her care, in accordance with 42 CFR 482.13(b)(2). The notice must also indicate how the hospital will meet the medical needs of any patient who develops an emergency medical condition, as defined in 42 CFR 489.24(b) [the EMTALA definition], at a time when no physician is present in the hospital. The regulation provides the same clarification about when a hospital stay or outpatient visit "begins" as in the regulation concerning physician-owned hospital disclosures.*

CONFIDENTIAL

ADAMHS000029829

DEF-MDL-14396.00285

## II. List of Rights

A. <u>Without limitation, patients shall be entitled to:</u>

- Considerate, respectful, humane care and treatment
- Impartial access to treatment regardless of race, religious creed, color, ancestry, national origin, sex, disability, marital status, familial status, or sexual orientation
- Be treated with human dignity and in an environment that contributes to a positive self-image
- Medical care and treatment in accordance with the highest standards accepted in medical practice to the extent that the facilities, equipment and personnel are available
- Care in a safe and sanitary setting
- Not participate in non-therapeutic labor
- Attend or not attend religious services
- Receive prompt evaluation and care, treatment, habilitation or rehabilitation about which he/she is informed insofar he /she is capable of understanding
- Receive information about the staff responsible for his or her care, treatment, or services
- Not be the subject of experimental research without his/her prior written and informed consent or that of his/her parent, if a minor, or his guardian; except that no involuntary patient shall be subject to experimental research;
- Decide not to participate or may withdraw from any research at any time for any reason
- Have access to consultation with a private physician at their own expense
- Be evaluated, treated, habilitated in the least restrictive environment
- Not be subjected to any hazardous treatment or procedure unless they, their parent (if a minor or the guardian consents); or unless such treatment or procedure is ordered by a court
- A nourishing, well-balanced and varied diet
- Be free from neglect, exploitation; verbal, mental, physical, sexual abuse, and all forms of abuse, harassment and corporal punishment
- Access to protective and advocacy services
- The right to have complaints reviewed by the organization
- Participate in the development of their plan of care
- Make informed decisions regarding their plan of care, or the legal guardian, or parent, if a minor)
- Formulate advance directives as permitted by State law and to have hospital staff and practitioners comply with these directives
- Accept or refuse medical care, or medications
- To have a family member or representative and their physician notified promptly of admission to the hospital
- Personal privacy (unless immediate and serious risk to harm self or others exists)
- Confidentiality of medical records and access to information contained in the medical record within a reasonable timeframe
- The right to receive visits from their attorney, physician or clergyman, in private, at reasonable times
- Exercise citizenship privileges, including their voting privileges

B. <u>Unless withheld for therapeutic reasons or under exceptional circumstances patients are also entitled:</u>

- To wear their own clothes and to keep their own possessions if not on the hospital contraband list
- To keep and be allowed to spend a reasonable sum of their own money for vending expenses
- To communicate by sealed mail or otherwise with persons inside or persons or agencies outside the facility
- To receive visitors of their own choosing at reasonable times
- To have reasonable access to a phone both to make and receive confidential calls
- To have access to their medical record
- To have opportunities for physical exercise and outdoor recreation
- To have reasonable, prompt access to current newspapers, magazines and radio/television programming

CONFIDENTIAL

DEF-MDL-14396.00286

ADAMHS000029830

- To an absolute right to receive visits from their attorney, physician or clergyman, in private, at reasonable times

## III. Right to Use a Telephone

Patients have the right to make phone calls in private. Patients requesting privacy during phone calls must contact a nurse to make arrangements. Telephones designated for patient use are provided on each patient care unit for incoming and outgoing patient phone calls. The hospital staff may not use the patient phones, and patients may not use hospital business phones, unless specifically approved by the charge nurse.

A. At admission, patients and their families are provided with information regarding how to reach a patient. Patients are encouraged not to use the telephone while programming is occurring but calls to legal counsel, licensing agencies, the courts, or the state attorney general may not be restricted.

B. Telephone use is scheduled during times that are not disruptive to the treatment programs or to other patients or during scheduled group activities

C. Long distance phone calls must be made "collect" or billed to another number.

D. Patients are encouraged to limit calls to ten minutes or less.

E. Patients are not allowed to keep or use cell phones during their hospitalization, even for long distance calling.

## IV. Restriction of Rights

A. The right to communicate with legal counsel, licensing agencies, the courts, or the state attorney general may not be restricted.

B. Rights that may be withheld for therapeutic reasons or under exceptional circumstances, when properly documented in the medical record, are:
- To send and receive mail
- To use a telephone
- To receive visitors at reasonable hours (except attorney, physician or clergyman)

C. To ensure that patient rights, as guaranteed by state and federal law, are safeguarded, any restrictions of patient rights must be ordered by the treating physician only to protect the patient's physical and/or emotional well-being or to protect another person. The physician will provide the patient, parent/conservator of a minor, or the legal guardian, if applicable, with a clear explanation of the clinical rationale for any restriction of rights.

D. The physician will document in the physician's order and in the progress notes of the medical record:
- The reasons for the restriction
- The explanation to the patient
- The duration of the restriction

An order for a restriction of a patient's rights is a <u>one-time order</u> unless the rights restriction is ongoing. If the rights restriction is to be continued, the physician must assess the patient <u>every 24 hours</u> and renew the rights restriction order if the clinical rationale remains unchanged.

The medical record documentation must contain patient assessment information and the rationale for continuance of the restriction as well as criteria for discontinuation of such restriction of rights. Any restriction of a patient's rights must be incorporated into the patient's treatment plan.

E. Monitoring – When the Client Rights Officer is made aware of a rights restriction, the following shall be considered:

ADM-15 Patient Rights and Responsibilities                                                                                                    Page 4

CONFIDENTIAL

DEF-MDL-14396.00287

ADAMHS000029831

1. Review of the patient's medical record and treatment plan to verify that the criteria have been met and properly documented.

    a. If the required components are not present, the Client Rights Officer will educate staff on proper documentation and the requirements of this policy.

    b. Notify appropriate Senior Leadership (CEO, CMO, CNO, DCS, or DPIRM) for further action, when needed.

## V.    Patient Responsibilities

Windsor Laurelwood Center informs patients of their responsibilities:

- To provide information that facilitates their care, treatment, and services
- To ask questions or acknowledge when they do not understand the treatment course or care decision
- To follow instructions, policies, rules, and regulations in place to support quality care for patients and a safe environment for all individuals in the hospital
- To support mutual consideration and respect by maintaining civil language and conduct in interactions with staff and physicians
- To be respectful and non-threatening in their interactions with staff and other patients
- To meet financial commitments
- To respect the rights and property of other patients and staff members.
- To take care of personal grooming, bathing, and dressing
- To carry out normal housekeeping tasks as appropriate, such as making the bed, straightening one's room and bathroom, maintaining personal clothing
- To be responsible for being honest and direct, telling staff about feelings related to personal issues, treatment, hospital environment, or other issues affecting the patient's well-being and care.
- To participate in treatment planning
- To involve family in participating in decisions regarding patient care as clinically and legally appropriate, as follows.

A. Adult Patients (Adult patients have the right to specifically exclude family members from participation unless the patient has a legal guardian)
1. Family members approved by the patient are invited to participate in family meetings.
2. Family meetings are arranged as appropriate by social work staff or the attending physician.
3. If possible, the existence of "Advanced Directives" will be confirmed with the family.

B. Adult Patients with Guardians
1. Guardians are required to approve admission and treatment of patients with the following condition; guardians must approve medication initiation and changes. Such approval is documented on the Consent for Treatment Form or via telephone.
2. Discharge plans are developed with and provided to the guardian.

C. Child/Adolescent Patients
1. The parent or legal guardian is identified as being responsible for care.
2. The appropriate individual will approve admission, medication initiation and changes, and will participate in special programming for Dual Diagnosis and/or Trauma as appropriate. Approval will be documented on the Consent for Treatment Form or double witnessed via telephone and included in the progress note.
3. The family or guardian is requested to participate in nursing assessments, psychosocial histories and family conferences as appropriate.
4. Families or guardians are encouraged to attend evening education and process groups, attendance is documented.
5. Nursing staff will contact families or guardians to provide any necessary treatment information.

Grievance Procedures -- See Policy ADM-15.1, Patient Rights: Grievances & the Client Rights Officer Role

CONFIDENTIAL

DEF-MDL-14396.00288

ADAMHS000029832

Admissions – See Policy ADM-15.2, Admissions: Voluntary & Involuntary

**REFERENCES:**
- 42 CFR 489.27
- 42 CFR 422.620
- 42 CFR 405.1205
- CMS Regulation A 117
- Joint Commission, Chapter: Rights and Responsibilities of the Individual (RI.01.01.01 – RI.02.01.01)

**ATTACHMENTS:**

1) Windsor Laurelwood - Patient Rights and Responsibilities Handbook
2) Admission Agreement
3) An Important Message From Medicare About Your Rights (Medicare)
4) An Important Message from Tricare (Tricare)
5) Notice of Privacy Practices

**ORIGINATING DEPARTMENT: Administration**

**CONTRIBUTING DEPARTMENT: Performance Improvement/Quality**

CONFIDENTIAL

ADAMHS000029833

DEF-MDL-14396.00289

## An important Message from TRICARE®



### YOUR RIGHTS WHILE A TRICARE HOSPITAL PATIENT

You have the right to receive all the hospital care that is necessary for the proper diagnosis and treatment of your illness or injury. According to Federal law, your discharge date must be determined solely by your medical needs, not by "Diagnostic Related Groups (DRGs)" or by TRICARE payments.

You have the right to be fully informed about decisions affecting your TRICARE coverage and payment of your hospital stay and any post-hospital services.

You have the right to request a review by a TRICARE Regional Review Authority (RRA) of any written notice of noncoverage that you may receive from the hospital stating that TRICARE will no longer pay for your hospital care. RRAs employ groups of doctors under contract by the Federal Government to review medical necessity, appropriateness and quality of hospital treatment furnished to TRICARE patients. The phone number and address of the RRA for your area are:

| North Region | South Region | West Region |
|---|---|---|
| Health Net Federal Services, LLC | Humana Military Healthcare | TriWest Healthcare Alliance |
| c/o PGBA, LLC/TRICARE | Services, Inc. | ATTN: Reconsideration Unit |
| Regional Review Authority | Utilization Management | P.O. Box 42049 |
| P.O. Box 870144 | P.O. Box 740044 | Phoenix, AZ 85080 |
| Surfside Beach, SC 29587-9744 | Louisville, KY 40201-9973 | |
| | | 1-888-TRIWEST (1-888-874-9378) |
| 1-877-TRICARE (1-877-874-2273) | 1-800-334-5612 | |

### TALK TO YOUR DOCTOR ABOUT YOUR STAY IN THE HOSPITAL

You and your doctor know more about your condition and your health needs than anyone else. Decisions about your medical treatment should be made between you and your doctor. If you have any questions about your medical treatment, your need for continued hospital care, your discharge, your need for possible post-hospital care, don't hesitate to ask your doctor. The hospital's patient representative or social worker will also help you with your questions and concerns about hospital services.

### IF YOU THINK YOU ARE BEING ASKED TO LEAVE THE HOSPITAL TOO SOON

Ask a hospital representative for a written notice of explanation immediately, if you have not already received one. This notice is called a "notice of noncoverage." You must have this notice of noncoverage if you wish to exercise your right to request a review by the RRA.

The notice of noncoverage will state whether your doctor or the RRA agrees with the hospital's decision that TRICARE should no longer pay for your hospital care.

- If the hospital and your doctor agree, the RRA does not review your case before a notice of noncoverage is issued. But the RRA will respond to your request for a review of your notice of noncoverage and seek your opinion. You cannot be made to pay for your hospital care until the RRA makes its decision if you request the review by noon of the first workday after you receive the notice of noncoverage.

- If the hospital and your doctor disagree, the hospital may request the RRA to review your case. If it does make such a request, the hospital is required to send you a notice to that effect. In this situation, the RRA must agree with the hospital or the hospital cannot issue a notice of noncoverage. You may request that the RRA reconsider your case after you receive a notice of noncoverage, but since the RRA has already reviewed your case once, you may have to pay for at least one day of hospital care before the RRA completes this reconsideration.

IF YOU DO NOT REQUEST A REVIEW, THE HOSPITAL MAY BILL YOU FOR ALL THE COSTS OF YOUR STAY BEGINNING WITH THE THIRD DAY AFTER YOU RECEIVE THE NOTICE OF NONCOVERAGE. THE HOSPITAL, HOWEVER, CANNOT CHARGE YOU FOR CARE UNLESS IT PROVIDES YOU WITH A NOTICE OF NONCOVERAGE.

Revised 6/13                                                                                                    1195

CONFIDENTIAL

DEF-MDL-14396.00290

ADAMHS000029834

## HOW TO REQUEST A REVIEW OF THE NOTICE OF NONCOVERAGE

If the notice of noncoverage states that your physician agrees with the hospital's decision:

- You must make your request for review to the RRA by noon of the first work day after you receive the notice of noncoverage by contacting the RRA by phone or in writing.
- The RRA must ask for your views about your case before making its decision. The RRA will inform you by phone and in writing of its decision on the review.
- If the RRA agrees with the notice of noncoverage, you may be billed for all costs of your stay beginning at noon of the day after you receive the RRA's decision.
- Thus, you will not be responsible for the cost of hospital care before you receive the RRA decision.
- If the notice of noncoverage states that the RRA agrees with the hospital's decision:
- You should make your request for reconsideration to the RRA immediately upon receipt of the notice of noncoverage by contacting the RRA in writing.
- The RRA can take up to three working days from receipt of your request to complete a review. The RRA will inform you in writing of its decision on the review.
- Since the RRA has already reviewed your case once prior to the issuance of the notice of noncoverage, the hospital is permitted to begin billing you for the cost of your stay beginning with the third calendar day after you receive your notice of noncoverage, even if the RRA has not completed its review.
- Thus, if the RRA continues to agree with the notice of noncoverage, you may have to pay for at least one day of hospital care.

**Note:** The process described above is called "immediate review." If you miss the deadline for this immediate review while you are in the hospital, you may still request a review of the TRICARE decision to no longer pay for your care at any point during your hospital stay or after you have left the hospital. The notice of noncoverage will tell you how to request this review.

## POST-HOSPITAL CARE

When your doctor determines that you no longer need all the specialized services provided in a hospital, but you still require medical care, he or she may discharge you to a skilled nursing facility or to home care. The discharge planner at the hospital will help arrange for the services you may need after your discharge. TRICARE and supplemental insurance policies have limited coverage for skilled nursing facility care and home health care. Therefore, you should find out which services will or will not be covered and how payment will be made. Consult with your doctor, hospital discharge planner, Health Benefits Advisor (HBA), patient representative and your family in making preparations for care after you leave the hospital. Don't hesitate to ask questions.

Questions involving billing or specific benefit coverage issues should be addressed to your TRICARE claims processor which is:

**North Region**
Health Net Federal Services, LLC
c/o PGBA, LLC/TRICARE
Correspondence
P.O. Box 870141
Surfside Beach, SC 29587-9741

1-877-TRICARE (1-877-874-2273)

**South Region**
TRICARE South Region
Claims Department
P.O. Box 7031
Camden, SC 29020-7031

1-800-403-3950

**West Region**
Wisconsin Physicians Service (WPS)

1-888-874-9378

---

## ACKNOWLEDGEMENT OF RECEIPT

My signature only acknowledges my receipt of this message from Windsor-Laurelwood Center for Behavioral

Medicine and does not waive any of my rights to request a review or make me liable for any payment.

_____                    _____
Signature of Patient                                Date Signed

---

*"TRICARE" is a registered trademark of the TRICARE Management Activity. All rights reserved.*
Revised 6/13                                                                1195

CONFIDENTIAL

DEF-MDL-14396.00291

ADAMHS000029835

Department of Health & Human Services
Centers for Medicare & Medicaid Services
OMB Approval No. 0938-0692

Patient Name:
Patient ID Number:
Physician:

## An Important Message From Medicare About Your Rights

### As A Hospital Inpatient, You Have The Right To:

- Receive Medicare covered services. This includes medically necessary hospital services and services you may need after you are discharged, if ordered by your doctor. You have a right to know about these services, who will pay for them, and where you can get them.

- Be involved in any decisions about your hospital stay, and know who will pay for it.

- Report any concerns you have about the quality of care you receive to the Quality Improvement Organization (QIO) listed here:

Name of QIO
**KePRO**

Telephone Number of QIO
**1-855-408-8557**

### Your Medicare Discharge Rights

**Planning For Your Discharge:** During your hospital stay, the hospital staff will be working with you to prepare for your safe discharge and arrange for services you may need after you leave the hospital. When you no longer need inpatient hospital care, your doctor or the hospital staff will inform you of your planned discharge date.

**If you think you are being discharged too soon:**
- You can talk to the hospital staff, your doctor and your managed care plan (if you belong to one) about your concerns.

- You also have the right to an appeal, that is, a review of your case by a Quality Improvement Organization (QIO). The QIO is an outside reviewer hired by Medicare to look at your case to decide whether you are ready to leave the hospital.

  - **If you want to appeal, you must contact the QIO no later than your planned discharge date and before you leave the hospital.**

  - If you do this, you will not have to pay for the services you receive during the appeal (except for charges like copays and deductibles).

- If you do not appeal, but decide to stay in the hospital past your planned discharge date, you may have to pay for any services you receive after that date.

- Step by step instructions for calling the QIO and filing an appeal are on page 2.

To speak with someone at the hospital about this notice, call Ian Dewalt at 440-953-3000 x3313

---

**Please sign and date here to show you received this notice and understand your rights.**

| Signature of Patient or Representative | Date/Time |
|---|---|
| | |

Form CMS-R-193 (Exp. 03/31/2020) | 1190

CONFIDENTIAL

DEF-MDL-14396.00292

ADAMHS000029836

## Steps To Appeal Your Discharge

- **Step 1:** You must contact the QIO no later than your planned discharge date and before you leave the hospital. If you do this, you will not have to pay for the services you receive during the appeal (except for charges like copays and deductibles).

  - ◘ Here is the contact information for the QIO:

    | Name of QIO (in bold) |
    |---|
    | **KePRO** |

    | Telephone Number of QIO |
    |---|
    | 1-855-408-8557 |

  - ◘ You can file a request for an appeal any day of the week. **Once you speak to someone or leave a message, your appeal has begun.**

  - ◘ Ask the hospital if you need help contacting the QIO.

  - ◘ The name of this hospital is :

    | Hospital Name | Provider ID Number |
    |---|---|
    | Windsor Laurelwood Center for Behavioral Medicine | 364029 |

- **Step 2:** You will receive a detailed notice from the hospital or your Medicare Advantage or other Medicare managed care plan (if you belong to one) that explains the reasons they think you are ready to be discharged.

- **Step 3:** The QIO will ask for your opinion. You or your representative need to be available to speak with the QIO, if requested. You or your representative may give the QIO a written statement, but you are not required to do so.

- **Step 4:** The QIO will review your medical records and other important information about your case.

- **Step 5:** The QIO will notify you of its decision within 1 day after it receives all necessary information.

  - ◘ If the QIO finds that you are not ready to be discharged, Medicare will continue to cover your hospital services.

  - ◘ If the QIO finds you are ready to be discharged, Medicare will continue to cover your services until noon of the day after the QIO notifies you of its decision.

## If You Miss The Deadline To Appeal, You Have Other Appeal Rights:

- You can still ask the QIO or your plan (if you belong to one) for a review of your case:

  - ◘ If you have Original Medicare: Call the QIO listed above.
  - ◘ If you belong to a Medicare Advantage Plan or other Medicare managed care plan: Call your plan.

- If you stay in the hospital, the hospital may charge you for any services you receive after your planned discharge date.

**For more information, call 1-800-MEDICARE (1-800-633-4227), or TTY: 1-877-486-2048.**
**CMS does not discriminate in its programs and activities. To request this publication in an alternate format, please call: 1-800-MEDICARE or email: AltFormatRequest@cms.hhs.gov .**

## Additional Information:

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938- 0692. The time required to complete this information collection is estimated to average 15 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.                                         1190

CONFIDENTIAL

ADAMHS000029837

# Windsor Laurelwood Center for Behavioral Medicine

## Performance Improvement Project Launch Checklist

*Use check list to ensure you have covered important steps to launch your PIP*

**Project Name:** _____

**PIP Leader:** _____

**PIP Members:** _____

Leadership and Team Members:

      Received approval by leadership
      Team assembled/Roles and responsibilities delegated
      Members understand how projects fits with WLW goals
      Members understand how their responsibilities fit with WLW goals
      PIP goals have been communicated to leadership

Project Resources:

      Financial support obtained
      Budget has been established
      Staff time allocated to project
      Materials/resources obtained

PIP Process:

      Timeline and plan established
      Training for staff members
      Team meetings have been scheduled
      Indicators/measures have been created to monitor PIP
      Format/frequency for documenting
      Format/frequency/committee for communicating PIP has been identified
      Identify process if issues arise and how to problem solve potential issues
      Location where documents to be stored
      Project start date



**TEAMWORK**

CONFIDENTIAL

DEF-MDL-14396.00295

CONFIDENTIAL

ADAMHS000029839

| Analysis (Describe Findings) | Quarter 1: Top line will reflect the most recent action items. If any action items were not completed from previous month, then these are listed once again in the next month. Please don't delete any data. This section will grow as the year progresses. The intent is to show a history of actions taken to achieve this goal. |
|---|---|
| Use this section to report your **DATA ONLY** (just report the facts & findings, not what you are doing about it. | |
| | Quarter 2: |
| I.E,: 10 chart were audited, only 6 were compliant. Upon investigation, it appears 2 employees were not | Quarter 3: |
| educated on the proper way to do _____. | Quarter 4: |

| **Action for Improvement** | Quarter 1: Top line will reflect the most recent action items. If any action items were not completed from previous month, then these are listed once again in the next month. Please don't delete any data. This section will grow as the year progresses. The intent is to show a history of actions taken to achieve this goal. |
|---|---|
| Use this section to explain (briefly) what, if anything, will be done to correct, improve, etc the reported results. | |
| I.E., (using example above) the action item might be.... | Quarter 2: |
| | Quarter 3: |
| "PI to meet with employees to review policies and procedures on on how to do ____." (Name of person Responsible, Date Due) | Quarter 4: |
| Be sure to include the name & title of person responsible for completing the task, and the date it is due! For EACH open action item. | |

DEF-MDL-14396.00296

CONFIDENTIAL

ADAMHS000029840

## Performance Improvement Indicators 2017 - Name of Process goes here

| INITIATIVE | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Numerator | 88 | 90 | 88 | 100 | 88 | 88 | 81 | | | | | |
| Denominator | 102 | 102 | 102 | 102 | 102 | 102 | 102 | | | | | |
| Percentage of Compliance | 86% | 88% | 86% | 98% | 86% | 86% | 79% | ###### | ###### | ###### | ###### | ###### |

| Quarterly Outcomes | Quarter 1 | | Quarter 2 | | Quarter 3 | | Quarter 4 | |
|---|---|---|---|---|---|---|---|---|
| Quarterly Percentage | 87% | | 90% | | #DIV/0! | | #DIV/0! | |

**Measurement:** Use this section to provide a DETAILED description of how this is being measured.

Include:
1) Where data is coming from/ How collected (live or closed chart?, observation, survey, audit form, etc)

2) How often the data is being collected (daily, weekly, monthly)

3) The Minimum # of data pieces (audits, charts, observations, etc)- Is this a sample (if so how many are to be done each month), or are you doing a 100% review?

4) Who is collecting the data

Insert a Graph or picture representation of your data here
Choose from Bar Graph, Trend lines, scatter points, etc
Please contact PI Mngr for assistance with this, if needed.
**Below is an example template.**
Graph must match data results reported above and show Year to date info



Page 1 of 2

A. Reports of PI activities are prepared and presented to the Quality Council by the department/service Director/Manager. Reports can include collected data, specific actions, outcomes, and status updates.

B. Performance improvement activities are also reported to the Medical Executive Council, Governing Board, and during Program Review / Staff meetings. The facility may also communicate quality improvement activities to patients/clients, families, and the public upon request.

C. The facility may also report performance improvement activities to the Joint Commission, CMS, ODHMAS, and/or other sources such as Referral Sources.

## CONFIDENTIALITY

A. The Performance Improvement Plan and any/all documentation, which is an integral part of the program, is confidential. Information is maintained in a manner that will preserve its character as not discoverable or admissible in a court of law as provided by state law.

B. The confidential nature of performance improvement records must be respected by participants. All staff must be committed to the maintenance of strict confidentiality. Policies pertaining to confidentiality are strictly enforced.

C. This information is maintained in by Manager of Quality/PI, Director of RM, and the Administrative Office. Subject to the foregoing, collected data is available only to those who are responsible for evaluation and participation in the performance improvement program and those organizations responsible for surveying the facility in order to assure the existence and effectiveness of the program for accreditation and licensing activities. Any other use or distribution of performance improvement data must be expressly authorized by the Quality Council, Governing Board, or CEO.

## COMPLIANCE REQUIREMENTS

A. Joint Commission:
   1) Accreditation standards: *Hospital [HAP] and Behavioral Health [BHC] programs*
   2) National industry benchmarks:–*Hospital Based In-Patient Psychiatric Services Core Measures (HBIPS)*

B. Centers for Medicare / Medicaid Services:
   1) Conditions-of-Participation ("A" and "B" Tags) - [42 CFR Chpt IV: §482. 1-57 and §482. 60, 61, 62]

C. State Licensure agencies:
   1) Ohio Department of Health [OAC: 3701-59-0 and 3727.33]
   2) Ohio Department of Mental Health and Addiction Services [OAC: 5122-14, 24-29], [OAC: 3793]

D. Lake County ADAMHS Board:
   1) Annual Continuous Quality Improvement Report
   2) Lake County Provider Agency Quality Improvement and Utilization Review Report
   3) Board Guidelines to Determine Official Approval of Contract Agency's Quality Improvement Plan

## APPENDICES

1) Appendix A: Performance Improvement Template
2) Appendix B: PIT Launch Checklist
3) Appendix C: PIT Inventory

CONFIDENTIAL
ADAMHS000029841

DEF-MDL-14396.00297

9) The leaders collaborate with staff and appropriate stakeholders to design services

## MEASUREMENT & DATA COLLECTION

A. Data is collected for measurement and assessment of processes and outcomes, particularly those *high risk, high volume and problem prone processes*, based upon a comprehensive set of performance measures. The findings are analyzed to identify significant variances and/or opportunities to improve patient care outcomes. The focus is directed toward dimensions of performance to assure that the proper service is provided to the proper patient at the proper time by qualified and competent individuals. This is demonstrated by verifying that the service provided was needed and that it was provided at the right time and at the right level of care with consideration given to the availability of alternative services and/or resources.

B. The facility may also measures performance of processes in each of the patient care and organizational functions identified by the Joint Commission, CMS, ODHMAS, and/or other sources.

C. Patient/Family surveys and Staff surveys are also utilized to assess quality improvement opportunities.

## IMPROVEMENT

A. The facility and staff will act on opportunities to improve by designing new processes or redesigning existing processes to attempt to reduce or eliminate undesirable variation in processes or outcomes.

B. Corrective action plans will involve planning the action, designing, measuring and assessing the effect of the action, planning new actions when tested ones are ineffective, and ultimately, implementing effective actions.

C. Types of corrective actions may include, but are not limited to, the following:

1) Staff education/training
2) New/revised policies and procedures
3) Staffing adjustments
4) Change in equipment or resources
5) Employee counseling and guidance
6) Adjustment in clinical privileges or staff status or, for employees, job responsibilities or assignment

## EVALUATION

The performance improvement program is reviewed and evaluated annually to ensure that the entire program is comprehensive, shows minimal duplication of effort, is cost efficient, results in improved patient care outcomes and clinical performance and meets the needs of the organization and the community it serves. Findings of the review are appropriately documented and reported to the CEO, Governing Body, the Medical Executive Committee and the Quality Council.

The Performance Improvement Plan may be amended or revised at any time that it is determined to be incomplete or ineffective by the Quality Council, the CEO, the Medical Executive Committee and/or the Governing Body. Amendments or revisions are not put into effect until final approval is given by the CEO, the Governing Body, the Medical Executive Committee and Quality Council.

## REPORTING

CONFIDENTIAL                                                                                      ADAMHS000029842

DEF-MDL-14396.00298

C. **Check**
   * Assess the effectiveness of the actions and document the improvement.

D. **Act**
   * Communicate the results to the Quality Council, Medical Executive Committee, Governing Board, Staff and relevant individuals, agencies, and regulatory bodies.

## IDENTIFICATION OF IMPROVEMENT OPPORTUNITIES

A. Consideration of program and process changes for improvement may be prompted by input from patient/family, Senior Leadership, the Governing Board, Referral Sources, and facility staff. Additionally, opportunities for improvement may be identified through review of standards of external accrediting and regulating entities, committee review activities, monitoring and trending of outcomes and processes. Input may come from direct or indirect solicitation of information.

B. Improvement opportunities may be prompted by risk or utilization management issues. Potential changes will be assessed in light of the facility's mission, vision and principles to ensure compatibility, consistency of purpose, and level of priority compared to other improvement efforts.

## ASSESSMENT

A. Assessment may include either a formal or informal approach:

   1) An _informal approach_ is utilized most frequently, occurring during normal day-to-day operations of the organization. This is most successful when the cause of the variance or problem is obvious and corrective action can be taken on the basis of preliminary findings without collecting additional data.

   2) A _formal approach_ is used when the defined problem might have many variables and the variables are related to clinical judgment and skills or there is no agreement to attribution or cause. Formal evaluation involves establishing pre-determined criteria, which are clinically valid and stated in measurable terms, measuring actual practice against the criteria and analyzing the differences between the criteria and actual practice.

## PRIORITIZATION OF IMPROVEMENT OPPORTUNITIES

A. In determining priorities for improvement, the Quality Council will consider whether processes affect a large number of patients, staff or others _(high volume)_, have the potential for causing harm if not done appropriately _(high risk)_, or have been or may be _problem-prone_. The Governing Board or regulatory agencies may also externally mandate performance improvement efforts.

B. When new processes are being designed or existing ones are being redesigned, the following elements are considered:

   1) Mission, vision and strategic plan of the facility
   2) Needs and expectations of patients/family, staff, and others
   3) Results of performance improvement activities
   4) Information about potential risks to patients
   5) Information about sentinel events, when available and relevant
   6) Professional practice guidelines, current information from professional literature
   7) Performance and results of the same or similar processes at other facilities
   8) Testing and analysis to determine whether the proposed design or redesign is an improvement

CONFIDENTIAL                                                                          ADAMHS000029843

DEF-MDL-14396.00299

appropriate action plans, and ensuring that action plans are completed.  Status updates and completion of PI activities are reported to the Quality Council.

H. All **Organization Departments/Services** participate in the performance improvement program. Performance baselines are established to set priorities for measurement and improvement.

1) Pharmacy and Therapeutics Function

Activities of this function include the development and approval of policies and procedures relating to all aspects of medication management including the selection, distribution, handling, use and administration of drugs, review and follow-up of medication errors as necessary, pharmacy quality controls, adverse drug reactions, evaluation of medication use, and safety medication practices.

2) Utilization Management

The utilization management process addresses appropriateness of admissions and clinical necessity of continued treatment stays, under- and over-utilization and inefficient scheduling of resources.  The process is designed to assure effective utilization of services for all patients while maintaining an optimal level of care.

3) EOC/Safety and Infection Control

The Safety Officer delegates the safety functions to the Environment of Care/Safety Committee, which is responsible for measuring and assessing all aspects of the safety/Environment of Care management programs.

The Director of RM and the Quality Council reviews infection control practices to ensure patient safety and quality patient care as it relates to infection control practices, reviewing infection surveillance reports, communicable diseases, environmental surveillance, and preventative activities.

## METHODOLOGY

The methodology utilized in the performance improvement program at Windsor Laurelwood is the PDCA model also known as the Plan-Do-Check-Act (PDCA) cycle for ongoing performance improvement activities.

The PDCA method is designed to facilitate the improvement of organizational systems and performance with the following approach:

> ✓ **P**lan the improvement
> ✓ **D**o the improvement, data collection, and analysis
> ✓ **C**heck and study the results
> ✓ **A**ct to hold the gain and continue to improve the process

A. **PLAN**
- Assign responsibility for measurement and assessment.
- Delineate the scope of care provided.
- Identify important functions/processes for measurement.
- Identify measures and appropriate clinical criteria for measurement.
- Collect and evaluate data by comparison with established performance databases.

B. **DO**
- Take actions to improve care or to correct identified variances and/or problems.

CONFIDENTIAL

ADAMHS000029844

DEF-MDL-14396.00300

3) Monitor performance of services provided
4) Monitor performance of processes that involve risk or may result in sentinel events
5) Monitor performance of areas targeted for further study
6) Monitor improvements in performance
7) Monitor the performance of new or modified processes
8) Report findings to the Governing Board, Medical Executive Committee and other organization committees as appropriate.

C. The **Medical Staff**, in collaboration with clinical and other staff, develops and approves performance measures for review of important processes and outcomes of care. Objective, measurable criteria reflect expected levels of achievement based upon current and clinically sound parameters against which performance can be assessed, using appropriate statistical quality control techniques and tools.

The Medical Staff is delegated the authority and accountability necessary for the delivery and assessment of all processes that contribute to the prevention of problems and the continual improvement of the quality, appropriateness, safety, and efficiency of patient care outcomes. Medical Staff responsibilities, duty and authority for performance improvement activities are defined in the Medical Staff Bylaws.

D. The **Senior Leadership Team** is responsible for supervising and implementing the performance improvement process within the facility and their respective departments or services.

E. The **Patient Safety Council** is responsible to report to the Quality Council and the Medical Executive Committee for the following functions:

1) Review of major patient safety issues based on claims history, probable claims reports, incident reports trends, risk issues identified from assessments, and/or any other areas identified as high risk through data analysis.

2) Development of corrective actions to decrease and prevent similar issues/incidents from occurring in the future. Communication of corrective actions to staff members and implementation using a proscribed and effective timeline.

3) Maintenance of an on-going, proactive program for identifying and reducing unanticipated adverse events and safety risks to patients to include the selection of at least one high-risk process annually by utilizing the Failure Mode and Effects Analysis (FMEA) process, analyze and take actions to minimize the risks in that process.

4) Ensuring that a root cause analyses is conducted that focuses on process and system factors whenever a sentinel event or other serious patient safety incident occurs.

5) The Director of RM provides reports on data collected from risk identification reports related to environmental safety, noting any trends, significant variances from clinical practice or issues of concern relating to the safety of patients, staff or visitors in accordance with the written risk management program.

F. The **Manager of Quality/PI** is assigned to the PI program to assist the leadership, medical staff and Quality Council in designing, planning, implementing and overseeing a comprehensive and integrated performance improvement program. The Director of Risk Management oversees the Quality program and assists in implementing, planning and overseeing the PI program.

G. **Performance Improvement Teams (PIT)** are established to help coordinate performance improvement efforts. Performance Improvement Teams are responsible for analyzing data, creating

CONFIDENTIAL                                                                                                                     ADAMHS000029845

DEF-MDL-14396.00301

3) Failure Mode Effect Analysis
4) Peer Review
5) Medical Record Review

C. To facilitate a proactive approach toward performance improvement and patient safety and evaluate actions taken to assure that desired results are achieved and sustained.

D. To promote communication and reporting of performance improvement activities by and between departments, administration, medical staff, governing body and others as deemed necessary.

- PI indicators for all departments are monitored and reported.

E. To maximize competent clinical performance by the medical staff and others through privileging, credentialing, orientation, training and continuing education.

F. To promote patient and staff safety and prevent untoward occurrences through systematic monitoring of the treatment environment.

G. To identify program needs and expectations of our internal and external customers through:
1) Patient Satisfactions Surveys
2) Continuous Quality Improvement (CQIs)
3) Employee Patient Safety Culture Survey
4) Referral Source Surveys
5) Complaint/Grievance process

H. Increase staff knowledge about performance improvement and facility PI activities.

## PRINCIPLES

A. Key elements of PI are systematically and continuously to measure, assess and improve through

1. Measuring the functioning of important processes and services,
2. Identifying changes that enhance performance,
3. Monitoring performance to ensure that improvements are sustained,
4. Focusing on outcomes of treatment, care and services.

B. Facility Leadership recognizes that an important aspect of improving organization performance is to reduce factors that contribute to unanticipated adverse events and/or outcomes.

## ORGANIZATION & FUNCTIONAL AREAS

A. The **Governing Board** has the ultimate responsibility and authority to establish, maintain and support an effective performance improvement program.  The Governing Board assures that the necessary structures are established and processes are implemented to assess and continually improve the overall quality and efficiency of patient care.  It receives and acts upon recommendations regarding quality assessment and improvement activities.

B. The **Quality Council** provides guidance for the Performance Improvement Program. The members work together to develop a systematic, coordinated and continuous approach to measure, assess, and improve the performance of those functions and processes determined to be most directly related to safe and high quality care.  The program will include measures related to:

1) Existing process stability
2) Identification of opportunities for improvement

PI 1.0 Performance Improvement Program                                                     Page 2

CONFIDENTIAL                                                                                       ADAMHS000029846

DEF-MDL-14396.00302

## Windsor Laurelwood Center for Behavioral Medicine

| | |
|---|---|
| | Policy Manual: Performance Improvement |
| **Performance Improvement Program** | Policy No.: PI 1.0 |
| | Original Policy Date: 9/07 |
| | Last Revision Date: 9/12, 8/13, 1/17, 1/19, 1/20 |
| | Last Review Date: 1/16, 1/17, 2/18, 1/19, 1/20 |
| | Policy Approval: Lauren Prokop |
| | Savannah Moody |
| | Shelley Zimmerman |

### PHILOSOPHY

Windsor Laurelwood Center for Behavioral Medicine is dedicated to providing quality care and services for all patients in a safe, clean and therapeutic environment. The facility fulfills its responsibilities to patients, professionals, support staff and the community through continuous and systematic measurement, assessment and improvement of its systems and processes.

### PURPOSE

The performance improvement (PI) program is designed to provide a coordinated, objective and systematic approach to organization-wide performance improvement activities. The program is based on a collaborative and interdisciplinary approach to increase the probability of desired patient outcomes and patient safety.

Data is collected for both improvement priorities and continuing measurement of those processes having the greatest impact on patient care, patient safety, and clinical performance, whether or not problems are suspected. Assessment findings are used to improve the processes that affect patient care outcomes and patient safety, identify educational needs and evaluate clinical competence of employees, medical staff and health professional affiliate staff.

### GOALS AND OBJECTIVES

The goal of the PI program is to assure continuous performance improvement in the delivery of quality mental health care and CD treatment services that is efficient, cost effective, and consistent with the facility's mission.

Objectives are:

A. To provide an effective and systematic mechanism to plan, design, measure, and assess quality improvement initiatives. The PI Program and Plan is reviewed annually to include achievement of goals/objectives, resolution of identified problems, and improvement of the service delivery system.

B. To continually improve the quality and safety of patient care through measurement and assessment of patient care through:
   1) HBIPS indicators
   2) Root Cause Analysis

PI 1.0 Performance Improvement Program                                                    Page 1

CONFIDENTIAL                                                                          ADAMHS000029847

DEF-MDL-14396.00303



**Windsor Laurelwood Center for Behavioral Medicine**

**Key Contacts**

| Key Contact Title | Key Contact Name | Email Address | Phone |
|---|---|---|---|
| Chief Executive Officer | Shelley Zimmerman | Shelley.zimmerman@uhsinc.com | 440-953-3295 |
| Chief Nursing Officer | Barb Moran | Barbara.moran@uhsinc.com | 440-953-3332 |
| Director, Business Development | Rachel Terzak | Rachel.terzak@uhsinc.com | 440-953-3265 |
| Quality Improvement Director | Elwood Walters | Elwood.walters@uhsinc.com | 440-602-8179 |
| Director, Clinical Services | Lauren Prokop | Lauren.prokop@uhsinc.com | 440-602-4695 |
| Client Rights Officer | Amy Allison | Amy.allison@uhsinc.com | 440-953-3000 Ext. 3237 |
| Marketing/Communications Contact | Rachel Terzak | Rachel.terzak@uhsinc.com | 440-953-3265 |
| Non-Medicaid Billing System Contact | Lorie White | Loretta.white@uhsinc.com | 440-954-3418 |

CONFIDENTIAL

DEF-MDL-14396.00304

ADAMHS000029848

**ACORD®**

## CERTIFICATE OF LIABILITY INSURANCE

| DATE (MM/DD/YYYY) |
|---|
| 12/28/2020 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must have ADDITIONAL INSURED provisions or be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | | | | CONTACT NAME: | | |
|---|---|---|---|---|---|---|
| Marsh USA, Inc. 1717 Arch Street Philadelphia, PA 19103 | | | | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| | | | | E-MAIL ADDRESS: | | |
| | | | | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| CN10227341B-LAU W–21-22     LAU     GAXHP | | | | INSURER A : Endurance American Specialty Insurance Company | | 41718 |
| INSURED Windsor Laurelwood Center c/o UHS of Delaware, Inc. 367 S. Gulph Road King of Prussia, PA 19406 | | | | INSURER B : National Union Fire Ins Co. of Pittsburgh PA | | 19445 |
| | | | | INSURER C : | | |
| | | | | INSURER D : | | |
| | | | | INSURER E : | | |
| | | | | INSURER F : | | |

## COVERAGES          CERTIFICATE NUMBER: CLE-005623295-35          REVISION NUMBER: 12

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSD | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | COMMERCIAL GENERAL LIABILITY | | | | | | EACH OCCURRENCE | $ |
| | ☐ CLAIMS-MADE  ☐ OCCUR | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | GENERAL AGGREGATE | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ OTHER: | | | | | | | $ |
| B | AUTOMOBILE LIABILITY | | | 6890150 (ADS) | 01/01/2021 | 01/01/2022 | COMBINED SINGLE LIMIT (Ea accident) | $ 2,000,000 |
| | X ANY AUTO | | | 6890152 (VA) | 01/01/2021 | 01/01/2022 | BODILY INJURY (Per person) | $ |
| | ☐ OWNED AUTOS ONLY  ☐ SCHEDULED AUTOS | | | 6890151 (MA) | 01/01/2021 | 01/01/2022 | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ONLY  ☐ NON-OWNED AUTOS ONLY | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| A | X UMBRELLA LIAB  X OCCUR | | | HLC10008193206 | 01/01/2021 | 01/01/2022 | EACH OCCURRENCE | $ 2,000,000 |
| | X EXCESS LIAB  X CLAIMS-MADE | | | (General Liability) | | | AGGREGATE | $ 2,000,000 |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY        Y / N | | | | | | ☐ PER STATUTE  ☐ OTH-ER | |
| | ANYPROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBEREXCLUDED? | N / A | | | | | E.L. EACH ACCIDENT | $ |
| | (Mandatory in NH) | | | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - POLICY LIMIT | $ |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
General Liability: The above referenced Insured is self insured for $3,000,000 each and every occurrence for 01/01/21 – 01/01/22.
Hospital Professional Liability: The above referenced insured is self insured for $5,000,000 each and every occurrence for 01/01/21 – 01/01/22.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| Windsor Laurelwood Center for Behavioral Medicine c/o UHS of Delaware, Inc. 367 S. Gulph Road King of Prussia, PA 19406 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| | AUTHORIZED REPRESENTATIVE of Marsh USA Inc. Manashi Mukherjee   *Manashi Mukherjee* |

© 1988-2016 ACORD CORPORATION. All rights reserved.

ACORD 25 (2016/03)          The ACORD name and logo are registered marks of ACORD

CONFIDENTIAL

DEF-MDL-14396.00305

ADAMHS000029849