No. _____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re: Adams County, Pennsylvania, et al.,
*Petitioners*,

On Petition for a Writ of Mandamus to the United States District Court for the Northern District of Ohio, Eastern Division, *In Re: National Prescription Opiate Litigation*,
Cause No. 1:17-md-2804, 1:20-op-45140, 1:20-op-45284, 1:19-op-45230; 1:19-op-45229, 1:19-op-45096, 1:20-op-45086, 1:20-op-45086, 1:20-op-450861:20-op-45001, 1:19-op-46156, 1:20-op-45257, 1:20-op-45021, 1:20-op-45149, 1:20-op-45182, 1:19-op-45801, 1:19-op-46167, 1:20-op-45256, 1:20-op-45388, 1:19-op-45757, 1:20-op-45002, 1:20-op-45258, 1:20-op-45126, 1:19-op-46170, 1:19-op-45765, 1:19-op-45989, 1:19-op-45755, 1:20-op-45003, 1:20-op-45067, 1:20-op-45128, 1:20-op-45058, 1:20-op-45000, 1:19-op-45990, 1:20-op-45259, 1:20-op-45129, 1:19-op-45711, 1:19-op-45988, 1:20-op-45183, 1:19-op-45756, 1:20-op-45061, 1:20-op-45185, 1:19-op-45987, 1:20-op-45141, 1:19-op-45400, 1:21-op-45046, 1:20-op-45022, 1:19-op-46148, 1:19-op-45415, 1:19-op-45496, 1:21-op-45017, 1:19-op-45717, 1:19-op-45497, 1:19-op-45858, 1:19-op-45500, 1:19-op-45709, 1:19-op-45708, 1:19-op-45498, 1:19-op-45718, 1:19-op-45495, 1:20-op-45004, 1:19-op-46155, 1:21-op-45045, 1:21-op-45024, and 1:19-op-45716

# PETITION FOR WRIT OF MANDAMUS
## OF CERTAIN PENNSYLVANIA MUNICIPALITIES, OHIO MUNICIPALITIES, DELAWARE MUNICIPALITIES, CITY OF HOLLY SPRINGS, AND OKLAHOMA MUNICIPALITIES

S. Ann Saucer
Texas Bar No. 00797885
Louisiana Bar No. 21368
asaucer@fnlawfirm.com
N. Majed Nachawati
Texas Bar No. 24038319
mn@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711

Joseph J. Cappelli (PA Bar 55166)
MARC J. BERN & PARTNERS, LLP
101 West Elm Street, Suite 520
Conshohocken, PA  19428
Tel. (610) 941-4444
jcappelli@bernllp.com

Todd A. Court (OBA 19438)
MCAFEE & TAFT A PROFESSIONAL CORPORATION
8th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK  73102
Tel. (405) 235-9621

*Counsel for Petitioners*
*Additional Counsel on Signature Page*

## **Complete List of Petitioners**

Pennsylvania Municipalities
Adams County, Lower Makefield Township, Armstrong County, Beaver County, Bensalem Township, Bradford County, Cambria County, Carbon County, Clarion County, Fayette County, Franklin County, Greene County, Huntingdon County, Lackawanna County, Lawrence County, Monroe County, Newtown Township, Norristown Municipality, Washington County, West Norriton Township, and Westmoreland County

Ohio Municipalities
City of Marietta, Washington County, Meigs County, and Noble County

Delaware Municipalities
City of Dover, Kent County, and City of Seaford

Mississippi Municipality
City of Holly Springs

Oklahoma Municipalities
Board of County Commissioners of Atoka County, Board of County Commissioners of Caddo County, Board of County Commissioners of Choctaw County, Board of County Commissioners of Cimarron County, Board of County Commissioners of Coal County, Board of County Commissioners of Custer County, Board of County Commissioners of Dewey County, Board of County Commissioners of Grady County, Board of County Commissioners of Greer County, Board of County Commissioners of Harmon County, Board of County Commissioners of Harper County, Board of County Commissioners of Haskell County, Board of County Commissioners of Hughes County, Board of County Commissioners of Jackson County, Board of County Commissioners of Jefferson County, Board of County Commissioners of Johnston County, Board of County Commissioners of Kay County, Board of County Commissioners of Kiowa County, Board of County Commissioners of Latimer County, Board of County Commissioners of Le Flore County, Board of County Commissioners of Lincoln County, Board of County Commissioners of Logan County, Board of County Commissioners of Love County, Board of County Commissioners of Major County, Board of County Commissioners of McCurtain County, Board of County Commissioners of Noble County, Board of County Commissioners of Pittsburg County, Board of County Commissioners of Pottawatomie County, Board of

County Commissioners of Roger Mills County, Board of County Commissioners of Stephens County, Board of County Commissioners of Texas County, Board of County Commissioners of Tillman County, Board of County Commissioners of Woods County, Board of County Commissioners of Woodward County, City of Ada, City of Altus, City of Anadarko, City of Bethany, City of Broken Arrow, City of Edmond, City of Elk City, City of Enid, City of Guthrie, City of Jenks, City of Lawton, City of Midwest City, City of Mustang, City of Oklahoma City, City of Owasso, City of Ponca City, City of Seminole, City of Shawnee, City of Stillwater, City of Tulsa, and City of Yukon

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...............................................................................1

II.  STATEMENT OF RELIEF SOUGHT ...............................................3

III. STATEMENT OF ISSUES PRESENTED .........................................3

IV.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND. ...........4

   A.  The District Court's Original Ongoing Common Benefit Order....................4

   B.  After Hundreds of Writ Petitioners Instituted *In re Harris County,* No. 22-3493, the District Court Responded in a "Clarifying" Order Addressing Footnotes Six and Eleven................................................................6

      1.  The District Court acknowledges the correctness of the *Harris County* Petition's interpretation of footnote six and amends it to authorize the coercion of state courts and parties. ......................7

      2.  The District Court addresses footnote eleven but leaves it unchanged...................................................................9

      3.  Recent events underscore that the District Court's argument minimizing the hold-back order as "likely to be a very small universe" is precatory in nature..............................................10

   C.  The Tax on State Cases Is Based on the ARCOS Data in Direct Contradiction of the PEC's Promises that No Charge Would Be Associated with the ARCOS Data.................................................................12

   D.  There Is No Proof that ARCOS Data or the MDL Repository Will Cause Future Recoveries in State-Filed Cases. ....................................13

   E.  Petitioners Did Not Receive Notice or an Opportunity to Be Heard. .........15

V.   REASONS WHY A WRIT OF MANDAMUS SHOULD ISSUE .................17

   A.  A Writ of Mandamus Is the Only Adequate Remedy..................................17

   B.  Petitioners Have a Clear and Indisputable Right to Proceed in State Court Without District Court Interference and Commandeering of Recoveries. .18

      1.  The Orders' attachment of proceeds from state-filed cases and interference with state court discovery are clear usurpations of authority...................................................................18

         a.  Every federal appeals court to address the issue has agreed that federal MDL hold-back orders cannot be applied to litigation outside of the District Court's jurisdiction. ........20

    b. The District Court usurped its authority in authorizing unidentified third parties to interfere with state court discovery...........................................................................22

   2. The Orders violate the Due Process Clause. ..............................27

 C. The Writ Is Otherwise Appropriate Under the Circumstances...................30

VI. CONCLUSION ................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ameritox, Ltd. v. Millennium Labs., Inc.*,
   803 F.3d 518 (11th Cir. 2015) ...............................................................................26

*Armstrong v. Manzo*,
   380 U.S. 545 (1965)................................................................................................28

*Badgerow v. Walters*,
   142 S. Ct. 1310 (2022)....................................................................................19, 26

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980)................................................................................................20

*Brown v. City of Upper Arlington*,
   637 F.3d 668 (6th Cir. 2011) ............................................................................25, 26

*Cafeteria & Rest. Workers Union v. McElroy*,
   367 U.S. 886 (1961). Notice ..................................................................................28

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
   542 U.S. 367 (2004)..........................................................................................17, 30

*Children's Ctr. for Developmental Enrichment v. Machle*,
   612 F.3d 518 (6th Cir. 2010) ..................................................................................25

*City of Holly Springs v. Johnson & Johnson*,
   477 F. Supp. 3d 547 (N.D. Miss. 2020)..................................................................11

*Exxon Mobil Corp. v. Allapattah Services, Inc.*,
   545 U.S. 546 (2005)................................................................................................19

*Farmers' & Merchants' Bank of Phoenix, Ariz. v. Ariz. Mut. Sav. &
   Loan Ass'n*,
   220 F. 1 (9th Cir. 1915) ..........................................................................................25

*In re Fine Paper Antitrust Litig.*,
   751 F.2d 562 (3d Cir. 1984) ...................................................................................29

*Garcia v. Fed. Nat'l Mortg. Ass'n*,
  782 F.3d 736 (6th Cir. 2015) ...............................................................28

*Geier v. Sundquist*,
  372 F.3d 784 (6th Cir. 2004) ...............................................................20

*In re Genetically Modified Rice Litig.*,
  764 F.3d 864 (8th Cir. 2014) ...............................................................21

*Gilbert v. Homar*,
  520 U.S. 924 (1997)...............................................................................28

*In re Harris County*,
  No. 22-3493 (filed 6th Cir. May 27, 2022) .................................*passim*

*In re Harris County, TX*,
  No. 21-3637 (6th Cir. March 11, 2022), 3-4 ......................................17

*Hartland v. Alaska Airlines*,
  544 F.2d 992 (9th Cir. 1976) ...............................................................18

*In re High Sulfur Content Gasoline Products Liability Litig.*,
  517 F.3d 220 (5th Cir. 2008) ...............................................................29

*In re Howard*,
  76 U.S. 175 (1869)...............................................................................25

*Kokkonen v. Guardian Life Ins. Co. of America*,
  511 U.S. 375 (1994)......................................................................19, 25

*Mathews v. Eldridge*,
  424 U.S. 319 (1976)...............................................................................28

*In re Matter of Motors Liquidation Co.*,
  829 F.3d 135 (2d Cir. 2016) ................................................................27

*Missouri v. Fiske*,
  290 U.S. 18 (1933).................................................................................26

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)...............................................................................28

*In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel*
    *Fire Litig.*,
    982 F.2d 603 (1st Cir.1992) ................................................................. 29

*Pawlak v. Greenawalt*,
    713 F.2d 972 (3d Cir. 1983) ................................................................. 27

*Pennhurst State Sch. & Hospital v. Halderman*,
    465 U.S. 89 (1984) ................................................................................. 26

*Schlagenhauf v. Holder*,
    379 U.S. 104 (1964) ............................................................................... 18

*In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–*
    *II*,
    953 F.2d 162 (4th Cir. 1992) .......................................................... 21, 23

*State by & through Tennessee Gen. Assembly v. United States Dep't of*
    *State*,
    931 F.3d 499 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 549 (2020) ............. 18, 21

*Steel Co. v. Citizens for a Better Env't*,
    523 U.S. 83 (1998) ............................................................................ 18-19

*In re Syngenta AG MIR 162 Corn Litig.*,
    No. 14-MD-2591-JWL, 2015 WL 2165341 (D. Kan. May 8, 2015) ................ 20

*In re United States*,
    32 F.4th 584 (6th Cir. 2022) ............................................................... 17

*In re Univ. of Michigan*,
    936 F.3d 460 (6th Cir. 2019) ......................................................... 23, 30

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ............................................................................... 26

*Will v. United States*,
    389 U.S. 90 (1967) ................................................................................. 30

*Williams v. Alioto*,
    549 F.2d 136 (9th Cir. 1977) ............................................................... 27

*In re Zyprexa Products Liability Litigation*,
467 F. Supp. 2d 256 (E.D. N.Y. 2006) ...............................................................21

**Constitution and Statutes**

U.S. CONST. amend. V .........................................................................................28

28 U.S.C. § 2072(a) ..............................................................................................22

**Other Authorities**

Alan Hirsch & Diane Sheehey, FED. JUDICIAL CTR, *Awarding
Attorneys' Fees and Managing Fee Litigation* 81 (2d ed. 2005) ................. 29-30

FED. R. CIV. P. 1 ...................................................................................................22

FED. R. CIV. P. 26(b)(1).........................................................................................7

## I.    INTRODUCTION

Petitioners are Ohio, Pennsylvania, Delaware, Oklahoma, and Mississippi municipalities that initiated state-court litigation to abate the opioid epidemic in their communities. Without waiving objections to jurisdiction,[1] Petitioners seek a writ mandating that the District Court in MDL 2804 vacate its orders redirecting proceeds from, and interfering with discovery in, state-filed cases over which there is no federal jurisdiction. The 84 Petitioners herein join the 621 Petitioners in *In re; Harris County, Texas, et al.,* No. 22-3493 (*Harris County* Petition).

Shortly after the *Harris County* Petitioners sought a writ vacating the District Court's Original Common-Benefit Order ("Original Order"), the District Court issued a "Clarifying Order" in direct response. This clarification fails because the District Court has no authority over Petitioners' cases in the first instance. It is axiomatic that jurisdiction is not created by clarifying how the underlying order, issued without jurisdiction, is to be implemented by the District Court. Having no authority to order a common-benefit fee hold-back in cases over which federal jurisdiction is lacking, the clarification also fails and leaves Petitioners without an adequate remedy at law.

The only actual *change* to the Original Order was a re-write of footnote six to omit the direct discovery injunction against state court judges, but authorize

---

[1] Petitioners hereby make a special appearance objecting to federal jurisdiction.

1

unnamed third parties to advise those judges that *inter alia* Petitioners should be forced to contract with the federal PEC and thereby agree to federal jurisdiction, a common benefit assessment, and a lien over future recoveries. Because the District Court cannot direct state courts, this too is a clarification that only attempts to create jurisdiction the District Court does not have.

While the Clarifying Order claims that the hold-back will only reach a small universe of municipalities, the 84 Petitioners herein and 621 Petitioners in the *Harris County* Petition prove otherwise. The 84 Petitioners here filed cases in state court, raising only state law claims against opioid defendants, including nondiverse defendants. Federal jurisdiction does not exist over any of these cases. Among them, 19 have never been removed and transferred to federal court, and Holly Springs, Mississippi's case, while removed twice, has never been transferred to MDL 2804. The City of Dover, Delaware's case includes 3 petitioners remanded from MDL 2804. The remaining cases remain in MDL 2804 today pending long-filed motions to remand filed in the transferor courts and/or transferee court.

Petitioners do not wish to participate in the federal MDL and have no adequate remedy other than to seek a writ of mandamus so that Petitioners' state-court discovery is not subject to obstruction, and before any funds are diverted. The District Court's Original Order and Clarifying Order are both erroneous and a usurpation of authority.

## II.    STATEMENT OF RELIEF SOUGHT

Petitioners request that this Court vacate the Ongoing Common Benefit Order and Order Clarifying Ongoing Common Benefit Order to the extent that either Order applies to cases over which the District Court does not have subject-matter jurisdiction and authority and issue a writ precluding the District Court from dictating attorney fees, expenses, discovery, and evidence in cases not properly before the District Court. This writ is not brought on behalf of plaintiffs whose cases belong in federal court, plaintiffs who agreed to pay a common benefit assessment through a Participation Agreement, or plaintiffs specifically proven to have actually substantially benefited from and used MDL 2804 work product.[2]

## III.   STATEMENT OF ISSUES PRESENTED

Petitioners raise the same basic issues as in *Harris County*, but with adjustments to reflect the Clarifying Order's amendment of Original Order footnote six.[3] The statement of facts and reasons herein address the Clarifying Order and recent events, which had not yet transpired and thus were not addressed in the *Harris County* Petition.

---

[2] The term "MDL 2804 work product" does not include the DEA's "ARCOS data," which is addressed below.

[3] Issues two and three are identical to *Harris County*. Issue one is adjusted slightly, and issue four differs.

1. Where a District Court lacks jurisdiction over cases, can it enter orders controlling attorney's fees and expenses?

2. Where a District Court lacks jurisdiction and authority over cases and fails to provide notice and an opportunity to be heard, can it require that a percentage of judgments and settlements be deposited into a federal fund?

3. Where a District Court lacks jurisdiction and authority, can it require that a percentage of judgments and settlements be deposited into a federal common benefit fund without proof that court-appointed counsel's work can be traced to a substantial benefit in such cases?

4. Can a District Court empower representatives or unidentified "third parties" to intervene in state proceedings with the imprimatur of federal law?

## IV. STATEMENT OF FACTS AND PROCEDURAL BACKGROUND.

### A. The District Court's Original Ongoing Common Benefit Order.

On May 9, 2022, without motion or hearing, the District Court entered an order *sua sponte* seizing 7.5% of future litigation recoveries and forbidding significant discovery in state-filed cases over which there is no federal jurisdiction. Exhibit 1, Ongoing Common Benefit Order, Doc. 4428 ("Original Order" or "Order"). Through this Order, the District Court exerts control over cases pending in state court. The Order applies to *inter alia* all opioid cases that were remanded

from MDL 2804 after being wrongfully removed, and to every state court opioid case a plaintiff's lawyer has if that lawyer has or had a case in MDL 2804.[4] In addition to the lack of motion, opportunity for response, or a hearing, and the application of the Order to non-federal cases, footnotes six and eleven highlight the injustice for which Petitioners seek redress.

Footnote eleven describes the calculation of the 7.5% hold-back, using a hypothetical statewide settlement of claims by both a state attorney general and local subdivision of that state. Original Order, at 18 n.11. The District Court hypothesizes that for a $400M abatement payment plus $40M for fees and costs, divided equally between the state and subdivisions, the common-benefit hold-back would be 7.5% of the subdivisions' $200M share, equaling $15M. *Id.* By this calculation, the Order would take 75%—not 7.5%—of the subdivisions' $20M fee recovery.

Footnote six in the Original Order deprived governmental entity plaintiffs in state courts of their rights to compel the production of "documents or evidence" from Defendants. *See* Original Order, 9 n.6. This clearly violated the Anti-Injunction Act.

---

[4] *See* Original Order, 11 ("will apply to . . . other plaintiffs and claims represented by plaintiffs' counsel with Opioid Cases pending in or remanded from MDL 2804"), 12 ("Court has authority over plaintiffs' counsel by and through their MDL cases" and is making "assessments on non-MDL cases *actually filed* in state courts"). *See also* Original Order, 3 n.1 (Opioid Cases defined as opioid-related litigation "in any court throughout the United States"), 18 n.11 (example indicating application to state-wide settlements).

*See* Exhibit 2, Petition for Writ of Mandamus of *Harris County et al.,* No. 22-3493 (filed 6th Cir. May 27, 2022) ("*Harris County* Petition"), 26-29.

### B. After Hundreds of Writ Petitioners Instituted *In re Harris County,* No. 22-3493, the District Court Responded in a "Clarifying" Order Addressing Footnotes Six and Eleven.

On May 27, 2022, some 621 governmental entity plaintiffs filed a writ of mandamus asking this Court to vacate the Ongoing Common Benefit Order to the extent that it applies to state-filed cases over which the federal judiciary lacks jurisdiction. Exhibit 2, *Harris County* Petition.

After redirecting future recoveries in cases over which there is no federal jurisdiction and forbidding state judges from applying state discovery rules in their own courts, the District Court issued an order that directly argues with the *Harris County* writ petitioners. Exhibit 3, Order Clarifying Ongoing Common Benefit Order, Doc. 4503 ("Clarifying Order"). The District Court filed the Clarifying Order with this Court, along with a cover letter stating that it resolved "one or more issues raised by petitioners" and "resolve[d] . . . or at least makes clear that [petitioners'] other issues are not ripe." Exhibit 4, Letter from Honorable Dan Aaron Polster, U.S.D.C. Judge, to Deborah S. Hunt, Clerk, U.S. Sixth Circuit (June 9, 2022). As explained in turn below, the Clarifying Order addresses the *Harris County* Petitioners' arguments regarding footnotes six and eleven.

1. **The District Court acknowledges the correctness of the *Harris County* Petition's interpretation of footnote six and amends it to authorize the coercion of state courts and parties.**

As to footnote six, the Clarifying Order states that "petitioners assert (correctly) that this language could be read to 'provide[] that state courts cannot compel Defendants to produce documents and evidence in accordance with state rules if the documents and evidence were produced in MDL 2804.'" Clarifying Order, 2 (quoting *Harris County* Petition). The District Court amended footnote six to provide the following with regard to state cases:

> [I]n any case remanded by this Court to any *state* court (or otherwise pending in any *state* court): (1) Defendants and third parties may urge the plaintiffs to look first to documents or evidence produced in the MDL, and may advise the state court of the provisions for access to the MDL Repository as a means for satisfying a discovery obligation in state court; and (2) any resulting access to such documents or evidence, or to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

Clarifying Order, 3.

The "third parties" who are granted federal court authority to "urge the plaintiffs" and "advise the state court" are not defined. As to why the District Court grants "third parties" the imprimatur of federal power to intercede in state litigation, the Clarifying Order reasons that, pursuant to the proportionality analysis of Federal Rule of Civil Procedure 26(b)(1), "[p]ut squarely: It makes no sense to . . . allow a plaintiff" the freedom to conduct discovery without abiding by the District Court's

Order. Clarifying Order, 2-3 & n.2. The Clarifying Order does not provide any explanation as to why the proportionality analysis of the federal Rule is relevant to state cases, or how proportionality in one case governs another.

Because the "third parties" are not limited to parties or counsel who are properly in these state cases, it is a mystery what "urg[ing]" and "advis[ing]" of municipal governments and state judges is being authorized. By empowering "third parties" both with and with*out* the capacity to speak on the state case record, the Clarifying Order would appear to anticipate *ex parte* communications with the state judges and the City or County attorneys.

Mandating that state court plaintiffs use the federal MDL Repository, as the original footnote six did directly and the amended footnote does indirectly, is improperly conditioned by the District Court on "the provisions of this Ongoing Common Benefit Order."[5] The Order would require signing the federal PEC "Participation Agreement," which would then submit the case to federal jurisdiction and bootstrap that entity into paying an assessment into the federal fund.[6] Signing the Participation Agreement does not just bind counsel, but also expressly requires

---

[5] Clarifying Order, 3; Original Order, 9 n.6.

[6] Original Order, 19 (directing federal court-appointed counsel to "obtain Participation Agreements . . . as a condition of access to and utilization of MDL 2804 work product"); Exhibit 5, Opioid Participation Agreement, Doc. 3352-3, I.A (incorporating Doc. 358), I.B & II.B (submission to federal court orders), I.C (unfiled and state cases included), II.D (must pay federal fee and expense fund assessments and deposit monies into the federal fund).

8

that "any client whom they represent in connection with opioid-related claims" is granting the federal "PEC a lien upon and/or a security interest in any recovery."[7] Therefore, the amended footnote six authorizes the coercion of Judges and parties in an attempt to force plaintiffs to forgo state court discovery and force them into the federal MDL discovery scheme.

### 2. The District Court addresses footnote eleven but leaves it unchanged.

Footnote eleven is addressed in the clarification but was not amended. The District Court also does not address the fundamental defect identified in the *Harris County* Petition as to the footnote: the District Court's lack of jurisdiction and authority either to assess fees from parties and cases not before it, or to hold hearings on the fairness of those assessments after the fact.

The Clarifying Order states that the hypothetical was designed only to illustrate that the assessment would not apply to states' shares. Clarifying Order, 4. The "larger point of the footnote," the District Court elaborated, was that parties could move for modification of any "unfair" assessments under the Court's Order after such unfair assessments take place. *Id.* at 4-5. Thus, neither the underlying jurisdictional error, nor the possibility that as much as 75% of the total available fees

---

[7] Exhibit 5, Opioid Participation Agreement, Doc. 3352-3, p. 6, II.D.

and expenses would be diverted to lawyers who did no work on the case were corrected or resolved.

### 3. Recent events underscore that the District Court's argument minimizing the hold-back order as "likely to be a very small universe" is precatory in nature.

The Clarifying Order states that the scope of the hold-back "is likely to be a very small universe." Clarifying Order, 5. The 705 writ Petitioners already evidence the wishful nature of that comment. One Petitioner herein, the City of Holly Springs, Mississippi, joins this writ because on July 12, 2022, the Mississippi Attorney General announced that the Endo opioid defendants negotiated a statewide settlement with the State of Mississippi, a non-federal claimant, and that because "[t]he Federal Court" ordered a hold-back applicable "in each state," every city and county allocation would be subject to a 7.5% hold-back to "cover [federal] common benefit charges." Exhibit 6, Email from Lynn Fitch, Attorney General, State of Mississippi (July 12, 2022), 1-2.[8] There is no basis or proof connecting the federal PEC to the Mississippi settlements, and no remedy outside this writ petition to stop the arbitrary application of the District Court's tax to state cases for which the federal PEC lawyers performed no legal services. There was no hearing or notice prior to the AG's declaration that the District Court's Order applied. The fact that the 7.5% will be deducted solely because of the District Court's hold-back demonstrates the

---

[8]  *See also* https://www.ago.state.ms.us/opioidsettlement/.

lack of remedy for Petitioners, and state claimants. *See* Exhibit 6 (citing "[t]he Federal Court" order as the source of the hold-back).

To highlight the issue, the City of Holly Springs, Mississippi, was wrongfully removed twice. The case was remanded in 2020. *City of Holly Springs v. Johnson & Johnson*, 477 F. Supp. 3d 547 (N.D. Miss. 2020). Thereafter, Holly Springs' case was litigated for well over a year in the Third Circuit District Court of Marshall County, Mississippi, with no assistance or work product from the federal PEC. Defendants then removed the case again.[9] The City defeated transfer (yet again), when the Judicial Panel on Multidistrict Litigation granted the City's motion and discontinued all automatic transfers to MDL 2804.[10] The federal PEC expressly declined to support the City's efforts,[11] and now wants 7.5% of the City's gross recovery despite the absence of any facts that would warrant such a tax.

---

[9] *See* Exhibit 7, Plaintiff's Brief in Support of Motion to Vacate CTO-211, MDL No. 2804, Doc. 9515-1 (J.P.M.L. Dec. 27, 2021).
[10] Exhibit 8, Order Denying Transfer and Vacating CTO, MDL No. 2804, Doc. 9586 (J.P.M.L. April 8, 2022).
[11] *See* Exhibit 9, MDL No. 2804 Plaintiffs' Leadership's Response to Pharmacy Defendants' Motion for Reconsideration of Order Denying Transfer and Vacating CTO 211, MDL No. 2804, Doc. 9598 (J.P.M.L. May 4, 2022) ("the PEC takes no position . . . .").

### C. The Tax on State Cases Is Based on the ARCOS Data[12] in Direct Contradiction of the PEC's Promises that No Charge Would Be Associated with the ARCOS Data.

The District Court acknowledged the "routine[] caution" against imposing assessments on state court cases, but justified the tax by referencing the "unprecedented expense" and "essential character" of ARCOS data obtained from the DEA. Original Order, at 12-13. The *Harris County* Petitioners argue that taxing state cases because of the ARCOS data directly contradicted the PEC's explicit promises. *See Harris County* Petition, 11-13 & exhibits 10-11 thereto. Petitioners agree, and marshal more evidence on this point.

First, in a December 2018 letter to state court litigants, the PEC offered free access to raw ARCOS data in the same state they received it from the DEA. Exhibit 10, Letter from Plaintiff Executive Committee to State Court Litigants (Dec. 5, 2018), 2. It emphasized the data would be available "AT NO COST to any attorney representing a state municipal litigant. . . ." *Id.* (caps in original). Second, months later, the PEC explained that the raw data was "not useful," so it invested in refining it. Exhibit 11, MDL 2804: Second Amended Notice of ARCOS Disclosure, Doc. 1613, at 1. The PEC repeatedly emphasized that both unrefined and refined ARCOS data was available without charge to any litigant, entity, or counsel who wanted it:

---

[12] ARCOS is the Drug Enforcement Administration's Automation of Reports and Consolidated Orders System database.

- "This letter explains how you may obtain, ***without charge***, refined data that shows in detail everything we know from the ARCOS database. . . ."

- "[A]vailable to you ***without charge*** . . . ."

- "We are also providing you, ***again without charge***, access to the result of that investment."

*Id.* (emphasis added).

Notably, litigants did not need the PEC to obtain ARCOS data in the first place. Refined data from the same set produced by the DEA has been freely available to the public since July of 2019.[13] The District Court's conclusion that the hold-back is justified by ARCOS data is unsupported, as addressed below.

### D.   There Is No Proof that ARCOS Data or the MDL Repository Will Cause Future Recoveries in State-Filed Cases.

The District Court commandeers 7.5% of the proceeds from state-filed opioid cases without evidence connecting federal court-appointed counsel with future recoveries or settlements in state-court litigation. Without any indication that the District Court knows the procedural history of document production and other discovery in these cases, which the District Court does not identify by name, the Order claims that the DEA-produced ARCOS data was allegedly "absolutely essential" to them. Original Order, 13. The *Harris County* Petition objected to this

---

[13] *See* Steven Rich et al., *How to download and use the DEA pain pills database*, WASH. POST (July 18, 2019), *available at* https://www.washingtonpost.com/national/2019/07/18/how-download-use-dea-pain-pills-database/.

finding for six different reasons.[14] Without addressing these six reasons, the Clarifying Order declares that the original Order "explained at length . . . that the [federal] PEC did provide critical work that inured to the benefit of state court cases." Clarifying Order, 4 n.3. The ARCOS data produced by the DEA thus remains the Orders' factual basis for why cases outside of the federal court's jurisdiction, wherein counsel did not sign a Participation Agreement or use the federal PEC's work product, allegedly can be subjected to a 7.5% federal tax. *See* Original Order, 12-13.[15] Neither Order identifies and discusses the facts in any of the instant or *Harris County* Petitioners' cases, much less cite to evidence that future recoveries in these cases could be attributed to the ARCOS data.

In addition to the fact that the PEC promised the ARCOS data was available without charge (*see* § IV.C *supra*), the Harris County Petition is correct:

- The PEC was criticized as an ***impediment*** to the efforts of State plaintiffs to negotiate settlements,[16] and failed to substantiate its legal arguments according to Professor Rubenstein.[17]

---

[14]  *Harris County* Writ Petition, 10-13 § IV.D.

[15]  The original Order discussed a fourth category of cases wherein the federal PEC documents and evidence were actually used (Original Order, 13-14), but none of the current or *Harris County* Petitioners fit into that category.

[16]  *See, e.g.,* Exhibit 12, Report and Recommendation Addressing Motion for Common Benefit Fund, MDL 2804 Doc. 3319, 6 (National Association of AGs claimed irreparable disruption).

[17]  *Id*. at 4 n.2 (responding to observations that PEC "proffer[s] no factual support for any of [its] statements" and observing that the PEC's arguments were not

- Cases are being worked up in the state courts without any help from the PEC.[18]

- The ARCOS data is **dated** and thus not likely to generate **future** judgments or settlements in state-filed cases.[19]

- While the District Court categorizes ARCOS compilation as a "virtually unprecedented expense,"[20] to the knowledge of undersigned, the PEC has been reimbursed a thousand times over.[21]

### E. Petitioners Did Not Receive Notice or an Opportunity to Be Heard.

The District Court's Orders were entered without a motion, a hearing, or any opportunity for those dispossessed of their future case recoveries and subjected to potential obstruction of state court discovery to be heard or present evidence for the record.[22] The federal PEC has argued that it filed a prior common benefit motion

---

"substantiated with proper supporting affidavits or documents"). *See also Harris County* Petition, 8-9.

[18]  *See, e.g.,* Exhibit 13, County of Harris' Br. in Resp. to Prof. Rubenstein's R&R, Doc. 3350 (N.D. Ohio June 23, 2020), at 2-3 (explaining how "[t]he parties to the State of Texas' *In Re Texas Opioid Litigation* have heavily litigated the claims of Texas governmental entities for years without any assistance from the PEC.").

[19] *See, e.g.*, *Harris County* Petition, 11-12.

[20] Original Order,  13.

[21]  *See Harris County* Petition, 13.

[22]  *See* Exhibit 14, Docket Sheet excerpts, Entry for Document 4428 (omitting Related Document number identification of any prior motion).

that was subject to notice.[23] However, that motion was filed, *sans* proof,[24] **over two years before** the Orders at issue here. *See* Exhibit 15, Amended Motion for Entry of Order Establishing Common Benefit Fund, Doc. 3112 (N.D. Ohio Jan. 28, 2020). The Orders at issue impose a 7.5% hold-back on gross proceeds, but the motion filed years earlier requested only 7%, had no discovery component, no explanatory footnotes, was never heard, and was denied. *See* Exhibit 16, Order Regarding Prof. Rubenstein's R&R, Doc. 3320 (N.D. Ohio June 3, 2020). Prior to the hold-back Orders at issue in these Petitions, there was no notice to Petitioners.[25] Moreover, the District Court had standing orders that forbade Petitioners from filing anything; therefore, they presumably could not have filed a response to a hypothetical motion even had one been filed.[26] The complete lack of procedural remedies afforded to Petitioners are highlighted by this argument and show the lack of remedy.

---

[23] *See* PEC's response to show cause in Walker County's appeal, Case No.22-3491, Docket No. 11-1, pp. 6-9 and p. 8 n. 2 (citing briefing to the motion **denied in 2020** in support of the (incorrect) argument that the Orders allegedly were entered with notice).

[24] *See also Harris County* Petition, 9.

[25] *See* note 22 *supra*. The MDL 2804 docket sheet clearly shows that the Original Order was not docketed as related to a prior motion.

[26] *See* Exhibit 17, CMO No. 1, Doc. 232, p. 11 ¶ 6.g ("No party may file any motion not expressly authorized by this Order absent further Order of this Court or express agreement of the parties.").

## V.      REASONS WHY A WRIT OF MANDAMUS SHOULD ISSUE

One traditional use of the writ of mandamus has been to confine the court against which mandamus is sought "to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (citation omitted). To confine writs to only extraordinary causes, three conditions must be satisfied. First, petitioners cannot have adequate alternative means to obtain the relief they seek. *Id*. at 380. Second, petitioners must show a "clear and indisputable" right to the relief sought. *Id*. at 381 (quotation omitted). Third, petitioners must show that issuing the writ is otherwise "appropriate under the circumstances." *Id*. *See also* Exhibit 18, Order, *In re Harris County, TX*, No. 21-3637 (6th Cir. March 11, 2022) ("*Harris County* Order"), 3-4. Each requisite is addressed in turn below.

### A. A Writ of Mandamus Is the Only Adequate Remedy

"[A] mandamus lies, if there be no other *adequate*, *specific*, *legal* remedy." *In re United States*, 32 F.4th 584, 590 (6th Cir. 2022) (quotation omitted). There is no other adequate remedy, as there is no final judgment the District Court can issue in Petitioners' cases. Some Petitioners were never in MDL 2804; some are plaintiffs in recently remanded cases; others remain in MDL 2804 but should be remanded to state court because there was never federal subject matter jurisdiction. In addition, the Clarifying Order authorizes interference with state cases so as to urge Petitioners

to sign participation agreements that grant liens and waive jurisdictional objections as a precondition for using the federal repository (*see* IV.B.1 *supra*). To the knowledge of the undersigned, there is no precedent or procedural mechanism to authorize a District Court to deputize its representatives or unnamed actors for this purpose. There may be no record of these communications. The Clarifying Order is engineered to force a waiver of rights, and hence, an adequate remedy requires that such unauthorized reach into state litigation be adjudicated at this time.

A "writ is appropriately … issued when there is usurpation of judicial power or a clear abuse of discretion." *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) (quotation marks omitted). Where, as here, the district court usurped judicial power by imposing a common-fund tax on the proceeds of claims not before the court, a writ of mandamus should issue to correct the jurisdictional overreach. *See, e.g., Hartland v. Alaska Airlines,* 544 F.2d 992 (9th Cir. 1976).

### B. Petitioners Have a Clear and Indisputable Right to Proceed in State Court Without District Court Interference and Commandeering of Recoveries.

#### 1. The Orders' attachment of proceeds from state-filed cases and interference with state court discovery are clear usurpations of authority.

"When a court lacks jurisdiction, it '**cannot proceed at all** in any cause.'" *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019), *cert. denied*, 141 S. Ct. 549 (2020) (quoting *Steel Co.*

*v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)) (emphasis added). The Supreme Court recently applied the fundamental principle that, "[t]he district courts of the United States are courts of limited jurisdiction, defined (within constitutional bounds) by federal statute." *Badgerow v. Walters*, 142 S. Ct. 1310, 1315 (2022) (citing *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)). "Congress has granted those courts jurisdiction over two main kinds of cases": diversity and federal-question cases. *Id*. at 1315-16. The *Badgerow* Court articulated two "bedrock principles" cabining federal District Court exercises of authority. "The federal 'district courts may not exercise jurisdiction absent a statutory basis.'" *Id.* at 1318 (quoting *Exxon Mobil Corp. v. Allapattah Services, Inc*., 545 U.S. 546, 552 (2005)). "And the jurisdiction Congress confers may not 'be expanded by judicial decree.'" *Badgerow*, at 1318 (quoting *Kokkonen*, 511 U.S. at 377).

The District Court has no jurisdiction to seize proceeds from state-filed cases and redirect money into a federal fund to compensate lawyers who never worked on the state cases. The equitable principles that the common fund doctrine is based on belie that outcome. Nor may the District Court award itself jurisdiction to later entertain motions to fix any errors in calculating the amount the District Court has ordered to be seized from entities over which the District Court had no subject-matter jurisdiction in the first instance (*see* § V.B.1.a *infra*). Finally, the District Court is

without authority to empower its unnamed representatives or third-parties to disrupt state court discovery practices (*see* § V.B.1.b *infra*).

> **a.**    **Every federal appeals court to address the issue has agreed that federal MDL hold-back orders cannot be applied to litigation outside of the District Court's jurisdiction.**

The common-benefit doctrine does not allow attachment of proceeds beyond the District Court's jurisdiction. The doctrine requires that the "benefits must be traceable with some accuracy" and "there must be reason for confidence that the costs can in fact be shifted with some exactitude to those benefitting." *Geier v. Sundquist*, 372 F.3d 784, 790 (6th Cir. 2004). As explained in the *Harris County* Petition, and emphasized here, the common fund doctrine does not countenance the Original Order's jurisdictional overreach. *Harris County* Petition, 16-24 (citing *inter alia Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)).

The *Harris County* Petition explains that, "[t]he only circuit courts of appeal to have addressed this issue have held that a district court does not have . . . jurisdiction to subject parties not before it to common benefit assessments." *In re Syngenta AG MIR 162 Corn Litig*., No. 14-MD-2591-JWL, 2015 WL 2165341, at *2 (D. Kan. May 8, 2015) (quoted at *Harris County* Petition, 20). The Clarifying Order does nothing to prove the *Harris County* Petitioners wrong. They are not. The District Court does not confine the 7.5% hold-back to the established limits of federal authority. Rather, the Clarifying Order reasons that diversion of potentially

20

75% of the available fee and cost compensation into the federal fund[27] is best corrected *post hoc*, because state court litigants can appear in federal court to request relief from the very tribunal these claimants contend lacked jurisdiction for the tax in the first instance. Clarifying Order, 4-5. This logic places the cart before the horse: The District Court cannot assume control over recoveries in cases without subject-matter jurisdiction in the first place. *Department of State*, 931 F.3d at 507 (quoted above); *see also In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–II*, 953 F.2d 162, 166 (4th Cir. 1992) (to challenge federal district court assessment for MDL discovery, state court litigants are "compelled to file a petition in the district court, yet the court has no jurisdiction to compel such a procedure in the first instance").

"Principles of comity and respect for state courts' supervision of their own dockets and the attorneys before them" counsel against "compel[ling] attorneys who represent both state and federal plaintiffs to set aside a portion of their fee recoveries in state cases." *In re Zyprexa Products Liability Litigation*, 467 F. Supp. 2d 256, 268 (E.D. N.Y. 2006); *see also In re Genetically Modified Rice Litig.*, 764 F.3d 864, 873 (8th Cir. 2014) ("The district court properly ruled . . . that it did not have jurisdiction to order holdbacks from state-court plaintiffs' recoveries."). As explained below, the

---

[27]  *See Harris County* Petition, 5.

Clarifying Order's unprecedented provisions deputizing unidentified parties to interfere with state court litigation also violate principles of comity and federalism.

> **b.** **The District Court usurped its authority in authorizing unidentified third parties to interfere with state court discovery.**

The Orders seek to pressure state-court litigants, over which there is no federal jurisdiction, to sign the Participation Agreement with the federal PEC.[28] The Clarifying Order cites no apposite precedent allowing a District Court to authorize unidentified third parties to interfere with state court discovery so as to coerce state litigants' use of a federal repository.

The District Court invokes Rule 26's proportionality analysis to say it "makes no sense" to allow state court plaintiffs to seek documents at their own expense. Clarifying Order, at 2-3 n.2. But this crosses statutory bounds; the Rules govern only "practice and procedure . . . for cases *in the United States district courts*"—not those pending in state courts. 28 U.S.C. § 2072(a) (emphasis added); *see also* FED. R. CIV. P. 1. (Rules govern "procedure in all civil actions and proceedings *in the United States district courts*") (emphasis added). That the District Court is a transferee court does not change the limited scope of federal rules and jurisdiction. "The authority

---

[28] As explained above (§ IV.B.1 *supra*), the Orders' provisions attempting to compel state court litigants to use the federal MDL Repository instead of their own document platforms is a means of compelling *inter alia* the hundreds of writ Petitioners to sign the Participation Agreement.

for consolidating cases on the order of the judicial panel on multi-district litigation . . . is merely procedural and does not expand the jurisdiction of the district court to which the cases are transferred." *Showa Denko*, 953 F.2d at 165.

Absent statutory authority, the District Court's actions must stem from the Constitution. *See In re Univ. of Michigan*, 936 F.3d 460, 462 (6th Cir. 2019). In *Univ. of Michigan*, this Court rejected the argument that "the district judge's understandable desire to settle the case" empowered the court to compel a University President to attend a public settlement conference, where the University had offered to send a representative with settlement authority in compliance with Rule 16. *Univ. of Michigan*, 936 F.3d at 464. Here, the District Court is not merely requiring something more than what is required under a federal rule. No federal authority exists that allows a federal court to dictate the terms of state cases to which limited federal jurisdiction does not reach.

In *Showa Denko*, the Fourth Circuit recognized that federal MDL courts lack the authority to disrupt state court cases. 953 F.2d at 166. Not only was that MDL court's tax of state court cases criticized for lack of jurisdiction, but the decision further discusses the "very real potential of interfering with discovery proceedings in state court, raising questions of conflict with the policy of comity between federal and state courts." *Id. Showa Denko*'s "potential" interference is realized here. The Clarifying Order justifies the unprecedented empowerment of unnamed third parties

to interfere in state court litigation and directly contact state judges with the logic that "squarely: It makes no sense" to allow state court plaintiffs to continue to use their own document depositories.[29] The lawyers appointed in MDL 2804 are not the only ones in the country who can handle document production and maintain a platform for litigation purposes. *Harris County* Petitioners and Petitioners herein do not want to use the federal MDL Repository, and instead maintain their own document platforms.[30] Petitioners here and in *Harris County* also do not want to sign the federal PEC's Participation Agreement or submit to federal court jurisdiction. After all, the PEC repeatedly promised that the ARCOS data was made available "without charge" "without charge" "without charge."[31] Inconsistently, the ARCOS data is the reason for the extra-jurisdictional charge.[32]

The District Court's inherent authority does not explain footnote six's empowerment of "third parties" to actively interfere in state court cases for the purpose of forcing the Participation Agreement upon parties that choose not to sign it. Inherent authority over cases extends only to cases actually before the court. "A

---

[29] *See* Clarifying Order, 3 & n.2. The Clarifying Order did not address the fact that hundreds of petitioners have been litigating in state courts without the federal MDL Repository.
[30] *See, e.g.*, Exhibit 13, County of Harris' Br. in Resp. to Prof. Rubenstein's R&R, Doc. 3350 (N.D. Ohio June 23, 2020), at  3 (discussing Texas document depository).
[31] Exhibit 11, MDL 2804: Second Amended Notice of ARCOS Disclosure, Doc. 1613; *see also* §IV.C *supra*.
[32] *See* §IV.C *supra*.

federal court's inherent power concerns efforts to 'manage [its] *own* affairs,' not the affairs of another sovereign's court." *Brown v. City of Upper Arlington*, 637 F.3d 668, 672–73 (6th Cir. 2011) (quoting *Children's Ctr. for Developmental Enrichment v. Machle*, 612 F.3d 518, 524 (6th Cir. 2010) (alteration and emphasis in original) (internal quotations omitted)). When a court "go[es] out of its appointed sphere" and exercises power over "strangers to its proceedings," its "action is void." *Farmers' & Merchants' Bank of Phoenix, Ariz. v. Ariz. Mut. Sav. & Loan Ass'n*, 220 F. 1, 6 (9th Cir. 1915) (citation omitted). It would be "against all principle and all reason" to even entertain "the proposition that the [district court's] judgment or decree . . . concludes the rights of third parties not before the court." *In re Howard*, 76 U.S. 175, 183 (1869).

This Court in *Brown v. City of Upper Arlington*, 637 F.3d at 673, examined *Kokkonen* and the limits on federal court authority. The *Brown* trial court had held the City in contempt of court, ordering that it pay the homeowner's attorney fees, as punishment for the City's destruction of a tree that was the subject of ongoing litigation. 637 F.3d at 671. The district court had ruled in the City's favor the day before it destroyed the tree, but the district court faulted the City's immediate destruction because it foreclosed meaningful review by the district and appellate courts. *Id*. This Court "appreciate[d] the district court's frustrations with the City's conduct," but saw "no basis for using the contempt power to deal with the problem."

25

*Id*. at 669. The case had been dismissed without an injunction protecting the tree, and "customs of trust in the local bar" did not imbue the district court with inherent authority or contempt power over a case no longer before it. *Id.* at 673-74. Here, twenty Petitioners have never been before the MDL 2804 District Court; others have, but their cases are now in state court after remand; many others are in the District Court but only because of wrongful removals, and their cases should be remanded to state court.

The District Court expresses a policy preference for forcing all state court litigants in opioid litigation to submit to the terms of the federal PEC Participation Agreement, but policy concerns cannot create jurisdiction. "[C]onsiderations of policy cannot override the constitutional limitation[s] on the authority of the federal judiciary." *Pennhurst State Sch. & Hospital v. Halderman*, 465 U.S. 89, 123 (1984) (citing *Missouri v. Fiske*, 290 U.S. 18, 25-56 (1933), and concluding policy limitations cannot override limitations imposed by Eleventh Amendment). The United States Supreme Court has recently reaffirmed that policy arguments are irrelevant if there is no federal jurisdiction in the first instance. "It is not for this Court to employ untethered notions of what might be good public policy to expand our jurisdiction." *Badgerow*, 142 S. Ct. at 1321 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990)). *See also Ameritox, Ltd. v. Millennium Labs., Inc.*, 803 F.3d 518, 539 (11th Cir. 2015) ("Considerations of fairness . . . do not support continued

exercise of jurisdiction."); *Williams v. Alioto*, 549 F.2d 136, 145 (9th Cir. 1977) (Federal courts cannot "create jurisdiction by resort to public policy considerations.").

In sum, the Clarifying Order admits that the *Harris County* Petitioners were correct in their criticisms of footnote six. The amended footnote six continues to constitute a usurpation of the District Court's authority because it continues to interfere with the conduct of state court litigation.

### 2.  The Orders violate the Due Process Clause.

Petitioners have a Constitutional right to Due Process before they are deprived of their property rights or autonomy. Under these facts, the District Court's entry of the Order which applies to every Opioid Case[33] into perpetuity, that was not brought by State Attorneys General, imposing a 7.5% tax on gross recoveries violates Due Process.  It is well settled that a claimant has a property right to their claim, and an attorney has a property right to their fee.[34] The District Court's unilateral and sweeping order depriving claimants and attorneys of 7.5% of a claimant's gross

---

[33] "Opioid Case" under the district court's definition is "litigation in any court throughout the United States involving the marketing, distribution, sale, or use of Opioid related drugs." Original Order, 3 n.1.

[34] Legal claims can constitute "property" such that a deprivation would trigger due process scrutiny. *In re Matter of Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016). An action for attorneys' fees under the equitable fund doctrine belongs to the attorney. *Pawlak v. Greenawalt*, 713 F.2d 972, 981 (3d Cir. 1983).

recovery without prior notice or an opportunity to be heard violates their Due Process rights.

Constitutional Due Process requires that "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. ("Due Process Clause"). The Sixth Circuit and Supreme Court have long held that due process "requires notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (internal quotations and citations omitted); *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). Due process is required to prevent, to the extent possible, *an erroneous deprivation of property*. *See Gilbert v. Homar*, 520 U.S. 924, 930-32 (1997) (due process calls for such procedural protections as the situation demands).

The extent to which procedural due process must be afforded a plaintiff is influenced by the extent to which he may suffer loss and depends upon whether his interest in avoiding that loss outweighs the governmental interest in summary adjudication. *See Cafeteria & Rest. Workers Union v. McElroy*, 367 U.S. 886, 895-96 (1961). Notice is required under Due Process to ensure that a party is well apprised of the matter potentially affecting one's property rights and that the party is ensured that the opportunity for a hearing is meaningful. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("Th[e] right to be heard has

little reality or worth unless one is informed that the matter [which has the potential to affect one's rights] is pending and can choose for himself whether to appear or default, acquiesce or contest."). The District Court's Order at issue here deprives Petitioners of a property interest in 7.5% of the gross settlement without prior notice or an opportunity to be heard. There has been no hearing on the issue at any time where Petitioners could be heard prior to the deprivation of 7.5% of their gross recovery (*see* § IV.E. *supra*).

As sister Circuits have guided, "[o]n a broad public level, fee disputes, like other litigation with millions at stake, ought to be litigated openly," and "when a judge constructs a process for setting fees, the process must contain at least the procedural minima of due process: notice and an opportunity to be heard."[35] The

---

[35] *In re High Sulfur Content Gasoline Products Liability Litig.*, 517 F.3d 220, 230-31 (5th Cir. 2008) (finding attorneys' agreement to a Fee Committee was not an agreement that committee would have ex parte hearing with court, and holding that district court abused discretion by engaging in ex parte hearing with Fee Committee, by sealing attorney fee information, by not sufficiently scrutinizing fee proposal before adoption, and by failing to provide all attorneys an opportunity to object) ((quotation marks omitted; citing *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 982 F.2d 603, 614 (1st Cir.1992) (reversing fee award in large-scale consolidated case in which lawyers from steering committee were permitted to testify, examine witnesses, and offer oral argument at evidentiary hearing, but other lawyers representing individual clients were not)); *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 584 (3d Cir. 1984) (stating that "the hearing on a fee application in an equitable fund case requires compliance with those procedural rules which assure fair notice and an adequate opportunity to be heard. Equally plainly, the requirement of an evidentiary hearing demands the application in that hearing of the Federal Rules of Evidence"); Alan Hirsch & Diane Sheehey, FED. JUDICIAL CTR., *Awarding Attorneys' Fees and Managing Fee Litigation* 81 (2d ed.

District Court entered its Order without notice, or an opportunity to be heard, and without establishing the reasonableness of the tax for a particular claimant, or that the assessment is reasonable given that the PEC has already been adequately compensated for obtaining and synthesizing the ARCOS data. Such error constitutes a violation of the Due Process rights of Petitioners.

Consequently, because there was no meaningful opportunity to be heard, and no prior notice before the District Court's Orders were entered, the Orders violate the Petitioners' Due Process rights and should be vacated.

### C. The Writ Is Otherwise Appropriate Under the Circumstances.

The third and final factor in this Court's writ calculus is "that issuing the writ is otherwise 'appropriate under the circumstances.'" *Harris County* Order, 3 (quoting *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 381 (2004)). Mandamus is "appropriate to prevent 'intrusion by the federal judiciary on a delicate area of federal-state relations[.]'" *Univ. of Michigan*, 936 F.3d at 466 (quoting *Will v. United States*, 389 U.S. 90, 95–96 (1967)); *see also Harris County* Petition, 31. That calculus has routinely been met for jurisdictional and due process issues.

The Clarifying Order also acknowledges that the *Harris County* Petition is correct in part, but nonetheless failed to vacate the Order, or confine the federal

---

2005) ("If a hearing is held, the court should ensure that all attorneys staking a claim to fees are given a reasonable opportunity to be heard.")).

Orders to those cases over which there is federal jurisdiction. The Orders' intent appears to be to divert fees from cases outside of the MDL into a federal fund over which the District Court retains jurisdiction, and shift the burden to Cities and Counties to petition a federal court—lacking jurisdiction in the first instance—to ameliorate any unfairness. Footnote six's authorization of unprecedented interference in state court discovery with the imprimatur of a federal court is irremediable without entertainment of this writ.

## VI.    CONCLUSION

Petitioners respectfully request, consistent with their objections to federal jurisdiction, that their petition be granted, that the District Court's Ongoing Common Benefit Order and Order clarifying same be vacated to the degree the Orders affect cases not pending in MDL 2804 and cases with meritorious remand motions, that the District Court be prohibited from entering any order affecting Petitioners' cases (other than remand to state court and associated defense sanctions), and for such other relief as may be just.

Date: August 2, 2022                Respectfully Submitted,[36]

                                    */s/ S. Ann Saucer*
                                    S. Ann Saucer
                                    Texas Bar No. 00797885
                                    Louisiana Bar No. 21368
                                    asaucer@fnlawfirm.com
                                    N. Majed Nachawati

---

[36] Signatories specially appear, preserving objections to federal jurisdiction.

Texas Bar No. 24038319
mn@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
Fax (214) 890-0712

Shirley C. Byers
BYERS LAW FIRM, LLC
Marshall County Prosecuting Attorney
P. O. Box 5008
125 East Van Dorn Avenue (38635)
Holly Springs, MS 38634-5008
662-252-6530

Matthew S. Daniel
Texas Bar No. 24047575
mdaniel@lawyerworks.com
FERRER POIROT & WANSBROUGH
2603 Oak Lawn Ave. Ste. 300
Dallas, TX 75219
Tel. (214) 521-4412
Fax (866) 513-0115

*Counsel for Petitioner City of Holly Springs*

*/s/ Joseph J. Cappelli*
Joseph J. Cappelli (PA Bar 55166)
Marc J. Bern & Partners, LLP
101 West Elm Street, Suite 520
Conshohocken, PA  19428
Tel: (610) 941-4444; Fax: (610) 941-9880
jcappelli@bernllp.com

*Counsel for Petitioners Adams County, PA; Lower Makefield Township, PA; Armstrong County, PA; Beaver County, PA; Bensalem Township, PA; Bradford County, PA; Cambria County, PA; Carbon County, PA; Clarion County, PA; Fayette*

32

*County, PA; Franklin County, PA; Greene County, PA; Huntingdon County, PA; Lackawanna County, PA; Lawrence County, PA; Monroe County, PA; Newtown Township, PA; Norristown Municipality, PA; Washington County, PA; West Norriton Township, PA; Westmoreland County, PA; City of Marietta, OH; Washington County, OH; Meigs County, OH; Noble County, OH; City of Dover, DE; Kent County, DE; and City of Seaford, DE*

*/s/ Todd A. Court*
TONY G. PUCKETT, OBA #13336
TODD A. COURT, OBA #19438
MCAFEE & TAFT A PROFESSIONAL
CORPORATION
8th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK  73102-7103
405/235-9621; 405/235-0439 (FAX)
tony.puckett@mcafeetaft.com
todd.court@mcafeetaft.com

MATTHEW J. SILL, OBA #21547
HARRISON C. LUJAN, OBA #30154
FULMER SILL LAW GROUP
P.O. Box 2448
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone/Fax: 405-510-0077
msill@fulmersill.com
hlujan@fulmersill.com

*Counsel for Board of County Commissioners of Atoka County, OK; Board of County Commissioners of Caddo County, OK; Board of County Commissioners of Choctaw County, OK; Board of County Commissioners of Cimarron County, OK; Board of County Commissioners of Coal County, OK; Board of County Commissioners of Custer County, OK; Board of*

*County Commissioners of Dewey County, OK; Board of County Commissioners of Grady County, OK; Board of County Commissioners of Greer County, OK; Board of County Commissioners of Harmon County, OK; Board of County Commissioners of Harper County, OK; Board of County Commissioners of Haskell County, OK; Board of County Commissioners of Hughes County, OK; Board of County Commissioners of Jackson County, OK; Board of County Commissioners of Jefferson County, OK; Board of County Commissioners of Johnston County, OK; Board of County Commissioners of Kay County, OK; Board of County Commissioners of Kiowa County, OK; Board of County Commissioners of Latimer County, OK; Board of County Commissioners of Le Flore County, OK; Board of County Commissioners of Lincoln County, OK; Board of County Commissioners of Logan County, OK; Board of County Commissioners of Love County, OK; Board of County Commissioners of Major County, OK; Board of County Commissioners of McCurtain County, OK; Board of County Commissioners of Noble County, OK; Board of County Commissioners of Pittsburg County, OK; Board of County Commissioners of Pottawatomie County, OK; Board of County Commissioners of Roger Mills County, OK; Board of County Commissioners of Stephens County, OK; Board of County Commissioners of Texas County, OK; Board of County Commissioners of Tillman County, OK; Board of County Commissioners of Woods County, OK; Board of County Commissioners of Woodward County, OK; City of Ada, OK; City of Altus, OK; City of Anadarko, OK; City of Bethany, OK; City of Broken Arrow, OK; City of Edmond, OK; City of Elk City, OK; City of Enid, OK; City of Guthrie, OK; City of Jenks, OK; City of Lawton, OK; City of Midwest City, OK; City of Mustang, OK; City of Oklahoma*

*City, OK; City of Owasso, OK; City of Ponca City, OK; City of Seminole, OK; City of Shawnee, OK; City of Stillwater, OK; City of Tulsa, OK; and City of Yukon, OK*

## CERTIFICATE OF COMPLIANCE

The foregoing petition complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 7,614 words, excluding accompanying documents required by Fed. R. App. P. 21(a)(2)(C) and items excluded from any length computation per Fed. R. App. P. 32(f). The words are counted using the word-count function on Microsoft Word 2016 software.

This petition complies with the requirements of Fed. R. App. P. 32(a) and Fed. R. App. P. 32(c)(2) because it has been prepared using Microsoft Word 2016 in Times New Roman, 14-point font.

*/s/ S. Ann Saucer*
S. Ann Saucer

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2022, a copy of this petition, appendix, and exhibits was filed electronically through this Court's CM/ECF system.

I further certify that service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.

*/s/ S. Ann Saucer*
S. Ann Saucer

**APPENDIX**

| Exhibit No. | Description | Location in Record | Page ID Range |
|---|---|---|---|
| 1 | Ongoing Common Benefit Order | 1:17-md-02804, Doc. 4428 | 516405-516422 |
| 2 | Petition for Writ of Mandamus of *Harris County et al.* with Exhibits 10 and 11 only | No. 22-3493 (filed in 6th Cir. May 27, 2022) | Doc. 1-2, Pages 1-57; Doc. 1-3, Page 84-104 |
| 3 | Order Clarifying Ongoing Common Benefit Order | 1:17-md-02804, Doc. 4503 | 585419-585423 |
| 4 | Letter from Honorable Dan Aaron Polster, U.S.D.C. Judge, to Deborah S. Hunt, Clerk, U.S. Sixth Circuit | No. 22-3493, Doc. 5 (filed in 6th Cir. June 9, 2022). | Pages 1-6 |
| 5 | Opioid Participation Agreement | 1:17-md-02804, Doc. 3352-3 | 495961-495967 |
| 6 | Email from Lynn Fitch, Attorney General, State of Mississippi (July 12, 2022) | Not located in record; in substance found at https://ago.state.ms.us/opioidsettlement/ | n/a |
| 7 | Plaintiff's Brief in Support of Motion to Vacate CTO-211 | MDL No. 2804, Doc. 9515-1 (J.P.M.L. Dec. 27, 2021). | Pages 1-21 |
| 8 | Order Denying Transfer and Vacating CTO | MDL 2804, Doc. 9586 (J.P.M.L. April 8, 2022). | Pages 1-3 |
| 9 | MDL No. 2804 Plaintiffs' Leadership's Response to Pharmacy Defendants' Motion for Reconsideration of Order Denying Transfer and Vacating CTO 211 | MDL 2804, Doc. 9598 (J.P.M.L. May 4, 2022). | Pages 1-7 |
| 10 | Letter from Plaintiff Executive Committee to State Court Litigants (Dec. 5, 2018) | | n/a |

| 11 | MDL 2804: Second Amended Notice of ARCOS Disclosure | 1:17-md-02804, Doc. 1613 | 45100-45103 |
|----|-----------------------------------------------------|--------------------------|-------------|
| 12 | Report and Recommendation Addressing Motion for Common Benefit Fund | 1:17-md-02804, Doc. 3319 | 494887-494896 |
| 13 | County of Harris' Brief in Response to Professor Rubenstein's Report and Recommendation | 1:17-md-02804, Doc. 3350 | 495854-495876 |
| 14 | Docket Sheet excerpts, Entry for Document 4428 (omitting Related Document number identification) | 1:17-md-02804 | n/a |
| 15 | Amended Motion for Entry of Order Establishing Common Benefit Fund (N.D. Ohio Jan. 28, 2020). | 1:17-md-02804, Doc. 3112. | 481997-482011 |
| 16 | Order Regarding Professor Rubenstein's Report and Recommendation | 1:17-md-02804, Doc. 3320 | 494897-494898 |
| 17 | Case Management Order No. 1 | 1:17-md-02804, Doc. 232 | 1084-1103 |
| 18 | Order, *In re Harris County, TX* | No. 21-3637 (6th Cir. March 11, 2022) | Pages 1-5 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | CASE NO. 1:17-md-2804 |
| This document relates to: | Judge Dan Aaron Polster |
| *ALL CASES* | ONGOING COMMON BENEFIT ORDER |

## I.    Introduction.

Since the commencement of these MDL proceedings in January 2018, numerous attorneys – including counsel appointed by this court to serve as Co-Lead Counsel, Liaison Counsel, members of the Plaintiffs' Executive Committee ("PEC"), various other committees, and counsel authorized by MDL leadership – have advanced many tens of millions of dollars in out-of-pocket expenses and devoted an enormous number of hours to shoulder the laboring oars in this litigation. These attorneys have done so on a contingent basis, with no guarantee of payment. They have performed and continue to perform the work of common discovery; of retaining, developing, and qualifying experts; of preparing and trying multiple bellwether cases; and of negotiating complex national settlements that provide billions of dollars in abatement recoveries to federal and state court litigating plaintiffs and beyond.

This common benefit work, which the Court has charged appointed counsel to undertake, is an absolute necessity and serves the interests of not only the litigants but also the Court and the nation. "By making manageable litigation that otherwise would run out of control, [leadership counsel] serve interests of the court, the litigants, the other counsel, and the bar, and the public at large, who are entitled to their chance at access to unimpacted courts." *In re Air Crash Disaster at Florida Everglades*, 549 F.2d at 1017 (5th Cir. 1977).

**EXHIBIT 1**

This common benefit work must and will continue in this MDL in order to fulfill the purposes of 28 U.S.C. §1407, as well as the expectations of the Judicial Panel on Multi-District Litigation ("the Panel"). The instant Ongoing Common Benefit Order is designed to ensure that the costs of counsel's prior and ongoing work, which inures to the common benefit of so many interested parties, will be equitably spread among all beneficiaries, as authorized and established by the United States Supreme Court in its common benefit doctrine, and as reaffirmed in the extensive jurisprudence thereunder.  As the Supreme Court has recognized for over a century, and as MDL Courts have repeatedly implemented in their common benefit orders, this common benefit doctrine entitles plaintiffs' attorneys to an award beyond their own contingent fees, assessed from funds paid in judgments and settlements that their litigation efforts help to secure.  *See, e.g.*, *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 126-27 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); *In re Air Crash Disaster at Florida Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir. 1977); *In re Diet Drugs*, 582 F.3d 524, 546-47 (3d Cir. 2009); *In re General Motors LLC Ignition Switch Litig.*, 977 F. Supp. 3d 170 (S.D.N.Y. 2020); *In re Vioxx Prods. Liab. Litig.*, 802 F.Supp.2d 740, 769 (E.D. La. 2011); 5 William B. Rubenstein, *Newberg on Class Actions* §§ 15:113-117 (5th ed. 2018).

## II.    Common Benefit Orders in MDL No. 2804.

Throughout the course of these MDL proceedings, the Court has issued a series of Orders designed to ensure that leadership counsel appointed by this Court, and others who perform common benefit work, are incentivized to do so with reasonable expectation of reimbursement and compensation for their efforts.  The Court has always anticipated that a portion of counsel's remuneration will include reasonable assessments levied upon judgments and settlements that rely upon common benefit work.

- 2 -

The earlier common benefit-related orders of this Court, all of which remain in effect, include: *Order Regarding Plaintiff Attorneys' Fees and Expenses* (docket no. 358); *Order Establishing Common Benefit Fee Fund and Directing Certain Payments* (docket no. 3794); *Order Appointing Certified Public Accountant to Maintain and Act as Escrow Agent for the Common Benefit Fee Fund* (docket no. 3810); *Order Regarding Contingency Fees* (docket no. 3814); *Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* (docket no. 3828); *Order Regarding Fee Panel, Fund Administrator and Assistants* (docket no. 4030); *Order Appointing Fee Committee and Addressing Related Matters* (docket no. 4286); and *Order Establishing Application Protocols for Reimbursement of Common Benefit Attorneys' Fees Under the Janssen and Distributors Settlement Agreements* (docket no. 4344).

This Order does not abrogate any of those earlier Orders. It provides an ongoing framework and structure to apply the common benefit doctrine to Opioid Cases[1] that: (1) are not brought by State Attorneys General; and (2) are not otherwise included in global settlements that have their own negotiated, Court-approved common benefit fees and cost structures. For example, the recent global settlements with the three largest Distributors (McKesson, AmerisourceBergen, and Cardinal Health), and with Manufacturer Janssen, provide for a fee fund to compensate counsel for common benefit work; therefore, no additional common benefit contribution from

---

[1] "Opioid Cases" is defined as "litigation in any court throughout the United States involving the marketing, distribution, sale, or use of Opioid related drugs." *ARCOS Protective Order* ¶5 at 5 (docket no. 1545).

governmental subdivisions participating in these global settlements (or their counsel[3]) is necessary or appropriate.

Notably, over two years ago, the PEC moved for entry of an Order establishing a common benefit fee fund, *see* docket no. 3112, and the Court "invited any interested party to file an opposition brief if they were so inclined," *Order* at 1 (docket no. 3397).  The Court received dozens of position papers, *see id.* at 1 n.1 and 2 n.3 (listing submissions), as well as a Report from the Court's expert consultant at the time, Professor William B. Rubenstein, *see* docket no. 3319.[4]  After prolonged and serious consideration, the Court declined to enter an Ongoing Common Benefit Order at that juncture in the case.  Specifically, on July 27, 2020, the Court issued an *Order Denying **Without Prejudice** the PEC's Motion for Common Benefit Fee Order* (docket no. 3397) (emphasis added).  In that Order, the Court observed:

> [T]here is a wide consensus confirming the accuracy of the PEC's statements that: (1) "scores of attorneys from the PEC firms and others" have "performed [work] for the common benefit of plaintiffs in the [MDL] proceedings," as well as in other opioid cases; and (2) those attorneys are entitled to some measure of "reimbursement and compensation of expenses and work incurred and performed for the common benefit" of those plaintiffs. The Court shares in this consensus.
>
> * * *
>
> The threshold question presented by the PEC's motion, however, is whether entry of a common benefit order is appropriate **at this time**. The Court concludes the time is not ripe because plaintiffs and defendants state uniformly that, given current settlement negotiations, they anticipate a global settlement will probably moot the need for a common benefit order.

---

[3] To be clear, counsel for a participating subdivision owes no additional common benefit contribution *related to the participating subdivision.*  If the same counsel also represents a *non*-participating subdivisions, then counsel *does* owe a 7.5% common benefit assessment related to any eventual recovery by that non-participating subdivision.  *See Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* at 18 (docket no. 3828).

[4] The Court has reviewed again all of these submissions in preparation for drafting this Order.

*Id.* at 2-3 (citations omitted, emphasis in original).

About one year later, the "Big 3" Distributors and Janssen announced conditional global settlements with governmental-entity plaintiffs.  These multi-billion dollar settlements are now finalized and initial settlement payments will begin to flow shortly. These settlements are complex, with intensely negotiated participation provisions and fee and cost structures, including common benefit provisions.[5] This Court retains an ongoing role in supervising and enforcing these common benefit-related agreements, as reflected in the above-listed Orders.

In addition to these two global settlements, however, various MDL Defendants have recently entered into other settlements of Opioid Cases that do not include common benefit provisions.  And the Court anticipates that MDL Defendants will reach additional global and non-global settlements in the future, some of which may not include specific, negotiated, Court-approved and -supervised fee and cost structures providing for an equitable contribution towards compensation of counsel who performed common benefit work.  Thus, the Court concludes the time has now come to enter an Ongoing Common Benefit Order that applies to certain settlements and judgments in Opioid Cases.

### III.    The Panel's Recent Order.

In addition to the imminency of other settlements and judgments in Opioid Cases that will be secured through reliance upon common benefit work, the Court notes that recent comments by the Judicial Panel on Multidistrict Litigation ("the Panel") also suggest the time has come for an Ongoing Common Benefit Order.

---

[5] The Distributors/Janssen settlement-related documents and other, ongoing settlement-related information are posted at https://nationalopioidsettlement.com/.

The Panel has explicitly recognized the intensive efforts and substantial progress of MDL No. 2084.  Having (at least for now) discontinued transfer of new cases into this MDL, the Panel is looking toward the completion of this Court's MDL work, and to assuring that its ongoing benefits are provided to subsequent related cases in order to avoid duplicative work and costs.  In an Order issued a few weeks ago, the Panel stated:

> [C]ommon discovery has largely been completed, several bellwether trials have been prepared, and a bellwether remand process established.  And myriad claims have been resolved through substantial settlements.
>
> * * *
>
> We see no reason why the parties in subsequent actions, subject to the same conditions imposed on the parties to MDL No. 2804, should not be able to avail themselves of the documents and depositions accumulated in this MDL.  The involved courts may find useful guidance in the numerous pretrial rulings of the Honorable Dan A. Poster in this docket.
>
> The parties also can employ alternatives to transfer to minimize whatever, if any, possibilities may arise of duplicative discovery or inconsistent pretrial rulings.  Thus, even absent transfer, most of the benefits of the MDL are available to expedite resolution of these cases.

*In re: National Prescription Opiate Litig.*, Case MDL No. 2804, Order at 2-3 (docket no. 9586) (J.P.M.L. Apr. 8, 2022) (citations omitted).

Of course, if "the parties in subsequent actions" are able to "avoid duplicative discovery" by obtaining access to "the documents and depositions accumulated in this MDL" – which are housed in an MDL Repository that is managed and paid for by the MDL PEC – those parties are taking appropriate advantage of work by others that inure to their and the common benefit.  As such, the Panel's Order suggests strongly that the time has now come for entry of an Ongoing Common Benefit Order.

**IV.     Assuring Full Use and Fair Payment For Past and Ongoing Common Benefit Work.**

The costs advanced, and the work dedicated, by the PEC to pursue the common discovery, pretrial proceedings, and bellwether trials in this MDL have been virtually unprecedented in their magnitude and intensity, continuing (unabated during COVID) for over four years.

Unlike most MDLs, there are literally hundreds of different Defendants named in the Opioid MDL cases, several of which are Fortune 50 companies.  There are also numerous categories of Plaintiffs, ranging from individuals to private businesses to governmental subdivisions.  To pursue all of the claims in this MDL, the PEC has so far, since its appointment in February 2018: (1) advanced about $86 Million in common benefit assessments, and incurred about an additional $24 Million in held costs; (2) collected, analyzed, and maintained over 70,000 terabytes of discovery from MDL defendants, third parties, bellwether plaintiffs, and other exhibits; (3) taken, defended, or collected over 900 relevant depositions; (4) retained, developed, and obtained reports from over 60 scientific, medical, public health, and economics experts; (5) fully prepared two bellwether cases for trial in the MDL Court (Case Tracks One and Two); (6) begun preparing another five bellwether cases (Case Tracks Seven through Eleven) for trial; and (7) supported trial of four other bellwether cases that were remanded to transferor courts (Track Two to West Virginia; Track Four to Chicago; Track Five to Oklahoma; and Track Six to San Francisco).

The trial-readiness of the Track One bellwether case in Fall of 2019 catalyzed what became the "Big 3" Distributors and Janssen national settlements, worth about $26 Billion. It is egregious understatement to observe that this $26 Billion settlement, which provides funds to States and local governments across the nation to abate the Opioid Crisis, inured to the common benefit of parties who were not litigating in Track One, or for that matter in the MDL.  The PEC's work has also

assisted in the trial of state court cases brought by Attorneys General and various cities and counties, some of which have separately settled for (in total) roughly an additional $2 Billion (without any common benefit assessment).  A total of 11 MDL active cases have been designated for trial against over a dozen different Defendant families.  The common benefit work is intensive and ongoing.

The PEC should not solely bear the cost, in time and money, of obtaining this extensive and essential discovery product.  The fruits of the labors expended pursuing claims in this MDL should and have and will be made available to all Opioid Case plaintiffs, subject to an assessment that spreads the costs equitably among all beneficiaries, without up-front expense to them.

Moreover, the MDL **Defendants** are also entitled to protection from costly and time-consuming duplicative discovery demands.  These are the very demands that MDL centralization under 28 U.S.C. § 1407 is designed to prevent, by providing that – as much as possible – common discovery is done, comprehensively, once, rather than multiple times.  The discovery effort has been arduous and expensive on both sides. The Court must be concerned with conserving the resources of Defendants as well as Plaintiffs.  This Ongoing Common Benefit Order ensures that discovery and litigation tasks, once completed, need not be repeated, as their results are made accessible to all – with the costs thereof equitably spread – in lieu of repetitive expenditures of time, money, and effort.  The provisions of this Order are designed to ensure that Defendants will not be subjected to wholesale repetition of discovery obligations they already met, either in cases remanded to transferor Courts or in factually related cases in other courts, by obligating the PEC

to maintain and make available this discovery product, subject to the assessment this Order imposes.[6]

This Court, assisted by its Court-appointed Special Masters, has actively supervised this centralized discovery: resolving discovery disputes, entering myriad discovery rulings, and making sure that discovery has proceeded in a fair, orderly, and proportional way, under the guidance of the federal rules, to fulfill the consistency, efficiency, and convenience goals of § 1407.  Defendants should not be subjected in non-MDL litigation to demands for documents and information they have already produced, or for depositions and reports that have already been taken and submitted, in MDL No. 2804.  An Ongoing Common Benefit Order will thus provide fairness to all MDL parties.

A unique and dramatic example of the PEC's accomplishments in this MDL bears noting. Early in the litigation, the PEC sought, over the objection of the United States Drug Enforcement Agency ("DEA"), the production to MDL plaintiffs of key data compiled in the DEA's Automated Records and Consolidated Orders System / Diversion Analysis and Detection System ("ARCOS/DADS") database.  In a series of Orders, the Court ordered the DEA to produce complete transactional ARCOS data for the period of January 1, 2006 through December 31, 2014 – first for six states (Ohio, West Virginia, Illinois, Alabama, Michigan, and Florida), and then for the remaining States and Territories. *See Order Regarding ARCOS Data* (docket no. 233); *Second Order Regarding ARCOS Data* (docket no. 397); *Third Order Regarding ARCOS Data* (docket no. 668).

---

[6] Accordingly, in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

The DEA produced ARCOS data to the PEC in essentially raw form. The PEC then organized, programmed, analyzed, and reported this data at great expense. As this Court has previously observed, the resulting detailed and vastly-more-user-friendly database readily shows "the number of opioid pills delivered to each City and County in America, partitioned by manufacturer and distributor and pharmacy." *Second Order Regarding ARCOS Data* at 2 (docket no. 397). This information has proved "essential" in enabling the parties in federal and state court Opioid Cases to correctly identify defendants, file and amend complaints, design discovery, bring and defend motions, develop damages and abatement models, inform experts, prepare for trial, and engage in meaningful settlement discussions. *Id.*

Ultimately, the PEC's "ARCOS database," as produced to, organized within, and protected by[7] this Court, now vests the Court with a centrality to the nationwide opioid litigation unmatched in other MDLs. The initial and ongoing efforts of the PEC to obtain, organize, and analyze the ARCOS data, and make it available in meaningful and useable form to all parties, provides an indispensable and uniquely beneficial resource to opioid litigants. The time and out-of-pocket costs to develop this common resource may and should be equitably spread among all beneficiaries.

This Court, which has ongoing jurisdiction over the ARCOS data produced by the DEA, as organized, analyzed, and made available by the PEC and this Court's protective and case management Orders, has the authority and may exercise the discretion to condition the use of the data by all parties in the MDL and their counsel, and all non-MDL litigants and their counsel (other than the States), who seek to use it for their non-MDL investigations and cases, upon payment of a back-end, contingent assessment. The same is true of the other discovery obtained and managed by the PEC and residing in the MDL Repository.

---

[7] Access to the ARCOS data continues to be governed by the Court's *ARCOS Protective Order* (docket no. 1545).

V.      **Parties and Counsel that will be Assessed.**

For the reasons set out below, this Ongoing Common Benefit Order will apply to: (1) plaintiffs with Opioid Cases pending in or remanded from MDL 2804, and their counsel; (2) plaintiffs' counsel who have signed a Participation Agreement with respect to any of their opioid claims and plaintiffs; (3) other plaintiffs and claims represented by plaintiffs' counsel with Opioid Cases pending in or remanded from MDL 2804; and (4) opioid claims and plaintiffs, whether inside or outside this MDL, that have relied upon work product developed within MDL 2804. Excepted from this list are cases and claims brought by State Attorneys General, and cases where a global settlement has its own MDL-Court-Approved common benefit structure.

The Court's authority over the first category of plaintiffs is plain. *See In re Diet Drugs*, 582 F.3d 524, 546–47 (3rd Cir. 2009) ("The Judicial Panel for Multidistrict Litigation is empowered, under 28 U.S.C. § 1407, to transfer related cases to a single court, and that court has—and is expected to exercise—the ability to craft a plaintiffs' leadership organization to assist with case management. Inherent in that ability . . . is the power to fashion some way of compensating the attorneys who provide class-wide services."); *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3rd Cir. 2015) (same); *see also In re Air Crash Disaster at Fla. Everglades on Dec. 29, 1972*, 549 F.2d 1006 (5th Cir.1977).

Regarding the second category, there is also no question that a common benefit assessment upon a Plaintiff's attorney is appropriate when the attorney agrees to it.  Pursuant to an "Opioid Litigation Participation Agreement," the Plaintiffs Co-Lead Counsel and the PEC have agreed to provide common benefit work product to any signatory "Participating Counsel."   The Court

incorporates into this Order this Participation Agreement, and the obligations it contains that are imposed upon Co-Lead Counsel and the PEC and Participating Counsel.

With respect to the third and fourth categories, this Court earlier noted that the propriety of "common benefit fee assessments on attorneys with cases not before the MDL judge is an unsettled issue." *Order Regarding Contingency Fees* at 10 n.27 (docket no. 3814). That said, there is ample authority for the proposition that common benefit fee assessments on attorneys with cases not before the MDL judge is permitted and appropriate in certain circumstances. *See In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 617 F. App'x 136, 141 (3rd Cir. 2015); *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 180 (S.D.N.Y. 2020) (allowing the assessment).

For example, with respect to the third category, the Court has authority over plaintiffs' counsel by and through their MDL cases. MDL courts, using their equity powers when applying the common benefit doctrine, regularly extend that authority over counsel's other, non-MDL cases in order to "preempt[] an extreme version of the free-rider problem: the lawyer who files only one case in the MDL to gain access to common benefit work and then leverages the knowledge gained from that work to settle dozens or hundreds of unfiled claims." *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 181 (S.D.N.Y. 2020).

The Court notes that MDL courts routinely caution against exercising authority to impose common benefit assessments on non-MDL cases *actually filed* in state courts, due to respect for principles of comity and because state courts can exercise their own authority over those plaintiffs to solve the free-rider problem. *See id.*; *see also In re Zyprexa Prods. Liab. Litig.*, 467 F. Supp. 2d 256, 268 (E.D.N.Y. 2006); *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 166 (4th Cir. 1992). In this instance, however, this Court firmly believes that levying a common benefit tax upon this category of Plaintiffs and their counsel is crucial because of: (1) the

virtually unprecedented expense incurred by the PEC for the common benefit in obtaining and synthesizing the ARCOS data; and (2) the absolutely essential character of the ARCOS data in allowing any and all opioid plaintiffs to prosecute their cases in the first place. In other words, the potential free-rider problem present in the Opioid Litigation is even more extreme than anything Judge Furman contemplated in *In re General Motors*, and it would be inequitable in the extreme for this Court not to remedy that problem through this Order.

Finally, with respect to the fourth category, MDL courts appear virtually unanimous on their authority to subject a recovery in a non-MDL forum to an appropriate assessment if the plaintiffs or their counsel ***actually used*** common benefit work product.  As Judge Furman observed:

> To be clear, the Firms do not appear to dispute that, if they actually used Common Benefit Work Product in a state-court or unfiled case, the Court has authority to subject any recovery in the latter to an assessment. That is for good reason, as the courts that have addressed the issue appear to be unanimous in upholding assessments in such circumstances. *See, e.g., In re Prempro Prods. Liab. Litig.*, No. 4:03-CV-1507 (BRW), 2014 WL 12758478, at *2 (E.D. Ark. Nov. 25, 2014) ("[I]n cases where lawyers used . . . common benefit work and obtained a . . . recovery in any state or federal forum, the recovery was subject to an assessment." (internal quotation marks and brackets omitted)); *In re Fosamax Prods. Liab. Litig.*, No. 06-MD-1789 (JFK), ECF No. 1012, at 6-7, 2011 WL 13257632 (S.D.N.Y. Apr. 28, 2011) (providing that "any plaintiff's counsel with cases not in the MDL who utilizes any aspect of the MDL common benefit work product . . . shall be subject to" an assessment, part of which was to be "subtracted from the client portion" of recoveries); *In re Phenylpropanolamine Prods. Liab. Litig.*, MDL No. 1407 (BJR), 2009 WL 6042809, at *1, 2009 U.S. Dist. LEXIS 126729, at *3 (W.D. Wa. Sept. 18, 2009) (noting that, "for state cases in which counsel wished to avail themselves of common benefit product, there was a three percent holdback").

*In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 184–85 (S.D.N.Y. 2020).

Here, as stated previously, the PEC's work in obtaining and processing the ARCOS data in particular, and pursuing and collecting the vast other Opioid Case discovery more broadly, is so

fundamental to this category of plaintiffs' claims, that whether or not they signed a Participation Agreement—or the *ARCOS Protective Order's* Acknowledgement of Protective Order and Agreement to be Bound, *see* docket no. 1545-1 & 1545-2— it is unlikely their claims would have any settlement value or likelihood of positive judgment had these plaintiffs not *actually utilized* the work the PEC did for the common benefit.

Accordingly, the Court imposes a common benefit assessment upon amounts paid in settlement or judgment in the four categories of cases listed in the first paragraph of this Section. Excepted from all of these categories are cases and claims brought by State Attorneys General and cases where a global settlement has its own MDL-Court-Approved common benefit structure.

## VI.    Determining An Appropriate Ongoing Common Benefit Assessment Amount.

When assessing common-benefit fees and costs combined, district courts generally award a fixed percentage of every recovery, often between 3% and 11%, as particular circumstances warrant. *See* 5 Rubenstein, *Newberg on Class Actions*, § 15:117 at 440-43. The Court concludes it is appropriate in this case to impose a holdback assessment of 7.5% going forward.[8] This is in the mainstream of MDL assessments generally, and is here imposed in an MDL where the scope and magnitude of common benefit expenditures and effort is virtually unparalleled, and in which such costs and efforts will be ongoing for some time in connection with discovery, trials, and trial preparation in Tracks 7-11, and in coordination with related actions, all as the Panel contemplates and expects.

The Court earlier imposed a 7.5% common benefit assessment on: (1) settlement amounts paid in Track One, *see Order Establishing Common Benefit Fee Fund and Directing Certain*

---

[8] To be clear, this assessment will not be imposed upon any payment due under a settlement or judgment that was entered before the date of this Order.

*Payments* (docket no. 3794) at 5-6; and (2) the gross recovery of any subdivision that did not participate in the global Distributors and Janssen Settlements, *see Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment* (docket no. 3828) at 18.  Moreover, in his *Report* to the Court two years ago, Professor Rubenstein observed that the common benefit assessment in large MDLs "is generally calculated in the range of 5% for fees and 2.5% for costs."  *Report* at 2 (docket no. 3319).  Thus, there is ample precedent for imposition of a 7.5% assessment.

Court-appointed counsel have the responsibility to make sure the burdens of common benefit work are allocated among all beneficiaries, both inside and outside the court.  This is usually done through the use of Participation Agreements.  *See In re Avandia Marketing, Sales Practices and Prods. Liab. Litig.*, 617 Fed. Appx. 136, 141 (3rd Cir. 2015) (affirming an Order "permit[ting] the Steering Committee to, essentially, trade work product for a share in the recovery in cases *not* before the MDL.")  Numerous counsel have executed Participation Agreements in this MDL. Plaintiffs' Co-Lead Counsel or their designees are hereby authorized and directed to condition sharing of MDL work product (including that related to common fact discovery, data, and development of MDL experts) on the execution of a Participation Agreement consistent with this Order.

While the global Distributors and Janssen Settlement Agreements will defray significant accrued common benefits costs and fees, it will not fully reimburse or compensate all of them, nor will it reimburse or compensate the substantial ongoing work to be done – including: (1) work in this MDL, in Opioid Cases upon remand, and in other opioid-related proceedings; (2) efforts in

pursuit of claims against non-settling Defendants; and (3) with respect to the categories of affected plaintiffs not included in settlements (e.g. Third Party Payors and Hospitals).

It bears noting that the amount collected pursuant to the 7.5% assessment is ***not*** necessarily what the Court will award to eventual applicants for common benefit awards. The Court mandates the 7.5% assessment only to ensure appropriate awards of common benefit fees and expenses are possible; the Court has no current opinion on what the total amount of any such awards will be, or who is or will be eligible.[9] *See In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 909-10 (N.D. Ohio 2003) (awarding $43 million in common benefit fee awards from a $50 million fund, and directing the remainder should be used for "payment of certain costs associated with effectuating the settlement and, if possible, distribution to the settlement class").

### VII.  Common Benefit Fund Account.

In connection with the Distributors and Janssen Settlement Agreements, the Court appointed a Fee Panel to oversee distribution of $1.6 Billion in attorney fees, including $960 Million in Common Benefit Fees; and the Court appointed Special Master Cohen (who is a Fee Panel Member) to oversee distribution of another $200 Million in Expense Reimbursement, a large portion of which is Common Benefit Expenses. The Fee Panel and Special Master Cohen have engaged counsel and accountants, created Trusts, and arranged for these funds to be invested in order to generate additional money for payment of administrative expenses.

---

[9] Provisions and procedures for reimbursement of common costs and compensation for common benefit time will be made in further Orders. At this juncture, the Court anticipates ordering that any funds held back by Defendants that are not approved and awarded as common benefit fees or costs by the Court will be returned to the plaintiffs or their counsel from whom the assessments were held back; however, the Court will make that determination at a later date.

To maximize efficiency, the Court concludes that the appointed Fee Panel should oversee the Court Common Benefit Fund into which assessments will be deposited, so that all Funds may be administered in the same way and use the same accountants, lawyers, investment advisors, and so on (as the Panel may choose or change within their discretion).[10]  The Court is ***not*** directing the Fee Panel to undertake any work toward determining awards from this Court Common Benefit Fund.  The Court will determine at a future time, with input from counsel, when and how such awards will be made.

Accordingly, the Court herby appoints David R. Cohen, Randi S. Ellis and Hon. David R. Herndon (the "Fee Panel") to administer and oversee the Court Common Benefit Fund pursuant to and in a manner consistent in all respects with the Court's August 8, 2021 Order (docket no. 3828).  The Court further orders that the Court Common Benefit Fee Fund shall be structured and operated in a manner so that it qualifies as a "qualified settlement fund" as described in Treasury Regulations Section 1.468B-1, and shall remain subject to the continuing jurisdiction of this Court.  Special Master David R. Cohen shall serve as Trustee and Administrator of the qualified settlement fund for purposes of Treasury Regulations Section 1.468B-2(k)(3), and shall be responsible for making any necessary tax filings and payments of taxes, estimated taxes, and associated interest and penalties, if any, by the Court Common Benefit Fund.

---

[10] The Court is also overseeing a Common Benefit Fund associated only with Track One settlements.  *See Order Establishing Common Benefit Fee Fund and Directing Certain Payments* (docket no. 3794); *Order Appointing Certified Public Accountant to Maintain and Act as Escrow Agent for the Common Benefit Fee Fund* (docket no. 3810).  The Court also directs escrow agent Mr. Greggory Dantio to coordinate with Special Master Cohen to take advantage of investment advisors hired by the Fee Panel.

**VIII.  Conclusion.**

For all the reasons stated above, the Court hereby **ORDERS** and **IMPOSES** an MDL Common Benefit assessment of 7.5% of gross recoveries from any Opioid Case that: (1) is not brought by a State Attorney General, and (2) is not otherwise included in a global settlement that has its own negotiated, MDL-Court-approved Common Benefit fee and cost structures.  This 7.5% assessment is payable from the attorneys' fee portions of such gross recoveries and applies to all settlements reached and judgments entered after the date of this Order.[11]  If the 7.5% amount exceeds one-half (½) of counsel's total contingency fee for a given client, then the contingent assessment will instead be limited to one-half (½) of the contingency fee of counsel on each settlement or judgment, unless a prior or subsequent Order of this Court states otherwise.

To ensure collection of this Common Benefit Assessment, each Defendant named in any case pending in MDL No. 2804 is hereby **ORDERED** to hold back the 7.5% common benefit percentage from all applicable judgments and settlements entered after the date of this Order and to deposit such amounts into the Court Common Benefit Fund.  Each Defendant shall report all judgments, settlements, and payments to Special Master Cohen and Co-Lead Counsel, and verify that the holdback is placed into the Court Common Benefit Fund until further Order of this Court.

---

[11] An example of how this calculation would work in a state-wide settlement involving claims by both the State Attorney General and governmental subdivisions within that State is as follows.  MDL "Defendant X" enters into a $440M state-wide settlement that resolves all claims made by the State and the subdivisions within it.  The total settlement amount from Defendant X is comprised of: (a) $400M, payable in 10 equal annual installments, to be shared by the State and subdivisions and used for abatement; plus (b) $40M for reimbursement of the State's and subdivisions' attorney fees and litigation costs, payable immediately in one lump sum. The settlement includes no common benefit fund to compensate counsel in this MDL (or elsewhere) who have performed common benefit work.  Using the assumption that half of the $400M settlement payment for abatement will be received by the State and the other half by the subdivisions – which assumption also underlies the Distributors and Janssen global settlements – the common benefit assessment would be 7.5% of the $200M subdivision share = $15M, payable in 10 equal annual installments.  Defendant X would thus be required to make 10 annual payments of $1.5M to the Court Common Benefit Fund. This example assumes all counsel have at least a 15% contingent fee; if some counsel have a lower percentage, the parties may move the Court for modification of the assessment.

Plaintiff Co-Lead and Liaison Counsel, or their designees, are hereby authorized and directed to obtain Participation Agreements with any and all counsel for plaintiffs in Opioid Cases, regardless of where or whether their cases or claims are filed, as a condition of access to and utilization of MDL 2804 work product.

Finally, the Court notes that, in his 2020 Report to the Court, Professor Rubenstein cautioned that "[a] single common benefit assessment levied on multiple different types of settlements involving many different types of plaintiffs and multiple defendants runs the risk of being too crude an approach."  *Report* at 5 (docket no. 3319).  The Court agrees that *all* common benefit assessment orders are necessarily blunt instruments *when first imposed*.  It is only after fee applications are received and weighed, the Court and its advisors sharpen their pencils, and common benefit awards are carefully crafted and issued, that the instrument of a common benefit assessment is honed.  These steps will take place in the future: this Court will enter further Orders as necessary regarding the operation, payment, allocation, award, and distribution of funds held back pursuant to this common benefit assessment, including return of collected funds if applicable. In the meantime, this Order ensures that future appropriate common benefit awards are possible and that parties and counsel who use common benefit work pay their fair share.

All of that said, the Court recognizes that the particular circumstances of a settlement or judgment in an Opioid Case may justify a case-specific modification of this Order.  The parties are free to move for modification at that time.

**IT IS SO ORDERED**.


    */s/Dan Aaron Polster*
    **DAN AARON POLSTER**
    **UNITED STATES DISTRICT JUDGE**


Dated: May 9, 2022

No. _____
# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

In re: County of Harris, Texas; County of Rockwall, Texas; County of Ellis, Texas; County of Walker, Texas; City of Albuquerque, New Mexico; City of Santa Fe, New Mexico; and Certain Municipalities in Arkansas and South Carolina, *Petitioners*,

On Petition for a Writ of Mandamus to the United States District Court for the Northern District of Ohio, Eastern Division, In Re: National Prescription Opiate Litigation, Cause No. 1:17-md-2804, 1:19-op-45713

## PETITION FOR WRIT OF MANDAMUS OF HARRIS, ROCKWALL, ELLIS, WALKER COUNTIES, TEXAS, ALBUQUERQUE AND SANTA FE CITIES, NEW MEXICO, AND CERTAIN MUNICIPALITIES IN ARKANSAS AND SOUTH CAROLINA

S. Ann Saucer
TX Bar 00797885, LA Bar 21368
N. Majed Nachawati
TX Bar 24038319
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
asaucer@fnlawfirm.com
mn@fnlawfirm.com

Dan Downey
TX Bar 06085400
DAN DOWNEY, P.C.
Tel. (512) 569-3400
Dandowney427@gmail.com

John B. White, Jr. (S.C. Bar 5996)
Marghretta H. Shisko (S.C. Bar 100106)
JOHN B. WHITE, JR. P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC 29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

F. Jerome Tapley
CORY WATSON, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
(205) 328 2200
jtapley@CoryWatson.com

*Counsel for Petitioners*
*Additional Counsel on Signature Page*

EXHIBIT
2

## **Complete List of Petitioners**

Texas Municipalities:
County of Harris, County of Rockwall, County of Ellis, and County of Walker

New Mexico Municipalities:
City of Albuquerque and City of Santa Fe

Arkansas Municipalities:
City of Adona, City of Alexander, City of Alicia, City of Allport, City of Alma, City of Almyra, City of Alpena, City of Altheimer, City of Altus, City of Amagon, City of Amity, City of Anthonyville, City of Antoine, City of Arkadelphia, City of Arkansas City, City of Ash Flat, City of Ashdown, City of Atkins, City of Aubrey, City of Augusta, City of Austin, City of Avoca, City of Bald Knob, City of Banks, City of Barling, City of Bassett, City of Batesville, City of Bauxite, City of Bay, City of Bearden, City of Beaver, City of Beebe, City of Beedeville, City of Bella Vista, City of Bellefonte, City of Belleville, City of Ben Lomond, City of Benton, City of Bentonville, City of Bergman, City of Berryville, City of Bethel Heights, City of Big Flat, City of Bigelow, City of Biggers, City of Birdsong, City of Biscoe, City of Black Oak, City of Black Rock, City of Black Springs, City of Blevins, City of Blue Eye, City of Blue Mountain, City of Bluff City, City of Blytheville, City of Bodcaw, City of Bonanza, City of Bono, City of Booneville, City of Bradford, City of Bradley, City of Branch, City of Briarcliff, City of Brinkley, City of Brookland, City of Bryant, City of Buckner, City of Bull Shoals, City of Burdette, City of Cabot, City of Caddo Valley, City of Caldwell, City of Cale, City of Calico Rock, City of Calion, City of Camden, City of Cammack Village, City of Campbell Station, City of Caraway, City of Carlisle, City of Carthage, City of Casa, City of Cash, City of Caulksville, City of Cave City, City of Cave Springs, City of Cedarville, City of Centerton, City of Central City, City of Charleston, City of Cherokee Village, City of Cherry Valley, City of Chester, City of Chidester, City of Clarendon, City of Clarksville, City of Clinton, City of Coal Hill, City of Colt, City of Concord, City of Conway, City of Corning, City of Cotter, City of Cotton Plant, City of Cove, City of Coy, City of Crawfordsville, City of Crossett, City of Cushman, City of Daisy, City of Damascus, City of Danville, City of Dardanelle, City of Datto, City of De Queen, City of Decatur, City of Delaplaine, City of Delight, City of Dell, City of Denning, City of Dermott, City of Des Arc, City of Devalls Bluff, City of Dewitt, City of Diamond City, City of Diaz, City of Dierks, City of Donaldson, City of Dover, City of Dumas, City of Dyer, City of Dyess, City of Earle, City of East Camden, City of Edmondson, City of Egypt, City of El Dorado, City of Elaine, City of Elkins, City of Elm Springs,

City of Emerson, City of Emmet, City of England, City of Enola, City of Etowah, City of Eudora, City of Eureka Springs, City of Evening Shade, City of Everton, City of Fairfield Bay, City of Fargo, City of Farmington, City of Fayetteville, City of Felsenthal, City of Fifty-Six, City of Fisher, City of Flippin, City of Fordyce, City of Foreman, City of Forrest City, City of Fort Smith, City of Fouke, City of Fountain Hill, City of Fountain Lake, City of Fourche, City of Franklin, City of Friendship, City of Fulton, City of Garfield, City of Garland, City of Garner, City of Gassville, City of Gateway, City of Gentry, City of Georgetown, City of Gilbert, City of Gillett, City of Gillham, City of Gilmore, City of Glenwood, City of Goshen, City of Gosnell, City of Gould, City of Grady, City of Grannis, City of Gravette, City of Green Forest, City of Greenbrier, City of Greenland, City of Greenway, City of Greenwood, City of Greers Ferry, City of Griffithville, City of Grubbs, City of Guion, City of Gum Springs, City of Gurdon, City of Guy, City of Hackett, City of Hamburg, City of Hampton, City of Hardy, City of Harrell, City of Harrisburg, City of Harrison, City of Hartford, City of Hartman, City of Haskell, City of Hatfield, City of Havana, City of Haynes, City of Hazen, City of Heber Springs, City of Hector, City of Helena-West Helena, City of Hermitage, City of Hickory Ridge, City of Higden, City of Higginson, City of Highfill, City of Highland, City of Hindsville, City of Holland, City of Holly Grove, City of Hope, City of Horatio, City of Horseshoe Bend, City of Horseshoe Lake, City of Hot Springs, City of Houston, City of Hoxie, City of Hughes, City of Humnoke, City of Humphrey, City of Hunter, City of Huntington, City of Huntsville, City of Huttig, City of Imboden, City of Jacksonport, City of Jacksonville, City of Jasper, City of Jennette, City of Jericho, City of Jerome, City of Johnson, City of Joiner, City of Jonesboro, City of Judsonia, City of Junction City, City of Keiser, City of Kensett, City of Keo, City of Kibler, City of Kingsland, City of Knobel, City of Knoxville, City of La Grange, City of Lafe, City of Lake City, City of Lake View, City of Lake Village, City of Lakeview, City of Lamar, City of Lavaca, City of Leachville, City of Lead Hill, City of Leola, City of Lepanto, City of Leslie, City of Letona, City of Lewisville, City of Lexa, City of Lincoln, City of Little Flock, City of Littlerock, City of Lockesburg, City of London, City of Lonoke, City of Lonsdale, City of Louann, City of Lowell, City of Luxora, City of Lynn, City of Madison, City of Magazine, City of Magness, City of Magnolia, City of Malvern, City of Mammoth Spring, City of Manila, City of Mansfield, City of Marianna, City of Marie, City of Marion, City of Marked Tree, City of Marmaduke, City of Marshall, City of Marvell, City of Maumelle, City of Mayflower, City of Maynard, City of Mccaskill, City of Mccrory, City of Mcdougal, City of Mcgehee, City of Mcnab, City of Mcneil, City of Mcrae, City of Melbourne, City of Mena, City of Menifee, City of Midland, City of Mineral Springs, City of Minturn, City of Mitchellville, City of Monette, City of Monticello, City of Montrose, City of Moorefield, City of

Moro, City of Morrilton, City of Morrison Bluff, City of Mount Ida, City of Mount Pleasant, City of Mount Vernon, City of Mountain Home, City of Mountain Pine, City of Mountain View, City of Mountainburg, City of Mulberry, City of Murfreesboro, City of Nashville, City of Newark, City of Newport, City of Nimmons, City of Norfork, City of Norman, City of Norphlet, City of North Little Rock, City of O'kean, City of Oak Grove, City of Oak Grove Heights, City of Oakhaven, City of Oden, City of Ogden, City of Oil Trough, City of Okolona, City of Ola, City of Omaha, City of Oppelo, City of Osceola, City of Oxford, City of Ozan, City of Ozark, City of Palestine, City of Pangburn, City of Paragould, City of Paris, City of Parkdale, City of Parkin, City of Patmos, City of Patterson, City of Pea Ridge, City of Peach Orchard, City of Perla, City of Perry, City of Perrytown, City of Perryville, City of Piggott, City of Pindall, City of Pine Bluff, City of Pineville, City of Plainview, City of Pleasant Plains, City of Plumerville, City of Pocahontas, City of Pollard, City of Portia, City of Portland, City of Pottsville, City of Powhatan, City of Poyen, City of Prairie Grove, City of Prattsville, City of Prescott, City of Pyatt, City of Quitman, City of Ratcliff, City of Ravenden, City of Ravenden Springs, City of Rector, City of Redfield, City of Reed, City of Reyno, City of Rison, City of Rockport, City of Roe, City of Rogers, City of Rondo, City of Rose Bud, City of Rosston, City of Rudy, City of Russell, City of Russellville, City of Salem, City of Salesville, City of Scranton, City of Searcy, City of Sedgwick, City of Shannon Hills, City of Sheridan, City of Sherrill, City of Sherwood, City of Shirley, City of Sidney, City of Siloam Springs, City of Smackover, City of Smithville, City of South Lead Hill, City of Sparkman, City of Springdale, City of Springtown, City of St. Charles, City of St. Francis, City of St. Joe, City of St. Paul, City of Stamps, City of Star City, City of Stephens, City of Strawberry, City of Strong, City of Stuttgart, City of Subiaco, City of Success, City of Sulphur Rock, City of Sulphur Springs, City of Summit, City of Sunset, City of Swifton, City of Taylor, City of Texarkana, City of Thornton, City of Tillar, City of Tinsman, City of Tollette, City of Tontitown, City of Traskwood, City of Trumann, City of Tuckerman, City of Tull, City of Tupelo, City of Turrell, City of Twin Groves, City of Tyronza, City of Ulm, City of Valley Springs, City of Van Buren, City of Vandervoort, City of Victoria, City of Vilonia, City of Viola, City of Wabbaseka, City of Waldenburg, City of Waldo, City of Waldron, City of Walnut Ridge, City of Ward, City of Warren, City of Washington, City of Watson, City of Weiner, City of Weldon, City of West Fork, City of West Memphis, City of West Point, City of Western Grove, City of Wheatley, City of Whelen Springs, City of White Hall, City of Wickes, City of Widener, City of Wiederkehr Village, City of Williford, City of Willisville, City of Wilmar, City of Wilmot, City of Wilson, City of Wilton, City of Winchester, City of Winslow, City of Winthrop, City of Wooster, City of Wrightsville, City of Wynne, City of Yellville, City of

Zinc, County of Arkansas, County of Ashley, County of Baxter, County of Benton, County of Boone, County of Bradley, County of Calhoun, County of Carroll, County of Chicot, County of Clark, County of Clay, County of Cleburne, County of Cleveland, County of Columbia, County of Conway, County of Craighead, County of Crawford, County of Crittenden, County of Cross, County of Dallas, County of Desha, County of Drew, County of Faulkner, County of Franklin, County of Fulton, County of Garland, County of Grant, County of Greene, County of Hempstead, County of Hot Spring, County of Howard, County of Independence, County of Izard, County of Jackson, County of Jefferson, County of Johnson, County of Lafayette, County of Lawrence, County of Lee, County of Lincoln, County of Little River, County of Logan, County of Lonoke, County of Madison, County of Marion, County of Miller, County of Mississippi, County of Monroe, County of Montgomery, County of Nevada, County of Newton, County of Ouachita, County of Perry, County of Phillips, County of Pike, County of Poinsett, County of Polk, County of Pope, County of Prairie, County of Pulaski, County of Randolph, County of Saline, County of Scott, County of Searcy, County of Sebastian, County of Sevier, County of Sharp, County of St. Francis, County of Stone, County of Union, County of Van Buren, County of Washington, County of White, County of Woodruff, and County of Yell

South Carolina Municipalities:
Aiken County, Anderson County, Calhoun County, Cherokee County, Chester County, Dillon County, Edgefield County, Florence County, Greenville County, Greenwood County, Horry County, Lancaster County, Laurens County, Marion County, Marlboro County, McCormick County, Newberry County, Oconee County, Pickens County, Spartanburg County, Sumter County, Union County, York County, Abbeville County, Allendale County, Bamberg County, Barnwell County, Beaufort County, Chesterfield County, Clarendon County, Colleton County, Dorchester County, Fairfield County, Hampton County, Jasper County, Kershaw County, Kershaw County Hospital Board, Lee County, Orangeburg County, Saluda County, Williamsburg County, City of Myrtle Beach, and Lexington County

## TABLE OF CONTENTS

I.  INTRODUCTION ......................................................................................1

II.  STATEMENT OF RELIEF SOUGHT ......................................................2

III.  STATEMENT OF ISSUES PRESENTED ..................................................3

IV.  STATEMENT OF FACTS AND PROCEDURAL BACKGROUND. .......4

   A.  The District Court's Order Strips State Litigants of Part of Their
      Recoveries and Their Rights to State Court Discovery. ...........................4

   B.  Petitioners' State-Filed Opioid Cases Have Either Never Been in
      Federal Court, or Were Only in Federal Court After an Improper
      Removal. ....................................................................................................6

   C.  The Court's Order Was Issued Without Notice, an Opportunity to Be
      Heard, or Proof that MDL 2804 Court-Appointed Counsel Provide A
      Benefit to Petitioners' Cases. ...................................................................8

   D.  The Order Relies on the PEC's Work with ARCOS Data
      Notwithstanding that Neither the PEC Nor Its ARCOS Data Provides
      Any Benefit to the State Cases. ...............................................................10

V.  REASONS WHY A WRIT OF MANDAMUS SHOULD ISSUE .............14

   A.  A Mandamus Writ Is the Only Adequate Remedy ................................15

   B.  Petitioners Have a Clear and Indisputable Right to Proceed in State
      Court Without Having Discovery Obstructed and Recoveries Siphoned
      Off to a Federal Fund. .............................................................................16

     1.  The District Court does not have the authority to dictate fees and e
        xpenses in state court cases ...............................................................16

       a.  The common-fund exception to the American Rule is inapplicable
          because the proceeds from state court cases are outside of the
          District Court's authority. ...........................................................17

       b.  Independently, the common-fund doctrine is inapplicable because
          the work of District Court-appointed counsel is not traceable to
          future proceeds in state court cases .............................................22

       c.  The Order violates Texas law. ....................................................24

     2.  The Order violates the Anti-Injunction Act. ....................................26

     3.  The Order violates the Due Process Clause. .....................................29

   C.  The Writ Is Otherwise Appropriate under the Circumstances. ............31

VI.  CONCLUSION .........................................................................................32

v

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Crash Disaster at Fla. Everglades*,
549 F.2d 1006 (5th Cir. 1977) ...........................................................17

*Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers*,
398 U.S. 281 (1970)...................................................................26, 27

*In re Avandia Marketing, Sales Practices and Products Liability
Litig.*,
617 F. App'x 136 (3d Cir. 2015) .........................................................20

*In re Baycol Prod.*,
No. MDL 1431, 2004 WL 190272 (D. Minn. Jan. 29, 2004)..........................20

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980)..........................................................................17

*U.S. ex rel. Bogart v. King Pharmas.*,
493 F.3d 323 (3d Cir. 2007) .........................................................17, 22

*Brillhart v. Excess Ins. Co. of Am.*,
316 U.S. 491 (1942)..........................................................................31

*Cheney v. U.S. Dist. Ct. for Dist. of Columbia*,
542 U.S. 367 (2004)..........................................................................15

*Colonial Pipeline Co. v. Morgan*,
474 F.3d 211 (6th Cir. 2007) ..............................................................31

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
No. 16-MD-02744, 2017 WL 6402992 (E.D. Mich. Mar. 21, 2017)................20

*In re Fed. Skywalk Cases*,
680 F.2d 1175 (8th Cir. 1982) ............................................................27

*Garcia v. Fed. Nat'l Mortg. Ass'n*,
782 F.3d 736 (6th Cir. 2015) ..............................................................29

*Geier v. Sundquist*,
    372 F.3d 784 (6th Cir. 2004) ........................................................................22, 23

*In re Gen. Motors LLC Ignition Switch Litig.*,
    477 F. Supp. 3d 170 (S.D.N.Y. 2020) ..................................................................21

*United States ex rel. Grubbs v. Kanneganti*,
    No. 1:05-CV-323, 2007 WL 9718264 (E.D. Tex. June 4, 2007) .......................26

*Guba v. Huron Co.*,
    600 Fed. App'x 374 (6th Cir. 2015) .....................................................................30

*Hall v. Cole*,
    412 U.S. 1 (1973)..................................................................................................23

*In re Harris County, TX*,
    No. 21-3637 (6th Cir. March 11, 2022)...................................................7, 11, 15

*Hartland v. Alaska Airlines*,
    544 F.2d 992 (9th Cir. 1976) ...................................................................16, 19, 20

*In re High Sulfur Content Gasoline Products Liability Litig.*,
    517 F.3d 220 (5th Cir. 2008) ...............................................................................30

*Hill v. Martin*,
    296 U.S. 393 (1935)..............................................................................................26

*In re Lidoderm Antitrust Litigation*,
    No. 14-md-02521-WHO, 2017 WL 3478810 (N.D. Cal. 2017) .......................20

*Martingale LLC v. City of Louisville*,
    361 F.3d 297 (6th Cir. 2004) ..........................................................................26, 28

*Middlesex County Ethics Comm. v. Garden State Bar Ass'n*,
    457 U.S. 423 (1982)..............................................................................................31

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970)..............................................................................................23

*Mitchum v. Foster*,
    407 U.S. 225 (1972)..............................................................................................27

*In re Motors Liquidation Co.*,
    829 F.3d 135 (2d Cir. 2016) .................................................................30

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)............................................................................30

*In re Nat'l Prescription Opiate Litig.*,
    927 F.3d 919 (6th Cir. 2019) ........................................................11, 12

*In re Nat'l Prescription Opiate Litig.*,
    MDL 2804 (N.D. Ohio July 22, 2021) ...............................................13

*Re: Opioid Litigation*,
    South Carolina Supreme Court Order August 9, 2018......................28

*Roche v. Evaporated Milk Ass'n*,
    319 U.S. 21 (1943)..............................................................................15

*In re Roundup Prod. Liab. Litig.*,
    544 F. Supp. 3d 950 (N.D. Cal. 2021) (appeal pending)...................21

*Schlagenhauf v. Holder*,
    379 U.S. 104 (1964)............................................................................15

*Shimman v. Int'l Union of Operating Engineers, Loc. 18*,
    744 F.2d 1226 (6th Cir. 1984) ...........................................................23

*In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–
    II*,
    953 F.2d 162 (4th Cir. 1992) .....................................................*passim*

*In re Simons*,
    567 F.3d 800 (6th Cir. 2009) .............................................................14

*Sprague v. Ticonic Nat'l Bank*,
    307 U.S. 161 (1939)............................................................................18

*Summit Valley Indus. Inc. v. Loc. 112, United Bhd. of Carpenters &
    Joiners of Am.*,
    456 U.S. 717 (1982)............................................................................16

*In re Syngenta AG MIR 162 Corn Litig.*,
    No. 14-MD-2591-JWL, 2015 WL 2165341 (D. Kan. May 8, 2015) ...........20, 22

*In re United States*,
32 F.4th 584 (6th Cir. 2022) ..............................................................................15

*In re Univ. of Michigan*,
936 F.3d 460 (6th Cir. 2019) .......................................................................16, 31

*Vietti v. Welsh & McGough, PLLC*,
No. 21-CV-58-JFH-SH, 2022 WL 1288314 (N.D. Okla. Apr. 30,
2022) .................................................................................................................26

*Vincent v. Hughes Air West, Inc.*,
557 F.2d 759 (9th Cir. 1977) .......................................................................17, 19

*In re Zyprexa Products Liability Litigation*,
467 F. Supp. 2d 256 (E.D. N.Y. 2006) ........................................................20, 31

**Statutes**

28 U.S.C. § 2283 ......................................................................................26, 27

Tex. Gov't Code §§403.501-511 ...........................................................................25

Tex. Gov't Code §403.506(c) ................................................................................25

Tex. Gov't Code §403.507.....................................................................................25

Tex. Gov't Code §2254.106 ..................................................................................24

Tex. Gov't Code §2254.108(d) .............................................................................24

Tex. Gov't Code §2254.110 ..................................................................................24

Tex. Gov't Code §2254.1036(a).............................................................................24

Tex. Gov't Code §2254.1038(a).............................................................................24

**Other Authorities**

15 Fed. Prac. & Proc. Juris. § 3866 (4th ed.)..........................................................20

U.S. Const. amend. V .............................................................................................29

## I.     INTRODUCTION

Petitioners are municipalities who initiated state-court litigation to abate the opioid epidemic in their communities. Without waiving objections to jurisdiction,[1] Petitioners seek a writ of mandamus requiring that the District Court in MDL 2804 vacate its order obstructing discovery in Petitioners' state court cases and requiring that settlements and judgments in these state cases be paid in part into a federal court fund.

Five of the Petitioners were granted writ relief by this Court, and as a result, their cases were remanded from MDL 2804 to the state courts with jurisdiction. However, on May 9, 2022, without any prior motion, notice, or opportunity for hearing, the District Court issued an Order explicitly commandeering aspects of state court cases, including Petitioners' cases. The Order requires that 7.5% of future opioid case settlements and judgments be diverted from *inter alia* Petitioners' state-court cases and deposited into the District Court's common-benefit fund. According to the Order's explanation of how the 7.5% is to be calculated, upwards of **75**% of attorney fees and costs must be paid to the federal fund from statewide settlements outside the District Court's jurisdiction and reach.

This Order also obstructs discovery in state courts and purports to divest state Judges of control over discovery in state cases. According to the Order, defendants

---

[1] Petitioners hereby make a special appearance objecting to federal jurisdiction.

need not re-produce documents and evidence in cases remanded to state court; however, plaintiffs not signatory to a federal "Participation Agreement" cannot access any of these documents and evidence—except through discovery in their home forum, i.e., except through the discovery the Order bars. For South Carolina and Texas Petitioners, the Order purports to contradict standing discovery orders issued in state court cases. This is a clear usurpation of power, because the District Court does not have jurisdiction to prevent defendants from producing their own documents in state court cases where they are parties. If the Order stands, substantial evidence will be outside the reach of governmental-entity plaintiffs trying to litigate their state court cases.

Petitioners have no adequate remedy other than to seek a writ of mandamus. Petitioners either were never before the District Court or are no longer before the District Court.[2] The Order is both clearly erroneous and a usurpation of authority.

## II.    STATEMENT OF RELIEF SOUGHT

Petitioners ask that this Court vacate the Ongoing Common Benefit Order to the extent that it applies to cases over which the District Court does not have subject-matter jurisdiction and authority, and issue a writ forbidding the District Court from dictating attorney fees, expenses, discovery, and evidence in cases not properly

---

[2] With the exception of Walker County, which remains in MDL 2804 notwithstanding the lack of federal subject matter jurisdiction.

before the District Court. This writ is not brought on behalf of plaintiffs whose cases belong in federal court, plaintiffs who agreed to pay a common benefit assessment through a Participation Agreement, or plaintiffs specifically proven to have actually substantially benefited from and used MDL 2804 work product.[3]

## III.  STATEMENT OF ISSUES PRESENTED

1. Can a District Court enter orders controlling attorney's fees, expenses, and discovery in cases over which the District Court lacks jurisdiction or authority?

2. Can a District Court, without notice and an opportunity to be heard, require that a percentage of judgments and settlements, in cases over which the District Court lacks jurisdiction and authority, be deposited into a federal fund?

3. Can a District Court require that a percentage of judgments and settlements, in cases over which the District Court lacks jurisdiction and authority, be deposited into a federal common benefit fund without proof that court-appointed counsel's work can be traced to a substantial benefit in such cases?

---

[3] The term "MDL 2804 work product" does not include the DEA's "ARCOS data," which is addressed below.

3

4.  Can a District Court order that a defendant in a state court case need not

produce documents and evidence when the state court has ruled otherwise?

## IV.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND.

### A. The District Court's Order Strips State Litigants of Part of Their Recoveries and Their Rights to State Court Discovery.

The District Court, without prior notice or an opportunity to be heard, entered

an order that dispossesses Petitioners of future litigation recoveries, divests state-

court judges of the authority to manage discovery in cases before them, and usurps

existing state court discovery orders. The District Court's "Ongoing Common

Benefit Order" provides that, "each Defendant named in any case pending in MDL

2804 is hereby ORDERED to hold back the 7.5% common benefit percentage from

all applicable judgments and settlements entered after the date of this Order and to

deposit such amounts into the Court Common Benefit Fund." Exhibit 1, Ongoing

Common Benefit Order, Doc. 4428 ("Order"), at 18. While the Order compels all

Defendants in MDL 2804 to make these deposits, the Order is not limited to

judgments and settlements of the **cases** pending in MDL 2804. The Order also

applies to *inter alia* all Opioid cases that were remanded from MDL 2804 after being

wrongfully removed, and appears to apply to every opioid case a plaintiff's lawyer

has if that lawyer has or had a case in MDL 2804.[4] As the District Court recognizes,

---

[4]   *See* Order, 11 ("will apply to . . . other plaintiffs and claims represented by plaintiffs' counsel with Opioid Cases pending in or remanded from MDL 2804"), 12

4

the Judicial Panel on Multidistrict Litigation (J.P.M.L.) has stopped the transfer of cases to MDL 2804,[5] yet the District Court Order taxes and dictates discovery practices for newly filed cases, state or federal.

The 7.5% number is also misleading in effect. The Order dictates how the assessment "would work in a state-wide settlement involving claims by both the State Attorney General and governmental subdivisions within the State." Order, 18 n.11. If there is a $400 million abatement payment plus $40 million for fees and costs, both divided equally between the State and subdivisions, then "the common benefit assessment [owed to the federal fund] would be 7.5% of the $200M subdivision share = **$15M**[.]" *Id*. (emphasis added). In this hypothetical, the subdivisions' fees and expense recovery is $20 million (half of the $40 million fee/cost total). The Order thus takes $15 million out of $20 million—**75% rather than 7.5%**—for the federal common benefit fund. Thus, the federal Plaintiffs' Executive Committee lawyers (PEC) walk away with the lion's share of the fee and cost compensation after doing no work at all in state cases.

_____

("Court has authority over plaintiffs' counsel by and through their MDL cases" and is making "assessments on non-MDL cases *actually filed* in state courts"). *See also* Order, 3 n.1 (Opioid Cases defined as opioid-related litigation "in any court throughout the United States"), n.11 (example indicating application to state-wide settlements).

[5] *See id.* at 6.

The Order also prevents state court judges from entering discovery orders pursuant to state law and facts applicable in the state cases, and would operate to abrogate existing state court orders. Specifically, the Order states that:

> [I]n any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

Order, 9 n.6; *see also id.* at 8 ("in factually related cases in other courts"). The reference to other "provisions" is significant: plaintiffs cannot access documents or evidence unless they are party to "Participation Agreements," and this prerequisite applies "**regardless of where or whether their cases or claims are filed**." Order, 19 (emphasis added). The Order thereby purports to strip *inter alia* Petitioners of their rights to compel the production of "documents or evidence" from Defendants in state court cases, regardless of the fact that federal subject matter jurisdiction never existed as to these cases.[6]

### B. Petitioners' State-Filed Opioid Cases Have Either <u>Never</u> Been in Federal Court, or Were Only in Federal Court After an Improper Removal.

Harris, Rockwall, and Ellis Counties, Texas, and Albuquerque and Santa Fe Cities, New Mexico, are now proceeding in state courts, thanks to this Honorable

---

[6] Petitioners will fight application of the Order in all state cases and reserve the right to do so.

Court granting their writ of mandamus. Exhibit 2, Order, *In re Harris County, TX*, No. 21-3637 (6th Cir. March 11, 2022) ("*Harris County* Order"). This Court found that Petitioners' motions to remand had been pending an unduly long time, that the unanimity of the decisions of courts that had adjudicated opioid defendants' removals lent significant support to Petitioners' arguments, and that Petitioners lacked an alternative remedy. *Id.* at 3-5. On March 11, 2022, this Court granted Petitioners' writ, ordered the District Court to promptly address Petitioners' remand motions, and required the District Court to submit a status report every thirty days. *Id*. at 5. Petitioners' cases were remanded to state court by March 30, 2022, without any objection from any Defendant[7]—demonstrating federal subject matter jurisdiction was never proper.

To the knowledge of the undersigned, the status of the Walker County, Texas case has not yet appeared on any monthly status reports on remand motions by the District Court to this Court. The only such report of which Petitioners are aware was made on April 1, 2022.

---

[7] Exhibit 3, Remand Order, Doc. 4335 (N.D. Ohio March 26, 2022) (Rockwall and Ellis County, Texas, remanded after removing Pharmacy Defendants consented to remand); Exhibit 4, Remand Order, Doc. 4341 (N.D. Ohio March 30, 2022) (Harris County, Texas and Cities of Santa Fe and Albuquerque, New Mexico, cases were remanded after defendants "did not submit supplementary filings as … required" in the New Mexico cases; the Harris County removal was mooted).

The Arkansas and South Carolina Petitioners are all proceeding in the state courts with jurisdiction over their claims. These cases for the most part were never in federal court; a handful were wrongfully removed and remanded back to state court before transfer to the JPML.

### C. The Court's Order Was Issued Without Notice, an Opportunity to Be Heard, or Proof that MDL 2804 Court-Appointed Counsel Provide A Benefit to Petitioners' Cases.

The District Court's Order was entered without motion, a hearing, or proof that PEC lawyers substantially benefitted any of Petitioners' state-initiated opioid cases.[8]

Two years ago, the PEC filed a motion requesting a common benefit assessment order, and this motion was denied without prejudice.[9] That motion sought only a 7% common-fund assessment.[10] A tsunami of objections were filed, including objections filed by certain Petitioners here.[11] Objectors explained that the PEC was an **impediment** to the efforts of State plaintiffs to negotiate settlements

---

[8] *See* Exhibit 5, Docket Sheet excerpts, Entry for Document 4428 (omitting Related Document number identification of any prior motion).

[9] *See* Order, 4.

[10] Exhibit 6, Am. Mot. for Entry of Order Establishing Common Benefit Fund, Doc. 3112 (filed N.D. Ohio Jan. 28, 2020).

[11] *See* Exhibit 7, R&R Addressing Mot. for Common Benefit Fund, Doc. 3319 (N.D. Ohio June 3, 2020), at 1 (listing thirteen opposition briefs).

8

with the opioid defendants.[12] Other objectors explained that cases were being worked up in the state courts without any help from the PEC.[13]

The District Court appointed Professor William Rubenstein to make a recommendation. The Professor reported that, "[t]o demonstrate their entitlement to a common benefit fee, proponents must show that their work 'substantially benefited' the cases to be taxed."[14] However, the PEC failed to "substantiate [their legal arguments] with proper supporting affidavits or documents" to demonstrate "that their efforts have substantially benefited the many satellite cases they seek to tax."[15] On May 9, 2022, when the District Court entered its Order diverting 7.5% of Petitioners' future recoveries to the federal fund, this deficiency was not corrected, and no responsive pleadings or hearing was allowed to make the record clear.

Consistent with the PEC's inability to prove entitlement to proceeds from cases on which it never worked, a prior District Court Order stated the PEC would no longer try. On July 22, 2021, a District Court fee-related Order memorialized that "[t]he PEC . . . makes clear it is *not* seeking a global common benefit order

---

[12]  *See, e.g.,* Exhibit 7, R&R, 6 (National Association of AGs claimed irreparable disruption).

[13]  *See, e.g.,* Exhibit 8, County of Harris' Br. in Resp. to Prof. Rubenstein's R&R, Doc. 3350 (N.D. Ohio June 23, 2020), at 2-3 (explaining how "[t]he parties to the State of Texas' *In Re Texas Opioid Litigation* have heavily litigated the claims of Texas governmental entities for years without any assistance from the PEC.").

[14]  *Id.* at 2.

[15]  *Id.* at 4 n.2.

applicable to any other case. Specifically, . . . the PEC will not seek to make it applicable to settlement proceeds or judgments payable . . . to any state court plaintiff that is entirely outside of the Court's jurisdiction (with certain understandable exceptions)."[16] Less than nine months later, the Order increases the assessment and does the very thing the PEC allegedly was "***not*** seeking."

Simply put, the May 9, 2022, Order was not preceded by a relevant motion, notice, hearing, or proof that the 7.5% holdback was sought or earned in any state-filed case.

### D. The Order Relies on the PEC's Work with ARCOS Data[17] Notwithstanding that Neither the PEC Nor Its ARCOS Data Provides Any Benefit to the State Cases.

The Order acknowledges the "routine[] caution against exercising authority to impose common benefit assessments on non-MDL cases actually filed in state courts." Order, 12 (emphasis omitted). The Order does so anyway. As to why state court cases are subjected to a federal common benefit assessment, the Order states:

> [L]evying a common benefit tax upon this category of Plaintiffs and their counsel is crucial because of: (1) the virtually unprecedented expense by the PEC for the common benefit in obtaining and synthesizing the ARCOS data; and (2) the absolutely essential character of the ARCOS data in allowing any and all opioid plaintiffs to prosecute their cases in the first place.

---

[16] Exhibit 9, Order Establishing Common Benefit Fee Fund and Directing Certain Payments, Doc. 3794, at 3 (emphasis in original).

[17] ARCOS is the Drug Enforcement Administration's Automation of Reports and Consolidated Orders System database.

Order, 12-13. This reasoning is impeached by six counterfactual points.

First, several Petitioners were not free "to prosecute their cases **in the first place**" (*id.,* emphasis supplied). Petitioners' cases were stayed for years in the District Court, which lacked jurisdiction and would not grant Petitioners leave to file anything—not even a remand motion.[18]

Second, the PEC were no help. Rather than benefitting Petitioners, MDL 2804 presented a roadblock that took some Petitioners years of court filings to navigate. Petitioners finally succeeded in their petition to this Court for a writ of mandamus.[19] The PEC never assisted any Petitioner, even though it was obvious that the cases were wrongfully removed.[20]

Third, the PEC's work on the ARCOS data is not "absolutely essential" to Petitioners' cases. There is **no** showing of substantial benefit to Petitioners. The ARCOS data stops at 2014,[21] and is limited to 14 products. Additionally, Petitioners are using superior sources of information, including, for example, Defendants' data, state governmental data, industry group data, and local information; these sources

---

[18] *See* Exhibit 2, *Harris County* Order, 2.

[19] *See In re Harris County, Texas,* No. 21-3637 (6th Cir.), at Doc. 1-3 (exhibits illustrating that five Petitioners filed remand motions in the transferor courts, tried filing remand motions in MDL 2804 but were denied leave, filed remand motions in the J.P.M.L., and ultimately applied to this Court for a writ).

[20] *See id.*; *see also* § IV.B & note 7 *supra*.

[21] *In re Nat'l Prescription Opiate Litig*., 927 F.3d 919, 925-26 (6th Cir. 2019) (the time period for ARCOS production ended December 31, 2014).

are more relevant, in terms of products, dates, and plaintiff-specific facts, than the

ARCOS data.[22]

Fourth, if Petitioners wanted the ARCOS data, Petitioners would not need the

PEC. The PEC stipulated to a protective order that would have kept the ARCOS data

under seal.[23] When the Washington Post appealed, this Court vacated the protective

order.[24] Therefore, if Petitioners wanted to use ARCOS data, they would not need to

get it from the PEC.

Fifth, the PEC explicitly and repeatedly promised that the ARCOS data would

not be the basis for a common benefit tax against recoveries.[25] Now, however, the

District Court *sua sponte* cites ARCOS data as its basis for taxing state cases. *See*

Order, 12-13 (quoted above).

---

[22] *E.g.*, Texas Prescription Monitoring Program, https://txpmp.org/.

[23]  *See In re Nat'l Prescription Opiate Litig.*, 927 F.3d at 930 ("the parties stipulated to a protective order. . . . It is a grave mischaracterization to state that Plaintiffs 'energetically fought' over the issue of public disclosure when they neither raised it before the district court nor even objected when the district court stated that the issue was not disputed.").

[24]  *In re Nat'l Prescription Opiate Litig.*, 927 F.3d at 938 ("we hold that the district court abused its discretion in finding 'good cause' not to permit disclosure of the ARCOS data pursuant to state public records requests").

[25]  Exhibit 10, MDL 2804: Second Amended Notice of ARCOS Disclosure, Doc. 1613, at 1 (first paragraph of letter from PEC "explains how you may obtain, **without charge**, refined data . . .  from the ARCOS database") (emphasis added), *ibid* ("the MDL PEC is making available to you **without charge** the unprocessed ARCOS data"), *ibid* ("We are also providing you, **again without charge**, access to the result of that investment") (emphasis added); *see also* Exhibit 11, The Mayor and City Council of Baltimore's Request as Amicus Curiae for Modification of the Court's August 12, 2021 Order, Doc. 3888, at 2-4.

Sixth, the PEC has already been more than compensated for ARCOS data processing expenses. While the District Court categorizes ARCOS compilation as a "virtually unprecedented expense,"[26] the Order fails to quantify what that expense actually was. To the knowledge of undersigned, the expense was previously reported by the PEC as in the area of one million dollars. The PEC has already been reimbursed a thousand times over. At the end of 2019, the Court ordered a hold-back from Track One settlements, and in July 2021, $14.2 million in fees and $7.1 million in expenses were disbursed.[27] More recently, two settling defendant groups agreed to pay $50 million into the MDL PEC-only Expense Fund;[28] an additional $160 million into a Participating Subdivision Counsel Expense Fund; and, more than $1,900,000,000.00 ($1.9 billion) into an attorney's fee fund (consisting of 40% contingency fee and 60% common benefit fee).[29]

---

[26] Order, 13.

[27] Exhibit 9, Order Establishing Common Benefit Fee Fund and Directing Certain Payments, Doc. 3794, *In re Nat'l Prescription Opiate Litig.,* MDL 2804 (N.D. Ohio July 22, 2021).

[28] Exhibit 12, Order to Establish QSF, Doc. 3828, p. 15 ("total of $50,000,000 . . . into the agreed-upon MDL Expense Fund.").

[29] *Id.* at 16 (7.5% of gross recovery, non-participating subdivisions). *See also* Distributor Master Settlement Agreement Exhibit R at R-2 https://opioidfeepaneldocuments.files.wordpress.com/2022/04/exhibit-r_distributor_settlement_agreement_3.25.22_final.pdf; Janssen Master Settlement Agreement Exhibit R at R-3 https://opioidfeepaneldocuments.files.wordpress.com/2022/04/exhibt-r-janssen-agreement-03302022-final2.pdf.

\* \* \*

To summarize, there is no dispute that:

- Petitioners filed their cases in state court.

- No Defendant tried to justify the wrongful removals of the five Petitioners' cases.

- Thus MDL 2804 did not and does not have subject matter jurisdiction over Petitioners' cases.

- Petitioners and their counsel have not signed a federal "Participation Agreement."

- No MDL "common benefit" work has been used in the Petitioners' cases.

- Petitioners intend to litigate their claims against the retail pharmacy defendants and other non-settling defendants in state court.

- Once Petitioners do so, the District Court's Order will substantially hamper their ability to prosecute and, if appropriate, resolve their cases by purporting to control discovery.

- The Order was issued without notice or opportunity to be heard.

## V.    REASONS WHY A WRIT OF MANDAMUS SHOULD ISSUE

"A party seeking relief in mandamus generally must demonstrate a 'clear and indisputable' right to that relief." *In re Simons*, 567 F.3d 800, 801 (6th Cir. 2009)

(citations omitted). One traditional use of the writ has been to confine the court against which mandamus is sought "to a lawful exercise of its prescribed jurisdiction." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 380 (2004) (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). To confine writs to only extraordinary causes, three conditions must be satisfied. First, petitioners cannot have adequate alternative means to obtain the relief they seek. *Id*. at 380. Second, petitioners must show a "clear and indisputable" right to the relief sought. *Id*. at 381 (quotation omitted). Third, petitioners must show that issuing the writ is otherwise "appropriate under the circumstances." *Id*. *See also Harris County* Order, 3-4. Each requisite is addressed in turn below.

### A. A Mandamus Writ Is the Only Adequate Remedy

"[A] mandamus lies, if there be no other *adequate*, *specific*, *legal* remedy." *In re United States*, 32 F.4th 584, 590 (6th Cir. 2022) (quotation omitted). There is no other adequate remedy, as there is no final judgment the District Court can issue in Petitioners' cases. Most Petitioners were never in federal court; five were recently remanded pursuant to the *Harris County* Order, and one Petitioner's case, Walker County's, remains in MDL 2804 but should soon be remanded to state court.

A "writ is appropriately … issued when there is usurpation of judicial power or a clear abuse of discretion." *Schlagenhauf v. Holder*, 379 U.S. 104, 110 (1964) (quotation omitted). Where, as here, the district court usurped judicial power by

15

ordering persons not within its jurisdiction to make payments into a court-designated fee fund, a writ of mandamus should issue to correct the jurisdictional overreach. *See, e.g., Hartland v. Alaska Airlines,* 544 F.2d 992 (9th Cir. 1976).

## B. Petitioners Have a Clear and Indisputable Right to Proceed in State Court Without Having Discovery Obstructed and Recoveries Siphoned Off to a Federal Fund.

### 1. The District Court does not have the authority to dictate fees and expenses in state court cases.

"Under the American Rule it is well established that attorney's fees 'are not ordinarily recoverable in the absence of a statute or enforceable contract providing therefor.'" *Summit Valley Indus. Inc. v. Loc. 112, United Bhd. of Carpenters & Joiners of Am.*, 456 U.S. 717, 721 (1982) (citation omitted). Absent recognized exceptions, "the rule has been consistently followed for almost 200 years." *Id.*

"A court can only act if it has power. And a court only has power if an act of Congress or the Constitution grants it." *In re Univ. of Michigan*, 936 F.3d 460, 467 (6th Cir. 2019). No statute or rule authorizes common benefit fees in multidistrict litigation. The District Court's reliance upon the common-fund doctrine as an exception to the American Rule is misplaced. First, every Circuit Court to address the issue has decided that if a district court does not have authority over the litigation, then it lacks authority to distribute proceeds from the litigation. Second, Petitioners should not be forced to pay for legal services they never received. Third, the Order violates state law.

16

> a. *The common-fund exception to the American Rule is inapplicable because the proceeds from state court cases are outside of the District Court's authority.*

The Supreme Court defined the common fund doctrine as follows:

> [P]ersons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. **Jurisdiction over the fund involved in the litigation** allows a court to prevent this inequity by assessing the attorneys' fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted) (emphasis added). The court's ability to "legitimately exercise authority or control" over the fund is "crucial." *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 770 (9th Cir. 1977). Because the MDL court cannot "legitimately exercise authority or control" over settlements and judgments in other courts—beyond the MDL—the common-fund doctrine cannot support ordering holdbacks from non-MDL cases. *See id.* at 771 n.11; *see also In re Air Crash Disaster at Fla. Everglades*, 549 F.2d 1006, 1018 (5th Cir. 1977) ("Determination of whether a fund exists is a combination of traditional and pragmatic concepts centering around the power of the court to control the alleged fund."); *id.* at 1018 n.16 ("Central, of course, is authority to adjudicate the rights and duties of interested parties."); *U.S. ex rel. Bogart v. King Pharmas.*, 493 F.3d 323, 329 (3d Cir. 2007) ("Application of the common fund doctrine . . . requires court 'control over a fund or jurisdiction over the parties.'"). The District

Court's attempt to do so is a gross overreach of its authority and an unwarranted expansion of the common fund doctrine.

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 167 (1939) (cited at Order, 2), underscores that the common-fund doctrine requires court control over the fund in order for the court to assess fees and costs. In *Sprague*, the fund consisted of specific property held by the defendant trustee in the case, i.e., certain bonds used to secure bank deposits, and this property was before the court. 307 U.S. at 162-63. The *Sprague* petitioner "established the claims of [others] pertaining to the same bonds." *Id*. at 166.

Consistently, the Circuit Courts have recognized that authority over the fund is an essential predicate to application of the common fund doctrine. For example, *In re Genetically Modified Rice Litigation* explains that "the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs*" and the defendant. 764 F.3d 864, 874 (8th Cir. 2014) ("*GMO Rice*"). "[S]tate-court cases, related or not, are not before the district court." *Id.* That remained true "[e]ven if the state plaintiffs' *attorneys* participated in the MDL" because the MDL court "does not have authority over separate disputes between state-court *plaintiffs* and" the defendant. *Id.*; *see also id.* (noting "the district court **does not have the power** to order parties in cases not before it to contribute to the Fund" (emphasis added)).

18

In *Hartland v. Alaska Airlines*, two claimants settled with the defendant airline, and the MDL judge required them to pay a portion of their recoveries as a holdback in anticipation of common benefit attorneys' fees and expenses. 544 F.2d at 996-97. Neither of the settled claims, however, was part of the MDL. One settlement resolved a state-court claim; the other settled before any suit was filed. *See id.* at 996-99. The appellate court issued a writ of mandamus to overturn the order, deeming the MDL court's decision to assess fees against non-MDL recoveries a "usurpation of power." *Id.* at 1001. The MDL court had no authority "to compel lawyers who were not parties to the action to pay" a holdback. *Id.* The Ninth Circuit subsequently followed *Hartland*, finding "the district court had no jurisdiction to compel [a non-party] to pay." *Vincent*, 557 F.2d at 766.

The Fourth Circuit similarly held that the MDL court "has **no power** to extend the obligations of its [holdback] order" to non-MDL plaintiffs. *In re Showa Denko K.K. L–Tryptophan Products Liability Litigation–II*, 953 F.2d 162, 166 (4th Cir. 1992) (emphasis added). The MDL court's authority "is limited to cases and controversies between persons who are properly parties to the cases transferred." *Id.* at 165-66. "[A]ny attempt without service of process to reach others who are unrelated is beyond the court's power." *Id.* at 166 (citing *Hartland*); *see also id.* (noting the MDL court "has no power to extend the obligations of its orders" to claimants outside MDL).

19

Other tribunals similarly recognize that a court does not have the authority to order that certain recoveries in cases not before the court be paid into a common benefit fund.[30] In sum, "[t]he **only** circuit courts of appeal to have addressed this issue have held that a district court does not have such jurisdiction to subject parties not before it to common benefit assessments." *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2015 WL 2165341, at *2 (D. Kan. May 8, 2015) (citing *Showa Denko*, 953 F.2d at 165–66; *GMO Rice*, 764 F.3d at 873–74) (emphasis added).

---

[30] *See In re Avandia Marketing, Sales Practices and Products Liability Litig.*, 617 F. App'x 136, 141 (3d Cir. 2015) ("[A] transferee court's jurisdiction in multi-district litigation is limited to cases and controversies between persons who are properly parties to the cases transferred."); *In re Zyprexa Products Liability Litigation*, 467 F. Supp. 2d 256, 268–69 (E.D. N.Y. 2006) (assessing state cases "should, in the first instance, be left to state court judges"); *In re Lidoderm Antitrust Litigation*, No. 14-md-02521-WHO, 2017 WL 3478810, at *3 (N.D. Cal. 2017) ("[D]istrict courts operating pursuant to their multi-district litigation powers do 'not have jurisdiction to order holdbacks from state-court plaintiffs' recoveries' absent some 'independent basis for jurisdiction over these state-court actions.'") (quoting *GMO Rice*, 764 F.3d at 874); *In re Baycol Prod.*, No. MDL 1431, 2004 WL 190272 (D. Minn. Jan. 29, 2004) (court lacked jurisdiction to assess fees and costs against parties whose cases had not been transferred into the MDL; amending PTO accordingly). *Cf. In re FCA US LLC Monostable Elec. Gearshift Litig.*, No. 16-MD-02744, 2017 WL 6402992, at *3 (E.D. Mich. Mar. 21, 2017) ("although a transferee judge has the authority to appoint a committee of attorneys to conduct consolidated discovery and can require parties in the MDL cases to make payments into a common discovery fund, that authority does not extend to parties or attorneys involved in related state court proceedings, un-transferred federal cases, or unfiled claims." (quoting 15 Fed. Prac. & Proc. Juris. § 3866 (4th ed.), citing *Showa Denko*, 953 F.2d at 164; *Hartland*, 544 F.2d at 1001)).

Here, the District Court acknowledged that other courts "routinely caution" against commandeering fees from cases filed in state court, but the court then ignored the routine limitations because of a purported "free-rider problem" caused by what it wrongly perceived to be the "unprecedented expense" of the ARCOS data. Order, 11, 12, 13 (quoting *In re Gen. Motors LLC Ignition Switch Litig.*, 477 F. Supp. 3d 170, 181 (S.D.N.Y. 2020)). Contrary to the District Court's reliance on *General Motors,* that case did "**not** apply [the common-fund tax] to state-court cases in which the Firms did not use Common Benefit Work Product." 477 F. Supp. 3d at 192 (emphasis added).

Nor is the "free-rider" theory a legitimate basis for seizing authority over proceeds in state-court cases where, as here, no federal work product is used and no "participation agreement" regarding such work product was signed. As one federal court observed last year:

> But free riding occurs all across our legal system. The presence of free riding, and the desire to address it, is not itself a source of judicial power. The power of a court to address free riding concerns—just like the power of a court to address any concern—must actually come from somewhere. . . . [T]hat power does not seem to come from the common fund doctrine.

*In re Roundup Prod. Liab. Litig.*, 544 F. Supp. 3d 950, 960 (N.D. Cal. 2021) (discussing *General Motors*) (appeal pending).

The presence of Defendants before the MDL 2804 Court did not give that court authority over **cases** pending elsewhere. *See GMO Rice*,764 F.3d at 874

("district court overseeing the MDL does not have authority over separate disputes between state-court plaintiffs" and defendant); *Bogart,* 493 F.3d at 329 (finding no authority "hold[ing] that jurisdiction over the defendant, alone, is sufficient to confer authority" to order payment of attorneys' fees from other plaintiffs' recoveries); *Showa Denko*, 953 F.2d at 166 (rejecting argument that jurisdiction over defendant grants authority to order holdback from non-MDL recoveries); *Syngenta*, 2015 WL 2165341, at *3 ("this Court's jurisdiction over the defendant and some attorneys with respect to cases in the MDL does not grant it jurisdiction to issue orders requiring assessments in cases not before this Court.").

Consistently, that a lawyer appears before the District Court does not grant authority over the lawyer's cases pending in different courts. "Even if the state plaintiffs' *attorneys* participated in the MDL, the district court overseeing the MDL does not have authority over separate disputes between state-court *plaintiffs* and [the defendant]." *GMO Rice*, 764 F.3d at 874; *see also Syngenta*, 2015 WL 2165341, at *3 (quoted above).

### b. *Independently, the common-fund doctrine is inapplicable because the work of District Court-appointed counsel is not traceable to future proceeds in state court cases*

The common benefit fund doctrine requires that the "benefits must be traceable with some accuracy" and "there must be reason for confidence that the costs can in fact be shifted with some exactitude to those benefitting." *Geier v.*

22

*Sundquist*, 372 F.3d 784, 790 (6th Cir. 2004). Federal courts have equitable power to award attorney's fees where "overriding considerations indicate the need for such a recovery." *Hall v. Cole*, 412 U.S. 1, 5 (1973) (quoting *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 391-392 (1970)). In *Hall* and *Mills*, reimbursement of attorney's fees to those who provided a "substantial service" "simply shift[ed] the costs of litigation to the class that has benefited from them and that would have had to pay them had it brought the suit." *Hall,* 412 U.S. at 8-9 (quotation omitted). "*Mills* and *Hall* did not change the requirement that the benefit be received in common by those against whom the fee award operates." *Shimman v. Int'l Union of Operating Engineers, Loc. 18*, 744 F.2d 1226, 1234–35 (6th Cir. 1984).

The common-fund prerequisites clearly are not satisfied. Even after Professor Rubenstein's report, the District Court taxed Petitioners' cases without proof that the PEC has or will provide them any legal services or benefit. The Order does not "trace[] with some accuracy" or explain with any "confidence" or "exactitude," *see Geier*, 372 F.3d at 790, why Petitioners' cases benefit from the federal PEC. Instead, the Order relies upon what could **at most** be incidental, i.e. the stale ARCOS data (*see* Order, 12-13). However, "[a]n incidental benefit . . . will not justify a fee award." *Shimman*, 744 F.2d at 1235.  Moreover, the PEC repeatedly promised the

23

ARCOS data would **not** be cause for a common benefit tax, the PEC has been amply compensated, and the ARCOS data is inferior to more current sources of proof.[31]

### c. The Order violates Texas law.

The Order violates Texas law. Texas law forbids the payment of any contingency fee for legal services on behalf of a Texas political subdivision unless several prerequisites are satisfied. "[N]o fees may be paid to any person under the contract **or under any theory of recovery**" without compliance with several prerequisites of the Texas Government Code.[32] Any contingent fee must be approved – before the legal work is performed – by the political subdivision and the Texas Attorney General ("Texas OAG") after statutorily prescribed notice.[33] The amount and payment of such fees are regulated.[34] Contingency fees and expenses must be based on work performed for the political subdivision.[35]

In addition, the Texas Political Subdivisions and the Texas OAG executed a binding agreement ("Texas Intrastate Allocation Agreement"), which caps fees from any statewide opioid settlement at 9.3925% plus expenses, and places such

---

[31] *See* §IV.D *supra*.
[32] TEX. GOV'T CODE §2254.110 (emphasis added).
[33] TEX. GOV'T CODE §2254.1036(a) (notice and open meeting approval requirements), §2254.1036(a)(1)(B) (content of public notice), §2254.1036(b) (requisite written statements of political subdivision); TEX. GOV'T CODE §2254.1038(a) ("political subdivision must receive attorney general approval").
[34] TEX. GOV'T CODE §2254.106(b, c) (directing computation).
[35] TEX. GOV'T CODE §2254.108(d).

recoveries under **the sole jurisdiction** of state Judge Schaffer, presiding over the Texas intra-state MDL Court.[36] The settlements that have occurred have complied with this term sheet.[37] An entire Texas code subchapter, Government Code Subchapter R, "Statewide Opioid Settlement Agreement," was enacted in 2021.[38] Texas statutory law thereby codified the Texas Intrastate Allocation Agreement regarding distribution terms,[39] and the deposit and allocation of settlement money.[40]

Any recovery of a percentage fee from a political subdivision in Texas is ineffective and unenforceable unless and until review and approval by the Texas OAG, Texas political subdivisions, and Judge Schaffer.[41] The PEC has not attempted to comply with any of these provisions of Texas law, which the Order violates. A District Court cannot usurp the authority of the Texas Legislature, but does so here.[42]

---

[36] Exhibit 13, Motion to Establish Application Protocols *et al.*, *In re: Texas Opioid Litigation,* No. 2018-63587 (152nd Jud. Dist. Ct. Harris County, Texas April 26, 2022), at Exhibit N to Exhibit B, ¶C.1 (control of any "fees and expenses to the 'Texas Opioid Fee and Expense Fund,' which shall be allocated and distributed by the Texas MDL Court").

[37] *See, e.g., id.* at Exhibit A (Janssen), Exhibit B (Distributors). These and other settlements (Endo, Teva) are posted on the Texas OAG website. *E.g.,* https://www.texasattorneygeneral.gov/sites/default/files/global/files/Teva%20-%20Final%20Texas%20AG%20Settlement%202.4.22.pdf.

[38] TEX. GOV'T CODE §§403.501-511.

[39] *See, e.g.,* TEX. GOV'T CODE §403.506(c) (codifying percent distributions).

[40] TEX. GOV'T CODE §403.507.

[41] *See* notes 33-41 *supra*.

[42] *See* §V.B.2, §V.C *infra*.

### 2.  The Order violates the Anti-Injunction Act.

"A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. "The Supreme Court has, on several occasions, recognized that the Anti–Injunction Act creates an absolute prohibition against enjoining state court proceedings, unless the injunction falls within one of three specifically defined exceptions." *Martingale LLC v. City of Louisville*, 361 F.3d 297, 302 (6th Cir. 2004) (quotation omitted). The phrase "proceedings in a State court" is "comprehensive" and "includes all steps taken or which may be taken in the state court or by its officers from the institution to the close of the final process." *Hill v. Martin*, 296 U.S. 393, 403 (1935). A federal order that would bar discovery in a state case implicates the Anti-Injunction Act.[43] "[T]he prohibition of § 2283 cannot be evaded by addressing the order to the parties." *Atlantic Coast Line R. Co. v. Brotherhood of Locomotive Engineers,* 398 U.S. 281, 287 (1970).

---

[43] *See Vietti v. Welsh & McGough, PLLC,* No. 21-CV-58-JFH-SH, 2022 WL 1288314, at *4 (N.D. Okla. Apr. 30, 2022) (request that federal court enjoin state-court deposition subpoena fell "squarely within the Anti-Injunction Act's prohibition"); *see also, e.g*., *United States ex rel. Grubbs v. Kanneganti*, No. 1:05-CV-323, 2007 WL 9718264, at *3 (E.D. Tex. June 4, 2007) (court lacked authority to protect a party from "noticed deposition in the state court proceeding").

The Supreme Court has "expressly rejected the view that the anti-injunction statute merely states a flexible doctrine of comity, and made clear that the statute imposes an absolute ban upon the issuance of a federal injunction against a pending state court proceeding, in the absence of one of the recognized exceptions." *Mitchum v. Foster*, 407 U.S. 225, 228–29 (1972) (note omitted). "[A] federal court does not have inherent power to ignore the limitations of § 2283 and to enjoin state court proceedings merely because those proceedings interfere with a protected federal right or invade an area preempted by federal law, even when the interference is unmistakably clear." *Atl. Coast*, 398 U.S. at 294. "[A] simultaneous in personam state action does not interfere with the jurisdiction of a federal court in a suit involving the same subject matter." *In re Fed. Skywalk Cases*, 680 F.2d 1175, 1183 (8th Cir. 1982).

The District Court's Order provides that state courts cannot compel Defendants to produce documents and evidence in accordance with state rules if the documents and evidence were produced in MDL 2804.[44] The Order then forbids Petitioners from accessing any such documents or evidence, because Petitioners are non-signatories to a "Participation Agreement."[45] The Order is not titled an

---

[44] Order, 9 n.6 ("in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL").

[45] Order, 9 n.6, 19 (quoted above at §IV.A).

"injunction," but the title is not controlling; the Order's practical effect is in the nature of a federal court injunction of state court proceedings.[46] The Anti-Injunction Act is violated because the Order prevents state court judges from controlling discovery in cases before them and none of the statutory exceptions apply.

The Order also contradicts existing discovery orders in intrastate MDLs. Texas Judge Robert Schaffer, presiding over *In re Texas Opioid Litigation*, No. 18-0358, promulgated orders dictating the production of documents, including documents produced in MDL 2804.[47] Similarly, South Carolina Judge Perry Gravely, vested "with exclusive jurisdiction to hear and dispose of all opioid litigation [cases],"[48] requires that defendants produce to the South Carolina plaintiffs "all document productions from MDL 2804 . . . that are not specific to the State of Ohio," as well as "all deposition transcripts of Rule 30(b)(6) witnesses and employees from the MDL."[49] This Order further provides that the defendants must

---

[46] For example, *Martingale* finds that the Anti-Injunction Act cannot be evaded by omitting a request for an injunction and asking instead for declaratory relief, if declaratory relief would have the same practical effect as an injunction. 361 F.3d at 303.

[47] Exhibit 14, ESI Production Protocol, *In Re: Texas Opioid Litigation*, No. 2018-63587, 4 ("each Texas MDL Defendant shall produce the non-jurisdiction specific documents and ESI that it has previously produced in the National MDL … to the individual member of Plaintiffs' Leadership Counsel"); Exhibit 15, Protocol for Coordination with the National MDL, *In Re: Texas Opioid Litigation*, No. 2018-63587.

[48] *Re: Opioid Litigation,* South Carolina Supreme Court Order August 9, 2018.

[49] Exhibit 16, CMO No. 2 (South Carolina), at §C.1.

make these productions on a rolling basis "as additional documents are produced by Defendants in the MDL proceedings."[50]

The Order appears to contradict these prior orders by seemingly adding the additional prerequisite, not otherwise required, that plaintiffs' counsel become parties to a federal "Participation Agreement." *See* Order, 19. The quagmire that the Order, if valid, would create in the state consolidated Courts is precisely why the Anti-Injunction Act is necessary. Defendants are ordered in state court to produce the documents to plaintiffs; however, according to the federal Order, plaintiffs cannot see them because they are non-signatories to the "Participation Agreement," that, *inter alia*, gives the federal court jurisdiction over counsel and counsel's cases.[51]

### 3. The Order violates the Due Process Clause.

"No person shall…be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. ("Due Process Clause"). The Sixth Circuit and Supreme Court have long held that due process, "requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Garcia v. Fed. Nat'l Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (quotations omitted).

---

[50] *Id*.

[51] *See* Exhibit 17, Opioid Participation Agreement, Doc. 3352-3, I.A (incorporating Doc. 358), I.B & II.B (submission to federal court orders), I.C (unfiled and state cases included), II.D (must deposit money in federal fund).

A primary purpose of the notice requirement of the Due Process Clause is to ensure that a party is well apprised of the matter potentially affecting one's property rights and that the party is ensured that the opportunity for a hearing is meaningful. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("Th[e] right to be heard has little reality or worth unless one is informed that the matter [which has the potential to affect one's rights] is pending and can choose for himself whether to appear or default, acquiesce or contest."). "[T]he root requirement of the Due Process Clause is that generally an individual [must] be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Guba v. Huron Co.*, 600 Fed. App'x 374, 382 (6th Cir. 2015) (quotation omitted).

"Legal claims are sufficient to constitute property such that a deprivation would trigger due process scrutiny." *In re Motors Liquidation Co.*, 829 F.3d 135, 158 (2d Cir. 2016). "On a broad public level, fee disputes, like other litigation with millions at stake, ought to be litigated openly," and "when a judge constructs a process for setting fees, the process must contain at least the procedural minima of due process: notice and an opportunity to be heard." *In re High Sulfur Content Gasoline Products Liability Litig.*, 517 F.3d 220, 230-31 (5th Cir. 2008) (quotation omitted).

Not only are Petitioners deprived of a portion of case recoveries without any prior motion, notice, or hearing, but the Order contradicts prior representations made by the PEC.[52]

### C. The Writ Is Otherwise Appropriate under the Circumstances.

Mandamus is "appropriate to prevent intrusion by the federal judiciary on a delicate area of federal-state relations[.]" *In re Univ. of Michigan*, 936 F.3d at 466 (quotation omitted). "Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided." *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 495 (1942); *see also Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982) (recognizing a "strong federal policy against federal-court interference with pending state judicial proceedings," grounded in notions of comity and federalism); *Colonial Pipeline Co. v. Morgan*, 474 F.3d 211, 222 (6th Cir. 2007) ("the state's interest in administration of its judicial system is important ... [and] federal court interference would be an offense to the state's interest" (quotation omitted)). "Principles of comity and respect for the state courts' supervision of their own dockets and the attorneys before them" counsel against "compel[ling] attorneys who represent both state and federal plaintiffs to set aside a portion of their fee recoveries in state cases." *Zyprexa*, 467 F. Supp. 2d at 268.  In *Showa Denko*, the Fourth Circuit concluded that a holdback order created

---

[52]  *See* §IV.C & note 16 *supra*.

31

the "very real potential of interfering with discovery proceedings in state court" and "raise[d] questions of conflict with the policy of comity between federal and state courts." 953 F.2d at 166.

The Order's substantial interference with state courts cannot be seriously denied as it contradicts numerous provisions of state law governing contingency fee contracts and opioid settlement proceeds,[53] and countermands the standing discovery orders of at least two state court jurists.[54]

## VI.    CONCLUSION

Petitioners respectfully request, consistent with their objections to federal jurisdiction, that their petition be granted, that the District Court's Ongoing Common Benefit Order be vacated to the degree it affects cases not pending in MDL 2804 and to cases with meritorious remand motions, that the District Court be prohibited from entering any order affecting Petitioners' cases (other than remand to state court and associated defense sanctions), and for such other relief as may be just.

Date: May 25, 2022                    Respectfully Submitted,[55]

                                      /s/ S. Ann Saucer
                                      S. Ann Saucer
                                      Texas Bar No. 00797885
                                      Louisiana Bar No. 21368
                                      asaucer@fnlawfirm.com
                                      N. Majed Nachawati

---

[53]  *See* §V.B.1.c *supra*.
[54]  *See* §V.B.2 *supra*.
[55] Signatories specially appear, preserving objections to federal jurisdiction.

Texas Bar No. 24038319
mn@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel. (214) 890-0711
Fax (214) 890-0712

Matthew S. Daniel
Texas Bar No. 24047575
mdaniel@lawyerworks.com
FERRER POIROT & WANSBROUGH
2603 Oak Lawn Ave. Ste. 300
Dallas, TX 75219
Tel. (214) 521-4412
Fax (866) 513-0115

*Counsel for Petitioners Ellis and Rockwall
Counties, Texas, Cities of Albuquerque and Santa
Fe, New Mexico*

Shelly A. Sanford
State Bar No. 00784904
WATTS GUERRA LLP
811 Barton Springs Rd. #725
Austin, TX 78704
Telephone: (210) 447-0500
Facsimile: (210) 447-0502
ssanford@wattsguerra.com

*On behalf of the Court-Appointed Liaison Counsel
for Texas Local Entity Plaintiffs to Federal MDL
2804*[56]

Pia Salazar
pia@salazar-sullivanlaw.com
Patrick Sullivan

---

[56] Exhibit 18, Order Appointing Leadership for the Plaintiffs, *In re: Texas Opioid
Litigation,* No. 2018-63587 (Nov. 26, 2018).

33

pat@salazar-sullivanlaw.com
SALAZAR, SULLIVAN & JASIONOWSKI
100 Gold Avenue SW, Suite 201
Albuquerque, New Mexico 87102
Tel. (505) 314-1414
Fax. (505) 31401419

*Counsel for Petitioners City of Albuquerque, New Mexico; City of Santa Fe, New Mexico*

THE GALLAGHER LAW FIRM
Michael T. Gallagher
SBOT Bar No. 5395
Texas State Bar No.07586000
Pamela McLemore
Texas State Bar No. 24099711
Boyd Smith
Texas State Bar No. 18638400
SDOT Bar No.: 8203
2905 Sackett Street
Houston, Texas 77098
(713) 222-8080
(713) 222-0066 – facsimile
mike@gld-law.com

Tommy Fibich
Texas State Bar No. 06952600
SDOT Bar #: 5482
Jay Henderson
Texas State Bar No. 09424050
Sara J. Fendia
Texas State Bar No. 06898800
FIBICH, LEEBRON, COPELAND BRIGGS
1150 Bissonnet Street
Houston, Texas 77005
Telephone: (713) 751-0025
Facsimile: (713) 751-0030
Email: tfibich@fibichlaw.com

Dan Downey

34

Dan Downey, P.C.
SBOT Bar # 459
Texas State Bar No. 06085400
1609 Shoal Creek Blvd. #100
Austin, TEXAS 78701
Telephone: (512) 569-3400
Dandowney427@gmail.com

*Counsel for Petitioner County of Harris, Texas*

Mark A. Correro
TX State Bar No. 24045702
Law Office of Mark A. Correro, P.C.
2900 North Loop West, Suite 400
Houston, TX 77092
(713) 955-3102
mark@correrolaw.com

*Counsel for Petitioner Walker County*

F. Jerome Tapley
Cory Watson, P.C.
2131 Magnolia Avenue South
Birmingham, AL 35205
Direct: (205) 271-7112
Main: (205) 328-2200
Toll Free: (800) 852-6299
jtapley@CoryWatson.com

*Counsel for Petitioners County of Arkansas, AR;
County of Ashley, AR; County of Baxter, AR;
County of Benton, AR; County of Boone, AR;
County of Bradley, AR; County of Calhoun, AR;
County of Carroll, AR; County of Chicot, AR;
County of Clark, AR; County of Clay, AR; County
of Cleburne, AR; County of Cleveland, AR; County
of Columbia, AR; County of Conway, AR; County
of Craighead, AR; County of Crawford, AR;
County of Crittenden, AR; County of Cross, AR;
County of Dallas, AR; County of Desha, AR;*

*County of Drew, AR; County of Faulkner, AR;
County of Franklin, AR; County of Fulton, AR;
County of Garland, AR; County of Grant, AR;
County of Greene, AR; County of Hempstead, AR;
County of Hot Spring, AR; County of Howard, AR;
County of Independence, AR; County of Izard, AR;
County of Jackson, AR; County of Jefferson, AR;
County of Johnson, AR; County of Lafayette, AR;
County of Lawrence, AR; County of Lee, AR;
County of Lincoln, AR; County of Little River, AR;
County of Logan, AR; County of Lonoke, AR;
County of Madison, AR; County of Marion, AR;
County of Miller, AR; County of Mississippi, AR;
County of Monroe, AR; County of Montgomery,
AR; County of Nevada, AR; County of Newton,
AR; County of Ouachita, AR; County of Perry, AR;
County of Phillips, AR; County of Pike, AR;
County of Poinsett, AR; County of Polk, AR;
County of Pope, AR; County of Prairie, AR;
County of Pulaski, AR; County of Randolph, AR;
County of Saline, AR; County of Scott, AR; County
of Searcy, AR; County of Sebastian, AR; County of
Sevier, AR; County of Sharp, AR; County of St.
Francis, AR; County of Stone, AR; County of
Union, AR; County of Van Buren, AR; County of
Washington, AR; County of White, AR; County of
Woodruff, AR; County of Yell, AR; City of Benton,
AR; City of Bentonville, AR; City of Conway, AR;
City of Fayetteville, AR; City of Fort Smith, AR;
City of Hot Springs, AR; City of Jacksonville, AR;
City of Jonesboro, AR; City of Littlerock, AR; City
of Monticello, AR; City of North Little Rock, AR;
City of Pine Bluff, AR; City of Rogers, AR; City of
Sherwood, AR; City of Springdale, AR; City of
Texarkana, AR; City of Adona, AR; City of
Alexander, AR; City of Alicia, AR; City of Allport,
AR; City of Alma, AR; City of Almyra, AR; City of
Alpena, AR; City of Altheimer, AR; City of Altus,
AR; City of Amagon, AR; City of Amity, AR; City
of Anthonyville, AR; City of Antoine, AR; City of*

*Arkadelphia, AR; City of Arkansas City, AR; City of Ash Flat, AR; City of Ashdown, AR; City of Atkins, AR; City of Aubrey, AR; City of Augusta, AR; City of Austin, AR; City of Avoca, AR; City of Bald Knob, AR; City of Banks, AR; City of Barling, AR; City of Bassett, AR; City of Batesville, AR; City of Bauxite, AR; City of Bay, AR; City of Bearden, AR; City of Beaver, AR; City of Beebe, AR; City of Beedeville, AR; City of Bella Vista, AR; City of Bellefonte, AR; City of Belleville, AR; City of Ben Lomond, AR; City of Bergman, AR; City of Berryville, AR; City of Bethel Heights, AR; City of Big Flat, AR; City of Bigelow, AR; City of Biggers, AR; City of Birdsong, AR; City of Biscoe, AR; City of Black Oak, AR; City of Black Rock, AR; City of Black Springs, AR; City of Blevins, AR; City of Blue Eye, AR; City of Blue Mountain, AR; City of Bluff City, AR; City of Blytheville, AR; City of Bodcaw, AR; City of Bonanza, AR; City of Bono, AR; City of Booneville, AR; City of Bradford, AR; City of Bradley, AR; City of Branch, AR; City of Briarcliff, AR; City of Brinkley, AR; City of Brookland, AR; City of Bryant, AR; City of Buckner, AR; City of Bull Shoals, AR; City of Burdette, AR; City of Cabot, AR; City of Caddo Valley, AR; City of Caldwell, AR; City of Cale, AR; City of Calico Rock, AR; City of Calion, AR; City of Camden, AR; City of Cammack Village, AR; City of Campbell Station, AR; City of Caraway, AR; City of Carlisle, AR; City of Carthage, AR; City of Casa, AR; City of Cash, AR; City of Caulksville, AR; City of Cave City, AR; City of Cave Springs, AR; City of Cedarville, AR; City of Centerton, AR; City of Central City, AR; City of Charleston, AR; City of Cherokee Village, AR; City of Cherry Valley, AR; City of Chester, AR; City of Chidester, AR; City of Clarendon, AR; City of Clarksville, AR; City of Clinton, AR; City of Coal Hill, AR; City of Colt, AR; City of Concord, AR; City of Corning, AR; City of Cotter,*

37

*AR; City of Cotton Plant, AR; City of Cove, AR;*
*City of Coy, AR; City of Crawfordsville, AR; City*
*of Crossett, AR; City of Cushman, AR; City of*
*Daisy, AR; City of Damascus, AR; City of*
*Danville, AR; City of Dardanelle, AR; City of*
*Datto, AR; City of De Queen, AR; City of Decatur,*
*AR; City of Delaplaine, AR; City of Delight, AR;*
*City of Dell, AR; City of Denning, AR; City of*
*Dermott, AR; City of Des Arc, AR; City of Devalls*
*Bluff, AR; City of Dewitt, AR; City of Diamond*
*City, AR; City of Diaz, AR; City of Dierks, AR;*
*City of Donaldson, AR; City of Dover, AR; City of*
*Dumas, AR; City of Dyer, AR; City of Dyess, AR;*
*City of Earle, AR; City of East Camden, AR; City*
*of Edmondson, AR; City of Egypt, AR; City of El*
*Dorado, AR; City of Elaine, AR; City of Elkins,*
*AR; City of Elm Springs, AR; City of Emerson, AR;*
*City of Emmet, AR; City of England, AR; City of*
*Enola, AR; City of Etowah, AR; City of Eudora,*
*AR; City of Eureka Springs, AR; City of Evening*
*Shade, AR; City of Everton, AR; City of Fairfield*
*Bay, AR; City of Fargo, AR; City of Farmington,*
*AR; City of Felsenthal, AR; City of Fifty-Six, AR;*
*City of Fisher, AR; City of Flippin, AR; City of*
*Fordyce, AR; City of Foreman, AR; City of Forrest*
*City, AR; City of Fouke, AR; City of Fountain Hill,*
*AR; City of Fountain Lake, AR; City of Fourche,*
*AR; City of Franklin, AR; City of Friendship, AR;*
*City of Fulton, AR; City of Garfield, AR; City of*
*Garland, AR; City of Garner, AR; City of*
*Gassville, AR; City of Gateway, AR; City of*
*Gentry, AR; City of Georgetown, AR; City of*
*Gilbert, AR; City of Gillett, AR; City of Gillham,*
*AR; City of Gilmore, AR; City of Glenwood, AR;*
*City of Goshen, AR; City of Gosnell, AR; City of*
*Gould, AR; City of Grady, AR; City of Grannis,*
*AR; City of Gravette, AR; City of Green Forest,*
*AR; City of Greenbrier, AR; City of Greenland,*
*AR; City of Greenway, AR; City of Greenwood,*
*AR; City of Greers Ferry, AR; City of Griffithville,*

38

*AR; City of Grubbs, AR; City of Guion, AR; City of Gum Springs, AR; City of Gurdon, AR; City of Guy, AR; City of Hackett, AR; City of Hamburg, AR; City of Hampton, AR; City of Hardy, AR; City of Harrell, AR; City of Harrisburg, AR; City of Harrison, AR; City of Hartford, AR; City of Hartman, AR; City of Haskell, AR; City of Hatfield, AR; City of Havana, AR; City of Haynes, AR; City of Hazen, AR; City of Heber Springs, AR; City of Hector, AR; City of Helena-West Helena, AR; City of Hermitage, AR; City of Hickory Ridge, AR; City of Higden, AR; City of Higginson, AR; City of Highfill, AR; City of Highland, AR; City of Hindsville, AR; City of Holland, AR; City of Holly Grove, AR; City of Hope, AR; City of Horatio, AR; City of Horseshoe Bend, AR; City of Horseshoe Lake, AR; City of Houston, AR; City of Hoxie, AR; City of Hughes, AR; City of Humnoke, AR; City of Humphrey, AR; City of Hunter, AR; City of Huntington, AR; City of Huntsville, AR; City of Huttig, AR; City of Imboden, AR; City of Jacksonport, AR; City of Jasper, AR; City of Jennette, AR; City of Jericho, AR; City of Jerome, AR; City of Johnson, AR; City of Joiner, AR; City of Judsonia, AR; City of Junction City, AR; City of Keiser, AR; City of Kensett, AR; City of Keo, AR; City of Kibler, AR; City of Kingsland, AR; City of Knobel, AR; City of Knoxville, AR; City of La Grange, AR; City of Lafe, AR; City of Lake City, AR; City of Lake View, AR; City of Lake Village, AR; City of Lakeview, AR; City of Lamar, AR; City of Lavaca, AR; City of Leachville, AR; City of Lead Hill, AR; City of Leola, AR; City of Lepanto, AR; City of Leslie, AR; City of Letona, AR; City of Lewisville, AR; City of Lexa, AR; City of Lincoln, AR; City of Little Flock, AR; City of Lockesburg, AR; City of London, AR; City of Lonoke, AR; City of Lonsdale, AR; City of Louann, AR; City of Lowell, AR; City of Luxora, AR; City of Lynn, AR; City of Madison, AR; City of Magazine, AR; City*

39

*of Magness, AR; City of Magnolia, AR; City of Malvern, AR; City of Mammoth Spring, AR; City of Manila, AR; City of Mansfield, AR; City of Marianna, AR; City of Marie, AR; City of Marion, AR; City of Marked Tree, AR; City of Marmaduke, AR; City of Marshall, AR; City of Marvell, AR; City of Maumelle, AR; City of Mayflower, AR; City of Maynard, AR; City of Mccaskill, AR; City of Mccrory, AR; City of Mcdougal, AR; City of Mcgehee, AR; City of Mcnab, AR; City of Mcneil, AR; City of Mcrae, AR; City of Melbourne, AR; City of Mena, AR; City of Menifee, AR; City of Midland, AR; City of Mineral Springs, AR; City of Minturn, AR; City of Mitchellville, AR; City of Monette, AR; City of Montrose, AR; City of Moorefield, AR; City of Moro, AR; City of Morrilton, AR; City of Morrison Bluff, AR; City of Mount Ida, AR; City of Mount Pleasant, AR; City of Mount Vernon, AR; City of Mountain Home, AR; City of Mountain Pine, AR; City of Mountain View, AR; City of Mountainburg, AR; City of Mulberry, AR; City of Murfreesboro, AR; City of Nashville, AR; City of Newark, AR; City of Newport, AR; City of Nimmons, AR; City of Norfork, AR; City of Norman, AR; City of Norphlet, AR; City of O'kean, AR; City of Oak Grove, AR; City of Oak Grove Heights, AR; City of Oakhaven, AR; City of Oden, AR; City of Ogden, AR; City of Oil Trough, AR; City of Okolona, AR; City of Ola, AR; City of Omaha, AR; City of Oppelo, AR; City of Osceola, AR; City of Oxford, AR; City of Ozan, AR; City of Ozark, AR; City of Palestine, AR; City of Pangburn, AR; City of Paragould, AR; City of Paris, AR; City of Parkdale, AR; City of Parkin, AR; City of Patmos, AR; City of Patterson, AR; City of Pea Ridge, AR; City of Peach Orchard, AR; City of Perla, AR; City of Perry, AR; City of Perrytown, AR; City of Perryville, AR; City of Piggott, AR; City of Pindall, AR; City of Pineville, AR; City of*

*Plainview, AR; City of Pleasant Plains, AR; City of Plumerville, AR; City of Pocahontas, AR; City of Pollard, AR; City of Portia, AR; City of Portland, AR; City of Pottsville, AR; City of Powhatan, AR; City of Poyen, AR; City of Prairie Grove, AR; City of Prattsville, AR; City of Prescott, AR; City of Pyatt, AR; City of Quitman, AR; City of Ratcliff, AR; City of Ravenden, AR; City of Ravenden Springs, AR; City of Rector, AR; City of Redfield, AR; City of Reed, AR; City of Reyno, AR; City of Rison, AR; City of Rockport, AR; City of Roe, AR; City of Rondo, AR; City of Rose Bud, AR; City of Rosston, AR; City of Rudy, AR; City of Russell, AR; City of Russellville, AR; City of Salem, AR; City of Salesville, AR; City of Scranton, AR; City of Searcy, AR; City of Sedgwick, AR; City of Shannon Hills, AR; City of Sheridan, AR; City of Sherrill, AR; City of Shirley, AR; City of Sidney, AR; City of Siloam Springs, AR; City of Smackover, AR; City of Smithville, AR; City of South Lead Hill, AR; City of Sparkman, AR; City of Springtown, AR; City of St. Charles, AR; City of St. Francis, AR; City of St. Joe, AR; City of St. Paul, AR; City of Stamps, AR; City of Star City, AR; City of Stephens, AR; City of Strawberry, AR; City of Strong, AR; City of Stuttgart, AR; City of Subiaco, AR; City of Success, AR; City of Sulphur Rock, AR; City of Sulphur Springs, AR; City of Summit, AR; City of Sunset, AR; City of Swifton, AR; City of Taylor, AR; City of Thornton, AR; City of Tillar, AR; City of Tinsman, AR; City of Tollette, AR; City of Tontitown, AR; City of Traskwood, AR; City of Trumann, AR; City of Tuckerman, AR; City of Tull, AR; City of Tupelo, AR; City of Turrell, AR; City of Twin Groves, AR; City of Tyronza, AR; City of Ulm, AR; City of Valley Springs, AR; City of Van Buren, AR; City of Vandervoort, AR; City of Victoria, AR; City of Vilonia, AR; City of Viola, AR; City of Wabbaseka, AR; City of Waldenburg, AR; City of Waldo, AR; City of Waldron, AR; City*

41

*of Walnut Ridge, AR; City of Ward, AR; City of Warren, AR; City of Washington, AR; City of Watson, AR; City of Weiner, AR; City of Weldon, AR; City of West Fork, AR; City of West Memphis, AR; City of West Point, AR; City of Western Grove, AR; City of Wheatley, AR; City of Whelen Springs, AR; City of White Hall, AR; City of Wickes, AR; City of Widener, AR; City of Wiederkehr Village, AR; City of Williford, AR; City of Willisville, AR; City of Wilmar, AR; City of Wilmot, AR; City of Wilson, AR; City of Wilton, AR; City of Winchester, AR; City of Winslow, AR; City of Winthrop, AR; City of Wooster, AR; City of Wrightsville, AR; City of Wynne, AR; City of Yellville, AR; and City of Zinc, AR;*

John B. White, Jr. (S.C. Bar No. 5996)
Marghretta H. Shisko (S.C. Bar No. 100106)
JOHN B. WHITE, JR. P.A.
291 S. Pine Street
P.O. Box 2465 (29304)
Spartanburg, SC  29302
(864) 594-5988
jwhite@johnbwhitelaw.com
mshisko@johnbwhitelaw.com

*Counsel for Petitioners Aiken County, SC; Anderson County, SC; Calhoun County, SC; Cherokee County, SC; Chester County, SC; Dillon County, SC; Edgefield County, SC; Florence County, SC; Greenville County, SC; Greenwood County, SC; Horry County, SC; Lancaster County, SC; Laurens County, SC; Marion County, SC; Marlboro County, SC; McCormick County, SC; Newberry County, SC; Oconee County, SC; Pickens County, SC; Spartanburg County, SC; Sumter County, SC; Union County, SC; and York County, SC*

Joseph J. Cappelli

42

Marc J. Bern & Partners LLP
101 West Elm Street, Ste. 520
Conshohocken, PA 19428
(610) 941-4444
jcappelli@bernllp.com

*Counsel for Petitioners Abbeville County, SC;
Allendale County, SC; Bamberg County, SC;
Barnwell County, SC; Beaufort County, SC;
Chesterfield County, SC; Clarendon County, SC;
Colleton County, SC; Dorchester County, SC;
Fairfield County, SC; Hampton County, SC;
Jasper County, SC; Kershaw County, SC and
Kershaw County Hospital Board; Lee County, SC;
Orangeburg County, SC; Saluda County, SC;
Williamsburg County, SC; and City of Myrtle
Beach, SC*

John S. Simmons
Simmons Law Firm, LLC
1711 Pickens Street
Columbia, SC 29201
(803) 779-4600
jsimmons@simmonslawfirm.com

*Counsel for Petitioner Lexington County, SC*

## CERTIFICATE OF COMPLIANCE

The foregoing petition complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 7,800 words, excluding accompanying documents required by Fed. R. App. P. 21(a)(2)(C) and items excluded from any length computation per Fed. R. App. P. 32(f). The words are counted using the word-count function on Microsoft Word 2016 software.

This petition complies with the requirements of Fed. R. App. P. 32(a) and Fed. R. App. P. 32(c)(2) because it has been prepared using Microsoft Word 2016 in Times New Roman, 14-point font.

*/s/ S. Ann Saucer*
S. Ann Saucer

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of May 2022, a copy of this petition, appendix, and exhibits was filed electronically through this Court's CM/ECF system.

I further certify that service on counsel for all parties in the district court has been accomplished via notice filed through the district court's CM/ECF system attaching a copy of this filing.

*/s/ S. Ann Saucer*
S. Ann Saucer

45

# APPENDIX

| Exhibit No. | Description | Location in Record | Page ID Range |
|---|---|---|---|
| 1 | Ongoing Common Benefit Order | 1:17-md-02804, Doc. 4428 | 516405-516422 |
| 2 | Order, *In re Harris County, TX* | 21-3637, Doc. 6-1 | Pages 1-5 |
| 3 | Remand Order | 1:17-md-02804, Doc. 4335 | 575458-575459 |
| 4 | Remand Order | 1:17-md-02804, Doc. 4341 | 575661-575662 |
| 5 | Docket Sheet excerpts, Entry for Document 4428 (omitting Related Document number identification) | 1:17-md-02804 | N/A |
| 6 | Amended Motion for Entry of Order Establishing Common Benefit Fund | 1:17-md-02804, Doc. 3112 | 481997-482011 |
| 7 | Report and Recommendation Addressing Motion for Common Benefit Fund | 1:17-md-02804, Doc. 3319 | 494887-494896 |
| 8 | County of Harris' Brief in Response to Professor Rubenstein's Report and Recommendation | 1:17-md-02804, Doc. 3350 | 495854-495876 |
| 9 | Order Establishing Common Benefit Fee Fund and Directly Certain Payments | 1:17-md-02804, Doc. 3794 | 514769-514774 |
| 10 | MDL 2804: Second Amended Notice of ARCOS Disclosure | 1:17-md-02804, Doc. 1613 | 45100-45103 |
| 11 | The Mayor and City Council of Baltimore's Request as Amicus Curiae for Modification of the Court's August 12, 2021 Order | 1:17-md-02804, Doc. 3888 | 534813-534825 |
| 12 | Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and | 1:17-md-02804, Doc. 3828 | 516405-516422 |

46

| | Distribution Process, and Approve Common Benefit Cost Payment and Assessment | | |
|---|---|---|---|
| 13 | Motion to Establish Application Protocols to the Arbitration Fee Panel for Reimbursement of Attorney Fees and Costs Under the Janssen Texas State-Wide Opioid Settlement Agreement and the Distributors Texas Settlement Agreement | *In re: Texas Opioid Litigation*, No. 2018-63587 | Pages 1-334 |
| 14 | ESI Production Protocol | *In re: Texas Opioid Litigation*, No. 2018-63587 | Pages 1-20 |
| 15 | Protocol for Coordination with the National MDL | *In re: Texas Opioid Litigation*, No. 2018-63587 | Pages 1-10 |
| 16 | Case Management Order No. 2 | In re: South Carolina Opioid Litigation, Case No. 2018-CP-23-01294 | Pages 1-4 |
| 17 | Opioid Participation Agreement | 1:17-md-02804, Doc. 3352-3 | 495961-495967 |
| 18 | Order Appointing Leadership for the Plaintiffs | *In re: Texas Opioid Litigation*, No. 2018-63587 | Pages 1-2 |



KIMBERLY LAMBERT ADAMS
BRIAN H. BARR
MICHAEL C. BIXBY
M. ROBERT BLANCHARD
BRANDON L. BOGLE
W. TROY BOUK
WESLEY A. BOWDEN
VIRGINIA M. BUCHANAN
WILLIAM F. CASH III
JEFF GADDY
REBECCA D. GILLILAND
*(LICENSED ONLY IN ALABAMA)*

RACHAEL R. GILMER
FREDRIC G. LEVIN
MARTIN H. LEVIN
ROBERT M. LOEHR
STEPHEN A. LUONGO
M. JUSTIN LUSKO
NEIL E. McWILLIAMS, JR.
CLAY MITCHELL
PETER J. MOUGEY
DANIEL A. NIGH
TIMOTHY M. O'BRIEN

MIKE PAPANTONIO
CHRISTOPHER G. PAULOS
EMMIE J. PAULOS
A. RENEE PRESTON
ROBERT E. PRICE
MARK J. PROCTOR
TROY A. RAFFERTY
MATTHEW D. SCHULTZ
W. CAMERON STEPHENSON
THOMAS A. TAYLOR
LEO A. THOMAS
BRETT VIGODSKY

OF COUNSEL:
LAURA S. DUNNING
*(LICENSED ONLY IN ALABAMA)*
BEN W. GORDON, JR.
ARCHIE C. LAMB, JR.
PAGE A. POERSCHKE
CHRISTOPHER V. TISI
*(LICENSED IN WASHINGTON, D.C.
AND MARYLAND)*

LEFFERTS L. MABIE, JR. (1925-1996)
D.L. MIDDLEBROOKS (1926-1997)
DAVID H. LEVIN (1928-2002)
STANLEY B. LEVIN (1938-2009)

### RE: MDL 2804: SECOND AMENDED NOTICE OF ARCOS DISCLOSURE

Dear Counsel:

You are receiving this letter from the Plaintiffs' Executive Committee of *In re National Opioid Prescription Litigation*, MDL No. 2804.  This letter explains how you may obtain, without charge, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there.

By way of background, ARCOS (Automation of Reports and Consolidated Orders System) is an automated, comprehensive drug reporting system administered by the DEA which monitors the flow of controlled substances from (1) their point of manufacture through (2) commercial distribution channels to (3) point of sale or dissemination at the dispensing/retail level (such as hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions). All DEA registrants who manufacture and/or distribute controlled substances are required to report to ARCOS.

In the MDL litigation, the DEA produced a subset of ARCOS Data reflecting all transactions nationally by every registered manufacturer and distributor of opioid drug products. In total, the ARCOS Data produced by the DEA has 500,709,803 transaction records. In order for the data to be useful, the Opioid MDL Executive Committee hired a strategic litigation consulting group out of Washington, D.C. to process, validate and augment the opioid ARCOS data. In doing so, the consulting group made certain corrections to and exclusions from the county-level processed ARCOS data, which are explained in the attached **Appendix**.

Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you without charge the unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA.

The PEC has found, however, that the data was not useful as received, so we spent extensive resources making it useful. We are also providing you, again without charge, access to the result of that investment.  The PEC's ARCOS website allows you to go straight to the county-level processed ARCOS data and county-level reports and download the information you need in order to understand from the ARCOS database exactly which opioid products flowed into your clients' jurisdictions and how they got there. While you have the right to download the unprocessed ARCOS data and process it yourself, we urge you to avoid that step and instead simply access the PEC's processed ARCOS data and reports.

**EXHIBIT 10**

To obtain either the unprocessed ARCOS data or access to the PEC's ARCOS website, please contact ARCOSRequest@levinlaw.com.

Sincerely,

Peter J. Mougey
On Behalf of the Plaintiffs' Executive
Committee

## Appendix:  Exclusions/Corrections to the ARCOS Data
## Reflected in the County-Level Reports

a. Duplicate transactions are excluded when the same transaction was reported to ARCOS more than once by the same registrant. [1]

b. Transactions are excluded where the Drug Code from the NDC dictionary is not one of the 14 opioids tracked by the DEA.

c. Transactions are excluded when the Action Indicator code, Correction Number, or both suggest the reported transaction is erroneous.

d. All transactions involving reverse distributors, analytical labs, importers, exporters, or researchers are excluded.

e. Transactions between two registrants are excluded when the transaction is reported by the registrant *receiving* the shipment, because the transaction was already reported to ARCOS by the registrant *sending* the shipment.

f. Transactions with obvious errors in the reported Quantity are excluded.

g. Transactions with Transaction Code "X" (Lost-in- Transit) are excluded, because "Transaction Code X" is an explanatory code which does not affect an ARCOS registrant's inventory.[2]

h. The Calculated Base Weight in Grams was corrected when it was calculated using an incorrect Ingredient Base Weight from the NDC dictionary.

---

[1] The ARCOS Data had 610,381 duplicate transactions in December 2007 for one of the Cardinal Health distribution centers (Seller DEA Number: RC0221236). All but one of each set of exact duplicate transactions was excluded.
[2] ARCOS Handbook, §5.8.3, p. 5-19.

i. Where the ARCOS Data (NDC, Drug Code, and Drug Name) differed from the NDC Dictionarythe ARCOS Data was updated to reflect the information in the November 2018 NDC Dictionary.[3]

j. For clarity, the trade name of the drug product ("Trade/Product Name") and the dosage form ("Package Measure") were added to the ARCOS Data using the NDC Dictionary.

k. Deletion requests and originally-reported transactions are excluded where: (1) they cancel each other out, or (2) the ARCOS Data already includes an adjusted or corrected transaction.

---

[3] The DEA's NDC dictionary is available at www.deadiversion.usdoj.gov/arcos/ndc/ndcfile.txt. The dictionary is explained at www.deadiversion.usdoj.gov/arcos/ndc/readme.txt. The DEA updates the NDC dictionary monthly to correct errors, add new drug products, and remove discontinued drug products. The consultant used the NDC dictionary updated on November 1, 2018, plus any discontinued drug products from earlier versions of the NDC dictionary in May 2018 –October 2018. An alternative NDC dictionary is maintained by the FDA (www.accessdata.fda.gov/scripts/cder/ndc/index.cfm).

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| All Cases | |

## THE MAYOR AND CITY COUNCIL OF BALTIMORE'S REQUEST AS *AMICUS CURIAE* FOR MODIFICATION OF THE COURT'S AUGUST 12, 2021 ORDER APPROVING COMMON BENEFIT ASSESSMENT

The Mayor and City Council of Baltimore ("the City") requests as *amicus curiae*[1] that the Court modify its August 12, 2021 order approving a common benefit assessment. Doc # 3828. Without requiring notice to state court plaintiffs or giving state court plaintiffs an opportunity to be heard, the Court's August 12 order granted the Plaintiffs' Executive Committee's ("PEC") August 10, 2021 motion, Doc. # 3823, and required non-settling state court plaintiffs to contribute 7.5% of their settlements and judgments to the PEC. The Court lacks jurisdiction over state court plaintiffs and cannot require them to contribute to the PEC from their own settlements and judgments.

---

[1] The City's filing of this request as an "interested party" and *amicus curiae* is made without consenting to this Court's jurisdiction—and without prejudice to the City's and its attorneys' rights to contest this Court's jurisdiction—over the City, its counsel Susman Godfrey LLP, or Case No. 24-C-18-000515 pending in the Circuit Court for Baltimore City, Maryland, and without prejudice to the City's right to seek appellate review of any order the Court enters regarding the common benefit fund.

**EXHIBIT**
**11**

Case: 1:17-md-02804-DAP  Doc #: 4598-1  Filed:  08/02/22  130 of 280.  PageID #: 594406
Case: 22-3493    Document: 1-3    Filed: 05/27/2022    Page: 89
Case: 1:17-md-02804  Doc #: 3888  Filed:  08/24/21  2 of 13.  PageID #: 534814

The City thought the PEC understood this. The PEC told this Court as recently as June 2021 that it would not seek to impose common benefit fund assessments on "any state court plaintiff that is not subject to the Court's jurisdiction," Doc. # 3765 at 2, and this Court recognized that commitment in its July 22, 2021 order approving the creation of a common benefit fund, Doc. # 3794 at 3. But with its August 10 motion, the PEC abandoned its past representations and sought an improper cash grab from any state court litigant that accepted ARCOS data from the PEC.

This Court lacks jurisdiction to force state court plaintiffs like the City to contribute to the PEC, and the PEC's attempt to force contribution from state court plaintiffs lacks merit for three additional reasons: (1) Supreme Court case law does not permit the PEC to impose a common benefit fund assessment on litigants that reach their own settlements, (2) the exorbitant 7.5% assessment (which is greater than the 7% assessment the PEC initially sought, Doc. # 3112) bears no relation to the benefit the PEC conferred on state court plaintiffs by providing the ARCOS data a few weeks before the data became publicly available, and (3) the PEC should be estopped from demanding payment for the ARCOS data because the PEC promised state court plaintiffs they would receive the ARCOS data "without charge," and state court plaintiffs detrimentally relied on that promise by withdrawing their own Touhy requests to obtain the data.

The Court should modify and strike the portion of its order that imposes a 7.5% assessment on state court litigants that reach their own settlements or judgments. Like many other state court plaintiffs, the City is actively litigating its own case, taking its own depositions, and developing its own expert work. There is no legal basis for the PEC to expect contribution from the City or any other state court plaintiff that obtains its own settlement or judgment, and the Court lacks jurisdiction to require contribution from state court plaintiffs.

Case: 1:17-md-02804-DAP Doc #: 4598-1 Filed: 08/02/22 131 of 280. PageID #: 594407
Case: 22-3493 Document: 1-3 Filed: 05/27/2022 Page: 90
Case: 1:17-md-02804 Doc #: 3888 Filed: 08/24/21 3 of 13. PageID #: 534815

# BACKGROUND

## I. In 2018 and 2019, the Court streamlined the process for obtaining ARCOS data, and it did not require litigants obtaining the data to pay the PEC

In mid-2018, the Court issued a series of orders that required the DEA to produce to the MDL plaintiffs ARCOS data from the period 2006 to 2014. Doc. #s 233, 397, 668. The Court first ordered the production of ARCOS data related to six bellwether states and then expanded its order to cover all ARCOS data for the entire United States. Doc. #s 233, 397.

On April 12, 2019, with the agreement of DOJ, DEA, and the MDL plaintiffs, the Court issued an opinion and consolidated ARCOS protective order, which allowed state court litigants to obtain the ARCOS data. Doc. # 1545. As the PEC explained in its March 15, 2019 motion seeking this order, Doc. # 1447, the order relieved the DOJ and DEA of the burden of having to respond to thousands of Touhy requests and made sure litigants across the country had access to the ARCOS data. This Court did not indicate in its April 12, 2019 order or in any of its rulings that state court litigants or anyone else would have to pay the PEC for the ARCOS data.

A few weeks after the Court's April 12, 2019 order, the PEC made the ARCOS data available to state court litigants. The PEC explained what it was doing in a May 6, 2019 letter to state court litigants, which stated three times that the PEC was providing the data "***without charge***." Ex. 1 (emphasis added). The PEC stated in the first paragraph of its letter that "This letter explains how you may obtain, ***without charge***, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there." Ex. 1 at 1 (emphasis added). The PEC explained that this Court was making the data available free of charge in accordance with an agreement with the DEA: "Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you ***without charge*** the

Case: 1:17-md-02804-DAP  Doc #: 4598-1  Filed:  08/02/22  132 of 280.  PageID #: 594408
Case: 22-3493    Document: 1-3    Filed: 05/27/2022    Page: 91
Case: 1:17-md-02804  Doc #: 3888  Filed:  08/24/21  4 of 13.  PageID #: 534816

unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA." Ex. 1 at 1 (emphasis added). The PEC explained that it took certain steps to filter the data and that "[w]e are also providing you, ***again without charge***, access to the result of that investment." Ex. 1 at 1 (emphasis added). The PEC even "urged" state court plaintiffs not to do their own data processing: "While you have the right to download the unprocessed ARCOS data and process it yourself, ***we urge you to avoid that step*** and instead simply access the PEC's processed ARCOS data and reports." Ex. 1 at 1 (emphasis added).

The PEC's letter could not have been clearer about two points: (1) state court litigants would receive the ARCOS data free of charge, and (2) there was no need for state court litigants to obtain or process the data on their own. Now, the PEC is doing an about-face on both points and saying that state court litigants have to pay the PEC because they did not process their own data. The Court should not tolerate this bait and switch.

The City took the PEC's letter at face value and relied on it in making decisions about how to develop its case. At the time the City learned that it would be able to receive the ARCOS data from the PEC, it had a pending Touhy request and had been in communication with the DOJ about obtaining the ARCOS data. After the data became available through the MDL, the DOJ requested that the City withdraw its Touhy request, and the City agreed to do so. The City would not have withdrawn its Touhy request if it had known the MDL PEC planned to charge a 7.5% assessment for using the ARCOS data, contrary to the PEC's representations that the data was available "without charge."

Just a short time after the City received the data from the PEC, the data became publicly available. On July 15, 2019, following a successful appeal by *The Washington Post* and several

4

Case: 1:17-md-02804-DAP   Doc #: 4598-1   Filed:  08/02/22   133 of 280.   PageID #: 594409
Case: 22-3493     Document: 1-3     Filed: 05/27/2022     Page: 92
Case: 1:17-md-02804   Doc #: 3888   Filed:  08/24/21   5 of 13.   PageID #: 534817

other media organizations, the Court lifted the ARCOS protective order as to all pre-2013 ARCOS data. Doc. # 1845. The Court later allowed the release of ARCOS data for 2013 and 2014, the full span of ARCOS data available in the MDL.

By January 17, 2020, the complete 2006 to 2014 ARCOS data was on *The Washington Post*'s website, where it remains today. Visitors to that site are able to download the 2006-2014 raw data for any county they choose (unlike through the MDL-approved process, which only allowed a county to get data for its own county, Doc. # 668). *See Drilling into the DEA's pain pill database*, Washington Post (Jan. 17, 2020), https://www.washingtonpost.com/graphics/2019/ investigations/dea-pain-pill-database/. Visitors can also download distributor, manufacturer, and pharmacy data for any county in the country and see with a few clicks of a button the five distributors, manufacturers, and pharmacies that were responsible for the most opioids in any county in the country.

## II.     In 2020, the PEC sought to impose a common benefit fund assessment on all opioid plaintiffs but later accepted that the Court lacked jurisdiction over state court plaintiffs

On January 28, 2020, the PEC moved for entry of an order establishing a common benefit fund. Doc. # 3112. On February 4, 2020, the Court issued a scheduling order calling for all interested parties to respond to the PEC's motion by February 28, 2020. The City and many other interested parties filed oppositions to the common benefit fund. Doc. # 3191. The City's opposition and several other oppositions explained that the PEC's proposed common benefit fund improperly sought to require contribution from state court plaintiffs that were beyond the Court's jurisdiction. Doc. # 3191 at 3–6. On July 27, 2020, the Court denied the PEC's common benefit fund motion without prejudice to refiling. Doc. # 3397.

A year later, the PEC filed a motion seeking to establish a common benefit fund that would receive funds from the Summit and Cuyahoga settlement holdback. In a June 22, 2021 supplemental brief supporting the common benefit fund motion, the PEC told the MDL Court:

> The PEC clarifies that no common benefit fee or litigation expense reimbursement will be charged against any settlement proceeds or judgment paid to any State Attorney General, or to any state court plaintiff that is not subject to the Court's jurisdiction (unless that plaintiff or counsel executed a participation agreement), consistent with the Court's prior order (Doc. # 358).

Doc. # 3765 at 2. On July 22, 2021, the Court established the common benefit fund. Doc. # 3794. The Court stated in its order that the PEC had explained to the Court that "with regard to any future common benefit Order, the PEC will not seek to make it applicable to settlement proceeds or judgments payable to a State Attorney General, ***nor to any state court plaintiff that is entirely outside of the Court's jurisdiction (with certain understandable exceptions)***." Doc. # 3794 at 3 (emphasis added).

## III. Contrary to its representations, the PEC's August 10 motion sought to impose common-benefit fund assessments on state court plaintiffs, and this Court granted the motion

Less than two months after the PEC told the Court it would not seek a common benefit fund assessment from "any state court plaintiff that is not subject to the Court's jurisdiction," the PEC sought to do just that. In its August 10, 2021 motion, the PEC asked the Court to impose a 7.5% assessment on any state court plaintiff that received ARCOS data from the PEC, Doc. # 3823 at 17–19, even though the PEC had told state court plaintiffs they would receive the data "without charge." This change of position would be problematic enough if the ARCOS data was proprietary PEC data, but it is sitting on *The Washington Post*'s website for anyone to review and download.

On August 12, 2021, two days after the PEC filed the motion, the Court granted the PEC's motion without requiring notice to state court litigants or providing an opportunity for a

Case: 1:17-md-02804-DAP  Doc #: 4598-1  Filed:  08/02/22  135 of 280.  PageID #: 594411
Case: 22-3493    Document: 1-3    Filed: 05/27/2022    Page: 94
Case: 1:17-md-02804  Doc #: 3888  Filed:  08/24/21  7 of 13.  PageID #: 534819

response. This procedure violated the due process rights of state court plaintiffs, and at the very least, the Court should call for a response from state court plaintiffs and consider, on the basis of the responses received, modifying the August 12 order and striking the portion of that order that allows the PEC to impose a 7.5% assessment on state court settlements and judgments.

## ARGUMENT

In 2020, this Court received briefing from numerous interested parties on how to structure a common benefit fund. That briefing made clear that this Court lacks jurisdiction over state court plaintiffs like the City, which have non-MDL counsel and did not sign a participation agreement with the MDL plaintiffs. The Court declined to implement a common benefit fund in 2020, and for a time the PEC accepted the uniform case law establishing that this Court lacks jurisdiction over state court plaintiffs. Now that the PEC is trying to secure sufficient support for a $26 billion settlement that will contribute billions in attorney's fees to the PEC, the PEC has had a change in tune. It sought to impose a fine on any state court plaintiff that opts out of the settlement, in an apparent effort to discourage those state court plaintiffs from depriving the PEC of substantial attorney's fees or derailing the settlement altogether.

In its August 10 motion, the PEC still could not show that the Court has jurisdiction over state court plaintiffs—it does not—so the PEC urged the Court to use its jurisdiction over the ARCOS data to assess a "back-end, contingent assessment of 7.5%" on all state court plaintiffs that used the ARCOS data. Doc. # 3823 at 18. The PEC's proposal suffered from numerous defects, and the Court should modify the portion of its August 12 order that required this unjustified post hoc assessment from state court plaintiffs.

## I.     This Court lacks jurisdiction over state court plaintiffs like the City

In its February 27, 2020 opposition to amended motion for entry of order establishing common benefit fund, the City explained that this Court lacks jurisdiction to impose a common

Case: 1:17-md-02804-DAP  Doc #: 4598-1  Filed:  08/02/22  136 of 280.  PageID #: 594412
Case: 22-3493    Document: 1-3    Filed: 05/27/2022    Page: 95
Case: 1:17-md-02804  Doc #: 3888  Filed:  08/24/21  8 of 13.  PageID #: 534820

benefit fund assessment on state court litigants, and the City incorporates its opposition here. Doc. # 3191 at 3–6. In its briefing, the City explained that this Court has already recognized that it lacks jurisdiction over state courts, Doc. No. 643 at 4, and that federal appellate courts have repeatedly and uniformly rejected the position that a federal court may exercise jurisdiction over state court proceedings and force state court litigants to contribute to a federal common benefit fund. *In re Genetically Modified Rice Litigation*, 764 F.3d 864, 874 (8th Cir. 2014) (holding that the district court lacked the authority to "order parties in cases not before it to contribute to the Fund"); *In re Showa Denko K.K. L-Trytophan Products Liability Litigation-II*, 953 F.2d 162, 166 (4th Cir. 1992) (holding that the district court "simply has no power to extend the obligations" of its common benefit fund order to state court plaintiffs); *Hartland v. Alaska Airlines*, 544 F.2d 992, 1001 (9th Cir. 1976) (holding that the district court "had not even a semblance of jurisdiction—original, ancillary, or pendent—to order anything or anybody, and least of all to compel lawyers who were not parties to the action to pay $3,250 into a fund").

The PEC cannot create jurisdiction over the City and its litigation based on the City's use of ARCOS data. The PEC cites nothing that would allow this Court to establish jurisdiction over any entity that received ARCOS data. The Court certainly never provided notice to state court plaintiffs that they were subjecting themselves to the jurisdiction of the Court because they were receiving ARCOS data, a premise that is not constitutionally sound and derives no support from the case law. The Court does not even have any control over the data at this point given that the Court lifted its ARCOS protective order and allowed the data to become publicly available and disseminated widely. The Court cannot force subdivisions beyond its jurisdictional reach to contribute to the PEC on the basis that the subdivisions received data from the PEC years ago that became publicly available a few weeks after the PEC provided it.

Case: 1:17-md-02804-DAP   Doc #: 4598-1   Filed: 08/02/22   137 of 280.   PageID #: 594413
Case: 22-3493   Document: 1-3   Filed: 05/27/2022   Page: 96
Case: 1:17-md-02804   Doc #: 3888   Filed: 08/24/21   9 of 13.   PageID #: 534821

The Court's lack of jurisdiction should end the matter, but there are three additional reasons that the Court should modify the portion of its order that imposes a common benefit fund assessment on state court plaintiffs that received ARCOS data from the PEC.

## II.   Supreme Court case law does not support the Court imposing a common benefit assessment on litigants that reach their own settlements

In the City's February 27, 2020 opposition, the City explained that exacting a common benefit fund assessment on the City's case would be inconsistent with the Supreme Court's common benefit fund jurisprudence if the City reached its own settlement, and the City incorporates that briefing here. Doc. # 3191 at 6–9. In its February 27, 2020 opposition, the City cited *Boeing Co. v. Van Gemert*, in which the Supreme Court explained:

> Since the decision in *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882), and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 5. S.Ct. 387, 28 L.Ed. 915 (1885), this Court has recognized consistently that a litigant or a lawyer ***who recovers a common fund for the benefit of persons other than himself or his client*** is entitled to a reasonable attorney's fee from the fund as a whole. See *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); cf. *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).

444 U.S. 472, 478 (1980) (emphasis added). The Supreme Court further explained that the "doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense" and "[j]urisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Id.*

At the time the City filed its February 27, 2020 opposition, it was unknown what the settlement structure would look like, but now it is clear that the PEC's proposed assessment on state court litigants directly conflicts with *Boeing*. The PEC's August 10, 2021 motion sought a 7.5% assessment ***only*** from "cases resolved outside the Settlement Agreement." Doc. # 3823 at

2. The PEC will not generate settlement funds for the cases resolved outside the Settlement Agreement, and contribution is not appropriate under *Boeing*.

If the City opts out of the settlement, the City will not receive the benefits of the PEC's settlement, and no assessment is appropriate under Supreme Court case law. Opt-out state court plaintiffs' attorneys, like the City's attorneys, will have to continue litigating their cases in order to achieve recoveries, so under the common benefit fund jurisprudence, it is inappropriate to apply the common benefit fund requirement to state court plaintiffs. *See also In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019 (5th Cir. 1977) (holding that "[o]ne who hires and pays his own lawyer is not a free rider if the attorney is a contributor to the final results" and approving the district court's decision to "exclud[e] from the 8% contributions attorneys who continued to be active").

### III.  The 7.5% assessment impermissibly bears no relation to the benefit state court plaintiffs received from having access to ARCOS data a few weeks before it became publicly available

The 7.5% assessment is also improper because it bears no relationship to the benefit that state court plaintiffs received from obtaining the ARCOS data from the PEC. In *Boeing*, when upholding the common benefit fund, the Supreme Court relied on the guidance of its prior holding in *Alyeska Pipeline Service Co. v. Wilderness Society* that a common benefit fund is appropriate where "the benefits could be traced with some accuracy" and "there was reason for confidence that the costs of litigation could indeed be shifted with some exactitude to those benefiting." 444 U.S. at 479 (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 265 n.39 (1980)) (internal quotation marks omitted) (alterations omitted).

The benefits of the PEC providing the ARCOS data to state court plaintiffs are not traceable with any accuracy, and they are certainly not worth a 7.5% assessment, which could amount to tens or hundreds of millions of dollars. The PEC provided the ARCOS data to state

Case: 1:17-md-02804-DAP  Doc #: 4598-1  Filed:  08/02/22  139 of 280.  PageID #: 594415
Case: 22-3493     Document: 1-3     Filed: 05/27/2022     Page: 98
Case: 1:17-md-02804  Doc #: 3888  Filed:  08/24/21  11 of 13.  PageID #: 534823

court plaintiffs starting in May 2019. Within a few weeks, the data was made publicly available for the years 2006 through 2012, and by January 2020, the full span of ARCOS data was publicly available on *The Washington Post*'s website.

As justification for the substantial assessment, the PEC points to the work they did to "organize and analyze" the data, but they overstate the importance of this work. Doc. No. 3823 at 18. The PEC's work consisted of filtering the data to show which distributors, manufacturers, and pharmacies provided the opioids. It was not complicated work, and if the City had known that the PEC might charge tens of millions of dollars for it (contrary to the PEC's representations that it was provided "without charge"), the City would have done its own work during the two years it has had the data. *The Washington Post*, moreover, has replicated much of the PEC's work, providing a user friendly interface that shows the five distributors, manufacturers, and pharmacies that provided the most opioids in every county in the country, and providing a ranking of all the distributors, manufacturers, and pharmacies that provided opioids to a county. No assessment is appropriate at all, and the 7.5% assessment bears no relationship to the marginal benefit the PEC provided state court plaintiffs. !

## IV. State court plaintiffs detrimentally relied on the PEC's promise that data was available without charge, so the PEC should be estopped from applying a retroactive assessment

In its May 6, 2019 letter to state court plaintiffs, the PEC told state court plaintiffs ***three times*** they would receive the ARCOS data "without charge," and state court litigants like the City relied on that representation, obtained the data from the PEC, and withdrew their own Touhy requests to get the data. Now that state court plaintiffs have detrimentally relied on the PEC's representations, the PEC should be estopped from assessing a retroactive 7.5% assessment on any litigant that received the ARCOS data from the PEC. *Dobrowski v. Jay Dee Contractors, Inc.*, 571 F.3d 551, 557 (6th Cir. 2009) (holding that estoppel arises when a person makes a

Case: 1:17-md-02804-DAP   Doc #: 4598-1   Filed: 08/02/22   140 of 280.   PageID #: 594416
Case: 22-3493   Document: 1-3   Filed: 05/27/2022   Page: 99
Case: 1:17-md-02804   Doc #: 3888   Filed: 08/24/21   12 of 13.   PageID #: 534824

misrepresentation of a material fact and the party asserting estoppel detrimentally and reasonably relied on the party making the representation).

State court litigants like the City should at least be given the opportunity to delete the ARCOS data they received from the PEC and obtain the ARCOS data on their own before the 7.5% assessment applies to their cases. It will now be easy to obtain the ARCOS data because the City and other state court litigants can download the data directly from *The Washington Post*'s website.

## CONCLUSION

The Court should modify its order and strike the requirement that state court litigants that do not join the settlement must provide 7.5% of their future settlements and judgments to the PEC. The Court lacks jurisdiction to impose the assessment, the assessment is improper under common benefit fund jurisprudence, and the assessment conflicts with the PEC's representation that it would not charge for the ARCOS data.


Dated: August 24, 2021                          Respectfully submitted,


                                                */s/ Seth Ard*

                                                JAMES L. Shea
                                                City Solicitor
                                                Sara Gross, Chief Solicitor
                                                Thomas P.G. Webb, Chief Solicitor
                                                BALTIMORE CITY LAW DEPARTMENT
                                                100 N. Holliday Street, Room 101
                                                Baltimore, Maryland 21202
                                                Tel: 410-396-3930
                                                Fax: 410-547-1025
                                                james.shea@baltimorecity.gov
                                                sara.gross@baltimorecity.gov
                                                tom.webb@baltimorecity.gov

Case: 1:17-md-02804-DAP  Doc #: 4598-1  Filed:  08/02/22  141 of 280.  PageID #: 594417
Case: 22-3493    Document: 1-3    Filed: 05/27/2022    Page: 100
Case: 1:17-md-02804  Doc #: 3888  Filed:  08/24/21  13 of 13.  PageID #: 534825

William Christopher Carmody
Arun Subramanian
Seth Ard
Jillian Hewitt
Max Straus
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: 212-336-8330
Fax: 212-336-8340
bcarmody@susmangodfrey.com
asubramanian@susmangodfrey.com
sard@susmangodfrey.com
jhewitt@susmangodfrey.com
mstraus@susmangodfrey.com

Ian Crosby
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Tel: 206-516-3880
Fax: 206-516-3883
icrosby@susmangodfrey.com

Sylvanus M. Polky
SUSMAN GODFREY L.L.P.
1000 Lousiana Street, Suite 5100
Houston, TX 77002
Tel: 713-651-5096
Fax: 713-651-9366
spolky@susmangodfrey.com

*Attorneys for Plaintiff Mayor & City Council of Baltimore*

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2021, I electronically filed the foregoing with the

Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by,

and may be obtained through, the Court CM/ECF system.

*/s/ Seth Ard*
Seth Ard



| KIMBERLY LAMBERT ADAMS | RACHAEL R. GILMER | MIKE PAPANTONIO | OF COUNSEL: |
| BRIAN H. BARR | FREDRIC G. LEVIN | CHRISTOPHER G. PAULOS | LAURA S. DUNNING |
| MICHAEL C. BIXBY | MARTIN H. LEVIN | EMMIE J. PAULOS | *(LICENSED ONLY IN ALABAMA)* |
| M. ROBERT BLANCHARD | ROBERT M. LOEHR | A. RENEE PRESTON | BEN W. GORDON, JR. |
| BRANDON L. BOGLE | STEPHEN A. LUONGO | ROBERT E. PRICE | ARCHIE C. LAMB, JR. |
| W. TROY BOUK | M. JUSTIN LUSKO | MARK J. PROCTOR | PAGE A. POERSCHKE |
| WESLEY A. BOWDEN | NEIL E. McWILLIAMS, JR. | TROY A. RAFFERTY | CHRISTOPHER V. TISI |
| VIRGINIA M. BUCHANAN | CLAY MITCHELL | MATTHEW D. SCHULTZ | *(LICENSED IN WASHINGTON, D.C.* |
| WILLIAM F. CASH III | PETER J. MOUGEY | W. CAMERON STEPHENSON | *AND MARYLAND)* |
| JEFF GADDY | DANIEL A. NIGH | THOMAS A. TAYLOR | |
| REBECCA D. GILLILAND | TIMOTHY M. O'BRIEN | LEO A. THOMAS | LEFFERTS L. MABIE, JR. (1925-1996) |
| *(LICENSED ONLY IN ALABAMA)* | | BRETT VIGODSKY | BEN W. GORDON (1926-1997) |
| | | | D.L. MIDDLEBROOKS (1926-1997) |
| | | | DAVID H. LEVIN (1928-2002) |
| | | | STANLEY B. LEVIN (1938-2009) |

### RE: <u>MDL 2804: SECOND AMENDED NOTICE OF ARCOS DISCLOSURE</u>

Dear Counsel:

You are receiving this letter from the Plaintiffs' Executive Committee of *In re National Opioid Prescription Litigation*, MDL No. 2804. This letter explains how you may obtain, without charge, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there.

By way of background, ARCOS (Automation of Reports and Consolidated Orders System) is an automated, comprehensive drug reporting system administered by the DEA which monitors the flow of controlled substances from (1) their point of manufacture through (2) commercial distribution channels to (3) point of sale or dissemination at the dispensing/retail level (such as hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions). All DEA registrants who manufacture and/or distribute controlled substances are required to report to ARCOS.

In the MDL litigation, the DEA produced a subset of ARCOS Data reflecting all transactions nationally by every registered manufacturer and distributor of opioid drug products. In total, the ARCOS Data produced by the DEA has 500,709,803 transaction records. In order for the data to be useful, the Opioid MDL Executive Committee hired a strategic litigation consulting group out of Washington, D.C. to process, validate and augment the opioid ARCOS data. In doing so, the consulting group made certain corrections to and exclusions from the county-level processed ARCOS data, which are explained in the attached **Appendix**.

Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you without charge the unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA.

The PEC has found, however, that the data was not useful as received, so we spent extensive resources making it useful. We are also providing you, again without charge, access to the result of that investment. The PEC's ARCOS website allows you to go straight to the county-level processed ARCOS data and county-level reports and download the information you need in order to understand from the ARCOS database exactly which opioid products flowed into your clients' jurisdictions and how they got there. While you have the right to download the unprocessed ARCOS data and process it yourself, we urge you to avoid that step and instead simply access the PEC's processed ARCOS data and reports.

OFFICE: **316 S. BAYLEN STREET** · SUITE 600 · PENSACOLA, FL 32502
CORRESPONDENCE: P.O. BOX 12308 · PENSACOLA, FL 32591   CONTACT: (850) 435-7000 · (850) 435-7020 FAX · WWW.LEVINLAW.COM

1

To obtain either the unprocessed ARCOS data or access to the PEC's ARCOS website, please contact ARCOSRequest@levinlaw.com.

Sincerely,

Peter J. Mougey
On Behalf of the Plaintiffs' Executive
Committee

OFFICE:  316 S. BAYLEN STREET  ·  SUITE 600  ·  PENSACOLA, FL 32502
CORRESPONDENCE:  P.O. BOX 12308  ·  PENSACOLA, FL 32591     CONTACT:  (850) 435-7000  ·  (850) 435-7020 FAX  ·  WWW.LEVINLAW.COM

2

### Appendix:  Exclusions/Corrections to the ARCOS Data
### Reflected in the County-Level Reports

a. Duplicate transactions are excluded when the same transaction was reported to ARCOS more than once by the same registrant. [1]

b. Transactions are excluded where the Drug Code from the NDC dictionary is not one of the 14 opioids tracked by the DEA.

c. Transactions are excluded when the Action Indicator code, Correction Number, or both suggest the reported transaction is erroneous.

d. All transactions involving reverse distributors, analytical labs, importers, exporters, or researchers are excluded.

e. Transactions between two registrants are excluded when the transaction is reported by the registrant *receiving* the shipment, because the transaction was already reported to ARCOS by the registrant *sending* the shipment.

f. Transactions with obvious errors in the reported Quantity are excluded.

g. Transactions with Transaction Code "X" (Lost-in- Transit) are excluded, because "Transaction Code X" is an explanatory code which does not affect an ARCOS registrant's inventory.[2]

h. The Calculated Base Weight in Grams was corrected when it was calculated using an incorrect Ingredient Base Weight from the NDC dictionary.

---

[1] The ARCOS Data had 610,381 duplicate transactions in December 2007 for one of the Cardinal Health distribution centers (Seller DEA Number: RC0221236). All but one of each set of exact duplicate transactions was excluded.

[2] ARCOS Handbook, §5.8.3, p. 5-19.

3

i. Where the ARCOS Data (NDC, Drug Code, and Drug Name) differed from the NDC Dictionarythe ARCOS Data was updated to reflect the information in the November 2018 NDC Dictionary.[3]

j. For clarity, the trade name of the drug product ("Trade/Product Name") and the dosage form ("Package Measure") were added to the ARCOS Data using the NDC Dictionary.

k. Deletion requests and originally-reported transactions are excluded where: (1) they cancel each other out, or (2) the ARCOS Data already includes an adjusted or corrected transaction.

---

[3] The DEA's NDC dictionary is available at www.deadiversion.usdoj.gov/arcos/ndc/ndcfile.txt. The dictionary is explained at www.deadiversion.usdoj.gov/arcos/ndc/readme.txt. The DEA updates the NDC dictionary monthly to correct errors, add new drug products, and remove discontinued drug products. The consultant used the NDC dictionary updated on November 1, 2018, plus any discontinued drug products from earlier versions of the NDC dictionary in May 2018 –October 2018. An alternative NDC dictionary is maintained by the FDA (www.accessdata.fda.gov/scripts/cder/ndc/index.cfm).

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IN RE: NATIONAL PRESCRIPTION** | ) | **CASE NO. 1:17-MD-2804** |
| **OPIATE LITIGATION** | ) | |
| | ) | **JUDGE POLSTER** |
| **THIS DOCUMENT RELATES TO:** | ) | |
| *"All Cases"* | ) | |
| | ) | **ORDER CLARIFYING ONGOING** |
| | ) | **COMMON BENEFIT ORDER** |
| | ) | |
| | ) | |

This Court earlier entered an *Ongoing Common Benefit Order* at docket no. 4428.  In response, one MDL Plaintiff filed a notice of appeal, *see* docket no. 4484, and numerous parties in Opioid state court litigation filed a petition for writ of mandamus, *see* docket no. 4486.

The Court has reviewed the mandamus petition and observes that two of the issues raised by petitioners are based upon language in the *Ongoing Common Benefit Order* that could have been more clear.  Accordingly, the Court enters the instant Order to clarify the following two points.

1.      **Footnote 6.**

In the *Ongoing Common Benefit Order*, the Court explained that one of the reasons for entry of that *Order* was to "ensure[] that discovery and litigation tasks, once completed, need not be repeated, as their results are made accessible to all – with the costs thereof equitably spread –  in lieu of repetitive expenditures of time, money, and effort." *Order* at 8.  In a footnote, the Court added: "Accordingly, in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the

EXHIBIT
**3**

plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order." *Id.* at 9 n.6.

Mandamus petitioners assert (correctly) that this language could be read to "provide[] that state courts cannot compel Defendants to produce documents and evidence in accordance with state rules if the documents and evidence were produced in MDL 2804." Docket no. 4486-1 at 27; *see id.* at 6 (asserting the *Order* "prevents state court judges from entering discovery orders pursuant to state law and facts applicable in the state cases, and would operate to abrogate existing state court orders").

This Court did not intend to enjoin or preclude any state court from entering any discovery order it concludes is appropriate.  Indeed, the Court has been careful throughout this MDL to coordinate with state courts and to avoid giving them any direction.[1]  The Court meant only to emphasize that, in every related Opioid case (both in state and federal courts), the presiding judge should be aware that plaintiffs, defendants, and third-parties have all spent great time and expense to produce to the MDL Repository an enormous amount of relevant discovery; and this discovery is available to any party that signs a Participation Agreement.  The basis for the *Ongoing Common Benefit Order* rests in part upon Fed. R. Civ. P. 26(b)(1), which directs that discovery "must be proportional to the needs of the case," and proportionality is clearly

---

[1]  *See, e.g.* docket no. 1029 at 2 ("This Court previously appointed Special Master Cathy Yanni to oversee state and federal coordination efforts . . . .  In order to enhance efficiency and avoid duplication of effort and unwarranted expense, the State-Federal Coordination Committee shall communicate on a regular basis with Special Master Yanni in order to coordinate discovery and case schedules in the MDL proceeding with discovery and case schedules in the state court cases to the maximum extent possible.").

2

undermined by repeated production of the same information in different courts in related cases.[2]

Nonetheless, mandamus petitioners are correct that the Court's language was imprecise, so the Court amends it here. The existing footnote 6 in the *Ongoing Common Benefit Order* is hereby replaced in its entirety with the following language:

> [6] Accordingly, in any case remanded by this Court to any other ***federal*** court (or otherwise pending in any ***federal*** court): (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, or to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.
>
> Similarly, in any case remanded by this Court to any ***state*** court (or otherwise pending in any ***state*** court): (1) Defendants and third parties may urge the plaintiffs to look first to documents or evidence produced in the MDL, and may advise the state court of the provisions for access to the MDL Repository as a means for satisfying a discovery obligation in state court; and (2) any resulting access to such documents or evidence, or to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

**2.      Footnote 11.**

In the *Ongoing Common Benefit Order*, the Court attempted to set out a rough illustration of how the 7.5% Common Benefit assessment might work in the case of a hypothetical, state-wide $440 million settlement that did not already include any common benefit provisions. *See Order* at 18 n.11. Mandamus petitioners observe that, under this

---

[2] Put squarely: It makes no sense to require or allow a plaintiff that requests discovery in "court A" to incur the costs of maintaining and preserving the information and data received from defendants and third parties, when another plaintiff in the MDL Court is already performing these services and paying those costs for the common benefit. There is no reason for the parties in "court A" to pay ***up front*** for discovery production and preservation, regardless of any ultimate recovery to defray these costs, when access to the same discovery can be obtained though an assessment that applies ***at the end*** of the "court A" case if and only if the plaintiff recovers. Moreover, it is not fair to require Defendants to produce duplicative discovery in different courts, after the MDL parties and the Court set up a mechanism specifically to avoid this result.

example: (1) counsel for local governmental subdivisions would receive $20 million toward payment of contingent fees; (2) the total common benefit assessment would be $15 million; and (3) therefore, 75% of counsel's contingent fee payments would go instead to the common benefit fund.[3]

Petitioners' calculation simply shows the results of the Court's fictional hypothetical. If the Court had written that the imaginary settlement included "$40M for reimbursement of *the subdivisions'* attorney fees and litigation costs," instead of *"the State's and subdivisions'* attorney fees and litigation costs," then the result of petitioners' calculation would be 37.5%, not 75%.  And if the amount was $60M instead of $40M, petitioners' calculation would instead yield 25%.  The Court could have constructed an imaginary deal that yielded 1.0%.  The Court's hypothetical is not real, and was designed mostly to illustrate that the common benefit assessment would apply *only to the subdivisions' share*, not also the state's share.  And the larger point of the footnote, which the Court highlights and clarifies here, is that "the parties may move the Court for modification of the assessment" depending on the terms of any *actual* settlement.  *Ongoing Common Benefit Order* at 18 n.11; *see also id.* at 19 ("the Court recognizes that the particular circumstances of a settlement or judgment in an Opioid case may justify a case-specific modification of this Order. The parties are free to move for modification at that time.").  The Court would not allow imposition of a 7.5% common benefit assessment

---

[3] Petitioners conclude that "the federal Plaintiffs' Executive Committee lawyers (PEC) [would] walk away with the lion's share of the fee and cost compensation after doing no work at all in state cases."  Docket no. 4486-1 at 5.  First, the entire point of the common benefit assessment, as explained at length in the *Ongoing Common Benefit Order*, is that the PEC **did** provide critical work that inured to the benefit of state court cases.  Second, the Court expects common benefit awards will be made to many attorneys, not just PEC lawyers – possibly including petitioners, themselves.

4

to yield unfair results in a non-hypothetical case.

\*       \*       \*       \*       \*

The Court concludes this Order by repeating that the common benefit assessment applies **ONLY** to a judgment or settlement of an Opioid case that is "not otherwise included in global settlements that have their own negotiated, Court-approved common benefit fees and cost structures." *Id.* at 3.  This is likely to be a very small universe.  The Court fully expects that parties in virtually every Opioid case will make the *Ongoing Common Benefit Order* moot by negotiating inclusion of mutually-acceptable common benefit provisions.  Indeed, the parties have a history of "negotiating around" the Court's fee-related orders.[4]  The *Ongoing Common Benefit Order* is meant to serve primarily as a source of context and last resort, applying only if the parties cannot come to their own agreement.[5]

       **IT IS SO ORDERED.**

                                      /s/ *Dan Aaron Polster*
                                      **DAN AARON POLSTER**
                                      **UNITED STATES DISTRICT JUDGE**

**Dated:** June 8, 2022

---

[4]  The Court earlier entered an Order capping certain contingent fee agreements at 15%, but also provided that counsel could negotiate "Back-Stop" agreements with State Attorneys General to provide additional compensation.  *See* Order at 1 and 6 n.18 (docket no. 3814).  Counsel then successfully negotiated about 30 such State Back-Stop agreements, increasing the available total contingent fee in about 80% of cases filed and yielding about $550 million in total additional contingent fee payments.

[5]  *See id.* at 5 n.17 (noting the Order that capped contingent fees "addresses contingent attorney fees *now*, prior to final consummation of the settlement agreement," so that the parties can take the cap into account during further settlement negotiations) (emphasis added).



# United States District Court
### Northern District of Ohio
### 801 West Superior Avenue
### Cleveland, Ohio 44113-1837

**Dan Aaron Polster**
**Judge**

Phone (216) 357-7190
Fax (216) 357-7195

Case: 22-3493    Document: 5    Filed: 06/09/2022    Page: 1

June 9, 2022

Deborah S. Hunt, Clerk
United States Court of Appeals for the Sixth Circuit
100 East Fifth Street, Room 540
Potter Stewart U.S. Courthouse
Cincinnati, OH  45202-3988
VIA EMAIL and US MAIL

   Re: Case No. 22-3493, *In re Harris County, Texas, et al*
     Originating Case Nos. 1:17-MD-2804 and 1:19-OP-45713

Dear Ms. Hunt:

  A petition for writ of mandamus was recently filed in the above-captioned case.  The petition takes issue with an Order I entered in the Multidistrict Litigation I am overseeing, *In re National Prescription Opiate Litig.*, MDL 2804.  Specifically, petitioners challenge the *Ongoing Common Benefit Order* that I entered on May 9, 2022 (docket no. 4428).

  I reviewed this petition (which was also filed on the MDL docket at no. 4486-1) and realized that at least some of petitioners' objection is based on language in my *Ongoing Common Benefit Order* that was unclear.  Accordingly, on June 8, 2022, I issued an *Order Clarifying the Ongoing Common Benefit Order* (docket no 4503).  It is attached.  I believe it directly resolves one or more issues raised by petitioners.  It may also resolve other of the petitioners' issues indirectly, or at least makes clear that those issues are not ripe.

  Thank you for your consideration.  Please contact me if I can be of further help in this matter.

     Sincerely,

     Dan Aaron Polster

---

**EXHIBIT**

**4**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION | ) | **CASE NO. 1:17-MD-2804** |
| OPIATE LITIGATION | ) | |
| | ) | **JUDGE POLSTER** |
| THIS DOCUMENT RELATES TO: | ) | |
| *"All Cases"* | ) | |
| | ) | **ORDER CLARIFYING ONGOING** |
| | ) | **COMMON BENEFIT ORDER** |
| | ) | |
| | ) | |

This Court earlier entered an *Ongoing Common Benefit Order* at docket no. 4428. In response, one MDL Plaintiff filed a notice of appeal, *see* docket no. 4484, and numerous parties in Opioid state court litigation filed a petition for writ of mandamus, *see* docket no. 4486.

The Court has reviewed the mandamus petition and observes that two of the issues raised by petitioners are based upon language in the *Ongoing Common Benefit Order* that could have been more clear. Accordingly, the Court enters the instant Order to clarify the following two points.

## 1. Footnote 6.

In the *Ongoing Common Benefit Order*, the Court explained that one of the reasons for entry of that *Order* was to "ensure[] that discovery and litigation tasks, once completed, need not be repeated, as their results are made accessible to all – with the costs thereof equitably spread – in lieu of repetitive expenditures of time, money, and effort." *Order* at 8. In a footnote, the Court added: "Accordingly, in any case remanded by this Court to any other court: (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the

plaintiffs' access to such documents or evidence, and to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order." *Id.* at 9 n.6.

Mandamus petitioners assert (correctly) that this language could be read to "provide[] that state courts cannot compel Defendants to produce documents and evidence in accordance with state rules if the documents and evidence were produced in MDL 2804." Docket no. 4486-1 at 27; *see id.* at 6 (asserting the *Order* "prevents state court judges from entering discovery orders pursuant to state law and facts applicable in the state cases, and would operate to abrogate existing state court orders").

This Court did not intend to enjoin or preclude any state court from entering any discovery order it concludes is appropriate. Indeed, the Court has been careful throughout this MDL to coordinate with state courts and to avoid giving them any direction.[1] The Court meant only to emphasize that, in every related Opioid case (both in state and federal courts), the presiding judge should be aware that plaintiffs, defendants, and third-parties have all spent great time and expense to produce to the MDL Repository an enormous amount of relevant discovery; and this discovery is available to any party that signs a Participation Agreement. The basis for the *Ongoing Common Benefit Order* rests in part upon Fed. R. Civ. P. 26(b)(1), which directs that discovery "must be proportional to the needs of the case," and proportionality is clearly

---

[1] *See, e.g.* docket no. 1029 at 2 ("This Court previously appointed Special Master Cathy Yanni to oversee state and federal coordination efforts . . . . In order to enhance efficiency and avoid duplication of effort and unwarranted expense, the State-Federal Coordination Committee shall communicate on a regular basis with Special Master Yanni in order to coordinate discovery and case schedules in the MDL proceeding with discovery and case schedules in the state court cases to the maximum extent possible.").

2

undermined by repeated production of the same information in different courts in related cases.[2]

Nonetheless, mandamus petitioners are correct that the Court's language was imprecise, so the Court amends it here. The existing footnote 6 in the *Ongoing Common Benefit Order* is hereby replaced in its entirety with the following language:

> [6] Accordingly, in any case remanded by this Court to any other **federal** court (or otherwise pending in any **federal** court): (1) Defendants are not required to re-produce documents or evidence they produced in the MDL; and (2) the plaintiffs' access to such documents or evidence, or to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.
> Similarly, in any case remanded by this Court to any **state** court (or otherwise pending in any **state** court): (1) Defendants and third parties may urge the plaintiffs to look first to documents or evidence produced in the MDL, and may advise the state court of the provisions for access to the MDL Repository as a means for satisfying a discovery obligation in state court; and (2) any resulting access to such documents or evidence, or to any MDL work product, is subject to the provisions of this Ongoing Common Benefit Order.

## 2.     Footnote 11.

In the *Ongoing Common Benefit Order*, the Court attempted to set out a rough illustration of how the 7.5% Common Benefit assessment might work in the case of a hypothetical, state-wide $440 million settlement that did not already include any common benefit provisions. *See Order* at 18 n.11. Mandamus petitioners observe that, under this

---

[2] Put squarely: It makes no sense to require or allow a plaintiff that requests discovery in "court A" to incur the costs of maintaining and preserving the information and data received from defendants and third parties, when another plaintiff in the MDL Court is already performing these services and paying those costs for the common benefit. There is no reason for the parties in "court A" to pay **up front** for discovery production and preservation, regardless of any ultimate recovery to defray these costs, when access to the same discovery can be obtained though an assessment that applies **at the end** of the "court A" case if and only if the plaintiff recovers. Moreover, it is not fair to require Defendants to produce duplicative discovery in different courts, after the MDL parties and the Court set up a mechanism specifically to avoid this result.

example: (1) counsel for local governmental subdivisions would receive $20 million toward payment of contingent fees; (2) the total common benefit assessment would be $15 million; and (3) therefore, 75% of counsel's contingent fee payments would go instead to the common benefit fund.[3]

Petitioners' calculation simply shows the results of the Court's fictional hypothetical. If the Court had written that the imaginary settlement included "$40M for reimbursement of *the subdivisions'* attorney fees and litigation costs," instead of *"the State's and subdivisions'* attorney fees and litigation costs," then the result of petitioners' calculation would be 37.5%, not 75%. And if the amount was $60M instead of $40M, petitioners' calculation would instead yield 25%. The Court could have constructed an imaginary deal that yielded 1.0%. The Court's hypothetical is not real, and was designed mostly to illustrate that the common benefit assessment would apply *only to the subdivisions' share*, not also the state's share. And the larger point of the footnote, which the Court highlights and clarifies here, is that "the parties may move the Court for modification of the assessment" depending on the terms of any *actual* settlement. *Ongoing Common Benefit Order* at 18 n.11; *see also id.* at 19 ("the Court recognizes that the particular circumstances of a settlement or judgment in an Opioid case may justify a case-specific modification of this Order. The parties are free to move for modification at that time."). The Court would not allow imposition of a 7.5% common benefit assessment

---

[3] Petitioners conclude that "the federal Plaintiffs' Executive Committee lawyers (PEC) [would] walk away with the lion's share of the fee and cost compensation after doing no work at all in state cases." Docket no. 4486-1 at 5. First, the entire point of the common benefit assessment, as explained at length in the *Ongoing Common Benefit Order*, is that the PEC *did* provide critical work that inured to the benefit of state court cases. Second, the Court expects common benefit awards will be made to many attorneys, not just PEC lawyers – possibly including petitioners, themselves.

to yield unfair results in a non-hypothetical case.

\* \* \* \* \*

The Court concludes this Order by repeating that the common benefit assessment applies **ONLY** to a judgment or settlement of an Opioid case that is "not otherwise included in global settlements that have their own negotiated, Court-approved common benefit fees and cost structures." *Id.* at 3. This is likely to be a very small universe. The Court fully expects that parties in virtually every Opioid case will make the *Ongoing Common Benefit Order* moot by negotiating inclusion of mutually-acceptable common benefit provisions. Indeed, the parties have a history of "negotiating around" the Court's fee-related orders.[4] The *Ongoing Common Benefit Order* is meant to serve primarily as a source of context and last resort, applying only if the parties cannot come to their own agreement.[5]

> **IT IS SO ORDERED.**

/s/ *Dan Aaron Polster*

**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated:** June 8, 2022

---

[4] The Court earlier entered an Order capping certain contingent fee agreements at 15%, but also provided that counsel could negotiate "Back-Stop" agreements with State Attorneys General to provide additional compensation. *See* Order at 1 and 6 n.18 (docket no. 3814). Counsel then successfully negotiated about 30 such State Back-Stop agreements, increasing the available total contingent fee in about 80% of cases filed and yielding about $550 million in total additional contingent fee payments.

[5] *See id.* at 5 n.17 (noting the Order that capped contingent fees "addresses contingent attorney fees *now*, prior to final consummation of the settlement agreement," so that the parties can take the cap into account during further settlement negotiations) (emphasis added).

**EXHIBIT C**

**OPIOID LITIGATION PARTICIPATION AGREEMENT**

This Agreement is made this_____day of_____,  20__,  by  and between Plaintiffs' Co-Lead Counsel appointed by the United States District Court for the Northern District of Ohio in MDL 2804 and _____ [Name of Law Firm].

WHEREAS, the United States District Court for the Northern District of Ohio, Eastern Division (Polster, J.) has appointed Paul J. Hanly, Jr., Joseph F. Rice and Paul T. Farrell, Jr. to serve as Co-Lead Counsel, has appointed Peter T. Weinberger, Troy Rafferty and Steven Skikos as Liaison Counsel, and has appointed 17 additional attorneys as members of Plaintiffs' Executive Committee (all of the foregoing attorneys collectively referred to as the "PEC" for simplicity of reference) to conduct and facilitate the pretrial proceedings in the coordinated federal multidistrict actions entitled In Re: National Prescription Opiate Litigation;

WHEREAS, the PEC in association with other attorneys working for the common benefit of plaintiffs have developed or are in the process of developing common benefit work product which will be valuable in the litigation of federal and state court proceedings involving opioids ("PEC Common Benefit Work Product"); and

WHEREAS, undersigned counsel is not a member of the PEC and is desirous of acquiring the PEC Common Benefit Work Product and establishing an amicable, working relationship with the PEC for the mutual benefit of their clients ("Participating Counsel");

NOW THEREFORE, in consideration of the covenants and promises contained herein, and intending to be legally bound hereby, the parties agree as follows:

2000208. 7

1

EXHIBIT

**5**

## I.  SCOPE OF AGREEMENT.

### A.  Purpose.

This Participation Agreement is a voluntary Participation Agreement between plaintiffs' attorneys who have cases pending in the MDL and/or in state court.  This Participation Agreement supplements and does not in any respect supplant any of the provisions of the Court's Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc. #358), all of which provisions are incorporated herein by reference. This agreement is entered to provide the fair and equitable sharing among plaintiffs, and their counsel, of the burden of services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation.  This Participation Agreement is a private cooperative agreement among attorneys retained by governmental entities and other plaintiffs, to share common benefit work product both in this MDL and in the various state courts in this complex litigation. This Participation Agreement is not intended to encompass the Attorneys General of the 50 states, American Samoa, the District of Columbia, Guam, Northern Mariana Islands, Puerto Rico and the Virgin Islands.   Participating Counsel who sign on to this Agreement thereby become entitled to receive the MDL PEC Common Benefit Work Product[10] and the state court work product of those attorneys who have signed the Participation Agreement if that work product has been provided to the PEC.

PEC Participating Counsel recognize that plaintiffs who have cases pending in separate and independent jurisdictions are *voluntarily* agreeing to share common benefit work product developed in these jurisdictions, including the MDL, California, Connecticut,

---

[10] This does not include the ARCOS/DADS data which is being made available under a separate agreement and procedure approved by the MDL Court.

Illinois, New York, Pennsylvania, Texas, and other states. Participating Counsel further recognize the separate and independent rights of each jurisdiction and of the litigants therein to fully represent the interests of their clients, including the right to conduct discovery, set cases for trial, conduct jury trials and/or resolve cases.  The Agreement and the Court's Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc. #358) shall not be cited by a party to the Participation Agreement in any other court in support of a position that adversely impacts the jurisdictional rights and obligations of the state courts and state court Participating Counsel.

**B.** **Governing Principles – The Common Benefit Doctrine.**

The governing principles are derived from the United States Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881); refined in, *inter alia, Central Railroad & Banking Co. v. Pettus,* 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co*., 396 U.S. 375 (1970); *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); and approved and implemented in the MDL context, in *inter alia, In re MGM Grand Hotel Fire Litigation*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); and *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

The reimbursement of common benefit costs and the payment of common benefit fees is subject to further order of the court to assure adherence to the principles and objectives of the equitable common fund doctrine under the particular circumstances of any judgment or resolution.

**C.** **Rights and Obligations of Participating Counsel.**

Upon execution of this Agreement, the PEC will provide to Participating Counsel

access to the PEC Common Benefit Work Product, including access to all documents and data produced to date and hereafter in the MDL as well as all transcripts, exhibits and sealed materials.[11] Participating Counsel agree that all cases in which they have a fee interest, including unfiled cases and cases filed in state and/or federal court, are subject to the terms of this Agreement. Participating Counsel shall provide to Co-Lead Counsel upon execution of this Agreement a list of each client represented by them who has filed a civil action related to the opioids crisis together with the Court and docket number of each such case, and shall further provide to Co-Lead Counsel a list of each client represented by them who has not yet filed a civil action related to the opioids crisis. Participating Counsel shall supplement these lists on a quarterly basis.

## II. <u>AGREEMENT TO PAY AN ASSESSMENT ON GROSS RECOVERY</u>

Participating Counsel hereby agree to pay a reasonable assessment on the gross recovery actually received by clients of the undersigned Participating Counsel, as defined below, on all claims against Defendants for monetary damages or for injunctive relief, whether said recovery is by way of settlements or judgments.  Such payment shall be paid from the fees of Participating Counsel, the client recovery, or by the settling defendant, depending on the circumstance of the settlement or judgment.

### A.      **Gross Recovery Defined.**

Gross recovery includes any and all amounts actually paid to clients of Participating Counsel by Defendants. In measuring the "gross recovery," the parties are to (a) exclude court costs that are to be paid by the Defendants; and (b) include the present value of any fixed and certain payments agreed or ordered to be made in the future. The assessment shall

---

[11] The PEC reserves the right to implement additional restrictive requirements necessary for the receipt of certain third-party documents and data.

apply to all cases in which Participating Counsel have a fee interest, whether pending in the MDL or in state courts and whether tolled, filed, unfiled, or subsequently filed by Participating Counsel.

**B.      Assessment Amount To Be Determined.**

The assessment amount referenced above imposed upon the gross recovery of a client represented by Participating Counsel shall be a percentage of the gross recovery fixed by the Court following review of the recommendations of the Fee Committee established pursuant to section 2 of the Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc #358) referenced above.  In no event shall such percentage exceed the maximum percentage assessed upon the gross recovery of a client represented by any PEC member. The intent being to assure Participating Counsel they will be assessed a percentage no higher than that which a PEC member firm is assessed.  The Court in its discretion may assess a greater percentage on the gross recovery of any counsel, other than any member of the PEC, who has not signed this Participation Agreement.

**C.      Covered Cases.**

The assessment provisions set forth above apply to all cases now pending or later filed in or transferred or removed to MDL 2804. Participating Counsel who sign the Participation Agreement further agree to pay the assessment amount on all cases in which they have a fee interest, whether unfiled or filed in state or other courts.

Counsel who do not sign the Participation Agreement are not required to pay an assessment on state court cases or on unfiled cases, provided, however, that such counsel may be subject to an increased assessment on all opioid cases in which they have a fee interest if they receive PEC Common Benefit Work Product or otherwise benefit from the

work performed in connection with the MDL.

      **D.**      **Attorney Fee Lien.**

With respect to each client whom they represent in connection with any opioid-related claims that are subject to the terms of this Participation Agreement and any Order implementing this Agreement, each counsel governed hereby shall deposit or cause to be deposited in the Opioid Fee and Expense Fund to be established in MDL 2804 the percentage assessments created hereby. Such counsel, on behalf of themselves, their affiliated counsel, and their clients, hereby grant and convey to the PEC a lien upon and/or a security interest in any recovery by any client whom they represent in connection with opioid-related claims in order to secure payment in accordance with the provisions of this Participation Agreement. Such counsel will undertake all actions and execute all documents which are reasonably necessary to effectuate and/or perfect this lien and/or security interest.  This Participation Agreement is not intended to perfect a lien and/or security interest on any State Attorney General.

**III.  COMMON BENEFIT FEES AND EXPENSES.**

Participating Counsel subject to the prior Order Regarding Plaintiff Attorneys' Fees and Expenses (Doc #358) shall be eligible to the recovery of common benefit fees and expenses. The format for the recovery of authorized common benefit fees and expenses shall be in accordance with Exhibit A attached hereto.  If any work performed on state court litigation is authorized as common benefit work, Participating Counsel agree to make available the state work product and documents to the MDL and PEC and other Participating Counsel.  If Participating Counsel intend to seek payment for common benefit work, they shall comply with the federal court Order Regarding Plaintiff Attorneys' Fees and Expenses.  In addition,

they shall provide Co-Lead Counsel a statement that a given case should be considered a bellwether case at the time they do the work.

## IV.  **INTENT OF THE PARTIES**

The parties to this Agreement confirm their mutual intent to pursue the payment of all attorney fees directly by any and all defendants and preserve the gross recovery for each client. Further the terms of this Agreement are intended to apply only if the defendants do not provide for an adequate direct payment of attorney fees and expenses.

## V.  **CONFIDENTIALITY**

Documents shall be produced to Participating Counsel upon entry of the MDL Protective Order or an appropriate state court protective order.  The terms of the Participation Agreement and any documents and/or information exchanged and/or shared pursuant thereto shall be attorney work product and is confidential as between Participating Counsel and the MDL PEC.


_____
**FIRM NAME**


_____
I elect to be a Participating Counsel


**PLAINTIFFS' EXECUTIVE COMMITTEE**


Dated: _____       _____

**From:** Kimberly Warren <Kimberly.Warren@ago.ms.gov>
**Sent:** Tuesday, July 12, 2022 11:18 AM
**To:** Matthew McCarley <mccarley@fnlawfirm.com>
**Subject:** Endo Settlement

---

**This message originated from outside your organization**

---

July 12, 2022

mccarley@fnlawfirm.com

Attorney General Lynn Fitch is pleased to inform you that the State of Mississippi has successfully negotiated another settlement in the ongoing opioid litigation.  Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. ("Endo") have agreed to make a lump-sum payment of $9 million to settle all claims against them.

As you may have seen in media reports or otherwise heard, Endo is expected to enter bankruptcy within the next several months so time is of the essence in finalizing this deal while we can still attain this multi-million-dollar settlement for Mississippi.

Like the previous settlements with Johnson & Johnson and the Distributor defendants, the Endo settlement requires each participating city and/or county to execute another Settlement Participation Agreement ("PA") which is attached to this correspondence.  The settlement distributions within the State will be based on the previously adopted "Mississippi State-Local Government Opioid Litigation Memorandum of Understanding."  *A copy of the settlement agreement and all city and county allocation percentages can be found on the Attorney General's opioid settlement website* (https://www.ago.state.ms.us/opioidsettlement/).

Like those previous settlements, the State will cover the required abatement portion of the settlement, so that **local governments will be able to use your funds as you see fit without a national fund administrator micromanaging their use.**

Unlike those previous settlements, however, the Endo settlement requires 100% participation for the specified list of counties and cities.  Funds will not be clawed back in increments depending on the participation level of local governments.  Instead, **Mississippi and its local governments will only get funding if all local governments participate.**

The Federal Court overseeing this multi-district opioid litigation ordered that 7.5% of the city and county allocations in each state be held-back to cover common

EXHIBIT
6

benefit charges. This hold-back amount will be applied against your contracted counsel's fee portion.

To participate in the settlement your subdivision must complete the attached Subdivision Settlement Participation Agreement and return it by August 5, 2022.

The State will not receive any funding from the settlement unless and until **ALL** eligible subdivisions have provided an executed PA. Further, we are working diligently to finalize this deal before Endo's expected bankruptcy makes this funding level less likely. Thus, it is vital that the attached form is executed and returned to our office as soon as practicable.

Should you have any questions, please email opioidsettlement@ago.ms.gov or contact Caleb Pracht, Special Assistant Attorney General, Consumer Protection Division of the Mississippi Attorney General's Office, at 601-359-9711.

Thank you in again for your time and cooperation.

Sincerely,

Lynn Fitch
Attorney General
State of Mississippi

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTI-DISTRICT LITIGATION**

**IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION**                                                    **MDL No. 2804**

This Document Relates to the Following:

*City of Holly Springs v. Johnson & Johnson, et al.*
3:21-cv-00246-DMB-RP (N.D. Mississippi)

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO VACATE
<u>CONDITIONAL TRANSFER ORDER (CTO-211)</u>**

EXHIBIT
**7**

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ............................................................................ 1

II.  PROCEDURAL HISTORY .............................................................................. 2

III. SUMMARY OF THE ARGUMENT .................................................................. 3

IV.  ARGUMENT AND AUTHORITIES ................................................................. 4

    A.  Transfer Will Not Serve the Convenience of the Parties and Witnesses and Will Not Promote the "Just and Efficient" Conduct of this Litigation; Therefore, Transfer Will Violate Subsection 1407(a) of Title 28, United States Code. ............................................ 6

        1.   The City of Holly Springs will be significantly prejudiced if the case is transferred. ........................................................................................................ 7

        2.   Transferring the case between courts lacking subject matter jurisdiction is inefficient. ......................................................................................................... 9

    B.  Because Federal Subject Matter Jurisdiction Is Obviously Lacking, Transfer Will Violate the Principle that Jurisdiction Be Established First in Priority. ........................................ 10

        1.   The second wrongful removal of the City's case violates the black letter of federal statutory law. ................................................................................................... 10

        2.   Because there is no subject matter jurisdiction, the only recourse is an immediate remand to state court; neither a cross-country transfer nor an indeterminate stay is appropriate in the absence of federal authority over the action in the first instance. ........................................................................................................................ 13

    C.  The Panel Should Abstain until the Mississippi Court Rules on the City's Motion to Remand. ...................................................................................................................... 14

V.   REQUEST FOR RELIEF ................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re: Accutane Prod. Liab. Litig.*,
   560 F. Supp. 2d 1370 (J.P.M.L. 2008)................................................................5

*In re Air Crash Disaster at J.F.K. Int'l Airport*,
   MDL-227 (J.P.M.L. filed July 20, 1977)..........................................................15

*In re Ameriquest Mortg. Co. Mortg. Lending Pracs. Litig.*,
   542 F. Supp. 2d 1357 (J.P.M.L. 2008)................................................................6

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006)..........................................................................................14

*City of Holly Springs v. Johnson & Johnson*,
   477 F. Supp. 3d 547 (N.D. Miss. 2020)....................................................1, 2, 14

*City of Las Vegas v. Purdue Pharma, L.P.*,
   No. 219CV2128JCMDJA, 2020 WL 223614 (D. Nev. Jan. 15, 2020) ..................8

*Clinton v. Jones*,
   520 U.S. 681 (1997)............................................................................................7

*In re Deering Milliken Patent*,
   328 F. Supp. 504 (J.P.M.L. 1970)....................................................................15

*Dunaway, et al. v. Purdue Pharma L.P., et al.*,
   391 F. Supp. 3d 802 (M.D. Tenn. 2019)...........................................................8, 9

*Fayetteville Arkansas Hosp. Co., LLC v. Amneal Pharm., LLC*,
   No. 5:20-CV-5036, 2020 WL 2521515 (W.D. Ark. May 18, 2020) .......................8

*In re: Grain Shipment Litig.*,
   319 F. Supp. 533 (J.P.M.L. 1970)......................................................................4

*Home Depot U. S. A., Inc. v. Jackson*,
   139 S. Ct. 1743 (2019)..................................................................................13, 14

*In re: IBM Antitrust Litig.*,
   316 F. Supp. 976 (J.P.M.L. 1970)......................................................................5

*Illinois Pub. Risk Fund v. Purdue Pharma L.P.*,
   No. 19 C 3210, 2019 WL 3080929 (N.D. Ill. July 15, 2019) ..............................8

*Johnson v. Wattenbarger,*
   361 F.3d 991 (7th Cir. 2004) ...............................................................................14

*In re Kaehni Patent,*
   311 F. Supp. 1342 (J.P.M.L. 1970) .......................................................................15

*Kokkonen v. Guardian Life Ins. Co. of America,*
   511 U.S. 375 (1994) .....................................................................................13, 14

*In re L.E. Lay & Co. Antitrust Litig.,*
   391 F. Supp. 1054 (J.P.M.L. 1975) .......................................................................15

*Mansfield, C. & L.M.R. Co. v. Swan,*
   111 U.S. 379 (1884) .............................................................................................13

*Ex parte McCardle,*
   7 Wall. 506 (1868) ...............................................................................................13

*McDonal v. Abbott Laboratories,*
   408 F.3d 177 (5th Cir. 2005) ...............................................................................13

*In re Plumbing Fixture Cases,*
   298 F. Supp. 484 (J.P.M.L. 1968) .........................................................................15

*In re Prof'l Hockey Antitrust Litig.,*
   352 F. Supp. 1405 (J.P.M.L. 1973) .......................................................................15

*In re Resource Exploration, Inc., Securities Litig.,*
   483 F. Supp. 817 (J.P.M.L. 1980) .........................................................................15

*Ruhrgas AG v. Marathon Oil Co.,*
   526 U.S. 574 (1999) .............................................................................................14

*Sangha v. Navig8 ShipManagement Private Ltd.,*
   882 F.3d 96 (5th Cir. 2018) .................................................................................14

*St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.,*
   774 F. Supp. 2d 596 (D. Del. 2011) ......................................................................7

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) .......................................................................................13, 14

*Sundby v. Bank of New York Mellon,*
   No. 11CV627 DMS (RBB), 2011 WL 1670914 (S.D. Cal. May 3, 2011) ..............................7

*Univ. of S. Alabama v. Am. Tobacco Co.,*
   168 F.3d 405 (11th Cir. 1999) .............................................................................14

iii

*In re: Welding Fume Prod. Liab. Litig.*,
   560 F. Supp. 2d 1356 (J.P.M.L. 2008) ........................................................................6

**Statutes**

28 U.S.C. § 1407(a) ..........................................................................................2, 3, 4, 5, 6

28 U.S.C. § 1446 ......................................................................................................1, 11

28 U.S.C. § 1446(a) .....................................................................................................12

28 U.S.C. § 1446(b)(1) ...........................................................................................10, 12

28 U.S.C. § 1446(b)(3) ...........................................................................................11, 12

28 U.S.C. § 1446 (c)(1) ..........................................................................................10, 12

28 U.S.C. § 1447(c) ................................................................................................4, 14

**Other Authorities**

Fed. R. Civ. P. 1 ..............................................................................................................3

Fed. R. Civ. P. 11(b) ......................................................................................................7

H.R. Rep. No. 1130, 90th Cong. 2nd Session, 1968 U.S.C.C.A.N. 1898 ............5, 9, 15

Judicial Panel on Multidistrict Litigation Rule of Procedure 7.1(f) ...............................1

Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor
   Courts and Transferee Courts* ..................................................................................15

Pursuant to Rule 7.1(f) of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation ("JPML"), City of Holly Springs, Mississippi ("Plaintiff" or "City") files this Brief in Support of its Motion to Vacate Conditional Transfer Order (CTO-211), and would show as follows:

**I. PRELIMINARY STATEMENT**

On May 12, 2020, Plaintiff City of Holly Springs instituted a civil action, in Mississippi state court, asserting claims arising under Mississippi state law in order to obtain recovery for the damages the City incurred as a result of the opioid crisis. *See* **Exhibit A**, Plaintiff's Original Complaint for Damages and Injunctive Relief ("Complaint"). In July 2020, the City's case was wrongfully removed to federal court for the first time. In a scholarly opinion, the proposed transferor court resoundingly rejected the removal grounds, and the case was remanded back to state court. *City of Holly Springs v. Johnson & Johnson*, 477 F. Supp. 3d 547 (N.D. Miss. 2020). Since that time, the state trial judge penned orders resolving numerous motions, and had taken other motions under advisement.

After the case had proceeded through defendants' numerous motions attempting to have the City's case dismissed, and with motions still pending, certain Defendants wrongfully removed the case ***a second time***. The second removal is not in good faith, to say the least. As explained below, Defendants Mississippi CVS Pharmacy, L.L.C., Walgreen Co., and Walmart Inc. (the "Removing Defendants") flagrantly violated 28 U.S.C. § 1446. Literally, the removal is triply untimely and suffers from fifty-four omissions of statutorily required orders and pleadings. The removal notice's fatally flawed timing and scores of brazen omissions are unique to the Holly Springs case. No other case pending in MDL 2804 requires judicial review of the case-specific removal deficiencies.

1

Without subject matter jurisdiction, any judicial action, including a cross-country transfer, would be an improper exercise of judicial authority. The most efficient course of action, both for the parties and for the Courts, is to permit the Northern District of Mississippi to determine the threshold jurisdictional issue: whether the second removal was proper. A transfer at this stage would not promote the "just and efficient" conduct of this action and would prejudice the City by causing further needless delay and unnecessary expense. *See* 28 U.S.C. § 1407(a). This is particularly true where, as here, this is the second wrongful removal of the case, and the remand motion raises issues unique to the egregiously defective removal papers, including a glaring omission that served to elide over the removal's gross untimeliness. Moreover, the case had been litigated for well over a year in the Third Circuit District Court of Marshall County, Mississippi, and the second removal interrupted the state court's resolution of outstanding motions. It would be the antithesis of justice to allow Removing Defendants to interrupt these state court proceedings based on a removal that is riddled with glaring errors and omissions.

## II.    PROCEDURAL HISTORY

The City filed suit in Mississippi state court, asserting state law claims against Defendants responsible for the opioid epidemic plaguing the City and crippling its resources. *See* **Exhibit A**, Complaint. Defendants seek to delay the City's pursuit of its claims by securing a cross-country transfer into the multidistrict litigation ("MDL 2804").

As their first lawless delay stratagem, Defendants Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. improperly removed the City's case on July 10, 2020. Seven days following the first improper removal, the City requested that the United States District Court for the Northern District of Mississippi remand this action. That motion was granted in a scholarly published opinion that resoundingly rejected the removal grounds. *City of Holly Springs v. Johnson &*

2

*Johnson*, 477 F. Supp. 3d 547 (N.D. Miss. 2020). After the case was remanded, it was actively litigated in the Third Circuit District Court of Marshall County, Mississippi, for approximately fifteen months.

With motions still outstanding, certain Defendants secured a grounding halt of the justice system. Defendants Mississippi CVS Pharmacy, L.L.C., Walgreen Co., and Walmart Inc. (the "Removing Defendants") filed a ***second*** notice of removal on December 1, 2021. **Exhibit B**, Notice of Removal. Fifteen days after the second wrongful removal was filed, the City moved for remand to state court. **Exhibit C**, Motion to Remand and Brief in Support [Doc## 26, 26-1 through 26-7, 27 in No. 3:21-cv-00246-DMB-RP]. On December 8, 2021, this Panel issued its Conditional Transfer Order (CTO-211) and the City filed its Notice of Opposition the next day. **Exhibit D**, Notice of Opposition to CTO-211. The City's motion to vacate is timely pursuant to this Panel's scheduling order. *See* Doc No. 9438, MDL 2804 (J.P.M.L. December 10, 2021) (promulgating December 27, 2021, deadline).

## III.     SUMMARY OF THE ARGUMENT

The City of Holly Springs respectfully requests that the Panel vacate its conditional transfer order and allow the Northern District of Mississippi to address the pending motion to remand. Doing so will foster the just, speedy, and inexpensive determination of this action. *See* Fed. R. Civ. P. 1. By contrast, transferring the City of Holly Springs's case to the MDL court in Ohio would do the opposite.

Transfer to a multidistrict litigation court "shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). Here, the interminable delay that the

transfer will cause will inconvenience the City, and its witnesses, and will promote injustice. Because the federal judiciary lacks subject matter jurisdiction, the penalty of an indefinite stay, which the transfer would impose, is unjust. Bouncing the case between federal courts that lack subject matter jurisdiction in the first instance certainly is the antithesis of efficiency. In short, all purposes to be served by multidistrict litigation are violated here if CTO-211 is not vacated.

Plaintiff respectfully avers that this Panel should not facilitate Defendants' gamesmanship of the legal system, specifically, the second baseless removal from state to federal court for the sole purpose of a subsequent transfer that would stay judicial consideration of the City's pending motion to remand. To enable this stratagem flies in the face of Supreme Court precedent providing that federal courts are tribunals of limited jurisdiction and that subject matter jurisdiction is to be considered first in priority. The baseless removal also violates the black letter of statutory law, which requires that, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). The patent lack of subject matter jurisdiction creates particular injustice here because the proposed transferee court has declared its refusal to even allow a motion to remand to be filed. **Exhibit E**, Order Regarding Remands, *In re National Prescription Opiate Litigation,* MDL 2804, Doc. #: 130 (N.D. Ohio Feb. 16, 2018); **Exhibit F**, CMO 1, *In re National Prescription Opiate Litigation,* MDL 2804, Doc. #: 232 (N.D. Ohio April 11, 2018), at ¶ 6.g. Granting this motion to vacate is the only avenue of securing justice and efficiency, as commanded by Section 1407, Title 28, United States Code.

## IV.   ARGUMENT AND AUTHORITIES

A conditional transfer order is an administrative act of the Panel Clerk "which can be and will be vacated upon the showing of good cause by any party." *In re: Grain Shipment Litig.*, 319

F. Supp. 533, 534 (J.P.M.L. 1970) (citing *In re: IBM Antitrust Litig*., 316 F. Supp. 976 (J.P.M.L. 1970)). Good cause exists where consolidation fails to promote the "just and efficient" conduct of the action. *See* 28 U.S.C. § 1407(a); *see also* H.R. Rep. No. 1130, 90th Cong. 2nd Session, 1968 U.S.C.C.A.N. 1898, 1900 (explaining that "pretrial consolidation must promote the just and efficient conduct of such actions and before the convenience of the parties and witnesses"). Congress intended for consolidation to be ordered "only where significant economy and efficiency in judicial administration may be obtained." *See* H.R. Rep. No. 1130, 1968 U.S.C.C.A.N. at 1900.

Congress has promulgated explicit requirements for transfer of a case into one multidistrict litigation court: "Such transfers shall be made by the judicial panel on multidistrict litigation authorized by this section upon its determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). This Panel has vacated conditional transfer orders based upon findings that transfer "would not necessarily serve the convenience of the parties and witnesses or promote the just and efficient conduct of this litigation at the present time." *In re: Accutane Prod. Liab. Litig*., 560 F. Supp. 2d 1370, 1370 (J.P.M.L. 2008). Here, transfer could not possibly serve "the convenience of parties and witnesses," or the promotion of "just and efficient conduct" of the City's action (*see* 28 U.S.C. § 1407(a)). The only purpose of the transfer will be to achieve a warrantless delay during which the case travels between courts lacking subject matter jurisdiction in the first instance.

As explained below, the only action that a federal court should take in this case is to consider the remand motion, which raises unique issues, including scores of deficiencies in the removal papers and proof that the second removal is fatally untimely. There is no federal subject matter jurisdiction in the first instance, and the prejudice to the City of Holly Springs is clear.

A.     **Transfer Will Not Serve the Convenience of the Parties and Witnesses and Will Not Promote the "Just and Efficient" Conduct of this Litigation; Therefore, Transfer Will Violate Subsection 1407(a) of Title 28, United States Code.**

The rationale that Removing Defendants will give for why this case should be transferred, notwithstanding the obvious lack of subject matter jurisdiction, is that the MDL No. 2804 court can resolve the lack of subject matter jurisdiction. As a factual matter, Removing Defendants know that the proposed transferee Court refuses to do so. *See* **Exhibits E, F & G**. Under the statute, the prerequisites of § 1407(a) must be met for this Panel to exercise its transfer authority. Here those prerequisites are not, because the proposed transferee court does not have any other remand motion before it that involves the same issues. Where, as here, the case likely requires consideration of unique issues, the conditional transfer order should be vacated. *See, e.g., In re: Welding Fume Prod. Liab. Litig.,* 560 F. Supp. 2d 1356, 1357 (J.P.M.L. 2008) (CTO vacated where majority of claims involved neurological injuries and the plaintiff whose case was subject to the CTO had developed a different injury, laryngeal cancer); *In re Ameriquest Mortg. Co. Mortg. Lending Pracs. Litig.,* 542 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008) ("The complaints in the two actions before us plead individual claims based on the specific loan transactions at issue in those actions, which will likely require unique discovery and other pretrial proceedings. Accordingly, we are persuaded that inclusion of these two actions in MDL No. 1715 is not presently warranted.").

It is a misuse of the MDL Panel procedures to file a blatantly defective and untimely Notice of Removal and then immediately seek to exploit the MDL process by transferring a case for no identifiable purpose other than to disrupt and indefinitely delay ongoing litigation. Yet this is precisely what Defendants have done here. The proposed transferee court refuses to allow the City to even file its motion to remand for the foreseeable future. **Exhibit E**; **Exhibit F**, at ¶ 6.g. Thus, transfer will doom the City to a forum that refuses to timely consider its lack of jurisdiction over

the claims. This is profoundly unjust, because there is no federal subject matter jurisdiction in the first instance. *See* **Exhibit C,** Motion to Remand and briefing.

### 1. The City of Holly Springs will be significantly prejudiced if the case is transferred.

The prejudice that the second removal seeks to impose upon the City is clear. The Mississippi state court in Marshall County was in the middle of deciding several outstanding motions, and had handed down opinions on numerous other motions, in the approximate fifteen months that the case was litigated in state court after the first remand and before the second baseless removal. Delay "increase[s] the danger of prejudice resulting from the loss of evidence." *Clinton v. Jones*, 520 U.S. 681, 707-08 (1997). A party "has a right to proceed in a timely manner on its claim and to do so in a court having jurisdiction."  *St. Joe Co. v. Transocean Offshore Deepwater Drilling Inc.*, 774 F. Supp. 2d 596, 601 (D. Del. 2011).

Removing Defendants removed this action solely for the purposes of delay. Other courts have recognized that such manipulation of the federal courts is improper, for example:

> If in fact the removal of this action was done for the purpose of delay, the Court strongly disapproves of such gamesmanship of the legal system and waste of judicial resources. Rule 11 states, "[b]y presenting to the court a pleading, written motion, or other paper ... an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b). Counsel should be mindful of this and cautious in pursuing such tactics in the future.

*Sundby v. Bank of New York Mellon*, No. 11CV627 DMS (RBB), 2011 WL 1670914, at *2 (S.D. Cal. May 3, 2011).

If this action is transferred, the City of Holly Springs will not have the opportunity to present its motion to remand in the proposed transferee court any time in the foreseeable future. The proposed transferee court in *In re National Prescription Opiate Litigation* MDL 2804 will not

even allow a City to file a motion to remand—much less will that court rule on one. The proposed

transferee Court entered a moratorium on City and County remand motions years ago.[1] As one

court succinctly explained, "[t]he judge presiding over the MDL has elected not to rule on any

motions for remand or permit discovery for a substantial period of time. Thus to defer ruling

now could have the effect of staying the litigation indefinitely." *Illinois Pub. Risk Fund v.*

*Purdue Pharma L.P.,* No. 19 C 3210, 2019 WL 3080929, at *1 (N.D. Ill. July 15, 2019).

> One decision has articulated the prejudice if a case is sent to MDL 2804:

> [T]he risk of hardship resulting from a postponement of a jurisdictional determination is **great**. . . . **The prospect of indefinitely postponing a jurisdictional ruling is especially troubling, given that this case involves Tennessee public officials, charged with representing the interests of the citizens of their respective judicial districts, seeking access to the state's courts to assert claims under the state's laws.** . . . If . . . jurisdiction is lacking, . . . the case should be returned to the state courts as soon as reasonably practicable. Otherwise, the federal courts will not only waste the parties' time but impair the state's interest in the administration of justice.

*Dunaway, et al. v. Purdue Pharma L.P., et al.,* 391 F. Supp. 3d 802, 808-809 (M.D. Tenn. 2019)

(emphasis added). More recently, another Court following *Dunaway* agreed that, "[i]f transferred,

this case will join a veritable sea of others in the MDL court. There is no guarantee of when that

heavily burdened court would be able to address the important jurisdictional issues raised here."

*Fayetteville Arkansas Hosp. Co., LLC v. Amneal Pharm., LLC*, No. 5:20-CV-5036, 2020 WL

2521515, at *3 (W.D. Ark. May 18, 2020). Other courts have concurred in *Dunaway*'s analysis.

*City of Las Vegas v. Purdue Pharma, L.P*., No. 219CV2128JCMDJA, 2020 WL 223614, at *3 (D.

Nev. Jan. 15, 2020) ("Judge Trauger's analysis in *Dunaway* is persuasive."); *Illinois Pub. Risk,*

---

[1]  **Exhibit E**, Order Regarding Remands, *In re National Prescription Opiate Litigation,* MDL 2804, Doc. #: 130 (N.D. Ohio Feb. 16, 2018) (entering moratorium on motions to remand); **Exhibit F**, Case Management Order No. 1, *In re National Prescription Opiate Litigation,* MDL 2804, Doc. # 232 (N.D. Ohio April 11, 2018), at ¶6.g ("No party may file any motion not expressly authorized by this Order absent further Order of this Court or express agreement of the parties.").

*supra*, 2019 WL 3080929, at *1 (citing *Dunaway*). Clearly, the City will suffer a prejudicial delay if its case is transferred into MDL 2804.

### 2. Transferring the case between courts lacking subject matter jurisdiction is inefficient.

Plaintiff's Motion to Vacate Conditional Transfer Order (CTO-211) should be granted because the most just and efficient course is to allow the Northern District of Mississippi Court to decide Plaintiff's pending Motion to Remand. A transfer of this action would not promote "significant economy and efficiency in judicial administration," but would delay the resolution of the motion to remand. H.R. Rep. No. 1130, 1968 U.S.C.C.A.N. at 1900. A transfer at this juncture would result in additional, unnecessary delay because the proposed transferee Court has ordered a moratorium on all substantive filings, including motions to remand. **Exhibit E; Exhibit F** at ¶ 6.g. A transfer would also result in inefficient use of judicial resources. The City has already filed and briefed its remand motion in the proposed transferor court. Moreover, the Mississippi state court has presided over several rounds of motions and briefing, and motions remained outstanding in the state court at the time of the second wrongful removal. The most efficient course of action would be to allow the Northern District of Mississippi to consider the threshold issue of subject matter jurisdiction before the City's case is transferred to an Ohio court, where the City's case will be stayed for an indeterminable amount of time.

Accordingly, the Panel should vacate Conditional Transfer Order (CTO-211) in order to promote the just, speedy, and inexpensive determination of this action.

**B.**    **Because Federal Subject Matter Jurisdiction Is Obviously Lacking, Transfer Will Violate the Principle that Jurisdiction Be Established First in Priority.**

1.    **The second wrongful removal of the City's case violates the black letter of federal statutory law.**

As the City illustrated in its Motion to Remand and supporting Brief (**Exhibit C**), the second wrongful removal violated the black letter of statutory law in several respects, including:

| Statutory Mandate for Removal | How Defendants Have Violated the Statutory Mandate |
|---|---|
| "The notice of removal of a civil action or proceeding shall be filed within **30 days after** the receipt by the defendant, through **service** or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within 30 days after the service of summons upon the defendant if such initial pleading has been filed in court and is not required to be served on the defendant, whichever period is shorter."<br><br>28 U.S.C. § 1446(b)(1) (emphasis added). | This second removal occurred approximately seventeen months after the deadline promulgated in 28 U.S.C. § 1446(b)(1). The first wrongful removal occurred on July 10, 2020. |
| **Independently:**<br>"A case **may not be removed** under subsection (b)(3) on the basis of jurisdiction conferred by section 1332 **more than 1 year after commencement of the action**, unless the district court finds that the plaintiff has acted in bad faith in order to prevent a defendant from removing the action."<br><br>28 U.S.C. § 1446 (c)(1) (emphasis added). | This case was commenced in Mississippi state court on May 12, 2020. The case was removed for the second time approximately six months after the deadline promulgated in 28 U.S.C. § 1446(c)(1). |
| **Even ignoring both of the above for the sake of argument, the second removal was _ten days too late_:**<br>"Except as provided in subsection (c), if the case stated by the initial pleading is not removable, a notice of removal may be filed **within 30 days after receipt by the defendant, through service or otherwise, of** | Even accepting Removing Defendants' theories as to why they were allowed to remove after the deadlines in Subsection (b)(1) **and** Subsection (c)(1) of Section 1446, the |

10

| | |
|---|---|
| **a copy of** an amended pleading, motion, order **or other paper from which it may first be ascertained** that the case is one which is or has become removable." <br><br> 28 U.S.C. § 1446(b)(3) (emphasis added). | removal is still ***ten days too late***. Removing Defendants apparently calendared the deadline from November 1, which is the date that a dismissal order was entered on the court docket. *See* **Exhibit B,** Notice of Removal, p. 19  ¶¶73-74. However, literally decades of controlling precedent, and a long line of trial court decisions, hold that the Subsection 1446(b)(3) deadline does not require a court filing and is triggered based on a letter containing the information of first ascertainment of (alleged) removability. *See* **Exhibit C,** Memorandum Brief in Support of Motion to Remand, pp. 12-16 [Doc. # 27, PageID # 5342-46]. <br><br> That letter was received by Removing and Consenting Defendants on October 20, 2021. *See* Exhibit 7 to Remand Motion [Doc. #26-7]. Thus, **this 30-day deadline commenced on October 20, but the case was not removed until December 1—ten days too late.** |
| **Independently:** <br><br> "A defendant or defendants desiring to remove any civil action from a State court shall file in the district court of the United States for the | Removing Defendants failed to file **54** pleadings and orders together with the notice |

11

| | |
|---|---|
| district and division within which such action is pending a notice of removal signed pursuant to Rule 11 of the Federal Rules of Civil Procedure and containing a short and plain statement of the grounds for removal, **together with a copy of all** process, **pleadings, and orders** served upon such defendant or defendants in such action."<br><br>28 U.S.C. § 1446(a) (emphasis added). | of removal. *See* **Exhibit C,** Memorandum Brief in Support of Motion to Remand, pp. 8-11 [Doc. # 27, PageID # 5338-5341]. This represents 54 separate statutory omissions. |

These statutory violations served Removing Defendants' purpose. Pursuant to 28 U.S.C. § 1446(a), it was mandatory that Removing Defendants file, together with the removal notice, all state court orders, including a dismissal order that conspicuously displayed an October 25 signing date:

ORDERED, this the _25th_ day of _October_, 2021.

Exhibit C, Motion to Remand at exhibit 6 [Doc. # 26-6, PageID # 5317 in No. 3:21-cv-00246-DMB-RP]. But Removing Defendants violated the statute (§ 1446(a)) by omitting this order from its December 1 filing. This is a telling omission. That order is the excuse Removing Defendants give for removing a case approximately seventeen months after the deadline promulgated in 28 U.S.C. § 1446(b)(1), *and* approximately six months after the deadline promulgated in 28 U.S.C. § 1446(c)(1). *See* **Exhibit B,** Notice of Removal, p. 19 [Doc. #1, PageID # 20 in No. 3:21-cv-00246-DMB-RP]. The October signing date of the missing order telegraphs that the removal was untimely pursuant to a *third* statutory provision, 28 U.S.C. § 1446(b)(3).[2] *See* **Exhibit C**, Remand Motion

---

[2] *See* **Exhibit C,** Memorandum Brief in Support of Motion to Remand, pp. 12-16 [Doc. # 27, PageID # 5342-46 in No. 3:21-cv-00246-DMB-RP].

12

and Brief. The inescapable conclusion is that the Removing Defendants are emboldened to violate the federal statute, multiple times over, because a cross-country transfer will indefinitely stay the case.

When Defendants' second wrongful removal violates three statutory deadlines, and there are fifty-four omissions in the removal papers, the time has come for the brazen delay tactic to fail.

> **2. Because there is no subject matter jurisdiction, the only recourse is an immediate remand to state court; neither a cross-country transfer nor an indeterminate stay is appropriate in the absence of federal authority over the action in the first instance.**

Congressional mandate and Supreme Court precedent require that jurisdiction be considered as a threshold matter and that wrongfully removed cases be remanded to state court. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)). The Supreme Court has "often explained that '[f]ederal courts are courts of limited jurisdiction.'" *Home Depot U. S. A., Inc. v. Jackson*, 139 S. Ct. 1743, 1746 (2019) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)).

"The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'" *Steel Co*., 523 U.S. at 94–95 (quoting *Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379, 382 (1884)); *see also McDonal v. Abbott Laboratories*, 408 F.3d 177, 180 (5th Cir. 2005) ("we consider the threshold inquiry of subject matter jurisdiction"). Federal Courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence

of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). The Court's "first duty" is "to determine the existence of subject-matter jurisdiction." *Johnson v. Wattenbarger*, 361 F.3d 991, 992 (7th Cir. 2004). *See also Sangha v. Navig8 ShipManagement Private Ltd.,* 882 F.3d 96, 100 (5th Cir. 2018) ("the general expectation" is "that federal courts address subject-matter jurisdiction at the outset in the 'mine run of cases' and reach other issues first only where the jurisdictional issue is 'difficult to determine' and the other grounds are relatively 'less burdensome.'") (citing *Ruhrgas*; further citation omitted).

Subject matter jurisdiction is clearly lacking, and the only action that can be taken in federal court is to remand the case, as required by the black letter of federal statutory law. "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case **shall be remanded**." 28 U.S.C.A. § 1447(c) (emphasis added). This statutory language is a mandatory command. *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999); see also City of Holly Springs, 477 F. Supp. 3d at 549 ("or jurisdiction purposes, the most important point for this court is that the MDL court is a *federal* court, and, if federal jurisdiction is lacking, then an MDL court likewise has no jurisdiction to hear this matter."). In addition to this statutory mandate, the United States Supreme Court has emphasized that jurisdiction is a requirement that should be decided as a threshold matter.[3]

### C.     The Panel Should Abstain until the Mississippi Court Rules on the City's Motion to Remand.

The City's Motion to Vacate Conditional Transfer Order (CTO-211) should be granted because the most just and efficient course is to allow the Northern District of Mississippi Court to

---

[3] *See Steel, Home Depot,* and *Kokkonen* (quoted above).

decide Plaintiff's motion to remand. Here, a transfer of this action would not promote "significant economy and efficiency in judicial administration," but would delay the resolution of the motion to remand. *See* H.R. Rep. No. 1130, 1968 U.S.C.C.A.N. at 1900. The Panel abstains from ordering transfer when important motions await decision by the originating court. *See, e.g., In re L.E. Lay & Co. Antitrust Litig.,* 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) (finding that "on principles of comity, we are reluctant to transfer any action that has an important motion under submission with a court") (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484, 496 (J.P.M.L. 1968)); *In re Prof'l Hockey Antitrust Litig.,* 352 F. Supp. 1405, 1406 (J.P.M.L. 1973) (declining, without prejudice to reconsideration by the panel, to transfer action where motion for preliminary injunction was *sub judice* because the Panel has "consistently adhered to well-founded principles of comity in deciding motions to transfer under Section 1407"); *In re Resource Exploration, Inc., Securities Litig.,* 483 F. Supp. 817, 822 (J.P.M.L. 1980) (declining to transfer an action "on principles of comity" due to the pendency of motion for summary judgment that had been submitted to the transferor judge). In particular, the Panel has stayed prior transfer decisions pending a decision by the originating court on significant matters such as motions to remand, motions to stay, and motions to dismiss. *See In re Air Crash Disaster at J.F.K. Int'l Airport,* MDL-227 (J.P.M.L. filed July 20, 1977) (unpublished order deferring Panel decision on question of transfer of tag-along action until decision by transferor court on *sub judice* motion to remand that action to state court) (cited by Stanley A. Weigel, *The Judicial Panel on Multidistrict Litigation, Transferor Courts and Transferee Courts,* 78 F.R.D. 575, 577, n. 15 (1978)); *see also In re Prof'l Hockey Antitrust Litig.,* 352 F. Supp. at 1406 (transfer order  stayed pending decision of transferor court on injunction); *In re Kaehni Patent,* 311 F. Supp.  1342, 1344 (J.P.M.L. 1970) (transfer order stayed pending decision of court on motion to dismiss); *In re Deering Milliken Patent,* 328 F. Supp. 504, 505-06 (J.P.M.L.

1970) ("There is a reasonable prospect that the multidistrict character of all the cases here before us may be eliminated by district court action on motions presently pending.").

Here, the remand motion is pending in the proposed transferor court, and other motions were pending in the state court at the time of the wrongful removal. The Panel respectfully should abstain until the unique issues regarding the second removal's untimeliness, compounded by the scores of omissions in the removal papers, are addressed and adjudicated by the Northern District of Mississippi.

## V.    REQUEST FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully requests that the Panel grant the Plaintiffs' motion to vacate in its entirety and vacate the December 8, 2021, order (CTO-211).

Dated: December 27, 2021                    Respectfully submitted,

                                             */s/ Matthew R. McCarley*
                                             Matthew R. McCarley
                                             Texas Bar No. 24041426
                                             mccarley@fnlawfirm.com
                                             **FEARS NACHAWATI, PLLC**
                                             5473 Blair Rd
                                             Dallas, TX 75231
                                             Tel. (214) 890-0711
                                             Fax (214) 890-0712

                                             ATTORNEY FOR THE PLAINTIFF

16

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION             MDL No. 2804

**ORDER DENYING TRANSFER AND VACATING CONDITIONAL TRANSFER ORDER**

    **Before the Panel:** Two motions are before us in this docket.  First, defendant Endo Pharmaceuticals Inc. in an Eastern District of Pennsylvania action (*Taylor*) moves under Section 1407 (c) to transfer the action, listed on Schedule A, to the Northern District of Ohio for inclusion in MDL No. 2804.  *Pro se* plaintiff Tad Taylor supports the motion to transfer.  Second, plaintiff in an action (*City of Holly Springs*) pending in the Northern District of Mississippi moves under Panel Rule 7.1 to vacate the order conditionally transferring its action, listed on Schedule A, to MDL No. 2804. Defendants[1] oppose the motion to vacate the conditional transfer order.

    After considering the parties' arguments, we find that transfer of these actions is not appropriate.  In our order centralizing this litigation, we held that the Northern District of Ohio was an appropriate Section 1407 forum for actions sharing factual questions regarding the allegedly improper marketing and distribution of various prescription opiate medications into states, cities, and towns across the country.  *See In re Nat'l Prescription Opiate Litig.,* 290 F. Supp.3d 1375, 1378-79 (J.P.M.L. 2017).  Both actions fall within the MDL's ambit, given that they share a factual core with the MDL actions: the manufacturer, distributor, and/or pharmacist defendants' alleged knowledge of and conduct regarding the diversion of these prescription opiates, as well as the manufacturers' allegedly improper marketing of the drugs.

    Multidistrict litigation, however, "is not static." *In re Bridgestone/Firestone, Inc., Tires Prods. Liab. Litig.*, 659 F. Supp. 2d 1371, 1372 (J.P.M.L. 2009).  Here, common discovery has largely been completed, several bellwether trials have been prepared, and a bellwether remand process established. And myriad claims have been resolved through substantial settlements.  The relative merits of transferring new tag-along actions to an MDL can change over time as the transferee court completes its primary tasks, and at a certain point the "benefits of transfer should not be assumed to continue." *Id*.  We are of the view that MDL No. 2804 has reached the point where the benefits are outweighed by the effects of transferring new cases to this mature litigation.  Based on our review of the progress of this litigation, we conclude that inclusion of these two actions and any future actions in MDL No. 2804 is no longer necessary to achieve the just and efficient conduct of the litigation.  *See* 28 U.S.C. § 1407(a).

---

[1] Amerisourcebergen Drug Corporation, Cardinal Health, Inc., McKesson Corporation, Mississippi CVS Pharmacy, L.L.C., Walgreen Co., and Walmart Inc.

**EXHIBIT**

**8**

- 2 -

We see no reason why the parties in subsequent actions, subject to the same conditions imposed on the parties to MDL No. 2804, should not be able to avail themselves of the documents and depositions accumulated in this MDL.  The involved courts may find useful guidance in the numerous pretrial rulings of the Honorable Dan A. Polster in this docket.

The parties also can employ alternatives to transfer to minimize whatever, if any, possibilities may arise of duplicative discovery or inconsistent pretrial rulings.  *See, e.g., In re Eli Lilly & Co. (Cephalexin Monohydrate) Patent Litigation*, 446 F. Supp. 242, 244 (J.P.M.L. 1978); *see also Manual for Complex Litigation, Fourth*, § 20.14 (2004).  Thus, even absent transfer, most of the benefits of the MDL are available to expedite resolution of these cases.

IT IS THEREFORE ORDERED that the motion, pursuant to 28 U.S.C. § 1407(c), for transfer of this action is DENIED;

IT IS FURTHER ORDERED that plaintiff City of Holly Springs's motion to vacate the conditional transfer order designated "CTO-211" is GRANTED;

IT IS FURTHER ORDERED that Panel Rule 7.1(a), requiring notification to the Clerk of the Panel of potential tag-along actions, is hereby suspended in this litigation until further notice.

PANEL ON MULTIDISTRICT LITIGATION

Karen K. Caldwell
Chair

Nathaniel M. Gorton        Matthew F. Kennelly
David C. Norton            Roger T. Benitez
Dale A. Kimball            Madeline Cox Arleo

**IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**          MDL No. 2804

**SCHEDULE A**

<u>Northern District of Mississippi</u>

CITY OF HOLLY SPRINGS v. JOHNSON & JOHNSON, ET AL., C.A. No. 3:21−00246

<u>Eastern District of Pennsylvania</u>

TAYLOR v. ENDO PHARMACEUTICALS, INC., C.A. No. 2:21−04276

**BEFORE THE UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION**

In re:

NATIONAL PRESCRIPTION OPIATE LITIGATION                    MDL No. 2804

Relates to:

   *City of Holly Springs v. Johnson & Johnson, et al.*, Civ. No. 3:21-cv-00246 (N.D. Miss.)

**MDL NO. 2804 PLAINTIFFS' LEADERSHIP'S RESPONSE
TO PHARMACY DEFENDANTS' MOTION FOR RECONSIDERATION OF ORDER
DENYING TRANSFER AND VACATING CONDITIONAL TRANSFER ORDER 211**

   The major national chain pharmacy defendants in thousands of opioid-related cases centralized in MDL No. 2804 (CVS, Walgreens, and Walmart, hereinafter "Pharmacy Defendants") have moved for reconsideration of this Panel's recent order forgoing further transfers of new cases to the MDL, Doc. # 9586. *See* Pharmacy Defendants' Motion for Reconsideration of Order Denying Transfer and Vacating Conditional Transfer Order 211 (CTO-211). Doc. # 9592. The Plaintiffs' Executive Committee for MDL No. 2804 ("PEC"), appointed by Transferee Judge Polster to conduct the work of the MDL on behalf of all MDL plaintiffs, responds to the Pharmacy Defendants' requests as follows:

   First, the PEC takes no position on the Pharmacy Defendants' request that the Panel reconsider its decision to forgo further transfers of new cases to MDL No. 2804. We appreciate the substantial benefits of centralization in complex proceedings such as the opioids litigation. We specifically acknowledge the considerable accomplishments achieved to date in MDL No. 2804. Such benefits can also be achieved through carefully crafted sharing orders and active coordination

**EXHIBIT
9**

between the MDL Transferee Judge and related non-MDL proceedings, without requiring the transferring-in of new cases.

Second, the PEC opposes the alternative form of relief suggested by the Pharmacy Defendants—the establishment of a new, separate Pharmacy Defendants MDL. The Pharmacy Defendants, who have long been active participants in MDL No. 2804, are in no way similarly situated to McKinsey & Co., for whom the Panel did create a new opioid-related MDL. Creation of a new Pharmacy-only MDL would be a disruptive step backward, would disserve the fairness and convenience goals of Section 1407, and would dramatically set back the process of resolving national opioid litigation.

**I.      The Work of MDL No. 2804**

The variety of parties and the scale of the national opioid crisis make MDL No. 2804 a proceeding unparalleled in complexity.  The work accomplished under the management of MDL Transferee Judge Polster is likewise unparalleled in magnitude and has been accomplished on what continues as a brisk and intensive schedule.  In just over four-years time, substantial national discovery has been conducted involving dozens of parties, including millions of pages of document productions and hundreds of depositions; much of that discovery has also been shared with state-court litigants. Scores of expert witnesses have been identified, retained, issued reports, been deposed, and subjected to *Daubert* review. Dozens of dispositive motions have been heard and resolved. Eleven bellwether case tracks have been established, with four cases to date readied for trial,[1] two now underway, and the remainder preparing for trial in the months to come.[2]  And, in

---

[1] The first of these bellwethers settled on the eve of trial; a second (against the Pharmacy Defendants) went to verdict on liability and is now proceeding to a remedy trial; a third has been tried to the bench and is awaiting verdict; while a fourth bellwether trial (including Walgreens as a defendant) is currently underway in the Northern District of California before Judge Breyer.
[2] Five of the remaining bellwethers are focused on claims against the Pharmacy Defendants.

an unprecedented accomplishment in an MDL proceeding, the PEC and four national defendants reached the largest partial settlement of tort claims known to date: the combined $26 billion settlement with the "Big 3" Distributors/ Janssen that is now beginning to deliver desperately needed abatement funds to States, cities and counties across the country.[3]

This MDL has been active – with active being very much the operative word. And, given all that has been accomplished thus far, the PEC agrees with the Panel's characterization of MDL No. 2804 as "mature litigation." Doc. #9586, at 1.

At the same time, the PEC wholeheartedly agrees with the Pharmacy Defendants that "much work . . . remain[s]." Doc. #9592-1, at 2. Numerous national defendants, including the Pharmacy Defendants, remain in active litigation, having neither entered into global settlements nor filed for bankruptcy protections. The MDL Transferee Court is now moving to establish bellwether proceedings for many of the remaining manufacturer and distributor defendants named in MDL cases. *See* MDL No. 2804, Doc. #4380. The MDL Court is also moving forward with bellwether proceedings involving additional categories of plaintiffs—such as hospitals, third-party payors, and school districts—that were not included in the earlier bellwether proceedings, which have focused on local governments and Indian tribes. *See* MDL No. 2804, 3/4/22 Minute Order. Partly due to defendants' intransigence, national discovery remains incomplete: as just one example, the Pharmacy Defendants have steadfastly resisted the PEC's efforts to discover national dispensing data, even though they regularly sell this data to vendors like IMS/IQVIA, which in turn sell that data to manufacturers for marketing purposes. Thus, the benefits of centralization— "the just and efficient conduct" of actions sharing common questions of fact, the elimination of

---

[3] This resolution could not have been accomplished but for the vision and commitment of the MDL Transferee Judge to encourage and enable resolution across federal/ state lines, among adversaries and competitors.

duplicative discovery, the prevention of inconsistent pretrial rulings, and the conservation of both party and judicial resources—unquestionably continue to exist. We do find it troubling that the Pharmacy defendants seek to maintain the centralization yet refuse national discovery that would allow the MDL to create the complete discovery package contemplated by the panel.

Nevertheless, the PEC respects the Panel's determination that "most of the benefits of the MDL are available to expedite resolution of [newly filed] cases" without further transfer. Doc. # 9586, at 2. We acknowledge that, with appropriate, carefully-crafted sharing orders, parties in these cases should "be able to avail themselves of the documents and depositions accumulated in this MDL." *Id.* And, even absent transfer, they can rely on the precedents established by the Transferee Judge and his discovery Special Master to avoid inconsistent pretrial rulings or duplicative discovery. Throughout MDL No. 2804, Judge Polster has actively coordinated and cooperated with other courts involved in related state-court proceedings; there is no reason why he could not continue to do the same with related, but uncentralized, proceedings in other federal courts. For these reasons, the PEC declines to take a position on the Pharmacy Defendants' request that the Panel reconsider its decision to forgo further transfers of new cases to MDL No. 2804.

**II.**   **The PEC Opposes Creation of a Separate Pharmacy Opioid MDL**

Nevertheless, the PEC must strenuously object to the alternative relief requested by the Pharmacy Defendants: the establishment of a separate opioids MDL for claims against Pharmacy Defendants. Such a step would frustrate the goals of the Multi-District Litigation Act. It could potentially send Plaintiffs' claims against the Pharmacy Defendants back to the starting gate, even though these Defendants have been active participants in virtually all of the proceedings since the outset of MDL No. 2804. Moreover, most of the currently centralized cases against the Pharmacy Defendants also involve numerous other parties; would only the claims against the Pharmacy Defendants be transferred to this proposed new MDL, or the entire action?  The former option

-4-

creates myriad inefficiencies and potential inconsistences, while the latter simply creates a new clone MDL. In either event, how would this new Transferee Judge coordinate with Judge Polster to prevent inconsistent rulings? And, of course, this alternative "solution" proposed by the Pharmacy Defendants would only double the amount of coordination required between the federal courts and parallel state-court proceedings.

The Pharmacy Defendants certainly cannot complain about having been ignored by the Transferee Court in MDL No. 2804. As the Panel suggested in its original December 2017 Transfer Order, *see* 290 F.Supp.3d 1375, 1379 (JPML 2017) ("The transferee judge might find it useful, for example, to establish different tracks for the different types of parties or claims."), Judge Polster has created separate case tracks for different categories of defendants, including the Pharmacy Defendants. Case Track 3, which was tried to verdict on liability against the pharmacies, will commence the remedy phase of the trial next week. Five other bellwethers are currently proceeding through discovery exclusively against those defendants, with forthcoming trials in districts across the country. Any action to separate the claims against the Pharmacy Defendants from MDL No. 2804 would drastically interfere with this advanced, and aggressive, bellwether litigation progress.

Although the Pharmacy Defendants attempt to analogize their situation to the recently created McKinsey opioids MDL, the factual circumstances here are nothing like the McKinsey case. While McKinsey was nominally a "consultant" to Purdue Pharma regarding its marketing of opioids, it was more active and embedded in the Purdue scheme (while simultaneously advising one of Purdue's regulators, the FDA: a level of activity even now being exposed in the Congressional Hearings that commenced on April 27, 2022). However unlike the Pharmacy defendants, McKinsey was not engaged in manufacturing and distribution of controlled substances regulated under the DEA, and thus was not named in the thousands of suits filed against the

-5-

Manufacturer, Distributor, and Pharmacy Defendants that were filed throughout the federal system and centralized by this Panel in late 2017. The Pharmacy Defendants have been named as co-defendants with manufacturers and distributors in thousands of cases in MDL No. 2804, as co-conspirators and as members of alleged Civil RICO enterprises. The common fact questions that this Panel recognized called for MDL centralization arose from precisely these inter-relationships.

The Pharmacy Defendants have actively participated in the work of MDL No. 2804 for the past four years; they have not been left behind, and much attention has been paid them: they are currently defendants in two active MDL bellwether trials, with more scheduled. The Pharmacy Defendants offer no explanation how  their proposed two-MDL multiverse  might more effectively advance the convenience, efficiency, fairness, economy, and consistency goals of centralization.

## **CONCLUSION**

Because the PEC can envision a non-duplicative and cost-efficient path forward either with further transfers of cases into MDL No. 2804, or instead through coordination between the existing MDL and newly filed federal cases, the PEC takes no position on the Pharmacy Defendants' motion for reconsideration of this Panel's order suspending its tag-along process. The PEC must strongly oppose the Pharmacy Defendants' alternative proposal- the creation of a separate MDL limited to opioids claims against Pharmacy Defendants- because it would not advance the statutory goals of MDL centralization.

May 4, 2022                                  Respectfully submitted,

                                             /s/Jayne Conroy
                                             Jayne Conroy
                                             SIMMONS HANLY CONROY
                                             112 Madison Avenue, 7th Floor
                                             New York, NY 10016
                                             (212) 784-6400
                                             (212) 213-5949 (fax)
                                             jconroy@simmonsfirm.com

2411059.1

/s/Joseph F. Rice
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464 (843)
216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

/s/Paul T. Farrell, Jr., Esq.
Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

/s/Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

2411059.1

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

In re:

NATIONAL PRESCRIPTION OPIATE LITIGATION          MDL No. 2804

Relates to:

*City of Holly Springs v. Johnson & Johnson, et al.*, Civ. No. 3:21-cv-00246 (N.D.
Miss.)

**<u>PROOF OF SERVICE</u>**

In compliance with Rule 4.1(a) of the Rules of Procedure for the United States Judicial

Panel on Multidistrict Litigation, the undersigned counsel hereby certifies that copies of the

foregoing Motion for Reconsideration of Order Denying Transfer and Vacating Conditional

Transfer Order 211 (CTO-211) were served electronically via the CM/ECF system.

 May 4, 2022

<div style="margin-left:45%">

*/s/Peter H. Weinberger*_____
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

</div>

2411059.1

Wednesday, December 05, 2018
10:15 AM


State Court Litigants

Re:        National Prescription Opiate Litigation MDL No. 2804

Good Afternoon,

This is an update from the MDL. The MDL Plaintiffs Steering Committee (a/k/a the Plaintiffs Executive Committee, "PSC" or "PEC") wishing to offer its colleagues that are litigating in State Court as much assistance and cooperation as any or each of them wants, including the extensive MDL work product. As you are aware from reviewing the State and Federal Coordination Order, Jayne Conroy, Steve Skikos, and Joe Rice are the MDL-designated attorneys responsible for State and Federal Coordination. The Order has some significant provisions that we wanted to point out. The Order can be found at **https://www.ohnd.uscourts.gov/sites/ohnd/files/17-2804.pdf** (Doc. 1029).

It is the position of this MDL's leadership, that plaintiffs in each state court have the right to proceed with liability discovery and trial.  The MDL leadership in this case has repeatedly and consistently stood for the rights of state court litigants to litigate their cases. The relationship between parties and courts in these cases is complex, but this MDL Court has already entered orders expressly recognizing that while there are important benefits to coordination for all parties, this Court has also recognized that "state courts are independent jurisdictions," Doc. 643, Section I(f)(1), and no party waives any jurisdictional rights or obligations with regard to discovery, trial setting, or trial by agreeing to coordinate with the MDL, including participating in MDL depositions that are cross-noticed in state cases.

The Order requires there be a database created to which every State Court attorney has access. This is being managed by Ankura Consulting and is being funded through the MDL. This database can be found at https://opioids-state-cases.mdl.online where you can register to use it. Ankura will send notification for two separate web-based training sessions in the next week. If you are unable to attend one of the training sessions, please contact Ankura at State-Federal-2804_Plaintiffs@Ankura.com, to set up additional webcast as necessary.  This database is our attempt to be sure State Court attorneys know exactly what depositions are being noticed and cross-noticed, as well as the status of that cross-notice.

In addition, there are a couple of things we want to be sure you are aware of related to document discovery in the MDL. Initially, Special Master Cohen in his Discovery Ruling No. 2 (Doc. 693) required the Defendants to produce documents that covered a broad region of the country. On a national basis the Order included documents related to marketing and promotion, brand planning and strategy, sales training and sales bulletins, prescriber educational materials, distribution monitoring, advocacy groups, speakers bureau programs, CMEs, diversion, suspicious order reports, adverse event reports, and regulatory activity ("Category One Discovery"), and on a regional basis it

Letter to State Court Litigants

EXHIBIT
**10**

Page 1 of 3

included the States of Ohio, Pennsylvania, West Virginia, Kentucky, Illinois, Georgia, and Florida, customer-specific information, such as call notes and transactional data ("Category Two Discovery").  The Defendants objected and sought revision for this Order. Special Master Cohen in fact amended his order and limited their requirement to produce documents related to certain topics to a limited jurisdictional area.  (See Discovery Ruling No. 3, Doc. 762) Understand when the Defendants say they are giving you documents produced in the MDL, it has a geographical limitation that could be significant to your individual case.

The MDL has received to date around 19.5 million documents totaling over 105 million pages. These include insurance documents, documents previously produced in other litigation or investigation (i.e. Congress and State investigation and litigation) and responses to requests to produce. We continue to get thousands of documents weekly. The MDL has over 400 attorneys actively engaged in document review, coding, and analysis. Depositions are proceeding on a very aggressive calendar with an expectation of over 200 in December and January.

The most immediate item that is being requested is the "ARCOS" (Automation of Reports and Consolidated Orders System) Database. By way of background, many of us started seeking the ARCOS database from the DEA prior to the MDL formation. Upon formation of the MDL, the efforts continued. That led to orders from the Court requiring DOJ to produce the raw database under a strict confidentiality order. (See Order Regarding ARCOS Data (Doc. 233) and Second Order Regarding ARCOS Data (Doc. 397), found at https://www.ohnd.uscourts.gov/sites/ohnd/files/397.pdf). Upon receiving the original data, we quickly learned that it was missing some significant drugs in the Opioid family, so an amended order was issued with the cooperation of DOJ. (See Third Order Regarding ARCOS Data (Doc. 668), found at https://www.ohnd.uscourts.gov/sites/ohnd/files/17-2804ARCOS.pdf ).

In order to receive this data, the Order requires a secured server and many other layered items of security. When we received these millions of lines of data, we started the process of taking this raw data, analyzing it, and organizing it into a useable transactional database. This required thousands of dedicated hours by lawyers, PHD, economists, and other analytical experts to write the code and undertake this transactional conversion that subsequently had to be tested and proven reliable.

Not only has the PSC been requested to produce the ARCOS database, many attorneys are seeking it from the DOJ. As stated above, the DOJ only has the raw data and that is all they have been required to produce. The PSC has agreed with the DOJ that it will produce to any attorney in the country the ARCOS data in the format received by the PSC under a DOJ-agreed-to confidentiality order. It is our understanding that Special Master Cohen and the DOJ are in the process of addressing the confidentiality provisions in an amended confidentiality order. Upon entry of that order, the PSC will make available this database AT NO COST to any attorney representing a state municipal litigant, Third Party Payor, or Hospital.

In addition, at the request of a number of the state attorneys, the PSC will attend a meeting to be held December 19th in Houston hosted by Mark Lanier at 14130 Hargrave Road. We will have experts attend to demonstrate what can be done with the raw data versus what one can do in an

analysis with the transactional database. Attendance at this meeting will be limited to those that have agreed to the protective order provided by the MDL Court.  A copy of the MDL Protective Order can be found at https://www.ohnd.uscourts.gov/sites/ohnd/files/441.pdf.  Please email your executed MDL Protective Order to Ankura at State-Federal-2804_Plaintiffs@Ankura.com.  If you have not executed the MDL Protective Order, you will be asked to sign one before being admitted into the meeting.

In the very near future, we will be circulating the document referred to as the "Participation Agreement" that is referenced in the State and Federal Coordination Order. Entry into the Participation Agreement is a voluntary act by each attorney. However, IT IS THE KEY that will allow the PSC to provide the attorney with access not only to the preliminary production of documents in the MDL but also to the work product of the MDL in document review, deposition preparation, expert witness preparation, and development in the transitional ARCOS database. To make clear, this will include all document depository, all hot document review processes, all deposition information, all third-party discovery that is not covered by separate protective order, and continuation of productions. The MDL is paying to store over ten million documents, and this will give you access to those documents without any storage costs. The Participation Agreement also describes the procedure for the submission of time and expenses (subject to review and acceptance) related to the case generally.

Each of you has been involved in complex litigation and coordination in MDL practice previously and are aware of the tens of thousands of hours and millions of dollars that are required to litigate a massive case. There has been no larger civil case than the Opioid litigation. There will be further discussion of the Participation Agreement at our upcoming December meeting and in further correspondence.

If you have any questions, please feel free to direct them to Ankura at State-Federal-2804_Plaintiffs@Ankura.com. We will wait ten days to receive all questions and then send a subsequent correspondence. Our reply to the questions will also be posted at a common site for everyone to review at their leisure.

We hope that this letter helps move forward the State and Federal Coordination and the cooperative effort among all litigants representing the Plaintiffs in Opioid litigation.

As we are,
Sincerely,


Joseph F. Rice
Jayne Conroy
Steven Skikos



KIMBERLY LAMBERT ADAMS
BRIAN H. BARR
MICHAEL C. BIXBY
M. ROBERT BLANCHARD
BRANDON L. BOGLE
W. TROY BOUK
WESLEY A. BOWDEN
VIRGINIA M. BUCHANAN
WILLIAM F. CASH III
JEFF GADDY
REBECCA D. GILLILAND
(LICENSED ONLY IN ALABAMA)

RACHAEL R. GILMER
FREDRIC G. LEVIN
MARTIN H. LEVIN
ROBERT M. LOEHR
STEPHEN A. LUONGO
M. JUSTIN LUSKO
NEIL E. McWILLIAMS, JR.
CLAY MITCHELL
PETER J. MOUGEY
DANIEL A. NIGH
TIMOTHY M. O'BRIEN

MIKE PAPANTONIO
CHRISTOPHER G. PAULOS
EMMIE J. PAULOS
A. RENEE PRESTON
ROBERT E. PRICE
MARK J. PROCTOR
TROY A. RAFFERTY
MATTHEW D. SCHULTZ
W. CAMERON STEPHENSON
THOMAS A. TAYLOR
LEO A. THOMAS
BRETT VIGODSKY

OF COUNSEL:
LAURA S. DUNNING
(LICENSED ONLY IN ALABAMA)
BEN W. GORDON, JR.
ARCHIE C. LAMB, JR.
PAGE A. POERSCHKE
(LICENSED ONLY IN ALABAMA)
CHRISTOPHER V. TISI
(LICENSED IN WASHINGTON, D.C.
AND MARYLAND)

LEFFERTS L. MABIE, JR. (1925-1996)
D.L. MIDDLEBROOKS (1926-1997)
DAVID H. LEVIN (1928-2002)
STANLEY B. LEVIN (1938-2009)

### RE: <u>MDL 2804: SECOND AMENDED NOTICE OF ARCOS DISCLOSURE</u>

Dear Counsel:

You are receiving this letter from the Plaintiffs' Executive Committee of *In re National Opioid Prescription Litigation*, MDL No. 2804.  This letter explains how you may obtain, without charge, refined data that shows in detail everything we know from the ARCOS database regarding which opioids flowed into your clients' jurisdictions, and how they got there.

By way of background, ARCOS (Automation of Reports and Consolidated Orders System) is an automated, comprehensive drug reporting system administered by the DEA which monitors the flow of controlled substances from (1) their point of manufacture through (2) commercial distribution channels to (3) point of sale or dissemination at the dispensing/retail level (such as hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions). All DEA registrants who manufacture and/or distribute controlled substances are required to report to ARCOS.

In the MDL litigation, the DEA produced a subset of ARCOS Data reflecting all transactions nationally by every registered manufacturer and distributor of opioid drug products. In total, the ARCOS Data produced by the DEA has 500,709,803 transaction records. In order for the data to be useful, the Opioid MDL Executive Committee hired a strategic litigation consulting group out of Washington, D.C. to process, validate and augment the opioid ARCOS data. In doing so, the consulting group made certain corrections to and exclusions from the county-level processed ARCOS data, which are explained in the attached **Appendix**.

Pursuant to agreement with the DEA and by order of the federal MDL Judge, the Honorable Dan A. Polster, the MDL PEC is making available to you without charge the unprocessed ARCOS data in the same format it was received from the DEA. This data is what you would receive if you filed a *Touhy Request* with the DEA.

The PEC has found, however, that the data was not useful as received, so we spent extensive resources making it useful. We are also providing you, again without charge, access to the result of that investment.  The PEC's ARCOS website allows you to go straight to the county-level processed ARCOS data and county-level reports and download the information you need in order to understand from the ARCOS database exactly which opioid products flowed into your clients' jurisdictions and how they got there. While you have the right to download the unprocessed ARCOS data and process it yourself, we urge you to avoid that step and instead simply access the PEC's processed ARCOS data and reports.

<div style="border:1px solid black">

**EXHIBIT**

**11**

</div>

To obtain either the unprocessed ARCOS data or access to the PEC's ARCOS website, please contact ARCOSRequest@levinlaw.com.

Sincerely,

Peter J. Mougey
On Behalf of the Plaintiffs' Executive
Committee

## Appendix:  Exclusions/Corrections to the ARCOS Data
## Reflected in the County-Level Reports

a. Duplicate transactions are excluded when the same transaction was reported to ARCOS more than once by the same registrant. [1]

b. Transactions are excluded where the Drug Code from the NDC dictionary is not one of the 14 opioids tracked by the DEA.

c. Transactions are excluded when the Action Indicator code, Correction Number, or both suggest the reported transaction is erroneous.

d. All transactions involving reverse distributors, analytical labs, importers, exporters, or researchers are excluded.

e. Transactions between two registrants are excluded when the transaction is reported by the registrant *receiving* the shipment, because the transaction was already reported to ARCOS by the registrant *sending* the shipment.

f. Transactions with obvious errors in the reported Quantity are excluded.

g. Transactions with Transaction Code "X" (Lost-in- Transit) are excluded, because "Transaction Code X" is an explanatory code which does not affect an ARCOS registrant's inventory.[2]

h. The Calculated Base Weight in Grams was corrected when it was calculated using an incorrect Ingredient Base Weight from the NDC dictionary.

---

[1] The ARCOS Data had 610,381 duplicate transactions in December 2007 for one of the Cardinal Health distribution centers (Seller DEA Number: RC0221236). All but one of each set of exact duplicate transactions was excluded.
[2] ARCOS Handbook, §5.8.3, p. 5-19.

i. Where the ARCOS Data (NDC, Drug Code, and Drug Name) differed from the NDC Dictionarythe ARCOS Data was updated to reflect the information in the November 2018 NDC Dictionary.[3]

j. For clarity, the trade name of the drug product ("Trade/Product Name") and the dosage form ("Package Measure") were added to the ARCOS Data using the NDC Dictionary.

k. Deletion requests and originally-reported transactions are excluded where: (1) they cancel each other out, or (2) the ARCOS Data already includes an adjusted or corrected transaction.

---

[3] The DEA's NDC dictionary is available at www.deadiversion.usdoj.gov/arcos/ndc/ndcfile.txt. The dictionary is explained at www.deadiversion.usdoj.gov/arcos/ndc/readme.txt. The DEA updates the NDC dictionary monthly to correct errors, add new drug products, and remove discontinued drug products. The consultant used the NDC dictionary updated on November 1, 2018, plus any discontinued drug products from earlier versions of the NDC dictionary in May 2018 –October 2018. An alternative NDC dictionary is maintained by the FDA (www.accessdata.fda.gov/scripts/cder/ndc/index.cfm).

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| _____ ) | **Case No. 1:17-MD-2804** |
| **IN RE: NATIONAL PRESCRIPTION** ) | |
| **OPIATE LITIGATION** ) | **Professor William B. Rubenstein** |
| ) | |
| ) | |
| ) | **REPORT AND RECOMMENDATION** |
| ) | **ADDRESSING MOTION FOR** |
| ) | **COMMON BENEFIT FUND** |
| _____ ) | |

Before the Court is Plaintiffs' *Amended* Motion for Entry of Order Establishing Common Benefit Fund.  Doc. #: 3112.  Numerous parties and non-parties have filed oppositions to the motion, Docs. ##: 3181, 3185, 3186, 3189, 3190, 3191, 3192, 3193, 3194, 3195, 3197, 3198, 3209, and the movants have filed a reply, Doc. #: 3212.  Pursuant to my role as expert consultant for the Court, *see* Doc. #: 3218, I recommend that the Court solicit additional briefing from interested parties before issuing a ruling on the motion.  This report explains the reasoning behind that recommendation and sets forth specific questions for further briefing.

A common benefit fee is a type of fee device typically employed in MDLs that consolidate numerous individual cases – each with its own individually-retained plaintiffs' attorney (IRPA) – and authorize a smaller group of attorneys to run the plaintiffs' side of the case as the plaintiffs' steering committee (PSC).  The common benefit fee requires the IRPAs to share a portion of their attorney's fee with the PSC.  (A common benefit fee may be taxed against the recoveries of un-represented settling parties in the same manner.)  In doing so, the common benefit fee solves two inter-related problems: (1) it ensures that the IRPAs are not unjustly enriched by reaping their full contingent fee even though other lawyers are doing some portion of their work, and (2) it simultaneously provides a mechanism for funding those other

EXHIBIT

**12**

lawyers' (the PSC's) work.  The intra-lawyer tax is labelled a "common benefit fee," in that it pays for legal work (typically, the PSC's) that "commonly benefited" any settling case.  *See generally* William B. Rubenstein, 5 *Newberg on Class Actions* § 15:112 (5th ed.) (hereinafter *Newberg on Class Actions*).

Ideally, the lawyers in a case of this structure work out the common benefit tax among themselves; if contracting is a viable option, then resort to court-imposed measures is unnecessary.  *See* Restatement (Third) of Restitution and Unjust Enrichment § 29(3)(d) (Am. Law Inst. 2011) ("(3) A beneficiary is liable in restitution only if . . . (d) liability will not impose an obligation that should properly have been the subject of contract between the claimant and the beneficiary.").  Where contracting has not worked – or where it cannot work – PSCs have turned to the courts for common benefit orders.  To demonstrate their entitlement to a common benefit fee, proponents must show that their work "substantially benefited" the cases to be taxed.  *See In re Genetically Modified Rice Litig.*, 835 F.3d 822, 830 (8th Cir. 2016) ("The equitable common-benefit doctrine permits a district court to redistribute costs among plaintiffs when the litigation has conferred a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them.") (internal quotation marks and citations omitted); *In re Diet Drugs*, 582 F.3d 524, 546 (3d Cir. 2009) ("[I]n order to obtain common benefit fees, an attorney must confer a substantial benefit to members of an ascertainable class, and the court must ensure that the costs are proportionately spread among that class.").  The tax is generally calculated in the range of 5% for fees and 2.5% for costs.  5 *Newberg on Class Actions* § 15:117.

If MDLs invariably resulted in a single aggregate settlement in the MDL forum, assessing common benefit fees would be straightforward and would parallel, in many ways, the assessment of a class action fee at the conclusion of a common fund class action case.  The problem in MDLs of this type is that, because there are so many lawyers and clients, large and small satellite settlements may arise throughout the course of the MDL – and often in advance of (or instead of) an aggregate settlement.  This raises a timing issue: if a common benefit assessment is appropriate, it may need to be levied prior to an aggregate settlement, lest satellite settlement monies be distributed and then lie outside the reach of a later levy.  MDL courts have solved this timing problem by developing a two-stage common benefit fee process.  At the first stage, a common benefit fee is assessed against early settlements and the monies are placed in an escrow account.  The mechanism for effectuating the monetary transfer from the IRPAs (or their settling clients) to the escrow fund is typically an order from the Court requiring that a defendant settling any case "hold back" a certain percentage of the settlement for this purpose.  *Id.* at § 15:115.[1]  At the second stage, usually after the PSC has reached an aggregate settlement, common benefit fees are distributed from the escrow fund via a normal fee application, with any excess funds being returned to the taxed parties.  *Id.*

The present motion is a first stage – assessment – motion, seeking a common benefit assessment of 7% (6% fees, 1% costs).  Doc. #: 3112 at 3.  The Plaintiffs' Executive Committee ("PEC") argues that it has worked tirelessly over a two-year period, at enormous financial and personal cost, and that its many efforts have served to move the litigation forward.  Doc. #: 3212

---

[1] This Court entered such a holdback order at the time of the initial bellwether settlements in this matter, though it ordered that the plaintiffs themselves direct the monies to an escrow fund.  *See* Order Regarding Track One Settlement Funds, Doc. #: 2980 at 1-2 (ordering, so as "ensure that any eventual common benefit assessment remains payable from settlement funds," that "the Track One Plaintiffs shall place into escrow 7.5% of any settlement funds they receive or received from any defendant").

at 3 (stating that the common benefit work includes "taking 550 depositions; serving 330 third party subpoenas; developing scores of experts; briefing and prevailing on multiple motions to dismiss and motions for summary judgment; preparing for multiple bellwether trials; and analyzing over 162 million pages of documents," and stating that the common benefit lawyers have expended "over 1.2 million hours of their time," and have paid "nearly $100 million" to "fund the common benefit work.").[2]  Essentially, the PEC contends that all of the time and money its members have invested have helped clarify factual and legal issues and helped establish the groundwork from which settlements might emerge.  Even opponents of the proposed assessment acknowledge some of these facts.  *See, e.g.*, Doc. #: 3192 at 2 ("[T]he Opposing Governmental Plaintiffs do not gainsay the value of the work that the Plaintiffs' Executive Committee (the 'PEC') and other plaintiffs' counsel have completed in the present multidistrict litigation (the 'MDL'). These attorneys are entitled to just compensation for their important work.").  The PEC has undertaken this work on a contingent basis, of course, meaning it may ultimately receive no compensation for those efforts.  Nonetheless, given the common benefit work to date (coupled with many other factors), it is not implausible that: (1) even absent a global settlement, one or more defendants could settle with single plaintiffs or groups of plaintiffs, and (2) the PEC's common benefit work will have significantly contributed to those outcomes, thereby conferring a "substantial benefit" and entitling the PEC to a common benefit fee.  That possibility, the PEC argues, demonstrates that a common benefit assessment order is timely.

---

[2] Some opponents point out that the moving papers, at present, proffer no factual support for any of these statements.  *See, e.g.*, Doc. #: 3189 at 5.  To the extent that the movants aim to demonstrate factually that their efforts have substantially benefited the many satellite cases they seek to tax, and the time and costs expended to achieve that end, the record would be stronger if their legal arguments were substantiated with proper supporting affidavits or documents.

Yet, my recommendation is that the Court proceed cautiously with respect to this request. This MDL is truly unique and, as with many aspects of this litigation, the present common benefit motion tests uncharted waters.  Four factors are of note.

*First*, the fee application comes in advance of any aggregate settlement.  This fact alone is fairly normal, as described above.  But in that normal situation, the Court levying the fee envisions that, if a future aggregate settlement is to take place, it is highly likely that the PSC will have created it and the MDL court will be the forum in which it is effectuated.  What is unique here is that it is entirely unclear at this point if an aggregate settlement is feasible, what structure it might take, which defendants will settle, what role this forum will play in it, and whether the settlement structure will require a "common benefit fee" approach to ensuring that these PEC's lawyers are compensated for their efforts.

*Second*, to the extent that the present motion aims to tax satellite settlements, those too differ from the typical MDL.  In the typical case, there are many plaintiffs and one or a few defendants.  Here, there are numerous different types of plaintiffs (cities, counties, tribes, hospitals, third-party-payors, and so on) and dozens and dozens of different defendants involved in distinct aspects of the pharmaceutical chain (manufacture, distribution, retail sale, etc.).  The permutations of possible settlements – and settlement types – are staggering.  A single common benefit assessment levied on multiple different types of settlements involving many different types of plaintiffs and multiple defendants runs the risk of being too crude an approach.

*Third*, the fact that most of the satellite settlements the PEC seeks to tax involve cases brought by state, county, city, or tribal governmental entities presents another unique factor that may pose difficult legal questions.

*Fourth*, the Court is being asked to rule on this motion while complex, multi-party aggregate settlement negotiations are underway and, as many opponents to the motion warn, any ruling from this Court concerning either a fee entitlement or calculation level could significantly impact those negotiations.  Indeed, the warnings are dire:  the National Association of Attorneys General suggests a common benefit fee might "disrupt" settlement progress "irreparably," Doc. #: 3181 at 1; the Defendants argue that a common benefit order would "seriously jeopardize" global settlement possibilities, Doc. #: 3186 at 1; and certain Governmental Plaintiffs contend that the order would "sabotage" global settlement efforts, Doc. #: 3192 at 3.

Cumulatively, these assertions show that the Court is being asked to act on novel legal issues in a state of factual uncertainty.

Given these difficult competing concerns, I recommend that the Court seek additional information to assist in its consideration of these complex issues.  Below, I identify five specific issues and set forth specific questions for further briefing on each issue.  I recommend that the Court issue an Order (a) requiring that the movants submit a brief addressing all five of the issues set forth below and (b) inviting any other interested party to submit a brief addressing any or all of these issues.

1.      The public record reflects that a global settlement may encompass a separate pot of money dedicated solely to attorney's fees.  *See, e.g.*, Doc. #: 3192 at 3 ("[I]t should be obvious from what has been publicly disclosed that any multi-billion-dollar resolution spearheaded by the Attorneys General would necessarily entail requests by the Distributor Defendants and Johnson & Johnson for broad releases and the resolution of claims for attorneys' fees, including by the MDL counsel. For that reason, the Proposed Order is unnecessary to protect the interests of the

MDL PEC or to reach a fair allocation of the available total fees among counsel prosecuting these cases in different jurisdictions.").

The Court should invite briefing on the following question:

**Q1:    (a) How likely is it that a global settlement will have specific funds to compensate all attorneys in these matters such that the Court will not need to render a common benefit order? (b) Can the Court simply wait to see if such settlement structures emerge before taking the more intrusive step of requiring common benefit holdbacks and, if not, why not?**

2.    Following the initial bellwether settlements, with the cooperation of the underlying attorneys, this Court entered an order that the settling parties escrow 7.5% of their recoveries in anticipation of a future common benefit order.  Doc. #: 2980.  As the parties are aware, other exemplary cases are scheduled for trial in federal courts throughout the country.  As noted above, court-ordered common benefit assessments are necessary only when the lawyers cannot voluntarily reach agreement among themselves.

The Court should invite briefing of the following question:

**Q2:    (a) How likely is it that the parties and lawyers in the upcoming exemplary cases can reach an agreement on a common benefit contribution?    (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement and how they might be resolved.**

3.    Some opponents of this request note that the PEC could attempt to enter agreements with state court plaintiffs as well.  Doc. #: 3191 at 10 ("Before the MDL Plaintiffs are permitted to exact a 7% tax on any state court recovery or settlement, the MDL Plaintiffs should have to obtain the written consent of state court plaintiffs to contribute to the common benefit fund. . . . If the MDL Plaintiffs want to condition the sharing of work product or anything else on a state court plaintiff's agreement to contribute to the common benefit fund, the MDL Plaintiffs should have to lay out the terms of the deal in writing and obtain written consent.").  Moreover, other parties propose that, in lieu of a common benefit assessment on state court

settlements, which raises significant federalism concerns, the PEC could simply seek a lien against those cases in state court.  Doc. #: 3192 at 11 ("To the extent that local counsel proceed to litigate individually in state court, the MDL is free to assert an 'attorneys lien' in state court to compensate them for the benefits conferred and costs saved to local counsel. The proper amount of such compensation will likely vary by circumstance. Relevant factors may include (i) the usefulness of the MDL attorney's work to the prosecution of a state court case, (ii) state court counsel's own costs and time spent prosecuting the case, and (iii) the total amount of attorney fees made available in that jurisdiction. State courts recognize that counsel should be paid for their contribution to successful litigation, and can be trusted to make it happen.").

The Court should invite briefing of the following question:

**Q3:  (a) How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution?  (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

4.      Percentage-based fee awards are a function of two data points – the percentage assessed and the amount it is a percentage of.  My empirical data from 35 fee assessments and 26 cost assessments show that the average assessment is 4.99% for fees and 2.49% for costs (about 7.5% altogether), and the median assessment is 4% for fees and 2% for costs (about 6% altogether).  5 *Newberg on Class Actions* § 15:117.  The PEC's request of 6% for fees and 1% for costs (7% altogether) is therefore, in total, just below the mean and just above the median. Yet empirical data strongly demonstrate that percentage-based attorney's fees decrease as settlement values increase.  *Id*. at § 15:81.  Potential settlements in this matter could be enormous.  *See, e.g.*, Doc. #: 3186 at 2 ("[A] 7% share of the settlement framework announced in October 2019 would exceed $3.3 billion. And that would be just the beginning: the PEC will

8

attempt to recover additional fees under contingency agreements, to say nothing of the amounts that other plaintiffs' counsel will demand.").

The Court should invite briefing of the following question:

**Q4:    (a) How should a common benefit assessment account for the potential size of the taxed settlements, if at all? (b) Does the PEC's proposed 7% common benefit assessment properly account for the potential size of settlements in this matter?  If so, explain how.  If not, explain how it should be adjusted to do so.**

5.    Some opponents of the common benefit assessment point out that the IRPAs' underlying contingent fee agreements are with public entities, often at below-market rates. *See, e.g.*, Doc. #: 3192 at 9 & n.4 ("[A]ssessments under the Proposed Order are potentially excessive and, if charged to local counsel, will dramatically and unfairly reduce their contracted for contingency rates. [FN4] Many of the firms signing this letter entered contingency contracts with their public entity clients at rates far less than they would charge private clients."); *id*. at 10 ("Unlike the ordinary contingency litigation involving private plaintiffs, if there were to be a global settlement here, local counsel will receive nowhere near the typical attorney fee contingencies (30-33 1/3%), as against which the 7% assessment would be applied.").

The Court should invite briefing of the following question:

**Q5:    (a) How should a common benefit assessment account for the size of the underlying IRPA's contingent fee, if at all?  (b) Does the PEC's proposed 7% common benefit assessment properly account for the level of these IRPAs' contingent fee contracts?  If so, explain how.  If not, identify what evidence there is of the contingent fee levels in the underlying contracts and discuss how the common benefit fee should be adjusted to take account of that evidence.**

\* \* \*

It is my recommendation that the Court (a) direct that the movants submit a brief no more than 25 pages in total length addressing all of these issues and (b) invite any other interested entity (whether or not a formal party within this MDL) to submit a similarly-limited brief

addressing any or all of these issues.  After the Court has received and reviewed these responses, it will be in a better position to issue a ruling on the outstanding motion, as necessary.

As this report and recommendation concludes my assignment at this time, I ask that the Court provide notice to the parties that my work in this matter has ended as of the Order date.  If the Court would welcome my assistance again, as the MDL progresses, I would of course be honored to be re-retained at that time.

Respectfully submitted,

*/s/ William B. Rubenstein*
**WILLIAM B. RUBENSTEIN**

**Dated:  June 3, 2020**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

<table>
<tr>
<td>

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

THIS DOCUMENT RELATES TO:

*County of Harris v. Purdue Pharma, et al.*,
Case No. 1:18-op-45677-DAP

</td>
<td>

MDL No. 2804

Case No. 17-md-2804

Judge Dan Aaron Polster

</td>
</tr>
</table>

## COUNTY OF HARRIS' BRIEF IN RESPONSE TO PROFESSOR RUBENSTEIN'S REPORT AND RECOMMENDATION

**EXHIBIT**

**13**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ................................................ 1

FACTUAL BACKGROUND AND RECENT DEVELOPMENTS ........................................ 2

ARGUMENT ........................................................................................................................ 6

    I.    One Obstacle to Harris County Agreeing to a Common Benefit Order Is that This Court Does Not Have Subject Matter Jurisdiction over Harris County's Case. ................................. 6

        A.    In the absence of federal subject matter jurisdiction, this Court cannot adjudicate attorney fees. ......................................................................................... 7

        B.    Substantial federalism concerns further compel the conclusion that the PEC cannot be rewarded for undermining the *In re Texas Opioid Litigation* MDL. .......... 9

    II.    Another Obstacle to Harris County Agreeing to Pay the PEC Is that the County Does Not Owe Anything to the PEC. ................................................................................................. 10

    III.  The Lien Approach Is Not an Appropriate or Viable Alternative Allowing the PEC to Be Paid for Settlements and Judgements of Harris County's Case................................................ 12

REQUEST FOR HEARING ............................................................................................... 15

CONCLUSION ................................................................................................................... 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alabama v. Bozeman*,
    533 U.S. 146 (2001) ................................................................................................7

*Am. Telecom Co. v. Republic of Lebanon*,
    501 F.3d 534 (6th Cir. 2007) .................................................................................8

*Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*,
    934 F.3d 876 (8th Cir. 2019), *cert. denied,* No. 19-656, 2020 WL 3146690
    (U.S. June 15, 2020) ...............................................................................................7

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ................................................................................................8

*Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human
    Res.*,
    532 U.S. 598 (2001) ..............................................................................................10

*County of Harris v. Purdue Pharma, L.P. et al*,
    No. 2017-83618 (133 Jud. Dist., D.C. Tex. Dec. 13, 2007).....................................6

*County of Harris v. Purdue Pharma, L.P., et al*,
    No. 4:18-cv-00490 (S.D. Tex. Feb. 20, 2018) .........................................................6

*Curry v. Del Priore*,
    941 F.2d 730 (9th Cir. 1991) ................................................................................14

*Davis v. Detroit Pub. Sch. Cmty. Dist.*,
    899 F.3d 437 (6th Cir. 2018) .................................................................................8

*Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*,
    941 F.2d 1217 (D.C. Cir. 1991) ............................................................................15

*In re Distributors*,
    No. 19-0783 (Tex. Oct. 18, 2019)...........................................................................3

*In re Distributors, Relators*,
    No. 01-19-00550-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019) .................3

*Fort Bend Cty., Texas v. Davis*,
    139 S. Ct. 1843 (2019) .......................................................................................8, 9

*Franklin v. Peterson*,
    878 F.3d 631 (8th Cir. 2017) .................................................................................7

*Gonzalez v. Thaler*,
   565 U.S. 134 (2012) ....................................................................................8, 9

*Gravel v. Am. Leadership Project*,
   249 F.R.D. 264 (N.D. Ohio 2008).......................................................................8

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991) ...........................................................................................9

*Healy v. Ratta*,
   292 U.S. 263 (1934) ...........................................................................................9

*Kalyawongsa v. Moffett*,
   105 F.3d 283 (6th Cir. 1997) ...........................................................................14

*Key Tronic Corp. v. United States*,
   511 U.S. 809 (1994) .........................................................................................10

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ...........................................................................................8

*Loren v. Blue Cross & Blue Shield of Mich.*,
   505 F.3d 598 (6th Cir. 2007) .............................................................................7

*Madeksho v. Abraham, Watkins, Nichols & Friend*,
   112 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (en
   banc) .................................................................................................................15

*Ex parte McCardle*,
   7 Wall. 506, 19 L.Ed. 264 (1868) ..................................................................7, 8

*Permanent Mission of India to the United Nations v. City of New York*,
   551 U.S. 193 (2007) .........................................................................................13

*Peter v. Nantkwest, Inc.*,
   140 S. Ct. 365 (2019) .......................................................................................10

*Printz v. United States*,
   521 U.S. 898 (1997) ...........................................................................................9

*In re Purdue Pharma, L.P.*,
   No. 19-0785 (Tex. Oct. 18, 2019) ......................................................................3

*In re Purdue Pharma LP, et al., Relators*,
   No. 01-19-00551-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019) .................3

*Shamrock Oil & Gas Corp. v. Sheets*,
   313 U.S. 100 (1941) ...........................................................................................9

*Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*,
   549 U.S. 422 (2007) ..............................................................................................8

*Smith v. State*,
   490 S.W.2d 902 (Tex. Civ. App.—Corpus Christi 1972), *writ refused NRE*
   (Apr. 25, 1973) ....................................................................................................15

*State by and through Tennessee Gen. Assembly v. U.S. Dep't of State*,
   931 F.3d 499 (6th Cir. 2019), pet. docketed (March 17, 2020) ...............................8

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) ............................................................................................7, 8

*Syngenta Crop Prot., Inc. v. Henson*,
   537 U.S. 28 (2002) ...............................................................................................9

*Tarrant Cty. Hosp. Dist. v. Jones*,
   664 S.W.2d 191 (Tex. App.—Fort Worth 1984, no writ) ......................................15

*TC Power Ltd. v. Guardian Indus. Corp.*,
   969 F. Supp. 2d 839 (E.D. Mich. 2013) ................................................................14

*In re Texas Opioid Litig.*,
   No. 18-0358 (Tex. MDL Panel June 13, 2018) .......................................................2

*In re Texas Opioid Litig.*,
   No. 18-0358 (Tex. MDL Panel Sept. 5, 2018) ........................................................2

*Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of*
   *Adjustment, Cent. Region*,
   558 U.S. 67 (2009) ...............................................................................................7

*United States v. Kentucky Home Mut. Life Ins. Co.*,
   292 F.2d 39 (6th Cir. 1961) .................................................................................14

*Youghiogheny & Ohio Coal Co. v. Vahalik*,
   970 F.2d 161 (6th Cir. 1992) ...............................................................................14

**Statutes & Rules**

5 U.S.C. § 552(a)(4)(E) .............................................................................................10

28 U.S.C. § 1407.......................................................................................................10

28 U.S.C. § 1447(c) ....................................................................................................7

Fed. R. Civ. P. 23 .....................................................................................................11

Tex. Gov't Code §§ 74.161 -74.163 ............................................................................9

iv

**Other Authorities**

7 Am. Jur. 2d Attorneys at Law § 320 ........................................................................................13

Black's Law Dictionary 941 (8th ed. 2004).............................................................................13

Charles Silver, Geoffrey P. Miller, *The Quasi-Class Action Method of Managing
    Multi-District Litigations: Problems and a Proposal,* 63 VAND. L. REV. 107,
    120 (2010)...........................................................................................................................10

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Harris County files this Brief without waiver of its challenge and objections to jurisdiction. In his Report and Recommendation to the Court, Professor William B. Rubenstein identifies what the Plaintiffs' Executive Committee (PEC) must show to succeed in its demand for a share of attorney's fees in opioid litigation: "To demonstrate their entitlement to a common benefit fee, proponents must show that their work 'substantially benefitted' the cases to be taxed."[1] Professor Rubenstein has reported to the Court that "no factual support" in the form of any "supporting affidavits or documents" were filed by the PEC to legitimize their argument that satellite cases received any substantial benefit from the PEC's efforts.[2] The PEC simply demanded an order diverting potentially billions of dollars to them without proof. Professor Rubenstein also reported that the PEC's motion was met with "dire" "warnings" to the effect that acceding to the PEC's demand might "'disrupt' settlement progress 'irreparably,'" "would 'seriously jeopardize' global settlement possibilities," and "would 'sabotage' global settlement efforts."[3] Thus, the PEC's unsubstantiated demand jeopardized settlement efforts occurring outside of this case. The PEC cannot possibly meet the substantial benefit standard.

The County of Harris, Texas, is an interested party opposed to the entry of the PEC's Amended Motion for Entry of Order Establishing Common Benefit Fund. [Doc. #: 3112]. This brief is filed pursuant to this Court's Order. [Doc. #: 3320].

---

[1]  Report and Recommendation Addressing Motion for Common Benefit Fund (hereinafter R&R), p. 2 [Doc. #: 3319, PageID #: 494888].

[2]  R&R, p. 4 n. 2 ("Some opponents point out that the moving papers, at present, proffer no factual support for any of these statements. *See, e.g.,* Doc. #: 3189 at 5. To the extent that the movants aim to demonstrate factually that their efforts have substantially benefited the many satellite cases they seek to tax, and the time and costs expended to achieve that end, the record would be stronger if their legal arguments were substantiated with proper supporting affidavits or documents.") [Doc. #: 3319, PageID #: 494890].

[3]  R&R, p. 6 (internal citations omitted) [Doc. #: 3319, PageID #: 494892].

Harris County responds to Professor Rubenstein's Question 3, and provides a relevant factual update bolstering the substantial federalism concerns that are an obstacle to granting the PEC's request. Harris County is included in the recent Texas settlement, which falls within the jurisdiction of the Texas State Court MDL (Factual Background *infra*). Harris County owes no money to the PEC because the PEC was, if anything, an obstacle to that settlement—much less can the PEC show that it conferred a substantial benefit (Factual Background, Argument § II *infra*). Independently, both the substantial federalism concerns noted by Professor Rubenstein and the strict limitations on federal subject matter jurisdiction are obstacles to the PEC's overreaching fee demand (Argument § I *infra*). These obstacles to granting the PEC's common benefit demand cannot be overcome by renaming the common benefit award a "lien" (Argument § III *infra*).

## FACTUAL BACKGROUND AND RECENT DEVELOPMENTS

On June 13, 2018, the Texas Multidistrict Litigation Panel established the Texas MDL, *In Re Texas Opioid Litigation*, No. 18-0358.[4] The Honorable Robert Schaffer, Judge of the 152nd Judicial District Court, Harris County, Texas, was appointed to preside over the State's MDL.[5] This proceeding includes claims brought by more than 43 Texas counties, and the Texas Attorney General, against numerous defendants.

The parties to the State of Texas' *In Re Texas Opioid Litigation* have heavily litigated the claims of Texas governmental entities for years without any assistance from the PEC. Since his appointment, Judge Schaffer has not only presided over pre-trial motions and discovery, but has

---

[4] Exhibit 1, Order of Multidistrict Litigation Panel, *In re Texas Opioid Litig.*, No. 18-0358 (Tex. MDL Panel June 13, 2018).
[5] Exhibit 2, Order of Multidistrict Litigation Panel, *In re Texas Opioid Litig.*, No. 18-0358 (Tex. MDL Panel Sept. 5, 2018).

set three bellwether cases for trial. Dallas and Bexar County are set for trial on April 12, 2021.[6] Arduous trial preparation has been ongoing in Judge Schaffer's court, including several hearings resolving substantive Texas state law issues, and ongoing regularly scheduled status conferences and resolution of scores of discovery disputes.[7] The Texas litigants maintain a document depository and are reviewing documents produced by defendants in the Texas state litigation. The manufacturer defendants moved to dismiss the Texas Counties' claims, and after voluminous briefing and oral argument, Judge Schaffer denied this motion. The distributor defendants' dismissal motion suffered the same fate. Both sets of motions challenged the viability of claims under Texas law, and the hundreds of pages of legal briefing called upon Judge Schaffer to resolve Texas state law issues. Both orders were unsuccessfully challenged in the Texas Court of Appeals in Houston, and that failing, to the Texas Supreme Court, which also denied the defendants' writ requests.[8] All of these proceedings have followed Texas state law, and the PEC has had no productive involvement in any of the litigation over which Judge Schaffer has presided for years.

On May 28, 2020, the Texas Attorney General announced the successful negotiation of an agreement entitled Texas Opioid Abatement Fund Council and Settlement Allocation Term Sheet, (hereinafter "Term Sheet"), between it and lawyers representing Texas political

---

[6]  Exhibit 3, 1st Am. Bellwether One Docket Control Order, *In re Texas Opioid Litig.*, No. 18-0358 (152nd Jud. Dist., Tex. March 31, 2020) (setting Dallas and Bexar Counties for trial). Kendall County will be the Defendants' trial pick.

[7]  *See* Exhibit 4, Docket Sheet, *In re Texas Opioid Litig.*, No. 18-0358.

[8]  Exhibit 5, Memorandum Opinion, *In re Distributors, Relators*, No. 01-19-00550-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019); Exhibit 6, Memorandum Opinion, *In re Purdue Pharma LP, et al., Relators*, No. 01-19-00551-CV (Tex. App.—Houston [1st Dist.] Aug. 23, 2019); Exhibit 7, Texas Supreme Court Orders Pronounced October 18, 2019, denying *In re Distributors*, No. 19-0783 (Tex. Oct. 18, 2019), and *In re Purdue Pharma, L.P.*, No. 19-0785 (Tex. Oct. 18, 2019).

subdivisions, concerning the division of future settlement proceeds and attorneys' fees.[9] Driven by the progress of ongoing discussions with certain defendants concerning settlement, the parties have agreed that the proceeds of any settlement will be directed 15% to the State of Texas through the office of the Texas Attorney General, 15% to the political subdivisions, and 70% to an opioid council to be established to disburse the money throughout the State for opioid treatment and abatement. In addition, a separate fund for payment of attorneys' fees will be established from which the lawyers representing political subdivisions will be paid. This is the first agreement of its kind in the nation and illustrates how much farther along Texas is toward an aggregate settlement. It is likely this Term Sheet will serve as a template for similar agreements in other states.

The entire process will be administered by Judge Shaffer through the Texas MDL.  He will have jurisdiction to resolve any complaints associated with the disbursement of funds, attorneys' fees,  or any other issues that might arise.  It is reasonable to assume that he may also direct that a common benefit fund be established to pay the Texas lawyers,  who have been engaged in arguing and briefing motions applying substantive Texas law, and discovery proceedings under Texas Rules of Procedure, all of which have facilitated the settlement of the cases under his care. It is easy to imagine the disruption created by a federal court order taxing such settlements for common benefit fees, (whether designated an "assessment" or "lien"), where Judge Schaffer may have issued a similar order affecting those very cases.  The major difference, of course, is that Judge Shaffer would actually have jurisdiction to issue such an order.

---

[9]  Exhibit 8, Term Sheet. *See also* Press Release, Texas Attorney General Ken Paxton, AG Paxton Reaches Bipartisan Agreement with Texas Counties and Cities in Preparation for Settlement with Opioid Defendants (May 28, 2020), available at https://www.texasattorneygeneral.gov/news/releases/ag-paxton-reaches-bipartisan-agreement-texas-counties-and-cities-preparation-settlement-opioid (last visited June 17, 2020).

This agreement was negotiated by the office of the Texas Attorney General along with lawyers for the Texas political subdivisions. Fifteen percent of the proceeds of any settlement will be paid to the Texas Attorney General. This Court has no authority to assess or impose any lien on those proceeds, and has recognized that limitation in at least two prior orders.[10]

The agreement also includes Texas political subdivisions that were wrongfully removed to the federal MDL and which have languished there for up to two years without a ruling on their motions to remand.  The most egregious circumstances involve Harris County, Texas.  No Texas statewide settlement can be reached without Harris County, the largest in Texas and the third largest in the nation.[11] The Texas Attorney General has for that reason included Harris County, (and other Texas counties wrongfully removed), in the negotiation of the Term Sheet. An assessment or lien by this Court on the settlement proceeds earmarked for Harris County, despite the Court's lack of jurisdiction over the underlying case, could jeopardize the Term Sheet agreement negotiated by the Texas Attorney General.

This Court has recognized the importance of the involvement of state attorneys general in state proceedings, "because their participation is critical if there is to be any global resolution."[12] The Texas Attorney General, and lawyers for the Texas political subdivisions have been engaged in serious discussions with certain defendants, creating the Term Sheet to establish a protocol for the receipt and distribution of settlement proceeds. As of this writing, Texas and Ohio are the

---

[10] *See*  Order of 1/24/18 [Doc. #:94, PageID #: 523] ("the Court recognizes it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations"); Order of 2/27/18 [Doc. #: 146, PageID #: 806] ("The Court recognizes it has no jurisdiction over (i) the AGs or their representatives, (ii) the State cases they have filed, or (iii) any civil investigations they may be conducting.").

[11]  *See* https://www.census.gov/newsroom/press-releases/2020/pop-estimates-county-metro.html; https://www.census.gov/content/dam/Census/newsroom/press-kits/2020/popest/popest-table1.png.

[12]  Order of 2/27/2018 [Doc. #: 146, PageID #: 806].

only states that have done so and Texas alone enjoys the benefit of a mature state MDL proceeding through which settlement can be effectuated.  If global resolution of the opioid litigation is the goal of this Court, then the sensible course would be to lift the moratorium and remand Harris County, and the other Texas cases wrongfully removed, to the Texas MDL, (without assessment or lien), for participation in any  upcoming resolution of these cases.

**ARGUMENT**

> **Q3: (a) How likely is it that the PEC and state court litigants can reach an agreement on a common benefit contribution?  (b) If an agreement seems unlikely, identify and discuss the obstacles to agreement, how they might be resolved, and whether a lien approach is an appropriate and viable alternative.**

I.  **One Obstacle to Harris County Agreeing to a Common Benefit Order Is that This Court Does Not Have Subject Matter Jurisdiction over Harris County's Case.**

Harris County brought its suit in the 133rd Judicial District Court of Harris County, Texas, in 2017.[13] Notwithstanding a wholesale lack of federal subject matter jurisdiction, three of the dozens of defendants removed the case to the United States District Court for the Southern District of Texas, Houston Division (Case No. 4:18-cv-004590) on February 15, 2018.[14] Certain that federal jurisdiction was lacking, Harris County filed its motion to remand a mere five days later, on February 20, 2018.[15] More than two years later, that motion to remand remains pending.

After refusing to help Harris County secure a remand, the PEC cannot benefit by collecting a tax on Harris County's recovery. The PEC's obstructionist behavior threatened rather than substantially benefited the Texas settlement. That Harris County's case is stalled in a

---

[13]  *See* Plaintiff's Original Petition, *County of Harris v. Purdue Pharma, L.P. et al*, No. 2017-83618 (133 Jud. Dist., D.C. Tex. Dec. 13, 2007) [1:18-op45677-DAP, Doc. #: 144-3].
[14]  Distributor Defendants' Notice of Removal [1:18-op-45677-DAP, Doc. #: 114-2].
[15]  Exhibit 9, Motion to Remand and Brief, *County of Harris v. Purdue Pharma, L.P., et al*, No. 4:18-cv-00490 (S.D. Tex. Feb. 20, 2018) [1:18-op-45677-DAP, Doc. #: 114-4].

court lacking subject matter jurisdiction is no substitute for the substantial benefit test that the PEC must meet.

### A. In the absence of federal subject matter jurisdiction, this Court cannot adjudicate attorney fees.

No federal statute, no federal rule, no controlling authority, and no apposite practice justifies the PEC's fee demand (*see* §II *infra*). There is, however, an abundance of controlling authority compelling the return of Harris County's case to state court and forbidding any federal ruling beyond a remand order.

Pursuant to the black letter of federal law, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case **shall** be remanded." 28 U.S.C. § 1447(c) (emphasis added). The use of the word "shall" is mandatory.[16]

Remand of a case upon the exposure of a jurisdictional defect is not only a statutory mandate, but it is also the outcome decreed in controlling jurisprudence. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514, 19 L.Ed. 264 (1868); *see also Union Pac. R. Co. v. Bhd. of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment, Cent. Region*, 558 U.S. 67, 84 (2009) (parenthetically quoting *Steel*); *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) (quoting *Steel*). "[J]urisdiction . . . is always our first and fundamental question." *Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876, 880 (8th Cir. 2019), *cert. denied,* No. 19-656, 2020 WL 3146690 (U.S. June 15, 2020) (quoting *Franklin v. Peterson*, 878 F.3d 631, 635 (8th Cir. 2017)). "As a threshold matter, this Court must determine whether it has subject matter jurisdiction over the

---

[16]  *See Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily 'the language of command.'") (citation omitted).

lawsuit." *Gravel v. Am. Leadership Project*, 249 F.R.D. 264, 265 (N.D. Ohio 2008) (citing *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007)).

To the degree that the PEC intends that this Court impose a fee order or lien upon a case without subject matter jurisdiction, this jurisdictional overreach would stand in defiance of controlling precedent. "When a court lacks jurisdiction, it '**cannot proceed at all** in any cause.'" *State by and through Tennessee Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 507 (6th Cir. 2019), pet. docketed (March 17, 2020) (quoting *Steel*, 523 U.S. at 94 (quoting *McCardle*, 74 U.S. at 514)) (emphasis added).[17] "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, . . . which is not to be expanded by judicial decree," and "[i]t is to be presumed that a cause lies outside this limited jurisdiction[.]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). "Unlike most arguments, challenges to subject-matter jurisdiction may be raised by the defendant 'at any point in the litigation,' and courts must consider them *sua sponte*." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct. 1843, 1849 (2019) (quoting *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012)). *See also Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (Federal Courts have "an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.") (citation omitted). Therefore, a ruling cannot be made in Harris County's case because there is no subject matter jurisdiction in the first instance.

---

[17] *See also Sinochem Int'l Co. Ltd. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007) ("a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction)") (citing *Steel*, 523 U.S. at 93—102); *Davis v. Detroit Pub. Sch. Cmty. Dist.*, 899 F.3d 437, 445 (6th Cir. 2018) ("Without jurisdiction the court cannot proceed at all in any cause.") (parenthetically quoting *Steel*, 523 U.S. at 94 (quoting *McCardle*, 74 U.S. at 514)).

**B. Substantial federalism concerns further compel the conclusion that the PEC cannot be rewarded for undermining the *In re Texas Opioid Litigation* MDL.**

The limits on federal subject matter jurisdiction are mandatory in all circumstances, but disregard of jurisdictional limits is all the more troubling where, as here, state sovereignty over its own courts is threatened. The Texas State Legislature enacted a state multidistrict litigation procedure engineered to afford efficient pretrial proceedings. *See* Tex. Gov't Code §§ 74.161 - 74.163. Like its federal counterpart, Texas' multidistrict protocol authorizes transfer, by order of a judicial panel, of civil actions involving common questions of fact to a specified district court for consolidated or coordinated pretrial proceedings where the transfer furthers convenience for the parties and where it will promote just and efficient conduct of the actions. *See* Tex. Gov't Code § 74.162. As explained above, Texas has established an *In re Texas Opioid* Multidistrict litigation, and the Texas settlement falls under the jurisdiction of Texas Judge Schaffer.

Our "system of 'dual sovereignty'" protects the States from encroachment by the federal government. *Printz v. United States*, 521 U.S. 898, 918 (1997) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)). "'Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined.'" *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100, 109 (1941) (quoting *Healy v. Ratta*, 292 U.S. 263, 270 (1934)). The policy underlying removal statutes "is one calling for the strict construction of such legislation." *Shamrock*, 313 U.S. at 108; *see also Syngenta Crop Prot., Inc. v. Henson*, 537 U.S. 28, 32 (2002) (parenthetically quoting same). Just last year, the United States Supreme Court in *Fort Bend* recognized that policing the boundary between state and federal jurisdiction remains the task of every federal judge when the Court reiterated that objections to subject matter jurisdiction must be considered *sua sponte*. *See Fort Bend*, 139 S. Ct. at 1849 (citing *Gonzalez*, 565 U.S. at 141).

The limitations on federal subject matter jurisdiction and the sovereignty of state courts would be violated if cases, properly in the state MDL, are subjected to a federal fee order.

## II.    Another Obstacle to Harris County Agreeing to Pay the PEC Is that the County Does Not Owe Anything to the PEC.

Pursuant to the American Rule, attorneys' fees are paid by the party who contracted to pay counsel for their representation.[18] There are statutory exceptions to the American Rule,[19] but when Congress promulgated Title 28, United States Code, Section 1407, Congress omitted any fee-shifting provision allowing payment to MDL counsel.[20] This Congressional inaction alone should give serious pause to an extra-jurisdictional expansion of the common benefit fund practice, if not the practice itself. The Supreme Court said last year that, "Congress must provide a sufficiently 'specific and explicit' indication of its intent to overcome the American Rule's presumption against fee shifting." *Peter v. Nantkwest, Inc.*, 140 S. Ct. 365, 372 (2019) (citation omitted). Congress omitted an exception to the American Rule in the MDL statute, and the Supreme Court has never stated that the common benefit fund doctrine applies in MDLs.[21]

---

[18] *See Key Tronic Corp. v. United States*, 511 U.S. 809, 814–15 (1994) ("Our cases establish that attorney's fees generally are not a recoverable cost of litigation 'absent explicit congressional authorization.' . . . Recognition of the availability of attorney's fees therefore requires a determination that 'Congress intended to set aside this longstanding American rule of law.'") (citations omitted).

[19] *See Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 532 U.S. 598, 602-03 (2001) (explaining that the "American Rule" is a general practice of not awarding fees to a prevailing party absent explicit statutory authority, and collecting statutory exceptions to American Rule). *Buckhannon* was superseded on other grounds, i.e., amendments to FOIA and the catalyst theory, 5 U.S.C. § 552(a)(4)(E).

[20] *See* 28 U.S.C. § 1407 (omitting fee-shifting provision); Charles Silver, Geoffrey P. Miller, *The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal,* 63 VAND. L. REV. 107, 120 (2010) ("The source of an MDL judge's power to remunerate is not obvious . . . . The MDL statute says nothing about fees.") (notes omitted).

[21] *See* Silver and Miller, *supra* note 20, at 109 ("This practice supposedly rests on the common fund doctrine, a creature of the law of restitution which undergirds fee awards in class actions. Yet the Supreme Court has never said the doctrine applies in MDLs").

The statutory omission is compounded by the lack of any rule addressing common benefit fees. Class action fees are allowed in, and policed through, Federal Rule of Civil Procedure 23; no Rule has been promulgated to allow, much less compel, a PEC award to a Committee in Multidistrict Litigation.[22] Exacerbating the lack of statutory authority and the omission of authority in any federal rule, Professor Rubenstein identified four factors distinguishing the PEC's MDL request from the chartered waters of other litigation. R&R, pp. 5-6 [Doc. #: 3319, PageID #: 494891-92]. Thus, the question of what could justify forcing Harris County or its contractually retained counsel to compensate the PEC is no trivial matter.

The only raison d'être that could possibly justify the PEC's demand is that, absent this Court's intervention on the PEC's behalf, the PEC will not receive adequate compensation for its work substantially benefiting parties who have not hired the PEC to represent them. That the PEC must thread its fee demand through the eye of this needle is manifestly clear from Professor Rubenstein's report. The underlying justification for a common benefit award is that "other lawyers are doing some portion of their work," his report explains. R&R, p. 1 [Doc. #: 3319, PageID #: 494887]. Professor Rubenstein identifies what the PEC must show to succeed in its motion: "To demonstrate their entitlement to a common benefit fee, proponents must show that their work 'substantially benefitted' the cases to be taxed." R&R, p. 2 [Doc. #: 3319, PageID #: 494888]. But, as Professor Rubenstein found, the PEC presented "no factual support." R&R, p. 4 n.2 [Doc. #: 3319, PageID #: 494890]. The PEC felt entitled to demand payouts potentially in the billions ***without any proof.***

Here, the PEC cannot prove that it substantially contributed to the Texas settlement, over which Judge Schaffer will exercise jurisdiction. The opposite is true. In response to the PEC's

---

[22] *See* Silver and Miller, *supra* note 20, at 120-21 (explaining that the federal class action rule does not provide authority for entry of fee awards in MDLs under the common benefit doctrine).

common benefit motion, which was both factually unsubstantiated and legally unprecedented, many opponents filed "dire" "warnings." *See* R&R, p. 6 (collecting quotes from opposition briefs); *accord id.* at p. 4 n. 2 (explaining lack of factual support), pp. 5-6 (listing four factors that reveal lack of prior apposite precedent) [Doc. #: 3319, PageID #: 494891-93]. The National Association of Attorneys General, certain Governmental Plaintiffs, and the Defendants themselves filed a chorus of disapproval, explaining the threat that the PEC was imposing by filing its motion in this Court. In opposition to the PEC's motion, the dire warnings included: "the National Association of Attorneys General suggests a common benefit fee might 'disrupt' settlement progress 'irreparably,' . . .  the Defendants argue that a common benefit order would 'seriously jeopardize' global settlement possibilities, . . .  and certain Governmental Plaintiffs contend that the order would 'sabotage' global settlement efforts[.]" R&R, p. 6 (internal citations omitted) [Doc. #: 3319, PageID #: 494892].[23]

Therefore, jurisdiction aside, the PEC cannot meet the substantial benefit test justifying recovery of settlement proceeds where, as here, its efforts only harmed the settlement negotiations.

### III.  The Lien Approach Is Not an Appropriate or Viable Alternative Allowing the PEC to Be Paid for Settlements and Judgements of Harris County's Case.

In his report to this Court, Professor Rubenstein references the proposal advanced by "other parties" to avoid the "significant federalism concerns" associated with a common benefit assessment on state court settlements, through the use of a "lien" against those very cases. R&R, pp. 7-8 [Doc. #: 3319, PageID #: 494893-94]. As quoted in Professor Rubenstein's report, any lien would be brought "in state court" (R&R, p. 8 (parenthetically quoting Doc. #: 3192 at 11));

---

[23] *Cf.* Silver and Miller, *supra* note 20, at 131 ("lead attorneys are fiduciaries who must put the interests of claimants and non-lead lawyers ahead of their own. Recently, however, lead attorneys have used their control of settlement negotiations to increase their compensation").

therefore, the charging lien theory, as it was raised in the brief quoted by Professor Rubenstein, cannot be a vehicle for an order of this Court awarding the PEC compensation. If members of the PEC choose to appear before Judge Schaffer and explain to him how they have garnered recovery in his court, as to justify a lien under Texas law, then that is an issue for another day.

To the extent that the Professor's Query 3(b) asks whether attorney liens could legitimize the PEC's motion soliciting a fee order from *this Court*, the lien theory is unavailing. As explained above, the obstacle to the PEC's overreaching more than raises the substantial federalisms concern cited by Professor Rubenstein, because the lack of subject matter jurisdiction means the Court cannot issue an order in Harris County's case. Whether described as an "assessment" or "lien," the imposition of either by a federal court on a state court is prohibited. For several reasons, a lien cannot possibly be a vehicle for directing funds to the PEC where, as here, the settlement arose from a state court MDL. Most fundamentally, an attorney charging lien is limited to the suit in which the judgment was recovered. 7 Am. Jur. 2d Attorneys at Law § 320 ("In the absence of a statute or a special agreement, a charging lien does not extend beyond the charges and fees in the suit in which the judgment was recovered."). Therefore, this Court has no authority over recovery, under the guise of a "lien" or otherwise, in cases not properly before the Court. The Texas settlement that has given rise to Harris County's settlement opportunity is before Judge Schaffer's court, not this Court.

Relatedly, a lien by its very nature is tied to the encumbered property.[24] There is no jurisdictional basis for this Court to force payment to a set of lawyers this Court appointed, to

---

[24]  *See Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 198 (2007) (quoting Black's Law Dictionary definitions that, a "lien" was defined as "[a] charge or security or incumbrance upon property" and, concluding that, "The practical effects of a lien bear out these definitions of liens as interests in property."); *see also* Black's Law Dictionary 941 (8th ed. 2004) (defining "lien" as a "legal right or interest that a creditor has in another's property");

work up federal cases, where the settlement commits the *res* to Judge Schaffer's authority and oversight. In *Kalyawongsa v. Moffett*, 105 F.3d 283, 286-87 (6th Cir. 1997), the Sixth Circuit recognized the district court's supplemental jurisdiction to award attorneys' fees where the plaintiffs' lawyer sought recovery for his work in the case before that district court, and looked to state law on the fee issue. The court reasoned that fees are part of "the underlying litigation," and quoted a Ninth Circuit case that, "fee disputes arising from litigation **pending before a district court** fall within that court's ancillary jurisdiction." *Id*. at 287 (quoting *Curry v. Del Priore*, 941 F.2d 730, 731 (9th Cir. 1991)) (emphasis added). A subsequent decision interpreting *Kalyawongsa* did not exercise jurisdiction over an attorneys' lien, even where the asserted lien applied to rights in a settlement of the case pending before that court, where the plaintiffs' counsel sought to recover against the defendants rather than the party plaintiff.[25]

Moreover, even assuming a jurisdictional basis, which is strongly denied, a nationwide "lien" cannot be issued because state law requirements for such a lien have not been met, making the lien theory "too crude an approach."[26] For example, under the operative law in certain

---

*United States v. Kentucky Home Mut. Life Ins. Co*., 292 F.2d 39, 42 (6th Cir. 1961) ("A lien is a charge or encumbrance upon property to secure the payment or performance of a debt, duty, or other obligation.").

[25] *TC Power Ltd. v. Guardian Indus. Corp*., 969 F. Supp. 2d 839, 842 (E.D. Mich. 2013) (even though plaintiffs' attorney was attempting to recover legal fees earned in the litigation, court would not exercise supplemental jurisdiction over fee dispute and found it insufficiently related to the main action, reasoning that plaintiffs' firm was "seeking to recover fees from *Defendants*, based not on any written agreement with Defendants, but instead on claims of having a charging lien and/or third-party beneficiary rights in the Settlement Agreement").

*Cf. Youghiogheny & Ohio Coal Co. v. Vahalik*, 970 F.2d 161, 162 (6th Cir. 1992) (recognizing that jurisdiction over a lien can be distinct from jurisdiction over benefits, court held that the Administrative Law Judge and Benefits Review Board did not have subject matter jurisdiction to enforce lien).

[26] *Cf*. R&R, p. 5 [Doc. 3319, PageID #: 494891] (discussing challenge of different types of settlements and parties).

jurisdictions, attorney's charging liens are asserted against clients, not against other lawyers.[27] Under Texas law, the attorney's lien has been described as a lien that an attorney has over money *actually collected*, and arising from the case *in which the attorney performed services*.[28] At this point, a lien could not possibly be established under Texas law, because there is no money that the PEC collected for Harris County, nor did the PEC perform work in Judge Schaffer's court. In fact, the PEC has only served to harm Harris County's recovery by failing to assist in the remand and, instead, prosecuting the common benefit motion.[29] The PEC does not possibly have a lien over monies Harris County collects as a result of the Texas AG settlement and funds distributed by Texas state Judge Schaffer.

## REQUEST FOR HEARING

Harris County respectfully requests that this Honorable Court conduct a hearing and grant the County an opportunity to be heard on its objection to the imposition of any fee arising from settlement or judgment of Harris County's case. In addition, and/or in the alternative, the County also asks to be heard on its pending remand motion.

---

[27] *See Democratic Cent. Comm. of D.C. v. Washington Metro. Area Transit Comm'n*, 941 F.2d 1217, 1219 (D.C. Cir. 1991) ("Attorney's liens are asserted by counsel against the client.").

[28] *E.g., Madeksho v. Abraham, Watkins, Nichols & Friend*, 112 S.W.3d 679, 689 (Tex. App.— Houston [14th Dist.] 2003, pet. denied) (en banc) (plurality op.) ("After judgment, attorneys who earn a contingency fee are equitable owners (not mere claimants) of their portion of the judgment.") (note omitted); *Tarrant Cty. Hosp. Dist. v. Jones*, 664 S.W.2d 191, 196 (Tex. App.—Fort Worth 1984, no writ) ("It is well settled that an attorney has a lien for attorney's fees on money collected by him for his client."); *Smith v. State*, 490 S.W.2d 902, 910 (Tex. Civ. App.—Corpus Christi 1972), *writ refused NRE* (Apr. 25, 1973) ("to raise the issue of a possessory lien, the attorney must make a demand for the unpaid amount or balance").

[29] Upon information and belief, this point may be better substantiated if the Motion to Unseal filed this day is granted, and the undersigned is allowed access to the closed-door proceedings. *See also* § II *supra.*

## CONCLUSION

The PEC's common benefit motion has instigated a firestorm of controversy for good reason. The PEC demanded potentially billions in fees *sans* proof. The PEC has done nothing to assist the Texas settlement, and if anything threatened the settlement by filing its extra-jurisdictional fee demand. If one group of lawyers is allowed to take a percentage of settlement proceeds arising out of different jurisdictions, without proof, then why cannot Judge Schaffer order that the PEC lawyers who are subject to personal jurisdiction in Texas pay the Texas MDL? Texas is the first and most comprehensive settlement, and Harris County is of the opinion that the PEC is riding on Texas' coattails. Or, for that matter, what about the States that have, unlike the PEC, actually tried opioid cases? Why not force the PEC to pay compensation because of the settlement momentum generated by those trials? There are excellent reasons why the American Rule has survived for as long as it has.

Professor Rubenstein articulated a standard the PEC cannot meet, at least not as to Harris County, that the PEC's work somehow "substantially benefited" Harris County's recovery. (R&R, p. 2). That is one obstacle to any agreement. A second is that this Court lacks subject matter jurisdiction over Harris County's case. If there is a jurisdiction that would allow a "lien" in these circumstances, it is not Texas.  The answers to Professor Rubenstein's Query, as is relevant to Harris County, only compels the conclusion that any common benefit award to the PEC cannot include cases over which there is no federal subject matter jurisdiction in the first instance.

Date: June 23, 2020

| Respectfully submitted, | |
|---|---|
| OFFICE OF HARRIS COUNTY ATTORNEY, VINCE RYAN | */s/ Michael T. Gallagher*<br>THE GALLAGHER LAW FIRM |

| | |
|---|---|
| _/s/ Vince Ryan_<br>Vince Ryan<br>Harris County Attorney<br>Texas Bar No. 17489500<br>Robert W. Soard<br>First Assistant Harris County Attorney<br>Texas Bar No. 18819100<br>Terence L. O'Rourke<br>Special Assistant Harris County Attorney<br>Texas Bar No. 15311000<br>John W. Odam, Jr.<br>General Counsel<br>Texas Bar No. 15192000<br>Pegi S. Block<br>Assistant County Attorney<br>Texas Bar No. 02498250<br>1019 Congress, 15th Floor<br>Houston, Texas 77002<br>Telephone:  (713) 274-5103<br>Facsimile (713) 755-1553<br>Vince,Ryan@cao,hetx.net<br>Robert.Soard@cao.hetx.net<br>Terence.Orourke@cao.hetx.net | Michael T. Gallagher<br>SDOT Bar No. 5395<br>Texas State Bar No.07586000 Pamela<br>McLemore<br>Texas State Bar No. 24099711 Boyd<br>Smith<br>Texas State Bar No. 18638400 SDOT<br>Bar No.: 8203<br>2905 Sackett Street<br>Houston, Texas 77098<br>(713) 222-8080<br>(713) 222-0066 – facsimile  mike@gld-law.com<br>COUNSEL FOR PLAINTIFF<br><br>Tommy Fibich<br>Texas State Bar No. 06952600 SDOT<br>Bar #: 5482<br>Jay Henderson<br>Texas State Bar No. 09424050 Sara J.<br>Fendia<br>Texas State Bar No. 06898800<br>FIBICH, LEEBRON, COPELAND BRIGGS<br>1150 Bissonnet Street<br>Houston, Texas 77005<br>Telephone:  (713) 751-0025<br>Facsimile:   (713) 751-0030  Email:<br>tfibich@fibichlaw.com<br>COUNSEL FOR PLAINTIFF |
| | Dan Downey<br>Dan Downey, P.C.<br>SDOT Bar # 459<br>Texas State Bar No.  06085400 1609<br>Shoal Creek Blvd. #100<br>Austin, TEXAS 78701<br>Telephone: (713) 907-9700<br>Dandowney427@gmail.com<br>COUNSEL FOR PLAINTIFF |

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of June, 2020, a copy of the foregoing document was served on all counsel of record listed below via the Court's ECF system and/or via U.S. Mail.

_/s/ Micheal T. Gallagher_
Michael T. Gallagher

Cat08,MDL2804,Protect,TrSched

## U.S. District Court
## Northern District of Ohio (Cleveland)
## CIVIL DOCKET FOR CASE #: 1:17–md–02804–DAP

In Re: National Prescription Opiate Litigation
Assigned to: Judge Dan Aaron Polster (MDL 2804)
Case in other court:  6th Circuit, 18–03839
                                  6th Circuit, 18–03860
                                  6th Circuit, 18–04054
                                  6th Circuit, 18–04115
                                  6th Circuit, 19–04097
                                  6th Circuit, 19–04099
                                  6th Circuit, 21–03460
Cause: 28:1446 Petition for Removal– Personal Injury

Date Filed: 12/12/2017
Jury Demand: Both
Nature of Suit: 360 P.I.: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 05/09/2022 | 4428 | **Ongoing Common Benefit Order**. Judge Dan Aaron Polster on 5/9/22. (P,R) (Entered: 05/09/2022) |

**EXHIBIT**

**14**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION | MDL 2804 |
| OPIATE LITIGATION | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track One Cases | |

### *AMENDED* MOTION FOR ENTRY OF ORDER ESTABLISHING COMMON BENEFIT FUND

Plaintiffs, through the undersigned Court-appointed Plaintiffs' Co-Lead Counsel and Plaintiffs' Liaison Counsel, and on behalf of the Plaintiffs' Executive Committee, respectfully submit this Motion for Entry of an Order Establishing Common Benefit Fund, in the exercise of the Court's case management authority as Transferee Court in these multidistrict proceedings, and pursuant to its earlier Order Regarding Plaintiff Attorneys' Fees and Expenses – Protocol for Work Performed and Expenses Incurred (Doc 358), to provide for the reimbursement and compensation of expenses and work incurred and performed for the common benefit of plaintiffs in the federal courts (including proceedings in and on appeal from this Court, the federal courts on remand, and the bankruptcy courts) and state courts, as more fully described in the accompanying (Proposed) Order. This Order is modeled on similar court orders that have become commonplace in MDL case management, as necessary and appropriate mechanisms to effectuate the purposes of the common benefit doctrine established by the United States Supreme Court nearly 150 years ago, and since applied specifically to complex multidistrict litigation by successive editions of the Manual for Complex Litigation, and utilized and endorsed by district and appellate courts throughout the country.

EXHIBIT
**15**

## **INTRODUCTION**

Since the very inception of commercial activity giving rise to what we now recognize as complex litigation, the Supreme Court has recognized both the equitable imperative and practical necessity of providing judicially supervised and enforced mechanisms to spread the costs of efforts undertaken for the common benefit among all beneficiaries.[1]  The Supreme Court's resulting "common benefit doctrine," empowering the district courts to apportion such fees and costs among all beneficiaries as a matter of federal equity jurisdiction, was the pre-existing principle that modern MDL courts have adopted and operationalized through common benefit orders.  Every edition of the Federal Judicial Center's *Manual for Complex Litigation* has prescribed both that a plaintiff's leadership structure be appointed at the outset of the litigation, and that provision be made to reimburse and pay these appointed counsel, on a contingent basis from all plaintiffs' recoveries, for the costs and services those they and other authorized counsel incur and provide to conduct and advance its prosecution and resolution.[2]  A robust jurisprudence of case management orders establishing common benefit funds through assessment of a modest percentage of plaintiffs' recoveries has developed, as reflected in the authorities cited here and in the accompanying (Proposed) Order, and courts and commentators have analyzed the norms and expectations arising from this jurisprudence, recognized the MDL common benefit mechanism as distinct from other fee award regimes (such as class action fees under

---

[1] *Trustees v. Greenough*, 105 U.S. 527 (1881); *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing v. Van Gemert*, 444 U.S. 472 (1980).

[2] *See Manual for Complex Litigation, Fourth* (Federal Judicial Center 2004), §§ 10.21-10.225; 14.21-14.216; 22.62, and corresponding sections in the Third (1995) and Second (1985) editions.  Similar provisions in the (revised) First Edition of the *Manual*, published in 1973, were the bases for the Fifth Circuit's landmark decision affirming MDL transferee courts' broad case management authority to provide for common benefit assessments in *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, 1012-1019 (Fifth Cir. 1977).

Fed. R. Civ. P. 23), and provided a backdrop against which a reasonable amount in this particular case can be established.[3]

## ARGUMENT

Plaintiffs here request a common benefit assessment of 7% (6% fees, 1% costs) to be assessed and administered as set forth in greater detail in the accompanying (Proposed) Order, which, like the other MDL common benefit orders cited here, provides a systematic protocol for common benefit assessment, administration, supervision and award by the court.  *See* (Proposed) Order Establishing Common Benefit Fund, Sections 1-4, pp. 4-9.

The Supreme Court's common benefit trinity of *Trustees v. Greenough*, *Central Railroad & Banking Co. v. Pettus*, and *Sprague v. Ticonic National Bank* predated the multidistrict litigation statute, modern class actions*,* and pharmaceutical and consumer products and services that give rise to most contemporary MDLs.  But these seminal and far-seeing decisions are far from dead letter, and their invocation of the federal district courts' equity powers to assess fees and costs from the recoveries of those benefitting from others efforts not only survived but thrived in the wake of the merger of law and equity, to find now routine expression in the common benefit orders of MDL courts.

The entry of common benefit orders by MDL courts long has been approved as a case management exercise, arising not only the courts' equity jurisdiction under the common benefit doctrine, but from the additional authority of MDL courts to assess common benefit fees and costs that "comes from the inherent 'managerial' power over the consolidated litigation."  *In re Cook Medical, Inc., Pelvic Repair* Systems, 365 F. Supp. 3d 685, 695 (MDL No. 2440) (S.D.W.V. 2019) (collecting cases).  *See also In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977); *In re*

---

[3] *See, e.g.,* Rubenstein, "On What a Common Benefit Order Is, Is Not, and Should Be," Class Action Attorney Fee Digest 87 (March 2009); *In re Avandia Marketing Sales Practices, and Prods. Liab. Litig.* (MDL No. 1871), 2012 WL 6923367 (E.D. Pa. 2012).

*Zyprexa Prods. Liab. Litig.* (MDL No. 1596), 467 F. Supp. 2d 256, 265-267 (E.D.N.Y. 2009); *In re Sulzer Hip Prosthesis and Knee Prosthesis Prods. Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005); *Manual For Complex Litigation* § 14.215 (4th ed., Federal Judicial Center 2004). A trial court has managerial power that has been described as "the power inherent in every court to control the disposition of the causes on is docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S. Ct. 162, 166, 81 L. Ed. 153, 158 (1936), as cited in *Florida Everglades*, 549 F. 2d at 1012.

Assessments in the 7%-9% range are not uncommon in contemporary MDLs.  *See, e.g., In re Aqueous Film-Forming Foam Prods. Liab. Litig.*, Case No. 2:28-MN-2873, Docket No. 72 (D.S.C. Apr. 29, 2019) (9%); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 510 (W.D. La. 2017) (8.6%); *In re Bard IVC Filters Prods. Liab. Litig.*, Case No. 2-15-MD-02641, Docket No. 372 ( D. Ariz. Dec. 18, 2015) (8%); *see also Bard IVC Filters*, 2018 WL 4279834 at *1; *In re Ivokana Prods. Liab. Litig.*, Case No. 3:16-md-02750, Docket No. 58 (D.N.J. Mar. 21, 2017) (7%).  In the *Gadolinium MDL*, this Court ordered a 6% assessment (5% fees/1% costs) in the exercise of its case management authority. *See In re Gadolinium Based Contrast Agents Prods. Liab. Litig.*, Case No. 08-GD-50000, Docket No. 277 (N.D. Ohio Feb. 20, 2009).  The above-cited orders and decisions, and those included in the Rubenstein "Common Benefit " survey, supra, provide ample support for a 7% assessment in the instant *National Prescription Opiate* MDL proceedings, which is one of near-universally recognized, unprecedented challenge and complexity.

Despite the unusually intensive (and expensive) commitment made by common benefit counsel on dual litigation and resolution tracks of MDL 2804, both in this district and in the other federal and state courts to which its related remand, bellwether, and bankruptcy work has spread, Plaintiffs seek a midrange assessment of 7%.  This is an ordinary assessment applied to truly

extraordinary proceedings, and, in this context, a modest one in recognition of the goals and priorities of this litigation.  It is a requested assessment grounded, both historically and operationally, in equity.

## CONCLUSION

As the Supreme Court perceived, and the experience of transferee courts in numerous MDLs has borne out, the reasonableness of a common benefit assessment is in the eye of the judicial beholder.  The court is intimately aware of the quantity and quality of the work performed for the common benefit to date, the magnitude of the out of pocket expenses it has required, the complexity of the legal and factual issues implicated in this litigation, the skill and commitment of the lawyers, and the benefit their work has conferred, and will continue to confer, on litigants across the country.  Plaintiffs respectfully request entry of a Common Benefit Order, in the accompanying form, that provides for a reasonable, indeed modest, 6%/1% set-aside, a percentage well within the mainstream of MDL assessments, in this extraordinary case.


Dated:  January 28, 2020                    Respectfully submitted,


                                            /s/ *Paul J. Hanly, Jr.*
                                            Paul J. Hanly, Jr.
                                            SIMMONS HANLY CONROY
                                            112 Madison Avenue, 7th Floor
                                            New York, NY 10016
                                            (212) 784-6400
                                            (212) 213-5949 (fax)
                                            phanly@simmonsfirm.com

                                            Joseph F. Rice
                                            MOTLEY RICE LLC
                                            28 Bridgeside Blvd.
                                            Mt. Pleasant, SC 29464
                                            (843) 216-9000
                                            (843) 216-9290 (Fax)
                                            jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
GREENE KETCHUM, LLP
419 Eleventh Street
Huntington, WV 25701
(304) 525-9115
(800) 479-0053
(304) 529-3284 (Fax)
paul@greeneketchum.com

*Plaintiffs' Co-Lead Counsel*

Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*
Peter H. Weinberger

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No.: 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | Judge Dan Aaron Polster |
| *ALL CASES* | |

## (PROPOSED) *CORRECTED* ORDER ESTABLISHING COMMON BENEFIT FUND

On January 4, 2018, the Court appointed a Plaintiffs' leadership structure charged with advancing this MDL litigation for the common benefit of all Plaintiffs.  (Doc #37).  The Court's *Order Regarding Plaintiff Attorneys' Fees and Expenses – Protocol for Work Performed and Expenses Incurred* (Doc. #358) ("Protocol Order") sets forth detailed instructions for the performance of common benefit work, and for the type of work and expenses that could qualify for potential compensation and reimbursement.  Under this authority and guidance, Plaintiffs' Co-Lead Counsel, Liaison Counsel, the members of the Plaintiffs' Executive Committee, and others duly authorized to perform common benefit work, have done so on an entirely contingent basis.  These counsel have invested more than one million hours and tens of millions of dollars to fund the substantial expenses of conducting extensive discovery against dozens of Defendants, in what many call the most complex civil litigation our courts have faced.

The Court is aware, from its active supervision of all aspects of the MDL proceedings, of the volume and quality of the work performed to advance the cases of all litigants.  This work has included hundreds of depositions, master pleadings, dispositive motions, scores of experts in

multiple disciplines, bellwether selection and development, pretrial motion practice, trial preparation, federal appellate litigation, and the representation and protection of the MDL Plaintiffs' interests in any bankruptcy case concerning or involving any Defendant in these MDL Proceedings.  These intensive litigation efforts have proceeded in parallel with similarly intensive efforts toward meaningful and effective settlement resolutions designed to address the massive societal challenges that have given rise to the opioids litigation.

The Court has and continues to require a cooperative approach by all litigating plaintiffs in federal court as well as state court.  The Court encouraged and approved of the sharing of work-product generated by the MDL plaintiffs with the Attorneys General for their respective cases.  For example, the Court has overseen the production, processing, and sharing of the massive Automated Reports and Consolidated Ordering System ("ARCOS") database, which has been programmed, analyzed, and shared, in a user-friendly format, with litigating Attorneys General, and with counsel litigating state court actions.  The MDL team has engaged in intensive settlement discussions with Defendants, under the auspices of this Court and with the assistance of its Special Masters.  Many joint meetings, at the request of the Attorneys General and/or the Defendants, have occurred in Cleveland and elsewhere in pursuit of both litigation and resolution.  The expenses of the Special Masters and their assistants have been funded 100% by the parties in federal court.  All of this work has informed and worked to the common benefit of all Opioids-related litigation, whether in state court, federal court, or an Attorney General action.

Given this background, the Court concludes it is just and appropriate to provide a system of assessment on some (but not all) of the settlements and recoveries to which this substantial effort has contributed, commensurate with common benefit assessments ordered in recent MDLs.

This Order is entered to provide for the fair and equitable sharing, by and among all appropriate beneficiaries, of the cost of the services performed and expenses incurred by attorneys acting for the common benefit of all plaintiffs in this complex litigation.  This is accomplished by directing each Defendant who has appeared in these proceedings, and over whom this Court has exercised jurisdiction, to either hold back a small percentage of their Opioids-related settlements, or to self-fund the designated percentage, in certain types of cases.  This Court's authority in this regard derives from the Supreme Court's common benefit doctrine, as established in *Trustees v. Greenough*, 105 U.S. 527 (1881), and further applied in *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116 (1884); *Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); and *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980).  Courts have long approved the doctrine's application in the MDL context as a case management exercise, recognizing an additional source of authority for MDL courts to access common benefit fees and costs that "comes from the inherent 'managerial' power over the consolidated litigation."  *In re Cook Medical, Inc., Pelvic Repair* Systems, 365 F. Supp. 3d 685, 695 (MDL No. 2440) (S.D.W.V. 2019) (collecting cases).  *See also In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 525-29 (D. Nev. 1987); *In re Air Crash Disaster at Florida Everglades on December 29,1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977); *In re  Zyprexa Prods. Liab. Litig.* (MDL No. 1596), 467 F. Supp. 2d 256, 265-267 (E.D.N.Y. 2009); *In re Sulzer Hip Prosthesis and Knee Prosthesis Prods. Liab. Litig.*, 268 F.Supp.2d 907 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778 (6th Cir. 2005); *Manual For Complex Litigation* §14.215 (4th ed., Federal Judicial Center 2004).

Various surveys of common benefit assessments in historical and contemporary MDLs have been conducted documenting a wide range of assessments, with many clustering in a range of 4-6%.  *See, e.g.*, Rubenstein, "On What A Common Benefit Order Is, Is Not, and Should Be,"

Class Action Attorney Fee Digest 87 (March 2009); *In re Avandia Marketing, Sales Practices, and Prods. Liab. Litig.* (MDL No. 1871), 2012 WL 6923367 (E.D. Pa. 2012) (surveying cases and awarding 6.25%). Assessments in the 7%-9% range are not uncommon in contemporary MDLs. *See, e.g., In re Aqueous Film-Forming Foam Prods. Liab. Litig.*, case no. 2:28-MN-2873, docket no. 72 (D.S.C. Apr. 29, 2019) (9%); *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 510 (W.D. La. 2017) (8.6%); *In re Bard IVC Filters Prods. Liab. Litig.*, case no. 2-15-MD-02641, docket no. 372 ( D. Ariz. Dec. 18, 2015) (8%); *see also Bard IVC Filters,* 2018 WL 4279834 at *1; *In re Ivokana Prods. Liab. Litig.*, case no. 3:16-md-02750, docket no. 58 (D.N.J. Mar. 21, 2017) (7%). In the *Gadolinium MDL*, this Court ordered a 6% assessment (5% fees/1% costs) in the exercise of its case management authority. *See In re Gadolinium Based Contrast Agents Prods. Liab. Litig.*, case no. 08-GD-50000, docket no. 277 (N.D. Ohio Feb. 20, 2009). These cases provide ample support for a similar assessment in the instant MDL proceedings.

**ACCORDINGLY, it is hereby ORDERED as follows**:

1.     **<u>Application</u>**

This Order applies to all cases and claims now pending, previously or later filed in, transferred to, or removed to, this Court and treated as part of the coordinated proceedings known as *In re: National Prescription Opiate Litigation*, MDL No. 2804. This Order further applies to: (1) all cases, claims and classes described in paragraph 2.c. of this Order, (2) all parties named in these cases, (3) all attorneys who represent such parties as clients who have cases now pending in, or later filed in, transferred to, or removed to, this Court, and (4) any and all plaintiffs' attorneys and their clients who have relied upon, used, accepted, or have had access to MDL generated work product whether with the express approval of the PEC or not, and (5) all plaintiffs' attorneys with state court cases and/or tolled or unfiled claims who have signed or will sign Participation Agreements with the PEC to share in the work-product of this MDL.

      **2.**      <u>**Common Benefit Assessment and Holdback by Defendants**</u>

      **a.**      All parties in these MDL proceedings and their attorneys, and those described in Paragraph 1 above, who have agreed or agree to settle, compromise, dismiss, or reduce the amount of a claim, or who recovered or recover a judgment (with or without trial) for monetary damages (including compensatory and punitive damages) or other monetary relief (including costs of abatement or costs of other equitable relief) with respect to any Opioids-related claims that have been or could have been brought by, on behalf of, or for the benefit of any of the MDL plaintiffs, are subject to an assessment of the Gross Monetary Recovery (defined below), to be withheld or self-funded by each Defendant and paid into the Common Benefit Fund by each Defendant, as provided herein.

      **b.**      The assessment amount shall be six percent (6%) for common benefit attorneys' fees and one percent (1%) for common benefit costs.  The assessment represents a hold back (*See In re Zyprexa Products. Liab. Litig.*, 467 F.Supp.2d 256, 266 (2d Cir. 2006).

      **c.**      With respect to all cases or claims as to which a settlement is entered into, or a settlement or judgment was or is paid, from and after October 20, 2019, that provides or purports to provide for the satisfaction, release, dismissal or compromise of the Opioids-related claims:  (1) of any or all private, public, or government entity plaintiffs (including Cities, Counties, municipalities, and Indian Tribes) whose cases are components of MDL 2804; (2) of any or all potential members of the Negotiation Class defined in the September 11, 2019 *Order Certifying Negotiation Class and Approving Notice* (Doc # 2591); or (3) that are or are purported to be brought for the benefit of any of the foregoing MDL No. 2804 plaintiffs, every settling Defendant is directed to withhold this 7% assessment (6% fees/1% costs) from the Gross Monetary Recovery; or, in the alternative, to self-fund an additional equivalent amount, depending upon the terms of the particular settlement, and promptly to pay that amount into the Common Benefit Fund. ***For***

*clarification, no assessment is due from a Defendant on any portion of a judgment or settlement in a State Attorney General action that resolves or satisfies that State's own damages claims.*

        **d.**     In measuring the "Gross Monetary Recovery,"

        (1)     Court costs that are to be paid by a settling Defendant shall be excluded.

        (2)     All fixed and certain payments are included, whether characterized as damages, abatement costs, or anything else.  Each defendant may choose to pay the present value of any fixed and certain payments to be made in the future, as if made in an up-front payment. The timing of assessment payments on settlements including future payments is subject to the agreement of the parties and the approval of the Court.

        (3)     The value of non-cash products or services provided by a Defendant shall be included, with the value subject to negotiation for purposes of this assessment.  Any disputes regarding the value of non-cash products or services, or any other aspect of Gross Monetary Recovery, will be resolved by the Court.

        **3.**     **Establishment of Common Benefit Fund**

An interest-bearing account will be established at a financial institution to be determined, under this Court's ongoing jurisdiction, to receive funds from Defendants and to disburse funds to approved recipients as provided in the Protocol Order, this Order, and further Orders of this Court. These funds will be held as funds subject to the direction of this Court and are hereinafter referred to as the "Common Benefit Fund."  No party or attorney has any individual right to any of these funds except to the extent of amounts directed to be disbursed to such person by order of this Court. These funds do not constitute the separate property of any party or attorney and are not subject to garnishment or attachment for the debts of any party or attorney except when and as directed to be disbursed to a specific person as provided by Court order.

6

      **a.**      The Court will appoint by subsequent order a qualified certified public accountant (the "CPA") to establish this account and act as escrow agent, keep detailed records of all deposits and withdrawals, and to prepare tax returns and other tax filings.  Each Defendant that enters a settlement, funds a judgment, or otherwise resolves a case covered by this Order shall within seven (7) days report in writing to the CPA the gross monetary payments paid, or to be paid, under the resolution.

      **b.**      Upon subsequent Orders of this Court, payments may be made from the Common Benefit Fund to counsel who did or will provide services or incur expenses for the joint and common benefit of plaintiffs in addition to their own client(s), whether those counsel are representing claimants in these MDL proceedings or in state-filed cases, including Attorneys General actions, or are representing the interests of the MDL Plaintiffs in any bankruptcy case concerning or involving any Defendant in these MDL Proceedings.  Such counsel who maintain actions in state court and obtain rulings that inure to the benefit of all plaintiffs, whether in the MDL or in state court, shall be permitted to submit, for common benefit consideration, the time and expenses associated with obtaining such rulings.  Amounts paid to counsel pursuant to private fee agreements must be disclosed so that the Court can ensure amounts counsel may also receive from the Common Benefit Fund are reasonable.

      **c.**      All submissions and applications for common benefit fees and/or costs, whether made by counsel performing such work in the MDL or in state courts, must comply with the procedures, requirements and guidelines of the Protocol Order, which is incorporated herein by reference.  Counsel performing common benefit work in state courts, who have not previously submitted their time and costs under the Protocol Order shall have 45 days to do so from the date of any future settlement to which their work applies.  If an attorney applies for and receives

common benefit treatment, all of the cases in which the attorney and/or his or her law firm are counsel of record are subject to the 7% assessment.[1]  This Court retains the discretion to amend or supplement the Protocol Order, and this Order, as necessary and appropriate to reflect ongoing developments in the litigation.

  **d.** Payments for Common Benefit fees and/or expenses will not exceed the fair value of the services performed, plus any court-approved multiplier, or the reasonable amount of the expenses incurred.  The total of payments received by an attorney for (i) Common Benefit fees and/or expenses plus (ii) fees and/or expenses from all other sources (e.g. contingent fees) must be reasonable.  Depending upon the total amount of the Common Benefit Fund, amounts paid to counsel may be limited to part of the value of such services and expenses.

  **e.** No amounts will be disbursed without review and approval by this Court under such mechanism as this Court may deem just and proper under the circumstances.  The Court will later determine whether it will decide disbursement amounts with the help of a Fee Committee, a Special Master, and/or other mechanisms.  Each Defendant's counsel shall provide at least quarterly notice to this Court, or its designee, and to Plaintiffs' Co-Lead Counsel, of the names and docket numbers of the cases for which it has withheld an assessment.  Monthly statements from the escrow agent shall be provided to Plaintiffs' Co-Lead Counsel or designee, Defendant's Liaison Counsel, and this Court or this Court's designee, showing, with respect to the funds controlled by the escrow agent, aggregate amounts of the monthly deposits, disbursements, interest earned, financial institution charges if any, and current balance.

  **f.** If the Common Benefit Fund exceeds the amount needed to make all

---

[1] By making application for Common Benefit fees or costs, an attorney is automatically eligible for work-product sharing as outlined in the Participation Agreement.

payments of Court-approved costs, fees, and any Court-approved multiplier on any fees, this Court may order a refund to those who have contributed to the Common Benefit Fund. Any such refund will be made in proportion to the amount of the contributions.

g. Nothing in this Order shall be deemed to modify, alter, or change the terms of any fee contracts between plaintiffs' counsel and their individual clients.

**4.** **Further Proceedings and Continuing Jurisdiction**

a. This Order is without prejudice to such other assessments of or awards of fees and costs as may be ordered by this Court under Rule 23(h), the common benefit doctrine, or that may be provided by contract between attorneys and clients. The intent of this Order is to establish, secure, and supervise a fund to promote the purposes and policies of the common benefit doctrine and provide a source for equitable payment of services rendered and costs incurred for the benefit of Opioids plaintiffs.

b. If all parties to a future settlement agree that exceptional circumstances warrant a departure from the holdback obligations, or other provisions of this Order, they shall submit affidavits thereon and request appropriate relief from this Court.

c. Any disputes or requests for relief from or modification of this Order will be decided by this Court in the exercise of its continuing jurisdiction over the parties, and its authority and discretion under the common benefit doctrine.

**IT IS SO ORDERED.**

_____
Honorable Dan Aaron Polster

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |
|---|---|
| _____ ) | **Case No. 1:17-MD-2804** |
| **IN RE: NATIONAL PRESCRIPTION** ) | |
| **OPIATE LITIGATION** ) | **Judge Dan Aaron Polster** |
| ) | |
| ) | |
| ) | **ORDER REGARDING** |
| ) | **PROFESSOR RUBENSTEIN'S** |
| ) | **REPORT AND RECOMMENDATION** |
| _____ ) | |

Before the Court is Plaintiffs' Amended Motion for Entry of Order Establishing Common Benefit Fund.  Doc. #: 3112.  The Court appointed Professor William B. Rubenstein to assist in its review of these complex matters.  Doc. #: 3218.  Some parties filed a motion seeking clarification of Professor Rubenstein's role. Doc. #: 3250.

Professor Rubenstein has submitted a Report to the Court and made recommendations as to how the Court should proceed on the common benefit motion.  *See* Doc. #: 3302.  The Court finds the recommendations in this Report, which suggest solicitation of additional briefing, are appropriate.  Accordingly, the Court:

1.  **adopts** the Report and its recommendations.  As Professor Rubenstein suggests, movants and interested parties should submit briefs of no more than 25 pages addressing the issues and questions raised, on or before the date 21 days from the date of this Order.  *See* Report at 9-10.  Interested parties should work to submit group briefs and avoid repetition as much as possible.

2.  **provides notice** that Professor Rubenstein's work is complete with the submission of his report and recommendations and that, as of the date of this Order, Professor Rubenstein's consultancy has ended;

**EXHIBIT
16**

3. **denies as moot** the motion seeking clarification of Professor Rubenstein's work (Doc. #: 3250); and

4. **directs** movants to ensure that all non-parties who filed oppositions to the motion receive a copy of the Report and this Order.

*/s/ Dan Aaron Polster*
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

**Dated:  June 3, 2020**

2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>*APPLIES TO ALL CASES* | Case No. 1:17-CV-2804<br><br>Hon. Dan A. Polster |

## CASE MANAGEMENT ORDER ONE

   The parties in this case have been pursuing, and are continuing to pursue, settlement discussions, and they have made good progress.  The parties have indicated, however, they believe settlement will be made more likely if, in addition to the "settlement track" they are currently pursuing, the Court also creates a "litigation track."  Accordingly, the Court hereby enters this Case Management Plan, which directs the parties to engage in motion practice, discovery, and trial preparation for certain cases in this MDL.

  1.  **APPLICABILITY AND SCOPE OF ORDER**

    a.  **Scope.**  This CMO is intended to conserve judicial resources, reduce duplicative service, avoid duplicative discovery, serve the convenience of the parties and witnesses, and promote the just and efficient conduct of this litigation.  *See* Fed. R. Civ. P. 1.  This Order and, unless otherwise specified, any subsequent pretrial or case management orders issued in this MDL, shall govern the practice and procedure in: (1) those actions transferred to this Court by the Judicial Panel on Multidistrict Litigation ("JPML") pursuant to its order entered on December 5, 2017, (2) any tag-along actions transferred to this Court by the JPML pursuant to Rules 7.1 and 7.2 of the Rules of Procedure of the Panel, after the filing of the final transfer order by the Clerk of the Court, and (3) all related actions originally filed in this Court or transferred or removed to this Court and assigned thereto as part of *In re: National Prescription Opiate*

EXHIBIT
**17**

*Litigation*, MDL No. 2804 ("MDL 2804").  These cases will be referred to as the "MDL proceedings."

The provisions of this Order, and any subsequent pretrial order or case management order issued in the MDL proceedings, shall supersede any inconsistent provisions of the Local Rules for the United States District Court, Northern District of Ohio ("Local Rules").  The coordination of MDL Proceedings, including certain of these cases that have been or may be directly filed into this MDL, does not constitute a waiver of any party's rights under *Lexecon v.  Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).  This CMO shall not be construed to affect the governing law or choice-of-law rules in any case subject to the CMO.

b.      **Application to All Parties and Counsel.**  This Order and all subsequent pretrial or case management orders shall be binding on all parties and their counsel in all cases currently pending, or subsequently transferred to, removed to, or pending in the MDL proceedings, and shall govern each case in the MDL proceedings unless the order explicitly states that it relates only to specific cases.

c.      **Amendment and Exceptions.**  This Order may be amended by the Court on its own motion, and any party may apply at any time to this Court for a modification or exception to this Order.  The Court expects it will issue subsequent case management orders addressing the cases mentioned in this CMO and other MDL proceedings.

2.      **MOTIONS TO DISMISS**

a.      The parties and Court agree that it will be efficient and informative to proceed with briefing on threshold legal issues on common claims.  Accordingly, the Court sets out below a process for choosing certain cases to brief these threshold legal issues, where these cases: (1) are filed in a representative variety of jurisdictions, (2) by a representative variety of

2

Plaintiffs, (3) against a representative variety of Defendants, and (4) which raise a representative variety of issues.

b.     **Cases filed by local governmental entities in Ohio and Illinois**.  **No later than Wednesday, April 25, 2018**, and subject to paragraph 2.j, Plaintiffs in the following cases shall amend their Complaints or provide notice that the Complaint will not be amended, and Defendants may file motions to dismiss in any or all of these cases within **28 days thereafter**: (1)  *The County of Summit, Ohio. v. Purdue Pharma L.P.*, Case No. 18-OP-45090 (N.D. Ohio); and (2) *The City of Chicago, Illinois v. Purdue Pharma L.P.,* Case No. 17-OP-45169 (N.D. Ohio).

c.     **Cases filed by local governmental entities in West Virginia, Michigan, and Florida.**   **No later than Wednesday, April 25, 2018**, and subject to paragraph 2.j, Plaintiffs in the following cases shall amend their Complaints or provide notice that the Complaint will not be amended, and Defendants may file motions to dismiss in any or all of these cases within **42 days thereafter**: (1) *Cabell County Commission, West Virginia v. AmerisourceBergen Drug Corp.*, Case No.  17-OP-45053 (N.D. Ohio); (2) *County of Monroe, Michigan v. Purdue Pharma L.P.*, Case No. 18-OP-4515 (N.D. Ohio); and (3) *Broward County, Florida v. Purdue Pharma L.P.*, Case No. 18-OP-45332 (N.D. Ohio).

d.     **Cases filed by Sovereigns – Alabama and Indian Tribes.  No later than Wednesday, May 9, 2018,** and subject to paragraph 2.j, Plaintiff in the following case shall amend the Complaint or provide notice that the Complaint will not be amended, and Defendants may file motions to dismiss within **42 days thereafter**: *The State of Alabama v. Purdue Pharma L.P.,* Case No. 18-OP-45236 (N.D. Ohio).  In addition, the Court will issue a supplemental case management order addressing the Indian Tribes cases.

    e.  **Cases filed by Hospitals and Third-Party Payors.  No later than**

**Friday, May 11, 2018**, the Hospital Representative of the Plaintiffs' Executive Committee

("PEC") shall identify for the parties and the Court a single MDL case filed by a hospital, the

claims of which are governed by the law of one of the States listed in paragraphs 2.b and 2.c.

Furthermore, **no later than Friday, May 11, 2018**, Defendants shall notify the parties and the

Court that they have identified a single MDL case filed by a third-party payor, the claims of

which are governed by the law of one of the States listed in paragraphs 2.b and 2.c.  The Court

will issue a subsequent case management order setting deadlines in these cases.

    f.  Plaintiffs may respond to the motions in each of the above actions within

**28 days** after the motions are filed, and Defendants may file replies within **21 days** thereafter.

State Attorneys General may file amicus briefs in response to any motions to dismiss filed in *State*

*of Alabama v. Purdue Pharma L.P.*

    g.  The parties shall endeavor to coordinate and consolidate briefing on all of

the motions to dismiss and avoid duplicative briefing by incorporating similar arguments by

reference.  For example: (1) manufacturer Defendants shall endeavor to file a single motion to

dismiss in each case, addressing issues common to all manufacturers; (2) distributor Defendants

shall endeavor to file a single motion to dismiss in each case, addressing issues common to all

distributors; (3) manufacturer and distributor Defendants shall endeavor to present common issues

together; (4) the parties shall not repeat arguments in subsequent cases or briefs; (5) Defendants

shall raise only those issues they believe are most critical and most relevant to the settlement

process; and so on.

    h.  The Court will strictly enforce provisions regarding length of memoranda

filed in support of motions; and the Court will apply limitations applicable to complex cases.  *See*

Local Rule 7.1.  Motions for relief from the length restrictions must show good cause for such relief and must be made <u>sufficiently in advance</u> to permit the Court to rule and the Clerk's Office to issue the ruling by regular mail.  Motions for relief from length restrictions which are filed contemporaneously with the memorandum exceeding the page limits will be denied.  In no event shall the request to exceed page limitations extend the time for filing of the underlying memorandum.

       i.      Chambers will not accept courtesy copies of motions or briefs unless expressly requested by the Court.  Exception: motions or briefs filed within two (2) business days of a conference/hearing/trial shall be emailed to the Court as well as opposing counsel on the same day it is filed.  The Court's email address for these filings is Polster_Chambers@ohnd.uscourts.gov.  Also, counsel shall provide to Special Master Cohen: (1) three-hole-punched, two-side-printed, written copies of all papers related to the motions to dismiss; and (2) thumb-drives containing as-filed PDFs of all papers related to the motions to dismiss, and also PDFs of all cases cited.

       j.      Defendants do not waive and shall be deemed to have preserved any defenses not addressed in the initial motions filed pursuant to the foregoing provisions, including but not limited to insufficient service of process and lack of personal jurisdiction.  Further, nothing in this Order is intended to waive any Defendant's right to file an individual motion to dismiss in any or all of the above-listed cases in the future on any grounds, including lack of personal jurisdiction.

       k.      Nothing in this Order is intended to waive any Plaintiff's right to move to file further amended pleadings in the above-listed cases if deemed appropriate.  Defendants reserve all rights related to any such motion or filings.

5

3.     **CASE TRACKS**

a.     **Track One.** The following three cases are included in Track One: (1) *The County of Summit, Ohio. v. Purdue Pharma L.P.*, Case No. 18-OP-45090 (N.D. Ohio); (2) *The County of Cuyahoga v. Purdue Pharma L.P.*, Case No. 17-OP-45004 (N.D. Ohio); and (3) *City of Cleveland v. AmerisourceBergen Drug Corp.*, Case No. 18-OP-45132 (N.D. Ohio).

b.     **Amendments to Track One Complaints.  No later than Wednesday, April 25, 2018**, Plaintiffs in Track One Cases shall amend their Complaints or provide notice that the Complaint will not be amended at this time.

c.     **Written Discovery in Track One.** Subject to the parameters in paragraph 9 below, written discovery in Track One Cases shall commence upon entry of this Order.

d.     **Insurance Information in Track One Cases**. Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iv), the parties shall produce any insurance agreements under which an insurance business may be liable to satisfy all or part of a possible judgment in the Track One Cases, or to indemnify or reimburse for payments made to satisfy any judgment. This includes agreements insuring against general liability, product liability, druggist liability, directors and officers liability, and any other applicable agreements. The parties shall also produce charts that depict the insurance coverage that is or may be applicable to the claims in the Track One Cases. The insurance agreements and coverage charts shall be produced within **30 days of the issuance of the protective order** referred to in paragraph 9.d. The protective order shall include a provision that permits the parties' insurance companies to have access to, and communicate concerning, the materials produced in the Track One Cases.

     e.     **Depositions in Track One Cases**.  Depositions of parties will proceed in the Track One Cases as set forth below.

     i.     The parties will meet and confer and submit a proposal, **no later than Monday, May 21, 2018**, regarding numerical limits on fact witness depositions.

     ii.     Beginning on **June 4, 2018**, the parties may begin noticing fact witness depositions, which shall be completed by **August 31, 2018**.

     f.     **Close of Fact Discovery in Track One Cases.**  Fact discovery in the Track One Cases shall be completed by **August 31, 2018**.

     g.     **Expert Discovery in Track One Cases.**

     i.     By **September 7, 2018**, Plaintiffs shall serve expert reports in the Track One Cases and, for each expert, provide two proposed deposition dates between **September 17 and October 5, 2018**.

     ii.     By **October 12, 2018**, Defendants shall serve expert reports in the Track One Cases and, for each expert, provide two proposed deposition dates between **October 22 and November 9, 2018**.

     h.     **Schedule for Daubert and Dispositive Motions in Track One Cases.**

| | |
|---|---|
| **November 16, 2018** | Deadline for *Daubert* and dispositive motions in Track One trial cases. |
| **December 14, 2018** | Deadline for responses to *Daubert* and dispositive motions. |
| **January 7, 2019** | Deadline for replies in support of *Daubert* and dispositive motions. |
| **Week of January 14, 2019** | Hearing on *Daubert* and dispositive motions, or as otherwise set by the Court, if necessary. |

     i.     **Initial Trial Setting.**  The Court's current intention is to consolidate all three Track One Cases for trial, and to try all then-surviving claims against all then-surviving

Defendants.  The Court intends to begin the trial at **9:00 a.m. Eastern Time on Monday, March 18, 2019,** to last for a period of three weeks.  The parties shall meet and confer and submit to the Court, **no later than Friday, January 25, 2019,** joint or competing proposals addressing issues relating to the structure of the first trial and deadlines for other pretrial submissions and additional activities through trial.  The Court may accept or modify completely the parties' proposals.

        j.    **Additional Case Tracks.**  The parties and the Special Masters shall confer by **August 17, 2018**, to adopt a process and schedule for additional case tracks, which shall involve cases from the state and tribal <u>jurisdictions</u> identified in paragraph 2.  These additional cases need not necessarily be the cases listed in paragraph 2.  The parties and the Special Masters shall confer regularly as the Track One cases progress, to determine whether any modifications to this CMO are necessary, including whether any other cases should be set for discovery.

    4.    **<u>ELECTRONIC FILING PROCEDURES</u>**

The parties are expected to follow the Northern District of Ohio's policies and procedures on Electronic Case Filing.  All counsel of record are hereby directed to take steps as necessary to be registered as electronic filers in the master docket, No. 1:17-MD-2804.  All filings discussed in this CMO shall be filed electronically in the master MDL docket.  Any document that pertains to one or multiple specific cases shall be electronically filed in each case docket *and* in the master MDL docket.  Electronic case filing of a document, other than an initial pleading, in the master docket shall be deemed to constitute proper service on all parties.  Discovery and other documents not filed with the Court shall be served by electronic mail on the appropriate Lead and Liaison Counsel and other appropriate counsel as set forth below in paragraph 9.c.

5.      **COMMUNICATIONS WITH THE COURT**

Unless otherwise ordered by the Court, all substantive communications with the Court shall be filed.  Excepted from this rule is correspondence with the Special Masters and discovery disputes, which are governed by paragraph 9.o below.

6.      **PLEADINGS AND MOTIONS**

a.      **Direct Filing.**  In order to eliminate delays associated with transfer to this Court of cases filed in or removed to other federal district courts, any Plaintiff whose case would be subject to transfer to these MDL proceedings may file its case directly in this District.  Direct filing shall not constitute a waiver of any party's contention that jurisdiction or venue is improper or that the action should be dismissed or transferred.  Direct filing shall not impact the choice of law to be applied in the case.

At the conclusion of pretrial proceedings, should the parties agree that a case filed directly in the MDL proceedings should be transferred <u>and</u> the district to which it should be transferred, the parties will jointly advise the Court of the district to which the case should be transferred at the appropriate time.  Should the parties disagree as to the district to which a case should be transferred, nothing in this Order precludes any party from filing a motion to transfer pursuant to 28 U.S.C. §1404(a) or §1406 at the conclusion of pretrial proceedings.

b.      **Amendment of Pleadings and Addition of Parties.**  In cases other than those mentioned in paragraphs 2 and 3, Plaintiffs shall file any amended pleading, including any amendment to add a party to a case, **no later than Friday, May 25, 2018**.  After that date, no complaint shall be amended by Plaintiffs to add a party or otherwise, absent leave of Court or stipulation of the parties.  The deadline for Defendants to add a party without leave of Court shall be **45 days before the close of fact discovery** applicable to a particular case.

9

c.      **Service of Summons and Complaint.**  Defendants are encouraged to avoid unnecessary expenses associated with serving the summons and, absent good cause, shall grant requests to waive service pursuant to Fed. R. Civ. P. 4(d)(1).

d.      Plaintiffs shall not name as a Defendant, nor seek to serve, any entity as to which Plaintiffs lack a good faith basis to assert that the entity is subject to personal jurisdiction in this Court.  Notwithstanding the foregoing, waiving service of a summons does not waive any objection to personal jurisdiction or to venue.  Fed. R. Civ. P. 4(d)(5).  **No later than Wednesday, April 25, 2018**, each Defendant shall file a notice in the master docket that attaches a proper form of a waiver request and a designated person to electronically accept the same. Such waiver requests shall be timely executed and returned to the requesting party for filing with the Court.  The Court previously tolled the deadline to achieve service of the summons and complaints through **May 18, 2018**.  The Court expects the Plaintiffs in all filed cases as of the date of this Order to effectuate service by **Wednesday, July 18, 2018**.  Service on a foreign corporation is suspended until further order of the Court.

e.      **Voluntary Dismissal.**  At this point, with the parties actively engaged in working towards global resolution, including through a litigation track, dismissal without prejudice of Trial Track cases or cases designated for motion to dismiss briefing has a potentially detrimental effect on the Court, the parties, and the MDL process.  Accordingly, because the timeframe for responsive pleading has been extended beyond that ordinarily contemplated by Fed. R. Civ. P. 41(a)(1)(A)(i), and notwithstanding the fact that Defendants may not yet have answered, any voluntary dismissals pending in this MDL as of the date of this Order or filed hereafter that would result in the dismissal of any such action against all named Defendants shall require leave of Court.

      f.     **General Motions and Briefing Requirements.**  Except as otherwise provided herein, all motions and briefs shall conform to Local Rule 7.1.  All motions on behalf of Plaintiffs or PEC or Plaintiffs' Steering Committee must be signed by Plaintiffs' Lead Counsel. All motions on behalf of all Defendants or a Defendants' Steering Committee must be signed by Lead Counsel for each moving Defendant.

      g.     **Motions.**  No party may file any motion not expressly authorized by this Order absent further Order of this Court or express agreement of the parties.   However, nothing in this Order limits the right of a State Attorney General to seek remand of any case brought by the Attorney General that is removed to the MDL. The Court shall decide any such motion on the merits.

### 7.    <u>COORDINATION WITH STATE COURT PROCEEDINGS</u>

The Court acknowledges it has no jurisdiction over related State court proceedings.  To achieve the full benefits and efficiencies of the MDL proceedings, however, this Court intends to coordinate with State courts presiding over related cases to the greatest extent possible, in order to avoid unnecessary duplication and inconsistency.  This includes efforts at coordination of written discovery and deposition protocols and cross-noticing of depositions.  The Court appoints Special Master Yanni to oversee these efforts.

### 8.    <u>PRESERVATION</u>

      a.     All parties and their counsel are reminded of their duty, consistent with the Federal Rules of Civil Procedure, to take reasonable measures to preserve documents, electronically stored information ("ESI"), and things that are potentially relevant.

      b.     The parties will meet and confer regarding a procedure for directing third-party records custodians to preserve records.

9.       **PRELIMINARY DISCOVERY PLAN AND PROCEDURES**

      a.      **Discovery Under the Plan.**   No party may conduct any discovery of another party in this MDL proceeding not expressly authorized by this Order absent further Order of this Court or express agreement of the parties.

      b.      **Waiver of Initial Disclosures.**   For all cases in the MDL proceedings, the parties are relieved from complying with the requirements of Fed. R. Civ. P. 26(a)(1) unless otherwise directed by the Court.

      c.      **Service of Discovery.**   Unless otherwise directed by this Court, the parties shall serve all papers that are not to be filed with the Court, including, but not limited to, discovery requests or responses, deposition notices, and certificates of service thereof, by electronic mail on Plaintiffs' Liaison Counsel and Defendant's Liaison Counsel. Such papers are not to be filed with the Clerk, nor are courtesy copies to be delivered to the Court, except when specifically ordered by the Court or to the extent needed in connection with a motion, and only in accordance with the protective order governing the MDL proceedings. Where a paper is applicable to all cases or substantially all cases, or such categories of cases as may be defined in subsequent Orders, Plaintiffs' Liaison Counsel also shall electronically serve such paper on counsel of record for the individual Plaintiff(s) to whom the paper is applicable. Where a paper to be served by a Defendant is applicable to a particular case, Defendants' Liaison Counsel shall electronically serve such paper on the counsel of record for the individual Plaintiff(s) in that case as well as Plaintiffs' Liaison Counsel.

      All discovery directed to Defendants and non-party witnesses on behalf of Plaintiffs shall be undertaken by, or under the direction of, the PEC on behalf of all Plaintiffs with cases in these MDL proceedings.

        d.      **Protective Order.**  Disclosure and discovery in this proceeding may involve production of confidential, proprietary, and private information for which special protection from public disclosure and from any purpose other than prosecuting this litigation would be warranted, including insurance information discussed in paragraph 3.d.  The parties will meet and confer and submit to the Court, **no later than Monday, April 30, 2018**, a proposed Protective Order, binding on all parties and counsel, to ensure the protection of confidential information, including any HIPAA-protected information.

        e.      **Format of Production.**  The parties will meet and confer and submit to the Court, **no later than Monday, April 30, 2018**, a proposed Document Production Protocol governing the format of production of documents.

        f.      **Deposition Protocol.**  The parties will meet and confer and submit to the Court, **no later than Monday, May 21, 2019**, a protocol governing depositions, including with respect to the scheduling, noticing, taking, and recording of depositions, and procedures to ensure that, absent agreement or court order, a witness will not be deposed more than once across any state or federal cases.

        g.      **Assertion of Privilege.**  Any party that withholds the production of requested documents or materials on the ground of any privilege or application of the work-product doctrine must provide a Privilege Log.  Each Privilege Log shall describe each document or thing for which a privilege or the work product doctrine is asserted in sufficient detail to reasonably permit the party seeking discovery to assess whether to dispute any such assertion.  This will include but is not limited to information regarding the document's subject, date, author, and all recipients, the specific privilege asserted, and the factual basis for the privilege.  Each party withholding materials shall provide opposing counsel a copy of the Privilege Log within **45 days**

**after the production**, absent agreement of the parties.  If a partial production is made, the party shall produce a privilege log relating to such partial production.  The parties will raise privilege issues with Magistrate Judge Ruiz, in accord with the procedures set out in paragraph 9.0, as soon as reasonably possible.

       h.    **Ex Parte Communications with Treating or Prescribing Healthcare Providers.**  Absent further order of the Court, contact with a non-party treating or prescribing healthcare provider for any patient whose medical care or treatment is the basis of any Plaintiff's claims shall be governed by the relevant procedural rules in the jurisdiction in which the healthcare provider resides.  The parties reserve the right to seek a further order governing ex parte communications with such non-party healthcare providers.

       i.    **Fact Sheets.**  The parties shall meet and confer and submit to the Court, **no later than Monday, April 30, 2018,** a proposed Order regarding Plaintiff Fact Sheets and Defendant Fact Sheets.  The fact sheets shall apply to each case within MDL 2804, and in all other cases that become part of this MDL by virtue of being filed in, removed to, or transferred to this Court.  The parties may agree to an exception regarding whether they will produce Fact Sheets, or their content, with regard to Track One Cases.

       j.    **Joint Records Collection.**  The parties are directed to confer and reach an agreement regarding the selection of one or more Joint Custodian(s) to collect and retain certain medical or other records from any third-party designated as a record custodian by either Plaintiffs or Defendants and present to the Court a protocol and Stipulated Joint Records Collection Order **no later than Monday, April 30, 2018**.

k.      **Prior Document Disclosures.**

i.      Upon entry of this Order, all documents, including ESI, that were previously produced by any Defendant in *City of Chicago v. Purdue Pharma L.P.*, Case No. 14-CV-04361 (N.D. Ill.), shall be deemed produced to all Plaintiffs in MDL 2804 and shall be made immediately available to the PEC by any parties or counsel in possession of same, at no cost to the party or counsel in possession.

ii.     **No later than Monday, June 11, 2018**, all Defendants shall review documents previously produced pursuant to any civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities involving the marketing or distribution of opioids and shall produce to the PEC non-privileged documents relevant to the claims in this MDL proceeding.  Defendants shall engage in rolling production of previously-produced documents during this 61-day period, and shall engage in rolling production of privilege logs and lodging of objections.

iii.    After Defendants complete the foregoing document productions, to the extent the PEC believes there are other documents that were produced by a Defendant in another proceeding that are discoverable in this proceeding, the PEC shall notify the Defendant and identify the specific document(s) and basis for requesting production, and the parties shall meet and confer to attempt to resolve the issue.  To the extent the parties are unable to resolve the issue, the PEC shall bear the burden to demonstrate to the Court that the document(s) should be produced in this proceeding.

iv.     Unless and until other arrangements are made by this Court regarding these specific materials, and in the interests of expediting discovery, Plaintiffs in MDL 2804 will be subject to any pre-existing Protective Orders or confidentiality agreements

governing this material.  As such, at this time, review by Plaintiffs and their experts of

discovery that has been produced in other cases and which is deemed produced in this MDL is

subject to any Protective Orders or confidentiality agreements entered in those cases.  The entry

of a Protective Order in this MDL proceeding, however, will supersede any pre-existing

Protective Order.

l.  **Written Discovery.**

i.  Any written discovery served on a Defendant pursuant to

paragraph 3 above shall be coordinated and served by the PEC.  Absent leave of Court, the PEC

may serve up to 35 Requests for Production and up to 35 Interrogatories on each Defendant

Family in cases in Track One and subsequent Case Tracks identified pursuant to paragraph

3.  For purposes of this requirement, a "Defendant Family" shall consist of all corporate

affiliates that are named as a Defendant in any action that is part of this MDL.  For illustration

purposes only, Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company

Inc. shall be treated as a single Defendant Family.

ii.  Each group of Defendants named in a case (e.g., the Manufacturer

Defendants, the Distributor Defendants, and the Retail Pharmacy Defendants) may serve up to

35 Requests for Production and up to 35 Interrogatories on each Plaintiff in cases in Track One

and subsequent Case Tracks identified pursuant to paragraph 3.

iii.  **No later than, Monday, July 16, 2018**, each Plaintiff in cases in

Track One that alleges money damages based upon unnecessary prescriptions shall identify: (a)

the prescriptions that each Plaintiff asserts were medically unnecessary or medically

inappropriate, to whom they were written, and whether Plaintiff reimbursed for them; (b) the

physicians or healthcare providers who wrote the prescriptions; and (c) Plaintiff's basis for

identifying the prescriptions that it asserts are medically unnecessary or medically inappropriate.

   m. **Third-Party Discovery.**  The parties may conduct appropriate third-party discovery in Track One cases, including discovery to identify the information discussed in paragraph l.iii.  Any party intending to serve third-party discovery shall comply with Fed. R. Civ. P. 45(a)(4).

   n. **Extension of Discovery Deadlines.**  Nothing in this Order shall be interpreted to restrict the ability of the parties to move, separately or (preferably) jointly, for an extension of discovery deadlines as permitted by the Rules.  Please note that the granting of an extension of any discovery deadline <u>shall not change the trial date, and the Court does not intend to move the trial date of the Track One case(s)</u>.  Should any of the deadlines set forth above become infeasible as a result of an unexpected technical or similar matter, the responding party shall provide advance notice and an estimated date for the response.  If, after meeting and conferring in good faith, the receiving party objects to any modified date, it may seek a conference with the Court.

   o. **Discovery Dispute Resolution.**  Counsel shall comply with Local Rule 37.1.  Specifically, the parties shall resolve discovery disputes by following these steps: (1) good faith resolution efforts by counsel; (2) telephone conference-call to Judge Polster's chambers, at which time the Court will direct the parties how and when they will present their issues to either Judge Polster or Magistrate Judge Ruiz; (3) if requested by the Court, position letters (normally not to exceed 3 pages); and (4) if required, discovery motion pursuant to Fed. R. Civ. P. 37.

   p. **Filing of Discovery Materials.**  No discovery materials shall be filed without leave of Court, except as necessary to support dispositive motions.  If a party intends to

rely on deposition testimony in support of a motion, the Court prefers the filing of the entire deposition in condensed form rather than excerpts, unless the party truly believes that excerpts are sufficient.  If any other party believes the excerpts offered are not sufficient, that party is free to file the entire deposition in condensed form.  In any event, discovery material submitted in support of a party's position shall be filed at the same time as that party's memorandum setting forth its position.

      10.     **EXPERT REPORTS AND EXPERT MATERIALS**

      a.     The designation of experts whose opinions may be submitted at trial must be accompanied by a report that complies with Fed. R. Civ. P. 26(a)(2)(B).  The report must be provided contemporaneously with the expert designation.  All parties' experts whose opinions may be submitted at trial shall be subject to deposition as directed in Fed. R. Civ. P. 26(b)(4)(A) prior to the close of expert discovery.

      b.     Unless otherwise stipulated or ordered by the Court, each disclosed expert will produce his or her final report pursuant to and consistent with Fed. R. Civ. P. 26(a)(2)(B), together with identification of all documents that the expert has considered in preparing and/or rendering the expert's opinion.  No other documents relating to expert reports will be produced, provided, however, that nothing in this order is intended to bar discovery of documents that are otherwise discoverable from a party or third party outside of the context of expert discovery.  Consistent with Fed. R. Civ. P. 26(b)(4), no party will seek discovery of any experts' notes, drafts of expert reports, or communications with counsel, provided, however, that counsel may serve discovery or inquire at a deposition about any facts, data, or assumptions provided to the expert by counsel and upon which such expert is relying in expressing the expert's opinions.  Each party also agrees to bear its own expert costs.

11.    **SUBSEQUENT TRIAL SETTINGS**

The parties shall meet and confer to discuss pretrial and trial schedules for subsequent trial settings, including as to cases that may be remanded to transferor courts for trial.  The  parties shall inform the Court if a proposed trial schedule would result in overlapping trial settings.

12.    **MOTIONS FOR REMAND**

In accord with paragraph 6.f, the Court will adopt a procedure, based on input from the parties, to efficiently address the filing and briefing of motions for remand at an appropriate time in the MDL proceedings.

13.    **REGULAR TELEPHONIC STATUS CONFERENCES**

The Court will hold regularly-scheduled telephonic status conferences, on roughly a biweekly basis.  Lead and Liaison Counsel for Plaintiffs and Defendants shall confer before each status conference and submit a joint status report three (3) business days before the conference. This joint report should include:  (a) a list of expected participants, (b) a summary of resolution discussions or efforts conducted since the last status conference; (c) a summary of discovery conducted since the last status conference; (d) a summary of any pending motions; (e) updates about related state cases; (f) any scheduling issues or other issues that the parties wish to raise with the Court; and (g) if the parties have differing views on issues raised with the Court, a brief statement of their respective positions on these issues.  The first such status conference shall be on **Wednesday, April 18, 2018 at noon Eastern Time**, and the second shall be on **Wednesday, May 2, 2018 at noon Eastern Time**.  A call-in number will be provided.

14.    **CONDUCT**

Pursuant to the Statement on Professionalism issued by the Supreme Court of Ohio on February 3, 1997, counsel are directed to be courteous and civil in all oral and written

communications with each other and the Court.  Submissions that do not conform to this

standard will be rejected.  Nothing in this Order precludes the Court from entering sanctions

against a party or counsel if warranted.

**IT IS SO ORDERED.**


/s/ *Dan Aaron Polster*

DAN AARON POLSTER
UNITED STATES DISTRICT JUDGE


Dated:  April 11, 2018

No.  21-3637

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

> **FILED**
> Mar 11, 2022
> DEBORAH S. HUNT, Clerk

In re:  HARRIS COUNTY, TX, et al.,        )
                                        )          O R D E R
Petitioners.                        )

Before:  GUY, CLAY, and DONALD, Circuit Judges.

This mandamus petition arises from multidistrict litigation concerning the over-prescription of opioid medications.  Three counties in Texas—Harris, Rockwall, and Ellis—and two cities in New Mexico—Albuquerque and Santa Fe—petition for a writ of mandamus.  They seek to compel the district court to adjudicate their motions to remand, each of which has been pending at least three years, and each of which challenges the district court's subject matter jurisdiction.  On our invitation, the district court responded.  We grant the petition.

Starting in 2017, cities, counties, and states began filing actions throughout the country against manufacturers and distributors of prescription opioid medications.  The Judicial Panel on Multidistrict Litigation ("JPML") centralized the proceedings in the Northern District of Ohio ("the MDL").  Shortly after the cases were centralized, the district court met with counsel and organized the parties into categories or tracks overseen by steering committees.  It also imposed a moratorium on filing substantive motions, including those to remand, so it could best use its limited resources and organize the litigation.  Motions to remand filed prior to centralization remained pending.  Despite this moratorium, the district court addressed some motions to remand challenging its jurisdiction.  It remanded one case for lack of federal question jurisdiction (removed on the basis that the state law claims were inextricably intertwined with federal issues).  It denied remand in other cases involving Indian tribes that were removed under

**EXHIBIT**
**18**

Case: 1:17-md-02804-DAP Doc #: 4598-1 Filed: 08/02/22 277 of 280. PageID #: 594553
Case: 21-3637 Document: 6-1 Filed: 03/11/2022 Page: 2

No. 21-3637
-2-

the federal officer removal statute. After state court judges from two States had contacted the district court to request remand of the cases transferred from their jurisdictions to promote judicial efficiency, it remanded one of the cases because the parties did not object. It remanded the other case because there were no federal causes of action and federal jurisdiction was otherwise very tenuous. Apart from jurisdiction, it remanded several cases to facilitate processing overlapping claims against various categories of defendants and jurisdictions. Further, it noted that it might remand additional cases so other courts could work parallel to the MDL to try segments of the case and pursue settlements.

Petitioners' motions to remand—promptly filed following removal of their cases from state court and challenging the district court's jurisdiction on various grounds, some overlapping—remain pending. Although the district court has revisited its moratorium, it kept it in place so that bellwether trials and/or settlement efforts could continue. In the meantime, litigation of the MDL has continued apace, with the district court addressing other threshold legal issues and dispositive motions. Against this backdrop, Petitioners moved the district court for suggestions of remand. In non-document orders, the district court denied the motions without any explanation. The JPML also denied Petitioners' motions to remand, while at the same time recognizing that they were entitled to a ruling on their motions. Petitioners' motions, however, remain unadjudicated.

Mandamus is a "drastic and extraordinary remedy reserved for really extraordinary causes." *Cheney v. U.S. Dist. Ct. for the Dist. of Columbia*, 542 U.S. 367, 380 (2004) (internal quotation marks and citation omitted). "The traditional use of the writ in aid of appellate jurisdiction . . . has been to confine [the court against which mandamus is sought] to a lawful exercise of its prescribed jurisdiction." *Id.* (quoting *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26 (1943)). To preserve its use to only extraordinary causes, petitioners must satisfy three conditions. First, they cannot have adequate alternative means to obtain the relief they seek. *Id.*

No. 21-3637
-3-

at 380−81.  Second, petitioners must show a "clear and indisputable" right to the relief sought. *Id.* at 381 (citation omitted).  Finally, petitioners must show that issuing the writ is otherwise "appropriate under the circumstances."  *Id.*

Petitioners lack adequate alternative remedies, given that they have sought and been denied a suggestion of remand before the MDL and a remand before the JPML.  *See In re Wilson*, 451 F.3d 161, 168−69 (3d Cir. 2006); *In re Patenaude*, 210 F.3d 135, 141−42 (3d Cir. 2000).

Petitioners also have a clear and indisputable right to relief.  We may issue a writ "where a district court persistently and without reason refuses to adjudicate a case properly before it." *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661−62 (1978) (internal quotation marks and citation omitted).  "The rule of law applies in multidistrict litigation . . . just as it does in any individual case."  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020).  Consequently, "determination of the parties' rights in an individual case must be based on the same legal rules that apply in other cases, as applied to the record in that case alone."  *Id.*; *see also Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173, 177 (3d Cir. 2021).  Thus, while an MDL court has "broad discretion to create efficiencies and to avoid unnecessary duplication in its management of pretrial proceedings in the MDL," it must find those efficiencies within the applicable statutes, "rather than in violation of them."  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 845.  The district court's reasons supporting its delay—the economic impact of the litigation; the efficiencies created by imposing a stay while a global settlement was sought; concern that lifting the stay would jeopardize settlement efforts; and that Petitioners will benefit from any global settlement reached—are grounded in policy with no basis in statute or the Federal Rules of Civil Procedure.  Moreover, a party's rights in one case cannot be impinged upon "to create efficiencies in the MDL generally."  *Id.*

Case: 1:17-md-02804-DAP   Doc #: 4598-1   Filed: 08/02/22   279 of 280.   PageID #: 594555
Case: 21-3637   Document: 6-1   Filed: 03/11/2022   Page: 4

No. 21-3637
-4-

Finally, issuance of the writ is appropriate.  Remand is required "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction."  28 U.S.C. § 1447(c).  The seemingly mandatory nature of this provision weighs in favor of finding that the district court clearly abused its discretion in abating rulings on the pending remand motions. Subject matter jurisdiction is of paramount importance, given that it "governs a court's adjudicatory capacity."  *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011).  Thus, although it may be raised "at any time," *id.* at 434, it is generally regarded as a threshold matter.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998).  Further, courts must adhere to jurisdictional rules "regardless of the costs [they] impose[]."  *Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004); *see also Camsoft Data Sys., Inc. v. S. Elecs. Supply, Inc.*, 756 F.3d 327, 339 (5th Cir. 2014) ("[T]he so-called waste of judicial resources that occurs when we dismiss a case for lack of jurisdiction is the price that we pay for federalism." (internal quotation marks and citations omitted)).

We recognize that, in MDL cases, district courts "face[] unique challenges not present when administrating cases on a routine docket."  *Hamer*, 994 F.3d at 178.  Thus, MDL courts are "granted significant latitude to manage their dockets and to mitigate 'potential burdens on the defendants and court.'"  *Id.* (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 246 (3d Cir. 2013)).  District courts managing multidistrict litigation "reasonably may conclude that the court's time, especially early in the litigation, is better spent on activities other than deciding scores or hundreds of individual remand motions."  *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 128 (2d Cir. 2010) (per curiam) (Kaplan, J., concurring).  But we are no longer at the outset of this litigation, and Petitioners' motions have been pending an unduly long time. Numerous courts, prior to transfer of cases into the MDL, addressed and granted pending motions to remand.  *See, e.g.*, *Mecklenburg Cnty. v. Purdue Pharma, L.P.*, No. 3:19-cv-00463, 2019 WL 3207795, at *2, *7 (E.D. Va. July 16, 2019) (collecting cases).  Although portions of

No. 21-3637
-5-

those jurisdictional questions were fact driven, the unanimity of these decisions lends significant support to the merits of Petitioners' jurisdictional arguments.  The district court's concern that it lacks adequate resources to address Petitioners' motions (and those of numerous other movants), is also not supported by the record.  The district court has frequently decided representative issues and applied that disposition to other parties in lieu of permitting all parties to file repetitive motions.  It has already taken this tack in addressing prior motions to remand, and we see no reason it cannot continue to employ this course to adjudicate the pending motions to remand.  The district court shall submit a status report every thirty (30) days advising the court of the status of the pending motions and actions taken in complying with this order.

Accordingly, the petition for a writ of mandamus is **GRANTED**.  The district court shall promptly address Petitioners' motions.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk