Exhibit 15

# JANSSEN NEW YORK STATE-WIDE OPIOID SETTLEMENT AGREEMENT

## TERM SHEET

## I.  Overview

This Agreement sets forth the principal terms and conditions of a settlement agreement between and among the State of New York, Nassau County, Suffolk County, all New York Participating Subdivisions, and Janssen (collectively, "the Parties") to resolve opioid-related Claims against Janssen.

The Parties intend the terms of this Agreement to parallel the terms of the Global Prescription Opiate Litigation Settlement Agreement ("Global Settlement") currently under negotiation. If the Global Settlement becomes effective by February 15, 2022, its terms will supersede the terms of this Agreement except for Sections VI (Dismissal of Claims), VII (Release), and IX (Attorney Fee and Cost Payments). If the Global Settlement is not effective by the aforementioned date, this Agreement and any subsequent Consent Judgment giving effect to its terms will control.

Janssen has agreed to the below terms for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose. This Agreement is not contingent on the Global Settlement taking effect.

## II.  Definitions

A.    "*Actions*" means *The County of Suffolk, New York v. Purdue Pharma L. P.*, Case No. 400001/2017; *The County of Nassau, New York v. Purdue Pharma L. P.*, Case No. 400008/2017; and *The People of the State of New York v. Purdue Pharma L.P.*, Case No. 400016/2018.

B.    "*Agreement*" means this term sheet together with the exhibits thereto.

C.    "*Bar*" means either (1) a ruling by the highest court of the State setting forth the general principle that no Subdivisions or Special Districts in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Subdivisions and Special Districts in the State from maintaining or asserting Released Claims against Released Entities; or (3) a Settlement Class Resolution in the State with full force and effect. For avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement) shall not constitute a Bar.

D.    "*Case-Specific Resolution*" means either (1) a law barring specified Subdivisions or Special Districts from maintaining Released Claims against Released Entities; (2) a ruling by a court of competent jurisdiction over a particular Subdivision or Special District that has the legal

1

effect of barring the Subdivision or Special District from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) in the case of a Special District, a release consistent with Section VII below. For avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it) shall not constitute a Case-Specific Resolution.

E.   "*Claim*" means any past, present, or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

F.   "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the date of execution of this Agreement (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

G.     "*Consent Judgment*" means a consent decree, order, judgment, or similar action.

H.     "*Court*" means the court to which the Agreement and the Consent Judgment are presented for approval and/or entry.

I.     "*Effective Date*" means the date of entry of a final Consent Judgment, which shall be filed no later than 30 days after the Initial Participation Date.

J.     "*Finality*" means:

      a.     the Agreement and the Consent Judgment have been approved and entered by the Court as to Janssen, including the release of all Released Claims against Released Entities as provided in this Agreement;

      b.     for all lawsuits brought by the State against Released Entities for Released Claims, either previously filed or filed as part of the entry of the Consent Judgment, the Court has stated in the Consent Judgment or otherwise entered an order finding that all Released Claims against Released Entities asserted in the lawsuit have been resolved by agreement; and

      c.     (1) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (a) hereof and entry of such order described in subsection (b) hereof has expired; or (2) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described in (a) hereof and the order described in subsection (b) hereof have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

K.     "*Global Settlement*" means an agreement in which the State of New York participates resolving the litigation and claims brought or threatened to be brought by states and subdivisions against Janssen, including claims against Janssen asserted in the multi-district litigation *In re: Nationwide Prescription Opiate Litigation,* MDL No. 2804 (N.D. Ohio) ("MDL") and state court prescription opiate litigation.

L.     "*Initial Participation Date*" means the date by which Subdivisions must join to become initial Participating Subdivisions. The Initial Participation Date shall be 150 days after the execution of this Agreement, provided that, in the event that Senate Bill S7194 becomes law and the New York Attorney General notifies Janssen within 75 days of the date of execution of this Agreement that all Subdivisions and Special Districts have become Participating Subdivisions or had their claims released consistent with Section VII, such that the State qualifies for Incentive A under Section III.C.3., the Initial Participation Date shall be 90 days after the date of execution of this Agreement.

M.     "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.

N.    "*Later Litigating Special District*" means a Special District that is not a Litigating Special District and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the execution date of this Agreement. It may also include a Litigating Special District whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Special District takes any affirmative step in its lawsuit other than seeking a stay or removal.

O.    "*Later Litigating Subdivision*" means a Subdivision that is not a Litigating Subdivision and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date. It may also include a Litigating Subdivision whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Effective Date, when such Litigating Subdivision takes any affirmative step in its lawsuit other than seeking a stay or removal.

P.    "*Litigating Special District*" means a Special District that brought any Released Claims against any Released Entities on or before the execution date of this Agreement that were not separately resolved prior to that date. A list of Litigating Special Districts will be agreed to by the parties.

Q.    "*Litigating Subdivision*" means a Subdivision that brought any Released Claims against any Released Entities on or before the Effective Date that were not separately resolved prior to that date. A list of Litigating Subdivisions will be agreed to by the parties.

R.    "*Non-Litigating Special District*" means a Special District that is neither a Litigating Special District nor a Later Litigating Special District.

S.    "*Non-Litigating Subdivision*" means a Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

T.    "*Non-Participating Subdivision*" means a Subdivision that is not a Participating Subdivision.

U.    "*Participating Subdivision*" means a Subdivision that signs the Election and Release Form annexed as Exhibit A and meets the requirements for becoming a Participating Subdivision under subsection VIII.A.

V.    "*Primary Subdivision*" means a Subdivision that has a population of 30,000 or more residents pursuant to the 2019 U.S. Census estimate.

W.    "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed or sold to be used together that includes opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone,

4

oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

X.      "*Qualified Settlement Fund*" means the fund established by this Agreement into which all payments by Janssen are made, unless otherwise expressly provided in this Agreement.

Y.      "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Litigating Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by the State, any of its Subdivisions or Special Districts, or any Releasor (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law.

Z.      "*Released Entities*" means Janssen and (1) all of Janssen's past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, assigns, and insurers (solely in their role as insurers with respect to the Released Claims), including Noramco, Inc. and Tasmanian Alkaloids PTY. LTD., (2) the past and present direct or indirect subsidiaries, divisions, and joint ventures, of any of the foregoing, and (3) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, Janssen). Collegium Pharmaceutical is not a released entity.

AA.     "*Releasors*" means (1) the State of New York; (2) Nassau and Suffolk Counties; (3) each Participating Subdivision; and (4) without limitation and to the maximum extent of the power of the State of New York's Attorney General to release Claims, (a) the State of New York's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts, and other Special Districts in the State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally

applicable to the general public with respect to the State of New York or Subdivisions in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide an Election and Release Form providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the Agreement. The State of New York's Attorney General represents that he or she has or has obtained the authority set forth in the Representation and Warranty Section.

BB.   "*Settlement Class Resolution*" means a class action resolution in a court of the State with respect to a class of Subdivisions and Special Districts in the State that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of court of the State and has achieved Finality; (3) is binding on all Non-Participating Subdivisions and Special Districts in the State (other than opt outs as permitted under the next sentence); (4) provides that no such Non-Participating Subdivision or Special District may bring Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; and (5) does not impose any costs or obligations on Janssen other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing 2.5% or more of the State's population opt out.

CC.   "*Settlement Fund Administrator*" means the entity that administers the Qualified Settlement Fund.

DD.   "*Special District*" means a formal and legally recognized sub-entity of the State that is authorized by State law to provide one or a limited number of designated functions, including but not limited to school districts, fire districts, healthcare & hospital districts, and emergency services districts. Special Districts do not include sub-entities of the State that provide general governance for a defined area that would qualify as a Subdivision.

EE.   "*State*" means the State of New York.

FF.   "*Subdivision(s)*" means a formal and legally recognized sub-entity of the State of New York that provides general governance for a defined area, including a county, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and other functional levels of sub-entities of the State that provide general governance for a defined area. Historic, non-functioning sub-entities of the State of New York are not Subdivisions. For purposes of this Agreement, the term Subdivision does not include Special Districts. A list of New York Subdivisions will be agreed to prior to any Subdivision sign-on period.

6

### III.     Monetary Relief and Payments

A.   **Remediation and Restitution Payments**

1.    Janssen shall pay into the Qualified Settlement Fund for purposes of remediation and restitution, the sum of $229,862,769.25 minus (1) any unearned incentive payments under subsection III.C below and (2) any moratorium adjustments under subsection III.D.1 below.

2.    The payments to the Qualified Settlement Fund shall be divided into base and incentive payments as provided in subsections III.B and III.C and shown in the exemplar payment schedules below.

3.    The exemplar payment schedules below do not account for deductions for unearned incentives or moratorium adjustments, which will be separately calculated for each payment.

B.   **Base Payments**

1.    Janssen will make base payments into the Qualified Settlement Fund totaling $98,493,957.74. The base payments will be paid in accordance with the payment schedules below, subject to potential acceleration and potential deductions as provided herein.

2.    If the State of New York qualifies for Incentive A (described below), Janssen will accelerate the base payment schedule so that the State receives its Year 1-3 base payment allocation and full Year 1-3 Incentive A amount within 90 days of notice, on or after the Effective Date, of the Bar's implementation. Year 4-9 payments are made annually and cannot be accelerated.

C.   **Incentive Payments**

1.    Janssen shall make incentive payments into the Qualified Settlement Fund potentially totaling up to $131,368,811.51, consisting of $119,875,673.05 for Incentive A (or, alternatively, up to $119, 875, 673.05 for combined Incentives B and C if Incentive A is not achieved) and $11,493,138.46 for Incentive D, if and to the extent the State of New York satisfies the requirements specified herein to receive such payments. The incentive payments will be paid in accordance with the payment schedules below, subject to potential acceleration and potential deductions as provided herein.

2.    The State of New York may qualify to receive incentive payments in addition to base payments if, within three years after: (i) the effective date of the Global Settlement, or (ii) the date on which it is determined that there will not be a Global Settlement (either of which is the "Global Resolution Date"), it meets the incentive eligibility requirements specified below. The State may qualify for incentive payments in four ways. If it qualifies for "Incentive A," it will become entitled to receive the maximum incentive payment allocable to the State. If the State does not qualify for

7

Incentive A, it can alternatively qualify for "Incentive B" and/or "Incentive C." The State can qualify for "Incentive D" regardless of whether it qualifies for another incentive payment.

3.    *Incentive A: Accelerated Incentive Payment for Full Participation.*

    a.    The State shall receive an accelerated Incentive A payment allocable to the State for full participation.

    b.    The State can qualify for Incentive A by: (1) complete participation in the form of releases consistent with Section VII below from all Non-Litigating Subdivisions and Non-Litigating Covered Special Districts and all Litigating Subdivisions and Litigating Special Districts in the State; (2) a Bar; or (3) a combination of approaches in clauses (1)-(2) that achieves the same level of resolution of Subdivision and Special District claims (e.g., a law barring future litigation combined with full joinder by Litigating Subdivisions and Litigating Special Districts). For purposes of Incentive A, a Subdivision or Special District is considered a "Litigating Subdivision" or "Litigating Special District" if it has brought Released Claims against Released Entities on or before the Effective Date; all other Subdivisions and Special Districts are considered "Non-Litigating."

    c.    Qualification for Incentive A entitles the State to expedited payment of base payments and incentive payments payable for Years 1-3, which Janssen shall pay into the Qualified Settlement Fund within 90 days after receiving notice from the Settlement Fund Administrator that a State has qualified for Incentive A, but no less than 90 days from the Effective Date. Base and incentive payments payable for Years 4-9 will not be expedited.

    d.    If the State qualifies for Incentive A after receiving an incentive payment under Incentives B or C, described below, the State's payments under Incentive A will equal the remainder of its total Incentive A payments less any payments previously received under Incentives B or C. If the State receives all of its maximum incentive allocation under Incentive A, it shall not receive additional incentive payments.

4.    *Incentive B: Early Participation or Released Claims by Litigating Subdivisions and Litigating Special Districts.*

    a.    If the State does not qualify for Incentive A, it may still qualify to receive up to 60% of its total potential Incentive A payment allocation under Incentive B.

    b.    The State can qualify for an Incentive B payment if Litigating Subdivisions and Litigating Special Districts representing at least 75% of the State's litigating population are either Participating Subdivisions or have their claims resolved through Case-Specific Resolutions.

8

(1)    The litigating population is the sum of the population of all Litigating Subdivisions and Litigating Special Districts. The litigating population shall include all Litigating Subdivisions and Litigating Special Districts whose populations overlap in whole or in part with other Litigating Subdivisions and Litigating Special Districts, for instance in the case of a Litigating Special District, city, or township contained within a county.

c.    The following time periods apply to Incentive B payments:

    (1)    <u>Period 1</u>: Zero to 210 days after the Effective Date.

    (2)    <u>Period 2</u>: 211 days to one year after the Effective Date.

    (3)    <u>Period 3</u>: One year and one day to two years after the Effective Date.

d.    <u>Within Period 1</u>: If Litigating Subdivisions and Litigating Special Districts representing at least 75% of the State's litigating population are Participating Subdivisions or have their claims resolved through Case-Specific Resolutions during Period 1, a sliding scale will determine the share of the funds available under Incentive B, with a maximum of 60% of the State's total potential incentive payment allocation available. Under that sliding scale, if Litigating Subdivisions and Litigating Special Districts collectively representing 75% of the State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 1, the State will receive 50% of the total amount available to it under Incentive B. If more Litigating Subdivisions and Litigating Special Districts become Participating Subdivisions or achieve Case-Specific Resolution status, the State shall receive an increased percentage of the total amount available to it under Incentive B as shown in the table below.

| Participation or Case-Specific Resolution Levels (As percentage of litigating population) | Incentive B Award (As percentage of total amount available to State under Incentive B) |
| :---: | :---: |
| 75% | 50% |
| 76% | 52% |
| 77% | 54% |
| 78% | 56% |
| 79% | 58% |
| 80% | 60% |
| 85% | 70% |
| 90% | 80% |
| 95% | 90% |
| 100% | 100% |

e.    Within Period 2: If the State did not qualify for an Incentive B payment in Period 1, but Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 2, then the State qualifies for 75% of the Incentive B payment it would have qualified for in Period 1.

f.    Within Period 3: If the State did not qualify for an Incentive B payment in Periods 1 or 2, but Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 3, then the State qualifies for 50% of the Incentive B payment it would have qualified for in Period 1.

g.    If the State receives the Incentive B payment for Periods 1 and/or 2, it can receive additional payments if it secures participation from additional Litigating Subdivisions and Litigating Special Districts (or Case-Specific Resolutions of their claims) during Periods 2 and/or 3. Those additional payments would equal 75% (for additional participation or Case-Specific Resolutions during Period 2) and 50% (for additional participation or Case-Specific Resolutions during Period 3) of the amount by which the increased litigating population levels would have increased the State's Incentive B payment if they had been achieved in Period 1.

h.    If Litigating Subdivisions and Litigating Special Districts that have become Participating Subdivisions or achieved Case-Specific Resolution status collectively represent less than 75% of the State's litigating population by the end of Period 3, the State shall not receive any Incentive B payment.

i.    Incentives earned under Incentive B shall accrue after each of Periods 1, 2, and 3. After each period, the Settlement Fund Administrator shall conduct a look-back to assess if the State vested an Incentive B payment in the preceding period. Based on the look-back, the Settlement Fund Administrator will calculate the incentives accrued under Incentive B for the period.

5.    *Incentive C: Early Participation of Subdivisions*

a.    If the State does not qualify for Incentive A, it may still qualify to receive up to 40% of its total potential Incentive A allocation under Incentive C, which has two parts.

(1)    Part 1: Under Incentive C, Part 1, the State can receive up to 75% of its Incentive C allocation. The State can qualify for a payment under Incentive C, Part 1 only if Primary Subdivisions (whether Litigating or Non-Litigating Subdivisions as of the Effective Date) representing at least 60% of the State's Primary Subdivision population become Participating Subdivisions or achieve Case-Specific Resolution status.

10

(2)    The State's Primary Subdivision population is the sum of the population of all Primary Subdivisions (whether Litigating or Non-Litigating Subdivisions as of the Effective Date) based on the 2019 U.S. Census estimate. Because Subdivisions include Subdivisions whose populations overlap in whole or in part with other Subdivisions, for instance in the case of a city or township contained within a county, the State's Primary Subdivision population is greater than the State's total population. (Special Districts are not relevant for purposes of Incentive C calculations.)

(3)    A sliding scale will determine the share of the funds available under Incentive C, Part 1 assuming the State meets the minimum 60% threshold. Under that sliding scale, if the State secures participation or Case-Specific Resolutions representing from Primary Subdivisions representing 60% of its total Primary Subdivision population, it will receive 40% of the total amount potentially available to it under Incentive C, Part 1. If the State secures participation or Case-Specific Resolutions from Primary Subdivisions representing more than 60% of its Primary Subdivision population, the State shall be entitled to receive a higher percentage of the total amount potentially available to it under Incentive C, Part 1, on the scale shown in the table below.

| Participation or Case-Specific Resolution Levels (As percentage of total Primary Subdivision population) | Incentive C Award (As percentage of total amount available to State under Incentive C, Part 1) |
|---|---|
| 60% | 40% |
| 70% | 45% |
| 80% | 50% |
| 85% | 55% |
| 90% | 60% |
| 91% | 65% |
| 92% | 70% |
| 93% | 80% |
| 94% | 90% |
| 95% | 100% |

b.    <u>Part 2</u>: If the State qualifies to receive an incentive under Incentive C, Part 1, the State can also qualify to receive an additional incentive amount equal to 25% of its total potential Incentive C allocation by securing 100% participation of the ten (10) largest Subdivisions by population in the State based on the 2019 U.S. Census estimate. (Special Districts are not relevant for purposes of this calculation.) If the State does not qualify for any amount under Incentive C, Part 1, it cannot qualify for Incentive C, Part 2.

11

c.     Incentives earned under Incentive C shall accrue on an annual basis up to three years after the Global Resolution Date. At one, two, and three years after the Global Resolution Date, the Settlement Fund Administrator will conduct a look-back to assess which Subdivisions had agreed to participate or had their claim resolved through a Case-Specific Resolution that year. Based on the look-back, the Settlement Fund Administrator will calculate the incentives accrued under Incentive C for the year. In New York, initial eligibility for Incentive C will be calculated using the responses to notices sent pursuant to the Global Settlement. If no such notices are sent or tallied, Incentive C will be calculated a year after the determination is made that they will not be sent or tallied. If, however, New York qualifies for Incentive C based on legislation, New York may claim Incentive C as soon as it is eligible.

6.     *Incentive D: Release of Payments if No Qualifying Special District Litigation.*

a.     $11,493,138.46 of the funds paid by Janssen under subsection III.A.1 shall be available for potential Incentive D payments according to the terms specified in this section.

b.     If, within five years of the execution date of this Agreement, a Covered Special District files litigation against any Released Entity, Janssen shall, within thirty days of Janssen being served, provide notice of the litigation to the State, which shall file a motion to intervene in the litigation and use its best efforts to obtain either dismissal of the litigation in cooperation with Janssen, or a release consistent with Section VII of the Special District's Claims.

c.     The State shall receive its allocation of the Incentive D payment if, within five years after the Effective Date (the "look-back date"), no Covered Special District within the State has filed litigation which has survived a Threshold Motion and remains pending as of the look-back date, unless the dismissal after the litigation survived the Threshold Motion is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it).

d.     Prior to the look-back date, a Released Entity shall not enter into a settlement with a Covered Special District unless the State consents to such a settlement or unreasonably withholds consent of such a settlement.

e.     "Covered Special Districts" are school districts, healthcare/hospital districts, and fire districts, subject to the following population thresholds:

(1)     For school districts, the K-12 student enrollment must be 25,000 or 0.10% of the State's population, whichever is greater;

(2)     For fire districts, the district must cover a population of 0.20% of the State's population. If not easily calculable from state data sources and agreed to between the State and Janssen, a fire district's population is calculated by dividing the population of the county or counties a fire district serves by the number of fire districts in the county or counties.

(3)     For healthcare/hospital districts, the district must have at least 125 hospital beds in one or more hospitals rendering services in that district.

B.     **Potential Payment Adjustments**

1.     *Moratorium*. If a Later Litigating Subdivision in the State with a population above 10,000 brings a lawsuit or other legal proceeding against Released Entities asserting Released Claims, Janssen shall, within thirty days of the lawsuit or other legal proceeding being served on Janssen, provide notice of the lawsuit or other legal proceeding to the State and provide the State an opportunity to intervene in the lawsuit or other legal proceeding. A Released Entity shall not enter into a settlement with a Later Litigating Subdivision unless the State consents to such a settlement or unreasonably withholds consent to such a settlement. If the Later Litigating Subdivision's lawsuit or other legal proceeding survives a Threshold Motion before Janssen makes its last settlement payment to the State, Janssen will, from the date of the entry of the order denying the Threshold Motion and so long as the lawsuit or other legal proceeding is pending, be entitled to a moratorium suspending the following payments it would otherwise owe the State: (1) all remaining incentive payments; and (2) the last two scheduled base payments, if not already paid. Upon resolution of the lawsuit or other proceeding, Janssen will reimburse any payments withheld under the moratorium and resume any suspended payments; provided that, if the lawsuit or other proceeding results in a judgment against Janssen, Janssen may offset 75% of the amount of the judgment against any payments due to be resumed and/or reimbursed. Janssen will make any payment required to be reimbursed under this subsection as part of the next annual payment to the Qualified Settlement Fund after the resolution of the lawsuit or other proceeding.

2.     *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution.* If Janssen made a payment as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution, and that Bar, Settlement Class Resolution, or Case-Specific Resolution is then revoked, rescinded, reversed, overruled, interpreted in a manner to limit the scope of the release or otherwise deprived of force or effect in any material respect ("a revocation event"), Janssen shall receive a dollar-for-dollar offset against its obligation to make remaining payments that would be apportioned to the State or Participating Subdivisions in it. This offset will be calculated as the dollar amount difference between (1) the total amount of Incentive Payments paid by Janssen during the time the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the revocation event was in effect, and (2) the total amount of incentive payments that would have been due from Janssen during that time without the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the

13

revocation event being in effect. The amount of incentive payments that would have been due, referenced in (2) above, will be calculated based on considering any Subdivision that provides a release within 180 days after the revocation event as having been a Participating Subdivision (in addition to all other Participating Subdivisions) during the time that the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the revocation event was in effect. If a revocation event causes the State to no longer qualify for Incentive D, the State shall return to Janssen all payments made under Incentive D.

3.  Notwithstanding anything to the contrary in subsections (1) and (2) above, if a Bar or Case-Specific Resolution is reinstated by the State, either through the same or different means as the initial Bar or Case-Specific Resolution, Janssen's right to an offset is extinguished and any amounts withheld to offset amounts paid on account of the revoked, rescinded, reversed, or overruled Bar or Case-Specific Resolution shall be returned to the State, less and except any incentive payments that would have been paid during the period in which the Bar or Case-Specific Resolution was revoked, rescinded, reversed, or overruled.

4.  *Tier Calculations*. The State of New York will be eligible for benefits associated with any tier implemented in the Global Settlement. If a moratorium is put into effect and it is later determined that the State would have been entitled to additional protection from the moratorium due to tier participation, any excess funds captured by the moratorium will be reimbursed. If the Global Settlement does not become effective by February 15, 2022, the State will be eligible for benefits associated with any tier negotiated in the Global Settlement, based on the number of initial participating states at the time of the Preliminary Agreement Date and if it meets the subdivision participation requirements for that tier on a statewide basis, provided that the parties negotiating the Global Settlement agreed on tier provisions prior to that settlement's Preliminary Agreement Date and the provisions are distributed as part of the notice process.

## IV.  Intra-State Allocation

Janssen's payments shall be allocated according to the Intrastate Term Sheet annexed hereto as Exhibit B and incorporated herein by reference.

## V.  Injunctive Relief

The Parties agree to the injunctive relief as specified in Exhibit C.

## VI.  Dismissal of Claims

Upon the execution of this Agreement, while awaiting formal approval of the Agreement by the Nassau and Suffolk County Legislatures, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Janssen and to jointly move for the claims against Janssen to be severed from the Actions. It is the Parties' intent that all litigation activities in the Actions relating to the State's and Nassau and Suffolk Counties' claims against Janssen shall immediately cease as of the date of the execution of this Agreement and that the claims against Janssen not be included in

the trial of the Actions against the other defendants that commenced with jury selection on June 8, 2021. Concurrently with the execution of this Agreement, Janssen and Nassau and Suffolk Counties will execute a Stipulation of Discontinuance with Prejudice, in the form annexed hereto as Exhibit D. The Parties will hold Nassau and Suffolk Counties' Stipulation of Discontinuance with Prejudice in escrow until the Counties' Legislatures approve the Agreement or a resolution is passed satisfying the approval process of the Agreement. Once approval is given, Nassau and Suffolk Counties and/or Janssen shall promptly submit the executed Stipulation of Discontinuance with Prejudice to the Court with a request that it be so ordered. In the event the Counties' Legislatures fail to approve the Agreement or the Court declines to so order the discontinuance of the Actions with prejudice as against Janssen, Janssen shall be entitled to terminate the Agreement and shall be excused from all obligations under it. Concurrently with the execution of this Agreement, Janssen and the State will execute a separate Stipulation of Discontinuance with Prejudice covering the State's claims against Janssen. The State's Stipulation of Discontinuance with Prejudice will be held in escrow until the Effective Date and shall be submitted to the Court with a request that it be so ordered concurrently with the entry of the Consent Judgment implementing this Agreement.

## VII.    Release

A.    *Scope*. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. The State of New York (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will, on or before the Effective date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the State of New York, its Attorney General, and each Releasor to release claims. The Release shall be a complete bar to any Released Claim.

B.    *Indemnification and Contribution Prohibited*. No Released Entity shall seek to recover any portion of any payment made under this Agreement from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner based on indemnification, contribution, or any other theory.

C.    *General Release*. In connection with the releases provided for in the Agreement, the State of New York (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by

him or her, would have materially affected his or her settlement with
the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.  *Cooperation*. Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims. The State shall use its best efforts to secure releases consistent with this Section from all Litigating or Later Litigating Subdivisions and Special Districts.

E.  *Representation and Warranty*. The signatories of this Agreement on behalf of the State of New York and its Participating Subdivisions expressly represent and warrant that they will, on or before the Effective Date, have (or have obtained) the authority to settle and release, to the maximum extent of the state's power, all Released Claims of (1) the State of New York, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State of New York's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license;[1] and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

F.  *Non-Party Settlement*. To the extent that, on or after the Effective Date, any Releasor settles any Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) it may have against any entity that is not a Released Entity (a "*non-Released Entity*") that is, as of the Effective Date, a defendant in the MDL and provides a release to such non-Released Entity (a "*Non-Party Settlement*"), including in any bankruptcy proceeding or through any plan of reorganization, the Releasor will include, unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Janssen in subsection VII.B, or a release from such non-Released Entity

---

[1] In New York, the department and agency that have the duties and powers in subclauses (2) and (3) are the Department of Health and the Department of Financial Services.

in favor of the Released Entities (in a form equivalent to the releases contained herein) of any Claim-Over as defined in subsection VII.G under which any Released Entity may be liable to pay any part of such Non-Party Settlement, compensate the Non-Released Entity for any part of such Non-Party Settlement, or otherwise be liable to such non-Released Entity. The sole remedy for a Releasor's failure to include such a provision in a Non-Party Settlement shall be the application of subsection VII.G below.

G. *Claim Over*. In the event that any Releasor has not obtained, or is unable to obtain, a prohibition on contribution or indemnity as set forth in subsection VII.F in a settlement with a non-Released Entity of a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), or if a Releasor obtains a judgment against a non-Released-Entity with respect to a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), or if a Releasor files against a non-Released Entity a Claim in bankruptcy involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity):

1. The State of New York (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) agrees that, if a Releasor asserts a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) against any non-Released Entity and such non-Released Entity in turn successfully asserts a Claim against a Released Entity relating to the same on the basis of contribution, indemnity, or other claim-over on any theory (a "*Claim-Over*"), except as provided in paragraph (2), the Releasor shall reduce its Claim and any judgment or settlement it may obtain against such non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law and to fully hold the Released Entity harmless from such Claim-Over. For purposes of this provision, successful assertion of a Claim means either (i) a final monetary judgment; *provided* that the State of New York Attorney General had notice of and opportunity to intervene in the proceeding giving rise to such judgment or (ii) a settlement; *provided* that the Released Entity sought the State of New York Attorney General's consent to the settlement and such consent was either obtained or unreasonably withheld. Should the judgment or settlement against the Released Entity resolve claims that are not Claim-Over claims, the reduction of the Claim and judgment or settlement shall be for the Claim-Over portion only, which shall be distinguishable in the judgment or settlement.

2. To the extent that the Claim-Over is based on a contractual indemnity, the obligation under paragraph 1 shall extend solely to a Claim involving Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) against a distributor that distributed the Products, a pharmacy, clinic, hospital or other purchaser, or dispenser of Products, a manufacturer that sold Products, or a pharmacy benefit manager or other third-party payor.

3. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and (if it is a party in the proceeding) shall join in any motion by any of the Released Entities to dismiss any Claim-Over on the grounds

that this Agreement moots or otherwise extinguishes any such Claim-Over. In the foregoing circumstance, in which a non-Released Entity asserts a Claim against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory, the Released Entity will take reasonable and necessary steps to defend against the Claim and will consent to the intervention of any Releasor seeking to defend against such Claim.

4.      Janssen shall notify the State of New York Attorney General, to the extent permitted by applicable law, in the event that any non-Released Entity, of the type specified in paragraph 2, asserts a contractual indemnity arising out of a Claim involving Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

H.      *Effectiveness*. The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

I.      *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under the Agreement for enforcement of the Agreement.

## VIII.    Participation by Subdivisions

A.      *Requirements for Becoming a Participating Subdivision: Litigating Subdivisions/Later Litigating Subdivisions*. A Litigating Subdivision or Later Litigating Subdivision in the State may become a Participating Subdivision by either executing an Election and Release Form and upon prompt dismissal of its legal action or by having its claims extinguished by operation or law or released by the Department of Law (New York State Attorney General's Office).

B.      *Initial Participating Subdivisions.* A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision by the Initial Participation Date.

C.      *Later Participating Subdivisions.* A Subdivision that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision after the Initial Participation Date and agreeing to be subject to the terms of the agreement reached by the State with Initial Participating Subdivisions. A Later Participating Subdivision shall not receive any share of any base or incentive payments paid to the Qualified Settlement Fund that were due before it became a Participating Subdivision.

D.  *Notice.* In conjunction and accordance with the notice process anticipated in the Global Settlement, the Office of the New York State Attorney General shall send individual notice to all Subdivisions in the State of New York eligible to participate in the settlement and the requirements for participation. Such notice may include publication and other standard forms of notification. Nothing contained herein shall preclude the State from providing further notice to or from contacting any of its Subdivision(s) about becoming a Participating Subdivision.

E.  *Requirements for Becoming a Participating Subdivision: Non-Litigating Subdivisions.* A Non-Litigating Subdivision may become a Participating Subdivision by either executing an Election and Release Form specifying (1) that the Subdivision agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims against all Released Entities, and (3) that the Subdivision submits to the jurisdiction of the court where the Consent Judgment is filed for purposes limited to that court's role under the Agreement or by having their claims extinguished by operation or law or release by the Department of Law (New York State Attorney General's Office).

F.  *Non-Participating Subdivisions.* Non-Participating Subdivisions shall not directly receive any portion of any base or incentive payments paid to the Qualified Settlement Fund and the State may choose that its Non-Participating Subdivisions are ineligible for benefits from the fund.

H.  *Representation With Respect to Participation Rate.* The State of New York represents and warrants for itself that it has a good faith belief that virtually all of New York's Litigating Subdivisions that are represented by Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC will become Participating Subdivisions. The State acknowledges the materiality of the foregoing representation and warranty. Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC, in good faith, believe this is a fair Settlement. Therefore, both law firms will, in their best efforts, recommend this Settlement to their subdivision clients within New York. A list of Subdivisions and Special Districts represented by Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC in litigation concerning Covered Conduct by Janssen is annexed hereto as Exhibit E.

J.  Within 5 days of entry of the Notice of Dismissal per subsection VI, the Parties will seek to have entered the Case Management Order annexed hereto as Exhibit F. And, further, Janssen will participate in making motions to dismiss barred claims upon their release.

## IX.    Attorney Fee and Cost Payments

A.  No later than 15 days after the Court so orders the Stipulation of Discontinuance with Prejudice entered between Janssen and Nassau and Suffolk Counties per Section VI, Janssen shall pay:

1.  $8,800,000.00 for Napoli Shkolnik PLLC's and Simmons Hanly Conroy LLC's attorney fees associated with their representation of Nassau and Suffolk Counties which shall be divided according to the allocation percentage of Nassau and Suffolk Counties as set forth in the Intrastate Allocation Agreement annexed hereto as

19

Exhibit B. The firms have provided their wire information to Janssen for that purpose. In consideration for this payment, Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC shall waive their contingency fee contracts with Nassau and Suffolk Counties, respectively. In consideration for this, Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC agree that they will seek reimbursement for attorney fees for other New York State clients from either the Global Settlement Contingency Fee Fund, if effective, or the New York State equivalent, if not, and will not otherwise seek to enforce their contingency fee contracts.

2.   $2,000,000.00 in costs and expenses associated with Napoli Shkolnik PLLC's and Simmons Hanly Conroy LLC's representation of Nassau and Suffolk Counties, provided the costs and expenses are documented according to the requirements as negotiated under the Global Settlement. The costs and expenses referred to in this paragraph are to be divided evenly between Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC.

3.   $2,750,000.00 to be allocated to the State of New York towards the State's fees and expenses.

B.   If the Global Settlement becomes effective by February 15, 2022:

1.   Nassau and Suffolk Counties will be treated as "non-participating" subdivisions for purposes of determining eligibility for the Contingency Fee Fund defined in that agreement, and the amount those counties' counsel would have received through the Contingency Fee Fund shall be rebated to Janssen. The counties' counsel will still be eligible to apply for fees from the Common Benefit Fund established in the MDL, if they are eligible.

2.   The $2,000,000.00 in costs and expenses paid per herein shall be offset against costs and expenses allocated to Subdivisions under the terms of the Global Settlement.

3.   The $2,750,000.00 to be allocated to the State of New York towards the State's fees and expenses under subsection IX.A will be offset against Janssen's share of the State's inside counsel fee payable under the Global Settlement.

C.   If the Global Settlement is not effective by February 15, 2022, Janssen shall pay into the Qualified Settlement Fund the following amounts:

1.   A minimum of $2,040,550.30 to be allocated to the State of New York for inside counsel attorney fees in addition to the $2,750,000.00 paid per subsection IX.A.3 above. The amount in this paragraph represents the State's share of the inside-counsel fees referenced in the proposed Global Settlement based on a maximum state participation rate and without reimbursement for certain expenses. The final amount may be more than stated here if so determined in the context of the Global Settlement.

2.   $16,584,615.40, less a partial credit calculated as described below for the Nassau and Suffolk fee payment paid per subsection IX.A.1, to be available to pay any required

20

assessment to the MDL Common Benefit Fund and to reimburse Participating Subdivision attorney fees, upon application by eligible counsel who waive their contingency fees. The credit will be based on Nassau and Suffolk Counties' percentage of New York's share of the Contingency Fee Fund contemplated in the Global Settlement. If no such fund is created, the amount will be $888,686.62 which represents 15.31% (Nassau's and Suffolk Counties' share of the State's allocation) of 5.39% (the State's share of the national allocation) of 35% (the anticipated percentage of the national fee fund that will be allocated to the Contingency Fee Fund) of Janssen's share of the national private attorney fee bucket ($307,692,308). The Parties will develop a mechanism for allocating those funds among eligible firms.

3. $813,646.29 in costs and expenses for New York State, these costs must be documented in the manner contemplated by subsection IX.A.2. The Parties will develop a mechanism for processing requests for reimbursement for such costs and expenses.

4. $725,576.90 to be available for reimbursement of litigation costs incurred by Participating Subdivisions. The Parties will develop a mechanism for allocating those funds among eligible firms.

D. The attorney fee and cost payments specified in Section IX shall be made on the Payment Schedule in Section X.

## X.    Payment Schedule

A. In the event that Senate Bill S7194 becomes law, Janssen's payment schedule will be accelerated as follows: 90 days following the Effective Date (anticipated to be in November or December 2021), Janssen will make a combined payment for Base Payment 1 and Base Payment 2 as reflected in the Scenario 1 schedule below; otherwise, Janssen will make its payments in accordance with the Scenario 2 schedule below. Payments shall be made on the 15th day of each month specified in the applicable payment schedule unless otherwise provided in this Agreement.

**Scenario #1: Senate Bill S7194 becomes law**

| Payment No/Date | Atty Fee[2] | Costs[2] | Base | Incentives B+C (max)[3] | Incentive D | Total |
|---|---|---|---|---|---|---|
| 0/ Jul 2021 | $11,550,000.00 | $2,000,000.00 | | | | $13,550,000.00 |
| 1/ ED+90 | $4,585,663.08 | $397,957.17 | $47,691,376.65 | | | $52,674,996.90 |
| 2/ Jan 23 | $4,585,663.03 | $397,957.16 | | $29,948,771.50 | | $34,932,391.69 |

---

[2] Attorney fees and costs paid assuming no global resolution.
[3] If the State achieves Incentive A, a portion of the base and incentive payments will be accelerated pursuant to Section III.B.2 above.

| | | | | | | |
|---|---|---|---|---|---|---|
| 3/ Jan 24 | $2,141,288.24 | $185,827.22 | $13,147,460.60 | $31,248,307.00 | | $46,722,883.06 |
| 4/ Jan 25 | $2,141,288.24 | $185,827.22 | $13,309,183.40 | $36,051,532.50 | | $51,687,831.36 |
| 5/ Jan 26 | $2,141,288.24 | $185,827.22 | $5,360,940.65 | $3,087,795.00 | | $10,775,851.11 |
| 6/ Jan 27 | $2,141,288.25 | $185,827.20 | $3,198,407.20 | $3,087,795.00 | $2,298,627.69 | $10,911,945.34 |
| 7/ Jan 28 | | | $3,198,407.15 | $3,087,795.00 | $2,298,627.69 | $8,584,829.84 |
| 8/ Jan 29 | | | $4,196,060.65 | $4,454,559.00 | $2,298,627.69 | $10,949,247.34 |
| 9/ Jan 30 | | | $4,196,060.75 | $4,454,559.00 | $2,298,627.69 | $10,949,247.44 |
| 10/ Jan 31 | | | $4,196,060.69 | $4,454,559.05 | $2,298,627.70 | $10,949,247.44 |
| Total | $29,286,479.08 | $3,539,223.19 | $98,493,957.74 | $119,875,673.05 | $11,493,138.46 | $262,688,471.52 |

### Scenario #2: Senate Bill S7194 does not become law

| Payment No/Date | Atty Fee[2] | Costs[2] | Base | Incentives B+C (max)[4] | Incentive D | Total |
|---|---|---|---|---|---|---|
| 0/ Jul 2021 | $11,550,000.00 | $2,000,000.00 | | | | $13,550,000.00 |
| 1/ ED+90 | $4,585,663.08 | $397,957.17 | $14,308,757.05 | | | $19,292,377.30 |
| 2/ Jan 23 | $4,585,663.03 | $397,957.16 | $33,382,619.60 | $29,948,771.50 | | $68,315,011.29 |
| 3/ Jan 24 | $2,141,288.24 | $185,827.22 | $13,147,460.60 | $31,248,307.00 | | $46,722,883.06 |
| 4/ Jan 25 | $2,141,288.24 | $185,827.22 | $13,309,183.40 | $36,051,532.50 | | $51,687,831.36 |
| 5/ Jan 26 | $2,141,288.24 | $185,827.22 | $5,360,940.65 | $3,087,795.00 | | $10,775,851.11 |
| 6/ Jan 27 | $2,141,288.25 | $185,827.20 | $3,198,407.20 | $3,087,795.00 | $2,298,627.69 | $10,911,945.34 |
| 7/ Jan 28 | | | $3,198,407.15 | $3,087,795.00 | $2,298,627.69 | $8,584,829.84 |
| 8/ Jan 29 | | | $4,196,060.65 | $4,454,559.00 | $2,298,627.69 | $10,949,247.34 |
| 9/ Jan 30 | | | $4,196,060.75 | $4,454,559.00 | $2,298,627.69 | $10,949,247.44 |
| 10/ Jan 31 | | | $4,196,060.69 | $4,454,559.05 | $2,298,627.70 | $10,949,247.44 |
| Total | $29,286,479.08 | $3,539,223.19 | $98,493,957.74 | $119,875,673.05 | $11,493,138.46 | $262,688,471.52 |

B.    If the Global Settlement becomes effective before February 15, 2022, all payments due after that date will be made to the funds established in the Global Settlement, and the above payment schedules will be adjusted to meet the Global Settlement schedule, provided that adjustment results in no more than a two-month delay in payment.

### XI.    Enforcement and Dispute Resolution

A.    The terms of the Agreement and Consent Judgment applicable to the State will be enforceable solely by the State and Janssen. Participating Subdivisions shall not have enforcement rights against Janssen with respect to the Agreement or Consent Judgment except as to payments that would be allocated to the Qualified Settlement Fund for subdivision use; provided, however, that the State shall establish a process for Participating Subdivisions to notify it of any perceived violations of the Agreement or Consent Judgment.

---

[4] If the State achieves Incentive A, a portion of the base and incentive payments will be accelerated pursuant to Section III.B.2 above.

B.      Janssen consents to the jurisdiction of the court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection XI.D for resolution in the court in which the Consent Judgment is filed.

C.      The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

D.      Disputes not resolved informally shall be resolved in the Court that entered the Consent Judgment.

## XII.    Most-Favored Nation

If, after execution of this Agreement, there is a collective resolution—through settlement, bankruptcy, or other mechanism—of substantially all Claims against Janssen via the Global Settlement under which New York State or Nassau or Suffolk Counties would have received a greater monetary amount than the sum of the amounts provided in this Agreement, Janssen shall remit to New York State or Nassau or Suffolk Counties the difference between the sums of the amounts provided in this Agreement and the monetary amount that New York State or Nassau or Suffolk Counties would have received if they had been participants in the Global Settlement according to the payment schedule in the Global Settlement. If Janssen enters a standalone settlement within four months of the date of this agreement with Santa Clara County, the County of Los Angeles, the City of Oakland, and Orange County, and that settlement would cause Janssen to pay more than the maximum abatement money those jurisdictions could receive under the proposed Global Settlement and California's intrastate allocation formula, Janssen will increase payments to Nassau and Suffolk Counties by the same percentage amount over their allocation in the New York intrastate allocation agreement.

## XIII.    Miscellaneous

A.      Statement on Restitution and Cooperation

1.      The Parties agree that, unless required by law, no less than 91% of the total maximum amount paid into the Qualified Settlement Fund, which assumes full joinder and attaining of all incentive payments, shall be directed to remediation and for restitution of harms allegedly caused by Janssen's conduct, and no more than 9% of that maximum amount shall be directed to payment of attorney fees. This assumes "fees" paid to the New York State Office of the Attorney General may be paid to remediation and restitution.

2.      The Parties agree that the purpose of the Qualified Settlement Fund, other than the amounts directed to payment of attorney fees and litigation costs, will be to receive from Janssen and pay over to the State and Participating Subdivisions monies to remediate the harms allegedly caused by Janssen's conduct or to provide restitution for such alleged harms that were previously incurred. The payments received by the Settlement Fund, other than the amounts directed to attorney fees and costs, shall be disbursed to the State and Participating Subdivisions, which were allegedly harmed

23

by Janssen in a manner consistent with their above-stated remedial and/or restitutive purpose. No amount paid to the Fund or paid over to any requesting entity constitutes a fine or penalty.

3.   The State and each Participating Subdivision shall, prior to receipt of any direct payments from the Settlement Fund, provide the Settlement Fund Administrator with a written statement certifying that: (1) the entity suffered harm allegedly caused by Janssen; (2) the payments to be received by the entity from Janssen represent an amount that is less than or equal to the actual monetary damage allegedly caused by Janssen; and (3) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Janssen or to provide restitution for such alleged harms that were previously incurred.

4.   The Settlement Fund Administrator shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering the Consent Judgment becomes binding. On the Form 1098-F, the Settlement Fund Administrator or requesting entity, as applicable, shall identify such payments from Janssen as remediation/restitution amounts. The Settlement Fund Administrator or State, as applicable, shall also, on or before January 31 of the year following the calendar year in which the order entering the Consent Judgment becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Janssen.

B.   Nothing in this Agreement shall be construed to authorize or require any action by Janssen in violation of applicable federal, state, or other laws.

C.   *Modification.* This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Janssen may contact the New York Attorney General and Counsel for Nassau and Suffolk Counties for purposes of coordinating this process.

D.   Any failure by any party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Judgment.

E.   *Entire Agreement.* This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

F.   *Counterparts.* This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

G.   *Notice.* All notices under this Agreement shall be provided to the following via email and

24

Overnight Mail:

Defendant:

Copy to Janssen's attorneys at:

Charles C. Lifland
Daniel R. Suvor
400 South Hope Street, 18th Floor Los Angeles, CA  90071
Phone: (213) 430-6000
clifland@omm.com
dsuvor@omm.com


For the Attorney General:

Noah Popp
Assistant Attorney General
Office of the Attorney General of the State of New York
28 Liberty Street,
New York, New York, 10005
Noah.Popp@ag.ny.gov


For Plaintiff Nassau County:

Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com


For Plaintiff Suffolk County:

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

**Approved:**

Dated: 6-25-2021

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS, INC., ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC., AND
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.

By: _____

Marc Larkins
Assistant Corporate Secretary
Johnson & Johnson

Dated: _____

THE PEOPLE OF THE STATE OF NEW YORK

By: _____

Jennifer Levy
First Deputy Attorney General
Office of the New York State Attorney
General

Dated: _____

THE COUNTY OF SUFFOLK, NEW YORK

By: _____
Signature

_____
Printed Name

_____
Title

Dated: _____

SIMMONS HANLY CONROY LLC

By: _____
Signature

_____
Printed Name

26

**Approved:**


Dated: _____          JOHNSON & JOHNSON, JANSSEN
                            PHARMACEUTICALS, INC., ORTHO-MCNEIL-
                            JANSSEN PHARMACEUTICALS, INC. N/K/A
                            JANSSEN PHARMACEUTICALS, INC., AND
                            JANSSEN PHARMACEUTICA INC. N/K/A
                            JANSSEN PHARMACEUTICALS, INC.

                            By:  _____
                                 Marc Larkins
                                 Assistant Corporate Secretary
                                 Johnson & Johnson


Dated: _6/25/21_            THE PEOPLE OF THE STATE OF NEW YORK

                            By:  _____
                                 Jennifer Levy
                                 First Deputy Attorney General
                                 Office of the New York State Attorney
                                 General


Dated: _____          THE COUNTY OF SUFFOLK, NEW YORK

                            By:  _____
                                 Signature

                                 _____
                                 Printed Name

                                 _____
                                 Title


Dated: _____          SIMMONS HANLY CONROY LLC

                            By:  _____
                                 Signature

                                 _____
                                 Printed Name

26

**Approved:**

Dated: _____

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS, INC., ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC., AND
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.

By: _____
    Marc Larkins
    Assistant Corporate Secretary
    Johnson & Johnson

Dated: _____

THE PEOPLE OF THE STATE OF NEW YORK

By: _____
    Jennifer Levy
    First Deputy Attorney General
    Office of the New York State Attorney
    General

Dated: _6/05/21_

THE COUNTY OF SUFFOLK, NEW YORK

By: _____
    Signature

    _____
    Printed Name

    _____
    Title

Dated: _____

SIMMONS HANLY CONROY LLC

By: _____
    Signature

    _____
    Printed Name

26

**Approved:**

Dated: _____

JOHNSON & JOHNSON, JANSSEN
PHARMACEUTICALS, INC., ORTHO-MCNEIL-
JANSSEN PHARMACEUTICALS, INC. N/K/A
JANSSEN PHARMACEUTICALS, INC., AND
JANSSEN PHARMACEUTICA INC. N/K/A
JANSSEN PHARMACEUTICALS, INC.

By: _____
    Marc Larkins
    Assistant Corporate Secretary
    Johnson & Johnson


Dated: _____

THE PEOPLE OF THE STATE OF NEW YORK

By: _____
    Jennifer Levy
    First Deputy Attorney General
    Office of the New York State Attorney
    General


Dated: _____

THE COUNTY OF SUFFOLK, NEW YORK

By: _____
    Signature

_____
Printed Name

_____
Title


Dated: June 25, 2021

SIMMONS HANLY CONROY LLC

By: _____
    Signature

    JAYNE CONROY
Printed Name

Attorneys for the County of Suffolk, New York

Dated:  June 25, 2021                THE COUNTY OF NASSAU, NEW YORK

                                     By: _____
                                         Signature

                                         _____
                                         John B. Chiara
                                         Printed Name

                                         _____
                                         Acting County Attorney
                                         Title

Dated: _____                 NAPOLI SHKOLNIK PLLC

                                     By: _____
                                         Signature

                                         _____
                                         Printed Name

                                     Attorneys for the County of Nassau, New York

27

Attorneys for the County of Suffolk, New York

Dated: _____

THE COUNTY OF NASSAU, NEW YORK

By: _____
    Signature

_____
    Printed Name

_____
    Title

Dated: 6/25/21

NAPOLI SHKOLNIK PLLC

By: _____
    Signature

_____
    Printed Name

Attorneys for the County of Nassau, New York

27

**Exhibit A**

**NEW YORK SUBDIVISION ELECTION AND RELEASE FORM**

This Election and Release Form for New York Participating Subdivisions resolves opioid-related Claims against Janssen under the terms and conditions set forth in the Janssen New York State-Wide Opioid Settlement Agreement between Janssen, the State of New York, and the Counties of Nassau and Suffolk (the "Agreement"), the provisions of which are here incorporated by reference in their entirety. Upon executing this Election and Release Form, a Participating Subdivision agrees that, in exchange for the consideration described in the Agreement, the Participating Subdivision is bound by all the terms and conditions of the Agreement, including but not limited to the Release found in Section VII of the Agreement and the provisions concerning participation by Subdivisions in Section VIII, and the Participating Subdivision and its signatories expressly represent and warrant on behalf of themselves that they have, or will have obtained on or before the Effective Date or on or before the execution of this Election and Release Form if executed after the Effective Date, the authority to settle and release, to the maximum extent of the Subdivision's power, all Released Claims related to Covered Conduct. If this Election and Release Form is executed on or before the Initial Participation Date, the Participating Subdivision shall dismiss Janssen and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Janssen or a Released Entity no later than the Initial Participation Date. If this Election and Release Form is executed after the Initial Participation Date, the Participating Subdivision shall dismiss Janssen and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Covered Claims against Janssen or a Released Entity concurrently with the execution of this form. By executing this Election and Release Form, the Participating Subdivision submits to the

29

jurisdiction of the Court where the Consent Judgment is filed for purposes limited to that Court's role under the Agreement.

Dated: _____

 [NY SUBDIVISION]

By: _____
[COUNSEL]
[FIRM]
[ADDRESS]
[TELEPHONE]
[EMAIL ADDRESS]

*Counsel for [NY SUBDIVISION]*

**<u>Exhibit B</u>**

## NEW YORK OPIOID SETTLEMENT SHARING AGREEMENT

This Agreement sets forth the terms and conditions governing the sharing and allocation of funds between and among the State of New York and the New York Subdivisions (as defined below) received from Statewide Opioid Settlement Agreements (as defined below) with the Opioid Supply Chain Participants (as defined below).

Whereas, the people of the State of New York and its communities have been harmed by misfeasance, nonfeasance, and malfeasance committed by certain entities within the opioid supply chain; and

Whereas, the State of New York and certain New York Subdivisions are engaged in litigation seeking to hold Opioid Supply Chain Participants accountable for the damage caused by their misfeasance, nonfeasance, and malfeasance; and

Whereas, the State of New York and the New York Subdivisions share a common desire to abate and alleviate the impacts of the misfeasance, nonfeasance, and malfeasance of the Opioid Supply Chain Participants throughout the State of New York;

Now therefore, the State of New York and the New York Subdivisions enter into this Agreement relating to the allocation, distribution, and use of the proceeds of Settlements (as defined below).

## I.      DEFINITIONS

A. "Approved Uses" means any opioid or substance use disorder related projects or programs that fall within the list of uses in Schedule C.

B. "Lead State Agency" means the New York State Office of Addiction Services and Supports. As provided for in Section V, The Lead State Agency will coordinate with the New York Department of Health, the New York Office of Mental Health, and the New York Division of Housing and Community Renewal, as well as other agencies, to expend and oversee funds from the Opioid Settlement Fund.

C. The "Advisory Board" means the advisory board created and described by Section V under the Lead State Agency.

D. "Direct Share Subdivision" means every county of the State of New York other than the County of Nassau, the County of Suffolk, and the City of New York.

E. "New York Subdivisions" means each county, city, town, village or special district in New York.

F. "Opioid Settlement Funds" shall mean monetary amounts obtained through a Statewide Opioid Settlement Agreement as defined in this Agreement.

G.  "Opioid Supply Chain Participant" shall mean any entity or person that engages in or has engaged in the manufacture, marketing, promotion, distribution, or dispensing of an opioid analgesic, including their officers, directors, employees, or agents, acting in their capacity as such.

H.  "Parties" means the State of New York and the New York Subdivisions who execute this agreement.

I.  "Statewide Opioid Settlement Agreements" shall mean settlement agreements jointly entered into by the State of New York and New York Subdivisions with any Opioid Supply Chain Participant.

J.  "Opioid Settlement Fund" means the fund created by Section IV, which will be used or distributed in accordance with Section IV and this Agreement.

## II.  GENERAL FINANCIAL AND STRUCTURE TERMS

A.  **Scope of Agreement.** This Agreement applies to all Statewide Opioid Settlement Agreements entered into with an Opioid Supply Chain Participant on or after June 1, 2021.

B.  **Allocation and Distribution of Funds for Restitution and Abatement**. Opioid Settlement Funds from each Settlement shall be allocated and distributed as follows:

1.  **17.5%** to the State of New York, unless not in accordance with state. The Office of the Attorney General shall have the discretion to allocate a portion of these funds to local governments not listed in the annexed allocation chart.

2.  **16.39%** to the Lead State Agency to be placed in the Opioid Settlement Fund for Regional Spending on Approved Uses. In combination, the amount of Regional Spending of the Opioid Settlement Fund committed to cities other than New York City with a 2020 population of more than 90,000 shall not be less than 1.89% of the total Opioid Settlement Funds.

3.  **20%** to the Lead State Agency to be placed in the Opioid Settlement Fund for Discretionary Spending on Approved Uses and for Administration of the Opioid Settlement Fund.

4.  **5.4%** to the Direct Share Subdivisions as "Direct Unrestricted Funds."

5.  **5.4%** to the Direct Share Subdivisions for spending on Approved Uses ("Direct Restricted Funds").

6.  **6.68%** to the County of Nassau for spending on Approved Uses.

33

7. **8.63%** to the County of Suffolk for spending on Approved Uses.

8. **20%** to the City of New York for spending on Approved Uses.

C. **Redistribution in Certain Situations**. In the event a New York Subdivision merges, dissolves, or ceases to exist, the allocation percentage for that New York Subdivision shall be redistributed equitably based on the composition of the successor New York Subdivision. If a New York Subdivision for any reason is excluded from a specific Settlement, including because it does not execute a release as required by Section III.A, the allocation percentage for that New York Subdivision pursuant to Sections II.B.4 and 5 shall be redistributed equitably among the participating New York Subdivisions.

D. **Direct Payment of Certain Funds**.  All Opioid Settlement Funds allocated to the Direct Share Subdivisions, the Counties of Nassau and Suffolk, and the City of New York pursuant to Sections II.B.4, 5, 6, 7 and 8 shall be paid directly and as promptly as reasonably practicable by the Opioid Supply Change Participant or settlement fund administrator(s) to the Direct Share Subdivisions, the Counties of Nassau and Suffolk, and the City of New York.

E. **Attorneys' Fees and Expenses.** Unless state law or the applicable Statewide Opioid Settlement Agreement provides otherwise, Attorneys' fees and expenses will be determined and paid according to each Direct Share Subdivision's and New York Subdivision's contracts with its respective counsel. This does not prevent counsel for New York subdivisions to agree to recover solely from: (1) the common benefit and contingency fee funds if established pursuant to settlements with Opioid Supply Chain Participants; or (2) payment of attorneys' fees and costs directly from Opioid Supply Chain Participants.

## III. THE DIRECT SHARE SUBDIVISION AND CITY OF NEW YORK FUNDS

**Distribution of the Direct Share Subdivision Funds.**  The Direct Unrestricted Funds and the Direct Restricted Funds shall be paid to the Direct Share Subdivisions that execute a release for a given Statewide Opioid Settlement Agreement, pursuant to Section II.B.4 and 5, and will be fully distributed among them pursuant to the allocation set forth in Schedule A to this Agreement.

**Certification of Spending on Approved Uses.**  Each year, the Direct Share Subdivisions, the City of New York and the Counties of Nassau and Suffolk shall certify to the Lead State Agency and the Advisory Board that all funds distributed to them pursuant to Sections II.B.5, 6, 7 and 8 of this Agreement, which were spent during the preceding year, were spent on projects and programs that constitute Approved Uses. These certifications shall be made by August 1 of each year following the year in which such funds were spent and shall be accompanied by a detailed accounting of the spending of such funds as well as analysis and evaluation of the projects and programs they have funded.

## IV.        THE OPIOID SETTLEMENT FUND

**A.        Establishment of the Opioid Settlement Fund.**

1. Each year the Lead State Agency will allocate approximately **45**% of the Opioid Settlement Fund (16.39% of the total Opioid Settlement Funds) for Approved Uses in the various regions and large cities of New York State, except New York City and the Counties of Nassau and Suffolk, pursuant to a commitment to spend in each such region and each city other than New York City with a population of more than 90,000 the corresponding percentages shown in Schedule B. Of this amount, at least 1.89% of the total Opioid Settlement Funds received by New York shall be set aside for cities other than New York City with a population of more than 90,000.  Each New York Subdivision other than New York City and the Counties of Nassau and Suffolk may apply for and receive funds from the Opioid Settlement Fund, provided however, that each such Subdivision shall, as a condition to the receipt of these funds, certify at the end of each fiscal year during which it receives such funds that all funds provided to it under this provision of the Agreement were spent on projects and programs that constitute Approved Uses and provided that it complies with the reporting requirements set forth in Section IV.E.

2. Each year the Lead State Agency will set aside approximately **55**% of the Opioid Settlement Fund (20% of the total Opioid Settlement Funds) for spending by the Lead State Agency to (a) fund State projects that constitute Approved Uses, and (b) carry out the duties of the Lead State Agency and Advisory Board under this Agreement, including oversight and administration of the Opioid Settlement Fund and the Advisory Board.  No more than 5% of the total Opioid Settlement Fund may be used in any fiscal year for oversight and administrative costs of the Opioid Settlement Fund and the Advisory Board.

**B. Approved Uses.** The Approved Uses are set forth in Schedule C below. The Advisory Board may recommend to the Legislature adding or removing Approved Uses in response to changing substance use disorder needs in the state. The Advisory Board may not recommend that Approved Uses be removed from the list of Approved Uses without the vote of three-fourths of the present members of the Advisory Board.

**D. Oversight and Auditing.**  The Lead State Agency will engage in oversight and audits of projects and programs funded through the Opioid Settlement Fund.

**E. New York Subdivision Reporting.**  Each New York Subdivision that receives funds from the Opioid Settlement Fund under this Agreement will annually provide to the Lead State Agency and Advisory Board a detailed accounting of the spending of such funds as well as analysis and evaluation of the projects and programs it has funded.  Such accounting shall be provided by August 1 of each year following the year in which such funds were spent.  The

Lead Agency may withhold future funds from any New York Subdivision that is delinquent in providing this reporting, until the required report is submitted.

**F. Lead Agency Reporting.** The Lead State Agency and other relevant government commissioners, in consultation with the Advisory Board, will annually provide the Governor, Speaker of the Assembly, the Temporary President of the Senate, and other legislative leaders as provided by law, a written report, which, among other things, provides a detailed accounting of the previous year's spending of all monies in the Opioid Settlement Fund, any spending by the Direct Share Subdivisions pursuant to Sections II.B.5, any spending by the Counties of Nassau or Suffolk pursuant to Section II.B.6 and 7, and any spending by New York City pursuant to Section II.B.8, as well as an analysis and evaluation of the projects and programs so funded.  This report shall be provided on or before November 1 of each year, beginning one year after the initial deposit of monies in the Opioid Settlement Fund. At the same time, in consultation with the Advisory Board, the Lead State Agency will report annually the results of research funded by funds from this Agreement, the status of any outstanding audits, and the non-binding recommendations of the Advisory Board.

## V.   THE ROLE OF THE ADVISORY BOARD

1. **The Structure of the Advisory Board.** The Advisory Board will be established under the Lead Agency and comprised of 19 members, serving set terms. Each member of the Advisory Board will have one vote, with all actions being taken by an affirmative vote of the majority of present voting members, except where otherwise provided for in this Agreement or by law.

   a. **Appointments to the Advisory Board**. The Advisory Board shall consist of 19 members, including the Commissioner of the Office of Addiction Services and Supports, the Commissioner of Mental Health, the Commissioner of Health (or their designees) serving as ex-officio non-voting members. The Governor, the Attorney General, the Speaker of the Assembly and the Temporary President of the Senate shall each appoint 2 voting members, and the Mayor of the City of New York shall appoint one voting member.  The remaining 7 voting members shall be appointed from a list of persons provided by the New York State Association of Counties. These appointments will be made two each by the Temporary President of the Senate and the Speaker of the Assembly, and one each by the Minority Leader of the Senate, the Minority Leader of the Assembly and the Attorney General. Appointed members shall serve three-year terms and in the event of a vacancy, such vacancy shall be filled in the manner of the original appointment for the remainder of the term. The Advisory Board membership shall include persons, to the extent possible, who have expertise in public and behavioral health, substance use disorder treatment, harm reduction, criminal justice, or drug policy. Further, the Advisory Board shall include individuals with personal or professional experience with substance use and addiction issues and co-occurring mental illnesses as well as providing services to

those that have been disproportionately impacted by the enforcement and criminalization of addiction.

b. **Meetings of the Advisory Board.**  The Advisory Board shall hold at least quarterly public meetings, to be publicized and located in a manner reasonably designed to facilitate attendance by residents throughout the State. The Advisory Board shall function in a manner consistent with New York's meeting, open government or similar laws, and with the Americans with Disabilities Act.

c. **Consensus**. Members of the Advisory Board shall attempt to reach consensus with respect to recommendations and other actions to the extent possible. Consensus is defined in this process as a general agreement achieved by the members that reflects, from as many members as possible, their active support, support with reservations, or willingness to abide by the decision of the other members. Consensus does not require unanimity or other set threshold and may include objectors. In all events, however, actions of the Advisory Board shall be effective if supported by at least a majority of its voting members, except where otherwise provided for by this Agreement or by law.

d. **Payment and Ethics.**  Members of the Advisory Board will receive no compensation but will be reimbursed for actual and necessary expenses incurred in the performance of their duties. The members of the Advisory Board shall not take any action to direct funding from the Opioid Abatement Fund to any entity in which they or their family members have any interest, direct or indirect, or receive any commission or profit whatsoever, direct or indirect.

2. **Responsibilities.**  On or before November 1 of each year, beginning November 1, 2021, the Advisory Board shall issue a written report of recommendations regarding specific opioid abatement priorities and expenditures from the Opioid Settlement Fund for Approved Uses. This report shall be provided to the Governor, the Temporary President of the Senate, the Speaker of the Assembly, and other legislative leaders as provided by law. In carrying out its obligations to provide such recommendations, the Advisory Board may consider local, state and federal initiatives and activities that have been shown to be effective in preventing and treating substance use disorders as well as maintaining recovery and assisting with the collateral effects of substance use disorders for individuals and their families or support system. Such recommendations may be Statewide or specific to Regions and recommend Statewide or Regional funding with respect to specific programs or initiatives. Such recommendations shall also incorporate mechanisms for measurable outcomes for determining the effectiveness of funds expended for Approved Uses; and monitor the level of permitted administrative expenses in paragraph IV.A.2. The goal is for a process that produces recommendations that are recognized as being an efficient, evidence-based approach to abatement that addresses the State's greatest needs while also including programs reflecting particularized needs in local communities. It is anticipated that such a process will inform and assist the State in making decisions about spending from the Opioid Settlement Fund. To the extent the State chooses not to follow a recommendation of the Advisory Board's, it will make publicly available within 14 days after the decision is made a

37

written explanation of the reasons for its decision, and allow 14 days for the Advisory Board to respond. The Advisory Board shall have additional advisory responsibilities, including reporting on projects and programs related to addressing the opioid epidemic, developing priorities, goals and recommendations for spending on such projects and programs, working with the Lead State Agency to develop measurable outcomes for such projects and programs, and making recommendations for policy changes.

3. **Staff and Administration.** The Lead State Agency and any other relevant agency will provide staff, resources and technical assistance to the Advisory Board.

4. **Research.**  The Advisory Board will recommend to the Lead State Agency research to fund and oversee related to addressing the opioid epidemic, including for outside grants.

## VI.     RECOVERIES OTHER THAN MONEY

In the event that any part of a Settlement is received other than in money, the Parties will negotiate in good faith to agree upon a method of sharing such Settlement in a manner as consistent as practicable with the sharing of Opioid Settlement Funds under this Agreement. In the event that the Parties are unable to reach an agreement, then the method of sharing shall be determined by the Advisory Board, whose decision shall be final and binding on the Parties.

## V.     RETENTION OF JURISDICTION

The Supreme Court, County of Nassau, shall retain jurisdiction of the Parties for the purpose of this Agreement, including its interpretation and enforcement.

**LETITIA JAMES**
**Attorney General of the State of New York**

By: _____*Jennifer levy*_____          Date:___6/25/21_____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov

*Counsel for The People of the State of New York*

**NAPOLI SHKOLNIK PLLC**

_____          Date:_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road

written explanation of the reasons for its decision, and allow 14 days for the Advisory Board to respond. The Advisory Board shall have additional advisory responsibilities, including reporting on projects and programs related to addressing the opioid epidemic, developing priorities, goals and recommendations for spending on such projects and programs, working with the Lead State Agency to develop measurable outcomes for such projects and programs, and making recommendations for policy changes.

3. **Staff and Administration.** The Lead State Agency and any other relevant agency will provide staff, resources and technical assistance to the Advisory Board.

4. **Research.**  The Advisory Board will recommend to the Lead State Agency research to fund and oversee related to addressing the opioid epidemic, including for outside grants.

## VI.  RECOVERIES OTHER THAN MONEY

In the event that any part of a Settlement is received other than in money, the Parties will negotiate in good faith to agree upon a method of sharing such Settlement in a manner as consistent as practicable with the sharing of Opioid Settlement Funds under this Agreement. In the event that the Parties are unable to reach an agreement, then the method of sharing shall be determined by the Advisory Board, whose decision shall be final and binding on the Parties.

## V.  RETENTION OF JURISDICTION

The Supreme Court, County of Nassau, shall retain jurisdiction of the Parties for the purpose of this Agreement, including its interpretation and enforcement.

**LETITIA JAMES**
**Attorney General of the State of New York**

By: _____          Date:_____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov

*Counsel for The People of the State of New York*

**NAPOLI SHKOLNIK PLLC**

_____          Date: 6/25/21
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road

38

Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com

*Counsel for Plaintiff Nassau County*


**SIMMONS HANLY CONROY LLC**

_____     Date: June 25, 2021
Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

*Counsel for Plaintiff Suffolk County*


**ADDITIONAL SIGNATORIES:**

_____     Date:_____
_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____     Date:_____
_____
_____
_____
_____
_____

39

Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com

*Counsel for Plaintiff Nassau County*


**SIMMONS HANLY CONROY LLC**

_____     Date:_____
Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

*Counsel for Plaintiff Suffolk County*


**ADDITIONAL SIGNATORIES:**

_____     Date:_____
_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____     Date:_____
_____
_____
_____
_____
_____
_____

39

*Counsel for* _____


_____
_____                    Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____
_____                    Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____
_____                    Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____
_____                    Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____

_____          Date:_____

_____

_____

_____

_____

_____

_____

*Counsel for* _____


_____          Date:_____

_____

_____

_____

_____

_____

_____

*Counsel for* _____


_____          Date:_____

_____

_____

_____

_____

_____

_____

*Counsel for* _____

## Schedule A

| | |
|---|---|
| Allegany | 0.492651319% |
| Cattaraugus | 0.885804166% |
| Chautauqua | 1.712744591% |
| Erie | 13.981832649% |
| Niagara | 3.416877066% |
| **Western Region** | **20.489909791%** |
| | |
| Genesee | 0.710630089% |
| Livingston | 0.678797077% |
| Monroe | 9.384433024% |
| Ontario | 1.309944722% |
| Orleans | 0.412856571% |
| Seneca | 0.386847050% |
| Wayne | 0.994089249% |
| Wyoming | 0.411657124% |
| Yates | 0.247909288% |
| **Finger Lakes Region** | **14.537164194%** |
| | |
| Broome | 2.790673871% |
| Chemung | 1.231939720% |
| Chenango | 0.516475286% |
| Delaware | 0.549364256% |
| Schuyler | 0.208248729% |
| Steuben | 1.137138754% |
| Tioga | 0.542347836% |
| Tompkins | 1.177586745% |
| **Southern Tier Region** | **8.153775199%** |
| | |
| Cayuga | 0.903523653% |
| Cortland | 0.541036257% |
| Madison | 0.810595101% |
| Onondaga | 6.323758786% |
| Oswego | 1.549495093% |
| **Central NY Region** | **10.128408890%** |
| | |
| Fulton | 0.462070473% |
| Herkimer | 0.658308079% |
| Montgomery | 0.453395949% |

| | |
|---|---|
| Oneida | 2.826733181% |
| Otsego | 0.670962131% |
| Schoharie | 0.277769778% |
| **Mohawk Valley Region** | **5.349239592%** |

| | |
|---|---|
| Clinton | 0.831513299% |
| Essex | 0.367293246% |
| Franklin | 0.457353060% |
| Hamilton | 0.030269643% |
| Jefferson | 1.273686826% |
| Lewis | 0.251124198% |
| St. Lawrence | 1.234262202% |
| **North Country Region** | **4.445502475%** |

| | |
|---|---|
| Albany | 2.791375201% |
| Columbia | 0.656790382% |
| Greene | 0.793267678% |
| Rensselaer | 1.270734936% |
| Saratoga | 1.679317072% |
| Schenectady | 1.217397796% |
| Warren | 0.612162823% |
| Washington | 0.479903545% |
| **Capital Region** | **9.500949434%** |

| | |
|---|---|
| Dutchess | 4.381104459% |
| Orange | 5.187725669% |
| Putnam | 1.184886753% |
| Rockland | 3.081816868% |
| Sullivan | 1.888626559% |
| Ulster | 2.462996041% |
| Westchester | 9.207894077% |
| **Mid-Hudson Region** | **27.395050426%** |

## **Schedule B**

**Western Region**          **18.127131908%**

**Finger Lakes Region**     **12.860822502%**

**Southern Tier Region**    **7.213529004%**

**Central NY Region**       **8.960459360%**

**Mohawk Valley Region**    **4.732396222%**

**North Country Region**    **3.932872842%**

**Capital Region**          **8.405354899%**

**Mid-Hudson Region**       **24.236011664%**

**Albany**                  **0.772105290%**

**Buffalo**                 **3.867429560%**

**Rochester**               **2.595770859%**

**Syracuse**                **1.749176400%**

**Yonkers**                 **2.546939490%**

# <u>Schedule C – Approved Uses</u>

## 1.  <u>TREATMENT</u>

### 1.  <u>TREAT OPIOID USE DISORDER (OUD)</u>

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder
or Mental Health (SUD/MH) conditions through evidence-based, evidence-informed, or
promising programs or strategies that may include, but are not limited to, the following:

1.  Expand availability of treatment for OUD and any co-occurring SUD/MH conditions,
    including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food
    and Drug Administration.

2.  Support and reimburse services that include the full American Society of Addiction
    Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions,
    including but not limited to:

    a.  Medication-Assisted Treatment (MAT);

    b.  Abstinence-based treatment;

    c.  Treatment, recovery, or other services provided by states, subdivisions,
        community health centers; non-for-profit providers; or for-profit providers;

    d.  Treatment by providers that focus on OUD treatment as well as treatment by
        providers that offer OUD treatment along with treatment for other SUD/MH
        conditions; or

    e.  Evidence-informed residential services programs, as noted below.

3.  Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH
    conditions, including MAT, as well as counseling, psychiatric support, and other treatment
    and recovery support services.

4.  Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based,
    evidence-informed or promising practices such as adequate methadone dosing and low
    threshold approaches to treatment.

5.  Support mobile intervention, treatment, and recovery services, offered by qualified
    professionals and service providers, such as peer recovery coaches, for persons with
    OUD and any co-occurring SUD/MH conditions and for persons who have experienced
    an opioid overdose.

6.  Treatment of mental health trauma resulting from the traumatic experiences of the opioid
    user (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and

45

family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support detoxification (detox) and withdrawal management services for persons with OUD and any co-occurring SUD/MH conditions, including medical detox, referral to treatment, or connections to other services or supports.

8. Training for MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or undeserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for certified addiction counselors and other mental and behavioral health providers involved in addressing OUD any co-occurring SUD/MH conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Scholarships for persons to become certified addiction counselors, licensed alcohol and drug counselors, licensed clinical social workers, and licensed mental health counselors practicing in the SUD field, and scholarships for certified addiction counselors, licensed alcohol and drug counselors, licensed clinical social workers, and licensed mental health counselors practicing in the SUD field for continuing education and licensing fees.

13. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD and provide technical assistance and professional support for clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## 2.  SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in treatment for and recovery from OUD and any co-occurring SUD/MH conditions through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

46

1. Provide the full continuum of care of recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, residential treatment, medical detox services, peer support services and counseling, community navigators, case management, transportation, and connections to community-based services.

2. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

3. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, or training for housing providers.

4. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

5. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

6. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

8. Identifying successful recovery programs such as physician, pilot, and college recovery programs, and providing support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

9. Engaging non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to manage the opioid user in the family.

10. Training and development of procedures for government staff to appropriately interact and provide social and other services to current and recovering opioid users, including reducing stigma.

11. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

12. Create or support culturally-appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

13. Create and/or support recovery high schools.

3. **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any cooccurring SUD/MH conditions through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is most common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

6. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into community treatment or recovery services through a bridge clinic or similar approach.

7. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

8. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

9. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

10. Provide funding for peer navigators, recovery coaches, care coordinators, or care managers that offer assistance to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced on opioid overdose.

11. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and supporting prevention, intervention, treatment, and recovery programs focused on young people.

12. Develop and support best practices on addressing OUD in the workplace.

13. Support assistance programs for health care providers with OUD.

14. Engage non-profits and faith community as a system to support outreach for treatment.

15. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

16. Create or support intake and call centers to facilitate education and access to treatment, prevention, and recovery services for persons with OUD and any co-occurring SUD/MH conditions.

17. Develop or support a National Treatment Availability Clearinghouse – a multistate/nationally accessible database whereby health care providers can list locations for currently available in-patient and out-patient OUD treatment services that are accessible on a real-time basis by persons who seek treatment.

## 4. ADDRESS THE NEEDS OF CRIMINAL-JUSTICE INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved – or are at risk of becoming involved – in the criminal justice system through evidence-based, evidence-informed or promising programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest and pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c. "Naloxone Plus" strategies, which work to ensure that individuals who have received Naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model; or

   e. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

      f.   Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise and to reduce perceived barriers associated with law enforcement 911 responses.

2.   Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.   Support treatment and recovery courts for persons with OUD and any co-occurring SUD/MH conditions, but only if they provide referrals to evidence-informed treatment, including MAT.

4.   Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.   Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison, who have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.   Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.   Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**5.  ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome, through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1.   Support evidence-based, evidence-informed, or promising treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Training for obstetricians and other healthcare personnel that work with pregnant women and their families regarding OUD treatment and any co-occurring SUD/MH conditions.

3. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

4. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

5. Enhanced family supports and child care services for parents with OUD and any cooccurring SUD/MH conditions.

6. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

7. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

8. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

## II. PREVENTION

## F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

2. Academic counter-detailing to educate prescribers on appropriate opioids prescribing.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a. Increase the number of prescribers using PDMPs;

    b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD.

6. Development and implementation of a national PDMP – Fund development of a multistate/national PDMP that permits information sharing while providing appropriate safeguards on sharing of private health information, including but not limited to:

    a. Integration of PDMP data with electronic health records, overdose episodes, and decision support tools for health care providers relating to OUD.

    b. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educating Dispensers on appropriate opioid dispensing.

## G. PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Corrective advertising or affirmative public education campaigns based on evidence.

2. Public education relating to drug disposal.

3. Drug take-back disposal or destruction programs.

4. Fund community anti-drug coalitions that engage in drug prevention efforts.

5. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

6. Engaging non-profits and faith community as a system to support prevention.

7.  Support evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

8.  School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

9.  Support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

10. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

11. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

## H. PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1.  Increasing availability and distribution of naloxone and other drugs that treat overdoses to first responders, overdose patients, opioid users, families and friends of opioid users, schools, community navigators and outreach workers, drug offenders upon release from jail/prison, and other members of the general public.

2.  Public health entities provide free naloxone to anyone in the community, including but not limited to provision of intra-nasal naloxone in settings where other options are not available or allowed.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, and other members of the general public.

4.  Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

7.  Public education relating to immunity and Good Samaritan laws.

8.  Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.  Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.


## III.   OTHER STRATEGIES

### I.   FIRST RESPONDERS

In addition to items C8, D1 through D7, H1, H3, and H8, support the following:

1.  Law enforcement expenditures related to the opioid epidemic

2.  Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

3.  Provisions of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

### J.   LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, and coordination to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

54

1. Community regional planning to identify goals for reducing harms related to the opioid epidemic, to identify areas and populations with the greatest needs for treatment intervention services, or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list including, but not limited to costs associated with local opioid task forces, community buprenorphine waiver trainings, and coordination and operation of community-based treatment prevention programing.

2. A government dashboard to track key opioid-related indicators and supports as identified through collaborative community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K. TRAINING

In addition to the training referred to in items above A7, A8, A9, A12, A13, A14, A15, B7, B10, C3, C5, E2, E4, F1, F3, F8, G5, H3, H12, and I2, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or network programs and services regarding the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-systems coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L. RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

55

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Research on expanded modalities such as prescription methadone that can expand access to MAT.

8. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

9. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

10. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## M. **POST-MORTEM**

1. Toxicology tests for the range of synthetic opioids presently seen in overdose deaths as well as newly evolving synthetic opioids infiltrating the drug supply.

2. Toxicology method development and method validation for the range of synthetic opioids observed now and in the future, including the cost of installation, maintenance, repairs and training of capital equipment.

3. Autopsies in cases of overdose deaths resulting from opioids and synthetic opioids.

4. Additional storage space/facilities for bodies directly related to opioid or synthetic opioid related deaths.

5. Comprehensive death investigations for individuals where a death is caused by or suspected to have been caused by an opioid or synthetic opioid overdose, whether intentional or accidental.

6. Indigent burial for unclaimed remains resulting from overdose deaths.

7.  Navigation-to-care services for individuals with opioid use disorder who are encountered by the medical examiner's office as either family and/or social network members of decedents dying of opioid overdose.

8.  Epidemiologic data management and reporting to public health and public safety stakeholders regarding opioid overdose fatalities.

**<u>Exhibit C</u>**

## <u>Injunctive Relief</u>

A. **Definitions Specific to this Exhibit**

1. "*Cancer-Related Pain Care*" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

2. "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), including all of their subsidiaries, predecessors, successors, current officers, directors, employees, representatives, agents, affiliates, parents, and assigns acting on behalf of Janssen in the United States.

3. "*End-of-Life Care*" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

4. "*Health Care Provider*" means any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, practice, hospital, clinic, or pharmacy.

5. "*In-Kind Support*" means payment or assistance in the form of goods, commodities, services, or anything else of value.

6. "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

7. "*Opioid(s)*" means all naturally occurring, synthetic, or semisynthetic substances that interact with opioid receptors and act like opium. For the avoidance of doubt, the term "Opioid(s)" does not include Imodium.

8. "*Opioid Product(s)*" means all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients (APIs) used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

59

9.    "*OUD*" means opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

10.   "*Product(s) for the Treatment of Opioid-Induced Side Effects*" means any over-the-counter or prescription remedy used to treat those side effects identified on the FDA label for any Opioid Product, except that, for purposes of the Agreement, Product(s) for the Treatment of Opioid-Induced Side Effects shall not include products that treat OUD or respiratory depression.

11.   "*Promote*," "*Promoting*," "*Promotion*," and "*Promotional*" means dissemination of information or other practices intended or reasonably anticipated to increase sales, prescriptions, or that attempts to influence prescribing practices in the United States. These terms shall not include the provision of scientific information or data in response to unsolicited requests from Health Care Providers or payors as allowed in subsection C.2.e-h.

12.   "*Third Party(ies)*" means any person or entity other than Janssen or a government entity.

13.   "*Treatment of Pain*" means the provision of therapeutic modalities to alleviate or reduce pain.

14.   "*Unbranded Information*" means any information that does not identify a specific branded or generic product.

a    **Ban on Selling and Manufacturing Opioids**

1.    Janssen shall not manufacture or sell any Opioids or Opioid Products for distribution in the State of New York. Janssen represents that prior to the Effective Date, it de-listed all of its Opioid Products and no longer ships any of them to or within the United States. Janssen shall provide notice to the State of New York when the last of the inventory Janssen has shipped has expired.

2.    Notwithstanding subsection B.1 above, Janssen may continue to manufacture Nucynta and Nucynta ER (collectively "Nucynta") in accordance with the terms of its April 2, 2015 contract with Depomed, Inc., rights to which were assigned to Collegium Pharmaceutical, Inc. ("Collegium") on February 13, 2020, so long as Janssen is not Promoting Nucynta, or selling Nucynta to anyone other than Collegium. Janssen shall not extend, amend, or otherwise alter the terms of its April 2, 2015 contract or enter into any similar agreement related to Nucynta or any other Opioid or Opioid Product. For the term of its April 2, 2015 contract, or until the expiration of subsection B.1, whichever is shorter, Janssen shall make an annual report to the State of New York showing the amount of Nucynta manufactured in accordance with the April 2, 2015 contract.

C.      **Ban on Promotion**

1.      Janssen shall not engage in Promotion of Opioids or Opioid Products including but not limited to, by:

   a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients, or to persons involved in determining the Opioid Products included in formularies;

   b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

   c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs for Promotion of Opioids or Opioid Products;

   d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

   e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

   f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

   g.    Engaging in internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet.

2.      Notwithstanding subsection C.1 directly above, Janssen may:

   a.    Maintain a corporate website;

   b.    Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

   c.    Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in New York;

61

d.  Provide the following by mail, electronic mail, on or through Janssen's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in New York;

e.  Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

f.  Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g.  Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h.  Provide information relating solely to the pricing of any Opioid Product;

i.  Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy (REMS) program or other federal or state law or regulation applicable in New York through an independent Third Party, which shall be responsible for the program's content without the participation of Janssen; and

j.  Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Janssen as the source of the information.

3.     Janssen shall not engage in the Promotion of Products for the Treatment of Opioid-induced Side Effects, including but not limited to:

   a.     Employing or contracting with sales representatives or other persons to Promote Products for the Treatment of Opioid-induced Side Effects to Health Care Providers or patients;

   b.     Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote Products for the Treatment of Opioid induced Side Effects;

   c.     Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote Products for the Treatment of Opioid-induced Side Effects;

   d.     Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Products for the Treatment of Opioid-induced Side Effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.     Notwithstanding subsection C, Janssen may Promote Products for the Treatment of Opioid-induced Side Effects so long as such Promotion does not associate the product with Opioids or Opioid Products.

5.     Treatment of Pain

   a.     Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the Treatment of Pain, except that Janssen may continue to Promote the Treatment of Pain with branded non-Opioids, including Tylenol and Motrin.

   b.     Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the concept that pain is undertreated, except in connection with Promoting the use of branded non-Opioids, including Tylenol and Motrin, for the Treatment of Pain.

   c.     Janssen shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or that otherwise Promotes Opioids or Opioid Products.

6.     Notwithstanding subsection C.5 above:

   a.     Janssen may Promote or provide educational information about the Treatment of Pain with non-Opioids or therapies such as acetaminophen or non-steroidal anti-inflammatory drugs (NSAIDS), including Promoting or providing educational information about such non-Opioids or therapies as alternatives

63

to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

b.    Janssen may provide educational information about the Treatment of Pain related to medical procedures involving devices manufactured or sold by Janssen, including educational information about Opioids or Opioid Products, so long as such information does not Promote Opioids or Opioid Products.

7.    The Promotional conduct prohibited in subsection C is not prohibited insofar as it relates to the Promotion of Opioids or Opioid Products for Cancer-Related Pain Care or End-of-Life Care only, and so long as Janssen is identified as the sponsor or source of such Promotional conduct.

## D.    No Financial Reward or Discipline Based on Volume of Opioid Sales

1.    Janssen shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products;

2.    Janssen shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product; and

3.    Janssen's compensation policies and procedures shall ensure compliance with the Agreement.

## E.    Ban on Funding/Grants to Third Parties

1.    Janssen shall not directly or indirectly provide financial support or In-Kind Support to any Third Party that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-induced Side Effects (subject to subsections B.2, 4, and 6), including educational programs or websites that Promote Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects, excluding financial support otherwise required by the Agreement, a court order, or by a federal or state agency.

2.    Janssen shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects.

3.    Janssen shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or products intended for the treatment of Opioid-induced side effects (subject to subsections B.2, 4, and 6).

4.      Janssen shall not use, assist, or employ any Third Party to engage in any activity that Janssen itself would be prohibited from engaging in pursuant to the Agreement. To the extent Janssen supports trade groups engaged in Lobbying, Janssen shall stipulate that such support not be used for any purpose prohibited by the Agreement.

5.      Janssen shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.      Janssen shall not compensate or support Health Care Providers or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payors, i.e., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers.

7.      No officer or management-level employee of Janssen may concurrently serve as a director, board member, employee, agent, or officer of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Janssen from concurrently serving on the board of a hospital.

8.      Janssen shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects. For avoidance of doubt, nothing in this paragraph shall prohibit Janssen from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

F.      **Lobbying Restrictions**

1.      Janssen shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

   a.      Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

   b.      Has the effect of limiting access to any non-Opioid alternative pain treatments; or

   c.      Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.      Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

a.  The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

b.  The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

c.  The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

d.  The limitation of initial prescriptions of Opioids to treat acute pain;

e.  The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f.  The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

g.  Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h.  The implementation or use of Opioid drug disposal systems.

3.  Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of PDMPs, including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4.  Notwithstanding the foregoing restrictions in subsections F.1-3, the following conduct is not restricted:

a.  Challenging the enforcement of or suing for declaratory or injunctive relief with respect to legislation, rules, or regulations referred to in subsection F.1;

b.  Communications made by Janssen in response to a statute, rule, regulation, or order requiring such communication;

c.  Communications by a Janssen representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as result of a mandatory order or subpoena commanding that person to testify;

d.  Responding, in a manner consistent with the Agreement, to an unsolicited request for the input on the passage of legislation or the promulgation of any

66

rule or regulation when such request is submitted in writing specifically to Janssen from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation; or

    e.    Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections F.1-3, so long as the company does not support specific portions of such legislation or regulation covered by subsection F.1 or oppose specific portions of such legislation or regulation covered by subsections F.2-3.

5.    Janssen shall provide notice of the prohibitions in subsection F to all employees engaged in Lobbying; shall incorporate the prohibitions in subsection F into trainings provided to Janssen employees engaged in Lobbying; and certify to the State of New York that it has provided such notice and trainings to Janssen employees engaged in Lobbying.

## G.    Ban on Prescription Savings Programs

1.    Janssen shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

2.    Janssen shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

3.    Janssen shall not directly or indirectly assist patients, Health Care Providers, or pharmacies with the claims and/or prior authorization process required for third-party payors to approve payment for any Opioid Product.

## H.    General Terms

1.    Janssen shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, or deceptive as defined under the law of New York State.  For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

2.    Janssen shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have.  For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

3.    For the avoidance of doubt, the Agreement shall not be construed or used as a waiver or limitation of any defense otherwise available to Janssen in any action, and nothing in the Agreement is intended to or shall be construed to prohibit Janssen in any way

whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in defense of litigation or other legal proceedings.

4.  Upon the request of the State of New York Attorney General, Janssen shall provide the New York Attorney General with copies of the following, within thirty (30) days of the request:

   a.  Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Janssen's Opioid Product(s); and

   b.  Warning or untitled letters issued by the FDA regarding Janssen's Opioid Product(s) and all correspondence between Janssen and the FDA related to such letters.

5.  The Agreement applies to conduct that results in the Promotion of Opioids or Opioid Products, or the Treatment of Pain inside the United States.

6.  Janssen will enter into the Agreement solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of the Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. The Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

7.  Nothing in the Agreement shall be construed to limit or impair Janssen's ability to:

   a.  Communicate its positions and respond to media inquiries concerning litigation, investigations, reports or other documents or proceedings relating to Janssen or its Opioid Products.

   b.  Maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products, including the website, www.factsaboutourprescriptionopioids.com.

I.  **Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1.  Janssen shall comply with all applicable state laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, including conduct permitted by subsection B.2, provided that nothing in this paragraph requires Janssen to violate federal law or regulations, including but not limited to:

   a.  New York State Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

   b.  New York State Consumer Protection Laws;

68

   c.  New York State laws, regulations, and guidelines related to opioid prescribing, distribution, and disposal; and

**J.**  **Clinical Data Transparency**

  1.  Janssen agrees to continue sharing clinical trial data under the Yale University Open Data Access (YODA) Project to allow researchers qualified under the program to access the company's propriety data under the terms of the project.

  2.  In the event Yale University discontinues or withdraws from the YODA Project agreement with Janssen, Janssen shall make its clinical research data regarding Opioids and Opioid Products, and any additional clinical research data that Janssen sponsors and controls regarding Opioids and Opioid Products, available to an independent entity that is the functional equivalent of the YODA Project under functionally equivalent terms.

**K.**  **Enforcement**

  1.  For the purposes of resolving disputes with respect to compliance with this Exhibit, should the State of New York have a reasonable basis to believe that Janssen has engaged in a practice that violates a provision of this Exhibit subsequent to the Effective Date, the State of New York shall notify Janssen in writing of the specific objection, identify with particularity the provision of the Agreement that the practice appears to violate, and give Janssen thirty (30) days to respond in writing to the notification; provided, however, that the State of New York may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

  2.  Upon receipt of written notice, Janssen shall provide a good faith written response to the State's notification, containing either a statement explaining why Janssen believes it is in compliance with the provisions of this Exhibit of the Agreement, or a detailed explanation of how the alleged violation occurred and a statement explaining how Janssen intends to remedy the alleged breach. Nothing in this section shall be interpreted to limit the State of New York's civil investigative demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable law, and Janssen reserves all of its rights in responding to a CID or investigative subpoena issued pursuant to such authority.

  3.  The State of New York may agree, in writing, to provide Janssen with additional time beyond thirty (30) days to respond to a notice provided under subsection L.1, above, without Court approval.

  4.  Upon giving Janssen thirty (30) days to respond to the notification described above, the State shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in possession, custody, or control of Janssen that relate to Janssen's compliance with each provision of the Agreement pursuant to the State of New York's CID or investigative subpoena authority.

5.      The State of New York may assert any claim that Janssen has violated the Agreement in a separate civil action to enforce compliance with the Agreement, or may seek any other relief afforded by law for violations of the Agreement, but only after providing Janssen an opportunity to respond to the notification described in subsection L.1, above; provided, however, the State of New York may take any action if the State believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

6.      In the event of a conflict between the requirements of the Agreement and any other law, regulation, or requirement such that Janssen cannot comply with the law without violating the terms of the Agreement or being subject to adverse action, including fines and penalties, Janssen shall document such conflicts and notify the State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Janssen's discovery of the conflict. Janssen shall comply with the terms of the Agreement to the fullest extent possible without violating the law.

7.      Janssen or the State may request that Janssen and the State meet and confer regarding the resolution of an actual or potential conflict between the Agreement and any other law, or between interpretations of the Agreement by different courts. Nothing herein is intended to modify or extend the jurisdiction of any single judicial authority as provided by law.

L.      **Compliance Duration**

1.      Subsections B-J of this Exhibit shall be effective for 10 years from the Effective Date.

2.      Nothing in this Agreement shall relieve Janssen of its independent obligation to fully comply with the laws of the State of New York after expiration of the 10-year period specified in this subsection.

M.      **Compliance Deadlines**

1.      Janssen must be in full compliance with the provisions included this Agreement by the Effective Date. Nothing herein shall be construed as permitting Janssen to avoid existing legal obligations.

**<u>Exhibit D</u>**

**COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---

IN RE OPIOID LITIGATION

---

*This document relates to*:

*The County of Suffolk, New York v. Purdue Pharma L. P.*, Case No. 400001/2017

*The County of Nassau, New York v. Purdue Pharma L. P.*, Case No. 400008/2017

Index No. 400000/2017

Hon. Jerry Garguilo

---

## STIPULATION OF DISCONTINUANCE WITH PREJUDICE

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, counsel of record for Plaintiffs Suffolk County, New York, Nassau County, New York, and for Defendants Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), that, pursuant to C.P.L.R. 3217, the following actions are hereby voluntarily discontinued with prejudice as to Janssen only, without costs as to any party against the other:

1. *The County of Suffolk, New York v. Purdue Pharma L. P.*, Case No. 400001/2017;

2. *The County of Nassau, New York v. Purdue Pharma L. P.*, Case No. 400008/2017.

Dated: June _____, 2021
New York, New York

**O'MELVENY & MYERS LLP**

/s/ *Charles C. Lifland*
Charles C. Lifland
(admitted *pro hac vice*)
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Phone: (213) 430-6000

**NAPOLI SHKOLNIK PLLC**

_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000

**COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---

IN RE OPIOID LITIGATION

_This document relates to_:

_The County of Suffolk, New York v. Purdue Pharma L. P._, Case No. 400001/2017

_The County of Nassau, New York v. Purdue Pharma L. P._, Case No. 400008/2017

Index No. 400000/2017

Hon. Jerry Garguilo

---

## STIPULATION OF DISCONTINUANCE WITH PREJUDICE

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, counsel of record for Plaintiffs Suffolk County, New York, Nassau County, New York, and for Defendants Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), that, pursuant to C.P.L.R. 3217, the following actions are hereby voluntarily discontinued with prejudice as to Janssen only, without costs as to any party against the other:

1. _The County of Suffolk, New York v. Purdue Pharma L. P._, Case No. 400001/2017;

2. _The County of Nassau, New York v. Purdue Pharma L. P._, Case No. 400008/2017.

Dated: June 25, 2021
New York, New York

**O'MELVENY & MYERS LLP**

_____
Charles C. Lifland
(admitted _pro hac vice_)
400 South Hope Street, 18th Floor Los Angeles, CA 90071
Phone: (213) 430-6000

**NAPOLI SHKOLNIK PLLC**

_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000

72

clifland@omm.com
*Counsel for Defendant Janssen*

sbadala@napolilaw.com

*Counsel for Plaintiff Nassau County*


**SIMMONS HANLY CONROY LLC**

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

*Counsel for Plaintiff Suffolk County*


So Ordered: _____       Date: _____
    Hon. Jerry Garguilo, J.S.C.

## <u>AFFIRMATION OF SERVICE</u>

I, _____, an attorney duly admitted to practice before the courts of this

State, hereby affirm under penalty of perjury that on June _____, 2021, I

caused the foregoing to be served via NYSCEF on counsel of record in this action.

_____

74

**<u>Exhibit E</u>**

| CITY OR COUNTY NAME[5] | COUNSEL MAIN | WITHIN COUNTY OR MULTIPLE COUNTIES | 2019 population estimate |
|---|---|---|---|
| ALLEGANY COUNTY | NAPOLI SHKOLNIK | | 46,091 |
| AMHERST TOWN | NAPOLI SHKOLNIK | ERIE COUNTY | 126,082 |
| AMSTERDAM CITY | NAPOLI SHKOLNIK | MONTGOMERY COUNTY | 17,766 |
| AUBURN CITY | NAPOLI SHKOLNIK | CAYUGA COUNTY | 26,173 |
| BUFFALO CITY | NAPOLI SHKOLNIK | ERIE COUNTY | 255,284 |
| CATTARAUGUS COUNTY | NAPOLI SHKOLNIK | | 76,117 |
| CAYUGA COUNTY | NAPOLI SHKOLNIK | | 76,576 |
| CHAUTAUQUA COUNTY | NAPOLI SHKOLNIK | | 126,903 |
| CHEEKTOWAGA TOWN | NAPOLI SHKOLNIK | ERIE COUNTY | 85,884 |
| CHEMUNG COUNTY | NAPOLI SHKOLNIK | | 83,456 |
| CHENANGO COUNTY | NAPOLI SHKOLNIK | | 47,207 |
| CLINTON COUNTY | NAPOLI SHKOLNIK | | 80,485 |
| CORTLAND COUNTY | NAPOLI SHKOLNIK | | 47,581 |
| ESSEX COUNTY | NAPOLI SHKOLNIK | | 36,885 |
| FRANKLIN COUNTY | NAPOLI SHKOLNIK | | 50,022 |
| GENESEE COUNTY | NAPOLI SHKOLNIK | | 57,280 |
| HAMILTON COUNTY | NAPOLI SHKOLNIK | | 4,416 |
| ITHACA CITY | NAPOLI SHKOLNIK | TOMPKINS COUNTY | 30,837 |
| KINGSTON CITY | NAPOLI SHKOLNIK | ULSTER COUNTY | 22,793 |

[5] This list is subject to confirmation prior to entry of the Consent Judgment.

76

| LANCASTER TOWN | NAPOLI SHKOLNIK | ERIE COUNTY | 43,325 |
|---|---|---|---|
| LIVINGSTON COUNTY | NAPOLI SHKOLNIK | | 62,914 |
| MADISON COUNTY | NAPOLI SHKOLNIK | | 70,941 |
| MOUNT VERNON CITY | NAPOLI SHKOLNIK | WESTCHESTER COUNTY | 67,345 |
| NASSAU COUNTY | NAPOLI SHKOLNIK | | 1,356,924 |
| NIAGARA COUNTY | NAPOLI SHKOLNIK | | 209,281 |
| OGDENSBURG CITY | NAPOLI SHKOLNIK | ST LAWRENCE COUNTY | 10,436 |
| ORLEANS COUNTY | NAPOLI SHKOLNIK | | 40,352 |
| OTSEGO COUNTY | NAPOLI SHKOLNIK | | 59,493 |
| POUGHKEEPSIE CITY | NAPOLI SHKOLNIK | DUTCHESS COUNTY | 30,515 |
| POUGHKEEPSIE TOWN | NAPOLI SHKOLNIK | DUTCHESS COUNTY | 44,062 |
| PUTNAM COUNTY | NAPOLI SHKOLNIK | | 98,320 |
| RENSSELAER COUNTY | NAPOLI SHKOLNIK | | 158,714 |
| ROCHESTER CITY | NAPOLI SHKOLNIK | MONROE COUNTY | 205,695 |
| SARATOGA SPRINGS CITY | NAPOLI SHKOLNIK | SARATOGA COUNTY | 28,212 |
| SCHOHARIE COUNTY | NAPOLI SHKOLNIK | | 30,999 |
| SCHUYLER COUNTY | NAPOLI SHKOLNIK | | 17,807 |
| STEUBEN COUNTY | NAPOLI SHKOLNIK | | 95,379 |
| TIOGA COUNTY | NAPOLI SHKOLNIK | | 48,203 |
| TOMPKINS COUNTY | NAPOLI SHKOLNIK | | 102,180 |
| TONAWANDA TOWN | NAPOLI SHKOLNIK | ERIE COUNTY | 71,675 |
| WARREN COUNTY | NAPOLI SHKOLNIK | | 63,944 |
| WESTCHESTER COUNTY | NAPOLI SHKOLNIK | | 967,506 |

| | | | |
|---|---|---|---|
| YATES COUNTY | NAPOLI SHKOLNIK | | 24,913 |
| BROOME COUNTY | SIMMONS HANLY CONROY LLC | | 190,488 |
| COLUMBIA COUNTY | SIMMONS HANLY CONROY LLC | | 59,461 |
| DUTCHESS COUNTY | SIMMONS HANLY CONROY LLC | | 294,218 |
| ERIE COUNTY | SIMMONS HANLY CONROY LLC | | 918,702 |
| FULTON COUNTY | SIMMONS HANLY CONROY LLC | | 53,383 |
| GREENE COUNTY | SIMMONS HANLY CONROY LLC | | 47,188 |
| HERKIMER COUNTY | SIMMONS HANLY CONROY LLC | | 61,319 |
| LEWIS COUNTY | SIMMONS HANLY CONROY LLC | | 26,296 |
| MONROE COUNTY | SIMMONS HANLY CONROY LLC | | 741,770 |
| NEW YORK CITY | SIMMONS HANLY CONROY LLC | MULTIPLE COUNTIES | 8,336,817 |
| ONTARIO COUNTY | SIMMONS HANLY CONROY LLC | | 109,777 |
| ORANGE COUNTY | SIMMONS HANLY CONROY LLC | | 384,940 |
| OSWEGO COUNTY | SIMMONS HANLY CONROY LLC | | 117,124 |
| SARATOGA COUNTY | SIMMONS HANLY CONROY LLC | | 229,863 |
| SCHENECTADY COUNTY | SIMMONS HANLY CONROY LLC | | 155,299 |
| SENECA COUNTY | SIMMONS HANLY CONROY LLC | | 34,016 |
| ST LAWRENCE COUNTY | SIMMONS HANLY CONROY LLC | | 32,261 |
| SUFFOLK COUNTY | SIMMONS HANLY CONROY LLC | | 1,476,601 |
| SULLIVAN COUNTY | SIMMONS HANLY CONROY LLC | | 75,432 |
| ULSTER COUNTY | SIMMONS HANLY CONROY LLC | | 177,573 |
| WASHINGTON COUNTY | SIMMONS HANLY CONROY LLC | | 61,204 |
| WYOMING COUNTY | SIMMONS HANLY CONROY LLC | | 39,859 |

**Exhibit F**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

IN RE OPIOID LITIGATION

Index No. 400000/2017

Hon. Jerry Garguilo

## CASE MANAGEMENT ORDER

This Case Management Order ("CMO") shall apply to all plaintiffs with cases pending as of [*Date of Final Court Approval of Settlement*] against Defendants and to all new plaintiffs filing cases after that date against Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are pending in this coordinated proceeding and not released by the Settlement Agreement in this action entered into on [*settlement date*] ("Settlement Agreement").  As used herein, "Defendants" refers to Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.  Pursuant to the order of the Coordination Panel, all such new cases filed in the State of New York shall be assigned to the *In re Opioids Cases* Litigation pending before this Court and shall be subject to the terms of this CMO.

Good cause appearing, it is ordered as follows:

A.      **Filing of Amended Complaints**

1.      Each Plaintiff with an existing case as of [*Date of Final Court Approval of Settlement*], shall file and serve on Defendants within ninety (90) days of that date an Amended Complaint satisfying the requirements of the Civil Practice Law and Rules ("CPLR") and this CMO, if that Plaintiff's case is not dismissed with prejudice prior to this deadline pursuant to the

80

Settlement Agreement.  Plaintiff's counsel shall comply with Rule 3025 of the CPLR when filing any such Amended Complaint.

2.      The time for Defendants to file a response to a new Complaint or Amended Complaint shall not begin to run until after the receipt by counsel for the Defendants of the Case-Specific Expert Report(s) required pursuant to this CMO, and after the claims process is concluded as described in Section B.3 below, whichever is later.

**B.**      **Plaintiffs' Requirement to Produce Certain Specified Information About Their Claims**

1.      **Plaintiffs' Production Requirements.**  Each Plaintiff shall serve the following documents and/or information upon counsel for Defendants:

(a)      **Fact Sheet.**  If not already completed, executed, and served, each Plaintiff shall serve upon the Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached as Exhibit A to Case Management Order No. 2. Each Plaintiff that has already completed, executed, and served a compliant Fact Sheet shall serve upon the Defendants within the deadlines specified herein an updated Fact Sheet reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies. Simultaneously with its service of its Fact Sheet or affirmation, each Plaintiff shall serve upon Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement and the state and regional abatement fund provided therein.

(b)     **Record Production.**

(i)     Each Plaintiff shall produce all records establishing the existence of a public nuisance within the Plaintiff's territory or borders, including a definition of the nuisance and evidence to support its existence.

(ii)     Each Plaintiff shall produce all records supporting a claim for nuisance "abatement" relief within the Plaintiff's territory or borders, including a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief.

(iii)     Each Plaintiff shall produce all records supporting a claim of damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages.  Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

(iv)     For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature of the expenditures, including how they will address any and all alleged harms.  Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(v)     Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

(c)     **Affidavit.**  An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit A to the Court's Case Management Order No. 2; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO.  If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)     **Expert Reports.**  Each Plaintiff shall serve on counsel for Defendants a case-specific expert report or reports executed by a qualified expert, under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report").  The Case-Specific Expert Report shall include all matter required to comply with Commercial Division Rule 13, New York law, and at least:

(i)     *Plaintiff's Information*.  The Plaintiff's name;

(ii)     *Expert's Information*.  The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)     *Plaintiff's Records*.  All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)     *Reliance Materials*.  All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)     *Locations*.  If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how

Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

      (vi)  *Subjects of Report(s)*.  The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

        (1)  Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

        (2)  Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

        (3)  Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that conduct;

        (4)  An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and Defendants' alleged conduct and the basis for that opinion;

        (5)  An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

2.    **Deadline to comply.**

(a)    For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

(b)    For each Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3.    **Failure to comply.**

(a)    *Notice of Non-Compliance and Opportunity to Cure.* If any Plaintiff fails to comply with any provision of this Order, Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

(b)    *Failure to Cure.* If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

(c)    *Extensions of Time.* The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

C.    **Discovery on Statute of Limitations and Other Time-Based Defenses**

      1.    Plaintiffs must, within the time frames established by Section B.2, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its complaint may be related to Defendants' conduct; (2) how the Plaintiff first learned the harms alleged in its complaint may be related to Defendants' conduct; (3) the date the Plaintiff first spoke to or corresponded with an attorney about potential litigation in this matter; and (4) the date the Plaintiff first retained counsel for litigation in this matter.  Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each such Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

D.    **Case-Specific Discovery and Related Dispositive Motion Practice**

      1.    If a Plaintiff complies with the production requirements outlined above in Sections B and C, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and *Frye* motions, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

      2.    During such discovery, the Parties are permitted to: serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition.  If a Plaintiff serves any written discovery upon

Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery.  The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendant at this time.  No other depositions may be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

3.     If a case survives the Defendant's summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues.  Discovery with regard to any other defendants will be addressed at this time as well.  The filing and briefing of summary judgment motions and *Frye* motions after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and *Frye* motions after completing full fact and expert discovery.  The Court's use of the term "non-duplicative" is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or *Frye* motions concerning witnesses addressed in *Frye* motions filed at the conclusion of the expedited discovery period.

4.     The foregoing provisions do not preclude any Party or other defendant from filing non-duplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.

Dated: _____              _____
                                     Jerry Gargiulo
                                     Justice