## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL 2804** |
| **THIS DOCUMENT RELATES TO:** | **Case No. 1:17-md-2804** |
| *Track Three Cases:* | **Judge Dan Aaron Polster** |
| *County of Lake, Ohio v.* <br> *Purdue Pharma, L.P., et al.,* <br> *Case No. 18-op-45032* | **<u>ABATEMENT ORDER</u>** |
| *County of Trumbull, Ohio v.* <br> *Purdue Pharma, L.P., et al.,* <br> *Case No. 18-op-45079* | |

### Introduction

In this Multidistrict Litigation, the Court has so far set 11 bellwether trials. The chosen cases all include as defendants various types of participants in the opioid drug industry, including: manufacturers (who make the opioids); distributors (who convey the opioids down the supply chain); and pharmacies (who dispense the opioids to end-user patients). In each bellwether case, the plaintiffs are local governmental entities—that is, cities and counties[1]—which assert, among other claims, that the defendants' actions and non-actions led to a severe oversupply of prescription opioids, which ultimately created a public nuisance.

The coordinated bellwether cases known as "Track One," presided over by the undersigned, were brought by Ohio's Summit County and Cuyahoga County. The cases settled on the eve of trial.

---

[1] In one bellwether trial case, the plaintiff is a Native American Indian Tribe.

"Track Two" was a bench trial before the Honorable David A. Faber in the Southern District of West Virginia. The three trial defendants in Track Two were all opioid distributors (McKesson, Cardinal, and AmerisourceBergen—the "Big Three Distributors"), while the plaintiffs were two West Virginia political subdivisions (the City of Huntington and Cabell County). Before trial, the Big Three Distributors settled opioid claims with nearly all political subdivisions in the other 49 States, for a total of about $21 Billion, but West Virginia subdivisions did not participate. Judge Faber recently issued an opinion concluding, among other things, that: (1) the Supreme Court of West Virginia would not "extend the law of public nuisance to the sale, distribution, and manufacture of opioids;" and (2) even if it did, the plaintiffs "failed to show that defendants' conduct interfered with a public right." *City of Huntington v. AmerisourceBergen Drug Corp.*, 2022 WL 2399876, at *59 (S.D.W.Va. July 4, 2022) (hereinafter, "*Huntington*").[2]

"Track Four" was also a bench trial before the Honorable Charles R. Breyer in the Northern District of California. The plaintiffs in Track Four were the City and County of San Francisco, and the sole defendant at trial was Walgreens. Judge Breyer bifurcated the trial, with the first phase directed only at determining whether Walgreens was liable for public nuisance. Judge Breyer recently held that "Walgreens substantially contributed to an opioid epidemic with far-reaching and devastating effects across San Francisco," and a second phase of trial "will be held to determine the extent to which Walgreens must abate the public nuisance it helped to create." *City & Cty. of San Francisco v. Purdue Pharma*, 2022 WL 3224463, at *60 (N.D. Cal. Aug. 10, 2022) (hereinafter, "*San Francisco*").

---

[2] The Track Two plaintiffs have appealed this decision to the Fourth Circuit. *See Plaintiffs' Joint Notice of Appeal* (docket no. 343, Case No. 3:17-cv-1665 (S.D.W.Va.)).

The instant Order issues in "Track Three," where two Ohio Counties—Lake County and Trumbull County—bring public nuisance claims against three pharmacies: CVS, Walmart, and Walgreens. Unlike Judge Faber's and Judge Breyer's cases, which are fully bench trials, Track Three was bifurcated, with the question of liability tried to a jury in "Phase I." After the jury found for Plaintiffs, the case entered Phase II, where the question of the appropriate abatement remedy was tried to this Court. Thus, this Order now sets out what the three Pharmacy Defendants must do to abate[3] the public nuisance found by the jury in Phase I.

To summarize, for all of the reasons set forth below, the Court reaches the following conclusions.

- The Court concludes that the multi-pronged abatement plan proposed by Plaintiffs' expert Dr. Alexander is necessary and appropriate, except as noted below. The abatement plan as proposed has an estimated cost of approximately $1.481 Billion over 15 years for Lake County, and $1.848 Billion over 15 years for Trumbull County, for a total of $3.329 Billion.

- The Court further concludes, however, that certain specific programs and interventions included within Alexander's plan are not reasonably calculated to abate directly the actual, unreasonable interferences with public health caused by the Pharmacy Defendants. Specifically, the Court concludes the total cost of programs included in Alexander's original plan that are not reasonably calculated to abate the opioid nuisance amounts to 6.3% of the costs for Lake County and 7.9% of the costs for Trumbull County. Defendants' responsibility for funding the abatement plans must be reduced accordingly.

- The Court also concludes a reduction is necessary to account for opioid addiction and abuse that would have occurred even in the absence of Defendants' wrongful conduct. Specifically, the Court accepts defense expert Dr. Chandra's calculation that 66.2% of the abatement costs for Lake County and 60.7% of the abatement costs for Trumbull County are attributable to Defendants' oversupply of prescription opioids (meaning 33.8% of the abatement costs for Lake County and 39.3% of the abatement costs for Trumbull County

---

[3] "To abate," as the Court uses it here, means "to stop, eliminate, mitigate or otherwise meaningfully ameliorate." *See Englewood v. Turner*, 897 N.E.2d 213, 221 (Ohio Ct. App. 2008) ("'To abate' means 'to put an end to, to nullify or to become void.'") (citation omitted); Merriam-Webster, https://www.merriam-webster.com/dictionary/abate ("1a: to put an end to; b: nullify; 2a: to reduce in degree or intensity: moderate").

are *not* attributable to Defendants' conduct). Again, Defendants' responsibility for funding the abatement plans must be reduced accordingly.

- The Court further concludes it is equitable and fair to allocate one-third (33%) of the recoverable abatement costs to the Pharmacy Defendants for the harm caused by improper dispensing conduct in the Counties. This allocation takes into account the fact that conduct of all three categories of actors along the pharmaceutical supply chain – that is, manufacturers, distributors, and dispensers of prescription opioids – contributed to the nuisance in this case, and it would be inequitable to hold the Pharmacy Defendants liable for more than a one-third share. The Court further concludes it is not appropriate to subdivide this allocation further by reducing the Pharmacy Defendants' responsibility based on their market share.

- Combining the conclusions above leads to the result that the Pharmacy Defendants will be jointly and severally responsible for 20.67% of the costs of Alexander's original abatement plan in Lake County, or approximately $306.2 Million over 15 years; and 18.63% of the costs of Alexander's original abatement plan in Trumbull County, or approximately $344.4 Million over 15 years (for a total of approximately $650.6 Million). The Court concludes it is appropriate to order the Pharmacy Defendants to pay immediately into an Abatement Fund two-years' worth of these amounts, or a total of $86.7 Million.

- The Court concludes it is appropriate to appoint an Administrator to oversee the Abatement Fund, over which the Court will retain continuing jurisdiction. The cost of the Administrator will be paid by Defendants.

- Finally, the Court concludes it is appropriate to enter an injunction directing that the Pharmacy Defendants undertake certain actions to ensure they are complying fully with the Controlled Substances Act and avoiding further improper dispensing conduct. Accordingly, as a part of this Abatement Order, the Court enters an Injunction Order containing terms similar to those in the "Settlement Agreement Regarding Injunctive Relief" recently entered between the Florida Attorney General and defendants CVS and Walgreens.

I.     **Litigation History Leading up to this Order**

As of this writing, there are over 3,000 cases consolidated in this Opioid MDL. As noted, the defendants named in these cases generally fall into three categories: manufacturers, distributors, and pharmacies. This Court set for trial two cases in "Track One," focusing on claims against the manufacturers and distributors. After the Track One individual cases settled, many of the largest manufacturers and distributors went on to reach national or state-wide settlements, some

through bankruptcy. These resolutions include claims against Johnson & Johnson, Malinckrodt, Endo, Teva, Allergan, Purdue Pharma, the Big Three Distributors, and others. In sum, a large swath of the MDL—that is, nearly all claims by governmental subdivisions against large manufacturers and distributors—has largely resolved. In contrast, one of the biggest remaining MDL segments is subdivisions' claims against large pharmacies.[4]

Accordingly, on April 16, 2020, the Court announced it would select cases "for a Track [Three] bellwether trial in the Northern District of Ohio, at which will be decided: (1) only public nuisance claims (2) against only the pharmacy defendants (2) in their roles as distributors and dispensers." *Order Regarding Track One-B and Track Three* at 2 (docket no. 3261). The Court eventually chose two cases for the Track Three trial: *County of Lake, Ohio v. Purdue Pharma, L.P. et al.*, Case No. 1:18-OP-45032 (N.D. Ohio); and *County of Trumbull, Ohio v. Purdue Pharma, L.P. et al.*, Case No. 1:18-OP-45079 (N.D. Ohio). *See Order Regarding Track Three* (docket no. 3282).

Earlier, during Track One, the Court had received briefs from the parties on whether the trial should be to a jury or to the bench. The Court concluded "that public nuisance liability will be determined by the jury. If liability attaches, the Court will separately fashion remedies." *Order Regarding Adjudication of Plaintiffs' Public Nuisance Claim* at 1 (docket no. 2629).[5] *See also Order Regarding Apportionability and Apportionment* at 3 (docket no. 3579)[6] (noting the Track

---

[4] Other remaining segments of the MDL include: (1) governmental subdivision claims against smaller, regional defendants; (2) claims by hospitals against all defendants; and (3) claims by third-party payors against all defendants.

[5] *In re Opiate*, 2019 WL 4621690, at *1 (N.D. Ohio Sept. 24, 2019).

[6] *In re Opiate*, 2020 WL 7330956, at *2 (N.D. Ohio Dec. 9, 2020).

One "parties' briefs made clear that virtually all of them agreed to this division of responsibility").

The Court ruled it would also use this two-Phase approach in Track Three. *Id.* at 4.[7]

Beginning on October 5, 2020, the undersigned presided over trial to a jury of Phase I of Track Three. Originally, the Track Three pharmacy defendants included Rite Aid, Giant Eagle, CVS, Walmart, and Walgreens; however, Rite Aid and Giant Eagle settled before or during Phase I. On November 23, 2021, after six weeks of presentation of evidence at trial, the jury deliberated for a week and found for Plaintiffs and against all three remaining defendants. Specifically, the jury concluded that both Lake and Trumbull Counties had "prove[d], by the greater weight of the evidence," that: (1) "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels, is a public nuisance in [the Plaintiff Counties]; and (2) each of the three defendants (CVS, Walmart, and Walgreens) "engaged in intentional and/or illegal conduct which was a substantial factor in producing the public nuisance." *Verdict Form* (docket no. 4176). With this conclusion, the jury affirmed that each defendant had "caused a significant and ongoing interference with a public right to health or safety" that is "ongoing today." *Jury Instructions* at 17 (docket no. 4206-1).

Following the verdict, the three Pharmacy Defendants submitted Rule 50 and Rule 59 motions. After extensive briefing, the Court concluded that: (1) the verdict was supported by the

---

[7] In its Order concluding that Phase I of Track Three would be tried to a jury, the Court observed: "if the Sixth Circuit later concludes the Court should have made its own findings of fact and conclusions of law regarding nuisance liability, the Court could prepare them expeditiously on remand without any need for a new trial." *Order Regarding Adjudication of Plaintiffs' Public Nuisance Claim* at 9 (docket no. 2629) (*In re Opiate*, 2019 WL 4621690, at *5 (N.D. Ohio Sept. 24, 2019)). Here, the Court simply observes that, based on all of the evidence adduced in Phase I, it agrees with the jury's ultimate conclusions. It also bears noting that the Court allowed the jury to submit written questions to be asked of the witnesses. The parties and the Court all agreed that the jury was extremely engaged and deliberative.

weight of the evidence, *see Order Denying JMOL* at 6, 21, 26, 29 (docket no. 4295);[8] and (2) Defendants were not entitled to a new trial. *See Order Denying New Trial* (docket no. 4296).[9]

In light of the jury's verdict, the Court presided over Phase II of Track Three from May 10–18, 2022. In several orders, the Court described the role it would play in Phase II. For example, in the context of ruling on *Daubert* motions in Track One, the Court explained as follows:

> In a traditional public nuisance case, a municipal entity who is harmed by the maintenance of a nuisance will give notice to and ask the offending party to abate the nuisance. If the offending party is unable or unwilling to abate, the harmed party can, when appropriate, abate the nuisance themselves or ask the court for the right to do so, and then seek compensation for the costs of abating the nuisance. This compensation is equitable in nature. The goal is not to compensate the harmed party for harms already caused by the nuisance. This would be an award of damages. Instead, an abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward.
>
> The opioid crisis litigation is, as this Court has repeatedly stated, unlike any other case. One example is that the opioid crisis is so massive that Plaintiffs cannot possibly hope to remedy it on their own without additional, substantial financial resources. If Defendants are eventually found liable for creating the opioid crisis, there is no realistic way the Court could order either that: (1) Defendants abate the crisis themselves (Defendants do not have the requisite infrastructure), or (2) Plaintiffs abate the crisis and then order Defendants to pay Plaintiffs the costs incurred in doing so (Plaintiffs do not have the financial resources). Thus, the Court must, if Defendants are found liable, have some mechanism to predict and fairly award prospective future costs to abate the crisis.
>
> In Ohio, "[w]hen a nuisance is established, the form and extent of the relief designed to abate the nuisance is within the discretion of the court." 72 Ohio Jur. 3d Nuisances § 49. Thus, the Court, exercising its equitable powers, has the discretion to craft a remedy that will require Defendants, if they are found liable, to pay the prospective costs that will allow Plaintiffs to abate the opioid crisis. The issue, and thus the "pertinent inquiry" to which a "valid scientific connection" must be made under *Daubert*, is to determine what is an appropriate remedy that will abate [the public nuisance of] the opioid crisis, and what that remedy will cost.

---

[8] *In re Opiate*, 2022 WL 671219, at *3, 10, 12, 14 (N.D. Ohio March 7, 2022).

[9] *In re Opiate*, 2022 WL 668434 (N.D. Ohio March 7, 2022).

*CT1 Daubert Order re Abatement* at 2–3 (docket no. 2519).[10]

The Court also made clear that its determination of the appropriate abatement remedy must include what share of that remedy these Defendants must shoulder. *See Order Regarding Apportionability and Apportionment* at 4 (docket no. 3579)[11] (if the jury finds defendants liable for public nuisance, "then it is **for the Court** to decide all matters connected to abatement, including: (a) whether and how the nuisance can be abated; (b) if abatement is possible, whether the costs of abatement can be apportioned to the defendants on some logical or reasonable basis, or instead those costs must be borne by defendants jointly and severally; and (c) if the costs can be apportioned, what the apportionment should be") (emphasis in original).

Finally, the Court repeatedly told the parties that, if the jury determined Defendants owed redress to Plaintiffs, that remedy would almost certainly have to include injunctive relief.[12] Thus, after the jury found for plaintiffs in Phase I, the Court directed counsel to submit proposals regarding injunctive relief, and to meet and confer to try and reach as much agreement as possible.

Unfortunately, the Defendants' submissions related to Phase II were almost entirely unhelpful to the Court. For example, the parties reached agreement on nothing at all related to

---

[10] *In re Opiate*, 2019 WL 4043938, at *1 (N.D. Ohio Aug. 26, 2019).

[11] *In re Opiate*, 2020 WL 7330956, at *2 (N.D. Ohio Dec. 9, 2020).

[12] Indeed, the topic of injunctive relief first arose years ago: the earliest settlement discussions in this MDL occurred between the Plaintiffs Executive Committee, State Attorneys General, and Purdue Pharma, eventually bearing fruit in bankruptcy court; and Purdue's agreement on the scope of injunctive relief came even before agreement on financial terms. *See In re Purdue Pharma, L.P.*, case no. 19-23649, docket no. 356 at ECF pages 15–28 (Bankr. S.D.N.Y. Apr. 29, 2022) (agreed injunctive relief). Similarly, the national global settlements by the Big Three Distributors and Johnson & Johnson in this MDL each include lengthy agreements regarding injunctive relief, *see, e.g., Janssen Settlement Agreement* at pageID 573058-070 (docket no. 4302-2), as does the statewide settlement of opioid litigation between the Florida Attorney General and defendants CVS and Walgreens. *See, e.g, Walgreens Fla. Settlement Excerpt* at pageID 586838-850 (docket no. 4513-1).

injunctive relief. Even knowing they had been found liable, Defendants agreed to virtually none of the changes in conduct proposed by Plaintiffs.

Defendants also largely ignored the Court's directives to submit their own proposed abatement plan, and not to merely attack and criticize Plaintiffs' proposed abatement plan. Despite the Court's order that the parties each propose a detailed plan for abatement, initially only the Plaintiffs proposed one. Upon further Court order compelling them to submit a plan, Defendants eventually submitted three paragraphs suggesting a proper abatement remedy would be comprised of drug takeback programs to facilitate disposal of diverted opioids—and nothing more.[13] But Defendants did not produce any evidence at the Abatement Trial, either through their own witnesses or through cross-examination of Plaintiffs' experts, that would support a finding that drug takeback programs, standing alone, would effectively abate the nuisance in the Counties. Defendants, instead, chose to challenge the legal validity, rather than the practical effectiveness, of all or various portions of Plaintiffs' plan.

---

[13] On January 3, 2022, the Court held a status conference regarding the Phase II abatement proceeding. During the conference, the Court ordered each party to submit a separate abatement plan. On January 4, 2022, the Court issued an order setting deadlines and requirements for these abatement plans. *See Order Regarding Abatement Proceeding* (docket no. 4220). Plaintiffs submitted a plan that met the Court's requirements. Defendants did not. Instead, Defendants only submitted a brief "concerning Plaintiffs' abatement plan." *Defs Br. Concerning Pls Abatement Plan* (docket no. 4315). Plaintiffs moved to compel Defendants to submit a plan that met the Court's requirements, (docket no. 4317), which the Court granted, docket no. 4319. On March 28, 2022, Defendants submitted their "abatement plan," which consisted of three paragraphs stating that "abatement should be limited to drug disposal programs," and ten more pages primarily reiterating arguments from prior briefing. *See Defs Abatement Plan* at 1 (docket no. 4337). Nowhere, for example, did Defendants discuss whether their so-called plan would effectively abate any nuisance, no matter how defined (not even the narrowly defined nuisance Defendants proposed). Although the Court sometimes refers to it as such below, under only the most charitable reading can Defendants' submission be considered an "abatement plan."

After the close of the Phase II trial, Defendants again squandered the opportunity to propose a meaningful plan to abate the nuisance.[14] Having done so, it appears Defendants have effectively forfeited any right to assert on appeal that the Court's abatement plan, which is a reduced version of Plaintiffs' plan, would be ineffective, or should include any element or aspect not suggested by Plaintiffs. At the same time, the Plaintiffs' plan is unrealistic because it asks for the sun and the moon: over $3.0 Billion from these three Defendants alone, jointly and severally.

---

[14] Walgreens and Walmart again argued the Court should allow abatement funding only of programs for safe disposal and take-back of opioids. *See* Walgreens' and Walmart's Closing Brief at 47 (docket no. 4511). But acknowledging the Court's request for a more equitable and comprehensive abatement proposal, these Defendants offered five different options that would allow Plaintiffs to recover one-year abatement awards that, combined for both Counties, range from approximately $4 million to $12 million for Walgreens, and $250,000 to $2 million for Walmart. *See id.* at 3. Generally speaking, these alternative proposals include: (1) a number of variations in the allowed costs; (2) from which would be subtracted the amounts Plaintiffs received from other settlements; and (3) the balance of which would then be divided by two, to attribute 50% of the dispensing responsibility to prescribers. *Id.* at 47-53. Walgreens and Walmart contend the final number of this calculation should then be allocated based on total dispensing market share, or total red-flag market share, as determined by defense expert Chandra.

CVS, for its part, again proposed the abatement remedy should be limited solely to injunctive relief aimed at reducing the oversupply of prescription opioids, with no monetary funding. *See* CVS Abatement Phase Post-Trial Brief at 27-28 (docket no. 4512). In response to the Court's request for a more equitable and comprehensive abatement proposal, CVS offered an alternative remedy requiring CVS to fund, for one year, 20 to 50% of the costs of treating specific persons for OUD upon the showing of certain criteria, including: "that CVS pharmacies in the counties filled opioid prescriptions for the resident and … that such prescriptions were sufficient to be deemed a cause of the person's condition." *Id.* at 29-32. CVS further contends that, if the Court allows funding for additional programs over CVS's objection, such funding should be limited to "programs and services that prevent overdose and connect individuals who used prescription opioids to addiction treatment." *Id.* at 32. CVS asserts these programs should be limited to: naloxone distribution and training; a telephone help-line; peer-recovery coaches; the Quick Response Team; and bridge programs to connect people in emergency rooms who have overdosed to addiction treatment. *Id.*

The common thread in the three Pharmacy Defendants' proposals is that the abatement programs they suggest would do virtually nothing to actually abate the nuisance the jury found they helped to create.

There is no way this Court would enter such a blue-sky order, nor any likelihood the Sixth Circuit would ever affirm it.

All of this brings us to the present moment, where the undersigned must do something no federal Judge in history has had to do: determine in equity the scope and cost of the measures necessary to address a small piece of a terrible and tenacious and escalating national tragedy. Specifically, the Court must adopt a program reasonably calculated to abate a public nuisance in Lake and Trumbull Counties caused in significant part by the three Pharmacy Defendants' over-dispensing of prescription opioids, and then decide what share of that program's costs should be paid by these Defendants.

There is no existing model for such an abatement program. The federal government correctly characterizes the nuisance that needs abating as a complex "epidemic," an ongoing "public health emergency," and a serious "crisis … with devastating consequences."[15] On a national level, these consequences include addiction and death of hundreds of thousands of adults, children, and even newborns, across all socio-economic strata and every demographic.[16] Given the scope of the entire MDL and the enormity of the stakes, there are days the Court feels inadequate to meet the task.

The Court gathers strength, however, from an ancient aphorism: "You are not obligated to complete the work, but neither are you free to desist from it."[17] With this Order, the Court takes another small step toward completing the work of this MDL. Specifically, this Abatement Order

---

[15] *See* https://www.hhs.gov/opioids/about-the-epidemic/index.html.

[16] *See San Francisco*, 2022 WL 3224463, at *6 (finding that, in the Bay Area, like the rest of the nation, opioid use has "increased across race, gender, and social class").

[17] Rabbi Tarfon, *Pirkei Avot* 2:21.

helps to resolve the dispute between some of the parties in two of the 3,000 MDL cases. The Court has used its very best efforts to reach a fair and reasoned resolution, with hope that this Order (and all of the Orders leading up to it) will help the parties and the nation come to a quicker "completion of the work."

## II.     Equitable Principles

As the Court considers all of the evidence and briefing adduced in both the Phase I and Phase II trials, the Court is governed by the following overarching principles in reaching its conclusions regarding abatement.

"[A] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999). "The essence of equity jurisdiction has been the power of the [Court] to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 51 (2008). "The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Weinberger v. Romero‒Barcelo*, 456 U.S. 305, 312 (1982) (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329‒30 (1944)).

"Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). "The task is to correct, by a balancing of the individual and collective interests, the [offensive] condition." *Id.* "An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound

discretion which guides the determinations of courts of equity." *Meredith v. Winter Haven*, 320 U.S. 228, 235 (1943).

"The judicial power to enjoin public nuisance at the instance of the Government has been a commonplace of jurisdiction in American judicial history." *United Steelworkers of Am. v. United States*, 361 U.S. 392 (1959). "The ground of [equity] jurisdiction in cases of … public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy, than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. *Mugler v. Kansas*, 123 U.S. 623, 673 (1887). Equity "is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury." *Id.*

Ohio and federal law are in agreement. "Equity is a jurisprudence which grew from the need to provide remedies unavailable or inadequate at common law. This provisioning had the effect of relieving the harshness implicit in legal remedies which fell short of the relief needed to correct a wrong." *City of Seven Hills v. City of Cleveland*, 439 N.E.2d 895, 902 (Ohio Ct. App. 1980). Thus, a court sitting in equity has the "power to rectify" the problem "when the crisis is severe." *Id.* Equity's "plasticity is such that one can say with some assurance that the perimeter of its authority will expand to fit the size of whatever problem is properly before a court with equity powers." *Id.*

"Under the principles of equity, the Court has broad powers to fashion effective relief, even though it may have to retain a continuing jurisdiction to modify or change orders granted."

*Biechele v. Norfolk & W. Ry. Co.*, 309 F. Supp. 354, 359 (N.D. Ohio 1969). "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need." *System Fed'n No. 91, Ry. Emps. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961). "If the [injunctive] relief originally ordered has not produced the intended result, the Court 'should modify the decree so as to achieve the required result with all appropriate expedition.'" *Lacoste Alligator S.A. v. Gderick.com*, 2014 WL 12536969, at *1 (S.D. Fla. Nov. 19, 2014) (quoting *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 252 (1968)). Thus, the Supreme Court itself has entered orders granting injunctive relief and retaining jurisdiction to modify that relief in case of "[a]ny change in conditions making modification of the decree or the granting of further relief necessary or appropriate." *Nebraska v. Wyoming*, 507 U.S. 584, 588 (1993) (quoting *Nebraska v. Wyoming*, 325 U.S. 589, 671–72 (1945)). *See Brown v. Plata*, 563 U.S. 493, 542 (2011) ("The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.").

## III.    Discussion of Public Nuisance

### A.    Ohio Law on Public Nuisance

In its Track Three order denying Defendants a new trial, the Court went to great lengths to describe and analyze public nuisance law in Ohio, which formed the legal underpinnings of its jury instructions. *See Order Denying New Trial* at 52–69 (docket no. 4296).[18] The Court briefly reiterates some of the most salient points here.

---

[18] *In re Opiate*, 2022 WL 668434, at *27-37 (N.D. Ohio March 7, 2022).

The Ohio Supreme Court has expressly affirmed that public nuisances have historically encompassed activity and/or conditions that extend beyond real property. *See Taylor v. City of Cincinnati*, 55 N.E.2d 724, 727 (Ohio 1944) ("[Nuisance law] comprehends not only the wrongful invasion of the use and enjoyment of property, but also the wrongful invasion of personal legal rights and privileges generally."). This principle was reaffirmed and expressly applied to public nuisances by Ohio's high court over 50 years later: "Contrary to appellees' position, there need not be injury to real property in order for there to be a public nuisance." *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002); *see id*. ("Unlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land.") (quoting Restatement of the Law 2d, Torts § 821B, cmt. h (1965)).

In *Beretta*, the plaintiff asserted public nuisance claims against handgun manufacturers and trade associations, alleging they "manufactured, marketed, and distributed their firearms in ways that ensure[d] the widespread accessibility of the firearms to prohibited users, including children and criminals." 768 N.E.2d at 1140. Finding these allegations sufficiently stated a public nuisance claim under Ohio law, the Ohio Supreme Court relied on the definition of "public nuisance" stated in Restatement (2d) Torts § 821B. Specifically, the Ohio Supreme Court recognized that an "unreasonable interference" with a public right includes: "[1] acts that significantly interfere with public health, safety, peace, comfort, or convenience, [2] conduct that is contrary to a statute, ordinance, or regulation, or [3] conduct that is of a continuing nature or one which has produced a permanent or long-lasting effect upon the public right, an effect of which the actor is aware or should be aware." *Id*. at 1142.

Applying this definition to the claims in *Beretta*, the Ohio Supreme Court upheld as viable a public nuisance claim that was virtually identical to the one alleged by Plaintiffs in this case. The

similarity of the claims is shown by replacing "firearms" with "opioids" in the Ohio Supreme

Court's own description of the claim:

> [Each Plaintiff] alleged in its complaint that [the Pharmacy Defendants] have created and maintained a public nuisance by … marketing, distributing, and selling [opioids] in ways that unreasonably interfere with the public health, welfare, and safety in [the Plaintiff Counties] and that the residents of [the Counties] have a common right to be free from such conduct. [Plaintiffs] further alleged that [the Pharmacy Defendants] know, or reasonably should know, that their conduct will cause [opioids] to be used and possessed illegally and that such conduct produces an ongoing nuisance that has a detrimental effect upon the public health, safety, and welfare of the residents of [the Plaintiff Counties].

*Id.* at 1141.

The Ohio Supreme Court also expressly rejected the assertion that "Ohio's nuisance law

does not encompass injuries caused by product design and construction, but instead is limited to

actions involving real property or to statutory or regulatory violations involving public health or

safety." *Id*. at 1142. Further, the court affirmatively held a public nuisance claim is viable "[e]ven

though there exists a comprehensive regulatory scheme involving the manufacturing, sales, and

distribution of [opioids]." *Id*. at 1143 (again, replacing "firearms").[19] In light of the Ohio Supreme

Court's rulings in *Beretta*, Ohio law on public nuisance easily embraces the claims brought by

Plaintiffs here.[20]

---

[19] After *Beretta* was decided, the Ohio General Assembly amended the definition of "product liability claim" under the Ohio Product Liability Act ("OPLA") to include public nuisance claims arising from "the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product." O.R.C. § 2307.71(A)(13). The Court has determined that Plaintiffs' claims do not fall under this definition, so they are not abrogated by OPLA. *See* T3 Order denying JMOL at 29-33 (docket no. 4295), *In re Opiate*, 2022 WL 671219, at *14-16 (N.D. Ohio March 7, 2022) (concluding Plaintiffs' public nuisance claims do not meet OPLA's definitional requirements of a "product liability claim" because, *inter alia*, they do not arise from a defective product or seek compensatory damages).

[20] Thus, Ohio law on public nuisance is entirely different from West Virginia law on public nuisance as interpreted by Judge Faber. Judge Faber found the West Virginia Supreme Court "has

B.      **Conduct versus Harm**

The parties post-trial briefs reveal disagreement about what precisely is the nuisance that

the jury found. Plaintiffs tend to characterize the nuisance as the "opioid epidemic." *Plaintiffs'*

*Closing Brief* at 6 (docket no. 4513) ("Due to the pervasiveness of the *opioid epidemic* and the rate

of relapse of OUD [opioid use disorder] in this population, only a robust and continuous plan with

periodic measurements of success followed by reaction and modification of the remedies can really

work.") (emphasis added); *Plaintiffs' Omnibus Response* at 5 (docket no. 4571) (asserting that

future damages, alone, are "nowhere near enough to abate the *nuisance*. Unless Plaintiffs can go

---

only applied public nuisance law in the context of conduct that interferes with public property or resources," and concluded it would not extend public nuisance law to cover the marketing and sale of opioids. *Huntington*, 2022 WL 2399876 at \*59. In contrast, the Ohio Supreme Court concluded public nuisance is not limited to claims of "interference with use and enjoyment of land." *Beretta*, 768 N.E.2d at 1142.

The Pharmacy Defendants point to Judge Faber's opinion, suggesting it shows the jury's liability finding in this case is flawed. Obviously, whether the evidence in *Huntington* established liability for the Distributors' conduct under West Virginia law is a separate determination from the jury's decision regarding the Pharmacies' liability in this case. Indeed, Judge Faber was careful to note that "[the Big Three] Distributors also are not pharmacists with expertise in assessing red flags that may be present in a prescription. \* \* \* 'There is no question that dispensers of controlled substances are obligated to check for and conclusively resolve red flags of possible diversion prior to dispensing those substances. Pharmacies are obviously best equipped to decide whether to fill prescriptions." *Huntington*, 2022 WL 2399876, at \*65 (emphasis added) (citing *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 629 (N.D. Ohio 2020), *clarified on denial of reconsideration*, *In re Opiate*, 2020 WL 5642173 (N.D. Ohio Sept. 22, 2020)).

Moreover, every West Virginia state court that has addressed identical public nuisance claims against opioid defendants has come to a different conclusion than Judge Faber on the scope and contours of West Virginia public nuisance law. *See, e.g., In re: Opioid Litig.*, Case No. NO. 21-C-9000 PHARM at 7, 30–34 (W.V. Mass Litig. Panel Aug. 3, 2022) (denying global motions filed by CVS, Walgreens, Walmart, and Rite Aid to dismiss opioid public nuisance claims; rejecting Judge Faber's analysis; and describing this MDL Court's opinions "regarding the nature and scope of public nuisance abatement [as] persuasive and applicable to this case"); *In re: Opioid Litig.*, Case No. NO. 21-C-9000 DISTRIBUTOR at 2 n.1 (W.V. Mass Litig. Panel July 1, 2022) (denying the Big Three Distributors' global motion for summary judgment on opioid public nuisance claims and listing West Virginia cases that "reject[] similar arguments").

further, and address the ongoing causes of the *epidemic*, … opioid misuse and addiction will continue to plague the Counties at unprecedented levels.") (emphasis added).

Defendants counter that the nuisance can only be defined or characterized as the "oversupply and diversion of legal prescription opioids." *See WAG/WMT Closing Brief* at 1 (docket no. 4511) ("In Phase I, the jury found a specific nuisance—the oversupply and diversion of prescription opioids—in Lake and Trumbull Counties."). Defendants further argue it would be novel and unprecedented to order them to assist in abating OUD[21] and addiction in the Counties, because these diseases are a "downstream effect" of the nuisance, and not the nuisance, itself. *WAG/WMT Closing Brief* at 33, 20–21 (docket no. 4511) ("Plaintiffs' abatement plan is … [an] untested program for the treatment of health, societal, and other downstream effects of all opioid use and abuse.").

Based on *Beretta* and its discussion of the Restatement's nuisance provisions, the Court concludes that Defendants' definition of the nuisance is far too narrow and Plaintiffs' is too broad; but the latter hits closer to the mark.[22]

Defendants assert the nuisance, as they define it, can only be abated using drug disposal sites and drug takeback programs. *See WAG/WMT Closing Brief* at 8 (docket no. 4511); *CVS*

---

[21] The Court uses the terms OUD (opioid used disorder) and opioid addiction interchangeably. *See San Francisco*, 2022 WL 3224463, at *2 n.1 ("Opioid addiction is synonymous with opioid use disorder. * * * Opioid use disorder has a more precise medical definition set out in The Diagnostic and Statistical Manual of Mental Disorders ('DSM'), which defines the severity as mild, moderate, or severe, depending on the symptoms present. * * * But both terms describe the same form of harmful behavior: the continued use of opioids despite deleterious effects to self or others.").

[22] Although the Court concludes Defendants' definition is too narrow, it does not conclude their arguments are meritless. The Court agrees it would be inequitable to hold Defendants responsible for "all opioid" use and abuse; therefore, as explained below, the Court makes equitable adjustments to Plaintiffs' proposal to address this concern.

*Closing Brief* at 28 (docket no. 4512). That is, if the nuisance is only "oversupply and diversion of prescription opioids," then the only necessary or appropriate abatement activities are for Defendants to provide mechanisms to take back and destroy unused opioids.[23] By insisting that drug takeback programs and safe disposal sites are the only appropriate abatement mechanisms, however, Defendants fundamentally misconstrue the public nuisance the jury found in this case. Defendants' definition of the nuisance improperly fails to consider the jury instructions, or the trial evidence, or the law established by *Beretta*.

As the Sixth Circuit has explained, a verdict form is not the sole guide to interpreting a jury's verdict: "[T]he verdict form [doesn't] stand alone. It [comes] with a user's manual: the jury instructions. So we evaluate the verdict form in the context of the instructions as a whole." *Moody v. United States*, 958 F.3d 485, 491 (6th Cir. 2020). Furthermore, "[t]he instructions and the verdict form should be considered together to determine whether they presented the issues to the jury in a clear and fair manner." *Hickson Corp. v Norfolk S. Ry. Co.*, 260 F.3d 559, 568 (6th Cir. 2001). In this case, the verdict forms clearly and fairly presented the relevant issues, which were: "'Does a nuisance exist?,' and 'If so, are the Defendant's liable for it?'" *Order Denying New Trial* at 56 (docket no. 4296).[24]

Of course, Defendants are not directly asking the Court to negate the jury's verdict by finding in their favor at the abatement stage of trial. But Defendants do attempt to manufacture inconsistency between the Abatement Order and the jury's verdict by focusing solely on the

---

[23] CVS also suggests the Court could order it not to dispense opioids at all, but CVS simultaneously observes such an order would be illegal. *See CVS Closing Brief* at 28 (docket no. 4512).

[24] *In re Opiate*, 2022 WL 668434, at *29 (N.D. Ohio March 7, 2022).

language of the verdict forms. In so doing, Defendants ignore controlling precedent that holds the

verdict forms must be considered in the context of the instructions as a whole.

Under Ohio law, "it is the province of the court to define a nuisance" and determine how

to effectively abate it. *City of Hamilton v. Dilley*, 165 N.E. 713, 714 (Ohio 1929); *City of Toledo*

*v. Gorney*, 1988 WL 128304, at *3 (Ohio Ct. App. Dec. 2, 1988) (same). Read together, the verdict

form and jury instructions make it apparent that the public nuisance found by the jury is not limited

to the Defendants' *conduct* of oversupply and the resulting diversion of opioids. The nuisance also

encompasses the *harm* that Defendants' conduct caused.

When drafting the jury instructions and verdict form, this Court hewed carefully to the

Restatement's definition of "nuisance," noting "the Restatement is clear that the nuisance is ***the***

***harm caused*** by human activity or physical condition. *See Order Denying New Trial* at 59 (docket

no. 4296)[25] (citing Restatement § 821A, cmt. b, which describes nuisance as "the harm caused by

the human conduct ***or*** physical condition [that is harmful or annoying to others]") (emphasis in

original)).

It is important to understand that "the harm" described by the Court and the Restatement

in the above passage—and not only the *conduct* that caused the harm—is the unreasonable

interference with a public right (*i.e.*, the nuisance). *See* Restatement § 821A, cmt. c ("[A]s it is

used in the Restatement, 'nuisance' does not signify any particular kind of *conduct* on the part of

the defendant. Instead, the word has reference to two particular kinds of *harm*—the invasion of

---

[25] *In re Opiate*, 2022 WL 668434, at *30 (N.D. Ohio March 7, 2022).

two kinds of interests[26]—by conduct that is tortious.") (emphasis added). Thus, Defendants'

definition of the nuisance based *solely* on their conduct of oversupplying prescription opioids

leading to diversion, is clearly incorrect. Instead, the nuisance that requires abating here is more

properly defined as the harm resulting from Defendants' conduct—the principal aspect of which

is the large population of individuals in Lake and Trumbull County suffering from OUD.[27]

Further, when a factfinder determines that the tortious conduct of a defendant creates a

condition (or, in the case of multiple tortfeasors, is a substantial factor in creating a condition) that

unreasonably interferes with a public right, that defendant is ***and remains*** liable for public

nuisance, even if it has since ceased the conduct that created the harmful condition. *See Order*

*Denying New Trial* at 59–60 (docket no. 4296)[28] ("[I]t is important to understand that a nuisance

can exist when … the ***condition resulting from the activity*** is the harm.") (emphasis in original)

(citing Restatement § 834, cmt. e) ("if the activity has resulted in the creation of a physical

condition that is of itself harmful after the activity that created it has ceased, a person who carried

on the activity that created the condition or who participated to a substantial extent in the activity

is subject to the liability for a nuisance, for the continuing harm."). Thus, even if the Pharmacy

---

[26] Those invaded interests are: (1) the private interest in the use and enjoyment of land (private nuisance); and (2) the interest in a common right held by the community at large (public nuisance).

[27] Judge Breyer simply defined the nuisance caused by Walgreens in the Bay Area as "the ongoing opioid epidemic," which itself is "defined by high rates of opioid abuse, addiction, and overdoses." *San Francisco*, 2022 WL 3224463, at *50, 59. The interferences with public health and safety caused by this epidemic in the Bay Area include "crime, homelessness, and destruction of city property," as well as "other downstream consequences that flow from opioid abuse," ranging from "syringes … found in the sandbox at children's playgrounds" to "[e]xcrement and refuse attributable to opioid use … found on streets" to opioid patients "overwhelm[ing] the city's hospitals … [and] emergency service teams." *Id*.

[28] *In re Opiate*, 2022 WL 668434, at *30-31 (N.D. Ohio March 7, 2022).

Defendants were to cease entirely their conduct of oversupplying prescription opioids, it would still be necessary to abate the resulting and ongoing harmful condition. And a court, sitting in equity, may require the defendant to abate (*i.e.*, eliminate, mitigate, or otherwise meaningfully ameliorate) that ongoing harmful condition, which continues to interfere with public health and safety.

In sum, a court sitting in equity may enjoin a defendant from continuing its nuisance-causing conduct *and* may order the defendant to abate a nuisance-causing condition it created; but in either case the entire purpose of the equitable remedy is to "eliminate the hazard that is causing prospective harm to the plaintiff." *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51, 132 (Cal. Ct. App. 2017) ("An equitable remedy's sole purpose is to eliminate the hazard that is causing prospective harm to the plaintiff.").[29] Through that lens, the Court now clarifies the nuisance the jury found.

## C.      The Nuisance the Jury Found

The opioid epidemic is a public health crisis. The evidence at trial bears this out. Testimony was consistent that rates of opioid addiction, overdose, and death continue to rise alarmingly, and many citizens who were once productive taxpayers have died or become unable to work.[30] Many

---

[29] In *ConAgra*, the trial court ordered defendants to prefund the remediation costs of removing lead-based paint from homes. The defendants in *ConAgra*, like those here, were found liable for creating a condition that continued to interfere with the public's right to health and safety *after their wrongful marketing conduct had stopped.* Thus, in making this statement, the *ConAgra* court was stating that the sole purpose of an abatement remedy is to eliminate the hazardous condition that continued to interfere with the public's collective right to health and safety. The *ConAgra* court's abatement plan was designed to mitigate the ongoing harm caused by defendants' conduct, even though the conduct itself had ceased.

[30] *See, e.g.,* 10/26/2021 Trial Tr. at 4243:9–4244:9 [Carraway] (docket no. 4090); 10/27/2021 Trial Tr. at 4383:2–7 [Fraser] (docket no. 4093).

have become a drain on the public fisc.[31] First responders and medical professionals are stretched thin responding to overdoses and attempting to meet the vast demand for effective drug treatment.[32] Families bear the weight of lost parents, siblings, children, and other caregivers.[33] Child welfare agencies are strained by the increased number of children who require out of home placement.[34] Schools have to teach children who are at higher risk of developing a substance use disorder because they were exposed to OUD in their home, or themselves suffer from Neonatal Opioid Withdrawal Syndrome ("NOWS") or Neonatal Abstinence Syndrome ("NAS").[35] There is no doubt that the opioid epidemic constitutes an unreasonable interference with public health.

Thus, when the jury's 12 members unanimously concluded, after receiving extensive instructions explaining Ohio's legal definition of "public nuisance," that the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels" is a nuisance in Lake and Trumbull Counties, *Verdict Form* at 2 (docket no. 4176), they necessarily concluded the aforementioned harms were the unreasonable interference with the public's collective right to health and safety. Restatement § 821A, cmt. b. The Court, therefore, agrees with Plaintiffs' statement that "[t]he nuisance is the unreasonable interference with public health *resulting from* the oversupply and diversion of legal prescription opioids." *Plaintiffs' Response to Select Legal Issues* at 10 (docket no. 4321) (emphasis added). The primary

---

[31] *See, e.g.,* 10/27/2021 Trial Tr. at 4365:11–4383:7 [Fraser] (docket no. 4093) (testifying to the numerous public services whose resources have been overwhelmed by the opioid epidemic).

[32] *See, e.g.,* 10/19/2021 Trial Tr. at 2795:20–96:20 [Villanueva] (docket no. 4050).

[33] *See, e.g.,* 10/27/2021 Trial Tr. at 4365:8–25 [Fraser] (docket no. 4093).

[34] *See, e.g.,* 10/26/2021 Trial Tr. at 4262:8–18 [Carraway] (docket no. 4090).

[35] *See, e.g.,* 5/11/2022 Trial Tr. at 256:16–61:5 [Young] (docket no. 4446).

aspect of this nuisance is the large population of individuals in Lake and Trumbull Counties suffering from OUD and addiction.

Accordingly, the ongoing public nuisance in Lake and Trumbull Counties actually found by the jury is correctly described and defined as follows:

(1) an unreasonable interference with public health, safety, and welfare;

(2) due to the widespread prevalence of opioid use disorder ("OUD") and addiction;

(3) which is the direct and foreseeable result of the "oversupply of legal prescription opioids, and diversion of those opioids into the illicit market outside of appropriate medical channels," caused by the Defendants' wrongful conduct. *Verdict Form* at 2 (docket no. 4176).

As discussed in greater detail below, the Court's task is to craft a remedy that will reduce (abate) this unreasonable interference with the public's right to health, safety, and welfare. Even if the Court could wave a magic wand and forever remove any existing or future oversupply of legal prescription opioids, and prevent all future diversion of legal prescription opioids into the illicit market, this conjuring would do nothing to reduce the nuisance that would continue to exist in Lake and Trumbull Counties—that is, the widespread prevalence of OUD and opioid addiction. Just as a polluter might stop dumping carcinogenic chemicals into a lake (ceasing its *conduct*) but still be ordered to clean up the water (ameliorate the continuing *harm*), abatement of the nuisance by the Pharmacy Defendants in this case requires both avoiding further oversupply of opioids and ameliorating rates of ongoing OUD and addiction.

One of the many things that make this case challenging and unique is that prescription opioids are highly addictive Schedule II drugs under the Controlled Substances Act ("CSA"). This means they have "a high potential for abuse," and "may lead to severe psychological or physical dependence." 21 U.S.C. § 812(b)(2)(A),(C). Evidence at trial established that a community

oversupplied with diverted prescription opioids *will* have a high incidence of OUD. It is not just direct and foreseeable, it is a near certainty. *See* 5/10/2022 Trial Tr. at 75:5–77:6 [Keyes] (docket no. 4438). Accordingly, the high prevalence of OUD in the Counties is not a "downstream effect" of the unreasonable interference with public health; it is the primary component of the public nuisance that exists in the Counties. That opioids are so addictive means, by definition, the nuisance will continue unless programs are created to treat and mitigate OUD.

Another challenging element of this case is that Schedule II drugs "ha[ve] a currently accepted medical use in treatment in the United States." 21 U.S.C. § 812(b)(2)(B). This means the Pharmacy Defendants will need to continue dispensing legal prescription opioids to patients who need them for legitimate medical purposes. Thus, even if the Court could legally enjoin *all* of Defendants' opioid dispensing conduct, it would not do so. The utility of the Defendants' dispensing conduct of medically necessary pharmaceuticals warrants a carefully tailored injunction that will not encroach on Defendants' socially appropriate, beneficial, and necessary dispensing conduct, but will ensure this conduct conforms with their diversion-control obligations under the CSA.

The ongoing, unreasonable interference with public health in this case is complicated and multi-faceted, and consists of both Defendants' ongoing conduct and the resulting nuisance-causing conditions. An order to meaningfully abate the nuisance the jury found will require the Court to carefully craft both: (1) injunctive relief to stop the Defendants' *wrongful* dispensing conduct, so they can no longer cause oversupply of legal prescription opioids that can be diverted, while still allowing *appropriate* dispensing; and (2) an abatement plan to reduce the incidence and prevalence of OUD in the Counties, thereby ameliorating the ongoing interference with public health. As explained immediately below, the Court concludes it can do so.

### D.    The Nuisance is Abatable

A nuisance is "abatable" if it can be mitigated by reasonable means. *Office of Scioto Twp. Zoning Inspector v. Puckett*, 31 N.E.3d 1254, 1264 (Ohio Ct. App. 2015) ("An 'abatable nuisance' is … '[a] nuisance that reasonable persons would regard as being removable by reasonable means.'") (quoting Black's Law Dictionary (9th ed. 2009)). The Court, sitting as factfinder, found credible Dr. Alexander's expert opinions and testimony that his proposed abatement plan will meaningfully reduce the rates of OUD in the Counties by more than 50% over 15 years. The Court finds that a 50% reduction in OUD constitutes a reasonable abatement of the nuisance. While it will undoubtedly take the expenditure of a great deal of money and effort, those expenditures are not so extraordinary as to render the nuisance effectively or actually unabatable. The Court, therefore, finds that the opioid nuisance is reasonably abatable. *See San Francisco*, 2022 WL 3224463, at *4 ("In the late 1990s, San Francisco pioneered public health programs to address heroin use in the city, *including expanding the availability of treatment programs and resources*. The public health programs *worked*. By the early 2000s, the city was winning the battle against heroin use. Heroin overdoses decreased dramatically from 150 per year in the late 1990s to 10 in 2010.") (emphasis added, citations omitted).

## IV.    Abatement versus Damages

Before turning to the topic of exactly what the Pharmacy Defendants must do to abate the nuisance they caused, the Court addresses Defendants' argument that Plaintiffs do not seek abatement at all. Defendants insist Plaintiffs are actually seeking damages, which may not be awarded by a court sitting in equity, and therefore this Court may not grant virtually any aspect of the relief Plaintiffs have requested.

This Court has repeatedly, but with limited success, attempted to help Defendants understand the difference between an abatement remedy, such as this, and a damages award. *See, e.g.*, *see Order Denying JMOL* at 31, n.97 (docket no. 4295);[36] *CT1 Order on Plaintiffs' Nuisance MSJ* at 5 (docket no. 2572);[37] *CT1 Daubert Order re Abatement* at 2–3 (docket no. 2519).[38] Despite the Court's efforts, the Pharmacy Defendants continue to operate under the false notion that the Court is fashioning a damages award. *See, e.g.*, *WAG/WMT Closing Brief* at 4 (docket no. 4511) ("money to address the health consequences and other downstream effects of a nuisance constitutes damages, not abatement"). It is not.

Defendants' ongoing and seemingly purposeful misunderstanding is evidenced by statements like this one: "Unlike a damages award, an equitable abatement award is designed solely to avoid out-of-pocket costs to Plaintiffs." *WAG/WMT Closing Brief* at 17–18 (docket no. 4511). This assertion bears no citation to authority and is plainly erroneous. While damages are compensatory in nature, the ***purpose*** of an abatement award—as Defendants, themselves, have frequently (and properly) pointed out—is, "'to eliminate the hazard that is causing prospective

---

[36] *In re Opiate*, 2022 WL 671219 at *15 n.97 (N.D. Ohio March 7, 2022) ("Although they certainly know better, Defendants incorrectly assert Plaintiffs seek payment for 'backward-looking damages.' Joint Motion at 25 (docket no. 4202). The Court has repeatedly rejected Defendants' attempts to mischaracterize Plaintiffs' requested relief in this manner.").

[37] *In re Opiate*, 2019 WL 4194272 at *3 (N.D. Ohio Sept. 4, 2019) ("Defendants also argue that what Plaintiffs' label as a claim for 'abatement costs' is in fact a 'claim for damages.' (See docket no. 2540 at 8–9). This point is not well-taken for the reasons explained in the Court's recent Order denying Defendants' motion to exclude Plaintiffs' abatement experts. Unlike tort damages that compensate an injured party for past harm, abatement is equitable in nature and provides a prospective remedy that compensates a plaintiff for the costs of rectifying the nuisance.") (footnote omitted).

[38] *In re Opiate*, 2019 WL 4043938 at *1 (N.D. Ohio Aug. 26, 2019) ("The goal is not to compensate the harmed party for harms already caused by the nuisance. This would be an award of damages.").

harm to the plaintiff.'" *WAG/WMT Closing Brief* at 4 (docket no. 4511) (quoting *ConAgra*, 17 Cal. App. 5th at 132). Contrary to Defendants' flawed assertion, "avoid[ance] of out-of-pocket costs to Plaintiffs" will ***not*** eliminate any hazard. Thus, it ***cannot*** be the sole design of an equitable abatement award.

The true purpose of an abatement remedy—eliminating a hazard that continues to cause prospective harm to a plaintiff—will, in virtually all cases, "cost" a liable defendant some amount of money. Often, those "costs" will be in the form of lost revenue caused by the cessation of a (presumably) money-making, but also nuisance-causing, activity due to an injunction. Sometimes, however, those "costs" take the form of an order requiring a defendant to spend money to eliminate, remediate, or mitigate the nuisance-causing condition it created. Put another way, an equitable abatement award is designed solely to force a liable defendant to clean up the mess it made, even when it has to pay someone else to do it.

In either instance, the fundamental focus of a court sitting in equity is neither on what amount it will cost a defendant, nor on the amount of costs a plaintiff may desire to avoid. Rather, the primary focus of an equitable remedy is on the necessary remedial plan that must be imposed upon the wrongful actor. The remedy will require the tortfeasor to do, or refrain from doing, specific acts, possibly including paying the costs to remediate harmful conditions it caused. In the case of an equitable abatement award, the specific act required is "simply to clean up the hazardous conditions that they assisted in creating." *ConAgra*, 17 Cal. App. 5th at 120.

*ConAgra*, which is cited repeatedly by both sides, presents an apt example. In *ConAgra*, the trial court ordered defendants to *prefund* the remediation costs of removing lead-based paint from homes. The prefunded abatement account allowed plaintiff or third parties to remediate the nuisance rather than requiring the defendants to do the remediation themselves. In affirming the

abatement order, the appellate court explained: "The trial court could have chosen to have defendants handle the remediation themselves, but such an order would have been difficult for the court to oversee and for defendants to undertake.… While the trial court's order in this case may be unusual in requiring defendants to prefund remediation costs, it was well within the court's discretion." *ConAgra*, 17 Cal. App. 5th at 133, 134.[39]

Requiring a party to fund remediation costs as a form of equitable abatement is not a novel concept. It is well-established that an order requiring defendants to pay money to abate harm going forward does not convert an equitable remedy into a damages award. *See, e.g., id*. at 133 ("The deposits that the trial court required defendants to make into the abatement account would be utilized not to recompense anyone for accrued harm but solely to pay for the prospective removal of the hazards defendants had created."); *United States v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009) ("That equitable remedies are always orders to act or not to act, rather than to pay, is a myth; equity often orders payment."); *United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) ("The funding of a diagnostic study in the present case, though it would require monetary payments, would be preventive rather than compensatory.").

---

[39] Defendants note that the *ConAgra* abatement order focused on removing lead paint from homes and did not fund treatment for the developmental and physical "health defects" children suffered as a result of their exposure to that lead paint. *See Defendants' Joint Brief Regarding Select Issues for Remedial Phase* at 4-5, n.2 (docket no. 4299). Defendants seem to suggest *ConAgra* stands for the proposition that this Court's abatement order cannot include funding for *treatment*. The *ConAgra* court recognized, however, that brain damage from lead paint is not analogous to OUD—the latter can be treated, while the former cannot. *See ConAgra*, 17 Cal. App. 5th at 66 ("The brain effects [of lead exposure] in children are **irreversible**, so the **only option** is to prevent the exposure in the first place.") (emphasis added, internal quotation marks omitted, brackets in original). Defendants thus overlook a key distinguishing feature of *ConAgra* and the real reason the *ConAgra* court excluded funding for treatment.

In sum, despite Defendants' resolute insistence otherwise, the Court's abatement remedy is not damages. It is equitable relief; and it is well within the Court's discretion, sitting in equity, to order Defendants to make payments into an abatement fund that will be used to remediate the nuisance conditions they caused.

## V.  Scope of the Abatement Remedy

As described above, an effective abatement remedy: (i) stops the conduct of, or alleviates or completely removes a condition created by, a defendant; (ii) that if not stopped or remediated, will continue to harm the plaintiff in the future. Thus, in this case, the proper scope of an abatement remedy must include programs and interventions that will lessen or remove the nuisance condition created by these Defendants. Given Defendants' utter failure to provide the Court with a realistic, proposed abatement plan, and the Court's conclusion that Dr. Alexander's plan is generally reasonable, necessary, and appropriate, the Court takes this view: only if a program or intervention described by Dr. Alexander is ***not*** reasonably calculated to reduce the population of individuals in Lake and Trumbull County suffering from OUD would it be beyond the proper scope.

For their part, Plaintiffs assert that all of the interventions and programs proposed by Dr. Alexander are necessary to "materially abate" the opioid crisis. *Plaintiffs' Closing Brief* at 1 (docket no. 4513). Defendants respond they should not be held liable for funding any program that is "too remote" from their dispensing conduct. *See WAG/WMT Closing Brief* at 25 (docket no. 4511) ("But even accepting the Court's position *arguendo*, much of the relief Plaintiffs request, even under their own causation theory, is far too remote from the three pharmacy defendants' dispensing conduct to be justifiable."). While Plaintiffs were unwilling to narrow the scope of their proposed remediation plan by withdrawing their request for even one of their proposed programs

or interventions, Defendants remained conspicuously silent on the most important aspect of an abatement remedy—that is, whether any iteration of their various proposed "plans" would actually abate the opioid nuisance.

Put differently, Defendants have provided the Court with no evidence nor any expert testimony about the efficacy of theirs, Plaintiffs', or any other plan. Rather, Defendants simply argued in broad terms that: (1) Plaintiffs' proposed abatement programs are "too remote" from Defendants' dispensing conduct for the Court to order them to provide funding for those programs; and (2) Plaintiffs' proposed programs cost too much or are otherwise "too speculative" because of math errors or faulty assumptions and estimates.

As previously discussed, looking solely at Plaintiffs' plan in terms of its cost is to view the issue through a "damages lens," and is therefore of only limited value to the Court. Remoteness, on the other hand, is a liability concept, which has already been decided against these Defendants by the jury.[40] The Court discusses these concepts below.

### A.      Too Speculative

Defendants assert correctly that "[n]uisance abatement actions seek injunctive relief and, [accordingly], are governed by the same equitable principles that apply to injunctive actions generally." *WAG/WMT Closing Brief* at 21 (docket no. 4511) (quoting *State ex rel. Miller v. Anthony*, 647 N.E.2d 1368 (Ohio 1995)). "To be legally enforceable, 'an injunction … should be sufficiently clear and definite in its terms to enable a person bound by the injunction or restraining

---

[40] If Defendants, while explaining which programs and interventions they thought were too remote from their dispensing conduct, had ***also*** provided some expert testimony or other evidence that some alternative abatement plan would nonetheless meaningfully abate the opioid nuisance, that information could have been immensely helpful to the Court in crafting its abatement remedy.

order to determine what he may and may not do." *Id*. (quoting 43A C.J.S. Injunctions § 451 (May 2022 update)). Defendants also argue that "the Court must limit any forward-looking abatement costs to the amount that can be shown in a non-speculative manner, which becomes increasingly difficult as the temporal scope of the requested relief expands." *Id*. at 22. They go on: "This limiting principle follows the general tort rule that a party seeking compensatory damages must prove (1) certainty that ***damages*** will occur; and (2) reasonable certainty as to the amount of those ***damages***." *Id.* (citing Restatement (2d) of Torts § 912 (1979) ("One to whom another has tortiously caused harm is entitled to compensatory damages for the harm if, but only if, he establishes by proof the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit.")) (emphasis added).

Defendants conflate two separate concepts. The first concept is that ***future damages*** must be reasonably certain, both as to whether they will actually occur and in amount. The second concept is that an ***injunction*** must be sufficiently clear and definite.

The requirement of reasonable certainty of future damages has only limited applicability in the abatement-remedy context. An equitable abatement remedy is not primarily concerned with how much it will cost a defendant to ameliorate the nuisance-causing condition the defendant created.[41] Instead, an abatement remedy is concerned with amelioration of the nuisance, itself. *See*

---

[41] When a hazardous condition causes continuous, ongoing harm, if that condition is not cured, the potentially widespread damages liability to a defendant may be impossible to know or calculate. That is why an abatement remedy appropriately seeks to ameliorate the condition causing the interference instead of forcing a defendant to pay future damages. *See City of Seven Hills v. City of Cleveland*, 439 N.E.2d 895, 902 (Ohio App. 1980) ("Equity is a jurisprudence which grew from the need to provide remedies unavailable or inadequate at common law."); *see also United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) ("The facts of the present case show clearly that the status quo is a condition of action which, if allowed to continue or proceed unchecked and unrestrained, will inflict serious irreparable injury.").

*Matthews v. State*, 25 Ohio St. 536, 541 (1874) ("The abatement of the nuisance is not therefore a punishment for the offense, but the removal of a thing injurious to the public."). Where the cost of remediation comes into play is only in the Court's determination of whether the nuisance is abatable by reasonable means.[42] In other words, a nuisance that can only be abated by the expenditure of an astronomical amount of money or effort is effectively unabatable, and thus is a permanent nuisance, for which the only remedy is damages.[43]

Legal remedies (*i.e.*, damages) follow a relatively straight-forward process: (1) a fact-finder determines all past losses a plaintiff has suffered and estimates, to a reasonable degree of certainty, the various losses the plaintiff will suffer in the future; and then (2) the fact-finder awards the plaintiff an amount of money that will compensate it for those losses. In that way, the damages award makes the wronged party whole.

Equitable remedies, on the other hand, need to meet the requirements of Fed. R. Civ. P. 65, which contains a specificity requirement.[44] However, an equitable remedy's "specificity"

---

[42] "By an 'abatable physical condition' is meant one that reasonable persons would regard as being susceptible of abatement by reasonable means. The law does not require the unreasonable or fantastic, and therefore even though it might conceivably be possible to abate a particular condition, it is not 'abatable' within the meaning of this Section unless its abatement can be accomplished without unreasonable hardship or expense." Restatement § 839, cmt. f.

[43] *See Mangini v. Aerojet-Gen. Corp.*, 912 P.2d 1220, 1221 (Cal. 1996) ("[B]ecause plaintiffs had failed to present any substantial evidence that the contamination of their land as a result of defendant['s] . . . practice of dumping and burning a toxic solvent was capable of being abated at a reasonable cost, the nuisance must be deemed permanent."); *cf. In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 45 (finding a nuisance unabatable where plaintiffs sought injunctive and abatement relief of "ongoing health hazards allegedly caused by the United States military's environmental contamination of the soil and food chains in vast regions of Vietnam." The Court ruled that "[s]uch injunctive relief is wholly impracticable. Furthermore, it could compromise Vietnam's sovereignty.").

[44] *See* Fed. R. Civ. P. 65(d)(1) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in

33

requirement and a legal remedy's "reasonable certainty" requirement are not interchangeable. The specificity requirement "serves two 'important' functions: (1) 'prevent uncertainty and confusion on the part of those faced with injunctive orders,' and thus "avoid … a contempt citation on a decree too vague to be understood'; and (2) enable 'an appellate tribunal to know precisely what it is reviewing.'" *Union Home Mortg. Corp. v. Cromer*, 31 F.4th 356, 362 (6th Cir. 2022) (quoting *Schmidt v. Lessard*, 414 U.S. 473, 476–77 (1974) (per curiam)). Here, the Pharmacy Defendants are not being asked to remediate the opioid nuisance themselves, and instead are being asked only to prefund an abatement account that Lake and Trumbull Counties will use to abate the nuisance. Therefore, there is no danger these Defendants might be held in contempt for simply not understanding what is required of them, so long as the Court includes in its order: (1) the amount of funding required; and (2) the time over which it must be provided. The requirement that the abatement remedy, itself, be reasonably calculated to abate the nuisance and provide direction to the party actually remediating the nuisance is, as discussed below, a separate issue.

Further, where the cleanup of a harm-causing hazardous condition is immensely complicated, courts have recognized that attempts to be "too specific" can actually undermine the purpose of the specificity requirement, by requiring parties to endlessly return to the court for various modifications or clarifications. *See, e.g., Apex Oil*, 579 F.3d at 739 ("The cleanup of the contaminated site is a huge project—[the defendant] says it will take 15 years to complete…. To specify the details of the project in the decree would either impose impossible rigidity on the performance of the cleanup or, more likely, require constant recourse to the district judge for interpretation or modification of the decree."); *see also* Wright & Miller, 11A Fed. Prac. & Proc.

---

reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.").

Civ. § 2955 (3d ed.) ("[A]s the detail, precision, and specificity of an order increases, the possibility of technical infractions by those enjoined and the opportunity for harassment by those benefitting from the order become greater.").

Due to the enormous complexity of this case, the Court will retain jurisdiction over the nuisance-abatement plan, conduct periodic hearings to carefully monitor the plan's progress, and make adjustments to this Order as necessary to effectuate the success of this remedy. *See Biechele*, 309 F. Supp. at 359 ("Under the principles of equity, the Court has broad powers to fashion effective relief, even though it may have to retain a continuing jurisdiction to modify or change orders granted."); *Wright*, 364 U.S. 642, 647 (1961) ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.").

Finally, even if "reasonable degree of certainty" were the appropriate standard for determining whether an abatement remedy will successfully abate a nuisance condition, it does not require absolute certainty. This Court has observed that "[a]ny time an expert is asked to make predictions about the future, those predictions necessarily include some degree of speculation." *CT1 Daubert Order re Abatement* at 5 (docket no. 2519)[45] (citing *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 726 (6th Cir. 2012) (allowing that "predictions about future earning potential [to determine future economic damages] are necessarily somewhat speculative.")). For an abatement remedy, the Court is not required to articulate with absolute precision the costs of abatement or every aspect of the abatement plan. S*ee ConAgra*, 17 Cal. App. 5th at 133 ("While the trial court did require defendants to make deposits into the account to provide the funds necessary to carry out the abatement, the court's estimate of the amount that would be necessary

---

[45] *In re Opiate*, 2019 WL 4043938 (N.D. Ohio Aug. 26, 2019).

for that purpose was just that: an estimate."); *Apex Oil*, 579 F.3d at 739–40 ("A degree of ambiguity is unavoidable in a decree ordering a complicated environmental clean-up. [Rule 65(d)] does not require the impossible. There is a limit to what words can convey.") (quotation marks omitted).

In sum, Defendants' arguments that the cost of the programs and interventions contained in Plaintiffs' abatement plan is too speculative are not well-taken. Moreover, as discussed below, any concerns about speculative costs are cured by two aspects of the Court's Abatement Order: (1) appointment of an Administrator; and (2) annual examination of the actual costs of the abatement programs, with credits awarded to Defendants if those actual costs are less than Defendants' payments.

### B.  Too Remote

Defendants assert Plaintiffs' abatement plan impermissibly seeks funding for programs that are too remote and too attenuated from the harm caused by their conduct. *See* WAG/WMT at 4-5, 24-25 (docket no. 4511); CVS Post-Trial Brief at 33-34 (docket no. 4512). Stated differently, Defendants contend they should not be required to pay for harms that are not "directly attributable" to their dispensing misconduct. *See id.* The Court agrees in principle with Defendants' contentions; however, it draws the line much differently than would Defendants. For instance, the Court strongly disagrees with Walgreens' and Walmart's contention that the treatment of individuals with OUD addresses an "*indirect, downstream effect*[] of [the] nuisance rather than the nuisance itself." WAG/WMT at 4 (docket no. 4511) (emphasis in original).

"Federal courts are courts in law and in equity, and a court of equity has traditionally had the power to fashion *any remedy deemed necessary and appropriate* to do justice in a particular case." *Carter-Jones Lumber*, 166 F.3d at 846 (citing *Price*, 688 F.2d at 211) (emphasis added). To "do justice" in this case, the Court must enter an abatement order aimed at ameliorating the

nuisance caused by these Defendants. To do so, the Court must consider what actions are reasonably calculated to mitigate or eliminate the principal nuisance condition that will otherwise continue to harm the Plaintiffs—that is, the widespread prevalence of OUD and addiction.

The jury found Defendants liable for their conduct, so Defendants' ongoing contention that the causal connection between their conduct and the resulting harm is too remote has already been decided against them. However, Defendants also assert a slight variation on their "too remote" theme—namely, that "any remedies the Court awards must **_directly abate_** the specific public nuisance that the jury found at trial." *WAG/WMT Closing Brief* at 5 (docket no. 4511) (emphasis added). Other than offering their improperly narrow interpretation of the "nuisance that the jury found," Defendants do not explain what they mean when they assert the suggested programs do not "directly abate" the nuisance, nor do they offer any citation that helps the Court understand their meaning.[46]

---

[46] The only case cited by Defendants to support their assertion is an inapposite Prohibition-era case from Iowa. In *Davidson v. Bradford*, 212 N.W. 476 (Iowa 1927), a landowner was sued for nuisance for illegally manufacturing liquor in his kitchen. The trial court ordered "closing and nailing up the doors of *all* the buildings and the gates on the [landowner's] entire 460 acres." *Id*. at 479 (1927) (emphasis added). The Iowa Supreme Court found the trial court's abatement order was too broad: it "include[d], merely because it belonged to the same owner, land and other buildings not covered by the indictment, which were in the possession of a tenant who had no connection with the nuisance, and which were not so used." *Id*. at 478. The court went on to say: "The [abatement] order was clearly void, so far as it directed the closing of premises that *by no possible construction* could be found to be included in the description of the nuisance set out in the indictment." *Id*. at 479 (emphasis added).

At most, then, *Davidson* stands for the proposition that an abatement remedy is overbroad if "no possible construction can be found" to connect the alleged nuisance to the plan designed by the court to mitigate it. Even assuming this Iowa case describes the proper standard in Ohio, Defendants did not even attempt to demonstrate there is "no possible construction" of Plaintiffs' proposed programs and interventions that would materially reduce the Counties' population of individuals suffering from OUD.

If what Defendants are attempting to argue is that the remedy cannot "indirectly abate" the nuisance, that argument is roundly rejected by the *ConAgra* decision. In *ConAgra*, the court did not enjoin the defendants to remove *all* lead-based paint from *all* houses in plaintiffs' jurisdictions. Some lead-based paint had to be removed, of course, but the trial court allowed some to be encapsulated, and some to be left intact. Because some of the lead-based paint would remain in people's homes, the trial court also required the defendants to fund remediation of water leaks, which might lead to future lead paint exposure. The defendants argued—like the Pharmacy Defendants' do here—that water leaks were too remote from their wrongful marketing conduct.[47] The *ConAgra* court disagreed:

> The [trial] court's decision to include remediation of water leaks in the judgment is ***not a causation issue***. Plaintiff did not contend that the water leaks should be remediated because they were caused by defendants' promotions. The reason why remediation of water leaks is properly part of the remediation plan is that the court did not order remediation of all interior lead paint. As water leaks could cause intact interior lead paint to deteriorate and present a dangerous hazard to children, the remediation of water leaks was ***an appropriate lesser alternative*** to removal of all interior lead paint. Since defendants' wrongful promotions caused the presence of interior lead paint, the court did not err in requiring remediation designed to prevent that interior lead paint from harming children in those homes.

*ConAgra*, 17 Cal. App. 5th at 107.

In the instant case, the Pharmacy Defendants will be required to fund programs to reduce OUD and addiction (though not ***all*** OUD and addiction) from the Counties' populations. Here, as in *ConAgra*, this is ***not a causation issue***. The issue, and the proper question before the Court, is

---

[47] Like the Pharmacy Defendants here, "[the *ConAgra* defendants] maintain that there was no evidence that their promotions of lead paint for interior residential use had a causal connection to the water leaks and soil lead that the court ordered them to remediate." *ConAgra*, 17 Cal. App. 5th at 101 (emphasis added).

whether a given remediation effort can reasonably be expected to reduce ongoing harms in the Counties resulting from the ongoing nuisance.

This Court gave the Defendants the opportunity—in fact, ordered them—to provide the Court with their own abatement plan. That plan might reasonably have included appropriate, less-expensive alternatives to Plaintiffs' programs and interventions. For those lesser alternatives to be "appropriate" necessarily means they would still be capable of materially reducing the population of individuals in the Counties with OUD. The Defendants did not even attempt to suggest any plausible lesser alternatives. Had Defendants provided the Court with a different proposal offering other effective interventions that might cost less than those proposed by Plaintiffs, the Court would have certainly considered them.

Even if the Court accepts their various "abatement plans" as *bona fide* proposals, Defendants offer no evidence whatsoever that any of their plans would meaningfully or materially abate the nuisance the Court expressly ordered them to address.[48] This utter failure to provide the Court with anything useful to guide its ruling leaves the Court only with the options provided by Plaintiffs, which the Court generally adopts but with amendments.

Finally, Defendants assert the Court should simply reject wholesale the Plaintiffs' proposed plan. *See WAG/WMT Closing Brief* at 5, 7, 8 (docket no. 4511); *CVS Closing Brief* at 1, 3, 9 (docket no. 4512). It is not clear from their briefing what Defendants actually expect. Even if the Court

---

[48] Defendants acknowledge the Court asked them to come up with a plan that would address not just their own *conduct* of opioid oversupply, but the harm this oversupply caused, which is the dramatically increased population of individuals in the Counties suffering from OUD and addiction. *See WAG/WMT Closing Brief* at 8 (docket no. 4511) ("Defendants ask that the Court reconsider its stated intention to award Plaintiffs funding for measures such as treatment of OUD in individuals."). Of course, simply asking the Court to reconsider its stated intention does not relieve Defendants of the responsibility to comply with the Court's order.

were to reject the entirety of Plaintiffs' abatement plan, that would not relieve Defendants of the obligation and responsibility to abate the nuisance they were found liable for creating.

A jury found the Defendants liable for causing a public nuisance in the Plaintiff Counties and the Court held a hearing to determine the remedy; the Defendants must now abate the nuisance; and Defendants cannot avoid their responsibility by pretending they were not found liable or by insisting there is no abatement plan that can work. The majority of Plaintiffs' abatement plan is reasonably calculated to abate the public nuisance and it was the only plan supported by credible evidence at trial. Accordingly, the Court defines below what programs and interventions Defendants must fund, as these programs and interventions are reasonably calculated to reduce or mitigate the nuisance-causing conditions resulting from Defendants' improper dispensing conduct.

### C.     The Proper Scope

To determine whether a particular abatement remedy is appropriate, the primary consideration is whether the remedy is reasonably calculated to abate the nuisance. *See Scioto Twp.*, 31 N.E.3d at 1264 ("An 'abatable nuisance' is … '[a] nuisance that reasonable persons would regard as being removable by reasonable means.'") (quoting Black's Law Dictionary (9th ed. 2009)).

In this case, the only way to effectively reduce the population of individuals suffering from OUD and addiction (and thus, abate the nuisance) is to fund programs for: (1) ***treatment*** of those suffering from opioid addiction or OUD, including funding of programs to identify and connect with those individuals; and (2) ***prevention*** of opioid abuse and opioid recidivism.[49]

---

[49] The Court's definition of "prevention" is broader than Dr. Alexander's definition. For example, Dr. Alexander's "Category 3 is focused on recovery and enhancing public safety and reintegration." 5/11/2022 Trial Tr. at 333:9–10 [Alexander] (docket no. 4446). The Court contemplates that many interventions in Dr. Alexander's "Recovery – Category (3)" will also fall

Plaintiffs assert their plan, if implemented *in its entirety*, will do these things.[50] But the record shows their plan is designed to also reach beyond direct treatment and prevention of opioid addiction and address subsidiary social ills.[51] For example, grief counseling for family members who have lost loved ones to the opioid crisis, and HIV treatment for individuals with OUD that contracted HIV from using needles to feed their addiction, are programs that appear to the Court to go beyond the scope of a proper abatement remedy. While these interventions would certainly be beneficial to County residents, they seem unlikely, as a practical matter, to reduce the population of individuals in the Counties suffering from OUD and addiction. The Court is aware of no evidence in the record, for example, explaining how grief counseling for survivors will **treat** someone who is already addicted to opioids or **prevent** anyone from becoming addicted.

In contrast, other interventions follow the "appropriate lesser alternative" concept discussed by the *ConAgra* court. For example, there is evidence in the record that a needle exchange program—which on its face does not seem designed to materially abate the opioid

---

under the Court's "prevention" rubric—that is, preventing recovering opioid addicts from returning to opioid abuse. *See, e.g., id.* at 357:18–24 [Alexander] ("So vocational training is a major opportunity, as is – as are other interventions such as recovery-oriented workplaces that are designed to better facilitate individuals who may be in recovery, reentering the workforce, rather than screening them out and saying, eh, you've got a felony or you have addiction or you've been in treatment and, you know, we can't take you.").

[50] *See* 5/11/2022 Trial Tr. at 331:8–10 [Alexander] (docket no. 4446) ("[E]ach of these categories is, I believe, important for a comprehensive and coordinated abatement plan in each county."); *id.* at 417:12–15 [Alexander] (docket no. 4446) ("Q: . . . You believe that the measures set out in your report in concert with one another can reduce opioid-related harms in the Counties by 50 percent over 15 years, correct? A: Yes. That's true.").

[51] 5/11/2022 Trial Tr. at 406:22–07:5 [Alexander] (docket no. 4446) ("The primary goal [of the abatement plan] is to reduce further harms, reduce overdoses, reduce rates of development of new addiction. But these other -- these other potential hardships and tragedies [that CVS's counsel was asking about], to the degree that they can be diverted, and I believe -- or prevented, and I believe that many of them can, then absolutely. My plan is designed to reduce those as well.").

nuisance—is an important "pathway for many individuals to ultimately enter the treatment system." 5/11/2022 Trial Tr. at 340:25–41:1 [Alexander] (docket no. 4446).[52]

In the end, neither party adequately put forth a reasonable plan the Court could adopt wholesale and would be upheld. Thus, the Court was compelled to conduct a line-by-line audit of Plaintiffs' plan to try to determine which aspects constitute appropriate expenditures (*i.e.*, those reasonably calculated to effectively reduce the population of individuals suffering from OUD via *treatment* and *prevention*) and which do not.

Because Defendants failed to offer their own, realistic abatement plan, the Court's only real choice is to adopt in large part Plaintiffs' proposed abatement plan. However, the Court is not blind to the fact that Plaintiffs' plan asks for too much.

The Court concludes the best solution to this situation is to: (1) use Alexander's total, top-line estimated cost numbers as a starting point; and (2) reduce these numbers based on (a) those programs the Court concludes are not reasonably calculated to abate the opioid nuisance, (b) valid critiques offered by defense expert Dr. Chandra, and (c) equitable considerations of apportionment and allocation of responsibility. Plaintiffs will then be left to use the resulting, less-than-desired amount to fund only those programs that are, in fact, directly related to treatment and prevention.

The Court has carefully gone through each line of Dr. Alexander's plan, and at least some of the proposed interventions are not directed sufficiently at treatment and prevention. For

---

[52] Dr. Alexander explained:
　　Q: . . . Can you give the Court an understanding of what you have categorized as harm reduction.
　　A: Well, the best example of harm reduction are syringe service programs, although, I also propose other types of services. . . . Harm reduction is a pathway to treatment, so while there are individuals that may be – participate in syringe programs, for example, that are not engaging in treatment, it is a pathway for many individuals to ultimately enter the treatment system.
　　5/11/2022 Trial Tr. at 340:14–41:1 [Alexander] (docket no. 4446).

example, in addition to those referenced above (grief counseling and HIV treatment), the Court concludes it is not appropriate to include in the abatement plan programs and interventions such as compassion fatigue interventions for first responders, stigma reduction training for police officers, transitional housing for newly released inmates, certain parent-child interventions for adoptive families, permanent supportive housing for homeless individuals with OUD, and several others. These programs are not reasonably calculated to reduce the actual, unreasonable interferences with public health caused by the Pharmacy Defendants' intentional and/or unlawful dispensing conduct—that is, the large population of individuals in Lake and Trumbull County suffering from OUD. In the end, the Court concludes the total cost of programs listed by Alexander that are not reasonably calculated to abate the opioid nuisance amounts to 6.3% for Lake County and 7.9% for Trumbull County.

To explain further, as described below, the Court makes several equitable reductions to Plaintiffs' estimated, total costs. The result of these reductions is to award Plaintiffs less than 20% of the total amount they requested. Because of these reductions, Plaintiffs will have to use the monies they receive judiciously and spend those abatement funds where they are needed most.

The Court has also put in place two additional elements to ensure the expenditure of funds is made only for proper abatement interventions. First, as discussed in Section VII of this Order, the Court will appoint an independent Administrator, who will work closely with the Counties to ensure funds are spent only on proper abatement interventions focused on treatment and prevention. Second, the Court's abatement remedy anticipates that any funds that remain at the end of a given year will roll over to the next, and/or will be refunded to Defendants. If the Administrator concludes that not all of the annual amount of funds paid by Defendants was needed

43

to pay for allowed abatement programs, the excess will be credited to Defendants and not simply retained by Plaintiffs.[53]

These three elements of the Court's abatement remedy—(1) total cost reduction, (2) an independent Administrator, and (3) refund of unspent funds—will ensure that monies paid by Defendants will be spent only on those programs and interventions that are reasonably calculated to abate the opioid nuisance in the Counties.

These elements also provide benefits to Plaintiffs. For example, it is clear from the record that the Counties will need flexibility to: (1) tailor the programs and interventions to their specific needs; and (2) be responsive to (a) future changes in the opioid epidemic itself, (b) improved treatment and intervention modalities, and (c) advancements in addiction science. As Dr. Alexander testified:

Q: And the truth is that the opioid epidemic is a complex phenomenon, correct?

A: Yes, it is.

Q: The opioid epidemic continues to change and evolve at a national and state level?

A: Yes.

Q: At a local level, these changes have often been even more profound in the opioid epidemic?

---

[53] Defendants argue the Collateral Source Rule should not apply. Plaintiffs disagree. The Court agrees conceptually with Defendants, if not doctrinally. Without deciding whether the Collateral Source Rule applies in the abatement context generally, the appropriate remedy, as the Court has explained, is a reduction in the size of the population of individuals suffering from OUD in the counties. Thus, if insurance companies pay for some treatment and governmental grants fund some programs, and those additional sources of funding allow for fewer expenditures to be drawn from the abatement fund, then, to the extent there are funds remaining at the end of the expenditure period, that money will rollover or refund to the Defendants. The goal of reducing the population of individuals with OUD, which is the Court's top priority in fashioning this remedy, does not hinge on where the money comes from.

A: Well, there's changes and evolution at every level.

5/11/2022 Trial Tr. at 435:2–10 [Alexander] (docket no. 4446). The simple truth is that successfully mitigating the opioid crisis and abating the nuisance caused by Defendants will be one of the largest, most complicated "clean-ups" in our nation's history. Unlike, for example, removing lead-based paint from people's homes, there are no relatively simple, easily understood, mechanical methods for removing OUD from a large population of individuals in a community. Instead, the Court agrees with Plaintiffs that only with a "comprehensive, long-term abatement plan" can the opioid nuisance in the Counties be materially abated. *Plaintiffs' Closing Brief* at 2 (docket no. 4513).

In addition, the Court finds that using Plaintiffs' top-line estimated total cost numbers as a starting point from which to deviate makes sense from a fairness standpoint. That is, the Court finds it more equitable to err on the side of the wronged party to ensure that the nuisance is abated, or in this case, that there are sufficient funds to abate the nuisance. However, the Court is careful to recognize that this abatement remedy is not (nor is it intended to be) a punishment. That is why any unused or remaining funds, once the nuisance is sufficiently abated, will be credited to the Pharmacy Defendants (either by rolling over to the next year or being refunded).

In sum, the proper scope of the abatement remedy comprises programs and interventions reasonably calculated to reduce the population of individuals in Lake and Trumbull County suffering from OUD and opioid addiction as a result of the oversupply of prescription opioids. Specifically, appropriate programs are those designed to **treat** those individuals with, and **prevent** new or repeat cases of, OUD and opioid addiction.[54] The Court leaves a reasonable amount of

---

[54] The Court reiterates that treatment must include various outreach programs to connect individuals to care. And prevention must include programs designed to prevent both (a) new cases of addiction (*e.g.*, educating doctors and the public on the dangers of opioids, and reducing the

discretion to the Counties to determine which programs will best achieve those goals, subject to approval of the Administrator and the continuing jurisdiction and oversight of the Court.

## VI.     Allocation of Abatement Costs Attributable to Defendants' Conduct

Both before and during the Phase II trial, the Court informed the parties it was not inclined to embrace either of their extreme positions, and asked them to propose a more equitable framework for apportioning abatement costs to the three Defendants on the facts of this case.[55] The reasons for this request were simple. On one hand, Defendants' contention that they should be held responsible for only a minuscule portion of the total abatement costs is flatly contradicted by the jury's finding that each Defendant's conduct was a "substantial factor" in creating the nuisance. On the other hand, Plaintiffs themselves have conceded the Manufacturers and Distributors, though they were not Defendants at trial, played an appreciable role in creating the opioid epidemic—a fact that undermines Plaintiffs' contention that Defendants should be required, in equity, to pay the entire cost of abating the nuisance.

In response to the Court's request for a more equitable proposal, Plaintiffs in their closing brief suggested an alternative calculation that would reduce the total amount of recoverable

---

oversupply and/or diversion of prescription opioids) and (b) recidivism (*e.g.*, supporting the recovery of individuals once they have been treated, to prevent them from returning to opioid misuse).

[55] *See* 5/18/2022 Trial Tr. at 1325:23–1326:14 [the Court] (docket no. 4464) ("But the point is, if I'm just going to get briefs from the plaintiffs urging me to . . . assess $3 billion over 15 years and I get briefs from the defendants urging . . . one percent of some diminished amount, I don't need them. . . . If either side has something that will help me, I'm happy to receive it."); Final Pretrial Tr. at 4:6–16 [the Court] (docket no. 4420) ("I had hoped a lot more would have been agreed upon between counsel. Maybe that was wishful thinking. . . . I'll end up doing . . . not what the plaintiffs want me to do and not what the defendants want me to do.").

abatement costs to account for the estimated "pre-existing" OUD population in the Counties in 1999. This approach acknowledges the Court's concern that some opioid abuse predated the conduct the jury found caused the public nuisance, and reduces Dr. Alexander's 2021 OUD population estimates to account for the OUD population present in the Counties before the Defendants' conduct at issue. *Plaintiffs' Closing Brief* at 20–23 (docket no. 4513). Similarly, CVS's health economist and health policy expert, Dr. Amitabh Chandra, proposed the Court could limit the abatement award by deducting costs attributable to harm arising solely from illicit, *non-prescription* opioid use.

Having considered carefully the approaches offered by the parties, the Court borrows aspects from each side's proposal on apportionment. First, the Court declines to hold Defendants jointly and severally liable for the entire amount of abatement costs. The Court agrees with the concept, proposed by both sides, that any abatement award should be tied to harm arising from the oversupply and diversion of *prescription* opioids, as opposed to harm caused solely by illicit opioids. Additionally, the Court recognizes that the conduct of other actors in the pharmaceutical supply chain—namely, Manufacturers and Distributors—also contributed to creating the nuisance, warranting a further diminution in the allocation of the three Pharmacy Defendants' responsibility for abatement. With this equitable reduction, the Court declines to hold Defendants jointly and severally liable for the *entire amount* of abatement costs. The Court declines to further apportion Defendants' responsibility based on their individual market share of prescription opioids dispensed in the Counties. Details of the Court's analysis are set forth below.

## A.    Harm Attributable to Illicit Opioids

The Court agrees with both sides that an equitable abatement award should account for the fact that some portion of OUD harm arose solely as a result of illicit, non-prescription opioid use,

independent of the oversupply by Pharmacy Defendants of licit prescription opioids. Drug addiction existed long before the advent of prescription opioids, and it is uncontroverted that some percentage of individuals with OUD would have become addicted to illicit opioids even in the absence of the nuisance created by these Defendants. The Court deems it unfair—that is, it would be inequitable—not to recognize this truth and adjust Defendants' abatement obligations accordingly.

Plaintiffs and Defendants have each proposed methods attempting to quantify the harm created by the oversupply of prescription opioids, alone; however, each method has its limitations. Plaintiffs propose a reduction of Dr. Alexander's OUD population estimates for 2021 by "the Counties' baseline OUD population numbers from 1999, which was before most (though not all) of the oversupply and diversion of prescription opioids occurred in the Counties." *Plaintiffs' Closing Brief* at 22 (docket no. 4513). Because the OUD population is a key input for determining the cost of many of the interventions in their abatement plan, Plaintiffs recalculated the cost of those interventions using the lower "net" OUD population figure, yielding a reduction in the overall cost of their plan by approximately 24.5% for Lake County and 33% for Trumbull County. *Id.* at 1, 20–23. Plaintiffs assert this calculation of "the OUD population attributable to the public nuisance found by the jury" is "a potential legal approach that has support in the evidence." *Id.*

Defense expert Chandra's approach, on the other hand, relies on data presented by Plaintiffs' epidemiology expert, Dr. Katherine Keyes, to identify the proportion of harm that is directly and indirectly attributable to prescription opioids, as opposed to harm arising solely from illicit opioid use. More specifically, Chandra relies on two categories of Keyes' data regarding the

percentage of opioid-related harm in each County: (1) mortality[56] resulting directly from prescription opioids; and (2) mortality resulting from illicit opioids, but indirectly attributable to prescription opioids via the so-called "gateway effect," where those who became addicted to prescription opioids then moved on to illicit opioids.[57] According to this data, 66.2% of the opioid-related harm in Lake County is associated with these two categories. For Trumbull County, this figure is 60.7%.[58] In step one of his analysis, therefore, Chandra proposes the Court should award only those percentages of the total abatement costs. By implication, Chandra suggests the remaining 33.8% of harm in Lake County and 39.3% of harm in Trumbull County must be excluded from Plaintiffs' recoverable abatement, because those portions are attributable solely to illicit, non-prescription opioids.

Plaintiffs point out that Chandra's estimation of opioid mortality indirectly caused by prescription opioids ("category 2" in the preceding paragraph) relies on figures reflecting the

---

[56] Experts for both Plaintiffs and Defendants used opioid-related mortality as a proxy for all opioid-related harm. *See* 05/17/2022 Trial Tr. at 1226:8–1230:13 [Chandra] (docket no. 4460); 5/10/2022 Trial Tr. at 49:3–50:5 [Keyes] (docket no. 4438).

[57] 05/17/2022 Trial Tr. at 1231:3–1236:18 [Chandra] (docket no. 4460).

[58] Keyes' calculations for opioid-related mortality directly and indirectly attributable to prescription opioids are:

| | Lake County | Trumbull County |
|---|---|---|
| Percent of opioid-related deaths directly attributable to prescription opioids | 26.5 % | 14.6 % |
| Percent of opioid-related deaths indirectly attributable to prescription opioids | 39.7 % | 46.1 % |
| Total | 66.2 % | 60.7 % |

Ex. 2 to Chandra's Report, CVS-MDL-05012 (docket no. 4593-2); 05/17/2022 Trial Tr. at 1231:3–1235:9 [Chandra] (docket no. 4460).

gateway effect, which is only one of the pathways to illicit opioid use caused by oversupply of prescription opioids. In the Phase II abatement trial, Keyes testified that, in addition to the gateway effect, epidemiological factors known as synergies and interactions also contributed to and elevated opioid addiction, even among people who never used prescription opioids.[59] Keyes explained that the oversupply of prescription opioids in the Counties created a population of people with OUD, which in itself caused more people to become addicted than only those who moved from prescription opioids to heroin and fentanyl:

> You have people who started on prescription opioids who then transitioned to heroin, and then you have other people, once the heroin dealers are in your neighborhood, who are going to use heroin, perhaps not having been exposed to prescription opioids, but those heroin dealers are there because there was a ready and available population of people with OUD who would have a high demand for the product. And so, that synergy of the oversupply of prescription opioids creating a population of people with opioid use disorder, some of whom transitioned to heroin, so now we've got the introduction of people who are going to profit from a population of people with OUD, those [factors] work together then to create an even worse problem in Lake and Trumbull County, including now people who start using heroin who might not be exposed to prescription opioids first.

05/10/2022 Trial Tr. at 72:24–77:6 [Keyes] (docket no. 4438).

Keyes' explanation of synergies and interactions has significant intuitive appeal. However, the record is devoid of any evidence quantifying the effect of these factors. In other words, the Court has no basis upon which to determine the proportion of harm arising from people who did not use prescription opioids, but nevertheless became addicted to illicit opioids because of the presence of an oversupply of prescription opioids in the communities. This lack of evidence

---

[59] 5/10/2022 Trial Tr. at 72–78 [Keyes] (docket no. 4438).

undermines Plaintiffs' critique that Chandra's approach underestimates the OUD population attributable to the oversupply and diversion of prescription opioids ("category 2").

Though perhaps not perfect, Chandra's calculations are grounded not only in the evidence, but in *Plaintiffs' own data*. By contrast, Plaintiffs' method of deriving modified OUD estimates was not presented at trial and is, by Plaintiffs' own admission, not "an epidemiological approach." *Plaintiffs' Closing Brief* at 22 (docket no. 4513). Moreover, Plaintiffs' proposal does not account for any purely illicit, non-prescription opioid addiction occurring after 1999.

Ultimately, the Court agrees Defendants' conduct did not cause all cases of OUD in the Counties, and finds Chandra's method of identifying and allocating the portion of OUD harm that was specifically caused by Defendants' conduct is reasonable and preferable to Plaintiffs' approach. Accordingly, the Court concludes that 66.2% of the abatement costs for Lake County and 60.7% of the abatement costs for Trumbull County are attributable to the oversupply and diversion of prescription opioids. These amounts represent the maximum abatement costs potentially recoverable from the Defendants in this case. As discussed below, a further reduction is also warranted based on the contribution of other actors in the pharmaceutical supply chain.

### B.      Apportionment and Joint and Several Liability

The Court next addresses whether Defendants should be held jointly and severally responsible for the entire amount of recoverable abatement costs attributable to the oversupply and diversion of prescription opioids. The Court recognizes (and both Plaintiffs and Defendants agree) that the conduct of Manufacturers and Distributors in the pharmaceutical supply chain also contributed meaningfully to creating the nuisance. Therefore, for the reasons set out below, the Court allocates only one-third of the allowable abatement costs to the Pharmacy sector in the Counties. The Court declines to further apportion Defendants' responsibility on the basis of market

share, as Defendants request, and therefore holds Defendants jointly and severally liable for the entire share of abatement costs allocable to the Pharmacy sector.

### 1. Legal Standards Regarding Apportionment

In determining the appropriate allocation of the abatement award for these Defendants, the Court, sitting in equity, is guided by Ohio law. Ohio common law follows the Restatement §§ 433A[60] and 433B,[61] and generally requires apportionment if a reasonable basis exists to approximate the contribution of each cause to an indivisible harm. *See Pang v. Minch*, 559 N.E.2d 1313, 1323–25 (Ohio 1990). Under this framework, where a single, indivisible harm results from the tortious acts of multiple defendants, plaintiff bears the initial burden of demonstrating that each defendant's conduct was a "substantial factor" in producing the harm, thus establishing a prima facie evidentiary foundation supporting joint and several liability. *Id.* at 1324–25. Thereafter, the burden of persuasion shifts to defendants to show the harm produced by their conduct is capable of apportionment. If defendants fail to make this showing, they are subject to joint and several liability. *Id.* at 1324–26.

CVS argues this burden-shifting framework does not apply here because the primary harm caused by its dispensing conduct is divisible: Plaintiffs could and should be required to show

---

[60] Section 433A provides:
(1) Damages for harm are to be apportioned among two or more tortfeasors where
    (a) there are distinct harms, or
    (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
(2) Damages for any other harm cannot be apportioned among two or more causes.

[61] Section 433B(2) provides:
Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.

whether, in fact, each individual who seeks treatment for opioid addiction had prescriptions filled at a particular CVS pharmacy. *See CVS Closing Brief* at 22–23 (docket no. 4512). In other words, CVS asserts it bears responsibility only for discrete harms that can be directly traced to individuals who physically filled opioid prescriptions at a CVS pharmacy. *See* 05/10/2022 Trial Tr. at 23:1–9, 25:7–16 (CVS counsel's opening argument) (docket no. 4438); *CVS Response Brief* at 10 (docket no. 4570) ("It can be determined from CVS's dispensing data whether an individual seeking addiction treatment was dispensed prescription opioids by CVS.").

This argument ignores the realities of the various, inter-related factors contributing to the harm caused by oversupply and diversion of prescription opioids in the Counties. CVS's pills reached individuals in multiple ways, far beyond only the people who physically filled a prescription written in their name at CVS. The jury heard evidence that some County residents obtained improperly dispensed CVS pills from other sources, such as the medicine cabinets of friends and family, or drug dealers on the black market. Furthermore, once these individuals became addicted, many turned to illicit opioids. The jury accepted (as does the Court) the testimony of Plaintiffs' epidemiologist expert, Dr. Katherine Keyes, that the oversupply of prescription opioids resulted in an increased population of people with opioid udse disorder, which led to a number of interacting, synergistic factors that worked together to create an indivisible harm, namely, the opioid epidemic.[62] The jury's verdict necessarily implies it concluded that CVS dispensed prescriptions it should not have, leading to oversupply and diversion of opioids in the community, which led linearly and foreseeably to addiction of *not only some CVS customers* but non-customers, as well. Of course, the same is true for each Defendant. Accordingly, the Court

---

[62] *See* 05/10/2022 Trial Tr. at 72:24–77:6 [Keyes] (docket no. 4438).

finds the harm created by Defendants' dispensing misconduct is not capable of division based on specific evidence regarding where certain individuals had their prescriptions filled.

Moreover, as previously discussed, the jury found each Defendant's conduct was a "substantial factor" in causing the nuisance. The Court, therefore, rejects Walgreens' and Walmart's assertion that Defendants are responsible for "only a miniscule share of [the opioid] problem." *WAG/WMT Closing Brief* at 2 (docket no. 4511). According to **defense** expert Chandra's market share calculations, these three Pharmacy Defendants collectively dispensed 50.8% of the red-flagged prescriptions dispensed in Lake County, and 23.4% of the red-flagged prescriptions dispensed in Trumbull County. Ex. 3A to Chandra's Report, CVS-MDL-05013 (docket no. 4593-3); Ex. 3B to Chandra's Report, CVS-MDL-05014 (docket no. 4593-4). The fact that an individual Defendant may have dispensed a relatively small percentage of total prescription opioids does not show the impact of its misconduct was insubstantial.[63]

The evidence at trial showed these three Pharmacy Defendants dispensed massive quantities of prescription opioids into the Plaintiff Counties. Between 2006 and 2019, CVS dispensed 25,528,782 dosage units of prescription opioids in Lake County, and 15,977,215 in Trumbull County; Walgreens dispensed 25,346,069 dosage units of prescription opioids in Lake County, and 27,969,541 in Trumbull County; and Walmart dispensed 9,890,771 dosage units of

---

[63] In denying the Small Distributors' motion for summary judgment in Track One, the Court found that "even a very small *proportional* contribution by one of numerous defendants could equate with a rather large and substantial *absolute* quantity, both in monetary terms and in terms of the consequent harms." *See CT1 MSJ Order re Small Distributors* at 5 (docket no. 2559) (*In re Opiate*, 2019 WL 4178588, at *2 (N.D. Ohio Sept. 3, 2019)) (emphasis added) (extremely small market share of 0.03% was not so de minimis as to preclude a jury from finding liability as a matter of law). The Court reaffirms that ruling here. Other courts weighing public nuisance claims agree. *See ConAgra*, 17 Cal. App. 5th at 102 ("a force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor', but a very minor force that does cause harm is a substantial factor") (cleaned up).

prescription opioids into Lake County, and 5,228,488 into Trumbull County.[64] *Order Denying JMOL* at 11, 16, 19 (docket no. 4295).[65] Certainly, this evidence supports the jury's determination that improper dispensing conduct by each Defendant substantially contributed to creation of the nuisance.

Because the nuisance is indivisible and the jury found each Defendant's conduct was a "substantial factor" in producing the nuisance, to avoid joint and several liability Defendants must show a reasonable basis to approximate the contribution of each cause to the harm. *See Pang*, 559 N.E.2d at 1324–26; *see also* Restatement § 433B, cmt. d (stating it would be unjust to allow a defendant to escape liability merely because the harm it inflicted combined with similar harm

---

[64] During this period, CVS dispensed an average of 7.99 dosage units of prescription opioids *per year* to every man, woman, and child in Lake County, and 5.46 per year to every man, woman, and child in Trumbull County. Comparable per capita figures for Walgreens are 7.84 dosage units (Lake) and 9.45 dosage units (Trumbull); and comparable per capita figures for Walmart are 3.49 dosage units (Lake) and 2.02 dosage units (Trumbull). *See* Pls. Ex. P-26319-A at 2 (docket no. 4046-14); Pls. Ex. P-26321 at 3 (docket no. 4036-3); Pls. Ex. P-26322-A at 2 (docket no. 4046-16). The significance of these numbers is highlighted by this statistic: every one-pill increase in per-capita pill volume is associated with a 0.2 percent increase in opioid-related deaths per 100,000 in the population. *See* 11/4/2021 Trial Tr. at 6020:21–6021:1 [Murphy] (docket no. 4118).

[65] *In re Opiate*, 2022 WL 671219 at *6, 8, 10 (N.D. Ohio March 7, 2022).

inflicted by other wrongdoers; the defendant should bear full responsibility if it is unable to produce evidence showing the harm is capable of apportionment);[66] Restatement § 840E.[67]

## 2. Contribution by Other Actors in the Pharmaceutical Supply Chain

During the Phase I liability trial, Plaintiffs' experts readily acknowledged that the oversupply of prescription opioids was not caused solely by the Pharmacies; rather, the improper conduct of others, chiefly including Manufacturers and Distributors, also contributed to creating the nuisance.[68] Indeed, the lawsuits filed by Lake County and Trumbull County initially named

---

[66] Defendants misleadingly assert that Comment e to Restatement § 433B requires a different analysis, and the Court *must* apportion the harm, and/or place the burden on Plaintiffs to disprove apportionment. *See CVS Closing Brief* at 23 (docket no. 4512); *WAG/WMT Closing Brief* at 34 (docket no. 4511). Comment e merely observes that the cases thus far applying Section 433B(2) have involved a small number of tortfeasors. Further, it notes a "possibility" could arise in which "there may be so large a number of actors, each of whom contributes a relatively small and insignificant part to the total harm, that the application of the rule [placing the burden on defendants to show apportionability] may cause disproportionate hardship to defendants." Restatement § 433B, cmt. e.

Defendants cite no cases where courts have declined to apply the burden-shifting framework of Section 433B(2) based on this comment. In light of the jury's finding that the improper dispensing conduct of each of these Pharmacy Defendants was a substantial factor in creating the nuisance, the Court discerns no disproportionate hardship in requiring Defendants to show a reasonable basis for approximating the contribution of other causes to the nuisance.

[67] Contrary to CVS's assertion, Comment b to Restatement § 840E does not require that a nuisance abatement award "*must* be apportioned." *CVS Closing Brief* at 22 (docket no. 4512) (emphasis added). Section 840E merely incorporates the same principles stated in Sections 433A and 433B, discussed *supra*, in the nuisance context. *See* Restatement § 840E, cmt. b (reciting the rules stated in §§ 433A and 433B that liability may be apportioned on some reasonable basis, and defendant bears the burden "to produce sufficient evidence to permit the apportionment to be made"). Indeed, Comment c to Section 840E repeats the same principle from Section 433B—that is, if the defendant fails to show a reasonable or rational basis for apportionment, joint and several liability applies. Restatement § 840E, cmt. c; *see also* Restatement § 433B, cmt. d; *ConAgra,* 227 Cal.Rptr.3d at 556 (when a court determines that apportionment of an abatement remedy cannot be accomplished, "each defendant who contributed is liable for the entire harm") (citing Restatement § 840E, cmt. c).

[68] *See, e.g.,* 10/22/2021 Trial Tr. at 3691:17–23; 3692:2–5 [Keyes] (docket no. 4065) (opining that Distributors and Manufacturers were causal factors in the Counties).

The Pharmacy Defendants do not disagree. *See, e.g. CVS Motion for JMOL* at 14 (docket

Manufacturers and Distributors as defendants, along with the Pharmacies. As a matter of MDL management, the Court effectively severed the proceedings along the lines of the three different sectors in the pharmaceutical supply chain when it created Track Three, in order to focus only on the Pharmacies.

Based on Chandra's testimony, Defendants suggest the Court should divide the allowable abatement costs equally among five categories that he identified as being responsible for creating the opioid epidemic: (1) manufacturers; (2) the federal government (in particular, the U.S. Food & Drug Administration ("FDA") and U.S. Drug Enforcement Administration ("DEA")); (3) prescribing doctors; (4) pharmacies; and (5) individuals who diverted prescription opioids after the drugs were dispensed.[69] Chandra did not, however, profess to have personal knowledge or expertise with regard to determining who the responsible actors are. In fact, he specifically stated his model allowed flexibility for the Court to make this determination.[70]

Upon careful consideration of the evidence and equities in this case, the Court finds it is reasonable and fair to allocate one-third of the recoverable abatement costs to the Pharmacy Defendants for the harm caused by improper dispensing conduct in the Counties.

This allocation takes into account the fact that all three categories of actors along the pharmaceutical supply chain—that is, manufacturers, distributors, and dispensers of prescription

---

no. 4207) (asserting "there were other actors—indeed, many of them—that played much more active and substantial roles in causing the alleged nuisance").

[69] Chandra testified he derived the five groups from three sources: Plaintiffs' experts, the complaints, and the verdicts. 05/17/2022 Trial Tr. at 1238:24–1240:13 [Chandra] (docket no. 4460). Curiously, Chandra did not include Distributors as a sixth group, even though they were one of the principal targets named in Plaintiffs' complaints and Keyes stated explicitly they were also to blame. This may be because the Pharmacy Defendants are also self-distributors and they prefer their expert not to acknowledge their duties in this regard.

[70] 05/17/2022 Trial Tr. at 1257:8–15 [Chandra] (docket no. 4460).

opioids—contributed to the nuisance in the Counties, and it would be inequitable to hold these Defendants liable for more than a one-third share. The numerous defendants named in these MDL proceedings fall overwhelmingly into these three categories. The Court finds this natural grouping, which corresponds to the tripartite opioid supply scheme contemplated by the Controlled Substances Act,[71] forms a rational basis to equitably apportion one-third of the responsibility for the nuisance to pharmacies for improper dispensing conduct in the Counties.[72] Accordingly, the

---

[71] As DEA registrants in the closed-delivery system established by the CSA and its implementing regulations for the flow of controlled substances through the pharmaceutical supply chain, *see* 21 U.S.C. §§ 801 *et seq.*; 21 C.F.R. §§ 1301 *et seq.*, participants in each of these sectors bear significant and independent responsibilities to ensure the safety and integrity of the supply of prescription opioids to the public, including the essential duty to provide effective controls and procedures to guard against diversion of these controlled substances. *See CT1 MSJ Order re CSA Duties* at 14–19 (docket no. 2483) (*In re Opiate*, 2019 WL 3917575, at *7-9 (N.D. Ohio Aug. 19, 2019)) (the CSA and its implementing regulations require manufacturers and distributors to: design and operate a system to identify suspicious orders of controlled substances, inform the DEA of suspicious orders when discovered, and not ship such orders unless due diligence reasonably dispels the suspicion); *Order Denying MTD* at 15 (docket no. 3403), *In re Opiate*, 477 F. Supp.3d 613, 624-25 (N.D. Ohio 2020) (21 C.F.R. § 1301.71(a) requires all DEA registrants, including manufacturers, distributors, and pharmacies, to provide effective controls and procedures to guard against diversion of controlled substances); *Daubert Order re Rafalski* at 3–5 (docket no. 3929), *In re Opiate*, 2021 WL 4060359, at *2-3 (N.D. Ohio Sept. 7, 2021) (citing Rafalski CT3 Rpt. at 8–9).

[72] For purposes of approximating the portion of harm attributable to improper dispensing, the Court has seen enough evidence in these MDL proceedings to determine that conduct by other actors along manufacturing and distribution points in the supply chain also contributed to creating the opioid epidemic in the Counties. *See, e.g., CT1 MSJ Order re Causation* at 4 (docket no. 2561) (*In re Opiate*, 2019 WL 4178617, at *2 (N.D. Ohio Sept. 3, 2019)) ("Plaintiffs have shown evidence sufficient to support their claim that the Manufacturers' allegedly fraudulent marketing activities caused an increase in the supply of prescription opioids in the Track One Counties."); *id.* at 7–9 (Plaintiffs presented evidence upon which a jury could reasonably conclude both Manufacturers and Distributors failed to maintain effective controls against diversion, and that these failures were a substantial factor in producing the nuisance). In reaching this determination, the Court makes no findings, and expresses no opinion, regarding how the remaining two-thirds of responsibility would or should be allocated to any other individual actors or categories of actors.

Court allocates one-third of the recoverable abatement costs to improper conduct in the pharmacy sector.[73]

### 3. Market Share Data Does Not Provide a Basis to Further Apportion Harm Attributable to Improper Dispensing

Based on Chandra's testimony, Defendants contend their responsibility for the harm attributable to improper dispensing can be further apportioned according to their respective market share of prescription opioids dispensed in the Counties. For both Lake County and Trumbull County, Chandra relied on data from the Ohio Automated Rx Reporting System ("OARRS") to calculate the market share of each Pharmacy Defendant for all dispensed opioid prescriptions in the Counties.[74] Additionally, Chandra performed these market share calculations for the two

---

[73] In reaching this result, the Court declines Defendants' invitation to assign responsibility to other categories of actors, including government regulators, prescribing doctors, and individuals who diverted prescription opioids after the drugs were dispensed. Although the Court has recognized that, "[f]rom the outset, it has been readily apparent that the opioid crisis was caused by a confluence of failures by virtually everyone," the evidentiary record does not provide a reliable basis for the Court to allocate responsibility to any other categories of actors, or to weigh the responsibility of one sector in the pharmaceutical chain more heavily than another. *Order Denying New Trial* at 68 (docket no. 4296) (*In re Opiate*, 2022 WL 668434, at *36 (N.D. Ohio March 7, 2022)). Further, there was no expert testimony or other reliable evidence presented on this subject.

[74] Chandra calculated the market share of each Pharmacy Defendant based on three different metrics: share of prescriptions, share of total MMEs (morphine milligram equivalents), and share of dosage units, all during the 2008 to 2018 time period. Chandra calculated these three market share numbers separately for all dispensed opioid prescriptions in the Counties. *See* 05/17/2022 Trial Tr. at 1250:3–1254:25 [Chandra] (docket no. 4460); Ex. 3A to Chandra's Report, CVS-MDL-05013 (docket no. 4593-3); Ex. 3B to Chandra's Report, CVS-MDL-05014 (docket no. 4593-4). Additionally, Chandra calculated these market share numbers for dispensed opioid prescriptions meeting the "red-flag" criteria that pharmacies could use to identify potentially illegitimate prescriptions. *See id.; Daubert Order re Catizone* at 2 (docket no. 3947) (*In re Opiate*, 2021 WL 4146672, *1 (N.D. Ohio Sept. 13, 2021)). Chandra opined that, although any of his market-share calculations could be used to allocate responsibility, the calculations for red-flagged prescriptions measured by total MMEs are the most useful. 05/17/2022 Trial Tr. at 1253:21–1254:8 [Chandra] (docket no. 4460).

settling Pharmacy Defendants, Rite Aid and Giant Eagle, and for a catch-all category labeled "non-defendants" representing all other pharmacies in the Counties.[75] Chandra then concluded each Pharmacy Defendant should be responsible only for its market share percentage of recoverable abatement costs.

Chandra's market-share analysis is problematic, however, because it does not provide a reasonable basis for the Court to approximate the relative responsibility of the settling pharmacies and non-defendant pharmacies. The responsibility for creating the nuisance in this case is not premised simply on the sheer number of red-flagged opioid prescriptions dispensed by a particular pharmacy. Rather, for liability to attach, a particular pharmacy must have failed to *investigate and resolve* red flags before dispensing the medication. Here, the jury found the improper dispensing conduct of each of the three Pharmacy Defendants, evidenced by their systemic failures to investigate and resolve red-flag prescriptions, was a substantial factor in creating the nuisance caused by oversupply and diversion of prescription opioids. No such adjudication has been made with regard to the settling pharmacy defendants, and virtually no evidence has been presented with respect to the anti-diversion efforts of any non-defendant pharmacies.

---

[75] Chandra's market share calculations for the total share of MMEs of red-flagged opioid prescriptions dispensed in the Counties are:

| Pharmacy | Lake County | Trumbull County |
|---|---|---|
| CVS | 21.4 % | 5.4 % |
| Wal-Mart | 8.1 % | 1.6 % |
| Walgreens | 21.3 % | 16.4 % |
| Rite Aid | 20.7 % | 22.4 % |
| Giant Eagle | 8.4 % | 6.9 % |
| Non-Defendants | 20.1 % | 47.3 % |
|  | 100.0 % | 100.0 % |

Ex. 3A to Chandra's Report, CVS-MDL-05013 (docket no. 4593-3); Ex. 3B to Chandra's Report, CVS-MDL-05014 (docket no. 4593-4).

On the other hand, specific evidence in the Phase I trial demonstrated that each of the three Pharmacy Defendants dispensed massive quantities of red-flagged prescriptions without taking adequate measures to investigate or otherwise ensure the prescriptions were appropriately dispensed. The mere fact that other pharmacies also may have dispensed red-flagged opioid prescriptions does not in itself show the other pharmacies bear similar responsibility for creating the public nuisance. Rather, to establish responsibility, Defendants would need to show the other pharmacies also failed to take adequate measures to investigate or otherwise ensure the red-flagged prescriptions were legitimate prior to dispensing them. Defendants have not produced any such evidence.

Because Defendants have not presented a reasonable basis to allocate responsibility for the harm caused by improper dispensing to any other pharmacies,[76] the Court finds it appropriate to

---

[76] In addition to Chandra's testimony, Defendants presented a regression analysis performed by health care economist Dr. Daniel Kessler. Kessler purported to determine a statistically significant association between opioid-related mortality and increased prescription opioid shipments, as compared to other factors that could also affect the demand for opioids, such as "[d]eindustrialization, lack of opportunity, disability, pain and work injury." 05/16/2022 Trial Tr. at 987:24–988:8, 989:10–990:25 [Kessler] (docket no. 4455). Kessler stated he measured the association between opioid mortality and prescription opioid shipments, as compared to other factors in society generally, such as race, education, employment, household income, and various health factors. *See* Appendix E to Kessler's Report (docket no. 4593-37).

The Court found Kessler's analysis impenetrable. He did not sufficiently explain the design of his regression analysis nor how it yielded his conclusions. Moreover, Kessler made no attempt to calculate the contribution of any other actors in the pharmaceutical supply chain. In the end, Kessler estimated the Pharmacy Defendants' combined responsibility totaled 1.314% of the total abatement costs in Lake County, and 1.16% in Trumbull County. 05/17/2022 Trial Tr. at 1146:20–1150:23 [Kessler] (docket no. 4460); WMT Dem. Ex. 002 at 17 (docket no. 4593-35). Kessler did not allocate responsibility for the remaining 98.66% of harm in Lake County and 98.84% in Trumbull County. 05/17/2022 Trial Tr. at 1146:20–1150:23 [Kessler] (docket no. 4460).

Ultimately, Kessler's results beggar belief and do not fit with the facts of this case, including the jury's determination that the improper dispensing conduct of these Defendants was a substantial factor in creating the nuisance. The Court therefore finds Kessler's regression analysis completely unhelpful to its allocation determination.

hold the three Pharmacy Defendants jointly and severally responsible for the entire portion of abatement costs allocated to the pharmacy sector. *See Pang*, 559 N.E.2d at 1324–26; *Nichols v. Hanzel*, 674 N.E.2d 1237, 1244 (Ohio App. 1996) (Ohio courts refuse to make an arbitrary apportionment for its own sake; when a reasonable basis for apportionment is not available, each of the causes is charged with responsibility for the entire harm); Restatement § 433A, cmt. i ("Where two or more causes combine to produce [] a single result, incapable of division on any logical or reasonable basis, and each is a substantial factor in bringing about the harm, courts have refused to make an arbitrary apportionment, and each of the causes is charged with responsibility for the entire harm.").

This conclusion is supported by other cases where courts have imposed joint and several liability in the nuisance context. *See, e.g., Briar Lake Ass'n v. Cent. Land Corp.,* 1982 WL 2335, at *9 (Ohio Ct. App. Feb. 4, 1982) (affirming the trial court's imposition of joint and several liability in a nuisance case, citing the general rule that, where two or more persons concurrently cause a single indivisible injury and it is impossible to measure or ascertain the amount of damage created by any one of the persons, those persons may be joined in one action and held jointly and severally liable); *ConAgra,* 227 Cal.Rptr.3d at 549, 556–558 (imposing joint and several liability for the entire costs of abating the nuisance resulting from the use of interior residential lead paint, where the defendants failed to present evidence showing the harm was capable of apportionment).

Further, the Court notes that Defendants' underlying dispensing misconduct was knowing and intentional, a factor that would support imposing joint and several liability under Ohio's apportionment statute. *See* O.R.C. § 2307.22.[77] This statute generally precludes joint and several

---

[77] Although the Court has determined the apportionment statute does not apply to Plaintiffs' equitable claims seeking abatement, *see CT1 Order on Plaintiffs' Nuisance MSJ* at 4–6 (docket no. 2572) (*In re Opiate*, 2019 WL 4194272, at *3-4 (N.D. Ohio Sept. 4, 2019)), the statute may

liability unless a defendant is responsible for causing over 50% of plaintiff's harm. *See* O.R.C. § 2307.22(A)(1).[78] However, where a defendant's underlying conduct is intentional, the statute expressly permits joint and several liability, regardless of the percentage of responsibility attributable to the defendant's conduct. *See* O.R.C. § 2307.22(A)(3).[79] Under the statutory scheme, an "intentional tort claim" alleges that "a tortfeasor knew or believed that the [harm] was substantially certain to result from the tortfeasor's conduct." O.R.C. § 2307.011.

Here, the evidence presented in the Phase I trial overwhelmingly demonstrated that Defendants' underlying dispensing conduct was both knowing and intentional.[80] The jury

---

nevertheless provide useful guidance for the Court's decision in equity. *See, e.g., Guar. Tr. Co. of N.Y. v. Grand Rapids, G.H. & M. Ry. Co.*, 7 F. Supp. 511, 526 (W.D. Mich. 1931), *aff'd sub nom. United Light & Power Co. v. Grand Rapids Tr. Co.*, 85 F.2d 331 (6th Cir. 1936) ("In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character."); *S.E.C. v. Mgmt. Sols., Inc.*, 2013 WL 594738, at *3 (D. Utah Feb. 15, 2013) (courts often look to analogous bankruptcy and non-federal receivership cases to determine the appropriate relief in an equity receivership).

[78] Generally speaking, the apportionment statute otherwise precludes joint and several liability for economic loss unless a defendant is responsible for causing more than 50% of plaintiff's harm. O.R.C. § 2307.22(A)(1). For non-economic loss, the statute requires apportionment in all circumstances. O.R.C. § 2307.22(C). The Court notes the abatement costs at issue here are economic in nature.

[79] This exception allowing for joint and several liability for intentional conduct is consistent with the "uniform" law in other jurisdictions. *See* Restatement (3d) Torts: Apportionment Liab. § 12 (2000) and Reporters' Note ("there is, so far as we are aware, no authority whatsoever for exempting intentional tortfeasors from joint and several liability"); Robert S. Peck, The Development of the Law of Joint and Several Liability, Haw. B.J., May 2011, at 9 ("nearly all states retain joint and several liability for intentional tortfeasors"); Jonathan M. Hoffman, Claim Splitting in the New World of Several Liability and Personal Jurisdiction, 86 J. Air Law & Commerce 377, 417 (2021) (most several-liability states exclude allocating the fault of intentional tortfeasors).

[80] *See Order Denying JMOL* (docket no. 4295) (*In re Opiate*, 2022 WL 671219 (N.D. Ohio March 7, 2022)). This Order summarizes the evidence that provided the jury with a reasonable basis to find that: (1) "each Defendant knew prescription opioids were highly addictive and had a high potential for abuse, and that diversion of prescription opioids would likely lead to significant harms in the community;" (2) "despite this knowledge, each Defendant dispensed massive

reasonably concluded that each Pharmacy Defendant dispensed opioids without having in place effective controls and procedures to guard against diversion—controls and procedures they knew were required and knew they had not adequately employed. The evidence also showed each Defendant knew or had strong reason to know the nuisance was substantially certain to result from their conduct. Under the apportionment statute, this intentional conduct would justify imposing joint and several liability against these Defendants, a factor this Court finds persuasive in reaching its equitable decision to hold these Defendants jointly and severally responsible for the abatement costs attributable to improper dispensing conduct in the Counties.

In sum, the Court concludes: (1) it is just and equitable to allocate one third of the recoverable abatement costs to the three Pharmacy Defendants; and (2) it is not appropriate to subdivide this allocation further and reduce the Pharmacy Defendants' responsibility based on their market share.

### 4. Defendants' Other Arguments are Unavailing

The Court concludes the result reached above is fair and equitable. Defendants' other arguments are unavailing.

Ohio law does not require the joinder of all other potential contributors to the dispensing harm, as Defendants contend. *See WAG/WMT Closing Brief* at 39–40 (docket no. 4511). The only case Defendants cite that arguably supports this assertion is outdated and overwhelmingly outweighed by prevailing Ohio law. *See id.* (citing *State of Ohio v. BASF Wayandotte Corp.*, 1975

---

quantities of opioids into Plaintiffs' communities without taking necessary steps to protect against diversion;" and (3) "each Defendant continued this dispensing conduct even after it had notice that diversion of prescription opioids was, in fact, contributing to high numbers of death and addiction." *Order Denying JMOL* at 21 (docket no. 4295) (*In re Opiate*, 2022 WL 671219, at *10 (N.D. Ohio March 7, 2022)).

WL 182459 (Ohio App. April 24, 1975)).[81] *BASF Wayandotte* is a 47-year-old, unpublished

decision, issued by a lower appellate court, that apparently has not been cited in any subsequent

published opinions. Most notably, however, *BASF Wayandotte* was decided before the Ohio

Supreme Court decided *Pang* in 1990, and does not rely on the Restatement principles adopted in

*Pang*. Not only would it be an impractical and likely insurmountable hurdle to require joinder of

all potential contributing tortfeasors, this result is flatly contradicted by Comment a to Restatement

---

[81] In *BASF Wayandotte*, the State of Ohio asserted nuisance claims against three chemical companies, alleging they polluted Lake Erie with mercury. The trial court treated the defendants' motions to dismiss as motions for summary judgment and entered a final judgment permanently enjoining the defendants from further discharging mercury into the Lake, and otherwise denying Plaintiffs' requests for monetary relief. *See BASF Wayandotte,* 1975 WL 182459, at *1. On appeal, the Ohio Court of Appeals reversed, finding, *inter alia,* that the trial court denied the parties an opportunity to present evidence regarding whether damages were apportionable based on the relative amounts of mercury deposited by each defendant. *See BASF Wayandotte,* 1975 WL 182459, at *1–3, 5.

In remanding the case for further proceedings, the appellate court noted that the issue of apportionment was "complicated" by the fact that not all of the mercury polluters were joined as defendants. *Id.* at *5. It instructed that, upon remand, the trial court should determine whether apportionment was possible absent the other mercury polluters. *Id.* Without citing any supporting authority, the appellate court further stated that, even if apportionment was deemed impossible, "in no instance" could the defendants in that case be held jointly and severally liable for mercury damage caused by non-defendants. *Id.* Walgreens and Walmart seize on this latter statement and argue they cannot be held liable for nuisance caused by other tortfeasors who have not been named as defendants in the case. But this proposition is entirely contrary to *Pang* and the Restatement, as discussed above.

The other cases Defendants cite involve alternative liability under Restatement § 433B(3), which is inapplicable here. *See WAG/WMT Closing Brief* at 39–40 (docket no. 4511) (citing *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 379 F. Supp.2d 348 (S.D.N.Y. 2005); *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069 (N.Y. 1989); and *Smith v. Cutter Biological, Inc.*, 823 P.2d 717 (Hawaii 1991)); *see also Huston v. Konieczny*, 556 N.E.2d 505, 509–10 (Ohio 1990) (in order to shift the burden of proof under Section 433B(3), "all tortfeasors should be before the court, if possible"). The issue of alternative liability arises where only one defendant's conduct (or product) has actually caused the harm, but the plaintiff is unable to determine which one. *See* Restatement § 433B(3) ("Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."). By contrast, this case falls under subsection (2) of Section 433B, which applies when the conduct of multiple actors has combined to cause the harm.

§ 433A, which expressly states it is "immaterial" whether all of the persons who caused the harm are joined as defendants in the particular action. Restatement § 433A, cmt. a. By way of analogy, this conclusion is further supported by Ohio's apportionment statute, discussed *supra*, which allows for joint and several liability without requiring that all tortfeasors be joined in the case. *See* O.R.C. §§ 2307.22, 2307.23.

Likewise, Walgreens' and Walmart's contention that the Court cannot impose joint and several liability absent proof of a common design or concerted action, *see WAG/WMT Closing Brief* at 35 (docket no. 4511), is clearly contrary to Ohio law. *See Pang,* 559 N.E.2d at 1323–25; *Nichols,* 674 N.E.2d 1244 (defendants need not act in concert: "[t]he criterion for joint and several liability is indivisibility of harm, not the indivisibility of causation"); *Schindler v. Standard Oil Co.*, 143 N.E.2d 133, 136 (Ohio 1957) (if Ohio law ever required a common design or concerted action to impose joint and several liability, that theory "has long since been abandoned") (citing *Wery v. Seff*, 25 N.E.2d 692, Syl. ¶ 5 (Ohio 1940)). *See also, e.g., City of Columbus v. Rohr*, 20 Ohio C.D. 155, 1907 WL 572, at *2 (Ohio Cir. Ct. Oct. 10, 1907) (persons contributing to the creation of a nuisance, though acting independently, are generally held jointly liable in an equitable suit to abate the nuisance); *Neibel v. Bd. of County Comm'rs*, 26 Ohio N.P. (N.S.) 195, 198–99 (Ohio Com. Pl. 1923) (the general rule is that persons who by their several acts create or maintain a nuisance are jointly and severally liable for damages); Ohio Jurisprudence (3d) on Nuisances § 16 (2022) (all persons who create a nuisance are "jointly liable in equity in a suit to abate the nuisance").

Finally, Defendants argue holding them jointly and severally liable for the entire costs of abatement would be grossly excessive in violation of their constitutional rights to due process and to be free of excessive fines. *See WAG/WMT Closing Brief* at 44–46 (docket no. 4511) (warning

that refusing to apportion and placing all of the blame on these Defendants would be grossly excessive and violate the Constitution); *CVS Closing Brief* at 23–24 (docket no. 4512) (contending it would be arbitrary, excessive, and fundamentally unfair not to apportion the costs of abatement). Defendants' rationale for this argument has been severely undercut by the Court's decision to allocate only about 20% of the total abatement costs to these Defendants. In any event, Defendants have received ample due process in these proceedings.[82] As explained above, the Court's equitable award is intended to abate the nuisance caused by Defendants' conduct. The Court has carefully crafted this award based on Defendants' proportional responsibility, under applicable legal and equitable principles, for harm attributable to their improper conduct. The award is remedial in nature; it is not punitive and does not implicate due process or the Excessive Fines Clause in any way.[83]

### C.    Conclusion

For the foregoing reasons, the jury's finding that each Defendant's improper dispensing conduct was a substantial factor in creating the nuisance establishes a prima facie evidentiary foundation supporting joint and several liability. *Pang,* 559 N.E.2d at 1324. Here, the Court has

---

[82] *See, e.g., BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 587 (1996) (Breyer, concurring) (the due process constitutional concern "arises out of the basic unfairness of depriving citizens of life, liberty or property through the application, not of law and legal processes, but of *arbitrary coercion*") (quotations and citation omitted, emphasis added). Indeed, in light of the entire litigation history of this MDL and Track Three, it is almost laughable for Defendants to assert they did not receive sufficient legal process that is due a party in a civil case.

[83] *See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 1519–20 (2003) (the Due Process Clause prohibits "the imposition of grossly excessive or arbitrary punishments on a tortfeasor"); *F.P. Dev., LLC v. Charter Township of Canton, Mich.*, 164 F.4th 198, 209 (6th Cir. 2021) (the purpose of a law designed to remedy the harm caused by tree removal was remedial in nature, not punitive, and therefore did not implicate the Excessive Fines Clause of the Eighth Amendment).

excluded from the Plaintiffs' recoverable abatement costs the portion of harm unrelated to the oversupply and diversion of prescription opioids, as identified by CVS's expert, Chandra. Moreover, the Court has determined in equity that the evidence produced in these MDL proceedings provides a reasonable basis to allocate only one-third of these allowable abatement costs to the Pharmacy sector. However, the record does not provide a reasonable basis for the Court to determine whether improper dispensing conduct by any other pharmacy substantially contributed to creating the nuisance. Accordingly, the Court declines to use market share data as a basis to further apportion Defendants' responsibility for harm caused by improper dispensing in the Counties.

The Ohio Supreme Court's decision in *Pang* explains why this is a fair and equitable result on the facts of this case:

> The reason for the exceptional rule placing the burden of proof as to apportionment upon the … defendants is the injustice of allowing a proved wrongdoer who has in fact caused harm to the plaintiff to escape liability merely because the harm which he has inflicted has combined with similar harm inflicted by other wrongdoers, and the nature of the harm itself has made it necessary that evidence be produced before it can be apportioned. In such a case the defendant may justly be required to assume the burden of producing that evidence, or if he is not able to do so, of bearing the full responsibility. As between the proved tortfeasor who has clearly caused some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of the harm caused should fall upon the former.

*Pang*, 559 N.E.2d at 1324 (quoting comment d to Restatement § 433B(2)).

Having carefully evaluated the relevant factors and evidence in this case, the Court concludes it is fair and reasonable to require these three Pharmacy Defendants to pay one-third of the total recoverable abatement costs, less any settlement amounts paid by other pharmacies in the Counties. *See Plaintiffs' Omnibus Response* at 36–38 (docket no. 4571) (conceding setoff for

settlement amounts received is appropriate, to the extent Defendants are held jointly and severally liable for the abatement award).[84] In reaching this result, the Court notes Defendants did not seek to join any other dispensers in the case.[85] Defendants note correctly they were not allowed to join *prescribers* in these proceedings; however, a doctor's prescribing duties are separate and distinct from a pharmacy's independent obligations under the CSA to protect against diversion and ensure that only valid prescriptions are filled.[86] Of course, Defendants remain free to seek contribution from one another and from any parties whom they believe are also responsible for causing the nuisance attributed to improper dispensing in the Counties.

## VII.     Administration of the Abatement Award

Plaintiffs and Defendants both suggest the Court should appoint a third-party neutral to administer and oversee the abatement funds collected from Defendants, and the payment of

---

[84] So far, the only settlement amounts paid by other pharmacies "to each county [are] $1.5 million from Giant Eagle and $1.5 to $3 million from Rite Aid." *CVS Response Brief* at 2 (docket no. 4570)

[85] In Phase I, Defendants introduced evidence regarding other dispensers in the Counties, arguing they engaged in more culpable conduct than Defendants did. For example, Defendants pointed to extremely high levels of opioid dispensing by two independent pharmacies—Franklin Pharmacy and Overholt's Pharmacy—and asserted criminals could easily visit these pharmacies to obtain and divert opioids. *See, e.g.,* 11/02/2021 Trial Tr. at 5535:18-5544:24 [Brunner] (docket no. 4111) (compared to Walgreens, Franklin and Overholt's each dispensed greater volumes of MMEs, filled more opioid prescriptions for cash, and dispensed a much higher percentage of high-dose opioid prescriptions); 10/04/2021 Trial Tr. at 162:2-163:20 [Counsel for Walgreens' Opening Statement] (docket no. 3991) (a well-known pill-mill doctor told his patients to only fill prescriptions he wrote at Overholt's).

[86] Allowing Defendants to assert third-party claims involving *prescribing* conduct would have been at odds with the primary reason the Court created Track Three: to focus on the role of *dispensing* conduct in creating the nuisance. Defendants did not bring claims against other *dispensers*, such as Franklin Pharmacy and Overholt's Pharmacy; had Defendants requested leave to do so, the Court would have permitted it.

allowable abatement expenses therefrom. *See Plaintiffs' Closing Brief* at 23–27 (docket no. 4513); *Defs Abatement Plan* at 9–10 (docket no. 4337); *WAG/WMT Closing Brief* at 31–33 (docket no. 4511); *CVS Closing Brief* at 34 (docket no. 4512). The Court agrees with the parties that it is not in a position, itself, to oversee the everyday details of the Abatement Plan.

The parties each propose a wide range of duties for this Administrator, including instituting mechanisms to prevent fraud and abuse. *See id.* Having carefully considered the proposals by both sides, the Court agrees and will appoint a neutral Administrator to perform the duties outlined below. Appointment will be made after the Court receives recommendations from the parties, but the Administrator will be chosen by the Court. The Administrator's fees will be paid by Defendants.

All abatement funds paid by Defendants shall be deposited in an interest-bearing fund under the custodianship of the Administrator. Funding for the abatement remedy shall be paid by Defendants annually in an amount of 1/15 of the total abatement award, except that Defendants shall make an initial payment comprising the first two years' worth of installments, in order to facilitate start-up costs of the abatement programs. The Counties will each report to the Administrator at the end of each year the extent to which they spent the funds received on approved abatement programs and interventions (with the first such report at the end of year two). To the extent a County does not spend the amount received, the excess will be credited to the next year's payment or returned to the Pharmacy Defendants, as the Administrator sees fit.

The Administrator will be authorized to undertake the following tasks:

- Establish accounts for each County, into which annual payment will be deposited.

- Decide whether the specific programs the Counties want to fund are reasonably calculated to abate the nuisance.

- Approve each year's annual spending plan before the disbursement of funds for the year.

- Disburse funds annually, or otherwise, as the Administrator deems appropriate.

- Ensure program providers are properly investigated and/or licensed to ensure they are suitable.

- Receive from the Counties periodic reports on spending and various abatement metrics, with frequency as required by the Administrator.

- Receive annual County certifications on the fund's proper use by the Counties and perform audits as necessary.[87]

- Prepare an annual report to the Court, including an accounting to the Court of the use of funds and abatement metrics.

- Take all other necessary and appropriate actions to effectuate the administration of the Award.

The Court may periodically ask the Administrator to report to the Court, and/or may hold

a hearing with the parties to evaluate:

- The success and progress of the abatement interventions conducted by Plaintiffs;

- Whether the annual funding needs to be adjusted; and

- Whether the program is making reasonable progress toward abating the nuisance, including whether it ought to be altered or discontinued.

## IX.     Injunctive Relief

To this point, the Court's Abatement Order has focused on putting into place a plan

whereby Defendants will be required to fund programs reasonably calculated to abate the nuisance-

---

[87]  Plaintiffs suggest the following procedure, which the Court recommends the Administrator adopt in some form: "(1) prior to receiving each annual disbursement, Plaintiffs will submit a certification to the Court and/or any Court-appointed fund administrator providing their best good-faith expectations as to how they intend to allocate the money for that year; and (2) within ninety (90) days from the end of each year, Plaintiffs will submit a certified accounting to the Court and/or any Court-appointed fund administrator of how the funds were actually spent (which would include an explanation for any deviation from the expected use of funds set forth in Plaintiffs' prior certification)." *Plaintiffs' Closing Brief* at 26 (docket no. 4513).

causing *condition* they created—that is, programs designed to treat and prevent OUD and opioid addiction in the Plaintiff Counties. It is also critical that the Court enjoin the Pharmacy Defendants from continuing their nuisance-causing *conduct*, which is the oversupply of prescription opioids.

As noted earlier, Defendants' proposals regarding behavioral change were extremely limited. For example, besides suggesting the Court could simply prohibit CVS from dispensing opioids (even though this would "not be right from a patient-care perspective, or legally"), CVS proposed only the following: The Court could "[r]equire[] CVS to provide for disposal of any excess prescription opioids that it dispensed through the following means in its pharmacies in Lake and Trumbull counties: (a) making available either drug disposal kiosks or drug disposal pouches, and (b) displaying or otherwise providing information about the need for drug disposal and the means available to do so." *CVS Closing Brief* at 28 (docket no. 4512). Were the Court to enter an injunction so limited, it would be ignoring the evidence produced at trial that showed, and which convinced a jury, that each Pharmacy Defendant dispensed massive quantities of opioids into Plaintiffs' communities without taking necessary steps to protect against diversion, including failing to adequately monitor for "red-flag" prescriptions. In other words, both lay and expert evidence at trial demonstrated there are many areas where each Pharmacy Defendant can modify its conduct, both by taking certain actions and refraining from taking other actions, to prevent continued oversupply of prescription opioids into the Plaintiff Counties.

Walgreens and Walmart provided the Court with an injunction proposal that was significantly better than CVS's; however, their proposal also fell short in many ways. For example, the Walgreens/Walmart proposal identifies only 4 red flags; Plaintiffs' expert, Catizone, suggested 16 red flags at trial, and the Florida settlement includes 11. The Walgreens/Walmart proposal's provisions regarding "Training" are woefully inadequate; containing only three requirements: "[1].

The Policy described above shall be disseminated to each Track 3 Pharmacy; [2]. The corporate offices or headquarters for each Track 3 Pharmacy will disseminate a reminder notice of the Policy to their Track 3 Pharmacies on an annual basis; [and 3]. Pharmacists on staff at a Track 3 Pharmacy shall undergo training on the Policy." *WAG/WMT Closing Brief*, Ex. C at 2 (docket no. 4511-3).The Florida settlement provides for comprehensive "mandatory training" for pharmacists and compliance personnel, including annual testing. The Walgreens/Walmart proposal also does not require designation of compliance personnel, formation of a compliance committee, or a mechanism for enforcement of the Court's order. The Court concludes that none of the Defendants' proposals are sufficient to prevent the ongoing wrongful dispensing conduct that caused the nuisance in Lake and Trumbull Counties.

District courts have "broad discretionary powers to craft an injunction to the specific violations found[.]" *Howe v. City of Akron*, 801 F.3d 718, 753 (6th Cir. 2015). Given that dispensing prescription opioids is often both legal and appropriate, however, and that the Pharmacy Defendants operate within a regulated environment, an Order by this Court setting out allowed and disallowed dispensing behavior, or various corrective actions, must be delicate. It is for this reason that the Court concludes Plaintiffs' proposal is well-taken: Plaintiffs recommend the Court model its injunction "on certain injunctive relief recently ***agreed to*** by CVS and Walgreens [on May 4, 2022] to resolve their opioid-related litigation with the State of Florida and its Office of the Attorney General (the 'Florida Settlements')." *Plaintiffs' Closing Brief* at 36 (docket no. 4513) (emphasis added).

Obviously, the actions that two of the three Pharmacy Defendants agreed to in the Florida Settlements are consonant with their existing legal and regulatory obligations. The Pharmacy Defendants would not, of course, agree in the Florida Settlements to any requirements that are "not

… right from a patient-care perspective, or legally." Further, the Court has reviewed the Florida Settlements carefully and notes that a great majority of the provisions therein appear to apply nationally (and thus to the two Counties) already.[88] For example, the Florida Settlements require the two Pharmacy Defendants to "implement or maintain a Controlled Substance Compliance Program ('CSCP')" that "include[s] written **standard** operating procedures and/or **corporate** policies." *Walgreens Fla. Settlement Excerpt*, Ex. F at 1 (docket no. 4513-1) (emphasis added).

Among other requirements, the "CSCP Policies and Procedures shall provide" that: (1) "if a pharmacist identifies any 'Patient Red Flags' associated with a Controlled Substance prescription …, [then] before filling the prescription the pharmacist must resolve them;" (2) "the resolution of all Red Flags identified by the pharmacist must be documented;" and (3) "even if all Red Flags are resolved, a pharmacist shall reject a prescription if, in his or her professional judgment, he or she believes that it was written or is being submitted for other than a legitimate medical purpose." *Id*. Ex. F at 6–7.

The evidence at trial showed the Pharmacy Defendants, to varying but substantial degrees, failed at these tasks of resolution / documentation / rejection of suspicious prescriptions in the

---

[88] Indeed, this Court allowed Plaintiffs to obtain *national* discovery from the three Pharmacy Defendants of certain categories of documents, rather than discovery merely regional in scope, because local pharmacies follow national policies and procedures. *See Track Three Order Regarding Various Discovery Issues* (docket no. 3655). *See also In re: Opioid Litigation*, 2020 WL 7087276 at *2 (W.Va. Cir. Ct. Oct. 20, 2020) (a West Virginia state court ordered discovery of opioid-related documents outside of plaintiff's locality, because "Walmart implemented policies, procedures, and protocols for its pharmacies on a national a [sic] basis, [so] any investigation that showed Walmart's policies were failing to prevent diversion in one state is evidence that Walmart knew those policies would fail in West Virginia"); *San Francisco*, 2022 WL 3224463, at *29 n.14 ("many of the issues that prevented Walgreens pharmacies from performing adequate due diligence were systemic and impacted pharmacies across the country"); *id*. at *30 n.15 ("the staffing, policies, and procedures across [all] Walgreens pharmacies are the same or highly similar").

Plaintiff Counties. So, as part of the injunctive relief ordered in this case, it is certainly just as appropriate to require the Defendants to follow the CSCP Policies and Procedures in the Counties, as in Florida. Moreover, it is unlikely the Pharmacy Defendants are following these CSCP Policies and Procedures only in Florida, even now; many, if not all, of these policies and procedures are probably already being applied nationally. Even if that is not yet true, having set up these CSCP mechanisms in Florida, they are that much easier for the Pharmacy Defendants to apply in other jurisdictions, including the Plaintiff Counties. Indeed, there are signs that the agreed-to Injunctive Relief contained in the Florida Settlement was negotiated with anticipation by the parties that it would be a model for other settlements, including possibly global settlements.[89] Notably, the injunctive relief agreed to by CVS and Walgreens in their Florida Settlements is identical.

Plaintiffs suggest the Florida Settlement Injunctive Relief does not go far enough. For example, the Florida Settlements list various "Red Flags" that Defendants must look for when presented with a prescription, but Plaintiffs propose "a broader, more accurate list of red flags." *Plaintiffs' Closing Brief* at 38 (docket no. 4513). The Court declines to make the injunctive relief applicable in the Counties highly divergent from the Florida Settlements, which could lead to administrative complications for Defendants.[90] The Injunctive Relief provisions contained in the Florida Settlements are necessary but also reasonably comprehensive and sufficient as applied to

---

[89] The Florida Settlement contains a "most favored nation" provision, so that if a "Pharmacy enters a global settlement resolving substantially all claims against it brought by states, counties, and/or municipalities nationwide that contains additional injunctive relief provisions, the State of Florida shall have the right to obtain the benefit of those provisions under the terms set forth in any such global settlement." *Walgreens Fla. Settlement Excerpt*, Ex. F at 13 (docket no. 4513-1).

[90] Of course, the injunctive relief ordered in this case does not define the entire scope of Defendants' legal obligations under the CSA, nor set forth an exhaustive list of red flags that due diligence requires.

the Counties.[91] Accordingly, the Court attaches an Exhibit A to this Order, setting out essentially the same injunctive relief requirements for the Pharmacy Defendants that are contained in the Florida Settlements with Walgreens and CVS.

## VIII.    Conclusion

For all the reasons and to the extent described in this Order, Defendants shall abate the opioid nuisance they caused in Lake County and Trumbull County, Ohio.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster  August 17, 2022**
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

---

[91] Plaintiffs' suggestions on ways the Florida Settlements could be improved are all good ones and are well-grounded in the evidence presented at trial. *See Plaintiffs' Closing Brief* at 37–41 (docket no. 4513) (suggesting, among other things: (1) better mechanisms to ensure compliance with the injunction; (2) additional Red-Flags based on evidence and expert testimony adduced at trial; (3) better data-sharing with pharmacists, including patient prescription information and pharmacist refusals-to-fill; (4) more careful definition of what a pharmacist must do to document how a red flag was resolved; and (5) improved employment and staffing metrics). The Court looks ahead with hope of global resolution, however, and concludes most of these should be added by the parties through future negotiation and not judicial fiat. The Injunction Order does differ from the Florida Settlements slightly, including that it appoints an Administrator to oversee it and includes different enforcement mechanisms, and the Court adopts some of Plaintiffs' suggestions.