UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| Track Three Cases | |

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY PENDING APPEAL

October 20, 2022

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**LEGAL STANDARD** ..................................................................................................... 1

**ARGUMENT** .................................................................................................................... 3

    A.   Defendants have not offered any bond or other terms to ensure that Plaintiffs' rights will be secured if the stay is granted. ................................................................ 3

    B.   Defendants fail to demonstrate that they will be irreparably harmed absent a stay. .......... 3

        1.   The Administrator's work will not compromise confidential patient information......... 4

        2.   The Administrator's fees, even if unrecoverable, do not constitute irreparable harm.... 5

        3.   Defendants' speculative and unsubstantiated claim that having Mr. Cohen serve as both Administrator and Special Master will create a conflict of interest is insufficient to establish irreparable harm. ........................................................... 12

    C.   Defendants fail to make a strong showing that they are likely to succeed on the merits of their appeal.......................................................................................... 20

    D.   The issuance of a stay will substantially injure Plaintiffs and is not in the public interest…............................................................................................................. 24

    E.   A temporary stay is unnecessary....................................................................... 28

**CONCLUSION** ............................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021) ...................................................................................................8, 9

*Allied World Surplus Lines Ins. Co. v. Richard Goettle, Inc.*,
No. 1:17-CV-670, 2020 WL 886191 (S.D. Ohio Feb. 24, 2020), *aff'd on other
grounds,* No. 20-3339, 2020 WL 8994338 (6th Cir. Nov. 5, 2020) ...........................3, 4, 5, 21

*Baker v. Adams Cnty./Ohio Valley Sch. Bd.*,
310 F.3d 927 (6th Cir. 2002) ......................................................................................2, 5

*In re Brooks*,
383 F.3d 1036 (D.C. Cir. 2004) ..............................................................................16, 19, 20

*BST Holdings, L.L.C. v. Occupational Safety and Health Administration, U.S. Dept. of
Lab.*,
17 F.4th 604 (5th Cir. 2021) ......................................................................................7, 8

*In re Bulger*,
710 F.3d 42 (1st Cir. 2013) .......................................................................................15, 16

*Castillo v. Whitmer*,
823 F. App'x 413 (6th Cir. 2020) ...............................................................................5

*City of Parma, Ohio v. Levi*,
536 F.2d 133 (6th Cir. 1976) .....................................................................................5

*Cobell v. Norton*,
334 F.3d 1128 (D.C. Cir. 2003) .................................................................................. *passim*

*ConverDyn v. Moniz*,
68 F. Supp. 3d 34 (D.D.C. 2014) ...............................................................................12

*D.A.B.E., Inc. v. City of Toledo*,
No. 3:03CV7637, 2004 WL 287415 (N.D. Ohio Jan. 30, 2004) ..................................... *passim*

*Dodds v. United States Dep't of Educ.*,
845 F.3d 217 (6th Cir. 2016) .....................................................................................1, 2, 20

*F.T.C. v. Standard Oil Co. of California*,
449 U.S. 232 (1980) ..................................................................................................5

*Gulf Oil Corp. v. Fed. Energy Admin.*,
No. G-76-121, 1976 WL 507 (W.D. Mich. Aug. 20, 1976) ..............................................6, 11

*Holiday CVS, L.L.C. v. Holder*,
   839 F. Supp. 2d 145 (D.D.C. 2012), *vacated as moot and remanded,* 493 F. App'x
   108 (D.C. Cir. 2012) ........................................................................................11, 12, 25

*IMS Health Inc. v. Sorrell*,
   631 F. Supp. 2d 429 (D. Vt. 2009)........................................................................25

*In re MCP NO. 165*,
   21 F.4th 357 (6th Cir. 2021) ...............................................................................7, 8

*Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*,
   945 F.2d 150 (6th Cir. 1991) ......................................................................... *passim*

*N. L. R. B. v. Gen. Motors Corp.*,
   510 F. Supp. 341 (S.D. Ohio 1980) ..................................................................21, 22

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*,
   142 S. Ct. 661 (2022) ..............................................................................................7

*In re Nat'l Prescription Opiate Litig.*,
   No. 21-3041, 2021 WL 3777638 (6th Cir. Jan. 12, 2021)............................. *passim*

*Nken v. Holder*,
   556 U.S. 418 (2009)...................................................................................... *passim*

*Ohio v. Becerra*,
   577 F. Supp. 3d 678 (S.D. Ohio 2021) ....................................................3, 5, 6, 10

*Philip Morris USA Inc. v. Scott*,
   561 U.S. 1301 (2010)..........................................................................................4, 6

*Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*,
   No. 3:22-CV-198-RGJ, 2022 WL 1698085 (W.D. Ky. May 26, 2022) .................1, 10, 20, 21

*Price v. Medicaid Dir.*,
   No. 1:13-CV-74, 2015 WL 7069349 (S.D. Ohio Nov. 12, 2015) .............................1, 2, 5, 10

*ProCraft Cabinetry, Inc. v. Sweet Home Kitchen & Bath, Inc.*,
   343 F. Supp. 3d 734 (M.D. Tenn. 2018).................................................................23

*SawariMedia, LLC v. Whitmer*,
   963 F.3d 595 (6th Cir. 2020) ...............................................................................1, 2

*In re Settlement Facility Dow Corning Tr.*,
   No. 14-1090, 2014 WL 4824822 (6th Cir. Mar. 31, 2014)............................ *passim*

*State Farm Mut. Auto. Ins. Co. v. Angelo*,
   No. 19-10669, 2022 WL 1538393 (E.D. Mich. May 14, 2022) .......................21, 23

iii

*Tempur Sealy Int'l, Inc. v. Wondergel, LLC*,
    No. 5:16-CV-83-JMH, 2016 WL 1435672 (E.D. Ky. Apr. 11, 2016)..............................23, 24

*Texas v. U.S. Envtl. Protec. Agency*,
    829 F.3d 405 (5th Cir. 2016) ............................................................................................9, 10

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994).........................................................................................................6, 7

*United States v. Apple Inc.*,
    992 F. Supp. 2d 263 (S.D.N.Y. 2014), *aff'd on other grounds,* 787 F.3d 131 (2d Cir.
    2015) ............................................................................................................................ *passim*

*United States v. Elsass*,
    No. 2:10-CV-336, 2014 WL 12860999 (S.D. Ohio Feb. 6, 2014) ................................5, 10, 24

*United States v. Harold*,
    No. 18-CV-10223, 2020 WL 2507623 (E.D. Mich. May 15, 2020) ...........................3, 21, 23

*United States v. Hartsel*,
    199 F.3d 812 (6th Cir. 1999) ............................................................................................14

*United States v. Lanier*,
    No. 2:14-CR-83, 2018 WL 296725 (E.D. Tenn. Jan. 3, 2018)................................................14

*United States v. Salim*,
    No. 3:15-CR-358, 2018 WL 1138287 (N.D. Ohio Mar. 2, 2018) ....................................28, 29

*United States v. Surapaneni*,
    14 F. App'x 334 (6th Cir. 2001) ........................................................................................14

*United States v. Viola*,
    No. 1:08 CR 506, 2015 WL 5084765 (N.D. Ohio Aug. 27, 2015)........................................14

*Wilson v. Williams*,
    No. 20-3447, 2020 WL 2904706 (6th Cir. June 1, 2020)....................................................3, 5

**STATUTES**

28 U.S.C. § 455.................................................................................................................14

**OTHER AUTHORITIES**

ABC 13 Eyewitness News (June 16, 2021), https://abc13.com/cvs-data-breach-medical-
    records-health-cyber-attack/10798172/ ................................................................................28

Alina Bizga, *Walgreens Discloses Data Breach Impacting Personal Health Information of More Than 72,000 Customers* (Aug. 13, 2020), https://www.bitdefender.com/blog/hotforsecurity/walgreens-discloses-data-breach-impacting-personal-health-information-of-more-than-72000-customers ...............................28

CVS 2021 Annual Report, https://s2.q4cdn.com/447711729/files/doc_financials/2021/ar/CVS2021_Annual-Report.pdf .............................................................................................................12

Erin Shaak, *Walmart, CaptureRx Hit with Class Action Over Feb. 2021 Data Breach Affecting Pharmacy Customers* (Aug. 18, 2021), https://www.classaction.org/news/walmart-capturerx-hit-with-class-action-over-feb-2021-data-breach-affecting-pharmacy-customers ..................................................................28

Fed. R. Civ. P. 62.........................................................................................................1, 3

Walgreens Boots Alliance Reports Fiscal Year 2022 Earnings (Oct. 13, 2022), https://investor.walgreensbootsalliance.com/news-and-events/financial-news/financial-news-details/2022/Walgreens-Boots-Alliance-Reports-Fiscal-Year-2022-Earnings/default.aspx (reporting "[s]ales from continuing operations in fiscal 2022 [to be] $132.7 billion") .................................................................................12

Defendants request a stay of the injunctive relief portion of the Court's judgment (Dkt. #4614) pending their appeal to the Sixth Circuit Court of Appeals and potential appeal to the United States Supreme Court. Specifically, they request a stay of both the Injunction Order (Dkt. #4611-1) and the Appointment Order (Dkt. #4652). Defendants fail, however, to satisfy their heavy burden to prove that a stay is warranted. Accordingly, their motion should be denied.

## LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) provides that "[w]hile an appeal is pending from [a] final judgment that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(d). A stay, however, intrudes "'into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right, even if irreparable injury might otherwise result to the appellant.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (internal citation omitted). *See also Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 220 (6th Cir. 2016). Rather, whether to grant a stay is within the court's judicial discretion and "is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (citation omitted).

The movant bears the burden of demonstrating that it is entitled to a stay. *Nken*, 556 U.S. at 433-34. *See also SawariMedia, LLC v. Whitmer*, 963 F.3d 595, 596 (6th Cir. 2020); *In re Nat'l Prescription Opiate Litig.*, No. 21-3041, 2021 WL 3777638, at *1 (6th Cir. Jan. 12, 2021). Because this burden "is a heavy one, more commonly stay requests will not meet this standard and will be denied." *D.A.B.E., Inc. v. City of Toledo*, No. 3:03CV7637, 2004 WL 287415, at *2 (N.D. Ohio Jan. 30, 2004) (citation omitted). *See also Price v. Medicaid Dir.*, No. 1:13-CV-74, 2015 WL 7069349, at *3 (S.D. Ohio Nov. 12, 2015); *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, & Kentucky, Inc. v. Cameron*, No. 3:22-CV-198-RGJ, 2022 WL 1698085, at *5 (W.D. Ky. May 26, 2022).

Courts balance four factors when determining whether a stay is appropriate: (1) whether the movant "has made a strong showing that he is likely to succeed on the merits;" (2) whether the movant "will be irreparably injured absent a stay;" (3) "whether issuance of the stay will

substantially injure the other parties interested in the proceeding;" and (4) "where the public interest lies." *Nken*, 556 U.S. at 425-26, 434. *See also Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002); *Nat'l Prescription Opiate*, 2021 WL 3777638, at *1. These factors are "interrelated considerations that must be balanced together." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991); *see also SawariMedia*, 963 F.3d at 596. The movant is required to "address each factor, regardless of its relative strength, providing specific facts and affidavits supporting assertions that these factors exist." *Michigan Coal.*, 945 F.2d at 154. *See also D.A.B.E.*, 2004 WL 287415, at *2; *Price*, 2015 WL 7069349, at *1.

The first two factors (success on the merits and irreparable harm) "are the most critical." *Nken*, 556 U.S. at 434. *See also Nat'l Prescription Opiate*, 2021 WL 3777638, at *1. "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay." *Michigan Coal.*, 945 F.2d at 153. *See also Baker*, 310 F.3d at 928; *D.A.B.E.*, 2004 WL 287415, at *1. In other words, "more of one excuses less of the other." *Michigan Coal.*, 945 F.2d at 153. *See also D.A.B.E.*, 2004 WL 287415, at *1; *Price*, 2015 WL 7069349, at *1. "This relationship, however, is not without its limits; the movant is *always* required to demonstrate more than the mere 'possibility' of success on the merits." *Michigan Coal.*, 945 F.2d at 153 (emphasis added). *See also SawariMedia*, 963 F.3d at 596 ("[W]e may not grant a stay 'where the movant presents no likelihood of merits success."); *D.A.B.E.*, 2004 WL 287415, at *1; *Price*, 2015 WL 7069349, at *1. Thus, "even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the [opposing party] if a stay is granted, he is still required to show, at a minimum, 'serious questions going to the merits.'" *Michigan Coal.*, 945 F.2d at 153-54 (citation omitted). *See also Dodds*, 845 F.3d at 221; *Baker*, 310 F.3d at 928; *D.A.B.E.*, 2004 WL 287415, at *1. If the movant is able to satisfy the first two factors, the court then assesses the harm to the opposing party and weighs the public interest. *Nken*, 556 U.S. at 435. Where, as here, the government is the opposing party, the final two factors merge into a single factor. *Id.*

## ARGUMENT

**A.    Defendants have not offered any bond or other terms to ensure that Plaintiffs' rights will be secured if the stay is granted.**

Rule 62(d) permits the Court to suspend or modify an injunction "on terms for bond or other terms that secure the opposing party's rights." FED. R. CIV. P. 62(d).  *See also United States v. Harold*, No. 18-CV-10223, 2020 WL 2507623, at \*2 (E.D. Mich. May 15, 2020) ("[A] party wishing to stay enforcement of the injunctive relief 'may obtain a stay by providing bond or other security,' or on 'other terms that secure the opposing party's rights.'") (citation omitted). Defendants have not proposed any bond or other terms that would secure Plaintiffs' rights if the stay of the injunctive relief is granted.[1]   For this reason alone the stay should be denied. *See Harold*, 2020 WL 2507623, at \*3 ("The fact that Defendants have not provided a bond, security, or terms that secure Plaintiff's rights, as required by Federal Rule of Civil Procedure 62(d), is sufficient alone to deny the stay.").

**B.    Defendants fail to demonstrate that they will be irreparably harmed absent a stay.**

Courts look to three factors when evaluating the harm that will occur absent a stay: "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *Michigan Coal.*, 945 F.2d at 154.  *See also Nat'l Prescription Opiate*, 2021 WL 3777638, at \*2; *In re Settlement Facility Dow Corning Tr.*, No. 14-1090, 2014 WL 4824822, at \*1 (6th Cir. Mar. 31, 2014).  More than a mere "possibility of irreparable injury" is required to satisfy the second factor.  *Nken*, 556 U.S. at 434-35 (citation omitted).  *See also Nat'l Prescription Opiate*, 2021 WL 3777638, at \*1; *Wilson v. Williams*, No. 20-3447, 2020 WL 2904706, at \*1 (6th Cir. June 1, 2020).  Rather, the harm "must be both certain and immediate, rather than speculative or theoretical." *Michigan Coal.*, 945 F.2d at 154.[2]  And even if a movant sufficiently

---

[1]    As discussed in § D below, substantial harm to Plaintiffs and the public interest will likely result if a stay is implemented.

[2]    *See also Nat'l Prescription Opiate*, 2021 WL 3777638, at \*2; *Settlement Facility*, 2014 WL 4824822, at \*1; *Ohio v. Becerra*, 577 F. Supp. 3d 678, 699 (S.D. Ohio 2021); *Allied World Surplus Lines Ins. Co. v. Richard Goettle, Inc.*, No. 1:17-CV-670, 2020 WL 886191, at \*7 (S.D. Ohio Feb. 24, 2020), *aff'd* (footnote continues on next page)

demonstrates it will be irreparably harmed in the absence of a stay, "[t]hat does not end the matter[:]" "A stay will not issue simply because the necessary conditions are satisfied.  Rather, sound equitable discretion will deny the stay when a decided balance of convenience weighs against it."  *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1305 (2010) (cleaned up).

Defendants claim they will be irreparably harmed without a stay in three ways: (1) "the oversight and enforcement powers of the Administrator will compromise the confidentiality of sensitive information in Defendants' possession, including, but not limited to, third-party patient Protected Health Information[;]" (2) "complying with the Administrator's demands and paying the fees of the Administrator, Assistant Administrator, and their staff will impose substantial costs that will be impossible for Defendants to recover[;]" and (3) "the appointment of Special Master Cohen to serve simultaneously as the Administrator of the Injunction Order (not to mention administrator of the Common Benefit Fund) creates a conflict of interest."  Motion, pp. 9-12.  For the reasons discussed below, each of these arguments are without merit and should be rejected.

### 1. The Administrator's work will not compromise confidential patient information.

There is no basis for Defendants' assertion that the Administrator's work will compromise the confidentiality of patients' protected health information or other sensitive information in Defendants' possession.  Indeed, the Injunction Order contains provisions protecting against those very concerns.  Specifically, the Injunction Order states that "[t]o the extent that the above[-referenced] records contain personal health information of patients, the personal health information of patients shall be redacted[.]"  Dkt. #4611-1 (Injunction Order) at § XVII.G.  The Injunction Order further states that Defendants are not obligated to disclose privileged or protected materials.  *Id.* at § XVII.F ("Nothing in this Order shall be interpreted to abrogate the Defendant's applicable privileges or protections from disclosure, including without limitation those related to attorney-client privilege, the attorney work product doctrine, and the patient-safety work product

---

*on other grounds,* No. 20-3339, 2020 WL 8994338 (6th Cir. Nov. 5, 2020).

4

privilege.  Nothing in this Order shall require the Defendant to provide or produce any such privileged or protected materials.").  Throughout this MDL, Defendants have produced extensive discovery related to their dispensing of opioids while still protecting confidential patient health information.  There is no reason that they cannot do the same with the materials they provide to the Administrator.

2. ***The Administrator's fees, even if unrecoverable, do not constitute irreparable harm.***

The fees paid by Defendants to the Administrator and his team during the pendency of the appeal, even if unrecoverable, do not constitute irreparable harm.  As a general rule, monetary costs incurred in complying with an injunction do not constitute irreparable harm.  *See Michigan Coal.*, 945 F.2d at 154 ("Mere injuries, however substantial, in terms of money, time, and energy necessarily expended in the absence of a stay, are not enough.") (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)); *Baker*, 310 F.3d at 929 (same); *Nat'l Prescription Opiate*, 2021 WL 3777638, at *2 (same).[3]  In an analogous case, the District Court for the Southern District of New York held that the "millions of dollars in fees" that the defendant expected to pay during the pendency of the appeal to the monitor appointed by the court to ensure the defendant's compliance with its injunction order did not constitute irreparable harm.  *See United States v. Apple Inc.*, 992 F. Supp. 2d 263, 266, 289 (S.D.N.Y. 2014) ("[P]aying fees to comply with a remedial order is typically not cognizable as 'irreparable harm' because 'ordinary compliance costs are typically insufficient to constitute irreparable harm.'") (citation omitted), *aff'd on other grounds,* 787 F.3d

---

[3]  *See also Castillo v. Whitmer*, 823 F. App'x 413, 417 (6th Cir. 2020) (neither "monetary loss" nor "logistical burden" is sufficient to demonstrate irreparable harm); *Wilson*, 2020 WL 2904706, at *1; *Settlement Facility*, 2014 WL 4824822, at *1; *Becerra*, 577 F. Supp. 3d at 699 ("Typically, 'economic loss does not, in and of itself, constitute irreparable harm.'") (citation omitted); *Allied World*, 2020 WL 886191, at *7 ("Mere monetary damage is unlikely to constitute irreparable harm."); *Price*, 2015 WL 7069349, at *2-3; *United States v. Elsass*, No. 2:10-CV-336, 2014 WL 12860999, at *2 (S.D. Ohio Feb. 6, 2014) ("[P]otential monetary injury or costs incurred in complying with an injunction ordinarily do not rise to the level of irreparable harm."); *cf. F.T.C. v. Standard Oil Co. of California*, 449 U.S. 232, 244 (1980) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury.") (quoting *Renegotiation Bd. v. Bannercraft Clothing Co.*, 415 U.S. 1, 24 (1974)); *City of Parma, Ohio v. Levi*, 536 F.2d 133, 135 (6th Cir. 1976) (same).

131 (2d Cir. 2015).

There are some circumstances where economic loss that cannot be recovered *may* constitute irreparable harm.  *See, e.g., Philip Morris*, 561 U.S. at 1304 ("If expenditures cannot be recouped, the resulting loss *may* be irreparable.") (emphasis added).  However, the mere fact that the economic loss is unrecoverable is not enough; it must also be both certain and great.  *See, e.g., Settlement Facility*, 2014 WL 4824822, at *1 (rejecting defendant's argument that it would "suffer immediate and irreparable harm because more than $100 million in irrevocable payments will be made that cannot be recovered if the ruling is later reversed"; "The harm asserted by Dow is primarily monetary harm, and it is merely speculative that the harm will occur."); *Becerra*, 577 F. Supp. 3d at 699 ("Where the economic loss is 'irrecoverable,' however, it 'may constitute irreparable injury' but 'a party asserting such a loss is not relieved of its obligation to demonstrate that its harm will be 'great.''"; the movant "must show that it will suffer harm that is 'more than simply irretrievable; it must also be serious in terms of its effect on the [movant]") (citations omitted); *Gulf Oil Corp. v. Fed. Energy Admin.*, No. G-76-121, 1976 WL 507, at *4 (W.D. Mich. Aug. 20, 1976) ("The injury must not only be 'irreparable' in the sense that damages will conceivably be inadequate, it must also be 'both certain and great.'").[4]

Most of the cases cited by Defendants simply illustrate the unique circumstances in which unrecoverable economic loss may cause irreparable harm.[5]  They involved requests for a

---

[4]  *Compare Philip Morris*, 561 U.S. at 1304-05 (finding harm to be irreparable where "a substantial portion" of the ~$242 million fund established by the defendant's payment would be "irrevocably expended[,]" as would "the $11,501,928 fee immediately payable toward administrative expenses in setting up the funded program").

[5]  *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), however, is entirely inapposite.  In that case, the issue was "whether the statutory-review scheme in the Federal Mine Safety and Health Amendments Act of 1977 . . . prevents a district court from exercising subject-matter jurisdiction over a pre-enforcement challenge to the Act."  *Id*. at 202.  The discussion of irreparable harm in the majority opinion and in Justice Scalia's concurrence was not in the context of the applicable standards for a stay, but rather to address the petitioner's claim that "due process require[d] district court review because the absence of pre-enforcement declaratory relief before the [Federal Mine Safety and Health] Commission will subject petitioner to serious and irreparable harm."  *Id*. at 216 ("We need not consider this claim, however, because neither compliance with, nor continued violation of, the statute will subject petitioner to a serious prehearing deprivation."); *see also id*. at 220 (Justice Scalia *declined to* (footnote continues on next page)

preliminary injunction or stay of a governmental agency's standard, rule, or action that would impose substantial unrecoverable costs on a multitude of individuals and businesses around the country, many of whom were not even parties to the litigation.  Three of the cases addressed a stay to prevent the enforcement of an OSHA emergency temporary standard (EST) requiring employees of covered employers to undergo COVID-19 vaccination or, alternatively, take weekly COVID-19 tests at their own expense and wear masks.  *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 662 (2022); *In re MCP NO. 165*, 21 F.4th 357, 365 (6th Cir. 2021); *BST Holdings, L.L.C. v. Occupational Safety and Health Administration, U.S. Dept. of Lab.*, 17 F.4th 604, 609-10 (5th Cir. 2021).  The EST would apply to "roughly 84 million workers, covering virtually all employers with at least 100 employees." *Nat'l Fed'n*, 142 S. Ct. at 662.  *See also BST Holdings*, 17 F.4th at 611, 615 (EST applied to "2 out of 3 private-sector employees in America, in workplaces as diverse as the country itself"). The petitioners offered evidence that "OSHA's mandate w[ould] force them to incur billions of dollars in unrecoverable compliance costs and w[ould] cause hundreds of thousands of employees to leave their job." *Nat'l Fed'n*, 142 S. Ct. at 666.[6]  *See also MCP*, 21 F.4th at 400 (noting that even OSHA acknowledged that the ETS would impose almost $3 billion in combined projected

---

*join that part of the majority opinion*, stating: "In my view, however, the preclusion of pre-enforcement judicial review is constitutional *whether or not* compliance produces irreparable harm—at least if a summary penalty does not cause irreparable harm (*e.g.*, if it is a recoverable summary fine) or if judicial review *is* provided before a penalty for *non*-compliance can be imposed. . . .  Were it otherwise, the availability of pre-enforcement challenges would have to be the rule rather than the exception, since complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.") (Scalia, J., concurring in part and concurring in the judgment).

[6]  Notably, the Supreme Court never specifically stated that these unrecoverable compliance costs constituted irreparable harm.  Indeed, it declined to weigh those costs against the government's assertion that the EST would "save over 6,500 lives and prevent hundreds of thousands of hospitalizations." *Id.* ("It is not our role to weigh such tradeoffs.  In our system of government, that is the responsibility of those chosen by the people through democratic processes.  Although Congress has indisputably given OSHA the power to regulate occupational dangers, it has not given that agency the power to regulate public health more broadly.  Requiring the vaccination of 84 million Americans, selected simply because they work for employers with more than 100 employees, certainly falls in the latter category.").  The Supreme Court ultimately granted the stay because the applicants were "likely to succeed on the merits of their claim that the Secretary lacked authority to impose the mandate." *Id.* at 664-65.

costs on petitioners) (Larsen, J., dissenting); *BST Holdings*, 17 F.4th at 618 ("[T]he companies seeking a stay in this case will also be irreparably harmed in the absence of a stay, whether by the business and financial effects of a lost or suspended employee, compliance and monitoring costs associated with the Mandate, the diversion of resources necessitated by the Mandate, or by OSHA's plan to impose stiff financial penalties on companies that refuse to punish or test unwilling employees. The Mandate places an immediate and irreversible imprint on all covered employers in America, and 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'") (citation omitted).

In *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485 (2021), various realtor associations and rental property managers in Alabama and Georgia sued to enjoin the CDC's "nationwide moratorium on evictions of any tenants who live in a county that is experiencing substantial or high levels of COVID-19 transmission and who make certain declarations of financial need." *Id.* at 2486. The district court granted summary judgment in favor of the plaintiffs, "holding that the CDC lacked statutory authority to impose the moratorium." *Id.* at 2487. However, the district court stayed its judgment pending appeal, and the D.C. Circuit declined to vacate the stay. *Id.* at 2487-88. The Supreme Court ultimately determined that the stay should be vacated, noting "[t]he applicants not only have a substantial likelihood of success on the merits—it is difficult to imagine them losing." *Id.* at 2488. The court further noted that "[a]t least 80% of the country, including between 6 and 17 million tenants at risk of eviction, falls within the moratorium" and the "$50 billion in emergency rental assistance" provided by Congress was "a reasonable proxy of the moratorium's economic impact." *Id.* at 2489.[7] Allowing the moratorium to stay in place pending appeal would "put the applicants, along with millions of landlords across the country, at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery." *Id.* ("Despite the CDC's determination that landlords should

---

[7] The court also recognized that "the issues at stake are not merely financial" because "[t]he moratorium intrudes into an area that is the particular domain of state law: the landlord-tenant relationship." *Id.*

bear a significant financial cost of the pandemic, many landlords have modest means.  And preventing them from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude.").

Finally, in *Texas v. U.S. Envtl. Protec. Agency*, "[t]he State of Texas, numerous energy companies, power plants, steel mills, consumer organizations, state regulators, and a labor union in Texas" sought a stay of an EPA final rule "disapproving Oklahoma's and Texas's plan for controlling regional haze and imposing EPA's own plans instead."  829 F.3d 405, 410-11 (5th Cir. 2016).  The petitioners alleged they would suffer substantial injuries if the EPA's final rule was not stayed.  *Id.* at 433 ("They argue that compliance with the Final Rule would impose $2 billion in costs on power companies, businesses, and consumers.  Because plant emission controls take several years to install, the regulated companies will have to begin installation almost immediately.  The costs of compliance would not only increase rates for consumers but would also endanger the reliability of power in ERCOT if plant operators close facilities rather than install or upgrade uneconomical emissions controls.  These closures would permanently shut down plants with up to 8,400 MW of generating capacity.  The petitioner steel mills and business associations allege they would also suffer injury as their input costs rise substantially.  The petitioner unions argue that their members would lose their employment at the various power and industrial plants that are threatened by the rule.  Petitioners also state that the absence of a stay would require the Public Utility Commission of Texas to spend significant resources enforcing compliance with a voided federal implementation plan rather than enforcing a valid state implementation plan.  Finally, Petitioners assert that allowing the Final Rule to stand pending the appeal would disrupt the system of cooperative federalism enshrined in the Clean Air Act.") (internal footnotes omitted).  The Fifth Circuit held that the petitioners had sufficiently demonstrated irreparable harm.  *Id.* at 434 ("Here Petitioners have raised threatened harms—including unemployment and the permanent closure of plants—that would arise during the litigation if a stay is not granted, that are irreparable, *and* that are great in magnitude.  Even setting aside the costs of compliance for the power company petitioners, if the Final Rules causes plant closures, the threat of grid instability and potential

brownouts alone constitute irreparable injury to Texans. Similarly, the institutional injury to Texas from the inversion of the federalism principles enshrined in the Clean Air Act may constitute irreparable injury. In sum, Petitioners have shown irreparable injury.").

The present case is entirely different than the cases cited by Defendants. The injunctive relief awarded by this Court impacts only Defendants. Notably, Defendants offer no evidence whatsoever quantifying the scope of their expected financial injury or demonstrating the likelihood it will occur. *See Price*, 2015 WL 7069349, at *3 (finding that the costs defendants would incur in complying with the court's order, which they claimed would be difficult or impossible to recover, did not constitute irreparable harm because "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough" and defendants "failed to provide any evidence whatsoever to quantify the scope of their expected financial injury").[8] Instead they offer conclusory assertions that the costs are "likely" to be "significant" or "substantial" because the Administrator and his assistant have the ability to hire additional assistants and consultants. Motion, p. 9. Defendants' apparent belief that the Administrator intends to hire an army of assistants to help him enforce the Injunction Order is nothing but rank speculation. *See, e.g., Michigan Coal.*, 945 F.2d at 154 (irreparable harm cannot be "speculative or theoretical").[9] Moreover, the Appointment Order specifically states that the

---

[8]  *See also Elsass*, 2014 WL 12860999, at *2 (noting that "the Defendants have failed to offer specific evidence detailing the degree of such harm or the likelihood that it will occur"); *Planned Parenthood*, 2022 WL 1698085, at *5 ("The movant must provide evidence from which the Court can make specific findings of fact."); *cf. Becerra*, 577 F. Supp. 3d at 699 ("Plaintiffs' potential harm is also highly speculative. Ohio has not submitted any evidence that the number of Title X applicants it will have to compete against has increased.").

[9]  Defendants also complain that the information to which the Administrator has access is not limited to the two Counties. Motion, p. 10. The Appointment Order specifically states that "[t]he parties will make readily available to the Administrator any and all individuals, information, documents, materials, programs, files, databases, services, facilities, and premises under their control *that the Administrator requires to perform his duties*." Dkt. #4652 (Appointment Order) at p. 8 (emphasis added). As demonstrated during trial, Defendants' dispensing policies and procedures are created by their corporate offices and implemented nationwide to all their pharmacies. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 24, 46-47, 66-67. Thus, it is critical that the Administrator and his team have access to certain national information of Defendants in order to fulfill his duties.

fees and expenses incurred by the Administrator and his team must be reasonable and necessary. Dkt. #4652 (Appointment Order) at p. 6 ("The Administrator and Assistant Administrator and their consultants and staff shall incur only such fees and expenses as may be reasonably necessary to fulfill his duties under this Order, or such other Orders as the Court may issue."); *see also id.* at p. 2 n.3 ("The Administrator shall endeavor to limit expenses to those that are reasonable and necessary."). Defendants can also assist the Administrator in keeping the costs down by "provid[ing] full cooperation to the Administrator and observ[ing] faithfully the requirements of any orders of the Court and rulings by the Administrator[,]" as required by the Appointment Order. *Id.* at p. 7. *See Apple*, 992 F. Supp. 2d at 288-89 (in holding that court-appointed monitor's fees did not constitute irreparable harm, court emphasized: "Apple can assist in making the Monitor's use of his time 'cost-effective', as required by the Injunction. It can do so by following the Injunction's requirement that it 'take no action to interfere with or two impede the External Compliance Monitor's accomplishment of its responsibilities.' After all, an entity cannot claim irreparable harm because of increased expenses where its cooperation would have resulted in a more cost-effective process.") (internal citations omitted).

Defendants further fail to demonstrate that any unrecoverable Administrator fees incurred during the pendency of the appeal will be so "great" as to be considered irreparable. Courts take into consideration the size and financial condition of the movant when making such determinations. *See, e.g., Gulf Oil*, 1976 WL 507, at *4 ("Although a loss in profits is nevertheless a loss to Gulf, is it not a loss of such 'greatness'' as to call into play the extraordinary remedy of preliminary injunctive relief. Moreover, the size of the [movant] is also a factor to weigh in determining whether injunctive relief is appropriate. The pecuniary injury alleged by Gulf, while perhaps great to a smaller corporation like Mid-Michigan, cannot be considered as 'great' for Gulf Oil. Gulf has failed to establish clearly how and why the asserted injury is 'both certain and great.'"); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145, 169-70 (D.D.C. 2012) ("[C]ourts in this Circuit and elsewhere have found the economic status of a plaintiff's parent corporation to be highly relevant when a plaintiff seeks to show irreparable economic harm. . . . The economic

11

status of CVS undermines to a significant degree the showing of irreparable economic harm to the plaintiffs, as the parent company's substantial resources are likely to mitigate any financial losses incurred by the two CVS pharmacies as a result of the temporary suspension of their DEA registrations."), *vacated as moot and remanded*, 493 F. App'x 108 (D.C. Cir. 2012).[10] As Defendants recently emphasized to the Court, "the annual revenue of Walmart alone" is "$573 *billion* per year[.]" Dkt. #4618 (Ds' M to Approve Bond) at p. 5.  Walgreens and CVS are also massive companies bringing in well over $100 *billion* in annual revenues/sales.[11]   Even assuming Defendants were to incur $500,000 in Administrator fees during the pendency of the appeal (and there is no reason to believe the amount will be that high), this would not be sufficiently "great" to constitute irreparable harm when compared to Defendants' financial condition.[12]

> **3.    *Defendants' speculative and unsubstantiated claim that having Mr. Cohen serve as both Administrator and Special Master will create a conflict of interest is insufficient to establish irreparable harm.***

Defendants argue that "the appointment of Special Master Cohen to serve simultaneously as the Administrator of the Injunction Order (not to mention administrator of the Common Benefit

---

[10]   *See also, e.g., ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014) ("A claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief."; finding movant's "alleged loss of $10 million per year, assuming *arguendo* that this estimate is accurate, is not of sufficient magnitude in light of [its] annual revenues of $100 million" to "rise to the level of irreparable harm"); *Apple*, 992 F. Supp. 2d at 288 n.17 ("For obvious reasons, Apple has not attempted to show that any payment to the Monitor in this case will constitute a material financial obligation.").

[11]   *See, e.g.,* Walgreens Boots Alliance Reports Fiscal Year 2022 Earnings (Oct. 13, 2022), https://investor.walgreensbootsalliance.com/news-and-events/financial-news/financial-news-details/2022/Walgreens-Boots-Alliance-Reports-Fiscal-Year-2022-Earnings/default.aspx    (reporting "[s]ales from continuing operations in fiscal 2022 [to be] $132.7 billion"); CVS 2021 Annual Report, https://s2.q4cdn.com/447711729/files/doc_financials/2021/ar/CVS2021_Annual-Report.pdf (reporting $292.1 billion in total revenues for 2021).

[12]   Additionally, Defendants' suggestion that Plaintiffs be required "to post a bond to cover the injunction-related costs that Defendants will incur while the appeal is pending" if a stay is denied should be rejected.  Defendants offer no basis for holding Plaintiffs liable for any of the Administrator's fees.

Fund) creates a conflict of interest" which "is a form of irreparable harm."  Motion, p. 11.[13]
Specifically they claim that: (i) the "personal knowledge" he will obtain through his work as the
Administrator "is inappropriate for a Special Master to have[;]" and (ii) his role as Administrator
(and his assistant's role as Assistant Administrator), "cannot be reconciled with his role as Special
Master" (and his assistant's role as assistant to the Special Master).  Motion, pp. 11-12.  These
vague and unsubstantiated allegations have no merit.

As a preliminary matter, Defendants did not assert any objections to Mr. Cohen at the time
Plaintiffs proposed him as the Administrator.  Nor have they filed a motion to disqualify
Mr. Cohen, which places this case in a different procedural posture than the cases Defendants cite
in support of their arguments.  *Infra*, pp. 15-20.  In their motion to stay, Defendants notably do not
identify any specific information that Mr. Cohen will be able to access as the Administrator that
he could not otherwise access as Special Master.  Indeed, the provisions for the Administrator's
access to information in the Appointment Order is nearly identical to the provisions for his access
to information pursuant to the order appointing him as Special Master.  *Compare* Dkt. #4652
(Appointment Order) at pp. 7-8, *with* Dkt. #69 (Special Master Appointment Order) at p. 8
("The parties will make readily available to the Special Masters any and all individuals,
information, documents, materials, programs, files, databases, services, facilities, and premises
under their control that the Special Masters require to perform their duties.  The parties will make
readily available to the Special Masters any and all facilities, files, databases, computer programs,
and documents necessary to fulfill the Special Masters' functions under this Order.  The Special
Masters may require reports from any party in a format specified by the Special Master, as
reasonably required to enable the Special Masters to perform all assigned duties.").

Regardless, any information Mr. Cohen learns in his role as Administrator is not the type
of "personal knowledge" that requires disqualification.  Defendants rely on Canon 3(C)(1)(a) of

---

[13]  They further claim that the "same conflicts exist for Mr. Borden, who serves as an assistant to
Mr. Cohen both as Special Master and as Administrator."  Motion, p. 12.  This argument should be
rejected for the same reasons discussed herein with respect to Mr. Cohen.

the Code of Conduct for United States Judges to argue that "those with personal knowledge of matters in a case are disqualified from being neutral judicial arbiters." Motion, p. 11. The language in Canon 3(C)(1)(a) mirrors the language in the federal disqualification statute. 28 U.S.C. § 455(b)(1) ("Any justice, judge, or magistrate judge of the United States . . . . shall also disqualify himself . . . [w]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]"). Courts have interpreted "personal knowledge" and "personal bias" in this context as that emanating from extrajudicial sources rather than from information learned from one's participation in the case. *See, e.g., United States v. Hartsel*, 199 F.3d 812, 820-21 (6th Cir. 1999) (recusal not required where "[a]ny information the judge learned about Hartsel or the events surrounding his criminal activities came from his judicial activities and not from extrajudicial sources"); *United States v. Surapaneni*, 14 F. App'x 334, 337 (6th Cir. 2001) ("Recusal is required if the judge demonstrates personal bias and/or personal knowledge of disputed evidentiary facts *from an extrajudicial source other than his participation in the case*.") (emphasis added).[14] Here, any information Mr. Cohen obtains in his roles as Administrator or Special Master is not from any extrajudicial source but rather through his participation in this MDL.

Defendants also fail to explain how Mr. Cohen's role as Administrator would cause a

---

[14] *See also United States v. Viola*, No. 1:08 CR 506, 2015 WL 5084765, at *2-3 (N.D. Ohio Aug. 27, 2015) ("Under [§ 455], recusal must be predicated upon 'extrajudicial conduct rather than on judicial conduct.' . . . [A]ny knowledge the Court may have regarding any conflict issues would have been obtained during court proceedings and would qualify as judicial rather than extrajudicial conduct.") (internal citation omitted); *United States v. Lanier*, No. 2:14-CR-83, 2018 WL 296725, at *4 (E.D. Tenn. Jan. 3, 2018) ("Defendants misunderstand the meaning of 'personal knowledge,' as it has been defined and interpreted by the courts. 28 U.S.C. § 455(b)(1) requires that the source of a judge's bias, prejudice, or knowledge be extrajudicial. The term 'extrajudicial' has been interpreted to mean arising from outside the scope of a judge's judicial activities, either within the proceeding at issue or related cases.") (internal citations omitted); *Apple*, 992 F. Supp. 2d at 286-87 (rejecting defendant's assertion that court-appointed monitor was acting out of personal bias or prejudice: "In making this argument, Apple misreads the meaning of § 455's 'personal knowledge' and 'personal bias or prejudice' provisions. As the Second Circuit recently reiterated: 'To be disqualifying under § 455, [t]he alleged bias and prejudice . . . must stem from an extrajudicial source and result in an opinion on the merits *on some basis other than what the judge has learned from his participation in the case*. Here, the Monitor's declaration stemmed from facts acquired in connection with the discharge of his duties as Monitor.") (internal citation omitted).

14

reasonable observer to question his impartiality as Special Master.[15]  It would certainly have no impact on his perceived or actual ability to resolve future discovery disputes that do not involve these specific Defendants.   And even with respect to future discovery disputes involving Defendants, any concerns regarding Mr. Cohen's impartiality are simply speculative and theoretical at this point.  *See, e.g., Nken*, 556 U.S. at 434-35 (more than a mere "possibility" of irreparable harm is required); *Michigan Coal.*, 945 F.2d at 154 (irreparable harm "must be both certain and immediate, rather than speculative or theoretical").  If at some point later in these MDL proceedings, Defendants can demonstrate that Mr. Cohen has obtained specific information through his role as Administrator that would impact his ability to act as a neutral judicial arbiter in a particular discovery dispute, they can request that such dispute be resolved in the first instance by the Court instead of the Special Master.

Defendants have failed to demonstrate any purported conflict of interest sufficient to constitute irreparable harm.  The cases cited by Defendants, which involved mandamus petitions seeking the recusal of judicial officials, are both factually and procedurally distinguishable.  In *In re Bulger*, a criminal defendant petitioned for a writ of mandamus reversing the district court's order denying a motion for recusal of the judge currently assigned to preside in the case.  710 F.3d 42, 43 (1st Cir. 2013).  The defendant was alleged to be the leader of a criminal organization in Boston from 1972 to 1999, and during "a significant period of time covered by the indictment" the judge "held a variety of managerial and supervisory appointments within the U.S. Attorney's Office in the District [of Massachusetts,]" which likely would have given him knowledge about the evidence underlying the crimes listed in the indictment.  *Id*. at 43-44.  The appellate court ultimately granted the writ because it was "clear that a reasonable person would question the capacity for impartiality of any judicial officer with the judge's particular background in the federal

---

[15]  Defendants also make a passing reference to Mr. Cohen's role as administrator of the Common Benefit Fund (Motion, p. 11), but fail to explain how that role (which solely relates to the apportionment of common benefit funds amongst plaintiffs' counsel) has any bearing on his role as Administrator (or Special Master).

prosecutorial apparatus in Boston during the period covered by the accusations." *Id*. at 43. Significantly, the court emphasized that the defendant's claim of appearance of bias and its implications could not themselves alone suffice to require the judge's recusal. *Id*. at 46. Rather, the court relied on independent support supplied by publicly-available "official reports and conclusions predating these proceedings . . . that disclosed disquieting links between the Government and the criminal element during the years in question, and that may fairly stimulate a critical attitude on the part of an independent observer." *Id*. at 47 (internal citation omitted).[16] The court further noted that the petitioner had also shown sufficient irreparable harm to warrant mandamus relief as well as "a balance of equities in his favor." *Id*. at 45, 49 ("As for the former, we can leave aside any question of harm personal to the defendant and concentrate on damage to the judicial system. It is enough to say that we need not consider a rule that a clear showing under the substantive recusal standard always suffices to demonstrate irreparable harm, for here the prior disclosures make it imperative to act promptly to preclude any reasonable question whether untoward Government action in the past may affect the fairness of the judicial branch in the present. Nor does balancing the equities present any close question. The prior disclosures take this case out of the category of the heckler's veto, and the defendant has represented that he will not seek any trial delay if a new judge is substituted.").

Both *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003), and *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004), arose from the same underlying litigation. In *Cobell*, the district court appointed a court monitor (Joseph Kieffer III) to supervise remedial efforts following the court's findings that officials within the Department of the Interior (DOI) had breached their fiduciary duties to beneficiaries of Individual Indian Money trust accounts by mismanaging those accounts. 334 F.3d

---

[16] *See also id.* at 48-49 ("The record likewise includes enough to justify a reasonable belief that the defense's claim probably portends an enquiry into just those dealings. Given the institutional ties described here, the reasonable person might well question whether a judge who bore supervisory responsibility for prosecutorial activities during some of the time at issue could suppress his inevitable feelings and remain impartial when asked to determine how far to delve into the relationship between defendant and Government, and to preside over whatever enquiry may ultimately be conducted. On this record, that question could not reasonably be avoided.").

at 1133.  Kieffer was initially appointed for one year, with the consent of the parties, and charged with "monitor[ing] and review[ing] all of the Interior defendants' trust reform activities and fil[ing] written reports of his findings with the Court."  *Id.*  The next year, the court renewed Kieffer's appointment over the defendants' objection, denying their request to narrow the scope of his role by limiting his "investigation to 'steps taken by the [DOI] to rectify the breaches of trust declared by the Court or steps taken that would necessarily delay rather than accelerate the ultimate provision of an adequate accounting.'"  *Id.* at 1142.  While serving as court monitor, Kieffer attended internal DOI meetings, including one particular "heated" meeting with the Deputy Secretary of the Interior, the Special Trustee, and other department officials, in which he discussed with those officials "his concerns about the way they were doing their jobs—concerns that he was subsequently to report to the district court."  *Id.* at 1135.  The defendants claimed that during this meeting, Kieffer "demonstrated his intention and his ability to assert powers constitutionally reserved to the Executive Branch of the Government." *Id.*  Based on Kieffer's unflattering reports regarding the DOI, the court issued orders holding two DOI officials in contempt of court.  *Id.* at 1135-36.  The court also, *sua sponte*, elevated Kieffer to "Special Master-Monitor[,]" by which he "assumed new responsibilities for the management of discovery[,]" but also retained his previous duties as court monitor.  *Id.* at 1136.

The appellate court held that mandamus relief was warranted to revoke Kieffer's appointments as court monitor and special master-monitor.  *Id.* at 1140 ("[T]he Department's right to relief is clear, and the injury it alleges—interference with the internal deliberations of a Department of the Government of the United States—cannot be remedied by an appeal from the final judgment.").  The court emphasized the expansive nature of Kieffer's role as monitor and the serious separation of powers concerns it presented.  *Id.* at 1142 ("The Monitor's portfolio was truly extraordinary; instead of resolving disputes brought to him by the parties, he became something like a party himself.  The Monitor was charged with an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system."), 1143 ("In this case, the district court's appointment of the Monitor entailed a license to intrude into the internal affairs of the

17

Department, which simply is not permissible under our adversarial system of justice and our constitutional system of separated powers.").[17]  The court further determined that Kieffer's appointment as special master-monitor should also be revoked because his "prior role and personal involvement in this case as Court Monitor[,]" and particularly the statements he made at the "heated" ex parte DOI meeting he attended, "would cause a reasonable person to doubt his ability to remain impartial while serving as Special Master":

> The district court's account of these events demonstrates that Kieffer had a settled opinion about what the Department should and should not do on remand to comply with the order of the district court, which opinion he developed in his extrajudicial role as Court Monitor with access to the internal deliberations of the Department regarding the lawsuit.  The district court's account also demonstrates that Kieffer's opinion was based in part upon ex parte communications received in his extra-judicial capacity as Monitor.  These facts so clearly cast a shadow over Kieffer's impartiality that the district court abused its discretion in appointing Kieffer to be Special Master (in addition to Monitor).

*Id*. at 1144; *see also id.* ("The district court appointed Kieffer to a judicial role in a case in which he had significant prior knowledge obtained in his role as a Court Monitor, on the basis of which he had formed and expressed opinions of continuing relevance to the litigation.  A newly appointed judge may not hear a case in which he previously played any role.").  Importantly, the appellate court emphasized that its holding was "a narrow one, tethered to the peculiar facts" of that case. *Id*. at 1141.

After Kiefer's removal in *Cobell*, various current and former DOI and DOJ officials and

---

[17]  The court specifically distinguished Kieffer's appointment as monitor from cases in which a district court appoints "a special master pursuant to Rule 53 to supervise implementation of a court order, especially a remedial order requiring major structural reform of a state institution." *Id*. at 1142 ("Putting aside the question whether those cases shed any light whatsoever upon the propriety of a federal court authorizing its agent to interfere with the affairs of another branch of the federal government, we think the present case goes far beyond the practice that has grown up under Rule 53."); *see also id.* at 1143 ("The Monitor was not limited to 'superintending compliance with the district court's decree,' but was instead ordered to 'monitor and review all of the . . . defendants' trust reform activities,' including 'the defendants' trust reform progress and any other matter Mr. Kieffer deems pertinent to trust reform.' Nor could the Monitor have been limited to enforcing a decree, *for there was no decree to enforce*, let along the sort of specific and detailed decree issued in *Ruiz* and typical of such cases.") (emphasis added).

employees, who were the subject of contempt proceedings, filed petitions for writs of mandamus seeking, *inter alia*, the suppression of certain written reports and recommendations of another special master in the case (Alan Balaran). *Brooks*, 383 F.3d at 1038. Balaran had been appointed with the consent of the parties to oversee the discovery process. *Id*. at 1039. He was also authorized to make on-site visits to any location where trust account records were maintained in order to protect such records from destruction or threatened destruction. *Id*. The court later referred to Balaran two contempt proceedings against various non-party employees and agents of the DOI, for which he was ordered to issue reports and recommendations. *Id*. at 1039-40. Several of the non-parties named in the referrals moved to recuse Balaran from participating in the contempt proceedings. *Id*. at 1040-41. The motions were denied and the non-parties filed their mandamus petitions. *Id*. at 1040. During the pendency of the proceedings, Balaran resigned from both the contempt proceedings and the underlying trust reform litigation. *Id*. The petitioners asked the appellate court "to suppress the reports and recommendations written (but not filed with the district court) by Special Master Balaran before he resigned." *Id*. at 1038, 1040. They argued that he should have been recused from the contempt proceedings because, as special master, he had been performing investigative and adjudicative tasks that entailed *ex parte* communications with witnesses and third parties in the underlying trust reform litigation. *Id*. at 1044. The appellate court agreed, noting: "Balaran's four-year involvement in the trust reform litigation entailed innumerable contacts with witnesses and third parties likely to have information relevant to the contempt proceedings. Inevitably, he would have formed impressions about the character or some, perhaps many, of the individuals named in the contempt proceedings." *Id*. at 1045-46.[18] The court

---

[18]   The court pointed to one particular letter the special master wrote to one of several DOJ attorneys who represented the DOI and later became a subject of his contempt inquiry, which described tensions between him and the DOJ lawyers: "In view of the tone and the substance of this letter, it seems likely, if not inevitable, that Balaran's compilation of the record for the district court's review, not to mention his reports and his recommendations, would be subject to selection bias; at the very least, an observer apprised of all the facts would reasonably question his impartiality. Indeed, if Balaran could properly serve as special master advising the district court whether to initiate contempt proceedings, then it would seem equally permissible for a judge presiding over a criminal proceeding to dispatch his law clerk to visit the scene of the crime, take fingerprints, interview witnesses, and report back to the judge
(footnote continues on next page)

rejected the respondents' assurances that the special master would not use the communications in the contempt proceedings. *Id*. at 1046 ("These assurances do not, however, cure the problem of selection bias. Our concern is not with information that 'enters the record and may be controverted or tested by the tools of the adversary process,'; our concern is with information that 'leave[s] no trace in the record,' - such as Balaran's *ex parte* contacts with 'moles' and unnamed DOI employees - that may reasonably be expected to color the way in which he approaches his task, and ultimately his reports and recommendations to the district court, and thus to taint the contempt proceedings despite the steps taken to insulate those proceedings from the information to which Balaran was exposed *ex parte*.")  (internal citation omitted).

The circumstances in *Bulger*, *Cobell*, and *Brooks* are nothing like the circumstances in this case, and Defendants have not demonstrated otherwise.  Defendants' speculative and unsubstantiated claim that having Mr. Cohen serve as both Administrator and Special Master will create a conflict of interest is insufficient to establish irreparable harm warranting a stay.

### C.    Defendants fail to make a strong showing that they are likely to succeed on the merits of their appeal.

It is well established that to demonstrate likelihood to succeed on the merits, "[m]ore than a mere possibility of relief" is required; it is not sufficient that the chance of success on the merits is "better than negligible."  *Nken*, 556 U.S. at 434 (cleaned up; citation omitted).  *See also Dodds*, 845 F.3d at 221; *Nat'l Prescription Opiate*, 2021 WL 3777638, at *1; *Settlement Facility*, 2014 WL 4824822, at *1.  Moreover, because the Court has already "considered fully the merits of the underlying action and issued judgment," Defendants have an even "greater difficulty in demonstrating a likelihood of success on the merits."  *Michigan Coal.*, 945 F.2d at 153.[19]

---

about his findings.  The judge's undertaking to review the clerk's findings *de novo* would not be assurance against the biases of the clerk affecting the judgment of the court; so much the worse if the clerk, like Special Master Balaran, had personal knowledge of the parties - and perhaps of the events in suit - from prior dealings with them."  *Id*. at 1045-46.

[19]    *See also Settlement Facility*, 2014 WL 4824822, at *1; *D.A.B.E.*, 2004 WL 287415, at *1; *Planned Parenthood*, 2022 WL 1698085, at *4; *Harold*, 2020 WL 2507623, at *2 ("This is a difficult showing at this stage because 'a motion for a stay pending appeal is generally made after the district court has

(footnote continues on next page)

Essentially, Defendants must demonstrate "that there is a likelihood of reversal." *Michigan Coal.*, 945 F.2d at 153 ("In essence, a party seeking a stay must ordinarily demonstrate to a reviewing court that there is a likelihood of reversal."). *See also D.A.B.E.*, 2004 WL 287415, at *1; *Allied World*, 2020 WL 886191, at *7; *Planned Parenthood*, 2022 WL 1698085, at *4. They have failed to do so.

Importantly, the fact that a case may involve substantial legal questions or matters of first impression is not dispositive of the first factor; it is merely something to be considered.[20] *See Allied World*, 2020 WL 886191, at *7 ("[T]his Court does not believe that there is a likelihood that its Summary Judgment Order will be reversed[,]" despite the fact that "serious questions on the merits of the Summary Judgment Order and this Order exist"), *aff'd on other grounds,* No. 20-3339, 2020 WL 8994338 (6th Cir. Nov. 5, 2020); *State Farm Mut. Auto. Ins. Co. v. Angelo*, No. 19-10669, 2022 WL 1538393, at *2 (E.D. Mich. May 14, 2022) (even "where 'substantial legal questions or matters of first impression are at issue,' it is still necessary that the equities 'favor the maintaining the status quo'") (citation omitted). Contrary to Defendants' assertions (Motion, p. 3), the court in *N. L. R. B. v. Gen. Motors Corp.*, 510 F. Supp. 341 (S.D. Ohio 1980), did not grant a stay based solely on the fact that the case presented novel issues. The district court in that case granted the National Labor Relations Board's request to enforce certain subpoenas it had issued to the respondents and those respondents then sought a stay of the order pending their appeal. *Id.* at 342. In addressing whether the respondents were likely to prevail

---

considered fully the merits of the underlying action and issued judgment,' so 'there is a reduced probability of error.'") (citation omitted).

[20] Defendants note that "this Court has already recognized that this case involves 'novel' and complex issues[.]" Motion, p. 2 (quoting Dkt. #4614 (Final Judgment) at p. 2). For context, the Court stated that Plaintiffs' public nuisance claim was "*relatively* novel" when explaining why final judgment on Plaintiffs' public nuisance claim was warranted under Rule 54(b), despite Plaintiffs having other previously-severed claims that had not yet been tried. Dkt. #4614 (Final Judgment) at p. 2 ("[B]ecause Plaintiffs' public nuisance theory is *relatively* novel and has been advanced by thousands of other plaintiffs in the MDL, all parties have repeatedly expressed an interest in obtaining, as soon as possible, appellate review of the Court's rulings leading up to and including the *Abatement Order* and *Injunction Order*.") (emphasis added).

on appeal, the court acknowledged the case presented some novel issues, which weighed in favor of a stay.[21]  However, the court proceeded to analyze the remaining three factors and found that they too weighed in favor of the stay.  *Id*. at 342-43.  It was undisputed that the respondents would suffer irreparable harm if the stay was denied: "If they obey the subpoenas, their appeal is mooted; if they ignore them, they could be held in contempt of court."  *Id*. at 342.  The court explained that it would "not force such a choice absent clear harm to other persons or the public interest."  *Id*. The court further noted that granting the stay would not harm N.L.R.B. or others, and that it would better serve the public interest.  *Id*. at 343 ("We agree that an expedient process of justice is in the public interest, but emphasize that the preservation of the respondents' right to appeal is also within the public interest.  If a trade-off is necessary, it must favor rights, not expediency.").

Here, even if one accepts that this case involves complex and novel issues, Defendants have failed to demonstrate a likelihood of reversal.  Instead, they merely regurgitate the same arguments they have made throughout this case.  Specifically, they argue that: (1) Plaintiffs' public nuisance claim is barred by the Ohio Product Liability Act; (2) the Court's decision "rests on a flawed reading of the Controlled Substances Act (CSA) and its implementing regulations[;]" (3) "the Court permitted Plaintiffs to argue—and the jury to find—that Defendants were liable even if they had fully complied with federal and state law[;]" (4) "Defendants did not proximately cause the opioid crisis[;]" and (5) a new trial is required due to juror misconduct.  Motion, pp. 3-8.  Each of these arguments has been extensively briefed by the parties,[22] and considered and

---

[21]  *Id*. ("While we are not persuaded that the Sixth Circuit Court of Appeals will reverse our decision, we are cognizant that this case came to us on somewhat unusual facts and presents some novel issues to the hearing officer.  These issues led to the subpoenas and to this Court's disposition of the subpoena issue.  The novelty of the issues before the hearing officer, which in turn creates novel issues in determining the propriety of the subpoena, makes the likelihood that the respondents will prevail on appeal somewhat greater than the position advocated by the N.L.R.B.  The likelihood is sufficient to favor granting a stay.").

[22]  *See, e.g.,* Dkt. #4242 (Ps' MNT Opp.) at pp. 3-9, 96-97; Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 13-19, 82-101, 106-07; Dkt. #4240 (Ps' Opp to M to Certify Orders for Interlocutory Appeal) at pp. 5-9; Dkt. #4218 (CT3 Ps' Opp. to GE MSJ) at pp. 45-46, 48-49; Dkt. #4127 (CT3 Ps' Response to Ds' Objection to Final Instructions) at pp. 1-3; Dkt. #4069 (Ps' Opp. to Mistrial Motion); Dkt. #3883 (CT3 Ps' Trial Brief) at pp. 1-7; Dkt. #3793 (CT3 Joint Submission re: Instructions/Verdict Form) at pp. 33-(footnote continues on next page)

properly rejected by the Court.[23] Rather than re-litigate these issues here, Plaintiffs incorporate this prior briefing and the Court's prior rulings as if fully set forth herein.

Importantly, Defendants offer no new arguments or authority as to why the Court's rulings are incorrect. This is insufficient to demonstrate a strong likelihood of success on the merits. *See D.A.B.E.*, 2004 WL 287415, at *2 ("Plaintiffs' disagreement with the result of this court's analysis of the takings claim does not automatically constitute a likelihood of reversal on appeal. Plaintiffs have failed to cite any relevant legal principle that was not considered and applied by this court in the November 19, 2003 order. Plaintiffs have also failed to point to any factual mistakes in the court's order."); *ProCraft Cabinetry, Inc. v. Sweet Home Kitchen & Bath, Inc.*, 343 F. Supp. 3d 734, 740, 742 (M.D. Tenn. 2018) (finding movant "has not demonstrated a strong likelihood of success on the merits"; "Although Procraft Cabinetry acknowledges the Court's analysis, it has offered no new arguments to cast it in doubt. . . . The Court's opinion was written after careful consideration of the parties' briefing of the issues and thorough review of relevant precedent."; while movant "did assert some problems it identifies in the district court's legal conclusions, the Court cannot say that [it] has carried its burden to make a '*strong* showing that it is likely to succeed on the merits") (cleaned up).[24]

---

34, 41-42; Dkt. #3456 (Ps' Opp. to M for Reconsideration) at pp. 2-8, 12-13; Dkt. #3366 (Ps' Opp. to MTD) at pp. 10-37; Dkt. #3002-1 (CT1 Ps' Opp. to Causation MSJ) at pp. 33-40, 44-59; Dkt. #2170 (CT1 Ps' Nuisance MSJ Opp.) at pp. 2-3, 7-8; Dkt. #654 (CT1 Ps' MTD Opp.) at pp. 11-15, 18-21.

[23]  *See, e.g.,* Dkt. #4296 (Order Denying Ds' MNTs) at pp. 4-9, 61-69; Dkt. #4295 (Order Denying Ds' Rule 50(b) Motions) at pp. 3-33, 37-38, 40-45; Dkt. #3913 (CT3 GE MSJ Order) at pp. 2-8; Dkt. #3499 (CT3 Reconsideration Order) at pp. 4-9; Dkt. #3403 (CT3 MTD Order) at pp. 13-33; Dkt. #3177 (Cleveland Bakers MTD Order) at pp. 23-24, 40, 44-47;Dkt. #1203 (CT1 Opinion and Order, adopting in part and rejecting in part Dkt. #1025 (R&R)) at pp. 22-28.

[24]  *See also, e.g., State Farm*, 2022 WL 1538393, at *2 ("[C]ourts have noted, under a similar procedural posture, that 'mere repetition of arguments previously considered and rejected cannot be characterized as a strong showing of a likelihood of success on the merits.'") (citation omitted); *Harold*, 2020 WL 2507623, at *4 ("This conclusory reiteration of Dr. Harold's arguments from the summary judgment stage does not articulate an error in the Court's analysis and therefore does not raise serious questions on the merits of the Court's grant of summary judgment."); *Tempur Sealy Int'l, Inc. v. Wondergel, LLC*, No. 5:16-CV-83-JMH, 2016 WL 1435672, at *1 (E.D. Ky. Apr. 11, 2016) ("Having considered the matter, the Court concludes that Purple fails to show that it has a substantial likelihood of succeeding on appeal, notwithstanding that it 'believe[s' it will 'likely' be successful with respect to the arguments (footnote continues on next page)

**D.      The issuance of a stay will substantially injure Plaintiffs and is not in the public interest.**

As discussed above, because Plaintiffs are governmental entities, the final two factors (injury to other interested parties and public interest) merge into a single factor.  *See Nken*, 556 U.S. at 435.  The equities at issue here clearly weigh against a stay.

The injunctive relief awarded in this case is meant to ensure that Defendants comply with their legal obligations to implement effective controls against diversion of prescription opioids. Dkt. #4611 (Abatement Order) at pp. 71-76 (noting that it is "critical" that Defendants be enjoined "from continuing their nuisance-causing ***conduct***") (emphasis in original).  The evidence at trial demonstrated that Defendants have failed to comply with these obligations for decades, even after being sanctioned by the DEA for such conduct.  *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 24-43, 47-64, 67-82; Dkt. #4611 (Abatement Order) at pp. 72-73.  Given their history, there is a substantial likelihood that, if a stay is implemented, Defendants will continue their unlawful behavior during the pendency of the appeal, which will further exacerbate the ongoing public nuisance in the Counties.  *Cf. Elsass*, 2014 WL 12860999, at *3 ("Further, if the stay were granted and the Defendants were allowed to solicit new customers, harm will come to the general public as there is a potential for the Defendants to revert to their old ways of duping unwary taxpayers into paying upfront fees in exchange for the pursuit of meritless claims.").[25]  Certainly preventing

---

that this court has already rejected . . . .  Absent something more than Purple's disagreement with the Court's decision to reject the arguments in favor of Purple's preferred resolution of the matter, there is no support for this factor.").

[25]      *Cf. Apple*, 992 F. Supp. 2d at 290 ("'[T]he public interest in vigilant enforcement of the antitrust laws' is indisputable.  At trial, this Court found that Apple's lawyers and its highest executives orchestrated a price fixing scheme with blatant and aggressive disregard for the requirements of the law.  Consumers of e-books—including Apple's own consumers—suffered hundreds of millions of dollars in harm, and the federal Government and the plaintiff States were forced to expend taxpayer money to bring the harm to an end.  Section VI was imposed to ensure that Apple reformed its policies such that this would never happen again.  While Apple would prefer to have no Monitor, it has failed to show that it is in the public interest to stop his work.  If anything, Apple's reaction to the existence of a monitorship underscores the wisdom of its imposition.  A monitorship is nothing less than 'a necessary and . . . unavoidable consequence' of Apple's violation of the antitrust laws.  'The District Court is not obliged to assume, contrary to common experience, that a violator of the antitrust laws will relinquish the fruits of his violation more completely than the court requires him to do. . . .  [I]t is strongly in the public's

(footnote continues on next page)

the oversupply and diversion of prescription opioids is in the public interest. *See Nat'l Prescription Opiate*, 2021 WL 3777638, at *2 ("The public also has a strong interest in the case. 'President Trump has declared the opioid epidemic a national emergency, and . . . the circumstances in this case, which affect the health and integrity of the entire country, are certainly compelling.'") (citation omitted); *Holiday CVS*, 839 F. Supp. 2d at 172 (finding "there is a strong public interest in preventing the illegal diversion of prescription drugs" and that the government had "a strong interest in enforcing the CSA and ensuring that pharmaceutical drugs are not improperly diverted while the administrative proceedings before the DEA are pending"); *cf. IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 429, 433 (D. Vt. 2009) ("Harm to the health of a member of the public outweighs financial harm [movants] claim they will suffer from enforcement of the law.").

Defendants claim that Plaintiffs have never argued Defendants' current systems are insufficient. Motion, p. 8.[26] Not true. Evidence adduced at trial demonstrates that Defendants' policies and procedures continue to be lacking. *See, e.g.,* Dkt. #4057 (10/20/21 Trial Tr.) [*Polster*] at 3071:19 – 3072:10 (WAG still does not include hydrocodone on its target good faith dispensing checklist), 3073:8-20 (same); Dkt. #4090 (10/26/21 Trial Tr.) [*Travassos*] at 4057:17 – 4058:6 (program "to alert pharmacists when there's a red flag and stop them from filling the prescription until they document the resolution of that flag" still had not been implemented at CVS as of August 2020); Dkt. #4132 (11/8/21 Trial Tr.) [*Cook*] at 6578:13-25 (even in today's iteration, RxConnect

---

interest for the Monitor to remain in place. A monitorship which succeeds in confirming the existence of a genuine and effective antitrust compliance program within Apple, is in the interest of not only the American public, but also Apple.'") (internal citations omitted).

[26] Defendants also argue that Plaintiffs "have effectively conceded that the equities do not require immediate imposition of injunctive terms" because its settlements with Rite Aid and Giant Eagle did not include them. Motion, p. 8. This argument should be rejected out of hand. As Defendants are well aware, the agreed terms of any particular settlement are based on a variety of factors, many of which have nothing to do with the actual merits or value of a specific claim. That injunctive relief was not included in Plaintiffs' settlements with other pharmacy defendants does not mean Plaintiffs are admitting that injunctive relief is not important or justified. Neither Defendants nor the Court were privy to Plaintiffs' settlement negotiations with Rite Aid and Giant Eagle. Thus, it would be inappropriate to make inferences from those settlements and apply them to Plaintiffs' claims against Defendants.

does not provide "information about CVS's investigations into suspicious prescribers[,]" information "about CVS's analysis of store dispensing habits[,]" "information about whether prescribers are top volume prescribers for hydrocodone or oxycodone"), 6579:7-15 (even in today's iteration, RxConnect does not provide information regarding whether a doctor is a top prescriber for a share of controlled drugs versus non-controlled drugs); *see also* Dkt. #4611 (Abatement Order) at p. 72 ("[B]oth lay and expert evidence at trial demonstrated there are many areas where each Pharmacy Defendant can modify its conduct, both by taking certain actions and refraining from taking other actions, to prevent continued oversupply of prescription opioids into the Plaintiff Counties.").

Significantly, the Court specifically ordered Defendants to provide a "detailed" accounting of whether their current policies and procedures complied with the Injunction Order's terms. Dkt. #4669 (10/7 Order) at pp. 1-2 ("[T]he Court orders each Defendant to submit a brief that carefully goes through each section and paragraph of the Injunctive Order that contains an affirmative requirement and provide the Court with a *detailed description* of: (a) whether and to what extent the Defendant is already in full or substantial compliance with the requirements of that section and paragraph; and (b) if it is not already in full or substantial compliance, the changes it must make to its current policies, practices, systems, or structures in order to fully comply with each of the terms of the Injunction Order, and how long they expect it will take to do so." (emphasis added) (internal footnote omitted). In response, however, Defendants simply submitted conclusory and mostly unsubstantiated assertions regarding the policies and procedures they currently have in place. Dkt. #4676-1 (CVS Response to 10/7 Order); Dkt. #4676-2 (WAG Response to 10/7 Order); Dkt. #4676-3 (WMT Response to 10/7 Order). Walgreens' response was particularly egregious, offering no detail whatsoever for the vast majority of the Injunction Order's terms with which it claims to be in full or substantial compliance. Dkt. #4676-2 (WAG Response to 10/7 Order). These responses are yet another example of their continued recalcitrance in failing to comply with the Court's clear directives. This type of behavior is exactly why injunctive relief was required in this case. *See, e.g., Apple*, 992 F. Supp. 2d at 290 ("If anything,

26

Apple's reaction to the existence of a monitorship underscores the wisdom of its imposition.").

Notably, the Court recently ordered, through Special Master Cohen, "each Defendant to file a supplemental response [by October 25], under seal if necessary, that: (a) more thoroughly and precisely complies with the Court's Order; and (b) appends appropriate corporate documents and/or sworn affidavits supporting their descriptions." **Ex. A** (10/18/22 Cohen Email). Defendants' supplemental responses will not be filed until after Plaintiffs' Opposition is due, and it is impossible to tell from Defendants' initial responses the extent to which their current policies and procedures *actually* comply with the Injunction Order's terms. However, even their initial filings show certain deficiencies in Defendants' current policies and procedures. For example, CVS acknowledges that its "policy imposes no documentation or other requirements on a pharmacist when [they refuse to fill prescriptions]." Dkt. #4676-1 (CVS Response to 10/7 Order) at p. 2. Plaintiffs presented ample evidence at trial establishing the necessity of such documentation requirements. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 29-31, 52-53, 72.

But most importantly, even policies that *appear* sufficient are paper are meaningless if not monitored and enforced. Plaintiffs presented substantial evidence at trial that Defendants have a long history of failing to monitor and enforce their controlled substance dispensing policies. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 26, 42-43, 50, 63-64, 70, 81-82. It is for that very reason that an Administrator is necessary to ensure Defendants' compliance moving forward. *See, e.g.,* Dkt. #4513 (Ps' Closing Brief) at pp. 36-37.

Defendants next argue that no evidence was introduced at trial suggesting "the injunctive terms were necessary to alleviate any harm currently being suffered in the counties." Motion, p. 8. Again, not true. Plaintiffs put on substantial evidence at trial of the ongoing public nuisance in the Counties caused by the oversupply and diversion of prescription opioids resulting from Defendants' failure to implement effective controls against diversion. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at pp. 3-13, 19-82, 84-94. Plaintiffs further offered evidence regarding the policies and procedures that must be in place in order to satisfy Defendants' legal obligations related to the dispensing of controlled substances. *See, e.g.,* Dkt. #4241 (Ps' Rule 50(b) Opp.) at

pp. 21-24, 27-30, 34-35, 45-46, 51-53, 56-57, 66, 71-72, 74-76. These are the very policies and procedures that the Injunction Order requires. Dkt. #4611-1 (Injunction Order).

Finally, Defendants suggest a stay is warranted because preventing the disclosure of confidential information, including patients' Protected Health Information is in the public interest. Motion, pp. 8-9. But as discussed above, the Injunction Order, which is the very order the Administrator is appointed to enforce, specifically provides safeguards to protect the confidentiality of this information. *Supra*, § B.1. Defendants also claim that

> neither the Administrator nor his Assistant have the ability to handle such sensitive information appropriately in a word in which wrongdoers are constantly looking to exploit gaps in the most sophisticated information security systems, to say nothing of those maintained by individuals like the proposed Administrator and his Assistant.

Motion, pp. 8-9. In support of this assertion, Defendants cite a news article discussing a security breach of the federal court digital document system. *Id*. at p. 9 n.2. Plaintiffs would simply point out that Defendants themselves have not been immune to such data breaches, despite their purportedly "sophisticated information security systems."[27] Defendants offer no explanation as to why such information would be more susceptible to hackers in the Administrator's hands than in their own.

### E. A temporary stay is unnecessary.

Finally, Defendants argue that the Court should enter a temporary stay to allow them to seek and obtain a stay at the Sixth Circuit. Motion, p. 12. The case cited by Defendants is factually distinguishable. In *United States v. Salim*, the federal government filed an emergency motion for a stay pending the appeal of the district court's order releasing a criminal defendant on bond.

---

[27] *See, e.g.,* Alina Bizga, *Walgreens Discloses Data Breach Impacting Personal Health Information of More Than 72,000 Customers*, Bitdefender.com (Aug. 13, 2020), https://www.bitdefender.com/blog/hotforsecurity/walgreens-discloses-data-breach-impacting-personal-health-information-of-more-than-72000-customers; *More than 1 billion CVS data records accidentally exposed, researcher says*, ABC 13 Eyewitness News (June 16, 2021), https://abc13.com/cvs-data-breach-medical-records-health-cyber-attack/10798172/; Erin Shaak, *Walmart, CaptureRx Hit with Class Action Over Feb. 2021 Data Breach Affecting Pharmacy Customers*, Classaction.org (Aug. 18, 2021), https://www.classaction.org/news/walmart-capturerx-hit-with-class-action-over-feb-2021-data-breach-affecting-pharmacy-customers.

No. 3:15-CR-358, 2018 WL 1138287, at *1 (N.D. Ohio Mar. 2, 2018).  The court denied the motion but granted a one-week temporary stay of the defendant's release to allow the government to seek and obtain a stay from the Sixth Circuit.  *Id.* at *3.  There is no need for a temporary stay here.  Plaintiffs presume that Defendants will file their motion to stay with the Sixth Circuit expeditiously.  Defendants have until November 15 to implement the terms of the injunction order.  Dkt. #4611-1 (Injunction Order) at § I.A.  If, however, the Court decides a temporary stay is warranted, it should be for no more than seven days, as in *Salim*.

**CONCLUSION**

For these reasons, Plaintiffs request that the Court deny Defendants' Motion for Stay Pending Appeal.

Dated:  October 20, 2022

Respectfully submitted,

*/s/ Jayne Conroy*
Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

*/s/ Joseph F. Rice*
Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304) 654-8281
paul@farrellfuller.com

29

*Plaintiffs' Co-Lead Counsel*

W. Mark Lanier
M. Michelle Carreras
LANIER LAW FIRM
10940 W. Sam Houston Pkwy N., Ste 100
Houston, TX  77064
(713) 659-5200
(713) 659-2204 (Fax)
wml@lanierlawfirm.com
mca@lanierlawfirm.com

*Trial Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

Frank L. Gallucci
PLEVIN & GALLUCCI CO., L.P.A.
55 Public Square, Suite 222
Cleveland, OH 44113 (216)
861-0804
(216) 861-5322 (Fax)
FGallucci@pglawyer.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK
270 Munoz Rivera Avenue, Suite 201
Hato Rey, Puerto Rico 00918
(787) 493-5088, Ext. 2007
hunter@napolilaw.com

*Counsel for Plaintiffs Lake County and
Trumbull County, Ohio*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 20, 2022, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*

Peter H. Weinberger
