# Exhibit C

## ALLERGAN NEW YORK STATEWIDE OPIOID SETTLEMENT AGREEMENT

## I.    OVERVIEW

This Allergan New York Statewide Opioid Settlement Agreement ("Agreement") sets forth the terms and conditions of a settlement agreement between and among the State of New York (for itself and other Releasors), the County of Nassau, the County of Suffolk, all New York Participating Subdivisions, and Allergan (collectively, "the Parties") to resolve opioid-related Claims against Allergan and the other Released Entities. This is a statewide opioid settlement agreement pursuant to and as defined in N.Y. Mental Hyg. Law § 25.18.

The Parties have agreed to the below terms for the sole purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Allergan and the other Released Entities expressly deny.  Neither Allergan nor any other Released Entity admits that it caused or contributed to any public nuisance, and neither Allergan nor any other Released Entity admits any wrongdoing that was or could have been alleged by any Releasor.  No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Allergan or any other Released Entity. No part of this Agreement is intended for use by any Third Party for any purpose, including submission to any court for any purpose.

## II.    DEFINITIONS

A.    "*Actions*" means *The County of Suffolk, New York v. Purdue Pharma L. P.*, Case No. 400001/2017; *The County of Nassau, New York v. Purdue Pharma L. P.*, Case No. 400008/2017; and *The People of the State of New York v. Purdue Pharma L.P.*, Case No. 400016/2018.

B.    "*Affiliated Companies*" (1) when used with respect to AbbVie Inc. ("AbbVie") shall mean all of the entities listed in Exhibit A; (2) when used with respect to Allergan shall mean all of the entities listed in Exhibit B; and (3) additionally shall include other entities owned now or in the past either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents, but only to the extent those other entities played any role relating to Covered Conduct, Opioid Products, and/or Released Claims during the period when they were owned either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents. The Parties intend this definition to cover each and every entity that is now or was ever part of the AbbVie and/or Allergan and/or each of their past parents' corporate families to the extent they ever played any role relating to Covered Conduct, Opioid Products, and/or Released Claims.

C.    "*Agreement*" means this agreement together with the exhibits thereto.

D.   "*Allergan*" means Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.) and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc). For the avoidance of doubt, Allergan does not include Teva Pharmaceuticals Industries Ltd. ("Teva Ltd."), Teva Pharmaceuticals USA, Inc. ("Teva USA"), Cephalon, Inc. ("Cephalon"), Actavis LLC ("Actavis LLC"), Watson Laboratories, Inc. ("Watson"), Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) ("Actavis Pharma"), or Anda, Inc. ("Anda").

E.   "*Claim(s)*" means any past, present, or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative or indemnity claim, request, assessment, charge, covenant, damage, debt, lien, loss, fine, penalty, restitution, reimbursement, disgorgement, expenses, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, including, but not limited to, relating to and arising from the alleged historic or continuing opioid-related overdose, abuse, crisis, epidemic, or injuries, whether legal, equitable, statutory, regulatory, or administrative, whether arising under federal, state, or local common law, statute, regulation, guidance, ordinance, or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen, or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs, or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

F.   "*Consent Judgment*" means a consent decree, order, judgment, or similar action.

G.   "*Court*" means the court to which the Agreement and the Consent Judgment are presented for approval and/or entry.

H.   "*Covered Conduct*" means any and all actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, service, work, misstatement, misleading statement, or other activity or inactivity of any kind whatsoever from the beginning of time through the date of execution of this Agreement (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, service, work, misstatement, misleading statement, or other activity or inactivity of any kind whatsoever) relating in any way to (1) the discovery, research, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, relabeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or

2

operating policies or procedures relating to, any Opioid Product, Product, or class of Products, or any system, plan, policy, procedure, or advocacy relating to any Opioid Product, Product, or class of Products, including, but not limited to, any unbranded or branded promotion, marketing, or advertising, Unbranded Information, patient support or assistance, educational programs, consultancy, research, or other programs, campaigns, Lobbying, or grants, sponsorships, charitable donations, or other funding relating to any Opioid Product, Product, or class of Products; (2) the characteristics, properties, risks, or benefits of any Opioid Product, Product, or class of Products; (3) the monitoring, reporting, disclosure, non-monitoring, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Opioid Product, Product, or class of Products; (4) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, repackaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, a precursor or component of Opioid Product, Product, or class of Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate of Opioid Product, Product, or class of Products; and/or (5) diversion control programs or suspicious order monitoring related to any Opioid Product, Product, or class of Products.

I.  "*Divested Actavis Generic Entities*" means Actavis LLC, Watson, and Actavis Pharma.

J.  "*Divested Entities*" means those companies listed on Exhibit C, annexed hereto.

K.  "*Effective Date*" means the date of entry of a final Consent Judgment, which shall be filed no later than 30 days after the Participation Date.

L.  "*Health Care Provider(s)*" means any physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical medications and any medical facility, practice, hospital, clinic, pharmacy, or any other health facility that provides health care services or prescribes or dispenses pharmaceutical medications.

M.  "*In-Kind Support*" means payment or assistance in the form of goods, commodities, services, or anything else of value.

N.  "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

3

O. "*Opioid(s)*" means all naturally occurring, synthetic, or semisynthetic substances that interact with mu-opioid receptors primarily in the central nervous system and have demonstrated addictive properties.

P. "*Opioid Product(s)*" means all past, current, and future medications containing Opioids approved by the U.S. Food & Drug Administration ("FDA") and listed by the U.S. Drug Enforcement Agency ("DEA") as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Product(s)" shall not include (1) methadone and other substances when used exclusively to treat opioid abuse, addiction, OUD, or overdose; or (2) raw materials, immediate precursors, and/or active pharmaceutical ingredients ("APIs") used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.  Also, by way of example, the terms "Opioid(s)" and "Opioid Product(s)" shall not include pharmaceutical medications that may relieve pain but not by interacting with mu-opioid receptors primarily in the central nervous system, such as BOTOX®, HUMIRA®, LINZESS®, ORIAHNN®, ORILISSA®, QULIPTA®, RINVOQ®, SAVELLA®, UBRELVY®, or VIBERZI®.

Q. "*Opioid Settlement Fund*" means the fund created by N.Y. Mental Hyg. Law § 25.18(a)(4).

R. "*OUD*" means opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

S. "*Participation Date*" means the date by which all Subdivisions and other Releasors must elect to participate in this Agreement and shall be 60 days after this Agreement is executed.

T. "*Participating Subdivision(s)*" means a Subdivision that signs the Election and Release Form annexed hereto as Exhibit D and meets the requirements for becoming a Participating Subdivision under Section IX.A.

U. "*Product(s)*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, that is an opioid or opiate, as well as any product containing any such substance. It also includes: (1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and (2) a combination or "cocktail" of any stimulant or other chemical substance prescribed or sold to be used together that includes opioids or opiates. "Product(s)" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine,

4

naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product(s)" also includes any natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence. Further, "Product(s)" includes, but is not limited to, the following: (a) Anexsia, Bancap HC, Combunox, Dilaudid, Duradyne, Esgic with Codeine, Fiorinal with Codeine, Fioricet with Codeine, Kadian, Lorcet, Lorcet Plus, Maxidone, MoxDuo, Norco, Procet, Reprexain, Vicodin, and Vicoprofen, and any type, version, strength, or dosage of the foregoing; and (b) Fentanyl citrate injection, Fentanyl citrate tablet, Fentanyl transdermal, Hydrocodone + acetaminophen, Meperidine hydrochloride injection, Meperidine hydrochloride tablet, Morphine sulfate injection, Morphine sulfate capsule, Morphine sulfate tablet, Oxycodone + acetaminophen, Oxycodone + aspirin, Oxycodone + ibuprofen, Tramadol hydrocholoride, Aspirin + butalbital + caffeine + codeine phosphate, Hydrocodone + acetaminophen, Hydrocodone + ibuprofen, Hydromorphone tablet, Oxycodone + aspirin, Homotropine methylbromide + hydrocodone bitartrate, Oxycodone + acetaminophen, Oxycodone + hydrochloride, Homatropine methylbromide + hydrocodone bitartrate, Morphine sulfate capsule, Morphine sulfate tablet, Oxycodone + acetaminophen, Oxycodone + hydrochloride, Oxycodone + ibuprofen, Oxymorphone tablet, Tramadol hydrochloride, Tramadol hydrochloride, Homatropine methylbromide + hydrocodone bitartrate, Oxymorphone tablet, Fentanyl transdermal, Oxycodone, and Morphine sulfate, and any type, version, strength, or dosage of the foregoing.

V. "*Qualified Settlement Fund*" means the trust, escrow, or similar account established pursuant to this Agreement and structured and operated in a manner that it qualifies as a "qualified settlement fund" within the meaning of 26 U.S.C. § 468B and 26 C.F.R. § 1.468B-1, *et seq.*, to be established by order of the Court into which Allergan makes certain payments that it is required to make pursuant to the terms and conditions set forth in this Agreement.

W. "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date, whether known or unknown, suspected or unsuspected, asserted or unasserted, in law or in equity, that Releasors, whether directly, representatively, derivatively, or in any other capacity, have, including all past and present civil, derivative, regulatory, administrative, or any other claims Releasors may have under any applicable state, federal, regulatory, or administrative law or statute relating to any Covered Conduct prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Subdivisions or other Releasors in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of, or in any way relating to, in

5

whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or proceedings, or in any comparable action or proceeding brought by the State or any of its Subdivisions or other Releasors (whether or not such State, Subdivision, or other Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly.

X.   "*Released Entities*" means Allergan and (1) all of Allergan's past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, agents (all of the foregoing solely in their capacity as such with respect to the Released Claims), and insurers (solely in their role as insurers, if any, with respect to the Released Claims), including, but not limited to, (a) AbbVie and (b) Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates) but solely as to the branded opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Opioid Products or Products before August 2, 2016; (2) the respective past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, partners, manufacturers, contractors, agents, and insurers (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (1), including Abbott Laboratories and Abbott Laboratories Inc.; (3) the respective past and present employees, officers, directors, members, shareholders, partners, trustees, contractors, consultants, and agents (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (1) and (2); and (4) any person or entity to the extent, and only to the extent, that such person or entity may have a Claim based on such person or entity having a business relationship with Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies, including, but not limited to, for contractual indemnity, equitable or implied indemnity, contribution, comparative fault, reimbursement, or apportionment (including, but not limited to, Halo Pharmaceuticals, Inc., Shionogi Inc., Mikart, LLC, PDI, Inc., TMS Health, LLC, National Health Information Network, Inc., Ventiv Commercial Services, LLC, inVentiv Commercial Services, LLC, UPS Supply Chain Solutions, Inc., and King Pharmaceuticals, Inc., and their respective past and current parents, subsidiaries, and affiliates) against Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies relating to any Covered Conduct, Opioid Products, and/or Released Claims arising from such business relationship. Notwithstanding the foregoing (and subject to certain provisions, including, but not limited to, the Non-Party Settlement at Section VII.F and the Set-Off at Section XI below), Released Entities shall exclude Divested

6

Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates, but not Allergan and other Released Entities), but solely as to: (i) their generic opioid drugs that are Opioid Products or Products, and/or (ii) the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioid Products or Products for which Releasors have also sought to hold Allergan (and/or other Released Entities) liable. For the avoidance of doubt, nothing in this Agreement shall release or impair any Claims against Teva Ltd., Teva USA, Cephalon, or Anda, except to the extent expressly set forth in this Agreement, including but not limited to the judgment set-off set forth in Section XI.A.

Y.  "*Releasors*" means (1) the State of New York; (2) Nassau and Suffolk Counties; (3) each Participating Subdivision; and (4) without limitation and to the maximum extent of the power of the State of New York's Attorney General to release Claims on behalf of all other Releasors including but not limited to the following: (a) the State of New York's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts, and other Special Districts in the State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief, including, but not limited to, fines, penalties, or punitive damages, on behalf of or generally applicable to the general public with respect to the State of New York, the Subdivisions or Special Districts, or other Releasors in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision or Special District. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide an Election and Release Form providing for a release to the fullest extent of the Participating Subdivision's authority, which is attached as Exhibit D to the Agreement.  For the avoidance of doubt and without limiting the foregoing, the New York State Department of Financial Services is a Releasor within the terms of this Agreement, and the Parties intend the releases provided for herein to include the New York State Department of Financial Services and for the New York State Department of Financial Services to provide a Release.

Z.  "*Settlement Fund Administrator*" means the entity that administers the Qualified Settlement Fund and as approved by the Court.

AA.   "*Special District(s)*" means a formal and legally recognized sub-entity of the State that is authorized by State law to provide one or a limited number of designated functions, including but not limited to, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, and healthcare and hospital districts. Special Districts do not include sub-entities of the State that provide general governance for a defined area that would qualify as a Subdivision.

BB.   "*State*" means the State of New York.

CC.   "*Subdivision(s)*" means a formal and legally recognized sub-entity of the State that is authorized by State law to provide general governance for a defined area, including, but not limited to, a county, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and other functional levels of sub-entities of the State that provide general governance for a defined area. Historic, non-functioning sub-entities of the State are not Subdivisions. For purposes of this Agreement, the term Subdivision does not include Special Districts.

DD.   "*Third Party(ies)*" means any person or entity other than Allergan or a Releasor.

EE.   "*Treatment of Pain*" means the provision of therapeutic modalities to alleviate or reduce pain.

FF.   "*Unbranded Information*" means any information that does not identify a specific branded or generic product.

## III.   MONETARY RELIEF AND PAYMENTS

### A.   Payments

1.    Allergan shall pay a total of $200,000,000.00 ("Total Payment"). $105,000,000.00 of the Total Payment shall be considered a "Base Payment." $95,000,000.00 of the Total Payment shall be considered a "Premium Payment" to the trial plaintiffs, i.e., the State and the Counties of Nassau and Suffolk, which accounts for the unique circumstances of this settlement, including (among other things) that this settlement is occurring after five months of trial and near the submission of the case to the jury. Releasors represent that fifty-six percent (56%) of the Total Payment constitutes consideration for the settlement of Claims involving, arising from, or related to generic opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioid Products or Products before August 2, 2016 that the Releasors are asserting or might otherwise assert or could assert that

8

Allergan (or any other Released Entity) is directly or indirectly and/or jointly or severally liable based on parent or control liability or a substantially similar theory.  Releasors represent that forty-four percent (44%) of the Total Payment constitutes consideration for the settlement of Claims involving, arising from, or related to branded opioid drugs that are Opioid Products or Products of or attributable to Allergan or any other Released Entity (including but not limited to branded opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and the other Divested Entities related to those branded opioid drugs that are Opioid Products or Products before August 2, 2016) that the Releasors are asserting or might otherwise assert or could assert against Allergan or any other Released Entity, of which seventy-seven percent (77%) is specifically involving, arising from, or related to Kadian® (including but not limited to Kadian manufactured, distributed, marketed, and/or sold from 1997 through 2008 by King Pharmaceuticals, Inc. and/or Alpharma Inc.).  For the avoidance of doubt, the Total Payment is the full and maximum extent of any monies owed by Allergan (and/or the other Released Entities), subject to Sections III.B.3 and IX, and includes attorneys' fees, expenses, and cost payments. The Total Payment shall be broken down as follows:

a.      A payment of $144,195,410.72 to the Qualified Settlement Fund;

b.      A payment of $27,142,857.14 to the County of Nassau, via Napoli Shkolnik, PLLC, as its attorneys, pursuant to wire instructions to be provided;

c.      A payment of $27,142,857.14 to the County of Suffolk, via Simmons Hanly Conroy, LLC, as its attorneys, pursuant to wire instructions to be provided;

d.      A payment of $662,709.67 to Napoli Shkolnik PLLC pursuant to wire instructions to be provided, representing attorneys' fees on Nassau County's share of the amount paid into the Qualified Settlement Fund; and

e.      A payment of $856,165.33 to Simmons Hanly Conroy LLC pursuant to wire instructions to be provided, representing attorneys' fees on Suffolk County's share of the amount paid into the Qualified Settlement Fund.

2.      The Qualified Settlement Fund payment pursuant to Section III.A.1.a above will be split into two funds:

a.  A Qualified Settlement Fund payment of $125,332,821.14 to be distributed pursuant to the Allergan New York Opioid Settlement Sharing Agreement annexed hereto as Exhibit E for the sole purposes of remediation and restitution;

b.  A Qualified Settlement Fund payment of $18,862,589.58. The amount paid hereunder into the Qualified Settlement Fund shall be used for reimbursement of attorneys' fees and costs, including attorneys' fees and costs associated with representing Subdivisions in the State of New York other than Nassau and Suffolk Counties in accordance with their respective contracts.

3.  AbbVie agrees to satisfy the obligations to make the payments due in this Section III if for any reason Allergan fails to fulfill its payment obligations under Section III.

B.  **Payment Schedule**

1.  Allergan will make payment to the Qualified Settlement Fund pursuant to Section III.A.1.a above within 105 days following the Effective Date, provided that the necessary W-9 form is provided to Allergan and Allergan's Bank Verification Form process is completed at least 21 days before payment is due.

2.  Allergan will make payments provided for in Section III.A.1.b-e above within the later of 5 business days following (a) the execution of this Agreement or (b) Allergan's receipt of W-9 forms for each payee specified by Nassau and Suffolk Counties and the completion of Allergan's Bank Verification Form process for each such payee's account. All payments provided pursuant to Section III.A.1.b-e shall be paid into escrow accounts according to instructions to be provided by Napoli Shkolnik, PLLC and Simmons Hanly Conroy, LLC, on behalf of themselves and their respective clients. Payments made pursuant to Section III.A.1.b-e shall be held in escrow accounts until the Court enters the Stipulations of Discontinuance with Prejudice pursuant to Section VI.A.

3.  The Parties agree that, upon its execution and the formal approval of the Nassau and Suffolk Counties Legislatures, this Agreement shall retain all force and effect as to Nassau and Suffolk Counties and shall be given the full effect of the law, notwithstanding whether this Agreement is terminated by Allergan pursuant to Section IX.E. Under any such termination under Section IX.E, Nassau and Suffolk Counties shall be entitled to receive the payments made pursuant to Section III.A.1.b-e and their share of the payment to which they are entitled under Section III.A.1.a, and Allergan will remain or be deemed dismissed with prejudice from the Actions filed by Nassau and Suffolk Counties, and the resolution of Nassau and Suffolk

Counties' claims against Allergan in the Actions shall be given the full effect of the law.  For the avoidance of doubt, the total payments of $60,361,214.28, which represent the payments provided for in Section III.A.1.b-e and Nassau and Suffolk Counties' share of the payment provided for in Section III.A.1.a, is the full and maximum extent of any monies owed by Allergan (and/or the other Released Entities) to Nassau and Suffolk Counties, and includes attorneys' fees, expenses, and cost payments, and nothing in this Agreement should be interpreted to mean anything to the contrary.

C.  **Remediation and Restitution**

1.  The Parties agree that, unless required by law, Allergan's Qualified Settlement Fund payment pursuant to Section III.A.2.a above shall be directed to remediation and restitution of harms allegedly caused by Allergan.  The Parties also agree that the purpose of the Qualified Settlement Fund will be to receive from Allergan and pay over to the State, Participating Subdivisions, and other Releasors monies to remediate the harms allegedly caused by Allergan or to provide restitution for such alleged harms that were previously incurred, none of which amount constitutes a fine or penalty. The State and each Participating Subdivision or other Releasor shall, prior to receipt of any direct payments from the Qualified Settlement Fund, provide the Settlement Fund Administrator with a written statement certifying that: (1) the entity suffered harm allegedly caused by Allergan; (2) the payments to be received by the entity from Allergan represent an amount that is less than or equal to the actual monetary damage allegedly caused by Allergan; and (3) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Allergan and/or to provide restitution for such alleged harms that were previously incurred.  All costs incurred related to any request for a private letter ruling from the I.R.S. affirming the tax deductibility of the settlement payment, and/or the tax-exempt status of the Qualified Settlement Fund pursuant to IRC Section 115 shall be borne in their entirety by Allergan and shall not be directly paid or reimbursed from the corpus of the fund, escrow, or trust. The Settlement Fund Administrator shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering the Consent Judgment becomes binding.  On the Form 1098-F, the Settlement Fund Administrator shall identify such payments from Allergan pursuant to Section III.A.2.a as remediation and restitution amounts.  The Settlement Fund Administrator or the State, as applicable, shall also, on or before January 31 of the year following the calendar year in which the order entering the Consent Judgment becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Allergan.

2.      Nassau and Suffolk Counties represent that they shall use the payments received pursuant to this Agreement, after payment of attorney's fees and costs, solely for remediation and restitution consistent with "Approved Uses" as defined in the Allergan New York Opioid Settlement Sharing Agreement, attached hereto as Exhibit E.  As soon as reasonably practicable following receipt of any payment owed to them under this Agreement, Nassau and Suffolk Counties shall inform Allergan of precisely how much of the payments received pursuant to this Agreement each of them will use for remediation and restitution consistent with "Approved Uses."  Nassau and Suffolk Counties shall each comply with their respective obligations to timely file with the Internal Revenue Service forms or reports as required by law relating to the funds they received hereunder.  Nassau and Suffolk Counties shall each complete and file Form 1098-F with the Internal Revenue Service at the appropriate time and shall also furnish Copy B of such Form 1098-F (or an applicable substitute statement) to Allergan.

## IV.    INJUNCTIVE RELIEF

Allergan does not currently manufacture, sell, promote, or Lobby for any Opioids or Opioid Products.  As provided below, Allergan shall not manufacture, sell, promote, or Lobby for any Opioids or Opioid Products in or for distribution in the State of New York.  However, the Parties acknowledge that certain Opioids or Opioid Products sold by Allergan prior to 2021 may still be circulating in the marketplace outside the possession and control of Allergan and the same is not a breach of any terms within this Agreement. For purposes of this Section IV only, *Allergan* means Allergan Finance, LLC, Allergan Limited, and AbbVie Inc., and each of their respective parents (as applicable), subsidiaries, successors, affiliates, and officers, directors, employees, representatives, and agents under the control of the foregoing.

A.      **Compliance Duration**

1.      Section IV of this Agreement shall be effective for 10 years from the Effective Date and is limited to conduct in the United States that involves or affects the State of New York.

2.      Nothing in this Agreement shall relieve Allergan of its independent obligation to fully comply with the laws of the State of New York before or after expiration of the 10-year period specified in this subsection.

B.      **Ban on Selling and Manufacturing Opioids**

1.      Allergan shall not manufacture or sell any Opioids or Opioid Products for distribution in the State of New York. Allergan represents that Kadian® and Norco® were voluntarily discontinued by the end of 2020 and that the last inventory shipped will expire on or before June 30, 2023.

C.      **Ban on Promotion**

1.   Allergan shall not engage in promotion of Opioids or Opioid Products, including but not limited to, by:

    a.   Employing or contracting with sales representatives, Health Care Providers, any Third Party, or other persons to promote Opioids or Opioid Products to (i) Health Care Providers, (ii) patients, (iii) third-party payors (e.g., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to manage care organizations and pharmacy benefit managers), or (iv) persons involved in determining formulary access or treatment guidelines to promote Opioids or Opioid Products;

    b.   Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for promotion of Opioids or Opioid Products; and

    c.   Creating or distributing promotional materials (such as advertisements) that promote Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, guides, websites or internet advertisements, social media accounts or networks, and providing hyperlinks, engaging in internet search engine optimization, or otherwise directing internet traffic by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet to promote Opioids or Opioid Products.

2.   Notwithstanding Section IV.C.1 directly above, Allergan may engage in other conduct, including but not limited to the following:

    a.   Maintain a corporate website that includes Opioid Products on company's list of products that contains principally the following content: the FDA-approved package insert, medication guide, and labeling;

    b.   Maintain a product website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

    c.   Provide factual information about Opioid Products sold by Allergan prior to 2021 which may still be circulating in the marketplace outside the possession and control of Allergan (including but not limited to an Opioid Product's NDC, SKU, or other relevant information such as formulation, package size, dosage, or pricing);

13

d.  Provide or collect information or support the provision or collection of information as expressly required by law or any state or federal government agency with jurisdiction in New York (including but not limited to collecting and/or reporting adverse events related to Opioid Products);

e.  Provide the following by mail, electronic mail, on or through Allergan's corporate or product websites, or through other electronic or digital methods: FDA-approved package insert, medication guide, and labeling for Opioid Products, or other prescribing information for Opioid Products that are published or approved by a state or federal government agency with jurisdiction in New York;

f.  Provide scientific and/or medical information to a Health Care Provider consistent with FDA standards, rules, regulations, and/or guidance, including, but not limited to, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

g.  Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved package insert, medication guide, and labeling for Opioid Products, to speak with a licensed Health Care Provider without describing the safety or effectiveness of any Opioid Product or naming any specific Health Care Provider, or to speak with their health insurance carrier regarding coverage of an Opioid Product;

h.  Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with FDA standards, rules, regulations, and/or guidance, including, but not limited to, FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

i.  Conduct or provide financial support or In-Kind Support for bona fide scientific research; and

14

       j.      Draft, publish, or provide financial support or In-Kind Support for bona fide scientific publications.

3.      Promotion of Treatment of Pain to promote Opioids or Opioid Products

      a.      Allergan shall not promote the Treatment of Pain with or by referring directly to Opioids or Opioid Products (including with Unbranded Information) or with the intent and purpose of promoting Opioids or Opioid Products.

      b.      Allergan shall not knowingly promote the Treatment of Pain with or by referring directly to Opioids or Opioid Products through Third Parties or with the intent and purpose of promoting Opioids or Opioid Products.

      c.      Allergan shall not promote the concept that pain is undertreated to promote Opioids or Opioid Products.

      d.      Allergan shall not knowingly promote the concept that pain is undertreated to promote Opioids or Opioid Products through Third Parties.

      e.      For the avoidance of doubt, this Section IV.C is not intended and shall not be interpreted to prohibit any and all discussions or references to Opioids or Opioid Products when doing so is not to promote Opioids or Opioid Product, including, for example, if certain patient populations, such as those with a history of abuse of Opioids or Opioid Products, are identified as having a higher prevalence of other conditions, such as Hepatitis C, or being appropriate candidates for treatment of those other conditions.

D.    **No Financial Reward or Discipline Based on Volume of Opioid Product Sales**

1.      Allergan shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products; and

2.      Allergan shall not offer or pay any remuneration (including any compensation or rebate), directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product (except to the extent a pre-existing contractual or legal requirement exists related to Opioid Products sold by Allergan before 2021).

E.    **Ban on Funding/Grants to Third Parties**

1.      Allergan shall not directly or indirectly provide financial support or In-Kind Support to any Third Party regarding conduct that promotes Opioids

or Opioid Products, including educational programs, brochures, newsletters, pamphlets, journals, books, guides, websites, or social media accounts or networks that promote Opioids or Opioid Products, but excluding financial support otherwise required by the Agreement, a court order, a federal or state agency (e.g., FDA-approved Risk Evaluation and Mitigation Strategy (REMs)), or a federal or state law or regulation.

2.    Allergan shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for medical education programs with the intent and purpose of promoting Opioids or Opioid Products.

3.    Allergan shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group related to conduct that promotes Opioids or Opioid Products.

4.    Allergan shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of promoting Opioids or Opioid Products.

5.    Allergan shall not use, assist, or employ any Third Party to engage in any activity that Allergan itself would be prohibited from engaging in pursuant to the Agreement. To the extent Allergan supports trade groups engaged in Lobbying, Allergan shall notify the trade groups at the time it makes its trade association payments that Allergan's support shall not be used to encourage the use of opioid medications or discourage the use of non-opioid medications for the purpose of indirectly encouraging the use of opioid medications (but shall not be responsible for how the trade group ultimately uses the support provided because it is outside of Allergan's control).

6.    Allergan shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids or Opioid Products.

7.    No officer or Vice President-level employee of Allergan may concurrently serve as a director, board member, employee, agent, or officer of any entity that primarily engages in conduct that promotes Opioids or Opioid Products. For the avoidance of doubt, nothing in this provision shall preclude an officer or Vice President-level employee of Allergan from concurrently serving on the board of a hospital.

8.    Allergan shall play no role in appointing persons to the board, or hiring persons to the staff, of any Third Party that primarily engages in conduct that promotes Opioids or Opioid Products. For avoidance of doubt, nothing

16

in this paragraph shall prohibit Allergan from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or board member at any such Third Party.

F. **Lobbying Restrictions**

1. Allergan shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

    a. Encourages or requires Health Care Providers to prescribe Opioids or Opioid Products or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

    b. Has the effect of limiting access to any non-Opioid alternative pain treatments; or

    c. Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2. Allergan shall not Lobby against the enactment of any federal, state, or local legislative or regulatory provision that supports:

    a. The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioids or Opioid Products, including but not limited to Third Party payment or reimbursement for such therapies;

    b. The use and/or prescription of immediate release Opioids or Opioid Products instead of extended-release Opioids or Opioid Products when an Opioid or Opioid Product is initiated, including but not limited to Third Party reimbursement or payment for such prescriptions;

    c. The prescribing of the lowest effective dose of an Opioid or Opioid Product, including but not limited to Third Party reimbursement or payment for such prescriptions;

    d. The limitation of initial prescriptions of Opioids or Opioid Products to treat acute pain;

    e. The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to Third Party reimbursement or payment for naloxone;

    f. The use of urine testing before starting use of Opioids or Opioid Products and annual urine testing when Opioids or Opioid Products

17

are prescribed, including but not limited to Third Party reimbursement or payment for such testing;

g.    Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to Third Party reimbursement or payment for such treatment; or

h.    The implementation or use of disposal systems when solely related to Opioids or Opioid Products (versus of general applicability to all pharmaceutical medications, for example).

3.    Allergan shall not Lobby against the enactment of any federal, state, or local legislative or regulatory provision expanding the operation or use of Prescription Drug Monitoring Programs ("PDMPs"), including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid Product use is initiated and with every prescription thereafter.

4.    Notwithstanding the foregoing restrictions in Sections IV.F.1-3, the following conduct is not restricted:

a.    Challenging the enforcement or interpretation of (including, but not limited to, suing for declaratory or injunctive relief) any laws, rules, or regulations;

b.    Communications by Allergan in response to a law, rule, regulation, or order requiring such communication;

c.    Communications by an Allergan representative appearing before a federal or state legislative, administrative, or regulatory body, committee, or subcommittee (including, but not limited to, as a result of a mandatory order or subpoena commanding that person or Allergan's designee to testify);

d.    Responding, in a manner consistent with the Agreement, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Allergan from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation; or

e.    Lobbying for or against provisions of legislation, rule, or regulation that address subjects other than those identified in Sections IV.F.1-3, so long as Allergan does not support specific portions of such legislation, rule, or regulation covered by Section IV.F.1 or oppose specific portions of such legislation, rule, or regulation covered by

Sections IV.F.2-3.  For the avoidance of doubt, Allergan may Lobby for or against any legislation, rule, or regulation that may be covered by Sections IV.F.1-3, if such legislation, rule, or regulation has general or specific provisions that affect medications beyond Opioids or Opioid Products, so long as Allergan's intent and purpose of doing so is not to promote Opioids or Opioid Products.

G.    **Ban on Prescription Savings Programs**

1.    Allergan shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product (except to the extent a pre-existing contractual or legal requirement exists related to Opioid Products sold by Allergan before 2021).

2.    Allergan shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product (except to the extent a pre-existing contractual or legal requirement exists related to Opioid Products sold by Allergan before 2021).

3.    Allergan shall not directly or indirectly assist patients or Health Care Providers with the claims and/or prior authorization process required for third-party payors to approve payment for any Opioid Product.

4.    For the avoidance of doubt, Allergan may directly or indirectly provide financial support or In-Kind Support to any Third Party that provides patient assistance or support services for the purposes of helping patients afford and gain access to the medications prescribed to them, so long as Allergan does not do so with the intent and purpose of promoting Opioid Products.

H.    **General Terms**

1.    Allergan shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, or deceptive as defined under the law of New York State. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

2.    Allergan shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have. For purposes of this paragraph, "Opioid Product" shall also include

19

methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

3.      For the avoidance of doubt, the Agreement shall not be construed or used as a waiver or limitation of any defense otherwise available to Allergan or any Released Entity in any action, and nothing in the Agreement is intended to or shall be construed to prohibit Allergan or any Released Entity in any way whatsoever from taking legal or factual positions with regard to any Opioid Products in prosecution or defense of litigation or other legal proceedings.

4.      Upon the request of the State of New York Attorney General and to the extent permitted pursuant to the State of New York's civil investigative demand ("CID") or investigative subpoena authority, Allergan shall provide the New York Attorney General with copies of the following, within thirty (30) days of the request:

a.      Any litigation or civil or criminal law enforcement subpoenas or CID relating to Allergan's Opioid Product(s); and

b.      Warning or untitled letters issued by the FDA regarding Allergan's Opioid Product(s) and all correspondence between Allergan and the FDA related to such letters.

5.      Allergan has agreed to the terms of this Agreement solely for the purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Allergan and the other Released Entities expressly deny. Neither Allergan nor any other Released Entity admits that it caused or contributed to any public nuisance, and neither Allergan nor any other Released Entity admits any wrongdoing that was or could have been alleged by any Releasor. No part of the Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Allergan or any other Released Entity. No part of the Agreement is intended for use by any Third Party for any purpose, including submission to any court for any purpose.

6.      Nothing in the Agreement shall be construed to limit or impair Allergan's ability to:

a.      Communicate its positions and/or respond to media inquiries concerning litigation, investigations, or other proceedings or matters relating to Allergan or its Opioid Products.

b. Maintain a website explaining its litigation positions and responding to allegations concerning Allergan or its Opioid Products.

I. **Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1. Allergan shall comply with all applicable State laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, provided that nothing in this paragraph requires Allergan to violate federal law or regulations, including but not limited to:

   a. New York State Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

   b. New York State Consumer Protection Laws; and

   c. New York State laws, regulations, and guidelines related to the prescribing, distribution, and disposal of Opioid Products.

J. **Clinical Data Transparency**

1. Allergan agrees to make available to an independent Third-Party data center or platform owner (e.g., Vivli) anonymized clinical data generated from Allergan-sponsored Phase II-IV interventional clinical studies—regardless of whether that data was submitted to a regulatory authority (e.g., FDA)—for branded opioid drugs that are Opioids or Opioid Products that have received an initial marketing authorization from a regulatory authority to the extent Allergan conducts a reasonable, good faith investigation to locate any such data and it is in Allergan's possession. For the avoidance of doubt, anonymized clinical data includes:

   a. Full analyzable data set(s) (including individual participant-level data de-identified);

   b. The clinical study report(s) redacted for commercial or personal identifying information;

   c. The full protocol(s) (including the initial version, final version, and all amendments); and

   d. Full statistical analysis plan(s) (including all amendments and documentation for additional work processes); and Dataset Specifications, which describe the available dataset variables (such as age, race, blood pressure, lab values, etc.).

2. The independent Third Party will facilitate the disclosure of such clinical data to qualified researchers with a bona fide scientific research proposal as

21

reviewed and approved by an independent review panel for scientific merit consistent with the panel's assessment criteria and pursuant to an agreed upon data use agreement.

3.  Allergan shall not interfere with decisions made by the staff or reviewers associated with the independent Third-Party data center or platform owner.

4.  Allergan shall bear all costs for making clinical data available pursuant to Section IV.J.1 of this Agreement.

## V.  COMPLIANCE

### A.  Enforcement

1.  For the purposes of resolving disputes with respect to compliance with Section IV of this Agreement, should the State of New York have a reasonable basis to believe that Allergan has engaged in a practice that breaches a provision of Section IV of this Agreement subsequent to the Effective Date, the State of New York shall notify Allergan in writing of the specific objection, identify with particularity the provision of the Agreement that the practice appears to breach, and give Allergan thirty (30) days to respond in writing to the notification; provided, however, that the State of New York may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

2.  Within thirty (30) days of receipt of written notice provided under Section V.A.1, above, Allergan shall provide a good faith written response to the State's notification, containing either a statement explaining why Allergan believes it is in compliance with the provisions of Section IV of this Agreement, or a detailed explanation of how the alleged breach occurred and a statement explaining how Allergan intends to remedy the alleged breach. Nothing in this section shall be interpreted to limit the State of New York's CID or investigative subpoena authority, to the extent such authority exists under applicable law, and Allergan reserves all of its rights in responding to a CID or investigative subpoena issued pursuant to such authority.

3.  The State of New York may agree, in writing, to provide Allergan with additional time beyond thirty (30) days to respond to a notice provided under Section V.A.1, above, without court approval.

4.  Upon giving Allergan thirty (30) days to respond to the notification described under Section V.A.1. above, the State shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in possession, custody, or control of

Allergan that relate to Allergan's compliance with each provision of the Agreement pursuant to the State of New York's CID or investigative subpoena authority.

5. The State of New York may assert any claim that Allergan has breached Section IV of the Agreement in a separate civil action to enforce compliance with the Agreement, or may seek any other relief afforded by law for breach of the Agreement, but only after providing Allergan an opportunity to respond to the notification described in Section V.A.1, above; provided, however, the State of New York may take any action if the State believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

6. In the event of a conflict between the requirements of Section IV of the Agreement and any other law, regulation, or requirement such that Allergan cannot comply with the law without breaching the terms of the Agreement or being subject to adverse action, including fines and penalties, Allergan shall document such conflicts and notify the State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Allergan's discovery of the conflict. Allergan shall comply with the terms of the Agreement to the fullest extent possible without violating the law.

7. Allergan or the State may request that Allergan and the State meet and confer regarding the resolution of an actual or potential conflict between Section IV of the Agreement and any other law, regulation, or requirement, or between interpretations of the Agreement by different courts. Nothing herein is intended to modify or extend the jurisdiction of any single judicial authority as provided by law.

B. **Compliance Deadlines**

1. Allergan must be in full compliance with the provisions included in Section IV of this Agreement within 180 days after the Effective Date. Nothing herein shall be construed as permitting or requiring Allergan to avoid existing legal obligations.

## VI.    DISMISSAL OF CLAIMS

A. Upon the execution of this Agreement, while awaiting formal approval of the Agreement by the Nassau and Suffolk County Legislatures, the Parties agree to stay or extend all deadlines and proceedings in the Actions as to Allergan and to jointly move for the claims against Allergan to be severed from the Actions.  It is the Parties' intent that all litigation activities in the Actions relating to the State's and Nassau and Suffolk Counties' claims against Allergan shall immediately cease as of the date of the execution of this Agreement and that the claims against Allergan

23

shall no longer be pursued in the trial of the Actions (including against the other defendants) that commenced with jury selection on June 8, 2021. Concurrently with the execution of this Agreement, Allergan and Nassau and Suffolk Counties will execute a Stipulation of Discontinuance with Prejudice, in the form annexed hereto as Exhibit F. The Parties will hold Nassau and Suffolk Counties' Stipulation of Discontinuance with Prejudice in escrow until the formal approval of the Agreement by the Nassau and Suffolk County Legislatures (by passing a resolution satisfying the approval process of the Agreement or otherwise). Once approval is given, Nassau and Suffolk Counties and/or Allergan shall promptly submit the executed Stipulation of Discontinuance with Prejudice to the Court with a request that it be so ordered. In the event the Nassau and Suffolk Counties' Legislatures fail to approve the Agreement or the Court declines to so order the discontinuance of the Actions with prejudice as against Allergan, Allergan shall be entitled to terminate the Agreement, shall be excused from all obligations under it, and shall be entitled to a refund of all payments made pursuant to Section III.A.1.b-e of this Agreement from Nassau and Suffolk Counties and Counsel for Nassau and Suffolk Counties. Concurrently with the execution of this Agreement, Allergan and the State will execute a separate Stipulation of Discontinuance with Prejudice, in the form annexed hereto as Exhibit G. The Parties will hold the State's Stipulation of Discontinuance with Prejudice in escrow until the Effective Date and it shall be submitted to the Court with a request that it be so ordered concurrently with the entry of the Consent Judgment implementing this Agreement.

B. Upon the execution of this Agreement, the New York Department of Financial Services shall move for a stay of all proceedings it has brought against any Released Entities. The Released Entities shall move for a stay of all proceedings brought against the New York Department of Financial Services. It is the Parties' intent that all activities relating to the New York Department of Financial Services' Claims and charges brought against any Released Entities shall immediately cease as of the date of the execution of this Agreement. Within three (3) business days of the Effective Date, the New York Department of Financial Services shall voluntarily dismiss with prejudice all Claims and charges brought against any Released Entities.

## VII. RELEASE

A. *Scope*. Effective upon the entry of Nassau and Suffolk Counties' Stipulation of Discontinuance with Prejudice, the Released Entities will be released and forever discharged from all of the Released Claims of Nassau and Suffolk Counties. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Released Claims of the State of New York and all other Releasors. The State of New York (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise

seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever.  The releases are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any claim, demand, liability, or relief of any kind or character whatsoever (including any Claim) as a result of, arising out of, or relating in any way to Released Claims and extend to the full extent of the power of the State of New York, its Attorney General, each Participating Subdivision, and other Releasors to release any and all Released Claims.  The release shall be a full, final, and complete bar to any Released Claim.  For the avoidance of doubt, Releasors agree to not seek any further claim, demand, liability, or relief of any kind or character whatsoever (including any Claim), including injunctive relief, from the Released Entities for any and all Covered Conduct of any kind whatsoever related to any of their Opioid Products, Products, or class of Products, including by or related to the Divested Actavis Generic Entities and/or other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates), but solely as to the branded opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Opioid Products or Products before August 2, 2016.  Notwithstanding the forgoing, the releases provided for in this Agreement specifically exclude any Claims by Releasors against Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and/or affiliates, including but not limited to Teva Ltd., Teva USA and their subsidiaries and affiliates, but not Allergan and its Released Entities), but solely as to: (i) their generic opioid drugs that are Opioid Products or Products, and/or (ii) the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioid Products or Products for which Releasors have also sought to hold Allergan (and/or other Released Entities) liable. For the avoidance of doubt, nothing in this Agreement shall release or impair any Claims against Teva Ltd., Teva USA, Cephalon, or Anda, except to the extent expressly set forth in this Agreement, including but not limited to the judgment set-off set forth in Section XI.A.

B.     *Indemnification and Contribution Prohibited.* No Released Entity shall seek to recover any portion of any payment made under this Agreement from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, Third Party vendor, trade association, distributor, or health care practitioner based on indemnification, contribution, or any other theory.  However, and notwithstanding the foregoing, this provision shall not preclude any Released Entity from seeking indemnification, contribution, or any other theory from and against Teva Ltd., Pfizer Inc., King Pharmaceuticals, Inc., and Alpharma Inc., and/or each of their respective past and current parents, subsidiaries, and/or affiliates.

25

C. *Broad Release*. In connection with the releases provided for in this Agreement, Releasors will expressly waive, release, acquit, and forever discharge to the fullest extent permitted by law and any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law.  A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but Releasors expressly waive and fully, finally, and forever settle, release, acquit, and discharge, upon the Effective Date, any and all Released Claims against any and all Released Entities that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or through no fault whatsoever, and which, if known, would materially affect any Releasor's decision to participate in the Agreement.

D. *Cooperation.* Releasors (1) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (2) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal with prejudice of any and all Released Claims.  The State shall use its best efforts to secure releases consistent with this Agreement from all Subdivisions, Special Districts, and other Releasors.

E. *Representation and Warranty.* The signatories of this Agreement on behalf of the State of New York and its Participating Subdivisions expressly represent and warrant that they will, on or before the Effective Date, have (or have obtained) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) the State of New York, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State of New York's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license;[1] and (4) any Participating Subdivisions or other Releasors.  For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor.  Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

F. *Non-Party Settlement.* To the extent that, on or after the execution of the Agreement, any Releasor settles any Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) it may have against any entity that is not a Released Entity (a "non-Released

---

[1]  In New York, the department and agency that have the duties and powers in subclauses (2) and (3) are the Department of Health and the Department of Financial Services.

Entity") that is, as of the execution of the Agreement, a defendant in the multi-district litigation *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio) ("MDL") and provides a release to such non-Released Entity (a "Non-Party Settlement"), including in any bankruptcy proceeding or through any plan of reorganization, the Releasor will include, unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Allergan in the first sentence of Section VII.B, or a release from such non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained herein) of any Claim-Over as defined in Section VII.G under which any Released Entity may be liable to pay any part of such Non-Party Settlement, compensate the non-Released Entity for any part of such Non-Party Settlement, or otherwise be liable to such non-Released Entity. The sole remedy for a Releasor's failure to include such a provision in a Non-Party Settlement shall be the application of Section VII.G below. For the avoidance of any doubt, non-Released Entities include, but are not limited to, Teva Ltd., Teva USA, Divested Actavis Generic Entities or other Divested Entities, and Anda (including for Section VII.G below).

G.    *Claim Over.*  In the event that any Releasor has not obtained, or is unable to obtain, a prohibition on any contribution or indemnity as set forth in Section VII.F in a settlement with a non-Released Entity of a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), or if a Releasor obtains a judgment against a non-Released Entity with respect to a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), or if a Releasor files against a non-Released Entity a Claim in bankruptcy involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), then:

1.    The State of New York (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) agrees that, if a Releasor asserts a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) against any non-Released Entity and such non-Released Entity in turn successfully asserts a Claim against a Released Entity relating to the same on the basis of contribution, indemnity, or other claim-over on any theory (a "*Claim-Over*"), the Releasor shall reduce its Claim and any judgment or settlement it may obtain against such non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law and to fully hold the Released Entity harmless from such Claim-Over. For purposes of this provision, successful assertion of a Claim means either (a) a final monetary judgment; *provided* that the State of New York Attorney General had notice of and opportunity to intervene in the proceeding giving rise to such judgment or (b) a settlement; *provided* that the Released Entity sought the State of New York Attorney General's consent to the settlement

27

and such consent was either obtained or unreasonably withheld. Should the judgment or settlement against the Released Entity resolve claims that are not Claim-Over claims, the reduction of the Claim and judgment or settlement shall be for the Claim-Over portion only, which shall be distinguishable in the judgment or settlement.

2. Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and (if it is a party in the proceeding) shall join in any motion by any of the Released Entities to dismiss any Claim-Over on the grounds that this Agreement moots or otherwise extinguishes any such Claim-Over. In the foregoing circumstance, in which a non-Released Entity asserts a Claim against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory, the Released Entity will take reasonable and necessary steps to defend against the Claim and will consent to the intervention of any Releasor seeking to defend against such Claim.

3. Allergan shall notify the State of New York Attorney General, to the extent permitted by applicable law, in the event that any non-Released Entity asserts a Claim-Over claim arising out of a Claim involving Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) against any Released Entities.

H. *Effectiveness*. The releases provided for in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

I. *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release, or limit any criminal liability, Claims for any outstanding liability under any tax or securities or antitrust laws, Claims against parties who are not Released Entities, Claims by private parties (except to the extent they seek punitive damages foreclosed by Section VIII), and any Claims arising under the Agreement for enforcement of the Agreement.

## VIII.  PUNITIVE DAMAGES CLAIMS BROUGHT BY PRIVATE PARTIES

A. The Parties agree that this Agreement is intended to bar any and all claims for punitive damages, accrued or unaccrued, by private parties (including, but not limited to, personal injury claimants, insurers or other third party payors, union trust, health benefit, or welfare funds, and private healthcare facilities), who are citizens or residents of New York or who assert a claim under New York law,

28

against any of the Released Entities that directly or indirectly are based on, arise out of, or in any way relate to or concern Covered Conduct occurring prior to the Effective Date, including, but not limited to, under the doctrine of res judicata and/or collateral estoppel.  Through this Section VIII.A of the Agreement, the Parties intend to incorporate the principles discussed in *Fabiano v. Philip Morris Inc.*, 54 A.D.3d 146, 151 (1st Dep't 2008), which explains, among other things, that "a claim by a private attorney general to vindicate what is an essentially public interest in imposing a punitive sanction cannot lie, where, as here, that interest has been previously and appropriately represented by the State Attorney General in an action addressed, on behalf of all of the people of the State, . . . to the identical misconduct."

## IX.    PARTICIPATION BY SUBDIVISIONS

A.    *Requirements for Becoming a Participating Subdivision*. A Subdivision in the State may become a Participating Subdivision by executing an Election and Release Form attached as Exhibit D and, as applicable, promptly dismissing its legal action.

B.    *Participation of Subdivisions Barred by Law.* A Subdivision may participate by having its claims extinguished by operation of law pursuant to Section 25.18(d) of the New York Mental Hygiene Law and released by the New York State Attorney General's Office in executing an Election and Release Form (with an exhibit identifying such Subdivisions).

C.    *Notice*. The Office of the New York State Attorney General shall send individual notice to all Subdivisions in the State of New York and the requirements for participation. Such notice may include publication and other standard forms of notification. Nothing contained herein shall preclude the State from providing further notice to or from contacting any of its Subdivisions about becoming a Participating Subdivision.

D.    *Representation With Respect to Participation Rate.*  The State of New York represents and warrants that Exhibit H is a list of all Subdivisions (including, but not limited to, those represented by Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC) that are the only Releasors (including but not limited to other Subdivisions, Special Districts, and/or other New York governmental entities) that filed Claims against Allergan and/or its Affiliated Companies on or before June 30, 2019.  The State acknowledges the materiality of the foregoing representation and warranty.  Counsel for Allergan represents that after a reasonably diligent search, to the best of its knowledge, information, and belief, Allergan has not been served with process in, or otherwise notified of, any such action that is not listed on Exhibit H, and it is unaware of any such action.  The State of New York represents and warrants for itself that it has a good faith belief that all of New York's Subdivisions listed in Exhibit H will become Participating Subdivisions.  Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC represent and warrant for themselves that they have a good faith belief that all of the Subdivisions that they represent will become

29

Participating Subdivisions, and that they, using their best efforts, will recommend this Agreement to their clients as a fair settlement. The State and Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC acknowledge the materiality of the foregoing representations and warranties. The State will use its best efforts to obtain the participation of all the Subdivisions listed in Exhibit H, including those that are not represented by Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC. The State acknowledges the materiality of the foregoing undertaking.

E.    *Full Participation Rate.* The State and Nassau and Suffolk Counties shall use their best efforts to secure full participation from all Subdivisions listed in Exhibit H. However, as of the Participation Date, if less than 90% of the Subdivisions listed in Exhibit H by population or less than 80% of the Subdivisions by number listed in Exhibit H become Participating Subdivisions, then Allergan shall have twenty-one (21) days from the Participation Date to decide in its sole discretion to terminate the Agreement. If Allergan timely notifies the State of its decision to terminate the Agreement under this paragraph, then the State shall have a twenty-one (21) day cure period in which to secure participation by 90% of the Subdivisions listed in Exhibit H by population and 80% of the Subdivisions listed in Exhibit H by number. In the event that the State secures the required participation during such cure period, the Agreement shall not terminate; if the State fails to obtain the necessary participation level during such cure period, then Allergan shall have twenty-one (21) days thereafter to decide in its sole discretion terminate the Agreement. Further, if less than 100% of the Subdivisions listed in Exhibit H do not participate and Allergan does not decide to terminate the Agreement, then the payment due pursuant to Section III.A.1.a shall be reduced by three times the total amount(s) that would have been received pursuant to the Allergan New York Opioid Settlement Sharing Agreement attached hereto as Exhibit E by any Subdivision that does not become a Participating Subdivision by the Participation Date.

F.    *Required Case Management Order.* Within five (5) business days of execution of this Agreement, the Parties shall jointly present and recommend the Case Management Order annexed hereto as Exhibit I to the Court for immediate entry. The State of New York and Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC shall use their best and good faith efforts to persuade the Court to immediately enter Exhibit I without any material modifications. If the Court declines to do so, and if less than 100% of the Subdivisions listed in Exhibit H participate, and if Allergan elects not to terminate the Agreement, then the payment due pursuant to Section III.A.1.a shall be reduced by four times the total amount(s) that would have been received pursuant to the Allergan New York Opioid Settlement Sharing Agreement attached hereto as Exhibit E by any Subdivision that does not become a Participating Subdivision by the Participation Date. If the Court agrees to entry, neither Napoli Shkolnik PLLC nor Simmons Hanly Conroy LLC will request any later modification to the resulting order.

G.    *Future Bellwether Actions.* Napoli Shkolnik PLLC and Simmons Hanly Conroy LLC are Plaintiff Co-Leads ("Plaintiff Co-Leads") in the New York *In re Opioid Litigation* (the "Coordinated Litigation"). As Plaintiff Co-Leads, the two law firms have the ability to propose to the Court future bellwether Plaintiffs and Defendants in the Coordinated Litigation. Therefore, the Plaintiff Co-Leads agree not to propose or agree to a bellwether case in the Coordinated Litigation in which Allergan or its Affiliated Companies is named as a defendant prior to December 15, 2023. Moreover, for any case involving Allergan or its Affiliated Companies as a defendant, the Plaintiff Co-Leads shall permit Allergan or its Affiliated Companies to select and propose a bellwether case and the Plaintiffs Co-Leads, using their best efforts, shall support said proposal before the Court, even if limited to a single plaintiff.

## X.    ENFORCEMENT AND DISPUTE RESOLUTION

A.    The terms of the Agreement and Consent Judgment applicable to the State, Nassau and Suffolk Counties, other Participating Subdivisions, and other Releasors will be enforceable solely by Allergan, the State, Nassau County, and Suffolk County.

B.    Allergan and Released Entities consent to the jurisdiction of the Court, in which the Consent Judgment is filed, solely for the resolution of disputes arising out of this Agreement, including, without limitation, disputes regarding the scope of the releases hereunder.

C.    The parties to a dispute hereunder shall promptly meet and confer in good faith to resolve any dispute prior to any filing or presentation to the Court.

## XI.    SET-OFF

A.    The Parties recognize that the State of New York, Nassau County, Suffolk County, other Participating Subdivisions, and/or other Releasors are pursuing Claims against Teva Ltd., Teva USA, Cephalon, Actavis LLC, Watson, Actavis Pharma, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates. If any of them achieves a judgment by verdict, judicial decision, or means other than settlement against any of Teva Ltd., Teva USA, Cephalon, Actavis LLC, Watson, Actavis Pharma, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates (including but not limited to the State and Nassau and Suffolk Counties in the Actions), each plaintiff listed above shall give the liable defendant(s) listed above a set-off equal to the amount they received from the $112,000,000.00 payment due under this Agreement (or 56% of the Total Payment of $200,000,000.00) from any and all monetary remedies awarded on all Claims (including but not limited to the State and Nassau and Suffolk Counties in the Actions) from the portion of the judgment attributable to the generic opioid drugs that are Opioid Products or Products distributed and/or sold by Divested Actavis Generic Entities and/or other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and/or other

Divested Entities related to those generic opioid drugs that are Opioid Products or Products. The foregoing judgment set-off provision is without prejudice to the position of any Party hereto regarding whether any such judgment set-off is or is not required under New York law. For the avoidance of doubt, the Parties are agreeing to the judgment set-off provision to facilitate a settlement, and the agreement shall apply even if a court orders that such a set-off is not required by New York law. Notwithstanding the foregoing, this set-off provision shall not apply to Anda.

B.    The State of New York, Nassau County, Suffolk County, other Participating Subdivisions, and/or other Releasors may reach a settlement agreement with Teva Ltd., Teva USA, Cephalon, Actavis LLC, Watson, Actavis Pharma, and/or other Divested Entities other than Anda, and/or each of their respective parents, subsidiaries, and/or affiliates that resolves some or all of their respective Claims (including but not limited to the Claims of the State, Nassau County, and/or Suffolk County in the Actions). In that event, the Releasors represent and agree that any payment(s) that the State, Nassau County, Suffolk County, other Participating Subdivisions, and/or other Releasors receives from Teva Ltd., Teva USA, Cephalon, Actavis LLC, Watson, Actavis Pharma, and/or other Divested Entities other than Anda, and/or each of their respective parents, subsidiaries, and/or affiliates reflects the amount over and above $112,000,000.00 that each and all of them deem to reflect a fair overall settlement value for liability attributable to the generic opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and/or other Divested Entities related to those generic opioid drugs that are Opioids or Opioid Products before August 2, 2016. In any such settlement agreement with Teva Ltd., Teva USA, Cephalon, Actavis LLC, Watson, Actavis Pharma, and/or other Divested Entities other than Anda, and/or each of their respective parents, subsidiaries, and/or affiliates, the State, Nassau County, Suffolk County, other Participating Subdivisions, and/or other Releasors shall include a provision expressly stating and without material change or qualification that "the agreed settlement amount reflects the value the parties to the agreement deem a fair settlement value over and above the payments made or due to be paid under the Allergan New York Statewide Opioid Settlement Agreement for generic opioid drugs that are Opioid Products or Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or relate to the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Opioids or Opioid Products before August 2, 2016."

## XII.   MOST-FAVORED NATION

A.    The Parties agree that the Total Payment to be received by the State of New York (and its Participating Subdivisions and other Releasors) under this Agreement shall

be no less favorable than the consideration the State of New York (and its Participating Subdivisions and other Releasors) would have received, considering the same level of participation of its Participating Subdivisions and other Releasors, pursuant to a collective resolution—through settlement or other mechanism—of substantially all Claims against Allergan brought by states, counties, or municipalities (a "Global Resolution").

B.      If, after the execution of this Agreement, Allergan reaches a Global Resolution, then Allergan agrees that the State of New York (and its Participating Subdivisions and other Releasors) shall have the sole discretion to either participate in such Global Resolution, in which case the Global Resolution agreement would supersede this Agreement, or maintain this Agreement in full force and effect.  In the event the State of New York (and its Participating Subdivisions and other Releasors) elect to participate in such a Global Resolution, then the amount due to be paid to the State of New York (and its Participating Subdivisions and other Releasors), considering the same level of participation, under such Global Resolution, shall not be reduced but shall be deemed paid and discharged to the extent of the Total Payment already provided by Allergan under this Agreement, with no further payment obligations under this Agreement.  For the avoidance of doubt, the total amount to be paid by Allergan under the Global Resolution shall be reduced by the same amount Allergan has already provided under this Agreement at the time of the election of the State of New York (and its Participating Subdivisions and other Releasors) to participate in such Global Resolution.

C.      Notwithstanding the foregoing, however, if, after the execution of this Agreement, there is for any reason a Global Resolution that does not include the State of New York (and its Participating Subdivisions and other Releasors), then the payment terms of the Global Resolution shall be compared to the payment terms of this Agreement in the following manner: the sum of $200,000,000 shall be added to the total amount to be paid under such Global Agreement (including attorneys' fees and costs) (the "Adjusted Global Total"); the Adjusted Global Total shall then be multiplied by the State of New York's allocation share of 5.3903813405% as provided in the List of States and Overall Allocation Percentages (Exhibit F to July 21, 2021 Janssen Settlement Agreement) agreed to by the state attorneys general as if the State of New York had not been excluded from the Global Resolution; in the event that the net present value of the State's payment under the Global Agreement exceeds the net present value of the $200,000,000 Total Payment under this Agreement, thereby accounting for the difference between the value of said resulting amounts, both as of the Effective Date of this Agreement, and the time of the payment(s) themselves, then Allergan shall promptly remit the excess to the State of New York (and its Participating Subdivisions and other Releasors), in accordance with payment instructions to be provided by them and on the same payment schedule as in the Global Agreement, in the amounts they would have received if the State of New York (and its Participating Subdivisions and other Releasors) had participated in such Global Agreement.

## XIII.  NO WAIVER

A.      This Agreement is agreed upon without trial or adjudication of any issue of fact or law or finding of liability of any kind and shall not be construed or used as a waiver or limitation of any defense otherwise available (including, but not limited to, jurisdictional defenses) to Allergan or any other Released Entity in any action (including, but not limited to, the Actions) or any other proceeding.   This Agreement shall not be construed or used as a waiver of any Released Entity's right to defend itself from, or make any legal or factual arguments in, any other regulatory, governmental, private party, or class claims or suits relating to the subject matter or terms of this Agreement.  For the avoidance of doubt, nothing in this Agreement is intended to or shall be construed to prohibit any Released Entity in any way whatsoever from taking legal or factual positions with regard to any Opioids, Opioid Products, or Products in defense of litigation or other legal proceedings.

## XIV.  MUTUAL INTERPRETATION

A.      The Parties agree and stipulate that this Agreement was negotiated on an arm's-length basis between parties of equal bargaining power.  This Agreement has been drafted jointly by counsel for each of the Parties.  Accordingly, this Agreement shall be mutually interpreted and not construed in favor of or against any of the Parties.

## XV.  GOVERNING LAW

A.      The terms of this Agreement shall be governed by the laws of the State of New York.

## XVI.  COUNTERPARTS

A.      This Agreement may be executed in counterparts, and an email, facsimile, or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

## XVII.  MISCELLANEOUS

A.      *Compliance with Laws.* Nothing in this Agreement shall be construed to authorize or require any action by Allergan in violation of applicable federal, state, or other laws, rules, regulations, or guidance.

B.      *Modification*. This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Allergan may contact the New York Attorney General and Counsel for Nassau and Suffolk Counties for purposes of coordinating this process.

C.    *No Waiver.* Any failure by any Party to this Agreement to insist upon the strict performance by any other Party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such Party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement, except to the extent the other Party is prejudiced by the delayed notice of any such alleged failure to comply with any of the provisions of this Agreement.

D.    *No Private Right of Action.* No part of this Agreement shall create a private right of action for any Third Party or confer any right to any Third Party for violation of any federal or state statute, not shall it be used as an admission of liability or wrongdoing in any subsequent proceeding.

E.    *Entire Agreement.* This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto. In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

F.    *Notice.* All notices under this Agreement shall be provided to the following via email and Overnight Mail:

        For Allergan:

        Office of General Counsel
        One North Waukegan Road
        North Chicago, IL 60064

        Copy to Allergan's attorneys at:

        James F. Hurst, P.C.
        Kirkland & Ellis LLP
        300 North LaSalle
        Chicago, IL 60654
        james.hurst@kirkland.com

        For the New York Attorney General:

        Muhammad Umair Khan
        Senior Advisor & Special Counsel

        Noah H. Popp
        Assistant Attorney General

        Office of the Attorney
        General of the State of

New York 28 Liberty
Street, New York, New
York, 10005
Umair.Khan@ag.ny.gov
Noah.Popp@ag.ny.gov

For Plaintiff Nassau County:

Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com

For Plaintiff Suffolk County:

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

**Approved:**

By: _____        Date: 12/8/2021

Robert A. Michael
Executive Vice President, Chief Financial Officer of AbbVie Inc.
President and Chief Executive Officer of Allergan Limited
President of Allergan Finance, LLC
1 North Waukegan Road
North Chicago, IL 60064
*On Behalf of Allergan and AbbVie*


By: _____        Date: _____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov
*Counsel for The People of the State of New York*


By: _____        Date: _____

Title: _____
The County of Nassau, New York


By: _____        Date: _____

Title: _____
The County of Suffolk, New York


**NAPOLI SHKOLNIK PLLC**
                                    Date: _____
_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com
*Counsel for Plaintiff Nassau County*

37

**Approved:**

By: _____        Date:_____
Robert A. Michael
Executive Vice President, Chief Financial Officer of AbbVie Inc.
President and Chief Executive Officer of Allergan Limited
President of Allergan Finance, LLC
1 North Waukegan Road
North Chicago, IL 60064
*On Behalf of Allergan and AbbVie*

By: _____        Date:_____
                                                                              12/8/2021
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov
*Counsel for The People of the State of New York*


By: _____        Date:_____

Title: _____
The County of Nassau, New York


By: _____        Date:_____

Title: _____
The County of Suffolk, New York


**NAPOLI SHKOLNIK PLLC**
                                                                              Date:_____
_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com
*Counsel for Plaintiff Nassau County*

37

**Approved:**

By: _____          Date: _____
Robert A. Michael
Executive Vice President, Chief Financial Officer
AbbVie Inc.
1 North Waukegan Road
North Chicago, IL 60064
*On Behalf of Allergan and AbbVie*


By: _____          Date: _____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov
*Counsel for The People of the State of New York*


By: _____          Date: _____
[THE COUNTY OF NASSAU, NEW YORK]

By: _____ *Chief Deputy County Attorney*   Date: 12/8/21
[THE COUNTY OF SUFFOLK, NEW YORK]


**NAPOLI SHKOLNIK PLLC**
                                       Date: _____
_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com
*Counsel for Plaintiff Nassau County*

**SIMMONS HANLY CONROY LLC**

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com
*Counsel for Plaintiff Suffolk County*

Date: 12/8/21

**ADDITIONAL SIGNATORIES:**

_____
_____
_____
_____
_____
_____
_____

*Counsel for* _____

Date:_____

_____
_____
_____
_____
_____
_____
_____

*Counsel for* _____

Date:_____

_____
_____
_____
_____
_____
_____
_____

*Counsel for* _____

Date:_____

37

**Approved:**

By: _____          Date:_____
Robert A. Michael
Executive Vice President, Chief Financial Officer
AbbVie Inc.
1 North Waukegan Road
North Chicago, IL 60064
*On Behalf of Allergan and AbbVie*


By: _____          Date:_____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov
*Counsel for The People of the State of New York*


By: _____          Date:   12/8/2021   _____
[THE COUNTY OF NASSAU, NEW YORK]


By: _____          Date:_____
[THE COUNTY OF SUFFOLK, NEW YORK]


**NAPOLI SHKOLNIK PLLC**
                                     Date:_____
_____
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com
*Counsel for Plaintiff Nassau County*

Approved:

By: _____               Date: _____
Robert A. Michael
Executive Vice President, Chief Financial Officer of AbbVie Inc.
President and Chief Executive Officer of Allergan Limited
President of Allergan Finance, LLC
1 North Waukegan Road
North Chicago, IL 60064
*On Behalf of Allergan and AbbVie*


By: _____               Date: _____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov
*Counsel for The People of the State of New York*


By: _____               Date: _____

Title: _____
The County of Nassau, New York


By: _____               Date: _____

Title: _____
The County of Suffolk, New York


**NAPOLI SHKOLNIK PLLC**
_____               Date: 12/8/21
Salvatore C. Badala
Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com
*Counsel for Plaintiff Nassau County*

37

Release of Opioid-Related Claims Pursuant to the Allergan New York
Statewide Opioid Settlement Agreement and New York Mental Hygiene Law
Section 25.18(d)

WHEREAS pursuant to the Allergan New York Statewide Opioid Settlement Agreement (the "Allergan Agreement"), the State of New York, Nassau and Suffolk Counties, and all Participating Subdivisions have released their Released Claims against Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.) and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc) (together "Allergan") and other Released Entities, as the terms "Participating Subdivisions," "Released Claims," and "Released Entities" are defined in the Allergan Agreement; and

WHEREAS the Allergan Agreement provides in Section VII.A that, as of the Effective Date of the Allergan Agreement, Allergan and the other Released Entities will be released and forever discharged from all of the Releasors' Released Claims, as the terms "Released Entities," "Releasors," and "Released Claims" are defined in the Allergan Agreement; and

WHEREAS the Allergan Agreement provides in Section I.Y that Releasors (as defined in the Allergan Agreement) who are releasing claims under Section VII.A include "to the maximum extent of the power of the State of New York's Attorney General to release Claims on behalf of," among others, "the State of New York's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind . . . any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts . . . and other Special Districts in New York State"; and

WHEREAS Section 25.18(d) of the Mental Hygiene Law provides the New York Attorney General with authority, through the release of opioid-related claims in a "statewide opioid settlement agreement" executed after June 1, 2021, to: (i) release the unfiled opioid related claims of New York government entities like those identified in Section I.Y against opioid manufacturers like Allergan, and (ii) to release opioid-related claims filed by such New York government entities after June 30, 2019 against manufacturers like the Allergan; and

WHEREAS the Allergan Agreement constitutes a "statewide opioid settlement agreement" under Section 25.18(d) of the Mental Hygiene Law;

THEREFORE, pursuant to the foregoing provisions of the Allergan Agreement and the power and authority of the New York Attorney General, including under Section 25.18(d) of the Mental Hygiene Law, Allergan and the other Released Entities are, as of the Effective Date, hereby released and forever discharged to the maximum extent of the State of New York's power from any and all Released Claims of New York State, any of New York State's past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts (including, without limitation, the New York State Department of Health), any of New York State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of pharmaceutical distribution licenses (including, without limitation, the New York State Department of Financial Services), and any Participating

Subdivisions or other Releasors (collectively, Releasors), as the terms "Participating Subdivisions," "Released Claims," "Released Entities," and "Releasors" are defined in the Allergan Agreement.  New York State (for itself and the Releasors), absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever, as the terms "Released Claims," "Released Entities," and "Releasors" are defined in the Settlement.


Dated: New York, New York
        Month __, Year

LETITIA JAMES
Attorney General of the State of New York

By: _____
        Jennifer Levy
        First Deputy Attorney General
        Office of the New York State Attorney General
        28 Liberty Street, 23rd Floor
        New York, NY 10006
        Tel: 212-416-8450
        Jennifer.Levy@ag.ny.gov

# Exhibit A: (AbbVie Entities)

EX-21 3 abbv-20201231xex21.htm EXHIBIT 21

**Exhibit 21**

# List Of Subsidiaries

The following is a list of subsidiaries of AbbVie Inc. as of December 31, 2020. AbbVie is not a subsidiary of any other corporation.

| Domestic Subsidiaries | Incorporation |
| --- | --- |
| AbbVie Aviation LLC | Illinois |
| AbbVie Biopharmaceuticals LLC | Delaware |
| AbbVie Bioresearch Center Inc. | Delaware |
| AbbVie Biotech Ventures Inc. | Delaware |
| AbbVie Biotherapeutics Inc. | Delaware |
| AbbVie Domestic Holdings Inc. | Delaware |
| AbbVie Endocrine Inc. | Delaware |
| AbbVie Endocrinology Inc. (d/b/a Pharmacy Solutions) | Delaware |
| AbbVie Finance Corporation | Delaware |
| AbbVie Finance LLC | Delaware |
| AbbVie Global Holdings Inc. | Delaware |
| AbbVie Holdco Inc. | Delaware |
| AbbVie Holdings Inc. | Delaware |
| AbbVie Investments Inc. | Delaware |
| AbbVie Pharma Inc. | Delaware |
| AbbVie Pharmaceuticals LLC | Delaware |
| AbbVie Products LLC | Georgia |
| AbbVie Purchasing LLC | Delaware |
| AbbVie Resources Inc. | Delaware |

| | |
|---|---|
| AbbVie Resources International Inc. | Delaware |
| AbbVie Respiratory LLC | Delaware |
| AbbVie Sales Inc. | Delaware |
| AbbVie Services Inc. | Delaware |
| AbbVie Stemcentrx LLC | Delaware |
| AbbVie Subsidiary LLC | Delaware |
| AbbVie US Holdings LLC | Delaware |
| AbbVie US LLC | Delaware |
| AbbVie Ventures LLC | Delaware |
| Aeropharm Technology, LLC | Delaware |
| AGN International Inc. | Delaware |
| AGN Kythera, LP | Delaware |
| AGN Labs LLC | Delaware |
| AGN LLC | Delaware |
| AGN Sundry, LLC | Delaware |
| Allergan Akarna LLC | Delaware |
| Allergan Finance, LLC | Nevada |
| ALLERGAN FINCO 2 INC. | Delaware |
| ALLERGAN FINCO INC. | Delaware |
| Allergan GI Corp | Delaware |
| Allergan GP Holding LLC | Delaware |

| | |
|---|---|
| Allergan Holdco US, Inc. | Delaware |
| Allergan Holdings B1, Inc. | Delaware |
| Allergan Holdings, Inc. | Delaware |
| Allergan, Inc. | Delaware |
| Allergan Laboratories, LLC | Delaware |
| Allergan Lending 2 LLC | Delaware |
| Allergan Lending LLC | Delaware |
| Allergan Pharma Inc. | Delaware |
| Allergan Property Holdings, LLC | Delaware |
| Allergan Puerto Rico Holdings, LLC | Delaware |
| Allergan Sales Puerto Rico, Inc. | California |
| Allergan Sales, LLC (d/b/a Allergan; d/b/a Bioscience Laboratories) | Delaware |
| Allergan Therapeutics LLC | Delaware |
| Allergan USA, Inc. (d/b/a Pacificom / Pacific Communications) | Delaware |
| Allergan W.C. Holding Inc. | Delaware |
| Anterios, Inc. | Delaware |
| Aptalis Pharma US, Inc. | Delaware |
| AqueSys, Inc. | Delaware |
| BioDisplay Technologies, Inc. | Illinois |
| Bonti, Inc. | Delaware |
| Cearna Aesthetics, Inc. | Delaware |

| | |
|---|---|
| Chase Pharmaceuticals Corporation | Delaware |
| Del Mar Indemnity Company LLC | Hawaii |
| Durata Holdings, Inc. | Delaware |
| Durata Therapeutics, Inc. | Delaware |
| Durata Therapeutics U.S. Limited | Delaware |
| Eden Biodesign, LLC | Delaware |
| Envy Medical, Inc. | Delaware |
| Exemplar Pharma, LLC | Delaware |
| Foresight Vision5, Inc. | Delaware |
| Fremont Holding L.L.C. | Delaware |
| Furiex Pharmaceuticals LLC | Delaware |
| IEP Pharmaceutical Devices, LLC | Delaware |
| Keller Medical, Inc. | Delaware |
| Knoll Pharmaceutical Company | New Jersey |
| KOS Pharmaceuticals, Inc. | Delaware |
| Life Properties Inc. | Delaware |
| LifeCell Corporation | Delaware |
| MAP Pharmaceuticals, LLC | Delaware |
| Mavupharma, Inc. | Delaware |
| MPEX Pharmaceuticals, Inc. | Delaware |
| Naurex Inc. | Delaware |
| Oculeve, Inc. | Delaware |

| | |
|---|---|
| Organics L.L.C. | Delaware |
| Pacific Pharma, Inc. | Delaware |
| Pharmacyclics LLC | Delaware |
| Pharmax Holding Limited | Delaware |
| Repros Therapeutics Inc. | Delaware |
| Rowell Laboratories, Inc. | Minnesota |
| RP Merger Sub, Inc. | Delaware |
| Sapphire Merger Sub, Inc. | Delaware |
| Silicone Engineering, Inc. | California |
| Suffolk Merger Sub, Inc. | Delaware |
| Tobira Therapeutics, Inc. | Delaware |
| Topokine Therapeutics, Inc. | Delaware |
| Transderm, Inc. | Delaware |
| Unimed Pharmaceuticals, LLC | Delaware |
| Venice Subsidiary LLC | Delaware |
| Vicuron Pharmaceuticals LLC | Delaware |
| Vitae Pharmaceuticals, LLC | Delaware |
| Warner Chilcott Leasing Equipment Inc. | Delaware |
| Warner Chilcott Sales (US), LLC | Delaware |
| Zeltiq A LLC | Delaware |
| Zeltiq Aesthetics, Inc. | Delaware |
| Zeltiq International, LLC | Delaware |

| Foreign Subsidiaries | Incorporation |
|---|---|
| AbbVie S.A. | Argentina |
| Allergan Productos Farmaceuticos S.A. | Argentina |
| Allergan Australia Pty Limited | Australia |
| Elastagen Pty Ltd | Australia |
| Kythera Biopharmaceuticals Australia Pty Ltd | Australia |
| AbbVie Pty Ltd | Australia |
| AbbVie GmbH | Austria |
| AbbVie Bahamas Ltd. | Bahamas |
| AbbVie SA | Belgium |
| Allergan N.V. | Belgium |
| Odyssa Pharma SPRL | Belgium |
| AbbVie Ltd | Bermuda |
| AbbVie Biotechnology Ltd | Bermuda |
| AbbVie Finance Limited | Bermuda |
| AbbVie Global Enterprises Ltd. | Bermuda |
| AbbVie Holdings Unlimited | Bermuda |
| Allergan Development Ventures I, LP | Bermuda |
| Allergan Holdings B Ltd. | Bermuda |
| Allergan Holdings B2, Ltd. | Bermuda |
| Kythera Holdings Ltd | Bermuda |

| | |
|---|---|
| Warner Chilcott Holdings Company II, Limited | Bermuda |
| Warner Chilcott Holdings Company III, Limited | Bermuda |
| Warner Chilcott Limited | Bermuda |
| AbbVie d.o.o. | Bosnia |
| AbbVie Farmacêutica Ltda. | Brazil |
| AbbVie Participações Ltda. | Brazil |
| Allergan Productos Farmaceuticos Ltda. | Brazil |
| AbbVie EOOD | Bulgaria |
| Allergan Bulgaria EOOD | Bulgaria |
| AbbVie Corporation | Canada |
| AbbVie Holdings Corporation | Canada |
| Allergan Inc. | Canada |
| Aptalis Pharma Canada ULC | Canada (Alberta) |
| Allergan Holdings C, Ltd. | Cayman Islands |
| Allergan Overseas Holding | Cayman Islands |
| Pharmacyclics Cayman Ltd. | Cayman Islands |
| Stemcentrx Cayman Ltd. | Cayman Islands |
| AbbVie Productos Farmacéuticos Limitada | Chile |
| Allergan Laboratorios Limitada | Chile |
| AbbVie Pharmaceutical Trading (Shanghai) Co., Ltd. | China |
| Allergan (Chengdu) Medical Aesthetics Clinic Co., Ltd. | China |

| | |
|---|---|
| Allergan Information Consulting (Shanghai) Co., Ltd. | China |
| Allergan Medical Device (Shanghai) Co., Ltd. | China |
| Pharmacyclics (Shanghai) Management Consulting Service Limited | China |
| AbbVie S.A.S. | Colombia |
| Allergan de Colombia S.A. | Colombia |
| Allergan Costa Rica S.R.L. | Costa Rica |
| AbbVie d.o.o. | Croatia |
| AbbVie Limited | Cyprus |
| AbbVie s.r.o. | Czech Republic |
| Allergan CZ, s.r.o. | Czech Republic |
| AbbVie A/S | Denmark |
| Allergan ApS | Denmark |
| AbbVie, S.R.L. | Dominican Republic |
| AbbVie L.L.C. | Egypt |
| AbbVie OÜ | Estonia |
| AbbVie Oy | Finland |
| Allergan Finland Oy | Finland |
| AbbVie SAS | France |
| Allergan France SAS | France |
| Allergan Holdings France SAS | France |
| Allergan Industrie SAS | France |

| | |
|---|---|
| Eurand France S.A.S. | France |
| Forest Holdings France S.A.S. | France |
| AbbVie Biotechnology GmbH | Germany |
| AbbVie Deutschland GmbH & Co. KG | Germany |
| AbbVie Komplementär GmbH | Germany |
| AbbVie Pharmaceuticals GmbH | Germany |
| AbbVie Real Estate Management GmbH | Germany |
| Allergan GmbH | Germany |
| AbbVie (Gibraltar) Holdings Limited | Gibraltar |
| AbbVie (Gibraltar) Limited | Gibraltar |
| AbbVie Pharmaceuticals Societe Anonyme | Greece |
| Allergan Hellas Pharmaceuticals S.A. | Greece |
| AbbVie, S.A. | Guatemala |
| AbbVie Limited | Hong Kong |
| Allergan Hong Kong Limited | Hong Kong |
| AbbVie Kft. | Hungary |
| Allergan Hungary Kft. | Hungary |
| Allergan Healthcare India Private Limited | India |
| Allergan India Private Limited* | India |
| AbbVie International Holdings Unlimited Company | Ireland |
| AbbVie Ireland Holdings Unlimited Company | Ireland |
| AbbVie Ireland Unlimited Company | Ireland |

| | |
|---|---|
| AbbVie Limited | Ireland |
| AbbVie Manufacturing Management Unlimited Company | Ireland |
| Allergan Botox Unlimited Company (In voluntary liquidation) | Ireland |
| Allergan Equities Unlimited Company | Ireland |
| Allergan Furiex Ireland Limited (In voluntary liquidation) | Ireland |
| Allergan Holdings Unlimited Company | Ireland |
| Allergan Ireland Finance Limited (In voluntary liquidation) | Ireland |
| Allergan Ireland Holdings Unlimited Company | Ireland |
| Allergan Ireland Limited | Ireland |
| Allergan Limited | Ireland |
| Allergan Pharma Limited | Ireland |
| Allergan Pharmaceuticals Holdings (Ireland) Unlimited Company (In voluntary liquidation) | Ireland |
| Allergan Pharmaceuticals International Limited | Ireland |
| Allergan Pharmaceuticals Ireland | Ireland |
| Allergan Services International, Unlimited Company | Ireland |
| Allergan WC Ireland Holdings Limited | Ireland |
| Forest Laboratories Ireland Limited | Ireland |
| Fournier Laboratories Ireland Limited | Ireland |
| Pharmacyclics (Europe) Limited | Ireland |

| | |
|---|---|
| Tosara Exports Unlimited Company (In voluntary liquidation) | Ireland |
| Warner Chilcott Intermediate (Ireland) ULC | Ireland |
| Zeltiq Ireland International Holdings Unlimited Company | Ireland |
| Zeltiq Ireland Unlimited Company | Ireland |
| AbbVie Biopharmaceuticals Ltd. | Israel |
| Allergan Israel Ltd. | Israel |
| Marbelle Threads Ltd. | Israel |
| AbbVie S.r.l. | Italy |
| Allergan S.p.A. | Italy |
| Aptalis Pharma S.r.l. | Italy |
| AbbVie GK | Japan |
| Allergan International YK | Japan |
| Allergan Japan KK | Japan |
| Allergan K.K. | Japan |
| Allergan NK | Japan |
| AbbVie Ltd | Korea, South |
| Allergan Korea Ltd. | Korea, South |
| AbbVie SIA | Latvia |
| AbbVie UAB | Lithuania |
| Allergan Baltics, UAB | Lithuania |
| AbbVie Biotherapeutics S.àr.l. | Luxembourg |

| | |
|---|---|
| AbbVie (Gibraltar) Holdings Limited Luxembourg S.C.S. | Luxembourg |
| AbbVie International S.à r.l. | Luxembourg |
| AbbVie Investments S.à r.l. | Luxembourg |
| AbbVie Overseas S.àr.l. | Luxembourg |
| AbbVie Holdings S.à r.l. | Luxembourg |
| AbbVie Global S.à r.l. | Luxembourg |
| Allergan AHI S.à r.l. | Luxembourg |
| Allergan Capital 2 S.à r.l. | Luxembourg |
| Allergan Capital S.à r.l. | Luxembourg |
| Allergan Europe S.à r.l. | Luxembourg |
| Allergan Finance S.à r.l. | Luxembourg |
| Allergan Funding SCS | Luxembourg |
| Allergan Global S.à r.l. | Luxembourg |
| Allergan Holdings S.à r.l. | Luxembourg |
| Allergan International Holding S.à r.l. | Luxembourg |
| Allergan Luxembourg International S.à r.l. | Luxembourg |
| Allergan WC 1 S.à r.l. | Luxembourg |
| Allergan WC 2 S.à r.l. | Luxembourg |
| AbbVie Sdn. Bhd. | Malaysia |
| Allergan Malaysia Sdn Bhd | Malaysia |
| Allergan Malta Holding Limited | Malta |
| Allergan Malta II Limited | Malta |

| | |
|---|---|
| Allergan Malta Limited | Malta |
| AbbVie Farmacéuticos, S.A. de C.V. | Mexico |
| Allergan Servicios Profesionales, S. de R.L. de C.V. | Mexico |
| Allergan, S.A. de C.V. | Mexico |
| AbbVie B.V. | Netherlands |
| AbbVie Central Finance B.V. | Netherlands |
| AbbVie Enterprises B.V. | Netherlands |
| AbbVie Finance B.V. | Netherlands |
| AbbVie Ireland NL B.V. | Netherlands |
| AbbVie Japan Holdings B.V. | Netherlands |
| AbbVie Logistics B.V | Netherlands |
| AbbVie Nederland Holdings B.V. | Netherlands |
| AbbVie Pharmaceuticals B.V. | Netherlands |
| AbbVie Research B.V. | Netherlands |
| AbbVie Venezuela B.V. | Netherlands |
| AbbVie Venezuela Holdings B.V. | Netherlands |
| Allergan B.V. | Netherlands |
| Aptalis Holding B.V. | Netherlands |
| Aptalis Netherlands B.V. | Netherlands |
| Forest Finance B.V. | Netherlands |
| Warner Chilcott Nederland B.V. | Netherlands |

| | |
|---|---|
| AbbVie Limited | New Zealand |
| Allergan New Zealand Limited | New Zealand |
| AbbVie AS | Norway |
| Allergan AS | Norway |
| AbbVie, S. de R.L. | Panama |
| Allergan Healthcare Philippines, Inc. | Philippines |
| AbbVie Polska Sp. z o.o. | Poland |
| AbbVie Sp. z o.o. | Poland |
| Allergan Sp. z .o.o. | Poland |
| AbbVie, L.da | Portugal |
| AbbVie Promoção, L.da | Portugal |
| AbbVie Corp | Puerto Rico |
| Knoll LLC | Puerto Rico |
| AbbVie S.R.L. | Romania |
| AbbVie Trading S.R.L. | Romania |
| Allergan S.R.L. | Romania |
| AbbVie Limited Liability Company | Russia |
| Allergan C.I.S. S.a.r.l. | Russia |
| Allergan Saudi Arabia LLC* | Saudi Arabia |
| Allergan d.o.o. Beograd | Serbia |
| AbbVie Operations Singapore Pte. Ltd. | Singapore |
| AbbVie Pte. Ltd. | Singapore |

| | |
|---|---|
| Allergan Singapore Pte. Ltd. | Singapore |
| AbbVie Holdings s.r.o. | Slovakia |
| AbbVie s.r.o. | Slovakia |
| Allergan SK s.r.o. | Slovakia |
| AbbVie Biofarmacevtska druzba d.o.o. | Slovenia |
| AbbVie (Pty) Ltd. | South Africa |
| Allergan Pharmaceuticals (Proprietary) Limited | South Africa |
| AbbVie Spain, S.L. | Spain |
| Allergan S.A. | Spain |
| AbbVie AB | Sweden |
| Allergan Norden AB | Sweden |
| AbbVie AG | Switzerland |
| AbbVie Biopharmaceuticals GmbH | Switzerland |
| Allergan AG | Switzerland |
| Pharmacyclics Switzerland GmbH | Switzerland |
| VarioRaw Percutive S.à r.l. | Switzerland |
| Warner Chilcott Pharmaceuticals Sárl | Switzerland |
| Allergan Pharmaceuticals Taiwan Co. Ltd. | Taiwan |
| AbbVie Ltd. | Thailand |
| Allergan (Thailand) Limited | Thailand |
| AbbVie Sarl | Tunisia |
| AbbVie Tıbbi İlaçlar Sanayi ve Ticaret Limited Şirketi | Turkey |

| | |
|---|---|
| Allergan Illaclari Ticaret Anonim Sirketi | Turkey |
| Allergan Ukraine LLC | Ukraine |
| Allergan Middle East Limited | United Arab Emirates |
| AbbVie Australasia Holdings Limited | United Kingdom |
| AbbVie Biotherapeutics Limited | United Kingdom |
| AbbVie Investments Limited | United Kingdom |
| AbbVie Ltd | United Kingdom |
| AbbVie Trustee Company Limited | United Kingdom |
| AbbVie UK Holdco Limited | United Kingdom |
| Akarna Therapeutics, Limited | United Kingdom |
| Allergan Biologics Limited | United Kingdom |
| Allergan Holdco UK Limited | United Kingdom |
| Allergan Holdings Limited | United Kingdom |
| Allergan Limited | United Kingdom |
| Aptalis Pharma UK Limited | United Kingdom |
| Lifecell EMEA Limited | United Kingdom |
| Northwood Medical Innovation, Ltd. | United Kingdom |
| Renable Pharma Ltd. | United Kingdom |
| Zeltiq Limited | United Kingdom |
| AbbVie S.A. | Uruguay |
| AbbVie Pharmaceuticals SCA. | Venezuela |
| Allergan de Venezuela, C.A. | Venezuela |

* Ownership of such subsidiary is less than 100% by AbbVie or an AbbVie subsidiary.

**Exhibit B: (Allergan Entities)**

EX-21.1 10 agn-ex211_448.htm EX-21.1

Exhibit 21.1

| Name | Jurisdiction of Incorporation |
|---|---|
| AGN International Inc. | US - Delaware |
| AGN Kythera, L.P. | US- Delaware |
| AGN Labs LLC | US - Delaware |
| AGN LLC | US - Delaware |
| AGN Sundry LLC | US - Delaware |
| Akarna Therapeutics, Limited | UK |
| Allergan  WC 1 S.a r.l. | Luxembourg |
| Allergan (Chengdu) Medical Aesthetics Clinic Co., Ltd. | China |
| Allergan (Thailand) Limited | Thailand |
| Allergan AG | Switzerland |
| Allergan AHI  S.à r.l. Management (DIFC Branch) | UAB |
| Allergan AHI S.á r.l. | Luxembourg |
| Allergan AHI S.á r.l.,  Luxembourg, Zweigniederlassung Zug Branch | Switzerland |
| Allergan Akarna LLC | US - Delaware |
| Allergan ApS | Denmark |
| Allergan AS | Norway |
| Allergan Australia Pty Limited | Australia |
| Allergan B.V. | Netherlands, The |
| Allergan Baltics, UAB | Lithuania |
| Allergan Baltics, UAB Eesti filiaal | Estonia Branch |
| Allergan Baltics, UAB Latvijas filias | Latvia |
| Allergan Biologics Ltd. | UK |
| Allergan Botox Unlimited Company | Ireland |
| Allergan Bulgaria EOOD | Bulgaria |
| Allergan C.I.S. SARL | Russian Federation |
| Allergan Capital  S.à r.l. | Luxembourg |
| Allergan Capital 2 S.à r.l. | Luxembourg |
| Allergan Capital 2 Sarl, Luxembourg, Zweigniederlassung, Zug | Switzerland |
| Allergan Capital S.à r.l., Luxembourg, Zweigniederlassung Zug Branch | Switzerland |
| Allergan Cayman Islands Irish Branch | Ireland |
| Allergan Costa Rica S.R.L | Costa Rica |
| Allergan CZ, s.r.o. | Czech Republic |
| Allergan d.o.o. Beograd | Serbia |
| Allergan de Colombia S.A. | Colombia |
| Allergan de Venezuela, C.A. | Venzuela |
| Allergan Development Ventures I Ireland Unlimited Company | Ireland |
| Allergan Development Ventures I LP | Bermuda |
| Allergan Development Ventures I UK | UK |
| Allergan Equities Unlimited Company | Ireland |
| Allergan Europe S.à r.l. | Luxembourg |
| Allergan Finance  S.à r.l. | Luxembourg |
| Allergan Finance, LLC | US - Nevada |
| Allergan Finco 2 Inc. | US - Delaware |
| Allergan Finco Inc. | US - Delaware |

**Exhibit 21.1**

| | |
|---|---|
| Allergan Finland Oy | Finland |
| Allergan France SAS | France |
| Allergan Funding SCS | Luxembourg |
| Allergan Furiex Ireland Limited | Ireland |
| Allergan GI Corp. | US - Delaware |
| Allergan Global S.à r.l. | Luxembourg |
| Allergan GmbH | Germany |
| Allergan GP Holding LLC | US- Delaware |
| Allergan Healthcare India Private Limited | India |
| Allergan Healthcare Philippines, Inc. | Philippines |
| Allergan Hellas Pharmaceuticals S.A. | Greece |
| Allergan Holdco UK Limited | UK |
| Allergan Holdco US, Inc. | US - Delaware |
| Allergan Holdings B Ltd. | Bermuda |
| Allergan Holdings B1, Inc. | US - Delaware |
| Allergan Holdings B2 Limited | Bermuda |
| Allergan Holdings C Ltd | Cayman Island |
| Allergan Holdings France SAS | France |
| Allergan Holdings Limited | UK |
| Allergan Holdings S. à r.l. | Luxembourg |
| Allergan Holdings Unlimited Company | Ireland |
| Allergan Holdings, Inc. | US - Delaware |
| Allergan Hong Kong Limited | Hong Kong |
| Allergan Hungary Kft. | Hungary |
| Allergan Ilaclari Ticaret A.S. | Turkey |
| Allergan Inc. | Canada |
| Allergan India Private Limited | India |
| Allergan Industrie SAS | France |
| Allergan Information Consulting (Shanghai) Co., Ltd. | China |
| Allergan International Holding  S.à r.l. | Luxembourg |
| Allergan International YK | Japan |
| Allergan Ireland Finance Limited | Ireland |
| Allergan Ireland Holdings Unlimited Company | Ireland |
| Allergan Ireland Limited | Ireland |
| Allergan Israel Limited | Israel |
| Allergan Japan KK | Japan |
| Allergan KK | Japan |
| Allergan Korea Ltd | Korea |
| Allergan Laboratories, LLC | US - Delaware |
| Allergan Laboratorios Limitada | Chile |
| Allergan Lending 2 LLC | US - Delaware |
| Allergan Lending LLC | US - Delaware |
| Allergan Limited | UK |
| Allergan Luxembourg International S.à r.l. | Luxembourg |
| Allergan Malaysia Sdn. Bhd. | Malaysia |

**Exhibit 21.1**

| | |
|---|---|
| Allergan Malta Holding Limited | Malta |
| Allergan Malta II Limited | Malta |
| Allergan Malta Limited | Malta |
| Allergan Medical Device  (Shanghai) Co., Ltd. | China |
| Allergan Middle East Limited | United Arab Emirates |
| Allergan N.V. | Belgium |
| Allergan New Zealand Ltd. | New Zealand |
| Allergan NK | Japan |
| Allergan Norden AB | Sweden |
| Allergan Norden AB Finnish branch | Finland |
| Allergan Overseas Holding | Cayman Island |
| Allergan Pharma Inc. | US - Delaware |
| Allergan Pharma Limited | Ireland |
| Allergan Pharmaceuticals  (Proprietary) Ltd. | South Africa |
| Allergan Pharmaceuticals Holdings (Ireland) Unlimited Company | Ireland |
| Allergan Pharmaceuticals International Limited | Ireland |
| Allergan Pharmaceuticals International Limited Jordan Office | Jordan |
| Allergan Pharmaceuticals International Limited Lebanon Office | Lebanon |
| Allergan Pharmaceuticals Ireland | Ireland |
| Allergan Pharmaceuticals Taiwan Co. Ltd. | Taiwan |
| Allergan Productos Farmaceuticos S.A. | Argentina |
| Allergan Produtos Farmaceuticos Ltda. | Brazil |
| Allergan Property Holdings, LLC | US - Delaware |
| Allergan Puerto Rico Holdings, Inc. | US - Delaware |
| Allergan S.A. | Spain |
| Allergan S.p.A. | Italy |
| Allergan Sales Puerto Rico, Inc. | US - California |
| Allergan Sales, LLC (d/b/a Allergan; d/b/a Bioscience Laboratories) | US - Delaware |
| Allergan Saudi Arabia LLC | Saudi Arablia |
| Allergan Scientific Office | Egypt |
| Allergan Services International Unlimited Company | Ireland |
| Allergan Servicios Profesionales, S. de R.L. de C.V. | Mexico |
| Allergan Singapore Pte. Ltd. | Singapore |
| Allergan Singapore Pte. Ltd. Indonesia Rep Office | Indonesia |
| Allergan Singapore Pte. Ltd. Vietnam Rep Office | Vietnam |
| Allergan SK s.r.o. | Slovak Republic |
| Allergan Sp. z.o.o. | Poland |
| Allergan S.R.L. | Romania |
| Allergan Therapeutics LLC | US- Delaware |
| Allergan UK LLP | UK |
| Allergan Ukraine, LLC | Ukraine |
| Allergan USA, Inc. (d/b/a Pacificom / Pacific Communications) | US - Delaware |
| Allergan W.C. Holding Inc. | US - Delaware |
| Allergan WC 2 S.a r.l. | Luxembourg |
| Allergan WC Ireland Holdings Ltd. | Ireland |

**Exhibit 21.1**

| | |
|---|---|
| Allergan, Inc. | US - Delaware |
| Allergan, S.A. de C.V. | Mexico |
| Anterios, Inc. | US - Delaware |
| Aptalis Holding B.V. | Netherlands, The |
| Aptalis Netherlands B.V. | Netherlands, The |
| Aptalis Pharma Canada ULC | Canada |
| Aptalis Pharma S.r.l. | Italy |
| Aptalis Pharma UK Limited | UK |
| Aptalis Pharma US, Inc. | US - Delaware |
| AqueSys, Inc. | US - Delaware |
| Bonti, Inc. | US - Delaware |
| Cearna Aesthetics, Inc | US - Delaware |
| Chase Pharmaceuticals Corporation | US - Delaware |
| Collagen Luxembourg SA | Luxembourg |
| Del Mar Indemnity Company, LLC | US - Hawaii |
| Durata Holdings, Inc. | US - Delaware |
| Durata Therapeutics U.S. Limited | US - Delaware |
| Durata Therapeutics, Inc. | US - Delaware |
| Eden Biodesign, LLC | US - Delaware |
| Elastagen Pty Limited | Australia |
| Envy Medical, Inc. | US - Delaware |
| Eurand France S.A.S. | France |
| Exemplar Pharma LLC | US - Delaware |
| Forest Finance B.V. | Netherlands, The |
| Forest Holdings France S. A.S. | France |
| Forest Laboratories Holdings Limited | Ireland |
| Forest Laboratories Ireland Ltd | Ireland |
| ForSight VISION5, Inc. | US - Delaware |
| Furiex Pharmaceuticals, LLC | US - Delaware |
| Keller Medical, Inc. | US - Delaware |
| Kythera Biopharmaceuticals Australia Pty Ltd. | Australia |
| Kythera Holdings Ltd. | Bermuda |
| LifeCell Corporation | US - Delaware |
| LifeCell EMEA Limited | UK |
| LifeCell EMEA Limited Austria branch | Austria |
| LifeCell EMEA Limited Italy branch | Italy |
| LifeCell EMEA Limited Sucursal en España | Spain |
| LifeCell EMEA Limited, Zweigniederlassung Zürich | Switzerland |
| LifeCell Medical Resources Limited in voluntary liquidation | Ireland |
| MAP Pharmaceuticals LLC | US - Delaware |
| McGhan Ireland Holdings Ltd. | Ireland |
| McGahn Limited | Ireland |
| MPEX Pharmaceuticals, Inc. | US - Delaware |
| Naurex Inc. | US - Delaware |
| Northwood Medical Innovation, Ltd. | UK |

**Exhibit 21.1**

| | |
|---|---|
| Oculeve, Inc. | US - Delaware |
| Odyssea Pharma SPRL | Belgium |
| Pacific Pharma, Inc. | US - Delaware |
| Pharm-Allergan GmbH Austria branch | Austria |
| Pharmax Holding Limited | US - Delaware |
| Renable Pharma Limited | UK |
| Repros Therapeutics Inc,. | US- Delaware |
| RP Merger Sub, Inc. | US - Delaware |
| Seabreeze Silicone Unlimited Company | Ireland |
| Silicone Engineering Inc. | US - California |
| Tobira Therapeutics, Inc. | US - Delaware |
| Topokine Therapeutics, Inc. | US - Delaware |
| Tosara Exports  Limited | Ireland |
| Transderm, Inc. | US - Utah |
| Varioraw Percutive Sàrl | Switzerland |
| Vicuron Pharmaceuticals LLC | US - Delaware |
| Viokace LLC | US - Delaware |
| Vitae Pharmaceuticals LLC | US - Delaware |
| Warner Chilcott Holdings Company II, Limited | Bermuda |
| Warner Chilcott Holdings Company III, Limited | Bermuda |
| Warner Chilcott Intermediate (Ireland) Limited | Ireland |
| Warner Chilcott Leasing Equipment Inc. | US - Delaware |
| Warner Chilcott Limited | Bermuda |
| Warner Chilcott Nederland B.V. | Netherlands, The |
| Warner Chilcott Pharmaceuticals S. àr.l. | Switzerland |
| Warner Chilcott Sales (US), LLC | US - Delaware |
| ZELTIQ A, LLC | US - Delaware |
| ZELTIQ Aesthetics, Inc. | US - Delaware |
| ZELTIQ International, LLC | US - Delaware |
| ZELTIQ International, LLC - Singapore Branch | Singapore |
| ZELTIQ Ireland International Holdings UC | Ireland |
| ZELTIQ Ireland Unlimited Company | Ireland |
| ZELTIQ Limited | United Kingdom |
| Zeltiq Limited Spanish branch | Spain |
| Zenpep LLC | US - Delaware |

**Exhibit C: (Divested Entities)**

**Schedule  4.6(c)-Transferred  Group**

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 1. | Warner Chilcott Company, LLC | Puerto Rico |
| 2. | Warner Chilcott (Ireland) Limited | Ireland |
| 3. | Warner Chilcott Finance LLC. | Delaware |
| 4. | Warner Chilcott Australia Pty. Ltd. | Australia |
| 5. | Warner Chilcott Pharmaceuticals B.V.B.A. | Belgium |
| 6. | Warner Chilcott France SAS | France |
| 7. | Warner Chilcott Italy S.r.l. | Italy |
| 8. | Actavis Pharma Iberia S.L. (f7k/a Warner Chilcott Iberia S.L.) | Spain |
| 9. | Robin Hood Holdings Ltd. | Malta |
| 10. | Paomar plc | Cyprus |
| 11. | Actavis Phanna Pty Ltd. | Australia |
| 12. | Makoff R&D Laboratories, Inc. | California |
| 13. | R&D Pharmaceutical, Inc. | California |
| 14. | R&D Ferriecit Capital Resources, Inc. | California |
| 15. | R&D Research & Development Corp. | California |
| 16. | R&D New Media Services, Inc. | California |
| 17. | Royce Laboratories, Inc. | Florida |
| 18. | Royce Research Group, Inc. | Florida |
| 19. | Royce Research & Development Limited Partnership I | Florida |
| 20. | The Rugby Group, Inc. | New York |
| 21. | Watson Laboratories, Inc. Ohio | New York |

ALLERGAN_MDL_03367098

**AL-NY-00831.00051**

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 22. | Rugby Laboratories, Inc. | New York |
| 23. | Changzhou Siyao Pharmaceuticals Co.,Ltd. | China |
| 24. | Watson Phannaceuticals (Asia) Ltd. | BVT |
| 25. | WP Holdings, Ltd. | BVI |
| 26. | Watson Pharn1aceuticals, China Ltd | BVI |
| 27. | Med All Enterprise Consulting (Shanghai) Co. Ltd. | China |
| 28. | Nicobrand Limited | Northern Ireland |
| 29. | Watson Pharmaceuticals International Ltd. | BVI |
| 30. | Watson Diagnostics, Inc. | Delaware |
| 31. | Del Mar Indemnity Co. Inc. | Hawaii |
| 32. | Actavis Laboratories NY, Inc. | New York |
| 33. | Circa Pharmaceuticals West, Inc. | California |
| 34. | Circa Sub | New York |
| 35. | Andrx Corporation | Delaware |
| 36. | Andrx South Carolina I, Inc. | South Carolina |
| 37. | Andrx Pharrnceuticals (Mass), Inc. | Florida |
| 38. | Andrx Pharrnceuticals Equipment #1, LLC | Florida |
| 39. | Andrx Pharmaceuticals (NC) Inc. | Florida |
| 40. | Andrx Pharmaceuticals, (NC) Equipment LLC | Delaware |
| 41. | SR Six, Inc. | Florida |
| 42. | Ancirc Pharmaceuticals | New York |
| 43. | RxAPS, Inc. | Florida |
| 44. | Andrx Pharmaceuticals Sales and Marketing, Inc. | Florida |

ALLERGAN_MDL_03367099

AL-NY-00831.00052

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 45. | Actavis Laboratories FL, Inc. | Florida |
| 46. | Watson Management Corporation | Florida |
| 47. | Watson Therapeutics, Inc. | Florida |
| 48. | Valmed Pharmaceuticals, Inc. | New York |
| 49. | Andrx Pharmaceuticals, LLC | Delaware |
| 50. | Andrx Labs LLC | Delaware |
| 51. | Andrx Laboratories (NJ) Inc. | Delaware |
| 52. | Watson Cobalt Holdings, LLC | Delaware |
| 53. | Watson Manufacturing Services, Inc. | Delaware |
| 54. | Natrapac, Inc. | Utah |
| 55. | Coventry Acquisition, LLC | Delaware |
| 56. | Cobalt Laboratories, LLC | Delaware |
| 57. | Watson Phanna Private Ltd. | India |
| 58. | Watson Laboratories, LLC | Delaware |
| 59. | Actavis Puerto Rico Holdings Inc. | Delaware |
| 60. | Actavis US Holding LLC | Delaware |
| 61. | Actavis LLC | Delaware |
| 62. | Actavis South Atlantic LLC | Delaware |
| 63. | Actavis Elizabeth LLC | Delaware |
| 64. | Actavis Kadian LLC | Delaware |
| 65. | Actavis Mid Atlantic LLC | Delaware |
| 66. | Actavis Totowa LLC | Delaware |
| 67. | Actavis  Phannaceuticals NJ, Inc. | Delaware |

ALLERGAN_MDL_03367100

AL-NY-00831.00053

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 68. | Watson Laboratories, Inc. | Connecticut |
| 69. | Watson Laboratories, Inc. | Delaware |
| 70. | Schein Bayer Pharnaceutical Services, Tnc. | Delaware |
| 71. | Schein Pharmaceutical International, Inc. | Delaware |
| 72. | Schein Pharmaceutical Ltd | Bermuda |
| 73. | Marsam Pharma, LLC | Delaware |
| 74. | MSI, Inc. | Delaware |
| 75. | Actavis Holding 2 Sarl | Luxembourg |
| 76. | Actavis Services (Asia) Ltd. | Malta |
| 77. | Arrow Laboratories, Ltd. | Malta |
| 78. | Arrow Supplies, Ltd. | |
| 79. | Arrow Pharna HK Ltd. | Hong Kong |
| 80. | Marrow Pharmaceuticals Research & Development Co Ltd. | China |
| 81. | Actavis S.a.r.l. | Luxembourg |
| 82. | Paomar Plc. | Cyprus |
| 83. | "Specifar" | Greece |
| 84. | Alet | Greece |
| 85. | Actavis Pharna Pty Ltd | Australia |
| 86. | Ascent Pham l ahealth Pty Ltd | Australia |
| 87. | Actavis Australia Pty Ltd | Australia |
| 88. | Ascent Australia Pty Ltd | Australia |
| 89. | Actavis Pty Ltd | Australia |
| 90. | Ascent Pham l a Pty Ltd. | Australia |

ALLERGAN_MDL_03367101

AL-NY-00831.00054

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 91. Ascent Phannahealth Asia Pte Ltd | Singapore |
| 92. Drug Houses of Australia Pte Ltd. | Singapore |
| 93. Ascent Pham,ahealth Hong Kong Ltd. | Hong Kong |
| 94. Actavis Sdn. Bhd. | Malaysia |
| 95. Arrow Group ApS | Denmark |
| 96. Arrow ApS | Denmark |
| 97. Makewhey Products Pty. Ltd. | South Africa |
| 98. Actavis Holdings South Africa (Pty) Ltd. | South Africa |
| 99. Actavis Phanna (Pty) Ltd. | South Africa |
| 100. Actavis (Pty) Ltd. | South Africa |
| 101. Scriptpham1 Marketing (Pty) Ltd | South Africa |
| 102. Referral-Net (Pty) Ltd. | South Africa |
| 103. Spear Pharmaceuticals (Pty) Ltd | South Africa |
| 104. Pharmascript Pham,aceuticals Ltd. | South Africa |
| 105. Arrow Pharma Tender (Pty) Ltd. | South Africa |
| 106. Scriptphann Risk Management (Pty) Ltd. | South Africa |
| 107. Imbani Phannaceuticals (Pty) Ltd. | South Africa |
| 108. Zelphy 1308 (Pty) Ltd. | South Africa |
| 109. Arrow Poland SA | Poland |
| 110. Arrowblue Produtos Fannaceuticos SA | Portugal |
| 111. Bowmed Ltd | UK |
| 112. Selamine Ltd. | Ireland |
| 113. Arrow Blue Ltd | Israel |

AL-NY-00831.00055

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 114. Seeker Investments Ltd. | BVI |
| 115. SC Pharma (Pty) Ltd. | Australia |
| 116. Spirit Pharmaceuticals NZ Pty Ltd. | New Zealand |
| 117. Willow Pharmaceuticals Pty Ltd. | Australia |
| 118. Medis Phanna Pty Ltd | Australia |
| 119. Eremad Pty Ltd. | Australia |
| 120. Arrow Lakemedel AB | Sweden |
| 121. Arrow Generics Ltd. | UK |
| 122. Arrow No 7 Ltd | UK |
| 123. Breath Ltd | UK |
| 124. Soosysoo Ltd. | BVI |
| 125. Actavis New Zealand Limited | New Zealand |
| 126. Watson Laboratories, S. de R.L. de C.V | Mexico |
| 127. Actavis Canada Company | Canada |
| 128. Actavis Pharma Company | Canada |
| 129. 3242038 Nova Scotia Company | Canada |
| 130. Abri Pharmceuticals Company | Canada |
| 131. Actavis Phanna Holding 4 ehf. (APH4) | Iceland |
| 132. Actavis Phanna Holding 5 ehf. (APH5) | Iceland |
| 133. Actavis Group ehf. | Iceland |
| 134. Actavis Group PTC ehf. | Iceland |
| 135. Actavis Dutch Holding BV | Netherlands |
| 136. LLC Actavis | Russia |

ALLERGAN_MDL_03367103

AL-NY-00831.00056

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 137. Actavis Ilaclari AS# TU0000001 | Turkey |
| 138. Opening Pharma Bulgaria EOOD | Bulgaria |
| 139. Open Pharma LLC | Russia |
| 140. Actavis ehf. | Iceland |
| 141. Medis ehf. | Iceland |
| 142. Medis Pharma France SAS | France |
| 143. Medis-Danmark A/S. # DA000003 | Denmark |
| 144. Actavis Ireland Ltd. | Ireland |
| 145. Actavis Italy S.p.A. # IT000001 | Italy |
| 146. Actavis Isle of Man Ltd. | Isle of Man |
| 147. Actavis Nordic A/S # DA000002 | Denmark |
| 148. Actavis Oy | Finland |
| 149. UAB Actavis Baltic | Lithuania |
| 150. Actavis Holding AB | Sweden |
| 151. Actavis AB | Sweden |
| 152. Actavis Holding Germany GmbH | |
| 153. Medis Pharma GmbH | Germany |
| 154. Actavis A/S #DA000001 | Denmark |
| 155. Actavis Norway AS | Norway |
| 156. Actavis, S. de. R.L. de C.V. | Mexico |
| 157. Actavis Pharma S. de R.L. de C.V. | Mexico |
| 158. Actavis Hungary Kft. | Hungary |
| 159. Arrow Phann (Malta) Ltd. | Malta |

ALLERGAN_MDL_03367104

AL-NY-00831.00057

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 160. Medis Pharma BV | Netherlands |
| 161. Pharma Pack International B.V. | Netherlands |
| 162. Actavis Polska Sp. z.o.o. | Poland |
| 163. Actavis International Ltd. | Malta |
| 164. Actavis Malta Ltd. | Malta |
| 165. Actavis Export International Ltd. | Malta |
| 166. Actavis Ltd. | Malta |
| 167. Actavis GmbH | Austria |
| 168. Actavis Holdings UK Ltd. | UK |
| 169. Actavis Holdings UK II Ltd. | UK |
| 170. Actavis UK Ltd. | UK |
| 171. Warner Chilcott Acquisition Limited | UK |
| 172. Chilcott UK Limited | UK |
| 173. Warner Chilcott Research Laboratories Ltd. | UK |
| 174. Warner Chilcott UK Limited | UK |
| 175. Warner Chilcott Pharmaceuticals UK Limited | UK |
| 176. Warner Chilcott Deutschland GmbH | Germany |
| 177. Millbrook (NI) Limited | UK |
| 178. Auden Mckenzie Holdings Ltd. | UK |
| 179. Auden Mckenzie (Pharma Division) Ltd. | UK |
| 180. NRIM Ltd. | UK |
| 181. Lime Pharma Ltd. | UK |
| 182. D3 Pharma Ltd. | UK |

ALLERGAN_MDL_03367105

AL-NY-00831.00058

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 183. Actavis d.o.o. Belgrade | Serbia |
| 184. Lotus Laboratories Private Ltd. | India |
| 185. Actavis Ukraine LLC | Ukraine |
| 186. Zdravlje AD | Serbia |
| 187. Actavis Switzerland AG | Switzerland |
| 188. Oncopharma AG# SZ000001 | Switzerland |
| 189. Sindan Pham1a SRL | Romania |
| 190. Actavis SRL | Romania |
| 191. Sindan Foundation | Romania |
| 192. Actavis CZ a.s. # EZ000001 | Czech Republic |
| 193. Actavis S.r.o. | Slovak Republic |
| 194. Biovena Pharma Sp. z.o.o. | Poland |
| 195. Actavis (Cyprus) Ltd. | Cyprus |
| 196. Actavis Operations EOOD | Bulgaria |
| 197. Balkanpharma Troyan AD | Bulgaria |
| 198. Balkanpharma Dupnitsa AD | Bulgaria |
| 199. Balkanpharma Security EOOD | Bulgaria |
| 200. Balkanpharma Healthcare International (Cyprus) Ltd. | Cyprus |
| 201. Actavis EAD | Bulgaria |
| 202. Actavis Istanbul Ilac Sanayive Ticaret Ltd. Sirketi | Turkey |
| 203. Actavis (MEEA) FZE | UAE |
| 204. Actavis Farmaceutica Limitada | Brazil |
| 205. Actavis Holding Asia BV | Netherlands |

ALLERGAN_MDL_03367106

AL-NY-00831.00059

| Company Name | Jurisdiction of Incorporation |
|---|---|
| 206. Actavis Hong Kong Limited | Hong Kong |
| 207. China Medical & Chemical Industrial Development Group Ltd. | China |
| 208. Actavis Phanna Development Centre Private Ltd. | India |
| 209. Actavis Pharma Private Ltd. | India |
| 210. PT Actavis Indonesia | Indonesia |
| 211. Actavis ASKA KK | Japan |
| 212. Actavis KK # JA0000001 | Japan |
| 213. Actavis (Asia Pacific) Pte. Ltd. | Singapore |
| 214. Actavis Thailand Co., Ltd. (flk/a Silom Medical Co., Ltd) | Thailand |
| 215. Silom Medical International Co., Ltd. | Thailand |
| 216. Forest Laboratories UK Ltd. | UK |
| 217. Pharmax Ltd. | UK |
| 218. Forest Pharma BV | Netherlands |
| 219. Forest Laboratories Osterreich GrnbH | Austria |
| 220. Forest Laboratories Denmark ApS | Denmark |
| 221. Forest Laboratories France S.A.S. | France |
| 222. Forest Laboratories Deutschland GmbH | Germany |
| 223. Forest Laboratories Italy S.r.L. | Italy |
| 224. Forest Laboratories Spain, SL | Spain |
| 225. Forest Laboratories Switzerland GmbH | |
| 226. Axcan France (Invest) SAS | France |
| 227. Actavis Biophanna SAS | France |
| 228. Aptalis Pharma SAS | France |

ALLERGAN_MDL_03367107

AL-NY-00831.00060

| Company Name | Jurisdiction of Incorporation |
|---|---|
| **229.** Forest Tosara Ltd. | Ireland |
| **230.** Allergan UK LLP | UK |
| **231.** Actavis Laboratories UT, Tnc. | Delaware |
| **232.** Watson Laboratories, Inc. | Nevada |
| **233.** Actavis Pham1a, Inc. | Delaware |
| **234.** Arrow International Ltd. | Malta |
| **235.** Allergan UK Group Ltd. | UK |

**236**. Actavis France ehf.

**237**. Actavis Holdco Us, Inc.

ALLERGAN_MDL_03367108
**AL-NY-00831.00061**

**Exhibit D**

**(New York Subdivision Election and Release Form)**

**NEW YORK SUBDIVISION ELECTION AND RELEASE FORM**

This Election and Release Form for New York Participating Subdivisions resolves Claims related to Covered Conduct, Opioids, Opioid Products, and Products against Allergan under the terms and conditions set forth in the Allergan New York Statewide Opioid Settlement Agreement between and among the State of New York (for itself and other Releasors), the County of Nassau, the County of Suffolk, all other New York Participating Subdivisions, and Allergan (the "Agreement")[1], the provisions of which are here incorporated by reference in their entirety. Upon executing this Election and Release Form, a Participating Subdivision agrees that, in exchange for the consideration described in the Agreement, the Participating Subdivision is bound by all the terms and conditions of the Agreement, including but not limited to the Release Section found in Section VII of the Agreement and the Participation by Subdivisions Section found in Section IX of the Agreement, and the Participating Subdivision and its signatories expressly represent and warrant on behalf of themselves that they have, or will have obtained on or before the Effective Date or on or before the execution of this Election and Release Form if executed after the Effective Date, the authority to settle and release, to the maximum extent of the Subdivision's power, all Released Claims related to Covered Conduct, Opioids, Opioid Products, and Products against all Released Entities. If this Election and Release Form is executed on or before the Participation Date, the Participating Subdivision shall dismiss Allergan and all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Claims related to Covered Conduct, Opioids, Opioid Products, and Products against Allergan and/or a Released Entity, as applicable, no later than the Participation Date. If this Election and Release Form is executed after the Participation Date, the Participating Subdivision shall dismiss Allergan and

---

[1]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

all other Released Entities with prejudice from all pending cases in which the Participating Subdivision has asserted Claims related to Covered Conduct, Opioids, Opioid Products, and Products against Allergan and/or any other Released Entity, as applicable, concurrently with the execution of this Election and Release Form. By executing this Election and Release Form, the Participating Subdivision submits to the jurisdiction of the Court where the Consent Judgment is filed for purposes limited to that Court's role under the Agreement.

Dated: _____

[NY SUBDIVISION]

By: _____

[COUNSEL]
[FIRM]
[ADDRESS]
[TELEPHONE]

[EMAIL ADDRESS]

*Counsel for [NY SUBDIVISION]*

**Exhibit E**

**(Allergan New York Opioid Settlement Sharing Agreement)**

**ALLERGAN NEW YORK OPIOID SETTLEMENT SHARING AGREEMENT**

This Agreement sets forth the terms and conditions governing the sharing and allocation of funds between and among the State of New York and the New York Subdivisions (as defined below) received from Allergan (as defined below) under the Allergan New York Statewide Opioid Settlement Agreement (defined below), which constitutes a "Statewide Opioid Settlement Agreement" as defined in N.Y. Mental Hyg. Law § 25.18(a)(8);

Whereas, the people of the State of New York and its communities have been allegedly harmed by misfeasance, nonfeasance, and malfeasance committed by Allergan; and

Whereas, the State of New York and certain New York Subdivisions are engaged in litigation seeking to hold Allergan accountable for the damage caused by their alleged misfeasance, nonfeasance, and malfeasance; and

Whereas, the State of New York and the New York Subdivisions share a common desire to abate and alleviate the impacts of the alleged misfeasance, nonfeasance, and malfeasance of Allergan throughout the State of New York; and

Now therefore, notwithstanding the New York Distributor Statewide Opioid Settlement Agreement and the New York Janssen Statewide Opioid Settlement Agreement, the State of New York and the New York Subdivisions enter into this Agreement relating to the allocation, distribution, and use of the proceeds of the Allergan New York Statewide Opioid Settlement Agreement (as defined below).

## I.  DEFINITIONS

A.      "Approved Uses" means any opioid or substance use disorder related remediation projects or programs that fall within the list of uses in Schedule D.

B.      "Lead State Agency" means the New York State Office of Addiction Services and Supports. As provided for in Section V, The Lead State Agency will coordinate with the New York Department of Health, the New York Office of Mental Health, and the New York Division of Housing and Community Renewal, as well as other agencies, to expend and oversee funds from the Allergan New York Statewide Opioid Settlement Agreement.

C.      The "Advisory Board" means the advisory board created and described by N.Y. Mental Hyg. Law § 25.18(c) and Section V of Exhibit N of the New York Distributor Statewide Opioid Settlement Agreement.

D.      "Direct Share Subdivision" means every county of the State of New York other than the County of Nassau, the County of Suffolk, and the City of New York.

E.      "Large New York Cities" means New York cities other than New York City with a 2020 population of more than 90,000 – *i.e.*, the cities of Albany, Buffalo, Rochester, Syracuse and Yonkers.

F.      "New York Distributor Statewide Opioid Settlement Agreement" means the Distributors New York Settlement Agreement, executed on July 20, 2021.

G.      "New York Janssen Statewide Opioid Settlement Agreement" means the Janssen New York Settlement Agreement, executed on June 25, 2021.

H.      "New York Subdivisions" means each county, city, town, village, or special district in New York.

I.      "Allergan Opioid Settlement Funds" shall mean monetary amounts obtained through the Allergan New York Statewide Opioid Settlement Agreement as defined in this Agreement.

J.      "Allergan" shall mean Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.) and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc).

K.      "Parties" means the State of New York and the New York Subdivisions who execute this Agreement.

L.      "Allergan New York Statewide Opioid Settlement Agreement" (or the "Allergan Agreement") shall mean the settlement agreement jointly entered into between and among the State of New York (for itself and other Releasors), the County of Nassau, the County of Suffolk, all New York Participating Subdivisions, and Allergan.

M.      "Opioid Settlement Fund" means the fund created by Section IV and N.Y. Mental Hyg. Law § 25.18(a)(4) which will be used or distributed in accordance with Section IV and this Agreement.

## II.      GENERAL FINANCIAL AND STRUCTURE TERMS

A.      **Scope of Agreement.** This Agreement applies to the Allergan New York Statewide Opioid Settlement Agreement.

B.      **Allocation and Distribution of Funds for Remediation, Restitution and Abatement**. Opioid Settlement Funds from the Allergan New York Statewide Opioid Settlement Agreement shall be allocated and distributed as follows:

1.      **17.5%** to the State of New York (unless not in accordance with state law). The Office of the Attorney General shall have the discretion to allocate a portion of these funds to local governments not listed in the annexed allocation chart for remediation and restitution as required in Section III of the Allergan Agreement.

2.      **16.39%** to the Lead State Agency to be placed in the Opioid Settlement Fund for Regional Spending on Approved Uses. In combination, the amount of Regional Spending of the Opioid Settlement Fund committed to the Large New York Cities shall not be less than 1.89% of the total Opioid Settlement Funds and the amount of Regional Spending of the Opioid Settlement Fund committed to the other

litigating municipalities listed in Schedule C shall not be less than 0.34% of the total Opioid Settlement Funds.

3.      **20%** to the Lead State Agency to be placed in the Opioid Settlement Fund for Discretionary Spending on Approved Uses and for Administration of the Opioid Settlement Fund.

4.      **7.98%** to the Direct Share Subdivisions as "Direct Unrestricted Funds."

5.      **7.98%** to the Direct Share Subdivisions for spending on Approved Uses ("Direct Restricted Funds").

6.      **0.69%** to the Large New York Cities for spending on Approved Uses ("Large New York Cities Restricted Funds").

7.      **2.52%** to the County of Nassau for spending on Approved Uses.

8.      **3.26%** to the County of Suffolk for spending on Approved Uses

9.      **23.68%** to the City of New York for spending on Approved Uses.

C.      **Redistribution in Certain Situations**. In the event a New York Subdivision merges, dissolves, or ceases to exist, the allocation percentage for that New York Subdivision shall be redistributed equitably based on the composition of the successor New York Subdivision.

D.      **Direct Payment of Certain Funds**.  All Opioid Settlement Funds allocated to the Direct Share Subdivisions, the Large New York Cities, the Counties of Nassau and Suffolk, and the City of New York pursuant to Sections II.B.4, 5, 6, 7, 8 and 9 shall be paid directly and as promptly as reasonably practicable by the Settlement Fund Administrator(s) (as defined in the Allergan Agreement) to the Direct Share Subdivisions, the Large New York Cities, the Counties of Nassau and Suffolk, and the City of New York, and the Settlement Fund Administrator(s) shall ensure strict compliance with Section III.C.1 of the Allergan Agreement.

### III.    THE DIRECT SHARE SUBDIVISION AND CITY OF NEW YORK FUNDS

A.  **Distribution of the Direct Share Subdivision Funds.**  The Direct Unrestricted Funds and the Direct Restricted Funds shall be paid to the Direct Share Subdivisions that execute a release for the Allergan Agreement, pursuant to Section II.B.4 and 5, and will be fully distributed among them pursuant to the allocation set forth in Schedule A to this Agreement.  The Large New York Cities Restricted Funds shall be paid to the Large New York Cities that execute a release for the Allergan Agreement, pursuant to Section II.B.6 and will be fully distributed among them pursuant to the allocation set forth in Schedule B to this Agreement.

B.  **Certification of Spending on Approved Uses.**  Each year, the Direct Share Subdivisions, the City of New York and the Counties of Nassau and Suffolk shall certify to the Lead State Agency and the Advisory Board that all funds distributed to them pursuant to Sections II.B.5, 6, 7 and 8 of this Agreement, which were spent during the preceding year, were spent on projects and programs that

constitute Approved Uses. These certifications shall be made by August 1 of each year following the year in which such funds were spent and shall be accompanied by a detailed accounting of the spending of such funds as well as analysis and evaluation of the projects and programs they have funded.

## IV.    THE OPIOID SETTLEMENT FUND

**A.    Establishment of the Opioid Settlement Fund.**

1.    Each year the Lead State Agency will allocate approximately **45%** of the Opioid Settlement Fund (16.39% of the total Opioid Settlement Funds) for Approved Uses in the various regions, Large New York Cities and other litigating municipalities of New York State, except New York City and the Counties of Nassau and Suffolk, pursuant to a commitment to spend in each the corresponding percentages shown in Schedule C. Of this amount, at least 1.89% of the total Opioid Settlement Funds received by New York shall be set aside for Large New York Cities and at least 0.34% of the total Opioid Settlement Funds received by New York shall be set aside for the other litigating municipalities, as listed in Schedule C. Each New York Subdivision other than New York City and the Counties of Nassau and Suffolk may apply for and receive funds from the Opioid Settlement Fund, provided however, that each such Subdivision shall, as a condition to the receipt of these funds, certify at the end of each fiscal year during which it receives such funds that all funds provided to it under this provision of the Agreement were spent on projects and programs that constitute Approved Uses and provided that it complies with the reporting requirements set forth in Section IV.E.

2.    Each year the Lead State Agency will set aside approximately **55%** of the Opioid Settlement Fund (20% of the total Opioid Settlement Funds) for spending by the Lead State Agency to (a) fund State projects that constitute Approved Uses, and (b) carry out the duties of the Lead State Agency and Advisory Board under this Agreement, including oversight and administration of the Opioid Settlement Fund and the Advisory Board.  No more than 5% of the total Opioid Settlement Fund may be used in any fiscal year for oversight and administrative costs of the Opioid Settlement Fund and the Advisory Board.

**B.    Approved Uses.** The Approved Uses are set forth in Schedule D below. The Advisory Board may recommend to the Legislature adding or removing Approved Uses in response to changing substance use disorder needs in the state. The Advisory Board may not recommend that Approved Uses be removed from the list of Approved Uses without the vote of three-fourths of the present members of the Advisory Board.

C.    **Oversight and Auditing.**   The Lead State Agency will engage in oversight and audits of projects and programs funded through the Opioid Settlement Fund.

D.  **New York Subdivision Reporting**.  Each New York Subdivision that receives funds from the Opioid Settlement Fund under this Agreement will annually provide to the Lead State Agency and Advisory Board a detailed accounting of the spending of such funds as well as analysis and evaluation of the projects and programs it has funded.  Such accounting shall be provided by August 1 of each year following the year in which such funds were spent.  The Lead Agency may withhold future funds from any New York Subdivision that is delinquent in providing this

reporting, until the required report is submitted.

E. **Lead Agency Reporting.** The Lead State Agency and other relevant government commissioners, in consultation with the Advisory Board, will annually provide the Governor, Speaker of the Assembly, the Temporary President of the Senate, and other legislative leaders as provided by law, a written report, which, among other things, provides a detailed accounting of the previous year's spending of all monies in the Opioid Settlement Fund, any spending by the Direct Share Subdivisions pursuant to Section II.B.5, any spending by the Large New York Cities pursuant to Section II.6, any spending by the Counties of Nassau or Suffolk pursuant to Section II.B.7 and 8, and any spending by New York City pursuant to Section II.B.9, as well as an analysis and evaluation of the projects and programs so funded. This report shall be provided on or before November 1 of each year, beginning one year after the initial deposit of monies in the Opioid Settlement Fund. At the same time, in consultation with the Advisory Board, the Lead State Agency will report annually the results of research funded by funds from this Agreement, the status of any outstanding audits, and the non-binding recommendations of the Advisory Board.

## V.      THE ROLE OF THE ADVISORY BOARD

The Advisory Board established pursuant N.Y. Mental Hyg. Law § 25.18(c) and Section V of Exhibit N of the New York Distributor Statewide Opioid Settlement Agreement will constitute the Advisory Board for this agreement.

## VI.      RETENTION OF JURISDICTION

The Supreme Court, County of Nassau, shall retain jurisdiction of the Parties for the purpose of this Agreement, including its interpretation and enforcement.

**LETITIA JAMES**
**Attorney General of the State of New York**

By: _____          Date:_____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
 Jennifer.Levy@ag.ny.gov

*Counsel for The People of the State of New York*

**NAPOLI SHKOLNIK PLLC**

_____          Date:_____
Salvatore C. Badala

Napoli Shkolnik PLLC
400 Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000
sbadala@napolilaw.com

*Counsel for Plaintiff Nassau County*

**SIMMONS HANLY CONROY LLC**

_____          Date:_____
Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

*Counsel for Plaintiff Suffolk County*

**ADDITIONAL SIGNATORIES:**

_____
_____          Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____
_____
_____          Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____

_____
_____          Date:_____

_____
_____
_____
_____
_____

*Counsel for* _____


_____          Date:_____
_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____          Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____          Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____          Date:_____
_____
_____

_____
_____
_____
_____

*Counsel for* _____


_____
_____                    Date:_____
_____
_____
_____
_____
_____

*Counsel for* _____


_____

## **Schedule A**

| | |
|---|---|
| Allegany | 0.492651319% |
| Cattaraugus | 0.885804166% |
| Chautauqua | 1.712744591% |
| Erie | 13.981832649% |
| Niagara | 3.416877066% |
| **Western Region** | **20.489909791%** |
| | |
| Genesee | 0.710630089% |
| Livingston | 0.678797077% |
| Monroe | 9.384433024% |
| Ontario | 1.309944722% |
| Orleans | 0.412856571% |
| Seneca | 0.386847050% |
| Wayne | 0.994089249% |
| Wyoming | 0.411657124% |
| Yates | 0.247909288% |
| **Finger Lakes Region** | **14.537164194%** |
| | |
| Broome | 2.790673871% |
| Chemung | 1.231939720% |
| Chenango | 0.516475286% |
| Delaware | 0.549364256% |
| Schuyler | 0.208248729% |
| Steuben | 1.137138754% |
| Tioga | 0.542347836% |
| Tompkins | 1.177586745% |
| **Southern Tier Region** | **8.153775199%** |
| | |
| Cayuga | 0.903523653% |
| Cortland | 0.541036257% |
| Madison | 0.810595101% |
| Onondaga | 6.323758786% |
| Oswego | 1.549495093% |
| **Central NY Region** | **10.128408890%** |
| | |
| Fulton | 0.462070473% |
| Herkimer | 0.658308079% |
| Montgomery | 0.453395949% |
| Oneida | 2.826733181% |
| Otsego | 0.670962131% |
| Schoharie | 0.277769778% |
| **Mohawk Valley Region** | **5.349239592%** |

| | |
|---|---|
| Clinton | 0.831513299% |
| Essex | 0.367293246% |
| Franklin | 0.457353060% |
| Hamilton | 0.030269643% |
| Jefferson | 1.273686826% |
| Lewis | 0.251124198% |
| St. Lawrence | 1.234262202% |
| **North Country Region** | **4.445502475%** |
| | |
| Albany | 2.791375201% |
| Columbia | 0.656790382% |
| Greene | 0.793267678% |
| Rensselaer | 1.270734936% |
| Saratoga | 1.679317072% |
| Schenectady | 1.217397796% |
| Warren | 0.612162823% |
| Washington | 0.479903545% |
| **Capital Region** | **9.500949434%** |
| | |
| Dutchess | 4.381104459% |
| Orange | 5.187725669% |
| Putnam | 1.184886753% |
| Rockland | 3.081816868% |
| Sullivan | 1.888626559% |
| Ulster | 2.462996041% |
| Westchester | 9.207894077% |
| **Mid-Hudson Region** | **27.395050426%** |

## **Schedule B**

| | |
|---|---|
| **Albany** | **6.69566439%** |
| **Buffalo** | **33.53818545%** |
| **Rochester** | **22.51041501%** |
| **Syracuse** | **15.16878370%** |
| **Yonkers** | **22.08695145%** |

## Schedule C

| | |
|---|---|
| **Western Region** | **17.702081918%** |
| **Finger Lakes Region** | **12.559258389%** |
| **Southern Tier Region** | **7.044384186%** |
| **Central NY Region** | **8.750352037%** |
| **Mohawk Valley Region** | **4.621429690%** |
| **North Country Region** | **3.840653755%** |
| **Capital Region** | **8.208263818%** |
| **Mid-Hudson Region** | **23.667718977%** |
| **Albany** | **0.772105290%** |
| **Buffalo** | **3.867429560%** |
| **Rochester** | **2.595770859%** |
| **Syracuse** | **1.749176400%** |
| **Yonkers** | **2.546939490%** |
| **Amherst Town** | **0.245448607%** |
| **Amsterdam City** | **0.044507465%** |
| **Auburn City** | **0.141444557%** |
| **Cheektowaga Town** | **0.060164531%** |
| **Geneva City** | **0.058136132%** |
| **Herkimer Village** | **0.025864082%** |
| **Ithaca City** | **0.119355968%** |
| **Lackawanna City** | **0.034046116%** |
| **Lancaster Town** | **0.039745967%** |
| **Mount Vernon City** | **0.076705358%** |
| **Ogdensburg City** | **0.033771645%** |
| **Plattsburgh City** | **0.049991967%** |
| **Poughkeepsie City** | **0.222941118%** |
| **Rome City** | **0.116809770%** |
| **Saratoga Springs City** | **0.105585390%** |
| **Schenectady City** | **0.123453584%** |

| | |
|---|---|
| **Tonawanda Town** | **0.063690259%** |
| **Troy City** | **0.179747858%** |
| **Utica City** | **0.333025258%** |

# Schedule D – Approved Uses

## I.    TREATMENT

### A.  TREAT OPIOID USE DISORDER (OUD)

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse services that include the full American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions, including but not limited to:

   a.    Medication-Assisted Treatment (MAT);

   b.    Abstinence-based treatment;

   c.    Treatment, recovery, or other services provided by states, subdivisions, community health centers; non-for-profit providers; or for-profit providers;

   d.    Treatment by providers that focus on OUD treatment as well as treatment by providers that offer OUD treatment along with treatment for other SUD/MH conditions; or

   e.    Evidence-informed residential services programs, as noted below.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based, evidence-informed or promising practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of mental health trauma resulting from the traumatic experiences of the opioid user (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support detoxification (detox) and withdrawal management services for persons with OUD and any co-occurring SUD/MH conditions, including medical detox, referral to treatment, or connections to other services or supports.

8.  Training for MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or undeserved areas.

9.  Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Scholarships and supports for certified addiction counselors and other mental and behavioral health providers involved in addressing OUD any co-occurring SUD/MH conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Scholarships for persons to become certified addiction counselors, licensed alcohol and drug counselors, licensed clinical social workers, and licensed mental health counselors practicing in the SUD field, and scholarships for certified addiction counselors, licensed alcohol and drug counselors, licensed clinical social workers, and licensed mental health counselors practicing in the SUD field for continuing education and licensing fees.

13. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD and provide technical assistance and professional support for clinicians who have obtained a DATA 2000 waiver.

14. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

15. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in treatment for and recovery from OUD and any co-occurring SUD/MH conditions through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1.  Provide the full continuum of care of recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, residential treatment, medical detox services, peer support services and counseling, community navigators, case management, transportation, and connections to community-based services.

2.  Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

3. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, or training for housing providers.

4. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

5. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

6. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

8. Identifying successful recovery programs such as physician, pilot, and college recovery programs, and providing support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

9. Engaging non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to manage the opioid user in the family.

10. Training and development of procedures for government staff to appropriately interact and provide social and other services to current and recovering opioid users, including reducing stigma.

11. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

12. Create or support culturally-appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

13. Create and/or support recovery high schools.

## C. **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any cooccurring SUD/MH conditions through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is most common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

6. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into community treatment or recovery services through a bridge clinic or similar approach.

7. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

8. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

9. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

10. Provide funding for peer navigators, recovery coaches, care coordinators, or care managers that offer assistance to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced on opioid overdose.

11. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and supporting prevention, intervention, treatment, and recovery programs focused on young people.

12. Develop and support best practices on addressing OUD in the workplace.

13. Support assistance programs for health care providers with OUD.

14. Engage non-profits and faith community as a system to support outreach for treatment.

15. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

16. Create or support intake and call centers to facilitate education and access to treatment, prevention, and recovery services for persons with OUD and any co-occurring SUD/MH conditions.

17. Develop or support a National Treatment Availability Clearinghouse – a multistate/nationally accessible database whereby health care providers can list locations for currently available in-patient and out-patient OUD treatment services that are accessible on a real-time basis by persons who seek treatment.

## D. <u>ADDRESS THE NEEDS OF CRIMINAL-JUSTICE INVOLVED PERSONS</u>

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved – or are at risk of becoming involved – in the criminal justice system through evidence-based, evidence-informed or promising programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest and pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

c. "Naloxone Plus" strategies, which work to ensure that individuals who have received Naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model; or

e. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

f. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise and to reduce perceived barriers associated with law enforcement 911 responses.

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts for persons with OUD and any co-occurring SUD/MH conditions, but only if they provide referrals to evidence-informed treatment, including MAT.

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison, who have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.   Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.   Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.   ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome, through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1.   Support evidence-based, evidence-informed, or promising treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.   Training for obstetricians and other healthcare personnel that work with pregnant women and their families regarding OUD treatment and any co-occurring SUD/MH conditions.

3.   Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

4.   Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

5.   Enhanced family supports and child care services for parents with OUD and any cooccurring SUD/MH conditions.

6.   Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

7.   Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

8.   Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

## II.     PREVENTION

### F.     PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

2.  Academic counter-detailing to educate prescribers on appropriate opioids prescribing.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

a.  Increase the number of prescribers using PDMPs;

b.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

c.  Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD.

6.  Development and implementation of a national PDMP – Fund development of a multistate/national PDMP that permits information sharing while providing appropriate safeguards on sharing of private health information, including but not limited to:

a.  Integration of PDMP data with electronic health records, overdose episodes, and decision support tools for health care providers relating to OUD.

b.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educating Dispensers on appropriate opioid dispensing.

### G.     PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the

following:

1. Corrective advertising or affirmative public education campaigns based on evidence.

2. Public education relating to drug disposal.

3. Drug take-back disposal or destruction programs.

4. Fund community anti-drug coalitions that engage in drug prevention efforts.

5. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

6. Engaging non-profits and faith community as a system to support prevention.

7. Support evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

8. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

9. Support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

10. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

11. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

**H.      PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)**

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Increasing availability and distribution of naloxone and other drugs that treat overdoses to first responders, overdose patients, opioid users, families and friends of opioid users, schools, community navigators and outreach workers, drug offenders upon release from jail/prison, and other members of the general public.

2. Public health entities provide free naloxone to anyone in the community, including but not limited to provision of intra-nasal naloxone in settings where other options are not available or allowed.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, and other members of the general public.

4. Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Support screening for fentanyl in routine clinical toxicology testing.

## III.     OTHER STRATEGIES

### I.     FIRST RESPONDERS

In addition to items C8, D1 through D7, H1, H3, and H8, support the following:

1. Law enforcement expenditures related to the opioid epidemic

2. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

3.  Provisions of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.**    **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, and coordination to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Community regional planning to identify goals for reducing harms related to the opioid epidemic, to identify areas and populations with the greatest needs for treatment intervention services, or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list including, but not limited to costs associated with local opioid task forces, community buprenorphine waiver trainings, and coordination and operation of community-based treatment prevention programing.

2.  A government dashboard to track key opioid-related indicators and supports as identified through collaborative community processes.

3.  Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.  Provide resources to staff government oversight and management of opioid abatement programs.

**K.**    **TRAINING**

In addition to the training referred to in items above A7, A8, A9, A12, A13, A14, A15, B7, B10, C3, C5, E2, E4, F1, F3, F8, G5, H3, H12, and I2, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or network programs and services regarding the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-systems coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

**L.**    **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Research on expanded modalities such as prescription methadone that can expand access to MAT.

8. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

9. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

10. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**M.     POST-MORTEM**

1. Toxicology tests for the range of synthetic opioids presently seen in overdose deaths as well as newly evolving synthetic opioids infiltrating the drug supply.

2. Toxicology method development and method validation for the range of synthetic opioids observed now and in the future, including the cost of installation, maintenance, repairs and training of capital equipment.

3. Autopsies in cases of overdose deaths resulting from opioids and synthetic opioids.

4. Additional storage space/facilities for bodies directly related to opioid or synthetic opioid related deaths.

5.     Comprehensive death investigations for individuals where a death is caused by or suspected to have been caused by an opioid or synthetic opioid overdose, whether intentional or accidental.

6.     Indigent burial for unclaimed remains resulting from overdose deaths.

7.     Navigation-to-care services for individuals with opioid use disorder who are encountered by the medical examiner's office as either family and/or social network members of decedents dying of opioid overdose.

8.     Epidemiologic data management and reporting to public health and public safety stakeholders regarding opioid overdose fatalities.

**Exhibit F**

**(Nassau and Suffolk Counties' Stipulation of Discontinuance with Prejudice)**

**COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

---

IN RE OPIOID LITIGATION

---

*This document relates to*:

*The County of Suffolk, New York v. Purdue Pharma L. P.*, Case No. 400001/2017

*The County of Nassau, New York v. Purdue Pharma L. P.*, Case No. 400008/2017

Index No. 400000/2017

Hon. Jerry Garguilo

---

## <u>STIPULATION OF DISCONTINUANCE WITH PREJUDICE</u>

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, counsel of record for Plaintiffs Suffolk County, New York, and Nassau County, New York, and for Defendants Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.) and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc) (collectively, "Allergan"), that, pursuant to C.P.L.R. 3217, the following actions are hereby voluntarily discontinued with prejudice as to Allergan only, without costs as to any party against the other:

1. *The County of Suffolk, New York v. Purdue Pharma L. P.*, Case No. 400001/2017; and
2. *The County of Nassau, New York v. Purdue Pharma L. P.*, Case No. 400008/2017.

Dated:  December ____, 2021
New York, New York

**KIRKLAND & ELLIS LLP**

_____
James F. Hurst, P.C. (pro hac vice)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Phone: (312) 862-2000
James.Hurst@kirkland.com

*Counsel for Allergan Finance,
LLC and Allergan Limited*

**NAPOLI SHKOLNIK PLLC**

_____
Salvatore C. Badala
Napoli Shkolnik PLLC 400
Broadhollow Road
Melville, NY 11747
Phone: (212) 397-1000

*Counsel for Plaintiff Nassau County*

**SIMMONS HANLY CONROY LLC**

_____
Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Ave 7th Floor
New York, NY 10016
Phone: (212) 257-8482
jconroy@simmonsfirm.com

*Counsel for Plaintiff Suffolk County*

**Exhibit G**

**(State of New York's Stipulation of Discontinuance with Prejudice)**

**COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

IN RE OPIOID LITIGATION

Index No. 400000/2017

*This document relates to*:

Hon. Jerry Garguilo

*The People of the State of New York v. Purdue Pharma L.P.*, Case No. 400016/2018

## <u>STIPULATION OF DISCONTINUANCE WITH PREJUDICE</u>

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, counsel of record for Plaintiff, the People of the State of New York, by its attorney, LETITIA JAMES, Attorney General of the State of New York, and for Defendants Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.) and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc) (collectively, "Allergan"), that, pursuant to C.P.L.R. 3217, the following action is hereby voluntarily discontinued with prejudice as to Allergan only, without costs as to any party against the other:

1.  *The People of the State of New York v. Purdue Pharma L.P.*, Case No. 400016/2018.

Date:  December _, 2021
New York, New York

**LETITIA JAMES**
**Attorney General of the State of New York**

By: _____
Jennifer Levy, First Deputy Attorney General
Office of the New York State Attorney General
28 Liberty Street, 23rd Floor
New York, NY 10006
Tel: 212-416-8450
Jennifer.Levy@ag.ny.gov

*Counsel for Plaintiff, The People of the State of
New York*

**KIRKLAND & ELLIS LLP**

_____
James F. Hurst, P.C. (pro hac vice)
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Phone: (312) 862-2000
James.Hurst@kirkland.com

*Counsel for Allergan Finance,
LLC and Allergan Limited*

**Exhibit H**

**(List of All Non-Statutorily Barred Releasors)**

| City / County Name | Within County | Main Counsel | 2019 population estimate | Filed Date | Case ID |
|---|---|---|---|---|---|
| ALBANY CITY | ALBANY COUNTY | DREYER BOYAJIAN LAMARCHE SAFRANKO | 96,460 | 1/8/2019 | 400004/2019 |
| ALBANY COUNTY | | MOTLEY RICE | 305,506 | 1/5/2018 | 1:18-op-45096-DAP |
| ALLEGANY COUNTY | | NAPOLI SHKOLNIK | 46,091 | 6/14/2019 | 1:19-op-46151 |
| AMHERST TOWN | ERIE COUNTY | NAPOLI SHKOLNIK | 126,082 | 3/6/2018 | 2017-4131 |
| AMSTERDAM CITY | MONTGOMERY COUNTY | NAPOLI SHKOLNIK | 17,766 | 6/25/2019 | 1:19-op-46162 |
| AUBURN CITY | CAYUGA COUNTY | NAPOLI SHKOLNIK | 26,173 | 6/7/2019 | 1:19-op-45843 |
| BROOME COUNTY | | SIMMONS HANLY CONROY LLC | 190,488 | 2/1/2017 | 400002/2017 |
| BUFFALO CITY | ERIE COUNTY | NAPOLI SHKOLNIK | 255,284 | 9/5/2019 | 1:19-op-46104 |
| CATTARAUGUS COUNTY | | NAPOLI SHKOLNIK | 76,117 | 6/18/2018 | 400027/2019 |
| CAYUGA COUNTY | | NAPOLI SHKOLNIK | 76,576 | 6/8/2018 | 400013/2019 |
| CHAUTAUQUA COUNTY | | NAPOLI SHKOLNIK | 126,903 | 1/12/2018 | KI-2018-57 |
| CHEEKTOWAGA TOWN | ERIE COUNTY | NAPOLI SHKOLNIK | 85,884 | 4/18/2018 | 806151/2018 |
| CHEMUNG COUNTY | | NAPOLI SHKOLNIK | 83,456 | 8/6/2018 | 400024/2019 |
| CHENANGO COUNTY | | NAPOLI SHKOLNIK | 47,207 | 6/19/2018 | 400021/2019 |
| CLINTON COUNTY | | NAPOLI SHKOLNIK | 80,485 | 1/12/2018 | 400003/2018 |
| COLUMBIA COUNTY | | SIMMONS HANLY CONROY LLC | 59,461 | 2/2/2018 | 400015/2018 |
| CORTLAND COUNTY | | NAPOLI SHKOLNIK | 47,581 | 8/6/2018 | 400019/2018 |
| DUTCHESS COUNTY | | SIMMONS HANLY CONROY LLC | 294,218 | 6/6/2017 | 400005/2017 |
| ERIE COUNTY | | SIMMONS HANLY CONROY LLC | 918,702 | 2/1/2017 | 400003/2017 |
| ESSEX COUNTY | | NAPOLI SHKOLNIK | 36,885 | 6/19/2018 | 400019/2019 |
| FRANKLIN COUNTY | | NAPOLI SHKOLNIK | 50,022 | 4/24/2018 | 400012/2018 |
| FULTON COUNTY | | SIMMONS HANLY CONROY LLC | 53,383 | 3/26/2018 | 400018/2018 |
| GENESEE COUNTY | | NAPOLI SHKOLNIK | 57,280 | 2/21/2018 | 400011/2018 |
| GENEVA CITY | MULTIPLE COUNTIES | CHERUNDOLO // BRINDISI | 12,631 | 3/13/2019 | 1:19-op-45214 |
| GREENE COUNTY | | SIMMONS HANLY CONROY LLC | 47,188 | 1/12/2018 | 400008/2018 |
| HAMILTON COUNTY | | NAPOLI SHKOLNIK | 4,416 | 2/26/2018 | 400005/2018 |
| HERKIMER COUNTY | | SIMMONS HANLY CONROY LLC | 61,319 | 4/17/2018 | 400008/2019 |
| HERKIMER VILLAGE | HERKIMER COUNTY | CHERUNDOLO // BRINDISI | 9,573 | 7/5/2018 | 1:18-op-45964 |
| ITHACA CITY | TOMPKINS COUNTY | NAPOLI SHKOLNIK | 30,837 | 1/24/2018 | 400002/2018 |
| JEFFERSON COUNTY | | CICALA LAW FIRM | 109,834 | 6/12/2019 | 1:19-op-45437 |
| LACKAWANNA CITY | ERIE COUNTY | CHERUNDOLO // BRINDISI | 17,720 | 4/15/2019 | 1:19-op-45303 |
| LANCASTER TOWN | ERIE COUNTY | NAPOLI SHKOLNIK | 43,325 | 6/13/2018 | 809160-2018 |
| LEWIS COUNTY | | SIMMONS HANLY CONROY LLC | 26,296 | 4/13/2018 | 400007/2019 |
| LIVINGSTON COUNTY | | NAPOLI SHKOLNIK | 62,914 | 3/15/2018 | 400012/2019 |

| | | | | |
|---|---|---|---|---|
| MADISON COUNTY | | NAPOLI SHKOLNIK | 70,941 | 1/12/2018 | 400028-2019 |
| MONROE COUNTY | | SIMMONS HANLY CONROY LLC | 741,770 | 1/24/2018 | 400017/2018 |
| MONTGOMERY COUNTY | | SIMMONS HANLY CONROY LLC | 49,221 | 9/5/2018 | 400009/2019 |
| MOUNT VERNON CITY | WESTCHESTER COUNTY | NAPOLI SHKOLNIK | 67,345 | 7/11/2018 | 400016/2019 |
| NASSAU COUNTY | | NAPOLI SHKOLNIK | 1,356,924 | 6/12/2017 | 400008/2017 |
| NEW YORK CITY | MULTIPLE COUNTIES | SIMMONS HANLY CONROY LLC | 8,336,817 | 1/23/2018 | 400006/2018 |
| NIAGARA COUNTY | | NAPOLI SHKOLNIK | 209,281 | 10/20/2017 | 400012/2017 |
| OGDENSBURG CITY | ST LAWRENCE COUNTY | NAPOLI SHKOLNIK | 10,436 | 6/7/2019 | 1:19-op-45852 |
| ONEIDA COUNTY | | CHERUNDOLO // BRINDISI | 228,671 | 3/14/2018 | 1:18-op-45338-DAP |
| ONONDAGA COUNTY | | CHERUNDOLO // BRINDISI | 460,528 | 1/23/2018 | 1:18-op-45170-DAP |
| ONTARIO COUNTY | | SIMMONS HANLY CONROY LLC | 109,777 | 4/13/2018 | 400001/2019 |
| ORANGE COUNTY | | SIMMONS HANLY CONROY LLC | 384,940 | 5/16/2017 | 400004/2017 |
| ORLEANS COUNTY | | NAPOLI SHKOLNIK | 40,352 | 8/6/2018 | 400029/2019 |
| OSWEGO COUNTY | | SIMMONS HANLY CONROY LLC | 117,124 | 1/4/2018 | 400007/2018 |
| OTSEGO COUNTY | | NAPOLI SHKOLNIK | 59,493 | 8/1/2018 | 400023/2019 |
| PLATTSBURGH CITY | CLINTON COUNTY | DREYER BOYAJIAN LAMARCHE SAFRANKO | 19,515 | 1/8/2019 | 400003/2019 |
| POUGHKEEPSIE CITY | DUTCHESS COUNTY | NAPOLI SHKOLNIK | 30,515 | 5/15/2019 | 1:19-op-46163 |
| PUTNAM COUNTY | | NAPOLI SHKOLNIK | 98,320 | 5/29/2018 | 400014/2019 |
| RENSSELAER COUNTY | | NAPOLI SHKOLNIK | 158,714 | 9/27/2017 | 400011/2017 |
| ROCHESTER CITY | MONROE COUNTY | NAPOLI SHKOLNIK | 205,695 | 6/5/2019 | 1:19-op-45853 |
| ROCKLAND COUNTY | | BLEAKLEY PLATT & SCHMIDT, LLP | 325,789 | 6/17/2019 | 1:19-op-45662 |
| ROME CITY | ONEIDA COUNTY | CHERUNDOLO // BRINDISI | 32,148 | 3/28/2019 | 1:19-op-45284 |
| SARATOGA COUNTY | | NAPOLI SHKOLNIK | 229,863 | 1/17/2018 | 400009/2018 |
| SARATOGA SPRINGS CITY | SARATOGA COUNTY | NAPOLI SHKOLNIK | 28,212 | 6/10/2019 | 1:19-op-45857 |
| SCHENECTADY CITY | SCHENECTADY COUNTY | DREYER BOYAJIAN LAMARCHE SAFRANKO | 65,273 | 1/8/2019 | 400005/2019 |
| SCHENECTADY COUNTY | | SIMMONS HANLY CONROY LLC | 155,299 | 6/15/2017 | 400009/2017 |
| SCHOHARIE COUNTY | | NAPOLI SHKOLNIK | 30,999 | 9/27/2017 | 400010/2017 |
| SCHUYLER COUNTY | | NAPOLI SHKOLNIK | 17,807 | 5/11/2018 | 400014/2018 |
| SENECA COUNTY | | SIMMONS HANLY CONROY LLC | 34,016 | 6/7/2017 | 400002/2019 |
| ST LAWRENCE COUNTY | | SIMMONS HANLY CONROY LLC | 32,261 | 1/12/2018 | 400002/2019 |
| STEUBEN COUNTY | | NAPOLI SHKOLNIK | 95,379 | 2/21/2018 | 400004/2018 |
| SUFFOLK COUNTY | | SIMMONS HANLY CONROY LLC | 1,476,601 | 8/31/2016 | 400007/2017 |
| SULLIVAN COUNTY | | SIMMONS HANLY CONROY LLC | 75,432 | 6/7/2017 | 400007/2017 |
| SYRACUSE CITY | ONONDAGA COUNTY | CHERUNDOLO // BRINDISI | 142,327 | 10/1/2018 | 1:18-op-46169 |
| TIOGA COUNTY | | NAPOLI SHKOLNIK | 48,203 | 6/19/2018 | 400022/2019 |
| TOMPKINS COUNTY | | NAPOLI SHKOLNIK | 102,180 | 1/5/2018 | 2017-4131 |

| TONAWANDA TOWN | ERIE COUNTY | NAPOLI SHKOLNIK | 71,675 | 7/11/2018 | 810783/2018 |
|---|---|---|---|---|---|
| TROY CITY | RENSSELAER COUNTY | DREYER BOYAJIAN LAMARCHE SAFRANKO | 49,154 | 1/8/2019 | 400006/2019 |
| ULSTER COUNTY | | SIMMONS HANLY CONROY LLC | 177,573 | 3/15/2018 | 400011/2019 |
| UTICA CITY | ONEIDA COUNTY | CHERUNDOLO // BRINDISI | 59,750 | 11/30/2018 | 1:18-op-46359 |
| WARREN COUNTY | | NAPOLI SHKOLNIK | 63,944 | 2/7/2018 | 400030/2019 |
| WASHINGTON COUNTY | | SIMMONS HANLY CONROY LLC | 61,204 | 6/15/2018 | 400010/2019 |
| WESTCHESTER COUNTY | | NAPOLI SHKOLNIK | 967,506 | 2/6/2018 | 400010/2018 |
| WYOMING COUNTY | | SIMMONS HANLY CONROY LLC | 39,859 | 2/22/2018 | 400013/2018 |
| YATES COUNTY | | NAPOLI SHKOLNIK | 24,913 | 8/3/2018 | 400026/2019 |
| YONKERS CITY | WESTCHESTER COUNTY | SANDERS PHILLIPS GROSSMAN, LLC | 200,370 | 5/29/2019 | 400020/2019 |

**Exhibit I**

(Case Management Order)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

Index No. 400000/2017

IN RE OPIOID LITIGATION

Hon. Jerry Garguilo

## CASE MANAGEMENT ORDER

This Case Management Order ("CMO") shall apply to all Plaintiffs with cases pending as of the execution of the Settlement Agreement against the Allergan Defendants, AbbVie Defendants, or Abbott Defendants (collectively, "Applicable Defendants") and to all new Plaintiffs filing cases after that date against the Applicable Defendants (collectively, "Plaintiff" or "Plaintiffs"), whose claims are pending in this coordinated proceeding and not released by the Allergan New York Statewide Opioid Settlement Agreement in this action entered into on the execution date ("Settlement Agreement").  As used herein, "Allergan Defendants" refers to (1) Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.), (2) Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc), (3) Allergan Sales, LLC, (4) Allergan USA, Inc., (5) Allergan, Inc., (6) Forest Laboratories, LLC, (7) Warner Chilcott Sales (US), LLC, and (8) any other entities currently affiliated with any of the foregoing, including AbbVie Inc., and/or whose defense is wholly or partially controlled by any of the foregoing, including but not limited to Abbott Laboratories and Abbott Laboratories Inc.  As used herein, "AbbVie Defendants" refers to (1) AbbVie Inc., (2) Knoll Pharmaceutical Company, and (3) any other entities currently affiliated with any of the foregoing and/or whose defense is wholly or partially controlled by any of the foregoing.  As used herein, "Abbott Defendants" refers to (1) Abbott Laboratories, (2) Abbott Laboratories Inc., and (3) any other entities currently affiliated with any of the foregoing and/or whose defense is wholly or

partially controlled by any of the foregoing.

Pursuant to the order of the Coordination Panel, all such new cases filed in the State of New York shall be assigned to the *In re Opioids Cases* Litigation pending before this Court and shall be subject to the terms of this CMO.

Good cause appearing, it is ordered as follows:

**A.** **Filing of Amended Complaints**

1. Each Plaintiff with an existing case as of of the Participation Date as defined in the Settlement Agreement, or the expiration of the cure period referred to in section IX.D, of the Settlement Agreement, whichever is later, shall file and serve on Applicable Defendants within ninety (90) days of that date an Amended Complaint satisfying the requirements of the Civil Practice Law and Rules ("CPLR") and this CMO, if that Plaintiff's case is not dismissed with prejudice prior to this deadline pursuant to the Settlement Agreement (including due to the operation of law, such as N.Y. Mental Hyg. Law § 25.18).  Plaintiff's counsel shall comply with Rule 3025 of the CPLR when filing any such Amended Complaint.

2. The time for the Applicable Defendants to file a response to the Plaintiff's new Complaint or Amended Complaint shall not begin to run until after the receipt by counsel for the Applicable Defendants of the Case-Specific Expert Report(s) required pursuant to this CMO, and after the claims process is concluded as described in Section B.3 below, whichever is later.

**B.** **Plaintiffs' Requirement to Produce Certain Specified Information About Their Claims**

1. **Plaintiffs' Production Requirements.**  Each Plaintiff shall serve the following documents and/or information upon counsel for the Applicable Defendants:

(a)     **Fact Sheet.**   If not already completed, executed, and served, each Plaintiff shall serve upon the Applicable Defendants within the deadlines specified herein a completed copy of the Fact Sheet, attached as Exhibit A to Case Management Order No. 2, or Exhibit A as is updated with the Court's approval solely as requested by the Applicable Defendants.  Each Plaintiff that has already completed, executed, and served a compliant Fact Sheet shall serve upon the Applicable Defendants within the deadlines specified herein an updated Fact Sheet, including as amended, if applicable, reflecting any material change in the facts underlying the Plaintiff's claims or shall affirm that no such material change applies or no additional information is required in response to the amended Fact Sheet, if applicable.  Simultaneously with its service of its Fact Sheet (new or updated, including as amended, if applicable), or affirmation, each Plaintiff shall serve upon the Applicable Defendants a verified statement under oath setting forth how each element of their claims has not been resolved pursuant to the terms of the Settlement Agreement and the state and regional abatement fund provided therein.

(b)     **Record Production.**

(i)     Each Plaintiff shall produce all records establishing the existence of a public nuisance within the Plaintiff's territory or borders, including a definition of the nuisance and evidence to support its existence, and all records in support of any other claims being asserted.

(ii)     Each Plaintiff shall produce all records supporting a claim for nuisance "abatement" relief within the Plaintiff's territory or borders, including a categorization and itemization of any requested nuisance abatement relief and evidence to support each component of such relief.

(iii)     Each Plaintiff shall produce all records supporting a claim of damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages, in support of the public nuisance claim and any other claim being asserted.  Each Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.

(iv)     For any other relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that will make the expenditures, when and how long those entities will make the expenditures, and the nature of the expenditures, including how they will address any and all alleged harms.  Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(v)     Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly medically unnecessary prescriptions shall identify those prescriptions, to whom and by whom the prescriptions were written, the pharmacy that filled each such prescription, whether the Plaintiff was reimbursed for them, and the Plaintiff's basis for identifying the prescriptions.

(c)     **Affidavit.**  An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit A to the Court's Case Management Order No. 2, including as amended, if applicable; (ii) attesting that all records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO.  If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)     **Expert Reports.**  Each Plaintiff shall serve on counsel for the Applicable Defendants all case-specific expert report or reports executed by a qualified expert, under oath, in support of its public nuisance and any other claims being asserted and subject to the penalties of perjury (a "Case-Specific Expert Report").  The Case-Specific Expert Report(s) shall include all matter required to comply with Commercial Division Rule 13, New York law, and at least:

(i)     *Plaintiff's Information.*  The Plaintiff's name;

(ii)     *Expert's Information.*  The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)     *Plaintiff's Records.*  All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)     *Reliance Materials.*  All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)     *Locations.*  If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how Plaintiff has been affected by such public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi)     *Subjects of Report(s).*  The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to rely, including but not limited to the following:

(1)     Whether the Plaintiff's records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)     Whether the Plaintiff's records reviewed by the expert(s) indicate the existence of a nuisance and, if so, the nature of the nuisance;

(3)     Whether the Plaintiff's records reviewed by the expert(s) indicate that the Applicable Defendants engaged in any wrongful conduct and, if so, the nature of that conduct;

(4)     An opinion that there is in fact a causal relationship between the individual Plaintiff's claims and the Applicable Defendants' alleged conduct and the basis for that opinion;

(5)     An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

2.     **Deadline to comply.**

(a)     For each Plaintiff with claims pending against the Applicable Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced no later than [DATE], or ninety (90) days after the date such Plaintiff elects not to settle its claims, whichever is sooner.

(b)     For each Plaintiff with claims newly filed in or transferred to this proceeding against the Applicable Defendants after the entry of this CMO, the items required by

Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

        3.      **Failure to comply.**

        (a)    *Notice of Non-Compliance and Opportunity to Cure*.  If any Plaintiff fails to comply with any provision of this Order, the Applicable Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance.  Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance.  During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to the Applicable Defendants, if any, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

        (b)    *Failure to Cure*.  If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Applicable Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against the Applicable Defendants with no additional opportunities to cure its non-compliance beyond sixty (60) days of service of the Notice of Non-Compliance.

        (c)    *Extensions of Time*. The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.

    **C.**    <u>**Discovery on Statute of Limitations and Other Time-Based Defenses**</u>

        1.      Plaintiffs must, within the time frames established by Section B.2, serve upon counsel for the Applicable Defendants an affidavit signed by the Plaintiff and its counsel providing the following information: (1) the date the Plaintiff first learned that the harms alleged in its complaint may be related to the Applicable Defendants' conduct; (2) how the Plaintiff first learned

the harms alleged in its complaint may be related to the Applicable Defendants' conduct; (3) the date the Plaintiff first spoke to or corresponded with an attorney about potential litigation in this matter; and (4) the date the Plaintiff first retained counsel for litigation in this matter.  The Applicable Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each such Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

### D.     Expedited Discovery and Initial *Frye* and Dispositive Motion Practice

1.     The deadlines for production, discovery and motions provided in the following paragraphs shall not begin to run in a case against the Applicable Defendants prior to December 15, 2022.

2.     If a Plaintiff complies with the production requirements outlined above in Sections B and C, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Applicable Defendants one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct additional fact discovery against the Plaintiff; (b) at the conclusion of fact discovery against the Plaintiff grants the Parties one-hundred and eighty (180) days for expert discovery against the Plaintiff; and (c) sets a schedule for initial summary judgment motions and *Frye* motions related to Plaintiffs' experts due one-hundred and twenty (120) days after depositions of Plaintiffs' expert finish, with twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

3.     During the expedited fact and expert discovery against the Plaintiff referred to immediately above, the Applicable Defendants are permitted to: serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of fact and

expert witnesses for the Plaintiff for up to seven hours each, with counsel for Applicable Defendants questioning first at each deposition. No discovery of the Applicable Defendants may be taken during the expedited discovery against Plaintiff absent prior leave granted by the Court upon a showing of good cause, including, but not limited to, how the Plaintiff would be prejudiced by waiting to seek discovery from the Applicable Defendants until after the expedited fact discovery and expert discovery period against Plaintiff.

        **E.**        **Additional Discovery and *Frye* and Dispositive Motion Practice**

        1.        If a case survives the Applicable Defendants' initial *Frye* and summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative fact and expert discovery of the Applicable Defendants solely limited to Plaintiff (as opposed to "generic" discovery) is necessary and to discuss other case management issues, including additional *Frye* and summary judgment motions. The Court's use of the term "non-duplicative" with respect to fact and expert discovery against the Applicable Defendants is intended to express the Court's intention not to allow fact and expert discovery of the Applicable Defendants that is duplicative of discovery taken in the federal MDL or in the litigation involving the State of New York, Nassau and Suffolk Counties, or "generic" discovery of the Applicable Defendants that is not Plaintiff-specific.

        2.        The Court shall also set deadlines for the Applicable Defendants' expert reports, which shall be due no earlier than ninety (90) days from entry of the order deciding the Applicable Defendants' initial summary judgment and *Frye* motions. Depositions of the Applicable Defendants' experts shall be limited to the Applicable Defendants' experts' opinions that are specific to the Plaintiff.

3.      The filing and briefing of summary judgment motions and *Frye* motions related to Plaintiff's experts after the expedited discovery against Plaintiff discussed above shall not prejudice or otherwise foreclose the opportunity for any Party (including the Applicable Defendants) or other defendant to file later, non-duplicative summary judgment and *Frye* motions after completing full fact and expert discovery.  The Court's use of the term "non-duplicative" with respect to motion practice is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period against Plaintiff or *Frye* motions concerning Plaintiff experts addressed in *Frye* motions filed at the conclusion of the expedited discovery period against Plaintiff.

F.      **Bellwether Selection and Trial**

1.      If a case survives the Applicable Defendants' final summary judgment motions, the Court will set a Case Management Conference to set a schedule for bellwether selection, pretrial filings, and trial.  Trial will not be scheduled against the Applicable Defendants until the Plaintiff's claims against all other defendants are resolved.  The parties shall have at least nine (9) months after a ruling on final summary judgment motions and *Frye* motions to select bellwethers and prepare pretrial filings and for trial.

2.      The foregoing provisions do not preclude any Party (including the Applicable Defendants) or other defendant from filing non-duplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.

Dated: _____          _____

                                 Jerry Garguilo
                                 Justice