# APPENDIX B

EXECUTION COPY

# DISTRIBUTORS' TRIBAL SETTLEMENT

EXECUTION COPY

# DISTRIBUTORS' TRIBAL SETTLEMENT AGREEMENT

This Distributors' Tribal Settlement dated as of October 26, 2022 (the "*Agreement*") sets forth the terms of settlement between and among the Participating Tribes, the TLC, and Settling Distributors (each, as defined below), to take effect as of the Effective Date (as defined below).

## Table of Contents

| | | |
|---|---|---|
| I. | Definitions | 1 |
| II. | Conditions to Effectiveness of Agreement | 8 |
| III. | Release | 9 |
| IV. | Monetary Relief and Payments | 14 |
| V. | Allocation and Use of Settlement Funds | 17 |
| VI. | Participation by Tribes | 24 |
| VII. | Plaintiffs' Attorneys' Fees and Costs | 26 |
| VIII. | Dispute Resolution | 27 |
| IX. | Miscellaneous | 27 |
| Exhibit A | Agreed List of Litigating Tribes | A-1 |
| Exhibit B | Agreed List of Non-Litigating Tribes | B-1 |
| Exhibit C | List of Opioid Remediation Uses | C-1 |
| Exhibit D | Tribal Participation Form | D-1 |
| Exhibit E | Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities | E-1 |
| Exhibit F | Payment Schedule | F-1 |
| Exhibit G | ABC IRS Form 1098-F | G-1 |
| Exhibit H | Cardinal Health IRS Form 1098-F | H-1 |
| Exhibit I | McKesson IRS Form 1098-F | I-1 |
| Exhibit J | TAFT III Trust Agreement | J-1 |

EXECUTION COPY

Exhibit K        Illustrative Prepayment Example ..................................................................K-1

Exhibit L        Adjusted Purdue Tribal Allocation Percentages ............................................L-1

Exhibit M        Final Tribal Allocation Distribution Percentages ........................................M-1

Exhibit N        Non-Litigating Tribal Populations ................................................................N-1

Exhibit O        Alleged Harms ..............................................................................................O-1

Exhibit P        Representation and Warranty Regarding Section II..................................... P-1

Exhibit Q        Representation and Warranty Regarding Section V.E.1.b ...........................Q-1

## I.  Definitions

Unless otherwise specified, the following definitions apply:

A.  "*Abatement Fund*" means the Tribal Abatement Fund Trust III ("TAFT III"), a Delaware Statutory Trust to be formed in accordance with the Tribal Abatement Fund Trust III Trust Agreement, which shall provide for distributions to Participating Tribes to be used for Opioid Remediation.

B.  "*Adjusted Purdue Tribal Allocation Percentage*" means the portion of the Tribal Settlement Amount set forth in Exhibit L designated to each Tribe for the purpose of determining participation under Section II.A.  The Adjusted Purdue Tribal Allocation Percentage for each tribe was calculated by adjusting the Cherokee Nation's Purdue Tribal Allocation Percentage upward to 14.5699999417% and multiplying all other Purdue Tribal Allocation Percentages by 97.2889852818%. The aggregate Adjusted Purdue Tribal Allocation Percentage of all Tribes and the Cherokee Nation shall equal one hundred percent (100%).  For the avoidance of doubt, the Adjusted Purdue Tribal Allocation Percentage shall be used only for the calculation of the 95% participation requirement for Litigating Tribes set forth in Section II.A and shall not be used in the calculation of payments made under this Agreement.

C.  "*Agreement*" means this Distributors' Tribal Settlement, inclusive of all Exhibits.

D.  "*Alleged Harms*" means the  alleged past, present, and future financial, societal, and public nuisance harms and related expenditures arising out of the alleged misuse and abuse of Products, non-exclusive examples of which are described in the documents listed on Exhibit O, all of which were filed in connection with MDL No. 2804, that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by the Settling Distributors.

E.  "*Annual Payment*" means the total amount payable to the Distributors' Settlement Trust by the Settling Distributors on the Payment Date each year, as calculated pursuant to Section IV and Section V.

F.  "*Approved Tribal Opioid Abatement Uses*" has the meaning set forth in Section 2 of the TAFT III TDP.

G.  "*Attorney Fee Fund*" means a segregated fund within the Distributors' Settlement Trust set aside to pay attorneys' fees and reimburse attorneys' costs in accordance with Section VII of this Agreement.

H.  "*Cherokee Nation*" means the Cherokee Nation as identified in the list of Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 87 Fed. Reg. 4636, 4637 (Jan. 28, 2022), and with its capital in Tahlequah, Oklahoma.

I.       "*Cherokee Nation Credit*" means the amount of $75,035,499.70, representing 14.5699999417% of the Tribal Settlement Amount.

J.       "*Cherokee Nation Settlement*" means the Cherokee Nation Settlement Agreement executed on November 24, 2021 between the Cherokee Nation and the Settling Distributors.

K.       "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

L.       "*Claim-Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

M.       "*Compensatory Restitution Amount*" means the aggregate amount paid by the Settling Distributors hereunder other than amounts paid as attorneys' fees and costs, investigation costs, or litigation costs.

N.       "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (1) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks, or benefits of any Product; (3) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders placed with any Released Entity; or (4) diversion control programs or suspicious order monitoring; *provided*, *however*, that as to any

2

Claim that a Releasor has brought or could bring, Covered Conduct does not include non-compliance with statutory or administrative supply security standards concerning cleanliness of facilities or stopping counterfeit products, so long as such standards apply to the storage and distribution of both controlled and non-controlled pharmaceuticals.

O.      "*Distributors' Settlement Trust*" means the interest-bearing fund established by the MDL Court in MDL No. 2804 into which all payments by the Settling Distributors will be made and which shall be administered by the Special Master.

P.      "*Effective Date*" means the date sixty (60) calendar days after the Tribal Reference Date or sixty (60) calendar days after the execution of this Agreement, whichever is later.

Q.      "*Eligible Entities*" has the meaning set forth in Section VI.G.

R.      "*Final Tribal Allocation Distribution Percentage*" means a Tribe's percentage as determined by the Tribal Allocation Appointees pursuant to Section V.D.  The aggregate Final Tribal Allocation Distribution Percentages of all Tribes, excluding the Cherokee Nation, shall equal 100%.

S.      "*Global Settlement*" means the Distributors' Settlement Agreement dated March 25, 2022 (as amended) that became effective on April 2, 2022 resolving the litigation and claims brought or threatened to be brought by states and subdivisions against the Settling Distributors, including claims against the Settling Distributors asserted in MDL No. 2804 and state court prescription opiate litigation.

T.      "*Later Litigating Tribe*" means a Tribe, a Tribe official asserting the right of or for the Tribe to recover for Alleged Harms to the Tribe and/or its citizens or members, or a Tribal Entity that (i) is not a Litigating Tribe as of the Effective Date and that (ii) files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date.

U.      "*Litigating Tribe*" means a Tribe, a Tribe official asserting the right of or for the Tribe to recover for Alleged Harms to the Tribe and/or its citizens or members, or a Tribal Entity that brought any Released Claims against any Released Entities set forth on Exhibit E prior to the Effective Date.  Each Litigating Tribe is set forth on Exhibit A.

V.      "*MDL Court*" means the United States District Court for the Northern District of Ohio, Eastern Division.

W.      "*MDL No. 2804*" means the case captioned *In re National Prescription Opiate Litigation*, No. 1-17-md-02804 (N.D. Ohio).

X.      "*Net Tribal Settlement Amount*" means the amount of $439,964,500.30, which is the Tribal Settlement Amount as reduced by the Cherokee Nation Credit.

Y.      "*Non-Litigating Tribes*" means those Tribes as set forth on <u>Exhibit B</u> that are neither Litigating Tribes nor Later Litigating Tribes.  For the avoidance of doubt, a Tribe listed on <u>Exhibit B</u> that becomes a Later Litigating Tribe will no longer be considered a Non-Litigating Tribe as of the date it becomes a Later Litigating Tribe.

Z.      "*Non-Participating Tribe*" means any Tribe that is not a Participating Tribe.

AA.      "*Non-Participating Non-Litigating Tribe*" means any Tribe that is neither a Litigating Tribe nor a Participating Tribe.

BB.      "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

CC.      "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

DD.      "*Non-Released Entity*" means an entity that is not a Released Entity.

EE.      "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures[1] except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic.  Schedule B of the TAFT III TDP provides a non-exhaustive list of programs, services and activities that qualify as expenditures for Opioid Remediation.  In addition, Schedule D of the TAFT III TDP provides a non-exhaustive list of Tribal Abatement Strategies that qualify as Opioid Remediation.  Qualifying expenditures may include reasonable related administrative expenses.

FF.      "*Participating Tribe*" means any Tribe that has met the requirements for becoming a Participating Tribe under <u>Section VI.C</u>, <u>Section VI.D</u>, and <u>Section VI.E</u>.  For the avoidance of doubt, a Participating Tribe is a "Settling Tribal Entity," as defined in the Tribal Participation Form, for all purposes under this Agreement.

GG.      "*Parties*" means the Settling Distributors, the TLC as counsel, and Participating Tribes (each, a "*Party*").

HH.      "*Payment Date*" means the date on which the Settling Distributors make the Annual Payment pursuant to <u>Section IV</u>.

II.      "*Payment Year*" means the calendar year during which the applicable Annual Payment is due pursuant to <u>Section IV.C</u>.  Payment Year 1 is 2021, Payment Year 2 is 2022, Payment Year 3 is 2023, Payment Year 4 is 2024, Payment Year 5 is 2025, Payment Year 6 is

---

[1] Reimbursement includes amounts paid to any Tribal Entities for past expenditures or programs.

4

2026, and Payment Year 7 is 2027. References to payment "*for a Payment Year*" mean the Annual Payment due during that year. References to eligibility "*for a Payment Year*" mean eligibility in connection with the Annual Payment due during that year.

JJ. "*Population*" means the citizenship or membership of a Non-Litigating Tribe as agreed by the Parties and as set forth in Exhibit N.

KK. "*Portal*" means the Tribal Opioid Settlement Portal at which (a) the Tribal Participation Agreements shall be received and maintained by the TLC for review and approval by the Settling Distributors and (b) the information related to the Final Tribal Allocation Distribution Percentage shall be maintained.

LL. "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is: (1) an opioid or opiate, as well as any product containing any such substance; or (2) benzodiazepine, carisoprodol, zolpidem, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances, or any similar substance.

MM. "*Purdue Tribal Allocation Percentage*" means the allocation percentages set forth in Schedule C to the Tribe Trust Distribution Procedures approved by the U.S. Bankruptcy Court for the Southern District of New York in *In re Purdue Pharma*, No. 19-23649 (RDD) (Bankr. S.D.N.Y.).

NN. "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against Released Entities by any Tribe or any Releasor in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a Tribe or any Releasor (whether or not such Tribe or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that this term, "Released Claims," be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. "Released Claims" is also used herein to describe claims brought by a Later Litigating Tribe or a Non-Participating

Tribe that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

OO.    "*Released Entities*" means, with respect to Released Claims, the Settling Distributors and (1) all past and present subsidiaries, divisions, predecessors, successors, and assigns (in each case, whether direct or indirect) of each Settling Distributor; (2) all past and present subsidiaries and divisions (in each case, whether direct or indirect) of any entity described in subsection (1); (3) the respective past and present officers, directors, members, trustees, and employees of any of the foregoing (each for actions that occurred during and related to their work for, or employment with, any of the Settling Distributors or the foregoing entities); (4) all past and present joint ventures (whether direct or indirect) of each Settling Distributor or its subsidiaries, including in any Settling Distributor or subsidiary's capacity as a participating member in such joint venture; (5) all direct or indirect parents and shareholders of the Settling Distributors (solely in their capacity as parents or shareholders of the applicable Settling Distributor with respect to Covered Conduct); and (6) any insurer of any Settling Distributor or any person or entity otherwise described in subsections (1)-(5) (solely in its role as insurer of such person or entity and subject to Section III.B.2).  Any person or entity described in subsections (3)-(6) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity.  For the avoidance of doubt, CVS Health Corp., Walgreens Boots Alliance, Inc., and Walmart Inc. (collectively, the "*Pharmacies*") are not Released Entities, nor are their direct or indirect past or present subsidiaries, divisions, predecessors, successors, assigns, joint ventures, shareholders, officers, directors, members, trustees, or employees (shareholders, officers, directors, members, trustees, and employees for actions related to their work for, employment with, or involvement with the Pharmacies) Released Entities.  Notwithstanding the prior sentence, any joint venture or past or present subsidiary of a Settling Distributor is a Released Entity, including any joint venture between a Settling Distributor or any Settling Distributor's subsidiary and a Pharmacy (or any subsidiary of a Pharmacy); *provided*, *however*, that any joint venture partner of a Settling Distributor or a Settling Distributor's subsidiary is not a Released Entity unless it falls within subsections (1)-(6) above.  Lists of Settling Distributors' subsidiaries, joint ventures, and predecessor entities are appended to this Agreement as Exhibit E.  With respect to joint ventures (including predecessor entities), only entities listed on Exhibit E are Released Entities.  With respect to wholly-owned subsidiaries (including predecessor entities), Exhibit E represents a good faith effort by the Settling Distributors to list all such entities, but any and all wholly-owned subsidiaries (including predecessor entities) of any Settling Distributor are Released Entities, whether or not they are listed on Exhibit E.  For the avoidance of doubt, any entity acquired, or joint venture entered into, by a Settling Distributor after the Tribal Reference Date is not a Released Entity.

PP.    "*Releasors*" means, with respect to Released Claims, (1) each Participating Tribe; and (2) without limitation and to the maximum extent of the power of each Participating Tribe to release Claims, (a) the Participating Tribe's departments, agencies, divisions, boards, commissions, subdivisions, districts, instrumentalities of any kind and attorneys, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any

agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services, districts, school districts, and hospital districts, and other special districts of the Participating Tribe, within the territory governed by a Participating Tribe, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Participating Tribe, whether or not any of them participate in this Agreement. To the extent that an organization or entity purports to bring a Claim on behalf of a Participating Tribe or its Releasors, each Participating Tribe affirms that it does not consent to the prosecution of such Claim.

QQ. "*Reversion Determination Date*" means the date four (4) years after the Effective Date.

RR. "*Settling Distributors*" means McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation (each, a "*Settling Distributor*").

SS. "*Special Master*" means David R. Cohen, or his successor, as appointed by the MDL Court in MDL No. 2804.

TT. "*TAFT III Directors*" means the individuals Mary Smith, Kevin Washburn, and Kathy Hannan, or their successors, as appointed by the MDL Court in MDL No. 2804.

UU. "*TAFT III Trust Agreement*" means the Tribal Abatement Fund Trust III Trust Agreement, substantially in the form attached hereto as <u>Exhibit J</u>.

VV. "*TAFT III TDP*" means the Trust Distribution Procedures set forth as <u>Exhibit 4</u> of the TAFT III Trust Agreement.

WW. "*TLC*" means the Tribal Leadership Committee appointed by the MDL Court in MDL No. 2804.

XX. "*Tribal Allocation Appointees*" means David R. Cohen and Layn Phillips, or their successors, as appointed by the MDL Court to set the procedures by which the Final Tribal Allocation Distribution Percentage will be completed and to jointly determine the Final Tribal Allocation Distribution Percentage.

YY. "*Tribal Entity*" means (i) any entity, sub-entity or instrumentality of a Tribe such as a department, agency, division, board, commission, subdivision, or district, (ii) any attorneys representing such an entity, sub-entity, or instrumentality, (iii) any person in his or her official capacity, whether elected or appointed, serving any such entity, sub-entity, or instrumentality, or (iv) any person, entity, sub-entity, or instrumentality acting by or through any entity, sub-entity, or instrumentality identified in clauses (i)-(iii).

ZZ.    "*Tribal Opioid Abatement Report*" means an annual report on the Approved Tribal Opioid Abatement Uses, as required under Section 2.5 of the TAFT III Trust Agreement.

AAA.    "*Tribal Participation Form*" means the form attached hereto as <u>Exhibit D</u>, or a substantially similar form, that Participating Tribes must execute and return to the Settling Distributors, and which shall (1) make such Participating Tribes signatories to this Agreement, (2) include a full and complete release of any and all such Tribe's claims, and (3) require the prompt dismissal with prejudice of any Released Claims that have been filed by any such Participating Tribe.

BBB.    "*Tribal Reference Date*" means the date the TLC provides written notice to the Settling Distributors that the conditions set forth in <u>Section II.A</u> are satisfied.

CCC.    "*Tribal Settlement Advance Credit*" means the amount of $1,000,000 to be credited against the Annual Payment for Payment Year 1 in consideration of the advance paid by Settling Distributors on February 25, 2022, which is in the Distributors' Settlement Trust, pending transfer to the Tribal Abatement Fund Trust III.

DDD.    "*Tribal Settlement Amount*" means the amount of $515,000,000.00.

EEE.    "*Tribe*" or "*Tribes*" means one or more Eligible Entities set forth on <u>Exhibit A</u> or <u>Exhibit B</u> of this Agreement.

FFF.    "*Unclaimed Allocation*" means the portion of each Annual Payment allocated to a Tribe that is a Non-Participating Non-Litigating Tribe.

## II.    Conditions to Effectiveness of Agreement

A.    *Participation*.  It is a condition of this Agreement that (1) at least 95% of Litigating Tribes, as determined by the Adjusted Purdue Tribal Allocation Percentage,[2] and (2) at least fourteen (14) Non-Litigating Tribes, each with a Population of at least 5,000 members or citizens as set out in <u>Exhibit N</u>, submit a properly executed Tribal Participation Form to the Portal. The TLC will give written notice to the Settling Distributors that the foregoing conditions have been met, and the date of such notice will be the Tribal Reference Date, *provided*, *however*, that the Settling Distributors shall have a reasonable opportunity to review every Tribal Participation Form submitted by a Participating Tribe and to notify the TLC of any such Tribal Participation Forms that are not properly executed and, *further provided*, *however*, that only Tribes that have submitted Tribal Participation Forms that the Settling Distributors have found to be properly executed shall receive the disbursement of any payment under this Agreement.  For the avoidance of doubt, any Tribe that initially submits a Tribal Participation Form that the Distributors find not to be properly executed shall have a reasonable opportunity to resubmit a

---

[2] The Cherokee Nation's Purdue Tribal Allocation Percentage shall count toward the 95% participation requirement for Litigating Tribes.

properly executed Tribal Participation Form, as determined by the Settling Distributors within a reasonable time upon re-submission.

B.      Attached as Exhibit P is written notice from the TLC to the Settling Distributors representing and warranting that the conditions in subsections (1) and (2) of Section II.A have been met and providing proof thereof by listing all Tribes that have executed Tribal Participation Forms as of the date of execution of this Agreement.  Based on that representation and warranty, the Parties agree that the conditions established in subsections (1) and (2) of Section II.A have been satisfied.

## III.     Release

A.      *Scope*.  As of the Effective Date, the Released Entities are hereby released and forever discharged from all of the Releasors' Released Claims.  The Parties and their Releasors hereby absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever.  The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Participating Tribe to release claims.  This Agreement shall be a complete bar to any Released Claim.

B.      *Claim Over and Non-Party Settlement*.

1.      It is the intent of the Parties that:

a.      Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

b.      the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

c.      Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.      the Agreement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

e.      The provisions of this Section III.B are intended to be implemented consistent with these principles.  This Agreement and the releases and dismissals provided for herein are made in good faith.

2.      No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it.  For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3.      To the extent that, on or after the Tribal Reference Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from the Settling Distributors in Section III.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over.  The obligation to obtain the prohibition and/or release required by this Section is a material term of this Agreement as to that Releasor.

4.      In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that described in Section III.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Section III.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, the Released Entity shall be relieved of the prohibition in Section III.B.2 with respect to that Non-Released Entity and that Releasor and the Settling Distributors shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Agreement by the Settling Distributors:

a.      Settling Distributors shall notify that Releasor of the Claim-Over within sixty (60) calendar days of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date of this Agreement, whichever is later;

b.      Settling Distributors and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that they are not required to pay more with respect to Covered Conduct than the amounts owed by Settling Distributors under this Agreement;

10

      c.     That Releasor and Settling Distributors shall take steps sufficient and permissible under applicable law to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Settling Distributors under this Agreement.  Such steps may include, where permissible:

> (i)     Filing of motions to dismiss or such other appropriate motion by Settling Distributors or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

> (ii)     Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor may obtain, or has authority to control from such Non-Released Entity;

> (iii)     Placement into the Distributors' Settlement Trust of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

> (iv)     Return of monies paid by Settling Distributors under this Agreement to the Distributors' Settlement Trust not yet distributed to Releasors to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

> (v)     Payment of monies to Settling Distributors by that Releasor to ensure they are held harmless from such Claim-Over, up to the amount that Releasor may obtain, or has authority to control from such Non-Released Entity;

> (vi)     Credit to the Settling Distributors under this Agreement to reduce the overall amounts to be paid under the Agreement such that they are held harmless from the Claim-Over; and

> (vii)     Such other actions as that Releasor and Settling Distributors may devise to hold Settling Distributors harmless from the Claim-Over.

      d.     The actions of that Releasor and Settling Distributors taken pursuant to paragraph (c) must, in combination, ensure Settling Distributors are not required to pay more with respect to Covered Conduct than the amounts owed by Settling Distributors under this Agreement.

e.      In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Settling Distributors may seek review by the Special Master.  In the event that the Special Master's actions do not result in Released Entities being held fully harmless, Settling Distributors shall have a claim for breach of this Agreement by that Releasor, with the remedy being payment of sufficient funds to hold Settling Distributors harmless from the Claim-Over.  For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Settling Distributors may have.

5.      To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section III.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor.  Each Settling Distributor shall notify the Participating Tribes within one hundred and twenty (120) calendar days of the assertion of the Claim-Over or one hundred and twenty (120) calendar days of the Effective Date of this Agreement, whichever is later, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it; *provided*, *however*, that within twenty-four (24) months of the assertion of the Claim-Over, the failure of a Settling Distributor to so notify the Participating Tribes of the assertion of the Claim-Over shall not relieve the Participating Tribes of any liability that they may have to such Settling Distributor except and solely to the extent that the Participating Tribes are actually and materially prejudiced in their defense of such Claim-Over.

C.      *General Release*.  In connection with the releases provided for in this Agreement, each Participating Tribe (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent**.  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Participating Tribe (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Participating Tribe's decision to enter into this Agreement or the Participating Tribe's decision to participate in this Agreement.

12

D.     *Assigned Interest Waiver*.  To the extent that any Participating Tribe has any direct or indirect interest in any rights of a third-party that is a debtor under the Bankruptcy Code as a result of a claim arising out of Covered Conduct by way of assignment or otherwise, including as a result of being the beneficiary of a trust or other distribution entity, to assert claims against a Settling Distributor (whether derivatively or otherwise), under any legal or equitable theory, including for indemnification, contribution, or subrogation, such Participating Tribe waives the right to assert any such claim ("Waived Claim"), or to receive a distribution or any benefit on account of a Waived Claim ("Assigned Distribution") and any Assigned Distribution to be received or actually received on account of a Waived Claim, shall be deemed assigned to such Settling Distributor.  It is the intent of the Parties that the obligations of a Participating Tribe under this Section III.D are self-executing and no further action by a Participating Tribe is required to effectuate the waiver and/or assignment contemplated by this Section III.D.  This Section III.D also authorizes a Settling Distributor to make any filing required by Rule 3001 of the Federal Rules of Bankruptcy Procedure to effectuate the assignment of a claim, or right to receive a benefit or distribution as contemplated in Section III.D.  The Parties further agree that if the TAFT III or the relevant trust or escrow account designated under the plan of reorganization or other applicable agreement giving rise to a violation of this provision (the "Applicable Trust") receives an Assigned Distribution, the Applicable Trust shall return the Assigned Distribution to the Settling Distributors.  In the event that an Assigned Distribution is paid to a Participating Tribe, the Settling Distributors shall be entitled to offset the amount of such Assigned Distribution against the Settling Distributors' next Annual Payments until such time as the Assigned Distribution is repaid to the Settling Distributors, or, if no such Annual Payment remains, shall be paid directly to the Settling Distributors from the TAFT III or, if there are insufficient funds that remain in the TAFT III, the trust or escrow account that paid out the Assigned Distribution in violation of this provision. The Participating Tribes agree that they will not knowingly take any action or cause anyone else to take any action that would cause an Applicable Trust to distribute an Assigned Distribution to the Participating Tribes in violation of this Section III.D.  The Parties further agree that under no circumstances shall any Participating Tribe be required to directly pay, forfeit, or otherwise return any distribution actually made to it in violation of this Section III.D; *provided*, *however*, that in the event that any Participating Tribe knowingly takes any action or causes anyone else to take any action that would cause an Applicable Trust to distribute an Assigned Distribution to the Participating Tribes in violation of this Section III.D, the Settling Distributors shall retain the right to seek return of such improper distribution from the Participating Tribe(s) that is the recipient of the Assigned Distribution.

E.     *Res Judicata*.  Nothing in this Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in this Agreement, and/or any stipulation of dismissal with prejudice or judgment entered on the Agreement, gives rise to under applicable law.

F.     *Effectiveness*.  The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law,

regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Abatement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Abatement Fund or any portion thereof.

G.    *Cooperation*.  Releasors (1) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (2) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

H.    *Non-Released Claims.*  Notwithstanding the foregoing or anything in the definition of Released Claims, this Agreement does not waive, release or limit Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under this Agreement for enforcement of this Agreement.

## IV.    Monetary Relief and Payments

A.    *Distributors' Settlement Trust*.  All payments of the Net Tribal Settlement Amount of $439,964,500.30 made under this <u>Section IV</u> shall be made into the Distributors' Settlement Trust.  The Distributors' Settlement Trust shall be allocated and used only as specified in <u>Section V</u>.

B.    *Annual Payments.*  The Settling Distributors shall pay the sum of the Net Tribal Settlement Amount into the Distributors' Settlement Trust by making seven (7) Annual Payments, under the terms and conditions of this Agreement, subject to the reductions described in this <u>Section IV.B</u> and <u>Section V.E</u>.  The Settling Distributors previously paid the Tribal Settlement Advance Credit to the Distributors' Settlement Trust.  The Annual Payment for Payment Year 1 shall be reduced by the amount of the Tribal Settlement Advance Credit.  For the avoidance of doubt, the total amount paid by the Distributors pursuant to this Agreement shall not exceed the Net Tribal Settlement Amount.  In the event the Settling Distributors overpay in any Payment Year as a result of the Final Tribal Allocation Distribution Percentages not yet being determined, the Settling Distributors shall receive a dollar-for-dollar offset for such overpayment on the Payment Date immediately following the determination of such Final Tribal Allocation Distribution Percentages.  The offset shall be based upon the Final Tribal Allocation Distribution Percentages assigned to (i) a Non-Participating Litigating Tribe that either affirmatively opts-out of this Agreement or does not become a Participating Tribe within one (1) year of the Effective Date, or (ii) a Later Litigating Tribe that fails to follow the requirements set forth in <u>Section V.E.1.e</u> and <u>Section VI.E</u>.

C.    *Payment Dates*.  The Payment Date for each of Payment Year 1 and Payment Year 2 shall be thirty (30) calendar days after the Effective Date. The Payment Date for Payment Year 3 is July 15 of the calendar year following the Effective Date and the Payment Date of successive Payment Years is July 15 of successive years; *provided*, *however*, that if the Final Tribal Allocation Distribution Percentages have not be determined by April 15, 2027, the Payment Date for Payment Year 7 shall not be until the date ninety (90) calendar days after the Final Tribal Allocation Distribution Percentages have been determined.

D.    *Allocation of Payments Among Settling Distributors.*  Payments due from the Settling Distributors under this <u>Section IV</u> and <u>Section VII</u> will be allocated among the Settling Distributors as follows:  McKesson – 38.1%; Amerisource – 31.0%; Cardinal – 30.9%.  A Settling Distributor's sole responsibility for payments under this Agreement shall be to make its share of each payment.  Beginning in Payment Year 3, at least sixty (60) calendar days prior to the Payment Date, the TAFT III Directors shall determine the total amount owed by Settling Distributors and the amount of each Settling Distributor's allocable share of the Annual Payment and provide written notice of such determinations to the Settling Distributors.  The obligations of the Settling Distributors in this Agreement are several and not joint.  No Settling Distributor shall be responsible for any portion of another Settling Distributor's share.

E.    *Pre-payment Option*.

1.    Any Settling Distributor shall have the right, subject to the limitations set forth in <u>Section IV.E.3</u>, to prepay any Annual Payment in whole or in part, without premium or penalty (a "*Settlement Prepayment*") by providing at least fourteen (14) calendar days prior written notice to the TAFT III Directors and TLC (a "*Prepayment Notice*").  Any Prepayment Notice shall specify:  (a) the gross amount of the Settlement Prepayment (the "*Gross Settlement Amount*"), (b) the manner in which such Settlement Prepayment shall be applied to reduce such Settling Distributor's future share of Annual Payments (*i.e.*, to which future year(s) the allocable portion of an Annual Payment owed by such Settling Distributor the Settlement Prepayment should be applied) (such manner of application, a "*Settlement Prepayment Reduction Schedule*"), (c) the net present value of the Settlement Prepayment as of the Prepayment Date based on the Settlement Prepayment Reduction Schedule using a discount rate equal to the prime rate as published by the *Wall Street Journal* on the date of the Prepayment Notice plus 1.75% (such net present value amount, the "*Net Settlement Prepayment Amount*"), and (d) the date on which the prepayment will be made, which shall be no more than fifteen (15) calendar days after the date of the Prepayment Notice (the "*Prepayment Date*").

2.    On the Prepayment Date the Settling Distributor shall pay the Net Settlement Prepayment Amount to the Distributors' Settlement Trust and such amount shall be used only as specified in <u>Section V</u>.  Following such payment, all future portions of the Annual Payments allocated to the applicable Settling Distributor under <u>Section IV.D</u> shall be reduced pursuant to the Settlement Prepayment Reduction Schedule, and <u>Exhibit F</u> will be updated to give effect to such reduction, and going forward such updated schedule will be <u>Exhibit F</u>.

3.    A Settling Distributor's right to make prepayments shall be subject to the following limitations:

a.    A Settling Distributor shall make no more than two (2) prepayments over the payment term.  A Settling Distributor shall not make a prepayment in consecutive years, there shall not be a prepayment in the first

15

payment year, and Settling Distributors shall not make prepayments against the Annual Payment for Payment Year 7.

b.      The total amount of a prepayment shall not be larger than the anticipated Annual Payment for any Payment Year affected by the prepayment.

c.      Prepayments shall be applied proportionately to all Participating Tribes.

d.      In a Payment Year against which there has been a prepayment, if the actual Annual Payment is greater than the amount prepaid prior to discounting calculations, the Settling Distributor shall pay the difference. If, in a Payment Year for which there has been a prepayment, the actual Annual Payment is less than the amount calculated at the time of the prepayment, there shall be a credit for the difference to the Settling Distributor to be applied in the subsequent Payment Year(s), if any.

4.      For illustrative purposes only, attached as Exhibit K is an example showing a Settlement Prepayment, the related calculation of the Net Settlement Prepayment Amount, and the related adjustment to the Settlement Payment Schedule.

F.      *Significant Financial Constraint.*

1.      A Settling Distributor's allocable share of the Annual Payment for a Payment Year may, at the election of such Settling Distributor, be deferred either (a) up to the amount by which that share plus amounts payable during that Payment Year by that Settling Distributor under the Global Settlement and the Cherokee Nation Settlement would exceed twenty percent (20%) of such Settling Distributor's total operating cash flow (as determined pursuant to United States generally accepted accounting principles) for its fiscal year that concluded most recently prior to the due date for that payment or (b) (i) up to twenty-five percent (25%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies (Fitch, Moody's, and Standard & Poor's) is below BBB or Baa2 or (ii) up to one hundred percent (100%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB- or Baa3.  If the reason for exceeding twenty percent (20%) of a Settling Distributor's total operating cash flow or the decrease in credit rating is substantially attributable to the incurrence of debt to fund post-settlement acquisitions or to the payment of dividends and/or share repurchases that together are of an amount that exceeds the total amount of those two items for the prior fiscal year, no deferral is available.  A Settling Distributor shall not be allowed to defer payment for a Payment Year if that Settling Distributor engaged in any share repurchases in the three fiscal quarters prior to the Payment Date for that Payment Year.  In the event the deferral in this Section IV.F.1 is triggered, the amount of deferral to which the Settling Distributor is entitled to elect shall not exceed the amount attributable to the

Annual Payment that is the Tribes' *pro rata* portion (taking into account the Annual Payments owed by Settling Distributors in the same year under the Global Settlement and under the Cherokee Nation Settlement) of the excess amount over the relevant percentage as set forth in clauses (a) and (b) of this paragraph.

2.      If a Settling Distributor has reason to believe that it will not be able to pay some or all of its allocable share of the Annual Payment for a Payment Year, it shall provide at least ninety (90) calendar days' prior written notice to the Settlement Fund Directors and TLC (a "*Deferred Payment Notice*").  Any Deferred Payment Notice shall specify and include:  (a) the gross amount of the payments owed, (b) the amount that the Settling Distributor believes it will be unable to pay, (c) the accounting and audited financial documents upon which the Settling Distributor relied for making this determination, and (d) any other relevant information for the TLC to consider.

3.      A Settling Distributor shall not utilize this provision during the first (3) Payment Years.  If a Settling Distributor defers some or all of the payments due in a Payment Year pursuant to this <u>Section IV.F</u>, it shall not repurchase any shares, or fund new acquisitions with an acquisition price greater than $250 million, during the deferral period until the deferred amount is fully repaid with interest.  Any amounts deferred shall bear interest at an interest rate equal to the prime rate as published by the *Wall Street Journal* on the date of the Deferral Payment Notice plus 0.5%.

4.      The Settling Distributor shall pay all deferred amounts, including applicable interest on the next Payment Date.  If the amounts previously deferred (including interest) together with the Settling Distributor's share of all payments due for a Payment Year would allow for a deferral under <u>Section IV.F.1</u>, the Settling Distributor shall pay as much of the previously deferred amounts (including interest) as it can pay without triggering the ability to defer payment and may defer the remainder as permitted under (and subject to the restrictions of) this <u>Section IV.F</u>.

5.      If a Settling Distributor could pay a portion of its allocable share of the Annual Payments due pursuant to this Agreement during a Payment Year without triggering this <u>Section IV.F</u>, the Settling Distributor shall be required to pay that portion as scheduled and only the excess would be subject to deferral at the election of the Settling Distributor (in whole or in part) as provided herein.

6.      The Settling Distributor shall pay any deferred amounts, including applicable interest, on or before the date on which the payment is due for Payment Year.

## V.      Allocation and Use of Settlement Funds

A.      *Components of Settlement Payments.*  Subject to <u>Section V.B.3</u>, the Annual Payments shall be earmarked for the Abatement Fund and for the Attorney Fee Fund as set forth in <u>Section V.B</u>.

17

B.      *Use of Settlement Payments.*

1.      The Special Master shall transfer funds from the Distributors' Settlement Trust within fifteen (15) calendar days after receiving the funds pursuant to Section IV.B as follows: 85% of such funds shall be paid to the Abatement Fund for distribution to Participating Tribes to use for Opioid Remediation in accordance with the TAFT III Trust Agreement and the TAFT III TDP; and 15% of such funds shall be set aside by the Special Master for the Attorney Fee Fund subject to Section VIII to pay attorneys' fees and litigation costs.

2.      For each Annual Payment, the TAFT III Directors shall set aside and hold back from transfer all Unclaimed Allocations, and the provisions of Section V.E.1 shall apply.

3.      The Special Master shall deduct the costs and expenses incurred in the administration of the Distributors' Settlement Trust from the Tribal Settlement Advance Credit and the interest accrued on the Distributors' Settlement Trust, and thereafter from the Distributors' Settlement Trust should such Tribal Settlement Advance Credit and interest prove insufficient.

4.      In no event may less than 85% of the Settling Distributors' payments to the Distributors' Settlement Trust be spent on Opioid Remediation. The Parties acknowledge and agree that the payments disbursed to the Tribes from the Abatement Fund in accordance with this Section V and Schedules B and D of the TAFT III TDP are exclusively for Opioid Remediation.

C.      *Duties and Expenses of the TAFT III Directors.*

1.      The TAFT III Directors shall have the duties set forth in this Agreement and in the TAFT III Trust Agreement.  For the avoidance of doubt, the TAFT III Directors will have duties and responsibilities comparable to those the same individuals exercise as trustees as set forth in the proposed Tribal Abatement Fund Trust Agreement filed 08/23/21 (Doc. 3634) with the Fifteenth Plan Supplement under the Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the "*Purdue Plan*"), confirmed by the Bankruptcy Court in *In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (S.D.N.Y) (without regard to the effectiveness of any other orders, documents, agreements or similar authorities that may otherwise be applicable to the Purdue Plan).

2.      Any reasonable expenses, costs and fees associated with or arising out of the duties of the TAFT III Directors shall be paid out of the Tribal Settlement Advance Credit and the interest accrued on the Distributors' Settlement Trust, and thereafter from the Abatement Fund should such Tribal Settlement Advance Credit and interest prove insufficient.

18

D.    *Duties and Expenses of Tribal Allocation Appointees.*

1.    The duties of David Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees are to set the procedures by which the Final Tribal Allocation Distribution Percentages shall be determined and to determine the Final Tribal Allocation Distribution Percentages, which shall govern the distributions to Participating Tribes in accordance with this Section V.  For the avoidance of doubt, such procedures include:

a.    Each Participating Tribe shall have had the right to meaningfully participate in the final allocation process and a right to be heard prior to entry of the final order setting forth the Final Tribal Allocation Distribution Percentages.

b.    The TAFT III Directors shall provide notice of the settlement to the unrepresented tribes.  The TAFT III Directors shall coordinate with David Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees and the TLC to set forth the procedures by which notice is provided.

c.    Unrepresented Participating Tribes shall have the same rights as the represented Tribes within the settlement allocation process.

d.    Settling Distributors acknowledge and expressly agree that they have no role whatsoever in the Final Tribal Allocation Distribution Percentages.

2.    Any expenses, costs and fees associated with or arising out of the duties of David Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees (including expenses of retaining experts or other professionals to assist them on allocation issues including BrownGreer and trust counsel), shall be agreed to by the Special Master consistent with Section V.B.3 and paid out of the Tribal Settlement Advance Credit and the interest accrued on the Distributors' Settlement Trust. Thereafter, all such expenses, costs and fees shall be paid from the principal of that portion of the Distributors' Settlement Trust which, under Section V.B.1, will be allocated to and paid to the Abatement Fund; *provided* that the Special Master may estimate the amount necessary to pay such reasonable allocation-related expenses, costs and fees reasonably expected to be incurred for up to one year after a Payment Date and reserve such estimated amount from payment to the Abatement Fund, to be held by a different sub-account of the Distributors' Settlement Trust to cover such allocation-related expenses, costs and fees for up to one year after a Payment Date, following which the balance, if any, remaining of any such reserved amount shall be paid to the Abatement Fund and available for allocation.

3.    The Parties acknowledge that the Final Tribal Allocation Distribution Percentages shall be determined in a manner consistent with the MDL Court's February 1, 2022 Order (Doc. 4262).

E.    *Treatment of Non-Participating Tribes.*

19

1.      *Non-Litigating Tribes*.

a.      There shall be no reduction to the Annual Payments for Non-Litigating Non-Participating Tribes for Payment Dates prior to the Reversion Determination Date; *provided*, *however*, that no payments shall be made to Participating Tribes until the Final Tribal Allocation Distribution Percentages have been determined.

b.      If, on the Reversion Determination Date, at least 67% of Non-Litigating Tribes, as determined by Population as set forth in Exhibit N, have become Participating Tribes, then the following shall occur:

(i)      All Unclaimed Allocations shall remain in the Distributors' Settlement Trust;

(ii)      The Settling Distributors shall continue to pay the Unclaimed Allocations for each Payment Year into the Distributors' Settlement Trust;

(iii)      On the final Payment Date, the Unclaimed Allocations shall be paid to the Participating Tribes in allocations corresponding to the Final Tribal Allocation Distribution Percentages of the Participating Tribes, up to a maximum of $20,000,000; and

(iv)      On the final Payment Date,  any funds remaining after the distribution described in Section V.E.1.b(iii) above shall immediately revert to the Settling Distributors.

c.      If, on the Reversion Determination Date, less than 67% of Non-Litigating Tribes, as determined by Population as set forth in Exhibit N, have become Participating Tribes, then the following shall occur:

(i)      All Unclaimed Allocations shall immediately revert to the Settling Distributors; and

(ii)      For the remaining Payment Years, the Settling Distributors shall no longer be required to pay any Unclaimed Allocations into the Distributors' Settlement Trust.

d.      Attached as Exhibit Q is written notice from the TLC to the Settling Distributors representing and warranting that the conditions in Section V.E.1.b have been met and providing proof thereof by listing all Non-Litigating Tribes that have executed Tribal Participation Forms as of the date of execution of this Agreement.  Based on that representation and warranty, the

20

Parties agree that the conditions established in <u>Section V.E.1.b</u> have been satisfied.

   e. If any Non-Litigating Non-Participating Tribe becomes a Later Litigating Tribe at any time until and including the Reversion Determination Date, all Unclaimed Allocations in the Distributors' Settlement Trust that are associated with that Tribe will revert to the Settling Distributors forty-five (45) calendar days following the filing of the Later Litigating Tribe's lawsuit, unless such Later Litigating Tribe becomes a Participating Tribe by fulfilling the requirements under <u>Section VI.E</u>, and the Settling Distributors shall not be required to pay such Later Litigating Tribe's allocation as part of the Annual Payment in any subsequent Payment Year.  In the event a Later Litigating Tribe becomes a Participating Tribe by fulfilling the requirements pursuant to <u>Section VI.E</u>, the Later Litigating Tribe shall receive payments due after the date on which such Later Litigating Tribe became a Participating Tribe by fulfilling the requirements pursuant to <u>Section VI.E</u>.

   2. *Litigating Tribes.*  Any Litigating Tribe that is not a Participating Tribe as of the Effective Date of this Agreement shall participate fully if it becomes a Participating Tribe pursuant to <u>Section VI.D</u> within one (1) year of the Effective Date, *provided* that such Litigating Tribe's case(s) remain inactive after the Effective Date (meaning that the Litigating Tribe does not pursue any discovery or file any motions or seek to advance the litigation in any way) and are dismissed with prejudice promptly upon submitting a properly executed Tribal Participation Form.  For the avoidance of doubt, such Litigating Tribe shall not be deemed a Participating Tribe until all required dismissals with prejudice have been entered by the appropriate court(s).  Any Litigating Tribe that becomes a Participating Tribe later than one (1) year after the Effective Date shall not be entitled to receive any share of any Settlement Funds due before such Tribe became a Participating Tribe.  Pursuant to <u>Section IV.B</u>, Settling Distributors shall receive a dollar-for-dollar offset based on the Final Tribal Allocation Distribution Percentages assigned to a Non-Participating Litigating Tribe that either affirmatively opts-out of this Agreement or does not become a Participating Tribes within one (1) year of the Effective Date.

F. *Provisions Regarding Abatement Fund.*

   1. The funds distributed by the Abatement Fund to each Participating Tribe shall be used for Opioid Remediation.

   2. The TAFT III Directors shall, in consultation with the TLC, design and implement a system of annual reporting by Participating Tribes relating to Opioid Remediation expenditures made using funds received from the Abatement Fund. The TAFT III Directors shall provide an annual Tribal Opioid Abatement Report to the Settling Distributors and the Special Master, which annual report may be filed by the Special Master, in his discretion, with the MDL Court.

G.    *Nature of Payment*.

1.    Each Settling Distributor, each Participating Tribe, and the TLC acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

a.    It has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

b.    In the actions this Agreement resolves, the Participating Tribes sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by the Participating Tribes;

c.    (i) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by the Participating Tribes; and (ii) the portion of the Compensatory Restitution Amount received by each Participating Tribe is no greater than the amount of the Alleged Harms allegedly suffered by such Participating Tribe;

d.    The payment of the Compensatory Restitution Amount by the Settling Distributors constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by the Settling Distributors;

e.    The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the Participating Tribes to the same position or condition that they would be in had the Participating Tribes not suffered the Alleged Harms; and

f.    For the avoidance of doubt:  (i) no portion of the Compensatory Restitution Amount represents reimbursement to any Participating Tribe, or other person or entity for the costs of any investigation or litigation, (ii) the entire Compensatory Restitution Amount is properly characterized as described in this Section V.G.1, and (iii) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, other punitive assessments, or attorneys' fees.

2.    *Tax Reporting and Cooperation*

a.    Upon request by any Settling Distributor, the TAFT III Directors agree to deliver to the Settling Distributors, and each Participating Tribe agrees to deliver to the TAFT III Directors such further documents as may be reasonably

necessary for the Settling Distributors to establish the statements set forth in Section V.G.1 to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

b.      Without limiting the generality of Section V.G.2.a, (i) each Participating Tribe shall cooperate in good faith with the TAFT III Directors with respect to (x) the obligations of the TAFT III Directors under Section V.G.2.a and (y) any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement and (ii) the TAFT III Directors shall cooperate in good faith with the Settling Distributors with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

c.      The Muscogee (Creek) Nation on behalf of all Participating Tribes, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "Appropriate Official").  The Muscogee (Creek) Nation shall direct and ensure that the Appropriate Official timely (i) files (A) at the time this Agreement becomes binding on the Parties , an IRS Form 1098-F in the form attached as Exhibit G, Exhibit H, and Exhibit I with respect to each of the Settling Distributors and (B) any legally required returns or amended returns with any applicable governmental authority, or any returns reasonably requested by the respective Settling Distributors, and (ii) provides to each of the Settling Distributors a copy of (A) the IRS Form 1098-F filed with respect to such Settling Distributor and (B) any legally required written statement pursuant to any applicable law and any other document referred to in clause (i)(B) above. TAFT III shall deliver annually to the Settling Distributors a copy of its filed federal and state (if any) tax returns and statements. The above described forms, returns, or statements shall be prepared and filed in a manner fully consistent with Section V.G.1.

d.      The Participating Tribes agree that any return, amended return, or written statement filed or provided pursuant to Section V.G.2.c, and any similar document, shall be prepared and filed in a manner consistent with reporting each Settling Distributor's portion of the Tribal Settlement Amount as the "Total amount to be paid" pursuant to this Agreement in Box 1 of IRS Form 1098-F, each Settling Distributor's portion of the Tribal Settlement Amount less the Compensatory Restitution Amount as the "Amount to be paid for violation or potential violation" in Box 2 of IRS Form 1098-F, and each Settling Distributor's portion of the Compensatory Restitution Amount as the "Restitution/remediation amount" in Box 3 of IRS Form 1098-F, as reflected in the attached Exhibit G,

23

Exhibit H, and Exhibit I.  If the Muscogee (Creek) Nation or Appropriate Official shall be required to file any return, amended return, or written statement contemplated by this Section V.G.2 other than an IRS Form 1098-F in the form attached as Exhibit G, Exhibit H, and Exhibit I, the Muscogee (Creek) Nation shall direct and ensure that the Appropriate Official provides to each Settling Distributor a draft of such return, amended return, or written statement in respect of such Settling Distributor no later than sixty (60) calendar days prior to the due date thereof and shall accept and reflect any reasonable comments of such Settling Distributor on the return, amended return, or written statement in respect of such Settling Distributor to the extent consistent with applicable law.

e.       For the avoidance of doubt, neither the Settling Distributors nor the Participating Tribes make any warranty or representation to any Participating Tribe or Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

f.       For the avoidance of doubt, each of the Participating Tribes, the TLC, the TAFT III Directors and the Settling Distributors is relying on its own counsel with respect to the tax consequences of the payment of any amounts under this Agreement.

## VI.     Participation by Tribes

A.       *Presentation of Aggregated Settlement Offer, Informed Consent and Compliance with Ethical Rules*.  The TLC negotiated the terms of this Agreement with the Settling Distributors on behalf of the Tribes through a judicially supervised mediation.  The TLC believes the gross settlement amount and term of years to be reasonable and recommends moving forward to present this Agreement and informed consent documentation to all Litigating Tribes identified on Exhibit A and all Non-Litigating Tribes identified on Exhibit B, and if applicable, to their counsel. Settling Distributors, the Released Entities, and the TLC recognize the ultimate decision to settle rests with each Tribe.  The TLC will work with all counsel to present the proposed aggregate settlement and allocation procedures to all Tribes and will use best efforts to secure 100% participation.

B.       *Notice to Unrepresented Tribes*.  The TAFT III Directors shall provide notice of the settlement to each Non-Litigating Tribe, each of which shall have the same rights as the Litigating Tribes with respect to the determination of the Final Tribal Allocation Distribution Percentage for that Tribe.

C.       *Requirements for Becoming a Participating Tribe—Non-Litigating Tribes*.  A Non-Litigating Tribe may become a Participating Tribe by uploading a properly executed Tribal Settlement Participation Form, attached hereto as Exhibit D, to the Portal.  A Tribe's executed Participation Form is evidence of its status as a Party to this Agreement, and the executed Participation Forms and their terms are incorporated herein by reference.

D.     *Requirements for Becoming a Participating Tribe—Litigating Tribes*.  A Litigating Tribe may become a Participating Tribe by uploading a properly executed Tribal Settlement Participation Form, attached hereto as Exhibit D, to the Portal, and upon prompt dismissal with prejudice of its lawsuit.  A Litigating Tribe may not become a Participating Tribe after the completion of opening statements in a trial of the lawsuit it brought that includes a Released Claim against a Released Entity.  A Tribe's executed Participation Form is evidence of its status as a Party to this Agreement, and the executed Participation Forms and their terms are incorporated herein by reference.

E.     *Requirements for Becoming a Participating Tribe—Later Litigating Tribes*.  If there has been no adverse judgment or ruling against any Released Entity in a lawsuit initiated by a Later Litigating Tribe, such Later Litigating Tribe may become a Participating Tribe by, within forty-five (45) calendar days of filing suit, filing a dismissal with prejudice of its lawsuit and uploading a properly executed Tribal Settlement Participation Form to the Portal.  A Later Litigating Tribe may not become a Participating Tribe after the completion of opening statements in a trial of the lawsuit it brought that includes a Released Claim against a Released Entity.  A Tribe's executed Participation Form is evidence of its status as a Party to this Agreement, and the executed Participation Forms and their terms are incorporated herein by reference.

F.     *Dismissal of Claims*.  Each Litigating Tribe and each Later Litigating Tribe that has submitted a Participation Form shall promptly provide, either directly or through its counsel, a dismissal with prejudice of all Released Claims by that Tribe against all Released Entities.  Dismissal of a Litigating Tribe's complaint against Released Entities shall be filed only upon the occurrence of the Effective Date.  The Parties will coordinate a streamlined dismissal process with the MDL Court that will allow for a bulk filing of the agreed dismissal within thirty (30) calendar days of the Effective Date.

G.     *Eligible Entities*.  Exhibit A and Exhibit B together set forth all entities eligible to participate in this Agreement ("*Eligible Entities*"):

1.     Each entity listed on Exhibit A is either (1) a federally recognized tribe that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and that has filed an opioid case against a Released Entity in MDL No. 2804 or in a case pending in State court, or (2) a "tribal organization," as defined in 25 U.S.C. § 5304(I), or an "inter-tribal consortium," as defined in 25 U.S.C. § 5381(a)(5), that provides health care pursuant to contracts/compacts with the Indian Health Service, and that has filed an opioid case against a Released Entity in MDL No. 2804 or in a case pending in State court.  Exhibit A includes the filing docket number and counsel of record for the listed entity.  Each entity listed on Exhibit A is entitled to participate in the settlement.

2.     Exhibit B includes entities that are federally recognized tribes that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and that have not filed an opioid

25

case against a Released Entity in MDL No. 2804 or in a case pending in State court as of the Effective Date.  Exhibit B also includes Alaska Native "tribal organizations," as defined in 25 U.S.C. § 5304(I) and "inter-tribal consortia," as defined in 25 U.S.C. § 5381(a)(5), that provide health care pursuant to contracts/compacts with the Indian Health Service, and that have not filed an opioid case against a Released Entity in MDL No. 2804 or in a case pending in State court.  Each entity listed on Exhibit B is entitled to participate in the settlement.

H.    *Calculating Tribal Allocation Voting Percentages for Tribal Health Organizations and Inter-Tribal Consortia.*

1.    In Alaska:  For purposes of determining whether the 95% participation threshold of Litigating Tribes has been met, the full amount of the Tribal Allocation Voting Percentage as listed on Exhibit L shall be used for each litigating Alaska Tribal Health Organization, litigating Alaska inter-tribal consortium, or litigating Alaska Tribe which is participating in the settlement.  In the event that a litigating Alaska Tribe which is not listed in Exhibit L, and which is a member of a listed Alaska Tribal Health Organization or Alaska inter-tribal consortium, has not submitted a Tribal Settlement Participation Form, then the Tribal Allocation Voting Percentage, as computed pursuant to the footnote set forth in Exhibit L, of that non-participating Alaska Tribe shall be calculated and deducted from the Tribal Allocation Voting Percentage of its Tribal Health Organization or inter-tribal consortium for purposes of determining whether the 95% participation threshold has been met.

2.    Outside of Alaska:  Litigating Tribal Health Organizations and inter-tribal consortia outside of Alaska have no Tribal Allocation Voting Percentage listed on Exhibit L and accordingly their participation in the settlement shall not count toward the 95% participation threshold.

## VII.    Plaintiffs' Attorneys' Fees and Costs

A.    The procedures to allocate and disburse the Attorney Fee Fund to Litigating Tribes' counsel shall be the subject of a separate document to which the Settling Distributors and the Released Entities shall not be parties.  Any costs or expenses incurred in allocating and disbursing the Attorney Fee Fund shall be borne by the Attorney Fee Fund.

B.    An attorney or law firm representing the Participating Tribes may not receive any payment from the Attorney Fee Fund unless they represent that they have no present intent to represent or participate in the representation of any Later Litigating Tribes or any Releasor with respect to Released Claims against Released Entities and unless such attorney presents or has presented this settlement to each tribal opioid client in good faith and uses best efforts to secure participation as set forth in Section VI.A above.

C.     The Settling Distributors agree that attorneys representing Participating Tribes have timely reached a settlement for Released Claims with Settling Distributors and/or Released Entities, as set forth in <u>Exhibit R</u>, <u>Section II.C.2</u> of the Global Settlement.

## VIII.  Dispute Resolution

A.     *Enforceability*.  This Agreement is enforceable only by the Participating Tribes, the TLC as counsel, and the Settling Distributors; *provided*, *however*, that Released Entities may enforce <u>Section III</u>.  Participating Tribes shall not have enforcement rights with respect to the terms of this Agreement that apply only to other Tribes.  For the avoidance of doubt, the TLC shall have, in their capacity as counsel and to the extent they are so empowered having been appointed by Special Master Yanni in a letter dated April 12, 2019, the right to enforce any provision of this agreement on behalf of all Participating Tribes, and the right to submit to the Common Benefit Fund, as set forth in <u>Exhibit R</u>, <u>Section II.C.2</u> of the Global Settlement.

B.     Any disputes arising out of this Agreement shall be heard before the Special Master as the arbitrator designated by the Parties to resolve disputes through binding arbitration.

## IX.  Miscellaneous

A.     *No Admission*.  Settling Distributors do not admit liability or wrongdoing. This Agreement shall not be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to the Settling Distributors.

B.     *No Third-Party Beneficiaries*.  Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Participating Tribe or Released Entity.  No Participating Tribe may assign or otherwise convey any right to enforce any provision of this Agreement.  Nothing in this Agreement extends to the TLC or Participating Tribes the authority to enforce injunctive terms provided in state-court consent judgments implementing the Global Settlement, which shall be enforceable only as provided therein; however, the Settling Distributors acknowledge that said injunctive terms apply equally on tribal and non-tribal lands within a State.

C.     *Calculation*.  Any figure or percentage referred to in this Agreement shall be carried to ten (10) decimal places.

D.     *Construction*.  None of the Parties shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement.  The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

E. *Cooperation*.  Each Party agrees to use its best efforts and to cooperate with the other Parties to cause this Agreement to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith.  Consistent with the foregoing, each Party agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement by any other person, and will support the integrity and enforcement of the terms of this Agreement.

F. *Entire Agreement*.  This Agreement, including its Exhibits and any other attachments, embodies the entire agreement and understanding between and among the Parties relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

G. *Execution.*  This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement.  One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof.  One or more counterparts of this Agreement may be signed by electronic signature.

H. *Good Faith and Voluntary Entry*.  Each Party warrants and represents that it negotiated the terms of this Agreement in good faith.  Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion.  The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

I. *No Prevailing Party*.  The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement.  The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.  Nothing in the previous sentence shall modify, or be construed to conflict with, <u>Section IX.H.</u>

J. *Non-Admissibility*. The settlement negotiations resulting in this Agreement have been undertaken by the Parties in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose.  This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement.

K. *Notices*. All notices or other communications under this Agreement shall be in writing (including, but not limited, to electronic communications) and shall be given to the recipients indicated below:

For the Tribal Leadership Committee:

        Lloyd Miller / Don Simon / Whitney Leonard
        Sonosky, Chambers, Sachse, Miller & Monkman, LLP

        Geoffrey Strommer / Caroline Mayhew
        Edmund Goodman
        Hobbs, Straus, Dean & Walker, LLP

        Tara Sutton / Tim Purdon
        Robins Kaplan LLP

        Lynn Sarko
        Keller Rohrback, L.L.P.

        Roe Frazer
        Frazer PLC

        Peter Mougey
        Levin Papantonio Rafferty

        Scott Gilbert
        Gilbert LLP

        Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
        Lieff Cabraser Heimann & Bernstein LLP

        Jane Joseph / Steve Skikos
        Crawford, Skikos & Joseph LLP

For Settling Distributors:

        Copy to AmerisourceBergen Corporation's attorneys at:
        Attn:  Michael T. Reynolds
        Cravath, Swaine & Moore
        825 Eighth Avenue
        New York, NY 10019
        mreynolds@cravath.com

        Copy to Cardinal Health, Inc.'s attorneys at:

        Attn:  Elaine P. Golin
        Attn:  JB Kelly
        Wachtell, Lipton, Rosen & Katz
        51 West 52nd Street
        New York, NY 10019

EPGolin@wlrk.com
JBKelly@wlrk.com

Copy to McKesson Corporation's attorneys at:
Attn:  Thomas J. Perrelli
Jenner & Block LLP
1099 New York Ave., NW, Suite 900
Washington, D.C. 20001
tperrelli@jenner.com

Any Settling Distributor or the TLC may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this Section.

L.      *No Waiver*.  The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties.  The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

M.      *Preservation of Privilege*.  Nothing contained in this Agreement, and no act required to be performed pursuant to this Agreement, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

N.      *Successors*.  This Agreement shall be binding upon, and inure to the benefit of, the Settling Distributors and their respective successors and assigns.  A Settling Distributor shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to a Settling Distributor's obligations under this Agreement.

O.      *Modification, Amendment, Alteration*.  After the Effective Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by the Settling Distributor to which the modification, amendment, or alteration applies, if the change applies to less than all Settling Distributors, along with the signatures of the Tribal Leadership Committee.

P.      *Termination*.

1.      Unless otherwise agreed to by the Settling Distributors and the Tribe in question, this Agreement and all of its terms (except <u>Section IX.J</u> and any other non-admissibility provisions, which shall continue in full force and effect) shall be canceled and terminated with respect to the Tribe, and the Agreement shall become null and void

and of no effect with respect to the Tribe if one or more of the following conditions applies:

       a.    The Tribe in question does not submit a properly executed Tribal Participation Form to the Portal; or

       b.    An insufficient number of Tribes pursuant to Section II.A sign the Tribal Participation Form.

    2.    If this Agreement is terminated with respect to a Tribe for whatever reason pursuant to Section IX.P.1, then:

       a.    An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date of this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that the Settling Distributors and the Participating Tribe in question shall be in the same position with respect to the statute of limitation as they were at the time the Participating Tribe filed its action; and

       b.    The Settling Distributors and the Participating Tribe in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Settling Distributors and the Participating Tribe in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

    3.    Unless each of the Settling Distributors and the TLC agree otherwise, this Agreement shall terminate as to all Parties as of the final payment date, *provided* that all Settling Distributors have performed their payment obligations under this Agreement as of that date.

    Q.    *Governing Law.*  Except (1) as otherwise provided in the Agreement or (2) as necessary, in the sole judgment of Judge Polster or another district judge of the U.S. District Court for the Northern District of Ohio supervising MDL No. 2804, to promote uniformity of interpretation for matters, this Agreement shall be governed by and interpreted in accordance with the respective laws of the State of Ohio without regard to the conflict of law rules of such State.  Notwithstanding any other provision in this subsection on governing law, the United States District Court for the Northern District of Ohio shall retain jurisdiction to enforce this Agreement.  Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Distributors' Settlement Trust shall be governed by and interpreted in accordance with the law of the State where the escrow agent has its primary place of business.

EXECUTION COPY

For the Tribal Leadership Committee:

_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP


_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____
Lynn Sarko
Keller Rohrback, L.L.P.


_____
Roe Frazer
Frazer PLC


_____
Peter Mougey
Levin Papantonio Rafferty


_____
Scott Gilbert
Gilbert LLP


_____
Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____
Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP


32

For the Tribal Leadership Committee:


_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP


_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____
Lynn Sarko
Keller Rohrback, L.L.P.


_____
Roe Frazer
Frazer PLC


_____
Peter Mougey
Levin Papantonio Rafferty


_____
Scott Gilbert
Gilbert LLP


_____
Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____
Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

For the Tribal Leadership Committee:


_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP


_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____

Lynn Sarko
Keller Rohrback, L.L.P.


_____

Roe Frazer
Frazer PLC


_____

Peter Mougey
Levin Papantonio Rafferty


_____

Scott Gilbert
Gilbert LLP


_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP


32

For the Tribal Leadership Committee:

_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP


_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____
Lynn Sarko
Keller Rohrback, L.L.P.

_____
Roe Frazer
Frazer PLC


_____
Peter Mougey
Levin Papantonio Rafferty


_____
Scott Gilbert
Gilbert LLP


_____
Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____
Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

EXECUTION COPY

For the Tribal Leadership Committee:

_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP

_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____
Lynn Sarko
Keller Rohrback, L.L.P.

_____
Roe Frazer
Frazer PLC

_____
Peter Mougey
Levin Papantonio Rafferty

_____
Scott Gilbert
Gilbert LLP

_____
Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____
Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

32

EXECUTION COPY

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP


_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____

Lynn Sarko
Keller Rohrback, L.L.P.


_____

Roe Frazer
Frazer PLC


_____

Peter Mougey
Levin Papantonio Rafferty

_____

Scott Gilbert
Gilbert LLP


_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP


32

EXECUTION COPY

For the Tribal Leadership Committee:

_____
Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP


_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____
Lynn Sarko
Keller Rohrback, L.L.P.


_____
Roe Frazer
Frazer PLC


_____
Peter Mougey
Levin Papantonio Rafferty


_____
Scott Gilbert
Gilbert LLP

_____
Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____
Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

32

For the Tribal Leadership Committee:

_____

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____

Lynn Sarko
Keller Rohrback, L.L.P.

_____

Roe Frazer
Frazer PLC

_____

Peter Mougey
Levin Papantonio Rafferty

_____

Scott Gilbert
Gilbert LLP

_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

32

EXECUTION COPY

For Settling Distributors:

33

**Authorized and agreed to by**:


Dated:  October 26, 2022                    AMERISOURCEBERGEN CORPORATION


By:_____
          Elizabeth S. Campbell
          Executive Vice President and Chief Legal Officer

STRICTLY CONFIDENTIAL

Authorized and agreed to by:

CARDINAL HEALTH, INC.

Dated:  _October 26, 2022_

By:  _____
Jessica L. Mayer
Chief Legal and Compliance Officer

**Authorized and agreed to by**:

Dated: 10/26/2022 _____

MCKESSON CORPORATION

By: _Saralisa Brau_ _____

Name: Saralisa Brau

Title: Corporate Secretary

## EXHIBIT A

## Agreed List of Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Akiak Native Community | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Alaska Native Tribal Health Consortium | Hobbs Straus Dean & Walker | 1:18-op-46293-DAP |
| Aleutian Pribilof Islands Association | Hobbs Straus Dean & Walker | 1:19-op-45024-DAP |
| Apache Tribe of Oklahoma | The Bruehl Firm | 1:19-op-46119-DAP |
| Arapaho Tribe of the Wind River Reservation, Wyoming | Burg Simpson | 1:18-op-45438-DAP |
| Arctic Slope Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Aroostook Band of Micmacs | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45349-DAP |
| Asa'carsarmiut Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | Frazer PLC | 1:19-op-45256-DAP 1:19-op-45270-DAP 1:19-op-45297-DAP |
| Bay Mills Indian Community, Michigan | Skikos | 1:19-op-45287-DAP |
| Bear River Band of the Rohnerville Rancheria, California | Lieff Cabraser Heimann & Bernstein, LLP | 1:18-op-46362-DAP |
| Big Sandy Rancheria of Western Mono Indians of California | Ceiba Legal, LLP | 1:18-op-45923-DAP |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | Ceiba Legal, LLP | 1:18-op-45922-DAP |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | Powell & Majestro, PLLC | 1:18-op-45749-DAP |
| Bristol Bay Area Health Corporation | Hobbs Straus Dean & Walker | 1:19-op-46175-DAP |
| Cahto Tribe of the Laytonville Rancheria | Frazer PLC | 1:19-op-45038-DAP |
| Catawba Indian Nation | Fields PLLC | 1:20-op-45234-DAP |
| Cayuga Nation | Robins Kaplan LLP | 1:20-op-45153-DAP |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Cheyenne and Arapaho Tribes, Oklahoma | Frazer PLC | 1:19-op-45231-DAP |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | Domina Law Group | 1:19-op-45114-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Chickasaw Nation | Whitten Burrage | 1:19-op-45066-DAP 1:20-op-45201-DAP |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | Skikos | 1:19-op-45395-DAP |
| Chitimacha Tribe of Louisiana | Frazer PLC | 1:18-op-45825-DAP |
| Choctaw Nation of Oklahoma | Whitten Burrage | 1:19-op-45065-DAP 1:20-op-45202-DAP |
| Chugachmiut | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Citizen Potawatomi Nation, Oklahoma | The Bruehl Firm | 1:19-op-46013-DAP |
| Cloverdale Rancheria of Pomo Indians of California | Robins Kaplan LLP | 1:18-op-46241-DAP |
| Coeur D'Alene Tribe | Skikos | 1:19-op-45115-DAP |
| Comanche Nation, Oklahoma | Skikos | 1:19-op-45442-DAP |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45364-DAP |
| Confederated Tribes and Bands of the Yakama Nation | Askman Law Firm LLC | 1:18-op-46202-DAP |
| Confederated Tribes of the Colville Reservation | Skikos | 1:19-op-45312-DAP |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | Frazer PLC | 1:19-op-45972-DAP |
| Confederated Tribes of the Grand Ronde Community of Oregon | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45097-DAP |
| Confederated Tribes of the Umatilla Indian Reservation | Skikos | 1:18-op-45541-DAP |
| Confederated Tribes of the Warm Springs Reservation of Oregon | Skikos | 1:19-op-45069-DAP |
| Consolidated Tribal Health Project, Inc. | Ceiba Legal, LLP; Beggs & Lane | 1:18-op-45919-DAP |
| Copper River Native Association | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Coquille Indian Tribe | Frazer PLC | 1:19-op-45970-DAP |
| Coushatta Tribe of Louisiana | Levin Papantonio | 1:19-op-45438-DAP |
| Cow Creek Band of Umpqua Tribe of Indians | Robins Kaplan LLP | 1:18-op-45417-DAP |
| Coyote Valley Band of Pomo Indians of California | Ceiba Legal, LLP | 1:18-op-45918-DAP |
| Delaware Nation, Oklahoma | The Bruehl Firm | 1:19-op-46011-DAP |
| Dry Creek Rancheria Band of Pomo Indians, California | Skikos | 1:20-op-45147-DAP |
| Eastern Aleutian Tribes | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |

A-2

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Eastern Band of Cherokee Indians | Baron & Budd | 1:18-op-45098-DAP |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | Skikos | 1:19-op-45412-DAP |
| Ely Shoshone Tribe of Nevada | Frazer PLC | 1:18-op-46003-DAP |
| Ewiiaapaayp Band of Kumeyaay Indians, California | Frazer PLC | 1:19-op-45038-DAP |
| Feather River Tribal Health, Inc. | Berkey Williams; Lieff Cabraser | 1:19-op-45334-DAP |
| Flandreau Santee Sioux Tribe of South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | Frazer PLC | 1:18-op-46146-DAP 1:18-op-46295-DAP 1:20-op-45250-DAP |
| Forest County Potawatomi Community, Wisconsin | Robins Kaplan LLP | 1:18-op-46342-DAP |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45364-DAP |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45078-DAP |
| Guidiville Rancheria of California | Ceiba Legal, LLP | 1:18-op-45917-DAP |
| Ho-Chunk Nation of Wisconsin | Frazer PLC | 1:19-op-45076-DAP |
| Hoopa Valley Tribe, California | Lieff Cabraser Heimann & Bernstein, LLP | 1:18-op-46361-DAP |
| Hopi Tribe of Arizona | Keller Rohrback LLP | 1:20-op-45204-DAP |
| Hopland Band of Pomo Indians, California | Ceiba Legal, LLP | 1:18-op-45913-DAP |
| Houlton Band of Maliseet Indians | Farrell Law | 1:19-op-45315-DAP |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | Robins Kaplan LLP | 1:19-op-45004-DAP |
| Indian Health Council | Hobbs Straus Dean & Walker | 1:18-op-46316-DAP |
| Iowa Tribe of Kansas and Nebraska | Skikos | 1:20-op-45099-DAP |
| Jamestown S'Klallam Tribe | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Jicarilla Apache Nation, New Mexico | Skikos | 1:19-op-45385-DAP |
| Kenaitze Indian Tribe | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Keweenaw Bay Indian Community, Michigan | Cooper Elliott | 1:20-op-45150-DAP |
| Kickapoo Traditional Tribe of Texas | Frazer PLC | 1:20-op-45104-DAP |

A-3

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | Skikos | 1:19-op-45381-DAP |
| Klamath Tribes | Weitz & Luxenberg | 1:19-op-45786-DAP |
| Kodiak Area Native Association | Hobbs Straus Dean & Walker | 1:18-op-46260-DAP |
| Koi Nation of Northern California | Frazer PLC | 1:19-op-45038-DAP |
| Kootenai Tribe of Idaho | Robins Kaplan LLP | 1:18-op-46153-DAP |
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | Skikos | 1:19-op-45397-DAP |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-45932-DAP |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | Frazer PLC | 1:18-op-45502-DAP |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | Skikos | 1:18-op-46239-DAP |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | Leech Lake Band of Ojibwe | 1:18-op-45052-DAP |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45350-DAP |
| Lower Sioux Indian Community in the State of Minnesota | Robins Kaplan LLP | 1:18-op-45976-DAP |
| Lummi Tribe of the Lummi Reservation | Keller Rohrback LLP | 1:18-op-45955-DAP |
| Lytton Rancheria of California | Levin Papantonio | 1:19-op-45580-DAP |
| Makah Indian Tribe of the Makah Indian Reservation | Keller Rohrback LLP | 1:18-op-46022-DAP |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Mashantucket Pequot Indian Tribe | Skikos | 1:19-op-45405-DAP |
| Mechoopda Indian Tribe of Chico Rancheria, California | Skikos | 1:19-op-45403-DAP |
| Menominee Indian Tribe of Wisconsin | Robins Kaplan LLP | 1:18-op-45426-DAP |
| Mentasta Traditional Council | Frazer PLC | 1:20-op-45024-DAP |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | Skikos | 1:19-op-45317-DAP |
| Miccosukee Tribe of Indians | The Moskowitz Law Firm | 1:19-op-45121-DAP |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | Lockridge Grindal Nauen | 1:19-op-45978-DAP |

A-4

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Mississippi Band of Choctaw Indians | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45279-DAP |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | Lockridge Grindal Nauen | 1:19-op-45650-DAP |
| Modoc Nation | Robins Kaplan LLP | 1:19-op-45439-DAP |
| Mohegan Tribe of Indians of Connecticut | Frazer PLC | 1:20-op-45164-DAP |
| Muckleshoot Indian Tribe | Skikos | 1:19-op-45213-DAP |
| Muscogee (Creek) Nation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:18-op-45459-DAP |
| Narragansett Indian Tribe | Frazer PLC | 1:20-op-45047-DAP |
| Native Village of Afognak | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Native Village of Port Heiden | Sonosky Chambers; Leiff Cabraser | 1:18-op-46309-DAP |
| Navajo Nation, Arizona, New Mexico & Utah | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:18-op-45496-DAP |
| Nez Perce Tribe | Keller Rohrback LLP | 1:18-op-45730-DAP |
| Nisqually Indian Tribe | Robins Kaplan LLP | 1:18-op-45412-DAP |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | Lockridge Grindal Nauen | 1:19-op-45010-DAP |
| Northwestern Band of the Shoshone Nation | | 1:20-op-45032-DAP |
| Norton Sound Health Corporation | Hobbs Straus Dean & Walker | 1:18-op-46261-DAP |
| Oglala Lakota Sioux Tribe | Robins Kaplan LLP | 1:18-op-45353-DAP |
| Omaha Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Oneida Nation | Levin Papantonio | 1:18-op-46034-DAP |
| Osage Nation | The Bruehl Firm | 1:19-op-45821-DAP |
| Otoe-Missouria Tribe of Indians, Oklahoma | Skikos | 1:19-op-45402-DAP |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | Frazer PLC | 1:18-op-45697-DAP |
| Pala Band of Mission Indians | Hobbs Straus Dean & Walker | 1:21-op-45052-DAP |
| Pascua Yaqui Tribe of Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Passamaquoddy Tribe Indian Township | Weitz & Luxenberg | 1:18-op-45876-DAP |
| Passamaquoddy Tribe Pleasant Point | Weitz & Luxenberg | 1:19-op-45100-DAP |
| Pawnee Nation of Oklahoma | The Bruehl Firm | 1:19-op-46017-DAP |

A-5

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Pinoleville Pomo Nation, California | Frazer PLC | 1:19-op-45974-DAP |
| Poarch Band of Creeks | Frazer PLC | 1:20-op-45231-DAP 1:20-op-45285-DAP 1:20-op-45286-DAP 1:20-op-45294-DAP |
| Ponca Tribe of Indians of Oklahoma | The Bruehl Firm | 1:18-op-45327-DAP |
| Ponca Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45557-DAP |
| Port Gamble S'Klallam Tribe | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |
| Potter Valley Tribe, California | Frazer PLC | 1:19-op-45038-DAP |
| Prairie Band Potawatomi Nation | Skikos | 1:20-op-45139-DAP |
| Prairie Island Indian Community in the State of Minnesota | Robins Kaplan LLP | 1:18-op-45975-DAP |
| Pueblo of Pojoaque, New Mexico | Frazer PLC | 1:19-op-45975-DAP |
| Puyallup Tribe of the Puyallup Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45660-DAP |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | Frazer PLC | 1:18-op-45696-DAP |
| Quapaw Nation | Greene Ketchum Farrell Bailey & Tweel LLP | 1:19-op-45264-DAP |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | Skikos | 1:20-op-45108-DAP |
| Quileute Tribe of the Quileute Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:20-op-45196-DAP |
| Quinault Indian Nation | Robins Kaplan LLP | 1:18-op-46154-DAP 1:19-op-45948-DAP |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-46116-DAP |
| Red Lake Band of Chippewa Indians, Minnesota | Baron & Budd | 1:18-op-45959-DAP |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | Ceiba Legal, LLP | 1:18-op-45916-DAP |
| Reno-Sparks Indian Colony, Nevada | Frazer PLC | 1:18-op-45699-DAP |
| Resighini Rancheria, California | Frazer PLC | 1:19-op-45038-DAP |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | Robins Kaplan LLP | 1:18-op-46151-DAP |
| Riverside San Bernardino County Indian Health Inc. | Berkey Williams; Lieff Cabraser | 1:19-op-45025-DAP |
| Robinson Rancheria | Ceiba Legal, LLP | 1:18-op-45912-DAP |

A-6

| Federally Recognized Tribe/Entity Name | Law Firm | Case No.<br>(if applicable) |
| --- | --- | --- |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Round Valley Indian Tribes, Round Valley Reservation, California | Ceiba Legal, LLP | 1:18-op-45915-DAP |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | Skikos | 1:20-op-45161-DAP |
| Sac & Fox Nation, Oklahoma | The Bruehl Firm | 1:19-op-46012-DAP |
| Saginaw Chippewa Indian Tribe of Michigan | Robins Kaplan LLP | 1:19-op-45841-DAP |
| Saint Regis Mohawk Tribe | Keller Rohrback LLP | 1:19-op-45018-DAP |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45366-DAP |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | Skikos | 1:20-op-45163-DAP |
| Santee Sioux Nation, Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:19-op-45078-DAP |
| Scotts Valley Band of Pomo Indians of California | Ceiba Legal, LLP | 1:18-op-45914-DAP |
| Seminole Tribe of Florida | The Moskowitz Law Firm | 1:19-op-45912-DAP |
| Seneca Nation of Indians | McHugh Fuller Law Group | 1:18-op-45746-DAP |
| Shakopee Mdewakanton Sioux Community of Minnesota | Robins Kaplan LLP | 1:18-op-45977-DAP |
| Shinnecock Indian Nation | Frazer PLC | 1:18-op-46142-DAP |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | Skikos | 1:19-op-45373-DAP |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | Robins Kaplan LLP | 1:18-op-45095-DAP |
| Sokaogon Chippewa Community, Wisconsin | Skikos | 1:19-op-45410-DAP |
| Southcentral Foundation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Southeast Alaska Regional Health Corporation | Hobbs Straus Dean & Walker | 1:18-op-46149-DAP |
| Spirit Lake Tribe, North Dakota | Robins Kaplan LLP | 1:18-op-45520-DAP |
| Squaxin Island Tribe of the Squaxin Island Reservation | Robins Kaplan LLP | 1:18-op-45531-DAP |
| St. Croix Chippewa Indians of Wisconsin | Frazer PLC | 1:18-op-45367-DAP |
| Standing Rock Sioux Tribe of North & South Dakota | Robins Kaplan LLP | 1:18-op-45220-DAP |
| Stockbridge Munsee Community, Wisconsin | Skikos | 1:19-op-45032-DAP |
| Suquamish Indian Tribe of the Port Madison Reservation | Hobbs Straus Dean & Walker | 1:18-op-45271-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Swinomish Indian Tribal Community | Lieff Cabraser Heimann & Bernstein | 1:21-op-45033-DAP |
| Sycuan Band of the Kumeyaay Nation | Robins Kaplan LLP | 1:19-op-45582-DAP |
| Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | Frazer PLC | 1:18-op-46017-DAP |
| Thlopthlocco Tribal Town | The Bruehl Firm | 1:19-op-46021-DAP |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | Skikos | 1:19-op-45376-DAP |
| Tohono O'odham Nation of Arizona | Skikos | 1:19-op-45411-DAP |
| Tonto Apache Tribe of Arizona | Skikos | 1:19-op-45398-DAP |
| Torres Martinez Desert Cahuilla Indians, California | Robins Kaplan LLP | 1:18-op-46152-DAP |
| Tulalip Tribes of Washington | Keller Rohrback LLP | 1:18-op-45589-DAP |
| Tule River Indian Tribe of the Tule River Reservation, California | Skikos | 1:19-op-45579-DAP |
| Tunica-Biloxi Indian Tribe | Simmons Hanly Conroy | 1:18-op-45996-DAP |
| Turtle Mountain Band of Chippewa Indians of North Dakota | Robins Kaplan LLP | 1:18-op-45521-DAP |
| United Keetoowah Band of Cherokee Indians in Oklahoma | McHugh Fuller Law Group | 1:19-op-45600-DAP |
| Upper Sioux Community, Minnesota | Robins Kaplan LLP | 1:18-op-45974-DAP |
| Walker River Paiute Tribe, Nevada | Frazer PLC | 1:18-op-45698-DAP |
| Wampanoag Tribe of Gay Head (Aquinnah) | Frazer PLC | 1:19-op-45844-DAP 1:20-op-45170-DAP |
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | Hill Peterson Carper Bee & Deitzler | 1:19-op-45357-DAP |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | Fields PLLC | 1:20-op-45243-DAP |
| Winnebago Tribe of Nebraska | Krupnick Campbell Malone Buser Slama Hancock, P.A. | 1:18-op-45621-DAP |
| Wyandotte Nation | Levin Papantonio | 1:19-op-45601-DAP |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | Feazell & Tighe LLP | 1:18-op-46355-DAP |
| Yukon Kuskokwim Health Corporation | Sonosky Chambers; Leiff Cabraser | 1:18-op-46268-DAP |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Yurok Tribe of the Yurok Reservation, California | Lieff Cabraser Heimann & Bernstein | 1:21-op-45026-DAP |
| Zuni Tribe of the Zuni Reservation, New Mexico | Sonosky, Chambers, Sachse, Endreson & Perry LLP | 1:20-op-45114-DAP |

## EXHIBIT B

## Agreed List of Non-Litigating Tribes

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Absentee-Shawnee Tribe of Indians of Oklahoma | | |
| *Agdaagux Tribe of King Cove** | | |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | | |
| Ak-Chin Indian Community | | |
| *Akiachak Native Community* | | |
| Alabama-Coushatta Tribe of Texas | | |
| Alabama-Quassarte Tribal Town | | |
| *Alatna Village* | Ristroph Law, Planning, and Research | |
| *Algaaciq Native Village (St. Mary's)* | | |
| *Allakaket Village* | | |
| Alturas Indian Rancheria, California | | |
| *Alutiiq Tribe of Old Harbor [previously listed as Native Village of Old Harbor and Village of Old Harbor]* | Hobbs Straus Dean & Walker | |
| *Angoon Community Association* | | |
| *Anvik Village* | | |
| *Arctic Village (See Native Village of Venetie Tribal Government)* | | |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | | |
| Augustine Band of Cahuilla Indians, California | | |
| *Beaver Village* | | |
| Berry Creek Rancheria of Maidu Indians of California | | |
| Big Lagoon Rancheria, California | | |
| Big Pine Paiute Tribe of the Owens Valley | | |
| *Birch Creek Tribe* | | |
| Bishop Paiute Tribe | | |
| Blue Lake Rancheria, California | | |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | | |
| Bridgeport Indian Colony | | |

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Buena Vista Rancheria of Me-Wuk Indians of California | | |
| Burns Paiute Tribe | | |
| Cabazon Band of Mission Indians, California | | |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | | |
| Caddo Nation of Oklahoma | | |
| Cahuilla Band of Indians | | |
| California Valley Miwok Tribe, California | | |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | | |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | | |
| Cedarville Rancheria, California | | |
| *Central Council of the Tlingit & Haida Indian Tribes* | | |
| *Chalkyitsik Village* | | |
| Cheesh-Na Tribe [previously listed as Native Village of Chistochina] | | |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | | |
| *Chevak Native Village* | | |
| Chickahominy Indian Tribe | Cultural Heritage Partners, PLLC | |
| Chickahominy Indian Tribe—Eastern Division | | |
| Chickaloon Native Village | | |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | Frazer PLC | |
| *Chignik Bay Tribal Council [previously listed as Native Village of Chignik]* | | |
| *Chignik Lake Village* | | |
| *Chilkat Indian Village (Klukwan)* | | |
| *Chilkoot Indian Association (Haines)* | | |
| *Chinik Eskimo Community (Golovin)* | | |
| *Chuloonawick Native Village* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Circle Native Community* | | |
| Cocopah Tribe of Arizona | | |
| Cold Springs Rancheria of Mono Indians of California | | |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | | |
| Confederated Tribes of Siletz Indians of Oregon | Dorsay & Easton LLP | |
| Confederated Tribes of the Chehalis Reservation | | |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | | |
| Cowlitz Indian Tribe | | |
| *Craig Tribal Association [previously listed as Craig Community Association]* | | |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | | |
| Crow Tribe of Montana | | |
| *Curyung Tribal Council* | | |
| Delaware Tribe of Indians | | |
| *Douglas Indian Association* | | |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | | |
| Eastern Shawnee Tribe of Oklahoma | | |
| *Egegik Village* | | |
| Eklutna Native Village | | |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | | |
| Elk Valley Rancheria, California | | |
| *Emmonak Village* | | |
| Enterprise Rancheria of Maidu Indians of California | | |
| *Evansville Village (aka Bettles Field)* | | |
| Eyak Native Village | Hobbs Straus Dean & Walker | |
| Federated Indians of Graton Rancheria, California | | |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | | |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | | |

B-3

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | | |
| Fort McDowell Yavapai Nation, Arizona | | |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | | |
| Fort Sill Apache Tribe of Oklahoma | | |
| *Galena Village (aka Louden Village)* | | |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | | |
| Greenville Rancheria | | |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | | |
| *Gulkana Village Council [previously listed as Gulkana Village]* | | |
| Habematolel Pomo of Upper Lake, California | | |
| Hannahville Indian Community, Michigan | | |
| Havasupai Tribe of the Havasupai Reservation, Arizona | | |
| *Healy Lake Village* | | |
| Hoh Indian Tribe | Dorsay & Easton LLP | |
| *Holy Cross Tribe [previously listed as Holy Cross Village]* | | |
| *Hoonah Indian AssociationStart Printed Page 7558* | | |
| *Hughes Village* | | |
| *Huslia Village* | | |
| *Hydaburg Cooperative Association* | | |
| *Igiugig Village* | | |
| Iipay Nation of Santa Ysabel, California | | |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | | |
| *Inupiat Community of the Arctic Slope* | | |
| Ione Band of Miwok Indians of California | | |
| Iowa Tribe of Oklahoma | | |
| *Iqugmiut Traditional Council [previously listed as Iqurmuit Traditional Council]* | | |
| *Ivanof Bay Tribe [previously listed as Ivanoff Bay Tribe and Ivanoff Bay Village]* | | |

B-4

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Jackson Band of Miwuk Indians | | |
| Jamul Indian Village of California | | |
| Jena Band of Choctaw Indians | | |
| *Kaguyak Village* | | |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | | |
| *Kaktovik Village (aka Barter Island)* | | |
| Kalispel Indian Community of the Kalispel Reservation | | |
| Karuk Tribe | | |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | | |
| *Kasigluk Traditional Elders Council* | | |
| Kaw Nation, Oklahoma | | |
| Ketchikan Indian Community | | |
| Kewa Pueblo, New Mexico | | |
| Kialegee Tribal Town | | |
| Kickapoo Tribe of Oklahoma | | |
| *King Island Native Community* | | |
| *King Salmon Tribe* | | |
| Kiowa Indian Tribe of Oklahoma | The Bruehl Firm | |
| *Klawock Cooperative Association* | | |
| Kletsel Dehe Band of Wintun Indians | | |
| Knik Tribe | | |
| *Kokhanok Village* | | |
| *Koyukuk Native Village* | | |
| La Jolla Band of Luiseno Indians, California | | |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | | |
| *Levelock Village* | | |
| *Lime Village* | | |
| Little River Band of Ottawa Indians, Michigan | | |
| Little Shell Tribe of Chippewa Indians of Montana | Robins Kaplan LLP | |
| Little Traverse Bay Bands of Odawa Indians, Michigan | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Lone Pine Paiute-Shoshone Tribe | | |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | | |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | | |
| Lower Elwha Tribal Community | | |
| Maniilaq Association | Hobbs Straus Dean & Walker | |
| *Manley Hot Springs Village* | | |
| *Manokotak Village* | | |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | | |
| Mashpee Wampanoag Tribe | | |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | | |
| *McGrath Native Village* | | |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | | |
| Metlakatla Indian Community | Hobbs Straus Dean & Walker | |
| Miami Tribe of Oklahoma | | |
| Middletown Rancheria of Pomo Indians of California | | |
| Monacan Indian Nation | Cultural Heritage Partners, PLLC | |
| Mooretown Rancheria of Maidu Indians of California | | |
| Morongo Band of Mission Indians, California | | |
| Mt. Sanford Tribal Consortium | | |
| *Naknek Native Village* | | |
| Nansemond Indian Nation | Cultural Heritage Partners, PLLC | |
| *Native Village of Akhiok* | | |
| *Native Village of Akutan* | | |
| *Native Village of Aleknagik* | | |
| Native Village of Ambler | | |
| *Native Village of Atka* | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Atqasuk [previously listed as Atqasuk Village (Atkasook)]* | | |
| *Native Village of Barrow Inupiat Traditional Government* | | |
| *Native Village of Belkofski* | | |
| *Native Village of Brevig Mission* | | |
| Native Village of Buckland | | |
| *Native Village of Cantwell* | | |
| *Native Village of Chenega (aka Chanega)* | | |
| *Native Village of Chignik Lagoon* | | |
| Native Village of Chitina | | |
| *Native Village of Chuathbaluk (Russian Mission, Kuskokwim)* | | |
| *Native Village of Council* | | |
| Native Village of Deering | | |
| *Native Village of Diomede (aka Inalik)* | | |
| *Native Village of Eagle* | | |
| *Native Village of Eek* | | |
| *Native Village of Ekuk* | | |
| *Native Village of Ekwok [previously listed as Ekwok Village]* | | |
| *Native Village of Elim* | | |
| *Native Village of False Pass* | | |
| *Native Village of Fort Yukon* | | |
| *Native Village of Gakona* | | |
| *Native Village of Gambell* | | |
| *Native Village of Georgetown* | | |
| *Native Village of Goodnews Bay* | | |
| *Native Village of Hamilton* | | |
| *Native Village of Hooper Bay* | | |
| *Native Village of Kanatak* | | |
| *Native Village of Karluk* | | |
| Native Village of Kiana | | |
| *Native Village of Kipnuk* | | |

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Native Village of Kivalina | | |
| *Native Village of Kluti Kaah (aka Copper Center)* | | |
| Native Village of Kobuk | | |
| *Native Village of Kongiganak* | | |
| Native Village of Kotzebue | | |
| *Native Village of Koyuk* | | |
| *Native Village of Kwigillingok* | | |
| *Native Village of Kwinhagak (aka Quinhagak)* | | |
| *Native Village of Larsen Bay* | | |
| *Native Village of Marshall (aka Fortuna Ledge)* | | |
| *Native Village of Mary's Igloo* | | |
| *Native Village of Mekoryuk* | | |
| *Native Village of Minto* | | |
| *Native Village of Nanwalek (aka English Bay)* | | |
| *Native Village of Napaimute* | | |
| *Native Village of Napakiak* | | |
| *Native Village of Napaskiak* | | |
| *Native Village of Nelson Lagoon* | | |
| *Native Village of Nightmute* | | |
| *Native Village of Nikolski* | | |
| Native Village of Noatak | | |
| *Native Village of Nuiqsut (aka Nooiksut)* | | |
| *Native Village of Nunam Iqua [previously listed as Native Village of Sheldon's Point]* | | |
| *Native Village of Nunapitchuk* | | |
| *Native Village of Ouzinkie* | | |
| *Native Village of Paimiut* | | |
| *Native Village of Perryville* | | |
| *Native Village of Pilot Point* | | |
| Native Village of Point Hope | | |
| *Native Village of Point Lay* | | |
| *Native Village of Port Graham* | | |
| *Native Village of Port Lions* | | |

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Native Village of Ruby* | | |
| *Native Village of Saint Michael* | | |
| *Native Village of Savoonga* | | |
| *Native Village of Scammon Bay* | | |
| Native Village of Selawik | | |
| *Native Village of Shaktoolik* | | |
| *Native Village of Shishmaref* | | |
| Native Village of Shungnak | | |
| *Native Village of Stevens* | | |
| *Native Village of Tanacross* | | |
| Native Village of Tanana | | |
| *Native Village of Tatitlek* | | |
| *Native Village of Tazlina* | | |
| *Native Village of Teller* | | |
| *Native Village of Tetlin* | | |
| *Native Village of Tuntutuliak* | | |
| *Native Village of Tununak* | | |
| Native Village of Tyonek | | |
| *Native Village of Unalakleet* | | |
| *Native Village of Unga* | | |
| *Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie)* | | |
| *Native Village of Wales* | | |
| *Native Village of White Mountain* | | |
| *Nenana Native Association* | | |
| *New Koliganek Village Council* | | |
| *New Stuyahok Village* | | |
| *Newhalen Village* | | |
| *Newtok Village* | | |
| *Nikolai Village* | | |
| Ninilchik Village | | |
| *Nome Eskimo Community* | | |
| *Nondalton Village* | | |

B-9

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Nooksack Indian Tribe | | |
| Noorvik Native Community | | |
| Northfork Rancheria of Mono Indians of California | | |
| *Northway Village* | | |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | | |
| *Nulato Village* | | |
| *Nunakauyarmiut Tribe* | | |
| Ohkay Owingeh, New Mexico | | |
| Oneida Indian Nation | | |
| Onondaga Nation | | |
| *Organized Village of Grayling (aka Holikachuk)* | | |
| *Organized Village of Kake* | | |
| *Organized Village of Kasaan* | | |
| *Organized Village of Kwethluk* | | |
| *Organized Village of Saxman* | | |
| *Orutsararmiut Traditional Native Council [previously listed as Orutsararmiut Native Village (aka Bethel)]* | | |
| *Oscarville Traditional Village* | | |
| Ottawa Tribe of Oklahoma | | |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | | |
| Pamunkey Indian Tribe | | |
| Paskenta Band of Nomlaki Indians of California | | |
| *Pauloff Harbor Village* | | |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | | |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | | |
| *Pedro Bay Village* | | |
| Penobscot Nation | | |
| Peoria Tribe of Indians of Oklahoma | | |
| *Petersburg Indian Association* | | |
| Picayune Rancheria of Chukchansi Indians of California | | |

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Pilot Station Traditional Village* | | |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | | |
| *Pitka's Point Traditional Council [previously listed as Native Village of Pitka's Point]* | | |
| *Platinum Traditional Village* | | |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | | |
| *Portage Creek Village (aka Ohgsenakale)* | | |
| *Pribilof Islands Aleut Communities of St. Paul & St. George Islands (Saint George Island and Saint Paul Island)* | | |
| Pueblo of Acoma, New Mexico | Hobbs Straus Dean & Walker | |
| Pueblo of Cochiti, New Mexico | | |
| Pueblo of Isleta, New Mexico | | |
| Pueblo of Jemez, New Mexico | | |
| Pueblo of Laguna, New Mexico | | |
| Pueblo of Nambe, New Mexico | | |
| Pueblo of Picuris, New Mexico | | |
| Pueblo of San Felipe, New Mexico | | |
| Pueblo of San Ildefonso, New Mexico | | |
| Pueblo of Sandia, New Mexico | | |
| Pueblo of Santa Ana, New Mexico | Hobbs Straus Dean & Walker | |
| Pueblo of Santa Clara, New Mexico | Hobbs Straus Dean & Walker | |
| Pueblo of Taos, New Mexico | | |
| Pueblo of Tesuque, New Mexico | | |
| Pueblo of Zia, New Mexico | | |
| *Qagan Tayagungin Tribe of Sand Point [previously listed as Qagan Tayagungin Tribe of Sand Point Village]* | | |
| *Qawalangin Tribe of Unalaska* | | |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | | |

B-11

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Ramona Band of Cahuilla, California | | |
| *Rampart Village* | | |
| Rappahannock Tribe, Inc. | Cultural Heritage Partners, PLLC | |
| Redding Rancheria, California | | |
| Sac & Fox Tribe of the Mississippi in Iowa | | |
| *Saint George Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)* | | |
| *Saint Paul Island (See Pribilof Islands Aleut Communities of St. Paul & St. George Islands)* | | |
| *Salamatof Tribe [previously listed as Village of Salamatoff]* | | |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | Hobbs Straus Dean & Walker | |
| Samish Indian Nation | Dorsay & Easton LLP | |
| San Juan Southern Paiute Tribe of Arizona | | |
| San Manuel Band of Mission Indians, California | | |
| San Pasqual Band of Diegueno Mission Indians of California | | |
| Santa Rosa Band of Cahuilla Indians, California | Robins Kaplan LLP | |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | Hobbs Straus Dean & Walker | |
| Sauk-Suiattle Indian Tribe | | |
| Seldovia Village Tribe | Hobbs Straus Dean & Walker | |
| Seneca-Cayuga Nation | | |
| *Shageluk Native Village* | | |
| Shawnee Tribe | | |
| Sherwood Valley Rancheria of Pomo Indians of California | | |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | | |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | Hobbs Straus Dean & Walker | |
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | | |
| *Sitka Tribe of Alaska* | | |

B-12

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Skagway Village* | | |
| Skokomish Indian Tribe | | |
| Skull Valley Band of Goshute Indians of Utah | | |
| Snoqualmie Indian Tribe | | |
| Soboba Band of Luiseno Indians, California | | |
| *South Naknek Village* | | |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | | |
| Spokane Tribe of the Spokane Reservation | | |
| *Stebbins Community Association* | | |
| Stillaguamish Tribe of Indians of Washington | | |
| Summit Lake Paiute Tribe of Nevada | | |
| *Sun'aq Tribe of Kodiak [previously listed as Shoonaq' Tribe of Kodiak]* | | |
| Susanville Indian Rancheria, California | | |
| Table Mountain Rancheria | | |
| *Takotna Village* | | |
| *Tangirnaq Native Village [previously listed as Lesnoi Village (aka Woody Island)]* | | |
| Tejon Indian Tribe | | |
| *Telida Village* | | |
| The Seminole Nation of Oklahoma | | |
| Timbisha Shoshone Tribe | | |
| Tolowa Dee-ni' Nation | | |
| Tonawanda Band of Seneca | | |
| Tonkawa Tribe of Indians of Oklahoma | | |
| *Traditional Village of Togiak* | | |
| *Tuluksak Native Community* | | |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | | |
| Tuscarora Nation | | |
| Twenty-Nine Palms Band of Mission Indians of California | | |
| *Twin Hills Village* | | |

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| *Ugashik Village* | | |
| *Umkumiut Native Village [previously listed as Umkumiute Native Village]* | | |
| United Auburn Indian Community of the Auburn Rancheria of California | | |
| Upper Mattaponi Tribe | Cultural Heritage Partners, PLLC | |
| Upper Skagit Indian Tribe | | |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | | |
| Ute Mountain Ute Tribe | | |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | | |
| *Village of Alakanuk* | | |
| *Village of Anaktuvuk Pass* | | |
| *Village of Aniak* | | |
| *Village of Atmautluak* | | |
| *Village of Bill Moore's Slough* | | |
| *Village of Chefornak* | | |
| *Village of Clarks Point* | | |
| *Village of Crooked Creek* | | |
| *Village of Dot Lake* | | |
| *Village of Iliamna* | | |
| *Village of Kalskag* | | |
| *Village of Kaltag* | | |
| *Village of Kotlik* | | |
| *Village of Lower Kalskag* | | |
| *Village of Ohogamiut* | | |
| *Village of Red Devil* | | |
| *Village of Sleetmute* | | |
| *Village of Solomon* | | |
| *Village of Stony River* | | |
| *Village of Venetie (See Native Village of Venetie Tribal Government)* | | |
| *Village of Wainwright* | | |

B-14

EXECUTION COPY

| Federally Recognized Tribe/Entity Name | Law Firm | Case No. (if applicable) |
|---|---|---|
| Washoe Tribe of Nevada & California | | |
| Wichita and Affiliated Tribes, Oklahoma | | |
| Wilton Rancheria, California | | |
| Winnemucca Indian Colony of Nevada | | |
| Wiyot Tribe, California | | |
| *Wrangell Cooperative Association* | | |
| Yakutat Tlingit Tribe | | |
| Yankton Sioux Tribe of South Dakota | | |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | | |
| Yavapai-Prescott Indian Tribe | | |
| Yocha Dehe Wintun Nation, California | | |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | | |
| Ysleta del Sur Pueblo | | |
| *Yupiit of Andreafski* | | |

\* *Italics indicate tribes that are members of a litigating tribal organization or consortium, whose share will be recovered through the respective organization*

## EXHIBIT C

### List of Opioid Remediation Uses

**Schedule A**
**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[3]

**A.  NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

1.  Expand training for first responders, schools, community support groups and families; and

2.  Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

**B.  MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1.  Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2.  Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3.  Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4.  Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[3] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

C.    **PREGNANT & POSTPARTUM WOMEN**

1.    Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

3.    Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

D.    **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

1.    Expand comprehensive evidence-based and recovery support for NAS babies;

2.    Expand services for better continuum of care with infant-need dyad; and

3.    Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E.    **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.    Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

2.    Expand warm hand-off services to transition to recovery services;

3.    Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.    Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

     5.     Hire additional social workers or other behavioral health workers to facilitate expansions above.

**F.**    **TREATMENT FOR INCARCERATED POPULATION**

     1.     Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

     2.     Increase funding for jails to provide treatment to inmates with OUD.

**G.**    **PREVENTION PROGRAMS**

     1.     Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

     2.     Funding for evidence-based prevention programs in schools;

     3.     Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

     4.     Funding for community drug disposal programs; and

     5.     Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

**H.**    **EXPANDING SYRINGE SERVICE PROGRAMS**

     1.     Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

**I.**    **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE: TREATMENT |
|---|

**A.    TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[4]

1.    Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2.    Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3.    Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.    Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.    Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.    Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[4] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Disseminate of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14.     Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

**B.**     **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer

support services and counseling, community navigators, case management, and connections to community-based services.

3.  Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.  Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.  Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.  Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.  Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.  Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.  Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.  Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.  Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.  Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.  Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.  Create and/or support recovery high schools.

C-6

15.     Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.    CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2.      Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.      Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.      Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.      Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6.      Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.      Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.      Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.      Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.     Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar

settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.    ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    2. Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

C-8

     5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

     6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.     Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.     Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.**     **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.      Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.      Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

6.      Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10.     Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

| PART TWO:  PREVENTION |
|---|

**F.   PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE
PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

    1.  Increase the number of prescribers using PDMPs;

    2.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.  Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increasing electronic prescribing to prevent diversion or forgery.

8.  Educating dispensers on appropriate opioid dispensing.

C-11

G.    **PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Funding media campaigns to prevent opioid misuse.

2.    Corrective advertising or affirmative public education campaigns based on evidence.

3.    Public education relating to drug disposal.

4.    Drug take-back disposal or destruction programs.

5.    Funding community anti-drug coalitions that engage in drug prevention efforts.

6.    Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7.    Engaging non-profits and faith-based communities as systems to support prevention.

8.    Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.    School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.    Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.    Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health

workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.  PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.  Public health entities providing free naloxone to anyone in the community.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.  Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

7.  Public education relating to immunity and Good Samaritan laws.

8.  Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.  Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.  Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.  Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

C-13

12.   Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.   Supporting screening for fentanyl in routine clinical toxicology testing.

| PART THREE:  OTHER STRATEGIES |
| --- |

## I.   **FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1.   Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.   Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.   **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.   A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.   Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery,

C-14

connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K. **TRAINING**

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

## L. **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

C-15

7.     Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8.     Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.     Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

**Schedule C**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe or Tribal Entity, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe or Tribal Entity is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or Tribal Entity may utilize its share of Abatement Funds.

**1.     Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

C-16

Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

## 2.      Culturally Competent Integrated Treatment Models

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

## 3.      Culturally Grounded Community Prevention

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma

of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

## 4.      Peacekeeping and Wellness Courts

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

## 5.      Community Workforce Development and Training

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers, Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

## EXHIBIT D

## Tribal Participation Form

The tribal entity identified below ("Tribe"), in order to obtain and in consideration for the benefits provided to the Tribe pursuant to the Distributors' Tribal Settlement ("Distributors' Tribal Settlement"), and acting through the undersigned authorized official, is an "Eligible Entity" as defined in the Distributors' Tribal Settlement, and hereby elects to participate in the Distributors' Tribal Settlement, release all Released Claims against all Released Entities, and agrees as follows.

1.      The Tribe is aware of and has reviewed the Distributors' Tribal Settlement, understands that all terms in this Tribal Participation Form ("Form") have the meanings defined therein, and agrees that by signing this Form, the Tribe elects to participate in the Distributors' Tribal Settlement and become a Settling Tribal Entity as provided therein.

2.      The Tribe agrees to the terms of the Distributors' Tribal Settlement pertaining to Settling Tribal Entities as defined therein.

3.      By agreeing to the terms of the Distributors' Tribal Settlement and becoming a Releasor, the Tribe is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date.

4.      The Tribe agrees to use any monies it receives through the Distributors' Tribal Settlement solely for the purposes provided therein.

5.      By signing this Participation Form, the Tribe agrees that, pursuant to Term Sheet and the Order entered by Judge Polster, Layn Phillips and Special Master David Cohen will set the procedures by which the allocation will be completed for this settlement and jointly determine the final inter-tribal allocation.

6.      The Tribe submits to the jurisdiction of the Northern District of Ohio for purposes limited to that court's role as provided in, and for resolving disputes to the extent provided in, the Distributors' Tribal Settlement. The Tribe agrees to arbitrate before Special Master David Cohen as provided in, and for resolving disputes to the extent otherwise provided in, the Distributors' Tribal Settlement.

7.      The Tribe has the right to enforce the Distributors' Tribal Settlement as provided therein.

8.      The Tribe, as a Settling Tribal Entity, hereby becomes a Releasor for all purposes in the Distributors' Tribal Settlement, including but not limited to all Release provisions, and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest

extent of its authority. As a Releasor, the Tribe hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Distributors' Tribal Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Tribe to release claims. The Distributors' Tribal Settlement shall be a complete bar to any Released Claim.

9.     The Tribe hereby takes on all rights and obligations of a Settling Tribal Entity as set forth in the Distributors' Tribal Settlement.

10.     In connection with the releases provided for in the Distributors' Tribal Settlement, each Tribe expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

> A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Tribe hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Tribes' decision to participate in the Distributors' Tribal Settlement.

11.     Within thirty (30) days of signing this Form, and prior to the Effective Date set forth in the Distributors' Tribal Settlement, the Tribe shall provide to Special Master Cohen and his TLC designee, a dismissal with prejudice of any Released Claims that it has filed. Upon the Effective Date, the dismissals with prejudice shall be provided to the Settling Distributors with a stipulation for filing.

12.     Nothing herein is intended to modify in any way the terms of the Distributors' Tribal Settlement, to which Tribe hereby agrees. To the extent this Form is interpreted differently from the Distributors' Tribal Settlement in any respect, the Distributors' Tribal Settlement controls.

D-2

EXECUTION COPY

| | |
|---|---|
| Tribal Entity: | |
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

I have all necessary power and authorization to execute this Form, a copy of which is also available as Exhibit D of the Distributors' Tribal Agreement, on behalf of the Tribe.

Signature: _____

Name: _____

Title: _____

Date: _____

D-3

## EXHIBIT E

### Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities

#### ABC

1. A.T. Pharma Consultancy FZC
2. AB Eurco Ltd
3. AB Financing, LLC
4. AB Finco Ltd
5. AB Health Ventures, LLC
6. AB Nokco Ltd
7. AB Singapore Investments Pte. Ltd.
8. AB Specialty Solutions, LLC
9. ABBP International Company
10. ABSG Canada Holdings, Inc.
11. Access M.D. Inc.
12. AERO LINK Courier GmbH
13. Agri-Laboratories, LTD
14. Agstrata, LLC
15. AH Luxco (f/k/a WBA Acquisitions Luxco 9 S.à.r.l.)
16. AH Schweiz GmbH
17. AH UK Holdco 1 Limited (f/k/a WBA UK Holdco 1 Limited)
18. Alcura France
19. Alcura Health España, S.A.
20. Alcura UK Limited
21. Alliance Apotheek Nederland BV (f/k/a Boots Nederland B.V.)
22. Alliance Health Services, Inc.
23. Alliance Healthcare (Distribution) Limited
24. Alliance Healthcare Acores (f/k/a Proconfar, S.A.)
25. Alliance Healthcare Ecza Deposu Anonim Şirketi
26. Alliance Healthcare España Holdings, S.L.
27. Alliance Healthcare España S.A.
28. Alliance Healthcare France SA
29. Alliance Healthcare Group France SA
30. Alliance Healthcare Management Services (Nederland) B.V.
31. Alliance Healthcare Management Services Limited
32. Alliance Healthcare Nederland B.V.
33. Alliance Healthcare Norge Apotekdrift AS (f/k/a Boots Norge AS)
34. Alliance Healthcare Participações SGPS, unipessoal, Lda.
35. Alliance Healthcare Répartition
36. Alliance Healthcare Romania SRL
37. Alliance Healthcare S.A.
38. Alliance Healthcare s.r.o.
39. Alliance Healthcare s.r.o. Slovakia Branch
40. Alliance Healthcare Services France (f/k/a Alliance Healthcare Formation SAS)
41. Alliance Healthcare Technology Services Limited
42. Alliance Healthcare Turkey Holding A.S.
43. Alliance Healthcare Yatirim Holding Anonim Şirketi
44. Alliance Home Health Care, Inc.
45. Alliance Nederland B.V. (f/k/a Alliance Boots BV)
46. Alliance Schweiz Investments GmbH (f/k/a Alliance Boots Schweiz Investments GmbH)
47. Alliance UniChem IP Limited
48. Alloga (Nederland) B.V.
49. Alloga France SAS
50. Alloga Logifarma, S.A.
51. Alloga Logistica (España) S.L.
52. ALLOGA LOGISTICS ROMANIA SRL
53. Alloga Portugal - Armazenagem e Distribuicao Farmaceutica, Lda
54. Alloga UK Limited

55. AllyDVM, Inc.
56. Almus Farmaceutica, S.A.
57. Almus France
58. Almus Pharmacuticals Limited
59. Almus, Lda.
60. Alphega SA
61. Ambulatory Pharmaceutical Services, Inc.
62. American Medical Distributors, Inc.
63. American Oncology Network, LLC
64. Amerisource Health Services Corporation
65. Amerisource Health Services, LLC
66. Amerisource Health Services, LLC d/b/a American Health Packaging
67. Amerisource Heritage Corporation
68. AmeriSource Heritage LLC
69. Amerisource Receivables Financial Corporation
70. Amerisource Sales Corporation
71. AmerisourceBergen Associate Assistance Fund
72. AmerisourceBergen BC, ULC
73. AmerisourceBergen Canada Corporation
74. AmerisourceBergen Canada GP LLC
75. AmerisourceBergen Canada GP, LLC
76. AmerisourceBergen Canada Holdings LP
77. AmerisourceBergen Consulting Services, Inc.
78. AmerisourceBergen Consulting Services, LLC
79. AmerisourceBergen Corporation
80. AmerisourceBergen Drug Corporation
81. AmerisourceBergen Foundation
82. AmerisourceBergen Global Holdings GmbH
83. AmerisourceBergen Global Investments S.a.r.l.
84. AmerisourceBergen Global Manufacturer Services GmbH
85. AmerisourceBergen Group GmbH (f/k/a AmerisourceBergen Group AG)
86. AmerisourceBergen Holding Corporation
87. AmerisourceBergen Integrated Services Offering, LLC
88. AmerisourceBergen International B.V. (f/k/a Wight Nederland Holdco 2 B.V.)
89. AmerisourceBergen International Holdings Inc.
90. AmerisourceBergen International Investments, LLC
91. AmerisourceBergen IT Services S.r.l.
92. AmerisourceBergen Luxembourg s.a.r.l.
93. AmerisourceBergen Services Corporation
94. AmerisourceBergen Sourcing, LLC
95. AmerisourceBergen Specialty Group Canada Corporation
96. AmerisourceBergen Specialty Group Canada Holdings, Inc.
97. AmerisourceBergen Specialty Group, Inc.
98. AmerisourceBergen Specialty Group, LLC
99. AmerisourceBergen Sweden Investments, AB
100. AmerisourceBergen Swiss Holdings GmbH
101. AmerisourceBergen Switzerland GmbH
102. AmerisourceBergen UK Holdings Ltd
103. Anderson Packaging, Inc.
104. AndersonBrecon Inc.
105. Animal Prescriptions Limited
106. Animalytix LLC
107. Apluspharma Ltd
108. Apotheek Hagi B.V.
109. Apotheek Lichtenvoorde B.V.
110. APS Acquisitions Corporation
111. APS Enterprises Holding Company, Inc.
112. Armila UAB
113. ASD Hemophilia Management, LLC

114. ASD Hemophilia Program, L.P.
115. ASD Specialty Healthcare, Inc.
116. ASD Specialty Healthcare, LLC
117. ASD Specialty Healthcare, LLC d/b/a ASD Healthcare
118. ASD Specialty Healthcare, LLC d/b/a Besse Medical
119. ASD Specialty Healthcare, LLC d/b/a Oncology Supply
120. Automed Technologies (Canada) Inc.
121. Automed Technologies (Canada) ULC
122. Automed Technologies, Inc.
123. BBC Laboratories
124. BBC Operating Sub, Inc.
125. BBC Packing Corporation
126. BBC Special Packaging, Inc.
127. BBC Transportation Co.
128. Beachcourse Limited
129. Bellco Drug Corp.
130. Bellco Health Corp.
131. Bergen Brunswig Corporation
132. Bergen Brunswig Drug Company
133. Bergen Brunswig Realty Services, Inc.
134. Bermuda Equity Holdings, Ltd.
135. Beverly Acquisition Corporation
136. Blue Hill II, Inc.
137. Blue Hill, Inc.
138. BluePoint Intellectual Property, LLC
139. BP Pharmaceuticals Laboratories Unlimited Company
140. BPL Brasil Participacoes Ltda.
141. BPL Brazil Holding Company s.a.r.l.
142. BPL Brazil, LLC
143. BPL Group, LLC
144. BPL Pharmaceuticals Holding Unlimited Company
145. BPLH Ireland Company Dublin, Zug Branch
146. BPLH Ireland Unlimited Company
147. Brecon Holdings Limited
148. Brecon Pharmaceuticals Holdings Limited
149. Brecon Pharmaceuticals Limited
150. Bridge Medical, Inc.
151. Brownstone Pharmacy, Inc.
152. Bruin Acquisition Corp.
153. Burt's Pharmacy, LLC
154. Cameron Stewart Lifescience Canada Inc.
155. Cannes RJ Participacoes S.A.
156. Capstone Med, Inc.
157. Capstone Pharmacy of Delaware, Inc.
158. CDRF Parent LLC
159. CDRF Parent, Inc.
160. Centaur Services Limited
161. Centro Farmaceutico Asturiano, SA
162. Century Advertising Inc.
163. Chapin Drug Company
164. Choice Medical, Inc.
165. Clinical Outcomes Resource Application Corporation
166. Clinical Outcomes Resource Application, Inc.
167. CliniCare Concepts, Inc.
168. ClinPharm, L.L.C.
169. Committed Provider Services, LLC
170. Compuscript, Inc.
171. Computran Systems, Inc.
172. Corrections Pharmacies Licensing Company, L.L.C.
173. Corrections Pharmacies of California, LP
174. Corrections Pharmacies of Hawaii, LP
175. Corrections Pharmacies, L.L.C.
176. Cubex, LLC
177. Datapharm Sarl
178. DD Wholesale, Inc.
179. Dialysis Purchasing Alliance, Inc.
180. Directlog
181. Documedics Acquisition Co., Inc.
182. Drug Service, Inc.
183. Dunnington Drug, Inc.
184. Dunnington RX Services of Massachusetts, Inc.
185. Dunnington RX Services of Rhode Island, Inc.
186. Durr-Fillauer Medical, Inc.
187. Durvet, Inc.

188. Dymaxium Healthcare Innovations, Ltd.
189. Dymaxium Holdings, Ltd.
190. Dymaxium, Ltd.
191. EMNEM Solutions, LLC
192. Entel d.o.o.
193. Escalante Solutions, L.P.
194. Esko Itriyat Sanayi ve Ticaret Anonim Şirketi
195. Euro Registratie Collectief B.V.
196. European Physician Networks GmbH
197. Express Pharmacy Services, Inc.
198. Falcon Acquisition Sub, LLC
199. Family Center Pharmacy, Inc.
200. Feeders Advantage, LCC
201. FirstView, LLC
202. General Drug Company
203. Goot Nursing Home Pharmacy, Inc.
204. Goot Westbridge Pharmacy, Inc.
205. Goot's Goodies, Inc.
206. Goot's Pharmacy & Orthopedic Supply, Inc.
207. Green Barn, Inc
208. H. D. Smith Holding Company
209. H. D. Smith Holdings, LLC
210. H. D. Smith Wholesale Drug Co.
211. H. D. Smith, LLC
212. HAI Acquisition, Inc.
213. HDS Solutions, LLC
214. Health Services Capital Corporation
215. Healthcare Prescription Services, Inc.
216. HealthForward Inc.
217. HealthQuest Partner II, L.P.
218. HealthTronics Data Solutions LLC
219. HealthTronics Data Solutions, LLC
220. HealthTronics Information Technology Solutions, Inc.
221. Hedef International Holdings BV
222. Home Medical Equipment Health Company
223. Hydra Pharm SPA
224. I.g.G. of America, Inc.
225. IHS Acquisition XXX, Inc.
226. Imedex, Inc.
227. Imedex, LLC
228. Independent Pharmacy Buying Group, Inc.
229. Innomar Pharmacy (BC) Inc.
230. Innomar Pharmacy (SK) Inc.
231. Innomar Pharmacy Inc.
232. Innomar Specialty Pharmacy, Inc.
233. Innomar Strategies Inc.
234. Innovation Cancer, Inc.
235. Insta-Care Holdings, Inc.
236. Insta-Care Pharmacy Services Corporation
237. Intake Initiatives Incorporated
238. IntegraConnect NewCo, LLC
239. Integrated Commercialization Solutions, Inc.
240. Integrated Commercialization Solutions, LLC
241. Integrated Health Systems Outcomes Coalition, LLC
242. Inteplex, Inc.
243. Interfill, LLC
244. International Oncology Network Solutions, Inc.
245. International Physician Networks, L.L.C.
246. International Rheumatology Network, L.L.C.
247. IntrinsiQ Holdings, Inc.
248. IntrinsiQ Specialty Solutions, Inc.
249. IntrinsiQ Tendler, Inc.
250. IntrinsiQ, LLC
251. J.M. Blanco, Inc.
252. James Brudnick Company, Inc.
253. K/S Instrument Corp.
254. KRP Investments, Inc.
255. Labpak Limited
256. LAD Drug Corporation
257. Leading Educational Research Network, LLC
258. Lexicon Pharmacy Services, L.L.C.
259. Liberty Acquisition Corp.
260. Libra C.V.
261. Los Angeles Drug Corporation

262. M.D.P. Properties, Inc.
263. Managed Care Network, Inc.
264. Marshall Reinardy LLC
265. Medical Health Industries, Inc.
266. Medical Initiatives, Inc.
267. Medidyne Corp.
268. Medselect Inc.
269. Memorial Pet Care, Inc.
270. Micro Technologies Canada Inc.
271. MWI Buying Group Limited (formerly St. Francis Limited)
272. MWI Supply (UK Acquisition) Limited
273. MWI Supply (UK Holdings) Limited
274. MWI Supply (UK) Limited
275. MWI Veterinary Supply Co.
276. MWI Veterinary Supply, Inc.
277. Nareks Ecza Deposu Ticaret Anonim Şirketi
278. Network for Medical Communication & Research Analytics, LLC
279. New Jersey Medical Corporation
280. Nexiapharma, SL
281. NMCR Holdings, Inc.
282. NMCR-Europe, LLC
283. Northeast Veterinary Supply Company, LLC
284. Oktal Pharma d.o.o
285. Oktal Pharma d.o.o
286. Oktal Pharma d.o.o [Zagreb]
287. Oktal Pharma d.o.o.
288. Oktal Pharma Hungary K.f.t.
289. Omni Med B, Inc.
290. OPH Oktal Pharma d.o.o
291. OTC Direct Limited
292. Paris Acquisition Corp.
293. Pharm Plus Acquisition, Inc.
294. Pharma One Corporation Limited
295. Pharmacy Corporation of America
296. Pharmacy Corporation of America - Massachusetts, Inc.
297. Pharmacy Healthcare Solutions, Ltd.
298. Pharmacy Review Services, Inc.
299. Pharmdata s.r.o.

300. PharMEDium Healthcare Corporation
301. PharMEDium Healthcare Holdings LLC
302. PharMEDium Healthcare Holdings, Inc.
303. PharMEDium Healthcare LLC
304. PharMEDium Pharmacy Services, LLC
305. PharMEDium R.E., LLC
306. PharMEDium Services, LLC
307. PharMerica Drug Systems, Inc.
308. PharMerica Technology Solutions, LLC
309. Pharmerica, Inc.
310. Pitango HealthTech Fund I, L.P.
311. Planet Software Limited
312. PMSI MSA Services, Inc.
313. PMSI, Inc.
314. PPSC USA, LLC
315. Premier Pharmacy, Inc.
316. Premier Source Diagnostics Inc.
317. Premier Source, LLC
318. Prescribe Wellness, LLC
319. Profarma Distribuidora de Produtos Farmaceuticos S.A.
320. Ramuneles Vaistine UAB
321. Reimbursement Education Network, LLC
322. Rightpak, Inc.
323. Rombro's Drug Center, Inc.
324. Roscoe Acquisition Corporation
325. S.R.P. (Services de la Répartition Pharmaceutique)
326. SecureDVM, LLC
327. Securos Europe GmbH
328. Silver Streak I, LLC
329. Skills in Healthcare France
330. Skills in Healthcare Pazarlama ve Tanitim Hizmetleri Anonim Şirketi
331. Skills in Healthcare Romania S.r.l.
332. Smart ID Works, LLC
333. Smith Medical Partners, LLC
334. Snipetjernveien 10 Norge AS
335. Solana Beach, Inc.

E-5

336. Southwest Pharmacies, Inc.
337. Southwestern Drug Corporation
338. SparkSense Analytics, Inc.
339. Specialty Advancement Network, LLC
340. Specialty Pharmacy of California, Inc.
341. Specialty Pharmacy, Inc.
342. Spielberg Acquisition Corp.
343. Spits B.V.
344. Stadt Solutions, LLC
345. Stephar B.V.
346. Strategic Pharmaceutical Solutions, Inc.
347. Swine Solutions Network, LLC
348. Taylor & Manno Asset Recovery, Inc.
349. Telepharmacy Solutions, Inc.
350. Terra-Lab d.o.o
351. The Allen Company
352. The Lash Group, Inc.
353. The Lash Group, LLC
354. TheraCom, L.L.C.
355. ThermoSecure Medical Equipment GmbH
356. TMESYS, Inc.
357. TrakCel Holding Company, Inc.
358. Trellis Healthcare Consulting, L.L.C.
359. Trellis Healthcare Consulting, LLC
360. Triose, Inc.
361. True Blue Indemnity Company
362. United Company of Pharmacists SAE
363. Universal Packaging Systems, Inc.
364. US Bioservices Corporation
365. Valley Wholesale Drug Co., LLC
366. Value Apothecaries, Inc.
367. Vedco, Inc.
368. Vetbridge Animal Health, LLC
369. Vetbridge Product Development (NM-OMP) LLC
370. VetSpace Limited
371. VetSpace, Inc.
372. Vetswest Limited
373. W.C. International Limited
374. Wight Nederland Holdco 4 BV
375. WML, LLC

376. Woodglen Properties Limited
377. Woodglen Properties Limited Portugal Branch
378. World Courier (Aust) Pty. Ltd.
379. World Courier (Austria) GmbH
380. World Courier (Austria) GmbH – Serbia Branch
381. World Courier (Deutschland) GmbH
382. World Courier (Finland) Oy
383. World Courier (India) Private Limited
384. World Courier (Ireland) Limited
385. World Courier (Lithuania), UAB
386. World Courier (Malaysia) Sdn. Bhd.
387. World Courier (Norway) AS
388. World Courier (NZ) Limited
389. World Courier (Poland) Sp. Z.o.o.
390. World Courier (Shanghai) Co., Ltd Guangzhou Branch
391. World Courier (Shanghai) Co., Ltd.
392. World Courier (Shanghai) Co., Ltd., Beijing Branch
393. World Courier (Sweden) AB
394. World Courier (Switzerland) SA
395. World Courier (U.K.) Limited
396. World Courier Asia (Thailand) Co., Ltd.
397. World Courier Belgium s.a.
398. World Courier Bulgaria
399. World Courier Czech Republic s.r.o.
400. World Courier de Chile Limitada
401. World Courier de Colombia S.A.
402. World Courier de Espana, S.A.
403. World Courier de Mexico S.A. de C.V.
404. World Courier de Portugal, Lda.
405. World Courier de Uruguay S.A.
406. World Courier del Ecuador S.A.
407. World Courier del Peru S.A.
408. World Courier Denmark A/S
409. World Courier do Brasil Transportes Internacionais Ltda.
410. World Courier France S.A.R.L.
411. World Courier Ground (Europe) Limited

412.  World Courier Ground, Inc.
413.  World Courier Group Logistics, Inc.
414.  World Courier Group S.a.r.l.
415.  World Courier Group, Inc.
416.  World Courier Group, Inc. Taiwan Branch
417.  World Courier Hellas Limited Liability Company
418.  World Courier Holland BV
419.  World Courier Hong Kong Limited
420.  World Courier Hungary Freight Forwarder and Service Provider Limited Liability Company
421.  World Courier Israel Ltd.
422.  World Courier Italia srl
423.  World Courier Japan Domestic K.K.
424.  World Courier K.K. Japan
425.  World Courier Korea Co., Ltd.
426.  World Courier Limited (Russia)
427.  World Courier Logistics (Europe) Limited
428.  World Courier Logistics (UK) Limited
429.  World Courier Logistics, Inc.
430.  World Courier Logistics, Inc. (DE)
431.  World Courier Logistics, Inc. (NY)
432.  World Courier Management Limited

433.  World Courier Management, Inc.
434.  World Courier of Canada Ltd
435.  World Courier Operations Kenya Limited
436.  World Courier Philippines – Representative Office
437.  World Courier Romania S.R.L.
438.  World Courier S.A.
439.  World Courier Singapore Pte Ltd
440.  World Courier Slovak Republic s.r.o.
441.  World Courier South Africa (Proprietary) Limited
442.  World Courier Tasimacilik ve Lojistik Hizmetleri Ticaret Limited Sirketi
443.  World Courier Ukraine LLC
444.  World Courier Venezuela, S.A.
445.  World Courier Zagreb d.o.o.
446.  World Courier, Inc.
447.  World Courier, kurirske storitve,d.o.o.
448.  World Customs Brokerage, Inc.
449.  Xcenda (UK) Limited
450.  Xcenda GmbH
451.  Xcenda Switzerland GmbH
452.  Xcenda, L.L.C.
453.  ZU Vase Zdravije

## Cardinal Health

1. A+ Secure Packaging, LLC
2. Abilene Nuclear, LLC
3. Access Closure, Inc.
4. Acuity GPO, LLC b
5. Aero-Med, LLC
6. Allegiance (BVI) Holding Co. Ltd.
7. Allegiance Corporation
8. Allegiance Healthcare (Labuan) Pte. Ltd.
9. Allegiance I, LLC
10. Allegiance Labuan Holdings Pte. Ltd.
11. API (Suppliers) Limited
12. AssuraMed Acquisition Corp.
13. AssuraMed Group, Inc.
14. AssuraMed Holding, Inc.
15. AssuraMed Intermediate Holding, Inc.
16. AssuraMed, Inc.
17. C. International, Inc.
18. Cardinal Distribution Holding Corporation - I
19. Cardinal Distribution Holding Corporation - II
20. Cardinal Health 100, LLC
21. Cardinal Health 104 LP
22. Cardinal Health 105, LLC
23. Cardinal Health 107, LLC
24. Cardinal Health 108, LLC
25. Cardinal Health 110, LLC
26. Cardinal Health 112, LLC
27. Cardinal Health 113, LLC
28. Cardinal Health 114, Inc.
29. Cardinal Health 115, LLC
30. Cardinal Health 116, LLC
31. Cardinal Health 118, LLC
32. Cardinal Health 119, LLC
33. Cardinal Health 121, LLC
34. Cardinal Health 122, LLC
35. Cardinal Health 123, LLC
36. Cardinal Health 124, LLC
37. Cardinal Health 125, LLC
38. Cardinal Health 126, LLC
39. Cardinal Health 127, Inc.
40. Cardinal Health 128, LLC
41. Cardinal Health 130, LLC
42. Cardinal Health 131, LLC
43. Cardinal Health 132, LLC
44. Cardinal Health 133, Inc.
45. Cardinal Health 2, LLC
46. Cardinal Health 200, LLC
47. Cardinal Health 201 Canada L.P.
48. Cardinal Health 201, LLC
49. Cardinal Health 215, LLC
50. Cardinal Health 222 (Thailand) Ltd.
51. Cardinal Health 242, LLC
52. Cardinal Health 246, Inc.
53. Cardinal Health 247, Inc.
54. Cardinal Health 249, LLC
55. Cardinal Health 250 Dutch C.V.
56. Cardinal Health 251, LLC
57. Cardinal Health 252, LLC
58. Cardinal Health 253, LP
59. Cardinal Health 3, LLC
60. Cardinal Health 414, LLC
61. Cardinal Health 418, Inc.
62. Cardinal Health 5, LLC
63. Cardinal Health 500, LLC
64. Cardinal Health 524, LLC
65. Cardinal Health 529, LLC
66. Cardinal Health 6, Inc.
67. Cardinal Health 7, LLC
68. Cardinal Health 8, LLC
69. Cardinal Health Australia 503 Pty Ltd.
70. Cardinal Health Austria 504 GmbH
71. Cardinal Health Belgium 505 BVBA
72. Cardinal Health Canada Holdings Cooperatie U.A.
73. Cardinal Health Canada Inc.
74. Cardinal Health Capital Corporation
75. Cardinal Health Cardiology Solutions, LLC
76. Cardinal Health Chile Limitada
77. Cardinal Health Colombia S.A.S.
78. Cardinal Health Commercial Technologies, LLC
79. Cardinal Health Corporate Solutions, LLC
80. Cardinal Health D.R. 203 II Ltd.
81. Cardinal Health Denmark ApS

82. Cardinal Health do Brasil Ltda.
83. Cardinal Health Finance
84. Cardinal Health Finland Oy
85. Cardinal Health Foundation
86. Cardinal Health France 506 SAS
87. Cardinal Health Funding, LLC
88. Cardinal Health Germany 507 GmbH
89. Cardinal Health Germany Manufacturing GmbH
90. Cardinal Health Holding International, Inc.
91. Cardinal Health International Philippines, Inc.
92. Cardinal Health IPS, LLC
93. Cardinal Health Ireland 419 Designated Activity Company
94. Cardinal Health Ireland 508 Limited
95. Cardinal Health Ireland Manufacturing Limited
96. Cardinal Health Ireland Unlimited Company
97. Cardinal Health Italy 509 S.r.l.
98. Cardinal Health Japan G.K.
99. Cardinal Health Korea Limited
100. Cardinal Health Luxembourg 420 S.a.r.l.
101. Cardinal Health Luxembourg 522 S.a.r.l.
102. Cardinal Health Malaysia 211 Sdn. Bhd.
103. Cardinal Health Malta 212 Limited
104. Cardinal Health Managed Care Services, LLC
105. Cardinal Health Medical Products India Private Limited
106. Cardinal Health Mexico 244 S. de R.L. de C.V.
107. Cardinal Health Mexico 514 S. de R.L. de C.V.
108. Cardinal Health Middle East FZ-LLC
109. Cardinal Health MPB, Inc.
110. Cardinal Health Napoleon Holding, LLC
111. Cardinal Health Netherlands 502 B.V.
112. Cardinal Health Netherlands 525 Cooperatie U.A.
113. Cardinal Health Netherlands 528 B.V.
114. Cardinal Health Norway AS
115. Cardinal Health P.R. 120, Inc.
116. Cardinal Health P.R. 218, Inc.
117. Cardinal Health P.R. 220, LLC
118. Cardinal Health P.R. 436, Inc.
119. Cardinal Health Panama, S. de R.L.
120. Cardinal Health Pharmaceutical Contracting, LLC
121. Cardinal Health Pharmacy Services, LLC
122. Cardinal Health Poland Spolka z ograniczona odpowiedzialnoscia
123. Cardinal Health Portugal 513, Unipessoal Lda.
124. Cardinal Health Russia
125. Cardinal Health Singapore 225 Pte. Ltd.
126. Cardinal Health Spain 511 S.L.
127. Cardinal Health Sweden 512 A.B.
128. Cardinal Health Switzerland 515, GmbH
129. Cardinal Health Systems, Inc.
130. Cardinal Health Technologies Switzerland GmbH
131. Cardinal Health Technologies, LLC
132. Cardinal Health U.K. 418 Limited
133. Cardinal Health U.K. 432 Limited
134. Cardinal Health U.K. Holding Limited
135. Cardinal Health U.K. International Holding LLP
136. Cardinal Health, Inc.
137. Cardinal MED Equipment Consulting (Shanghai) Co., Ltd.
138. Cirpro de Delicias S.A. de C.V.
139. Clinic Pharmacies III, LLC
140. Clinic Pharmacies, LLC
141. Community Pharmacy Enterprises, LLC
142. Convertors de Mexico S.A. de C.V.
143. Cordis (Shanghai) MED Devices Co., Ltd.
144. Cordis Cashel Unlimited Company
145. Cordis Corporation
146. Cornerstone Rheumatology LP

E-9

147. Covidien Manufacturing Solutions, S.A.
148. Dutch American Manufacturers II (D.A.M. II) B.V.
149. Ellipticare, LLC
150. EPIC Insurance Company
151. Especialidades Medicas Kenmex S.A. de C.V.
152. Experience East, LLC
153. Flexible Stenting Solutions, LLC
154. Frog Horned Capital, Inc.
155. Generic Drug Holdings, LLC
156. GetOutcomes, LLC
157. Griffin Capital, LLC
158. HDG Acquisition, LLC
159. imgRx Healdsburg, Inc.
160. imgRx Salud, Inc.
161. imgRx SJ Valley, Inc.
162. imgRx SLO, Inc.
163. imgRx Sonoma, Inc.
164. InnerDyne Holdings, Inc.
165. Innovative Therapies, LLC
166. Instant Diagnostic Systems, Inc.
167. InteCardia-Tennessee East Catheterization, LLC
168. ITI Sales, LLC
169. Kendall-Gammatron Limited
170. Killilea Development Company, Ltd.
171. Kinray I, LLC
172. KPR Australia Pty. Ltd.
173. KPR Switzerland Sales GmbH
174. KPR U.S., LLC
175. Leader Drugstores, Inc.
176. Ludlow Technical Products Canada, Ltd.
177. Marin Apothecaries
178. Medicap Pharmacies Incorporated
179. Medicine Shoppe Capital Corporation
180. Medicine Shoppe International, Inc.
181. Medicine Shoppe Internet, Inc.
182. Mediquip Sdn. Bhd.
183. Mirixa Corporation
184. MosaicGPO, LLC
185. mscripts Holdings, LLC
186. Cardinal Health International India Private Limited
187. mscripts, LLC
188. Nippon Covidien Ltd.
189. One Cloverleaf, LLC
190. Outcomes Incorporated
191. Owen Shared Services, Inc.
192. Pharmacy Operations Of New York, Inc.
193. Pharmacy Operations, Inc.
194. Physicians Purchasing, Inc.
195. Pinnacle Intellectual Property Services, Inc.
196. Pinnacle Intellectual Property Services- International, Inc.
197. Quiroproductos de Cuauhtemoc S. de R.L. de C.V.
198. RainTree Administrative Services, LLC
199. RainTree Care Management, LLC
200. RainTree GPO, LLC
201. Ransdell Surgical, Inc.
202. Red Oak Sourcing, LLC
203. Renal Purchasing Group, LLC
204. RGH Enterprises, LLC
205. RT Oncology Services Corporation
206. Rxealtime, Inc.
207. Sierra Radiopharmacy, L.L.C.
208. Sonexus Health Access & Patient Support, LLC
209. Sonexus Health Distribution Services, LLC
210. Sonexus Health Financial Solutions, LLC
211. Sonexus Health Pharmacy Services, LLC
212. Sonexus Health, LLC
213. TelePharm, LLC
214. The Harvard Drug Group, L.L.C.
215. Tianjin ITI Trading Company
216. Tradex International, Inc.
217. Traverse GPO, LLC
218. Wavemark Lebanon Offshore s.a.l.
219. Wavemark, Inc.
220. Red Oak Sourcing, LLC
221. API (Suppliers) Limited
222. Sierra Radiopharmacy, L.L.C.
223. Abilene Nuclear, LLC

224. InteCardia-Tennessee East Catheterization, LLC
225. Kendall-Gammatron Limited
226. Almus Pharmaceuticals USA LLC
227. Cardinal Health (H.K.) Co. Limited
228. Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
229. Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
230. Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
231. Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
232. Dalian Zhongda Pharmaceutical Company Limited
233. NaviHealth Holdings, LLC
234. Parch, L.L.C.
235. 6464661 Canada Inc.
236. Academy Of Managed Care Medicine, L.L.C.
237. Alaris Medical 1 (Suisse) Sarl
238. Alaris Medical New Zealand Limited
239. Allegiance Healthcare International GmbH
240. Allegiance Pro Inc.
241. Allied Healthcare Services, Inc.
242. Almus Pharmaceuticals Singapore Pte. Ltd.
243. Almus Pharmaceuticals USA LLC
244. American Threshold Industries, Inc.
245. Anoka, LLC
246. ARCH Collection Corporation
247. ARCH, S.A.
248. Armand Scott, LLC
249. Aurum Pharmaceuticals Limited
250. Behrens Inc.
251. Beijing Baiji Advanced Specialty Company Limited
252. Bellwether Oncology Alliance, Inc.
253. Bentley Merger Sub, LLC
254. Bindley Western Funding Corporation
255. Bindley Western Industries II Of Maine, Inc.
256. Biosigna GmbH Institut für Biosignalverarbeitung und Systemanalyse

257. Bird Products (Japan) Ltd.
258. Bird Products Corporation
259. Brighton Capital, Inc.
260. Buffalo Merger Corp.
261. BW Transportation Services, Inc.
262. Cardal II, LLC
263. Cardal, Inc.
264. Cardinal Florida, Inc.
265. Cardinal Health (Beijing) China Pharmaceutical Co., Ltd.
266. Cardinal Health (Beijing) Medical Trading Co., Ltd.
267. Cardinal Health (Beijing) Pharmacy Co., Ltd.
268. Cardinal Health (Chengdu) Pharmacy Co., Ltd.
269. Cardinal Health (China) Investment Co., Ltd.
270. Cardinal Health (Chongqing) Pharmaceutical Co., Ltd.
271. Cardinal Health (Chongqing) Pharmacy Co., Ltd.
272. Cardinal Health (H.K.) Co. Limited
273. Cardinal Health (Hubei) Pharmaceutical Co., Ltd.
274. Cardinal Health (L) Co., Ltd.
275. Cardinal Health (Liaoning) Pharmaceutical Co., Ltd.
276. Cardinal Health (P02296)
277. Cardinal Health (P04080)
278. Cardinal Health (Shanghai) Commercial and Trading Company Limited
279. Cardinal Health (Shanghai) Cosmetics Trading Co., Ltd.
280. Cardinal Health (Shanghai) Logistics Co., Ltd.
281. Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
282. Cardinal Health (Shanghai) Pharmacy Co., Ltd.
283. Cardinal Health (Shanxi) Pharmaceutical Co., Ltd.
284. Cardinal Health (Shenyang) Pharmacy Co., Ltd.

E-11

285. Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
286. Cardinal Health (Tianjin) Pharmaceutical Co., Ltd.
287. Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
288. Cardinal Health (WuXi) Pharmacy Co., Ltd.
289. Cardinal Health (Zhejiang) Pharmaceutical Co., Ltd.
290. Cardinal Health 101, Inc.
291. Cardinal Health 102, Inc.
292. Cardinal Health 103, Inc.
293. Cardinal Health 106, Inc.
294. Cardinal Health 109, Inc.
295. Cardinal Health 111, LLC
296. Cardinal Health 113, LLC
297. Cardinal Health 117, LLC
298. Cardinal Health 129, Inc.
299. Cardinal Health 208, Inc.
300. Cardinal Health 301, LLC
301. Cardinal Health 400, Inc.
302. Cardinal Health 401, Inc.
303. Cardinal Health 402, Inc.
304. Cardinal Health 403, Inc.
305. Cardinal Health 404, Inc.
306. Cardinal Health 405, Inc.
307. Cardinal Health 406, Inc.
308. Cardinal Health 406, LLC
309. Cardinal Health 407, Inc.
310. Cardinal Health 408, Inc.
311. Cardinal Health 409, Inc.
312. Cardinal Health 410, Inc.
313. Cardinal Health 411, Inc.
314. Cardinal Health 412, Inc.
315. Cardinal Health 413, Inc.
316. Cardinal Health 415, Inc.
317. Cardinal Health 416, Inc.
318. Cardinal Health 417, Inc.
319. Cardinal Health 419, LLC
320. Cardinal Health 420, LLC
321. Cardinal Health 421 Limited Partnership
322. Cardinal Health 421, Inc.
323. Cardinal Health 422, Inc.
324. Cardinal Health 501 Dutch C.V.

325. Cardinal Health Austria 201 GmbH
326. Cardinal Health Bermuda 224, Ltd.
327. Cardinal Health Brasil 423 Servicos Farmaceuticos Nucleares Ltda
328. Cardinal Health Canada 204, Inc.
329. Cardinal Health Canada 301, Inc.
330. Cardinal Health Canada 302, Inc.
331. Cardinal Health Canada 307, ULC
332. Cardinal Health Canada 403, Inc.
333. Cardinal Health Canada 437, Inc.
334. Cardinal Health Canada Inc.
335. Cardinal Health Canada LP
336. Cardinal Health Cayman Islands Holding Co. Ltd
337. Cardinal Health Cayman Islands Ltd.
338. Cardinal Health China Co., Ltd.
339. Cardinal Health D.R. 203 Limited
340. Cardinal Health Europe IT GmbH
341. Cardinal Health France 205 SAS
342. Cardinal Health France 309 SAS
343. Cardinal Health Germany 206 GmbH
344. Cardinal Health Germany 234 GmbH
345. Cardinal Health Germany 318 GmbH
346. Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
347. Cardinal Health Hong Kong Limited
348. Cardinal Health I, Inc.
349. Cardinal Health Imaging, LLC
350. Cardinal Health India Private Limited
351. Cardinal Health International Ventures, Ltd.
352. Cardinal Health Ireland 406 Ltd.
353. Cardinal Health Ireland 527 General Partnership
354. Cardinal Health Italy 208 S.r.l.
355. Cardinal Health Italy 312 S.p.A.
356. Cardinal Health Lease Funding 2002A, LLC
357. Cardinal Health Lease Funding 2002AQ, LLC
358. Cardinal Health Lease Funding 2003A, LLC
359. Cardinal Health Lease Funding 2003AQ, LLC
360. Cardinal Health Lease Funding 2003B, LLC

361. Cardinal Health Lease Funding 2003BQ, LLC
362. Cardinal Health Lease Funding 2004A, LLC
363. Cardinal Health Lease Funding 2004AQ, LLC
364. Cardinal Health Luxembourg 523 S.a.r.l.
365. Cardinal Health Mauritius Holding 226 Ltd.
366. Cardinal Health Mexico 213, S.A. de C.V.
367. Cardinal Health Netherlands 238 BV
368. Cardinal Health Netherlands 526 B.V.
369. Cardinal Health Netherlands Financing C.V.
370. Cardinal Health Netherlands Holding B.V.
371. Cardinal Health New Zealand 313 Limited
372. Cardinal Health Norway 315 A/S
373. Cardinal Health P.R. 227, Inc.
374. Cardinal Health P.R. 409 B.V.
375. Cardinal Health PTS, Inc.
376. Cardinal Health PTS, LLC
377. Cardinal Health S.A. 319 (Proprietary) Limited
378. Cardinal Health Singapore 304
379. Cardinal Health Singapore 423 Pte. Ltd.
380. Cardinal Health Spain 219 S.L.U.
381. Cardinal Health Spain 239 SA
382. Cardinal Health Specialty Pharmacy, LLC
383. Cardinal Health Sweden 220 AB
384. Cardinal Health Sweden 314 AB
385. Cardinal Health Switzerland 221 Sarl
386. Cardinal Health Switzerland 317 Sarl
387. Cardinal Health Trading (Shanghai) Co., Ltd.
388. Cardinal Health U.K. 100 Limited
389. Cardinal Health U.K. 101 Limited
390. Cardinal Health U.K. 102 Limited
391. Cardinal Health U.K. 103 Limited
392. Cardinal Health U.K. 104 Limited
393. Cardinal Health U.K. 105 Limited
394. Cardinal Health U.K. 106 Limited
395. Cardinal Health U.K. 223 Limited
396. Cardinal Health U.K. 232 Limited
397. Cardinal Health U.K. 235 Limited
398. Cardinal Health U.K. 236 Limited
399. Cardinal Health U.K. 240 Limited
400. Cardinal Health U.K. 305 Limited
401. Cardinal Health U.K. 306 Limited
402. Cardinal Health U.K. 433 Limited
403. Cardinal Health U.K. 434 Limited
404. Cardinal Syracuse, Inc.
405. Cardinal.Com Holdings, Inc.
406. Care Fusion Development Private Limited
407. Care Fusion Incorporated
408. CareFusion 202, Inc.
409. CareFusion 203, Inc.
410. CareFusion 205, Inc.
411. CareFusion 206, Inc.
412. CareFusion 207, Inc.
413. CareFusion 209, Inc.
414. CareFusion 210, Inc.
415. CareFusion 211, Inc.
416. CareFusion 212, LLC
417. CareFusion 213, LLC
418. CareFusion 214, LLC
419. CareFusion 2200, Inc.
420. CareFusion 2201, Inc.
421. CareFusion 302, LLC
422. CareFusion 303, Inc.
423. CareFusion 304, LLC
424. CareFusion Australia 200 Pty Ltd.
425. CareFusion Australia 316 Pty Limited
426. CareFusion Australia 500 Pty Ltd
427. CareFusion Belgium 202 BVBA
428. CareFusion Brasil 231 Servico e Comercia de Productos Medicos Ltda
429. CareFusion Corporation
430. CareFusion EIT, LLC
431. CareFusion Iberia 308 S.L.U.
432. CareFusion Italy 237 Srl
433. CareFusion Italy 311 Srl
434. CareFusion Japan 228 K.K.
435. CareFusion Japan 233, Inc.
436. CareFusion Luxembourg 501 Sarl

437. CareFusion Manufacturing Ireland 241 Limited
438. CareFusion Manufacturing, LLC
439. CareFusion Netherlands 214 B.V.
440. CareFusion Netherlands 238 BV
441. CareFusion Netherlands 310 B.V.
442. CareFusion Netherlands 503 B.V.
443. CareFusion New Zealand 217 Limited
444. CareFusion New Zealand 313 Limited
445. CareFusion Resources, LLC
446. CareFusion Singapore 243 Pte. Ltd.
447. CareFusion Solutions, LLC
448. CareFusion U.K. 284 Limited
449. CareFusion U.K. 286 Limited
450. CareFusion U.K. 287 Limited
451. CareFusion U.K. 288 Limited
452. Cascade Development, Inc.
453. CCB, Inc.
454. CDI Investments, Inc.
455. Centralia Pharmacy, Inc.
456. Centricity, LLC
457. Chapman Drug Company
458. Chengdu Baiji Advanced Specialty Pharmacy Company Limited
459. Cheshire Merger Sub, Inc.
460. CMI Net, Inc.
461. College Park Plaza Associates, Inc.
462. Comprehensive Medical Imaging-Anaheim Hills, Inc.
463. Comprehensive Medical Imaging-Apple Valley, Inc.
464. Comprehensive Medical Imaging-Boynton Beach, Inc.
465. Comprehensive Medical Imaging-Downey, Inc.
466. Comprehensive Medical Imaging-Encino, Inc.
467. Comprehensive Medical Imaging-Fort Lauderdale, Inc.
468. Comprehensive Medical Imaging-Fremont, Inc.
469. Comprehensive Medical Imaging-Hesperia, Inc.
470. Comprehensive Medical Imaging-Huntington Beach, Inc.
471. Comprehensive Medical Imaging-Palm Springs, Inc.
472. Comprehensive Medical Imaging-Rancho Cucamonga, Inc.
473. Comprehensive Medical Imaging-Rancho Mirage, Inc.
474. Comprehensive Medical Imaging-Salisbury, Inc.
475. Comprehensive Medical Imaging-Sherman Oaks, Inc.
476. Comprehensive Medical Imaging-Tempe, Inc.
477. Comprehensive Medical Imaging-Van Nuys, Inc.
478. Comprehensive Medical Imaging-Victorville, Inc.
479. Comprehensive Medical Imaging-Westlake Village, Inc.
480. Comprehensive Open MRI-Carmichael, Inc.
481. Comprehensive Open MRI-Folsom, Inc.
482. Comprehensive Open MRI-Fullerton, Inc.
483. Comprehensive Open MRI-Laguna Hills, Inc.
484. Comprehensive Open MRI-Sacramento, Inc.
485. Comprehensive Reimbursement Consultants, Inc.
486. Consumer2patient, LLC
487. CR Medicap, Inc.
488. Curaspan Health Group, Inc.
489. Cytokine Pharmasciences, Inc.
490. Dalian Zhongda Pharmaceutical Company Limited
491. Daniels Pharmaceuticals Limited
492. DC Merger Corp
493. Denver Biomedical, Inc.
494. Desert PET, LLC
495. Dik Drug Company, LLC
496. Dik Medical Supplies, LLC
497. Discor Limited
498. Dismed Inc.
499. Dohmen Distribution Partners Southeast, L.L.C.

E-14

500. Dover Communications, LLC
501. Duquoin Pharmacy, Inc.
502. Dutch American Manufacturers (D.A.M.) B.V.
503. East Iowa Pharmacies, Inc.
504. EGIS Holdings, Inc.
505. Eldon Laboratories Limited
506. Ellicott Drug Company
507. EME Medical, Inc.
508. Enturia Canada ULC
509. Enturia de Mexico S. de R.L. de C.V.
510. Enturia Limited
511. Enturican, Inc.
512. EON Media Inc.
513. Eureka Merger Sub, Inc.
514. European Pharmaceuticals Group Ltd.
515. First Choice, Inc. Of Maine
516. Flower Merger Corp.
517. Futuremed Health Care Products Limited Partnership
518. Futuremed Healthcare Products Corporation
519. Futuremed Holdings General Partner Inc.
520. Fuzhou Baiji Pharmacy Company Limited
521. Gala Design, Inc.
522. Gelatin Products International, Inc.
523. Geodax Technology, Inc.
524. Glacier Corporation
525. Grand Avenue Pharmacy, Inc.
526. Graphic Holdings, Inc.
527. Griffin Group Document Management Services, Inc.
528. Guangzhou Baiji Advanced Specialty Pharmaceutical Chain Stores Company Limited
529. Guangzhou Baiji Drug Store Company Limited
530. Guangzhou City Kangwei Information Technology Company Limited
531. Guangzhou Ruixun Pharmaceutical Company Limited
532. Guizhou Yibai Medical Co., Ltd.
533. Hangzhou Baiji Advanced Specialty Drug Store Company Limited
534. Heartland Diagnostic Services, Inc.
535. HLS Advantage, LLC
536. Homecare (North-West) Limited
537. Humiston-Keeling, Inc.
538. IMI Of Boca Raton, Inc.
539. IMI Of Miami, Inc.
540. IMI Of North Miami Beach, Inc.
541. Inland Empire Regional Pet Center, LLC
542. InnerDyne, Inc.
543. Inpharm Nationwide Limited
544. InteCardia-Tennessee East Diagnostic, LLC
545. Intercare Holdings Limited
546. Intercare Investments Limited
547. Intercare Properties Plc
548. Iowa Falls Pharmacy, Inc.
549. IVAC Overseas Holdings LP
550. JakaMed AB AB
551. Jinan Baiji Drug Store Company Limited
552. JRG, Ltd.
553. Kendall Patient Recovery BVBA
554. Kinetic Surgical, LLC
555. Kinray, Inc.
556. Kinray, LLC
557. KPR Italia S.r.l.
558. KPR U.S., Inc.
559. Kunming Baiji Advanced Specialty Pharmacy Company Limited
560. Lake Charles Pharmaceutical Supply Company, LLC
561. Liaoning Longda Pharmaceutical Co., Ltd.
562. Liberty Communications Network, LLC
563. Ludlow Technical Products Corporation
564. Macarthy Group Trustees Limited
565. Macarthys Laboratories Limited
566. Macarthy's Limited
567. Marmac Distributors, Inc.
568. Martindale Pharma GmbH
569. Martindale Pharmaceuticals Limited
570. Medcon S.A.
571. MedEd Resources, LLC

572. Medesta Associates, LLC
573. Medical Concepts Development, Inc.
574. Medical Diagnostic Leasing, Inc
575. Medical Education Systems, LLC
576. Medical Media Communications, LLC
577. Medical Strategies, Inc.
578. MediQual Systems, Inc.
579. Meditrol Automation Systems, Inc.
580. Meditrol, Inc.
581. MedMined, Inc.
582. Mercury Merger Sub, LLC
583. Mesa Merger Corp.
584. MicroGas Limited
585. MicroMedical Deutschland GmbH
586. Microport Healthcare, LLC
587. Midland Pharmacies, Inc
588. Mississippi Medical Supply Cooperative, L.L.C.
589. MRI Equipment Partners, Ltd.
590. Mudhen Merger Corp.
591. Multi-Medica S.A.
592. Multipharm Limited
593. Nanjing Baiji Advanced Specialty Drug Store Company Limited
594. Nanning Baiji Advanced Specialty Pharmacy Company Limited
595. Nationwide Ostomy Supplies Limited
596. Navigator Health, Inc.
597. NaviHealth Holdings, LLC
598. NaviHealth SM Holdings, Inc.
599. NaviHealth, Inc.
600. Nexus Healthcare, Inc.
601. Nitric Bio Therapeudics, Inc.
602. Northern Michigan Supply Alliance, L.L.C.
603. Ohio Valley-Clarksburg, Inc.
604. Oncology Holdings, Inc.
605. Onpointe Medical Communications, LLC
606. Oval (Shanghai) Technologies, Inc.
607. Oval Technologies (H.K.) Pty Limited
608. Owen Healthcare Building, Inc.
609. Pacific Surgical Innovations, Inc.
610. Panther Merger Sub II, Inc.
611. Panther Merger Sub, Inc.
612. Parch, L.L.C.
613. Parch, L.L.C. State File
614. ParMed Pharmaceuticals, LLC
615. PatientScribe Inc.
616. PCI Acquisition I, Inc.
617. PCI Acquisition II, Inc.
618. PCI Services Holdings, Inc.
619. PCI Services III, Inc.
620. PCI/Acquisition III, Inc.
621. PCI/All Pack Holdings, Inc.
622. PCI/Delvco, Inc. State File
623. PCI/Tri-Line (Usa), Inc.
624. Pharmaceutical & Diagnostic Services, LLC
625. Pharmacy Service Corporation
626. Phillipi Holdings, Inc.
627. PHR Staffing, Inc.
628. Post-Acute Care Center For Research, LLC
629. Practicome Solutions, LLC
630. Princeton Diagnostic Isotopes, Inc.
631. Priority Healthcare Services Corporation
632. Procedure-Based Instrument Services, L.L.C.
633. Productos Urologos de Mexico S.A. de C.V.
634. Professional Health-Care Resources, Inc.
635. Pyxis Capital Corporation
636. Pyxis Funding II, LLC
637. Pyxis Funding, LLC
638. R Cubed, Inc.
639. R. P. Scherer Hardcapsule (West)
640. R.P. Scherer Inc.
641. R.P. Scherer Technologies, Inc.
642. Radiopharmacy Of Boise, Inc.
643. Radiopharmacy Of Northern California, Inc.
644. Renlar Systems, Inc.
645. RightCare Solutions, Inc.
646. Royal Merger Sub, Inc.
647. Scela, Inc.
648. Scriptline, Inc.
649. SensorMedics (Deutschland) GmbH
650. SensorMedics Corporation

651. Shanghai Baiwei Drug Store Company Limited
652. Shanghai Cardinal Baiwei Drug Store Co., Ltd.
653. Shanghai Jinyi Health Management Consultation Co., Ltd.
654. Shanghai Luoda Pharmaceutical Company Limited
655. Shenzhen Zhengdan Investment Company Limited
656. Simolo (GL) Limited
657. Sistemas Medicos ALARIS S.A. de C.V.
658. Snowden Pencer Holdings, Inc.
659. Snowden Pencer, Inc.
660. Solomons Company
661. Source Medical Corporation
662. SRX, Inc.
663. Strategic Implications International, LLC
664. Supplyline Technologies Limited
665. Surgical Carepair, L.L.C.
666. Surgical Instrument Repair Service, L.L.C.
667. Syncor Belgium SPRL
668. Syncor Diagnostics Bakersfield, LLC
669. Syncor Diagnostics Dallas, LLC
670. Syncor Diagnostics Encino, LLC
671. Syncor Diagnostics Fullerton, LLC
672. Syncor Diagnostics Laguna Hills, LLC
673. Syncor Diagnostics Plano, LLC
674. Syncor Diagnostics Sacramento, LLC
675. Syncor Financing Corporation
676. Syncor Italy srl
677. The Enright Group, Inc.
678. The Heron Corporation
679. The LVC Corporation
680. Tianjin Cardinal Pharmacy Co., Ltd.
681. Toledo Pharmacy Company
682. Tropic Merger Sub, Inc.
683. UroMed, Inc.
684. VIASYS Healthcare Ireland Limited
685. VIASYS Healthcare Island EHF
686. VIASYS Healthcare S.A.R.L.
687. VIASYS Holdings Inc.
688. VIASYS NeuroCare France SAS
689. VIASYS Polymer Products LLC
690. Virginia Imaging Center, LLC
691. Virginia Merger Corporation
692. Vistant Corporation
693. Vistant Holdings, Inc.
694. Vubiq Inc.
695. Wenzhou Xinte Pharmaceutical Co., Ltd.
696. West Hudson, Inc.
697. West Texas Nuclear Pharmacy Partners
698. Wholesale (PI) Limited
699. Williams Drug Distributors, Inc.
700. Wolf Merger Corp.
701. Wrangler Acquisition Sub, Inc.
702. Wuhan Baiji New & Special Drug Store Company Limited
703. Xiamen Cardinal Baiwei Drug Store Co., Ltd.
704. Xi'an Baiji Advanced Specialty Pharmacy Company Limited
705. Yorkshire Pharmacy, Inc.
706. Blue Robin, LLC
707. SOAR Network, LLC
708. ScalaMed Pty. Ltd.
709. ScalaMed (US), Inc.
710. Cardinal Health Hungary Finance K.F.T.
711. Wavemark Cyprus Pvt. Ltd.

## McKesson

1. "Aewige" ärztliche Wirtschaftsgesellschaft m.b.H., HG Wien
2. "die apoteeke in teesdorf" Mag. pharm. Gerda Kohlhauser KG, LG Wiener Neustadt
3. "Esplanade-Apotheke" Mag. pharm. Anna-Maria Köck KG, Landesgericht Wels
4. "Panther Apotheke" Mag. pharm. Sandra Krokos KG, Landesgericht Graz
5. 10101 Woodloch Forest LLC
6. 2012 DREAM LIMITED, England
7. 28CVR LIMITED, England
8. 3068312 Nova Scotia ULC
9. 3069163 Nova Scotia Limited
10. 3069164 Nova Scotia Limited
11. 30MC LIMITED, England 12.
12. 701985 N.B. INC.
13. A C FERGUSON (CHEMIST) LIMITED, England
14. A. SUTHRELL (HAULAGE) LIMITED, England
15. A.F.M. Bergamo S.p.A., Italy
16. A.L.I. Holdings LLC
17. A.L.I. Imaging Systems Corp.
18. A.L.I. Technologies (International) LLC
19. AAH BUILDERS SUPPLIES LIMITED, England
20. AAH FURB PENSION TRUSTEE LIMITED, England
21. AAH Glass & Windows Limited, England
22. AAH Ireland, Dublin
23. AAH LIMITED, England
24. AAH Lloyds Insurance (IoM) Limited, Isle Of Man
25. AAH LLOYDS PENSION TRUSTEES LIMITED, England
26. AAH NOMINEES LIMITED, England
27. AAH ONE LIMITED, Scotland England
28. AAH PHARMACEUTICALS LIMITED, England
29. AAH TWENTY FOUR LIMITED, Scotland
30. AAH TWENTY LIMITED, England
31. AAH TWENTY SIX LIMITED,
32. ABG Apotheken-Beratungsgesellschaft mbH, Stuttgart
33. Access Health NZ Limited
34. AccessMed Holdings, Inc.
35. AccessMed, Inc. (AccessMed, LLC)
36. AccessMed, LLC
37. ACME DRUG CO. LIMITED, Scotland
38. Action Software, Inc.
39. ADDED MARKETING LIMITED, England
40. Adler Apotheke Krems Mag. Gabriele Denk KG, LG Krems an der Donau
41. Adler-Apotheke Mag.pharm. Ingrid Chvatal KG, LG Leoben
42. Admenta Beteiligungs GmbH, HG Wien
43. Admenta Denmark ApS, Copenhagen
44. Admenta Deutschland GmbH, Stuttgart
45. ADMENTA HOLDINGS LIMITED, England
46. ADMENTA ITALIA S.P.A., CCIAA di Bologna
47. ADMENTA PENSION TRUSTEES LIMITED, England
48. Admenta Sweden AB
49. ADMENTA UK LIMITED, England
50. Admenta Verwaltungs GmbH, HG Wien
51. Advanced ENT and Allergy, PLLC
52. Aetion, Inc.

53. AFM S.p.A., CCIAA di Bologna
54. AHLP PHARMACY LIMITED, England
55. ALCHEM (SOUTHERN) LIMITED, England
56. Aledade, Inc.
57. AllStripes Research, Inc.
58. ALPE-ADRIA PHARMA farmacevtsko podjetje d.o.o., Ljubljana
59. Alphar Ayeneux, Belgium
60. Alphar Gilly DL, Belgium
61. Alphar Monceau sur Sambre, Belgium
62. Alphar Partners SA, Belgium
63. Alte Löwen-Apotheke Mag. pharm. Kristina Taubald KG, HG Wien
64. Alte Spora Apotheke Mag.pharm. Stephan Öhlzelt KG, LG St. Pölten
65. American Oncology Associates, LLC
66. American Pharmacy Network Solutions, LLC
67. Amethyst Acquisition Corp.
68. Ancavion GmbH, AG Darmstadt
69. Ancillary Management Solutions, Inc.
70. Anton-Bruckner-Apotheke Mag.pharm. Christian Schwarzenbrunner KG, LG Linz
71. AOR Holding Company of Indiana, Inc. (AOR Holding Company of Indiana, LLC)
72. AOR Holding Company of Indiana, LLC
73. AOR Management Company of Alabama, Inc.
74. AOR Management Company of Arizona, Inc. (AOR Management Company of Arizona, LLC)
75. AOR Management Company of Arizona, LLC
76. AOR Management Company of Central Florida, Inc.
77. AOR Management Company of Florida, Inc.
78. AOR Management Company of Indiana, Inc. (AOR Management Company of Indiana, LLC)
79. AOR Management Company of Indiana, LLC
80. AOR Management Company of Kansas, Inc.
81. AOR Management Company of Missouri, Inc. (AOR Management Company of Missouri, LLC)
82. AOR Management Company of Missouri, LLC
83. AOR Management Company of Nevada, Inc.
84. AOR Management Company of New York, Inc.
85. AOR Management Company of North Carolina, Inc.
86. AOR Management Company of Ohio, Inc.
87. AOR Management Company of Oklahoma, Inc. (AOR Management Company of Oklahoma, LLC)
88. AOR Management Company of Oklahoma, LLC
89. AOR Management Company of Oregon, Inc.
90. AOR Management Company of Pennsylvania, Inc. (AOR Management Company of Pennsylvania, LLC)
91. AOR Management Company of Pennsylvania, LLC
92. AOR Management Company of South Carolina, Inc.
93. AOR Management Company of Texas, Inc.
94. AOR Management Company of Virginia, Inc. (AOR Management Company of Virginia, LLC)
95. AOR Management Company of Virginia, LLC
96. AOR of Indiana Management Partnership

97. AOR of Texas Management Limited Partnership
98. AOR of Texas Management, LLC
99. AOR Real Estate, Inc. (AOR Real Estate, LLC)
100. AOR Real Estate, LLC
101. AOR Synthetic Real Estate, Inc.
102. (AOR Synthetic Real Estate, LLC) 102.AOR Synthetic Real Estate, LLC
103. AORIP, Inc.
104. AORT Holding Company, Inc. (AORT Holding Company, LLC)
105. AORT Holding Company, LLC
106. AORT LP, LLC
107. Aporana AS
108. Apotheke "Zum Bergmann" Mag.pharm. Sabine Tuttner KG, LG Leoben
109. Apotheke "Zur heiligen Dreifaltigkeit" Mag. pharm. Edith Schuller-Grundnig KG, Landesgericht Korneuburg
110. Apotheke "Zur Mutter Gottes" Mag. pharm. Karin Nozicka KG, HG Wien
111. Apotheke Atzgersdorf Mr. Hermann Latzin KG, Wien
112. Apotheke im Messepark Mag. pharm. Dietmar Purin KG, LG Feldkirch
113. Apotheke Niklasdorf Mag. pharm. Matthias Schöggl KG, LG Leoben
114. APOTHEKE U1 TROSTSTRASSE, Mag. pharm. Max Wellan KG, HG Wien
115. Apotheke Zum heiligen Antonius Mag. pharm. Walter Staschek KG, LG Wiener Neustadt
116. Apotheke zum heiligen Schutzengel Mag.pharm. Barbara Penz-Arzberger KG, Landesgericht Graz
117. Apotheke zum Patriarchen Mag. pharm. Brigitte Kölbl KG, HG Wien
118. Apotheke Zur hl. Dreifaltigkeit Mag. pharm. Doris Richter KG, LG Wiener Neustadt

119. Apotheke Zur Hütte Mag. pharm. Mrak KG, LG Leoben
120. Apovest AS
121. Apovest Drift AS
122. Art Acquisition Subsidiary, Inc.
123. Ascalon International, Inc.
124. Aspen Health, Inc.
125. Atlantic Urological Associates, P.A.
126. ATLAS Travel Clinic Limited, England
127. Attentus Medical Sales, Incorporated (Attentus Medical Sales, LLC)
128. Attentus Medical Sales, LLC
129. Augmedix, Inc.
130. Awarix, Inc.
131. Axis Medical Management, Inc.
132. AYRSHIRE PHARMACEUTICALS LIMITED, Scotland
133. AZIENDA FARMACEUTICA MUNICIPALE di Cremona S.p.A., CCIAA di Cremona
134. Azienda Farmacie Milanesi S.p.A., CCIAA di Milano
135. Babbingore Limited, Dublin
136. BAILLIESTON HEALTH CENTRE PHARMACY LIMITED, Scotland
137. Ballycane Pharmacy Limited, Ireland
138. BANNISTER & THATCHER LIMITED, England
139. BARCLAY PHARMACEUTICALS (ATHERSTONE) LIMITED, England
140. BARCLAY PHARMACEUTICALS LIMITED, England
141. BARLEY CHEMISTS HOLDINGS LIMITED, England
142. BARRY SHOOTER (ROMFORD) LIMITED, England
143. Baylor Health Enterprises, LP
144. BDI Pharma, Inc. (BDI Pharma, LLC)
145. BDI Pharma, LLC
146. Beausejour Drugs Limited
147. BEAUTY CARE DRUGSTORES LIMITED, England
148. Beldere Corporation

149. BeneVi Health LLC (Biologics, Inc.)
150. BENU Apotheken B.V., Chamber of commerce Amsterdam
151. BENU Nederland BV, Kamer van Koophandel Amsterdam
152. Bergemoen Apotek AS
153. BERKSHIRE MEDICAL SUPPLIES LIMITED, England
154. BETTERLIFEHEALTHCARE LIMITED, England
155. BIG PHARMA LIMITED, Scotland
156. Biologics, Inc.
157. Blackhall Pharmaceutical Distributors Limited
158. Blackhawk Development LLC
159. Blackstaff Pharmaceuticals Limited, England
160. Blomsterdalen Apotek AS
161. Blue Medical Supply, Inc. (McKesson Medical-Surgical Inc.)
162. Boad Seven, Inc.
163. BOFH Holdings Unlimited Company, Ireland
164. Bottomline Medical Solutions, LLC (Linear Holdings, LLC)
165. Boulder Radiation Management Company, LLC
166. Bradbury (Surgical) Limited, Northern Ireland
167. Breamor Pharmacy Limited, Ireland
168. Brevard Radiation Oncology, LLC
169. Brickyard Acquisition Inc. (Biologics, Inc.)
170. BRIDPORT MEDICAL CENTRE SERVICES LIMITED, England
171. Brocacef Groep N.V., Maarssen
172. Brockton Hospital, Inc. dba Signature Healthcare Brockton Hospital, Inc.
173. Brockton Radiation Oncology Associates, LLC
174. Brockton Radiation Oncology, LLC
175. Brooklyn Radiation Oncology, LLC
176. Brukar Enterprises, Inc.
177. Bullet Acquisition Corporation
178. CAHILL MAY ROBERTS GROUP LIMITED, Dublin
179. California Golden State Finance Company
180. Camic Pharmacies Limited, Ireland
181. Canada Distribution Holdings Limited Partnership
182. Canada Retail Holdings Limited Partnership Societe en Commandite Gestion Detail Canada
183. Cancer Care Centers of Brevard, Inc.
184. Cancer Treatment Associates of Northeast Missouri, Ltd.
185. CancerIQ, Inc.
186. CARONET TRADING LIMITED, England
187. Carrollton Radiation Therapy Center, LLC
188. Cascade Medical Supply, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
189. Cavalier Acquisition Company LLC
190. CCCN NW Building JV, LLC
191. Celesio Business Services Ltd., Ireland
192. Central Ohio Urology Group, Inc.
193. CENTRALE D`ADMINISTRATION DE BIENS IMMOBILIERS, Bobigny
194. CGSF Funding Corporation (CGSF Funding LLC)
195. CGSF Funding LLC
196. Chem Labs Limited, Dublin
197. CHNG Newco LLC
198. CHNG NewSub Inc.
199. City of Hope Medical Foundation
200. City Properties, S.A.
201. Civiche Farmacie Desio S.p.A., Italy
202. Claimone, LLC (Linear Holdings, LLC)
203. ClaimSecure Inc. (SUCCESSOR)
204. CLARK CARE GROUP LIMITED, England
205. CLARK MUNRO LIMITED, Scotland

E-21

206. ClarusONE Sourcing Services LLP
207. Clinicians Database, L.L.C.
208. CMR Holdings Ltd, Dublin
209. Coleham, Dublin
210. Colorado Cancer Centers, LLC
211. Combined Enterprises Corporation
212. COMPANY CHEMISTS ASSOCIATION LIMITED, England
213. COMPTOIR MONEGASQUE DE BIOCHIMIE, Monaco
214. COMPTOIR PHARMACEUTIQUE MEDITERRANEEN, Monaco
215. CONSORZIO SERVIZI SALUTARI S.C.A. R.L., Italy
216. CookCo, Inc.
217. Cophana SA, Belgium
218. Corporation Groupe Pharmessor/Pharmessor Group Corporation (SUCCESSOR 10/01/2017)
219. Corporation of America
220. CoverMyMeds LLC
221. CoverMYMeds Specialty Pharmacy Holdings LLC
222. CoverMYMeds Specialty Pharmacy LLC
223. CPG Industries, Inc.
224. Crocker Plaza Company (Crocker Plaza LLC)
225. Crocker Plaza LLC
226. CROSS AND HERBERT (DEVON) LIMITED, England
227. CROSS AND HERBERT (HOLDINGS) LIMITED, England
228. CROSS AND HERBERT LIMITED, England
229. Crowley`s Blackrock Limited, Dublin
230. Cypress Import Brokerage LLC
231. Cypress Medical Products LLC
232. D & K Healthcare Resources LLC
233. D & K Healthcare Resources, Inc. (D & K Healthcare Resources LLC)
234. D & K Pharmacy Solutions, Inc.
235. D & K Receivables Corporation

236. D.F. O'Neill (Chemists) Ltd, Dublin
237. Dale Apotek AS
238. Danubia-Apotheke Mag. pharm. Barbara Sedelies KG, HG Wien
239. Dargle Pharmacies Holdings Limited, Ireland
240. DATACARE Datenpflege des Pharmagroßhandels Ges.m.b.H., HG Wien
241. DATAPHARM, Paris
242. Daytona Beach Radiation Oncology, LLC
243. DC Land Company
244. DCAZ Land Company
245. Deaconess Hospital, Inc.
246. Delta Clinical Research, LLC
247. DEPOTRADE, Bobigny
248. Derm Vantage, LLC
249. Diana-Apotheke Dr. et Mag. pharm. Michaela Stipsits KG, LG Eisenstadt
250. Die Apotheke Ebenfurth, Mag.pharm. Beate Haage-Löwe KG, LG Wiener Neustadt
251. Dispensing Solutions Acquisition Corporation (DS Holdings, Inc.)
252. Dispensing Solutions, Inc. (Dispensing Solutions, LLC)
253. Dispensing Solutions, LLC (DS Holdings, Inc.)
254. Ditt Apotek Amfi Os AS
255. Ditt Apotek Rodberg AS
256. Ditt Apotek Sorumsand AS
257. Ditt Apotek Tvedt AS
258. Diversified Healthcare, LLC
259. Dix Bulles Pharma, Belgium
260. DLI Market Intelligence ApS, Denmark
261. DOL Pharmacy Limited, Ireland
262. Donnybrook Pharmacy Limited, Ireland
263. Downtown Los Angeles Radiation Oncology, LLC
264. DS Holdings, Inc. (DS Holdings, LLC)

E-22

265. DS Holdings, LLC (McKesson Medical-Surgical Top Holdings Inc.)
266. DSRX, Inc. (DS Holdings, Inc.)
267. Dublin 2016 Acquisition, LLC
268. Dublin Holdings Acquisitions, LLC (Vantage Oncology Holdings, LLC)
269. Dublin POS I Acquisition Corp. (POS I Corp.)
270. East Indy CC, LLC
271. ECLIPSE HEALTHCARE LIMITED, England
272. Edwards Medical Supply, Inc.
273. EM Acquisition Corporation
274. Emploi AS
275. Engel-Apotheke Mag. pharm. Susanne Zauner KG, LG Wiener Neustadt
276. Ephrata Diamond Spring Water Co.
277. ESCON (ST NEOTS) LIMITED, England
278. Espafarmed S.L., Belgium
279. EUROSANTE (Société en liquidation), Luxembourg
280. Evangelical Services Corporation
281. Evesland Limited, Dublin
282. Evidation Health, Inc.
283. EVOLUTION HOMECARE SERVICES LIMITED, England
284. EXPERT HEALTH LIMITED, England
285. Family Pharmacy @ Las Colinas LLC
286. Fana Apotek AS
287. FAR.CO.SAN S.p.A., CCIAA di Arezzo
288. FARILLON LIMITED, England
289. Farmacia Garbatella I S.r.l., Italy
290. Farmacie Comunali di Modena S.p.A., Italy
291. Farmacie Comunali di Padova S.p.A., Italy
292. Farmacie di Sassuolo S.p.A., Italy
293. Farmacie Pratesi Pratofarma S.p.A., CCIAA di Prato
294. FARMALVARION S.R.L. SOCIO UNICO, Italy

295. FASTPRO International, Inc.
296. Federal Medical Supplies, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
297. Felview Limited, Dublin
298. First Aid Service, Inc.
299. First Choice Medical Supply Holding, Inc. (First Choice Medical Supply Holding, LLC)
300. First Choice Medical Supply Holding, LLC
301. First Choice Medical Supply, LLC
302. FIRTH & PILLING LIMITED, England
303. Flex-Master Technology Holdings, Inc.
304. Floriani-Apotheke Mag.pharm. Doris Leykauf KG, LG Graz
305. Foremost de Venezuela, S.A. (Forvensa)
306. Foremost Homes Hawaii, Ltd.
307. Foremost Iran Corporation
308. Foremost Shir, Inc.
309. Foremost Tehran, Inc.
310. FOSTER & PLUMPTON GROUP LIMITED, England
311. FOSTER & PLUMPTON LIMITED, England
312. Foundation For Opioid Response Efforts
313. FU-RAD Holdings, LLC
314. G J MALEY LIMITED, Isle Of Man
315. G K CHEMISTS (GLOS) LIMITED, England
316. G K CHEMISTS LIMITED, England
317. Galileo, Inc.
318. GEHE Immobilien GmbH & Co. KG, Stuttgart
319. GEHE Immobilien Verwaltungs-GmbH, Stuttgart
320. GEHE Pharma Handel GmbH, Stuttgart
321. General Medical Inc.

322. GEORGE STAPLES (STOKE) LIMITED, England
323. Gerard Ryan Pharmacy (Clonmel) Limited, Dublin
324. GERSTHOFER-APOTHEKE Mag.pharm. Elisabeth Reisegger KG, HG Wien
325. GI Winston Parent LP
326. Giardina Enterprises, Inc.
327. Glendale Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
328. Golden State Company, Ltd.
329. Golden State Corporate Services LLC
330. Golden State Insurance Company Limited
331. Golden State Milk Products Company
332. Goodman Manufacturing Company
333. Gorrys Pharmacy Limited, Ireland
334. Goviltown Limited, Westmeath
335. GPL 2007 LIMITED, England
336. GRAEME PHARMACY (STIRLING) LIMITED, Scotland
337. GREENS PHARMACEUTICAL (HOLDINGS) LIMITED, England
338. Greenville Radiation Care, Inc.
339. Greystones Pharmacy Limited, Dublin
340. GROUPE PHR, France
341. Gulf South Medical Supply, Inc. (Gulf South Medical Supply, LLC)
342. Gulf South Medical Supply, LLC
343. Gwinnett Radiation Oncology, LLC
344. H THATCHER LIMITED, England
345. Haleston Enterprises Limited, Dublin
346. Harvard Medical Faculty Physicians at Beth Israel Deconess Medical Center, Inc.
347. Hassingen Apotek
348. HBO & Company (VI), Inc.
349. HBO & Company of Georgia
350. HBOC Ventures, Inc.
351. HC Beteiligungsgesellschaft mbH, HG Wien
352. HDSC Acquisition Corp.

353. Health Data Sciences Corporation
354. Health Mart Atlas, LLC
355. Health Mart Systems, Inc.
356. HEALTH NEEDS LIMITED, England
357. Health Ventures
358. HEALTHCLASS LIMITED, England
359. Healthgrades Operating Company, Inc.
360. Heinz Management Co.
361. Helmard Holdings Limited, Dublin
362. HEP HealthQx Holdings, Inc. (McKesson Technologies Inc.)
363. Herba Chemosan Apotheker-AG, HG Wien
364. HERBERT FERRYMAN LIMITED, England
365. Hercules Parent LLC
366. Herz -– Jesu Apotheke Mag. Pharm. Marianne Keller KG, HG Wien
367. Herz Jesu Apotheke & Parfümerie Mag. Pharm. Ingrid Heller KG, LG Feldkirch
368. HF Land Company
369. HFN of Northwest Florida, Inc.
370. HIGGINS & SON (CHEMISTS) LIMITED, England
371. HILL-SMITH (WARRINGTON) LIMITED, England
372. Hims, Inc.
373. HisComp Co., Zee Medical Service Co.
374. HMS Acquisition Corp.
375. HOLLYFAR - Marcas e Comunicação, Unipessoal, Lda., Portugal
376. Holmlia Apotek AS
377. HOLMSCROFT HC LIMITED, Scotland
378. HOLON, S.A., Portugal
379. Honeybee Bridge LLC
380. HTP Inc. (HTP LLC)
381. HTP LLC

382. Hubertus-Apotheke Mag.pharm. E. Klettenhofer KG, HG Wien
383. HUSKY AQUISITION INC.
384. Hygeia Bottled Water, Inc.
385. HYWEL DAVIES (CAERPHILLY) LIMITED, England
386. IHA Corp.
387. Imagine Health, Inc.
388. INDEPENDENT PHARMACY CARE CENTRES (2008) LIMITED, England
389. Indian River Radiation Oncology, LLC
390. Infolab, LLC
391. Innovent Oncology, LLC
392. INSPIRON DISTRIBUTION LIMITED, England
393. Integrated Cancer Care, LLC
394. Integrated Pathology Services
395. IntelliClaim, Inc.
396. Inten GmbH, Stuttgart
397. Intercal, Inc.
398. International Dairy Engineering Co. of Asia, Inc.
399. InterQual Inc.
400. intraFUSION GP, LLC
401. Intrafusion Holding Corp.
402. intraFUSION Purchasing Network, LLC
403. intraFUSION Research Network, LLC
404. Inviva, McKesson Pharma Care Network Corporation / La Corporation Inviva, Reseau de soins pharmacologiques McKesson (SUCCESSOR)
405. Iowa Pharmaceutical Services, LLC
406. IPCC LIMITED, England
407. IPD Holdings, Inc.
408. IVXpress, Inc.
409. J S DENT LIMITED, England
410. J.G. Crowley Pharmacy Limited, Dublin
411. JACS, Inc.
412. Jaron, Inc.

413. Jeffersonville Radiation Technology, LLC
414. Jeløy Apotek AS
415. Jessheim Apotek AS
416. Jewett Drug Co.
417. Jewett Drug LLC
418. Johannes Apotheke Mag. pharm. Deutsch KG, LG Graz
419. JOHN BELL & CROYDEN LIMITED, England
420. JOHN HAMILTON (PHARMACEUTICALS) LIMITED, Scotland
421. Jupiter Acquisition Ltd.
422. Kairnbury, Dublin
423. Kathleen Properties Subdivision Association, Inc.
424. Keling Limited
425. Keltman Pharmaceuticals, Inc. (Linear Holdings, LLC)
426. Kemofarmacija, veletrgovina za oskrbo zdravstva, d.d., Ljubljana
427. Keystone/Ozone Pure Water Company
428. Kilshallow Limited, Dublin
429. KINGSWOOD CHEMISTS LIMITED, England
430. KINGSWOOD GK LIMITED, England
431. Kitco, Inc.
432. Knowledgeable Healthcare Solutions, Inc.
433. Komodo Health, Inc.
434. Koneska Health, Inc.
435. Kreuz-Apotheke KG, HG Wien
436. KWS & P, Inc
437. KWS & P/SFA, Inc.
438. KYLE & CARRICK HOLDINGS LIMITED, Scotland
439. Kyruus, Inc.
440. Laboratoria Flandria NV, Belgium
441. Laboratory Supply Company
442. Labsco Holdings, Inc. (McKesson Medical-Surgical Inc.)
443. Leesburg Radiation Oncology, LLC

444. LEVELCROWN LIMITED, England
445. Liberty Real Estate NJ LLC
446. Lightship, Inc.
447. Lind-Apotheke Mag. pharm. Alexander Telesko KG, LG Klagenfurt
448. Linear Holdings, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
449. Linear Holdings, LLC (Linear Holdings, Inc.)
450. Linear Medical Solutions, LLC
451. LINFORD PHARMACIES LIMITED, England
452. LISEAPOTEKENE AS
453. Lissone Farmacie S.p.A., CCIAA di Monza e Brianza
454. Live Better with Limited
455. LIVINGSTON HEALTH CENTRE (P.D) CO. LIMITED, Scotland
456. LKW, Inc.
457. LLOYDS CHEMISTS LIMITED, England
458. LLOYDS CHEMISTS RETAIL (NORTHERN) LIMITED, England
459. LLOYDS CHEMISTS RETAIL LIMITED, England
460. LLOYDS GROUP PROPERTIES LIMITED, England
461. Lloyds Pharmacy Clinical Homecare Limited, England
462. LLOYDS PHARMACY LIMITED, England
463. LLOYDS PROPERTIES LIMITED, England
464. LLOYDS Property Management Company Belgium S.A., Belgium
465. LLOYDS RETAIL CHEMISTS LIMITED, England
466. Lloyds Retail S.r.l., Socio Unico, Italy
467. LLOYDSFARMACIA ROMA 4 S.R.L., Italy
468. Lloydspharma Group S.A., Belgium
469. Lloydspharma S.A., Belgium
470. Lloydspharmacy Ireland Limited, Dublin
471. Lory Apotheke Mag. pharm. Karin Eichinger KG, HG Wien
472. LP Clinical Homecare Group Limited, England
473. LPL ONE LIMITED, England
474. LVS Parent, LLC
475. M H GILL LIMITED, England
476. M PAYNE & CO LIMITED, England
477. M2Gen Holdings LP
478. Macfor International Finance Company
479. MACON Acquisition Corp.
480. Macro Helix LLC
481. Madison Acquisition Inc.
482. Marathon Acquisition Subsidiary, Inc.
483. Mariahilf-Apotheke Mag. pharm. Christoph Rücklinger KG, LG St. Pölten
484. Mariahilf-Apotheke Mag. pharm. Helga Mann KG, Landesgericht Graz
485. Marien-Apotheke Mag. pharm. Thomas Job KG, LG Eisenstadt
486. Marien-Apotheke, Mag.pharm. Eva Grabner KG, Landesgericht Korneuburg
487. Maryland First Aid Co., Inc.
488. MASTA Limited, England
489. Masters Drug Company, Inc.
490. MATIS Immobilien OHG, Stuttgart
491. Matternet, Inc.
492. Maurice F. Dougan Limited, Dublin
493. May Roberts Ltd, Dublin
494. MCK Acquisition Corp.
495. McK International Financial Holdings (Barbados) SRL
496. McKesson (Cayman Islands) Inc.
497. McKesson (Shanghai) Trading Company Limited
498. McKesson + Strategic Solutions ULC / Solutions Strategiques McKesson + ULC
499. McKesson Automation Systems Inc.

E-26

500. McKesson Belgium Holdings SPRL, Belgium
501. McKesson Business Services Lithuania, UAB
502. McKesson Canada Corporation / La Corporation McKesson Canada (PREDECESSOR)
503. McKesson Canada Corporation/La Corporation McKesson Canada (SUCCESSOR)
504. McKesson Canada Finance IA ULC
505. McKesson Canada Finance IB ULC
506. McKesson Capital Funding Corp.
507. McKesson Capital Funding Corporation
508. McKesson Capital LLC
509. McKesson Central Fill LLC (McKesson Distribution Holdings LLC)
510. McKesson Contract Research Organization LLC
511. McKesson Cork Business Solutions Unlimited Company
512. McKesson Corporate Properties, Inc.
513. McKesson Corporation
514. McKesson Development Corp.
515. McKesson Distribution Holdings LLC
516. McKesson Drug Company LLC
517. McKesson Europe AG
518. McKesson Europe Holdings GmbH & Co.  KGaA
519. McKesson Europe Holdings Verwaltungs GmbH
520. McKesson Europe Services GmbH
521. McKesson Financial Holdings II Unlimited Company
522. McKesson Financial Holdings Unlimited Company
523. McKesson Financing Trust III
524. McKesson Financing Trust IV
525. McKesson Foundation Inc.
526. McKESSON FRANCE HOLDINGS, Bobigny
527. McKesson France Retail, Bobigny B
528. McKesson Funding Company of Canada
529. McKesson Global Procurement & Sourcing Limited
530. McKesson Global Sourcing Limited
531. McKesson Global Sourcing Limited [Irish Branch]
532. McKesson Health Solutions Holdings LLC
533. McKesson Health Solutions LLC
534. McKesson Health Solutions Puerto Rico Inc.
535. McKesson Health Solutions Texas Inc.
536. McKesson High Volume Solutions Inc.
537. McKesson Information Solutions Finance S.a.r.l.
538. McKesson Information Solutions Holdings II S.a.r.l.
539. McKesson Information Solutions Holdings III S.a.r.l.
540. McKesson Information Solutions Holdings IV S.a.r.l.
541. McKesson Information Solutions Holdings V S.a.r.l.
542. McKesson Information Solutions III LLC
543. McKesson Information Solutions Inc. (McKesson Information Solutions LLC)
544. McKesson Information Solutions IV LLC
545. McKesson Information Solutions LLC
546. McKesson Information Solutions Topholdings S.a.r.l.
547. McKesson Information Solutions UK Limited
548. McKesson International Bermuda IP2A Limited
549. McKesson International Bermuda IP2B Unlimited
550. McKesson International Bermuda IP3A Limited

551. McKesson International Bermuda IP3B Unlimited (McKesson International Bermuda IP3A Limited)
552. McKesson International Bermuda IP4A Limited
553. McKesson International Bermuda IP4B Unlimited (McKesson International Bermuda IP4A Limited)
554. McKesson International Bermuda IP5A Limited
555. McKesson International Bermuda IP5B Unlimited (McKesson International Bermuda IP5A Limited)
556. McKesson International Bermuda Opco1A Limited
557. McKesson International Bermuda Opco1B Unlimited (McKesson International Bermuda Opco1A Limited)
558. McKesson International Bermuda Opco3A Limited
559. McKesson International Bermuda Opco3B Unlimited (McKesson International Bermuda Opco3A Limited)
560. McKesson International Bermuda Opco4A Limited
561. McKesson International Bermuda Opco4B Unlimited
562. McKesson International Finance III Limited (McKesson US Finance Corporation)
563. McKesson International Finance S.a.r.l.
564. McKesson International Holdings III S.a.r.l.
565. McKesson International Holdings IV S.a.r.l.
566. McKesson International Holdings S.a.r.l.
567. McKesson International Holdings Unlimited Company
568. McKesson International Holdings VI S.a.r.l.
569. McKesson International Holdings VII S.a.r.l.
570. McKesson International Investment Corp.
571. McKesson International Ireland I Limited
572. McKesson International LLC
573. McKesson International Malaysia Sdn Bhd
574. McKesson International S.a.r.l.
575. McKesson International Topholdings S.a.r.l.
576. McKesson Ireland Limited
577. McKesson Logistics Solutions
578. McKesson Medical Imaging Company Ltd. (predecessor)
579. McKesson Medical-Surgical FDT Inc.
580. McKesson Medical-Surgical Government Solutions LLC
581. McKesson Medical-Surgical Holdings Inc.
582. McKesson Medical-Surgical Inc.
583. McKesson Medical-Surgical Iowa Inc.
584. McKesson Medical-Surgical Iowa Supply Inc.
585. McKesson Medical-Surgical Maine Inc.
586. McKesson Medical-Surgical Manufacturing Inc.
587. McKesson Medical-Surgical MediMart Inc.
588. McKesson Medical-Surgical MediNet Inc.
589. McKesson Medical-Surgical Minnesota Inc. (McKesson Medical-Surgical Holdings Inc.)
590. McKesson Medical-Surgical Minnesota Supply Inc.
591. McKesson Medical-Surgical Supply Chain Services LLC
592. McKesson Medical-Surgical Top Holdings Inc.
593. McKesson Medication Management Holdings Inc.

E-28

594. McKesson Medication Management Virgin Islands Inc.
595. McKesson Norway Holdings AS
596. McKesson Pharmacy Optimization LLC
597. McKesson Pharmacy Systems Canada ULC
598. McKesson Pharmacy Systems LLC
599. McKesson Plasma and Biologics LLC
600. McKesson Prescription Drug Plan LLC
601. McKesson Property Company, Inc.
602. McKesson Purchasing Company LLC
603. McKesson Services Inc. (McKesson Services LLC)
604. McKesson Services LLC
605. McKesson Sourcing Services Inc.
606. McKesson Specialized Distribution Inc. / McKesson Distribution Specialisee Inc. (Successor)
607. McKesson Specialty Arizona Inc.
608. McKesson Specialty Care Distribution Corporation (McKesson Specialty Care Distribution LLC)
609. McKesson Specialty Care Distribution JV LLC
610. McKesson Specialty Care Distribution LLC
611. McKesson Specialty Corporation
612. McKesson Specialty Distribution LLC
613. McKesson Specialty Health Innovative Practice Services, LLC
614. McKesson Specialty Health Management Services LLC
615. McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC
616. McKesson Specialty Health Pharmaceutical & Biotech Solutions, LP (McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC)
617. McKesson Specialty Health Technology Products LLC
618. McKesson Specialty Pharmacy, LP (RxC Acquisition Company)
619. McKesson Specialty Prescription Services (Atlantic) Corporation/Corporation McKesson Services de Prescription Spécialisée (Atlantique)
620. McKesson Specialty Prescription Services (B.C.) Corporation
621. McKesson Specialty Prescription Services Corporation
622. McKesson SPS (Manitoba) Corporation
623. McKesson Strategic Services Limited
624. McKesson Technologies Inc.
625. McKesson Trading Company
626. McKesson Transportation Systems, Inc.
627. McKesson UK Finance I Limited
628. McKesson UK Finance IA Limited
629. McKesson UK Finance II Limited
630. McKesson UK Finance V Limited
631. McKesson UK Holdings Limited
632. McKesson US Finance Corporation
633. McKesson US Holdings GP
634. McKesson Ventures LLC
635. McKesson Ventures Unlimited Company
636. McQueary Bros. Drug Company
637. McQueary Bros. Drug Company, LLC
638. McSweeney Dispensers 10 Limited, Ireland
639. McSweeney Dispensers 23 Limited, Ireland
640. MDD pharma N.V., Belgium
641. MED3000 Health Solutions Southeast
642. MED3000 RPG
643. Medaid Supply, Inc.
644. Medcon Telemedicine Technology, Inc.
645. Median Healthcare Services Unlimited Company, Ireland
646. Medical & Vaccine Products, Inc.

E-29

647. Medical Advisory Services for Travellers Abroad Limited, England
648. Medical Specialties Distributors Holdings, Inc. (MSD Parent Corporation)
649. Medical Specialties Distributors, LLC
650. Medical Specialties Holdings Corp. (Medical Specialties Holdings II Corp.)
651. Medical Specialties Holdings II Corp.
652. Medicentres Canada Inc. (SUCCESSOR)
653. Medicine Shoppe Atlantic Corporation
654. Medicine Shoppe Canada Corporation
655. Medicine Shoppe Canada Real Estate Corporation
656. MEDIMART LIMITED, England
657. MediVation, Inc.
658. MedVantx, Inc.
659. MedVentive Inc.
660. MeMed CZ s.r.o., Praha
661. Memorial Hermann Hospital System
662. Menges Medizintechnik Schweiz AG, Sankt Gallen
663. Merlin Subsidiary Inc.
664. Merrick Healthcare Limited
665. Metabolic Healthcare Holdings Limited, England
666. Metabolic Healthcare Limited, England
667. Methodist Hospital of Dallas
668. Metropolitan Integrated Cancer Center, L.L.C.
669. MH/USON Radiation Management Company, LLC
670. MHD-USO General, LLC
671. MHD-USO Management Company, LP
672. MHS Connecticut LLC
673. Michigan Pharmaceutical Services, LLC
674. Mid-Atlantic Radiation Oncology LLC
675. Millennium Merger Corporation

676. Mohawk Liqueur Corporation
677. Mohren-Apotheke Mag. Christian Müller KG, LG Graz
678. Monarch Insurance Company LLC
679. Moore Medical LLC (McKesson Medical-Surgical Government Solutions LLC)
680. Mosaic Acquisition Corporation
681. Mother Frances Hospital Regional Health Care Center
682. MOUNT PHARMACY LIMITED, England
683. MSA Products LLC
684. MSD Acquisition Corp. (Medical Specialties Holdings Corp.)
685. MSD Parent Corporation (MSD Acquisition Corp.)
686. Multum Information Services, Inc.
687. MUNRO PHARMACY LIMITED, Scotland
688. MWPC Acquisition Corp.
689. MWPC Acquisition Corp. (PA)
690. My MHealth Limited, England & Wales
691. myhca, inc.
692. NARO, LLC
693. National Oncology Alliance, Inc.
694. Natureline, Dublin
695. NDC of Canada, Inc.
696. NDCHealth Corporation
697. NDCHealth Pharmacy Systems and Services, Inc.
698. Nebraska Pharmaceutical Services, LLC
699. Negatron, Inc.
700. Nensi d.o.o., Ljubljana
701. NERO GP, LLC
702. New Experimental Therapeutics of San Antonio, LLC
703. NEW KIRK PHARMACY LIMITED, Scotland
704. New Mexico Pharmaceutical Services, LLC
705. NewHealthCo, LLC

E-30

706. NexCura, LLC (McKesson Specialty Health Technology Products LLC)
707. Next Virginia, LLC
708. Nibelungen-Apotheke Mag. pharm. Michaela Wachter KG, LG St. Pölten
709. Norsk Medisinaldepot AS
710. North Carolina Pharmaceutical Services, LLC
711. North Texas Health Facilities Management, Inc.
712. Northeast Pennsylvania Radiation Oncology, LP
713. Northern Arizona Oncology Centers, LLC
714. Northern Boulevard Radiation Oncology Management, LLC
715. Northern San Fernando Valley Radiation Oncology, LLC
716. Northstar Healthcare Holdings Limited
717. Northstar Healthcare Holdings Unlimited Company
718. Northstar Healthcare Limited
719. Northstar Healthcare Unlimited Company
720. Northstar International Holdings Limited
721. Northstar Rx LLC
722. Norvern Enterprises, Inc.
723. NR Direct, Inc. (McKesson Patient Care Solutions Inc.)
724. O`Leary Pharmacy (Lucan) Limited, Dublin
725. OCP FORMATION, Bobigny
726. OCP PORTUGAL, PRODUTOS FARMACÊUTICOS, S.A., Maia
727. OCP REPARTITION, Bobigny B
728. OCP, Bobigny
729. OncoHealth Group Holdings, L.P.
730. OncoHealth Intermediate, Inc.
731. OncoHealth Parent, Inc.
732. Oncology Analytics, Inc.
733. Oncology Holdings II, Inc.
734. Oncology Holdings, Inc.
735. Oncology Rehab Partners, LLC
736. Oncology Therapeutics Network Corporation
737. Oncology Today, LP
738. OnMark, Inc.
739. Ontada LLC
740. Optimed Health Limited, England & Wales
741. Orca Acquisition Corp.
742. Ørebekk Apotek AS
743. Oswald-Apotheke Mag. pharm. Ilse Pedevilla KG, LG Feldkirch
744. OTN Generics, Inc.
745. OTN Participant, Inc.
746. Outpatient Infusion Systems, Inc
747. Øygarden Apotek AS
748. P C Cahill & Company Limited, Dublin
749. P.L.C.E., Inc.
750. Packable Holdings, LLC
751. Packet Merger Sub Inc.
752. PALEMODA LIMITED, England
753. Palm Merger Sub, Inc.
754. Panther Acquisition Corporation
755. Panther-Apotheke Mag. pharm. Margarete Breyha KG., LG St. Pölten
756. Paracelsus-Apotheke Mag. pharm. Dr. Birgit Müller KG, Austria
757. Pathology Service Associates, LLC
758. Pathway Purchasing Network, LLC
759. Patient Account Management Services, Inc.
760. PAUL WHEELER LIMITED, England
761. PCB SA, Belgium
762. PEEL STREET PHARMACY LIMITED, England
763. peerVue, Inc. (DE)
764. peerVue, Inc. (NH)
765. Pemberton Marketing International Limited
766. Penn-Chem Corporation

767. PERILLA Grundstücks-Verwaltungsgesellschaft mbH & Co. KG, AG München
768. Per-Se Transaction Services, Inc.
769. PF2 McKesson Technologies Inc.
770. PF2 SpinCo Inc.
771. Pharma Belgium Belmedis SA, Belgium
772. PHARMA PARTNERS, Belgium
773. Pharma Services (NI) Limited, Northern Ireland
774. Pharmaceutical Distributors Federation Ireland Company Limited By Guarantee
775. Pharmaceutical Support Services, Inc.
776. Pharmacie Ananga-Talom, Belgium
777. Pharmacie de la Bascule, Belgium
778. PHARMACTIV DISTRIBUTION, Bobigny B
779. Pharmacy O`Riada Holdings Limited, Dublin
780. PHARMAGEN LIMITED, England
781. PHILIP GOODMAN LIMITED, England
782. PHR ANTILLES, FORT DE FRANCE
783. PhyServ Solutions, Inc.
784. Physician Micro Systems, Inc.
785. Physician Oncology Services Management Company, LLC
786. Physician Reliance Holdings, LLC
787. Physician Reliance Maryland, LP
788. Physician Reliance Network, Inc. (Physician Reliance Network, LLC)
789. Physician Reliance Network, LLC
790. Physician Reliance, L.P.
791. Physician Reliance, LLC
792. Physician Sales & Service Limited Partnership
793. Physician Sales & Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
794. Pindsle Apotek AS
795. PMLX Limited

796. POC Management Group, LLC (Dispensing Solutions, Inc.)
797. Podiatry Online, Inc.
798. Portico Systems of Delaware, Inc.
799. POS I Corp. (Dublin 2016 Acquisition, LLC)
800. Pratt Radiation Oncology Associates, Inc.
801. Presbyterian Cancer Center-Dallas, LLC
802. Presbyterian Hospital of Dallas
803. Prescribing Support Services Limited, England & Wales
804. Prima Brands Limited, Northern Ireland
805. PRIMELIGHT LIMITED, England
806. Prismedica S.A.S.
807. PRN Physician Reliance, LLC
808. Pro-AvO GmbH, Deutschland
809. Proclaim, Inc. (McKesson Medical-Surgical MediMart Inc.)
810. PRODILAB, France
811. Providence Radiation Oncology Partners LLC
812. PSS China Sourcing Limited
813. PSS Global Holdings
814. PSS Global Sourcing China Business Trust
815. PSS Global Sourcing Hong Kong Limited
816. PSS Global Sourcing Limited [Hong Kong]
817. PSS HK 1 Limited
818. PSS Holding, Inc. (McKesson Medical-Surgical Inc.)
819. PSS Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
820. PSS Southeast Asia Limited
821. PSS World Medical, Inc.
822. PST Products, LLC
823. PST Services, Inc. (PST Products, LLC)
824. Purchasing Alliance for Clinical Therapeutics, LLC

E-32

825. R F FOSKETT & SON LIMITED, England
826. R GORDON DRUMMOND LIMITED, England
827. R/X Automation Solutions, LLC
828. Raabtal-Apotheke Mag.pharm. Karin Drawetz KG, Landesgericht Graz
829. Radiation Oncology Associates, Inc.
830. Radiation Oncology Services of America, Inc.
831. Radiotherapy Clinic Holdings, LLC
832. Radiotherapy Clinics of Kentuckiana, LLC
833. Radiotherapy Clinics of Kentuckiana-2, LLC
834. Radius Data Solutions, LLC
835. Radius Reimbursement Services, LLC
836. Radunnco, Inc.
837. Rancare, Inc.
838. Randolph Home Care Inc.
839. Randolph Medical Inc.
840. RCOG Cancer Centers, LLC
841. Rebel Distributors Corp. (McKesson Medical-Surgical Top Holdings Inc.)
842. recucare GmbH, Stuttgart
843. recusana GmbH, Stuttgart
844. Regenbogenapotheke "Am Leberberg" Mag. pharm. Andreas Portisch KG, HG Wien
845. Reimagine Care, Inc.
846. RelayHealth Corporation (McKesson Information Solutions LLC)
847. Renoir Acquisition Corporation
848. Renoir Acquisition Corporation (DE)
849. RESEAU SANTE, BREST
850. RetraceHealth, Inc.
851. Rexall Pharmacies (BC) ULC
852. Rexall Pharmacies (SASK) ULC
853. Rexall Pharmacies Ltd.
854. Rexall Pharmacy Group Ltd.
855. Rexall Pharmacy Group ULC
856. Rexall/Pharma Plus Pharmacies (BC) Ltd.

857. Rexall/Pharma Plus Pharmacies (Sask) Ltd.
858. Rexall/Pharma Plus Pharmacies Ltd.
859. Riel, Inc.
860. Riverside Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
861. R-jet, Incorporated
862. RMCC Cancer Center, Inc. (RMCC Cancer Center, LLC)
863. RMCC Cancer Center, LLC
864. Rock Health Seed Fund II, LLC
865. ROSA of Eastern Shore, LLC
866. ROSA of Georgia, LLC
867. ROSA of South Alabama, LLC
868. ROSA of Southern New Jersey, LLC
869. Roth Medical Services, Inc.
870. RPRS, LLC
871. RX Information Technology LLC
872. RxC Acquisition Company
873. RxCrossroads 3PL LLC
874. RxVantage, Inc.
875. Ryle and De Lacy Pharmacies Limited, Ireland
876. S.K.U., Inc.
877. Salus-Apotheke Mag. pharm. Simone Gaigg KG, Salzburg
878. Salvator - Apotheke Mag. pharm. Gertrude Pölzl KG, LG Leoben
879. San Bruno Mountain Ltd., A California Limited Partnership
880. Sandviken Apotek AS
881. Sangers (Northern Ireland) Limited, Northern Ireland
882. SANOVA Pharma GesmbH, HG Wien
883. SAVORY & MOORE (JERSEY) LIMITED, Jersey
884. SAVORY & MOORE LIMITED, Scotland
885. SCHOLES (CHEMISTS) LIMITED, England
886. Schutzengelapotheke Neufeld Mag. Schweifer KG, LG Eisenstadt

887. Scrip Pak, LLC (Linear Holdings, LLC)
888. Script2U Holdings LLC
889. Script2U LLC
890. ScriptHero LLC
891. ScriptHero Pharmacy Holdings LLC
892. ScriptHero Pharmacy LLC
893. Select RX, LLC (Linear Holdings, LLC)
894. SelectPlus Oncology, LLC
895. Senior Housing NewCo, LLC
896. Sens Arbeidsinkludering AS
897. Sens Eiendom AS
898. Sens Gruppen AS
899. Sens Utvikling AS
900. SERVICE DE LA REPARTITION PHARMACEUTIQUE, Paris
901. SF Valley Derm Equipment I, LLC
902. Sherman Oaks Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
903. Sherman Oaks Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
904. Shoup Properties, Inc.
905. SHS V Medtech Investments GmbH & Co. KG
906. Simply Medical LLC
907. Sisters of Charity of the Incarnate Word
908. SIVEM Pharmaceuticals ULC/SIVEM Produits Pharmaceutiques ULC
909. Six R Investments, Inc.
910. SMP Enterprises-Illinois, Inc.
911. SOCIETE COOPERATIVE OUEST PARTAGE, BREST
912. SOCIETE D`ETUDES ET DE REALISATIONS INFORMATIQUES, Monaco
913. Sofarmex BVBA, Belgium
914. Sofiadis SCRL, Belgium
915. Soldier Acquisition Corporation
916. Søm Apotek AS
917. SOPI The Lough Limited, Ireland

918. SOPI Youghal Limited, Ireland
919. SourceTenn LLC
920. South Alabama Cancer Centers, LLC
921. South Bay Radiation Oncology, LLC
922. South Pacific Medical Inc.
923. South Suburban Radiation Oncology, LLC
924. Southeast Merger Corp.
925. Southeast Texas Cancer Centers, L.P.
926. Southern California Head & Neck Medical Group
927. Southern California Radiation Oncology, LLC
928. Spider Acquisition Corporation
929. Spirit Acquisition Corporation
930. Spring Valley Industries, LLC
931. St. Louis Pharmaceutical Services, LLC
932. St. Lucas-Apotheke Mag.pharm. Ilona Elisabeth Leitner KG, HG Wien
933. St. Markus Apotheke Dr. Elke Kramberger-Kaplan KG, LG Linz
934. St. Richard Apotheke Mag.pharm. Ursula Kohl KG, Landesgericht Korneuburg
935. Stadion-Apotheke Mag. pharm. Ulrike Grosser-Schmidt KG, LG St. Pölten
936. Stadt-Apotheke "Zur heiligen Barbara" Mag. pharm. Igor Mauritsch KG, Austria
937. Stadtapotheke Fürstenfeld Mag. pharm. Waltraud Maier KG, Landesgericht Graz
938. Stat RX USA, LLC (Linear Holdings, LLC)
939. STATIM FINANCE LIMITED, England
940. STEPHEN SMITH LIMITED, Guernsey
941. Sterling Medical Services, LLC (McKesson Patient Care Solutions Inc.)
942. STQ LLC
943. Strategic Health Alliance II, Inc.

944. Strategic Health Alliance Management Corp.
945. Strategic Sourcing Services LLC
946. Streator Radiation Oncology, LLC
947. Stubaital-Apotheke Mag.pharm. Christian Kernstock KG, LG Innsbruck
948. Summa Script LLC
949. Sund Apotek AS
950. SUPERFIELD LIMITED, England
951. Supplylogix LLC
952. T AND I WHITE LIMITED, England
953. T. Sheridan Sales & Marketing, Dublin
954. Tabor Apotheke Mag. pharm. Wolfram Schaden KG, LG Steyr
955. Tact.ai Technologies, Inc.
956. Targa Parent Holdings, LLC
957. TBC Products, Inc.
958. Temperature Controlled Pharmaceuticals Limited
959. Test Corporation changed 2 GM 3 AG
960. Test Entity - Corporation
961. Test Entity - Corporation (Glenette)
962. Test Entity - LLC (Anne)
963. Test Entity - LLC (Glenette)
964. Test Entity - LLC (Karen)
965. Test Entity - LLC (Melissa)
966. Test Entity - LP
967. Test Entity - Manager LLC
968. Test Entity - Member LLC
969. Test Entity - Parent Corporation
970. Texas Oncology, P.A.
971. Texas Pharmaceutical Services, LLC
972. Texas Proton Therapy Center, LLC
973. The Oregon Cancer Centers, Ltd.
974. Theratech, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
975. Thriftymed, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
976. THURNBY ROSE LIMITED, England
977. Titus Home Health Care LLC
978. Tjellesen Max Jenne A/S, Rodovre

979. Todin A/S, Denmark
980. TOPS Pharmacy Services, Inc.
981. Tower Radiation Technology, LLC
982. Tracer Enterprises LLC
983. Tri-State Radiation Oncology Centers, LLC
984. Truveris, Inc.
985. Tuna Acquisition Corp.
986. Tyler Radiation Equipment Leasing, LLC
987. Unicare Dispensers 16 Limited, Ireland
988. Unicare Dispensers 27 Limited, Ireland
989. Unicare Dispensers 5 Limited, Ireland
990. Unicare Pharmacy Group Limited, Dublin
991. United Drug (Wholesale) Limited
992. United Drug Distributors Ireland Limited
993. Unity Oncology, LLC
994. Urbani-Apotheke Mag. pharm. Bernhard Prattes KG, LG Graz
995. Urological Surgeons of Northern California
996. Urology of Indiana, LLC
997. Urology Specialists Radiation Assets Holdings Company, LLC
998. US Oncology Corporate, Inc.
999. US Oncology Holdings, Inc.
1000. US Oncology Lab Services, LLC
1001. US Oncology Pharmaceutical Services, LLC
1002. US Oncology Pharmacy GPO, L.P.
1003. US Oncology Reimbursement Solutions, LLC
1004. US Oncology Research, Inc. (US Oncology Research, LLC)
1005. US Oncology Research, LLC
1006. US Oncology Specialty, LP
1007. US Oncology, Inc.
1008. USCITA LIMITED, England
1009. USON Insurance Company
1010. USON Risk Retention Group, Inc.

E-35

1011. Utah Acquisition Corporation
1012. Valley Equipment Company
1013. Valley Health Enterprises, Inc
1014. Vantage Acquisition Company, LLC (Vantage Oncology, LLC)
1015. Vantage Acquisition Finance, LLC (Vantage Oncology, LLC)
1016. Vantage Cancer Care - Alabama, LLC (Vantage Cancer Care Networks, LLC)
1017. Vantage Cancer Care - Indiana, LLC (Vantage Cancer Care Networks, LLC)
1018. Vantage Cancer Care - New Mexico, LLC (Vantage Cancer Care Networks, LLC)
1019. Vantage Cancer Care Network of Alabama, LLC (Vantage Cancer Care Networks, LLC)
1020. Vantage Cancer Care Network of Indiana, LLC (Vantage Cancer Care Networks, LLC)
1021. Vantage Cancer Care Network of New Mexico, LLC (Vantage Cancer Care Networks, LLC)
1022. Vantage Cancer Care Networks, LLC
1023. Vantage Cancer Centers of Georgia, LLC
1024. Vantage Central Ohio Radiation Therapy, LLC
1025. Vantage Equipment Acquisition, LLC
1026. Vantage Exton Radiation Oncology, LLC
1027. Vantage Medical Management Services, LLC
1028. Vantage Mokena Radiation Oncology, LLC
1029. Vantage Oncology - Brooklyn, LLC
1030. Vantage Oncology Centers - Beverly Hills, LLC
1031. Vantage Oncology Finance Co. (Vantage Oncology, LLC)
1032. Vantage Oncology Holdings, LLC

1033. Vantage Oncology LLC PAC Corporation
1034. Vantage Oncology Physics, LLC
1035. Vantage Oncology Treatment Centers - Brevard, LLC
1036. Vantage Oncology Treatment Centers - Brockton, LLC
1037. Vantage Oncology Treatment Centers - Central Florida, LLC (Vantage Oncology Treatment Centers, LLC)
1038. Vantage Oncology Treatment Centers - Northern Arizona, LLC
1039. Vantage Oncology Treatment Centers - Ohio, LLC (Vantage Oncology Treatment Centers, LLC)
1040. Vantage Oncology Treatment Centers - San Antonio, LLC (Vantage Oncology Treatment Centers, LLC)
1041. Vantage Oncology Treatment Centers - Tri-State, LLC
1042. Vantage Oncology Treatment Centers, LLC
1043. Vantage Oncology, LLC
1044. Vantage Operational Support Services, LLC
1045. Vantage Radiation Oncology Associates, LLC
1046. Vantage San Antonio Radiation Oncology, LLC (Vantage Oncology Treatment Centers - San Antonio, LLC)
1047. Vantage South Suburban Radiation Oncology, LLC
1048. VC Services, Inc.
1049. VEC GP, LLC
1050. VerbalCare, LLC
1051. Verdal Apotek AS
1052. Very Important Products, Inc.
1053. Vineti, Inc.
1054. Vipal Soni, M.D. Inc.
1055. Visitacion Associates
1056. Vitapharm, proizvodnja in trgovina farmacevtskih izdelkov d.o.o., Murska Sobota

E-36

1057. Vitusapotek Jessheim Storsenter AS
1058. Vitusapotek Risør AS
1059. Vitus-Apoteket Torvbyen Fredrikstad AS
1060. VOTC-Queens, LLC
1061. Vulcan Acquisition Subsidiary, Inc.
1062. W H CHANTER LIMITED, England
1063. W H GREEN (CHEMISTS) LIMITED, England
1064. W JAMIESON (CHEMISTS) LIMITED, England
1065. W.H.C.P. (DUNDEE) LIMITED, Scotland
1066. Walsh Distribution, L.L.C.
1067. Walsh Healthcare Solutions LLC
1068. Walsh Healthcare Solutions, Inc.
1069. Walsh Heartland, L.L.C.
1070. Walsh Southwest L.L.C.
1071. Warrior Parent, LLC
1072. Well.ca ULC
1073. West Florida Radiation Therapy, LLC
1074. West Wholesale Drug Co.
1075. WESTCLOSE LIMITED, England
1076. Western Tumor Medical Group, Incorporated
1077. Western Tumor Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
1078. Westside LA Derm Equipment I, LLC
1079. WFCC Radiation Management Company, LLC
1080. Wickham Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
1081. Wiley Industries, LLC
1082. Wilkes Barre Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
1083. Wilkes-Barre Hospital Company, LLC
1084. Wilkes-Barre Radiation Oncology, LLC
1085. Windmill Realty, LLC
1086. WOODSIDE PHARMACY (GLASGOW) LIMITED, Scotland
1087. World Medical Government Solutions, LLC
1088. WorldMed Shared Services, Inc.
1089. WZ-WundZentren GmbH, AGm Düsseldorf
1090. Xealth, Inc.
1091. Ybbstal-Apotheke Mag.pharm. Adelheid Tazreiter KG, LG St. Pölten
1092. Zeepro, Inc

# EXHIBIT F

## Payment Schedule

The below reflects the maximum payment if all Tribes become Participating Tribes and no offsets or reductions pursuant to this Agreement apply.

The text of this Agreement explains the terms, conditions, and underlying calculations for each of these Payments.

| Payment Number | Amount | |
|---|---|---|
| Payment 1 | $ | 62,852,071.47 |
| Payment 2 | $ | 62,852,071.47 |
| Payment 3 | $ | 62,852,071.47 |
| Payment 4 | $ | 62,852,071.47 |
| Payment 5 | $ | 62,852,071.47 |
| Payment 6 | $ | 62,852,071.47 |
| Payment 7 | $ | 62,852,071.48 |
| **Total** | **$** | **439,964,500.30** |

$ 439,964,500.30 *Max After Credits*
$ 75,035,499.70 *Cherokee Nation Credit*
$ 515,000,000.00 *Tribal Settlement Amount*

F-1

EXECUTION COPY

**EXHIBIT G**

**ABC IRS Form 1098-F**

| | | | |
|---|---|---|---|
| 0303 | ☐ VOID | ☐ CORRECTED | |

| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Total amount required to be paid<br>$ 136,388,995.09 | OMB No. 1545-2284 | **Fines, Penalties, and Other Amounts** |
|---|---|---|---|
| [APPROPRIATE OFFICIAL]<br>Muscogee (Creek) Nation<br>[ADDRESS] | 2 Amount to be paid for violation or potential violation<br>$ | Form **1098-F**<br>(Rev. January 2022) | |
| | 3 Restitution/remediation amount | For calendar year<br>20 22 | |

| FILER'S TIN<br>XX-XXXXXXX | PAYER'S TIN<br>23-3079390 | $ 136,388,995.09.83 | 5 Date of order/agreement | **Copy A** |
|---|---|---|---|---|
| | | 4 Compliance amount<br>$ | XX/XX/2022 | **For Internal Revenue Service Center** |
| PAYER'S name<br>AmerisourceBergen Corporation | | 6 Court or entity | | **File with Form 1096.** |
| Street address (including apt. no.)<br>1 West First Avenue | | 7 Case number | | For Privacy Act and Paperwork Reduction Act Notice, see the **current General Instructions for Certain Information Returns.** |
| City or town, state or province, country, and ZIP or foreign postal code<br>Conshohocken, PA 19428 | | 8 Case name or names of parties to suit, order, or agreement | | |
| | | 9 Code<br>A, B | | |

Form **1098-F** (Rev. 1-2022)  Cat. No. 71382B  www.irs.gov/Form1098F  Department of the Treasury - Internal Revenue Service

Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page

G-1

EXECUTION COPY

# EXHIBIT H

## Cardinal Health IRS Form 1098-F

<table>
<tr><td colspan="2">0303    ☐ VOID    ☐ CORRECTED</td><td></td><td></td></tr>
<tr>
<td rowspan="3">FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no.<br><br>[APPROPRIATE OFFICIAL]<br>Muscogee (Creek) Nation<br>[ADDRESS]</td>
<td>1 Total amount required to be paid<br>$ 135,949,030.59</td>
<td>OMB No. 1545-2284</td>
<td rowspan="2">Fines, Penalties, and Other Amounts</td>
</tr>
<tr>
<td>2 Amount to be paid for violation or potential violation<br>$</td>
<td>Form 1098-F<br>(Rev. January 2022)</td>
</tr>
<tr>
<td>3 Restitution/remediation amount<br>$ 135,949,030.59</td>
<td>For calendar year<br>20 22</td>
<td></td>
</tr>
<tr>
<td>FILER'S TIN<br>XX-XXXXXXX</td>
<td>PAYER'S TIN<br>31-0958666</td>
<td>5 Date of order/agreement<br>XX/XX/2022</td>
<td>Copy A<br>For Internal Revenue Service Center</td>
</tr>
<tr>
<td>PAYER'S name<br>Cardinal Health, Inc. and consolidated subsidiaries</td>
<td>4 Compliance amount<br>$</td>
<td>6 Court or entity<br>U.S. District Court for the Northern District of Ohio and jurisdictions of other cases settled under the Settlement Agreement entered into by the Settling Distributors and the Participating Tribes (each as defined in such agreement), dated as of [].</td>
<td>File with Form 1096.</td>
</tr>
<tr>
<td>Street address (including apt. no.)<br>7000 Cardinal Place</td>
<td></td>
<td>7 Case number<br>No. 1:17-MD-02804 and other cases settled under the Settlement Agreement entered into by the Settling Distributors and the Participating Tribes (each as defined in such agreement), dated as of [].</td>
<td rowspan="2">For Privacy Act and Paperwork Reduction Act Notice, see the current General Instructions for Certain Information Returns.</td>
</tr>
<tr>
<td>City or town, state or province, country, and ZIP or foreign postal code<br>Dublin, Ohio 43017</td>
<td></td>
<td>8 Case name or names of parties to suit, order, or agreement<br>In re National Prescription Opiate Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors and the Participating Tribes (each as defined in such agreement), dated as of [].</td>
</tr>
<tr>
<td></td>
<td></td>
<td>9 Code<br>A, B</td>
<td></td>
</tr>
<tr>
<td>Form 1098-F (Rev. 1-2022)</td>
<td>Cat. No. 71382B</td>
<td>www.irs.gov/Form1098F</td>
<td>Department of the Treasury - Internal Revenue Service</td>
</tr>
</table>

Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page

H-1

# EXHIBIT I

## McKesson IRS Form 1098-F

| | | |
|---|---|---|
| **0303** ☐ VOID ☐ CORRECTED | | |

| FILER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | 1 Total amount required to be paid $ 167,626,474.61 | OMB No. 1545-2284 |
|---|---|---|
| | | Form **1098-F** |
| [APPROPRIATE OFFICIAL] Muscogee (Creek) Nation [ADDRESS] | 2 Amount to be paid for violation or potential violation $ | (Rev. January 2022) |
| | 3 Restitution/remediation amount $ 167,626,474.61 | For calendar year 20 22 |

| FILER'S TIN XX-XXXXXXX | PAYER'S TIN 23-3079390 | 4 Compliance amount $ | 5 Date of order/agreement XX/XX/2022 |
|---|---|---|---|

| PAYER'S name McKesson Corporation | 6 Court or entity   U.S. District Court for the Northern District of Ohio and |
|---|---|

Fines, Penalties, and Other Amounts

Copy A

For Internal Revenue Service Center

File with Form 1096.

For Privacy Act and Paperwork Reduction Act Notice, see the current General Instructions for Certain Information Returns.

6 Court or entity   U.S. District Court for the Northern District of Ohio and jurisdictions of other cases settled under the Settlement Agreement entered into by the Settling Distributors and the Participating Tribes (each as defined in such agreement), dated as of [].

Street address (including apt. no.)
6535 N. State Highway 161

City or town, state or province, country, and ZIP or foreign postal code
Irving, TX 75039

7 Case number   1:17-MD-2804 and other cases settled under the Settlement Agreement entered into by the Settling Distributors and the Participating Tribes (each as defined in such agreement), dated as of [].

8 Case name or names of parties to suit, order, or agreement
In re Opioid Litigation and other cases settled under the Settlement Agreement entered into by the Settling Distributors and the Participating Tribes (each as defined in such agreement), dated as of [].

9 Code
A, B

Form **1098-F** (Rev. 1-2022)      Cat. No. 71382B      www.irs.gov/Form1098F      Department of the Treasury - Internal Revenue Service

**Do Not Cut or Separate Forms on This Page — Do Not Cut or Separate Forms on This Page**

EXECUTION COPY

## **EXHIBIT J**

## **TAFT III Trust Agreement**

EXECUTION COPY

**<u>TRIBAL ABATEMENT FUND TRUST III</u>**

**<u>TRUST AGREEMENT</u>**

**DATED AS OF [●], 2022**

*Pursuant to the Distributors' Tribal Settlement Agreement*
*Between the Tribal Leadership Committee and*
*the Settling Distributors and their affiliates*
*Dated [●], 2022*

EXECUTION COPY

# TRIBAL ABATEMENT FUND TRUST III

## TABLE OF CONTENTS

**Page**

ARTICLE 1 AGREEMENT OF TRUST.................................................................................2
    Section 1.1    Creation and Name.................................................................2
    Section 1.2    Purposes.................................................................................2
    Section 1.3    Transfer of Assets.................................................................3
    Section 1.4    Acceptance of Assets............................................................3
    Section 1.5    Tribe Beneficiaries...............................................................4
    Section 1.6    Jurisdiction...........................................................................4

ARTICLE 2 POWERS AND TRUST ADMINISTRATION .........................................4
    Section 2.1    Powers...................................................................................4
    Section 2.2    General Administration .......................................................6
    Section 2.3    Accounting...........................................................................6
    Section 2.4    Financial Reporting .............................................................7
    Section 2.5    Tribal Opioid Abatement Reporting....................................7
    Section 2.6    Beneficiary Reporting .........................................................7
    Section 2.7    Limitation of the Directors' Authority ...............................8

ARTICLE 3 ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES .....8
    Section 3.1    Accounts. .............................................................................8
    Section 3.2    Investment Guidelines ........................................................8
    Section 3.3    Payment of TAFT III Operating Expenses. ........................8

ARTICLE 4 ABATEMENT DISTRIBUTIONS.............................................................9
    Section 4.1    Abatement Distributions......................................................9
    Section 4.2    Manner of Payment of Abatement Distributions. ...............9
    Section 4.3    Delivery of Abatement Distributions. ...............................10

ARTICLE 5 DIRECTORS AND DELAWARE TRUSTEE ........................................10
    Section 5.1    Number of Directors; Managing Director. .........................10
    Section 5.2    Term of Service, Successor Directors. ...............................10
    Section 5.3    Directors' Meetings............................................................12
    Section 5.4    Compensation and Expenses of Directors ..........................13
    Section 5.5    Directors' Independence.....................................................13
    Section 5.6    Standard of Care; Exculpation. ..........................................13
    Section 5.7    Protective Provisions..........................................................14
    Section 5.8    Indemnification. .................................................................15
    Section 5.9    Bond....................................................................................16
    Section 5.10    Delaware Trustee...............................................................16
    Section 5.11    Meeting Minutes; Rights of Inspection. ............................18

Section 5.12   Trust Protector...............................................................................19

ARTICLE 6 GENERAL PROVISIONS....................................................................20

    Section 6.1    Irrevocability................................................................................20
    Section 6.2    Term; Termination.......................................................................20
    Section 6.3    Taxes............................................................................................20
    Section 6.4    Modification.................................................................................21
    Section 6.5    Communications...........................................................................22
    Section 6.6    Severability..................................................................................22
    Section 6.7    Notices.........................................................................................22
    Section 6.8    Successors and Assigns................................................................24
    Section 6.9    Limitation on Transferability; Tribe Beneficiaries' Interests.................24
    Section 6.10   Exemption from Registration......................................................25
    Section 6.11   Entire Agreement; No Waiver....................................................25
    Section 6.12   Headings......................................................................................25
    Section 6.13   Governing Law.............................................................................25
    Section 6.14   Dispute Resolution......................................................................26
    Section 6.15   Sovereign Immunity....................................................................26
    Section 6.16   Effectiveness...............................................................................26
    Section 6.17   Counterpart Signatures................................................................26

EXHIBIT 1 PARTICIPATING TRIBES and FINAL TRIBAL ALLOCATION
DISTRIBUTION PERCENTAGES.............................................................................28

EXHIBIT 2 FORM OF CERTIFICATE OF TRUST OF THE  TRIBAL ABATEMENT
FUND TRUST III........................................................................................................29

EXHIBIT 3 INVESTMENT GUIDELINES..............................................................30

EXHIBIT 4 TRIBAL ABATEMENT FUND TRUST III TRUST DISTRIBUTION
PROCEDURES...........................................................................................................33

## TRIBAL ABATEMENT FUND

## TRUST III AGREEMENT

This Tribal Abatement Fund Trust III ("**TAFT III**" or the "**Trust**") Agreement (together with all Exhibits hereto, this "**Trust Agreement**"), dated and effective as of [●], 2022 (the "**Effective Date**"), is entered into in furtherance of the administration of the Distributors' Tribal Settlement Agreement between the Tribal Leadership Committee ("**TLC**") and AmerisourceBergen Corporation, Cardinal Health, Inc., and McKesson Corporation (collectively, the "**Settling Distributors**" and with the TLC, the "**Parties**"), dated October 26, 2022 (as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Distributors' Tribal Settlement Agreement**" or "**DTSA**"),[1] in the matter of *In re National Prescription Opiate Litigation,* MDP No. 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio (the "**Court**"). This Trust Agreement is entered into by the trustees of the Tribal Abatement Fund Trust III who are further identified on the signature pages hereto (together with any successor trustee serving in such capacity, the "**Directors**"),[2] the Delaware Trustee (together with any successor serving in such capacity, the "**Delaware Trustee**") and the Trust Protector, the individual who is further identified on the signature pages hereto (together with any successor serving in such capacity, the "**Trust Protector**").

## <u>RECITALS</u>

**WHEREAS**, the Settling Distributors Tribal Opioid Settlement Trust Fund (the "**Settling Distributors Settlement Trust**") has been established pursuant to the sealed order of the Court filed December 24, 2021 (the "**Settling Distributors QSF Order**"), to aid in the administration of the Parties' settlement;

**WHEREAS**, the Parties entered into the DTSA, dated as of October 26, 2022, subject to certain required participation acceptances by the Tribes as set forth in the DTSA;

**WHEREAS**, the TLC has notified the Settling Distributors that the required participation acceptances have occurred and, as a result, the "Tribal Reference Date" under the DTSA has occurred;

**WHEREAS**, the DTSA provides that following the Effective Date, David R. Cohen and Judge Layn Phillips (the "**Tribal Allocation Appointees**") will determine the Final Tribal

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Distributors' Tribal Settlement Agreement or any Exhibits attached hereto, as applicable.

[2] The initial Directors shall be Kevin Washburn, Mary Smith and Kathy Hannan; the initial Trust Protector shall be Professor Stacy Leeds.

Allocation Distribution Percentages, which shall be set forth on Exhibit [M] to the DTSA and which shall be incorporated herein as **Exhibit 1** of this Trust Agreement;

**WHEREAS**, pursuant to the Settling Distributors QSF Order, David R. Cohen, Special Master to Judge Polster in MDL No. 2804 (the "**Special Master**") was appointed as Trust Administrator of the Settling Distributors Settlement Trust and is authorized to receive the Settling Distributors' payments under the DTSA and to direct funds to be distributed to the Tribes, as provided in the DTSA;

**WHEREAS**, in accordance with the DTSA, TAFT III has been established for the distribution to and abatement reporting by Tribe Beneficiaries, as defined in Section 1.5(a), in accordance with the terms of the DTSA and this Trust Agreement.

**WHEREAS**, pursuant to the DTSA, TAFT III shall (a) receive distributions from the Settling Distributors Settlement Trust, (b) make Abatement Distributions (as defined below) to Tribe Beneficiaries in accordance with this Trust Agreement and the TAFT III TDP attached hereto as **Exhibit 4** (the "**TAFT III TDP**"), and (c) carry out such other matters as are set forth in the Trust Documents (as defined below).

**WHEREAS**, pursuant to the DTSA, the Trust shall (a) distribute Trust Assets in accordance with this Trust Agreement and the TAFT III TDP; (b) pay TAFT III Operating Expenses, as defined in Section 1.2(f)(ii); (c) hold and maintain the TAFT III Operating Reserve, as defined in Section 1.2(f)(ii); and (d) hold, manage, protect and invest all Trust Assets received by the Trust for the benefit of the Tribe Beneficiaries, pending distribution to Tribe Beneficiaries, satisfaction of TAFT III obligations, or payment of TAFT III Operating Expenses.

**WHEREAS**, the Trust is intended to qualify as a "qualified settlement fund" within the meaning of Section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended (the "**Code,**" and such regulations, the "**QSF Regulations**") and corresponding or similar provisions of relevant state or local law.

**NOW**, **THEREFORE**, it is hereby agreed as follows:

## ARTICLE 1
## AGREEMENT OF TRUST

**Section 1.1    Creation and Name.** There is hereby created a trust known as the "**Tribal Abatement Fund Trust III**" or "**TAFT III.**" The Directors may transact the business and affairs of the Trust in the name of TAFT III. It is the intention of the Parties hereto that the Trust constitutes a statutory trust under Chapter 38 of Title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "**Act**") and that this Trust Agreement together with all Exhibits hereto (collectively, the "**Trust Documents**") constitute the governing instruments of the Trust. The Directors and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as **Exhibit 2**.

**Section 1.2    Purposes**. The purposes of the Trust are, among other things, to:

(a)    receive distributions from the Settling Distributors Settlement Trust;

(b)    hold, manage, protect and invest the Trust Assets in accordance with the terms of the Trust Documents, for the benefit of the Tribe Beneficiaries;

(c)    engage in any lawful act or activity, including, without limitation, to enter into leasing, financing or other agreements with third parties, that is consistent with, necessary or incidental to the Trust Documents;

(d)    qualify at all times as a "qualified settlement fund" within the meaning of the QSF Regulations and corresponding or similar provisions of relevant state or local law;

(e)    engage in any lawful activity necessary or incidental to the foregoing; and

(f)    use the Trust Assets to:

    (i)    make Abatement Distributions (as defined below) to Tribe Beneficiaries in accordance with this Trust Agreement and the TAFT III TDP;

    (ii)    hold and maintain reserves to pay the fees and expenses incurred with administering the Trust (including the TAFT III TDP) and managing the Trust Assets (together, the "**TAFT III Operating Expenses**") of the Trust (such reserves, the "**TAFT III Operating Reserve**"), which shall be funded with cash and cash equivalents held by the Trust in accordance with the Trust Documents;

    (iii)    pay TAFT III obligations and the TAFT III Operating Expenses from the TAFT III Operating Reserve; and

    (iv)    replenish periodically, until the dissolution of the Trust, the TAFT III Operating Reserve from cash held or received by the Trust to the extent deemed necessary by the Directors to satisfy and pay estimated future TAFT III Operating Expenses in accordance with the Trust Documents.

**Section 1.3    Transfer of Assets.** Pursuant to the DTSA, the Trust shall receive distributions from the Settling Distributors Settlement Trust (together with any income or gain earned thereon, collectively, the "**Trust Assets**"). The Trust Assets shall not be subject to attachment, disgorgement or recoupment by any person, except there shall be allowed a reversion of Trust Assets to the Settling Distributors only to the extent set forth in Section 4.2.

**Section 1.4    Acceptance of Assets.**

(a)    In furtherance of the purposes of the Trust, the Directors, in their capacity as

trustees, on behalf of the Trust, accept the transfer to the Trust of the initial TAFT III funding from the Settling Distributors Settlement Trust and shall accept the subsequent funding and transfers contemplated by the DTSA, subject to the terms of the Trust Documents. Except as otherwise provided in Section 4.2, the Settling Distributors will have no equitable or legal interest in, or with respect to, the Trust Assets or the Trust.

(b)    Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TAFT III TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law.

(c)    In this Trust Agreement and the TAFT III TDP, the words "must," "will," and "shall" are intended to have the same mandatory force and effect, while the word "may" is intended to be permissive rather than mandatory.

### Section 1.5    Tribe Beneficiaries.

(a)    The beneficial owners (within the meaning of the Act) of the Trust are the tribes or tribal organizations identified as Participating Tribes on **Exhibit 1** hereto (together with the tribe or tribal entity organization added to such **Exhibit 1** after the Effective Date in accordance with the DTSA, each, a "**Tribe Beneficiary**" and, collectively, the "**Tribe Beneficiaries**").

(b)    The Tribe Beneficiaries shall have only such rights with respect to the Trust and its assets as are set forth in this Trust Agreement and the TAFT III TDP and no greater or other rights, including upon dissolution, liquidation or winding up of the Trust, shall be deemed to apply to such Tribe Beneficiaries.

(c)    The Tribe Beneficiaries shall be subject to the terms of this Trust Agreement, including, without limitation, Article 4 and the terms of the TAFT III TDP.

### Section 1.6    Jurisdiction. The Court shall have continuing jurisdiction over the Trust, provided, however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Trust.

## ARTICLE 2
## POWERS AND TRUST ADMINISTRATION

### Section 2.1    Powers.

(a)    The Directors in their capacity as trustees are and shall act as fiduciaries to the Trust in accordance with the provisions of this Trust Agreement. The Directors shall, at all times, administer the Trust in accordance with the purposes set forth in Section 1.2 above. Subject to the limitations set forth in the Trust Documents, the Directors shall have the power to take any and all actions that in the judgment of the Directors are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power

reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware. In the event of any ambiguity or conflict between the terms of this Trust Agreement and the TAFT III TDP, the TAFT III TDP shall control.

(b)     Except as required by applicable law or the Trust Documents, the Directors need not obtain the order or approval of any court for the exercise of any power or discretion conferred hereunder.

(c)     Without limiting the generality of Section 2.1(a) above, and except as limited in the Trust Documents and by applicable law, the Directors shall have the power to:

(i)      receive and hold the Trust Assets and exercise all rights with respect thereto;

(ii)     invest the monies and other Trust Assets held from time to time by the Trust, subject to the limitations set forth in Section 3.2 below;

(iii)    enter into leasing, financing or other agreements with third parties as deemed by the Directors in their discretion to be useful in carrying out the purposes of the Trust;

(iv)    determine and pay obligations and liabilities of the Trust and the TAFT III Operating Expenses;

(v)     establish accounts and reasonable reserves within the Trust, as deemed by the Directors in their discretion to be necessary, prudent or useful in administering the Trust;

(vi)    bring any action in any court of competent jurisdiction, including the Court;

(vii)   initiate, prosecute, defend and resolve all legal actions and other proceedings related to any Trust Asset, liability or responsibility of the Trust;

(viii)  supervise and administer the Trust in accordance with the Trust Documents, including, without limitation, to monitor the Abatement Distribution (as defined below) recipients' compliance with the TAFT III TDP requirements for Approved Tribal Opioid Abatement Uses and Approved Administrative Expenses (as defined in the TAFT III TDP);

(ix)    appoint such officers and retain such employees, consultants, advisors, attorneys, independent contractors, experts and agents and engage in such legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Directors permit and as the Directors, in their discretion, deem

advisable or necessary in order to carry out the terms of this Trust Agreement;

(x)     pay reasonable compensation and expenses to any of the Trust's employees, consultants, advisors, independent contractors, experts and agents for legal, financial, administrative, accounting, investment, auditing and alternative dispute resolution services and activities as the Trust requires;

(xi)    compensate the Directors, Delaware Trustee, the Trust Protector, and their employees, consultants, advisors, independent contractors, experts and agents, and reimburse the Directors, the Delaware Trustee and the Trust Protector for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xii)   execute and deliver such instruments as the Directors consider necessary or desirable in administering the Trust;

(xiii)  enter into such other arrangements with third parties as are deemed by the Directors to be advisable or necessary in carrying out the purposes of the Trust; provided that such arrangements do not conflict with any other provision of this Trust Agreement;

(xiv)   in accordance with Section 5.8 below, defend, indemnify and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined in Section 5.6(a) below) to the maximum extent permitted by law;

(xv)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.6 below; provided that such investment advisors and investment managers shall be in compliance with the Investment Guidelines (as defined in Section 3.2) at all times;

(xvi)   make, join, pursue (by litigation or otherwise), abandon, collect, compromise or settle, or otherwise resolve, in the name of the Trust any claim, right, action or cause of action of the Trust, before any court of competent jurisdiction and without approval of the Court;

(xvii)  contract for the establishment and continuing maintenance of (a) a secure method of internet-based communications for the Trust and the Tribe Beneficiaries as described in Section 6.5 herein (the "**Tribal Opioid Settlement Portal**") and (b) a public-facing website to publish all information required to be published under the Trust Documents (the "**Tribal Opioid Settlement Website**"); and

(xviii)  exercise any and all rights of the Directors, and take any and all actions as are permitted, in accordance with and subject to the terms of this Trust Agreement.

(d)  The Directors shall not have the power to cause the Trust to guarantee any debt of other persons.

(e)  Except as otherwise set forth in the Trust Documents, and subject to retention of jurisdiction by the Court as provided in the DTSA, but without prior or further authorization, the Directors may control and exercise authority over the Trust Assets and over the protection, conservation and disposition thereof. No person dealing with the Trust shall be obligated to inquire into the authority of the Directors in connection with the protection, conservation or disposition of the Trust Assets.

**Section 2.2  General Administration**. The Directors shall act in accordance with the Trust Documents. The mailing address of the Trust is Tribal Abatement Fund Trust III, P.O. Box 65097, Washington, DC 20035. The Directors may change the location of the principal office and may establish other offices at other locations. The Directors shall provide notice to the Tribe Beneficiaries upon establishment of any office by posting such information in the Tribal Opioid Settlement Portal (or by other means approved by the Directors).

**Section 2.3  Accounting**. The fiscal year of the Trust shall begin on January 1 and shall end on December 31 of each calendar year. The Directors shall maintain the books and records relating to the Trust Assets and income and the payment of expenses of and liabilities against the Trust. The detail of these books and records and the duration of time during which the Directors shall keep such books and records shall be such as to allow the Directors to make a full and accurate accounting of all Trust Assets, as well as to comply with applicable provisions of law and standard accounting practices necessary or appropriate to produce an annual report containing special-purpose financial statements of the Trust, including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year (the "**Annual Report**"); provided, however, that the Directors shall maintain such books and records until the wind-up of the Trust's affairs and satisfaction of all of the Trust's liabilities.

**Section 2.4  Financial Reporting**. The Directors shall engage a firm of independent certified public accountants (the "Independent Auditors") selected by the Directors, to audit the Annual Report. Within one hundred twenty (120) days following the end of each calendar year, the Directors shall (a) deliver to the Settling Distributors Settlement Trust the Annual Report audited by the Independent Auditors and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements, and (b) publish a copy of such Annual Report on the Tribal Opioid Settlement Website.

**Section 2.5  Tribal Opioid Abatement Reporting.**

(a)  Within one hundred and twenty (120) days following the end of each calendar year,

the Directors shall (i) cause to be prepared and delivered to the Settling Distributors Settlement Trust and to the Settling Distributors an annual report on the Approved Tribal Opioid Abatement Uses with respect to such period, together with such additional information as the Directors determine necessary or appropriate in their discretion (each, a "**Tribal Opioid Abatement Report**"), and (ii) post a copy of the Tribal Opioid Abatement Report on the Tribal Opioid Settlement Website.

(b)    For the avoidance of doubt, the Directors shall not be required to include in any TAFT III Tribal Opioid Abatement Report any abatement matters except those that pertain to TAFT III exclusively.

**Section 2.6    Beneficiary Reporting.**

(a)    Reporting of Approved Tribal Opioid Abatement Uses by the Tribe Beneficiaries shall be required to the extent set forth in the TAFT III TDP. The Directors shall establish the form, content, and due dates of periodic reports with respect to Approved Tribal Opioid Abatement Uses to be submitted by the Tribe Beneficiaries (each, a "**Beneficiary Abatement Use Report**") to the Directors through the Tribal Opioid Settlement Portal (or delivered by other means approved by the Directors). The Directors may prescribe a modified reporting regime for certain Tribe Beneficiaries based upon appropriate standards to be developed by the Directors, provided such modified reporting regime is not inconsistent with the Trust's reporting obligations, as determined by the Directors in their discretion. The Directors shall endeavor to implement appropriate mechanisms, in their discretion consistent with the Trust Documents, to obtain efficiency in reporting by Tribe Beneficiaries with respect to TAFT III and other comparable opioid abatement trusts benefitting the Tribe Beneficiaries. Each Beneficiary Abatement Use Report shall contain the information necessary to:

(i)    enable the Trust to satisfy the audited Annual Report requirements described in Section 2.4 above; and

(ii)    enable the Trust to satisfy the Tribal Opioid Abatement Report requirements described in Section 2.5(a) above.

**Section 2.7    Limitation of the Directors' Authority**. The Directors are not authorized to engage in any trade or business with respect to the Trust Assets or proceeds therefrom. The foregoing limitation shall not prevent the Directors from managing the investment of the Trust Assets.

**ARTICLE 3**
**ACCOUNTS, INVESTMENTS, ADMINISTRATIVE EXPENSES**

**Section 3.1    Accounts.**

(a)    The Directors shall maintain one or more accounts ("**Trust Accounts**") on behalf of the Trust with one or more financial depository institutions (each, a "**Financial Institution**").

J-12

Candidates for the positions of Financial Institution shall fully disclose to the Directors any interest in or relationship with the Settling Distributors or a named defendant in MDL No. 2804, their affiliated persons, or any Released Entities. Any such interest or relationship shall not be an automatic disqualification for the position, but the Directors shall take any such interest or relationship into account in selecting a Financial Institution.

(b)     The Directors may, from time to time, create such accounts and reasonable reserves within the Trust Accounts as authorized in this Section 3.1 and as they may deem necessary, prudent or useful in order to provide for Abatement Distributions (as defined herein) to the Tribe Beneficiaries and the payment of TAFT III Operating Expenses and may, with respect to any such account or reserve, restrict the use of money therein for a specified purpose (the "**Trust Subaccounts**"). Any such Trust Subaccounts established by the Directors shall be held as Trust Assets and are not intended to be subject to separate entity tax treatment as a "disputed claims reserve" within the meaning of the Code or the Treasury Regulations, or a "disputed ownership fund" within the meaning of the Treasury Regulations, or otherwise.

(c)     The Directors may replace any retained Financial Institution with a successor Financial Institution at any time and such successor shall be subject to the considerations set forth in Section 3.1(a).

**Section 3.2     Investment Guidelines**. The Directors may invest the Trust Assets in accordance with the Investment Guidelines, attached hereto as **Exhibit 3** (the "**Investment Guidelines**"). Notwithstanding any contrary provision of the Trust Documents, this Section 3.2 and the Investment Guidelines cannot be modified or amended.

**Section 3.3     Payment of TAFT III Operating Expenses.** All TAFT III Operating Expenses shall be payable out of the TAFT III Operating Reserve. None of the Directors, the Delaware Trustee, the Trust Protector, the Tribe Beneficiaries, the Settling Distributors, nor any of their employees, officers, consultants, advisors, independent contractors, experts or agents shall be personally liable for the payment of any TAFT III Operating Expense or any other liability of the Trust. In their discretion, the Directors may incur and pay TAFT III Operating Expenses after making appropriate allocations of common charges that are incurred for the benefit of TAFT III and other tribal opioid abatement entities created prior to or after the Effective Date (for example, the Tribal Opioid Settlement Website).

## ARTICLE 4
## ABATEMENT DISTRIBUTIONS

**Section 4.1     Abatement Distributions**. The Directors shall make Abatement Distributions only as and to the extent set forth in this Article 4 and the TAFT III TDP (the "**Abatement Distributions**"). Abatement Distributions shall be used by the Tribe Beneficiaries as described in Section 3 of the TAFT III TDP.

**Section 4.2     Manner of Payment of Abatement Distributions.**

(a)     The Directors shall endeavor to provide ten (10) days' notice to the Tribe Beneficiaries of any upcoming Abatement Distribution through the Tribal Opioid Settlement Portal (or by other means approved by the Directors); provided, however, that the Directors may shorten such notice period in their discretion.

(b)     Abatement Distributions shall be made to Participating Tribes in accordance with the Final Tribal Allocation Distribution Percentages to be set forth on **Exhibit 1** hereto. Abatement Distributions shall be made to Tribes that become Participating Tribes after the Effective Date in accordance with Section V.E of the DTSA.

(c)     Abatement Distributions may be made by the Directors or by a disbursement agent retained by the Trust to make Abatement Distributions on its behalf (the "**Disbursement Agent**"). Abatement Distributions shall be made in accordance with the TAFT III TDP on the dates approved for distribution by the Directors.

(d)     The Directors may cause Abatement Distributions to be withheld with respect to any Tribe Beneficiary that has failed to deliver timely a completed Beneficiary Abatement Use Report by the applicable due date. The Directors shall allow for a reasonable period of time to cure any delinquent Beneficiary Abatement Use Report and may continue to withhold distributions to a Tribe Beneficiary until all such delinquent Beneficiary Abatement Use Reports of such Tribe Beneficiary have been cured.

(e)     If the Directors determine, in their discretion, that making the final Abatement Distribution immediately prior to the termination and dissolution of the Trust is not cost-effective with respect to the final amounts to be distributed to the Tribe Beneficiaries, the Directors shall have the authority to direct such final Abatement Distribution, in full, to a tax-exempt organization that has opioid abatement as part of its mission, such as the National Indian Health Board, as selected by the Directors in their discretion. The Directors shall instruct the tax-exempt organization to use the Abatement Distribution solely for opioid abatement purposes.

(f)     Notwithstanding the foregoing, the Directors shall cause Trust Assets to revert to the Settling Distributors only to the extent required by Section V.E of the DTSA.

(g)     Prior to disbursing funds to any Participating Tribe, the Directors shall obtain from each Participating Tribe any required payment documentation (including, as needed, wire instructions and W-9 forms) as well as an authorization that the account to which the funds will be sent is authorized to receive funds for the Participating Tribe in connection with the Distributors' Tribal Settlement Agreement.

### Section 4.3     Delivery of Abatement Distributions.

(a)     All Abatement Distributions under this Trust Agreement shall be made (i) in accordance with the electronic transfer information or (ii) by check at the address provided by the Tribe Beneficiaries in accordance with the TAFT III TDP. Changes to such electronic transfer information or address, as applicable, must be provided to the Trust or the Disbursement Agent in

J-14

writing at least five (5) business days prior to any upcoming Abatement Distribution date; provided, however, that the Directors and Disbursement Agent shall have the authority, in their discretion, to seek further direction from the Tribe Beneficiaries regarding the transfer information of Abatement Distributions under this Trust Agreement.

(b)      In the event that any Abatement Distribution is undeliverable, no further Abatement Distribution shall be made unless and until the Directors have been notified of the then current wire instructions or address, as applicable, as directed by such Tribe Beneficiary, at which time such distribution shall be made without interest. The Directors shall take reasonable efforts to obtain a current address or wire instructions, as applicable, for any Tribe Beneficiary with respect to which any distribution is undeliverable, but shall have no obligation to make further inquiry with respect to designated recipients of such Tribe Beneficiaries.

(c)      No Trust Asset or any unclaimed property shall escheat to any federal, state or local government or any other entity.

## ARTICLE 5
## DIRECTORS AND DELAWARE TRUSTEE

### Section 5.1      Number of Directors; Managing Director.

(a)      **Number**. In addition to the Delaware Trustee appointed pursuant to Section 5.10, there shall be three (3) Directors. The initial Directors shall be those persons named on the signature page hereof.

(b)      **Managing Director**. At their first meeting, the initial Directors shall designate one of their number to serve as the Managing Director of the Trust, with such administrative duties as the Directors may determine (the "**Managing Director**"). The Directors may change the designation of the individual to serve as Managing Director from time to time as circumstances warrant. The Managing Director or, in the Managing Director's absence, another Director selected by the Directors shall preside at meetings of the Directors. The Managing Director, or the Director presiding over such meeting, shall be responsible for taking meeting minutes at each meeting of the Directors and for performing such other administrative duties and services as shall be assigned to or required of the Managing Director by the Directors. The Managing Director shall maintain a list of current Directors, including their addresses and contact information.

### Section 5.2      Term of Service, Successor Directors.

(a)      Term. Each Director shall serve until the earlier of (i) his or her death, (ii) his or her resignation or removal pursuant to Section 5.2(c) below, or (iii) the termination of the Trust pursuant to the terms of this Trust Agreement. The term of a newly appointed Director shall commence upon his or her acceptance as such.

(b)      Appointment of Successor Directors.

(i)     In the event of a vacancy in the position of one (1) Director for any reason, the vacancy shall be filled by the unanimous vote of the remaining Directors. In the event that the remaining Directors cannot agree on a successor Director within thirty (30) days, each of the remaining Directors shall propose a Director candidate and the Trust Protector (as defined in Section 5.12(a) below) shall select one such candidate as the Successor Director.

(ii)    In the event of a vacancy in the position of two (2) Directors for any reason, the remaining Director and the Trust Protector shall, after consultation, jointly appoint two (2) successor Directors, both of whom shall each be acceptable to both of the remaining Director and the Trust Protector. In the event the remaining Director and the Trust Protector cannot agree on two (2) successor Directors, the selection of two (2) successor Directors shall be resolved in accordance with the dispute resolution provisions of Section 6.14.

(iii)   In the event of a vacancy in the position of three (3) Directors for any reason, the Trust Protector shall recommend three (3) successor Directors for the Delaware Court of Chancery to appoint and any costs relating thereto shall be borne by the Trust.

(iv)    Notice of the appointment of any successor Director(s) shall be filed with the Court and shall be published on the Tribal Opioid Settlement Website when it is filed with the Court.

(v)     In filling any vacancy in the position of one or more Directors, the remaining Director(s) and/or the Trust Protector shall apply the following standard to any successor Director: the successor Director shall be a disinterested, independent individual with experience in one or more of the following areas: public policy/public health, tribal health or welfare, tribal self-determination, administration or self-governance, other tribal affairs, ethics and compliance, finance, general business and/or corporate governance.

(vi)    Immediately upon the appointment of any successor Director(s), all rights, titles, duties, powers and authority of the predecessor Director(s) hereunder shall be vested in, and undertaken by, the successor Director (s) without any further act. No successor Director(s) shall be liable personally for any act or omission of his or her predecessor Director. No successor Director shall have any duty to investigate the acts or omissions of his or her predecessor Director.

(c)     **Resignation or Removal**. A Director may resign by giving written notice to either

of the other Directors. Such notice shall specify a date when such resignation shall take effect, which, except in the case of incapacity or disability, shall not be less than ninety (90) days after the date such notice is given, where practicable. A Director may be removed by unanimous vote of the remaining Directors in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence or for other good cause, provided such Director has received reasonable notice and an opportunity to be heard by the remaining Directors. Other good cause shall mean fraud, self-dealing, intentional misrepresentation, willful misconduct, indictment for or conviction of a felony in each case whether or not connected to the Trust, any substantial failure to comply with the administration of the Trust or a consistent pattern of neglect and failure to perform or participate in performing the duties of a Director hereunder. For the avoidance of doubt, any removal of a Director pursuant to this Section 5.2(c) shall require the approval of the Court and shall take effect at such time as the Court shall determine.

**Section 5.3    Directors' Meetings.**

(a)    **Regular Meetings**. The Directors shall hold regular meetings not less than quarterly, which may be held without notice at such times and at such places as may be determined from time to time by the Directors. For the avoidance of doubt, the Delaware Trustee shall not be required or permitted to attend any meetings of the Directors contemplated by this Section 5.3.

(b)    **Special Meetings**. Special meetings of the Directors may be called by any Director by giving written notice to each other Director not less than one (1) business day prior to the date of the meeting. Any such notice shall include the time, place and purpose of the meeting, given to each Director by overnight courier, personal delivery, facsimile, electronic mail or other similar means of communication. Notice shall be addressed or delivered to each Director at the Director's address as shown upon the records of the Trust or as may have been given to Directors by the Director for purposes of notice. If a Director's address is not shown on such records or is not readily ascertainable, notice to the Director may be given care of the principal office of the Trust. Notice by overnight courier shall be deemed to have been given one (1) business day after the time that written notice is provided to such overnight courier. Any other written notice shall be deemed to have been given at the time it is personally delivered to the recipient or actually transmitted by the person giving the notice by electronic means to the recipient.

(c)    **Action and Quorum**. In all matters pertaining to the affairs of the Trust, the Directors shall act by a vote of a majority of the number of Directors then in office, which such majority shall constitute a quorum of the Directors for the transaction of business, except to adjourn as provided in Section 5.3(f).

(d)    **Participation in Meetings by Telephone Conference**. Directors may participate in a meeting of the Directors by conference telephone or similar communications equipment (which shall include virtual meetings via video conferencing software), as long as all Directors participating in such meeting can hear one another. Participation by a Director in a meeting pursuant to this Section 5.3(d) shall constitute presence in person at such meeting.

(e)     **Waiver of Notice**. Notice of a meeting need not be given to any Director who signs a waiver of notice, whether before or after the meeting. All such waivers shall be filed with the Trust records or made a part of the minutes of the meeting. Attendance at a meeting by a Director shall constitute a waiver of notice of such meeting except when the Director attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any Director meeting need be specified in any waiver of notice.

(f)     **Adjournment**. A majority of the Directors present, whether or not a quorum exists, may adjourn any Directors meeting to another time and place.

(g)     **Action by Unanimous Written Consent**. Any action required or permitted to be taken at any meeting of the Directors may be taken without a meeting, if all of the Directors then in office consent thereto in writing or by Electronic Transmission, which writing may be executed in one or more counterparts, and the writing or Electronic Transmission are filed with the meeting minutes of the Directors. As used herein, "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 5.4     Compensation and Expenses of Directors**. The Directors shall receive compensation from the Trust for their services as Directors. The Trust shall also, upon receipt of appropriate documentation, reimburse all reasonable out-of-pocket costs and expenses incurred by each Director in the course of carrying out their duties as Directors in accordance with reasonable policies and procedures as may be adopted from time to time, including in connection with attending meetings of the Directors. The amounts paid to the Directors for compensation and expenses shall be disclosed in the Annual Report.

**Section 5.5     Directors' Independence.**

(a)     The Directors shall not, during their service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for Settling Distributors or a defendant in MDL No. 2804, their affiliated persons, or any Released Entities. No Director shall act as an attorney for any Tribe in a matter that (i) directly or indirectly relates to claims arising from the use of opioids by any person, or (ii) is directly adverse to the claims of another Tribe. For the avoidance of doubt, this provision shall not apply to the Delaware Trustee.

(b)     The Directors, and the Delaware Trustee, shall be indemnified by the Trust in acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order or other paper or document believed by them to be genuine and to have been signed or presented by the proper party or parties.

(c)     Persons dealing with the Trust, the Directors, and the Delaware Trustee with respect to the affairs of the Trust, shall have recourse only to the Trust Assets to satisfy any liability incurred by the Trust, the Directors, or the Delaware Trustee to such person in carrying out the

terms of this Trust Agreement, and neither the Directors, the Delaware Trustee, the Tribe Beneficiaries, nor any of their professionals, advisors, officers, agents, consultants or lawyers shall have any personal obligation to satisfy any such liability.

**Section 5.6     Standard of Care; Exculpation.**

(a)     As used herein, the term "**Trust Indemnified Party**" shall mean each Director, the Delaware Trustee, the Trust Protector, the Special Master, the Tribal Allocation Appointees, and each of their respective members, officers, employees, agents, consultants, lawyers, advisors or professionals (collectively, the "**Trust Indemnified Parties**").

(b)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall not have or incur any liability for actions taken or omitted in their capacities as Trust Indemnified Parties, or on behalf of the Trust, except those acts found by a final, non-appealable order by a court of competent jurisdiction (a "**Final Order**") to be arising out of their willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the DTSA or the Trust Agreement (other than taxes in the nature of income taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by a Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(c)     To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Tribe Beneficiaries, it is hereby understood and agreed by the Parties hereto and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties; provided, however, that, with respect to the Trust Indemnified Parties other than the Delaware Trustee, the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to this Section 5.6 and its subparts.

(d)     The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties as determined by the Directors in their discretion.

**Section 5.7     Protective Provisions.**

(a)     Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.7.

(b)     In the event the Directors retain counsel (including at the expense of TAFT III), the

Directors shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Directors be deemed to have waived any right or privilege, including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Directors in the performance of duties hereunder. A successor to any of the Directors shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Tribe Beneficiary or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all Parties.

(c)     To the extent that, at law or in equity, the Directors have duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Tribe Beneficiaries, it is hereby understood and agreed by the Parties and the Tribe Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Directors; provided, however, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of this Trust Agreement, including but not limited to Section 5.6 herein.

(d)     No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith, gross negligence or fraud as determined by a Final Order.

(e)     No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties and powers hereunder.

(f)     In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants and other professionals to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants or other professionals.

**Section 5.8     Indemnification.**

(a)     To the maximum extent permitted by applicable law, the Trust Indemnified Parties shall be entitled to indemnification and reimbursement for reasonable fees and expenses (including attorneys' fees and costs but excluding taxes in the nature of income taxes imposed on compensation paid to the Trust Indemnified Parties) in defending any and all of their actions or inactions in their capacity as Trust Indemnified Parties, or on behalf of the Trust, and for any other liabilities, losses, damages, claims, costs and expenses arising out of or due to the implementation or administration of the DTSA or the Trust Agreement (other than taxes in the nature of income

taxes imposed on compensation paid to such persons), in each case, except for any actions or inactions found by a Final Order to be arising out of their willful misconduct, bad faith, gross negligence or fraud. Any valid indemnification claim of any of the Trust Indemnified Parties shall be satisfied from the Trust.

(b)      Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit or proceeding, whether civil, administrative or arbitrative, from which they are indemnified by the Trust shall be paid by the Trust in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Parties, to repay such amount in the event that it shall be determined ultimately by a Final Order of the Court that the Trust Indemnified Parties or any other potential indemnitee are not entitled to be indemnified by the Trust.

(c)      The Directors shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Directors, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor or consultant of any such person.

(d)      The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified. Termination or modification of this Trust Agreement shall not affect any indemnification rights or obligations in existence at such time. In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under this Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)      The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**Section 5.9     Bond**. The Directors and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Court.

**Section 5.10   Delaware Trustee.**

(a)      There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least twenty-one (21) years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity. The initial Delaware Trustee shall be Wilmington Trust, National Association. If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.10,

it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.10(c) below. For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder. The Directors shall have no liability for the acts or omissions of any Delaware Trustee.

(b) The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities, of the Directors set forth herein. The Delaware Trustee shall be a trustee of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act. The duties (including fiduciary duties), liabilities and obligations of the Delaware Trustee shall be limited to accepting legal process served on the Trust in the State of Delaware and the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act. There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the Trust or the Tribe Beneficiaries, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of any trustee or any Director. Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights, the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith, gross negligence or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Directors or any other person pursuant to the provisions of this Trust Agreement unless the Directors or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The Delaware Trustee shall be entitled to request and receive written instructions from the Directors and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Directors. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c) The Delaware Trustee shall serve until such time as the Directors remove the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Directors in accordance with the terms of Section 5.10(d) below. The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Directors; provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Directors in accordance with Section 5.10(d) below; provided, further, that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Directors. If the Directors do not act within such sixty

J-22

(60) -day period, the Delaware Trustee, at the expense of the Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Directors shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee. Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act. Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Directors, and any fees and expenses due to the outgoing Delaware Trustee are paid. Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement. The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of TAFT III in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the Parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not an original or a copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for, nor have any duty to monitor, the performance or any action of the Trust, the Directors or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement

J-23

or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not be regarded as making, nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out of, or caused directly or indirectly by, circumstances beyond its control, including, without limitation, any act or provision of any present or future law or regulation or governmental authority; acts of God; earthquakes; fires; floods; wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

**Section 5.11    Meeting Minutes; Rights of Inspection.**

(a)     The minutes of proceedings of the Directors shall be kept in written form (which may be electronic) at such place or places designated by the Directors, or, in the absence of such designation, at the principal office of the Trust.

(b)     Every Director shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind and to inspect the physical properties of the Trust.

**Section 5.12    Trust Protector.**

(a)     Notwithstanding any other provision of this Trust Agreement, there shall at all times be one Trust Protector to serve in accordance with the provisions of this Section 5.12. The Trust Protector shall be a Trust Indemnified Party. The initial Trust Protector shall be Dean Stacy Leeds.

(b)     Any Trust Protector acting hereunder may resign at any time (i) by delivering written notice thereof to the Directors then serving; provided that notice to one Director shall constitute notice to all Directors then serving, or (ii) if there are no Directors then serving, by delivering written notice to the Delaware Trustee.

(c)     A Trust Protector may be removed for good reason upon the unanimous consent of three (3) Directors then serving; provided, however, if there are less than three (3) Directors then serving, the Trust Protector shall not be removed except upon order of the Court. If a vacancy in the position of Trust Protector exists for any reason, the Directors may, upon unanimous consent of the Directors then serving, appoint a new Trust Protector. If the Directors do not appoint a new Trust Protector within thirty (30) days, then the Directors shall petition the Delaware Court of Chancery to appoint a successor Trust Protector to serve and any costs relating to the petition shall be borne by the Trust; provided, however, that if there are no Directors serving at the time of the

Trust Protector vacancy, then the Delaware Trustee shall petition the Delaware Court of Chancery as provided above. At no time may the Settling Distributors or any party related to the Settling Distributors or their affiliates be eligible to serve as Trust Protector. A vacancy in the position of Trust Protector shall not limit the Directors from exercising any powers afforded them under the Trust Documents.

(d)     The Trust Protector shall have only the authority set forth in Section 5.2(b), which authority may not be expanded by an amendment or modification of this Trust Agreement.

(e)     The Trust Protector shall exercise the Trust Protector's authority in a fiduciary capacity and in a way that the Trust Protector reasonably believes to be in accordance with the purposes of this Trust Agreement. The Trust Protector shall not be under any duty to inquire into or ensure the performance by the Directors of their duties and shall not be liable for any loss to such trust (unless such loss results from actions in bad faith or the willful misconduct of the Trust Protector).

(f)     The Directors shall have no liability for the selection of, or exercise of authority by, the Trust Protector.

(g)     The Trust Protector shall be entitled to:

(i)     receive reasonable compensation and reimbursement for reasonable expenses for serving as Trust Protector;

(ii)     retain advisors to advise and assist in carrying out the duties of the Trust Protector and the costs thereof shall be borne by the Trust; and

(iii)     receive and review minutes of the meetings or other actions of the Directors, but only at such time as the Trust Protector is required to act pursuant to Section 5.2(b).

## ARTICLE 6
## GENERAL PROVISIONS

**Section 6.1     Irrevocability**. To the fullest extent permitted by applicable law, the Trust is irrevocable.  Subject to Section V.E of the DTSA (regarding when certain funds will revert to the Settling Distributors), the Settling Distributors shall not (i) retain any ownership or residual interest whatsoever with respect to any Trust Assets, including, but not limited to, the funds transferred to fund the Trust, and (ii) shall not have any rights or role with respect to the management or operation of the Trust, or the Directors' administration of the Trust.

**Section 6.2     Term; Termination.**

(a)     The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the provisions of this Section 6.2.

(b)      The Trust shall automatically dissolve as soon as practicable but no later than ninety (90) days after the date on which the Court approves the dissolution upon the satisfaction of the purposes of the Trust, wherein (i) all reasonably expected assets have been collected by the Trust, (ii) all Abatement Distributions have been made to the extent set forth in Section 4.2(b), (iii) necessary arrangements and reserves have been made to discharge all anticipated remaining Trust obligations and TAFT III Operating Expenses in a manner consistent with the DTSA and the Trust Documents, and (iv) a final accounting has been filed and approved by the Court (the "**Dissolution Date**").

(c)      On the Dissolution Date or as soon as reasonably practicable thereafter, after the wind-up of the Trust's affairs by the Directors and payment of all of the Trust's liabilities have been provided for as required by applicable law including Section 3808 of the Act, all monies remaining in the Trust shall be distributed to the Tribe Beneficiaries in accordance with Section 4.2(b), except as otherwise provided in Section 4.2(e).

(d)      Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate, and the Directors, or any one of them, shall execute and cause a Certificate of Cancellation of the Certificate of Trust of TAFT III to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. A certified copy of the Certificate of Cancellation shall be given to the Delaware Trustee for its records promptly following such filing.

### Section 6.3    Taxes.

(a)      The Trust is intended to qualify as one or more "qualified settlement funds" within the meaning of the **QSF Regulations**, and, to the extent permitted under applicable law, for state and local income tax purposes. Notwithstanding anything to the contrary herein, no provision in this Trust Agreement or the TAFT III TDP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as one or more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law. The Trust shall be treated as a qualified settlement fund from the earliest date possible, and the Parties agree to any relation-back election required to treat the Trust as a qualified settlement fund from the earliest date possible.

(b)      The Managing Director shall be the "administrator" of the Trust within the meaning of Treasury Regulation Section 1.468B-2(k)(3) and, in such capacity, such administrator shall (i) prepare and timely file, or cause to be prepared and timely filed, such income tax and other tax returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust out of the Trust Assets, which assets may be sold by the Directors to the extent necessary to satisfy tax liabilities of the Trust, (ii) be responsible for all tax reporting, filing and withholding requirements for the Trust and comply with all applicable tax reporting, filing and withholding obligations, (iii) send copies of any tax filings and returns of the Trust to the Settling Distributors in accordance with the DTSA, (iv) cooperate in the provision of documentation to the Settling

Distributors in accordance with Section V.G.2.a of the DTSA, and (v) obtain federal and state taxpayer identification numbers for the Trust and provide the same to the Directors and the Settling Distributors .

(c)     Subject to Section 6.3(a) and (b) above and (d) below, following the Effective Date, the Directors shall be responsible for all of the Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Directors shall be responsible for causing the Trust to satisfy all requirements necessary to qualify and maintain qualification of the Trust as one or more "qualified settlement funds" within the meaning of the QSF Regulations and under corresponding or similar provisions of relevant state or local law.  The Directors shall take no action that could cause the Trust to fail to qualify as one or  more "qualified settlement funds" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law or that is inconsistent with such treatment.

(d)     The "taxable year" of the Trust shall be the "calendar year" as such terms are defined in Section 441 of the Code.  The Trust shall use the accrual method of accounting as defined in Section 446(c) of the Code.

(e)     Notwithstanding anything in this Trust Agreement or the Distributors' Tribal Settlement Agreement to the contrary, neither the Directors nor any other person shall on behalf of or in connection with the Trust seek a private letter ruling, technical advice memorandum or any other ruling or guidance from the Internal Revenue Service or any other taxing authority on any matter without consulting with and obtaining the prior written consent of each Settling Distributor (at each Settling Distributor's sole discretion).

### Section 6.4    Modification.

(a)     Material modifications to this Trust Agreement may be made only pursuant to an order of the Court; provided, however, that the Directors may amend this Trust Agreement by unanimous consent of the Directors from time to time without the consent, approval or other authorization of, but with notice to, the Court, to make: (i) minor modifications or clarifying amendments necessary to enable the Directors to effectuate the provisions of this Trust Agreement; or (ii) modifications to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, statute, ruling or regulation of any federal, state or foreign governmental entity. Notwithstanding the foregoing proviso, no amendment or waiver of this Trust Agreement shall modify this Trust Agreement in a manner that is inconsistent with the Distributors' Tribal Settlement Agreement. The Directors shall provide to the Tribe Beneficiaries notice of any proposed modification to this Trust Agreement, whether material or minor, through the TAFT Portal at the time of notice to the Court and not less than ten (10) business days before such modification becomes effective; provided, however, that the Directors may shorten such notice period only in the event that a ten (10) -day notice period would be materially adverse to the Trust and the Tribe Beneficiaries.  The Directors shall provide the Settling Distributors with a copy of any such notice of any proposed modification to this Trust Agreement at the same time as notice is provided to the Tribe Beneficiaries.

J-27

(b)    Notwithstanding anything set forth in this Trust Agreement to the contrary, none of this Trust Agreement, nor any document related thereto shall be modified or amended in any way that could jeopardize or impair (i) the Trust's status as a "qualified settlement fund" within the meaning of the QSF Regulations or under corresponding or similar provisions of relevant state or local law, or (ii) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee.

**Section 6.5    Communications**. The Directors shall establish and maintain the Tribal Opioid Settlement Portal (or other means of communication approved by the Directors) so as to (a) enable Tribe Beneficiaries to deliver the required documentation under the Beneficiary Abatement Use Reports in an electronic format and (b) enable secure communications between the Directors and the Tribe Beneficiaries.

**Section 6.6    Severability**. If any provision of this Trust Agreement or application thereof to any person or circumstance shall be determined by a Final Order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provisions to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

**Section 6.7    Notices.**

(a)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by overnight courier, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Directors:

Dr. Kathy Hopinkah Hannan
Tribal Abatement Fund Trust III
P.O. Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

Mary L. Smith
Tribal Abatement Fund Trust III
P.O. Box 65097
Washington, DC 20035
Email: Directors@tribalopioidsettlements.com

Kevin Washburn
Tribal Abatement Fund Trust III

           P.O. Box 65097
           Washington, DC 20035
           Email: Directors@tribalopioidsettlements.com

with a copy (which shall not constitute notice) to:

           Brown Rudnick LLP
           7 Times Square
           New York, NY 11036
           Attn: David J. Molton, Esq., Barbara J. Kelly, Esq.
           Email: dmolton@brownrudnick.com, bkelly@brownrudnick.com

To the Delaware Trustee:

           Wilmington Trust, N.A.
           1100 North Market Street
           Wilmington, DE 19890
           Attn: Russell L. Crane
           Email: rcrane@wilmingtontrust.com

with a copy (which shall not constitute notice) to:

           Morris James, LLP
           500 Delaware Avenue, Suite 1500
           Wilmington, DE 19801
           Attn: Ross Antonacci, Esq.
           Email: RAntonacci@morrisjames.com

To the Trust Protector:

           Stacy Leeds
           c/o Leeds Consulting LLC
           11177 N. Highway 10
           Tahlequah, OK 74464

with a copy (which shall not constitute notice) to:

           Brown Rudnick LLP
           7 Times Square
           New York, NY 11036
           Attn: David J. Molton, Esq., Barbara J. Kelly, Esq.
           Email: dmolton@brownrudnick.com, bkelly@brownrudnick.com

To the Settling Distributors:

EXECUTION COPY

Copy to AmerisourceBergen Corporation's attorneys at:

> Attn: Michael T. Reynolds
> Cravath, Swaine & Moore
> 825 Eighth Avenue
> New York, NY 10019
> mreynolds@cravath.com

Copy to Cardinal Health, Inc.'s attorneys at:

> Attn: Elaine P. Golin, Esq.
> Attn: JB Kelly, Esq.
> Wachtell, Lipton, Rosen & Katz
> 51 West 52nd Street
> New York, NY 10019
> EPGolin@wlrk.com
> JBKelly@wlrk.com

Copy to McKesson Corporation's attorneys at:

> Attn:  Thomas J. Perrelli
> Jenner & Block LLP
> 1099 New York Ave., NW, Suite 900
> Washington, D.C. 20001
> tperrelli@jenner.com

(b)      All such notices and communications, if mailed, shall be effective when physically delivered at the designated addresses, or if electronically transmitted, shall be effective upon transmission.

**Section 6.8     Successors and Assigns**. The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Directors, the Delaware Trustee and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its, or their, rights or obligations under this Trust Agreement except, in the case of the Directors, as contemplated by Section 2.1 and Section 5.2 above, and in the case of the Delaware Trustee, as contemplated by Section 5.10 above.

**Section 6.9     Limitation on Transferability; Tribe Beneficiaries' Interests**. Tribe Beneficiaries' interests in the Trust shall not (a) be assigned, conveyed, hypothecated, pledged or otherwise transferred, voluntarily or involuntarily, directly or indirectly, and any purported assignment, conveyance, pledge or transfer shall be null and void *ab initio*; provided, however, that nothing set forth in this Trust Agreement shall be deemed to preclude Tribe Beneficiaries from directing their Abatement Distribution to a tribal organization or an inter-tribal consortium or from aggregating their Abatement Distributions or otherwise directing their Abatement Distributions for common Approved Tribal Opioid Abatement Uses and/or common Tribal Abatement

J-30

Strategies; (b) be evidenced by a certificate or other instrument; (c) possess any voting rights; (d) give rise to any right or rights to participate in the management or administration of the Trust or the Trust Assets; (e) entitle the holders thereof to seek the removal or replacement of a Director, whether by petition to the Court or any other court or otherwise; (f) entitle the holders thereof to receive any interest on Abatement Distributions; nor (g) give rise to any rights to seek a partition or division of the Trust Assets. In accordance with the Act, Tribe Beneficiaries shall have no interest of any kind in any of the Trust Assets; rather, Tribe Beneficiaries shall have an undivided beneficial interest only in cash assets of the Trust but only to the extent such cash assets are declared by the Directors to be distributable as Abatement Distributions in accordance with the Trust Documents. For the avoidance of doubt, Tribe Beneficiaries shall only have such rights as expressly set forth in this Trust Agreement.

**Section 6.10   Exemption from Registration**. The Parties hereto intend that the rights of the Tribe Beneficiaries arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws.

**Section 6.11   Entire Agreement; No Waiver**. The entire agreement of the Parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**Section 6.12   Headings**. The headings used in this Trust Agreement are inserted for convenience only and do not constitute a portion of this Trust Agreement, nor in any manner affect the construction of the provisions of this Trust Agreement.

**Section 6.13   Governing Law**. This Trust Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction. For the avoidance of doubt, none of the following provisions of Delaware law shall apply to the extent inconsistent with the terms of the Trust Documents: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for Directors, officers, agents or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of property, (d) fees or other sums payable to Directors, officers, agents or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of Trust Assets, (g) the existence of rights or interests (beneficial or otherwise) in Trust Assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, and (i) the establishment of fiduciary or other standards or

responsibilities or limitations on the acts or powers of Directors or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Directors set forth or referenced in this Trust Agreement. Section 3540 of Title 12 of the Act shall not apply to the Trust.

     **Section 6.14   Dispute Resolution**. The DTSA shall govern the resolution of any dispute under this Trust Agreement.

     **Section 6.15   Sovereign Immunity**. Nothing set forth in the Trust Documents shall be construed as a waiver of a claim of sovereign immunity in any dispute resolution, action or proceeding, including, without limitation, any dispute resolution, action or proceeding occurring after the Effective Date.

     **Section 6.16   Effectiveness**. This Trust Agreement is effective as of the Effective Date.

     **Section 6.17   Counterpart Signatures**. This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument. A signed copy of this Trust Agreement or any amendment hereto delivered by facsimile, email or other means of Electronic Transmission shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

*[Remainder of Page Intentionally Left Blank]*



EXECUTION COPY

IN WITNESS WHEREOF, the Parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

*[Signature Pages to TAFT III Agreement follow]*

J-33

EXECUTION COPY

**EXHIBIT 1**
**PARTICIPATING TRIBES and FINAL TRIBAL ALLOCATION DISTRIBUTION**
**PERCENTAGES**

[Reserved – to be added post-Effective Date]

EXECUTION COPY

**EXHIBIT 2**
**FORM OF CERTIFICATE OF TRUST OF THE**
**TRIBAL ABATEMENT FUND TRUST III**

This Certificate of Trust of the TRIBAL ABATEMENT FUND TRUST III (the "*Trust*") is being duly executed and filed by the undersigned Directors of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. <u>Name</u>. The name of the statutory trust formed hereby is:

**TRIBAL ABATEMENT FUND TRUST III**

2. <u>Delaware Trustee</u>. The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:  [[To be added]]

3. <u>Effective Date</u>. This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEES: | DELAWARE TRUSTEE: |
|---|---|
| _____ | |
| in his/her capacity as a trustee and not individually. | |
| _____ | By: _____ |
| in his/her capacity as a trustee and not individually. | Name: |
| | Title: |
| _____ | |
| in his/her capacity as a trustee and not individually. | |

J-35

## EXHIBIT 3
## INVESTMENT GUIDELINES

**In General**. Only the following investments will be permitted:

(i)     Demand and time deposits, such as certificates of deposit, in banks or other savings institutions whose deposits are federally insured;

(ii)     U.S. Treasury bills, bonds, and notes, including, but not limited to, long-term U.S. Treasury bills, bonds, notes, and other Government Securities as defined under Section 2(a)(16) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(16), including, but not limited to, Fannie Mae, Freddie Mac, Federal Home Loan Bank, and Federal Farm Credit;

(iii)     Repurchase agreements for U.S. Treasury bills, bonds, and notes;

(iv)     Commercial Paper (rated A1/P-1 by Standard & Poor's and Moody's);

(v)     AA or AAA corporate bonds (with the rating awarded by at least two of the three major rating agencies (Standard & Poor's, Moody's, or Fitch)); or

(vi)     Open-ended mutual funds owning only assets described in subparts (i) through (v) of this subsection.

The value of bonds of any single company and its affiliates owned by the Trust directly rather than through a mutual fund shall not exceed 10% of the investment portfolio at time of purchase; this restriction does not apply to any of the following: Repurchase Agreements; Money Market Funds; U.S. Treasuries; and U.S. Government Agencies.

Any such investments shall be made consistently with the Uniform Prudent Investor Act. The determination of the rating of any investments shall be made by the Trust's financial advisor on the date of acquisition of any such investment or on the date of re-investment. The Trust's financial advisor shall reconfirm that all investments of Trust Assets still meet the original rating requirement on a quarterly basis. If the Trust's financial advisors determine that any particular investment no longer meets the rating requirement, there shall be a substitution of that investment with an investment that meets the ratings requirement as promptly as practicable, but in no event later than the next reporting period. Previously purchased securities downgraded below AA may be held for a reasonable and prudent period of time if the Trust's financial advisor believes it is in the interest of the Trust to do so.

The borrowing of funds or securities for the purpose of leveraging, shorting, or other investments is prohibited. Investment in non-U.S. dollar denominated bonds is prohibited. The standing default investment instruction for all cash in any account or subaccount that holds any Trust Assets in cash shall be invested in the BlackRock Fed Fund (CUSIP 09248U700).

See example fund-level requirements table on following page.

EXECUTION COPY

## Fund Level Requirements

1. OTC Derivatives Counterparty Exposure – Not allowed
2. Non-U.S. dollar denominated bonds – Not allowed

| Type of Investment | Eligible | Prohibited | Comments |
|---|---|---|---|
| U.S. Treasury Securities | X | | |
| U.S. Agency Securities | X | | |
| Mortgage-Related Securities | | x | |
| Asset-Backed Securities | | x | |
| Corporate Securities (public) | X | | |
| Municipal bonds | X | | |
| | | | |
| **DERIVATIVES:** | | No investment, including futures, options and other derivatives, may be purchased if its return is directly or indirectly determined by an investment prohibited elsewhere in these guidelines. | |
| Futures | | x | |
| Options | | x | |
| Currency Forwards | | x | |
| Currency Futures | | x | |
| Currency Options | | x | |
| Currency Swaps | | x | |
| Interest Rate Swaps | | x | |
| Total Return Swaps | | x | |
| Structured Notes | | X | |
| Collateralized Debt Obligations | | x | |
| Credit Default Swaps | | X | |
| Mortgage-Related Derivatives | | X | |
| | | | |
| **FOREIGN / NON-U.S. DOLLAR:** | | | |
| Foreign CDs | | X | |
| Foreign U.S. Dollar Denominated Securities | | X | |
| Non-U.S. Dollar Denominated Bonds | | X | |
| Supranational U.S. Dollar Denominated Securities | | X | |
| | | | |
| **COMMINGLED VEHICLES (except STIF):** | | | |
| Collective Funds | | X | |
| Commingled Trust Funds (open ended mutual funds only) | | X | |
| Common Trust Funds | | X | |
| Registered Investment Companies | | X | |
| | | | |
| **MONEY MARKET SECURITIES:** | | | |
| Qualified STIF | | x | |
| Interest Bearing Bank Obligations Insured by a Federal or State Agency | X | | |
| Commercial Paper | | x | |
| Master Note Agreements and Demand Notes | | x | |
| Repurchase Agreements | | x | |
| | | | |
| **OTHER:** | | | |
| Bank Loans | | x | |
| Convertibles (e.g., Lyons) | | x | |
| Municipal Bonds | X | | |
| Preferred Stock | | x | |
| Private Placements (excluding 144A) | X | | |
| Rule 144A Issues | X | | |
| Zero Coupon Bonds | X | | |
| Commodities | | X | |
| Catastrophe Bonds | | X | |

J-37

EXECUTION COPY

J-38

EXECUTION COPY

**EXHIBIT 4**
**TRIBAL ABATEMENT FUND TRUST III**
**TRUST DISTRIBUTION PROCEDURES**

| Issue | Description |
|---|---|
| **1. APPLICABILITY OF AGREEMENT** | These terms shall apply to the consideration received and distributed by<br><br>(A) the Tribal Abatement Fund Trust III ("**TAFT III**") under the Distributors' Tribal Settlement Agreement between the Tribal Leadership Committee ("**TLC**"), Participating Tribes,[1] and AmerisourceBergen Corporation, Cardinal Health, Inc., McKesson Corporation and their affiliated entities dated October 26, 2022 ("**Distributors' Tribal Settlement Agreement**"), entered into in connection with the matter of *In re National Prescription Opiate Litigation*, MDP No. 2804, Case No. 17-md-2804 in the United States District Court for the Northern District of Ohio (the "**Court**"); and<br><br>(B) any trust where the terms of such trust agreement expressly adopt these Tribal Opioid Litigation Settlement Trust Distribution Procedures ("**TDP**") (each of (A) and (B), a "**Tribe Trust**" and collectively, the "**Tribe Trusts**").<br><br>The Tribe Trusts shall benefit the Tribe Beneficiaries to the extent set forth in the respective trust agreement of the Tribe Trust (with all applicable exhibits and schedules, each a "**Trust Agreement**" and collectively, the "**Trust Agreements**").<br><br>The distributions made pursuant to this TDP are the exclusive distributions that will be made by the Tribe Trusts and the Tribe Beneficiaries will have no further or other recourse against any party other than what is provided for under this TDP.<br><br>The terms set forth herein will be deemed incorporated into the Trust Agreements, *provided*, *however*, each Trust Agreement may have a unique **Schedule T** for allocation of distributions among Tribes. |

---

[1] Capitalized terms used but not herein defined shall have the meaning ascribed to them in the Distributors' Tribal Settlement Agreement or the TAFT III Trust Agreement, as applicable.

| Issue | Description |
|---|---|
| | These terms set forth the manner in which the Tribe Trusts shall make Abatement Distributions to the Tribe Beneficiaries, which may be used exclusively on the parameters set forth herein. |
| **2.  PURPOSE** | These TDPs are intended to establish the mechanisms for the distribution and allocation of funds distributed by the Tribe Trusts to the Tribe Beneficiaries. All such funds described in the foregoing sentence are referred to herein as "**Abatement Funds**" and shall be used to abate the opioid crisis in accordance with the terms hereof, with recognition of the culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe Beneficiary, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>Specifically, (i) no less than ninety five percent (95%) of the Abatement Funds distributed under the Trust Agreements shall be used by Tribe Beneficiaries for abatement of the opioid crisis by funding opioid or substance use disorder related projects or programs that fall within the scope of **Schedules B** and **D** (the "**Approved Tribal Opioid Abatement Uses**"); and (ii) no more than five percent (5%) of the Abatement Funds may be used to fund administrative expenses incurred in connection with the spending of Abatement Funds for Approved Tribal Opioid Abatement Uses ("**Approved Administrative Expenses**," and, together with the Approved Tribal Opioid Abatement Uses, "**Approved Uses**").<br><br>For the avoidance of doubt, **Schedule D** is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of a Tribe Beneficiary, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.<br><br>The Tribe Trusts shall distribute Abatement Funds to Tribe Beneficiaries for Approved Uses.<br><br>Notwithstanding anything in these TDPs that might imply to the contrary, projects or programs that constitute Approved Tribal Opioid Abatement Uses may be provided by Tribe Beneficiaries, tribal agencies or subdivisions or nongovernmental parties and funded from Abatement Funds. |
| **3.  DISBURSEMENT OF ABATEMENT** | The trustees under each Trust Agreement shall distribute the Abatement Funds consistent with the Tribal Allocation Percentages set forth on the |

| Issue | Description |
|---|---|
| **DISTRIBUTIONS** | applicable **Schedule T**. Each Trust Agreement may have its own unique **Schedule T**. |
| **4. ATTORNEYS' FEES AND COSTS FUND** | Reserved. |
| **5. TRIBAL ABATEMENT FUNDING** | 1. The allocation of distributions of Abatement Funds among Tribe Beneficiaries will be consistent with the applicable Tribal Allocation Percentages set forth on **Schedule T**. Each Trust Agreement may have its own unique **Schedule T**. The **Schedule T** for TAFT III shall be the Final Tribal Allocation Distribution Percentages, which shall be determined by the Tribal Allocation Appointees and shall be **Exhibit 1** of the TAFT III Trust Agreement.<br><br>2. The Tribe Beneficiaries will use funds received from the Tribe Trusts for programs on the approved list of abatement strategies (see **Schedule B**) and also for culturally appropriate activities, practices, teachings or ceremonies that are, in the judgment of a Tribe Beneficiary, aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community. A list of representative examples of such culturally appropriate abatement strategies, practices, and programs is attached hereto as **Schedule D** (the "**Tribal Abatement Strategies**"). The separate allocation of abatement funding and illustrative list of Tribal Abatement Strategies recognizes that American Indian and Alaska Native Tribes and the communities they serve possess unique cultural histories, practices, wisdom, and needs that are highly relevant to the health and well-being of American Indian and Alaska Native people and that may play an important role in both individual and public health efforts and responses in Native communities.<br><br>3. The Tribe Beneficiaries agree that Abatement Funds distributed pursuant to the Trust Agreements shall be used to abate the opioid crisis in accordance with the terms of these TDPs. |
| **6. COMPLIANCE, REPORTING, AUDIT AND ACCOUNTABILITY** | 1. The trustees of the Tribe Trusts shall impose appropriate reporting requirements on the Tribe Beneficiaries to ensure that Abatement Funds are used only for Approved Uses. The trustees may authorize modified reporting requirements for Tribe Beneficiaries with allocations below a certain level. |

EXECUTION COPY

| Issue | Description |
|-------|-------------|
|       | 2. The Tribe Trusts shall prepare an annual report (an "**Annual Report**") that shall be audited by independent auditors as provided in the Trust Agreements. |
|       | 3. The Court shall have continuing jurisdiction over the Tribe Trusts, provided however, the courts of the State of Delaware, including any federal court located therein, shall also have jurisdiction over the Tribe Trusts. |
|       | 4. The trustees shall have the power to take any and all actions that in the judgment of the trustees are necessary or proper to fulfill the purposes of the Trust Agreements, including the requirement that 100% of the Abatement Funds distributed shall be used to abate the opioid crisis in accordance with the terms hereof. |
|       | 5. Notwithstanding any other provision of these TDPs, the trustees of the Tribe Trusts shall implement these TDPs in accordance with the Indian Self-Determination and Education Assistance Act of 1975, 25 U.S.C. 5301 *et seq*. and, for the avoidance of doubt, a Tribe Beneficiary or inter-tribal consortium may charge its federally-approved indirect cost rate consistent with such Act with respect to opioid abatement programs carried out by such Tribe Beneficiary or inter-tribal consortium. |

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

---

PART ONE: TREATMENT

---

A.   **TREAT OPIOID USE DISORDER (OUD)**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following[1]:

1.   Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.   Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions

3.   Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.   Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.   Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.   Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

---

[1] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established through the mechanisms described in the Public Creditor Trust Distribution Procedures.

7.      Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.      Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.      Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.     Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11.     Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12.     Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13.     Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

14.     Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

**B.      SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.      Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3.  Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.  Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.  Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.  Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.  Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.  Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.  Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.  Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.  Training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.  Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.  Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14.  Create and/or support recovery high schools.

15.  Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

**C.  CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have – or at risk of developing – OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.     Expand warm hand-off services to transition to recovery services.

12.     Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.     Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage non-profits and the faith community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D.     ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   1.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   2.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   3.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   4.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   5.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

   6.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

J-47

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.     Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.     Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.     ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.     Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

J-48

3.      Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.      Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.      Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.      Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.      Enhanced family supports and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8.      Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.      Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.     Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

---

| PART TWO: PREVENTION |
| --- |

**F.      PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2.      Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.      Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.      Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.      Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    1.      Increase the number of prescribers using PDMPs;

    2.      Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3.      Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.      Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.      Increase electronic prescribing to prevent diversion or forgery.

8.      Educate Dispensers on appropriate opioid dispensing.

## G.  PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Fund media campaigns to prevent opioid misuse.

2.      Corrective advertising or affirmative public education campaigns based on evidence.

3.      Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.     Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.     Engage non-profits and faith-based communities as systems to support prevention.

8.     Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.     School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.    Create of support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.    Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.    Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.     PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2.     Public health entities providing free naloxone to anyone in the community.

J-51

3.     Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.     Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.     Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.     Public education relating to emergency responses to overdoses.

7.     Public education relating to immunity and Good Samaritan laws.

8.     Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.     Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11.    Support mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12.    Provide training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13.    Support screening for fentanyl in routine clinical toxicology testing.

---

## PART THREE: OTHER STRATEGIES

---

**I.     FIRST RESPONDERS**

In addition to items in section C, D and H relating to first responders, support the following:

1. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.   LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K.   TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2.      Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.      RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1.      Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.      Research non-opioid treatment of chronic pain.

3.      Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.      Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5.      Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.      Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.      Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.      Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.      Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

J-54

**Schedule D**
**Tribal Abatement Strategies**

The following is a non-exhaustive, illustrative list of culturally appropriate activities, practices, teachings or ceremonies that may, in the judgment of the Tribes, be aimed at or supportive of remediation and abatement of the opioid crisis within a tribal community.

Each of the 574 federally recognized Tribes in the United States has its own cultures, histories and traditions. Each Tribe is best suited to determine the most effective abatement strategies for the specific community it serves. The following list provides select examples of tribal abatement strategies and is not intended to limit the remediation and abatement activities for which any Tribe or tribal organization may utilize its share of Abatement Funds.

1.      **Traditional Activities Associated with Cultural Identity and Healing**

Tribal cultural activities can help address historical and intergenerational trauma and feelings of cultural loss that may be underlying root causes and/or contributing factors to addiction. These can include, for example:

- Utilization of traditional healers and spiritual and traditional approaches to healing;
- Sweat lodges, sacred pipe ceremonies, smudging and other ceremonies;
- Talking circles;
- Cultural activities such as basket weaving, pottery making, drum making, canoe building, etc., depending on the Tribe;
- Cultural and linguistic immersion programs.

These traditional activities may be combined with other treatment or included in integrated treatment models, as discussed below.

> Example: Drum-Assisted Recovery Therapy for Native Americans (DARTNA) is supported by research. Drums are a sacred instrument in many American Indian and Alaska Native cultures and are often associated with ceremonies and healing. In addition to providing a sense of cultural connection, drumming may have physical and psychological effects that make it a promising focus for treatment.

> Example: Some Tribes have utilized seasonal cultural immersion camps in lieu of or in combination with residential treatment for substance use disorder. Participants practice traditional lifeways, including hunting, fishing, living in traditional dwellings and cultural and/or spiritual practices during the course of treatment.

2.      **Culturally Competent Integrated Treatment Models**

Example: The Swinomish Tribe designed and developed a unique treatment program called Didgʷálič that integrates evidence-based chemical dependency treatment with holistic, culturally competent care to successfully deal with the effects of opioid use disorder (OUD). Didgʷálič provides a full array of medical and social services, utilizing a model of care that centers on and incorporates the Tribe's culture and values. The Tribal government and individual Tribal members provide cultural leadership and advice on the use of Native language and practices in the program.

Example: The Tulalip Tribe operates the Healing Lodge, a culturally sensitive transitional home facility for tribal members who are seeking to recover from addiction. In addition to a clean and sober living environment, the facility provides transportation to and from Chemical Dependency/ Mental Wellness groups and individual counseling sessions, sober support groups and cultural activities such as sweats, powwow and family nights. The program also connects residents with educational activities such as life skills trainings, budgeting, post generational trauma and Red Road to Wellbriety, a recovery and wellness program similar in some ways to the 12 Steps of AA but designed especially for Native American and following the teachings of the Medicine Wheel.

3.    **Culturally Grounded Community Prevention**

Culturally competent prevention programs, tailored to each tribal community, can play an important role in stopping and reversing the spread of the opioid epidemic.

Example: The Healing of the Canoe is a collaborative project between the Suquamish Tribe, the Port Gamble S'Klallam Tribe and the University of Washington Alcohol and Drug Abuse Institute (ADAI). It has led to the development and dissemination of the Culturally Grounded Life Skills for Youth curriculum, an evidence-based, strengths-based life skills curriculum for Native youth that uses elements of a Tribe's culture to help prevent substance abuse and connect its youth to their tribal community and culture. It teaches Native youth the skills they need to navigate their life's journey without being pulled off course by alcohol or drugs, using tribal values, traditions and culture both as a compass to guide them and an anchor to ground them. By reversing the historical trauma of forced assimilation, this approach attacks the root cause of so much substance abuse among tribal youth.

Example: The Association of Village Council Presidents has responded to the opioid crisis through the Healthy Families Program, which promotes and supports whole health through the sharing, teaching, and practice of traditional values through Elluarluteng Illakutellriit - a framework illustrating the Yup'ik life cycle of traditional practices, values and beliefs from Yup'ik Elders. This framework functions alongside western and medical practices to help individuals overcome their addictions permanently.

4.    **Peacekeeping and Wellness Courts**

Many Tribes have had success treating opioid offenders using traditional healing practices and alternative institutions, sometimes called wellness courts or peacekeeping courts.

> Example: The Yurok Tribal Court, in coordination with the California State courts in Humboldt and Del Norte Counties, operates its Family Wellness Courts (FWC) for Yurok families suffering from opioid abuse problems. The FWC seeks to develop judicial practices that are consistent with Yurok tribal values and needs, combining the resources and expertise of both systems. It focuses on reintegrating tribal members into the culture and life of the Yurok community and helping them establish a drug-free lifestyle.

5. **Community Workforce Development and Training**

Cultural competency training as well as community workforce development can be a critical tool for addressing gaps in services, especially in rural and remote tribal communities, where it can be extremely difficult to recruit and retain qualified health care professionals.

> Example: In Alaska, the Community Health Aide Program (CHAP) has increased access to medical treatment to more than 170 rural Alaskan villages utilizing a workforce development model geared toward Native people. Under CHAP, individuals selected by their communities are provided with training as community health aides and practitioners to work in rural villages under the supervision of, and in collaboration with, higher level medical professionals, often aided by telemedicine technology. As part of CHAP, behavioral health aides (BHAs) are trained as counselors, educators and advocates to help address mental health and addiction issues.

> Example: Part of the Swinomish Tribe's Didgʷálič treatment model, discussed above, is training for Tribal members with a goal of building a new generation of clinically trained and culturally competent Native counselors and providers.

J-57

## Schedule T
## PARTICIPATING TRIBES and TRIBAL ALLOCATION DISTRIBUTION PERCENTAGES

[Reserved - to be added post-Effective Date]

EXECUTION COPY

# EXHIBIT K

## Illustrative Prepayment Example

Example

Gross Settlement Prepayment: $125,704,142.94

Settlement Prepayment Reduction Schedule: Reduce Settlement Payment in Year 5 by $62,852,071.47 and Reduce Settlement Payment in Year 6 by  $62,852,071.47

Net Settlement Prepayment Amount (assumes discount rate of 6.5%):  $107,446,142.54 ($52,032,030.29 in Year 2 and $55,414,112.25  in Year 4)

| Payment Year | Distributor Payment Schedule | Settlement Prepayment Reduction (-) | Net Prepayment Amount (+) | Prepayment Applied To | Revised Payment Schedule |
|---|---|---|---|---|---|
| 1 | $62,852,071.47 | | | | $62,852,071.47 |
| 2 | $62,852,071.47 | | $52,032,030.29 | Year 5 | $114,884,101.76 |
| 3 | $62,852,071.47 | | | | $62,852,071.47 |
| 4 | $62,852,071.47 | | $55,414,112.25 | Year 6 | $118,266,183.73 |
| 5 | $62,852,071.47 | $62,852,071.47 | | | $0.00 |
| 6 | $62,852,071.47 | $62,852,071.47 | | | $0.00 |
| 7 | $62,852,071.48 | | | | $62,852,071.48 |
| **Total** | **$439,964,500.30** | **$125,704,142.94** | **$107,446,142.54** | | **$421,706,499.91** |

K-1

# EXHIBIT L

## Adjusted Purdue Tribal Allocation Percentages

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| **Total** | **85.4300000583%** |
| Absentee-Shawnee Tribe of Indians of Oklahoma | 0.5423679625% |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 0.0394952417% |
| Ak-Chin Indian Community | 0.0617856712% |
| Alabama-Coushatta Tribe of Texas | 0.0285261193% |
| Alabama-Quassarte Tribal Town | 0.0108073539% |
| ALL Alaskan Tribes | 9.0131352353% |
|     Alaska Native Tribal Health Consortium | 1.8370665729% |
|     Aleutian Pribilof Islands Association | 0.0655713006% |
|     Arctic Slope Native Association | 0.2748351993% |
|     Bristol Bay Area Health Corporation | 0.4604584065% |
|     Chickaloon Native Village | 0.0102151136% |
|     Chugachmiut | 0.1026375700% |
|     Copper River Native Association | 0.0896984261% |
|     Eastern Aleutian Tribes | 0.0989406718% |
|     Eklutna Native Village | 0.0121608495% |
|     Eyak Native Village | 0.0196519328% |
|     Kodiak Area Native Association | 0.1767701087% |
|     Kenaitze Indian Tribe | 0.1502108134% |
|     Ketchikan Indian Community | 0.1004972605% |
|     Knik Tribe | 0.0114798420% |
|     Maniilaq Association | 0.3916766416% |
|     Metlakatla Indian Community | 0.0683926177% |
|     Mt. Sanford Tribal Consortium | 0.0260728614% |
|     Norton Sound Health Corporation | 0.5768134148% |
|     Southcentral Foundation | 1.4734085287% |
|     Southeast Alaska Regional Health Corporation | 0.5705870598% |
|     Seldovia Village Tribe | 0.0313263484% |
|     Tanana Chiefs Conference (including Council of Athabascan Tribal Governments) | 0.9065183671% |
|     Yakutat Tlingit Tribe | 0.0282131709% |
|     Yukon Kuskokwim Health Corporation | 1.4580372149% |
|     Native Village of Chitina | 0.0111879816% |
|     Ninilchik Village | 0.0281158841% |
|     Native Village of Tanana | 0.0184844913% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Native Village of Tyonek | 0.0141065855% |
| Alturas Indian Rancheria, California | 0.0007785652% |
| Apache Tribe of Oklahoma | 0.1297416480% |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 0.3350493703% |
| Aroostook Band of Micmacs | 0.0359722526% |
| Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana | 0.3686012816% |
| Augustine Band of Cahuilla Indians, California | 0.0012366416% |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 0.1491503723% |
| Bay Mills Indian Community, Michigan | 0.0694700934% |
| Bear River Band of the Rohnerville Rancheria, California | 0.0493045029% |
| Berry Creek Rancheria of Maidu Indians of California | 0.1091038714% |
| Big Lagoon Rancheria, California | 0.0026357753% |
| Big Pine Paiute Tribe of the Owens Valley | 0.0310904749% |
| Big Sandy Rancheria of Western Mono Indians of California | 0.0318898347% |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 0.1180795516% |
| Bishop Paiute Tribe | 0.1013071167% |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 0.5231994555% |
| Blue Lake Rancheria, California | 0.0037210946% |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 0.0797575781% |
| Bridgeport Indian Colony | 0.0024974889% |
| Buena Vista Rancheria of Me-Wuk Indians of California | 0.0032603789% |
| Burns Paiute Tribe | 0.0113112869% |
| Cabazon Band of Mission Indians, California | 0.0016230921% |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 0.0054429517% |
| Caddo Nation of Oklahoma | 0.1054948698% |
| Cahto Tribe of the Laytonville Rancheria | 0.0201582661% |
| Cahuilla Band of Indians | 0.0357853168% |
| California Valley Miwok Tribe, California | 0.0042326142% |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 0.0234386383% |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California; Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California) | 0.0621691518% |
| Catawba Indian Nation | 0.0723234487% |
| Cayuga Nation | 0.0068498455% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Cedarville Rancheria, California | 0.0018166521% |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 0.0176171685% |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 0.0194582236% |
| Cheyenne and Arapaho Tribes, Oklahoma | 0.7513969325% |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 0.2827069077% |
| Chickahominy Indian Tribe | 0.0306699881% |
| Chickahominy Indian Tribe—Eastern Division | 0.0082651861% |
| Chickasaw Nation | 2.0981927257% |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 0.0025076107% |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 0.2266579580% |
| Chitimacha Tribe of Louisiana | 0.0337966704% |
| Choctaw Nation of Oklahoma | 5.3319273840% |
| Citizen Potawatomi Nation, Oklahoma | 1.4271007450% |
| Cloverdale Rancheria of Pomo Indians of California | 0.0504186685% |
| Cocopah Tribe of Arizona | 0.0356200154% |
| Coeur D'Alene Tribe | 0.2787232354% |
| Cold Springs Rancheria of Mono Indians of California | 0.0105534705% |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 0.2708640585% |
| Comanche Nation, Oklahoma | 0.6799893008% |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 0.5876595527% |
| Confederated Tribes and Bands of the Yakama Nation | 0.6072810219% |
| Confederated Tribes of Siletz Indians of Oregon | 0.4177818424% |
| Confederated Tribes of the Chehalis Reservation | 0.0862704591% |
| Confederated Tribes of the Colville Reservation | 0.4100013327% |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 0.0526164821% |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 0.0140009294% |
| Confederated Tribes of the Grand Ronde Community of Oregon | 0.2389019386% |
| Confederated Tribes of the Umatilla Indian Reservation | 0.1512298452% |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 0.3282806006% |
| Coquille Indian Tribe | 0.0901246415% |
| Coushatta Tribe of Louisiana | 0.0256930665% |
| Cow Creek Band of Umpqua Tribe of Indians | 0.1490175216% |
| Cowlitz Indian Tribe | 0.3914472300% |
| Coyote Valley Band of Pomo Indians of California | 0.0328176571% |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 0.1463677553% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Crow Tribe of Montana | 0.7373051740% |
| Delaware Nation, Oklahoma | 0.0332893201% |
| Delaware Tribe of Indians | 0.3048798776% |
| Dry Creek Rancheria Band of Pomo Indians, California | 0.0689955968% |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 0.0218268495% |
| Eastern Band of Cherokee Indians | 0.9300638497% |
| Eastern Shawnee Tribe of Oklahoma | 0.0532830183% |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 0.1419878707% |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 0.0098399626% |
| Elk Valley Rancheria, California | 0.0061020609% |
| Ely Shoshone Tribe of Nevada | 0.0535561390% |
| Enterprise Rancheria of Maidu Indians of California | 0.1775911926% |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 0.0004006605% |
| Federated Indians of Graton Rancheria, California | 0.0748896737% |
| Flandreau Santee Sioux Tribe of South Dakota | 0.0217874846% |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 0.3290159374% |
| Forest County Potawatomi Community, Wisconsin | 0.0258464450% |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 0.1617122183% |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 0.0085898808% |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 0.0101402780% |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 0.0206732583% |
| Fort McDowell Yavapai Nation, Arizona | 0.0828990704% |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 0.1570303274% |
| Fort Sill Apache Tribe of Oklahoma | 0.0188357144% |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 2.4946917675% |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 0.0205041144% |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 0.1012476757% |
| Greenville Rancheria | 0.0916708898% |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 0.0248492282% |
| Guidiville Rancheria of California | 0.0133044556% |
| Habematolel Pomo of Upper Lake, California | 0.0267331834% |
| Hannahville Indian Community, Michigan | 0.0271037785% |

L-4

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Havasupai Tribe of the Havasupai Reservation, Arizona | 0.0315832135% |
| Ho-Chunk Nation of Wisconsin | 0.2715364453% |
| Hoh Indian Tribe | 0.0031000030% |
| Hoopa Valley Tribe, California | 0.2575174809% |
| Hopi Tribe of Arizona | 0.4353488497% |
| Hopland Band of Pomo Indians, California | 0.0703120320% |
| Houlton Band of Maliseet Indians | 0.0340924426% |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 0.2179252184% |
| Iipay Nation of Santa Ysabel, California | 0.0132557714% |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 0.0007953463% |
| Ione Band of Miwok Indians of California | 0.1181887357% |
| Iowa Tribe of Kansas and Nebraska | 0.0513095876% |
| Iowa Tribe of Oklahoma | 0.0932817543% |
| Jackson Band of Miwuk Indians | 0.0052166063% |
| Jamestown S'Klallam Tribe | 0.0334194242% |
| Jamul Indian Village of California | 0.0080132097% |
| Jena Band of Choctaw Indians | 0.0112830667% |
| Jicarilla Apache Nation, New Mexico | 0.2735367292% |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 0.0153379538% |
| Kalispel Indian Community of the Kalispel Reservation | 0.0363865052% |
| Karuk Tribe | 0.2471344203% |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 0.0042011370% |
| Kaw Nation, Oklahoma | 0.1278410634% |
| Kewa Pueblo, New Mexico | 0.1124136699% |
| Keweenaw Bay Indian Community, Michigan | 0.1051120213% |
| Kialegee Tribal Town | 0.0169038100% |
| Kickapoo Traditional Tribe of Texas | 0.0170574817% |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 0.0564716609% |
| Kickapoo Tribe of Oklahoma | 0.5445349375% |
| Kiowa Indian Tribe of Oklahoma | 0.4248560693% |
| Klamath Tribes | 0.1728078681% |
| Kletsel Dehe Band of Wintun Indians | 0.0353357899% |
| Koi Nation of Northern California | 0.0136371085% |
| Kootenai Tribe of Idaho | 0.0094417622% |
| La Jolla Band of Luiseno Indians, California | 0.0361617444% |

EXECUTION COPY

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation, California | 0.0028714001% |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 0.1567729508% |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 0.2087245323% |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 0.0301419018% |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 0.3463765396% |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 0.3771399438% |
| Little River Band of Ottawa Indians, Michigan | 0.0900160333% |
| Little Shell Tribe of Chippewa Indians of Montana | 0.1968056186% |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 0.1716664958% |
| Lone Pine Paiute-Shoshone Tribe | 0.0204240504% |
| Los Coyotes Band of Cahuilla and Cupeno Indians, California | 0.0152706486% |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 0.0167959815% |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 0.0485584071% |
| Lower Elwha Tribal Community | 0.0667601495% |
| Lower Sioux Indian Community in the State of Minnesota | 0.0229177590% |
| Lummi Tribe of the Lummi Reservation | 0.2042788482% |
| Lytton Rancheria of California | 0.0231601145% |
| Makah Indian Tribe of the Makah Indian Reservation | 0.1782838245% |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 0.0796788006% |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 0.0044740421% |
| Mashantucket Pequot Indian Tribe | 0.0359186161% |
| Mashpee Wampanoag Tribe | 0.0668710119% |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 0.0169772648% |
| Mechoopda Indian Tribe of Chico Rancheria, California | 0.1609884598% |
| Menominee Indian Tribe of Wisconsin | 0.2515451054% |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 0.0327682669% |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 0.2678171544% |
| Miami Tribe of Oklahoma | 0.0500419222% |
| Miccosukee Tribe of Indians | 0.0261672694% |
| Middletown Rancheria of Pomo Indians of California | 0.0252887040% |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 0.1260211857% |
| Mississippi Band of Choctaw Indians | 0.4416672545% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 0.0418896565% |
| Modoc Nation | 0.0052620483% |
| Mohegan Tribe of Indians of Connecticut | 0.0647669154% |
| Monacan Indian Nation | 0.0572288348% |
| Mooretown Rancheria of Maidu Indians of California | 0.1896571971% |
| Morongo Band of Mission Indians, California | 0.0773114748% |
| Muckleshoot Indian Tribe | 0.2749690675% |
| Muscogee (Creek) Nation | 2.7882175666% |
| Nansemond Indian Nation | 0.0069205064% |
| Narragansett Indian Tribe | 0.0423432335% |
| Navajo Nation, Arizona, New Mexico & Utah | 14.8080642123% |
| Nez Perce Tribe | 0.2285110068% |
| Nisqually Indian Tribe | 0.0643318423% |
| Nooksack Indian Tribe | 0.0480955820% |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 0.2465827352% |
| Northfork Rancheria of Mono Indians of California | 0.1159874356% |
| Northwestern Band of the Shoshone Nation | 0.0044669851% |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 0.0715379962% |
| Oglala Sioux Tribe | 0.9322485735% |
| Ohkay Owingeh, New Mexico | 0.2165964833% |
| Omaha Tribe of Nebraska | 0.1068606727% |
| Oneida Indian Nation | 0.0770285948% |
| Oneida Nation | 0.6080040075% |
| Onondaga Nation | 0.0278328984% |
| Osage Nation | 0.2916667865% |
| Otoe-Missouria Tribe of Indians, Oklahoma | 0.1373874820% |
| Ottawa Tribe of Oklahoma | 0.0286048916% |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 0.0840498422% |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 0.1550222247% |
| Pala Band of Mission Indians | 0.0636277027% |
| Pamunkey Indian Tribe | 0.0144946245% |
| Pascua Yaqui Tribe of Arizona | 0.5864891836% |
| Paskenta Band of Nomlaki Indians of California | 0.0059760389% |
| Passamaquoddy Tribe Indian Township | 0.0584258157% |

EXECUTION COPY

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Passamaquoddy Tribe Pleasant Point | 0.0737419276% |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 0.0131497252% |
| Pawnee Nation of Oklahoma | 0.1628932877% |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 0.1575945163% |
| Penobscot Nation | 0.0976392051% |
| Peoria Tribe of Indians of Oklahoma | 0.0413138110% |
| Picayune Rancheria of Chukchansi Indians of California | 0.0797541924% |
| Pinoleville Pomo Nation, California | 0.0262057459% |
| Pit River Tribe, California (includes XL Ranch, Big Bend, Likely, Lookout, Montgomery Creek and Roaring Creek Rancherias) | 0.1113364796% |
| Poarch Band of Creeks | 0.1309979269% |
| Pokagon Band of Potawatomi Indians, Michigan and Indiana | 0.1164891239% |
| Ponca Tribe of Indians of Oklahoma | 0.2311571155% |
| Ponca Tribe of Nebraska | 0.1255393175% |
| Port Gamble S'Klallam Tribe | 0.0817783003% |
| Potter Valley Tribe, California | 0.0004837984% |
| Prairie Band Potawatomi Nation | 0.0661839314% |
| Prairie Island Indian Community in the State of Minnesota | 0.0029532627% |
| Pueblo of Acoma, New Mexico | 0.1727703347% |
| Pueblo of Cochiti, New Mexico | 0.0585869289% |
| Pueblo of Isleta, New Mexico | 0.9380109031% |
| Pueblo of Jemez, New Mexico | 0.4587429283% |
| Pueblo of Laguna, New Mexico | 0.2928293806% |
| Pueblo of Nambe, New Mexico | 0.0659676964% |
| Pueblo of Picuris, New Mexico | 0.0144258007% |
| Pueblo of Pojoaque, New Mexico | 0.0354511439% |
| Pueblo of San Felipe, New Mexico | 0.1908652295% |
| Pueblo of San Ildefonso, New Mexico | 0.0500601318% |
| Pueblo of Sandia, New Mexico | 0.0523941987% |
| Pueblo of Santa Ana, New Mexico | 0.1182981124% |
| Pueblo of Santa Clara, New Mexico | 0.0945804644% |
| Pueblo of Taos, New Mexico | 0.1220357378% |
| Pueblo of Tesuque, New Mexico | 0.0358407169% |
| Pueblo of Zia, New Mexico | 0.1104272350% |
| Puyallup Tribe of the Puyallup Reservation | 0.3366834516% |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 0.2054602142% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Quapaw Nation | 0.0658381931% |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 0.0203535522% |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 0.2241404772% |
| Quileute Tribe of the Quileute Reservation | 0.0432994905% |
| Quinault Indian Nation | 0.1511856279% |
| Ramona Band of Cahuilla, California | 0.0015458020% |
| Rappahannock Tribe, Inc. | 0.0065965582% |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 0.0661539488% |
| Red Lake Band of Chippewa Indians, Minnesota | 0.3243048374% |
| Redding Rancheria, California | 0.3169349449% |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 0.0208033306% |
| Reno-Sparks Indian Colony, Nevada | 0.4540474782% |
| Resighini Rancheria, California | 0.0113426543% |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 0.0292687432% |
| Robinson Rancheria | 0.0560877870% |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 0.3799728000% |
| Round Valley Indian Tribes, Round Valley Reservation, California | 0.1268752814% |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 0.0064208825% |
| Sac & Fox Nation, Oklahoma | 0.4656185329% |
| Sac & Fox Tribe of the Mississippi in Iowa | 0.0634298945% |
| Saginaw Chippewa Indian Tribe of Michigan | 0.1568486093% |
| Saint Regis Mohawk Tribe | 0.3078430940% |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 0.3589862770% |
| Samish Indian Nation | 0.0494460536% |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 0.9574703693% |
| San Juan Southern Paiute Tribe of Arizona | 0.0050210220% |
| San Manuel Band of Mission Indians, California | 0.0206568970% |
| San Pasqual Band of Dieguéno Mission Indians of California | 0.0093320631% |
| Santa Rosa Band of Cahuilla Indians, California | 0.0158444707% |
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 0.0551968646% |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 0.0476194665% |
| Santee Sioux Nation, Nebraska | 0.0395938490% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Sauk-Suiattle Indian Tribe | 0.0039642310% |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 0.7510325911% |
| Scotts Valley Band of Pomo Indians of California | 0.0136356953% |
| Seminole Tribe of Florida | 0.4401090840% |
| Seneca Nation of Indians | 0.4268484045% |
| Seneca-Cayuga Nation | 0.0707146436% |
| Shakopee Mdewakanton Sioux Community of Minnesota | 0.0038445468% |
| Shawnee Tribe | 0.0374201026% |
| Sherwood Valley Rancheria of Pomo Indians of California | 0.0378975402% |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 0.0562386493% |
| Shinnecock Indian Nation | 0.0132248400% |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 0.0377426115% |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 0.2501659726% |
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 0.1051754585% |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 0.2413530569% |
| Skokomish Indian Tribe | 0.0479019559% |
| Skull Valley Band of Goshute Indians of Utah | 0.0030544734% |
| Snoqualmie Indian Tribe | 0.0260358499% |
| Soboba Band of Luiseno Indians, California | 0.1159351518% |
| Sokaogon Chippewa Community, Wisconsin | 0.0115558118% |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 0.0794216045% |
| Spirit Lake Tribe, North Dakota | 0.1321148992% |
| Spokane Tribe of the Spokane Reservation | 0.1161931963% |
| Squaxin Island Tribe of the Squaxin Island Reservation | 0.0460727419% |
| St. Croix Chippewa Indians of Wisconsin | 0.0700651441% |
| Standing Rock Sioux Tribe of North & South Dakota | 0.2384107366% |
| Stillaguamish Tribe of Indians of Washington | 0.0067205345% |
| Stockbridge Munsee Community, Wisconsin | 0.0638452191% |
| Summit Lake Paiute Tribe of Nevada | 0.0043343490% |
| Suquamish Indian Tribe of the Port Madison Reservation | 0.0374931955% |
| Susanville Indian Rancheria, California | 0.0914112889% |
| Swinomish Indian Tribal Community | 0.0666743620% |
| Sycuan Band of the Kumeyaay Nation | 0.0048480131% |
| Table Mountain Rancheria | 0.0007374038% |
| Tejon Indian Tribe | 0.0223615010% |

L-10

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) | 0.1521766438% |
| The Seminole Nation of Oklahoma | 0.4383707582% |
| Thlopthlocco Tribal Town | 0.0374538634% |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 0.2110749918% |
| Timbisha Shoshone Tribe | 0.0059311060% |
| Tohono O'odham Nation of Arizona | 1.3792149374% |
| Tolowa Dee-ni' Nation | 0.1313737812% |
| Tonawanda Band of Seneca | 0.0100435426% |
| Tonkawa Tribe of Indians of Oklahoma | 0.0376882041% |
| Tonto Apache Tribe of Arizona | 0.0181780404% |
| Torres Martinez Desert Cahuilla Indians, California | 0.0482435214% |
| Tulalip Tribes of Washington | 0.3053692780% |
| Tule River Indian Tribe of the Tule River Reservation, California | 0.1001705718% |
| Tunica-Biloxi Indian Tribe | 0.0178033937% |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 0.0245305851% |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 0.4262745507% |
| Tuscarora Nation | 0.0123198641% |
| Twenty-Nine Palms Band of Mission Indians of California | 0.0022241582% |
| United Auburn Indian Community of the Auburn Rancheria of California | 0.3195255887% |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 0.1770830503% |
| Upper Mattaponi Tribe | 0.0188284993% |
| Upper Sioux Community, Minnesota | 0.0053937769% |
| Upper Skagit Indian Tribe | 0.0243632737% |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 0.3254083005% |
| Ute Mountain Ute Tribe | 0.1311781858% |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 0.0029457561% |
| Walker River Paiute Tribe, Nevada | 0.0897012927% |
| Wampanoag Tribe of Gay Head (Aquinnah) | 0.0209916944% |
| Washoe Tribe of Nevada & California | 0.2350774123% |
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 0.3044623729% |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 1.2483764436% |
| Wichita and Affiliated Tribes, Oklahoma | 0.1025387359% |
| Wilton Rancheria, California | 0.0743691562% |

| Federally Recognized Tribe Name | Adjusted Purdue Allocation |
|---|---|
| Winnebago Tribe of Nebraska | 0.1399426543% |
| Winnemucca Indian Colony of Nevada | 0.0117399249% |
| Wiyot Tribe, California | 0.0499246853% |
| Wyandotte Nation | 0.0835082514% |
| Yankton Sioux Tribe of South Dakota | 0.1266151762% |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 0.1597353699% |
| Yavapai-Prescott Indian Tribe | 0.0450794661% |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 0.0531638082% |
| Yocha Dehe Wintun Nation, California | 0.0088678863% |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 0.0157326730% |
| Ysleta del Sur Pueblo | 0.0516381083% |
| Yurok Tribe of the Yurok Reservation, California | 0.4806914407% |
| Zuni Tribe of the Zuni Reservation, New Mexico | 0.4311808505% |

EXECUTION COPY

## **<u>EXHIBIT M</u>**

### **<u>Final Tribal Allocation Distribution Percentages</u>**

[RESERVED][1]

---

[1] Final Tribal Allocation Distribution Percentages shall be determined pursuant to <u>Section V.D</u> and, when so determined, shall be deemed to constitute <u>IX.Q.Exhibit M</u> to this Agreement.

M-1

EXECUTION COPY

**EXHIBIT N**

**Non-Litigating Tribal Populations**

| Tribe Name | Population |
|---|---|
| Absentee-Shawnee Tribe of Indians of Oklahoma | 4,512 |
| Agdaagux Tribe of King Cove | 0 |
| Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | 511 |
| Ak-Chin Indian Community | 1,118 |
| Akiachak Native Community | 0 |
| Akiak Native Community | 0 |
| Alabama-Coushatta Tribe of Texas | 1,348 |
| Alabama-Quassarte Tribal Town | 468 |
| Alaska Native Tribal Health Consortium | 0 |
| Alatna Village | 0 |
| Aleutian Pribilof Islands Association | 0 |
| Algaaciq Native Village (St. Mary's) | 0 |
| Allakaket Village | 0 |
| Alturas Indian Rancheria, California | 15 |
| Alutiiq Tribe of Old Harbor [previously listed as Native Village of Old Harbor and Village of Old Harbor] | 0 |
| Angoon Community Association | 0 |
| Anvik Village | 0 |
| Apache Tribe of Oklahoma | 2,662 |
| Apache Tribe of Oklahoma | 0 |
| Arapaho Tribe of the Wind River Reservation, Wyoming | 10,529 |
| Arctic Slope Native Association | 0 |
| Aroostook Band of Micmacs | 1,527 |
| Asa'carsarmiut Tribe | 0 |
| Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation, Montana | 10,000 |
| Augustine Band of Cahuilla Indians, California | 16 |
| Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | 8,660 |
| Bay Mills Indian Community, Michigan | 2,235 |
| Bear River Band of the Rohnerville Rancheria, California | 636 |
| Beaver Village | 0 |
| Berry Creek Rancheria of Maidu Indians of California | 642 |

| Tribe Name | Population |
|---|---|
| Big Lagoon Rancheria, California | 34 |
| Big Pine Paiute Tribe of the Owens Valley | 650 |
| Big Sandy Rancheria of Western Mono Indians of California | 556 |
| Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | 1,200 |
| Birch Creek Tribe | 0 |
| Bishop Paiute Tribe | 2,118 |
| Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | 17,276 |
| Blue Lake Rancheria, California | 48 |
| Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | 3,052 |
| Bridgeport Indian Colony | 117 |
| Bristol Bay Area Health Corporation | 0 |
| Buena Vista Rancheria of Me-Wuk Indians of California | 20 |
| Burns Paiute Tribe | 402 |
| Cabazon Band of Mission Indians, California | 21 |
| Cachil DeHe Band of Wintun Indians of the Colusa Indian Community of the Colusa Rancheria, California | 96 |
| Caddo Nation of Oklahoma | 6,572 |
| Cahto Tribe of the Laytonville Rancheria | 250 |
| Cahuilla Band of Indians | 463 |
| California Valley Miwok Tribe, California | 43 |
| Campo Band of Diegueno Mission Indians of the Campo Indian Reservation, California | 351 |
| Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California) | 931 |
| Capitan Grande Band of Diegueno Mission Indians of California: Viejas (Baron Long) Group of Capitan Grande Band of Mission Indians of the Viejas Reservation, California | 0 |
| Catawba Indian Nation (aka Catawba Indian Tribe of South Carolina) | 3,397 |
| Cayuga Nation | 526 |
| Cedarville Rancheria, California | 35 |
| Central Council of the Tlingit & Haida Indian Tribes | 0 |
| Chalkyitsik Village | 0 |
| Cheesh-Na Tribe [previously listed as Native Village of Chistochina] | 0 |
| Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | 1,012 |
| Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | 251 |
| Cherokee | 0 |

| Tribe Name | Population |
|---|---|
| Cherokee Nation | 392,294 |
| Chevak Native Village | 0 |
| Cheyenne and Arapaho Tribes, Oklahoma | 12,955 |
| Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | 15,993 |
| Chickahominy Indian Tribe | 898 |
| Chickahominy Indian Tribe - Eastern Division | 242 |
| Chickaloon Native Village | 33 |
| Chickasaw Nation | 70,934 |
| Chicken Ranch Rancheria of Me-Wuk Indians of California | 41 |
| Chignik Bay Tribal Council [previously listed as Native Village of Chignik] | 0 |
| Chignik Lake Village | 0 |
| Chilkat Indian Village (Klukwan) | 0 |
| Chilkoot Indian Association (Haines) | 0 |
| Chinik Eskimo Community (Golovin) | 0 |
| Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | 6,784 |
| Chippewa Tribe of Sault STE Marie | 0 |
| Chitimacha Tribe of Louisiana | 1,542 |
| Choctaw Nation of Oklahoma | 223,279 |
| Chugachmiut | 0 |
| Chuloonawick Native Village | 0 |
| Circle Native Community | 0 |
| Citizen Potawatomi Nation, Oklahoma | 36,315 |
| City of Haverhill | 0 |
| Cloverdale Rancheria of Pomo Indians of California | 641 |
| Cocopah Tribe of Arizona | 1,196 |
| Coeur D'Alene Tribe | 2,548 |
| Cold Springs Rancheria of Mono Indians of California | 184 |
| Colorado River Indian Tribes of the Colorado River Indian Reservation, Arizona and California | 4,565 |
| Comanche Nation, Oklahoma | 17,526 |
| Confederated Salish and Kootenai Tribes of the Flathead Reservation | 8,014 |
| Confederated Tribes and Bands of the Yakama Nation | 11,073 |
| Confederated Tribes of Siletz Indians of Oregon | 5,537 |
| Confederated Tribes of the Chehalis Reservation | 979 |
| Confederated Tribes of the Colville Reservation | 9,447 |
| Confederated Tribes of the Coos, Lower Umpqua and Siuslaw Indians | 1,234 |
| Confederated Tribes of the Goshute Reservation, Nevada and Utah | 631 |

EXECUTION COPY

| Tribe Name | Population |
|---|---|
| Confederated Tribes of the Grand Ronde Community of Oregon | 5,573 |
| Confederated Tribes of the Umatilla Indian Reservation | 3,155 |
| Confederated Tribes of the Warm Springs Reservation of Oregon | 5,363 |
| Consolidated Tribal Health Project | 0 |
| Copper River Native Association | 0 |
| Coquille Indian Tribe | 1,200 |
| Council of Athabascan Tribal Governments | 0 |
| Courtney | 0 |
| Coushatta Tribe of Louisiana | 964 |
| Cow Creek Band of Umpqua Tribe of Indians | 1,890 |
| Cowlitz Indian Tribe | 4,254 |
| Coyote Valley Band of Pomo Indians of California | 407 |
| Craig Tribal Association [previously listed as Craig Community Association] | 0 |
| Crow Creek Sioux Tribe of the Crow Creek Reservation, South Dakota | 4,276 |
| Crow Tribe of Montana | 12,000 |
| Curyung Tribal Council | 0 |
| Delaware Nation, Oklahoma | 1,907 |
| Delaware Tribe of Indians | 11,200 |
| Douglas Indian Association | 0 |
| Dry Creek Rancheria Band of Pomo Indians, California | 1,281 |
| Duckwater Shoshone Tribe of the Duckwater Reservation, Nevada | 423 |
| Eastern Aleutian Tribes | 0 |
| Eastern Band of Cherokee Indians | 15,779 |
| Eastern Shawnee Tribe of Oklahoma | 3,651 |
| Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | 4,462 |
| Egegik Village | 0 |
| Eklutna Native Village | 44 |
| Elem Indian Colony of Pomo Indians of the Sulphur Bank Rancheria, California | 100 |
| Elk Valley Rancheria, California | 85 |
| Ely Shoshone Tribe of Nevada | 1,198 |
| Emmonak Village | 0 |
| Enterprise Rancheria of Maidu Indians of California | 1,045 |
| Evansville Village (aka Bettles Field) | 0 |
| Ewiiaapaayp Band of Kumeyaay Indians, California | 6 |
| Eyak Native Village | 344 |
| Feather River Tribal health | 0 |
| Federated Indians of Graton Rancheria, California | 1,440 |

EXECUTION COPY

| Tribe Name | Population |
|---|---|
| Flandreau Santee Sioux Tribe of South Dakota | 766 |
| Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | 4,192 |
| Forest County Potawatomi Community, Wisconsin | 1,704 |
| Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | 8,314 |
| Fort Bidwell Indian Community of the Fort Bidwell Reservation of California | 361 |
| Fort Independence Indian Community of Paiute Indians of the Fort Independence Reservation, California | 212 |
| Fort McDermitt Paiute and Shoshone Tribes of the Fort McDermitt Indian Reservation, Nevada and Oregon | 341 |
| Fort McDowell Yavapai Nation, Arizona | 889 |
| Fort Mojave Indian Tribe of Arizona, California & Nevada | 1,441 |
| Fort Sill Apache Tribe of Oklahoma | 792 |
| Four Winds Tribe Louisiana Cherokee | 0 |
| Freeland | 0 |
| Galena Village(aka Louden Village) | 0 |
| Gila River Indian Community of the Gila River Indian Reservation, Arizona | 22,883 |
| Grand Portage Band of the Minnesota Chippewa Tribe, Minnesota | 1,089 |
| Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | 4,189 |
| Greenville Rancheria | 153 |
| Grindstone Indian Rancheria of Wintun-Wailaki Indians of California | 164 |
| Guidiville Rancheria of California | 165 |
| Gulkana Village Council [previously listed as Gulkana Village] | 0 |
| Habematolel Pomo of Upper Lake, California | 277 |
| Hannahville Indian Community, Michigan | 1,003 |
| Havasupai Tribe of the Havasupai Reservation, Arizona | 767 |
| Healy Lake Village | 0 |
| Ho-Chunk Nation of Wisconsin | 7,874 |
| Hoh Indian Tribe | 272 |
| Holy Cross Tribe [previously listed as Holy Cross Village] | 0 |
| Hoonah Indian Association | 0 |
| Hoopa Valley Tribe, California | 3,513 |
| Hopi Tribe of Arizona | 14,656 |
| Hopland Band of Pomo Indians, California | 872 |
| Houlton Band of Maliseet Indians | 1,835 |
| Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | 2,410 |
| Hughes Village | 0 |

| Tribe Name | Population |
|---|---|
| Hui Huliau, A Native Hawaiian Organization | 0 |
| Huslia Village | 0 |
| Hydaburg Cooperative Association | 0 |
| Igiugig Village | 0 |
| Iipay Nation of Santa Ysabel, California | 250 |
| Inaja Band of Diegueno Mission Indians of the Inaja and Cosmit Reservation, California | 15 |
| Indian Health Council | 0 |
| Inupiat Community of the Arctic Slope | 0 |
| Ione Band of Miwok Indians of California | 725 |
| Iowa Tribe of Kansas and Nebraska | 4,990 |
| Iowa Tribe of Oklahoma | 800 |
| Iqugmiut Traditional Council [previously listed as Iqurmuit Traditional Council] | 0 |
| Ivanof Bay Tribe | 0 |
| Jackson Band of Miwuk Indians | 32 |
| Jamestown S'Klallam Tribe | 532 |
| Jamul Indian Village of California | 120 |
| Jena Band of Choctaw Indians | 399 |
| Jicarilla Apache Nation, New Mexico | 4,049 |
| Kaguyak Village | 0 |
| Kaibab Band of Paiute Indians of the Kaibab Indian Reservation, Arizona | 367 |
| Kaktovik Village (aka Barter Island) | 0 |
| Kalispel Indian Community of the Kalispel Reservation | 481 |
| Karuk Tribe | 8,676 |
| Kashia Band of Pomo Indians of the Stewarts Point Rancheria, California | 78 |
| Kasigluk Traditional Elders Council | 0 |
| Kaw Nation, Oklahoma | 3,575 |
| Kaydee FReese | 0 |
| Kenaitze Indian Tribe | 0 |
| Ketchikan Indian Community | 2,901 |
| Kewa Pueblo, New Mexico | 2,456 |
| Keweenaw Bay Indian Community, Michigan | 3,589 |
| Kialegee Tribal Town | 732 |
| Kickapoo Traditional Tribe of Texas | 1,091 |
| Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | 1,624 |
| Kickapoo Tribe of Oklahoma | 2,687 |
| King Island Native Community | 0 |

| Tribe Name | Population |
|---|---|
| King Salmon Tribe | 0 |
| Kiowa  Indian Tribe of Oklahoma | 10,600 |
| Klamath Tribes | 5,710 |
| Klawock Cooperative Association | 0 |
| Kletsel Dehe Band of Wintun Indians | 245 |
| Knik Tribe | 97 |
| Kodiak Area Native Association | 0 |
| Koi Nation of Northern California | 2,000 |
| Kokhanok Village | 0 |
| Kootenai Tribe of Idaho | 163 |
| Koyukuk Native Village | 0 |
| La Jolla Band of Luiseno Indians, California | 682 |
| La Posta Band of Dieguene Mission Indians of the La Posta Indian Reservation, California | 43 |
| Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | 8,255 |
| Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | 4,490 |
| Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | 793 |
| Las Vegas Tribe of Paiute Indians of the Las Vegas Indian Colony, Nevada | 55 |
| Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | 9,777 |
| Levelock Village | 0 |
| Lime Village | 0 |
| Little River Band of Ottawa Indians, Michigan | 4,152 |
| Little Shell Tribe of Chippewa Indians of Montana | 5,767 |
| Little Traverse Bay Bands of Odawa Indians, Michigan | 400 |
| llliiinnnrrr | 0 |
| Lone Pine Paiute-Shoshone Tribe | 427 |
| Los Coyotes Band of Cahuilla & Cupeno Indians, California | 288 |
| Lovelock Paiute Tribe of the Lovelock Indian Colony, Nevada | 650 |
| Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | 4,341 |
| Lower Elwha Tribal Community | 887 |
| Lower Sioux Indian Community in the State of Minnesota | 1,176 |
| Lummi Tribe of the Lummi Reservation | 5,299 |
| Lytton Rancheria of California | 430 |
| Makah Indian Tribe of the Makah Indian Reservation | 3,110 |
| Manchester Band of Pomo Indians of the Manchester Rancheria, California | 1,013 |
| Maniilaq Association | 7,179 |

| Tribe Name | Population |
|---|---|
| Manley Hot Springs Village | 0 |
| Manokotak Village | 0 |
| Manzanita Band of Diegueno Mission Indians of the Manzanita Reservation, California | 67 |
| Martha Charles | 0 |
| Mashantucket Pequot Indian Tribe | 1,082 |
| Mashpee Wampanoag Tribe | 2,600 |
| Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | 583 |
| McGrath Native Village | 0 |
| Mechoopda Indian Tribe of Chico Rancheria, California | 647 |
| Menominee Indian Tribe of Wisconsin | 8,965 |
| Mentasta Traditional Council | 0 |
| Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | 618 |
| Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | 5,230 |
| Metlakatla Indian Community | 1,294 |
| Metlakatla Indian Community, Annette Island Reserve | 0 |
| Miami Tribe of Oklahoma | 5,517 |
| Miccosukee Tribe of Indians | 605 |
| Middletown Rancheria of Pomo Indians of California | 257 |
| Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | 4,843 |
| Mississippi Band of Choctaw Indians | 11,042 |
| Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | 328 |
| Modoc Nation | 496 |
| Mohegan Tribe of Indians of Connecticut | 2,258 |
| Monacan Indian Nation | 2,292 |
| Mooretown Rancheria of Maidu Indians of California | 1,116 |
| Morongo Band of Mission Indians, California | 1,018 |
| Mt. Sanford Tribal Consortium | 82 |
| Muckleshoot Indian Tribe | 3,027 |
| Muscogee (Creek) Nation | 91,307 |
| Naknek Native Village | 0 |
| Nansemond Indian Nation | 200 |
| Narragansett Indian Tribe | 3,317 |
| Native Village of Afognak | 0 |
| Native Village of Akhiok | 0 |
| Native Village of Akutan | 0 |
| Native Village of Aleknagik | 0 |

| Tribe Name | Population |
|---|---|
| Native Village of Ambler | 0 |
| Native Village of Atka | 0 |
| Native Village of Atqasuk [previously listed as Atqasuk Village (Atkasook)] | 0 |
| Native Village of Barrow Inupiat Traditional Government | 0 |
| Native Village of Belkofski | 0 |
| Native Village of Brevig Mission | 0 |
| Native Village of Buckland | 0 |
| Native Village of Cantwell | 0 |
| Native Village of Chenega (aka Chanega) | 0 |
| Native Village of Chignik Lagoon | 0 |
| Native Village of Chitina | 45 |
| Native Village of Chuathbaluk (Russian Mission, Kuskokwim) | 0 |
| Native Village of Council | 0 |
| Native Village of Deering | 0 |
| Native Village of Diomede (aka Inalik) | 0 |
| Native Village of Eagle | 0 |
| Native Village of Eek | 0 |
| Native Village of Ekuk | 0 |
| Native Village of Ekwok [previously listed as Ekwok Village] | 0 |
| Native Village of Elim | 0 |
| Native Village of Eyak (Cordova) | 0 |
| Native Village of False Pass | 0 |
| Native Village of Fort Yukon | 0 |
| Native Village of Gakona | 0 |
| Native Village of Gambell | 0 |
| Native Village of Georgetown | 0 |
| Native Village of Goodnews Bay | 0 |
| Native Village of Hamilton | 0 |
| Native Village of Hooper Bay | 0 |
| Native Village of Kanatak | 0 |
| Native Village of Karluk | 0 |
| Native Village of Kiana | 0 |
| Native Village of Kipnuk | 0 |
| Native Village of Kivalina | 0 |
| Native Village of Kluti Kaah (aka Copper Center) | 0 |
| Native Village of Kobuk | 0 |
| Native Village of Kongiganak | 0 |
| Native Village of Kotzebue | 0 |

EXECUTION COPY

| Tribe Name | Population |
|---|---|
| Native Village of Koyuk | 0 |
| Native Village of Kwigillingok | 0 |
| Native Village of Kwinhagak (aka Quinhagak) | 0 |
| Native Village of Larsen Bay | 0 |
| Native Village of Marshall (aka Fortuna Ledge) | 0 |
| Native Village of Mary's Igloo | 0 |
| Native Village of Mekoryuk | 0 |
| Native Village of Minto | 0 |
| Native Village of Nanwalek (aka English Bay) | 0 |
| Native Village of Napaimute | 0 |
| Native Village of Napakiak | 0 |
| Native Village of Napaskiak | 0 |
| Native Village of Nelson Lagoon | 0 |
| Native Village of Nightmute | 0 |
| Native Village of Nikolski | 0 |
| Native Village of Noatak | 0 |
| Native Village of Nuiqsut (aka Nooiksut) | 0 |
| Native Village of Nunam Iqua [previously listed as Native Village of Sheldon's Point] | 0 |
| Native Village of Nunapitchuk | 0 |
| Native Village of Ouzinkie | 0 |
| Native Village of Paimiut | 0 |
| Native Village of Paimiut | 0 |
| Native Village of Perryville | 0 |
| Native Village of Pilot Point | 0 |
| Native Village of Point Hope | 0 |
| Native Village of Point Lay | 0 |
| Native Village of Port Graham | 0 |
| Native Village of Port Heiden | 0 |
| Native Village of Port Lions | 0 |
| Native Village of Ruby | 0 |
| Native Village of Saint Michael | 0 |
| Native Village of Savoonga | 0 |
| Native Village of Scammon Bay | 0 |
| Native Village of Selawik | 0 |
| Native Village of Shaktoolik | 0 |
| Native Village of Shishmaref | 0 |
| Native Village of Shungnak | 0 |
| Native Village of Stevens | 0 |

| Tribe Name | Population |
|---|---|
| Native Village of Tanacross | 0 |
| Native Village of Tanana | 222 |
| Native Village of Tatitlek | 0 |
| Native Village of Tazlina | 0 |
| Native Village of Teller | 0 |
| Native Village of Tetlin | 0 |
| Native Village of Tuntutuliak | 0 |
| Native Village of Tununak | 0 |
| Native Village of Tyonek | 162 |
| Native Village of Unalakleet | 0 |
| Native Village of Unga | 0 |
| Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie) | 0 |
| Native Village of Wales | 0 |
| Native Village of White Mountain | 0 |
| NATO | 0 |
| Navajo Nation, Arizona, New Mexico & Utah | 399,494 |
| Nenana Native Association | 0 |
| New Koliganek Village Council | 0 |
| New Stuyahok Village | 0 |
| Newhalen Village | 0 |
| Newtok Village | 0 |
| Nez Perce Tribe | 3,541 |
| Nicole Uncapher | 0 |
| Nikolai Village | 0 |
| Ninilchik Village | 586 |
| Ninilchik Village | 0 |
| Nisqually Indian Tribe | 824 |
| Nome Eskimo Community | 0 |
| Nondalton Village | 0 |
| Nooksack Indian Tribe | 1,902 |
| Noorvik Native Community | 0 |
| Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation, Montana | 11,724 |
| Northfork Rancheria of Mono Indians of California | 2,260 |
| Northway Village | 0 |
| Northwestern Band of the Shoshone Nation | 454 |
| Norton Sound Health Corporation | 0 |
| Nottawaseppi Huron Band of the Potawatomi, Michigan | 1,601 |

| Tribe Name | Population |
|---|---|
| Nulato Village | 0 |
| Nunakauyarmiut Tribe | 0 |
| Oglala Sioux Tribe | 45,697 |
| Ohkay Owingeh, New Mexico | 3,000 |
| Omaha Tribe of Nebraska | 5,427 |
| Oneida Indian Nation | 954 |
| Oneida Nation | 17,328 |
| Onondaga Nation | 474 |
| Opioid trilbal lawsuit settlement | 0 |
| Organized Village of Grayling (aka Holikachuk) | 0 |
| Organized Village of Kake | 0 |
| Organized Village of Kasaan | 0 |
| Organized Village of Kwethluk | 0 |
| Organized Village of Saxman | 0 |
| Orutsararmiut Native Council's | 0 |
| Orutsararmiut Traditional Native Council [previously listed as Orutsararmuit Native Village (aka Bethel)] | 0 |
| Osage Nation | 22,925 |
| Oscarville Traditional Village | 0 |
| Otoe-Missouria Tribe of Indians, Oklahoma | 3,293 |
| Ottawa Tribe of Oklahoma | 1,520 |
| Paiute Indian Tribe of Utah (Cedar Band of Paiutes, Kanosh Band of Paiutes, Koosharem Band of Paiutes, Indian Peaks Band of Paiutes, and Shivwits Band of Paiutes) | 919 |
| Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | 1,564 |
| Pala Band of Mission Indians | 1,200 |
| Pamunkey Indian Tribe | 429 |
| Pascua Yaqui Tribe of Arizona | 21,061 |
| Paskenta Band of Nomlaki Indians of California | 288 |
| Passamaquoddy Tribe Indian Township | 1,542 |
| Passamaquoddy Tribe Pleasant Point | 2,175 |
| Pauloff Harbor Village | 0 |
| Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | 248 |
| Pawnee Nation of Oklahoma | 3,624 |
| Pechanga Band of Luiseno Mission Indians of the Pechanga Reservation, California | 2,039 |
| Pedro Bay Village | 0 |
| Penobscot Nation | 2,398 |

| Tribe Name | Population |
|---|---|
| Peoria Tribe of Indians of Oklahoma | 3,509 |
| Petersburg Indian Association | 0 |
| Picayune Rancheria of Chukchansi Indians of California | 1,554 |
| Pilot Station Traditional Village | 0 |
| Pinoleville Pomo Nation, California | 325 |
| Pit River Tribe, California | 1,800 |
| Pitka's Point Traditional Council [previously listed as Native Village of Pitka's Point] | 0 |
| Platinum Traditional Village | 0 |
| Poarch Band of Creeks | 2,843 |
| Pokagon Band of Potawatomi Indians, Michigan & Indiana | 5,915 |
| Ponca Tribe of Indians of Oklahoma | 4,012 |
| Ponca Tribe of Nebraska | 5,127 |
| Port Gamble S'Klallam Tribe | 1,367 |
| Portage Creek Village (aka Ohgsenakale) | 0 |
| Potter Valley Tribe, California | 6 |
| Prairie Band Potawatomi Nation | 4,515 |
| Prairie Island Indian Community in the State of Minnesota | 1,064 |
| Pribilof Islands Aleut Communities of St. Paul & St. George Islands (Saint George Island and Saint Paul Island) | 0 |
| Pueblo of Acoma, New Mexico | 5,182 |
| Pueblo of Cochiti, New Mexico | 1,280 |
| Pueblo of Isleta, New Mexico | 4,929 |
| Pueblo of Jemez, New Mexico | 3,905 |
| Pueblo of Laguna, New Mexico | 8,783 |
| Pueblo of Nambe, New Mexico | 1,016 |
| Pueblo of Picuris, New Mexico | 309 |
| Pueblo of Pojoaque, New Mexico | 546 |
| Pueblo of San Felipe, New Mexico | 4,170 |
| Pueblo of San Ildefonso, New Mexico | 771 |
| Pueblo of Sandia, New Mexico | 446 |
| Pueblo of Santa Ana, New Mexico | 1,007 |
| Pueblo of Santa Clara, New Mexico | 1,310 |
| Pueblo of Taos, New Mexico | 2,614 |
| Pueblo of Tesuque, New Mexico | 552 |
| Pueblo of Zia, New Mexico | 940 |
| Puyallup Tribe of the Puyallup Reservation | 5,703 |
| Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | 2,991 |

| Tribe Name | Population |
|---|---|
| Qagan Tayagungin Tribe of Sand Point [previously listed as Qagan Tayagungin Tribe of Sand Point Village] | 0 |
| Qawalangin Tribe of Unalaska | 0 |
| Quapaw Nation | 5,349 |
| Quartz Valley Indian Community of the Quartz Valley Reservation of California | 368 |
| Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | 3,954 |
| Quileute Tribe of the Quileute Reservation | 835 |
| Quinault Indian Nation | 3,405 |
| Ramona Band of Cahuilla, California | 20 |
| Rampart Village | 0 |
| Rappahannock Tribe, Inc. | 249 |
| Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | 7,545 |
| Red Lake Band of Chippewa Indians, Minnesota | 13,486 |
| Redding Rancheria, California | 374 |
| Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | 258 |
| Reno-Sparks Indian Colony, Nevada | 1,187 |
| Resighini Rancheria, California | 158 |
| Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | 552 |
| Riverside San Bernardino County Indian Health | 0 |
| Robinson Rancheria | 570 |
| Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | 35,354 |
| Round Valley Indian Tribes, Round Valley Reservation, California | 5,481 |
| Sac & Fox Nation of Missouri in Kansas and Nebraska | 482 |
| Sac & Fox Nation, Oklahoma | 4,058 |
| Sac and Fox Tribe of the Mississippi in Iowa | 1,400 |
| Saginaw Chippewa Indian Tribe of Michigan | 3,489 |
| Saint Regis Mohawk Tribe | 16,280 |
| Salamatof Tribe [previously listed as Village of Salamatoff] | 0 |
| Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | 10,813 |
| Samish Indian Nation | 2,100 |
| San Carlos Apache Tribe of the San Carlos Reservation, Arizona | 16,761 |
| San Juan Southern Paiute Tribe of Arizona | 206 |
| San Manuel Band of Mission Indians, California | 272 |
| San Pasqual Band of Dieguexno Mission Indians of California | 176 |
| Santa Rosa Band of Cahuilla Indians, California | 205 |

| Tribe Name | Population |
|---|---|
| Santa Rosa Indian Community of the Santa Rosa Rancheria, California | 1,136 |
| Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | 116 |
| Santee Sioux Nation, Nebraska | 2,901 |
| Sauk-Suiattle Indian Tribe | 305 |
| Sault Ste. Marie Tribe of Chippewa Indians, Michigan | 45,298 |
| Scotts Valley Band of Pomo Indians of California | 330 |
| Seldovia Village Tribe | 714 |
| Seminole Tribe of Florida | 4,286 |
| Seneca Nation of Indians | 8,482 |
| Seneca-Cayuga Nation | 5,422 |
| Shageluk Native Village | 0 |
| Shakopee Mdewakanton Sioux Community of Minnesota | 622 |
| Shawnee Tribe | 3,021 |
| Sherwood Valley Rancheria of Pomo Indians of California | 470 |
| Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | 485 |
| Shinnecock Indian Nation | 1,588 |
| Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | 455 |
| Shoshone-Bannock Tribes of the Fort Hall Reservation | 6,084 |
| Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada | 2,300 |
| Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | 14,357 |
| Sitka Tribe of Alaska | 0 |
| Skagway Village | 0 |
| Skokomish Indian Tribe | 2,400 |
| Skull Valley Band of Goshute Indians of Utah | 151 |
| Snoqualmie Indian Tribe | 739 |
| Soboba Band of Luiseno Indians, California | 1,500 |
| Sokaogon Chippewa Community, Wisconsin | 1,628 |
| South Naknek Village | 0 |
| Southcentral Foundation | 0 |
| Southeast Alaska Regional Health Corporation | 0 |
| Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado | 1,498 |
| Spirit Lake Tribe, North Dakota | 7,562 |
| Spokane Tribe of the Spokane Reservation | 2,907 |
| Squaxin Island Tribe of the Squaxin Island Reservation | 1,120 |
| St. Croix Chippewa Indians of Wisconsin | 1,061 |
| Standing Rock Sioux Tribe of North & South Dakota | 16,095 |

EXECUTION COPY

| Tribe Name | Population |
|---|---|
| Stebbins Community Association | 0 |
| Stillaguamish Tribe of Indians of Washington | 369 |
| Stockbridge Munsee Community, Wisconsin | 1,722 |
| Summit Lake Paiute Tribe of Nevada | 125 |
| Sun'aq Tribe of Kodiak [previously listed as Shoonaq' Tribe of Kodiak] | 0 |
| Suquamish Indian Tribe of the Port Madison Reservation | 1,225 |
| Susanville Indian Rancheria, California | 1,250 |
| Swinomish Indian Tribal Community | 1,005 |
| Sycuan Band of the Kumeyaay Nation | 268 |
| Table Mountain Rancheria | 126 |
| Takotna Village | 0 |
| Tanana Chiefs Conference | 0 |
| Tangirnaq Native Village [previously listed as Lesnoi Village (aka Woody Island)] | 0 |
| Tejon Indian Tribe | 1,047 |
| Telida Village | 0 |
| Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) [Only Wells Band is unrepresented] | 2,362 |
| The Seminole Nation of Oklahoma | 18,646 |
| Thlopthlocco Tribal Town | 1,137 |
| Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | 16,823 |
| Timbisha Shoshone Tribe | 124 |
| Tohono O'odham Nation of Arizona | 35,500 |
| Tolowa Dee-ni' Nation | 1,830 |
| Tolowa Dee-ni' Nation | 0 |
| Tonawanda Band of Seneca | 1,200 |
| Tonkawa Tribe of Indians of Oklahoma | 868 |
| Tonto Apache Tribe of Arizona | 176 |
| Torres Martinez Desert Cahuilla Indians, California | 627 |
| Traditional Village of Togiak | 0 |
| Tulalip Tribes of Washington | 5,047 |
| Tule River Indian Tribe of the Tule River Reservation, California | 2,401 |
| Tuluksak Native Community | 0 |
| Tunica-Biloxi Indian Tribe | 1,509 |
| Tuolumne Band of Me-Wuk Indians of the Tuolumne Rancheria of California | 496 |
| Turtle Mountain Band of Chippewa Indians of North Dakota | 32,676 |
| Tuscarora Nation | 1,200 |

| Tribe Name | Population |
|---|---|
| Twenty-Nine Palms Band of Mission Indians of California | 29 |
| Twin Hills Village | 0 |
| Ugashik Village | 0 |
| Umkumiut Native Village [previously listed as Umkumiute Native Village] | 0 |
| United Auburn Indian Community of the Auburn Rancheria of California | 170 |
| United Keetoowah Band of Cherokee Indians in Oklahoma | 13,825 |
| Upper Mattaponi Tribe | 600 |
| Upper Sioux Community, Minnesota | 525 |
| Upper Skagit Indian Tribe | 1,325 |
| Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | 2,855 |
| Ute Mountain Ute Tribe | 2,134 |
| Utu Utu Gwaitu Paiute Tribe of the Benton Paiute Reservation, California | 138 |
| Village of Alakanuk | 0 |
| Village of Anaktuvuk Pass | 0 |
| Village of Aniak | 0 |
| Village of Atmautluak | 0 |
| Village of Bill Moore's Slough | 0 |
| Village of Chefornak | 0 |
| Village of Clarks Point | 0 |
| Village of Crooked Creek | 0 |
| Village of Dot Lake | 0 |
| Village of Iliamna | 0 |
| Village of Kalskag | 0 |
| Village of Kaltag | 0 |
| Village of Kotlik | 0 |
| Village of Lower Kalskag | 0 |
| Village of Ohogamiut | 0 |
| Village of Red Devil | 0 |
| Village of Sleetmute | 0 |
| Village of Solomon | 0 |
| Village of Stony River | 0 |
| Village of Wainwright | 0 |
| Walker River Paiute Tribe, Nevada | 2,436 |
| Walpole island | 0 |
| Wampanoag Tribe of Gay Head (Aquinnah) | 1,392 |

| Tribe Name | Population |
|---|---|
| Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches) | 1,400 |
| White Earth Band of the Minnesota Chippewa Tribe, Minnesota | 17,987 |
| White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | 17,059 |
| Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma | 3,503 |
| Wilton Rancheria, California | 857 |
| Winnebago Tribe of Nebraska | 5,312 |
| Winnemucca Indian Colony of Nevada | 17 |
| Wiyot Tribe, California | 644 |
| Wrangell Cooperative Association | 0 |
| Wyandotte Nation | 6,720 |
| Yakutat Tlingit Tribe | 330 |
| Yankton Sioux Tribe of South Dakota | 11,594 |
| Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | 2,607 |
| Yavapai-Prescott Indian Tribe | 180 |
| Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch, Nevada | 468 |
| Yocha Dehe Wintun Nation, California | 77 |
| Yomba Shoshone Tribe of the Yomba Reservation, Nevada | 161 |
| Ysleta del Sur Pueblo | 4,569 |
| Yukon Kuskokwim Health Corporation | 0 |
| Yupiit of Andreafski | 0 |
| Yurok Tribe of the Yurok Reservation, California | 6,279 |
| Zuni Tribe of the Zuni Reservation, New Mexico | 12,591 |

EXECUTION COPY

## **EXHIBIT O**

## **Alleged Harms**

The following export reports that were filed in connection with the case captioned *In re National Prescription Opiate Litigation*, No. 1-17-md-02804 (S.D. Ohio):

1. Expert report of Professor David Cutler, dated March 25, 2019.
2. Expert report of Dr. Jeffrey B. Liebman, dated March 25, 2019.
3. Expert report of Professor Thomas McGuire regarding damages to Bellwethers, dated March 25, 2019.
4. Report of Professor Thomas McGuire regarding public nuisance, dated March 25, 2019.

# EXHIBIT P

## Representation and Warranty Regarding Section II

## CERTIFICATION of PARTICIPATION

The TLC provides written notice to the Settling Distributors representing and warranting that the conditions in subsections (1) and (2) of Section II.A have been met and hereby provide the listing of all Tribes that have executed Tribal Participation Forms as of the date of the execution of this Agreement.

Steve Skikos
Chair of the MDL Tribal Leadership Committee.

P-1

EXECUTION COPY

| Status | Participation Agreement | | | | Total | Current Participation | Participation Needed |
|---|---|---|---|---|---|---|---|
| | Submitted | | Not Submitted | | | | |
| | # | Allocation Share | # | Allocation Share | | | |
| **Litigating Tribes** | 186 | 82.1964786938% | 0 | 0.0000000000% | **186** | **100.00%** | **95%** |
| **Non-Litigating with Population of at least 5,000** | 17 | 4.9556869767% | 0 | 0.0000000000% | **17** | **17** | **14** |

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 1. | Navajo Nation, Arizona, New Mexico & Utah | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Arizona | 399,494 | 15.2206996192% | Yes | Yes |
| 2. | Cherokee Nation | Fields PLLC | Oklahoma | 392,294 | 12.1894428123% | Yes | Yes |
| 3. | Choctaw Nation of Oklahoma | Whitten Burrage | Oklahoma | 223,279 | 5.4805046723% | Yes | Yes |
| 4. | Muscogee (Creek) Nation | Sonosky, Chambers, Sachse, Endreson | Oklahoma | 91,307 | 2.8659128868% | Yes | Yes |
| 5. | Chickasaw Nation | Whitten Burrage | Oklahoma | 70,934 | 2.1566600984% | Yes | Yes |
| 6. | Oglala Sioux Tribe | Robins Kaplan LLP | South Dakota | 45,697 | 0.9582262275% | Yes | Yes |
| 7. | Sault Ste. Marie Tribe of Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Michigan | 45,298 | 0.7719605553% | Yes | Yes |
| 8. | Citizen Potawatomi Nation, Oklahoma | The Bruehl Firm | Oklahoma | 36,315 | 1.4668677455% | Yes | Yes |
| 9. | Tohono O'odham Nation of Arizona | Skikos | Arizona | 35,500 | 1.4176475717% | Yes | Yes |
| 10. | Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota | Robins Kaplan LLP | South Dakota | 35,354 | 0.3905609653% | Yes | Yes |
| 11. | Turtle Mountain Band of Chippewa Indians of North Dakota | Robins Kaplan LLP | North Dakota | 32,676 | 0.4381529414% | Yes | Yes |
| 12. | Osage Nation | The Bruehl Firm | Oklahoma | 22,925 | 0.2997942528% | Yes | Yes |
| 13. | Gila River Indian Community of the Gila River Indian Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Arizona | 22,883 | 2.5642078189% | Yes | Yes |
| 14. | Pascua Yaqui Tribe of Arizona | Sonosky, Chambers, Sachse, Endreson | Arizona | 21,061 | 0.6028320492% | Yes | Yes |
| 15. | White Earth Band of the Minnesota Chippewa Tribe, Minnesota | Levin Papantonio Consortium | Minnesota | 17,987 | 0.3129463957% | Yes | Yes |
| 16. | Comanche Nation, Oklahoma | Skikos | Oklahoma | 17,526 | 0.6989376020% | Yes | Yes |
| 17. | Oneida Nation | Levin Papantonio Consortium | Wisconsin | 17,328 | 0.6249463963% | Yes | Yes |
| 18. | Blackfeet Tribe of the Blackfeet Indian Reservation of Montana | Levin Papantonio Consortium | Montana | 17,276 | 0.5377787156% | Yes | Yes |
| 19. | White Mountain Apache Tribe of the Fort Apache Reservation, Arizona | Fields PLLC | Arizona | 17,059 | 1.2831631865% | Yes | Yes |
| 20. | Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota | Skikos | North Dakota | 16,823 | 0.2169567204% | Yes | Yes |
| 21. | San Carlos Apache Tribe of the San Carlos Reservation, Arizona | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Arizona | 16,761 | 0.9841508435% | Yes | Yes |
| 22. | Saint Regis Mohawk Tribe | Keller Rohrback LLP | New York | 16,280 | 0.3164213227% | Yes | Yes |
| 23. | Standing Rock Sioux Tribe of North & South Dakota | Robins Kaplan LLP | South Dakota | 16,095 | 0.2450541918% | Yes | Yes |
| 24. | Cheyenne River Sioux Tribe of the Cheyenne River Reservation, South Dakota | Domina Law Group | South Dakota | 15,993 | 0.2905847017% | Yes | Yes |
| 25. | Eastern Band of Cherokee Indians | Levin Papantonio Consortium | North Carolina | 15,779 | 0.9559806252% | Yes | Yes |
| 26. | Hopi Tribe of Arizona | Keller Rohrback LLP | Arizona | 14,656 | 0.4474801011% | Yes | Yes |
| 27. | Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota | Robins Kaplan LLP | South Dakota | 14,357 | 0.2480785016% | Yes | Yes |
| 28. | United Keetoowah Band of Cherokee Indians in Oklahoma | Levin Papantonio Consortium | Oklahoma | 13,825 | 0.1820175735% | Yes | Yes |
| 29. | Red Lake Band of Chippewa Indians, Minnesota | Levin Papantonio Consortium | Minnesota | 13,486 | 0.3333417821% | Yes | Yes |
| 30. | Cheyenne and Arapaho Tribes, Oklahoma | Frazer PLC | Oklahoma | 12,955 | 0.7723350493% | Yes | Yes |
| 31. | Zuni Tribe of the Zuni Reservation, New Mexico | Sonosky, Chambers, Sachse, Endreson & Perry LLP | New Mexico | 12,591 | 0.4431959581% | Yes | Yes |
| 32. | Northern Cheyenne Tribe of the Northern Cheyenne Indian Reservation Montana | Lockridge Grindal Nauen | Montana | 11,724 | 0.2534539080% | Yes | Yes |
| 33. | Confederated Tribes and Bands of the Yakama Nation | Askman Law Firm LLC | Washington | 11,073 | 0.6242032643% | Yes | Yes |

P-2

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 34. | Mississippi Band of Choctaw Indians | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Mississippi | 11,042 | 0.4539745719% | Yes | Yes |
| 35. | Arapaho Tribe of the Wind River Reservation, Wyoming | Burg Simpson | Wyoming | 10,529 | 0.3443857178% | Yes | Yes |
| 36. | Leech Lake Band of the Minnesota Chippewa Tribe, Minnesota | Leech Lake Band of Ojibwe | Minnesota | 9,777 | 0.3876491699% | Yes | Yes |
| 37. | Confederated Tribes of the Colville Reservation | Skikos | Washington | 9,447 | 0.4214262606% | Yes | Yes |
| 38. | Menominee Indian Tribe of Wisconsin | Robins Kaplan LLP | Wisconsin | 8,965 | 0.2585545575% | Yes | Yes |
| 39. | Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin | Frazer PLC | Wisconsin | 8,660 | 0.1533065351% | Yes | Yes |
| 40. | Seneca Nation of Indians | Levin Papantonio Consortium | New York | 8,482 | 0.4387427860% | Yes | Yes |
| 41. | Fort Belknap Indian Community of the Fort Belknap Reservation of Montana | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Montana | 8,314 | 0.1662184242% | Yes | Yes |
| 42. | Lac Courte Oreilles Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | Wisconsin | 8,255 | 0.1611415211% | Yes | Yes |
| 43. | Confederated Salish and Kootenai Tribes of the Flathead Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Montana | 8,014 | 0.6040350313% | Yes | Yes |
| 44. | Ho-Chunk Nation of Wisconsin | Frazer PLC | Wisconsin | 7,874 | 0.2791029678% | Yes | Yes |
| 45. | Spirit Lake Tribe, North Dakota | Robins Kaplan LLP | North Dakota | 7,562 | 0.1357963585% | Yes | Yes |
| 46. | Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin | Frazer PLC | Wisconsin | 7,545 | 0.0679973675% | Yes | Yes |
| 47. | Chippewa Cree Indians of the Rocky Boy's Reservation, Montana | Skikos | Montana | 6,784 | 0.2329739152% | Yes | Yes |
| 48. | Wyandotte Nation | Levin Papantonio Consortium | Oklahoma | 6,720 | 0.0858352578% | Yes | Yes |
| 49. | Yurok Tribe of the Yurok Reservation, California | Lieff Cabraser Heimann & Bernstein, LLP | California | 6,279 | 0.4940861901% | Yes | Yes |
| 50. | Shoshone-Bannock Tribes of the Fort Hall Reservation | Skikos | Idaho | 6,084 | 0.2571369944% | Yes | Yes |
| 51. | Klamath Tribes | Weitz & Luxenberg | Oregon | 5,710 | 0.1776232608% | Yes | Yes |
| 52. | Puyallup Tribe of the Puyallup Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Washington | 5,703 | 0.3460653338% | Yes | Yes |
| 53. | Confederated Tribes of the Grand Ronde Community of Oregon | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Oregon | 5,573 | 0.2455590815% | Yes | Yes |
| 54. | Round Valley Indian Tribes, Round Valley Reservation, California | Ceiba Legal, LLP | California | 5,481 | 0.1304107356% | Yes | Yes |
| 55. | Omaha Tribe of Nebraska | Domina Law Group | Nebraska | 5,427 | 0.1098384081% | Yes | Yes |
| 56. | Confederated Tribes of the Warm Springs Reservation of Oregon | Skikos | Oregon | 5,363 | 0.3374283324% | Yes | Yes |
| 57. | Quapaw Nation | Levin Papantonio Consortium | Oklahoma | 5,349 | 0.0676728130% | Yes | Yes |
| 58. | Winnebago Tribe of Nebraska | Domina Law Group | Nebraska | 5,312 | 0.1438422385% | Yes | Yes |
| 59. | Lummi Tribe of the Lummi Reservation | Keller Rohrback LLP | Washington | 5,299 | 0.2099711983% | Yes | Yes |
| 60. | Mescalero Apache Tribe of the Mescalero Reservation, New Mexico | Skikos | New Mexico | 5,230 | 0.2752800368% | Yes | Yes |
| 61. | Ponca Tribe of Nebraska | Domina Law Group | Nebraska | 5,127 | 0.1290375443% | Yes | Yes |
| 62. | Tulalip Tribes of Washington | Keller Rohrback LLP | Washington | 5,047 | 0.3138785723% | Yes | Yes |
| 63. | Iowa Tribe of Kansas and Nebraska | Skikos | Kansas | 4,990 | 0.0527393594% | Yes | Yes |
| 64. | Mille Lacs Band of the Minnesota Chippewa Tribe, Minnesota | Lockridge Grindal Nauen | Minnesota | 4,843 | 0.1295328401% | Yes | Yes |
| 65. | Prairie Band Potawatomi Nation | Skikos | Kansas | 4,515 | 0.0680281856% | Yes | Yes |
| 66. | Lac du Flambeau Band of Lake Superior Chippewa Indians of the Lac du Flambeau Reservation of Wisconsin | Frazer PLC | Wisconsin | 4,490 | 0.2145407639% | Yes | Yes |
| 67. | Eastern Shoshone Tribe of the Wind River Reservation, Wyoming | Skikos | Wyoming | 4,462 | 0.1459444461% | Yes | Yes |
| 68. | Lower Brule Sioux Tribe of the Lower Brule Reservation, South Dakota | Levin Papantonio Consortium | South Dakota | 4,341 | 0.0499115157% | Yes | Yes |
| 69. | Seminole Tribe of Florida | The Moskowitz Law Firm | Florida | 4,286 | 0.4523729822% | Yes | Yes |
| 70. | Fond du Lac Band of the Minnesota Chippewa Tribe, Minnesota | Frazer PLC | Minnesota | 4,192 | 0.3381841598% | Yes | Yes |

P-3

EXECUTION COPY

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 71. | Grand Traverse Band of Ottawa and Chippewa Indians, Michigan | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Michigan | 4,189 | 0.1040690017% | Yes | Yes |
| 72. | Sac & Fox Nation, Oklahoma | The Bruehl Firm | Oklahoma | 4,058 | 0.4785932668% | Yes | Yes |
| 73. | Jicarilla Apache Nation, New Mexico | Skikos | New Mexico | 4,049 | 0.2811589908% | Yes | Yes |
| 74. | Ponca Tribe of Indians of Oklahoma | The Bruehl Firm | Oklahoma | 4,012 | 0.2375984443% | Yes | Yes |
| 75. | Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona | Skikos | California | 3,954 | 0.2303862833% | Yes | Yes |
| 76. | Pawnee Nation of Oklahoma | The Bruehl Firm | Oklahoma | 3,624 | 0.1674324048% | Yes | Yes |
| 77. | Keweenaw Bay Indian Community, Michigan | Cooper Elliott | Michigan | 3,589 | 0.1080410295% | Yes | Yes |
| 78. | Nez Perce Tribe | Keller Rohrback LLP | Idaho | 3,541 | 0.2348786002% | Yes | Yes |
| 79. | Hoopa Valley Tribe, California | Lieff Cabraser Heimann & Bernstein, | California | 3,513 | 0.2646933568% | Yes | Yes |
| 80. | Saginaw Chippewa Indian Tribe of Michigan | Robins Kaplan LLP | Michigan | 3,489 | 0.1612192879% | Yes | Yes |
| 81. | Quinault Indian Nation | Robins Kaplan LLP | Washington | 3,405 | 0.1553985042% | Yes | Yes |
| 82. | Catawba Indian Nation (aka Catawba Indian Tribe of South Carolina) | Fields PLLC | South Carolina | 3,397 | 0.0743387841% | Yes | Yes |
| 83. | Narragansett Indian Tribe | Frazer PLC | Rhode Island | 3,317 | 0.0435231526% | Yes | Yes |
| 84. | Otoe-Missouria Tribe of Indians, Oklahoma | Skikos | Oklahoma | 3,293 | 0.1412158649% | Yes | Yes |
| 85. | Confederated Tribes of the Umatilla Indian Reservation | Skikos | Oregon | 3,155 | 0.1554439536% | Yes | Yes |
| 86. | Makah Indian Tribe of the Makah Indian Reservation | Keller Rohrback LLP | Washington | 3,110 | 0.1832518079% | Yes | Yes |
| 87. | Muckleshoot Indian Tribe | Skikos | Washington | 3,027 | 0.2826312421% | Yes | Yes |
| 88. | Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada | Frazer PLC | Nevada | 2,991 | 0.2111854837% | Yes | Yes |
| 89. | Santee Sioux Nation, Nebraska | Domina Law Group | Nebraska | 2,901 | 0.0406971549% | Yes | Yes |
| 90. | Poarch Band of Creeks | Frazer PLC | Alabama | 2,843 | 0.1346482611% | Yes | Yes |
| 91. | Apache Tribe of Oklahoma | The Bruehl Firm | Oklahoma | 2,662 | 0.1333569752% | Yes | Yes |
| 92. | Coeur D' Alene Tribe | Skikos | Idaho | 2,548 | 0.2864900220% | Yes | Yes |
| 93. | Walker River Paiute Tribe, Nevada | Frazer PLC | Nevada | 2,436 | 0.0922008720% | Yes | Yes |
| 94. | Hualapai Indian Tribe of the Hualapai Indian Reservation, Arizona | Robins Kaplan LLP | Arizona | 2,410 | 0.2239978326% | Yes | Yes |
| 95. | Tule River Indian Tribe of the Tule River Reservation, California | Levin Papantonio Consortium | California | 2,401 | 0.1029618837% | Yes | Yes |
| 96. | Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band) [Only Wells Band is unrepresented] | Pro Se | Nevada | 2,362 | 0.1564171353% | Yes | Yes |
| 97. | Mohegan Tribe of Indians of Connecticut | Frazer PLC | Connecticut | 2,258 | 0.0665716835% | Yes | Yes |
| 98. | Bay Mills Indian Community, Michigan | Skikos | Michigan | 2,235 | 0.0714059184% | Yes | Yes |
| 99. | Passamaquoddy Tribe Pleasant Point | Weitz & Luxenberg | Maine | 2,175 | 0.0757967897% | Yes | Yes |
| 100. | Koi Nation of Northern California | Frazer PLC | California | 2,000 | 0.0140171145% | Yes | Yes |
| 101. | Delaware Nation, Oklahoma | The Bruehl Firm | Oklahoma | 1,907 | 0.0342169465% | Yes | Yes |
| 102. | Cow Creek Band of Umpqua Tribe of Indians | Robins Kaplan LLP | Oregon | 1,890 | 0.1531699824% | Yes | Yes |
| 103. | Houlton Band of Maliseet Indians | Levin Papantonio Consortium | Maine | 1,835 | 0.0350424485% | Yes | Yes |
| 104. | Stockbridge Munsee Community, Wisconsin | Skikos | Wisconsin | 1,722 | 0.0656243037% | Yes | Yes |
| 105. | Forest County Potawatomi Community, Wisconsin | Robins Kaplan LLP | Wisconsin | 1,704 | 0.0265666714% | Yes | Yes |
| 106. | Sokaogon Chippewa Community, Wisconsin | Skikos | Wisconsin | 1,628 | 0.0118778213% | Yes | Yes |
| 107. | Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas | Skikos | Kansas | 1,624 | 0.0580452770% | Yes | Yes |
| 108. | Shinnecock Indian Nation | Frazer PLC | New York | 1,588 | 0.0135933579% | Yes | Yes |
| 109. | Paiute-Shoshone Tribe of the Fallon Reservation and Colony, Nevada | Frazer PLC | Nevada | 1,564 | 0.1593420100% | Yes | Yes |

P-4

EXECUTION COPY

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 110. | Passamaquoddy Tribe Indian Township | Weitz & Luxenberg | Maine | 1,542 | 0.0600538853% | Yes | Yes |
| 111. | Chitimacha Tribe of Louisiana | Frazer PLC | Louisiana | 1,542 | 0.0347384345% | Yes | Yes |
| 112. | Aroostook Band of Micmacs | Levin Papantonio Consortium | Maine | 1,527 | 0.0369746405% | Yes | Yes |
| 113. | Tunica-Biloxi Indian Tribe | Laborde Earles Law Firm | Louisiana | 1,509 | 0.0182994957% | Yes | Yes |
| 114. | Wampanoag Tribe of Gay Head (Aquinnah) | Frazer PLC | Massachusetts | 1,392 | 0.0215766403% | Yes | Yes |
| 115. | Port Gamble S'Klallam Tribe | Hobbs Straus Dean & Walker | Washington | 1,367 | 0.0840571007% | Yes | Yes |
| 116. | Dry Creek Rancheria Band of Pomo Indians, California | Skikos | California | 1,281 | 0.0709181997% | Yes | Yes |
| 117. | Suquamish Indian Tribe of the Port Madison Reservation | Hobbs Straus Dean & Walker | Washington | 1,225 | 0.0385379654% | Yes | Yes |
| 118. | Big Valley Band of Pomo Indians of the Big Valley Rancheria, California | Ceiba Legal, LLP | California | 1,200 | 0.1213699077% | Yes | Yes |
| 119. | Coquille Indian Tribe | Frazer PLC | Oregon | 1,200 | 0.0926360176% | Yes | Yes |
| 120. | Pala Band of Mission Indians | Hobbs Straus Dean & Walker | California | 1,200 | 0.0654007260% | Yes | Yes |
| 121. | Ely Shoshone Tribe of Nevada | Frazer PLC | Nevada | 1,198 | 0.0550485123% | Yes | Yes |
| 122. | Reno-Sparks Indian Colony, Nevada | Frazer PLC | Nevada | 1,187 | 0.4666997778% | Yes | Yes |
| 123. | Lower Sioux Indian Community in the State of Minnesota | Robins Kaplan LLP | Minnesota | 1,176 | 0.0235563758% | Yes | Yes |
| 124. | Thlopthlocco Tribal Town | The Bruehl Firm | Oklahoma | 1,137 | 0.0384975373% | Yes | Yes |
| 125. | Santa Rosa Indian Community of the Santa Rosa Rancheria, California | Skikos | California | 1,136 | 0.0567349577% | Yes | Yes |
| 126. | Squaxin Island Tribe of the Squaxin Island Reservation | Robins Kaplan LLP | Washington | 1,120 | 0.0473565859% | Yes | Yes |
| 127. | Kickapoo Traditional Tribe of Texas | Frazer PLC | Texas | 1,091 | 0.0175327984% | Yes | Yes |
| 128. | Mashantucket Pequot Indian Tribe | Skikos | Connecticut | 1,082 | 0.0369195094% | Yes | Yes |
| 129. | Prairie Island Indian Community in the State of Minnesota | Robins Kaplan LLP | Minnesota | 1,064 | 0.0030355571% | Yes | Yes |
| 130. | St. Croix Chippewa Indians of Wisconsin | Frazer PLC | Wisconsin | 1,061 | 0.0720175505% | Yes | Yes |
| 131. | Manchester Band of Pomo Indians of the Manchester Rancheria, California | Frazer PLC | California | 1,013 | 0.0818990971% | Yes | Yes |
| 132. | Swinomish Indian Tribal Community | Lieff Cabraser Heimann & Bernstein, LLP | Washington | 1,005 | 0.0685322823% | Yes | Yes |
| 133. | Coushatta Tribe of Louisiana | Levin Papantonio Consortium | Louisiana | 964 | 0.0264090189% | Yes | Yes |
| 134. | Hopland Band of Pomo Indians, California | Ceiba Legal, LLP | California | 872 | 0.0722713181% | Yes | Yes |
| 135. | Quileute Tribe of the Quileute Reservation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Washington | 835 | 0.0445060562% | Yes | Yes |
| 136. | Nisqually Indian Tribe | Robins Kaplan LLP | Washington | 824 | 0.0661244868% | Yes | Yes |
| 137. | Lac Vieux Desert Band of Lake Superior Chippewa Indians of Michigan | Wagstaff & Cartmell, LLP | Michigan | 793 | 0.0309818236% | Yes | Yes |
| 138. | Flandreau Santee Sioux Tribe of South Dakota | Robins Kaplan LLP | South Dakota | 766 | 0.0223946057% | Yes | Yes |
| 139. | Mechoopda Indian Tribe of Chico Rancheria, California | Skikos | California | 647 | 0.1654744977% | Yes | Yes |
| 140. | Cloverdale Rancheria of Pomo Indians of California | Robins Kaplan LLP | California | 641 | 0.0518236143% | Yes | Yes |
| 141. | Bear River Band of the Rohnerville Rancheria, California | Lieff Cabraser Heimann & Bernstein, LLP | California | 636 | 0.0506784018% | Yes | Yes |
| 142. | Confederated Tribes of the Goshute Reservation, Nevada and Utah | Frazer PLC | Nevada | 631 | 0.0143910735% | Yes | Yes |
| 143. | Torres Martinez Desert Cahuilla Indians, California | Robins Kaplan LLP | California | 627 | 0.0495878555% | Yes | Yes |
| 144. | Shakopee Mdewakanton Sioux Community of Minnesota | Robins Kaplan LLP | Minnesota | 622 | 0.0039516773% | Yes | Yes |
| 145. | Miccosukee Tribe of Indians | The Moskowitz Law Firm | Florida | 605 | 0.0268964357% | Yes | Yes |
| 146. | Robinson Rancheria | Ceiba Legal, LLP | California | 570 | 0.0576507061% | Yes | Yes |
| 147. | Big Sandy Rancheria of Western Mono Indians of California | Ceiba Legal, LLP | California | 556 | 0.0327784636% | Yes | Yes |
| 148. | Rincon Band of Luiseno Mission Indians of the Rincon Reservation, California | Robins Kaplan LLP | California | 552 | 0.0300843340% | Yes | Yes |
| 149. | Pueblo of Pojoaque, New Mexico | Frazer PLC | New Mexico | 546 | 0.0364390109% | Yes | Yes |

P-5

EXECUTION COPY

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 150. | Jamestown S'Klallam Tribe | Hobbs Straus Dean & Walker | Washington | 532 | 0.0343506761% | Yes | Yes |
| 151. | Cayuga Nation | Robins Kaplan LLP | New York | 526 | 0.0070407205% | Yes | Yes |
| 152. | Upper Sioux Community, Minnesota | Robins Kaplan LLP | Minnesota | 525 | 0.0055440777% | Yes | Yes |
| 153. | Modoc Nation | Robins Kaplan LLP | Oklahoma | 496 | 0.0054086784% | Yes | Yes |
| 154. | Sac & Fox Nation of Missouri in Kansas and Nebraska | Skikos | Kansas | 482 | 0.0065998042% | Yes | Yes |
| 155. | Yerington Paiute Tribe of the Yerington Colony & Campbell Ranch Nevada | Feazell & Tighe LLP | Nevada | 468 | 0.0546452489% | Yes | Yes |
| 156. | Northwestern Band of the Shoshone Nation | Porteous, Hainkel and Johnson, LLP | Utah | 454 | 0.0045914603% | Yes | Yes |
| 157. | Lytton Rancheria of California | Levin Papantonio Consortium | California | 430 | 0.0238054847% | Yes | Yes |
| 158. | Coyote Valley Band of Pomo Indians of California | Ceiba Legal, LLP | California | 407 | 0.0337321404% | Yes | Yes |
| 159. | Scotts Valley Band of Pomo Indians of California | Ceiba Legal, LLP | California | 330 | 0.0140156620% | Yes | Yes |
| 160. | Moapa Band of Paiute Indians of the Moapa River Indian Reservation, Nevada | Lockridge Grindal Nauen | Nevada | 328 | 0.0430569364% | Yes | Yes |
| 161. | Pinoleville Pomo Nation, California | Frazer PLC | California | 325 | 0.0269359844% | Yes | Yes |
| 162. | Sycuan Band of the Kumeyaay Nation | Robins Kaplan LLP | California | 268 | 0.0049831059% | Yes | Yes |
| 163. | Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California | Ceiba Legal, LLP | California | 258 | 0.0213830276% | Yes | Yes |
| 164. | Cher-Ae Heights Indian Community of the Trinidad Rancheria, California | Frazer PLC | California | 251 | 0.0200004385% | Yes | Yes |
| 165. | Cahto Tribe of the Laytonville Rancheria | Frazer PLC | California | 250 | 0.0207199880% | Yes | Yes |
| 166. | Tonto Apache Tribe of Arizona | Skikos | Arizona | 176 | 0.0186845822% | Yes | Yes |
| 167. | Guidiville Rancheria of California | Ceiba Legal, LLP | California | 165 | 0.0136751921% | Yes | Yes |
| 168. | Kootenai Tribe of Idaho | Robins Kaplan LLP | Idaho | 163 | 0.0097048625% | Yes | Yes |
| 169. | Resighini Rancheria, California | Frazer PLC | California | 158 | 0.0116587241% | Yes | Yes |
| 170. | La Posta Band of Diegueno Mission Indians of the La Posta Indian Reservation California | Skikos | California | 43 | 0.0029514134% | Yes | Yes |
| 171. | Potter Valley Tribe, California | Frazer PLC | California | 6 | 0.0004972797% | Yes | Yes |
| 172. | Ewiiaapaayp Band of Kumeyaay Indians, California | Frazer PLC | California | 6 | 0.0004118251% | Yes | Yes |
| 173. | Alaska Native Tribal Health Consortium | Hobbs Straus Dean & Walker | Alaska | 0 | 1.8883030170% | Yes | Yes |
| 174. | Southcentral Foundation | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 1.5145109690% | Yes | Yes |
| 175. | Yukon Kuskokwim Health Corporation | Sonosky, Chambers, Sachse, Endreson & Perry LLP | Alaska | 0 | 1.4986849164% | Yes | Yes |
| 176. | Tanana Chiefs Conference | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 0.9317792512% | Yes | Yes |
| 177. | Norton Sound Health Corporation | Hobbs Straus Dean & Walker | Alaska | 0 | 0.5929257395% | Yes | Yes |
| 178. | Southeast Alaska Regional Health Corporation | Hobbs Straus Dean & Walker | Alaska | 0 | 0.5865434615% | Yes | Yes |
| 179. | Bristol Bay Area Health Corporation | Hobbs Straus Dean & Walker | Alaska | 0 | 0.4732786851% | Yes | Yes |
| 180. | Arctic Slope Native Association | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 0.2825285395% | Yes | Yes |
| 181. | Kodiak Area Native Association | Hobbs Straus Dean & Walker | Alaska | 0 | 0.1816665008% | Yes | Yes |
| 182. | Kenaitze Indian Tribe | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 0.1543808172% | Yes | Yes |
| 183. | Chugachmiut | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 0.1055166699% | Yes | Yes |
| 184. | Eastern Aleutian Tribes | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 0.1017146669% | Yes | Yes |
| 185. | Copper River Native Association | Sonosky, Chambers, Sachse, Endreson | Alaska | 0 | 0.0922354600% | Yes | Yes |
| 186. | Aleutian Pribilof Islands Association | Hobbs Straus Dean & Walker | Alaska | 0 | 0.0673533409% | Yes | Yes |
| 187. | The Seminole Nation of Oklahoma | Pro Se | Oklahoma | 18,646 | 0.4505862168% | No | Yes |
| 188. | Crow Tribe of Montana | Pro Se | Montana | 12,000 | 0.7578506157% | No | Yes |
| 189. | Yankton Sioux Tribe of South Dakota | Pro Se | South Dakota | 11,594 | 0.1301433825% | No | Yes |

P-6

EXECUTION COPY

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 190. | Delaware Tribe of Indians | Pro Se | Delaware | 11,200 | 0.3133755344% | No | Yes |
| 191. | Salt River Pima-Maricopa Indian Community of the Salt River Reservation Arizona | Hobbs Straus Dean & Walker | Arizona | 10,813 | 0.3689896404% | No | Yes |
| 192. | Kiowa Indian Tribe of Oklahoma | Pro Se | Oklahoma | 10,600 | 0.4366949332% | No | Yes |
| 193. | Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation, Montana | Pro Se | Montana | 10,000 | 0.3788725728% | No | Yes |
| 194. | Pueblo of Laguna, New Mexico | Pro Se | New Mexico | 8,783 | 0.3009892432% | No | Yes |
| 195. | Karuk Tribe | Pro Se | California | 8,676 | 0.2540209660% | No | Yes |
| 196. | Maniilaq Association | Hobbs Straus Dean & Walker | Alaska | 7,179 | 0.4025746617% | No | Yes |
| 197. | Caddo Nation of Oklahoma | Pro Se | Oklahoma | 6,572 | 0.1084345463% | No | Yes |
| 198. | Pokagon Band of Potawatomi Indians, Michigan & Indiana | Pro Se | Michigan | 5,915 | 0.1197351618% | No | Yes |
| 199. | Little Shell Tribe of Chippewa Indians of Montana | Robins Kaplan LLP | Montana | 5,767 | 0.2022897228% | No | Yes |
| 200. | Confederated Tribes of Siletz Indians of Oregon | Dorsay & Easton LLP | Oregon | 5,537 | 0.4294235788% | No | Yes |
| 201. | Miami Tribe of Oklahoma | Pro Se | Oklahoma | 5,517 | 0.0514363698% | No | Yes |
| 202. | Seneca-Cayuga Nation | Pro Se | Oklahoma | 5,422 | 0.0726851487% | No | Yes |
| 203. | Pueblo of Acoma, New Mexico | Hobbs Straus Dean & Walker | New Mexico | 5,182 | 0.1775846816% | No | Yes |
| 204. | Pueblo of Isleta, New Mexico | Pro Se | New Mexico | 4,929 | 0.9641491278% | No | Yes |
| 205. | Ysleta del Sur Pueblo | Pro Se | Texas | 4,569 | 0.0530770345% | No | Yes |
| 206. | Cowlitz Indian Tribe | Pro Se | Washington | 4,254 | 0.4023551370% | No | Yes |
| 207. | Little River Band of Ottawa Indians, Michigan | Pro Se | Michigan | 4,152 | 0.0925243829% | No | Yes |
| 208. | Pueblo of Jemez, New Mexico | Pro Se | New Mexico | 3,905 | 0.4715260695% | No | Yes |
| 209. | Eastern Shawnee Tribe of Oklahoma | Pro Se | Oklahoma | 3,651 | 0.0547677809% | No | Yes |
| 210. | Kaw Nation, Oklahoma | Pro Se | Oklahoma | 3,575 | 0.1314034298% | No | Yes |
| 211. | Peoria Tribe of Indians of Oklahoma | Pro Se | Oklahoma | 3,509 | 0.0424650446% | No | Yes |
| 212. | Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie) Oklahoma | Hobbs Straus Dean & Walker | Oklahoma | 3,503 | 0.1053960380% | No | Yes |
| 213. | Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | Pro Se | Minnesota | 3,052 | 0.0819800698% | No | Yes |
| 214. | Shawnee Tribe | Pro Se | Oklahoma | 3,021 | 0.0384628357% | No | Yes |
| 215. | Spokane Tribe of the Spokane Reservation | Pro Se | Washington | 2,907 | 0.1194309880% | No | Yes |
| 216. | Ketchikan Indian Community | Pro Se | Alaska | 2,901 | 0.1032674702% | No | Yes |
| 217. | Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | Pro Se | Utah | 2,855 | 0.3344759939% | No | Yes |
| 218. | Kickapoo Tribe of Oklahoma | Pro Se | Oklahoma | 2,687 | 0.5597087234% | No | Yes |
| 219. | Pueblo of Taos, New Mexico | Pro Se | New Mexico | 2,614 | 0.1254363353% | No | Yes |
| 220. | Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | Pro Se | Arizona | 2,607 | 0.1641864898% | No | Yes |
| 221. | Mashpee Wampanoag Tribe | Pro Se | Massachusetts | 2,600 | 0.0687344119% | No | Yes |
| 222. | Skokomish Indian Tribe | Pro Se | Washington | 2,400 | 0.0492367721% | No | Yes |
| 223. | Monacan Indian Nation | Cultural Heritage Partners, PLLC | Virginia | 2,292 | 0.0588235499% | No | Yes |
| 224. | Samish Indian Nation | Dorsay & Easton LLP | Washington | 2,100 | 0.0508238369% | No | Yes |
| 225. | Nooksack Indian Tribe | Pro Se | Washington | 1,902 | 0.0494357937% | No | Yes |
| 226. | Nottawaseppi Huron Band of the Potawatomi, Michigan | Pro Se | Michigan | 1,601 | 0.0735314444% | No | Yes |
| 227. | Picayune Rancheria of Chukchansi Indians of California | Pro Se | California | 1,554 | 0.0819765898% | No | Yes |
| 228. | Ottawa Tribe of Oklahoma | Pro Se | Oklahoma | 1,520 | 0.0294019837% | No | Yes |
| 229. | Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches) | Pro Se | Nevada | 1,400 | 0.2416279825% | No | Yes |
| 230. | Alabama-Coushatta Tribe of Texas | Pro Se | Texas | 1,348 | 0.0293210164% | No | Yes |
| 231. | Pueblo of Santa Clara, New Mexico | Hobbs Straus Dean & Walker | New Mexico | 1,310 | 0.0972160046% | No | Yes |

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 232. | Metlakatla Indian Community | Hobbs Straus Dean & Walker | Alaska | 1,294 | 0.0703389051% | No | Yes |
| 233. | Pueblo of Cochiti, New Mexico | Pro Se | New Mexico | 1,280 | 0.0602194881% | No | Yes |
| 234. | Morongo Band of Mission Indians, California | Pro Se | California | 1,018 | 0.0794658044% | No | Yes |
| 235. | Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | Pro Se | California | 1,012 | 0.0181080812% | No | Yes |
| 236. | Pueblo of Santa Ana, New Mexico | Hobbs Straus Dean & Walker | New Mexico | 1,007 | 0.1215945588% | No | Yes |
| 237. | Hannahville Indian Community, Michigan | Pro Se | Michigan | 1,003 | 0.0278590412% | No | Yes |
| 238. | Pueblo of Zia, New Mexico | Pro Se | New Mexico | 940 | 0.1135043547% | No | Yes |
| 239. | Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California) | Pro Se | California | 931 | 0.0639015318% | No | Yes |
| 240. | Chickahominy Indian Tribe | Cultural Heritage Partners, PLLC | Virginia | 898 | 0.0315246254% | No | Yes |
| 241. | Lower Elwha Tribal Community | Pro Se | Washington | 887 | 0.0686204603% | No | Yes |
| 242. | Iowa Tribe of Oklahoma | Pro Se | Oklahoma | 800 | 0.0958811051% | No | Yes |
| 243. | Fort Sill Apache Tribe of Oklahoma | Pro Se | Oklahoma | 792 | 0.0193605827% | No | Yes |
| 244. | Pueblo of San Ildefonso, New Mexico | Pro Se | New Mexico | 771 | 0.0514550868% | No | Yes |
| 245. | Ione Band of Miwok Indians of California | Pro Se | California | 725 | 0.1214821342% | No | Yes |
| 246. | Seldovia Village Tribe | Hobbs Straus Dean & Walker | Alaska | 714 | 0.0321615888% | No | Yes |
| 247. | Wiyot Tribe, California | Pro Se | California | 644 | 0.0513158660% | No | Yes |
| 248. | Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | Pro Se | California | 618 | 0.0336813739% | No | Yes |
| 249. | Upper Mattaponi Tribe | Cultural Heritage Partners, PLLC | Virginia | 600 | 0.0193531665% | No | Yes |
| 250. | Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | Pro Se | Michigan | 583 | 0.0174503463% | No | Yes |
| 251. | Pueblo of Tesuque, New Mexico | Pro Se | New Mexico | 552 | 0.0368394395% | No | Yes |
| 252. | Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | Pro Se | California | 511 | 0.0405957998% | No | Yes |
| 253. | Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California | Pro Se | California | 485 | 0.0578057723% | No | Yes |
| 254. | Kalispel Indian Community of the Kalispel Reservation | Pro Se | Washington | 481 | 0.0374004365% | No | Yes |
| 255. | Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | Hobbs Straus Dean & Walker | Washington | 455 | 0.0387943315% | No | Yes |
| 256. | Pueblo of Sandia, New Mexico | Pro Se | New Mexico | 446 | 0.0538541938% | No | Yes |
| 257. | Pamunkey Indian Tribe | Pro Se | Virginia | 429 | 0.0148985258% | No | Yes |
| 258. | Burns Paiute Tribe | Pro Se | Oregon | 402 | 0.0116264825% | No | Yes |
| 259. | Little Traverse Bay Bands of Odawa Indians, Michigan | Pro Se | Michigan | 400 | 0.1764500835% | No | Yes |
| 260. | Jena Band of Choctaw Indians | Pro Se | Louisiana | 399 | 0.0115974760% | No | Yes |
| 261. | Stillaguamish Tribe of Indians of Washington | Pro Se | Washington | 369 | 0.0069078062% | No | Yes |
| 262. | Eyak Native Village | Hobbs Straus Dean & Walker | Alaska | 344 | 0.0202311687% | No | Yes |
| 263. | Habematolel Pomo of Upper Lake, California | Pro Se | California | 277 | 0.0274781192% | No | Yes |
| 264. | Hoh Indian Tribe | Dorsay & Easton LLP | Washington | 272 | 0.0031863864% | No | Yes |
| 265. | Middletown Rancheria of Pomo Indians of California | Pro Se | California | 257 | 0.0259933886% | No | Yes |
| 266. | Rappahannock Tribe, Inc. | Cultural Heritage Partners, PLLC | Virginia | 249 | 0.0067803752% | No | Yes |
| 267. | Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | California | 248 | 0.0135161500% | No | Yes |
| 268. | Chickahominy Indian Tribe - Eastern Division | Cultural Heritage Partners, PLLC | Virginia | 242 | 0.0084955004% | No | Yes |
| 269. | Native Village of Tanana | Pro Se | Alaska | 222 | 0.0189597916% | No | Yes |

P-8

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 270. | Santa Rosa Band of Cahuilla Indians, California | Robins Kaplan LLP | California | 205 | 0.0162859862% | No | Yes |
| 271. | Nansemond Indian Nation | Cultural Heritage Partners, PLLC | Virginia | 200 | 0.0071133503% | No | Yes |
| 272. | Yavapai-Prescott Indian Tribe | Pro Se | Arizona | 180 | 0.0463356319% | No | Yes |
| 273. | San Pasqual Band of Diegueno Mission Indians of California | Pro Se | California | 176 | 0.0095921065% | No | Yes |
| 274. | United Auburn Indian Community of the Auburn Rancheria of California | Pro Se | California | 170 | 0.3284293569% | No | Yes |
| 275. | Jamul Indian Village of California | Pro Se | California | 120 | 0.0082365025% | No | Yes |
| 276. | Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation California | Hobbs Straus Dean & Walker | California | 116 | 0.0489464109% | No | Yes |
| 277. | Elk Valley Rancheria, California | Pro Se | California | 85 | 0.0062720984% | No | Yes |
| 278. | Yocha Dehe Wintun Nation, California | Pro Se | California | 77 | 0.0091149952% | No | Yes |
| 279. | Native Village of Chitina | Pro Se | Alaska | 45 | 0.0114684628% | No | Yes |
| 280. | Eklutna Native Village | Pro Se | Alaska | 44 | 0.0124997976% | No | Yes |
| 281. | Chicken Ranch Rancheria of Me-Wuk Indians of California | Frazer PLC | California | 41 | 0.0025774867% | No | Yes |
| 282. | Buena Vista Rancheria of Me-Wuk Indians of California | Pro Se | California | 20 | 0.0033512313% | No | Yes |
| 283. | Ramona Band of Cahuilla, California | Pro Se | California | 20 | 0.0015888767% | No | Yes |
| 284. | Akiak Native Community | Lieff Cabraser Heimann & Bernstein, LLP | Alaska | 0 | 0% | Yes | Yes |
| 285. | Asa'carsarmiut Tribe | Lieff Cabraser Heimann & Bernstein, LLP | Alaska | 0 | 0% | Yes | Yes |
| 286. | Native Village of Afognak | Lieff Cabraser Heimann & Bernstein, LLP | Alaska | 0 | 0% | Yes | Yes |
| 287. | Native Village of Port Heiden | Lieff Cabraser Heimann & Bernstein, LLP | Alaska | 0 | 0% | Yes | Yes |
| 288. | Alatna Village | Ristroph Law, Planning, and Research | Alaska | 0 | 0% | No | Yes |
| 289. | Algaaciq Native Village (St. Mary's) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 290. | Chignik Bay Tribal Council [previously listed as Native Village of Chignik] | Pro Se | Alaska | 0 | 0% | No | Yes |
| 291. | Galena Village(aka Louden Village) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 292. | Hoonah Indian Association | Pro Se | Alaska | 0 | 0% | No | Yes |
| 293. | Ivanof Bay Tribe | Pro Se | Alaska | 0 | 0% | No | Yes |
| 294. | Native Village of Gakona | Pro Se | Alaska | 0 | 0% | No | Yes |
| 295. | Native Village of Kluti Kaah (aka Copper Center) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 287. | Native Village of Larsen Bay | Pro Se | Alaska | 0 | 0% | No | Yes |
| 296. | Native Village of Minto | Pro Se | Alaska | 0 | 0% | No | Yes |
| 297. | Native Village of Ouzinkie | Pro Se | Alaska | 0 | 0% | No | Yes |
| 298. | Native Village of Port Graham | Pro Se | Alaska | 0 | 0% | No | Yes |
| 299. | Native Village of Unalakleet | Pro Se | Alaska | 0 | 0% | No | Yes |
| 300. | Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 301. | Native Village of White Mountain | Pro Se | Alaska | 0 | 0% | No | Yes |
| 302. | Northway Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| 303. | Orutsararmiut Native Council's | Pro Se | Alaska | 0 | 0% | No | Yes |
| 304. | Platinum Traditional Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| 305. | Qawalangin Tribe of Unalaska | Pro Se | Alaska | 0 | 0% | No | Yes |
| 306. | Sitka Tribe of Alaska | Pro Se | Alaska | 0 | 0% | No | Yes |
| 307. | Skagway Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| 308. | South Naknek Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| 309. | Village of Alakanuk | Pro Se | Alaska | 0 | 0% | No | Yes |
| 310. | Village of Stony River | Pro Se | Alaska | 0 | 0% | No | Yes |

## EXHIBIT Q

### Representation and Warranty Regarding Section V.E.1.b

### CERTIFICATION of PARTICIPATION – Non-Litigating Tribes

The TLC provides written notice to the Settling Distributors representing and warranting that the conditions in Section V.E.1.b have been met and hereby provide the listing of all Non-Litigating Tribes that have executed Tribal Participation Forms as of the date of the execution of the this Agreement.

_____
Steve Skikos
Chair of the MDL Tribal Leadership Committee.

EXECUTION COPY

| Status | Participation Agreement | | | | Total Tribes | Current Participation | Participation Needed |
|---|---|---|---|---|---|---|---|
| | Submitted | | Not Submitted | | | | |
| | # | Total Membership, Adjusted | # | Total Membership, Adjusted | | | |
| **Non-Litigating Tribes** | 97 | 253,177 | 98 | 82,493 | **195** | **75.42%** | **67%** |

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 1. | The Seminole Nation of Oklahoma | Pro Se | Oklahoma | 18,646 | 0.4505862168% | No | Yes |
| 2. | Crow Tribe of Montana | Pro Se | Montana | 12,000 | 0.7578506157% | No | Yes |
| 3. | Yankton Sioux Tribe of South Dakota | Pro Se | South Dakota | 11,594 | 0.1301433825% | No | Yes |
| 4. | Delaware Tribe of Indians | Pro Se | Delaware | 11,200 | 0.3133755344% | No | Yes |
| 5. | Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona | Hobbs Straus Dean & Walker | Arizona | 10,813 | 0.3689896404% | No | Yes |
| 6. | Kiowa Indian Tribe of Oklahoma | Pro Se | Oklahoma | 10,600 | 0.4366949332% | No | Yes |
| 7. | Assiniboine & Sioux Tribes of the Fort Peck Indian Reservation, Montana | Pro Se | Montana | 10,000 | 0.3788725728% | No | Yes |
| 8. | Pueblo of Laguna, New Mexico | Pro Se | New Mexico | 8,783 | 0.3009892432% | No | Yes |
| 9. | Karuk Tribe | Pro Se | California | 8,676 | 0.2540209660% | No | Yes |
| 10. | Maniilaq Association | Hobbs Straus Dean & Walker | Alaska | 7,179 | 0.4025746617% | No | Yes |
| 11. | Caddo Nation of Oklahoma | Pro Se | Oklahoma | 6,572 | 0.1084345463% | No | Yes |
| 12. | Pokagon Band of Potawatomi Indians, Michigan & Indiana | Pro Se | Michigan | 5,915 | 0.1197351618% | No | Yes |
| 13. | Little Shell Tribe of Chippewa Indians of Montana | Robins Kaplan LLP | Montana | 5,767 | 0.2022897228% | No | Yes |
| 14. | Confederated Tribes of Siletz Indians of Oregon | Dorsay & Easton LLP | Oregon | 5,537 | 0.4294235788% | No | Yes |
| 15. | Miami Tribe of Oklahoma | Pro Se | Oklahoma | 5,517 | 0.0514363698% | No | Yes |
| 16. | Seneca-Cayuga Nation | Pro Se | Oklahoma | 5,422 | 0.0726851487% | No | Yes |
| 17. | Pueblo of Acoma, New Mexico | Hobbs Straus Dean & Walker | New Mexico | 5,182 | 0.1775846816% | No | Yes |
| 18. | Pueblo of Isleta, New Mexico | Pro Se | New Mexico | 4,929 | 0.9641491278% | No | Yes |
| 19. | Ysleta del Sur Pueblo | Pro Se | Texas | 4,569 | 0.0530770345% | No | Yes |
| 20. | Cowlitz Indian Tribe | Pro Se | Washington | 4,254 | 0.4023551370% | No | Yes |
| 21. | Little River Band of Ottawa Indians, Michigan | Pro Se | Michigan | 4,152 | 0.0925243829% | No | Yes |
| 22. | Pueblo of Jemez, New Mexico | Pro Se | New Mexico | 3,905 | 0.4715260695% | No | Yes |
| 23. | Eastern Shawnee Tribe of Oklahoma | Pro Se | Oklahoma | 3,651 | 0.0547677809% | No | Yes |
| 24. | Kaw Nation, Oklahoma | Pro Se | Oklahoma | 3,575 | 0.1314034298% | No | Yes |
| 25. | Peoria Tribe of Indians of Oklahoma | Pro Se | Oklahoma | 3,509 | 0.0424650446% | No | Yes |
| 26. | Wichita and Affiliated Tribes (Wichita, Keechi, Waco & Tawakonie), Oklahoma | Hobbs Straus Dean & Walker | Oklahoma | 3,503 | 0.1053960380% | No | Yes |
| 27. | Bois Forte (Nett Lake) Band of the Minnesota Chippewa Tribe, Minnesota | Pro Se | Minnesota | 3,052 | 0.0819800698% | No | Yes |
| 28. | Shawnee Tribe | Pro Se | Oklahoma | 3,021 | 0.0384628357% | No | Yes |
| 29. | Spokane Tribe of the Spokane Reservation | Pro Se | Washington | 2,907 | 0.1194309880% | No | Yes |
| 30. | Ketchikan Indian Community | Pro Se | Alaska | 2,901 | 0.1032674702% | No | Yes |
| 31. | Ute Indian Tribe of the Uintah & Ouray Reservation, Utah | Pro Se | Utah | 2,855 | 0.3344759939% | No | Yes |
| 32. | Kickapoo Tribe of Oklahoma | Pro Se | Oklahoma | 2,687 | 0.5597087234% | No | Yes |
| 33. | Pueblo of Taos, New Mexico | Pro Se | New Mexico | 2,614 | 0.1254363353% | No | Yes |
| 34. | Yavapai-Apache Nation of the Camp Verde Indian Reservation, Arizona | Pro Se | Arizona | 2,607 | 0.1641864898% | No | Yes |
| 35. | Mashpee Wampanoag Tribe | Pro Se | Massachusetts | 2,600 | 0.0687344119% | No | Yes |
| 36. | Skokomish Indian Tribe | Pro Se | Washington | 2,400 | 0.0492367721% | No | Yes |
| 37. | Monacan Indian Nation | Cultural Heritage Partners, | Virginia | 2,292 | 0.0588235499% | No | Yes |
| 38. | Samish Indian Nation | Dorsay & Easton LLP | Washington | 2,100 | 0.0508238969% | No | Yes |
| 39. | Nooksack Indian Tribe | Pro Se | Washington | 1,902 | 0.0494357937% | No | Yes |

Q-2

EXECUTION COPY

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 40. | Nottawaseppi Huron Band of the Potawatomi, Michigan | Pro Se | Michigan | 1,601 | 0.0735314444% | No | Yes |
| 41. | Picayune Rancheria of Chukchansi Indians of California | Pro Se | California | 1,554 | 0.0819765898% | No | Yes |
| 42. | Ottawa Tribe of Oklahoma | Pro Se | Oklahoma | 1,520 | 0.0294019837% | No | Yes |
| 43. | Washoe Tribe of Nevada & California (Carson Colony, Dresslerville Colony, Woodfords Community, Stewart Community, & Washoe Ranches) | Pro Se | Nevada | 1,400 | 0.2416279825% | No | Yes |
| 44. | Alabama-Coushatta Tribe of Texas | Pro Se | Texas | 1,348 | 0.0293210164% | No | Yes |
| 45. | Pueblo of Santa Clara, New Mexico | Hobbs Straus Dean & Walker | New Mexico | 1,310 | 0.0972160046% | No | Yes |
| 46. | Metlakatla Indian Community | Hobbs Straus Dean & Walker | Alaska | 1,294 | 0.0703389051% | No | Yes |
| 47. | Pueblo of Cochiti, New Mexico | Pro Se | New Mexico | 1,280 | 0.0602194881% | No | Yes |
| 48. | Morongo Band of Mission Indians, California | Pro Se | California | 1,018 | 0.0794658044% | No | Yes |
| 49. | Chemehuevi Indian Tribe of the Chemehuevi Reservation, California | Pro Se | California | 1,012 | 0.0181080812% | No | Yes |
| 50. | Pueblo of Santa Ana, New Mexico | Hobbs Straus Dean & Walker | New Mexico | 1,007 | 0.1215945588% | No | Yes |
| 51. | Hannahville Indian Community, Michigan | Pro Se | Michigan | 1,003 | 0.0278590412% | No | Yes |
| 52. | Pueblo of Zia, New Mexico | Pro Se | New Mexico | 940 | 0.1135043547% | No | Yes |
| 53. | Capitan Grande Band of Diegueno Mission Indians of California (Barona Group of Capitan Grande Band of Mission Indians of the Barona Reservation, California) | Pro Se | California | 931 | 0.0639015318% | No | Yes |
| 54. | Chickahominy Indian Tribe | Cultural Heritage Partners, | Virginia | 898 | 0.0315246254% | No | Yes |
| 55. | Lower Elwha Tribal Community | Pro Se | Washington | 887 | 0.0686204603% | No | Yes |
| 56. | Iowa Tribe of Oklahoma | Pro Se | Oklahoma | 800 | 0.0958811051% | No | Yes |
| 57. | Fort Sill Apache Tribe of Oklahoma | Pro Se | Oklahoma | 792 | 0.0193605827% | No | Yes |
| 58. | Pueblo of San Ildefonso, New Mexico | Pro Se | New Mexico | 771 | 0.0514550868% | No | Yes |
| 59. | Ione Band of Miwok Indians of California | Pro Se | California | 725 | 0.1214821342% | No | Yes |
| 60. | Seldovia Village Tribe | Hobbs Straus Dean & Walker | Alaska | 714 | 0.0321615888% | No | Yes |
| 61. | Wiyot Tribe, California | Pro Se | California | 644 | 0.0513158660% | No | Yes |
| 62. | Mesa Grande Band of Diegueno Mission Indians of the Mesa Grande Reservation, California | Pro Se | California | 618 | 0.0336813739% | No | Yes |
| 63. | Upper Mattaponi Tribe | Cultural Heritage Partners, | Virginia | 600 | 0.0193531665% | No | Yes |
| 64. | Match-e-be-nash-she-wish Band of Pottawatomi Indians of Michigan | Pro Se | Michigan | 583 | 0.0174503463% | No | Yes |
| 65. | Pueblo of Tesuque, New Mexico | Pro Se | New Mexico | 552 | 0.0368394395% | No | Yes |
| 66. | Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California | Pro Se | California | 511 | 0.0405957998% | No | Yes |
| 67. | Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract) California | Pro Se | California | 485 | 0.0578057723% | No | Yes |
| 68. | Kalispel Indian Community of the Kalispel Reservation | Pro Se | Washington | 481 | 0.0374004365% | No | Yes |
| 69. | Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation | Hobbs Straus Dean & Walker | Washington | 455 | 0.0387943315% | No | Yes |
| 70. | Pueblo of Sandia, New Mexico | Pro Se | New Mexico | 446 | 0.0538541938% | No | Yes |
| 71. | Pamunkey Indian Tribe | Pro Se | Virginia | 429 | 0.0148985258% | No | Yes |
| 72. | Burns Paiute Tribe | Pro Se | Oregon | 402 | 0.0116264825% | No | Yes |
| 73. | Little Traverse Bay Bands of Odawa Indians, Michigan | Pro Se | Michigan | 400 | 0.1764500835% | No | Yes |
| 74. | Jena Band of Choctaw Indians | Pro Se | Louisiana | 399 | 0.0115974760% | No | Yes |

Q-3

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| 75. | Stillaguamish Tribe of Indians of Washington | Pro Se | Washington | 369 | 0.0069078062% | No | Yes |
| 76. | Eyak Native Village | Hobbs Straus Dean & Walker | Alaska | 344 | 0.0203211687% | No | Yes |
| 77. | Habematolel Pomo of Upper Lake, California | Pro Se | California | 277 | 0.0274781192% | No | Yes |
| 78. | Hoh Indian Tribe | Dorsay & Easton LLP | Washington | 272 | 0.0031863864% | No | Yes |
| 79. | Middletown Rancheria of Pomo Indians of California | Pro Se | California | 257 | 0.0259933886% | No | Yes |
| 80. | Rappahannock Tribe, Inc. | Cultural Heritage Partners, | Virginia | 249 | 0.0067803752% | No | Yes |
| 81. | Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation, California | California | 248 | 0.0135161500% | No | Yes |
| 82. | Chickahominy Indian Tribe - Eastern Division | Cultural Heritage Partners, PLLC | Virginia | 242 | 0.0084955004% | No | Yes |
| 83. | Native Village of Tanana | Pro Se | Alaska | 222 | 0.0189597916% | No | Yes |
| 84. | Santa Rosa Band of Cahuilla Indians, California | Robins Kaplan LLP | California | 205 | 0.0162859862% | No | Yes |
| 85. | Nansemond Indian Nation | Cultural Heritage Partners, | Virginia | 200 | 0.0071133503% | No | Yes |
| 86. | Yavapai-Prescott Indian Tribe | Pro Se | Arizona | 180 | 0.0463356319% | No | Yes |
| 87. | San Pasqual Band of Diegueno Mission Indians of California | Pro Se | California | 176 | 0.0095921065% | No | Yes |
| 88. | United Auburn Indian Community of the Auburn Rancheria of California | Pro Se | California | 170 | 0.3284293569% | No | Yes |
| 89. | Jamul Indian Village of California | Pro Se | California | 120 | 0.0082365025% | No | Yes |
| 90. | Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California | Hobbs Straus Dean & Walker | California | 116 | 0.0489464109% | No | Yes |
| 91. | Elk Valley Rancheria, California | Pro Se | California | 85 | 0.0062720984% | No | Yes |
| 92. | Yocha Dehe Wintun Nation, California | Pro Se | California | 77 | 0.0091149952% | No | Yes |
| 93. | Native Village of Chitina | Pro Se | Alaska | 45 | 0.0114684628% | No | Yes |
| 94. | Eklutna Native Village | Pro Se | Alaska | 44 | 0.0124997976% | No | Yes |
| 95. | Chicken Ranch Rancheria of Me-Wuk Indians of California | Frazer PLC | California | 41 | 0.0025774867% | No | Yes |
| 96. | Buena Vista Rancheria of Me- Wuk Indians of California | Pro Se | California | 20 | 0.0033512313% | No | Yes |
| 97. | Ramona Band of Cahuilla, California | Pro Se | California | 20 | 0.0015888767% | No | Yes |
| 99. | Alatna Village | Ristroph Law, Planning, and Research | Alaska | 0 | 0% | No | Yes |
| 100. | Algaaciq Native Village (St. Mary's) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 101. | Chignik Bay Tribal Council [previously listed as Native Village of Chignik] | Pro Se | Alaska | 0 | 0% | No | Yes |
| 102. | Galena Village(aka Louden Village) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 103. | Hoonah Indian Association | Pro Se | Alaska | 0 | 0% | No | Yes |
| 104. | Ivanof Bay Tribe | Pro Se | Alaska | 0 | 0% | No | Yes |
| 105. | Native Village of Gakona | Pro Se | Alaska | 0 | 0% | No | Yes |
| 106. | Native Village of Kluti Kaah (aka Copper Center) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 107. | Native Village of Larsen Bay | Pro Se | Alaska | 0 | 0% | No | Yes |
| 108. | Native Village of Minto | Pro Se | Alaska | 0 | 0% | No | Yes |
| 109. | Native Village of Ouzinkie | Pro Se | Alaska | 0 | 0% | No | Yes |
| 110. | Native Village of Port Graham | Pro Se | Alaska | 0 | 0% | No | Yes |
| 111. | Native Village of Unalakleet | Pro Se | Alaska | 0 | 0% | No | Yes |
| 112. | Native Village of Venetie Tribal Government (Arctic Village and Village of Venetie) | Pro Se | Alaska | 0 | 0% | No | Yes |
| 113. | Native Village of White Mountain | Pro Se | Alaska | 0 | 0% | No | Yes |
| 114. | Northway Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| 115. | Orutsararmiut Native Council's | Pro Se | Alaska | 0 | 0% | No | Yes |
| 116. | Platinum Traditional Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| 117. | Qawalangin Tribe of Unalaska | Pro Se | Alaska | 0 | 0% | No | Yes |
| 118. | Sitka Tribe of Alaska | Pro Se | Alaska | 0 | 0% | No | Yes |

Q-4

EXECUTION COPY

| Row | Federally Recognized Tribe Name | Law Firm | State | Tribal Membership, Adjusted | Division of Funds (Allocation %) | Litigating? (Yes/No) | Participating? (Yes/No) |
|---|---|---|---|---|---|---|---|
| **119.** | Skagway Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| **120.** | South Naknek Village | Pro Se | Alaska | 0 | 0% | No | Yes |
| **121.** | Village of Alakanuk | Pro Se | Alaska | 0 | 0% | No | Yes |
| **122.** | Village of Stony River | Pro Se | Alaska | 0 | 0% | No | Yes |

Q-5