UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION ) ) ) THIS DOCUMENT RELATES TO: ) ) *Frederick County, Virginia, v.* ) *Mallinckrodt PLC, et al.* ) Case No. 1:20-OP-45233 ) ) *City of Roanoke Virginia v.* ) *Mallinckrodt PLC, et al.* ) Case No. 1:19-OP-45696 ) | MDL 2804  Case No. 1:17-md-2804  Judge Dan Aaron Polster  **ORDER** |

**Opinion & Order**

Before the Court are Motions to Remand filed by Virginia Plaintiffs Frederick County and City of Roanoke. The Court has reviewed the Motions, Opposition Briefs, and Supplemental Briefs and, for the reasons below, **DENIES** both Motions.

**I. Introduction**

**A. Procedural History**

**1.** ***Frederick County, Virginia v. Mallinckrodt PLC,*** **Case No. 1:20-OP-45233**

Plaintiff Frederick County filed a complaint in Virginia State Court against more than one hundred Defendants, seeking $90 Million and also injunctive relief for harms caused by the opioid public health crisis. The County categorized the Defendants into four groups, based on their alleged roles in creating the crisis: (1) drug manufacturers, (2) drug wholesalers/distributors, (3)

pharmacy benefit managers ("PBMs"), and (4) pharmacies. *See* case no. 20-OP-45233, docket no. 1-2 at ¶3.

The Express Scripts Defendants – a group consisting of a holding company, a PBM, and two mail-order pharmacies[1] – removed the action to the Western District of Virginia, citing the federal officer removal statute, 28 U.S.C. § 1442. *See* case no. 20-OP-45233, docket no. 1. Defendants then filed for a temporary stay until the Judicial Panel on Multidistrict Litigation ("JPML") decided whether to transfer the action to the *National Prescription Opiate Litigation* MDL. *See id.*, docket no. 20. Plaintiff opposed the stay request and filed a motion to remand. *See id.*, docket no. 23. The Western District of Virginia granted the requested stay, and the JPML transferred the case to this MDL Court with the motion to remand still pending. *See id.*, docket no. 39.

### 2. *City of Roanoke Virginia v. Mallinckrodt PLC*, Case No. 1:19-OP-45696

Plaintiff City of Roanoke also filed a complaint in Virginia. *See* case no. 19-OP-45696, docket no. 1-2. The complaint contained substantially similar allegations and causes of action as the *Frederick County* complaint. Initially, Roanoke sued only Express Scripts Holding Company, Inc. and Express Scripts, Inc., but subsequently amended the complaint to add the two Express Scripts mail-order pharmacies. *See id.* docket no. 48. The case was removed to the Western District of Virginia shortly after the original complaint was filed, and Plaintiff moved to remand the case

---

[1] The Express Scripts Defendants are: (1) Express Scripts Holding Company; (2) Express Scripts, Inc. ("ESI"), which is a PBM; (3) Express Scripts Pharmacy, Inc.; and (4) ESI Mail Pharmacy Service, Inc. The latter two entities are mail-order pharmacies affiliated with ESI. Express Scripts Holding Co. is a holding company that operates through two wholly-owned subsidiaries, one of which is ESI. Because Express Scripts Holding Company acts through its wholly-owned subsidiary ESI, the two entities are interchangeable for purposes of determining federal jurisdiction.

2

to state court. *See id.*, docket no. 11. Just like in *Frederick County*, the case was stayed and later transferred to this MDL Court with the motion to remand still pending. *See id.*, docket no. 43.

### 3. *Supplemental Remand Briefing*

On April 26, 2022, this Court initiated a process to address the approximately 300 motions to remand pending in MDL cases, stating it would address these motions in tranches. *See* MDL docket no. 4389 at 3.  The Court then issued rulings on the first tranche of 20 motions, *see* MDL docket no. 4502 ("*First Remand Order*").  The Court directed the parties to apply the rulings in the *First Remand Order* to other pending motions and identify: (1) cases the parties agree should be remanded; (2) cases the parties agree should not be remanded; and (3) cases about which the parties could not agree. *See* docket no. 4594. The Court further instructed liaison counsel for plaintiffs and defendants to each select representative cases from the third category for supplemental briefing.

Among other cases, the parties then submitted supplemental briefing on the remand motions in *Frederick County* and *City of Roanoke*.  These two motions are focused upon the issue of federal officer removal. As before, the Court now directs the parties to apply the rulings in this *Second Remand Order* to other pending remand motions.  Within 30 days of the date of this *Order*, the parties shall identify those cases the parties agree should and should not be remanded, based on the Court's conclusions in this *Order*.

## II. Factual Background

Frederick County's and Roanoke's complaints are two of the thousands filed in cases regarding the opioid epidemic, over 3,000 of which have been consolidated in this MDL. These complaints allege that Defendants misrepresented the dangers posed by prescription opioids while

3

profiting from their manufacture, distribution, marketing, dispensing, and reimbursement; therefore, Defendants share liability for opioid-related harms under several Virginia legal theories, including public nuisance, negligence, civil conspiracy, and fraud.

Plaintiffs assert that PBMs, including ESI, designed prescription drug benefit programs and formularies that set criteria for the utilization and reimbursement of prescription opioids. *See* case no. 20-OP-45233, docket no. 1-2 at ¶17. In this role, ESI acted as a gatekeeper by promulgating drug formularies that established guidelines for drug co-pays, number of refills allowed per prescription, and reimbursement by insurance providers. *Id*. at ¶21. Plaintiffs further allege these formularies improperly prioritized opioids over other medications, and this prioritization was influenced by unethical financial incentives contained in the contracts between the Express Scripts Defendants and drug manufacturers. In turn, the placement of opioids in preferred reimbursement tiers ensured that opioids were easily accessible and contributed to higher levels of opioid misuse in Plaintiffs' communities. *Id.* at ¶189-90.

Plaintiffs also claim ESI profited from self-dealing with its affiliated mail-order pharmacies, Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc (collectively "ESI Mail-Order Pharmacies"). These Pharmacies allegedly failed to "monitor, detect, investigate, refuse to fill, and report suspicious orders which the Pharmacy Defendants knew or should have known were likely to be diverted." *Id.* at ¶18. Finally, Plaintiffs claim the wrongdoing perpetrated by PBMs and Pharmacies caused Plaintiffs to incur substantial costs, often in the form of increased public services, to abate the harms caused by the opioid epidemic. *Id.* at ¶229. These alleged harms include higher numbers of infants born with neonatal abstinence syndrome ("NAS"), a 160% increase in opioid consumption, and a two-fold increase in drug-related overdose deaths. *Id.* at ¶232-38.

The Express Scripts Defendants removed the *Frederick County* and *City of Roanoke* cases under 28 U.S.C. § 1442, asserting that Plaintiffs' allegations arose from various PBM and Mail-Order pharmacy services Defendants performed under the direction of the Department of Defense ("DoD"). The DoD has a statutory mandate to provide health care to military members and their families through the TRICARE federal health insurance program. *See* 10 U.S.C. § 1073a. The DoD fulfills this responsibility by contracting with private entities, including the Express Scripts Defendants, to provide pharmacy benefit management and mail-order pharmacy services for federal employees. The contract between the DoD and ESI is substantial—the DoD is ESI's second largest client and has accounted for 15.5% to 25.5% of ESI's' members with prescription claims in the State of Virginia.[2]

The DoD-ESI contract is memorialized in a lengthy 174-page Statement of Work ("SOW"). *Id* at ¶3. The SOW contains detailed requirements for the price, eligibility verification, shipping time, and shipping accuracy of pharmaceuticals. *Id.* at ¶11. The contract also requires ESI to operate the TRICARE Mail-Order Pharmacy. *Id.* at ¶8. ESI subcontracts the operation of the TRICARE Mail-Order Pharmacy to the ESI Mail-Order Pharmacies. A government contracting officer oversees ESI's performance under the SOW and has the right to audit the ESI Mail-Order Pharmacies who serve as subcontractors. *Id.* at ¶22, 27. The SOW directs ESI to act as a "fiscal intermediary on behalf of the DoD," using government funds to acquire covered drugs for use by the government. *See* case no. 20-OP-45233, docket no 29-4 at ¶C.1.6.

---

[2] *See* MDL docket no. 4653-1 at ¶6 (declaration of William T. Cahill, Vice President of Account Management at Express Scripts, Inc.) ("the number of TRICARE members with pharmacy claims in the State of Virginia, which includes TRICARE members with prescription claims in the City of Roanoke, ranged from approximately 15.5% in 2014 to approximately 25.5% in 2019, of the total number of Express Scripts members with prescription claims.").

Of particular importance here, the SOW requires exclusive use of the DOD Uniform Formulary when acquiring drugs for federal government employees. *See* MDL docket no. 4653-1 at ¶10. The DoD formulary specifies which drugs are authorized for TRICARE members and sets requirements for prior authorization and utilization reviews, to assure "medical necessity, clinical appropriateness and/or cost-effectiveness." *See* case no. 20-OP-45233, docket no. 29-4 at ¶C.1.4. The SOW also contains a "Prescription Restriction Program" that requires ESI to submit quarterly lists of patients for potential pharmacy benefit restrictions "based upon the number of controlled medications filled, the number of physicians prescribing controlled medications and the number of pharmacies that fill these prescriptions." *See* MDL docket no. 4653-1 at ¶12. Once these lists are submitted, another entity determines if a restriction is appropriate and only then can the Express Scripts Defendants restrict a beneficiary's prescription benefits. *Id*.

### III. Analysis

**A. Standard of Review**

As this Court has previously held, when a motion to remand challenges removal under a federal statute, such as 28 U.S.C. 1442, the transferee court applies the precedent of its own circuit. *In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1068 (N.D. Ohio 2018); *see In re Korean Air Lines Disaster*, 829 F.2d 1171, 1175–76 (D.C. Cir. 1987) (holding "it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations" from other circuits when resolving an issue of "unitary federal law"). Accordingly, this Court applies Sixth Circuit case law in its analysis of the Federal Officer Removal Act.

Pursuant to 28 U.S.C. 1142(a)(1), a civil action against "any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual

6

capacity, for or relating to any act under color of such office," may be removed to federal district court. Congress enacted this statute to provide a federal forum for a party to "assert federal immunity defenses." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007).

The Supreme Court has stated that Federal Officer Removal Statute "must be liberally construed" to achieve this end. *Id.* at 147. Although there are limits to a liberal construction of the statute, the Supreme Court's "policy favoring removal 'should not be frustrated by a narrow, grudging interpretation of 28 U.S.C. §1442(a)(1)'" *Ariz. v. Manypenny*, 451 U.S. 232, 242 (1981) (citing *Willingham v. Morgan* 395 U.S. 402, 407 (1969)). The Sixth Circuit has interpreted the Federal Officer Removal Statute broadly, as mandated by the Supreme Court. *See Bennett v. MIS Corp.,* 607 F.3d 1076, 1084–85 (6th Cir. 2010).

The Express Scripts Defendants are not federal officers themselves; therefore, they must satisfy a "three-pronged test" to remove this case under § 1142(a)(1). *Id.* at 1085. Defendants must show that: (1) they are persons who acted under the direction of a federal officer; (2) the actions for which they are being sued were performed under color of federal office; and (3) there is a colorable federal defense to the Plaintiff's claims. *Id.*

B. "Acting Under"

In *Watson*, the Supreme Court carefully parsed the "acting under" language in the first prong of the removal test. *Watson*, 551 U.S. at 151–52. To satisfy this requirement, a defendant's working relationship with a federal officer must involve "subjection, guidance, or control." *Id.* at 151. The private person must also attempt to "assist, or help carry out, the duties or tasks of the federal superior." *Id.* at 152. A private contractor assists in the duties of a federal superior when it "fulfill[s] basic governmental tasks . . . that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* This assistance needs to extend beyond simple

7

compliance with the law, even in highly regulated fields that are closely monitored by the government. *Id.* at 153 (holding that extensive regulation governing the testing of tar and nicotine in cigarettes did not support a finding that cigarette manufacturer "acted under" the federal government). Finally, in holding that the Federal Officer Removal Statute did not apply to the case before it, the *Watson* Court noted the defendant presented no evidence of "any contract, any payment, any employer/employee relationship, or any principal/agent arrangement." *Id.* at 156.

Two federal courts have already applied the "acting under" test articulated in *Watson* to several of the Express Scripts Defendants. The Fourth Circuit addressed this issue in relation to the two ESI Mail-Order Pharmacies. In *County Board of Arlington, Va. v. Express Scripts Pharm., Inc.,* 996 F.3d 243 (4th Cir. 2021), the Pharmacies operated the TRICARE Mail-Order Pharmacy under a contract with the DoD virtually identical to the one in this case. *See id. at* 247. The court drew attention to several key aspects of the contract: (1) it required exclusive use of the DoD's own drug formulary; (2) the defendants operated the ESI Mail-Order Pharmacies in accordance with contractual guidelines set by the DoD, including pricing, eligibility verification, and payment; and (3) a DoD contracting officer was in charge of managing the defendants' performance under the contract. *Id.* at 252-53.

Furthermore, the ESI Mail-Order Pharmacies' role as subcontractors did not exclude them from the scope of the "acting under" requirement. The Fourth Circuit held that the SOW expressly contemplated the involvement of subcontractors and required them to perform in adherence with the contract terms. *Id.* at 253. Therefore, a lack of privity between the DoD and the ESI Mail-Order Pharmacies was not determinative; rather, the relevant question was whether the DoD was exercising guidance and control over the defendants as they carried out tasks that would have otherwise been performed by the government. *Id.* at 254. The Fourth Circuit concluded the ESI

8

Mail-Order Pharmacies were "acting under" the DoD because the relationship between the two was "unusually close . . . involving detailed regulation, monitoring, or supervision." *Id.* at 251.

Similarly, the Western District of Kentucky held that ESI was "acting under" a federal officer when it provided PBM services to the DoD. *See Grider Drug, LLC v. Express Scripts, Inc.*, 2009 Ohio U.S. Dist. Lexis 107515 (W.D. Ky. Nov. 17, 2009) at *6-8, *aff'd* 500 F.App'x 402 (6th Cir. 2012). Just like *Frederick County* and *City of Roanoke*, the contract between the DoD and ESI in *Grider* stated that DoD funds would be used to pay for TRICARE prescriptions, and ESI would operate a retail pharmacy network as a fiscal intermediary for the DoD. Additionally, the government verified each individual beneficiary's eligibility and authorized payments for each prescription claim submitted by ESI. *Id.* at *7. The *Grider* court held that this close working relationship satisfied the "acting under" requirement of the statute. *Id.* at 8.

There is extensive overlap between the facts in *Grider* and *County Board* and those present in *Frederick County* and *City of Roanoke*, including the contractual requirement that the Express Scripts Defendants use the DoD Uniform Formulary. By requiring exclusive use of its own Uniform Formulary—which is created and updated by the DoD Pharmacy and Therapeutics Committee—the DoD exercises guidance and control over the Express Scripts Defendants' performance. The formulary determines which pharmaceuticals are covered by TRICARE prescription benefit plans, and it contains cost-sharing tiers that determine the reimbursement amounts for various medications, including prescription opioids. Furthermore, the Uniform Formulary dictates which drugs are subject to prior authorization or utilization review requirements. *See* case no. 20-OP-45233, docket no. 29-4, ¶C.1.4. All prescription claims handled by the Express Scripts Defendants must be "processed according to the benefit design" and the restrictions contained in the Uniform Formulary. *Id.* at ¶C.6.1.16.

9

In addition, effectuating the Prescription Restriction Program requires ongoing, close coordination between the Express Scripts Defendants and the DoD. To prevent prescription drug abuse, the Express Scripts Defendants are required to use claims data to create a list of patients for potential prescription restriction, based on the number of controlled medications filled by the patient, the number of physicians prescribing these medications, and the number of pharmacies filling the prescriptions. However, the Express Scripts Defendants do not themselves have any authority to restrict a TRICARE member's prescriptions based on the lists they compile. Instead, the Defendants must send this data to a Military Treatment Facility or a Managed Care Support Contractor, who alone can determine whether restricting a patient's prescription benefits is appropriate. If these entities decide to impose a restriction, ESI must then take one of only two available restrictive actions delineated in the DoD contract. *Id.* at ¶C.9.4.2.4.

These contract terms leave the Express Scripts Defendants little, if any, room for discretion as they administer the TRICARE program. Indeed, the contract states that Defendants are to be paid fees for "performing administrative services under the contract." *Id.* at ¶C.1.6. A review of the contract reveals that this characterization is correct – the Defendants perform largely administrative tasks as they carry out the directives of the government. The fees paid by the government for services rendered are evidence of a principal/agent relationship and weigh in favor of removal, in contrast to the lack of payment present in *Watson.* Moreover, providing prescription drug benefits to military members and veterans is a "basic governmental task" assigned to the DoD by statute. *See* 10 U.S.C. § 1073a. The DoD would have to administer the TRICARE program itself if the task was not delegated to Defendants; this fact also strongly favors removal.

In sum, the Express Scripts Defendants' relationship with the DoD is accurately described as one involving "subjection, guidance, or control" by the federal government, as outlined by the Supreme Court in *Watson*.³ Defendants have satisfied the first prong of the removal test.

**C. Causal Nexus**

The next prong of the Federal Officer Removal test requires that the actions for which a defendant is being sued were performed under the color of federal office. *Bennett v. MIS Corp.*, 607 F.3d 1076, 1088 (6th Cir. 2010). The hurdle erected by this requirement is quite low. *Id.* Under this factor, a defendant must demonstrate a "nexus, a causal connection between the charged conduct and [the] asserted official authority." *Id.* (quoting *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 138 (2nd Cir. 2008)). In other words, the removing party must show it is being sued because of the acts it performed at the direction of a federal officer. *Id.* In the corporate context, a corporation needs to show that the acts for which it is being sued occurred because of what it was asked to do by the Government. *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2nd Cir. 2008).

Plaintiffs argue their lawsuits are not related to the contract between the Express Scripts Defendants and the DoD because their two complaints do not even mention the contract. This formalistic argument widely misses the mark. Federal jurisdiction cannot be avoided merely by careful or creative word-smithing. Under the second prong of the removal test, the dispositive

---

³ Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc.'s status as subcontractors does not exclude them from the scope of federal officer removal. Just like in the *County Board* decision, the DoD contract contemplates the involvement of subcontractors and requires them to be "thoroughly trained and knowledgeable regarding the requirements" of the SOW. *See* case no. 20-OP-45233, docket no. 29-4, ¶C.16.1. Through the detailed terms of the contract, the DoD exercised significant guidance and control over the performance of the Express Scripts Mail-Order Pharmacies, just as it did with ESI. Accordingly, all four of the Express Scripts Defendants were "acting under" the direction of the federal officer when they provided services under the DoD contract.

11

question is whether the government directed a defendant to perform the acts for which it is being sued, not whether the complaint mentions the government contract. Here, the central allegations against the Express Scripts Defendants are two-fold: (1) as a PBM, Express Scripts, Inc. used a formulary that caused more opioids to be dispensed in its community than were medically and clinically necessary; and (2) the dispensing practices of the ESI Mail-Order Pharmacies failed to prevent diversion of opioids for non-medical use. As in *Bennett*, these PBM and Mail-Order pharmacy services were "performed at the direction of [DoD] officers under contract" and are the "alleged cause[s] of plaintiff's personal injuries . . . . This establishes the nexus required by § 1142(a)(1)." *Bennett*, 607 F.3d at 1088 (6th Cir. 2010). The holding in *Bennett* applies equally here because the DoD asked the Express Scripts Defendants to perform the acts that allegedly harmed Plaintiffs. *Id.*

Even though the causal connection factor presents a low hurdle, Plaintiffs direct most of their supplemental briefing toward attacking this prong of the removal test. Plaintiffs argue the declaration provided by Defendants in support of removal is too generic to demonstrate a causal connection between the DoD contract and the allegations in Plaintiffs' complaints. Specifically, Plaintiffs challenge ESI's declaration that 15.5 to 25.5% of the prescription claims processed by the Express Scripts Defendants in Virginia were made by TRICARE beneficiaries. *See* docket no. 4653-1 at ¶6. Plaintiffs argue this declaration is overly broad in two ways: (1) it provides percentages for all prescription claims, not just opioids; and (2) the data covers the whole state of Virginia, not just Frederick County and the City of Roanoke. According to Plaintiffs, a causal connection can only be shown through a more narrow declaration focused solely on opioid prescriptions in Frederick County and Roanoke. Plaintiffs assert that Defendants' declaration

leaves open the possibility that Defendants only dispensed a *de minimis* number of opioids in Plaintiffs' jurisdictions, which would not be a sufficient nexus to justify removal.

Although it would have been marginally more helpful if Defendants had provided more narrowly-tailored data, its absence does not weigh against removal. Given the enormous size of the Express Scripts Defendants (Express Scripts Holding Company alone has a market capitalization around $50 billion), 15–25% of the prescriptions processed by the Express Scripts Defendants in Virginia represents a very large number of patients. There can be no real doubt that many of those prescription claims have been for opioids prescribed in the Plaintiff jurisdictions and covered under the DoD formulary. Indeed, Plaintiffs themselves allege the Defendants flooded their community with opioids from 2014 to 2019 and opioid use increased by 160% during the period covered by the complaints. Plaintiffs' own theory of the case depends on the allegation that a significant number of the prescriptions dispensed by the Express Scripts Defendants were in fact for opioids and were filled in Plaintiffs' jurisdictions.[4] Therefore, the Court finds that the Express Scripts Defendants have demonstrated a causal nexus between actions performed pursuant to the DoD contract and Plaintiffs' lawsuits.

---

[4] Plaintiff's *de minimis* argument has scant case law support; plaintiffs cite a single district court opinion and dicta from the Seventh Circuit. *See Bailey v. Monsanto Co.,* 176 F. Supp. 3d 853, 870 (E.D. Mo. 2016); *Baker v. Atl. Richfield Co.,* 962 F.3d 937, 945 (7th Cir. 2020). In *Bailey v. Monsanto*, the issue was exposure to an allegedly toxic chemical manufactured by defendants, only "one one-hundredth of one percent" of which was sold to government entities. *Bailey*, 176 F. Supp. 3d at 863. That miniscule percentage is a far cry from the 15.5–25.5% figure provided by Defendants here. And in *Baker v. Atl. Richfield Co.*, the Seventh Circuit *reversed* the district court's decision to remand the case, holding there was "no support in the statute or precedent" for a requirement that most transactions must occur under the direction of a federal officer for removal to be appropriate. *Baker*, 962 F.3d at 945. Even if courts did require more than a *de minimis* number of federal transactions (which the Seventh Circuit acknowledged made some policy sense), the 5–20% of transactions in *Baker* would have cleared that hypothetical threshold. *Id.* Here, it is uncontested that the Express Scripts Defendants had 15–25.5% of federal transactions during the relevant time periods, an even higher percentage than was present in *Baker*.

**D. Colorable Federal Defenses**

Finally, the party seeking removal must claim a colorable federal defense. This prong also presents a low bar that is cleared when a defendant plausibly asserts a defense that is based in federal law. *Mesa v. California*, 489 U.S. 121, 129-30 (1989). A defendant is not required to prove "the success of the defense" at the removal stage. *Bennett*, 607 F.3d at 1090 (6th Cir. 2010) (citing *Mesa v. California*, 489 U.S. at 133 (1989)). The "defense need only be plausible; its ultimate validity is not to be determined at the time of removal." *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996). Here, Defendants claim two colorable federal defenses: government contractor immunity and federal preemption.

**1. Government Contractor Defense**

The government contractor defense applies when: "(1) the government approved reasonably precise specifications; (2) the contractor's performance conformed to those specifications; and (3) the contractor alerted the government to dangers known to [the contractor] but not to the United States." *County Board*, 996 F.3d at 255 (internal quotations omitted). Further, the government contractor defense "only applies if a contractor's obligations to the government conflict with the state law such that the contractor may not comply with both." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 210 (4th Cir. 2016) (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988); *see also Bennett*, 607 F.3d at 1089. The rationale for the defense is an extension of sovereign immunity: "in circumstances where the government would not be liable, private

14

actors acting pursuant to government directives should not be liable either." *Bennett*, 607 F.3d at 1090 (citing *Carley v. Wheeled Coach*, 991 F.2d 1117, 1123 (3d Cir. 1993)).[5] "

In this case, the Express Scripts Defendants assisted the government by providing healthcare services pursuant to *highly* precise directives contained in a lengthy contract with the DoD. The contract governed virtually every aspect of how the Express Scripts Defendants processed prescription claims and dispensed pharmaceuticals to TRICARE beneficiaries. Most notably, the contract required the exclusive use of the DoD formulary and implementation of the government's "Prescription Restriction Program," both of which conflict with the core state law duties asserted by Plaintiffs. Plaintiffs claim Defendants should have employed a formulary that placed stricter restrictions on prescription opioids, but this assertion is at odds with Defendants' contractual obligation to use the DoD's formulary. Plaintiffs also allege the ESI Mail-Order Pharmacies filled suspicious opioid prescriptions that were subsequently diverted for extra-medical use. However, the Express Scripts Defendants operating the TRICARE Mail-Order Pharmacy did not have the authority to restrict the prescriptions of TRICARE members without first seeking prior approval from the government.[6] These two conflicts made it impossible for the

---

[5] In *Bennett*, the Sixth Circuit held that the government contractor defense could plausibly be applied to performance contracts and was not limited to the military procurement context in which the defense was developed. The court noted that in *Boyle*, where the government contractor defense was first recognized, the Supreme Court reasoned that the federal interest justifying the government contractor defense exists equally "in procurement contracts as in performance contractor; we see no basis for a distinction." *Boyle,* 487 U.S. at 506 (1988).

[6] The status of the ESI Mail-Order Pharmacies as subcontractors who operated the TMOP does not limit the applicability of the government contractor defense in this case. The Fourth Circuit found these same Defendants plausibly raised the government contractor defense as subcontractors to a contract virtually identical to the DoD contract at issue in this case. *County Board*, 996 F.3d 243. The Sixth Circuit has indicated support for the rule that a "subcontractor receives the benefit of the relationship between the prime contractor and the government" in applying the government contractor defense. *Tate v. Boeing Helicopters*, 140 F.3d 654 (6th Cir. 1998) (citing *Maguire v. Hughes Aircraft Corp.*, 912 F.2d 67 (3rd Cir. 1990)).

Express Scripts Defendants to comply with the state law duties alleged by Plaintiffs and also fulfill their obligations under the DoD contract.

Finally, the Express Scripts Defendants can plausibly argue their performance conformed to the specifications in the DoD contract and they did not have greater awareness than did the government of the dangers of prescription opioids. *See In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1078 (N.D. Ohio 2018) (holding it was plausible that defendant McKesson's contract with the government to provide opioid medications contained "reasonably precise specifications and that McKesson's deliveries conformed to those specifications," and "McKesson can plausibly argue that it was aware of no greater danger than the government was already aware of."). These arguments may or may not survive future scrutiny, but the Court need not determine whether the Express Scripts Defendants' government contractor defense will ultimately be successful. *Bennett*, 607 F.3d at 1090 (6th Cir. 2010).

### 2. Federal Preemption

Regarding federal preemption, Defendants point to 32 C.F.R. § 199.21(o)(2). This regulation documents DoD's determination that State law "does not apply in connection with TRICARE pharmacy contracts" and "preemption of State and local laws . . . is necessary to achieve important Federal interests." The exact interplay between § 199.21(o)(2), Plaintiffs' allegations, and the DoD contract has not yet been fully developed, and the ultimate validity of the preemption defense is yet to be determined. At this stage, however, the Express Scripts Defendants have a colorable argument that the DoD contract preempts the Plaintiffs' state law claims. *See Grider*, 2009 U.S. Dist. LEXIS 107515, *10 (holding that Express Scripts, Inc. advanced a colorable federal preemption defense based on a DoD contract); *County Board*, 996 F.3d 243 (same).

Accordingly, the Express Scripts Defendants have twice satisfied the third prong of the removal test and have earned the right to test the validity of their defenses in a federal forum.

## IV. Conclusion

The Motions to Remand filed by Plaintiffs Frederick County and City of Roanoke are hereby DENIED.

**IT IS SO ORDERED.**

                                                 /s/ Dan Aaron Polster   January 12, 2023
                                                **DAN AARON POLSTER**
                                                **UNITED STATES DISTRICT JUDGE**