# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| TOWN OF BENNINGTON; TOWN OF BRATTLEBORO; and TOWN OF SHARON, VERMONT<br><br>        Plaintiffs,<br><br>        v.<br><br>EVERNORTH HEALTH, INC. (FORMERLY EXPRESS SCRIPTS HOLDING COMPANY); EXPRESS SCRIPTS, INC.; EXPRESS SCRIPTS ADMINISTRATORS, LLC; ESI MAIL PHARMACY SERVICE, INC.; EXPRESS SCRIPTS PHARMACY, INC.; EXPRESS SCRIPTS SPECIALTY DISTRIBUTION SERVICES, INC.; MEDCO HEALTH SOLUTIONS, INC.; MERCK-MEDCO MANAGED CARE, LLC; UNITEDHEALTH GROUP, INC.; OPTUMRX INC.; OPTUMINSIGHT LIFE SCIENCES, INC.; THE LEWIN GROUP, INC.; INGENIX, INC.; INGENIX PHARMACEUTICAL SERVICES, INC. AND OPTUMINSIGHT, INC.<br><br>        Defendants. | **MDL 2804**<br><br>**Case No. 1:17-md-2804-DAP**<br><br>**Member Case No. 1:19-op-45791**<br><br>**Judge Dan Aaron Polster**<br><br><br><br>**REDACTED**<br><br>**Jury Trial Demanded** |

**SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.  INTRODUCTION................................................................................................ 3

II.  VENUE AND JURISDICTION........................................................................ 12

III.  PARTIES ........................................................................................................... 14

    A.  Plaintiffs ................................................................................................. 14

    B.  Defendants ............................................................................................. 14

IV.  FACTUAL ALLEGATIONS........................................................................... 24

    A.  Background on Express Scripts and UHG/Optum as PBMs ............... 24

    B.  The PBM Corporate Families Function As a Single, Unified Entity in
        Profiting Off the Opioid Epidemic ....................................................... 29

        1.  Express Scripts/Evernorth Corporate Family ........................... 29

        2.  The UHG/Optum Corporate Family ......................................... 30

    C.  Defendants' Mail Order Pharmacies Are Among the Largest in the Country
        and Dispensed Billions of MMEs of Opioids ...................................... 34

    D.  Defendants Have Known That the Opioid Epidemic Was Occurring for
        Decades ................................................................................................. 38

    E.  Defendants Ensured that Opioids Were Regularly Prescribed and Flooded the
        Market ................................................................................................... 41

    F.  Defendants Have Admitted They Could Have Prevented the Opioid Epidemic .. 52

    G.  PBM Defendants Conspired Directly with the Opioid Manufacturers ................ 53

        1.  Express Scripts partnered with Purdue to Increase OxyContin
            Utilization ................................................................................ 53

        2.  UHG/Optum Corporate Family Also Partnered with Purdue and Other
            Opioid Manufacturers to Increase Opioid Utilization .............................. 56

            a.  UHG/Optum and Purdue.............................................. 56

            b.  UHG/Optum Also Conspired with the Other Opioid
                Manufacturers .............................................................. 60

H.    Despite Conspiring with Purdue for the Conduct That Gave Rise to the Opioid Epidemic, UHG/UHC Files a $9.8 Billion Claim in the Purdue Bankruptcy ........................................................................................ 60

I.    Express Scripts and UHG/Optum Created a Public Health Crisis ....................... 62

**V.    TOLLING OF THE STATUTE OF LIMITATIONS ................................................. 63**

**VI.    CAUSES OF ACTION ............................................................................................. 65**

1.    Public Nuisance ..................................................................................... 65

2.    Public Nuisance Violation Of 24 V.S.A. § 2121 ................................. 72

3.    Negligence Per Se ................................................................................. 79

4.    Negligence ............................................................................................. 81

5.    Unjust Enrichment ................................................................................ 84

6.    Civil Conspiracy ................................................................................... 84

**PRAYER FOR RELIEF .......................................................................................................... 86**

Plaintiffs, the Town of Bennington, the Town of Brattleboro and the Town of Sharon, Vermont, by and through the undersigned attorneys, (hereinafter "Plaintiffs," "Town of Bennington," "Town of Brattleboro," or "Town of Sharon") against above Defendants Evernorth Health, Inc. (formerly Express Scripts Holding Company); Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution services, Inc.; Medco Health Solutions, Inc.; Merck-Medco Managed Care, LLC (collectively, "Express Scripts"); UnitedHealth Group, Inc.; OptumRx Inc.; OptumInsight Life Sciences, Inc.; The Lewin Group, Inc.; Ingenix, Inc.; Ingenix Pharmaceutical Services, Inc.; and OptumInsight, Inc. (collectively "UHG/Optum") (together "Express Scripts" and "UHG/Optum" are referred to as "Defendants"), alleges as follows:

## I.     INTRODUCTION

1.      This case arises from the worst man-made epidemic in modern medical history— the over-prescription, misuse, and abuse of opioids.

2.      The opioid epidemic the has resulted in economic, social and emotional damage to virtually every community in the United States and millions of Americans. It is indiscriminate and ruthless. It has impacted across demographic lines, harming every economic class, race, gender and age group. Prescription and illegal opioids account for more than sixty percent (60%) of overdose deaths in the United States, a toll that has quadrupled over the past two decades, according to the United States Centers for Disease Control and Prevention ("CDC"). More people died from opioid-related causes than car accidents or guns.  More than one hundred seventy-five (175) people die every day from opioid overdoses, as if an airplane crashes killing everyone on board, every day.

3.      The costs of healthcare, lost productivity, addiction treatment, and criminal justice involvement due to opioid use disorder and fatal opioid overdose $1.02 trillion a year.

4.      The devastating impact of opioid abuse cannot be overstated. After years of decreasing death rates in the United States, they are now on the rise fueled in part by an increase in opioid-related drug overdose deaths. Drug overdoses are now the leading cause of death for Americans under the age of fifty (50). The number of Americans who died of drug overdose deaths in 2017 was roughly equal the number of Americans who died in the Vietnam, Iraq, and Afghanistan wars combined.

5.      From 1999 through the present, over 1,000,000 people died from an overdose involving opioids. Well over half of those deaths involved opioids prescribed by doctors to treat pain. These opioids include brand-name prescription medications like OxyContin, Opana, Nucynta, Duragesic, Subsys, Actiq and Fentora which were manufactured respectively by Purdue, Endo, Janssen/J&J, Insys, and Teva/Cephalon ("Opioid Manufacturers"). Generic opioids such as hydrocodone, oxycodone, fentanyl, hydromorphone, morphine, methadone, tapentadol, and oxymorphone were also responsible for creating this epidemic.

6.      The opioid epidemic rages on to this day and continues to get worse every year.  A staggering 110,000 people died of opioid overdoses in 2022.

7.      Many of the overdoses from non-prescription opioids are also directly related to prescription pills. Many opioid users, having become addicted to but no longer able to obtain prescription opioids, have turned to heroin. According to the American Society of Addiction Medicine, 80% of people who initiated heroin use in the past decade started with prescription painkillers—which, at the molecular level and in their effect, closely resemble heroin. In fact, people who are addicted to prescription painkillers are 40 times more likely to become addicted to heroin, and the CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. Individuals who used prescription opioids more recently have turned to or been exposed to fentanyl, with even more lethal effects.

8.     In the words of Robert Anderson, who oversees death statistics at the Centers for Disease Control and Prevention, "I don't think we've ever seen anything like this. Certainly not in modern times." On October 27, 2017, then-President Trump declared the opioid epidemic a public health emergency. Just weeks ago, on December 22, 2022, Health and Human Services Secretary Xavier Becerra renewed the determination that "a opioid public health emergency exists nationwide."

9.     While the opioid crisis has harmed nearly every corner of the country, Vermont, and Plaintiffs have been hit particularly hard by the opioid epidemic. For example, the rate of overdose deaths in Bennington County, Vermont, where the Town of Bennington is located, has sharply risen from 6.78 deaths per 100,000 people in 2003 to 14.5 deaths per 100,000 people in 2017. Similarly, the rate of overdose deaths in Windham County, Vermont, where the Town of Brattleboro is located, has sharply risen from 9.24 deaths per 100,000 people in 2003 to 27.66 deaths per 100,000 people in 2017.  Additionally, the rate of overdose deaths in Windsor County, Vermont, where the Town of Sharon is located, has sharply risen from 8.42 deaths per 100,000 people in 2003 to 21.17 deaths per 100,000 people in 2017.

10.     The startling increase in recorded overdose deaths is likely not inclusive of all opioid overdose deaths in the Towns of Bennington, Brattleboro and Sharon, as local information reflects the fact the Town of Bennington averages about ten fatal opioid overdoses per year. Windham County had 24 residents die of opioid overdoses in 2018, eight of them in the Town of Brattleboro alone.  Windsor County had 14 residents die of opioid overdoses in 2018. Perhaps not surprisingly, the death rates in the Towns of Bennington, Brattleboro and Sharon have increased over the last two decades as the amount of opioids distributed to Plaintiffs has increased.

11.     The increase in the volume of opioids to Plaintiffs is a microcosm of the statewide pattern in Vermont. In 2010, 482,572 opioid prescriptions were dispensed in Vermont, a state with

a population of just over 625,000. That number continued to rise. In 2015, the number of opioid prescriptions increased to 498,973, the equivalent of giving a prescription to every 1.3 people living in Vermont, including infants.

12.     There is no question that this volume of opioids leads to increased incidence of dependence and addiction. Vermont ranks as the 8th-highest state for drug dependence nationwide, despite other favorable health indicators like better access to health care and insurance coverage as compared to other states.

13.     Opioids are killing Vermont citizens at a skyrocketing rate, and a common origin is prescription opioids. Drug-related fatalities involving opioids nearly doubled between 2012 and 2016.  While the national average of opioid-related overdose deaths in 2016 was 13.3 per 100,000 persons, the rate in Vermont was 18.4. These overdose deaths have a broad impact. In a state like Vermont, there are no anonymous deaths.

14.     Vermont opioid related deaths have continued to spike—from April 2020 to April 2021, Vermont's opioid-related deaths increased 70%—the biggest rise in the country over that time period.

15.     Towns of Bennington, Brattleboro, and Sharon are now having to allocate substantial taxpayer dollars, resources, staff, energy and time to address the damage the opioid scourge has left in its wake and to address its many casualties. Fire and emergency medical services are over-utilized because of an increased number of opioid-related overdoses. The burden on law enforcement is substantially increased by opioid-related crimes related to prescription opioid theft, diversion, and sales on the black market. County and Town jails, hospitals, clinics, treatment centers, intervention programs, social workers, foster care, courts, schools—virtually every aspect of County and Town service and budget has been significantly and negatively impacted by this Defendant-made epidemic.

16.     The damage inflicted cuts across ages and generations. Many who have succumbed to overdoses have overdosed more than once. Those who survive are often not alone at the time. Family members, including young children, have watched their loved ones lose consciousness or die. Young children, including toddlers, also have been the direct victims of overdoses themselves after coming into contact with opiates.

17.     Children are being displaced from their homes and raised by relatives or placed in the County's or Towns' care due to parents' addiction. Others lose the chance to go home. Unable to be discharged from the hospital with their mothers, babies born addicted to opioids due to prenatal exposure are being placed in the care of the Town or local citizens or non-profits who do their best to comfort them through the pain of withdrawal

18.     The opioid epidemic was partially created and sustained by a wide array of profit-seeking actors in the opioid supply and payment chain: the Opioid Manufacturers, distributors, pharmacies, and pharmacy benefit managers ("PBMs"), including Defendants Express Scripts and UHG/Optum. Whether by colluding with the Opioid Manufacturers to make opioids more available as a form of pain treatment or by ignoring the mounting evidence of addiction and misuse in their own claims data, Express Scripts' and UHG/Optum's role in creating and sustaining the opioid epidemic until recently has been largely hidden from public scrutiny but nevertheless facilitated the reckless promotion of opioids by manufacturers, the oversupply of opioid shipments by distributors, and the irresponsible dispensing of prescription opioids by numerous pharmacies.

19.     Express Scripts' and UHG/Optum are the gatekeepers to the opioid market—more than any actor in the pharmaceutical distribution and payment chain, Defendants had control over and insight into the flow of opioids into communities across the country.

20.     Express Scripts and UHG/Optum are each vertically-integrated colossuses that dominate the opioid reimbursement and delivery chain—currently sitting at 5th (OptumRx) and 12th (Express Scripts) on the Fortune 500 list ranking largest corporations by revenue.

21.     These two corporate monoliths are among: (1) the largest PBMs in the United States (collectively covering over 166 million lives); (2) the largest pharmacies in the country (making up 2 of the top 5 dispensing pharmacies in the U.S.); (3) the largest insurance companies in the world and (3) among the largest healthcare data, consulting, and analytics companies in the United States.

22.     As mail order pharmacies Defendants operate within the federally control closed drug distribution system, and yet despite their obligations to dispense opioids in a safe and effective manner as part of this system, they dispensed tens of billions of MMEs of opioids into communities across the country.

23.     Express Scripts and UHG/Optum further control pharmacy networks that include approximately 70,000 pharmacies, representing over 98% of retail pharmacies in the country.  In real time, Defendants collect and maintain detailed dispensing data on every opioid prescription that is filled and every opioid pill, lozenge or patch that is dispensed from every pharmacy in their networks.

24.     Defendants represent that they police these pharmacies to identify and address instances of opioid over-prescribing and diversion. Express Scripts and UHG/Optum failed in these obligations as well, allowing major retail pharmacies in their network to over-dispense dangerous opioids for decades.

25.     Express Scripts and UHG/Optum are also hired by third party payors, insurers, and health plans to design formularies and administer prescription drug programs. In this role,

Defendants represent to their clients, patients, and the public that they design these formularies and drug programs in a manner that promotes safe use and appropriate prescribing of opioids.

26.     Yet, over time, Express Scripts and UHG/Optum have developed a business model that does the opposite, and in doing so, they have adopted business practices designed to increase the utilization of opioids and, in turn, maximize their own profits.

27.     Opioid Manufacturers understand Express Scripts and UHG/Optum have the power to control drug utilization. As a result, the Manufacturers allocate substantial resources towards partnering with Defendants through every phase of their opioids' launch and marketing plans. The Opioid Manufacturers paid Express Scripts and UHG/Optum billions of dollars in exchange for services such as formulary management, which dictate what opioids enter the marketplace and with what restrictions.

28.     Since 2014, payments to Defendants by manufacturers as rebates or fees to ensure the formulary placement of their drugs have risen by 16% per annum, and now constitute 40% or more of branded prescription drug costs.

29.     Express Scripts and UHG/Optum have contributed substantially to the opioid crisis by colluding with the Opioid Manufacturers to place opioid drugs on their formularies with preferred status and declining to impose limits on their approval for use in exchange for manufacturer rebate payments and fees generated through their strategic partnerships. As a result, far greater quantities of prescription opioids entered the market than they knew could be necessary for legitimate, safe, or appropriate medical uses.

30.     To make matters worse, Express Scripts and UHG/Optum also *participated in* the efforts of the Opioid Manufacturers to deliberately pollute the national marketplace with lies and misinformation about the  addictive nature of opioids, as well the "appropriate" use of opioids, and expand their use beyond traditional cancer treatment and palliative care contexts—i.e., the precise

activities that formed the foundation of liability that has resulted in billions of dollars in settlements by the Opioid Manufacturers.

31.     Additionally, because Express Scripts and UHG/Optum have access to and analyze opioid utilization data for their approximately 166 million covered lives, they have a unique insight into prescribing habits at both the patient and prescriber levels, as well as data on prescribing and use of opioids in the aggregate. Defendants quite literally tracked the opioid epidemic, pill-by-pill, as it unfolded over decades.

32.     At the individual level Express Scripts and UHG/Optum could monitor their data to identify conduct commonly associated with opioid misuse, addiction, and diversion, such as early refills of opioid prescriptions, multiple prescriptions for one individual or for dangerously high volumes or dosages of opioids or "doctor shopping," the practice by which individuals receive multiple opioid prescriptions from unknowing prescribers. On the prescriber level, Express Scripts and UHG/Optum could identify problematic prescribers who were prescribing unreasonably high volumes of opioids to unreasonably high numbers of patients, co-prescribing opioids with drugs commonly abused with them, such as benzodiazepines, prescribing opioids outside the regular scope of their practice, or who wrote prescriptions for the same dose and duration to all of their patients—all classic signs of "pill mills." Express Scripts and UHG/Optum can also determine the aggregate volume of opioids being used in a geographic area, as well as the diagnosis, duration, and dosages of opioids being used. Defendants had access to all of this data well before Vermont and other states established their Prescription Drug Monitoring Programs in order to perform these analyses and stem the tide of the opioid crisis.

33.     Express Scripts served as a PBM for residents in Vermont, generally, and in the Towns of Bennington, Brattleboro and Sharon, specifically, during the relevant time period. Upon information and belief, during the relevant time period, Express Scripts served the following clients

with members in the Towns of Bennington, Brattleboro and Sharon: Walmart, Sears Holding Corporation, and Verizon Communications.

34.    UHG/Optum served as a PBM for residents in Vermont and the Towns of Bennington, Brattleboro and Sharon as well. Upon information and belief, during the relevant time period, UHG/Optum served the following clients with members in the Towns of Bennington, Brattleboro and Sharon: General Electric, Best Buy, and Big Lots.

35.    Given Defendants' dominant position in the market and level of expertise, their clients typically accept the offered baseline standard formularies with little to no modification. Indeed, customers hire Express Scripts and UHG/Optum for their specialized knowledge in constructing and managing prescription drug formularies and policing pharmacy networks. In addition, there are often significant financial penalties for deviating from standard formularies, which Defendants rely on to ensure that they can deliver drug sales to their drug manufacturer-partners. Thus, Defendants' formularies control what opioids enter the marketplace and with what restrictions. This is precisely the reason that Defendants boast they are uniquely situated to address the opioid crisis.

36.    Express Scripts and UHG/Optum tout their substantial influence over nationwide drug utilization as one of their strongest selling points to their customers. Defendants are not bystanders in the opioid crisis; they helped fuel the fire.

37.    As described *infra*, by unreasonably colluding with the Opioid Manufacturers and by knowingly ignoring their own data that essentially chronicled the opioid epidemic in real time, Express Scripts and UHG/Optum have placed profits over safety and engaged in unreasonable conduct that substantially contributed to the opioid epidemic.

38.    Defendants' conduct has had a severe and far-reaching public health consequence, the costs of which are borne by Plaintiffs and other governmental entities.

39.     Defendants' conduct has created a public nuisance and a blight. Governmental entities, and the services they provide their citizens, have been strained by this public health crisis.

40.     The other actors—including the Opioid Manufacturers, distributors, and pharmacies—with whom Defendants worked directly with in creating this public health crisis have faced civil and at times criminal liability for their roles; they have been made to contribute billions of dollars to assist with the generation devastation caused by their efforts.  A few examples include:

> (a)     In October 2020, the Department of Justice announced that Purdue entered into a federal settlement of more than $8 billion to resolve pending criminal and civil investigations into Purdue's role in causing the opioid epidemic;

> (b)     In February 2022, the largest U.S. drug distributors and Opioid Manufacturer Janssen/J&J agreed to finalize a proposed $26 billion settlement resolving claims by states and local governments that they helped fuel the U.S. opioid epidemic;

> (c)     In July 2022, Teva announced it would pay up to $4.25 billion as part of a nationwide settlement to end litigation over its alleged role in the U.S. opioid crisis;

> (d)     In August 2022, following a jury trial, a federal judge ruled that the major retail pharmacies Pharmacy operators CVS, Walmart and Walgreens must pay a combined $650.6 million to two Ohio counties to address the damage done by the opioid epidemic;

> (e)     In August 2022, Opioid Manufacturer Endo agreed to pay $450 million to states to resolve opioid lawsuits across the country.

41.     Working alongside these other actors, Express Scripts and UHG/Optum helped cause the ongoing opioid crisis and are necessary parties to addressing the damage it has wreaked, including the costs of abatement.

42.     Plaintiffs bring this suit to help address the devastating march of this epidemic and to hold Defendants responsible for the crisis they helped cause.

## II.     VENUE AND JURISDICTION

43.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and Plaintiffs are of a different citizenship than Defendants.

44.     Defendants are subject to the Court's jurisdiction because Defendants conduct business in Vermont, purposefully direct or directed their actions toward Vermont, consented to be sued in Vermont by registering an agent for service of process, consensually submitted to the jurisdiction of Vermont when obtaining a manufacturer, distributor or pharmacy license, and have the requisite minimum contacts with Vermont necessary to permit the Court to exercise jurisdiction over Defendants.

45.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this judicial district and because all defendants are subject to this Court's exercise of personal jurisdiction.

46.     Venue is proper within this District pursuant to 28 U.S.C. § 1391, as this District is a judicial district where Defendants are subject to personal jurisdiction in accordance with 28 U.S.C. §§ 1391(a) and (c), as well as Vermont's long-arm statute, 12 V.S.A. § 913(b).

47.     Defendants are non-domiciliaries of Vermont who regularly engage in business within Vermont. These defendants have committed tortious acts outside and within Vermont that have caused injury within Vermont and to the Towns of Bennington, Brattleboro and Sharon. Defendants expect or should reasonably have expected those acts to have consequences in Vermont. Defendants, moreover, solicited business within Vermont, engaged in persistent courses of conduct in Vermont, and derived substantial revenue from goods used and services rendered in Vermont through interstate commerce.

48.      Defendants are regularly engaged in the business of dispensing and reimbursing prescription opioids in Vermont and, specifically, in the Towns of Bennington, Brattleboro and Sharon. Defendants' activities in the Towns of Bennington, Brattleboro and Sharon in connection with the dispensation and reimbursement of prescription opioids was, and is, continuous and systematic, and give rise to the causes of action alleged herein.

### III.    PARTIES

**A.    Plaintiffs**

49.    The Town of Bennington is a municipal corporation duly chartered and existing under the laws of Vermont with its governing body being the Bennington Selectboard. The Town of Bennington has standing to bring this suit. 24 App. V.S.A. c. 103 § 101.

50.    The Town of Brattleboro is a municipal corporation duly chartered and existing under the laws of Vermont with its governing body being the Brattleboro Selectboard. The Town of Brattleboro has standing to bring this suit. 24 App. V.S.A. c. 103 § 101.

51.    The Town of Sharon is a municipal corporation duly chartered and existing under the laws of Vermont with its governing body being the Sharon Selectboard. The Town of Sharon has standing to bring this suit. 24 App. V.S.A. c. 103 § 101.

**B.    Defendants**

52.    **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.

53.    Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

54.    Evernorth, through its executives and employees, control the company policies that inform its PBM and mail order services, including with respect to the at-issue drugs, as well as Express Scripts' data, analytics, and research services.

55.    Evernorth's conduct has had a direct effect in Vermont, including the Towns of Bennington, Brattleboro and Sharon.

56.     Evernorth is the immediate or indirect parent of pharmacy, PBM, and research subsidiaries that operate throughout Vermont, including the Towns of Bennington, Brattleboro and Sharon, which engaged in the activities that gave rise to this Complaint.

57.     In each annual report for at least the last decade, Evernorth has repeatedly, continuously, and explicitly stated "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to . . . improve members' health outcomes."

58.     **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

59.     Express Scripts, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

60.     Express Scripts, Inc. holds an active license with the Vermont Department of Insurance.

61.     Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Vermont that engaged in the conduct, which gave rise to this Complaint.

62.     During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order services, including with respect to the at-issue drugs, as well as Express Scripts' data and research services.

63.     **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

64.     Express Scripts Administrators, LLC is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464–9919.

65.     Express Scripts Administrators, LLC holds an active license with the Vermont Department of Insurance.

66.     During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Vermont, including the Towns of Bennington, Brattleboro and Sharon, discussed in this Complaint.

67.     **Defendant Medco Health Solutions, Inc.** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey and is a wholly owned subsidiary of Evernorth.

68.     Medco is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

69.     **Defendant Merck-Medco** was acquired in the early 1990s by Merck & Co as its pharmacy benefit manager subsidiary.

70.     In 2002, Merck & Co spun off Merck-Medco into a publicly traded company, Medco Health Solutions.

71.     Merck-Medco and Medco Health Solutions, Inc. are referred to herein as "Medco."

72.     In 2012, Express Scripts acquired Medco for $29 billion.

73.     Prior to the merger Express Scripts and Medco were two of the largest PBMs in the United States and in Vermont.

74.     Prior to the merger, Medco provided the PBM and mail order services, including with respect to the at-issue drugs, as well as the company's data and analytics services in Vermont, which gave rise to Plaintiffs' causes of action in this Complaint.

75.    Following the merger, all of Medco's PBM, mail order pharmacy, and data and research functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's customers becoming Express Scripts' customers.

76.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

77.    ESI Mail Pharmacy Service, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

78.    ESI Mail Pharmacy Service, Inc. holds active licenses with the Vermont Board of Pharmacy.

79.    During the relevant time period, ESI Mail Pharmacy Service provided the mail order pharmacy services in Vermont, including the Towns of Bennington, Brattleboro and Sharon, discussed in this Complaint, which gave rise to the causes of action in this Complaint.

80.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

81.    Express Scripts Pharmacy, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

82.    Express Scripts Pharmacy, Inc. holds active licenses with the Vermont Board of Pharmacy.

83.     Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. are referred to herein as "Express Scripts Mail Order Pharmacy."

84.     In 2021, Express Scripts Mail Order Pharmacy was the third largest dispensing pharmacy in the United States and made $54.4 billion in prescription revenues.

85.     From 2006-2014, Express Scripts Pharmacy bought over 22.9 billion MMEs of opioids spread over 1.1 billion opioid dosage units.

86.     **Defendant Express Scripts Specialty Distribution Services, Inc**. is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Specialty Distribution Services, Inc.'s principal place of business is at the same location as Evernorth.

87.     Express Scripts Specialty Distribution Services, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

88.     Express Scripts Specialty Distribution Services, Inc. holds active licenses with the Vermont Board of Pharmacy.

89.     During the relevant time period, as described in more detail below, Express Scripts Specialty Distribution Services, Inc. worked directly with the Opioid Manufacturers to expand the opioid market, ███████████████████████████████████████████

███████████████████████████████████

90.     Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Express Scripts Mail Order Pharmacy, Express Scripts Specialty Distribution Services, Inc., and Medco, including all predecessor and successor entities, are referred to as "Express Scripts."

91.     Express Scripts is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, and research provider; and (3) mail order pharmacy. During the relevant time period,

Express Scripts contracted directly with the Opioid Manufacturers in each of these capacities. At all relevant times, Express Scripts performed these services in Vermont and in the Towns of Bennington, Brattleboro and Sharon.

92.    Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. Express Scripts' market power has only increased since the Cigna merger.

93.    Express Scripts' annual revenue as of 2022 is over $100 billion.

94.    As of December 31, 2018, more than 68,000 retail pharmacies, representing over 98% of all retail pharmacies in the nation, participated in one or more of Express Scripts' networks.

95.    According to Express Scripts' annual reports and public statements, Express Scripts standard formularies are "governed by [its] National Pharmacy & Therapeutics Committee (the 'P&T Committee'), a panel of independent physicians and pharmacists in active clinical practice, representing a variety of specialties and practice settings and typically with major academic affiliations." Express Scripts touts that the "the P&T Committee considers the drug's *safety and efficacy*," and the company "fully compl[ies] with the P&T Committee's clinical recommendations regarding drugs that must be included or excluded from the formulary based on their assessment of *safety and efficacy*." Express Scripts "re-evaluate[s] [its] National Preferred Formulary on an annual basis. [It] looks at the formulary first from a clinical perspective to ensure that it provides access to *safe and effective* medications in all therapy classes."

96.    At all times relevant hereto, Express Scripts maintained formularies that are used nationwide, including in Vermont and the Towns of Bennington, Brattleboro and Sharon. At all times relevant hereto, those formularies included opioids, including those at issue in this case. At all times relevant hereto, those formularies allowed for the dispensing and reimbursement of such opioids in Vermont, including in the Towns of Bennington, Brattleboro and Sharon.

97.     **Defendant UnitedHealth Group, Inc**. ("UnitedHealth Group" or "UHG") is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

98.     UnitedHealth Group may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

99.     UnitedHealth Group holds an active license with the Vermont Department of Insurance

100.    UnitedHealth Group, Inc. is a Fortune 5 diversified managed healthcare company. In 2022, UnitedHealth Group listed revenue in excess of $324 billion. UnitedHealth Group, Inc. offers a spectrum of products and services including health insurance plans and pharmacy benefits through its wholly-owned subsidiaries.

101.    UnitedHealth Group operates through two connected divisions—Optum and UnitedHealthcare ("UHC"). As discussed in greater detail below, Optum provides PBM services; mail order pharmacy services; and data, analytics, consulting, and research services. UHC provides health insurance and health benefit services.

102.    UnitedHealth Group, through its executives and employees, control the enterprise-wide policies that inform both UHC and Optum's lines of business in order to maximize profits across the corporate family.

103.    UnitedHealth Group's conduct had a direct effect in Vermont, including the Towns of Bennington, Brattleboro and Sharon.

104.    **Defendant OptumInsight, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

105.    OptumInsight, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

106.    OptumInsight, Inc. holds an active Third-Party Administrator license with the Vermont Department of Financial Regulation.

107.    **Defendant OptumInsight Life Sciences, Inc.** is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota.

108.    In 2011, UHG renamed QualityMetric as Optum Life Sciences, Inc.

109.    OptumInsight Life Sciences, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

110.    **Defendant The Lewin Group, Inc.** is a North Carolina corporation with its principal place of business located in Eden Prairie, Minnesota.

111.    The Lewin Group, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

112.    **Defendant Ingenix Pharmaceutical Services, Inc. and Defendant Ingenix, Inc. ("Ingenix")** were wholly owned subsidiaries of UnitedHealth Group.

113.    In 2011, UHG renamed Ingenix as OptumInsight. The name change came after the State of New York investigated Ingenix related to a scheme to defraud consumers by manipulating reimbursement rates, resulting in a $50 million settlement with the State and giving rise to U.S. Congressional hearings.

114.    OptumInsight, Inc.; OptumInsight Life Sciences, Inc.; Ingenix, and The Lewin Group, Inc., as well as their predecessors, successors, affiliates, including but not limited to

21

Innovus, Innovus Research, i3, QualityMetric, Htanalytics, ChinaGate, and CanReg, are referred to herein as "OptumInsight."

115.    OptumInsight provides data, analytics, research, consulting, technology and managed services.

116.    OptumInsight is an integral part of the conduct that gave rise to Plaintiffs' causes of action. As discussed in detail below, throughout the relevant time period, OptumInsight worked directly with the Opioid Manufacturers, including ███, to convince ████████████ ████████████████████████████████████████████████████ ████████████

117.    Each Opioid Manufacturer had dedicated executives assigned to OptumInsight. The Opioid Manufacturers utilized their relationships with OptumInsight to deepen their ties to the overall UHG/Optum corporate family.

118.    OptumInsight was paid tens of millions of dollars by the Opioid Manufacturers during the relevant time period for its work to expand the opioid market.

119.    **Defendant OptumRx, Inc. ("OptumRx")** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

120.    OptumRx is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 17 G W Tatro Dr, Jeffersonville, VT 05464 – 9919.

121.    OptumRx holds an active license with the Vermont Board of Pharmacy and an active Third-Party Administrator license with the Vermont Department of Financial Regulation.

122.    Prior to 2011, OptumRx was known as Prescription Solutions. In addition, as depicted in the PBM Consolidation Chart below, OptumRx grew as a result of numerous mergers and acquisitions. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter,

SXC Health Solutions Corp. renamed the company Catamaran Corp. Following this UHG bought Catamaran Corp in a deal worth $12.8 billion and merged Catamaran with OptumRx.

123.    Prior to merging with OptumRx (or being renamed), Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. engaged in the at-issue PBM and mail order activities.

124.    OptumRx and all of its predecessors including but not limited to Prescription Health Solutions, Catalyst Health Solutions, Inc., and Catamaran Corp. are referred to herein as "OptumRx."

125.    Collectively, UHG, OptumRx, and OptumInsight are referred to as "UHG/Optum."

126.    UHG/Optum is named as a Defendant in its capacities as a: (1) PBM; (2) data, analytics, consulting, and research provider; and (3) mail order pharmacy. During the relevant time period, UHG/Optum contracted directly with the Opioid Manufacturers in each of these capacities. At all relevant times, UHG/Optum performed these services and derived substantial revenue in Vermont, including the Towns of Bennington, Brattleboro and Sharon.

127.    UHG/Optum provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

128.    At all times relevant hereto, UHG/Optum offered pharmacy benefit management services and constructed standard formularies that are used throughout Vermont, including the Towns of Bennington, Brattleboro and Sharon. During the relevant time period, these formularies included opioids.

129.    At all times relevant hereto, UHG/Optum offered mail order pharmacy services and dispensed opioids in Vermont, including the Towns of Bennington, Brattleboro and Sharon.

130.    In 2021, UHG/Optum's mail order pharmacy was the fourth largest dispensing pharmacy in the United States and made $34.2 billion in prescription revenues.

131.     From 2006-2014, UHG/Optum's mail order pharmacy bought over 4.5 billion MMEs of opioids spread over 252 million opioid dosage units.

132.     Collectively, Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Express Scripts Specialty Distribution services, Inc.; Medco Health Solutions, Inc; Merck-Medco Managed Care, LLC; UnitedHealth Group, Inc.; OptumRx Inc.; OptumInsight Life Sciences, Inc.; The Lewin Group, Inc.; and OptumInsight, Inc. are referred to as "Defendants" or "PBMs".

### IV.     FACTUAL ALLEGATIONS

**A.     Background on Express Scripts and UHG/Optum as PBMs**

133.     Opioid Manufacturers cannot influence drug prescribing and utilization alone. They require other participants in the closed drug distribution and reimbursement system to play key roles in the management, distribution, prescription and reimbursement of opioids.

134.     Defendants arguably play the most critical role in the closed system.

135.     PBMs Express Scripts and UHG/Optum are essential because they link Opioid Manufacturers to prescribing physicians, pharmacists, clients, and consumers with the objective of influencing drug utilization. As recognized by their own internal presentations, the services and products offered by these PBMs █████████████████████████████████████████

█████████████████████████████████

136.     Express Scripts and UHG/Optum are in fact the "gatekeepers" of the opioid market.

137.     Defendants control the opioid market in multiple ways.

138.     One key method of control is the use of drug formularies that the PBMs create.  A drug formulary is a list of preferred generic and brand name prescription drugs that PBMs will ensure are covered by insurance.

139. Not all drugs listed on a formulary are treated equally. Formularies are often divided up into tiers which determine consumers' cost-share amounts. The lower tiers (which are reserved for generic and preferred brands) have lower cost share amounts than the higher tiers, which is to say that a drug on Tier One will be less expensive for the consumer than a drug on Tier Three.

140. Preferential formulary treatment, such as being listed on a lower tier, increases a drug's utilization, since consumers are generally more likely to pick the lower cost alternative.

141. In addition to tier placement, Express Scripts and UHG/Optum also influence consumer behavior and drive drug utilization through utilization management ("UM") tools they implement into their formularies.

142. UM tools are used to help control the flow of prescription drugs at the pharmacy counter. These tools include quantity limits, refill limits, prior authorizations (which require additional PBM approval before the drug is dispensed) and step edits (which require that a patient try a different, safer drug before being given a more dangerous one).

143. When implemented properly, UM tools can help restrict the flow of opioids entering the market.

144. Express Scripts and UHG/Optum provide their client health insurance plans and large employer benefit plans with standard, recommended formularies and with recommendations regarding UM tools. Because of their market power and the financial consequences they impose for deviation, nearly all of their clients accept the standard formulary and UM criteria with respect to pain treatment.

145. Express Scripts and UHG/Optum, in coordination with the Opioid Manufacturers, thereby directly control opioid utilization.

146. Indeed, Express Scripts' and UHG/Optum's standard plan designs and formularies control: (a) which opioids will be available (or not available) to patients; (b) which opioids are

most effective for each therapeutic use; (c) in what quantities the opioids will be dispensed; (d) at what co-pay will the opioids be dispensed; (e) what level of authorization will be required for the dispensing of opioids to a consumer patient; and (f) what less addictive pain treatments, beneficial drugs or other treatments will not be available.

147.    Express Scripts and UHG/Optum have exerted and continue to exert direct, intentional control and influence over the prescribing, use, distribution, reimbursement, and consumption of opioids.

148.    At all relevant times, Express Scripts and UHG/Optum represented to their clients, patients, and the public that they use this market power to design formularies that promote safe use and appropriate prescribing of opioids.

149.    These representations are false.

150.    Rather, Express Scripts and UHG/Optum construct formularies in a manner that is the most profitable for them and the Opioid Manufacturers.

151.    Indeed, Express Scripts and UHG/Optum, in concert with the Opioid Manufacturers, have reaped enormous financial benefits from their benefit plan design and formulary management.

152.    Express Scripts and UHG/Optum are incentivized to increase utilization of both brand and generic opioids.  On the brand side, Express Scripts and UHG/Optum collude with the Opioid Manufacturers who pay fees in the form of rebates, administrative fees and other incentives in exchange for favorable formulary placement.

153.    The Opioid Manufacturers pay these rebates to Express Scripts and UHG/Optum based on the volume of their products that were used or sold by clients served by Defendants. Nearly 40% of all expenditures on branded drugs are eventually rebated back—and, most of these rebates directly benefit Express Scripts and UHG/Optum.

154.    As noted above, the more favorable the formulary placement, the greater the utilization, which means that Opioid Manufacturers are heavily incentivized to pay PBMs to secure formulary placement and to secure advantageous treatment on the formulary.

155.    The Opioid Manufacturers also pay Express Scripts and UHG/Optum to ensure that UM tools do not restrict the amount of their opioids that enter the marketplace. Utilization inures to the financial benefit of Defendants and the Opioid Manufacturers. It also leads to more prescriptions and more pills available to the general public, many of which find their way to the black market.

156.    Express Scripts and UHG/Optum make additional profits through imprecise definitions of what constitutes a brand drug, particularly one facing generic competition, as in this case.  Defendants treat such brand drugs as "true brands" for purpose of pricing through their mail order facilities (thereby earning additional profit at a higher reimbursement price); they treat such brands as generics when called upon to make a reimbursement payment themselves to an unaffiliated retailer.

157.    On the generic side, Express Scripts and UHG/Optum make substantial profits through their interactions with, and operation of, mail order and retail pharmacies.  At all times relevant hereto, Express Scripts and UHG/Optum were operating both and dispensing or reimbursing generic opioids through both.

158.    Express Scripts and UHG/Optum routinely pocket the spreads between the reimbursement they receive for generics from its clients as compared with the price Defendants pay the pharmacy for that same drug (including when that pharmacy is one of Defendants' own captive mail order pharmacy).  In this way Express Scripts and UHG/Optum profit from every generic it sells or reimburses.

159.     Express Scripts and UHG/Optum further increase these profits generated by generic opioids by constructing their formularies in manner that increases generic utilization by eliminating (or failing to put into place) any restrictions to these opioids entering the market.

160.     Express Scripts and UHG/Optum also routinely reimburse brick and mortar retail pharmacies based on the lowest available published prices. But then they pay their own captive mail order pharmacies based on a higher published price for the very same drug.

161.     Retail pharmacies also pay Express Scripts and UHG/Optum significant additional fees for every opioid sold. Through this disparate reimbursement, Express Scripts and UHG/Optum enhance what they earn on any opioid they dispense. This gamesmanship creates an incentive for the PBM to drive customers towards its own mail order delivery system.  The practice is all the more pernicious given that mail order drugs are most commonly maintenance drugs used to treat chronic conditions. It is well established that there is no support for the proposition that opioids are effective to treat chronic pain.

162.     As discussed *infra*, Express Scripts and UHG/Optum also made additional profits on opioids through their strategic consulting and research partnerships with the Opioid Manufacturers, which were designed to increase utilization overall—brand and generic—by expanding the opioid market to include chronic pain treatment and by downplaying the risks of addiction.

163.     The power of these PBMs has evolved over time. Originally mere claims processors, today Express Scripts and UHG/Optum manage the drug benefits—and control which drugs will be covered—for approximately 166 million insured lives in the United States. Together, Express Scripts and UHG/Optum made over $300 billion last year.

164.     The Opioid Manufacturers understand that Express Scripts and UHG/Optum control which opioids will be paid for and reimbursed, and thus which drugs enter the marketplace.

28

In homage to this power, the Opioid Manufacturers allocate substantial resources toward working with Defendants through every phase of the Manufacturers' opioids' launch and marketing plans. The Opioid Manufacturers understand that partnering with Defendants is essential to the success of any opioid.

**B.     The PBM Corporate Families Function As a Single, Unified Entity in Profiting Off the Opioid Epidemic**

    **1.     Express Scripts/Evernorth Corporate Family**

165.    The Evernorth corporate family does not operate as separate entities. The public filings, documents, and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco, Express Scripts Specialty Distribution Services, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to Plaintiffs' causes of action in this Complaint.

166.    All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco, Express Scripts Specialty Distribution Services, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

167.    Evernorth and Express Scripts, Inc. actively control Express Scripts Administrators, LLC, Medco, ESI Mail Pharmacy Service, Inc., Express Scripts Specialty Distribution Services,

Inc., and Express Scripts Pharmacy, Inc's operations, management and business decisions related to the at-issue formulary construction, data/analytics services, and mail order pharmacy services.

168. Among other indicia of control and interconnectivity, during the relevant time period, these parent and subsidiaries have had common officers and directors:

(a) Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

(b) Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

(c) Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

(d) Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

(e) Officers and/or directors that have been shared between Medco and Evernorth include David Queller, President and Senior VP of Sales & Accounting, Christine Houston, VP and COO, Timothy Smith, VP and Treasurer and all of the officers of Medco are also officers of Express Scripts, Inc.

169. Evernorth also directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Medco, Express Scripts Specialty Distribution Services, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

**2.      The UHG/Optum Corporate Family**

170. The UHG/Optum corporate family does not operate as separate entities. The public filings, documents, and statements of UnitedHealth Group presents its subsidiaries, including UHC, OptumRx, and OptumInsight as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live

30

healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The UHG/Optum enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to Plaintiffs' causes of action in this Complaint.

171.    All the executives of UHC, OptumRx, Inc. and OptumInsight ultimately report to the executives, including the CEO, of UnitedHealth Group.

172.    UnitedHealth Group actively controls UHC, OptumInsight, and OptumRx's operations, management, and business decisions related to the at-issue formulary construction, negotiations, and mail-order pharmacy services.

173.    Among other indicia of control and interconnectivity, during the relevant time period, these parent and subsidiaries have had common officers and directors:

    (a)    Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

    (b)    Dan Schumacher is president of Optum, Inc, the Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and oversees OptumInsight;

    (c)    Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and also oversees the branding, marketing, and advertising for UnitedHealth Group and Optum, Inc.;

    (d)    Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

    (e)    Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and also Assistant Secretary at OptumRx, Inc.;

    (f)    Peter Gill is Vice President at UnitedHealth Group, Inc. and also Treasurer at OptumRx, Inc.;

(g)     John Santelli leads Optum Technology, the leading technology division of Optum serving the broad customer base of Optum and UnitedHealthcare and also serves as UnitedHealth Group's chief information officer;

(h)     Eric Murphy is the Chief Growth and Commercial Officer for Optum, Inc. and has also led OptumInsight;

(i)     Timothy Wicks, CFO and Executive Vice President of Industry and Network relations for OptumRx, Inc. also held "executive management positions" with UnitedHealth Group "including operations product management and business development roles at UnitedHealthcare, OptumInsight and most recently, Optum Shared Services."

174.    UnitedHealth Group also directly or indirectly owns all the stock of UHC, OptumRx, Inc. and OptumInsight.

175.    In addition, Opioid Manufacturers, including Purdue, expressly recognized that the UHG/Optum family operated as a single, unified enterprise that worked together to increase opioid utilization.

176.    For example, in 2003 a key executive in Purdue's role in creating opioid epidemic acknowledged ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████

177.    The Purdue executive further noted in this email that he had done some ██████████████████████████████████████████████████████████ ████████████████████████████████████

178.    Throughout the relevant time period, Purdue worked directly with OptumInsight, UHC, and OptumRx together to further their mutual goals of promoting opioid use for the treatment of chronic pain.

179.    One example occurred in ████████████ when UHC and OptumInsight met with Purdue to give a presentation on ████████████████████████████████████████ The

goal of this presentation was to ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████

180.    As a result of this meeting, in 2004 OptumInsight and Purdue ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████

181.    OptumInsight and Purdue ██████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

182.    The project, ████████████████████████████████████████████████
████████████████████████████████████████████████



183.    In addition to working together on joint opioid-chronic pain programs, another
example demonstrating that the UHG/Optum corporate family acts as a single, unified enterprise
is that ████████████████████████████████████████████████████████████



184.    Further evidence that the UHG/Optum operated as a unified enterprise is that in nearly all of its consulting and research efforts with the Opioid Manufacturers discussed below, OptumInsight utilized the ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████

185.    Finally, UHG's executives also have oversight of and direct involvement in the UHG enterprise-wide formulary construction—including for UHC and OptumRx formularies—and the utilization management criteria that governed these formularies.

**C.    Defendants' Mail Order Pharmacies Are Among the Largest in the Country and Dispensed Billions of MMEs of Opioids**

186.    Express Scripts and UHG/Optum also operate two of the largest pharmacies in the country that have purchased, dispensed and profited from the movement of the brand and generic opioids at issue in this litigation.

187.    As such, Express Scripts and UHG/Optum are part of the closed system and are required to comply with the provisions of the Controlled Substances Act ("CSA") and Vermont laws.

188.    Express Scripts' and UHG/Optum's obligations as registrants include the responsibility to maintain effective controls against diversion of opioids. 21 C.F.R. § 1301.71(a). This includes an obligation to use the information available to them, such as the vast amounts of prescription and prescriber data they maintained or could access, to prevent the diversion of opioids. Upon information and belief, Express Scripts and UHG/Optum failed to utilize this data to detect or guard against diversion, and otherwise failed to meet their CSA obligations.

189.    Express Scripts and UHG/Optum were also required to comply with Vermont's controlled substances law and pharmacy regulations. This includes, but is not limited to, ensuring that adequate safeguards were in place to dispense opioids in a safe and effective manner, providing effective controls and procedures to deter and detect theft and diversion, and complying with federal controlled substances laws, such as the requirement to maintain effective controls against diversion. Express Scripts and UHG/Optum failed to meet these obligations.

190.    Instead, during the 2006-2014 time period, Express Scripts and UHG/Optum pharmacies purchased more than 27 billion MMEs, spread over more than 1.4 billion dosage units according to the DEA's Automated Reports and Consolidated Ordering System ("ARCOS").



**National Mail Order MME by Manufacturer**
**ARCOS 2006-2014**

191.    The DEA ARCOS database reveals that over 49% of the 46+ billion MMEs moved through the PBM pharmacy or mail order channel were purchased by Express Scripts pharmacies. Specifically, during the 2006-2014 time-period, Express Scripts pharmacies bought over 22.9 billion MMEs spread over 1.1 billion opioid dosage units.

192.    Not surprisingly, given their lengthy collaboration with regard to OxyContin, over 26% of Express Scripts pharmacies' MME purchases were for Purdue opioids.

193.    23.63% of Express Scripts pharmacies' opioid purchases were for Teva opioids; 14.38% were for Mallinckrodt opioids; 8.34% were for Endo opioids; 4.78% were for Indivior opioids; and 4.59% were for Mylan opioids. Express Scripts pharmacies dispensed these opioid products by mail to patients nationwide, including in Vermont and the Towns of Bennington, Brattleboro and Sharon.

**Express Scripts Pharmacies MME by Manufacturer**
**ARCOS 2006-2014**



194.    The DEA ARCOS data also reveals that 9.6% of the 46+ billion mail order MMEs were purchased by UHG/Optum's pharmacies. Specifically, during the 2006-2014 time period, UHG/Optum pharmacies bought and sold over 4.5 billion MMEs spread over 252 million opioid dosage units.

195.    21.75% of UHG/Optum's pharmacy opioid purchases were for Mallinckrodt opioids; 17.27% were for Teva opioids; 15.76%  were for Purdue opioids; 11.83% were for Endo opioids; and 4.95% were Indivior opioids. UHG/Optum dispensed these opioid products by mail to patients nationwide, including in Vermont and the Towns of Bennington, Brattleboro and Sharon.



196. Express Scripts and UHG/Optum's pharmacies earn substantial profits from their purchase and dispensing of generic drugs, including the generic opioids at issue in this litigation. As a general proposition, drugs dispensed from mail order pharmacies account for a minority of Express Scripts and UHG/Optum's prescriptions but more than half of their per-prescription profits.

197. They earn these profits in assorted ways, including but not limited to manipulation of maximum allowable cost (MAC) pricing lists; spread pricing practices; repackaging; and negotiating discounts for generic purchases that are not shared with their customers.

**D.     Defendants Have Known That the Opioid Epidemic Was Occurring for Decades**

198. Express Scripts and UHG/Optum tracked the opioid epidemic, pill-by-pill, as it unfolded. They did so by employing advanced data analytics collected from hundreds of millions

of pharmacy claims. These data points provided details about nearly every point in the prescription drug distribution and payment chain.

199. Express Scripts and UHG/Optum have access to an extraordinary amount of data, including data showing: the volume, nature, dosage, and conditions for which health care providers are prescribing opioids to individual patients and on an aggregate basis; the volume of opioids obtained by individual patients and by geography (including signs of doctor- and pharmacy-shopping, early-refills, fatal and non-fatal overdoses, treatment for substance use disorders, co-prescribing with dangerous or commonly abused drugs, such as benzodiazepines or the "Holy Trinity"); the pharmacies at which opioids were dispensed and the volume of opioids dispensed by geographic area, among other data.

200. Express Scripts and UHG/Optum also track the number of opioids that move through their own mail order pharmacies.

201. Thus, Express Scripts and UHG/Optum can see detailed information on individual prescribers and pharmacies, but can also aggregate that data across manufacturers, patients, pharmacies, and payors. Their visibility is both uniquely granular and comprehensive.

202. As publicly explained by an Express Scripts' representative, "Because Express Scripts interacts with patients, pharmacies, prescribers, and payers, our company is uniquely situated to collect data when patients receive and fill a prescription for an opioid under pharmacy benefit."

203. Likewise, UHG/Optum has made similar public statements: "PBMs are uniquely positioned to connect and partner with physicians, pharmacists, patients, pharmaceutical manufacturers, health systems and other components of the industry . . .."

204. For the entire relevant time period, Express Scripts has had access to and analyzed opioid utilization data for its 100 million covered lives.

205.    One example of Express Scripts' nationwide data efforts is its 2014 "Nation in Pain Report," which reviewed 36 million pharmacy claims from 2009 to 2013 in demonstrating the widespread opioid epidemic. The Report concluded, among other things, that "Prescription rates for opioids increased dramatically in the past two decades . . ." and that "Opioid abuse is an epidemic in the U.S."

206.    Express Scripts acknowledged internally that ██████████████████████ ████████████████████████████ Yet—as discussed in detail below—for years after the 2014 study (and the 2016 CDC Guidelines), Express Scripts took no material steps to change its formularies to appropriately manage opioid usage.

207.    UHG/Optum also tracked the opioid prescriptions for tens of millions of their covered lives, including UHC covered lives, as well as for the prescriptions dispensed through their mail order pharmacies.

208.    UHG/Optum have had access to this data for its 66 million UHC and OptumRx covered lives for the duration of the relevant time period

209.    For example, in March 2017, a UHG/Optum executive gave a talk at ████████ ██████ titled ████████████████████████████████████████████ ████████████ (emphasis added).

210.    UHG/Optum used its own claims data ██████████████████ to show ██ ████████████████████████████████████████████████████████ ████████████████

211.    As a result of their data tracking and analyzing efforts, Defendants knew for decades—as early as 2000—that dangerous amounts of opioids were being dispensed in communities across the country.

212.     Defendants' access to this data allowed them to identify illegitimate and dangerous prescribing, dispensing, and use of opioids, as well as doctor-shopping, pharmacy-shopping, and other signs of misuse, abuse, and dangerous and illegitimate use.

213.     Rather than using this knowledge to benefit the health and safety of consumers, Defendants failed to take any actions to prevent diversion and other harm in Vermont and in the Towns of Bennington, Brattleboro and Sharon.

214.     Defendants could have used this data to prevent overutilization, abuse, and diversion of opioids in their mail order pharmacies and retail pharmacy network.

215.     But, instead of stemming the tide of opioids entering into communities across the country, Express Scripts and UHG/Optum opened the floodgates.

**E.     Defendants Ensured that Opioids Were Regularly Prescribed and Flooded the Market**

216.     Despite knowing for decades that dangerous amounts of opioids were being dispensed into communities throughout the country, throughout the relevant time period, Defendants granted the most dangerous opioids unrestricted, preferred formulary status because it was more profitable for them to do so.

217.     At all times relevant hereto, Defendants have had the ability to install safeguards on the number of opioid pills, refills, and daily MME readily available. Express Scripts and UHG/Optum were well aware of their influence over utilization as a result of benefit plan design, formulary placement, and drug utilization management.  They knew and understood that through their self-dealing, more addictive opioids—brand and generic—would enter the marketplace and more addicts would be created.

218.     Indeed, Express Scripts and UHG/Optum have expressly acknowledged that they are "uniquely positioned to help address the opioid epidemic."

219.    Yet, for over a decade they elected to construct standard formularies designed to maximize access to the most dangerous, addictive, overused and oversupplied drugs at issue in this national epidemic.

220.    For example, notwithstanding its express assurance to its customers that it "agrees to act as a fiduciary in good faith, with candor and due diligence in connection with the performance of [its PBM contract] and any negotiations related thereto," UHG/Optum proceeds to define its formulary as follows:

> "A list of prescription drugs administered by PBM that has been evaluated by the PBM for inclusion on its formulary ('Formulary') …. [T]he drugs included on the PBM's Formulary may be modified by PBM . . . from time-to-time as a result of factors *including, but not limited to*, medical appropriateness, *manufacturer rebate arrangements* and patent expirations." [emphasis added]

221.    Notably, UHG/Optum does not explain how "manufacturer rebate arrangements" impact its formulary design.  Nor does UHG/Optum explain its strategic partnership with Purdue and other opioid manufacturers designed to maximize opioid utilization and profits for all.

222.    Express Scripts likewise is paid by drug manufacturers based on formulary design:

> Express Scripts contracts for its own account with pharmaceutical manufacturers to obtain rebates attributable to the utilization of certain prescription products by individuals who receive benefits from clients for whom we provide PBM services. *Rebate amounts vary based on the volume of utilization as well as the benefit design and formulary position applicable to utilization of a product*. . . *Express Scripts also receives administrative fees* from pharmaceutical manufacturers participating in the rebate program discussed above. *The services provided to participating manufacturers include* making certain drug utilization data available, as allowed by law, for purposes of verifying and evaluating the rebate payments. The administrative fees paid to Express Scripts by manufacturers for participation in the rebate program do not exceed 3.5% of the AWP of the rebated products.

223.    It is notable that Express Scripts does not commit to share all of the rebates it receives from drug manufacturers with its clients, nor does it commit to share any of the administrative fees.  Nor does it explain all of the services for which it receives the administrative fees.  Nor does it explain how any of these payments actually influence its formulary design. Also noteworthy is that Express Scripts pegs its administrative fees to Average Wholesale Price (AWP), which is a reported price higher than any price an Express Scripts customer pays for any drug.

224.    Express Scripts' standard contract language contemplates that it will derive even further revenue from drug manufacturers in other vaguely described arrangements, none of which are shared with its customers:

> "[I]f any, ESI and ESI's wholly-owned subsidiaries derive margin from fees and revenue in one or more of the ways as further described [herein] ESI and ESI's wholly-owned subsidiaries act on their own behalf, and not for the benefit of or as agents for [its customers]. *ESI and ESI's wholly-owned subsidiaries retain all proprietary rights and beneficial interest in such fees and revenues* described in the Financial Disclosure and, accordingly, *[customer] acknowledges that neither it, any Member, nor the Plan, has a right to receive, or possesses any beneficial interest in, any such fees or revenues*"

225.    In addition, nowhere does any Express Scripts or UHG/Optum formulary advise that opioids are inappropriate for chronic pain treatment outside active cancer, end-of-life or palliative care. To the contrary, virtually every opioid analgesic on every formulary is available through Defendants' mail order pharmacy.

226.    For most of the relevant time period, despite numerous clients reaching out to Express Scripts to discuss concerns over abuse and diversion issues with OxyContin and despite Express Scripts knowing that OxyContin overutilization was creating a public health crisis, Express Scripts continued to grant Purdue's OxyContin unrestricted, preferred formulary status for nearly all of its standard formularies.

227.    ███████████████████████████████████████

████████████████████████████████████████████████

█████████

228.    Indeed, Express Scripts granted OxyContin preferred formulary status based on the amount of money Express Scripts received, rather than on the safety/efficacy of opioids. Representative examples:



229.    Likewise, for most of the relevant time period, UHG/Optum also granted OxyContin unrestricted, preferred formulary status for most of its standard formularies.

230.    In one case, UHG/Optum suggested that a member taking Butrans consider switching to a "lower cost alternative," such as OxyContin or extended-release morphine, according to a letter provided by the member. Mr. Wiggin, UHG/Optum representative, said the company's rules and preferred drug list "are designed to ensure members have access to drugs they

need for acute situations, such as post-surgical care or serious injury, or ongoing cancer treatment and end of life care, as well as for long-term use after alternatives are tried."

231.    In addition, UHC—relying on UHG/Optum as a PBM—placed morphine on its lowest-cost drug coverage tier with no prior permission required, while in many cases excluding Butrans. And it places Lyrica, a non-opioid, brand-name drug that treats nerve pain, on its most expensive tier, requiring patients to try other drugs first.

232.    As a direct result of the manner in which they constructed their formularies, for the majority of the relevant time period, Express Scripts was Purdue's top Oxycontin commercial account based on prescription numbers and sales. Indeed, for certain years in the relevant period, Express Scripts ███████████████████████████████████████ ████████████████████████

233.    OxyContin sales were so rampant at Express Scripts that in 2013 Express Scripts' executives acknowledged that Express Scripts was ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

234.    In an additional statement in 2013, Express Scripts further represented that ███████████████████████████████████████████████████ ███████████████████████████████████████████

235.    For its part, UHG/Optum's PBM work contributed to the fact that UHG/Optum's insurance arm, UHC, was the largest third-party OxyContin payer in the country for much of the relevant time period.

236.    In addition to brand name opioids, such as OxyContin, Defendants also granted unrestricted, tier one formulary status on nearly all of their formularies for generic opioids

throughout the relevant time period despite knowing that dangerous amounts of generic opioids were flooding into communities.

237.    Moreover, Defendants do not disclose to clients or the public the details of their agreements with the Opioid Manufacturers; nor do they disclose their rationale behind the manner in which they construct their formularies; nor do they disclose the details related to their agreements with payors and pharmacies.

238.    Defendants sign overly broad confidentiality agreements with any entity in the supply chain with whom they contracts.

239.    Defendants have gone as far as suing governmental entities to block the release of details on their agreements with manufacturers and pharmacies.

240.    The harm caused by Defendants is not just monetary: "The PBMs and insurers are harming the health of patients with chronic and rare diseases by limiting access and charging them retail for drugs they buy at deep discounts."[1]

241.    Defendants also fail to control quantities, or numbers of refills for highly addictive drugs and ignore or neglect their duties to ensure patient wellness.

242.    Defendants also provide discount drug cash cards so individuals can directly purchase medications without going through insurance companies. This allows individuals to fill multiple prescriptions while avoiding the oversight that insurance coverage brings, thus fueling the epidemic.

---

[1] Jonathan Wilcox, *PBMs Must Put Patients First*, HUFFINGTON POST, Feb. 28, 2017, https://www huffingtonpost.com /entry/pbms-must-put-patients-first_us_58b60bd8e4b02f3f81e44dcc

243.    Defendants allow this loophole because they are paid for every prescription filled in this manner. Defendants' cash cards have been described as a "back door to America's opioid epidemic."[2]

244.    For example, UHG/Optum's standing policy was not to place any restrictions on cash cards—despite its members' ability to purchase opioids unrestricted through these cards.

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████

245.    Upon information and belief, UHG/Optum did not put any limitations on the use of cash cards to purchase opioids until at least 2018.

246.    MedPageToday, a source for clinical and policy coverage that directly affects the lives and practices of health care professionals, describes Defendants' complicity in the opioid crisis this way:

> We live in a world where payers—not physicians—determine what drugs and treatments patients receive.  If patients have a life-threatening condition, it is not unusual for a payer to demand that a physician first prescribe a cheaper and less effective alternative. Physicians know that the drugs they are allowed to use may not work very well, but frequently, payers demand that they be tried first anyway.
>
> What happens if the patient doesn't respond to the cheap drug?  Often, the physician continues to prescribe it, because—to gain access to the more effective drug—physicians need to go through a painful process of preauthorization. For many practitioners, it isn't worth it.
>
> So we spend more for healthcare than any other country in the world, but Americans do not get the care they need. There is a simple reason.

---

[2] Kelly Ayotte, *Shut the back door to America's Opioid Epidemic*, The Hill (July 3, 2018), https://thehill.com/opinion/healthcare/395401-shut-the-back-door-to-americas-opioid-epidemic/.

> Treatment decisions are not being driven based on a physician's knowledge or judgment. They are being driven by what payers are willing to pay for.[3]

247.    Thus, people with chronic pain are at the mercy of Defendants, yet Defendants make it easier to get opioids than to get other pain medication that is less addictive, because opioids are generally cheaper than non-opioid alternatives and the Opioid Manufacturers have provided rich incentives, as described above. According to a study by the Vermont Times and ProPublica, of 35.7 million people on Medicare prescription drug plans, in the second quarter of 2017 only one-third of them had access to pain medication less addictive than opioids.

248.    Even when they were asked to limit accessibility to opioids, Defendants refused. The seeds of the opioid epidemic were sown with early over prescription of OxyContin. In 2001, officials in the West Virginia state employee health plan (PEIA) reached out to Purdue and Express Scripts (PEIA's PBM) and tried to get Purdue and Express Scripts to require prior authorizations to restrict the flow of OxyContin. PEIA explicitly informed Express Scripts that the "impetus for this program is the escalating use of OxyContin and other narcotics by citizens of West Virginia, as well as other states across the country."   Express Scripts and Purdue refused; using the financial quid pro quo exchanged between Purdue and Express Scripts to prevent insurers from limiting access to the drug. This practice was consistent nationwide. As explained in a national publication:

> The strategy to pay [Express Scripts] extended to other big pharmacy benefit managers and to many other states, according to a former Purdue official responsible for ensuring favorable treatment for OxyContin. The payments were in the form of "rebates" paid by Purdue to the companies. In return, the pharmacy benefit managers agreed to make the drug available without prior authorization and with low copayments.
>
> "That was a national contract," Bernadette Katsur, the former Purdue official, who negotiated contracts with pharmacy benefit managers, said in an interview. "We would negotiate a certain rebate percentage for keeping

---

[3] Milton Packer MD, *Are Payers the Leading Cause of Death in the United States?,* MEDPAGETODAY, Nov. 1, 2017, https://www.medpagetoday.com/blogs/revolutionandrevelation/68935

it on a certain tier related to copay or whether it has prior authorization. We like to keep prior authorization off of any drug."

249.     Another example of Defendants refusing to limit opioid accessibility occurred in 2003. One of Express Scripts' largest customers at that time was UHG/Optum's insurance arm, UHC.  In an in-person meeting, ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

250.     At the request of UHC, Purdue worked with OptumInsight and Express Scripts to ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████

251.     Based on the joint efforts of Purdue, Express Scripts, and OptumInsight—and despite expressly acknowledging that its failure to restrict the amount of OxyContin dispensed was leading to abuse and diversion—UHC subsequently doubled ████████████████████████

████████████████████████████████████

252.     Even when Defendants finally began putting formulary restrictions on brand name opioids, they still failed to place any restrictions on generic opioids, even though the PBMs knew that by the mid to late 2010s (because of brand opioid patent loss), generics were being overutilized and abused throughout the country.

253.     Making matters worse, in addition to making it easy to obtain generic highly addictive opioids, PBMs make it **harder** to obtain **treatment**. A NY Times/ProPublica study found that insurers have erected more hurdles to approving addiction treatments than for the addictive substances themselves. Only after being subjected to mounting public pressure and congressional investigations did some insurers remove the barriers to addiction treatment.

254.    As one news outlet described it, "[o]ne overlooked culprit worsening the epidemic, however, comes straight from our health care system: pharmacy benefit managers, or PBMs. To improve their bottom line, they're blocking access to prescriptions that can help prevent overdoses."

255.    A 2008 study by the Mayo Clinic found that patients who were weaned off opioids and followed a non-drug treatment experienced less pain than when they were on opioids and had improved functioning. Some plans cover these costs but others do not.

256.    Express Scripts and UHG/Optum also market their ability to manage and oversee the quality of the retail pharmacies that are contracted to be in their network, which is evidence of their ability to foresee the damage that could be caused by retail pharmacies that did not act responsibly.

257.    At critical times, Express Scripts and UHG/Optum were—at best—asleep at the switch when it came to auditing pharmacies that were dispensing huge quantities of opioids. The fact that very few if any "pill-mill" pharmacies or over-prescribing physicians were reported by Express Scripts and UHG/Optum to the State Boards of Pharmacies or State Medical Boards is testament to Defendants' lack of oversight of opioids.

258.    In fact, UHG/Optum has recently been transparent with its knowledge that 45% of "first fill" opioid prescriptions nationwide are not in compliance with CDC guidelines.

259.    There have always been steps available for Express Scripts and UHG/Optum to reduce opioid misuse and encourage less addictive alternatives for pain treatment. They could have made it easier to access other non-addictive forms of pain relief. They could have required doctors to start treating pain first with non-opioid pain medications as recommended by the CDC and turn to opioids as a last resort. They could have covered alternative, non-medication treatments for pain. They could have made addiction treatment more accessible. They could have monitored

prescriptions. They could have forbidden 90-day supplies of opioids absent doctor's orders. They could have audited pharmacies. They could have required doctors and pharmacies in their networks to use PDMPs. They could have made their pricing more transparent so everyone could see if they were being improperly influenced by manufacturers to make choices for financial, not medical reasons.

260.    To make matters worse, Defendants expressly recognize that they have the ability to abate the opioid epidemic. UHG/Optum admits that PBMs are "uniquely positioned to help address the opioid epidemic." Express Scripts admits that "we have the ability to make a significant impact."

261.    Yet PBMs have not voluntarily done all they (easily) can to halt the improper dispensing of opioids and expand access to treatments for opioid overdose and addiction.

262.    Each of the PBM Defendants recently began offering opioid management programs for certain customers—programs for which they claimed (falsely) that when they were introduced that they were consistent with the March 2016 U.S. Centers for Disease Control and Prevention, CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016, 65 Morbidity and Mortality Weekly Report 1 (2016) ("CDC Guideline").

263.    In truth, even these new opioid management programs did not apply across the board to all customers and still fell woefully short of the CDC Guidelines and all current medical literature regarding the highly dangerous properties of opioids when they were first introduced.

264.    None of the big three PBMs' new opioid management programs were consistent with the CDC Guideline when they were released—they still permitted the largely unchecked prescribing of opioids for chronic pain (the CDC says opioids are not proven effective for chronic pain); still provided seven-day quantity limits for acute pain (when the CDC says "three days or less will often be sufficient" and the PBMs themselves acknowledge that "a few days" can make a

difference in whether one becomes addicted); still permitted opioid prescriptions to be delivered through mail-order pharmacies for conditions outside of active cancer, end-of-life or palliative care (which typically supply maintenance drugs for chronic conditions; it is well-established that except for active cancer, end-of-life or palliative care, opioids should not be dispensed for chronic pain); did not adhere to CDC MME/day recommendations; did not cover high dosage nonopioid alternatives; did not require step therapies; and did not require prior authorizations for the most commonly prescribed immediate-release opioids.

265.    At the same time, even when their new OM programs were launched, the PBMs continued to impose unnecessary restrictions on access to treatments for opioid overdose and addiction.

266.    These failures and the delay in offering national programs to address the opioid epidemic have contributed mightily to the roots of the opioid epidemic and its ongoing impact today.

**F.    Defendants Have Admitted They Could Have Prevented the Opioid Epidemic**

267.    Express Scripts' and UHG/Optum's own documents confirm that had Defendants acted decades ago, when they first knew that opioids were being overutilized, over dispensed, and abused throughout the country they could have stopped the opioid epidemic.

268.    For example, UHG/Optum recently reported that after implementing appropriate formulary and utilization management measures to restrict opioids—that it should have implemented years ago—there was a 82% decrease in first fill opioid prescriptions that fell above the CDC recommended dosage; a 65% decrease in first-fill opioid prescriptions exceeding the 7 day maximum supply; a 68% decrease in prescriptions for chronic opioid utilizers that exceeded 90mg Morphine Equivalent Dosing per day; and a 14% reduction in average doses among all opioid prescriptions.

269.    Likewise, Express Scripts recently reported that after implementing appropriate formulary and utilization management measures to restrict opioids—that it should have implemented years ago—Express Scripts observed a 38% reduction in hospitalizations and 40% reduction in emergency room visits, a 19% decrease in the days' supply of opioids dispensed; 93% of patients prescribed an opioid for the first time started with a 7-day supply or less; 77% of patients prescribed a long-acting opioid therapy were redirected to a safer, short-acting medication; and the average day's supply per claim for first time opioid users dropped 55% from 18.6 days to 8.3 days.

270.    Had Defendants taken these steps when they first knew the opioid epidemic was unfolding—as early as 2000— Express Scripts and UHG/Optum could have prevented the public health crisis with which this country is now dealing.

### G.    PBM Defendants Conspired Directly with the Opioid Manufacturers

271.    Express Scripts and UHG/Optum further helped create and exacerbate the opioid epidemic by providing consulting, marketing, and research strategies and tactics to the Opioid Manufacturers to help reconfigure the narrative about the addictive nature of opioids and what constitutes "appropriate" use for these dangerous drugs—i.e., the precise activities that have resulted in civil—and at times criminal—liability for the Opioid Manufacturers (*see supra* ¶ 40).

#### 1.    Express Scripts partnered with Purdue to Increase OxyContin Utilization

272.    Express Scripts partnered with Purdue for numerous joint efforts throughout the relevant time period to increase OxyContin sales.

273.    For example, in the late 1990s, Purdue and Express Scripts 

Following these efforts, the sales for OxyContin increased, while those for the competing product declined.

274.    Starting in the early 2000s and continuing for at least a decade, Express Scripts and

Purdue ████████████████████████████████████████████████████████

████████████████████████████████████████████

275.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

276.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

277.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████

278.    In addition, starting in the 1990s and continuing for decades, Express Scripts also

worked as ████████████████████████████████████████████████

████████████████████████

279.    The parameters for this program created by Purdue and Express Scripts ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

280. The ▮▮▮ program raised numerous red flags, including dispensing large amounts of opioid to individuals, failing to conduct proper due diligence on patients, inappropriately recording deaths, and rerouting prescriptions to get around state laws.

281. ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████

282. In 2012, Express Scripts agreed to pay the federal government millions of dollars to settle a case following a DEA inspection which revealed that prescription drugs were diverted into illicit channels at several Express Scripts' mail order facilities.  The DEA determined that the diversions were caused by Express Scripts employee thefts, inventory discrepancies, Express Scripts' employees generating invalid DEA registration numbers, and Express Scripts failing to report to the DEA losses that occurred during the mail order process.

283. Express Scripts also worked directly with Purdue and the other Opioid Manufacturers in a research and consulting capacity.

284. In the late 1990s and early 2000s, Purdue executives sought out Express Scripts and Medco because ████████████████████████████████

████████████████████████████████

285. In August of 2000, ████████████████████████

██████████████████████████████████

██████████████████████████████████



286. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

287.    In the early 2000s, Express Scripts provided ███████████████

████████████████████████████████████████████

████████████████████

288.    During this same time—and continuing on for decades into at least the mid-2000s,

Express Scripts repeatedly provided to and received from Purdue ███████████████████

████████████████████████████

289.    Both Purdue and Express Scripts used this information to increase utilization of and

profits generated from Purdue's opioids.

### 2.    UHG/Optum Corporate Family Also Partnered with Purdue and Other Opioid Manufacturers to Increase Opioid Utilization

290.    The UHG/Optum corporate family also conspired directly with the Opioid

Manufacturers, including Purdue, to increase opioid utilization

#### a.    UHG/Optum and Purdue

291.    From early on Purdue's internal marketing plans focused on partnering with

UHG/Optum because ████████████████████████████████████████

292.    Starting in at least the 1990s and continuing for decades, UHG/Optum provided

Purdue research and evidence to support its efforts to expand the opioid market into and to promote

the benefits of opioid use to treat chronic pain, low back pain, and osteoarthritis. Examples include:



293.    During these same years, OptumInsight, Purdue, and UHC also developed a series

294.    As part of these efforts UHG/Optum worked with long-time Purdue co-conspirator

295.

296.    Part of this effort included UHC accepting a $250,000 payment from Purdue in 2002 for █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████

297.    In May of 2007, the Purdue Frederick Company—the parent of Purdue Pharma, L.P.—pled guilty in the Western District of Virginia to charges related to the misbranding of OxyContin. At that time, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS"). Pursuant to the agreement, for a period of five years, ending in 2012, Purdue was obligated to retain an Independent Monitor and submit yearly compliance reports concerning its marketing and sales practices and training of sales representatives with regard to their interactions with health care providers.

298.    In 2010, as Purdue's Corporate Integrity Agreement was near its end, OptumInsight's work with Purdue ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████

299.    From 2010 to at least 2015, UHG/Optum ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████

300.    The goal of these joint efforts was to: ███████████████████████████

████████████████████████████████████████████████████████████████████

58



301.    These efforts involved multiple stages over the course of five years including:

302.    This multiyear effort—continuing until at least 2015—involved UHG/Optum creating

303.    In other words, OptumInsight generated aspirational/marketing statements first—such as "OxyContin is effective for moderate chronic pain"—and then created a plan to retroactively generate evidence to support these statements.

304.    As a direct result of UHG/Optum and Express Scripts' collaborative efforts with Purdue, OxyContin sales skyrocketed in the early years, jumpstarting the entire opioid epidemic.

305.    The OxyContin market grew from $48 million in 1996 to over $1 billion in the early 2000s. The high availability of OxyContin created by Defendants and Purdue correlated directly with increased abuse, diversion, and addiction, and by 2004 OxyContin had become a leading drug of abuse in the United States.

306.    In sum, for over a decade UHG/Optum partnered directly with Purdue to:

        (a)    Overstate the benefits of opioids for chronic pain;

        (b)    Downplay the risks of addiction;

    (c)     Promote the concept of "pseudoaddiction"

    (d)     Claim that opioid dependence and withdrawal are easily managed;

    (e)     Deny the risks of higher opioid dosages; and

    (f)     Exaggerate the effectiveness of "abuse-deterrent" opioid formulations in preventing abuse.

### b.    UHG/Optum Also Conspired with the Other Opioid Manufacturers

307.    UHG/Optum's Opioid Manufacturer support was not limited to Purdue. It also provided data and research to Indivior, Endo, Teva, and J&J/Janssen to expand their efforts to increase opioid utilization for chronic, non-cancer pain. For example:

    (a)     From 2007 through at least 2014, UHG/Optum provided data and research to



308.    As a result of these joint efforts between Express Scripts, UHG/Optum, and the Opioid Manufacturers, opioid utilization exploded from the late 1990s until at least 2015.

### H.    Despite Conspiring with Purdue for the Conduct That Gave Rise to the Opioid Epidemic, UHG/UHC Files a $9.8 Billion Claim in the Purdue Bankruptcy

309.    In September 2019, Purdue filed bankruptcy as a direct result of the thousands of lawsuits filed by local and state governments across the country alleging the company fueled the opioid crisis with deceptive marketing of OxyContin.

310.    Astonishingly, on July 30, 2020, UHC filed a proof of claim asking for $9.8 billion to be paid to UHC out of the Purdue bankruptcy *because it was allegedly a victim of the exact same conduct that UHC and its corporate family conspired with Purdue to set in motion*.

311.    In particular, UHC claimed it was harmed because "[P]urdue spent millions of dollars on promotional activities and materials that falsely den[ied] or trivializ[ed] the risks of opioid use while overstating the benefits of using opioids for chronic pain."

312.    UHC went on to detail its claim, swearing under oath that "[s]pecifically Purdue falsely and misleadingly" in marketing and promotional materials:

(a)     Overstated the benefits of opioids for chronic pain;

(b)     Downplayed the risks of addiction;

(c)     Created and promoted the concept of "pseudoaddiction" and advocated that the signs of addiction should be treated with more opioids;

(d)     Exaggerated the effectiveness of screening tools in preventing addiction;

(e)     Claimed that opioid dependence and withdrawal are easily managed;

(f)     Denied the risks of higher opioid dosages; and

(g)     Exaggerated the effectiveness of 'abuse-deterrent' opioid formulations in preventing abuse."

313.    Further, UHC admitted in its proof of claim that "[a]s a direct result of Purdue's conduct, Opioid addiction rates have skyrocketed over the past decades."

314.    UHC also stated that Purdue's above-described conduct violated (and UHC should be allowed to recover against it for) state consumer protection laws, unjust enrichment, breach of implied warranty, subrogation, federal RICO, public nuisance, negligence, common law fraud, and civil conspiracy.

315.    In other words, UHG/Optum has explicitly admitted that the exact conduct that it conspired with Purdue to undertake should give rise to liability.

316.     Shockingly, UHG/Optum's proof of claim also claimed that as a direct result of this conduct for which Purdue and UHG/Optum were mutually engaged, Purdue should pay UHG/Optum $10 billion dollars—money that could have and should have gone to the actual victims of the opioid epidemic.

## I.     Express Scripts and UHG/Optum Created a Public Health Crisis

317.     By conspiring with the Opioid Manufacturers, by facilitating and failing to address the overprescribing and overuse of opioids, by failing to address evidence of the overuse, abuse, and addiction to opioids, and by failing to prevent diversion in its mail-order dispensing and in its pharmacy networks, Defendants contributed to the oversupply of opioids in Vermont and Towns of Bennington, Brattleboro and Sharon and the resulting public nuisance.

318.     While UHG/Optum and Express Scripts have profited from the alarming rate of opioid use in the United States, communities across the country, especially those in lower-income areas, have suffered.

319.     According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that over 1,000,000 people died from an overdose involving opioids from 1999 until present. Based on the latest data, approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022.  Aggregate costs for prescription opioid overdose, abuse, and dependence were estimated at over $120 billion in 2022.

320.     The opioid epidemic has been devastating to Vermont communities, including Plaintiffs, and continues to worsen.  Opioid related overdose deaths have spiked in recent years in Vermont—increasing nearly 60% in the last three years and 70% in the year of 2021 alone.  As a result, Vermont spends nearly 25% more than the national average attempting to combat the opioid epidemic.

321.    While Defendants were reaping billions of dollars in profits from their wrongful conduct, Plaintiffs have been required to allocate substantial public monies and resources to combat the opioid crisis in Towns of Bennington, Brattleboro and Sharon and deal with its fallout.

322.    Plaintiffs have incurred and continues to incur substantial costs because of UHG/Optum's and Express Scripts' conduct as described herein, including, but not limited to, costs of increased services with respect to law enforcement and first responders, such as emergency medical services; city health facilities, including hospitals and clinics; detention centers and jails; courts, including drug courts; diversion programs; prevention and treatment centers; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention programs in schools; inmate services including housing, health and support staff; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs.

323.    Defendants must contribute to rectify the damage their intentional and purposeful conduct in the context of pharmacy benefit management has foreseeably caused Plaintiffs.

## V.    TOLLING OF THE STATUTE OF LIMITATIONS

324.    Defendants' conduct has continued from the 1990s through today and is still ongoing.  The continued tortious and unlawful conduct by Defendants causes a repeated or continuous injury.  The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The public nuisance remains unabated.

325.    In addition, Defendants are equitably estopped from relying upon a statute of limitations defense. In Vermont, the statute of limitations is tolled if, as occurred here, the

63

defendant fraudulently concealed the existence of the claim. Only when the plaintiff discovers or could have discovered the claim through reasonable diligence does the clock start again.

326.    Here, Defendants undertook efforts to purposefully conceal their unlawful conduct, by manipulating and distorting public information, knowledge, and facts; misrepresenting their role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing; failing to make public or otherwise produce nonpublic information, over which Defendants had exclusive possession, dominion, and control, that would have revealed the truth; and by deliberately and fraudulently concealing the truth.

327.    Defendants had in their possession and control information that the Opioid Manufacturer's opioids were addictive; data suggesting or proving that large amounts of opioids were being diverted from legitimate channels; and information that specific doctors and pharmacies were engaged in an illegal pattern of conduct.

328.    Defendants purposely concealed their wrongful conduct, including by assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse.  The Defendants were aware of the falsity of their misrepresentations because they were aware of their own history of conduct which included repeated breaches of such duties.

329.    Defendants fraudulently hid their relationships with the Opioid Manufacturers, making it impossible for the Towns of Bennington, Brattleboro and Sharon to discover Defendants' role in promoting opioids through reasonable diligence.

330.    The relationships between Defendants and the Opioid Manufacturers remain notoriously opaque even to the present day.

331.    Defendants have also concealed and prevented discovery of information that will confirm their identities and the extent of their wrongful and illegal activities.

332.     Because Defendants concealed the facts surrounding the opioid epidemic, the Towns of Bennington, Brattleboro and Sharon did not know of the existence or scope of the Defendants' misconduct and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

333.     Defendants intended that their false statements and omissions be relied upon.

334.     Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including the Towns of Bennington, Brattleboro and Sharon.

335.     Only Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid overutilization and diversion.

336.     Defendants cannot claim prejudice due to a late filing because this suit was filed upon discovering the facts essential to the claim. Indeed, the full existence, extent, and damage of the opioid crisis and those responsible, including Defendants, has yet to come to light and will only be fully understood after Plaintiffs have had an opportunity to obtain discovery.

## VI.      CAUSES OF ACTION

### COUNT I
### PUBLIC NUISANCE

337.     Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

338.     As set forth herein in detail, Defendants have engaged in intentional conduct, negligent conduct, and conduct that is unusually hazardous, abnormal, or out of place considering the surroundings. Defendants' conduct has adversely harmed the health, safety, peace, comfort, and convenience of the general community of the Towns of Bennington, Brattleboro and Sharon. The public nuisance complained of herein results predictably from the over-saturation and

unlawful availability of highly dangerous opioids in the Towns of Bennington, Brattleboro and Sharon as a result of Defendants' unreasonable, intentional, unlawful, abnormal, reckless and negligent conduct.

339.    Defendants knew that opioids were being dispensed into Vermont, including the Towns of Bennington, Brattleboro and Sharon and surrounding areas in dangerous amounts and were being overutilized, abused, and diverted into illicit drug markets.

340.    Defendants knowingly and intentionally designed benefit plans and standard national formularies that would maximize opioid utilization.

341.    Defendants knowingly, intentionally, recklessly and negligently failed to manage these plans to minimize the use and abuse of opioids.

342.    Defendants knowingly and intentionally chose to include opioids on their formularies that they knew were highly addictive and dangerous. Defendants did not install reasonable controls in the form of quantity limits, prior authorization requirements or MME daily limits.

343.    Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them).

344.    Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. To this date, dozens of non-narcotic pain treatments are not covered by Defendants' baseline national formularies. This led directly to the increased sale and use of opioids.

345.    Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

346.    To this date, Defendants chose not to cover or create barriers to accessing drugs typically used to treat Opioid Use Disorder ("OUD") such as naloxone, methadone, buprenorphine and naltrexone.

347.    At all relevant times, Defendants had the power to minimize the sale and use of less effective, more addictive and more divertible opioids. They could have installed preauthorization requirements for opioid prescriptions for chronic pain, when other non-opioid options were available. They could have responded favorably to direct requests from governmental payors attempting to control opioid flow and offer non-opioid options. They could have made it easier for patients to access less addictive, less dangerous drugs and treatment drugs. They could have monitored and modified patients' usage. They could have imposed stricter quantity limits or refill limitations or pre-authorization requirements.

348.    Defendants have also created and maintained a public nuisance by colluding with the Opioid Manufacturers to make opioids more available, by ignoring evidence of addiction and misuse found in their data, by failing to maintain effective controls against diversion, by expanding the opioid market relying on and disseminating false and misleading information regarding the efficacy of opioids for chronic pain and dangers (or lack thereof) of addiction, leading to an oversupply of opioids in the Towns of Bennington, Brattleboro and Sharon.

349.    Defendants have also created and maintained a public nuisance through their role as a dispenser of opioids in Vermont and the Towns of Bennington, Brattleboro and Sharon. Through this role Defendants' unlawful and unreasonable nuisance-creating conduct includes violating federal and Vermont statutes and regulations, including the controlled substances laws, by dispensing opioids without maintaining effective controls against diversion, including but not limited to failing to utilize their own data and the data available to them to detect or guard against diversion.

350.    At all times relevant to this Complaint, Defendants knew that increasing the availability of opioids would increase the number of opioids that would be abused, misused, and diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

351.    At all times relevant to this Complaint, Defendants knew that opioids were dangerous because these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

352.    Indeed, opioids are akin to medical grade heroin. Defendants' wrongful and unreasonable conduct of pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiffs—exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

353.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiffs described herein.

354.    Because of Defendants' actions to make opioids more available in the marketplace and Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

355.    Defendants' conduct was and continues to be a substantial factor causing the ongoing, persistent public nuisance described and the harm to Plaintiffs. Given their gatekeeper position in the prescription drug marketplace, the Defendants have always been, to quote their own words, "uniquely positioned to abate the opioid crisis."

356.    Defendants knew, or should have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has created an ongoing, persistent public nuisance that endangers the health and safety of the residents of and the Towns of Bennington, Brattleboro and Sharon and impacts negatively on Plaintiffs' ability to provide essential services.

357.    The public nuisance created by Defendants' intentional and persistent course of conduct has caused and continues to cause significant harm to Vermont and the Towns of Bennington, Brattleboro and Sharon that includes but is not limited to:

(a)    Responding to opioid-related drug overdoses and deaths;

(b)    Allocating resources for the disease of addiction and other diseases related to long-term opioid use;

(c)    Allocating resources for child abuse and neglect resulting from opioid abuse;

(d)    Allocating resources for crime associated with illegal drug use and opioid sales;

(e)    Addressing related blight, vagrancy, property damage, and property crime.

358.    Defendants' actions also foreseeably created a new secondary market for opioids—providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

359.    The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids caused by Defendants' misconduct has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of the Plaintiffs.

360.    The public nuisance created by the Defendants endangers the life, health and safety of the Towns of Bennington, Brattleboro and Sharon and surrounding areas.

361.    The public nuisance created by Defendants interferes with the reasonable and comfortable use of the Plaintiffs' property and resources.

362.    The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the community that includes but is not limited to:

      (a)    Opioid-related drug overdose deaths;

      (b)    The disease of opioid addiction and other diseases related to long-term opioid use;

      (c)    Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

      (d)    Increases in the need for foster care and adoption services for children whose families have been harmed by opioid addiction;

      (e)     Other child abuse and neglect resulting from opioid abuse;

      (f)    Crime associated with illegal drug use and opioid sales;

      (g)    Unemployment resulting from an inability to work while addicted to opioids;

      (h)    Blight, vagrancy, property damage, and property crime.

363.    Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which would otherwise be used to serve the public at large in the Towns of Bennington, Brattleboro and Sharon.

364.    Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in Defendants assisting the Opioid Manufacturers dissemination  of false "scientific" facts and advice in their pursuit of increased profits and the expense of communities and families nationwide. There is no legitimate societal interest in the

Defendants constructing formularies that ensure uncontrolled opioids and create barriers to treatment and less addictive pain alternatives.

365.    The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiffs and the harm inflicted outweighs any offsetting benefit.

366.    As a direct and proximate result of the public nuisance, the Towns of Bennington, Brattleboro and Sharon have sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of hospital services, healthcare, emergency medical services, social services, prevention, treatment, education, intervention and law enforcement and overhead expenses as set forth more fully herein. These damages constitute a unique harm to the Towns of Bennington, Brattleboro and Sharon, which harm can only be suffered by Plaintiffs and is different from the harm suffered by the citizens at large.

367.    The public nuisance – *i.e.* the opioid epidemic deliberately created, perpetuated and maintained by the Defendants can be abated and further recurrence of such harm can be abated.

368.    Defendants should be required to pay for the harm the Towns of Bennington, Brattleboro and Sharon have suffered and/or will suffer because of the public nuisance Defendants caused.

369.    Defendants' intentional and persistent course of deceptive and improper conduct, as alleged herein, has created an ongoing, conscious, and deliberate nuisance that is continuing and recurring to this day.

370.    Defendants' conscious and deliberate acts have caused long-lasting and permanent harm to Plaintiffs, as described herein in detail.

371.    Plaintiffs seek to abate the nuisance created by Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public**.**

372.    Therefore, Plaintiffs demand judgment in its favor against Defendants for injunctive relief, abatement of the public nuisance, and for damages in an amount to be determined by a jury, together with all costs of this action, including pre-judgment interest, post-judgment interest, costs and expenses, attorneys' fees and such other relief as this Court deems just and equitable.

## COUNT II
## PUBLIC NUISANCE
## VIOLATION OF 24 V.S.A. § 2121

373.    Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

374.    This action is brought by Plaintiffs pursuant to 24 V.S.A. § 2121 to abate the public nuisance created by Defendants, and to recover costs Plaintiffs have already incurred and future costs the Plaintiffs expect to incur in its provision of emergency services that are reasonably required to abate the public nuisance created by Defendants.

375.    As set forth herein in detail, Defendants have engaged in intentional conduct, negligent conduct, and conduct that is unusually hazardous, abnormal, or out of place considering the surroundings. Defendants' conduct has adversely harmed the health, safety, peace, comfort, and convenience of the general community of the Towns of Bennington, Brattleboro and Sharon. The public nuisance complained of herein results predictably from the over-saturation and unlawful availability of highly dangerous opioids in the Towns of Bennington, Brattleboro and Sharon as a result of Defendants' unreasonable, intentional, unlawful, abnormal, reckless and negligent conduct.

376.     Defendants knew that opioids were being dispensed into the Towns of Bennington, Brattleboro and Sharon and surrounding areas in dangerous amounts and were being overutilized, abused, and diverted into illicit drug markets.

377.     Defendants knowingly and intentionally designed benefit plans and standard national formularies that would maximize opioid utilization.

378.     Defendants knowingly, intentionally, recklessly and negligently failed to manage these plans to minimize the use and abuse of opioids.

379.     Defendants knowingly and intentionally chose to include opioids on their formularies that they knew were highly addictive and dangerous. Defendants did not install reasonable controls in the form of quantity limits, prior authorization requirements or MME daily limits.

380.     Defendants knowingly and intentionally chose to include opioids that were easier to misuse (for example, by crushing them into powder and mixing them with liquid in order to inject them).

381.     Defendants knowingly and intentionally made it more expensive or more difficult to obtain knowingly efficacious non-opioid medications for pain. To this date, dozens of non-narcotic pain treatments are not covered by Defendants' baseline national formularies. This led directly to the increased sale and use of opioids.

382.     Defendants knowingly and intentionally chose not to include certain medications that would prevent overdoses or made them more difficult or expensive to obtain.

383.     To this date, Defendants chose not to cover or create barriers to accessing drugs typically used to treat Opioid Use Disorder ("OUD") such as naloxone, methadone, buprenorphine and naltrexone.

384.    At all relevant times, Defendants had the power to minimize the sale and use of less effective, more addictive and more divertible opioids. They could have installed preauthorization requirements for opioid prescriptions for chronic pain, when other non-opioid options were available. They could have responded favorably to direct requests from governmental payors attempting to control opioid flow and offer non-opioid options. They could have made it easier for patients to access less addictive, less dangerous drugs and treatment drugs. They could have monitored and modified patients' usage. They could have imposed stricter quantity limits or refill limitations or pre-authorization requirements.

385.    Defendants have also created and maintained a public nuisance by colluding with the Opioid Manufacturers to make opioids more available, by ignoring evidence of addiction and misuse found in their data, by failing to maintain effective controls against diversion, by expanding the opioid market relying on and disseminating false and misleading information regarding the efficacy of opioids for chronic pain and dangers (or lack thereof) of addiction, leading to an oversupply of opioids in the Towns of Bennington, Brattleboro and Sharon.

386.    Defendants have also created and maintained a public nuisance through their role as a dispenser of opioids in Vermont and the Towns of Bennington, Brattleboro and Sharon. Through this role Defendants' unlawful and unreasonable nuisance-creating conduct includes violating federal and Vermont statutes and regulations, including the controlled substances laws, by dispensing opioids without maintaining effective controls against diversion, including but not limited to failing to utilize their own data and the data available to them to detect or guard against diversion.

387.    At all times relevant to this Complaint, Defendants knew that increasing the availability of opioids would increase the number of opioids that would be abused, misused, and

diverted into the illegal, secondary market and would be obtained by persons with criminal purposes

388.    At all times relevant to this Complaint, Defendants knew that opioids were dangerous because these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

389.    Indeed, opioids are akin to medical grade heroin. Defendants' wrongful and unreasonable conduct of pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiffs—exactly as would be expected when medical grade heroin in the form of prescription opioids flood the community and are diverted into an illegal, secondary market.

390.    It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiffs described herein.

391.    Because of Defendants' actions to make opioids more available in the marketplace and Defendants' special position within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

392.    Defendants' conduct was and continues to be a substantial factor causing the ongoing, persistent public nuisance described and the harm to the Towns of Bennington, Brattleboro and Sharon. Given their gatekeeper position in the prescription drug marketplace, Defendants have always been, to quote their own words, "uniquely positioned to abate the opioid crisis."

393.    Defendants knew, or should have known, that their intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that

their conduct has created an ongoing, persistent public nuisance that endangers the health and safety of the residents of and the Towns of Bennington, Brattleboro and Sharon and impacts negatively on Plaintiffs' ability to provide essential services.

394.    The public nuisance created by Defendants' intentional and persistent course of conduct has caused and continues to cause significant harm to Plaintiffs that includes but is not limited to:

(a)      Responding to opioid-related drug overdoses and deaths;

(b)      Allocating resources for the disease of addiction and other diseases related to long-term opioid use;

(c)      Allocating resources for child abuse and neglect resulting from opioid abuse;

(d)      Allocating resources for crime associated with illegal drug use and opioid sales;

(e)      Addressing related blight, vagrancy, property damage, and property crime.

395.    Defendants' actions also foreseeably created a new secondary market for opioids – providing both the supply of narcotics to sell and the demand of addicts to buy them. The result of Defendants' deceptive and improper conduct is not only an explosion of prescription opioids on the black market, but also—predictably—a marked increase in the availability of heroin and synthetic opioids.

396.    The diversion of opioids into the secondary, criminal market and the increase in the number of individuals who abuse or are addicted to opioids caused by Defendants' misconduct has placed unnecessary and excessive demands on the medical, public health, law enforcement, and financial resources of the Plaintiffs.

397.    The public nuisance created by the Defendants endangers the life, health and safety of the Towns of Bennington, Brattleboro and Sharon.

398. The public nuisance created by Defendants interferes with the reasonable and comfortable use of Plaintiffs' property and resources.

399. The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the community that includes but is not limited to:

      (a)     Opioid-related drug overdose deaths;

      (b)     The disease of opioid addiction and other diseases related to long-term opioid use;

      (c)     Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

      (d)     Increases in the need for foster care and adoption services for children whose families have been harmed by opioid addiction;

      (e)     Other child abuse and neglect resulting from opioid abuse;

      (f)     Crime associated with illegal drug use and opioid sales;

      (g)     Unemployment resulting from an inability to work while addicted to opioids;

      (h)     Blight, vagrancy, property damage, and property crime.

400. Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which would otherwise be used to serve the public at large in the Towns of Bennington, Brattleboro and Sharon.

401. Defendants' nuisance-causing activities are not outweighed by the utility of Defendants' behavior. In fact, their behavior is illegal and has no social utility whatsoever. There is no legitimate societal interest in Defendants assisting the Opioid Manufacturers dissemination of false "scientific" facts and advice in their pursuit of increased profits and the expense of communities and families nationwide. There is no legitimate societal interest in the Defendants constructing formularies that ensure uncontrolled opioids, and create barriers to treatment and less addictive pain alternatives.

402.    The public nuisance created by Defendants' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiffs and the harm inflicted outweighs any offsetting benefit.

403.    As a direct and proximate result of the public nuisance, the Towns of Bennington, Brattleboro and Sharon has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of hospital services, healthcare, emergency medical services, social services, prevention, treatment, education, intervention and law enforcement and overhead expenses as set forth more fully herein. These damages constitute a unique harm to Plaintiffs, which harm can only be suffered by Plaintiffs and is different from the harm suffered by the citizens at large.

404.    The public nuisance—*i.e.* the opioid epidemic deliberately created, perpetuated and maintained by the Defendants can be abated and further recurrence of such harm can be abated.

405.    Defendants should be required to pay for the harm Plaintiffs have suffered and/or will suffer because of the public nuisance Defendants caused.

406.    Defendants' intentional and persistent course of deceptive and improper conduct, as alleged herein, has created an ongoing, conscious, and deliberate nuisance that is continuing and recurring to this day.

407.    Defendants' conscious and deliberate acts have caused long-lasting and permanent harm to Plaintiffs, as described herein in detail.

408.    Plaintiffs seek to abate the nuisance created by Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

409. As a direct and proximate result of the public nuisance, the Towns of Bennington, Brattleboro and Sharon have sustained (and continue to sustain) harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendants' nuisance-causing activity, including, but not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of the Towns of Bennington, Brattleboro and Sharon's limited and diverted resources as set forth more fully above.

410. Therefore, Plaintiffs demand judgment in its favor against Defendants for injunctive relief, abatement of the public nuisance, and for damages in an amount to be determined by a jury, together with all costs of this action, including pre-judgment interest, post-judgment interest, costs and expenses, attorneys' fees and such other relief as this Court deems just and equitable.

## COUNT III
## NEGLIGENCE PER SE

411. Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

412. As set forth herein, Defendants failed to perform their voluntarily undertaken statutory and regulatory obligations under the federal and Vermont laws, which were enacted to promote safety and to prevent exactly the type of harm that occurred as a result of Defendants' failures.

413. Defendants failed to maintain effective controls against oversupply and diversion as required under 21 C.F.R. § 1301.74(b).

414. Defendants failed to report suspicious orders to law enforcement and perform due diligence prior to filling orders.

415.     Defendants failed to design and operate a reliable system to identify suspicious orders of controlled substances.

416.     Together, these requirements were intended to prevent opioid misuse, oversupply and diversion.

417.     Defendants also failed to perform their statutory and regulatory obligations under 20–4 Vt. Code R.§ 1400:17.1 *et seq.*; 20–4 Vt. Code R. § 1400:10.1 *et seq.*; and 26 V.S.A. § 2068 *et seq.*, which were enacted to promote public health and safety and prevent the type of harm resulting from Defendants' failures.

418.     The Defendants failed to maintain effective controls against diversion, failed to report suspicious orders to law enforcement and perform due diligence prior to filling orders, and failed to design and operate a system to disclose suspicious orders of controlled substances, as required by Vermont law and the CSA. As a result, excess opioids were shipped into the Towns of Bennington, Brattleboro and Sharon and diverted into the black market, causing the Towns of Bennington, Brattleboro and Sharon to incur substantial costs.

419.     Defendants' failure to comply with these requirements caused precisely the type of harm that the requirements were intended to prevent.

420.     As a proximate result of these failures, pills flooded the system causing substantial socio-economic harm to the Towns as described herein. These costs include, but are not limited to, increased law enforcement, medical, fire, prevention, treatment, social services, and court services, lost tax revenues, and lost communal benefits of the Towns' limited and diverted resources.

421.     These injuries are a direct and proximate result of Defendants' conduct, and Plaintiffs should be awarded civil penalties pursuant to the CSA and 20–4 Vt. Code R.§ 1400:17.1 *et seq.,* and 26 V.S.A. § 2068 *et seq.*, and all other damages and relief available under the law.

## COUNT IV
## NEGLIGENCE

422.    Plaintiffs re-allege and incorporate by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

423.    Defendants have a duty to Plaintiffs to employ a reasonable standard of care in their voluntary undertaking of services affected with a significant public interest, *to wit*, the sale, distribution, dispensing, reimbursement and promotion of what Defendants knew to be highly addictive, dangerous opioids. This includes a duty to not create a foreseeable risk of harm and a duty to use reasonable care in the services provided.

424.    Any reasonable person in the position of Defendants would recognize that a failure to perform the services competently and carefully would have catastrophic consequences. The nature of the services Defendants voluntarily undertook gives rise to a duty to use reasonable care.

425.    Societal expectations, including those of Plaintiffs, are that Defendants will perform the services they offer with reasonable care. For example, society expects that opioid manufacturers will not lie about the addictive properties and dangers of their products; society expects that distributors will abide their statutory obligations, reporting requirements, and professed commitment to public safety; society expects that Defendants will honor their public statements regarding commitment to public health, and will not conspire with Opioid Manufacturers or construct self-serving plans or formularies.

426.    Consistent with societal expectations, Plaintiffs also reasonably expected that the companies profiting from activity within the Towns of Bennington, Brattleboro and Sharon would conduct such activity with reasonable care and would abide their own repeated affirmations of commitment to public health and safety.

427.    Plaintiffs never could have foreseen the extraordinary wrongful conduct described herein or protected itself against the harm it has suffered and continues to suffer.

428.    Defendants breached this duty by failing to exercise reasonable care or skill with respect to their voluntary opioid-related conduct. Working in coordination with the Opioid Manufacturers, Defendants made highly addictive prescription opioids available to the marketplace with the knowledge that they were likely being used for non-medical purposes and/or posed an inherent danger especially to patients who were using opioids for chronic pain not associated with active cancer, end-of-life or palliative care. Defendants knew their breach would foreseeably cause harm to the Towns of Bennington, Brattleboro and Sharon and local governments nationwide.

429.    Defendants are and have always been uniquely positioned to abate the crisis they have created. Defendants had superior knowledge of the risks of opioids—which they did not disclose and affirmatively misrepresented. Defendants were in the best position to protect the Plaintiff towns from the foreseeable harm resulting from Defendants' misconduct, which Plaintiffs could never have anticipated.

430.    Defendants have always been fully aware of the roles played by the others in the opioid scheme described herein, and the inter-relationship of those roles. Defendant profited from the oversupply of opioids and the demand created for opioids as a result of the scheme alleged.

431.    Defendants were negligent in failing to abide their duties to conduct themselves with the requisite care and skill and faithfulness in the context of activities and services they voluntarily undertook.

432.    Defendants placed their profit motives above their legal duties and enabled, encouraged and caused the over-use and over-supply of opioids.

433.    Defendants are highly sophisticated and knowledgeable actors in the health care marketplace, well informed of the highly addictive nature of prescription opioids and likelihood of foreseeable harm to communities from prescription opioid addiction, oversupply, and diversion. Defendants breached their duties when they failed to act with reasonable care in their respective voluntarily assumed roles, roles which positioned each of them to help abate the opioid epidemic if they elected to use their power for good, instead of profit.

434.    A negligent and/or intentional violation of Defendants' duties poses distinctive and significant dangers to the Towns. Given the addictive and dangerous properties of opioids, the illegal opioid market, and criminal activities which the Towns of Bennington, Brattleboro and Sharon must now address were foreseeable consequences of Defendants' negligence.

435.    At all times, Defendants each had the ability and obligation to control the opioid access and utilization that led to this man-made epidemic.

436.    As a proximate result of their failures, Defendants have caused the Towns of Bennington, Brattleboro, and Sharon to incur excessive social and economic costs related to responding to the opioid crisis. These costs include but are not limited to, increased law enforcement, medical, fire, and court services, lost tax revenues, lost productivity, strains on social services and lost communal benefits of the Plaintiffs' limited and diverted resources.

437.    The injuries to Plaintiffs would not have happened in the ordinary course of events had Defendants exercise the degree of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the transaction of their business in the manufacture, marketing, sale and distribution of opioids.

438.    Plaintiffs are entitled to recover compensatory damages as a result of Defendants' negligence, in an amount to be determined at trial.

439. As a result of Defendants' intentional, willful, wanton and/or reckless conduct described herein, Plaintiffs are entitled to treble, punitive, exemplary and/or otherwise enhanced damages to the full extent available under state law, in an amount to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

440. Plaintiffs re-allege and incorporates by reference each of the allegations contained in the preceding Paragraphs of this Complaint as though fully alleged herein.

441. As an intended result of the intentional wrongful conduct as set forth in this Complaint, Defendants have profited and benefited from the opioid epidemic they caused.

442. Defendants were aware they were receiving this benefit.

443. Defendants' conduct was designed to bring about this benefit.

444. Defendants have been unjustly enriched in the form of profits because of their wrongful conduct.

445. As a matter of equity, Defendants should be required to disgorge their unjustly obtained proceeds and other monetary benefits, including income, salaries and bonuses resulting from their unlawful conduct and provide restitution to Plaintiffs.

## COUNT VI
## CIVIL CONSPIRACY

446. Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

447. Defendants acted in concert for the purpose of increasing the use of opioids and fraudulently selling and distributing as many opioids as possible, causing significant harm to the Towns of Bennington, Brattleboro and Sharon.

448. Defendants were aware of the tortious conduct and violations of law set forth herein being carried out by the Opioid Manufacturers. Defendants provided substantial assistance to the opioid manufacturers in the achievement of the violations of law described above.

449.    Defendants' acted in concert with the Opioid Manufacturers and violated Vermont law and the CSA by, *inter alia*:

>       (a)     fraudulently making false or misleading statements, falsely marketing opioids as safe for treatment of chronic pain; falsely representing that their opioids were less likely to be abused or were safer; suppressing evidence to the contrary, and improperly inducing physicians to prescribe opioids for chronic pain;
>
>       (b)     evading controls on opioid diversion, increasing opioid quotas; and
>
>       (c)     failing to design and operate a system to disclose suspicious orders of controlled substances, failing to provide and maintain appropriate inventory controls.

450.    Defendants and the Opioid Manufacturers also coordinated to ensure that the maximum number of opioids were prescribed and sold, and Defendants and Opioid Manufacturers got the maximum profit at the expense of patients.

451.    Each of the participants in the conspiracy received revenue, directly or indirectly, and/or otherwise benefitted from the scheme to promote opioids as safe and non-addictive.

452.    At all relevant times, each Defendant was a knowing and willing participant in the conspiracy, and reaped profits from the conspiracy in the form of rebates, chargebacks, kickbacks, administrative fees, and other financial incentives to promote opioids.

453.    All participants of the enterprise described herein were aware of Defendants' control over the activities of the conspiracy in promoting opioids for use in every situation in which a patient is in pain and selling a grossly excessive amount of opioids. Each part of the conspiracy benefited from the existence of the other parts.

454.    The persons engaged in the conspiracy are systematically linked through contractual relationships, financial ties, and continuing coordination of activities.

455.    Defendants' concerted actions caused excess opioids to enter the Towns of Bennington, Brattleboro and Sharon, which were diverted into the black market.

456.    The Towns of Bennington, Brattleboro and Sharon have been injured by reason of these violations in that it has incurred increased costs attempting to stop the flow of excess opioids into the Towns of Bennington, Brattleboro and Sharon and bearing the costs of clean up, including, but not limited to the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of Towns of Bennington, Brattleboro and Sharon's limited and diverted resources as set forth more fully above. The Towns of Bennington, Brattleboro and Sharon would not have incurred these costs had Defendants not conspired together. The injuries suffered by the Towns of Bennington, Brattleboro and Sharon were directly and proximately caused by Defendants' actions and inactions.

457.    Plaintiffs were directly and proximately harmed by the Defendants' civil conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Towns of Bennington, Brattleboro and Sharon prays that the Court enter judgement against the Defendants granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

(1)    Abatement of the nuisance;

(2)    Equitable and injunctive relief in the form of Court-enforced corrective action, programs, and communications;

(3)    Disgorgement of unjust profits;

(4)    Compensatory damages in an amount as determined at trial;

(5)    Punitive damages in the amount to be determined at trial;

(6)    Costs and expenses of suit;

(7)    Pre- and post-judgment interest; and

(8)     Such other and further relief as the Court deems just and proper.


THIS IS THE FIRST REQUEST FOR INJUNCTIVE RELIEF


Dated: January 24, 2023                    /s/ *Joanne M. Cicala*

                                           **THE CICALA LAW FIRM PLLC**
                                           Joanne M. Cicala
                                           Josh Wackerly
                                           R. Johan Conrod, Jr.
                                           Cristina Moreno
                                           Shelbi Flood
                                           101 College Street
                                           Dripping Springs, TX 78620
                                           joanne@cicalapllc.com
                                           johan@cicalapllc.com
                                           josh@cicalapllc.com
                                           cristina@cicalapllc.com
                                           shelbi@cicalapllc.com
                                           Tel.: (512) 275-6550
                                           Fax: (512) 858-1801

                                           **SANFORD HEISLER SHARP, LLP**
                                           Kevin Sharp
                                           Christine Dunn
                                           ksharp@sanfordheisler.com
                                           cdunn@sanfordheisler.com
                                           611 Commerce Street, Suite 3100
                                           Nashville, Tennessee 37203
                                           Tel: (615) 434-7000
                                           Fax: (615) 434-7020

                                           *Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2023, I electronically filed a version of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys of record at their e-mail addresses on file with the Court.

*/s/ Joanne Cicala*
Joanne Cicala