# **EXHIBIT B**

**THE STATE OF NEW HAMPSHIRE**

**MERRIMACK, SS.**                                                                 **SUPERIOR COURT**

State of New Hampshire

v.

Johnson & Johnson, et al.

Docket No. 217-2018-CV-00678

## ORDER

The Plaintiff has brought this action alleging claims for violation of the New Hampshire Consumer Protection Act ("CPA") and public nuisance arising out of the Defendants' alleged involvement in the opioid epidemic. Currently pending before the Court are the following motions: (1) the Plaintiff's Motion for Summary Judgment on a number of the Defendants' affirmative defenses; (2) the Plaintiff's Motion for Partial Summary Judgment on the Defendants' obligations under the Controlled Substances Act ("CSA"); (3) the Defendants' Motion for Summary Judgment on the Plaintiff's claim for public nuisance; and (4) the Defendants' motion requesting judicial notice of a number of documents filed in connection with their motion for summary judgment. The Court held a hearing on November 12, 2021. Upon consideration of the pleadings, arguments, and relevant law, the Court finds and rules as follows.

### Legal Standard

In deciding whether to grant summary judgment, the court considers the pleadings, affidavits, and other evidence, as well as all inferences properly drawn from

them, in the light most favorable to the non-moving party. See Amica Mut. Ins. Co. v. Mutrie, 167 N.H. 108, 111 (2014). In order to defeat summary judgment, the non-moving party "must put forth contradictory evidence under oath sufficient to indicate that a genuine issue of material fact exists." Brown v. Concord Grp. Ins. Co., 163 N.H. 522, 527 (2012). An issue of fact is "material" for purposes of summary judgment if it affects the outcome of the litigation under the applicable substantive law. Macie v. Helms, 156 N.H. 222, 224 (2007) (quoting VanDeMark v. McDonald's Corp., 153 N.H. 753, 756 (2006)). "If there is no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, the grant of summary judgment is proper." Town of Barrington v. Townsend, 164 N.H. 241, 244 (2012) (quoting Bates v. Vt. Mut. Ins. Co., 157 N.H. 391, 394 (2008)); see also RSA 491:8-a, III.

## Analysis

### I. The Plaintiff's Motion for Summary Judgment Re: Affirmative Defenses

In the most current iteration of its complaint, the Plaintiff alleges three claims: (1) unfair or deceptive practices in violation of New Hampshire's CPA; (2) unfair competition in violation of the CPA; and (3) public nuisance. The Plaintiff alleges that the Defendants caused and contributed to the opioid epidemic through deceptive marketing of their products, by failing to control the supply of their products, and shipping opioids into the state without an adequate system in place to detect and prevent diversion and to investigate, report, and refuse to fill suspicious orders. (Joint Statement of Material Facts (Doc. 196) ¶ 5.) In connection with its CPA claims, the Plaintiff seeks injunctive relief; an order directing restitution to consumers, the Plaintiff, and other payors of money spent on the Defendants' prescription opioids; civil penalties;

2

and legal costs and expenses. (Id. ¶ 8.) With respect to its public nuisance claim, the Plaintiff seeks an order "providing for abatement of the nuisance that [the Defendants] created or [were] a substantial factor in creating, and enjoining [the Defendants] from further conduct contributing to the nuisance." (Id. ¶ 10.)

In their Answer, the Defendants assert thirty-eight affirmative defenses. The Plaintiff now moves for summary judgment on thirteen of these affirmative defenses, which it has divided into two categories. First, the "fault-shifting" category includes: comparative or contributory fault (Twenty-Fourth Affirmative Defense); failure to mitigate damages (Twenty-Fifth Affirmative Defense); credit/offset (Twenty-Second Affirmative Defense); collateral source (Thirty-Second, Thirty-Third, and Thirty-Fourth Affirmative Defenses); and a catch-all defense asserting assumption of risk, informed consent, contributory or comparative negligence, contributory or comparative fault, and proportionate responsibility (Thirty-First Affirmative Defense). The second category consists of the following equitable defenses: laches (Fifth Affirmative Defense); waiver (Sixth Affirmative Defense); equity (Seventh Affirmative Defense); unclean hands (Ninth Affirmative Defense); estoppel (Tenth Affirmative Defense); and ratification (Fourteenth Affirmative Defense).

1. Fault-Shifting Defenses

As an initial matter, the Defendants argue that summary judgment is not an appropriate means of dismissing affirmative defenses. The Court disagrees. As the Plaintiff notes, the purpose of summary judgment is to "pierce the pleadings and asses the proof . . . in order to determine [whether] there is a genuine issue of material facts requiring a formal trial of the action." Community Oil Co. v. Welch, 105 N.H. 320, 321

3

(1964). "It is an excellent device to make possible the prompt disposition of controversies on their merits without a trial, if in essence there is no real dispute as to the salient facts or if only a question of law is involved." Omiya v. Castor, 130 N.H. 234, 237 (1987). Whether framed as a motion for summary judgment, a motion to strike, or a motion in limine, to the extent certain defenses are inapplicable as a matter of law, the Defendants should be precluded from raising them at trial.

With respect to the merits, the Plaintiff first argues that fault shifting is not available to the Defendants on the grounds that it is not seeking damages in this case, but rather equitable relief, civil penalties under the CPA, and abatement of the alleged public nuisance. The Defendants argue that New Hampshire has expanded its comparative fault statute to apply to all tort actions instead of only actions for negligence. Indeed, the New Hampshire Supreme Court has held that RSA 507:7-d "applies to all tort actions." Bohan v. Ritzo, 141 N.H. 210, 215 (1996). However, RSA 507:7-d states, in pertinent part, that "[c]ontributory fault shall not bar recovery in an action by any plaintiff or plaintiff's legal representative, *to recover damages in tort for death, personal injury or property damage*." (Emphasis added). The Defendants' reliance on Bohan is misplaced, as that case involved the application of RSA 507:7-d to a strict liability dog bite case; in other words, a tort action seeking compensatory damages.

"The United States Supreme Court and various federal courts have rejected the proposition that damages, which are compensatory in nature and payable to a private litigant, are congruent with civil penalties, which are punitive in nature and payable to a governmental entity." State v. Emeritus Corp., 466 S.W.3d 233, 247 (Tx. Ct. App.

4

2015); see also Gabelli v. SEC, 568 U.S. 442, 451–52 (2013) (finding civil penalties, "which go beyond compensation, are intended to punish, and label defendants wrongdoers"); Tull v. United States, 481 U.S. 412, 422 (1987) (finding civil penalties are "intended to punish culpable individuals," not "to extract compensation or restore the status quo"); United States v. Balistrieri, 981 F.2d 916, 936 (7th Cir. 1992) ("Civil penalties and punitive damages serve a common purpose: to punish wrongdoing.").

The Restatement section governing public nuisance also notes that "[t]here are numerous differences between an action for tort damages and an action for injunction or abatement, and precedents for the two are by no means interchangeable." Restatement (Second) of Torts § 821B, cmt. i. "[A]n award of damages is retroactive, applying to past conduct, while an injunction applies only to the future." Id. Moreover, "[t]o maintain a damage action for a public nuisance, one must have suffered damage different in kind from that suffered by the general public; this is not necessarily true in a suit for abatement or injunction." Id. The Plaintiff here is not seeking damages for past harm, but rather prospective abatement to address the ongoing effects of the opioid epidemic.

The Plaintiff also argues that fault is not an element of a public nuisance claim. Section 821B of the Restatement (Second) of Torts sets forth three circumstances in which a public nuisance may exist, only one of which asks "whether the conduct is proscribed by a statute, ordinance or administrative regulation." See City of Gary ex rel. King v. Smith & Wesson Corp., 801 N.E.2d 1222, 1233 (Ind. 2003) ("The Restatement . . . supports the view that neither real estate nor unlawful conduct is a requirement of a public nuisance claim."). The Plaintiff further maintains that government suits seeking

5

abatement of a public nuisance are not akin to claims for negligence, and are not subject to negligence defenses. "Unlike tort damages that compensate an injured party for past harm, abatement is equitable in nature and provides a prospective remedy that compensates a plaintiff for the costs of rectifying the nuisance." In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, 2019 WL 4194272, at *3 (N.D. Ohio Sept. 4, 2019). "[T]he fact that 'nuisance' is sometimes characterized as a variety of 'tort' does not change the fact that an equitable claim to abate a nuisance is not a tort claim seeking compensatory damages." Id.; see also People v. ConAgra Grocery Prods. Co., 227 Cal. Rptr. 3d 499, 569 (Cal. Ct. App. 2017) ("An abatement order is an equitable remedy, while damages are a legal remedy."). The Court is persuaded by the Plaintiff's position, and finds that the remedies it seeks are not subject to the Defendant's fault-shifting defenses.

The Plaintiff further argues that the state's decisions with respect to the opioid crisis are subject to discretionary function immunity, and thus cannot be subject to fault-shifting defenses. The New Hampshire Supreme Court has "recognized that certain essential, fundamental activities of government must remain immune from tort liability so that our government can govern." Everitt v. General Elec. Co., 156 N.H. 202, 210 (2007). "To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations." Id. at 210–11. Discretionary function immunity applies to "acts and omissions constituting (a) the exercise of a legislative or judicial function, and (b) the exercise of an executive or planning function involving the making of a basic

6

policy decision which is characterized by the exercise of a high degree of official judgment or discretion." Id. at 211.

The Defendants argue that discretionary function immunity is inapplicable here, as this action does not involve a tort claim against the state. In support, the Defendants cite to a decision in In re Opioid Litigation, No. 400000/2017, 2020 WL 1879004, at *1 (N.Y. Sup. Ct. April 13, 2020), for the proposition that discretionary function immunity does not apply "in a situation where the government is the plaintiff in a civil lawsuit and is not acting solely in its role as discretionary enforcer of the public interest." Id. at *3. However, that case is inapposite. There, the court specifically noted that "plaintiffs . . . are not seeking to restrain or abate the claimed nuisance. Rather, they seek to recover damages for the alleged harm resulting from the defendants' concerted efforts to market, promote, and sell prescription opioids." Id. "[I]t seems clear that where, as here, a governmental entity is seeking damages for injury to its interest in protecting public money expended for health insurance costs, it is not acting to enforce a public right or discharge a statutory duty; rather, it is acting essentially as a private party." Id. "And if a governmental entity institutes a suit for damages like a private litigant, it seems inequitable to the court to deny the defendant a defense or defenses which could be available against another plaintiff." Id.

Here, as noted above, the Plaintiff is not seeking damages like a private litigant, but is seeking to enforce the public interest through equitable relief and civil penalties. To the extent the Defendants seek to shift fault to the Plaintiff for its own alleged failings in connection with the opioid epidemic—such as delaying the implementation of a prescription drug monitoring program—these are the exact types of allegations to which

7

discretionary function immunity is intended to apply. The Court sees no reason why the state's role as plaintiff in this case would render it liable for policy decisions for which it would otherwise be immune.

Finally, the Plaintiff argues that credit/offset and other affirmative defenses related to collateral source payments are unavailable where damages will not be awarded. The Defendants object, arguing that the Plaintiff should be barred from a double recovery, as it has already joined settlements against numerous other parties in connection with the opioid epidemic. Specifically, the Defendants note that the Plaintiff joined a $21 billion settlement with a number of opioid distributors as well as a $573 million settlement with McKinsey & Company. (Defs.' Obj. Summ. J. (Doc. 195) at 10.)

"The pro tanto credit is premised and rooted in joint-and-several liability," and "[i]ts purpose is to prevent a plaintiff from recovering twice from the same assessment of liability." Nilsson v. Bierman, 150 N.H. 393, 398 (2003). Contrary to the Defendants' position, the Court finds the practice of reducing remedies based on a plaintiff's settlement with another party is limited to actions seeking compensatory damages. The collateral source rule also makes clear reference to traditional damages. "Under the collateral source rule if a plaintiff is compensated in whole or in part for his damages by some source independent of the tort-feasor he is still permitted to make full recovery against him." Moulton v. Groveton Papers Co., 114 N.H. 505, 509 (1974); see also Cyr v. J.I. Case Co., 139 N.H. 193, 195 (1994) (noting that collateral source rule "provides that an award of damages may not be reduced by the amount of benefits a plaintiff receives from a collateral source").

8

Because the Plaintiff is not seeking compensatory damages here, none of these principles apply. That being said, as an abatement remedy is equitable in nature, principles of equity require that the Defendants only bear responsibility for the abatement of harms that is has caused. How this will be calculated will depend on the evidence presented at trial. Nevertheless, because such a remedy does not constitute damages in the traditional sense, the Plaintiff's receipt of money from other settling parties does not implicate credit or offset principles. Further, as noted above, the purpose of a civil penalty is to have some deterrent effect on the offending conduct. A civil penalty would be stripped of its deterrent effect if it could be offset by amounts recovered in another action.

Accordingly, for the foregoing reasons, the Plaintiff's motion for summary judgment on the fault-shifting affirmative defenses is GRANTED.

2. Equitable Defenses

The Plaintiff argues that laches is inapplicable because the Defendants cannot establish that any relevant delay attributable to the state was unreasonable and prejudicial. It also argues that applying estoppel against the state is disfavored. Finally, the Plaintiff argues that the Defendants offer no support for a claim that the Plaintiff had an "actual intention to forego a known right," a requirement for waiver, Am. Ins. Co. v. Nationwide Mut. Ins. Co., 110 N.H. 192, 195 (1970), and that the Defendants "ha[ve] no basis to assert that ratification, unclean hands, or the general concept of 'equity' are applicable here." (Doc. 161 at 20.)

Despite making the foregoing blanket claims, the Plaintiff has failed to establish that it is entitled to summary judgment on the equitable defenses. The Plaintiff attempts

9

to place the burden on the Defendants by claiming that they cannot show pertinent evidence or support their claims, but it is the Plaintiff, as the party moving for summary judgment, that bears the burden of establishing the availability of the challenged affirmative defenses. However, the statement of material facts submitted in connection with the instant motion merely summarizes the complaint and lists the relevant affirmative defenses. (See Doc. 196.) While the Plaintiff argued at the hearing that it is incapable of proving a negative, the complete lack of material facts suggests that this matter is not appropriate for summary judgment. Moreover, as noted above, the Defendants should only pay for abatement directly attributable to their wrongdoing. Therefore, it is entitled to raise equitable defenses at trial.

Accordingly, consistent with the foregoing, the Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.

## II.     The Plaintiff's Motion for Partial Summary Judgment Re: the CSA

As an initial matter, although the parties submitted statements of material fact in connection with this motion, the Plaintiff made it abundantly clear at the hearing that none of the facts contained in the pleadings are relevant to the issues raised. Rather, Plaintiff maintained that the facts it put forth were merely facts it intends to prove at trial. The Plaintiff claims that it seeks a pure ruling of law for which no findings of fact are necessary. Therefore, the Court shall not address any of the facts set forth in the joint statement of material facts, many of which are disputed.

The Plaintiff moves for summary judgment seeking an order effectively defining the Defendants' obligations under the CSA. Specifically, the Plaintiff seeks an order confirming that (1) the Defendants had an obligation to use available data to ensure its

10

products were not being diverted for unlawful purposes; (2) the Defendants had an obligation to design and operate a suspicious order monitoring system, report suspicious orders to the DEA, and halt shipment of suspicious orders unless they first determined that the order was not likely to be diverted; and (3) failure to do the foregoing, if proven at trial, constitutes an unreasonable interference with the health, safety, peace, comfort or convenience of the general community for purposes of finding a public nuisance under New Hampshire law. (See Pl.'s Mot. Summ. J. (Doc. 168) at 20.) In support of its argument, the Plaintiff cites to several sections of the CSA and its implementing regulations. See, e.g., 21 U.S.C. § 823(a); 21 U.S.C. § 827(a)(3); 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1301.74(b).

In its memorandum, the Plaintiff argues that "[w]hile the parties may have factual disputes about whether [the Defendants'] controls to prevent diversion were effective, there can be no reasonable dispute that failing to implement effective controls against diversion is an unreasonable interference with the health, safety, peace, comfort or convenience of the general public under New Hampshire law." (Doc. 168 at 19–20.) At the hearing, the Plaintiff made clear that it is not seeking a ruling that a violation of the CSA constitutes a per se public nuisance; the Plaintiff acknowledged it must establish both that the Defendants violated the CSA and that there was a resulting interference with a public right. At present, the Plaintiff is solely seeking a ruling that, assuming it proves the foregoing at trial, the interference was unreasonable.

"Essential to a finding of either a public or a private nuisance is a determination that the interference complained of is substantial." Robie v. Lillis, 112 N.H. 492, 495 (1972). "Substantial harm is that in excess of the customary interferences a land user

11

suffers in an organized society. It denotes an appreciable and tangible interference with a property interest." Id. at 495–96. "This requirement of a finding of unreasonableness is the crux of the law of nuisance." Id. at 496. In short, an evaluation of Defendants' implementation of the CSA and its connection to New Hampshire's public nuisance law is a highly fact-specific inquiry that has not been adequately addressed by the instant pleadings. Finding that the Defendants' conduct has resulted in a substantial interference with a right common to the general public goes to the heart of the matter being litigated, and doing so based entirely on hypotheticals is not beneficial. The Court will not short circuit this complex case by making a ruling on the existence of an element of public nuisance without the benefit of all evidence actually presented at trial.

At the hearing, the Plaintiff argued that the Court need not grant its motion in its entirety. Instead, the Plaintiff proposed an order identifying and defining the relevant duties under the CSA. However, the Court is not inclined to do so. As above, the Court will not broadly define the scope of the relevant duties at this stage without the benefit of a fuller understanding of how the statutes and regulations fit into the broader scheme at issue. This is a matter best addressed after the parties have had a full opportunity to present all relevant evidence at trial.

Accordingly, for the foregoing reasons, Plaintiff's motion for partial summary judgment is DENIED.

## III. The Defendants' Motion for Summary Judgment on Public Nuisance

The Defendants move for summary judgment on the Plaintiff's claim for public nuisance, arguing that such a claim fails as a matter of law because: (1) the remedy sought by the Plaintiff, i.e., abatement, is unavailable; (2) common law public nuisance

12

claims are limited to unreasonable uses of real property or public spaces; and (3) the Plaintiff has presented no evidence that the Defendants have interfered with a public right.

With respect to their first argument, the Defendants maintain that a public nuisance under New Hampshire law is limited to abatement of conduct or behavior that constitutes a nuisance and does not authorize the government to seek funds to redress injuries that result from said nuisance. The Defendants thus argue that an abatement remedy in this case would be limited to stopping the conduct the Plaintiff identifies in the complaint: the deceptive marketing and selling of opioids. As the Defendants no longer engage in the sale or marketing of opioids, they maintain that no abatement can be had. See State v. Strickford, 70 N.H. 297, 297 (1900) ("A nuisance cannot be abated, with or without legal process, if it has been discontinued, and has not been renewed when proceedings are begun against it.").

The Plaintiff responds that public nuisance can be based on past conduct. The New Hampshire Supreme Court has adopted the definition of public nuisance set forth in the Restatement (Second) of Torts, which provides that a public nuisance "is an unreasonable interference with a right common to the general public." Robie v. Lillis, 112 N.H. 492, 495 (1972) (quoting Restatement (Second) of Torts § 821B(1)). "It is behavior which unreasonably interferes with the health, safety, peace, comfort or convenience of the general community." Id. Pursuant to the Restatement, one circumstance in which a public nuisance may exist is where the conduct "is of a continuing nature *or has produced a permanent or long-lasting effect*, and, as the actor

13

knows or has reason to know, has a significant effect on the public right." Restatement (Second) of Torts § 821B(2)(c) (emphasis added).

Here, it is clear that the effects of the opioid epidemic are ongoing. Whether and to what extent the Defendants' past conduct caused or contributed to the epidemic is a matter to be established at trial. However, to the extent the Plaintiff succeeds in proving that Defendants' advertising and sale of opioids within this state did cause or contribute to the epidemic, the plain language of the Restatement would justify an abatement remedy to address its ongoing effects.

The Defendants next argue that New Hampshire common law limits public nuisance liability to unreasonable uses of real property or public spaces. The Defendants maintain that *every* public nuisance case in this state has involved either private property or public ways. (See Doc. 176 at 11 (citing cases).) Therefore, because the Plaintiff's claim arises out of the marketing and sale of goods, the Defendants argue that no claim for public nuisance can lie.

The Defendants' argument was addressed by a previous order of this Court on a motion to dismiss in State v. Purdue Pharma, Inc., No. 217-2017-cv-402, 2018 WL 4566129, at *1 (N.H. Super. Ct. Sept. 18, 2018). In that case, the defendant similarly argued that a public nuisance cause of action must "arise from the active or passive use of real property, whereas the State challenges only manufacturing and marketing activity." Id. at *13. The Court rejected this argument, relying on the definition of "public nuisance" set forth in Robie, and noting that numerous jurisdictions that also rely on the Restatement "have expressly concluded that an action for public nuisance may lie even though neither the plaintiff nor the defendant acts in the exercise of private property

14

rights." Id.; see Restatement (Second) of Torts § 821B, comment h ("Unlike private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land."); City of Gary ex rel. King, 801 N.E.2d at 1233 ("The Restatement . . . supports the view that neither real estate nor unlawful conduct is a requirement of a public nuisance claim."). "As nuisances are of very various kinds, agreeing in nothing but the common character of being annoying and injurious to the community, it is obvious that the terms of the charge must be as various as the nuisances themselves." State v. Noyes, 30 N.H. 279, 295 (1855). Based on the foregoing, the Court finds that the Plaintiff's claim need not arise out of the use of real property or public spaces.

The Court is similarly unpersuaded by the Defendants' argument that there can be no public nuisance claim here because "[m]uch of the conduct referred to in the reports of the State's experts occurred outside of New Hampshire altogether," such as "the production of raw materials in Tazmania, the activities of academics in Wisconsin, and lobbying activities in Washington, D.C." (Doc. 176 at 12.) As the Plaintiff argues, the public nuisance claim is based on an allegation that all of the foregoing efforts were part of an intentional national campaign to increase sales in all jurisdictions, including New Hampshire. Therefore, while certain activities occurred elsewhere, the effects of those activities have been felt here.

Finally, the Defendants argue that the Plaintiff has no evidence of any interference with a public right. Specifically, the Defendants argue that the Plaintiff's case consists merely of aggregated private injuries. In support of their argument, the Defendants at the hearing relied on a recent decision of the Oklahoma Supreme Court in State ex rel. Hunter v. Johnson & Johnson, No. 118,474, 2021 WL 5191372 (Okla.

15

Nov. 9, 2021). In that case, the State of Oklahoma went to trial on a single claim of public nuisance, after which the district court entered a judgment of $465 million. Id. at *2. On appeal, the supreme court reversed the judgment, finding that the conduct of which Johnson & Johnson was accused did not constitute a public nuisance. Id. at *6–7.

The court observed that "[a] public nuisance involves a violation of a public right; a public right is more than an aggregate of private rights by a large number of injured people." Id. at *6. "Rather, a public right is a right to a public good, such as an indivisible resource shared by the public at large, like air, water, or public rights-of-way." Id. "The damages the State seeks are not for a communal injury but are instead more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventive treatment to certain, though numerous, individuals." Id. Ultimately, the court found the State failed to show a violation of a public right, "[a]nd as the manufacture and distribution of products rarely cause a violation of a public right, [it] refuse[d] to expand public nuisance to claims against a product manufacturer." Id. at *7.

This Court is not persuaded that the New Hampshire Supreme Court would follow in Oklahoma's footsteps. As established above, the New Hampshire Supreme Court follows the Restatement in defining and applying public nuisance. The Restatement recognizes that a significant interference with public health, safety, peace, comfort or convenience may constitute a public nuisance. Restatement (Second) of Torts § 821B(2)(a). The Restatement also notes that "[i]t is not . . . necessary that the entire community be affected by a public nuisance, so long as the nuisance . . . affects

16

the interests of the community at large." Restatement (Second) of Torts § 821B cmt. g. The Court previously relied on this same language when it denied a motion to dismiss in State v. Cardinal Health, Inc., No. 217-2019-CV-220 (Order, Kissinger, J.) (February 11, 2020). In that case, the Court found that "[i]f the Defendants knowingly facilitated State residents suffering from addition with access to opioid pharmaceuticals then they also 'significantly interfered' with the right to 'public health,' a traditionally recognized public right." Id. at 6. "Though a significant aggravation of the opioid epidemic may not directly affect all citizens, it heavily deteriorates the health and safety of the community." Id. at 7.

Other jurisdictions that have addressed similar issues are in accord. In the Ohio multi-district litigation, the court stated: "Defendants argue that the opioid crisis implicates private individual rights and not a public right to public health. This argument ignores the Restatement's express inclusion of 'significant interference with the public health' as one of the 'circumstances that may sustain a holding that an interference with a public right is unreasonable.'" In re Nat'l Prescription Opiate Litig., No. 1:17-md-2804, 2019 WL 4194272, at *2 n.3 (N.D. Ohio Sept. 4, 2019); see In re Opioid Litig., No. 400000/2017, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018) ("As for the manufacturer defendants' claim that the plaintiffs have failed to plead substantial interference with a public right, it suffices to note the defendants' failure to establish why public health is not a right common to the general public, nor why such continuing, deceptive conduct as alleged would not amount to interference; it can scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged to have

17

created or contributed to a crisis of epidemic proportions, has affected 'a considerable number of persons.'").

At the hearing, the Plaintiff argued that the impact of the opioid epidemic on the public includes not only addiction and death from the misuse of opiates, but additional burdens on hospitals, jails, schools, and the police. "Plaintiffs cite statistics showing an unprecedented opioid-related increase in, for example, opioid deaths over the last decade; overdose hospital admissions and emergency room visits; crisis center detoxifications; . . . hepatitis diagnoses . . . ; a growing need for foster care placements for children who lost parents to overdoses or incarceration; and increases in drug-related arrests and prosecutions." In re Nat'l Prescription Opiate Litig., 406 F. Supp. 3d 672, 674 (N.D. Ohio 2019) (citations omitted). "A factfinder could reasonably conclude that this evidence demonstrates an interference with public health and public safety rights." Id.

Based on the foregoing, the Court finds that the Plaintiff has articulated a viable claim for public nuisance under New Hampshire law. Accordingly, the Defendants' motion for summary judgment is DENIED.

## IV.  Request for Judicial Notice

In connection with their motion for summary judgment, the Defendants ask the Court to take judicial notice of the prescription drug labels for Duragesic, Nucynta, and Nucynta ER as approved by the Federal Drug Administration. (See Doc. 179, Exs. A, B, C.) "A court may take judicial notice of a fact." N.H. R. Evid. 201(a). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of

accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Id.

In light of the Court's ruling on the Defendants' motion for summary judgment, the Court DEFERS taking judicial notice of the foregoing drug labels until trial. At this stage of the proceedings, it is unclear what relevance these documents have to the case.

SO ORDERED.

Date 1/6/2022

John C. Kissinger, Jr
Presiding Justice

Clerk's Notice of Decision
Document Sent to Parties
on 01/06/2022