# EXHIBIT A

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3                      – – –

4      _____
                                    :
5   IN RE: NATIONAL PRESCRIPTION : MDL No. 2804
    OPIATE LITIGATION             :
6                                 : Case No. 17-md-2804
    THIS DOCUMENT RELATES TO:     :
7   "Case Track Seven"            : Judge Dan Aaron Polster
                                  :
8      _____:

9              Monday, January 9, 2023

10              HIGHLY CONFIDENTIAL
        SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

12

13           Remote deposition of PATRICK J. MARSHALEK,

14   M.D., commencing at 10:03 a.m., on the above date,

15   before Carol A. Kirk, Registered Merit Reporter,

16   Certified Shorthand Reporter, and Notary Public.

17

18

19

20

21

22            GOLKOW LITIGATION SERVICES
        877.370.3377 ph | 917.591.5672 fax
23               Deps@golkow.com

24

```
 1          R E M O T E   A P P E A R A N C E S

 2                        - - -

 3    On behalf of the Plaintiffs:

 4          LIEFF CABRASER HEIMANN & BERNSTEIN
            BY:  MARK P. CHALOS, ESQUIRE
 5               mchalos@lchb.com
            222 2nd Avenue South, Suite 1640
 6          Nashville, Tennessee  37201
            615-313-9000
 7
            LIEFF CABRASER HEIMANN & BERNSTEIN
 8          BY:  MIRIAM E. MARKS, ESQUIRE
                 mmarks@lchb.com
 9          275 Battery Street, Suite 2900
            San Francisco, California  94111
10          415-956-1000

11

12    On behalf of Defendant The Kroger Company:

13          BOWLES RICE LLP
            BY:  MICHAEL C. CARDI, ESQUIRE
14               mcardi@bowlesrice.com
            125 Granville Square, Suite 400
15          Morgantown, West Virginia  26501
            304-285-2561
16
            BOWLES RICE LLP
17          BY:  FAZAL A. SHERE, ESQUIRE
                 fshere@bowlesrice.com
18          600 Quarrier Street
            Charleston, West Virginia  25301
19          304-347-1100

20

21

22    ALSO PRESENT:

23          Jon Knowles, Trial Tech

24
```

1                    INDEX TO EXAMINATION

2    WITNESS                                    PAGE

3    PATRICK J. MARSHALEK, M.D.

4        CROSS-EXAMINATION BY MR. CHALOS            5

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1                    INDEX TO EXHIBITS

 2    MARSHALEK       DESCRIPTION                       PAGE

 3    Exhibit 1       Report and Opinions of             50
                      Patrick J. Marshalek, M.D.
 4
      Exhibit 2       Article titled "Testing the        65
 5                    Gateway Hypothesis"

 6    Exhibit 3       Article titled "Expanding          79
                      Access to OUD Treatment:  The
 7                    Role of Telehealth"

 8    Exhibit 4       PowerPoint, with "The Road Less    83
                      Traveled" as the first slide
 9
      Exhibit 5       Article titled "Pills to           87
10                    Powder:  A 17-Year Transition
                      From Prescription Opioids to
11                    Heroin Among US Adolescents
                      Followed Into Adulthood"
12
      Exhibit 6       Article titled "The Changing      101
13                    Face of Heroin Use in the
                      United States:  A Retrospective
14                    Analysis of the Past 50 Years"

15    Exhibit 7       Curriculum Vitae of Patrick J.    130
                      Marshalek, M.D.
16
      Exhibit 8       Article titled "Responding to     151
17                    the opioid crisis in North
                      America and beyond:
18                    Recommendations of the
                      Stanford-Lancet Commission
19
      Exhibit 9       Article titled "Bringing          161
20                    Science to Bear on Opioids"

21    Exhibit 10      Three invoices for Patrick        179
                      Marshalek in the amount of
22                    $13,200.00 each

23

24
```

```
 1                    - - -

 2              P R O C E E D I N G S

 3                    - - -

 4          PATRICK J. MARSHALEK, M.D.

 5   being by me first duly sworn, as hereinafter

 6   certified, deposes and says as follows:

 7                CROSS-EXAMINATION

 8   BY MR. CHALOS:

 9          Q.    Okay.  Thanks, Doctor, for being

10   here today.

11                My name is Mark Chalos.  I'll be

12   asking you questions.

13                Your name is pronounced Marshalek?

14          A.    Marshalek.

15          Q.    Marshalek.  Okay.  I will try to

16   remember that.

17                So you are here today to testify

18   on behalf of Kroger.

19                Is that your understanding?

20          A.    Yes.

21          Q.    You've spent a significant part of

22   your professional life treating or otherwise

23   dealing with issues around opioid addiction; is

24   that right?
```

```
 1        A.    Yes.

 2        Q.    Were you born and raised in

 3   West Virginia?

 4        A.    Yes.

 5        Q.    What year were you born?

 6        A.    1978.

 7        Q.    Okay.  So during -- you were

 8   licensed to practice medicine in 2007?

 9        A.    Yes.

10        Q.    Okay.  Were you born in

11   Morgantown?

12        A.    Yes.

13        Q.    Have you spent your entire adult

14   life in Morgantown?

15        A.    For the most part.

16        Q.    Have you lived anywhere else?

17        A.    Not -- no permanent residence

18   anywhere else.

19        Q.    Okay.  Were there times that you

20   lived somewhere else?

21        A.    I lived in Portland, Oregon

22   briefly when I was in the process of

23   transitioning jobs.

24        Q.    When was that?
```

1          A.     That was February -- February of

2   last year till April of last year.

3          Q.     Were you working in Portland?

4          A.     Yeah.  Yes, I took a job there.

5          Q.     What was your job in Portland?

6          A.     I accepted a position as senior

7   medical director for Cascadia Healthcare.

8          Q.     And you did that job for four

9   months?

10          A.     I think.  Roughly.

11          Q.     And then you left that job?

12          A.     Yes.

13          Q.     Why did you leave?

14          A.     The job and relocation, for family

15   reasons and other reasons, didn't work out.

16          Q.     Okay.  What were the other reasons

17   other than family?

18          A.     It's complicated.

19          Q.     Yeah, I certainly understand that.

20                 Can you tell us about that?  What

21   was complicated about it?

22          A.     Just relocation in general.

23          Q.     Okay.  Did you have the option to

24   continue working at Cascadia Behavioral

```
 1    Healthcare if you wanted to?

 2          A.    Yes.

 3          Q.    So it was your decision to leave

 4    there?

 5          A.    Yes.

 6          Q.    Why did you take the job with

 7    Cascadia?

 8          A.    I was at a point in my career

 9    where I was ready -- ready for a change.  I felt

10    like I wanted to take some of what -- some of my

11    skillsets, what I learned here, practicing here,

12    and take them somewhere else, and, you know,

13    best case scenario, you know, lend my expertise

14    and also learn, learn from others in a different

15    setting.

16          Q.    Prior to working at Cascadia

17    Healthcare, you were an associate professor at

18    WVU; is that right?

19          A.    Yes.

20          Q.    So you left your job as an

21    associate professor at WVU to take the job at

22    Cascadia Healthcare?

23          A.    Yes.

24          Q.    And you worked at Cascadia
```

1    Healthcare for about four months and then

2    returned to be an associate professor at WVU?

3           A.    Correct.

4           Q.    Have you ever lived in Ohio?

5           A.    No.

6           Q.    Have you been to Ohio?

7           A.    Yes.

8           Q.    Have you been to Montgomery

9    County, Ohio ever?

10          A.    No.

11          Q.    Have you ever spoken with anyone

12   who lives in Montgomery County, Ohio?

13          A.    Not that I'm aware of.

14          Q.    Have you ever treated any patient

15   for addiction who lives in Montgomery County,

16   Ohio?

17          A.    Not that I recall.

18          Q.    Have you ever spoken with anyone

19   who works at a Kroger or worked at a Kroger in

20   Montgomery County, Ohio?

21          A.    Not that I'm aware of.

22          Q.    Have you spoken with anyone who

23   works at Kroger in connection with this

24   litigation?

1          A.    Not that I'm aware of.

2          Q.    Opioids have been a big problem in

3    your community in West Virginia, right?

4                MR. CARDI:  Object to form,

5          foundation.

6                You can answer, Doctor.

7          A.    Opioids -- can you ask the

8    question again.  I'm sorry.

9          Q.    Sure.

10               Opioids have been a big problem in

11   your community in West Virginia, correct?

12               MR. CARDI:  Same objection.

13         A.    I'd want to know how you define

14   "big problem."

15         Q.    Okay.  Would you, in your

16   judgment, consider opioids to be a big problem

17   in your community in West Virginia?  Let's start

18   with today.

19         A.    Yes.

20         Q.    And that's been true during the

21   entirety of your professional life, right, since

22   you've been licensed in 2007?

23               MR. CARDI:  Object to form,

24         foundation.

1          A.     Opioids have been a problem for

2    that whole period of time?

3          Q.     Yes, sir.

4          A.     I think to a certain extent.  It's

5    hard to quantify exactly when and where.

6          Q.     Your professional career has been

7    dedicated to dealing with opioids in one form or

8    another; isn't that right?

9                 MR. CARDI:  Form, foundation.

10         A.     Can you ask that again, please.

11         Q.     Sure.

12                Your professional career has been

13   dedicated to dealing with opioids in one form or

14   another; is that right?

15         A.     I would say part of my career has

16   been.

17         Q.     And that's been true since you

18   were licensed in 2007?

19         A.     Yes.

20         Q.     In 2007, West Virginia had some of

21   its historically highest rates of opioid

22   prescriptions; is that right?

23         A.     I would need to see data

24   surrounding that.

1        Q.     Have you ever looked at data about

2    the number of prescriptions over time in

3    West Virginia?

4        A.     I have reviewed that data in the

5    past.

6        Q.     What do you recall about that?

7        A.     I have difficulty recalling

8    specifics.

9        Q.     Have you ever looked at data

10   regarding the numbers of prescriptions over time

11   in Montgomery County, Ohio?

12       A.     Not that I recall.

13       Q.     You were taught in medical school

14   that pain is the fifth vital sign, right?

15       A.     If I recall correctly.

16       Q.     If you recall correctly, yes, you

17   were taught that pain is the fifth vital sign

18   when you were in medical school?

19       A.     I really -- I don't -- I do not

20   recall specifics regarding the pain management

21   didactics.

22       Q.     Okay.  Have you ever worked as a

23   pharmacist?

24       A.     No.

1          Q.      Have you ever supervised a

2    pharmacist?

3          A.      Can you define "supervised"?

4          Q.      That's a great question.  Can I

5    define "supervise."

6                  Okay.  Have you ever worked in a

7    pharmacy?

8          A.      I volunteered in a pharmacy

9    previously.

10         Q.      When was that?

11         A.      I was in medical school.  At the

12   free clinic in town.

13         Q.      And what was your role as a

14   volunteer in the pharmacy?

15         A.      Roughly -- just roughly preparing,

16   packaging medications up, putting them in bags.

17         Q.      How long did you do that for?

18         A.      I can't recall exactly how long.

19         Q.      Was it more than one day?

20         A.      Yes.  It was over the course of

21   probably a year or two.

22         Q.      And how often would you do that

23   during that year or two?

24         A.      It was roughly a weekly basis.

1      Q.    So once a week, you'd go work in

2  the pharmacy?

3      A.    If I recall correctly.

4      Q.    Okay.  And for how long at a time?

5  Would you work for an entire day or a couple

6  hours?

7      A.    If I recall correctly, half days

8  or so.

9      Q.    Did you dispense the medication to

10  patients when you volunteered at the community

11  pharmacy?

12      A.    Not that I recall.

13      Q.    Did you package at any time opioid

14  medications?

15      A.    No.

16      Q.    Okay.  So let's go back to my

17  question.

18            Have you ever had a pharmacist who

19  reported to you in a professional capacity as an

20  employee?

21      A.    Can you ask that one more time?

22      Q.    Sure.

23            Have you ever had, in a

24  professional capacity, a pharmacist report to

1    you as an employee of yours?

2         A.    I work in multiple different

3    settings for a large health system.  So I

4    wouldn't employ a pharmacist, but I work on

5    teams where pharmacists -- pharmacists are on

6    some of the teams that I work on.

7         Q.    Okay.  Have you ever been the boss

8    of a pharmacist?

9         A.    How would you define "boss"?

10        Q.    Well, do you have a boss now?

11        A.    Boss.  I think I have probably

12   several.

13        Q.    Do you know who they are?

14        A.    Yes.

15        Q.    Okay.  Are you the boss of anybody

16   right now yourself, professionally?

17        A.    I guess it depends on how you kind

18   of utilize that term.  Either from an

19   administrative capacity as a medical director or

20   a team leader in clinical settings, I would view

21   myself as kind of the leader of a team.

22        Q.    Have you ever had any role in

23   setting policies for dispensing at a pharmacy?

24        A.    Not that I'm aware of.

```
 1          Q.    Are you familiar with the

 2   obligations that pharmacies have before

 3   dispensing opioids?

 4          A.    Ask that again.  I'm sorry.

 5          Q.    Sure.

 6                Are you familiar with the

 7   obligations that pharmacies have before

 8   dispensing opioids?

 9          A.    No.  But as a clinician with

10   prescriptive authority, I interface with

11   pharmacists and pharmacies on a regular basis.

12          Q.    Are you familiar with any policies

13   or procedures that Kroger has used at any time

14   regarding dispensing opioids?

15          A.    Not that I'm aware of.

16          Q.    Have you ever heard the term

17   "corresponding responsibility" in the context of

18   pharmacies?

19          A.    Not that I'm aware of.

20          Q.    Do you know what the term

21   "corresponding responsibility" means in the

22   context of pharmacies and dispensing opioids?

23          A.    I'm sorry.  I want to make sure

24   I'm understanding the last part of that question
```

1    correctly.

2              Q.    Sure.  And let me ask it a

3    different way.

4              In the context of pharmacies

5    dispensing opioids, do you know what the term

6    "corresponding responsibility" means?

7              A.    Not that I'm aware of.

8              Q.    Do you agree that pharmacies are

9    the last line of defense against illegitimate

10   prescriptions for opioids being dispensed?

11             MR. CARDI:  Form, foundation.

12             A.    I want to make sure I understand

13   what you mean by "last line of defense."

14             Q.    You don't understand the term

15   "last line of defense"?

16             A.    In the context of your question.

17             Q.    Okay.  Every opioid prescription

18   that is written for an outpatient must be

19   dispensed by a pharmacy, right?

20             A.    If I recall correctly.

21             Q.    And in the chain of supplying

22   opioids to the public, the last opportunity to

23   determine whether an opioids prescription is

24   legitimate is at the point of dispensing by the

1    pharmacist.

2              Do you agree with that?

3        A.   I want to make sure I understand

4    your question.

5        Q.   Okay.  Would you like me to repeat

6    the question?

7        A.   If you could, please.

8        Q.   Sure.

9              In the chain of supplying opioids

10   to the public, the last opportunity to determine

11   whether an opioid prescription is legitimate is

12   at the point of dispensing by the pharmacist.

13              Do you agree with that?

14        A.   I don't know if I agree with that.

15   I feel that the clinician -- the clinician

16   assessing the patient through an informed

17   consent process determines whether or not the

18   benefits outweigh the risk with respect to that

19   intervention in regular clinical settings.

20        Q.   In your view, does the pharmacist

21   have any responsibility to determine whether an

22   opioids prescription was written for a

23   legitimate medical purpose?

24        A.   And, again, I apologize.  I want

1    to make sure I understood the first part of that

2    question.

3           Q.    Okay.  Does the pharmacist have

4    any responsibility to determine whether an

5    opioids prescription was written for a

6    legitimate medical purpose?

7           A.    Again, I'm not sure if I agree

8    with that, for reasons I stated previously.

9           Q.    Okay.  Can you restate those

10   reasons?  I'm not sure I caught them.

11          A.    So in a -- has that been -- was my

12   prior statement recorded?  I want to make

13   sure -- I just would refer back to that.  If

14   not --

15          Q.    It was.  Everything you said today

16   is being typed by the court reporter, Ms. Kirk.

17                So let me ask it again and see if

18   we can get to the bottom of this.

19                In your view, does the

20   pharmacist -- prior to dispensing an opioids

21   prescription, does a pharmacist have any

22   obligation to determine whether the prescription

23   for opioids was written for a legitimate medical

24   purpose?

```
 1              MR. CARDI:  Objection; asked and
 2        answered.
 3        A.    Again, I just would -- I think in
 4   a clinical setting, the provider with
 5   prescriptive authority is the one assessing the
 6   patient, determining the need and if the
 7   benefits outweigh the risk.  In that situation,
 8   that's routine clinical practice.  It's that
 9   shared decision-making between the clinician and
10   the patient.
11        Q.    Does the pharmacist have any
12   obligation -- before dispensing the opioids
13   prescription that was written for the patient,
14   does the pharmacist have any obligation to
15   determine whether the prescription was written
16   for a legitimate medical purpose?
17        A.    I don't know how the pharmacist
18   could since they weren't in the office and did
19   not have the information that the provider with
20   prescriptive authority had, and ...
21        Q.    Okay.  I think I understand.
22              So in your view, the pharmacist
23   has no responsibility to determine whether an
24   opioids prescription was written for a
```

1    legitimate medical purpose; is that fair?

2              MR. CARDI:  Objection; asked and

3         answered.

4         A.    I'm not -- like I said before,

5    I don't think that the pharmacist was in the

6    doctor's office and has any ability to

7    determine, didn't play a role in the assessing

8    or informed consent process that led to that

9    recommendation.

10         Q.    Does the pharmacist -- when we're

11   talking about opioids prescriptions, does the

12   pharmacist have to do anything at all to

13   determine whether the prescription was written

14   for a legitimate medical purpose before the

15   pharmacist fills the prescription?

16              MR. CARDI:  Objection; asked and

17         answered.

18         A.    I'm sorry.  I want to make sure I

19   understand that question.

20         Q.    Would you like me to repeat the

21   question?

22         A.    Please.  Thank you.

23         Q.    Before the pharmacist fills a

24   prescription for opioids, does the pharmacist

1    have any obligation to determine whether that

2    prescription was written for a legitimate

3    medical purpose?

4                MR. CARDI:  Objection; asked and

5          answered.

6          A.    I'm not a pharmacist, but I'm a

7    clinician, and that's the setting where the

8    recommendations sprang forth.  The pharmacist

9    wasn't present there and is ...

10         Q.    So the pharmacist has no

11   obligation to determine whether the prescription

12   was written for a legitimate medical purpose?

13               MR. CARDI:  Objection; asked and

14         answered.

15         A.    I'm not a pharmacist, but I'm a

16   clinician, so I understand the obligations with

17   respect to prescriptive authority and assessing

18   of the patient, weighing of the risks and

19   benefits, informed consent, shared

20   decision-making leads to that in legitimate

21   medical practice.

22         Q.    Okay.  So do you know one way or

23   another whether a pharmacist has an obligation

24   to determine whether an opioids prescription was

1    written for a legitimate medical purpose before

2    the pharmacist fills the prescription?

3         A.    Can you repeat that, please.

4         Q.    Sure.

5              Do you know one way or another --

6    and if you don't know, that's fine.

7              But do you know one way or another

8    whether a pharmacist has an obligation before

9    filling an opioid prescription to determine

10   whether that prescription was written for a

11   legitimate medical purpose?

12        A.    As a clinician, I'm unable to

13   look -- I'm unable to assess whether a script

14   was written legitimately or not.  I'm not

15   trained as a pharmacist.  I'm not exactly sure

16   how they would be able to either.

17              Oftentimes we do not realize that

18   it was written for other than legitimate

19   purposes until well after the fact.  That's in

20   my practice.  Once the provider is in the news

21   or a clinic is shut down, that's oftentimes when

22   we realize it was not legitimate, and it's far

23   too late.

24        Q.    Okay.  So -- and I appreciate --

1    I understand you're trying to answer my

2    question.  We may be just missing each other on

3    this.  But what I'm asking at first is a yes or

4    no question.  You can take all the time you'd

5    like to explain your answer.

6              But my question to you, sir, is,

7    do you know one way or another whether a

8    pharmacist has an obligation to determine

9    whether an opioid prescription was written for a

10   legitimate medical purpose before the pharmacist

11   fills a prescription?

12             MR. CARDI:  Objection; asked and

13        answered.

14             Mark, is the confusion here we're

15        talking about legal obligations?  I

16        mean --

17             MR. CHALOS:  Listen, I don't know

18        what the confusion is here, frankly.

19        I'm just asking -- I asked first does

20        the pharmacist have an obligation, and I

21        don't think I got a yes or no answer to

22        that.

23             And now I'm asking if he knows

24        whether the pharmacist has an

1          obligation.  I'm not getting a yes or no

2          answer to that either.

3                  So I don't know what the confusion

4          is.  So I'm going to try it again.

5    BY MR. CHALOS:

6          Q.    I apologize.  I know this is

7    tedious, Doctor, and I don't mean it to be.

8                  Do you know, as you sit here

9    today -- I understand you're a clinician.

10                  Do you know, as you sit here

11   today, whether a pharmacist has an obligation

12   under industry standards, medical practice

13   standards, pharmaceutical standards, the law,

14   the federal law, state law, under any law, does

15   the pharmacist have any obligation before

16   filling an opioids prescription to determine

17   whether that prescription was written for a

18   legitimate medical purpose?

19         A.    I just don't know.  I, as a

20   clinician, cannot determine that, and I don't

21   know how a pharmacist could either.

22         Q.    Okay.  Have you heard the term

23   "red flags" in the context of a pharmacist

24   dispensing opioids?

1           A.      Not that I recall.

2           Q.      Okay.  Have you heard the term

3     "due diligence" in the context of a pharmacist

4     dispensing opioids?

5           A.      Not that I can recall.

6           Q.      Do you have any information about

7     what Kroger did to ensure it was meeting any

8     obligations it or its pharmacists might have

9     prior to dispensing opioids in Montgomery

10    County?

11                  MR. CARDI:  Objection; asked and

12              answered.

13          A.      Can you repeat that.  I'm sorry.

14          Q.      Sure.

15                  Do you have any information at all

16    about what Kroger did to ensure it was meeting

17    any obligations that it or its pharmacists might

18    have had prior to dispensing opioids in

19    Montgomery County?

20          A.      Not that I'm aware of.

21          Q.      Have you -- and I may have asked

22    this, and if I have, I apologize.

23                  Have you reviewed any documents

24    related to any Kroger policies or procedures

1  regarding the dispensing of opioids?

2          MR. CARDI:  Objection; asked and

3      answered.

4      A.    Not that I'm aware of.

5      Q.    Are you aware of any policies or

6  procedures that Kroger had at any time to alert

7  its pharmacists about suspicious prescribers?

8          MR. CARDI:  Objection; asked and

9      answered.

10     A.    Not that I'm aware of.

11     Q.    Are you aware of any policies or

12 procedures that Kroger had at any time to alert

13 its pharmacists about suspicious patients?

14         MR. CARDI:  Objection; asked and

15     answered.

16     A.    Not that I'm aware of.

17     Q.    Are you aware of any obligation on

18 pharmacies and pharmacists to document due

19 diligence conducted prior to filling any opioids

20 prescriptions in writing?

21         MR. CARDI:  Objection; asked and

22     answered.

23     A.    Not that I'm aware of.

24     Q.    Let me ask that question again,

1    because I think I may have misspoken.

2              Are you aware of any obligation on

3    pharmacies or pharmacists to document in writing

4    any due diligence that the pharmacist conducted

5    prior to filling any opioids prescription?

6         A.   Not that I'm aware of.

7         Q.   Have you ever worked for the DEA?

8         A.   I believe I have.

9         Q.   In what capacity?

10        A.   As a consultant.

11        Q.   Can you tell me more about that.

12        A.   Initially I would be contacted by

13   investigators if they were investigating cases

14   attempting to determine legitimacy of clinical

15   practices surrounding controlled substances.

16        Q.   Was your work in connection with

17   criminal prosecutions?

18        A.   At times, it was.

19        Q.   At times was it in connection with

20   civil prosecutions?

21        A.   No.

22        Q.   Okay.  Were there -- did you do

23   work for the DEA other than in connection with

24   criminal prosecutions?

1           A.    I was not -- as mentioned earlier,

2     they would seek my input regarding clinical

3     practices and/or prescribers in clinic settings.

4                 In the cases where it appeared

5     there were not legitimate prescriptions, that

6     would advance forward to trial, and had before.

7                 Other times my reports back to

8     them would be that that's standard practice and

9     appeared to be legitimate, and it would not

10    advance forward.

11          Q.    I see.

12                On how many occasions did you --

13    were you contacted by the DEA?

14          A.    I can't recall the exact number of

15    times.

16          Q.    Can you give me a ballpark?

17          A.    Honestly, I have trouble -- I'm

18    sorry.  I can't tell you the exact amount of

19    times.  It's based on kind of the time spread

20    and the nature and extent of the cases.

21          Q.    Okay.  Over -- when was the first

22    time you were contacted by the DEA?

23          A.    I don't recall the exact date.

24          Q.    Can you give me a ballpark on the

1  time frame?  Were you -- well, let me ask you

2  this way:  Were you licensed to practice

3  medicine the first time that the DEA contacted

4  you?

5          A.    Yes.  It was -- it was all after

6  at least 2010.

7          Q.    Okay.  When was the last time you

8  were contacted by the DEA?

9          A.    Sometime in 2020 or 2021.

10          Q.    Would it happen roughly once a

11  year?  Is that a fair estimate?

12          A.    I do not recall the exact amount

13  of time or the frequency.  I'm sorry.

14          Q.    Okay.  All right.  And we'll go

15  through your resumé and your prior testimony.

16  That might help jog your memory some.

17                  Have you ever had any discussions

18  with anyone at the DEA or any other federal

19  agency about opioids manufacturing quotas?

20          A.    Not that I recall.

21          Q.    Do you know how the DEA or any

22  other federal agency set manufacturing quotas

23  for opioids?

24          A.    Not that I can recall.

```
 1            Q.     Do you know how the federal

 2    government decided how opioids would be

 3    scheduled?

 4            A.     Can you repeat that?  I'm sorry.

 5            Q.     Sure.

 6                   Do you know how the federal

 7    government decided how opioids would be

 8    scheduled?

 9            A.     I can't recall the specifics

10    regarding that.

11            Q.     Have you spoken with anyone at the

12    federal government about how it decides how

13    opioids would be scheduled?

14            A.     Not that I can recall.

15            Q.     Do you know how the FDA decides

16    which indications to approve for opioid

17    medications?

18            A.     I'm sorry.  You mentioned FDA.

19    Could you repeat that again.  I want to make

20    sure.

21            Q.     Sure.

22                   Do you know how the FDA decides

23    which indications to approve for opioid

24    medications?
```

1          A.    I don't recall the specifics of

2    that process.

3          Q.    Okay.  What do you recall in

4    general?

5          A.    Regarding?

6          Q.    The process by which the FDA

7    decides which indications to approve for opioid

8    medications.

9          A.    Just I only know the -- just kind

10   of -- I'm sorry.  I want to make sure I'm

11   answering that correctly, because I don't recall

12   the specifics of how -- how that unfolds.

13         Q.    Okay.  What do you recall about

14   how the FDA decides which indications to approve

15   for opioid medications?

16         A.    I recall just vague -- what I do

17   recall are just the phases of trials that

18   medications need to pass through before they're

19   at market and have indications, and that's rough

20   and vague.

21         Q.    Okay.  Do you recall or do you

22   know anything more specific than that, about the

23   FDA process?

24         A.    Not that I can recall at this

1    moment.

2           Q.    Do you have any opinions, as you

3    sit here today, about which indications any

4    particular opioids should have had?

5                 MR. CARDI:  Object to form,

6           foundation.

7           A.    Not that I can recall at this

8    moment.

9           Q.    Okay.  And as you sit here today,

10   do you have any opinions about what quotas for

11   manufacturing opioids DEA should have set at any

12   time?

13                MR. CARDI:  Objection; form,

14          foundation.

15          A.    Not that I can recall at this

16   moment.

17          Q.    Are you an epidemiologist?

18          A.    No.  But my education, training,

19   clinical practice entails understanding and

20   knowledge of that topic.

21          Q.    Do you consider yourself an

22   epidemiologist?

23                MR. CARDI:  Objection; asked and

24          answered.

1           A.    No.  But my education, training,

2    and clinical experience entails knowledge and

3    understanding of topics in that field.

4           Q.    Have you heard the term "risk

5    factor"?

6           A.    I've heard that term before.

7           Q.    What does that mean in the context

8    of epidemiology?

9           A.    What does "risk factor" mean?

10   That's a rather vague term.

11          Q.    Okay.  You've had some exposure to

12   epidemiology in the course of your medical

13   education, right?

14          A.    Yes.

15          Q.    Okay.  Do you know in the context

16   of epidemiology what the term "risk factor"

17   means?

18          A.    I know what it can mean.

19          Q.    Okay.  What can it mean?

20          A.    It's a rather nonspecific term.

21   That's why I was hoping to get a little bit of

22   understanding of the context.  In its simplest

23   form, it implies risk, something -- a factor

24   that carries risk.

1          Q.     What are the risk factors for

2     opioid use disorder?

3          A.     That's a really difficult question

4     to answer.

5          Q.     Can you give it your best shot?

6          A.     I think to answer that question,

7     you would need to have an understanding of -- if

8     I understand your question correctly, what puts

9     somebody at risk for addiction and/or substance

10    use disorders in general.

11               And I feel like we're still, as a

12    scientific field, working to gain a deeper

13    understanding of that, this rather complex

14    illness.

15         Q.     Do you treat patients for opioid

16    use disorder?

17         A.     Yes.

18         Q.     Do you treat patients for

19    substance use disorder?

20         A.     Yes.

21         Q.     Do you know what the risk factors

22    are for substance use disorder?

23         A.     Do I know what the risks are for

24    substance use disorder?  Is that the question?

1          Q.     Do you know what the risks -- let

2     me ask it a different way.

3                 Do you know what any risk factors

4     are for substance use disorder?

5          A.     One of the risks that I teach on

6     is adverse childhood experiences or traumatic

7     experiences.

8          Q.     Can you think of any other risk

9     factors for substance use disorder?

10         A.     Again, I want to know how we're

11    defining risks.

12         Q.     However you define risk factors in

13    the context of epidemiology and diagnosing

14    substance use disorder is fine for the purposes

15    of this question.

16         A.     Then I think the adverse childhood

17    experiences are something that I mentioned.

18         Q.     Okay.  Can you think of any other

19    risk factors for substance use disorder?

20         A.     I can't recall at this moment.

21         Q.     Okay.  Let's talk about opioid use

22    disorder.

23                 Can you think of any risk factors

24    for opioid use disorder?

1          A.      I would want to answer the same.

2          Q.      A risk factor for opioid use

3    disorder is adverse childhood experiences?

4          A.      Yes.

5          Q.      Can you think of any other risk

6    factors for opioid use disorder?

7          A.      Not that I can recall at this

8    time.

9          Q.      Do you treat patients for opioid

10   use disorder who use illicit opioids such as

11   heroin and fentanyl?

12         A.      Yes.

13         Q.      Do you ask them how they got

14   started on opioids as part of your practice?

15         A.      Yes.

16         Q.      Have you ever treated a patient

17   for opioid use disorder who uses heroin or

18   fentanyl whose first exposure to opioids was

19   through prescription opioids?

20         A.      I just want to make sure

21   I understand that.  If you could repeat it.

22   Thank you.

23         Q.      Sure.

24                 Of the patients that you treat for

```
1    opioid use disorder who use heroin or fentanyl,

2    have any of those patients had their first

3    exposure to opioids through prescription

4    opioids?

5            A.    Yes.  Some have.

6            Q.    Do you have a ballpark in terms of

7    percentage of the patients that you treat for

8    opioids use disorder who use illicit drugs like

9    heroin or fentanyl who started using opioids

10   initially as prescription opioids?

11                MR. CARDI:  Object to form,

12           foundation.

13           A.    Not that I can recall.

14           Q.    Have you reviewed Dr. Katherine

15   Keyes' report in the Montgomery County

16   litigation?

17           A.    Not that I can recall.

18           Q.    Do you have, as you sit here

19   today, any opinions or criticisms about

20   Dr. Keyes' report in the Montgomery County

21   litigation?

22           A.    I'm sorry.  Can you repeat that.

23           Q.    Sure.

24                As you sit here today, do you have
```

1    any criticisms or other opinions about

2    Dr. Keyes' report in the Montgomery County

3    litigation?

4          A.    Not that I can recall.

5          Q.    Do you know who

6    Dr. Katherine Keyes is?

7          A.    I don't recall exactly who she is.

8          Q.    Have you written any articles at

9    any time about the risk factors for opioid use

10   disorder?

11         A.    Not that I can recall.

12         Q.    Have you written any articles

13   about the role of the federal government in

14   regulating the opioids industry?

15         A.    Not that I can recall.

16         Q.    Have you written any articles

17   about the obligations of pharmacies with respect

18   to dispensing opioid prescriptions?

19         A.    Not that I can recall.

20         Q.    Have you ever written or spoken on

21   the obligations of pharmacies with respect to

22   dispensing opioid prescriptions?

23         A.    Not that I can recall.

24         Q.    Have you ever written or spoken on

1    the risk factors for opioid use disorder in any

2    context?

3            A.    I just -- can you repeat that last

4    question, please.

5            Q.    Sure.

6            Have you ever written or spoken on

7    the risk factors for opioid use disorder in any

8    context?

9            A.    I don't recall exactly.  Sorry.

10           Q.    Okay.  Have you written or spoken

11   in any context on the FDA process for

12   determining indications for opioids or any other

13   medications?

14           A.    Not that I can recall.

15           Q.    Have you reviewed any depositions

16   of any DEA or FDA witnesses in the opioids

17   litigation?

18           A.    Not that I can recall.

19           Q.    When were you first contacted to

20   work on this case?

21           A.    I do not recall the exact date or

22   time.

23           Q.    Okay.  Can you give us a ballpark

24   on when that was?

1          A.    I'm sorry.  I can't recall exactly

2    because -- I just can't.

3          Q.    Your report is dated -- maybe this

4    will help.  Your report is dated December 12,

5    2022.

6                Does that help give you any

7    context for a ballpark on when you were first

8    contacted about working on this case?

9          A.    It may have been in 2022, if I'm

10   recalling correctly.

11         Q.    Did you write the report in this

12   case?

13         A.    Yes.  I wrote that report.

14         Q.    How long did that take you, about?

15         A.    I can't recall exactly how long it

16   took me to prepare and write it.

17         Q.    Did you log your time in some way

18   or write down your time to keep track of it?

19         A.    Yes.

20         Q.    Is that reflected in the invoice

21   that you sent in this case?

22                MR. CARDI:  Object to form,

23           foundation.

24         A.    I prepared an invoice.

1          Q.    Okay.  I've only seen one invoice.

2    Well, it's three invoices to three different

3    companies, but it's only for one time period.

4    Does that sound right?  And we'll take a look at

5    it.  But just from your memory, does that sound

6    right?

7          A.    I think.

8          Q.    Who contacted you to work in this

9    case?

10         A.    I cannot recall the initial point

11   of contact.

12         Q.    Was it someone from a law firm?

13         A.    I do not recall.

14         Q.    Who have you talked with about

15   your work in this case?

16              MR. CARDI:  I'm just going to

17          object now preliminarily.  We're getting

18          close to the area of attorney-client

19          privilege, but I think this question is

20          probably fine as long as we're limiting

21          it to who he spoke with.

22              MR. CHALOS:  I'm not sure I

23          understand that objection.

24

1    BY MR. CHALOS:

2         Q.    The question was, who have you

3    talked with about your work in this case, sir?

4         A.    I cannot recall every person I've

5    talked to.

6         Q.    How many people have you talked

7    with?

8         A.    I can't recall that either.

9         Q.    More than ten?

10        A.    I don't think so.

11        Q.    Okay.  You spoke with Mr. Cardi

12   about your work in this case?

13        A.    Yes.

14             MR. CARDI:  Objection; foundation.

15        Q.    Have you spoken with any --

16             MR. CHALOS:  I'm sorry, Michael.

17        Were you about to say something?

18             MR. CARDI:  I was just lodging an

19        objection.

20             MR. CHALOS:  Okay.

21   BY MR. CHALOS:

22        Q.    Have you spoken with anyone other

23   than lawyers about this case?

24        A.    Not that I can recall.

1          Q.    Did anyone help you -- let's leave

2    the lawyers outside.  But did anybody help you

3    write your report in this case?

4          A.    You're saying other than lawyers?

5          Q.    Yes, sir.

6          A.    I don't believe so.

7          Q.    And do you have an assistant or a

8    colleague who helped you write the report?

9          A.    I do not have an assistant.

10         Q.    Did any colleague help you write

11   the report other than lawyers?

12         A.    No.  That's my report.

13         Q.    Have you ever done work for

14   Mr. Cardi's law firm before this case?

15         A.    Not that I'm aware of.

16         Q.    Your rate of compensation for the

17   work in this case is $400 per hour for the

18   report preparation and $500 per hour for

19   testimony; is that right?

20         A.    I believe that's correct.

21         Q.    How did you come up with those

22   rates?

23         A.    I don't recall exactly how I came

24   up with that.

1          Q.     What do you understand your

2     assignment to be in this litigation?

3          A.     I don't know if I understand your

4     question.  I'm sorry.

5          Q.     You were at some point asked to do

6     some work in connection with the Montgomery

7     County litigation, right?

8          A.     I believe so.

9          Q.     What do you understand your work

10    to be in this case?  In other words, what were

11    you asked to do?

12         A.     I was asked to provide opinions.

13    My expertise was sought out.

14         Q.     What were you asked to provide

15    opinions about?

16              MR. CARDI:  Object to form,

17         foundation.

18         A.     Opinions regarding my clinical

19    practice, expertise.

20         Q.     What do you understand about the

21    lawsuit that we're here about?  What's the

22    lawsuit about?

23         A.     I don't recall the exact

24    specifics.

1          Q.     Do you know anything at all about

2     what the litigation is that you were asked to

3     provide your opinions in?

4          A.     I don't recall specifics of the

5     litigation.  My opinions were more regarding

6     clinical practice patient care based on my

7     expertise.

8          Q.     What was your understanding when

9     you were first hired about who you would be

10    working for?

11         A.     I don't recall the specifics

12    surrounding that.

13         Q.     How about today?  Do you have any

14    understanding of who you're working for today?

15         A.     Can you ask -- I want to make sure

16    I understand your question.  In terms of who am

17    I working for?

18         Q.     Yes, sir.  On behalf of what

19    entity are you providing opinions here today?

20         A.     I'm not sure if I can recall the

21    exact entity.

22         Q.     What do you recall about the

23    entity on whose behalf you're providing opinions

24    today?  Do you recall anything, or do you know

1   anything?

2         A.    I want -- can you ask me that

3   question either the same or in a different way.

4   I want to understand it correctly.  I'm sorry.

5         Q.    Sure.  Yeah.  And it's not meant

6   to be a trick question.

7               You said earlier that you were

8   asked to give opinions regarding your clinical

9   practice and expertise in this litigation,

10  right?

11        A.    Yes.

12        Q.    Who asked you to do that?

13        A.    I don't recall exactly who asked

14  me to do that.

15        Q.    Do you -- did you have any

16  understanding on whose behalf they were asking

17  you to do that?  I understand you may not

18  remember their name, but who they were working

19  for?  Did you recall that?

20        A.    Who the -- who is who working for?

21        Q.    The person who asked you to give

22  opinions.

23        A.    I can't recall exactly.

24        Q.    Are you planning to testify at

1    trial in this litigation?

2         A.    I'm prepared to testify if that's

3    what ends up happening.

4         Q.    Did you disclose to West Virginia

5    University that you were providing opinions in

6    litigation about opioids?

7         A.    Yes.

8         Q.    And how did you provide that?

9         A.    There's a standard request

10   submission process.

11        Q.    Did you fill out a form of some

12   kind?

13        A.    Yes, I believe so.

14        Q.    And what did you tell

15   West Virginia University about who hired you to

16   give opinions in opioids litigation?

17        A.    I don't recall exactly what's on

18   the form at this moment.

19        Q.    Did you at some point know who

20   hired you to give opinions in this case and

21   you've forgotten?

22        A.    I'm sorry?

23        Q.    Did you at some point know who

24   hired you to give opinions in this case?

```
 1            A.    At some point.  I just cannot

 2   recall right now.  I don't have any of that in

 3   front of me.  I know Bowles Rice.

 4            Q.    Okay.  Who's Bowles Rice?

 5            A.    It's the law firm.

 6            Q.    Are they the law firm that hired

 7   you to work in this case?

 8            A.    I believe so.

 9            Q.    Do you know who Bowles Rice

10   represents in this litigation?

11            A.    I can't recall exactly who they're

12   representing.

13                  MR. CARDI:  Mark, we're getting up

14            in an hour here.  Whenever a good time

15            for a break.

16                  MR. CHALOS:  Yeah.  Okay.  That's

17            fine.  We can take a break now.

18                  MR. CARDI:  All right.  10:10

19            return?

20                  MR. CHALOS:  Yeah, that works.

21                  THE COURT REPORTER:  Off the

22            record at 10:01 a.m.

23                  (Recess taken.)

24                  THE COURT REPORTER:  We are back
```

1           on the record at 10:12.

2    BY MR. CHALOS:

3           Q.    Doctor, we sent to you over the

4    weekend some documents.

5                 Did you receive that?

6           A.    Yes.

7           Q.    Okay.  Do you have that in front

8    of you or near you?

9           A.    I've got a box here.  Yep.

10                     - - -

11       (Marshalek Deposition Exhibit 1 marked.)

12                     - - -

13   BY MR. CHALOS:

14          Q.    Okay.  If you could pull out of

15   that box tab number 2.

16          A.    Okay.

17          Q.    And we'll mark that as Exhibit

18   Number 1 to your deposition.  I'll represent to

19   you it's a document that says "Report and

20   Opinions of Patrick J. Marshalek, M.D.," dated

21   December 12, 2022.  It's also up on the screen.

22                Yeah, it's in the notebook, and

23   there should be tabs in there, and we're looking

24   at tab number 2.

1         A.    I apologize.  Which tab?

2         Q.    Number 2.

3         A.    Thank you.  There.

4         Q.    Do you have that in front of you?

5         A.    Yes, I do.

6         Q.    Okay.  Great.

7               So is this your report in this

8    litigation?

9         A.    Yes.

10        Q.    Does this report contain all of

11   the opinions that you intend to give at trial in

12   this litigation?

13        A.    I want to make sure I'm

14   understanding your question, because I feel

15   like -- if you're saying trial, I may put forth

16   other opinions besides here, if need be.

17        Q.    Okay.  So I only get one --

18   typically one chance to question you about your

19   opinions prior to trial.  And to do that, we are

20   relying on your report to contain all of the

21   opinions that you have in connection with the

22   litigation and the bases for those opinions.

23               As you sit here today, do you have

24   opinions that you intend to give at trial in

1    this litigation that are not listed in your

2    report?

3           A.    I'm sorry.  I'm not sure if I

4    understand that question.  I just know I don't

5    know what might be asked of me if this were to

6    advance forward.

7           Q.    Okay.  As you sit here today, do

8    you have opinions about this litigation other

9    than what's set forth in your report?

10          A.    I did my best to set out all my --

11    all my opinions in this report.

12          Q.    Okay.  Do you think that there

13    are -- that you have opinions, as you sit here

14    today, that you weren't able to put in your

15    report for some reason?

16          A.    Not that I'm aware of.

17          Q.    Okay.  If you would turn -- the

18    report -- the pages aren't numbered in the

19    report.  So what I did was, excluding the cover

20    page, I just on my copy handwrote in numbers.

21    So page 1 is background and qualifications, and

22    then I numbered them sequentially from there.

23                You're welcome to do that to

24    follow along.  Otherwise, we're going to put up

1    on the screen the pages I'm referencing where

2    you can just count along.  But that's the

3    convention I use to try to keep orderly here.

4              So if you would, sir, if you would

5    turn to page 6, which says "Prior Writings."

6              Do you see that?

7    A.    Yes.

8    Q.    Okay.  What's listed here?  It's

9    on page 6, 7, and part of 8.  What did you

10   intend to list here?  Is this all of the

11   writings that you've done, or is this a subset

12   of the writings that you've done?

13        A.    I believe these are my

14   publications.

15        Q.    Are these limited to

16   opioids-related topics, or are these all of the

17   writings you've done on any professional topic?

18        A.    I think the latter is more

19   accurate.

20        Q.    Okay.  And then if you turn to

21   page 11, on the top it says "References/Reliance

22   Materials."

23        A.    Yes.

24        Q.    Do you see that?

1          A.    I do.

2          Q.    Are these -- on pages 11 and 12,

3    does this list all of the materials that you

4    considered in connection with forming your

5    opinions in this case?

6               MR. CARDI:  Object to form.

7          A.    I'd want to know how you're

8    defining "considered."

9          Q.    Did you review any other materials

10   other than what are listed in your report either

11   under "Prior Writings" on pages 6, 7, and 8 or

12   under "References/Reliance Materials" on

13   pages 11 and 12 in connection with your work in

14   this case?

15         A.    Yes.  It's common practice to

16   spend time in the medical indices, PubMed in

17   particular, and consult a variety of journal

18   practices.  I probably do that on a daily basis

19   just in my routine clinical practice.

20         Q.    In connection with preparing your

21   report here, did you review any other documents

22   other than what's listed in your report?

23         A.    Did I review any other documents

24   other than what's listed here?  Well, yeah, over

1    the course of my career and leading up to this,

2    I've reviewed multiple journal articles on these

3    topics and many other topics.

4            Q.    Do you have a list of those

5    journal articles anywhere?

6            A.    No, I do not.

7            Q.    Have you considered those journal

8    articles in forming the opinions that you set

9    forth in your report, Exhibit Number 1?

10            MR. CARDI:  Object to form.

11            A.    I'm not sure which articles you're

12    referring to now.

13            Q.    Okay.  So here's the situation,

14    Doctor:  The federal rules require that you

15    disclose the facts and data considered by the

16    witness in forming the opinions in the case.

17                You've given us a list in your

18    report, Exhibit Number 1, of some materials that

19    you considered in forming your opinions here.

20    And now you're telling me there are other

21    materials that you might have considered in

22    forming your opinions; is that correct?

23            MR. CARDI:  Objection;

24            mischaracterizes prior testimony.  I

1           think he's just saying that he's

2           reviewed materials over the course of

3           his career that may be relevant.

4           Q.    Is that what you're saying,

5    Doctor?

6           A.    Yes.

7           Q.    Can you give me a list of the

8    materials that you've considered in the course

9    of your career that may be relevant to the

10   opinions you've set forth in your report in this

11   case?

12          A.    I don't think that would be

13   possible.

14          Q.    As you sit here today, do you

15   recall any materials that you've considered in

16   the course of your career that are relevant to

17   the opinions you've set forth in your report?

18          A.    I'm sorry.  I'm having trouble

19   with that question.

20          Q.    Sure.

21               Do you recall, as you sit here

22   today, any materials that you have considered at

23   any time in forming the opinions that you set

24   forth in Exhibit Number 1, your report in this

1   case?

2          A.     Again, my clinical practice over

3   years involves interfacing with reading multiple

4   medical journals.  My clinical practice

5   surrounds these topics.  A lot of that also

6   formed the basis for the opinions in my report.

7   And I'm unable to list you every single journal

8   article I've read over the course of my career.

9   I'm sorry.

10         Q.     Can you list for me the articles

11  that you considered in forming the opinions that

12  you've set forth in Exhibit Number 1, your

13  report in this case?

14         A.     I would -- I would look to the

15  reference and reliance materials then.

16         Q.     Okay.  Are there any other

17  materials that you've considered in forming the

18  opinions in your report other than what's listed

19  in your references and reliance materials, in

20  the report itself?

21         A.     Not that I can recall, other than

22  what we discussed.

23         Q.     What did we discuss?

24         A.     My career and clinical practice.

1          Q.    All right.  Well, look, we're

2     entitled to know what materials you considered

3     in forming the opinions set forth in your

4     report.

5                Can you give me a list of those

6     that are not already listed in your report, as

7     we sit here today?

8                MR. CARDI:  Objection; asked and

9          answered.

10         A.    I would look again to the

11    reference and reliance materials.

12         Q.    Can you give me a list of any

13    materials that are not set forth in the

14    reference and reliance materials section of your

15    report that you considered in forming the

16    opinions listed in your report?

17               MR. CARDI:  Objection; asked and

18         answered.

19         Q.    Yes or no?

20               MR. CARDI:  You don't have to

21         answer yes or no.

22               Mark --

23         Q.    Yes, you do, sir.

24               MR. CHALOS:  Michael, you're in

1                violation of the rules in a number of

2                respects.  Number one, your report is

3                incomplete.  Number two, your objections

4                are -- the basis of your objection, and

5                that's it.  You're giving speaking

6                objections now.

7      BY MR. CHALOS:

8            Q.    Dr. Marshalek, I'm asking you a

9      question, yes or no, can you tell me what other

10     materials you considered in forming the opinions

11     set forth in your report other than the

12     materials listed in your Reference/Reliance

13     Materials section?

14                MR. CARDI:  Objection; asked and

15           answered.

16                Dr. Marshalek, you can answer to

17           the extent you can.

18                THE WITNESS:  I think I tried to

19           previously.

20           Q.    Okay.  Do it again, please.

21                MR. CARDI:  Objection; asked and

22           answered.

23           A.    I outlined it in my reference and

24     reliance materials.  Other than quantifying what

1  entailed years of clinical practice surrounding

2  some of these topics that also was relied upon,

3  my clinical experience and expertise.

4      Q.   Are there any other written

5  materials that you considered in forming the

6  opinions set forth in your report other than

7  what's listed in your References/Reliance

8  Materials section?

9          MR. CARDI:  Objection; asked and

10         answered.

11     A.   Again, I thought I tried to answer

12  that as best I could.

13     Q.   Answer it again then, please.

14         MR. CARDI:  Objection; asked and

15         answered.

16     A.   I've outlined the reference and

17  reliance materials, cited them in my report, and

18  also have utilized and relied upon my clinical

19  experience, clinical expertise on this topic.

20     Q.   So there are no other written

21  materials that you considered in forming the

22  opinions in your report other than what's listed

23  in the reference and reliance material section?

24     A.   I feel the Reference/Reliance

1    Materials substantiate the points I'm making in

2    my report.

3           Q.    There are no other written

4    materials that you considered in forming the

5    opinions in your report other than what's listed

6    in the Reference/Reliance Materials section; is

7    that true or not true?

8           A.    I'm just having trouble with that

9    question, because these are my opinions.  My

10   opinions are not simply a regurgitation of these

11   reference and reliance materials.  They're based

12   on my training, education, clinical experience,

13   and a host of other activities that deepen my

14   knowledge and understanding surrounding these

15   topics.

16               These reference/reliance materials

17   I've relied upon to substantiate and cite as

18   standard practice in clinical publications my

19   opinions.

20   BY MR. CHALOS:

21           Q.    Are there other materials --

22   leaving aside your experience, other written

23   materials that you relied on to substantiate

24   your opinions?

1          A.     These references and reliance

2    materials are what I utilized to substantiate my

3    opinions.

4          Q.     And no others?

5          A.     Other than what I discussed

6    earlier.

7          Q.     Are there other written materials

8    that you considered in forming the opinions you

9    set forth in your report?

10         A.     Not that I'm aware of.

11         Q.     Okay.  Did you read every single

12   word of every single document you listed in the

13   reference and reliance materials?

14         A.     That, I can't recall.

15         Q.     Let's talk about the opinions

16   you've set forth in your report.  I count -- let

17   me see, one -- two, three -- four pages of

18   substantive text that make up your report.

19                Does that sound right in terms of

20   the opinions?

21         A.     I believe so.

22         Q.     If you would turn, please, to

23   page 3 of your report, the second full paragraph

24   from the bottom.  It starts with "The 'gateway'

1   theory."

2              Do you see that?

3        A.    Yes.

4        Q.    What is the gateway theory?

5        A.    I think it's just that.  It's a

6   theory or hypothesis.

7        Q.    Is that the end of your answer?

8        A.    Yes.

9        Q.    The sentence you wrote in your

10  report says, "The 'gateway' theory, which

11  proposes that the use of prescription opioids

12  directly leads to the use of illicit drugs, is

13  unsubstantiated and controversial."

14             Do you see that?

15       A.    Yes.

16       Q.    Okay.  What materials listed in

17  your report support that sentence?

18       A.    Number 14 under my references and

19  reliance materials.

20       Q.    Okay.  So the sentence that you

21  put forth in your report says that the gateway

22  theory proposes that the use of prescription

23  opioids directly leads to the use of illicit

24  drugs; is that correct?

1        A.    Yes.

2        Q.    And the support for that sentence

3    you believe is reference 14; is that correct?

4        A.    Reference 14 lists directly after

5    the sentence it was listed, and then clinical

6    experience and opinion regarding this theory,

7    and that it does not match what I've seen in my

8    clinical practice.

9        Q.    Are you aware of any other written

10   material, whether it's an article or textbook or

11   any other writing, that supports your sentence,

12   "The 'gateway' theory, which proposes that the

13   use of prescription opioids directly leads to

14   use of illicit drugs, is unsubstantiated and

15   controversial"?

16           MR. CARDI:  Object to form.

17       A.    Yeah, I think that's the main

18   controversy surrounding it, is that it's a

19   theory.  It's a hypothesis.  And the causality

20   is not -- has not been proven.  That's a common

21   objection.  And that's my opinion.

22       Q.    Other than the Miller article that

23   you've listed as reference 14, are you aware of

24   any other medical article or any other writing

1    that supports your sentence on page 3 of your

2    report about the gateway theory?

3            A.    Can you repeat your question,

4    please.

5            Q.    Sure.

6                  Are you aware of any other

7    writing, medical article, textbook, anything

8    else in writing, leaving aside your clinical

9    experience, that supports your sentence about

10   the gateway theory on page 3 of your report?

11           A.    I can't right here right now

12   recall specific other writings.  It's mainly my

13   clinical experience as well.

14                       - - -

15       (Marshalek Deposition Exhibit 2 marked.)

16                       - - -

17   BY MR. CHALOS:

18           Q.    Let's -- if you would turn,

19   please, to Tab 5 of your notebook, which is the

20   reference I believe number 14 in your report,

21   Michael L. Miller, and Yasmin, Y-a-s-m-i-n, L.

22   Hurd, H-u-r-d, commentary called "Testing the

23   Gateway Hypothesis."  And that's published in

24   Neuropsychopharmacology 2017, Volume 42, pages

1    985 through 986.

2              Do you see that document, sir?

3    It's Tab 5 of your notebook.

4         A.    Yes.

5         Q.    Is this the document that you

6    cited at footnote 14 of your report on page 3?

7         A.    I believe so.

8         Q.    Would you read the first sentence

9    of that document, please.

10        A.    "The gateway drug hypothesis

11   refers to the pattern of substance use during

12   adolescence whereby legal substances, such as

13   nicotine and alcohol, precede the progressive

14   use of illicit substances like cocaine and

15   heroin."

16        Q.    That is a different gateway theory

17   than the gateway theory that proposes the use of

18   prescription opioids directly leads to use of

19   illicit drugs, right?

20              MR. CARDI:  Object to form.

21        A.    Yeah, I'm not sure what you mean

22   by that.

23        Q.    Okay.  The gateway hypothesis

24   referred to in your report, as you define it,

1    proposes that the use of prescription opioids

2    directly leads to the use of illicit drugs,

3    correct?

4           A.    I'm not sure if I understand that.

5           Q.    Okay.  The words you use on page 3

6    of Exhibit 1, second full paragraph from the

7    bottom, are these:  "The 'gateway' theory, which

8    proposes that the use of prescription opioids

9    directly leads to use of illicit drugs, is

10   unsubstantiated and controversial."

11              Correct?

12          A.    That's what I read.  Yes.

13          Q.    Okay.  And the citation you used

14   to support that is the Miller article, correct?

15          A.    The Miller article is more to

16   substantiate I believe the last sentence that

17   the 14 is attached to.

18          Q.    Okay.  What then supports your

19   sentence, "The 'gateway' theory, which proposes

20   that the use of prescription opioids directly

21   leads to use of illicit drugs, is

22   unsubstantiated and controversial"?

23              MR. CARDI:  Objection; asked and

24              answered.

1          A.     Again, I think I would look to the

2     last paragraph in that article.

3          Q.     In what article?

4          A.     The article that we were just

5     looking at.

6          Q.     The article about, "The gateway

7     hypothesis that refers to the pattern of

8     substance use during adolescence whereby legal

9     substances, such as nicotine and alcohol,

10    precede the progressive use of illicit

11    substances like cocaine and heroin"?

12         A.     No.  It's the sentence that says,

13    "Despite the growing number of published papers

14    relevant to the gateway drug hypothesis, many

15    complex factors still have not been thoroughly

16    addressed to determine causality in animal

17    models, excluding -- even excluding

18    human-specific confounds that impact

19    interpretations such as social, psychological,

20    and legal considerations."

21         Q.     And you think that the Miller

22    article refers to the use of prescription

23    opioids directly leading to the use of illicit

24    drugs?

1          A.    I'm not sure if I understand that

2    question.

3          Q.    You think the Miller article is

4    about opioids?

5          A.    This article is about this theory.

6    Opioids have been used to kind of put into this

7    theory.  You know, the theory had normally been,

8    oh, you started smoking cigarettes and lead to

9    alcohol, and you kind of move stepping stone --

10   in a stepping stone pattern or kind of on to

11   harder and more and more drugs as your illness

12   evolves.  And that just does not -- does not

13   click with what I've seen clinically.

14         Q.    Do you, Doctor, think that the

15   Miller article, gateway drug hypothesis, is

16   about opioids?

17               MR. CARDI:  Objection; asked and

18         answered.

19         A.    I'm not sure how to answer that

20   question.  I think this theory has been used in

21   a variety of ways, and I don't like how it's

22   been used because I don't think causality.

23               It stemmed from epidemiologic

24   studies initially, and it's not really relevant

1  I'm finding it in clinical practice based on the

2  key part, key criticism of it, and the causality

3  has yet to be established.

4      Q.    Have you read any articles at all

5  other than the Miller article about the gateway

6  theory as it relates to opioids?

7      A.    I can't recall the exact articles.

8      Q.    Have you read any of them?

9      A.    I can't recall what I've read over

10  the course of my career exactly.

11      Q.    Can you point to any article that

12  says the gateway theory from prescription

13  opioids to illicit opioids is unsubstantiated

14  and controversial other than, in your opinion,

15  the Miller article?

16      A.    I cited a common criticism of this

17  theory is the causality is yet to be

18  established.  That's why I feel it's unfair to

19  point the finger at any one given substance and

20  say it's causing an illness.  It's complex and

21  still poorly understood as addiction.

22      Q.    Who else says that other than you?

23      A.    I can't recall exactly who all

24  says that.

1          Q.    Can you tell me a single person

2    other than you who says that, sir, with respect

3    to opioids?

4          A.    I can't recall specific people

5    right at this moment.

6          Q.    Have you ever --

7               MR. CHALOS:  I'm sorry.  Was

8          somebody speaking?

9               MR. CARDI:  Yeah.  That was me,

10         Mark.  I thought we were at a breaking

11         point.  I just wanted to point out that

12         I think you referred to Tab 2 as

13         Exhibit 1, and I don't recall it being

14         marked.  I just wanted to point that

15         out.

16              MR. CHALOS:  The report?

17              MR. CARDI:  Yes.  Maybe it was.  I

18         apologize.  I just -- I didn't recall

19         it, so I wanted to point that out in

20         case it wasn't.

21              MR. CHALOS:  Yeah, so tab 2,

22         Dr. Marshalek's report, was marked as

23         Exhibit 1, I believe.

24              And marked as Exhibit Number 2 to

1          this deposition is tab number 5, the

2          Miller and Hurd article, "Testing the

3          Gateway Hypothesis."  First sentence,

4          "The gateway hypothesis refers to the

5          pattern of substance use during

6          adolescence whereby legal substances,

7          such as nicotine and alcohol, precede

8          the progressive use of illicit

9          substances like cocaine and heroin."

10              That's Exhibit Number 2 to this

11          deposition.

12              MR. CARDI:  Okay.

13   BY MR. CHALOS:

14          Q.    And you, Doctor, have actually

15   given a presentation about the process of

16   patients moving from prescription opioids to

17   heroin, haven't you?

18              MR. CARDI:  Objection.

19          A.    Ask me again.  I'm sorry.

20          Q.    Sure.

21              You have given a presentation

22   about patients moving from prescription opioids

23   to heroin, haven't you?

24              MR. CARDI:  Objection.

1          A.     Which presentation are you

2   speaking of?

3          Q.     All right.  Let me ask you a

4   different way.

5                 Have you ever given a presentation

6   that includes a discussion of patients moving

7   from prescription opioids to heroin?

8          A.     It's likely I would have discussed

9   that based on discussing the nature and extent

10  of a substance use disorder.  A patient with

11  opioid use disorder is going to utilize opioids

12  in order to avoid the withdrawal from that after

13  they've achieved tolerance and dependence.  And

14  at that point in time, the illness itself does

15  not discriminate which opioid to seek out.  It

16  just seeks out opioids.

17         Q.     In your clinical experience,

18  patients who develop opioid -- patients can

19  develop opioid use disorder while taking

20  prescription opioids, correct?

21         A.     That's my point.  You can develop

22  use disorders to a host of substances, whether

23  it's prescription, illicit, however you want to

24  define them.  And I think not only -- substances

1    are not the only thing people can have use

2    disorders.  It doesn't have to be a substance.

3           Q.    In your experience, have you had

4    patients develop opioid use disorder while

5    taking prescription medication medically?

6           A.    I'm having trouble with that

7    question, understanding what exactly you mean by

8    taking -- that last part of it.  I'm sorry.

9           Q.    Sure.

10          Have you ever heard the term

11   taking opioids -- prescription opioids medically

12   versus non-medically?

13          A.    I may have.

14          Q.    Okay.  What do you understand

15   about the difference between medically and

16   non-medically?

17          A.    I think it can mean different

18   things.  It depends on kind of who's

19   interpreting it and how.

20          If I write a prescription for a

21   patient, I'm giving them very specific detailed

22   instructions on how to take the medication; how

23   much to take, how often to take it, what route

24   of administration, and kind of also the duration

1   of therapy.  So that, in my opinion, would more

2   like likely mirror what medical use is.

3          Q.    What's non-medical use?

4          A.    Kind of, again, after the kind of

5   informed assessment, informed consent process

6   and so on.

7          Q.    What is non-medical use?

8          A.    I think anything that's not that,

9   in some ways.

10          Q.    In your clinical practice, have

11  you seen patients develop opioid use disorder

12  that were taking opioids medically, prescription

13  opioids?

14          A.    I want to make sure I'm

15  understanding your question correctly.

16          Q.    Okay.

17          A.    So if you could please repeat it.

18  I apologize.

19          Q.    Sure.

20                In your clinical practice, have

21  you ever treated a patient for opioid use

22  disorder who started taking opioids medically

23  and progressed to develop opioid use disorder?

24          A.    I think so.

1        Q.    A patient taking opioids medically

2    can develop opioid use disorder, right?

3              MR. CARDI:  Objection; asked and

4        answered.

5        A.    What did I -- I'll just give the

6    same answer I gave before.

7        Q.    All right.  Well, let's do it

8    again.

9              When he says "asked and answered,"

10   you can ignore that.  He's not trying to coach

11   you.  He's just making a record here.  So you

12   can ignore that and just answer the question.

13             So my question is to you:  A

14   patient taking opioids medically can develop

15   opioid use disorder, right?

16       A.    I've seen that in my clinical

17   practice.  You're saying "medically."  That gets

18   a little tricky, I think.  I think I'd have

19   to -- I could start to describe clinical

20   situations and give context.  I wouldn't want to

21   kind of have that a broad-based statement.

22       Q.    Well, you've certainly seen

23   patients who took prescription opioids as

24   prescribed -- I'm not talking about you

1    prescribing them the opioids, but a doctor

2    prescribing them opioids, they followed their

3    doctor's instructions, and developed opioid use

4    disorder.

5              You've seen that, right?

6              MR. CARDI:  Asked and answered.

7         A.    I've taken care of patients that

8    have been cared for, unfortunately, by pill

9    mills.  So they started out and they weren't

10   screened adequately.  They were drinking.

11   I know they had an alcohol use disorder that

12   went ignored.  They were prescribed high dose

13   regimens that were above and beyond what they

14   probably should have been prescribed --

15             (Court reporter clarification.)

16             THE WITNESS:  I'm sorry.

17        A.    These are patients of pill mills

18   prescribed high dose opioid regimens,

19   potentially not legitimately, and they're taking

20   them, quote, as prescribed, end quote, and end

21   up having -- developed an opioid use disorder

22   based on the fact that they weren't screened.

23   They were given more of something than what they

24   needed and may have been misusing it from the

1    get-go and using other things with it.

2              So, I mean, I think, to me, it's

3    incredibly complex what may be going on behind

4    the scene.  I've taken care of patients that

5    were taking their prescribed opioids, but then

6    also supplementing with opioids from elsewhere.

7    So on paper, it looked like they were taking it

8    as prescribed.

9              So I think they're just -- all the

10   different paths and clinical scenarios I could

11   go on and on about, but ...

12        Q.    In order to develop opioid use

13   disorder, a patient must have exposure to

14   opioids, right?

15        A.    You're saying you have to be

16   exposed to opioids.  Not everyone that is

17   exposed to opioids develops an opioid use

18   disorder.

19        Q.    But everyone who develops an

20   opioid use disorder has been exposed to opioids,

21   correct?

22        A.    In some way.  And I think that's

23   the core of these use disorders, in my opinion.

24   It's development of an unhealthy relationship

1   with that substance.  That's where the

2   substance, I think, becomes less important.

3   It's more the relationship with it and then the

4   dysfunction that begins to surround that

5   unhealthy relationship.  And that's why it can

6   evolve to include things other than substances.

7            So, for example, I've taken care

8   of patients with opioid use disorder that then

9   have developed metabolic syndrome because

10  they've developed an unhealthy relationship with

11  food.

12       Q.    Let's look at tab 7 in your

13  notebook.  We'll mark that as Exhibit Number 3.

14                   - - -

15   (Marshalek Deposition Exhibit 3 marked.)

16                   - - -

17  BY MR. CHALOS:

18       Q.    What is this document, Doctor?

19  You can take as much time as you need to review

20  it.

21       A.    This is a trip down memory lane.

22  I think this is I think a project that we worked

23  on.  It was connected to I think the work I was

24  doing at the time at WVU regarding trying to

1    improve access to treatment for opioid use

2    disorder utilizing telehealth.  We wanted to let

3    people know kind of why we were doing that and

4    how.

5         Q.    Who did you give this presentation

6    to?

7         A.    I can't recall exactly.  I've

8    given several or multiple presentations on this

9    topic.

10        Q.    Do you recall when you gave this

11   presentation?

12        A.    No.  Sorry.

13        Q.    Turn, if you would, to -- well, I

14   don't know how you can count it, but it's about

15   a little more than halfway through.  The slide

16   says "TELECOAT," T-E-L-E-C-O-A-T, and it has

17   your name on it.  It's probably 60 percent of

18   the way through the deck.

19             Do you see that?

20        A.    Hold on one second.

21        Q.    Yeah.  No rush.  You can take as

22   much time to review the whole document if you'd

23   like.

24        A.    You're saying TELECOAT?

1      Q.    That's what it says.

2      A.    Okay.  You're saying this is

3  multiple people.

4      Q.    It looks like a slide deck that

5  includes slides for multiple people.  You're the

6  third, and so you're probably more than

7  60 percent.

8      A.    I'm there now.

9      Q.    Okay.  It looks like that

10  (indicating).  I don't know if you can see it.

11            So it says, "TELECOAT."  What does

12  TELECOAT mean?

13      A.    COAT is an acronym that refers to

14  comprehensive opioid addiction treatment.  It's

15  a term utilized to describe our group's approach

16  to treating opioid use disorder and utilizing

17  medications for opioid use disorder.

18            TELE just was placed in front of

19  it to basically demonstrate that we utilize this

20  model.  We deployed this model through TELE to

21  some of the harder hit areas in West Virginia.

22      Q.    Was this before the pandemic?

23      A.    Yes.

24      Q.    If you flip to the next page after

1    "TELECOAT," it says "Opioid Epidemic."  And then

2    the first bullet says "Rx -- arrow -- heroin."

3              Do you see that?

4         A.   Yes.

5         Q.   All right.  What did you discuss,

6    if you recall, about Rx with the arrow to

7    heroin?

8         A.   Likely discussed the fact that

9    this was likely after I think the CDC started

10   flying the flag about prescription opioids, and

11   people were noticing the deaths, and the number

12   of overall prescriptions was decreasing.  That's

13   what we were seeing clinically.

14              So despite the fact that the

15   opioid prescriptions were decreasing, it didn't

16   really change the overall number of patients

17   that we were seeing struggling with opioid use

18   disorder.

19              And as I mentioned earlier, if you

20   have an opioid use disorder, you don't --

21   regardless of how you arrived at it, you don't

22   really discriminate with respect to what opioid

23   you'll end up utilizing.

24         Q.   All right.  Let's -- and do you

1    recall -- when they started reducing the number

2    of opioids prescriptions, do you recall what was

3    happening nationwide to the percentage of

4    patients using illicit opioids?

5           A.    I'm sorry.  Can you repeat that.

6           Q.    Do you want me to try that again?

7           A.    Yes, please.

8           Q.    Sure.

9                 At the time when the number of

10   prescriptions for opioids was decreasing, do you

11   recall what was happening with the number of

12   patients using illicit opioids, such as heroin

13   and fentanyl?  Was it increasing or decreasing?

14          A.    I think -- I still was seeing a

15   decent amount of patients suffering from opioid

16   use disorder.  They were using a variety of

17   opioids.

18          Q.    Including illicit opioids?

19          A.    Probably.

20          Q.    Let's turn to tab 8.  We'll mark

21   this as Exhibit Number 4.

22                        - - -

23      (Marshalek Deposition Exhibit 4 marked.)

24                        - - -

1  BY MR. CHALOS:

2          Q.     This is another PowerPoint

3  presentation with your name listed first on it.

4  It says, "The Road Less Traveled:  Using

5  Buprenorphine-Naloxone to Treat High Risk

6  Chronic Pain Patients."

7                 Do you see that?

8          A.     Yes.

9          Q.     Okay.  What is this document?

10         A.     This was -- I think we were

11  asked -- we were invited to present this.

12  I can't recall the -- yeah, the PCSS asked us to

13  do this training.

14         Q.     What is PCSS?

15         A.     It's Providers' Clinical Support

16  System for opioid therapies.

17         Q.     Is that a private organization?

18         A.     I don't know.

19         Q.     All right.  If you turn to the

20  second page -- page 2 of Exhibit Number 4.  The

21  slide on the bottom, "How did we get started?"

22                 Do you see that?

23         A.     Yes.

24         Q.     The last bullet point there says,

1    "Buying pain pills off street, turning to

2    illicit drugs, experiencing withdrawal."

3                Do you see that?

4         A.    Yes.

5         Q.    All right.  Do you recall what

6    your point there was?

7         A.    I think our point was, because we

8    were talking about pain management, was -- I

9    think this is kind of connected to that pendulum

10   swing that is often discussed where the push was

11   to focus on pain and then treat it at all costs.

12   And then as we kind of started to realize some

13   of the costs associated, it got pushed over the

14   other way.

15               And I think caught in the middle

16   were a lot of patients that had been prescribed

17   opioids without a lot of screening, without a

18   lot of oversight.  And it just -- it varied

19   widely I guess is the best way I could say it.

20               So these were the patients our

21   team was seeing, these patients that were

22   hospitalized, and they were in opioid

23   withdrawal, and we weren't sure if they were in

24   opioid withdrawal because they were seeing a

1    pill mill unknowingly and they presented to the

2    emergency department at 3:00 in the morning

3    after they started to run out of medication and

4    didn't know where else to go get it.

5              You know, providers were

6    prescribing less, and they looked, at first

7    glance, maybe like they did have a use disorder.

8    They really didn't.  They were just experiencing

9    withdrawal.

10             So we were trying to find a way to

11   target some of this population or come up with a

12   kind of clinical approach to treating them

13   because very often you weren't really able to

14   figure out everything you needed to in the

15   context of one quick visit.  You needed to be

16   able to kind of assess, diagnose, and treat in

17   the context of continuity.  And then some of

18   those risk factors that we would identify could

19   also be, I think, modified and/or treated.

20             Namely, if we brought on a patient

21   that we felt had risk factors and those were

22   simply a fact that they weren't getting good

23   care and they had really bad depression and that

24   needed treated, then we modified those,

1    decreased the risks, improve their outcomes.

2              Whereas, you know, some of them

3    were to actually -- needed -- in order to have

4    their pain adequately treated, they needed to be

5    moved more in the direction of formal addiction

6    treatment, kind of like a router.  That was the

7    programming.

8              We utilize buprenorphine, which is

9    an opioid analgesic, in those cases to take

10   advantage of some of the benefits that also make

11   it a good medication for those with opioid use

12   disorder.

13        Q.    Turn, if you would, please, to

14   tab 16 of your notebook.  We'll mark this as the

15   next numbered exhibit, which I think is

16   Exhibit 5.

17                   - - -

18      (Marshalek Deposition Exhibit 5 marked.)

19                   - - -

20              MR. CHALOS:  Is that correct,

21        Madam Court Reporter?

22              THE COURT REPORTER:  Yes.

23              TRIAL TECH:  Yes, sir.

24

```
 1    BY MR. CHALOS:

 2         Q.    We're going to mark as Exhibit 5

 3    an article by McCabe, et al. entitled "Pills To

 4    Powder:  A 17-Year Transition From Prescription

 5    Opioids to Heroin Among U.S. Adolescents

 6    Followed Into Adulthood."

 7              This was published by the Journal

 8    of -- published in the Journal of Addiction

 9    Medicine, Volume 15, Number 3, May/June 2021.

10              Have you, Doctor, heard of the

11    American Society of Addiction Medicine?

12         A.    Yes.

13         Q.    Are you a member of it?

14         A.    Not that I'm aware of.

15         Q.    Okay.  Have you ever heard of the

16    Journal of Addiction Medicine?

17         A.    Yes.

18         Q.    And that's a peer-reviewed

19    journal?

20         A.    I believe so.

21         Q.    I'm sorry.  Did you say you do not

22    believe so or you do believe so?

23         A.    I'm sorry.  I didn't speak up

24    there.
```

1          I believe so.

2          Q.    Okay.  Do you know any of the

3    doctors listed as authors of this publication?

4          A.    Not that I'm aware of.

5          Q.    Do you subscribe to the Journal of

6    Addiction Medicine?

7          A.    Not that I'm aware of.

8          Q.    Do you subscribe to any medical

9    journals?

10          A.    Not that I'm aware of.

11          Q.    Do you read on a regular basis any

12    medical journals?

13          A.    Yes.

14          Q.    Which journals do you read on a

15    regular basis?

16          A.    I can't recall.  I read a wide

17    variety.  Based on the fact that I work at an

18    academic institution, I utilize the libraries

19    within our organization, and then the -- they

20    have subscriptions to those on our behalf, so I

21    can access them electronically.

22          Q.    Okay.  Have you ever reviewed any

23    articles published in the Journal of Addiction

24    Medicine?

1           A.    I may have.  It's likely that I

2     have.

3           Q.    Okay.  Have you ever reviewed any

4     articles published in the New England Journal of

5     Medicine?

6           A.    It's likely that I have.

7           Q.    Okay.  Let's look at Exhibit

8     Number 5, the "Pills to Powder" article written

9     by Dr. McCabe and others.

10                Have you ever seen this article

11    before today?

12          A.    I don't believe so.

13          Q.    Okay.  Look at the section

14    entitled "Conclusions."  It's on the first page

15    of Exhibit 5.

16                Do you see that?

17          A.    Yes.

18          Q.    Okay.  Can you please read that

19    first sentence under "Conclusions"?

20          A.    "There is increased risk for

21    heroin use among adolescents who initiated

22    non-medical misuse or adolescents prescribed

23    opioids in more recent cohorts."

24          Q.    Okay.  Do you have any reason to

1   dispute that as a conclusion of Dr. McCabe and

2   his colleagues?

3        A.   I would need to apply -- I would

4   need to look through this article and dig deeper

5   into it as I would any article before I kind of

6   just take the conclusion at face value.

7        Q.   Okay.  Well, let's look at Table 2

8   of this article, and take as much time as you

9   need to review it.  We can take a break if you

10  want to review the entire article.  It's only

11  three pages, four pages.

12            Do you want to do that, or do you

13  want to go through it with me?

14        A.   I don't mind either way.  I can

15  look at it with you.

16        Q.   All right.

17        A.   If I need more time, I'll let you

18  know.

19        Q.   Okay.  Let's look at Table 2 here.

20  It's titled "Prevalence and Adjusted Odds of

21  Heroin Use Over 17 Years as a Function of

22  Medical Use and Nonmedical Misuse History of

23  Prescription Opioids During Adolescence."

24            Do you see that?

1        A.    Say that again, please.

2        Q.    Yeah.  I'm just reading the title

3   of Table 2.

4        A.    Yes.

5        Q.    Do you see the title there?

6        A.    Yes, I see it.

7        Q.    Okay.  They -- this uses a term

8   "AOR" that they define as adjusted odds ratio.

9              Do you see that?

10       A.    Yes.

11       Q.    What is an odds ratio?

12       A.    I don't recall the exact

13  definition.

14       Q.    Is that an epidemiological term?

15       A.    I don't recall exactly who kind of

16  owns that term.  It's utilized in research.

17       Q.    Okay.  Do you know what it means?

18       A.    Like I said, I don't know the

19  exact definition of it right here right now as I

20  sit.

21       Q.    Do you know the definition of the

22  term "odds ratio" in an epidemiological context?

23       A.    I'm familiar with that but unable

24  to recite or recall an exact definition as we

1    sit here.

2           Q.    Okay.  And then they also use this

3    term "CI."

4                 Do you see that?

5                 It's in the heading where it says

6    "Baseline Opioid Exposure (Modal Age 18)."

7                 Do you know what a mode is?

8           A.    I mean, these -- I'm familiar with

9    statistics, as many articles report back topics,

10   and these are statistical terms.

11          Q.    Okay.  What does "mode" mean in

12   the statistical context?

13          A.    I can't recall exact definition.

14          Q.    Okay.  And then do you see it says

15   AOR -- the first column, "AOR (95 percent CI)"?

16          A.    Yes.

17          Q.    Do you know what a "CI" is?

18          A.    They likely refer to what that is

19   somewhere here.  Typically it means confidence

20   interval, but I'd want to see -- I'd want to

21   make sure that they -- usually somewhere -- the

22   first time they state that in an article,

23   they'll usually abbreviate it thereafter.  So I

24   just want to make sure that that's --

1          Q.    Okay.  Let's assume it means

2    confidence interval.  What is a confidence

3    interval?

4          A.    Again, it's the physical term.

5    I can't -- I'm unable to recall, I apologize,

6    the exact definition as we sit here.

7          Q.    Okay.  And then it says in that

8    first column, AOR, adjusted odds ratio, and then

9    it says 95 percent CI.  And then there's a

10   little symbol.  And if you look at the reference

11   to the symbol there, it refers you down into

12   the -- underneath the table.

13              Do you see that?

14         A.    I see some p-values.

15         Q.    Yeah.  Right.  Let's look -- so

16   there's a couple different instances of

17   p-values.

18              Do you know what p-values are,

19   what that term means?

20         A.    These are a variety of statistical

21   terms that as we sit here now I'm unable to

22   recall the exact or precise definition.  So I

23   apologize.

24         Q.    All right.  So if we look at the

1  right column here, it says, "Recent baseline

2  cohorts (1997 to 2000) heroin use ages 19 to

3  35."

4           Do you see that?  It's the

5  right-hand column of Table 2 of Exhibit

6  Number 5.

7       A.    You said which one again?

8  I apologize.

9       Q.    Yeah, the column on the right,

10  "Recent Baseline Cohorts."

11       A.    Yes.  Yes.

12       Q.    Okay.  So if you look at the

13  "medical use only" row, it shows an adjusted

14  odds ratio of 2.68.

15           Do you see that?

16       A.    Yes.

17       Q.    Do you know -- do you have any

18  idea what that means?

19       A.    Again, this is getting --

20  I would -- this is getting into statistical kind

21  of referencing.

22       Q.    Okay.  Do you know whether this

23  article, the McCabe article, Pills to Powder,

24  Exhibit Number 5 -- do you know whether this

1   substantiates the gateway theory of prescription

2   opioids to heroin use?

3          A.    I don't believe it does.

4   I believe it just only demonstrates, you know,

5   correlation, not necessarily causation.

6          Q.    Why do you say that?

7          A.    Because that's a limitation of a

8   study like this based on how it's designed.

9          Q.    How is this study designed?

10         A.    The methods outline that.  The

11   discussions in the article would have to kind of

12   touch on that as well.  There are many studies

13   like this.

14         Q.    Like what?

15         A.    That demonstrate a wide variety

16   of -- not just with opioids.  Many studies,

17   whether they make it to news media or stay in

18   journals, they demonstrate a wide variety of

19   correlations, but that does not equal causation.

20   That's a pre-foundational teaching topic for

21   those that are kind of initially approaching

22   literature such as this.

23         Q.    Does this analysis that's

24   reflected in the McCabe paper, Pills to Powder,

1    Exhibit Number 5, does this analysis establish

2    that there was an increased risk for any

3    subsequent heroin use among adolescents who had

4    already initiated non-medical prescription

5    opioid misuse and adolescents prescribed opioids

6    in more recent cohorts?

7              MR. CARDI:  Object to form.

8         A.    Again, I just want to say that

9    correlation doesn't equal causation.

10             Q.    Okay.  Do you understand the

11   concept of increased risk?

12             A.    I'd want you to define increased

13   risk.  I mean, I think it -- risk can mean a lot

14   of different things in a lot of different

15   contexts.  I know it doesn't mean cause.

16             Q.    Is it your belief that there is no

17   plausible, biological explanation for exposure

18   to prescription opioids causing heroin use

19   later?

20             A.    I'm sorry.  I had trouble

21   following that question.

22             Q.    Okay.  Well, let me back up then a

23   little bit, and let's see if we can put it into

24   context.

1                    Are you familiar with the Bradford

2      Hill criteria?

3           A.    I don't recall the exact criteria,

4      as we sit here.

5           Q.    Okay.  Have you ever heard of the

6      Bradford Hill criteria?

7           A.    I believe I've heard of it before.

8           Q.    Okay.  And what is it in general

9      terms?

10          A.    I don't -- I'm unable to recall,

11     as we sit here.

12          Q.    Okay.  What do you know about the

13     Bradford Hill criteria?

14          A.    I've heard the term used before.

15          Q.    But you don't know what it means?

16          A.    I can't recall exactly, as we sit

17     here.

18          Q.    Do you believe that for

19     epidemiologists, to establish a causal

20     relationship between two variables, that they

21     must establish a plausible mechanism between

22     cause and effect?

23          A.    Can you repeat that, please.

24          Q.    Sure.

1                    Do you believe, in your opinion,

2      that for an epidemiologist to establish a causal

3      relationship between two variables, that the

4      epidemiologist must establish a plausible

5      mechanism between cause and effect?

6           A.     That question comes to me -- it

7      feels vague because I think as far as the

8      complex illness of addiction, it gets way more

9      challenging, so I don't -- I'm not sure if

10     you're kind of -- that's open enough to say that

11     there could be scenarios.

12                   I think with addiction, the

13     challenge is kind of establishing causality, the

14     bar is much, much higher because of the complex

15     nature of this illness and the variety of

16     factors that can contribute.

17          Q.     Have you ever reviewed any of the

18     data from the National Survey on Drug Use and

19     Health, sometimes called NSDUH?

20          A.     I don't recall exactly.

21          Q.     As part of your work in this case,

22     did you review any of the NSDUH data?

23          A.     I don't recall.

24          Q.     As part of your work in this case,

1   have you reviewed any articles or any data that

2   address the question of whether exposure to

3   prescription opioids is a risk factor for using

4   illicit opioids?

5           A.    Sorry.  I'm having trouble with

6   that question.

7           Q.    Sure.

8                 Have you -- as part of your work

9   in this case, have you reviewed any articles or

10  any data about the question of whether exposure

11  to prescription opioids is a risk factor for

12  later using illicit opioids?

13          A.    I don't believe so.

14          Q.    You know that there are a lot of

15  articles out there that establish through data

16  that exposure to prescription opioids is a risk

17  factor for later using heroin, right?

18                MR. CARDI:  Object to form.

19          A.    Again, I think I discussed this

20  when I gave my opinion on the gateway theory,

21  and then also with respect to studies that

22  establish correlations but not necessarily

23  causations.  And the challenges of doing so with

24  respect to an illness as complicated as

```
 1   addiction.

 2        Q.    Okay.  Have you read any articles

 3   that establish a correlation between use of

 4   prescription opioids and later use of heroin and

 5   other illicit opioids?

 6        A.    I don't recall the specifics,

 7   other than the fact that we discussed anyone

 8   with a use disorder, opioid use disorder,

 9   there's really not a discrimination regarding

10   what -- you know, what opioid they end up having

11   an unhealthy relationship with, unless it's

12   their own preference.

13             MR. CARDI:  Mark, we're at an hour

14        here.  Whenever it's a good time for a

15        break.

16             MR. CHALOS:  All right.  We're not

17        quite there yet, but we'll take a break

18        relatively soon.

19                   - - -

20      (Marshalek Deposition Exhibit 6 marked.)

21                   - - -

22   BY MR. CHALOS:

23        Q.    Let me -- please turn to page --

24   sorry -- tab 15.  We'll mark as Exhibit Number 6
```

1   this article.  It's by Cicero, et al.  The title

2   is "The Changing Face of Heroin Use in the

3   United States:  A Retrospective Analysis of the

4   Past 50 Years."  Published in the JAMA

5   Psychiatry.  It's a Journal of the American

6   Medical Association, Psychiatry, 2014, Volume 71

7   (7), pages 821 to 826, published May 28, 2014.

8              Are you, Doctor, a member of the

9   American Medical Association?

10             Sorry.  I didn't catch that.  Was

11  that yes?

12        A.   No.  Sorry.

13        Q.   Okay.

14        A.   You asked me -- I want to make

15  sure I understand.  You asked me if I am a

16  member?

17        Q.   Right.  Are you a member of the

18  American Medical Association presently?

19        A.   No.

20        Q.   Have you ever been a member of the

21  American Medical Association?

22        A.   I don't recall.

23        Q.   Have you ever read the Journal of

24  the American Medical Association, Psychiatry?

1          A.    I may have.

2          Q.    Okay.  Take as much time as you

3    need to review this article.

4                My question to you first is going

5    to be:  Have you ever seen this article that

6    we've marked as Exhibit Number 6 before today?

7          A.    I can't recall.

8          Q.    Have you ever participated in any

9    clinical studies as a researcher?

10         A.    I believe so.

11         Q.    Okay.  Related to opioids in any

12   way?

13         A.    I believe so.

14         Q.    Okay.  What studies have you

15   participated in?

16         A.    I can't recall all the exact

17   studies.  Being at an academic center, we often

18   collaborate if a discipline is joined together.

19         Q.    Do you recall any studies that

20   you've participated in as a researcher related

21   to opioids?

22         A.    Can you define what "related to

23   opioids" means?

24         Q.    Have you -- do you recall any

1    studies that had anything at all to do with

2    opioids that you've participated in as a

3    researcher?

4          A.    Yeah.  Many of those have been

5    published.

6          Q.    Okay.  So they're listed in your

7    report; is that right?

8          A.    I believe so.

9          Q.    Have you participated as a

10   researcher in any studies that are not listed in

11   your report?

12         A.    Those would be yet to be

13   published.  They're still ongoing research

14   activities.

15         Q.    Do any of those relate to opioids

16   or involve opioids in any way?

17         A.    I don't recall the exact -- I'd

18   have to look and see.  I don't know exactly

19   everything.  Any -- yeah, I mean -- I don't

20   think so, no, but I can't be 100 percent sure.

21   I'm just not able to recall.

22         Q.    All right.  Well, let's look at

23   page 823.  It's the one, two -- third page of

24   Exhibit 6, Figure 1.

1             Do you see that?

2        A.    Figure 1?

3        Q.    Yes, sir.  It's on the right side.

4        A.    Yes.  I see it.

5        Q.    Okay.  And the title of this is,

6   "Percentage of Total Heroin-Dependent Sample

7   That Used Heroin or a Prescription Opioid as

8   Their First Opioid of Abuse."

9             Do you see that?

10       A.    Yes.

11       Q.    And if you look at the line graph,

12  do you see the line with the circle says

13  "Prescription Opioid," and the line with the

14  square says "Heroin"?

15       A.    Yes.

16       Q.    And if you look from 2000s through

17  the 2010s, it shows that for those two decades,

18  between 60 and 75 percent of the sample reported

19  prescription opioids as their first opioid of

20  abuse.

21             Do you see that?

22       A.    Where exactly?

23       Q.    If you look at the 2000s on the

24  X axis.

```
 1           A.    Yes.

 2           Q.    You go up from there to the line

 3   with the circle on it, right there, and it's

 4   about, I don't know, 74, 75 percent of the

 5   sample.

 6           A.    Yes.

 7           Q.    Do you see that?

 8           A.    Yes, I see it.

 9           Q.    And then if you look at the 2010s,

10   it's somewhere about 65, 64, 65 percent.

11                 Do you see that?

12           A.    Yes.

13           Q.    And the conclusion that the

14   authors in the Journal of American Medical

15   Association, Psychiatry, Dr. Cicero, et al.,

16   reached here is that 75 percent of those who

17   began their opioid abuse in the 2000s reported

18   that their first regular opioid was a

19   prescription drug.

20                 Do you agree that that's what's

21   reflected in this chart?

22           A.    You referred where after we looked

23   at the chart again?

24           Q.    Well, if you look at the chart,
```

1  you can -- what I just read is from right

2  underneath the chart under "Opioid Abuse

3  Initiation," the paragraph that starts with

4  Figure 1.

5          A.    I think, again, correlation

6  doesn't equal causation.  I think this -- I see

7  this, and it reminds me of a statement I made in

8  my report, which is addiction -- if there's been

9  an addiction epidemic, it doesn't discriminate

10 whether it's prescription opioids or heroin.  So

11 it's like heroin was the problem, and now it's

12 prescription opioids, then it's heroin.

13          So I think that this illness

14 really doesn't discriminate, and it doesn't care

15 if it's opioids.  It looks for anything to burn

16 through, and it's fueled by more than just I

17 think a substance in and of itself.  The

18 substance is not what causes this illness.

19 That's my opinion.

20          Q.    Do you believe that the rate of

21 opioid use disorder in the United States has

22 been consistent for the last, let's say,

23 50 years?

24          A.    I'm not -- as we sit here, I'm not

1    able to answer that question.

2           Q.    Have you seen any data that

3    establishes the rate of opioid use disorder

4    increased substantially as the number of opioid

5    prescriptions increased?

6           A.    Can you ask that again?

7           Q.    Sure.

8                 Have you ever seen any data that

9    establishes that the rate of opioid use disorder

10   in the United States increased substantially as

11   the number of opioid prescriptions increased?

12          A.    I can't recall, as we sit here.

13          Q.    Do you know one way or the other

14   whether that's true?

15          A.    Whether there are more patients

16   with opioid use disorder now?

17          Q.    No.  That the rate of opioid use

18   disorder increased substantially as the number

19   of opioid prescriptions increased?

20          A.    I can't recall, as we sit here.

21                MR. CHALOS:  All right.  Let's

22          take a break.

23                THE COURT REPORTER:  We are off

24          the record at 11:26 a.m.

```
 1                    (Recess taken.)

 2                    THE COURT REPORTER:  We are back

 3            on the record at 11:36 a.m.

 4    BY MR. CHALOS:

 5            Q.    Doctor, in connection with your

 6    work in this case, did you do any literature

 7    searches?

 8            A.    Yes.  It's common.  I'm in the

 9    literature all the time.

10            Q.    Okay.  Did you do that

11    specifically in connection with your work here

12    for your report?

13            A.    That's hard, because I'm just in

14    it so often for routine clinical practice and

15    then over the course of my career, and, yes, for

16    the report.

17            Q.    What searches did you do

18    specifically in connection with preparing your

19    report in this case?

20            A.    That, I'd have trouble recalling.

21            Q.    How did you find the articles that

22    are listed in your report?

23            A.    They're indexed in PubMed, the

24    database.
```

1          Q.    Did you find all of the articles

2    that are listed in your report?

3          A.    Did I find?

4          Q.    Yes, sir.

5          A.    What do you mean by that?

6          Q.    In other words, did anybody direct

7    you to these articles, or did you just do

8    literature searches and found the articles that

9    are listed in your report?

10          A.    More the latter.

11          Q.    Okay.  So you found the articles

12    that are listed in your report?

13          A.    Yes.

14          Q.    How did you do that?

15          A.    Utilizing the database that's

16    PubMed.

17          Q.    In the course of doing your

18    literature searches, did you find any articles

19    that addressed the correlation between exposure

20    to prescription opioids and the later use of

21    illicit opioids?

22          A.    I have difficulty recalling that.

23          Q.    Would you keep any record of your

24    literature searches?

1          A.    I don't believe so.  That's not my

2   standard practice.

3          Q.    Okay.  Did you find in the course

4   of your literature searches either the Cicero

5   article or the McCabe article that we discussed

6   so far today?

7          A.    I don't recall.

8          Q.    How did you decide which articles

9   to include in your report?

10          A.    Again, I practiced clinically for

11   a number of years, and that clinical experience

12   is invaluable.  That also requires regular

13   interfacing with these indices and these journal

14   articles.

15               So I've read countless articles,

16   too many to count and recall that if all either

17   kind of informed my practice or maybe not,

18   depending on my interpretation of the evidence

19   put forth by those articles.

20               It's my job as a clinician to kind

21   of critically analyze the evidence base that

22   grows.  These evidence bases grow, and then it

23   go to inform standards of care.  That's where I

24   live, seeing patients, treating patients.

1    That's my primary job.

2        Q.    How did you decide what articles

3    to include in your report?

4        A.    I don't recall exactly my

5    decision-making process, other than what I just

6    discussed.  Much of my experience, much of my

7    familiarity with what's written -- or not

8    necessarily the specifics, but what would be

9    referred to as evidence bases.

10       Q.    Surely in your -- oh, I'm sorry.

11   Go ahead.

12       A.    No.  Go ahead.

13       Q.    Surely in your search of the

14   literature, you found articles that did not

15   support or maybe even contradicted some of the

16   statements in your report, correct?

17       A.    That's possible.  I think, again,

18   that's my job as a clinician, to weigh these

19   evidence bases and determine how I'm going to

20   let the evidence that emerges every time

21   something is published, if that's sufficient

22   enough evidence to shift my practice.

23       Q.    But you chose not to include in

24   your report any articles that contradicted any

1    of your statements, right?

2              A.    My report contains my opinions.

3    My references substantiate those.

4              Q.    Did you include in your report any

5    references that contradict any of your opinions?

6              A.    Not that I recall.

7              Q.    And you understand that part of

8    the process of making opinions based on medical

9    literature and research is the back-and-forth

10   among scholars where some might disagree, right?

11             A.    My career has been in an academic

12   setting, so I'm familiar with that.

13             Q.    And it's possible that some of

14   your opinions are wrong?

15             A.    What do you mean by that?  I'm

16   sorry.

17             Q.    Okay.  It's possible that some of

18   the statements that you've made in your report

19   are, in fact, wrong?  They're just not correct,

20   right?

21             A.    They're just my opinions.

22             Q.    Right.  So they might be right.

23   They might be wrong.

24                   MR. CARDI:  Object to form.

1          A.     We could just say that they're my

2     opinions.

3          Q.     Is it possible some of them are

4     wrong, Doctor?

5          A.     These are my opinions as I hold

6     them now and outlined in this report.  That's

7     all they are.

8          Q.     And there's certainly data out

9     there that contradict your opinions, right?

10               I'm sorry.  What was your answer?

11          A.     I'm sorry.  I want you to ask that

12     again.

13          Q.     Sure.

14               There are certainly data out there

15     that contradict your opinions, correct?

16               MR. CARDI:  Object to form.

17          A.     There may be.

18          Q.     Have you ever seen any of the

19     evidence that established that restricting

20     prescription opioid supply among those who are

21     dependent on opioids has led to an increase in

22     heroin use?

23          A.     I'm sorry.  I missed the first

24     part of that question.

1          Q.     Sure.

2                 Have you seen any of the evidence

3     that establishes that restricting the

4     prescription opioid supply among those who are

5     dependent on opioids has led to an increase in

6     heroin use?

7          A.     I can't recall right now, as I sit

8     here.

9          Q.     Is that consistent with what

10    you've seen in your clinical practice?

11         A.     Is what consistent?  I'm sorry.

12         Q.     That the restriction of

13    prescription opioid supply among those who are

14    dependent on opioids has led to an increase in

15    heroin use?

16         A.     I'm sorry.  I'm having trouble

17    with that question.

18         Q.     Okay.  What's your trouble with

19    it?

20         A.     I want to make sure I'm

21    understanding it correctly.  I think I want to

22    hear the first part again.

23         Q.     Okay.  In your clinical practice,

24    have you seen that the restriction of the

1    prescription opioid supply for those who are

2    dependent on opioids has led to an increase in

3    their heroin use?

4          A.    I think currently it's more

5    fentanyl, I would say.

6          Q.    Okay.  So let me ask it more

7    broadly.

8                Have you seen in your clinical

9    practice that the restriction of the

10   prescription opioid supply among those who are

11   dependent on opioids has led to an increase in

12   illicit opioid use?

13         A.    My clinical practice, the patients

14   I care for with opioid use disorder, especially

15   those with severe disorder, really don't

16   discriminate.  They use whatever opioid that's

17   the most easily assessable and/or cheapest.

18   They don't discriminate.

19               Just like the illness of addiction

20   itself, I stated before I don't feel

21   discriminates regarding what substance.  It can

22   shift from one to the other, and it does not

23   have to be a substance.

24         Q.    Do you agree that a small but

1  significant proportion of individuals who used

2  prescription opioids have progressed to heroin

3  use?

4          A.    There are a few words at the

5  beginning part of that question I'd like to hear

6  again.

7          Q.    Sure.

8                Tell me if you agree with this

9  statement:  A small but significant proportion

10  of individuals who use prescription opioids

11  progressed to heroin use?

12          A.    I don't know if I agree with how

13  that's phrased.

14          Q.    Okay.  What's your disagreement?

15          A.    The juxtaposition of small but

16  significant.

17          Q.    Okay.  How about this:  Some

18  individuals who use prescription opioids

19  progress to heroin use?

20          A.    I've seen that clinically.  That

21  fails to really take into account what was going

22  on before the prescription opioids, which is

23  often overlooked, in my opinion, clinically.

24          Q.    If you would, sir, can you please

1  turn to Exhibit Number 1, which is your report

2  in this case, page 9, which is your prior

3  testimony.

4          A.    Yes.

5          Q.    Okay.  You've listed four matters

6  in which you've provided testimony at trial or a

7  deposition during the prior four years.

8              Do you see that?

9          A.    Yes, I do.

10         Q.    Okay.  Let's talk about these in

11  order.  The first case is the United States

12  versus Brizuela.  I don't know if I'm

13  pronouncing that correctly.

14         A.    I believe so.

15         Q.    Okay.  And then the second case is

16  the United States versus Brizuela and Naum,

17  N-a-u-m.

18              Are those the same case, or are

19  those different cases?

20         A.    Those are different.

21         Q.    All right.  Let's talk about the

22  first one then, United States versus Brizuela.

23              Did you give testimony at trial or

24  just in a deposition?

1          A.     Brizuela, it was testimony in

2    court, the trial.

3          Q.     Is that a criminal case?

4          A.     Yes.

5          Q.     And what was the nature of your

6    testimony?

7          A.     That he was running a pill mill.

8          Q.     Okay.  Brizuela was a doctor?

9          A.     Yes.

10          Q.     And you testified on behalf of the

11   government?

12          A.     Yes.

13          Q.     And the government was prosecuting

14   Dr. Brizuela criminally?

15          A.     I believe so.

16          Q.     Okay.  And how did that case turn

17   out?

18          A.     I can't recall the specifics, but

19   I think it resulted in a -- I don't want to

20   misuse the legal term, so -- I think there was a

21   conviction, though, if that's the right way to

22   say it or ...

23          Q.     Did Dr. Brizuela go to prison?

24          A.     I'm not aware of any of those

1    outcomes downstream of ...

2         Q.    Approximately when was that that

3    you testified in the trial in the United States

4    versus Brizuela?

5         A.    Oh, I'm sorry.  I can't recall the

6    exact dates.  I think it was pre-pandemic.

7         Q.    Dr. Brizuela's clinic was in

8    Morgantown?

9         A.    I believe so.

10        Q.    And you also listed that you

11   testified in another case, United States versus

12   Brizuela and Naum, N-a-u-m, and you said that's

13   a different case from the first case against

14   Dr. Brizuela; is that right?

15        A.    Yes.

16        Q.    Okay.  What was the difference

17   between the cases?

18        A.    One was a pain management --

19   Brizuela was operating as, I think, an

20   independent practitioner, a clinic that was a

21   pill mill.  And as we've seen, a lot of the pill

22   mills then moved away from prescription opioids

23   into kind of pill mills with respect to

24   medications for opioid use disorder,

1    specifically buprenorphine-based compounds.

2              And he was also involved in a pill

3    mill that was distributing buprenorphine-based

4    products, an addiction treatment clinic that was

5    ultimately a pill mill.

6         Q.    You testified in trial in the

7    Brizuela and Naum case?

8         A.    Yes.

9         Q.    Did you give a deposition in that

10   case?  I assume not, but did you?

11        A.    I don't believe so.

12        Q.    Did this trial result in a

13   conviction?

14        A.    I believe so, but I can't recall

15   exactly.

16        Q.    And you've listed a third case,

17   United States versus Naum, in the Northern

18   District of West Virginia.

19              Was that also a criminal case?

20        A.    I believe so.

21        Q.    And you testified on behalf of the

22   federal government?

23        A.    Yes.

24        Q.    Was this another pill mill case?

1          A.     Yes, addiction treatment clinic.

2          Q.     Is Naum a doctor, or was Naum a

3     doctor?

4          A.     Yes.

5          Q.     Was your testimony in these three

6     cases -- was the nature of your testimony in

7     general the same, that these doctors were

8     prescribing opioid medications improperly?

9          A.     I believe so, whether it was

10    prescription opioids for pain in the context of

11    a pill mill not being legitimate or prescription

12    medications -- prescription opioids for

13    substance use disorder treatment in the context

14    of a pill mill, not legitimate.

15         Q.     Did your testimony in any of these

16    three cases relate to in any way the pharmacy

17    dispensing opioids?  In other words, was the

18    substance of your testimony related to a

19    pharmacy dispensing opioids?

20         A.     I don't believe so.  It was

21    focused more on the legitimacy of the orders

22    issued by the practitioners with prescriptive

23    authority.

24         Q.     Okay.  Was Dr. Naum convicted in

1   the third case?

2          A.    I believe so, but can't recall

3   specifics.

4          Q.    The fourth case, Hatcher versus

5   B&K Pharmacies, Inc., the Circuit Court of

6   Mingo County, West Virginia, what was the nature

7   of that case?

8          A.    I have difficulty recalling

9   specifics, but it, again, was associated with a

10  pill mill.

11         Q.    Who did you testify on behalf of

12  in that case?

13         A.    I can't recall the specifics at

14  this point.

15         Q.    Was that a criminal case?

16         A.    I do not recall.

17         Q.    When was that case?

18         A.    Either -- I think it was before

19  the pandemic at some point.

20         Q.    Did you testify in a deposition?

21         A.    Yes.  So it was a deposition.

22         Q.    Did you ever testify in a trial?

23         A.    No.

24         Q.    Were you testifying on behalf of

1   the pharmacy in that case or against the

2   pharmacy?

3          A.    I do not recall the specifics.

4   I was -- I rendered opinions regarding, I think,

5   with just the pill mill and the legitimacy of it

6   and similar ...

7          Q.    Similar to what?

8          A.    I think prior -- prior work.

9          Q.    Similar to the work in the

10  Brizuela and Naum cases?

11         A.    If I recall correctly, regarding

12  kind of standards of practices regarding pain

13  management, legitimacy of prescriptions,

14  opioids, addiction.

15         Q.    Was this a case where families of

16  patients were suing the pharmacies for providing

17  opioids to them?

18         A.    I'm not sure.  I apologize.

19  I can't recall.

20         Q.    Did you in the Hatcher versus B&k

21  pharmacies case give any opinions about the

22  standard of care applicable to pharmacies?

23         A.    Not that I can recall, other than

24  I think commenting on -- unless it was -- pill

1   mills are really criminal enterprises as opposed

2   to clinical practices.  And in order to maximize

3   profits, a lot of prescriptions need to be

4   written for and filled ultimately, and sometimes

5   those pill mills grow to include pharmacies and

6   interface with them in a manner to further the

7   criminal enterprise.

8           Q.    Did that case, the Hatcher case --

9   did your testimony in the Hatcher case involve

10  you giving any opinions about the pharmacies

11  themselves?

12          A.    I can't recall.

13          Q.    Who hired you in that case?  Was

14  it a law firm?

15          A.    Yes.

16          Q.    Do you remember the name of the

17  law firm?

18          A.    I think it was Legato & Cagle.

19          Q.    Did that case ever go to trial?

20          A.    I don't recall.  I think it may

21  have settled.

22          Q.    Other than these four cases in the

23  last four years, have you at any time given

24  testimony as an expert by deposition or trial,

1   other than these four cases?

2          A.    Not that I'm aware of.

3          Q.    At any time -- I'm not limiting my

4   question to the last four years.

5                At any time have you given

6   testimony as an expert in deposition or trial

7   other than these four cases?

8          A.    I don't believe so.

9          Q.    Have you ever given testimony that

10  you recall here today regarding the obligations

11  of pharmacies as it relates to filling opioid

12  prescriptions?

13         A.    I don't recall doing so.

14         Q.    Have you given testimony either by

15  deposition or at trial at any time regarding the

16  role of the federal government in regulating the

17  opioids industry?

18         A.    I don't believe so.

19         Q.    Have you ever given testimony

20  either by deposition or at trial regarding your

21  opinions about the gateway theory related to

22  prescription opioids and illicit drugs?

23         A.    I do not believe so.

24         Q.    Have you ever given testimony in

1   any deposition or trial regarding the

2   responsibility of community pharmacies for the

3   crisis of addiction?

4          A.    I don't recall doing so.

5          Q.    Has your testimony ever been

6   successfully excluded from any court proceeding?

7          A.    Can you define -- I'm not sure if

8   I understand what that would mean.

9          Q.    Yeah.  That's probably a legal

10  term.

11               Sometimes in court proceedings,

12  one side will challenge whether an expert should

13  be permitted to give testimony in a trial.

14               Has that ever -- has anybody ever

15  challenged your ability to give testimony in any

16  of the four trials you've been -- or four cases

17  you've been involved in?

18         A.    I think, if I recall correctly,

19  that occurred in the context of maybe -- that

20  was part of -- I think they did -- yeah, I'm

21  sorry.  I don't -- I don't understand all the

22  legal terms and kind of that process, but I know

23  that came up as a question when I was

24  testifying.  And I think then they let me move

1    forward with that.

2            Q.    You've anticipated my next

3    question, which is do you know whether those

4    challenges were successful?

5            A.    I don't believe they were.

6            Q.    Other than the four cases where

7    you've provided testimony either at trial or in

8    a deposition, have you ever written a report for

9    litigation but then were not asked to give

10   either deposition or trial testimony?

11           A.    I believe that's occurred in --

12           Q.    On how many occasions has that

13   occurred?

14           A.    Well, I think some of it depends

15   on who was kind of making the initial request

16   for work.

17                 So I think with the cases that --

18   the cases with the federal government, they

19   initially are kind of brought forward or the

20   connecting link, as we discussed earlier, is

21   with the investigators at the DEA.

22                 So I'd say roughly half of the

23   cases brought to me regarding kind of

24   prescribing practices have led -- you see what's

1    up here now.  Probably the other half didn't

2    really lead to any -- you know, didn't move

3    forward to formal report preparation and/or

4    testimony.

5          Q.    How about in any civil cases?

6    Have you ever written a report and then did not

7    give either deposition or trial testimony?

8          A.    I don't believe so.  The other

9    work I think listed on my CV, I've worked for

10   the Board of Medicine in kind of more

11   administrative board actions that didn't

12   progress to that point.

13              And then I also consulted with the

14   Maryland Attorney General's Office in another

15   case that never progressed due to, I think,

16   federal prosecution kind of occurring.

17         Q.    Did you give a report or write a

18   report in that case?

19         A.    No, I don't believe I did.

20         Q.    Have you ever testified before

21   Congress?

22         A.    No.

23         Q.    Have you ever given testimony

24   before a grand jury?

```
 1              A.    I don't believe so.

 2                         - - -

 3        (Marshalek Deposition Exhibit 7 marked.)

 4                         - - -

 5   BY MR. CHALOS:

 6              Q.    Let's mark as the next numbered

 7   exhibit tab 1, which is your curriculum vitae.

 8                   MR. CHALOS:  This will be, what,

 9             Exhibit 6?

10                   TRIAL TECH:  7.

11                   MR. CHALOS:  7.

12   BY MR. CHALOS:

13              Q.    Okay.  Exhibit 7 will be your

14   curriculum vitae, which is tab 1 of your

15   notebook.

16                   Tell me when you have that in

17   front of you, Doctor.

18              A.    I do.

19              Q.    Is everything listed in Exhibit 7,

20   your curriculum vitae, accurate?

21              A.    To the best of my knowledge.

22              Q.    Is it current?

23              A.    I believe so.

24              Q.    Let's walk through this.
```

1                    Your education, you got your

2    Bachelor of Science at the West Virginia

3    University in May of 2020 [sic]; is that right?

4            A.    Yes.

5            Q.    And then you started medical

6    school shortly thereafter in July of 2020 [sic]

7    at WVU as well?

8            A.    Yes.

9            Q.    The general psychiatry training,

10   is that the residency you did in psychiatry?

11           A.    That is correct.

12           Q.    What made you decide to go into

13   psychiatry?

14           A.    That's a good question.

15                    I always tell people I would have

16   laughed if you told me when I started out in med

17   school I was going to go into psychiatry.  But I

18   think it's -- I had wonderful experience doing

19   my clerkship and kind of understood the things

20   that psychiatrists were able to diagnose and

21   treat and had the most fun doing that.  So

22   that's the path I went down.

23           Q.    Did you intend when you decided on

24   psychiatry as a focus to get into addiction

1    medicine?

2         A.    Well, yeah, I think addiction

3    being part of -- part of psychiatry.  I think

4    that -- seeing that addiction was being

5    approached as an illness and treated and being

6    treated by psychiatrists and other allied health

7    professionals was certainly a pull.  Not the

8    only pull, but a pull in the direction of

9    psychiatry.

10         Q.    Did you grow up in Morgantown?

11         A.    Yes, I did.

12         Q.    You saw, I assume through your

13    adolescence and adulthood, that there's a real

14    bad opioids problem in Morgantown?

15              MR. CARDI:  Object to form.

16         A.    I always pivot back and say, you

17    know, it's an addiction problem.  Yeah.  Some of

18    my -- if I look through a high school yearbook,

19    I'll see some folks that aren't here anymore and

20    for a variety -- you know, alcohol, opioids,

21    other drugs.

22         Q.    You got your medical license in

23    2007?

24         A.    Yes.

1          Q.    And it's listed here that you have

2    a certification that says ABPN.  What does that

3    mean?

4          A.    That's the American Board of

5    Psychiatry and Neurology.  That's the

6    governing -- that's the board that allows me

7    to -- allowed me to seek and receive a

8    certification in psychiatry.

9          Q.    I see.

10               And you got that in January of

11   2012 for psychiatry?

12         A.    Yes.  That certification process

13   entailed sitting for and passing a written exam,

14   and then going forward and doing an oral portion

15   of the board as well.

16         Q.    Did you pass the boards on your

17   first attempt?

18         A.    Yes.

19         Q.    You also have an ISN-ECT

20   certification.  What is that?

21         A.    That was a certification that ISN,

22   the International Society for Neuro --

23   modulation or simulation.  I apologize because

24   they've changed their name maybe since I

1    received that initially.

2              Looking at some of the

3    neuromodulation, which would entail

4    electroconvulsive therapy or ECT, transcranial

5    magnetic stimulation or TMS.

6         Q.    Do you administer ECT as part of

7    your practice?

8         A.    Yes, yes.  A big part of my

9    practice is also focusing on advancing therapies

10   for patients suffering from treatment resistant

11   mood disorders.

12        Q.    Do you use ECT as an addiction

13   treatment?

14        A.    I mean, that's a good question.

15   I think -- you know, addiction I think doesn't

16   discriminate.  It oftentimes doesn't live alone,

17   so there are other comorbidities that will live

18   near it, chicken or egg, not always kind of

19   known clearly at the time what came first.

20              But, yes, I've taken care of

21   patients that have had serious alcohol use

22   disorders.  The alcohol was fueling a depression

23   and also kind of medicating it, and the patient

24   really wouldn't get better until we treated

1    their depression kind of aggressively with ECT.

2    And then that led to less relapses on alcohol

3    because they were feeling better, if that makes

4    sense.

5          Q.    You've also received a board

6    certification in addiction medicine?

7          A.    That is correct.

8          Q.    Did you pass those boards on your

9    first attempt?

10         A.    Yes, I did.

11         Q.    All right.  You were an assistant

12   professor at WVU School of Medicine between

13   July 2010 and June of 2017; is that right?

14         A.    That's correct.

15         Q.    Okay.  What did you teach?  What

16   courses did you teach?

17         A.    I can't recall the courses

18   I taught.  I think -- our academic rank is the

19   basis of kind of clinical, academic, and other

20   scholarly output.

21         Q.    Was that a full-time job?

22         A.    Yes.

23         Q.    And then you were promoted to

24   associate professor in July of 2017?

1          A.     That's correct.

2          Q.     You held that job until February

3    2022 when you left briefly to work in Portland,

4    Oregon; is that right?

5          A.     That's correct.  Yes.

6          Q.     Did you continue teaching at WVU

7    that spring of 2022?

8          A.     Yes.  That's why I was -- that's

9    why I think as I transitioned away, I retained a

10   clinical adjunct in order to do so.

11         Q.     What courses did you teach during

12   that time?

13         A.     I can't recall if there were any

14   active courses or didactics that I needed to

15   present at that -- during that kind of brief

16   time period.

17         Q.     Then you came back full time as an

18   associate professor in June of 2022?

19         A.     Correct.

20         Q.     What does it mean to be the

21   addiction division section chief which you've

22   done from September 2022 to present?

23         A.     We have a large group of allied

24   health professionals that treat patients with

1  substance use disorders.  It's a division that

2  encompasses routine ambulatory treatment of

3  those conditions.  And then all the way from

4  there to, you know, hospital-based treatment of

5  folks presenting in the emergency department

6  and/or to the clinical floor with a host of

7  things and everything in between, including

8  residential treatment.

9            So it's leading kind of a large

10  group that are working in a variety of clinical

11  settings and making sure that they have -- that

12  we grow it, that they're supported, that we're

13  adhering to the current standards, and so on.

14            Q.    Do you also have a clinical

15  practice currently?

16            A.    Yes.

17            Q.    And that's at the Chestnut Ridge

18  Center, or is it in addition to that?

19            A.    Well, my practice current --

20  I currently am -- the assignment I have is

21  running our consultation liaison service and

22  emergency psych services.  I'm filling in for a

23  provider who is out.

24            Q.    Who is "we" in that sentence?

1          A.    I'm sorry.  I can't remember when

2   I said "we."

3          Q.    Okay.  All right.  Let me ask

4   you -- fair enough.

5                You said the assignment you have

6   is running -- I'm sorry -- our consultation

7   liaison service.  Is that WVU's?

8          A.    Yes.  My academic appointment is

9   through WVU, the academic institution.  The

10  health system is also who's paying me to see

11  patients.

12               The patients I'm seeing currently

13  are in either Ruby Memorial Hospital floor

14  emergency department, primarily.  That's the

15  clinical area I'm covering due to the provider

16  that covers that -- those service lines is out.

17               And that includes general academic

18  consultation liaison service.  That includes a

19  substance use -- dedicated substance use

20  disorder team that I helped build and grow, and

21  some grant-funded emergency psych services to

22  system EDs.

23         Q.    What was that very last part?

24         A.    Grant-funded emergency psychiatry

1   services to system EDs.

2          Q.    EDs being emergency departments?

3          A.    Emergency departments.

4          Q.    What is the Chestnut Ridge Center?

5          A.    It's where my office is.  It's

6   a -- the upstairs is acute inpatient psych.  The

7   downstairs is ambulatory.  It's just one of many

8   centers that are kind of housing various service

9   lines that our department and health system has.

10         Q.    Is that part of the WVU network?

11         A.    Yes.  I kind of chuckle briefly

12  only because at one point in time -- and I'm the

13  last person to probably comment -- it was a

14  private institution owned by the Ramsey

15  Corporation that then, through the years,

16  funneled into the health system, and it's now

17  part of it, albeit a standalone, not directly

18  connected to the hospital.

19         Q.    Standalone physically you mean?

20         A.    Yeah.  Yeah.  It's like this

21  little two-story building that's -- yeah.

22         Q.    What is the William R. Sharpe, Jr.

23  Hospital?

24         A.    That's one of our state hospitals.

1        Q.    And you're currently on staff

2   there as a psychiatrist?

3        A.    No.  I was when I first came back

4   due to -- based on my prior administrative and

5   clinical experience and acute inpatient psych

6   and kind of medical directorship, that

7   institution right as I was coming back was in

8   transition.  They were transitioning from one

9   medical director to another.  And we were also

10  on-boarding a couple new faculty that I had

11  trained previously.

12            So I was asked, as I came back, to

13  kind of go down there and help with some of

14  those transitions.  I'm no longer down there

15  now.

16        Q.    I see.

17            When did you stop your work with

18  the Sharpe Hospital?

19        A.    I think it -- I might have listed

20  it.  Hold on.  Let me see.  Did I list it?

21        Q.    It says through present.

22        A.    Oh, that's -- that might be a

23  typo.  I think it was about -- somewhere between

24  August and September I transitioned away from

1    there.  That would need to be updated.

2    I apologize.

3         Q.    Okay.  Was your work at Cascadia

4    Behavioral Healthcare -- was that related to

5    addiction treatment?

6         A.    Yeah.  That was the pull-out there

7    that -- it was a certified community behavioral

8    health center that recently received FQHC

9    lookalike status.  So a big part of my career

10   had been trying to develop and deploy new

11   programming.

12              So this was a wonderful

13   opportunity to kind of continue to do so as the

14   combination of the FQHC and the certified

15   community mental health center would allow us to

16   deploy some novel programming for kind of whole

17   health, kind of collaborative or

18   multidisciplinary care.

19              So it was myself as the senior

20   psych leadership alongside an internal medicine

21   physician, senior medical leadership, and the

22   plan was to work together.

23         Q.    You said in your report in your

24   background that you assisted with the successful

1    launch of the WVU Medicine Center for

2    Integrative Pain Management.

3                    What is that?

4          A.    We expanded our pain clinic to

5    be -- become much larger and much more

6    comprehensive.  I was called upon to lend my

7    expertise with respect to psychiatry, pain

8    management, and addiction to help grow that, to

9    be able to tackle, you know, any number of cases

10   that would present there.

11         Q.    Is that still in operation?

12         A.    Yes, it is.

13         Q.    Do you have any involvement with

14   it presently?

15         A.    Indirectly just based on my role

16   as the addiction division section chief now.

17         Q.    Going back to your CV, Exhibit

18   Number 7, the section "Invited Lectures and

19   Presentations."  It's on pages 6, 7, 8, and most

20   of 9.  The last one listed here, the most recent

21   one listed, is May of 2021, "TMS for

22   Depression."

23                    Have you given any lectures or

24   presentations since May of 2021?

1          A.     Yeah.  I think I gave -- I need to

2     update that.  I gave one in September.

3          Q.     What was that about?

4          A.     On psychedelics and psychiatry.

5     It was an update of a talk I've given over the

6     years.

7          Q.     What's the nature of that talk?

8          A.     Just giving kind of some

9     historical context regarding medication -- you

10    know, what are psychedelics, and then kind of

11    fast-forwarding to some of what's going on now

12    regarding kind of ketamine for

13    treatment-resistant depression, MDA for

14    treatment-resistant PTSD, and psilocybin for

15    other treatment-resistant conditions.

16         Q.     Are there any invited lectures or

17    presentations that you've given that are not

18    listed on pages 6, 7, 8, and 9 of your

19    curriculum vitae?

20         A.     I don't believe so.  I hope this

21    is accurate and just needs to be updated to

22    reflect the last presentation we just discussed.

23         Q.     All right.  Starting on page 9

24    through pages 10, and most of page 11, your

1    publications are listed.

2              First of all, is this all

3    accurate?

4         A.    I believe it is.  I believe this

5    was everything in press currently.

6         Q.    All right.  Are there any articles

7    that you have -- that have been published that

8    you were involved with as an author or

9    researcher that are not listed here?

10         A.    Not that I can recall.

11         Q.    Have you submitted any articles

12    for publication that were rejected?

13         A.    I believe so.

14         Q.    Did any of those relate to opioids

15    in any way?

16         A.    I can't recall the exact projects.

17    Many of the -- I'd want to know how you're

18    defining "rejection."  A lot of times things

19    aren't accepted upon initial submission and

20    require, you know, some degree of revisions, as

21    I'm sure you're aware.  So I can't recall if

22    anything never kind of -- never really failed to

23    get published.

24         Q.    Okay.  You've listed your book

1    chapters starting on page 11 of Exhibit 7, and

2    it looks like there are two book chapters that

3    you've authored; is that right?

4           A.    I believe so.

5           Q.    Have you authored any other book

6    chapters other than the ones listed here?

7           A.    I don't believe so.

8           Q.    All right.  Editorial, you've

9    listed yourself as the associate editor of the

10   Frontiers in Public Health:  Substance Use

11   Disorder and Behavioral Addictions.

12               Do you see that?

13          A.    Yes.

14          Q.    It looks like there might be a

15   typo in "addictions" there for when you're

16   revising your resumé next.

17               Who publishes Frontiers in Public

18   Health?

19          A.    I don't recall.  Sorry.

20          Q.    Is it a medical organization?  Do

21   you have any idea?

22          A.    I'm not -- I can't recall off the

23   top of my head if they're connected to a

24   broader-based something.

1          Q.    Okay.  Are you paid for your work

2    as the associate editor?

3          A.    No.

4          Q.    All right.  You're also an ad hoc

5    reviewer for the Journal of Groups in Addiction

6    and Recovery; is that right?

7          A.    Yes.

8          Q.    Who publishes that journal?

9          A.    I'm sorry.  I'm not able to

10    recall.

11          Q.    You're also an ad hoc reviewer for

12    the Journal of Human Lactation.  Is that still

13    true?

14          A.    I believe so.

15          Q.    Do you know who publishes the

16    Journal of Human Lactation?

17          A.    I'm sorry.  I do not recall.

18          Q.    And as an ad hoc reviewer for both

19    of those journals, you are called upon

20    periodically to review submissions for

21    publication; is that right?

22          A.    That's accurate.

23          Q.    All right.  Let's look here at

24    your expert consultation.  We'll get through

1    this, and we'll take a lunch break.

2              You list here that West Virginia

3    Board of Medicine, you've assisted the board

4    with multiple cases against physicians; is that

5    right?

6         A.    Yes.

7         Q.    Did any of your work with the

8    West Virginia Board of Medicine involve you

9    giving testimony in a hearing?

10        A.    I don't believe it did.

11        Q.    Have any of the matters that

12   you've consulted with the West Virginia Board of

13   Medicine involved pharmacy practices?

14        A.    I don't recall.

15        Q.    With respect to the Department of

16   Justice, Drug Enforcement Administration,

17   United States Attorney's Office, you said in

18   that section three cases went to trial and

19   testimony provided.

20              Those are the cases we described

21   earlier against Dr. Brizuela and Naum; is that

22   right?

23        A.    Yes.

24        Q.    You said here that you've written

1  reports -- or written reports are submitted when

2  indicated/requested.

3          Did you do written reports in

4  cases other than the three listed on your CV?

5          A.    I don't believe so.

6          Q.    All right.  Maryland Attorney

7  General, we talked about that earlier.  You

8  consulted regarding the Insys Therapeutics

9  matter; is that right?

10          A.    Correct.

11          Q.    And that never resulted in any

12  report or testimony; is that correct?

13          A.    That's correct.

14          Q.    And then this is the Mingo County

15  case that you've listed here, and that is the

16  case we discussed earlier, Hatcher versus B&K

17  Pharmacies; is that right?

18          A.    I believe so.

19          Q.    Where you provided a deposition

20  giving opinions about the prescribing practices

21  of, I assume, physicians; is that right?

22          A.    And legitimacy of those

23  prescriptions.

24          Q.    And I may have asked this, but did

1    your work in the Mingo County case involve you

2    giving any opinions about pharmacy dispensing?

3           A.    I don't believe so, unless it was

4    related to kind of the connection of a pharmacy

5    to a pill mill to further the criminal

6    enterprise.

7                 MR. CHALOS:  I see.  Okay.  Why

8           don't we break here and take lunch.

9                 THE COURT REPORTER:  We are off

10          the record at 12:27 p.m.

11                      - - -

12                (Thereupon, at 12:27 p.m. a luncheon

13   recess was taken until 1:03 p.m.)

14                      - - -

15

16

17

18

19

20

21

22

23

24

```
1                              Monday Afternoon Session
                               January 9, 2023
2                              1:03 p.m.

3                      - - -

4              THE COURT REPORTER:  We are back

5         on the record at 1:03 p.m.

6   BY MR. CHALOS:

7         Q.    All right.  Let's look, Doctor, at

8   Exhibit 1, which is your report.  And I'd like

9   to focus your attention on the last -- well,

10  it's page 5, the last -- second to last

11  paragraph on page 5.  It starts with "Far

12  upstream."

13             And I'm looking primarily at that

14  first sentence.  You can take as much time as

15  you need to review the paragraph or the whole

16  document.

17        A.    I see it.

18        Q.    Okay.  So the sentence that you

19  wrote says, "Far upstream from the busy

20  prescriber, pharmacist, and community pharmacy

21  sat those with power and ability to limit the

22  overall amount of prescriptions that ultimately

23  contributed to the epidemic of overdose deaths."

24             Do you see that sentence?
```

1          A.    Yes.

2          Q.    The footnote 23 that you cite

3    there, if you turn to page 12 of your report,

4    Exhibit Number 1, is the Stanford-Lancet

5    Commission publication.

6                Do you see that?

7          A.    Yes.

8                      - - -

9      (Marshalek Deposition Exhibit 8 marked.)

10                     - - -

11   BY MR. CHALOS:

12         Q.    And if you turn to tab 10 of your

13   notebook, you'll find, I believe, the document

14   that you referenced in footnote 23 of your

15   report as support for that sentence we just

16   read.

17               Do you see that?

18         A.    Yes.

19         Q.    Is this the Stanford-Lancet

20   Commission report that you intended to cite in

21   footnote 23 of your report?

22         A.    I believe so.

23         Q.    Where in this document do you find

24   support for the sentence, "Far upstream from the

1  busy prescriber, pharmacist, and community

2  pharmacy sat those with the power and ability to

3  limit the overall amount of prescriptions that

4  ultimately contributed to the epidemic of

5  overdose deaths"?

6          A.    Your question again?  I'm sorry.

7  I was looking --

8          Q.    Yeah.  The question is, where in

9  that report, what we've marked as Exhibit

10  Number 8, the Stanford-Lancet Commission

11  report -- where in there do you find the support

12  for that sentence you wrote in your report?

13          A.    I'd have to -- I need a little

14  time to figure -- this is a longer article.  I

15  haven't read it since I kind of prepared for the

16  report.

17              I mean, I think one -- it's --

18  part of it's bulleted in the key messages, the

19  second key message, with respect to just

20  regulation where they expand upon kind of the

21  regulatory.

22              I think that's -- my statement is

23  kind of highlighting the clinical situations

24  that I'm familiar with where patients are coming

1    in and out.  Prescriptions for more than just

2    opioids are moving, you know, out of the office

3    into pharmacies, and kind of how far downstream

4    that is.

5              You know, it's like if opioids are

6    raining, and there was rain, you know, far

7    upstream of that, the rain could have been

8    stopped by specifically the federal government,

9    whether it's with respect to overall amounts of

10   opioids kind of being issued each year or

11   various programs that could kind of either

12   improve education, maximize the benefits, or

13   minimize some of the risks.

14        Q.    Pharmacies played a role in the

15   oversupply of opioids into communities, right?

16             MR. CARDI:  Object to form.

17        A.    Yeah, I don't know what role you

18   mean.

19        Q.    All right.  Well, let's look at

20   page 12 of the Stanford-Lancet Commission

21   report.  Let's take a look at what they found.

22             Page 12, there's a section that

23   says, "Domain 1."

24             Do you see that?

```
 1                    And there's a quote from

 2     Patrick Radden Keefe's book, Empire of Pain.  It

 3     says the, "The opioid crisis is, among other

 4     things, a parable about the awesome capability

 5     of private industry to subvert public

 6     institutions."

 7                    Do you see that?

 8          A.    Yes.

 9          Q.    Do you agree with that sentence?

10          A.    I do with respect to what we've

11     come to know about private industry's role in

12     this epidemic.

13          Q.    If you look then -- the bottom of

14     the second full paragraph under that section,

15     it's actually on the upper right of the page.

16     It says "and profit-seeking" is the sentence,

17     the last sentence of that paragraph.

18                    MR. CHALOS:  You had it right,

19             Jon, the first time.  It's on the top

20             right after those superscripts.  It says

21             "and profit-seeking."

22                    TRIAL TECH:  Oh, I see it.

23     BY MR. CHALOS:

24          Q.    Okay.  It says, "And
```

1   profit-seeking was not entirely external to the

2   health care system.  Some hospitals, clinics,

3   pharmacies, professional societies, and

4   individual healthcare professionals also

5   enriched themselves."

6                    Do you see that?

7        A.    Yes.

8        Q.    So the Stanford-Lancet Commission

9   concluded that at least some pharmacies played a

10  role in contributing to the opioid crisis,

11  right?

12       A.    I think I've stated that before.

13  I think the pill mills and those -- some of the

14  other things connected to pill mills, those are

15  clinical settings.  Those are driven where --

16  those are criminal enterprises, not legitimate

17  clinical settings.

18                    I think that's the -- they've done

19  a tremendous amount of damage based on the fact

20  that they kind of took their understanding of

21  how health care was delivered and manipulated it

22  in order to only seek profit and no other kind

23  of legal or ethical considerations.

24       Q.    And some pharmacies, some

1  community pharmacies, not connected with pill

2  mills also contributed to the opioid crisis by

3  filling prescriptions that shouldn't have been

4  filled, right?

5          MR. CARDI:  Object to form.

6      A.    I don't know if I agree with that

7  based on what we talked about before.

8  Pharmacies -- unless you present me with kind of

9  direct evidence of pharmacies kind of focusing

10  solely on profit margins and otherwise kind of

11  more closely aligned with a kind of criminal

12  enterprise than a clinical enterprise, they're

13  still not in a position to question the

14  legitimacy of those prescriptions.  That's an

15  incredibly challenging thing to do.

16      Q.    It's your opinion that pharmacies

17  are not in a position to question the legitimacy

18  of opioids prescriptions?

19      A.    I'm just not sure how they can.

20  They weren't in the doctor's office where it was

21  being written.  They don't know if it was just

22  handed to that person by an office staff, you

23  know, that was just using a stack of scripts

24  that had kind of the same prescriptions stamped

1    on them, or if it was a legitimate pain

2    management practice that was doing their best to

3    take good care of the patient.

4         Q.    So it's your belief that

5    pharmacies have no tools to use to determine

6    whether a prescription was written for a

7    legitimate medical purpose?

8              MR. CARDI:  Object to form.

9         A.    Like I said, I think they're at a

10   distinct disadvantage to question and to kind of

11   call that into question.  To the extent that

12   they increasingly call that into question poses

13   other kind of unintended consequences and risks

14   related to kind of delays and delivery of much

15   needed care potentially and so on.

16        Q.    So it's your view that pharmacies

17   should not question the legitimacy of an opioids

18   prescription?

19             MR. CARDI:  Object to form.

20        A.    I just don't know -- sorry.

21             MR. CARDI:  You can proceed.

22             Object to form.

23        A.    I just don't know how they can

24   since they weren't in the office where the

1  patient was being diagnosed and treated and that

2  recommendation sprang forth.

3            The list of potential explanations

4  ranges from, you know, extremely legitimate to

5  not, and how they can begin to step into and

6  investigate that and whether they should is a

7  whole other --

8       Q.    And that belief that you just set

9  forth is one of the bases for your opinions in

10  this case?

11      A.    I'd want to make sure I understood

12  kind of exactly what I said and how I said it.

13  The fact that this, the highlighted sentence, I

14  mean -- I've taken care of patients that sought

15  to enrich themselves.

16            So I've witnessed anyone from a

17  patient, prescriber, pharmacy, pharmacist,

18  upwards on that chain all the way up to the

19  manufacturer take steps to enrich themselves in

20  a variety of ways.

21            And oftentimes those steps

22  involved deceptive practices making it much

23  harder to determine how legitimate it is because

24  it's like a Trojan horse in some ways.

1        Q.    One of the bases for your opinions

2   in this case is the belief that pharmacies are

3   not in a position to question whether an opioids

4   prescription is written for a legitimate medical

5   purpose; is that correct?

6        A.    I believe so.

7        Q.    Who is Dr. Judith Feinberg?

8        A.    Dr. Feinberg, if I understand

9   correctly, is on faculty at WVU, an infectious

10  disease specialist.

11       Q.    She's a professor of behavioral

12  medicine and psychiatry at WVU?

13       A.    She's an infectious disease

14  specialist who has -- is a part of our

15  department based on her work.

16       Q.    Okay.  And that's your department,

17  right, the department of behavioral medicine and

18  psychiatry?

19       A.    Yes.

20       Q.    She's in your department?

21       A.    Her appointment is in our -- she

22  has an appointment in our department I think

23  similar to my appointment being in anesthesia

24  based on my pain experience, even though I'm not

1  an anesthesiologist.

2       Q.    Okay.  And she's the vice chair

3  for research in the department of medicine at

4  WVU?

5       A.    I don't know if that is accurate

6  at this time.

7       Q.    All right.  You know her

8  personally, right?

9       A.    I know her.  I have chatted with

10 her before, I think.  Not I think.  I have

11 chatted with her.  I don't interact with her on

12 a very regular basis, though.

13      Q.    Do you have any view of her

14 professional competence?

15      A.    I'm not -- she's an infectious

16 disease specialist.  I'm not --

17           MR. CHALOS:  Okay.  What

18      exhibit are we up to?  Is it 9?

19           MR. CARDI:  I believe the next

20      exhibit would be 9.  Yes.

21           MR. CHALOS:  Let's mark as

22      Exhibit 9 the document that we sent over

23      the lunch break.  It's the ASPPH

24      document dated November 2019 "Bringing

1          Science to Bear on Opioids."

2                    - - -

3      (Marshalek Deposition Exhibit 9 marked.)

4                    - - -

5    BY MR. CHALOS:

6          Q.    Are you familiar with the

7    Association of Schools and Programs of Public

8    Health, Doctor?

9          A.    I don't believe so.

10         Q.    Okay.  I'll represent to you that

11    if you -- well, let's look at it.  Let's go to

12    the very last page of the document.

13              And you'll see in the bottom right

14    corner that the West Virginia University School

15    of Public Health is a member institution of the

16    ASPPH.  It's a little bit further up.  Yeah,

17    there it is.

18              Do you see that?

19         A.    Yes.

20         Q.    And if you go to page 35 of this

21    document, you'll see that Dr. Judith Feinberg is

22    listed as a member of the task force.

23              Do you see that?

24         A.    Yes.

1          Q.     And if you look -- let's go to

2     page 38.

3                 If you look at the last sentence

4     under Dr. Feinberg's bio there, it says, "As

5     professor of behavioral medicine and psychiatry

6     and professor of medicine/infectious diseases,

7     she is working hard to turn the tide on opioid

8     misuse and opioid-related epidemics."

9                 Do you see that?

10         A.     Yes.

11         Q.     Okay.  Have you worked

12    professionally with Dr. Feinberg in any of the

13    opioid-related issues?

14         A.     Her being an infectious disease

15    specialist and my kind of -- my specializations,

16    we cross paths with a really complex and acute

17    subpopulation that suffers from addiction, and

18    those tend to be patients that have progressed

19    to using IV drugs.  And once you start using IV

20    drugs, like I said, the complexity and acuity

21    increases above and beyond what you would

22    normally expect.

23                 So we interface in terms of how do

24    we take care of patients suffering from

1    infective endocarditis related to injection drug

2    use or a whole host of other relatively nasty,

3    for lack of a better term, infectious

4    complications from those that progressed

5    injecting drugs into their bloodstream, not just

6    opioids.

7            Q.    Let's look at page 8.  This is

8    within the introduction of this document.

9                 Well, let me back up.  Let's go up

10   to page 3, the Executive Summary.

11                The second bullet point, the task

12   force cites here a sentence that says, "On

13   average, 130 Americans die each day from an

14   opioid overdose."  And they cite to the CDC

15   document for that.

16                Do you see that?

17           A.    Yes.

18           Q.    Do you know if that's accurate?

19           A.    Well, I hope if it's being put

20   forth in here, but I can't tell with certainty.

21           Q.    All right.  Do you have any reason

22   to dispute that?

23           A.    I don't.

24           Q.    All right.  And the bullet point

1    above that says, "More Americans die each year


3              "More Americans die each year from

4    opioid overdoses than died in any armed conflict

5    since the end of World War II."

6              Do you see that?

7         A.   Yes.

8         Q.   And they cite the National

9    Academies of Science, Engineering and Medicine

10   report for that.

11             Any reason to dispute that?

12        A.   No.

13        Q.   Let's turn over to page 8 in their

14   introduction to the task force's report here.

15             If you look at the last paragraph,

16   the second sentence.  The task force that

17   included Dr. Feinberg from your department

18   concluded, "The tremendous expansion of the

19   supply of powerful (high-potency as well as

20   long-acting) prescription opioids led to scaled

21   increases in prescription opioid dependence, and

22   the transition of many to illicit opioids,

23   including fentanyl and its analogs, which have

24   subsequently driven exponential increases in

1    overdose."

2              Do you see that?

3         A.    Yes.

4         Q.    Do you dispute that sentence, sir?

5         A.    I don't know if I would phrase it

6    that way.  Again, it's what we talked about

7    before.  These things correlated.

8              Now, whether it caused the kind of

9    increase in OUD or kind of increased overdoses,

10   that's a different story.  So I think I'd be

11   careful how I phrased it, and I would not phrase

12   it that exact way.

13        Q.    Okay.  So you take issue with

14   their use of the word "led" where they say the

15   "expansion of supply of powerful prescription

16   opioids led to scaled increases in prescription

17   opioid dependence and the transition of many to

18   illicit opioids"?

19        A.    Yeah, I don't know if I agree with

20   how that's phrased and what it states.

21        Q.    What would you say then, sir?

22        A.    I would say some of what we said

23   before, because I think, you know what, the

24   increased prescriptions were not all legitimate.

1    We talked about that.  So it's not citing the

2    role that -- it's making it seem like just

3    regular pain management led to all these

4    problems.  And I just think there's a lot to

5    unpack in that sentence.

6              Q.    So you, looking at this document

7    of this task force, included your colleague

8    Dr. Feinberg and -- I don't know -- a dozen or

9    so other distinguished physicians and scholars,

10   you think they're wrong when they said that the

11   tremendous expansion of supply of powerful

12   opioids led to increase in prescription opioid

13   dependence and the transition of many to illicit

14   opioids?

15             MR. CARDI:  Object to form.

16             A.    I'm not saying -- I can't even

17   remember what the question was at that point.

18   I'm sorry.

19             Q.    You're saying they're wrong.

20             A.    I'm saying I don't agree with how

21   they're saying what they're saying and the

22   sentence being taken out of context.  I doubt

23   I'd disagree with every single thing in here.

24                   In fact, you know, some of what

1  they're talking about, I'm a big proponent of

2  prevention.  I'm a big proponent of anti-stigma.

3  I think some of these statements taken out of

4  context can actually contribute stigma to kind

5  of opioids and opioid use disorder in general,

6  and also kind of pain management with opioids.

7          Q.    And you're basing that, sir, on

8  your clinical experience, right?

9          A.    In part.

10         Q.    You're not basing that on any

11  studies that you've done, are you?

12              MR. CARDI:  Object to form.

13         A.    I just citied some of what --

14  I cited that I agreed with some of these

15  recommendations here.  Maybe what's behind it

16  and what context some of these other words are

17  utilized in -- because I think that the

18  qualitative -- you know, if you ask me

19  qualitatively to evaluate that, say yeah, this

20  is a problem, I think I agree with them in that

21  sense.  Yes.

22              But no one's going to sit here,

23  including myself, and say, yeah, there aren't a

24  lot of overdoses or, no, that's not a problem.

1  How we got to that point, I think there are a

2  lot of different ways to look at that and state

3  them.

4       Q.   Are you basing that opinion on any

5  studies that you have done?

6       A.   I'm basing it on my education,

7  training, clinical experience, and kind of

8  continual evaluation of the evidence base, you

9  know, how we got to where we got and formed my

10  opinion of that, which is not in lockstep with

11  that.  I think that's also something that's

12  risky in some of these situations kind of

13  adhering to group think potentially.

14            I would cite that as a reason why

15  we kind of got into some of these problems in

16  the first place with pushing too hard to treat

17  pain and who was pushing, where, when, and how,

18  and why.

19            Again, I think there's a lot to

20  unpack in that sentence, and it could be

21  interpreted in a variety of ways, you know,

22  looking at something as simple as the tremendous

23  expansion of the supply and what was behind

24  that, you know, so how we got to that point.

1         Q.    Do you agree that the tremendous

2    expansion of the supply of powerful prescription

3    opioids, however we got there, led to scaled

4    increases in prescription opioid dependence and

5    the transition of many to illicit opioids?

6         A.    I don't know if I -- I struggle

7    with how that's -- how that -- everything

8    they're trying to pack into that sentence.  So I

9    don't think I would say it that way.  I don't

10   think I agree with it.

11        Q.    You think they might be subject to

12   group think?

13        A.    I wouldn't go that far.  I just

14   worry about situations where that can occur.

15        Q.    Do you consider your opinions in

16   this case to be outside of the mainstream?

17              MR. CARDI:  Object to form.

18        A.    I would not believe so.

19        Q.    Do you think your opinions are in

20   the mainstream?

21        A.    I honestly don't -- I'm not sure

22   how I'd answer that.

23        Q.    Do you think you're potentially

24   subject to group think?

1          A.    I think anybody is.

2                MR. CARDI:  Object to form.

3          Q.    How about the opinions you've

4    expressed in this case?  Let's go back to your

5    report, Exhibit Number 1.

6                You say -- I'm on page 3 of

7    Exhibit Number 1 -- "The 'gateway' theory, which

8    proposes that the use of prescription opioids

9    directly leads to use of illicit drugs, is

10   unsubstantiated and controversial"?

11               You do not cite to a single source

12   for that sentence, do you, sir?

13               MR. CARDI:  Object to form.

14         A.    I think we discussed how that was

15   cited and the basis for that opinion.

16         Q.    Okay.  Answer my question, please.

17         A.    Can you ask it again, please.

18         Q.    Sure.

19               Do you cite to a single source,

20   any source, to support your sentence on page 3

21   of Exhibit Number 1, "The 'gateway' theory,

22   which proposes that the use of prescription

23   opioids directly leads to use of illicit drugs,

24   is unsubstantiated and controversial."

1              Do you cite to a single source to

2   support that sentence?

3              MR. CARDI:  Objection; asked and

4         answered.

5         A.    Yeah, I believe I answered that

6   earlier.

7         Q.    Answer it again, please, Doctor.

8         A.    The fact that there's not been --

9   causality hasn't been proven, so to advance a

10  theory forward to suggest that somebody that's

11  exposed to opioids is now like they're exposed

12  to some sort of communicable disease is now

13  going to develop it and kind of to view that as

14  a pathogen despite knowing how complex and all

15  the other kind of aspects of addiction that we

16  know and all the things that we don't know,

17  I don't think that's fair.

18        Q.    Okay.  With all due respect,

19  Doctor, you didn't answer my question.

20             My question is this:  Did you cite

21  to a single source to support that sentence?

22        A.    Yes.

23             MR. CARDI:  Objection; asked and

24        answered.  We discussed this for

1    15 minutes at the beginning of this

2    deposition.

3    Q.    And the single source you cite to

4  is the Miller article; is that right?

5    A.    We discussed citing the Miller

6  article, as well as my -- the basis for my

7  opinion being connected to my education,

8  training, clinical experience, and practice.

9    Q.    And you believe that your theory

10  in that sentence is in the mainstream of the

11  epidemiological community?

12    MR. CARDI:  Objection;

13    mischaracterizes his prior testimony.

14    A.    I don't believe I'm alone in

15  criticizing this theory or hypothesis based on

16  the fact that causality has failed to be

17  established.

18    Q.    But you didn't cite anyone else

19  who criticizes the theory that prescription

20  opioid exposure leads to the use of illicit

21  drugs?

22    MR. CARDI:  Object to form.

23    A.    Again, the basis for that article

24  and multiple other articles led into that

1    article which led into those articles and so on,

2    so ...

3           Q.    I'm not sure if I understand what

4    you mean by that.  What other articles?

5           A.    Well, we looked at 14.  We looked

6    at all the articles that 14 cited, anything that

7    substantiate -- when they talk about causality

8    not being there, they cite that, and it's based

9    on that.

10                So there's a body of evidence.

11   I'm not alone in feeling that the causality is

12   an important part that has yet to be established

13   for that.

14          Q.    Well, let's look at that article,

15   then.  Let's look at the Miller article.

16          A.    What tab is that?  I'm sorry.

17          Q.    That is tab number 5 in your

18   notebook.

19                MR. CHALOS:  And what is this

20          exhibit number?  Jon, do you know,

21          offhand?  I didn't write it.

22                TRIAL TECH:  Exhibit 2.

23   BY MR. CHALOS:

24          Q.    All right.  So let's look at

1    Exhibit 2, which is tab 5 in your notebook.

2              And you said, "Let's look at all

3    the articles that were cited in the Miller

4    article," and let's look at those.

5              So there are exactly six articles

6    cited as references in the Miller article.  The

7    first one is titled "Paternal alcohol exposure

8    and hyperactivity in rat offspring:  Effects of

9    amphetamine."

10             Do you see that?

11        A.   Yes.

12        Q.   The second article is "Genetic

13   influences on adolescent behavior."

14             The third article is "Prior

15   exposure to alcohol has no effect on cocaine

16   self-administration and relapse in rats:

17   Evidence from a rat model that does not support

18   the gateway hypothesis."

19             The next article says, "Sex

20   differences and longstanding consequences of

21   adolescent ethanol exposure for the rewarding

22   effects of cocaine in mice."

23             The next article, "Consequences of

24   adolescent use of alcohol and other drugs: Study

1    using rodent models."

2              And the last article is

3    "Epigenetic effects of cannabis exposure."

4              Do you see that?

5        A.    Yes.

6        Q.    Have you read any of those

7    articles?

8        A.    I don't recall if I've read any of

9    these articles.

10       Q.    Well, which articles in this list

11   support your theory that the gateway theory

12   related to prescription opioids and illicit

13   drugs is unsubstantiated?

14       A.    What we discussed before, simply

15   the fact that this is still referred to as a

16   theory or a hypothesis, and that much of what

17   has been written about this is -- will cite,

18   readily cite, that the causality has not been

19   established.

20       Q.    All right.  Doctor, you didn't

21   answer my question.

22              My question is, which of those six

23   articles support your theory that the gateway

24   theory related to prescription opioids and

1  illicit drugs is unsubstantiated?  Which of

2  those six is my question.

3          A.    I'm not sure which of those six.

4  I'd have to read through all six of them.

5          Q.    But you haven't done that, have

6  you?

7              MR. CARDI:  Objection;

8          mischaracterizes prior testimony.

9          A.    I don't recall if I've read all of

10 those articles.

11         Q.    Do you recall reading any of the

12 articles?

13         A.    Which articles?  The referenced

14 articles?

15         Q.    Yes, sir.

16         A.    I just do not recall if I've read

17 any of those articles.

18         Q.    Okay.  So as we sit here today,

19 other than what you believe the Miller article

20 to be, what other articles can you point us to

21 that support your theory that the gateway theory

22 related to prescription opioids and illicit

23 drugs is unsubstantiated?  Can you point us to a

24 single other article other than Miller that you

1   believe supports that sentence?

2           A.    I'd have to go back into it and do

3   a review of the literature in order to answer

4   that question.

5           Q.    Can you cite, as we sit here

6   today, a single article other than Miller that

7   you believe supports your theory about gateway?

8           A.    I can't recall, as we sit here,

9   specific articles.

10          Q.    Did you do that literature search

11  before you submitted your report to a federal

12  district court in this case?

13               MR. CARDI:  Objection; asked and

14          answered.

15          A.    I think we talked about that

16  earlier.  Throughout my career, I spent a lot of

17  time in medical journals seeking to better

18  understand current evidence bases and have read

19  articles on a wide variety of topics, many of

20  which I can't recall the exact nature of.

21               It's possible I've read previous

22  articles that have touched on that in the past.

23  I just can't recall as we sit here.

24          Q.    You spent 99 hours writing this

1    report, sir?

2                MR. CARDI:  Object to form.

3          A.    I believe we discussed that

4    earlier.  I think that's correct.

5          Q.    I don't think you discussed that

6    with me.

7                In that 99 hours, you didn't find

8    one article beyond Miller that you believe

9    supports your theory about gateway and opioids;

10   is that right?

11               MR. CARDI:  Object to form.

12         A.    Can you ask me that question

13   again, please.

14         Q.    Sure.

15               In the 99 hours you spent working

16   on this case, you did not find one single

17   article beyond the Miller article that you

18   believe supports your gateway theory?

19               MR. CARDI:  Object to form.

20         A.    I believe this article best

21   substantiated my opinion.  And that's why I

22   chose it.

23         Q.    Okay.  Let's look at tab 18 of

24   your notebook.  We'll mark that as the next

1    numbered exhibit, and I have lost track.

2              MR. CHALOS:  What is the next

3         number?

4              TRIAL TECH:  This will be 10,

5         Exhibit 10.

6                   - - -

7      (Marshalek Deposition Exhibit 10 marked.)

8                   - - -

9    BY MR. CHALOS:

10         Q.    Okay.  Exhibit 10 is three pages

11   of invoice -- it looks like three separate

12   invoices.  One is directed to Publix.  One is

13   directed to Albertsons.  One is directed to

14   Kroger.

15              Do you see that, sir?

16         A.    Oh, right there.  Okay.

17         Q.    It's on the screen.  It also

18   should be tab 18 in your notebook.

19         A.    Oh, I'm sorry.  I was looking --

20   it must have been 17.

21              Yeah, I see that.  I apologize.

22         Q.    Does this three pages -- is this

23   the entirety of your invoices to date in this

24   case?

1          A.     To date, yes.

2          Q.     And you were, I guess, at some

3   point retained to work on behalf of Albertsons,

4   Publix, and Kroger?

5          A.     That's a question?  Did you --

6          Q.     Yes.  Oh, I'm sorry.  Yes.

7   Question mark at the end of that.

8                 Were you at some point retained to

9   work on behalf of Albertsons, Publix, and

10  Kroger?

11         A.     I believe so.  I can't recall

12  specifics.

13         Q.     It looks like these -- the invoice

14  was for a total of 99 hours at $400 per hour for

15  a total amount of $39,600, which is then, as it

16  says here in the invoice, one-third portion

17  attributed each to Publix, Albertsons, and

18  Kroger; is that correct?

19         A.     That's what I see before me.

20         Q.     Did you prepare these invoices?

21         A.     I submitted my hours in a generic

22  invoice.  I think this was -- this was

23  prepared -- I can't recall exactly how this was

24  prepared.

1          Q.     Who did you submit your invoice

2     to?

3          A.     I can't recall the exact person

4     I sent it to at this moment.

5          Q.     Was it somebody at a law firm?

6          A.     It might have been Aaron Boone.

7          Q.     Who is Aaron Boone?

8          A.     Aaron works for Bowles Rice.

9          Q.     And you think after that, somebody

10    divided the invoice into three parts.

11         A.     I don't exactly recall how and why

12    that's split up.

13         Q.     Is 99 hours a correct number of

14    hours that you spent to date in this litigation?

15              MR. CARDI:  Object to form.

16         A.     That's the time period stated on

17    the invoice.  That's the amount of time spent.

18         Q.     Is that correct?

19         A.     Within that time period, to the

20    best of my knowledge.

21         Q.     And the time period reflected in

22    the invoice is November 16, 2022 through

23    December 16, 2022, right?

24         A.     Yes.

1          Q.    And is that accurate?

2          A.    I believe it is.

3          Q.    Did you do work in this litigation

4    prior to November 16, 2022?

5          A.    I don't recall doing any work

6    before then.

7          Q.    Were you contacted shortly before

8    November 16, 2022 to do work in this case?

9          A.    I don't recall the exact dates.

10          Q.    Was it about that time that you

11    were contacted?

12          A.    I honestly don't recall.

13          Q.    Do you have anywhere a breakout of

14    what you spent your time doing for those

15    99 hours?

16          A.    I don't recall breaking that down

17    or having a breakout.

18          Q.    The invoice that you submitted to

19    counsel, did it include more detail than just

20    working with counsel in preparing the Track 7

21    report?

22          A.    I can't recall exactly what it --

23    what it had in it.

24          Q.    Do you have that invoice still?

1          A.    Did we look at it earlier?

2     I can't recall if we did.

3          Q.    No, sir.  Not with me.

4                Do you still have that invoice?

5          A.    I don't recall where it is.

6          Q.    How did you send that to counsel?

7     By e-mail?

8          A.    I believe so.

9                MR. CHALOS:  We ask that you

10               produce the invoice.  And this is

11               directed to Mr. Cardi; that you produce

12               the invoice that Dr. Marshalek sent to

13               counsel.  If it's different in any way

14               or if it's just a different document

15               from the one we have here, we ask that

16               you produce that.

17    BY MR. CHALOS:

18         Q.    Dr. Marshalek, did you keep your

19    hours in a notebook or a calendar in some way in

20    connection with your work in this case?

21         A.    In a notebook.

22         Q.    Did you write a description of the

23    work that you did for those hours in your

24    notebook?

1      A.    If I recall correctly, I may have.

2      Q.    Don't throw that notebook away,

3  please, Doctor.

4            Do you still have it?

5      A.    No.

6      Q.    What did you do with it?

7      A.    I believe I have shredded it with

8  any other kind of documents that would be

9  connected to this other than what we have here.

10     Q.    What documents did you shred?

11     A.    Just notes and I think kind of

12 some of the initial engagement paperwork that

13 was sent onward.

14     Q.    Why did you shred documents?

15     A.    That's common practice when I'm

16 doing clinical work, writing notes.  A lot of

17 it's protected health information or

18 confidential.

19     Q.    I'm sorry.  What protected health

20 information was at issue in this case?

21     A.    Well, that's just my -- that's

22 common with my clinical practice, to kind of

23 have paperwork and/or notes or documentation

24 containing protected health information or other

1  confidential topics.

2      Q.   You shredded in this case your

3  notes that you created in connection with your

4  work here?

5      A.   Well, my notes moved into my

6  report, and I had no use for them after that.

7  And I think based on some of the engagement

8  stuff, if I recall correctly, some aspects of

9  this is confidential.  So that was my way of

10  securing it.

11     Q.   Did somebody tell you to shred

12  documents?

13     A.   No.  That's just my common

14  practice with -- if not, I would be overrun with

15  an office full of confidential and/or protected

16  health information.

17     Q.   Did anybody tell you that you need

18  to keep your documents related to your work in

19  this litigation?

20     A.   I don't recall.

21     Q.   You don't recall if anybody ever

22  told you that?

23     A.   I don't.

24     Q.   Did you have any discussions with

1  anybody about whether you should shred documents

2  in connection with your work in this litigation?

3        A.   I don't recall.

4        Q.   And you also believe that you

5  shredded your notebook where you kept a log of

6  the work that you did and the hours you spent

7  doing that work?

8        A.   Once submitted, I tend to get --

9  once it's in electronic format, there's no need

10  to hold anything behind, at least in my opinion.

11  So that's what's behind that practice.

12        Q.   Okay.  But I'm asking you a

13  question.

14             You shredded the notebook where

15  you kept a log of the work that you did and the

16  hours you spent doing that work?

17        A.   I believe so.

18        Q.   Did you include in what you

19  submitted to counsel a description of the work

20  that you did and the time you spent doing that

21  work?

22        A.   I'm sorry.  Can you repeat that?

23        Q.   Sure.

24             Did you include in the invoice you

1    submitted to counsel a description of the work

2    that you did and the time you spent doing that

3    work?

4            A.    I believe so.

5            Q.    What else did you shred, sir?

6            A.    I can't recall.  I think just the

7    stuff that I felt I had no need for and that was

8    just cluttering or already kind of -- already

9    made its way into electronic format and passed

10   along.

11            MR. CHALOS:  All right.  Let's

12        take a break.  Let's take ten minutes.

13            THE COURT REPORTER:  We are off

14        the record at 1:47 p.m.

15            (Recess taken.)

16            THE COURT REPORTER:  We are back

17        on the record at 2:00 p.m.

18            MR. CHALOS:  Doctor, I have no

19        further questions at this time.

20            MR. CARDI:  Okay.  I have no

21        questions.

22            MR. CHALOS:  All right.  You're

23        free to go.

24            THE WITNESS:  Thank you.

```
 1                    (Signature reserved.)

 2                          - - -

 3                    Thereupon, at 2:00 p.m., on

 4   Monday, January 9, 2023, the deposition was

 5   concluded.

 6                          - - -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    CERTIFICATION

 2

 3          I, Carol A. Kirk, Registered Merit Reporter and

 4   Certified Shorthand Reporter, do hereby certify that

 5   prior to the commencement of the examination,

 6   PATRICK J. MARSHALEK, M.D., was duly remotely sworn by

 7   me to testify to the truth, the whole truth, and

 8   nothing but the truth.

 9          I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place, and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14          I DO FURTHER CERTIFY that I am neither a

15   relative nor an employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20

21

22   Carol A Kirk

     Carol A. Kirk, RMR, CSR
23   Notary Public

24
```

1                    DEPOSITION ERRATA SHEET

2

3

4    Case Caption:  National Prescription Opioid Litigation
                     Case Track 7
5

6          DECLARATION UNDER PENALTY OF PERJURY

7

8          I declare under penalty of perjury that I

9    have read the entire transcript of my deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                        _____

                          PATRICK J. MARSHALEK, M.D.
18

19   SUBSCRIBED AND SWORN TO

20   before me this _____ day

21   of _____, A.D. 20____

22

                     _____
23          Notary Public

24

1                    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23
     SIGNATURE_____DATE:_____
24            PATRICK J. MARSHALEK, M.D.