# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>**This document relates to:**<br><br>*The Montgomery County Board of County Commissioners, et al., v. Cardinal Health, Inc., et al.,* Case No. 1:18-op-46326-DAP | **MDL No. 2804**<br><br>**Case No. 1:17-md-2804**<br><br>**Judge Dan Aaron Polster** |

**MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENSE EXPERT
JOHN E. SCHNEIDER, PHD AND INCORPORATED MEMORANDUM IN SUPPORT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1
BACKGROUND ........................................................................................................................... 1
    I.    Dr. Schneider's Background. ............................................................................................. 1
    II.   Dr. Schneider's Opinions ................................................................................................... 2
          A.    Liability and Potentially Responsible Parties ....................................................... 3
          B.    OUD-Attributable Costs ....................................................................................... 6
          C.    Comments on the Expert Report of Dr. Alexander ............................................. 7
LEGAL STANDARDS ................................................................................................................. 8
ARGUMENT ................................................................................................................................. 9
    I.    Dr. Schneider's Opinions in Sections 4, 5, and 6 Are Inadmissible Because They Are Irrelevant, Because They Fit Neither the Facts nor the Law of this Case, and Because They Are Likely to Confuse and Mislead the Jury. ................................................................. 9
    II.   Dr. Schneider Is Unqualified to Critique Dr. Alexander's Abatement Opinions and the Critique He Offers Is Largely Irrelevant. .................................................................................. 13
CONCLUSION ............................................................................................................................ 15

# TABLE OF AUTHORITIES

**Cases**

*Daubert v. Merrell Dow Pharm., Inc.*
  509 U.S. 579 (1993). ............................................................................................................. 1
*First Tennessee Bank Nat. Ass'n v. Barreto*,
  268 F.3d 319 (6th Cir. 2001). ................................................................................................ 8
*In re Nat'l Prescription Opiate Litig.*, 2019 WL 3934597
  (N.D. Ohio Aug. 20, 2019). ..................................................................................... 8-9, 11, 12
*In re Rezulin Products Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004). ................................................................................... 9
*Stevenson v. Holland*,
  504 F. Supp. 3d 1107 (E.D. Cal. 2020). ............................................................................... 12
*Wolfe v. McNeil-PPC, Inc.*,
  2011 WL 1673805 (E.D. Pa. May 4, 2011). ........................................................................ 11

**Statutes**

Fed. R. Evid. 401 ........................................................................................................................ 1, 9
Fed. R. Evid. 402 ........................................................................................................................... 9
Fed. R. Evid. 403 ........................................................................................................... 1, 9, 14, 17
Fed. R. Evid. 702 ............................................................................................................. 1, 9, 11, 14

## INTRODUCTION

Plaintiff Montgomery County ("Plaintiff") respectfully submits this Motion to exclude certain opinions of John E. Schneider, PhD, a health economist, under Federal Rules of Evidence 401, 403, and 702, as well as *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993). Specifically, Plaintiff seeks to exclude the opinions set forth in Dr. Schneider's December 12, 2022, Expert Report in Sections 4, 5, 6, and 8, and those portions of Section 9 (Dr. Schneider's summary section) contained in paragraphs 9.1 through 9.5, as well as the last sentence of paragraph 9.6. *See* Ex. A (Schneider Rpt.). The opinions in Sections 4, 5, and 6, and the corresponding portions of Section 9 found in paragraphs 9.1 through 9.5, are entirely irrelevant to any issue in this case, do not fit the law or the facts of this case, and are likely to confuse or mislead the jury. The opinions in Section 8 opine about an area in which Dr. Schneider admittedly is not an expert. As discussed in detail below, these opinions are inadmissible and this Court should exclude them.

## BACKGROUND

### I. Dr. Schneider's Background.

Dr. Schneider is health economist working at a private consulting firm that he co-owns. *See* Ex. B (1/6/2023 Schneider Dep. Tr. (hereinafter "Dep. Tr." at 22:3-11). His firm, Avalon Health Economics, does litigation support and other work, consisting principally of cost-effectiveness and cost-benefit analysis for new drugs or devices for medical device and pharmaceutical companies. *See* Ex. C, 4/7/2022 Schneider Dep. Tr. (hereinafter "N.M. Dep. Tr.") at 14:18-15:5). He has identified no prior experience concerning opioids outside his retention by certain defendants in the MDL. In Track 1, he prepared a narrow report calculating the market share of one of the defendants. *See* Ex. C, N.M. Dep. Tr. at 8:23-9:7. In New Mexico, Kroger

1

retained him to "analyze the attributable costs of opioid use disorder in the state of New Mexico and . . . use that to determine abatement costs or an abatement cost ceiling," but he did not testify at trial. Ex. C, N.M. Dep. Tr. at 63:9-15.

As his most relevant background, Dr. Schneider describes "[s]ome of [his past] work" as related to abatement costs of economic externalities. Ex. A, Rpt. ¶ 1.5. Principally, this appears to entail work on behalf of the City of San Francisco[1] and in the context of tobacco product litter (cigarette butts). *See id.* In that area, he has co-authored papers that related to work using data from San Francisco's "Street Litter Audits" to calculate the costs of removing litter and a potential per-pack tax amounts in support of policy initiatives.[2] He also is the lead author for a peer-reviewed paper titled "Online Simulation Model to Estimate the Total Costs of Tobacco Product Waste in Large U.S. Cities," explaining a model that uses "data on city population, smoking prevalence rates, and per capita litter mitigation costs," but he has not made use of that model here.[3]

As to his other expert witness work, he estimates he has testified at trial approximately 10-12 times, typically in the context of calculating the reasonable value of medical services or in contract disputes. *See* Ex. B, Dep. Tr. at 8:19-9:5; Ex. C, N.M. Dep. Tr. at 32:8-25. He has twice been excluded as an expert, both times in reasonable value cases. Ex. B, Dep. Tr. at 9:6-17.

**II.     Dr. Schneider's Opinions**

Dr. Schneider's report, titled "Contributing Factors Associated with Prescription Opioid Supply and Opioid Attributable Costs in Montgomery County," offers opinions under nine

---

[1] His work for San Francisco was unrelated to opioid litigation and he was not an expert witness in CT4. *See* Ex. B, Dep. Tr. at 9:23-11:16.

[2] *Compare e.g.*, Ex. C, N.M. Dep. at 49:17-23 (describing 2011 paper as summarizing his work in San Francisco "in a very general, sort of conceptual way").

[3] Online Simulation Model to Estimate the Total Costs of Tobacco Product Waste in Large U.S. Cities - PMC (nih.gov)

2

headings. The first three, "Introduction," "Background," and "Economics of Externalities" present what he frames as general background information and certain economic principles. The next three sections, "Responsible Parties," OUD-Attributable Costs," and "Implications" present Dr. Schneider's theories and opinions about liability. Section 7, entitled "Comment on Cutler Report" contains Dr. Schneider's critique of the expert report of Plaintiff's expert, Dr. David Cutler; Section 8, labelled "Comment on Alexander Report" contains Dr. Schneider's critique of the expert report of Plaintiff's abatement expert, Dr. Caleb Alexander. Finally, Section 9, titled "Summary," summarizes the opinions in the preceding sections. In particular, paragraphs 9.1 through 9.5 synthesize and summarize the material in Sections 4, 5, and 6, while paragraph 9.6 summarizes the opinions set forth in Sections 7 and 8.

### A. Liability and Potentially Responsible Parties

Dr. Schneider's opinions about responsible parties, costs attributable to OUD, and the implications of his analysis purport to discuss liability for abatement costs. Specifically, Dr. Schneider testified that the assignment he was given when he was retained by Kroger was to "conduct [an] analysis of liability." Ex. B, Dep. Tr. at 17:24-18:3. Dr. Schneider took a narrow approach to his assignment of assessing "liability." He declined to review any of the documents or testimony in this case, or the broader MDL (save the CT7 depositions of two experts whose reports he was asked to criticize). *See* Ex. B, Dep. Tr. at 43:8-44:21. Nor did he request or review any type of materials related to diversion-control at Kroger. *See* Ex. B, Dep. Tr. 188:11-15 & 228:15-21. Certain of his opinions, however, are based on "bits and pieces" of information he has seen "come out" in the public sources "mostly as a result of [] this ongoing litigation." Ex. B, Dep. Tr. at 86:8-17. As to those opinions, he "expect[s] that the attorneys in these matters have access to better data than" he does. Ex. B, Dep. Tr. 87:25-88:8. Although access to information and role

3

in diversion play a key role in his opinions concerning liability, he chose not to research these areas with respect to pharmacies. *See* Ex. B, Dep. Tr. 86:18-87:18, 188:11-15, & 228:15-229:1.

He has not reviewed the County's complaint and is therefore unfamiliar with the "specifics" allegedly giving rise to Kroger's liability, including whether allegedly unlawful conduct or filling illegitimate prescriptions is at issue here. Ex. B, Dep. Tr. at 45:13-15 & 188:8-10. His report nevertheless includes repeated references to allegations and arguments by "plaintiffs" in opioid cases. *See, e.g.,* Ex. A, Rpt. ¶¶ 2.4, 4.4, 4.8 n. 74, & 6.1. It appears he gleaned these opinions from what he describes as the "data on settlement agreements and proceedings [] involving opioids" he obtained through either online research or other exposure to media coverage. Ex. B, Dep. Tr. 88:1-5.

Dr. Schneider describes his approach to liability as "two-fold," consisting of first "identifying contributing factors," and then "mapping those contributing factors into responsible parties." Ex. B, Dep Tr. at 18:16-23. In support of the "potentially responsible parties" or "PRP" component of this approach, he relies on: (1) articles from *The Business Lawyer (American Bar Association)* and *Environmental Law* regarding Superfund response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); (2) a chapter of an environmental economics textbook titled "Examples of Environmental Liability Laws" which describes certain laws; and (3) another article outlining legal liability under the environmental laws of various nations. *See* Ex. A, Rpt. at ¶¶ 4.1-4.3 & Notes 67-69. He has never been an expert in a CERCLA case, nor has he ever done any consulting work or published in the Superfund arena. Ex. B, Dep. Tr. at 113:4-14. His "limited understanding of the legal details" in this area, which are "outside his realm of expertise," is that CERCLA "does not specifically indicate how liability should be allocated" and one therefore looks at the statute only "to some

4

extent" to see who can be liable, or assigned responsibility, since the statute "doesn't explicitly lay" that out. Ex. B, Dep. Tr. at 109:18-112:19. He is not applying CERCLA directly here but appears to believe that this area is an example, or appropriate analogy, to the ability of economists to craft their own bases for "allocating" "liability" in economics. Ex. B, Dep. Tr. at 107:16-113:3, 119:14-22; Ex. A, Rpt. at ¶¶ 4.1-4.3. For each "factor" that Dr. Schneider believes increased the supply of opioids, he identifies PRPs that he believes are "associated" with that factor, borrowing the term PRP from the CERLCA context or the sources described above outlining legal liability under certain environmental laws.

As Dr. Schneider explained at his deposition, in his liability analysis, it is the increase in supply, and not the resulting harms, such as OUD, for which he believes the PRPs are responsible. *See id.* Moreover, although he opines that the PRPs are "associated" with particular factors linked to increases in opioid supply, being "associated," in Dr. Schneider's parlance, does *not* mean being a cause of the factor (or of OUD). *See* Ex. B., Dep. Tr. at 92:23-93:1, 105:19-106:4, 121:13-17, 123:1-4, 123:9-12, 132:15-134:23. Indeed, as Dr. Schneider's uses the term, "association" encompasses a variety of disparate connections between the factors he identifies and the PRPs he links to them. *See* Ex. B, Dep. Tr. at 131:2-6. Thus, Dr. Schneider finds that regulatory authorities are PRPs due to their perceived failures in regulating, while patients are PRPs "associated" with macroeconomic factors that increase supply because he believes they were affected by this factor, in which they had no causal role. Ex. B, Dep. Tr. at 131:2-6 & 133:22-134:5.

Dr. Schneider provides an image with two dotted-line paths in a diagram he created, identifying what he opines are the two sources of "non-prescription" opioids: drug traffickers and diversion of legitimate supply. *See* Ex. A, Rpt. ¶ 4.5, Figure 4-1. The only PRPs he specifically associated with diversion in his report is the group he labels "drug traffickers." *See id.* He opines

that the group of "drug traffickers" "would mainly be individuals who are obtaining opioids from drug traffickers." Ex. B, Dep. Tr. at 148:1-3. This group also includes patients, if they have breached what he terms their implied obligations under the controlled substances laws, *see* Ex. A, Rpt. ¶¶ 4.12 & 4.19, or "generally the responsibility to use prescription drugs responsibly and appropriately and as directed." Ex. B, Dep. Tr. 152:19-21. It could not, however, include pharmacies that knowingly fill illegitimate prescriptions, because Dr. Schneider lacks any information about "the extent to which that is happening or not happening." Ex. B, Dep. Tr. 151:16-152:3.

Dr Schneider does not consider pharmacies PRPs and has no opinion on whether pharmacies have obligations under the controlled substances laws. Ex. B, Dep. Tr. 152:22-153:4; *see generally* Ex. A, Rpt. at § 4. Dr. Schneider also does not know if pharmacies are Controlled Substances Act ("CSA") registrants. *See* Ex. B, Dep. Tr. at 161:2-3. That issue "might be" relevant to his opinion about whether pharmacies are PRPs, but he "would have to look into that." Ex. B, Dep. Tr. at 161:4-8. Although he has only a "very general[]" familiarity with the CSA, Ex. C, N.M. Dep. Tr. at 84:4-13, he does consider DEA a PRP based on what he believes to be DEA's obligations concerning quotas under the CSA and in attempting to prevent drug trafficking. Ex. B, Dep. Tr. 145:13-146:3, 158:18-22, & 162:4-18.

### B. OUD-Attributable Costs

Dr. Schneider also addresses what he calls "OUD-attributable costs." He opines that not all misuse and not all OUD leads to such costs. But although Dr. Schneider uses the term "opioid [or OUD] attributable cost" and although he refers to studies that use that term, he has not yet decided what it means and has no plans to explore at this stage "what those costs should or shouldn't consider." Ex. B, Dep. Tr. at 104:15-105:7 & 180:15-24. Nor has he performed any cost

6

calculations. *See id.*; *see generally* Ex. A, Rpt. § 5. He offers this aspect of his opinions "only because economists typically talk about the cost of externalities." Ex. B, Dep. Tr. at 93:23-94:6. His chief opinion in this area is that whatever opioid attributable costs are, at least some percentage of OUD did not lead to those costs because the person suffering was "not incurring additional health care costs" or interacting with the criminal justice or social services systems. Ex. A, Rpt. ¶ 5.1, Figure 5-1; Ex. B, Dep. Tr. 173:1-14 & 175:11-19. He also theorizes that the reason for this lack of interaction may be that OUD did not meaningfully impact a person's life. Ex. A, Rpt. ¶ 5.6 n. 117; Ex. B, Dep. Tr. at 175:1-5.

### C. Comments on the Expert Report of Dr. Alexander

The final section of Dr. Schneider's report offers comments concerning the expert report of Dr. Alexander, a medical doctor and pharmacoepidemiologist who offers opinions about the measures needed to abate the opioid epidemic. Dr. Schneider's critique of Dr. Alexander appears to conflate "abatement" with damages. Thus, Dr. Schneider criticizes Dr. Alexander for failing to establish that public entities such as the plaintiff have actually incurred additional costs in addressing the opioid epidemic. Ex. A, Rpt. ¶ 8.2. He similarly complains that some of the costs Dr. Alexander identifies may already be part of a county's budget. *Id.* ¶8.1. Under the misapprehension that Dr. Alexander is of the view that the remedy in this case should be to reduce the "attributable costs" of "externalities" (namely, OUD), to $0, Ex. A, Rpt. ¶ 8.7, Dr. Schneider also opines that full abatement should not be the goal of the remedy in this case, but does so purely on economic, rather than legal, grounds. *Id.* ¶8.7.[4] He also criticizes Dr. Alexander for including in his abatement plan measures that Dr. Schneider believes "could have been employed" by the plaintiff. *Id.* ¶ 8.6.

---

[4] In fact, Dr. Alexander opines only that the appropriate goal is substantial reduction.

7

## LEGAL STANDARDS

Under Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Applying these standards, "[t]he Sixth Circuit has identified three factors a court should consider when deciding whether expert testimony is admissible." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3934597, at *2 (N.D. Ohio Aug. 20, 2019). "The proponent of the expert has the burden to demonstrate that the expert's testimony meets all of the *Daubert* criteria[.]" *Id.* "First, the proposed expert must have the requisite qualifications." *Id.* at *2. This factor concerns not "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Id.* at *2 (internal quotation marks omitted). "In this regard, a trial court must determine whether the expert's training and qualifications relate to the specific subject matter of his or her proposed testimony." *Id.* at *2. At the same time, lack of familiarity with some aspects of the subject matter "merely affect[s] the weight and credibility of his testimony, not its admissibility." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001).

"Second, the proposed testimony must be relevant." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3934597, at *2. That, is, "the expert must 'fit' the facts of the case into the principles and methodologies used to render his opinion." *Id.* at *3. *"Daubert*'s 'fit' requirement seeks to ensure that a jury is presented with expert evidence only when that evidence is demonstrably germane to the facts of the case." *Id.* "Third, the proposed testimony must be reliable." *Id.* at *2.

8

"Testimony can be reliable if it is 'based on sufficient facts or data' or 'the product of reliable principles and methods' which the expert, in turn, has applied to the facts of the case." *Id.* at *3.

"Finally, as with any testimony, the gatekeeping function also requires an examination of whether the testimony's 'probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *Stevenson v. Holland*, 504 F. Supp. 3d 1107, 1117 (E.D. Cal. 2020).[5]

**ARGUMENT**

**I.   Dr. Schneider's Opinions in Sections 4, 5, and 6 Are Inadmissible Because They Are Irrelevant, Because They Fit Neither the Facts nor the Law of this Case, and Because They Are Likely to Confuse and Mislead the Jury.**

Dr. Schneider's opinions are irrelevant because they fit neither the law nor the facts of this case and threaten to confuse the jury with their focus on "liability" — a legal term. Although couched in terms of "liability" and "responsibility," Dr. Schneider's opinions are unrelated to liability or responsibility under Ohio nuisance law. Dr. Schneider's opinions are also untethered to the legal framework of the Controlled Substances Act (CSA), which governs Kroger's responsibility for providing effective controls against diversion and for dispensing prescriptions only pursuant to a valid prescription and provides a predicate for a finding of nuisance liability. Indeed, Dr. Schneider is wholly unfamiliar with the requirements of the CSA and with Kroger's

---

[5] The concepts of "fit" and prejudice under Rule 702 incorporate the requirements of relevance under Rules 401, 402, and 403. Under Rules 401 and 402, evidence is admissible only if it "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401; *see also* Fed. R. Evid. 402. Moreover, under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

9

responsibilities under it. *See infra*. His use of the term "potentially responsible party" is drawn instead from terminology used under CERCLA. *See infra*.

Moreover, as used by Dr. Schneider, the term PRP encompasses both perpetrators and victims of harms, as both may be "associated" with particular factors that led to the opioid epidemic. *See, e.g.,* Ex. B, Dep. Tr. at 105:19-106:4 & 131:2-6. Thus, the term "responsible" as used by Dr. Schneider does not align with either legal or factual concepts of causation or liability. Nor is Dr Schneider assessing responsibility for the harms at issue in this case; rather he means only that he believes the PRPs are responsible for increased supply of opioids, without regard to whether they are "responsible" for the interferences with public health and safety that constitute the nuisance in this case. *See* Ex. B, Dep. Tr. at 127:2-18 & 130:14-17.

Dr. Schneider's opinions also do not fit the facts of this case, with which he is largely unfamiliar. Thus, Dr. Schneider opines about Kroger's responsibility (or perceived lack thereof), but admits he simply does not know whether pharmacies, including Kroger, have dispensed opioids pursuant to illegitimate prescriptions. *See infra*; *see also* Ex. B, Dep. Tr. at 186:9-13 & 226:23-227:4. He attributes the harms of OUD to diversion, but seems unaware of the role that pharmacies — as the point where controlled substances leave the "closed system" established by the CSA — play in either preventing or facilitating diversion. *See infra*. For example, although he is familiar with the concept of red flags, he does not know whether a pharmacy that receives a prescription raising a red flag has an obligation to inquire further. *See* Ex. B, Dep. Tr. at 188:16-189:11. Thus, it would not affect his opinions if he learned that Kroger was turning a blind eye to red flags of diversion. *See id.* at 189:13-18. His focus on drug dealers simply ignores the fact (of which his lack of familiarity with the CSA has left him unaware) that dealers must obtain their wares somewhere, and that, in the case of prescription opioids, this can only occur through

10

diversion from the CSA's "closed system." Accordingly, it would have no effect on his opinions if, for example, the prescriptions from the pill mills he references in his Report were being filled at Kroger. *See id.* at 242:20-243:1. *See also, e.g.,* Ex. B, Dep. Tr. at 154:2-4 & 155:16-158:10 (opining that the term "suspicious orders" in the distribution context does not necessarily mean suspicious for diversion and that he does not consider pharmacies placing "suspicious orders" to be doing anything wrong).

Dr. Schneider's opinions are thus irrelevant because they do not address any issue in this case. They are, moreover, highly prejudicial, because they encompass a term, liability which is typically understood as a legal concept, and which he ultimately is offering as a basis for determining responsibility for abatement costs. Such testimony suggests to the jury that it is appropriate to decide the Phase I issues by some standard other than the one the Court will articulate, based on concepts other than those that will appear on the verdict form. Dr. Schneider's opinions effectively attempt to usurp the Court's role in articulating how to adjudge liability and responsibility for abatement relief. Such testimony is unhelpful to the jury and should be excluded. *See In re Nat'l Prescription Opiate Litig.*, 2019 WL 3934597, at *3. The jurors would necessarily expect that, if they are hearing an expert opinion, it is pertinent to the issues they will decide. *Compare In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004) (excluding expert "opinions and rhetoric concerning ethics as alternative and improper grounds for decision on bases other than the pertinent legal standards," which would likely lead to unfair prejudice and "confuse the trier"); *Wolfe v. McNeil-PPC, Inc.*, 2011 WL 1673805, at *9 (E.D. Pa. May 4, 2011) (excluding testimony for multiple reasons, including under Rule 403, due to its "tendency . . . to encourage the jury to impose liability on an improper basis"). Should Dr. Schneider seek to propose, as a policy suggestion, an alternative liability scheme and criteria for becoming subject

11

to court-ordered abatement relief in a speech or article, he is free to seek an audience with which to share those views, but he may not do so in court.

Further, it is well established that "[t]estimony based on theories that do not fit the facts is not helpful to the jury and is not relevant." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3934597, at *3. Here, Dr. Schneider's opinions are unmoored from, and of no use to, the jury in deciding any factual question at issue in the case. The jury will be called upon to address whether there is a public nuisance, whether Kroger engaged in misconduct, and whether Kroger's misconduct was a substantial factor in causing the harm to public health and safety. *See, e.g.*, MDL Doc. 4176 (Track 3 Verdict Form). Dr. Schneider's opinions go to none of those issues and are not based in any way on either the legal theories or the evidence in this case, of which Dr. Schneider has remained ignorant.

Additionally, Dr. Schneider plans to distinguish for the jury "cost-incurring" OUD from "non-cost-incurring" OUD (which costs remain undefined but pertain to *financial* expenses incurred by providers of healthcare and public services) when the issue in the County's public nuisance case is harm to *public health and safety.* His focus on costs that the County has incurred could, in theory, relate to damages, which are not at issue in this case, but is simply irrelevant to the existence of a public nuisance.[6]

Adding to the confusion and further underscoring the irrelevance of his "allocation" opinions, Dr. Schneider also is not weighing the relative contribution of PRPs *vis à vis* each other,

---

[6] It is additionally problematic that Dr. Schneider plans to suggest that the reason some OUD is "non-cost-incurring" is because the person suffering was "not meaningfully impacted" by a "delimited episode" of addiction — even though, as an economist, he is not a medical provider, social worker, or epidemiologist and does not know, for example, if his opinion is inconsistent with the DSM V. *See* Ex. A, Rpt. ¶ 5.6 n. 117; Ex. B, Dep. Tr. at 175:1-176:2. More fundamentally, this opinion ignores, and insultingly understates, the human toll of this crisis. In Dr. Schneider's view, for example, if an individual suffered a fatal overdose without incurring whichever type of treatment or social services costs he ultimately elects to consider, the loss of that life would be placed in the "non-cost incurring" column of his analysis.

12

opining about the extent to which they are responsible relative to others, or seeking to apportion supply between them. *See* Ex. B, Dep. Tr. at 237:16-24. *See also, e.g., id.* at 130:14-17 (admitting that he did not do any analysis as to the extent to which any of the factors he identifies plays an indirect role in diversion). In fact, he opines that the PRPs to whom abatement costs should be assigned include individuals or entities with too "atomistic" a role to be identified and sued. Ex. A, Rpt. ¶ 4.2.

Because the opinions in Sections 4, 5, and 6 are grounded in standards at odds with the legal standards in this case and likely to confuse the jury, and because they are untethered to the facts of the case, they are inadmissible under Rule 702 and *Daubert*. The same is true for the summary of these opinions set forth in paragraphs 9.1 – 9.5 of Section 9 in Dr. Schneider's report. Dr. Schneider should be precluded from offering any of this material at trial.

## II. Dr. Schneider Is Unqualified to Critique Dr. Alexander's Abatement Opinions and the Critique He Offers Is Largely Irrelevant.

Dr. Schneider also plans to critique the opinions expressed in an expert report of G. Caleb Alexander, MD, MS, titled "Abatement Strategies for Addressing the Opioid Crisis." Dr. Alexander is a pharmacoepidemiologist and medical doctor who was retained to "provide [his] scientific expertise regarding how to abate or reduce the harms caused by opioid epidemic in the United States." *See* Ex. D, Alexander Rpt. ¶ 1. His report does not focus on any specific community, but outlines evidence-based strategies for abating the opioid crisis, "discuss[ing] the scientific foundation and rationale for programs and services as they may be applied in numerous cities, counties and states around the United States." *Id.*

Dr. Schneider is neither a medical doctor nor an epidemiologist. He admits that he is not an expert on what strategies are needed to abate the opioid epidemic. *See* Ex. B, Dep. Tr. at 210:4-7. He is also admittedly unqualified to design an abatement plan for the opioid epidemic. *See id.*

13

at 210:8-10. Given his lack of qualifications in these areas, he is unqualified to criticize the opinions of someone who *is* an expert in these fields. His opinions therefore should be excluded under Rule 702 and *Daubert*.

Additionally, Dr, Schneider's critique is, for the most part, irrelevant because it is grounded in fundamental misconceptions about the work to which he is responding. Perhaps due to his lack of expertise, Dr. Schneider misconstrues and misstates both the purpose of Dr. Alexander's report and what he believes to be opinions expressed therein. He begins from the fundamentally mistaken premise that the "main approach" of Dr. Alexander's report is to "identify[] all the different ways in which opioid use disorder could potentially affect public services." Ex. B, Dep. Tr. at 210:19-211:13 (projecting that this "seems to be his main approach" although "abatement strategies" might also be at issue); *id.* at 212:19-214:11 (conceding that his criticism of Dr. Alexander for not considering fixed and variable costs went to an issue that is "not necessarily important in identifying abatement strategies"). He further opines, for example, that Dr. Alexander's goal is to reduce the "attributable costs" of "externalities" (namely, OUD), to $0. Ex. A, Rpt. ¶ 8.7. On its face, however, Dr. Alexander's report states a different goal: "If implemented in a coordinated and comprehensive fashion, the interventions [Dr. Alexander] propose[s] can reduce cumulative opioid overdoses and opioid-related harms substantially over ten to fifteen years." Ex. D, Alexander Rpt. ¶ 237. Taking the time to unravel Dr. Schneider's confusion in attempting to critique an expert in a different field is the classic "waste of time" to be avoided under Rule 403.

Finally, it bears noting that here, too, Dr. Schneider uses his purported expertise as a vehicle to assert opinions, devoid of any foundation in the facts of the case, about the conduct of the County and Kroger. He reiterates his opinion that the County could have done more to abate the opioid epidemic, even though he admittedly does not know what the County did, or any specific additional

14

action it could have taken. *See* Ex. B, Dep. Tr. at 217:21-219:5, 219:22-220:13, 220:21-221:5, & 222:10-22. He simply theorizes that perhaps "there might have been something they could do, perhaps maybe in terms of coordination of services across the county," *id.* at 224:4-10, while admitting ignorance in this same area so profound that he has never heard of a widely publicized, nationally-recognized coalition about which information is readily available online, *see id.* at 224:11-22.[7] Meanwhile, if testifying about abatement, Dr. Schneider would opine that, although he lacks any specific source for this opinion and, as noted above, knows nothing about Kroger's practices, he believes pharmacies have done their part to reduce opioid supply. *See* Ex. A, Rpt. ¶ 8.4; Ex. B, Dep. Tr. at 228:9-18, 228:23-229:1, & 229:15-230:18. These opinions, like those offered in Sections 4, 5, and 6 of his Report, are simply unconnected to the law or the facts of this case. They are irrelevant, unhelpful, and prejudicial, and should be excluded.

## CONCLUSION

For the reason set forth above, Dr. Schneider's opinions as disclosed in Sections 4, 5, 6, and 8, and the corresponding summaries of those opinions in Section 9, should be excluded.

Dated: February 8, 2023   Respectfully submitted,

*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com
*Plaintiffs' Liaison Counsel*

---

[7] *See, e.g.,* Overdose | Community Overdose Action Team | United States (mccoat.org)

15

Linda Singer
Elizabeth Smith
MOTLEY RICE LLC
401 9th Street NW
Suite 630
Washington, DC 20004
(202) 386-9626
lsinger@motleyrice.com
esmith@motleyrice.com
*Attorneys for Plaintiff Montgomery County*

Michael Elsner
Lisa Saltzburg
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
(843) 216-9000
melsner@motleyrice.com
lsaltzburg@motleyrice.com
*Attorneys for Plaintiff Montgomery County*

Mathias H. Heck, Jr.
MONTGOMERY COUNTY
PROSECUTING ATTORNEY
301 West Third Street
P.O. Box 972
Dayton, Ohio 45422
Telephone: (937) 225-5599
Fax Number: (937) 225-4822
E-mail: heckm@mcohio.org
*Attorney for Plaintiff Montgomery County*

Ward C. Barrentine
Chief Assistant Prosecuting Attorney –
Civil Division
MONTGOMERY COUNTY
PROSECUTOR'S OFFICE
301 West Third Street
4th Floor, Suite 461
Dayton, Ohio 45422
Telephone: (937) 496-7797
E-mail: BarrentinW@mcohio.org
*Attorney for Plaintiff Montgomery County*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 8, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system and may be obtained by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/Peter H. Weinberger*
Peter H. Weinberger
