# EXHIBIT B

1                UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                     EASTERN DIVISION

3

    IN RE: NATIONAL          )
4   PRESCRIPTION             )   MDL No. 2804
    OPIATE LITIGATION        )
5   _____  )   Case No.
                             )   1:17-MD-2804
6                            )
    THIS DOCUMENT RELATES    )   Hon. Dan A.
7   TO: "Case Track Seven"   )   Polster

8
                  FRIDAY, JANUARY 6, 2023
9
       HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW

11                      – – –

12              Remote oral deposition of John

13   Schneider, Ph.D., held at the location of the

14   witness in Coral Gables, Florida, commencing

15   at 9:27 a.m. Eastern Time, on the above date,

16   before Carrie A. Campbell, Registered

17   Diplomate Reporter, Certified Realtime

18   Reporter, Illinois, California & Texas

19   Certified Shorthand Reporter, Missouri,

20   Kansas, Louisiana & New Jersey Certified

21   Court Reporter.

22

23                      – – –
              GOLKOW LITIGATION SERVICES
24                  877.370.DEPS
                 deps@golkow.com
25

```
 1        R E M O T E   A P P E A R A N C E S :

 2

 3        MOTLEY RICE LLC
          BY:  LISA SALTZBURG
 4             lsaltzburg@motleyrice.com
          28 Bridgeside Boulevard
 5        Charleston, South Carolina 29464
          (843) 216-9000
 6        Counsel for Plaintiffs

 7

 8        BOWLES RICE
          BY:  AARON C. BOONE
 9             aboone@bowlesrice.com
               GRAYSON O'SAILE
10             gosaile@bowlesrice.com
          501 Avery Street, Fifth Floor
11        Parkersburg, West Virginia  26101
          (304) 420-5501
12        Counsel for Kroger

13

14     ALSO PRESENT
            AMANDA UNTERREINER, paralegal, Motley
15          Rice

16

17     TRIAL TECHNICIAN:
            GINA VELDMAN,
18          Precision Trial Solutions

19                       - - -

20

21

22

23

24

25
```

INDEX

PAGE

APPEARANCES.................................. 2

EXAMINATIONS

   BY MS. SALTZBURG.......................... 5

   BY MR. BOONE............................ 259

   BY MS. SALTZBURG........................ 263

   BY MR. BOONE............................ 266


EXHIBITS

   No.   Description                              Page

   1     Notice of Deposition of John          12
         Schneider

   2     Avalon Health Economics Invoicing     27
         Summary, December 12, 2022

   3     Contributing Factors Associated       33
         with Prescription Opioid Supply
         and Opioid Attributable Costs in
         Montgomery County, Ohio, Expert
         Report of John E. Schneider,
         Ph.D., December 12, 2022

   4     John E. Schneider, Ph.D.             251
         curriculum vitae


    (Exhibits attached to the deposition.)

CERTIFICATE................................268

ACKNOWLEDGMENT OF DEPONENT..................270

ERRATA.....................................271

LAWYER'S NOTES.............................272

```
 1              COURT REPORTER:  All parties to
 2         this deposition are appearing remotely
 3         and have agreed to the witness being
 4         sworn in remotely.
 5              Due to the nature of remote
 6         reporting, please pause briefly before
 7         speaking.
 8              All parties please state their
 9         appearance.
10              MS. SALTZBURG:  This is Lisa
11         Saltzburg, Motley Rice, for Montgomery
12         County.
13              MR. BOONE:  This is Aaron Boone
14         with the law firm of Bowles Rice.
15         Here with me is my counsel and
16         co-counsel Grayson O'Saile.  Also
17         present is Kroger's expert, John
18         Schneider.
19
20              JOHN SCHNEIDER, Ph.D.,
21    of lawful age, having been first duly sworn
22    to tell the truth, the whole truth and
23    nothing but the truth, deposes and says on
24    behalf of the Plaintiffs, as follows:
25
```

```
 1                  DIRECT EXAMINATION

 2   QUESTIONS BY MS. SALTZBURG:

 3        Q.     Good morning, Dr. Schneider.  I

 4   know we met offline.  I'm Lisa Saltzburg.

 5   I'm a lawyer with Motley Rice, which is the

 6   outside counsel assisting the prosecutor's

 7   office with this case.

 8        A.     Good morning.

 9        Q.     And you are based in

10   Morristown, New Jersey, correct?

11        A.     No, not -- in the past I have.

12   I'm actually based now in Coral Gables,

13   Florida.

14        Q.     Okay.  And is that where you

15   plan to be, say, through the next year or so,

16   too?

17        A.     Correct.

18        Q.     And you're in Miami today for

19   the deposition, correct?

20        A.     Actually, in Coral Gables,

21   yeah.

22        Q.     Fair enough.

23        A.     It's basically -- we're

24   surrounded by the City of Miami, so you're

25   essentially correct.
```

1          Q.     I get you.  I live in a suburb,

2    too.

3                 And you've been deposed many

4    times before, correct?

5          A.     Correct.

6          Q.     Okay.  So you know all of the

7    ground rules, and before we jump right in,

8    I'll just go over a couple of things briefly.

9                 If you need a break at any

10   time, please let me know.  I'll try to take a

11   break about every hour, but if you want to

12   break before then, just let me know, and the

13   only thing I ask is if there's a question

14   pending, go ahead and answer the question

15   first.

16         A.     Okay.

17         Q.     We'll have to make sure not to

18   try to talk over each other, and as you know,

19   you'll want to check the natural tendency in

20   conversation to nod your head, something like

21   that, and make sure you're giving verbal

22   answers so that the court reporter can take

23   everything down.

24                 Your lawyer might object from

25   time to time.  If that's the case, just give

1    him a minute to do that and then you can go

2    ahead and answer unless he instructs you not

3    to.

4              And if you didn't hear or

5    didn't understand a question, please let me

6    know.  I can be soft spoken, so if that -- if

7    you don't ask me, I'll assume that you've

8    heard and understood.

9              Okay?

10   A.     Okay.

11   Q.     All right.  Now, when you were

12   deposed before, was it always as an expert or

13   have you ever testified as a fact witness?

14   A.     Honestly, as a layperson, I'm

15   not sure I understand the difference.  Can

16   you explain the difference?

17   Q.     Okay.  Were you preparing a

18   report in all the cases before?

19   A.     When you say "all the cases,"

20   are you referring to opioid-related matters

21   or just my entire career as an expert?

22   Q.     Your career as an expert.

23   A.     Generally, I -- I have prepared

24   reports in my testimony.  I would not say all

25   the time, but most of the time.

1       Q.      Okay.  And did any of the cases

2  in which you testified before involve

3  opinions about causation?

4       A.      Yes.

5       Q.      Which cases were those?

6       A.      I think off the top of my head

7  one would be the tobacco product litter

8  matter in the City of San Francisco.  I

9  testified as to the causes of tobacco product

10 litter.

11      Q.      And was that a lawsuit?

12      A.      Correct.

13      Q.      Okay.  And did you testify at

14 trial in that case or only in a deposition?

15      A.      I'm not -- I don't remember

16 exactly.  I'm pretty sure it was only

17 deposition.  There could have been trial,

18 too, in that.  I just don't remember.

19      Q.      Okay.  And how many cases have

20 you testified at trial?

21      A.      Maybe a total of 10 or 12 over

22 my career.

23      Q.      Okay.  And do those generally

24 involve the reasonable value of medical

25 bills?

1          A.      They have involved a pretty

2   wide range of things.  Contract dispute,

3   reasonable value as you mentioned.  Things

4   like -- well, I guess -- contract dispute as

5   long as that's fairly broadly defined.

6          Q.      Have you ever been excluded

7   from testifying as an expert?

8          A.      Yes.  I think there were a

9   couple times I was excluded, I believe both

10  in the state of Mississippi, and it was

11  regarding reasonable value cases.

12         Q.      Okay.  And was that only in

13  Mississippi or somewhere else, too?

14         A.      I think the exclusions that I

15  recall were in Mississippi.  I think I -- my

16  testimony may have been limited in another

17  case.

18         Q.      And do you know why you were

19  excluded there?

20         A.      Yes, it was over a

21  misunderstanding of the extent to which I was

22  relying on collateral sources.

23         Q.      And how many of your prior

24  depositions have been in opioid-related

25  cases?

1       A.      Only two.

2       Q.      Is that New Mexico and the

3   Track 1 litigation?

4       A.      Correct.

5       Q.      Okay.  Do you have any other

6   depositions scheduled in opioid cases?

7       A.      Not currently.

8       Q.      And are you retained as an

9   expert in other opioid cases?

10      A.      Well, can you -- can you

11  further explain what you mean by that?

12      Q.      Sure.

13              Are you planning -- have you

14  been retained to prepare an expert report in

15  any other opioid cases?

16      A.      Well, not different that this

17  one, although I'm anticipating continuing to

18  work for my current clients, yes.

19      Q.      Okay.  And when you say "this

20  one," do you mean the Track 7 case in

21  Montgomery County?

22      A.      Correct.

23      Q.      And who are your current

24  clients?

25      A.      My current clients in

1    Montgomery County, or do you mean just --

2    again --

3         Q.    Not in your non-opioid cases,

4    no.  I realize that might take a long time.

5    I'm only interested right now in your clients

6    in the Track 7 case in Montgomery County.

7         A.    Okay.  My client in the Track 7

8    case in Montgomery County is only Kroger.

9         Q.    Okay.  So only Kroger.

10         And is it still true you're not

11   doing any work in the bankruptcy proceedings

12   for Insys, right?

13         A.    No.  No.

14         Q.    Okay.  Have you testified at

15   trial in any opioid-related case?

16         A.    No.

17         Q.    And have you ever given any

18   testimony before the FDA, CDC or DEA?

19         A.    I'm sorry, can you repeat that?

20         Q.    Sure.

21         Have you ever testified for the

22   FDA, CDC or DEA?

23         A.    I'm sorry, testified for them?

24   I'm not --

25         Q.    Before them.

1        A.      No.  No.  I haven't.

2        Q.      And did you receive a notice

3    for this deposition?

4        A.      Yes, I believe so.

5        Q.      Okay.  And did you get a box of

6    documents?

7        A.      The FedEx folder sitting in

8    front of me.  If that's what you're referring

9    to, yes.

10       Q.      It is, yes.

11               And did you open it?

12       A.      No, not yet.

13       Q.      Okay.  Good for you.  This

14   would be a good time to do that.

15       A.      All right.

16               (Schneider Exhibit 1 marked for

17        identification.)

18   QUESTIONS BY MS. SALTZBURG:

19       Q.      And so while you're opening

20   that, I'll just tell you the first folder in

21   there, folder 1, should be the deposition

22   notice that you received.  And this would be

23   a good time to mark that as an exhibit.

24       A.      Okay.  Exhibit 1 notice?  That?

25       Q.      Yes.

1      A.     Is that what you want me to

2  open?  You want me to not open anything else,

3  correct?

4      Q.     Correct.

5             MR. BOONE:  John, are there two

6        sets there?

7             MS. SALTZBURG:  Yeah, there

8        should be a set for your counsel.

9             THE WITNESS:  Okay.  There we

10       go.  Okay.  So I've got now four

11       folders.  One of which is --

12            MS. SALTZBURG:  I forgot that

13       yours and Mr. Boone's were in the same

14       box.

15            THE WITNESS:  Okay.  I just

16       want to make sure there's nothing else

17       in there.  Nothing else in the folder.

18       So you want me to open Exhibit 1,

19       notice?

20            MS. SALTZBURG:  Yes.

21            THE WITNESS:  Okay.

22  QUESTIONS BY MS. SALTZBURG:

23      Q.     And all I'm going to ask you

24  about this notice is this is the notice that

25  you received?

1     A.     Yes.

2     Q.     Okay.  And we can put that away

3  now.

4            What did you do to prepare for

5  this deposition today?

6     A.     I met with Mr. Boone and

7  Mr. O'Saile.

8     Q.     Was there anybody else present?

9     A.     Yes.  Ms. Kara Kapke.  Am I

10  pronouncing her last name right?  If anyone

11  knows.  I'm not sure how -- if I'm

12  pronouncing her last name correctly, but she

13  represents Publix.

14     Q.     Okay.  She represents Publix.

15            And is Publix also a client of

16  yours?

17     A.     Yes.

18            So just to clarify, when you

19  asked me before who my client is in the Mo

20  Co. matter, it is Kroger.  However, I have

21  continued to do work for other retail

22  pharmacies as well, including Publix.

23     Q.     Okay.  And is the work for the

24  other retail pharmacies for other opioid

25  cases in the MDL?

1      A.     Well, I would say more

2  generally it is in anticipation of me

3  possibly being used in future matters, hence

4  their continued involvement.

5      Q.     Okay.  I just wanted to make

6  sure I understand.

7             So as you sit here today, are

8  you retained in any of what we call the

9  Tracks 8 through 11 cases?

10     A.     Well, what I meant to say is I

11  don't know whether I am or not or whether I

12  will be or not.

13     Q.     Okay.  And how long was that

14  meeting?

15     A.     I think probably roughly five

16  hours.

17     Q.     And when was that?

18     A.     That was yesterday.

19     Q.     And did you look at any

20  documents?

21     A.     I looked at my report.  No.

22     Q.     And, Dr. Schneider, how did you

23  come to be a testifying expert?

24     A.     That's a good question.  I

25  think probably -- you'll have to -- you mean

1  originally for the first -- starting with the

2  first time that I became a testifying expert?

3      Q.    Right.

4      A.    Okay.  I was a -- on the

5  faculty at the University of Iowa in Iowa

6  City, Iowa, and I was contacted by an

7  attorney working in a trademark infringement

8  case, and they needed some -- they needed an

9  economist to opine or to analyze and opine on

10  market boundaries for hospitals in their

11  system versus the system -- or the opposing

12  system with whom they had a dispute.

13      Q.    How did you come to be an

14  expert witness for Kroger?

15      A.    For Kroger I have -- that sort

16  of kickoff expert testimony story I just gave

17  you.  In the years since then, I continued to

18  add more types of cases to the -- to the work

19  that I did, mainly while I was still in

20  academia.

21          And then I went into

22  consulting, primarily consulting, sort of

23  continued doing litigation work, and

24  somewhere along the way I met Mr. Boone in

25  that work.  And we worked on one case, and

1  then he contacted -- years had gone by and

2  then he contacted me again regarding the

3  opioid matter.

4       Q.     Okay.  And when did he contact

5  you about being an expert in the opioid

6  matter?

7       A.     I don't remember the exact

8  date, but would have been in -- sometime in,

9  I want to say, maybe early 2021.

10      Q.     Okay.  And I guess really where

11  I want to go here, is when were you

12  approached about being an expert witness in

13  this case?

14      A.     Okay.  Again, sorry just to

15  clarify, you mean the --

16      Q.     Track 7?

17      A.     Montgomery County, Track 7

18  matter.

19      Q.     Yes.  I realize I shouldn't

20  have interrupted you, but, yes.

21      A.     Let me think.  I would say

22  probably, I want to say, maybe the middle

23  of last year.  So mid-2022.

24      Q.     Okay.  And when you were

25  approached in the Montgomery County case,

1  what were you being retained to do?

2      A.    Well, at that time I was being

3  retained to conduct analysis of liability.

4  For lack of a better word, liability was

5  explained to me that the case would likely --

6  at that time it was believed that the case

7  would likely be bifurcated and that I would

8  start with liability.

9      Q.    Anything specific with -- well,

10  let me ask you a better question.

11          What do you mean by liability?

12      A.    Well, that's why I said for

13  lack of a better term.  In the field of

14  economics, liability is usually employed when

15  you're talking about externalities, who is

16  responsible for an externality.  So in

17  economics we use the term liability, but we

18  more often use the term responsible parties.

19          So my approach to liability is

20  twofold.  One is -- as an economist, one is

21  identifying contributing factors, and the

22  second would be mapping those contributing

23  factors into responsible parties.

24      Q.    Okay.  Are you opining that

25  liability for economics is the same as

1    liability for litigation?

2         A.    No, I'm not.  Mainly because as

3    an economist, and the methodology and the

4    theory that I bring in for economics doesn't

5    provide a very nuanced definition of

6    liability.  So -- and given that that's where

7    all of my training is, I do not have a very

8    nuanced understanding of liability.  My

9    understanding is only from the perspective of

10   an economist.

11        Q.    Okay.  And do you have an

12   understanding of what the purpose of your

13   assignment was for the Montgomery County

14   case?

15        A.    Yes.

16        Q.    And what was that?

17        A.    Well, as I said, it was to

18   study aspects of liability and responsible

19   parties associated with the increase in

20   supply of prescription opioids.

21        Q.    Okay.  And were you provided

22   with any assumptions to use for purposes of

23   that work?

24        A.    No.

25        Q.    I know you mentioned one case.

1   Have you done any other expert work in

2   connection with the Bowles Rice law firm

3   apart from the opioid cases?

4        A.    No.

5        Q.    And what percentage of your

6   income is derived from expert witness work

7   versus other work?

8        A.    Well, in my company, I'm paid a

9   salary, so it's difficult to answer that

10  question directly.

11       Q.    Okay.  So would the percentage

12  be based on a percentage of your time then?

13       A.    Yes, that's probably fair.

14  Well, actually, no.  Because I am paid a

15  salary regardless of what I work on.  So,

16  yeah, so that -- that makes that question

17  difficult to answer.

18       Q.    Okay.  Do you have an estimate

19  at all or --

20       A.    Yes.  So as a company, about

21  25 percent of our -- 25, 30 -- 25 to

22  30 percent of our revenue, depending on the

23  month, would be derived from any matter

24  regarding litigation support, you know,

25  economic -- law and economics.  And then the

1  other 70 to 75 percent would be life sciences

2  consulting and things like that.

3            So that's the best breakdown I

4  could provide.

5      Q.     And do you have any other

6  employment outside of Avalon?

7      A.     I am currently -- just small

8  contract, you know, kind of one-off contract

9  appointment.  So currently I have an

10  appointment at San Diego State University,

11  the purposes of which is for a specific

12  grant.

13            I recently had an appointment

14  at Columbia University, also for a specific

15  grant.

16            And that would be it.  Those

17  are employment agreements, but they're

18  part-time -- time-limited appointments.

19      Q.     I see.

20            And when you say appointment,

21  what kind of work is it?

22      A.     Participating in a research

23  team on a -- on a -- two very specific

24  projects.  So Columbia University and San

25  Diego State University were very different

1    projects.

2         Q.     I see.

3                Okay.  And you are the

4    principal and CEO of Avalon, correct?

5         A.     Correct.

6         Q.     And are you still one of the

7    owners or the main owner?

8         A.     Yes.

9         Q.     And are there still two other

10   owners?

11        A.     Correct.

12        Q.     And have there been any

13   significant changes to the work of Avalon

14   Health Economics since your deposition in New

15   Mexico?

16        A.     No.

17        Q.     And is it still the case that

18   you don't own any stock in pharmaceutical

19   distribution or pharmacy industry companies?

20        A.     That is still the case.

21        Q.     And since your deposition in

22   New Mexico, have you done any speaking

23   engagements on behalf of the pharmaceutical

24   or the pharmacy industry?

25        A.     No.

1    Q.    And did you fully disclose any

2  prior speaking engagements in that

3  deposition?

4    A.    I believe so.

5    Q.    And have you ever done

6  consulting work for pharmacies or

7  distributors, apart from the expert work in

8  the opioid cases?

9    A.    Avalon Health Economics does

10  consulting work.  Some of its consulting work

11  is done for pharmaceutical companies.

12    Q.    What about pharmacies?

13    A.    No.

14    Q.    Wholesale distributors?

15    A.    No.

16    Q.    I think you told me, but I just

17  want to make sure I understand.

18         What is the particular

19  expertise that you consider yourself to bring

20  to this case?

21    A.    Well, I've done a -- well,

22  first of all, as an economist, I -- what I

23  was asked to do in this case was in the

24  purview of economics.  So I start with that

25  as my background in economics.

1            And I'm also specialized in a

2    subfield of economics called health

3    economics, and that also is an area in which,

4    you know, for example, a lot of the work done

5    and studies of various aspects of opioids

6    have been conducted by health economists.

7            And then further down below

8    that would be specifically I've worked on

9    this concept of attributable costs or

10   attributable risk.

11       Q.    Do you have an estimate of how

12   many total hours you've spent to the -- on

13   the Montgomery County case from the time that

14   you were first approached about being an

15   expert?

16       A.    No, I would have to -- I would

17   have to look back on the invoicing documents

18   to try to figure that out.

19       Q.    Okay.  And did anyone help you

20   with your report or your work in this case?

21       A.    Yes.

22       Q.    And who was that?

23       A.    This is various staff at Avalon

24   Health Economics who have helped me.  Various

25   people.  Would you like me to provide their

1    names?

2         Q.    Yes.

3         A.    Ryan Bresnahan.

4         Q.    Uh-huh.

5         A.    Karen Beltran.

6         Q.    Uh-huh.

7         A.    Karen.  Just a footnote on

8    Karen.  She's moved on to a different

9    position.  She's no longer at our company.

10        Q.    Uh-huh.

11        A.    Let's see.  Who else might

12   have?  Amy Duren, D-u-r-e-n.

13              And then administrative

14   support?  Do you want to go to that level?

15        Q.    No.

16        A.    Okay.

17        Q.    All right.  For the other

18   three, what did they do?

19        A.    In various -- I would describe

20   it broadly as research assistants.  Various

21   types of retrieving PDFs of published

22   articles, compiling data and spreadsheets,

23   things like that.

24        Q.    And would you need to look at

25   the invoices to estimate your time, too?

1      A.      Yes.

2      Q.      And you're charging or Avalon

3  is charging $400 an hour for your time and

4  $250 an hour for staff time, correct?

5      A.      Correct.

6      Q.      Okay.  How did you come up with

7  those numbers?

8      A.      Well, we have a rate sheet,

9  Avalon Health Economics has a rate sheet.

10  Those particular numbers were -- however,

11  were negotiated with the clients at the onset

12  of the work.

13      Q.      And are there any charges in

14  the Montgomery County case that are not based

15  on hourly work?

16      A.      Can you clarify what you mean

17  by that?

18      Q.      Sure.

19              I guess like what I'm asking

20  is, in terms of the amount that -- or that

21  you're charging for your expert work in

22  Montgomery County, is it all based on an

23  hourly rate?

24      A.      Yes.

25      Q.      And do you apply that same rate

1   for trial testimony, too?

2      A.      No, we had a higher rate for

3   trial testimony or I have a higher rate for

4   trial testimony.

5      Q.      And what is that?

6      A.      In this case, I believe it's

7   $800 an hour.

8          MS. SALTZBURG:  And just for

9      your counsel, we request that to the

10     extent there are any additional

11     invoices in this case, that we be

12     provided those in advance of trial.

13          (Schneider Exhibit 2 marked for

14     identification.)

15  QUESTIONS BY MS. SALTZBURG:

16     Q.      And if you will go back to your

17  FedEx box, could you pull out Exhibit 2,

18  please?  And we can mark this as an exhibit

19  while you're doing that.

20     A.      Okay.  I have it.

21     Q.      You have it.  Okay.

22          We do have your invoices, or

23  actually, I should ask you, can you identify

24  what this is?

25     A.      Yes, this appears to be the

1  invoices that -- that we submitted to our

2  client over the time period beginning in May

3  of 2022 through November 2022.

4       Q.     Looks like there's a summary in

5  the first page and then the invoices are

6  behind it?

7       A.     Correct.

8       Q.     And did you prepare those

9  invoices and summary?

10       A.     No, I did not.

11       Q.     Who did?

12       A.     It would be our administrative

13  team.

14       Q.     And are you able to testify

15  that the information in this summary and

16  invoices is correct?

17       A.     Yes, I reviewed these materials

18  before they were provided, and they appear to

19  be correct to me.

20       Q.     Okay.  And if you discover any

21  inaccuracies later, could you bring those to

22  our attention through your counsel?

23       A.     Yes.

24       Q.     And do you have any invoices or

25  time that you have yet to submit for payment?

1     A.     Yes.

2     Q.     Okay.  Do you have a sense of

3   how much that is?

4     A.     No.  I do not.

5            We typically submit invoices to

6   our client at the end of each month, however,

7   due to the holidays, we have not yet

8   submitted or compiled or submitted the

9   invoicing for what would be the month of

10  December 2022.

11    Q.     I see.

12           And I guess between this is

13  dated December 12, 2022, correct?

14    A.     Correct.

15    Q.     So between December 12, 2022,

16  and today, did you do anything other than the

17  deposition that we are now in and the meeting

18  yesterday?

19    A.     Well, I did my own preparatory

20  work.

21    Q.     Okay.

22    A.     Which would -- which I did.  It

23  was not part of yesterday.  Yesterday was

24  with counsel.  I did some work prior to that

25  just reviewing my report.

1      Q.      Anything else?

2      A.      I don't think so.

3      Q.      Looking through this exhibit, I

4    noticed that these invoices appear to be in a

5    different format than the ones you had in the

6    New Mexico case, correct?

7      A.      No, I wasn't aware of that.

8      Q.      Okay.  Well, let me ask you, do

9    your invoicing records usually show a

10   breakdown of, say, the -- in the description

11   of the hourly work and the date it was

12   performed?

13     A.      To some degree, yes.  Not

14   all -- not always.  I wouldn't say they're

15   always consistently presented in that format.

16     Q.      Okay.  One thing that's

17   confusing me a little bit about this summary

18   is if you look at the top, it says J.

19   Schneider, Montgomery County T7 matter,

20   correct?

21     A.      Correct.

22     Q.      And then you said Kroger is the

23   client for Track 7, correct?

24     A.      Correct.

25     Q.      But you have a breakdown here

1    also for Albertsons, Meijer and Publix,

2    correct?

3            A.      Correct.

4            Q.      Why is that included?

5            A.      Okay.  When we compiled this

6    summary, we chose a start date of May because

7    that was after the New Mexico matter was more

8    or less -- had more or less ended.  So we

9    took our invoices straight through from May

10   until November, which was the most recent one

11   we had as of December 12th.

12              Now, what we -- what that

13   meant -- the way we did this and I perhaps

14   could have asked my secretary to have done it

15   differently, but when we did this, we

16   included all the work that we did between May

17   and November, whether it had directly --

18   whether it was directly applicable to

19   Montgomery County or not.

20              So you are correct, that the

21   title is somewhat misleading in that this

22   includes work that was not done specifically

23   for Montgomery County.

24           Q.      And do you have a way to tell

25   what part of the work was specifically for

1   Montgomery County?

2       A.      Unfortunately because of the

3   way we tracked hours in this case, no, it

4   would be difficult to do that.

5       Q.      Okay.  One question I have,

6   too.  You have a column that says "Kroger

7   sampling" at the top?

8       A.      Correct.

9       Q.      And what is the sampling there?

10      A.      Well, we're asked by Kroger

11  counsel to conduct a sampling, apparently --

12  my -- I don't have a very deep understanding

13  of the use of the sampling because all we

14  were asked to do was to conduct -- to

15  actually draw the sample, but apparently

16  other defendants -- well, the defendants and

17  the plaintiffs were agreeing upon a sampling

18  strategy with a specific seed number, and so

19  we were just executing that sample on a set

20  of claims that we were provided.

21      Q.      And was that for Montgomery

22  County, or was that for something else?

23      A.      Well, I actually don't know.

24  We were given some claims and asked to do the

25  sampling.  And I presume it was for

1    Montgomery County, but I'm not 100 percent

2    sure.

3          Q.     Okay.  You say you were given

4    some claims.  Can you explain to me what you

5    mean by that?

6          A.     Unfortunately, I don't have

7    much more detail than that.  I recall looking

8    at it, and they appeared to be records of

9    prescriptions that were filled at Kroger

10   stores, and it was a large sample.  I don't

11   remember how many records were in the sample,

12   but we were provided the sample and we were

13   asked to -- we were provided a seed number

14   and we were asked to draw a random sample

15   from that.

16         Q.     Okay.  I think I understand.

17                Was this dispensing data from

18   Kroger?

19         A.     Yes, that's correct.

20                (Schneider Exhibit 3 marked for

21         identification.)

22   QUESTIONS BY MS. SALTZBURG:

23         Q.     Okay.  We can put this away.  I

24   would like to talk about the materials that

25   you reviewed for this case.

1          And to do that, let's take a
2  look at your report.  It should be -- if you
3  can pull out Exhibit 3, please.  And we can
4  mark that while you're doing that.
5          A.      Okay.
6          Q.      And just for the record, can
7  you identify this document?
8          A.      Just going to quickly review
9  it.
10          Q.      Take all the time that you
11  need.
12          A.      Yes, this appears to be my
13  report for Montgomery County.
14          Q.      Okay.  And your counsel have
15  confirmed that the materials cited in this
16  report constitute all of the materials that
17  you considered in forming your opinions in
18  this case, correct?
19          A.      Correct.
20          Q.      I guess a better way to ask
21  that, is that correct?
22          A.      That is correct.
23          Q.      All right.  And how did you
24  select those materials?
25          A.      Well, in the course of doing --

1  researching the objectives that I was

2  addressing in this report, I conducted a

3  variety of literature searches primarily in

4  an online tool called PubMed which indexes

5  medical literature.  And I also consulted

6  with economics materials from JSTOR, which is

7  an economics indexing source.  I had also

8  consulted published materials in the form of

9  books that -- that are publicly available,

10  published books, you know, hardcover books,

11  most of which I have on my shelf.  Some of

12  which were ordered specifically for this

13  matter.

14      Q.     And how did you select the

15  materials that you reviewed?

16      A.     Well, as an economist and a

17  health economist, I know the landscape of

18  source material, and the selection of

19  materials is based on a review of everything

20  that addresses the question that I'm asking,

21  and then a further assessment of the quality

22  of that material.

23      Q.     And were any of the materials

24  provided by counsel?

25      A.     No.

1      Q.      And did you do any independent

2   outside research apart from the materials

3   that are cited here?

4      A.      Can you just explain a little

5   more what you mean by that?

6      Q.      Sure.

7              Other than what you just

8   described, did you do any independent outside

9   research?

10     A.      No.

11     Q.      And did you base your opinions

12  on any sources other than those listed in

13  your report?

14     A.      No.

15     Q.      Is there anything you felt like

16  you needed to look at and you did not have

17  the opportunity to do that?

18     A.      No, not for the most part.

19     Q.      What do you mean "for the most

20  part"?

21     A.      I mean, as an academic

22  economist, I think we are kind of wired to --

23  always wanting to do more.  It's just our

24  nature being an academic researcher, and so

25  that's why I say that, that added clause.

1          Q.      Okay.  And do you have a sense

2    of how many hours you plan to spend working

3    on the Track 7 case in the future?

4          A.      No.

5          Q.      Are you planning to be at the

6    trial?

7          A.      As far as I know, yes.

8          Q.      And is there anything further

9    you plan to do for Track 7 between now and

10   the trial?

11         A.      Can you tell me when the trial

12   is scheduled for?  Because I'm not sure how

13   to answer that question.

14         Q.      There's not any.

15         A.      Well, then I may be asked to do

16   additional work, but I have not been yet.

17         Q.      Is there anything more you need

18   to give your opinions in this case?

19         A.      Again, you're talking about

20   regarding the liability phase for Montgomery

21   County?

22         Q.      Uh-huh.

23         A.      No.

24         Q.      Okay.  And how certain are you

25   of the opinions offered in this case?

1           MR. BOONE:  I'm sorry, what was

2      that?

3  QUESTIONS BY MS. SALTZBURG:

4      Q.      How certain are you of the

5  opinions offered in this case?

6      A.      Very certain.

7      Q.      And do you have a file for the

8  materials in this case?

9      A.      Yes.

10      Q.      And can you describe that?

11      A.      The file contains the --

12  primarily the PDFs of the cited materials.

13      Q.      You have a part 7 of your

14  report here, which we'll get to later.  You

15  referenced a regression that you did,

16  correct?

17      A.      Correct.

18      Q.      So I'm not an economist, but I

19  assume you don't do the regression in your

20  head, right?

21      A.      Correct.

22      Q.      There's got to be some kind of

23  documentation or something like that that

24  comes out of those?

25      A.      There are regression results.

1          Q.     And do you have those results?

2          A.     I do.  Not handy, but I do.

3     They exist, yes.

4               MS. SALTZBURG:  And we would

5          request that those be provided.

6               MR. BOONE:  Counsel, I note

7          your request.  Thank you.

8     QUESTIONS BY MS. SALTZBURG:

9          Q.     And just since we don't have

10    them right now, can you -- well, let's wait

11    on that.

12               But do you know, in what do you

13    have, do you have the coefficient estimates

14    that you used?

15         A.     You mean the resulting

16    coefficient estimates?

17         Q.     Yes.

18         A.     I do not have them in front of

19    me, no.

20         Q.     Do you have them in your file?

21         A.     They're in my file, yes.

22         Q.     And do you have backup analysis

23    in the file?

24         A.     I'm sorry, can you repeat that?

25         Q.     Do you have backup analysis in

1   the file?

2        A.      Oh, what do you mean by backup

3   analysis?

4        Q.      So any sort of backup analysis

5   that you did for the regression that you

6   reference.

7        A.      I would say no.  Just partly

8   because I'm not sure exactly what that would

9   constitute.

10              I -- in my file there is a page

11  of regression output regarding the rerunning

12  of Dr. Cutler's regressions, controlling for

13  endogeneity.  So there's two sets of

14  regression results.  I believe that is all

15  that is -- that is all that exists.

16       Q.      Okay.  So you have two sets of

17  results.

18              Did you do any regression that

19  you didn't include in the report?

20       A.      No.

21       Q.      Okay.  And go to paragraph 1.2

22  of the report.

23       A.      Okay.

24       Q.      You mentioned here that you

25  don't necessarily agree with all the

1    findings, methods or summary opinions in the

2    materials that you cite, correct?

3         A.       Correct.

4         Q.       Okay.  And how did you decide

5    which parts of the materials you would rely

6    on?

7         A.       Well, the reason I included

8    that statement was because some of the

9    materials are relied on, certainly not all of

10   them.  Some of them included data analysis,

11   but some of them also include opinions,

12   either in the introductions or in the

13   discussion sections.

14             And I just wanted to be careful

15   to make it clear that in citing a document --

16   and as you know from my report, I cite a lot

17   of documents.  But in citing a document, I

18   didn't want to imply that I agreed with

19   everything in that citation.

20        Q.       And is there a way to tell from

21   the report which part you do agree with?

22        A.       Well, yes, indirectly, one

23   could look to see what I'm -- you know, for

24   example, if I'm citing a number from a

25   published study, then it is the reporting of

1    that number in the study that I'm interested

2    in, not necessarily the author's opinions

3    about opioids either, which, again, usually

4    appear in the introduction or the discussion,

5    sometimes in the conclusion section of those

6    articles.

7            Q.      Okay.  So is it fair to say

8    that if you're citing a document, you should

9    understand that -- you're relying on it for

10   the specific thing you're citing it for, not

11   for anything else?

12           A.      Exactly.

13           Q.      Okay.  And was there any

14   materials or categories of materials that you

15   can think of that you did agree with

16   everything?

17           A.      Probably not.  I don't recall

18   off the top of my head, but I -- it's -- just

19   generally in my experience in being an

20   academic economist and health economist, I

21   don't -- it's rare that I agree with

22   everything in a particular article.

23   Sometimes, but it's rare.

24           Q.      And apart from the sources that

25   we discussed a little bit earlier, what

1  documents or materials did you have access to

2  in preparing your report?

3      A.     Those -- the materials we

4  discussed.  Also the reports by Dr. Cutler

5  and Dr. Alexander, and the deposition

6  transcripts for both of those experts as

7  well.

8      Q.     And did you review any of the

9  deposition testimony other than those two

10  transcripts?

11      A.     I don't think so.

12      Q.     Would you have cited it if you

13  did?

14      A.     Well, not necessarily, because

15  I'm not sure that I cite the Cutler or

16  Alexander deposition transcripts.  I may

17  have.  I don't recall whether I did or not.

18      Q.     Do you know if you reviewed any

19  testimony from witnesses in Montgomery

20  County?

21      A.     From other witnesses other than

22  Cutler and Alexander, is that what you're

23  asking?

24      Q.     Correct.

25      A.     I'm quite sure that I did not.

1      Q.      Okay.  And did you review any

2  documents produced by any party in the

3  Montgomery County case?

4      A.      Documents -- I'm sorry, could

5  you just explain what you -- maybe give me an

6  example.

7      Q.      Yes.

8          So in litigation the parties

9  exchange documents.  Did you review any of

10  those documents?

11      A.      I don't think so.

12      Q.      Maybe a way to explain is this,

13  when a document is produced in the case it

14  will have what we call a Bate stamp in the

15  bottom right-hand corner, letters and a

16  number.

17          Were any of the documents you

18  reviewed stamped like that?

19      A.      No.

20          Thank you for that

21  clarification.

22      Q.      All right.  And did you review

23  any data produced in the Montgomery County

24  case?

25      A.      Well, so if we could go back to

1    the sampling issue we were discussing before,

2    would that count as data produced in the

3    Montgomery County case?

4          Q.     It would.

5          A.     It would.  Well, then, yes.

6          Q.     Okay.  And did you review

7    that -- just for that -- for the sampling --

8    drawing the sample that we talked about

9    earlier or for purposes of this report?

10         A.     Just for the sampling.

11         Q.     Okay.  Any other data?

12         A.     For this report, no.

13         Q.     Okay.  And have you reviewed

14   the complaint in this case?

15         A.     No.

16         Q.     And just for clarity, did you

17   review the reports of any experts in this

18   case, other than Dr. Alexander and

19   Dr. Cutler?

20         A.     No.

21         Q.     And for both of those experts,

22   did you review all of the appendices and

23   exhibits to those reports?

24         A.     Yes.

25         Q.     And did you select those

1   reports to review or were they provided by

2   counsel?

3         A.      They were provided by counsel.

4         Q.      And how would you receive those

5   reports?  Electronic or copy?

6         A.      Electronic.

7         Q.      Do you know Dr. Cutler either

8   personally or by reputation?

9         A.      By reputation, yes.

10        Q.      Okay.  And how is that?

11        A.      How do I know?  I work -- used

12  to work at a company called -- research

13  company called the Center for Health

14  Economics Research.  It was located in

15  Boston.  Dr. Cutler had just joined, I

16  believe, the Harvard faculty then.  He could

17  have been somewhere else in Boston, but he

18  was in Boston.  And I would see him at

19  lectures and symposiums and things like that.

20        Q.      And what about Dr. Alexander?

21        A.      Dr. Alexander, I'm less

22  familiar with.  I know his name, but I'm not

23  familiar with his work, nor have I ever met

24  him or seen him present or anything.

25        Q.      Okay.  And when you say you

1    know his name, can you explain what you mean

2    by that?

3         A.    Well, in my field of health

4    economics, we read a lot of materials.  I've

5    had employees leave and go to Johns Hopkins,

6    enroll in programs and we have -- we

7    interview doctoral students for potential

8    positions at our company.  Some of them come

9    from Johns Hopkins and -- yeah.  So we just

10   see -- there's a lot of exposure when you're

11   in the academic field that's as sort of --

12   health economics is not a huge field.  It's a

13   subfield within economics.  So everyone tends

14   to -- there's quite a bit of name

15   recognition, especially among the

16   academic-based -- well, Alexander is not a

17   health economist, but he's one that opines

18   on -- or writes on matters of health policy,

19   quite a bit, in epidemiology and things like

20   that, and we in health economics overlap

21   quite a bit with those types of studies.

22        Q.    Okay.  And other than the --

23   well, actually, strike that.  Let me ask you.

24              Did you ever have any

25   discussion with experts for other defendants

1  in this case, apart from the pharmacies that

2  were retained -- I guess let me ask it this

3  way.

4        Do you know who the other

5  experts retained by Kroger for Track 7 are?

6     A.    I -- no, not -- not -- many of

7  them I don't know.  I believe, I'm not

8  certain, that they have retained someone I

9  know to help with determining market size,

10  but as far as I know that wasn't an issue --

11  obviously not an issue in this matter and not

12  anything I relied on in this report.

13     Q.    So I'm guessing you did not

14  have any discussion with those experts then?

15     A.    Correct.

16     Q.    Okay.  And have you -- so for

17  the Track 7, have you had any calls or

18  meetings with lawyers representing anyone

19  other than Kroger?

20     A.    Yes.

21     Q.    And who is that?

22     A.    Well, the attorneys

23  representing -- if you recall from the

24  invoicing documents, the other pharmacy --

25  the other pharmacies whom I've been -- who

1  have retained me, that would be Albertsons,

2  Meijer and Publix, have been occasionally

3  involved in calls over the -- over that time

4  period.

5      Q.    Okay.  Anyone other than those

6  pharmacies?

7      A.    No.

8      Q.    And have you discussed your

9  testimony in this case with anyone other than

10  Kroger and its counsel and counsel for Publix

11  at the one meeting?

12      A.    Yes.  There were some earlier

13  phone calls in which some of the counsel for

14  some of the other pharmacies were present.

15      Q.    Okay.  And that's the same

16  calls that you were just talking about?

17      A.    Well, just for clarity,

18  distinguish -- distinguish those calls from

19  yesterday's prep calls, is that what you

20  mean?

21      Q.    Yes.

22      A.    Okay.  That's correct, yes.

23      Q.    Okay.  But nothing other than

24  that?

25      A.    No.

1      Q.      Okay.  And do you plan to use

2  any demonstratives at trial?

3      A.      I have not considered that as

4  of yet.

5      Q.      Let's turn to your opinions in

6  this case, and I guess before we do that,

7  we've been going almost an hour.  Would you

8  like a break, or would you like to keep

9  going?

10      A.      I would like a -- I was about

11  to say, I would like a break.  It doesn't

12  have to be a long one.

13              MS. SALTZBURG:  All right.  How

14      long would you y'all like to take?

15              THE WITNESS:  Five, ten

16      minutes.  10 minutes, 15 minutes.  I

17      don't know.  Whatever is customary.

18              MS. SALTZBURG:  All right.  You

19      want to say ten or --

20              MR. BOONE:  Let's go with ten

21      and we'll reveal on our cameras when

22      we're ready to go.

23              MS. SALTZBURG:  Okay.

24              MR. BOONE:  But thank you for

25      that courtesy.

1                    THE WITNESS:  Thank you.

2               (Off the record at 10:25 a.m.)

3    QUESTIONS BY MS. SALTZBURG:

4          Q.      All right.  Dr. Schneider, if

5    you could look at Exhibit 3, please.

6          A.      I already opened it.  Is that

7    the report?

8          Q.      Same one.  Uh-huh.  You should

9    still have it.

10         A.      Yes.  I have it in front of me.

11         Q.      All right.  And there are no

12   separate subject areas or subjects of

13   testimony that you intend to give that are

14   not outlined in this report, correct?

15         A.      That is correct.

16         Q.      And so is it fair to say that

17   this report is a complete and final copy that

18   sets forth all of your opinions and the basis

19   for them?

20         A.      I think generally, yes, unless

21   anything else emerges between now and -- if

22   I'm asked to testify at trial, that is

23   correct.

24         Q.      Okay.  And when you say if

25   anything else emerges, you mean any new

1    information or --

2         A.     I honestly don't have much of

3    an idea what that might be.  But I'm assuming

4    if I'm asked to look at something or do

5    something, then I will do it.

6         Q.     Okay.  Have you realized any

7    corrections that you needed to make to this

8    report between December 12th and now?

9         A.     I think I found some very minor

10   typos here and there, but nothing

11   substantive.

12        Q.     Only typos?

13        A.     Correct.

14        Q.     If you later discover any

15   inaccuracy that's not a typo, we ask that we

16   be provided that in advance of trial.

17        A.     Okay.

18        Q.     Did you prepare any notes for

19   purposes of this report?

20        A.     No.

21        Q.     Okay.  What about an outline?

22        A.     The report started as an

23   outline, and then I just filled it in.  So,

24   no, there's no specific outline.

25        Q.     All right.  And it looks like

1    in the introduction, that first paragraph,

2    1.1, it lists objectives of the report,

3    correct?

4              Is that intended as an outline

5    of your opinions?

6         A.    Yes.

7         Q.    Okay.  And if you'll go to

8    Section 2, it's entitled "Background."

9              GINA VELDMAN:  Lisa, could you

10        help with pages?

11             MS. SALTZBURG:  Yes, I can.

12        Sorry.  This one is going to be on

13        page 3, and if you'll actually go all

14        the way to page 6 there, there's a

15        Figure 2.1.

16   QUESTIONS BY MS. SALTZBURG:

17        Q.    Is this a figure you created?

18        A.    Yes.

19        Q.    Okay.  And what does it show?

20        A.    This shows total opioid

21   prescriptions between 2010 and 2020.

22        Q.    And is it based on CDC data?

23        A.    I'm sorry, you said CDC data?

24        Q.    Yes.

25        A.    Yes, it is.

1      Q.      Okay.  And if you will jump

2  right below it to paragraph 2.6 on that same

3  page, referencing that figure, I think, you

4  say that the climb in opioid prescriptions

5  was precipitated primarily by two factors,

6  correct?

7      A.      Correct.

8      Q.      Okay.  And the factors you cite

9  are changes in clinical guidelines and

10 increased state and federal government

11 oversight and monitoring such as through

12 prescription data monitoring programs or

13 PDMPs, correct?

14     A.      Correct.

15     Q.      Okay.  And how did PDMPs affect

16 supply?

17     A.      Well, I think a number of

18 different ways, both direct and indirect.  So

19 first directly a PDMP might limit the

20 prescribing of an opioid, so that's going

21 to -- this is the supply of prescription

22 opioids that we're talking about, so PDMP

23 could prevent an opioid from being

24 prescribed, which would impact the supply.

25              Also, I would say perhaps more

1   on the indirect side, the physician may be

2   much more circumspect in writing an opioid

3   prescription knowing about the existence of

4   PDMPs.  In other words, he or she might be --

5   might write a prescription -- or might

6   approach the writing of a prescription

7   differently knowing about the existence of a

8   PDMP.

9          Those are two things that

10  come -- there are other factors, too, but

11  those are probably the two most important

12  ones.

13  Q.    Okay.  And for -- I guess let's

14  go with the indirect one first.

15          When you say a prescription --

16  or, I'm sorry, a physician might look at it

17  differently.  Are you opining that

18  physicians, in fact, did do that?

19  A.    I don't know for a fact that

20  physicians did that.  As the chart shows,

21  Figure 2.1, we know that the supply of opioid

22  prescriptions declined consistently since

23  2012.  We know that around that time there

24  were a number of policies enacted that -- and

25  guidelines as I cite here.  Generally higher

1  level of awareness.  There were also things

2  that I -- that are not included in these two.

3  These are -- I'm calling these primarily two

4  factors.  I believe there are other factors

5  as well that contributed to this decline.

6           And I further am of the opinion

7  that all of those factors worked

8  synergistically.  So it's difficult to

9  disentangle the effects of each one.

10     Q.    So you answered one question I

11  was going to ask you, which is whether there

12  were also other factors.

13           I want to stick to PDMPs for

14  right now, and just follow up on what you

15  were saying before about the impact of PDMPs.

16           How did PDMPs prevent opioids

17  from being prescribed?

18     A.    Well, a query to a PDMP system

19  could identify a case that -- or a situation

20  that would warrant further investigation into

21  whether it's an appropriate prescription.

22     Q.    And do you have an

23  understanding of whether pharmacies are

24  expected to check PDMPs?

25     A.    Well, my understanding is that

1    they are expected to make use of PDMPs or

2    interact with PDMPs, but I'm not sure exactly

3    operationally how they do that.

4         Q.     Okay.  And operation site

5    aside, would failure of pharmacies to check

6    PDMPs affect supply?

7         A.     So just repeating the question,

8    you're asking would failure of pharmacies to

9    check a PDMP affect supply?

10                I think you would have to say

11   all other things equal.  So there -- as I

12   said before, there's so many different

13   factors at play here.  So the PDMP is not

14   meant to be the sole -- the only tool to

15   monitor the prescribing of opioids.  This is

16   sort of -- if you think of my report in

17   reverse, you think about the things that

18   contribute to an increase in opioids are all

19   things that could also be utilized to either

20   decrease the increase or affect a decrease.

21                So all of those things, you

22   know, I say unfortunately -- only from a

23   methodological point of view, unfortunately

24   it's difficult -- it's not unfortunate that

25   they exist.  It's unfortunate for an

1   economist like me to disentangle the effects.

2        Q.      Understood.

3              And I guess what I'm trying to

4   understand is, is there a difference in your

5   mind between a doctor checking a PDMP and a

6   pharmacist checking a PDMP?

7        A.      Is there a difference?  Yes.

8   Because it is the physician who is initiating

9   the prescription, and I believe that it is

10  much more incumbent on the physician, much

11  more important for the physician, to check a

12  PDMP.

13             Because, in a sense, the PDMP,

14  you could think of -- as being kind of a

15  little bit like a medical record.  Not

16  exactly.  It's certainly not containing the

17  level of information that's in a medical

18  record.  But if a PDMP indicates that, for

19  example, that an individual filled a

20  prescription somewhere else by another doctor

21  at, you know, a time period not equal to the

22  amount dispensed, whatever, then a physician

23  should know that.  A physician should know

24  that they're dealing with someone who is

25  exhibiting potentially drug-seeking behavior.

1    So I believe that if the

2  responsibility were to fall solely on the

3  pharmacies, then we're missing an enormous

4  opportunity to -- for the physician to inform

5  his or her treatment decisions based on that

6  piece of information.

7    Q.    I think you may be saying two

8  different things.  I'm not saying solely on

9  pharmacies, but I guess my question is, are

10  you also missing an opportunity if the

11  pharmacy isn't checking the PDMP?

12    A.    Yes, I think that pharmacies

13  generally -- again, I'm not here to opine on

14  pharmacy -- retail pharmacy operations, but a

15  pharmacy in fulfilling its legal obligation

16  to fill only legal prescriptions should

17  perform the due diligence that it's required

18  to perform.  But, again, I think the

19  physician is the one who is, you know,

20  historically in the -- at least in the US

21  health care industry, physicians are the ones

22  who determine medical need, medical

23  necessity, and that is -- I believe the

24  primary responsibility falls on them.

25    Q.    And when you say you believe

1  the primary responsibility is with them, are

2  you relying on any documents or sources

3  there?  Or is that sort of your belief?

4          A.    There's some reliance on --

5  it's part my experience, my 30-plus years

6  working in this industry, but it's also --

7  there's specific articles, some of which I

8  cite in this report, where physicians are

9  specifically taking that responsibility.

10 There's some opinions written by physicians

11 saying you're the ones who should be the

12 primary, I guess, gatekeeper, if you will,

13 for opioid prescriptions or the prescriptions

14 of anything that requires an additional level

15 of oversight.

16          And, yeah, so it's not just me;

17 it's the medical community as well.

18      Q.    Okay.  And that's the source

19 cited in your report, correct?

20      A.    Correct.

21      Q.    And then if you go to the next

22 paragraph, 2.7, it starts on that same page

23 and go into the next.

24          It starts out "contributing

25 factors," correct?

1        A.      Yes.

2        Q.      Okay.  How do the seven factors

3   that you identify in this paragraph relate to

4   the two factors we just discussed?

5        A.      Well, there's not a direct

6   relationship between the two.  So the two

7   factors we just discussed are things that

8   happened that affected either a slowing of

9   the decrease -- I'm sorry, a slowing of the

10  increase or an actual decrease.  And what

11  we're -- what I'm turning to here in this

12  section are the contributing factors to the

13  increase in opioid supply.  It would be

14  like -- like, for example, the sentence after

15  note 16 that begins with "from an economic

16  perspective."  That sentence, "from an

17  economic perspective, these drivers can be

18  the ones that increase the supply of opioids

19  or increase the demand for opioids."  So

20  that's the most succinct summary of what

21  these factors do.

22       Q.      So I just want to make sure I

23  understand.

24              So are you saying there are

25  different drivers for increases than for the

1  decrease that you just discussed?

2      A.     Well, there's some overlap.  I

3  think the -- for example, the clinical --

4  let's start with the clinical practice

5  guidelines.

6            Clinical practice guidelines,

7  which are often drafted by medical societies,

8  those were -- it was the -- essentially the

9  same medical societies that were responsible

10  for the increase in opioid supply back in

11  maybe 20 years ago when they were strongly

12  advocating for more aggressive pain

13  management.

14            So those same factors that

15  later changed were originally driving supply.

16      Q.     Okay.  So for the seven factors

17  that you discussed, did you attempt to

18  apportion the extent to which each factor was

19  a contributor?

20      A.     I'm sorry, could you repeat

21  that?

22      Q.     Sure.

23            So you identify seven factors

24  as contributing to opioid supply, correct?

25      A.     Correct.

1          MR. BOONE:  Object to form.

2          THE WITNESS:  Attributing to

3      the increase in opioid supply, yes.

4  QUESTIONS BY MS. SALTZBURG:

5      Q.     Okay.  And let me ask it this

6  way.  Okay.  When you were referencing the

7  seven factors in paragraph 2.7, what are you

8  opining they are causative drivers of?

9      A.     I'm opining that they're

10 creative drivers in the increase of opioid

11 supply.

12     Q.     And did you attempt to

13 apportion the extent to which each factor was

14 a contributor to the increase in supply?

15     A.     No.

16     Q.     Okay.  Did you assign any

17 particular weight to each factor?

18     A.     No.

19     Q.     Okay.  Did you attempt to

20 assess the significance of the causal role

21 for each?

22     A.     Yes.  Via the literature.

23     Q.     What do you mean by "via the

24 literature"?

25     A.     Well, I would say the main body

1    of my report, some of which is in this

2    Section 2, some of which is in the next

3    section and the one after that, cite to the

4    evidence that these factors were important.

5        Q.    Okay.  And are there other

6    contributing factors as well?

7        A.    There might be other

8    contributing factors that I have missed, but

9    I believe these are the primary ones.

10       Q.    Okay.  And are you relying on

11   any sources other than the literature you

12   cite for determining that these are the

13   primary ones?

14       A.    No.

15       Q.    All right.  I want to make sure

16   I understand something.

17             You mentioned and you talked a

18   little bit about you prepared an expert

19   report in New Mexico, correct?

20       A.    Correct.

21       Q.    And you had a list of eight

22   factors in that report, correct?

23       A.    I don't recall the details of

24   that report, so if -- are you able to share

25   it?

1      Q.     I don't have it as an exhibit,

2  and I was sort of wondering if you knew

3  offhand why those lists would be different.

4      A.     Not off the top of my head, I

5  don't recall.

6      Q.     Okay.  And do you recall if you

7  have a review of the cost studies in your

8  report in New Mexico?

9      A.     Yes.  So the New Mexico report

10  was a combination of both liability and

11  abatement, and that might actually partially

12  answer your previous question.  That because

13  that report involved an abatement component,

14  there are some differences between that

15  report and this report.

16      Q.     Okay.  And you're not offering

17  any abatement opinions in this report,

18  correct?

19      A.     That's correct.

20      Q.     Not trying to apportion any

21  abatement costs, anything like that?

22      A.     Correct.

23      Q.     Okay.  I think we can go

24  earlier, actually, in the page, on page 5,

25  paragraph 2.4.

1            And here I think you say you

2     consider dosage units a preferred calculation

3     to MMEs, correct?

4          A.     For the purposes of my report

5     that has an economic perspective, yes.

6          Q.     Okay.  And why is that?

7          A.     For the three reasons that I

8     list here.

9          Q.     And what materials did you rely

10    on for that opinion?

11         A.     I relied on both my own

12    experience with economic modeling around

13    externalities combined with some literature,

14    but primarily it was a judgment call on my

15    part, but I would note -- as I note in one of

16    these points here that the -- in most cases

17    MMEs and the number of prescriptions are how

18    they're correlated.

19         Q.     And that was going to be my

20    next question.

21            So do you have an issue with

22    using either measure?

23         A.     I don't have an issue with

24    using either measure, that's correct.

25         Q.     All right.  And I'm going to

1  look at the seven factors you discussed.  I'm

2  going to try to save us some time here,

3  because I think you testified about all seven

4  these of factors in New Mexico, correct?

5      A.     Yes, that's correct.

6      Q.     Okay.  And is that testimony

7  equally applicable here?

8      A.     Only in a very general sense.

9  My testimony here has been enhanced and I've

10  added some things to it.  Again, only in a

11  very general sense.

12      Q.     Okay.  That was going to be my

13  next question.

14          Do you have any new or

15  different opinions about these factors in

16  this case?

17      A.     I think so.  Without the New

18  Mexico report side-by-side here, I can't say

19  with certainty, but I do believe that I have

20  added more information, perhaps reorganized

21  some of the information, and added some

22  additional citations to this discussion.

23      Q.     And that's in the report,

24  correct?

25      A.     All of those changes would be

1    reflected in this Montgomery County liability

2    report, correct.

3         Q.     Okay.  And is everything that

4    you said about these factors in New Mexico

5    still your opinion for purposes of your

6    testimony in Montgomery County?

7         A.     I --

8         Q.     Yeah, I'm trying to come up

9    with a better way to get at what I think

10   you're agreeing with but wanting to be

11   careful about, and that is --

12        A.     Yeah, I understand.  And, like

13   I said, I understand you're trying to save

14   some time.

15              So let me just reiterate.

16   Again, I'm not trying to be difficult.  I'm

17   just reiterating that the -- I had an

18   opportunity to revisit these issues.  I was

19   not asked to revisit.  In other words, I

20   think I could have just produced the exact

21   same material, because fundamentally I

22   continue to agree with what I did in New

23   Mexico.

24              However, I had an opportunity

25   here to enhance it and to expand it, to make

1    it a little bit more, I guess, cohesive.

2         Q.    I'll try to go through each

3    factor, but in the interest of efficiency

4    to -- rather than asking this question every

5    time.

6              My understanding of the way

7    your report is structured is that you have

8    the paragraphs about each factor, and then

9    the materials that you're relying on for your

10   opinion about that factor are cited in

11   footnotes to those paragraphs, correct?

12        A.    Correct.

13        Q.    There aren't different sources

14   somewhere else?

15        A.    Correct.

16        Q.    That will save us some time.

17   So if you'll go to page 8, please.

18        A.    Okay.

19        Q.    You have a factor that you

20   reference as regulatory approval, correct?

21        A.    Correct.

22        Q.    Is there anything important

23   that you feel like you need to explain about

24   your opinion on this factor that you didn't

25   already articulate in your New Mexico

1    deposition or in the report here?

2         A.     Well, I believe this

3    description in 2.8 is, again, without having

4    both reports in front of me, I can't say for

5    sure, but I believe this description is

6    somewhat different.

7         Q.     Okay.

8         A.     And there might be some

9    additional evidence cited.

10        Q.     And in that case let me ask

11   you, how -- what is your opinion as to how

12   the FDA is a factor?

13        A.     Well, the FDA is something as

14   an a health economist I'm quite familiar

15   with.

16             As I indicated earlier today,

17   we do work for life sciences companies,

18   device companies, diagnostic companies, and a

19   lot of those -- obviously a lot of those

20   companies have to interact with the FDA.

21             So I'm familiar with the rigor

22   of the FDA approval process.  And when the

23   FDA approves a prescription drug, it is only

24   after a fair amount of research and

25   development on the part of the manufacturer

1   combined with assessment -- about a year-long

2   assessment by the FDA itself.  So when the

3   FDA approves a prescription drug, the -- for

4   better or for worse, the community accepts

5   that drug.  In other words, it's a stamp of

6   approval.

7           So FDA approval, if it's not --

8   if the FDA misses something, the implications

9   of that can be serious because they've given

10  a drug a stamp of approval and all of the

11  rest of the health care supply chain refers

12  to or defers to that approval.

13      Q.     And so are you opining that the

14  FDA should not have approved opioids here?

15      A.     No, I wouldn't say that.  And

16  the reason for that is twofold.  One is it's

17  true that 96 percent, approximately, of

18  opioids are used as directed.  Opioids have

19  demonstrated clinical need.  There's a large

20  literature on that.  So I wouldn't say that

21  they -- that they shouldn't have approved it.

22          My opinion about the FDA is

23  that they should have done a better job doing

24  postmarket surveillance of adverse events

25  associated with the utilization of

1  prescription opioids.

2      Q.     And is -- okay.  But you're not

3  opining taking some opioids off the market

4  based on that surveillance, correct?

5      A.     Well, okay.  So that introduces

6  another layer.  So when you say "some

7  opioids," so I think there were some products

8  that were particularly -- or had high risks

9  associated with them and higher rates of

10  adverse events associated with them.  So in

11  those cases they might have considered that.

12  However, I'm not -- that's beyond my area of

13  expertise.

14      Q.     Okay.  What are you opining the

15  FDA should have done based on that postmarket

16  surveillance?

17      A.     Well, I think they should have

18  done a better job of postmarket surveillance

19  in terms of adverse events.  They were in a

20  position given the way that information is in

21  the postmarket phase is filed with the FDA or

22  expected to be filed with the FDA.

23  Physicians are supposed to -- it's very easy

24  for a physician to notify the FDA of things

25  that they observe.  I don't know the extent

1  to which any of that was happening, but I do

2  know the end result was the FDA was very,

3  very slow to move to do anything regarding

4  opioids.

5      Q.    Okay.  Is there any specific

6  action you are opining the FDA should have

7  taken based on postmarket surveillance?

8      A.    Well, I don't have an opinion

9  about a specific action.  Again, that's --

10  the regulation of prescription drugs is --

11  while it's something I'm familiar with, the

12  specifics of it are probably outside the

13  scope of my expertise.

14      Q.    Okay.  And then the next factor

15  is medical need, correct, that you cite?

16      A.    Correct.

17      Q.    And what is your opinion about

18  medical need?

19      A.    Well, medical need is important

20  to consider because there was some -- the

21  timeline, it's important.  So around the time

22  that opioids were coming onto the market

23  corresponded to two things that were

24  happening in terms of medical need:  One was

25  the shift of care to the outpatient setting;

1  and the other was the -- well, as I say in my

2  report, increased life expectancy and

3  survival rates from treatment.  Both of

4  those, again, are -- it's well-documented

5  that both of those factors were -- they would

6  increase the need for prescription pain

7  medication.

8       Q.     Okay.  And I have a question on

9  page 9 about paragraph 2.10.

10      A.     Okay.

11      Q.     And that paragraph continues

12  into page 10, which is the part I'm going to

13  read from.

14            And you write that,

15  "Opioid-based pain management helps meet this

16  rising demand, even if a substantial

17  proportion of physician opioid prescribing at

18  discharge was subsequently found to be

19  inappropriate or excessive."

20            Correct?

21      A.     Correct.

22      Q.     So are you including

23  inappropriate or excessive prescriptions in

24  medical need here?

25      A.     Well, it's a -- it's a fine

1  distinction.  Physicians faced a number --

2  considering all of these factors, I know

3  we're just talking about medical need right

4  now.  But just focused on the medical need

5  factors, but keeping in mind all the other

6  ones that exist, physicians faced a lot of

7  incentives, pressure, whatever word you want

8  to use, to prescribe pain -- effective pain

9  medication.

10          So my point in adding this

11  clause was only to say that even if

12  afterwards some of those were deemed to be

13  inappropriate, in other words, a physician

14  prescribing an opioid when they shouldn't

15  have or a physician prescribing a pain

16  medication when they shouldn't have,

17  according to medical -- according to the

18  world of medical necessity, which, again, I'm

19  not an expert on.

20          So those would still be

21  considered -- in my opinion, that's still

22  considered a prescription written sort of in

23  the name of medical need, even if it were

24  later determined that it might have been

25  inappropriate or excessive.

1    Q.    Okay.  I think you're sort of

2  getting at my next question, which is, how

3  are you defining medical need here?

4    A.    Medical need is based on the

5  judgment of a physician.  So I'm describing,

6  I guess, two different ways.  One is there

7  were structural changes in the industry that

8  increased medical need.  That would be

9  survival from disease -- increased survival

10 rates, life expectancy and shift to -- those

11 are structural things.

12         But then physicians have to

13 respond to those structural things and write

14 prescriptions for pain management to manage

15 those structural changes.

16         So it -- the two things are

17 intertwined.

18    Q.    Okay.  Let's go to government

19 advocacy, which starts on the same page here.

20         What is your opinion about

21 government advocacy?

22    A.    Well, my opinion is that

23 government advocacy was out in front on

24 promoting the use of pain management and,

25 again, the -- you have to think of the

1  timeline here.  The invention of opioids and

2  the manufacturers making opioids available

3  corresponded or coincided with pretty

4  strident efforts on the part of the

5  government to promote pain management.  This

6  would be the -- yeah, the decade of pain

7  control and things like pain is the fifth

8  vital sign.  There was a lot of promotion on

9  the part of various government agencies along

10  those lines.

11       Q.    So in this paragraph you

12  reference an orchestrated effort throughout

13  the US public and private health care system,

14  correct?

15       A.    Correct.

16       Q.    So are you also including in

17  this factor advocacy to the government?

18       A.    Yes, that would mainly be

19  covered under my next point, which is medical

20  advocacy -- what I call medical advocacy, and

21  that would be the role of medical societies

22  sort of lobbying government agencies to

23  increase access to pain management.

24       Q.    Okay.  So sticking with

25  government for a moment here, you described

1  state-level accuracy I think, correct?

2      A.    Well, in this bucket, I would

3  include federal and state.

4      Q.    Okay.  And were there

5  differences across states?

6      A.    Only in the sense that some

7  states were more vocal about it than others,

8  but there were no states that were arguing

9  that we should be more circumspect in our

10  approach to pain management.  They were all

11  on the pain management bandwagon, if you

12  will, back around that time.

13      Q.    And did you do any research

14  specific to advocacy in Ohio?

15      A.    I believe I did review some

16  documents from the Ohio Medical Society.  I

17  don't recall.  I think I might reference

18  those in subsequent sections.

19      Q.    Okay.  If you did, would they

20  be in a section here somewhere?

21      A.    Yes.

22      Q.    Okay.  And you started to talk

23  about medical advocacy, which is the next

24  category starting on page 11, correct?

25      A.    Correct.

1      Q.      What is your opinion about

2   medical advocacy?

3      A.      Well, again, corresponding

4   time-wise or temporally to the advocacy on

5   the part of government, governmental

6   agencies, the medical societies were also

7   advocating for pain management.  And these

8   medical societies -- I list some of them in

9   Section 2.12, the US Pain Foundation,

10   American Academy of Pain Medicine, the

11   Academy of Integrated Pain Management.

12   There's a whole bunch of them.  They were --

13   going back and looking at the documents that

14   they produced, sometimes in conjunction with

15   the federal and state governments, they were

16   contributing to, again, an advocacy, not so

17   much for opioids specifically, although some

18   of them did -- would list opioids as a way of

19   fulfilling this sort of aggressive pain

20   management philosophy.

21      Q.      Okay.  And I know you mentioned

22   looking at the literature.  When you're

23   talking about documents they produced, did

24   you review the documents themselves?

25      A.      Yes, I don't recall offhand the

1  specific documents, but, yes, I reviewed --

2  and that goes for everything in this report I

3  reviewed myself.

4       Q.     Okay.  Are they cited in the

5  report?

6       A.     Yes.

7       Q.     Okay.  And you referenced a

8  time frame here.

9              Just for clarity, what time

10  frame are you covering in this

11  paragraph 2.12?

12       A.     I think most of these causation

13  or causative factors that we're looking at

14  right now would generally correspond to, say,

15  the late '90s through 20 -- somewhere between

16  2010 and 2015.

17       Q.     Do some have different time

18  frames than others?

19       A.     Yes, I think -- you know, a lot

20  of these initiatives started and stopped at

21  different times.  The federal government

22  initiatives kind of were spread out over a

23  ten-year period -- well, I think all of these

24  initiatives were spread out over a 10- to

25  15-year period, with different starting and

1    stop dates.

2         Q.    Okay.  And in this

3    paragraph 2.12 here, kind of in the middle, I

4    want to make sure I understand your opinion

5    here.

6              You write, "While there was

7    general awareness among the medical community

8    and provider groups of the risks of opioids

9    at this time," correct?

10        A.    Correct.

11        Q.    And then you go on.  There's

12   more, but...

13             So are you opining there that

14   there were no misperceptions about the risks

15   of opioids?

16        A.    No, I'm not saying that.

17        Q.    Okay.  Or the benefits of

18   opioids?

19        A.    Well, can you just say the

20   first part of the question again?

21        Q.    Sure.

22             And so I guess are you opining

23   that there were no misperceptions about the

24   benefits of opioids?

25        A.    I'm not opining that either.

1          Q.      Okay.  And then on the same

2    page starts your opinion on quality ratings,

3    correct?

4          A.      Correct.

5          Q.      What is your opinion about

6    quality ratings?

7          A.      Quality ratings were something

8    that also -- again, referring back to the

9    general timeline, around this time, around

10   the early '90s through, you know, early --

11   first decade of the 2000s, quality ratings

12   became a very important factor.  Actually, it

13   started a little bit before there at the late

14   '90s.  And quality ratings include things

15   like value-based reimbursement systems,

16   sometimes called value-based payment.  These

17   were things that were scales, usually, that

18   hospitals and health systems would fill out.

19   Well, doctors, too, doctors had their own

20   version of it.  And they would score -- they

21   would be scored, sometimes by patients

22   themselves, on performance, how good are they

23   doing as medical providers.  These quality

24   ratings were important because they provided

25   financial incentives for providers to do

1    better on the scales.

2              The scales often or I think

3    uniformly included questions regarding

4    patient satisfaction.  And studies have shown

5    that the patient satisfaction score is

6    heavily dependent on the effectiveness of

7    pain management.  And this became a very

8    well-known fact.  Around this time I was

9    working -- or around that time, back then, I

10   was working with the California Association

11   of Health Plans, and it was a big -- that was

12   a big topic of conversation regularly among

13   the leaders of health insurance companies in

14   California at the time, was how do we do

15   better on our value-based payment scores, how

16   do our providers do better on our value-based

17   performance scores.  And one of answers to

18   that question is -- at the top of the list of

19   answers to that question is we need to do a

20   better job of pain management.  So that's why

21   quality ratings are on this list.

22        Q.    Okay.  And then the next one on

23   page 12 is manufacturer marketing, correct?

24        A.    Correct.

25        Q.    Okay.  What is your opinion

1  about manufacturer marketing?

2      A.      Well, I think there's

3  reasonably good evidence or reasonably

4  convincing evidence that manufacturers went

5  beyond what they would normally or they

6  did -- they did things that would be

7  considered beyond what they normally would do

8  to market opioids.

9           Now, I say that with the caveat

10  that they were doing this with a lot of other

11  drugs as well, but they were particularly

12  aggressive in their marketing of opioids, and

13  I think there's good evidence of that, and I

14  cite to that evidence in this paragraph.

15      Q.      And you have contributors under

16  manufacturing marketing, too, correct?

17      A.      Correct.

18      Q.      Why is that?

19      A.      Well, my opinion is, again, as

20  a health economist is that these

21  distributors -- the large independent

22  distributors, these would be like Cardinal

23  Health and McKesson and AmerisourceBergen,

24  companies like that, were -- or have been

25  historically primarily aligned with the

1    manufacturers and working with the

2    manufacturers to get drugs out into the

3    market.  So the independent distributors also

4    have some sort of co -- I guess aligned

5    incentives is better way of putting it versus

6    other types of distributors.

7        Q.    Okay.  And so am I

8    understanding you correctly that you're

9    relying on your background here for this, not

10   any specific facts from the opioid context,

11   correct?

12           MR. BOONE:  Objection.

13           THE WITNESS:  Yeah, there's

14        some evidence that those big

15        distributors, those ones that I

16        mentioned, comprise about 85 percent

17        of the independent distributor market.

18        And there's some evidence that they

19        were working sort of in an aligned way

20        with manufacturers when it came to

21        opioids.  I am not -- I have not done

22        a deeper analysis of that issue, other

23        than what I've reported here.

24   QUESTIONS BY MS. SALTZBURG:

25        Q.    Okay.  And part of your opinion

1    is that they were aware of sharp increases in

2    supply because of the data that they had,

3    correct?

4         A.    Correct.

5         Q.    How does that fit into the

6    opinion on marketing?

7         A.    Well, a number of ways.  One is

8    that these independent distributors, I

9    believe, to some degree, enabled the

10   manufacturers in their quest to increase

11   demand for their products.  Again, the

12   details of which I've only seen bits and

13   pieces of come out, mostly as a result of

14   the -- this ongoing litigation.  And the

15   other aspect would be, I think what you just

16   alluded to, which would be using their data

17   to identify, you know, potential problems.

18        Q.    And for purposes of this

19   report, did you do any research into what

20   type of data chain pharmacies have?

21        A.    Can you just clarify what you

22   mean by what type of data they have?

23        Q.    What data they possess.

24        A.    Well, I didn't do any specific

25   research into that.  I know chain pharmacies

1  have some very limited data on individuals

2  who fill prescriptions at their pharmacies,

3  name, address, primary care doctor -- or

4  prescribing doctor, things like that.  I

5  think beyond that, they don't have what I

6  would call -- I would make a distinction

7  between population-level data and

8  business-level data.  I would say pharmacies

9  have business-level data.  Population-level

10  data would be held by entities like the CDC,

11  but I would also argue to some extent these

12  large distributors also have some degree of

13  population-level data.

14      Q.    And do you know if, for

15  example, Kroger had access to IQVIA data?

16      A.    I don't know whether they had

17  access to IQVIA data.  I think the -- yeah, I

18  can't really comment on that.

19      Q.    I think you opine here that

20  manufacturers were among the first to be

21  found liable, correct?

22      A.    Correct.

23      Q.    Are you relying on the

24  settlement agreements for that?

25      A.    More or less, again, this is

1  where, as an economist, where my -- when I

2  look for data on settlement agreements and

3  proceedings on -- involving opioids, it is --

4  I'm only -- I'm basing my opinions only on

5  what I find.  I don't access to any more

6  detail than that.  I expect that the

7  attorneys in these matters have access to

8  better data than I have in that regard.

9      Q.     Okay.  Recognizing those

10  limits, did you know that a jury found chain

11  pharmacies liable in a case by two Ohio

12  counties?

13      A.     I've heard about that.  I don't

14  know any specifics of that ruling.

15      Q.     Okay.  And would that affect

16  your opinion at all?

17      A.     No.

18      Q.     Okay.  I think we reached our

19  last factor here, which is on page 14.  It's

20  macroeconomic factors, correct?

21      A.     Correct.

22      Q.     And what is your opinion about

23  macroeconomic factors?

24      A.     I think macroeconomic factors

25  are important in -- well, it's not that I

1  think that.  I think there is evidence that

2  suggests that macroeconomic factors are

3  important in substance use disorder

4  generally, and they have been identified as

5  important factors in opioid use disorder

6  specifically.

7      Q.      Okay.  And I want to focus on

8  that first line there in paragraph 2.17 where

9  you say, "There is no debate the economic

10  factors in the US played a prominent and

11  unprecedented role in opioid utilization in

12  OUD."

13          Correct?

14      A.      Correct.

15      Q.      Now, you say there's no debate

16  about the extent of the role of macroeconomic

17  factors?

18      A.      I don't believe there is.  The

19  materials I reviewed, I have not seen

20  anything that suggests that they were not a

21  factor.

22      Q.      Okay.  Have you ever done any

23  empirical analysis on the relationship

24  between economic factors and opioid use or

25  OUD?

1        A.      No, I haven't.

2        Q.      Before we move on, I just want

3   to understand something about the

4   relationship of this section and then your

5   discussion about potentially responsible

6   parties in section, I think it's 4.

7              It seems like there's some

8   overlap between the two, correct?

9        A.      Correct.

10       Q.      So, for example, you have

11  manufacturer marketing as a factor, but then

12  you could have manufacturers as a potentially

13  responsible party because of marketing,

14  correct?

15       A.      Correct.

16       Q.      So why are they two separate

17  sections?

18       A.      So there are two separate

19  sections because the first section is

20  contributing factors, and I thought it was

21  important to lay out the contributing factors

22  as there's a lot of literature supporting

23  each one of those.  And but then you have

24  things like we have issues -- like

25  macroeconomic factors, for example, is not a

1   responsible party.  And the marketing example

2   you gave is the most clearcut, but even in

3   the medical advocacy, it's not obvious who

4   the responsible party is in that case.  So I

5   felt there was a need for an additional level

6   of discussion.  That's one reason.

7               The second reason is I -- my

8   approach is through the lens of economic

9   theory, and in economics there's a common

10  construct called externalities, which I

11  believe is the section above the one you're

12  showing right now on the screen.

13  Externalities are -- the way that economists

14  handle externalities is they need to know who

15  are the responsible parties for the

16  externality.  There's a liability component

17  of externalities.  And that's why I'm --

18  essentially why I'm -- why I wrote this

19  report in the first place, is that I believe

20  that from an economics perspective, you know,

21  within which I have all of my training,

22  the construct of externalities is a useful

23  construct within which to discuss opioids.

24       Q.    And I guess kind of a big

25  picture level it seems even for the factors,

1  right, to determine that something like you

2  have regulatory approval as a factor, you

3  have to have some evidence that the FDA or

4  someone did something, that's why you have

5  that as a factor, correct?

6      A.    I have it as a factor so in the

7  sense on the factor side, FDA -- regulatory

8  approval is the stamp of approval that

9  signals to people that it's okay to use a

10  drug or a device or a diagnostic.

11          The -- on the responsible party

12  side is, you know, what -- let's look at the

13  evidence of what the FDA did specifically or

14  didn't do specifically to contribute to the

15  increase in opioid supply.

16      Q.    And are you opining in this

17  case that increased opioid supply caused

18  increased opioid use?

19      A.    I'm sorry, if you could just --

20  say that again.

21      Q.    Sure.  I just want to make sure

22  I'm clear on your opinions.

23          Are you opining that increased

24  opioid supply caused OUD or increased opioid

25  use?

1          A.     No.

2          Q.     Okay.  Let's go on to

3    externalities.  I think you started to

4    discuss.  And that section begins on page 15.

5                 And you describe OUD as an

6    externality of opioid misuse, correct?

7          A.     Yes, with the caveat that it's

8    a complicated dynamic, as we just alluded

9    to -- I think as I alluded to in the

10   answering of my question before the -- this

11   is a somewhat more complicated -- or I

12   shouldn't say complicated.  It's a more

13   complex application of externalities than we

14   might typically see, say, in the world of

15   environmental economics when we're talking

16   about pollution.  So in the environmental

17   world, the production of a thing like steel

18   produces pollution.  Pollution is the

19   externality.

20                 As I get into in this section,

21   it's more complicated in the case of opioid

22   supply and opioid use disorder.

23          Q.     I guess I have just really kind

24   of a basic question, which is, if OUD is an

25   externality, what is the purpose of going on

1    to calculate -- or to discuss costs or to

2    translate OUD into costs?

3         A.    Well, only because economists

4    typically talk about the cost of

5    externalities.  That's the only reason for

6    putting it in that language.

7         Q.    Okay.  And if you'll flip the

8    page to page 16.  I want to talk about your

9    caveats a little bit that you just mentioned.

10            So you said opioids are more

11   regulated than something like alcohol,

12   correct?

13        A.    I'm sorry, where are you

14   exactly?

15        Q.    In paragraph 3.3.

16        A.    Okay.

17        Q.    And I think one of your caveats

18   that were -- that you mentioned there we're

19   just discussing is that you opine that

20   opioids are more heavily regulated than

21   something like alcohol, correct?

22        A.    Correct.

23        Q.    How does it follow from that

24   that the DEA or other regulators are to blame

25   for the externality?

1   A.  Well, in the -- in my opinion,

2 the magnitude of the externality is what --

3 is what's at issue here.  So if the

4 regulatory agencies are largely failing in

5 their remit to mitigate the externality, then

6 the result is a higher magnitude of the

7 externality.

8   Q.  Would that be true for any

9 externality?

10   A.  I think so, yes.  If we think

11 about pollution, for example, the EPA, the

12 Environmental Protection Agency's remit is to

13 monitor emissions.  And again, I don't know

14 much about that -- the specifics, but let's

15 just go with that as an example.

16     The EPA monitors pollution.  If

17 the EPA fails or sort of underperforms in its

18 job of doing that, then we're going to wind

19 up with more pollution than we thought we

20 had.

21   Q.  Okay.  And when you're talking

22 about the DEA here, is it your opinion that

23 diversion plays an important role in OUD?

24   A.  Diversion plays a role.  The --

25 whether it plays an important role or not, it

1  depends on what you mean by important.

2      Q.     Do you have an opinion about

3  the extent to which diversion plays a role in

4  OUD?

5      A.     I think -- yes, and I think the

6  extent of my opinions is summarized in the

7  figure that appears in this -- in this

8  section with regard to diversion.

9      Q.     With regard to diversion.

10          Which figure is that?  Are you

11  thinking of 4.1?

12     A.     I am.  Oh, no, I'm sorry.

13  Actually I'm thinking of 5.1, which, I

14  apologize, it wasn't in the section that we

15  were in.

16          And if that's going too far

17  ahead, we can come back to that or I can just

18  summarize it now.

19     Q.     Why don't you go ahead and

20  summarize it now.

21     A.     And I -- I'm sorry.

22          MR. BOONE:  She needs to find

23      it.

24          THE WITNESS:  Oh, she needs to

25      find it.

1  QUESTIONS BY MS. SALTZBURG:

2      Q.     It's on page 22.

3      A.     No.  I think it's page 29, no.

4      Q.     You're right, I'm looking at

5  4.2.

6      A.     Okay.  So, you know, you asked

7  about diversion, so I'm going to follow up

8  with that.  When we talk about diversion,

9  we're talking about opioids being misused,

10  and so they're being diverted away from

11  either the people they were prescribed to or

12  they're being stolen or obtained from friends

13  and all of these other sources that have been

14  identified in the literature.

15          So diverted opioids would

16  generally be considered nonmedical use of

17  opioids.  So in other words, if they're being

18  diverted, they're probably being diverted for

19  nonmedical use.

20          When they're diverted for

21  nonmedical use, now there are three different

22  ways in which -- three different buckets, if

23  you will, that that diverted -- those

24  diverted opioids could fall into.  And, by

25  the way, when you're in this bucket -- so if

1  we look at the -- it's the peach-colored or

2  salmon-colored cylinder, I guess, if you

3  will, on the right here that says "nonmedical

4  use of opioids" that would contain diverted

5  opioids.  But it would also contain illicit

6  opioids.  So that would feed into this bucket

7  as well.

8       Q.    Okay.  And I do want to get

9  into this figure.  I think we are getting a

10  little bit ahead of ourselves, but the one

11  thing I do want to understand you have --

12  this figure --

13       A.    Sorry.

14       Q.    Is someone trying to talk?

15       A.    I'm sorry, I said -- maybe I

16  already answered your question on diversion,

17  but I --

18       Q.    No, I think what I'm asking is,

19  this figure is in the cost section.  For

20  purposes of your opinions about causes --

21  what I'm trying to understand is -- let me

22  ask you this.

23            On responsible parties -- well,

24  we haven't gotten there either.  I'm going to

25  wait and come back to this when we can talk a

1    little more about the diagram.

2         A.    Okay.

3         Q.    Going back to your just your

4    general discussion of externalities, in

5    paragraph 3.4 on page 16, you start out

6    there, "Economists have described specific

7    remedies and policy instruments to address

8    negative externalities."

9              Correct?

10        A.    Correct.

11        Q.    Okay.  And what is the

12   significance of that to your opinion in this

13   case?

14        A.    I bring that up because --

15   again, because of using -- as an economist, I

16   would -- I would want to use this externality

17   construct.  And I think in using that

18   construct, I would have to do due diligence

19   as to the things that economists would want

20   to look at and consider in using an

21   externality framework, and that's what this

22   list contains.

23        Q.    Okay.  And I guess what I'm

24   trying to understand is, are you suggesting

25   remedies or policy instruments here?

1        A.        No, I'm not.

2        Q.        Okay.  And would list be the

3    same, like whether you're looking at -- you

4    list out here taxes, regulation, bargaining

5    and courts?

6        A.        Yes, I think you would need to

7    address each of the items on this, maybe

8    to varying degrees depending on the type of

9    remedy, but each of these items would have to

10   be addressed.

11       Q.        Okay.  I didn't see a cite

12   here, so I want to understand.  What sources

13   did you rely on in opining that each of these

14   four things that you list here would need to

15   be addressed?

16       A.        Well, that would just be any

17   source from economics that describes

18   externalities.  So textbooks on

19   externalities, things like that.  I think I

20   do -- maybe in a different place, I might

21   cite those kinds of materials.

22       Q.        Okay.  And the four things you

23   list, which are you addressing in this

24   report?

25       A.        I'm addressing, I believe, just

1    Item Number 2.

2         Q.    Okay.  Just number 2.

3              Does number 2 need to fit with

4    somebody else doing items number 1, 3 and 4?

5         A.    Right, that's true.  So if one

6    were to do a full accounting of an

7    externality, you would have to do -- similar

8    to the way this case has been -- has been

9    divided between liability and abatement, you

10   would -- an economist would approach it

11   similarly.

12             So item -- well, these items

13   don't line up exactly with that, but Item 2,

14   of course, is the -- is the liability part,

15   and Items 3 and 4 would be the -- would be

16   the abatement part.

17             Item Number 1 is just that just

18   the -- has the negative externality result in

19   a measurable cost.  I think everyone agrees

20   that OUD has a measurable cost.  So that Item

21   Number 1 is sort of satisfied already, and so

22   it's 2 through 4 that would have to be done

23   in a full analysis.  But, again, given the

24   scope of this particular report, I'm only

25   interested in number 2.

1       Q.      Okay.  And you said everyone

2    agrees OUD has a measurable cost; is that

3    correct?

4       A.      Yes, I think the literature is

5    pretty clear on that, that there -- that OUD

6    has an attributable cost associated with it.

7    I'm not -- by simply saying that, I'm not

8    saying that it -- that we know the -- all the

9    different nuances of it.  I think there's

10   still a lot more work to be done, but there's

11   a body of literature out there that says OUD

12   has an attributable cost associated with it,

13   and I don't -- I don't disagree with that

14   general finding.  I might disagree on the

15   amounts and the methods and that sort of

16   thing, but...

17      Q.      But isn't the amount and the

18   method the measuring part?

19      A.      I'm sorry, say that again.

20      Q.      So I guess I'm trying to square

21   what you're saying here with what you have in

22   your report, where I'm looking at page 17,

23   paragraph 3.5.  And you say essentially

24   there's agreement there's some degree of cost

25   or measurable cost, and then you write, well,

1    there is important debate as to the extent of

2    opioid attributable costs, correct?

3         A.    Correct.  Yeah, that's a --

4    actually what I was just trying to say

5    before.

6         Q.    Okay.  And I think I didn't

7    understand that, because what I'm wrestling

8    with is you have a measurable cost, but isn't

9    the measurement the extent of cost?

10        A.    Yes.  Okay.  So let me clarify

11   that.  So in other words, if an

12   externality -- in economics, in the theory

13   the externalities, which is, again a common

14   construct within economics, if they -- if the

15   cost of an externality is zero, then we don't

16   need to do anything about it.  So in other

17   words, if pollution was harmless, then it

18   wouldn't be -- we wouldn't even be calling it

19   an externality.  So it would be something we

20   just didn't have to worry about.

21             So when an externality has a

22   cost, that's what -- that's when we have to

23   look into sort of what to do about it.

24        Q.    Okay.  So you're opining

25   there's at least some measure of cost, not

1    that you can measure the full cost of OUD.

2              Is that fair?

3              MR. BOONE:  Object to form.

4              THE WITNESS:  Well, I just want

5         to make clear, that's not the remit of

6         this report.  So I'm not trying to do

7         that in this report, nor am I trying

8         to suggest that those issues are

9         important to my findings in this

10        report.

11   QUESTIONS BY MS. SALTZBURG:

12        Q.     Are you opining that the full

13   cost of OUD is measurable?

14        A.     No.

15        Q.     And when you refer to the cost

16   of OUD, are you referring to economic cost or

17   the harms to the public health and safety?

18        A.     Well, here I'm referring to the

19   studies that have shown the cost of OUD, the

20   attributable cost of OUD.  However, I'm

21   not -- and certainly not for the purposes of

22   this report, I'm not suggesting that it's --

23   at this -- at this stage and this discussion

24   to distinguish or explore what those costs

25   should or shouldn't consider.

1    Q.    And when you say attributable

2  costs or opioid attributable costs here, are

3  you referring generally to Medicaid and

4  criminal justice costs?

5    A.    Those are the types of costs

6  that are most commonly reported in published

7  studies, yes.

8            MS. SALTZBURG:  Okay.  And

9      we've been going about another hour.

10      Would you like to do a break, or would

11      you like to keep going?

12            MR. BOONE:  Take a break.

13            MS. SALTZBURG:  Okay.

14      (Off the record at 11:48 a.m.)

15  QUESTIONS BY MS. SALTZBURG:

16    Q.    All right.  Let's move to

17  Section 4, which is Responsible Parties.

18  We're still on that same page, 17.

19            And just to orient us, when you

20  talk about responsible parties for

21  externality here, are you talking about

22  parties responsible for supply, OUD or

23  something else?

24    A.    I'm referring to parties

25  responsible for the increase in supply.

1          Q.     Okay.  So it's not parties

2    responsible for OUD?

3          A.     Correct.

4          Q.     Okay.  Increase in supply.

5                 And then if you'll look at

6    paragraph 4.2 at the bottom of the page here,

7    you write, "Regardless of the approach to

8    liability allocation, the idea that liability

9    should to some extent be allocated to both

10   present and absent defendants is

11   well-established."

12                Correct?

13         A.     Correct.

14         Q.     And I didn't see a cite there.

15   It may be later, but could you explain your

16   basis for that conclusion?

17         A.     Well, that's introduced in the

18   paragraph above.  This idea of orphan shares

19   is a common construct in economics,

20   specifically it's been mainly applied in

21   environmental economics, but it just happens

22   to be where most of that activity is.

23                But orphan shares are the

24   shares that are representing firms or

25   entities that are, for lack of a better word,

1  not at the table for a variety of reasons

2  that I identify here in the report.

3      Q.    Okay.  And you say it's mostly

4  the environmental context.

5          The sources that you cite in

6  footnote 67 there, are those representing

7  CERCLA or Superfund?

8      A.    Yes, as I said, most of the

9  examples in economics are environmental ones.

10  Some of them are public health-related, but

11  also sort of have an environmental flavor to

12  them, too, like contaminated water supplies

13  and things like that.  But that's where -- it

14  just happens to be in the economics that's

15  where most of the examples are.

16      Q.    And when you say examples,

17  you're analogying to legal liability under

18  CERCLA here, correct?

19      A.    Well, yes and no.  So I am not

20  a legal expert, so my knowledge of CERCLA is

21  limited to its application in environmental

22  economics from the economics perspective.

23      Q.    And lists concept of allocating

24  of present and absent defendants.

25          Can you give any examples

1    outside the CERCLA context?

2         A.    Well, sure.  There's -- there

3    are -- there's product liability, for

4    example, cases and situations where there

5    might be more than one responsible party, and

6    those responsible parties might be either

7    poorly defined or insolvent, et cetera.

8              There are cases -- more public

9    health-oriented cases regarding contaminated

10   buildings or contaminated water that are not

11   necessarily CERCLA cases.  The CERCLA cases

12   tend to be the big Superfund, sort of big

13   environmental contamination cases.  There are

14   a lot of other examples commonly called to

15   environment economics that are sort of

16   smaller scale things that would perhaps cross

17   over between environmental and public health.

18        Q.    And, for example, when you're

19   referring to cases, are those court cases?

20        A.    Yes.  And most of the

21   literature will cite to cases.  Again, I'm

22   not approaching this from the legal

23   perspective, so I am citing -- when I do this

24   citing economists reporting of cases rather

25   than my delving into those cases.

1          Q.      Okay.  But economists are

2    reporting about allocation to defendants in

3    legal cases, correct?

4          A.      Right.  So the study of

5    externalities -- I think there was a

6    paragraph that you were referring to before.

7    The study of externalities is one that

8    involves -- or can involve remedies that span

9    from taxes to regulation to bargaining and to

10   courts.  So the three of those, taxes,

11   regulation and courts, involves usually some

12   aspect of law.

13              So the field of law and

14   economics and the fields of environmental

15   economics and, again, to some degree public

16   health economics, are all -- all kind of come

17   together in -- on these kinds of issues.

18         Q.      So I guess what I'm trying to

19   understand here is, is your opinion about

20   allocation of liability, are you suggesting

21   that the way to do it should be to analogize

22   as to who could appropriately be given a

23   share of liability under CERCLA?

24         A.      No.  And to clarify, the -- I'm

25   not saying that -- I'm citing to CERCLA more

1   as an example of the way that economists

2   approach the allocation of liability.

3           I'm not suggesting that the

4   CERCLA laws themselves should be employed

5   here.  I'm citing to them as an example.

6   Q.     Okay.  Right.  And I'm not

7   suggesting you're saying we should apply

8   CERCLA here.

9           I guess what I'm confused about

10  is you're saying you're looking at

11  responsible parties as you would in a CERCLA

12  action, but to determine who's responsible in

13  CERCLA, you look at the statute, right?

14  A.     Well, yes, to some extent, and

15  I do get into that in subsequent sections.

16  I'm not sure if they're showing on the screen

17  right now.  I get into how in the CERCLA

18  cases or CERCLA-type cases they have

19  approached the allocation of responsibility.

20  Q.     So I guess what I'm confused

21  about, are you suggesting that these economic

22  articles or sources that you cite are

23  suggesting that liability should be assigned

24  or allocated differently than under the

25  CERCLA statute?

1          A.      Well, to be clear, the CERCLA

2     statute, again, based on my limited

3     understanding of the legal details of it and

4     the legal -- and the application of it in

5     court, that is outside of my realm of

6     expertise.  But my understanding of it

7     generally is that it does not specifically

8     indicate how liability should be allocated.

9     It simply says that it needs to be allocated,

10    and others have opined on ways in which it

11    can be allocated.

12               There are CERCLA cases that

13    have shown a resulting allocation.  Generally

14    the allocation is -- should be based either

15    on volumetric data, if it exists, but

16    volumetric data only applies when everyone's

17    producing the same thing.

18               So if it's a paint factory, we

19    can look at how many gallons of paint

20    Sherwin-Williams produced on the site versus

21    Benjamin Moore, for example.  I'm not saying

22    that's a specific case, but that's the type

23    of -- that's what I mean by volumetric.

24               The other means of allocating

25    responsibility when volumetric is not

1  available is a fair and reasonable approach.

2  And --

3      Q.    And --

4      A.    I'm sorry, go ahead.

5      Q.    No, I don't want to interrupt

6  you.  Were you done?

7      A.    Yes, I was just about to end.

8      Q.    Okay.  Do you have something

9  more?

10      A.    No, that's it.

11      Q.    All right.  And I want to

12  understand that.  So when you talk about --

13  you're saying -- your understanding is that

14  CERCLA doesn't say how to allocate liability,

15  correct?

16      A.    My understanding of CERCLA is

17  that it doesn't explicitly lay out how to

18  assign liability, again, other -- apart from

19  what I just mentioned before.

20      Q.    Okay.  So is it your

21  understanding that CERCLA doesn't say who

22  should be -- it doesn't spell out standards

23  for who can be a responsible party?

24      A.    My understanding is that there

25  are some standards that are applied

1  typically.  I'm not as familiar with the

2  specifics of them, but they collapse down to

3  the two methods that I've described before.

4      Q.     Okay.  Have you ever been an

5  expert in a case involving CERCLA?

6      A.     No, I've worked in

7  environmental cost cases, but I haven't -- I

8  have not been involved in a CERCLA case.

9      Q.     And do you have any experience

10  in your consulting work with Superfund?

11     A.     Not with Superfund, no.

12     Q.     Have you ever published on that

13  subject?

14     A.     No, not Superfund.

15     Q.     Okay.  And you were mentioning

16  orphan shares.

17             What's your understanding of --

18  to whom orphan shares under CERCLA can be

19  assigned?

20     A.     My understanding is that they

21  can be assigned to either insolvent entities

22  or entities that have some other sort of

23  sovereign immunity.  Entities that are

24  otherwise difficult to name in a lawsuit.

25  Again, this is -- I'm not exactly sure how

1  this has been applied in the real world, but

2  that is my understanding.

3       Q.      And is it your understanding

4  that liability could be applied under CERCLA

5  without identifying a specific individual or

6  entity?

7       A.      I believe that's probably

8  possible, but I don't have a deeper

9  understanding of that.

10      Q.      Okay.  And is it -- do you

11  have -- are you opining a liability could be

12  assigned under CERCLA without proof that

13  someone violated CERCLA?

14      A.      Well, let me reiterate a point

15  I made earlier, that here I -- I'm

16  applying -- I'm not applying CERCLA laws.

17  I'm using CERCLA as an example of how

18  economists would go about determining who's a

19  responsible party in a study of

20  externalities, which, again, is a common

21  construct in economics.

22              So, again, I'm not opining that

23  I -- I'm not offering a legal opinion or even

24  a legal concept that CERCLA is an applicable

25  law in this case.  I'm not going in that

1  direction at all.  I'm merely saying that it

2  is a -- it is one way to approach the

3  identification of responsible parties.

4      Q.     Okay.  So what I want to

5  understand, too, is I understood you in your

6  report to be sort of pulling the term PRP or

7  responsible party from the CERCLA context,

8  correct?

9      A.     Yes, that's one area in which

10  that acronym is used.

11      Q.     PRP?

12      A.     Correct.

13      Q.     What other areas are the

14  acronym PRP used?

15      A.     Well, I've seen the acronym

16  used in environmental economics literature

17  and not necessarily with respect to CERCLA,

18  just used generally in the environmental

19  economics literature.

20      Q.     And when you refer to the

21  literature on environmental economics, is

22  that literature on how to establish

23  causation?

24      A.     That's part of that literature,

25  yes.

1      Q.      Can you give me an example of

2  something from that literature?

3      A.      Well, I mean, I'm not sure what

4  exactly you're looking for, but an

5  environmental economics textbook will talk

6  about liability and causation and responsible

7  parties, not necessarily in the context of

8  CERCLA, but it is a -- those concepts are

9  very common in environmental economics.

10  Again, as I said before, they're also common

11  in public health matters as well.

12      Q.      One thing that would be helpful

13  is -- one of the sources that you cite under

14  responsible parties on page 17 in

15  paragraph 4.1, you have paragraph 68.

16  There's an article by Kilbert, "Neither Joint

17  Nor Several:  Orphan Shares in Private CERCLA

18  Actions."

19      A.      Yes.

20      Q.      Is that one of the examples

21  that you're thinking about?

22      A.      Well, that -- I can't remember

23  the background of the authors who wrote that,

24  whether they were environmental economists or

25  not, but that was cited primarily because it

1   was, I thought, a useful description of the

2   concept of orphan shares.

3         Q.      And I guess what I want to

4   understand is, when you say there's

5   literature and text discussing liability in

6   the context of environmental economics, is

7   that legal liability?

8         A.      I think an important

9   distinction is that when economists think of

10  liability, they don't think of it as legal

11  liability necessarily.  Economist's approach

12  to liability is in alignment with the

13  identification of responsible parties.  So it

14  is -- again, referring back to the very

15  common economics example of pollution, like

16  air pollution, an economist would say --

17  would be interested in which factories are

18  producing the pollution.  You would need to

19  know which factories were producing the

20  pollution.

21              So that's -- so that's

22  different than a -- I believe, it's different

23  than a legal liability argument.  It's not

24  a -- based on the finding of liability.  It's

25  based on trying to figure out who produced

1    what.

2         Q.    I know you're saying you're not

3    a legal expert.  I'm not trying to belabor

4    that point.

5              What I want to understand is

6    you're analogizing to CERCLA for allocation

7    to responsible parties, correct?

8         A.    Actually, what I'm taking from

9    this discussion of CERCLA and the reason I'm

10   using it as an example is really just for two

11   things.  Well, one thing, and that's what you

12   just identified, and that's the

13   identification -- not even the

14   identification, it's the concept of

15   potentially responsible parties or just

16   responsible parties.

17             And that concept -- this is, I

18   think, a very good example of that concept.

19   We see it in -- we've seen it in public

20   health context as well, tobacco, for example.

21   It's -- the interest was in identifying the

22   producers of tobacco and who produced -- you

23   know, that may be a more volumetric approach,

24   who produced what and when.

25             So it is used -- my use of it

1    here doesn't go any further than this is one

2    example of a construct or a conceptual

3    framework in which potentially responsible

4    parties could be identified.

5         Q.    And -- okay.  I just want to

6    make sure.  You're saying you pulled the

7    concept of responsible parties from the

8    CERCLA context, correct?

9         A.    Well, I think that that

10   language appears in other contexts, but, yes,

11   I begin this section on responsible parties

12   by referencing CERCLA just as a way to create

13   that construct.

14        Q.    Okay.  And last question that's

15   specific to CERCLA.

16             Is it your understanding that

17   allocation as you described it comes into

18   play before or after liability is

19   established?

20        A.    Well, that's a -- that's an

21   interesting question that is beyond the scope

22   of my report here.  However, I would say,

23   yes, I think the -- your questions of

24   liability.  And again, in economics, one

25   would want -- again, using an economic

1  definition of liability, which is responsible

2  parties.  Responsible parties should need to

3  be -- would need -- generally, need to be

4  identified in advance of an abatement

5  allocation, if that is what you're asking.

6      Q.    Right.

7            So I guess it just seems a

8  little circular to me and that's what I'm

9  trying to understand, because you're

10 saying -- you're looking at liability

11 allocation, but you seem to be equating that

12 with whether someone is a responsible party.

13     A.    I'm not sure I follow.  Can you

14 try rephrasing that?

15     Q.    Sure.

16           So when you refer to liability

17 allocation, what does liability allocation

18 mean to you?

19     A.    In the context that I used that

20 in this report is in the economics concept.

21 So the economic theory, the economic theory

22 approach to liability, which as I described

23 before, would be expected to be different

24 than an actual legal construct of liability.

25           So an economic theory, there's

1  a need when we're -- studying externalities,

2  there's a need to identify the sources of the

3  factors that contributed to the externality.

4  A need, more specifically, to identify

5  responsible parties.

6            So that's why I've included

7  this discussion in this report, given the

8  objectives of this report.

9       Q.    Okay.  So when you say the

10  sources of factors, is that another way of

11  saying the causes?

12       A.    Well, we have to be careful

13  there, because as I said before, the -- I'm

14  not opining that the responsible parties

15  generated the externality directly.  So in

16  other words, I'm not saying that, for

17  example, the FDA is responsible for OUD.  I'm

18  saying that -- again, picking on the FDA is

19  just as an example -- that the FDA is

20  responsible for increase in supply of

21  opioids, and then as we'll, I suspect, get

22  into later, that there's a relationship

23  between that and the externality, which is

24  opioid use disorder.

25       Q.    Okay.  But when you say the FDA

1    is responsible or whoever -- any of these

2    responsible -- anyone is responsible for the

3    increase in supply, are you saying they used

4    the increase in supply?

5         A.    Well, yes, to an extent that is

6    what I'm saying.  So I -- when I -- I called

7    them contributing factors in Chapter 2 or

8    Section 2 of this report that we're looking

9    at.

10        Q.    Uh-huh.

11        A.    And when I say contributing

12   factors, I do distinguish those factors to be

13   causative.  And then in -- if you'll permit

14   me just to identify the right figure, just

15   because I want to make things very clear --

16   actually, I don't think we've gotten to the

17   figure yet.  Let me see.

18             In Figure 4-1 on page 19, I map

19   those contributing factors which, again,

20   could be called causative factors, causative

21   of the increase in the supply of opioids, I

22   map those to the -- to the corresponding

23   PRPs.  I apologize because I know we're not

24   at this diagram yet in terms of the order of

25   things, but it -- your question raises this

1  point that the contributing factors are

2  causative of an increase in supply of

3  opioids, not necessarily causative of an

4  increase in the externality of OUD.

5      Q.    Okay.  I just want to make sure

6  I understand.  Maybe it would be helpful to

7  back up a little bit and we can keep this

8  diagram.

9          But so you're not opining that

10  the potentially responsible parties that you

11  identify in 4.1 are causes of OUD, correct?

12      A.    Correct.

13      Q.    Okay.  Are you opining that the

14  potential responsible parties in Figure 4.1

15  are causes of opioid supply?

16      A.    Causes of an increase in opioid

17  supply, yes.

18      Q.    Okay.  Fair enough.  Causes of

19  an increase in opioid supply.

20          And so you testified earlier,

21  you are not opining that the increase supply

22  caused OUD, correct?

23      A.    I'm sorry, just repeat that

24  again.

25      Q.    I don't want to mischaracterize

1   your testimony.

2           I think you told me earlier

3   that you weren't going to opine that

4   increased supply of opioids caused OUD,

5   correct?

6       A.      Correct.

7       Q.      So what is the purpose of

8   identifying responsible parties for increased

9   supply then?

10      A.      Well, because to some extent

11  there's going to be some proportion of OUD

12  that maps back to the increase in supply of

13  opioids.  And so my opinion is that that

14  proportion does sort of make its way back up

15  through this diagram to these responsible

16  parties, but I'm not saying that it's a

17  direct relationship.  And again, that's

18  that -- in another section I deal with that.

19      Q.      Okay.  I just want to make sure

20  I understand.

21           When you say it maps back to,

22  though, isn't that another way of saying

23  causes?

24      A.      Well, it's maybe a more careful

25  way of saying that these responsible -- these

1  potentially responsible parties, or PRPs,

2  that are shown in this diagram that you're

3  showing were contributing -- have contributed

4  or there's evidence showing that they have

5  contributed to an increase supply of opioids.

6          There is some proportion of an

7  increase supply in opioids, some proportion

8  that is attributable to three different

9  misuse outcomes.  Again, this is getting

10  ahead of ourselves, and I prefer to talk

11  about that when we get to that section,

12  but -- and that -- the relationship, as I was

13  speaking to before earlier, is complex and,

14  you know, I would need to explain that more

15  carefully than we can when we're in this

16  section here.

17      Q.    Okay.  And just to understand,

18  what I'm stuck on is I feel like you spent a

19  lot of time in the report on factors and

20  responsible parties for opioid supply, but

21  what is the purpose of doing that if you

22  don't think opioid supply is an important --

23  is the cause of -- is an important cause or

24  contributing cause to OUD?

25      A.    Well, the purpose of doing that

1    is that there's some proportion of opioid

2    supply, of the increase in opioid supply.

3    That is so -- again, we're -- let's look at

4    this diagram.

5              So there's the supply of

6    opioids, and then some proportion of those

7    are diverted to misuse.  The way this diagram

8    shows, it shows the diversion going to

9    nonprescription opioids.  So what I mean by

10   that is that it starts as a prescription

11   opioid, there's diversion and then it becomes

12   a nonprescription opioid in the hands of

13   someone who presumably is either going to

14   misuse it or pass it along to somebody who is

15   going to misuse it.

16             So the relationship from OUD,

17   which isn't even shown in this diagram, back

18   up into this potentially responsible parties

19   is through that mechanism.

20        Q.    Okay.  And so are you

21   opining -- it's through the mechanism of

22   diversion, correct?

23        A.    Correct.

24        Q.    And are you opining that any of

25   these potentially responsible parties --

1    well, let me back up.

2             Are you opining that any of the

3    factors you identify in this far left column

4    are causes of diversion?

5         A.    Causes of divergence.

6         Q.    Diversion, yes.

7             MR. BOONE:  I'm sorry, could

8    you repeat that, Lisa?

9    QUESTIONS BY MS. SALTZBURG:

10        Q.    Causes of diversion.

11        A.    The factors in the left column,

12   you're asking about?

13        Q.    Yes.

14        A.    Not directly, no.

15        Q.    Okay.  Are they indirect

16   causes?

17        A.    I think so, yes.  Some of them

18   are.

19        Q.    I mean, which ones are those?

20        A.    Well, for example,

21   macroeconomic factors is, I think, going to

22   be associated with divergence I think -- or

23   diversion, I should say.  So diversion is

24   going to occur when there's a market for

25   diverted opioids.  And macroeconomic factors

1   insofar as they are influencing or driving

2   rates of substance use disorder, that's going

3   to increase the market for diverted

4   prescription opioids.  And also increase the

5   market for illicit opioids.  That's --

6        Q.     Is that why you have the dotted

7   line to drug traffickers here?

8        A.     Correct.

9        Q.     Okay.  Are there any other

10  factors in this list that you opine are

11  causes of diversion?

12       A.     Again, indirectly to the extent

13  that some of these factors contributed to an

14  overprescribing of prescription opioids, to

15  the extent that some of these factors

16  contributed to potentially inappropriate --

17  medically inappropriate or medically

18  unnecessary opioid prescriptions, then that

19  would indirectly increase the -- excuse me,

20  increase the likelihood of diversion in the

21  sense that it could create a supply of unused

22  prescription opioids.

23       Q.     Okay.  And can you identify

24  which factors in this list that would be for

25  these indirect ones?

1        A.      I think it's most of them.  So,

2    for example, changes in medical need,

3    physicians believing that there's greater

4    medical need for aggressive pain management.

5    And again, as we talked about before, that

6    was also due to government advocacy and

7    medical advocacy might err on the side of

8    overprescribing opioids.

9            Again, in that era of the late

10    '90s to -- through 2010, 2015, somewhere

11    around there, that that was the case.  That

12    was what was happening.  And physicians were

13    prescribing opioids in -- potentially in

14    situations where they probably shouldn't have

15    or whether they should have -- perhaps they

16    should have prescribed less.  And that's been

17    discussed in the literature.

18            That's a situation, where,

19    again, if there's excess supply due to these

20    contributing factors, that could potentially

21    increase the likelihood of diversion.

22        Q.      Okay.  Out of these -- and you

23    only have -- you have seven factors here.

24    Apart from changes in medical need and

25    macroeconomic factors, are there any others

1    that you would opine are indirect causes of

2    diversion?

3         A.      Yes, government advocacy and

4    medical advocacy are also -- actually,

5    including -- and quality ratings as well and

6    manufacturer marketing, all of these -- four

7    factors have put pressure on physicians to

8    prescribe more, and that's why they're on

9    this list.  And any time a physician is

10   prescribing more and perhaps more than what

11   is medically necessary, that increases the

12   supply of prescription opioids and increases

13   the probability of diversion.

14        Q.      Okay.  And did you do any

15   analysis of the extent to which any of these

16   factors play a role in indirectly diversion?

17        A.      No.

18        Q.      Okay.  And I'm looking at

19   macroeconomic factors.  You have alignment of

20   patients, providers and government, correct?

21        A.      Correct.

22        Q.      And that's under the PRPs,

23   correct?

24        A.      Correct.

25        Q.      So are you saying that patients

1  are responsible for macroeconomic factors?

2      A.      I'm not saying that patients

3  are responsible for macroeconomic factors,

4  no.  I'm saying that macroeconomic factors

5  affect patients and can affect patient, for

6  example, drug-seeking behavior.

7      Q.      Okay.  So why then are patients

8  responsible if they're being affected rather

9  than causing this factor?

10      A.      Well, they're responsible

11  because they are responsible for the

12  appropriate use of prescription drugs.  So if

13  they're engaging in activities surrounding

14  diversion, whether they're on the receiving

15  end or the diverting end, then they're

16  responsible.

17          If they are engaged in

18  obtaining opioids in some form from a drug

19  trafficker, they are contributing to --

20  they're potentially a responsible party in

21  that regard as well.

22      Q.      And I'm still trying to

23  understand -- we can talk more about that,

24  but I'm just trying to understand

25  structurally how this diagram works.

1           Is the intent that this column

2    under PRPs, this identifies who is

3    responsible for the factor that you

4    identified?

5        A.    Not necessarily.  I think that

6    could be one way to say it, but I think the

7    main way I'm approaching it here is that we

8    have -- contributing factors are again --

9    which again, I've flagged up as

10   causative-type factors, and that's the seven

11   that are listed here.  And then how -- the

12   flow of the diagram is important because I'm

13   saying, these factors have been -- or map

14   into specific responsible parties.

15           And it doesn't necessarily mean

16   that the responsible parties are the -- are

17   solely driving those factors.  And that's

18   especially true in the macroeconomic factor's

19   bucket, but it's also to some degree true in

20   some of the others as well.

21           So what I'm saying is these are

22   the parties that are associated with that

23   factor.

24       Q.    Okay.  And I think that's what

25   I'm trying to understand.  I'm stuck on the

1    map onto part.

2              The purpose of these two

3    columns, as I understand it, is that you're

4    saying a factor and then this next column you

5    identify who is responsible for that factor.

6              And I think we covered then --

7    when you were saying responsible, you mean

8    caused that factor, correct?

9        A.    Well, again, that may be more

10   true of them than for others.  So, for

11   example, let's look at the -- well, let's

12   look at the government advocacy bucket.

13             So for that one, federal and

14   state governments were responsible for the

15   government advocacy.  That's pretty clearcut.

16             The medical advocacy, providers

17   were responsible for the medical advocacy.

18   Not necessarily en mass.  It was more

19   provider organizations that were involved in

20   advocacy, but nevertheless, they are

21   providing providers.

22             In terms of regulatory approval

23   or monitoring, it is the FDA, the DEA and the

24   CDC who have explicit remits to carry out

25   regulatory approval and monitoring, and it

1    is -- it is their actions in carrying out or

2    to some degree failing to carry out that

3    remit or failing to perform it efficiently

4    that resulted in an increase in supply of

5    orders.

6                   So that's the way this diagram

7    should be read.  It doesn't work very well

8    when you get to macroeconomic factors because

9    I'm not saying that patients cause

10   macroeconomic factors.  This is a -- this is

11   where the important -- the direction of the

12   effect is important.  The macroeconomic

13   factors are determined by much greater

14   external forces, globalization, for example.

15   And those are things that affect how patients

16   behave, if you will, and it affects how

17   providers behave and it affects how

18   governments behave.  And it affects -- and

19   the mitigation of macroeconomic factors is to

20   some extent the responsibility of government,

21   for example, to some extent.  So that's how

22   these columns interact, and that's how they

23   differentiate as well.

24        Q.    So are you saying the columns

25   interact differently for different boxes?

1      A.      Well, I think it's pretty

2   consistent down to macroeconomic factors.

3   Macroeconomic factors is the one that should

4   have a footnote on it that it works a little

5   bit differently because I'm not suggesting

6   that any of those responsible parties were

7   responsible for the mac -- for globalization,

8   for example.

9      Q.      Okay.  And so just in terms of

10  how this diagram is intended to work -- you

11  said there's an association between the PRPs

12  and the factors.

13          Are you saying that -- I guess

14  you have this arrow from factors to PRPs and

15  then eventually down to supply, correct?

16     A.      Correct.

17     Q.      So, and I know you've covered

18  already that the role of factors -- or your

19  opinions about factors and supply.

20          Are you opining that the PRPs

21  are causes of increased opioid supply?

22     A.      What I'm saying here in this

23  diagram and in this section, Section 4, is

24  that these -- there were actions taken or

25  inactions, in some cases it's inactions, on

1  the part of the -- of what I've identified as

2  potentially responsible parties.  There are

3  actions taken or inactions that contributed

4  to the increase in the supply of opioids.

5       Q.    Okay.

6       A.    Sorry, just to further add.  I

7  probably should have -- that blue box

8  probably should say increase in supply of

9  opioids.  I think in the --

10      Q.    Okay.

11      A.    -- text I say that, but the

12  diagram doesn't reflect that.

13      Q.    Okay.  Let me write that on my

14  end.  I understand that.

15            I just want to make sure I

16  understand, though.  You said the PRPs

17  contribute to the increased supply.

18            Are you saying that each of the

19  PRPs is a cause of increased supply?

20      A.    I think that's a fair

21  restatement.

22      Q.    Okay.  And so why do you need

23  the factors column at all?

24      A.    Well, that's a good question.

25  I wanted to map it back to my discussion of

1    factors.  I -- the way I approached this as

2    an economist is to first identify factors,

3    and factors being more -- it's sort of more

4    broadly defined, and then identify, okay,

5    what are the entities within each of those

6    factors.

7              It sometimes -- you know, if,

8    for example, we were here mainly talking

9    about the role of manufacturers, I wouldn't

10   need to do that.  I wouldn't have to have a

11   manufacturing factor and a manufacturing PRP

12   because it's pretty obvious they're the same

13   thing.

14             In this case I decided to do it

15   this way because, for example, you know,

16   medical advocacy, that's kind of a diffuse

17   term, what does that mean.  It's the actions

18   of individual physicians, but it's also the

19   actions of individual -- of medical

20   societies.

21             So when I discuss it in the

22   context of factor, I'm talking about medical

23   societies, clinical practice guidelines,

24   presentations at conferences, all of these

25   things that physicians are doing, saying,

1  hey, we need to do a better job at pain

2  management.

3              When I discuss it as a PRP, I'm

4  just saying providers, in this case

5  physicians and health systems.  I'm not

6  necessarily -- I'm trying to identify an

7  entity or set of entities as opposed to a

8  factor.

9      Q.    Okay.  So is a fair way to look

10  at it that you're opining that PRPs are a

11  cause of supply, you're not necessarily

12  saying PRPs are a cause of all of the factors

13  like we discussed with macroeconomic?

14      A.    I think that's a fair way to

15  restate it, yes.

16      Q.    Okay.  And you're opining that

17  this diagram where you have the factors and

18  the PRPs, this is an established method of

19  showing causation in economics?

20      A.    Yes.

21      Q.    Okay.  And there's no empirical

22  analysis that you're doing here for any of

23  these PRPs or factors, correct?

24      A.    That's correct, but I'm relying

25  on empirical analyses undertaken by others

1    via the materials that are cited.

2         Q.    Okay.  So I think I understand

3    that.  I've seen in your report sometimes

4    you'll say, you know, some experts say or

5    experts agree, correct?

6         A.    Well, yeah, sometimes I say

7    that in the context, but in the footnotes,

8    the sources that align with each of these

9    responsible parties are sources -- or

10   examples of sources.  Obviously the opioid

11   literature is very large, so these are

12   examples of sources that support the

13   identification of the responsible party.

14        Q.    Okay.  And so for forming your

15   opinions, you're applying -- you're relying

16   on the opinions of experts in these other

17   sources; is that fair?

18        A.    That is fair.

19        Q.    Okay.  And I know you mentioned

20   you don't agree with all of the opinions and

21   in all of the sources or it's rare that you

22   would, right?

23        A.    Correct.

24        Q.    What's your method for deciding

25   what part of a source you're going to pull

1    out for forming your opinion?

2        A.      If, for example, I want to

3    know -- let's again, just use the FDA as an

4    example.  I want to know what the role of the

5    FDA was in the opioid era, because it goes

6    back to the approval of OxyContin and onward

7    from there, then I will research -- begin

8    researching that, reading all of the

9    materials having to do with the FDA's role in

10   that, and generally go about that

11   chronologically.

12              When -- you know, for

13   example -- and this goes for all of the PRPs

14   and contributing factors, the process is the

15   same.  I'm just picking on the FDA because

16   it's the top of the list there.

17              When I do that, I look for

18   the -- for materials that are -- that are,

19   first of all, just generally helpful.  So is

20   it -- is it answering the question that I'm

21   asking, the role of the FDA in opioids.  So

22   does it have to do with the approval of

23   opioids, does it have to do with postmarket

24   surveillance.  What is the -- you know, and

25   then -- yeah, so, I mean, that's pretty much

1    it.  The determination of what part of the

2    article to consider, if that's what you're

3    saying about.

4         Q.    It is.

5         A.    Then is what parts of the

6    article address the query that I am making.

7    So if I'm doing a search in PubMed, for

8    example, I might retrieve articles.  If I do

9    a search, for example, on FDA and opioids,

10   I'll get a number of hits, probably a pretty

11   large number of hits.  Only a small portion

12   of those will talk about or address the role

13   of the FDA in the opioid situation that, you

14   know, again from the approval of OxyContin on

15   forward.

16          Some of them will say -- some

17   of them will be -- some of those articles

18   will be just sort of descriptive.  Some of

19   them come from the FDA and, for example,

20   FDA's produced -- or produced a timeline of

21   all of its activities regarding opioids.

22   That's certainly very helpful.

23          Some of the articles, however,

24   will focus more on sort of what, for example,

25   maybe what the -- how -- if it's an article

1   from 19 -- you know, late '90s or something

2   like that, it might be on, you know, the

3   promises of opioids and how the FDA's

4   approaching the approval of OxyContin or

5   something like that.

6            You know, that may or may not

7   be helpful.  Again, it really just comes down

8   to -- maybe a better example is one I gave

9   before, which is if I'm looking for a

10  particular number, let's say I want to know

11  what percent of opioids are -- what percent

12  of prescription opioids are misused, that

13  search, that type of a search in PubMed can

14  generate literally thousands of articles.  So

15  what I then have to do is find the ones that

16  report an actual percentage and then look at

17  those studies to determine what are they

18  looking at, what are they studying, how do

19  they do it, what are their sources.  Some of

20  them -- and it's sometimes -- a point of

21  frustration in the health field is that some

22  articles will simply offer opinions and a lot

23  of articles will just simply report what

24  other people reported.

25            So there's sometimes a need to

1  sort of look for the -- what the value added

2  of that particular article is.

3        Q.      Okay.  And going back to the

4  way that this diagram fits together, we

5  talked about this dotted line with diversion

6  to and some of the factors have an indirect

7  role.

8              As we work our way down this

9  box towards the right-hand side, so you have

10 the PRPs each with a line that goes down to

11 the increase in supply, correct?

12       A.      Correct.

13       Q.      And are those -- are any of the

14 PRPs either opining are causes of diversion

15 also?

16       A.      Well, I think you asked me

17 something like that before, and the way I

18 would answer that is that these -- each of

19 these PRPs are factors that I'm identifying

20 as being associated with the increase in the

21 supply of opioids.

22       Q.      Okay.

23       A.      There is -- we know there's

24 diversion of prescription opioids to --

25 diversion to misuse, you know, just -- I know

1    the diagram shows diversion to

2    nonprescription opioids, but that's not --

3    it's really diversion to misuse.

4             So what we don't necessarily

5    know is that the nuances of the relationship

6    between, for example, the FDA's role in

7    divergence {sic} versus the physician -- the

8    individual physician role in divergence

9    versus the role of the accreditation agency

10   in divergence -- I keep saying divergence,

11   but it's diversion.  We don't know the

12   specific allocation of that responsibility.

13             MR. BOONE:  Ms. Saltzburg, the

14        time --

15             MS. SALTZBURG:  Oh, is your

16        lunch here?

17             MR. BOONE:  It is.

18             MS. SALTZBURG:  Let me wrap up

19        just a couple of questions and then

20        we'll stop.

21   QUESTIONS BY MS. SALTZBURG:

22        Q.    I just want to make sure I

23   understand.  Is there any PRP or PRP group in

24   this diagram other than drug traffickers that

25   you're opining is directly related to the

1  supply of nonprescription opioids?

2      A.    Well, there's -- the two arrows

3  going into that box would be diversion and

4  drug traffickers, yes.

5      Q.    Okay.  So you're not opining

6  that any of the PRPs in these first seven

7  boxes are directly causes of the supply of

8  nonprescription opioids, correct?

9      A.    The only -- the only caveat I

10  would give to that is the DEA.  Because the

11  DEA is listed here sort of -- as to some

12  degree double-listed.

13          The DEA is responsible for

14  establishing quotas of opioid production and

15  distribution or any prescription drug or I

16  guess Schedule I, Schedule II prescription

17  drug distribute -- production and

18  distribution, the DEA has a -- has a role in

19  monitoring that through its enforcement of

20  quotas.  So that's the way it's used in

21  that -- in the top of the box there.

22          In terms of drug trafficking,

23  the DEA is also charged with controlling or,

24  you know, attempting to control drug

25  trafficking and matters related to that.  So

1    the DEA would be -- would be an example of

2    a -- of a PRP that is serving sort of a dual

3    purpose here.

4         Q.    Okay.  And I guess my question

5    is, if you have to get to diversion before

6    you get to the supply of nonprescription

7    opioids here, what is the purpose of having

8    all these other boxes besides the DEA and the

9    drug traffickers?

10        A.    I'm not sure I understand your

11   question.

12        Q.    Okay.  So you -- I understand

13   you to be opining on, we need to have -- you

14   need to get to the supply of nonprescription

15   opioid box on this diagram before you get to

16   harms, correct?

17        A.    I'm sorry, I'm still not

18   tracking.  I'm sorry.

19             MS. SALTZBURG:  Okay.  I feel

20        bad I'm keeping you from your lunch.

21        Let me ask you if I can think of a

22        better way to phrase that.  Why don't

23        we break for lunch and we can start

24        back up on this diagram again

25        afterwards.

1          MR. BOONE:  Okay.

2          THE WITNESS:  Okay.

3          MS. SALTZBURG:  And how long

4     would y'all like to take?

5          MR. BOONE:  Let's go off the

6     record.

7      (Off the record at 12:56 p.m.)

8  QUESTIONS BY MS. SALTZBURG:

9     Q.     So we're discussing your

10 diagram before lunch, and I think one thing

11 that might be helpful is if we go to

12 paragraph 4.10 of your report, which is on

13 page 22 to 23, just to identify who you have

14 in that drug trafficker box.

15          Are you there?

16     A.     Yeah, I'm sorry, you're talking

17 about 4.10, that refers to physicians.

18     Q.     Yeah, you're right.

19     A.     You were asking about drug

20 traffickers.

21     Q.     Where is drug traffickers?

22 Later?  4.19, page 26.

23     A.     Okay.  I'm there.

24     Q.     So who do you include in the

25 group for drug traffickers?

1        A.      Oh, this would mainly be

2   individuals who are obtaining opioids from

3   drug traffickers.  So these are -- these are

4   not at all opioids sourced from the health

5   care system.  This would be either illegally

6   imported into the country from a border state

7   or imported via the mail.  So that's one

8   group.

9              I guess technically, a patient

10  could become a drug trafficker if a patient

11  is hoarding prescription drugs and then

12  giving them to their friends and so forth.  I

13  think they're definitionally kind of fitting

14  the description of a drug trafficker,

15  although obviously not the standard-applied

16  definition.

17       Q.      And I think you write in here

18  you would include individuals and patients

19  who knowingly divert controlled substances

20  for nonmedical use; is that right?

21       A.      You're in that same paragraph?

22       Q.      Yeah, I'm kind of in the

23  middle.

24              It says, "Thus, group of drug

25  traffickers includes not only criminals

1   involved in the business of illicit drug

2   manufacturing and distributing, but also

3   individuals and patients who knowingly divert

4   controlled substances for nonmedical use."

5           Correct?

6       A.      Yes, correct.  So that refers

7   to the comment that I made initially, which

8   is in some cases a patient or an individual

9   could cross over into this -- into the --

10  into a drug trafficker type of role.  Again,

11  I wouldn't be an expert on to how to

12  necessarily classify a drug trafficker versus

13  someone who is otherwise illegally

14  distributing prescription drugs, but it

15  seemed to me from my research that there are

16  situations where one could cross over into

17  the other group at -- perhaps based on the

18  volume of activity.

19      Q.      What kinds of situations would

20  those be?

21      A.      I think, for example, some

22  individuals -- there's research on

23  individuals who engaged -- either directly

24  engaged in drug-seeking behavior or directly

25  engaged in consistent diversion-type

1  activities for the purpose of distributing or

2  selling those opioids at school or at work.

3  I think the sort of traditional definition of

4  drug trafficker wouldn't necessarily fit that

5  person, but they are for all intents and

6  purposes, at least from an economics

7  perspective, they're performing a similar

8  function.

9       Q.     Okay.  And when you say

10  drug-seeking, would that include people with

11  OUD?

12       A.     It could.  It doesn't

13  necessarily have to.

14       Q.     I think you said in New Mexico,

15  at least, that you weren't blaming people

16  with OUD, correct?

17       A.     Oh, I'm sorry, could you

18  rephrase that?

19       Q.     Sure.  I guess -- I think you

20  testified in New Mexico that you weren't

21  blaming people with OUD, correct?

22       A.     Well, very generally, no, I'm

23  not blaming people with OUD, that's correct.

24       Q.     Is there a way that is not

25  general?

1        A.      And that's that if an

2    individual is, you know, actively

3    aggressively seeking drugs and purchasing

4    drugs from drug traffickers and their OUD is

5    as a result of that, you know, that's perhaps

6    a different type of situation than somebody

7    who sort of passively ends up in the OUD

8    category.

9               But either way, I'm not --

10   that's not important to my analysis to blame

11   individuals that have OUD.

12       Q.      Okay.  So for this group of

13   parties here, could it also include

14   pharmacies that knowingly fill illegitimate

15   prescriptions?

16       A.      Well, I would break that

17   question up into two categories.  So my

18   answer to the question as you asked it is no.

19   There -- there's -- because the question

20   implies that pharmacies are filling, I think

21   as you put it, illegitimate prescriptions,

22   and I don't have any evidence of that or the

23   opinions to the extent to which that is

24   happening or not happening.

25       Q.      So you're not opining one way

1    or the other about whether pharmacies are

2    filling illegitimate prescriptions, correct?

3         A.     Correct.

4         Q.     Okay.  And let me ask you this.

5    I think you've written in your report here, I

6    think you mentioned patients have sort of an

7    implied obligation under the controlled

8    substances laws, correct?  And that's part of

9    why you include them?

10        A.     I'm sorry, do you mean why I

11   include them as a potentially responsible

12   party?

13        Q.     Uh-huh.

14        A.     Yes, but, again, not

15   necessarily -- it -- it's not based entirely

16   on that implicit contract or opioid contracts

17   and things like that.

18             It's based on the -- more

19   generally the responsibility to use

20   prescription drugs responsibly and

21   appropriately and as directed.

22        Q.     And do pharmacies have

23   obligations under the controlled substances

24   laws?

25        A.     I don't have an opinion as to

1  whether they do or not.

2      Q.    Okay.  And I think -- let me go

3  to -- let's look right above that paragraph

4  actually, still page 26 at 4.18.

5           You have a paragraph on

6  distributors, correct?

7      A.    Correct.

8      Q.    One of your opinions as to why

9  distributors are essentially a responsible

10  party is for failing to diligently respond to

11  suspicious orders, correct?

12      A.    Correct.

13      Q.    Okay.  And what does it -- what

14  is your opinion that distributors did wrong

15  with respect to suspicious orders?

16      A.    I think these large national

17  distributors, the one that comprised

18  85 percent of the independent distributor

19  network were in a position to use their data

20  because they have data that's not quite

21  population-level, but it's pretty extensive.

22  They have the ability to -- or they had the

23  ability to use their data to identify, you

24  know, potential problems.  That's my opinion,

25  and that's why -- that's how I'm using that

1    Item Number 2 there.

2         Q.      And the suspicious orders, that

3    would be suspicious of diversion, correct?

4         A.      Not necessarily.  So there are

5    ways of determining, for example, whether a

6    shipment to a particular region of the

7    country reflects or looks like something that

8    it should look like.  And that -- the

9    distributors, again, because of their size,

10   because they have data from all over the

11   country, would have been in a position to

12   potentially identify those types of shipments

13   as potentially problematic.  And others

14   have opined that they had that ability and

15   didn't exercise it.

16        Q.      Okay.  And the orders that

17   distributors failed to diligently respond to

18   are orders being placed by pharmacies

19   primarily, correct?

20        A.      I -- yes, I think that's to

21   some extent true.  There could be -- they

22   might receive orders differently, too.  I

23   don't know, for example, the extent to which

24   a pharmacy benefit manager is involved in

25   that -- in that process.

1          But I think there's a number of

2  different entities with whom -- who are --

3  who are purchasing from the large

4  distributors that would include also

5  hospitals themselves and health systems and

6  things like that.

7          Q.     Okay.  And the orders would

8  include orders from chain pharmacies,

9  correct?

10         A.     My limited understanding of

11  pharmacy operations is that some of them have

12  their own distributors.  I don't know which

13  ones have their own distributors versus which

14  ones rely on these large, independent

15  distributors.

16         Q.     Okay.  And you're relying to

17  some extent on your -- as you've discussed,

18  literature or public sources, opinions of

19  others, correct, with respect your opinion

20  related to suspicious orders?

21         A.     That's my understanding, yes.

22         Q.     Okay.  And do you know if those

23  sources, if they are opining or if they're

24  looking at evidence about whether the orders

25  that were suspicious were coming from chain

1    pharmacies like Kroger?

2         A.      I don't have any knowledge of

3    that.

4         Q.      Okay.  And what is the -- I

5    guess why is it your opinion that if the

6    pharmacies were placing the order that the

7    distributors are responsible for failing to

8    respond to it as suspicious but the

9    pharmacies are not responsible?

10        A.      I think the distributors,

11   again, these large, independent distributors,

12   in particular, have an ability that a retail

13   pharmacy doesn't have, and that's to have the

14   ability to see a larger picture in terms of

15   the relationship between geographic

16   characteristics, population characteristics

17   and shipments.  So there's a -- the

18   distributors, in my opinion, would have the

19   ability to calculate what an expected

20   shipment would be based on the

21   characteristics of the region in which the

22   opioids are being shipped.  By virtue of

23   their -- the vastness of their data.  I don't

24   believe that the retail pharmacies share that

25   ability.

1    Q.    So I guess the reason -- my

2 question, though, is the discussion of all of

3 that knowledge that distributors have, the

4 reason that's relevant is that because it

5 gives them, you know, the view, right, as to

6 why the order might be suspicious, correct?

7    A.    Well, not per se.  I think

8 the -- it gives them the ability to detect

9 some instances of suspicious orders.  Again,

10 they would be -- that would have to be done

11 statistically, and statistics is -- there's

12 going to be some margin of error around that.

13            So I'm wouldn't say that they

14 can -- it's not a definitive process.  In

15 other words, they would not be able to

16 definitively say, that's a suspicious order

17 or a problematic order and that one is not.

18 I think it would be difficult to do that.

19    Q.    I guess maybe it would be

20 helpful to ask.

21            What is your understanding of

22 what a suspicious order is?

23    A.    Well, again, I think I've been

24 hinting at that, maybe not directly

25 addressing it, but the -- a suspicious order

1  in this case would be an order that

2  doesn't -- that is -- that is misaligned with

3  the probable demand for opioids.  And as I

4  said before, that demand for opioids is

5  largely driven by physician prescriptions for

6  opioids.

7          So I'm not saying that all of

8  that demand is medically necessary.  I'm

9  saying it's a demand that was triggered by

10  licensed physicians.

11      Q.     Okay.  So let's talk about the

12  DEA a little bit.  That part, if you want to

13  reference it, is on page 20 in paragraph 4.7.

14          So --

15      A.     Okay.

16      Q.     What are you opining makes the

17  DEA responsible here?

18      A.     Well, in this context, I'm

19  talking about its the DEA's role in

20  monitoring quotas and -- or establishing

21  quotas and then enforcing those quotas.

22  That's one part of it.

23          But also as the OIG, the Office

24  of Inspector General, found the DEA also has,

25  as the OIG phrased it, its data systems and

1    strongest administrative enforcement tools,

2    the ability to detect and regulate diversion

3    effectively.

4              So the opinion of the Office of

5    the Inspector General, which is a monitoring

6    organization of other government agencies, is

7    that the DEA failed in its remit to monitor

8    and control the distribution -- the

9    production and distribution of prescription

10   opioids.

11        Q.    Okay.  And is your opinion with

12   respect to that second part you discussed

13   based on the OIG report?

14        A.    That's part of it.  There are

15   others that have similarly opined on the role

16   of the DEA.

17        Q.    And are those others stated in

18   your report, too?

19        A.    They may be.  I would have to

20   check.

21        Q.    Are there --

22        A.    I'm sorry.  I'm sorry.  For

23   example, I just looked down and I saw right

24   away that there's the OIG report, but there's

25   also a GAO report, a Government

1    Accountability Office report, that

2    essentially reaches similar findings, and

3    that's referenced.

4         Q.    Okay.  And there was an

5    obligation to provide the materials that were

6    considered, so if you -- if there are

7    materials that you're basing your opinion

8    about the DEA on that are not cited in this

9    report, can you provide those through your

10   counsel?

11        A.    Yes, I would, but I think I --

12   I think the materials that I relied on are

13   cited here.

14        Q.    Okay.  And in terms of I think

15   what you're discussing there, is you're

16   saying the DEA policies and regulations did

17   not adequately hold registrants accountable

18   to prevent the diversion of pharmaceutical

19   opioids, correct?

20        A.    Correct.

21        Q.    And who are the registrants?

22        A.    Well, the registrants for --

23   are the entities that have to -- or that are

24   the sort of the recipient of the DEA

25   controls, and I believe those would be

1    distributors and manufacturers.

2         Q.    Are pharmacies registrants?

3         A.    I'm not sure.

4         Q.    Would that be relevant to your

5    opinion about whether pharmacies are

6    potentially responsible parties?

7         A.    It might be.  I would have to

8    look into that.

9         Q.    Okay.  And do you know if --

10   let me ask you this.

11               Based on your reading of these

12   sources, in terms of holding registrants

13   accountable, are you suggesting the DEA

14   should have taken more enforcement actions

15   against registrants?

16        A.    I think the general opinion of

17   the OIG report and the GAO report is that

18   there's more the DEA could have done given

19   their role in this process.  And in the

20   process of -- on the micro level, all of the

21   full span of things they could have done, I

22   don't know.  But certainly there are many

23   experts who agree that they should have done

24   more due to their position, due to their data

25   access and things like that.

1      Q.      Is there any specific thing

2  that you're opining here the DEA should have

3  done?

4      A.      Well, I think -- you know, for

5  example, there -- the DEA supposedly knows

6  the number of opioids that are produced and

7  distributed in the US.  They supposedly know

8  via their data where those opioids are being

9  distributed to.  So I -- in that regard,

10 they're similar to the distributors.  They

11 have access to population-level data.  They

12 could have potentially used those data to

13 identify patterns that either violated their

14 own quotas or suggested that their own quotas

15 were set incorrectly, or even if their quotas

16 were set correctly, maybe perhaps the data

17 would have suggested the quota levels should

18 have been different.

19     Q.      Okay.  Anything else?

20     A.      No, that's the main example.

21     Q.      Okay.  And for quotas, what's

22 your understanding of the function of DEA

23 quotas?

24     A.      My understanding is the quotas

25 is -- the purpose of the quota is to monitor

1   the volume of prescription drugs produced and

2   distributed in the US.

3        Q.    Okay.  And is it your

4   understanding or -- a better way to ask that.

5              Let me say, is it your opinion

6   that opioid sales are intended to be

7   unconstrained as long as they're under the

8   quota?

9        A.    No, that's not my opinion.

10       Q.    Okay.  Why is that not the

11  case?

12       A.    Well, because you used the word

13  "unconstrained," and I think any prescription

14  drug has to go through a sort of supply chain

15  and the -- at -- the most important link in

16  there is the physician.  So all physicians

17  are under an obligation to exercise

18  constraint when they write any prescription

19  drug.

20       Q.    So for all supply chain

21  participants, regardless of what the quota

22  is, there's an obligation to exercise

23  constraint, correct?

24       A.    Well, to the -- to the best of

25  the abilities of each of the elements in the

1    supply chain, yes.

2         Q.    Okay.  Let me go to -- let me

3    jump around to that diagram that you were

4    starting to show me earlier.

5               I believe it was page 29, 5.1.

6         A.    Okay.

7         Q.    Before I do that, you were

8    starting to tell me a little bit about the

9    distinction between medically necessary

10   prescriptions and medical use.

11              Is that right?

12        A.    I don't recall what we started

13   talking about at that juncture.

14        Q.    Okay.  I'll wait until we get

15   there.  Let's stick with page 29 then.

16              Sorry, so what does this

17   diagram show?

18        A.    This diagram picks up kind

19   of -- where the other diagram that had a

20   similar US supply of opioids box at the

21   bottom, this diagram picks up essentially

22   where that one left off.

23        Q.    Okay.  So that's that same box

24   at the top as at the bottom of the other one?

25        A.    Correct.

1          Q.      Okay.  And then you're opining

2    that 96 percent of medical -- of opioids are

3    for medical use, correct?

4          A.      Correct.

5          Q.      And you saying -- I think here

6    is where we get into what I was just asking

7    about with medical use and medically

8    necessary.

9                  What are -- what do you mean by

10   medical use?

11         A.      Oh, medical use of opioids

12   definitionally -- it's not my definition,

13   it's the medical community's definition --

14   would be an opioid that is used as -- well,

15   let me back up.

16                 So it would be an opioid that

17   was written, a prescription that was written,

18   by a licensed medical provider, and it was

19   based on the perception of that medical

20   provider's medical need on the part of the

21   patient, and the patient then filled that

22   prescription properly and then is taking the

23   prescription properly.  That would be

24   considered medical use.

25         Q.      Okay.  And what's the

1    difference between medical use and medically

2    necessary prescriptions?

3         A.      There is a difference.  Medical

4    use is just what I just described.  Medically

5    necessary is a medical, a clinical concept.

6    So a medical necessity is, for example, would

7    a -- if you're a physician and you're writing

8    a prescription based on your perception of

9    medical need, whether it's medically

10   necessary would be based on -- the

11   determination of medical necessity would be

12   based on if you had a -- if you took the

13   case, data -- or not the case, but the

14   medical record and handed it over to another

15   physician and if they were able to confirm,

16   yes, this is a medically necessary

17   prescription or perhaps a panel of physicians

18   and the panel of physicians agrees, yes, this

19   is a medically necessary prescription, that's

20   what we mean when we say medically necessary.

21        Q.    Okay.

22        A.     Or medically appropriate.

23   Sometimes those things are interchanged.

24        Q.    Okay.  And have you seen the

25   term "medically necessary" used differently

1    in different contexts?

2         A.     Yes.  It sometimes is, yes.

3         Q.     Per your diagram here, you have

4    4 percent as nonmedical use of opioids,

5    correct?

6         A.     Correct.

7         Q.     And is this just prescription

8    opioids?

9         A.     Yes.

10        Q.     So where did that 4 percent

11   figure come from?

12        A.     Again, a combination of two

13   difference sources.  The one is the NSDUH,

14   which is the National Survey of Drug Use and

15   Health I think is what that stands for,

16   reports a 3.59 prevalence of nonmedical use

17   of prescription opioids and -- so 3.59.

18               And then another source

19   probably need to refresh -- yes, this is

20   described in Section 5.3.  Another source

21   which is the National Epidemiologic Survey on

22   Alcohol and Related Conditions, and NESARC

23   reports a 4.1 percent.  So I'm taking

24   3.59 percent and 4.1 percent and calling it

25   4 percent.  These are both survey estimates,

1    so I'm sort of averaging the two.  The

2    average of the two would be a little lower

3    than 4 percent, but just rounding off.

4         Q.    Okay.  And other than those two

5    sources, did you rely on anything else in

6    arriving at that 4 percent figure?

7         A.    No.

8         Q.    Okay.  And are you opining that

9    the nonmedical use of opioids was 4 percent

10   of the supply for the entire period we've

11   been discussing?

12        A.    No, that 4 percent -- or those

13   data are -- there's not a lot of accuracy in

14   terms of the period of time they refer to.

15             So the National Epidemiologic

16   Survey on Alcohol and Related Conditions,

17   which is -- yields the 4.1 percent, is based

18   on an earlier period.  So that's based on a

19   peak period of total US -- total US supply of

20   opioids.

21             So presumably that would be,

22   perhaps, an overestimate because of the time

23   period that it comes -- that it comes from.

24   I think a current number would be lower.

25             The NSDUH number is a little

1  bit more up to date than that, but it's still

2  asking individuals a few years ago, asking

3  them about the previous year.  So it's

4  already -- there's a lag there on the NSDUH

5  data as well.

6           But that would explain why the

7  NSDUH number is a little bit lower than the

8  NESARC number because they come from

9  different time periods.

10     Q.     Okay.  And I think you have

11  this in the footnotes actually.

12           So is the NSDUH data that you

13  used the data from 2018 to 2019, correct?

14     A.     Correct.

15     Q.     And only that year?

16     A.     Yes, I believe that's the year

17  that I had pulled.

18     Q.     Okay.  And why is that year?

19     A.     I think at the time that I

20  pulled it, it was the most recent available.

21     Q.     And then the other data, I

22  don't think I can tell as well what time

23  period the other data source was from.

24           When is that from?

25     A.     2012 to 2013.

1      Q.      2012 to 2013.

2              Okay.  So for purposes of this

3   figure, what time period are you intending

4   these percentages to cover in terms of your

5   opinions?

6      A.      Well, there isn't really a

7   precise time period that's covered here.

8   It -- and this is -- this is a topic of

9   debate.  Does the -- in other words, does the

10  time period start when opioids, long-acting

11  opioids, were approved, which would be, let's

12  say, 1995, or does it start when opioid use

13  disorder started emerging in the community.

14  So it's -- there's some debate about that.

15              I don't argue or opine that

16  this diagram pertains precisely to a specific

17  time period.

18     Q.      Okay.  So you're not trying to

19  say factually nonmedical use of opioids was

20  actually 4 percent in any given year,

21  correct?

22     A.      Well, I think that's -- I think

23  that's approximately correct, yes.  I'm not

24  saying it's 4 percent in a particular year.

25  It's certainly on average 4 percent.  The

1  number has changed over time.  I would argue

2  that it has not changed a lot, if it has

3  changed.  It's been a fairly stable number.

4          And also, again, this diagram

5  here, the use of that year in that diagram is

6  illustrative rather than calculative.

7      Q.      Okay.  So illustrative rather

8  than calculative.  It's an example, and

9  you're not trying to say, you know, the

10  evidence is that this is -- that 4 percent of

11  opioids in Montgomery County were for

12  nonmedical use, correct?

13      A.      That's correct.  Because for

14  the objectives that I identified earlier in

15  this report, it's not important that I make

16  that determination in an empirical way in

17  this report.

18      Q.      Okay.  Then you have

19  consequences -- or further arrows for the

20  nonmedical use but not the medical use,

21  correct?

22      A.      Correct.

23      Q.      So are you opining there's not

24  externality associated with the medical use?

25      A.      That is correct, yes.

1    Q.    Okay.  So you have got all of

2  the externality on the nonmedical use side.

3         And then here -- let's see.

4  You have, is it fair to say, three

5  externalities that you refer to?

6    A.    No.  Do you mean on the

7  right-hand side of the diagram?

8    Q.    Sure.

9         What would you call those three

10  boxes on the bottom right-hand side?

11    A.    Okay.  Let me describe those.

12         What I'm saying here, what I'm

13  showing here, again, in an illustrative

14  manner, is that the nonmedical use of opioids

15  can be further disaggregated into three

16  buckets.  Let's just call them three buckets.

17    Q.    Okay.

18    A.    And then starting from the

19  right and moving left, first is

20  non-cost-incurring use, so that's an

21  individual who is technically misusing an

22  opioid, in other words, taking -- they're

23  supposed to take three per day, four per day,

24  that would land into that bucket.

25         The middle bucket is not

1  cost-incurring OUD.  So this is an individual

2  who might have been diagnosed as OUD but is

3  not incurring a cost, in other words, they're

4  not incurring additional health care costs.

5  They're not interacting with the criminal

6  justice system, nor are they interacting with

7  the social and family assistance system or

8  other systems wherein OUD attributable costs

9  could be conceivably incurred.

10        So, again, it's an important

11  distinction.  Just because somebody has a

12  diagnosis of OUD doesn't mean they're

13  interacting with those systems and incurring

14  or generating attributable costs.

15        Go ahead.

16     Q.    Go ahead.

17     A.    Well, I was just going to

18  finish my thought in that the left-hand

19  bucket down, again, on this three-batch part

20  of the diagram is cost-incurring OUD.  And

21  this would be costs of OUD that do interact

22  with the health care system or the criminal

23  justice system or the social and family

24  assistance programs and that sort of thing.

25     Q.    So for all of these three

1  boxes, you're looking at monetary costs,

2  correct?

3      A.    Well, again, I'm using costs as

4  a -- as an outcome -- or, yeah, as an

5  outcome, right.  Because I'm an economist and

6  this is a liability report from the

7  perspective of an economist.

8            So ultimately as an economist,

9  we put everything in cost terms, so that's

10  what I'm doing here.  I'm just demonstrating

11  how the supply of opioids or the increase in

12  the supply of opioids might -- how that maps

13  down into OUD.

14      Q.    Okay.  And so you're not

15  attempting to demonstrate what are the harms

16  to the public, correct?

17      A.    Well, in this report, I'm not

18  doing anything like that, that's correct.

19      Q.    Okay.  And I have a question

20  about your non-cost-incurring box.  So I

21  think if we go to footnote 117 of your

22  report, which is on page 30 at the bottom.

23      A.    Okay.

24      Q.    Okay.  You say, "An example of

25  non-cost-incurring OUD would be an individual

1  who experiences a delimited episode of OUD

2  but does not seek medical attention during

3  the episode, whose life is otherwise not

4  meaningfully impacted by the OUD episode, and

5  for whom there is clinical uncertainty as to

6  the differential diagnosis."

7          Correct?

8      A.      Correct.

9      Q.      So are you saying it's unclear

10 whether that person really has OUD?

11     A.      Well, I'm saying that there --

12 that they might meet some of the criteria for

13 an OUD diagnosis.  They might even receive an

14 OUD diagnosis, but they're not -- they're

15 not -- they're not incurring costs in the

16 system.  They're not -- for whatever reason,

17 they're just not incurring costs in the

18 system.  I guess that's probably an easier

19 way to describe it.

20     Q.      Okay.  Because my question, do

21 you know if under the DSM-5 the definition of

22 OUD involves a clinically significant

23 impairment or distress?

24     A.      I don't recall offhand, but I

25 do know that the -- that the DSM definitions

1    don't typically have any requirement in terms

2    of whether it's cost-generating or not.

3         Q.    So in this Box 2 -- and we can

4    put that footnote away.

5              Would you include here someone

6    who is suffering from OUD but doesn't get

7    into treatment, so there's no financial costs

8    to the treatment provider?

9         A.    I think if that individual was

10   not incurring any costs across the system,

11   they would be in that non-cost-incurring OUD

12   box.  However, if that person -- if it's

13   inevitable -- if that person is in the

14   process of seeking treatment or in the

15   process of needing assistance, then, you

16   know, for all intents and purposes, they

17   would be in the cost-incurring OUD box.

18        Q.    And how would you know that

19   they were in the process?

20        A.    Well, and you wouldn't

21   necessarily know that.  This diagram is

22   not -- and the intention here in this

23   discussion, not just the diagram, the entire

24   discussion, is that this isn't a clinical

25   decision-making tool.  So this is not

1    something I would hand to a physician and

2    say, you know, here, can you -- please put

3    your patients into these boxes.  This is more

4    of an economics tool to say, what is the

5    pathway through which the externality is

6    generated.

7        Q.    The externality is OUD, right?

8        A.    Correct.

9        Q.    And so what is the pathway to

10   OUD here?

11       A.    Well, the pathway to OUD is the

12   non -- starts with the nonmedical use of

13   opioids and then it generates a

14   cost-incurring OUD.

15            In economics -- the next box

16   over, which is the non-cost-incurring OUD,

17   the way to think about that would be like

18   if there's -- if there's a level of pollution

19   that doesn't cause -- that doesn't result in

20   a measurable cost of any kind, it doesn't

21   affect people's health, it doesn't affect the

22   environment, the climate change, et cetera,

23   then that is still pollution.  It's still a

24   negative externality, but it is one, as of

25   that time, zero cost.

1           Now, if you just add a little
2  bit more pollution to it, it could become a
3  measurable cost.  But that's the best example
4  I can give.  I'm not sure if that's helpful.
5       Q.     I think so.  And I guess going
6  back to the boxes.  So what if someone dies
7  of an overdose without being diagnosed with
8  OUD, what box would that be?
9       A.     Without being diagnosed with
10  OUD even posthumously?
11       Q.     Correct.
12       A.     Well, that individual
13  statistically is going not be -- generally be
14  counted as OUD.  The costs incurred by that
15  person, though, might still be recorded in
16  various places, even without the OUD
17  diagnosis.
18           But, you know, unfortunately in
19  that situation there would be no way to
20  really associate those -- that person as --
21  there would be no way to classify that person
22  as an OUD case.
23       Q.     Someone could be in all three
24  boxes at different times, correct?
25       A.     Correct.

1          Q.     Okay.  And I think you've

2    already answered this, but I just want to be

3    clear.

4                 You don't use what you

5    described as the opioid attributable costs as

6    a proxy as harm to the public, correct?

7          A.     I'm of the opinion that you

8    can.  I'm not saying here that it's a simple

9    process.  In other words, if we know that

10   cost, then we know the harm to the public.  I

11   do think, though, that in the case of --

12   considering the other two boxes, that those

13   two boxes would be expected to result in

14   either zero costs or minimal costs to the

15   system or harms, and whereas the

16   cost-incurring OUD is where the costs are

17   incurred.

18                 So in the way that I'm

19   approaching this, I'm not -- I'm assuming

20   that cost-incurring OUD is the main

21   externality here.

22         Q.     Okay.  And that's an assumption

23   that you're making?

24         A.     Well, it's an assumption, but

25   it's just not -- it's not -- it's grounded in

1   the -- the assumption is grounded in the

2   literature on OUD.  For example, most of the

3   studies, if not all of the studies, to date

4   on OUD look at cost-incurring OUD or make the

5   assumption that any -- that the attributable

6   costs associated with OUD, in other words,

7   patients with OUD versus without, diagnosed

8   patients with versus without, that

9   attributable cost difference is -- is the

10  externality, is the cost, is the cost of the

11  negative externality.

12        Q.    Okay.  And that may be helpful

13  to understand because I was reading this box

14  as cost to the county.

15              Are you including all, you

16  know, financial costs of, you know,

17  treatment, criminal justice or only costs

18  incurred by the County?

19        A.    Well, just to be clear, in this

20  liability report, I'm not doing any of that.

21  So I haven't gotten that far in any of the

22  work that I've done, and I'm certainly --

23  it's certainly not part of this report to --

24  to get into the patients.

25        Q.    I guess moving on, if you

1  have -- let's say you're removing barriers to

2  treatment, you're getting more people into

3  treatment, so you're seeing higher treatment

4  costs could you have higher costs but it's

5  not correlated with harm for OUD?

6      A.    Well, there's difficult

7  question to answer.  I think you have to

8  identify what you mean by harm.

9      Q.    Okay.  And then on this same

10  part of the report where you're talking about

11  the attributable costs, on page 31, you also

12  have some -- an opinion about the prevalence

13  of OUD, correct?

14      A.    Well, this refers to the -- to

15  those numbers we were referring to

16  Figure 5-1, yes.

17      Q.    And for the two OUD boxes that

18  we were looking at the bottom there, you

19  opine that the prevalence of OUD is

20  .89 percent, correct?

21      A.    Correct.

22      Q.    And how did you arrive at that

23  figure?

24      A.    That number is the NSDUH.

25      Q.    And the NSDUH data is widely

1  recognized as undercounting OUD, correct?

2      A.      I disagree with that.  I

3  wouldn't say that it's widely recognized as

4  undercounting.

5      Q.      Do you have an opinion about

6  whether the NSDUH data undercounts OUD?

7      A.      My feeling is that NSDUH data

8  is a reasonable source of information on

9  that.  I don't have an opinion as to whether

10 it overcounts or undercounts.  I think the

11 arguments -- I'm familiar with the arguments

12 made that it undercounts.  I think similar

13 arguments could be made that it might

14 overcount.

15     Q.      Okay.  And what is the purpose

16 of estimating the prevalence of OUD here in

17 terms of how that fits into your overall

18 opinion that we were just looking at?

19     A.      Well, it actually doesn't fit

20 into the overall opinion.  It is -- it is

21 included in this chart as an illustration,

22 and my opinions in this report don't actually

23 rely on that.

24     Q.      Okay.  So your opinions don't

25 rely on that figure?

1      A.      Correct.

2      Q.      And I just want to understand.

3  What is the purpose of including them in the

4  report then?

5      A.      Well, because I have these

6  pathways that are shown in Figure 5-1, and I

7  thought it would be useful for the reader to

8  sort of see the -- well, let me back up.

9  Sometimes when economists draw flowcharts,

10  they'll use a thicker arrow to refer to sort

11  of capture approximately the volume that's

12  going in that direction of the arrow.  So

13  that's one way I could have done it.

14          I've chosen instead to just

15  provide some percentages based on some widely

16  cited data as an illustration of how patients

17  or opioids would sort of trickle down through

18  this process leading to the externality.

19          So it's really just as an

20  illustration.

21      Q.      Okay.  So it's just an

22  illustration.  You're saying that was the

23  prevalence of OUD in Montgomery County at any

24  given time?

25      A.      Correct.

1    Q.    And I didn't ask you this for

2  all of the sections we've been going through.

3  I think I just did for section 2.

4         But do they all work the same

5  way, where the materials you're relying on

6  for, you know, a given point are cited in the

7  footnotes to that paragraph or paragraphs?

8    A.    Yes.

9    Q.    Okay.  And then let's look at

10  the Section 6 on implications, starting on

11  page 31.

12    A.    Before we start that, would it

13  be okay to take a quick break?

14         MS. SALTZBURG:  Oh, yeah.

15    Let's go off the record.

16    (Off the record at 2:22 p.m.)

17  QUESTIONS BY MS. SALTZBURG:

18    Q.    I was about to go into

19  Section 6.  I realized it might make sense

20  before we get that specific to Montgomery

21  County to keep on big picture first.  So I

22  want to jump to the section with your opinion

23  Dr. Cutler's report, which is Section 7,

24  starting on page 34.

25    A.    Okay.

1    Q.    Okay.  So one of your

2    overarching critiques is the opinion that

3    retail pharmacies do not induce demand for

4    prescriptions, correct?

5    A.    Correct.

6    Q.    In your view, based on what

7    we've discussed so far, failure to perform

8    monitoring functions has the same effect as

9    inducing sales, correct?

10   A.    I think it can in some cases,

11   yes.

12   Q.    Okay.  So for an example in a

13   pharmacy case, the effect of filling instead

14   of refusing to fill an illegitimate

15   prescription would be more prescriptions,

16   right?

17   A.    Well, I think there's an

18   important distinction there, and that is that

19   a pharmacy has to start with a prescription,

20   whereas a lot of these other factors were

21   factors that drove the increase in the number

22   of prescriptions.

23          So, again, I would argue that

24   that's an important distinction.

25   Q.    In terms of that overall number

1  of prescriptions, though, if a pharmacy fills

2  a prescription rather than refusing to fill

3  it, there are going to be more prescriptions,

4  right?

5       A.    Let me think about that.  I'm

6  sorry, can you just rephrase that or repeat

7  it anyway?

8       Q.    Sure.

9             I think you said you don't have

10  an opinion one way or the other about whether

11  pharmacies are actually filling prescriptions

12  that are illegitimate, correct?

13       A.    Correct.

14       Q.    Do you have an opinion about

15  whether pharmacies have an obligation not to

16  fill prescriptions that are illegitimate?

17       A.    I think they have an obligation

18  to fill legitimate prescriptions.

19       Q.    Do they have an obligation to

20  refuse to fill prescriptions that are not

21  legitimate?

22       A.    I think it depends on the

23  ability of the pharmacy to identify what's

24  legitimate and what's not legitimate.

25       Q.    So let me back up for a minute.

1    I think go to paragraph 7.3 on the next page,

2    top of page 35.

3              About halfway through, you say,

4    "A retail pharmacy cannot dispense a filled

5    prescription without a verified and legal

6    prescription initiated by a licensed health

7    care provider."

8              Correct?

9        A.    Correct.

10       Q.    And is it your opinion that

11   it's practically impossible for a retail

12   pharmacy to do that?

13       A.    Well, I'm not sure what you

14   mean by practical, but I would say it is --

15   it is not possible for a retail pharmacy to

16   fill a prescription that does -- either does

17   not exist or is obviously fraudulent, let's

18   say, for example.

19       Q.    Okay.  When you say it's not

20   possible, do you mean it's not legal?

21       A.    Correct.

22       Q.    But as a factual matter, it is

23   possible to do something that's not legal,

24   correct?

25       A.    That's -- as a factual matter,

1    yes, but I'm not aware of any illegal or

2    criminal allegations along those lines.  If

3    they exist, I'm not familiar with them.

4         Q.     Okay.  So do you know one way

5    or the other whether the county in this case

6    is alleging that Kroger filled prescriptions

7    that are not for legitimate medical purpose?

8         A.     As I said before, I didn't

9    review the complaint before this deposition,

10    so I'm not familiar with the specifics of it.

11         Q.     Okay.  And you didn't request

12    any materials from Kroger one way or the

13    other related to its diversion controls,

14    correct?

15         A.     Correct.

16         Q.     Are you familiar with the

17    concept of red flags of diversion?

18         A.     Yes, I'm familiar with the

19    concept.

20         Q.     Do you know if a pharmacy has

21    an obligation with respect to red flags of

22    diversion?

23         A.     I'm sorry, what do you mean by

24    obligation exactly?

25         Q.     Let me ask.  So if a pharmacy

1    receives a prescription that raises red

2    flags, does the pharmacy have an obligation

3    to inquire further?

4                MR. BOONE:  Objection.  Form.

5                THE WITNESS:  I honestly don't

6          know enough about the specifics of the

7          red flag system to the extent it is a

8          system.  I'm not familiar with what

9          the -- operationally what pharmacies

10         are -- how pharmacies are supposed to

11         respond to those.

12   QUESTIONS BY MS. SALTZBURG:

13         Q.    Okay.  And would it affect your

14   opinion in this case if there were evidence

15   that Kroger or chain pharmacies were turning

16   a blind eye to red flags of diversion?

17         A.    It would not affect this

18   report.

19         Q.    Okay.  And one of your main

20   opinions is that retail pharmacies have no

21   incentive to -- or no economic incentive to

22   increase prescriptions, correct?

23         A.    Well, can you point to where I

24   said that?  I don't recall phrasing it that

25   way.

1    Q.    Maybe I am phrasing it on

2  economically -- let me just ask.  Do retail

3  pharmacies have an economic incentive to

4  increase prescriptions?

5    A.    Well, that's kind of like a --

6  it's a very difficult question to answer

7  because it's not possible for pharmacies to

8  increase prescription sales.

9    Q.    Well, it's theoretically

10  possible to increase sales if they were

11  filling prescription -- let me ask you this.

12         Do you know one way or the

13  other if chain pharmacies has sales targets

14  for their stores?

15    A.    No, I don't.

16    Q.    Would it make economic sense

17  for a pharmacy to set sales goals if there's

18  nothing that their staff can do to meet them?

19    A.    I don't know the nature of

20  those types of sales goals, to the extent

21  they exist.

22    Q.    I'm just asking as a general

23  economic concept.

24         Would it make economic sense to

25  set sales goals that staff has no way of

1    meet?

2              MR. BOONE:  Objection to form.

3              THE WITNESS:  No, that would

4        not make sense.

5    QUESTIONS BY MS. SALTZBURG:

6        Q.    Okay.  You opined that there

7    were pill mills in Montgomery County,

8    correct?

9        A.    Correct.

10       Q.    And the pill mills were writing

11   prescriptions, correct?

12       A.    Correct.

13       Q.    And those prescriptions were

14   being filled at pharmacies, correct?

15       A.    Well, I know that at least in

16   one of those high-profile pill mill cases the

17   prescriptions would be filled at the

18   physician's own pharmacy.

19       Q.    In which case was that?

20       A.    I don't recall offhand which

21   case it was.

22       Q.    But it was a pharmacy, correct?

23       A.    It was the physician's own

24   pharmacy apparently located in the

25   physician's building.

1      Q.     Were there other pill mills

2   that you read, you know, literature material

3   about his prescriptions were being filled at

4   pharmacies?

5      A.     Well, there were other pill

6   mills, but I don't have any information on

7   those pill mills as to where prescriptions

8   were being filled, what types of retail

9   pharmacies were filling them.

10     Q.     Okay.  I'm not asking about

11  types of retail pharmacies, but I'm just

12  asking were they being filled at retail

13  pharmacies?

14     A.     Well, I presume so, but I don't

15  know, for example, whether they would be

16  filled at the physician's own pharmacies kind

17  of similar to that -- to that one case that

18  I'm thinking of.

19     Q.     You just don't know one way or

20  the other?

21     A.     Correct.

22     Q.     Let me turn to paragraph 7.11,

23  which is on page 37.  And you start out

24  there, "Cutler also is of the opinion that

25  opioids shipped to Montgomery County did not

1    reflect medical need.  I disagree."

2              Correct?

3         A.     Yeah -- yes, I see that

4    section.

5         Q.     Okay.  So is it your opinion

6    that opioids shipped to Montgomery County

7    were exclusively for a medical need?

8         A.     No.

9         Q.     Okay.  So why are you

10   disagreeing with Dr. Cutler there?

11        A.     Well, Cutler seems to imply in

12   his report that they were -- that the

13   shipments did not reflect medical need.  My

14   argument would be that some proportion of the

15   shipments did reflect medical need.

16        Q.     Okay.  So are you reading

17   Dr. Cutler's report to say all of the

18   shipments to Montgomery County were for

19   illegitimate use?

20        A.     Well, I'm not sure -- I don't

21   have his report in front of me, so I don't

22   recall how he phrased it, but I was under the

23   impression after reading his report that he

24   was of the opinion that a large proportion of

25   the opioids shipped to Montgomery County did

1    not reflect medical need.

2         Q.    Okay.  And you disagree with

3    that?

4         A.    Well, I disagree with it to the

5    extent that Montgomery County is -- it has a

6    less healthy population relative to the state

7    of Iowa {sic} and relative to the country,

8    and that alone could reflect some proportion

9    of whatever additional opioids may have been

10   sent to Montgomery County and that may have

11   justified a substantial portion of the

12   medical need.

13             I don't know what those

14   proportions are, so it's just my opinion that

15   it's -- that one can't say that the opioids

16   shipped to Montgomery County did not reflect

17   medical need.

18        Q.    Okay.  So you're agreeing that

19   some portion is not reflective of medical

20   need, and you don't have an opinion about

21   what that portion is; is that fair?

22        A.    That's fair.

23        Q.    Okay.  And when you say that

24   Montgomery County is less healthy, are you

25   referring to back I think there were some

1    sources about the number of adults who were

2    smokers and maybe another publication there?

3         A.    Yes, it was smokers, cancer

4    rates, obesity, things like that.

5         Q.    Okay.  Well, actually, let's --

6    we don't need the report because you remember

7    them.

8              Is it your opinion that the

9    number of adults who are smokers is

10   correlated to the need for opioids?

11        A.    It can be.  Smoking has been

12   shown to be a risk factor in cardiovascular

13   disease, certain types of cancers, and some

14   metabolic diseases and wounding healing.  All

15   of those things could then secondarily be

16   indicative of demand for pain management,

17   pain medications, including opioids.

18        Q.    Okay.  And Dr. Cutler's

19   analysis has some variables that were

20   intended to control for pain management

21   needs, though, right?

22        A.    Are you referring to his

23   regression analysis?

24        Q.    Yes.  Dr. Cutler's report

25   describes controlling for economic,

1    demographic and medical variables.  I'm doing

2    that memory, so it may not be exact, so

3    that's why I'm --

4         A.    Yes, Dr. Cutler does attempt to

5    control for those factors, and I think it

6    was -- it was right for him to attempt to

7    control for those factors.

8         Q.    And would those factors

9    address, you know, what your concerns about

10   Montgomery County being less healthy?

11        A.    I'm not sure the fact of the

12   data that he was using would sufficiently

13   capture those effects, and in addition to

14   that of course as I point out later, there

15   was some other issues with his regression

16   analyses that could also bias the results in

17   such a way that it wouldn't matter whether he

18   had a better measure of that or not.

19        Q.    Well, let's -- maybe if we jump

20   to the regression, we can come back to the --

21   which I believe --

22        A.    Page 38.

23        Q.    38.  And it wasn't clear to me

24   what specific regression or exhibit to the

25   report you were critiquing.

1          Could you just describe what

2   that is?

3          A.     Yes.  And -- yeah, I'm sorry, I

4   didn't identify exactly which tables.  But

5   these comments refer to all of his

6   regressions that appear in the appendix or

7   appendices, I should say.  And because I

8   think all of his -- because he used the same

9   approach in each of his regressions, each

10  regression in my opinion suffers from the

11  same limitations that I identify here.

12         Q.     Okay.  And you opined that the

13  regression suffered from admitted variable

14  bias, correct?

15         A.     Correct.

16         Q.     Okay.  What variables are you

17  saying should have been included that were

18  not?

19         A.     Well, to start, I would look

20  back at my Chapter 2 or Section 2 of my

21  report to make sure that there are -- well,

22  the combination of the contributing factors

23  discussion and the PRP discussion to

24  identify -- to make sure that all efforts

25  have been made to identify all the variables

1   that reflect those contributing factors

2   because those, again, are the ones that have

3   been identified in the literature as

4   contributing to an increase in the supply of

5   prescription opioids, which is the outcome of

6   interest in Dr. Cutler's regressions.

7       Q.      Okay.  And just for purposes of

8   understanding here, would Dr. Cutler in his

9   regressions -- and his report is not

10  available.  Are there specific variables that

11  you're saying should have been input?

12      A.      I think, yes, how those

13  variables would be measured and exactly where

14  those data would come from I think is a -- is

15  a -- would be kind of a separate analysis

16  that I have not undertaken at this time.

17              But in looking at his list,

18  it's clear that he was trying to include some

19  number of contributing factors, but there

20  were some that he didn't include.  For

21  example, in his models of opioid use disorder

22  or mortality -- or opioid-related mortality,

23  let's say.  Mortality -- in a model --

24  mortality would be modeled like a survival

25  function and -- which is a common tool used

1  by health economists, epidemiologists and

2  biostatisticians.  And a survival function

3  would have to include something about

4  treatment.  So are there -- mortality is a

5  function both of whatever is causing the

6  mortality like, say, lung cancer, mortality

7  is a function of smoking, but also treatment.

8  So you can survive lung cancer with treatment

9  or certainly survive longer with treatment.

10  So that would have to be part of the

11  equation.

12            So in this instance the way

13  that now Cutler's regressions are at the

14  county-level, he distinguishes between small

15  counties, large counties, but his regression

16  are at the county-level.  So at the county --

17  when running a mortality model at the county

18  level, still needs to somehow take into

19  account the extent to which those individuals

20  are being treated or not.  So let's say, for

21  example, in county X, for some reason there

22  was limited access to treatment and -- but in

23  county Y, there was a lot of treatment where

24  you're going to find very different mortality

25  rates and that would have to be accounted for

1    in the model.  This is just one example.

2    There are several other examples of those

3    types of variables that you would expect to

4    have to be included in a model of mortality.

5        Q.     And are all of those examples

6    in the report to the extent that you've

7    identified them?

8        A.     I think I've identified some of

9    them in the report.  I wouldn't say that my

10   list is exhaustive.  I think, again, I have

11   not sat down as part of my report to do my

12   own set of regressions and come up with my

13   own alternative set of coefficients and that

14   kind of thing.  I'm not doing that here.

15            So I'm suggesting that there

16   are -- there appear to be enough omitted

17   variables to have -- to be causing an omitted

18   variable bias.  I was not under the

19   impression that Dr. Cutler sufficiently

20   addressed that problem.

21       Q.     So you're saying you haven't

22   done your own analysis.  So you aren't

23   affirmatively opining that inclusion of the

24   variable as you described as omitted wouldn't

25   have changed the results, correct?

1     A.     I don't know whether they would

2  have or not.  I suspect they would have.  In

3  a regression, any time you add or subtract a

4  variable, the results could change.  I don't

5  know the extent to which the inclusion of

6  those variables would change the outcome of

7  the model.  It would depend a lot on how

8  those variables were measured, what the

9  sources of data were, that kind of thing.

10     Q.     And you mentioned that there

11  are some variables that were omitted in the

12  report.

13          What are those?

14     A.     Well, I would have to think

15  about that.  Actually, it's difficult to do

16  without Cutler's regression results in front

17  of me.

18     Q.     Okay.  You opine in your report

19  about variables that were omitted, correct?

20     A.     Correct.

21     Q.     You can't tell me what those

22  were?

23     A.     Well, yeah, I can tell you the

24  ones that I list in my report, yes.  In

25  Section 7.15, I list patient characteristics,

1   patient comorbidities, the role of illicit

2   opioids, treatment modalities and the role of

3   co-occurring substance use disorder.  Those

4   are all things that you might want to include

5   in a mortality model.  And again, Cutler,

6   includes some things that get at least one of

7   those, so patient characteristics, he had age

8   and gender in his model.  Correct -- rightly

9   so, but he didn't have a lot of those other

10  measures in his model.

11      Q.    When you say might want to

12  include, are you saying it's necessary to

13  include those?

14      A.    Yes, it's necessary to include.

15  I probably should have phrased it that way.

16      Q.    Any other variables that you

17  can think of that you think are necessary?

18      A.    I think Cutler was also a

19  little bit light on supply side variables.

20  So, for example, a supply side variable could

21  be, for example, the DEA quotas that we were

22  talking about.  Is there a way -- would there

23  be a way to incorporate the DEA quota

24  information into a model like this.

25      Q.    Do you know if there is a way

1    to incorporate it or not?

2         A.      I suspect there is.  Again, I

3    haven't explored that.  I haven't attempted

4    to do these types of regressions on my own.

5         Q.      So you don't know one way or

6    the other today whether that's possible?

7         A.      Correct.

8         Q.      And if you could go on -- or,

9    actually, I think we have to go backwards now

10   to 7.4, which is on page 35.

11              And you opine that, "Opioid

12   misuse is likely to some degree endogenous to

13   supply."

14        A.      Correct.

15        Q.      Okay.  And what is endogeneity?

16   I'm probably pronouncing that wrong.

17        A.      Endogeneity, also referred to

18   as simultaneity, it means that in a -- it's a

19   concept that's really kind of unique to

20   regression analysis.  It's a situation where

21   in a regression the determination of -- well,

22   let me give a -- provide a little background

23   on regression just for the record so that

24   there's some understanding of the terms that

25   I'm using.

1              Regression has independent

2    variables or right-hand side variables which

3    are believed to be variables that are

4    associated with the outcome or the left-hand

5    side variable.

6              The outcome variable is --

7    again, is believed to be a function of the

8    independent variables.

9              In simultaneity or endogeneity,

10   the outcome variable and one of the

11   independent variables are codetermined or

12   they're codetermined at the -- meaning that

13   you can't have one without the other.  And

14   when you include -- when you specify a

15   regression model that has that problem, then

16   all the results end up being biased or

17   potentially end up being biased.

18       Q.    When you say it's likely,

19   you're not opining there's, in fact,

20   endogeneity here, correct?

21       A.    Well, actually, I am, because I

22   actually took a couple of his regression

23   models and corrected for endogeneity in them

24   and that did change the results.  So it is my

25   opinion that the endogeneity was very

1  important.

2      Q.    Okay.  And you say a couple of

3  his regressions.  Are those the two that you

4  described when we were talking about your

5  file for the case earlier?

6      A.    Yes.

7      Q.    Okay.  Is there a reason you

8  didn't include those in the report?

9      A.    The regression results?

10      Q.    Uh-huh.

11      A.    That was more or less an

12  oversight.  I wasn't -- I didn't

13  intentionally not include them.  I was doing

14  the -- I did this analysis as a -- I guess I

15  was thinking in my head, this is an

16  illustration of how the model -- his models

17  are susceptible to endogeneity, and I wanted

18  to point out, you know, how they're

19  susceptible to endogeneity.

20      Q.    Is it your opinion that OUD

21  causes opioid shipments?

22      A.    Well, no, not -- not exactly.

23  This why it is a construct that is primarily

24  something that is important to regression and

25  it may not have a good, real world analog.

1          It is my opinion that it is

2  possible for areas that have higher rates of

3  OUD to have higher rates of opioid shipments,

4  not necessarily implying that one causes the

5  other.  And it is -- and the argument there

6  is essentially along the lines of, you need

7  more opioids in order to have more opioid use

8  disorder.  That doesn't mean they have to be

9  prescription opioids.  In fact, of course in

10  recent years we know that most of it, the

11  vast majority of it, is coming from illicit

12  opioids.

13          But there is some level --

14  again, the real world analog doesn't work as

15  well, but regression-wise, when you have two

16  variables that could potentially be

17  codetermined, you have that endogeneity

18  problem, and again, the result of that is it

19  biases the coefficients on all of the

20  variables, all of the independent variables.

21     Q.    And I think you've answered

22  this, but did you do any analysis to

23  establish the level of shipments that medical

24  need was justified in Montgomery County?

25     A.    I did not.

1     Q.     And in saying that people in
2  Montgomery County are less healthy than in
3  other areas, it did not appear to me that you
4  looked at whether the statistics you cited
5  changed over time, correct?

6     A.     I don't believe I looked at
7  changes over time.  I think I looked at a
8  point in time.

9     Q.     Okay.  And the only regression
10 analysis that you did is the part we already
11 talked about, correct?

12    A.     The only regression I did was
13 rerunning two of Dr. Cutler's regressions.

14    Q.     Okay.  And in those you say you
15 replicated a regression with 2SLS.

16           Correct?

17    A.     Correct.

18    Q.     And was that an OUD regression
19 alone or something else?

20    A.     Let me refer to the report and
21 see if I can remember which -- yeah, I think
22 I meant to indicate which tables.  I think
23 one, if I remember, is table -- I think it
24 was A-6.  He had a number of different
25 regressions.  One of them was -- one of them

1  was the effect of opioid shipments on opioid

2  morality rates.  I think he also had one on

3  the effect of opioid shipments on OUD.

4          I believe those were the two I

5  replicated.

6      Q.    Okay.  And can you provide any

7  additional information about what you did

8  apart from what's in the report?

9      A.    What I did was -- it was pretty

10  simple.  I -- because I had Dr. Cutler's data

11  and I had Dr. Cutler's regression equations,

12  I simply replicated exactly what they did but

13  doing it -- using this two-stage least

14  squares approach, which is an accepted, a

15  very commonly-applied way of controlling for

16  endogeneity.

17          Now, when you do the two-stage

18  least squares regression, if there isn't any

19  endogeneity, your results should be the same.

20  And so there's unusually -- economists will

21  think there's no harm in doing a two-stage

22  regression just to see if there's

23  endogeneity.

24          And when I did this, I

25  wasn't -- I didn't know what to expect.  I

1   did suspect that the structure of the

2   regression was affected by endogeneity, but I

3   didn't know whether at the -- doing a

4   two-stage least squares would show that or

5   not.

6           So when I did it, I -- that's

7   where I could say that the opioid shipment

8   variable, the significance -- the statistical

9   significance of it went away, disappeared,

10  when you -- when you -- when we did a

11  two-stage least squares regression as opposed

12  to the single-stage regression that Cutler

13  did.

14      Q.      In forming your opinions in

15  this case, did you do any research or

16  analysis as to whether shipments were

17  targeted to areas with more cancer rates?

18      A.      No.

19      Q.      Before being retained in this

20  case, had you ever done any regression

21  analysis related to OUD?

22      A.      No.

23      Q.      I'm going to shift gears and

24  talk about Dr. Alexander for a minute.  And

25  you can put the report down if it's helpful

1  for a second or the place we're going to go

2  next is Section 8, which starts on page 39.

3          A.      Okay.

4          Q.      Do you consider yourself an

5  expert on what strategies are needed to abate

6  the opioid epidemic?

7          A.      No.

8          Q.      And are you qualified to design

9  an abatement plan for the opioid epidemic?

10         A.      No.

11         Q.      You're not presenting an

12  abatement plan for Montgomery County here,

13  correct?

14         A.      Correct.

15         Q.      And you're not opining one way

16  or the other on whether there is an opioid

17  epidemic to abate, correct?

18         A.      Correct.

19         Q.      What's your understanding of

20  the purpose of Dr. Alexander's report?

21         A.      Well, I think Dr. Alexander's

22  report does a comprehensive job of

23  identifying all the different ways in which

24  opioid use disorder could potentially affect

25  public services.  I'm not saying -- I

1  don't -- I'm not saying I agree with that.  I

2  think he does a very comprehensive job of

3  just listing every single potential avenue in

4  which a public service could be affected.

5      Q.    So your interpretation is

6  looking at how public services could be

7  affected?

8      A.    That seems to be -- to me, that

9  seems to be his main approach.  Or maybe

10  not -- I'm probably not saying it right.  Not

11  just public services that could be affected,

12  but abatement strategies that could be

13  employed.

14      Q.    And I should have asked this

15  with respect to Dr. Cutler, too, so I'll go

16  back.

17          All of your critiques of

18  Dr. Cutler's report, other than the backup

19  and the material for the regression that we

20  talked about, are included in your report?

21      A.    Yes.

22      Q.    Okay.  And are all of your

23  critiques of Dr. Alexander's report included

24  in your report?

25      A.    Yes.

1    Q.    And what issues did you have

2  with Dr. Alexander's report?

3    A.    Well, these were things that an

4  economist would pick out.  I understand that

5  Dr. Alexander -- unlike Dr. Cutler,

6  Dr. Alexander is not an economist -- a health

7  economist or an economist, so he doesn't have

8  the same kind of background I have.

9         And so I decided my approach to

10  Dr. Alexander's report would be to tease out

11  the economic aspects of some of the things

12  that he mentions and some of the things he

13  discusses and flag those things as, you know,

14  potentially important limitations to where

15  he's going with his report.

16    Q.    What limitations or potentially

17  important limitations did you identify to

18  where you will attempt to be going?

19    A.    Well, for example, one of the

20  things that I pull out and I focus on is this

21  idea of fixed versus variable cost.  And I

22  think it's important now -- it's not

23  necessarily important in identifying

24  abatement strategies, but it is important in

25  identifying what part of that abatement

1  strategy is attributable to OUD versus

2  other -- either other forms of substance use

3  disorder or other social problems.

4      Q.    Okay.  And in paragraph 8.6 --

5  well, actually, before we go there, you

6  didn't do any analysis of your own, correct,

7  on the issue you just described?

8      A.    That's correct.

9      Q.    Okay.

10      A.    Well, except to point out that

11  I'm not sure I finished answering the other

12  question sufficiently, but except to point

13  out that there is a fixed versus variable

14  problem to the extent that we -- and I do

15  provide some data on that here in this

16  report.  Because I think it's important, like

17  I said, in other words, there could be an

18  abatement program that already exists, that's

19  already serving a proportion of the

20  population, and so there's really just two

21  issues.  One is the attribution of OUD to

22  that program and then there's the fixed

23  versus variable cost aspects of that problem.

24      Q.    How would the fixed and

25  variable costs analysis tell you anything

1    about attribution of OUD?

2         A.    There's two different things.

3    I didn't mean to imply they were related.

4    There were two requirements that would need

5    to be -- or not requirements, but there are

6    two issues that would need to be

7    investigated.  But the fixed versus variable

8    cost issue is that a lot of these programs

9    need to expend a significant amount of

10   subcosts or fixed costs to get,

11   quote/unquote, up and running.

12              And when they're up and

13   running, the volume of patients that are

14   treated and in some cases even the types of

15   patients that are treated -- or I shouldn't

16   say treated.  Served is probably a better

17   word because a lot of these are problems and

18   things like that that are serving

19   individuals.  So I probably shouldn't say

20   treating patients.

21              But a program or a -- or a

22   strategy might be able to serve more

23   individuals without incurring much in the way

24   of additional costs.  That would be a service

25   that has a relatively high fixed cost

1  component to it.

2      Q.     Okay.  Would the extent to

3  which additional costs are incurred, how does

4  that tell you whether or not the program is

5  needed as part of an abatement strategy?

6      A.     Well, indirectly, it does,

7  because if a program already exists and it's

8  already serving some proportion of the

9  population in some way, we -- whether -- the

10  ability of the program to serve additional

11  individuals is an important question.

12  Whether -- if the program can serve

13  additional individuals without incurring an

14  additional cost, then that's an important

15  thing to know.

16      Q.     So if a different expert is

17  offering an opinion about the costs of the

18  abatement plan, does that affect your

19  opinions here?

20      A.     I'm sorry, can you repeat that?

21      Q.     If a different expert is

22  offering costs -- or opinions about costs of

23  the abatement plan, does that affect your

24  opinions here?

25      A.     No, because I -- my comments on

1   the Alexander report that we're talking about

2   now are not -- they're not -- I'm not

3   focusing necessarily on the levels of costs.

4   I don't think Dr. Alexander does either, so

5   I'm just pointing out more sort of important

6   economic, conceptual things.

7         Q.    Okay.  And is it your opinion

8   that an abatement expert has to proceed from

9   an economic, conceptual perspective?

10        A.    I think that an economist -- or

11  specifically a health economist like myself

12  is the most qualified to render an opinion on

13  abatement costs.  Again, that's not happening

14  in this report or in the reports of Mr. -- or

15  of Dr. Cutler or Dr. Alexander.  But an

16  economist's approach is important -- I think

17  a health's economist approach is important

18  because the -- you know, the other approach

19  would be an accounting kind of approach, and

20  an accounting approach is difficult to -- as

21  I -- I think the things I pointed out before.

22  It's difficult to attribute aspects of

23  operations to one thing or another.

24        Q.    Okay.  And you didn't do any

25  specific analysis of, for example, criminal

1    justice costs in Montgomery County, correct?

2         A.    Correct.

3         Q.    And you didn't do any analysis

4    at all of costs incurred in Montgomery

5    County, correct?

6         A.    Correct.

7         Q.    And I guess my question is,

8    isn't it sort of an apples to oranges thing

9    where if Dr. Alexander is a

10   pharmacoepidemiologist and you're opining on

11   entirely different subject area?

12        A.    Well, and that's why my

13   comments on Dr. Alexander's report I think

14   are fairly limited.  I read it and provided

15   some sort of, I guess, top-line opinions on

16   some of the material he's included, but I

17   agree that I think his objective in that

18   report appears to be a little bit different

19   than mine.  I think Cutler's maybe aligns a

20   little bit better than Alexander's.

21        Q.    And I'm going to go to page 42,

22   paragraph 8.6 at the bottom there.  You start

23   out, "Many of the services Alexander deems

24   essential for abating the alleged costs of

25   OUD represent activities that could have been

1    employed by the plaintiffs to potentially

2    identify OUD earlier."

3            Correct?

4       A.      Correct.

5       Q.      And what services are you

6    referencing there?

7       A.      I think this is generally --

8    you know, for example, Montgomery County's

9    own employees, they're a self-insured county

10   in terms of health coverage.  It means they

11   have access to data on medical -- pretty much

12   full medical care claims data for other

13   employees to be identified, of course, but

14   they would have had the ability to look at

15   patterns, at least among their own employees.

16   I know that's just a subsection of Montgomery

17   County population, but they would have had

18   that ability.

19               They also could have worked

20   with the state Medicaid program.  Medicaid

21   program has full claims data, much more

22   comprehensive than Montgomery County's own

23   self-insured data, in the sense that it's a

24   truly population-level analysis -- or

25   population-level data for the state of Ohio.

1                Those data could have been used

2     by Montgomery County to monitor -- to

3     identify OUD attributable or OUD cases

4     earlier on and patterns in those cases and

5     things like that.

6          Q.     And I've got a few questions

7     there.

8                When you say "worked with state

9     Medicaid," what do you mean worked with state

10    Medicaid?

11         A.     Well, the County can obtain

12    data from the state Medicaid program.  This

13    is not uncommon.  In fact, even a health

14    economist can sometimes obtain state Medicaid

15    program data.  So the County could have gone

16    to the state Medicaid program and said, we

17    would like to see data on our county.  Or

18    just data more generally about areas around

19    the state that have changes in OUD cases, and

20    they could have used those data to identify

21    potential problems earlier.

22         Q.     And can anyone go to the

23    Medicaid program that requests that?

24         A.     No.  It is not something that's

25    widely available.  Some states don't make it

1    available at all.  I assume that most states

2    would make it -- sort of make it available to

3    itself.  Montgomery County being part of the

4    state of Ohio, I would assume that they would

5    have an avenue through which to access those

6    data.

7         Q.    Montgomery County is a separate

8    entity from the State of Ohio, correct?

9         A.    Correct.

10        Q.    So did you check if Montgomery

11   County has access to state Medicaid data?

12        A.    I attempted to, but I wasn't

13   able to determine whether they did or not.

14        Q.    Okay.  And when you say

15   "identify OUD earlier," did you -- let me ask

16   you this.

17             You didn't do any research into

18   efforts by Montgomery County to abate the

19   opioid epidemic, correct?

20        A.    Correct.

21        Q.    You didn't do any research into

22   use of data by Montgomery County, correct?

23        A.    Correct.

24        Q.    And you don't know whether or

25   to what extent Montgomery County did use data

1    to identify OUD, correct?

2         A.    That's correct, but I also

3    point out those last three questions you

4    asked me would have been out of scope of

5    the -- of the objectives of my report.

6         Q.    I'm just asking about your

7    opinion here.  You're saying it could have

8    done something earlier.

9              What's the basis for saying

10   that they could have identified OUD earlier?

11        A.    Well, I think it goes back --

12   it does tie in with my discussion of

13   contributing factors and potentially

14   responsible parties.  Because I recall from

15   that discussion I identify payors as being in

16   that group.

17             Here I'm saying Montgomery

18   County is itself a payor, so that's one way

19   in which -- so all of that discussion prior

20   about payors would apply here, specifically

21   to Montgomery County.

22             And the discussion of payors

23   also applies to the state Medicaid program.

24             Now, I don't know for a fact

25   that a county in Iowa {sic} -- I'm sorry, in

1    Ohio has rights to obtain state Medicaid

2    data, but I would be surprised if they

3    didn't.  So I'm putting them -- I'm lumping

4    those things together here.

5        Q.    And to opine that the County

6    should have done something earlier, don't you

7    need to know what the County did?

8        A.    Well, again, I'm commenting --

9    this is just in the form of a comment on

10   Dr. Alexander's report.  I didn't look to see

11   where Montgomery County did anything like

12   this in the past.

13       Q.    I understand it's in the

14   context of commenting on Dr. Alexander, but

15   just how do you critique Montgomery County

16   for not doing something earlier without

17   knowing what they did?

18            MR. BOONE:  Object to form.

19            THE WITNESS:  Well, the way I'm

20       saying it here is that they could have

21       done that.  If indeed they did do it,

22       well, then I think that's good.  So

23       I'm not necessarily saying they didn't

24       do it.  I'm just saying they would

25       have had the ability to do it.

1  QUESTIONS BY MS. SALTZBURG:

2      Q.      Okay.  And Montgomery County

3  government does not have unlimited resources,

4  correct?

5      A.      Correct.

6      Q.      What Montgomery County can

7  do -- well, let's see.  Let me ask you.  Did

8  you consider any resource constraints in

9  forming your opinions about what the county

10  should have done?

11      A.      No.

12      Q.      Okay.  And then you opined

13  county-level data is less useful than, say,

14  the larger, more national data that you

15  talked about in other contexts, correct?

16      A.      Well, my comment there is that

17  the county-level data would only be a

18  thousand individuals as opposed to, you know,

19  a million or hundreds of thousands.

20      Q.      Okay.  And it would be limited

21  to county employees, correct?

22      A.      Correct.

23      Q.      And you're saying that they

24  could have identified OUD.

25              What are you saying they should

1  have done then differently?

2      A.    Well, again, I'm not.  I'm

3  saying they could have identified patterns of

4  OUD.  I'm not suggesting specific actions

5  that they could have taken, but generally

6  more information is better than less

7  information.  So I would think that there

8  might have been something they could do,

9  perhaps maybe in terms of coordination of

10  services across the county.

11      Q.    Have you ever heard of the

12  COAT?

13      A.    I'm sorry, say that again.

14      Q.    Are you familiar with the

15  acronym COAT?

16      A.    I -- maybe.  What does that

17  acronym stand for?

18      Q.    Well, I'm asking you.

19      A.    I don't know.

20      Q.    Okay.  Do you know what the

21  Community Overdose Action Team is?

22      A.    No.

23      Q.    All right.  And you say you got

24  the impression from Dr. Alexander's report

25  that he was attempting to entirely eliminate

1    all occurrence of OUD.

2              Am I understanding that

3    correctly?

4         A.    I'm sorry, say that again.

5         Q.    Sure.  So let's look at

6    paragraph 8.7 on page 43.

7              And you say Alexander implies

8    that full abatement of OUD should be the

9    goal.

10             Correct?

11        A.    Correct.

12        Q.    He doesn't do that in his

13   report, right?

14        A.    I think he says it directly.

15   He doesn't say it exactly like that, but my

16   impression from reading his report is, you

17   know, in various places he implies that.

18        Q.    And so when you say "full

19   abatement," what do you mean by full

20   abatement?

21        A.    Well, eliminating OUD

22   completely.

23        Q.    Okay.  And it's the -- if the

24   strategies are not designed to -- I guess let

25   me ask you this.

1                If it's not to eliminate OUD to

2    zero but to substantially reduce OUD, would

3    that change your opinion?

4         A.     Well, that -- that is -- that's

5    kind of what I'm saying here, is that the --

6    that in virtually all aspects, if not all

7    aspects, of public health, safety-type

8    issues, the goal is never full abatement.

9    It's always some level of acceptable -- or

10   some level of externality that is acceptable.

11        Q.     I want to go backwards to

12   paragraph 8.4 of your report, which is

13   page 41.

14             MR. BOONE:  Counsel, when you

15        get to a stopping point, let's take a

16        quick break.

17             MS. SALTZBURG:  Yes.  I am

18        pretty much wrapping up, Dr. Alexander

19        {sic}.  Do you want to go a few more

20        minutes?

21             MR. BOONE:  Sounds good.

22   QUESTIONS BY MS. SALTZBURG:

23        Q.     Okay.  So we spent a lot of

24   time today talking about pharmacies, and you

25   opined that you don't have an opinion about

1    whether pharmacies are filling illegitimate

2    prescriptions or anything like that.

3                    Correct?

4        A.        Correct.

5        Q.        Okay.  So I want to understand

6    paragraph 8.4 at the bottom of page 41.

7                    In the middle of it, you have a

8    sentence that starts out, "In other words,

9    insofar as pharmacies have done their part in

10   further limiting supply of prescription

11   opioids, then they cannot then also be held

12   liable for the subsequent increasing demand

13   for illicit opioids."

14                   Correct?

15       A.        Correct.

16       Q.        Okay.  And what's the basis for

17   your opinion that pharmacies have done their

18   part in limiting supply?

19       A.        Well, I think everyone who's

20   been involved in any aspect of opioids has --

21   has -- and this is a point I attempted to

22   make earlier in the report.  I think in

23   Section 2.  All entities have attempted to

24   change the way that they approach opioids and

25   to be more vigilant, I think that's true of

1  all the potentially responsible parties that

2  I identified.

3      Q.     And you didn't identify

4  pharmacies as a potentially responsible

5  party?

6      A.     No.

7      Q.     Okay.  So what have pharmacies

8  done that you're opining affected supply?

9      A.     Well, for example, the

10  prescription drug monitoring programs, the

11  pharmacies' interactions with those kinds of

12  programs is an example of that.

13      Q.     And are there any others?

14      A.     Not that I'm aware of.

15      Q.     Okay.  And you didn't look at

16  any of the information regarding diversion

17  control at Kroger, correct?

18      A.     Correct.

19          MR. BOONE:  Object to form.

20          Do you mean diversion?

21          MS. SALTZBURG:  Diversion.

22  QUESTIONS BY MS. SALTZBURG:

23      Q.     Do you know what Kroger's

24  policy and procedures are with respect to

25  PDMP checking?

1      A.      No.

2      Q.      And here are you opining that

3  pharmacies do affect supply?

4      A.      Well, I'm opining that the

5  collective effect of -- on the part of

6  literally everyone involved in this have

7  affected a decrease in opioid supply starting

8  in -- prescription supply starting in 2012.

9  It's difficult to attribute specifically

10  portions of that to -- the actions of various

11  entities, but everyone who -- all entities

12  who have been involved in any way in this

13  have contributed to some extent to that

14  change.

15      Q.      Okay.  And are any sources that

16  you're relying on for your opinion that

17  pharmacies have done their part cited in the

18  report?

19      A.      No.

20      Q.      Okay.  What other sources are

21  there?

22      A.      I'm sorry, I think I

23  misunderstood your question then.

24              Could you say it again?

25      Q.      Sure.

1              What materials did you rely on

2    as the basis for your conclusion that

3    pharmacies have done their part?

4         A.     Again, this is just a general

5    comment that all entities have done their

6    part.  And again, in the context of this --

7    in the context of this discussion, it's -- it

8    specifically having to do with this idea that

9    if -- as the supply of prescription opioids

10   has decreased, the supply of illicit opioids

11   has increased, and so that's an important

12   distinction to make in terms of that shifting

13   of sources of supply.

14        Q.     Okay.  Are there any specific

15   sources that you're relying upon for opining

16   that pharmacies have done their part?

17        A.     No specific sources identified

18   here.

19             MS. SALTZBURG:  Okay.  Let's go

20        on a break.

21        (Off the record at 3:33 p.m.)

22   QUESTIONS BY MS. SALTZBURG:

23        Q.     So, Dr. Schneider, I would like

24   to go to Section 6 of the report on

25   implications.  It starts on page 31.

1    A.      Okay.

2    Q.      Okay.  And so you're opining

3  here that there are implications for opioid

4  litigation generally and Montgomery County

5  specifically, correct?

6    A.      Correct.

7    Q.      And are those implications

8  different in any way?

9    A.      Do you mean between Montgomery

10  County and the general?

11    Q.      Yes.

12    A.      A little bit different.

13  There's some aspects of Montgomery County

14  that I highlight in this -- in this section

15  that not necessarily apply to other

16  jurisdictions.

17    Q.      Let's go through those then.

18           I guess before I do that, same

19  page, paragraph 6.2.  You say, "The State of

20  Ohio and Montgomery County are subject to all

21  factors that affect the entire country."

22           Correct?

23    A.      Correct.

24    Q.      And what do you mean there?

25    A.      Well, in other words, a lot of

1   the intervening factors I identified are

2   national factors of FDA, CDC, DEA, factors

3   that don't distinguish or do things

4   differently by county or by state.  That's

5   what I mean by that.

6        Q.     Okay.  So as part of the

7   nation, Montgomery County would be subject to

8   all of the national factors?

9        A.     Correct.

10       Q.     And that's the seven factors

11  that we've talked about in part 2, correct?

12       A.     Correct.

13       Q.     So based on that, would you not

14  expect to see significant variation in

15  shipments to Montgomery County and other

16  parts of the country?

17       A.     Well, we might.  So, for

18  example, the discussion about medical need

19  and the different health care indicators in

20  Montgomery County might suggest a greater

21  medical need in Montgomery County.  It's a

22  point I've made in a couple of different

23  places here today.  So that's one aspect.

24       Q.     Okay.  Let's talk about medical

25  need.

1          You address that in 6.4 on

2    page 32, correct?

3          A.     Correct.

4          Q.     And are you relying on anything

5    other than sources cited in that paragraph?

6          A.     No.

7          Q.     And we talked a little bit

8    about smoking.

9          Are you opining that the

10    percentage of adults who are obese is a

11    driver of the medical need for opioids?

12          A.     Yes.

13          Q.     Okay.  And are you aware of any

14    studies on that?

15          A.     Yes, there are.  They're not

16    necessarily cited -- they're not cited here,

17    but there's a large literature on metabolic

18    disorders like obesity and to the extent they

19    contribute to other issues.  I mean, obesity

20    itself generally doesn't require -- directly

21    require pain management, but a lot of the

22    secondary effects associated with obesity and

23    metabolic disorders do require pain

24    management.

25          Q.     Okay.  Is it your opinion that

1 the percentage of adults who are physically

2 active is a director of a clinical need for

3 opioids?

4      A.     It can be.  That would be

5 correlated with obesity and other types of

6 metabolic disorders, potentially diabetes and

7 things like that, which, again, would be --

8 would have -- would be associated with

9 secondary factors that would require pain

10 management.

11      Q.     And do you have a sense of what

12 percentage of opioid prescriptions in

13 Montgomery County are for cancer patients?

14      A.     No, I don't.

15      Q.     And I think you opined that

16 opioid prescriptions in Montgomery County

17 began to decline earlier than the national

18 average, correct?

19      A.     Slightly earlier, yes.

20      Q.     Do you have an opinion on why

21 that is?

22      A.     No, I'm not sure why that is.

23      Q.     And going through the factors

24 that you're saying might be different, on

25 page 33 you have physicians in 6.5, correct?

1      A.      Correct.

2      Q.      What's different about

3  physicians in Montgomery County?

4      A.      Well, generally, not much is

5  the short answer to that.  I think Montgomery

6  County appears to be, when you do research

7  on sort of high prescribing physicians and

8  cases involving those types of physicians,

9  some Montgomery County physicians pop up.

10          It doesn't necessarily -- that

11  doesn't necessarily mean that the same thing

12  wasn't happening in other parts of the

13  country, but there is some clear evidence

14  that it was happening in Montgomery County,

15  whereas there are counties for which there is

16  less evidence of it occurring.

17      Q.      Okay.  And were there more pill

18  mills in Montgomery County?

19      A.      Well, kind of the same answer.

20  We don't know the number of pill mills -- how

21  the number of pill mills in Montgomery County

22  compares to the number of pill mills in other

23  counties.  You know, we would have to control

24  for population when we did something like

25  that, if we were to do something like that.

1    Because there isn't a good common data set on

2    pill mills.

3        Q.    Okay.  And I don't know if we

4    talked about your general opinion nationally

5    on why physicians would be what you would

6    call responsible parties.

7              Why is that?

8        A.    Why physicians would be a

9    responsible party?

10        Q.    Yes.

11        A.    Well, I think they're the --

12    one of the most responsible parties.  I don't

13    differentiate them that way, but if I did, I

14    would put them close to the top of the list.

15              Physicians are responsible for

16    making decisions regarding medical need,

17    they're responsible for making decisions

18    regarding treatment strategies, and they're

19    responsible for understanding what's going on

20    with the patient sitting in front of them.

21    So they're the ones who are in the best

22    position to evaluate whether an individual

23    has a medical need for pain management, and

24    more specifically, opioid pain management.

25        Q.    Okay.  And for your purposes of

1  your opinion here, are you saying all

2  physicians in Montgomery County are

3  responsible or are you identifying certain

4  physicians?

5      A.      I'm doing neither of this.  I'm

6  saying that physicians are clearly a

7  responsible party by virtue of their position

8  and certainly by virtue of the fact that

9  they're the only ones writing prescriptions.

10             I'm not opining as to a

11  percentage of Montgomery County physicians

12  who have perhaps, you know, written more

13  unnecessary prescriptions than others.  I

14  don't have an opinion about that.  I don't

15  think there's very good data on that.

16      Q.      Okay.  And are you -- for all

17  of these responsible parties, are you opining

18  about the extent to which they are

19  responsible relative to others?

20      A.      No.

21      Q.      And you're not trying to

22  apportion the amount of supply between them,

23  correct?

24      A.      That's correct.

25      Q.      All right.  I think you

1  mentioned some pill mills in your report.

2  That's the next paragraph down here.

3              Who are the two prescribers

4  that you mentioned in this paragraph?

5      A.     Are you referring to

6  Section 6.5 still?

7      Q.     I'm on -- well, I'm on 6.6,

8  government.

9              But that does raise a good

10  question, so let me back up here.  I'm going

11  to withdraw that question.

12              Why are -- why is the

13  government responsible for pill mills and not

14  the pill mill itself?

15      A.     Oh, I'm not suggesting that

16  it's the government and not the pill mill

17  itself.  I'm suggesting both.  So in

18  Section 6.5, I'm identifying -- I have

19  already identified in the report that

20  physicians are a -- are a potentially

21  responsible party and then here I'm saying,

22  commenting, that in Montgomery County, there

23  are known instances of pill mills.

24              In the next section under

25  government, I'm saying that the -- this

1    relates to what we were discussing before

2    regarding state Medicare -- I'm sorry, state

3    Medicaid and also federal Medicare.  Both of

4    those programs were in a position and

5    continue to be a position to identify pill

6    mills and to potentially trigger some sort of

7    corrective action either through claims

8    denial or some other interconnectivity

9    between government agencies.  But they're as

10   payors in a position to identify a pill mill.

11   So in a claims data set, a pill mill would

12   show up very, very distinctly.

13       Q.    Okay.  Have you ever looked at

14   claims data for the purposes of identifying a

15   pill mill at the county level?

16       A.    No.

17       Q.    Okay.  And you didn't look at

18   the claims data for Montgomery County here,

19   correct?

20       A.    Correct.

21       Q.    Okay.  And I think out of the

22   responsible parties, you did say some were

23   entities operated by a plaintiff, which would

24   be this paragraph.

25            Which entities are you talking

1    about?

2         A.    Can you point me to where --

3         Q.    Sure.  It's 6.1.  So it's back

4    a couple of pages.  It's page 31.

5         A.    Oh, I see it.  Item Number 3 in

6    6.1.

7         Q.    Uh-huh.

8         A.    Yes, you're asking about the

9    phrase, some of which are entities operated

10   by the plaintiffs in this matter.  That would

11   be -- that would be their own -- their own

12   programs, their own criminal justice system

13   and the data collected through that, their

14   own social and family assistance programs and

15   the data collected through that.

16              And again, the extent to which

17   the county is connected to the state Medicaid

18   program as well.

19        Q.    So basically what you discussed

20   in the context of Dr. Alexander's report?

21        A.    Correct.

22        Q.    I will not ask you again.

23              Are you saying there's anything

24   else that makes the County responsible?

25        A.    No.

1    Q.    Okay.  And jumping back to 33,

2  page 33, on physicians in paragraph 6.5.

3            You didn't name two pill mill

4  prescribers.  Do you remember who they were?

5    A.    No, I don't.

6            MR. BOONE:  Object to form.

7            THE WITNESS:  I don't.  I'm

8        looking at the footnotes to see if

9        they're -- if the name appears there,

10        but it doesn't.  So I don't know

11        offhand.

12  QUESTIONS BY MS. SALTZBURG:

13    Q.    Okay.  And is all of the

14  information that you considered related to

15  pill mills in Montgomery County cited in

16  these paragraphs 6.5 and 6.6?

17    A.    Yes.

18    Q.    Okay.  And for the

19  paragraph 6.6, you write in that first

20  sentence, "In the first physician example

21  above, all the opioid units distributed in

22  that Montgomery pill mill were paid for by

23  Medicare or Ohio Medicaid."

24            Correct?

25    A.    Correct.

1    Q.    So is it your opinion that all

2  of the, I guess -- let me strike that.

3           Is it your opinion that that

4  pill mill was only serving Medicare and

5  Medicaid patients?

6    A.    I believe that's the case, yes.

7    Q.    Would it alter your opinion if

8  that were not the case?

9    A.    No, it wouldn't.  Because it

10 doesn't -- all part of that sentence is not

11 critical to the point that I'm making.

12   Q.    So it's not really relevant to

13 what extent they're Medicare, Medicare or

14 cash payments?

15   A.    Correct.  If it's a larger

16 proportion, then it would be potentially more

17 visible and -- in claims data, but it's

18 not -- it doesn't have to be all.  It doesn't

19 have to be 100 percent.

20   Q.    Okay.  And do you know if their

21 prescriptions were filled at Kroger

22 pharmacies?

23   A.    I do not know that.

24   Q.    Would it affect your opinions

25 if they were?

1      A.      No.

2      Q.      Okay.  Is there any difference

3  in your opinion about quality -- excuse me,

4  quality ratings nationally in Montgomery

5  County?

6      A.      No.  The point I make here in

7  6.7 is fairly general and would apply to any

8  quality rating system and any state Medicaid

9  program.

10      Q.      Okay.  And are all of the

11  materials you considered related to quality

12  ratings with respect to Montgomery County

13  cited in this paragraph 6.7?

14      A.      Yes.

15      Q.      Okay.  And then going on to

16  6.8, manufacturers and distributors.

17           Is there any difference in the

18  role of manufacturers and distributors

19  nationally and in Montgomery County?

20      A.      Not that I'm aware of.

21      Q.      Okay.  And are all of the

22  sources you cite you considered for purposes

23  of manufacturers and distributors in

24  Montgomery County cited in that

25  paragraph 6.8?

1      A.     Yes.

2      Q.     Okay.  Going on to

3  macroeconomic affairs, on the next page,

4  which is page 34.

5      A.     Okay.

6      Q.     So you appeared to be opining

7  there that there's a correlation between

8  unemployment and OUD rates from the mid-'90s

9  to 2010.

10            Is that fair?

11     A.     Yes.

12     Q.     Okay.  And in your opinion, is

13  the correlation enough to establish

14  causation?

15     A.     No.

16     Q.     And did you do any independent

17  analysis of unemployment and opioid

18  prescriptions in Montgomery County?

19     A.     No, I did not.

20     Q.     Okay.  And you don't cite any

21  study finding a causal link here, correct?

22     A.     Correct.

23     Q.     And what's your opinion with

24  respect to drug trafficking in Montgomery

25  County?

1      A.     If I -- if I may just go back

2   to -- one thing I would add to the last

3   question I just -- of yours that I just

4   answered, is that I do earlier cite a number

5   of studies that identified a correlation

6   between macroeconomic factors and substance

7   use disorder and opioid use disorder.  So I

8   just -- I think it's important just to

9   footnote that because I think -- I believe

10  your question was directly pertaining to

11  Montgomery County, but I just wanted to add

12  that.

13      Q.     Understood.  Okay.  And it was.

14         And my question is, the two

15  things you say are correlated in that

16  paragraph, you're not aware of any studies on

17  that information, correct?  That might be

18  poorly worded.

19      A.     Not specific to Montgomery

20  County, correct.

21      Q.     Okay.  Not specific to

22  unemployment rates and OUD rates in

23  Montgomery County?

24      A.     Correct.

25      Q.     Okay.  That may be a better way

1    of asking that.  Thank you.

2            So let's go on to drug

3    trafficking then.  What's your opinion about

4    drug trafficking in Montgomery County?  Is it

5    different than national?

6        A.    It's not necessarily different

7    than national, but that Montgomery County is

8    one of the 33 high intensity drug trafficking

9    areas identified by the DEA or DOJ.  I'm not

10   sure who.  One of those agencies.  So given

11   that they are one of the 33 nationwide would

12   suggest and of course the data further

13   suggests that illicit opioids are a bigger

14   problem in Montgomery County than many other

15   counties.

16       Q.    Okay.  And are all of the

17   sources that you considered for your opinions

18   about drug trafficking specific to Montgomery

19   County cited in this paragraph 6.10?

20       A.    Yes, I have some additional

21   citations on drug trafficking generally in

22   other parts of the report.

23       Q.    Okay.  And I think you

24   acknowledge it there, that there's limited

25   capacity at the local, state and federal

1   level to address drug trafficking, correct?

2        A.    Yes.  And the point of making

3   that point is that that explains the rise in

4   the introduction and utilization of illicit

5   opioids.

6        Q.    Okay.  And in forming your

7   opinions on the implications for Montgomery

8   County, did you use any empirical techniques?

9        A.    Regarding drug trafficking?

10       Q.    Regarding the implications that

11  are specific to Montgomery County in this

12  Section 6.

13       A.    Okay.  And so I'm sorry.  Ask

14  the question again.

15       Q.    Sure.

16             In forming your opinions on the

17  implications specific to Montgomery County,

18  did you do any sort of empirical analysis?

19       A.    Not different than what is

20  presented here in Section 6.

21       Q.    Sorry, I don't understand.

22       A.    Well, empirical analysis could

23  include, for example, the data that I show

24  for the health indicators for Montgomery

25  County.  It depends what you mean by

1   empirical.

2        Q.     Yeah, let me ask you a better

3   way.

4              Did you do anything, like a

5   regression, anything like that, as opposed to

6   looking at the public sources that are cited?

7        A.     No.

8        Q.     Okay.  You had started to talk

9   a little bit about transition from

10  prescription opioids to illicit opioids

11  earlier, correct?

12       A.     Correct.

13       Q.     Okay.  I want to go back to

14  that briefly.  And that is in the next

15  section.  I think it relates to your critique

16  of Dr. Cutler.  It's page 37, paragraph 7.12.

17             Okay.  And you acknowledge

18  there at the bottom of that page, "it is

19  possible that some illicit opioid use is

20  preceded by use of diverted prescription

21  opioids."

22             Correct?

23       A.     Correct.

24       Q.     Okay.  And have you done any

25  analysis to seek to quantify that amount?

1      A.      No.

2      Q.      Okay.  And I think you also

3  opine in that paragraph that you don't think

4  it's well-established that illicit opioid

5  abuse is due to earlier prescription opioid

6  abuse, correct?

7      A.      Correct.  And that's the reason

8  why this sentence says that some illicit

9  opioid abuse is preceded by.  So there's some

10  evidence that there's some -- that some

11  illicit opioid abuse is preceded by diverted

12  prescription opioid use, but the -- my

13  opinion is that the literature -- again, we

14  were just talking about associations versus

15  causations.  The literature -- some

16  literature has found an association along

17  those lines, but my read of the literature is

18  that it hasn't proven a causal link between

19  the two.

20      Q.      Okay.  And what sources are you

21  relying on for that opinion?

22      A.      Well, those are some sources

23  that I'm not sure are cited in this report.

24  I do think that Dr. Cutler cites them in his

25  report.

1     Q.     Okay.  And I couldn't tell you.

2  There was one part of your report where it

3  wasn't clear to me that you were suggesting

4  that prescription opioid abuse was due to

5  illicit opioid abuse.  Are you offering that

6  opinion?

7     A.     No, I'm not.  So but just to

8  clarify -- let me clarify.  The -- it's

9  important to distinguish the fact that opioid

10 use disorder, which is the externality that

11 we're talking about today, opioid use

12 disorder is attributable to illicit opioids

13 and to some degree diverted prescription

14 opioids.

15          So what's happening in recent

16 years is that it is increasingly attributable

17 to illicit opioids.  So for the last, let's

18 say, five years or more, illicit opioids is

19 the dominant type of opioid found in OUD

20 cases and OUD mortality.

21          But the -- but they're both --

22 but there is some proportion of diverted

23 opioids not sourced directly from the health

24 care system that are -- that are contributing

25 to OUD.

1              (Schneider Exhibit 4 marked for

2        identification.)

3   QUESTIONS BY MS. SALTZBURG:

4        Q.     Okay.  With that, I'm ready to

5   put this report away and move on to your CV,

6   which is Exhibit 4, if you still have your

7   box or folder.

8        A.     Opening Exhibit 4.  Okay.

9        Q.     Okay.  Is this your CV?

10       A.     Yes.

11       Q.     Is it the current version?

12       A.     It's reasonably current, yes.

13       Q.     Do you have a newer one?

14       A.     I might.  I don't know if

15  there's -- if I've added any publications and

16  that kind of thing to this.  I may have added

17  an expert case or two as well.

18       Q.     Okay.  If you do a newer

19  version, could we have a copy?

20       A.     Yes.

21       Q.     Okay.  And if you update it

22  before trial, could you also provide a copy?

23       A.     Yes.

24       Q.     And do you have any new

25  publications that you anticipate coming out

1    that aren't on the CV yet that are relevant

2    to this case?

3         A.    Oh, relevant to this case, no.

4         Q.    Is there anything in the

5    updates that you're referencing earlier that

6    has to do with opioids or issues relevant to

7    this case?

8         A.    No.

9         Q.    Okay.  And do you use the same

10   CV for testifying and non-testifying work?

11        A.    Yes.

12        Q.    And did you prepare the CV

13   yourself?

14        A.    I prepare it myself.  It's --

15   I'm not always the one updating it.

16        Q.    Is somebody else updating this

17   one?

18        A.    Well, I typically have my -- if

19   I have a new publication come out or a new

20   case, I'll typically have my administrative

21   assistant -- I'll send them -- I'll send them

22   the information, they'll add it to the CV.

23        Q.    Okay.

24        A.    But that doesn't occur on a

25   daily basis.  At any given point in time,

1   there's often one or two things missing from

2   the CV.

3        Q.    Okay.  And I think in your New

4   Mexico deposition you discussed a lot of your

5   expert work and your publications, correct?

6        A.    I recall that, yes.

7        Q.    Are there any that you think

8   are relevant here that you didn't discuss in

9   New Mexico?

10        A.    That I didn't -- well, I don't

11   remember exactly what I discussed in the New

12   Mexico deposition, but I would say that

13   that -- that that would have -- I don't

14   remember that discussion being quite lengthy,

15   so it probably would have covered most of the

16   relevant materials.

17        Q.    Okay.  I mean, I know it's hard

18   to remember.  Let me ask it this way.

19            Is there any work that you've

20   done before April 2022 that is relevant to

21   this case that wouldn't have been relevant in

22   New Mexico?

23        A.    No.

24        Q.    Okay.  And you mentioned a case

25   that you had testified in about causal

1   factors earlier in San Francisco.

2              Do you remember that?

3       A.    Yes.

4       Q.    And I was looking during the

5   break.  I could not find it on here.

6              Which of the cases were you --

7       A.    Oh, okay.  I'm sorry for

8   interrupting.

9              My CV shows the most recent

10  five years --

11      Q.    Okay.

12      A.    -- testimony.  That testimony

13  was probably maybe ten -- actually maybe more

14  than ten years ago.

15      Q.    Okay.  Do you remember who the

16  parties were other than San Francisco?

17      A.    The other party was Philip

18  Morris.

19      Q.    Okay.  And do any of the other

20  cases -- and do any of the -- I guess let me

21  ask you this.

22              Do any of the cases in this

23  list involve trial testimony where you

24  offered opinions about potentially

25  responsible parties?

1      A.      Please give me a minute to

2   review the list.

3      Q.      Take all the time you need.

4      A.      Item Number 12.  I'll just list

5   them as I encounter them.  Item Number 12,

6   Maryland Cares versus Evolve, Incorporated.

7   Not opioid-related, but sort of attributable

8   cost of potentially responsible party.

9      Q.      Okay.

10      A.      I think on this list that is

11   the only one.

12      Q.      Okay.  Are there any earlier

13   ones other than Philip Morris and San

14   Francisco that you can think of?

15      A.      Yes, there are.

16      Q.      And for clarity, just trial,

17   not if you did a deposition.  I'm not asking

18   you to remember that.

19      A.      Oh, okay.  Yeah, well, that's

20   what I was going to say.  I think I did a

21   deposition in cases involving attributable

22   costs and potentially responsible parties.  I

23   don't recall -- they're not on this list

24   because they predate this list.

25      Q.      Okay.

1      A.      Yeah.

2      Q.      And turning to the

3  peer-reviewed publications, do any of these

4  involve sort of the CERCLA analogy that we

5  walked through earlier?

6      A.      None of these would explicitly

7  cite to that.  However, there are some

8  publications -- the publications I've done

9  involving tobacco product waste are -- were

10  sort of environmental economics-type issues,

11  and one of those is a WHO bulletin

12  publication that's not out yet, so it's not

13  on this list.  And then there are sort of a

14  couple of others which I could -- one would

15  be -- indirectly number 8, which is the

16  publication, the International Journal of

17  Environmental Research and Public Health.

18          Again, indirectly, Item

19  Number 27, which is the journal -- something

20  published in Tobacco Control.

21          That's probably it.

22      Q.      I think I just have a few last

23  questions for you.  You can put the CV away.

24      A.      Okay.  And let me just put an

25  end to that.  I got through the list.  I

1  don't think there's anything else that

2  would --

3      Q.    Oh, I'm sorry.  I didn't mean

4  to --

5      A.    No, no, that's fine.  I

6  understand.

7      Q.    All right.  The only thing I

8  wanted to ask you about.  I do want to go

9  back to that general section on potentially

10  responsible parties, which is Section 4.  I

11  was hoping we can sort of cover it through

12  the Montgomery County discussion.

13          And I have a question about

14  page 20.  And it's paragraph 4.8 at the

15  bottom there.

16          And it looks to me like you're

17  holding the CDC responsible, you know, for

18  its role in managing epidemics.

19          Is that right?

20      A.    Correct.

21      Q.    Okay.  But I understood you to

22  be saying that this responsibility is for

23  supply, not for, you know, OUD or the

24  epidemics, correct?

25      A.    Well, correct.  These are

1  factors that would affect supply, so I

2  would -- my argument here is that the CDC

3  through its inactions didn't fulfill its

4  obligations to identify the growing number of

5  cases of OUD and the sources of OUD.

6      Q.    And how does that impact

7  supply?

8      A.    Well, by not identifying OUD as

9  a problem, it slowed any response to the

10 supply of OUD -- I'm sorry, to the supply of

11 prescription opioids, you know, through

12 various programs and changes in clinical

13 practice guidelines and all of that, all of

14 those things we already discussed.

15     Q.    Okay.  So is it fair to say

16 kind of as a general rule you're applying

17 that slowness in putting steps in place to

18 monitor impacts supply?

19     A.    Generally, yes, in the -- in

20 situations where entities are positioned to

21 be able to do that.

22     Q.    Okay.  And I want to ask a

23 couple of questions.  You can put that away.

24          Is there any additional

25 information you feel would strengthen or

1    weaken your opinions in this case?

2         A.    No, not that I can think of

3    offhand.

4         Q.    Okay.  And any information that

5    we didn't already discuss that would

6    influence or change your opinions?

7         A.    Again, not that I can think of

8    offhand.

9              MS. SALTZBURG:  All right.

10        That is all of the questions I have.

11        Thank you for your time.

12              THE WITNESS:  Thank you.

13              MR. BOONE:  I'm going to look

14        at John since he's in the room with

15        me, so forgive me for not facing that

16        direction.

17              MS. SALTZBURG:  Understood.

18              CROSS-EXAMINATION

19   QUESTIONS BY MR. BOONE:

20        Q.    So, John, I want to walk back

21   to a moment earlier you were talking about

22   being an expert in abatement.

23              So you understand that in

24   Track 7 in Montgomery County the Court has

25   bifurcated the liability section from the

1    abatement phase, correct?

2          A.     That's my understanding, yes.

3          Q.     So sitting here today with the

4    Track 7 report, that is a report that is not

5    for the abatement phase, not at least as of

6    yet, correct?

7          A.     Correct.

8          Q.     Now, in New Mexico, that was a

9    different proposition.  The report you

10   offered in New Mexico did get into abatement,

11   correct?

12         A.     That's correct, yes.

13         Q.     So you felt that you were

14   appropriate to serve as an expert in the

15   abatement phase in New Mexico?

16         A.     Yes, specifically I think --

17   okay.  I think the -- in my -- my opinion is

18   that I'm an expert on calculating the costs

19   of abatement or the costs attributable to

20   abatement, as I did in New Mexico.  So that's

21   what I say -- so I'm -- what I'm not an

22   expert on are the types of programs that work

23   better or not as good in terms of actually --

24   in terms of actual abatement.

25                So some -- for example, some of

1   the things that Dr. Alexander was opining on

2   in terms of the specifics of the functioning

3   of a program, that's not something I'm an

4   expert on.

5        Q.     Okay.  And so you would feel

6   comfortable serving in the abatement phase as

7   an expert in Montgomery County, if so asked?

8        A.     Yes.

9        Q.     Okay.  Now, the PRP, the

10  primary responsible parties, that you've

11  identified in Figure 2-2 --

12       A.     Okay.  You said primary

13  responsible parties.  I assume you meant

14  potential responsible parties.

15       Q.     Let's try again.

16              In Figure 4-1, you identify

17  potential responsible parties, correct?

18       A.     Correct.

19       Q.     Now, I noticed that there has

20  been no effort in this report for

21  allocation -- by allocation I mean assigning

22  a percentage, perhaps -- with respect to one

23  another.

24              Is that correct?

25       A.     Correct.

1      Q.     Is that an effort that is more

2   appropriate for the abatement phase of the

3   report?

4      A.     Yes, I would undertake that in

5   an abatement exercise.

6      Q.     All right.  Now, I know that

7   this report here is strictly for causation.

8           In the report that you've

9   proffered thus far for Track 7 is strictly a

10  report for causation, liability, correct?

11     A.     Correct.

12     Q.     Is it fair to say that the

13  effort and information conducted reflected in

14  this report would inform your efforts in

15  crafting a report for an abatement phase at

16  the trial?

17     A.     Correct.  And that's what I was

18  trying to communicate when we were talking

19  about externalities and we were talking about

20  the steps in assessing an externality.

21          MR. BOONE:  Okay.  Can we just

22     take a quick moment and I'll see if I

23     have additional questions?  Okay?  So

24     let's go off the record for about ten

25     minutes.

1          MS. SALTZBURG:  Sure.

2          (Off the record at 4:31 p.m.)

3          REDIRECT EXAMINATION

4   QUESTIONS BY MS. SALTZBURG:

5      Q.    Dr. Schneider, when Mr. Boone

6   was asking about the causation phase, are you

7   still understanding that to mean you would be

8   offering opinions about the causes of opioid

9   supply, not causes of the opioid epidemic?

10     A.    Yes, just to clarify, causes of

11  the increase in opioid supply.

12     Q.    Okay.  And I think you

13  mentioned the PRPs on this Figure 4.1 that he

14  was referencing.

15          Many of them, the majority of

16  these are PRPs that you've opined have a role

17  in driving the supply that you've

18  characterized as legitimate, correct?

19     A.    Well, just explain what you

20  mean by legitimate.

21     Q.    Sure.

22          We discussed, you know, the

23  purpose of the PRPs.  You're assigning

24  responsibility for supply, not for OUD,

25  correct?

1      A.      That's correct, yeah, for

2  supply -- well, for the increase in supply,

3  yes.

4      Q.      Okay.  And so you were asked

5  questions about would you be testifying

6  that -- or might you be testifying that all

7  of these PRPs should be apportioned harm in

8  the abatement phase, correct?

9              MR. BOONE:  Objection to form.

10             THE WITNESS:  Yeah, I'm sorry,

11         maybe you could just say that again,

12         at least.  You don't have to rephrase

13         it.

14  QUESTIONS BY MS. SALTZBURG:

15     Q.      Maybe I didn't understand.

16             Were you telling Mr. Boone that

17  if there were an abatement phase in this

18  case, one of the things that you would be

19  doing is allocating abatement costs to the --

20  all of the PRPs in this figure?

21     A.      Well, so, yes, but just with

22  the caveat that I would -- I would -- if I

23  were to undertake an abatement cost analysis,

24  I would reconsider again the -- these PRPs.

25  I would -- yes, I would think the way this

1  analysis was structured was in the context of

2  externalities, and as I described before, one

3  of the steps is identifying the PRPs.

4        Q.    Okay.  And so you would be

5  assigning abatement costs to PRPs that you

6  have described as having only an indirect

7  role in supply, correct?

8        A.    Correct.

9        Q.    Let me -- okay.  And PRPs that

10  you don't necessarily view as responsible for

11  causing OUD, correct?

12        A.    Well, let me clarify.

13             So what I'm doing in this

14  section and this figure is identifying PRPs

15  that are -- that are associated with an

16  increase in prescription opioids, but not

17  necessarily a -- directly responsible for

18  OUD.  If that's what you're asking, that's

19  correct.

20        Q.    Okay.  So that's a good way to

21  put it.  You would be assigning abatement

22  costs regardless of whether there's any

23  direct responsibility for OUD?

24        A.    Correct.

25             MS. SALTZBURG:  Okay.  That's

1        all the questions I have.

2            MR. BOONE:  One more follow-up.

3            RECROSS-EXAMINATION

4    QUESTIONS BY MR. BOONE:

5        Q.    Now, I think the question that

6    was proffered by counsel included the word

7    opioid epidemic, the words opioid epidemic.

8    And I think this was what the answer that you

9    gave was addressing, but I just wanted to

10   clarify, that your report does not opine

11   whether there is or is not an opioid

12   epidemic, correct?

13       A.    Correct, yeah, I discuss that

14   in my report.

15       Q.    Sorry, you do discuss that in

16   your report?

17       A.    I discuss it in my report.

18       Q.    What do you say about that?

19       A.    I say it's not my opinion that

20   it's an epidemic, although I acknowledge that

21   others have called it that.

22            MR. BOONE:  Okay.  That's all I

23       have.

24            MS. SALTZBURG:  And I have

25       nothing further.

1            MR. BOONE:  Okay.

2            COURT REPORTER:  Mr. Boone, I

3      don't believe your firm has a standing

4      order in this case, so I didn't know

5      if you needed a copy of this.

6            MR. BOONE:  Oh, yes, I will

7      need an original and E-Tran.  And we

8      will read.

9      (Deposition concluded at 4:39 p.m.)

10            - - - - - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2              I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
4  of the examination, John Schneider, Ph.D.,
   was duly sworn by me to testify to the truth,
5  the whole truth and nothing but the truth.

6              I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
7  testimony as taken stenographically by and
   before me at the time, place and on the date
8  hereinbefore set forth, to the best of my
   ability.
9
             I DO FURTHER CERTIFY that I am
10 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
11 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
12 that I am not financially interested in the
   action.
13

14          _Carrie A. Campbell_
            _____
16          CARRIE A. CAMPBELL,
            NCRA Registered Diplomate Reporter
17          Certified Realtime Reporter
            California Certified Shorthand
18          Reporter #13921
            Missouri Certified Court Reporter #859
19          Illinois Certified Shorthand Reporter
            #084-004229
20          Texas Certified Shorthand Reporter #9328
            Kansas Certified Court Reporter #1715
21          New Jersey Certified Court Reporter
            #30XI00242600
22          Louisiana Certified Court Reporter
            #2021012
23          Notary Public

24

25

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8              After doing so, please sign the

9    errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13             It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do
    hereby certify that I have read the foregoing
 5  pages and that the same is a correct
    transcription of the answers given by me to
 6  the questions therein propounded, except for
    the corrections or changes in form or
 7  substance, if any, noted in the attached
    Errata Sheet.
 8

 9

10

11

12  _____

    John Schneider, Ph.D.              DATE
13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

```
 1                    _  _  _  _  _  _
                            ERRATA
 2                    _  _  _  _  _  _

 3       PAGE     LINE    CHANGE

 4       _____    _____   _____

 5       _____    _____   _____

 6       _____    _____   _____

 7       _____    _____   _____

 8       _____    _____   _____

 9       _____    _____   _____

10       _____    _____   _____

11       _____    _____   _____

12       _____    _____   _____

13       _____    _____   _____

14       _____    _____   _____

15       _____    _____   _____

16       _____    _____   _____

17       _____    _____   _____

18       _____    _____   _____

19       _____    _____   _____

20       _____    _____   _____

21       _____    _____   _____

22       _____    _____   _____

23       _____    _____   _____

24       _____    _____   _____

25
```

1                      _ _ _ _ _ _ _

                      LAWYER'S NOTES

2                      _ _ _ _ _ _ _

3      PAGE    LINE

4      _____   _____   _____

5      _____   _____   _____

6      _____   _____   _____

7      _____   _____   _____

8      _____   _____   _____

9      _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25