# EXHIBIT C

Highly Confidential - Subject to Further Confidentiality Review

```
 1                FIRST JUDICIAL DISTRICT COURT

 2                    COUNTY OF SANTA FE

 3                    STATE OF NEW MEXICO

 4

 5   STATE OF NEW MEXICO, ex rel.,

     HECTOR BALDERAS, Attorney

 6   General,

 7             Plaintiff,

 8   VS.                        NO. D-101-2017-02541

 9   PURDUE PHARMA, L.P., et al.,

10             Defendants.

11

                          * * * * *

12

13

14                    April 7, 2022

15      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

                 CONFIDENTIALITY REVIEW

16

17

18             Remote video deposition of JOHN E. SCHNEIDER,

19             Ph.D., taken via Zoom teleconference, commencing

20             at approximately 9:02 a.m. EST.

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S
 2    COUNSEL FOR PLAINTIFFS:
                  POWELL & MAJESTRO PLLC
 3                405 Capitol Street, Suite P1200
                  Charleston, West Virginia  25301
 4                BY:  Anthony J. Majestro, Esquire
                       Amajestro@powellmajestro.com
 5
 6    COUNSEL FOR WALMART:
                  JONES DAY
 7                2727 N. Harwood Street
                  Dallas, Texas 75201
 8                BY:  Andrew Junker, Esquire
                       Ajunker@jonesday.com
 9
10    COUNSEL FOR CVS:
                  MODRALL SPERLING
11                P. O. Box 2168
                  Albuquerque, New Mexico  87102
12                BY:  Kevin D. Pierce, Esquire
                       Kdp@modrall.com
13
14    COUNSEL FOR KVK-TECH:
                  BAKER STERCHI COWDEN & RICE, LLC
15                23 Public Square, Suite 400
                  Belleville, Illinois  62220
16                BY:  Laura K. Beasley, Esquire
                       Lbeasley@bscr-law.com
17
18    COUNSEL FOR KROGER:
                  BOWLES RICE LLP
19                501 Avery Street
                  Parkersburg, West Virginia  26101
20                BY:  Aaron C. Boone, Esquire
                       Aboone@bowlesrice.com
21
22                BUTT THORNTON & BAEHR, P.C.
                  P. O. BOX 3170
23                Albuquerque, New Mexico  87190
                  BY:  Monica R. Garcia, Esquire
24                     Mrgarcia@btblaw.com
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S - (continued)
 2    COUNSEL FOR ALBERTSONS:
                 GREENBERG TRAURIG, LLP
 3               77 West Wacker Drive, Suite 3100
                 Chicago, Illinois  60601
 4               BY:  Francis A. Citera, Esquire
                     Citeraf@gtlaw.com
 5
                 GREENBERG TRAURIG, LLP
 6               1717 Arch Street, Suite 400
                 Philadelphia, Pennsylvania  19103
 7               BY:  Kaitlyn Maxwell, Esquire
                     Maxwellk@gtlaw.com
 8
 9    COUNSEL FOR WALGREENS:
10               BARTLIT BECK LLP
                 1801 Wewatta Street
11               Denver, Colorado  80202
                 BY:  John Phillips, Esquire
12                   John.phillips@bartlitbeck.com
13
14
15
16
17
18    VIDEOGRAPHER:
19               Phillip Todd
20
      COURT REPORTER:
21
                 LOIS ANNE ROBINSON, RPR, RDR, CRR, CRC
22
23
24
25
```

```
 1                    I N D E X

 2    EXAMINATION                              PAGE

 3    By Mr.  Majestro                           6

 4    By Mr. Boone                             144

 5                       * * * *

 6    EXHIBITS

 7    Deposition Exhibit 1                      11

 8       Avalon Health Time and Fees

 9    Deposition Exhibit 2                      70

10       Expert report - March 18, 2022

11    Deposition Exhibit 3                      19

12       Curriculum vitae - November 11, 2020

13    Deposition Exhibit 6                      70

14       Expert report - Revised April 5, 2022

15    Deposition Exhibit 7                      20

16       Updated curriculum vitae April 2022

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   VIDEOGRAPHER:

 2              Good morning.  We are now on the

 3   record.

 4              My name is Phillip Todd.  I am a

 5   videographer for Golkow Litigation Services.

 6              Today's date is April 7th, 2022, and

 7   the time is 9:02 a.m.

 8              This remote video deposition is being

 9   held in the matter of the State of New Mexico,

10   ex rel, Hector Balderas, Attorney General, versus

11   Purdue Pharma, L.P., et al., for the First

12   Judicial District Court, County of Santa Fe,

13   State of New Mexico.

14              The deponent is Dr. John E. Schneider.

15              All parties to this deposition are

16   appearing remotely and have agreed to the witness

17   being sworn in remotely.  Due to the nature of

18   remote reporting, please pause briefly before

19   speaking to ensure all parties are held -- are

20   heard completely.

21              Counsel will be noted on the

22   stenographic record.

23              The court reporter, Lois Robinson, will

24   now swear in the witness.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              JOHN E. SCHNEIDER, Ph.D.,

 2         the witness, after having first been

 3    duly sworn to tell the truth, the whole truth,

 4    and nothing but the truth, was examined and

 5    testified as follows:

 6                    EXAMINATION

 7    BY MR. MAJESTRO:

 8    Q        Good morning, Dr. Schneider.  Again,

 9    I'm Anthony Majestro.  I represent the state in

10    this case.

11             Let me ask you, just to cover a couple

12    of things, have you been deposed before?

13    A        Yes, sir.

14    Q        How many times, approximately?

15    A        Maybe about 40 or so times.

16    Q        Did you say four or 40?

17    A        I'm sorry.  40.  Four zero.

18    Q        Okay.  So you're a pro.  You know --

19    you know the routine.

20             I will tell you that -- that -- that,

21    generally, I'm -- I'm pretty laid back.  If

22    you -- if we need to take a break for any reason,

23    let me know, and we can -- we can stop.

24             If I ask a question -- sometimes I ask

25    questions that make absolutely no sense -- and
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    you don't understand the question, please ask me

 2    to clarify it in any manner.  And we'll just go

 3    forward, and let's get through it.

 4              I don't think we're gonna be here all

 5    day.  But if -- if, you know --

 6              I suspect we would take breaks every

 7    hour 15 minutes, hour and a half, generally my --

 8    what I usually do.

 9              Okay.  First of all, what -- what

10    documents do you have in front of you?

11    A         All right.  Well, I have my invoices --

12    Q         Good.  Okay.

13    A         -- I have my report --

14    Q         Uh-huh.

15    A         -- unmarked, just a straight-up copy of

16    my report, and I have your FedEx package

17    unopened.

18    Q         Okay.

19    A         Oh, also a blank -- just a blank piece

20    of paper for any notes that I need to jot down.

21    Q         Perfect.

22              Can you go ahead and -- go ahead and

23    open the FedEx package so we can save some time.

24    A         Okay.  I've got, looks like, Exhibits

25    2, 3, and 5.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q        Okay.  And the other exhibits are the

2    documents that were provided to me yesterday, and

3    we'll just --

4             Which version of your report do you

5    have in front of you?

6    A        Well, what I have is the -- the

7    original March 18th version.  And then I just

8    printed out pages, two -- two separate pages

9    corresponding to the areas in which we made

10   corrections.

11   Q        Okay.  Fair enough.

12            All right.  Let's -- let me start with

13   how you -- how you got involved in this case.

14   When did you first become an expert in this case?

15   And by "this case," I'm referring to the

16   litigation initiated by my client, State of New

17   Mexico.

18   A        Yeah.  I believe it was some --

19   probably sometime around October of 2021.

20   Q        Okay.  And prior to that time, had you

21   been involved in the opioid litigation in any

22   fashion?

23   A        I was involved in one case or -- not

24   one case -- one -- one matter where I was asked

25   to opine on a -- on a market share in the Insys

1    case.  Or I don't know.  But it was the Ohio

2    track, and it was -- I was testifying on behalf

3    of Insys.

4    Q        And was that the case brought by

5    Cuyahoga County and Summit County, pending in the

6    multidistrict litigation in Cleveland?

7    A        Yes, that's correct.

8    Q        And, so, the manufacturer, Insys, hired

9    you?

10   A        Correct.

11   Q        And when would that have been when you

12   were first hired by Insys?

13   A        I -- I think maybe --

14            I honestly don't remember.  I think

15   probably -- probably three or four years ago, at

16   least.  Possibly more.

17            No.  I think probably -- probably four

18   years ago.

19   Q        And I -- and did you do a report in

20   that case?

21   A        I believe so.  I did a very brief

22   report, yes.

23   Q        Were you deposed in that case?

24   A        Yes.

25   Q        And I take it your work in that matter

```
 1    ended with Insys's filing a bankruptcy?

 2    A        Yes.

 3    Q        Have you participated in the bankruptcy

 4    proceedings at all?

 5    A        No, I have not.

 6    Q        So let's move --

 7             Between the time of Insys's bankruptcy

 8    and your work in -- on the New Mexico case on

 9    behalf of Kroger and Albertsons, have you done

10    any work in the opioid litigation at all?

11    A        No.

12    Q        Was the -- this -- this New Mexico case

13    the first time you were retained by Kroger or

14    Albertsons?

15    A        Yes, that's correct.

16    Q        And -- and I -- and I -- I'm asking the

17    question assuming that's who it is that retained

18    you in this case.

19    A        That's right.

20    Q        Do you know how the -- how --

21             Well, first of all, who contacted you,

22    first?

23    A        Mr. Boone.

24    Q        Do you know how Mr. Boone found you?

25    A        I had worked with Mr. Boone once in the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   past.

 2   Q        Okay.  And what kind of case was that

 3   regarding?

 4   A        That was calculating the reasonable

 5   value in a personal injury case.

 6   Q        Okay.

 7   A        I'm sorry.  The value -- I'm sorry.

 8   Reasonable value of medical bills.

 9   Q        Yes.  Back in my other life, I knew how

10   to do that stuff, before I became an opioid

11   lawyer.

12            So did you -- had you done any work for

13   Mr. Boone's firm other than this case or the one

14   matter you just testified about?

15   A        No, I haven't.

16   Q        I'm -- so I have copied over into the

17   marked exhibit folder all of the exhibits I'm

18   going to use today, and some of them are the ones

19   that Dr. Schneider has in front of him.  The

20   other of them are ones that were just given to us

21   yesterday.  And I'm gonna start with Exhibit 1,

22   which is your invoices.

23   A        Okay.

24            (DEPOSITION EXHIBIT NUMBER 1

25             WAS MARKED FOR IDENTIFICATION.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    MR. MAJESTRO:

 2    Q        So I presume that you have in -- you

 3    said you have your invoices in front of you.

 4    What -- what was provided to me were seven pages.

 5    Looks like they are printouts of spreadsheet

 6    columns, but, you know...

 7            Is that -- is that what you have in

 8    front of you?

 9    A        Yes.  That's correct.  Seven pages.

10    Q        And can you identify the seven pages

11    for us, what those are?

12    A        Yeah.  I'll go in order.  The first

13    page is the -- is our --

14            When I say "our," I mean --

15    Q        Well, I mean, let me -- that's probably

16    a vague question.  I meant generally, can you

17    describe for the record what those pages

18    represent?

19    A        Yes.  These pages are our invoices from

20    Avalon Health Economics for this matter, for this

21    New Mexico matter.

22    Q        Are you working on other cases for

23    Kroger and Albertsons or other cases in the

24    opioid litigation?

25    A        No.
```

Highly Confidential Doc - Subject to Further Confidentiality Review

```
 1   Q        Okay.  So my crack legal assistant adds

 2   up that you have 885.92 hours through March 22nd,

 3   2022.  Trusting her math is correct, is there

 4   additional time that you have spent on this

 5   matter that is not reflected in these invoices?

 6   A        Just the time since the -- the date of

 7   the last invoice.  So I would say since -- well,

 8   beginning on March 19th until present.

 9   Q        Would you identify for me --

10           So there's time on your invoices that

11   is indicated as time you spent.  I'm looking at

12   the first page of Exhibit 1, the third line down,

13   Dr. Schneider hours.  I take it that's a

14   reflection that is work that you did personally?

15   A        Correct.

16   Q        And, then, there are other indications

17   on these invoices, staff research team hours.  It

18   has Kenna, Karen, and several other -- several

19   other people.  Can you tell me who those staff

20   members are and describe for me their -- their

21   background and experience?

22   A        Sure.

23           Kenna is a master's in economics and is

24   a health economist, or was a health economist.

25   She's since moved on.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              And Karen is a research analyst with

 2     us.  Her background's in mechanical engineering

 3     and statistics.

 4              Let me see who else is listed here.

 5     Q        Scheibling and Amy are the other two

 6     that I --

 7     A        Oh, okay.  Yeah.  Scheibling --

 8     Scheibling --

 9     Q        Scheibling?

10     A        -- Scheibling is an MBA background, and

11     Amy is a bachelor's degree in, I think,

12     biochemistry or something like that.

13     Q        Okay.  Are they all employees of Avalon

14     Health Economics?

15     A        Yes, that's correct.

16     Q        What -- what is Avalon Health

17     Economics?

18     A        Avalon Health Economics is a healthcare

19     economics and business consulting company, and we

20     provide services to healthcare entities of

21     various kinds.  We do litigation support like

22     we're talking about today is part of what we do,

23     but we also provide services to medical device

24     companies, diagnostic companies, med -- med tech

25     companies, pharmaceutical companies, and usually
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    in the form of providing economic evidence of

 2    novel drugs and devices.

 3    Q         What do you mean by economic evidence?

 4    A         So cost-effectiveness analysis,

 5    cost-benefit analysis, that kind of thing.

 6    Q         Okay.  Is Avalon Health Economics a

 7    for-profit entity?

 8    A         Yes.

 9    Q         Who -- who owns Avalon Health

10    Economics?

11    A         I'm one of the owners, Cara Scheibling

12    is one of the owners, and then the third owner is

13    Andrew Briggs.

14    Q         All right.  So we've marked Exhibit 1,

15    the invoices as Exhibit 1.  Did you prepare those

16    invoices?

17    A         No.

18    Q         Can you confirm that they are, to the

19    best of your knowledge, correct?

20    A         Yes.

21    Q         In the report, it appears that your

22    hourly rate is $400 an hour, and you're -- you're

23    billing staff at -- looks pretty uniformly at

24    $250 an hour.  Is that correct?

25    A         That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Q         All right.  Is that your -- is that

 2   your current rate?

 3   A         Well, we -- we have different rates.

 4   This is -- my current rate ranges from 400 to

 5   550.

 6   Q         How -- how do you decide what rate to

 7   charge?

 8   A         It -- it just depends on -- on the case

 9   and the expected volume of hours.  So we applied

10   a lower rate to this case because we expected a

11   large volume of hours.

12   Q         Do you have a different rate for trial

13   versus -- and deposition testimony than the time

14   you've billed on Exhibit 1?

15   A         Yes.

16   Q         And what are those rates?

17   A         The normal deposition and testimony --

18   and court testimony rate's $1,000 an hour.

19   Q         Is your work at Avalon your full-time

20   job?

21   A         Yes.

22   Q         Do you have any other employment?

23   A         Well, I have some outside appointments

24   that are not a major source of income at all.

25   For example, the San Diego State University, I
```

```
 1    have an appointment there that doesn't run

 2    through Avalon, separate -- a separate

 3    engagement.

 4    Q        What percent of Avalon Health's work is

 5    litigation support?

 6    A        It usually hovers between -- I would

 7    say between 20 -- around 20 percent, maybe

 8    sometimes 25 percent, depending on the month.

 9    Q        Have you -- are you currently or have

10    you in the past consulted with others in the

11    pharmaceutical industry, other than this work

12    you're doing for Kroger?  By that I'm referring

13    to drug manufacturers, those in the distribution

14    chain, incl- -- up to and including pharmacies.

15    A        Okay.  So we haven't in the past worked

16    for or consulted with pharmacies or distributors.

17    We have and continue to work directly with

18    pharmaceutical manufacturers in the capacity I

19    described before conducting cost-effectiveness

20    analysis.

21    Q        Have you ever had occasion to do

22    consulting work for pharmaceutical manufacturers

23    involving opioid products or other -- or other

24    pain relief products?

25    A        Um, not opioid products.  We worked
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   with a small biotech on a novel non-opioid pain

 2   relief product.  I'm blanking on the name of the

 3   company right now.

 4   Q        Do you remember -- do you recall the

 5   name of the product?

 6   A        No, I don't.

 7   Q        Was it -- was it a medicine or device?

 8   A        It was a medicine.

 9   Q        Do you own any stock in any

10   pharmaceutical, drug distribution, or

11   pharmacy -- -ceutical -- pharmacy industry

12   company?

13   A        No, I don't.

14   Q        Have you had any speaking -- speaking

15   engagements on behalf of anyone in the

16   pharmaceutical/pharmacy industry?

17   A        Um, yes.

18   Q        Tell me about that.

19   A        Well, I've participated in some

20   advisory boards, and -- but those are -- I mean,

21   they're not really technically public speaking

22   engagements, but they're speaking in front of a

23   large group.

24            And I've also presented at conferences,

25   and sometimes those presentations were linked to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   a -- to some work we did for a pharmaceutical

 2   company.

 3   Q        Are those on your CV?  We're gonna go

 4   over your CV in a little bit.  So if they're on

 5   your CV, we'll deal with them then.

 6   A        Some of them might be.  I don't

 7   remember offhand, but, yeah.

 8   Q        Okay.  When we get there, we can add to

 9   that list.

10            All right.  You said you had your CV in

11   front of you?  Do I remember that correctly?

12   A        I -- I don't, but I can -- I can --

13            Yeah.  I don't have it.  Sorry.

14   Q        Open Exhibit 3, the one that's...

15            (DEPOSITION EXHIBIT NUMBER 3

16            WAS MARKED FOR IDENTIFICATION.)

17   MR. MAJESTRO:

18   Q        I think I need to have a discussion

19   with my secretary about her -- her overly

20   enthusiastic taping.

21   A        Oh, I just have to take the bottom

22   open.  I'm fine.

23   Q        Oh, that's smart.  Last witness

24   suffered through the tape.

25   A        Okay.  I have it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    Q         Okay.  Can you identify Exhibit 3?

2    A         Yes.  This is my CV.

3    Q         And can you tell me when the CV was

4    last updated, that version?

5    A         Yeah.  This one -- this one says

6    updated November 11th, but I -- I believe this CV

7    may have been --

8              Well, the CV's been updated since.

9    Q         I have another -- I have another one

10   that counsel provided for me yesterday that was

11   too late -- we got it too late to put in your

12   packet.  On the electronic documents, it's marked

13   as Exhibit 7.

14             (DEPOSITION EXHIBIT NUMBER 7

15             WAS MARKED FOR IDENTIFICATION.)

16   MR. MAJESTRO:

17   Q         Do you have the link --

18             Is the link to the electronic documents

19   in the chat?  No.

20   MR. MAJESTRO:

21             Lois, can you -- can you put a link to

22   the public marked exhibits in the chat?

23   THE COURT REPORTER:

24             I don't even have it.  Nobody gave it

25   to me.
```

```
 1   MR. MAJESTRO:

 2          Well, let's see.

 3          All right.  Let's try this.

 4          All right.  Somebody else besides me,

 5   if you can log in, see if you can pull that up,

 6   that link up.

 7   VIDEOGRAPHER:

 8          It's asking for a user name and

 9   password.

10   MR. MAJESTRO:

11          That's what I figured.

12          All right.  Well, we'll do this another

13   way.

14   A      Mr. Majestro, I have the updated CV.

15   MR. MAJESTRO:

16   Q      Oh, okay.

17   A      If it -- yeah.  If you want to just

18   talk for --

19   Q      Sure.  That --

20   A      I don't have it printed in front of me,

21   but I have it.  It was an attachment that I

22   received yesterday.

23   Q      I just did a share screen of what I

24   received yesterday.

25   A      Yeah.  That's right.  That's correct.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Q        So we've marked this as, I guess,

 2   Exhibit 7.

 3            Can you identify this document for us?

 4   A        That's my updated CV.

 5   Q        Can you identify what's changed since

 6   the prior version that was originally provided

 7   us?

 8   A        Sure.  I think the main things were

 9   that -- changing the -- the header to say

10   "updated April 2022," and then if you go to the

11   section on peer-reviewed publications, which on

12   the old version was page 4 -- should still be on

13   page 4 -- those first three publications were

14   added.  They were recent publications, two of

15   them very recent.  One of them's late 2021.

16            And then I also, right above -- if you

17   just travel up to the top of your screen there,

18   that -- that Santiago case, I think, was added.

19   Let me just confirm that.

20            Actually, looks like there might have

21   been a few cases added at the bottom there.

22   Q        And this is -- these are cases you

23   testified as a witness --

24   A        Correct.

25   Q        -- in?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Okay.  Well, let's turn to page 3 of

 2    the -- of the April 2022 CV, talk about your

 3    expert cases a little bit.

 4            By my count -- I numbered them.  So

 5    there are 22 cases?  No.  Actually, we're up to

 6    26 cases?

 7    A       Right.  Correct.

 8    Q       And it looks like the vast majority of

 9    the cases where you've provided testimony as an

10    expert witness, you were testifying on behalf of

11    the defendant in the litigation.  Is that fair to

12    say?

13    A       Yes.

14    Q       My count is three cases for the

15    plaintiff, and the rest were for the defendant.

16    I think that was on your original version.

17    A       That sounds right.

18    Q       It looks like all the new ones that

19    you've added were cases for the defendant.

20    A       Yes.  That's correct.

21    Q       So we've identified the Insys case.  I

22    just saw it on your list, and I lost it.

23            Okay.  Here.  Number 11.

24    A       Yes.

25    Q       Other than number 11 -- and if you want
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to -- I'll ask you the question and give you a

 2    minute to review the list and -- and refresh your

 3    memory, if you need to.

 4              Any of the -- does any of the other

 5    expert work involve the issues that you're

 6    testifying about in this case today?

 7    A         Just to clarify, when you say "involve

 8    the issues," do you mean involve the methodology

 9    or involve opioids specifically?

10    Q         Well, let's -- I -- I take it the

11    second -- the answer to the second question is

12    no.

13    A         Right.

14    Q         That this is the only case -- this and

15    the Insys case are the only case you've given

16    testimony regarding opioids.

17    A         That's correct.

18    Q         Okay.  So -- so let's -- so go ahead

19    and answer the first question, if you can.

20    A         Um, okay.  So I think the -- in terms

21    of the -- generally, the methodology, I would say

22    it would be num- -- I'll just refer to the number

23    in the case.  So --

24    Q         Sure.

25    A         -- number 6.  Number 6, UHS of Delaware
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    versus United Health Service, Incorporated.

 2    Number 15, Maryland Care versus Envolve,

 3    Incorporated.  And that would be it from this

 4    list.

 5    Q        Okay.  You say this -- you say "this

 6    list."  Makes me wonder, is there another list?

 7    A        Well, there isn't, but this list is

 8    updated to drop off anything that's more than

 9    five years old.

10    Q        Okay.

11    A        So there are -- there were previous

12    cases that I've worked on that would have

13    involved a similar approach.

14    Q        And the -- so I take it if I ask you

15    about the cases that have dropped off -- we'll go

16    through the same two questions -- the answer to

17    the question that --

18             Well, let me just ask you.  Were any of

19    those cases that are not on this list that --

20    which you have previously provided expert

21    testimony on involve opioids?

22    A        No.

23    Q        And were there -- there cases that,

24    prior to five years ago that you provided

25    testimony on, did any of those involve the same
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    methods that you're using in this case?

2    A       Yes.

3    Q       Can you identify those?

4    A       One that comes to mind -- there might

5    be others that I'm forgetting -- but one that

6    comes to mind is work I did for the City of

7    San Francisco on environmental impact of tobacco

8    product waste.  That involved testimony.

9            I did some other work for the City of

10   San Francisco, similar type of work, similar

11   methodology, and that -- but that didn't progress

12   to anything involving litigation.

13   Q       Environmental impact of tobacco waste?

14   Is that like cigarette butts?

15   A       Yes.

16   Q       Okay.  Let's talk about the two on the

17   list you identified.  Number 6, UHS versus

18   Delaware, or UHS of Delaware versus United Health

19   Services.  What was involved in that case and

20   what was your role in it?

21   A       This was a -- well, like a -- a

22   trademark infringement case.  UHS of Delaware and

23   UHS, Incorporated, of Harrisburg, Pennsylvania,

24   both had the same, as you can see, the same

25   acronym for their name.  So it was a calculating
```

```
 1   damages case associated with possible consumer

 2   confusion between the two brands, so

 3   attributing -- attributing costs from possible

 4   confusion, brand confusion to -- to damages.

 5   Q        So how was the methodology -- what

 6   methodology did you use in that case that was

 7   similar to the methodology you used in this case?

 8   A        Well, it was sort of a similar -- a

 9   simpler approach to attributing costs than

10   apportioning costs.  So there's -- it's

11   identifying what the cost would have been or

12   what -- what the -- let's say revenue or probably

13   not cost -- but what the revenue would have been

14   given no brand confusion versus possible brand

15   confusion, the extent to which there could be

16   brand -- the extent to which brand confusion

17   could have affected revenue, that sort of thing.

18   Q        Okay.  All right.  Then what about

19   number 15, Maryland Care versus Evolve [sic]?

20   A        Yes.

21   Q        Envolve.

22   A        Yeah.  That case involved a health

23   insurance provider.  Maryland Care is a -- sort

24   of an Affordable Care Act managed Medicaid

25   program in Maryland, and they had retained --
```

```
 1   brought in Envolve to manage a certain amount of

 2   their operations.  The case -- Maryland Care

 3   alleged that Envolve had essentially mismanaged

 4   the -- or failed to do their duties in that

 5   engagement.  And, so, I had to figure out how

 6   much of -- you know, it was a damages case, so it

 7   was figuring out how much of the sort of

 8   decrement in Maryland Care's patient level

 9   margins or enrolling level margins were

10   attributable to Envolve's behavior and actions

11   and things like that.

12   Q        Okay.  And, then, tell me about how the

13   analysis in that case was similar to the analysis

14   that you've done in this case.

15   A        Well, in that case, there was the

16   similar sort of problem where we have an

17   external -- an exogenous influence of some kind,

18   and the question is how much effect did that

19   exogenous influence have on -- on the outcome of

20   interest.

21            And, so, there was a -- essentially, an

22   attribution process to try to figure out what --

23   what proportion of -- of -- of change, if you

24   will, was attributable to Envolve versus

25   attributable to other factors.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q        Okay.  In any of the cases where you've

 2    served as an expert witness, have you ever been

 3    the subject of a Daubert challenge?  And if you

 4    don't know what that is, I'll explain it.

 5    A        I've -- I've heard the term before.  I

 6    don't believe I've ever been the subject of a

 7    Daubert challenge.

 8    Q        And by that, the subject -- someone's

 9    challenging your ability to offer the opinions

10    that you were offering in that case.

11    A        Right.  No, I don't believe I've been

12    the subject of a Daubert challenge.

13    Q        To your knowledge, any of the --

14    have -- your prior expert work, did you do any of

15    that work for any of the law firms that are

16    involved in this case, other than the Insys case

17    and, obviously, the Kroger and Albertsons case in

18    New Mexico?

19    A        I'm sorry.  Can you just rephrase that?

20    I'm not sure I follow.

21    Q        I'm wondering if you -- if you have

22    done any work for any of the other law firms that

23    are involved in the opioid litigation other than

24    the -- the two instances where you provided

25    testimony.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A          It's hard for me to answer that.  We,

 2   over the years, worked for a lot of multi-state

 3   law firms.  And I'm not also -- I'm not familiar

 4   with all the different law firms who are involved

 5   in the -- in this opioid matter.

 6   Q          In this case, have you had any -- been

 7   on any calls or meetings with lawyers who were

 8   representing other defendants?

 9   A          Lawyers who are representing other

10   defendants.

11   Q          Yes.

12   A          Oh.  Yes, I have.

13   Q          Can you tell me about that?

14   A          I mean, some of the calls that I've

15   been on, there have been defendants from other

16   pharmacies, other retail pharmacies, present on

17   the call.

18   Q          Is your report being offered on behalf

19   of anybody other than Kroger and Albertsons?

20   A          Not as far as I know.

21   Q          Let's go back to Exhibit 1.  Can you

22   identify the billing entry that went with the

23   calls you were on that involved defendants

24   other -- the other pharmacy defendants?

25   A          No.  I'm not gonna be able to do that.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I don't recall which of these.  I -- I do know

 2    the calls involving other defendants came much

 3    later in the process.

 4    Q       Were other experts on that call, those

 5    calls, or just other counsel?

 6    A       Just other counsel.

 7    Q       And what do you recall regarding

 8    what -- what the substance of -- of those calls

 9    involved?

10    A       Well, they weren't materially different

11    from calls preceding it in the sense that I was

12    just -- we discussed the work that I was doing.

13    I presented my sort of thoughts about my

14    methodological approach in much the same way that

15    I had been doing on other calls.

16    Q       What else do you remember about those

17    calls?

18    A       That -- that's about it.  They were

19    otherwise unremarkable.  Like I said, the --

20            Mostly, the attorneys for -- for other

21    defendants were -- were fairly quiet in those

22    calls, and I think they just wanted to get up to

23    speed on what I was doing.

24    Q       Did you take notes of those calls?

25    A       Nothing -- no, nothing substantial.
```

```
1    Q        Okay.  Did you take insubstantial notes

2    of those calls?

3    A        I -- I'm sure I jotted some things

4    down.

5    Q        Do you -- would you have retained those

6    notes?

7    A        No.

8    Q        So I -- Exhibit 7, I'm not sure --

9    yeah, Exhibit 7, updated list of cases where you

10   provided testimony, were there other cases where

11   you were retained as an expert and produced

12   reports that you were not asked to give

13   testimony?

14   A        Yes.

15   Q        Do you -- do you recall those cases and

16   why you were not asked to give testimony?

17   A        Well, they were primarily personal

18   injury cases where I was asked to provide an

19   opinion on reasonable value of medical bills.

20   And in the vast majority of cases that didn't

21   make this list, those cases were settled prior to

22   the need to depose me, or prior to trial.

23   Q        So let me ask you a little bit about

24   those reasonable value cases.  So we have a

25   hypothetical case where a plaintiff is injured
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    and let's just say a -- a simple case, a car

 2    wreck, incurs medical bills, brings a lawsuit

 3    against the person he or she alleges is

 4    responsible for causing the accident and presents

 5    those medical bills as evidence of their claim

 6    for damages.  What would your role be in a case

 7    like that?

 8    A         Yeah.  In a case like that, I -- I

 9    would look at the medical bills and try to get an

10    understanding of what happened, look at

11    corresponding medical records, if necessary,

12    again, to try to understand what happened, what

13    services were provided, and then the goal becomes

14    calculating the reasonable value of those

15    services.

16              So it starts with the premise that the

17    billed amounts are not the same as -- as the

18    amounts that are transacted in the marketplace.

19    So the -- the amounts -- in other words, the

20    amounts on the bills are not reflective of

21    reasonable value.

22              And in -- in most jurisdictions,

23    reasonable value is something that's --

24              I'm not an attorney, so I don't

25    remember the exact legal language around it, but
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    reasonable value is something that is either

 2    required or allowed to be put on the board.  And,

 3    so, I would calculate what that reasonable value

 4    was.  In other words, an approximation of what --

 5    of what the services would be, what they would be

 6    transacted at in the marketplace.

 7    Q        So you would not be --

 8             Let me strike that and ask it --

 9             So, for example, in my hypothetical,

10    the plaintiff in that case was somebody on --

11    that had Medicaid providing their health

12    insurance, and -- and they go to the hospital.

13    The hospital sends a bill for a hundred dollars,

14    but Medicaid pays 50 -- 50 dollars.  Would that

15    be the situation where you would be called to

16    testify about what that -- the value of those

17    services actually was?

18    A        Yes, something like that, although I

19    wouldn't necessarily look at or concern myself

20    with what a payor paid.  I would approach it

21    differently and not necessarily take that

22    information into account.  But, yes, otherwise,

23    that's correct.

24    Q        But how did -- how would you approach

25    that?
```

```
 1    A          Well, there's a number of different

 2    ways to approach reasonable value.  The -- in the

 3    case of professional services of medical bills, I

 4    typically look at benchmarking data sets, things

 5    like FAIR Health or Context 4 Healthcare, and use

 6    those data sets to determine median billed

 7    amount.  And that's the -- so that's the billed

 8    amount.

 9          So, you know, I know I just said that

10    billed amounts weren't reflective of reasonable

11    value.  But things like professional services

12    that occur at very high numbers, the billed

13    amount is -- is appropriate if you look at the

14    median where -- where you can tamp down the

15    effect of extremely low est- -- or extremely low

16    bills and extremely high bills.  So that's --

17    that's for professional services.

18          For hospital services and ambulatory

19    surgery centers, they use a different approach.

20    Hospital services, I look at the Department of

21    Health and Human Services cost reports, hospital

22    cost reports, ATRs, and from those I'm able to

23    take a medical bill and calculate, using the cost

24    charge ratios from the hospital-specific hospital

25    cost report, I'm able to calculate a -- an
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    estimate of the cost.  And then I add on to that

 2    a rate of return, reasonable rate of return to

 3    develop a estimate of the reasonable value of the

 4    hospital service.  Again, it's based primarily on

 5    the services provided as they're recorded in the

 6    bill.

 7    Q        Okay.  Have you ever testified before

 8    Congress or -- or any state legislative body?

 9    A        Um, no.  I -- I --

10             Well, I was deposed by a -- by the

11    Department of Justice in a case that -- in a

12    federal case involving physician-owned hospitals,

13    and it was a long time ago.  I don't know if that

14    counts.

15    Q        That was gonna be -- that was gonna be

16    one of my next questions.  But how about -- how

17    about a criminal grand jury in either state or

18    federal level?

19    A        No.

20    Q        Then the last area would be what I

21    think your Department of Justice testimony is,

22    statements or testimony given to a regulatory

23    agency.  So you identified the Department of

24    Justice.  And tell me about that instance again.

25    A        Yeah.  That was -- that was a case
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   where the -- there's some legislation enacted

 2   that limited the -- in some way limited

 3   physician-owned hospitals.  So these were

 4   typically small hospitals where physicians had a

 5   majority ownership share.  They had been -- they

 6   already were in existence.  They had been

 7   permitted via some additional legislation added

 8   onto the -- what's it called? -- the

 9   anti-kickback kind of -- kind of legislation from

10   many years prior.  So there were legal entities,

11   but then these additional restrictions were put

12   on them.  And in -- you know, the -- the

13   physician-owned hospitals as a group sued or

14   filed some sort of --

15           Yeah.  Again, I'm not an attorney, so I

16   don't remember the exact --

17   Q       Sure.

18   A       -- language around it.  But they --

19   they -- they --

20   Q       They challenged that rule somehow.

21   A       Yes.  Thank you.  Yes.  They challenged

22   it, and they put me forward as their expert, one

23   of their -- I was one of many experts, but I was

24   an expert on the sort of functioning of

25   physician-owned hospitals and, basically, the --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   how -- what -- you know, whether they're sort of

 2   problematic in any way from a health services or

 3   health economics point of view and also whether

 4   they had a --

 5           Actually, that had an attributable cost

 6   element to it as well in terms of trying to

 7   figure out whether the presence of

 8   physician-owned hospitals had any sort of

 9   deleterious impact on community hospitals,

10   non-physician-owned hospitals.

11   Q        All right.  Let's go to the top of --

12   of your CV.

13   A        Okay.

14   Q        The education, B.A., University of

15   Maine; M.A., University of Maine; Ph.D., U-Cal

16   Berkeley.  Any other education -- post-high

17   school education that's not listed there?

18   A        No.

19   Q        The section on professional experience,

20   is that complete?  Is there anything missing?

21   Any other professional positions you've had that

22   are not listed there?

23   A        Let me take a quick look.

24   Q        Sure.

25   A        No.  I think that looks correct.
```

1    Q        Your work at Oxford Outcomes, was that

2    similar to the work you're now doing for Avalon?

3    A        Yes, very similar.

4    Q        Same question with respect to Health

5    Economics Consultant Group.

6    A        Yes, very similar.

7    Q        What is the Gerson Lehrman Group Health

8    Care Council?

9    A        Well, this is a -- this is a group

10   that -- GLG for short, and they -- it's an expert

11   services group, not -- not just for litigation.

12   In fact, mostly not for litigation.  It's for

13   people in the financial community who need a

14   quick hourly consult.  In this case, I am -- I'm

15   part of their health care group.  So, for

16   example, a private equity investor would contact

17   me through this group and say, you know, "Can you

18   give me some sense of what's happening in the

19   diagnostic market right now?"  That kind of

20   thing.

21   Q        So your work -- your work for the Wall

22   Street Journal, the weekly reviews you describe

23   here, were they all published in the Journal?  If

24   I wanted to go back and pull those up, I could --

25   to -- to -- to the extent I have access to

```
 1    Journal articles from 2005 to 2007, would I find

 2    them there?

 3    A       Well, in their professor journal

 4    section, yes, possibly.  They were available.

 5    I'm not sure -- I haven't tried in a while.

 6    Q       Okay.  But they were -- but they were

 7    publicly distributed through the Journal as

 8    opposed to a private subscription, some sort of

 9    other private subscription service?

10    A       Well, I'm not sure about that.  I think

11    they -- they were -- this was for their thing or

12    their product called The Professor Journal, and

13    that was distributed to -- I think it may have

14    been distributed on a -- on a -- on a membership

15    basis or subscription basis like the regular Wall

16    Street Journal.  So I -- I -- I'm not sure that

17    they were -- they weren't just necessarily posted

18    for general consumption.

19    Q       So it's not a product that was included

20    with the Wall Street Journal.  It's some -- it's

21    some other product that they -- that they

22    separately sold?  Is that your understanding?

23    A       Yes, that's correct.

24    Q       In any of your professional consulting

25    work, have you ever had to -- had occasion to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   evaluate the cost benefits, economic cost

 2   benefits of prescription opioids for use in

 3   treatment of pain?

 4   A        No.

 5   Q        All right.  Go to page 4 of the CV.

 6   A        Okay.

 7   Q        So page 4 starts a list of 54

 8   peer-reviewed publications.  Do you have other

 9   peer-reviewed publications that are not listed in

10   this CV?

11   A        No, not -- not -- there shouldn't be.

12   I may have missed one or two along the way, but I

13   don't think so.  I think this is the full list.

14   Q        In connection with your testimony today

15   and your report in this case, do you rely on any

16   of those peer-reviewed publications?

17   A        I'm sorry.  Just to clarify, do I rely

18   on any of my own peer-reviewed publications?

19   Q        Yes.

20   A        I don't believe so.

21   Q        Are any of them relevant to the

22   testimony that you're going to offer in this case

23   and that you've set forth in your report?

24   A        Only to the extent that they -- that

25   some of them involve methods that are -- that are
```

Highly Confidential - Subject to Further Confidentiality Review

1    similar, not exactly the same but similar.

2    Q        Can you give me a couple examples?

3    A        Sure.  We can go through.

4    Q        Take a minute, if you want to look

5    through the list.

6    A        Yes.  I will do that.

7             Well, do you want me to just flag them

8    up as -- as we go or as I go through the list, or

9    do you want me to just identify them and then

10   we --

11   Q        Why don't you identify them.  And then

12   if I have questions, I'll -- we can talk about

13   specific ones.

14   A        Okay.  I'll go through the list, then,

15   and I'll just jot down the numbers that I think

16   are more or less relevant.

17            Okay.

18   Q        Okay.  So which ones?

19   A        Okay.  Do you want me to just rattle

20   off the numbers?

21   Q        Yeah.  Well, just one at a time.  If I

22   have questions about --

23   A        Okay.

24   Q        We'll stop.

25   A        Okay.  Number 5.

 1    Q        Okay.  What about that is relevant to

 2    the testimony -- that article, number 5, is

 3    relevant to the testimony in this case?

 4    A        Well, that's -- that's essentially an

 5    attributable cost exercise trying to figure out

 6    how much -- to what extent are genetic factors

 7    attributable to changes -- levels and changes in

 8    obesity.

 9    Q        Okay.  What's the next one?

10    A        Number 8.

11    Q        Okay.  Go ahead.  Explain that one.

12    A        Yeah.  Number 8 is -- I mentioned

13    before the tobacco product waste.  This is one of

14    those studies.  This looks at -- this is testing

15    an online simulation model to attribute costs of

16    tobacco product waste to -- I think it was 30

17    large U.S. cities.  And it uses a very simple

18    simulation model -- a simulation model as a -- as

19    a -- you know, as an exercise, a demonstration of

20    how something like that could be done.

21    Q        So how -- briefly, how did -- did you

22    simulate -- how did you attribute the -- the cost

23    of the waste?

24    A        Well, it's -- in this --

25             Again, this was just sort of an

```
 1    illustration in this paper.  The idea is to look

 2    at the total litter costs --

 3              And it was quite simple, actually.

 4              So look at the total litter costs and

 5    apply a percentage of -- of all litter costs that

 6    are attributed or that might be attributable to

 7    tobacco product waste.

 8              And, again, this is all

 9    literature-based.

10              And -- and, then, I think there's maybe

11    a couple of other adjustments that are made, and

12    then that's done -- you know, replicated for

13    these cities based on the demographics of each of

14    those cities.

15    Q         And, so, this is -- this would be

16    essentially the cost of picking up cigarette

17    butts?

18    A         Oh, it's -- we call it prevention and

19    abatement.  So, yes, it would be the cost -- the

20    general cost of cleanup.  So -- and some cleanup

21    efforts don't target tobacco product waste

22    specifically.  They target instead general

23    litter, so it's a matter of apportioning some

24    part of the general litter to tobacco product

25    waste.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Q        And how is it that you figure out what

 2   portion is tobacco waste?

 3   A        Well, there's a number of different

 4   things.  So there's some litter studies done at

 5   the -- at the city level from around the world.

 6   There was some --

 7            I actually took part in one of the

 8   studies in San Francisco that did a litter --

 9   on-the-ground litter survey as to determine what

10   portion of the -- what direct proportion of

11   the -- of the -- of litter found in the

12   environment was attributable to tobacco product

13   waste.  So that's -- that's one -- well, that's

14   the main source.

15            There are other estimates that are

16   based more on the -- the smoking rates, number of

17   people smoking, the amount of cigarettes smoked,

18   and applying to that a littering rate.  But

19   that's -- that's not the approach I used in this

20   paper.

21   Q        In your work on tobacco product waste,

22   did you, in allocating the -- the cost, did you

23   allocate the cost based on which manufacturer --

24   which manufacturer's products might have led to

25   the waste?
```

```
 1    A          I'm sorry.  What do you mean, which

 2    manufacturer?

 3    Q          So I mean --

 4               So you have a number of different

 5    companies who -- who manufacture cigarettes.

 6    Were you looking at their respective shares of

 7    the problem of tobacco waste at all?

 8    A          No.

 9    Q          Why not?

10    A          I'm sorry.  You said why not?

11    Q          Yeah.

12    A          Um, it just wasn't part of what I was

13    trying to do.  I was trying to focus more on the

14    prevention and abatement cost total rather than

15    any particular entity's responsibility.

16    Q          Okay.  What's the next one?

17    A          I think it's number 18.  That's --

18    yeah.  Number 18, assessing the impact of state

19    opt-out policy on access to and costs of

20    surgeries and other procedures requiring

21    anesthesia services.

22    Q          What's an opt-out -- state opt-out

23    policy?

24    A          In this case, the opt-out policy was

25    that states could opt out of limits that were put
```

```
 1   on nurse anesthetists, practice limits or scope

 2   of practice limits I guess is what they're

 3   usually called.  So if the state opted out of the

 4   limits on the scope of practice for nurse

 5   anesthetists, they -- they could then allow nurse

 6   anesthetists to do more, provide more anesthesia

 7   services mainly in outpatient surgeries but also

 8   some inpatient surgeries.

 9          So the goal of this paper was to figure

10   out how much -- whether there was any additional

11   attributable cost associated with that, with

12   being an opt-out state or being a not -- or not

13   being an opt-out state just to see -- see what

14   the effect of the opt-out states may have had.

15   Q       And what methodology did you use in

16   that case that's relevant to your testimony

17   today?

18   A       It -- it's -- methodologically, the

19   approach is -- is -- is similar.  I think the --

20   I can't remember what the data source was.  I

21   think it might have been --

22          I'd have to go back and check, but I

23   think it was a claims data set, possibly Medicare

24   data I believe we used for that.  And the idea is

25   to sort of figure -- use the Medicare data to
```

```
 1   figure out the attributable costs to the opt-out

 2   policy.  So it's looking at a -- how -- looking

 3   at changes over time in costs in the opt-out

 4   states versus the non-opt-out states.

 5   Q        What's the next one?

 6   A        The one below it, 19.  This is actually

 7   very similar to the one above it.  It's the

 8   same -- part of the same scope of research we

 9   were doing there.

10   Q        Okay.  What's the next one?

11   A        Same.  So same answers as above.

12   Q        Okay.

13   A        Not so much opt out.  I think it was

14   just unexpected.  Disposition means outcomes that

15   were not expected.

16   Q        Okay.  What's the next one?

17   A        Twenty-seven.

18   Q        That's another tobacco litter case?

19   A        Yeah.  And this one in tobacco control

20   was a summary, kind of a brief summary of the

21   work I'd done in San Francisco.  The work in

22   San Francisco was never published as such.  It

23   was a report, a technical report provided to the

24   city, to the --

25   Q        Hold on one second, guys.  I'm gonna
```

1   see if I can get the dog...

2              (Pause in proceedings)

3   MR. MAJESTRO:

4   Q       All right.  I'm back.  I'm sorry.

5           Did you -- why don't you repeat that

6   answer, because I don't know if we got it on the

7   record.  I certainly didn't hear it.

8   A       Okay.  I'm sorry.  You're gonna have to

9   repeat the question, because I want to make sure

10  I answer the right question.

11  Q       I think the question was --

12          Well, it's the same question we've been

13  going on.  It's how is this paper relevant to the

14  opinions you have today?  You were telling me

15  that this was -- you were describing the San

16  Francisco -- your San Francisco work.

17  A       Right.  I think I finished my answer.

18  So I -- I -- I was, as I said before, I was

19  engaged by the City of San Francisco.  It's quite

20  awhile ago, actually, several years preceding

21  even this -- this paper.  This is 2011, Tobacco

22  Control.  So this paper summarizes that work in a

23  very general, sort of conceptual way.

24  Q       Okay.  Are there any others?

25  A       Twenty-nine.  So 29 I provided a

1    reference to before in the context of that DOJ

2    case.

3    Q        Right.

4    A        Item 29 reflects the work I did

5    on phys- -- some of the work I did on

6    physician-owned hospitals.  And in this case it's

7    attributing costs of physician-owned hospitals to

8    overall Medicare expenditures at an area level.

9    Q        Okay.  Next one?

10   A        Oh, let's see.  That was 29.  So looks

11   like 37.

12   Q        Okay.

13   A        I marked 37 just because it had to do

14   with specialty hospitals, and I had done a lot of

15   work in that area.  I don't recall exactly what

16   the scope of this particular paper was.  I think

17   it was an overview of the issues, so more of a

18   conceptual paper.

19   Q        Okay.  Next one?

20   A        Forty.  Okay.  Yeah.  So, again,

21   specialty hospitals.  This is the impact, similar

22   to the paper up above, which was the impact on

23   Medicare expenditures.  This is the impact on --

24   on general hospital managed performance.  So it's

25   attributing some proportion of the impact of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    specialty hospitals on general hospital

 2    management departments.

 3    Q        Okay.  Next one?

 4    A        Forty-five.  I flagged this one up

 5    because it had a lot to do with clinical practice

 6    guidelines, and that's something that I -- I

 7    reference in a couple of different places in --

 8    in my -- in the current -- in the report for

 9    today's matter.  This represented some work I did

10    on the impact of clinical practice guidelines,

11    private-paying organizations, things like that.

12    Q        Okay.  The next one?

13    A        The last one would be -- I marked 51.

14    And this was the -- this was looking at the --

15    the effect on hospital operating costs of -- of

16    changes in mandatory rate regulation.  So, again,

17    this is an attribution kind of process using a

18    regression analysis over a period of time.

19             That was the last one.

20    Q        Okay.  Sure.

21             And, then, turning to your technical

22    project reports and manuscripts.

23    A        Actually, before we start that, could

24    we take a quick break?

25    Q        Sure.
```

```
 1   A          Great.  Thank you.

 2   Q          I tell you what.  Let's take five or --

 3   five -- five or ten minutes or so, and then,

 4   Doctor, what I would like you to do before we get

 5   back on the record is go through these 19 and

 6   pick out the ones we -- we should talk -- same

 7   question as I asked you with respect to your

 8   peer-reviewed publications; which, if any, of

 9   these would relate to methods or work that would

10   be relevant to your testimony that you're giving

11   in this case.

12   A          Okay.  Well, then, I would -- I would

13   like -- ten minutes would be good?

14   MR. MAJESTRO:

15             Sure.

16   MR. BOONE:

17             Fifteen minutes?

18   MR. MAJESTRO:

19   Q          We'll just take 15 minutes.  We'll come

20   back at 10:30.

21   A          10:30.  Okay.

22   VIDEOGRAPHER:

23             The time is now --

24             Are we ready to go off the record?

25   MR. MAJESTRO:
```

1          Yes.

2     VIDEOGRAPHER:

3          10:15 a.m., we're off the record.

4               (OFF THE RECORD.)

5     VIDEOGRAPHER:

6          10:30 a.m.  We're back on the record.

7     MR. MAJESTRO:

8     Q     All right.  Doctor, I think when we

9     took a break I had asked you to go through the

10    section of your report dealing with technical

11    projects and manuscripts, or technical project

12    reports and manuscripts, and asked you to

13    identify -- the same that we did for your

14    peer-reviewed publications and identify ones that

15    might use methods or otherwise be relevant to

16    your opinions in this case.  Did you have a

17    chance to do that?

18    A     Yes, I have.

19    Q     Okay.  So are there any?

20    A     Yes, there were.  I identified six

21    different technical reports.

22    Q     Okay.  And which ones?  Go ahead.

23    Which ones -- let's start with the first one of

24    those.

25    A     The first of those is number 5.

```
 1   Q        Okay.  Can you explain how -- how that

 2   would meet the criteria that I've -- I've asked

 3   you to use?

 4   A        Yeah.  So this is relevant because it

 5   looked at a -- the focus was alcohol-attributable

 6   costs to the City of San Francisco, and, of

 7   course, there was an additional -- as that title

 8   implies, there was an additional element, too,

 9   which was developing a regulatory fee structure

10   to -- to abate those costs.

11   Q        Which number is that?

12   A        Oh.  I'm sorry.  Well, it's -- it's --

13   I'm sorry.  It's number 5 on the old --

14            So what I did, another -- I forgot I

15   made another edit to this manuscript.  I mean to

16   this CV.

17            The first four elements on the -- on

18   the old CV were -- I noticed were marked as in

19   review.  Those were manuscripts that were in

20   review.

21   Q        Uh-huh.

22   A        And those had all either been published

23   in some form or another or -- or not.  So I -- I

24   deleted all of those because none of those were

25   relevant anymore.
```

```
 1    Q        Okay.

 2    A        That was an edit I made for this

 3    updated April one.  So -- so we're actually

 4    talking about number 1.  I'm sorry.  I'm going to

 5    have to amend my numbering as we go --

 6    Q        Okay.

 7    A        -- but I can do that on the fly.

 8             Yes.  So did you have further question

 9    about that?

10    Q        Yeah.  Now that I -- why don't you

11    explain again why that one meets the criteria?

12    Because I was scratching my head when I was

13    looking at what's at number 6.

14    A        Yeah, yeah.  Apologies again for that.

15    That's -- I confused myself on that.

16             So, yeah.  So item number 1 on the

17    technical report, entitled "Regulatory Fee

18    Structure Analysis For Alcohol-Attributable Costs

19    in San Francisco."  So this case -- or not case.

20    It's not a litigation matter.  But this endeavor

21    was to calculate, number 1, the costs -- the

22    alcohol-attributable costs to the City of

23    San Francisco --

24             So this would be abatement costs, using

25    the language of our -- our current matter.
```

1          -- and, then, on top of that, creating

2     a regulatory fee structure.  So it -- a means by

3     which alcohol manufacturers or distributors

4     could -- could potentially pay for that

5     attributable cost.

6     Q          How could I get a copy of that paper?

7     A          Yeah.  That's a good question.  I -- I

8     think it's available through the -- through the

9     city, but I'm not a hundred percent sure.  I -- I

10    can -- I can get back to you on -- on where that

11    might be available.

12    Q          Do you have a copy -- do you retain a

13    copy of it?

14    A          I might.  It was a long time ago, so --

15    12 years ago or so.  So I -- I'm not sure how

16    readily I could put my hands on it.

17    Q          Okay.  Appreciate it if you would make

18    an inquiry on that and report back to Mr. Boone

19    about that.

20               So how did you determine what the

21    alcohol-attributable costs were for

22    San Francisco?

23    A          Um, well, what we did in that case was

24    looked at the -- the effect of alcohol-related --

25               So, essentially, again --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              This is 12 years ago, so my memory's a
 2     bit fuzzy, but I can give you the broad strokes.
 3              Looking at the -- first of all,
 4     identifying alcohol-attributable conditions and
 5     illnesses and things like that, so fatty liver
 6     disease, alcohol-related fatty -- fatty liver
 7     disease, things like that, other types of acute
 8     alcohol poisoning-type issues, things like that.
 9     And it's figuring out what the costs of those
10     were to the city.
11              So, obviously, all the -- all of the --
12     all of those types of -- of conditions don't fall
13     on the city because some of them are covered by
14     private insurers.
15     Q        Dr. Schneider, I hate to interrupt you.
16     I've got somebody at my front door, and I'm the
17     only one home.  And, so, let me go -- let me real
18     quick deal with that.  We can stay on the record.
19     I think this will just take a minute.  Probably
20     just somebody who needs me to sign for a package.
21     A        Okay.
22              (Pause in proceedings)
23     MR. MAJESTRO:
24     Q        Apologize for that.  I'm back.
25              So we're still on the record?  Okay.
```

```
 1              So, Dr. Schneider, you were explaining

 2      how -- how you determined what the

 3      alcohol-attributable costs were.

 4      A        Right.

 5      Q        Did you complete that answer?

 6      A        Well, I'm not sure where I left off, so

 7      I'll just repeat it.

 8              So the -- the agreement was to figure

 9      out first how to -- oh, I'm sorry -- first, to

10      identify types of conditions, both chronic and

11      acute, that are associated with alcohol use and

12      then to take those identified conditions and then

13      to use data from the city, claims, you know, from

14      their hospitals, that kind of thing, or discharge

15      data from their hospitals, claims data from their

16      clinics and things like that to identify what

17      proportion of -- of services,

18      alcohol-attributable condition services, was the

19      city paying for and had the city paid for over

20      some period of time.  I don't remember the time

21      frame.  That was essentially it.

22              And then the next -- the second half of

23      that was to figure out, okay, well, if the cost

24      is X, how could we potentially go to the

25      manufacturers and -- and distributors and -- and
```

Highly Confidential - Subject to Further Confidentiality Review

1   seek abatement for those costs?

2   Q        So the cost you looked at, did you look

3   at the, for the diagnoses and the treatments, did

4   you look at what the city was expending or just

5   the costs in totality?

6   A        Well, I think the -- I think the

7   research included some element of both.  But

8   mainly, the city was interested -- and the city

9   was the -- was the client in this case.  They

10  were interested in what they were paying for

11  alcohol-attributable illnesses and conditions.

12  Q        Did you look at the consequences beyond

13  the physical impact of alcohol on a particular

14  person, consequences to third parties or the city

15  in general that could --

16  A        Could you give me a for example?

17  Q        Babies born who've had neonatal alcohol

18  exposure, whether or not they had increased costs

19  for schooling, for example.

20  A        Yeah, okay.  I -- I don't recall

21  whether that was part of the scope or not.

22  Q        Did you look, like, things like law

23  enforcement expenses that were related to alcohol

24  use?

25  A        No.  That -- that -- I'm quite sure

1    that wasn't part of the scope.  I think the scope

2    was healthcare-related costs.

3    Q        All right.  Next technical project

4    report and manuscript?

5    A        That would be the one -- the one below

6    it, number 2, item number 2.  And this one was

7    actually very similar in every respect to the

8    preceding one, the alcohol-attributable costs.

9    This was -- although it's a different title, it

10   was essentially the exact same analysis for

11   calorically sweetened beverages.

12   Q        Okay.  Next one?

13            And same -- same question I'd have on

14   that one.  If you can retrieve a copy of that,

15   would you please let Mr. Boone know?

16   A        Yes, I will.

17            Okay.  The next one, I have to do the

18   renumbering in my head.  That would be number 6.

19   Q        Okay.

20   A        This was a analysis of California's

21   single-parent healthcare proposal at the time

22   called SBA40 and for the California Association

23   of Healthcare Underwriters.  My agreement here,

24   our agreement here was to figure out the -- what

25   the cost impact would be of the single-parent

```
 1    healthcare proposal on California -- on the

 2    California health system.  So it involved a lot

 3    of different cost attributions, sort of

 4    mechanisms and analyses.

 5    Q        Okay.  Next one?

 6    A        So this would be the --

 7             Number 9 is the -- the relationship

 8    between organizational performance and health

 9    status in the VA.  This -- this didn't involve --

10    that particular project didn't involve costs, but

11    it was, instead, trying to attribute clinical

12    practice guideline efforts or adherence to

13    clinical practice guidelines as the outcome

14    measured for organizational performance and

15    attribute those to health status measures in the

16    VA system using VA claims data.

17    Q        Okay.  Next one?

18    A        The work described in number -- in item

19    number 10, which is generally -- that --

20    actually, there's one or two things listed there.

21    Actually, item number 10 and 11 are kind of

22    related.  But 10 is more specific to what we're

23    talking about today, and that's looking at the

24    cost impact, the attributable cost of specific

25    managed care regulations in California in 1999.
```

```
 1    Q         Okay.  Next one?

 2    A         I think that's -- I think that's it.

 3    Did we go through six or did I miss one?

 4    Q         I think we've gone through six.

 5    A         Yeah.  Because I identified six.  I

 6    just lost track, with the interruption, of where

 7    we were at.

 8              But I don't think -- in any case, there

 9    are none below that last one I just mentioned.

10    Q         Okay.  All right.  Did you prepare your

11    CV?

12    A         Yes.

13    Q         Do you use a different CV for

14    non-testifying work?

15    A         No.  I just have the one CV.

16    Q         What professional organizations are you

17    a member of?

18    A         Um, it's changed periodically over the

19    years, but I think right now it's just the

20    International Society of Pharmacoeconomics and

21    Outcomes Research, or ISPOR, and the Academy of

22    Managed Care Pharmacy.

23    Q         Okay.  Have there been other

24    professional organizations you've been a member

25    of in the past?
```

```
 1   A          Yeah.  I've been sort of in and out of

 2   the International Health Economics Association,

 3   the American Economics Association --

 4              Well, maybe -- maybe just those two.

 5   Q          Did you have leadership roles in any of

 6   the -- the professional organizations you've

 7   identified?

 8   A          No.

 9   Q          When you were first retained by

10   Mr. Boone, what were you asked to do?

11   A          I was asked to -- to analyze the

12   attributable costs of opioid use disorder in the

13   state of New Mexico and -- and use that to

14   determine abatement costs or an abatement cost

15   ceiling.

16   Q          Explain what you mean by an abatement

17   cost ceiling.

18   A          Well, the ceiling that -- the ceiling

19   word was -- was my word, not Mr. Boone's.  My

20   approach to -- to this was to --

21              Essentially, we have a large number of

22   studies that have been done on this topic.  I was

23   aware that -- that -- that the plaintiffs were

24   also engaging -- at the time I was engaged, I --

25   that the plaintiffs were also engaging in their
```

```
 1    own assessment of abatement costs.  So what --

 2    what I viewed my job as is to come up with an

 3    alternative method of calculating an abatement

 4    cost ceiling.

 5            And, again, just to clarify, what I

 6    mean by abatement cost is simply what -- what the

 7    actual attributable costs of, in this case,

 8    opioid use disorder, or OUD, would be in the

 9    state of New Mexico, based on my opinion, based

10    on my approach to this problem.

11    Q       In your work in the multidistrict

12    litigation proceeding in Cleveland, did you have

13    occasion to look at the reports of other experts

14    who were doing this kind of work?

15    A       No.

16    Q       Prior to --

17            Well, I assume you've reviewed the

18    reports prepared by Dr. Miller and Dr. Dobson

19    that plaintiffs have retained in this case;

20    correct?

21    A       That's correct.  Yes.

22    Q       Prior to reviewing those reports, have

23    you had occasion to look at the work of any other

24    expert that was attempting to calculate abatement

25    costs or similar damage -- damage analysis?
```

```
 1   A        I -- I -- I did look at a couple of

 2   other reports.

 3   Q        And what were -- what would those

 4   reports have been?

 5   A        I think I looked at a report by

 6   Jonathan Gruber.  And there was another one.  I

 7   can't remember the -- the author's name.  I think

 8   I looked at -- yeah, Gruber and another report

 9   from -- from -- which I don't think were -- had

10   anything to do with New Mexico.  They were from a

11   prior -- you know, prior track.

12   Q        Do you -- do you know which case those

13   came from?

14   A        No, I don't.

15   Q        I didn't note in your report that --

16   that you had looked at either one of those, those

17   documents.  Do you still have those reports?

18   A        Yes.  I believe so, yeah.

19   Q        At some point I'd ask you to identify

20   those reports to -- to Mr. -- Mr. Boone.

21   A        Okay.

22   Q        Were you given any assumptions in this

23   case?

24   A        Please describe more what you mean by

25   that.
```

1    Q        Sometimes in a case the party will tell

2    the expert "I want you to assume X is true and

3    then do analysis based on that assumption."  Were

4    you given any assumptions from counsel or from

5    your client, Kroger and Albertson [sic]?

6    A        No, I wasn't.

7    Q        All right.  Let's -- I'm gonna talk

8    about the information you reviewed in this case.

9    Do you have somewhere a list of documents that

10   you reviewed or relied on?

11   A        No.  I didn't -- I didn't list them out

12   in the report in one place.  They're just cited

13   throughout.

14   Q        Did you review, other than the

15   expert -- two expert reports we've talked about,

16   Gruber and the one whose name you can't remember,

17   did you review any documents in connection with

18   your opinions in this case that are not

19   identified in your report?

20   A        Um, I would say there were probably

21   some peer-reviewed literature that has been

22   retrieved over the time period I've been working

23   on this, and not all of which is -- is cited

24   here.

25            So, in other words, I -- I retrieved

Highly Confidential - Subject to Further Confidentiality Review

```
 1    probably more than I needed, and some of it ended

 2    up not getting cited.  So in that sense, yes,

 3    there were some other materials reviewed.

 4    Q        And by "retrieved," do you have a file

 5    in this case where -- that would contain that --

 6    those additional articles that you retrieved but

 7    did not cite in your report?

 8    A        Well, I'm not sure if I have the full

 9    text of the articles I didn't retrieve -- I'm

10    sorry -- that I didn't cite.  I might have some

11    of them.  So, yes is -- partially, yes, I will

12    have some of them.

13    Q        Okay.  And that -- I'd appreciate if

14    you would -- you would give those documents in

15    that list to Mr. Boone also.

16    A        Okay.

17    Q        Did you review any testimony?

18    A        No.

19    Q        Did you review reports from experts

20    that were attained by -- were retained by

21    Kroger's and Albertson [sic] or any of the other

22    defendants?

23    A        Yes, I did review some of those

24    reports.

25    Q        Okay.  And which one?  Can you identify
```

1    those for me?

2    A        Well, I reviewed the report by

3    Dr. Dobson, the report by Dr. Miller, the report

4    by Dr. Kessler, and the report by Mr. Girardi.

5    Q        In your report you identify -- in the

6    revised report you identify LoSasso?

7    A        Oh, yes.  I'm sorry.  I left that one

8    out.  Yes.  That is a very recent addition.  I

9    reviewed the report by Dr. LoSasso.

10   Q        And Dr. Glickman?

11   A        Yes.  I was -- I was -- I only reviewed

12   one page from or a couple pages from

13   Dr. Glickman.

14   Q        Okay.  What in his report did you --

15   did you review?

16   A        In Dr. Glickman's report?

17   Q        Yes.

18   A        In -- it was the -- his table

19   identifying market shares for Albertsons.

20   Q        Okay.  And what did you review with

21   respect to Dr. LoSasso?

22   A        Same.  A table regarding market shares

23   but for Kroger.

24   Q        Did you review any of the documents

25   that Kroger or Albertsons produced in this case,

Highly Confidential - Subject to Further Confidentiality Review

1    internal company documents?

2    A        No, I don't believe so.

3    Q        Did you conduct any independent or

4    outside research, apart from the data that was

5    provided to you?

6    A        Well, explain that a little bit better.

7    Q        I intend that question to be broad.  I

8    mean, that is, I take it that --

9              Well, the -- the literature that's

10   cited in your report, that's literature you

11   developed.  By "developed," I meant you went out

12   and got as opposed to literature that was

13   provided to you.  Is that correct?

14   A        That's right.  Yes.

15   Q        So -- so other than the literature

16   that's cited in your report, did you -- did you

17   conduct any other independent or outside

18   research?

19   A        No.  I think the report reflects the

20   work that I did.

21   Q        You testified briefly about conference

22   calls with counsel for some of the other pharmacy

23   defendants in this case.  Have you discussed your

24   testimony or your opinions with anyone else other

25   than what you've described previously?  And --

1    and your clients in this case.

2    A       No.

3    Q       What documents did you review in

4    preparation for your testimony today?

5    A       I reviewed the -- sort of the major

6    sources that I relied on in terms of the

7    published literature, the Society of Actuaries

8    report.  My own report was reviewed again, and

9    some of the plaintiff expert reports, so Dobson,

10   Miller, and Girardi.  I think that's pretty much

11   it.

12           (DEPOSITION EXHIBIT NUMBER 2

13            WAS MARKED FOR IDENTIFICATION.)

14   MR. MAJESTRO:

15   Q       Okay.  So we've marked as Exhibit 2

16   your report dated March 18, 2022, which I believe

17   you have in front of you.

18   A       Yes.

19           (DEPOSITION EXHIBIT NUMBER 6

20            WAS MARKED FOR IDENTIFICATION.)

21   MR. MAJESTRO:

22   Q       And, then, we've marked as Exhibit 6

23   the revised report, which is dated March 8 --

24   well, it's revised April 5, 2022.  And I believe

25   you testified that you have printed out the

1    pages, the particular pages that changed in --

2    from March to April.

3    A          Correct.

4    Q          So the -- does the revised report dated

5    April 5, 2022, contain all of your opinions that

6    you intend to offer in this case?

7    A          Yes, with the caveat that if anything

8    new comes along that I'm asked to opine on, I

9    would amend my report.

10   Q          Okay.  And you would expect that that

11   amended report would be provided to us prior to

12   trial?

13   A          Yes, I would expect that.

14   Q          Have you created any demonstrative

15   exhibits for use at trial, other than the --

16   what's contained in your report?

17   A          No, I haven't.

18   Q          Do you have a plan to use demonstrative

19   exhibits at trial?

20   MR. BOONE:

21              Object to the form.

22   A          I -- I have not given that any thought

23   yet.

24   MR. MAJESTRO:

25   Q          Do you plan to testify at the trial of

Highly Confidential - Subject to Further Confidentiality Review

1   this case?

2   A       If asked to, I will, yes.

3   Q       Do you know when the trial is?

4   A       Um, not off the top of my head.

5   Q       Have you been given the trial date, I

6   guess is the question.

7   A       I -- I don't recall whether I have or

8   not.

9   Q       Okay.  What are the pages that are new

10  in the April version of the report that you have

11  printed out?

12  A       Page 34, table 7-1 includes an edit.

13  And, then, the other is the -- would be the --

14  essentially, new page 41, which includes the

15  addition of a section 8.51 and 8.52 and table

16  8-2.

17  Q       Okay.  Why were those added in April?

18  A       As I was reviewing my report in

19  preparation for this deposition, I noticed a -- a

20  typo on table 7-1.  So that's the reason behind

21  the 7-1 edit.  That's a typo that was

22  inconsequential to the analysis.  It was not a --

23  an error, didn't reflect an error in my

24  calculations.  It just reflected simply a typo on

25  the table and copying and pasting of the wrong

```
 1   numbers into the table.

 2            And, then, the reason for adding

 3   section 8.51 and 8.52 was that I had been made

 4   aware of Dr. LoSasso's report and Dr. Glickman's

 5   reports, and I did not have those at the time of

 6   the March 18th submission of this report.  Having

 7   had those, I thought it would be useful to -- to

 8   continue my -- continue section 8.5 and show how

 9   those market shares would relate to -- to actual

10   retail pharmacies.  So I essentially had this as

11   an example.

12   Q        When did you receive those reports?

13   A        I -- I don't recall the exact day, but

14   it was just a few days ago.

15   Q        And were those reports dated March 18

16   also, or thereabouts?

17   A        I believe so, yes.

18   Q        Was there any reason --

19            Did you request those reports or did

20   counsel just give them to you?

21   A        Counsel gave them to me.

22   THE COURT REPORTER:

23            I didn't hear an answer.  Was there an

24   answer?

25   MR. MAJESTRO:
```

```
 1              Yes.  He said counsel gave them -- gave

 2    them to him.

 3    THE COURT REPORTER:

 4              Thank you.

 5    MR. MAJESTRO:

 6    Q         All right.  Dr. Schneider, I'd like to

 7    go through your opinions in this case one at a

 8    time.  So what is the first opinion that you

 9    intend -- that's contained in your report that

10    you intend to offer testimony regarding at trial?

11    A         Well, my report develops a number of

12    opinions, I think probably maybe five or -- five

13    or six opinions.  So my very first opinion would

14    be that causation of the opioid problem or opioid

15    utilization and opioid use disorder is

16    multifactorial and attributable to several

17    different causes, primary causes, and secondary

18    factors.

19    Q         Okay.  So why did you -- can you

20    identify for me the -- what your opinion is

21    regarding what are the causes of the -- of opioid

22    use disorder in New Mexico?

23    A         Sure.  I would --

24    Q         Can we direct -- can you direct me to a

25    particular page in your report that would be
```

```
 1    helpful?

 2    A         Yes.  That's what I was about to do.

 3    So I would suggest Figure 2-1 on page 6.

 4    Q         Okay.

 5    A         So this is the first --

 6              Well, actually, you know, I think my --

 7    the opinion I just mentioned is -- is, to some

 8    degree, summarized in this figure, maybe not

 9    completely.  But the -- the top of the figure, I

10    identify eight different factors that have fed

11    into opioid prescriptions and utilization over

12    the years.

13    Q         Okay.

14    A         Yeah.  And just -- I'll keep going if

15    you want.

16    Q         Sure.

17    A         Yeah.  The first of those is FDA

18    approval.  That's the initiating factor.

19    Obviously, there can't be any use of prescription

20    drugs without FDA approval, except for illicit

21    use, which we'll get to.

22              Medical need, actually, it looks like

23    in the figure that the word "need" is cut off

24    there, but it's in the narrative.  But the

25    medical -- medical need just refers to the need
```

1    to prescribe pain relievers, pain relief

2    medications to individuals suffering from either

3    post-surgical pain, chronic pain, or breakthrough

4    cancer pain, things like -- things like that.

5              Macroeconomic factors, these are

6    identified in the literature as being associated

7    with substance abuse generally and have also been

8    identified as being associated with -- with

9    opioid abuse.

10             Government advocacy refers to a variety

11   of government agencies, including government

12   payers, advocating for -- and better and more

13   aggressive pain control.  And, again, in my

14   report I provide a lot of examples of this, that

15   this was a concerted effort and sort of a -- you

16   could describe it as a multi-agency concerted

17   effort to -- to increase the rate at which

18   individuals get proper or effective treatment for

19   pain.

20             Provider advocacy is item number 5.

21   Provider advocacy here I refer to in a similar

22   capacity as government advocacy, except here I'm

23   referring to mainly medical societies and, in

24   some cases, also individual physicians, but it's

25   mainly physicians acting as groups and promoting

1    clinical practice guidelines and things like that

2    aimed at pain control.  So these are the earlier

3    generation of pain control guidelines which were,

4    again, very sort of aggressive and suggesting

5    that providers do a better job of managing pain.

6              Number 6 is performance incentives.

7    These were incentives put in place by payers,

8    public payers, private payers, a variety of other

9    types of payers that were designed to provide

10   financial reward for performance measures.  And

11   one common performance measure across a lot of

12   different performance metrics is pain control.

13   And that was something that was introduced in the

14   time period I referred to in the sort of mid-'90s

15   to early 2000s.

16             Seven is manufacturing marketing.  This

17   is also well-documented.  Well, I should preface

18   this by saying all of these are well-documented,

19   and I go into that in detail in the subsequent

20   pages.  Manufacturing marketing is the one that I

21   think most people have been hearing about, and

22   there are, of course, studies showing that

23   certain manufacturers engaged in marketing

24   behavior that heavily promoted the use of opioids

25   in the context of being able to address some of

```
 1   the government advocacy, provider advocacy, and

 2   performance incentives.

 3          And, then, finally, the last element,

 4   element number 8 is drug trafficking.  There's a

 5   large number of -- a large and growing number of

 6   illicit opioids coming into the country by mail

 7   from China and across -- and by border crossing,

 8   mainly on the southern border.  Mexico is a major

 9   producer of illicit heroin.  China is a major

10   producer of illicit fentanyl.  Those are coming

11   into this country in spite of the efforts of the

12   Drug Enforcement Agency or Administration to

13   limit that and in spite of the efforts of border

14   patrol and in spite of the efforts of state

15   police.  It has been very difficult to stop the

16   influx of opioids via drug trafficking.

17   Q       Okay.  I'll ask you a question about a

18   couple of those.  The manufacturer's marketing,

19   in that box, do you include manufacturers'

20   efforts to impact government advocacy and

21   provider advocacy, in addition to direct

22   marketing?

23   A       Well, yes.  I mean, that's -- that's a

24   good point.  I think that in some cases those are

25   intermingled, and there's some evidence of the
```

1    intermingling of those things.  I break them out

2    as a separate -- I break out separately in this

3    diagram and in my discussion because I do believe

4    that there was separate and independent

5    government advocacy that was taking place

6    independent from manufacturing influence.

7            Likewise, I believe there was separate

8    and independent provider advocacy that was also

9    taking place independent from manufacturer

10   influence.

11   Q       With respect to all eight of these

12   items, are you -- is it your testimony that they

13   all are causes of opioid use disorder and the

14   opioid epidemic?

15   A       Yeah.  I would say that they're

16   primary -- I would just further distinguish that

17   as primary causes.  There are other elements

18   involved.  These are the primary causes, in my

19   opinion, of the -- I would say more the rise in

20   opioid utilization, whether it's prescription

21   opioids or illicit opioids.  Obviously, drug

22   trafficking is driving illicit opioids, and

23   provider advocacy is driving more prescription

24   opioids.  So there's some differences in terms of

25   what types of opioids we're talking about here.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                But, generally speaking, I would -- I

 2    would say that that -- that these factors are

 3    driving opioid prescription volume and

 4    utilization and then -- of which opioid use

 5    disorder is part of that.  But I -- I don't -- I

 6    don't -- I wouldn't say that any one of these is

 7    directly associated with opioid use disorder.

 8    Q        With respect to the trafficking, the

 9    increase of people with opioid use disorder in

10    part explains the drug trafficking we have with

11    respect to synthetic or illegal heroin in this

12    country; correct?

13    A        Well, I'm sorry.  Can you just rephrase

14    that?  I'm not sure I follow.

15    Q        There are certain --

16             So the nonmedical use of opioids has

17    led to a population with opioid use disorders.

18    Correct?

19    A        Well, yeah.  So, just to clarify, so

20    that within nonmedical use of opioids, there is a

21    opiate use disorder subset of that group, yeah.

22    Q        And that subset of that group is

23    responsible for at least some of the increase in

24    drug trafficking in this country.  Correct?

25    A        Well, so is what you're asking is
```

1   whether the -- the individuals of opioid use

2   disorder, the sort of demand for illicit opioids

3   in that group is encouraging drug trafficking?

4   Is that -- is that where you're going?

5   Q       Yes.

6   A       Well, yeah.  This is the supply push

7   versus demand pull hypothesis.  I -- I don't know

8   that that's -- I mean, I think there -- I think

9   it's a little above.  I think there might be some

10  truth to that, but I think there's also -- you

11  know, drug cartels I think are very smart in

12  terms of also creating demand for their products.

13  And you look over history, and they've done a

14  very effective job of that.

15          So I think -- I don't think it's --

16  it's not solely due to the demand among

17  individuals with opioid use disorder.  It's

18  also -- it's a bit more proactive, sort of supply

19  push on the part of drug cartels and illicit drug

20  makers generally.

21  Q       And what's the basis for your opinion

22  on that?

23  A       Just materials I've read in the course

24  of doing this -- this project.  I don't remember

25  specific materials, but certainly some of the --

1   maybe some of the things I cite regarding -- or

2   some of the bigger reports from the Drug

3   Enforcement Administration touched on -- on that

4   issue.  I can't think of specific citations off

5   the top of my head.

6   Q        And why is FDA approval one of these

7   factors?

8   A        Well, in a lot of the capacity of my

9   nonlitigation work with pharmaceutical -- new

10  novel pharmaceuticals and the eval- -- economic

11  evaluation thereof, and, so, I've been able to

12  work with pharmaceutical companies in -- in the

13  stages leading up to FDA approval and then

14  following FDA approval.  And through that

15  process, I've become very familiar with the FDA

16  approval process, and I think anyone in my

17  business would agree that the FDA approval

18  process is -- is a rigorous and difficult process

19  to get through.  They don't typically

20  rubber-stamp new drugs and -- and devices and

21  things like that.

22           And it's -- it's also a process that

23  pharmaceutical companies have to pay a lot of

24  money to -- to manage.  So clinical trials are

25  very expensive.  There's multiple phases of

Highly Confidential - Subject to Further Confidentiality Review

1    clinical trials that are necessary.

2           So in my mind, first of all, there can

3    be no utilization of a drug without FDA approval,

4    so it's sort of a gatekeeper in that regard.

5    But -- but it goes beyond that and -- and I think

6    there's -- there's good literature on this, that

7    FDA approval is a marker of -- of -- of more

8    general approval.

9           So, for example, payers will pay for

10   things that are -- that it received FDA approval

11   because they've assumed -- and most of the time I

12   think it's incorrectly -- that the FDA has done

13   its due diligence in analyzing the clinical trial

14   data very carefully and basing its approval

15   decision based on those clinical trial data.

16   Q        You'll agree with me that opioids are

17   in a class of drugs that are subject to

18   regulation apart from the FDA?

19   A        Yeah.  Currently, you -- there's a

20   distinction that they are currently that -- in

21   that group.  I would agree, yes.

22   Q        Well, they've been subject to -- to

23   regulation for over a hundred years, controlled

24   substances have, haven't they?

25   A        And, generally, yes.  But I wasn't sure

```
 1   what kind of regulation you're referring to.  I

 2   mean, they're more regulated now than they were

 3   in the past, I would say.

 4   Q        And because of the -- are you familiar

 5   with the Controlled Substances Act?

 6   A        Only very generally.

 7   Q        And do you have an understanding that

 8   under the Controlled Substances Act there are

 9   certain regulations that are imposed on those in

10   the distribution -- manufacture and distribution

11   chain for controlled substances, of which opioids

12   are one of those drugs?

13   A        Generally familiar with that, yes.

14   Q        And, so, in addition to FDA approval,

15   there are other steps that -- that are in between

16   use by a patient, either nonmedical or medical,

17   and -- and FDA approval; correct?

18   A        Yes.  Yeah, generally correct.  Yes.

19   Q        And would it be fair to say that those

20   obligations, like FDA approval, are required

21   before the drugs leave the shelves of a pharmacy?

22   A        Yes, I think that's fair to say.

23   Q        So, for example, let's take the

24   pharmacies.  You know, apart from drug

25   trafficking, opioid -- prescription opioid
```

```
 1   medicine doesn't get in the hands of an

 2   individual person without going through a

 3   pharmacy.  Is that correct?

 4   A        Correct.

 5   Q        So the -- so we could put a box 9 that

 6   said "pharmacies"; correct?

 7   A        Well, I -- I further -- I make a

 8   further distinction on this in chapter 8 of my

 9   report where I -- I view pharmacies as more of a

10   gatekeeping factor rather than a primary causal

11   factor.

12   Q        Okay.  All right.  Well, we'll -- we

13   can -- we can get to that later.

14            Well, let's just, while we're on the

15   topic, what's the distinction?  Why is -- why

16   is -- why are pharmacies gatekeepers and the FDA

17   is not?  What's the difference between a pharmacy

18   and an FDA in the FDA approval?

19   A        Well, it can't -- I think of it this

20   way, or I think of it this way.  A drug can't be

21   dispensed to -- to an individual with a

22   prescription from their doctor unless it is first

23   FDA approved.  So that that -- there is that --

24   that's one of the first hurdles a drug has to get

25   over.
```

```
 1   Q        Right.

 2   A        You mentioned a Controlled Substance

 3   Act, but you think of -- you could think of that

 4   as a second hurdle.  I was just sort of lumping

 5   that in with regulatory approval.  So that's --

 6   that's my distinction between those two, that

 7   they couldn't --

 8            One is an enabling factor.  One, the

 9   FDA is an enabling -- enables a prescription of

10   an opioid to be written.

11            These other factors that I've

12   identified here are also -- can also be thought

13   of as enabling factors or causal factors.

14   Whether a -- a pharmacy --

15            I don't -- I don't agree that a

16   pharmacy could be thought of as an enabling or

17   causative factor because they're filling a

18   prescription that was written by a doctor.  That

19   prescription, to some extent, was influenced

20   already -- or writing that prescription was

21   influenced by all these other things before it

22   got to the retail pharmacy.  So there's that

23   temporal element in here as well.

24   Q        So is it your belief that a pharmacy

25   with a prescription from a doctor has no ability
```

1    to stop that prescription from being filled?

2    MR. BOONE:

3            Object to the form.

4    A        I'm not sure that I would say no

5    ability.  I'm -- I am, again, in chapter 8,

6    admitting to a -- a gatekeeping role.  So there

7    is some ability.  And I think, likewise, there's

8    some ability on the part of -- of all of these

9    entities -- well, except for things like

10   macroeconomic factors that are more macro and

11   sort of not necessarily controllable in any

12   centralized way.

13           But -- but a lot of these entities have

14   a responsibility or an ability to -- to control

15   the flow of opioids.  And -- and my distinction

16   here is that these eight were -- are -- are the

17   primary ones, and a secondary one would be retail

18   pharmacies, and I also identify consumers as

19   having a responsibility.  Again, that's not --

20   it's part of my opinion, but it's also documented

21   that there is a sort of consumer contract or an

22   implied consumer contract versus an explicit

23   consumer contract to, you know, not abuse

24   prescription drugs.  So there is that -- that

25   element as well.  So -- but, again, I view that

```
 1    as gate- -- more gatekeeping factor as well.

 2    Q        So if a pharmacy has certain duties --

 3    and we'll use your gatekeeping

 4    characterization -- a pharmacy not meeting those

 5    legal and regulatory duties to serve as a

 6    gatekeeper, they would be an additional cause,

 7    then, wouldn't they?

 8    A        I mean, to the extent that they were

 9    found to -- to have not performed the duties that

10    they were expected to perform, I would view them

11    as having some -- yeah, some role in -- in their

12    gatekeeping capacity, yes.

13    Q        All right.  Let's continue with figure

14    2-1.

15    A        Okay.  So we discussed the top of the

16    figure, which is my eight causal factors, again,

17    which the subsequent narrative describes those in

18    more detail; then, in sort of flow chart design

19    here where we're coming down into the medical use

20    of opioids versus the nonmedical use of opioids,

21    some literature that suggests the split is about

22    95 percent medical use, 5 percent nonmedical use.

23    We typically refer, sometimes refer to the

24    nonmedical use as diversion, diversion away from

25    medical use.  And, then, within that 5 percent of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    nonmedical use, I further distinguish between

 2    three different things.  You can have a

 3    non-cost-incurring misuse, you can have

 4    non-cost-incurring opiate use disorder, and you

 5    can have cost-incurring opiate use disorder.  The

 6    distinctions are for purposes of analysis.

 7    Q        Okay.  Let's -- I want to back up and

 8    ask you.  So tell me the basis for your 95

 9    percent and 5 percent characterizations.

10    A        I think there's one study that I cite,

11    but there are other studies that also have been

12    cited.  Let me see if I can put my finger on

13    those.

14             I cite a couple of different sources,

15    the Bowles study and the Saha study, which appear

16    in footnote 41.

17    Q        The category of nonmedical use, to what

18    extent are those users people who started out in

19    the 95 percent?

20    A        I -- I don't know off the top of my

21    head what that percentage would be.

22    Q        So it's true, though, that nonmedical

23    use of opioids can lead to --

24             No.  Sorry.  Strike that.

25             It's true that medical use of opioids
```

```
 1    can lead to nonmedical use of opioids.

 2    A         Yes.  That is true.

 3    Q         And you're not offering an opinion on

 4    how many people start off in medical use category

 5    and end up in the nonmedical use.

 6    A         Correct.  I'm not offering that

 7    opinion.

 8    Q         All right.  Let's -- let's go to

 9    your -- let's go down to the three boxes.  Let's

10    talk about the two green boxes.  Explain to me

11    what non-cost-incurring OUD is.

12    A         These would be individuals who might

13    otherwise be classified as having opiate use

14    disorder by the strict definitions of opioid use

15    disorder but incur no additional costs.  So, in

16    other words, they're not incurring criminal

17    justice system costs or -- or healthcare costs.

18    Q         But those are the only -- are those the

19    only cost items you're looking at for the

20    purposes of your analysis?

21    A         Yes.  For the purposes of my analysis,

22    that's where my focus is.

23    Q         And, then, what are non-cost-incurring

24    misuse?  What's that category?

25    A         Well, this would be looking at -- with
```

1   the understanding that among nonmedical use of

2   opioids there is more sort of general misuse and

3   abuse versus OUD.  So this would just --

4            Here I use the term "misuse" to refer

5   to non-OUD nonmedical use, if that makes sense.

6   And --

7   Q        Can you give me an example of that?

8   A        Well, yeah.  So it would be an

9   individual who is -- is taking their -- so it's

10  nonmedical use, so they're taking their opioids

11  in ways not prescribed by their physician, or --

12  or they don't have a physician and they're taking

13  opioids obtained not through the healthcare

14  system, and they are -- so, therefore, they're

15  misusing them.  But, again, they're not incurring

16  any costs, so they're not -- they're not showing

17  up, I guess, for lack of better term, in state

18  Medicaid costs or state criminal justice costs.

19  Q        People in the cost-incurring OUD

20  category start out in one of the other two boxes.

21  Isn't that true?

22  A        Yes.  They could be.  Yes.  They could

23  start there.

24  Q        Well, they all start there; right?

25  That is, if you take the first -- you take the

1   first pill, you're probably not cost-incurring.

2   A        Right.  So as you -- as you move -- the

3   way I have the boxes aligned is as you move

4   from -- from the right to the left across those

5   three boxes, you're getting, you know, you sort

6   of -- you're becoming a more -- I don't know what

7   the right word is.  You're becoming more cost

8   incurring or more acute or a worst-case fight by

9   health definitions.

10  Q        And then we have the bottom boxes,

11  excess attributable cost.

12  A        Right.  So the -- and this just kind of

13  lays the groundwork for the scope of my report.

14  So here I'm saying I'm looking -- we're looking

15  at cost-incurring opioid use disorder, and from

16  that, what are the excess attributable costs to

17  the state Medicaid -- a state Medicaid program --

18  in this case, New Mexico -- or state and local

19  criminal justice costs, which is a source of

20  direction.

21  Q        How did you pick those two cost items?

22  A        I picked these because I thought they

23  were the -- the largest components of a state's

24  costs that would be in any way associated with

25  opioid use disorder.  So recognizing that there

Highly Confidential - Subject to Further Confidentiality Review

```
1    might be some other ancillary costs, I -- I -- I

2    chose not to focus on those.

3              And, in part, there was also, for

4    practical reasons, too, that I felt like I could

5    get the most information for these two

6    categories, where some of the ancillary other

7    costs I -- I did not have a lot of confidence I'd

8    be able to find a lot of evidence on.

9    Q        What percentage of people who are

10   diagnosed with OUD are Medicaid beneficiaries?

11   A        I don't know off the top of my head.  I

12   don't know what that number is.

13   Q        It's -- and a number greater than zero,

14   though; correct?

15   A        Correct.  Yes.

16   Q        And, so, none of their costs, excess

17   attributable costs, are taken into account by

18   your analysis; correct?

19   A        Correct.

20   Q        The state and local criminal justice,

21   that's essentially the law enforcement -- I'll

22   call it the law and order box.  It's the police

23   and the court systems, expenses necessary to run

24   the police and the court system that you have

25   attributable to -- to opioid use disorder;
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    correct?  It would not -- would not include the

 2    cost to society in general.  For example, if an

 3    addict is -- steals my bike off my front porch,

 4    that cost would not be included.

 5    A         Sorry.  I wasn't able to hear that.

 6    Q         Hold on a second.  I've got somebody at

 7    the door again.

 8    MR. BOONE:

 9              Hey, Anthony, Tony, would now be a good

10    time to take a short break?

11    MR. MAJESTRO:

12              Yeah.  I think that would be good.

13    Yeah.

14    VIDEOGRAPHER:

15              We're off the record at 11:37 a.m.

16                   (OFF THE RECORD.)

17    VIDEOGRAPHER:

18              11:59 a.m., we're back on the record.

19    MR. MAJESTRO:

20    Q         Dr. Schneider, I think the question --

21    I'll just start over with the question I was

22    going -- I was going to ask.

23              The excess costs that you are

24    testifying about with respect to criminal justice

25    don't include costs to victims of crimes;
```

```
 1   correct?

 2   A          That's correct, yes.

 3   Q          They also don't include quality of life

 4   issues to communities that have crime that is a

 5   result of opioid epidemic; correct?

 6   A          Correct.

 7   Q          They don't include the cost of

 8   communicable diseases that might be spread by

 9   opioid addicts; correct?

10   A          Um, well, no.  I -- I -- generally, no.

11   I mean, I think some of the Medicaid analyses

12   that -- that have been done and that I rely on

13   could potentially include inadvertently some of

14   those types of costs.

15   Q          But, for example, someone who, as a

16   result of injecting heroin, transmits hepatitis

17   or HIV to a non-Medicaid user, those medical

18   costs would not be captured -- the medical costs

19   to the nonmedical user from that exposure would

20   not be captured by your analysis; correct?

21   A          I think what you meant to say was to

22   the non-Medicaid enrollee.

23   Q          Yes.

24   A          So, yes.  And, then, yes is my answer.

25   Q          Okay.  Okay.  I think I'm through with
```

```
 1   questions on this first category of opinions.

 2   What was -- what's the second one?  Let's go down

 3   the list.

 4   A        Yeah.  And the second one, again, I'm

 5   kind of -- I'm working right now off of -- I

 6   mean, my report generally flows in the same

 7   direction, but I'm working off of the discussion

 8   on page 38 --

 9   Q        Okay.

10   A        -- of what I call chapter 8.  And, so,

11   in that regard, we -- we've already covered, I

12   think, in the previous discussion, my first two

13   opinions, which would be -- number one was the

14   multifactorial causation of opioid volume and

15   utilization, and number 2 was the medical use of

16   the 95/5 percent distinction.  We've discussed

17   both of those.

18   Q        Okay.  Before we get to those, I think

19   what I'd like to do is discuss the opinions that

20   you have in your report regarding Dr. Miller and

21   Dr. Dobson.

22   A        Okay.

23   Q        And I think the first, as we're going

24   through your report, I have is maybe on page 17?

25   A        Let me see.
```

```
 1              Yes.

 2              Well, hold on.  Let me just confirm --

 3              I'm not sure if Dobson comes up before

 4    then.

 5    Q         Let me just -- let me ask -- just ask

 6    you without tying it to particular pages of the

 7    report.  What opinions do you intend to offer

 8    regarding Dr. Dobson's analysis?

 9    A         Well, okay.  So they're contained in my

10    report, but I can try to kind of give you a top

11    line summary.

12    Q         Yeah.

13    A         I would say, number 1, I -- I think

14    Dr. Dobson's methodology is flawed in -- in a

15    number of ways.  It -- I think his identification

16    of OUD patients is not -- not -- or I think is

17    flawed.  I think his identification or control --

18    the control for comorbidities is -- that is

19    matched to his control analysis is flawed.  And I

20    think his objective on the abatement window -- in

21    other words, trying to get -- trying to return to

22    1995 levels of -- of opioid -- I think it was

23    opioid mortality rates -- is also flawed as an

24    objective -- as an abatement window objective.

25    Q         Now, are you speaking about Dobson or
```

```
 1   Miller?

 2   A        Oh.  Oh, well I was -- maybe I was

 3   conflating the two.  I was starting out talking

 4   about Dobson.  I may have ended talking about

 5   Miller.

 6   Q        Yeah.

 7   A        Yeah.  Sorry about that.

 8   Q        All right.  So you first indicated that

 9   you think Dr. Dobson's identification of opioid

10   use disorder numbers is flawed.  How so?

11   A        Um, well, I think, you know, again, as

12   I identify in the report, I think there's a

13   tendency in administrative data for the

14   identification of cases to be based on -- on

15   cases that are already incurring a fair number of

16   costs.

17            So in identifying OUD cases in Medicaid

18   data, I believe Dr. Dobson's also identifying

19   high cost cases or costs [sic] that have

20   significant costs, if not objectively high.

21            And, so, in doing, there's this sort of

22   confounding bias there in terms of his -- in

23   terms of that approach.  Or, actually, that's --

24   that's technically, I think, a collider bias in

25   the sense that you're -- you're -- you're more
```

```
 1   likely to come up with an attributable cost, a

 2   nonattributable --

 3            Sorry.  My phone is ringing.  I was

 4   putting it away.

 5            You're more likely to come up with an

 6   attributable cost in this scenario because you're

 7   identifying cases that already have with them --

 8   associated with them a very high level of

 9   comorbidities.

10            And, so, there are other studies that

11   help us just to sort of shed -- these individuals

12   are much more likely to have a high level of

13   comorbid conditions, HIV, hepatitis, things like

14   that; in some cases, very costly comorbid

15   conditions.

16   Q        And how is that problematic?  It would

17   seem to me that -- that you have, you know --

18            I guess if persons in the population

19   have comorbidities that are a result of their

20   exposure --

21            The two you've identified are ones that

22   have been causally linked to OUD.  So I'm not

23   sure how that's an issue.

24   A        So -- so causally linked to OUD but not

25   necessarily always causally linked to OUD.  So I
```

1    think there's -- that that -- or it's -- it's

2    omnidir- -- I'm sorry.  Yes, omnidirectional in

3    term of causation.

4           So some OUD patients are gonna be more

5    likely to have HIV.  Some HIV patients are gonna

6    be more likely to have OUD.

7           But, then, I don't want to just focus

8    on those two.  I mean, there's -- there's --

9    there are studies that list ten or fifteen common

10   comorbidities.  I can't remember off the top of

11   my head what some of the other ones are.  But --

12   but they're -- they're highly, highly, highly

13   more likely, you know, odds ratios of, you know,

14   between five and ten, which is very, very high

15   for odds ratios, indicating the likelihood of

16   having those comorbidities.

17          So back to your original question, why

18   is that a problem, it's a problem if you can't

19   fully adjust or account for those comorbidities.

20   In other words, if we were to say -- if we were

21   to in some way be able to take them fully out of

22   the equation, then we could isolate the OUD cost.

23   But --

24          And anyone who does this kind of work,

25   including myself, knows that that's very

1    difficult to do.  It's very difficult to -- to

2    disaggregate costs in patients that have layered

3    on multiple comorbidities.

4    Q        How -- how is it that you account for

5    those in your analysis?

6    A        Well, I don't.  To be fair, I don't.

7    Because I'm basing my analysis on -- on what I

8    think is -- is one of the better attributable

9    cost studies, and -- which I assume we'll get to

10   in discussion.  But when -- when -- when we get

11   to that, I can tell you more about it.

12           But -- but that study is one that, you

13   know, I think does a reasonable job of trying to

14   mitigate these problems.  But I -- I do not --

15   it's not my opinion that that study fully

16   mitigated those problems or otherwise does a

17   necessarily better job of [sic] anyone else of

18   mitigating those problems.

19           Those medication control issues are

20   common to any kind of -- anyone attempting to do

21   this kind of work would face those problems.

22           I think if one had a, you know, an NIH

23   grant spanning a couple of years, one could

24   probably do a very good job of figuring out how

25   to isolate those costs.

```
 1              But I think, apart from that, the

 2    studies --

 3              Certainly, the way I approach my

 4    analysis is to rely on some published studies,

 5    and, in so doing, I am also -- some of those

 6    problems that I identified do come into play

 7    unavoidably.

 8    Q       Okay.  Then I think that your -- the

 9    third item you identified was -- and I think

10    that's Dr. Miller's bailiwick, and that is the

11    return, reducing the OUD numbers to his -- to

12    pre-epidemic levels.

13    A       Right.  And apologies for conflating

14    those two.  But I think generally the

15    extrapolation methods used are -- are also a --

16    sort of a common problem in -- in these types of

17    studies.  Any time an extrapolation has to be

18    done, there are different ways to do it, and --

19    and I had issues with the way that Miller

20    approached it.  I recognize that the Dobson and

21    Miller were essentially trying to synch up on

22    some -- some of the issues that they were looking

23    at.

24    Q       Yeah.  And, so, what -- what is your

25    criticism of how -- the way Dr. Miller did it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A          Yeah.  I'm sorry.  I just got a

 2    notification that my network, my -- my connection

 3    was unstable.  Can everyone hear me okay?

 4    Q          Your froze up.  Your -- your voice came

 5    through fine.  Your screen froze for a second,

 6    but it's fine now.

 7    A          Okay.  Good.

 8    Q          Phillip gives us a thumbs up.

 9    A          Yeah.

10               So the question was what -- what was

11    my -- my opinion about Dr. Miller's extrapolation

12    approach.  Is that correct?

13    Q          Yes.

14    A          Okay.  Yeah.  Dr. Miller opined that

15    the correct landing point, if you will, for --

16    that would drive the ex- -- the extrapolations

17    would be the 1995 levels of opioid -- I think it

18    was opioid death rates, mortality rate.  And

19    my -- my opinion is that -- is that when doing

20    this kind of abatement, one should look at what

21    would be a -- what we -- the goal should be to

22    return to a level that would be expected and,

23    more generally -- I mean, more specifically,

24    actuarially expected.

25               So, in other words, if we were trying
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   to mitigate -- let's say we were talking -- we

 2   were here today talking about obesity, which is

 3   another very, very costly condition, if we were

 4   trying -- if we were talking about abatement cost

 5   related to obesity, a question -- a reasonable

 6   question would be do we return to a situation

 7   where nobody's obese, which was, you know, pretty

 8   much in the 1950s, or do we return to some level

 9   of actuarially expected obesity, which would be

10   some level of obesity we'd normally find in the

11   population?

12           And, so, my -- my opinion -- this may

13   not be the best example, but my approach to this

14   would be to let -- would be to have an abatement

15   window that corresponds to returning to levels

16   that would be actuarially expected.  And, so, I

17   approach that --

18           I don't know if you want me to launch

19   into my approach of that, but that's --

20   Q       Yeah.  Seems like it's as good a time

21   as any to do that.  Go ahead.

22   A       Okay.  So I -- I have a 10-year

23   abatement window.  And the way I came up with

24   that was I noticed that the -- in terms of opioid

25   prescriptions, so the volume of prescriptions,
```

Highly Confidential - Subject to Further Confidentiality Review

1   peaked in 2012.  So from -- from 2000 to 2012, it

2   went from about --

3           I'm just gonna round off some numbers

4   because I don't remember the specific numbers.

5           But let's say it went -- I think it

6   went from 60 per 100 in 19- -- in 2000 to about

7   80 per 100 in 2012.  And that fell from 2012 to

8   2017.  So in a five-year period --

9           So, and again, in 12 years it went from

10  60 to 80.  And it took five years, so less than

11  half that time, to go from 80 to 60, back to 60.

12  So it was around 59, I think, in 2017.

13          So opioid prescription volume went,

14  again, from -- so I think the graph, it's 60, up

15  to 80, back down sharply to -- back down to 60 in

16  five years.

17          So in 2017, we were already at 2000

18  levels of opioid sales.  So how far back do we go

19  from there?

20          I had a little bit of a data constraint

21  in that it was difficult to find data in the form

22  that I wanted it in, which was prescriptions per

23  100 going back further than that.  So what I did

24  was -- was assume that in an additional five

25  years, so from 2012 to 2017 -- again, we're back

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to 2000 levels.  In another five years, which I

 2    think was a very conservative assumption, we

 3    would return to levels around 1998, let's say,

 4    which would be -- you know, '97, '98, even '96,

 5    which would -- which would be what I would call

 6    actuarially expected opioid utilization, which

 7    would reflect medical need.

 8              So, again, I'm -- I'm -- my opinion's

 9    based on the assumption that -- that -- and this

10    is, I think, backed up by the medical

11    literature -- that there still remains to this

12    day a medical need rationale for opioids.

13              And -- and, so, my -- my opinion is

14    that within ten years we would return opioid

15    utilization or, again, opioid prescription,

16    buying of prescriptions, to that level

17    representing medical need.

18    Q         That analysis doesn't take into account

19    the number of opioid users who transitioned to

20    heroin or fentanyl, does it?

21    A         That's correct.  It doesn't.

22    Q         Okay.  So we were hijacked -- I

23    hijacked you.  You were getting ready to delve

24    into your third opinion when I hijacked you to

25    discuss Miller and Dobson.  So let's go there
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   now.

 2   A        Okay.  I'm just gonna return to

 3   section -- chapter 8.

 4            Well, again, actually, in your

 5   hijacking me to talk about Miller and Dobson, we

 6   also then addressed what I think would be my

 7   third opinion, which is these types of studies

 8   have important limitations that should be taken

 9   into consideration.  In other words, it -- it --

10   one could argue that the attributable cost of OUD

11   is zero.  That could be argued.  That's actually

12   not my opinion here.  But the -- but one could

13   argue that because the -- because of the

14   limitations of these studies, yeah.

15            So, I mean, again, we just went through

16   it with Dobson and a little bit with Miller on

17   the extrapolation.  So...

18   Q        And it's not that the attributable

19   costs are zero.  That would be that the studies

20   don't establish what those costs actually are.

21   Correct?

22   A        Exactly, yeah.  Yes, that's correct.

23   So the studies don't -- the studies, you know,

24   have something to offer.  I'm not saying they're

25   completely useless.  But -- but they're limited.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    One must approach these studies with precaution.

2    Q        Okay.  So, then, what page are we on

3    now?

4    A        Well, I'm sort of working off of page

5    38, although, you know, I think that this -- this

6    isn't a list of the totality of my opinions

7    because -- it wasn't really intended to be that

8    way, but it's a -- just a -- useful for me to

9    keep track of what I've covered.

10            And along those lines, item number 4 on

11   that list, which would be 8.1.4, page 38, we also

12   just discussed.  So we've sort of covered that

13   one as well.

14   Q        Before we get there, can you -- I have

15   some questions about table 6-2 on page 32.

16   A        Hold on.

17            Okay.  I'm there.

18   Q        Okay.  Could you give me a top-level

19   description of what table 6-2 is?

20   A        Sure.  So the -- the heading, the row

21   heading, baseline data, refers to data that comes

22   from the Society of Actuaries report, which I

23   know we haven't talked about much yet, but

24   it's -- it's the report that I selected to serve

25   as the reference point for my apportionment
```

1    calculations.  And, so, the first, looks like,

2    five rows there come from -- from that report.

3    The -- the last row under baseline data refers to

4    just trending those data up to 2021 so they're

5    all in the same units.  And I used the Consumer

6    Price Index for that.

7           The bottom part of the table represents

8    some adjustments I made to those costs prior to

9    doing anything -- any sort of apportionment.

10   Again, this is just U.S.

11          And again, the Society of Actuaries

12   report goes from 2015 to -- to 2019, and the 2020

13   data I extrapolated using the average annual

14   increase in each year from the Society of

15   Actuaries report.

16          So the bottom part there shows a

17   baseline state share of Medicaid cost adjustment

18   and then the resulting number below that, and

19   then a source from healthcare cost adjustment and

20   then the resulting number below that.

21          So, again, this is taking cited actuary

22   data, pretty much as presented, again, with the

23   exception being the inflation adjustment, and

24   then applying two adjustments, one for --

25          Since this is a U.S. table, I used a

 1   baseline 50 percent Medicaid versus federal cost

 2   share.  I get in later into how that changes for

 3   New Mexico.  And then I applied the source from

 4   healthcare system data, which is from a --

 5           This number's from one particular

 6   study.  There are some other studies that

 7   corroborate this number.

 8   Q        So with respect -- (Zoom distortion.)

 9   A        Excuse me.  I'm having trouble hearing

10   you, counsel.

11   Q        Yeah.  Sorry.

12           So explain again the source from

13   healthcare system.

14   A        So this is --

15           I'm sorry.  I cut you off.

16   Q        No.  You're good.

17   A        Okay.  The source from healthcare

18   system data comes from I think a study that --

19           Let me just see which study I reference

20   here specifically.  Let me point you to the

21   discussion.

22           Actually, I think it might come before

23   that.  Oh, yeah.  This discussion starts in

24   section 6.6 and continues into section 6.7.  And

25   with -- so -- so I direct your attention to table

```
 1   6-1, which would be the top of page 30, and then

 2   the discussion below that in section 6.7.

 3           So what -- what I report in table 6-1,

 4   which actually shows that number that appeared

 5   in -- in table 6-2 that you asked about, the top

 6   number in my table 6-1 in bold is that number, is

 7   that.  So the 36.59 you see there, that's the

 8   36.6 percent that shows up in the -- in table

 9   6-2.  And that's based on the study by Park and

10   Wu.  However, as I point out in section 6.7, I

11   determined that there were some other studies

12   that actually showed a lower percent of -- of

13   opioid source from the healthcare system.  So,

14   conservatively, I chose the Park and Wu estimate

15   but -- but was happy to see that there are some

16   other studies that buttress that.

17   Q       Okay.  Let's go to --

18           Well, before we do that, on 6- -- on

19   table 6-2 --

20   A       Okay.

21   Q       -- the state share reduction, that's

22   just -- you're basically saying the state's

23   paying 50 percent on average, not that the costs

24   are 50 percent less; correct?

25   A       Correct.  That's correct.
```

```
 1   Q          And I take it, as a matter of law, you

 2   have no opinion as to whether the 50 percent

 3   number is the appropriate number versus the

 4   hundred percent number.

 5   A          Well, let me just -- let me just

 6   clarify.  So the 50 percent --

 7              So I think the answer to your question

 8   is yes.  I'm not opining on anything legal here.

 9   But the -- I'm -- I'm arguing that the 50 percent

10   is on average across --

11              Again, this table's focused on the

12   U.S., not -- we're not into the New Mexico

13   analysis yet.

14              But on this table, I'm saying, on

15   average, typically, states only pay for or are

16   only responsible for financing half of their

17   Medicaid costs.

18   Q          Okay.

19              All right.  Let's go to table 7-1.

20   A          Okay.

21   Q          So the bottom- -- the bottom-line

22   number, total excess Medicaid and OUD costs,

23   those are annual for each of those years.

24   A          Oh.  Yeah.  And, actually, this cursed

25   table, which we've already edited, that should
```

```
 1   probably say Medicaid and CJS costs.

 2   Q        I figured that's -- CJS --

 3   A        Excess.  Yeah.  Thank you.  So I got

 4   distracted by that.  Could you --

 5   Q        Yeah.  So let's just clarify that.  The

 6   total is the total criminal justice and Medicaid

 7   costs combined; correct?

 8   A        Correct.  Yes.

 9   Q        From this -- from this table.  You're

10   just adding up the --

11            Like, for example, in 2015, you're

12   adding up the 10.19 and the 6.90, what -- what's

13   17.09.

14   A        Correct.

15   Q        So that is the total for 2015.  And

16   then the numbers for each of the following years,

17   those are annual numbers.  They're not aggregate;

18   correct?

19   A        That's correct.  Yes.

20   Q        So let's go to figure 7.- -- 7-2A.

21   A        Okay.

22   Q        So the 2020 number is the same number

23   that we -- it comes from the same table that we

24   were just looking at; correct?  The 8.45?

25   A        Yeah.  That's right.  It comes from
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   table 7-1, the 2020 column of table 7-1.

 2   Q        And how -- explain to me how you're

 3   extrapolating out to 2030.

 4   A        So I'm taking the average annual

 5   decline in opioid prescriptions in New Mexico

 6   from 2015 to 2020.  So that's the data that I

 7   have.  So I'm averaging a decline of 11.56

 8   percent.  And I assumed that that average annual

 9   decline continues over this extrapolation period,

10   the extrapolation period boundaries as I

11   described in earlier testimony.

12   Q        And, then, 7-2B does essentially the

13   same analysis with respect to criminal justice

14   system.

15   A        Correct.

16   Q        Okay.  Now I think we're ready for

17   table -- for table 8-1.

18   A        I'm sorry.  Which table?

19   Q        8-1.

20   A        Okay.  So -- yes.  So 8-1, just to tie

21   this in with the previous tables, it's the bottom

22   row of 8-1.  The 95.65 links up with the -- the

23   95.65 in figure 7-3.

24   Q        Okay.

25   A        Figure 7-3, of course, is based on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    extrap- -- the sum of the extrapolations from

 2    figure 7-2A and 7-2B.

 3    Q         Okay.  So why don't you give me the

 4    top-line explanation of -- of how you get -- how

 5    you get to the -- the calculations in the right

 6    column, the far right column.

 7    A         Sure.  So what I've done here is I've

 8    linked back to the earlier discussion in chapter

 9    2, partly, and -- where I identify eight primary

10    factors.  I'm adding in two secondary factors

11    here, retail pharmacies and patients, and I'm

12    taking my total abatement cost estimate,

13    abatement cost ceiling estimate --

14            Again, I'm not suggesting or opining

15    that that is the right abatement cost, you know,

16    the correct amount or the right amount.  I'm just

17    saying, you know, based on all the previous

18    analysis, were the abatement cost ceiling to be

19    this number, as I've calculated it, this is how I

20    would allocate --

21            There's two -- two different options

22    shown here in terms of allocating it across these

23    different factors.  So to some extent, that's

24    what we're trying to do here, to the extent we're

25    trying to figure out who's responsible for these
```

```
 1   abatement costs.  We talked about that earlier.

 2           I -- I -- in the first two columns I'm

 3   saying, well, let's just assume it's

 4   proportional, and in the second two columns I'm

 5   saying let's -- let's give the primary factors a

 6   higher weight than the secondary factors.

 7           So my final opinion on this would be

 8   the appropriate allocation mechanism would be the

 9   adjusted scenario where we give the primary

10   factors a heavier weight than the secondary

11   factors.

12   Q       And what is your basis for saying that

13   FDA approval has the same weight as drug

14   trafficking, for example?

15   A       Well, I mean, that's the -- the

16   difficulty with this type of analysis.  I'm

17   not -- there's -- I'm not offering an opinion

18   that there's a scientific way of deriving these

19   levels of -- of responsibility.  But as an

20   economist, what one might do is -- is look at

21   these different -- look at different weighting

22   scenarios and keep them relatively

23   straightforward and simple.

24           So I don't have enough data, for

25   example, to -- to differentiate between the --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the enabling factor of FDA approval versus the

 2   enabling factor of drug trafficking in years

 3   since FDA approval.  I don't have a mechanism

 4   related to -- to -- to make that allocation.  And

 5   that's why --

 6   Q        For that matter, the allocation -- I

 7   take it, for that matter, the allocation to

 8   retail pharmacies and patients.

 9   A        I'm sorry.  Ask that again?

10   Q        I said and for that, the same -- I take

11   it your testimony would be the same with respect

12   to the allocations for retail pharmacies and

13   patients.

14   A        Correct.

15   Q        There's not any literature you can cite

16   to or economic analysis that you can cite to that

17   says the secondary factor for retail pharmacies

18   is 10 percent or 5 percent or 50 percent or 2

19   percent; correct?

20   A        That's correct.  But --

21            I mean, I'll just repeat that there is

22   a -- there is a sort of an economic logic to this

23   that has to do with all the preceding discussion

24   in the report.

25   Q        Okay.  Explain to me the economic
```

```
1    logic.
2    A         Well, again, if you go back to -- to --
3    to chapter 2 and some of the discussion there --
4              Because think about it this way.  As
5    you -- one could go through each one of these
6    primary factors and ask the same question.  Is it
7    zero?  Is it a hundred?  I'm sorry.  To be clear,
8    is it zero percent or a hundred percent?  You go
9    through each one of these factors and land on
10   something.
11             There are some economists who would
12   weight things differently.  So, for example, I
13   think a manufacturer marketing, for example,
14   would get weighted quite heavily by some analysts
15   in this industry and some experts in this
16   industry, or in this space, I should say, more
17   generally.  There are some who opine that
18   government advocacy and provider advocacy were
19   huge factors in this.
20             So -- so as you go down that list, you
21   might -- you know, you can assign -- one can
22   assign different weights to each one of those.
23   You know, we can imagine surveying a bunch of
24   experts and having them --
25             This is probably -- this is what I
```

1    would have liked to have done.

2          -- survey a bunch of experts, have them

3    assign weights to each one of these elements

4    and -- and use -- and do something like that.

5          So -- but I don't have privy to that

6    data.  I don't have the ability to do that.  So I

7    would -- I'm, instead, opining that it's not zero

8    percent and it's probably not a hundred percent

9    that you can assign to any one of these.  It's

10   some number in between.

11         So the -- saying, well, some number in

12   between, so let's just -- and we don't know what

13   that number is, let's do the apportion

14   allocation.  That's the column -- first set of

15   columns.

16         And, then, the second set of columns,

17   just simply saying, okay, well, I've already gone

18   through the trouble of identifying primary

19   factors versus secondary factors, primary factors

20   versus gatekeeping factors, and, so, let's --

21   let's do the apportionment consistent with that

22   discussion.

23   Q      What -- other than your judgment, what

24   can you rely on to differentiate the primary

25   factors from the secondary factors?

Highly Confidential - Subject to Further Confidentiality Review

```
 1    A         Well, again, I think I, as I try to

 2    describe in -- in chapter 2, that the secondary

 3    factors are distinguishable from primary -- I'm

 4    sorry.  The primary factors are distinguishable

 5    from secondary factors because they had a

 6    causative or enabling element to them.

 7    Q         Okay.  I'm just -- that same discussion

 8    again.  Explain to me the patient secondary

 9    factor.

10    A         Well, there's literature on sort of

11    patient responsibility and the extent to which

12    patients are responsible for using prescription

13    drugs responsibly.  And -- and, so, I -- I felt

14    the need to include patients on this list rather

15    than exclude them just because I was trying to

16    capture all the different elements that -- that I

17    think in some way factored into changes in opioid

18    volume and utilization.

19    Q         Are you saying that patients are at

20    fault for becoming addicted?

21    A         No, that's not what I'm saying.  I'm

22    saying that -- that if we're going to identify --

23    and my -- my sort of self-imposed remit in this

24    section and also in the primary factors discussed

25    in chapter 2 was to think about the scope of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    responsibility in -- more generally in opioid --

 2    in the volume of opioids and the use of opioids,

 3    so not specifically opioid use disorder.

 4            So, in this case, I'm looking at

 5    things ---factors, as I said, discussed in

 6    chapter 2, these factors that are driving the --

 7    the volume of opioid prescriptions.

 8            And patients, there's literature on

 9    patients seeking opioids and the -- the -- the

10    steps that -- that some patients take to seek

11    opioids, and then there's also patients who are

12    irresponsible or -- or are careless in their --

13    in their use of opioids.  Again, we're creating

14    a -- maybe falling into that misuse category.  So

15    I'm just, just for completeness, trying to make

16    sure that the list is complete and that -- I

17    think there's --

18            Again, there's -- there's medical

19    opinion as to -- which I'm not offering,

20    necessarily, but there are medical opinions as to

21    what the patient responsibility is and the

22    patient contract, which is another term that's

23    commonly used regarding patient use of

24    prescription drugs.

25    Q       Okay.  You would agree with me that
```

Highly Confidential - Subject to Further Confidentiality Review

 1   those situations -- scenarios are foreseeable

 2   consequences of prescribing a highly addictive

 3   drug like opioids?

 4   A        I think toward -- maybe not in the

 5   initial years following, let's say, the FDA

 6   approval of OxyContin.  But I think --

 7            Again, there's a point I make earlier

 8   in the report.

 9            I think the medical community did

10   become aware -- arguably, they were exposed to,

11   at least, information regarding the risks around

12   opioids.  So physicians prescribing a bunch of

13   opioids was often, you know, sort of blamed for,

14   in part, the rise in opioid use.  But, again --

15            Well, so, yes.  I think I've answered

16   your question.

17   Q        So it's your -- it's your opinion that

18   physicians were not aware of the addictive nature

19   of opioids prior to sometime after OxyContin was

20   launched in the '90s?

21   A        No, I -- I wouldn't say that.  I'm

22   sorry if I implied that.  No.  I would say that

23   there was -- there was probably some general

24   awareness since long before that, you know, at

25   least since 1945, and research that came out of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    World War II, morphine and addiction and things

 2    like that.

 3            So there was some general awareness of

 4    it.  I think it -- you know, I think when you're

 5    talking about the physician community, it's --

 6    it's all about diffusion.  And the diffusion of

 7    knowledge around opioids, I think, took quite a

 8    while to work its way through the medical

 9    community.  And as you can see on --

10            Actually, I can point you to -- it

11    might help me make my point if we go to -- pardon

12    me -- page 10, figure 2-2.  And you can see --

13    see what's going on here.  Just in general, the

14    term --

15            There's -- there's always been

16    publications on opioid abuse and opioids, medical

17    publications.  These are as indexed in PubMed

18    using these two terms.  But it was obviously a

19    big uptick, you can see here, in 20- -- let's say

20    2010.  And -- and -- and that, of course, the way

21    the medical community typically -- the way

22    information diffuses through the medical

23    community, this would suggest that prior to that

24    year that the -- the level of awareness may not

25    have been where we would have wanted it,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   necessarily, as a society, among physicians.

 2   Q        Okay.  And your -- and the basis for 5

 3   percent or 10 percent or zero or 90 percent in

 4   that category is the same -- same basic analysis

 5   that we discussed with respect to the other

 6   factors; correct?

 7   MR. MAJESTRO:

 8            We lost him.

 9   Q        Oh, there you go.

10   A        I'm back.  I lost everything briefly,

11   and then it came back.  Sorry about that.

12   Q        Do you need me to repeat my question?

13   A        I sure do.  Yes.  Thank you.

14   Q        So the basis for ascribing a percentage

15   to the patient secondary factor of 10 percent or

16   5 percent or zero percent or a hundred percent, I

17   take it your analysis would be the same as for

18   the other -- for the numbers for the other

19   factors?

20   A        Um, let me make sure I understand your

21   question.  So if I were to, let's say, conduct a

22   separate study, you know, like we talked about

23   surveying experts on what they thought were

24   levels of responsibilities, is that what we're

25   talking about?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1   Q        Yes.

2   A        Yeah.  I -- I -- if I were to do a

3   study like that, I would -- you know, I'd like to

4   contact, like, a thousand different experts or

5   500 different experts, and I would also ask

6   them --

7            Yeah.  I would approach it the same way

8   for each one of these factors and see what kind

9   of responses I got.

10  Q        Is it fair to say that table 8-1 is

11  based on the two -- the two scenarios are

12  assumptions?  So if you assume proportional,

13  that's the number you -- that's the number in the

14  third column is what you get, and if you assume

15  your adjusted scenario, the number in the last

16  column is the -- is the number you would arrive

17  at?  Not that the -- that either of those

18  scenarios is accurate, likely, whatever -- just

19  whatever adjective.  Those -- those two scenarios

20  are just basically assumptions; correct?

21  A        Correct.

22  Q        And you're not going to testify that

23  either one of those assumptions, to a reasonable

24  degree of economic certainty, is accurate.

25  A        Well, I -- you know, this is -- I
```

 1    wouldn't agree with that.  So I -- I put it in

 2    here for a reason, and -- and I put it in here

 3    because I thought these are two reasonable ways

 4    of approaching this problem.  So I -- I think

 5    the --

 6            My -- you know, again, my opinion is --

 7    and I think I not just hint at this but I think I

 8    explicitly mention it in a few places -- that

 9    the -- just because there isn't a readily

10    identifiable entity, which would be the case for

11    several of these --

12            So FDA approval, I mean, I'm not

13    sure -- I'm not even sure you can sue the FDA, so

14    I'm not sure if that's a readily identifiable

15    entity.

16            Medical need, obviously, there are some

17    physicians who have been brought up on criminal

18    charges already, but -- so for maybe -- but --

19    but that doesn't really fit in the medical need

20    category so much.  So -- so there's no real

21    medic- -- there's no real identifiable entity

22    there.

23            Macroeconomic factors, obviously not a

24    readily identifiable entity.

25            So my -- my opinion is that just

Highly Confidential - Subject to Further Confidentiality Review

1  because there's not a readily identifiable

2  entity, there is a non-zero --

3          And I would argue that it's nonzero.

4  But I think all -- I wouldn't have put any of

5  these factors on here if I thought their impact,

6  causal or enabling impact, was zero.  I'm,

7  instead, saying this is some non-zero number.

8  So --

9          So in terms of it not being accurate,

10 I'm not sure I would use those words.  I would

11 say that this is, based on the available

12 evidence, this is -- this is one reasonable way

13 to do it, and I would agree that -- or I would

14 further opine that I think most economists

15 would -- would look at this and agree that it's a

16 reasonable way to do it in the absence of

17 anything more specific.

18 Q       So a lot of times when we're dealing

19 with statistics and such, experts will calculate

20 probabilities that a -- that a certain data point

21 is within, you know, a -- you know, 95 percent

22 probable it's within, you know, range X to Y.  I

23 take it you're familiar with that kind of

24 analysis?

25 A       Sure.  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Q        You did not do that here; correct?

 2    A        Correct.  Yeah.  Kind of what you're

 3    talking about is like a bootstrapping approach

 4    where you can determine a confidence interval.

 5    Q        Yes.

 6    A        And, of course, there's the more

 7    technical kind of bootstrapping approach, which

 8    is what you would do if you actually had a big

 9    database, or if we had the kind of survey data

10    that I was referring to hypothetically before.

11    Yeah.  So you could approach -- you could

12    approach it that way.  You could create a

13    confidence interval.

14            I didn't have the ability to do that

15    here, so there -- there's not a -- again, there's

16    not a uniform source.  Again, I can find --

17    there's evidence that says -- as I said before,

18    there's evidence that says manufacturers --

19            Some experts who think that

20    manufacturing marketing was -- they're 90 percent

21    responsible.  And there's some evidence or

22    some -- some experts, I should say, that say

23    that macroeconomic factors are, you know, say, 50

24    percent responsible for the problem.

25            So how do you take -- when you're --
```

```
 1    when you -- when you have a bunch of estimates

 2    and they don't add up to a hundred percent, you

 3    have a couple of options.  One is you can prorate

 4    them and force them to come up -- force them to

 5    proportionally sum to a hundred percent, or you

 6    can discount them.  Because the problem is --

 7            And I ended up doing -- discounting

 8    them.  Because if you have a report that says the

 9    entire opioid situation was due to manufacturing

10    marketing, I don't know that that expert took

11    into account any other factors.  So they're

12    saying it was all due to that or all due to that

13    and provider advocacy.  There are some papers

14    that reached those conclusions.

15            If that's their conclusion, I don't

16    know that they've taken into account the other

17    factors.  So I don't know what their allocative

18    process is.  So that poses a problem for me.  If

19    I don't know what their allocative approach is,

20    then I don't know what number to take from their

21    study.

22            So if they say it's a hundred percent

23    due to manufacturers, do I take a hundred -- if I

24    take that, drop it into my table, then everything

25    else goes to zero.  And that doesn't, to me, seem
```

Highly Confidential - Subject to Further Confidentiality Review

1    like an appropriate thing to do, because I don't

2    think someone who says it's a hundred percent

3    manufacturer's responsibility is taking into

4    account other factors.

5            So what I'm trying to do here is

6    actually trying to be fair and take into account

7    what I think are all the factors rather than,

8    say, just the ones in which there have been

9    settlements or just the ones that have been the

10   most vocal among the experts, et cetera.

11   Q       Can you say, to a reasonable degree of

12   certainty, that either the proportional scenario

13   or the adjusted scenario is accurate; that those

14   are the numbers?

15   A       Well, yes.  I think that's -- that's --

16   that's in keeping with my testimony here.  So

17   I'm --

18           I included both of these scenarios on

19   this table rather than just the -- the one that

20   gives the retail pharmacies the lower proportion

21   because I think either one of these approaches is

22   reasonable.

23           I think the proportional allocation

24   just says we've got, you know, ten different

25   entities.  Let's split it evenly because we don't

Highly Confidential - Subject to Further Confidentiality Review

```
 1   know exactly how to nail that --

 2   Q        Okay.  Doctor, I'm gonna stop you

 3   because I think you're answering a different

 4   question than the one I asked, so it probably

 5   means I have a bad question.  So I'm gonna

 6   withdraw that question and ask it another way.

 7            Can you say that it is reasonably

 8   certain that the proportional scenario is --

 9   A        Okay.  Mr. --

10   Q        I'm sorry?

11   A        Excuse me.  You're breaking up, and I

12   don't know --

13   Q        I think you're breaking up.

14   A        One of us is breaking up.  I don't know

15   if the videographer knows who's --

16            I seem to still have a good Internet

17   connection.  I'm not sure what the problem is.

18   VIDEOGRAPHER:

19            Dr. Schneider, your Internet connection

20   is going sort of in and out.  On my end I can see

21   your reception bars are white and then going

22   yellow and then going red, and then you break up

23   a little bit, but we still have clear audio, and

24   then it goes back to white.

25   THE WITNESS:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Phillip, do you recommend I try

 2     switching to phone hot spots?  It's my only other

 3     option.

 4     VIDEOGRAPHER:

 5              Do you have an Ethernet cable you can

 6     hard wire into the network?  I presume you're on

 7     Wi-Fi.

 8     THE WITNESS:

 9              I'm on Wi-Fi, yeah.

10              No, I -- excuse me for a second.  Let

11     me --

12              No.  There's no -- there's no Ethernet

13     jack in here, so I don't think that's an option.

14     MR. MAJESTRO:

15     Q       Sometimes -- it's my experience,

16     sometimes -- and it works about half the time --

17     but if you just reboot your computer, it -- it

18     either reconnects to a different frequency or

19     does --

20     VIDEOGRAPHER:

21              Yeah.

22     MR. MAJESTRO:

23              You end up with a better connection.

24     MR. BOONE:

25              Tony, we're getting close to the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   1 o'clock hour.  I don't know if you're nearing

 2   completion of your questions.  But if you've got

 3   more questions to ask and if we want John to

 4   reboot his computer, maybe we should break for

 5   lunch.

 6   MR. MAJESTRO:

 7            That's fine with me.  I mean, I

 8   don't --

 9   MR. BOONE:

10            If you're almost done -- if you're

11   almost done, we can plow through.  I mean, John's

12   connection seems to be fine now.  But those seem

13   to be two options.

14   MR. MAJESTRO:

15            I'd like to finish the two questions I

16   was asking, and then I -- I probably have another

17   hour.  Probably have less than an hour if I have

18   a chance to go through my notes during lunch.

19   THE WITNESS:

20            Okay.  Let's -- go ahead.  And I'm

21   sorry, Mr. Majestro.  I'm going to ask you to

22   repeat that again.  I know this will be your

23   third time through.  But try it again, and I'll

24   try to answer quickly before my connection goes.

25   MR. MAJESTRO:
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1   Q        This is the price I pay for not getting

 2   on an airplane.

 3   A        Right.

 4   Q        So my question is:  Can you say to a

 5   reasonable degree of economic certainty that the

 6   percentages in your proportionate -- proportional

 7   scenario in table 8-1 are correct numbers, or the

 8   number, not a reasonable number?

 9   MR. BOONE:

10            Object to the form.

11   A        I mean, the way you're phrasing the

12   question is I -- I would say that these are two

13   reasonable allocation schemes.  I don't know

14   whether they are the correct allocation schemes.

15   In other words, there -- there could be

16   information out there that I'm not aware of, or,

17   again, a hypothetical study that could address

18   specifically this question, which hasn't been

19   done.  That -- that would shed some light on

20   this.

21            And, so, I -- I would -- I would kind

22   of summarize it by saying based on what is

23   available now and what was available to me, it's

24   my opinion that -- that either of these

25   allocation scenarios are reasonable within --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    within the field of economics.

 2    Q         Okay.  And there also could be a

 3    hundred other reasonable allocations that a

 4    factfinder could come up with in this case, too;

 5    correct?

 6    A         Well, I'm not going to agree to a

 7    number, but there are other allocation scenarios

 8    that -- that -- that could be plausible, yes.

 9    Q         Or could be even reasonable, to use

10    your term.

11    A         Yes.

12    Q         And back to my question, the

13    are-these-the-numbers question, you'll agree with

14    me that it's unlikely that the factors would be

15    the same, each of the primary factors and each of

16    the secondary factors would be the same number?

17    A         Yes.  I would agree with that.

18    Q         Okay.  I'm ready for lunch break.

19    A         All right.  Reconvening when?

20    Q         I don't know.

21    MR. MAJESTRO:

22              Aaron, what do you want to do?

23    MR. BOONE:

24              It's 1 o'clock right now.  How about we

25    try for 1:45?
```

```
 1   MR. MAJESTRO:

 2          Works for me.

 3   THE WITNESS:

 4          Okay.

 5   MR. MAJESTRO:

 6   Q      Does that work for you, Dr. Schneider?

 7   A      Yes, it does.

 8   Q      Okay.  All right.  We'll see you all in

 9   45 minutes.

10   VIDEOGRAPHER:

11          The time is 12:58 a.m.  We're off the

12   record.

13                (OFF THE RECORD.)

14   VIDEOGRAPHER:

15          The time is 2:03 p.m.  We're back on

16   the record.

17   MR. MAJESTRO:

18   Q      Afternoon, Doctor.  I think we were --

19   I think we were finished with table 8-1.  Let's

20   go to table 8-2.

21   A      Okay.

22   Q      What is the basis for the percentage

23   allocations in table 8-2?

24   A      Well, I took the 5 percent from --

25   which would be the adjusted scenario, from table
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    8-1, which, again, as I said before, I believe is

2    a more sizable, accurate representation of what

3    an allocation scheme should be.  And, so, I'm

4    bringing that over into here and I'm applying a

5    Kroger market share and an Albertsons market

6    share as reported in those respective market

7    share expert reports.

8    Q        So this market share does not account

9    for the number of potentially problematic

10   prescriptions that the pharm- -- any of the

11   pharmacies dispensed; correct?

12   A        Well, just to clarify, so the

13   pharmacies -- so the -- this -- and I guess some

14   of the -- most, if not all, of the other cases

15   allege that retail pharmacies are responsible to

16   some degree for the -- for opioid use disorder

17   via that -- their contribution to opioid volume.

18   So that's the alleged, I guess, you know,

19   complaint language.

20            So -- so because of that, I focus on,

21   then, opioid volume, or number of prescriptions,

22   whatever you want to call it.  That's -- that's

23   my focus.  So you'll see --

24            Or, as we've discussed already, the

25   theme from figure 2-1, which focuses on the
```

```
 1   primal -- or primary causative factors and

 2   enabling factors for opioid prescription volume

 3   and then all the way through my analysis of

 4   abatement cost ceilings to this, it's all sort of

 5   consistently focused on opioid volume as opposed

 6   to other measures.

 7          So I thought it -- to the extent that

 8   that's the -- or insofar as that's the reason why

 9   Kroger and Albertsons are named as defendants,

10   then I will focus on their actual market share in

11   terms of prescriptions sort of handled, I guess,

12   in the case of the pharmacy.

13   Q       So, again, then --

14           Let me ask the question -- a different

15   question.  Are you familiar with the claims based

16   on the DEA's red flag analysis --

17   A       As I --

18   Q       -- in pharmacies?

19   A       I'm sorry.  I cut you off.

20   Q       Yeah.  Are you familiar with the red

21   flag analysis as it applies to -- to retail

22   pharmacies?

23   A       In a very general sense, yes.

24   Q       So if the theory of liability against

25   the retail pharmacies is the failure to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    adequately investigate red flag prescriptions, a

 2    market share analysis does not take into account

 3    how good or a bad job any of the pharmacies did

 4    in meeting that duty; correct?

 5    A        Well, yes, in the sense, also, that

 6    the -- the -- you know, the red flags themselves

 7    are not necessarily indicators of -- of misuse or

 8    OUD.  So the red flags are merely

 9    process-oriented measures.  They're, you know,

10    from what I understand, imperfect measures of

11    that process.  And there's one -- I think there's

12    one source I cite for that as an example.

13    Q        So you believe volume is a better

14    measure?

15    A        Well, I mean, volume is kind of --

16             The way I look at it is volume is why

17    we're here today.  So retail -- I don't think

18    retail pharmacies would be part of the discussion

19    were it not for -- for volume.  So I think I --

20    you know, I opine and, like I said before, I'm

21    consistent all the way through my report, that

22    volume is the right metric to look at.

23             And, so, if -- if we're looking at

24    volume, then, yes, I think market share is the

25    correct measure.
```

```
 1   Q        Paragraph 8.6.

 2   A        Yes.

 3   Q        Actually, I'm not gonna ask that

 4   question.

 5            All right.  Let's --

 6            So you've issued the one corrected

 7   report.  Are you aware of any other inaccuracies

 8   that exist in Exhibit 6 as you sit here today?

 9   A        I'm sorry.  Exhibit --

10   Q        Exhibit 6 is the April updated report.

11   A        Yes.

12            No, I'm not aware of any other

13   inaccuracies in that report.

14   Q        So your opinion is complete and

15   accurate, to the best of your knowledge?

16   A        Correct.

17   Q        Have you planned to do any additional

18   work in preparation for trial of this case?

19   A        Other than preparation itself, no, I am

20   not planning on doing any additional work.

21   Q        Are there any documents or testimony

22   that you believe would be helpful in your

23   opinions that you've requested that haven't

24   been -- and haven't received?

25   A        No.
```

1    Q        So you testified you reviewed

2    Dr. Miller and Dr. Dobson's reports.  Do you know

3    either of them personally or by reputation?

4    A        No for both questions on Miller.

5    Dobson I'm aware of -- I was aware of him as a

6    health economist from the literature, but I do

7    not know him personally.

8    Q        How about by reputation?

9    A        By reputation, only that he was a --

10   that he's a health economist.  You know, he's a

11   known health economist, known to me.  No, I don't

12   know anything about his reputation.

13   Q        And, so, I take it that it would not be

14   anything you would need to offer -- you would

15   offer at trial regarding Dr. Dobson other than

16   your analysis of the work he's done in this case?

17   A        That's correct.

18   Q        How about with the -- the other experts

19   involved in the case that are potentially going

20   to testify on the defendants' side?  Other than

21   the -- the two reports you -- from Dr. Glickman

22   and Dr. LoSasso --

23            Well, first of all, do you know either

24   of those two gentlemen?

25   A        I don't know Glickman.  I know LoSasso.

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Q        How do you know LoSasso?

 2   A        Just through the field, health

 3   economics.  LoSasso had a fairly high-profile

 4   position for several years as the head of the

 5   American Society of Health Economists, and -- and

 6   I think before that he was pretty involved with

 7   the International Health Economics Association.

 8   So I knew him as a familiar face at those

 9   conferences.

10   Q        Are you aware of any of the other

11   experts who -- various other -- well, Kroger and

12   Albertson [sic] and other defendants may have

13   identified in this case?

14   A        Experts for the defense?

15   Q        Yes.

16   A        Yes.  Daniel Kessler, again, I would

17   put him in the category of Dr. Dobson.  I -- I --

18   Dr. Kessler, I don't know him personally, but I

19   know of him from -- just from his publications

20   and his work.

21   Q        Do you have any opinions or testimony

22   that you intend to offer about him?

23   A        I'm sorry.  Just to clarify, about him

24   personally?

25   Q        Yeah.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   A       Or professionally or --

 2   Q       Yes.

 3   A       -- reputation, that kind of thing?

 4   Q       Exactly.

 5   A       No.

 6   Q       Okay.  I think that's all the questions

 7   I have.  Lunch was helpful.  I got to cross a lot

 8   of things off my list.  So --

 9   MR. BOONE:

10           Hey, Tony, give me just a few minutes

11   to take a look at my notes --

12   MR. MAJESTRO:

13           Sure.

14   MR. BOONE:

15           -- and I'll see if I have any

16   questions.  Okay?

17           Let's go off record.

18   VIDEOGRAPHER:

19           Time is 2:14 p.m.  We're off the

20   record.

21

22               (OFF THE RECORD.)

23

24   VIDEOGRAPHER:

25           2:19 p.m.  We're back on the record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    EXAMINATION

 2  BY MR. BOONE:

 3  Q        Dr. Schneider, this is Aaron Boone.

 4  Thank you for your time and attention today.

 5           I wanted to draw your attention to

 6  Section 8.5.1 of your report.  Would you turn

 7  there, please?

 8  A        Yes, I'm there.

 9  Q        Okay.  And this is in the section

10  dealing with allocation specifically with respect

11  to the market share of Kroger; correct?

12  A        Correct.  Yep.

13  Q        All right.  And, so, I'm gonna read

14  that paragraph and ask you a question.  It says,

15  "For example, according to the expert report by

16  Dr. Anthony LoSasso, Kroger has a 4 percent

17  market share in New Mexico.  Thus, based on the

18  allocation scenarios shown in table 8-1, Kroger's

19  OUD attributable 10-year abatement ceiling would

20  be 191,305 before any further appropriate

21  reductions."

22           Sir, if you could explain what you mean

23  by "before any further appropriate deductions."

24  A        Well, I mean, this would just be

25  anything that -- that might be --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A further reduction could be, for

 2    example -- it could come in a lot of forms.  So

 3    it could be that perhaps somebody determines

 4    that -- that the overall responsibility to retail

 5    pharmacies is less than 5 percent instead of 5

 6    percent, for example.  Other appropriate

 7    reductions could come from, for example --

 8    other -- other parties could determine that there

 9    was some -- some limit on -- some additional

10    limit on liability that comes from some other

11    realm of the litigation, things like that.

12    Q         Now, and there may be others, but a

13    moment ago Mr. Majestro mentioned red flags and

14    the red flag discussion that has circulated in

15    this litigation.  So if there was a proportion of

16    the market share that plaintiffs identify as

17    being, quote, unquote, a red flag prescription or

18    a red flag market share, might that be another

19    possible reduction that could be considered when

20    determining these numbers?

21    A         Yeah.  Exactly.  I mean, that's -- the

22    second example I gave would fall into that

23    category.

24    Q         Okay.  All right.

25    MR. BOONE:
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Tony, that's all the questions I have

 2    for now.

 3    MR. MAJESTRO:

 4            All right.  Anybody else or are we

 5    done?  Going, going, gone.

 6    MR. BOONE:

 7            And, Tony, we will read.

 8    VIDEOGRAPHER:

 9            Okay.  If there's nothing further, the

10    time is now 2:22 p.m.  This concludes today's

11    testimony from Dr. John E. Schneider.  We are now

12    off the record.

13        (Deposition concluded at 2:22 p.m. EST.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              C E R T I F I C A T E

 2

 3          I do hereby certify that the above and

 4    foregoing transcript of proceedings in the matter

 5    aforementioned was taken down by me in machine

 6    shorthand, and the questions and answers thereto

 7    were reduced to writing under my personal

 8    supervision, and that the foregoing represents a

 9    true and correct transcript of the proceedings

10    given by said witness upon said hearing.

11          I further certify that I am neither of

12    counsel nor of kin to the parties to the action,

13    nor am I in anywise interested in the result of

14    said cause.

15

16

17

18                    Lois Anne Robinson

                 LOIS ANNE ROBINSON, RPR, RMR

19               REGISTERED DIPLOMATE REPORTER

                 CERTIFIED REALTIME REPORTER

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition

 4    over carefully and make any necessary

 5    corrections.  You should state the reason

 6    in the appropriate space on the errata

 7    sheet for any corrections that are made.

 8              After doing so, please sign

 9    the errata sheet and date it.

10              You are signing same subject

11    to the changes you have noted on the

12    errata sheet, which will be attached to

13    your deposition.

14              It is imperative that you

15    return the original errata sheet to the

16    deposing attorney within thirty (30) days

17    of receipt of the deposition transcript

18    by you.  If you fail to do so, the

19    deposition transcript may be deemed to be

20    accurate and may be used in court.

21

22

23

24

25
```

```
 1              - - - - - -

                  E R R A T A

 2              - - - - - -

 3

 4    PAGE  LINE  CHANGE

 5    ____  ____  _____

 6       REASON: _____

 7    ____  ____  _____

 8       REASON: _____

 9    ____  ____  _____

10       REASON: _____

11    ____  ____  _____

12       REASON: _____

13    ____  ____  _____

14       REASON: _____

15    ____  ____  _____

16       REASON: _____

17    ____  ____  _____

18       REASON: _____

19    ____  ____  _____

20       REASON: _____

21    ____  ____  _____

22       REASON: _____

23    ____  ____  _____

24       REASON: _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1

 2            ACKNOWLEDGMENT OF DEPONENT

 3

 4              I,_____, do

 5    hereby certify that I have read the

 6    foregoing pages, and that the same is

 7    a correct transcription of the answers

 8    given by me to the questions therein

 9    propounded, except for the corrections or

10    changes in form or substance, if any,

11    noted in the attached Errata Sheet.

12

13

14    _____

15     JOHN E. SCHNEIDER, Ph.D.          DATE

16

17

18    Subscribed and sworn
      to before me this

19    _____ day of _____, 20_____.

20    My commission expires:_____

21

      _____

22    Notary Public

23

24

25
```