# EXHIBIT 2

**The Growth, Institutionalization, and Subversion of Narcotic Conservatism:**

**The Historical Background of the Opioid Addiction and Overdose Crises**

Expert Report and Appendices Pertinent to

IN RE: OPIOID LITIGATION, Case No. 1:18-op-46326-DAP

THE MONTGOMERY COUNTY BOARD OF COUNTY COMMISSIONERS and THE

STATE OF OHIO EX REL. MATHIAS H. HECK, JR., PROSECUTING ATTORNEY,

Plaintiff, vs. CARDINAL HEALTH, INC. et al., Defendants

**David T. Courtwright, Ph.D.**

Presidential Professor Emeritus

Department of History, University of North Florida

August 22, 2022

**Outline of Report by David T. Courtwright, Ph.D.**

Credentials and Biographical Sketch

Note on Historical Methods

Opinions

Introduction: Opiate Addiction Epidemics in American History

Section I: Lessons Learned: The Growth of Narcotic Conservatism

      A. Doctors, Pharmacists, Opiates, Pain, and Legal Reform, 1870-1923

      B. Illustration: The Relative Rarity of Iatrogenic Heroin Addiction, 1898-1924

Section II: Lessons Reinforced: The Institutionalization of Narcotic Conservatism

      A. Education, Regulation, and Additional Legislation, 1895-1986

      B. Illustration: Control of Methadone, Oxycodone, and Morphine, 1936-1974

Section III. Lessons Ignored: The Subversion of Narcotic Conservatism

      A.  The Academic Origins of Opioid Revisionism, 1980-1986

      B.  Manufacturers and Opioid Revisionism, Promotion, and Supply, 1986-2016

            1.  Purdue's Early Support for Academic Revisionism

            2.  Roles of Key Opinion Leaders

            3.  Development of Revisionist Organizations

            4.  Blockbuster: Revisionism and the Success of OxyContin

            5.  Emulation and Extension of Purdue's Revisionist Marketing

            6.  Manufacturers, Medical Education, and Medical Institutions

            7.  Pharma and Narcopharma

      C.  Distributors, National Pharmacies, and Opioid Revisionism, 1996-2016

            1.  Distributors and the Promotion of Opioids

2.   National Pharmacies and the Promotion of Opioids

3.   Distributors' and National Pharmacies' Denials of Opioid Promotion

D.  Knowledge of the Harms of Opioid Revisionism and Oversupply, 2000-2016

E.  Distributors, National Pharmacies, and Opioid Diversion, 2005-2016

1. Distributors, the DEA, and the HDMA

2. National Pharmacies, Suspicious Orders, and Suspicious Prescriptions

Summary: Manufacturers, Distributors, National Pharmacies, and Prescription-Opioid Addiction

Appendix A: Curriculum Vitae

Appendix B: Prevalence and Characteristics of U.S. Opiate Addicts, 1895-1995

Appendix C: Abbreviations

**Credentials and Biographical Sketch**

David T. Courtwright is Presidential Professor Emeritus in the Department of History of the University of North Florida. He taught at the university for thirty years and in April 2019 he retired from full-time teaching. He remains active in research and scholarly refereeing and is an internationally recognized authority on the history of drug use and drug policy, an area in which he has published since 1978.

Courtwright's books include *Dark Paradise: A History of Opiate Addiction in America* (Harvard University Press, 1982, revised 2001); *Addicts Who Survived: An Oral History of Narcotic Use in America before 1965* (University of Tennessee Press, 1989, revised 2012); *Forces of Habit: Drugs and the Making of the Modern World* (Harvard University Press, 2001); and *The Age of Addiction: How Bad Habits Became Big Business* (Belknap Press of Harvard University Press, 2019). Two other books, *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City* (Harvard University Press, 1996) and *No Right Turn: Conservative Politics in a Liberal America* (Harvard University Press, 2010) describe drug use and drug policy in relation to U.S. social and political history.

Courtwright's drug-related articles have appeared in the *New England Journal of Medicine*, *Annual Review of Public Health*, *Addiction*, *BioSocieties*, *Social History of Alcohol and Drugs*, *Business History*, *Drug and Alcohol Dependence*, and other journals listed in the appended c.v.

Courtwright has received several awards for his scholarly work. These include an appointment as the 2015 Douglas Southall Freeman Professor of History at the University of

Richmond and a research fellowship from the American Council of Learned Societies. He has

received fellowships from the National Endowment for the Humanities, which in 2015 named

him an inaugural recipient of its highly competitive Public Scholar Award. In 2002 the College

of Problems on Drug Dependence conferred its Media Award for *Forces of Habit*, which also

received the journal *Addiction*'s annual book award. With translations into Chinese, Japanese,

French, Spanish, and Swedish, *Forces of Habit* has become both a standard international history

of drug use and a widely read introduction to the field.

Courtwright has served as a member of the Institute of Medicine's Substance Abuse

Coverage Committee, which in 1990 reported to Congress on the adequacy of U.S. drug abuse

treatment. From 2009 to 2011 he served as president of the Alcohol and Drugs History Society

(ADHS), an international scholarly organization dedicated to the study of licit and illicit drugs.

He continues to serve on the ADHS's executive board and on the editorial board of its journal,

*The Social History of Alcohol and Drugs*, published by the University of Chicago Press.

Courtwright has twice served as a primary grant reviewer for the National Institute on

Drug Abuse. He has refereed articles for medical journals, including the *New England Journal of*

*Medicine*, the *American Journal of Public Health*, and the *American Journal of Preventive*

*Medicine*, as well as history journals such as the *Bulletin of the History of Medicine*. He serves

on the *Bulletin*'s editorial board as well as those of *Pharmacy in History* (now *History of*

*Pharmacy and Pharmaceuticals*) and *The International Journal of Drug Policy*. He has refereed

drug-related book proposals and manuscripts for California, Cambridge, Chicago, Harvard,

Johns Hopkins, North Carolina, NYU, Oxford, Yale, and other university presses.

Journalists in print and electronic media have interviewed Courtwright about his research. He has been quoted in such publications as the *New York Times*, the *Washington Post*, the *Atlantic*, *Smithsonian Magazine*, *CQ Researcher*, *Vox*, and the *Huffington Post*. He has been interviewed for such programs as NPR's "All Things Considered" and "Weekend Edition;" Radio France's "La Fabrique de l'histoire" and "Culturesmonde;" the Australian Broadcasting Company's "Rear Vision;" Virginia Public Radio's "Back Story;" and Malcolm Gladwell's "Revisionist History." He has given lectures and papers on drug-history-related topics in such venues as the Yale School of Medicine; Harvard's Kennedy School of Government and Radcliffe Institute for Advanced Study; the London School of Economics; Cambridge University; the National History Center; and the Office of National Drug Control Policy.

Courtwright has been recognized as an expert witness in federal district courts in Florida, Georgia, Missouri, and West Virginia. In 1993 and 1994 he testified about the historical background of U.S. drug laws in relation to constitutional challenges to crack-cocaine sentencing provisions. In May 2019 he testified as an expert witness in *State of Oklahoma* v. *Purdue Pharma, L.P. et al.* In May 2021 he testified as an expert witness in *Cabell County Commission and City of Huntington, West Virginia* v. *AmerisourceBergen Drug Corporation, Cardinal Health, Inc., and McKesson Corporation,* track two of *In Re: National Prescription Opiate Litigation*. In July 2021 he testified as an expert witness in *In Re Opioid Litigation* for New York State and Suffolk and Nassau Counties. In November 2021 he testified as an expert witness in *State of Washington* v. *McKesson Drug Corporation, Cardinal Health Inc., and AmerisourceBergen Drug Corporation.* In April 2022 he testified as an expert witness in *In Re: Opioid Litigation, State of West Virginia Opioid Manufacturer Proceedings* and *State of Florida* v. *Purdue Pharma L.P et al.* He has also been deposed as expert witness for track one of *In Re:*

*National Prescription Opiate Litigation*; *State of Washington* v. *Purdue Pharma L.P. et al.*; *State of Rhode Island* v. *Purdue Pharma et al.; In Re Texas Opioid Litigation 18-0358*; *State of Washington* v. *Johnson & Johnson, et al.* He has been disclosed as an expert witness for *In re: Opioid Litigation, Civil Action No. 21-C-9000 PHARM: State of West Virginia* v. *Walgreens Boots Alliance, Inc., et al.* and *State of Nevada* v. *McKesson Corporation et al.*

Courtwright is being compensated at a rate of $550 an hour for his services.

**Note on Historical Methods**

Historians use a variety of methods to pursue a common goal, reconstructing a true story about the past. Different topics require different methods. The most appropriate methods for a history of U.S. narcotic addiction epidemics in relation to changing therapeutic norms are the standard quantitative and qualitative techniques employed by historians of medicine. These include 1) the statistical analysis of data from such sources as collections of case histories, surveys of physicians and pharmacists, records of drug imports, and prescription samples; 2) the assembly and review of hearings, reports, statutes, regulations, and correspondence from government entities charged with regulating medical practice and controlling drug use; 3) the recording, transcription, and analysis of oral history interviews with a range of subjects, from patients in treatment to medical opinion leaders; and 4) the location and close reading of pertinent primary and secondary sources. Examples of primary sources consulted in this report include archived letters, minutes, and reports; advertising and promotional materials; articles published in contemporaneous medical journals and newspapers; and contemporaneous medical monographs and textbooks. Examples of secondary sources are books, articles, and conference papers written by professional historians; similar works by credentialed scholars in other social-

science disciplines; and published accounts by investigative reporters with access to primary sources. These are all types of sources that medical historians rely upon professionally.

A key question in medical-historical investigations is whether the quantitative and qualitative analyses converge in support of a hypothesis. If, for example, one posits that addiction prevalence was rising (or falling) during a certain period, one ascertains whether the statistical evidence, contemporary observations, official reports, interviewee recollections, and secondary accounts consistently support the hypothesis. If not, one must account for the anomalous findings, for example by reference to known regional variations in addiction prevalence.

Once medical historians have identified patterns and explained (also on the basis of interlocking quantitative and qualitative analyses) why these patterns changed over time, they submit their work for peer review and criticism. Reviewers call attention to potentially contradictory evidence, possible alternative explanations, unexplored data sources, and other issues that must be addressed before publication.

Here I would add that the core historical finding of this report—that liberal prescribing practices have fostered iatrogenic opioid addiction, while conservative prescribing practices have prevented it—has been subjected to peer review and has already appeared in print. I have made this and other arguments in refereed books and articles published by selective university presses and journals that require review by multiple peers whose identities are unknown to the authors.

The secondary historical sources on which I draw, such as books and articles by Professors David Musto and Caroline Acker, have undergone similar independent review

processes. They too appeared in print years before the filing of this Expert Report and

Appendices Pertinent to *In Re: Opioid Litigation, Case No. 1:18-op-46326-DAP.*

**Opinions**

In the course of an epidemic of opiate addiction in the late nineteenth century, medical

and pharmaceutical professionals and public health reformers learned that it was dangerous to

prescribe narcotic drugs to patients suffering from what is now called chronic nonmalignant pain

(CNP). The principal risk of such treatment was addiction.

The knowledge of the addictive danger of prescribing narcotics for CNP was significant,

lasting, and institutionalized.

It was significant because it helped end, through primary prevention, the country's first

major opiate addiction epidemic.

It was lasting because warnings against prescribing narcotics for CNP became a fixture of

medical instruction and literature.

It was institutionalized because it was expressed in laws and regulations enforced by

federal and state agencies and courts that oversaw the licit narcotics trade. Regulators checked

oversupply and overprescribing, which carried inherent risks of diversion and abuse, and they

warned pharmaceutical manufacturers and distributors of the addictive potential of opioid

products that they proposed to market.

This cautionary knowledge and these institutions prevented further large-scale epidemics

of iatrogenic narcotic addiction until the end of the twentieth century. While there were periodic

increases in *heroin* addiction, notably from the late 1940s to the early 1950s, and again from the late 1960s to the early 1970s, these episodes were nonmedical in character.

A necessary condition for the restoration of a mass market for prescription narcotics and, consequently, for a second large-scale epidemic of medical narcotic addiction was that cautionary axioms about treating CNP with opioids had to be inappropriately revised or rendered irrelevant. Prescription narcotic gatekeepers, medical and institutional, had to be persuaded that the warnings about iatrogenic addiction and related risks of expanded supply and availability had been overemphasized to the detriment of pain patients. That, or the warnings no longer applied to newer opioid analgesics that were safe and non-addictive.

The revisionist campaign against narcotic conservatism crystallized in the early-to-mid 1980s. The published research of its early advocates mischaracterized historical experience with narcotics and their regulation and relied upon evidence that understated, or was irrelevant to, the long-term risks of outpatient opioid treatment for CNP.

Opioid manufacturers backed revisionist critics of narcotic conservatism and supported projects that advanced the cause of liberal opioid prescribing. During and after the 1990s Purdue and other manufacturers took advantage of this shifting climate of medical opinion, which they had helped to direct and engineer, to aggressively market opioid painkillers for CNP. The success of one blockbuster drug, OxyContin, inspired pharmacological competition and promotional emulation as several competitors strove to devise and position new opioids in a growing and lucrative market.

Large distributors, which had historically played a role in marketing as well as in storing and transporting drug products, promoted specific opioids as well as the broader concept of prescription-opioid safety and efficacy in CNP. McKesson, Cardinal, and AmerisourceBergen collaborated with, and received payments from, manufacturers for these promotions.

National pharmacies assisted manufacturers by promoting branded opioid products and by arranging for their pharmacists to receive manufacturer-sponsored pro-opioid educational materials and to participate in manufacturer-sponsored continuing education programs.

The entwined efforts of manufacturers, distributors, and national pharmacies to promote prescription opioids in CNP occurred before, during, and after 2000-2003, years in which the prescription-opioid addiction epidemic attracted widespread publicity and during which scientists and physicians produced further evidence of the dangers of exposing opioid-naïve patients to prescription painkillers.

Despite the emergence of the addiction and overdose crises in the early 2000s, and despite warnings from the DEA, opioid distributors, including national pharmacies that handled their own opioid distribution, failed to report and/or to stop suspicious orders, as required by law. These supply-control derelictions occurred in Ohio and other states, including Florida, whence large quantities of painkillers were diverted into Ohio and nearby states.

National pharmacies compounded the diversion problem by continuing to fill suspicious opioid prescriptions, despite detailed warnings from law enforcement and from their own employees. These supply-control derelictions occurred in Ohio and in other states, whence large quantities of painkillers were diverted into the illicit interstate traffic.

From 2008 to 2016, as government officials sought stricter controls on opioid prescribing and stricter reporting of suspicious orders, the Big Three distributors and the trade organization they dominated, the Healthcare Distribution Management Association (HDMA), opposed the effort to reimpose narcotic conservatism. So did the National Association of Chain Drug Stores (NACDS), the trade association representing national pharmacies.

The HDMA and NACDS lobbying efforts, which were supported by opioid manufacturers and by industry-financed patient advocacy groups and networks, delayed the rescheduling of hydrocodone combination drugs by two-and-a-half years and helped secure passage of the 2016 Marino bill. The primary object of the Marino bill was to impede Drug Enforcement Administration enforcement actions against distributors (including national pharmacies handling their own distribution) accused of ignoring the large, suspicious orders that had led to widespread diversion, increased addiction, and more overdose fatalities.

Corporations at all three levels of a promotionally, politically, and logistically interlinked supply system—opioid manufacturers, distributors, and national pharmacies—thus engaged in a series of actions intended to undermine and eliminate longstanding barriers, attitudinal and regulatory, to the sale of prescription opioids: in a word, to undermine narcotic conservatism. The principal and foreseeable externalities of these actions were the exposure millions of opioid-naïve Americans to powerful opioid painkillers and the ensuing rapid, sustained increase in abuse, addiction, and overdose deaths that characterized the second large-scale medicinal-opiate addiction epidemic in U.S. history.

**Introduction: Opiate Addiction Epidemics in American History**

Prior to the current epidemic of *opioid* addiction, the United States experienced three historically significant epidemics of *opiate* addiction. They were epidemics in the sense that each entailed an unexpectedly rapid increase in the number of new cases. They were opiate addiction epidemics because "opiate" was the adjective contemporaries then used for opium-based drugs.[1]

The first of the three opiate addiction epidemics involved opium and morphine. It began around 1870 and peaked in the mid-1890s. A second, which involved heroin, occurred in the late 1940s and early 1950s. A third and larger heroin epidemic occurred in the late 1960s and early 1970s. The number of U.S. addicts ballooned to around 600,000, an increase reflected in the diagram attached as Appendix B.

Neither of the twentieth-century heroin epidemics originated in medical practice. After 1924 heroin was essentially an outlaw drug, an arrangement formalized by the 1970 Controlled Substances Act (CSA). However, the first opiate addiction epidemic, in the late nineteenth century, was different in character. Like the current opioid addiction epidemic, it had two main sources of initiation, medical and nonmedical usage.

The primary nonmedical source of the nineteenth-century epidemic was opium smoking by Chinese immigrants. This practice, widely regarded as a vice, spread in the white underworld during the 1870s and 1880s. The primary medical source of the first epidemic was the diffusion of hypodermic medication among American physicians that likewise occurred during the 1870s

---

[1] As late as 1974 *Dorland's Illustrated Medical Dictionary*, a standard authority, contained no entry for "opioid." It referred only to "opiate," defined as "a remedy containing or derived from opium." *Dorland's Illustrated Medical Dictionary*, 25th ed. (Philadelphia: W.B. Saunders, 1974), 1092. "Opioid" did not come into common usage until the late 1970s and 1980s.

and 1880s. Patients also became addicted through self-medication with patent medicines or laudanum or other narcotic remedies. But the most common cause of medical addiction was the hypodermic administration of morphine, typically initiated by a physician. The likelihood of addiction increased if the physician or patient continued the injections during an extended and painful illness. Hundreds of reports of iatrogenic (physician-initiated) morphine addicts appeared in late nineteenth-century medical journals.

Two cases, reported in 1890, illustrate the situation. The first was of a sixteen-year-old Vermont girl suffering from pelvic cellulitis. In 1882 a homeopathic physician began relieving her pain with 1/8 grain (8 mg) of morphine hypodermically. A regular practitioner who later (and critically) described the case wrote that, "to save himself the annoyance of being called upon so often," the girl's doctor told her to procure a hypodermic syringe and use 1/4 grain (16 mg) at a dose. "This she did, and now with the reins in her own hands she steadily increased the dose and its frequency." By 1890, when the patient died at age twenty-four, she was injecting 20 grains (nearly 1,300 mg) daily.[2]

The original reason that the girl's physician injected morphine was to provide prompt relief from the pain caused by a stubborn bacterial infection about which he could otherwise do nothing. Late-nineteenth-century physicians often remarked upon patients' suffering. They knew that, for alleviating painful symptoms, an injection of morphine had no equal. Adding to the addiction risk, no law prevented the woman from heeding her doctor's advice of procuring her own hypodermic syringe and continuing the injections indefinitely. State control of medicinal

---

[2] E. W. Shipman, "The Promiscuous Use of Opium in Vermont," *Transactions of the Vermont Medical Society*, no vol. (1890), 74-75.

opiate sales was then weak or nonexistent. Virtually all drug stores stocked opiates. Wholesalers like McKesson & Robbins kept local druggists supplied with a variety of injection equipment.[3]

Doctor-addicts had their own hypodermic syringes. The second representative case was that of a physician who began treating his facial neuralgia with "small doses" of morphine around 1877. Ten years later he had worked himself up to 30 grains (1994 mg) of morphine daily. His bloated body was covered with hypodermic abscesses that ran from his shoulders to his calves. He died in 1887, age 40. Apart from the initial self-administration, the pattern was largely the same as the first case: Ongoing, often intense pain, followed by relief with morphine injections, followed by dependence, tolerance, escalating doses, and addiction, followed by complications and early death.[4]

Such deaths were preventable, as a generation of concerned physicians, legislators, journalists, and regulators came to understand. America's first encounter with widespread opiate addiction, in the late nineteenth century, taught a vital lesson. The lesson was that it was unwise to use narcotics, above all potent narcotics like morphine, to treat chronic pain, always excepting pain from terminal disease.

---

[3] McKesson & Robbins, *Illustrated Catalogue of Druggists' Sundries, Fancy Goods, Surgical Instruments, Sponges, Chamois, etc.* (New York: Daniel G. F. Class, 1883), 137.

[4] Shipman, "Promiscuous Use of Opium in Vermont," 74. Thirty grains was far from the limit. Leslie E. Keeley, *The Morphine Eater: Or, from Bondage to Freedom* (Dwight, Ill.: C.L. Palmer & Co., 1881), 23, https://wellcomecollection.org/works/ts3drfxz/items?canvas=31, reported a case of an addicted Missouri farmer who took 40 grains (2,592 mg) daily, and several others who consumed between 60 grains (3,888 mg) and 72 grains (4,666 mg) daily. The development of seemingly "incredible" levels of tolerance was common, Keeley wrote, even though the initial dose might have been as low as 1/8 grain (8 mg) of morphine.

*

The first section of this report shows how this lesson was learned in the late nineteenth and early twentieth centuries; the second how it was reinforced by educational, legal, and regulatory practice throughout most of the twentieth century. Each of these sections examines a drug or drugs (prescription heroin, methadone, oxycodone, and morphine) to illustrate shifts in attitudes and practices. Excerpts from primary sources show how thinking evolved with respect to the perennial problem of prescribing and regulating narcotic medications.

Because the attitudinal shift occurred across the country, and found expression in a variety of private, professional, federal, and state initiatives, the report offers illustrative sources from within and without Ohio. The growth and institutionalization of narcotic conservatism—the subject of the report's second section—was, at bottom, a national trend that prevented the reoccurrence of widespread prescription-opioid epidemics until the end of the twentieth century.

The third section describes the subversion of narcotic conservatism, which paved the way for the return of widespread abuse of and addiction to prescription opioids. This too was a national movement, though initially a small one inaugurated in the early 1980s by a handful of academic revisionists. Their efforts were significant, however, because they created the basis for a much larger, industry-financed and -orchestrated campaign in which manufacturers, with assistance from distributors and national pharmacies, undermined narcotic conservativism.

What follows is thus a history of the rise and fall of narcotic conservatism. The history centers on 1870 to 2016, from the first flurry of medical warnings about iatrogenic morphine addiction to the Centers for Disease Control and Prevention's (CDC) issuance of new guidelines

to rein in the revival of liberal opioid prescribing. That the CDC felt compelled to do so was the result of one of the most remarkable turns of opinion and practice in American medical history. It is my opinion that the turn away from narcotic conservatism, which began in the 1980s, was initially encouraged and facilitated by Purdue Frederick, and subsequently by other opioid manufacturers, with assistance from national distributors and pharmacy chains. These same distributors and chains disregarded—and later organized political opposition to—anti-diversion regulations, thereby exacerbating the crisis of opioid abuse, addiction, and overdose deaths that originated with the subversion of narcotic conservatism.

Only national pharmacies are defendants in this case. Though national pharmacies fostered revisionism, failed to exercise CSA-mandated supply oversight, and lobbied to rein in enforcement, they were not alone in their actions. The revisionist actions of opioid manufacturers and distributors were both antecedent to and coterminous with those of the national pharmacies, with which they partnered. The subversion of narcotic conservatism was a layered and sequential phenomenon. Accordingly, the report's third section documents the overlapping and often collaborative roles played by manufacturers, distributors, and national pharmacies in the chronological order in which they emerged and attracted critical notice.

## I. Lessons Learned: The Growth of Narcotic Conservatism

### A. Doctors, Pharmacists, Opiates, Pain, and Legal Reform, 1870-1923

Opium addiction was comparatively rare in the United States prior to 1830, morphine addiction rarer still. The medical literature on opiates focused, not on addiction, but on indications, contraindications, and toxic effects, which physicians confronted in cases of

deliberate or accidental overdose. Opium was also frequently used as a home remedy, particularly for diarrheal complaints. It was given to children as well as adults. When doses were misjudged, misfortunes followed.[5]

Statistical and literary evidence suggests that opiate addiction became somewhat more widespread during the mid-nineteenth century, years punctuated by outbreaks of cholera and dysentery. The problem did not, however, become a full-blown epidemic until the 1870s and 1880s, decades during which the nation's per capita consumption of opiates approximately tripled. The lingering physical and psychological trauma of the Civil War was one factor in the increase, though not the primary one. Survey data consistently showed that most medicinal opium and morphine addicts were white, native-born women, and that medical personnel were far more frequently addicted than veterans.[6]

The two most important risk factors were exposure to opiates and a history of chronic illness. Regardless of the addict's sex, palliation of recurrent pain and distress from such conditions as neuralgia, migraine, neuroma, chronic respiratory or gastrointestinal infection, anxiety, depression, and dysmenorrhea (painful menstruation) was the most common origin of addiction. "Uterine and ovarian complications," Dr. Frederick Heman Hubbard wrote in 1881, "cause more ladies to fall into the habit, than all other diseases combined." Dr. Jansen Beemer Mattison, also an addiction specialist, observed that the "vast majority of habitués" dated their

---

[5] The early nineteenth-century concern with opium toxicity is apparent in Hugo Krueger et al., *The Pharmacology of the Opium Alkaloids*, part 2, supplement no. 165 to the *Public Health Reports* (Washington, D.C.: Government Printing Office, hereafter GPO, 1943), 1089-93.

[6] David T. Courtwright, *Dark Paradise: A History of Opiate Addiction in America*, rev. ed. (Cambridge, Mass.: Harvard University Press, 2001), chaps. 1-2.

addictions to the protracted use of opiates to treat pain. Even when the underlying source of the pain was resolved, such treatment "had created a demand for continual taking that would not be denied." Opium smoking to one side, late-nineteenth-century addiction was fundamentally a byproduct of medicating or self-medicating painful disorders. What the public needed to understand, the *New York Times* explained in 1878, was that two-thirds of the country's opiate addicts were respectable men and women who had become addicted, not through their own culpability, "but in consequence of their physical and mental ailments, and chiefly through the instrumentality of their physicians."[7]

Dr. William Osler, the preeminent physician of his generation and author of its outstanding medical textbook, was of the same opinion. "The [morphine] habit is particularly prevalent among women and physicians who use the hypodermic syringe for the alleviation of pain, as in neuralgia or sciatica," he wrote in 1892. "The acquisition of the habit as a pure luxury is rare in this country." Alarmed by the rapid rise in medical morphine addiction, Dr. Osler urged medical students and doctors to exercise "the utmost caution in prescribing morphia, particularly in female patients. Under no circumstances whatever should a patient with neuralgia or sciatica be allowed to use the hypodermic syringe, and it is even safer not to intrust [sic] this dangerous instrument to the hands of the nurse."[8]

---

[7] Ibid., chap. 2. The quotations are from "The Opium Habit: Some Extraordinary Stories of the Extravagant Use of the Drug in Virginia," *New York Times*, March 2, 1878, p. 2; Fred. [sic] Heman Hubbard, *The Opium Habit and Alcoholism* (New York: A.S. Barnes & Co., 1881), 17; J.B. Mattison, "The Genesis of Opium Addiction," *Detroit Lancet* 7 (1883): 303; and "The Opium Habit's Power: Popular Errors Corrected," *New York Times*, January 6, 1878, p. 5.

[8] William Osler, *The Principles and Practice of Medicine: Designed for the Use of Practitioners and Students of Medicine* (New York: D. Appleton, 1892), 1005-1006, 1007 (quotations).

Dr. W. C. Slusher, a Bluefield, West Virginia, physician, recounted one such female case. She was a woman "from a good family, reared in the country, accustomed to more than the average country person's pleasures and comforts." But morphine had changed all that, reducing her to a state of poverty and degradation. "She started down the scale of human depravity by taking morphine for neuralgia," Dr. Slusher reported, "prescribed, so she said, by a reputable physician." The woman had finally resolved to quit the morphine and, after enduring weeks of exhausting withdrawal, regained her old spirit. She scrubbed and ironed her old clothes, combed her hair, and walked into Slusher's office "with a wan smile on her face. I beheld a new woman. With this regeneration came the desire to return to her home and live as she formerly lived." Slusher nonetheless judged her ordeal preventable. "Every time a doctor prescribes an opiate to be taken by a patient he should think of the plight of some dope fiend; many of whom all practicing physicians have knowledge. For practically all of them blame doctors for their downfall."[9]

Civil War veterans became addicted through treatment of lingering diarrheal diseases, trauma, or the painful sequelae of wounds. Dr. Jonathan S. Jones, a historian who assembled and analyzed 100 Civil War addiction cases, described a common downward course. What the men called "slavery" to opiates undermined health, morals, mental acuity, and masculinity even as it restricted their access to entitlements like military pensions. Because contemporaries often regarded addiction as a matter of vice and personal weakness, Civil War addicts struggled with stigma as well as the physical effects of long-term opiate addiction. Prolonged use of opiates, Dr.

---

[9] W.C. Slusher, "'A Prodigal Sister,'" *West Virginia Medical Journal* 11 (1917): 353-355, https://babel.hathitrust.org/cgi/pt?id=uc1.b4811067&view=1up&seq=367. Punctuation thus. Dr. Slusher did not specify when the woman first became addicted. Judging from her dire condition, however, she had been using morphine for some time.

Jones wrote, "ruined veterans' bodies, leaving them fatigued, emaciated, impotent, and riddled with ghastly self-inflicted injection scars. The ever-increasing dosages necessary to offset tolerance to the drugs proved a burdensome expense and all too often ended in accidental fatal overdoses."[10]

Whether for civilian or military patients, hypodermic administration was the most dangerous means of administering morphine. Addicted patients, Dr. Hubbard wrote, became familiar with the technique, acquired their own syringe, and were soon "confirmed in the habit." Another physician who had himself become addicted after observing the "quick relief" opiates provided, cursed "that trouble-saving but insidious instrument, the hypodermic syringe. How many patients have learned the trick of that instrument, and learned it to their own ruin!" Dr. M.K. Lott, a Texas practitioner who had personally treated twenty-five addicts, warned colleagues that hypodermic administration lay behind the increase in "drug habitués throughout the country."[11]

Dr. Charles E. Terry, municipal health officer of Jacksonville, Florida, from 1910 to 1917, held similar views. In August 1912, Dr. Terry secured passage of a city ordinance that tightened prescription requirements for opiates and cocaine. Duplicate copies of opiate and cocaine prescriptions went to the Health Department, which compiled a census of habitual users.

---

[10] Jonathan S. Jones, "Opium Slavery: Civil War Veterans and Opiate Addiction," *Journal of the Civil War Era* 10 (2020): 186.

[11] Hubbard, *Opium Habit*, 162; Keeley, *The Morphine Eater*, 147, 150 (referring to Dr. B——, surname partially redacted in original); M.K. Lott, "The Drug Habit: Its Treatment," *Texas Medical Journal* 42 (1901): 157, 158, http://hdl.handle.net/2027/hvd.32044102979390 (quotation).

Unusually, the ordinance empowered the health officer to "give to any user a prescription for as much of any habit-forming drug as he should deem expedient"—an early experiment in maintenance, motivated by the desire to pre-empt illegal sales.[12]

By the end of 1913 the Jacksonville Health Department had identified 887 habitual users. Of these 442 used opiates, 346 cocaine, and 99 both types of drugs. The sex ratio was five females for four males. Whites outnumbered blacks by more than two to one, even though Jacksonville's population was then roughly divided between the races. "One of the most important discoveries we made at that time," Dr. Terry later wrote,

> was that a very large proportion of the users of opiate drugs—not cocaine—were respectable hard-working individuals in all walks of life, and that the smaller part only, according to my figures about 18 per cent [sic], could in any way be considered as belonging to the underworld. In this 18 per cent were included those who used cocaine, as well as the true opiate addict.

> Of the total number of registered addicts, about one-half were personally known to me. Many of these came regularly for their prescriptions, while others who could well afford to pay for their prescriptions, but were aware of our interest in the subject, came to me for advice and help. One of the first questions that I was asked, and this practically invariably, when it was seen that I was not trying to persecute but merely to discover facts, was 'Where can I get treatment? How can I get rid of this thing?' *I have yet to see*

---

[12] David T. Courtwright, "Charles Terry, *The Opium Problem*, and American Narcotic Policy," *Journal of Drug Issues* 16 (1986): 421-434, quotation pp. 423-424.

*the first drug addict who does not honestly wish to be cured*, and I have known them in all walks of life from the preacher to the prostitute.

Dr. Terry asked his Jacksonville patients how they became addicted. A "large proportion," he discovered, "owed their origin to the therapeutics of the medical profession, to the ignorant or unavoidable prescribing of narcotic drugs for prolonged periods."[13]

Dr. Terry subsequently wrote a history of opiates, which he included in *The Opium Problem*, a survey that he and Mildred Pellens (who subsequently became a physician) published in 1928. Like other investigators, Drs. Terry and Pellens highlighted the role that hypodermic injection played in the first morphine addiction epidemic. Hypodermic medication gained a foothold in America in 1856, though it was not until well after the Civil War that most rank-and-file practitioners embraced the new technology. Initially they were enthusiastic. "I now enter the chamber of *suffering*," Georgia physician Dr. William Greene wrote in 1867, "*knowing* that I have in my possession an *unfailing* remedy for pain. 'Relieve me of my pain, Doctor,' is the cry of the sufferer. With a Hypodermic syringe, this agonizing cry can be promptly, and without injury, hushed."[14]

---

[13] Ibid., 424 (statistics); Charles E. Terry, "Narcotic Drug Addiction and Rational Administration," *American Medicine* 26 (1920): 29-35, https://archive.org/details/americanmedicine26newyuoft/page/28/mode/2up, quotations pp. 30, 33, italics in original. Dr. Terry long advocated for proper treatment—including, if necessary, supervised maintenance treatment—of opiate addicts. They were, he said were "just as truly sick as they would have been had Bright's disease or typhoid been the diagnosis" (33). The stance earned him a small but enduring place in medical history as an early champion of what is now called destigmatization, harm reduction, and medication-assisted treatment, or MAT. Courtwright, "Charles Terry."

[14] Charles E. Terry and Mildred Pellens, *The Opium Problem*, reprint ed. (Montclair, N.J.: Patterson Smith, 1970); William A. Greene, "Hypodermic Administration of Medical Agents,"

By 1870, however, medical journal contributors and correspondents were calling attention to the addiction risk of hypodermic administration. When New York City physician J.G. Sewall read a report that "when the long-continued use of morphia is required, the danger of the habit of opium eating will be avoided if we inject the opiate," he objected. The opinion was "entirely a mistaken one," he wrote, "and calculated to lead to grave errors in practice." Dr. Sewall offered two cases, including that of a forty-year-old neuralgia sufferer who had become addicted, badly confused, and covered with puncture marks. That same year, 1870, warnings of the dangers of iatrogenic morphine addiction appeared in English-language journals published as far apart as California and Great Britain. "Most impatiently did she await the injection, morning and evening, often crying like a child," an alarmed physician wrote of a neuralgic woman under his care. "And always exclaiming, as I entered—'Oh doctor, shoot me quick!'"[15]

---

*Atlanta Medical and Surgical Journal* 8 (1867): 97, all italicization and capitalization thus. Dr. George Pettey reported that one of his patients, a physician who had trained at Harvard in the 1870s, was told by a misinformed faculty member that hypodermic administration of morphine was nonaddictive. The medical student became addicted, as did four of his classmates. All but Pettey's patient died prematurely, and he did not finally quit using until thirty-seven years later. "Fallacious teachings did much to increase the number of habitual users of opium," Pettey wrote, "but aside from these influences the discovery of morphine and the perfection of the hypodermic syringe have been the greatest factors in extending the use of narcotics." George E. Pettey, *The Narcotic Drug Diseases and Allied Ailments: Pathology, Pathogenesis, and Treatment* (Philadelphia: F.A. Davis Co., 1913), 2, Internet Archive transcript at https://www.archive.org/stream/narcoticdrugdis00pettgoog/narcoticdrugdis00pettgoog_djvu.txt.

[15] J. G. Sewall, "Opium-Eating and Hypodermic Injection," *Medical Record* 5 (1870): 137; H. Gibbons, "Letheomania: The Result of the Hypodermic Injection of Morphia," *Pacific Medical Journal* 12 (1870): 481, 495, "quick" p. 487 (quotation also appears on p. 7 of the offprint of the Gibbons article published by F. Clarke [San Francisco, 1870]); Clifford Albutt, "On the Abuse of Hypodermic Injections of Morphia," *Practitioner* 5 (1870): 327-331.

24



RESULT OF SUBCUTANEOUS INJECTION (see p. 71).

Shooting morphine entailed risks other than addiction. These were graphically illustrated in Dr. H. H. Kane's *Drugs that Enslave* (1881), a classic work that remains available in paperback reprints and a Kindle edition. The illustration above was taken from a photograph of a male nurse at Bellevue Hospital shortly before he died; the abscesses and scarring were a consequence of morphine addiction. Dr. Kane reported that he had under his care other patients, including a young married woman, "who were quite as badly scarred." He emphasized that addiction carried multiple risks, including personal and familial ruin and the abnormal development of children born to opiate-dependent mothers. Though Dr. Kane thought patients with nervous disorders most vulnerable to addiction, he wrote that medicinal opiates, particularly injected morphine, ensnared people in all walks of life. Whatever the initial effects of relief and euphoria, the long-term consequences were quite the reverse:

> Those not acquainted with the truth in this matter will be surprised to learn that there are to-day [sic] thousands of educated and respectable people in all countries and among all

classes, confirmed habitués; slaves to a habit that is more exacting that the hardest taskmaster, that they loathe beyond all else, and yet that binds them in chains that they are wholly unable to break.

Everything must give way to this vice. Business is neglected or but imperfectly performed; family ties are sundered; hope, ambition, happiness, self-respect are meaningless words; the one thing that fills the mind is the gratification of this passion, which they loathe, but from which they cannot break.

Thus from day to day, week to week, year to year, they go on; not living—simply existing. Each day, each hour, each minute binds them more firmly, until at last they feel their own inability to cope with the demon that has overpowered them, and abandon themselves, hopelessly, listlessly, to the vice. Repentance comes too late. The momentary pleasure, the short period of excitement, the hour of vivacity bears fruit a thousand-fold; fruit, the bitter taste of which must last them a lifetime. That which at first gave them pleasure has now become the veriest tyrant, enforcing long hours of pain and anguish, gloom and despondency. They do not continue its use *because it gives them pleasure*, but simply because it is the only thing that, in increasing doses, can save them from the torment it has itself imposed; because without it they are sunk into a living hell.[16]

---

[16] H. H. Kane, *Drugs that Enslave: The Opium, Morphine, Chloral and Hashisch Habits* (Philadelphia: Presley Blakiston, 1881), 18-19 (block quotation, italics in original), 44 (children), 71-73 (Bellevue nurse). Dr. Kane also summarizes the international alarm over the dangers of the hypodermic administration of morphine. The original edition is his work is available online at The original edition of his work is available online at https://www.chestnut.org/resources/68508d7f-b648-4c27-8785-6af99a3e5271/1881-percent-

Ohio physicians repeated Kane's warning of morphine "enslavement," emphasizing the intense suffering that patients underwent trying to break a fully formed addiction. The *Cincinnati Lancet-Clinic*, the leading southern Ohio medical journal, documented cases of women needlessly poisoned by, or addicted to, morphine injected by hypodermic-wielding physicians. The *Lancet-Clinic* reprinted the warning of Dr. Henry P. C. Wilson, a prominent gynecologist, to avoid "the prompt and certain hypodermic, which is sure to be demanded again, and is sure to bring reproach and condemnation on the physician who first and secondly gave it." Never, he added, had he heard "more violent condemnations heaped on any physician than on those who first gave the opiate to those who have acquired the opium habit."[17]

Ohio newspapers ran numerous stories about the dangers of iatrogenic morphine addiction, citing both U.S. and overseas medical authorities on what had become an international problem. Others found material closer to home: a Cincinnati sciatica sufferer fatally addicted through his doctor's morphine injections, or addicts undergoing treatment in a Lebanon, Ohio,

---

20Kane-percent-20Drugs-percent-20That-percent-20Enslave.pdf; reprint editions, e.g., https://www.amazon.com/Drugs-That-Enslave-Morphine-Hashisch/dp/1331196272.

[17] F.O. Marsh, "Morphinism," *Cincinnati Lancet-Clinic* n.s. 33 (1894): 459-465, https://www.google.com/books/edition/The_Cincinnati_Lancet_clinic/na9XAAAAMAAJ?hl=en&gbpv=1&dq ("enslavement"); Wm. H. Jones, "The Reckless Injection of Morphine Hypodermically," *Cincinnati Lancet-Clinic* n.s. 18 (1887): 195-196, https://www.google.com/books/edition/Cincinnati_lancet_and_observer/33xEAQAAMAAJ?hl=en&gbpv=1&dq (poisoning); "Obstetrical Society of Cincinnati: Official Report," comment of Dr. W.H. Wenning, *Cincinnati Lancet-Clinic* n.s. 39 (1897): 302, https://www.google.com/books/edition/The_Cincinnati_Lancet_clinic/nbNXAAAAMAAJ?hl=en&gbpv=1&dq (morphine addiction); "Who Makes the Opium Slaves?" *Cincinnati Lancet-Clinic* n.s. 28 (1892): 388-389, https://www.google.com/books/edition/The_Cincinnati_Lancet_clinic/7K1XAAAAMAAJ?hl=en&gbpv=1&dq  (Dr. Wilson, "condemnations").

asylum. Journalist Frank Gessner, who visited the asylum in 1892, found that many of the patients were highly educated: doctors, lawyers, even appellate judges. "No pen, however facile, can describe the torture we endure," one patient told him. "I don't think hell itself has any more remorseful misery." Gessner saw a baby with contracted pupils, opiate-dependent since birth, cradled in the arms of its addicted mother. He learned that the road to addiction often began with paregoric, which mothers gave to infants or to themselves to produce sleep and calm nerves; doctors compounded the problem by prescribing laudanum for pain. When opium tinctures no longer sufficed, users turned to stronger, faster-acting morphine injections, often developing abscesses. "Some patients have come here with their bodies so terribly punctured and sore that there was hardly a spot of clean skin into which a hypodermic needle could be thrust," Gessner wrote. "No wonder they wanted a cure."[18]

Cautionary articles and books like those of Drs. Sewall and Kane, echoed in Ohio and other states, marked the beginning of the debate over the use of novel, potent, technologically advanced narcotic remedies that were purportedly safe and effective for treating chronic, nonterminal pain. Three points should be noted. First, the debate commenced well over a century before the introduction of another generation of purportedly safe prescription narcotics. Second, the debate drew attention to the danger, not only of addiction, but to addiction's physical and

---

[18] "Tyrant Morphine," *Van Wert Times*, August 7, 1885, p. 1, https://ohiomemory.org/digital/collection/p16007coll54/id/425/rec/16 (U.S. authorities); "Danger of Acquiring the Morphine Habit," *Democratic Northwest*, March 6, 1890, p. 1, https://chroniclingamerica.loc.gov/lccn/sn84028296/1890-03-06/ed-1/seq-1/#date1=1868&index=5&rows=20 (international); "Killed by Opium," *Noble County Republican*, December 30, 1886, https://ohiomemory.org/digital/collection/p16007coll44/id/1646/rec/13 (Cincinnati); Frank B. Gessner, "In a Sanitarium," *Western Star*, November 17, 1892, p. 1, https://ohiomemory.org/digital/collection/p16007coll84/id/22238/rec/12.

psychological sequelae. Third, the debate was resolved in favor of the skeptical position. Increasing numbers of physicians and journalists weighed in on the dangers of iatrogenic opiate addiction. The frequency and sophistication of their admonitions increased throughout the 1870s and 1880s, even as the opiate addiction epidemic worsened.

Representative of these dressing-downs was Dr. James F.A. Adams's "Substitutes for Opium in Chronic Disease," which appeared in 1889 in the *Boston Medical and Surgical Journal*. Dr. Adams reminded colleagues of three basic truths. First, opiates were highly toxic. Second, their benefits were offset by side effects that ranged from constipation to depression. Third, opiate therapy often led to addiction. Dr. Adams judged that 150,000 Americans had fallen victim to the "opium-habit" (a nineteenth-century term for addiction to any type of opiate), not counting those who had brought it on themselves by smoking the drug. Why not, Dr. Adams urged, use newer, non-opiate analgesics and hypnotics to treat the symptoms that commonly motivated patients to seek out physicians?[19]

Dr. Adams's advice was sound. Yet it also raises a question. Why, if doctors were warned for nearly twenty years about the risk of iatrogenic addiction, did per capita consumption of medicinal opiates keep climbing, not reaching a peak until about 1895?

---

[19] J. F.A. Adams, "Substitutes for Opium in Chronic Disease," *Boston Medical and Surgical Journal* 121 (1889): 351-56. Like many medical critics of opiate overprescribing, Dr. Adams had served in the Civil War. Dr. Jones reports that the self-reform effort was led by "young, elite ex-Union army physicians" concerned with restoring the profession's reputation as well as preventing addiction. "Guest Posts: "'A Mind Prostrate': Physicians, Opiates, and Insanity in the Civil War's Aftermath," Medical Heritage Library, November 21, 2018, http://www.medicalheritage.org/2018/11/21/guest-posts-a-mind-prostrate-physicians-opiates-and-insanity-in-the-civil-wars-aftermath/.

The answer is that the American medical profession was in a sorry state in 1870-1895. Scientific medicine was in its infancy. The average practitioner was poorly educated, possessing no more than two years of instruction in a proprietary medical school. Doctors lacked effective treatments for most diseases. The heart of medical practice remained diagnosis, prognosis, case management, and symptomatic treatment. Opiates were enormously tempting in this last regard, being potent pain relievers in the short term. Opiates developed a reputation as the "the lazy physician's remedy," a convenient way to pacify a pain patient without exerting effort to investigate the underlying disorder. Even physicians who were neither incompetent nor indolent faced economic pressure to prescribe. In the late nineteenth century too many doctors competed for too few discretionary dollars from too few patients. Professional incomes averaged around $1,000 a year, or roughly $28,500 in 2020 dollars. Doctors faced stiff competition from sectarian practitioners, as well as from colleagues with regular medical training. Physicians knew that, if they did not "shoot first," a rival might, thereby gaining a valuable patient. "Before the advent of this handy instrument the patient expected to wait a suitable time for relief," wrote Dr. George E. Pettey, who specialized in treating addiction. "In more modern times the physician who delays relieving pain for the action of slower drugs is in danger of losing his patient to the physician who is handy with the needle."[20]

---

[20] T.D. Crothers, "Medicolegal Relations of Opium Inebriety and the Necessity for Legal Recognition," *Journal of the American Medical Association,* hereafter *JAMA*, 35 (1900): 413, "lazy" (comment on Dr. Crothers's paper by Dr. Kenniston); Paul Starr, *The Social Transformation of American Medicine* (New York: Basic Books, 1982), chaps. 1-2, income statistics pp. 84-85; Courtwright, *Dark Paradise*, 50-51; Geo. [sic] E. Pettey, "The Narcotic Drug Addictions. Etiological Factors; Reasons for Past Failures; Principles Involved in Treatment," *Texas State Journal of Medicine* 6 (1910): 25.
  The temptation to administer opiates was heightened by their increasing abundance, due to the pharmaceutical industry's mechanization and increased scale of operations. Historian Joseph Gabriel gives the example of Parke, Davis, a Detroit firm that manufactured hypodermic

Then, from 1895 to 1915, the first narcotic addiction crisis waned. It did so for several interrelated reasons, all tied to medical progress. Surgery, revolutionized by antiseptic and aseptic techniques, effected lasting cures for some painful conditions. Public health reform, rationalized by advances in bacteriology, reduced infectious disease morbidity and mortality, particularly in cities. The prevalence of diarrheal diseases, often treated with opiates, declined. Greater diagnostic precision, made possible by new technologies like X-rays or Wassermann tests for syphilis, discouraged the unthinking palliation of disease. Should symptomatic treatment still be required, new, non-opiate alternatives for pain and fever were becoming available: acetanilide, phenacetin, and, ultimately, aspirin, which was introduced commercially in 1899 and soon became Bayer Pharmaceutical's best-selling product. Though these drugs were not without side effects, recommending them for painful conditions like headache or arthritis was safer than prescribing opiates.[21]

There remained the problem of self-medication. Many patent medicines (proprietary, heavily advertised nostrums based on secret formulae) contained opiates. Fraudulent "doctors"

---

syringes as well as opiates, cocaine, and other drugs. In 1875 Parke, Davis operated out of a single two-story building that employed twenty people. By the early 1900s its buildings stretched over six city blocks and housed up to 2,500 employees. Meanwhile the price of the opium from which Parke, Davis and other manufacturers extracted morphine was declining, as was true of commodity prices generally in the late nineteenth century. Joseph M. Gabriel, "Restricting the Sale of 'Deadly Poisons': Pharmacists, Drug Regulation, and Narratives of Suffering in the Gilded Age," *Journal of the Gilded Age and Progressive Era* 9 (2010): 318-319, https://www.jstor.org/stable/pdf/20799393.pdf?refreqid=excelsior%3Addf0c95d80ff2d46408b4be20d72014c. For the firm's narcotic and hypodermic products, see Parke, Davis, *Complete Catalogue ... Revised to January 1913*, https://babel.hathitrust.org/cgi/pt?id=hvd.hc35fc&view=1up&seq=5.

[21] Courtwright, *Dark Paradise*, 51-52; Jan R. McTavish, "Aspirin in Germany: The Pharmaceutical Industry and the Pharmaceutical Profession," *Pharmacy in History* 29 (1987): 103-115.

touted opium-habit "antidotes" that were disguised but pricey morphine solutions. And many pharmacists honored ancient, tattered prescriptions or simply dispensed with formalities and sold narcotics directly to addicts. Morphine and soda water, admitted one, kept him in business. Even reputable druggists made their excuses, saying that to refuse sale would simply alienate customers, who would go elsewhere to purchase their drugs.[22]

Progressive doctors and pharmacists therefore lobbied, with growing success, for laws to regulate narcotic sales. One key piece of federal legislation was the 1906 Pure Food and Drug Act, which required patent medicine makers to list their ingredients. Wary consumers, whose worries were reinforced by muckraking journalists, looked at the list of toxic drugs on the label and decided they wanted no part of the product. Sales of all patent medicines containing opiates were down, a Boston wholesale druggist reported in 1908. The "trade in Winslow's Soothing Syrup has been almost wiped out." Druggists who had once ordered bottles "by the carload" now handled only "a few dozen at a time." Researcher Hawkins Taylor, who analyzed a 1908 federal survey, concluded that national sales of patent medicines containing opiates were off by 20 to 30 percent, even as opiate prescribing by physicians was simultaneously declining.[23]

---

[22] Keeley, *Morphine Eater*, 146-147 ("antidotes"); "The Opium Habit's Power," *New York Times*, December 30, 1877, p. 8 (druggists).

[23] John Phillips Street, "The Patent Medicine Situation," *American Journal of Public Health* 7 (1917): 1037-38, and William P. Millay to Hamilton Wright, August 24, 1908, box 29, Records of the United States Delegation to the International Organization and Conference (hereafter USIOC), Record Group 43, National Archives, Washington, D.C. (customers scared by ingredients). Quotations: "Boston Notes" (TS, 1908), no pp., quoting Mr. Carter of Carter, Carter, & Meigs, and Hawkins Taylor to Hamilton Wright, October 5, 1908, with unpaginated "General Statistics" in box 43, USIOC. The best-known journalistic exposé of the patent-

Particularly hard hit were heavily advertised infant pacifiers like the aforementioned Mrs. Winslow's Soothing Syrup. Federal chemists denounced them as "baby killers" and warned that "if you value your child's health and life never use any of these preparations." Physicians had long observed that physically dependent infants born to addicted mothers suffered outcomes ranging from early, cyanosed deaths to retarded physical and mental development. Postpartum resort to opiates entailed the same grave risks, and the effect of such public denunciations was to reduce both the number of narcotized patent medicines and the doses they contained. The makers of Mrs. Winslow's dropped the morphine content from 0.4 grain (26 mg) per ounce in 1908 to 0.16 grain (10 mg) in 1911 to nothing in 1915.[24]

Like most states, Ohio followed the federal lead on drug labeling. The Ohio *General Code* of 1910 declared a drug to be misbranded if failed to bear a label on the quantity or proportion of opiates, among other toxic drugs. Even more basic to reform, however, were state narcotic prescription laws. Ohio's 1910 statute required the original, written prescription of a

---

medicine industry was Samuel Hopkins Adams, *The Great American Fraud*, 4th ed. (Chicago: Press of the American Medical Association, 1907).

[24] "A Warning to Parents," *La Grange Journal*, January 5, 1911, p. 1, https://texashistory.unt.edu/ark:/67531/metapth997059/ (quotes); David F. Musto*, The American Disease: Origins of Narcotic Control*, 3rd ed. (New York: Oxford University Press, 1989), 94 (doses). A representative medical account of the effects of opiates *in utero* is T. J. Happel, "Morphinism from the Standpoint of the General Practitioner," *JAMA* 35 (1900): 408, https://jamanetwork.com/journals/jama/article-abstract/468116. Newspapers likewise described the suffering of dependent infants born to and/or nursed by morphine-addicted mothers, heightening awareness of the dangers of medical narcotic exposure, e.g., "The Youngest Lunatic in the World," *Wheeling Register*, October 25, 1896, p. 9, https://chroniclingamerica.loc.gov/lccn/sn86092523/1896-10-25/ed-1/seq-9/; "Baby Was a Morphine Addict, Mother Wanted to Suicide [sic]," *Clarksburg Daily Telegram*, October 19, 1915, p. 8, https://chroniclingamerica.loc.gov/lccn/sn85059715/1915-10-19/ed-1/seq-8/; "Confession of Drug Addict to Be Laid Before Expected Congressional Investigation," *West Virginian*, June 29, 1922, p. 3, https://www.newspapers.com/image/378483314/.

state-licensed physician, dentist, or veterinary surgeon for the legal purchase of narcotics and forbade pharmacists from making more than one refill. (Only "liquid preparations sold in good faith as medicines" containing small amounts of opiates needed no prescription, an exemption common to most state laws.) The prescriptions themselves had to be kept on file for at least two years, where they would remain open to inspection by police and the State Board of Pharmacy. Possession of non-exempt narcotics by unauthorized persons, including unlicensed sellers and consumers lacking a valid prescription, was "prima-facie evidence of violation of the law" and punishable by fines, imprisonment, or both. Newspaper reports, the tip of the prosecutorial iceberg, show that Ohio brought at least 41 cases for illegal sale and possession in 1914, making it one of the most active anti-narcotic-abuse states in the nation.[25]

The national law aimed at controlling narcotic sales was the Harrison Narcotic Act. Proposed in 1910, it was not enacted until late 1914, owing to protracted negotiations with drug industry trade associations that sought to water down its most stringent provisions. The final version of the bill required all who dealt in or distributed narcotic drugs to register with the Treasury Department, to pay a small tax, and to keep accurate records of their transactions. Nominally a revenue law, the Harrison Act's real goal was to confine narcotic use to legitimate medical purposes and narcotic commerce to legitimate medical channels, where all transactions

---

[25] Martin I. Wilbert, "Efforts to Curb the Use of Narcotic Drugs," *Public Health Reports* 30 (1915): 893-923, Ohio statistics and laws, pp. 897, 916-917, quotations pp. 916 and 917; Martin I. Wilbert and Murray Galt Motter, *Digest of Laws and Regulations in Force in the United States Relating to the Possession, Use, Sale, and Manufacture of Poisons and Habit-Forming Drugs*, Public Health Bulletin No. 56 (Washington, D.C.: GPO, 1912), pp. 186-187, https://babel.hathitrust.org/cgi/pt?id=nyp.33433066558572&view=1up&seq=194&skin=2021 (misbranding, no more than one refill, open to inspection). The 1910 Ohio law also forbade operating or visiting opium dens, another common feature of state and municipal statutes.

would be transparent and open to official inspection. Unregistered persons contemplating the unauthorized, clandestine sale of narcotics faced penalties of up to five years in prison and a $2,000 fine.[26]

In Ohio federal officials used newspapers to warn doctors, dentists, veterinarians, and pharmacists to register by March 1, 1915, the day the Harrison Act took effect. The law had a swift impact. Illicit drug dealing in the northern district of Texas, U.S. Attorney James Clifton Wilson reported in early 1916, had declined "90 percent since the passage of the Harrison anti-narcotic law."[27]

---

[26] *Statutes at Large*, vol. 38, part 1, 785-790, https://tile.loc.gov/storage-services/service/ll/llsl//llsl-c63/llsl-c63.pdf. Prior to 1910 Congress regulated opiates through tax policy. Importers of medicinal opiates (crude opium, morphine or its salts) paid moderate or sometimes no customs duties, while importers of opium prepared for smoking paid high customs duties intended to discourage opium smoking, then viewed as vice associated with Chinese immigrants and the white underworld. Though imports of smoking opium were banned outright in 1909, the policy of heavy taxation on socially problematic forms of opiate commerce was resurrected by New York State in 2018, an action that, as of this writing, has been upheld by the Second U.S. Circuit Court of Appeals and the U.S. Supreme Court. Sara Randazzo, "New York State Can Enact $200 Million Tax on Opioid Industry, Court Rules," *Wall Street Journal*, September 14, 2020, https://www.wsj.com/articles/new-york-state-can-enact-200-million-tax-on-opioid-industry-court-rules-11600122604, and Lawrence Hurley and Nate Raymond, "U.S. Supreme Court Rejects Challenge to New York Tax on Opioid Companies," Reuters wire story, October 4, 2021, https://www.usnews.com/news/top-news/articles/2021-10-04/us-supreme-court-rejects-challenge-to-new-york-tax-on-opioid-companies. Pre-1909 opiate tax policy and imports: Courtwright, *Dark Paradise*, chap. 1.

[27] Ohio newspaper warnings: "Ban on Narcotics," *Medina Sentinel*, February 26, 1915, p. 1, https://chroniclingamerica.loc.gov/lccn/sn84028262/1915-02-26/ed-1/seq-1/#date1=1914&index=5&rows=20, and "International [sic] Revenue Collector," *Celina Democrat*, February 26, 1915, p. 1, https://chroniclingamerica.loc.gov/lccn/sn88077067/1915-02-26/ed-1/seq-1/#date1=1914&index=0&rows=20. Wilson: "Says Sales of Drugs Cut Down 90 Per Cent," *Weekly Herald* (Weatherford, Tx.), February 17, 1916, p. 2, https://texashistory.unt.edu/ark:/67531/metapth586167/, reprinting an article for the *Dallas Herald Times*. For additional information on the background, passage, and impact of the Harrison Act, see Courtwright, *Dark Paradise*, 100-104.

The Harrison Act, together with state regulation of narcotic sales, marked the beginning of a closed system of drug control—a system that would evolve, strengthen, and expand over the next seven decades. In theory, the firms regulated by federal and state laws fell into one of several distinct categories: Importers, manufacturers, wholesalers, and retailers. In practice, the distinctions among these categories, as well as between distribution and marketing, were often blurred. An example is McKesson & Robbins, then as now an important supplier of narcotic medications. Like most members of the National Wholesale Druggists Association, McKesson & Robbins had long embraced the concept of "service wholesaling." According to the company's official history,

> The essential theory was as sound as it was simple. Beyond taking orders passively, the wise wholesaler owed it to himself and to his customers to help increase sales and profits at the retail level. In this sense, the wholesaler was now much more than a middle-man; he was becoming an indispensable link between manufacturer and retailer.

McKesson & Robbins served as "an indispensable link" for two sorts of opiates, those manufactured by others and those it manufactured itself. The company handled imported morphine and domestically produced patent medicines, including Scotch Oats Essence, a nostrum whose real essence was whiskey and morphine disguised with a bitter tincture. By 1883 McKesson & Robbins was also making and selling its own branded morphine, a "much lighter and whiter article, which we offer with great confidence to the trade, guaranteeing quality and appearance." The morphine could be injected through one of several models of hypodermic syringes the company promoted. One was said to offer "almost painless" injections; to be always

reliable "at a critical moment;" and to be durable, cheap, and safe to use, whether by the nurse or by the patient.[28]

In the first two decades of the twentieth century McKesson & Robbins's operations, like those of other narcotic suppliers and promoters, became subject to increasing federal and state control. However, not all Progressive-Era controls and sanctions were formal. Pharmacists and suppliers who dodged the new laws faced the threat of professional ostracism as well as prosecution. In New York a pharmacist wrote that every drug store should post a sign, "A greedy criminal druggist will sell you morphine or cocaine; we are not of that kind." In Washington State the secretary of the state board of pharmacy threatened to inform newspapers of any drug stores that employed unregistered or unqualified clerks in the filling of narcotic prescriptions. A

---

[28] *The Road to Market; 125 Years of Distribution Service: McKesson & Robbins, Incorporated, 1833-1958* (N.c.: McKesson & Robbins, 1958), 18, "essential theory" p. 31*; Prices Current of Drugs* (New York: McKesson & Robbins, 1883), vi, 38, 114, 451; Courtwright, *Dark Paradise*, 56 (Scotch Oats Essence ingredients).The advice about safe home use catches the eye, insofar as physicians were already warning against leaving hypodermic syringes with patients, e.g., F. M. Hamlin, "The Opium Habit," *Medical Gazette* (1882): 427. Note also that, regardless of the actual manufacturer, the "McK. & R." logo appeared on the hypodermic syringes in the company's *Illustrated Catalogue*. This was done "in order to identify them [the promotional illustrations] specially as our own, and still further to prevent, as far as possible, having them copied and used by other houses." (Quotation from the unpaginated preface following p. 151 of *Prices Current of Drugs*, cited above.)

McKesson & Robbins remained a volume manufacturer and importer of opiates, as Schieffelin & Co. (another manufacturer and importer) reported to Hamilton Wright, July 20, 1908, box 29, USIOC. In 1928-1930 McKesson & Robbins also expanded its national marketing operations by acquiring several dozen regional wholesalers. "The consolidation strengthened the position of the whole drug industry," explains the official history. "Manufacturers, aware of the advantage of dealing directly with one organization whose experienced regional subsidiaries offered the quickest and most economical distribution of the greatest quantity of goods at a sound, steady profit, immediately agreed to help create an aggressive merchandising and advertising program. As for the retailers, 15,000 of them responded immediately by subscribing in 1929 to the new McKesson Plan of Service that would bring them modern selling techniques." *Road to Market*, 28, 42-45.

Boston physician, Dr. C.J. Douglas, condemned a local pharmacy for selling heroin so

indiscriminately that the neighborhood had acquired the nickname "Heroin Square." Charles A.

West, a prominent wholesale druggist who also worked in Boston, said that, when his firm

received orders for opiates from those not entitled to them, he refused to fill them and returned

their money. Donald McKesson, appearing before Congress in 1910 on behalf of McKesson &

Robbins, testified that "orders which have come to us from suspicious people, we have put in the

hands of the proper authorities for tracing, and prosecution if necessary." By the early twentieth

century ethical pharmacists steered clear of black or gray markets.[29]

One such pharmacist, Henry P. Hynson, gave a candid appraisal of the situation. Hynson

was a manufacturing pharmacist in Baltimore, a professor of commercial pharmacy at the

---

[29] "We Want to Know," *Pharmaceutical Era* 29 (1903): 445 ("greedy"); "Laws Governing Narcotic Sales Enforced as Never Before," *Pharmaceutical Era* 158 (1914), 17; "Board Examinations: Washington," *Pharmaceutical Era* (1914): 78; Charles A. West to Hamilton Wright, August 14, 1908, vol. 3, Massachusetts to New Mexico correspondence, USIOC; and Donald McKesson testimony, December 14, 1910, U.S. House of Representatives, Ways and Means Committee, *Importation and Use of Opium* (Washington, D.C.: GPO, 1911), p. 132.

Dr. Christopher Koch, Vice President of the State Pharmaceutical Examining Board of Pennsylvania and Chairman of the Legislative Committee of the Philadelphia Association of Retail Druggists, testified at the same hearings on behalf of the legislation. "The poor unfortunate 'dope fiend' is more sinned against than sinning," Dr. Koch said. "Had the law provided sufficient safeguards around the sale and distribution of these drugs, he would never have acquired such a habit. Had the manufacturer who sells these drugs any conscience, he would make it his business to know to whom he sold them in unusual quantities. Since he won't do it on moral grounds, it becomes the duty of the government to compel him to do it by law" (86).

Dr. Harvey W. Wiley, champion of pure food and drug legislation, also testified. "I know the great importance of mitigating pain," Dr. Wiley said, "but, gentlemen, it is better to suffer a few days than to be a slave for all the remainder of your lives if you happen to get well." The solution, he argued, was stricter regulation. "I would not hesitate to impose additional burdens on [the pharmaceutical] trade if by them I could lessen the dangers which come from the indiscriminate use of these drugs" (146-147).

University of Maryland, and an influential member of the American Pharmaceutical Association. These are the notes of an interviewer who spoke to him in 1908:

> Hynson … stated that the American Pharmaceutical Association strongly approves of the anti-opium crusade and has done a great deal in the last few years to direct the sale of narcotic drugs to licit channels and necessary use. He says that a few unscrupulous drug jobbing houses in Baltimore sell opium, morphine and other opium derivatives at retail to old habitués. First-class manufacturing chemists sell only to jobbers and first-class jobbers only to retail druggists. This is the general practice throughout the country.

> A large number of retail druggists are unscrupulous and will sell opium and its derivatives whenever they can. Quantities of morphine are sometimes brought in from other cities and sold from hand to hand on the Baltimore streets. This has, however, been largely stopped since a new local ordinance passed, making it both finable and imprisonable not only to use or sell but to be found in possession of narcotics.

> He knows personally of about 50 cases of the habitual hypodermic use of morphine, the habit having been contracted as the result of careless prescribing. He does not sell proprietary medicines containing opium, etc. He thought there had been a 25 % reduction in the sale of such medicines since the Pure Food and Drug Act went into effect.

> In his business today he prescribes [sic] less morphine than five years ago, because of the tendency on the part of physicians and surgeons to operate on those cases that formerly had opium in some form prescribed to lessen pain, or to the use of coal tar anodynes. He thought that the present practice of operating for painful diseases has appreciably

lessened the amount of morphine used legitimately in this country and that, on the whole, there should have been a decrease rather than an increase in our importations of opium and morphine.[30]

In fact, there had been a steady decrease in the per capita consumption of medicinal opiates during the first decade of the twentieth century. Though some officials had suggested otherwise, in hopes of spurring further diplomatic and legislative action, per capita imports were trending down, as were the percentages of prescriptions containing opiates. In 1888, 14.5 percent of prescriptions filled in Boston drug stores contained opiates. In 1908, the comparable figure for California was 3.6 percent.[31]

Consumer awareness as well as professional concern lay behind the growing narcotic wariness, a wariness that gave some pharmaceutical manufacturers an opening. As early 1878 the *Daily Ohio State Journal* warned against treating pain with morphine and giving morphine-laced "soothing syrups" to infants and children, thought to be more inclined to opiate addiction later in life if exposed early. Well before the 1906 Pure Food and Drug Act, makers of some remedies for infants and children stressed the absence of narcotics. In the 1890s Ohio newspapers carried numerous advertisements and testimonials for Dr. Samuel Pitcher's Castoria. The ads emphasized that the product contained no narcotics and that mothers could safely use it

---

[30] "Professor Henry P. Hynson," *Drug Trade Weekly* 4 (April 23, 1921), 15; "Baltimore Notes" (TS, 1908), box 43, USIOC, with minor spelling corrections and paragraph breaks.

[31] Virgil G. Eaton, "How the Opium Habit is Acquired," *Popular Science Monthly* 33 (1888): 665 (Boston); Charles B. Whilden, California State Board of Pharmacy, to Hamilton Wright, September 17, 1908, p. 4, box 43, USIOC. For per capita trends and additional USIOC correspondence corroborating the decline in medicinal opiate consumption see Courtwright, *Dark Paradise*, pp. 25 (figure 5) and 213-214 n 139.

"instead of the various quack nostrums which are destroying their loved ones, by forcing opium, morphine, soothing syrup and other hurtful agents down their throats, thereby sending them to premature graves."[32]

The no-narcotic marketing trend extended to other remedies advertised in Ohio in the early twentieth century. Stuart's Catarrh Tablets contained "no cocaine, morphine or poisonous narcotics so often found in catarrh powders, and the use of which often entails a habit more dangerous than the disease." Kemp's Balsam, a cough-and-cold cure, contained no opium, morphine, or other narcotic drug. National drug promotions played on the same theme. A 1913 advertisement for Hyperol, a "Utero-Ovarian Tonic," proclaimed the remedy "absolutely free from all opiates or narcotic drugs." As late as 1934 Hyperol's manufacturer—Purdue Frederick—was still using the tag line, adding that, despite the absence of narcotics, the remedy was "a notable reliever of pain."[33]

Of all pharmaceutical manufacturers, however, Bayer was the best suited to take advantage of the growing preference for non-narcotic drugs. In the 1910s and 1920s newspaper

---

[32] "Morphine Drinking," *Daily Ohio State Journal*, November 28, 1878, p. 1, https://ohiomemory.org/digital/collection/p16007coll22/id/61817/rec/15. Castoria, e.g., *Hocking Sentinel*, July 5, 1894, p. 1, https://chroniclingamerica.loc.gov/data/batches/ohi_delta_ver01/data/sn85038119/00237282693/1894070501/0262.pdf.

[33] Stuart's: "Plain Talk to Catarrh Sufferers," *Akron Daily Democrat*, October 24, 1901, p. 8, https://chroniclingamerica.loc.gov/data/batches/ohi_bravo_ver01/data/sn84028140/00237283582/1901102401/0317.pdf. Kemp's Balsam: *Marion Daily Mirror*, February 8, 1908, p. 13, https://chroniclingamerica.loc.gov/data/batches/ohi_juliet_ver01/data/sn88077573/00237289146/1908020801/1022.pdf. Hyperol: *American Journal of the Medical Sciences* 146 (December 1913), 6, and "From the Collections: Drugs," Special Collections, Drexel University College of Medicine, http://archives.drexelmed.edu/blog/?p=18.

ads for Bayer Aspirin, which ran in Ohio and throughout the nation, promoted the drug as a safe

analgesic suitable, not only for colds and flu, but for achy heads and teeth, earache, rheumatism,

lumbago, "stiff neck," joint pains, and "pain" generally—conditions that, fifty years and a

therapeutic revolution before, had been routinely treated with opiates.[34]

.

---

[34] Aspirin ads in Ohio: e.g., *Fulton County Tribune*, April 11, 1919, p. 7,
https://chroniclingamerica.loc.gov/data/batches/ohi_magellan_ver01/data/sn87076552/00296028
939/1919041101/0318.pdf. Aspirin ads elsewhere: e.g., Texas's *Carrolton Chronicle*, March 14,
1924, p. 2, https://texashistory.unt.edu/ark:/67531/metapth592203/.

**Figure 1**: Advertisements for non-narcotic medicines referenced in the text, 1894-1934









In this changing climate of opinion and practice the question of why some physicians

were still writing frequent narcotic prescriptions drew attention. In 1919 Dr. Thomas S. Blair,

head of the Pennsylvania Bureau of Drug Control, reported that one-third of state's physicians and dentists wrote 90 percent of narcotic prescriptions. While perhaps 150 of these men were out-and-out dope doctors, mostly addicts themselves, the heavy prescribers were more typically older and less competent practitioners who had been trained before the dangers of opiates were stressed. By contrast, the conservative prescribers (8,000 of the state's 12,000 doctors) were either younger and better trained or in mid-career and "keeping abreast of the times." Dr. Blair's description of their outlook defines narcotic conservatism and shows how doctors' attitudes shifted during the early twentieth century, when a rising generation equated caution in prescribing opiates with medical progress and ethical practice:

> These physicians are seeking for remedies specifically meeting definitely diagnosed pathology, whether the remedy be a drug, a serum, a vaccine or surgical intervention. But they know that specific remedies are few, and, so, they stress case-management in the run of practice, regarding the administration of symptomatic medication as only a *part* of case-management, and, often, the least important part. They know from experience and from reading that the narcotics *cure* no condition having a definite pathology, and they regard the administration of narcotics as emergency symptomatic medication, to meet violent pain and spasm, certain surgical and traumatic emergencies, acute inflammation of serous membranes, aggravated dyspnea, cases of pneumonia and typhoid fever with talkative delirium in which the patient simply *must* have sleep, inoperable cancer, and so on. They know that, in certain aggravated conditions, the temporary use of a narcotic is lifesaving, even though it is not specifically curative; and, thus, they prescribe narcotics conservatively and scientifically, ever keeping in view the associated danger of addiction. No law interferes with such practice, and these physicians no more think of supplying to

a patient at one time 200 morphine pills than they do of giving an equal number of calomel tablets or aconitine granules.

Calomel was a violent, mercury-based purgative associated with the bygone days of depletion-based therapeutics. Aconitine was a notoriously toxic alkaloid sometimes administered in small doses to treat pain and other symptoms. By analogy and implication, unthinking palliation with frequent, heavy doses of narcotics was a risky and retrograde medical practice, associated with doddering "routinists" or greedy doctors out for a quick buck.[35]

From 1919 on physicians and pharmacists in Ohio and other states faced added scrutiny. In March of that year the U.S. Supreme Court held, in *Webb et al.* v. *the United States*, that physicians might not, under the provisions of the Harrison Act, prescribe morphine "for the purpose of providing the user with morphine sufficient to keep him comfortable by maintaining his customary use." Writing and filling prescriptions for decreasing amounts of narcotics in reduction treatment aimed at detoxification and cure was one thing. Quite another was the practice of Dr. W.S. Webb, a Memphis physician, and Jacob Goldbaum, a Memphis pharmacist. They had entered an understanding that Goldbaum (like Webb, registered under the Harrison Act) would use his official order forms to procure a large stock of morphine from wholesalers—thirty times the amount typically dispensed by larger retail druggists. Dr. Webb would liquidate the oversupply by writing prescriptions for fifty cents apiece, which Goldbaum would fill. Purchasers included out-of-state buyers. They secured and filled as many as ten one-dram

---

[35] Thomas S. Blair, "Is Opium the 'Sheet-Anchor of Treatment'?" *American Journal of Clinical Medicine* 26 (1919): 830-831, italics in original, and "The Dope Doctor and Other City Cousins of the Moonshiner," *Survey* 44 (1920), 18 (routinists).

prescriptions, each made out in a separate and fictious name, for a total of 17,718 mg. The Court held that Goldbaum had knowingly used his order blanks for a prohibited purpose and that Webb, as the government charged in its brief, was not prescribing in any ethical sense at all. He was trafficking in drugs.[36]

One question the Supreme Court did not address in *Webb* was the legal status of clinic-based addict maintenance authorized by governments, an experiment subsequently tried by thirty-five municipalities (including Youngstown, Ohio) in twelve different states. Treasury Department officials opposed these programs as well. They managed to close most of them by 1920, with the last major program (in Shreveport, Louisiana) ceasing operations in 1923. During the brief time they were in operation, however, federal prosecutors brought cases against clinic patients who resold a portion of their maintenance supplies to other persons. They too were a threat to a system that sought to check all forms of narcotic diversion.[37]

---

[36] *Webb et al.* v. *United States* 249 U.S. 96; *Brief on Behalf of the United States, W.S. Webb and Jacob Goldbaum* v. *The United States* (Washington: GPO, 1919), 34-35. A Treasury Department agent subsequently reported that Goldbaum had also conspired with physicians to sell morphine from a "one horse drug store" in Alabama, and that he had been found to have $170,000 worth of morphine in his possession. "Joe Peak, Noted Secret Service Operative, Is Here," *Wheeling Intelligencer*, October 25, 1919, p. 9,
https://chroniclingamerica.loc.gov/data/batches/wvu_iconia_ver01/data/sn86092536/002717684
36/1919102501/0582.pdf.
    Medical opinion leaders also condemned physicians who continued to write prescriptions for large quantities of morphine for one addict after another: "Naturally this is not the *lawful practice of medicine* within the meaning of the language of the act," italics in original, "First Year of the Harrison Narcotic Act," *Boston Medical and Surgical Journal* 174 (1916): 434,
https://books.google.com/books?id=N7I1AQAAMAAJ&pg=RA1-PA407&lpg=RA1-
PA407&dq#v=onepage&q&f=false.

[37] The clinic era is described in Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*, chap. 12, and Courtwright, *Dark Paradise*, 11-15, Youngstown at p. 13. An example of

### B.  Illustration: The Relative Rarity of Iatrogenic Heroin Addiction, 1898-1924

Narcotic conservatism arose from reform forces within and without the medical and pharmaceutical professions. Progressive physicians and pharmacists, retail and wholesale, warned against the overuse of narcotics and endorsed labeling and prescription laws. State legislatures and the federal government turned physicians and pharmacists, and those who supplied them, into registered gatekeepers for licit narcotic commerce and threatened criminal sanctions should they abuse that privilege. Whether addict maintenance fell under the heading of "abuse" was initially contested and remained, at least in academic and legal circles, a source of debate throughout the mid-twentieth century. What was not contested was the conviction that the overpromotion and over-prescription of narcotic medications for pain arising from chronic, nonterminal conditions was a dangerous practice.

The growth of narcotic conservatism helped to prevent medical addiction and to reduce its prevalence. The clearest example of this trend was heroin, a semisynthetic prescription opiate introduced in 1898. Though heroin was similar to morphine in its molecular structure and narcotic effects, it had a dissimilar early history, owing to a combination of more narrowly focused marketing and more skeptical evaluation. For all its potency, heroin triggered no wave of iatrogenic addiction remotely comparable to that which followed the popularization of morphine injections or the introduction of oxycodone pills for treating CNP.

---

prosecution for resale is "Opium Dealers on Trial with Drug Addicts," *Houston Daily Post*, September 26, 1919, p. 5, https://texashistory.unt.edu/ark:/67531/metapth608318/.

Medically induced heroin addiction was in fact rare. In 1918 Dr. Carl Scheffel, an expert on medical jurisprudence, described the background of fifty addicted patients who had voluntarily sought cures. Addiction treatment being expensive, his sample consisted largely of middle-class medical addicts. Only one of the patients, a victim of trigeminal neuralgia, had become addicted by using heroin. The rest followed the traditional pattern, most having become addicted after a physician prescribed morphine for a chronic and painful condition.[38]

Psychiatrist Lawrence Kolb, who became the federal government's leading authority on narcotic addiction in the 1920s and 1930s, also determined that iatrogenic addiction to heroin was rare. With Dr. John Remig, a Pennsylvania State Health Department drug-control inspector, Kolb reviewed the cases of 150 medical addicts who had begun using narcotics between 1898 and 1924—that is, between the year Bayer introduced heroin and the year Congress outlawed its manufacture. They found just two heroin users, 1.3 percent of the total. Kolb's hypothesis, "the use of heroin in medical practice seldom resulted in addiction," was borne out. Heroin addiction overwhelmingly originated from use "in the underworld for dissipation."[39]

Why were there so few medical heroin addicts? First, Bayer's marketing was relatively restrained. In contrast to morphine and cocaine, which had been introduced earlier and touted for a wide range of conditions, the literature on heroin emphasized its role as a specific in treating cough and respiratory disorders. It was often administered in small doses (some as low as 1 or 2

---

[38] Carl Scheffel, "The Etiology of Fifty Cases of Drug Addictions," *Medical Record* 94 (1918): 853-854.

[39] "Questionaire [sic] re Drug Habit," box 6, and Kolb to Remig, November 14, 1927, box 4, both Lawrence Kolb Papers, History of Medicine Division, National Library of Medicine, Bethesda, Maryland.

mg) and in tablet, pastille, or syrup form rather than by injection. "The fact that the therapeutic dose of heroin was much smaller than that of morphine made it less likely for heroin to cause addiction when it was prescribed," Kolb observed. A 1906 *Journal of the American Medical Association (JAMA)* literature review noted that heroin was "recommended chiefly for the treatment of the air passages attended with cough, difficult breathing and spasm"—in other words, conditions like bronchitis, pneumonia, tuberculosis, or asthma. The same review nonetheless cautioned that heroin depressed respiration, that it was toxic in higher doses, and that addiction formed readily and with deplorable consequences. A few authorities did venture, in print, that heroin would make an effective general analgesic. This idea, however, was controversial. It soon drew fire from both German and American physicians.[40]

Medical writers also rebutted a handful of early reports that heroin was not addictive and that it might serve as a treatment for morphine addiction. In a short-term sense this was true. Heroin, which breaks down into morphine and codeine in the bloodstream, brought temporary relief from opiate-addiction withdrawal symptoms. But that was hardly a cure. On close inspection, heroin looked every bit as dangerous as its predecessor alkaloids.

In a 1903 article, "The Heroin Habit Another Curse," Dr. Pettey stated the case for wariness:

---

[40] Lawrence Kolb, *Drug Addiction: A Medical Problem* (Springfield, Ill.: Charles C Thomas, 1962), 51; "Heroin Hydrochloride," *JAMA* 47 (1906): 1303. Heroin was diluted in another way, when small amounts were combined with other drugs like terpin hydrate to create a compound with both antitussive and expectorant properties, e.g., Parke, Davis, *Catalog…1913*, 248. David T. Courtwright, "The Roads to H: The Emergence of an American Heroin Complex, 1898-1956," in *One Hundred Years of Heroin*, ed. David F. Musto et al. (Auburn House: Westport, Conn., 2002), 4-5, describes early debates over heroin's appropriate therapeutic uses.

Many articles have appeared in medical literature during the last two years lauding this new agent, and doubtless much can be truthfully said in its favor, but some who have written in its praise seem to have been misled by the claim of its promoters, that even its prolonged use does not result in the formation of a habit.

When we consider the fact that Heroin is a morphine derivative, being the diacetyl of morphine, and that in this form it retains almost all of the properties of the salt from which it is derived, it does not seem reasonable that such a claim could be well founded. It is strange that such a claim should mislead any one [sic] or that there should be found among the members of our profession those who would reiterate and accentuate it without first subjecting it to the most critical tests, but such is the fact.

Dr. Pettey reviewed five previously published accounts by physician "promoters" who claimed that heroin either carried no risk of habit formation or was useful in treating morphine addiction. Reading the reports with an eye for clinical details, he saw that the findings did not add up. The patients had either been treated with heroin in hospitals following surgery (which is to say in a controlled environment and for a limited period of time) or as outpatients for "a few days." In most instances the authors had not specified the length of treatment, or the length of time they had followed up the patients, so their assertions about the safety of heroin's "continued use" were impossible to prove.

As for the salvation of morphine addicts, Dr. Pettey reviewed records of 150 drug addicts who had come under his care. Eight used heroin, but only three of these cases had begun with the drug. Another had been an abstinent morphine addict who relapsed when given heroin by a well-intentioned surgeon following a painful operation. "The other four cases were morphine users

who had substituted Heroin for morphine with the idea that they were curing themselves of the habit, but after the substitution was made they were unable to leave off the Heroin." The conclusion was obvious: "Be not deceived, it is an opiate."[41]

## II. Lessons Reinforced: The Institutionalization of Narcotic Conservatism

### A.  Education, Regulation, and Additional Legislation, 1895-1986

The principal benefit of such wariness, of not being deceived by ill-considered therapeutic advice or puffery, was the avoidance of new cases of addiction. This was why Drs. Scheffel, Kolb, Remig, and Pettey found that only 1.7 percent (6 of 350) of the addiction cases they collected originated in therapeutic heroin use. Of even greater benefit, though, was narcotic conservatism's effect on iatrogenic opium and morphine addiction, the main source of the problem. The 1895-1915 decline in the number of opiate addicts depicted in Appendix B occurred because doctors were creating fewer new addicts, even as existing addicts became abstinent or, more typically, succumbed to age, illness, or overdose. The decline in prevalence had a demographic tailwind, at least for medical addicts who were sicker and older than the younger and less sympathetic "pleasure users" who occupied, by default, an increasingly conspicuous place in the changing American narcotic landscape.[42]

---

[41] George E. Pettey, "The Heroin Habit Another Curse," *Alabama Medical Journal* 15 (1903): 174-180, capitalization thus.

[42] Charles E. Sceleth and Sydney Kuh, "Drug Addiction," *JAMA* 82 (1924): 679 ("pleasure users"). "Fifteen or twenty years ago," Sceleth and Kuh noted, "most addicts acquired the habit through physical disease or discomfort. Today the number of new addictions through physicians' prescriptions is small. The great majority of cases now result from association with addicts,

By the turn of the century, then, the American medical profession had absorbed a crucial lesson in primary prevention. For most of the twentieth century that lesson was reinforced by medical opinion leaders and health educators, legislators, and federal officials, whose combined efforts reduced the therapeutic exposure of opiate-naïve pain patients and thus lowered the risk of medical opiate addiction. Lowered, but not eliminated. For example, in New York City in the 1950s an addict with the right connections could pay $25 to a doctor to write a prescription for Dilaudid ("drugstore heroin") and another $25 to a pharmacist to get it filled. But this sort of arrangement was expensive. Moreover, physicians and pharmacists who skirted the law—typically to supply respectable white rather than minority or "street" users—were essentially providing maintenance doses for existing addicts, not creating new ones.[43]

More worrisome were periodic attempts by pharmaceutical manufacturers to break into the large pain market by making misleading claims about the safety of new narcotic analgesics. These attempts, however, were checked by federal regulators. Authorities presented a consistent message, backed by force of law: Minimize opiate exposure.

In a word, narcotic conservatism was institutionalized. Medical, legislative, regulatory, educational, media, and philanthropic institutions pulled at the same supply-reduction oar, which

---

following their advice in taking a 'shot' or a 'sniff' for 'what ails you' and searching for new sensations."

[43] David T. Courtwright, Herman Joseph, and Don Des Jarlais, *Addicts Who Survived: An Oral History of Narcotic Use in America before 1965*, rev. ed. (Knoxville: University of Tennessee Press, 2012), 174-175 (Dilaudid prescription). David Herzberg, "Entitled to Addiction? Pharmaceuticals, Race, and America's First Drug War," *Bulletin of the History of Medicine* 91 (2017): 586-623, and Courtwright, *Dark Paradise*, 136-137, describe covert physician maintenance.

is why historians refer to the mid-twentieth century as "the classic era of narcotic control." This section offers several examples of those institutional efforts and shows how they reinforced and perpetuated the narcotic conservatism that emerged in the late nineteenth and early twentieth centuries.[44]

The starting point for narcotic conservatism was medical education. Standard texts emphasized that symptomatically treating any form of dysmenorrhea with opiates ran the risks of addiction and professional condemnation. "He who is compelled to resort frequently to opium and stimulants," the authors of *An American Text-Book of Gynecology* wrote in 1898, "must be considered devoid in diagnostic ability, and consequently ought not to be entrusted with the management of such cases." Professors boasted in print of how infrequently they prescribed opiates and reiterated the need to carefully monitor patients. I am a neurologist, Dr. William J. Herdman told his students in 1902. I see more pain than most. Yet I write far fewer prescriptions for potent narcotics than the average general practitioner and still get better results.[45]

Rank-and-file practitioners noted the pedagogical trend. The teaching now, Tennessee physician T.J. Happel wrote in 1895, was "when in doubt, do not give it." C.W. Bonyge, a Los Angeles police surgeon, attributed the decline in medical addiction to "teachers of Materia

---

[44] Historians who have used "the classic era" as a chronological framework and reference point include Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*, 1-44; Caroline Jean Acker, *Creating the American Junkie: Addiction Research in the Classic Era of Narcotic Control* (Baltimore: Johns Hopkins University Press, 2002), 1-12; and Herzberg, "Entitled to Addiction?"

[45] Henry T. Byford et al., *An American Text-Book of Gynecology*, second rev. ed. (Philadelphia: W.B. Saunders, 1898), 105; Walter F. Boggess, "Morphinism," *Medical Age* 17 (1899): 883; Dr. Herdman comment on C.B. Burr, "Concerning Morphine Addiction and Its Treatment," *JAMA* 39 (1902): 1592.

Medica [Pharmacology] and the text books [being] very persistent in their warnings of the danger." Dr. Oscar C. Young, in a 1901 paper before the New Hampshire Medical Society, said that new doctors had been so thoroughly warned about the dangers of opiates in their medical school lectures and ward rounds that their patients might endure "agonies worse than any hell for want of one-eighth of a grain of morphine."[46]

This was putting the matter too strongly. Narcotic conservatism was never narcotic nihilism. The proper standard of care, as Dr. Blair explained, was to limit opiate prescribing to cases involving emergencies, trauma, surgery, and acute or terminal pain. The concept of circumspect use to minimize addiction became a staple of mid-century journal articles. In 1931, for example, *JAMA* ran a series of articles on the indispensable uses of narcotics. In the introduction, *JAMA*'s editor, Dr. Morris Fishbein, explained that, whatever responsibility physicians bore for narcotic addiction in the past, the profession needed to "diminish as far as possible" future iatrogenic cases. This could be accomplished by limiting "the prescribing of narcotic drugs to cases in which the prescriptions are essential, and in which, after due thought, [the physician] is convinced that no other drug would suffice." Dr. Fishbein quoted Dr. Walter L. Treadway, who was, like Dr. Kolb, an addiction specialist at the U.S. Public Health Service. Treadway stressed that, while some patients were constitutionally prone to addiction, "evidence is at hand … to show that addiction may be induced by the injudicious use of drugs in persons

---

[46] T.J. Happel, "The Opium Curse and Its Prevention," *Medical and Surgical Reporter* 72 (1895): 728; Bonyge to Hamilton Wright, August 12, 1908, box 29, USIOC; Oscar C. Young, "On the Use of Opiates, Especially Morphine," *Medical News* 80 (1902): 154.

apparently free from any nervous or mental instability, and conversely, that due care in administration may avert this result even in the unstable."[47]

In 1933 Dr. Treadway summarized current thinking on the origins, prevention, and treatment of narcotic addiction. Ease of access to narcotics, Dr. Treadway said, was causally related to addiction. Though mentally unstable patients were especially vulnerable, care needed to be exercised even for patients with no apparent mental or nervous instability, as they too could become addicted. Physicians should consider whether the substitution of less dangerous analgesics would suffice. If opiates were indicated, they should never be prescribed in larger or more frequent doses than necessary. Hypodermic administration should be avoided, if possible, and patients should never be allowed to inject themselves. Those requiring daily doses were to be carefully monitored, kept in the dark as to the nature of the analgesia, and cut off as soon as the use of narcotics was no longer required.[48]

Similar advice appeared in Drs. Louis Goodman and Alfred Gilman's *The Pharmacological Basis of Therapeutics*, an authoritative textbook first published in 1941 and

---

[47] Morris Fishbein, "The Indispensable Uses of Narcotics," *JAMA* 96 (1931), 856, https://jamanetwork.com/journals/jama/article-abstract/251256. Other specialists concurred that, while individual susceptibility varied, opiates eventually produced addiction if exposure was prolonged, e.g., Pettey, *Narcotic Drug Diseases*, 18, 22.

[48] Dr. Treadway's remarks appeared in a 1933 address that was published the following year as "Narcotic Drug Addiction," *Texas State Journal of Medicine* 30 (1934): 7-18. Dr. Treadway also advised his audience to consult the 1931 *JAMA* series on the appropriate uses of narcotics, which were by then available in book form. Other physicians recommended that patients not be told when they received narcotics. That way "all those charmed by the effect of narcotics—and they are many, and among them many upright and normal persons—would be spared of learning what they wanted," and which they might seek from nonmedical sources. Ernest M. Poate, "The Brookhart Narcotic Bill" (letter), *New York Times*, February 17, 1931, p. 24, https://timesmachine.nytimes.com/timesmachine/1931/02/17/98322168.html?pageNumber=22.

thereafter continuously updated and reissued for use in medical schools throughout the United States. Goodman and Gillman emphasized the importance of using minimum effective doses for specific conditions, such as shock following trauma. Even then the patient should never be told that he was receiving an opiate, never be entrusted with hypodermic means of administration, and never be given a prescription for more than necessary for "a short interval" of treatment before again seeing the physician. Though addiction ordinarily took two weeks or more to develop, it could manifest itself after only a few doses in some patients, another reason to administer narcotics for the briefest possible time. Should treatment require "several days," the physician was to observe closely "after cessation of therapy to discover whether [the patient] is addicted." This addiction risk underscored Drs. Goodman and Gilman's summary judgment: "The physician should never employ a narcotic when another drug will accomplish the same end."[49]

---

[49] Louis Goodman and Alfred Gilman, *The Pharmacological Basis of Therapeutics: A Textbook of Pharmacology, Toxicology and Therapeutics for Physicians and Medical Students* (New York: Macmillan, 1941), 217-221, quotations p. 217, and Caroline Jean Acker, "From All-Purpose Anodyne to Marker of Deviance: Physicians' Attitudes towards Opiates in the US from 1890 to 1940," in *Drugs and Narcotics in History*, ed. Roy Porter and Mikuláš Teich (Cambridge: Cambridge University Press, 1995), 128. Acker adds that, after 1928, the American Medical Association routinely communicated with federal authorities and state licensing boards to identify physicians "convicted for violating the Harrison Act so that evocation of licensure and publication of the offenders' names in *JAMA* might prevent their resuming their practices" (124).

Drs. Acker and Musto have pointed out that twentieth-century physicians also became increasingly wary of treating, or having anything to do, with narcotic addicts, whom they viewed as untrustworthy drug-seekers who would try virtually any trick to obtain a prescription or an injection. One Centralia, Mo., doctor encountered a heavily bandaged man who claimed that he had been injured in a car crash. Asked if he "knew how much he could take," the man replied by suggesting a heavy dose of morphine, revealing that he was an addict. "He didn't make the riffle." Untitled news item, *Centralia Fireside Guard*, November 2, 1923, 1, https://shsmo.newspapers.com/image/581102100/. See also Acker, *Creating the American Junkie*, 62, and Musto, *American Disease*, 92.

The Federal Bureau of Narcotics (FBN) was equally direct in a 1938 pamphlet on appropriate prescribing and dispensing. Physicians should prescribe narcotics conservatively, and pharmacists should fill narcotic prescriptions warily. William S. Burroughs caught the prevailing mood in a 1955 letter, in which he described an encounter with a druggist he asked to fill a prescription for relatively mild codeine tablets. "His *pince-nez* falls off. Then he calls the doctor (but can't find him in), asks questions, finally refuses to fill the script without talking to the doctor. Codeine!!" Even when stronger narcotics were clearly indicated, as in cases of advanced cancer and other terminal illnesses, Bureau guidelines warned prescribers to keep the dosage within professional norms. To be legitimate, a prescription for narcotics should not exceed the quantity "ordinarily recognized by members of [the] profession to be sufficient for the proper treatment of a given case;" written only for bona fide patients personally attended by the physician; and not intended for addict maintenance. Druggists acted as the system's backstop. They had a "corresponding responsibility" to "determine, in good faith, that the prescription was issued in the course of professional practice, and not for the purpose of gratifying addiction." And they were to exercise caution "to avoid being imposed upon by unscrupulous persons" and to carefully check all prescriptions for forgeries and alterations.[50]

The guidelines reflect the Bureau's supply-control priority. Apart from the maintenance taboo, Bureau officials were uninterested in deciding whether opiates were appropriate for individual patients. That was up to the doctors. The Bureau was, however, concerned that the

---

[50] William S. Burroughs to Allen Ginsberg, April 20, 1955, *The Letters of William S. Burroughs, 1945-1959*, ed. Oliver Harris (New York: Viking, 1993), 273; H.J. Anslinger, "Prescribing and Dispensing Narcotics Under Harrison Narcotic Law," Pamphlet No. 56, rev. ed. (Washington, D.C.: Bureau of Narcotics, 1938), 2-5.

amounts they prescribed should be within reasonable and customary limits and that both physicians and pharmacists should monitor those receiving prescriptions. Iatrogenic addiction had two aspects: the direct risk of addiction to the patient and the indirect risk that over-prescription, from venal or other motives, would lead to diversion and enable secondary abuse and addiction and related harms like theft and prostitution. Protecting public health and safety meant limiting narcotic consumption to what was medically and scientifically necessary.

Neglect or, worse, conspiracy leading to opiate diversion entailed risk of prosecution, something that pharmacists had known since the passage of state and federal narcotic laws in the early twentieth century. Indeed, the landmark *Webb* case of 1919 had upheld the conviction of a pharmacist as well as a physician for conspiring to violate the Harrison Act. Beyond legal strictures, pharmacists' professional training reinforced the ethic of narcotic conservatism, as when students' reference manuals stressed the need for vigilance. The 1957 *Pharmacist's Reference* listed eighteen "narcotic don'ts" for pharmacists, including "[d]on't fill narcotic prescriptions for unusual qualities unless checking with [the] physician." The reason: "Diversion to addicts is a profitable business—as much as $1.00 for ¼ gr. MS [morphine sulfate, 16 mg]."[51]

Medical lecturers and attending physicians also stressed the importance of monitoring patients and minimizing dosage. "We were all—nurses, pharmacists, physicians—taught: Don't overdose, don't overdose, don't overdose," said Martha Stanton, a nurse trained in the 1960s and 1970s. "You give the smallest amount of medication over the longest period of time because you don't want to give a patient too much, for fear of addiction." Dr. Marcia L. Meldrum, a hospital

---

[51] *Pharmacist's Reference*, 8th revision (Indianapolis: Eli Lilly, 1957), 327, https://babel.hathitrust.org/cgi/pt?id=osu.32435004460770&view=1up&seq=3&skin=2021.

58

health care manager who became a Ph.D. historian specializing in the history of pain management, was even more succinct: "Physicians were trained to give minimal opioids for pain, often even less than prescribed, unless death seemed imminent."[52]

Beyond standard medical training, specialized studies dealing with pain and its management also stressed the need for caution. The chapter on analgesia in *Chronic Pain*, a comprehensive anthology edited by specialists at the Duke University Medical Center, reflects the wariness still prevailing in the mid-1980s:

> In patients with chronic benign states who have anxiety, depression, and/or severe character pathology, the potential for abuse is high and opioid drugs are not effective drugs for the management of pain. Similarly, caution should be exercised in prescribing opioid analgesics to patients who have a history of substance abuse. Informed consent from the patient should be obtained before using opiates for the management of chronic pain. The patient needs to have a clear understanding of the possible side effects, habituation, and physical dependency that may occur with opioid drugs. More potent opioid analgesics (methadone, morphine, oxycodone) should be used only when weaker opioid analgesics do not provide effective pain control. Regular follow-up visits are essential to monitor dose, to prevent or minimize tolerance, and to monitor side effects. The goal is to establish the lowest effective maintenance dose with a minimum of side effects.

---

[52] Sam Quinones, *Dreamland: The True Tale of America's Opiate Epidemic* (New York: Bloomsbury Press, 2016), 94 (Stanton); Marcia L. Meldrum, "The Ongoing Opioid Prescription Epidemic: Historical Context," *American Journal of Public Health* 106 (2016): 1365.

Guidelines from the Federal Bureau of Narcotics [sic; the old name for what was by then the Drug Enforcement Administration] state that physicians may use narcotics to relieve acute pain. Physicians directly in charge of patients suffering from a chronic disease can use opioid analgesics for the relief of pain over an extended period if the doses are kept within limits accepted by other physicians, and if proper care and reasonable precautions are taken to prevent illicit diversion of the drugs. It is advisable that physicians document the indication for continuous use, maintain records of the drug use, and obtain consultation for the use of opioid analgesics in chronic pain patients.

Advice books aimed at lay readers contained blunter warnings. "Narcotics should not be used to manage chronic nonmalignant pain," summed up one. "Their negative consequences usually outweigh any positive benefits."[53]

School children also received advice about narcotic drugs, although in their case the worry was youthful experimentation, not medical exposure. As early as 1910 the Ohio legislature mandated that public school students receive instruction in the nature and effects of narcotic drugs as well as alcohol; Ohio teachers responsible for physiology and hygiene were required to undergo instruction and examination on the subject.[54]

---

[53] Randal D. France, K. Ranga Rama Krishnan, and Ananth N. Manepalli, "Analgesics in Chronic Pain," in *Chronic Pain*, ed. Randal D. France and K. Ranga Rama Krishnan (Washington, D.C.: American Psychiatric Press, 1988), 438. Though the imprint is 1988, the chapter contains no references postdating 1984, suggesting that it was composed around 1985 and subsequently published with the other chapters. See also Richard W. Hanson and Kenneth E. Gerber, *Coping with Chronic Pain: A Guide to Patient Self-Management* (New York: Guilford, 1990), 37 (quotation).

[54] Wilbert and Motter, *Digest of Laws*, 186.

Messages about the dangers of exposure to narcotic drugs reached larger and more diverse audiences through novels, plays, and motion pictures. The opium poppies that menaced Dorothy and her companions in *The Wonderful Wizard of Oz* were described as lethal poisons in L. Frank Baum's 1900 novel, and in the many theatrical productions and movies based on the book. (The most famous of the adaptations, Metro-Goldwyn-Mayer's 1939 film, became the most widely viewed movie in history, according to the Library of Congress.) Nelson Algren's National-Book-Award-winning novel, *The Man with the Golden Arm* (1949, film version 1955) featured a morphine-addicted war veteran and emphasized the danger of relapse and the agony of withdrawal. Theater and moviegoers revisited the history of iatrogenic addiction in Eugene O'Neill's play, *Long Day's Journey into Night*. Published and posthumously staged in 1956, the play went on to sell more than one million copies; win a Tony Award for Best Play and a Pulitzer Prize for Drama; and enjoy frequent revivals. In the 1962 film version, Katharine Hepburn played the morphine-addled Mary Tyrone, closely modeled on O'Neill's mother, Mary "Ella" O'Neill. Ella had become addicted in 1888, following the birth of her third son, Eugene. During a long, painful recovery "a cheap hotel doctor," as he is called in the play, gave her injections of morphine. She spent the next 25 years of her life addicted to the drug. Another classic, Harper Lee's *To Kill a Mockingbird* (1960; film version 1962), depicted a morphine addict named Mrs. Henry Layfayette Dubose. An ill-tempered, invalided widow residing in a Depression-era Alabama town, Dubose had become addicted years before through treatment for a chronic, painful condition. Told that she was dying, she struggled (with the unwitting help of

the novel's young protagonists) to withdraw from the drug, being determined, as Atticus Finch put it, to "leave this world beholden to nothing and nobody."[55]

If professional opinion, official guidelines, school curricula, and mass-media portrayals sustained and strengthened narcotic conservatism during most of the twentieth century, so did Congress, state legislatures, courts, and administrators. The legal and policy pattern from 1906 to 1986 was one of increasingly tight control of supply and increasingly strict punishment of violators, punctuated by brief counter-cycles of liberalization. A timeline and summary of key federal legislative, judicial, and administrative developments from the first protective law to the current governing statute, the CSA, makes the trend clear:

**1906** Pure Food and Drug Act. Created labeling requirements for ingredients, such as narcotics or alcohol, that were potentially toxic and addictive.

**1909** Smoking Opium Exclusion Act. Banned all imports of opium prepared for smoking.

**1912** Hague Opium Convention. Laid the groundwork for a system of international narcotic control in which supply was to be limited to estimated medical and scientific needs. The treaty

---

[55] "The Power of the Poppy: Exploring Opium Through 'The Wizard of Oz,'' National Museum of American History, November 9, 2016, https://americanhistory.si.edu/blog/opium-through-wizard-oz; "*The Wizard of Oz*: An American Fairy Tale," Library of Congress, http://www.loc.gov/exhibits/oz/ozsect2.html; Nelson Algren, *The Man with the Golden Arm* (Garden City, N.Y.: Doubleday, 1949); Lisa Mulleneaux, "Ella's Addiction: The Story of a Mother and Morphine," *Hektoen International: A Journal of Medical Humanities* (Winter 2019), https://hekint.org/2019/03/27/ellas-addiction-the-story-of-a-mother-and-morphine/; Eugene O'Neill, *Long Day's Journey into Night* (New Haven: Yale University Press, 1956); "*Long Day's Journey into Night*, second edition," Yale University Press, https://yalebooks.yale.edu/book/9780300093056/long-days-journey-night (more than one million); and Harper Lee, *To Kill a Mockingbird* (Philadelphia: J.B. Lippincott, 1960), 108-121.

pledged signatories, which included the United States, to enact and enforce laws to control domestic manufacture and sale of medicinal narcotics. (Subsequent diplomacy, led by the United States, tightened international production controls and reporting requirements, culminating in the 1953 Opium Protocol and the 1961 Single Convention. The Single Convention consolidated previous treaties, placed all parties under the same regulatory obligations, and created today's International Narcotics Control Board as a supranational oversight agency.)

**1914** Harrison Narcotic Act. Used federal taxing power to create a registration system whose goal was to make commerce in opiates and cocaine transparent and confined to legitimate medical channels. Transactions outside medical channels were subject to criminal prosecution.

**1919** Volstead Act. Changed the status of spiritous beverages to prescription drugs and increased federal law enforcement capacity. Voided by Repeal in 1933.

**1919** U.S. Supreme Court rulings in *United States* v. *Doremus* and *Webb et al.* v. *United States*. The former affirmed the constitutionality of the Harrison Act's exercise of the federal police power to control narcotic commerce. The latter reversed an earlier Supreme Court decision and ruled that a physician or pharmacist registered under the Harrison Act might not provide opiates for the sole purpose of sustaining an addict's habit, a practice known as "maintenance."

**1919-1921** Treasury Department closure of most municipal narcotic clinics. The closures ended the attempts of more than thirty cities (including Youngstown, Ohio) to provide some form of institutional maintenance as an alternative to physician prescriptions or the black market.

**1922** Jones-Miller Act. Established the Federal Narcotics Control Board to oversee and regulate the import and export of narcotics and increased maximum penalties for narcotic law violations.

Opiate imports were forbidden for other than medical purposes, and exports limited to nations with adequate licensing and control systems.

**1924** Heroin Act. Forbade the importation of opium for the manufacture of heroin.

**1928** Committee on Drug Addiction (CDA) established by the National Research Council. Originally focused on an attempt, ultimately unsuccessful, to find a non-addictive narcotic analgesic, the CDA (rechristened CDAN, the Committee on Drug Addiction and Narcotics) evolved into a skeptical referee of pharmaceutical companies' claims about the toxicity and addiction potential of new narcotic preparations.

**1929** Porter Act. Funded two federal narcotic prison-hospitals (or "farms") that opened in Lexington, Kentucky, in 1935 and in Fort Worth, Texas, in 1938. The former housed the Addiction Research Center (ARC), whose medical researchers used patient volunteers to evaluate claims about the addiction liability of new narcotics before they were marketed.

**1930** Federal Bureau of Narcotics (FBN). Consolidated the functions of the Treasury Department's Narcotic Division and the Federal Narcotics Control Board in a new agency headed by Harry Anslinger. As director from 1930 to 1962, Anslinger pursued a strict but consistent supply-control policy aimed at limiting pharmaceutical production, minimizing diversion, interdicting trafficking, suppressing nonmedical use, isolating addicts, forbidding maintenance, and punishing violators with mandatory minimum sentences.

**1933-1937** Uniform Narcotic Drug Act. At the urging of the FBN, all but nine state states replaced dissimilar legislation with a model national bill. Ohio did so in 1935, with violators facing fines and prison terms of up to five years.

**1938** Food, Drug and Cosmetic Act. Replaced and strengthened the 1906 legislation, adding requirements that manufacturers include directions for safe use, secure pre-marketing approval for new drugs shown to be safe, and refrain from making false therapeutic claims.

**1951** Durham-Humphrey Amendment to the Food, Drug, and Cosmetic Act. Clarified the definition of prescription drugs as those that were habit-forming or sufficiently toxic to require medical supervision, including new drugs approved under the safety provisions of the 1938 law that warranted medical supervision. Required prescription drugs to bear a label, "Caution: Federal law prohibits dispensing without prescription."

**1951** Boggs Act. Imposed lengthy mandatory minimum sentences for federal narcotic possession and sale convictions and inspired "Little Boggs Laws" and other punitive measures in state legislatures. In 1955 Ohio enacted one of the strictest laws in the nation, providing sentences of two to ten years for possession of narcotics, ten to twenty years for possession with intent to sell, and twenty to forty years for actual illegal sale.

**1956** Narcotic Control Act. Further increased fines and mandatory minimum sentences for federal violations and made possible the death penalty in cases involving narcotic sales to minors.

**1962** White House Conference on Narcotics and Drug Abuse. Raised possibility of less punishment and more treatment for heroin addicts and addressed the need to bring widely abused non-narcotic drugs (e.g., barbiturates, amphetamines) under tighter control. President Kennedy also signed the Kefauver-Harris Amendments to the Pure Food and Drug Act. These required drug manufacturers to demonstrate new drug efficacy with controlled clinical studies prior to

Food and Drug Administration (FDA) approval and gave the FDA authority over prescription drug advertising, which was required to accurately describe potential side effects.

**1965** Drug Abuse Control Amendments. Limited the number of refills for a single prescription and imposed stricter record keeping by manufacturers, distributors, pharmacists, and physicians who dispensed drugs directly. Created within the FDA a new Bureau of Drug Abuse Control (BDAC), which was concerned with barbiturates and amphetamines and other psychostimulants.

**1968** Bureau of Narcotics and Dangerous Drugs (BNDD). Formed by a merger of the FBN and BDAC and relocated in the U.S. Department of Justice (DOJ), the BNDD was the nation's lead drug enforcement agency until 1973, when Congress authorized further mergers to create the Drug Enforcement Administration (DEA).

**1970** Controlled Substances Act (CSA). Rationalized and reformed the accumulated drug-control legislation by replacing more than fifty separate congressional acts and amendments with what Attorney General John Mitchell called "one body of organic law." The centerpiece of the CSA was the scheduling system, which allowed the FDA in consultation with BNDD (later DEA) to sort drugs into five categories according to their therapeutic value and abuse potential. Schedule I drugs were prohibited. Schedule II drugs, which included medical narcotics like Dilaudid or oxycodone, were the most tightly regulated. They warranted no prescription refills, triplicate order forms for transfers, BNDD production quotas, enhanced storage security requirements, and BNDD preapproval for all imports and exports.[56]

---

[56] U. S. House of Representatives, Committee on Interstate and Foreign Commerce, *Comprehensive Drug Abuse Prevention and Control Act of 1970,* House Report No. 91-1444, part 1, September 10, 1970 (Washington, D.C.: GPO, 1970), 6 (fifty laws); Attorney General

Beyond matching control to risk, reforming and rationalizing sentencing, and establishing procedures to schedule newly approved drugs, the CSA sought to consolidate, expand, and improve the closed system of distribution that had been evolving for over half a century. Officials highlighted the need to prevent diversion, not only of opiates but of an ever-widening range of toxic, habituating pharmaceuticals—a concern highlighted in the bill's original title, the "Controlled Dangerous Substances Act."[57]

---

John Mitchell to House Speaker John W. McCormack, July 15, 1969, "Comprehensive Drug Abuse Prevention and Control Act," vertical files, Drug Enforcement Administration Library, Arlington, Va. (quote); and Kenneth C. Baumgartner and Michael X. Morrell, "Pharmaceutical Industry Regulation by the DOJ," *Syracuse Law Review* 23 (1972): 203-205 (Schedule II procedures). The CSA proper consisted of Titles II and III of the omnibus Comprehensive Drug Abuse Prevention and Control Act of 1970, Public Law 91-513, October 27, 1970, https://www.govinfo.gov/content/pkg/STATUTE-84/pdf/STATUTE-84-Pg1236.pdf.

The timeline and summaries draw on Acker, *Creating the American Junkie*; Richard J. Bonnie and Charles H. Whitebread II, *The Marijuana Conviction: A History of Marijuana Prohibition in the United States* (New York: Lindesmith Center, 1999), uniform law data p. 115; Courtwright, *Dark Paradise*; Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*; Joseph Spillane and William B. McAllister, "Keeping the Lid On: A Century of Drug Regulation and Control," *Drug and Alcohol Dependence* 70 (2003): S5-S12, https://www.sciencedirect.com/science/article/abs/pii/S0376871603000966; *Federal Drug Control: The Evolution of Policy and Practice*, ed. Jonathon Erlen and Joseph F. Spillane (New York: Pharmaceutical Products Press, 2004); David Herzberg, *Happy Pills in America: From Miltown to Prozac* (Baltimore: Johns Hopkins University Press, 2009); Musto, *American Disease*, 3rd ed.; FDA, "Kefauver-Harris Amendments Revolutionized Drug Development," kefauver-harris_amendments.fda.thalidomide.pdf (gvsu.edu); and Brian T. Yeh, "The Controlled Substances Act: Regulatory Requirements," Congressional Research Service, December 13, 2012, https://fas.org/sgp/crs/misc/RL34635.pdf. 1935 Ohio Law: Sol A. Herzog, "The First Authentic Digest of New State Laws," *American Druggist* (October 1936): 46, 138, https://books.google.com/books?id=4VwgAQAAMAAJ&pg=RA9-PA138&lpg=#v=onepage&q&f=false. 1955 Ohio law: FBN, *Prevention and Control of Narcotic Addiction* (Washington, D.C.: GPO, 1960), 29, https://www.google.com/books/edition/Prevention_and_Control_of_Narcotic_Addic/QKV89aIKNJ8C?hl=en&gbpv=1&dq.

57 Sentencing reform: David T. Courtwright, "The Controlled Substances Act: How a 'Big Tent' Reform Became a Punitive Drug Law," *Drug and Alcohol Dependence* 76 (2004): 9-15. Original title: "Highlights of the Controlled Dangerous Substances Act," *Congressional Record—Senate*,

The bill's drafter and supporters called the accreted drug-control system inefficient and skewed. It focused too much on punishing illicit narcotic and marijuana dealers and users, and too little on protecting the broader public from pharmaceutical drug diversion and abuse. In 1969 BNDD Deputy Chief Counsel Michael Sonnenreich, the bill's chief architect, said that he had selectively combined provisions of existing laws with regulatory innovations to create a coherent system that ensured legitimate drugs reached legitimate users, while minimizing societal drug abuse, including abuse of scheduled pharmaceuticals through diversion. The "improper distribution of controlled dangerous substances," Sonnenreich wrote, "is prohibited." Sen. Thomas Dodd (D, CT), who championed the bill in the Senate, stressed the need to stop the improper distribution of sedatives, stimulants, and tranquilizers, which he said were recklessly overpromoted and inadequately controlled. The act thus included "strict regulatory provisions aimed at preventing the illicit diversion of drugs." President Richard Nixon, in his July 1969 special message to Congress, also addressed the consumer-protection dimension. He called the legislation "a fair, rational and necessary approach to the *total* drug problem. It will tighten the regulatory controls and protect the public against illicit diversion of many of these drugs from legitimate channels." The House Committee on Interstate and Foreign Commerce, reporting favorably on the bill in September 1970, described the measure as "designed to improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing for a 'closed' system of drug distribution for legitimate handlers of such drugs." The aim was to "significantly reduce the widespread diversion of these drugs out of

---

January 24, 1970, 995, https://www.congress.gov/bound-congressional-record/1970/01/24/senate-section?p=0.

legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control."[58]

"Closed" meant that transactions could lawfully occur only among authorized registrants, typically when a registered manufacturer sold to a registered distributor, which in turn supplied a registered retail pharmacy, which in turn supplied the ultimate consumer, a patient possessing a legitimate prescription issued by a registered medical or dental practitioner. Scheduled drugs were to remain under the control of registrants, and only registrants, until such time as they reached their intended medical users. The primary challenges were commercial volume and the number of registrants. The new law regulated the conduct of nearly half a million professionals, from drug makers and distributors to health care providers. (The growth of the health care sector continuously added to their ranks. By 2007, there were 1.24 million registrants; by 2012, 1.4 million.) Even with expanded powers, no agency could possibly monitor every transaction. This

---

[58] Michael Sonnenreich, "The Controlled Dangerous Substances Act of 1969—Governmental Response to Needs of Better Regulation Over the Legitimate Industry" (TS, 1969), 15 ("prohibited"), 20-21, vertical files, DEA Library; "Highlights of the Controlled Dangerous Substances Act," 995-998, quotation at 998 (Dodd's remarks); Richard Nixon, "Special Message to the Congress on Control of Narcotics and Dangerous Drugs," July 14, 1969, The American Presidency Project, https://www.presidency.ucsb.edu/documents/special-message-the-congress-control-narcotics-and-dangerous-drugs (emphasis added); House Committee on Interstate and Foreign Commerce, *Comprehensive Drug Abuse Prevention and Control Act of 1970,* 6.
    In 1972 Kenneth C. Baumgartner, BNDD Assistant Chief Counsel, and Michael X. Morrell, also of the BNDD office of Chief Counsel, reviewed the purpose and requirements of the CSA in the *Syracuse Law Review*. Title II, they wrote, established a "closed regulatory system" for legitimate registrants intended "to prevent diversion of legitimately manufactured drugs into illicit channels of distribution." To preserve the system's integrity, the law imposed several requirements beyond the basic one of registration. Among these requirements were suspicious order monitoring and reporting. "In addition to the stringent security controls non-practitioners are required to employ in storage and manufacturing areas, they are also required to report to BNDD any suspicious orders, including those of unusual size, or unusual frequency, or deviating substantially from a normal pattern." Baumgartner and Morrell, "Pharmaceutical Industry Regulation by the Department of Justice," 790-791, 792 n. 18 (quotations).

had always been true, which was why, over the course of a century, precautionary professional

norms had both strengthened and co-evolved with statutory narcotic controls.[59]

When the CSA took effect, in 1971, the government assigned registrants the

responsibility of safeguarding the newly consolidated system as well as following its rules. The

*Code of Federal Regulations* stipulated that all registrants were to "provide effective controls

and procedures to guard against theft and diversion of controlled substances." Non-practitioner

registrants, including those who manufactured and distributed controlled substances, were

additionally required to report significant thefts or losses of scheduled drugs and to "design and

operate a system to disclose to the registrant suspicious orders of controlled substances." When

discovered, suspicious orders were to be reported to DEA field division offices. Suspicious

---

[59] Yeh, "Controlled Substances Act." Half-million: Spillane and McAllister, "Keeping the Lid On," S10. 1.24 million: Mary Johnson-Rochee, "DEA's Diversion Control Registration Highlights," 2007 DEA Pharmaceutical Industry Conference (slide deck, 2007), slide 4, https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/13th_pharm/mrochee.pdf. 1.4 million: "Responses to Questions for the Record of Joseph T. Rannazzisi," U.S. House of Representatives, Committee on Energy and Commerce, "Prescription Drug Diversion: Combating the Scourge," Hearing of March 1, 2012, (Washington: D.C.: GPO, 2013), 202. Rannazzisi's "Statement for the Record," *idem*, 84-84, summarizes the origins and purposes of the CSA's closed system.

In 1969, anticipating passage of the CSA, the BNDD set as a goal the reduction of diversion to 0.5 percent of the legal drugs manufactured by June 30, 1972. Planners recognized that "the Bureau cannot possibly solve the problem through investigative programs alone. An active voluntary program must be in effect. BNDD will have to take the leadership." To take the initiative the Bureau planned several measures, including contacting and notifying all distributors of the law's provisions and publishing "a comprehensive booklet for the professions on voluntary compliance." An example of the latter is *The Controlled Substances Act of 1970 ... a BNDD Manual for the Pharmacist* (Washington, D.C.: BNDD, 1970), https://babel.hathitrust.org/cgi/pt?id=osu.32435062715651&view=1up&seq=3. Quotations: "BNDD Operational Plan" (TS, October 15, 1969), 44-45, box 46, President's Advisory Council on Executive Organization (White House Central Files: Staff Member and Office Files), Richard Nixon Presidential Library, Yorba Linda, California.

orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."[60]

In this manner the CSA expanded registrants' responsibilities, as well as the number and types of drugs to be controlled. In 1943 the U.S. Supreme Court had upheld the conviction of a mail-order wholesaler, the Direct Sales Co., that had, despite FBN warnings, targeted and supplied physicians who frequently ordered suspiciously large quantities of morphine. After 1970 registrants were required to do more than avoid tacit conspiracies to divert narcotics. The general requirements for effective controls and procedures to prevent theft and diversion and the specific requirements for non-practitioners to monitor and report suspicious orders were intended to assist federal drug-control authorities to maintain the integrity of the closed system. The CSA deputized registrants, imposing additional supply-chain responsibilities and costs. Among these were non-practitioner registrants' systematic monitoring of suspicious orders and the potential interruption of sales to registrants who, by virtue of the unusual size or frequency of their orders, were also likely to be high-volume customers.[61]

---

[60] 21 CFR Ch. II (April 1, 1996 edition) §§ 1301.71, CFR-1996-title21-vol9-sec1301-71.pdf (govinfo.gov), and 1301.73, 1301.74, https://www.gpo.gov/fdsys/pkg/CFR-1996-title21-vol9/pdf/CFR-1996-title21-vol9-sec1301-74.pdf.

[61] *Direct Sales Co.* v *United States*, 319 U.S. 703. (This case is discussed in more detail below.) Delegating suspicious order monitoring to non-practitioner registrants promised qualitative as well as quantitative personnel gains for the closed control system. As DEA Diversion Control Director Gene R. Haislip wrote in 1993, employees of corporations that distributed controlled substances were "in the best position to determine what is excessive or unusual based on knowledge of their customers and usual purchasing practices." When a McKesson branch in Fort Worth, Texas, submitted excessive-purchase reports stating that "we are leaving *to the DEA* the final determination of whether they are suspicious or unusual," Haislip stated that the claim was "clearly in contravention to the requirements" of 21 CFR § 1301.74(b). No registrant could legally "abrogate its responsibility to identify suspicious orders and to determine whether to ship,

The CSA was the finishing touch on a drug-control system that the federal government had been building since the Progressive Era of the early twentieth century. The system sought to protect the American public against illicit traffickers as well as licit pharmaceutical manufacturers and distributors who might be tempted to employ irresponsible marketing, sales, and distribution practices. The primary difference was that the new law and its regulations went well beyond the traditional emphasis on suppressing the illicit trafficking of narcotics like heroin. It recognized that the drug problem lay more broadly in the proliferation and underregulation of licit psychoactive pharmaceuticals. As one FDA official put it, mid-century drug control was like a "great big boiling kettle with a few handles on it. We never have a hand on every handle." The CSA was a bipartisan attempt to grip the handles and pull the kettle from the fire. To do so Congress created a closed regulatory system beyond anything that had existed before. The CSA increased the scope and powers of the BNDD and its successor agency, the DEA, and imposed additional reporting and anti-diversion responsibilities on the licensed professional registrants they oversaw.[62]

Federal regulators remained vigilant after the CSA's 1970 enactment. Though most media attention fell on Congressional hardening of the CSA to combat illicit drugs (for example, by amendments enacted in 1980, 1986, and 1988 that imposed stricter punishments for Schedule I trafficking offenses), regulators continued to ratchet up controls over the licit trade. Between 1970 and 1977 they scheduled thirty-five additional drugs, including so-called minor

---

or refuse to ship, the controlled substance order." Gene R. Haislip to Phillip E. Jordan, December 8, 1993, US-DEA-00026154-US-DEA-00026155, emphasis added.

[62] Spillane and McAllister, "Keeping the Lid On," S5 (quotation), S10.

tranquilizers. They rescheduled eight others by moving them up into Schedule II. The six drugs that were decontrolled were mostly narcotic antagonists—that is, drugs that reversed the effects of narcotics.[63]

In the 1970s, then, narcotic conservativism evolved toward broader psychotropic conservatism for licit drugs. The 1970s were to sedatives, tranquilizers, and psychostimulants what the turn-of-the-century had been to prescription narcotics: A period of reaction to widespread abuse, addiction, and overdose that fostered both legal and attitudinal changes. In 1980 attorney Robert T. Angarola, who served as a drug-policy adviser in the Nixon and Carter administrations, told an interviewer that with "prescription drugs like barbiturates, tranquilizers, amphetamines, things like that[,] we have seen an amazing drop off, a 50% cutback in the number of prescriptions for a lot of drugs that should not have been written. It is an educational process . . . I think we are going to see more of that in the next four to five years, and awareness on the part of consumers and professionals that you need to question medication before you just take it blindly[;] very healthy." History had repeated itself, belatedly but in a good way.[64]

**B. Illustration: Control of Methadone, Oxycodone, and Morphine, 1936-1974**

---

[63] Courtwright, "Controlled Substances Act," 9-15; DOJ, *Summary of Drug Control Actions Under the Controlled Substances Act of 1970* (Washington, D.C.: DEA Office of Compliance and Regulatory Affairs, 1977).

[64] "Interview with Bob Angarola of Domestic Policy Staff, November 26, 1980 … Interviewer: Emily Soapes" (TS, 1980), 12, Jimmy Carter Presidential Library, https://www.jimmycarterlibrary.gov/assets/documents/oral_histories/exit_interviews/Angarola.pdf, with bracketed changes in punctuation to the transcript inserted for clarity. The growing reluctance to prescribe or take tranquilizers and other scheduled, nonopioid drugs was also reported in the national media, e.g., Philip J. Hilts, "Doctors Cut Prescriptions Dramatically," *Washington Post*, July 29, 1983, A1, A10.

73

A key reason that the federal government had to keep adjusting the drug-control system was that the pharmaceutical industry kept developing potent new psychoactive drugs, including synthetic and semi-synthetic opiates. These innovations were not necessarily bad. As the preamble to the CSA states, drugs in Schedules II through V had legitimate and healthful benefits when properly used, "substantial and detrimental" harms when improperly used. The object of policy was to regulate drugs in a way that maximized their health benefits while minimizing their harms. This public goal had long been in tension with the profit-making aims of the makers and distributors of psychoactive drugs. Maximum profit, particularly in a large market like CNP patients, required minimizing regulatory restrictions and oversight.[65]

The result was a cat-and-mouse game that played out during the postwar decades. When it came to opiates, the cat—the federal government—usually won. Methadone, for example, was heavily regulated before, during, and after the maintenance revolution of the 1960s and early 1970s. Knowledge of how to make methadone, manufactured by I.G. Farben during World War II, arrived in the United States as part of the postwar haul of German scientific and technical information. Where FBN officials saw danger, drug companies saw opportunity. Firms like Eli Lilly, Abbott, and Winthrop wanted to bring the drug to market as a synthetic analgesic. The FBN wanted to limit its manufacture and distribution because CDAN experiments proved the drug to be addictive.

---

[65] *Statutes at Large, 1970-1971*, vol. 84, part 1 (Washington, D.C.: GPO, 1971), public law 91-513.

The experiments included trials on an unspecified but reportedly large number of detoxified narcotic addicts in federal institutions. Investigators reported that

> Most of the men expressed satisfaction with the effects of the drug as long as 10-mg doses, or higher, were given. The greater the dose given the greater the satisfaction expressed by the addicts. Most subjects stated that the effects were similar to those of morphine, heroin, or dilaudid [sic], but were slower to develop. Intravenous doses produced the greatest degree of satisfaction.

> Definite euphoria has been observed in a large number of cases following the injection of amidone [i.e., methadone, also called Dolophine]. The patients became more talkative, boasted of their exploits, asked for more of the drug, and attempted to devise ways to get even more. Typical comments following injection of the drug were 'That is great stuff. I wouldn't have believed it possible for a synthetic drug to be so like morphine. Can you get it outside? Will it be put under the narcotic laws? I wish I could get some to kick my next habit with.'

The last remark was prescient. Because methadone was long-acting when taken orally, it turned out to be useful for tapering addicts during withdrawal. More controversially, it could be used for long-term maintenance, as Drs. Vincent Dole and Marie Nyswander were to show in the 1960s. But in 1946 the subjects' comments were simply taken as evidence "that narcotic drug addicts

would abuse methadon [sic] and would become habituated to it if were freely available and not controlled."[66]

More alarming was the prospect, which Anslinger outlined in high-level meetings in April 1947, that numerous pharmaceutical companies, which had filed or contemplated filing FDA new drug applications (NDAs) for methadone, would produce a huge methadone surplus that "would find its way into abusive use." Anslinger said that "experience had shown that where there was overproduction there would be diversion." CDAN's experts unanimously agreed "that such overproduction would inevitably be reflected in the spread of drug addiction." Unfortunately, a primary means to prevent oversupply, the FBN's ability to impose production quotas, had been called into legal question. Methadone was a *synthetic* drug. It was not derived from opium. Hence it was arguably not subject to the usual narcotic manufacturing controls.[67]

The industry lost the argument. On July 31, 1947, following a round of reports and public hearings, President Harry Truman issued a proclamation that methadone had "an addiction-forming and addiction-sustaining liability similar to morphine." It was thus an opiate and thus subject to federal controls over manufacturing, distribution, and prescribing. The FBN then directed that the drug be dispensed with the same medical and pharmaceutical care as morphine. Physicians were to report all cases of methadone addiction "whether primary or sustained … to

---

[66] Quotation from "Tolerance and Addiction Liability of 4, 4-Diphenyl-6-Dimethylamino-Hepatone-3" (TS, 1947), "Amidone Investigation," file 0480-203A [hereafter Amidone file], Records of the Drug Enforcement Administration, Record Group 170, National Archives II, College Park, Maryland.

[67] CDAN meeting minutes of April 15, 1947 ("abusive") and April 22, 1947 ("experience"); Lewis H. Weed to Secretary of the Treasury John W. Snyder, April 24, 1947 ("spread"), all Amidone file.

the Bureau with as complete a history of the circumstances as possible." The FBN also flatly denied Eli Lilly's request "to give free of charge to those [physicians] who request it, a tube of ten of the 5-milligram size tablets and a two-ounce bottle of the cough syrup, containing 10 milligrams 'Dolophine' in each 30 cc." Orally administered or not, there would be no free samples.[68]

Worries about methadone abuse and diversion were not confined to the 1940s. They cropped up again in the early 1970s. Public health officials in New York and other cities, with the support of the Nixon administration, were then rapidly expanding methadone maintenance programs. Though methadone maintenance did improve the health and behavior of individual addicts, it also entailed a risk—most acute in poorly managed private programs—of diversion and overdose. National media carried reports of deaths tied to methadone diversion. The FDA and the BNDD responded with new dispensing and take-home rules, clinic inspections, and demands for tighter security. In 1974 this diffuse regulatory reaction was codified in the Narcotic Addict Treatment Act. The act amended the CSA which, as noted above, became a more restrictive and punitive law during the 1970s and 1980s.[69]

---

[68] "Drug Amidone an Opiate" (TS, 1947), subsequently printed and dated in *Statutes at Large*, vol. 61, part 2 (Washington, D.C.: GPO, 1948), 1075; "General Circular No. 181" (TS, 1947); and I.H. Small to Will S. Wood, September 9, 1947, and Wood to Small, September 15, 1947, all Amidone file. Postwar concern about the oversupply of synthetic narcotics was international as well as domestic. In 1948 the United Nations Commission on Narcotic Drugs framed the Synthetic Narcotics Protocol, which ensured that synthetic opiates not covered by existing treaties would be regulated and reported on the same basis as plant-based opiates. The Protocol took effect in 1949, having quickly gained widespread support. William B. McAllister, *Drug Diplomacy in the Twentieth Century* (New York: Routledge, 1999),164-165.

[69] Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*, 319-356; Committee on Federal Regulation of Methadone Treatment, Division of Biobehavioral Sciences and Mental Disorders, Institute of Medicine, *Federal Regulation of Methadone Treatment*, ed. Richard A. Rettig and

Federal regulators monitored semi-synthetic, as well as synthetic, opiates. FBN Director Anslinger and his CDAN allies insisted on independent evaluation of all opiate safety, effectiveness, and addiction liability; strictly limited opiate imports and manufacturing to medical need; and used the power to curtail opium supplies to force narcotic manufacturers to toe the line on labeling, advertising, and marketing. Anslinger in particular confronted manufacturing executives, including those whose companies made and marketed Dilaudid, Pantopon, and Demerol.[70]

Anslinger also kept a watchful eye on oxycodone. Derived from the opium alkaloid thebaine, oxycodone was the primary ingredient in Nucodan, a preparation of Endo Laboratories,

---

Adam Yarmolinsky (Washington, D.C.: National Academy Press, 1995), chaps. 4-5. National media, e.g., National media, e.g., Richard Severo, "Ethics of Methadone Use Questioned," *New York Times*, April 18, 1971, pp. 1, 69, https://timesmachine.nytimes.com/timesmachine/1971/04/18/91279582.html?pageNumber=1, and James M. Markham, "Methadone Found Rising as a Killer: Overdose Deaths Here and in Capital Up Sharply," *New York Times*, March 14, 1972, p. 48.

In 1975 the U.S. Supreme unanimously upheld the conviction, under § 841(a)1 of the CSA, of Dr. Thomas W. Moore, Jr., a physician who had prescribed unusually large amounts of methadone for patients without providing adequate physical examinations and for fees based on pill quantity rather than actual medical services. A 50-tablet prescription cost $15, 75 cost $25, 100 cost $35, and "you could come back as often as you wanted to." Some witnesses testified that "they came back every day or every other day, a few came back[,] on occasion, more than once in a single day." *United States* v. *Moore*, Oral Argument, October 7, 1975, https://www.oyez.org/cases/1975/74-759. In reviewing the CSA's legislative history, the Supreme Court found that Congress had intended to allow registered doctors reasonable discretion in treating patients. However, it had not intended "to exempt from serious criminal penalties those acts by physicians that go beyond the limits of approved 'professional practice'"—a category into which cash-for-scrips prescribing of a synthetic narcotic plainly fell. *United States* v. *Moore*, 423 U.S. 122, https://supreme.justia.com/cases/federal/us/423/122/.

[70] David Herzberg, "Big Pharma's Real Nemesis? Putting the FBN back into Pharmaceutical History," paper for the American Association of the History of Medicine annual meeting, Chicago, May 10, 2014.

then an independent company based in Manhattan. Like most manufacturers, Endo prepared informational materials for its products. In 1949 Anslinger objected to Endo's brochure for Nucodan and referred the matter to CDAN. Endo had likened Nucodan to codeine, a relatively mild opiate, and suggested that rabbit experiments demonstrated no addiction liability. Company representatives testified that oral administration and the presence of homatropine, an anticholinergic drug, "would be a strong deterrent to addiction."[71]

CDAN's experts, Drs. Nathan Eddy, Lyndon Small, and Harris Isbell, dismantled every assertion. The rabbit experiments (which Dr. Eddy himself had conducted) were cited out of context. The tablets could be dissolved and boiled to remove the homatropine, which in any case offered little deterrent effect. Nucodan was far closer in addiction liability to morphine than codeine, and the brochure must warn physicians up front. Endo should have been aware of the risk. German medical literature, Dr. Eddy pointed out, contained several references to addiction to Eucodal, the German trade name for oxycodone. Eucodal, Anslinger added, was regarded by German and United Nations regulators as a morphine equivalent.[72]

---

[71] "Committee on Drug Addiction and Narcotics Meetings: Fifth Meeting—5 November, 1949 (TS, 1949), pp. 76-78, quotation p. 77; November 1949 meetings folder, Committees on Drug Addiction, Drug Addiction (Advisory), and Drug Addiction and Narcotics, 1928-1965, Archives of the National Academy of Sciences, Washington, D.C.

[72] Ibid. David Herzberg, *White Market Drugs: Big Pharma and the Hidden History of Addiction in America* (Chicago: University of Chicago Press, 2020), 120-127, relates that Endo tried again in the late 1950s and early 1960s to expand oxycodone sales in the CNP market. This time its vehicle was Percodan, a combination oxycodone-aspirin product Endo promoted with a misleadingly mild warning of "may be habit forming." In 1963, despite intense lobbying by Endo, the FBN removed Percodan from the list of drugs exempted from written prescribing, causing an immediate decline in sales. "Overall," Herzberg writes, "the Percodan saga showed the opioid control system working imperfectly but well…. All-out lobbying had bought Endo

As it happened, William F. Burroughs, the mid-twentieth century's self-styled "Master Addict," conducted his own trials of Eucodal. In early 1957 Burroughs published a famous letter in the *British Journal of Addiction* that cataloged his drug self-experimentation. In the opiate class he had used, in addition to Eucodal, opium, heroin, morphine, Dilaudid, Pantopon, Demerol, methadone, and other preparations of varying strengths. All had narcotic effects. All were habit-forming. "Nor does it make much difference how the drug is administered, smoked, sniffed, injected, taken orally, inserted in rectal suppositories, the end result will be the same: addiction." Two years earlier, in a letter to Allen Ginsberg (also subsequently published), Burroughs was franker. He had been injecting Eucodal and had become hopelessly strung out. "Trust the Germans," he wrote, "to concoct some really evil shit. It acts direct [sic] on nerve centers. This stuff is more like coke than morphine. A shot of Eukodol [sic] hits the head first with a rush of pleasure. Ten minutes later you want another shot. Between shots you are just killing time." Oxycodone was anything but a relatively mild, codeine-like drug.[73]

Anslinger and other FBN officials investigated the activities of distributors they thought dangerous, as well as manufacturers. In New York State, they and federal prosecutors made cases against narcotic traffickers who created wholesale distribution fronts, complete with

---

two extra years, but it had not been enough to entrench expanded markets for oxycodone. The system held" (127).

[73] William S. Burroughs, "Letter from a Master Addict to Dangerous Drugs," *British Journal of Addiction* 53 (1957): 119-120, and Burroughs to Ginsberg, June 16, 1954, *Letters of William S. Burroughs*, ed. Harris, 215. Though the article publication date is January 1957, Burroughs composed the letter on August 3, 1956, hence two years.

innocuous names and customized invoices, circulars, and envelopes. Their real business was selling narcotics throughout the country, at 100 percent profit, to anyone willing to pay.[74]

The FBN took a different approach with legitimate narcotic manufacturers and wholesalers. The goals were the same, to prevent diversion and minimize addiction. But Anslinger, schooled in diplomacy as well as law enforcement, preferred to instruct, warn, warn again, and prosecute as a last resort. His warnings took the form of official memoranda circularized to all registered manufacturers and wholesalers. Anslinger and his FBN successors provided them with lists of persons, including physicians, dentists, and pharmacists, convicted of serious narcotic-law violations. No sales of morphine or its synthetic or semisynthetic equivalents were to be made to these individuals without first checking with the FBN district supervisor. Anslinger reminded registrants to stay vigilant. Others could be violating the law, "and wholesalers sometimes find themselves involved where drugs are furnished to customers who dispense them to addicts and peddlers." He attached a form so that all recipients might "promptly" acknowledge receipt of his warning letter and violator list.[75]

The FBN reminded all registered manufacturers and wholesalers of the dangers of promoting narcotics. "The Bureau does not look with favor on any type of advertising of narcotic drugs or preparations to the general public and has written the manufacturers and distributors in

---

[74] "Agents Seize 7 Here in Big Narcotic Raid," *New York Times*, February 8, 1927.

[75] Anslinger to Manufacturers and Wholesalers of Narcotic Drugs, Registrants Mimeograph No. 127 (TS, February 26, 1958), and George Gaffney to Manufacturers and Wholesalers of Narcotic Drugs, Registrants Mimeograph No. 161 (TS, April 11, 1967), both Records of the Drug Enforcement Administration, Record Group 170, Subject Files 1916-1970, box 56, folder 0370-3, National Archives II, College Park, Md.)

all cases called to its attention," Anslinger wrote in February 1952. It was unnecessary, he pointed out, to advertise familiar opiates like morphine to medical professionals who already understood their properties. Price lists and unadorned catalogs would suffice. New or recently introduced synthetic or semi-synthetic narcotics might be advertised, provided the ads kept to the drug's availability, nature, indications, and "merits it is believed to possess based on reliable pharmacologic tests." Equally important to "representations of the alleged merits of the drug," Anslinger cautioned, was an "unequivocal statement that the drug is habit-forming and that, in prescribing or dispensing it the same caution should be observed as in prescribing or dispensing morphine." All advertising should be sparing, and never stimulate narcotic purchases "beyond actual, bona-fide medical needs."[76]

New or old, narcotics should never be purchased or stocked "beyond normal current needs." FBN-specified sales ceilings for practitioners, retailers, hospitals, clinics, or sanitaria were not to be exceeded. When checks of prescription files at retail pharmacies turned up seemingly excessive narcotic purchases, FBN investigators asked questions—until, as often happened, they found that a physician had requested extra supplies for a cancer victim. "Nothing as effective as Dilaudid," one doctor explained, adding that large amounts were needed to control the intractable pain of his patient, a woman with advanced metastatic cancer. "This matter will be considered closed," the agent wrote his supervisor.[77]

---

[76] Anslinger to Manufacturers and Wholesalers of Narcotic Drugs, Registrants Mimeograph 108 (TS, February 8, 1952), with attached circular memorandum of November 12, 1946, both in Records of the Drug Enforcement Administration, Record Group 170, Subject Files 1916-1970, box 56, folder 0370-3, National Archives II, College Park, Md.

[77] G.W. Cunningham to Manufacturers and Wholesale Dealers in Narcotic Drugs, Registrants Mimeograph No. 98 (TS, October 19, 1949), Records of the Drug Enforcement Administration,

FBN agents checked storage facilities. "Entirely unsatisfactory," wrote one who visited railroad warehouses in Sparks, Nevada. The Norwich Pharmacal [sic] Co. would need more than plasterboard walls and a cheap hasp and padlock. The inspector suggested building a storage space of concrete-block or heavy steel-mesh construction—the type of secure facility now called a "cage." Similar rules applied to pharmacies. Those with steel safes for narcotic storage passed muster. Those with wooden cabinets did not. "The situation was called to the attention of the pharmacists in attendance," the inspecting agent reported, "and same will be remedied."[78]

Anslinger and his agents thus played a dual role: implacable foes of illicit narcotic traffickers, stern instructors of licit ones. Corporate registrants generally followed the Bureau's anti-diversion instructions. Others went further, sending diversion tips to the FBN. Upjohn reported a dentist who had ordered 1,000 half-grain (32 mg) codeine tablets four months running. In volume and in frequency, his order was suspicious.[79]

---

Record Group 170, Subject Files 1916-1970, box 56, folder 0370-3, National Archives II, College Park, Md. ("needs"). Cancer examples: Memoranda reports of Richard A. Robinson, March 4, 1963; John C. Wilkie, April 12, 1963; and John C. Wilkie, September 21, 1967 (quotations from the last), all in Records of the Drug Enforcement Administration, Record Group 170, Subject Files 1916-1970, box 168, file 0955, National Archives II, College Park, Md. Investigations prompted by larger-than-normal prescriptions for seriously ill, Demerol-dependent veterans who had undergone multiple surgeries ended in like fashion, with the field agents quickly closing the matter. Lawrence B. Slotnik, memorandum report of February 4, 1963, idem, box 168, file 0955.

[78] Memorandum report of Robert S. O'Brien, August 12, 1965, Records of the Drug Enforcement Administration, Record Group 170, Subject Files 1916-1970, box 168, file 0955, National Archives II, College Park, Md. (warehouse) and memoranda reports of J. H. Mulgallan, both December 16, 1953, in idem, box 31, file 0955 (pharmacies).

[79] Memorandum report of Joseph G. Masterson, June 6, 1963, Records of the Drug Enforcement Administration, Record Group 170, Subject Files 1916-1970, box 168, file 0955, National Archives II, College Park, Md.

Companies that did the opposite, that encouraged orders of unusual volume and frequency, faced prosecution. The best-known case involved Direct Sales, a Buffalo, New York, firm whose conviction for conspiracy to violate the Harrison Act the United States Supreme Court affirmed in 1943. Direct Sales, registered under the Harrison Act as both a manufacturer and a wholesaler, was the largest mail-order drug distributor in the country. In addition to manufacturing and wholesaling, it engaged in marketing, mailing catalogs to over 14,000 physicians, mostly small-town doctors who dispensed drugs themselves. The catalogs offered morphine sulfate, from which the company derived 15 percent of its revenue, in quantities of up to 5,000 half-grain tablets, at a discounted price 30 to 40 percent less than that of local wholesalers.[80]

The FBN first tried jawboning. In 1936 the Bureau cautioned Direct Sales that 55 of its customers were on a list of physicians convicted of violating the Harrison Act; that legitimate doctors typically ordered no more than 200 to 400 quarter-grain (16 mg) morphine tablets annually; and that physicians' purchases of half-grain tablets (32 mg) were signs of illegal maintenance and other transactions of a medically illegitimate character. Joseph M. Bransky, the agent Anslinger dispatched to personally deliver these warnings, was a licensed pharmacist who had also attended law school. Bransky evoked "the spirit of cooperation to control large quantities of drugs that were going into illicit traffic." Anslinger himself wrote that the Bureau sought "the active cooperation of manufacturers and wholesale dealers." What he sought was

---

[80] U.S. Supreme Court, *Transcript of Record, October Term, 1942: No 593, Direct Sales Company, Petitioner,* vs. *the United States of America* (Washington, D.C.: Judd & Detweiler, 1943), 112-113 (30 to 40 percent), 139 (14,000 physicians), 202-203 (dual registration, largest firm, 15 percent), 218 (small-town).

compliance with two rules: No sales to known bad actors, and no large sales to individual physicians, period.[81]

George Dotterweich, who became president of Direct Sales in September 1936, agreed to the first rule. He said he would not sell to Harrison Act violators listed by the FBN. He also agreed to limit mail-order sales to individual physicians to 1,000 half-grain tablets. However, the last concession proved hollow when Direct Sales simply increased the frequency of 1,000-tablet shipments to its "best" morphine customers. One such customer, Dr. John V. Tate of Calhoun Falls, S.C., acquired 79,000 half-grain tablets between November 1937 and January 1940. That was enough morphine to provide 400 standard doses a day in a town of about 1,800 people. Dr. Tate bought the pills at a steep discount (which Direct Sales continued to provide, despite the Bureau's protests) and resold them to others who illegally used or diverted the drugs, or who worked as government agents or informants. In 1940 Dr. Tate pleaded guilty to four counts of

---

[81] Ibid., 117-119 (Bransky), 120-122 (listed doctors, normal orders, half-grain red flag), 126 ("spirit"), 160 ("active cooperation," two rules). George Dotterweich is not to be confused with his brother Joseph Dotterweich, whom George succeeded as Direct Sales' president. Both men were involved in important drug-regulation precedents. Joseph Dotterweich was also the president and general manager of Buffalo Pharmacal Company, which was indicted for placing misbranded and adulterated drugs into interstate commerce. Though Joseph Dotterweich had no personal knowledge of the shipments, the United States Supreme Court found him criminally liable under the Federal Food, Drug, and Cosmetic Act. *United States* v. *Dotterweich*, 320 U.S. 277 (also decided in 1943), became the foundation of the responsible corporate officer doctrine, the same doctrine applied in 2007 to three Purdue Frederick officers, Michael Friedman, Howard Udell, and Dr. Paul Goldenheim, who pleaded guilty to misdemeanor charges of misbranding OxyContin. *United States of America* v. *The Purdue Frederick Company, Inc., et al*., http://www.vawd.uscourts.gov/OPINIONS/JONES/107CR00029.PDF.

illegal narcotic sales. The following year, 1941, Direct Sales was indicted in the Western District of South of Carolina for conspiring with Dr. Tate to violate the Harrison Act.[82]

At trial George Dotterweich contended that his company had operated legally so long as it recorded all narcotic orders and sales; made the records available to officials; and avoided selling to doctors listed for Harrison Act convictions, as it had promised to do in 1936. The job of preventing diversion and illegal prescribing from the likes of Dr. Tate lay entirely with the Bureau of Narcotics. "We are not supposed to police our customers," Dotterweich said during cross-examination. "It is up to the Commissioner and his agents to keep this thing straight."[83]

The jury, the district court judge, the circuit court judges, and the Supreme Court justices all disagreed. "The salient facts," summed up Justice Wiley Rutledge, who wrote for a unanimous Supreme Court, "are that Direct Sales sold morphine sulphate to Dr. Tate in such quantities, so frequently and over so long a period of time that it must have known he could not dispense the amounts received in lawful practice and was therefore distributing the drug illegally. Not only so, but it actively stimulated Tate's purchases." Though the business was transacted by mail, and the parties had never met in person, Direct Sales had conspired to violate federal law.[84]

---

[82] Ibid., 217 (400 doses), 218 (best), and *Brief for the United States in Opposition, Direct Sales Company, Inc., Petitioner* v. *United States of America* (Washington: GPO, 1943), 2-5, 12-16. Population: U.S. Department of Commerce, Bureau of the Census, *1950 Census of Population: Preliminary Counts* (TS, August 18, 1950), https://www2.census.gov/library/publications/decennial/1950/pc-02/pc-2-14.pdf.

[83] *Transcript of Record, Direct Sales*, 206-207, 216 (quotation).

[84] *Direct Sales Co.* v *United States*, 319 U.S. 703, quotation p. 705.

Narcotic drugs, Justice Rutledge wrote, were not ordinary commodities. Though legal, they had an inherent capacity for harm and addiction. Selling morphine was like selling machine guns, something that could only be done under tight restrictions. But "mass advertising and bargain-counter discounts are not appropriate to commodities so surrounded with restrictions." The primary effect of such tactics "is rather to create black markets for dope and to increase illegal demand and consumption." Direct Sales was aware of these realities but benefitted from disregarding them: "Petitioner's stake [in the conspiracy] was in making the profits it knew could come only from its encouragement of Tate's illicit operations." Direct Sales' defense—that it had fulfilled its duty to the law by making sure that all legally required forms were filled out, and that it bore no responsibility for what the physician did or might do with the narcotics after they left its custody—was insufficient to counter the overwhelming circumstantial evidence of mutually beneficial conspiracy.[85]

---

[85] Ibid., quotations pp. 712, 713. Diversion of another regulated psychoactive substance, alcohol, figured in a second famous manufacturer/distributor case from the 1930s, that of McKesson & Robbins. Before and during national Prohibition (1920-1933) McKesson & Robbins had sold large quantities of alcoholic beverages and alcohol-based cosmetic products that could be made potable, along with medical drugs and appliances. After Repeal, in 1933, McKesson & Robbins employed 700 drug salesmen and 400 wine-and-liquor salesmen; by 1936 its net liquor sales surpassed its net drug sales. This was unsurprising, given that Philip Musica, a fraudster and bootlegger who had reinvented himself as Dr. F. Donald Coster, had taken over McKesson & Robbins in 1926. In 1938, when Coster's identity and trail of falsified drug-sales records unraveled, Musica shot himself as a federal marshal rang the doorbell of his mansion. The next day Assistant United States Attorney General Brien McMahon called Musica probably "the biggest illicit liquor dealer in the country." (Beverage-alcohol distribution then remained illegal in large parts of the U.S.) Newspapers and newsweeklies reported that Musica supplemented his McKesson & Robbins fraud and bootlegging income by trafficking in narcotics and munitions, the latter being conveyed to belligerents in cases labeled "Milk of Magnesia." *Road to Market*, 49-50 (sales force, data); "Gone Since 1920," *New York Times*, December 16, 1938, pp. 1, 4, https://timesmachine.nytimes.com/timesmachine/1938/12/16/issue.html; "Lawyer Swears Musica Drew Arms Contract," *Washington Evening Star*, December 19, 1938, pp. A-1, A-5, https://chroniclingamerica.loc.gov/data/batches/dlc_1miro_ver02/data/sn83045462/00280602322/1938121901/0385.pdf (McMahon, Milk of Magnesia); "My God, Daddy!" *Time* (32 (December

The same year the Supreme Court handed down its decision, 1943, the country was in the midst of a natural experiment that validated the importance of narcotic supply control. United States government purchases for anticipated military needs caused raw opium prices to triple, and the outbreak of World War II disrupted international shipping and smuggling routes. Whatever the origin of their addiction, Dr. Michael Pescor told students who visited the Fort Worth Narcotic Hospital in 1940, the patients had one thing in common: They could not afford to buy narcotics because of the war. Mexican and Cuban narcotic traffickers tried to fill the supply void, but they could not meet the street demand, particularly in big cities. In 1980 I interviewed "Arthur," an addicted man of Afro-Caribbean ancestry who had been born in Harlem in 1914. This is how he described the situation:

> There were no drugs in New York during World War II, no drugs in Philadelphia, no drugs in Chicago—there were no drugs on the East Coast. *No drugs.* We traveled around in 'wolf packs.' Somebody would come and say, 'There's some drugs on Forty-second Street!' We'd yell, 'Taxi! Taxi! Taxi!' Everybody would run down there; as soon as you'd get there it was out. Then another group would come and say, 'There's some drugs up on 131st Street and Madison Avenue. Somebody's got something that came through.' Everybody'd jump in cabs and run up there…
>
> We boiled down paregoric, used pills. We used to take Nembutals, mix it up, and shoot it. That would knock you out. I used to take three; my old lady would take five, and she

---

26, 1938), https://content.time.com/time/subscriber/article/0,33009,772221,00.html; and Sheila D. Foster and Bruce A. Strauch, "Auditing Cases that Made a Difference: McKesson & Robbins," *Journal of Business Case Studies* 5 (July/August 2009): 1-16, https://clutejournals.com/index.php/JBCS/article/view/4708/4797.

would fall out. I'd just lay her back and then, when we'd come to, we'd do it all over again. [Laughs.] They were very cheap, twenty for a dollar.

The quality of heroin was much worse after World War II than it was prior to World War II. There were spots, you know—some shipment would come through, word would get around. During the late forties I was able to get a little bit of heroin, but the quality was so weak I had to augment with other things. I used Dilaudid during this period; I used anything I could get to maintain, to function normally every day.

I got the Dilaudid by making doctors. Old doctors, located in Manhattan and the Bronx. They'd write a scrip out for you; most of them knew what was happening. I had one particular doctor who I used to make, not for Dilaudid, but for barbiturates. You could only go once a month. I had a book, and I would list five names in it, one for each day of the week. I would go and put this book in front of him and he would write a prescription: 'Mary Jones, thirty Tuinals, take one a night at bedtime; John Brown, thirty ….' He'd give me five different prescriptions, see. And I'd give him twenty-five dollars. That's what he used to charge.

I used to get Dolophines from doctors, too. Same thing: at the time it was five dollars a prescription. Some of them would write, some of them would throw you out of the room. They'd yell, 'Get out! Get out! Get out! I don't want blah, blah, blah.' It's hell trying to make doctors. You go to about ten, and you're lucky to get two that will write.[86]

---

[86] Courtwright, *Dark Paradise*, 147; "Eby Leads Psychology Club on Tour U.S. [sic] Narcotic Farm," *Campus Chat*, November 15, 1940, p. 4 (Pescor), https://texashistory.unt.edu/ark:/67531/metapth313238/; Courtwright, Joseph, and Des Jarlais,

Three details of Arthur's story stand out. First, the number of active narcotic addicts was related to available supply. In late 1942, Lawrence Kolb, the leading medical authority on the subject, judged that the war had cut the nation's narcotic addiction problem by nearly half. Demand for addiction treatment had so diminished that the Fort Worth Narcotic Hospital had been largely given over to mental patients. The hospital soon became a refuge for those suffering from war neuroses: shell-shocked Marines; a sailor who survived the sinking of three ships in one week; even a delusional German POW. Asked what had happened to the addicts for whom the hospital had been built, Kolb said that they had mostly turned to whiskey, "which does not lead so quickly to the same fatal consequences."[87]

Second, escalating cost and diminishing availability prompted addicts to find substitute drugs. The opiate users started with was not necessarily the one they stayed with. Early twentieth-century medical addicts, when denied morphine by their alarmed families, contrived to secure laudanum, whiskey, or other drugs to ward off withdrawal symptoms. Though upset and angry relatives often read these acts as signs of bad character or moral degeneration brought on

---

*Addicts Who Survived*, 107-108 (interview). (The addicts' names in the book are aliases.) In 1943 the going rate for illicit morphine prescriptions in Washington, D.C., was $2 to $5. The buyers were known or suspected addicts, or narcotic agents posing as same, in which case prosecutions ensued. Federal officials emphasized, however, that most medical professionals gave the FBN the "finest co-operation" in preventing such illegal prescribing. "Three Doctors Face Narcotics Quiz Thursday," *Washington Evening Star*, January 26, 1943, B-1, https://chroniclingamerica.loc.gov/data/batches/dlc_1xul_ver01/data/sn83045462/00280603338/1943012601/0556.pdf.

[87] [Thomas R. Henry, "Of Stars, Men and Atoms: Notebook of Science Progress in Laboratory, Field and Study," *Washington Evening Star*, November 28, 1942, p. A-8, https://chroniclingamerica.loc.gov/data/batches/dlc_1xul_ver01/data/sn83045462/00280603296/1942112801/0238.pdf. War neurosis examples: J'Nell L. Pate, *Arsenal of Defense: Fort Worth's Military Legacy* (Denton, Texas: Texas State Historical Association, 2011), 113-116.

by narcotic use, they were at bottom manifestations of what Dr. Pettey called the "impelling force [of] intense suffering."[88]

Desperation to escape withdrawal prompted similar behavior among nonmedical addicts. Opium smokers switched to morphine or heroin when supplies of their preferred drug dried up. Journalists noted the trend ("Chinese dope addicts … adopted the needle along with other western habits"), as did epidemiologists who analyzed admissions to the Lexington Narcotic Hospital. Nonmedical addicts who were morphine injectors often had to shift, temporarily or permanently, to the adulterated heroin that criminal traffickers preferred to sell in the 1920s and 1930s. "Heroin is used chiefly when morphine is unavailable or when it sells cheaper than morphine," explained Dr. Pescor, who had also studied usage patterns among addicts admitted to the Lexington Narcotic Hospital in 1936-1937. By 1962 over 75 percent of a sample (n = 1,924) of Lexington's male addict patients listed heroin as their primary drug, while less than 5 percent listed synthetic opioid analgesics like meperidine. In the late 1960s and 1970s, however, addicts who wearied of heavily adulterated heroin began turning to methadone, sometimes after sampling the diverted street variety. "When I drank it I noticed, in a short time, that I evened off. I wasn't high, but I wasn't sick," recalled "Red," a saxophonist addicted to heroin. "My next aim then was to get on a program, although I continued buying heroin when I couldn't find the street methadone."[89]

---

[88] Pettey, *Narcotic Drug Diseases*, 311-317, p. 313.

[89] Courtwright, *Dark Paradise*, 83-84, 227 n. 99 ("needle"); John C. Ball and M. P. Lau, "The Chinese Opiate Addict in the United States," in John C. Ball and Carl D. Chambers, eds., *The Epidemiology of Opiate Addiction in the United States* (Springfield, Ill.: Charles C. Thomas, 1970), 240-248 (epidemiologists noted); Michael J. Pescor, "A Statistical Analysis of the Clinical Records of Hospitalized Drug Addicts," *Public Health Reports*, supplement no. 143

During the 1970s other intravenous narcotic users responded to the high cost and adulteration of heroin by switching to prescription opioids, including "blues" and "T's and blues." Blues of the first sort were oxymorphone tablets Endo sold under the brand name Numorphan. They were easy to dissolve, widely abused, and extremely potent. "Endo withdrew Numorphan from the market in 1972 due to regulatory pressure since it was so sought after by drug addicts," Endo district manager Richard Welch wrote in 2011. "It was a major problem and produced better 'highs' than heroin." Heather Thomson, a clinical affairs manager for Endo, wrote, in the context of a 2009 review of the history behind Opana, that "[b]y the early 1970s, there was a really high demand for 'blues' or 'Nu-blues' by our friends in the IV drug abuse world, so the drug got pulled in favor of restricting it to hospitals, and only in the IV and I think suppository formulations....People who have substance abuse disorders use what they can get, preferably in large quantities, and the old oral Numoprphans were widely available and supplied a high IV dose under easy extraction methods."[90]

---

(1938), 4 ("unavailable"); John C. Ball, "Two Patterns of Opiate Addiction," in Ball and Chambers, eds., *Epidemiology of Opiate Addiction*, 91 (percentages); Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*, 327 ("Red"). Assistant United States Solicitor General Paul L. Friedman made a similar observation about street methadone in the 1975 *Moore* Case: "In fact because it is cheaper and it is often more readily available than heroin, some heroin addicts use it as a substitute for heroin when they cannot get heroin." *United States* v. *Moore*, Oral Argument, October 7, 1975, https://www.oyez.org/cases/1975/74-759. For more on the historical shift from opium to morphine and heroin see Courtwright, *Dark Paradise*, chaps. 3-5.

[90] Richard Welch email chain, January 21, 2011, quotation EPI000443330, and Heather Thomson email chain, February 2, 2009, quotation at ENDO-OPIOID_MDL-07813621. In 2003, when Endo was contemplating a blue color for its new 5 mg immediate-release oxymorphone tablet, several KOLs and key opioid prescribers warned against the color because of the historical association with injecting "Blue Bombers" or, worse, "Endo Blues," as Numorphan was also called. "That would be a horrible mistake and leave you open to the resurrection of the stories about addiction and abuse," Dr. Portenoy said. The pill's marketing sub-team accepted the color-change advice. "EN3202/03 Strategic Project Team Recommendations" (slide deck, February 27, 2003), ENDO-OPIOID_MDL04103450, slide 4 (warnings, "horrible") and "Sub-

The blues in "T's and blues," likewise abused in the 1970s, were 50 mg Talwin (pentazocine hydrochloride) tablets crushed and dissolved together with blue tripelennamine antihistamine tablets. The combination produced its own heroin-like effect and, in 1983, prompted Winthrop Laboratories to add a small amount (0.5 mg) of the opioid antagonist naloxone to its Talwin 50 tablets. Abuse of T's and blues subsequently declined, as intravenous users returned to heroin or other opioids.[91]

Circumstantial switching driven by considerations of price, availability, and the need to stave off withdrawal was noted, not only by pharmaceutical executives, but by addiction researchers in the United States and abroad, where observers documented such trends as the substitution of heroin injection for opium smoking in Hong Kong. Those who manufactured, distributed, and sold prescription opioids knew that patients who became addicted to one type of opioid would be motivated to turn to cheaper or more readily accessible opioids if market conditions changed. This was what happened in the 2000s and 2010s, when some prescription-opioid users turned to inexpensive nonprescription alternatives, including heroin and, especially after 2013, fentanyl and fentanyl analogs. "I was really, really sick," recalled a twenty-nine-year-old woman, interviewed in Dayton, Ohio, in 2006. She could no longer work, or do much of

---

team Action Item Log: EN3202/03" (TS, May 8, 2003), ENDO_FLAG-00433860 (accept change). Another Endo executive pointed out, correctly, that the "blues" referenced in Gus Van Sant's 1989 movie *Drugstore Cowboy* were Numorphan tablets. The film was set in 1971 and featured itinerant IV drug users who consumed a variety of opioids and other drugs. Matthew Wieman, "Opioids" (slide deck, 2001), END-OPIOID_MDL-02272959, slide 32.

[91] Carla Carlson, "Talwin 50 Reformulated to Avert "T's and Blues Abuse," *JAMA* 249 (1983): 1689, https://jamanetwork.com/journals/jama/article-abstract/385281, and Alphonse Poklis, "Decline in Abuse of Pentazocine/Tripelennamine (T's and Blues) Associated with the Addition of Naloxone to Pentazocine Tablets," *Drug and Alcohol Dependence* 14 (1984): 135-140, https://pubmed.ncbi.nlm.nih.gov/6510217/.

anything until a friend introduced her to heroin. "He said that it would take the dope sick away. And from there on, you know, it's cheaper, it's quicker." By 2008, a Dayton treatment provider reported, half of his heroin-addicted clients had already "shifted from OxyContin or other pills to heroin."[92]

"I watched the story change," journalist Sam Quinones wrote of the years after he published *Dreamland*, in 2005. In that book he had shown how, "predictably, narcotic pain relievers turned out to be addictive for a lot of patients the longer they used." Others became addicted through pain-pill diversion. Some turned to heroin, especially after the prescription opioid addiction epidemic alerted Mexican traffickers to expanding demand. In the 2010s, after years of escalation, doctors began prescribing fewer pain pills, "though not before creating an enormous new population of opiate addicts who would use anything that kept withdrawal away. Now the drugs came mostly from the underworld, piggybacking on the consumer market that the epidemic created. Heroin took the place of pain pills—for a while." Then came heroin cut with fentanyl—a potent, easily smuggled synthetic opioid—and, finally, pure fentanyl. Some addicts who staved off opioid craving with Suboxone got high with cheap methamphetamine, another synthetic flooding the black market. In *The Least of Us*, his 2021 sequel to *Dreamland*, Quinones

---

[92] Harold Traver, "Opium to Heroin: Restrictive Legislation and the Rise of Heroin Consumption in Hong Kong," *Journal of Policy History* 4 (1992): 307-324; Theodore J. Cicero et al., "The Changing Face of Heroin Use in the United States: A Retrospective Analysis of the Past 50 Years," *JAMA Psychiatry* 7 (2014): 821-826; "Prescription Opioid Use is a Risk Factor for Heroin Use," National Institute on Drug Abuse, January 2018, https://www.drugabuse.gov/publications/research-reports/relationship-between-prescription-drug-heroin-abuse/prescription-opioid-use-risk-factor-heroin-use; Patil Armenian et al., "Fentanyl, Fentanyl Analogs, and Novel Synthetic Opioids: A Comprehensive Review," *Neuropharmacology* 134 Part A (2018): 121-132. Dayton quotations: Robert G. Carlson et al., "Trends in Pharmaceutical Opioid Abuse in Ohio," Ohio Substance Abuse Monitoring Network (slide deck, ca. 2009), slides 18, 19, https://slideplayer.com/slide/12434245/.

wrote that the root cause of the opioid addiction epidemic was not, as he had originally supposed, economic devastation. It was the growing availability of powerful, brain-altering, toxic, and substitutable drugs to which Americans in all walks of life were susceptible. Increased opioid supply and opioid fungibility were key to explaining the prescription opioid crisis and its metamorphosis into the heroin and fentanyl crisis that emerged in the 2010s.[93]

The third key detail of Arthur's story is that, while "makeable" doctors have always been with us, their presence alone is not enough to trigger an epidemic. The older, marginal physicians whom Arthur approached would sometimes grudgingly (and cautiously) write prescriptions, but they limited the practice and wrote only for addicts looking for a fix. Epidemics are characterized by a rapid increase in the number of *new* cases during a relatively brief span of time; there were thus no epidemics of *prescription* opioid use before, during, or immediately after World War II. As noted in the introduction and Appendix B, the next opiate addiction epidemic involved smuggled heroin, whose supply returned at the end of the 1940s. This time the drug took its toll on a new generation of inner-city youth, disproportionately African American and Latino, in New York and other cities. Here again was the demonstration of a well-established truth: Increases in availability and exposure of opioid-naïve subjects were the primary drivers of narcotic addiction epidemics.[94]

---

[93] Quinones, *Dreamland* and *The Least of Us: True Tales of America and Hope in the Time of Fentanyl and Meth* (New York: Bloomsbury, 2021), quotations pp. 2, 3. Quinones makes the related point that when heavy opioid prescribers lost their medical licenses their many patients sought alternatives, at first street pills or heroin (p. 69).

[94] Courtwright, *Dark Paradise*, chap. 6.

Hence the logic of U.S. and international narcotic control in the mid-twentieth century. Produce enough narcotics for conservatively defined medical and scientific needs; otherwise do everything possible to limit supply. Anslinger went so far as to order property managers at the War Assets Administration to track down the buyers of military-surplus life rafts to retrieve syrettes of morphine tartrate inadvertently left behind in the first aid kits. "In most cases they got back their morphine," journalist Fred Othman reported in October 1946. "Anslinger and his agents helped." Though popular history remembers him as a fierce opponent of illicit traffickers and legal maintenance, Anslinger was an across-the-board supply-sider, equally willing to confront bureaucrats and executives careless of the risks of narcotic oversupply.[95]

I will conclude this mid-century survey by mentioning one other pertinent development, in the field of epidemiology. Using analytical statistics and growing computational power to sort through health data, researchers began to explore how exposure to various psychoactive substances affected both addiction rates and the amount of illness and premature death within a population. In 1973 sociologist Philip Baridon published a study of narcotic addiction rates for thirty-three countries. He identified twelve independent variables, such as a country's wealth, urbanization, racial homogeneity, and proximity to supply. He applied multiple-regression analysis, a technique for estimating relative causal weights, and he discovered that supply proximity explained far more variance (45 percent) than any of the other eleven factors. In one way this was simply a mathematical demonstration of historical common sense. A society like late-nineteenth-century China had suffered high rates of narcotic addiction because the country

---

[95] Fred C. Othman, "Here's the Dope on Dopes and Dope in the Life Rafts," *Washington Daily News*, October 11, 1946, p. 41.

was both a major producer and importer (from nearby India) of opium. But the systematic work of Baridon and other statisticians strengthened and generalized the point. "The most fundamental fact about drug abuse is frequently overlooked in the welter of complicated psychosocial explanations," Baridon wrote. "If the drug is not available, there will be no abuse of it."[96]

The same principle applied to another potent psychoactive substance, alcohol. In the 1950s and 1960s a French demographer, Sully Ledermann, showed that many diseases and social problems closely tracked national alcohol consumption. Tuberculosis, cancers of the digestive tract, psychiatric admissions, accidents, crimes, vandalism: Their rates rose when French alcohol consumption rose, and not just among the heaviest drinkers. The findings laid bare the contradictions of French alcohol policy, then geared to promoting consumption for the sake of alcohol producers, retailers, and tax collectors. Keep on that path, Ledermann said, and you will keep on promoting alcoholism and alcohol-related mortality. Though the French initially ignored the advice, Ledermann's ideas caught on among Scandinavian, British, and North American alcohol researchers. By the mid-1970s they had made reduction in overall consumption a central goal of alcohol-control policy.[97]

---

[96] Philip Baridon, "A Comparative Analysis of Drug Addiction in 33 Countries," *Drug Forum* 2 (1973): 335-355, quotation p. 342. Beginning in the 1970s, neuroscientists gained growing insight into how powerful psychoactive drugs like opioids caused long-term changes in brain structure and function, and how those changes were conducive to addiction—a paradigm shift described in more detail below. Quinones, among others, points out that this knowledge (which was also readily available to pharmaceutical researchers and executives by the late 1990s) highlights the importance of supply and exposure. Drug availability and potency are critical risk factors, and "no matter what a person's genetic disposition, no one gets addicted to drugs she hasn't tried." *The Least of Us*, 151.

[97] M. Craplet, "Policies and Politics in France: 'From Apéritif to Digestif,'" *From Science to Action? 100 Years Later—Alcohol Policies Revisited*, ed. Richard Müller and Harald Klingemann (New York: Kluwer, 2004), 127; Virginia Berridge, *Demons: Our Changing*

One way to reduce consumption was to raise the legal drinking age. In 1984 the U.S. government did so by raising the minimum drinking age to twenty-one. The move was initially controversial, but the controversy faded when studies showed upwards of a thousand fewer traffic deaths a year. Some teenagers still drank, of course. But proportionately fewer of them did so, or crashed their cars, or blacked out, or suffered other adverse health consequences, notably higher rates of alcoholism, statistically associated with early and heavy drinking. The implication was clear. Supply restriction meant fewer dead and addicted kids.[98]

One apparent exception to the less-is-better psychoactive substance rule was methadone maintenance. As mentioned above, clinical and statistical studies from the late 1960s on showed that heroin addicts enjoyed better health and committed fewer crimes when switched to a steady daily dose of methadone. The main reason was that methadone, a legal, orally administered, and comparatively long-acting opioid, had inherent advantages over black-market heroin, which was none of these things. However, these advantages accrued to patients who were *already* confirmed addicts, not to opioid-naïve subjects who were better off if never exposed to methadone or other narcotics on a long-term basis. The public health moral was clear. Allow carefully monitored "agonist" treatment with drugs like methadone (and, later, buprenorphine) in the addict subpopulation, but minimize opioid supply and exposure in the general population,

---

*Attitudes to Alcohol, Tobacco, and Drugs* (Oxford: Oxford U. Press, 2013), 190-191; Alex Mold, "'Everybody Likes a Drink. Nobody Likes a Drunk': Alcohol, Health Education and the Public in 1970s Britain," *Social History of Medicine* 30 (2017): 612–636.

[98] William DeJong and Jason Blanchette, "Case Closed: Research Evidence on the Positive Public Health Impact of the Age 21 Minimum Legal Drinking Age in the United States," *Journal of Studies on Alcohol and Drugs* supplement no. 17 (2014): 108-115.

except in situations like surgery or terminal illness for which the drugs were indicated. The new dispensation of liberalized opioid prescribing, which would consign nonmalignant pain patients to the pharmacological equivalent of indefinite methadone maintenance even though they were not (yet) addicted to narcotics, thus ran contrary to the public health implications of mid-twentieth-century addiction epidemiology.

## III. Lessons Ignored: The Subversion of Narcotic Conservatism

### A.  The Academic Origins of Opioid Revisionism, 1980-1986

In 1996 Dr. Russell Portenoy defined the "traditional perspective" on prescription narcotics as ascribing "both transitory benefit and substantial cumulative risk to long-term opioid therapy." According to this view, he wrote,

> the inevitability of tolerance limits the possibility of sustained efficacy, and other pharmacological properties increase the likelihood of adverse outcomes, including persistent side-effects, impairment in physical and psychosocial functioning, and addiction. If accurate, these outcomes would indeed justify the withholding of opioid therapy for all but the most extreme cases of chronic malignant pain.

Though Dr. Portenoy himself questioned the accuracy of the traditional view (and later backtracked and questioned the wisdom of his own dissent), his words are a fair summary of the thinking behind narcotic conservatism and the precautionary teachings and policies that flowed

from it. This was how clinicians and regulators and most of the public thought about prescription narcotics and CNP in the 1980s, and indeed for most of the twentieth century.[99]

This report shows why they came to think this way and reviews the accumulated historical evidence that the use of opioids to treat CNP entailed serious risks. As of the early 1980s, that evidence, available to any pharmaceutical researcher, executive, or lawyer with access to a library, included 1) thousands of documented cases of iatrogenic opiate addiction in hundreds of refereed articles in the international medical literature, arranged by subject heading in standard finding aids like *Index Medicus*; 2) anthologies that gathered medical opiate addiction cases and statistics; 3) reprint editions of classic studies that stressed the danger of medical opiate addiction; 4) scholarly and popular histories of America's first opiate addiction epidemic; 5) authoritative medical texts that reiterated the importance of narcotic conservatism; 6) proclamations, statutes, schedules, and regulations that defined synthetic and semi-synthetic opioids as potent narcotics of morphine-like effect subject to a closed system of narcotic control requiring diversion prevention and monitoring and reporting of suspicious sales; 7) national newspaper and periodical coverage of opioid abuse and overdoses; and 8) epidemiological

---

[99] Russell K. Portenoy, "Opioid Therapy for Chronic Malignant Pain: Clinicians' Perspective," *Journal of Law, Medicine, and Ethics* 24 (1996): 296 (quotation); Thomas Catan and Evan Perez, "A Pain-Drug Champion Has Second Thoughts," *Wall Street Journal*, December 17, 2012, https://www.wsj.com/articles/SB10001424127887324478304578173342657044604 (backtracked). Investigative journalist Gerald Posner reports that Dr. Portenoy said, in a conversation with another physician, "I gave innumerable lectures in the late 1980s and '90s about addiction that weren't true." Gerald Posner, *Pharma: Greed, Lies, and the Poisoning of America* (New York: Avid Reader Press, 2020), quotation p. 368. Dr. Portenoy has also acknowledged that doctors of his and previous generations were wary of indirect iatrogenesis, the risk that prescribing opioids could harm others through diversion. "That was known forever," he testified. "That was one of the main concerns that reduced doctors likelihood of using opioids in the '80s and before." Russell K. Portenoy, deposition in *City of Chicago vs. Purdue Pharma L.P.*, *et al.,* July 29, 2021, p. 225.

research that linked psychoactive substance exposure and use to higher rates of addiction, illness, and early death.[100]

The length of the list, and the breadth of the sources, raises the question of how individual and corporate opponents of narcotic conservatism managed, over the next two decades, to successfully challenge such substantial evidence of serious risk. The process by which narcotic conservatism was subverted was involved and protracted, though its origins are clear enough. It began in 1980-1986 with the efforts of a handful of medical academics who laid the foundations of opioid revisionism. It was on that foundation, however shaky, that opioid manufacturers and their distributor and national-pharmacy allies built a sophisticated campaign to convince health care providers, patients, regulators, and legislators that long-term opioid analgesia was a safe and effective treatment for CNP.

\*

The most influential of the opioid revisionists in the early 1980s was Dr. Kathleen Foley of Memorial-Sloan Kettering Cancer Center. Though some opioid revisionists professed indifference to the past, Dr. Foley found another way to dismiss contrary historical data. She cited it selectively and inaccurately and then compared it to more recent studies that purportedly superseded older findings. Because Dr. Foley was an influential role model with a vision for

---

[100] Examples of case histories, medical texts, media coverage, laws, regulations, and epidemiological and scientific studies are given above. Representative of anthologies, reprint editions, and histories then available are Kolb, *Drug Addiction*; *Yesterday's Addicts: American Society and Drug Abuse, 1865-1920*, ed. H. Wayne Morgan (Norman: University of Oklahoma Press, 1974); Terry and Pellens, *The Opium Problem* (1970 reprint ed.); David F. Musto, *The American Disease: Origins of Narcotic Control* (New Haven and New York: Yale and Oxford University Presses, three editions [1973, 1987, 1999]); and Edward M. Brecher and the Editors of *Consumer Reports*, *Licit and Illicit Drugs* (Boston: Little, Brown, 1972).

transforming the pain management field, and because she authored or co-authored the seminal articles in the campaign to liberalize opioid prescribing, her method of historical revisionism merits especially close consideration.[101]

In June 1980 Dr. Foley presented a paper at a conference on strategies for pain management sponsored by the National Institute on Drug Abuse (NIDA). In 1981 NIDA published the paper, "Current Issues in the Management of Cancer Pain," in the conference proceedings. Inadequate treatment of cancer pain was then a topic of growing concern, and the question of opioid therapy was central to it. Despite disagreements on such issues as the optimal route and timing of administration, or the inevitably of tolerance, reform-minded cancer specialists like Dr. Foley agreed that exaggerated fears of narcotic befuddlement and addiction, entertained by providers and patients alike, impeded more effective and humane end-of-life pain

---

[101] Mitchell Max Oral History Interview, conducted by Marcia Meldrum, March 1999, pp. 4-7, file:///C:/Users/N00009~1/AppData/Local/Temp/Max,%20Mitchell%20oral%20history%201999.pdf, describes Dr. Foley's mentoring style and vision. Dr. Max was one of Dr. Foley's several protégés.

Indifference to the past: Asked in a 2015 deposition if he had "ever studied the history of addiction and how it has played out in the 19th and 20th centuries," Purdue's Dr. Richard Sackler replied, "I'm not a student of that literature." His profession of ignorance was striking, given his leadership role at a company that manufactured and marketed drugs long associated with opioid addiction epidemics and given his training in medicine, a profession that makes retrospective analysis of mistakes and failures a priority. What Dr. Sackler did profess was a notion that opioids were underprescribed because stigmatized. "I'm not a student of the issue," he said again, "but I believe the stigma existed because of a popular understanding by both professionals and by laymen that morphine was an end-of-life drug, if it was to be used at all." Asked if there were concerns about morphine dependence and addiction, Dr. Sackler admitted that "some people had those concerns" without referencing the body of historical and medical evidence from which the concerns derived. Richard Sackler deposition in *Commonwealth of Kentucky* v. *Purdue Pharma L.P., et al.,* August 28, 2015, p. 18, PPLP004030499, also available at https://www.documentcloud.org/documents/5745056-Depo-022019.html.

management. The pendulum of narcotic conservativism had swung too far to the right for cancer patients and their caregivers.[102]

Dr. Foley was not alone in this view, which was shared by such prominent pain experts as Drs. John J. Bonica and Jerome H. Jaffe. Dr. Bonica, known for his advocacy of multimodality approaches to treating pain, thought cancer pain could be mismanaged in two ways. The less common failing was to "snow the patient under" by administering opiates too soon, a form of "false humanitarianism" that could aggravate "the depressant effects of the disease and cause the patient to have narcotic-induced anorexia, nausea, and vomiting." The more common failing, however, was the underuse of narcotics in cancer patients because the physician had underestimated the effective dose range, overestimated the duration of action, and/or exaggerated the dangers of addiction. The dangers of addiction, Dr. Bonica reiterated, were not a significant consideration in patients in the preterminal or terminal stages of recurrent or metastatic cancer. Dr. Jaffe, the first head of President Richard Nixon's Special Action Office for Drug Abuse Prevention and advocate of methadone maintenance and other innovative treatment approaches to heroin addiction, likewise thought cancer pain undertreated. His belief was strengthened by his cancer-stricken father's and father-in-law's deaths—deaths Dr. Jaffe thought needlessly painful because the attending physicians' approaches had been too conservative. No patient in

---

[102] Kathleen M. Foley, "Current Issues in the Management of Cancer Pain: Memorial Sloan-Kettering Cancer Center," *New Approaches to Treatment of Chronic Pain: A Review of Multidisciplinary Pain Clinics and Pain Centers*, ed. Lorenz K. Y. Ng, NIDA Research Monograph 36 (Washington, D.C.: GPO, 1981), 169-181, https://archives.drugabuse.gov/sites/default/files/monograph36.pdf. The cancer-pain debates and reform activism of the era are described in *Opioids and Pain Relief: A Historical Perspective*, ed. Marcia L. Meldrum (Seattle: IASP Press, 2003), espec. chaps. 8 and 14.

his final days, Dr. Jaffe later wrote, "should ever wish for death because of his physician's reluctance to use adequate amounts of effective opioids."[103]

These views were both humanitarian and plausible. Several studies in the 1970s had found end-stage cancer pain to be poorly managed. Another small study, from 1973, argued that hospitalized patients with painful illnesses, noncancerous and cancerous, experienced significant distress because wary house staff gave them too little meperidine (Demerol). What set Dr. Foley apart from the emerging reform consensus, however, was her willingness to push the indications for opioid therapy beyond pain from advanced cancer. In the last pages of her paper she addressed the larger issue of treating CNP:

> [I]t is this profound fear of addiction that plays a major role in physicians' underuse of narcotic analgesics in medical illness. In fact, there is limited available published data to determine the degree of tolerance, physical dependence, substance abuse or addiction in patients receiving narcotic analgesics *for any type of chronic medical illness and pain.* Many of the published studies do not adhere to strict definitions for drug use and abuse, making any review of such data practically impossible. However, in an attempt to review

---

[103] John J. Bonica, "Cancer Pain," in John J. Bonica, ed., *Pain: Research Publications: Association for Research in Nervous and Mental Disease*, vol. 58 (New York: Raven Press, 1980), 335-362, quotation p. 341; Jerome H. Jaffe, "Misinformation: Euphoria and Addiction," *Advances in Pain Research and Therapy*, vol. 11: *Drug Treatment of Cancer Pain in a Drug-Oriented Society*, ed. C. Stratton Hill, Jr. and William S. Fields (New York: Raven Press, 1989), 163-174, quotation p. 165. Physicians in several nations shared Drs. Bonica's and Jaffe's concerns about inadequate pain control. Their efforts informed the World Health Organization's 1986 Cancer Pain Relief Program, whose origins and early history are recounted in Marcia Meldrum, "The Ladder and the Clock: Cancer Pain and Public Policy at the End of the Twentieth Century," *Journal of Pain and Symptom Management* 29 (2005): 41-54, https://www.sciencedirect.com/science/article/pii/S0885392404004427.

the available data on the subject of chronic pain and addiction, information on narcotic drug use could be obtained from several sources. In 1925, Kolb described the personality types of 230 narcotic addicts and reported that 9% of these addicts were 'persons of a normal nervous constitution to whom an opiate had been prescribed to the point of addiction to relieve the suffering of some prolonged physical condition.' Pescor in 1939 reported that 3.8% of patients admitted to the Drug Addiction Center at Lexington, Kentucky, had been addicted to morphine given for 'legitimate' reasons. Rayport (1954) used the term 'medical addict' and defined such a patient as 'one who states that he first received narcotics from a physician to the point of addiction in the course of treatment of illness.' He divided medical addicts into 3 subclasses based on the fate of their illness: Group 1 with self-limited illness, Group 2 with reversible illness, and Group 3 with irreversible illness. Studying a representative group of 1,020 male opiate addicts consecutively admitted to the Public Health Service Hospital in Lexington, Kentucky, he found the incidence of medical patients addicted to narcotics was 27% among whites and 1.2% among blacks. This high incidence figure is often quoted to support the anecdotal data that the use of narcotic analgesics in patients with chronic illness leads to narcotic addiction. However, these data present a very biased view of the subject. In a more recent prospective study (Porter & Jick, 1980) monitoring the incidence of narcotic addiction in 39,946 hospitalized medical patients, of 11,882 who received at least one narcotic preparation, there were only 4 cases of reasonably well-documented addiction in patients who had no history of addiction. Their data, taken from a survey on [sic] a general

population, suggests that medical use of narcotics is rarely, if ever, associated with the development of addiction.[104]

This account was selective and inaccurate, beginning with Dr. Foley's literature review:

- There were not three, but hundreds, of catalogued articles on medical addiction published in the 1870s through the 1930s.

- These articles included statistical as well as case-study accounts.

- Though their authors used different terminology (e.g., "morphinism"), they clearly referred to addictive disorders marked by dependence and withdrawal; tolerance as measured by escalating dose; loss of control over use; and a tendency to relapse. They did not describe vague conditions irrelevant to contemporary medical addiction.

- Uncited statistical studies ran contrary to Dr. Foley's conclusions. In 1918, for example, Dr. Scheffel reported that 92 percent of a series of 50 patients presenting themselves voluntarily for treatment had begun using narcotics through prescribed

[104] Foley, "Current Issues," 178-179, emphasis added. Dr. Foley's 1,020 figure is incorrect. Because 182 patients left the hospital before Dr. Rayport had a chance to screen them, his actual sample size was 838. See Mark Rayport, "Experience in the Management of Patients Medically Addicted to Narcotics," *JAMA* 156 (1954): 686.

The 1970s studies suggesting cancer-pain undertreatment are reviewed in Bonica, "Cancer Pain," 338-339. The 1973 study is Richard M. Marks and Edward J. Sachar, "Undertreatment of Medical Inpatients with Narcotic Analgesics," *Annals of Internal Medicine* 78 (1973): 173-181. The Marks and Sachar study was later cited in Marcia Angell, "The Quality of Mercy," *New England Journal of Medicine* 306 (1982): 98-99, a 1982 editorial sometimes labeled as an early revisionist text. However, Dr. Angell's sources and language indicate that her main concern was the less parsimonious use of narcotics to relieve pain in cancer and hospitalized patients. Dr. Foley certainly agreed with this position, but went well beyond it in advocating long-term opioid analgesia for many CNP outpatients.

medication or self-medication for illness. Only 8 percent had begun of their own accord when in normal health.[105]

- The studies Dr. Foley cited appeared in the mid-twentieth-century, when older medical addicts were being superseded by younger nonmedical addicts. The cumulative effects of narcotic conservatism, stricter drug control, and the passage of time had changed the makeup of the addict population, as illustrated in Appendix B. Dr. Kolb, the leading authority in the field, had himself remarked the change. He confirmed that addiction to medicinal opiates and opiate-laced patent medicines had expanded in the late nineteenth century, when these drugs "could be bought anywhere with no more restrictions than are placed on the purchase of candy today."[106]

- Dr. Kolb stated that 14 percent of his sample were medical cases, not 9 percent as reported by Dr. Foley. These cases were, Dr. Kolb wrote, "people of normal nervous constitution accidentally or necessarily addicted through medication in the course of illness." Necessary medical addicts were those for whom narcotic prescribing was prompted by a serious chronic illness, as opposed to accidental medical addicts, who were not seriously ill but who had nonetheless been led to addiction by physician overprescribing or self-medication. The two types constituted, respectively, 9 and 5 percent, summing to 14 percent of the total sample.[107]

---

[105] Scheffel, "Etiology," 854.

[106] Lawrence Kolb, "Controlling Drug Addiction," *Hygeia* 3 (1925): 201.

[107] Lawrence Kolb, "Types and Characteristics of Drug Addicts," *Mental Hygiene* 9 (1925): 301. Dr. Rayport's 9 percent figure referred only to the "necessary" subtype, which was evidently how Dr. Foley, who copied Dr. Rayport without studying the original source, came up with the misleadingly low 9 percent figure in her own paper.

- Dr. Foley misreported Dr. Kolb's findings because, instead of accurately citing the original source, she copied, almost word for word, Dr. Mark Rayport's account of one aspect of Dr. Kolb's research on medical addicts, "Kolb in 1925 … found 9% to be 'persons of normal nervous constitution to whom an opiate had been prescribed to the point of addiction to relieve the suffering of some prolonged physical condition.'"[108]

- Dr. Foley omitted Dr. Rayport's conclusion that Drs. Kolb's and Pescor's earlier findings were underestimates. "The figures in these reports have often been taken to represent the incidence of narcotic addiction during medical treatment," Dr. Rayport wrote. "Used in that manner, *these figures must be low*, since addiction to narcotics in the course of illness is certainly not limited to persons of normal personality structure." Patients with personality disorders or a history of inebriety also became chronically ill. They were also, or more so, at risk of addiction if narcotics were prescribed. But medical exposure to narcotics for any reason carried addiction risk, a principle corroborated by Dr. Rayport's observed racial differences. Mid-century whites had greater social and financial access to medical care and prescription drugs

---

What Kolb meant by a "necessary" medical addict was exemplified by G____ J____, a West Virginia railroad fireman addicted to morphine in 1912 following a locomotive overturning that left him with burns and other injuries. He took morphine two or three times daily during his eleven-week hospital stay, and returned home with a two-month supply of morphine pills that left him thoroughly addicted. When he tried, twice, to withdraw from the drug, the pains from his injuries returned and he relapsed. Kolb found him "a good[,] moral, hard[-]working citizen who had ample reason for becoming an addict and who is now in such a state of health that [further attempted] cure would be of no benefit to him even if it could be affected [sic]." Case report (TS, September 21, 1926), in "Narcotics' [sic] Case Histories, 1926-1928" folder, box 7, Lawrence Kolb Papers, History of Medicine Division, National Library of Medicine, Bethesda, Maryland.

[108] Rayport, "Experience," 685.

than African Americans, and physicians harbored racial stereotypes that disinclined
them to prescribe narcotics to black patients.[109]

- Dr. Foley omitted a similar qualification in Dr. Pescor's 1939 study. His 3.8 percent
  figure referred, narrowly, to "normal individuals accidentally addicted." It did not
  refer to all addicts who had first used or who had been given narcotics because of
  disease or trauma. In more detailed published research, not consulted by Dr. Foley,
  Dr. Pescor reported that the *majority* of his 1,036 cases, normal and abnormal
  personalities included, "gave a history of chronic illnesses, infectious diseases with
  sequelae, or serious injuries during adult years."[110]

---

[109] Ibid., 685, emphasis added. Racial considerations in who gets what pain-relieving drug are of
long standing and have persisted to this day. See Martin S. Pernick, *A Calculus of Suffering:
Pain, Professionalism, and Anesthesia in Nineteenth-Century America* (New York: Columbia
University Press, 1985), especially chap. 7; Austin Frakt and Toni Monkovic, "A 'Rare Case
Where Racial Biases' Protected African-Americans" [sic], *New York Times*, November 25, 2019,
updated online December 2, 2019, https://www.nytimes.com/2019/11/25/upshot/opioid-
epidemic-blacks.html; and Joe Brumley email chain, April 12, 2001, PKY181985212. The last
document relays an oncologist's account of "a black female patient who was told that the
[Walgreens] store did not carry this item [OxyContin] … and two hours later her white husband
was getting the medication filled at the same store."

[110] M.J. Pescor, "The Kolb Classification of Drug Addicts," *Public Health Reports*, supplement
no. 155 (1939): 2 ("normal"), and Pescor, "Statistical Analysis," 15 (majority). Two details
require further comment. First, Dr. Pescor specified a high, not to say aspirational, standard for
normality in accidentally addicted patients. He wrote that cases of this sort typically enjoyed
normal childhood development and moderate discipline in economically comfortable, native-
born, rural families with no ancestral taint of psychopathy; manifest steady work habits; reported
a happy marital history with two or more children; showed acceptable social adjustment despite
addiction; and had no criminal history, apart from running afoul of the Harrison Act.
("Classification," p. 2.) Second, Dr. Pescor could not always determine whether the illnesses and
injuries had preceded or followed addiction. This is likely why, in "Statistical Analysis," he did
not calculate an overall percentage of medical cases, as Kolb had done for his smaller sample in
"Types and Characteristics." Dr. Pescor remained confident, however, that "venereal disease
does play a part in the etiology of addiction," an unspecified number of patients having attributed
their addiction to its painful sequelae ("Statistical Analysis," p. 15). However, on another
occasion, Dr. Pescor did give an estimate of the percentage of Fort Worth Narcotic Hospital
cases that were of medical origin. In 1940 he told visitors to the facility that 30 percent of the

- The risk inherent in exposure prompted Dr. Rayport's recommendation, unmentioned by Dr. Foley, of a multimodality, patient-centered approach to pain management that stressed nonnarcotic therapies and social interventions such as reducing stress or prolonging rest, a view then advocated by leaders in the pain management field. "Morphine is not the answer to chronic pain," Dr. Rayport wrote. As tolerance developed, pain relief became inadequate. Morphine in CNP was "a short-lived type of kindness. Long-term kindness would begin when opiates are withheld or withdrawn in favor of other therapeutic measures."[111]

- Dr. Foley's rejoinder to Dr. Rayport ("these data present a very biased view of the subject") did not specify the nature of his bias. Nor did it mention that the Lexington Narcotic Hospital's practice of admitting prisoner-addicts as well as voluntary patients would have biased the percentage of medical cases downward, not upward.

Recurrence to original sources shows Dr. Foley's account of the historical evidence to have been incomplete, inaccurate, and misleading. Worse, because of its toxic afterlife, was her use of Porter and Jick's letter to erase previous findings about the risks of opioid prescribing for CNP. I refer here to the judgment of the author himself. Dr. Hershel Jick is a respected Boston physician and researcher. (Jane Porter, nominally the first author, was his graduate research assistant.) Their contribution, "Addiction Rare in Patients Treated with Narcotics," appeared in a leading journal. Yet it was neither a "study" nor was it applicable to CNP. It was a five-sentence

---

patients had begun using narcotics "to relieve suffering from pain." ("Eby Leads Psychology Club," p. 4.)

[111] Rayport, "Experience," 690-691.

letter, which was unlikely to have been formally refereed and which drew its findings from a

database of hospitalized medical patients in an acute-care setting with no history of addiction

who had received "narcotic preparations" of unknown and varying potency, including aspirin-

combination drugs like Percodan, in some cases as infrequently as a single dose. "If you read it

carefully," Dr. Jick later said, "it does *not* speak to the level of addiction in outpatients who take

these drugs for chronic pain." Careful readers would likewise have found no mention of the

diversion and secondary addiction risks inherent to prescribing opioids on an outpatient basis. In

any event, Porter and Jick's letter offered no foundation for Dr. Foley's sweeping conclusion,

"medical use of narcotics is rarely, if ever, associated with the development of addiction."[112]

---

[112] Jane Porter and Hershel Jick, "Addiction Rare in Patients Treated with Narcotics," *New England Journal of Medicine* 302 (1980): 123. The inappropriate use of the Porter and Jick letter is described in Steven D. Passik, "Responding Rationally to Recent Reports of Abuse/Diversion of Oxycontin® [sic]," *Journal of Pain and Symptom Management* 21 (2001): 359-360, https://reader.elsevier.com/reader/sd/pii/S0885392401002792?token=2F47B9BB852FF627538928489D9D20F521B35628176F46B17F291D25AE7245359FE79CE307DD626FB948FA8DCDBAD3EA; Barry Meier, *Pain Killer: An Empire of Deceit and the Origins of America's Opioid Epidemic*, expanded ed. (New York: Random House, 2018), 32-33; Quinones, *Dreamland*, 15-16, 92, 107-110, 266 (Jick quotation p. 110, italics in original); Sarah Zhang, "The One Paragraph Letter from 1980 That Fueled the Opioid Crisis," *The Atlantic*, June 2, 2017, https://www.theatlantic.com/health/archive/2017/06/nejm-letter-opioids/528840/; and Pamela T.M. Leung et al., "A 1980 Letter on the Risk of Opioid Addiction," *New England Journal of Medicine* 376 (2017): 2194-2195, fig. 1, https://www.nejm.org/doi/full/10.1056/NEJMc1700150.

Dr. David Juurlink, who co-authored and led the research for the last-named study, has said that it is "difficult to overstate the role of this letter. It was the key bit of literature that helped the opiate manufacturers convince front-line doctors that addiction is not a concern." Dr. Jick concurred. In June 2017 he accused the pharmaceutical companies that seized on his publication of "bizarre," "unhealthy," and unprecedented abuse of the letter to cloak prescription opioids in the mantle of non-addictiveness. If he had known in 1980 the disaster that their misappropriation would cause, he "would never have published it." Sari Horwitz et al., "Inside the Opioid Industry's Marketing Machine," *Washington Post*, December 16, 2019, https://www.washingtonpost.com/graphics/2019/investigations/opioid-marketing/ (Juurlink) and "Doctor Who Wrote 1980 Letter on Painkillers Regrets that It Fed the Opioid Crisis," NPR transcript of Jick interview with David Greene, June 17, 2017, https://www.npr.org/templates/transcript/transcript.php?storyId=533060031.

Dr. Foley's errors and omissions would have mattered less had not she and a Sloan-Kettering fellow, Dr. Portenoy, republished her analysis in 1986, together with some additional case material. The new evidence, a retrospective study of 38 cases without any control groups, was thin. Drs. Portenoy and Foley had asked pain patients to recall past experiences with opioids, rather than describe real-time reactions going forward—a stronger form of analysis unbiased by recall effects.[113]

The journal to which they submitted the article, *Pain*, rejected it. What happened next is described in a 2003 oral history interview with Dr. Portenoy, conducted by Dr. Meldrum:

MELDRUM: You and Kathleen Foley did a study on opioids and nonmalignant pain, which I think is probably considered to be very important in the literature. I have a copy of it, I spend [sic] time reading it. It was a study of thirty-eight patients, and what I get out of there is that it was definitely saying it's not just cancer patients that can benefit from opioids. We've taken these thirty-eight patients and we've given them opioids, and only two of them developed an addiction problem, and those two had a past history. On

---

[113] R.K. Portenoy and K.M. Foley, "Chronic Use of Opioid Analgesics in Non-malignant Pain: Report of 38 Cases," *Pain* 25 (1986): 171. For a discussion of the evidentiary weaknesses of the 1986 article, see Anna Lembke, *Drug Dealer, MD: How Doctors Were Duped, Patients Got Hooked, and Why It's So Hard to Stop* (Baltimore: Johns Hopkins University Press, 2016), 60-62, and Herzberg, *White Market Drugs*, 265-267.

    Dr. Herzberg, who calls the article a mix of "token cautions and boosterish enthusiasm," adds that Drs. Portenoy and Foley warned, not of the possibility of addiction, but of "psychological dependence" Their choice of words highlighted "another important strategy in their article: redefining addiction. Tolerance and physical dependence, Drs. Foley and Portenoy argued, were normal, expected side effects of opioid treatment and should not be thought of as elements of addiction" (266-267). As will be seen, such redefinition was almost universal among revisionists. Some went further, arguing that tolerance in pain patients was really "pseudoaddiction," behavior that looked like addiction but simply manifested inadequate pain relief. The solution: increase the dosage of opioids.

the other hand, only twenty-four, which is about two-thirds roughly of the patients, did get relief. It seems to me that sort of lays out the problem in a lot of different ways. I wonder if you wanted to comment on that, and sort of where the study came from.

PORTENOY: It's one of those interesting phenomena where what should have been a little paper turned into an important paper. It was Kathy's idea to do. I was actually looking around for something to study, and Kathy said, 'Why don't you review our experience with nonmalignant pain?' Again, I think it was Kathy's tremendous insight into the sociology of medicine at that time. She had a sense that we had to be very smart about writing the discussion section. Really, what it was was a very simple survey of clinical observations. It wasn't a study, and it was retrospective, and it was weak, weak, weak data. Nowadays, we would, I think, call that level five data. It was the weakest data there is.

In fact, the paper was rejected. The first time we sent it to the *Journal of Pain* [sic], it was rejected by Pat Wall. I was a young—was I a fellow then? It was in 1986, so I think I was still a—yes, I guess I was a fellow. So to be rejected by Pat Wall was a devastating experience, and I immediately wanted to bury my head. Instead, Kathy read the reviews, and she said, 'They're not reasonable. Write back and tell them it's wrong, we're going to resubmit it.' (chuckles) I don't know if she remembers that.

I wrote a letter, and we both signed it and basically asked Dr. Wall if he would re-review the paper because the reviewers didn't get the point. The point was, basically, to show a phenomenology, to illustrate a phenomenology that experienced pain specialists like us knew existed but was being doubted in the field, and also throughout medicine, and, in

addition to that, was being gainsaid by other clinical observations to suggest that drugs always produce problems.

So there were a series of papers that were coming out of places like the Mayo Clinic published around those times that were observations of a different type of patient, suggesting that people who took opioids were doing poorly, and they were becoming addicted, they had side effects that didn't allow them to function, and they always needed escalating doses, and they did much, much better when the drugs were taken away. That was the key message of those papers. If you put a person into a pain management program and you eliminate the drugs—detoxification was part of the program—and if you did that, then these patients did better.

What Kathy Foley and I were trying to do with that paper is not to say that those observations were invalid, which got misunderstood initially, in those early years. It was never to say that those observations were invalid, but it *was* to say that here's another set of observations, that patients being treated by Ray Hood [sic; should be Houde] for more than a decade on opioid drugs, patients that I had begun to treat for more than a year, and patients that Kathy was treating for more than five years, who were taking these drugs in a responsible way, not needing to escalate the doses, maintaining good pain control, and functioning better, at least from what we could see, as a result of the therapy, and not developing aberrant behaviors that would be consistent with abuse or addiction.

That's what we wanted to do, and it should have been a little paper like a snapshot of a clinical experience and published and promptly forgotten. Of course, Richard Sternbach wrote a scathing letter to the editor afterwards, which, as a young physician, as a young

academic physician, I had never even *seen* a letter published that attacked authors the way that his did. Later on, we made amends with each other. We had never met at that point.

But he wrote a letter that basically said that these people from Sloan-Kettering didn't understand the nature of pain, that we thought pain was all biologic and we didn't understand it. There was a psychologic and behavioral component to pain, and that because we misunderstood and thought pain was always biologic, we thought that opioids would always work, and we were advocating that therapy.

I wrote a response to that, and from that point on, that generated a tremendous dialog in the field. I lectured very extensively on that topic, and I'm still very involved with it. My department now has a program on pain and chemical dependency. Now we're hosting international conferences on pain and chemical dependency, the sixth conference coming up next year. It all boils down to a series of observations that started back in the mid-eighties and [that] really have a message. And the message is that people are different one from another and that if you use drugs that have addiction potential, and you use drugs that have a side effect liability, you have to recognize that some people will do well and some people won't do well.

And you have to recognize—I think this was another point that we tried to make in the paper—that the potential for bad outcomes isn't inherent in the tablet or in the injection. It's not inherent in there. These drugs have certain characteristics, which, when

interacting with a certain kind of brain, can lead to bad outcomes; but it's not inherent in the pill such that everybody given that pill becomes an addict.[114]

The last point, that some pain patients were able to use opioids for years without descending into self-destructive addiction, was correct. In fact, the welfare of such patients was the reason why some early twentieth-century physicians like Dr. Terry had criticized the federal government's anti-maintenance policy. Clinical experience had taught him that many long-term medical addicts would be better served by officially monitored narcotic prescribing, rather than being cut off and forced into withdrawal. Yet Dr. Terry was adamant that liberal provision of opiates to patients *not yet addicted* had been a primary cause of the nation's first surge of narcotic addiction.[115]

In dismissing contrary historical opinion and data—inaccurately reported and improperly contextualized in the 1986 article, as in the 1981 trial balloon—Drs. Portenoy and Foley cited the Porter and Jick letter and psychiatrist Lee Robins's study of Vietnam veterans who had used heroin overseas. In 1974 Dr. Robins and her colleagues reported that, for the most part, veterans who had used heroin in Vietnam had refrained from using it upon returning to the United States,

---

[114] Oral History Interview with Russell K. Portenoy (recorded 2003, transcribed 2013), Ms. Col. No. 127.67, John C. Liebeskind History of Pain Collection, History and Special Collections for the Sciences, Library Special Collections, Louise M. Darling Biomedical Library, University of California at Los Angeles, pp. 17-19.

[115] Dr. Terry made his case in a 1928 study, *The Opium Problem*. In 1970 the same book was extensively excerpted in Drs. John C. Ball and Carl D. Chamber's *The Epidemiology of Opiate Addiction in the United States* and republished in its entirety in the Patterson-Smith reprint series. (Ball and Chambers, eds., *Epidemiology of Opiate Addiction*, chap. 3; Terry and Pellens, *Opium Problem*.) Neither of these standard historical surveys was cited by Dr. Foley in 1980 or 1981 or by Drs. Foley and Portenoy in 1986. For more on Dr. Terry's policy views, see Courtwright, *Dark Paradise*, 126-127.

and that their readdiction rates had been exceptionally low. Drs. Foley and Portenoy thought the finding "further contradict[ed] the inevitability of abuse behaviors in those chronically exposed to opioids."[116]

This is not, however, the only reading of Dr. Robins's study. The relatively high rates of heroin use and addiction among US soldiers abroad and their low rates after returning could be explained, epidemiologist Dr. Wayne Hall observes, "by the extreme differences in the price, purity, availability, and social acceptability of heroin use between Vietnam and the United States." The heroin in Vietnam was pure, cheap, and smokable, which overcame qualms about needle use. The heroin in the U.S. was heavily adulterated, expensive, and had to be injected to produce much of an effect. Moreover, returning veterans who steered clear of bad heroin did not necessarily steer clear of drugs. Among those who had begun using narcotics in Vietnam, 32 percent used amphetamines or barbiturates after they came home. "Three years after their return," Dr. Hall added, "alcohol abuse was a major problem for more than a third of veterans, and especially among those who had used heroin in Vietnam." As during World War II, shifts in opioid price, purity, and availability prompted behavioral shifts in drug consumption.[117]

The question of availability also concerned Dr. H. A. Adriaensen, an Antwerp anesthesiologist who in 1988 replicated the Portenoy-Foley retrospective study using 410 well

---

[116] Foley and Portenoy, "Chronic Use," 183.

[117] Lee N. Robins, Darlene H. Davis, and David N. Nurco, "How Permanent was Vietnam Drug Addiction," *American Journal of Public Health,* Supplement 64 (1974): 38-43, https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.64.12_Suppl.38 (32 percent statistic, p. 40); Wayne Hall and Megan Weier, "Lee Robins' Studies of Heroin Use among US Vietnam Veterans," *Addiction* 112 (2016): 176-180, quotations p. 178.

documented files from his own pain clinic. He found a 12 percent addiction rate among CNP

outpatients using narcotic analgesics, considerably higher than the 5 percent in the Portenoy-

Foley sample and vastly higher than the 0.03 percent in the Porter-Jick sample. The latter

discrepancy Dr. Adriaensen attributed to hospital patients' limited and temporary access to

narcotics. Outpatients, by contrast, were in an ambulatory setting where self-medication

frequently occurred.[118]

Dr. Adriaensen judged Drs. Portenoy and Foley's proposed solution, screening pain

patients for psychological problems or a previous history of drug abuse, to be inadequate. Long-

term pain and unresolved disease could itself generate psychological problems, such as anxiety

and depression, not necessarily manifest when opioid therapy commenced. "[D]octors involved

in pain-clinic work know that even mentally healthy patients often run into coping problems if

their health problems do not get solved," Dr. Adriaensen wrote. "Therefore it is difficult to

predict how a patient will react to the chronic administration of narcotic agents, even if at the

start careful psychological testing does not show relevant abnormalities." Long-term opioid

analgesia therefore remained "a controversial therapy which must be prescribed with caution,

and should not become generalised [sic] before its safety has been proved by further research and

clinical experience."[119]

Dr. Richard Sternbach's rebuttal in *Pain* (the letter Dr. Portenoy called "scathing")

questioned Drs. Portenoy and Foley's methods, research, and judgment. They had collected data

---

[118] H. Adriaensen, "Opioid Drugs in Chronic Non-Malignant Pain?" *Acta Anaesthesiologica Belgica* 39 supplement 2 (1988): 67-70.

[119] Ibid., 69, 70 (quotations).

retrospectively and nonuniformly. They studied patients taking different opioids of varying

potencies. They lacked controls. They ignored the literature on return to normal function in pain

patients treated in cognitive-behavioral programs. "[B]y stark and shocking contrast, the patients

in the Portenoy and Foley study showed 'few substantial gains in employment or social function'

attributable to opioid treatment!" The 5 percent addiction rate in their sample was "unacceptable,

and it is doubtful if many physicians would wish to responsible for such a high rate of iatrogenic

drug addiction in cases of non-malignant pain. … By maintaining the patients on opiates,

continuing their dysfunctional status with excess disability, and at a risk for addiction, the

approach is neither safe nor salutary nor humane." The weaknesses of the paper were so serious,

Dr. Sternbach wrote, "that it ought not to have passed editorial review."[120]

But the paper did appear in print, and its "phenomenological" snapshot and "smart"

discussion of "weak, weak, weak data" that should have been "promptly forgotten" became a

foundational study of national importance. Dr. Portenoy acknowledged as much, as did

researchers and journalists who subsequently identified the 1986 article as a breakthrough in the

campaign, co-opted and subsidized by pharmaceutical firms, to revolutionize CNP opioid

prescribing. Asked to explain the origins of the prescription-opioid epidemic, a group of

physicians interviewed by the National Commission on Compensation Insurance identified

---

[120] Richard A. Sternbach, letter to the editor, *Pain* 29 (1987): 257-258, exclamation point in the original. Dr. Portenoy and Foley's reply, *Pain* 29 (1987): 259-261, took the consciousness-raising line that Dr. Portenoy described in the interview quoted above; pointed out that opioids were cheaper than behavioral-cognitive programs; posited that long-term opioid therapy "appears to be valuable in selected patients strictly monitored," regardless of their lack of functional improvement; and "that the data on which the adamant condemnation of this approach is based is meager." The last claim was false. The data, historical and quantitative, supporting narcotic conservatism was substantial, not "meager."

"significant marketing efforts to promote opioids and what may be characterized by some as controversial scientific research [that] began a cultural shift for many physicians, starting with a study in the mid-1980s that addressed the use of opioids for pain relief." That study was Drs. Portenoy and Foley's seminal 1986 article. The two physicians, journalist Chris McGreal wrote,

> had tapped into a frustration among a group of younger pain doctors at their inability to offer anything more than superficial relief to the march of patients whose lives were dominated and destroyed by debilitating pain. To many of those doctors, opioid treatments were a magic bullet kept beyond reach.

> The *Pain* paper marked the start of a revolution that turned attitudes toward opioids on their head and brought about a fundamental shift in medical culture. Portenoy and Foley thought the long stigma against opioid treatment needed to be broken down. They had fired the opening shot with a paper that seemed to pull the rug from under the old arguments.[121]

---

[121] Dr. Portenoy's remarks on the article's importance, despite its limitations, are in his 2003 oral history interview with Dr. Meldrum, pp. 17-19, and his deposition in *City of Chicago vs. Purdue Pharma L.P.*, *et al.,* July 29, 2021, pp. 208-209. "Controversial scientific research": "On Opioids: The Doctors' Perspective," NCCI Insights, April 23, 2018, https://www.ncci.com/Articles/Pages/II_OnOpioids-Doctors.aspx. "Tapped": Chris McGreal, *American Overdose: The Opioid Tragedy in Three Acts* (New York: Public Affairs, 2018), 23.

Dr. Portenoy himself cited the 1986 study as the first among "several" reports of a "series of cases in which opioid maintenance therapy was successfully managed for a long periods of time." (Russell K. Portenoy, "Drug Treatment of Pain Syndromes," *Seminars in Neurology* 7 [1987]: 147.) The evidentiary foundation of opioid revisionism thus resembled a nest of Russian dolls: Porter and Jick (1980) became nested in Foley (1981), which became nested in Portenoy and Foley (1986), which became nested in Portenoy (1987), and so on. Dr. Foley did the same thing, e.g., citing without qualification the 1986 article as a "recent study" indicating that "effective" long-term opioid use in CNP patients "is not associated with psychological dependence." Kathleen Foley, "Controversies in Cancer Pain: Medical Perspectives," *Cancer* 63, no. 11 (1989, supplement): 2263.

More precisely, Drs. Portenoy and Foley had fired the opening shot on a new front in the war over the appropriate uses of narcotic drugs. In the late 1980s and 1990s the shot became a fusillade. "I gave so many lectures to primary care audiences in which the Porter and Jick article was just one piece of data that I would then cite," Dr. Portenoy said in a 2011 interview, in which he reflected on his method and motives. "And I would cite 6, 7, maybe 10 different avenues of thought or avenues of evidence, none of which represented real evidence. And yet what I was trying to do was to create a narrative so that the primary care audience would look at this information in toto and feel more comfortable about opioids in a way they hadn't before. In essence, this was education to destigmatize and, because the primary goal was to destigmatize, we often left evidence behind."[122]

### B.  Manufacturers and Opioid Revisionism, Promotion, and Supply, 1986-2016

Sound medicine is data-driven, not narrative based, which was why critics like Dr. Nathaniel Katz subsequently accused Dr. Portenoy and other "so-called thought leaders" of creating and perpetuating "myths" by misinterpreting studies like Porter and Jick's. Though the

---

Physicians studying the history of pain management have also concluded that the 1986 Portenoy and Foley article—and the Porter and Jick letter it promoted—were landmarks in opioid revisionism. "These reports became heavily cited in peer-reviewed and non-peer reviewed [sic] literature; the reports were also incorporated into the training of new physicians, nurses, dentists and other health care providers. However, these early claims of low addiction risk when generalized to chronic pain management were based upon insufficient evidence as history has shown." D. Andrew Tompkins, J. Greg Hobelmann, and Peggy Compton, "Providing Chronic Pain Management in the 'Fifth Vital Sign' Era: Historical and Treatment Perspective on a Modern-Day Medical Dilemma," *Drug and Alcohol Dependence* 173 (2017 Suppl 1): S11-S21, unpaginated author MS, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5771233/.

[122] Dr. Portenoy interview in *Long-Term Opioid Therapy Reconsidered: Addiction is NOT Rare in Pain Patients* (Physicians for Responsible Opioid Prescribing video, 2011), https://www.youtube.com/watch?v=DgyuBWN9D4w.

criticism is valid, it is insufficient to answer a key historical question: How did an empirically shoddy campaign to destigmatize opioids for long-term CNP therapy prove successful in an era when politicians, health officials, and even street artists were *restigmatizing* licit and illicit drug use? The 1980s were the decade of Be Smart, Don't Start; Just Say No; and Crack is Wack. Like any *Zeitgeist*, this one had countercurrents. Methadone programs had broken, however imperfectly, the maintenance taboo; appeals for better end-of-life care drew political and media interest; and doctors desired more, and more effective, options for CNP patients. Schedule II opioids nonetheless remained heavily regulated and highly suspect in professional and lay circles. To explain how a coterie of creative revisionists managed to make them more widely available and frequently prescribed, I turn now to their sources of corporate support. Chronologically, the first to propagate their cause were the manufacturers of opioids— manufacturers that continued to provide financial support after the harms of liberalized CNP prescribing and expanded opioid supply became apparent.[123]

1. Purdue's Early Support for Academic Revisionism

Accounts of manufacturer support for opioid revisionism properly begin with Purdue Frederick's efforts in the 1980s. I should, however, acknowledge that Purdue representatives have explicitly denied involvement with early opioid revisionism. In June 2019 David Sackler, son of Dr. Richard Sackler and a Purdue board member from 2012 to 2018, granted an interview to *Vanity Fair*. Sackler said that he and his family had been miscast as villains who had fomented the opioid crisis. The misimpression had arisen because they had remained silent too long,

---

[123] Dr. Katz interview in ibid.

allowing others to frame the narrative. "To argue that OxyContin started this," he said, "is not in keeping with history." The company had launched the drug when attitudes toward pain medication had already begun shifting. Purdue had ridden the wave, relying on the new evidence that addiction risk was minimal. The interviewer, Bethany McClean, wrote that Sackler cited the second edition of Dr. Bonica's *The Management of Pain*, a standard clinical reference published in 1990, six years before the company launched OxyContin. "'Narcotic addiction,'" the textbook states flatly, 'occurs rarely, or not at all, in patients receiving narcotics for medical use.' By citing such sources, Sackler is making an argument that he returns to again and again; that Purdue was not alone in believing that opioids like OxyContin were safe and effective enough to justify the risk."[124]

David Sackler was correct in one respect: The narrative had been framed. Only it was Purdue's framing, and it began well before the publication of Dr. Bonica's revised book. In 1986 Clarence H. Nash, the Purdue marketing representative for Washington State, had contacted Dr. Bonica, suggesting that he write to Purdue Frederick's assistant medical director, Dr. Robert Kaiko, about a Purdue subsidy for his revisions and updating. Dr. Bonica did so because he knew the work would be expensive, with an estimated 65 specialist contributors, 1,400 pages, and 550 illustrations.[125]

---

[124] Bethany McClean, "'We Didn't Cause the Crisis': David Sackler Pleads His Case on the Opioid Epidemic," *Vanity Fair*, June 19, 2019, https://www.vanityfair.com/news/2019/06/david-sackler-pleads-his-case-on-the-opioid-epidemic.

[125] Bonica to Kaiko, August 19, 1986, correspondence files, box 3, folder 129, "Kaiko, Robert F., 1986-1988," John J. Bonica Papers, MS 118, History and Special Collections Division, Louise M. Darling Biomedical Library, University of California at Los Angeles, hereafter JJBP. By the time it was complete, Bonica's project had grown even larger, and required two volumes.

Purdue provided financial assistance and more, underwriting an annual lecture named in Dr. Bonica's honor. Several of Dr. Bonica's contributors also subsequently received Purdue financial support. One was Washington State pain specialist Dr. Stephen H. Butler, whom Purdue executive Jane Petty later characterized as "a terrific resource for us here in Seattle … [with good] pain management philosophy and product usage." And it was Dr. Butler, together with pain and palliative medicine specialist Costantino Benedetti, who first framed the "rarely" sentence that David Sackler quoted in defense of his company and family.[126]

Looking more closely, Drs. Benedetti and Butler referenced two studies from the early 1980s to support the claim that addiction rarely—they did not write "or not at all"—occurred in those who received narcotics for medical use. One source, by Drs. Ronald Kanner and Kathleen Foley (who also became Purdue speakers, Foley first receiving payments in 1985) was based on cancer patients and thus not directly applicable to long-term prescription of opioids for patients with CNP. (Dr. Bonica's reuse and strengthening of the quotation likewise appeared in the

---

Purdue Frederick courted Dr. Bonica in other ways. On April 13, 1985, Nash wrote a flattering letter thanking Dr. Bonica for taking time to see him about MS Contin and pointing out that "we are taking the same position in cancer you are advocating." On January 13, 1988, Dr. Bonica wrote to Dr. Kaiko to thank him "for the lovely gift you sent me during the holidays." Both letters are in box 68, folder 28, "Purdue Frederick Co., 1985-1992," JJBP.

[126] Drs. Benedetti and Butler also reviewed the page proofs of several other chapters, as acknowledged in John Bonica, *The Management of Pain*, 2nd ed., vol. II (Philadelphia: Lea and Febiger, 1990), xi. Bonica Lectureship acknowledgment: Bonica to Richard Sackler, May 21, 1990, box 5, folder 111, JJBP. Butler quote: Jane Petty email, November 13, 2000, PPLPC030000287208. Dr. Benedetti, though praised by Purdue executives for his advocacy for pain patients and pro-opioid legislation, subsequently had a checkered history with the company. This was due, in part, to his enthusiasm for rival opioid products, including Duragesic. Cf. Julia Radlund email chain, January 18, 2001, PDD8806210091-PDD8806210093; Alan Must email, April 21, 2001, PPLPC008000016034; and Windell Fisher email, May 11, 2000, PDD8806022217.

context of his chapter on cancer pain, with all his supporting references to studies of treating malignant pain.) The other source that Drs. Benedetti and Butler relied on was Porter and Jick, the letter whose misappropriation Dr. Jick subsequently decried.[127]

Dr. Bonica and his contributors were not the only beneficiaries of Purdue's support during the 1980s. Purdue Frederick organized and sponsored two international conferences on opioid analgesia, both of which dovetailed with MS Contin marketing. MS Contin was an extended-release morphine pill pioneered by Napp, a British pharmaceutical firm that the Sackler brothers—Drs. Arthur, Mortimer, and Raymond—had acquired in 1966. Dr. Robert Twycross, a leading figure in the British palliative care movement, urged Napp to develop such a drug, which the company introduced and marketed in the U.K. in the early 1980s. Called MST Continus, it enjoyed favorable reviews as an innovative treatment for cancer pain. In 1984 Purdue Frederick,

---

[127] The original quotation appears in Constantino Benedetti and Stephen H. Butler, "System Analgesics," Bonica, *Management of Pain*, vol. II, 1654, and reads in full, "Fear of addiction has been an important factor in the underdosing of opioids in patients with cancer pain and other severe pain, but opioid addiction rarely occurs in patients receiving opioids for medical purposes." The nature of "other severe pain" is not specified. Dr. Bonica's version is in idem, vol. 1, p. 429, and reads in full, "As previously mentioned, fear of addiction has been the primary factor for narcotic underdosing in patients with cancer and other severe pains. Narcotic addiction occurs rarely, or not at all, in patients receiving narcotics for medical use (Chapter 78)." Dr. Kanner's support: Paul Goldenheim to Kanner, October 28, 1986, 7003145507 for the Western District of Virginia. Dr. Foley's 1985 payments, respectively $1,000 and $2,500, are documented in Paul D. Goldenheim to Foley, July 1 and October 31, 1985, PDD1701924974 and PDD1701924978. Theresa Newell to Foley, March 24, 1992, PDD1701924926, is representative of several of Dr. Foley's later Speakers' Bureau engagements. Foley later testified that "I have been on the speakers [sic] bureaus of various drug companies over the years including Purdue and Abbott and Noel and Janssen." Her institution, Memorial Sloan-Kettering, also received grants from these companies to support her research. Deposition of Kathleen Foley, M.D., August 27, 2004, *Michael McCallister et al.* v. *Purdue Pharma L.P.,* pp. 7-8, https://www.industrydocuments.ucsf.edu/drug/docs/#id=yfwf0232.

which was also owned by the Sackler brothers, introduced the drug into the United States as MS Contin—without bothering to secure FDA approval.[128]

Dr. Richard S. Sackler, the son of Dr. Raymond Sackler and the central figure in Purdue Frederick's embrace of opioid analgesia, invited more than 350 delegates to attend the first international conference, held in September 1984 at the University of Toronto Medical School. Purdue "guided" the program's planning and financed the event, which convened a month before MS Contin went on sale in the U.S. Dr. Richard Sackler's letter of invitation promised "an interesting exchange of worldwide concepts of pain theory and management including that of cancer pain." The "including" signaled a broader agenda. Several presenters affirmed the utility of MST Continus as a postoperative analgesic. One speaker, Dr. Eckhard Beubler, of the Institute for Experimental and Clinical Pharmacology of the University of Graz, went further, claiming that morphine was underutilized for the treatment of "severe pain," cause not specified.[129]

---

[128] In October 1984 Purdue introduced MS Contin 30 mg tablets in the United States. It did so without having an approved NDA from the FDA. The FDA responded with a letter, Frederick R. Carlson to Raymond Sackler, January 14, 1985, PDD8023010659 PDD8023010660, stating that Purdue Frederick was in violation of the Federal Food, Drug, and Cosmetic Act. On January 25, 1985, Raymond Sackler replied to FDA Compliance Officer Gail T. Costello that, as far as the company was concerned, MS Contin was "grandfathered" and that its marketing was within the law. The bottom line: "MS Contin Tablets 30 mg continued to be distributed." Raymond Sackler to Gail T. Costello, January 25, 1985, and attachments, PDD8023010661-PDD8023011036, quotations from PDD8023010661 and PDD8023011036. See also Patrick Radden Keefe, *Empire of Pain: The Secret History of the Sackler Dynasty* (New York: Doubleday, 2021), 59-62. The 1984 and 1988 conferences and their published proceedings are described below.

[129] Keefe, *Empire of Pain*, part II (Sackler the central figure); "Dr. Romagosa on Symposium in Toronto," Lafayette *Daily Advertiser*, Aug. 19, 2021, p. 89, https://www.newspapers.com/image/538488685/ (350 delegates, "interesting exchange"); *Advances in the Management of Chronic Pain: The International Symposium on Pain Control: Toronto, Canada*, ed. P.R. Band, J.H. Stewart, and R.T. Towson (Toronto: Purdue Frederick, 1986), pp. 3 ("guided"), 35-37 (Graz, "severe"), 113-118, 127-130 (postoperative uses). Purdue

The question was why. Dr. Beubler attributed the neglect to "exaggerated fears" of complications, such as respiratory depression or addiction. Tolerance, he said, rarely occurred when morphine was administered orally. Physical dependence did occur in patients taking opioids long-term, and it was this effect, often labeled "addiction," that engendered most of the prejudice against morphine. However, he explained, "addiction really evolved out of psychological dependence (a craving for the drug's psychic effects) associated with street abuse of narcotics. Addiction does not occur in patients requiring morphine for pain control."[130]

Dr. Beubler cited as authority for the last claim Porter and Jick's 1980 letter, whose findings derived from hospitalized patients who received, in varying dosages and at varying intervals, assorted narcotic and narcotic-compound drugs, not just morphine. As for physical dependence, Dr. Beubler asserted that "patients given morphine, particularly oral morphine, for the relief of pain may be withdrawn easily and completely, provided this is done gradually." He concluded by reminding the audience that oral morphine was now available in a convenient extended-release formulation, which had been introduced by Napp in Britain and by Mundipharma (another Sackler enterprise) in Austria. Purdue Frederick, he said, would soon be marketing the drug in the United States and Canada.[131]

Dr. Beubler's and other conferees' remarks appeared in a 1986 paperback book, *Advances in the Management of Chronic Pain: The International Symposium on Pain Control:*

---

Frederick's financial support and "behind the scenes" services are further acknowledged on p. 149.

[130] *Advances in the Management of Chronic Pain*, ed. Band et al., 35-36.

[131] Ibid., 36 (quotation), 37.

*Toronto, Canada*, published and copyrighted by Purdue Frederick. The first editor, Dr. Pierre R. Band, was affiliated with the British Columbia Cancer Control Agency; the second and third editors, John H. Stewart and Dr. R. T. Towson, were Purdue employees. Dr. Gordon M. Wyant, a pain management specialist who reviewed the publication, wrote that the book showed "a deplorable bias toward morphine and its derivatives." Though clinically valuable, opioids were by no means the only treatments for chronic pain. "The lopsided emphasis on morphine is easily explained by the symposium's sponsorship by a pharmaceutical manufacturer specializing in an oral morphine preparation," he observed, adding that absence of a price implied that the book was "destined for free commercial distribution to interested parties."[132]

---

[132] Gordon M. Wyant, review of *Advances in the Management of Chronic Pain,* in *Canadian Medical Association Journal* 137 (1987): 138-139, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1492641/pdf/cmaj00146-0050b.pdf. The book's editors replied to Wyant's negative review by reiterating that oral morphine was "highly effective in controlling severe cancer pain and … does not result in addiction, euphoria or rapid tolerance." Pierre R. Band, John H. Stewart, R.T. Towson, "*Advances in the Management of Chronic Pain*," letter in Canadian Medical Association Journal 137 (1987): 700-701, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1267299/pdf/cmaj00152-0014c.pdf. The same letter establishes that Stewart and Dr. Towson worked for Purdue; Stewart headed research and development at Purdue's Canadian division in the early 1980s, according to Grant Robertson, "OxyContin Creator Expands into Canadian Pot Industry," *Globe and Mail*, December 2, 2016, https://www.theglobeandmail.com/news/national/leadership-behind-canadian-medical-marijuana-company-has-an-oxycontin-past/article33200287/.
    Dr. Jerome Romagosa, who attended the conference, embraced the pro-opioid messaging that Dr. Wyant criticized. "Morphine is the safest and best drug for the control of severe, chronic pain," Dr. Romagosa told readers of his newspaper column. "That statement was echoed repeatedly by delegates from all over the world" at the Toronto conference. The emphasis was necessary to "counteract numerous myths that have come to surround opium derivatives, especially morphine." Among these myths were the fear of addiction in patients experiencing severe pain; the fear of tolerance, which arose from "more pain" rather than drug itself; and the fear of giving too much, when in fact "[m]orphine dosage has no ceiling." "Morphine Safest to Control Pain," Lafayette *Daily Advertiser*, February 17, 1985, p. 81, https://www.newspapers.com/newspage/539245332/.

In 1989, a year in which affirmational citations of Porter and Jick increased tenfold over 1988, Raven Press published the proceedings of "perhaps the most unusual conference on pain ever held." Convened at Houston's M.D. Anderson Cancer Center in March 1988, the conferees' papers appeared as *Advances in Pain Research and Therapy,* vol. 11: *Drug Treatment of Cancer Pain in a Drug-Oriented Society*. The editors, Drs. C. Stratton Hill, Jr., director of M.D. Anderson's Pain Service, and William S. Fields, also of M.D. Anderson, acknowledged Purdue's indispensable assistance. "First and foremost we thank Richard Sackler, M.D., senior vice president, and Paul Goldenheim, M.D., vice president and medical director, of the Purdue Frederick Company for their enthusiastic support, both conceptually and financially," they wrote. "Without this support the conference would not have been possible."[133]

The Houston conference papers and book advanced more than cancer-pain treatment. They advanced opioid revisionism across the board, and did so more forcefully than at the 1984 Toronto conference. Authored by a *Who's Who* of early revisionists, the contributions provided much of the vocabulary and many of the arguments that became staples of opioid promotional campaigns. Those campaigns would be orchestrated by Purdue, which had sponsored the proceedings, but also by rival opioid manufacturers such as Johnson & Johnson (J & J), Endo, and Cephalon and by pharmaceutical firms operating throughout the supply chain. It is therefore important to examine the key revisionist claims set forth at this seminal 1988 conference.

---

[133] *Advances in Pain Research and Therapy*, ed. Hill and Fields, pp. v ("unusual," per Dr. Louis Lasagna) and ix (Purdue support). Citation increase: Pamela T.M. Leung et al., "A 1980 Letter on the Risk of Opioid Addiction," *New England Journal of Medicine* 376 (2017): 2194-2195, fig. 1, https://www.nejm.org/doi/full/10.1056/NEJMc1700150.

A good place to begin is with the work of Dr. John P. Morgan, who coined the phrase "opiophobia." Dr. Morgan broached the concept (originally dubbed "narcophobia" but changed to avoid confusion with "fear of sleep") at a 1981 conference on prescription drugs financed by McNeil Pharmaceutical, Ortho Pharmaceutical, and several other drug manufacturers. The paper found in a wider audience in 1983, as a chapter in an anthology that Dr. Morgan co-edited. Dr. Morgan's work appeared twice in the 1988 Houston conference proceedings, where he published a short paper on the undertreatment of postoperative pain and republished "American Opiophobia: Customary Underutilization of Opioid Analgesics." The last was an extended version of the 1983 chapter, and its republication was unusual in two respects. The long-format version had already appeared in print, twice. And Dr. Morgan, a professor of pharmacology, was primarily concerned with the undertreatment of acute pain. Nonetheless, his skepticism of drug restrictions (he was also a prominent drug-war critic); his interpretation of a small (n=60) 1979 survey of New York City physicians; the Porter and Jick letter; and Drs. Foley and Kanner's report of minimally inappropriate use of opioids among cancer patients led him to a more sweeping conclusion. Dr. Morgan thought that narcotic conservatism was an irrational but professionally reinforced phobia about addiction.[134]

---

[134] John P. Morgan and David L. Pleet, "Opiophobia in the United States: The Undertreatment of Severe Pain," *Society and Medication: Conflicting Signs for Prescribers and Patients*, ed. John P. Morgan and Doreen V. Kagan (Lexington, Mass.: D.C. Heath, 1983), 313-318, "narcophobia" p. 313, with 1981 conference information and pharmaceutical sponsors on pp. xvi-xvii. Dr. Morgan's Houston version, "American Opiophobia: Customary Underutilization of Opioid Analgesics," *Advances in Pain Research and Therapy*, ed. Hill and Fields, 181-189, had previously appeared as an article in *Advances in Alcohol and Substance Abuse* 5, nos. 1-2 (Fall 1985-1986) and in a book version of the same journal, *Controversies in Alcoholism and Substance Abuse*, ed. Barry Stimmel (New York: Haworth Press, 1986), 163-173. (Dr. Stimmel also addressed the Houston conference.) Dr. Morgan's background is described in "In

The heart of the problem, Dr. Morgan wrote, was physicians' inability to distinguish between physical dependence, which formed readily, and addiction, which formed rarely. Only 15 percent of the survey respondents knew "that all humans treated with opioids even briefly (greater than 48 hr [sic]) will develop physical dependence, manifest by a mild and clinically unimportant flulike syndrome on [sic] abstinence. Since most of our respondents do not know this, they probably cannot distinguish between 'physical dependence' and 'addiction.'" The latter condition, addiction, "has only social determinants:"

> It refers to a life in which drug use has become paramount. Addicted humans sacrifice to their drug and its use a large measure of what the larger culture holds dear; e.g., resources, savings, family respect, sexual activity, noncriminal status, joy of eating, health, and even life itself. This commitment and ability to give over life to a drug is rare and unusual, and even those characterized as addicts spend much of their time as nonaddicts; most who survive become nonaddicts again. Physical dependence is usually part of addiction to opioids, but it does little to explain opioid abuse; and physical dependence is not even necessary for addiction to nonopioids such as cocaine.
>
> Physical dependence is something that happens to individuals who use or are given opioids appropriately. It is best compared with becoming wet by entering the water. However, entering the water and getting wet both precede, for example, swimming the English Channel. Few swimmers, although wet, proceed to that involvement. Few users of opioids, although physically dependent, proceed to addiction. It is a rare individual

Memoriam: Dr. John P. Morgan," StoptheDrugWar.org, February 21, 2008, https://stopthedrugwar.org/chronicle/2008/feb/21/memoriam_dr_john_p_morgan.

who will proceed from drug use as an incidental event in life to drug use as the cardinal event in life.[135]

That opioid withdrawal was clinically insignificant, and that medical addicts were as innumerous as English Channel swimmers, would have come as news to late-nineteenth-century physicians who bore witness to the first great epidemic. That addiction was a bizarre abnormality, rather than a common if individually variable consequence of exposure, would not have occurred to mid-century regulators. (Certainly not to Anslinger, who observed that far more drug-exposed physicians and nurses became addicts than lawyers, yet nobody thought lawyers collectively more virtuous or stable than medical personnel.) That addiction was purely a social construct would have been disputed by NIDA-funded neuroscientists who, in the late 1970s and early 1980s, delineated brain-reward pathways distinct from the anatomical pathways responsible for withdrawal symptoms. These reward pathways became pathologically disordered through long-term exposure to drugs; consequently, the criteria for diagnosing addiction shifted from physical dependence and toward compulsion, craving, and anhedonia triggered by long-term brain changes. That was why, as Dr. Morgan correctly observed, cocaine could addict without producing physical withdrawal symptoms like those produced by opioids.[136]

Morgan's views on minimal risk, counterproductive regulation, and the need to push the issue beyond cancer pain surfaced often in the proceedings. In "The 'Decriminalization' of

---

[135] Morgan, "American Ophiophobia," quotations pp. 187-188.

[136] David T. Courtwright, *Forces of Habit: Drugs and the Making of the Modern World* (Cambridge, Mass.: Harvard University Press, 2001), 95 (Anslinger); Teresa Pollin and Jack Durell, "Bill Pollin Era at NIDA (1979-1985)," *Drug and Alcohol Dependence* 107 (2010): 89-90 (reward pathways).

Cancer Pain," Dr. Foley revisited Porter and Jick to suggest "that the medical use of opioids is

rarely associated with the development of addiction." These words closely paraphrased her 1986

article with Dr. Portenoy, which she listed as first among "several recent studies [that] described

the use of chronic opioid therapy in patients with nonmalignant pain and reported that their

effective use is not associated with psychological dependence."[137]

Dr. Louis Lasagna—a renowned clinical pharmacologist, longtime friend to Sackler

family patriarch Dr. Arthur Sackler, and dean of the eponymous Sackler School of Graduate

Biomedical Sciences at Tufts University—was likewise familiar with the concept of

ophiophobia. He had published in *JAMA* a favorable review of the aforementioned 1983

anthology that Dr. Morgan had co-edited and in which Dr. Morgan had presented his

ophiophobia thesis in print. Indeed, Dr. Morgan, a former colleague for whom Dr. Lasagna had

written letters of recommendation for academic posts, had dedicated the anthology to "Louis

Lasagna, M.D., mentor, friend, and all-around guiding light."[138]

---

[137] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 8 (Foley).

[138] Friendship: Keefe, *Empire of Pain*, 133. Dr. Lasagna's review of Dr. Morgan's anthology: *JAMA* 250 (1983): 3343. Recommendation letters for Dr. Morgan: Box 30, folder 1, Louis C. Lasagna Papers, hereafter LCLP, Special Collections, River Campus Libraries, University of Rochester, Rochester, N.Y. Dedication: *Society and Medication*, ed. Morgan and Kagan, p. v. In 1983 Dr. Lasagna also agreed to write the introduction to *One Man and Medicine*, a collection of Dr. Arthur Sackler's writings in the *Medical Tribune*, which Dr. Sackler published and in which Purdue Frederick and pharmaceutical clients of the Sackler-owned William Douglas McAdams advertising agency frequently placed ads. *One Man and Medicine* was "conceived as a surprise seventieth birthday gift for Arthur from his children," and was also intended "to be used as a promotional item" for Medical and Science Communications Development Corporation. The corporation was a holding company that owned *Medical Tribune* and several other periodicals, and in which Dr. Arthur Sackler was a shareholder. Quotations: Stuart I. Frolick to Louis Lasagna, September 7, 1983, box 24, folder 25, LCLP. Dr. Arthur Sackler and *Medical Tribune*: Keefe*, Empire of Pain*, 59-60, 65, 112, 122, and Joseph Gennis to John Adriani et al., May 10, 1962, https://drc.uc.edu/bitstream/handle/2374.UC/700386/mteaboar_1960-

Dr. Lasagna wrote the foreword to the Houston conference proceedings and contributed his own paper on undertreatment and overregulation, both of which he thought rooted in exaggerated concern for medical addiction. "Regulation of the prescribing of narcotics," Lasagna wrote, "has suffered from not appreciating the distinction between drug abusers and patients with a legitimate medical need for pain relief." Rigid DEA quotas sometimes produced shortages of drugs like hydromorphone. DEA paperwork was excessive and wasteful, as were state requirements that physicians fill out triple-prescription blanks. Narcotic conservatism had become narcotic paranoia. Dr. Lasagna had heard stories of night-shift nurses "spending hours trying to track down one 'lost' dose of a narcotic." FDA processing of NDAs—new drug applications—was similarly burdensome. Administrators were too concerned with the need for placebo controls, too insistent on toxicity testing in the pre-clinical stage, and too focused on "herd response" in evaluating clinical trials. Whatever their average group effects, new analgesics might suit subsets of patients who received tailored medical care. Physicians needed to avail themselves of such opportunities. Regulators needed to cease imposing "silly" and "simple-minded" controls aimed at cutting down diversion and abuse.[139]

Dr. Lasagna's equation of underuse and exaggerated fears was reiterated by Dr. Ray Houde in "Misinformation: Side Effects and Drug Interactions," another paper that cited Porter

---

63_034.pdf?sequence=1. Other correspondence in LCLP confirms the cordial relationship, e.g., Arthur Sackler to Louis Lasagna, June 21, 1980, box 8, folder 7, and Jill Sackler to Louis Lasagna, June 7, 1986, and enclosed photograph, box 10, folder 3. Dr. Lasagna's introduction, which lauds Dr. Arthur Sackler as "a modern Renaissance man," appears in Arthur M. Sackler, *One Man and Medicine: Selected Weekly Columns from the International Medical Tribune (1972-1983)*, ed. Joy Hurwitz (New York: Medical Tribune, Inc., 1983), 11-12, quotation p. 12.

[139] *Advances in Pain Research and Therapy*, ed. Hill and Fields, vi, 236-238 (quotations).

and Jick. Drs. Houde and Lasagna had known one another for thirty years, and Dr. Lasagna had also written in support of Dr. Houde's academic promotion. In this small world Dr. Houde had helped to train Dr. Foley, with whom he collaborated on several articles. (Dr. Robert Kaiko, who had played a key role in the development of MS Contin and would play a similar role in the development of OxyContin, likewise co-authored several articles with Drs. Houde and Foley.) In 1981, as her own career was flowering, Dr. Foley also become associated with Dr. Hill, who had invited her to speak at an earlier Houston conference. Dr. Hill became an ally and booster. "You get on the phone over there to Kathy Foley at Memorial," he told a former colleague at the American Cancer Society, "and tell her to write you a chapter on pain."[140]

The M.D. Anderson conference was as much a reunion as a meeting. Its financial backers and organizers assembled, not just revisionists, but a maturing revisionist network of like-minded practitioners and researchers who knew, trusted, supported, and, in several cases, trained one another. Ultimately, the lines of influence traced back to Dr. Bonica, whom Dr. Hill, a friend and respected ally, had invited to the meeting. Though conflicts prevented Dr. Bonica from attending, he was acknowledged—correctly—in the proceedings for his decades of leadership and "untiring efforts" in the chronic pain field. Among those efforts was the revision of

---

[140] Houde, "Misinformation," Ibid., 145-161. Dr. Lasagna's recommendation letter for Dr. Houde (to Paul Sherlock, January 5, 1982) and Dr. Houde's c.v., pp. 10-13, listing his co-authored papers publications with Drs. Foley, Kaiko, and others are in box 26, folder 25. LCLP. Impact of Dr. Houde and others on Dr. Foley: Dr. Mitchell Max Oral History, 7. (Dr. Max, who moderated the closing panel at the 1988 Houston conference, said that his own early career was shaped by Dr. Houde as well as by Dr. Foley, p. 8.) Kaiko, MS Contin, and OxyContin: Keefe, *Empire of Pain*, 175, 178, 180-181, 216-217, 242. Hill quotation: C. Stratton Hill oral history interview with Tacey [sic] A. Rosolowski, February 17, 2012, chpt. 8, "The Problem of Pain Management in the 70s and 80s," https://mdanderson.contentdm.oclc.org/digital/collection/p16333coll1/id/943/rec/26.

*Management of Pain*, on which Dr. Bonica labored during 1988, despite undergoing his fourth back surgery, a legacy of his youthful wrestling career. "John Bonica's influence is fantastic, you know," Dr. Houde recalled. "He was a real, a real pusher, you know. He really got things done." Though his academic heirs were more aggressive in extending opioid analgesia beyond cancer pain, Dr. Bonica was the patriarch of revisionist genealogy.[141]

Dr. Bonica frankly acknowledged the relationship in his correspondence with Dr. Foley. "I have looked at you as one of my daughters," he wrote to her in 1988. He spoke of their "many favorable interactions and my repeated efforts to help you and your colleagues when I was asked to or was in a position to make a favorable decision." (On occasion he helped mutual allies, acknowledging in another letter that he "gave a plug to Purdue Frederick" after Dr. Foley shared information during a 1987 New York meeting.) Dr. Bonica's prestige, manifest through the assembly of many colleagues and protégés who had become academic stars themselves, amplified the Houston conference's critique of narcotic conservatism—a critique that appeared, in the proceedings, as an assured and progressive consensus view. "[T]his was a very heavyweight faculty that we had for this conference," Dr. Hill recalled in a 2012 oral history

---

[141] Hill-Bonica relationship and 1988 meeting invitation: Letters of July 1, 1983, December 28, 1984, January 25, 1985, February 25, 1985, and January 13, 1988, all box 3, folder 79, "Hill, C. Stratton, 1983-1988," JJBP. "Untiring efforts": "Introduction," *Advances in Pain Research and Therapy*, ed. Hill and Fields, xi. "Fantastic": Oral History Interview with Raymond W. Houde (recorded 2003, transcribed 2013), interviewer Marcia L. Meldrum, p. 113, Ms. Col. No. 127.16, John C. Liebeskind History of Pain Collection, History and Special Collections for the Sciences, Library Special Collections, Louise M. Darling Biomedical Library, University of California at Los Angeles.

interview, "and this was the first time we really tried to put everything together in terms of what impacted the treatment of pain."[142]

Another member of the network was Dr. Ronald Kanner. One of Dr. Foley's Memorial Sloan-Kettering fellows and co-authors, Dr. Kanner had subsequently set Dr. Portenoy on the pain-career path that led to his fellowship and fateful collaboration with Dr. Foley. In Houston Dr. Kanner and Ellen S. Cooper, both affiliated with New York's Montefiore Medical Center, addressed the availability of narcotic analgesics for ambulatory pain patients. Their survey research, supported by the opioid manufacturer Roxane Laboratories and the National Association of Retail Druggists, showed that pharmacists who failed to stock narcotic analgesics did so mainly out of lack of prescription demand. (Other reasons included fears of robbery and addiction, trouble obtaining medications from wholesalers, and—the concern least frequently mentioned—low profit margins.) If narcotics-shy physicians undertreated hospitalized patients' pain, they were doing the same with outpatients. Even when they wrote outpatient prescriptions, patients could have a hard time filling them. Dr. Kanner and Cooper thought that if doctors became better acquainted with the range of available narcotic analgesics and "the extremely low incidence of psychological dependence in patients treated for pain [reference: Porter and Jick], they may become less hesitant to prescribe adequate doses of appropriate medications." Other fixes included better security for pharmacists, so that they might begin stockpiling narcotics, and

---

[142] Letters: John J. Bonica to Kathleen Foley, December 16, 1988 ("daughter"), and John J. Bonica to Kathleen Foley, November 24, 1987 ("plug"), correspondence files, box 2, folder 137, JJBP. "Heavyweight": Hill oral history interview. Dr. Bonica's "daughter" and "help" comments were in the context of an after-everything-I've-done-for-you rebuke to Dr. Foley for making a programming change in an international symposium without his knowledge or approval. Dr. Bonica was letting off steam. The breach did not last, as is evident in Dr. Bonica's warmly congratulatory letter to Dr. Foley of May 24, 1990, also box 2, folder 137, JJBP.

reform of federal regulations that discouraged ethical physicians from prescribing and hospital pharmacies from providing narcotics to outpatients.[143]

Regulatory reform was on the minds of two Washington, D.C., attorneys, Robert T. Angarola and Susan D. Wray, whose paper addressed "Legal Impediments to Cancer Pain Treatment." In the 1970s Angarola had been a White House drug-policy adviser who, as mentioned, praised the reduction of barbiturate, tranquilizer, and amphetamine overprescribing. Now in private practice, serving as counsel to J & J in opioid related-matters, Angarola was of a different mind about opioid prescribing. He thought there was too little of it, especially in cases of cancer.[144]

---

[143] "Availability of Narcotic Analgesics for Ambulatory Patients with Pain." *Advances in Pain Research and Therapy*, ed. Hill and Fields 191-195, quotation p. 194. Kanner, Portenoy, and Foley: Oral History Interview with Russell K. Portenoy, pp. 7-8. "Ron is so dynamic and so interested and so supportive and collaborative that he and I started to do some things together. I began to give some lectures." Dr. Portenoy recalled. "In 1982, while I was still only a second-year resident, he dragged me to go to the American Pain Society meeting" (p. 8). Cooper: The conference proceedings state (p. xvii) that she was affiliated with Montefiore's Unified Pain Service, but it is not clear from the text that she was trained as a physician.

[144] Angarola had grappled with opium-supply and terminal-pain issues in the Carter White House, where he had served as liaison to an interagency committee investigating new approaches to alleviating intractable pain in dying patients. He entered private legal practice in 1981, joining Hyman, Phelps & McNamara, a Washington, D.C., firm specializing in food and drug regulation. When Angarola began representing J & J is uncertain. By 1986, however, he was on the brief for the intervenor, McNeil Pharmaceutical (a J & J subsidiary), in *Reckitt & Colman, Ltd*. v. *Administrator, Drug Enforcement Admin*., 788 F.2d 22. See also "Interview with Bob Angarola," 8-10, and U.S. Department of Health, Education, and Welfare, "The Interagency Committee on New Therapies for Pain and Discomfort: Report to the White House" (TS, May 1979), p. II-2, https://www.google.com/books/edition/The_Interagency_Committee_on_New_Therapi/FAOFAAAAIAAJ?hl. "Robert T. Angarola Dies," *Washington Post*, March 5, 1996, https://www.washingtonpost.com/archive/local/1996/03/05/robert-t-angarola-dies/81e1d705-2c5a-4209-b105-5ebf1097fa73/, adds that Angarola also became active in such industry-financed, pro-opioid groups as the American Pain Society (APS).

At first glance, the data Angarola and Wray cited failed to support this claim. In 1988 Americans already exceeded most other industrialized nations (including Australia, France, Canada, the Netherlands, Germany, Austria, and Japan) in per capita consumption of medicinal narcotics, to say nothing of developing nations like Egypt and Mexico. This was to be explained, however, by the fact that other countries were even more opiophobic than the United States. "There is ample evidence," Angarola and Wray wrote, "to suggest that, worldwide, narcotics are underused for the treatment of pain and suffering."[145]

These failures in an otherwise well-endowed U.S. health care system were due to excessive anxiety about abuse and addiction. This reluctance was exacerbated by red tape, notably triplicate-prescription laws, such as the one in Texas that required physicians to purchase, fill out, retain, and file with regulators state-issued prescription forms for Schedule II narcotics. Finally, Angarola and Wray blamed the confusion between physical dependence and the rare, "abnormal" event of addiction. They quoted, with emphasis, an assertion from a cancer pain management handbook that addiction "*occurs with a frequency of less than 1:1000 in patients who receive opioids for pain control*"—a further simplification of Porter and Jick's 1980 report that 4 of 11,882 patients with no prior addiction history had developed addictions as a result of receiving some form of narcotic medication during their hospital stays.[146]

---

[145] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 224.

[146] Ibid., 218-219 (Texas forms), 222 ("abnormal," "1:1000"). Angarola and Wray's source, D.E. Weissman et al., *Handbook of Cancer Pain Management* (Madison, Wisconsin: University of Wisconsin Medical School, 1988), did not use footnotes and hence did not cite Porter and Jick directly. However, the *Handbook*'s authors prepared a brief list of references featuring works by industry-supported organizations and researchers, including Drs. Foley and Portenoy, who had incorporated Porter and Jick's findings. The *Handbook* also conflated malignant and nonmalignant pain, e.g., "Patients and their families should be counseled about the rarity of

Angarola and Wray wanted to "shift the focus from the aberrants, the minuscule number of people who abuse narcotic drugs, to the millions of people in both the developed and developing world who have a medical need for opiates, especially to cancer patients in pain." What was needed was mobilization to achieve a better balance between the risk of abuse and essential use. "We should encourage patients, patients' families, health professionals, and national and international agencies to demand the proper use of opiates. The goal must be to eliminate legal impediments if they exist and to educate health care professionals to provide and patients to expect adequate amounts of pain medication."[147]

David E. Joranson, MSSW, and Dr. June L. Dahl, Ph.D., members of the University of Wisconsin's Pain Research Group, shared these views. In "Achieving Balance in Drug Policy," Joranson and Dr. Dahl described the status quo as anything but balanced. They criticized multiple-prescription laws, again singling out host-state Texas, which had launched its triplicate-prescription program in 1981 and which had substantially reduced per capita consumption of

---

addiction when opioids are prescribed for *legitimate medical indications*" (p. 13, emphasis added). The *Handbook*'s first author, Dr. Weissman, eventually became a top Purdue speaker (PPLPC025000004774), as did one of his co-authors, Dr. June Dahl, who is discussed below.

[147] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 229. Why people who were more susceptible to addiction because they suffered from such conditions as anxiety or bipolar disorder should be labeled as "aberrants" is unclear.
 Angarola repeated many of these points in a solo-authored paper, "Availability and Regulation of Opioid Analgesics," *Advances in Pain Research and Therapy*, vol. 16: *Proceedings of the Second International Congress on Cancer Pain*, ed. Kathleen M. Foley et al. (New York: Raven Press, 1990): 513-524. The Congress convened at Memorial Sloan-Kettering Cancer Center on July 14-17, 1988 (p. v). The proceedings editors, which included Dr. Bonica as well as Dr. Foley, expressed "particular gratitude to Raymond and Richard Sackler, Paul Goldenheim, and Robert Kaiko who participated and contributed every step of the way from initial program conception and development to providing the financial foundation for the meeting" (p. vii). Other pharmaceutical companies, including Knoll, Roxane, McNeil, Mallinckrodt, and Janssen Pharmaceutica, also supported the undertaking (pp. vii-viii).

hydromorphone, oxycodone, and morphine. That the DEA attributed such declines to fewer

incidents of diversion, and that it had received no significant complaints that the declines had

adversely reflected patient care, could itself be explained as a function of ingrained opiophobia:

> Any evaluation of the effects of additional regulation of opioids should recognize that
>
> cancer pain is already seriously undertreated; that schedule II opioids, the mainstay of
>
> therapy for severe cancer pain, are underprescribed for this purpose; that some physicians
>
> tend to be opiophobic, are not well trained in pain management, and are overly concerned
>
> about addiction; and that the public and patients have fearful attitudes about opioids and
>
> addiction. It is not surprising that there are few complaints when new laws are passed
>
> restricting use of controlled substances in the name of controlling drug abuse.

The possibility, Joranson and Dr. Dahl concluded, "that patients are not receiving adequate pain

relief is not a matter that can be dismissed for lack of complaints." Doctors should not be walled

in by regulations. The war on drugs—then at its zenith—should not be allowed to impede their

ongoing war on disease, pain, and suffering.[148]

---

[148] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 202. Joranson's views and
pharmaceutical funding are discussed in detail below. Dr. Dahl, a professor of pharmacology at
the University of Wisconsin, was also a prominent revisionist and, by 1999, one of Purdue's top
speakers (PPLPC025000004770). In 2006 and 2007 she participated in another industry-funded
conference and report, *The Politics of Pain: Balancing Vigilance and Compassion: Report of the
Texas Pain Summit: Improving Pain Care in Texas, 2007*, ii, 33, 35,
https://www.michigan.gov/documents/mdch/PoliticsofPain2007TXPI_211302_7.pdf. The 2007
report (p. iv) credits "generous financial support" from Cephalon, Endo, and Purdue Pharma as
well as the Alliance of State Pain Initiatives and the Lance Armstrong Foundation, both of which
would also receive Purdue grants. (PPLPC012000292676 and PPLPC012000292686, online at
https://www.mass.gov/files/documents/2019/07/17/_12%20Affidavit%20of%20Robert%20Cord
y%20Exhibits%20046-060%20filed%2007-16-2019.pdf.) In 2014 Dahl, who remained an active
professor at age eighty-four, qualified her revisionism: "It appears that the promotion of better
pain management has led to more liberalization of the prescribing of opioids, which has led to an

The editors of the conference proceedings, Drs. Hill and Fields, concluded with a call for action. They appealed to state regulatory boards to make it easier for physicians to prescribe narcotics for pain patients with malignant *and* nonmalignant conditions. The latter could, with the help of opioids, be restored to "normal, or near-normal" functionality. The tenor and the recommendations of the conference and its published proceedings were thus openly revisionist. Editors and contributors charged that pain was widely undertreated because of internal professional taboos against prescribing opioids and external oversight that made it difficult to do so. They challenged the bedrock assumption of narcotic conservatism, that the risks of Schedule II narcotics in treating CNP far outweighed the benefits.[149]

Neither the conference title, "Drug Treatment of Cancer Pain in a Drug-Oriented Society: Adequate or Inadequate?" nor the abbreviated proceedings subtitle, *Drug Treatment of Cancer Pain in a Drug-Oriented Society*, hinted at the scope of the reform agenda. Yet the stated focus, cancer pain, had obvious advantages. Cancer patients were sympathetic. Arguments that some of them would benefit from freer, better-informed use of narcotic analgesia were credible. And the cancer focus drew attention from potential side effects from long-term opiate use other than addiction. Among these were chronic constipation, dizziness, endocrine disorders, falls, cognitive decline, immune suppression, respiratory depression, accidental overdoses, and hyperalgesia and hyperesthesia, or increased sensitivity to pain and pain from sensual stimuli like noise. These issues received scant attention at the 1988 Houston conference, in comparison to

---

increase in the availability of the drugs, which has led to some people abusing them, and then, when they can't get pills, to heroin as criminals promoted it." McBride, "UW Madison."

[149] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 360.

regulation and the risk of abuse and addiction. The consensus being that both had been overdone,

the case for looser regulation and increased prescribing stood affirmed.[150]

There was, however, one strong dissent. It came from attorney Gene R. Haislip, director

of the DEA's Office of Diversion Control and the conference's token regulator. Diversion of

---

[150] That one revisionist objective, looser regulation, was closely linked to the other, increased prescribing, was subsequently demonstrated by qualitative and quantitative studies. In early 1995, before the FDA approved OxyContin, Purdue used focus groups in New Jersey, Connecticut, and Texas to explore the willingness of physicians to prescribe its new product for CNP. Doctors in states with triplicate-prescription laws were reluctant to do so, citing the trouble and scrutiny that prescribing Schedule II narcotics in such cases would bring. A 2019 National Bureau of Economic Research analysis confirmed that "triplicate states" had 50 percent fewer OxyContin prescriptions per capita after its 1996 launch, as well as fewer opioid overdose deaths thereafter. R. Winston to [Mark] Alfonso, April 13, 1995, and attached focus-group study of March 8, 1995, p. 3, OXY08221, https://www.scribd.com/document/440306799/Purdue-focus-group-documents?secret_password=0jVgiWk1VXSR2dnIVqb4; Abby E. Alpert et al., "Origins of the Opioid Crisis and Its Enduring Impacts," NBER Working Paper No. 26500 (November 2019), https://www.nber.org/papers/w26500.pdf.

As revisionism gained momentum, there was less need for need for a better-treatment-of-cancer-pain cover. "[P]revious symposia which we have organized around controlled-release oral morphine have focussed [sic] on its use and evaluations primarily in cancer-related pain,' Dr. Kaiko wrote to Dr. Bonica in early 1992. "Having now completed a number of studies in other painful indications, we would now like to organize a national controlled-release oral morphine symposium, much wider in scope than previous meetings." Dr. Kaiko envisioned a conference with papers on oral morphine for specific conditions like "sickle cell crisis pain" and, more broadly, "chronic non-malignant pain syndromes." Would Dr. Bonica chair and assist in the organization of national pain symposium in1993? Dr. Bonica replied that he would be pleased to do so. Robert Kaiko to John J. Bonica, January 9, 1992 (quotations); Robert Kaiko to Donna Rowe, April 23, 1992; and John J. Bonica to Robert Kaiko, July 29, 1992, all in correspondence files, box 68, folder 28, "Purdue Frederick Co.," 1985-1992, JJBP.

For descriptions and discussions of opioid-therapy side effects other than addiction see Art Van Zee, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy," *American Journal of Public Health* 99 (2009): 221-227; Mitchell H. Katz, "Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith," *Archives of Internal Medicine* 170 (2010): 1422-1433; Fredrick Von Stieff, *Brain in Balance: Understanding the Genetics and Neurochemistry Behind Addiction and Sobriety* (San Francisco: Canyon Hill, 2011), 166; and Erin E. Krebs et al., "Effect of Opioid vs Nonopioid Medications on Pain-Related Functions in Patients with Chronic Back Pain or Hip or Knee Osteoarthritis Pain: The SPACE Randomized Clinical Trial," *JAMA* 319 (2018): 872-882.

legitimately manufactured drugs had diminished since the early 1980s, Haislip noted. But it remained a serious worry. Diverted drugs were typically purer and stronger than street drugs, and much more expensive. A 4 mg tablet of hydromorphone that costs pennies to make sold to a bona fide patient for 60 cents. On the street, the same pill sold for $50 or $60. A patient walking around with a legitimate prescription thus had "a thousand or more dollars of potential illicit drug profits in his or her pocket."[151]

Haislip acknowledged that manufacturers and distributors had once been the principal sources of diversion, a claim for which there is also historical evidence. In the 1920s black-market narcotic buyers sometimes found that their purchases still bore the original factory packaging. Purchasing drugs from overseas manufacturers and smuggling them into the United States was a common underworld gambit. And we have seen that wholesalers sometimes oversupplied doctors who resold morphine at inflated prices. But a combination of international treaties, particularly the 1931 Convention for Limiting the Manufacture and Regulating the Distribution of Narcotic Drugs; preemptive moves against the overproduction and overpromotion of synthetic and semi-synthetic narcotics; and sustained law enforcement had helped contain diversion from manufacturers and distributors, at least for opiates in the U.S. market.[152]

In the 1980s, Haislip continued, most leakage involved doctors and pharmacists who connived with one another as well as buyers. Though a small percentage of their respective

---

[151] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 205-206, quotation p. 206.

[152] Ibid., 206; Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*, 181, 184 (manufacturers' packaging); McAllister, *Drug Diplomacy in the Twentieth Century*, Part II (treaties).

professions, they were sufficiently numerous to represent a significant problem unless checked by law enforcement. Licit drug policy was only as sound as its control of medical and pharmaceutical outliers. Despite this danger, authorities had not "criminalized" cancer pain. The law and the DEA specifically recognized the need to provide adequate pain relief for cancer patients. There were risks: Medication intended for cancer patients could always be stolen. Yet the balance was "clearly in favor of the medical needs of terminally ill patients."[153]

Haislip stressed that the DEA and its state counterparts were no longer as focused on narcotics as they had been in Anslinger's era. The laws and regulations they oversaw were now concerned with the oversupply and diversion of an array of controlled substances. Dope doctors had expanded their portfolios. But drug companies were also to blame, insofar as they overpromoted dangerous products in the first place:

> Overuse has been very well documented for certain drugs, particularly the stimulants methamphetamine and amphetamine, given in the so-called fat clinics, and the benzodiazepines, most notably diazepam, overprescribed in the 1950s and 1960s. I could cite other cases in which, in my opinion, the medical community has shown a marked tendency to overuse drugs to treat problems for which they were not designed and against which they could never be effective. I think such use is, to some extent, propelled by marketing forces. Indeed, it has never been clear to me who prescribes drugs in our country, the physicians or the drug company representatives who explain what a drug can do and how it should be prescribed, based on the determinations of the company that

---

[153] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 206.

markets the drug. In other words, overuse may sometimes be propelled by nonmedical marketing forces.[154]

Haislip's singling out of diazepam at a conference sponsored by Purdue Frederick catches the eye. The late Dr. Arthur Sackler (1913-1987)—who, with his physician-brothers Mortimer and Raymond, had purchased Purdue Frederick in 1952—pioneered modern medical advertising. His most notable success had been for Roche's Librium and Valium, benzodiazepines initially cast as "emotional aspirin" for relief of stress and anxiety that became blockbuster drugs in the 1960s and 1970s. Roche advertised heavily, and used its sales force to distribute thousands of complimentary books to physicians that cast its benzodiazepine- and methyprylon-based drugs as safe alternatives to barbiturates and narcotics for anxiety, insomnia, and other common complaints. While opiates were sometimes prescribed for pain-induced sleeplessness, noted Roche's *The Anatomy of Sleep* (1966), "the addiction potential of narcotics is well recognized in our century, as it was not always in the past." Just so. After 1975, the same fate befell Librium and Valium, whose dangers Haislip evoked when he criticized the multi-indicial marketing of psychoactive drugs.[155]

---

[154] Ibid., 209, 210 (quotation).

[155] Sackler, Roche, advertising: Posner, *Pharma*, chaps. 9-10, 15-16, 19, 21, 31, "emotional aspirin" p. 145, and Keefe, *Empire of Pain*, chap. 5. Promotional books: Catherine (cai) E. Guise-richardson [sic], "Protecting Mental Health in the Age of Anxiety: The Context of Valium's Development, Synthesis, and Discovery in the United States, to 1963," Ph.D. diss. (Iowa State University, 2009), 306-309. https://lib.dr.iastate.edu/etd/10574. "Narcotics:" Roche Laboratories, *The Anatomy of Sleep* (Nutley, N.J.: Hoffman-LaRoche, 1966), 111. Post-1975 Valium fears: Herzberg, *Happy Pills*.

Haislip noted opioids' indispensable uses and conceded that, if officials overreacted to their dangers, they risked cowing prescribers or creating spot drug shortages. Yet nothing in his experience or statistical oversight suggested that these were significant problems with narcotics for cancer pain. DEA agents did not trouble themselves with cancer patients or with oncologists who wrote for a relatively high volume of narcotics. And the amounts of codeine, morphine, oxycodone, methadone, and hydrocodone available for medical use had all substantially increased from 1982 to 1986. A variety of narcotics being available in ample quantity, "the law is not the problem in providing an adequate supply of drugs, particularly narcotics, to patients for the treatment of intractable pain." The same applied to the state triplicate-prescription statutes that other conferees had attacked. They had produced declines in Schedule II prescribing because they deterred the minority of physicians—the unscrupulous outliers—who wrote illegally for large amounts, not those who were engaged in the legitimate practice of medicine.[156]

Though Haislip drew his examples and data from the recent past, his remarks illustrated how drug control had evolved over the course of a century. In the 1880s, medical addiction was a serious yet circumscribed problem. When a doctor addicted a patient to morphine, or when a self-medicating consumer addicted him- or herself to a patent medicine or laudanum, the matter typically ended there. Victorian-era medical addicts were secretive, often deeply ashamed people. One, a respectable widow and mother, secured her supply of laudanum from a drug store ten miles distant to keep her neighbors in ignorance. Such addicts were neither inclined to recruit others nor able to resell their own opiates at wildly inflated prices, cheaper legal sources then

---

[156] *Advances in Pain Research and Therapy*, ed. Hill and Fields, 207 (statistics) 209 ("law is not the problem").

being available. Medical addiction could be, and was, countered by two methods. One was raising awareness of risk among medical professionals and consumers. The other was imposing more stringent prescription, labeling, registration, and tracking laws and regulations.[157]

Unfortunately, the development and strengthening of narcotic control increased black-market temptations. With them came a second route to medically sourced addiction, diversion. The task of control (not just of narcotics, but of scheduled substances generally) grew more complex over time. The key, however, remained supply limitation. The fewer and less potent the drugs in circulation, the better the prospects of limiting diversion and secondary cases of prescription-medication abuse and addiction. Hence Haislip's wariness of aggressive promotion, as well as industry-supported calls for liberalized prescribing of Schedule II opioids, claims of minimal risk, and appeals for repealing proven means of discouraging diversion. When he found himself at a conference with all these items on its agenda, he did not mince words. "I think, in fact, that the drug abuse problem is related to a 'marketing' problem. If one analyzes drug traffic and abuse problems, one always finds them connected with so-called legitimate drug activity."[158]

---

[157] Alonzo Calkins, *Opium and the Opium-Appetite* (Philadelphia: J.B. Lippincott, 1871), 152, https://collections.nlm.nih.gov/ext/kirtasbse/66640160R/PDF/66640160R.pdf (widow).

[158] Ibid. 211. Like Anslinger, Haislip (pronounced HAY-slip) consistently emphasized the imperative of supply control and the need for close supervision. In 1989, the year the conference proceedings were published, Haislip testified before a House select committee that Congress should not loosen the controls on methadone maintenance programs it had enacted in 1974. The controls had been challenged in the name of worthy causes, such as easier access to treatment to reduce exposure to HIV/AIDS. But the reality was that loosely controlled programs had diverted methadone in the early 1970s, and they would so again if allowed to operate as mere facilities to "dispense drugs." Haislip's testimony is in C-Span, "Narcotics Abuse: House Select Comte. [sic] on Narcotics Abuse & Control," https://www.c-span.org/video/?8577-1/narcotics-abuse.
Haislip and Anslinger shared another belief. They understood that pharmaceutical firms could profit in ways other than making, marketing, and supplying drugs. In the absence of effective regulation, they could also operate as de facto mints, churning out the currency of an

Among the conferees who held the opposing view, that undertreated pain was a concomitant of so-called legitimate enforcement activity, was Dr. Hill. After the conference Dr. Hill continued to press the case against overregulation, adding his concern that drug-war propaganda had made the pain-control situation worse. In 1989 he lobbied, successfully, for Texas to enact a law that protected physicians from state medical board discipline in cases where they prescribed narcotics for intractable pain. He traveled widely advocating the passage of similar legislation.[159]

---

alternative illicit economy that fostered crime as well as addiction. Journalists Fox Butterfield, "Theft of Painkiller Reflects Its Popularity on the Street," *New York Times*, July 7, 2001, https://www.nytimes.com/2001/07/07/us/theft-of-painkiller-reflects-its-popularity-on-the-street.html; Paul Tough, "The Alchemy of OxyContin," *New York Times Magazine*, July 29, 2001, https://www.nytimes.com/2001/07/29/magazine/the-alchemy-of-oxycontin.html; and Sam Quinones, *Dreamland*, described how these fears were realized in the early 2000s. Butterfield reported that 10, 20, 40, 80, and 160 mg OxyContin sold on the street for $1 per mg, making them so valuable that some drug-store robbers ignored the cash register and took only the pills. Quinones described addicts taking payment for shoplifted merchandise in mg units of OxyContin rather than in dollars (p. 216).

[159] "Narcotics and Cancer Pain Control," *OncoLog* 33 (July-September 1988): 1, 2-3, 8, https://texashistory.unt.edu/ark:/67531/metapth903313/, summarizes Dr. Hill's post-conference views and reprises Dr. Morgan's attack on opiophobia. Quotation: James S. Olson, *Making Cancer History: Disease and Discovery at the University of Texas M.D. Anderson Cancer Center* (Baltimore: Johns Hopkins University Press, 2009), 212, https://books.google.com/books?id=plCmOSd4vVoC&pg=PA212&lpg=PA212&dq.

As Dr. Hill's views suggest, those who favored liberalized prescription of opioids and those who opposed the drug war had overlapping interests. Both objected to what they saw as overly aggressive government interference in drug markets—licit in the one instance, illicit in the other—and concomitant stigmatization of drug use. Though pharmaceutical funding aimed to bolster revisionists, it sometimes gave those with a broader libertarian agenda opportunities to air their views. In 2014, for example, *PAINWeek*'s annual conference (sponsored by Teva and Janssen, with participation by the Purdue- and Endo-supported American Society of Pain Educators [ASPE], among other industry-backed groups) featured Ethan Nadelmann as its keynote speaker. Nadelmann, an attorney and prominent opponent of the drug war who received financial support from the libertarian philanthropist George Soros, spoke on "The Sound and the Fury: What Ending the Drug War Looks Like." *PAINWeek 8th Annual Conference Program Guide* (2014), unpaginated sponsorship list (Teva, Janssen, ASPE), 65 (keynote), https://www.painweek.org/sites/medical/painweek/files/inline-files/pw14-pg-web.pdf); U.S.

Purdue supported these efforts, as well as the 400-page conference proceedings Dr. Hill co-edited. In August 1989 Purdue's training and development department sent a copy of *Advances in Pain Research and Therapy* to every member of the Purdue sales force. It instructed the representatives to review the book's contents and "to use the information it contains to help you in your understanding of the issues in your promotion of MS Contin."[160]

Dr. Hill made a well-received video, "*My Word Against Theirs"... Narcotics for Cancer Pain Control*, which the M.D. Anderson Pain Service described as "another product" of the 1988 conference. By 1989 Purdue was using the video, together with an open letter from Dr. Hill on M.D. Anderson Hospital stationery, as advertising materials for MS Contin, the company's extended-release morphine tablet. These materials were accompanied by such claims as "narcotic pain control can enable patients to live normal, fulfilling lives," "maintenance narcotics for pain control rarely, if ever, produce euphoria," and "tolerance develops slowly to oral opioids, if at all." Purdue Frederick representatives made *"My Word"* available, at no charge, to health care professionals.[161]

---

Senate Finance Committee, Senators Chuck Grassley and Ron Wyden, December 16, 2020, letter re "Findings from the Investigation of Opioid Manufacturers' Financial Relationships with Patient Advocacy Groups and Other Tax-Exempt Entities," p. 4n22 and Appendix C (APSE, Purdue, Endo), https://www.finance.senate.gov/imo/media/doc/2020-12-16%20Finance%20Committee%20Bipartisan%20Opioids%20Report.pdf; Drug Policy Alliance, "Ethan Nadelmann, Founder," https://drugpolicy.org/staff/ethan-nadelmann-founder (Soros).

[160] Memorandum from Training & Development to Sales, August 3, 1989, PDD1504060466.

[161] "Another product": *Research Report, 1989* (Houston: University of Texas M.D. Anderson Cancer Center, 1989), p. 290, also available at https://www.google.com/books/edition/Research_Report_1989/O6EKAQAAMAAJ. Letter and claims are attached to Purdue's FDA report, "Transmittal of Advertisements and Promotional Labeling for Drugs for Human Use" (TS, August 21, 1989), PDD8023012764. No charge: Pamela J. Haylock and Carol P. Curtiss, *Cancer Doesn't Have to Hurt: How to Conquer the*

2.  Roles of Key Opinion Leaders

Purdue was generous to Dr. Hill and other KOLs, industry shorthand for key opinion

leaders. Over the next decade Dr. Hill continued to participate in the Purdue's speakers' bureau

and to receive Purdue honoraria and grants, the latter in the range of $30,000 to $34,000. Janssen

Pharmaceutica also included Dr. Hill in its speakers' bureau and invited him to chair its

sponsored pain management symposia.[162]

Dr. Hill's case was typical. KOLs with good credentials and prestigious institutional

affiliations received funding from multiple opioid manufacturers and marketers. Dr. Dahl, who

attributed pain undertreatment to opioid overregulation, received grant support and speaker fees

from Purdue, grants from Abbott, and grants from Endo, which had a "great" (and financially

ongoing) relationship with Dr. Dahl and the Alliance of State Pain Initiatives (ASPI), a national

"umbrella organization" that she directed and that "help[ed] to guide all state pain

initiatives/advocacy efforts." Dr. Foley was a speaker for Janssen and Abbott as well as Purdue.

Dr. Portenoy, who addressed primary care audiences across the country, received, in addition to

Purdue money, funding from opioid manufacturers Covidien Mallinckrodt, Endo, Cephalon,

ProStrakan, Janssen, J & J, Teva, Alpharma, and Insys, as well as funding from manufacturers of

---

*Pain Caused by Cancer* (Alameda, Ca.: Hunter House, 1997), 155,
https://books.google.com/books?id=jJQm7W7a_vgC&pg=PA154&lpg=PA154&dq.

[162] Hill honoraria, e.g., Letter of Agreement with St. Joseph's Hospital and Medical Center,
August 2, 1993, PKY180787862 (for $1,000). Grants, e.g., Paul Goldenheim to Robert Kaiko
email chain, May 5, 1995, PPLPC013000015167 (for $30,000) and "Purdue Pharma Inc.:
Minutes of a Meeting of the Board of Directors" (TS, September 18, 1998), p. 5, PKY180173668
(for $34,000). Purdue and Janssen speakers' bureaus: "Pain Medicine" (TS, May 4, 2001),
PKY180932752. Janssen symposia: c.v. of Dr. Stephen P. Long, October 1, 1999, p. 24,
PKY182702335.

implantable opioid pumps. One of Dr. Portenoy's mentees, the clinical psychologist Dr. Steven

Passik, received speaking honoraria from several manufacturers, including Cephalon, Endo,

Janssen, and Purdue. Dr. Bill McCarberg, who collaborated with Dr. Passik and who became

president of the American Academy of Pain Medicine (AAPM, also subsidized by opioid

manufacturers), began receiving money from Purdue in 1998. He ultimately collected over

$700,000 from several opioid makers, including industry leaders like J & J and its subsidiary

Janssen; Mallinckrodt; and Endo, which listed Dr. McCarberg among seventeen "national

thought leader[s]" who were also "Opana ER trained speakers." Dr. Howard Heit, who became a

prominent Purdue speaker in the late 1990s, began consulting for Cephalon in 2003 and then, in

2004, for Ligand and Organon, co-promoters of AVINZA, a sustained-release morphine

medication. Dr. Scott Fishman, a Purdue speaker and grant recipient, found work with J & J

subsidiary Ortho-McNeil, Cephalon, Endo, and other opioid makers. Dr. Lynn Webster, a Salt

Lake City pain medicine specialist, accepted consulting and speaking fees and honoraria from

manufacturers Cephalon, Teva, Insys, Egalet, and Depomed (which in 2015 acquired Janssen's

Nucynta brands); Mallinckrodt supplemented such conventional emoluments with unspecified

"gifts" worth several thousand dollars.[163]

---

[163] Dr. Dahl's grants are acknowledged in Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (Washington, D.C.: Waterford Life Sciences, 2007), v. For ASPI, "great," and "umbrella," see "State Pain Initiatives: Q1 2010 Summary" (TS, April 19, 2010), ENDO_SF-00081312. Dr. Dahl appears in Purdue's "Top Speakers 1999," PPLPC02500000470, and "2001 Top 100 Speakers," PDD1507250599. Dr. Dahl received $1,000 honoraria for talks on pain management and implementing JCAHO standards, e.g., PKY180470186 and PKY180468521-PKY180468529. She commented on the significance of the JCAHO revisions for the *New York Times*: "We had to put some teeth into this so that there are requirements. Because of these standards, pain is now on every hospital's radar screen." Laurie Tarkin, "New Efforts Against an Old Foe: Pain," New York Times, December 26, 2000, https://www.nytimes.com/2000/12/26/science/new-efforts-against-an-old-foe-pain.html.

Dr. Foley's speaking arrangements are recounted in Deposition of Kathleen Foley, M.D., August 27, 2004, *Michael McCallister et al. vs. Purdue Pharma*, p. 8. Dr. Foley testified that, in the 1980s and 1990s, "it predominantly was speaking at medical grand rounds where the grand rounds people were given the money, I wasn't. Then they paid me whatever they paid me," meaning that the opioid manufacturers' money was passed through to her. In fact, Purdue also paid Foley directly to speak at both hospital and non-hospital events, e.g. Theresa Newell to Foley, November 7, 1990, and June 17, 1991, PKY181118399 and PKY181118407. The latter includes a direct payment for Dr. Foley's address to the inaugural meeting of the Texas Cancer Pain Initiative, a hotel-based event subsidized by Purdue and Russ Pharmaceutical (maker of Lortab) that featured four speakers from the seminal 1988 M.D. Anderson conference. Texas Cancer Pain Initiative, "Program, Organizational Meeting" (unpaginated brochure, 1991). Dr. Passik is described as Dr. Portenoy's mentee in Catan and Perez, "A Pain-Drug Champion Has Second Thoughts."

For Dr. Portenoy's funding, see disclosure forms PPLPC017000471179 and RP_000140-RP_000141, as well as his deposition in *State of Oklahoma* v. *Purdue Pharma, L.P. et al.*, January 24, 2019, pp. 14-15, 45, 110-111, PPLP004492934-PPLP004492935, PPLP004492965, and PPLP004493021-PPLP004493031.

Dr. Passik acknowledged speaking honoraria and other support on his Emerging Solutions in Pain webpage, https://www.emergingsolutionsinpain.com/about-us/contributing-faculty/17-steven-passik. This webpage was subsequently taken down; however, other documents, including Dr. Passik's c.v., MNKOI 0006831567, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=mhwd0254, and the Jessica Churchill email chain, April 26, 2011, MNKOI 0002842879, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=xmfh0240, confirm that he received opioid industry funding and honoraria.

Dr. McCarberg's funding is detailed in USSFCF, pp. 6-7. "Bill H. McCarberg, MD," Practical Pain Management, https://www.practicalpainmanagement.com/author/12504/mccarberg, lists Mallinckrodt advising and research support. Endo's "national thought leader" designation is in "OPANA ER Trained Speakers" (Excel spreadsheet, December 12, 2006), ENDO-CHI_LIT-00561231.xls.

By 1997 Dr. Heit was a paid speaker for Purdue, e.g., Stephanie Cocolis to Howard A. Heit, December 19, 2000, and February 27, 2001, PKY180415554 and PKY180415552. Two years later he was included in Purdue's "Top Speakers 1999," PPLPC02500000471. For Cephalon, Ligand, and Organon, see Dr. Heit's disclosure statement in "The Truth About Opioid Pain Management," https://www.yumpu.com/en/document/read/48747401/the-truth-about-opioid-pain-management-the-canadian-pain-. Dr. Heit's slides in this source cite Drs. Foley, Portenoy, and Haddox and reiterate such revisionist claims as pseudoaddiction arising from pain undertreatment.

Dr. Fishman also made Purdue's "Top Speakers 1999," PPLPC025000004771. His Purdue subsidies and grants are described in Michael A. Innaurato to Fishman, April 26, 1996, PPLPC02100000516, and Laura Jean McDonald to Fishman, May 31, 2000, PKY180614432. Ortho-McNeil: Gloria Vanderham to Melissa Leichter, March 25, 2008, JAN-MS-00505427. Other financial disclosures are in Scott Fishman, *Responsible Opioid Prescribing*, vi.

Drs. Chris Neumann and Michael Toscani were PharmDs who specialized in advising pharmaceutical firms on acquiring and "managing" KOLs. In 2005 they put together a primer on the subject for Cephalon. Multiple KOL sponsorships, they explained, inhered in medicine's hierarchical learning model: a master-apprentice system that extended throughout a doctor's career. The single most important reason doctors changed prescribing behavior was peer influence, which ran from KOLs to specialists, and from specialists to primary care doctors. Atop this pyramid of influence sat a "small number" of thought leaders who affected hundreds of prescribers. Hence "all pain pharma companies are actively seeking the support of the same, few KOLs." This elite was "critical to the success of new product launches." It helped shape drug development, product positioning, brand development, life-cycle management, and prescribing practices, all of which translated into "$$$." From their perch in academic medicine, they influenced opinion in fifteen distinct ways, from their own publications and lectures to more subtle, gatekeeping functions like journal editorships and service on pharmaceutical and therapeutics committees (Figure 2).[164]

**Figure 2**: Means of KOL Influence on Pharmaceutical Products and Trends, 2005

---

Except for Cephalon, Dr. Webster's examples are from the 2014-2016 listings in Open Payments: Lynn Webster, https://openpaymentsdata.cms.gov/physician/1136720. His Cephalon payments, for Actiq, are listed in a spreadsheet, TEVA_MDL_A_13610632, e.g. line 4792.

[164] Chris Neumann and Michael Toscani, "Key Opinion Leader (KOL) Development Plan for Cephalon Pain Franchise," printed slide presentation, February 4, 2005 ("critical to success," "$$$" slide 5 "small number," "actively seeking," slide 21), TEVA_OK_0306398, https://www.industrydocuments.ucsf.edu/drug/docs/#id=hygg0230. Drs. Neumann and Toscani represented KOL, L.L.C., a consulting firm specializing in "Opinion Leader Management," as per https://kolonline.com/ol-management-services/. See also their respective LinkedIn sites, https://www.linkedin.com/in/christopher-neumann-pharmd-76a49911 and https://www.linkedin.com/in/michael-toscani-pharm-d-b1062ab.



(Figure 2 Source: Chris Neumann and Michael Toscani, "Key Opinion Leader (KOL)

Development Plan for Cephalon Pain Franchise," printed slide presentation, February 4, 2005,

slide 6, TEVA_OK_0306398,

https://www.industrydocuments.ucsf.edu/drug/docs/#id=hygg0230.)

Although the majority of KOLs and speakers were physicians, opioid manufacturers

deployed health care professionals with pharmacy and nursing credentials in Ohio and

surrounding states. In March 2000 Dr. Laurie Cooksey, PharmD, a Purdue speaker active in the

region, presented a seminar in Marietta, Ohio, on CNP management for the Southeastern Ohio

Academy of Pharmacy and the Parkersburg Academy of Pharmacy. In January 2001 Drs. Ruth

Plant and Mary C. Cook, PharmDs who worked for Purdue as medical science liaisons, began a

series of meetings and presentations on pain assessment and management with the Health

Alliance of Greater Cincinnati, then considering removing OxyContin from its formulary "based

on cost and abuse." In September and December 2001 Cathy Trame, a clinical nurse specialist

for pain services at Miami Valley Hospital, a member of the Ohio Pain Initiative, and a Purdue

speaker, gave pain talks at quarterly meetings of Fidelity Home Health Care in Dayton. In

October 2002 Dr. Deanna Finnell, a PharmD and Purdue medical science liaison, spoke to the

Pharmaceutical and Therapeutics Committee of the West Virginia Department of Health and

Human Resources on "the critical role OxyContin plays in treating patients with pain." That

December Dr. Finnell lectured West Virginia pharmacists from Walmart and other stores at the

Sleepy Hollow Country Club. Her subject was non-malignant pain. Attendees received dinner

and CE (continuing education) credits, a popular means of instructing retail pharmacists about

the safety and propriety of long-term opioid analgesia for CNP. Purdue's National Accounts

division had made similar arrangements with pharmacy chains in Ohio, as when, in June 2001, it

paid Dr. Susan Lynch, PharmD, to provide two CE courses on pain management for CVS

pharmacists in Cleveland.[165]

Why chain pharmacists were a key audience is a subject to which we will return. The

point to be made here is that KOLs found ways to assist opioid manufacturers beyond those

listed in Figure 2. Dr. Foley's contact with Purdue began at least as early as 1983 and 1984,

when she became involved in an MS Contin Multi-Center Study. By 1985, as we have seen, she

---

[165] Purdue lecture program spreadsheet (1997-2002), PPLPC018000000081, lines 10443 (Dr. Cooksey), 23808 (Dr. Lynch), and 24142-24143 (Trame's Dayton talks). Trame's credentials: "Central Region: Advocacy & Policy Overview" (TS, n.d.), n.p., PSJ3 Exhibit 52, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=htyw0232. Drs. Plant and Cook in Cincinnati: Scott Burandt email chain, January 16, 2001, PKY181170083. Dr. Plant's credentials: Ruth Plant, email chain, February 20, 2004, PPLPC023000040965, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=fxff0232. Dr. Cook's credentials: Rena Rosenberg email chain, July 10, 2013, MCK-MAAG-3121251-MCK-MAAG-3121252, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=jxcg0256. Dr. Finnell: Minutes of the West Virginia Department of Health and Human Resources, Bureau for Medical Services, Pharmaceutical and Therapeutics Committee (TS, October 23, 2002), p. 4, https://dhhr.wv.gov/bms/BMS%20Pharmacy/Documents/PT%20Comm/Archieved%20Agendas%20and%20meetings/2002/October%2023,%202002/bms_pdl_20021023minutes.pdf; Purdue program spreadsheet, row 27,504, PPLPC053000007660_Confidential.xls (WV dinner lecture).

was a paid Purdue speaker. As her career advanced, she became, in the eyes of Purdue's Dr.

Richard Sackler—the company's chief promoter of OxyContin—a "great friend," "world

influencer," research consultant, oxycodone enthusiast, talent scout, behind-the-scenes lobbyist,

and promotional asset. So close and valued was the relationship that Dr. Richard (as he was

known in the company) served as Dr. Foley's personal "medical liaison," or handler, the only

one of Purdue's leading KOLs so honored. Dr. Richard once arranged to fly Dr. Foley first-class

to Tokyo where, among other activities, she joined him and other Purdue and Japanese

pharmaceutical executives at a dinner "where we can talk up the virtues of OxyContin Tablets."

When, in early 2001, U.S. journalists began to express grave misgivings about the virtues of

OxyContin tablets, Dr. Foley assumed the role of crisis adviser, advocating a collective,

industry-wide effort to defend opioid analgesics. "I think that there is a tightrope you need to

walk, because you are a drug company and it would be much better if the advocacy came from

outside of the drug company and even better without much in the way of support from you," she

emailed Dr. Richard that April. "So along those lines, the kinds of things that I am thinking of is

that maybe we should call a meeting, bring together representatives from all of the companies,

ideally high level representatives, like presidents or major leaders and strategize about the way to

play the media issues."[166]

---

[166] MS Contin: Edward I. Takesue to Kathleen M. Foley, June 13, 1983, PDD1701924967-
PDD1701924968, and John J. Savarese to Kathleen M. Foley, November 27, 1984,
PDD1701924970-PDD1701924971. Dr. Sackler's regard for and use of Dr. Foley is described in
his emails and faxes to, from, or about her dated December 5, 1999, PPLPC057000000451
("great friend"); October 3, 1995, PPLPC042000000258 ("world influencer"); August 10, 1999,
PPLPC045000000964 (research consultant); November 30, 1991, PDD9316701014 (oxycodone
enthusiast); August 6, 1999, PPLPC045000000929 (talent scout); November 29, 1999,
PPLPC022000001731 (behind-the-scenes lobbyist); and July 29, 1999, PPLPC045000000858
(Tokyo). Medical liaison: "2001 Top 100 Speakers," PDD1507250600. Crisis: Kathleen M.
Foley to Richard Sackler, email, April 4, 2001, PPLPC037000008901,

Purdue also dispatched KOLs to "hot spots," including the Cincinnati region. In January 2001 Brett Ciricillo, Purdue's Cincinnati district manager, reported several high-profile setbacks, including four Oxycontin-related pharmacy burglaries at CVS and Ridgeway pharmacies in Dayton. Then there was the Cincinnati Police Division, "which continues to be the biggest problem with their monthly news letter [sic]. The past three months have been heavily focused on OxyContin."[167]

Ciricillo surveyed what had been done to confront the crisis. Dr. Brian Ginsberg, a top-ranked Purdue KOL, had already given two well-received talks on pain management, attended by more than 175 area physicians and nurses. Dr. Haddox had spoken to WCPO Channel 9 News about JCHAO guidelines and OxyContin. And Drs. Plant and Cook had begun their aforementioned meetings with the Health Alliance of Greater Cincinnati. Seven additional district speaker or lecture programs were planned for the next two months. These were "targeted to physicians, hospitals, and retail pharmacies."[168]

---

https://www.industrydocuments.ucsf.edu/opioids/docs/#id=rkyw0232. The same email advised Dr. Richard not to address the crisis through the APS board: "My concern about going to the American Pain Society is that within the organization there are enemies as well, and we can talk about this further by phone," PPLPC037000008902. For Dr. Richard as OxyContin's chief proponent, see Keefe, *Empire of Pain*, book II. Despite these activities—some paid, some unpaid—Foley testified that she had never been employed by any of Purdue's companies or "by any pharmaceutical company in any capacity." Deposition of Kathleen Foley, M.D., August 27, 2004, *Michael McCallister et al. vs. Purdue Pharma*, pp. 6-7.

[167] Scott Burandt email chain, January 16, 2001, PKY181170083; district manager title at PDD1503450017, attachment to Purdue circular memorandum, October 15, 2002, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=kymw0232.

[168] Scott Burandt email chain, January 16, 2001, PKY181170083. Dr. Ginsberg: "Top Speakers 1999," PPLPC025000004771, and "2001 Top 100 Speakers," PDD1507250600.

Ciricillo promised longer-term educational programs to strategically influence Cincinnati's integrated health systems: "This will help sell OxyContin while we preach proper pain management and JCAHO guidelines." Meanwhile "[w]e will continue to set up retail pharmacy programs through Pharmaceutical [sic] societies and retail chains" and "round table discussions / pivotal dinners with PCP [primary care providers] and high[-]prescribing specialists." In Greater Cincinnati and elsewhere, KOLs worked proactively and reactively. They continued to advocate liberalized opioid prescribing while dealing with revisionism's "hot spots," a metaphor whose literal meaning is those parts of a forest fire burning most actively.[169]

KOLs also testified reactively as expert witnesses on behalf of pill-mill doctors. In 2013 Dr. Carol Warfield, an anesthesiologist who had been a paid and top-rated OxyContin speaker, and who had played prominent roles in the APS, AAPM, and other opioid manufacturer-funded pain societies, testified on behalf of Dr. Cynthia Cadet, a Parkland, Florida, physician accused of causing the deaths of seven patients by overprescribing opioid painkillers. Dr. Warfield testified that it was possible that Dr. Cadet had been "duped" by drug-seeking patients and out-of-state traffickers and dealers. If so, she was duped on a daily basis. The clinics at which she worked "didn't accept insurance and cash payments were stuffed into wastebaskets and garbage bags behind the front counter," according to the testimony of their felon-owner, Chris George. Federal jurors found Dr. Cadet guilty of money laundering, for which she received six-and-a-half years in prison.[170]

---

[169] Scott Burandt email chain, January 16, 2001, PKY181170083-PKY181170084.

[170] "Duped," "stuffed": Paula McMahon, "Pain Expert Said Pill Mill Doc Did Nothing Wrong; Case Going to Jury Soon," *Sun Sentinel*, July 23, 2013, https://www.sun-sentinel.com/news/fl-xpm-2013-07-23-fl-pill-mill-harvard-expert-20130723-story.html. Dr. Cadet's career as a pill-

Dr. Alexander Weingarten testified at the trial of a pill-mill prescriber accused of killing patients. Dr. Weingarten had served as president of the industry-supported New York State Pain Society; had received personal funding from opioid manufacturers, including Teva, and had become, by 2014, a favorite of Insys. "Loves Subsys," his Insys sales representative reported. "I used 70% of my speaker $$$ on Doctor Weingarten. He is my biggest writer, and I always get a return on investment." In 2014 Dr. Weingarten testified on behalf of Dr. Stan Xuhui Li. During perfunctory office visits Dr. Li wrote large, escalating, and often early opioid prescriptions for cash-only patients lined up at his take-a-number-and-wait-to-be-called pain clinic in Queens, New York. His conduct, Dr. Weingarten opined, was within accepted prescribing norms. Early refills and increased doses could be explained and justified by such revisionist principles as "pseudoaddiction," i.e., what looked like addiction was simply inadequate dosing that had caused the patients to consume their pills too quickly and seek more for their "legitimate medical pain

---

mill doctor is recounted in John Temple, *American Pain: How a Young Felon and His Ring of Doctors Unleashed America's Deadliest Drug Epidemic* (Guilford, Ct.: Lyons Press, 2016 [first published 2015]), sentencing at p. 271.

Dr. Warfield a paid speaker: PDD1701018717 identifies her as an "OxyContin Speaker," together with such prominent revisionists as Drs. Elizabeth Narcessian, Russell K. Portenoy, and C. Stratton Hill. Western District of Virginia 8112643655 confirms that Purdue paid Dr. Warfield as a dinner speaker for health care providers, and that the honorarium was billed to the OxyContin account. PDD1701225811 states that Purdue's Mary Pannullo had "broken out a $2K honorarium for the 4 talks you will be giving" at "your upcoming whirlwind at DUMC [Duke University of Medical Center.]" A May 1995 financial report, PDD1701553478, shows that Dr. Warfield received $2,000 from Purdue for her 1995 "medical education" trip to Dallas, https://www.industrydocuments.ucsf.edu/drug/docs/#id=jmnw0232. Top-rated: "2001 Top 100 Speakers," PDD1507250600. Roles: An autobiographical sketch, "Carol A. Warfield, M.D., Consultant for the ABC News OnCall+ Pain Management Center," ABC News, April 17, 2008, https://abcnews.go.com/Health/PainNews/story?id=4069316, states that Dr. Warfield "has served as an officer, on the board of trustees, and/or committees of numerous organizations," including the APS, AAPM, and the International Association for the Study of Pain (IASP). All of these organizations were heavily subsidized by opioid manufacturers, according to U.S. Senate Finance Committee, "Findings from the Investigation of Opioid Manufacturers."

issues." The jury, unpersuaded, convicted Dr. Li of multiple counts of selling prescriptions, reckless endangerment, and manslaughter. Dr. Weingarten collected his fee for testifying, along with $123,275 in fees and benefits from drug companies that year.[171]

In reviewing these facts, I do not imply that the KOLs acted from purely mercenary motives. The views of the early revisionists, however well or poorly supported by evidence, were seemingly earnest. "That they were wrong," points out attorney and investigative journalist Gerald Posner, "does not mean they were not sincere." Dr. Passik has described the early movement as based less on evidence and more on zealous determination to alleviate patients' suffering. "It had all the makings of a religious movement at the time," he said in 2012. "It had that kind of spirit to it." Hope proved a poor substitute for evidence, however, in that it led revisionists into a cognitive trap. When a public health initiative succeeds, the passage of time makes it easy to forget the significance of what has *not* happened. What had not happened when revisionism was first gaining adherents was the recrudescence of widespread medical opioid addiction. The benefits of narcotic conservatism were invisible. The burdens were all too visible,

---

[171] Dr. Weingarten's testimony and financial support: Charlotte Bismuth, *Bad Medicine: Catching New York's Deadliest Pill Pusher* (New York: One Signal, 2020), 223-231, and Pro Publica, Dollars for Docs, Alexander Weingarten, Yearly Payment Breakdowns [for 2013 and 2014], https://projects.propublica.org/docdollars/doctors/pid/24637/year/2013. New York State Pain Society: Among the grantors and/or exhibitors listed in in the Society's 2013 meeting program were Purdue, Allergan, Endo, Janssen, Mallinckrodt, and Teva. *Final Program, April 19-21, 2013*, https://www.nypainsociety.org/wp-content/uploads/2013/04/FINAL-PROGRAM.pdf. "Loves Subsys": Sonia Palermo's notes, "Alexander Weingarten, MD," *USA* v. *Babich* et al., Case 1:16-cr-10343-ADB, filed March 17, 2019, p. 63, https://www.docketbird.com/court-documents/USA-v-Babich-et-al/Exhibit-1-Trial-Exhibit-116/mad-1:2016-cr-10343-185341-00779-001. In 2020 Palermo was herself indicted on kickback charges arising from abuse of the speaker program. Robert E. Kessler, "Drug Firm Saleswoman from LI Charged in Opioid Prescription Bribery Scheme," *Newsday*, February 21, 2020, https://www.newsday.com/long-island/crime/bribe-drug-sales-fentanyl-scheme-1.42045906.

particularly for physicians and nurses who daily confronted chronic pain and who imagined a better future for their patients if taboos were cast aside and the power of opioids unleashed.[172]

Whatever the origins of revisionists' beliefs, their published opinions created a novel and exploitable situation. Academic revisionism revived, for the first time in nearly a century, the medical debate over the use of opioids in treating CNP. Both sides fielded advocates from respected institutions. Opioid manufacturers ignored or disdained the conservatives, whose advice discouraged wider use of narcotics, but lavished attention and money on their opponents, whose views encouraged wider use of narcotics at higher doses. The weed sprouts got the water and fertilizer, not the established plants. Revisionism flowered in the late 1980s, 1990s, and early 2000s because Purdue and other manufacturers and their allies identified, cultivated, subsidized, and deployed reform-minded individuals as part of a long-term campaign to reshape professional opinion and prescribing practices and to loosen regulations. What the company-favored revisionists lacked in evidence and sound arguments they made up for in charisma and communication skills ("C. Stratton Hill was *VERY* well received.  ☺")[173]

---

[172] Posner, *Pharma*, 367; Catan and Perez, "A Pain-Drug Champion Has Second Thoughts" ("religious").

[173] "Well received:" note on letter of agreement with Central Texas Medical Foundation, March 27, 1995, PKY180788254. The emphasis on opioid analgesics in CNP also meant less funding and attention for non-drug approaches. Asked if funding from opioid manufacturers influenced the type of projects the APF pursued or failed to pursue, Dr. Portenoy testified that such had been his experience. "To my recollection, the management of the APF never pursued a specific project to try to increase knowledge or use of non-pharmacological approach[es] like exercise or nerve blocks or any other kind of therapy used for pain." Such approaches could be discussed, he said, but not funded if understood as "harmful" to the manufacturer-sponsors' interests. "[A]s a general rule, the types of projects that can be done just in terms of the capacity to pay for them are constrained by who is going to be doing the funding or what entities will be doing the

Early revisionism's other key problem, the small number of physician-advocates, was also solved by the application of pharmaceutical resources. By March 2001 Purdue had invited 2,000 to 3,000 doctors to three-day retreats at resorts in California, Arizona, and Florida. There, reported the *New York Times*, "they received instruction about treating chronic pain, while being recruited to serve as paid speakers at medical meetings sponsored by Purdue." One Purdue speaker, Dr. Susan Bertrand, told the *Times* reporters that "recent studies showing the undertreatment of pain had been 'almost a religious experience,' making her realize how poorly she and others had been trained to deal with the problem. To help change that, she said, she gave about a dozen paid speeches sponsored by Purdue. The company also helped her start the Appalachian Pain Foundation, an educational group on pain management."[174]

Sales representatives scouted speaker talent. The pharmaceutical industry's "unspoken bedrock principle," wrote Dr. Shahram Ahari, an Eli Lilly sales representative who switched careers and became an emergency medicine physician, was that growing market share was not enough: "We had to grow the market, too." Growth depended on a "synergistic marketing apparatus, which aims to permeate the medical establishment and control its discourse." Sales representatives equipped with prescribing data, cherry-picked articles, bonhomie, and lunch invitations played a key role in the process, but so did the medical professionals they recruited. When he was a sales representative, Dr. Ahari pursued "friendly 'thought leaders' to groom for

---

funding." Dr. Portenoy's deposition in *City of Chicago vs. Purdue Pharma L.P., et al.*, July 29, 2021, pp. 99-101.

[174] Barry Meier and Melody Petersen, "Sales of Painkiller Grew Rapidly, But Success Brought a High Cost," *New York Times*, March 5, 2001, https://www.nytimes.com/2001/03/05/business/sales-of-painkiller-grew-rapidly-but-success-brought-a-high-cost.html.

the speaking circuit. Once selected, a physician would give lectures around the district. I would

carefully watch for tell-tale signs of their allegiance. This includes how they handled questions

that criticized our product, how their prescribing habits fluctuated, or simply how eager they

were to give their next lecture." The principal target of "local speaking gigs" was in fact the

speaker, whose appreciation might translate into more prescribing. But the talks doubled as

auditions, with charismatic and well-credentialed physicians being elevated to the national circuit

or given CME telecasts.[175]

Over time the proselytizing became self-sustaining, particularly at the leadership level.

Once the "leading pain management contrarians had built their reputations as physicians with the

courage to challenge long-established medical dogma as archaic," Posner observes,

"[a]cknowledging that opioids were far more addictive than they had originally predicted would

have shattered their careers." It would have curtailed pharmaceutical funding, too. "[E]ven if the

money does not lead to outright and calculated intellectual dishonesty or fraudulent behaviour

[sic]," writes bioethicist Christian Munthe, "human psychology has to be taken into account. The

money arrives because the funding party likes what one is saying and as one becomes

---

[175] Shahram Ahari, "I Was a Drug Rep. I Know How Pharma Companies Pushed Opioids," *Washington Post*, November 26, 2019, https://www.washingtonpost.com/outlook/i-was-a-drug-rep-i-know-how-pharma-companies-pushed-opioids/2019/11/25/82b1da88-beb9-11e9-9b73-fd3c65ef8f9c_story.html, and Adriane Fugh-Berman and Shahram Ahari, "Following the Script: How Drug Reps Make Friends and Influence Doctors," *PLoS Medicine* 4 (2007): 623 ("gigs"), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1876413/pdf/pmed.0040150.pdf.

Dr. Ahari was also struck by how Purdue had ramped up its speaker recruiting drive and tied it to its OxyContin launch. To put numbers to his impression, the Government Accountability Office (GAO) reported that Purdue's speaker-bureau list for 1996 through mid-2002 included 2,500 physicians, of whom over 1,000 were active participants. Ahari, "I Was a Drug Rep;" GAO, *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem* (Washington, D.C.: GAO, 2003), 22. Purdue also trained nurses and pharmacists at its conferences, whose total attendees numbered about 5,000 over five years (p. 22).

increasingly dependent on the financial support, one will (like it or not, conscious or not) become less and less likely to say something else."[176]

The same may be said of expert consultants and witnesses, who are often accused of telling one side of the story at the expense of the other. Let me say, then, that the government was not always on the side of the angels. Federal officials fudged data and played on racial stereotypes to help persuade legislators and judges, dubious about expanding federal police power, to accept the 1914 Harrison Narcotic Act. The Treasury Department's 1919-1920 decision to close even well-run municipal maintenance clinics was bad public policy. So was the jacking up of state and federal drug sentences in the 1950s and again in the 1970s and 1980s. Opioid revisionists had no monopoly on incautious crusading. By the late 1980s American drug policy, especially in its penal aspect, stood in need of reform.[177]

Whatever impetus drug-war excesses may have provided for opioid revisionists, however, their main objective was not sentencing reform. Their main objective was to rebrand narcotic conservatism, in both its attitudinal and regulatory dimensions, as opiophobia, clearing the way for more widespread use of opioid analgesia in pain of noncancerous as well as cancerous origin. In destigmatizing opioid therapy revisionists re-stigmatized its most visible failures—prescription-opioid addicts, recast as a small minority of defective or selfish spoilers

---

[176] Posner, *Pharma*, 368; Christian Munthe, "Senate Probe into Pharma Sponsoring of U.S. Bioethics Center," Philosophical Comment, May 12, 2012, http://philosophicalcomment.blogspot.com/2012/05/intersting-probe-into-pharma-sponsoring.html; (quotation).

[177] I expressed these criticisms in *Dark Paradise*, chaps. 1, 4-7.

whose abuse of otherwise valuable analgesics held back progress against the real epidemic, that of undertreated pain. Defining opioid addiction in revisionist terms provided gave opioid-makers and -promoters with a tautological defense: When things go wrong, it is not the misappraised drug, it is the miscreant person. Dr. Richard Sackler and others would seize on this argument after 2000, when their opioid promotion campaign began to publicly unravel. First, however, they faced a more fundamental task, the cooptation and propagation of the new skepticism about narcotic conservatism. What elevated the dissenting views of a handful of academics into a force that upended the lives of millions of Americans and their families was pharmaceutical industry backing for, and orchestration of, the revisionist movement that crystallized in the 1980s.[178]

### 3.  Development of Revisionist Organizations

By "orchestration" I mean that the industry supported and coordinated the activities of key revisionist organizations as well as individual KOLs. Prominent among these organizations were professional pain management associations and patient-advocacy groups that promoted liberalized opioid prescribing. One such beneficiary was the American Pain Foundation (APF), established in 1997 as a 501(c)3 nonprofit organization. The APF grew into the largest advocacy organization for pain patients, whose sympathetic stories it deployed to shape journalistic,

---

[178] Faulting opioid abusers, e.g., Richard Sackler to Tom Gruber, email, February 1, 2001, PDD8801133516. Keefe, *Empire of Pain*, 62-65, describes how Dr. Arthur Sackler, Dr. Richard's uncle and Sackler family patriarch, made virtually identical blame-shifting arguments for the abuse of Librium and Valium, the drugs that made the family's first great fortune.

legislative, and consumer opinion. Endo, King Pharmaceuticals, J & J, Purdue, Cephalon, Abbott, and other opioid manufacturers provided more than 90 percent of APF's funding.[179]

"APF is a Pharma front," wrote Dr. Michael Schatman, a psychologist and pain researcher. "[T]hey are funded by Pharma and spend most of their time trying to advocate for patients' right for 'pain treatment,' i.e., access to opioids." Journalistic and congressional investigators judged APF "an industry mouthpiece that masqueraded as a patient advocacy organization." When reporting to its paymasters, APF dropped the mask. It boasted of state and federal lobbying efforts; public relations initiatives; Spanish-language patient education; email and toll-free phone information services; media briefings to "fight misconceptions about opioids;" high-level coordination with allied pain groups; and heightened web visibility, APF's site reaching no. 3 in Google "pain" searches for 2002. It spent a year maneuvering to land a story in the American Association of Retired Persons' flagship magazine, *Modern Maturity*, which had over seven million readers. ("[I]t resulted in 200% increase in calls to our toll-free info line.") And it did these things until May 3, 2012, when the APF board, facing investigation by the Senate Finance Committee, voted to dissolve the organization.[180]

---

[179] American Pain Foundation, 2010 *Annual Report*, https://www.documentcloud.org/documents/277604-apf-2010-annual-report.html, 1 (largest advocacy organization), 16-19 (funding sources). The page numbers given are those of the original document.

[180] Michael Schatman to Jennifer Wagner, email, April 15, 2011, CHI_000623586 ("front"); Posner, *Pharma*, 487 ("mouthpiece"); U.S. Senate Finance Committee, "Findings from the Investigation of Opioid Manufacturers," pp. 4-5, including the link to John D. Giglio to Pamela Bennett, September 19, 2002, https://www.finance.senate.gov/imo/media/doc/26.%20APF254%20-%20Report%20to%20Purdue%20on%202002%20Accomplishments%20to%20Purdue.pdf (APF initiatives reported to funders, "misconceptions," Google, "200%"); and Charles Ornstein and Tracy Weber, "American Pain Foundation Shuts Down as Senators Launch Investigation of

Despite its size—80,000 members—the APF was a replaceable loss. Since the 1990s

opioid manufacturers had cultivated national, regional, state, and metropolitan organizations:

Greater Philadelphia had its own affiliate of American Pain Society (APS). The primary purpose

of these organizations, typically called pain societies, foundations, associations, or initiatives,

was to influence health care providers, patients, and policy makers. But they also gave revisionist

advocates credibility and cover. Professional groups like the American Academy of Pain

Management, explained Purdue public relations executive Robin Hogen, allowed talented Purdue

speakers to "fly under [their] umbrella," enjoy "tremendous credibility," and avoid being

"discounted as a company fla[c]k."[181]

---

Prescription Narcotics," ProPublica, May 8, 2012, https://www.propublica.org/article/senate-panel-investigates-drug-company-ties-to-pain-groups#:~:text=American%20Pain%20Foundation%20Shuts%20Down%20as%20Senators%20Launch%20Investigation%20of,newly%20defunct%20American%20Pain%20Foundation.

Dr. Schatman, who also received funding from opioid manufacturers, earned a "bad egg" reputation for his heterodoxy: KOLs who failed to toe the line were of little use to manufacturers and their fronts. Will Rowe email chain, December 14, 2011, CHI_000680206 ("bad egg"). Dr. Schatman also landed on a Teva watch list of problem KOLs. "Dr Schatman feels special interest groups and industry have 'tainted' pain medicine the ability to treat patients effectively. This includes Universities [sic], medical schools, some pain groups and pharma and is a KOL that Teva should monitor for activity." "Teva Advocacy Mapping: Identifying Advocacy Partners to Enhance Patient Care" (TS, March 28, 2013), quotation at TEVA_OK_00101720, https://www.industrydocuments.ucsf.edu/drug/docs/#id=lngg0230.

[181]The groups and their "influence map and functional responsibility" are described in "States with Potential Access Issues: Advocacy & Policy Overview" (TS, 2009), n.p., JAN-MS-02494562. Quotations in Hogen to Michael Friedman email, April 10, 2000, PDD8801104393. McGreal, *American Overdose*, part I and chap. 12, offers an overview of how opioid manufacturers funded pro-opioid opinion leaders and advocacy groups.

Pain societies for health care professionals did not begin life as pharmaceutical fronts. The APS, for example, was formed in 1976 by twenty-eight national leaders in different disciplines and specialties who had a common interest in pain treatment, education, and research, and who wanted to establish a U.S. affiliate for the recently founded IASP. John Bonica to Judith A. Turner, July 2, 1992, and Judith A. Turner to John Bonica (with attachments), June 10, 1992, box 51, folder 22, "American Pain Society," JJBP. However, by the 1990s and 2000s, as Dr. Joel

Similarly camouflaged were pain surveys that pharmaceutical manufacturers and their public relations agencies salted with questions designed to sway consumer attitudes and promote products: "push polls" in common parlance. The APF internally analyzed nine such polls between 1994 and 2002, the majority on behalf of J & J subsidiaries that manufactured opioids. Although none of the surveys was initiated by an independent nonprofit organization, they often involved groups like the National Council on Aging or the Arthritis Foundation. Such names, the APF reviewers wrote, lent "credibility to the studies and increase likelihood of media coverage," as did hiring reputable polling agencies to conduct the surveys. Professional pain organizations provided additional cover. In 1998 the APS and the AAPM co-sponsored Janssen's Duragesic-keyed phone survey of individuals identified as chronic pain patients. In 2000 Purdue used Partners Against Pain, its unbranded educational and advocacy arm, to release the findings of a pain-patient phone survey "designed specifically to promote OxyContin."[182]

Partners Against Pain, which had been founded by Purdue in 1993, developed an eponymous website that featured its own chronic-pain survey and Purdue's popular Pain Assessment Scale. The scale was another marketing device, worrisome test results being a well-trod path to seeking and obtaining prescriptions. Other pages offered advice about how pain could be managed with opioids. The answer was aggressively. One page claimed that oxycodone and other pure opioid agonists (those not part of a mixed analgesic product like Percocet) had no

---

Saper indicates below, opioid manufacturers and their affiliated KOLs held increasing sway over the APS and its programming.

[182] American Pain Foundation, "Review of American Pain Surveys Designed to Gain Media Placement and/or Influence Consumer Attitudes, 1994-Present" (TS, May 2020), "credibility" and "designed" pp. 2, 13, JAN-MS-02325533-JAN-MS-02325548.

ceiling dose. That high doses suppress breathing and increase the risk of death went unmentioned.[183]

In April 2001, when OxyContin abuse, addiction, and overdose deaths were becoming headline news, Purdue's advocacy director, Pamela Bennett, solicited help from Partners against Pain to contain the crisis. Bennett dispatched a 53-page public relations kit with bolded talking points and a public-relations primer:

- **Criminals and drug abusers are threatening to complicate or prevent legitimate access to the very medications that chronic pain sufferers need most.**

- **These patients with chronic pain can no longer "suffer silently" and may be denied the medications and adequate dosing they require. They will vociferously make their case known by "suffering out loud."**

- **We cannot allow drug abusers to dictate our public health policy.**

These three messages reduce the issue to a few words—exactly the terse format that reporters and public officials like to utilize to express themselves on important matters. The words in these message statements should become your mantra in every contact you make with people in a position to tell the story of what's really going on in the field of chronic pain management.

---

[183] Posner, *Pharma*, 412-413. Testing increases prescribing: Sergio Sismondo, *Ghost-Managed Medicine: Big Pharma's Invisible Hands* (Manchester: Manchester Press, 2018), p. 8, https://www.matteringpress.org/books/ghost-managed-medicine. Purdue later recruited the actress Jennifer Grey to make television appearances on behalf of PartnersAgainstPain.com, which she represented as "a really interesting educational program" for people in chronic pain to "become advocates for themselves." Horwitz et. al., "Inside the Opioid Industry's Marketing Machine."

"Your mantra" was Purdue's mantra, expressed eight weeks earlier by Dr. Richard Sackler: "We have to hammer on the abusers in every way possible. They are the culprits and the problem. They are reckless criminals." The catch was that Purdue could not be seen to do the hammering, because, as Bennett admitted, reporters discounted what self-interested pharmaceutical companies had to say. But before-and-after-treatment stories and "word portraits of patient groups indignant that prescription pad thieves and other criminals are stealing access to much needed medications for pain … have high interest and credibility with the media. In these situations patients and their advocates are speaking for themselves."[184]

Except that they were not speaking for themselves, or not entirely. Purdue composed, word-for-word, the post cards, letters to states' attorneys general, flyer material, civic-association talks, and other tactical tools for Partners Against Pain, along with helpful advice on placing op-eds and looking good for television interviews. Such ventriloquizing tactics were used to sway regulators and policy makers as well as to promote specific drugs and devices. "When they need to," writes Dr. Sergio Sismondo, "companies can create patient advocates and advocacy organizations out of thin air (and money), to give voice to their interests in a way that has or can

---

[184] Richard Sackler to Tom Gruber, email, February 1, 2001, PDD8801133516; Partners Against Pain, "Pain Control Advocacy Toolkit" (TS, April 4, 2001), JAN-MS-00304077-JAN-MS-00304129, quotations on pp. 7-9. Purdue also used the stigmatizing strategy against individual litigants who became addicted to OxyContin. As Purdue attorney Howard Udell put it, "When you ignore safety warnings and take an otherwise safe and effective product in an irresponsible and illegal manner, no personal injury lawyer will be able to help you cash in on your own misconduct by suing the product's maker." The catch that was oxycodone tolerance and addiction, which prompted or exacerbated drug-seeking behavior in many patients, meant that OxyContin was neither "an otherwise safe and effective product" nor unimplicated in users' "misconduct," to say nothing of the externalities addictive behavior generated. Udell: Nora Freeman Engstrom and Robert L. Rabin, "Pursuing Public Health Through Litigation," *Stanford Law Review* 72 (2021): 312 n. 138, https://review.law.stanford.edu/wp-content/uploads/sites/3/2021/02/Engstrom-Rabin-73-Stan.-L.-Rev.-285.pdf.

be taken to have legitimacy." Purdue's *vox populi* cost $8 million, the price of creating and subsidizing Partners Against Pain.[185]

4. Blockbuster: Revisionism and the Success of OxyContin

Purdue's early, coordinated, and ongoing support of revisionist KOLs and advocacy organizations paid large dividends after December 28, 1995, when the FDA approved OxyContin for treating moderate-to-severe pain lasting for more than a few days. This stipulation, unprecedented for a Schedule II controlled substance, was made, Purdue later conceded, on the basis of no clinical studies showing OxyContin to be "less addictive, less subject to abuse and diversion, or less likely to cause tolerance and withdrawal than other pain medications." The FDA's approval nonetheless opened the "big non-cancer marketplace for OxyContin" that the company had been eyeing. The way having been cleared to "much, much more effectively address a much, much bigger market!" Dr. Richard Sackler enjoined his sales force to bury the competition in a "blizzard of prescriptions." To conjure up the blizzard they sought out receptive practitioners and, through them, patients suffering from complaints like back pain, arthritis, and fibromyalgia. Most side effects, Purdue promised in May 1996, would quickly diminish. OxyContin pills provided "smooth and sustained" pain relief. There was no need to worry about "iatrogenic 'addiction' to opioids legitimately used in the management of pain," as the condition was "very rare." The hypodermic hope that Dr. Greene had voiced in 1867 ("I now enter the chamber of *suffering*, *knowing* that I have in my possession an *unfailing* remedy for pain") was

---

[185] "Pain Control Advocacy Toolkit;" Sismondo, *Ghost-Managed Medicine*, 176; Posner, *Pharma*, 413 ($8 million).

reassuringly updated to safe, oral, long-lasting, and unfailing. Purdue had helped overturn narcotic conservatism and, in the process, turned opioid revisionism into a marketing tool.[186]

OxyContin was an immediate success. During its first year on the market, doctors wrote a half million prescriptions for the drug in cases of CNP. Two years after the launch OxyContin was responsible for 80 percent of Purdue's profits. The success was due to a decade of revisionist groundwork followed by aggressive promotion and—chance favoring the prepared pharmaceutical mind—opportunistic grasp of a subtle misperception. In a June 2, 1997, summary of OxyContin market research, Purdue executive Michael Cullen reported that "some physicians, particularly Oncologists [sic]" perceived OxyContin as "not being as strong as MS Contin." Though the error had cost some cancer-pain sales, the belief that oxycodone was "a 'weaker' opioid than morphine" was a net positive. Because the CNP market was vastly larger, Cullen reasoned, "it is important that we allow this product to be positioned where it currently is

---

[186] "Agreed Statement of Facts," *United States* v. *Purdue Frederick Company, Inc. et al*. (TS, 2007), 4, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=zfdf0232 (no clinical studies); "OxyContin Launch Team Minutes" (TS, April 4, 1995), http://documents.latimes.com/oxycontin-launch-1995/ ("marketplace"); Richard Sackler, "OxyContin: The Most Significant Product Launch in Purdue History!" *Teamlink* 11 (Winter 1996): 1-2, 8, quotations pp. 2 and 8 [PKY180280952, PKY180280958]; "New Hope for Millions of Americans…," OxyContin press release (TS, May 31, 1996), http://documents.latimes.com/oxycontin-press-release-1996/, 1, 2, 8, scare quotes in original; and Greene, "Hypodermic Administration," 97. Keefe, *Empire of Pain*, 192-197, recounts Purdue's campaign to win over Dr. Curtis Wright IV, the FDA medical reviewer in charge of evaluating the OxyContin NDA. Approximately a year later Dr. Wright took a job at Purdue Pharma "with a first-year compensation package of nearly $400,000" (196).

in the physician's mind" and "not to change the perception of physicians toward oxycodone when developing promotional pieces, symposia, review articles, studies, etc."[187]

Cullen's boss Michael Friedman, Purdue's head of marketing and sales, agreed. He had kept his boss, Dr. Richard Sackler, informed of the OxyContin team's findings. Friedman thought the fact that oxycodone was commonly prescribed in combination with non-opioid analgesics (for example, in Percocet tablets) accounted for the belief that it was appropriate for "less serious" nonmalignant pain. Given that Purdue was already developing hydromorphone-based medications "to relaunch into cancer pain," the prevailing attitude toward oxycodone dovetailed with its marketing plans:

> When we launched OxyContin, we intentionally avoided a promotional theme that would link OxyContin to cancer pain. We specifically linked OxyContin to the oxycodone combinations with our 'old way, new way' campaign. We made sure that our initial detail pieces provided reps with the opportunity to sell the product for a number of different pain states. With all of this, we were still concerned that the drug would be slotted for cancer pain and that we would encounter resistance in the 'non-malignant pain market.'…
>
> Despite our initial uncertainty, we have been successful beyond our expectations in the non-malignant pain market. Doctors use the drug in non-malignant pain because it is effective and the 'personality' of OxyContin is less threatening to them, and their

---

[187] Posner, *Pharma*, 420-421 (sales and profits); Michael Cullen email, June 2, 1997, re OxyContin team meetings, most recently that of May 23, 1997, PAK003806691. Scare quotes in the original.

patients, than that of the morphine alternatives. (I apologize for this unscientific term, but, I feel it captures the notion that there are image related [sic] attributes that influence drug acceptance.) While we might wish to see more of this product sold for cancer pain, it would be extremely dangerous, at this early stage in the life of this product, to tamper with this 'personality,' to make physicians think the drug is stronger or equal to morphine.

"I agree with you," Dr. Richard Sackler replied. "Is there general agreement, or are there some holdouts?"[188]

There was none. Instead Purdue and its KOLs stuck to the revisionist line on opioid safety. In 1998 Dr. Alan Spanos, a pain specialist and one of Purdue's top paid speakers, appeared in a promotional video, fifteen thousand copies of which the company distributed without FDA approval. "In fact," said Dr. Spanos, "the rate of addiction amongst pain patients who are treated by doctors is much less than 1 percent. They [the opioids] don't wear out. They go on working. They do not have serious medical side effects. And so these drugs—which, I repeat, are our best, strongest pain medications—should be used much more than they are for patients in pain."[189]

---

[188] Friedman to Sackler email, May 28, 1997, with Sackler reply to Friedman, May 28, 1997, PAK003806689. The exchanges recall Haislip's comment, quoted above: "It has never been clear to me who prescribes drugs in our country, the physicians or the drug company representatives who explain what a drug can do and how it should be prescribed, based on the determinations of the company that markets the drug."

[189] Dr. Spanos: *Long-Term Opioid Therapy Reconsidered* and "Top Speakers 1999" (TS, September 1999), PPLPC025000004773. Distribution, FDA: GAO, *Prescription Drugs*, 4-5, 27-28; John Fauber and Ellen Gabler, "Anatomy of an Epidemic: The Opioid Movie," September 9, 2012, https://www.medpagetoday.com/neurology/painmanagement/34650. Fauber and Gabler

Purdue drilled its expanding sales force, whose bonuses were tied to revenue from OxyContin sales, in techniques to overcome any lingering narcotic conservatism. Representatives were taught to exaggerate the difficulty of extracting pure oxycodone for abuse; highlight the purported absence of euphoria and other undesirable "peak and trough" blood-level effects; minimize the likelihood of tolerance and withdrawal symptoms; and point to the "less than one percent" chance of medical addiction. "He had the *New England Journal of Medicine* article saying that people don't get addicted," West Virginia physician Rajan Masih recalled of his Purdue sales representative. "If they have legitimate pain, they won't get addicted. That got handed out to every doctor." The front-desk staff got pizza, mugs, and pens to ensure entrée. "It's not subtle," Dr. Masih said of Purdue's method. But it did work. "It was a very effective presentation," remembered Phillip Prior, a family physician in Chillicothe, Ohio. "It really did make you doubt what you'd been taught in medical school."[190]

---

inquired into the fates of the seven patients who appeared in the video. They found that "two of the seven patients died as active opioid abusers. A third became addicted, suffered greatly, and quit after realizing she was headed for an overdose. Three patients still say the drug helped them cope with their pain and improved their quality of life. A seventh patient declined to answer questions."

[190] "Agreed Statement of Facts," *United States* v. *Purdue Frederick,* 5-6; Meier, *Pain Killer*, 73-84, "one percent" p. 80; McGreal, *American Overdose*, 40 (Masih); Quinones, *Dreamland*, 132 (Prior). McGreal adds that "a typical Purdue rep was paid $55,000 in 2001 but pulled in bonuses of $71,500" (48). Posner, *Pharma*, 421, reports that, by 2000, Purdue sales representatives were earning $40 million in year-end bonuses on total sales of $1.1 billion.
　　Purdue sales representatives also approached pharmacists, the last point in the supply chain for preventing abuse and diversion. One representative told druggist Samuel A. Okoronkwo that he could get into trouble for "arbitrarily" refusing to fill prescriptions he judged likely to be abused. Okoronkwo held his ground: "I told him I didn't have to fill a prescription that I didn't feel was medically necessary." Meier and Petersen, "Sales of Painkiller Grew Rapidly."

Dr. Loree Kalliainen, who trained as a physician and hand surgeon during the 1990s, witnessed both aggressive opioid marketing and the changes it wrought in the pattern of drug abuse, addiction, and overdose deaths. Toward the end of her fellowship, in the late 1990s, she was approached by "a lot of drug reps" who told her "you really should use these wonderful, amazing new opioid prescriptions because you'll never get tolerance, you'll never get addictions, they're great for pain." But then, she said, "you start to see what was going on." What was going on she illustrated with Ohio data ("mirrored across the country") that showed the sharp, sustained increase in unintentional drug overdoses during and after the late 1990s. Her data, from a 2010 Ohio study, appear in Figure 3. In the early 1990s, Dr. Kalliainen observed, the biggest source of overdoses had been crack cocaine. By the early 2000s it was prescription opioids, and the situation had become conspicuously worse. She was struck by the similarity to another iatrogenic phenomenon, escalating antibiotic resistance. "We overdo," Dr. Kalliainen said. "and now we're facing the problem."[191]

**Figure 3**: Unintentional Drug Overdose Deaths in Ohio, 1979-2008, Before, During, and After Dr. Loree Kalliainen's Medical Training

---

[191] Quotations from Loree K. Kalliainen, "Multimodal Pain Management Strategies in the Opioid Epidemic Era," Webinar, June 14, 2015, https://www.youtube.com/watch?v=aap5hgBIGmk.



(Fig. 3 sources: Loree K. Kalliainen, "Multimodal Pain Management Strategies in the Opioid Epidemic Era," Webinar, June 14, 2015, https://www.youtube.com/watch?v=aap5hgBIGmk, and Ohio Prescription Drug Abuse Task Force, *Final Report*, October 1, 2010, p. 20, https://medicine.wright.edu/sites/medicine.wright.edu/files/page/attachments/OPDATF.pdf.)

5. Emulation and Extension of Purdue's Revisionist Marketing

OxyContin's marketing and sales—revenue jumped from $48 million in 1996 to $1.1 billion in 2000—did not go unnoticed. Neither did the broader, revisionist-encouraged increase in opioid use in CNP. In 1980 doctors prescribed opioids in 8 percent of office visits involving chronic musculoskeletal pain. In 2000 they prescribed opioids in 16 percent of visits—twice as many, despite the fact that the rate of visits for this type of pain had little changed. Moreover, doctors in 2000 who treated these patients with opioids were far more likely to use more potent varieties (hydrocodone, oxycodone, morphine, methadone, fentanyl, hydromorphone, and

meperidine) than weaker varieties like codeine. The percentage of visits for musculoskeletal pain in which physicians wrote prescriptions for strong opioids rose from 2 percent in 1980 to 9 percent in 2000. The 9 percent represented 5.9 million patient visits, a rise of 4.6 million visits from 1980. And this was for just one variety, albeit a common one, of CNP.[192]

The pattern of modern pharmaceutical history is that the commercial success of a new type of prescription drug (e.g., broad-spectrum antibiotics, tranquilizers, oral contraceptives) or a new formulation of existing drugs (e.g., fixed-dose combination antibiotics) prompts a competitive scramble. Several firms introduce similar branded drugs of purportedly superior safety or efficacy and tout them with promotional tactics that often mirror those of the original blockbuster. Whenever possible, generic manufacturers compete for a share of a market that, boosted by ongoing branded and unbranded promotions, continues to expand. In 1998 Viagra became available for patients with ED. In 2018 doctors and patients could choose among Viagra, Cialis, Levitra, and generic tadalafil and sildenafil, the last being the compound Pfizer had originally developed for treating hypertension and angina but which had proved most effective (and profitable) for treating ED.[193]

There is nothing inherently wrong with such competition-driven expansion, except in cases where some or all of the proliferating products entail fewer demonstrable therapeutic

---

[192] Posner, *Pharma*, 421 (OxyContin sales data) and Margaret A. Caudill-Slosberg, Lisa M. Schwartz, Steven Woloshin, "Office Visits and Analgesic Prescriptions for Musculoskeletal Pain in US: 1980 vs. 2000," *Pain* 109 (2004): 514-519, https://journals.lww.com/pain/Abstract/2004/06000/Office_visits_and_analgesic_prescriptions_f or.38.aspx.

[193] Posner, *Pharma*, sildenafil background at 372-373.

benefits and/or more serious risks that pharmaceutical firms choose to ignore, obfuscate, and/or misrepresent to regulators, physicians, and/or consumers. This happened twice with prescription opioids. First, firms ignored, obfuscated, and misrepresented the *existing* historical and medical evidence. Then they ignored, obfuscated, and misrepresented *new* evidence that accumulated in the early 2000s with the emergence of the prescription-opioid addiction and overdose crises. Before assessing their conduct during these crises, however, I will describe examples of opioid product repositioning, development, and marketing influenced by Purdue's success—a success intertwined with the industry's collective (though often disguised) effort to liberalize professional, legal, and consumer attitudes toward opioid prescribing. What Purdue started others emulated and extended. The result was that, by 2010, firms throughout the supply chain were marketing and selling prescription opioids in the face of an expanding opioid addiction epidemic.[194]

Of all Purdue's potential competitors, J & J found itself in the most complex strategic situation. Depending on where they sat, J & J executives saw OxyContin's success as an opportunity, a threat, or both. On October 15, 1998, Michael Kindergan, vice president of Noramco, a J & J subsidiary, wrote to Ed Miglarese, vice president of supply management for P.F. Laboratories, Purdue's manufacturing subsidiary. Kindergan said that J & J had begun

---

[194] Emulated and extended: Keefe, *Empire of Pain*, 367, and "Duragesic™ Disease Modeling" (slide deck, April 29, 2002), JAN-MS-02109422. The latter, an analysis by the consulting firm McKinsey, acknowledged that "OxyContin created the sustained release opioid market in chronic back pain." The market, "fast growing," "complex," and with "significant unmet need," held further potential if J & J targeted the right patients, especially older women, and the right physicians, "pain specialists [who] write so many Rx that even those with low DURAGESIC share are move valuable than DURAGESIC-loyal PCPs [primary care providers]." Quotations slides 3-4, spelling and capitalization thus.

receiving high-thebaine concentrate of poppy straw. It came from Tasmanian Alkaloids, another J & J subsidiary that had ramped up cultivation of a patented poppy strain designedly rich in thebaine. (What made thebaine commercially important was its ready convertibility into one of several semisynthetic opioids, including hydrocodone and oxycodone.) Meanwhile J & J had been upgrading and increasing its own oxycodone manufacturing capacity at its plants in Wilmington, Delaware, and Athens, Georgia. Kindergan spelled out the mutual advantages:

*Thebaine*

As discussed in my letter of August 10, in the context of a long-term agreement, Noramco will work with PF Laboratories to secure its *entire*, *worldwide* requirements.

This is not a minor point. As we have discussed, access to raw materials is going to be critical to obtaining security of supply.

*Next Step*

We have been discussing supply of oxycodone for many years now. The proposal we have made involves commitments such as

- Accelerating bringing capacity on stream

- Dedicating capacity to PF Laboratories' requirements

- Changing Tasmanian Alkaloids' cultivation / extraction strategy

With a long term [sic] commitment, Noramco can work to provide even more capacity than in this proposal that will give PF Laboratories the maximum security of supply for its franchise by virtue of:

a)      having two sources of supply—both with proven compliance track records and both with state-of-the-art facilities,

b)      gaining access to raw materials on a worldwide basis which simply cannot be provided by any other company.

Of course, we need a long term [sic] commitment from PF to be able to provide the support this proposal envisions.[195]

Two years later, in 2000, Kindergan publicly repeated his warning of possible shortages in the *Wall Street Journal*. By then Noramco was nearing the end of a long but ultimately successful lobbying campaign launched a decade before by Robert Angarola. In 1990 Angarola appeared as outside counsel for J & J in House hearings on opium importation. He and Raymond J. Stratmeyer, then president of Normaco, sought changes in the so-called 80/20 rule, which favored opiate imports from India and Turkey. They wanted to make it easier to import concentrate of poppy straw, which was richer in alkaloids, more cost-efficient than Indian gum opium, and a potential source of profit for both Noramco and Tasmanian Alkaloids. Though Angarola and Stratmeyer's initial attempt to change the rule failed, Normaco and its allies persisted. Their efforts bore fruit in 2000, when lobbyists for Noramco, Tasmanian Alkaloids,

---

[195] Michael Kindergan to Ed Miglarese, October 15, 1998, PDD1701649792, https://www.documentcloud.org/documents/6145945-Letter-From-Noramco-to-PF-Laboratories.html, italics in original, and Peter Whoriskey et al., "How Johnson & Johnson Companies Used a 'Super Poppy' to Make Narcotics for America's Most Abused Opioid Pills," *Washington Post*, March 26, 2020, https://www.washingtonpost.com/graphics/2020/business/opioid-crisis-johnson-and-johnson-tasmania-poppy/ https://www.washingtonpost.com/graphics/2020/business/opioid-crisis-johnson-and-johnson-tasmania-poppy/. The U.S. patent, filed in 1996 and issued in 2000, is at https://patentimages.storage.googleapis.com/13/a6/68/4ba029e38555d8/US6067749.pdf

Glaxo, Mallinckrodt, and the Australian government raised the specter of scarcity and got

thebaine imports exempted from the rule. Thebaine, the *Wall Street Journal* explained, "is turned

into oxycodone, an ingredient in some popular painkillers. Sales of one such drug, OxyContin

from Purdue Pharma …, leapt 95% last year to about $600 million."[196]

J & J could thus make money by selling its thebaine and thebaine-based derivatives to

Purdue and other expanding opioid manufacturers. In 2011, J & J reported to the Therapeutic

Goods Administration, the Australian equivalent of the FDA, that Tasmanian Alkaloids had

come to dominate the global market:

> In 1995, Tasmanian Alkaloids initiated a project to develop a high-thebaine poppy. In
>
> sampling the alkaloid content of thousands of plants, one plant was found to have a high
>
> content of thebaine and no morphine, and the first commercial crop of these unique
>
> poppies was harvested in 1998. The new plant revolutionised [sic] thebaine production
>
> and today it has up to 80% of the worldwide market for Oxycodone [sic] raw materials.

---

[196] U. S. House of Representatives, *The Licit Importation of Opium: Hearing before the Subcommittee on Crime of the Committee on the Judiciary* (Washington, D.C.: GPO, 1990), 47-65, https://books.google.com/books?id=y7ysYT0rbgcC&pg; Whoriskey et al., "How Johnson & Johnson Companies Used a 'Super Poppy' to Make Narcotics" (Glaxo, Tasmanian Alkaloids, Australian government lobbying); Peter Andrey Smith, "How an Island in the Antipodes Became the World's Leading Supplier of Licit Opioids," Pulitzer Center, July 11, 2019, https://pulitzercenter.org/reporting/how-island-antipodes-became-worlds-leading-supplier-licit-opioids (thebaine exemption); and Steve Stecklow and Jonathan Karp, "Opium Importers Assail U.S. Rule that Favors India and Turkey," *Wall Street Journal*, April 3, 2000, https://www.wsj.com/articles/SB954716501828527155 (Kindergan, Noramco and Mallinckrodt lobbying, quotation). Glaxo, later part of GlaxoSmithKline, was another Tasmanian opium processor; Mallinckrodt was a U.S. opioid manufacturer.

Tasmanian Alkaloids is presently the largest manufacturer of active pharmaceutical

ingredients in Australia and the largest exporter of codeine and thebaine in the world.

One importer was Noramco, the leading U.S. processor of the active ingredients for opioid

analgesics. By 2015 Noramco accounted for a 65 percent market share of the oxycodone used by

U.S. pharmaceutical manufacturers; 60 percent of morphine; 60 percent of codeine; 54 percent of

hydrocodone; and smaller but appreciable percentages of hydromorphone and oxymorphone,

14% and 9% respectively. Of the $190 million Noramco earned in 2014 from sales of these six

opioid ingredients, $94 million—almost exactly half—came from oxycodone.[197]

The problem for J & J was that Noramco's total sales of opioid *ingredients* represented a

fraction of the total retail sales for finished products—for example, 2.4 percent of the $8 billion

U.S. market in opioid analgesics in 2014. Throughout the late 1990s and early 2000s the biggest

markups were for branded prescription opioids, especially the more potent varieties. J & J

competed in that market, too. It had begun by introducing acetaminophen-plus-codeine

analgesics of varying strengths in the 1960s and 1970s. The popularity of these drugs (Tylenol

with Codeine nos. 1, 2, 3, and 4) had led, in 1979, to the establishment of the Noramco

subsidiary, initially intended to support the manufacturing of the codeine product line. Then, in

---

[197] Johnson and Johnson Family of Companies in Australia, "Submission to the Transparency Review of the Therapeutic Goods Administration" (February 11, 2011), 6, scroll down to the archived pdf at https://webarchive.nla.gov.au/awa/20110405002252/http://www.tga.gov.au///consult/cons-transparency.htm; "Noramco Has Steadily Gained U.S. Market Share" (sales data slide in *Washington Post* article accessed via a link labeled "according to an October 2015 sales presentation"), https://www.washingtonpost.com/graphics/2020/business/opioid-crisis-johnson-and-johnson-tasmania-poppy/, also JAN-OK-00150013, https://www.industrydocuments.ucsf.edu/drug/docs/#id=slgg0230.

1990, J & J had introduced Duragesic, a transdermal fentanyl patch. The FDA denied approval

for acute postoperative pain—fentanyl proved too dangerous in opioid-naïve patients—but it did

approve Duragesic for treatment of chronic pain "such as that of malignancy" that required

continuous opioid analgesia and that could not be managed by less potent non-opioid and opioid

analgesics. Duragesic enjoyed commercial success, but the rapid rise of Purdue's heavily

promoted rival, OxyContin, threatened J & J's share of the long-acting opioid market.[198]

Two solutions presented themselves: beat them or join them. J & J considered both. The

join-them plan was called "Project Pearl." The pearl was Purdue, whose OxyContin success J &

J tracked carefully. In early 2000 J & J and Purdue executives began discussing the possibility of

collaboration. J & J envisioned a partnership "that leverages each partner's assets and

capabilities to create a Pain Management Franchise that is significantly larger and more

profitable than that which the partners could build on their own." The partnership options ranged

---

[198] U.S. Food and Drug Administration, "FDA Analysis of Long-Term Trends in Prescription Opioid Analgesic Products" (March 1, 2018), 4, https://www.fda.gov/media/111695/download ($8 billion); Posner, *Pharma*, 417 (markups); McNeil Consumer Healthcare Company, "History of TYLENOL [sic]," http://www.nancywest.net/pdfs/McNeilConsumerHealthcareCompany.pdf (1960s, 1970s); Posner, *Pharma*, 417 (markups); McNeil Consumer Healthcare Company, "History of TYLENOL [sic]," http://www.nancywest.net/pdfs/McNeilConsumerHealthcareCompany.pdf (1960s, 1970s); "Noramco, Inc., a Johnson & Johnson Company," https://topworkplaces.com/company/noramco-inc-a-johnson/delawareonline/ (founded 1979); Theodore H. Stanley, "The Fentanyl Story," *Journal of Pain* 15 (2014): 1220, https://www.jpain.org/action/showPdf?pii=S1526-5900%2814%2900905-5 (postoperative patients, commercial success); "Janssen Duragesic Fentanyl Transdermal Patch Approved for Chronic Pain, One Week After NDA Day; J&J Partner Alza Will Co-Promote to Oncologists, *Pink Sheet*, August 13, 1990, https://pink.pharmaintelligence.informa.com/PS017889/JANSSEN-DURAGESIC-FENTANYL-TRANSDERMAL-PATCH-APPROVED-FOR-CHRONIC-PAIN-ONE-WEEK-AFTER-NDA-DAY-JampampJ-RampampD-PARTNER-ALZA-WILLampnbspCOPROMOTE-TO-ONCOLOGISTS ("such as"); and 1993 Duragesic label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2003/19813se1-036_duragesic_lbl.pdf (indications).

from reciprocal co-promotion of pain products to shared research and development to a joint

venture "that creates a stand-alone 'Pain Company.'" Whatever form the franchise assumed, it

would market a range of delivery systems and products, from J & J's relatively weak Ultram

(oral tramadol) to Duragesic, then being strategically positioned "to move down in [the] pain

spectrum and broaden use beyond cancer." Opioid analgesics in the developmental pipeline, such

as Purdue's Palladone (sustained-release hydromorphone), would further expand the franchise's

ability to treat any pain state, mild or severe, cancerous or noncancerous. Another advantage was

cost-cutting. One sales force could detail both companies' pain products.[199]

The negotiations, still active in October 2000, ended sometime in early 2001. The last

mention of Project Pearl I have located refers to "new awareness of OxyContin abuse,"

presumably the reason J & J's interest cooled. That left the beat-them option, which meant

energized promotion of Janssen's own opioids as possessing some key advantage such as fewer

side effects or superior mode of administration.[200]

Despite the attempts at product differentiation, the Janssen opioid campaigns of the early

2000s bore a strong resemblance to their Purdue counterparts. Both emphasized product image,

Janssen going so far as to describe "the move toward evidence-based prescribing" as a "threat"

---

[199] Steve Zollo to Kati Chupa, email, February 18, 2000, JAN-MS-00246903 (began discussing); "Project Pearl Discussion Guide" (undated slide printouts), JAN-MS-01051777, slides 2, 5, 14 (quotations) and 11-12 (proposed product range and Palladone); Ron R. Kuntz deposition *In Re: National Prescription Opiate Litigation*, January 23, 2019, pp. 88-89 (potential savings on sales force), https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-2/ohnd-1:2017-md-02804-02634-003.

[200] "Analgesic Franchise—Business Development Update" (TS, January 2001), Purdue Frederick update of October 3, 2000, JAN-MS-04290087 (still active); "ULTRAM SR SCENARIOS" (slide deck, January 12, 2001), slide 7, JAN-TX-00275055 ("new awareness").

to its pain franchise. Both stressed undertreated noncancer pain and targeted conditions like back injuries or arthritis in a "promotionally responsive market" characterized by increasing consumer "involvement" and "demands." Both relied on identifying, cultivating, and rewarding high-prescribing physicians. Both furnished behind-the-scenes support for, and coordination of, the revisionist project. And both used a mix of highly incentivized sales representatives and outside firms in pursuit of these aims.[201]

One such firm, Discovery International, was a sales-support company that packaged Continuing Medical Education (CME) programs, organized conferences, trained speakers, and prepared films, slides, publications, and websites. In August 2001 Discovery International presented a plan to sell more Duragesic, Janssen's transdermal fentanyl patch. The goal was to make Duragesic the "1st opioid choice for chronic ATC [around-the-clock] pain," particularly the CNP variety. Central to Discovery's endeavor was NPEC, the National Pain Education Council. Funded by Janssen, NPEC was to be cochaired by Dr. Portenoy and Dr. Richard Payne, another KOL with industry ties. NPEC's steering, curriculum, and peer-review committees included such opioid advocates as Drs. June Dahl, Perry G. Fine, Judith Paice, Steven D. Passik, Charles Cleeland, Kathleen Foley, and David Joranson, whose credentials were upgraded to "MD" in the Discovery International proposal. The NPEC team would develop curricular and other materials that promoted opioid use generally and Duragesic particularly, e.g., by providing information on fentanyl patch technology, dosing, titration, and "ten years of safety and efficacy."[202]

---

[201] "Janssen 2001 Pain Franchise Plan" (slide deck, August 3, 2000), slide 30, JAN-MS-00785781 (quotations).

[202] "Duragesic Tactical Plan Review Presented by Discovery International to Janssen Pharmaceutica" (slide deck, August 15, 2001), https://www.docketbird.com/court-documents/In-

NPEC commenced operations in 2002. It featured a one-stop website linked to selected medical and regulatory sites, pain management guidelines and literature, pain society calendars, downloadable slides, and printable pain assessment forms. It housed multimedia courses and case studies that simulated "real-life situations with virtual patients whose pain progresses over time. Practitioners have the opportunity to navigate through each interactive case as if they were treating the patient, while having the opportunity to follow the virtual patients' [sic] progress." The monitoring occurred under the KOL's virtual oversight. Drs. Portenoy and Payne prepared two of the cases, one for cancer pain and one for osteoarthritis. Dr. Portenoy added tests in which examinees could receive additional information by linking to suitable studies or authorities. The latter offered "more clinically based (rather than evidence-based) discussion by an expert (e.g., Dr. Portenoy, Payne, Foley, Joranson)" in audio, video, and/or textual format.[203]

---

re-National-Prescription-Opiate-Litigation/Exhibit-81/ohnd-1:2017-md-02804-02313-030;"1st choice" from slide 2, "ten years" from slide 19.

     J & J evaluated Discovery International as an advertising entity. It performed well its first year. However, dissatisfaction with the firm's second-year performance led to NPEC being transferred to another group of designers and managers called Discovery East. Kati Chupa, "Johnson & Johnson Advertising Group Agency Performance Survey: Discovery International" (TS, April 25, 2002), JAN-MS-02392886.

[203] "National Pain Education Council Is Comprehensive New Resource for Health Care Professionals," *ONS News* 18 (February 2003): 11, https://web.p.ebscohost.com/ehost/pdfviewer/pdfviewer?vid=4&sid=7193d653-008d-4768-b31b-eeea49f56672%40redis ("real-life"); Discovery International, "Meeting Summary Report" (TS, February 19, 2002), p. 2, JAN-MS-00312347-JAN-MS-00312351("clinically based"). "AP-48: Shifting the Paradigm to Enhance Patient Care: Medical Education Strategies and Tactics" (slide deck, 2003), JAN-MS-042055270, slide 35, lists the fully operational NPEC website's features, including "Interactive Web-based Case Studies." Drs. Foley and Portenoy's financial backing is documented above; Mr. Joranson's support is discussed and documented below. For Dr. Payne, see Matthew Perrone, "Federal Pain Panel Rife with Links to Pharma Companies," *Seattle Times*, January 27, 2016, https://www.seattletimes.com/business/federal-pain-panel-rife-with-links-to-pharma-companies/, and NPEC, *Appropriate Opioid Pharmacotherapy for Chronic Pain Management: Primer with Posttest* (2002), https://www.industrydocuments.ucsf.edu/drug/docs/#id=mlgg0230.

NPEC's web-based CME functioned as a pro-opioid information loop. Janssen hired educational program designers and managers who selected revisionist content and revisionist thought leaders who selected revisionist commentators who discussed nonmalignant and malignant pain. Although Dr. Portenoy protested that he worked hard to "maintain a firewall" between himself and pharmaceutical marketers, the real firewall in this instance was between the accumulated evidence of opioids' risks in CNP and the "more clinically based" dispensation of liberalized opioid prescribing.[204]

NPEC also had a missing firewall: the one between marketing and CME. Discovery International performed both services. The CME program's purpose, marketing, remained unspoken outside Janssen. In 2019 Dr. Portenoy, the co-chair, testified that Janssen had not told him that the CME platform was meant to persuade physicians to prescribe Duragesic to CNP

---

*Appropriate Opioid Pharmacology* indicated that all six of the CME's case studies (for low back, diabetic neuropathy, fibromyalgia, and burn pain, as well as cancer and osteoarthritis pain) were prepared and/or featured "clinical consults" by KOLs with ties to Janssen or, in the case of Dr. Dahl, other opioid manufacturers (pp. 4, 7-8). It claimed that, despite advances in opioid analgesia, professional and lay misperceptions and fears remained barriers to overcoming America's costly epidemic of undertreated pain (pp. 5, 16-17). And it hinted that some opioids, Duragesic among them, possessed clinical advantages, e.g., "While constipation is common in both oral and transdermal opioids, studies have suggested that the transdermal route of administration has a lower incidence of constipation than the oral route" (p. 18).

Kati Chupa, then Janssen's product director for analgesia, commemorated the launch of the website in an email, June 18, 2002, JAN-MS000786581: "I want to thank you with [sic] the content and the SPIRIT in which the NPEC launch kicked off here at Janssen. Bill made quite a big splash walking around in his 'sign board'!! The balloons, cake, stickers, magnets and signs were all great and we appreciate every late night minute that you all spent working on the website. I think we are off to a terrific start with NPEC, now we just have to keep driving those physicians to the site!"

The NPEC site, judged a "valuable resource," was updated to improve navigation, functionality, and interactivity and relaunched on June 10, 2005. Sharon Vaulman and Bruce Ritchie to Pain Sales Force, June 30, 2005, JAN-MS-03071078.

[204] Portenoy oral history interview, 34.

patients. He said he found the revelation troubling because "continuing medical education is supposed to be based on information that's balanced and comprehensive and medically appropriate."[205]

Endo's equivalent to NPEC was the CME-accredited National Initiative on Pain Control (NIPC), created in 2001. Over the next decade NIPC used multiple formats—live regional and national meetings, dinner programs, audioconferences, podcasts, newsletters, and a website called PainKnowledge—to reach more than 1.23 million health care providers, from physicians to podiatrists. Endo described NIPC as an "integrated" and "independent" educational initiative. The former term was accurate, the latter was not. NIPC and its educational programs were funded solely by Endo, which worked with revisionist organizations such as the APF and opinion leaders such as Dr. Perry Fine.[206]

One of NIPC's popular CME offerings, "Advances in Opioid Analgesia: Maximizing Benefit, Minimizing Harm," provided its own history of opiate use and control. China had fought and lost wars to suppress the illegal opium trade, and morphine addiction had become a problem in the late nineteenth century and early twentieth centuries. What followed, however, was a

---

[205] Dr. Portenoy's deposition in *State of Oklahoma* v. *Purdue Pharma, L.P. et al.*, January 24, 2019, pp. 89-91, PPLP004493009-PPLP004493011. Janssen supported NPEC CME programming through at least April 30, 2004, as indicated in Chris Tompson to Kay Sadik, March 10, 2004, JAN-MS-00789915. As of September 2004, NPECWEB.ORG was still "Janssen's funded website." Janelle Sullivan email chain, September 3, 2004, JAN-TX-00072834.

[206] Draft letter to Vice President Joe Biden, March 2010, ENDO-OPIOID MDL-01940510 ("integrated," 1.23 million); Endo's "Riskmap Update Report for Opana® ER" (TS, September 1, 2010), END00358523-END00358524 (website, APF, Dr. Fine, and affiliated CME activities); Endo's "Riskmap Update Report for Opana® ER" (TS, June 2007), ENDO-OR-CID-00640194-ENDO-OR-CID-00640196 (sole funder, dinners, newsletter).

"harsh" legislative overreaction that "severely limit[ed] opioid availability" and shuttered

morphine maintenance clinics, encouraging illicit heroin use as a "step-down agent." The

pendulum of medical opinion swung back during and after the 1960s, as the hospice, palliative

care, and patients' rights movements refocused attention on opioids as important analgesics.

Controlled clinical trials "demonstrated the efficacy of opioids for both acute and cancer pain."

In 1999 JCAHO approved standards that "specifically mandated the rights of patients to receive

appropriate pain management." Data suggested "that addiction potential was possibly

overstated." The new millennium would be an "era of balance" in which professional, regulatory,

and pharmaceutical stakeholders would recognize the indispensability of opioids in treating

chronic pain and strive to "maximize symptom relief and functional improvement while

minimizing addiction, diversion, and side effects."[207]

NIPC's history was a mixture of truth, omission, and misinterpretation. Supply

expansion—of opium in China, of morphine in the United States—had triggered epidemics of

opiate addiction. Supply reduction and conservative narcotic control had contained them, while

also closing experimental maintenance clinics and prompting drug-switching among addicts. The

"rejustification of opioid use"—NIPC's term for revisionism—did trace back to concerns over

better treatment of cancer pain. But JCAHO's about-face was prompted by industry lobbying and

financial support, not clear-cut evidence. Controlled studies of acute and cancer pain did not

justify long-term opioid management of CNP. Nor did "data" of exaggerated addiction risk,

---

[207] "Advances in Opioid Analgesia: Maximizing Benefit, Minimizing Harm" (slide deck, 2002), KP360_OHIOMDL_000344240, slides and slide notes 4-6, quotations from slides and slide notes 5-6.

given that the data consisted of a 1982 article about pain management of burn victims undergoing debridement and Porter and Jick's 1980 letter about hospitalized patients.[208]

NIPC's appeal for balancing risks and benefits of opioid therapy came with a qualification: "Some degree of noncompliant behavior is common in clinical practice." Physicians alert for signs of abuse and addiction were warned to think twice before firing patients, because "not all 'addict-like' behavior is an infallible sign of addiction." Patients engaged in apparently aberrant, drug-seeking behavior might be experiencing undertreated pain or an undiagnosed pathology. They were "pseudoaddicts" in need of more, rather than less, opioid-based treatment. This concept, based on similarly flimsy studies, featured in other revisionist continuing education courses.[209]

Neither Janssen nor Endo regarded CME programs as stand-alone endeavors. Janssen conceived NPEC as one part of a long-term sales strategy to increase Duragesic market share, particularly in CNP conditions that "represent considerable growth opportunities for the brand. Our objective is to convince physicians that DURAGESIC is effective and safe to use in moderate to severe chronic pain such as back pain and degenerative joint disease like osteoarthritis." Built around a "Life, Uninterrupted" promotional theme, the campaign targeted likely prescribers directly with visits from representatives equipped with reprints on improved functionality, dermal-patch-shaped Post-it notes, and "leave-behind" refrigerator magnets reminding patients when to change their fentanyl patches. Janssen reminded its sales force that

---

[208] Ibid., slide 5 and notes.

[209] Ibid., slides and slide notes 36-42, quotations from slides and slide notes 37, 41, 42. The promotion of pseudoaddiction in other continuing education courses is described below.

indirect marketing from third parties was also in play, including NPEC invitations to enroll in its

new CME course. The invitations went to primary care physicians, residents, nurses, and

pharmacists as well as pain specialists and oncologists.[210]

Endo went a step a further, preparing NIPC-branded and -sponsored flyers in English in

Spanish aimed at patients rather than health care providers. "Pain: Opioid Therapy" promised

that "opioids can be taken safely for pain relief"—including moderate pain as low as "4" on a

10-point pain scale—and reviewed "the risks and benefits of opioid therapy, and what you can

expect once *you* start taking an opioid medication." Among those risks was addiction, not usual

for "people who take opioids as prescribed." (Or, in the Spanish version, not usual "for people

who take prescription opioids" generally.) Patients seeking more information were invited to talk

to their healthcare professional, whose names and addresses were to be stamped in the contact

box at the end of what was transparently an appeal to opioid-naïve consumers.[211]

If eduational intiatives could be made to dovetail with other marketing initiatives, they

could also be mapped out well in an advance of a new opioid analgesic's approval and launch. In

2003 Janssen asked Discovery East, which had taken over management of the NPEC project, to

plan the pre-launch marketing for a fentanyl transdermal system code-named AP-48, then under

development. AP-48 contained naltrexone, a narcotic antagonist that could theoretically reduce

---

[210] "Duragesic Fentanyl Transdermal System" (TS, 2002), n.p., JAN-MS-00310227-JAN-MS-00310229), and Horwitz et al., "Inside the Opioid Industry's Marketing Machine" (Post-it). Why pharmacists, who fill rather than write prescriptions, were educational program targets is discussed below.

[211] NIPC, "Pain: Opioid Therapy" and "*Dolor: Tratamiento Opioide*" (brochures, 2009), JAN-MS-03087536-JAN-MS-03087539, quotations from pp. 1 (italics added) and 2 of the English version, translation from p. 2 of the Spanish version.

the abusability of the fentanyl in the patch. Discovery East proposed an NPEC-style educational campaign to promote the new product and position Janssen's transdermal fentanyl favorably against OxyContin, whose potential for abuse and addiction had by then become significant liabilities. The campaign centered on "medical education strategies and tactics," including publication planning; KOL advocacy and development; speaker training and programs to support the field sales force; expert dialogues; videos; additional NPEC CME courses; and "pre-launch advetorials" with an "educational tone" to be "run in journals widely read by target audiences" with "reprints distributed at professional meetings."[212]

Discovery East described how it would "develop and foster relationships that ultimately result in preferential treatment for Janssen and AP-48" and how it would rely on "opinion leader management and stratification," which assigned to KOLs prestige- and specialty-specific roles. The elite, the "policy influencers," consulted, participated in guideline programs and consensus conferences, and served as "strategic figurehead[s]." Medical educators acted as advisory and editorial board members, trained "faculty" (i.e., national or regional speakers), served as "publications/author" for review articles and newsletters, and offered tactical advice as consultants. Researchers conducted clinical trials, authored publications (including "original manuscripts"), and served as speakers in their particular area of expertise.[213]

---

[212] Susan Roman to Stephen Cornwell, email, October 23, 2003, JAN-MS-04205269; "AP-48: Shifting the Paradigm to Enhance Patient Care: Medical Education Strategies and Tactics" (slide deck, 2003), JAN-MS-042055270, quotations slides 1, 21. Naltrexone/fentanyl product under development: "AP-48 D-TRANS fentanyl + naltrexone" (slide deck, October 22, 2001), JAN-MS-02462099.

[213] "AP-48: Shifting the Paradigm to Enhance Patient Care: Medical Education Strategies and Tactics" (slide deck, 2003), JAN-MS-042055270, quotations slides 69, 72. Discovery East's predecessor, Discovery International, viewed KOL stratification and management in similar

In late 2003 J & J subsidiary Alza Corporation, citing the need for additional data to satisfy FDA filing requirements, decided not to submit an NDA for AP-48. Discovery's proposal, and the approved NPEC program on which it was modeled, nonetheless illustrate Janssen's underlying marketing strategy. That was to design and execute, with outside expertise and assistance, a promotional campaign with academic medical cover that emphasized both opioid underuse in CNP and the advantages of its particular opioids; to disseminate the message through multiple outlets to multiple audiences; and to begin shaping opinion well before the drug's approval and release.[214]

In this last respect AP-48's pre-launch marketing closely resembled Purdue's planning for Palladone, its long-acting hydromorphone product. In late 2004 Purdue finally secured FDA approval for Palladone, but then had to pull it from the market in mid-2005 because the potent opioid could interact fatally with alcohol. Purdue bet on Palladone and lost, though not for want of advance preparation. By late 1999 the company anticipated 100 additional "reps promoting pain" when Palladone launched, this in addition to the 820 reps selling OxyContin. That same October, five years before FDA approval, Purdue was promoting Palladone's name recognition

---

terms, as in David Duvall to Jim Witt, Dennis Fitzgerald, and the Duragesic Team, undated email, p. 2, exhibit 502, *State of Oklahoma* v. *Purdue Pharma L.P. et al.*, https://www.industrydocuments.ucsf.edu/drug/docs/#id=hhwf0232.

[214] "Alza Corporation Delays AP-48 Filing," J & J press release, Dec 9, 2003, https://johnsonandjohnson.gcs-web.com/news-releases/news-release-details/alza-corporation-delays-ap-48-filing.

among "important future customers" with a booth featuring a smoothie machine and models "enlisted to capture leads on-site." The site was the APS annual scientific meeting.[215]

Nothing in prescription-opioid marketing was unplanned. In 2013 Teva, then expanding "in the pain space" after its 2011 acquisition of Cephalon, hired public relations firm GolinHarris to prepare an "advocacy map" to identify and prioritize "groups with which Teva is most aligned" by using a proprietary program to "better understand potential allies and detractors as an important early step in developing strategies to engage and/or minimize them." (Top influential allies included AAPM and APS; top detractors Physicians for Responsible Opioid Prescribing and its founder, Dr. Andrew Kolodny, who advocated for less frequent opioid prescribing in CNP and for moving hydrocodone products to the more restrictive Schedule II.) In 2016 Teva identified, assessed, selected, ranked, and approved KOLs and devised storyboards for "patient

---

[215] Marc Kaufman, "Painkiller Palladone Pulled Over Alcohol Risk," *Washington Post*, July 14, 2005 (alcohol); "Scott Levin SFSS" (data matrix dated Q3/99-Q1/00), column headed "Reps Promoting Pain," JAN-MS-00785795; and "American Pain Society 18th Annual Scientific Meeting, October 21, 1999" [Purdue staff guide to the meeting], PKY180433144 ("important") and PKY180433164 ("customers," "leads").
    The last document indicates that those who visited the OxyContin booth across the aisle (PKY180433151) got OxyContin-branded Slim Jims, "Partners Against Pain" pins, Dr. Spanos's video, and "Myths about Opioids," among other giveaways. Attendees were also invited to a dinner symposium, "New Options in Opioid Therapy," held at the Fort Lauderdale beach resort and paid for by a Purdue "unrestricted educational grant" (PKY180433167). As early as 1996 Dr. Richard Sackler and other Purdue executives had discovered, through data analysis, that "physicians who attended dinner programs or the weekend meetings wrote more than double the number of new Rxs for OxyContin compared to the control group, and this was sustained over the 3-month post-meeting evaluation period." Sackler email, October 23, 1996, PAK00306895.

video vignettes" as part of its pre-launch activities for Vantrela ER, an extended-release hydrocodone tablet.[216]

Janssen similarly conceived its "Neo Pathways" project as a "successful unbranded campaign" to achieve "flawless launch readiness." The products to be launched were a short- and long-acting version of Nucynta (tapentadol). Tapentadol is a Schedule II synthetic drug that works as an opioid agonist and norepinephrine-reuptake inhibitor, meaning it has two potential means of achieving analgesia. Though the FDA did not approve the short-acting version of Nucynta until late 2008, or the long-acting version until 2011, Janssen began its "message rollout" to medical professionals in early 2007. The message was that both acute and chronic moderate-to-severe pain were "under-managed" due to ignorance, opiophobia, and unpleasant gastric side effects, notably constipation. Acute pain, the condition short-acting Nucynta targeted, was important because its neglect could lead to "chronification," i.e., permanent pain. "The NEO Pathways Hook" was to position tapentadol as the solution: a drug possessing dual analgesic action as well as better tolerability and efficacy, generating more willing prescribers and more compliant patients. The revolution in opioid analgesia—and Janssen's opioid sales— had yet to reach their full potential. NEO Pathways would foster both by creating a stir before introducing a competitively advantageous product.[217]

---

[216] "Teva Advocacy Mapping," TEVA_OK_00101618 (quotations), TEVA_OK_00101622 (top groups), TEVA_OK_00101720 (Dr. Kolodny); "Marketing Deliverables: Vantrela ER Launch," 2016 Excel spreadsheet, lines 89-92, 502-503, 509, TEVA_MDL_A_02778947.

[217] "Tapentadol Global Commercial Team" (slide deck, April 15, [2008]), JAN-MS-00457581, quotations from slides 7, 27. "Global" meant just that. The commercial team disseminated information at EU as well as US medical meetings (slides 132-141), and its digital marketing tools had an international reach.

NEO Pathway's catchphrase was "Disrupting the Complacent Marketplace." What the disruption entailed is shown in Figure 4, the "high-level overview of the set of initiatives and tactics" from the April 2008 planning meeting. Janssen planned to create a "Leadership Council," which included prominent revisionists Drs. Fine and Payne, to inform the messaging for the unbranded and branded marketing campaigns. It would have its own Medscape webpage, a "KOL driven unbranded site" aimed at clinicians that focused "on key communication points of the unbranded campaign." Among these was Epocrates, a Blackberry-friendly drug-information resource used by 213,000 physicians that could also provide "KOL driven information" and "dispel myths about addiction."[218]

**Figure 4**: Janssen's Pre-Launch Marketing Plans for Nucynta (tapentadol), 2008

---

[218] Ibid., slide 15 ("overview"); slide 21 and notes (Drs. Fine and Payne, "KOL driven…"); and slide 23 and notes (Epocrates and related quotes). Epocrates continued to feature as a "non-personal delivery tactic" in "2012 Business Plan Forecast: Nucynta & Nucynta ER" (slide deck, 2012), slide 26, JAN00012414. The 2012 plan also recommends roughly $8 million to cover live speaker programs, approximately 500 regional programs "targeting defined hot spot states," speaker bureau "management fees," virtual speaker programs, speaker "message reinforcement through news channels," and speaker bureau training, the common aim being to establish these opioids as the "new standard in moderate-severe pain management" (slide 21, JAN00012409). The 2012 plan refers to APF contributions as developing national "advocacy" partnerships and platforms for health care providers and "patient access," and labels "Let's Talk Pain" as one of three "un-branded programs" under the heading of "public relations programming" (slide 24, JAN000012412). Capitalization has been removed from these quotations.

198



(Figure 4 Source: "Tapentadol Global Commercial Team" [slide deck, April 15, 2008], JAN-MS-004575s81, slide 15.)

The leadership council was assisted by nearly sixty medical advisors, some of whom would also participate in the "publication plan." These works (76 planned or published posters and abstracts, 39 planned, pending, or published articles) dealt with such primary concerns as the results of the tapentadol clinical trials. Janssen also envisioned "secondary" or "unbranded" publications that highlighted problems with existing therapies and thus created an opening for tapentadol. Several articles were already in the pipeline; more were to come. In July 2009 PriCara, a division of Ortho-McNeill-Janssen, contracted with Health Sciences Communications for the "overall scientific and strategic development" of four research articles on chronic pain. The four articles were to appear on an unbranded website after approval by PriCara and their

nominal faculty authors. The fee, $131,895, was billed to the Tapentadol ER advertising account.[219]

Among the means of personal promotion were the "Unbranded Speaker Bureau" and the sales force. The bureau was to feature 100-150 local speakers, trained at regional advisory meetings, who would appear at dinner programs, roundtable meetings, in-office programs, webcasts with live question-and-answer sessions, and archived tapes on MedScape/WebMD. (The activities were compensated at different rates. In Texas's College Station Territory, in 2009, the honoraria for a "NEO speaker turned Tapentadol speaker" was $1,000 for a local presentation, $1,500 for an out-of-town engagement, and $500 for a teleconference.) By late 2008 the sales force was also being drilled in Project Neo's key messages. Janssen representatives were instructed to warn physicians about "opiophobia as a barrier" and to remind them that the risks of prescribing "are much smaller than commonly believed," both from the standpoint of "physician disciplinary action" and prescription-opioid addiction and misuse. They were also to cultivate pharmacists as "pain management advocates" and steer them to NEO speaking programs that featured "trained pharmacy speakers."[220]

---

[219] "Tapentadol Global Commercial Team", slides 36-39 (advisors) and 47-53 (publications); PriCara contract with Health Science Communication, July 7, 2009, JAN-MS-00323414-JAN-MS-00323418. An example of a NEO advisor who doubled as author was Yale School of Medicine anesthesiologist Dr. Raymond Sinatra. His review article, "Causes and Consequences of Inadequate Management of Acute Pain," appeared in *Pain Medicine* 11 (2010): 1859-1871, https://academic.oup.com/painmedicine/article/11/12/1859/1943985. Here too Health Science Communications "provided editorial support during the development of the manuscript and administrative assistance with the electronic submission. The support was funded by PriCara®" (p. 1866).

[220] "Tapentadol Global Commercial Team," slide 34 (bureau); Tammy Scahill email chain, April 7, 2009, JAN-TX-00003575 ("turned," honoraria); and "NEO Pathways: New Directions in Pain,

A key component of "advocacy development" (Figure 4, under non-personal promotion) was Let's Talk Pain, an unbranded coalition that bore a close resemblance to Purdue's Partners Against Pain. In February 2008 PriCara began planning the new advocacy group in conjunction with the APF, the AAPM, and the American Society for Pain Management Nursing, all organizations to which Janssen had previously contributed. Let's Talk Pain, which made its formal debut at the December 2011 AAPM annual meeting, used multiple media outlets to criticize excessive regulation and featured a "personalized" website that "captured individual preferences" with the help of cookies. The public face of Let's Talk Pain was Dr. Scott Fishman, a prominent KOL and author. Dr. Fishman stressed that pain remained a leading public health problem and too often undertreated.[221]

---

District Hub Meeting" (slide deck, November 2008), JAN-TX-00002318, sales-instruction quotations from slides 13, 14, 26, 27.

Additional evidence that the Nucynta speaker program was operationalized is in the Haya Taitel email chain, June 25, 2009, JAN-MS-00254146: "I received a disturbing feedback about a speaker program in which the speaker indicated to the audience that NUCYNTA should not be prescribed for more than 90 days…. Can we educate the speaker that we studied NUCYNTA for 90 days in our safety study but the FDA via our label did not put time restriction on this medication. While it is an acute pain indication, acute exacerbation of pain can be of longer use need [sic]."

[221] Kick-off meeting minutes attached to Chris Handler distribution email, February 29, 2008, JAN-MS-01239405-JAN-MS-01239407 (sponsors) and JAN-MS-01239411 (website); "'Let's Talk Pain' Coalition to Improve Care," MedNews, December 16, 2011, https://ulifiz.wordpress.com/2011/12/16/lets-talk-pain-coalition-to-improve-care/ (launch, Dr. Fishman); and Temple, *American Pain*, 49-50 (criticize regulation). Dr. Fishman's ties to manufacturers are documented above. Janssen donations: "Contributions to Advocacy Organizations" (TS, February 25, 2019), exhibit s1349, *State of Oklahoma* v. *Purdue Pharma L.P. et al.* Let's Talk Pain also promoted "pseudoaddiction," the revisionist concept that what looked like drug-seeking behavior by an addict may simply be the result of undertreatment of pain. (The origins of the concept are discussed below; an example is "Pain: The Real Story: Understanding Addiction," Let's Talk Pain, April 22, 2012, https://web.archive.org/web/20100628173947/http://www.letstalkpain.org/real_story/addictions.html.) Posner, *Pharma*, 413, notes that Partners Against Pain also gathered information about

The notion that pain was a "major health crisis and a public priority" had been voiced before, in a J & J 2004 global pharmaceutical strategy session that also described the pain market as "very attractive" and "still growing." The claim surfaced again in 2011, when Janssen Medical Affairs launched a complement to Let's Talk Pain called Imagine the Possibilities Pain Coalition. This "broad-based coalition of leaders" was a mix of old and new KOLs acting as paid consultants who met periodically with Janssen executives seeking a "strategic focus" and an alignment of thinking on "priority issues and unmet needs." One need was the development of a new communications platform to advance "principles and practices of pain management," the first principle being that "Chronic Pain is the #1 public health problem."[222]

There was in fact no consensus that chronic pain constituted a public health problem as opposed to a clinical problem manifest, often in complex or idiopathic ways, in individual patients. And there was certainly no consensus that chronic pain outranked well-documented killers like tobacco smoking or obesity or alcohol and drug addiction as sources of preventable morbidity and mortality in the U.S. population. Even so, the new #1 was to be supported with "a

---

visitors to its site, and used it to refer them to local pain specialists known to be heavy opioid prescribers. Purdue targeted the patients in this database during its 1996 OxyContin launch.

[222] J & J Pharmaceuticals Group, "Pain: Environmental Overview—External: Pain is a Very Attractive Market" (slide deck, July 22, 2004), JAN-MS00432798, slide 1 and notes, slide 2 (2004 quotations); "Imagine the Possibilities Pain Coalition, Launch Meeting" (slide deck, June 24, 2011), JAN-MS-00939903, slides 3 ("broad"), 7 ("priority"), 8 (membership list); "Imagine the Possibilities Pain Coalition" (slide deck, October 12, 2011), JAN-MS-00940009, slide 3 ("#1"). Janssen's consultants included familiar faces, such as Dr. Richard Payne, and relative newcomers such as the well-known bioethicist Dr. Arthur Caplan, whose consulting agreement is Janssen Contract # ICD 378379, JAN-MS-014971-JAN-MS-014987. Also involved was Penny Cowan, founder of the American Chronic Pain Association, which received Janssen funding and which Janssen internally listed as a "primary external partner." Jim Rendon, "How Nonprofits Helped Fuel the Opioid Crisis," *Chronicle of Philanthropy* (February 2022), 29-37, quotation p. 33.

wide dissemination plan that encompasses multidimensional means to channel communications using graphics, on-line, and traditional vehicles." The means envisioned ranged from articles in prestigious health policy journals such as the *Milbank Quarterly* to retail chain ads along the lines of "Starbucks—*Pain* message of the day."[223]

If chronic pain was a big problem, its solution entailed relatively little risk of addiction. That was the message of *Finding Relief: Pain Management for Older Adults*, a 2009 guidebook and DVD sponsored by Ortho-McNeil-Janssen's PriCara division, acting in partnership with AAPM, an organization to which Janssen had by then contributed $551,570. The guidebook's author was Stephen R. Braun, who wrote the similarly revisionist *Exit Wounds*, a 2009 Purdue- and APF-sponsored book aimed at (and given free-of-charge to) U.S. military veterans. In *Finding Relief*, Braun assured readers that proper use of opioids enabled CNP patients to "return to normal," notwithstanding "opioid myths" about addictiveness, loss of function, and tolerance. "Many studies show that opioids are *rarely* addictive when used properly for the management of chronic pain."[224]

---

[223] Imagine the Possibilities Pain Coalition," JAN-MS-00940009, slide 3.

[224] *Finding Relief: Pain Management for Older Adults*, pp. 17 (quotations, italics in original), 34-35 (Braun the author; sponsor PriCara, partner AAPM), exhibit 61, *County of Wayne and County of Oakland* vs. *Purdue Pharma et al.,* https://millerlawpc.com/wp-content/uploads/2017/10/Opioid-Complaint-Exhibits-51-111.pdf. *Finding Relief* (p. 30) offered additional resources and web addresses for such organizations as the American Chronic Pain Association, American Geriatrics Society, and the National Pain Foundation, all of which Janssen had supported financially up to and including the year of publication, 2009. The donations and the $551,570 AAPM figure (computed through 2009) are listed in "Contributions to Advocacy Organizations," exhibit s1349, *State of Oklahoma* v. *Purdue Pharma, L.P. et al.*
        Braun was the co-author of Derek McGinnis with Stephen R. Braun, *Exit Wounds: A Survival Guide to Pain Management for Returning Veterans and Their Families* (Washington, D.C.: Waterford Life Sciences, 2009), copyright page (APF, Purdue), 103-108 (pro-opioid advice). Braun later described his career as a medical ghostwriter and the bias in pharmaceutical-

This was revisionism in a nutshell, and it was central to the prescription-opioid marketing campaigns. The unbranded initiatives of Purdue, J & J, and Endo reviewed above show that these companies and their subsidized, often overlapping allies worked to promote a market-broadening *concept* as well as to differentiate and promote particular products. The concept was that, if old prejudices and burdensome regulations were cast aside, chronic pain—widespread, undertreated, and pathogenic in own right—could be safely managed with long-term opioid analgesia in a way that enhanced most patients' functioning without serious risk of addiction.

Hydrocodone manufacturers, whose sales also grew rapidly during the 1990s and the early 2000s, made use of the same revisionist thesis. In 2001 Watson Pharma spelled out its importance in its sales manual for Norco, then a Schedule III hydrocodone combination product

---

industry-backed studies and publications in "'Promoting 'Low T:' A Medical Writer's Perspective," *JAMA Internal Medicine* 173 (2013): 1458-1460, https://www.kaisergornick.com/documents/JAMA-Article-Braun.pdf.

In its *2010 Annual Report*, p. 8, https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Appendix-157-APF-Annual-Report/ohnd-1:2017-md-02804-01896-160 (also ENDO-OPIOID_MDL-02959090, which has metadata date of December 31, 2010), the APF stated that it distributed 4,000 copies of *Exit Wounds* to wounded veterans staying in Fisher House Foundation homes (accommodations built near military and VA medical centers to assist veterans and their families when someone requires hospitalization) and another 500 copies to veterans attending the 2010 National Convention of the Disabled American Veterans.

Teva also declared itself a sponsor of *Exit Wounds* and made plans for publishing a second edition. Although the second edition never appeared in print, Teva did subsidize the book's named author, Derek McGinnis, "for his time and … for his participation in media interviews." McGinnis biographical sketch (TS, October 2013 ), TEVA_MDL_A_01136224. Planned second edition: Excel contract spreadsheet, line 45275, 11/24/2015 TEVA_MDL_A_03437093. *Exit Wounds* sponsorship: "Vantrela™ ER Core Team Meeting" (slide deck, December 9, 2014), slide 29. The same slide lists Teva meeting sponsorships and memberships for such organizations as the APS and the AAPM.

(HCP) that combined low-dose acetaminophen with 5, 7.5, or 10 mg of hydrocodone, to be taken up to six times a day:

> The alleviation of pain was one of medicine's earliest and most important objectives. Although the use of opiates was suppressed for a number of years based on the false belief that patients using the drugs appropriately for pain relief would necessarily become psychologically addicted and abuse them, the current, more enlightened attitude has led to a growing demand for these products.

That growing demand had made hydrocodone-acetaminophen combinations the most commonly prescribed drugs in the United States, with more than 85 million prescriptions a year and with a 15 percent annual growth rate. Watson had become the largest producer of hydrocodone for this market, in which it wanted to further expand its product line. The company's representatives were told that hydrocodone carried lower dependence risks than "most other opioids" and reminded them to stress that prescribing Norco did not require a triplicate prescription. They were drilled in the revisionist basics. "[T]he greatest abuse of narcotics is not inducing addiction, but rather not using a narcotic because of the *fear of addiction*." Managing withdrawal "should rarely be a clinical problem." Addiction was "quite rare" in pain patients. The risky drug was the acetaminophen, toxic at high doses. Hence the low dose of acetaminophen in Norco. Hydrocodone had side effects, too, but addiction in pain patients was not among them. "There is essentially no evidence that adequate administration of opioids for pain produces addiction. Indeed, there is reason to suppose that administering effective doses of opioids consistently on a

schedule may produce less risk of abuse than administering them only when pain becomes unbearable."[225]

When approaching doctors, representatives were to use a variant of the opioids-are-good, but-my-opioid-is-better pitch. They were to say that Norco was unique because it carried little risk of acetaminophen toxicity but provided up to of 10 mg of hydrocodone, "the preferred starting dose." They were to say that Norco "uncomplicates prescribing," with most states allowing phone-in prescriptions. When dealing with trade customers, they were to emphasize the low prices, rebates, and "high-powered promotional campaign under way to insure [sic] that the product message gets out. Plus, the promotion is being directed specifically at high prescribers of these products, where the message can have the greatest impact on prescriptions."[226]

By early 2002 Watson had ramped up Norco promotion in ten "target states," eight of which were located in or bordered on the South. Selected Watson representatives were told to "*blitz* all independent and small chain accounts that *have not* purchased Norco" and another Watson HCP called Maxidone. "Do not get into any type of discussion or dialog about efficacy or your opinions. Stick to the script. We are offering the pharmacist free product to put on their shelf so they can fill the Norco and Maxidone scripts. End of discussion." The object of the

---

[225] *Norco Training Binder* (Corona Calif.: Watson Pharma, 2001), pp. 3.3, 3.4, 5.1, 6.1, 6.2, with italics in original, Allergan_MDL_03255938-Allergan_MDL_03255055. Marketing materials for pure opioid analgesics, such as Kadian, similarly stressed the dangers of acetaminophen, e.g., "Opioids Can be a Safer Option than Other Analgesics," slide 7 of "Managing Chronic Pain and the Importance of Customizing Opioid Treatment" (undated slide deck, ca. 2006), Acquired_Actavis_00943445, https://www.industrydocuments.ucsf.edu/drug/docs/#id=hhff0232.

[226] *Norco Sales Training Manual: Frequently Asked Questions and Answers* (undated), quotations pp. 6.1, 6.3, 6.5, Allergan_MDL_03352621-Allergan_MDL_03352627.

discussion: "100% distribution of Norco and Maxidone in Independent and non-warehousing

chain drug accounts."[227]

6. Manufacturers, Medical Education, and Medical Institutions

In due course we will see that manufacturers also worked with national pharmacy chains

and distributors to promote prescription opioids, e.g., by providing revisionist CE programs to

re-educate pharmacists and, through them, their customers. However, marketing of this sort

made sense only if physicians could also be persuaded to prescribe opioids for CNP. Sales

representatives, CMEs, conferences, KOL presentations, favorable articles and studies, and other

methods reviewed above offered manufacturers multiple means for persuading physicians

already in practice. Better still, however, if physicians in training, who represented the future of

prescribing, could be directly socialized into revisionist norms. Best of all if professional

regulatory and accrediting institutions could be induced to support the revisionist line.

By the early 2000s opioid revisionism had been percolating through the medical

curriculum for more than a decade, much as narcotic conservatism had a century before. One San

Francisco physician, who participated in an interview-based study of changing attitudes toward

opioid prescribing, recalled that the "mantra" during his residency in the mid-1990s was

"Believe the patient's pain." The patient, not the clinician, was the judge of "the fifth vital sign."

The physician's role was to "treat, keep escalating narcotics until a patient is pain-free. There

was a lot of teaching around trying to maximize pain control in sort of a non-judgemental [sic]

---

[227] "Norco/Maxidone Stocking Program Guidelines" (TS, n.d., referencing campaign of January 18, 2002, through February 28, 2002), ALLERGAN_MDL_03733544. Italics in original.

way." Another San Francisco clinician told the interviewers that he was given no evidence of the efficacy of opioids in CNP. He nonetheless learned that "it was like that was the good thing to do, the right thing to do, 'If people have pain, treat their pain.'"[228]

The revisionist teaching trend was national, and it included elite medical schools. "My instructors told me that when you take opioids for pain you can't become addicted because pain absorbs the euphoria," recalled Dr. Nathaniel Katz, a Boston pain specialist. "That was at Harvard Medical School. It was rubbish, we all know now." But he and his classmates absorbed the messages "because we wanted them to be true." They had always had the authority to prescribe narcotics, but they now felt they could do so with minimal risk of addiction. "I went to medical school during the period [2003-2007] when it was like, if you have pain, we have to

---

[228] Kelly R. Knight et al., "Opioid Pharmacovigilance: A Clinical-Social History of the Changes in Opioid Prescribing for Patients with Co-occurring Non-Cancer Pain and Substance Use," *Social Science and Medicine* 186 (2017): 89, 90, https://reader.elsevier.com/reader/sd/pii/S0277953617303441?token=94D6A412C7B00F33A26 BE2ED48AE97742239E5C29852AE06CE9DB2ABE573FFFDFB406231CC9159B631A07B9A 9002DBB8&originRegion=us-east-1&originCreation=20220225211823.
  Training occurred outside as well as inside of medical schools. Endo supported the "Fundamentals of Pain Management," an annual "primer" program for 100 residents and fellows held in conjunction with the annual meeting of the APS, into which Endo also enrolled the students by paying the first year of their dues. The cost for Endo in just one year, 2010, was over $400,000. The APS characterized the event as being "without any input or bias from industry," notwithstanding the presence of such speakers as Drs. Charles Argoff and Steve Stanos, both of whom received substantial payments from opioid manufacturers. Quotations, Endo support, speaker list: APS 2012 Honolulu meeting program, APS-MDL00000015-APS-MDL00000019, https://www.industrydocuments.ucsf.edu/drug/docs/#id=ktyw0232. ENDO 2010 payments: "Patient Education [sic], Pain spreadsheet," END00041233-END00041234, https://www.industrydocuments.ucsf.edu/drug/docs/#id=sgpw0232. Payments to Drs. Argoff and Stanos: U.S. Senate Homeland Security and Governmental Affairs Committee, Ranking Minority Member's Office, *Fueling an Epidemic*, report 2, p. 10, https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20 Third%20Party%20Advocacy%20Groups.pdf.

treat it," recalled Dr. Emily Brunner, who trained at the University of Michigan Medical School.

"Pain is a vital sign. You can't get addicted to opiates if you have real pain." Dr. Andrew

Kolodny, who trained at Temple University, heard the same pronouncement. "If patients have

legitimate pain, we were taught that they don't become addicted to these medicines, and that

instead of allowing people to suffer needlessly, we should be much more liberal in our

prescribing of opioids." Dr. Kolodny, who became an addiction specialist and medical director of

Phoenix House, a national drug treatment organization, emerged as a leading critic of the

industry-backed movement.[229]

In the late 1990s and early 2000s doctors new and old also encountered an increasingly

official and insistent version of opioid revisionism. In 1997 the APS issued, in conjunction with

the AAPM, a "consensus statement" that summarized the case for opioid revisionism. Among its

claims were these: 1) "the de novo development of addiction when opioids are used for the relief

of pain is low," 2) side effects were either easily treated or "usually dissipate with continued

use," 3) "tolerance has not proven to be a prevalent limitation to long term [sic] opioid use," 4)

---

[229] Quinones, *Dreamland*, 313-315, Katz quotation p. 313; Amy C. Sullivan*, Opioid Reckoning: Love, Loss, and Redemption in the Rehab State* (Minneapolis: University of Minnesota Press, 2021), 122 (Dr. Brunner); and Kolodny interview in *Long-Term Opioid Therapy Reconsidered*. Dr. Brunner herself became addicted to Ativan and oxycodone prescriptions following abdominal surgery and a difficult pregnancy and delivery. Her time in recovery "taught her about addiction in ways that her medical training never had. 'What the hell, this is a disease? Why didn't someone tell me?'" (122).

"tolerance is usually progression of disease," and 5) "for most opioids, there does not appear to be an arbitrary upper dosage limit, as was previously thought."[230]

These claims were shaped by the committee's lead author, Dr. J. David Haddox, another Purdue-supported revisionist, and several other figures with close industry ties which were not disclosed, including J & J advocate Robert Angarola, who died before the consensus statement's publication. Dr. Portenoy, listed as the committee's consultant, read a draft of the statement and later testified that he failed to recall suggesting specific editorial changes. If that is so, he had cause to regret it, for he came to view the statement as a risk-minimizing promotion for the wider use of opioids in CNP "without any explicit warnings concerning … prescription practices." These defects, Dr. Portenoy testified, did not prevent the consensus statement from being distributed to attendees at pain society meetings or to healthcare providers by opioid manufacturers' sales representatives for the sake of promoting their products.[231]

The authors of APS/AAPM consensus statement also observed—correctly—that state laws and regulations had begun to liberalize, as evidenced by the passage of intractable pain treatment acts that protected opioid prescribers and more accommodating policy statements from state boards of medical examiners. The examining boards, which had the power to discipline physicians and suspend their licenses, had traditionally served as opioid watchdogs—in effect,

---

[230] J. David Haddox et al., "The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement from the American Academy of Pain Medicine and the American Pain Society," *Clinical Journal of Pain* 13 (March 1997): 6-8.

[231] Dr. Portenoy's deposition in *City of Chicago vs. Purdue Pharma L.P.*, *et al.,* July 29, 2021, pp. 110-113, quotation p. 113.

mini-FBNs. By the late 1990s and early 2000s, however, they had assumed a much more permissive stance toward prescription opioids.[232]

The liberalizing trend was national, and it was facilitated by the national coordinating body, the Federation of State Medical Boards (FSMB). In April 1998 the FSMB approved new model guidelines for the use of controlled substances in treating pain. The core message was that pain was undertreated and that state medical boards should, in cooperation with state attorneys general, ease regulatory restrictions that "impede the effective use of opioids to relieve pain." The guidelines were written with the help of unspecified contributions from APS and AAPM, among other organizations. By the FSMB's own account, the 1998 guidelines "were widely distributed to state medical boards, medical professional organizations, other health care regulatory boards, patient advocacy groups, pharmaceutical companies, state and federal regulatory agencies, and practicing physicians and other health care providers." By 2004 twenty-two state medical boards had fully or partially subscribed to the guidelines, which the FSMB had

---

[232] Haddox et al., "Use of Opioids." Watchdogs, e.g., in 1953 the Oregon board warned every doctor in the state that physician addiction from self-medication was rising, with 80 percent of recent cases involving synthetic narcotics. Doctors were insufficiently aware of their dangers, in part because of "publicity given to early over-optimistic claims that the synthetic analgesics were non-addictive." To counter that misimpression, the board described the addiction liability of the most commonly used synthetic and semisynthetic narcotics. Among them were methadone, hydrocodone, and oxycodone. Ralph E. Purvine to "Dear Doctor," December 10, 1953, and "Dangerous Addictive Properties of the Newer Narcotic Analgesics," file brochure (N.c.: Oregon State Board of Medical Examiners, 1953), "Synthetic Substitutes," file 0480-76, Records of the Drug Enforcement Administration, Record Group 170-74-12, box 3, National Archives II, College Park, Maryland.

updated and reframed as a "Model Policy" for prescribing controlled substances in pain treatment.[233]

The APS and AAPM continued to support FSMB's pain messaging and literature. So did opioid manufacturers, who contributed nearly $2 million by 2012. The most ambitious joint undertaking was the promotion of Dr. Scott Fishman's *Responsible Opioid Prescribing: A Physician's Guide* (2007), a book that aimed to translate the FSMB's model policy into "real-life practice." The policy stressed the need to balance concerns over diversion and abuse with the physicians' duty to promptly assess and treat pain—a duty that, if neglected, could warrant disciplinary charges as "a departure from an acceptable standard of practice." The policy further stipulated that physicians should understand that opioid analgesics "may be essential" for treating CNP and recognize that "tolerance and physical dependence are normal consequences of sustained use of opioid analgesics and are not the same as addiction." However, surveys suggested that many doctors remained unfamiliar with this guidance or how to implement it in clinical settings. The FSMB therefore sought to distribute Dr. Fishman's book to 700,000 physicians, a large undertaking for which it sought manufacturers' financial assistance.[234]

---

[233] FSMB, "Model Policy for the Use of Controlled Substances for the Treatment of Pain," https://dprfiles.delaware.gov/medicalpractice/Model_Policy_Treatment_Pain.pdf.

[234] Catan and Perez, "A Pain-Drug Champion Has Second Thoughts" (2 million); Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (Washington, D.C.: Waterford Life Sciences, 2007, 2009), 4 ("real-life practice"); FSMB, "Model Policy," ("departure," "essential," "not the same"); James M. Thompson to Pamela Bennett, August 29, 2007, and attached educational grant request, PPLP003477100-PPLP003477124. By 2009, Dr. Fishman's book bore two copyright dates, one for the original publication and one for the related CME.

In August 2007 the FSMB Board voted to request a $100,000 subvention from Purdue, despite the delicate matter of the company's recently having pled guilty to charges of OxyContin misbranding. Purdue had nonetheless funded the FSMB's initial work, and the FSMB Board judged, correctly, that it would continue its support. Though $100,000 was "a lot of money," wrote Howard Udell, Purdue's chief legal officer, better to spend it than let Alpharma, Endo, Cephalon, and other competitors get all the credit. Dr. Haddox argued that Purdue had long shaped FSMB policy and the larger revisionist undertaking in which it was embedded:

> Purdue has been at the forefront of efforts to promote the proper therapeutic use of opioid analgesics, including funding the very first meeting of the AAPM/APS/ASAM leadership (when I was president of AAPM) to begin the collaboration that eventually led to the Consensus statement on definitions of pain and addiction. Many of the players in that effort have also been involved with this newest effort of the FSMB to provide guidance to physicians who use these medicines. Purdue was involved in funding the meeting that led to the revision of the Model Guidelines to become what is now the Model Policy, upon which Dr. Fishman's book is based. I also represented Purdue at that meeting and many of my suggestions and clarifications were accepted by the group th[at] revised the Guidelines into the Policy document it is today. In addition, at Dr. Fishman's request, I performed a detailed review of his final draft and submitted the comments to him, many of which, I am told, he accepted. Thus, Purdue has had an extensive, but entirely appropriate, involvement in the efforts that led to the development of the book and the Policy from which it derives. To contribute the funding for distribution of this book

would be a natural sequela to our efforts to educate physicians in this area of health care.[235]

Purdue's history of behind-the-scenes pump-priming was not "entirely appropriate," given its financial stake in the FSMB model policy's development and promulgation. More accurate was Dr. Haddox's reference to leading KOLs as "players." (Other insiders used a different collective metaphor, "Pain Mafia," to describe prominent revisionist activists. Endo executives spoke of "FriEndos," as in "How's that for a stellar faculty, not to mention a Who's Who of FriEndos?") Like stars on a sports circuit, elite KOLs belonged to the same professional organizations, crossed paths frequently, and knew one another's moves. "From the informal reviews," Dr. Portenoy wrote gratefully to Dr. Haddox after one conference, "I think that the audience thought that you were my plant and that we had rehearsed. Well, maybe this is true?

---

[235] Pamela Bennett to J. David Haddox et al., email, August 27, 2007, PPLP003477114 (FSMB board request); Howard Udell to Pamela Bennett et al., email, August 27, 2007, PPLP003477111 ("lot of money"); and Haddox to Teri Toth, email, September 11, 2007, PPLP003477109 (Dr. Haddox's assessment). Purdue's 2007 legal troubles are discussed in more detail below.

The conflict of interest represented by Purdue's Dr. Haddox reviewing and editing Dr. Fishman's book was not an isolated episode. Dr. Portenoy later testified, in *State of Oklahoma* v. *Purdue Pharma, L.P. et al.*, January 24, 2019, pp. 165-169, PPLP004493085-PPLP004493089, that Purdue and other manufacturers consistently presented research findings in a way that highlighted benefits but minimized risks. Purdue's educational spending was meant to maximize its sales, not disseminate balanced scientific findings.

Relatedly, and despite their talk of an epidemic of untreated pain, Purdue executives were reluctant to sponsor internationally renowned KOLs who judged narcotics like cheap morphine to be more cost-effective than the company's patented, controlled-release formulations. Richard Sackler email chain, August 9, 1997, 8855110326 in response to Grand Jury Subpoena No. 513C, and Paul Manners, email, August 22, 1997, PDD1701817854.

Anyway, you were great, the case was perfect, and all those cute political agenda items that always are the subtext of every academic moment went just the way I had hoped."[236]

Top performers, like Dr. Fishman, attracted more than one sponsor. So did Dr. Fishman's paid medical writer, Stephen Braun, who, after finishing *Responsible Opioid Prescribing*, lent his ghostwriting talents to Purdue's *Exit Wounds* and J & J's *Finding Relief*. The FSMB's *Responsible Opioid Prescribing* was less the work of a single physician or organization than a collective enterprise involving a dedicated, interlocking group—a team—of revisionist players and sponsors. The sponsors included six opioid manufacturers (Abbott, Alpharma, Cephalon, Endo, King Pharmaceuticals, and Purdue) and several groups that received manufacturers' money, such as the APS, APF, and the University of Wisconsin's Pain and Policies Study Group.[237]

By August 2008 the FSMB had shipped, or was about to ship, over 80,000 copies of *Responsible Opioid Prescribing*. In 2009 the University of Wisconsin's School of Medicine and

---

[236] "Pain Mafia:" Chris Kottenstette, undated memorandum, PSJ3 Exhibit 665, https://www.industrydocuments.ucsf.edu/drug/docs/#id=nhwf0232. (Kottenstette, a physician assistant who specialized in pain management, was an initial member of the APS/AAPM National Expert Panel for the Clinical Practice Guideline Panel in Opioids for Non-Cancer Pain and Founder and President of PAs in Pain Management [LinkedIn, https://www.linkedin.com/in/ckotten]. In the memo he includes himself in the Pain Mafia, along with such physician KOLs as Drs. Fishman, Haddox, Portenoy, Passik, Heit, and Lynn Webster.) "FriEndos:" Marcia Speiller email chain, June 18, 2003, ENDO_FLAG-00374490, quotation from Carey R. Aron at ENDO_FLAG-00374492. "Plant:" Portenoy to Haddox, December 2, 1999, PPLPC025000005615.

[237] *Responsible Opioid Prescribing*, copyright page (list of sponsors), vi (Braun listed as "medical writer.") Industry support for Portenoy, Fishman, Braun, the APS, and APF is documented above. Pain and Policy Studies Group: John Fauber, "UW a Force in Pain Drug Growth," *Milwaukee Journal Sentinel*, April 2, 2011, http://archive.jsonline.com/watchdog/watchdogreports/119130114.html/.

Public Health, home of the Pain and Policies Study Group, partnered with Endo Pharmaceuticals, which contributed an additional $119,000 to the project, to create an online CME course. The course was based on Dr. Fishman's book, which doubled as required reading. The CME's "educational reviewer" was Dr. Aaron Gilson, whose Ph.D. was in social welfare, whose dissertation was on child abuse, and who nonetheless served as co-director of the Pain and Policy Studies Group. Dr. Gilson listed financial ties to Purdue, Abbott, and Cephalon, but did not disclose honoraria from the FSMB and Janssen or the "unrestricted educational grants" that Alpharma, Purdue, and Endo provided to his Pain and Policy Studies Group. Endo subsidized both the CME and the policy shop of the CME's official reviewer—a conflict of interest that the University of Wisconsin later, and inaccurately, denied.[238]

Assisting Dr. Gilson in the task of oversight was Dr. Perry Fine, whom the FSMB credited as an associate editor and a member of both the project's advisory board and planning committee. It will be recalled that Dr. Fine, who acknowledged financial ties to six opioid manufacturers, had served in a similar capacity for Janssen's NPEC and Endo's NPIC

---

[238] Lisa Miller to Teri Toth, email and attachment, August 21, 2008, PPLP003477093-PPLP003477094 (2008 book distribution); Aaron M. Gilson c.v., Exhibit s0619, *State of Oklahoma* v. *Purdue*, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=hxgg0230 (degree, dissertation); Fishman, *Responsible Opioid Prescribing*, copyright page, iv-vii, back cover (CME details, advisors, titles, financial disclosures); Roger Chou et al., "Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain," *Journal of Pain* 10 (2009): 113-130, p. 25 of author manuscript, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4043401/pdf/nihms-578614.pdf (Dr. Gilson's honoraria and the unrestricted educational grants); and John Fauber, "Follow the Money: Pain Policy and Profit," February 19, 2012, MEDPAGE TODAY, https://www.medpagetoday.com/neurology/painmanagement/31256 (Endo's $119,000, UW denial of conflict). Fauber reports that more than 160,000 copies of the Dr. Fishman's book were eventually distributed. Kottenstette, in the undated memorandum cited above, includes Dr. Gilson in the "Pain Mafia."

educational undertakings, which also provided CME credit. Other revisionist stalwarts on the

planning committee included Dr. June Dahl (Abbott, Endo, Purdue) and Dr. David Weissman,

who said that he had "no relevant financial relationships to disclose." Dr. Weissman had in fact

been receiving Purdue speaking honoraria from at least a decade before the CME launch, and

had been internally ranked by Purdue as a leading speaker. So had Drs. Dahl and Fine.[239]

"At nearly every step along the way," summed up investigative reporter John Fauber,

"financial connections between the FSMB policy and companies can be found." Those

connections yielded a set of guidelines, a policy, a book, and an online CME that advocated, if in

defensively "balanced" fashion, a long-term, opioid-based CNP therapy for which there was still

no evidence of safety and efficacy. Several of the physicians Fauber contacted for his 2012 story

"were critical of the book because it failed to point out the lack of science supporting the use of

opioids for chronic, non[-]cancer pain. Instead, the books says the drugs may be essential for

chronic pain." Dr. Fishman himself issued a statement conceding that "when the first edition of

the book was written in 2006, the science on the effectiveness of opioids 'was not robust' and

data on the severe risks 'had yet to emerge.'"[240]

Dr. Fishman's first claim, about the lack of evidence of efficacy, was true. His second

claim, about ignorance of severe risk, was false. It was false as it applied to the existing historical

and epidemiological evidence, and it was false as it applied to the fresh wave of concern over

---

[239] Fishman, *Responsible Opioid Prescribing*, iii-vi (Drs. Fine, Dahl, Weissman). For their rankings as leading speakers, see "Top Speakers 1999," PPLPC025000004770, PPLPC025000004774 and "2001 Top 100 Speakers," PDD1507250599, PDD1507250604.

[240] Fauber, "Follow the Money."

prescription-opioid abuse, addiction, and overdoses that arose after 2000 —not, as Fishman claimed, after 2006, when his team of editors, reviewers, consultants, and medical writers began drafting the FSMB's book.[241]

While manufacturer penetration of FSMB's educational programming was thorough, it was by no means exclusive. Opioid manufacturers targeted another powerful national institution, the Joint Commission on Accreditation of Healthcare Organizations. Known as the Joint Commission or Jay-Co (from JCAHO), this organization was to hospitals and clinics what regional accrediting bodies were to colleges and universities: the agency whose approval or disapproval could mean institutional life or death. What made the Joint Commission "critical," Dr. Dahl explained in a 2002 paper (presented at a Purdue-funded symposium, and published in an Endo-underwritten book), was that it accredited hospitals that accounted for 96 percent of inpatient visits, as well as behavioral health and long-term-care facilities and home health agencies. Without accreditation, these institutions could not receive Medicare and Medicaid money. Hence they paid close attention to the new Joint Commission pain standards, which required pain assessment of every patient.[242]

The Joint Commission's revised standards, released in mid-1999 and formally added to its survey and accreditation process in January 2001, effectively made "Pain the 5th Vital Sign"—a phrase trademarked by the APS. Pain was to be assessed along with heart rate,

---

[241] The post-2000 revelations of increased prescription-opioid abuse, addiction, and overdoses are documented in a separate section of this report.

[242] June L. Dahl, "The State Cancer Pain Initiative Movement in the United States: Successes and Challenges," *Opioids and Pain Relief*, ed. Meldrum,163-174, "critical" p. 169, symposium and book funding sources, pp. ix-x.

temperature, respiratory rate, and blood pressure. What differentiated pain from the other vital

signs was that it was to be lowered as much as possible, even though it was not objectively

measurable. The Joint Commission therefore promoted efforts to quantify pain by such means as

the Visual Analog Scale, smiley to sad faces ranged above a spectrum running from a no-pain 0

to an agonizing 10. As critics later pointed out, no scientific studies showed that pain scales

actually led to better therapeutic outcomes. What studies did show was that pain scoring

encouraged opioid prescribing and use.[243]

So did educational materials on pain management that the Joint Commission sold to

medical institutions preparing for their next review. The Joint Commission acquired many of

these materials, which amounted to hard-to-ignore advice, free of charge from Purdue. One guide

stated that, despite "inaccurate and exaggerated concerns" about addiction, tolerance, and opioid-

related deaths, "there is no evidence that addiction is a significant issue when persons are given

opioids for pain control." According to a 2003 U.S. Government Accountability Office (GAO)

investigation, the Joint Commission also "sponsored a series of educational programs on pain

---

[243] Ibid., 169 (guidelines released); Colin L. Fernandes, "The Fifth Vital Sign," *Federal Practitioner* (December 2010), 26, https://cdn.mdedge.com/files/s3fs-public/Document/September-2017/027120026.pdf (APS trademark); Anna Lembke, *Drug Dealer, MD*, 65-67, 123-126 (pain-scoring criticisms). One study of a large HMO in southeastern Michigan assembled data on 523,623 individuals and 1,066,700 opioid pharmacy fills from 1997 through 2011. After the revised Joint Commission pain management standards took effect, in January 2001, the authors observed "a consistent and unabated increased in the rate of opioids fills and the proportion of chronic use" together with a near-continuous rise in the average strength of opioid prescriptions and "a parallel increase in the annual rate of adverse events," meaning opioid-related poisonings and deaths. Brian K. Ahmedani et al., "Policies and Events Affecting Prescription Opioid Use for Non-Cancer Pain Among an Insured Patient Population," *Pain Physician* 17 (2014): 205-216, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4716455/pdf/nihms750572.pdf, quotation p. 205.

management standards with various cosponsors, including pain-related groups such as the APS and the AAPM." As noted, these were the same manufacturer-subsidized pain societies that had issued their own guidelines minimizing concern over iatrogenic addiction, side effects, and tolerance stemming from long-term opioid use. [244]

Revisionism was thus institutionalized, creating professional pressure for health care providers to treat pain more aggressively, with opioids if necessary. "This was a bonanza for opioid manufacturers," writes historian David Herzberg. "By the late 1990s and early 2000s … industry-funded advocates had been given bigger and more prestigious individual platforms to circulate their views, and these views had also been institutionalized among the (also industry-funded) professional and regulatory bodies that determined and enforced medical standards of care."[245]

In a 2018 historical review of the origins of the prescription opioid crisis, Drs. Teresa A. Rummans, M. Caroline Burton, and Nancy L. Dawson, all Mayo Clinic physicians, reached the same conclusion. Consensus statements, deceptive marketing, and Joint Commission pressure to

---

[244] Catan and Perez, "A Pain-Drug Champion Has Second Thoughts" ("inaccurate," "no evidence"), and GAO, *Prescription Drugs,* 23 ("educational programs"). Revisionist recommendations that bore the imprimatur of manufacturer-funded organizations also featured in the manufacturers' own promotional materials. In 2010 Actavis produced "Managing Chronic Pain and the Importance of Customizing Opioid Treatment," a training and marketing slide presentation centered on the virtues of Kadian, an extended-release morphine product available in doses from 10 to 200 mg. Actavis made the by-then-standard revisionist claims that chronic pain was widely undertreated and that opioids played a central role in its safe management. The sources cited included guidelines and statements from the FSMB, AAPM, and APS. "Managing Chronic Pain in the United States," slide deck, January 26, 2010, ALLERGAN_MDL_01877292-ALLERGAN_MDL_01877302.

[245] Herzberg, *White Market Drugs*, 274-275.

surveil and treat patient-reported pain had increased opioid prescribing and overdoses. The
reward for conscientious physicians who bucked the revisionist trend was poor patient-
satisfaction scores. Dr. Ahari, who had experience of pharmaceutical marketing, medical
education, and clinical practice, agreed. Opioid prescribing had grown rapidly in the early 2000s,
when groups like the APS and the Joint Commission rebranded pain as the fifth vital sign:

> Such organizations, whose boards included doctors who received consulting fees and
> honoraria from opioid-makers, circulated teaching materials designed by drug companies.
> Medical students and doctors didn't just learn how to assess and pay attention to patients'
> pain — they also internalized the idea that prescribing opioids was a professional, even
> an ethical, obligation. Exaggerating the clinical significance of pain drastically expanded
> the market for opioids, bringing them to populations with a high risk for addiction, like
> adolescents. From 2005 to 2015, nearly 15 percent of teens and young adults who went to
> the emergency room received an opioid prescription, according to a study in the journal
> *Pediatrics*. The prescribing rate was 38 percent for ankle fractures; for dental issues, the
> rate was 60 percent.

> Physicians and sales reps are locked in a double delusion. When I was a drug rep, I really
> believed my pitch for our products — and I believed that by exerting influence over
> doctors, I helped patients access medicine they needed. As a doctor, I now have
> colleagues — colleagues with sharp, clinically trained minds and only the best of
> intentions — who think they write prescriptions on a wholly rational basis.

They don't know what I know: that people are paid six figures and armed with fat

expense accounts to make them feel confident that they're acting without bias. In the case

of opioids, this delusion has exacted a terrible human cost.

The cost was measured in the rate of misuse, between 21 and 29 percent for patients prescribed

opioids, and in the rate of addiction, between 8 and 12 percent: a far cry, Dr. Ahari observed,

from less than 1 percent. Of the opioid overdoses he had more immediate knowledge. "A week

doesn't go by without my having to resuscitate someone."[246]

---

[246] Teresa A. Rummans, M. Caroline Burton, and Nancy L. Dawson, "How Good Intentions
Contributed to Bad Outcomes: The Opioid Crisis," *Mayo Clinic Proceedings* 93 (2018): 344-
350, https://www.mayoclinicproceedings.org/article/S0025-6196(17)30923-0/fulltext; Ahari, "I
Was a Drug Rep." The study Dr. Ahari cites is Joel D. Hudgins et al., "Trends in Opioid
Prescribing for Adolescents and Young Adults in Ambulatory Care Settings," *Pediatrics* 143
(June 2019): e20181578,
https://pediatrics.aappublications.org/content/pediatrics/143/6/e20181578.full.pdf. The original
source for the estimated misuse and addiction percentages for CNP patients is Kevin E. Vowles
et al., "Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: A Systematic Review
and Data Synthesis," *Pain* 156 (2015): 569-576,
https://journals.lww.com/pain/Abstract/2015/04000/Rates_of_opioid_misuse,_abuse,_and_addict
ion_in.3.aspx, also available at Microsoft Word -
Vowles_et_al_2015_Opioid_Misuse_and_Addiction_Review (qub.ac.uk). Vowles et al.
concluded that "it is not clear that the risks of opioid use outweigh the potential for benefit. The
efficacy of opioids and their suitability for the long-term management of chronic pain still
remains very much in question … and while this uncertainty in effectiveness is well established,
it stands in somewhat stark contrast to the clinical reality of chronic pain treatment, where rates
of prescriptions have skyrocketed such that opioids are now amongst the most frequently
prescribed medications."

Drs. Herzberg and Ahari are not alone in describing revisionism's penetration of
regulatory and accrediting institutions as a key factor in opioid overprescription. See, e.g.,
Lembke, *Drug Dealer, MD*, chap. 4, and McGreal, *American Overdose*, chap. 7. It is noteworthy
that, in her 2004 deposition, Dr. Foley attributed the growing acceptance of opioids for the
management of pain to the influence of institutions such as the IASP, the APF, and, especially,
JCAHO, which had seen to it that "every patient who enters the hospital or every patient who is
in a nursing home or seen in an outpatient facility has to have their pain measured. And that
institution has to tell the patient what their options for treatment are." What Dr. Foley did not
say—possibly because she did not then know—was that these institutions had received
substantial financial support from opioid manufacturers, as detailed above. Deposition of

from less than 1 percent. Of the opioid overdoses he had more immediate knowledge. "A week doesn't go by without my having to resuscitate someone."[247]

7. Pharma and Narcopharma

In 2009 Dr. Joel Saper, a neurologist and pain physician who specialized in treating headache, reflected on the consequences of two decades of industry-financed and coordinated opioid revisionism. He had witnessed the inversion of narcotic conservatism at first hand, both as a prominent member of professional pain organizations and as a hospital patient himself. The day after he underwent major surgery he requested a nonopioid analgesic for bone pain. The

---

Kathleen Foley, M.D., August 27, 2004, *Michael McCallister et al. vs. Purdue Pharma,* 69-71, quotation 70-71.

[247] Ahari, "I Was a Drug Rep." The study Dr. Ahari cites is Joel D. Hudgins et al., "Trends in Opioid Prescribing for Adolescents and Young Adults in Ambulatory Care Settings," *Pediatrics* 143 (June 2019): e20181578, https://pediatrics.aappublications.org/content/pediatrics/143/6/e20181578.full.pdf. The original source for the estimated abuse and addiction percentages for CNP patients is Kevin E. Vowles et al., "Rates of Opioid Misuse, Abuse, and Addiction in Chronic Pain: A Systematic Review and Data Synthesis," *Pain* 156 (2015): 569-576, https://journals.lww.com/pain/Abstract/2015/04000/Rates_of_opioid_misuse,_abuse,_and_addiction_in.3.aspx, also available at Microsoft Word - Vowles_et_al_2015_Opioid_Misuse_and_Addiction_Review (qub.ac.uk). Vowles et al. concluded that "it is not clear that the risks of opioid use outweigh the potential for benefit. The efficacy of opioids and their suitability for the long-term management of chronic pain still remains very much in question … and while this uncertainty in effectiveness is well established, it stands in somewhat stark contrast to the clinical reality of chronic pain treatment, where rates of prescriptions have skyrocketed such that opioids are now amongst the most frequently prescribed medications."
    Drs. Herzberg and Ahari are not alone in describing revisionism's penetration of regulatory and accrediting institutions as a key factor in opioid overprescription. See, e.g., Lembke, *Drug Dealer, MD*, chap. 4, and McGreal, *American Overdose*, chap. 7.

request provoked incredulity. The young physician heading his pain-treatment team could not fathom

> why it would not be more appropriate to prescribe an opioid through a PCA [patient-controlled anesthesia system] or dorsal column catheter [rather] than a non-opioid, such as an NSAID, to initially treat what was essentially post-op bone pain. It was evident that the 'pain team' had come to believe that post-op pain could *only* be controlled by opioids and that anything else would be substandard care, if not a violation of Joint Commission standards. No query as to my past use of opioids, addiction risk, or other chronic pain conditions. Ultimately ibuprofen proved an effective treatment. Had I not been who I am, I would have surely been on opioids needlessly for many days. What is clearly evident is that the opioid indoctrination of young doctors and nurses who were committed to treat pain had been effective.[248]

---

[248] Joel R. Saper, "The Influence of Pharma and Device Manufacturers on APS and Other PMAs: A War Within a War" (TS, October 12, 2011), pp. 10-11, exhibit 6 of Dr. Saper's deposition, *In Re: National Prescription Opiate Litigation*, January 11, 2019. Though dated 2011, this typescript document includes and expands points Dr. Saper originally made in a 2009 debate with Purdue's Dr. Haddox (p. 1).

Dr. Nora Volkow, the addiction neuroscientist appointed NIDA Director in 2003, has described her own revelatory prescription-opioid experience. In 1995, hospitalized after a serious car crash, she received Demerol. She was not, she told a science journalist, prepared for what happened next. "'It was extraordinary, those impressive sensations,' she says. A moment of ecstasy, one she describes as comparable only to long-lasting sexual pleasure, eclipsed all other feelings." Volkow continued taking the medication "for another few days" and was sent home with more pills. Knowing that opioid analgesics were hard to quit, she decided not to take the Demerol. "That night, a discomfort she had never felt before overran her body. She felt restless, agitated, desperate. Volkow took a painkiller and, like an apparition, the feeling faded away. 'It was then that I realized how fast dependence develops,' she says. 'It also made me realize that I'm very afraid of opiates.'" Emiliano Rodríguez Mega, "The Psychiatrist at the Centre of the Opioid Crisis," *Nature News*, April 1, 2020, https://www.nature.com/articles/d41586-020-00921-9.

Neither Dr. Saper's brush with narcotic overmedication, nor the harms to more compliant patients, were accidental. He had sat on the boards of the APS and the AAPM and had watched money from opioid manufacturers transform these groups and their missions. Initially, he applauded the efforts of reform-minded members to remove barriers to the more effective use of opioids in the treatment of acute, cancer, and end-of-life pain. But then he recognized that their aim, as at the 1988 Houston conference, was much more far-reaching:

> In their zeal and with the financial backing from narcopharma, the initiative evolved from its initial goals, to incite an avalanche of opioid prescriptions and widespread availability. Opioids were advocated and became available not just to patients reporting convincing, severe pain, but to almost anyone who reported pain, whether that pain was convincingly severe or in some cases believable at all. Whether other remedies were a better choice; whether the patient was trustworthy and compliant; whether the physician knew the patient at all.

> It is reasonable to ask the question: Was this an accidental outcome derived from a well intended effort by well meaning [sic] professionals, or did this epidemic begin as a result of a creative and brilliant, though stealth marketing strategy, energized through financial incentives to cash-starved organizations with the help of willing professionals? I think both.[249]

Like Dr. Munthe, Dr. Saper judged the influence of pharmaceutical money to be subtle, cumulative, and ultimately determinative. The industry's opening derived from the expectation

---

[249] Saper, "Influence of Pharma," 7-8, no hyphens in original.

that professional medical organizations would provide "quality educational programs, among other services." But such events were expensive. Enter narcopharma, whose representatives subsidized the meetings; bought product-information booths and mailing lists; underwrote physician attendance, honoraria, meals, and social activities; cultivated friendships and built networks; spun off satellite symposia; and provided funding for "practice guidelines and other doctrines that influence physician professional behavior."[250]

Educational subsidies, if limited, were neither inherently unethical nor injurious to patients. But it had proved otherwise with opioids. "[I]n my personal experience, the educational programs of AAPM and APS, particularly as they involve advocacy, were greatly influenced by the commercial largess," Dr. Saper wrote. "In my opinion commercial dynamics indeed influenced, if not steered, the selection of abstracts, course topics, and faculty to commercially friendly participants as it involved opioid advocacy, largely ignoring those opposing or exhorting caution against the growing advocacy for opioids for chronic non-malignant pain."[251]

Dr. Saper judged that the reasons for caution inhered in opioid therapy itself. "[D]espite arguments to the contrary," he wrote, "opioids *are indeed* different than other drugs. They produce dependency, craving, euphoria, major endocrine disturbances, and tranquilization, and they are more likely to be lethal and harmful than most other day-to-day treatments." The harms were collective as well as individual. "The overadministration of these [opioid] agents for what many, including me, believe to be inappropriate cases of reported pain, has produced a drug

---

[250] Ibid., 3. At Purdue the APS booklet, "Managed Care and Pain," was referred to as a "selling tool." Lynn Nagorski, "Quarterly Central Area Summary, PPLPC02800002667.

[251] Saper, "Influence of Pharma," 3-4.

crisis in the U.S., an epidemic in the view of many, to such an extent that government has predictably stepped in to regulate the practice of medicine as it relates to the prescribing of opioids."[252]

Dr. Saper's observation that opioids are indeed different is important for understanding the historical and regulatory context of this case. Narcopharma was a worst-case scenario of the pharmaceutical industry's excesses. In the 1980s, 1990s, and early 2000s the American pharmaceutical industry collectively became more adept at lobbying, manipulating regulatory agencies (whose costs it increasingly covered), shading scientific research, influencing curricula, shaping public opinion, controlling patient advocacy groups, and targeting physicians with attractive, personable, gift-laden sales representatives with ample expense accounts who reaped large bonuses if doctors frequently prescribed their products. What set the opioid manufacturers apart, however, was that they and their representatives were promoting—often misleadingly and sometimes off-label—drugs that the law designated as controlled substances and that medical and lay opinion had long held to be of limited use because of their toxicity, abusability, addictiveness, and likelihood of diversion. The legal, ethical, and practical problems surrounding the marketing of opioids were inherently more difficult than marketing, say, a new proton pump inhibitor. Yet the serious, long-understood risks of opioids in cases of CNP did not prevent

---

[252] Ibid., 5, 6; emphasis in original. Saper to Judith Paice and B. Todd Sitzman, July 1, 2008, Saper Deposition exhibit 3, https://www.industrydocuments.ucsf.edu/drug/docs/#id=znpw0232, reiterates Dr. Saper's concerns over excessive opioid prescribing by doctors inexpert in pain management and excessive industry influence over APS and AAPM recommendations "due to a large amount of funding from the opioid manufacturers over the past decade" (p. 3).

opioid manufacturers from availing themselves of every trick in the industry's public relations and marketing playbook.[253]

Which takes us back to David Sackler's remarks in *Vanity Fair*. When David Sackler denied that Purdue had anything to do with opioid revisionism, he failed to mention Purdue's funding of Dr. Bonica's book—the same book he cited in his not-us defense. Nor did he reveal Purdue's planning, funding, and promotion for Dr. Hill's seminal Texas conference, book, and film. Nor did he disclose Purdue's longstanding support of other KOLs and organizations working to destigmatize, deregulate, and expand opioid prescribing for CNP.

Corporate documents rebut David Sackler's assertion of corporate innocence by way of unlucky timing or historical happenstance. The primary and secondary sources pertinent to this case consistently show that Purdue and other opioid manufacturers, those whom Dr. Saper dubbed "narcopharma," actively shaped opioid history and adjusted their marketing plans accordingly. By 1990, Dr. Kaiko wrote, Purdue was already "'going laterally' with MS Contin to non-cancer pain indications." For Dr. Kaiko the real problem was "the prospect of generic MS

---

[253] Carl Elliott, "The Drug Pushers," *Atlantic* (April 2006), https://www.theatlantic.com/magazine/archive/2006/04/the-drug-pushers/304714/, and Quinones, *The Least of Us*, 60-65 (sales reps, recruiting doctors); McGreal, *American Overdose*, chaps. 9, 12 (growing influence over FDA, lobbying power); Katie Thomas, "More than 80 Percent of Patient Groups Accept Drug Industry Funds," *New York Times*, March 1, 2017, https://www.nytimes.com/2017/03/01/health/patient-groups-drug-industry-money.html; Matthew S. McCoy et al., "Conflicts of Interest for Patient Advocacy-Organizations," *New England Journal of Medicine* 376 (March 2, 2017), 880-885, Sharon Batt et al., "Pharmaceutical Ethics and Grassroots Activism in the United States: A Social Historical Perspective," *Bioethical Inquiry* 17 (2020): 49-60, https://link.springer.com/content/pdf/10.1007/s11673-019-09956-8, and Jim Rendon, "How Nonprofits Helped Fuel the Opioid Crisis" (control of advocacy groups). Another problem was that sales representatives were not necessarily well trained in such fundamentals as opioid tolerance and dependence. Mark Killion deposition, September 11, 2020, *In Re: Texas Opioid Litigation*, Master File No. 2018-63587, pp. 17-23, 60-64.

Contin competition" after its patent expired. The solution, as we have seen, was OxyContin, which Purdue patented in 1993 and marketed in 1996, more than a decade after the company had begun supporting researchers who advocated more indications for, and less regulation of, opioid analgesia.[254]

If David Sackler had a legitimate complaint, it was that national media singled out Purdue for critical coverage during and after 2001. "Although OxyContin was Purdue's top seller," Posner observes, "it was then less than 10 percent of the opioid market. Johnson & Johnson, Janssen, Cephalon, and Endo Pharmaceuticals had their own narcotic pain relievers and their ads were as 'aggressive' as any from Purdue. Their sales teams also pitched them for neck and back pain, and the companies subsidized many of the same nonprofits and patient advocacy groups as did Purdue." The same companies promoted off-label prescribing, as in the case of Actiq, Cephalon's fentanyl "lollipop." In 1998 the FDA approved Actiq for treatment of breakthrough cancer pain. By 2005 four-fifths of Actiq patients had no cancer, the result of Cephalon's off-label campaign to penetrate the general pain market, "including but not limited to osteoarthritis, rheumatoid arthritis, chronic back pain, [and] migraine headaches." Alec Burlakoff, a Cephalon representative, was trained to promote off-label prescribing and told not to worry about tolerance. "And I'll never forget," Burlakoff said, "You can go as high as you want, as long as they're still in pain." Allowing that Purdue broke first from the corporate-revisionist

---

[254] Harriet Ryan, Lisa Girion, and Scott Glover, "'You Want a Description of Hell:' OxyContin's 12-Hour Problem," *Los Angeles Times*, May 5, 2016, https://www.latimes.com/projects/oxycontin-part1/ (Kaiko memo); United States Patent 5,266,331, November 30, 1993, https://patentimages.storage.googleapis.com/7c/1a/e0/40de013f040a8f/US5266331.pdf.

gate, it had no monopoly on promotional behavior that endangered patients and threatened public health. Dr. Saper was correct. The problem was not that a single company pulled opioids' promotional strings. The problem was that narcopharma did so.[255]

The industry's motives for spinning the straw of academic speculation into the gold of the opioid marketing were straightforward. By the 1980s opioid manufacturers faced four realities. First, tens of millions of Americans suffered from chronic pain for which no sure, convenient, and safe narcotic treatment was available. They were frustrated, and their caregivers were frustrated. As one focus-group study put it, physicians universally agreed that "they would like to have the efficacy of the narcotics without the concern regarding side effects or addiction." Second, despite a half century of trying, researchers had failed to find the holy grail of such a safe, non-addictive narcotic analgesic. No drug was to morphine what Novocain was to cocaine: a pain-deadener that did not also produce brain reward, tolerance, and potential addiction. Third, any company that successfully marketed a narcotic analgesic *as if it were this grail* could realize a substantial profit. Fourth, conventional medical opinion and federal regulators regarded any such attempt as, respectively, unethical or unlawful. Narcotic conservatism stood in the way of market expansion. Absent a genuine discovery of a non-addictive narcotic analgesic, profit

---

[255] Posner, *Pharma*, 440 (quotation, four-fifths); "Money, Dinners and Strip Clubs: How Pharmaceutical Executives Bribed Doctors to Prescribe Dangerous Fentanyl Drugs," *60 Minutes*, June 21, 2020, https://www.cbsnews.com/news/opioid-epidemic-pharmaceutical-executives-60-minutes-2020-06-21/ ("including," "never forget"). When Burlakoff subsequently became Vice President of Sales at Insys he frankly monetized the manufacturer-prescriber relationship. "NO more [speaker] programs for Dr. Banchik, this is disgraceful!," he wrote in one email. "Clearly she does not believe Subsys is the best choice for her patients." Dr. Banchik's offense: She had prescribed rival Fentora more than twice as often as Subsys in the previous twelve weeks. Burlakoff to Mia Guzman, email, January 17, 2013, INS-BOS-122116902.

maximization required that narcotic conservatism and the regulatory system that supported it be subverted.[256]

## C.  Distributors, National Pharmacies, and Opioid Revisionism, 1996-2016

The behind-the-scenes influence of opioid manufacturers is a recurrent theme in historical, journalistic, medical, and government accounts of the opioid addiction and overdose crisis. From *New York Times* reporter Barry Meier's pioneering *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic* (first ed. 2003) to investigative journalist Patrick Radden Keefe's *Empire of Pain: The Secret History of the Sackler Dynasty* (2021), every independent, in-depth investigation found that opioid manufacturers encouraged and subsidized revisionist KOLs and pain organizations as part of a profit-maximizing campaign to downplay the risks and overstate the benefits of long-term opioid use in cases of CNP.[257]

---

[256] R. Winston to [Mark] Alfonso, April 13, 1995, and attached focus-group study of March 8, 1995, p. 23, OXY08241, https://www.scribd.com/document/440306799/Purdue-focus-group-documents?secret_password=0jVgiWk1VXSR2dnIVqb4. Acker, *Creating the American Junkie*, chap. 3, describes the origins of the quest for a non-addictive opiate in the 1920s.

[257] Examples of journalistic, government, medical, and academic investigations of manufacturers' opioid promotions and misrepresentations include Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic* (New York: Random House, 2003, 2018 expanded ed.); GAO, *Prescription Drugs*; Art Van Zee, "The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy," *American Journal of Public Health* 99 (2009): 221-227; Quinones, *Dreamland*; John Temple, *American Pain*; Lembke, *Drug Dealer, MD*; Patrick Radden Keefe, "Empire of Pain," *New Yorker* 93 (October 30, 2017), 34-49; Beth Macy, *Dopesick: Dealers, Doctors, and the Drug Company that Addicted America* (New York: Little, Brown, 2018); McGreal, *American Overdose*; Sergio Sismondo, *Ghost-Managed Medicine: Big Pharma's Invisible Hands* (Manchester: Manchester Press, 2018), espec. pp. 30-39; Herzberg, *White Market Drugs*; Posner, *Pharma*; Quinones, *The Least of Us*; and Keefe, *Empire of Pain*.

Another theme in this literature is that opioid distributors and national pharmacies such as CVS and Walgreens (which at times acted as their own distributors) exacerbated the crisis by undermining traditional safeguards against oversupply, diversion, abuse, and addiction. These corporations repeatedly failed to investigate, suspend, and report suspicious orders and prescriptions, as required by CSA regulations. Then, from 2008 to 2016, they lobbied through trade organizations to rein in DEA enforcement actions against these violations.[258]

---

[258] Examples of book-length investigations of distributors' conduct include Temple, *American Pain*; McGreal, *American Overdose*; Eric Eyre, *Death in Mud Lick: A Coal Country Fight Against the Drug Companies* (New York: Scribner, 2020); and Scott Higham and Sari Horwitz, *American Cartel: Inside the Battle to Bring Down the Opioid Industry* (New York: Twelve, 2022). Representative news accounts of distributors include Danny Hakim, William K. Rashbaum, and Roni Caryn Rabin, "The Giants at the Heart of the Opioid Crisis," *New York Times*, April 22, 2019, https://www.nytimes.com/2019/04/22/health/opioids-lawsuits-distributors.html and Scott Higham, Sari Horwitz, and Steven Rich, "76 Billion Opioid Pills: Newly Released Federal Data Unmasks the Epidemic," *Washington Post*, July 16, 2019, https://www.washingtonpost.com/investigations/76-billion-opioid-pills-newly-released-federal-data-unmasks-the-epidemic/2019/07/16/5f29fd62-a73e-11e9-86dd-d7f0e60391e9_story.html. Representative government investigations of distributors include U.S. Senate Homeland Security and Governmental Affairs Committee, Ranking Minority Member's Office, *Fueling an Epidemic*, report 3, https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf, and U.S. House of Representatives, Subcommittee on Oversight and Investigations, "Combatting the Opioid Epidemic: Examining Concerns about Distribution and Diversion, Tuesday, May 8, 2018" (preliminary TS transcription, 2018), 4, 8-9, https://docs.house.gov/meetings/IF/IF02/20180508/108260/HHRG-115-IF02-Transcript-20180508.pdf. Representative news accounts of national pharmacies' role in the crisis include Scott Higham and Lenny Bernstein, "The Drug Industry's Triumph over the DEA," *Washington Post*, October 15, 2017, https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/ and Jenn Abelson et al., "At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids," *Washington Post*, November 7, 2019, https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/?arc404=true.

My opinion is that the published allegations are true but incomplete. The documents discussed above show a pattern of manufacturer subsidies for, and appropriation of, the opioid revisionist initiative, while documents to be reviewed later corroborate reports that large distributors and national pharmacies failed to monitor suspicious orders, ignored widespread opioid diversion, and lobbied to check DEA enforcement actions against their repeated violations of CSA regulations. However, the published literature neglects or understates other aspects of the origins and persistence of the opioid addiction epidemic.

Beginning in the mid-1990s, large pharmaceutical distributors also subverted narcotic conservatism through marketing, educational, and other for-profit promotional services that attacked conservative prescribing norms and promoted opioids as low-risk, high-efficacy analgesics. From 1996, and continuing through the late 1990s and 2000s, large chain pharmacies like Walmart, Walgreens, and CVS (often referred to as "national pharmacies") also began promoting liberalized opioid prescribing for CNP. They did so through various means, including continuing education programs and marketing directed at company pharmacists, many of whom had doubts about the new opioid analgesics and the wisdom of prescribing them for nonmalignant pain. Virtually all of these educational promotions involved mutually beneficial collaborations with opioid manufacturers. And most of these promotions (and all of the major DEA enforcement actions against large distributors and national pharmacies) occurred after 2000, the year that marked the beginning of a two-decade wave of fresh, compelling evidence of the inherent risks of opioid exposure and oversupply.

Section III.C reviews evidence that large distributors and national pharmacies promoted revisionist practices as well as particular prescription opioids and shows that their claims to the

contrary are false. Section III.D describes the post-2000 reaction to opioid overpromotion, overpromotion, and oversupply. It documents narcotic conservatism's rebirth, an event that revisionist pioneers ruefully acknowledged but that manufacturers, distributors, and national pharmacies ignored or resisted for the sake of maintaining sales and profits. Section III.E describes a key aspect of that resistance, the unwillingness to detect, report, and stop suspicious prescription-opioid transactions, as required by law. It shows that the consequence of these failures, which persisted despite external and internal warnings, was the prolonged diversion of large quantities of prescription opioids.

1.  Distributors and the Promotion of Opioids

That the large U.S. drug wholesalers promoted the opioid renaissance is unsurprising, in that they had long outgrown their factory-to-pharmacy transport role. By the late nineteenth century they had become vertically integrated operations involved in marketing as well as supply, "service wholesalers" in industry parlance. Their services multiplied during the twentieth century. By 1930 McKesson & Robbins had launched a "propaganda" campaign on behalf of independent druggists; appointed an executive to advance "hard-headed merchandising ideas" to bolster their net profits; and launched a Sunday afternoon radio program aimed at pharmacists that featured customers' letters, a sort of *Car Talk* for druggists. By 1959 McKesson provided druggists with store-design assistance, monthly advertising, sales management counseling and special promotions, and the "Rex" McKay pharmaceutical information and service center. Van-equipped representatives provided quick deliveries of drugs and quick updates on new products, so that pharmacists could advise both customers and doctors. McKesson saw druggists as "pharmaceutical consultant[s] to the health team" who were well situated to disseminate

information about novel prescription drugs, which the American pharmaceutical industry was then introducing in variety and abundance.[259]

It was in keeping with history, then, that McKesson and other service-oriented distributors became involved in promoting OxyContin, which Purdue launched in early 1996 as a twelve-hour oxycodone analgesic that purportedly modulated opioid highs and lows and provided ongoing pain relief, eliminating the temptation to increase the amount or frequency of doses. To help promote the new drug Purdue had, by May 1996, initiated or planned nineteen "OxyContin Wholesaler Special Programs." Three distributors, Bergen Brunswig Corporation (which in 2001 merged with AmeriSource Health to become AmerisourceBergen Corporation, hereafter ABC), Cardinal Health, and McKesson, were slated to receive over 82 percent of Purdue's initial expenditure of $132,661. The money went for such distributor-managed promotional schemes as rebates, telemarketing, and screen-saver advertising.[260]

[259] "A phrase you don't see any more—'The Independent Druggist is Doomed!'" advertising offprint (N.c.: McKesson & Robbins, 1930), 177 ("propaganda"), 181 ("hard-headed"), 182 (radio); "You are served 14 ways better … by McKesson," brochure (N.c.: McKesson, 1959), n. p., both Kremers Reference Files, F.B. Power Pharmaceutical Library, Madison, Wisconsin.

By 1964 there were about 350 full-line service wholesale drugs houses in the United States, over 100 of which were operated by McKesson. So dependent had small druggists become on the advice of service wholesalers that their sales personnel were "allowed to check the store stock and decide what is to be bought. The salesman's recommendation is often enough to determine whether or not new merchandise in the wholesaler's line is ordered." Paul C. Olsen, *Marketing Drug Products*, revised ed. (New York: Topics Publishing, 1964), 214-215. [

[260] Ryan, Girion, and Glover, "'You Want a Description of Hell'" (twelve hours) and OxyContin Wholesaler Special Promotions, PKY181732374. Purdue's OxyContin launch planners envisioned cooperative marketing efforts with distributors and national pharmacies (McKesson, Bergen Brunswig, Cardinal, FoxMeyer, AmeriSource, Walgreens, Eckerd Drug, Revco, Rite Aid, and Wal-Mart) at least six months before the FDA actually approved the drug. G.R. Green to M. Innaurato, June 2, 1995, PKY180255278-PKY180255280.

In June 1996 Purdue submitted an application for OxyContin to receive a DIANA (*D*istribution *I*ndustry *A*ward for *N*otable *A*chievements in Healthcare), an Oscar-like honor conferred annually by the National Wholesale Druggists' Association (NWDA) for "innovative new product introductions and promotions." In the accompanying letter, Guerdon R. Green, executive director of Purdue's National Accounts and Trade Division, expressed his gratitude for the wholesalers' help during the OxyContin launch, thanking them for "the assistance the active NWDA members gave us in the marketing of this product."[261]

A year later, in May 1997, Green gave a blunter appraisal of the value of wholesaler marketing programs in a memo to James Lang, Purdue's vice president for sales and marketing:

> Obstacles to our growth lie predominately with our reluctance to spend money on wholesaler programs. While many of the programs are difficult to tie to actual sales growth, they build a tremendous amount of goodwill with the wholesaler. Our participation in a variety of wholesaler programs with the launch of OXYCONTIN insured [sic] that every wholesaler distribution center would stock OXYCONTIN. Without programs designed by the wholesaler to move product at the retail level, the wholesaler is reluctant to stock their warehouse.

Green judged four distributors—McKesson, Bergen, Cardinal, and AmeriSource—particularly important to cultivate, as they controlled over 80 percent of the drug wholesaler market. These "wholesaler trading partners are moving away from simply performing a distribution function.

---

[261] Guerdon R. Green to John Hammond, June 17, 1996, PDD1701421278. The DIANA Award, which has been conferred since 1959, is described at the Healthcare Distribution Alliance's website, https://www.hda.org/about/industry-recognition/diana.

More and more they are becoming information vendors. They have captured information in terms of compliance, substitution, and patient demographics, that they wish to sell it to us [sic]."[262]

Sell they did over the over the coming years, as the Big Three struck a variety of promotional deals with opioid manufacturers. The pattern was industry-wide and continuous with what Green called the historical trend toward information-based services. In 2010, for example, Janssen engaged McKesson Patient Relationship Solutions to develop savings cards as part of its Nucynta patient assistance program. McKesson also provided Janssen sales representatives with online territory reports for the drug's savings-card and voucher programs. (Vouchers provided ten free Nucynta pills. The prescriber wrote one prescription for the ten free pills, a second prescription for sixty pills, and advised the patient to fill the first as a "trial" and the second "if satisfied." McKesson tracked and analyzed the results and reported back to Janssen.) The following year, 2011, McKesson organized an advertising campaign on behalf of Actavis's generic extended-release oxymorphone tablets. The campaign included faxes to selected pharmacies and specialist telephone calls to their buyers, as well as banner ads prepared by a McKesson design group. The ads ran on McKesson Connect, the distributor's proprietary online ordering platform, used by more than 30,000 McKesson pharmacy customers.[263]

---

[262] G.R. Green to J. Lang, May 21, 1997, quotations PKY180256914 and PKY180256915. Green's information-vendor prophecy was confirmed the following year, 1998, when McKesson, the nation's largest drug wholesaler, acquired HBOC, the nation's leading healthcare information provider. "McKesson Buys HBOC," CNN Money, October 19, 1998, https://money.cnn.com/1998/10/19/deals/mckesson/.

[263] McKesson and Nucynta: Felix Hsieh to Lisa Fergus, email, August 3, 2010, JAN-MS-00864385 (savings cards); Stacy Viger group email, March 8, 2010, JAN-TX-00034444, and Derek Soderquist, "How to Get McKesson Reports on your iPad2," JAN-TX-00015814 (territory

In 2012 McKesson signed product promotional agreements for Mallinckrodt's Exalgo and Teva's Actiq and Fentora. Exalgo is extended-release hydromorphone. Actiq and Fentora are dissolvable fentanyl products designed to enter the bloodstream through oral mucosa, the tissues that line the mouth. McKesson's marketing services included access to its RxBulletin, an email system that distributed the latest manufacturer-provided information about branded products.[264]

McKesson also owned a "hub" service-packaging program, AccessMED, that assisted in the off-label marketing of Fentora. The off-label marketing began in 2009, when AccessMED contracted with Fentora's maker, Cephalon. The arrangement continued after Teva acquired Cephalon in 2011. The problem facing both manufacturers was that the FDA had approved Fentora only for breakthrough cancer pain. Cephalon and Teva wanted physicians to be able to prescribe, and patients to be able to afford, Fentora for common CNP conditions such as neuropathy and low-back pain. So AccessMED provided physicians with template letters of

reports); "10 Free Pill Voucher Utilization Insights" (slide deck, 2012), JAN-MS-00666949, slide 3 (quotations); McKesson Patient Relationship Services, "JnJ Nucynta Business Reviews" (December 1, 2010), JAN-MS-01130535-JAN-MS-01130566 (voucher and savings card reports). McKesson ad proposal and Actavis approval: Jinping McCormick to David Myers email, September 2, 2011, ACTAVIS0622787, and attachment, ACTAVIS0622788-ACTAVIS0622789. Design role: David Myers to John Hansen, emails of September 16, 2011 and September 23, 2011, ALLERGAN MDL 00493045-00493047. Some manufacturers used independent marketing firms rather than distributors to manage discount programs. Actavis ran its co-pay-card program through a vendor called Triple i [sic]. The goal was to recruit new patients for Kadian and to enable them to use the drug for longer periods of time. Mark Killion deposition, September 11, 2020, pp. 47-53, and "Kadian Sales Training" (slide deck, February 26, 2010), Allergan_MDL_00436914.

[264] McKesson Manufacturer Marketing Product Promotional Agreement contracts for Mallinckrodt's Exalgo signed by McKesson representative Robert James, October 2, 2012, MCKMDL02223257, and for Teva's Actiq and Fentora, signed by McKesson Representative Martha Torres-Morgan, January 25, 2012, MCKMDL00353368-MCKMDL00353369. For an example of an RxBulletin (for Exalgo) see MNK-T1_0000990994-MNK-T1_0000990996, dated October 25, 2012.

medical necessity to justify insurance reimbursement in these cases. The letters, which ran to eight pages with endnotes, were miniature briefs that cited such industry-supported authorities as the FSMB, the APS, and the AAPM to make the case for covering Fentora treatment of CNP. Doctors and their staffs had only to fill in the patient's name, policy number, and medical information in a Word template and dispatch the letter asking the insurer to approve the prescription drug claim. Doctors also received an AccessMED hotline number ("877-4FENTORA") if they needed assistance. In effect, Teva paid McKesson to go fishing. Each new Fentora catch represented an "annual patient value" of $20,916 for Teva.[265]

As it had in the late nineteenth century, McKesson also manufactured and marketed its own opioids. In 2008 McKesson launched North Star Rx, a company that produced generic drugs under its own label, but which remained a subsidiary of McKesson. (The sale of "private label products," as they were known, was more profitable for the wholesaler and the retail pharmacies they supplied.) North Star Rx began with a modest $8.7 million in sales in 2008 but grew to $600 million in revenue by 2014. Among the products it sold to pharmacies via the McKesson ordering website were 50 mg Tramadol in bottles of 500 tablets. McKesson, long a vertically integrated service wholesaler, had become a digitally integrated service wholesaler with an

---

[265] Approved for breakthrough cancer pain: FDA Highlights of Prescribing Information, https://www.accessdata.fda.gov/drugsatfda_docs/label/2019/021947s029lbl.pdf#page=20. AccessMed doctor-contact and template letters: USMedInfo email and attachments, May 29, 2009, TEVA-MDL_A-00944625-TEVA-MDL_A-00944653. McKesson owns AccessMed: Thomas Reinke, "Boosting a Drug's Market Share Can Cross a Dangerous Line," July 10, 2016, https://www.managedcaremag.com/archives/2016/7/boosting-drug-s-market-share-can-cross-dangerous-line. Teva continues the agreement with McKesson through at least 2013: "Sixth Amendment to the Services Agreement" (October 31, 2013), TEVA_MDL_A_01179506-TEVA_MDL_A_011795012. Patient value: "Fentora Situation Analysis" (PowerPoint Presentation, June 15, 2011), TEVA_MDL_A_01184479_slide 31.

Amazon-style format ("professionals also viewed," "view alternatives") that sold opioid analgesics, its own among them, in national, international, and virtual realms.[266]

Cardinal provided a range of marketing opportunities to opioid manufacturers. Cardinal telemarketers promoted OxyContin to pharmacies in early 1996. In early 1997, when Purdue introduced 80 mg OxyContin tablets, Cardinal's Medicine Shoppe franchisees received Purdue rebate offers, up to $70 per bottle, limit three per pharmacy. Cardinal provided "DSP Marketing Points" to Actavis and Insys and other opioid manufacturers who signed distribution deals. "As part of your distribution service agreement with Cardinal Health, Insys has been allocated marketing points to use towards marketing programs at no additional out of pocket cost to you," Cardinal senior marketing consultant Kristine Fidler explained to Dion Reimer, a trade and distribution executive at Insys. "Our programs offer you a variety of ways to promote your Brand Rx products to pharmacists, physicians, nurses and even consumers."[267]

---

[266]Adam J. Fein, *2014-15 Economic Report on Pharmaceutical Wholesalers and Specialty Distributors*, pp. 20 (more profitable), 90 (North Star), Anda_Opioids_MDL_0000001254 and 0000001324. Quotations from McKesson product ordering site, North Star Tramadol tablets, accessed February 26, 2021, https://mms.mckesson.com/product/861705/North-Star-Rx-16714011111. Note: These quotations are from 2021; the same link now leads to a message, "The requested product is no longer available in our Catalog."
    ABC also sells oxycodone and oxycodone-acetaminophen products through its subsidiary, American Health Packaging, https://www.americanhealthpackaging.com/product-catalog/product-search-listing?query=oxycodone, accessed February 26, 2021.

[267] G.R. Green distribution email, March 20, 1996, PDD1706044077 (telemarketing); "Introductory Offer for Pharmacies," dated February 6, 1997, PDD1701383797; Kristine Fidler email to Nathalie Leitch, June 10, 2010, Acquired_Actavis_00368043 (Actavis); and Fidler to Dion Reimer, April 16, 2012, INSYS-MDL-007717507. The marketing points came with a use-it-or-lose-it catch: "Insys has a total of 2 marketing points," Fidler continued, "of which 1 point expires in June if unused."

Cardinal advertised directly to consumers through its Pharmacy Health Network (PHN). This Cardinal described as a "digital signage network" that offered manufacturers an "out-of-home advertising opportunity which connects your brand to health-conscious consumers at the point of influence," i.e., the drug store:

> Customized, dynamic media is delivered on flat panel LCD screens that are placed strategically in over 1,050 Cardinal Health retail independent and small chain pharmacies, **reaching over 3 million consumers each month** [bolded in original].

> PHN provides a balanced mix of health content and advertising, and includes weather updates provide by AccuWeather™, health and wellness content provided by recognizable and trusted sources such as Reader's Digest, Parents Magazine, Better Home and Gardens, and news and sports updates.

> A recent Nielsen study shows that PHN resonates with consumers and drives action. Overall PHN ad-recall rate is 63%, while 48% of those surveyed felt encouraged to discuss a product/brand with their physician or pharmacist.

Manufacturer PHM advertising opportunities included "dynamic audio/full motion video spot[s]" of 30-, 60-, and 90-seconds duration, as well as static advertising spots and "disease state video sponsorship[s]," presumably infomercials about ailments for which their products were indicated.[268]

---

[268] Cardinal Health, "Marketing Programs Overview: Manufacturer Marketing Services" (2011), n.p., CAH_MDL2804_00131705_Confidential (quotations).

Cardinal offered several "Awareness Programs" designed to influence retail pharmacists. Among these was the Service Flash, which relayed commercial information to more than 27,000 outlets. In 2009 Actavis used Service Flash to notify pharmacists that it was extending its co-pay assistance program for Kadian, extended-release morphine sulphate capsules. That same year Actavis used DSP Service Points to have Cardinal create Service Flash ads, linked to the Actavis website, for its fentanyl products. In 2012 Insys signed a contract with Cardinal to use Service Flash for a full-page ad for Subsys, a fentanyl sublingual spray. In 2009 and 2014 Actavis used DSP points to promote Kadian through two other Cardinal outlets, telemarketing and eConnection (email) services.[269]

Cardinal assured clients that its telemarketing campaigns used Cardinal Health employees to contact the customers, who had "an established relationship with the callers." The 2,900 customers were a select group, having opted into the program to learn about new deals and new products. Caller rapport and customer attentiveness made Cardinal telemarketing "a great way to

---

[269] Service Flash details are in ibid. Kadian Service Flash co-pay program announcement is attached to Nathalie Leitch to Jennifer Altier email chain, October 25, 2010, Acquired_Actavis_00368043-Acquired_Actavis_00368048. Fentanyl Service Flash ads: Kristine Fidler to Robyn DesJardins, email, October 19, 2009, CAH_MDL2804_00134256. 2012 Insys marketing agreement: INSYS-MDL-007717511 and INSYS-MDL-0077117351. 2009 and 2014 telemarketing and eConnect agreements with Actavis: Acquired_Actavis_00367035 and ACTAVIS0220735. Cardinal also offered Actavis a marketing program called *Rx*Deals [sic], described as providing "special offers—rebates or off-invoice discounts—to retail chain and independent pharmacies, including CVS and Walgreen's [sic], to move your product." Cardinal Health Service Flash to Jinping McCormick, November 8, 2010, Acquired_Actavis_00376614-Acquired_Actavis_00376615.

enhance your existing marketing programs and to increase company and product awareness within our Retail Independent and Medicine Shoppe customer base."[270]

Cardinal offered eDetail, an upgraded version of its basic eConnect email program. The eDetail service, as described in a 2006 Cardinal proposal to market OxyContin, offered "an interactive way to deliver important information regarding your products to healthcare providers who need it most." The message, which could be sent to more than 50,000 doctors and 70,000 pharmacy healthcare providers, took the form of a five-to-eight minute "self-guided flash presentation that may include interactive polling, a key opinion leader, and charts/graphs. An email invitation will be sent to the selected participants inviting them to view your eDetail and providing an honorarium for their time." Should Purdue elect to combine eDetail with other services, such as vouchers or co-pay cards "to use for sampling and patient loyalty/compliance," it would receive a pricing break for bundling the marketing programs.[271]

ABC and its predecessor, Bergen Brunswig, offered similar services, as well as managed care and continuing education (CE) programs. In 2000 Purdue agreed to market OxyContin through PlusCare, Bergen's managed care business. The plan had two phases. Using cover letters bearing the PlusCare and Good Neighbor Pharmacy logos, Bergen would dispatch customized document mailings to more than 1,800 members of its national pharmacy network. Purdue would follow up by sending representatives to the same pharmacies "to make sure a) they received the

---

[270] Employees place all calls: Cardinal Health Service Flash to Kristine Fidler, email, February 14, 2011, CAH_MDL2804_00134452.

[271] eDetail description: Lauren Fiore, "Marketing Proposal: Oxycontin [sic] Communication Plan" (TS, September 2006), PPLPC004000083260. Sampling, patients, price break for bundling: Lauren Fiore to Donald Tasser, September 22, 2006, PPLPC004000083256.

information b) would they like additional information c) make sure that they are stocking OxyContin d) make the pharmacist aware of who the high prescribers of opioids are in the area e) inform the provider that this particular 'Good Neighbor Pharmacy' stocks OxyContin and f) further educate the pharmacist on proper pain management." The mailing, wrote Joseph Hennessy, a Purdue senior area manager for managed care, "provides us a good opportunity to educate pharmacists on proper pain management and why OxyContin is appropriate. They in turn can help educate patients on why this medicine is appropriate vs. questioning why the patient is prescribed."[272]

To tip the balance from "questioning" to "appropriate" the mailing included "Opioids for Managing Patients with Chronic Pain: Community Pharmacists' Perspectives and Concerns" by Drs. Brian D. Greenwald and Elizabeth J. Narcessian. The article's authors were physicians who had accepted Purdue honoraria, the latter on numerous occasions. (Purdue subsequently funded, in her honor, the APS's Elizabeth Narcessian Award for "outstanding educational achievements in pain management.") Drs. Greenwald and Narcessian acknowledged the assistance and advice of David Joranson and Dr. Aaron Gilson of the University of Wisconsin Pain and Policy Study Group. Joranson, a critic of state narcotic controls, vice chairman and co-author of the APS / AAPM's 1997 consensus statement on opioids in CNP, and soon-to-be NPEC advisor, had in fact founded the Wisconsin Group, which received $1.6 million from Purdue from 1999 to 2010.

---

[272] Cover letters: PPLPC05300000723-PPLPC05300000724. Georgette Dzwilewski to Tim Richards, email, August 7, 2000, PPLPC03500000377 ("make sure") and Joe Hennessey to Tim Richards, email, July 26, 2000, PPLPC034000102543 ("good opportunity").

His colleague Dr. Gilson took Purdue money to give talks and author papers, a fact not always acknowledged when the papers appeared in print.[273]

   Drs. Greenwald and Narcessian published their article in the *Journal of Pain and Symptom Management*. The copyright was held, not by the authors, but by the U.S. Cancer Pain Relief Committee, which owned the journal. The Cancer Pain Relief Committee was a Madison, Wisconsin-based 501(c) nonprofit with an antiregulatory agenda and global ambitions. The committee's president was Joranson, who, as noted, had assisted and advised Drs. Greenwald and Narcessian in the preparation of the article. Though the committee's name and annual reports spoke of cancer pain, several of its board members—Drs. Kathleen Foley, Mitchell Max, and Richard Payne—were KOLs committed to CNP revisionism who had ties to the opioid

---

[273] Article: Brian D. Greenwald and Elizabeth J. Narcessian, "Opioids for Managing Patients with Chronic Pain: Community Pharmacists' Perspectives and Concerns," *Journal of Pain and Symptom Management* 17 (1999): 369-375.
   Dr. Greenwald: Purdue Pain Management Speaker Training Program, 1999: PPLPC037000027441_Greenwald.xls, and honorarium, 2000 spreadsheet, PKY182578032.
   Dr. Narcessian honoraria: Medical Education Departmental Charges, PDD17001553478- PDD17001553481. Dr. Narcessian also prepared Partners Against Pain's "Patient Comfort Assessment Guide," https://www.yumpu.com/en/document/read/11912702/patient-comfort-assessment-guide-partners-against-pain.
   Narcessian Award: "American Pain Society Presents 2012 Achievement Awards," APS, May 17, 2012, https://www.newswise.com/articles/american-pain-society-presents-2012-achievement-awards ("outstanding"), and Purdue funding, APS Industry Funding spreadsheet, APS-MDL0000002, https://www.industrydocuments.ucsf.edu/drug/docs/#id=ktyw0232.
   Joranson: Fauber, "UW a Force in Pain Drug Growth" (founded Pain Group); Jessica McBride, "UW-Madison Researchers Played Role in Increasing Opioid Use," GMToday.com, September 10, 2014, https://www.gmtoday.com/health/on_heroins_trail/uw-madison-researchers-played-role-in-increasing-opioid-use/article_524678d0-4862-11ea-ae17-5f9d38dbf6aa.html (Purdue funding).
   Dr. Gilson: John Fauber, "Academics Profit by Making the Case for Opioid Painkillers," MEDPAGE TODAY, April 3, 2011, https://www.medpagetoday.com/special-reports/specialreports/25683.

manufacturers and pain organizations. As a young physician, Dr. Payne had been stirred by Dr.

Foley's call to arms at the 1988 M.D. Anderson conference; he remained a staunch (and widely

deployed) revisionist throughout his long career. Dr. Max, a protégé of Dr. Foley, was past

president of the APS and a seminal figure in the "pain, the fifth vital sign" movement. Drs. Foley

and Payne were paid Purdue speakers, as was Dr. Portenoy, another Foley protégé, who served

as the Relief Committee's vice president and, as it happened, editor-in-chief of the *Journal of*

*Pain and Symptom Management*.[274]

---

[274] Copyright: Greenwald and Narcessian, "Opioids," 369. Ownership: Russell K. Portenoy, *JPSM* Affiliates with the AAHPM," *Journal of Pain and Symptom Management* 37 (2009): 1, https://www.jpsmjournal.com/action/showPdf?pii=S0885-3924%2808%2900615-5. U.S. Cancer Pain Committee officers and board members: U.S. House of Representatives, Offices of Representatives Katherine Clark and Hal Rogers, *Corrupting Influence: Purdue & the WHO* (May 22, 2019), p. 19, https://katherineclark.house.gov/_cache/files/a/a/aaa7536a-6db3-4192-b943-364e7c599d10/818172D42793504DD9DFE64B77A77C0E.5.22.19-who-purdue-report-final.pdf; 2001 form 990 at ProPublica, United States Cancer Pain Relief Committee Inc., https://projects.propublica.org/nonprofits/organizations/391573802.
  Dr. Foley's Purdue payments and ties to Dr. Sackler are documented above, as are Dr. Portenoy's multiple sponsorships by Purdue and other manufacturers. Dr. Portenoy's c.v., PPLP003376302, lists the journal editorship and numerous Purdue-financed events, e.g., speaking engagements at Reading Hospital, April 28-29, 1998, c.v., PPLP003376380, with his compensation ($2,500) detailed in Jennifer Henry to Portenoy, March 18, 1998, PKY180606605. Purdue funded APS events at which Dr. Portenoy also received honoraria, e.g., Nicki LaCroix to Portenoy, October 2, 1996, PKY180958885.
  By 1995, if not before, Dr. Payne was receiving Purdue honoraria for $2,000, as shown in Medical Education Departmental Charges, PDD1701553479. In 1999 Purdue listed both Drs. Payne and Dr. Portenoy as "Top Speakers," PPLPC025000004772-PPLPC025000004773. As late as 2013-2015, Dr. Payne was receiving substantial payments from Purdue and other manufacturers. Matthew Perrone and Ben Wieder, "Pro-painkiller Echo Chamber Shaped Policy Amid Drug Epidemic," AP News, September 19, 2016, https://www.apnews.com/3d257452c24a410f98e8e5a4d9d448a7. As late as 2017 Dr. Payne, in his capacity as Medical Director of the PAINS Project (established in 2011 by Purdue-subsidized Center for Practical Bioethics) was still defending the revisionist project and deploring the turn toward more conservative prescribing norms. Richard Payne, "Back to the Future—the Tragedy of Unrelieved Pain and Suffering," PAINS Member Update (June 2017), MNKOI 0001493320, https://s3-us-west-2.amazonaws.com/edu.ucsf.industrydocuments.artifacts/t/z/m/m/tzmm0237/tzmm0237.pdf. (The same article recalls Dr. Foley's 1988 address.) "Impact Stories and History," Center for Practical

The article was, in brief, a classic instance of "ghost-managed medicine," seemingly objective research shaped by a pharmaceutical stakeholder employing a team of "players" to ventriloquize views on disease management, treatment, and regulations in ways that promoted its products. Yet mere publication, particularly in a non-prestigious journal, was insufficient. What Bergen Brunswig offered was the ability to send the ghosted information directly to its network of pharmacist-vendees. They were important because they advised and reassured customers. Pharmacists, wrote Drs. Greenwald and Narcessian, played key roles in patient pharmacotherapy generally and in chronic pain management specifically. Should their knowledge of pain pharmacotherapy be inadequate or dated, their patients might suffer.[275]

Drs. Greenwald and Narcessian's survey of 36 New Jersey retail community pharmacists suggested that this was the case. Asked about the perceived legality of prescribing opioids for more than several months, 75 percent of pharmacists surveyed said that this was lawful and

---

Bioethics, https://www.practicalbioethics.org/impact-stories/ acknowledges the 2011 founding of PAINS, Pain Action Alliance to Implement a National Strategy. For Purdue's funding of the Center for Practical Bioethics, see USSFCF, p. 4.

Dr. Max's roles in the APS and the pain-assessment movement it supported are recounted in David W. Baker, *The Joint Commission's Pain Standards: Origins and Evolution*, May 5, 2017, pp. 2-3, https://www.jointcommission.org/-/media/tjc/documents/resources/pain-management/pain_std_history_web_version_05122017pdf.pdf?db=web&hash=E7D12A5C3BE9DF031F3D8FE0D8509580. Dr. Max's March 1999 oral history interview with Dr. Marcia Meldrum describes his relationship with Dr. Foley (3-6), as well as his own role in the movement "to make pain visible" (24-28), https://history.nih.gov/display/history/Max%2C+Mitchell+1999.

Global ambitions: The Committee and its house journal supported *Cancer Pain Release*, a pro-opioid quarterly printed in several languages as "a publication of the World Health Organization Collaborating Center for Symptom Evaluation in Cancer Care." The "Collaborating Center" was directed by Joranson, whose Madison address was one and the same as the Center's. Cf. *Cancer Pain Release* 6 (Winter 1992-Spring 1993): p. 8, PDD1706020448, with Joranson's c.v., PPLP0090000049425-PPLP0090000049426.

275 The phrase is from Sismondo, *Ghost-Managed Medicine*. Pharmacists' role: Greenwald and Narcessian, "Opioids," 369-70, 374.

generally acceptable medical practice. But only 36.1 percent said that it was lawful and generally acceptable if the cancer patient had a history of opioid abuse; 16.6 percent if prescribed for CNP only; and 2.8 percent for CNP with a patient history of opioid abuse.[276]

Drs. Greenwald and Narcessian set about scrubbing away these vestiges of narcotic conservatism by dispelling "common myths and misperceptions." Tolerance, they wrote, did not limit the efficacy of opioids for long-term management of pain. Withdrawal symptoms could be handled by tapering should the need for opioid therapy cease. Physical dependence was distinct from addiction, which developed in less than 1 percent of medical patients with no prior history, as shown in Porter, J, and Jick, H, *N Engl J. Med*., 1980. Though state multiple-copy prescription laws were misguided and burdensome, pharmacists should understand that it was "not illegal to prescribe or dispense opioids for the management of chronic malignant or nonmalignant pain at either the federal or state level. Furthermore, it is not illegal to treat a patient with a history of substance abuse with opioids for pain"—setting aside the requirement that addicted patients treated with methadone required prescriptions from specially registered physicians. Nothing to fear, in short, except opiophobia itself, the irrational concern that lay behind the epidemic of chronic pain and attendant suffering that purportedly afflicted one in three Americans.[277]

The 2000 Bergen Brunswig package mailing also contained a Purdue-underwritten CE program for pharmacists. The "Use of Opioids in Chronic Noncancer Pain" was prepared by Drs. Arthur G. Lipman and Kenneth C. Jackson II, both of whom held PharmD degrees. Dr. Lipman

---

[276] Greenwald and Narcessian, "Opioids," 370, 373.

[277] Ibid., 373, 374 (quotations).

was a Purdue consultant and grant recipient. He had regularly received Purdue honoraria since at least 1995 and was ranked as one of Purdue's top speakers in 1999. His co-author, Dr. Jackson, began training as a Purdue speaker in 1999 and subsequently declared himself as a paid speaker for Ortho-McNeil as well as Purdue. Drs. Lipman and Jackson explained that undertreated pain was widespread and dangerous. "Authoritative publications" from the AAPM, APS, and FSMB had "clearly documented that opioids have a place in the management of many patients' chronic nonmalignant pain." Misperceptions about dependence, addiction, and tolerance remained barriers to effective use. While chronic opioid analgesic therapy "frequently" permitted CNP patients "to maintain relatively normal function and lifestyle," they could also "frequently … be tapered or discontinued once the desired outcomes are achieved."[278]

The multiple-choice exam at the end of the CE program advanced both a narrow Purdue agenda (e.g., questions indicating that oral oxycodone was safer than morphine) as well as a broader revisionist agenda:

16. Opioids cause more end-organ toxicity than NSAIDs.

A. true

B. false

17. The risk of addiction in chronic pain patients taking opioids for pain relief is:

---

[278] "Use of Opioids in Chronic Noncancer Pain," Power-Pak C.E., April 1, 2000, ENDO-OPIOID MDL-02344092 through 02344114, "authoritative" at 02344094, "frequently" at 02344134. Lipman: 1995 honoraria in Medical Education Departmental Charges, PDD17001553479-PDD17001553481, and listed in 1999 "Top Speakers," PPLPC02500000477. Jackson: "Attendees 1998/1999/2000 Speaker Training Programs" (February 5, 2000), PDD8800000894, and speakers' bureau affiliations, APS, "Guideline for the Management of Fibromyalgia Syndrome Pain in Adults and Children" (2005, updated 2010), http://teamworkstherapy.com/pdf/APS%20guideline-%20Fibromyalgia.pdf.

A. very high (>>50%)

B. high (30%-40%)

C. moderate (10%-20%)

D. low (1%-10%)

E. extremely low (<<1%)

The correct answers, B and E, reinforced the claims of safety and non-addictiveness central to

the opioid analgesia campaign. The evidence Drs. Lipman and Jackson offered for extremely low

addiction risk included Porter and Jick.[279]

In 2007 ABC and Purdue again collaborated on an educational marketing plan. Advocate

Rx Solutions, an ABC subsidiary, offered programs for pharmacists at CE meetings. One was

Medication Therapy Management (MTM), which focused on how pharmacists could help

patients improve therapeutic outcomes. At ABC's 2007 National Healthcare Conference and

Exposition, Purdue's Dr. Kristi Dover gave a presentation, "Incorporating Pain Care into

Medication Therapy Management Reviews," that urged pharmacists to offer MTM services in

certain situations. The patient would meet at least once a year with the pharmacist "to address

ongoing medication monitoring issues and event-based medication therapy problems." Whether

and how often the meetings occurred would depend on the complexity of the problems, the

extent of patient's insurance coverage, or both.[280]

---

[279] "Use of Opioids in Chronic Noncancer Pain," ENDO-OPIOID MDL-02344105 (questions)
and ENDO-OPIOID MDL-02344100 (Porter and Jick).

[280] PPLPC031000352606, slide 11 and notes.

Should the patient's medication issues involve opioids, Dover wanted pharmacist-adviser to be clear on certain points. Opioids had no standardized correct dose. Titration to response was "the only consistently useful way to determine the optimal dose," as per APS guidelines. Physical dependence "DOES NOT = ADDICTION," as per another APS/AAPM consensus paper. And beware of pseudoaddiction, which looked like drug-seeking behavior but was really inadequate pain relief:

> Many medical students are taught that if opioids are prescribed in high doses or for a prolonged time, the patient will become an addict. Therefore, the common wisdom is to prescribe the lowest possible dose at the longest possible dosing interval. As a result, opioids are frequently prescribed in doses that are inadequate and at time intervals beyond the duration of action of the drug, resulting in poor analgesia.

The term pseudoaddiction, Dr. Dover explained, had been introduced in 1989 by Drs. David E. Weissman and J. David Haddox to describe "the iatrogenic syndrome of abnormal behavior developing in direct consequence of inadequate pain management." Opioid iatrogenesis, formerly understood as a byproduct of overprescribing, was really a consequence of underprescribing. The harm manifest itself as "escalation of analgesic demands by the patient associated with behavioral changes to convince others of the pain's severity" and "a crisis of mistrust between the patient and the health care team." However, trust could be re-established between the patient and the team by "providing appropriate and timely analgesics to control the patient's level of pain," that is, more opioids.[281]

---

[281] Ibid., slides 37 and notes, 40 and notes, and 41 and notes, capitalization thus.

What Dr. Dover did not say at ABC's educational conference was that the funding for APS and AAPM, whose guidelines she used, came mainly from opioid manufacturers. Or that Drs. Weissman and Haddox were paid Purdue speakers. Or that in 1999 Dr. Haddox became a high-level Purdue executive. Or that Dr. Weissman and Haddox's speculative article was based on a single case, that of a seventeen-year-old boy with leukemia.[282]

2.  National Pharmacies and the Promotion of Opioids

Like wholesalers, pharmaceutical manufacturers had long offered marketing and technical assistance to pharmacists. Eli Lilly, for example, provided educational materials for mid-twentieth-century pharmacy students and, for practicing druggists, letter inserts promoting their prescription services. These inserts the druggists dispatched to community physicians and regular customers—targeted advertising for the price of a letter and a three cent stamp.[283]

National pharmacies also played a role in continuing education and marketing programs, including those aimed at promoting opioid prescribing for CNP. This section examines that role

---

[282] As documented above, Weissman was a top Purdue speaker in 1999 and 2001. Haddox, who also served as an APS president, was a "very good speaker" whom Purdue targeted for "important venues." Email chain, October 1999, PPLPC010000005050-PPLPC0100000005051. LinkedIn lists Dr. Haddox as a Purdue vice president from September 1999 to October 2018, https://www.linkedin.com/in/j-david-haddox-dds-md-24524179. Single case: D.E. Weissman and J.D. Haddox, "Opioid Pseudoaddiction—an Iatrogenic Syndrome," *Pain* 36 (March 1989): 363-366. Also unsaid was that Purdue's profit margins were higher on high-dose than low-dose OxyContin, and that high doses entailed greater risks of addiction and respiratory failure. Posner, *Pharma*, 417-418.

[283] *Pharmacist's Reference*, 8th revision (Indianapolis: Eli Lilly, 1957) and Herman C. Nolen and Harold H. Maynard, *Drug Store Management* (New York: McGraw-Hill, 1941), https://babel.hathitrust.org/cgi/pt?id=mdp.39015072276408&view=1up&seq=218&skin=2021, 163, 174-175, 306.

by providing examples of local, state, and national educational and marketing collaborations involving several states. I concentrate on two, Ohio and Florida. Understanding what happened in Florida is important for understanding what happened in Ohio because, by 2010, per capita oxycodone sales in Florida were running three times the national average. Much of the overage was diverted north to Ohio and adjacent states—so much so that Portsmouth, Ohio, on the north bank of the Ohio River, became known as "Broward County North." Investigation of the Pain Center of Broward, a pill mill at the Florida end of the pipeline, revealed that half of the customers lived out of state. During the clinic's heyday, from 2008 to 2014, they traveled from Ohio, Kentucky, Georgia, and even Massachusetts. Some were so exhausted by the journey that they slept overnight in their cars in the parking lot.[284]

Like the Big Three distributors, U.S. pharmacy chains had grown from modest beginnings into large and complex enterprises. In the case of Walgreens, three generations of the company's founding family had turned a single Chicago drug store into a national chain known for introducing new merchandise, innovative store layout and marketing, and manufacturing and distributing its own fountain treats and low-cost drugs. (To this day a Walgreens subsidiary, Almus, manufactures tramadol capsules for the European market.) However, at the height of the U.S. prescription-opioid addiction epidemic, from 2006 to 2012, Walgreens acted as an opioid

---

[284] Three times: "Oxycodone Sales in Kilograms per 100,000 People, Florida vs. U.S.," Plaintiff's Exhibit PX-FL-3284, *State of Florida* v. *Walgreen Co.* Diverted north: Higham and Horwitz, *American Cartel*, 35, 44, 50 ("County North"), 65, and *United States* v. *Elliott*, 876 F.3d 855 (2017)**,** 857-858, https://cite.case.law/f3d/876/855/ (Pain Center of Broward). Diversion from Florida to Ohio and other Ohio River Valley states is discussed in more detail below.

distributor and retailer. The company purchased 97 percent of its oxycodone and hydrocodone pills from manufacturers and stored them in two of its own specially equipped distribution centers. One of the centers, in Jupiter, Florida, became the focus of a major DEA investigation. The investigation, described below, found that Walgreens had ignored suspicious, high-volume orders placed by its own pharmacies in Florida, whence much of the illegal flow of prescription opioids to eastern and midwestern states originated.[285]

---

[285] Growth of Walgreens: "Walgreen, Charles Rudolph," *Biographical Dictionary of American Business Leaders, V-Z,* ed. John N. Ingham (Westport, Conn.: Greenwood Press, 1983), pp. 1533-1536, https://www.google.com/books/edition/Biographical_Dictionary_of_American_Busi/uzI79XfsOIwC?gbpv=1. Tramadol: Almus Generics Product List, http://www.almus.co.uk/web/guest/product-list, accessed November 8, 2020. Florida's key role in national diversion: Jenn Abelson et al., "At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids," *Washington Post*, November 7, 2019, https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/?arc404=true; "Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties Under the Controlled Substances Act," DEA press release, June 11, 2013, https://www.dea.gov/press-releases/2013/06/11/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under; Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, pp. 6-7, https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-22/ohnd-1:2017-md-02804-02208-022; and Pat Beall, "How Florida Spread Oxy across America," part 2 of Igniting the Heroin Epidemic: *Palm Beach Post* Exclusive Investigation, https://heroin.palmbeachpost.com/how-florida-spread-oxycodone-across-america/?ref=leftnav.

In June 2020, in response to the State of West Virginia's lawsuit against Walgreens, company spokesperson Phil Caruso said that Walgreens "never manufactured or marketed opioids, and never sold opioids to the pain clinics, internet pharmacies and 'pill mills' that fueled the opioid crisis." The sources cited show that the claim about pill mills is misleading. The DEA did not accuse Walgreens of selling or distributing opioids *to* pill mills. It accused Walgreens distributors of filling suspiciously large orders placed by its own pharmacies which in turn filled suspiciously large volumes of prescriptions written by mercenary doctors who operated *from* pill mills or similar facilities. Caruso's denial of marketing is also false, as shown below. Quotation: "West Virginia Sues Walgreens, Rite-Aid for Flooding Their Pharmacies with Tens of Millions of Painkillers," Associated Press, June 5, 2020, https://www.marketwatch.com/story/west-virginia-sues-walgreens-rite-aid-over-painkillers-flood-2020-06-05.

Walgreens had had run-ins with the DEA before the Florida crisis, as in 2006, when DEA diversion-control investigators reported that the "formulation used by the firm for reporting

Well before 2013, when Walgreens resolved the DEA investigation by paying record civil penalties for violations of the CSA, the company worked with Purdue and other manufacturers to remove barriers to prescription-opioid sales. The principal concern was the one voiced by Drs. Greenwald and Narcessian: wary pharmacists who were a hallmark and a legacy of narcotic conservatism. As with physicians, pharmacists' conservatism was born of the nineteenth-century opiate addiction epidemic and the reform reaction to it. It had been reinforced throughout most of the twentieth century by narcotic-control regulators and by professional pharmaceutical education. This was evident in Drs. Greenwald and Narcessian's survey data. Only one in six pharmacists trained between 1960 and 1995 found long-term opioid prescribing for CNP legally and medically unexceptionable.[286]

Purdue knew that many pharmacists had reservations about filling prescriptions for strong opioids for CNP patients. In 2000 the company received field reports of "several issues of pharmacists questioning physicians on their CII Rx [Schedule II controlled substance prescriptions] for non-cancer pain." That June Dr. Mary Cook, a regional Purdue medical liaison, stressed the need to "continue to work the JCAHO concept" for hospital-based health care professionals and to set up CE meetings for "large numbers" of pharmacists. "We have established that pharmacists are huge barriers to pain management—I'd encourage some CE

---

suspicious ordering of controlled substances was insufficient," among other security and record-keeping failures. Robert Corso to Todd Polarolo, May 17, 2006, WAGMDL00709510.

[286] U.S. Attorney's Office, Southern District of Florida, "Walgreens Agrees to Pay a Record Settlement of $80 Million for Civil Penalties under the Controlled Substances Act," June 11, 2013, https://www.justice.gov/usao-sdfl/pr/walgreens-agrees-pay-record-settlement-80-million-civil-penalties-under-controlled. Greenwald and Narcessian, "Pharmacists' Perspectives and Concerns," 370, 373 (survey).

programs for Walgreens and other retail chains in the region. They are generally very receptive to the offering of such programs as the corporate leaders do try to provide CE for their staff pharmacists."[287]

This was true. In 1998 and 1999 Walgreens requested, and Purdue provided, MD and PharmD speakers on such topics as "Current Trends and the Pharmacist's Role in the Treatment of Chronic Non-Malignant Pain," presented by Dr. Joanie Smoot at the Walgreens District Meeting in Knoxville, Tenn. In Washington State, Walgreens Pharmacy Supervisor Scott Diveney landed Dr. Louis Saeger, a top-rated Purdue speaker active on the West Coast. In Corpus Christi, Texas, Walgreens staff arranged for another Purdue-trained speaker, Dr. Joel Joselevitz, to address the regional pharmacists' association on "Pain Management." Dr. Joselevitz's penchant for prescribing opioids and other controlled substances was such that he was ultimately disciplined by the Texas Medical Board, which suspending his prescribing privileges and permanently barred him from threating chronic-pain patients after three of them died under his care.[288]

---

[287] Unsigned memorandum re Purdue / Walgreens CE programs in Florida, April 3, 2000, PPLPC024000014423 ("several issues"); and "West Central Regional Meeting, June 14-15, 2000: Thoughts from Mary Cook" (TS, June 2000), PPLPC024000019583 ("JCAHO concept," "large numbers," "huge barriers").

[288] "Per your request" Walgreens speaker-confirmation letters from Purdue: August 12, 1999, PKY180524065 (Smoot); December 21, 1998, PKY180836236 (Saeger); and April 7, 1999, PKY181959925 (Joselevitz). Dr. Saeger a leading speaker, "Top Speakers 1999" (TS, September 1999), PPLPC02500000473, and active on West Coast, Purdue lecture programs spreadsheet (2000), pp. 37-41, PKY182578166-PKY182578170, https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-200C/ohnd-1:2017-md-02804-02347-046. Dr. Joselevitz: *Cox Media Group LLC* v. *Dr Joel Joselevitz*, Court of Appeals of Texas, Houston (14th Dist.), no. 14-16-00333-CV, March 21, 2017, https://caselaw.findlaw.com/tx-court-of-appeals/1853958.html. The January 31, 1999, notes of Michele Clayborne, the Purdue sales representative who called on Dr. Joselevitz, convey

Walgreens invited Purdue speakers to address its pharmacists in Florida. In March and April of 2000 Walgreens dispatched 1,500 invitations to Tampa Bay-area pharmacists to attend weekend CE programs at local hotels. Purdue paid for the food, rooms, audio-visual services, and speaker. Dr. Jaqueline LaPerriere, PharmD, Purdue's Medical Science Liaison and Clinical Field Trainer for the southeastern United States, addressed 110 pharmacists on "Pain Management for the Pharmacists" [sic] and "received great feedback as well as great evaluations." Celeste Poland, Purdue's Tampa Bay sales representative, reported that the Walgreens CE programs had helped address concerns over OxyContin in CNP. ("We have had several issues of pharmacists questioning physicians on their CII Rx [Schedule II opioid prescriptions] for non-cancer pain.") More, "the support of these [Walgreens CE] programs will enable Purdue to gain the commitment of Walgreens for the stocking of new products and dosage strengths at Walgreens pharmacies." The new dosage strength Purdue was set to release was the 160 mg OxyContin tablet. It contained 36 times as much oxycodone per tablet as combination opioid analgesics like Percocet and Tylox.[289]

---

something of his enthusiasm: "Follow-up after speaker training. Has converted 4 new patien [sic] today alone to OxyContin, will start using earlier than he was, and converting people from short acting sooner." PKY182471903.

[289] Quotations: David Denning to Harry Lazarus, email, January 17, 2000, 7003107553, and David Denning to Windell Fisher, email, April 3, 2000, attaching Celeste Poland's report of the same date, PPLPC024000014422-PPLPC024000014423. Feedback for "Pain Management for Pharmacists," a CE talk Dr. LaPerriere subsequently presented to eighty-eight Tampa-area pharmacists, was similarly positive. "Excellent subject matter," wrote one attendee. "I'll be less prejudiced." "Program Evaluation Summary" (TS, June 19, 2001), 7003198551. Purdue's Mitch Holt reported overhearing similar comments among pharmacists attending a Walgreens-Purdue CE program in Orlando on October 28, 2001. Stephen Seid email chain, November 5, 2001, PPLPC008000021438-PPLPC008000021440. For Dr. LaPerriere and Poland's titles see LinkedIn, https://www.linkedin.com/in/jacqueline-a-laperriere-42739640 and https://www.linkedin.com/in/celeste-poland-36085531. For OxyContin 160 mg introduction (in July 2000) and relative strength see DEA, National Drug Intelligence Center, "OxyContin Diversion

In September 2001 Walgreens executive Dawn DiLullo, who helped oversee educational programs, asked Purdue's Tony Scifo if Purdue might provide a five-hour CE program for "virtually all 2,000 Walgreens pharmacists in Florida" in cities from Palm Beach to Jacksonville. Scifo reported that DiLullo was "open to pain management topics" and had suggested "patient testimonials at these programs to help the pharmacist in understanding the need for high dosage [sic] levels given appropriately to people in need." Although logistical considerations inclined Scifo toward a two-hour CE format, he nonetheless saw the request as a "great opportunity." Stephen Seid, Scifo's boss and head of Purdue's National Accounts Group, agreed. The credit hours and program numbers could be negotiated. The "big picture" was what mattered. Walgreens sought a regional approach. "We can hit a lot more pharmacists this way," Seid wrote. "I realize the expense, but we *want* [his emphasis] to educate a lot of pharmacists."[290]

---

and Abuse: Background," January 2001, https://www.justice.gov/archive/ndic/pubs/651/backgrnd.htm.

 Walgreens arranged for its pharmacists to attend other dinner CE meetings with Dr. LaPerriere, e.g., in September 2021 with fifty Jacksonville-area pharmacists on the topic of "Non-Malignant Pain." Tony Scifo email chain, August 8, 2001, 70003130976-70003130978. Following a May 25, 1999, meeting with thirty Orange Park, Fl., pharmacists, Dr. LaPerriere wrote "Walgreens RPh audience seemed to be more informed & open to stocking opioids, regulator issues, etc. Should be more approachable in future when rep. call." "Purdue Pharma … Follow-Up Form" (TS and MS, June 1, 1999), 7003137295.

 Dr. LaPerriere used meetings with Eckerd and Walgreens pharmacists to scout talent. In November 1999 she recommended an articulate, CII-opioid-friendly Walgreens pharmacist for training as a Purdue speaker. She also described good results from JCAHO-related presentations in Florida, e.g., the Jupiter Medical Center "is a bit overwhelmed with the task at hand and has asked Purdue to partner with them in the process of meeting the new standards. This has given [sales rep] Kim [Workman] a great 'in' with a previously resistant facility that should enable her to increase the amount of Purdue products the hospital uses over time as the new standards and protocols are used." Jacqueline A. LaPerriere to H. Berkowitz, monthly field report, November 4, 1999, 7100034850-7100034852.

[290] Quotations: Chris Sposato email chain, September 17, 2001, PPLPC008000020434-PPLPC008000020436 DiLullo's responsibilities: Deposition of Stephen L. Seid, December 9,

Purdue and Walgreens collaborated on CE ventures. Seid directed his staff to "offer educational materials to CVS and Walgreens" and later testified that such efforts were coordinated with, and required the approval of, CVS and Walgreen corporate headquarters. The process was transactional. In March 2002, for example, DiLullo met Scifo to set up more speaker programs. She asked if Purdue might also subsidize a program on reducing pharmacy errors. Scifo said that Purdue could make a small contribution "if we could have one of our programs on pain management with this program." DiLullo agreed and asked if she might also have a digitized version of Purdue's guide for counseling patients on opioids in pain management for posting on the Walgreen Pharmacist Website. "Already working on the last point," Seid emailed when he learned of the request.[291]

Purdue's guide for pharmacists offering counsel was revisionist. It emphasized pharmacists' "pivotal role" in pain education and in allaying patients' "unfounded fears and apprehensions" about opioids, best understood as "effective" rather than "strong" pain medications "not limited to a maximum dose." Though opioid analgesia may cause addiction, "the risk has been reported to be small." Faux disorders, pseudoaddiction and "pseudotolerance," were other possibilities pharmacists should bear in mind.[292]

---

2021, *City and County of San Francisco, California and The People of the State of California* v. *Purdue Pharma et al*., Case Number 3:18-cv-7591, p. 76.

[291] Deposition of Stephen L. Seid, January 20, 2022, *State of Florida* v. *Purdue Pharma et al*., Case Number 2018-CA-001438, pp. 17 ("offer"), 22, 39-42, 99-107; Stephen Seid email chain, March 13, 2002, PPLPC008000023258-PPLPC008000023259 (March example).

[292] "A Pharmacist's Guide: Counseling Patients & Their Families on the Role of Opioid Analgesics in Pain Management," undated brochure, 7001107315-7001107327, quotations and citations pp. 1, 7, 11, 13, 15, 21. Another version of the brochure, 7002877307-7002877332, included a bibliography that cited the 1980 Porter and Jick letter, the 1997 AAPM / APS

Walgreens also devised its own educational materials. In late 2000 it sought Purdue's financial support for an in-house pain-management CE program, to be rolled out in Florida and then offered to "all the Walgreen pharmacists throughout the country." The Walgreens curriculum emphasized that chronic pain was commonly treated with opioids; that misapprehensions about addiction could result in the withholding of highly effective opioid medications; and that, beyond the traditional role of reporting signs of medication abuse, pharmacists should identify patients with uncontrolled chronic pain, serve as their "advocates," and share their updated knowledge of pain management with prescribers.[293]

The most common arrangement, however, was for Walgreen to encourage its pharmacists to avail themselves of Purdue's speakers and CE materials. In 2001, for example, Walgreens sent invitations on its stationery to pharmacists in Florida and Illinois to attend Purdue-funded CE seminars on pain management. That same year Walgreens district manager Richard Ashworth requested help for a local issue, inadequate stocking of OxyContin in Port St. Lucie, a "top 10 hot spot" for abuse and diversion. "OxyContin is one of the most highly profitable items to dispense," Ashworth told his Purdue counterpart, Thomas Mollick. Ashworth said he "did not want to miss out on any sales because of fear of theft or suspicion or diversion." One solution Ashworth envisioned for his thirty pharmacists was "to personally educate and mandate

---

consensus statement, and pharmacist-focused articles by such industry-backed KOLs as David Joranson and Dr. Aaron Gilson.

[293] Stephen Seid email chain, November 16, 2000, attaching outline and abstract for "Current Concepts in the Management of Acute and Chronic Pain," PPLPC02000008350-PPLPC02000008355.

completion of [Purdue's] CE program by Lipman[,] 'The Use of Opioids in Chronic Pain,' at his next biweekly meeting or as soon as we can get the literature to him."[294]

Dr. Lipman, whose revisionist educational materials Bergen Brunswig also distributed, was a pharmacy professor who was a Purdue consultant, grant recipient, top-rated speaker, and KOL of sufficient prominence to be numbered among the "Pain Mafia." Purdue and the pharmacies with which it collaborated made Dr. Lipman's and similar educational materials available through multiple routes. Bernadette Katsur, a regional and later national account manager at Purdue, reported that, in June 2000, Giant Eagle Pharmacies, a chain operating in Ohio and nearby states, received a "custom mailing" of 550 booklets on opioids for the treatment of CNP. "These pieces will be [re]mailed to all of the dispensing pharmacies in all the Giant Eagle stores." Eckerd, another large chain, received 550 copies of Dr. Lipman's CE materials with the same understanding, that Eckerd would distribute the materials nationally. In July 2000, Purdue shipped 150 assessment videos and "Lipman CE booklets" to consultant pharmacists at Omnicare, a Wadsworth, Ohio, based provider of prescription drugs and pharmaceutical consulting services to geriatric facilities that was later acquired by CVS. That October Dr. Lipman's CE programs were distributed to 90 Acme Food and Drug Centers throughout Ohio, together with audiotapes by Dr. Neil Irick, of whom more below. The stated purpose of the Acme shipment was "to educate retail pharmacists." [295]

---

[294] Stephen Seid email chain, October 19, 2001, attaching Florida and Illinois letterhead invitations, PPLPC008000021157-PPLPC008000021163; Stephen Seid email chain, June 19, 2001, forwarding June 13, 2001, report from Thomas Mollick, PPLPC008000017823-PPLPC008000017824.

[295] Dr. Lipman's Purdue ties are listed in Lipman and Jackson, "Use of Opioids in Chronic Noncancer Pain," ENDO-OPIOID_MDL-02344092, his speaker status in 1999 "Top Speakers,"

In other states, as in Ohio, Purdue and chain pharmacies viewed such education as mutually advantageous. In April 2001 Alexa Tolley, a Tennessee Purdue sales representative, asked her district sales manager, Mark Griffin, to provide Dr. Lipman's CE programs for Walgreens, whose Knoxville district manager, Keith Ford, had requested them. "He was very pleased to hear that we had a pain CE and he wants 150 of them so that he can mail them to all of the pharmacists in his district," Tolley wrote. "This will impact at least 6 [Purdue] reps and maybe as many as 8. He [Ford] would like me to bring them by his office and he will mail them out asking all of his pharms to read and return the form." Griffin authorized the shipment the same day.[296]

Purdue also collaborated with national pharmacies to distribute pain management CE materials to their employees without regard to district or state lines. In July 1996 Walmart notified its pharmacists that they could earn two hours of credit for participating in the "Wal-Mart Pharmacy Live Satellite CE Program: New Trends in Pain Management." Purdue furnished $1,000 honoraria for each of the speakers, Dr. Neil Irick, a physician, and Dr. Henry Freedy, a PharmD. Walmart's Pharmacy Division invoiced Purdue for $10,000 in administrative and consulting fees and another $20,000 for an "unrestricted educational grant." In exchange,

---

PPLPC02500000477 and "2001 Top 100 Speakers," PDD1507250601, and "Pain Mafia" prominence in Kottenstette, undated memo, PSJC Exhibit 665. Mailings: Bernie Katsur, "B2000 AE Monthly Highlight Report," PPLPC028000022982 (Giant Eagle, Omnicare), PPLPC028000022985 (Eckerd), PPLPC028000022986 (Acme) and Lynn Nagorski, "Quarterly Central Area Summary … for Quarter Ending … 12/30/00" (TS, 2001), PPLPC028000026655 ("educate retail pharmacists"). Katsur's title is from LinkedIn, https://www.linkedin.com/in/bernadettekatsur. Note that Katsur refers to Dr. Lipman's CE by its shipping code, OMC113, an identifier confirmed in the Tony Goodman email chain, April 19, 2001, PPLPC0080000015959.

[296] Tolley and Griffin: Tony Goodman email chain, April 19, 2001, PPLPC0080000015959.

Walmart allowed Purdue to advertise its program to Walmart pharmacists at 2,125 stores. An estimated 700 to 900 Walmart pharmacists participated.[297]

Purdue asked Dr. Freedy to speak to the Walmart pharmacists on "Use of Opioid Analgesic Agents in the M[anage]g[e]m[ent]t of Moderate to Severe Chronic Pain" and Dr. Irick to speak on "Pain Control, Shifting the Paradigm"—titles later changed to "New Trends in the Use of Opioids in Pain Management." Both Walmart and the speakers were paid from Purdue's OxyContin account. Dr. Irick was another top-ranked revisionist KOL whom Purdue deployed in several roles. He made educational audiotapes that downplayed the risk of prescription-opioid addiction; lectured to medical faculty and students; appeared in promotional videos; and championed the revised JCAHO standards on the Partners Against Pain website.[298]

Purdue judged Dr. Irick's Walmart CE program ("impressive," "went well," "large audience a plus") a successful broadcast experiment. So did Dr. Irick. "Superb way to impact as

---

[297] "Wal-Mart Pharmacy Live Satellite CE Program: New Trends in Pain Management" (TS, 1996), PKY181263907 (title, quotation); 1996 Symposium Information Sheet and attachments (TS and MS, 1996), PKY180794346-PKY180794354 (payments, attendance estimates).

[298] Initial titles, OxyContin account, Dr. Irick quotation: 1996 Symposium Information Sheet and attachments, cited above. Top-ranked: "Top Speakers," PPLPC02500000471 and "2001 Top 100 Speakers," PDD1507250601. Downplayed: Van Zee, "Promotion and Marketing of OxyContin," 223 and n. 43. Promotional videos, JCAHO, website: U.S Senate, Committee on Health, Education, Labor, and Pensions, *OxyContin: Balancing Risks and Benefits*, S. Hrg. 107-287 (February 12, 2003), p. 52, https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/pdf/CHRG-107shrg77770.pdf. Lectured: Spreadsheet, PSJC Exhibit 200D, PKY182578212, https://www.industrydocuments.ucsf.edu/drug/docs/#id=zlyw0232.

many people as possible with one lecture in one site!" he reported after the event. "Can we do this for other retailers?"[299]

Purdue executives' assistance was grounded in their continued awareness that pharmacists were potential sales bottlenecks. In January 2001, when Walgreens asked that Purdue "defray some of the cost" of the Annual Walgreens Meeting in Milwaukee, Purdue account manager Richard McCormick saw an "opportunity" to educate Walgreens pharmacists. "[T]he last thing we need is a retail pharmacist refusing to fill or questioning a prescription that one of [Purdue's] reps worked so hard to generate" due to misapprehensions about "physical dependence, addiction, abuse, diversion, etc." Seid responded that Purdue and Walgreens would "absolutely work together on this," with Scifo adding that DiLullo wanted "all programs to go through her corporate office" at Walgreens.[300]

Asked about Walgreens in a December 2021 deposition, Seid said that he was concerned that the company's pharmacists would sometimes refuse to fill prescriptions for Purdue's opioids. He had no direct power to intervene: "The ultimate responsibility under the law, under the Controlled Substance [sic] Act, is that the—the—ultimately, the pharmacist makes the final decision as to whether it's appropriate or not appropriate." Seid could, however, attempt to educate the "final gatekeepers." Asked if getting Purdue's educational information to individual Walgreens pharmacists required the cooperation of the Walgreens corporate office, Seid said,

---

[299]Central Region report (TS, 2000), PKY180640950, https://www.industrydocuments.ucsf.edu/drug/docs/#id=zzff0232.

[300] Tony Scifo email chain, January 31, 2001, PPLPC008000014078-PPLPC008000014079, forwarding McCormick's comments. McCormick is identified as an account manager in the "1999 Budget Submission" (TS, November 1998), PPLPC063000007640.

"Yeah, that would be fair to say. There could be some efforts on local levels by our representatives, but for a broader approach, we would work through corporate."[301]

Walgreens corporate did more than work with Purdue. Walgreens corporate asked Purdue to scale up its own educational programs. In April 2001 Walgreens executive Sheila Bennett, who was in charge of nationwide pharmacy distribution, told Seid that there had "been a lot of recent demand from the field," noted "the importance of coordinating our educational efforts," and "volunteered" that Purdue's education would be more efficient if conducted through "Regional Level Market Programs" that drew around 250-300 pharmacists. As indicated above, Seid's response was positive: The more Walgreens pharmacists, the better.[302]

Bennett followed through in an August 2001 meeting with Seid at the NACDS Pharmacy and Technology Conference. "We discussed the need to step up the CE programs at Walgreens," Seid reported. "Currently they are done on an ad hoc basis with the blessing of corporate. She indicated that it is time to contact the three regional directors to set up more comprehensive

---

[301] Deposition of Stephen L. Seid, December 9, 2021, *City and County of San Francisco,* 24, 25, 27.

[302] Stephen L. Seid to Jim Lang, April 27, 2001, 7000381661-700381664. Later that year Seid told Scifo that he had "done a good job with Walgreens' program and I believe it is going to make a significant impact in the important Florida market" and that it was "good for me to see first hand [sic] how important this was for the Walgreens' organization and their strong commitment to the programs [sic] success." Stephen L. Seid to Tony Scifo, October 19, 2001, 7003217715-7003217721. Bennett's job at Walgreens: Deposition of Stephen L. Seid, December 9, 2021, *City and County of San Francisco,* 20.

programs. They are also considering doing pain management CEs for all new pharmacists hired." Seid directed Scifo to follow up with the Walgreens regional program directors.[303]

Seid received, and responded to, several similar requests for educational help at the 2001 NACDS meeting. Bob Breetz, Kroger's pharmacy procurement manager, "is interested in doing programs, with our various brochures included, on a regional level. He provided a list of regional managers." Winn-Dixie and Shaw's Supermarkets wanted Purdue's help; Seid arranged it for two Winn-Dixie pharmacy CE programs in Florida and for 100 CE programs to be sent to Shaw's. Duane Reade received 200 CE programs, 400 abuse and diversion brochures "personalized with their logo," and support for two hours of Purdue content in an eight-hour CE program for 140-160 Duane Reade pharmacists. Walgreens acquired the Duane Reade chain in 2010, in what was then the company's largest retail acquisition.[304]

CVS also collaborated with Purdue on pharmacist education. In the spring of 2001, when OxyContin came under fire for widespread abuse and addiction, three CVS officials met with Purdue executives. CVS pharmacist-attorney Barry Jasilli said that "they felt that Purdue was in many ways being victimized by the situation. That the product is not the issue, but the abuser is

---

[303] Steve Seid to Shelton Benson et al., NACDS meeting report, August 24, 2001, PPLPC008000019964, Walgreens at PPLPC008000019966.

[304] Ibid., Kroger at PPLPC008000019965, Winn-Dixie, Shaw's, and Duane Reade at PPLPC008000019967; Peter Lattman and Timothy W. Martin, "Walgreen [sic] to Acquire Drugstore Chain Duane Reade," *Wall Street Journal*, February 18, 2010, https://www.wsj.com/articles/SB10001424052748703444804575071054122423216.

the issue." Jasilli told the Purdue executives that, "from his perspective, we should be fighting back even harder. We should be pointing out the benefits of our brand."[305]

A month later Jasilli and Susan DelMonico, another CVS pharmacist-attorney, and Purdue's Dr. Robert Reber co-signed a letter to all CVS pharmacists, who were asked the share it with their technicians. The letter urged the pharmacists to educate themselves against diversion, with the help of an enclosed Purdue brochure, and reminded them that Purdue was "a leader in educating the healthcare community on effective pain management and the appropriate use of pain medicines." It urged CVS pharmacists and their customers to visit "the award-winning website—www.partnersaginstpain.com—which provides pain information, assessment tools, and support—24 hours a day." Given that the website information was pro-opioid, that its "assessment tools" were recruitment devices, and that Partners Against Pain was Purdue's unbranded educational and advocacy arm, the letter was a form of co-marketing. It appeared on letterhead that bore the logos of both Partners Against Pain and CVS Pharmacy and was described by CVS as a "joint initiative [that] was advantageous to both of our organizations." The context of the remark was a $46,079 follow-up request to Purdue to develop "another mutually beneficial opportunity," CE programs that would instruct pharmacists "how to communicate effectively with patients and physicians about appropriate pain management therapy" as well as "how to resolve conflict with a drug 'seeker.'"[306]

---

[305] Steve Seid Memo Jim Lang, May 11, 2001, 7003203712.

[306] "Dear CVS Pharmacists," June 2001, PPLPC008000017705 ("leader," website). "Request for Support: CVS 'Quality First'™ Communication Skills" Continuing Education Program" (TS, 2001), PPLPC008000019586 (quotations)-PPLPC008000019588. Note also that the brochure that accompanied the "personalized" letter was a Purdue publication that bore a CVS logo. Steve

Other CVS overtures to Purdue were local in character. In April 2001 George Koontz, a CVS regional health care manager, requested a Purdue speaker and Purdue money for food for a pain-management CE event for 40 pharmacists at the Holiday Inn in Morgantown, WV. The program, initially scheduled for June, was rescheduled over two days in mid-August at the same venue. The speaker was Dr. Ruth Plant, PharmD, a Purdue medical liaison for the region.[307]

Two weeks later Dr. Plant made another appearance, this time before the Drug Management Review Board for Kentucky's Medicaid Services. Dr. Plant told the board that physicians and pharmacists "traditionally, to this date anyway, don't get a lot of pain management in school. And if we can help supply third-party, nonprofessional pieces that might help with that educational process, that's why we're coming to you all to see if you'd like to work with us with a mailing." She and her Purdue colleague, Kevin Connell, wanted Kentucky health care providers to receive anti-diversion guidance, but also Purdue's CE program, "The Use of Opioids in Chronic Noncancer Pain;" a zero-to-ten pain scale ("being used more and more because of the Joint Commission standards for pain as a fifth vital sign"); the 1997 APS/AAPM joint statement on opioids in CNP; and a new APS/AAPM statement on "common definitions in the treatment of pain—addiction versus pseudo-addiction, tolerance versus pseudo-tolerance."[308]

---

Seid to Jim Lang, email, May 11, 2001, PKY180267741. The promotional uses of the Partners Against Pain website are documented above.

[307] Purdue speaker request form (TS, April 16, 2001), PPLPC008000016151-PPLPC008000016153 (Koontz), and Purdue lecture program spreadsheet (1997-2002), PPLPC018000000081, lines 23767, 24341, 24343.

[308] Commonwealth of Kentucky, Department for Medicaid Services, Transcript of Drug Management Review Advisory Board Meeting (TS, August 29, 2001), https://s3-us-west-

In negotiating joint educational initiatives with CVS, Purdue evoked its record of collaboration with other retailers and distributors. In January 2001 CVS's corporate manager of professional practices, Sharon Galzarano, told Seid that she would like to arrange, with Purdue's support, six hours' worth of CE credits on pain management and related issues for that spring and fall. She asked for examples of similar programs Purdue had arranged or was planning to arrange. Seid described multi-topic, multi-speaker programs then underway for Pathmark pharmacists in New York and New Jersey and for Publix pharmacists in Florida and Georgia, adding "[w]e are also in the process of working with AmeriSource on providing continuing education on various subjects at their national trade show. We are also doing something similar with McKesson and Bergen. Sharon, this is just a small representation of numerous educational programs that Purdue has participated in with various medical professionals."[309]

Jim Lang, Purdue's vice president for field operations, confirmed Seid's representations in an October 2001 summary slide used in internal Purdue deliberations. The slide credited Seid's National Accounts division for taking an "aggressive role in the education of pharmacists" on pain management; for establishing "major programs" with CVS, Walgreens, Longs, Osco, Eckerd, Publix, Winn-Dixie, Amerisource, and Bergen; and for booking forty programs

---

2.amazonaws.com/edu.ucsf.industrydocuments.artifacts/n/l/d/f/nldf0232/nldf0232.pdf, quotations at 12 ("being used," quoting Connell), 13 ("pseudo, quoting Connell), and 15-16 ("don't get a lot," quoting Dr. Plant).

[309] Seid to Sharon Galzarano, February 7, 2001, PDD1701196422-PDD1701196423.

"impacting 2400+ pharmacists"—a figure that did not yet include the attendees for the Florida CE programs scheduled for late October and early November.[310]

In 2001 Eckerd was still a subsidiary of J.C. Penney Co. In 2004, however, CVS acquired more than 1,200 Eckerd drug stores, 662 of which were located in Florida. Eckerd, like CVS, had sought use of Purdue's educational resources. On June 19, 2001, Dr. David Medvedeff, Eckerd's manager of clinical services, met Seid at Eckerd's corporate headquarters "to lay the groundwork for a solid ongoing mutually beneficial relationship." Seid told his boss, Purdue's Jim Lang, that the relationship would entail "work on educational programs through Eckerd to deal with some of the issues facing both of our organizations as relates to abuse and diversion." Dr. Medvedeff was "very strong on the fact that there was a need for regional programs coordinated corporately on pain management" in Eckerd's five regions. Planning for live CE programs was already underway, Seid wrote, but Dr. Medvedeff wanted to make the collaboration ongoing via CEcity.com, an online portal utilized by more than 8,000 Eckerd pharmacists. The service could digitize the exam portions of Purdue CE pain management programs. In early 2002 Eckerd went a step further, formally requesting a Purdue grant to digitally "re-purpose" a slide-based Purdue pain-management program for mandatory online education via CEcity.com for its 8,000 pharmacists and 11,000 pharmacy technicians. Seid endorsed the plan, which he said would "further enhance relationships Purdue and Eckerd as it relates to the education of pharmacists."[311]

---

[310] James J. Lang to Stephen Seid, email, October 24, 2001, PPLPC008000021189, with slide deck attached.

[311] "CVS to Buy 1,260 Eckerd Stores, Overtake Walgreen," *Boston Globe*, April 6, 2004, https://www.baltimoresun.com/news/bs-xpm-2004-04-06-0404060397-story.html; Seid to Jim

In August 2001 Seid met with Robert Verscharen, Eckerd's vice president for pharmaceutical purchasing and formulary management. Seid reported to his subordinates that Verscharen took "the entire issue very personally," that "he would like to help us fight this thing," and that he "is looking to utilize data that Eckerd has on file to limit the abuse and diversion." The data was held at "a central site with central access and full scope exposure," but in a way that did not raise patient privacy concerns.[312]

Why Verscharen would offer to use Eckerd's centralized data to limit future abuse and diversion of Purdue's controversial blockbuster, when his company had, theoretically, been using just such data to prevent all controlled-substance abuse and diversion under thirty years of CSA mandates is not clear. What is clear, however, is that this and other discussions with Seid and his subordinates took place in a crisis atmosphere. The events of 2000-2002, the mounting anxieties, crime, and adverse publicity surrounding OxyContin, prompted Purdue and its national pharmacy partners to respond, although in a way that preserved the revisionist premises on which market growth depended. Hence the mutual desire to provide chain pharmacists' with, and in some cases to mandate completion of, CE and other educational programming that acknowledged potential abuse and diversion, yet stressed that opioids remained a vital and legitimate part of treating patients with CNP. The same day that Seid met with Verscharen he

---

Lang, email, June 22, 2001, 7003203839-7003203841 (Medvedeff); Seid to Meredith Hall, email, February 12, 2002, 7000381651 ("re-purpose," "further enhance").

[312] Steve Seid to Shelton Benson et al., NACDS meeting report, August 24, 2001, PPLPC008000019968.

breakfasted with Eckerd's Dr. Medvedeff "to follow up on his proposal for mandatory CE programs. He also discussed other partnering opportunities as far as educational ventures."[313]

Before acquiring the Eckerd stores, CVS had itself partnered with Purdue on CE programs in Ohio and other states. In late March 2001, with the OxyContin abuse story erupting, Don Tasser, Purdue's account manager for CVS, recommended a request from CVS's regional healthcare manager, Rich Kowalski, for a pain-management program for eighty Cleveland-area pharmacists. Tasser went straight to the point:

> The pharmacists are very concerned about stocking Oxycontin [sic] in area pharmacies due to abuse and diversion issues. Some pharmacists would rather opioids only be used with malignant pain. This program is part of a total chain CE program to run throughout the year.

Tasser used the same words to describe alarmed and dubious CVS pharmacists who were slated for a Purdue-sponsored meeting in Lynchburg, Va., later that August. The Lynchburg program, he added, would affect "the entire east coast with the number of pharmacists in attendance." Of a May 2001 Pensacola CE program under CVS's regional healthcare manager Allan Browning, Tasser wrote, and bolded, **"*DIVERSION AND ABUSE AREA*"**[314]

---

[313] Ibid.

[314] These three requests and requests for two more CVS CE programs are attached to Donald Tasser to LP National Accounts, email, April 23, 2001, PPLPC008000016083, Pensacola, Cleveland, and Lynchburg comments at PPLPC008000016093, PPLPC008000016096, PPLPC008000016099, respectively. In the cover email Tasser reported that he was awaiting information to finalize three additional CE requests, two for Kmart and one for a program for Rite Aid for 600-700 pharmacists. Tasser, who reported to Seid, was responsible for CVS, Rite

Pharmacist CE ventures continued after 2002 and involved collaborations with manufacturers other than Purdue. In May 2005 Mallinckrodt launched "Pharmacist Pain Management," a course that addressed the "lack of awareness of the extent to which pain can be managed with opioid analgesics" and "concerns of excessive side effects from opioids." The course instructed pharmacists to play an active role in evaluating patients' pain status and included test questions that reinforced their advocacy role.[315]

In early July 2005 Mallinckrodt's Marketing Director, Nancy Buckingham, reported to Michael Gunning, Mallinckrodt's Senior Director of Sales and Marketing, that 737 pharmacists had successfully completed the course within two months. Of these, 192 worked at Rite Aid, 122 at Walgreens, 94 at CVS, 67 at Brooks, and 59 at Osco/Savon. By early August Buckingham was able to report that 1,348 pharmacist had participated, and that "Kroger and Rite Aid Tradeshow comments indicated that Pharmacists [sic] were extremely appreciative of the CE program." Rite Aid, she noted, had also conferred on Mallinckrodt its "Generic Vendor of the Year" award.[316]

---

Aid, and several other accounts, as indicated in Steve Seid, "Living Our Vision" (slide deck, 2001), slide 13, PPLPC008000018733.

[315] Joseph R. Ineck and Carla Rubingh, "Pharmacist Pain Management: A Focus on Opioids and Conversion Issues" (CE program, May 1, 2005), MNKOI 0006486044-MNKOI 0006486049, "lack of awareness" and "concern" at MNKOI 0006486045, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=lpfy0253.

[316] Nancy Buckingham to Mike Gunning, email, July 5, 2005, MNKOI 0004585611, quotations at MNKOI 0004585614, and idem, email, August 7, 2005, MNKOI 0002708832, quotations at MNKOI 00008834. Job titles: LinkedIn, https://www.linkedin.com/in/nancy-buckingham-aa34074b (Buckingham) and "Mallinckrodt Pharmaceutical Generics," Free Library, https://www.thefreelibrary.com/Mallinckrodt+Pharmaceuticals+Generics.-a0137076570 (Gunning). A published company source, "Pharmaceuticals Educates Customers," *Pharma News*, no. 1 (June 2006), n.p., MNKOI 0001102573,

Purdue continued to field requests from national pharmacies well into the decade. In August 2008 Dr. Lisa Miller, PharmD, Purdue's executive director for healthcare education and liaison programs, reported receiving a call from CVS pharmacist Michael Tortorici, whose district manager had asked him "to organize education for 17 CVS stores in Ohio." Russ Gasdia, Purdue's vice president of sales and marketing, replied that the offer "appears to be a great opportunity for us in a state where we have had some perception issues." Opportunity knocked again, this time in Florida. In early October Michael Cullen, by then Purdue's director of national accounts and institutional sales, reported "on two upcoming CVS Meetings where Purdue Pharma, L.P.[,] has been contacted by people from CVS to provide one of our Medical Liaison PharmD's [sic] to give a talk." Dr. Kristi Dover would be the speaker, Cullen wrote, and both talks would have a "subject area of pain management and appropriate prescribing issues."[317]

This was the Dr. Dover who addressed ABC's National Healthcare Conference and Exposition the previous year, and whose revisionist views on appropriate pain management and prescribing practices have been set forth. On October 3, Cullen continued, Dr. Dover would address the CVS regional operations meeting in Boca Raton, with an expected attendance of 120 CVS pharmacists and about the same number of store managers. On November 5 she would

---

https://www.industrydocuments.ucsf.edu/opioids/docs/#id=rmdb0237, states that 3,000 pharmacists had completed the course by mid-2006.

[317] Phil Cramer email chain, August 25, 2008, PPLPC014000078842-PPLPC014000078843 (Dr. Miller, Gasdia); Michael Cullen email chain, October 3, 2008, PPLPC004000176617 (Cullen).

address an expected audience of 40-50 CVS pharmacists at Brio's Restaurant in Beaver Creek, a

suburb of Dayton.[318]

On October 4 Tortorici emailed Cullen that he was looking forward to Dr. Dover's

presentation, and that she would be sending him a flyer that he would have distributed to CVS

pharmacists in southwestern Ohio. "I will be the CVS contact and the RSVP person for CVS.

Thanks again for your efforts and support." Following the November 5 dinner and talk, Tortorici

expressed his gratitude to Dr. Dover. "On behalf of CVS and myself, thank you for an

outstanding presentation on pain management. The attendees enjoyed the informative

presentation. As we discussed, perhaps we can you present to our pharmacy interns sometime

next summer. I think they would benefit from your expertise." Dr. Dover replied, thanking

Tortorici for his preparatory work and expressing her willingness "to discuss future opportunities

as they arise."[319]

How, and when, such educational opportunities arose are significant details. Narcotic

conservatism did not decline simply because Purdue and other opioid manufacturers coopted and

promoted academic revisionism and funded advocacy organizations. Opioid manufacturers

changed minds with the help of corporations throughout the supply chain, including national

distributors (which began offering Purdue's CE programs at their trade shows in 2001) and

national pharmacies. National pharmacies wanted access to Purdue's financial and educational

resources. Purdue wanted access to restive pharmacist audiences and their employers'

---

[318] Michael Cullen email chain, October 3, 2008, PPLPC004000176617.

[319] Kristi Dover to Michael Cullen, email chain, October 6, 2008, PPLPC024000337240.

cooperation. CVS sent out the invitations for the Beaver Creek dinner, CVS collected the

RSVPs. Also telling is the date, Fall 2008, and Gasdia's reference to "perception issues." CVS

invited Purdue and Dr. Dover to give pain-management talks in Ohio and Florida eight years into

the public phase of the still-expanding prescription-opioid addiction and overdose epidemic.[320]

*

National pharmacies engaged in other types of opioid promotions well into the epidemic.

If they advanced revisionism through speakers and educational programs, they also promoted

branded opioids through such time-honored methods as rebates and coupons. In April 2004

Purdue launched a rebate program to encourage national pharmacies to "stock additional

inventory of all strengths of OxyContin." Purdue's National Accounts division contacted "all of

the wholesalers and the chain headquarters to gain support for distributing the information."

Gasdia estimated that over 45,600 stores—independents, small chain stores, and large chain

stores—would be contacted "at least one time" about the special OxyContin rebate. Chains

"willing to solicit support" included Wal-Mart, Walgreens, Rite Aid, and several grocery-store-

chain pharmacies. "The rebates for these accounts will be managed corporately."[321]

---

[320] Steve Seid, "Living Our Vision" (slide deck, 2001), slide 50, PPLPC008000018733 references the "[f]irst ever [pharmacy] CE program at a trade show, Bergen July 2001, 90 of Bergen's top customers" and "[f]ive CE programs at the AmeriSource show." The same slide references pharmacy education programs completed or underway for Publix, Walgreens, Pathmark, Longs, Safeway, Eckerd, and CVS.

[321] Russ Gasdia to Entire Field Force, email and attachment, April 23, 2004, PURCHI-003288172-PURCHI-003288172. In November 2006 Seid reported on another chain pharmacy collaboration, this one involving OxyContin coupons and saving cards. Seid reported that "85% of the coupon redemptions came from Walgreens and CVS. In general they are responsible for 30-32% of all Rxs [prescriptions]. Florida has a lot of stores for both [Walgreens and CVS]. 32% of all of Walgreens and 25% of all of CVS redemptions were in Florida (59% of all redemption

Like the Big Three distributors, the national pharmacies sold access to in-house communication platforms that allowed manufacturers to distribute product information to its pharmacists and technicians. In 2011 Janssen paid Walgreens Health Initiatives $25,000 for a "Nucynta ER pharmacist communication prog[ram]." That September Walgreens proposed a $61,000 program to Actavis to "push" the news that Walgreens was stocking Oxymorphone ER, the generic version of Opana ER. The audience was 26,000 registered pharmacists linked by Walgreens' intranet, as well as "Top 10,000 Prescribing MD[s]" to receive a separate "physician awareness" mailing relaying Oxymorphone ER availability at Walgreens and additional "prescribing info." Actavis accepted the Walgreens proposal, or one similar to it. In October 2011 Actavis reported the "Walgreens stocking and awareness campaign" to be among its "current campaigns that are in process." As in most drug launches, the Walgreens initiative was one piece of a larger campaign. Actavis simultaneously engaged distributors for such marketing services as "McKesson website posting of Actavis Oymorphone and calls to targeted pharmacies for stocking promotion" and "HD Smith website awareness."[322]

Walgreens worked with manufacturers to target opioid consumers. In 2011 Walgreens prepared a template letter, on Walgreens stationery, aimed at patients who had filled prescriptions for Opana ER 7.5 and 15 mg tablets during the previous year. These strengths of

---

was in Florida.)" Florida was an important source of prescription opioid diversion to other states. Seid to Andrew Udell, email, November 13, 2006, PPLPC004000089723.

[322] "Tapentadol Retail Tactics" (slide deck, 2008), slide 10, JAN-MS-01125407 (Walgreens communication platform); Nucynta marketing spreadsheet (2011), tab KSB2, line 296, JAN-MS-01071154 ($25,000); "Proposal for RPh and MD Education Programs for Oxymorphone 7.5mg and 15mg" (slide deck, September 1, 2011), slide 2, Acquired_Actavis_01820566 ("push," "top," "awareness," "info"); Ara Aprahamian to Mark Killion and Nathalie Leitch, email, October 4, 2011, Allergan_MDL_04398973 ("current campaigns," McKesson, H.D. Smith).

the branded opioid having been discontinued (though not "*due to safety reasons,*" the letter stressed), patients should talk to their physician or Walgreens pharmacist about switching to Actavis' new oxymorphone extended-release equivalent. Jinping McCormick, Actavis's senior director of marketing for generic products, approved of the concept: "I recommend that we move forward on the patient side as this is a segment we cannot reach ourselves."[323]

Walgreens worked with manufacturers to promote consumer discount programs. In 2015 Purdue arranged for Walgreens to distribute a pharmacist's guidebook for Hysingla ER (extended-release hydrocodone) tablets. The guidebook included information on a trial offer that promised initial co-pays "as low as $0" and on sales cards that promised savings "up to $100 on each prescription after paying first $25." In 2016 Endo pain specialists worked with Walgreens healthcare supervisors to distribute Opana ER sell sheets (one-page advertisements) and co-pay-card brochures for Opana ER and BELBUCA (buprenorphine buccal film for chronic pain) to Walgreens pharmacists in North Carolina and Virginia.[324]

Endo labeled its 2016 sell-sheet and co-pay-card deal as a "Marketing Shipment for Walgreens." The description was accurate, and not just for Walgreens. Competitors such as

---

[323] Walgreens 2011 template letter, Acquired_Actavis_02115060, italics in original; Jinping McCormick email chain, December 5, 2011, ACTAVIS0333951 ("move forward"). McCormick's corporate title is from p. 25 of his deposition for *In Re: National Prescription Opiate Litigation*, U.S. District Court for the Northern District of Ohio, Eastern Division, January 9, 2019, https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/McCormick-Jinping-Teva-01-09-19-Redacted/ohnd-1:2017-md-02804-01981-014.

[324] Hysingla ER: Tony Scifo email chain, June 12, 2015, PPLPC031001349510, and *Pharmacist's Guide: A Familiar Molecule, Reengineered*, p. 13, PPLPC031001349518. Opana ER and BELBUCA: Todd Reynolds email chain, April 29, 2016, ENDO-OPIOID_MDL-03514864.

CVS, Rite Aid, Kroger, and Kmart provided outlets for opioid promotions as well as opioid medications. Figure 5 charts some of the opportunities these companies offered in 2008, from the vantage of Nucynta launch planners, who saw national pharmacies and distributors as providing complementary means of implementing "pain market retail tactics." The national pharmacies conveyed, for a fee, information to their pharmacists, who in turn influenced customers and other medical professionals. In the case of Kroger, communications to pharmacists were "developed jointly[;] we submit content to Kroger for their review and approval."[325]

**Figure 5**: National Pharmacy and Distributor Communication Programs Considered for 2008-2009 Nucynta Promotional Campaign.



| Retail Communication Programs | | | |
|---|---|---|---|
| Name | Number of Stores | Programs | Cost |
| CVS (Gribbin) | 6,245 | NewScript Rx<br>E mail Communication<br>Clinical FoCVS | $35,000<br>$40,000 |
| Walgreens (Gribbin) | 6,306 | Weekly Pharmacy Update<br>¼ - 1/3 page message<br>Walgreens Intranet<br>2 page monograph | $15,000 for both |
| Rite Aid (Valcarcel) | 5,182 | Medication Minute<br>E Product Announcement | $15,000<br>$7,500 |
| Kroger (Gribbin) | 1,964 | Informational Communication to Pharmacies (Mail or email) | $5,892 |
| K-Mart (TBD) | 1,135<br>(2,400 RPhs) | E Mail Blast | $5,000 |
| SuperValu<br>Albertsons/Savon/Osco (Gribbin) | 925 | Intranet | $5,000 |
| Ahold (Valcarcel) | 545 | Email | $1,000 |

| Wholesaler Communication Programs | | | |
|---|---|---|---|
| Name | Number of Stores<br>(Primary Wholesaler) | Programs | Cost |
| McKesson (West) | 4,000 | Online advertising<br>Online messaging<br>Broadcast fax | $3,750/week<br>$2,000/week<br>$5,000/week |
| Cardinal Health (Noetzel) | 16,000<br>CVS & Walgreens | Service Flash<br>¼ to ½ Page<br>Full Page | $7,500<br>$12,000 |
| AmerisourceBergen Corporation (Valcarcel) | 15,000<br>GNP | Promotional Mailer<br>Telemarketing<br>THE LINK® | $8,200<br>$12,000 |
| Kinray, Inc. (Gribbin) | 3000 | Promotional Mailer | $3,000 |
| H.D. Smith (Gribbin) | 2000 | Monthly Circular | $2,500 |

---

[325] "Marketing Shipment:" Todd Reynolds email chain, April 29, 2016, ENDO-OPIOID_MDL-03514864; "Tapentadol Retail Tactics" (slide deck, 2008), slide 3 ("tactics"), slide 11 (Kroger), JAN-MS-01125407. Frank Mashett, an Ortho-McNeill-Janssen marketing expert, recommended purchasing the communication services offered by Walgreens, Rite Aid, Kroger, Kmart, SuperValu Albertsons/Savon/Osco, and Ahold. He recommended against only the CVS program, which was "very detailed" but which overlapped with other Nucynta coverage planned for the American Pharmaceutical Association's *New Therapeutics Bulletin*. However, "if you have additional funds then I would say include that [CVS] program too." Frank Mashett to Carole Carter-Cleaver et al., email, October 7, 2008, JAN-MS-01125406 and attached spreadsheet, JAN-MS-01125408.

(Figure 5 Source: "Tapentadol Retail Tactics" [slide deck, 2008], slides 4-5, JAN-MS-01125407.)

At least one national pharmacy also offered the possibility of influencing consumers directly, in a manner analogous to, and yet more sophisticated than, Cardinal's Digital Signage Network. On October 22, 2002, the Walgreen Co. announced that it had signed a multi-million-dollar deal with Tribune Media Net to create Walgreens Presents RxTV, a half-hour weekly health magazine aired by WGN-TV and WGN Superstation. "Walgreens was looking for credible content for their customers," said Ron Goldberg, director of Tribune Cross-Media Sales, "and from our perspective delivering that to a national audience as a news magazine just made sense." Mediapost.com reported that advertising spots "may be made available to other marketers. Some commercial breaks during RxTV will be used for Walgreens' ads and promotions, while the remainder will be sold by Walgreens to its vendors."[326]

On October 24, 2002, one of those vendors, Purdue Pharma, received a Walgreens email announcing that RxTV was "an excellent national media opportunity," and inviting applications to Greg Pankow, a Walgreens category manager for purchasing health and wellness. "Folks," Purdue's Seid wrote to his associates,

Walgreens is our #1 customer. This is based on scrips dispensed. In a meeting a couple of months ago their director of pharmacy operations indicated that they do .5 OxyContin

---

[326] "Walgreens Inks Ad, Content Deal with Tribune," October 22, 2002, https://www.mediapost.com/publications/article/14573/walgreens-inks-ad-content-deal-with-tribune.html.

scrips/store/day on average. That would translate to about 10.5% of our weekly Rx volume. This could be a good venue for us for both Laxatives [which Purdue also sold] and our public service commercials.

James Heins, a Purdue corporate affairs and communications executive, agreed. He thought the Walgreens offer represented a "good opportunity" from both a business and customer-relations standpoint. RxTV could remove "patient/family barriers to pain management." These barriers included reluctance to take pain medication generally, as well as specific worries such as "fear of addiction or of being perceived as an addict by physician, family" and "fear of unmanageable side effects." Heins supported the Walgreens offer because, he wrote, "It makes good sense to educate the consumers."[327]

3.  Distributors' and National Pharmacies' Denials of Opioid Promotion

The fact that national pharmacies collaborated with manufacturers like Janssen through educational and communication programs contradicts these same pharmacies' denials of involvement in opioid marketing. Walgreens has said that it "never marketed or promoted opioid medications." In fact Walgreens hosted revisionist speakers at company-sponsored gatherings of its pharmacists; drafted letters about generic oxymorphone for its customers and top-prescribing

---

[327] All quotations from Charlene Bailey email chain, November 5, 2002, PPLPC008000028058-PPLPC008000028061. In his deposition Greg Pankow, who was copied on the original Walgreens email offering RxTV services, was asked whether the negotiation came to fruition. He said that he did not recall. In Re: National Prescription Opioid Litigation, Track 7 Case: Deposition of Greg Pankow, June 28, 2022, p. 54.

physicians; and worked with manufacturers to implement discount programs, among other promotional activities described above.[328]

CVS has likewise denied marketing Schedule II controlled substances. It has stated that "opioids are made and marketed by drug manufacturers, not pharmacists." Yet the evidence reviewed above shows that, from early 2001, CVS and Purdue executives collaborated on CE and other educational initiatives and communicated to CVS pharmacists through letters that bore the logos of both Partners Against Pain and CVS Pharmacy. Nor was Purdue the only manufacturer with which CVS collaborated. In 2012, for example, CVS agreed with Endo to provide Opana ER "patient education communications" which CVS would "print and deliver to its customers at the 'point of sale' in certain of its pharmacy locations."[329]

Distributors' spokespersons have similarly denied that their industry in any way promoted products that fueled the prescription-opioid addiction epidemic. In late 2016 the Healthcare Distribution Alliance (HDA), the successor to the HDMA, had its legal, communications, and public affairs experts draft "talking points on opioid abuse." These denied that distributors "manufacture or promote these products." In early 2018 the HDA's president,

---

[328] Abelson et al., "At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids" ("never").

[329] Jan Hoffman, "Big Pharmacy Chains Also Fed the Opioid Epidemic, Court Filing Says," New York Times, May 20, 2020, https://www.nytimes.com/2020/05/27/health/opioids-pharmacy-cvs-litigation.html ("not pharmacists"); "CVS Carecheck Plus Patient Education Service Exhibit," addendum to Master Service Agreement between CVS and Endo, March 8, 2012, ENDO-Opioid_MDL-06157733.

John Gray, similarly informed the U.S. Senate that "wholesale distributors do not drive demand for products."[330]

**Figure 6**: Distributor executives being sworn in before testifying to the U.S. House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, May 8, 2018



(Figure 6 Source: AP photo by Alex Brandon, https://www.vnews.com/Drug-supply-firm-execs-say-they-didn-t-cause-opioids-crisis-17388908. Left to right: George Barrett of Cardinal Health, Dr. Joseph Mastandrea of Miami-Luken, John Hammergren of McKesson Corporation, J. Christopher Smith of H.D. Smith, and Steven Collis of ABC.)

---

[330] John Parker to John Gray and Patrick Kelly, email, November 7, 2016, HDA_MDL_000202950, and "Industry Talking Points on Opioid Abuse" (TS, November 6, 2016), quotation at HDA_MDL_000202952; John Gray's January 3, 2017, response to Senator Diane Feinstein's Questions for the Record, Senate Judiciary Committee, Hearing on "Oversight of the Ensuring Patient Access and Effective Drug Enforcement Act," December 12, 2017, p. 3, https://www.judiciary.senate.gov/imo/media/doc/Gray%20Responses%20to%20QFRs1.pdf.

On May 8, 2018, four distributor executives repeated the marketing denials in testimony before a U.S. House subcommittee (figure 6) investigating the opioid addiction epidemic. The hearings made headlines for the four executives' sworn denials that they or their companies had contributed to the opioid addiction epidemic. (A fifth executive, Miami-Luken's chairman, Dr. Joseph Mastandrea, admitted responsibility.) The executives also used the occasion to address the question of opioid marketing. Their collective answer was that distributor marketing did not exist. Cardinal's former CEO and current Executive Chairman of the Board, George S. Barrett, stated that Cardinal did not market medications. It was "an intermediary in the supply chain." ABC's CEO, Steven H. Collis, described his company's function as logistical. ABC purchased and shipped drugs. It did not manufacture them and it played "absolutely no role in shaping clinical decisions or in determining the number of pills ordered by its customers." John Hammergren, McKesson's CEO, said that his firm had devoted its 185 years to building "a safe, secure pharmaceutical supply chain." As a distributor, he said, "McKesson does not manufacture prescription drugs, and we do not market them to doctors or patients. Nor do we market any particular category of drugs, such as opioids, to pharmacies." J. Christopher Smith, the former CEO of H.D. Smith (a large, privately held distributor that ABC acquired in January 2018), denied that his company marketed "or otherwise promoted medicines, including opioids, to customers, patients or their physicians."[331]

---

[331] U.S. House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, "Hearing on 'Combating the Opioid Epidemic: Examining Concerns about Distribution and Diversion,'" May 8, 2018, https://energycommerce.house.gov/committee-activity/hearings/hearing-on-combating-the-opioid-epidemic-examining-concerns-about links to the four executives' prepared statements, from which I have quoted. Headlines: Katie Zezima and Scott Higham, "Drug Executives Express Regret Over Opioid Crisis, One Tells Congress His Company Contributed to the Epidemic," *Washington Post*, May 8, 2018, https://www.washingtonpost.com/national/drug-executives-to-testify-before-congress-about-

These denials, like those of Walgreens and CVS, were false. All four distributors provided marketing services, as their predecessors had done for decades. False, too, was the basis for the opioid sales promotions, the misleading, manipulated, and statistically underpowered studies at the heart of the manufacturer-supported revisionist research that the Big Three helped to distribute and popularize among professional and lay audiences through prescription-opioid advertisements, educational programs, and infomercials. By continuing to perform their historical role—service wholesaling, now reinforced by digital technology—distributors did more than simply ship orders in amounts independently determined by physicians prescribing, pharmacists providing, and patients consuming the drugs. Distributors sold services designed to increase demand by influencing the behavior of all three groups. Template letters for off-label fentanyl prescribing; programs on how pharmacists can advise and reassure patients about opioids; in-pharmacy digital ads to catch the eyes of customers: These and other marketing initiatives provided revenue to distributors, increased sales for manufacturers, and undermined the ethic of narcotic conservatism among physicians, pharmacists, and consumers that had served as the principal bulwark against another epidemic of prescription-opioid addiction.[332]

---

role-in-opioid-crisis-one-is-deeply-sorry/2018/05/08/f4d91536-5259-11e8-a551-5b648abe29ef_story.html.

[332] Big Three marketing activities are documented above. H.D. Smith marketing: "In addition to supplying drugs, H.D. Smith offers a variety of marketing and merchandising services, including point-of-purchase signage, store design, direct-to-consumer advertising programs, and loyalty program implementation. Pharmaceutical distribution giant AmerisourceBergen acquired H.D. Smith for $815 million in early 2018." Company Profile: H.D. Smith, LLC, Dun & Bradstreet, https://www.dnb.com/business-directory/company-profiles.h_d_smith_llc.baba18dbf366cfa92a5c152fb48e6fe6.html. H.D. Smith provided marketing services through subsidiaries such as Triplefin. In 2013 Dale Smith, the CEO of H.D. Smith, explained that Triplefin's acquisition was "sparked by the company's specialized offerings across patient support programs, distribution/fulfillment, marketing, pharmacy services, technology and specialty product education functions. Together, our organizations have already

### D.  Knowledge of the Harms of Opioid Revisionism and Oversupply, 2000-2016

Historically, increased sales from promotional schemes are unexceptionable in market economies. The exception is when the products are shown to be toxic, addictive, or otherwise unsafe to consumers. That was why alcohol and tobacco marketing have a long history of controversy and litigation in the United States, as have the marketing of opium-based medicines and their synthetic equivalents. That was why, in April 1947, Anslinger confronted pharmaceutical executives who sought to manufacture and market methadone as if it were something other than an abusable narcotic subject to strict domestic and international control. And that was why, in September 2003, DEA Deputy Director for Diversion Control Terrance W. Woodworth told the executives gathered at that the DEA's annual pharmaceutical industry conference that intensified "commercial activities" threatened the CSA control regime. "Wholesale-level marketing sectors are creeping into the controlled substances arena and utilizing similar sales tactics applied to non-controlled substances," he said. Deputy Director Woodworth made the same point that Haislip had made in Houston fifteen years before: "Promotion = Sales = Availability." The consequences of widespread availability were, by 2003, most apparent for high-dose, extended-release prescription opioids like OxyContin, aggressively and innovatively touted, in Woodworth's phrase, as "effective pain relief, use it for everyone."[333]

---

integrated many of our functions, and established an end-to-end service value chain touching all aspects of prescription medicine distribution and support." Michael Johnson, "H.D. Smith Completes Purchase of Reimbursement, Patient Assistance and Brand-Support Services Companies," Drug Store News, September 30, 2013, https://drugstorenews.com/pharmacy/hd-smith-completes-purchase-reimbursement-patient-assistance-and-brand-support-services-comp.

[333] Woodworth's welcoming remarks, DEA Office of Diversion Control, "Eleventh Pharmaceutical Industry Conference," https://web.archive.org/web/20090403210751/http://www.deadiversion.usdoj.gov/mtgs/pharm_in

Opioid manufacturers and distributors did not have to attend DEA conferences to learn that federal officials considered promotion-driven increases in narcotic availability to be dangerous. On December 3, 2002, Purdue executives received a subpoena for corporate records—the first of nearly 600 such requests—from the United States Attorney for the Western District of Virginia, effectively notifying the company that the DOJ had opened an investigation into OxyContin marketing. The ultimate outcome of that investigation, the highest-profile legal event during the decade, was announced in a federal courtroom in Abingdon, Virginia, on July 20, 2007. Judge James P. Jones accepted the guilty plea from Purdue for feloniously misbranding OxyContin, for which it paid $600 million in criminal fines, forfeitures, and civil recoveries. From three of Purdue's top executives—attorney Howard R. Udell, former medical director Paul D. Goldenheim, and president Michael Friedman—he accepted misdemeanor guilty pleas for misbranding the drug, for which they collectively paid $64.5 million in fines. Testifying before the U.S. Senate Judiciary Committee eleven days later—another high-profile event—U.S. Attorney John L. Brownlee summarized the matter thus:

---

dustry/11th_pharm.htm#1 ("wholesale-level") and "Risk Management of Pharmaceutical Controlled Substances" (slide deck, 2003), PPLPC030000179742, "commercial" slide 3, "promotion" slide 10, "effective" slide 28. Pamela E. Pennock, *Advertising Sin and Sickness: The Politics of Alcohol and Tobacco Marketing, 1950-1990* (DeKalb: Northern Illinois University Press), is a representative historical study of the controversies surrounding alcohol and tobacco promotion in the United States.

Two years earlier, in 2001, Woodworth had also criticized Purdue for failing to add an opioid antagonist to OxyContin, a preventive measure that would have discouraged the crushing or injecting of the drug by those who sought to abuse it. Barry Meier, "Maker Chose Not to Use a Drug Abuse Safeguard," *New York Times*, August 13, 2001, https://www.nytimes.com/2001/08/13/us/maker-chose-not-to-use-a-drug-abuse-safeguard.html?searchResultPosition=10.

Backed by an aggressive marketing campaign, Purdue's OxyContin became a promising pain medication for many doctors and patients. Purdue claimed it had created a new, low risk drug that could provide long acting pain relief but was less addictive and less subject to abuse than other pain medications.

But OxyContin was not what Purdue claimed it was. Purdue's assertions that OxyContin was less addictive and less subject to abuse and diversion were false—and the company knew its claims were false. Purdue's misrepresentations contributed to a serious national problem in terms of abuse of this prescription drug. Purdue's OxyContin did not offer a low risk way of reducing pain, as promised. Due, in part, to Purdue's aggressive and misleading marketing campaign, prescriptions for OxyContin increased from approximately 300,000 in 1996 to nearly 6 million in 2001. As OxyContin became more available, its abuse and diversion increased, and that increased availability had, in my judgment, a devastating effect on many communities throughout Virginia and the United States, as documented by the DEA and local law enforcement.[334]

These developments were widely reported in the media. So too were the warnings of journalists, physicians, and scientists who demonstrated that opioid overprescription and oversupply posed serious threats to individual and public health. "You'd have to kind of have your head buried in the sand" not to know about the opioid epidemic, said Mark Killion, who worked as a regional sales director for Actavis's Kadian from May 2009 to December 2012. Dr.

---

[334] Barry Meier, "In Guilty Pleas, OxyContin Maker to Pay $600 Million," *New York Times*, May 10, 2007; Brownlee testimony before the U.S. Senate Judiciary Committee Hearings, July 31, 2007, https://www.judiciary.senate.gov/imo/media/doc/Brownlee%20Testimony%20073107.pdf.

Foley herself conceded, in a 2012 interview, that the pendulum of medical opinion had swung back in the direction of narcotic conservatism. Overpromotion and oversupply nonetheless persisted, as did the epidemic itself. Rates of opioid prescribing, addiction, and overdose deaths increased throughout the first decade of twenty-first century. Yet opioid manufacturers, distributors, and national pharmacies persisted in revisionist advocacy, training, and marketing long after the dangers became apparent.[335]

Endo illustrates the pattern of ongoing support. In addition to its educational and marketing projects, the company maintained payments to revisionist organizations with which it had "strategic partnerships." Between 1998 and 2012 Endo contributed $5.9 million to the APF, $4.2 million to the APS, $1.3 million to the AAPM, and $369,000 to the FSMB, whose opioid-prescribing book (2007) and CME (2009) it underwrote. Endo continued supporting the AAPM and other pro-opioid groups until 2017, the year the company withdrew its reformulated Opana ER from the market because of FDA concerns about injection abuse and worries that the drug's risks outweighed its benefits.[336]

---

[335] Mark Killion deposition, September 11, 2020, p. 70 (quotation); "Easing Pain the World Over: A Conversation with Kathleen Foley," *Pain Research Forum*, May 4, 2012, https://www.painresearchforum.org/forums/discussion/15815-easing-pain-world-over. Another KOL who had second thoughts was Dr. Barry Cole, who told reporters that "by about 2010" he was awakening to the dangers of opioid painkillers "for most chronic pain patients.…We thought we could just get away with putting everybody on opioids, and it would be hunky-dory. And it didn't work and it had darker consequences than any of us were predicting." Harriet Ryan, Lisa Girion, and Scott Glover, "OxyContin Goes Global—'We're Only Just Getting Started,'" *Los Angeles Times*, December 18, 2016, https://www.latimes.com/projects/la-me-oxycontin-part3/. The sense of a swing back toward narcotic conservativism was shared by rank-and-file clinicians, e.g., those interviewed in Knight et al., "Opioid Pharmacovigilance."

[336] U.S. Senate Finance Committee, "Findings from the Investigation of Opioid Manufacturers," pp. 6-7 and Appendix B, "strategic partnerships" p. 7; FDA, "FDA Requests Removal of Opana ER for Risks Related to Abuse," press release, June 8, 2017, https://www.fda.gov/news-

By then the country was into the seventeenth year of the public phase of the opioid crisis, which commenced in 2000 and initially centered on OxyContin. On April 6, 2000, the *Bangor Daily News* described how Medicaid patients and recreational drug users in Maine had discovered OxyContin and other prescription opioids. Maine then had the nation's second-highest per capita consumption of OxyContin and the fourth highest of fentanyl. Addiction and related crime were growing. So was prescription drug diversion, a lucrative business that had "gone off the charts" in the previous two years. On May 21, 2000, the *Boston Globe* published a similar story on painkiller abuse, diversion, and addiction-driven crime in Washington County, Maine, in the poor, isolated, easternmost corner of the state. By the end of 2000 national journalists were connecting the local dots. On December 31, 2000, *Time* published "The Potent Perils of a Miracle Drug." The story was national in scope and emphasized the threat to young people, citing a survey from southwestern Virginia that "20% of high school kids and 10% of middle school kids know about OxyContin and how to obtain it."[337]

---

events/press-announcements/fda-requests-removal-opana-er-risks-related-abuse. Endo's involvement with the FSMB and its educational and marketing activities are described above.

[337] Renee Ordway, "Narcotics Abuse on Rise: Pharmaceutical Drug Fraud, Misuse Worry Officials, *Bangor Daily News*, April 6, 2000, https://archive.bangordailynews.com/2000/04/06/narcotics-abuse-on-rise-pharmaceutical-drug-fraud-misuse-worry-officials/; Gold, "A Prescription for Crime," *Boston Globe*, May 21, 2000; Timothy Roche, "The Potent Perils of a Miracle Drug Donna," *Time*, December 31, 2000, online edition, http://content.time.com/time/magazine/article/0,9171,93319,00.html.
　　High levels of pharmaceutical opioid abuse by high school students were first reported in Dayton in 2000. In 1996 4.7 percent of twelfth graders had ever abused opioids. In 1998 the figure rose to 6.1 percent, and then more than tripled to 18.4 percent in 2000. Ohio Substance Abuse Monitoring Network, "High Levels of Pharmaceutical Opioid Abuse Continue Among High School and College Age Youth," January 2005, https://mha.ohio.gov/static/ResearchandData/Research/osam/2005-Jan-OSAM-O-Gram-High-Levels-Pharma.pdf.

A month later, in January 2001, the DEA's National Drug Intelligence Center warned that OxyContin diversion and abuse had become "a major problem," particularly in Maine, Ohio, and West Virginia, as well as in eastern Kentucky, Maryland, western Pennsylvania, and rural southwestern Virginia. Fatal overdoses and hospital emergency department visits involving oxycodone, OxyContin's active ingredient, had risen sharply since 1997 and 1998. Kentucky, Ohio, Virginia, and West Virginia had all multiple OxyContin overdose deaths. Heroin loomed: OxyContin abusers who had never touched heroin might do so if they lost access to a medical source and could not afford street pills. Cases of such switching behavior had already surfaced in West Virginia's northernmost counties.[338]

National coverage of OxyContin expanded rapidly in February 2001. NBC News aired another story, quoting a Kentucky police official on the "highly addictive" nature of the drug. *New York Times* correspondents Francis X. Clines and Barry Meier reported that OxyContin abuse, addiction, and diversion were emerging across the nation and in areas not previously associated with heavy narcotic use. The drug had caused a rash of overdose deaths. "I personally counted 59 deaths since January of last year that local police attributed to addicts using the drug, and I suspect that's pretty conservative," said Joseph L. Famularo, the United States Attorney for the Eastern District of Kentucky. In late winter and spring ABC News, the *Washington Post*, the Associated Press, the *New York Times*, and *Newsweek* all ran or followed up with similar stories.[339]

---

[338] DEA, National Drug Intelligence Center, OxyContin Diversion and Abuse (web site, January 2001), archived at https://www.justice.gov/archive/ndic/pubs/651/651p.pdf.

[339] "Concern Grows in Eastern States About Abuse of Pain Killer, OxyContin," February 10, 2001, NBC News transcript retrieved from Nexis Uni; Francis X. Clines with Barry Meier,

Local and regional coverage likewise expanded in the spring of 2001. That April Ohio newspapers such as the *Cincinnati Enquirer*, Ohio radio stations such as Akron's WKDD-FM, and Ohio television stations such as Cleveland's WJW and Youngstown's WYTV all ran OxyContin stories. Purdue tracked the coverage, which linked its product to diversion and overdose deaths in Akron; complaints of robberies, skyrocketing abuse, and "exploded" illegal sales in Cleveland; possession arrests and high-school expulsions of teenagers in or near Youngstown; and armed trafficking in Cincinnati.[340]

---

"Cancer Painkillers Pose New Abuse Threat," *New York Times*, February 9, 2001, https://www.nytimes.com/2001/02/09/us/cancer-painkillers-pose-new-abuse-threat.html (Famularo). Other late winter and spring coverage, e.g., "What the Doctor Ordered; Young People Hooked on a Miracle Painkiller, OxyContin," ABC News *20/20*, February 9, 2001; Josh White, "Abuse Reports Bring Meeting on Painkiller; Manufacturer Wants Education on Drug's Risk," *Washington Post*, February 16, 2001; Hank Kurz, Jr., "OxyContin Summit Produces Seven-Point Plan to Address Abuse," Associated Press wire story, March 1, 2001; Berry Meier and Melody Peterson, "Sales of Painkillers Grew Rapidly, but Success Brought a High Cost," *New York Times*, March 5, 2001; Claudia Kalb, "Painkiller Crackdown," *Newsweek*, May 14, 2001. These sources were retrieved from the Nexis-Uni database.

[340] The April 2001 Ohio media coverage is listed and summarized in "Purdue Media Chart" (April 2001), PKY180628146-PKY180628190, pp. 1, 3, 4, 6, 15, 23, 25, 28, 32 ("exploded"), 35, 36, 37, 41, and 44. In July 2001 Purdue President Michael Friedman also received word, in the form of a *Dayton Daily News* story, that attorneys from Dayton and other communities were filing a class-action lawsuit based on OxyContin misrepresentations. Dan Colucci to Michael Friedman, email, July 21, 2001, PPLPC016000000382- PPLPC016000000384.

Purdue had other sources of information about conditions in Ohio. One particularly graphic warning came from a Purdue sales representative alarmed by a confrontation with the Hocking County, Ohio, coroner, Dr. David Cummins. Infuriated by the promotion of a "bad drug" that should be "pulled from the market," Dr. Cummins handed her photographs of a young man who had just died of an OxyContin overdose. "This is what OxyContin does to people," he said. "IT'S KILLED MORE PEOPLE THAN ITS EVER HELPED." Mark Alfonso email chain, November 20, 2000, PPLPC013000059011-PPLPC013000059014, capitalization in original.

Journalistic investigations have shown that Purdue executives received other evidence (medical-journal articles, emails, internet references, and field reports from sales representatives) of MS Contin and OxyContin diversion and abuse years before news stories began appearing in 2000—the same year that Udell and Dr. Friedman met with Maine federal prosecutor Jay McCloskey to discuss widespread OxyContin abuse in his state. Purdue executives, including Dr. Richard Sackler, nonetheless denied that they were aware of the problem prior to 2000. Meier,

In July 2001 Paul Tough published an exposé in the *New York Times Magazine* describing how young drug experimenters, including early adopters in eastern Ohio and other Appalachian regions, became hooked on OxyContin. They saw the pill as "cleaner" than heroin and initially mistook it for less potent painkillers like Percocet. The problem was national. "It's the idea that passes on," a young OxyContin addict told Tough. "That's how it spreads. There aren't mules running the drug across the country. It's dealt by word of mouth." He could call a friend across the country and say, "Hey, I've got this crazy pill, an OC 80, an OC 40. You've got to go to the doctor and get it. Tell him you back hurts." Liberalized prescribing facilitated abuse and diversion, and made nonmedical opioid addiction, once largely tied to urban heroin markets, more geographically dispersed and ethnically diverse—another surprising aspect of the emerging story.[341]

In August 2001 the House Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce held hearings in Bensalem, a Bucks County township bordering on Northeast Philadelphia. The representatives heard similar testimony from experts: Diverted OxyContin appealed to young people who considered it "to be a cleaner, prettier, more powerful form of heroin," but who were oblivious to its overdose risks. They heard Purdue executives state, inaccurately, that the company knew nothing of OxyContin abuse prior to 2000.

---

*Pain Killer*, chap. 11, and Keefe, *Empire of Pain*, chap. 18. For an example of an early internal warning (from Dr. Kaiko), see the Kathe Sackler email chain, August 5, 1997, PDD1701345999-PDD1701345000, https://www.mass.gov/doc/july-16-2019-affidavit-in-support-of-directors-motion-to-dismiss-exhibits-001-015/download.

[341] Tough, "The Alchemy of OxyContin." Meier, *Pain Killer*, 202, reports that Purdue was not only aware of his and Tough's reporting, but upbraided the *Times* for its handling of the OxyContin story. Geographically and ethnically diverse: Courtwright, Joseph, and Des Jarlais, *Addicts Who Survived*, 374.

And they asked the same executives to explain why they were able to closely track physician prescriptions for sales targeting purposes, but unable to identify mercenary doctors who were "writing prescriptions out the wazoo." Purdue, pointed out Rep. James Greenwood (R, Pa.), "has a responsibility to be looking at this data and not relying on what law enforcement tells you, but saying what does Purdue Pharma have as a responsibility to do with the data that we have that tells … which doctors are writing how many prescriptions … and how do we make sure that those are all good prescriptions, and weed out the bad actors? It is in your interest to do that." "Yes," agreed, Purdue's attorney, Howard Udell. "It is absolutely in our interest to do so."[342]

In January 2003 Purdue received another sort of official warning, a faxed FDA letter addressed to the company's president, Michael Friedman. The FDA singled out two OxyContin ads that had appeared in *JAMA* in October and November 2002. The ads had minimized OxyContin's risks and promoted it for uses beyond those shown to be safe and effective. Neither ad had presented in the body of the advertisement (the place where physicians customarily look for warnings about the most significant risks) "*any* information from the boxed warning discussing OxyContin's potential for abuse." Nor had they adequately warned that "the drug can be fatal if taken by certain patients under certain conditions. It is particularly disturbing that your November ad would tout 'Life with Relief' yet fail to warn that patients can die from taking OxyContin." The ads had appeared in a widely read medical journal more than a year after Purdue, following its initial discussions with the FDA, had changed the drug's labeling. Yet

---

[342] U.S. House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, "OxyContin: Its Use and Abuse," August 28, 2001, 54-59, quotations pp. 54, 58, and 59; Keefe, *Empire of Pain*, pp. 242-243 (inaccurately).

marketing efforts "not in accordance with the FDA's prescription drug advertising regulations" and "in violation of the Federal Food, Drug, and Cosmetic Act" had persisted.[343]

In 2003 the GAO issued *Prescription Drugs: OxyContin Abuse and Diversion and Efforts to Address the Problem*. The report similarly noted that Purdue's corrective efforts after the July 2001 labeling change had been desultory. Purdue had agreed to discontinue distribution of four misleading promotional videos, but did not retrieve or destroy the thousands of copies of the videos (which included the "less than 1 percent" claim and information about Purdue's highest-dose 160 mg OxyContin tablet) that had already been distributed.[344]

By 2003 alarmed physicians were also disputing the safety and efficacy of long-term, high-dose opioid analgesia in high-profile publications. Writing in the *New England Journal of Medicine*, Drs. Jane C. Ballantyne and Jianren Mao found that, in actual practice settings, "the reality of dealing with patients who have complex problems often forces physicians to compromise. As a consequence, very large doses of opioids are prescribed for patients with chronic pain that is not associated with terminal disease, often in the absence of any real improvement in the patient's pain or level of functioning." At high doses some patients experienced greater sensitivity to pain and other serious complications. "Whereas it was

---

[343] Thomas W. Abrams to Michael Friedman, January 17, 2003, http://wayback.archive-it.org/7993/20170112065652/http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/UCM168946.pdf (quotations; italics in original)."

[344] GAO, Prescription Drugs, 27-28.

previously thought that unlimited dose escalation was at least safe, evidence now suggests that prolonged, high-dose opioid therapy may be neither safe nor effective."[345]

In December 2003 Dr. David Musto, a physician and historian of U.S. drug use and policy, quoted Drs. Ballantyne and Mao's judgement in his *New York Times* review of Barry Meier's *Pain Killer*. Dr. Musto was struck by the parallels between the origins of the prescription-opioid addiction epidemic Meier reported and those of the nineteenth-century epidemic. Doctors had given people with conditions like arthritis morphine and hypodermic syringes, with the result that as many as four in five morphine addicts could trace their condition to medications first provided by physicians. Meier's book showed how revisionist promotion of OxyContin had re-created this primal fiasco. "If the drug had remained limited to patients with the most severe pain," Musto wrote, "the story would probably be different, but advocates for pain treatment minimized the danger of addiction and recommenced prescribing OxyContin for milder and chronic pains." Like Meier, Musto judged the "mere 1 percent, perhaps less" addiction risk claim to be sophistically misleading. "The low figure came from postoperative hospital patients, not from out-patients on long-term opioid therapy. No studies on prolonged treatment with OxyContin had been conducted. Nevertheless, doctors acted as if OxyContin had solved the difficult balancing act between offering pain relief and avoiding addiction, and began

---

[345] Jane C. Ballantyne and Jianren Mao, "Opioid Therapy for Chronic Pain," *New England Journal of Medicine* 349 (2003): 1943-1953, quotation p. 1951, https://www.nejm.org/doi/full/10.1056/NEJMra025411. Over the course of the decade other high-profile medical journals published articles critical of the principles and practices of opioid revisionism, e.g., Van Zee, "Promotion and Marketing of OxyContin," 221-227, and Katz, "Long-term Opioid Treatment of Nonmalignant Pain," 1422-1433.

prescribing it for many kinds of pain for which milder pharmaceuticals would be much more appropriate. Then the problems began."[346]

Meier's 2003 book and Dr. Musto's *New York Times* review capped a three-year outpouring of warnings—official and unofficial, lay and professional—about the growing risks of heavily promoting and liberally prescribing Schedule II narcotics like OxyContin under the increasingly dubious dispensation of opioid revisionism. The industry monitored such criticism carefully. Purdue's internally circulated "Media Chart" for one month, April 2001, required 45 small-font pages to catalog and abstract several hundred adverse or cautionary mentions of prescription opioids, with OxyContin the drug most frequently named.[347]

As a public scandal, the overpromotion and overprescription of opioids for CNP had a clear chronology and three distinct stages. Prior to 2000, the situation received practically no coverage. From spring 2000 through autumn 2003, the story broke and achieved widespread notoriety. After 2003, the story had legs. Journalists covered such developments as prescription-

---

[346] David F. Musto, "Books of the Times; Boon for Pain Sufferers, and Thrill Seekers," review of *Pain Killer: A 'Wonder' Drug's Trail of Addiction and Death*, *New York Times*, December 17, 2003, https://www.nytimes.com/2003/12/17/books/books-of-the-times-boon-for-pain-sufferers-and-thrill-seekers.html.

[347] The corporate tracking information is from "Purdue Media Chart" (TS, April 2001), PKY180628146-PKY180628190. Throughout the crisis Purdue continued to compile and circulate news summaries, e.g., "Purdue News Summary—AM Report—July 9, 2012," email, PPLPC001000108630 through PPLPC001000108643. Other manufacturers also tracked and analyzed news stories during the epidemic, e.g., Endo's "Riskmap Update Report for Opana® ER" (TS, September 1, 2010), END00358538.

opioid sales from internet "pharmacies" and pill mills; crackdowns on the distributors who supplied them; and the mounting social costs of what Meier called "profiting from pain." [348]

The coverage made, or should have made, the situation obvious to pharmaceutical executives. In December 2020 hearings of the House Committee on Oversight and Reform, Rep. Kelly Armstrong (R, ND) stressed this point when examining David Sackler, who served on Purdue's Board of Directors from 2012 to 2018:

> Mr. ARMSTRONG. So, my question is, do you have cable?
>
> Mr. DAVID SACKLER. I do have cable, yes.
>
> Mr. ARMSTRONG. Do you get newspapers?
>
> Mr. DAVID SACKLER. No, I don't receive subscriptions to newspapers. I see—I get my news online.
>
> Mr. ARMSTRONG. I was practicing criminal defense at the time all this was going on, and don't—I wish we could have every one of these companies in here at every different way. But I think it goes beyond the pale of believability to think that, after settling with the Federal Government in 2007, you can honestly say, watching the sales of your own company's drugs, that you didn't know a problem was coming down the pipe. And to say

---

[348] Representative post-2003 stories on these themes are Erik Eckholm, "Abuses Are Found in Online Sales of Medication," *New York Times*, July 9, 2008, https://www.nytimes.com/2008/07/09/health/09drugs.html?searchResultPosition=2; Lizette Alvarez, "Florida Shutting 'Pill Mill' Clinics," *New York Times*, August 31, 2011, https://www.nytimes.com/2011/09/01/us/01drugs.html?searchResultPosition=1; Barry Meier, "A New Painkiller Crackdown Targets Drug Distributors," *New York Times*, October 17, 2012, https://www.nytimes.com/2012/10/18/business/to-fight-prescription-painkiller-abuse-dea-targets-distributors.html?searchResultPosition=1; and Barry Meier, "Profiting from Pain," *New York Times*, June 22, 2013, https://www.nytimes.com/2013/06/23/sunday-review/profiting-from-pain.html.

that just defies believability and is absolutely abhorrent and appalling to the victims of opioid addiction.[349]

In a 2021 deposition Dr. Portenoy testified that Purdue and other opioid manufacturers had disregarded, not only headlines, but growing concern among academic pain experts about opioid abuse, addiction, and overdoses. After 2000 prominent KOLs, who still believed that many patients could benefit from long-term opioid analgesia, nevertheless recognized that too little attention had been paid to risk. Not so the opioid marketers. "When the public health problem of addiction, abuse, and … overdose deaths became very, very prominent and very worrisome," Dr. Portenoy testified, "the marketing strategies being used by the pharmaceutical industry manufacturing opioid drugs did not recalibrate in the sense that the academic community was trying to, and instead of focusing more on risk and providing detailed information about risk, the same kinds of strategies that had been used were continuing to being used."[350]

---

[349] U.S. House of Representatives, Committee on Oversight and Reform, "The Role of Purdue Pharma and the Sackler Family in the Opioid Epidemic," Hearing of December 17, 2020, https://www.congress.gov/116/chrg/CHRG-116hhrg43010/CHRG-116hhrg43010.pdf (quotation); Jan Hoffman, "Sacklers Face Furious Questions in Rare Testimony on Opioid Epidemic," *New York Times*, December 17, 2020, https://www.nytimes.com/2020/12/17/health/opoids-sacklers-purdue-testimony.html (board service).

[350] Dr. Portenoy's deposition in *City of Chicago vs. Purdue Pharma L.P.*, *et al.,* July 29, 2021, pp. 356-357 (quotation). Dr. Portenoy had previously stated that drug companies "used my work to provide content and expert support for a strongly positive message about opioids, and in much of the material produced by drug companies, the content lacked context and warnings, and in so doing, presented a message that lacked balance. The effect was to promote opioid therapy to prescribers." Declaration of Russell K. Portenoy (TS, January 17, 2019), *State of Oklahoma vs.*

Marketing thus lagged expert clinical reassessment, as when Purdue included the boosterish 1997 APS and AAPM consensus statement, imprinted with both organizations' logos, in a Purdue-funded educational "tool kit" aimed at nurses. The date of its release was September 2007, years after the epidemic entered its public phase and months after Purdue Frederick pleaded guilty to the felony misbranding of OxyContin.[351]

Opioid marketing likewise disregarded neuroscientific research on addiction, then also attracting growing media and medical attention. Addiction researchers had assembled and articulated a model of addiction that emphasized the harmful effects of long-term drug exposure on the brain's reward, motivation, and memory pathways, commencing a process of pathological learning that could end in compulsive behavior. In a landmark 1997 *Science* article, "Addiction is a Brain Disease, and It Matters," National Institute on Drug Abuse (NIDA) director Dr. Alan Leshner summarized the new paradigm and gave it a name. What neuroscience had demonstrated, Leshner said, was the need to "see the addict as someone whose mind (read: brain) has been altered fundamentally by drugs." Leshner allowed that not everyone who took drugs became addicted. Social circumstances and genetic predisposition played a role, as did the neurotoxicity of substances like opioids. But once addiction had occurred, Leshner cautioned, brain alteration was permanent. Addiction threw a switch that affected every realm and level of brain activity, neurologically hardwiring a tendency to relapse and creating a lifelong condition

---

*Purdue Pharma L.P. et al.*, 28-29,
https://www.industrydocuments.ucsf.edu/opioids/docs/#id=nshg0230.

[351] "Partners for Understanding Pain Tool Kit: Nurses Care Campaign," CHI_000445270, CHI_000445353-CHI_000445356, https://www.industrydocuments.ucsf.edu/docs/xzff0232.

that could be treated but never completely eliminated. Addiction entailed a pathological alteration of memory and an enduring susceptibility to relapse cues.[352]

Leshner and his NIDA successors—most notably Dr. Nora Volkow, a leading researcher and spokesperson who championed the brain disease model in such forums as *60 Minutes*—went on to show that this pattern of neural alteration occurred across a range of psychoactive substances and that frequent, sustained use was the quickest path to it. The clear implication (so clear that NIDA's brain-disease findings were cited by the DEA) was that controlling supply and reducing exposure in drug-naïve subjects was the surest route to prevention.[353]

Addiction neuroscience underscored the conventional, risk-minimizing wisdom of narcotic conservatism, while allowing—as addiction researchers had long done—that individuals varied in susceptibility. Dr. Anna Lembke, a psychiatrist who specialized in treating addiction, summarized the situation by saying that vulnerability to addiction came down to nature, nurture, and neighborhood. Those who were inclined toward states like depression or anxiety were more vulnerable, as were those whose early lives were marked by trauma or neglect. (As an aside, stressful early life events also predicted more *physical* illness and chronic pain in adult life— another reason to be wary of treating CNP patients with addictive drugs.) "Neighborhood" was Lembke's term for exposure-based risk. Someone who lived in a neighborhood where drugs were sold openly was likelier to use and become addicted to drugs, other things being equal.

---

[352] Alan I. Leshner, "Addiction Is a Brain Disease, and It Matters," *Science* 278 (1997): 45-47.

[353] David T. Courtwright, "The NIDA Brain Disease Paradigm: History, Resistance, and Spinoffs," *BioSocieties* 5 (2010): 137-147. Dr. Volkow's *60 Minutes* appearance and other public presentations are at https://www.drugabuse.gov/news-events/nida-in-news/nida-director-dr-nora-volkow-profiled-cbs-60-minutes.

What the rapid increase in the availability of prescription opioids in the late 1990s and early

2000s had done was to change everyone's neighborhood, increasing the risk of iatrogenic

prescription-opioid addiction as well as addiction via diversion to nonmedical use. Supply

increases that exposed more and more of an opioid-naïve but variably susceptible population

were bound to engender new cases of addiction, for the simple reason that—Dr. Lembke again—

"substance use disorder is strongly related to the sheer availability of addictive substances."[354]

**Figure 7**: Opioid pain reliever (OPR) sales, OPR overdose deaths, and OPR substance abuse

treatment admissions, adjusted for population, United States, 1999-2010.

---

[354] Lembke, *Drug Dealer, MD*, 16-17, quotation p. 17. Higher levels of early trauma predict higher levels of adult illness and physical pain, e.g., Vincent J. Felitti et al., "Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study," *American Journal of Preventive Medicine* 14 (1998): 245-258, https://www.ajpmonline.org/action/showPdf?pii=S0749-3797%2898%2900017-8; Natalie J. Sachs-Ericsson, "When Emotional Pain Becomes Physical: Adverse Childhood Experiences, Pain, and the Role of Mood and Anxiety Disorders," *Journal of Clinical Psychology* 73 (2017): 1403-1428, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6098699/pdf/nihms-982976.pdf; and W. Clay Jackson, "Connecting the Dots: How Adverse Childhood Experiences Predispose to Chronic Pain," *Practical Pain Management*, 20 (May/June 2020): 24-28, https://www.practicalpainmanagement.com/treatments/psychological/connecting-dots-how-adverse-childhood-experiences-predispose-chronic-pain.



(Figure 7 Source: "Vital Signs: Overdoses of Prescription Opioid Pain Relievers—United States, 1999-2008," *MMWR: Morbidity and Mortality Weekly Report* 60 (November 4, 2011), 1487-1492, fig. 2, as updated by Andrew Kolodny et al., "The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction," *Annual Review of Public Health* 36 (2015): 559-574, fig. 1.)

Figure 7 illustrates and amplifies Dr. Lembke's point with CDC data. Admissions to treatment programs for opioid addiction and opioid deaths rose in tandem with prescription-opioid sales in the first decade of the twenty-first century. These national trends were also apparent, and reported, in Ohio. From 1999 to 2007 the per capita distribution of prescription opioids through retail pharmacies increased by 325 percent in Ohio. During the same period the unintentional drug overdose death rate increased by 305 percent. The Ohio Prescription Drug Abuse Task Force reported that "[t]hese increases represent a nearly one-to-one correlation,

demonstrating that increased exposure to opioids has contributed to Ohio's overdose epidemic."[355]

Neither the Ohio task force nor its academic consultants supposed that "one-to-one" meant that the people who overdosed were necessarily the ones who had been prescribed the drugs. "I'd sneak into my mom's room and just take a couple here and there," a young man in Dayton told an interviewer. "And there'd be 80-millgram OxyContins, there'd be uh, there'd be uh, Klonopin 2-millgrams, there would be um, Lortab [hydrocodone and acetaminophen]…And I would sneak in, and then I would go to school and sell 'em." (An 80 mg OxyContin tablet then sold for between $35 and $120 in the Dayton market.) Dr. Kalliainen, who attributed the 1998-2008 overdose death rise in Ohio and other states to liberalized opioid prescribing, warned colleagues that they were living in a "dream world" if they didn't think their patients' family members and friends weren't picking through their medicine cabinets for opioids. Her own chief-of-staff and his statistician-spouse discovered that opioids had been stolen during their family Christmas party. "If it's happening to them, it's happening to many, many people."[356]

In 2006 Purdue's own researchers reached the same conclusion through statistical analysis. Examining hospital emergency department reports for 1992 through 2004, the Purdue employees found that diversion and abuse increased in direct proportion to availability, with the

---

[355] Ohio Prescription Drug Abuse Task Force, *Final Report*, October 1, 2010, p. 22, https://medicine.wright.edu/sites/medicine.wright.edu/files/page/attachments/OPDATF.pdf.

[356] Ibid., 24; Carlson et al., "Trends in Pharmaceutical Opioid Abuse in Ohio," slides 13 ("sneak") and 14 ($35-$120); Kalliainen, "Multimodal Pain Management of Hand Surgery Patients in the Opioid Epidemic Era." Peter Grinspoon, *Free Refills: A Doctor Confronts His Addiction: A Memoir* (New York: Hachette, 2016), 141-142, confirms Dr. Kalliainen's observation—from the vantage of a doctor who was himself an accomplished opioid thief.

steepest rates of increase observed for the most powerful opioids. Non-medical use was a

function of the number and potency of prescriptions, a claim substantiated by regression

analysis. "Using the potency-adjusted total kilograms of opioid in prescriptive use for all the

opioids evaluated," they wrote, "there was a statistically significant association ($r^2 = 0.9791$,

[that is to say, near-perfect correlation]) with the reported morbidity for prescription analgesics

as a class." They concluded in the published report that "non-medical use of opioids is a

predictable parallel phenomenon of their prescriptive availability and that the extent of diversion

and the related medical consequences is well predicted by the relative potency of the drug and

the amount in prescriptive use." They added that "abuse and diversion and the related medical

consequences are problems of all drugs in this class and are difficult to control."[357]

Among the related consequences was addiction, as demonstrated by another Purdue

analysis, this one unpublished. Called "Project Tango" and dated September 2014, it focused on

whether Purdue should attempt to acquire Reckitt Benckiser's Suboxone, a mixed opioid

agonist-antagonist that had become a mainstay of medication-assisted treatment (MAT). The

premise was that Suboxone was "a good fit and next natural stop for Purdue," which should

---

[357] Nabarun Dasgupta et al., "Association Between Non-Medical and Prescriptive Use of Opioids," *Drug and Alcohol Dependence* 82 (2006): 135-142, quotations pp. 135, 141. The Purdue researchers included Dr. Curtis Wright IV, who had been hired and generously compensated by the company after he oversaw OxyContin's approval as an FDA employee. Deposition of Curtis Wright, IV, In Re: National Prescription Opiate Litigation, December 19, 2018, pp. 224-229, and Keefe, *Empire of Pain*, 196.
 Ahmedani et al., "Policies and Events Affecting Prescription Opioid Use for Non-Cancer Pain," confirms the Dasgupta et al. findings. It will be recalled that Dr. Ahmedani and his colleagues observed that opioid-related poisonings and deaths tracked opioid prescriptions, which rose rapidly in number and potency after 2001. Dr. Foley also stated, in 2004, that potential for abuse and addiction is related to opiate dose and duration of use, among other factors. Deposition of Kathleen Foley, M.D., August 27, 2004, *Michael McCallister et al.* v. *Purdue Pharma L.P*, p. 104, PKY183381151.

"consider expansion across the pain and addiction spectrum." The market for addiction treatment among patients existed because "pain treatment and addiction are naturally linked," even for opioid products with abuse-deterrent formulations. And the treatment market had become quite large. Addiction to opioids *other than heroin* had increased at a 20 percent compound annual growth rate between 2000 and 2010. Purdue and its consultants judged that some 2.1 million patients manifested opioid addiction, in NIDA's sense of suffering a chronic, relapsing disease caused by a drug's alteration of neural structure and function that manifest itself in compulsive drug seeking despite harmful and often self-destructive consequences. Though these patients "encompasse[d] all demographics," from older women with chronic lower back paid to adolescent males with sports injuries, over 1.4 million of the 2.1 million opioid addicts remained untreated for addiction. Should barriers to MAT be eased, Suboxone sales might represent over half of Purdue's sales by 2023.[358]

**Figure 8:** Purdue's Analysis of the Origins and Extent of Untreated Opioid Addiction Among U.S. Patients, 2014

---

[358] "BDC meeting—Project Tango" (slide deck, September 12, 2014), PSJ2 Exh 87, https://www.industrydocuments.ucsf.edu/drug/docs/#id=hqpw0232, "good fit," "consider expansion," and "naturally linked," slide 8; "all demographics" and brain disease, slide 9; 2.1 million addicts, slide 11; half of 2023 sales, slide 20. To return to an earlier observation, Project Tango is clear evidence that Purdue and its expert advisers, most of whom consulted for other opioid manufacturers, were aware of the risk implications of the NIDA brain-disease model, then as now the dominant paradigm in the addiction research field.





(Figure 8 Source: "BDC meeting—Project Tango" [slide deck, September 12, 2014], slides 8, 9,

PSJ2 Exh 87, https://www.industrydocuments.ucsf.edu/drug/docs/#id=hqpw0232.)

The trend lines in Figure 7 and Purdue's about-face on iatrogenesis in Figure 8 bring to mind the first U.S. opiate addiction epidemic, which was also medically driven and prolonged. Only this time the cause could not be laid to medical backwardness. Early twenty-first century American physicians possessed a scientific foundation for evidence-based therapeutics; a large armamentarium; and an ethic of avoiding prescribing drugs in situations where risks likely outweighed benefits. What they needed was the most accurate possible information about what the real risks were.

That information was not forthcoming after 2000. Despite the guilty pleas and record fines of 2007, Purdue persisted in efforts (some collaborative, as with ABC nationally and with CVS in Ohio and Florida) to calm fears about liberalized opioid prescribing. During the 2010s the company increasingly targeted established, high-volume prescribers, some of whom who received kickbacks as corporate advisors and speakers. In October 2020 these and other Purdue offenses led to a second round of guilty pleas, this time for felony charges. Purdue agreed to pay criminal and civil penalties of $8.3 billion dollars—a sum uncertain of collection, as Purdue had meanwhile declared bankruptcy.[359]

---

[359] 2007 agreement: U.S. District Court for the Western District of Virginia, Abingdon Division, plea agreement for *U.S.* v. *Purdue Frederick*, May 10, 2007, https://graphics8.nytimes.com/packages/pdf/business/20070510_DRUG_Purdue.pdf. Post-2007 misleading promotions, illegal sales tactics, pleas, and bankruptcy: David Crow, "How Purdue's 'One-Two' Punch Fuelled [sic] the Market for Opioids," *Financial Times*, September 10, 2018, https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c; DOJ, "Justice Department Announces Global Resolution of Criminal and Civil Investigations with Opioid Manufacturer Purdue Pharma and Civil Settlement with Members of the Sackler Family," press release, October 21, 2020, https://www.justice.gov/opa/pr/justice-department-announces-global-resolution-criminal-and-civil-investigations-opioid, and attached "Addendum A to [Purdue] Settlement Agreement," https://www.justice.gov/opa/press-release/file/1329571/download; Jan Hoffman and Katie Benner, "Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales," *New York Times*, October 21, 2020, https://www.nytimes.com/2020/10/21/health/purdue-

Other manufacturers continued to fund advocacy organizations such as the APF and APS and to engage in unbranded opioid marketing. They distributed revisionist literature, such as *Finding Relief,* the 2009 Ortho-McNeil-Janssen guidebook aimed at seniors and published in partnership with the AAPM, an organization to which Janssen had contributed more than half a million dollars. *Finding Relief* assured readers that "opioids may make it easier to live normally," that doses did not necessarily "have to get bigger over time," and that addiction was rare in CNP patients. It appeared nine years into the public phase of the prescription-opioid epidemic.[360]

From 2009 to 2014 Teva and its subsidiaries engaged in marketing (including off-label CNP marketing) of fentanyl products Actiq and Fentora, as well as morphine-based Kadian. The Senate Finance Committee, which investigated opioid manufacturers' contributions to nonprofit organizations "helpful to their respective businesses," found that Teva topped all 40 firms between 2012 and 2019: "Teva led the way, having paid over $4.8 million." Its largest beneficiaries included biddable groups such as the American Chronic Pain Association, which had been identified by Teva's public relations research firm as "the leading patient group in the chronic pain space" with "an agenda largely set by the funding it receives from third parties."[361]

A May 2008 McKinsey study provides insight into why revisionist marketing and subsidies persisted deep into the opioid crisis. A key finding was that that "[c]linicians and

---

opioids-criminal-charges.html; Keefe, *Empire of Pain*, chaps. 27-29; and Quinones, *The Least of Us*, 110-117, 173-180.

[360] *Finding Relief* quotations, p. 17. Examples of APS and APF funding are given above.

[361] Actiq, Fentora, and Kadian marketing are described above. Quotations: U.S. Senate Finance Committee, "Findings from the Investigation of Opioid Manufacturers," 9, and "Teva Advocacy Mapping," TEVA_OK_00101659.

[third-party] payers agree that the primary unmet need in pain management is effective and tolerable analgesics offering far better safety profiles than NSAIDs and opioids." Revisionist claims notwithstanding, the holy grail remained to be found. Financial rewards awaited companies that developed and marketed superior analgesic drugs and devices with fewer side effects and, in the case of opioids, abuse liabilities. The pain market was large, and it was growing as the population aged.[362]

Figure 9, from the McKinsey study, describes pain-syndrome prevalence and treatment in the United States around 2007. It shows that cancer pain remained a relatively small, uncontroversial, and self-limiting part of the market. The same was true of acute pain following trauma or surgery, which third-party payers saw as "self-limiting and therefore significantly less costly." The center of cost—and profit—remained CNP management. For every patient with a cancer pain syndrome, there were ten with arthritis-pain syndromes and more than thirteen with back-pain syndromes.[363]

**Figure 9:** McKinsey's Analysis of the Prevalence and Treatment of Common Pain Syndromes in the U.S., ca. 2007.

---

[362] Quotation: Eric David et. al, "Overview of the Market for Pain Management Therapeutics" [slide deck, May 23, 2008], slides 1, 13, MCK-MAAG-0119306.000004, https://s3-us-west-2.amazonaws.com/edu.ucsf.industrydocuments.artifacts/t/x/h/k/txhk0255/txhk0255.pdf.

[363] Ibid., slides 4 (quotation), 10.



(Figure 9 Source: Eric David et. al, "Overview of the Market for Pain Management Therapeutics" [slide deck, May 23, 2008], slide 10, MCK-MAAG-0119306.000010, https://s3-us-west-2.amazonaws.com/edu.ucsf.industrydocuments.artifacts/t/x/h/k/txhk0255/txhk0255.pdf. Though the report is dated 2008, most of the data it references are from 2007.)

Figure 9 also confirms that opioids had become "common treatments" for widespread CNP syndromes. That was what Purdue's Friedman had hoped for when he advised, in 1997, that OxyContin's "personality" should be maintained as other than that of a strong cancer drug. And that was why other manufacturers, with the help of distributors and national pharmacies, strove to emulate Purdue's success and tactics: treating CNP was where the growth was. Yet their

success had proved sticky, in that any walking back of now-controversial claims that opioids were safe and effective for treating most cases of CNP would surrender what was manifestly the largest segment of the pain-management market. That market, according to a 2007 Mallinckrodt study, generated $14.5 billion dollars annually and was "dominated by narcotics," which had come to account for nearly half of all pain-medication sales.[364]

If manufacturers persisted in encouraging CNP opioid prescribing before, during, and after the revelations of 2000-2003, the same was true of the national distributors and national pharmacies that collaborated with them. From 1996 to 2002, these collaborative efforts centered on making revisionist CE programs available to pharmacists and on promoting OxyContin. From 2009 to 2014, however, the Big Three promoted a range of Schedule II opioids, including Kadian, Fentora, Nucynta, Exalgo, Actiq, and Subsys. What stands out is the lateness of these dates, and the fact that large distributors and national pharmacies that handled their own distribution were simultaneously embroiled in protracted diversion-control disputes with the DEA. It is to these disputes that we now turn.[365]

### E.  Distributors, National Pharmacies, and Opioid Diversion, 2005-2016

Historians of American drug policy concur that federal enforcement priorities shifted over time. In the case of opiates, the emphasis in the early twentieth century was on the

---

[364] Friedman's discussion of OxyContin's "personality" (PAK003806689) is recounted above. "Pain Management Market" (slide deck, November 26, 2007), slides 5 ($14.5 billion, nearly half) and 51 ("dominated"), MNKOI 0003887937, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=ntpp0244.

[365] These promotional efforts, summarized here, are documented above.

suppression of smoking opium imports and the inappropriate prescription and diversion of licitly manufactured morphine. In the mid-to-late twentieth century the focus was on trafficking in illicitly manufactured heroin. In the early twenty-first century, federal regulators and investigators also became increasingly concerned with the diversion of the licitly manufactured synthetic and semi-synthetic opioids at the heart of the emerging prescription opioid epidemic. DEA officials and Congressional investigators found that distributors (including national pharmacies that handled their own distribution) had failed to discharge their responsibilities under the CSA to detect, report, and suspend suspicious orders of such drugs, and that they persisted in this conduct despite repeated warnings from the DEA.

My review of the historical evidence confirms that distributors were lax in suspicious order monitoring (SOM) of prescription opioids, especially prior to 2013. The DEA responded to these distributor supply-control failures in traditional escalatory fashion: first, by attempts at improving performance by education; then by warnings; then by enforcement actions entailing closures and fines. Finally, the historical evidence shows that the large distributors and national pharmacies and their respective trade associations regarded these enforcement actions as a threat and provocation, to be met by public relations and lobbying activities designed to rein in the DEA and blame others for the prescription opioid epidemic.

1.  Distributors, the DEA, and the HDMA

One of the first to become aware of an alarming increase in prescription opioid diversion and related harms was a DEA official named Joseph T. Rannazzisi. The holder of degrees in law and pharmacy, Rannazzisi was an old-school narcotic conservative who believed that supply control was key to preventing abuse and addiction. In 2003 Rannazzisi had been an assistant

special agent in the DEA's Detroit office. There he had helped organize raids in places like Flint, Michigan, where prescription-opioid addiction and related problems were rapidly worsening. In 2004 Rannazzisi moved to DEA Headquarters, where he served as deputy director of diversion control and then deputy chief of enforcement operations. He served in that capacity until August 2015.[366]

Rannazzisi was disturbed by revisionist opioid marketing, which he challenged on pharmacological and historical grounds. He made the same point that Dr. Musto made, that the country had gone through medicinal opiate addiction crises before. He and his team assembled a slide slow on the history of opioid addiction that ran from the nineteenth century to the advent of internet pharmacies. Rannazzisi presented it to medical, pharmaceutical, law enforcement, and community groups and to congressional committees. "All of a sudden the whole medical community says, 'Oh, you know what, they're not as addictive as we thought they were,' he told his audiences. "That's crazy because we have had a hundred years-plus of addiction here based on these drugs." When invariably asked during the question period about "the study that shows that less than 1 percent of people [sic] get addicted to opioids," Rannazzisi replied that the statistic was "ridiculous," conjectural, and lacking in peer-reviewed proof.[367]

---

[366] Scott Higham and Lenny Bernstein, "Who is Joe Rannazzisi: The DEA Man Who Fought the Drug Companies and Lost," *Washington Post*, October 15, 2017; Ken Palmer and Marjory Raymer, "Officials Mum About Raids on Doctor's Places," *Flint Journal*, September 27, 2003; Joseph Rannazzisi deposition, April 26, 2019, *In Re: National Prescription Opiate Litigation*, vol. 1, pp. 19, 321 (DEA jobs).

[367] Higham and Horwitz, *American Cartel*, 20.

An even larger concern for Rannazzisi was distributors' failure to prevent diversion. What he found, he later told journalist Chris McGreal, was that the big distributors were not doing their job. "These companies have one task, and that is the safe and secure distribution of drugs, particularly prescription drugs," Rannazzisi said. "Otherwise, FedEx or UPS could do this role … This is the equivalent of a tech company failing on cybersecurity. If these companies were doing their job right, you shouldn't be seeing black-market prescription painkillers."[368]

In practice, the Big Three rejected Rannazzisi's one-task premise. Their industry had become an oligopoly that competed by discharging multiple, information-based tasks as well as warehousing and shipping pills. Some of these activities, such as helping manufacturers market opioids, streamlining distribution, and minimizing regulatory obstacles to sales growth were in tension with what Rannazzisi called their core legal responsibility under the CSA, the safe and secure distribution of controlled substances. Underlying everything were considerations of cost, profit, and customer satisfaction. In September 2007 Stephen Reardon, Cardinal's vice president for quality and regulatory affairs, stated the problem succinctly: The sort of strengthened SOM systems the DEA now demanded, and which it had recently forced ABC to implement, were "complex and onerous" and "not customer friendly;" they could delay the "filling and delivery of controlled substance orders to the customer."[369]

---

[368] McGreal, *American Overdose*, 204-205, quotation p. 205. Later told: During 2016-2018 McGreal interviewed Rannazzisi on three occasions, p. 303.

[369] Steve Reardon, email, September 14, 2007, CAH_MDL_PRIORPROD_DEA07_01198345, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=nyvf0232. Higham and Horwitz, *American Cartel*, chap. 4, discuss distributor concerns over financial losses inherent to detecting and suspending suspicious orders.

Like Anslinger before him, Rannazzisi addressed the distributor situation in stepwise fashion: instruction, then warnings, and then legal action. In Fall 2005 he established the DEA's Distributor Initiative Program and briefed 76 companies about it. He stressed the unique role distributors played in the closed system. He sought to educate them about the importance of monitoring and reporting suspicious orders, meaning those of unusual size, those that deviated substantially from a normal pattern, and/or those of unusual frequency. The Initiative enabled him and his staff to hold individual meetings with distributors to review the requirements and show specific instances of where their customers' behaviors suggested diversion—to teach, as it were, by example. "They were provided with what a suspicious order is," Rannazzisi said. "They were provided with examples of suspicious orders. They were provided with the statute and the regs that identified what their requirements were under the act and under the regulations." They were also reminded that failure to effectively control diversion could cause them to lose their DEA registrations, and that "any distributor who is selling controlled substances that are being dispensed outside the course of professional practice must stop immediately."[370]

Like his predecessors, Rannazzisi knew that diversion control was impossible without distributor cooperation. As early as 1969 BNDD planners had recognized that "the Bureau

---

[370] Lenny Bernstein and Scott Higham, "Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control," *Washington Post*, October 22, 2016, https://www.washingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-d7c704ef9fd9_story.html (established, briefed); Rannazzisi deposition, vol. 1, 256-257 ("They were provided"); U.S. House of Representatives, Energy and Commerce Committee Majority Staff, *Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia* (December 19, 2018), https://republicans-energycommerce.house.gov/wp-content/uploads/2018/12/Opioid-Distribution-Report-FinalREV.pdf, 28-33, "any distributor," p. 32.

cannot possibly solve the [diversion] problem through investigative programs alone," and had

laid plans to meet with industry leaders to discuss mutual problems and solutions and to brief

distributors "in an effort to familiarize them with responsibilities, laws, penalties and [to]

maintain this contact on a regular basis." Rannazzisi and his representatives had used this type of

meeting, such as the one with the HDMA on September 7, 2007, to emphasize two points. First,

suspicious orders were not merely to be reported, but stopped before delivery until the customer

had been evaluated. Second, the DEA lacked the resources to inspect every pharmacy. Hence it

was crucial for distributors to "know their customers."[371]

The DEA's distributor briefings "were pretty extensive," Rannazzisi later testified. "And

they were asked if they had any questions before they left. And they assured us that they

understood what the rules were." What surprised him was how the attempt to reach out to

distributors provoked mummery. "They said, We're going to look at this closely. Yes, we

understand.' But in reality, nothing," Rannazzisi told McGreal. "They weren't doing anything….

It was like a joke. It was almost like, 'DEA's just checking a box, so we're just going to continue

what we're doing because quite frankly we're making a lot of money.'"[372]

Rannazzisi persisted. On September 27, 2006, and February 7, 2007, he sent letters to all

registered distributors warning them that they had a statutory responsibility to detect, report, and

---

[371] "BNDD Operational Plan" (TS, October 15, 1969), p. 44, box 46, President's Advisory
Council on Executive Organization (White House Central Files: Staff Member and Office Files),
Richard Nixon Presidential Library, Yorba Linda, California, and "Summary of the DEA-
HDMA Meeting on Suspicious Orders … September 7, 2007," attached to Steve Reardon, email,
September 14, 2007, CAH_MDL_PRIORPROD_DEA07_01198346,
https://www.industrydocuments.ucsf.edu/opioids/docs/#id=nyvf0232.

[372] Rannazzisi deposition, vol. 1, p. 41 (testified); McGreal, *American Overdose*, 205-206.

avoid filling all suspicious orders. He listed circumstances that were red flags for diversion. He reminded distributors that their vigilance in recognizing which customers could be trusted to avoid unlawful sales was essential if the CSA's closed system was to function as Congress envisioned. A single distributor whose actions facilitated diversion could cause enormous harm. "As each of you is undoubtedly aware," he wrote on February 7, "the abuse (nonmedical use) of controlled prescription drugs is a serious and growing health problem in this country."[373]

Part of the problem, as Rannazzisi explained in Senate testimony later that year, was that teenagers thought prescription painkillers, readily obtained from family medicine cabinets, friends, and internet outlets, bore little stigma and less risk. (A Dayton high school counselor, interviewed by an Ohio drug researcher, made the same point: "Oh, the pills, that's huge. They don't even know what they're taking…and don't seem to be concerned about it.") The truth, Rannazzisi said, was that the pills were highly dangerous, potentially lethal, and too often diverted through online pharmacies—a point of emphasis for the DEA's Internet Distributor Initiative, which he had launched the previous year.[374]

---

[373] Rannazzisi letters of September 27, 2006, CAH_MDL_PRIORPROD_DEA07_00837645, and February 7, 2007, CAH_MDL_PRIORPROD_DEA07_00866702.

[374] Rannazzisi testimony before the Senate Judiciary Committee, May 16, 2007, https://www.judiciary.senate.gov/imo/media/doc/rannazzisi_testimony_05_16_07.pdf; Ohio Prescription Drug Abuse Task Force, *Final Report*, October 1, 2010, p. 19 (school counselor). In the 1990s, a Muncie, Indiana, resident told Quinones, youthful misbehavior meant drinking. "That was it. Nobody had no crack, no heroin, no meth. We were scared to death to ever touch anything like that." Then came prescription pain pills. "Doctor wasn't prescribing you crack, so it wasn't that big a deal. It's a *pain* pill. It was something that someone who's supposed to help you gives you." No one imagined that they would sell their clothes to chase the pill high, or eventually end up using heroin. "And that's what happened. I have at least ten friends who died—guys that I went to school with who lived near here." Quinones, *The Least of Us*, 125, italics in the original.

On December 27, 2007, Rannazzisi wrote a third letter, this time to both manufacturers and distributors. He reminded them that they were to report suspicious orders immediately upon discovery and to follow up with their own independent analysis of whether diversion was likely prior to completing the sales. After-the-fact reports of "excessive" or "high unit" purchases to the DEA Division Office absolved no registrant of responsibility if they knew, or should have known, that diversion was occurring.[375]

In 2007 and 2008 Rannazzisi moved on to legal sanctions. The DEA brought enforcement actions against ABC, Cardinal, and McKesson. In April 2007 the DEA suspended ABC's Orlando facility's license to distribute controlled substances, principally for its failure to monitor suspicious shipments of hydrocodone to retail internet pharmacies. The facility was permitted to reopen in August 2007 after ABC agreed to implement more sophisticated and rigorous monitoring programs in all its distribution centers—the same programs that Cardinal's Reardon called "complex and onerous" and "not customer friendly."[376]

Cardinal, whose executives had met with DEA officials on August 22, 2005, and who were also warned about the internet hydrocodone diversion issue, was investigated for continuing to fill "thousands of suspicious orders placed by pharmacies participating in illicit Internet schemes." The DEA's Acting Administrator, Michele Leonhart, announced that the

---

[375] Rannazzisi letter of December 27, 2007, CAH_ MDL_PRIORPROD_DEA07_01053067.

[376] Scott Higham and Lenny Bernstein, "The Drug Industry's Triumph over the DEA," *Washington Post*, October 15, 2017 (Rannazzisi); "AmerisourceBergen Signs Agreement with DEA…,"June 22, 2007, https://www.sec.gov/Archives/edgar/data/1140859/000119312507141013/dex991.htm; Steve Reardon, email, September 14, 2007, CAH_MDL_PRIORPROD_DEA07_01198345, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=nyvf0232.

DEA had made "repeated attempts to educate Cardinal Health on diversion awareness and prevention," but that the company had nonetheless "engaged in a pattern of failing to report blatantly suspicious orders for controlled substances filled by its distribution facilities located throughout the United States. Cardinal's conduct, she said, had "contributed to our nation's serious pharmaceutical abuse problem." In October 2008 Cardinal agreed to pay $34 million in civil fines to settle the case.[377]

McKesson had by then settled a similar case. After receiving its DEA talking-to on September 1, 2005, McKesson was investigated for continuing to fill, and failing to report, suspicious orders from internet pharmacies as well as unusually large orders from brick-and-mortar pharmacies and clinics. In May 2008 the company paid a $13.25 million fine.[378]

Rannazzisi thought this and other fines small in comparison to the profits earned and harm done. He nonetheless hoped that the Big Three defendants, all of whom had signed memoranda of understanding to improve their compliance with CSA regulations, had finally gotten the message.[379]

---

[377] United States Attorney's Office, Colorado, "Cardinal Health Inc., Agrees to Pay $34 Million to Settle Claims that It Failed to Report Suspicious Sales of Widely-Abused Controlled Substances," October 2, 2008, https://www.justice.gov/archive/usao/co/news/2008/October08/10_2_08.html.

[378] DOJ, "McKesson Corporation Agrees to Pay More than $13 Million to Settle Claims that It Failed to Report Suspicious Sales of Prescription Medications," May 2, 2008, https://www.justice.gov/archive/opa/pr/2008/May/08-opa-374.html.

[379] McGreal, *American Overdose*, 206-207.

They had not. This became obvious as the diversion problem shifted, later in the decade, from internet pharmacies to rogue pharmacies and pill mills. Doctors who owned or worked for pill mills provided opioids with minimal diagnostic testing and follow-up. Pill-mill prescribing fed inter- as well as intrastate opioid trafficking. From 2008 until 2010 Lake Medical, a seedy Los Angeles clinic, provided traffickers with prescriptions for more than a million OxyContin tablets. Couriers drove the pills over 1,000 miles to Everett, Washington. Elsewhere pain patients traveled to distant pill mills and then resold a portion of their opioids when they returned home, creating a "mushroom" effect of increased opioid abuse, addiction, and overdose in communities that could spread across several states. Rannazzisi noticed pain clinics popping up overnight off interstate exit ramps. He said that he had never seen anything like Florida's pain-pill bazaar, not even during the crack epidemic. The distributors' indifference, though, felt familiar. "It was the same thing over again…," he told McGreal. "[T]hey just kept shipping them."[380]

And, in at least one instance, laughing about it. In 2011 ABC diversion-control employees circulated, by way of a "Saw This and Had to Share It …" email with a smiley-face emoticon, a parody of the "Beverly Hillbillies" theme song that mocked addicted out-of-state patrons of Florida's pill mills. "Well the first thing you know ol' Jed's a drivin South / Kinfolk said Jed don't put too many in your mouth / Said Sunny Florida is the place you ought to be / So

---

[380] Los Angeles to Everett: Harriet Ryan, Lisa Giron, and Scott Glover, "More than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew," *Los Angeles Times*, July 10, 2016, https://www.latimes.com/projects/la-me-oxycontin-part2/, and Harriet Ryan, Scott Glover, and Lisa Giron, "How Black-Market OxyContin Spurred a Town's Descent into Crime, Addiction, and Heartbreak," *Los Angeles Times*, July 10, 2016, https://www.latimes.com/projects/la-me-oxycontin-everett/. Elsewhere: Temple, *American Pain*, "mushroom" p. 239; "Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress," CBS News, *60 Minutes*, October 15, 2017, https://www.cbsnews.com/news/ex-dea-agent-opioid-crisis-fueled-by-drug-industry-and-congress/; McGreal, *American Overdose*, 207.

they loaded up the truck and drove speedily / South, that is. Pain Clinics, cash 'n carry. A Bevy of Pillbillies!" ABC has represented the email as "simply a demonstration of the fact that part of AmerisourceBergen's comprehensive monitoring program includes tracking for potential illegal activity and prescription drug diversion trends via the internet." If so, in 2011 internet monitoring would have found detailed accounts of diversion and interstate trafficking from Florida clinics at such locations as the *Wall Street Journal*'s website. There was no need to parse doggerel. By 2011 widespread prescription-opioid diversion from high-volume pain clinics was as much a matter of public record as the news that long-term opioid analgesia for CNP posed significant risks of addiction, overdose, and death.[381]

Congressional investigators reached the same conclusion: McKesson, ABC, and Cardinal knew what was happening, but continued to ship opioids in bulk to suspicious retailers. Between 2012 and 2017 the three firms shipped to Missouri, a state with a known and significant diversion problem, 1.6 billion dosage units of prescriptions opioids. That was roughly 50 pills per year for every Missouri resident. Between 2007 and 2012 the Big Three accounted for 510

---

[381] Julie Eddy email chain, April 22, 2011, ABDCMDL00569571; Meryl Kornfield, "Drug Distributor Employees emailed a Parody Song about 'Pillbillies,' Documents Show," *Washington Post*, May 23, 2020, https://www.washingtonpost.com/national/drug-distributor-employees-emailed-a-parody-song-about-pillbillies-documents-show/2020/05/23/823f148e-9cf4-11ea-a2b3-5c3f2d1586df_story.html; Arian Campos-Flores, "Fighting Over a Fix for Florida 'Pill Mills,'" *Wall Street Journal*, February 19, 2011, https://www.wsj.com/articles/SB10001424052748703961104576148753447131080.

A 2012 Google alert and other sources, including a remark from the DEA, notified McKesson executives that, as oxycodone sales were finally declining in Florida, opioid addicts in such states as Ohio and Kentucky were "moving to heroin and Meth." "Good," responded Tracy Jonas, McKesson's director of regulatory processes, "let them move to heroin and meth … we don't have to monitor that …" Dave Gustin, director of regulatory affairs for the company's North Central region, replied "I was thinking that but didn't want to verbalize it………….." [sic]. David Gustin, email chain, February 2, 2012, MCKMDL01476376, all ellipses thus.

million of the more than 700 million opioid pills shipped to West Virginia, the epicenter of the prescription-opioid epidemic. Between 2006 and 2016, Kermit and Williamson, West Virginia—two towns with three drug stores between them—received 37.5 million hydrocodone and oxycodone pills. Rep. Diana DeGette (D-CO) found the distributors' foreknowledge of the consequences of oversupply as troubling as the amounts involved. In 2018 House hearings she made the point chronologically:

> In 2007, CDC reported that drug overdose deaths nationwide increased by 276 percent between 1999 and 2014, and in West Virginia, drug overdose deaths were up by 550 percent.

> A well-publicized 2008 *JAMA* study specifically implicated prescription opioids in the rise of overdose deaths.

> In 2010, the *New England Journal of Medicine* article, "A Flood of Opioids, a Rising Tide of Deaths," showed that the prescription opioids [sic] death toll continued to rise, particularly in West Virginia.

> In 2011, the *Charleston Gazette* published a major story describing how residents began calling the town of Williamson, quote, "Pilliamson," because so many opioids had flooded that town.

> And this is just a small sampling of the articles that highlighted the rise of this epidemic.

So yet, even as this information was coming out, it appears that, over 3 years, distributors sent more than 11 million pills to one pharmacy in a town of 400 and more than 12 million total pills to two pharmacies in a town of 3,000. I mean, come on.

Those four words, "I mean, come on," go to the question at the heart of distributor conduct during the height of the prescription-opioid addiction epidemic. With overdose deaths rising, the media clambering, and executives signing memoranda of understanding to establish compliance programs, large distributors persisted in making large shipments to suspicious customers. This was true of the Big Three as well as national pharmacies that handled their own distribution— and whose own clashes with law enforcement officials are reviewed later in the report.[382]

DEA officials have described distributors' persistent misconduct as a profit-driven calculation. "Why would you want to cut off a customer that's paying you $2 million a year?" said former DEA supervisor Frank Younker. "They have sales reps and sales quotas and bonus structures and employees of the month. Everyone was making a lot of money." Rannazzisi chose

---

[382] Missouri: U.S. Senate Homeland Security and Governmental Affairs Committee, Ranking Minority Member's Office, *Fueling an Epidemic*, report 3, pp. 1, https://www.hsgac.senate.gov/imo/media/doc/REPORT-Fueling%20an%20Epidemic-A%20Flood%20of%201.6%20Billion%20Doses%20of%20Opioids%20into%20Missouri%20and%20the%20Need%20for%20Stronger%20DEA%20Enforcement.pdf. West Virginia data, DeGette comments are in U.S. House of Representatives, Subcommittee on Oversight and Investigations, "Combatting the Opioid Epidemic: Examining Concerns about Distribution and Diversion, Tuesday, May 8, 2018" (preliminary TS transcription, 2018), 4, 8-9, https://docs.house.gov/meetings/IF/IF02/20180508/108260/HHRG-115-IF02-Transcript-20180508.pdf.

the same words, "a lot of money," to explain why corporate distributors "didn't want to change their way of doing business."[383]

Yet business as usual entailed risks: more enforcement actions, more civil settlements, and more bad publicity. All three hit the industry during the 2010s. In June 2013 Walgreens, which owned and staffed its own distribution centers, paid $80 million in civil penalties for ongoing failures to detect and report suspicious orders and agreed to surrender, for two years, its ability to distribute or dispense Schedule II controlled substances. In December 2016 Cardinal paid another $44 million in fines for similar failings, McKesson $150 million in January 2017.[384]

A key regulatory problem, from the industry's point of view, was the DEA's power to issue orders to show cause (OTSC), which required registrants to show why their registrations should not be revoked or suspended, given the evidence of CSA violations the DEA had assembled against them. The accused had at least thirty days to respond unless the DEA Administrator declared its actions an imminent danger to public health or safety, in which case the revocation or suspension took effect immediately. The last action, an immediate suspension order (ISO), was the agency's most powerful diversion-control measure. In November 2007 the

---

[383] "Bernstein and Higham, "Investigation: The DEA Slowed Enforcement" (Younker); McGreal, *American Overdose*, 208 (Rannazzisi).

[384] Settlements: U.S. Attorney's Office, Southern District of Florida, "Walgreens Agrees to Pay;" U.S. Attorney's Office, District of Maryland, "Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act," December 23, 2016, https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act; DOJ, Office of Public Affairs, "McKesson Agrees to Pay Record $150 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs," January 17, 2017, https://www.justice.gov/opa/pr/mckesson-agrees-pay-record-150-million-settlement-failure-report-suspicious-orders.

DEA had issued an ISO against Cardinal's Auburn, Washington, distribution center. Cardinal received another ISO in February 2012, when the DEA issued one against its Lakeland, Florida, distribution center. Cardinal initially fought the action in court, but in May agreed to suspend shipments of controlled substances from the Lakeland facility for two years.[385]

Between 2006 and 2015, the Big Three distributors came to regard the DEA's Diversion Control Division as a once-quiescent watchdog that had begun, on occasion, to bite hard. Cardinal's Lakeland capitulation was one such bite, and it provided collective incentive to seek legislative changes on Capitol Hill. "It was one thing for the feds to cut off a few doctors and pharmacies," as McGreal put it. "It was another for the DEA to have the power to unilaterally shut down deliveries by some of the country's biggest corporations to entire states and regions. If the agency couldn't be reined in by pulling strings inside the Justice Department, then the distributors would have to work on Congress."[386]

The distributors' primary vehicle for Congressional action was the HDMA, whose executive committee was dominated by the Big Three. From 2006 to 2012, the Big Three distributed 44 percent of the most commonly abused prescription opioids, hydrocodone and oxycodone; by 2016 they distributed nearly 90 percent of all prescription opioids. The HDMA advocated on behalf of the industry through congressional testimony, legislative endorsements,

---

[385] DEA Diversion Control Division, 21 CFR §§ 1301.36 and 1301.37, DEA Diversion Control Website, https://www.ecfr.gov/current/title-21/chapter-II/part-1301/subject-group-ECFR3b1489fb21ea6df. Auburn: "DEA Suspends Seattle Branch of Cardinal Health Drug Company." Lakeland: "Cardinal Facility Suspended Under DEA Settlement," Reuters news wire, May 15, 2012, https://www.reuters.com/article/us-cardinalhealth/cardinal-facility-suspended-under-dea-settlement-idUSBRE84E0VR20120515.

[386] McGreal, *American Overdose*, 213.

"a political action committee to raise funds for political causes bearing on the industry," and a "Legislative Education Fund" to cover its lobbying costs.[387]

The HDMA initially tried non-legislative tactics. One was to frame, in 2008, detailed "industry compliance guidelines" on reporting suspicious orders. The guidelines stated that distributors shared, with manufacturers, pharmacies, and healthcare providers, "a mission and responsibility to continuously monitor, protect and enhance the safety and security" of the drug-control system against increasingly sophisticated attacks; being "at the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers." Should their (preferably automated) monitoring systems flag an order, the distributors "*should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest*." Better still if questionable orders never arrived. The guidelines emphasized the concept of "know your customer," HDMA president John Gray told Congress in March 2012. That meant "obtaining and reviewing thorough background information about a perspective healthcare

---

[387] Douglas MacMillan and Kevin Schaul, "Drug Companies Seek Billion-Dollar Tax Deductions from Opioid Settlement," *Washington Post*, February 12, 2021, https://www.washingtonpost.com/business/2021/02/12/opioid-settlement-tax-refund/?arc404=true (44 percent); John M. Gray deposition, June 30, 2020, *Cabell County Commission and City of Huntington, West Virginia* v. *AmerisourceBergen Drug Corporation et al.,* pp. 22-41 (executive committee; Big Three dominance; 90 percent statistic on p. 23), and "When Issues are Debated, HDMA is Industry Advocate," *Dow Jones Factiva* (October 2006), (quotations).

provider prior to doing business with them." Thus problems could often be avoided "even before an order is placed."[388]

The HDMA industry compliance guidelines backfired when the DEA used them as evidence in the Florida Walgreens case that the company knew or should have known what to do about suspicious orders filled from its own distribution center. The implication that the guidelines entailed an enforceable "industry standard" was sufficiently alarming that, in 2013, the HDMA government policy council had them removed from the association's website, to be replaced by a statement "to the effect that the industry is very committed to compliance, but that practices have evolved since 2008."[389]

---

[388] "Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" (2008), HDS_MDL_0021851, HDS_MDL_00218659 ("mission," "center," "*not ship*," emphasis in original); Statement of John M. Gray, "Prescription Drug Diversion," hearing of the House Committee on Energy and Commerce, March 1, 2012, 105. In the same hearing Rannazzisi agreed that distributors should know their controlled-substance customers, and testified that they were in a better position to do so than the DEA. The problem was that "I don't believe that the distributors and the wholesalers are actually looking at their customers as closely as they should." Rannazzisi also stated that manufacturers and distributors had the duty, not only to report, but to suspend suspicious orders until the suspicions were resolved. "It is important to note that even if a registrant establishes a reliable suspicious order monitoring system, if the registrant ignores the system or fails to follow the procedures outlined by the system, the system is not an effective control against diversion." "Prescription Drug Diversion," 93, 201.

[389] Patrick Kelly deposition transcript, May 10, 2019, *In Re: National Prescription Opiate Litigation*, pp. 295-303. "Industry standard" is from Kelly exhibit 31, "Chronology of HDMA/HDA Executive Committee and Board of Directors' Drug Abuse and Diversion Discussions at Meetings/Conference Calls" (TS, January 2, 2018), p. 7, HDA_MDL_000155936. "Very committed" is from Kelly exhibit 32, Anita Ducca email, September 27, 2013, HDA_MDL_00081415. Scott Higham, Sari Horwitz, Steven Rich, and Meryl Kornfield, "Inside the Drug Industry's Plan to Defeat the DEA," *Washington Post*, September 13, 2019, https://www.washingtonpost.com/graphics/2019/investigations/drug-industry-plan-to-defeat-dea/, describe the background of the compliance guidelines and other HDMA tactics.

In the early 2010s the DEA did not believe the industry to be "very committed to compliance." On December 19, 2011, four HDMA officials met with six DEA officials including Gary Boggs, Rannazzisi's executive assistant. According to the HDMA meeting summary, Boggs "stated that DEA's single greatest concern was their belief that wholesale distributors were lax in analysis, review and acting on their own ARCOS [Automation of Reports and Consolidated Orders System] data. He stated that sometimes the data were 'pretty egregious.' He went on to explain that the agency had not seen changes in registrants' behavior that it expected after presenting its analysis of ARCOS data to them "so we have upped our game"—that is, increased their investigative efforts. The DEA officials "stressed this point repeatedly through the meeting. They seemed frustrated and stated this was occurring even among wholesale distributors that had been in the DEA Suspicious Orders (SO) educational meetings, and even among those who had SO monitoring programs. Their belief is that if the wholesale distributors were to look at their own data, problem customers would be very evident."[390]

By April 2012 HDMA executives were sufficiently alarmed by the DEA's intensified enforcement that they sought outside legal advice. Williams & Connolly attorneys Robert Barnett and Richard Cooper told them that the immediate prospect of favorable Congressional legislation was dim and advised "that we may be better off averting DEA actions by taking even stronger compliance measures." The HDMA could, for example, create a combined product-order data base to provide its members with more timely and complete information about their purchasers. However, rather than take such a concrete remedial step, judged to be potentially

---

[390] "Summary of DEA-HDMA Meeting" (TS, December 19, 2011), ABDCMDL00139028-ABDCMDL00139031, all quotations from pp. 1-2.

"very expensive," the HDMA board opted instead to hire a public relations firm to help explain how it was handling the issue.[391]

The firm they chose was APCO, a multinational crisis communications company previously employed by such clients as tobacco giant Philip Morris. In April 2013 APCO completed its *HDMA Crisis Playbook: An Interactive Guide to Crisis Communications*, a collection of industry-promoting and blame-shifting talking points. APCO's plan, explained John Gray, provided a "cross-functional task force that has the authority to act quickly and decisively in response to critical reputational and crisis issues." It enabled HDMA and its individual corporate members to manage "High Risk Scenarios" involving diversion and supply-chain security issues.[392]

The risk was to reputation and profit. Should, hypothetically, the DEA suspend the registration of an HDMA member's distribution center for fulfilling an unusually large number of opioid prescriptions for several pharmacies, the crisis might present opportunities to "proactively push its message of misdirected DEA enforcement with national media," to "proactively inform relevant members of Congress about the action to head off greater criticism," and to approach policymakers and advocacy groups to "proactively engage to tell our side of the story and reassure that the industry is fulling obligations in a responsible manner." The press statement should declare the industry's commitment to "working collaboratively to

---

[391] John Gray email and attachment, April 20, 2012, HDA_MDL_000215234-HDA_MDL_000215236 ("better off," "very expensive"); "Minutes of the HDMA Annual Board and Membership Meeting" (TS, October 1, 2012), HDA_MDL_000088241-42 (APCO hire); and Gray deposition, June 30, 2020, pp. 51-79.

[392] Higham and Horwitz, *American Cartel*, chap. 17; John Gray email, April 25, 2013, and playbook attachment, CAH_MDL2804_02546747- CAH_MDL2804_02546791.

address the serious national epidemic of prescription drug abuse and to being part of the solution" while maintaining "a safe and sufficient supply for patients in need while keeping prescription drugs out of the hands of individuals who will abuse them." That spring Gray had used virtually identical words to reassure readers of the *Wall Street Journal* about the industry's commitment to safety, security, and diversion prevention. The HDMA's 2013 website similarly pledged "working collaboratively" to end a U.S. epidemic that, it acknowledged, killed by overdose one person every nineteen minutes, with the three quarters of the deaths "caused by the use of prescription painkillers."[393]

Should such crisis-framing prove insufficient, APCO provided HDMA with a primer on "tough Q&A." If asked whether the industry had a profit motive for ignoring signs of diversion, the answer was "No." The industry's "best interest" was served by supply-chain security. If asked whether, in light of repeated DEA actions, the public should be alarmed by an industry-wide problem, the response was that "[o]ur members follow rigorous statutory and regulatory requirements to detect and prevent diversion."[394]

---

[393] Ibid., CAH_MDL2804_02546772. John Gray, "This is No Way to Fight Drug Abuse," *Wall Street Journal*, March 7, 2013, https://www.wsj.com/articles/SB10001424127887324582804578344124218057476, Fighting an Epidemic: Combating Prescription Drug Abuse and Diversion Fact Sheet (2012), HDA_MDL _000087759.

[394] *HDMA Playbook*, CAH_MDL2804_02546773. The *Playbook* further recommended that, in this crisis situation, the HDMA should cite its industry compliance guidelines for diversion prevention and reporting suspicious orders "as part of our industry's ongoing commitment to the safe and efficient distribution of prescription medications." This particular piece of advice was short-lived. Within months of the *Playbook*'s release the government policy committee, alarmed that the DEA was actually citing the guidelines as an industry standard in legal documents, withdrew them from its website, as noted above.

These reassurances ran counter to the DEA enforcement actions that eventuated in suspensions and fines and to subsequent findings by the U.S. House Energy and Commerce Committee's investigation of distributor conduct in West Virginia. One of the distributors in question, McKesson, did not send the DEA a single suspicious order report for a West Virginia pharmacy between 2006 and 2012, despite having shipped more than 162 million doses of oxycodone and hydrocodone to the state during those years and despite—this from the congressional report—"the plain and unambiguous text of the regulation which requires distributors to report suspicious orders when they are discovered." As for the working collaboratively to resolve the crisis, in 2012 the HDMA decided to cancel expert studies by the RAND Corporation and the Partnership for a Drug-Free America aimed at finding actual solutions to widespread prescription-opioid diversion and addiction. The deal-breaker in the former instance was Gray's reluctance to proceed without assurance that the HDMA could halt publication of RAND's report if its findings were "unfavorable to our purposes." In the latter instance, the Partnership for a Drug-Free America, the executive committee voted to give the $200,000 appropriated for the study to the APCO public relations firm instead.[395]

---

[395] John Gray deposition, June 30, 2020, pp. 126-127 (no reports, 162 million), 130-155 (Rand, Partnership for a Drug-Free America, APCO); *Red Flags and Warning Signs Ignored,* 240 ("plain and unambiguous"); John Gray to Paul Julian, email, June 24, 2013, HDA_MDL_000087598 ("unfavorable"). "DRAFT Options for Controlled Substance Regulatory and Related Activity" (TS, September 6, 2012), CAH_MDL2804_01530082, and Thomas Prevoznik deposition, May 17, 2019, *In re: National Opiate Litigation*, vol. III, pp. 959-961, provide additional evidence for the HDMA's preference for "optics" and public relations over substantive remedies. This preference and the RAND episode are described further in Higham and Horwitz, *American Cartel*, chap. 49.

    The HDMA's decision to manage appearances rather than to help resolve the problem exemplifies a larger pattern—that what Purdue started, others extended. In 2001 Purdue hired Nichols Dezenhall, the self-described "leader in crisis management and high-stakes communications," to develop media outlets and commentators who would broadcast the "anti-story" of user accountability. Michael Friedman made sure that the Sackler family and Purdue

In June 2013, shortly after receiving its crisis playbook, the HDMA also began its congressional effort to rein in the DEA. The HDMA, its legal advisors, and other pharmaceutical stakeholders worked with Representatives Tom Marino (R-PA) and Marsha Blackburn (R-TN) to draft legislation, introduced on February 14, 2014, as the Ensuring Patient Access and Effective Drug Enforcement Act. Commonly referred to as the Marino bill, the proposed legislation narrowly defined two CSA phrases in a way that would make it more difficult for the DEA to issue an ISO. "Consistent with public health and safety" would mean "having a substantial relationship to this Act's purpose of preventing diversion and abuse of controlled substances." "Imminent danger" would become "a significant and present risk of death or serious bodily harm that is more likely than not to occur in absence of an immediate suspension order." The Attorney General would be required to cite specific violations of the law before revoking or suspending registrations and to give accused registrants opportunities to submit corrective action plans that, if deemed satisfactory, would terminate or defer legal proceedings. Drug regulators, including the DEA, would be required to join a presidentially appointed working group with representatives from patient advocacy, pharmaceutical, and medical organizations. The group would report to Congress on anti-diversion efforts and how they affected such matters as legitimate medical access to Schedule II and III drugs. Wanting "to ensure the bill was not totally

---

executives were kept apprised of "the important media successes" of "our new agency." Purdue continued to pay the firm, which specialized in pugnacious debunking, until its bankruptcy in September 2019, at which time Dezenhall joined the line of Purdue's creditors. Eric Dezenhall to Michael Friedman, August 3, 2001, PDD17063502 ("leader," "anti-story"); Michael Friedman to Beverly Sackler et al., email forwarded by Ron Levine, August 9, 2001, PDD1706067353 ("important," "new"); David Armstrong, "How Purdue Planted Its 'Anti-Story' and Delayed the Reckoning for Its Role in the Opioid Epidemic," STAT, November 19, 2019, https://www.statnews.com/2019/11/19/how-purdue-pharma-planted-its-anti-story/; Keefe, *Empire of Pain*, 251.

one-sided against DEA," Marino inserted a provision to require background checks and drug tests for registrants' employees. However, some Democratic representatives expressed reservations that the provision would be "out of step" with state marijuana liberalization. Opioid manufacturers voiced discomfort "with a federal mandate . . . punishable by civil, monetary penalties." In May 2014 the placatory section disappeared from the bill, which reverted to its "totally one-sided" form.[396]

On April 7, 2014, John Gray testified to Congress that the bill represented a serious industry effort to "foster greater collaboration, communication, and transparency between industry stakeholders and regulators, especially the DEA" in common cause against prescription drug abuse. Two weeks before he had told the HDMA executive committee a different story. The DEA "adamantly opposed" the bill and was "very concerned with this legislation 'tying the agency's hands' to actively and aggressively address diversion and compliance with the CSA. Essentially the DEA is categorically opposed to the provisions in the legislation to mandate definitions of 'imminent danger' and 'consistent with public health and safety,' implement

---

[396] Higham et al., "Inside the Drug Industry's Plan to Defeat the DEA." Bill summary and definitions: HDMA, "The Ensuring Patient Access and Effective Drug Enforcement Act" (n.d, attachment to February 21, 2014, email), HDA_MDL_000080489, HDA_MDL_000080492-HDA_MDL_000080493. "One-sided" and "reservations": Patrick Kelly to Connie Woodburn, email with attached report by John Gray, "Status of Marino-Blackburn Legislation (H.R. 4069)," March 24, 2014, CAH_MDL2804_01108232-CAH_MDL2804_01108235, quotations at CAH_MDL2804_01108233 and CAH_MDL2804_01108234. Dropped: H.R. 4709, version of May 21, 2014, CAH_MDL2804_01388618- CAH_MDL2804_01388623, and Jewelyn Cosgrove email distributing Kristen LaRose Freitas update, May 22, 2014, HDA_MDL_000106163.

corrective action plans, and force the agency to participate in a stakeholder working group. They are aware that HDMA is a supporter of the legislation."[397]

HDMA support included hiring an outside lobbying firm to provide questions for representatives to pose to the DEA during hearings, e.g., "What are you doing to help well-intentioned registrants to determine who they can do business with?" (As if *Direct Sales* had never been decided, or that customer vetting was the DEA's statutory responsibility, or that Rannazzisi, to whom Rep. Blackburn posed the question, had not initiated anti-diversion education for distributors in 2005.) The HDMA's efforts were not, however, enough to get the House-passed bill through the Senate, owing to DOJ and DEA opposition.[398]

The battle did have one lasting consequence. In September 2014, co-sponsors Marino and Blackburn complained to the Justice Department Inspector General that Rannazzisi had attempted "to intimidate the United States Congress" by saying, in a July 2 conference call with committee staff, the proposed legislation would be "supporting criminals." Though the charge was never substantiated, it was a blow to Rannazzisi. So was the May 2015 appointment of a new DEA acting Administrator, Chuck Rosenberg, who preferred a less confrontational

---

[397] "Statement from John M. Gray…for the U.S. House of Representatives Energy and Commerce Committee Subcommittee on Health" (TS, April 7, 2014), ABC-MSAGC00000325; Gray, "Status of Marino-Blackburn Legislation," CAH_MDL2804_01108234 and CAH_MDL2804_01108235.

[398] Higham et al., "Inside the Drug Industry's Plan to Defeat the DEA."

approach to the industry and wished to mend fences with Congress. Rannazzisi was replaced in

August 2015. He retired from the DEA that October.[399]

The HDMA had meanwhile revised its "communications strategy" for West Virginia,

where pill-crisis headlines portended more legal and political trouble. Tactics included

"seek[ing] third parties to tell the untold story" and "WVA media outreach by HDMA (editorial

boards, op-eds, letters to the editor, etc.)." A key message was that "[p]inning the responsibility

solely on distributors is blaming the messenger." Another emphasis was "a stronger, more visible

role with the media in the passage of S. 483"—the Marino-Blackburn bill, whose passage was

thought imperiled by the particularly adverse West Virginia publicity.[400]

In 2015 the HDMA also resumed its national legislative campaign. It marshalled the

support of the members of Pain Care Forum (PCF) and other patient advocacy groups—twenty-

six organizations altogether, ranging alphabetically from the Alliance for Patient Access to the

Virginia Fibromyalgia and Chronic Pain Support Group. The PCF, described in 2016 as a

coalition of opioid manufacturers and industry-backed fronts that "blanketed Washington with

messages touting prescription painkillers' vital role in the lives of millions of Americans,

creating an echo chamber that has quietly derailed efforts to curb U.S. consumption of the

---

[399] Jackie Kucinich, "Two House Republicans Accuse DEA Official of Intimidation," *Washington Post*, September 29, 2014, https://www.washingtonpost.com/blogs/in-the-loop/wp/2014/09/29/two-house-republicans-accuse-dea-official-of-intimidation/; Higham and Bernstein, "The Drug Industry's Triumph Over the DEA;" Bernstein and Higham, "Investigation: The DEA Slowed Enforcement;" Higham and Horwitz, *American Cartel*, chaps. 24, 26.

[400] "Turning the Tide in WVA: HDMA Communications Strategy Revised: June 19, 2015" (slide deck, 2015), ABDCMDL00269301.pptx, quotations slides 8-10.

drugs," included distributors and their trade organizations. The HDMA joined in 2008 and began briefing the PCF on its regulatory and legislative concerns. Now, in 2015, it was rallying its PCF opioid allies.[401]

The HDMA also made use of representatives and senators it cultivated, particularly Senator Orrin Hatch (R-UT), who sponsored the bill in the Senate and assisted in negotiations with DOJ and DEA over the new clause defining imminent danger. This was reworded to apply only to registrants whose failures to comply with their CSA obligations presented "a substantial

---

[401] Jewelyn Cosgrove to Burt Rosen, email and attached support letter, March 5, 2015, HDA_MDL_000081651-HDA_000081654 (PCF, 26 groups); Mathew Perrone and Ben Wieder, "Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic," Center for Public Integrity, September 19, 2016, https://publicintegrity.org/politics/state-politics/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic/ ("blanketed"); Patrick Kelly deposition transcript, 225-227 (joined, briefed PCF). Individual distributors such as McKesson, which signed up in February 2016, could also join the PCF and make "voluntary contributions." McKesson's was $2,000. Burt Rosen to Pete Slone, email, February 11, 2016, PPLPC020000993284, and Pete Slone to Burt Rosen, February 11, 2016, PPLPC020000993284.

A July 2009 PCF Media Committee conference call illustrates the organization's composition, objectives, methods, and priorities. The conferees included two representatives from AAPM; one from the Center to Advance Palliative Care; one from APF; one from Pain Treatment Topics, a publication and website supported by Mallinckrodt; and one each from Purdue and Cephalon. The collective concern was to address, through media outreach, the FDA's interest in developing Risk Evaluation and Mitigation Strategies (REMS) intended to lower the chances of prescription-opioid diversion, abuse, addiction, and overdose. The minutes report that the "concept that the abuse and diversion problem should not, and could not, be solved on the backs of people with pain was broadly supported as a key message." Consensus was also developing that the campaign "should be driven by the not-for-profit community, potentially with multiple industry sponsors" and with help from in-house industry PR staff. However, some conferees balked at "pain kills" as a name for the campaign. "Concerns were raised that this could be misinterpreted to suggest pain medications are associated with deaths." In fact, there were at least 13,500 deaths attributable to prescription-opioid overdoses in 2009 alone. Pain Care Forum Media Committee, draft minutes, July 17, 2009, PPLP004051807- PPLP004051808 (quotations); "Pain-Topics.org Addresses Oxycodone Safety Concerns," Pain Treatment Topics, press release, June 12, 2007, https://www.pr.com/press-release/41743 (Mallinckrodt); Puja Seth et al., "Quantifying the Epidemic of Prescription Opioid Overdose Deaths," *American Journal of Public Health* 108 (2018): 500-502, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5844400/ (2009 deaths).

likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registrant." The DEA still did not want the bill but accepted the language as "a less bad option," according to an unnamed DOJ official interviewed by the *Washington Post*. For whatever reason (Rosenberg's desire for rapprochement was another obvious possibility, though one about which he declined to be interviewed), the DEA and DOJ did not formally object to the legislation, and the bill passed the Senate by unanimous consent on March 17, 2016. President Barack Obama signed it into law on April 19.[402]

Rannazzisi, who had gone from supervising 600 people to supervising no one, said he could not understand why Congress would strip the DEA of its authority at the height of an opioid epidemic. Asked by *60 Minutes* correspondent Bill Whitaker why it happened, he said, "Because I think that the drug industry—the manufacturers, wholesalers, distributors, and chain drugstores—have an influence over Congress that has never been seen before. And these people came in with their influence and their money and got a whole statute changed because they didn't like it."[403]

Rannazzisi's *60 Minutes* story, which aired on October 15, 2017, and which was accompanied by extensive reporting in the *Washington Post*, brought renewed attention to both the prescription-opioid crisis and the HDMA's role in passing the Marino bill. Joseph Ganley, Vice President of Regulatory and Government Affairs at McKesson, prepared distributor

---

[402] Higham et al., "Inside the Drug Industry's Plan to Defeat the DEA;"130 Stat. 354, Public Law 113-115, April 19, 2016, https://www.congress.gov/114/plaws/publ145/PLAW-114publ145.pdf.

[403] "Ex-DEA Agent," *60 Minutes*.

damage-control talking points before the Senate Judiciary Committee held hearings on the matter in December 2017. He framed Rannazzisi's whistle-blowing as a "sour-grapes campaign through the media to smear the members of this committee, and indeed the entire Congress and President Obama." As for the large shipments of pain pills, that was just filling orders. Manufacturers made the pills under quotas set by the DEA. Registered pharmacists ordered them because registered physicians prescribed them. "The real question is not why were 768 million pills shipped to West Virginia, the real question is why were 768 million pills prescribed in West Virginia?" Should issues of consultation and lobbying arise, Ganley thought the HDMA's "input" and "strong support" of the Marino bill should be acknowledged. But its aim was not adversarial. "To combat the opioid epidemic effectively we need better closer [sic] collaboration between the DEA and industry than was the case prior to 2015."[404]

John Gilbert, Jr., a former DEA attorney acting as outside counsel to the HDMA, came closer to the stating HDMA's true motives and achievements. In an April 28, 2016, report, which John Gray described and circulated widely as "a useful outline of the important areas of the new law," Gilbert made it clear that the point had been to limit the DEA's OTSC and ISO enforcement actions. The Corrective Action provision "essentially forces the DEA to consider whether a corrective action plan can adequately address the Agency's concerns short of a revocation of the DEA registration," Gilbert wrote. "In practical effect it requires DEA to consider a potential settlement before pursuing a revocation of the registration." The new

---

[404] Joseph Ganley, "Questions and Proposed Answers: Senate Judiciary Committee" (TS, December 4, 2017), MCKMDL000590826- MCKMDL000590828.

imminent danger definition "requires DEA to demonstrate a direct causal relationship between a registrant's action or inaction and specific adverse effects."[405]

The key words were "direct causal relationship" and "specific." Epidemiological and scientific insight into the likely but diffused consequences of increased exposure through diversion—Dr. Lembke's "neighborhood" effect—would no longer suffice. Nor could DEA any longer use "generalized allegations of past or future diversion to justify an immediate suspension." No matter how many times a defendant's hand had been caught in the cookie jar, the Agency "could only pursue an immediate suspension upon a showing of a 'substantial likelihood' that these specific adverse events will occur in the absence of immediate suspension of the registrant."[406]

*

The year 2016 was not, however, one of unalloyed triumph for the opioid industry. That August Surgeon General Vivek Murthy sent a letter to all U.S. health care providers. "Nearly two decades ago, we were encouraged to be more aggressive about treating pain, often without enough training and support to do so safely," he wrote. "This coincided with heavy marketing of opioids to doctors. Many of us were even taught–incorrectly–that opioids are not addictive when prescribed for legitimate pain." The results had been a steady increase in opioid overdose deaths since 1999 and a nation awash with narcotic painkillers. The amount of reported pain had not

---

[405] John Gray, email and attached Gilbert Memorandum, April 29, 2016, HDA_MDL_000157967- HDA_MDL_000157970.

[406] Ibid., HDA_MDL_000157969.

changed, but now nearly 2 million Americans had prescription opioid use disorders, which had fostered increased heroin use and the spread of HIV and hepatitis C infections. To resolve the crisis, health care professionals had to reeducate themselves in the safe and effective management of pain. Dr. Murthy provided an abstract of new CDC recommendations. Rule one appeared in caps. "IN GENERAL, DO NOT PRESCRIBE OPIOIDS AS THE FIRST-LINE TREATMENT FOR CHRONIC PAIN" for adults unless dealing with active cancer or end-of-life care.[407]

Several state medical boards, Ohio's among them, had already reached the same conclusion. The State Medical Board of Ohio's 2013 CNP opioid prescribing guidelines stipulated that "providers should first consider non-pharmacologic and non-opioid therapies; should "avoid starting a patient on long-term opioid therapy when treating chronic pain;" should exercise vigilance for "the wide range of potential adverse effects associated with long-term opioid therapy and misuse of extended-release formulations;" and should carefully reassess compliance as patients approached "trigger points" like 80 mg morphine equivalent daily dose (MED). The higher the dose, the greater the risk of dangerous side-effects and aberrant behavior. This was "pseudoaddiction" turned on its head.[408]

---

[407] Murthry's August 2016 letter is archived at https://wayback.archive-it.org/9280/20180417154434/https://turnthetiderx.org/. The link to his reformed-practice pledge is https://wayback.archive-it.org/9280/20180417154440/https://turnthetiderx.org/join/. The link to the summary of the 2016 CDC guidelines (including the "DO NOT PRESCRIBE" quotation) is https://wayback.archive-it.org/9280/20170811211208/http://turnthetiderx.org/wp-content/uploads/2016/06/TurnTheTide_PocketGuide_Final.pdf.

[408] State Medical Board of Ohio, "Guidelines for Prescribing Opioids for the Treatment of Chronic, Non-Terminal Pain[;] 80 mg of Morphine Equivalent Daily Dose (MED) 'Trigger Point,'" May 9, 2013, https://www.med.ohio.gov/Portals/0/80-MED-Guidelines.pdf. Ohio's policy shift toward narcotic conservatism continued, e.g., with the passage of 2017 legislation

The Ohio medical board's response was part of a broader pushback that had begun in Washington State during the previous decade. Washington State had joined the liberalization movement in late 1999, when administrative code changes gave practitioners wide latitude in prescribing opioids for CNP. Dr. Gary Franklin, Medical Director of the Washington State Department of Labor and Industries, later blamed the permissive turn on "fake lobbying by drug companies and their surrogates." He became a prominent critic of revisionism after documenting the state's first fatalities among CNP patients, injured workers with conditions "like low back ache or a shoulder ache, and they died within a few years from [taking] prescription opioids."[409]

Dr. Franklin's key insight was that the distinction between physical dependence and addiction, as measured by a checklist of aberrant behaviors, masked the real danger. What drove mortality was severe opioid dependency. Washington State prescription opioid overdose deaths had more than tripled in the seven years after 1999—this at a time when heroin overdose deaths remained flat. Both opioid prescribing and average daily doses had increased in the early 2000s.

---

generally prohibiting the filling of prescriptions more than 14 days after issuance or providing more than a 90-day outpatient supply of opioid analgesics. State of Ohio Board of Pharmacy, "New Requirements for Opioid Prescriptions—Effective 4.6.2017, Updated 8-7-2017," https://docs.google.com/viewerng/viewer?url=https://docobook.com/download/new-requirements-for-opioid-prescriptions-effective-46.html?reader%3D1. For a survey of state prevention actions and programs in place by late 2017 see Christine Vestal, "In Opioid Epidemic, States Intensify Prescription Drug Monitoring," Pew Stateline, December 29, 2017, https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2017/12/29/in-opioid-epidemic-states-intensify-prescription-drug-monitoring.

[409] Gary Franklin et al., "A Comprehensive Approach to Address the Prescription Opioid Epidemic in Washington State: Milestones and Lessons Learned," *American Journal of Public Health* 105 (2015): 463-464. "Lobbying," "died:" Dr. Franklin's comments at the press conference video accompanying Washington State, Office of the Attorney General, "Ferguson: Distributors Ignored Red Flags While Pouring Staggering Amounts of Opioids into Washington" (press release, May 12, 2019).

By 2006, 10,000 Washington State residents enrolled in public insurance programs were taking prescription opioids in amounts equal to or greater than an MED of 120 mg, a dangerously high level. Recognizing that opioid prescribing practices were driving the epidemic of overdose deaths, a group of Washington State agency medical directors that purchased or regulated health care worked with pain management experts to craft new prescribing guidelines, announced in early 2007. The guidelines included a reassessment of high-dose patients, with an eye to reducing or withdrawing opioids if significant side effects had developed.[410]

In 2010 the Washington State Legislature decided that the voluntary guidelines were insufficient to bring down still-high levels of prescription-opioid addiction and overdose deaths. Despite continued opposition from opioid-industry front organizations such as the APF, the legislature charged an interdisciplinary panel with creating a set of practices that prescribers would be legally expected to follow in treating CNP. One of the requirements, which took effect in 2011, was that doctors refer adult CNP patients whose dosage had reached or exceeded 120 mg MED to certified pain specialists for independent evaluation. The intent, said Seattle physician Dr. Claire Trescott, was to end the dangerous practice of "chasing pain" by unthinkingly increasing dosage in patients who were developing tolerance but not improving functionally. Here again a central tenet of revisionism, that tolerance was no bar to long-term opioid analgesia, was tried and found wanting.[411]

---

[410] CDC WONDER data in National Institute on Drug Abuse, Washington Opioid Summary, https://nida.nih.gov/download/21989/washington-opioid-involved-deaths-related-harms.pdf?v=904c3d5c5ec5abeb33be97231a2aa394 (tripled) and Franklin et al., "Comprehensive Approach," 464-465.

[411] Barry Meier, "Move to Restrict Pain Killers Puts Onus on Doctors," *New York Times*, July 28, 2010, https://www.nytimes.com/2010/07/29/business/29pain.html, and Meier, "Tightening the

Dr. Franklin's counterpart at the CDC was its director, Dr. Thomas Frieden. The 2016 national guidelines Dr. Murthy recommended originated in a 2015 initiative by Dr. Frieden, who decided that his agency should take the reform lead. "If not us, who?" he later told an interviewer. "It became rapidly clear to us that most of the people working in this space were heavily conflicted. The industry influence was all over the place. It was funding a lot of medical groups. It was funding medical boards in the states. It was funding massive education." So Dr. Frieden put together an expert group of specialists who were not financially compromised. He asked them to propose best-practices guidelines for prescribing opioids.[412]

Despite more opposition from opioid industry lobbyists and front organizations, the CDC guidelines appeared in March 2016—the same month Congress passed the Marino bill. The guidelines called for greater caution in prescribing opioids for CNP, or for not prescribing them at all. Physicians' first resort should be nonpharmacologic or nonopioid therapies. They should bear in mind that the reputed benefits of long-term opioid therapy for CNP lacked scientific evidence. They should weigh the risks and benefits of any opioid prescription and discuss them with patients. They should use short-acting opioids at the lowest possible dosage. Extended release, opioid-packed drugs were the last, not the first, to start with. Even at lower doses doctors

---

Lid on Pain Prescriptions," *New York Times*, April 8, 2012, https://www.nytimes.com/2012/04/09/health/opioid-painkiller-prescriptions-pose-danger-without-oversight.html ("chasing pain"). Permanent Rules: Department of Health, *Washington State Register*, WSR 11-12-2012, https://apps.leg.wa.gov/documents/laws/wsr/2011/12/11-12-025.htm. Sources documenting industry lobbying efforts include Kristi Dover to Pamela Bennett, with "Take Action Now!" APF attachment, email, January 24, 2010, PWG000137133; Saper, "Influence of Pharma," 13-14 (pain organizations); and Dionetta Hudzinski, April 11, 2019, deposition in *State of Washington* v. *Purdue Pharma*, April 11, 2019, pp. 136-141 (advocates with a history of Purdue funding).

[412] McGreal, *American Overdose*, 263 ("If not us, who?").

should continue prescribing opioids only after confirming that improvements in pain and function had been achieved without significant risks or harms. They should set clear standards for tapering or curtailing opioid prescriptions, and back them with urine screens and checks of prescription-drug monitoring programs. They should be especially vigilant if daily use exceeded 50 morphine milligram equivalents and avoid prescribing above 90 morphine equivalent milligrams, the point at which the risk of fatal overdose rose rapidly. In cases of acute pain, such as that following surgery, they should write for fewer pills, a three-day supply normally sufficing.[413]

In April 2016, a month after the guidelines appeared, Dr. Frieden and co-author Dr. Debra Houry defended the CDC's recommendations in the *New England Journal of Medicine*. "Efforts to improve pain management resulted in quadrupled rates of opioid prescribing, which propelled a tightly correlated epidemic of addiction, overdose, and death from prescription opioids that is now further evolving to include increasing use and overdoses of heroin and illicitly produced fentanyl," Drs. Frieden and Houry wrote. "Beginning in the 1990s, efforts to improve treatment of pain failed to adequately take into account opioids' addictiveness, low therapeutic ratio [i.e., relatively small margin between an effective and a toxic dose], and lack of documented effectiveness in the treatment of chronic pain. Increased prescribing was also fueled

---

[413] "CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016," *Morbidity and Mortality Weekly Report* 65 (March 18, 2016): 1-49, and "Checklist for Prescribing Opioids for Chronic Pain," March 2016, CDC Stacks: Public Health Publications, https://stacks.cdc.gov/view/cdc/38025. Industry-backed opposition: Dora H. Lin et al., "Financial Conflicts of Interest and the Centers for Disease Control and Prevention's 2016 Guidelines for Prescribing Opioids for Chronic Pain," *JAMA Internal Medicine* 177 (2017): 427-428, https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2598092, demonstrates a close correlation (p < .001) between the negativity of public comments on the CDC guidelines and opioid industry funding.

by aggressive and sometimes misleading marketing of long-acting opioids to physicians." If the long-term benefits were doubtful, the risks were certain. They included aggravated pain and fatal overdose. No other medicine routinely used for nonterminal conditions killed patients as frequently as prescription opioids. Virtually all of the prescription opioids on the market were "no less addictive than heroin." Some abuse-deterrence versions had made it harder for patients to inject melted pills. Yet even these formulations lent themselves to addiction and fatal overdose via oral administration. The science was clear. "For the vast majority of patients, the known, serious, and too-often-fatal risks far outweigh the unproven and transient benefits."[414]

The CDC guidelines drew fire from some pain specialists who worried about patients who were functioning reasonably well on opioid therapy and who were now apprehensive about continued access. They turned their editorial guns on colleagues who embraced the conservative renaissance, to the point that "a civil war" broke out in the pain management community. Opinion divided over whether the comfort and anxieties of compliant CNP patients should have priority over the mounting evidence of a public health disaster. The CDC had unapologetically gone with the evidence. "People even now will say we're swinging to the other side of the pendulum and we're underprescribing opioids," said Dr. Roger Chou, one of the guidelines'

---

[414] Thomas R. Frieden and Debra Houry, "Reducing the Risks of Relief—The CDC Opioid Prescribing Guideline," *New England Journal of Medicine* 374 (2016): 1501-1504. Dr. Scott Hadland (like Drs. Frieden and Houry, a physician trained in public health) and associates provided further corroboration in "Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related Overdoses," *JAMA Network Open* 2 (2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914. Their county-level analysis of 2013-2015 data showed that, the greater the manufacturers' payments to doctors (e.g., for meals, trips, speaking and consulting fees), the greater the number of prescription opioid deaths one-year later. More marketing meant more prescribing, and more prescribing meant more deaths—a finding consistent with the DAWN-based correlations Dasgupta et al. reported in "Association Between Non-Medical and Prescriptive Use of Opioids."

authors. "My response is, 'No, we're not.' We swung one way based on no data. Now we actually know what some of the benefits and harms are."[415]

Opioid distributors also attended to the growing body of official criticism, if for different reasons. Cardinal Health quoted Surgeon General Murthy, the CDC, and other authorities who stressed the harmful consequences of introducing large numbers of pain patients to powerful opioid painkillers. The implication was that these consequences were not Cardinal's fault. Doctors, it seemed, had been misled by other corporate actors. Many of their more vulnerable patients had become addicted. The HDA, in its May 2017 press release, referenced the CDC criticisms and stated that "leading public health experts and researchers have consistently found that the prevalence of opioid abuse and misuse was tied to the overprescribing of opioids."[416]

This version of events was less wrong than incomplete, in that it omitted the distributors' promotional activities and their record of disregarding, circumventing, and/or lobbying to attenuate anti-diversion regulations. The prescription opioid crisis was initiated by KOLs and manufacturers who, beginning in the 1980s, began subverting narcotic conservatism. But the

---

[415] "A 'Civil War' Over Painkillers Rips Apart the Medical Community," PBS News Hour, January 21, 2017, https://www.pbs.org/newshour/health/painkillers-controversy-doctors, and McGreal, *American Overdose*, 280 (Chou, from a 2017 interview). Stricter state prescribing laws, as in Washington State, also prompted controversy and acknowledgment of a growing rift within the profession. In 2015 Dr. McCarberg wrote that "[t]oday, I hear colleagues, thought leaders in pain management describe themselves as ophiophobs [sic]." Bill McCarberg, "President's Message: Washington State Opioid Prescribing Guidelines," *Pain Medicine* 16 (2015): 1455.

[416] Cardinal Health, "Origins of the Opioid Epidemic," 2018, https://www.cardinalhealth.com/content/dam/corp/web/documents/fact-sheet/cardinal-health-opioid-epidemic-factsheet.pdf; Healthcare Distribution Alliance News, "The Rest of the Story: Facts About Pharmaceutical Distributors and the Opioid Crisis," May 18, 2017, https://hda.org/sharedcontent/news/facts-about-rx-distributors-and-the-opioid-crisis ("leading").

crisis was exacerbated by distributors who, notwithstanding multiple DEA warnings and fines, failed to detect, report, and/or suspend suspicious opioid shipments. These derelictions led to the widespread diversion of the Schedule II and III opioids, sustaining, expanding, and prolonging the epidemic of opioid abuse, addiction, and overdose deaths.

### 2. National Pharmacies, Suspicious Orders, and Suspicious Prescriptions

Distributor and HDMA resistance to monitoring and blocking suspicious orders frustrated Rannazzisi's plan to combat the opioid crisis by restricting supply at its most obvious chokepoint. "This is an industry," Rannazzisi said in 2017, "that allowed millions and millions of drugs to go into bad pharmacies and doctors' offices, that distributed them out to people who had no legitimate need for those drugs."[417]

The bad pharmacies that Cardinal and other distributors supplied with unusually large quantities of opioids included chain stores. In 2015 CVS agreed to pay $22 million in fines to settle DEA cases involving two of its Sanford, Florida, pharmacies. They had ordered more than twenty times the national average of oxycodone pills. "It's a tremendous amount, way beyond what would be for legitimate use," said Mark Trouville, head of the DEA's Miami Field Division. "We're not talking about a gray area here." Cardinal, which supplied both CVS stores between 2008 and 2011, and which failed to report the unusually large orders as suspicious, paid a $34 million fine in connection with the case.[418]

---

[417] "Ex-DEA Agent," *60 Minutes*.

[418] "DEA: Oxycodone Orders by Pharmacies 20 Times Average," ABC News, February 7, 2012, https://abcnews.go.com/Business/dea-oxycodone-orders-pharmacies-20-times-average/story?id=15528272 (Sanford orders, Trouville); U.S. Attorney's Office, Middle District

CSA regulations stipulate that "the responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioners, but a corresponding responsibility rests with the pharmacist who fills the prescription." Indeed, doctors' orders for controlled substances not issued in the usual course of professional treatment or in authorized research projects should not be considered as "prescriptions" at all, within the meaning of the law. Those who filled such illegitimate prescriptions, as well as those who issued them, were in violation of the CSA.[419]

For decades federal narcotics officials had provided guidance to differentiate legitimate from illegitimate prescriptions, a process Anslinger formalized in 1938 with his pamphlet on lawfully prescribing and dispensing narcotics. By 2000 the DEA provided advice digitally, in such online brochures as "A Pharmacist's Guide to Prescription Fraud." The guide reminded pharmacists that they were legally and ethically obligated to protect their practices from becoming easy opportunities for drug diversion by educating themselves about situations where it was likely to occur—which situations the DEA proceeded to enumerate. The intent was

---

of Florida, "United States Reaches $22 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances," press release, May 13, 2015, https://www.justice.gov/usao-mdfl/pr/united-states-reaches-22-million-settlement-agreement-cvs-unlawful-distribution (fine); Higham, Horwitz, and Rich, "76 Billion Opioid Pills" (Cardinal supplied Sanford stores).

[419] 21 CFR § 1306.04(a).

preventive and practical, like drivers' education. Instruct registrants what to look out for, so as to avoid violations, accidents, investigations, and legal consequences later.[420]

In 2010 the DEA tried its education-first tack on CVS's Florida managers. Agency officials met with them to express concern over the high-order volume and rising overdose deaths and to review with them signs of suspicious prescriptions. Jennifer Lalani, CVS's district supervisor with responsibility for the two Sanford stores, met twice with the DEA, in December 2010 and again in August 2011. Yet when DEA investigators began interviewing pharmacy employees onsite, in October 2011, they discovered that obvious warning signs were still being ignored.[421]

Paras Priyadarshi, the head pharmacist of one of the CVS Sanford stores, said that "the majority of the diagnosis codes listed by the prescribing practitioners were the same, and that customers requested certain brands of oxycodone, referring to them as 'Ms' or 'blues.'" The terms referred to Roxicodone, the "M"-brand-marked, light-blue colored, 30 mg oxycodone hydrochloride tablets that Mallinckrodt massively oversupplied to Florida from 2008 to 2012, and whose northbound diversion to Georgia, Kentucky, West Virginia, and Ohio earned I-75— which runs through Dayton—the nickname "the Blue Highway." (Mallinckrodt would eventually pay a $35 million fine for its failure to detect and report such large, suspicious shipments and for other CSA violations.) Priyadarshi also told the agents that he saw nothing wrong with two

---

[420] Anslinger, "Prescribing and Dispensing Narcotics Under Harrison Narcotic Law," and DEA, Diversion Control Division, "A Pharmacist's Guide to Prescription Fraud," online brochure, February 2000, https://www.deadiversion.usdoj.gov/pubs/brochures/pharmguide.htm.

[421] Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, pp. 9-14. See also Higham and Horwitz, American Cartel, chap. 7.

customers listing the same address receiving the exact same prescriptions, even though the prescriptions were for oxycodone, alprazolam, and muscle relaxants, a common but dangerous "cocktail" associated with abuse and frequently written by pill-mill doctors. As for volume, Priyadarshi said "no one from CVS/Caremark, Inc. had said anything" about the large amounts of oxycodone shipped to his store or the large number of oxycodone prescriptions it filled.[422]

Despite the volume, the pharmacist in charge at the second Stanford store, Jessica Merrill, told DEA agents that she had to set a daily limit, based on the amount currently on hand, of the number of oxycodone 30 mg prescriptions her pharmacy would fill each day. This was done, she said, to make sure the pharmacy had enough to fill the prescriptions of its "real pain patients." Like Priyadarshi, she noticed that "patients brought in the same combination of controlled substance prescriptions, and that many of the oxycodone prescriptions were written for similar quantities." Many paid with cash or a discount card. Some arrived in cars at the drive-through window, where "two or more individuals in the vehicle would present prescriptions for the same controlled substances at the same quantities, on prescriptions written by the same practitioner." Merrill "admitted that these prescriptions were probably not legitimate and further

---

[422] Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, 15; Higham, Horwitz, and Rich, "76 Billion Opioid Pills" (Mallinckrodt, blue pills); U.S. DOJ, Office of Public Affairs, "Mallinckrodt Agrees to Pay Record $35 Million Settlement for Failure to Report Suspicious Orders of Pharmaceutical Drugs and for Recordkeeping Violations," press release, July 11, 2017, https://www.justice.gov/opa/pr/mallinckrodt-agrees-pay-record-35-million-settlement-failure-report-suspicious-orders; and Lenny Bernstein and Scott Higham, "The Government's Struggle to Hold Opioid Manufacturers Accountable," *Washington Post*, April 2, 2017, https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/ ($35 million fine).

described the pharmacy's oxycodone customers as 'shady.'" By way of confirmation Shawn Porter, the store's manager, told the DEA that one of his jobs was to act as bouncer.[423]

Then there were the physicians who wrote the prescriptions filled daily at the Sanford CVS stores—filled, that is, until mid-morning, by which time the stores had usually sold out their supply to queued customers. The DEA discovered that the pharmacies had filled prescriptions for at least twenty practitioners "who have been the subject of action by [the] DEA or the State of Florida." All but four of the twenty were located in South Florida. Drugstore customers not usually traveling 200 miles to fill prescriptions, this was another missed flag, one of several that the DEA had warned of in its 2010 and 2011 meetings with CVS Florida executives.[424]

In 2016 CVS paid another $8 million fine to resolve DEA allegations, this time centered on Maryland. CVS acknowledged that between 2008 and 2012 pharmacists in certain of its Maryland stores had dispensed oxycodone, fentanyl, and hydrocodone without ensuring that the drugs had been issued for legitimate medical purposes. In the late 2000s and early 2010s, however, it was diversion in and from Florida that had the greatest impact on the accelerating national prescription-opioid addiction epidemic. That was because Florida was central to the era's two most important diversion schemes.[425]

---

[423] Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al*., 15-16.

[424] Ibid., 10, 13, 16-17 (quotations).

[425] "DEA Reaches $8 Million Settlement Agreement with CVS for Unlawful Distribution of Controlled Substances," DEA press release, February 12, 2016, https://www.dea.gov/press-releases/2016/02/12/dea-reaches-8-million-settlement-agreement-cvs-unlawful-distribution.

The first scheme, which flourished between 2005 and 2009, involved the illegal diversion of opioids, particularly hydrocodone, through rogue internet pharmacies. Rannazzisi called Florida the "epicenter" for these operations, by which "tens of millions of dosage units of hydrocodone"—that is, tablets—"were diverted across the United States." One Florida-based internet pharmacy alone shipped hundreds of thousands of hydrocodone, phentermine (a stimulant), alprazolam (Xanax), and codeine tablets; some 200 of its customers were in Washington State, as far from the pharmacy's home base in South Florida as it was possible to get in the continental United States. The passage, in April 2009, of the Ryan Haight Online Pharmacy Consumer Protection Act (Haight was an eighteen-year-old student whose mother found him dead in his bed after overdosing on internet-purchased Vicodin) and stepped-up law enforcement temporarily curtailed this form of diversion.[426]

The second scheme involved pain clinics, again concentrated in Florida. "Unfortunately," Rannazzisi testified, "that [internet diversion] system moved back to Florida and turned into pain clinics, and pain clinics grew." With the help of complicit physicians, the Florida clinics dispensed millions of oxycodone tablets. Many went to drug seekers and runners who traveled to the clinics to obtain oxycodone and other controlled substances, the so-called "pillbillies" parodied in the ABC diversion-control email. Their vehicles bore tags from Ohio, Kentucky, West Virginia, and other states. The drugs they took home, Rannazzisi wrote in early 2012, were "in turn illegally distributed along the entire east coast and Midwest." Oxycodone tablets the

---

[426] Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, 6 (quotations); United States Attorney's Office, Western District of Washington, "Seven Involved with Online Pharmacy Based in Florida Indicted for Internet Pharmacy and Money Laundering Conspiracy," May 29, 2014, https://www.justice.gov/usao-wdwa/pr/seven-involved-online-pharmacy-based-florida-indicted-internet-pharmacy-and-money.

runners did not themselves consume sold back home for up to ten times the Florida purchase price, paid in cash. Gerald Dixon, a convicted Ohio drug dealer, told clinic doctors he was in pain from years of weight training and boxing. His hands hurt. "It's all about cash, cash, cash," he said. "You go, you pay the money, and they're going to come back and say, 'Yeah, you're right, you was hurt.'" He drove to Florida once a month, collected a bagful of pain pills, and drove back to Ohio to sell them for tens of thousands and dollars in profit. Christopher Thompson, of Galloway, Ohio, took the next logical step. He recruited fifteen traffickers, mostly from Columbus, who acquired the pills in Florida and mailed them back to him for distribution in Central Ohio.[427]

Dixon, who was arrested in 2008 with 6,000 pills concealed in a false exhaust system, and Thompson, who was arrested in 2011 with 14,000 pills and nine firearms, represented the worst-case scenario of the diversion danger Haislip had described twenty years before. Only now it was more than the occasional patient with a valuable prescription who turned a fast buck. The increase in supply and registrants' derelictions in confining it to legitimate medical channels had made the problem national and systemic.[428]

---

[427] "Prescription Drug Diversion," hearings, March 1, 2012, 78 ("moved back"), 83; Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, "distributed" p. 7; Kornfield, "Drug Distributor Employees Emailed a Parody Song about 'Pillbillies;'" "Florida 'Pill Mills" Were 'Gas on the Fire' of Opioid Crisis," Associated Press, July 20, 2019, https://apnews.com/article/0ced46b203864d8fa6b8fda6bd97b60e (license plates); Andrew Welsh-Huggins, "'Prescription Tourists' Thwart States' Crackdown on Illegal Sales of Painkillers," NBC News, July 8 2012, https://www.nbcnews.com/id/wbna48111639 (ten times, Dixon); "Prescription Pill Pipeline Leader Receives 15 Year Prison Term," DEA press release, December 9, 2011, https://www.dea.gov/press-releases/2011/12/09/prescription-pill-pipeline-leader-receives-15-year-prison-term (Thompson).

[428] Andrew Welsh-Huggins, "'Prescription Tourists'" (exhaust); "Prescription Pill Pipeline Leader" (Thompson).

These realities were apparent in Ohio as well as Florida. On March 24, 2009, the Ohio

Board of Pharmacy sent an email to 14,000 registered Ohio pharmacists warning them of "a

significant volume" of suspect prescriptions from Florida physicians being written for patients

from Ohio and Kentucky. The prescriptions were for opioids and other controlled substances

and, rather than being filled in Florida, were being brought back home. Ohio law required that all

prescriptions be issued for legitimate medical purposes by individual prescribers in the course of

his or her professional practice. "The responsibility for the proper prescribing is upon the

prescriber, but a corresponding responsibility rests with the pharmacist who dispenses the

prescription." How, the board wondered, did "legitimate medical purpose" apply when "a patient

who is supposedly in severe pain can ride to Florida and back to receive treatment when we have

excellent facilities." Contact Agent Bill Padgett at the Board of Pharmacy if you have doubts.[429]

Over the next three days Padgett received more than 300 calls, faxes, and emails, many

from Ohio pharmacists confronting customers presenting suspect Florida opioid prescriptions.

"On further checking, many of those individuals had criminal records for drug-related activities,

making it clear that that the majority of these prescriptions were not issued for a legitimate

medical purpose," reported the *Ohio State Board of Pharmacy News*. Distance and dose provided

---

[429] Donald Casar, email blast, March 24, 2009, HBC_MDL00181625. William "Bill" Winsley,
who served as executive director of the Ohio State Board of Pharmacy, incorporated the 2009
email in presentations he subsequently made at DEA Pharmacy Diversion Awareness
Conferences. Winsley made five additional points, the last rhetorical: 1) "The pharmacist is
responsible for what he/she knew *or should have known* on every Rx filled;" 2)
"'Corresponding' [responsibility] means 'equal' [responsibility];" 3) "Pharmacists have a
covenant with society;" 4) "Society allows us to practice, but we have a return duty to protect
them from harm;" 5) "Does contributing to abuse of drugs cause harm?????? Even if 'only' due
to neglect?" William Winsley, "Pain Clinics or Pill Mills? What's a Pharmacist to Do?," slide
deck appended to Kevin Nicholson email chain, September 5, 2012, WAGMDL00441397
(capitalization altered, italics in the original).

other obvious clues. Patients in severe pain, as indicated by a prescription for 180 or 240 doses of 30 mg extended-release oxycodone tablets *on their first visit*, were unlikely candidates for a car trip from Ohio to Florida and back.[430]

The editors of the *Ohio State Board of Pharmacy News* expressed the hope that the state-wide warning had slowed the filling of unlawful Florida prescriptions in Ohio. If so, it did not halt the flow of drug seekers to Florida. By 2010 the east-coast diversion traffic had become so routine that Florida pain-clinic staff checked winter-weather reports for Kentucky and West Virginia to learn if their business would be slow for a few days. For those unwilling to chance wintry roads or endure a long drive, Allegiant Air offered cheap round-trip flights between the Huntington Tri-State Airport and South Florida. "The planes were so packed with drug runners," wrote journalist John Temple, "that the flight was nicknamed 'The Oxy Express.'" Awaiting them in Florida in 2010 were 98 of the nation's top 100 opioid prescribers and 100 pharmacies that collectively dispensed 126 million oxycodone pills, an average of more than one million per store.[431]

Local officials reinforced DEA warnings about Florida pharmacies' growing role in opioid diversion and interstate trafficking. In October 2010 Hillsborough County Sheriff David

---

[430] "Pharmacy Board E-Mail Blast," *Ohio State Board of Pharmacy News* (May 2009), 4, MR 4125_000001. The article was presumably written by Winsley, who is listed as the "state news editor; he bolded "on the first visit" in the original.

[431] Temple, *American Pain*, 171, 176 (quotation); Florida Department of Health, Office of Communications, "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic," press release, July 1, 2011, http://research.floridahospices.org/Laws,%20Rules,%20&%20Guidelines%20(State%20&%20Federal)/Florida%20DOH%20(press%20release)%20Declaration%20of%20Public%20Health%20Emergency%20regarding%20Pill%20Mills%20(07.01.2011).pdf (Florida data).

Gee wrote to Tampa Bay-area pharmacists, alerting them to the influx of drug seekers and runners from Ohio, West Virginia, Tennessee, and Kentucky and "ask[ing] for your help in closely scrutinizing these prescriptions, which were written for out-of-town individuals and NOT filling them if you have that option." Sheriff Gee also said, to a Fox News interviewer, "there's not a pharmacist out there, if you go and speak to one, [who] won't tell you they get several customers a day that come in that they know they probably shouldn't get the medicine and they're fraudulently obtaining it." Hillsborough County Commissioner Rose Ferlita, herself a pharmacist, said that she saw suspicious prescriptions all the time and urged her colleagues to do the right thing. "We have that code of ethics that binds us to saying if there's something wrong about this, I'm not going to fill it, and to continue to partner with law enforcement."[432]

"You could think about the manufacturers as having lit the fire, and the distributors and pill mills were really pouring gas on the fire," was how Dr. Kolodny characterized the Florida-centered prescription-opioid diversion crisis. But pharmacies, which Rannazzisi called the closed system's "last major line of defense," also fed the flames, particularly after the Florida enacted legislation (effective October 1, 2010, and July 1, 2011) that restricted physicians' on-premises dispensing of Schedule II and III drugs. No more cash and carry. Now it was cash at the clinic, and then find an obliging pharmacy on the way home.[433]

---

[432] Quotations from Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, attachment 4, Case 1.12-cv-00191-RBW Document 19-10.

[433] Spencer, "Florida 'Pill Mills,'" (Dr. Kolodny); Declaration of Joseph Rannazzisi, *Holiday CVS* v. *Eric Holder, Jr. et al.*, pp. 4 ("last") and 8 (legislation).

CVS was not the only national pharmacy to accommodate the demand. The DEA's 2012 investigation of Walgreens Florida operations, which culminated in the company's admission that it had failed to uphold its obligations as a DEA registrant and its agreement to pay an $80 million civil penalty, revealed a similar pattern of behavior. In addition to allowing its Florida stores to order and receive at least three times the Florida average for opioids such as oxycodone and to fill customers' prescriptions for other than legitimate medical uses, Walgreens had ignored insider warnings and created disincentives for its own pharmacists to refuse suspicious prescriptions.[434]

One insider was Kristine Atwell, who oversaw Schedule II drug shipments from the Jupiter, Florida, distribution center. (Walgreens, unlike CVS, handled most of its own distribution, including Schedule II opioids. CVS was not DEA-licensed to ship Schedule II drugs from its own distribution centers.) In January 2011 Atwell had "raised questions within the organization about what she correctly identified as unusually larger orders for Schedule II narcotics placed regularly by several customer pharmacies." Atwell cited the example of the Walgreens in Port Richey, a Gulf Coast town near Tampa and I-75. According to the DEA, she noted that Walgreens "had shipped this store 3[,]271 bottles of 100 count 30 mg oxycodone (i.e., 327,000 dosage units) in the 40[-]day period from 12/1 to 1/10/11, causing her to question 'how they can even house this many bottle[s].' She then inquired of the same corporate manager: 'How do we go about checking the validity of these orders?'" The answer was, we don't. Walgreens reported none of the orders as suspicious and made no inquiry into the circumstances

---

[434] "Walgreens Agrees to Pay a Record Settlement."

of the Port Richey orders. The following month it shipped "orders totaling another 285,800 dosage units of 30 milligram oxycodone to same pharmacy."[435]

The DEA investigation cited several reasons for such increases. In 2010 Walgreens corporate headquarters had launched "a concerted, corporate-directed effort to increase oxycodone sales at retail pharmacies." That effort, combined with a bonus program for pharmacists based on the number of prescriptions they filled, served as an incentive for pharmacists and pharmacy technicians to ignore red flags on prescriptions. Then, in October 2010, Florida began restricting the amounts of controlled substances physicians could dispense directly. "As a result, Florida pharmacies and the distributors who served them knew or should have known that starting in late 2010, there would be a significant increase in requests to dispense pursuant to prescriptions issued by physicians with the pain clinics."[436]

Which was what happened. By the end of 2011 sixteen of Walgreens top twenty-five oxycodone purchasers (including all six of its top purchasers) were Walgreens pharmacies in Florida. Oviedo, a town northeast of Orlando and west of I-95, had two Walgreens stores, both of which became diversion sites. In June 2010 the pharmacy at one store, #06997, filled an average of four oxycodone prescriptions per day and purchased 6,600 dosage units of oxycodone

---

[435] CVS distribution centers not licensed for Schedule II: John J. Andrade to Pam J. Hinkle, July 10, 2012, CVS-MDLT1-000083855-CVS-MDLT1-000083856. Atwell: DEA, *In the Matter of Walgreen Co.*: Order to Show Cause and Immediate Suspension of Registration, September 13, 2012, p. 5, Exhibit 335, *In Re: National Prescription Opioid Litigation*, https://www.docketbird.com/court-documents/In-re-National-Prescription-Opiate-Litigation/Exhibit-335-Order-to-Show-Cause/ohnd-1:2017-md-02804-01965-017. I have omitted the DEA's italicization of the direct quotes in Atwell's communication.

[436] DEA, *In the Matter of Walgreen Co.*, 6-7.

products per month. A year later, in June 2011, the same pharmacy purchased 169,700 dosage units of oxycodone. Oviedo's population was then around 34,000 persons.[437]

In late 2010 and early 2011 Jeffrey Chudnow, the Oviedo police chief and former head of the Coral Gables narcotics unit, became alarmed about illegal opioid sales and use in the Walgreens parking lots. Chudnow repeatedly alerted Walgreens pharmacists. His letters, on police department stationery, described the latest criminal incident, typically the resale of a controlled substance acquired through a prescription filled at their store. He named the customers arrested and the diverted drugs, usually oxycodone and/or a benzodiazepine. He pointed out that the drugs were not being used for the legitimate treatment of a chronic or recurrent illness and that he was once again requesting their "help in dealing with the prescription[-]medication epidemic" by committing themselves to stopping such incidents.[438]

In February 2011 Sheriff Chudnow met and shared his concerns with Walgreens loss-prevention officials. He later testified as to the attitude of the Walgreens executives. "They seemed conciliatory," Chudnow said. "They nodded a lot, but I didn't feel they were sincere."

---

[437] Ibid., pp. 2, 7.

[438] Chudnow's background: *State of Florida.* v. *Walgreen Co*., Circuit Court of the Sixth Judicial Circuit in and for Pasco County, Florida, trial transcript, April 18, 2022, p. 1513. Quotations from Chudnow to "Dear Pharmacist," November 23, 2010, WAGMDL00760560. For similar letters see WAGMDL00760561-WAGMDL00760571. DEA, *In the Matter of Walgreen Co.*, p. 7, reports that Chudnow's warnings "reached the highest levels of Walgreens' Loss Prevention Operations," the evidence being a January 28, 2011, email from the Director of Divisional Loss Prevention acknowledging that Chudnow was "concerned that we are filling too many C2 prescriptions…. From what I've been told, he is referencing 100 plus incidents/arrests in his jurisdiction." The quotation is italicized in the original.

Asked why not, Chudnow said that neither the letters he had sent nor the in-person meeting put a stop to "what they were doing, and the drug activity in the parking lots."[439]

On March 15, 2011, Chudnow, though "extremely frustrated," tried again. This time he went straight to the top. He sent identical letters to the company's chairman, Alan G. McNally, and its president and CEO, Gregory D. Watson. He informed them that their pharmacists' prescribing practices had created a noisome and dangerous situation. Their stores' parking lots had become "a bastion of illegal drug sales and drug use" with addicts and prescription resellers lined up outside and inside the stores, waiting for their prescriptions to be filled. Once acquired, the drugs were "sold, distributed as payment, crushed and snorted, liquefied and injected, or multiple pills swallowed" while the customers were still in the parking lot. The atmosphere discouraged normal business and encouraged crime. One woman was robbed in broad daylight, in the presence of regular customers, by a man who had arranged for her to fill the prescription. (She changed her mind and decided to keep the pills for herself.) Parking-lot users who got high and then drove off created a "hazardous situation" for other motorists. [440]

Chudnow told McNally and Watson that, since mid-October 2010, his department had made more than 120 arrests involving oxycodone and other Schedule II opioids. The majority of

---

[439] DEA, *In the Matter of Walgreen Co.*, p. 7 (February meeting) and *State of Florida* v. *Walgreen Co*., trial transcript, April 18, 2022, p. 1534 (quotations). Even before the February meeting with Chudnow, news of "100 plus incidents/arrests in his jurisdiction" had reached Walgreens Loss Prevention division. Doug Lemmons to Ed Svihra, email chain, January 28, 2011, WAG00000902-WAG00000903.

[440] *State of Florida* v. *Walgreen Co*., trial transcript, April 18, 2022, p. 1544 ("extremely frustrated") and Chudnow to Alan G. McNally, March 15, 2021, and Chudnow to Gregory D. Wasson, March 15, 2021, WAGMDL00760572-WAGMDL00760575 (other quotations).

the prescriptions involved were "written at pill mills" and by just five doctors. The "vast majority" of arrested customers lived outside the city and the county. "[Y]et," Chudnow wrote, "scripts continued to be filled." The situation would persist "without the cooperation of pharmacies," whose parking lots would otherwise continue to serve as drug emporiums. He asked for Walgreens to help "by allowing your pharmacist [sic] not to fill suspected illicit prescriptions from doctors who have shown a propensity to prescribe large quantities of these drugs in multiple prescriptions, 180 pills per prescription of one strength and 180 pills of another strength, per visit. These types of prescriptions overtly denote misuse and possible street sales of these drugs." Chudnow expressed confidence that Walgreens regarded the matter "as a serious issue and does not want their retail locations to be viewed as enabling this type of activity." [441]

Chudnow's confidence was misplaced. He heard back from neither executive. (He did, however, hear back from a nearby independent pharmacy where his officers had made similar arrests; the owner agreed to stop filling opioid prescriptions.) Meanwhile oxycodone deliveries to Walgreens #06997 in Oviedo doubled, from 72,900 dosage units in March 2011 to 145,300 dosage units in July. "Perhaps even more significant than the enormous amount of oxycodone Respondent shipped to this store despite the information provided by the Chief of Police to its pharmacists and most senior leaders," the DEA's Leonhart wrote in the 2012 Walgreens OTSC and ISO, "is the fact that the dispensing records for both Oviedo Walgreens pharmacies show that on multiple occasions, they each dispensed additional prescriptions of commonly diverted narcotics to the same individuals who they knew had been previously arrested for drug offenses

---

[441] Chudnow to McNally and Wasson, March 15, 2021, above.

at their pharmacies. I find this to be a staggering disregard of Walgreens' [sic] obligations under the Controlled Substances Act."[442]

Chudnow, who had flagged the chronic drug offenders, found a staggering irony in the fact that the Walgreens store managers had continued to ask *him* to police the unruly crowds gathered in their parking lots. He later shared his thoughts on the situation in an interview with *Washington Post* reporters Scott Higham and Sari Horwitz. "Seriously. You're causing this problem. We've talked to you about the problem. And now you're calling on us to help you?"[443]

Walgreens failures went beyond its Oviedo stores. In December a pharmacist anonymously emailed Walgreens CEO Gregory Wasson that her Ft. Pierce, Florida, pharmacy, Walgreens #04391, was catering to out-of-county or -state customers filling controlled-substance prescriptions. "In the past we usually refused all C II [Schedule II] scripts from doctors outside of the county because they are mainly brought in by drug users in an illegal drug trade," she explained. Now the illegal drug trade was visible in the parking lot, customers were complaining that the store was supplying drug dealers, and management was ignoring the situation for the sake of gross profits, up 74 percent the previous month "when we were filling these prescriptions like candy." Charles Bernard, a Walgreens executive copied on the email, advised that the

---

[442] *State of Florida* v. *Walgreen Co*., trial transcript, April 18, 2022, p. 1532 (agreed to stop); DEA, *In the Matter of Walgreen Co.*, p. 8 (statistics and quotations); and Lenny Bernstein, David S. Fallis, and Scott Higham, "How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job,'" *Washington Post*, October 22, 2016, https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html (never heard back).

[443] Higham and Horwitz, *American Cartel*, 82. Italics removed from original quotation.

pharmacist be reassured that Walgreens was investigating the matter. "While I hope that none of this is true, we don't want the writer to find another outlet to register concerns because it does not appear that we are taking any action." Whatever action Walgreens did take failed to stop the diversion. In 2010 the store sold 881,400 dosage units of oxycodone. In 2011 it sold 1,329,600, a more than 50 percent increase. About two-thirds of the commonly abused 30 mg Roxicodone pills, from which I-75 got its "Blue" tag, went to customers living outside the Ft. Pierce area.[444]

Sales at a second Walgreens store in Ft. Pierce, #04727, jumped from 507,100 oxycodone dosage units in 2010 to 1,192,000 in 2011, an increase of 135 percent. In September 2010 a pharmacist at the store reported to law enforcement officials that he had mistakenly provided 120 extra 15 mg oxycodone pills to a customer. He called the customer to request the pills' return. The customer's girlfriend answered the phone and explained that he was an addict who also sold his prescription pills. He regarded the extra oxycodone as "pot of gold" which he would not return. "Despite this incident," Leonhardt wrote, "Walgreens #04727 filled several additional oxycodone prescriptions issued to this customer in December 2010 and January 2011."[445]

---

[444] Kermit Crawford email chain, December 30, 2010, WAGFLAG00093302, quotations at WAGFLAG00093303; DEA, *In the Matter of Walgreen Co.*, p. 3 (oxycodone units). The whistleblower's simile—like candy—was the same one Dr. Kolb had chosen to describe the unregulated sales that had made medicinal-opiate addiction common in the era before state and federal intervention. Two-thirds: From a Walgreens review of Roxicodone prescription fills at the store for October through December 2010 in Edward Forbes to Georgia Lehoczky, email chain, January 22, 2011, WAGFLDEA00001314. Walgreens also confirmed that there had been a rapid increase in oxycodone fills at the store in the last quarter of 2010. Ken Amos to Doug Lemmons, email, January 18, 2011,WAGFLDEA00000867-WAGFLDEA00000868.

[445] DEA, *In the Matter of Walgreen Co*, pp. 3 (increases) 8 (quotations).

Leonhardt included such details to make the point that Walgreens had possessed specific, actionable information about diversion and had ignored it. A related problem was the company's reluctance to share centralized data about suspect prescribers with local pharmacists. Even after 2013 when, as part of its settlement with the DEA, Walgreen's created a pharmaceutical integrity department to help prevent further diversion, the company withheld from its pharmacists information about doctors' prescribing habits, including such red flags as writing for high quantities of opioids. Asked if Walgreens corporate declined to share this type of data with pharmacists to use as a tool in deciding whether or not to fill opioid prescriptions, Eric Stahmann, a Walgreens pharmaceutical integrity manager, confirmed the policy. "Yeah," he said, "our direction to pharmacists was to make a decision based on that particular prescription and not history or prescribing data or anything else. They were supposed to look at each individual prescription on a case-by-case basis."[446]

---

[446] Deposition of Eric Stahmann, March 11, 2022, *State of New Mexico* v. *Purdue Pharma L.P*., et al., 130-131. Charles R. Breyer, Fact and Conclusions of Law Regarding Walgreens, *City and County of San* Francisco, et al. v. *Purdue Pharma L.P., et al.,*, August 10, 2022, also cites Stahmann's testimony. "Walgreens pharmacies operated in information silos," Judge Breyer wrote. "This need not have been so. Walgreens had access to large volumes of prescribing data that that could have been used to identify suspicious prescribing trends" (49-50).
    More generally, Judge Breyer's finding of Walgreen Co.'s "systemic failure to perform due diligence on opioid prescriptions" (52) in San Francisco resembles Leonhardt and other officials' account of its failures in Florida, down to improperly filling suspect prescriptions that were promptly resold in the Walgreens parking lot (66). In Ohio's Lake and Trumbull Counties, CVS and Walmart, as well as Walgreens, were found to have significantly contributed to the opioid addiction epidemic through knowing, intentional, and systemic dispensing failures. Calling the demonstration of such failures "overwhelming," Judge Polster found that the "jury reasonably concluded that each Pharmacy Defendant dispensed opioids without having in place effective controls and procedures to guard against diversion—controls and procedures they knew were required and knew they had not adequately employed. The evidence also showed each Defendant knew or had strong reason to know the nuisance was substantially certain to result from their conduct." Judge Dan Aaron Polster, In Re: National Prescription Opiate Litigation, Track Three Cases: Abatement Order, August 17, 2022, p. 63-64.

Walmart's problems with opioid distribution and information sharing with pharmacists resembled those of Walgreens. Walmart ran afoul of the DEA in 2009. Late that year an investigation into a Walmart pharmacy in San Diego prompted the agency to issue an OTSC. The investigation turned up evidence that Walmart pharmacists filled controlled-substance prescriptions written by internet physicians for other than legitimate medical purposes; by physicians not licensed to practice in the state; and by physicians with expired, suspended, and/or invalid DEA registration numbers. The investigation also found evidence of prescriptions being filled ahead of schedule, and for customers that Walmart's pharmacists knew, or should have known, were diverting controlled substances.[447]

On March 1, 2011, Walmart signed a memorandum of agreement, which Rannazzisi countersigned, covering the next four years and committing the company to establishing a compliance program, updated as necessary, to prevent diversion as required by the CSA and DEA regulations. The program would include procedures to identify doctor-shopping, early refill requests, prescriptions from doctors not licensed to practice where the patient lived, and other

---

[447] Katie Benner and Mickael Corkery, "Justice Dept. Accuses Walmart of Fueling Opioid Crisis," *New York Times*, December 22, 2020, https://www.nytimes.com/2020/12/22/business/walmart-opioid-lawsuit.html; Walmart/DEA, "Administrative Memorandum of Agreement" (TS, February 18, 2011), 1, https://assets.documentcloud.org/documents/6818269/Walmart-MOA-03-17-2011-Final.pdf.
DEA officials knew that San Diego's chain-drug-store diversion problem was not confined to Walmart. A contemporaneous investigation of Walgreens pharmacy in San Diego uncovered a similar list of violations, including turning a blind eye to doctor-shopping. One customer managed to fill hydrocodone prescriptions issued by four different physicians practicing in Florida, over two thousand miles away. In April 2011 Walgreens also agreed to maintain a national program to prevent diversion from its stores. Abelson et al., "At Height of Crisis, Walgreens Handled Nearly one in Five of the Most Addictive Opioids."

common signs of prescriptions written for other than legitimate medical purposes. Walmart

agreed to train current and future employees in the procedures; to report to the DEA their

refusals to fill prescriptions; to "make and enforce a policy that allows and encourages its

pharmacists to obtain and review a patient and/or doctor profile" from Prescription Drug

Monitoring Program databases if the pharmacist thought such checks warranted.[448]

Prior to 2018 Walmart, like Walgreens, used its own distribution centers to fill orders for

opioids from its own pharmacies. (Walmart did not initially handle Schedule II opioid shipments

to its own pharmacies, but began doing so in 2002.) Walmart thus possessed information on the

size, frequency, and composition of every shipment to more than 5,000 of its store pharmacies,

including Sam's Club pharmacies. However, it had no formal suspicious order monitoring policy

or system in place prior to the end of 2011. It subsequently imposed caps on some, though not

all, large orders, without informing the DEA of the cuts. Individual Walmart pharmacies whose

orders were cut could augment opioid stocks by placing orders with outside distributors

McKesson and ABC—orders whose quantity, frequency, and composition were known to

Walmart's corporate headquarters. Overall, Walmart ordered 5.5 billion oxycodone or

hydrocodone pills from 2006 to 2012, a volume that trailed only Walgreens and CVS. Yet as late

---

[448] Walmart/DEA, "Administrative Memorandum of Agreement," 2-3. The DEA sponsored its own training programs to achieve similar ends. In February 2012 Rannazzisi invited CSA-registered pharmacists, including those at Walmart and other national pharmacies, to earn up to seven CE credits by attending a DEA-funded Pharmaceutical Diversion Awareness Conference. "DEA cannot effectively combat this diversion alone," Rannazzisi wrote. "We rely on DEA registrants to remain diligent in complying with controlled substance laws and regulations and to be vigilant in detecting and preventing diversion in any form. As dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion." Rannazzisi "Dear Registrant" letter of February 9, 2012, http://ppsconline.com/articles/2012/FL_PDAC.pdf.

as October 2013 an internal assessment of suspicious order monitoring found that Walmart had "no processes in place" to fulfill its CSA distributor obligations, thus risking "severe" financial and reputational damage. Not until late 2014 did Walmart establish a written policy to hold and investigate suspicious orders.[449]

Walmart had a second line of defense against diversion. Individual Walmart pharmacists could and sometimes did refuse to fill suspicious prescriptions. It was this duty that the Ohio Board of Pharmacy had stressed in its March 2009 warning to Ohio pharmacists, including those employed by Walmart. In 2020, however, the DOJ brought suit charging that Walmart had long ignored and even discouraged such actions by its own pharmacists in the interest of maximizing revenue and cutting costs generated by effective enforcement—this in addition to failing to adequately control controlled-substance orders placed by its in-store pharmacies. Robert Higdon, Jr., U.S. Attorney for the Eastern District of North Carolina, cited the case of Dr. Sanjay Kumar, a New Bern pain doctor who launched a pill mill in 2011. Dr. Kumar prescribed more than 1.2 million oxycodone pills between 2013 and 2016, and was convicted of unlawfully distributing oxycodone and related federal charges in 2019, receiving a sentence of twenty years in prison. "As it turns out," Higdon said, "that physician expressly directed patients to Walmart to have their opioid prescriptions filled. Walmart's own pharmacists reported concerns about the doctor

---

[449] Quotations: "Portfolio Scoring Worksheet: Suspicious Order Monitoring" (Excel document), WMT_MDL_000048101. Walmart's opioid distribution operations and procedures: Depositions of Jeff Abernathy, November 15, 2018, *In Re: National Prescription Opioid Litigation*, pp. 19-153, and Susanne Hiland, January 22, 2019, *In Re: National Prescription Opioid Litigation*, pp. 47-53, 259-297. More than 5,000 stores, 5.5 billion pills: Abha Bhattarai, "Justice Department Sues Walmart, Alleging it Helped Fuel Opioid Crisis, *Washington Post*, December 22, 2020, https://www.washingtonpost.com/business/2020/12/22/walmart-opioid-crisis-lawsuit/.

up the corporate chain, but for years, Walmart did nothing—except to continue to dispense thousands of opioid pills."[450]

In March 2013, Anne Perry, a Walmart pharmacist in New Bern, spoke to Shannon England, Walmart's Market Health and Wellness Director in Greenville, N.C. Perry followed with an email ("Subject: Dea inquiry") that identified three suspect physicians in New Bern, Dr. Kumar among them. Perry reported that, as of April 1, Realo, Walgreens, and Harris Teeter Pharmacy would no longer accept any of the three doctors' prescriptions. Rite Aid declined to accept prescriptions specifically from Dr. Kumar, whose practice was dotted with red flags. He kept his office "open at odd times on holidays, late night and weekends—definite issue. What do we do? SOP is not enough—they assure patient relationship and provide diagnosis codes, but there is no way that many 25 year olds need 120 to 240 oxycodone per month."[451]

England forwarded Perry's email to Brad Nelson, a senior manager for corporate compliance at Walmart's headquarters in Bentonville, Arkansas. Nelson declined to do what his competitors had done by imposing a blanket ban on the three suspect physicians' prescriptions.

---

[450] Donald Casar, email blast, March 24, 2009, HBC_MDL00181625 (Ohio warning); U.S. Attorney's Office, Eastern District of North Carolina, "New Bern Medical Doctor Sentenced for Unlawfully Distributing Oxycodone, Money Laundering and Tax Evasion," September 8, 2020, https://www.justice.gov/usao-ednc/pr/new-bern-medical-doctor-sentenced-unlawfully-distributing-oxycodone-money-laundering (Kumar); DOJ, "Department of Justice Files Nationwide Lawsuit Against Walmart Inc. for Controlled Substances Violations," press release, December 22, 2020, https://www.justice.gov/opa/pr/department-justice-files-nationwide-lawsuit-against-walmart-inc-controlled-substances-act (Higdon), with a link to the complaint for *United States of America* v. *Walmart*, also December 22, 2020, https://www.justice.gov/opa/press-release/file/1347906/download.

[451] Anne Perry to Shannon England, email, March 26, 2013, WMT_MDL_001019837. Perry is identified as a Walmart pharmacist in *New Bern in United States of America* v. *Walmart*, p. 87.

Dr. Kumar and his colleagues held valid licenses and DEA registration numbers, he replied. Individual pharmacists could and should continue to exercise professional judgment in declining particular prescriptions, provided they made sure to fill out the proper refusal-to-fill forms. These were meant to protect them and Walmart from "from false claims of discrimination from the Prescriber or the patient."[452]

Dr. Kumar was an unlikely candidate for making such a claim. The refusal-to-fill forms filed over the next three years in eastern North Carolina were explicit as to his conduct and reputation:

- Patient [name redacted] called to see if we had this medication in stock (was slurring her words and seemed incoherent). Patient drove all the way from [place redacted]. Been to multiple pharmacies in the past. Only filled Oxycodone [sic] in our pharmacy twice. Patient gave us "instructions" to call Dr. Kumar to get the RX verified and told us that Dr. Kumar told him to come to our particular store. Questionable patient-provider relationship even though it was filled twice before at our pharmacy, in my professional judgment, I was unwilling to fill it at this time. Patient was very irritable. [Jacksonville, N.C., submitted August 20, 2013, following oxycodone refusal.]

- Rx was written by Dr Sanjay Kumar from New Bern who writes for excessive C2's…Unable to verify the rx, nor even drop it into the system because the patient took it back before we could do so. However I was unconfortable [sic] filling the rx since it was written by a dr who was writing for excessive C2s and more pharmacists

---

[452] Brad Nelson to Shannon England, email, March 26, 2013, WMT_MDL_001019833.

in this area and neighboring cities are refusing to fill any C2 written by this dr. Patient also let it slip that Walgreens refused to fill the rx. [Goldsboro, N.C. submitted September 9, 2013, following Percocet 10/325 mg refusal.]

- WRITTEN FOR A VERY LARGE QUANTITY BY A DOCTOR THAT IS KNOWN TO GIVE LARGE QUANTITIES OF C2 PRESCRIPTIONS AND NO OTHER RX'S, IS NOT OPEN DURING THE DAY FOR VERIFICATION….THE PROVIDER WRITES ONLY FOR C2 RX'S AND IS ALWAYS FOR VERY LARGE QUANTITIES. THE PATIENTS NEVER HAVE ANY OTHER PRESCRIPTIONS. (THIS ONE DID NOT EITHER.) [Havelock, N.C., submitted October 29, 2013, following oxycodone refusal.]

- The patient lives in New Bern a good hour away. The doctor practices out of New Bern. The patient has never filled here and had to drive pass [sic] multiple pharmacies to get here. The pt stated he had tried to fill the prescription at other pharmacies but was refused…. The patient added that the provider tells his patients that only Wal-Mart will fill his prescriptions because they are the only pharmacy that has a no discrimination policy against prescribers. While all other pharmacies in the area refuse to fill for this prescriber. [Jacksonville, N.C., submitted July 12, 2014, following oxycodone refusal.]

- New patient, prescriber under investigation. Patient came in right at closing 5 minutes before. Demanding narcotics. Would not let me call to validate prescription. Would not leave store. I called security to get her out. [Richlands, N.C., submitted July 18, 2015, following oxycodone refusal.]

According to the DOJ, Walmart pharmacists submitted a total of seventy refusal-to-fill forms for Dr. Kumar from July 2013 to July 2015. Still Walmart refrained from an automatic ban. Dr. Kumar meanwhile became an out-and-out drug dealer, wearing a handgun during his cash-for-scripts office visits, stockpiling high-capacity firearms and 40,000 rounds of ammunition, and keeping a dozen separate bank accounts and $450,000 in cash sealed in duct-taped PVC pipes. The DOJ nonetheless estimated that, from June 26, 2015, until June 2016, when Dr. Kumar was arrested on trafficking charges, Walmart pharmacies filled more than 1,000 of his controlled-substance prescriptions.[453]

Dr. Kumar's counterpart in Charleston, West Virginia, was Dr. Muhammed Samer Nasher-Alneam. In June 2020 Judge David Faber sentenced Dr. Nasher-Alneam to 63 months in prison for illegal distribution of opioids. (His guilty plea agreement stipulated that he had illegally prescribed methadone and oxycodone pills, though the full list of charges included distributions causing death; maintaining drug-involved premises, and international money laundering.) Five years previously, in July 2015, Walmart pharmacists in South Charleston and Charleston had submitted refusal-to-fill reports stating that other area pharmacies had refused to fill Dr. Nasher-Alneam's controlled-substance prescriptions:

- The patient presented a new rx [for Norco 10/325] at drop off and asked if she could speak with a pharmacist to see if we would fill a prescription. She told Cody that Rite Aid, Kroger and Larry's Pharmacy would not fill this prescription and was wanting to

---

[453] Walmart Refusal-to-fill reports WMT_MDL__000966202, WMT_MDL__000966634, WMT_MDL__000964046, WMT_MDL__000842329, and WMT_MDL__000859507. More than 70, more than 1,000: *United States of America* v. *Walmart*, 88-89.

know if we would fill it for her. Cody told her that we must verify diagnosis on controlled medications but could fill any noncontrol [sic] without following up with the physician. She stated that she was offended that we wouldn't fill the prescription and wanted her hard copy back. The patient drove around 30 minutes to get to the pharmacy and presented an out of state ID. There were many DEA red flags present which led us to turning the script away such as traveling a long distance to the pharmacy, duplication of prescribing habits from the physician, patient trying to force the pharmacy to fill the prescription and acting in an unusual manner.

- New patient presented to the pharmacy with hardcopy for Norco 10/325. Checked on PMP [prescription monitoring program] to see where patient was filing previously which turned out to be Rite Aid in South Charleston. Upon speaking with them, they stated they have stopped filling for Dr. Nasher and he has been blocked from their system. PMP check also showed the patient is also taking Oxycodone [sic] 30 mg. Attempted to contact physician but was placed on hold for 10-15 minutes then hung up on. Made the decision to deny the rx due to 2 immediate release narcotics and not being able to verify the diagnosis with the physician.

From mid-2015 through mid-2018—the year Walmart finally placed Dr. Nasher-Alneam on a "central prescriber block list" and the government filed its criminal indictment—the DOJ estimates that Walmart pharmacists filled nearly 3,000 of his controlled-substance prescriptions.[454]

---

[454] U.S. Attorney's Office, Southern District of West Virginia, "Charleston Doctor Sentenced to Over Five Years in Federal Prison for Illegal Distribution of Methadone," June 29, 2020, https://www.justice.gov/usao-sdwv/pr/charleston-doctor-sentenced-over-five-years-federal-

The patients of Dr. Ralph Miniet of Hialeah, Florida, filled prescriptions at Walmart pharmacies as far distant as Salt Lake City. One Ohio patient tried filling hers at a Walmart in Tifton, Georgia, along I-75. The pharmacist, noting that she changed her story multiple times, and doubting her claim that "the entire *State* of Florida is out of Roxicodone," refused her request and faxed a report to Walmart's Regulatory affairs, together with Dr. Miniet's name and DEA number. Another report, from June 2015, describes Kentucky patients fanning out from Dr. Miniet's office to Walmart pharmacies across the Midwest, as far north as central Wisconsin. Asked if he had seen Dr. Miniet's name "on the RTF" [refusal to fill], Walmart's Nelson replied "Yep Ralph minuet [sic] is one of the three doctors I have to Miranda [sic] to check out. This was the dr we filled rxs in sale lake, MISSOURI, Iowa, and Arkansas. His patients are famous for the giant triangle for service." Neither infamy nor criminal organization (the email to which Nelson replied was headed "Krew from Kentucky" and stated that "these prescriptions are not likely prescribed for ethical purposes") sufficed to end the fills. Per the DOJ, "many Walmart pharmacies continued to fill [Dr.] R[alph] M[iniet]'s prescriptions." The Walmart pharmacies that continued to honor his prescriptions were located in thirty-two states, including Ohio. Even after November 2015, when a federal grand jury indicted Dr. Miniet for violations of controlled-substance laws, Walmart pharmacies kept filling his prescriptions for scheduled narcotics.[455]

---

prison-illegal-distribution; Amended Consent Order, West Virginia Board of Medicine, *In Re: Muhammed Samer Nasher-Alneam, MD*, Complaint Nos. 15-41-W, 16-33-W, 17-197-W, pp. 5-7, MCKMDL02113539-MCKMDL02113551 (other charges, guilty plea agreement); Walmart refusal-to-file reports WMT_MDL_000858930 and WMT_MDL_000589611 (quotations); Walmart Controlled Substances Compliance to "Dear Pharmacist," distribution email, March 19, 2018, WMT_MDL_001029169 (central prescriber block); United States of America v. Walmart, 77 (nearly 3,000).

[455] Julie Jill Knight to Regulatory Affairs, faxed report, February 19, 2014, WMT_MDL_001152677 (Tifton, "out of"); Brad Nelson to Caroline Riogi, email, June 25,

In sum, spot refusals by conscientiousness individual pharmacists were not enough to keep Walmart from leaking opioids. The leaks occurred across the country, and involved patients who traveled long distances and requested multiple controlled substances. Despite specific internal warnings about specific prescribers, Walmart pharmacies continued to fill "cocktail" combinations, inherently suspect multiple prescriptions for opioids, Xanax, Soma, and other drugs that enhanced users' highs—and increased their risk of respiratory depression. The prescriptions were written by such pill-mill doctors as Dr. Frank H. Bynes, Jr., of Savannah, Georgia; Dr. Howard Diamond of Sherman, Texas; and Dr. Michael Moyer of Winter Park and Orlando, Florida, whose first arrest for opioid trafficking had been in June 2010.[456]

When Reps. Armstrong ("Do you get newspapers?") and DeGette ("I mean, come on") expressed incredulity that opioid manufacturer and distributor executives did not understand their role in the crisis unfolding before them, they were referring to public events and reports.

---

2015, WMT_MDL_0009538453 (gang, "giant triangle"); and *United States of America* v. *Walmart*, 82-83.

[456]*United States of America* v. *Walmart*, pp. 53-56 (Dr. Bynes); pp. 63-67 (Dr. Diamond); pp. 71-76 (Dr. Moyer); pp. 83-85 (long distances), and 101-197 (cocktails); Autumn Amber Wolf et al., "The Perfect Storm: Opioid Risks and 'The Holy Trinity,'" *Pharmacy Times*, September 24, 2014, https://www.pharmacytimes.com/view/the-perfect-storm-opioid-risks-and-the-holy-trinity (respiratory depression). The DOJ complaint uses physicians' initials rather than full names, though these may be ascertained in (and charges of illicit trafficking corroborated by) the following sources: U.S. Attorney's Office, Southern District of Georgia, "Pill-mill Doctor Gets Decades in Prison for Healthcare Fraud, Illegally Prescribing Massive Amounts of Drugs," February 14, 2020, https://www.justice.gov/usao-sdga/pr/pill-mill-doctor-gets-decades-prison-healthcare-fraud-illegally-dispensing-massive (Dr. Bynes); U.S. Attorney's Office, Eastern District of Texas, "Two North Texas Doctors, One Nurse Sentenced to Prison for Federal Drug Trafficking Violations," May 9, 2019, https://www.justice.gov/usao-edtx/pr/two-north-texas-doctors-one-nurse-sentenced-prison-federal-drug-trafficking-violations (Dr. Diamond); and Amy Pavuk, "'Exotic dancer' Entrapped Me, Winter Park Doctor in Pill-mill Case Says," *Palm Beach Post*, May 11, 2012, https://www.palmbeachpost.com/story/news/2012/04/05/exotic-dancer-entrapped-me/7595592007/ (Dr. Moyer 2010 arrest).

National pharmacy executives had access to the same public information—and more. They had warnings from their own employees and local officials, including the names of specific stores, customers, and physicians. When employees reported that there was not enough room on a pharmacy's shelves to hold all the opioid orders; or that the local police chief had provided a list of customers arrested for using and dealing in the parking lot; or that their store was dispensing controlled substances like candy; or that other pharmacies in town refused to honor a certain doctor's suspect prescriptions; or that a Florida pain doctor's patients were filling suspect prescriptions across the country, national pharmacies possessed granular information that corroborated the general warnings and that enabled them, had they chosen to do so, to report and curtail outlier misconduct, the key to maintaining the CSA's closed system of narcotic control.[457]

Meanwhile Rannazzisi continued his campaign to warn and educate. "DEA cannot effectively combat this diversion alone," he wrote in a February 9, 2012, letter to CSA registrants. Though all registrants needed to remain vigilant, he had planned a special conference on diversion awareness aimed at pharmacists and pharmacist technicians, "often the last line of defense in preventing diversion." The conference, Rannazzisi later testified, was held in West Palm Beach that March, and was one of the best-attended events of his tenure, with representatives of all of the national pharmacy chains present.[458]

---

[457] Quotations: U.S. House Oversight and Reform hearings, "Combatting the Opioid Epidemic," 9 (DeGette) and "The Role of Purdue Pharma and the Sackler Family in the Opioid Epidemic," 18 (Armstrong). The examples of internal warnings are documented above.

[458] Rannazzisi to "Dear Registrant," February 9, 2012, p. 1, Plaintiff's Exhibit PX-FL-22808, *State of Florida* v. *Walgreen Co* and *State of Florida* v. *Walgreen Co*., trial transcript, April 18, 2022, pp. 1602-1603. Bill Winsley, who, as noted above, campaigned against pharmaceutical diversion in Ohio and who made frequent DEA presentations on pharmacists' corresponding

Rannazzisi maintained a second channel of information to national pharmacies that handled their own distribution. One such meeting occurred on August 19, 2015, between representatives of the DEA's Office of Diversion Control and Walmart executives. The occasion was another distributor initiative, this one centered on Walmart Warehouse #45, which filled controlled-substance orders for all Walmart and Sam's Club pharmacies. Since 2005 the DEA had staged such educational meetings for 84 firms, briefing them on their "due diligence responsibilities under the CSA" by discussing their SOM systems, reviewing their ARCOS data for Schedule II and III purchases, and "discussing national trends involving the abuse of prescription controlled substances," up sharply since 1999. "The information presented should not be considered new information," the DEA representatives reminded the Walmart executives. "The substance of this presentation has been previously available and communicated through the Controlled Substances Act, its regulations, Federal Register Notices, DEA-sponsored conferences, correspondence from the DEA, and releases from the popular press, as well as your own sales data."[459]

That sales data would contain red flags about particular recipients, such as pharmacies where many customers came from long distances or bought controlled substances with cash or credit cards, as well as orders of unusual size, pattern, and/or frequency. The DEA representatives reminded Walmart that responsibility for deciding whether to label a particular

_____

responsibility to prevent diversion, was one of the featured speakers at the conference (exhibit, p. 2, transcript pp. 1607, 1670-1671).

[459] Cathy A. Gallagher to Louis J. Milione and Demetra Ashley, October 1, 2015, US-DEA-00001316 (all pharmacies), and Abby Hayes, Inez Davis, and Leslie Spratley, "Distributor Briefing: Wal-Mart Warehouse #45" (slide deck, August 19, 2015), US-DEA-00000367, quotations from slides 2, 5.

order as suspicious remained with the company; however, once an order was so designated it "must *not* be shipped." Simply reporting the matter to the DEA "does *NOT* relieve the distributor of the responsibility to maintain effective controls against diversion." Walmart's pharmacists also played a role. Legal prescriptions were those written for legitimate medical purposes by practitioners acting in the usual course of their professional practices, but a "*corresponding responsibility*"—Anslinger's words from the 1930s, with DEA-added emphasis—"rests with the pharmacist who fills the prescription."[460]

\*

Walmart and other national pharmacies thus had information about diversion, its consequences, and its means of prevention from multiple sources, internal and external, before and during the prescription opioid crisis. Notwithstanding this flow of information, the national pharmacies lobbied against legislation to check prescription-opioid diversion. In 2012 and 2013 the NACDS, the trade organization for the national pharmacies, worked in concert with the HDMA and other pharmaceutical groups to oppose rescheduling HCPs like Vicodin and Lortab from Schedule III to the more restrictive Schedule II. The change, championed by Sen. Joe Manchin (D-WV) and co-sponsored by Sen. Jay Rockefeller (D-WV), initially took the form of a 2012 bipartisan amendment to the Prescription Drug Use Fee Act. The NACDS and its allies

---

[460] Hayes, Davis, and Spratley, "Distributor Briefing," quotations from slides 28, 29, and 33. The DEA representatives also referenced two pertinent Supreme Court decisions, *Direct Sales Co.* v. *United States* and *United States* v. *Moore*, both of which are described above.

charged that the measure would raise barriers for pain patients and increase overhead "with no assurance of reduction in diversion and abuse."[461]

Sen. Manchin countered that the scheduling change, supported by a broad coalition of healthcare and law enforcement groups, required an original prescription for the pills, greater security for their storage and transportation, and increased fines and penalties for their illicit trafficking. On June 14, 2012, Sen. Manchin explained to his colleagues why these measures should be applied to all drugs containing hydrocodone:

> Last month, I stood here on the Senate floor and shared the stories I have heard in communities across West Virginia about why this amendment is so urgently needed. Prescription drug abuse is responsible for about 75 percent of drug-related deaths in the United States—and 90 percent in West Virginia….
>
> But no statistic can illustrate the scope of this problem like hearing the pleas of children who are begging their leaders to do something to get drugs out of their communities. Children like those I met in Wyoming County, West Virginia[,] last October where more

---

[461] HDMA opposition: "Chronology of HDMA/HDA Executive Committee and Board of Directors Drug Abuse and Diversion Discussion at Meetings/Conference Calls" (TS, January 2, 2018), HDA_MDL_000155930- HDA_MDL_000155947, pp. 2, 3, 9, 10-11. NACDS opposition: Julie Khani email chain, May 30, 2012, CAH_MDL2804_02168066-CAH_MDL2804_0216806; Chrissy Kopple email chain, October 25, 2013, CVS-MDLT1-000121577; and Jim Frederick, "Enact PDUFA, but Leave Restrictions Out of It," June 11, 2012, *Drug Store News*, https://drugstorenews.com/news/enact-pdufa-leave-restrictions-out-it ("no assurance"). Manchin bipartisan amendment, Rockefeller co-sponsorship: "Manchin Fights for Measure to Help Prevent Prescription Drug Abuse in House-Senate Compromise Bill," press release, June 14, 2012, https://www.manchin.senate.gov/newsroom/press-releases/manchin-fights-for-measure-to-help-prevent-prescription-drug-abuse-in-house-senate-compromise-bill;

than 120 people have died from drug overdoses in the past seven years, including 41 in 2011 and 12 just this year.

M[r.] President, since that proud moment when the Senate unanimously passed my hydrocodone rescheduling amendment, it has come under fire from groups who seem to think that trying to limit the number of hydrocodone pills making their way into our communities—and oftentimes, into the wrong hands—is a bad idea because it affects their bottom lines.

Now, I recognize that this amendment does not fit into the business model of selling as many pills as possible. But with that being said, I believe that we have a responsibility to this great nation of ours—especially to our children and the generations to come—to win this war on prescription drugs. And right now, hydrocodone is one of the most abused substances out there.[462]

House negotiators nonetheless failed to agree to the amendment, a story the *New York Times* headlined as "Lobbying Effort is Said to Sink New Controls on Painkillers." However, another law enacted in 2012, the Food and Drug Administration Safety Innovation Act, directed the FDA to hold public hearings on the matter. On January 25, 2013, an FDA advisory committee voted to recommend placing HCPs in the more restrictive Schedule II. On December

---

[462] "Manchin Fights for Measure" (speech). It may be noted that the NACDS favored a different type of penal escalation: stiffer sanctions for trafficking in *counterfeit* prescription drugs that originated in, and whose profits remained in, the illicit market. Antoinette Alexander, "NACDS Expresses Support of 'Chairman's Mark' of Senate Bill to Reauthorize PDUFA," *Drug Store News*, April 26, 2012, https://drugstorenews.com/news/nacds-expresses-support-chairmans-mark-senate-bill-reauthorize-pdufa.

16, 2013, after further review (and continued NACDS and industry opposition), the FDA's

parent agency, the Department of Health and Human Services, made the same recommendation.

Though the NACDS and its allies continued to allege harms to legitimate patients for small gain

in curbing abuse, the DEA finally implemented the change on October 6, 2014, two-and-a-half

years after Sens. Manchin and Rockefeller had sought to achieve the same end through

legislation.[463]

    By then the national pharmacies were on the legislative offensive, having joined with

opioid distributors and manufacturers and their trade associations and political action committees

to support the Marino bill. Individual chains, such as Rite Aid and Walgreens, as well as the

NACDS, contributed millions of dollars to the lobbying effort. On April 25, 2015, attorney

Deborah Kelly reported to the NACDS board of directors that the House of Representatives had

---

[463] Robert Pear, "Lobbying Effort is Said to Sink New Controls on Painkillers," *New York Times*, June 18, 2012, https://www.nytimes.com/2012/06/19/health/policy/move-to-restrict-painkillers-founders-in-congress.html. History of rescheduling: "FDA Advisory Committee Votes 19 to 10 in Favor of Rescheduling Combination Hydrocodone, FDA Law Blog, January 30, 2013, https://www.thefdalawblog.com/2013/01/fda-advisory-committee-votes-19-to-10-in-favor-of-rescheduling-combination-hydrocodone/; [John J. Coleman,] "Rescheduling Hydrocodone Combination Products: Addressing the Abuse of America's Favorite Opioid," ASAM Blog, August 9, 2021, https://www.asam.org/blog-details/article/2021/08/09/rescheduling-hydrocodone-combination-products-addressing-the-abuse-of-america-s-favorite-opioid; DEA Diversion Control Division, "Rules-2014," https://www.deadiversion.usdoj.gov/fed_regs/rules/2014/fr0822.htm. NACDS opposition, e.g., David Silver to Walt Kaczmarek, email, February 4, 2013, MNKOI 0003125295, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=trnd0241; "In the News: Pharmacy Organizations Urge DEA Not to Reschedule Hydrocodone Combination Products," *Pharmacy Times*, May 10, 2014, https://www.pharmacytimes.com/view/in-the-news-pharmacy-organizations-urge-dea-not-to-reschedule-hydrocodone-combination-products; "Pharmacy Associations Oppose Rescheduling of Hydrocodone Combination Products," *Pharmacy Times*, June 16, 2014, https://www.pharmacytimes.com/publications/issue/2014/june2014/pharmacy-associations-oppose-rescheduling-of-hydrocodone-combination-products; and Lisa Boylan, "The Other Side of the Pain Medication Debate—Legitimate Patients," NACDS, October 2, 2014, https://www.nacds.org/news/the-other-side-of-the-pain-medication-debatelegitimate-patients/.

passed the bill four days before and that "the association's lobbying efforts will now turn to the Senate. A new attorney general and DEA director will also provide an opportunity to make ground on this important issue." Don Bell, the Senior Vice President for Legal Affairs and General Counsel for NACDS, added "that the legislation creates new DEA enforcement standards and allows pharmacies that run afoul of DEA standards to submit a corrective action plan in lieu of just being shut down"—the same desideratum that ex-DEA attorney Gilbert outlined for the HDMA.[464]

John J. Mulrooney, II, the DEA Chief Administrative Law Judge, chose different words to describe the corrective-action-plan provision. It was akin, he wrote in 2017, "to a state legislature mandating that law enforcement authorities allow shoplifting suspects caught in the act to outline how they intend to replace purloined items on store shelves; allow intoxicated drivers to pull to the side of the road and park their previously swerving vehicles; or perhaps allow bank robbers to round up and return ink-stained money and agree not to rob any more banks—all before any of those wrongdoers actually admit fault and without any consequence that might deter such behavior in the future."[465]

---

[464] Higham and Bernstein, "Drug Industry's Triumph over the DEA" (lobbying expenditures); NACDS Board of Directors Meeting Minutes, April 25, 2015 (TS, August 10, 2015), p. 8, WAGMDL00633977 (Kelly, Bell).

[465] John J. Mulrooney II [sic] and Katherine E. Legel, "Current Navigation Points in Drug Diversion Law: Hidden Rocks in Shallow, Murky, Drug-Infested Waters," *Marquette Law Review* 101 (Winter 2017): 340, https://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=5348&context=mulr. In November 2017 forty-four state attorneys general seconded Judge Mulrooney's objections and asked Congress to repeal the law. At this writing, it remains in place. Lenny Bernstein and Scott Higham, "44 State Attorneys General Want Repeal of Law that Curbed DEA Powers," *Washington Post*, November 14, 2017, https://www.washingtonpost.com/national/health-science/44-state-attorneys-general-want-repeal-of-law-that-curbed-dea-

In endorsing the bill in February 2014 and again in January 2015 the NACDS claimed the opposite motivation. NACDS president Steven C. Anderson stated that the trade association and its members were committed to "partnering" with law enforcement and they would "continue to support policies that enable law enforcement entities to serve the public and act to address prescription drug diversion and abuse, while still maintaining patient access to medically necessary medications." These stated intentions, and the HDMA-style public relations campaign that accompanied them, were eyewash. By 2015 national pharmacies had a history of violating rather than continuing to support law enforcement policies designed to prevent diversion and abuse. That was why they got in trouble with the DEA in the first place, and that was why they joined forces with other defendants in the supply chain to seek legislation to check the DEA's most powerful enforcement tool for preventing diversion.[466]

Among the other defendants-to-be was Purdue Pharma. Purdue executives had been concerned with DEA diversion-control assertiveness since at least December 2007, when Jack

---

powers/2017/11/14/4f746f4a-c975-11e7-b0cf-7689a9f2d84e_story.html?utm_term=.8101aaa7479f&tid=a_inl_manual.

[466] "NACDS Backs Bill to Curb Prescription Drug Abuse," *Chain Drug Review*, February 25, 2014, NACDS backs bill to curb prescription drug abuse - CDR – Chain Drug Review ("partnering") and Steven C. Anderson to Marino, January 20, 2015, https://www.nacds.org/pdfs/pr/2015/1_21_Marino_Letter.pdf ("continue to support"). NACDS Board of Directors Meeting Minutes, April 25, 2015, p. 8, WAGMDL00633977, reports that, in addition to lobbying for the Marino bill, NACDS hired a PR firm in Florida to reframe the issue as patient access to needed medications rather than widespread abuse. The firm was "to assist with our efforts to get pharmacy's message out and to help set up meetings with newspaper editorial boards in Florida to educate them on this issue. NACDS has also participated in radio interviews in Florida on the subject of ensuring patients [sic] access to legitimate medications."

Crowley, Purdue's executive director for CSA compliance, commiserated with a counterpart at Cardinal. "I'm sorry that DEA is being so aggressive with this Suspicious Orders stuff," Crowley wrote. "I wish there was something I could do to help in this situation—we are all in the same boat." As it transpired, there was something that could be done: Pull together on the oars of the Marino bill. Purdue's Rosen acknowledged the collaboration in an internal email of April 12, 2016, sent after the House of Representatives had passed the bill, which the President was expected to sign. "The bill is one we have been working on with HDMA and NACDS for the past two years," Rosen wrote. The proviso for "corrective action" prior to DEA revocation or suspension of licensure remained intact, and "Purdue was very active in influencing the ultimate definition of an 'imminent danger to the public health or safety.'"[467]

Purdue's support of the Marino bill was neither unique nor transparent. Purdue and other opioid manufacturers relied on professional societies and advocacy groups they funded to lobby for the legislation. One was the Academy of Integrative Pain Management (the old American Academy of Pain Management with a new name); it received $1.2 million from opioid manufacturers between 2012 and 2017. Another was the Alliance for Patient Access (AfPA). Founded in 2006, the AfPA was run by a Washington D.C. public relations firm; governed by a board whose six physician-members took money from drug companies; and funded by PhRMA, which contributed more than a half million dollars, and by opioid manufacturers, including

---

[467] Jack Crowley to Elaine Trautman, email, December 7, 2007, CAH_MDL_PRIORPROD DEA07_00842131, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=qxyc0230; Pamela Bennett email attaching Burt Rosen email of April 12, 2016, PPLPC017000701492, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=njyw0232. For an example of Purdue's ongoing coordination with the HDMA and PCF to secure passage of the Marino bill, see Rosen, email chain, January 15, 2015, HAD_MDL_000081283-HAD_MDL_000081284, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=hxyw0232.

Allergan, Endo, J &J, Purdue, and Teva, whose dues ran between $25,000 and $50,000 annually.[468]

In short, the drafting and passage of the Marino bill was a cooperative, industry-wide effort involving manufacturers, distributors, national pharmacies, and their trade and front organizations, all of which opposed DEA efforts to suspend business operations that ignored or failed to stop diversion, whose suppression was an explicit and primary aim of the legislation that Congress had, in 1970, enacted to control access to dangerous drugs.

---

[468] Academy of Integrative Pain Management, December 13, 2013, http://www.ihpc.org/team/american-academy-of-pain-management/ (name change); Higham and Horwitz, *American Cartel*, 176-177 ($1.2 million); "Opioid-law Scandal Sheds Light on Lobbying by Industry-Funded 'Patient Access' Groups," Yahoo News, October 18, 2017, https://www.yahoo.com/news/opioid-law-scandal-sheds-light-lobbying-industry-funded-patient-access-groups-195153461.html (lobbying by both groups); "Alliance Steering Committee Organizations" (TS, June 6, 2014), MNKOI 0004172314- MNKOI 0004172315, https://www.industrydocuments.ucsf.edu/opioids/docs/#id=hqjx0246 (AfPA founded 2006); Mary Chris Jaklevic, "Non-profit Alliance for Patient Access Uses Journalists and Politicians to Push Big Pharma's Agenda, HealthNewsReview.Org, https://www.healthnewsreview.org/2017/10/non-profit-alliance-patient-access-uses-journalists-politicians-push-big-pharmas-agenda/ (AfPA organization and funding).

**Summary:**

**Manufacturers, Distributors, National Pharmacies, and Prescription-Opioid Addiction**

Dr. Carl Erik Fisher, an addiction psychiatrist and bioethicist, has recently written that Purdue did not create the prescription opioid addiction epidemic on its own. Purdue's leaders, though expert at their craft, "were simply playing a role in a larger system that has existed and evolved for generations. Drug epidemics throughout history have commonly featured not just a novel drug but also a powerful industry promoting that drug."[469]

The principal driver of the prescription opioid addiction and overdose epidemic was promotion by an *industry*, not a single company. Only in this instance the promotion extended beyond a drug, or class of drugs, to an *idea*, revisionism, that debunked conservative prescribing norms and advocated a return to widespread opioid use in managing CNP. Firms throughout the supply chain (and outside consulting, public relations, and CE-preparation companies) collaborated, with awareness and approval at central executive levels, to subvert narcotic conservatism.

Previous attempts to do so had been largely unsuccessful. In the 1940s pharmaceutical companies that sought to expand the CNP market for novel opioids were checked by regulators. From 1995 on pharmaceutical companies that sought to expand the same market enjoyed greater success, both in securing initially favorable regulatory treatment and in fending off regulators' attempts to reassert control. Diversion watchdogs like Anslinger and Haislip did not have to deal

---

[469] Carl Erik Fisher, *The Urge: Our History of Addiction* (New York: Penguin Press, 2022), 29.

with the likes of Rep. Marino, who, after introducing hamstringing legislation, was feted at a fundraising luncheon sponsored by ABC, Cardinal, and the NACDS. Rannazzisi did face such sophisticated opposition and was defeated—initially. A theme running through journalistic and jurisprudential accounts of the opioid crisis is that the post-2017 wave of litigation arose, in part, because of regulatory capture and the lobbying power of the opioid industry. Courts became an alternative means of holding companies responsible for community harms caused by their products and deterring their future misconduct.[470]

The most basic explanation for this change of fortune (and institutional venue) is that the postwar American pharmaceutical industry had become vastly wealthier and more influential than its fragmented prewar predecessor, which was so economically marginal that Moody's Investors Service did not bother to class it as a major industry. That status changed in the 1940s, when the government-led penicillin revolution fostered concentration and expanded manufacturing and research capabilities that enabled rapid future growth. In 1950 less than 1 percent of U.S. consumer spending went to pharmaceuticals; by 2016, when drug sales hit $450 billion, nearly 4 percent did so. Revenue on this scale gave manufacturers, large distributors, and national pharmacies access to more, and more sophisticated, tools of persuasion and influence.[471]

---

[470] Two recent works exemplifying this theme are Higham and Horwitz, *American Cartel*, and Rebecca L. Haffajee, "The Public Health Value of Opioid Litigation," *Journal of Law, Medicine & Ethics* 48 (2020): 279-292. For lobbying details see *American Cartel*, chaps. 18 and 21, Marino luncheon at p. 103.

[471] Peter Allen Younkin, "A Healthy Business: The Evolution of the U.S. Market for Prescription Drugs," Ph.D. diss. (University of California, Berkeley, 2010), Moody's pp. 2-3; "U.S. Pharmaceutical Spending as a Percent of Total Consumer Spending in the U.S. from 1930 to 2016," Statista, November 15, 2017, https://www.statista.com/statistics/783135/pharma-spending-as-a-share-of-consumer-spending-in-us/ (percentages); and "U.S. Drug 2016 Sales, at $450 Billion, Moderate to Single-Digit Growth," Pharmaceutical Commerce, May 16, 2017,

The pro-opioid tools of persuasion described in this report include direct grants and subsidies for favorably disposed KOLs; propagation of their views through article reprints, advertisements, news stories, editorials, books, promotional videos, unbranded websites, push polls, paid talks, conferences, consensus panels, continuing education courses, and speaker-training programs; behind-the-scenes crafting of medical research and patient-education materials; development of new (and patentable) medications pitched as superior to old standbys; highly incentivized sales forces that sought out, cultivated, and rewarded accommodating practitioners; coordinated marketing and revisionist educational efforts throughout the supply chain; encouraging off-label prescribing; the formation, funding, and guidance of patient advocacy groups; financial influence over professional, regulatory, and accrediting bodies dependent on industry money; revolving-door recruitment of experts and attorneys from regulatory agencies; hiring of public relations firms and crisis managers; and donations to politicians who sponsored and supported favorable legislation.

Historians, social scientists, and journalists concur that the pharmaceutical industry has deployed these and other methods to promote and protect products other than opioids. When Stephen Braun described his work as a professional medical writer, he used testosterone supplements as an illustration, not the FSMB's *Responsible Opioid Prescribing*, Purdue's *Exit Wounds*, or J & J's *Finding Relief*. When it came to prescription opioids, however, five points stand out.

---

https://www.pharmaceuticalcommerce.com/latest-news/us-drug-2016-sales-450-billion-moderate-single-digit-growth/.

- The drive to increase sales and fend off regulation was fraught because opioids carried inherent risks of addiction, overdose, and other serious side effects.

- These risks were well established before manufacturers, with the assistance of distributors and national pharmacies, turned opioid revisionism into a marketing campaign.

- The revisionist campaign persisted for nearly two decades after evidence emerged that it was premised on faulty data and misleading advice.

- The harms of liberalizing opioid prescribing were magnified by registrants' failures to monitor, report, and stop suspicious opioid orders and prescriptions.

- The misleading promotions, supply-oversight derelictions, and lobbying against diversion control occurred throughout the prescription-opioid supply chain.[472]

The result was a prolonged increase in Americans' exposure to prescription opioids, as shown in Figure 7. Montgomery County's share, according to 2006-2014 ARCOS data analyzed by the *Washington Post*, was 230,039,673 prescription pain pills, or about 47 pills per person per year.[473]

Not everyone who takes prescription opioids becomes addicted, an observation that has long engendered controversy about causation. In this respect opioids are like environmental

---

[472] Promotions of non-opioid drugs are described in, e.g., Hertzberg, *Happy Pills* and *White Market Drugs*, Guise-richardson, "Protecting Mental Health in the Age of Anxiety," Sismondo, *Ghost-Managed Medicine,* and Posner, *Pharma*. Braun: "'Promoting 'Low T:' A Medical Writer's Perspective."

[473] Scott Higham, Sari Horwitz, and Steven Rich, "76 Billion Opioid Pills,", using "explore the database" link.

carcinogens, which sicken and kill some exposed individuals, but not others. For opioids, the likelihood that individuals will abuse or become addicted to opioids varies according to several factors. Among these factors are genetic predisposition; trauma, neglect, and/or intoxicant exposure in early life; mental illness (e.g., depression, anxiety, bipolar disorder); social disruption and familial disorganization; a history of substance abuse and/or other addictive disorders; poverty; demoralization associated with downward economic mobility; and stress, including stress caused by patients' growing frustration when pain and illness persist.[474]

A key clinical problem, described by Dr. Pescor in the 1930s, is that many at-risk patients are also pain patients. It is not easy or straightforward for physicians to sort them out. Arthritis, low-back pain, headache, and neuralgia afflict the addiction-prone and the non-addiction-prone alike. That was why, prior to the opioid industry's revisionist démarche, doctors and authoritative medical textbooks had discouraged narcotic use in cases other than those involving terminal illness, surgery, trauma, and a handful of other non-chronic conditions. Better safe than sorry.

---

[474] The history of medical and social-scientific thinking about addiction risk factors is reviewed in Courtwright *Dark Paradise*, chaps. 5 and 6, and Courtwright, *The Age of Addiction: How Bad Habits Became Big Business* (Cambridge, Mass: Belknap Press of Harvard University Press, 2019), chaps. 3 and 6. Demoralization: Anne Case and Angus Deaton, *Deaths of Despair and the Future of Capitalism* (Princeton: Princeton University Press, 2020). Prolonged illness: Adriaensen, "Opioid Drugs in Chronic Non-Malignant Pain?"

**Figure 10:** A model of sources of opioid exposure in the U.S.



Figure 10 depicts a population-based model that summarizes historical, epidemiological, medical, and regulatory thinking about the relationship between opioid exposure and opioid abuse and addiction and their sequelae. A population consists of individuals of varying liability to opioid abuse and addiction, labeled heuristically as L, A, or H, for low, average, or high susceptibility. The illicit pathway involves sales of prohibited narcotics like heroin as well as prescription opioids that have been illegally diverted. The licit pathway involves opioids legally purchased and consumed by patients with a prescription.



Increases in both sorts of supply, licit and illicit, expose more individuals, as illustrated by the movement of the second set of lines. Additional users who ultimately become addicted to legally manufactured opioids either do so directly, through their own prescribed medications, or indirectly, by acquiring the drugs through various forms of diversion. Either way, once they are addicted, they are more likely to relapse following treatment if opioids remain cheap, potent, and readily available. Recall what happened after the Vietnam War: Most returning veterans abstained from using opiates in the United States, where heroin was then relatively weak, expensive, and hard to come by. The situation reversed in the late 1990s. "The supply of prescription pain pills was massive and everywhere, because doctors prescribed them," as Quinones put it. "Heroin followed; supplies skyrocketed, and prices fell." Even small towns had

pill and heroin dealers, which made it harder for addicts in recovery to avoid temptation and relapse cues.[475]

Indirect iatrogenesis was not a significant source of medicinal opiate addiction in the late nineteenth century. Direct iatrogenesis, which was significant, was countered in two ways. One was by raising awareness of risk, both among medical professionals and consumers. The other was by controlling supply through more stringent prescription, labeling, registration, and tracking laws and regulations. These attitudinal and legal changes reduced new cases of medicinal opiate addiction through primary prevention, i.e., no exposure in the first place. This

---

[475] Cf. Hall and Weier, "Lee Robins' Studies of Heroin Use among US Vietnam Veterans," and Quinones, *The Least of Us*, 85-92, 151, quotation p. 88. Dasgupta et al., "Association Between Non-Medical and Prescriptive Use of Opioids," 138, adds another significant detail. The authors found that, the more potent the prescription opioid, the steeper the slope of the regression line when emergency room admissions are regressed on annual kilogram use of a particular opioid. That is, annual consumption increases in relatively mild prescription opioids like codeine produce fewer problems than corresponding consumption increases in strong opioids like fentanyl and hydromorphone.

I prepared these illustrative diagrams before Judge Polster issued his August 17, 2022, abatement order. I was nonetheless struck by the close parallels between the causal logic of the diagrams and his specific findings for Lake and Trumbull Counties: "CVS's pills reached individuals in multiple ways, far beyond only the people who physically filled a prescription written in their name at CVS. The jury heard evidence that some County residents obtained improperly dispensed CVS pills from other sources, such as the medicine cabinets of friends and family, or drug dealers on the black market. Furthermore, once these individuals became addicted, many turned to illicit opioids. The jury accepted (as does the Court) the testimony of Plaintiffs' epidemiologist expert, Dr. Katherine Keyes, that the oversupply of prescription opioids resulted in an increased population of people with opioid [use] disorder, which led to a number of interacting, synergistic factors that worked together to create an indivisible harm, namely, the opioid epidemic. The jury's verdict necessarily implies it concluded that CVS dispensed prescriptions it should not have, leading to oversupply and diversion of opioids in the community, which led linearly and foreseeably to addiction of *not only some CVS customers* but non-customers, as well. Of course, the same is true for each Defendant." In Re: National Prescription Opiate Litigation, Track Three Cases: Abatement Order, p. 53, italics in original.

trend was widely noted by medical and police authorities in the late nineteenth and early twentieth centuries.[476]

Yet patient addiction was only one dimension of the problem. The diversion threat grew and became more complex as new opioids were introduced and as black-market incentives increased. Prescriptions for Schedule II opioids, as Gene Haislip remarked in 1988, could be turned into thousands of dollars if the pills were resold illegally. Hence his wariness of industry-backed calls for liberalized prescribing of powerful narcotics.[477]

Haislip's concerns proved to be well founded. During the next quarter century the ongoing subversion of narcotic conservatism produced a situation like that of the late nineteenth century: rapid increases in consumption of, and addiction to, medicinal opioids, with such familiar sequelae as infections, overdoses, and neonatal abstinence syndrome. The second American medicinal opioid addiction epidemic was worse than the first, whether measured in absolute numbers (Appendix B) or as a rate.

The change in Ohio was particularly dramatic. In 1920 there were, at most, about two opiate addicts per thousand persons in the United States as a whole, down from a maximum of 4.6 per thousand in 1895, at the peak of the first epidemic. In Ohio the 1920 rate appears to have been even lower, judging from the fact that the Youngstown morphine maintenance clinic enrolled only 65 patients, a rate of 0.49 per thousand. The precipitous decline continued during

---

[476] Courtwright, *Dark Paradise*, chaps. 1, 2, 4, and 5.

[477] Haislip, "Impact of Drug Abuse on Legitimate Drug Use," *Advances in Pain Research and Therapy*, ed. Hill and Fields, 205-206.

the mid-twentieth century. By 1960 the FBN estimated that there were fewer than 200 narcotic addicts in Ohio, yielding a maximum addiction prevalence of 0.022 per thousand. Allowing that FBN data excluded opioid-dependent patients under medical supervision, such as those receiving palliative care, Ohio in the Eisenhower years was sufficiently untroubled by narcotic addiction that the FBN reduced the number of its agents in the state from twenty to just three.[478]

In the early twenty-first century, by contrast, Ohio had a serious and growing opioid addiction problem. In 2020 researchers at the U.S. Substance Abuse and Mental Health Services Administration estimated that, during 2017-2019, the annual average prevalence of opioid use disorder in the past year in Ohio was 142,000, a rate of 12.1 per thousand for the total population. The state's opiate addiction rate had thus ballooned from practically nothing in the early 1960s to nearly three times that of the ceiling estimate of the previous peak in the mid-1890s, in the heyday of hypodermic-wielding physicians and patent-medicine hucksters.[479]

---

[478] 1895 and 1920 estimates, Youngstown: Courtwright, *Dark Paradise*, 13, 33-34; FBN, *Prevention and Control of Narcotic Addiction*, pp. 6, 29, rate computed using population denominator from 1960 U. S. Census, Table 14, p. 1-23, https://www2.census.gov/library/publications/decennial/1960/population-volume-1/vol-01-01-f.pdf. Three years later, in 1963, the FBN files reported 295 male narcotic addicts in Ohio—still a comparatively low rate. That year only 44 of 2,453 (1.8 percent) of addict admissions to the federal narcotic hospitals were Ohio residents. By contrast, 5.3 percent of all Americans then lived in Ohio. John C. Ball and Carl D. Chambers, "Overview of the Problem," *Epidemiology of Opiate Addiction in the United States*, p. 7

[479] U.S. Substance Abuse and Mental Health Services Administration, *Behavioral Health Barometer: Ohio*, vol. 6, https://www.samhsa.gov/data/sites/default/files/reports/rpt32852/Ohio-BH-Barometer_Volume6.pdf, using a 2018 (median year) population denominator from "2018 Ohio County Population Estimates," https://co.geauga.oh.us/Portals/0/resources/County%20Documents/planning%20commission/census/2018-ohio-county-population-estimates.pdf

A significant contributing factor to, and a necessary condition for, a reversal of epidemiological fortune of such magnitude was the campaign to subvert narcotic conservatism and the strict regulatory regime with which it was associated. Opioid manufacturers, distributors, and national pharmacies all played multiple roles in that campaign. The common, intended effect of their efforts was to substantially increase exposure to prescription opioids, despite their known addictive and toxic properties. The result of that exposure was that Ohioans and other Americans endured a second prolonged epidemic of medicinal opioid addiction, this one far more destructive than the wave of national narcotic addiction that crested and broke at the end of the nineteenth century.

Respectfully submitted,

David T. Courtwright, Ph.D.                                    August 22, 2022

**APPENDIX A:** DAVID T. COURTWRIGHT, CURRICULUM VITAE

## POSITIONS AND TITLES

**Presidential Professor**, University of North Florida, 2005-2019; prof. of history since 1988. Voted emeritus status, effective April 2019.

**Associate Professor of History**, University of Hartford, 1985-1988.

**Assistant Professor of History**, University of Hartford, 1979-1985.

**Assistant Clinical Professor of Community Medicine**, University of Connecticut Health Center, 1981-1988, concurrent with the University of Hartford appointment.

**Faculty Associate in Epidemiology**, University of Texas School of Public Health, 1978-1979.

## EDUCATION

**Ph.D.** Rice University, History, 1979. Dissertation: "Opiate Addiction in America, 1800-1940."

**B.A.** University of Kansas, English, *summa cum laude* and Phi Beta Kappa, 1974.

## SELECTED AWARDS AND HONORS

**NEH:** Public Scholar Grant, 2016-2017 (to write *The Age of Addiction*); Fellowship, 1998-1999 (to write *Forces of Habit*).

**University of Richmond**: Douglas Southall Freeman Professor of History, 2015.

**UNF**: John A. Delaney Presidential Professorship, 2005; Outstanding Scholarship Award, 2002, 2012; Teaching Awards, 1998, 1999, 2001, 2002, 2005; Distinguished Professor, 1998.

**College on Problems of Drug Dependence**: Media Award, 2002 (for *Forces of Habit*).

**American Council of Learned Societies**: Fellowship, 1993-1994 (to write *Violent Land*).

## BOOKS BEARING ON THE HISTORY OF DRUG USE AND DRUG POLICY

*The Age of Addiction: How Bad Habits Became Big Business* (Belknap Press of Harvard University Press, 2019).

*Addicts Who Survived: An Oral History of Narcotic Use before 1965,* rev. ed. (Tennessee, 2012).

*No Right Turn: Conservative Politics in a Liberal America* (Harvard, 2010).

*Forces of Habit: Drugs and the Making of the Modern World* (Harvard, 2001).

*Dark Paradise: A History of Opiate Addiction in America*, exp. ed. (Harvard, 2001).

*Violent Land: Single Men and Social Disorder from the Frontier to the Inner City* (Harvard, 1996).


## REFEREED ARTICLES AND CHAPTERS ON DRUGS, ALCOHOL, AND TOBACCO

"Preventing and Treating Narcotic Addiction—A Century of Federal Drug Control," *New England Journal of Medicine* 373 (2015): 2095-2097.

"The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction," *Ann. Rev. of Public Health* 36 (March 2015): 559-574; second author.

"Addiction and the Science of History," *Addiction* 107 (2012): 486-492, reprinted with commentaries and my response in "Addiction, History, and Historians: A Symposium," *Points*, https://pointsadhsblog.wordpress.com/2012/03/02/addiction-and-historians-a-symposium/.

"Modernity and Anti-Modernity: Drug Policy and Political Culture in the United States and Europe in the Nineteenth and Twentieth Centuries," *Drugs and Culture: Knowledge, Consumption and Policy*, ed. Geoffrey Hunt et al. (Farnham: Ashgate, 2011), 213-224; principal author.

"The NIDA Brain Disease Paradigm: History, Resistance, and Spinoffs," *BioSocieties* 5 (2010): 137-147.

"Mr. ATOD's Wild Ride: What Do Alcohol, Tobacco, and Other Drugs Have in Common?" *Social History of Alcohol and Drugs* 20 (2005): 105-140, with commentaries.

"'Carry on Smoking': Public Relations and Advertising Strategies of American and British Tobacco Companies since 1950," *Business History* 47 (2005): 421-432.

"The Controlled Substances Act: How a Big Tent Reform Became a Punitive Drug Law," *Drug and Alcohol Dependence* 76 (2004): 9-15.

"The Roads to H: The Emergence of the American Heroin Complex, 1898-1956," *100 Years of Heroin*, ed. David F. Musto et al. (Westport, Conn.: Auburn House, 2002), 3-19.

"Morality, Religion, and Drug Use," *Morality and Health*, ed. Allan M. Brandt and Paul Rozin (New York: Routledge, 1997), 231-250.

"The Prepared Mind: Marie Nyswander, Methadone Maintenance, and the Metabolic Theory of Addiction," *Addiction* 92 (1997): 257-265.

"The Rise and Fall and Rise of Cocaine in the United States," *Consuming Habits: Drugs in History and Anthropology*, ed. Jordan Goodman, Paul E. Lovejoy, and Andrew Sherratt (London: Routledge, 1995), 206-228, revised and republished in 2nd ed., 2007.

"The Hidden Epidemic: Opiate Addiction and Cocaine Use in the South, 1860-1920," *Journal of Southern History* 49 (1983): 57-72.

"Opiate Addiction as a Consequence of the Civil War," *Civil War History* 24 (1978): 101-111. Awarded the Mary Hayes Ewing Publication Prize in Southern History, 1979.

## RELATED PROFESSIONAL ACTIVITIES

President, Alcohol and Drugs History Society, 2009-2011.

Editorial Boards: *Bull. Hist. Med* (1999-2001); *Hist. Pharmacy & Pharmaceuticals*; *Intl. J. of Drug Policy*

Member, Institute of Medicine Substance Abuse Coverage Committee, 1988-1990. The committee investigated the adequacy of drug abuse treatment in the U.S. and made recommendations to Congress in *Treating Drug Problems*, 2 vols. (Washington, D.C.: National Academy Press, 1990, 1992).

**ADDRESS** 3871 Arrow Point Trail W., Jacksonville, FL 32277, dcourtwr@yahoo.com

**APPENDIX B**: Prevalence and Characteristics of U.S. Opiate Addicts, 1895-1995



1895 — medical addicts using opium or morphine — nonmedical addicts mainly using smoking opium

1915 — medical addicts using opium or morphine — nonmedical addicts using heroin (in the East), smoking opium (mainly Chinese), or morphine (alone or in combination with cocaine)

1935 — medical addicts mainly using morphine — nonmedical addicts mainly using heroin

1955 — medical addicts using morphine or synthetic opiates — nonmedical addicts, increasingly from the ghetto or barrio, using heroin

1975 — medical addicts using morphine or synthetic opiates — nonmedical addicts, mainly inner-city residents, plus some youthful whites and Vietnam veterans, using heroin and/or methadone

1995 — medical addicts using morphine or synthetic opiates — nonmedical addicts, including aging inner-city heroin injectors, methadone patients, cocaine users who switched to or added heroin, and some white avant-garde heroin smokers and sniffers

Appendix B, continued: Though contemporary prevalence estimates varied, reanalysis of available data indicates that there could not have been more than approximately 300,000 addicts in 1895, the peak of the first U.S. epidemic. By 1975 there were approximately 600,000 addicts, overwhelmingly nonmedical heroin users, up from around 100,000 in 1967. "In those days … it wasn't 'the drug problem,'" commented Dr. Robert DuPont, the first director of the National Institute on Drug Abuse, "it was 'the heroin problem.'"[480]

The outstanding characteristic of the epidemic that commenced after 1995, apart from its unprecedented scale, was its reversion to the older pattern of most addicts becoming addicted through prescription drugs rather than illicit "street" drugs. By 2014, according to NIDA Director Dr. Nora Volkow, "an estimated 1.9 million people in the United States suffered from substance use disorders related to prescription opioid pain medications and 586,000 suffered from a heroin use disorder." If one were to add a circle for 2014 to Appendix B, it would resemble the medical/nonmedical pattern for 1895—save that, to capture expanded prevalence, it would be at least four times as large as the circle for 1975 or 1995.[481]

---

[480] Appendix B is adapted from Courtwright, *Dark Paradise*, figure 13, p. 183. See *idem*, chaps. 1, 6, and 7, for the statistical basis of the demographic generalizations and prevalence estimates. The DuPont quotation is on p. 171. Around 100,000 in 1967: John C. Ball, David M. Englander, and Carl D. Chambers, "The Incidence and Prevalence to Opiate Addiction in the United States," in Ball and Chambers, eds., *The Epidemiology of Opiate Addiction in the United States*, 68-78. This study is also available online at https://pdfs.semanticscholar.org/9fae/bc71c2f4e43ceb65b8aebd333b01a52b76f1.pdf.

[481] Nora D. Volkow, "What Science Tells Us About Opioid Abuse and Addiction" (Dr. Volkow's testimony before U.S. Senate Judiciary Committee, January 27, 2016), https://www.drugabuse.gov/about-nida/legislative-activities/testimony-to-congress/2016/what-science-tells-us-about-opioid-abuse-and-addiction. Dr. Volkow was referencing 2014 data from the Substance Abuse and Mental Health Services Administration.

**APPENDIX C**: Abbreviations

| | |
|---|---|
| AAPM | American Academy of Pain Medicine |
| ABC | AmerisourceBergen Corporation |
| ADHS | Alcohol and Drugs History Society |
| APF | American Pain Foundation |
| APS | American Pain Society |
| ARC | Addiction Research Center |
| ASAM | American Society of Addiction Medicine |
| ASPE | American Society of Pain Educators |
| ASPI | Alliance of State Pain Initiatives |
| BDAC | Bureau of Drug Abuse Control |
| BNDD | Bureau of Narcotics and Dangerous Drugs |
| CDA | Committee on Drug Addiction |
| CDAN | Committee on Drug Addiction and Narcotics |
| CDC | Centers for Disease Control and Prevention |
| CE | Continuing education |
| CME | Continuing medical education |
| CNP | Chronic nonmalignant pain |
| CSA | Controlled Substances Act |
| DEA | Drug Enforcement Administration |
| DOJ | Department of Justice |
| FBN | Federal Bureau of Narcotics |
| FDA | Food and Drug Administration |

| FSMB | Federation of State Medical Boards |
|------|-----------------------------------|
| GAO | Government Accountability Office |
| GPO | Government Printing Office |
| HCP | Hydrocodone combination product |
| HDA | Healthcare Distribution Alliance |
| HDMA | Healthcare Distribution Management Association |
| IASP | International Association for the Study of Pain |
| ISO | Immediate suspension order |
| J & J | Johnson & Johnson |
| *JAMA* | *Journal of the American Medical Association* |
| JCAHO | Joint Commission on Accreditation of Healthcare Organizations |
| JJBP | John J. Bonica Papers, MS 118, History and Special Collections Division, Louise M. Darling Biomedical Library, University of California at Los Angeles |
| KOL | Key opinion leader |
| LCLP | Louis C. Lasagna Papers, Special Collections, River Campus Libraries, University of Rochester, Rochester, N.Y. |
| MED | Morphine equivalent daily |
| MTM | Medication Therapy Management |
| NACDS | National Association of Chain Drug Stores |
| NDA | New Drug Application |
| NIDA | National Institute on Drug Abuse |
| NIPC | National Initiative on Pain Control |
| NSAID | Nonsteroidal anti-inflammatory drug |

NWDA          National Wholesale Druggists' Association

OPR           Opioid pain reliever

OTSC          Order to show cause

PCF           Pain Care Forum

PHN           Pharmacy Health Network

REMS          Risk Evaluation and Mitigation Strategies

SO            Suspicious orders

SOM           Suspicious order monitoring

USIOC         U.S. Delegation to the International Opium Commission & Conference, records