# EXHIBIT B

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION

 3                         - - -

 4     _____
                                      :
 5     IN RE: NATIONAL PRESCRIPTION   : MDL No. 2804
       OPIATE LITIGATION              :
 6                                    : Case No. 17-md-2804
       THIS DOCUMENT RELATES TO:      :
 7     "Case Track Seven"             : Judge Dan Aaron Polster
       _____:
 8

 9                Monday, January 9, 2023

10                HIGHLY CONFIDENTIAL
         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

12

13            Remote deposition of PATRICK J. MARSHALEK,

14     M.D., commencing at 10:03 a.m., on the above date,

15     before Carol A. Kirk, Registered Merit Reporter,

16     Certified Shorthand Reporter, and Notary Public.

17

18

19

20

21

22              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
23                  Deps@golkow.com

24
```

 1         A.    Opioids have been a problem for
 2   that whole period of time?
 3         Q.    Yes, sir.
 4         A.    I think to a certain extent.  It's
 5   hard to quantify exactly when and where.
 6         Q.    Your professional career has been
 7   dedicated to dealing with opioids in one form or
 8   another; isn't that right?
 9               MR. CARDI:  Form, foundation.
10         A.    Can you ask that again, please.
11         Q.    Sure.
12               Your professional career has been
13   dedicated to dealing with opioids in one form or
14   another; is that right?
15         A.    I would say part of my career has
16   been.
17         Q.    And that's been true since you
18   were licensed in 2007?
19         A.    Yes.
20         Q.    In 2007, West Virginia had some of
21   its historically highest rates of opioid
22   prescriptions; is that right?
23         A.    I would need to see data
24   surrounding that.

```
 1          Q.    Have you ever looked at data about
 2   the number of prescriptions over time in
 3   West Virginia?
 4          A.    I have reviewed that data in the
 5   past.
 6          Q.    What do you recall about that?
 7          A.    I have difficulty recalling
 8   specifics.
 9          Q.    Have you ever looked at data
10   regarding the numbers of prescriptions over time
11   in Montgomery County, Ohio?
12          A.    Not that I recall.
13          Q.    You were taught in medical school
14   that pain is the fifth vital sign, right?
15          A.    If I recall correctly.
16          Q.    If you recall correctly, yes, you
17   were taught that pain is the fifth vital sign
18   when you were in medical school?
19          A.    I really -- I don't -- I do not
20   recall specifics regarding the pain management
21   didactics.
22          Q.    Okay.  Have you ever worked as a
23   pharmacist?
24          A.    No.
```

```
 1         Q.    Have you ever supervised a
 2   pharmacist?
 3         A.    Can you define "supervised"?
 4         Q.    That's a great question.  Can I
 5   define "supervise."
 6               Okay.  Have you ever worked in a
 7   pharmacy?
 8         A.    I volunteered in a pharmacy
 9   previously.
10         Q.    When was that?
11         A.    I was in medical school.  At the
12   free clinic in town.
13         Q.    And what was your role as a
14   volunteer in the pharmacy?
15         A.    Roughly -- just roughly preparing,
16   packaging medications up, putting them in bags.
17         Q.    How long did you do that for?
18         A.    I can't recall exactly how long.
19         Q.    Was it more than one day?
20         A.    Yes.  It was over the course of
21   probably a year or two.
22         Q.    And how often would you do that
23   during that year or two?
24         A.    It was roughly a weekly basis.
```

 1          Q.    So once a week, you'd go work in
 2    the pharmacy?
 3          A.    If I recall correctly.
 4          Q.    Okay.  And for how long at a time?
 5    Would you work for an entire day or a couple
 6    hours?
 7          A.    If I recall correctly, half days
 8    or so.
 9          Q.    Did you dispense the medication to
10    patients when you volunteered at the community
11    pharmacy?
12          A.    Not that I recall.
13          Q.    Did you package at any time opioid
14    medications?
15          A.    No.
16          Q.    Okay.  So let's go back to my
17    question.
18                Have you ever had a pharmacist who
19    reported to you in a professional capacity as an
20    employee?
21          A.    Can you ask that one more time?
22          Q.    Sure.
23                Have you ever had, in a
24    professional capacity, a pharmacist report to

```
 1   you as an employee of yours?
 2         A.    I work in multiple different
 3   settings for a large health system.  So I
 4   wouldn't employ a pharmacist, but I work on
 5   teams where pharmacists -- pharmacists are on
 6   some of the teams that I work on.
 7         Q.    Okay.  Have you ever been the boss
 8   of a pharmacist?
 9         A.    How would you define "boss"?
10         Q.    Well, do you have a boss now?
11         A.    Boss.  I think I have probably
12   several.
13         Q.    Do you know who they are?
14         A.    Yes.
15         Q.    Okay.  Are you the boss of anybody
16   right now yourself, professionally?
17         A.    I guess it depends on how you kind
18   of utilize that term.  Either from an
19   administrative capacity as a medical director or
20   a team leader in clinical settings, I would view
21   myself as kind of the leader of a team.
22         Q.    Have you ever had any role in
23   setting policies for dispensing at a pharmacy?
24         A.    Not that I'm aware of.
```

```
 1         Q.    Are you familiar with the
 2   obligations that pharmacies have before
 3   dispensing opioids?
 4         A.    Ask that again.  I'm sorry.
 5         Q.    Sure.
 6               Are you familiar with the
 7   obligations that pharmacies have before
 8   dispensing opioids?
 9         A.    No.  But as a clinician with
10   prescriptive authority, I interface with
11   pharmacists and pharmacies on a regular basis.
12         Q.    Are you familiar with any policies
13   or procedures that Kroger has used at any time
14   regarding dispensing opioids?
15         A.    Not that I'm aware of.
16         Q.    Have you ever heard the term
17   "corresponding responsibility" in the context of
18   pharmacies?
19         A.    Not that I'm aware of.
20         Q.    Do you know what the term
21   "corresponding responsibility" means in the
22   context of pharmacies and dispensing opioids?
23         A.    I'm sorry.  I want to make sure
24   I'm understanding the last part of that question
```

 1   correctly.

 2           Q.    Sure.  And let me ask it a

 3   different way.

 4                 In the context of pharmacies

 5   dispensing opioids, do you know what the term

 6   "corresponding responsibility" means?

 7           A.    Not that I'm aware of.

 8           Q.    Do you agree that pharmacies are

 9   the last line of defense against illegitimate

10   prescriptions for opioids being dispensed?

11                 MR. CARDI:  Form, foundation.

12           A.    I want to make sure I understand

13   what you mean by "last line of defense."

14           Q.    You don't understand the term

15   "last line of defense"?

16           A.    In the context of your question.

17           Q.    Okay.  Every opioid prescription

18   that is written for an outpatient must be

19   dispensed by a pharmacy, right?

20           A.    If I recall correctly.

21           Q.    And in the chain of supplying

22   opioids to the public, the last opportunity to

23   determine whether an opioids prescription is

24   legitimate is at the point of dispensing by the

```
 1          Q.    Do you know what the risks -- let
 2   me ask it a different way.
 3                Do you know what any risk factors
 4   are for substance use disorder?
 5          A.    One of the risks that I teach on
 6   is adverse childhood experiences or traumatic
 7   experiences.
 8          Q.    Can you think of any other risk
 9   factors for substance use disorder?
10          A.    Again, I want to know how we're
11   defining risks.
12          Q.    However you define risk factors in
13   the context of epidemiology and diagnosing
14   substance use disorder is fine for the purposes
15   of this question.
16          A.    Then I think the adverse childhood
17   experiences are something that I mentioned.
18          Q.    Okay.  Can you think of any other
19   risk factors for substance use disorder?
20          A.    I can't recall at this moment.
21          Q.    Okay.  Let's talk about opioid use
22   disorder.
23                Can you think of any risk factors
24   for opioid use disorder?
```

```
 1          A.    I would want to answer the same.
 2          Q.    A risk factor for opioid use
 3   disorder is adverse childhood experiences?
 4          A.    Yes.
 5          Q.    Can you think of any other risk
 6   factors for opioid use disorder?
 7          A.    Not that I can recall at this
 8   time.
 9          Q.    Do you treat patients for opioid
10   use disorder who use illicit opioids such as
11   heroin and fentanyl?
12          A.    Yes.
13          Q.    Do you ask them how they got
14   started on opioids as part of your practice?
15          A.    Yes.
16          Q.    Have you ever treated a patient
17   for opioid use disorder who uses heroin or
18   fentanyl whose first exposure to opioids was
19   through prescription opioids?
20          A.    I just want to make sure
21   I understand that.  If you could repeat it.
22   Thank you.
23          Q.    Sure.
24                Of the patients that you treat for
```

 1   opioid use disorder who use heroin or fentanyl,

 2   have any of those patients had their first

 3   exposure to opioids through prescription

 4   opioids?

 5          A.    Yes.  Some have.

 6          Q.    Do you have a ballpark in terms of

 7   percentage of the patients that you treat for

 8   opioids use disorder who use illicit drugs like

 9   heroin or fentanyl who started using opioids

10   initially as prescription opioids?

11              MR. CARDI:  Object to form,

12         foundation.

13          A.    Not that I can recall.

14          Q.    Have you reviewed Dr. Katherine

15   Keyes' report in the Montgomery County

16   litigation?

17          A.    Not that I can recall.

18          Q.    Do you have, as you sit here

19   today, any opinions or criticisms about

20   Dr. Keyes' report in the Montgomery County

21   litigation?

22          A.    I'm sorry.  Can you repeat that.

23          Q.    Sure.

24              As you sit here today, do you have

1                    And there's a quote from

2    Patrick Radden Keefe's book, Empire of Pain.  It

3    says the, "The opioid crisis is, among other

4    things, a parable about the awesome capability

5    of private industry to subvert public

6    institutions."

7            Do you see that?

8        A.   Yes.

9        Q.   Do you agree with that sentence?

10       A.   I do with respect to what we've

11   come to know about private industry's role in

12   this epidemic.

13       Q.   If you look then -- the bottom of

14   the second full paragraph under that section,

15   it's actually on the upper right of the page.

16   It says "and profit-seeking" is the sentence,

17   the last sentence of that paragraph.

18           MR. CHALOS:  You had it right,

19       Jon, the first time.  It's on the top

20       right after those superscripts.  It says

21       "and profit-seeking."

22           TRIAL TECH:  Oh, I see it.

23   BY MR. CHALOS:

24       Q.   Okay.  It says, "And

1  profit-seeking was not entirely external to the

2  health care system.  Some hospitals, clinics,

3  pharmacies, professional societies, and

4  individual healthcare professionals also

5  enriched themselves."

6          Do you see that?

7      A.  Yes.

8      Q.  So the Stanford-Lancet Commission

9  concluded that at least some pharmacies played a

10 role in contributing to the opioid crisis,

11 right?

12     A.  I think I've stated that before.

13 I think the pill mills and those -- some of the

14 other things connected to pill mills, those are

15 clinical settings.  Those are driven where --

16 those are criminal enterprises, not legitimate

17 clinical settings.

18         I think that's the -- they've done

19 a tremendous amount of damage based on the fact

20 that they kind of took their understanding of

21 how health care was delivered and manipulated it

22 in order to only seek profit and no other kind

23 of legal or ethical considerations.

24     Q.  And some pharmacies, some

1  community pharmacies, not connected with pill

2  mills also contributed to the opioid crisis by

3  filling prescriptions that shouldn't have been

4  filled, right?

5          MR. CARDI:  Object to form.

6     A.   I don't know if I agree with that

7  based on what we talked about before.

8  Pharmacies -- unless you present me with kind of

9  direct evidence of pharmacies kind of focusing

10 solely on profit margins and otherwise kind of

11 more closely aligned with a kind of criminal

12 enterprise than a clinical enterprise, they're

13 still not in a position to question the

14 legitimacy of those prescriptions.  That's an

15 incredibly challenging thing to do.

16    Q.   It's your opinion that pharmacies

17 are not in a position to question the legitimacy

18 of opioids prescriptions?

19    A.   I'm just not sure how they can.

20 They weren't in the doctor's office where it was

21 being written.  They don't know if it was just

22 handed to that person by an office staff, you

23 know, that was just using a stack of scripts

24 that had kind of the same prescriptions stamped

1  on them, or if it was a legitimate pain

2  management practice that was doing their best to

3  take good care of the patient.

4         Q.   So it's your belief that

5  pharmacies have no tools to use to determine

6  whether a prescription was written for a

7  legitimate medical purpose?

8              MR. CARDI:  Object to form.

9         A.   Like I said, I think they're at a

10 distinct disadvantage to question and to kind of

11 call that into question.  To the extent that

12 they increasingly call that into question poses

13 other kind of unintended consequences and risks

14 related to kind of delays and delivery of much

15 needed care potentially and so on.

16        Q.   So it's your view that pharmacies

17 should not question the legitimacy of an opioids

18 prescription?

19             MR. CARDI:  Object to form.

20        A.   I just don't know -- sorry.

21             MR. CARDI:  You can proceed.

22             Object to form.

23        A.   I just don't know how they can

24 since they weren't in the office where the

```
 1   patient was being diagnosed and treated and that
 2   recommendation sprang forth.
 3              The list of potential explanations
 4   ranges from, you know, extremely legitimate to
 5   not, and how they can begin to step into and
 6   investigate that and whether they should is a
 7   whole other --
 8        Q.   And that belief that you just set
 9   forth is one of the bases for your opinions in
10   this case?
11        A.   I'd want to make sure I understood
12   kind of exactly what I said and how I said it.
13   The fact that this, the highlighted sentence, I
14   mean -- I've taken care of patients that sought
15   to enrich themselves.
16              So I've witnessed anyone from a
17   patient, prescriber, pharmacy, pharmacist,
18   upwards on that chain all the way up to the
19   manufacturer take steps to enrich themselves in
20   a variety of ways.
21              And oftentimes those steps
22   involved deceptive practices making it much
23   harder to determine how legitimate it is because
24   it's like a Trojan horse in some ways.
```