**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE:  NATIONAL PRESCRIPTION OPIATE LITIGATION** | |
| THIS DOCUMENT RELATES TO: | **MDL No. 2804** <br> **Case No. 17-md-2804** <br> **Judge Dan Aaron Polster** |
| *Track Seven* | |

**KROGER DEFENDANTS' OPPOSITION TO MOTION TO EXCLUDE CERTAIN**
**OPINIONS OF DEFENSE EXPERT JOHN E. SCHNEIDER, Ph.D.**
**AND MEMORANDUM OF LAW IN SUPPORT OF THEIR OPPOSITION**

Defendants The Kroger Co., Kroger Limited Partnership I, and Kroger Limited Partnership II (hereafter collectively referred to as "Kroger"), by and through counsel, hereby submit their response in opposition to Plaintiff's Motion to Exclude Certain Opinions of Defense Expert John E. Schneider, Ph.D. ("Dr. Schneider"). Kroger respectfully requests that the Court deny Plaintiff's Motion, for the reasons explained herein.

## I.    SUMMARY & INTRODUCTION

Kroger's expert Dr. John Schneider is a well-respected, published health economist who is uniquely qualified to render opinions related to the costs to address public health issues, including opioids.  Dr. Schneider and other experts in his field have written and numerous articles, periodicals, treatises, and the like, in the realm of identifying the costs to address public health issues.  Based on these materials, Dr. Schneider will assess the "costs to abate" any opioid crisis in Montgomery County, Ohio, and will explain how, in the realm of public health, those "costs to abate" must be *apportioned* among entities who are responsible for those costs (i.e. "Primary Responsible Parties (PRPs)").  To be clear, Dr. Schneider's opinions relating to the "costs to abate"

will be more fully revealed during the "Abatement" phase of this case. However, given that Dr. Schneider's apportionment analysis inherently involves an inquiry into the responsibility (i.e., liability) of PRPs, Kroger has, in good faith, produced those opinions now (on December 12, 2022).[1]  It is these opinions ( the identity and liability of PRPs) that Plaintiff inappropriately seeks to strike.  To be clear, Kroger maintains that these opinions should be addressed during the current liability phase.

In its Motion to Exclude Certain Opinions of Defense Expert John E. Schneider, Ph.D., Plaintiff ignores the totality of Dr. Schneider's opinions and testimony; mischaracterizes portions of his testimony and report; and overlooks that Dr. Schneider's report is tendered now for liability purposes, which must be addressed at this stage of litigation.  For reasons discussed more fully below, Dr. Schneider's proffered opinions are within the standards set by the Federal Rules of Evidence, and should not be limited, restricted or excluded by the Court. As such, the Court should enter an Order denying Plaintiff's motion to Exclude Certain Opinions of John E. Schneider, Ph.D.

## II.    LEGAL STANDARD

Expert testimony is admissible under Federal Rule of Evidence 702:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

---

[1] To be clear, Dr. Schneider's report for Track 7, dated December 21, 2022, contains additional opinions above and beyond the opinions that are at issue in Plaintiff's Motion to Exclude Certain Opinions of Defense Expert John E. Schneider, Ph.D., including, but not limited to, opinions criticizing Plaintiff's expert David Cutler. Given that those opinions have not been challenged, Kroger will not address those opinions (or any other opinions not otherwise disputed) in this response.

> evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

And under Fed. R. Evid. 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

The focus of a court's inquiry under Rule 702 is the expert's principles and methodology, not the conclusions generated. The court's duty is to weigh the "scientific validity and thus the evidentiary relevance and reliability of the principles that underlie" an expert's proposed submission. *Daubert v. Merrill Dow Pharm., Inc.,* 509 U.S. 579, 595 (1993).  In *Daubert,* the Court provided four non-exhaustive factors to use in gatekeeping determinations of reliability: ability to test, peer review and publication, known potential rates of error and general acceptance within the relevant community.[2] Further, *Daubert's* fit requirement is a liberal one that seeks to ensure evidence is relevant to the issues to be tried or will be helpful to the trier of fact.[3] Evidence is relevant if it "(a) has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."[4]

---

[2] *Supra,* at 593-94.

[3] *See United States v. Bonds*, 12 F.3d 540 at 555 (6th Cir. 1993) (expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue.").

[4] *Fed. R. Evid. 401.*

## III.    BACKGROUND

A.    <u>Dr. Schneider's Qualifications and Expertise</u>

As a health economist, Dr. Schneider is qualified to render his opinions regarding the public health issues in this case.  Dr. Schneider is highly qualified given his knowledge, skill, experience, training and education, having attained a Ph.D. in Health Services and Policy Analysis/Health Economics nearly 25 years ago from the University of California, Berkeley.[5]  That program was an interdisciplinary doctoral program between three UC Berkeley colleges and departments: the College of Public Health's Department of Health Management & Policy, the Department of Economics, and The Haas School of Business. One of his dissertation committee members, Oliver Williamson, won the Nobel Prize in Economics in 2009.

Dr. Schneider attained his bachelor's and master's degrees in economics nearly 35 years ago from the University of Maine;  Dr. Schneider has worked as a health care economist his entire career, serving as an assistant professor of health management and policy in the Department of Health Management & Policy, College of Public Health, at the University of Iowa.[6] His additional teaching and research activities included a secondary appointment in the Department of Economics at the same university. Dr. Schneider has served in many additional academic positions and affiliations that are also listed in his CV,[7] including having taught healthcare leadership, institutional economics, health economics, health insurance and managed care, advanced health economics, health services research methods, health politics and policy, introduction to

---

[5] See John E. Schneider, Ph.D. Curriculum Vitae, at 1, attached as Exhibit A.
[6] *Id.*, at 1.
[7] *Id.*, at 2.

micro/macro economics in classes made up of undergraduates, masters' and Ph.D. candidates.[8] He has chaired doctoral dissertation committees and undergraduate economics honors thesis committees.[9] Dr. Schneider has served on at least five committees and advisory boards in regard to health and medical review programs,[10] and received awards and honors for his work, investigations, research and analysis.[11] Dr. Schneider's peer-reviewed publications include numerous analyses of economic factors,[12] technical project reports and manuscripts,[13] and he has many professional presentations in his field of expertise on his CV.[14]

Dr. Schneider has served as an expert witness on numerous occasions,[15] and as explained, his primary expertise lies in health economics, including economic analyses of health care policies and law. He served as an expert witness in related opioid litigation in 2019, testifying for the defendant Insys, Inc., in the United States District Court, Northern District of Ohio, Eastern Division, and last year testifying on behalf of retail pharmacies[16] in *State of New Mexico v. Purdue Pharma,* State of New Mexico, County of Santa Fe, First Judicial District Court.

Plaintiff's criticism of Dr. Schneider's qualifications to testify as an expert is completely unfounded. While it generously mentions Dr. Schneider's experience in rendering

---

[8] *Id.*, at 12-13.
[9] *Id.*, at 13.
[10] *Id.*
[11] *Id.*, at 13-14.
[12] Id., at 4-8.
[13] *Id.*, at 8-9; *see also* John Schneider, Ph.D., Dep. pp 37-38, 40-43, 45 and 47-48 (April 7, 2022), attached as Exhibit B.
[14] John E. Schneider, Ph.D. Curriculum Vitae, at 9-11; *see also* Schneider Dep.*, supra,* pp 15-16 and 34-35.
[15] John E. Schneider, Ph.D. Curriculum Vitae, at 2-4.
[16] *Id.,* at 3-4.

expert opinions in tobacco litigation on behalf of the City of San Francisco, Plaintiff ignores other relevant and pertinent work of Dr. Schneider's, including but not limited to analyses of:

- attributable costs of alcohol,
- attributable costs of obesity/calorically sweetened beverages,
- attributable costs of obesity/genetic factors,
- analysis of epidemiology data and Medicare data to determine the attributable costs of smoking, and
- a large number of studies wherein the costs of health conditions and diseases were attributable to either an intervention or a control, a methodological approach not fundamentally different than the attribution of the cost of an externality to one or more causes (i.e., interventions) associated with the externality.

Dr. Schneider's work shares a common grounding in economics and health economics, and the tools used in those professions to calculate costs and attributable costs to their sources.  It is notable that in each of the analyses listed above, Dr. Schneider was retained by plaintiffs, including the City of San Francisco. It must also be noted that none of this information is not secret – it is contained in his CV, report and testimonies, all of which is in Plaintiff's possession.

    B.  Summary of Dr. Schneider's Opinions

        Dr. Schneider's opinions are outlined in his report[17] and further elucidated in his deposition testimony, but in brief are summarized as:

- Contributing causative factors are those which created, enabled, perpetuated or promoted opioid sales, either in the form of supply-push or demand-pull.[18]

---

[17] "Contributing Factors Associated with Prescription Opioid Supply and Opioid Attributable Costs in Montgomery County, Ohio"; Expert Report of John E. Schneider, Ph.D., December 12, 2022.
[18] *Id.*, ¶ 9.l, p 43 of 75.

- Economists have described specific remedies and policy instruments to address negative externalities, including taxes, regulation, bargaining and courts. Generally, four primary sources of information are required for implementation, as enumerated in his report.[19]

- Contributing factors to opioid supply map to the following potentially responsible parties: The FDA, DEA, CDC, Physicians, Health Systems, Patients, the Federal Government, State Government, Accreditation Agencies, Payers, Manufacturers, Distributors and Drug Traffickers.[20]

- Externality Costs: Non-medical use of prescription opioids has approximately a 4% prevalence, leading to three possible externality outcomes:  non-cost-incurring misuse, non-cost-incurring OUD and cost-incurring OUD. These categories align with attributable costs, with non-cost-incurring misuse expected to have zero or negligible costs, non-cost-incurring OUD expected to have trivial or low costs, and cost-incurring OUD expected to have some measurable level of attributable costs.[21]

- Montgomery County, Ohio and the State of Ohio are subject to all factors that affect the United States. These factors are enumerated in Dr. Schneider's report.[22]

- Plaintiff's expert David Cutler fails to make an evidence-based argument that supports each link in the causal chain between retail pharmacies and OUD externalities. A critical underpinning of Plaintiff's argument is that retail

---

[19] *Id.*, ¶ 9.2, p 43 of 75.
[20] *Id.*, ¶ 9.3, p 43 of 75.
[21] *Id.*, ¶ 9.4, pp 43-44 of 75.
[22] *Id.*, ¶ 9.5, p 44 of 75.

pharmacies generate demand for new prescriptions, with which Dr. Schneider disagrees.[23]

- The report tendered by Plaintiff's expert Dr. Alexander is flawed mainly in its assertion that government agencies and entities have incurred or will in future incur OUD-attributable costs but offers little evidence as to how the operational functions of these entities were changed or expected to be changed in future, by OUDs, and how OUD may have differentially impacted fixed *vs.* variable costs.[24]

## IV.    ARGUMENT AND ANALYSIS

Plaintiff's arguments can be summarized into the following areas of challenge, based on Plaintiff's contentions:

- Dr. Schneider is unqualified to serve as an expert health economist to render opinions on analyses of costs to abate a health crisis, because he lacks an M.D. or a degree in epidemiology; he is unqualified due to having no prior experience with opioid litigation, laws, rules, regulations, policies, or procedures of pharmacies under the CSA; he is not an expert on abatement strategies and unqualified to design an abatement plan.

- Dr. Schneider is unqualified to critique a report made by an M.D. regarding abatement strategies.

- Dr. Schneider's opinions are irrelevant, lack foundation, are not fact-based, do not fit this case and are therefore inadmissible under Fed. R. Evid. 702 and *Daubert.*

---

[23] *Id.*, ¶ 9.6, p 44 of 75.
[24] *Id.*, ¶ 9.6, p 43 of 75.

- Dr. Schneider's opinions will confuse a jury with use of the terms "liability," "responsibility" and "PRPs"; use of these terms is prejudicial; use of terms is untethered to "liability" or "responsibility" *vis a vis* Ohio nuisance law.

- Dr. Schneider's opinions utilize economic framework not specific to opioid litigation.

- Dr. Schneider's opinion "ignores and insultingly understates the human toll of the opioid crisis."

A.  <u>Plaintiff's arguments ignore the rules of evidence and common law regarding admissibility of expert testimony</u>

Plaintiff contends that Dr. Schneider's opinions should be excluded because they are unrelated to liability or responsibility under Ohio nuisance law and are also untethered to the legal framework of the Controlled Substances Act (CSA). (ECF No. 4886 at 12).  Plaintiff's main complaint is that Dr. Schneider is unfamiliar with the requirements of the CSA and with Kroger's responsibilities under it. (*Id.* at 12-13).  But lack of familiarity with statutory provisions is not grounds for disqualification. "The fact that a proffered expert may be unfamiliar with pertinent statutory… standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify." *Morales v. American Honda Motor Co., Inc.,* 151 F.3d 500, 516 (6th Cir. 1998) (citing *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984)); *see also Brewer v. Cuyahoga Valley Ry. Co.,* 2004 WL 5508630, at *1 (N.D. Ohio Oct. 14, 2004).

In *Davis,* the defendant employer appealed the trial court's admission of the testimony of an expert witness, a professor in management and marketing who had written personnel policies and conducted training sessions in personnel matters. 742 F.2d at 918-19.  The

expert in *Davis* testified at trial, after a review of the employer's personnel records, that Davis was terminated on the basis of his age. *Id.* The Sixth Circuit held that the trial court did not err in admitting this testimony because the witness was properly qualified as an expert despite being unfamiliar with the ADEA and discrimination laws in general. *Id.* Further, the court held that the bulk of his testimony was admissible under FRE 704 because an expert may offer opinion testimony that embraces an ultimate issue of fact. *Id*; *see also* Oh. Evid. R 704.

Not surprisingly, Plaintiff does not cite legal authority in support of its argument that Dr. Schneider is required to be familiar with the requirements of the CSA. The lack of familiarity with the CSA may be raised by Plaintiff to attack the credibility of Dr. Schneider, but does not serve as grounds for disqualification of his opinions from the instant case. *See Davis*, 742 F.2d at 919.

Additionally, Plaintiff's mischaracterizations of Dr. Schneider's opinion and methodology for approaching this case do not demonstrate that his testimony fails to meet the flexible standard for reliability. To the extent Plaintiff has such criticisms, they go to the weight of his testimony, not its admissibility. *See, e.g. United States v. L.E. Cooke Co.,* 991 F.2d 336, 342 (6th Cir. 1993) (citing *Davis*, 742 F.2d at 919) ("[A]ny weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility.")

Plaintiff further contends that "Dr. Schneider's opinions also do not fit the facts of this case." (ECF No. 4886 at 13). "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Synergetics v. Hurst,* 477 F.3d

949, 955 (8th Cir. 2007) (quoting *Bonner v. ISP Tech.,* 259 F.3d 924, 929 (8th Cir. 2001)). If Plaintiff disagrees with the facts on which Dr. Schneider relied, the County is fully able to examine those issues on cross examination. If an expert opinion could be excluded because the other side disagrees with its conclusions, there would be no point to expert testimony at all.  Plaintiff makes much of the fact that Dr. Schneider is not familiar with Plaintiff's Complaint in this case, but that, again, is not grounds for disqualification.  See *Boyer v. Shirley*, No. 6:18-CV-90-REW, 2020 WL 6785940, at *7 (E.D. Ky. Nov. 18, 2020) ("The Court does not view [the expert's] relative familiarity with the record of this case as preliminarily disqualifying; [the expert's] obvious confusion about some facts does not, necessarily, render all of her opinions unreliable. Rather, such issues go to weight. Defendants may explore any inaccuracies in either of [the expert's] reports and her deposition testimony, as well as any inconsistencies between her presumed facts and the record, on cross.").

And lastly, Plaintiff contends that Dr. Schneider's opinions are "highly prejudicial, because they encompass a term, liability, which is typically understood as a legal concept."  This argument is a red herring. Just because Dr. Schneider's expert's report contains the term "liability," it does not warrant the exclusion of his report because Dr. Schneider's report does not provide legal opinions or interpret legal terms.

Federal Rule of Evidence 702 has been broadly interpreted to allow expert testimony in the discretion of the district court so long as it will assist the trier of fact. *See Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962) (the U.S. Supreme Court held that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence..."); *Davis v. Combustion Engineering, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984) (Section 702 "should be broadly interpreted on the basis of whether the use of expert testimony will assist

the trier of fact."). And, courts in this Circuit have even gone so far as to say that "the rejection of expert testimony is the exception rather than the rule." *Republic Services, Inc. v. Liberty Mutual Insurance Company, et al.*, No.03-494-KSF, 2007 WL 152102, at *6 (E.D. Ky. Jan. 12, 2007). The district court "may admit 'opinion testimony if the expert's specialized knowledge is helpful to the jury to understand the evidence or determine a fact in issue, even if the opinion embraces an ultimate issue to be decided by the jury.'" *Flanagan v. Altria Group, Inc.*, 423 F. Supp. 2d 697, 701 (E.D. Mich. 2005) (citing *United States v. Brown*, 110 F.3d 605, 610 (8th Cir. 1997)).

As mentioned above, "otherwise admissible opinion testimony by an expert is not objectionable on the ground that it embraces an ultimate issue of fact." *Davis*, 742 F.2d at 919. Dr. Schneider's opinions relate to facts that are important to the determination of ultimate issues in this case, and that is clearly permissible under Rule 704. Although Plaintiff's motion appears to intimate that an expert cannot render a legal opinion, Plaintiff misses the point. Dr. Schneider is not giving legal opinions, and Kroger has no intention of asking Dr. Schneider to do so at trial. Dr. Schneider's report examines complex factual issues in this case, identifies the entities that have contributed to the opioid supply and provides an explanation of these entities' role in the opioid supply, or more precisely oversupply.  This is far from attempting to usurp the Court's role in articulating how to adjudge liability and responsibility for abatement relief.

Plaintiff's insincere argument is further belied by the motion to exclude itself. While criticizing Dr. Schneider's approach, Plaintiff states: "***Nor is Dr. Schneider assessing responsibility for the harms at issue in this case***; rather he means only that he believes the PRPs are responsible for increased supply of opioids, ***without regard to whether they are 'responsible' for the interferences with public health and safety that constitute the nuisance in this case***." (ECF No. 4886 at 13) (emphasis added).  Plaintiff thus admits that Dr. Schneider is not providing

a legal opinion or conclusion as to how adjudge ultimate liability in this case.  And disagreement

with the expert's conclusions is not a basis for exclusion. *See Melton v. Jewell*, No. 1:02CV1242

T/P, 2006 WL 5175756, at *7 (W.D. Tenn. Feb. 17, 2006) ("A party's disagreement with an

opposing expert's reasoning or conclusions is not a basis for exclusion, but rather such arguments

are proper subjects of cross-examination and go to the weight of the evidence.").

    B.    <u>Dr. Schneider's Liability Testimony Appropriately Fits His Expertise and This Case</u>[25]

    Contrary to the Motion's characterization that Dr. Schneider's approach is narrow,

his approach would be more appropriately characterized as "macro," because his focus is on

identifying all the contributing factors and potentially responsible parties ("PRPs") in the opioid

---

[25] This Court previously ruled that an economist is permitted to ground his opinions not only on economics literature, but also on the work of scholars and other experts in other fields. The Court denied Defendants' challenges to Jonathan Gruber, Ph.D., a health care economist in Track One cases. Defendants based their challenges on "relevance or fit" with the facts of that case and took exception to the appropriateness and reliability of his methods. This Court ruled that

> Gruber's analysis, though imperfect, employs sufficiently reliable methods of economic analysis to withstand *Daubert* scrutiny. *Daubert*, 509 U.S. at 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993).[25]

There is no mention found in the Order regarding whether Dr. Gruber has an M.D. degree or is an epidemiologist, or that he had prior experience in opioid litigation, but the Order does note he has prior expert experience in tobacco litigation.

matter. From the perspective of economics, and more specifically, the economics of externalities, if a specific entity (*e.g*., Kroger) were to be found liable, it would necessarily have to be in the context of an assessment of *all* responsible parties. The multi-factorial and multi-causal aspect of opioid utilization is not an issue that is debated among experts; all agree that the increase in opioid utilization beginning in the late 1990s was the result of the confluence of several factors, all of which are clearly identified and referenced in Dr. Schneider's report. If one is to understand the mechanisms and pathways leading to the liability of a specific entity, it would necessarily have to be in the context of the all the mechanisms and pathways, including those associated with other contributing factors and PRPs.

Dr. Schneider's reliance on evidentiary materials certainly is not limited; his citations to supporting evidence is incorrectly mischaracterized as "bits and pieces," when in fact the basis of evidence supporting the appropriateness of the "responsible party" concept is well established in environmental economics. One of Dr. Schneider's cites includes the entirety of one of the leading textbooks in environmental economics in which this topic is covered in detail. Further, the citations in the externality sections of Dr. Schneider's report, in Sections 3 and 5, add further weight to the importance of the identification of responsible parties. The overall logic is also helpful; in the absence of the identification of responsible parties, it would otherwise be impossible to progress to a discussion of remedies and abatement, which is, after all, the supposed goal of this litigation.

It is also important to note the evidentiary base supporting the identification of responsible parties does not necessarily need to rely upon established theory, whether it be from economics or environmental economics or law. In the social sciences (*e.g*., economics) and health sciences (*e.g.,* public health and medicine), it is common to rely upon empirical evidence itself as

the sole basis for a conclusion. The large peer-reviewed literature on the root causes of the increase in opioid utilization in the United States (which is cited throughout Sections 4 and 5 of Dr. Schneider's report) provides a robust and consistent empirical basis upon which to conclude, as many experts have, that the causes of the increase in opioid utilization was multifactorial. In other words, this simple fact is not one that requires a theoretical basis. Thus, citing to environmental economics to provide a theoretical basis was more to help the reader understand the context of opioid liability via the application of a standard construct, one that has some useful and helpful parallels with public health. Given the overshadowing of the CERCLA legal framework by the empirical evidence on liability in opioid utilization, it is largely irrelevant whether Dr. Schneider has worked on CERCLA cases in the past or even whether CERCLA is a useful construct in this context.

It is also important to note that environmental economics and public health economics are closely related, and historically, always have been. For example, there is a large literature referenced in PubMed that covers topics related to the health effects of contaminated air, water, soil, drinking water supplies, and the like. There has always been a close relationship between environmental economics and public health economics and these fields join with economics and health economics in studies of the liability and costs associated with externalities.

Plaintiff's confusion should not be permitted to obfuscate the issues before this court. In its Motion, Plaintiff alleges that Dr. Schneider's report and deposition testimony are unclear on the role of PRPs and how they are related to the externality of opioid use disorder ("OUD"). The Motion further suggests in this context that there is no clear differentiation between "association" and "causation." Not only is Dr. Schneider's report clear on this distinction, but in

deposition testimony he further clarified this point:[26] it is his opinion is that the contributing factors identified in Section 3 are *causative* and this is made clear in Sections 4 and 5 of his report.  In shifting the discussion to PRPs in Section 4, Dr. Schneider has identified the entities (i.e. PRPs) *associated* with each contributing factor. As such, Dr. Schneider is opining that each PRP had some level of *causative* role in the increase in opioid utilization. Causation can include actively increasing opioid utilization or failing to monitor or mitigate increasing opioid utilization. Again, the empirical evidence supporting one or the other of these actions on the part of each PRP is robust.

Plaintiff is either confused or attempting to mislead the court in alleging that Dr. Schneider's opinion is that the only PRP associated with diversion is drug traffickers. It is undisputed that some percentage of all prescription opioid supply is unused, and some percentage of that unused supply is diverted to misuse. This concept is clearly explained in Dr. Schneider's report.[27]

The concept of externalities is clearly relevant in an analysis of opioids, and any discission of externalities must to some extent quantify the costs associated with the externality in advance of allocating responsibility. To be clear, the quantification of such costs was not the scope of Dr. Schneider's report on liability. The rationale for including the topic of costs in Section 3 of Dr. Schneider's report was only in the context of understanding and explaining the relatively complex pathways between the cost-driver of the externality (i.e., OUD) and the PRPs. Clearly,

---

[26] *See* Schneider Dep. p 71.
[27] *See* Schneider Rpt. pp 9 – 10 and Figure 2-2.

the included material on externalities (Section 3 of Dr. Schneider's report) is relevant to the topic of liability.

   The factors discussed in Section 3 address characteristics of Montgomery County that could potentially serve as "shift parameters" in an ultimate assessment of liability. As indicated in Section 6, for example, it is possible that higher cancer rates could be associated with higher opioid shipments, and it is possible that worse macroeconomic conditions could increase levels of substance use disorder, of which OUD is part. An economist studying externalities would want to know these descriptive characteristics in any assessment of liability, because these factors could potentially help explain some proportion of the increase in opioid utilization.

  C. <u>Dr. Schneider's Criticisms of Dr. Alexander's Report Are Appropriate and Should Not Be Excluded</u>

   Dr. Schneider's opinions regarding Dr. Alexander's report are limited because Dr. Alexander does put forth any sort of theory or evidence regarding liability. Instead, Dr. Alexander identifies county-level services that he believes will be necessary to abate harms attributable to OUD. Although Dr. Schneider is not an expert on the design and implementation of such public health and social services, the economic perspective brought to his assessment of liability (and any future assessment of abatement costs) would necessarily estimate the costs of such programs and attribute a portion of those costs to OUD. Thus, it is relevant for an economist to understand the costs of such services, but it is not necessary to provide opinions on the design, implementation, and medical necessity of such services. For this reason, Dr. Schneider's comments on Dr. Alexander's opinions are directed towards the issues that a health economist would be concerned with in the course of an abatement cost calculation. In sum, it is misleading to allege that Dr. Schneider has strayed from the objectives of a report on liability in response to Dr. Alexander's

report, the objectives of which do not appear to have any connection whatsoever with the concept of liability.

Further, and equally important, is to underscore that Plaintiff's primary argument for exclusion appears to be Dr. Schneider having made a fundamental mistake by reading Dr. Alexander's Report as opining on the "cost of externalities" such as OUD and how OUD affects public services when in reality the overall goal stated in Alexander's report is: "If implemented in a coordinated and comprehensive fashion, the interventions [Dr. Alexander] propose[s] can reduce cumulative opioid overdoses and opioid-related harms substantially over ten to fifteen years."[28]

However, the section of Dr. Alexander's report where this goal is stated is titled "ESTIMATED IMPACT OF PROPOSED ABATEMENT REMEDIES", and it outlines the economic impact of programs and services aimed at preventing and treating OUD as ultimately "cost-effective" due to savings that result from preventing OUD-related deaths and injuries. Thus, one of the key conclusions supporting Dr. Alexander's opinion that his model will "reduce cumulative opioid overdoses and opioid-related harms substantially" is that "improving treatment uptake and use for OUD is not just the right clinical thing to do, it also makes good economic sense, in part because OUD has so many direct and indirect costs."[29] As a result, Plaintiff's contention is completely without merit where it in claims that because Dr. Schneider's expertise is as a health economist, not a medical doctor or an epidemiologist, he is necessarily excluded from criticizing Dr. Alexander's opinions.

---

[28] Alexander Rpt. ¶ 237, attached as Exhibit D to Plaintiff's Motion to Exclude Certain Opinions of Defense Expert John E. Schneider.

[29] Alexander Rpt. ¶ 235, attached as Exhibit D to Plaintiff's Motion to Exclude Certain Opinions of Defense Expert John E. Schneider.

Dr. Alexander's ultimate opinions on his abatement strategy and its effectiveness are based, at least in part, on the economic impact of OUD-related services versus the cost levied upon a community as a result of OUD as an externality. It is undisputed that Dr. Schneider is qualified to provide an expert opinion on these matters. As this court has previously concluded, expertise related to the economics of a proposed abatement remedy "will be helpful in ultimately crafting an abatement remedy should it become necessary."[30]

Plaintiff further mischaracterizes the opinions offered by Dr. Schneider in concluding that: "if testifying about abatement, Dr. Schneider would opine that, although he lacks any specific source for this opinion and, as noted above, knows nothing about Kroger's practices, he believes pharmacies have done their part to reduce opioid supply."  Pl's Motion to Exclude, p. 15. This is a purposeful misrepresentation of Dr. Schneider's Report as a whole and serves no purpose other than to deceive the court as to the nature of Dr. Schneider's expected testimony.

Tellingly, in Plaintiff's nearly page-long argument against the relevance of Dr. Schneider's opinions, Plaintiff cites to only a single paragraph of Dr. Schneider's report. The "offending" paragraph states, in pertinent part,

> Regarding abatement, Alexander implied that his lengthy list of public services would constitute items included in abatement, and further suggests that these costs have already been incurred. Yet he also makes the point that many of the initiatives already in place to reduce opioid supply have already succeeded in doing so, and this in turn has created more demand for illicit opioids. If we are to assume that is true, then the costs associated with "initiative-related demand" should be "deducted" from OUD-attributable abatement costs. In other words, insofar as pharmacies have done their part in further limiting supply of prescription

---

[30] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4043938, at *2 (N.D. Ohio Aug. 26, 2019).

opioids, then they cannot also be held liable for the subsequent increasing demand for illicit opioids.[31]

As Dr. Schneider testified in the deposition excerpts cited by Plaintiff, he is not opining generally that "he believes pharmacies have done their part to reduce opioid supply."[32] Rather, he is pointing out that Dr. Alexander's proposed abatement plan fails to account for the fact that the supply of prescription opioids continues to decrease, in part due to programs such as "drug-take back initiatives based in pharmacies"[33] while the supply of illicit opioids, which cannot be attributed to pharmacies, has increased.[34] Dr. Schneider is not opining as to the activities of the County or Kroger, but rather he is opining as to oversights and shortcomings in Dr. Alexander's proposed abatement plan. These opinions are as connected to the law and facts of this case as Plaintiff asserts Dr. Alexander's report to be, and therefore should not be excluded.

In those portions of Plaintiff's arguments which mischaracterize Dr. Schneider's criticism of Dr. Alexander, Plaintiff seems to allege that Dr. Schneider simply does not understand what Dr. Alexander's opinions are and is therefore unqualified to criticize him. That is an incorrect assumption on Plaintiff's part. Dr. Schneider does not have to be an expert on every element of every issue on which he relies in formulating his opinions. As a health economist, he is entitled to include those issues in his calculation of the attributable costs. Further, there is no requirement or even need for Dr. Schneider to be able to formulate abatement programs; as a health economist building cost models it is appropriate and necessary for him to consider and include various programs that are consistent for health issues. Dr. Schneider's opinions are not being asserted for

---

[31] Schneider Rpt. ¶ 8.4.

[32] Schneider Dep., 231:4-13.

[33] *See* Alexander Rpt. ¶¶ 59, 115 Figure 4, attached as Exhibit D to Plaintiff's Motion to Exclude Certain Opinions of Defense Expert John E. Schneider.

[34] *See id.*, at ¶ 238.

the purposes of claiming that he is an expert on abatement. He doesn't design health care programs, but attributable costs are commonly viewed and used as methods to *determine* attributable costs.

Dr. Schneider's field is one in which a health economist is examining different programs, for instance, to determine cost models of various methods. If one is trained by a physician, one on one, what is the cost of that method *versus* a method where a hundred people are trained by that one physician? Or where materials are written and presented in lieu of formal in-person training, or a webinar is presented where unlimited persons can attend? These are the types of differences in programs with which a health economist is concerned:  tantamount is not bankrupting the entity that will ultimately provide the service. Plaintiff appears to assert that there is only one remedy, but as a health economist, Dr. Schneider must review cost models to determine which are reasonable products based on the benefits produced at the cost to be borne.

## V.     CONCLUSION

As shown, Dr. Schneider is an expert in the field of health economics, and is qualified as an expert by knowledge, skill, experience, training, and education. He should be permitted by this court to testify in the form of opinion because his technical and specialized knowledge will assist the trier of fact in understanding the evidence or to determine a fact in issue. Further, his testimony is based on sufficient facts and data and is the product of reliable principles and methods, and he has reliably applied the principles and methods to the facts of the case thus far.

For these and other reasons apparent to the Court, Plaintiff's Motion to Exclude Certain Opinions of Defense Expert John E. Schneider, Ph.D., should be denied with prejudice.

Dated:  March 9, 2023

Respectfully submitted,

**The Kroger Co., Kroger Limited Partnership I, Kroger Limited Partnership II,**

**By counsel,**

*/s/ Ronda L. Harvey*

Ronda L. Harvey, Esq. (WVSB 6326)
Ashley Hardesty Odell, Esq. (WVSB 9380)
Fazal A. Shere, Esq. (WVSB 5433)
**BOWLES RICE LLP**
600 Quarrier Street
Charleston, West Virginia 25301
304-347-1100
rharvey@bowlesrice.com
ahardestyodell@bowlesrice.com
fshere@bowlesrice.com

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on March 9, 2023, the foregoing document was filed with the Clerk of Court using the CM/ECF system which will send notice to all counsel of record. Copies of this document may be obtained through the CM/ECF system.

*/s/Ronda L. Harvey*

Ronda L. Harvey, Esq. (WVSB 6326)

15546991.1

23