# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION

 3
    IN RE: NATIONAL        )
 4  PRESCRIPTION           )   MDL No. 2804
    OPIATE LITIGATION      )
 5  _____  )   Case No.
                           )   1:17-MD-2804
 6                         )
    THIS DOCUMENT RELATES  )   Hon. Dan A.
 7  TO: "Case Track Seven" )   Polster

 8
                FRIDAY, JANUARY 6, 2023
 9
      HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW

11                      – – –

12              Remote oral deposition of John

13  Schneider, Ph.D., held at the location of the

14  witness in Coral Gables, Florida, commencing

15  at 9:27 a.m. Eastern Time, on the above date,

16  before Carrie A. Campbell, Registered

17  Diplomate Reporter, Certified Realtime

18  Reporter, Illinois, California & Texas

19  Certified Shorthand Reporter, Missouri,

20  Kansas, Louisiana & New Jersey Certified

21  Court Reporter.

22

23                      – – –
                GOLKOW LITIGATION SERVICES
24                   877.370.DEPS
                   deps@golkow.com
25
```

```
 1        A.      Yes.
 2        Q.      Okay.  And we can put that away
 3   now.
 4                What did you do to prepare for
 5   this deposition today?
 6        A.      I met with Mr. Boone and
 7   Mr. O'Saile.
 8        Q.      Was there anybody else present?
 9        A.      Yes.  Ms. Kara Kapke.  Am I
10   pronouncing her last name right?  If anyone
11   knows.  I'm not sure how -- if I'm
12   pronouncing her last name correctly, but she
13   represents Publix.
14        Q.      Okay.  She represents Publix.
15                And is Publix also a client of
16   yours?
17        A.      Yes.
18                So just to clarify, when you
19   asked me before who my client is in the Mo
20   Co. matter, it is Kroger.  However, I have
21   continued to do work for other retail
22   pharmacies as well, including Publix.
23        Q.      Okay.  And is the work for the
24   other retail pharmacies for other opioid
25   cases in the MDL?
```

1      A.     Well, I would say more

2   generally it is in anticipation of me

3   possibly being used in future matters, hence

4   their continued involvement.

5      Q.     Okay.  I just wanted to make

6   sure I understand.

7             So as you sit here today, are

8   you retained in any of what we call the

9   Tracks 8 through 11 cases?

10     A.     Well, what I meant to say is I

11  don't know whether I am or not or whether I

12  will be or not.

13     Q.     Okay.  And how long was that

14  meeting?

15     A.     I think probably roughly five

16  hours.

17     Q.     And when was that?

18     A.     That was yesterday.

19     Q.     And did you look at any

20  documents?

21     A.     I looked at my report.  No.

22     Q.     And, Dr. Schneider, how did you

23  come to be a testifying expert?

24     A.     That's a good question.  I

25  think probably -- you'll have to -- you mean

1  originally for the first -- starting with the

2  first time that I became a testifying expert?

3      Q.    Right.

4      A.    Okay.  I was a -- on the

5  faculty at the University of Iowa in Iowa

6  City, Iowa, and I was contacted by an

7  attorney working in a trademark infringement

8  case, and they needed some -- they needed an

9  economist to opine or to analyze and opine on

10  market boundaries for hospitals in their

11  system versus the system -- or the opposing

12  system with whom they had a dispute.

13      Q.    How did you come to be an

14  expert witness for Kroger?

15      A.    For Kroger I have -- that sort

16  of kickoff expert testimony story I just gave

17  you.  In the years since then, I continued to

18  add more types of cases to the -- to the work

19  that I did, mainly while I was still in

20  academia.

21          And then I went into

22  consulting, primarily consulting, sort of

23  continued doing litigation work, and

24  somewhere along the way I met Mr. Boone in

25  that work.  And we worked on one case, and

1    then he contacted -- years had gone by and

2    then he contacted me again regarding the

3    opioid matter.

4         Q.     Okay.  And when did he contact

5    you about being an expert in the opioid

6    matter?

7         A.     I don't remember the exact

8    date, but would have been in -- sometime in,

9    I want to say, maybe early 2021.

10        Q.     Okay.  And I guess really where

11   I want to go here, is when were you

12   approached about being an expert witness in

13   this case?

14        A.     Okay.  Again, sorry just to

15   clarify, you mean the --

16        Q.     Track 7?

17        A.     Montgomery County, Track 7

18   matter.

19        Q.     Yes.  I realize I shouldn't

20   have interrupted you, but, yes.

21        A.     Let me think.  I would say

22   probably, I want to say, maybe the middle

23   of last year.  So mid-2022.

24        Q.     Okay.  And when you were

25   approached in the Montgomery County case,

1  Montgomery County, but I'm not 100 percent

2  sure.

3      Q.    Okay.  You say you were given

4  some claims.  Can you explain to me what you

5  mean by that?

6      A.    Unfortunately, I don't have

7  much more detail than that.  I recall looking

8  at it, and they appeared to be records of

9  prescriptions that were filled at Kroger

10 stores, and it was a large sample.  I don't

11 remember how many records were in the sample,

12 but we were provided the sample and we were

13 asked to -- we were provided a seed number

14 and we were asked to draw a random sample

15 from that.

16     Q.    Okay.  I think I understand.

17           Was this dispensing data from

18 Kroger?

19     A.    Yes, that's correct.

20           (Schneider Exhibit 3 marked for

21     identification.)

22 QUESTIONS BY MS. SALTZBURG:

23     Q.    Okay.  We can put this away.  I

24 would like to talk about the materials that

25 you reviewed for this case.

1             And to do that, let's take a

2    look at your report.  It should be -- if you

3    can pull out Exhibit 3, please.  And we can

4    mark that while you're doing that.

5        A.    Okay.

6        Q.    And just for the record, can

7    you identify this document?

8        A.    Just going to quickly review

9    it.

10       Q.    Take all the time that you

11   need.

12       A.    Yes, this appears to be my

13   report for Montgomery County.

14       Q.    Okay.  And your counsel have

15   confirmed that the materials cited in this

16   report constitute all of the materials that

17   you considered in forming your opinions in

18   this case, correct?

19       A.    Correct.

20       Q.    I guess a better way to ask

21   that, is that correct?

22       A.    That is correct.

23       Q.    All right.  And how did you

24   select those materials?

25       A.    Well, in the course of doing --

1  researching the objectives that I was

2  addressing in this report, I conducted a

3  variety of literature searches primarily in

4  an online tool called PubMed which indexes

5  medical literature.  And I also consulted

6  with economics materials from JSTOR, which is

7  an economics indexing source.  I had also

8  consulted published materials in the form of

9  books that -- that are publicly available,

10  published books, you know, hardcover books,

11  most of which I have on my shelf.  Some of

12  which were ordered specifically for this

13  matter.

14      Q.    And how did you select the

15  materials that you reviewed?

16      A.    Well, as an economist and a

17  health economist, I know the landscape of

18  source material, and the selection of

19  materials is based on a review of everything

20  that addresses the question that I'm asking,

21  and then a further assessment of the quality

22  of that material.

23      Q.    And were any of the materials

24  provided by counsel?

25      A.    No.

```
 1           Q.     And did you do any independent
 2    outside research apart from the materials
 3    that are cited here?
 4           A.     Can you just explain a little
 5    more what you mean by that?
 6           Q.     Sure.
 7                  Other than what you just
 8    described, did you do any independent outside
 9    research?
10           A.     No.
11           Q.     And did you base your opinions
12    on any sources other than those listed in
13    your report?
14           A.     No.
15           Q.     Is there anything you felt like
16    you needed to look at and you did not have
17    the opportunity to do that?
18           A.     No, not for the most part.
19           Q.     What do you mean "for the most
20    part"?
21           A.     I mean, as an academic
22    economist, I think we are kind of wired to --
23    always wanting to do more.  It's just our
24    nature being an academic researcher, and so
25    that's why I say that, that added clause.
```

1          Q.      Okay.  And do you have a sense

2    of how many hours you plan to spend working

3    on the Track 7 case in the future?

4          A.      No.

5          Q.      Are you planning to be at the

6    trial?

7          A.      As far as I know, yes.

8          Q.      And is there anything further

9    you plan to do for Track 7 between now and

10   the trial?

11         A.      Can you tell me when the trial

12   is scheduled for?  Because I'm not sure how

13   to answer that question.

14         Q.      There's not any.

15         A.      Well, then I may be asked to do

16   additional work, but I have not been yet.

17         Q.      Is there anything more you need

18   to give your opinions in this case?

19         A.      Again, you're talking about

20   regarding the liability phase for Montgomery

21   County?

22         Q.      Uh-huh.

23         A.      No.

24         Q.      Okay.  And how certain are you

25   of the opinions offered in this case?

1            MR. BOONE:  I'm sorry, what was

2       that?

3  QUESTIONS BY MS. SALTZBURG:

4       Q.     How certain are you of the

5  opinions offered in this case?

6       A.     Very certain.

7       Q.     And do you have a file for the

8  materials in this case?

9       A.     Yes.

10      Q.     And can you describe that?

11      A.     The file contains the --

12  primarily the PDFs of the cited materials.

13      Q.     You have a part 7 of your

14  report here, which we'll get to later.  You

15  referenced a regression that you did,

16  correct?

17      A.     Correct.

18      Q.     So I'm not an economist, but I

19  assume you don't do the regression in your

20  head, right?

21      A.     Correct.

22      Q.     There's got to be some kind of

23  documentation or something like that that

24  comes out of those?

25      A.     There are regression results.

1    Q.    And do you have those results?

2    A.    I do.  Not handy, but I do.

3    They exist, yes.

4              MS. SALTZBURG:  And we would

5         request that those be provided.

6              MR. BOONE:  Counsel, I note

7         your request.  Thank you.

8    QUESTIONS BY MS. SALTZBURG:

9    Q.    And just since we don't have

10   them right now, can you -- well, let's wait

11   on that.

12             But do you know, in what do you

13   have, do you have the coefficient estimates

14   that you used?

15   A.    You mean the resulting

16   coefficient estimates?

17   Q.    Yes.

18   A.    I do not have them in front of

19   me, no.

20   Q.    Do you have them in your file?

21   A.    They're in my file, yes.

22   Q.    And do you have backup analysis

23   in the file?

24   A.    I'm sorry, can you repeat that?

25   Q.    Do you have backup analysis in

1    the file?

2         A.    Oh, what do you mean by backup

3    analysis?

4         Q.    So any sort of backup analysis

5    that you did for the regression that you

6    reference.

7         A.    I would say no.  Just partly

8    because I'm not sure exactly what that would

9    constitute.

10              I -- in my file there is a page

11   of regression output regarding the rerunning

12   of Dr. Cutler's regressions, controlling for

13   endogeneity.  So there's two sets of

14   regression results.  I believe that is all

15   that is -- that is all that exists.

16        Q.    Okay.  So you have two sets of

17   results.

18              Did you do any regression that

19   you didn't include in the report?

20        A.    No.

21        Q.    Okay.  And go to paragraph 1.2

22   of the report.

23        A.    Okay.

24        Q.    You mentioned here that you

25   don't necessarily agree with all the

1  findings, methods or summary opinions in the

2  materials that you cite, correct?

3  A.  Correct.

4  Q.  Okay.  And how did you decide

5  which parts of the materials you would rely

6  on?

7  A.  Well, the reason I included

8  that statement was because some of the

9  materials are relied on, certainly not all of

10  them.  Some of them included data analysis,

11  but some of them also include opinions,

12  either in the introductions or in the

13  discussion sections.

14  And I just wanted to be careful

15  to make it clear that in citing a document --

16  and as you know from my report, I cite a lot

17  of documents.  But in citing a document, I

18  didn't want to imply that I agreed with

19  everything in that citation.

20  Q.  And is there a way to tell from

21  the report which part you do agree with?

22  A.  Well, yes, indirectly, one

23  could look to see what I'm -- you know, for

24  example, if I'm citing a number from a

25  published study, then it is the reporting of

1  that number in the study that I'm interested

2  in, not necessarily the author's opinions

3  about opioids either, which, again, usually

4  appear in the introduction or the discussion,

5  sometimes in the conclusion section of those

6  articles.

7       Q.    Okay.  So is it fair to say

8  that if you're citing a document, you should

9  understand that -- you're relying on it for

10  the specific thing you're citing it for, not

11  for anything else?

12       A.    Exactly.

13       Q.    Okay.  And was there any

14  materials or categories of materials that you

15  can think of that you did agree with

16  everything?

17       A.    Probably not.  I don't recall

18  off the top of my head, but I -- it's -- just

19  generally in my experience in being an

20  academic economist and health economist, I

21  don't -- it's rare that I agree with

22  everything in a particular article.

23  Sometimes, but it's rare.

24       Q.    And apart from the sources that

25  we discussed a little bit earlier, what

1   documents or materials did you have access to

2   in preparing your report?

3        A.     Those -- the materials we

4   discussed.  Also the reports by Dr. Cutler

5   and Dr. Alexander, and the deposition

6   transcripts for both of those experts as

7   well.

8        Q.     And did you review any of the

9   deposition testimony other than those two

10  transcripts?

11       A.     I don't think so.

12       Q.     Would you have cited it if you

13  did?

14       A.     Well, not necessarily, because

15  I'm not sure that I cite the Cutler or

16  Alexander deposition transcripts.  I may

17  have.  I don't recall whether I did or not.

18       Q.     Do you know if you reviewed any

19  testimony from witnesses in Montgomery

20  County?

21       A.     From other witnesses other than

22  Cutler and Alexander, is that what you're

23  asking?

24       Q.     Correct.

25       A.     I'm quite sure that I did not.

1    Q.    Okay.  And did you review any

2  documents produced by any party in the

3  Montgomery County case?

4    A.    Documents -- I'm sorry, could

5  you just explain what you -- maybe give me an

6  example.

7    Q.    Yes.

8          So in litigation the parties

9  exchange documents.  Did you review any of

10  those documents?

11    A.    I don't think so.

12    Q.    Maybe a way to explain is this,

13  when a document is produced in the case it

14  will have what we call a Bate stamp in the

15  bottom right-hand corner, letters and a

16  number.

17          Were any of the documents you

18  reviewed stamped like that?

19    A.    No.

20          Thank you for that

21  clarification.

22    Q.    All right.  And did you review

23  any data produced in the Montgomery County

24  case?

25    A.    Well, so if we could go back to

1    the sampling issue we were discussing before,

2    would that count as data produced in the

3    Montgomery County case?

4         Q.     It would.

5         A.     It would.  Well, then, yes.

6         Q.     Okay.  And did you review

7    that -- just for that -- for the sampling --

8    drawing the sample that we talked about

9    earlier or for purposes of this report?

10        A.     Just for the sampling.

11        Q.     Okay.  Any other data?

12        A.     For this report, no.

13        Q.     Okay.  And have you reviewed

14   the complaint in this case?

15        A.     No.

16        Q.     And just for clarity, did you

17   review the reports of any experts in this

18   case, other than Dr. Alexander and

19   Dr. Cutler?

20        A.     No.

21        Q.     And for both of those experts,

22   did you review all of the appendices and

23   exhibits to those reports?

24        A.     Yes.

25        Q.     And did you select those

1    reports to review or were they provided by

2    counsel?

3        A.    They were provided by counsel.

4        Q.    And how would you receive those

5    reports?  Electronic or copy?

6        A.    Electronic.

7        Q.    Do you know Dr. Cutler either

8    personally or by reputation?

9        A.    By reputation, yes.

10       Q.    Okay.  And how is that?

11       A.    How do I know?  I work -- used

12   to work at a company called -- research

13   company called the Center for Health

14   Economics Research.  It was located in

15   Boston.  Dr. Cutler had just joined, I

16   believe, the Harvard faculty then.  He could

17   have been somewhere else in Boston, but he

18   was in Boston.  And I would see him at

19   lectures and symposiums and things like that.

20       Q.    And what about Dr. Alexander?

21       A.    Dr. Alexander, I'm less

22   familiar with.  I know his name, but I'm not

23   familiar with his work, nor have I ever met

24   him or seen him present or anything.

25       Q.    Okay.  And when you say you

1  know his name, can you explain what you mean

2  by that?

3         A.      Well, in my field of health

4  economics, we read a lot of materials.  I've

5  had employees leave and go to Johns Hopkins,

6  enroll in programs and we have -- we

7  interview doctoral students for potential

8  positions at our company.  Some of them come

9  from Johns Hopkins and -- yeah.  So we just

10  see -- there's a lot of exposure when you're

11  in the academic field that's as sort of --

12  health economics is not a huge field.  It's a

13  subfield within economics.  So everyone tends

14  to -- there's quite a bit of name

15  recognition, especially among the

16  academic-based -- well, Alexander is not a

17  health economist, but he's one that opines

18  on -- or writes on matters of health policy,

19  quite a bit, in epidemiology and things like

20  that, and we in health economics overlap

21  quite a bit with those types of studies.

22         Q.      Okay.  And other than the --

23  well, actually, strike that.  Let me ask you.

24                 Did you ever have any

25  discussion with experts for other defendants

1    in this case, apart from the pharmacies that

2    were retained -- I guess let me ask it this

3    way.

4              Do you know who the other

5    experts retained by Kroger for Track 7 are?

6         A.    I -- no, not -- not -- many of

7    them I don't know.  I believe, I'm not

8    certain, that they have retained someone I

9    know to help with determining market size,

10   but as far as I know that wasn't an issue --

11   obviously not an issue in this matter and not

12   anything I relied on in this report.

13        Q.    So I'm guessing you did not

14   have any discussion with those experts then?

15        A.    Correct.

16        Q.    Okay.  And have you -- so for

17   the Track 7, have you had any calls or

18   meetings with lawyers representing anyone

19   other than Kroger?

20        A.    Yes.

21        Q.    And who is that?

22        A.    Well, the attorneys

23   representing -- if you recall from the

24   invoicing documents, the other pharmacy --

25   the other pharmacies whom I've been -- who

1   have retained me, that would be Albertsons,

2   Meijer and Publix, have been occasionally

3   involved in calls over the -- over that time

4   period.

5          Q.    Okay.  Anyone other than those

6   pharmacies?

7          A.    No.

8          Q.    And have you discussed your

9   testimony in this case with anyone other than

10  Kroger and its counsel and counsel for Publix

11  at the one meeting?

12         A.    Yes.  There were some earlier

13  phone calls in which some of the counsel for

14  some of the other pharmacies were present.

15         Q.    Okay.  And that's the same

16  calls that you were just talking about?

17         A.    Well, just for clarity,

18  distinguish -- distinguish those calls from

19  yesterday's prep calls, is that what you

20  mean?

21         Q.    Yes.

22         A.    Okay.  That's correct, yes.

23         Q.    Okay.  But nothing other than

24  that?

25         A.    No.

1    deposition or in the report here?

2        A.    Well, I believe this

3    description in 2.8 is, again, without having

4    both reports in front of me, I can't say for

5    sure, but I believe this description is

6    somewhat different.

7        Q.    Okay.

8        A.    And there might be some

9    additional evidence cited.

10       Q.    And in that case let me ask

11   you, how -- what is your opinion as to how

12   the FDA is a factor?

13       A.    Well, the FDA is something as

14   an a health economist I'm quite familiar

15   with.

16             As I indicated earlier today,

17   we do work for life sciences companies,

18   device companies, diagnostic companies, and a

19   lot of those -- obviously a lot of those

20   companies have to interact with the FDA.

21             So I'm familiar with the rigor

22   of the FDA approval process.  And when the

23   FDA approves a prescription drug, it is only

24   after a fair amount of research and

25   development on the part of the manufacturer

1    combined with assessment -- about a year-long

2    assessment by the FDA itself.  So when the

3    FDA approves a prescription drug, the -- for

4    better or for worse, the community accepts

5    that drug.  In other words, it's a stamp of

6    approval.

7              So FDA approval, if it's not --

8    if the FDA misses something, the implications

9    of that can be serious because they've given

10   a drug a stamp of approval and all of the

11   rest of the health care supply chain refers

12   to or defers to that approval.

13        Q.    And so are you opining that the

14   FDA should not have approved opioids here?

15        A.    No, I wouldn't say that.  And

16   the reason for that is twofold.  One is it's

17   true that 96 percent, approximately, of

18   opioids are used as directed.  Opioids have

19   demonstrated clinical need.  There's a large

20   literature on that.  So I wouldn't say that

21   they -- that they shouldn't have approved it.

22              My opinion about the FDA is

23   that they should have done a better job doing

24   postmarket surveillance of adverse events

25   associated with the utilization of

1   prescription opioids.

2          Q.      And is -- okay.  But you're not

3   opining taking some opioids off the market

4   based on that surveillance, correct?

5          A.      Well, okay.  So that introduces

6   another layer.  So when you say "some

7   opioids," so I think there were some products

8   that were particularly -- or had high risks

9   associated with them and higher rates of

10  adverse events associated with them.  So in

11  those cases they might have considered that.

12  However, I'm not -- that's beyond my area of

13  expertise.

14         Q.      Okay.  What are you opining the

15  FDA should have done based on that postmarket

16  surveillance?

17         A.      Well, I think they should have

18  done a better job of postmarket surveillance

19  in terms of adverse events.  They were in a

20  position given the way that information is in

21  the postmarket phase is filed with the FDA or

22  expected to be filed with the FDA.

23  Physicians are supposed to -- it's very easy

24  for a physician to notify the FDA of things

25  that they observe.  I don't know the extent

1           What materials did you rely on

2    as the basis for your conclusion that

3    pharmacies have done their part?

4        A.       Again, this is just a general

5    comment that all entities have done their

6    part.  And again, in the context of this --

7    in the context of this discussion, it's -- it

8    specifically having to do with this idea that

9    if -- as the supply of prescription opioids

10   has decreased, the supply of illicit opioids

11   has increased, and so that's an important

12   distinction to make in terms of that shifting

13   of sources of supply.

14       Q.       Okay.  Are there any specific

15   sources that you're relying upon for opining

16   that pharmacies have done their part?

17       A.       No specific sources identified

18   here.

19           MS. SALTZBURG:  Okay.  Let's go

20       on a break.

21       (Off the record at 3:33 p.m.)

22   QUESTIONS BY MS. SALTZBURG:

23       Q.       So, Dr. Schneider, I would like

24   to go to Section 6 of the report on

25   implications.  It starts on page 31.

1        A.      Okay.

2        Q.      Okay.  And so you're opining

3   here that there are implications for opioid

4   litigation generally and Montgomery County

5   specifically, correct?

6        A.      Correct.

7        Q.      And are those implications

8   different in any way?

9        A.      Do you mean between Montgomery

10  County and the general?

11       Q.      Yes.

12       A.      A little bit different.

13  There's some aspects of Montgomery County

14  that I highlight in this -- in this section

15  that not necessarily apply to other

16  jurisdictions.

17       Q.      Let's go through those then.

18              I guess before I do that, same

19  page, paragraph 6.2.  You say, "The State of

20  Ohio and Montgomery County are subject to all

21  factors that affect the entire country."

22              Correct?

23       A.      Correct.

24       Q.      And what do you mean there?

25       A.      Well, in other words, a lot of

1  the intervening factors I identified are

2  national factors of FDA, CDC, DEA, factors

3  that don't distinguish or do things

4  differently by county or by state.  That's

5  what I mean by that.

6      Q.     Okay.  So as part of the

7  nation, Montgomery County would be subject to

8  all of the national factors?

9      A.     Correct.

10     Q.     And that's the seven factors

11  that we've talked about in part 2, correct?

12     A.     Correct.

13     Q.     So based on that, would you not

14  expect to see significant variation in

15  shipments to Montgomery County and other

16  parts of the country?

17     A.     Well, we might.  So, for

18  example, the discussion about medical need

19  and the different health care indicators in

20  Montgomery County might suggest a greater

21  medical need in Montgomery County.  It's a

22  point I've made in a couple of different

23  places here today.  So that's one aspect.

24     Q.     Okay.  Let's talk about medical

25  need.