IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*The Montgomery County Board of County Commissioners, et al. v. Cardinal Health, Inc., et al.,* Case No. 1:18-op-46326-DAP | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>Judge Dan Aaron Polster |

**REPLY IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENSE EXPERTJOHN E. SCHNEIDER, PHD**

Plaintiff Montgomery County ("Plaintiff") respectfully submits this reply in support of its Motion to exclude certain opinions of John E. Schneider, PhD, under Federal Rules of Evidence 401, 403, and 702, as well as *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993). In particular, as stated in more detail in the Motion, Plaintiff seeks to exclude: (1) specified liability opinions due to their irrelevance, lack of fit, and likelihood of confusing and misleading the jury; and (2) abatement opinions that Dr. Schneider is admittedly unqualified to offer, lack relevance, and are likely to confuse the jury, particularly given that they are based largely on Dr. Schneider's own confusion about the role of Dr. Caleb Alexander's expert opinions. Kroger's Response leaves these core issues largely uncontested. Instead, it spends the bulk of its brief mischaracterizing both the Motion and Dr. Schneider's opinions.[1]

---

[1] Kroger also includes numerous irrelevancies in its brief. For example, whether a member of Dr. Schneider's dissertation committee went on to do great things is not at issue here and does nothing to address Dr. Schneider's qualifications, or to counter the inadmissibility of the particular opinions contained in his report.

Much of Kroger's response ignores the limited nature of Plaintiff's motion and addresses arguments Plaintiff has not made. The County is not seeking to preclude Dr. Schneider from offering basic background, however selective, slanted, and even confused, about increases in opioid supply. And because the Report's "factors" Section is not at issue, Kroger's arguments about whether Dr. Schneider can opine that increased supply increase was "multifactorial" are irrelevant.

Of greater significance, Kroger's response fails to grapple with the fact that Dr. Schneider's opinions offer an alternative liability scheme, unmoored from, and indeed at odds with, the legal standards applicable to this case.  Kroger says only that Dr. Schneider need not know the applicable law and that Dr. Schneider does not offer an opinion on the ultimate issue in the case. But neither response addresses the issue Plaintiff raised, which is that Dr. Schneider bases his concept of "responsible" person on factors different from those that give rise to legal responsibility under Ohio law.  That Dr. Schneider does not tell the jury what it should conclude about responsibility under Ohio law does not make his opinions admissible, when he purports to tell the jury who is responsible under an entirely different framework based on factors not recognized in applicable law, but rather drawn from analogy to an inapposite environmental law. Similarly, Dr. Schneider purports to opine about "opioid attributable" *costs*, but the County does not seek to recover its costs but instead seeks abatement.

Nor does Kroger grapple with the absence of a "fit" between Dr. Schneider's opinions and the facts of this case. The problem is not that the County disagrees with Dr. Schneider's conclusions, or even with the facts on which Dr. Schneider relied in forming them. It is that Dr. Schneider purports to decide who is "responsible" for abatement costs without being aware of what Kroger, or other parties, actually did.

Kroger also concedes that Dr. Schneider is unqualified to opine on abatement strategies, but argues that, to the extent the abatement strategies in Dr. Caleb Alexander's report are based on an analysis of cost-effectiveness, Dr. Schneider *is* qualified to opine about that. The point is irrelevant, however, because Dr. Alexander's abatement report does *not* include and is not based on cost-effectiveness; rather, Dr. Alexander provides a plan to substantially reduce opioid overdoses and opioid harms. The type of "cost model" for those interventions, concerning which Dr. Schneider claims to have expertise, is outside the scope of the report Dr. Schneider purports to criticize. It can serve no purpose to permit Dr. Schneider to offer critiques of what Dr. Alexander did *not* do, all the more so when he is unqualified to offer critiques of what Dr. Alexander did do. Rather, it would only waste time and serve to confuse the jury.

For the reasons set forth in Plaintiff's Motion, and in detail below, this Court should preclude Dr. Schneider from offering the opinions set forth in the portions of Dr. Schneider's report specified in the Motion.

**I. Kroger's Response Only Confirms that Dr. Schneider's Testimony Is Irrelevant and Is Grounded in an Alternative Liability Scheme at Odds with the Legal Standards that Govern This Case.**

Kroger concedes that the purpose of Dr. Schneider's testimony is to argue that abatement costs must be "*apportioned*" to what Kroger calls "Primary Responsible Parties," Doc. 4950 at 1 (emphasis in original), and Dr. Schneider names "potentially responsible parties" or "PRPs," Doc. 4886-1 at 17 & 19. Kroger further concedes: (a) that this is an analysis of "responsibility (i.e. liability)" for abatement relief; and (b) that Kroger seeks to have Dr. Schneider opine about the "liability of PRPs" as part of Phase I because opinions offered for "liability purposes . . . must be addressed" now. Doc. 4950 at 2. The intended purpose of Dr. Schneider's opinions is that, as Kroger puts it: "if a specific entity (e.g., Kroger) were to be found liable, it would necessarily have to be in the context of" assessing other parties' responsibility as well, which context Dr. Schneider

3

seeks to provide through an assessment of "*all* responsible parties." Doc. 4950 at 14 (further arguing that without identifying "responsible parties" it is "impossible" to reach the abatement phase or the "supposed goal of this litigation").  These opinions clearly address the legal issues in this case—who is responsible and how should responsibility be apportioned—but they are grounded in an alternative framework for assessing responsibility.

In response, Kroger does not suggest that Dr. Schneider's opinions are grounded in Ohio law of nuisance, apportionment, joint and several liability, or abatement, or even that they are consistent with that body of law.  Rather than address this problem, Kroger misconstrues Plaintiff's challenges. Thus, Kroger argues that an expert does not need to be familiar with legal standards. *See id.* That is, of course, true, but it also misses the point. The issue raised in the Motion is that experts may not simply craft their own liability standards and direct the jury whom to hold responsible under those alternate standards. *See In re Rezulin Products Liab. Litig.*, 309 F. Supp. 2d 531, 545 (S.D.N.Y. 2004); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2011 WL 1673805, at *9 (E.D. Pa. May 4, 2011); *see also* Doc. 4886 at 9-13. The problem is not that Dr. Schneider is unfamiliar with the law; it is that his analysis relies on criteria for liability that are at odds with applicable law and is therefore both irrelevant and misleading. Kroger similarly argues that Dr. Schneider's opinion is not improper because it does not tell the jury what ultimate conclusion it should draw under Ohio law.  But again, this response misses the mark. Dr. Schneider *does* purport to tell the jury whom to hold responsible; indeed, that is the terminology he uses. The problem is that he seeks to do so under principles other than those of the law applicable to this case.  Dr. Schneider proposes to tell the jury whom *he* thinks is responsible under criteria of his own devising; this is not appropriate expert testimony.

Kroger's insistence that Dr. Schneider is merely "identif[ying] the entities that have contributed to the opioid supply and provid[ing] an explanation of these entities role in the opioid supply, or more precisely oversupply," *see* Doc. 4950 at 12, is unavailing.[2] Dr. Schneider's report is shot through with language of "responsibility," "liability," and "apportionment." His construct for determining what these terms mean, and what it would mean to "contribute" to the opioid supply is inherently legal, even as it is at odds with applicable legal standards.

The cases Kroger cites are readily distinguishable. For example, in *Davis v. Combustion Eng'g, Inc.*, the primary decision on which Kroger relies, the expert testified that in his opinion, as a factual matter, the plaintiff "was terminated because of his age." 742 F.2d 916, 919 (6th Cir. 1984). He did not purport to explain to the jury liability for age discrimination or who should provide relief in the case based on his own liability scheme. Likewise, in *Davis*, the "ultimate issue"[3] with which the expert's opinion overlapped was one of *fact*, not a directive on how and to whom to assign legal responsibility.[4] *Compare also, e.g.*, *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (expert opined about valuation of land). In both cases, the opinions lined up with what the law required, even if the expert could not explain how that was the case. For that reason, neither ran afoul of the rule that "[a]lthough an expert's opinion may 'embrace[ ]

---

[2] Kroger's claim that Dr. Schneider's report addresses opioid "over-supply," rather than merely supply, is curious in light of the overwhelming focus of the report on opioid utilization – that is supply. Even where Dr. Schneider potentially touches on "over-supply," as where he discusses the prevalence of non-medical use, Dr. Schneider himself testified that it was "not important" to determine the extent of non-medical use "in an empirical way," *see* Schneider Dep. at 170:2-171:17.

[3] Doc. 4950 at 10 (citing *Davis* & Oh. Evid. R 704).

[4] The language Kroger cites refers to an inapposite argument concerning a factual issue. *See Davis*, 742 F.2d at 919. In the interest of candor, the County notes that the appellant there did also raise a separate argument about whether a "bit of testimony" referencing "unlawful age discrimination" was improperly admitted as well, but the decision declined to reach the issue, reasoning that any error was harmless in the context of that case. *See id.* at 919-20.

an ultimate issue to be decided by the trier of fact[,]' Fed. R. Evid. 704(a), the issue embraced must be a factual one." *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (holding that expert testimony was "received in violation of the Federal Rules of Evidence"). Here, here the ultimate issue on which Dr. Schneider seeks to opine is who bears responsibility, and who should pay for abatement, under the "liability" principles he advocates—but the question who bears responsibility and who should pay is, inevitably a legal one.

Kroger argues that Dr. Schneider's "liability" opinions are actually economics opinions, not "legal opinions" or opinions that "interpret legal terms." Doc. 4950 at 11. But legal opinions are precisely what they are. As discussed above, Dr. Schneider is opining as to who is responsible for the relief sought in this case. And, liability is manifestly a legal term. Undisputedly, the sources on which Dr. Schneider relies are written in large part by lawyers, not economists. He derived his PRP concept from sources such as the American Bar Association's *The Business Lawyer*. *See* Doc. 4886 at 4 & Doc.4886-1 at ¶¶ 4.1-4.3 & Notes 67-69. Even the non-legal sources he cites are referencing statutory standards and terms. *See* Doc. 4886 at 4-5. *See e.g.*, L. Priya, G. K. Varghese, and I. K. Shah, *Liability allocation in pollution involving multiple responsible parties*, Environ. Sci. Pollut. Res. Int. 27, no. 36 (2020) (journal article, cited by Dr. Schneider, acknowledging that in the environmental context to which Dr. Schneider analogizes "[t]he responsibility allocation and consequently the cost allocation among polluters are done *by courts based on the relevant statute(s)/legal provisions*") (emphasis added)). Even the textbook Kroger cites in support of its contention that Dr. Schneider's opinions do not encompass legal standards describes *legal* liability frameworks established through statutes and the court system; it in no way suggests that economists should craft their own responsible-party liability standards in *lieu* of those set forth in

6

the environmental statutes it describes. *See* Phaneuf and Requate, A Course in Environmental Economics: Theory, Policy, and Practice, §§ 10.6-10.7 (Attached as Exhibit A).[5]

To be sure, Dr. Schneider is not applying any *valid*, *applicable* legal standard in assessing liability (or in assessing OUD-attributable costs). But he is opining on legal concepts – responsibility, liability, damages, and apportionment—nonetheless.[6] "It is the responsibility of the court, not testifying witnesses, to define legal terms." *Berry*, 25 F.3d at 1353; *see also Woods v. Lecureux*, 110 F.3d 1215, 1220 (6th Cir. 1997) ("*Berry* teaches that a district court abuses its discretion when it allows a witness to define legal terms, especially terms that carry a considerable amount of legal baggage"). Dr. Schneider's use of these terms to mean something other than what they mean under applicable law is worse than irrelevant—it is actually misleading. *Compare Torres v. Cnty. of Oakland*, 758 F.2d 147, 151 (6th Cir. 1985) (if "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular . . . exclusion is appropriate").

Unable to defend the relevance or admissibility of Dr. Schneider's opinions, Kroger attempts to shore them up, or perhaps suggest that other courts have accepted them, by vaguely alluding to other work for "plaintiffs" as "relevant and pertinent" (although it fails to explain how). *See* Doc. 4950 at 6. This effort is both unavailing and misleading. As an initial matter, the publications Kroger cites do not pertain to litigation at all—on behalf of plaintiffs or defendants. *See* Doc. 4950-1. They concern cost-calculations for potential policy or regulatory measures or, as

---

[5] Kroger mistakenly states that Dr. Schneider referenced the entire book, rather than the two chapters he cited. *Compare* Doc. 4950 at 14 *with* Doc. 4886-1 ¶¶ 4.1-4.3 & Notes 67-69. This error is immaterial, as the remainder of the text is as unsupportive of Kroger's contentions as the portion Dr. Schneider cited.

[6] In another example, Dr. Schneider would opine that whether Kroger turned a blind eye to signs of diversion has no bearing on the liability analysis and thus its responsibility in this case. *Compare* Doc. 4950 at 10 *with* Doc. 4886 at 10. This is directly contrary to the legal standards in this case.

Kroger puts it, other "studies." Doc. 4950 at 6; *see also* Doc. 4950-1 at 5 & 8 (CV). That an analysis at odds with governing legal principles may have some use outside of litigation in no way suggests that such an analysis is admissible at trial under Rule 702. Interestingly, despite the greater freedom in presenting to an audience unconstrained by the Federal Rules of Evidence, Dr. Schneider still did not use the approach he advocates here (nor does Kroger make any attempt to argue that he did). Absent from the papers Kroger cites are any mention of "responsible parties," "PRPs," or "liability" at all, much less the type of liability opinions advanced here.[7] There is simply no support for the notion that Dr. Schneider may usurp the role of the judge in the manner Kroger advocates. *See Berry*, 25 F.3d at 1353 ("It would have been easy enough for the drafters of the Federal Rules of Evidence to have said that a properly qualified expert may opine on the ultimate question of liability. They did not do so.").

Ultimately, even Kroger backs away from the "Responsible Parties" portion of the report in Section 4 (and related identification of such parties in Montgomery County in Section 6).[8] Kroger contends that Dr. Schneider "does not necessarily need to rely on an established theory" in this area or have "a theoretical basis" at all. Doc. 4950 at 14-15. According to Kroger, Dr. Schneider's role is to "help" the jury "understand the context of opioid liability" through a liability

---

[7] To the extent they can be discerned from Kroger's vague allusions, pertinent materials include: "Nexus Report delivered to San Francisco City Council" titled in his CV as "Regulatory Fee Structure Analysis for Alcohol-Attributable Costs in San Francisco," *available at* Microsoft Word - LEWINVA-#511670-v1-SF_Alcohol_Mitigation_Fee_-_Final_Report.DOC; Schneider, JE, CS Decker, JM Weintraub, R Bhatia, E Finkelstein, and A Honeycutt (2009). "The Public Burden of Liquid Candy: The Costs of Sugar-Sweetened Beverages in San Francisco." Nexus Report delivered to San Francisco City Council, *available at* The Public Burden of Liquid Candy: The Costs of Sugared Beverages to San Francisco (sfdph.org); Dick K, Schneider JE, Briggs A, Lecomte P, Regnier SA, Lean M. Mendelian randomization: estimation of inpatient hospital costs attributable to obesity. Health Econ Rev. 2021 May 14;11(1):16, *available at* https://pubmed.ncbi.nlm.nih.gov/33990897/. *See* Doc. 4950-1 at 5 & 8.

[8] Kroger makes no meaningful effort at all to address Section 5, which should be excluded for the reasons stated in the Motion.

framework that Kroger believes "has some useful and helpful parallels with public health." Doc. 4950 at 15. It notes that "environmental economics and public health economics" are closely related, *id.*, but fails to address that the *legal* framework for identifying "responsible parties" under CERLA is quite distinct from the legal framework applicable to public nuisance. Thus, Kroger makes no attempt to counter the legal authority making clear the type of testimony Dr. Schneider attempts to offer is inadmissible in Rules 401-402, Rule 702, and *Daubert*. Nor does it explain how theories of liability—whether purportedly based on economics or otherwise—that do not comport with the legal standards that govern this case can possibly provide helpful context. *See Woods*, 110 F.3d at 1221 ("Testimony . . . which attempts to tell the jury what result to reach and which runs the risk of interfering with a district court's jury instructions, hardly can be viewed as being helpful to the jury."). Its only purpose appears to be to suggest to the jury that there are other ways to think about the allocation of responsibility for harm other than those reflected in the legal rules on which it will be instructed by the Court and even to go so far as to make its decision as to responsibility based on those alternatives—a manifestly improper purpose. Further, it bears noting that Kroger does not even attempt to contest the County's arguments concerning the likelihood of confusing and misleading the jury under Federal Rule of Evidence 403.

## II. Dr. Schneider's Irrelevant Liability Opinions Undisputedly Do Not Fit the Facts Case.

Kroger makes no genuine attempt to counter the County's contentions concerning the absence of any correspondence between Dr. Schneider's opinions and the facts of this case, other than to suggest that "fit" is a matter of weight, rather than admissibility. *See* Doc. 4950 at 10-11. But that is not the case; "fit," or relevance is a fundamental requirement of admissibility. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 WL 3934597 at *2 (N.D. Ohio Aug. 20, 2019). Kroger also confuses Plaintiff's fitness challenge with an attack on Dr. Schneider's

9

*conclusions. See* Doc. 4950 at 11. But the problem here is not that the County disagrees with Dr. Schneider's conclusions (although of course it does), but rather the inapplicability of Dr. Schneider's opinions *to the facts of this case.* The overarching issue is the extent to which his opinions are "demonstrably germane to the facts of the case." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3934597, at *3. Manifestly, they are not.

Nor is the issue, as Kroger would have it, that Dr. Schneider is unfamiliar with the facts alleged in the Complaint.[9] Rather, the problem is that the proposed testimony does not pertain to any of the facts that will be presented at trial. This is so in part because, in assessing the responsibility of various parties, Dr. Schneider declined to consider *any* Kroger or pharmacy conduct. This is not an issue of "weak[]" evidence, as Kroger suggests, but of an expert who refused to consider *any* facts concerning the monitoring failures of Kroger or the misconduct of pharmacy chains, yet plans to render opinions on precisely the area he ignored. *See* Doc. 4886 at 3-4, & 6 (background) & 10-11 (argument). Dr. Schneider's opinion about who is responsible here cannot possibly fit the facts of this case, because it was formed by considering only the conduct of certain parties and ignoring the conduct of the defendant. Kroger has no response to this issue.[10]

Similarly, Kroger makes no meaningful attempt to defend Section 6 of Dr. Schneider's Report. To the extent it is referenced at all, it is not in regard to any opinions concerning PRPs,

---

[9] It is of course puzzling that a report which makes Dr. Schneider's view of what "plaintiffs" allege such a recurrent theme would be one in which the author has not read the relevant allegations, *see* Doc. 4886 at 4, but that is not, as Kroger mistakenly suggests, the crux of the issue.

[10] Kroger complains that the County described (accurately), Dr. Schneider's Report as specifically linking only "drug traffickers" to diversion but fails itself to identity any other PRP so linked. *See* Doc. 4950 at 16. Neither the diagram nor the Report pages Kroger cites reference diversion. *See* Doc. 4886-1 at 9-10 & Figure 2-2. Additionally, when pressed in his deposition, Dr. Schneider described the DEA as the only other PRP directly linked to diversion.

costs, or "liability" frameworks. Kroger argues only that "shift parameters" such as "higher cancer rates" could lead to higher shipments. Doc. 4950 at 17. It cites nothing for this proposition, however, nor does it articulate any relevance. Dr. Schneider, meanwhile, has no sense of what percentage of opioid prescriptions in Montgomery County are for cancer patients, nor did he do any research into whether shipments were targeted to areas with higher cancer rates. Doc. 4886-2 at 209:14-18 & 234:11-14. Kroger's argument in this regard also seems in some tension with its summary of Dr. Schneider's opinions concerning the County, which is simply that Montgomery County is subject to the same national factors as the rest of the nation. *See* Doc. 4950 at 7.

Kroger does spend time attempting to defend Dr. Schneider' opinion that increased opioid supply is "multi-factoral" and "multi-causal" due to the "confluence of several factors." Doc. 4950 at 14. But, as noted above, the discussion of those "factors," appears in Section 2, the background section that is not at issue in this Motion.[11] Similarly, Kroger's defense of certain opinions set forth in Section 3 of Dr. Schneider's report, *see, e.g.,* Doc. 4950 at 16-17, is beside the point, as the County has not challenged this section either. Although Plaintiff's "fit" challenge may apply more broadly to other portions of the report as well, the County has limited its Motion, seeking to exclude only those opinions which particularly stand to cause significant confusion, prejudice, and/or waste of time.

### III. Kroger Concedes that Dr. Schneider Is Not an Abatement Expert with the Capacity to Critique Dr. Alexander.

Following its extensive discussion of Dr. Schneider's background, Kroger goes on to concede that "Dr. Schneider is not an expert on the design and implementation of . . . public health

---

[11] The County notes that it is somewhat disingenuous for Kroger to suggest Dr. Schneider's opinions regarding causal factors reflect a consensus view, given that Dr. Schneider himself testified that he disagreed with at least part of most everything on which he based his opinions. *See* Doc. 4886-1 at ¶ 1.2; Doc. 4886-2 at 42:17-23 & 139:19-23.

and social services" such as those described in Dr. Alexander's Report. Doc. 4950 at 17. A person unqualified to opine on the design and implementation of an abatement remedy is also unqualified to criticize someone else's design and implementation of that same remedy. This common-sense proposition is uncontradicted by Kroger. If anything, Kroger itself appears to believe that it would not be an appropriate role for Dr. Schneider to "provide opinions on the design, implementation, and medical necessity of" the services described in Dr. Alexander's Report. Doc. 4950 at 17; *see also id.* at 21 (admitting that Dr. Schneider "doesn't design health care programs", but arguing, circularly, that "attributable costs are commonly viewed and used as methods to *determine* attributable costs") (emphasis in original)).

Kroger faults the County for not delving into the weeds of all of Dr. Schneider's evident confusion about Dr. Alexander's report. *See* Doc. 4950 at 19 (arguing that the County's brief is too short). While the County addressed more than one "offending" paragraph, Doc. 4950 at 19, the issue is Dr Schneider's evident lack of qualifications to critique Dr. Alexander at all. In any event, the County offered examples of his misplaced arguments concerning, for example, fixed and variable costs, as well as his overall misunderstanding of Dr. Alexander's report. Doc. 4886 at 14; *accord, e.g.,* Doc. 4886-1 at ¶¶ 8.1-8.2 (Dr. Schneider mistakenly characterizing Dr. Alexander as focusing on areas in which "opioid attributable costs" are "expected to be incurred").

Kroger nevertheless contends that Dr. Schneider is qualified to critique Dr. Alexander's report because, Kroger maintains, that report is based on the economic impact of abatement versus the economic impact of OUD, and thus on the cost-effectiveness of the strategies Dr. Alexander identifies. Doc. 4950 at 19. Dr. Schneider, they argue, is qualified to critique *that*. Thus, unable to make Dr. Schneider an abatement expert, Kroger attempts to transform Dr. Alexander's report into a discussion of abatement costs. But that is a mischaracterization of Dr. Alexander's report—

12

and of Dr. Schneider's response to it. Meanwhile, even Dr. Schneider himself testified that Dr. Alexander's "objective appears to be a little bit different than [his]." Doc. 4886-2 at 217:12-20.

Kroger's argument is based almost entirely on a single paragraph within the hundreds of pages comprising Dr. Alexander's report and Appendices which states that "improving treatment uptake and use for OUD is not just the right clinical thing to do, it also makes good economic sense, in part because OUD has so many direct and indirect costs." *See* Doc. 4950 at 18. Nowhere, however, does Kroger actually suggest that Dr. Schneider disagrees with that conclusion as part of his admittedly "limited" critiques (or that it had any relevance to his opinions). *See* Doc. 4886-2 at 217:12-14. Moreover, both Kroger and Dr. Schneider are well aware that Dr. Alexander's intended scope of testimony does not include the type of cost issues about which Dr. Schneider seeks to opine. Not only is this apparent on the face of Dr. Alexander's report, he discussed it in his deposition. *See, e.g.*, Exhibit A, Alexander Dep. at 39:22-42:21 (Dr. Alexander was not asked to develop a cost model and his report "does not get into the dollar signs of what it would cost to abate any public nuisance in Montgomery County"). Dr. Alexander's opinions concern what is needed to save lives, bring families back together, and heal the public harm in Montgomery County. If Dr. Schneider (who has not conducted his own cost estimates) wants to apply his expertise in "review[ing] cost models," he will need to wait until there is a cost model to review. Doc. 4950 at 21.

Kroger fares no better with its additional argument that Dr. Schneider is "opining as to oversights and shortcomings in Dr. Alexander's proposed abatement plan" such as the failure to take into account drug take-back programs by pharmacies. Doc. 4950 at 20. Although it offers various criticisms of Dr. Alexander, the Schneider Report, on its face, does *not* criticize Dr. Alexander for failing to take into account drug take-back programs; Kroger is thus defending an

13

opinion that Dr. Schneider isn't offering.[12] Dr. Schneider, for his part, was as unaware of drug-take back programs as he was of other pharmacy operations. *See* Doc. 4886 at 15. And, contrary to Kroger's characterization, Dr. Schneider admittedly could not think of any specific source to support his opinion, nor did he supply one in his report. *See id.* More broadly, even in response to questioning from Kroger, Dr. Schneider conceded that he is "not an expert on [] the types of programs that work better or not as good in terms of actually in terms of actual abatement." Doc. 4886-2 at 260:16-261:4 (explaining that his expertise is in calculating costs and that, "for example, some of the things that Dr. Alexander was opining on in terms of the specifics of the functioning of a program, that's not something I'm an expert on").

In sum, because Dr. Alexander's report does not include a cost model, any expertise Dr. Schneider has with respect to such models is inapplicable. Kroger's efforts to re-characterize Dr. Alexander's report as something other than what it is in order to justify criticisms from Dr. Schneider should be rejected.

## CONCLUSION

For the reason set forth above and the County's Motion, Dr. Schneider's opinions as disclosed in Sections 4, 5, 6, and 8, and the corresponding summaries of those opinions in Section 9, should be excluded.

Dated: March 23, 2023

                                                 Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

---

[12] Strangely, Kroger also cites a page of Dr. Schneider's deposition that has nothing to do with his critique of Dr. Alexander or drug take-back programs. *See* Doc. 4886-2 at 231.

14

>Joseph F. Rice
>MOTLEY RICE LLC
>28 Bridgeside Blvd.
>Mt. Pleasant, SC 29464
>(843) 216-9000
>(843) 216-9290 (Fax)
>jrice@motleyrice.com
>
>Paul T. Farrell, Jr., Esq.
>FARRELL & FULLER LLC
>1311 Ponce de Leone Ave., Suite 202
>San Juan, PR  00907
>(304)654-8281
>paul@farrellfuller.com
>
>*Plaintiffs' Co-Lead Counsel*
>
>*/s/Peter H. Weinberger*
>Peter H. Weinberger (0022076)
>SPANGENBERG SHIBLEY &LIBER
>1001 Lakeside Avenue East, Suite 1700
>Cleveland, OH 44114
>(216) 696-3232
>(216) 696-3924 (Fax)
>pweinberger@spanglaw.com
>
>*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system and may be obtained by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

>*/s/Peter H. Weinberger*
>Peter H. Weinberger