*MOTION FOR LEAVE TO FILE SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT*

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>Case No. 1:18-op-46136-DAP<br><br>Case No. 1:19-op-45913-DAP<br><br>Case No. 1:21-op-45092-DAP<br><br>Case No. 1:22-op-45025-DAP | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**SETTLED DEFENDANTS' MOTION TO DISMISS
CLAIMS FILED BY NON-PARTICIPATING FLORIDA SUBDIVISIONS
AS RELEASED BY THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ............................................................................................... 1

II.     BACKGROUND ................................................................................................. 2

        A.      Plaintiffs' Complaints .......................................................................... 2

        B.      Florida's Participation in the Global Settlements and Release of
                Subdivision Claims ............................................................................... 3

        C.      The Florida Attorney General's Declaratory Judgment Suit ................... 4

III.    ARGUMENT ....................................................................................................... 6

        A.      The Florida Attorney General Has The Power To, And Did, Release All
                Opioid-Related Claims Brought By Its Governmental Entities, Including
                Its Political Subdivisions ....................................................................... 6

        B.      Plaintiffs Are Political Subdivisions And Their Claims Are Released ........ 9

IV.     CONCLUSION .................................................................................................... 9

ii

## I. INTRODUCTION

Settled Defendants[1] move this Court to dismiss all claims against Settled Defendants filed by the following Florida subdivision plaintiffs (collectively, "Plaintiffs"):

- Lee Memorial Health System, d/b/a Lee Health (Case No. 1:21-op-45092-DAP);

- Sarasota County Public Hospital District d/b/a Memorial Healthcare System, Inc. (Case No. 1:18-op-46136-DAP);

- School Board of Miami-Dade (Case No. 1:19-op-45913-DAP); and

- Putnam County School Board (Case No. 1:22-op-45025-DAP).

Plaintiffs' claims against Settled Defendants must be dismissed on the ground that such claims have been released by the Florida Attorney General pursuant to the Janssen and Distributor Global Settlements.

As part of Florida's participation in the Global Settlements, the Florida Attorney General provided a broad release of opioid-related claims, including claims asserted by Florida's political subdivisions. It is not reasonably in dispute that this release was a proper and lawful exercise of the Attorney General's power: a Florida state court faced with this precise issue just reached this exact conclusion. In that lawsuit—a declaratory judgment action filed by the Florida Attorney General against subdivisions that include the Plaintiffs here—the Florida court concluded, at summary judgment, that the Florida Attorney General "had the authority to release [the subdivisions'] claims and did, indeed, release [the subdivisions'] claims." *See* Order, *Office of the*

---

[1] The Settled Defendants are Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen, Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. (collectively, "Janssen"), AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, McKesson Corporation, and Cardinal Health, Inc. (collectively, "Distributors") as well as any other Released Entities, as that term is defined in the Settlement Agreements, that have been named as defendants in Plaintiffs' Complaints. *See infra* n.3; Janssen Final Consent Judgment and Order of Dismissal (relevant excerpts attached as **Exhibit 1**) at Exhibit A p. 8-9 & Exhibit J thereto; Distributor Final Consent Judgment and Order of Dismissal (relevant excerpts attached as **Exhibit 2**) at Exhibit A p. 8 & Exhibit J thereto; *infra* n.3 (citing complaints).

*Att'y Gen. v. Sarasota Cnty. Public Hosp. Dist. et al.*, No. 2022 CA 000541 (Fla. Cir. Ct. May 26, 2023) (attached as **Exhibit 3**).

This Court should give effect to the well-reasoned opinion of the Florida court.  Because Plaintiffs' claims are extinguished by operation of the settlements and the release provided pursuant thereto by the Florida Attorney General, Settled Defendants request that the Court enter an order and final judgment, pursuant to Fed. R. Civ. P. 54(b), dismissing the claims against the Settled Defendants.[2]

## II.    BACKGROUND

### A.    Plaintiffs' Complaints

Plaintiffs are two public hospital districts and two public school districts that filed opioid-related lawsuits either directly in this Court or in federal court in Florida between 2018 and 2022.[3] Plaintiffs admit in their complaints that they are public entities:

- "Plaintiff, Lee Health, is a political subdivision of the State of Florida, i.e. Lee Health is a special district created by Special Act of the Florida Legislature to operate, control, and maintain a public hospital and other healthcare facilities in Southwest Florida pursuant to Chapter 2000-439, Laws of Florida (2000)."  Lee Memorial Complaint ¶ 29.

---

[2] This Court previously dismissed claims asserted by similarly-situated subdivisions against Settled Defendants in other states based on settlement-related statutory bars.  *See In Re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio), Dkt. Nos. 4547 (June 21, 2022) (dismissing claims of New York subdivisions) & 4651 (Sept. 29, 2022) (dismissing claims of Minnesota subdivisions).  This is the first motion Settled Defendants have filed to dismiss claims based on a State Attorney General's release of subdivision claims.

[3] *See generally Lee Memorial Health Sys., d/b/a Lee Health v. Actavis LLC, et al.*, Case No. 1:21-op-45092-DAP (N.D. Ohio July 15, 2021) (Dkt. No. 1) ("Lee Memorial Complaint"); *Sarasota Cnty. Pub. Hosp. Dist. d/b/a Sarasota Mem. Healthcare Sys. v. Purdue Pharma L.P., et al.*, Case No. 1:18-op-46136-DAP (N.D. Ohio Mar. 19, 2021) (Dkt. No. 20) ("Sarasota Complaint") & (Dkt. No. 26) (short-form complaint adding additional defendants); *Sch. Bd. of Miami-Dade Cnty., Fla. v. Endo Health Solutions Inc. et al.*, Case No. 1:19-op-45913-DAP (N.D. Ohio Sept. 30, 2019) (Dkt. No. 1) ("Miami-Dade Complaint"); *Putnam Cnty. Sch. Bd., et al. v. Cephalon, Inc., et al.*, Case No. 1:22-op-45025-DAP (N.D. Ohio May 27, 2022) (Dkt. No. 1) ("Putnam Complaint").

- "Plaintiff Sarasota County Public Hospital District, d/b/a Sarasota Memorial Health Care System is a community hospital chartered and organized under the laws of the State of Florida."  Sarasota Complaint ¶ 16.

- "Plaintiff THE SCHOOL BOARD OF MIAMI-DADE COUNTY, FLORIDA is a political subdivision organized under the laws of the State of Florida."  Miami-Dade Complaint ¶ 26.

- "Plaintiff brings this civil action against Defendants on behalf of itself and other similarly situated independent public school districts in Florida . . . ."  Putnam Complaint ¶ 32.

Plaintiffs' allegations relate generally to the opioid-abuse crisis.  They assert claims familiar to this Court, including public nuisance and various tort claims, as well as federal and state statutory claims, including for violation of the Florida Deceptive and Unfair Trade Practices Act.  *See supra* n.3.

### B.  Florida's Participation in the Global Settlements and Release of Subdivision Claims

On July 21, 2021, the Florida Attorney General announced Florida's participation in nationwide opioid settlements with Settled Defendants (the "Global Settlements").[4]  The Global Settlements were subsequently embodied in Final Consent Judgments and Orders of Dismissal. Both the Janssen Final Consent Judgment and Dismissal with Prejudice and the Distributor Final Consent Judgment and Dismissal with Prejudice were entered on May 4, 2022 in the Circuit Court of the Sixth Judicial Circuit in Pasco County, Florida.  *See* Ex. 1 (Janssen); Ex. 2 (Distributors).

The Settlement Agreements include broad releases of all opioid-related claims.  *See* Ex. 1 at Exhibit A p. 8 (definition of "Released Claims") & p. 14-18 (release provision); Ex. 2 at Exhibit A p. 7-8 (definition of "Released Claims") & p. 44-49 (release provision).  The broad language of the releases applies to claims brought by Florida's governmental entities, including its political

---

[4] *See* Press Release: Billions Secured Through Historic Opioid Litigation Agreements, Fla. Office of Att'y Gen. (July 21, 2021), https://www.myfloridalegal.com/newsrelease/billions-secured-through-historic-opioid-litigation-agreements.

subdivisions.  For example, "Releasors" (*i.e.*, the entities whose claims are released) is defined in the Distributor Settlement as follows:

> "*Releasors*." **With respect to Released Claims**, (1) each Settling State; (2) each Participating Subdivision; and (3) **without limitation and to the maximum extent of the power of each Settling State's Attorney General** and/or Participating Subdivision to release Claims, (a) **the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind** and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) **any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts in a Settling State,** and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in this Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. . . .

Ex. 2 at Exhibit A at p. 8-9 (emphasis added).[5]

Accordingly, to the maximum extent allowable by law, Florida's release of opioid-related claims also released the claims of its governmental entities, including "departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind" and "any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts."  Ex. 2 at Exhibit A at p. 8-9; *see also* Ex. 1 at Exhibit A at p. 9.

### C.    The Florida Attorney General's Declaratory Judgment Suit

On April 2, 2022, the Florida Attorney General initiated a declaratory judgment action in the Circuit Court of the Second Judicial Circuit in and for Leon County, Florida (the "Florida

---

[5] Because the definition of "Releasors" in the Janssen settlement is materially similar, the Motion will excerpt only the Distributor Settlement Agreement for purposes of clarity and efficiency.  *Compare* Ex. 1 at Exhibit A at p.9, *with* Ex. 2 at Exhibit A at p. 8-9.

Court") against several Florida political subdivisions that refused to participate in the Global Settlements.  *See Office of the Att'y Gen. v. Sarasota Cnty. Public Hosp. Dist. et al.*, No. 2022 CA 000541 (Fla. Cir. Ct.).  The Florida Attorney General filed an Amended Complaint on June 2, 2022 ("Declaratory Judgment Complaint") (attached as **Exhibit 4**).  The subdivisions named as defendants in the Declaratory Judgment Complaint include the four MDL Plaintiffs that are the subject of this Motion filed by Settled Defendants.  *See* Ex. 4 ¶¶ 26 (Sarasota County Public Hospital District), 27 (Lee Memorial Health System), 31 (School Board of Miami-Dade County), 32 (Putnam County School Board); *see also id.* ¶ 33 ("Defendants have brought actions against opioid manufacturers, distributors, and dispensers.  Each of these actions have been transferred to the Prescription Opioids Multidistrict Litigation ('Opioid MDL'), Case No. 1:17-md-2804.").

The Declaratory Judgment Complaint set forth as allegations:  the background of the opioid litigation in Florida, including the Florida Attorney General's opioid lawsuit against Settled Defendants and the lawsuits filed by Florida subdivisions in the federal MDL; information about Florida's opioid-related settlements, including the Distributor and Janssen Global Settlements; and the harms that would result to Florida by virtue of certain subdivisions' refusal to participate in the settlements. Ex. 4 ¶¶ 1-21.  The Declaratory Judgment Complaint sought a declaration that "the Attorney General had the power to release, and did release, Defendants' subordinate claims through execution of Settlement Agreements and Release Provisions with the Settlement Agreements."  *Id.* ¶ 22.

The Florida Attorney General subsequently moved for summary judgment, which the Florida Court granted in an order dated May 26, 2023.  *See* Ex. 3.  The Order concluded, among other things, that Florida Attorney General was "entitled to judgment as a matter of law because

the Attorney General had the authority to release the Defendants' claims and did, indeed, release

the Defendants' claims." *Id.* at 12.[6]

### III.    ARGUMENT

#### A.    The Florida Attorney General Has The Power To, And Did, Release All Opioid-Related Claims Brought By Its Governmental Entities, Including Its Political Subdivisions

The Florida Court correctly concluded that the Florida Attorney General has the authority

to release the opioid-related claims filed by Florida's political subdivisions, including specifically

the Plaintiffs here.

The Florida Court began its analysis by noting that, pursuant to the Florida Constitution,

the Attorney General is the "chief state legal officer." *Id.* at 7 (citing Fla. Const. Art. IV §§ 10(a),

10(b)).  Pursuant to Florida statute, the Attorney General "shall have and perform all powers and

duties incident or usual to such office." *Id.* (citing Fla. Stat. §§ 16.01(4), (5)).  "Florida courts

have, repeatedly, interpreted this provision within its plain language and intent to mean that the

Attorney General retains all of the historic, sovereign common law powers and duties to represent

and protect the people of Florida and their interests." *Id.* (citation omitted).

The Florida Court addressed these powers and duties with specific reference to certain of

the causes of action at issue here.  Regarding "public nuisance-like claims," the Florida Court

explained that "it is the Attorney General's duty to abate and prevent nuisances." *Id.* at 8 (citing

*State ex rel. Landis v. S.H. Kress & Co.*, 155 So. 823, 827 (Fla. 1934)).  The Attorney General also

has, by legislative grant, "the authority to enforce consumer protection laws, including the

authority to bring an action 'on behalf of one or more consumers or *governmental entities* for the

---

[6] Certain of the defendant subdivisions (including certain of the Plaintiffs here) have appealed the Florida Court's Order to the First District Court of Appeal.  As of the date of filing of this Motion, the Florida Court's Order has not been stayed pending appeal.

actual damages caused by an act or practice in violation of this part.'"  *Id.* at 8-9 (citing Fla. Stat. § 501.207(1)(c)) (emphasis in Order).  This is especially true for claims under Florida's Deceptive and Unfair Trade Practices Act, "because the violations alleged in the relevant opioid lawsuits in the state affect 'more than one judicial circuit.'"  *Id.* at 8 (citing Fla. Stat. § 501.203).

The Florida Court then explained that, "absent an explicit statutory limitation," the Attorney General "typically may exercise all such authority as the public interest requires" and any such "undertakings are presumed to be lawful sovereign actions."  *Id.* at 8-9 (citing *Shevin v. Exxon*, 526 F.2d 266, 268 (5th Cir. 1976)).  "And the attorney general has wide discretion in making the determination as to the public interest."  *Id.* at 9 (citing *Shevin*, 526 F.2d at 269).

The Florida Court next discussed important Florida appellate precedent regarding the Attorney General's power.  First, in *Shevin v. Exxon*, the Fifth Circuit was presented with the question of "whether the [Florida] Attorney General may institute actions under federal law to recover damages sustained by departments, agencies, and political subdivisions that have not affirmatively authorized the Attorney General to bring suit for recovery on their behalf."  *Id.* at 9-10 (citing 526 F.2d at 270).  The Fifth Circuit answered in the affirmative:  "[B]ecause [the court] could find no legislation barring the Attorney General from bringing an action on behalf of subdivisions without their consent, the Attorney General may act."  *Id.* at 10 (citing 526 F.2d at 270, 273-74).

Second, in *Barati v. State*, 198 So. 3d 69, 72 (Fla. 1st Dist. Ct. App. 2016), the First District Court of Appeal considered "whether the Attorney General had the power to dismiss an action in which she had not intervened."  *Id.*  The court concluded that the Attorney General did, both under statutory authorization for false claims suits and more generally based on "the constitutional authority of the executive branch vested in the Attorney General of the State of Florida to act as

7

the State's chief legal officer." *Id.* (citing 198 So. 3d at 72, 84).  "[C]onducting and terminating legal actions brought in the name of and for the benefit of the State is the *sine qua non* of the State's chief legal officer." *Id.* (citing 198 So. 3d at 84).

Applying this appellate precedent, the Florida Court concluded that "if the Attorney General has the power to *bring litigation* on behalf of the people of Florida and its subdivisions, she must also be able to *settle litigation* on behalf of the people of Florida and its subdivisions— including the subordinate claims brought by Defendants." *Id.* at 10-11.  "Based on the foregoing authorities and given that the Defendants are subdivisions," the Florida Court "conclude[d] that the Attorney General has the power to release claims, including the claims at issue in this case." *Id.* at 11.

Finally, the Florida Court emphasized the important public policy issues underlying its decision.  "[W]hen there is conflict (or overlap) between sovereign state interests and insular subdivision interests, the sovereign's interest necessarily must be deemed to be superior because the State's interest subsumes, in its entirety, the subdivision's interest." *Id.* at 11-12.  Here, the Florida Court explained:

> Allowing [the subdivisions] to continue pursuing their subordinate opioid claims threatens Florida's sovereign interest in vindicating its citizens' rights-all of its citizens' rights-when confronted with societal harms such as the opioid crisis. These are collective harms. They do not flow in an insular fashion to individual subdivisions-the harms cross city and county lines.

*Id.* at 12 (citations and footnotes omitted).  And the Florida Court noted the practical consequences: "[The subdivisions'] continued pursuit of their opioid claims in contravention of the Opioid Settlements jeopardizes the flow of tens of millions of dollars that will aid in the abatement of the opioid epidemic throughout the State of Florida." *Id.*  Accordingly, "Florida is entitled to judgment as a matter of law because the Attorney General had the authority to release the [the subdivisions'] claims and did, indeed, release the [the subdivisions'] claims." *Id.*

8

### B.    Plaintiffs Are Political Subdivisions And Their Claims Are Released

Here, there can be no doubt that Plaintiffs are political subdivisions.  Plaintiffs admitted this in their complaints.  *See, e.g.*, Lee Health Complaint ¶ 29 ("Plaintiff, Lee Health, is a political subdivision of the State of Florida . . . .");  *supra* at 2-3.  The Florida Attorney General confirmed this in its declaratory judgment complaint.  Ex. 4 ¶¶ 26, 27, 31, 32.  And the Florida Court reiterated this fact in its Order.  Ex. 3 at 6 ("It is undisputed that the Defendants are political subdivisions of the State of Florida.").

The settlement releases unambiguously released the claims of Florida's governmental entities, including its subdivisions.  *See* Ex. 2 at Exhibit A p. 8-9 (providing a release on behalf of "departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind" and "any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts"); Ex. 1 at Exhibit A p. 9; *see also supra* n.5.

The Florida Court—considering the applicability of this release for these subdivisions and their opioid-related lawsuits consolidated in this MDL—concluded that the Florida Attorney General had the power to provide that release and did, in fact, release these claims.  In so concluding, the Florida Court applied a wide range of authority, including the Florida Constitution, Florida statutes, and appellate authority from both federal and state courts.  Ex. 3 at 6-12.  While the Florida Supreme Court has not ruled on this precise issue, the Florida Court's Order is highly persuasive and deserving of deference.  This Court should give effect to the Florida Court's well-reasoned decision and grant Settled Defendants' Motion to Dismiss.

### IV.    CONCLUSION

For the foregoing reasons, Settled Defendants respectfully request that this Court dismiss all claims by Plaintiffs against Settled Defendants.

Dated:

Respectfully submitted,

*/s/ Robert A. Nicholas*
Robert A. Nicholas
Shannon E. McClure
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
Telephone:  (215) 851-8100
Fax: (215) 851-1420
smcclure@reedsmith.com

*Counsel for AmerisourceBergen Corporation*

*/s/ Enu A. Mainigi*
Enu A. Mainigi
Jennifer G. Wicht
Steven Pyser
Ashley Hardin
WILLIAMS & CONNOLLY LLP
680 Maine Ave SW
Washington, DC  20024
 (202) 434-5000 / tel.
(202) 434-5029/ fax
emainigi@wc.com

*Attorneys for Defendant Cardinal Health, Inc.*

*/s/ Geoffrey E. Hobart*
Geoffrey E. Hobart
Timothy  C. Hester
Christian J. Pistilli
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Tel: (202) 662-5281
ghobart@cov.com
thester@cov.com
cpistilli@cov.com

10

*Counsel for Defendant McKesson Corporation*

/s/ Charles C. Lifland

Charles C. Lifland
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071
Tel: (213) 430-6000
Fax: (213) 430-6407
clifland@omm.com

*Counsel for Defendants Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; and Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.*

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>Case No. 1:18-op-46136-DAP<br><br>Case No. 1:19-op-45913-DAP<br><br>Case No. 1:21-op-45092-DAP<br><br>Case No. 1:22-op-45025-DAP | MDL No. 2804<br><br>Hon. Dan Aaron Polster |

**[PROPOSED] ORDER GRANTING SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT**

Upon consideration of Settled Defendants' Motion To Dismiss Claims Filed By Non-Participating Florida Subdivisions As Released By The Attorney General Pursuant To Settlement ("Settled Defendants' Motion"), and any opposition thereto, and as there is no just reason for delay, it is hereby ORDERED that Settled Defendants' Motion is GRANTED. It is further ORDERED that the claims asserted against Settled Defendants[1] in the above-captioned lawsuits filed by

---

[1] The Settled Defendants are Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen, Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc. (collectively, "Janssen"), AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, McKesson Corporation, and Cardinal Health, Inc. (collectively, "Distributors") as well as any other Released Entities, as that term is defined in the Settlement Agreements, that have been named as defendants in Plaintiffs' Complaints. *See* Janssen Final Consent Judgment and Order of Dismissal (relevant excerpts attached as Exhibit 1 to Settled Defendants' Motion) at Exhibit A p. 8-9 & Exhibit J thereto; Distributor Final Consent Judgment and Order of Dismissal (relevant excerpts attached as Exhibit 2 to Settled Defendants' Motion) at Exhibit A p. 8 & Exhibit J thereto.

Plaintiffs[2] Lee Memorial Health System, d/b/a Lee Health, Sarasota County Public Hospital District d/b/a Memorial Healthcare System, Inc., School Board of Miami-Dade; and Putnam County School Board are hereby DISMISSED WITH PREJUDICE.

_____

Hon. Dan A. Polster
United States District Judge

---

[2] *See Lee Memorial Health Sys., d/b/a Lee Health v. Actavis LLC, et al.*, Case No. 1:21-op-45092-DAP (N.D. Ohio July 15, 2021) (Doc No. 1); *Sarasota Cnty. Pub. Hosp. Dist. d/b/a Sarasota Mem. Healthcare Sys. v. Purdue Pharma L.P., et al.*, Case No. 1:18-op-46136-DAP (N.D. Ohio Mar. 19, 2021) (Doc. No. 20) & (Doc. No. 26); *Sch. Bd. of Miami-Dade Cnty., Fla. v. Endo Health Solutions Inc. et al.*, Case No. 1:19-op-45913-DAP (N.D. Ohio Sept. 30, 2019) (Doc. No. 1); *Putnam Cnty. Sch. Bd., et al. v. Cephalon, Inc., et al.*, Case. No. 1:22-op-45025-DAP (N.D. Ohio May 27, 2022) (Doc No. 1).

*SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT*

# EXHIBIT 1

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT

IN AND FOR PASCO COUNTY, FLORIDA

STATE OF FLORIDA, OFFICE OF THE
ATTORNEY GENERAL, DEPARTMENT OF
LEGAL AFFAIRS,

       Plaintiff,

    v.

PURDUE PHARMA L.P., PURDUE PHARMA,
INC., THE PURDUE FREDERICK COMPANY,
INC., ENDO HEALTH SOLUTIONS INC.,
ENDO PHARMACEUTICALS INC., JANSSEN
PHARMACEUTICALS, INC., JOHNSON &
JOHNSON, CEPHALON, INC., TEVA
PHARMACEUTICALS USA, INC., ALLERGAN
FINANCE, LLC, ACTAVIS PHARMA, INC.,
ACTAVIS LLC, INSYS THERAPEUTICS, INC.,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH, INC.,
MCKESSON CORPORATION,
MALLINCKRODT LLC, WALGREEN CO., CVS
HEALTH CORPORATION, and CVS
PHARMACY, INC.,

       Defendants.

Case No. 2018-CA-001438

Filed For Record
Pasco County, Florida
2022 MAY -4 AM II: 55
Nikki Alvarez-Sowles
Clerk & Comptroller
Pasco County, Florida

## FINAL CONSENT JUDGMENT AND DISMISSAL WITH PREJUDICE

The State of Florida ("State") and Johnson & Johnson, Janssen Pharmaceuticals, Inc.,

Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively,

"*Janssen*" or "*Defendants*") (together with the State, the "*Parties*," and each a "*Party*") have

entered into a consensual resolution of the above-captioned litigation (the "*Action*") pursuant to a

settlement agreement entitled Janssen Settlement Agreement, dated as of July 21, 2021 (as

subsequently updated) (the "*Agreement*"), a copy of which is attached hereto as <u>Exhibit A</u>.  The

Agreement shall become effective by its terms upon the entry of this Final Consent Judgment

(the "*Judgment*") by the Court without trial or adjudication of any contested issue of fact or law,

and without finding or admission of wrongdoing or liability of any kind.

**RECITALS:**

1.      Each Party warrants and represents that it engaged in arm's-length negotiations in

good faith.  In hereby executing the Agreement, the Parties intend to effect a good-faith settlement.

2.      The State has determined that the Agreement is in the public interest.

3.      Janssen denies the allegations against it and that it has any liability whatsoever to

the State, its Subdivisions, and/or (a) any of the State's or Subdivisions' departments, agencies,

divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, including its

Attorney General and any person in her official capacity whether elected or appointed to serve any

of the foregoing and any agency, person, or other entity claiming by or through any of the

foregoing, (b) any public entities, public instrumentalities, public educational institutions,

unincorporated districts, fire districts, irrigation districts, and other Special Districts, and (c) any

person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general,

*qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the

general public.

4.      The Parties recognize that the outcome of the Action is uncertain and a final

resolution through the adversarial process likely will require protracted litigation.

5.      The Parties agree to the entry of the injunctive relief terms pursuant to Exhibit P of

the Agreement.

6.      Therefore, without any admission of liability or wrongdoing by Janssen or any other Released Entities (as defined in the Agreement), the Parties now mutually consent to the entry of this Judgment and agree to dismissal of the claims with prejudice pursuant to the terms of the Agreement to avoid the delay, expense, inconvenience, and uncertainty of protracted litigation.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

In consideration of the mutual promises, terms, and conditions set forth in the Agreement, the adequacy of which is hereby acknowledged by all Parties, it is agreed by and between Defendants and the State, and adjudicated by the Court, as follows:

1.      The foregoing Recitals are incorporated herein and constitute an express term of this Judgment.

2.      The Parties have entered into a full and final settlement of all Released Claims of Releasors against Janssen (including but not limited to the State) and the Released Entities pursuant to the terms and conditions set forth in the Agreement.

3.      The "Definitions" set forth in Section I of the Agreement are incorporated by reference into this Judgment. The State is a "Settling State" within the meaning of the Agreement. Unless otherwise defined herein, capitalized terms in this Judgment shall have the same meaning given to them in the Agreement.

4.      The Parties agree that the Court has jurisdiction over the subject matter of the Action and over the Parties with respect to the Action and this Judgment. This Judgment shall not be construed or used as a waiver of any jurisdictional defense Janssen or any other Released Entity may raise in any other proceeding.

5.      The Court finds that the Agreement was entered into in good faith.

3

6.  The Court finds that entry of this Judgment is in the public interest and reflects a negotiated settlement agreed to by the Parties. The Action is dismissed with prejudice, subject to a retention of jurisdiction by the Court as provided herein and in the Agreement.

7.  By this Judgment, the Agreement is hereby approved by the Court, and the Court hereby adopts the Agreement's terms as its own determination of this matter and the Parties' respective rights and obligations.

8.  The Court shall have authority to resolve disputes identified in Section XII.F.2 of the Agreement, governed by the rules and procedures of the Court.

9.  By this Judgment, the Janssen Florida State-Wide Opioid Settlement Agreement and Settlement Term Sheet, a copy of which is attached hereto as Exhibit B and as incorporated into the Agreement pursuant to Exhibit O of the Agreement, is hereby approved by the Court as the means by which relevant funds paid pursuant to the Agreement will be divided within the State, subject to the full acceptance by any Subdivision receiving such funds of the terms of the Agreement, including the releases provided therein.

10. The Parties have satisfied the Condition to Effectiveness of Agreement set forth in Section VIII of the Agreement and the Release set forth in Sections IV.A, D, and E of the Agreement, as follows:

a.  The Attorney General of the State exercised the fullest extent of her powers to release Janssen and all other Released Entities from all Released Claims pursuant to the release attached hereto as Exhibit C (the "*Release*").

b.  Janssen has determined that there is sufficient State participation and sufficient resolution of the Claims of the Litigating Subdivisions in the Settling States to proceed with the Agreement.

c.  The Settlement Participation Form for each Initial Participating Subdivision in the State has been delivered to Janssen. As stated in the Settlement Participation Form, and for the avoidance of doubt, nothing in the Settlement Participation Form executed by the Participating Subdivisions is intended to modify in any way the terms of the Agreement to which the Participating Subdivisions agree. As

4

stated in the Settlement Participation Form, to the extent the executed version of the Settlement Participation Form differs from the Agreement in any respect, the Agreement controls.

d.   Pursuant to the Settlement Participation Form, each Participating Subdivision in the State is dismissing with prejudice any Released Claims that it has filed against Janssen and the Released Entities.

11.   <u>Release</u>.   The Parties acknowledge that the Release, which is incorporated by reference herein, is an integral part of this Judgment.   Pursuant to the Agreement and the Release and without limitation and to the maximum extent of the power of the State's Attorney General, Janssen and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (a) the State and its Participating Subdivisions and any of their departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including the State's Attorney General, and any person in her official capacity whether elected or appointed to serve any of the foregoing, and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in the State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State or any Subdivision in the State, whether or not any of them participate in the Agreement.   Pursuant to the Agreement and the Release and to the maximum extent of the State's power, Janssen and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (1) the State, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State's past and present executive departments, agencies,

divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license, and (4) any Participating Subdivision. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Further, the provisions set forth in Section IV of the Agreement are incorporated by reference into this Judgment as if fully set forth herein. The Parties acknowledge, and the Court finds, that those provisions are an integral part of the Agreement and this Judgment, and shall govern the rights and obligations of all participants in the settlement. Any modification of those rights and obligations may be made based only on a writing signed by all affected parties and approved by the Court.

  12. <u>Release of Unknown Claims.</u> The State expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

13. The State may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State expressly waived and fully, finally, and forever settled, released and discharged, through the Agreement and Release, any and all Released Claims that may exist as of the Effective Date but which the State does not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no

fault whatsoever, and which, if known, would have materially affected the State's decision to enter into the Agreement.

14.     Costs and Fees.  The Parties will bear their own costs and attorneys' fees except as otherwise provided in the Agreement.

15.     No Admission of Liability.  Defendants are consenting to this Judgment solely for the purpose of effectuating the Agreement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Defendants expressly deny.  No Defendant or Released Entity admits that it caused or contributed to any public nuisance, and no Defendant or Released Entity admits any wrongdoing that was or could have been alleged by the State, its Participating Subdivisions and/or Participating Special Districts, or any other person or entity.  No part of this Judgment shall constitute evidence of any liability, fault, or wrongdoing by Defendants or any other Released Entity.  The Parties acknowledge that payments made under the Agreement are not a fine, penalty, or payment in lieu thereof and are properly characterized as described in Section VI.F of the Agreement.

16.     No Waiver.  This Judgment is entered based on the Agreement without trial or adjudication of any contested issue of fact or law or finding of liability of any kind.  This Judgment shall not be construed or used as a waiver of Janssen's right, or any other Released Entity's right, to defend itself from, or make any arguments in, any other regulatory, governmental, private individual, or class claims or suits relating to the subject matter or terms of this Judgment. Notwithstanding the foregoing, the State may enforce the terms of this Judgment as expressly provided in the Agreement.

17.  <u>No Private Right of Action</u>.  This Judgment is not intended for use by any third party for any purpose, including submission to any court for any purpose, except pursuant to Section XII.A of the Agreement.  Except as expressly provided in the Agreement, no portion of the Agreement or this Judgment shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or Released Entity.  The State shall allow Participating Subdivisions in the State to notify it of any perceived violations of the Agreement or this Judgment.  No Settling State, including the State, may assign or otherwise convey any right to enforce any provision of the Agreement.

18.  <u>Admissibility</u>.  It is the intent of the Parties that this Judgment not be admissible in other cases against Defendants or binding on Defendants in any respect other than in connection with the enforcement of this Judgment or the Agreement.  For the avoidance of doubt, nothing herein shall prohibit Defendants from entering this Judgment or the Agreement into evidence in any litigation or arbitration concerning (1) Defendants' right to coverage under an insurance contract or (2) the enforcement of the releases provided for by the Agreement and this Judgment.

19.  <u>Preservation of Privilege</u>.  Nothing contained in the Agreement or this Judgment, and no act required to be performed pursuant to the Agreement or this Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

20.  <u>Mutual Interpretation</u>.  The Parties agree and stipulate that the Agreement was negotiated on an arm's-length basis between parties of equal bargaining power and was drafted jointly by counsel for each Party.  Accordingly, the Agreement is incorporated herein by reference

8

and shall be mutually interpreted and not construed in favor of or against any Party, except as expressly provided for in the Agreement.

21.    <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction of the Parties for the limited purpose of the resolution of disputes identified in Section XII.F.2 of the Agreement.  The Court shall have jurisdiction over Participating Subdivisions in the State for the limited purposes identified in the Agreement.

22.    <u>Successors and Assigns</u>.  This Judgment is binding on Defendants' successors and assigns.

23.    <u>Modification</u>.  This Judgment shall not be modified (by the Court, by any other court, or by any other means) without the consent of the State and Defendants, or as provided for in Section XIII.S of the Agreement.

So ORDERED this ___4th___ day of __May__2022.

_____
Honorable Kimberly Sharpe Byrd
Circuit Court Judge

9

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

**For the Janssen Defendants:**

Date:                            By: _____

Marc Larkins

Assistant Corporate Secretary, Johnson & Johnson

Approved as to form:

Date:                            By: _____

Charles C. Lifland

O'Melveny & Myers

Counsel for Defendants

Date:                            By: _____

Virginia L. Gulde

Nelson Mullins

Local Counsel for Defendants

10

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

**For the Janssen Defendants:**

Date: _____ By: _____

Marc Larkins

Assistant Corporate Secretary, Johnson & Johnson

Approved as to form:

Date: _____ By: _____

Charles C. Lifland

O'Melveny & Myers

Counsel for Defendants

Date: _____ By: _____

Virginia L. Gulde

Nelson Mullins

Local Counsel for Defendants

10

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

**For the Janssen Defendants:**

Date: _____        By: _____

Marc Larkins

Assistant Corporate Secretary, Johnson & Johnson

Approved as to form:

Date: _____        By: _____

Charles C. Lifland

O'Melveny & Myers

Counsel for Defendants

Date: _____        By: _____

Virginia L. Gulde

Nelson Mullins

Local Counsel for Defendants

10

**THE STATE OF FLORIDA**
**ASHLEY MOODY**
**Attorney General**

By: _____

Name: John Guard
         Chief Deputy Attorney General

Date: _____

**STATE OUTSIDE LITIGATION COUNSEL**

**Kellogg, Hansen, Todd, Figel & Frederick,**
  **P.L.L.C.**

By: _____

Name:  David C. Frederick

Date: _____


**Drake Martin Law Firm, LLC**

By: _____

Name:  Drake Martin

Date: _____

11

**<u>EXHIBIT A</u>**

**<u>JANSSEN SETTLEMENT AGREEMENT</u>**

# JANSSEN SETTLEMENT AGREEMENT

## **Table of Contents**

I.      Definitions ............................................................................................................. 1

II.     Participation by States and Condition to Preliminary Agreement.......................... 13

III.    Injunctive Relief.................................................................................................... 14

IV.     Release ................................................................................................................. 14

V.      Monetary Relief and Payments............................................................................. 18

VI.     Allocation and Use of Settlement Funds .............................................................. 29

VII.    Participation by Subdivisions and Special Districts .............................................. 36

VIII.   Condition to Effectiveness of Agreement and Filing of Consent Judgment ................... 39

IX.     Potential Payment Adjustments ........................................................................... 40

X.      Additional Restitution Amount ............................................................................ 42

XI.     Plaintiffs' Attorneys' Fees and Costs .................................................................... 43

XII.    Enforcement and Dispute Resolution ................................................................... 43

XIII.   Miscellaneous ...................................................................................................... 48

EXHIBIT A – Alleged Harms ........................................................................................ A-1

EXHIBIT B – Enforcement Committee Organizational Bylaws........................................ B-1

EXHIBIT C – Litigating Subdivision and Special District List .......................................... C-1

EXHIBIT D – [Intentionally Omitted] ........................................................................... D-1

EXHIBIT E – List of Opioid Remediation Uses .............................................................. E-1

EXHIBIT F – List of States and Overall Allocation Percentages ...................................... F-1

EXHIBIT G – Subdivisions Eligible to Become Participating Subdivisions and Default Subdivision Fund Allocation Percentages .................................................................... G-1

EXHIBIT H – Participation Tier Determination ....................................................... H-1

EXHIBIT I – Primary Subdivisions and Subdivisions with Population Over 10,000 ................. I-1

EXHIBIT J – Janssen Predecessors and Former Affiliates ......................................... J-1

EXHIBIT K – Settlement Participation Form ........................................................ K-1

EXHIBIT L – Settlement Fund Administrator ........................................................ L-1

EXHIBIT M – Settlement Payment Schedule .......................................................... M-1

EXHIBIT N – Additional Restitution Amount Allocation ............................................ N-1

EXHIBIT O – Adoption of a State-Subdivision Agreement ........................................... O-1

EXHIBIT P – Injunctive Relief ................................................................... P-1

EXHIBIT Q – Non-Released Entities ............................................................... Q-1

EXHIBIT R – Agreement on Attorneys' Fees, Costs, and Expenses ................................... R-1

EXHIBIT S – Agreement on the State Cost Fund Administration ..................................... S-1

EXHIBIT T – Severity Factors .................................................................... T-1

EXHIBIT U – Agreement on the State Outside Counsel Fee Fund ..................................... U-1

## JANSSEN SETTLEMENT AGREEMENT

This settlement agreement dated as of July 21, 2021 (the "*Agreement*") sets forth the terms of settlement between and among the Settling States, Participating Subdivisions, and Janssen (as those terms are defined below). Upon satisfaction of the conditions set forth in Sections II and VIII, this Agreement will be binding on the Settling States, Janssen, and Participating Subdivisions. This Agreement will then be filed as part of Consent Judgments in the respective courts of each of the Settling States, pursuant to the terms set forth in Section VIII.

## I. <u>Definitions</u>

Unless otherwise specified, the following definitions apply:

1. "*Abatement Accounts Fund*" means a component of the Settlement Fund described in subsection VI.E.

2. "*Additional Restitution Amount*" means the amount available to Settling States listed in Exhibit N of $67,307,692.

3. "*Agreement*" means this agreement as set forth above, inclusive of all exhibits.

4. "*Alleged Harms*" means the alleged past, present, and future financial, societal, and related expenditures arising out of the alleged misuse and abuse of opioid products, non-exclusive examples of which are described in the documents listed on Exhibit A, that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by Janssen.

5. "*Allocation Statute*" means a state law that governs allocation, distribution, and/or use of some or all of the Settlement Fund amounts allocated to that State and/or its Subdivisions. In addition to modifying the allocation, as set forth in subsection VI.D.2, an Allocation Statute may, without limitation, contain a Statutory Trust, further restrict expenditure of funds, form an advisory committee, establish oversight and reporting requirements, or address other default provisions and other matters related to the funds. An Allocation Statute is not required to address all three (3) types of funds comprising the Settlement Fund or all default provisions.

6. "*Annual Payment*" means the total amount payable to the Settlement Fund by Janssen on the Payment Date each year in 2023 and onward, as calculated by the Settlement Fund Administrator pursuant to Section V. For the avoidance of doubt, this term does not include the Additional Restitution Amount or amounts paid pursuant to Section XI.

7. "*Appropriate Official*" means the official defined in subsection XIII.E.

1

8.    "*Attorney Fee Fund*" means an account consisting of funds allocated to pay attorneys' fees and costs pursuant to the agreement on attorneys' fees and costs attached as Exhibit R.

9.    "*Bar*" means either (1) a ruling by the highest court of the State or the intermediate court of appeals when not subject to further review by the highest court of the State in a State with a single intermediate court of appeals setting forth the general principle that no Subdivisions or Special Districts in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Subdivisions and Special Districts in the State from maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement) shall not constitute a Bar.

10.   "*Case-Specific Resolution*" means either (1) a law barring specified Subdivisions or Special Districts from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); (2) a ruling by a court of competent jurisdiction over a particular Subdivision or Special District that has the legal effect of barring the Subdivision or Special District from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) in the case of a Special District, a release consistent with Section IV below. For the avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it) shall not constitute a Case-Specific Resolution.

11.   "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert

2

*revised March 30, 2022*

fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

12. "*Claim Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

13. "*Compensatory Restitution Amount*" means the aggregate amount of payments by Janssen hereunder other than amounts paid as attorneys' fees and costs or identified pursuant to subsection VI.B.2 as being used to pay attorneys' fees and investigation costs or litigation costs.

14. "*Consent Judgment*" means a state-specific consent judgment in a form to be agreed upon by the Settling States, Participating Subdivisions, and Janssen prior to the Initial Participation Date that, among other things, (1) approves this Agreement and (2) provides for the release set forth in Section IV, including the dismissal with prejudice of any Released Claims that the Settling State has brought against Released Entities.

15. "*Court*" means the respective court for each Settling State to which the Agreement and the Consent Judgment are presented for approval and/or entry as to that Settling State, or the Northern District of Ohio for purposes of administering the Attorney Fee Fund and any related fee and cost agreements.

16. "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Reference Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished

*revised March 30, 2022*

active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

17.  "*Designated State*" means New York.

18.  "*Effective Date*" means April 2, 2022.

19.  "*Enforcement Committee*" means a committee consisting of representatives of the Settling States and of the Participating Subdivisions. Exhibit B contains the organizational bylaws of the Enforcement Committee. Notice pursuant to subsection XIII.O shall be provided when there are changes in membership or contact information.

20.  "*Global Settlement Abatement Amount*" means the abatement amount of $4,534,615,385.

21.  "*Global Settlement Amount*" means $5 billion, which shall be divided into the Global Settlement Abatement Amount, the Additional Restitution Amount, and the Global Settlement Attorney Fee Amount.

22.  "*Global Settlement Attorney Fee Amount*" means the attorney fee amount of $398,076,923.

23.  "*Incentive A*" means the incentive payment described in subsection V.E.4.

24.  "*Incentive B*" means the incentive payment described in subsection V.E.5.

25.  "*Incentive C*" means the incentive payment described in subsection V.E.6.

26.  "*Incentive D*" means the incentive payment described in subsection V.E.7.

27.  "*Incentive Payment Final Eligibility Date*" means, with respect to a Settling State, the date that is the earliest of (1) three years after the Effective Date; (2) the date of completion of opening statements in a trial of any action brought by a Subdivision in that State that includes a Released Claim against a Released Entity when such date is more than two (2) years after the Effective Date; or (3) two (2) years after the Effective Date in the event a trial of an action brought by a Subdivision in that State that includes a Released Claim against a Released Entity began after the Initial Participation Date but before two (2) years after the Effective Date.

28.  "*Initial Participating Subdivision*" means a Subdivision that meets the requirements set forth in subsection VII.D.

29.  "*Initial Participation Date*" means January 26, 2022, as extended by written agreement of Janssen and the Enforcement Committee on December 29, 2021.

*revised March 30, 2022*

30. "*Initial Year Payment*" means the total amount payable to the Settlement Fund by Janssen on each of the two Payment Dates in 2022, as calculated by the Settlement Fund Administrator pursuant to Section V. For the avoidance of doubt, this term does not include the Additional Restitution Amount or amounts paid pursuant to Section XI.

31. "*Injunctive Relief Terms*" means the terms described in Section III and set forth in Exhibit P.

32. "*Janssen*" means Johnson & Johnson, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.

33. "*Later Litigating Special District*" means a Special District (or Special District official asserting the right of or for the Special District to recover for alleged harms to the Special District and/or the people thereof) that is not a Litigating Special District and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Preliminary Agreement Date. It may also include a Litigating Special District whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Special District takes any affirmative step in its lawsuit other than seeking a stay or removal.

34. "*Later Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that is not a Litigating Subdivision and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Trigger Date. It may also include a Litigating Subdivision whose claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the execution date of this Agreement, when such Litigating Subdivision takes any affirmative step in its lawsuit other than seeking a stay or removal.

35. "*Later Participating Subdivision*" means a Participating Subdivision that meets the requirements of subsection VII.E but is not an Initial Participating Subdivision.

36. "*Litigating Special District*" means a Special District (or Special District official) that brought any Released Claims against any Released Entities on or before the Preliminary Agreement Date that were not separately resolved prior to that date. A list of Litigating Special Districts will be agreed to by the parties and attached hereto as of the Preliminary Agreement Date.

37. "*Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claim against any Released Entity prior to the Trigger Date that were not separately resolved prior to that

*revised March 30, 2022*

Trigger Date. A Prior Litigating Subdivision shall not be considered a Litigating Subdivision. Exhibit C is an agreed list of the Litigating Subdivisions. Exhibit C will be updated (including with any corrections) periodically, and a final version of Exhibit C will be attached hereto as of the Reference Date.

38. "*National Arbitration Panel*" means the panel described in subsection XII.F.

39. "*National Disputes*" means the disputes described in subsection XII.F.

40. "*Non-Litigating Special District"* means a Special District that is neither a Litigating Special District nor a Later Litigating Special District.

41. "*Non-Litigating Subdivision*" means a Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

42. "*Non-Participating Subdivision*" means a Subdivision that is not a Participating Subdivision.

43. "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

44. "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

45. "*Non-Released Entity*" means an entity that is not a Released Entity.

46. "*Non-Settling State*" means a State that is not a Settling State.

47. "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of the opioid abuse crisis, including on those injured as a result of the opioid abuse crisis. Exhibit E provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

48. "*Overall Allocation Percentage*" means a Settling State's percentage as set forth in Exhibit F. The aggregate Overall Allocation Percentages of all States (including Settling States and Non-Settling States) shall equal 100%.

49. "*Participating Special District*" means a Special District that executes a release consistent with Section IV below and meets the requirements for becoming a Participating Special District under Section VII.

*revised March 30, 2022*

50.     "*Participating Subdivision*" means a Subdivision that meets the requirements for becoming a Participating Subdivision under Section VII. Participating Subdivisions include both Initial Participating Subdivisions and Later Participating Subdivisions.

51.     "*Participation Tier*" means the level of participation in this Agreement as determined pursuant to subsection VIII.C using the criteria set forth in Exhibit H.

52.     "*Parties*" means Janssen and the Settling States (each, a "*Party*").

53.     "*Payment Date*" means the date on which Janssen makes its payments pursuant to Section V and Exhibit M.

54.     "*Payment Year*" means the calendar year during which the applicable Initial Year Payments or Annual Payments are due pursuant to subsection V.B. Payment Year 1 is 2022, Payment Year 2 is 2023 and so forth. References to payment "for a Payment Year" mean the Initial Year Payments or Annual Payment due during that year. References to eligibility "for a Payment Year" mean eligibility in connection with the Initial Year Payments or Annual Payment due during that year.

55.     "*Preliminary Agreement Date*" means the date on which Janssen gives notice to the Settling States and MDL PEC of its determination that a sufficient number of States have agreed to be Settling States. This date shall be no more than fourteen (14) days after the end of the notice period to States, unless it is extended by written agreement of Janssen and the Enforcement Committee.

56.     "*Primary Subdivision*" means a Subdivision that has a population of 30,000 or more. A list of Primary Subdivisions in each State is provided in Exhibit I.

57.     "*Prior Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that brought any Released Claim against any Released Entity prior to the Trigger Date and all such Released Claims were separately settled or finally adjudicated prior to the Trigger Date; *provided, however*, that if the final adjudication was pursuant to a Bar, such Subdivision shall not be considered a Prior Litigating Subdivision. Notwithstanding the prior sentence, Janssen and the State of the relevant Subdivision may agree in writing that such Subdivision shall not be considered a Prior Litigating Subdivision.

58.     "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the

7

avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

59. "*Reference Date*" means the date on which Janssen is to inform the Settling States and MDL PEC of its determination whether there is sufficient resolution of claims and potential claims at the Subdivision level to go forward with the settlement. The Reference Date is February 25, 2022, as extended by written agreement of Janssen and the Enforcement Committee on December 29, 2021.

60. "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Reference Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by any Settling State or any of its Litigating Subdivisions or Litigating Special Districts in any federal, state or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a State, any of its Subdivisions or Special Districts, or any Releasors (whether or not such State, Subdivision, Special District, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought by a Later Litigating Subdivision or other non-party Subdivision or Special District that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

61. "*Released Entities*" means Janssen and (1) all of Janssen's past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, assigns, including Noramco, Inc. and Tasmanian Alkaloids PTY. LTD.; (2) the past and present direct or indirect subsidiaries, divisions, and joint ventures, of any of the foregoing; (3) all of Janssen's insurers (solely in their role as insurers with respect to the Released Claims); (4) all of Janssen's, or of any entity described in subsection (1), past and present joint ventures; and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as

*revised March 30, 2022*

shareholders of the foregoing entities), partners, trustees, agents, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, Janssen). Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity. For the avoidance of doubt, the entities listed in Exhibit Q are not Released Entities; *and provided further* that any joint venture partner of Janssen or Janssen's subsidiary is not a Released Entity unless it falls within subsections (1)-(5) above. A list of Janssen's present subsidiaries and affiliates can be found at https://johnsonandjohnson.gcs-web.com/static-files/f61ae5f3-ff03-46c1-bfc9-174947884db2. Janssen's predecessor entities include but are not limited to those entities listed on Exhibit J. For the avoidance of doubt, any entity acquired, or joint venture entered into, by Janssen after the Reference Date is not a Released Entity.

62.    "*Releasors*" means (1) each Settling State; (2) each Participating Subdivision; and (3) without limitation and to the maximum extent of the power of each Settling State's Attorney General and/or Participating Subdivision to release Claims, (a) the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in a Settling State, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Subdivision Settlement Participation Form or the Election and Release Form referenced in Section VII providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the Agreement. Each Settling State's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Participation Date) the authority set forth in the Representation and Warranty subsection of Section IV.

63.    "*Revocation Event*" means with respect to a Bar, Settlement Class Resolution, or Case-Specific Resolution, a legislative amendment or a revocation, rescission, reversal, overruling, or interpretation that in any way limits the effect of such Bar, Settlement Class Resolution, or Case-Specific Resolution on Released Claims or any other action or event that otherwise deprives the Bar, Settlement Class Resolution or Case-Specific Resolution of force or effect in any material respect.

*revised March 30, 2022*

64.    "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in a Settling State with respect to a class of Subdivisions and Special Districts in that State that (1) conforms with that Settling State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in that State and has become final as defined in "State-Specific Finality"; (3) is binding on all Non-Participating Subdivisions and Special Districts in that State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions or Special Districts may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Janssen other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable state law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing more than 1% of the total population of all of that State's Subdivisions listed in Exhibit G opt out. In seeking certification of any Settlement Class, the applicable State and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

65.    "*Settlement Fund*" means the interest-bearing fund established under the Agreement into which all payments by Janssen are made other than amounts paid as attorneys' fees and costs or identified pursuant to subsection VI.B.2 as being used to pay attorneys' fees and costs. The Settlement Fund comprises the Abatement Accounts Fund, State Fund, and Subdivision Fund.

66.    "*Settlement Fund Administrator*" means the entity that determines the Annual Payments (including calculating Incentive Payments pursuant to Section V) and any amounts subject to suspension or offset pursuant to Sections V and IX), determines the Participation Tier, and administers and distributes amounts into the Settlement Fund. The duties of the Settlement Fund Administrator shall be governed by this Agreement. Prior to the Initial Participation Date, the Parties shall agree to selection and removal processes for and a detailed description of the Settlement Fund Administrator's duties, including a detailed mechanism for paying the Settlement Fund Administrator's fees and costs, all of which shall be appended to the Agreement as Exhibit L.

67.    "*Settlement Fund Escrow*" means the interest-bearing escrow fund established pursuant to this Agreement to hold disputed or suspended payments made under this Agreement.

68.    "*Settlement Payment Schedule*" means the schedule of payments attached to this Agreement as Exhibit M. A revised Settlement Payment Schedule will be

*revised March 30, 2022*

substituted for Exhibit M after any offsets, reductions, or suspensions under Sections V and IX are determined.

69. "*Settling State*" means any State that has entered the Agreement.

70. "*Special District*" means a formal and legally recognized sub-entity of a State that is authorized by State law to provide one or a limited number of designated functions, including but not limited to school districts, fire districts, healthcare & hospital districts, and emergency services districts. Special Districts do not include sub-entities of a State that provide general governance for a defined area that would qualify as a Subdivision.

71. "*State*" means any state of the United States of America, the District of Columbia, American Samoa, Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands. Additionally, the use of non-capitalized "state" to describe something (e.g., "state court") shall also be read to include parallel entities in commonwealths, territories, and the District of Columbia (e.g., "territorial court").

72. "*State Fund*" means a component of the Settlement Fund described in subsection VI.C.

73. "*State-Specific Finality*" means, with respect to the Settling State in question:

   a. the Agreement and the Consent Judgment have been approved and entered by the Court as to Janssen, including the release of all Released Claims against Released Entities as provided in this Agreement;

   b. for all lawsuits brought by the Settling State against Released Entities for Released Claims, either previously filed or filed as part of the entry of the Consent Judgment, the Court has stated in the Consent Judgment or otherwise entered an order finding that all Released Claims against Released Entities asserted in the lawsuit have been resolved by agreement; and

   c. (1) the time for appeal or to seek review of or permission to appeal from the approval and entry as described in subsection (a) hereof and entry of such order described in subsection (b) hereof has expired; or (2) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described in (a) hereof and the order described in subsection (b) hereof have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

74. "*State-Subdivision Agreement*" means an agreement that a Settling State reaches with the Subdivisions in that State regarding the allocation, distribution, and/or use of funds allocated to that State and to Participating Subdivisions in that State.

11

*revised March 30, 2022*

A State-Subdivision Agreement shall be effective if approved pursuant to the provisions of Exhibit O or if adopted by statute. Preexisting agreements addressing funds other than those allocated pursuant to this Agreement shall qualify if the approval requirements of Exhibit O are met. A State and its Subdivisions may revise, supplement, or refine a State-Subdivision Agreement if approved pursuant to the provisions of Exhibit O or if adopted by statute.

75.  "*Statutory Trust*" means a trust fund established by state law to receive funds allocated to a State's Abatement Accounts Fund and restrict their expenditure to Opioid Remediation purposes subject to reasonable administrative expenses. A State may give a Statutory Trust authority to allocate one or more of the three Settlement Funds, but this is not required.

76.  "*Subdivision*" means a formal and legally recognized sub-entity of a State that provides general governance for a defined area, including a county, parish, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and parishes and other functional levels of sub-entities of a State that provide general governance for a defined area. Historic, non-functioning sub-entities of a State (such as Connecticut counties) are not Subdivisions, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, parens patriae, or any other capacity. For purposes of this Agreement, the term Subdivision does not include Special Districts. A list of Subdivisions by state will be agreed to prior to any Subdivision sign-on period.

77.  "*Subdivision Allocation Percentage*" means for Subdivisions in a Settling State that are eligible to receive an allocation from the Subdivision Fund pursuant to subsection VI.C or subsection VI.D, the percentage as set forth in Exhibit G. The aggregate Subdivision Allocation Percentage of all Subdivisions receiving a Subdivision Allocation Percentage in each State shall equal 100%. Immediately upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3) that addresses allocation from the Subdivision Fund, or upon any, whether before or after the Initial Participation Date, Exhibit G will automatically be amended to reflect the allocation from the Subdivision Fund pursuant to the State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3. The Subdivision Allocation Percentages contained in Exhibit G may not change once notice is distributed pursuant to subsection VII.A, except upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by subsection VI.D.3) that addresses allocation from the Subdivision Fund. For the avoidance of doubt, no Subdivision

not listed on Exhibit G shall receive an allocation from the Subdivision Fund and no provision of this Agreement shall be interpreted to create such an entitlement.

78. "*Subdivision Fund*" means a component of the Settlement Fund described in subsection VI.C.

79. "*Subdivision Settlement Participation Form*" means the form attached as Exhibit K that Participating Subdivisions must execute and return to the Settlement Fund Administrator, and which shall (1) make such Participating Subdivisions signatories to this Agreement, (2) include a full and complete release of any and of such Subdivision's claims, and (3) require the prompt dismissal with prejudice of any Released Claims that have been filed by any such Participating Subdivision.

80. "*Threshold Motion*" means a motion to dismiss or equivalent dispositive motion made at the outset of litigation under applicable procedure. A Threshold Motion must include as potential grounds for dismissal, any applicable Bar or the relevant release by a Settling State or Participating Subdivision provided under this Agreement and, where appropriate under applicable law, any applicable limitations defense.

81. "*Trigger Date*" means, in the case of a Primary Subdivision, the Reference Date, or, in the case of all other Subdivisions, the Preliminary Agreement Date.

## II.    Participation by States and Condition to Preliminary Agreement

A.    *Notice to States*. On July 22, 2021 this Agreement shall be distributed to all States. The States' Attorneys General shall then have a period of thirty (30) days to decide whether to become Settling States. States that determine to become Settling States shall so notify the National Association of Attorneys General and Janssen and shall further commit to obtaining any necessary additional State releases prior to the Reference Date. This notice period may be extended by written agreement of Janssen and the Enforcement Committee.

B.    *Condition to Preliminary Agreement*. Following the notice period set forth in subsection II.A above, Janssen shall determine on or before the Preliminary Agreement Date whether, in its sole discretion, enough States have agreed to become Settling States to proceed with notice to Subdivisions as set forth in Section VII below. If Janssen determines that this condition has been satisfied, and that notice to the Litigating Subdivisions should proceed, it will so notify the Settling States by providing notice to the Enforcement Committee and Settlement Fund Administrator on the Preliminary Agreement Date. If Janssen determines that this condition has not been satisfied, it will so notify the Settling States by providing notice to the Enforcement Committee and Settlement Fund Administrator, and this Agreement will have no further effect and all releases and other commitments or obligations contained herein will be void.

C.    *Later Joinder by States*. After the Preliminary Agreement Date, a State may only become a Settling State with the consent of Janssen, in its sole discretion. If a State becomes a

*revised March 30, 2022*

Settling State more than sixty (60) days after the Preliminary Agreement Date, but on or before January 1, 2022, the Subdivisions and Special Districts in that State that become Participating Subdivisions and Participating Special Districts within ninety (90) days of the State becoming a Settling State shall be considered Initial Participating Subdivisions or Initial Participating Special Districts. A State may not become a Settling State after January 1, 2022.

### III.     <u>Injunctive Relief</u>

A.     *Entry of Injunctive Relief.* As part of the Consent Judgment, the Parties agree to the injunctive relief terms attached as Exhibit P.

### IV.     <u>Release</u>

A.     *Scope.* As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims. The Release shall be a complete bar to any Released Claim.

B.     *Claim Over and Non-Party Settlement.*

    1.     *Statement of Intent.* It is the intent of the Parties that:

        a.     Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Settlement Agreement;

        b.     the payments made under this Settlement Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

        c.     Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

        d.     the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

*revised March 30, 2022*

e. The provisions of this subsection IV.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2. *Contribution/Indemnity Prohibited*. No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3. *Non-Party Settlement*. To the extent that, on or after the Reference Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Janssen in subsection IV.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4. *Claim-Over*. In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection IV.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection IV.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Janssen shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by Janssen:

a. Janssen shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Settlement Agreement, whichever is later;

b. Janssen and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement;

15

*revised March 30, 2022*

c.  That Releasor and Janssen shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement. Such steps may include, where permissible:

(1)  Filing of motions to dismiss or such other appropriate motion by Janssen or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

(2)  Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(3)  Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(4)  Return of monies paid by Janssen to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(5)  Payment of monies to Janssen by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(6)  Credit to Janssen under this Settlement Agreement to reduce the overall amounts to be paid under the Settlement Agreement such that it is held harmless from the Claim-Over; and

(7)  Such other actions as that Releasor and Janssen may devise to hold Janssen harmless from the Claim Over.

d.  The actions of that Releasor and Janssen taken pursuant to paragraph (c) must, in combination, ensure Janssen is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement.

e.  In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Janssen may seek review by the National Arbitration Panel, provided that, if the parties agree, such dispute may be heard by the state court where the relevant Consent Judgment was filed. The National Arbitration Panel shall have authority to

16

*revised March 30, 2022*

require Releasors to implement a remedy that includes one or more of the actions specified in paragraph (c) sufficient to hold Released Entities fully harmless. In the event that the panel's actions do not result in Released Entities being held fully harmless, Janssen shall have a claim for breach of this Settlement Agreement by Releasors, with the remedy being payment of sufficient funds to hold Janssen harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Janssen may have.

5.     To the extent that the Claim-Over is based on a contractual indemnity, the obligations under subsection IV.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Janssen shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C.     *General Release*. In connection with the releases provided for in the Agreement, each Settling State (for itself and its Releasors) and Participating Subdivision expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Settling State (for itself and its Releasors) and Participating Subdivision hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Settling States' decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.     *Res Judicata*. Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

*revised March 30, 2022*

E.    *Representation and Warranty.* The signatories hereto on behalf of their respective Settling States and its Participating Subdivisions expressly represent and warrant that they will obtain on or before the Effective Date (or have obtained) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) their respective Settling States; (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts; (3) any of their respective Settling State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license; and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from a State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

F.    *Effectiveness.* The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Settlement Fund or any portion thereof.

G.    *Cooperation.* Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

H.    *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under the Agreement for enforcement of the Agreement.

## V.    <u>Monetary Relief and Payments</u>

A.    **Structure of Payments**

1.    All payments under this Section V shall be made into the Settlement Fund, except that where specified, they shall be made into the Settlement Fund Escrow. The Settlement Fund shall be allocated and used only as specified in Section VI.

2.    Janssen shall pay into the Settlement Fund the sum of Four Billion, Five Hundred Thirty-Four Million, Six Hundred Fifteen Thousand, Three Hundred Eighty-Five Dollars ($4,534,615,385) minus (1) the offsets and credits specified in subsection

*revised March 30, 2022*

V.C below, (2) any unearned incentive payments under subsection V.E below, and (3) any adjustments under Section IX below.

3. The payments to the Settlement Fund shall be divided into base and incentive payments as provided in subsections V.D and V.E below.

B. **Payment Process**

1. Except as otherwise provided in this Agreement, Janssen shall make two Initial Year Payments and nine (9) Annual Payments. The Initial Year Payments will consist of base payments. The first Annual Payment shall consist of incentive payments and subsequent Annual Payments shall each consist of base and incentive payments. The amount of all Initial Year Payments and Annual Payments shall be determined by the Settlement Fund Administrator applying Section V and Exhibit M. The Payment Date for the first Initial Year Payment shall be no later than ninety (90) days after the Effective Date. The Payment Date for the second Initial Year Payment shall be no later than July 15, 2022. The Payment Date for the first Annual Payment shall be no later than one year and sixty days following the Effective Date; the Payment Date for the second Annual Payment shall be no later than two years and sixty days following the Effective Date, and so forth, until all Annual Payments are made.

2. All data relevant to the determination of each such payment shall be submitted to the Settlement Fund Administrator sixty (60) days prior to the Payment Date for each payment. Prior to the Initial Participation Date, the Parties will include an exhibit to the Agreement setting forth in detail the process for submitting such data to the Settlement Fund Administrator prior to each Payment Date. The Settlement Fund Administrator shall then determine the Initial Year Payment or Annual Payment and the amount to be paid to each Settling State and its Participating Subdivisions, consistent with the provisions in Exhibit L, by:

   a. determining, for each Settling State, the amount of base and incentive payments to which the State is entitled by applying the criteria in this Section;

   b. applying any reductions, suspensions, or offsets required by Sections V and IX; and

   c. determining the total amount owed by Janssen to all Settling States and Participating Subdivisions.

3. The Settlement Fund Administrator shall then allocate the Initial Year Payment or Annual Payment pursuant to Section VI among the Settling States, among the separate types of funds for each Settling State (if applicable), and among the Participating Subdivisions.

4. As soon as possible, but no later than fifty (50) days prior to the Payment Date for each payment and following the determination described in subsection V.B.2, the

*revised March 30, 2022*

Settlement Fund Administrator shall give notice to Janssen, the Settling States, and the Enforcement Committee of the amount of the Initial Year Payment or Annual Payment, the amount to be received by each Settling State, the amount to be received by the separate types of funds for each Settling State (if applicable), and the amount to be received by each Settling State's Participating Subdivisions.

5.      Within twenty-one (21) days of the notice provided by the Settlement Fund Administrator, any party may dispute, in writing, the calculation of the Initial Year Payment or Annual Payment, or the amount to be received by a Settling State and/or its Participating Subdivisions. Such disputing party must provide a written notice of dispute to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and Janssen identifying the nature of the dispute, the amount of money that is disputed, and the Settling State(s) affected.

6.      Within twenty-one (21) days of the sending of a written notice of dispute, any affected party may submit a response, in writing, to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and Janssen identifying the basis for disagreement with the notice of dispute.

7.      If no response is filed, the Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute, and Janssen shall pay the adjusted amount as the Initial Year Payment or Annual Payment on the Payment Date. If a written response to the written notice of dispute is timely sent to the Settlement Fund Administrator, the Settlement Fund Administrator shall notify Janssen of the preliminary amount to be paid, which shall be the greater of the amount originally calculated by the Settlement Fund Administrator or the amount that would be consistent with the notice of dispute, *provided*, *however* that in no circumstances shall the preliminary amount to be paid be higher than the maximum amount of base and incentive payments for that payment as set forth in Exhibit M. For the avoidance of doubt, a transfer of suspended payments from the Settlement Fund Escrow does not count toward determining whether the amount to be paid is higher than the maximum amount of base and incentive payments for that payment as set forth in Exhibit M.

8.      The Settlement Fund Administrator shall place any disputed amount of the preliminary amount paid by Janssen into the Settlement Fund Escrow and shall disburse any undisputed amount to each Settling State and its Participating Subdivisions receiving direct allocations within fifteen (15) days of the Payment Date or at such later time as directed by each Settling State.

9.      Disputes described in this subsection (other than those for which no response is filed under subsection V.B.6) shall be resolved in accordance with the terms of Section XII.

10.     The process described in this subsection V.B shall also apply to accelerated payments made pursuant to Incentive A under subsection V.E.4.

*revised March 30, 2022*

11.     For the avoidance of doubt, Subdivisions not listed on Exhibit G shall not receive an allocation from the Subdivision Fund.

C.     **Offsets for Non-Settling States and Credits**

1.     A credit of Two Hundred and Seventy Million Dollars ($270,000,000) shall be deducted from the maximum Settlement Fund amount to be paid by Janssen under subsection V.A.2 above and applied to the payment amounts as specified by Exhibit M. For the avoidance of doubt, the base payments and maximum incentive payment amounts shown on Exhibit M already reflect the deduction of the offset.

2.     In addition to the credit, an offset equal to Four Billion, Two Hundred Sixty-Four Million, Six Hundred Fifteen Thousand, Three Hundred Eighty-Five Dollars ($4,264,615,385) times the percentage allocation assigned to each Non-Settling State in Exhibit F shall be deducted from the total amount to be paid by Janssen to the Settlement Fund under subsection V.A.2 above.

3.     Notwithstanding any other provision of this Agreement or any other agreement, in the event that: (1) Janssen enters into an agreement with any Settling State that resolves such Settling State's Claims consistent with Section IV of this Agreement and such agreement has an effective date prior to the Effective Date of this Agreement (such agreement, a "State-Specific Agreement") and (2) pursuant to the terms of the State-Specific Agreement, any payments, or any portion thereof, made by Janssen thereunder are made in lieu of any payments (for the avoidance of doubt, including the Additional Restitution Amount), or any portion thereof, to be made under this Agreement and Janssen makes such a payment pursuant to the State-Specific Agreement, then Janssen will reduce any payments allocable to such Settling State (whether made to the Settlement Fund Escrow or the Settlement Fund) made pursuant to this Agreement to the extent such amount was already paid pursuant to the terms of the State-Specific Agreement. This provision includes but is not limited to any corresponding amounts already paid to the Qualified Settlement Fund established under the Agreement between Janssen and the State of New York dated June 25, 2021.

4.     Non-Settling States shall not be eligible for any payments or have any rights in connection with this Agreement. Accordingly, the stated maximum dollar amounts of the payments specified in Exhibit M are reduced by the aggregate Overall Allocation Percentage of Non-Settling States as set forth in Exhibit F.

D.     **Base Payments**

1.     Janssen shall make base payments into the Settlement Fund totaling One Billion, Nine Hundred Forty-Two Million, Three Hundred Forty-Six Thousand, One Hundred Fifty-Five Dollars ($1,942,346,155) minus the offsets and credits specified in subsection V.C above. The base payments will be paid in accordance

*revised March 30, 2022*

with the payment schedule specified by Exhibit M, subject to potential acceleration and potential deductions as provided herein.

2.    The base payments will be allocated by Settling State proportionate to each Settling State's assigned percentages in Exhibit F, adjusted for any Non-Settling States.

3.    If a State qualifies for Incentive A (described below), Janssen will accelerate the base payment schedule so that the State receives its Payment Year 1-4 base payment allocations and full Payment Year 1-4 Incentive A payment amounts within ninety (90) days of notice, on or after the Effective Date, of the Bar's implementation. Payment Year 5-10 payments are made annually and cannot be accelerated.

4.    The exemplar payment schedule in Exhibit M does not account for deductions for offsets or unearned incentives, which will be separately calculated for each payment.

E.    **Incentive Payments**

1.    Janssen shall make incentive payments into the Settlement Fund potentially totaling up to Two Billion, Three Hundred Twenty-Two Million, Two Hundred Sixty-Nine Thousand, Two Hundred Thirty Dollars ($2,322,269,230), consisting of $2,109,038,461 for Incentive A (or, alternatively up to $2,109,038,461 for combined Incentives B and C if Incentive A is not achieved) and $213,230,769 for Incentive D, prior to being adjusted for credits if every State is a Settling State and were to satisfy the requirements specified below to earn its maximum incentive amount. The incentive payments will be paid in accordance with the payment schedule in Exhibit M, subject to potential acceleration and potential deductions as provided herein.

2.    The maximum incentive amount for any Settling State shall be $2,322,269,230 times the percentage allocation assigned that Settling State in Exhibit F.

3.    A Settling State may qualify to receive incentive payments in addition to base payments if, as of the Incentive Payment Final Eligibility Date, it meets the incentive eligibility requirements specified below. Settling States may qualify for incentive payments in four ways. If a Settling State qualifies for "Incentive A," it will become entitled to receive the maximum Incentive A payment allocable to the State as stated in subsection V.E.1. If a Settling State does not qualify for Incentive A, it can alternatively qualify for "Incentive B" and/or "Incentive C." A Settling State can qualify for "Incentive D" regardless of whether it qualifies for another incentive payment. The Incentive Payment Final Eligibility Date is not relevant to Incentive D.

*revised March 30, 2022*

4.    *Incentive A: Accelerated Incentive Payment for Full Participation.*

a.    A Settling State shall receive an accelerated Incentive A payment allocable to the State for full participation as described in subsection V.E.4.b.

b.    A State qualifies for Incentive A by: (1) complete participation in the form of releases consistent with Section IV above from all Litigating Subdivisions and Litigating Special Districts, Non-Litigating Subdivisions with population over 10,000, and Non-Litigating Covered Special Districts (as defined in subsection V.E.7.e); (2) a Bar; or (3) a combination of approaches in clauses (1)-(2) that achieves the same level of resolution of Subdivision and Special District claims (e.g., a law barring future litigation combined with full joinder by Litigating Subdivisions and Litigating Special Districts). For purposes of Incentive A, a Subdivision or Special District is considered a "Litigating Subdivision" or "Litigating Special District" if it has brought Released Claims against Released Entities on or before the Reference Date; all other Subdivisions and Special Districts are considered "Non-Litigating." For purposes of Incentive A, Non-Litigating Special Districts shall not include a Special District with any of the following words or phrases in its name: mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

c.    Qualification for Incentive A entitles the qualifying Settling State to expedited payment of base payments and incentive payments for Payment Years 1-4, which Janssen shall pay into the Settlement Fund within ninety (90) days after receiving notice from the Settlement Fund Administrator that a State has qualified for Incentive A, but in no event less than ninety (90) days from the Effective Date. Base and incentive payments for Payment Years 5-10 will not be expedited.

d.    If a Settling State qualifies for Incentive A after receiving an incentive payment under Incentives B or C, described below, the Settling State's payments under Incentive A will equal the remainder of its total Incentive A payments less any payments previously received under Incentives B or C. A Settling State that receives all of its maximum incentive allocation under Incentive A shall not receive additional incentive payments under Incentives B or C.

e.    A Settling State that is not eligible for Incentive A as of the Incentive Payment Final Eligibility Date shall not be eligible for Incentive A for that Payment Year or any subsequent Payment Years.

*revised March 30, 2022*

5.      *Incentive B: Early Participation or Released Claims by Litigating Subdivisions and Litigating Special Districts.*

a.      If a Settling State does not qualify for Incentive A, it may still qualify to receive up to 60% of its total potential Incentive A payment allocation under Incentive B.

b.      A Settling State can qualify for an Incentive B payment if Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the Settling State's litigating population are either Participating Subdivisions or have their claims resolved through Case-Specific Resolutions.

   (1)    A Settling State's litigating population is the sum of the population of all Litigating Subdivisions and Litigating Special Districts. A Settling State's litigating population shall include all Litigating Subdivisions and Litigating Special Districts whose populations overlap in whole or in part with other Litigating Subdivisions and Litigating Special Districts, for instance in the case of a Litigating Special District, city, or township contained within a county.

   (2)    For example, if a Litigating Special District and a city that is a Litigating Subdivision are located within a county that is a Litigating Subdivision, then each of their individual populations would be added together to determine the total litigating population. Special District populations shall be counted in the manner set forth in subsection XIII.C. If each qualifies as a Litigating Subdivision or Litigating Special District and the county has a population of 10, the City has a population of 8, and the Special District has a population of 1, the total litigating population would be 19.

c.      The following time periods apply to Incentive B payments:

   (1)    <u>Period 1</u>: Zero to two hundred ten (210) days after the Effective Date.

   (2)    <u>Period 2</u>: Two hundred eleven (211) days to one year after the Effective Date.

   (3)    <u>Period 3</u>: One year and one day to two years after the Effective Date.

d.      <u>Within Period 1</u>: If Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of a Settling State's litigating population are Participating Subdivisions or have their claims resolved through Case-Specific Resolutions during Period 1, a sliding scale will determine the share of the funds available under Incentive B, with a

*revised March 30, 2022*

maximum of 60% of the Settling State's total potential incentive payment allocation available. Under that sliding scale, if Litigating Subdivisions and Litigating Special Districts collectively representing 75% of a Settling State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 1, a Settling State will receive 50% of the total amount available to it under Incentive B. If more Litigating Subdivisions and Litigating Special Districts become Participating Subdivisions or achieve Case-Specific Resolution status, the Settling State shall receive an increased percentage of the total amount available to it under Incentive B as shown in the table below.

| Participation or Case-Specific Resolution Levels (As percentage of litigating population) | Incentive B Award (As percentage of total amount available to State under Incentive B) |
|---|---|
| 75% | 50% |
| 76% | 52% |
| 77% | 54% |
| 78% | 56% |
| 79% | 58% |
| 80% | 60% |
| 85% | 70% |
| 90% | 80% |
| 95% | 90% |
| 100% | 100% |

e. <u>Within Period 2</u>: If a Settling State did not qualify for an Incentive B payment in Period 1, but Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the Settling State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 2, then the Settling State qualifies for 75% of the Incentive B payment it would have qualified for in Period 1.

f. <u>Within Period 3</u>: If a Settling State did not qualify for an Incentive B payment in Periods 1 or 2, but Litigating Subdivisions and Litigating Special Districts collectively representing at least 75% of the Settling State's litigating population become Participating Subdivisions or achieve Case-Specific Resolution status by the end of Period 3, then the Settling State qualifies for 50% of the Incentive B payment it would have qualified for in Period 1.

g. A Settling State that receives the Incentive B payment for Periods 1 and/or 2 can receive additional payments if it secures participation from additional Litigating Subdivisions and Litigating Special Districts (or Case-Specific Resolutions of their claims) during Periods 2 and/or 3.

*revised March 30, 2022*

Those additional payments would equal 75% (for additional participation or Case-Specific Resolutions during Period 2) and 50% (for additional participation or Case-Specific Resolutions during Period 3) of the amount by which the increased litigating population levels would have increased the Settling State's Incentive B payment if they had been achieved in Period 1.

h.      If Litigating Subdivisions and Litigating Special Districts that have become Participating Subdivisions or achieved Case-Specific Resolution status collectively represent less than 75% of a Settling State's litigating population by the end of Period 3, the Settling State shall not receive any Incentive B payment.

i.      If there are no Litigating Subdivisions or Litigating Special Districts in a Settling State, and that Settling State is otherwise eligible for Incentive B, that Settling State will receive its full allocable share of Incentive B.

j.      Incentives earned under Incentive B shall accrue after each of Periods 1, 2, and 3. After each period, the Settlement Fund Administrator shall conduct a look-back to assess which Settling States vested an Incentive B payment in the preceding period. Based on the look-back, the Settlement Fund Administrator will calculate the incentives accrued under Incentive B for the period; *provided* that the percentage of Incentive B for which a Settling State is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

6.      *Incentive C: Early Participation of Subdivisions*

a.      If a Settling State does not qualify for Incentive A, it may still qualify to receive up to 40% of its total potential Incentive A payment allocation under Incentive C, which has two parts.

(1)     Part 1: Under Incentive C, Part 1, a Settling State can receive up to 75% of its Incentive C allocation. A Settling State can qualify for a payment under Incentive C, Part 1 only if Primary Subdivisions (whether Litigating Primary Subdivisions or Non-Litigating Primary Subdivisions as of the Reference Date) representing at least 60% of the Settling State's Primary Subdivision population become Participating Subdivisions or achieve Case-Specific Resolution status.

(2)     A Settling State's Primary Subdivision population is the sum of the population of all Primary Subdivisions (whether Litigating Primary Subdivisions or Non-Litigating Primary Subdivisions as of the Reference Date). Because Subdivisions include Subdivisions whose populations overlap in whole or in part with other

26

Subdivisions, for instance in the case of a city or township contained within a county, the Settling State's Primary Subdivision population is greater than Settling State's total population. (Special Districts are not relevant for purposes of Incentive C calculations.)

(3)     A sliding scale will determine the share of the funds available under Incentive C, Part 1 to Settling States meeting the minimum 60% threshold. Under that sliding scale, if a Settling State secures participation or Case-Specific Resolutions from Primary Subdivisions representing 60% of its total Primary Subdivision population, it will receive 40% of the total amount potentially available to it under Incentive C, Part 1. If a Settling State secures participation or Case-Specific Resolutions from Primary Subdivisions representing more than 60% of its Primary Subdivision population, the Settling State shall be entitled to receive a higher percentage of the total amount potentially available to it under Incentive C, Part 1, on the scale shown in the table below. If there are no Primary Subdivisions, and that Settling State is otherwise eligible for Incentive C, that Settling State will receive its full allocable share of Incentive C, Part 1.

| Participation or Case-Specific Resolution Levels (As percentage of total Primary Subdivision population) | Incentive C Award (As percentage of total amount available to State under Incentive C, Part 1) |
|---|---|
| 60% | 40% |
| 70% | 45% |
| 80% | 50% |
| 85% | 55% |
| 90% | 60% |
| 91% | 65% |
| 92% | 70% |
| 93% | 80% |
| 94% | 90% |
| 95% | 100% |

b.     Part 2:  If a Settling State qualifies to receive an incentive under Incentive C, Part 1, the State can also qualify to receive an additional incentive amount equal to 25% of its total potential Incentive C allocation by securing 100% participation of the ten (10) largest Subdivisions by population in the Settling State. (Special Districts are not relevant for purposes of this calculation.) If a Settling State does not qualify for any amount under Incentive C, Part 1, it cannot qualify for Incentive C, Part 2.

c.     Incentives earned under Incentive C shall accrue on an annual basis up to three years after the Effective Date. At one, two, and three years after the

*revised March 30, 2022*

Effective Date, the Settlement Fund Administrator will conduct a look-back to assess which Subdivisions had agreed to participate or had their claim resolved through a Case-Specific Resolution that year. Based on the look-back, the Settlement Fund Administrator will calculate the incentives accrued under Incentive C for the year; *provided* that the percentage of Incentive C for which a Settling State is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

7. *Incentive D: Release of Payments if No Qualifying Special District Litigation.*

a. $213,230,769 shall be available for potential Incentive D payments according to the terms specified in this subsection V.E.7.

b. If, within five years of the Reference Date, a Covered Special District files litigation against any Released Entity, Janssen shall, within thirty (30) days of Janssen being served, provide notice of the litigation to the Settling State in which the Covered Special District sits, which shall file a motion to intervene in the litigation and use its best efforts to obtain either dismissal of the litigation in cooperation with Janssen, or a release consistent with Section IV of the Special District's Claims.

c. A Settling State shall receive its allocation of the Incentive D payment if, within five years after the Effective Date (the "look-back date"), no Covered Special District within the Settling State has filed litigation which has survived a Threshold Motion and remains pending as of the look-back date, unless the dismissal after the litigation survived the Threshold Motion is conditioned or predicated upon payment by a Released Entity (apart from payments by Janssen incurred under the Agreement or injunctive relief obligations incurred by it).

d. Prior to the look-back date, a Released Entity shall not enter into a settlement with a Covered Special District unless the State in which the Covered Special District sits consents to such a settlement or unreasonably withholds consent of such a settlement.

e. "*Covered Special Districts*" are school districts, healthcare/hospital districts, and fire districts, subject to the following population thresholds:

(1) For school districts, the K-12 student enrollment must be 25,000 or 0.12% of a State's population, whichever is greater;

(2) For fire districts, the district must cover a population of 25,000, or 0.20% of a State's population if a State's population is greater than 18 million. If not easily calculable from state data sources and agreed to between the State and Janssen, a fire district's population is calculated by dividing the population of the county or counties a

*revised March 30, 2022*

fire district serves by the number of fire districts in the county or counties.

(3)     For healthcare/hospital districts, the district must have at least 125 hospital beds in one or more hospitals rendering services in that district.

## VI.     Allocation and Use of Settlement Funds

A.      *Components of Settlement Fund*. The Settlement Fund shall be comprised of an Abatement Accounts Fund, a State Fund, and a Subdivision Fund for each Settling State. The payments under Section V into the Settlement Fund shall be initially allocated among those three (3) sub-funds and distributed and used as provided below or as provided for by a State-Subdivision Agreement (or other State-specific allocation of funds). Unless otherwise specified herein, payments placed into the Settlement Fund do not revert back to Janssen.

B.      *Use of Settlement Payments*.

1.      It is the intent of the Parties that the payments disbursed from the Settlement Fund to Settling States and Participating Subdivisions listed in Exhibit G be for Opioid Remediation, subject to limited exceptions that must be documented in accordance with subsection VI.B.2. In no event may less than 86.5% of Janssen's maximum amount of payments pursuant to Sections V, X, and XI over the entirety of all Payment Years (but not any single Payment Year) be spent on Opioid Remediation.

2.      While disfavored by the Parties, a Settling State or Participating Subdivision listed on Exhibit G may use monies from the Settlement Fund (that have not been restricted by this Agreement solely to future Opioid Remediation) for purposes that do not qualify as Opioid Remediation. If, at any time, a Settling State or a Participating Subdivision listed on Exhibit G uses any monies from the Settlement Fund for a purpose that does not qualify as Opioid Remediation, such Settling State or Participating Subdivision shall identify such amounts and report to the Settlement Fund Administrator and Janssen how such funds were used, including if used to pay attorneys' fees, investigation costs, litigation costs, or costs related to the operation and enforcement of this Agreement, respectively. It is the intent of the Parties that the reporting under this subsection VI.B.2 shall be available to the public. For the avoidance of doubt, (a) any amounts not identified under this subsection VI.B.2 as used to pay attorneys' fees, investigation costs, or litigation costs shall be included in the "Compensatory Restitution Amount" for purposes of subsection VI.F and (b) Participating Subdivisions not listed on Exhibit G or Participating Special Districts that receive monies from the Settlement Fund indirectly may only use such monies from the Settlement Fund for purposes that qualify as Opioid Remediation.

29

*revised March 30, 2022*

C.  *Allocation of Settlement Fund.* The allocation of the Settlement Fund allows for different approaches to be taken in different states, such as through a State-Subdivision Agreement. Given the uniqueness of States and their Subdivisions, Settling States and Participating Subdivisions are encouraged to enter into State-Subdivision Agreements in order to direct the allocation of their portion of the Settlement Fund. As set out below, the Settlement Fund Administrator will make an initial allocation to three (3) state-level sub-funds. The Settlement Fund Administrator will then, for each Settling State and its Participating Subdivisions listed on Exhibit G, apply the terms of this Agreement and any relevant State-Subdivision Agreement, Statutory Trust, Allocation Statute, or voluntary redistribution of funds as set out below before disbursing the funds.

1.  <u>Base Payments</u>. The Settlement Fund Administrator will allocate base payments under subsection V.D among the Settling States in proportion to their respective Overall Allocation Percentages. Base payments for each Settling State will then be allocated 15% to its State Fund, 70% to its Abatement Accounts Fund, and 15% to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in subsection VI.D.

2.  <u>Incentive Payments</u>. The Settlement Fund Administrator will treat incentive payments under subsection V.E on a State-specific basis. Incentive payments for which a Settling State is eligible under subsection V.E will be allocated 15% to its State Fund, 70% to its Abatement Accounts Fund, and 15% to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in subsection VI.D.

3.  <u>Application of Adjustments</u>. If a reduction, offset, or suspension under Section IX applies with respect to a Settling State, the reduction, offset, or suspension shall be applied proportionally to all amounts that would otherwise be apportioned and distributed to the State Fund, the Abatement Accounts Fund, and the Subdivision Fund for that State.

4.  <u>Settlement Fund Administrator</u>. Prior to the Initial Participation Date, Janssen and the Enforcement Committee will agree to a detailed mechanism consistent with the foregoing for the Settlement Fund Administrator to follow in allocating, apportioning, and distributing payments, which shall be appended hereto as Exhibit L.

5.  <u>Settlement Fund Administrator Costs</u>. Any costs and fees associated with or arising out of the duties of the Settlement Fund Administrator as described in Exhibit L with regard to Janssen's payments to the Settlement Fund shall be paid out of interest accrued on the Settlement Fund and from the Settlement Fund should such interest prove insufficient.

D.  *Settlement Fund Reallocation and Distribution.* As set forth below, within a particular Settling State's account, amounts contained in the Settlement Fund sub-funds may be reallocated and distributed per a State-Subdivision Agreement or other means. If the

*revised March 30, 2022*

apportionment of amounts is not addressed and controlled under subsections VI.D.1-2, then the default provisions of subsection VI.D.4 apply. It is not necessary that a State-Subdivision Agreement or other means of allocating funds pursuant to subsections VI.D.1-2 address all of the Settlement Fund sub-funds. For example, a Statutory Trust might only address disbursements from a Settling State's Abatement Accounts Fund.

1. <u>Distribution by State-Subdivision Agreement</u>. If a Settling State has a State-Subdivision Agreement, amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under subsection VI.C shall be reallocated and distributed as provided by that agreement. Any State-Subdivision Agreement entered into after the Preliminary Agreement Date shall be applied only if it requires: (1) that all amounts be used for Opioid Remediation, except as allowed by subsection VI.B.2, and (2) that at least 70% of amounts be used solely for future Opioid Remediation (references to "future Opioid Remediation" include amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms). For a State-Subdivision Agreement to be applied to the relevant portion of an Initial Year Payment or an Annual Payment, notice must be provided to Janssen and the Settlement Fund Administrator at least sixty (60) days prior to the Payment Date.

2. <u>Distribution by Allocation Statute</u>. If a Settling State has an Allocation Statute and/or a Statutory Trust that addresses allocation or distribution of amounts apportioned to such State's State Fund, Abatement Accounts Fund, and/or Subdivision Fund and that, to the extent any or all such sub-funds are addressed, requires (1) all amounts to be used for Opioid Remediation, except as allowed by subsection VI.B.2, and (2) at least 70% of all amounts to be used solely for future Opioid Remediation, then, to the extent allocation or distribution is addressed, the amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under subsection VI.C shall be allocated and distributed as addressed and provided by the applicable Allocation Statute or Statutory Trust. For the avoidance of doubt, an Allocation Statute or Statutory Trust need not address all three (3) sub-funds that comprise the Settlement Fund, and if the applicable Allocation Statute or Statutory Trust does not address distribution of all or some of these three (3) sub-funds, the applicable Allocation Statute or Statutory Trust does not replace the default provisions in subsection VI.D.4 of any such unaddressed fund. For example, if an Allocation Statute or Statutory Trust that meets the requirements of this subsection VI.D.2 only addresses funds restricted to abatement, then the default provisions in this Agreement concerning allocation among the three (3) sub-funds comprising the Settlement Fund and the distribution of the State Fund and Subdivision Fund for that State would still apply, while the distribution of the applicable State's Abatement Accounts Fund would be governed by the qualifying Allocation Statute or Statutory Trust.

3. <u>Voluntary Redistribution</u>. A Settling State may choose to reallocate all or a portion of its State Fund to its Abatement Accounts Fund. A Participating Subdivision listed on Exhibit G may choose to reallocate all or a portion of its

allocation from the Subdivision Fund to the State's Abatement Accounts Fund or to another Participating Subdivision or Participating Special District. For a voluntary redistribution to be applied to the relevant portion of an Initial Year Payment or an Annual Payment, notice must be provided to the Settling Distributors and the Settlement Fund Administrator at least sixty (60) days prior to the Payment Date.

4. <u>Distribution in the Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust</u>. If subsections VI.D.1-2 do not apply, amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under subsection VI.C shall be distributed as follows:

   a. Amounts apportioned to that State's State Fund shall be distributed to that State.

   b. Amounts apportioned to that State's Abatement Accounts Fund shall be distributed consistent with subsection VI.E. Each Settling State shall submit to the Settlement Fund Administrator a designation of a lead state agency or other entity to serve as the single point of contact for that Settling State's funding requests from the Abatement Accounts Fund and other communications with the Settlement Fund Administrator. The designation of an individual entity is for administrative purposes only and such designation shall not limit funding to such entity or even require that such entity receive funds from this Agreement. The designated entity shall be the only entity authorized to request funds from the Settlement Fund Administrator to be disbursed from that Settling State's Abatement Accounts Fund. If a Settling State has established a Statutory Trust then that Settling State's single point of contact may direct the Settlement Fund Administrator to release the State's Abatement Accounts Fund to the Statutory Trust.

   c. Amounts apportioned to that State's Subdivision Fund shall be distributed to Participating Subdivisions in that State listed on Exhibit G per the Subdivision Allocation Percentage listed in Exhibit G. Subsection VII.I shall govern amounts that would otherwise be distributed to Non-Participating Subdivisions listed in Exhibit G.

   d. Special Districts shall not be allocated funds from the Subdivision Fund, except through a voluntary redistribution allowed by subsection VI.D.3. A Settling State may allocate funds from its State Fund or Abatement Accounts Fund for Special Districts.

5. <u>Restrictions on Distribution</u>. No amounts may be distributed from the Subdivision Fund contrary to Section VII, *i.e.*, no amounts may be distributed directly to Non-Participating Subdivisions or to Later Participating Subdivisions in excess of what is permissible under subsection VII.E. Amounts allocated to the Subdivision Fund that cannot be distributed by virtue of the preceding sentence shall be distributed

*revised March 30, 2022*

into the sub-account in the Abatement Accounts Fund for the Settling State in which the Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement described in subsection VI.D.1 or by an Allocation Statute or a Statutory Trust described in subsection VI.D.2.

E.   *Provisions Regarding Abatement Accounts Fund.*

1.   <u>State-Subdivision Agreement, Allocation Statute, and Statutory Trust Fund Provisions</u>. A State-Subdivision Agreement, Allocation Statute, or Statutory Trust may govern the operation and use of amounts in that State's Abatement Accounts Fund so long as it complies with the requirements of subsection VI.D.1 or VI.D.2 as applicable, and all direct payments to Subdivisions comply with subsections VII.E-H.

2.   <u>Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust</u>. In the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust that addresses distribution, the Abatement Accounts Fund will be used solely for future Opioid Remediation and the following shall apply with respect to a Settling State:

a.   *Regional Remediation.*

(1)   At least 50% of distributions for remediation from a State's Abatement Accounts Fund shall be annually allocated and tracked to the regional level. A Settling State may allow the Advisory Committee established pursuant to subsection VI.E.2.d to define its regions and assign regional allocations percentages. Otherwise, a Settling State shall (1) define its initial regions, which shall consist of one (1) or more Subdivisions and which shall be designated by the State agency with primary responsibility for substance abuse disorder services employing, to the maximum extent practical, existing regions established in that State for opioid abuse treatment or other public health purposes; and (2) assign initial regional allocation percentages to the regions based on the Subdivision Allocation Percentages in Exhibit G and an assumption that all Subdivisions listed on Exhibit G will become Participating Subdivisions.

(2)   This minimum regional expenditure percentage is calculated on the Settling State's initial Abatement Accounts Fund allocation and does not include any additional amounts a Settling State has directed to its Abatement Accounts Fund from its State Fund, or any other amounts directed to the fund. A Settling State may dedicate more than 50% of its Abatement Accounts Fund to the regional expenditure and may annually adjust the percentage of its Abatement Accounts Fund dedicated to regional expenditures as long as the percentage remains above the minimum amount.

33

(3)     The Settling State (1) has the authority to adjust the definition of the regions, and (2) may annually revise the percentages allocated to each region to reflect the number of Subdivisions in each region that are Non-Participating Subdivisions.

b.     *Subdivision Block Grants*. Certain Subdivisions listed on Exhibit G shall be eligible to receive regional allocation funds in the form of a block grant for future Opioid Remediation. A Participating Subdivision listed on Exhibit G eligible for block grants is a county or parish (or in the case of States that do not have counties or parishes that function as political subdivisions, a city) that (1) does not contain a Litigating Subdivision or a Later Litigating Subdivision for which it has the authority to end the litigation through a release, bar, or other action; (2) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more; and (3) has funded or otherwise managed an established health care or treatment infrastructure (e.g., health department or similar agency). Each Subdivision listed on Exhibit G eligible to receive block grants shall be assigned its own region.

c.     *Small States*. Notwithstanding the provisions of subsection VI.E.2.a, Settling States with populations under four (4) million that do not have existing regions described in subsection VI.E.2.a shall not be required to establish regions. However, such a Settling State that contains one (1) or more Subdivisions listed on Exhibit G eligible for block grants under subsection VI.E.2.b shall be divided regionally so that each block-grant eligible Subdivision listed on Exhibit G is a region and the remainder of the state is a region.

d.     *Advisory Committee*. The Settling State shall designate an Opioid Settlement Remediation Advisory Committee (the "*Advisory Committee*") to provide input and recommendations regarding remediation spending from that Settling State's Abatement Accounts Fund. A Settling State may elect to use an existing advisory committee or similar entity (created outside of a State-Subdivision Agreement or Allocation Statute); provided, however, the Advisory Committee or similar entity shall meet the following requirements:

(1)     Written guidelines that establish the formation and composition of the Advisory Committee, terms of service for members, contingency for removal or resignation of members, a schedule of meetings, and any other administrative details;

(2)     Composition that includes at least an equal number of local representatives as state representatives;

(3)     A process for receiving input from Subdivisions and other communities regarding how the opioid crisis is affecting their

*revised March 30, 2022*

communities, their abatement needs, and proposals for abatement strategies and responses; and

(4) A process by which Advisory Committee recommendations for expenditures for Opioid Remediation will be made to and considered by the appropriate state agencies.

3. <u>Abatement Accounts Fund Reporting</u>. The Settlement Fund Administrator shall track and assist in the report of remediation disbursements as agreed to among the Parties.

F. *Nature of Payment.* Janssen, the Settling States, the Participating Subdivisions, and the Participating Special Districts, acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

1. Janssen has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

2. The Settling States, the Participating Subdivisions, and the Participating Special Districts sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions;

3. By executing this Agreement the Settling States, the Participating Subdivisions, and the Participating Special Districts certify that: (a) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions; and (b) the portion of the Compensatory Restitution Amount received by each Settling State or Participating Subdivision is no greater than the amount of the Alleged Harms allegedly suffered by such Settling State or Participating Subdivision;

4. The payment of the Compensatory Restitution Amount by Janssen constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by Janssen;

5. The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the Settling States and Participating Subdivisions to the same position or condition that they would be in had the Settling States and Participating Subdivisions not suffered the Alleged Harms;

6. For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to any Settling State, Participating Subdivision, Participating Special District, or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount

35

*revised March 30, 2022*

is properly characterized as described in subsection VI.F, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, other punitive assessments, or attorneys' fees; and

7.     New York, on behalf of all Settling States, Participating Subdivisions, and Participating Special Districts (the "Form 1098-F Filer") shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering this Agreement becomes binding. On the Form 1098-F, the Form 1098-F Filer shall identify the entire Compensatory Restitution Amount received by the Form 1098-F Filer as remediation/restitution. The Form 1098-F Filer shall also, on or before January 31 of the year following the calendar year in which the order entering this Agreement becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Janssen.

## VII.     Participation by Subdivisions and Special Districts

A.     *Notice.* No later than fifteen (15) days after the Preliminary Agreement Date, the Settling States, with the cooperation of Janssen, shall send individual written notice of the opportunity to participate in this Agreement and the requirements of participation to all Subdivisions in the Settling States of this Agreement that are (1) Litigating Subdivisions or (2) Non-Litigating Subdivisions listed on Exhibit G. Janssen's share of costs of the written notice to such Subdivisions shall be advanced by Janssen and deducted from its initial settlement payment. Notice shall also be provided simultaneously to counsel of record for Litigating Subdivisions and Non-Litigating Subdivisions on Exhibit G. The Settling States, with the cooperation of Janssen, will also provide general notice reasonably calculated to alert Non-Litigating Subdivisions listed on Exhibit G in the Settling States to this Agreement, the opportunity to participate in it and the requirements for participation. Such notice may include publication and other standard forms of notification, as well as notice to national state and county organizations such as the National Association of Counties and the National League of Cities. The notice will include that the deadline for becoming an Initial Participating Subdivision is the Initial Participation Date. Nothing contained herein shall preclude a Settling State from providing further notice to or otherwise contacting any of its Subdivisions about becoming a Participating Subdivision, including beginning any of the activities described in this paragraph prior to the Preliminary Agreement Date.

B.     *Requirements for Becoming a Participating Subdivision: Non-Litigating Subdivisions.* A Non-Litigating Subdivision in a Settling State that is listed on Exhibit G may become a Participating Subdivision by returning an executed Subdivision Settlement Participation Form specifying (1) that the Subdivision agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims against all Released Entities, (3) that the Subdivision agrees to use monies it receives, if any, from the Settlement Fund pursuant to the applicable requirements of Section VI, and (4) that the Subdivision submits to the jurisdiction of the court where the Consent Judgment is filed

*revised March 30, 2022*

for purposes limited to that court's role under the Agreement. The required Subdivision Settlement Participation Form is attached as Exhibit K.

C. *Requirements for Becoming a Participating Subdivision: Litigating Subdivisions/Later Litigating Subdivisions*. A Litigating Subdivision or Later Litigating Subdivision in a Settling State may become a Participating Subdivision by returning an executed Subdivision Settlement Participation Form to the Settlement Fund Administrator and upon prompt dismissal of its legal action. A Settling State may require each Litigating Subdivision in that State to specify on the Subdivision Settlement Participation Form whether its counsel has waived any contingency fee contract with that Participating Subdivision and intends to seek fees according to Exhibit R. The Settlement Fund Administrator shall provide quarterly reports of this information to the parties organized by Settling State. Except for trials begun before the Initial Participation Date, a Litigating Subdivision or a Later Litigating Subdivision may not become a Participating Subdivision after the completion of opening statements in a trial of a legal action it brought that includes a Released Claim against a Released Entity.

D. *Initial Participating Subdivisions.* A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision set forth in subsections VII.B or VII.C by the Initial Participation Date. Provided however, all Subdivision Settlement Participation Forms shall be held by the Settlement Fund Administrator until Janssen provides the notice in subsection VIII.B that it intends to proceed with the settlement, at which time the obligations created by such forms become effective.

E. *Later Participating Subdivisions.* A Subdivision that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision after the Initial Participation Date and agreeing to be subject to the terms of a State-Subdivision Agreement (if any) or any other structure adopted or applicable pursuant to subsections VI.D or VI.E. The following provisions govern what a Later Participating Subdivision can receive (but do not apply to Initial Participating Subdivisions):

1. A Later Participating Subdivision shall not receive any share of any base or incentive payments paid to the Subdivision Fund that were due before it became a Participating Subdivision.

2. A Later Participating Subdivision that becomes a Participating Subdivision after July 15, 2022 shall receive 75% of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision before that date (unless the Later Participating Subdivision is subject to subsections VII.E.3 or VII.E.4 below).

3. A Later Participating Subdivision that, after the Initial Participation Date, maintains a lawsuit for a Released Claim(s) against a Released Entity and has judgment entered against it on every such Claim before it became a Participating Subdivision (other than a consensual dismissal with prejudice) shall receive 50%

*revised March 30, 2022*

of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision prior to such judgment; *provided, however*, that if the Subdivision appeals the judgment and the judgment is affirmed with finality before the Subdivision becomes a Participating Subdivision, the Subdivision shall not receive any share of any base payment or incentive payment.

4. A Later Participating Subdivision that becomes a Participating Subdivision while a Bar or Case-Specific Resolution involving a different Subdivision exists in its State shall receive 25% of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision without such Bar or Case-Specific Resolution.

F. *No Increase in Payments*. Amounts to be received by Later Participating Subdivisions shall not increase the payments due from Janssen.

G. *Ineligible Subdivisions.* Subdivisions in Non-Settling States and Prior Litigating Subdivisions are not eligible to be Participating Subdivisions.

H. *Non-Participating Subdivisions*. Non-Participating Subdivisions shall not directly receive any portion of any base or incentive payments, including from the State Fund and direct distributions from the Abatement Accounts Fund; however, a Settling State may choose to fund future Opioid Remediation that indirectly benefits Non-Participating Subdivisions.

I. *Unpaid Allocations to Later Participating and Non-Participating Subdivisions*. Any base payment and incentive payments allocated pursuant to subsection VI.D to a Later Participating or Non-Participating Subdivision that cannot be paid pursuant to this Section VII, will be allocated to the Abatement Accounts Fund for the Settling State in which the Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement or by a Statutory Trust.

J. *Requirements for Becoming a Participating Special District: Non-Litigating Special Districts*. A Non-Litigating Special District may become a Participating Special District by either executing a release consistent with Section IV or by having its claims extinguished by operation of law or released by a Settling State.

K. *Requirements for Becoming a Participating Special District: Litigating Special Districts/Later Litigating Special Districts.* A Litigating Special District or Later Litigating Special District in a Settling State may become a Participating Special District by either executing a release consistent with Section IV and upon prompt dismissal of its legal action or by having its claims extinguished by operation of law or released by a Settling State.

L. *Initial Participating Special Districts*. A Special District qualifies as an Initial Participating Special District if it meets the applicable requirements for becoming a Participating Special District by the Initial Participation Date.

*revised March 30, 2022*

M.  *Later Participating Special Districts.* A Special District that is not an Initial Participating Special District may become a Later Participating Special District by meeting the applicable requirements for becoming a Participating Special District after the Initial Participation Date and agreeing to be subject to the terms of any agreement reached by the applicable Settling State with Initial Participating Special Districts. A Later Participating Special District shall not receive any share of any base or incentive payments paid to the Settlement Fund that were due before it became a Participating Special District.

### VIII.  Condition to Effectiveness of Agreement and Filing of Consent Judgment

A.  *Determination to Proceed With Settlement.* Janssen will determine on or before the Reference Date whether there has been a sufficient resolution of the Claims of the Litigating Subdivisions in the Settling States (through participation under Section VII, Case-Specific Resolution(s), and Bar(s)) to proceed with this Agreement. The determination shall be in the sole discretion of Janssen and may be based on any criteria or factors deemed relevant by Janssen.

B.  *Notice by Janssen.* On or before the Reference Date, Janssen shall inform the Settling States and MDL PEC of its determination pursuant to subsection VIII.A. If Janssen determines to proceed, the Parties will proceed to file the Consent Judgments. If Janssen determines not to proceed, this Agreement will have no further effect and all releases (including those given by Participating Subdivisions) and other commitments or obligations contained herein will be void.

C.  *Determination of the Participation Tier.*

1.  On July 1, provided that Janssen determines to proceed with this Agreement, the Settlement Fund Administrator shall determine the Participation Tier. The criteria used to determine the Participation Tier are set forth in Exhibit H. Any disputes as to the determination of the Participation Tier shall be decided by the National Arbitration Panel.

2.  The Participation Tier shall be redetermined by the Settlement Fund Administrator annually as of the Payment Date, beginning with Payment Year 1, pursuant to the criteria set forth in Exhibit H.

3.  After Payment Year 3, the Participation Tier cannot move higher, unless this restriction is waived by Janssen.

4.  In the event that a Participation Tier redetermination moves the Participation Tier higher, and that change is in whole or in part as a result of the post-Reference Date enactment of a Bar and there is later a Revocation Event with respect to that Bar, then on the next Payment Date that is at least one hundred eighty (180) days after the Revocation Event, the Participation Tier shall move down to the Participation Tier that would have applied had the Bar never been enacted, unless the Bar is reinstated or all Subdivisions affected by the Revocation Event become Participating Subdivisions within one hundred eighty (180) days of the

*revised March 30, 2022*

Revocation Event. This is the sole circumstance in which, on a nationwide basis, the Participation Tier can move down.

5.  In the event that there is a post-Reference Date Revocation Event with respect to a Bar that was enacted in a Settling State prior to the Reference Date, then, on the next Payment Date that is at least one hundred eighty (180) days after the Revocation Event, unless the Bar is reinstated or all Subdivisions affected by the Revocation Event become Participating Subdivisions within one hundred eighty (180) days of the Revocation Event, the Participation Tier shall decrease – solely for the State in which the Revocation Event occurred – to the Participation Tier commensurate with the percentage of Litigating Subdivisions in that State that are Participating Subdivisions and the percentage of Non-Litigating Subdivisions that are both Primary Subdivisions and Participating Subdivisions, according to the criteria set forth in Exhibit H, except that the calculations shall be performed as to that State alone. For the avoidance of doubt and solely for the calculation in this subparagraph, the Settling States Column of Exhibit H shall play no role. This is the sole circumstance in which one Settling State will have a different Participation Tier than other Settling States.

6.  The redetermination of the Participation Tier under subsection VIII.C.2 shall not affect payments already made or suspensions or offsets already applied.

### IX.    Potential Payment Adjustments

A.  *Later Litigating Subdivisions.*

1.  If a Later Litigating Subdivision in a Settling State with a population above 10,000 brings a lawsuit or other legal proceeding against Released Entities asserting Released Claims, Janssen shall, within thirty (30) days of the lawsuit or other legal proceeding being served on Janssen, provide notice of the lawsuit or other legal proceeding to the Settlement Fund Administrator and the Settling State in which the Later Litigating Subdivision sits and provide the Settling State an opportunity to intervene in the lawsuit or other legal proceeding. A Released Entity shall not enter into a settlement with a Later Litigating Subdivision unless the State in which the Later Litigating Subdivision sits consents to such a settlement or unreasonably withholds consent to such a settlement.

2.  If no Participation Tier applies and the Later Litigating Subdivision's lawsuit or other legal proceeding survives a Threshold Motion before Janssen makes its last settlement payment to the Settling State, the following shall apply:

    a.  Janssen will, from the date of the entry of the order denying the Threshold Motion and so long as the lawsuit or other legal proceeding is pending, be entitled to a suspension of the following payments it would otherwise owe the Settling State in which the Later Litigating Subdivision is located: (1) all remaining incentive payments to the relevant state; and (2) the last two scheduled base payments, if not already paid (the "Suspended Payments").

*revised March 30, 2022*

    b.    For each Payment Year that Janssen is entitled to a suspension of payments, the Settlement Fund Administrator shall calculate the Suspended Payments applicable to the next Payment due from Janssen. The Suspended Payments shall be paid into the Settlement Fund Escrow account.

3.    If a Participation Tier applies at the time the Threshold Motion is denied, Janssen will be entitled to a suspension of the following percentages of Suspended Payments depending on the applicable Tier—75% for Tier 1, 50% for Tier 2, 35% for Tier 3, and 25% for Tier 4. Otherwise, the requirements of subsection IX.A.2 apply.

4.    If the Released Claim is resolved with finality without requirement of payment by a Released Entity, the placement of any remaining balance of the Suspended Payments into the Settlement Fund Escrow shall cease and the Settlement Fund Administrator shall immediately transfer amounts in the Settlement Fund Escrow on account of the suspension to the Settling State at issue and its Participating Subdivisions listed on Exhibit G. The lawsuit will not cause further suspensions unless the Released Claim is reinstated upon further review, legislative action, or otherwise.

5.    If the Released Claim is resolved with finality on terms requiring payment by a Released Entity (*e.g.*, if the lawsuit in which the Released Claim is asserted results in a judgment against Janssen or a settlement with Janssen), the Settlement Fund Administrator will transfer the amounts in the Settlement Fund Escrow on account of the suspension to Janssen necessary to satisfy 75% of the payment obligation of the Released Entity to the relevant Later Litigating Subdivision. The Settlement Fund Administrator shall immediately transfer any remaining balance in the Settlement Fund Escrow on account of the suspension to the Settling State at issue and its Participating Subdivisions listed on Exhibit G. If the amount to be transferred to Janssen exceeds the amounts in the Settlement Fund Escrow on account of the suspension, Janssen shall receive a dollar-for-dollar offset for the excess amount against its obligation to pay any remaining payments that would be apportioned to the Settling State at issue and to its Participating Subdivisions listed on Exhibit G.

B.    *Settlement Class Resolution Opt Outs.* If a Settling State is eligible for Incentive A on the basis of a Settlement Class Resolution, and a Primary Subdivision that opted out of the Settlement Class Resolution maintains a lawsuit asserting a Released Claim against a Released Entity, the following shall apply. If the lawsuit asserting a Released Claim either survives a Threshold Motion or has an unresolved Threshold Motion fewer than sixty (60) days prior to the scheduled start of a trial involving a Released Claim, and is resolved with finality on terms requiring payment by the Released Entity, Janssen shall receive a dollar-for-dollar offset for the amount paid against its obligation to make remaining Incentive A payments that would be apportioned to that State or Participating Subdivisions listed on Exhibit G. For the avoidance of doubt, an offset shall not be

*revised March 30, 2022*

applicable under this subsection if it is applicable under subsection IX.A with respect to the Subdivision at issue.

C.    *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution.*

    1.    If Janssen made a payment as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution in a Settling State, and that Bar, Settlement Class Resolution, or Case-Specific Resolution is subject to a Revocation Event, Janssen shall receive a dollar-for-dollar offset against its obligation to make remaining payments that would be apportioned to that State or Participating Subdivisions listed on Exhibit G. This offset will be calculated as the dollar amount difference between (1) the total amount of incentive payments paid by Janssen during the time the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event was in effect, and (2) the total amount of Incentive Payments that would have been due from Janssen during that time without the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event being in effect. The amount of incentive payments that would have been due, referenced in (2) above, will be calculated based on considering any Subdivision that provides a release within one hundred eighty (180) days after the Revocation Event as having been a Participating Subdivision (in addition to all other Participating Subdivisions) during the time that the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event was in effect. If a Revocation Event causes a Settling State to no longer qualify for Incentive D, the Settling State shall return to Janssen all payments made under Incentive D.

    2.    Notwithstanding anything to the contrary in paragraph 1 above, if a Bar or Case-Specific Resolution is reinstated by the Settling State, either through the same or different means as the initial Bar or Case-Specific Resolution, Janssen's right to an offset is extinguished and any amounts withheld to offset amounts paid on account of the revoked, rescinded, reversed, or overruled Bar or Case-Specific Resolution shall be returned to the Settling State, less and except any incentive payments that would have been paid during the period in which the Bar or Case-Specific Resolution was revoked, rescinded, reversed, or overruled.

## X.    Additional Restitution Amount

A.    *Additional Restitution Amount.* Pursuant to the schedule set forth below and subject to the reduction specified in subsection X.B below, Janssen shall pay an Additional Restitution Amount to the Settling States listed in Exhibit N. Such funds shall be paid on the schedule set forth on Exhibit M on the Payment Date for each relevant Payment Year to such Settling States as allocated by the Settlement Fund Administrator pursuant to Exhibit N.

        Payment Year 1      $15,384,615.38

        Payment Year 2      $26,923,076.92

*revised March 30, 2022*

Payment Year 3          $25,000,000.00

B.     *Reduction of Additional Restitution Amount*. In the event that any Non-Settling State appears on Exhibit N, the amounts owed by Janssen pursuant to this Section X shall be reduced by the allocation set forth on Exhibit N for any such Non-Settling States.

C.     *Use of Funds*. All funds paid as an Additional Restitution Amount shall be part of the Compensatory Restitution Amount, shall be used for Opioid Remediation, except as allowed by subsection VI.B.2, and shall be governed by the same requirements as specified in subsection VI.F.

## XI.     <u>Plaintiffs' Attorneys' Fees and Costs</u>

A.     The Agreement on Attorneys' Fees, Expenses and Costs is set forth in Exhibit R and incorporated herein by reference. The Agreement on the State Outside Counsel Fee Fund and Agreement on the State Cost Fund Administration are set forth in Exhibit U and Exhibit S, respectively, and are incorporated herein by reference.

## XII.     <u>Enforcement and Dispute Resolution</u>

A.     *Enforceability*. The terms of the Agreement and Consent Judgment applicable to or in a Settling State will be enforceable solely by that Settling State and Janssen. Settling States or Participating Subdivisions shall not have enforcement rights with respect either to the terms of this Agreement that apply only to or in other States or to any Consent Judgment entered into by another Settling State. Participating Subdivisions shall not have enforcement rights against Janssen with respect to the Agreement or any Consent Judgment except as to payments that would be allocated to the Subdivision Fund or Abatement Accounts Fund pursuant to Section VI; *provided, however*, that each Settling State shall allow Participating Subdivisions in that State to notify it of any perceived violations of the Agreement or Consent Judgment.

B.     *Jurisdiction*. Janssen consents to the jurisdiction of the court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection XII.F.2 for resolution in the court in which the Consent Judgment is filed.

C.     *Specific Terms Dispute Resolution.*

1.     Any dispute that is addressed by the provisions set forth in the Injunctive Relief terms in Exhibit P shall be resolved as provided therein.

2.     In the event Janssen believes the 86.5% threshold established in subsection VI.B.1 is not being satisfied, any Party may request that Janssen and the Enforcement Committee meet and confer regarding the use of funds under subsection VI.B.1. The completion of such meet-and-confer process is a precondition to further action regarding any such dispute. Further action concerning subsection VI.B.1 shall: (i) be limited to Janssen seeking to reduce its Annual Payments by no more than 5% of the difference between the actual amount of Opioid Remediation and the 86.5% threshold established in subsection VI.B.1; (ii) only reduce Annual

43

*revised March 30, 2022*

Payments to those Settling States and its Participating Subdivisions that are below the 86.5% threshold established in subsection VI.B.1; and (iii) not reduce Annual Payments restricted to future Opioid Remediation.

D.   *State-Subdivision Enforcement.*

1.   A Participating Subdivision shall not have enforcement rights against a Settling State in which it is located with respect to the Agreement or any Consent Judgment except: (1) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust with respect to intrastate allocation; or (2) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, as to allegations that: (a) the Settling State's use of Abatement Accounts Fund monies were not used for uses similar to or in the nature of those uses contained in Exhibit E; or (b) a Settling State failed to pay funds directly from the Abatement Accounts Fund to a Participating Subdivision eligible to receive a block grant pursuant to subsection VI.E.2.b.

2.   A Settling State shall have enforcement rights against a Participating Subdivision located in its territory: (1) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust; or (2) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, as to allegations that the uses of Abatement Accounts Fund monies by Participating Subdivisions listed on Exhibit G were not for uses similar to or in the nature of those uses contained in Exhibit E.

3.   As between Settling States and Participating Subdivisions, the above rights are contractual in nature and nothing herein is intended to limit, restrict, change, or alter any other existing rights under law.

E.   *Subdivision Payment Enforcement.* A Participating Subdivision shall have the same right as a Settling State pursuant to subsection XII.F.4.a(4) to seek resolution of any failure by Janssen to make its required base and/or incentive payments in a Payment Year.

F.   *Other Dispute Resolution Terms.*

1.   Except as provided in subsection XII.C, the parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this subsection XII.F to resolve the dispute.

2.   Except as provided in subsections XII.C and XII.F.4, disputes not resolved informally shall be resolved in either the court that entered the relevant Consent Judgment or, if no Consent Judgment was entered, a state or territorial court with jurisdiction located wherever the seat of state government is located. State court proceedings shall be governed by the rules and procedures of the forum. For the avoidance of doubt, disputes to be resolved in state court include, but are not limited to, the following:

*revised March 30, 2022*

a.    disputes concerning whether expenditures qualify for Opioid Remediation;

b.    disputes between a Settling State and Participating Subdivisions located in such Settling State as provided by subsection XII.D, except to the extent the State-Subdivision Agreement provides for other dispute resolution mechanisms. For the avoidance of doubt, disputes between a Settling State and any Participating Subdivision shall not be considered National Disputes;

c.    whether this Agreement and relevant Consent Judgment are binding under state law;

d.    the extent of the Attorney General's or other participating entity's authority under state law, including the extent of the authority to release claims;

e.    whether the requirements of a Bar, a Case-Specific Resolution, State-Specific Finality, Later Litigating Subdivision, Litigating Subdivision, or a Threshold Motion have been met; and

f.    all other disputes not specifically identified in subsections XII.C and XII.F.4.

3.    Any Party may request that the National Arbitration Panel provide an interpretation of any provision of the settlement that is relevant to the state court determination, and the National Arbitration Panel shall make reasonable best efforts to supply such interpretation within the earlier of thirty (30) days or the time period required by the state court proceedings. Any Party may submit that interpretation to the state court to the extent permitted by, and for such weight provided by, the state court's rules and procedures. If requested by a Party, the National Arbitration Panel shall request that its interpretation be accepted in the form of an amicus curiae brief, and any attorneys' fees and costs for preparing any such filing shall be paid for by the requesting Party.

4.    National Disputes involving a Settling State, Participating Subdivision, and/or Janssen shall be resolved by a National Arbitration Panel.

a.    "*National Disputes*" are disputes that are exceptions to subsection XII.F.2's presumption of resolution in state courts because they involve issues of interpretation of Agreement terms applicable to all Settling States without reference to a particular State's law. Disputes between a State and any Participating Subdivisions shall not be considered National Disputes. National Disputes are limited to the following:

(1)    the amount of offset and/or credit attributable to Non-Settling States and Tribes;

(2)    issues involving the scope and definition of "Product";

45

*revised March 30, 2022*

(3)     interpretation and application of the terms "Covered Conduct" and "Released Entities";

(4)     disputes over a given year's payment or the payment of the Additional Restitution Amount to all Settling States (for the avoidance of doubt, disputes between a Settling State and Janssen over the amounts owed to only that State shall not be considered National Disputes);

(5)     questions regarding the performance and/or removal of the Settlement Fund Administrator;

(6)     disputes involving liability of successor entities;

(7)     disputes that require a determination of sufficient Subdivision and Special District participation to qualify for Incentives A, B, C, or D, as well as disputes over qualification for Participation Tiers;

(8)     disputes that require interpretation of Agreement terms (i) that concretely affect four (4) or more Settling States; and (ii) do not turn on unique definitions and interpretations under State law; and

(9)     any dispute subject to resolution under subsection XII.F.2 but for which all parties to the dispute agree to arbitration before the National Arbitration Panel under the provisions of this subsection XII.F.4.

b.     The "*National Arbitration Panel*" shall be comprised of three (3) neutral arbitrators. One (1) arbitrator shall be chosen by Janssen, one (1) arbitrator shall be chosen by the Enforcement Committee with due input from Participating Subdivisions, and the third arbitrator shall be agreed upon by the first two (2) arbitrators. The membership of the National Arbitration Panel is intended to remain constant throughout the term of this Agreement, but in the event that replacements are required, the retiring arbitrator shall be replaced by the party that selected him/her.

(1)     The National Arbitration Panel shall make reasonable best efforts to decide all matters within one hundred eighty (180) days of filing, and in no event shall it take longer than one (1) year.

(2)     The National Arbitration Panel shall conduct all proceedings in a reasonably streamlined process consistent with an opportunity for the parties to be heard. Issues shall be resolved without the need for live witnesses where feasible, and with a presumption in favor of remote participation to minimize the burdens on the parties.

(3)     To the extent allowed under state law, a Settling State, Participating Subdivision, and (at any party's request) the National

*revised March 30, 2022*

Arbitration Panel may certify to an appropriate state court any question of state law. The National Arbitration Panel shall be bound by a final state court determination of such a certified question. The time period for the arbitration shall be tolled during the course of the certification process.

(4)     The arbitrators will give due deference to any authoritative interpretation of state law, including any declaratory judgment or similar relief obtained by a Settling State, Participating Subdivision, or Janssen on a state law issue.

(5)     The decisions of the National Arbitration Panel shall be binding on Settling States, Participating Subdivisions, Janssen, and the Settlement Fund Administrator. In any proceeding before the National Arbitration Panel involving a dispute between a Settling State and Janssen whose resolution could prejudice the rights of a Participating Subdivision(s) or Participating Special District(s) in that Settling State, such Participating Subdivision(s) or Participating Special District(s) shall be allowed to file a statement of view in the proceeding.

c.     Nothing herein shall be construed so as to limit or otherwise restrict a State from seeking injunctive or other equitable relief in state court to protect the health, safety, or welfare of its citizens.

d.     Each party shall bear its own costs in any arbitration or court proceeding arising under this subsection XII.F. The costs for the arbitrators on the National Arbitration Panel shall be divided and paid equally by the disputing sides for each individual dispute, *e.g.*, a dispute between Janssen and Setting States/Participating Subdivisions shall be split 50% by Janssen and 50% by the Settling States/Participating Subdivisions that are parties to the dispute; a dispute between a Settling State and a Participating Subdivision shall be split 50% by the Settling State and 50% by any Participating Subdivisions that are party to the dispute.

5.     Prior to initiating an action to enforce pursuant to this subsection XII.F, the complaining party must:

a.     Provide written notice to the Enforcement Committee of its complaint, including the provision of the Consent Judgment and/or Agreement that the practice appears to violate, as well as the basis for its interpretation of the disputed provision. The Enforcement Committee shall establish a reasonable process and timeline for obtaining additional information from the involved parties; *provided, however*, that the date the Enforcement Committee establishes for obtaining additional information from the parties shall not be more than forty-five (45) days following the notice.

*revised March 30, 2022*

The Enforcement Committee may advise the involved parties of its views on the complaint and/or seek to resolve the complaint informally.

b.  Wait to commence any enforcement action until thirty (30) days after the date that the Enforcement Committee establishes for obtaining additional information from the involved parties.

6.  If the parties to a dispute cannot agree on the proper forum for resolution of the dispute under the provisions of subsections XII.F.2 or XII.F.4, a committee comprising the Enforcement Committee and sufficient representatives of Janssen such that the members of the Enforcement Committee have a majority of one (1) member will determine the forum where the dispute will be initiated within twenty-eight (28) days of receiving notification of the dispute relating to the proper forum. The forum identified by such committee shall be the sole forum for determining where the dispute shall be heard, and the committee's identification of such forum shall not be entitled to deference by the forum selected.

G.  *No Effect*. Nothing in this Agreement shall be interpreted to limit the Settling State's Civil Investigative Demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable state law and the CID or investigative subpoena is issued pursuant to such authority, and Janssen reserves all of its rights in connection with a CID or investigative subpoena issued pursuant to such authority.

## XIII.  Miscellaneous

A.  *No Admission.* Janssen does not admit liability or wrongdoing. Neither this Agreement nor the Consent Judgments shall be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to Janssen.

B.  *Population of Subdivisions*. The population figures for Subdivisions shall be the published U.S. Census Bureau's population estimates for July 1, 2019, released May 2020. These population figures shall remain unchanged during the term of this Agreement.

C.  *Population of Special Districts*. For any purpose in this Agreement in which the population of a Special District is used, other than the use of "Covered Special District": (a) School Districts' population will be measured by the number of students enrolled who are eligible under the Individuals with Disabilities Education Act ("*IDEA*") or Section 504 of the Rehabilitation Act of 1973; (b) Health Districts' and Hospital Districts' population will be measured at 25% of discharges; and (c) all other Special Districts' (including Fire Districts' and Library Districts') population will be measured at 10% of the population served.

D.  *Population Associated with Sheriffs*. For any purpose in this Agreement in which the population associated with a lawsuit by a sheriff is used, the population will be measured at 20% of the capacity of the jail(s) operated by the sheriff.

*revised March 30, 2022*

E.    *Tax Reporting and Cooperation.*

    1.    Upon request by Janssen, the Settling States, Participating Subdivisions, and Participating Special Districts agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for Janssen to establish the statements set forth in subsection VI.F to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

    2.    Without limiting the generality of subsection XIII.E, each Settling State, Participating Subdivision, and Participating Special District shall cooperate in good faith with Janssen with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

    3.    The Designated State, on behalf of all Settling States, Participating Subdivisions, and Participating Special Districts, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "Appropriate Official").

    4.    For the avoidance of doubt, neither Janssen nor the Settling States, Participating Subdivisions, and Participating Special Districts make any warranty or representation to any Settling jurisdiction or Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

F.    *No Third-Party Beneficiaries.* Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or Released Entity. No Settling State may assign or otherwise convey any right to enforce any provision of this Agreement.

G.    *Calculation.* Any figure or percentage referred to in this Agreement shall be carried to seven decimal places.

H.    *Construction.* None of the Parties and no Participating Subdivision shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

I.    *Cooperation.* Each Party and each Participating Subdivision agrees to use its best efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and the Consent Judgments to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or any Consent Judgment

*revised March 30, 2022*

by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Consent Judgments.

J.  *Entire Agreement*. This Agreement, its exhibits and any other attachments, including the attorneys' fees and cost agreement in Exhibit R, embodies the entire agreement and understanding between and among the Parties and Participating Subdivisions relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

K.  *Execution*. This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement. One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof. One or more counterparts of this Agreement may be signed by electronic signature.

L.  *Good Faith and Voluntary Entry*. Each Party warrants and represents that it negotiated the terms of this Agreement in good faith. Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion. The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

M.  *No Prevailing Party.* The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement. The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

N.  *Non-Admissibility.* The settlement negotiations resulting in this Agreement have been undertaken by the Parties and by certain representatives of the Participating Subdivisions in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose. This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement.

O.  *Notices.* All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

*revised March 30, 2022*

1.  For the Attorney(s) General:

  Ashley Moody,
  Attorney General
  State of Florida
  The Capitol,
  PL-01
  Tallahassee, FL 32399

  Josh Stein, Attorney General
  North Carolina Department of Justice
  Attn: Daniel Mosteller
  PO Box 629
  Raleigh, NC 27602
  Dmosteller@ncdoj.gov

2.  For the Plaintiffs' Executive Committee:

  Paul F. Farrell
  Farrell Law
  P.O. Box 1180
  Huntington, WV 25714-1180

  Jayne Conroy
  Simmons Hanly Conroy LLC
  112 Madison Avenue, 7th Floor
  New York, NY 10016-7416
  JConroy@simmonsfirm.com

  Joseph F. Rice
  Motley Rice LLC
  28 Bridgeside Blvd.
  Mount Pleasant, SC 29464
  jrice@motleyrice.com

  Peter Mougey
  Levin Papantonio Rafferty
  316 South Baylen St.
  Pensacola, FL 32502
  pmougey@levinlaw.com

  Paul J. Geller
  Robbins Geller Rudman & Dowd LLP
  120 East Palmetto Park Road
  Boca Raton, FL 33432
  PGeller@rgrdlaw.com

*revised March 30, 2022*

3.      For Janssen:

Charles C. Lifland
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor Los Angeles, CA 90071
Phone: (213) 430-6000
clifland@omm.com

Daniel R. Suvor
O'Melveny & Myers LLP
400 South Hope Street, 18th Floor Los Angeles, CA 90071
Phone: (213) 430-6000
dsuvor@omm.com

Any Party or the Plaintiffs' Executive Committee may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this subsection.

P.      *No Waiver*. The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties. The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

Q.      *Preservation of Privilege.* Nothing contained in this Agreement or any Consent Judgment, and no act required to be performed pursuant to this Agreement or any Consent Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

R.      *Successors*. This Agreement shall be binding upon, and inure to the benefit of, Janssen and its respective successors and assigns. Janssen shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to Janssen's obligations under this Agreement.

S.      *Modification, Amendment, Alteration*. After the Reference Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by Janssen along with the signatures of at least thirty-seven (37) of those then-serving Attorneys General of the Settling States along with a representation from each Attorney General that either: (1) the advisory committee or similar entity established or recognized by that Settling State (either pursuant to subsection VI.E.2, by a State-Subdivision Agreement, or by statute) voted in favor of the modification, amendment, or alteration of this Agreement including at least one Participating Subdivision-appointed member; or (2) in States without any advisory committee, that 50.1% of the Participating Subdivisions by population expressed approval of the modification, amendment, or alteration of this Agreement in writing.

*revised March 30, 2022*

Provided, however, in the event the modification, amendment, or alteration relates to injunctive relief, interstate allocation between the Settling States, intrastate allocation in a particular Settling State, or fees or costs of Settling States and Participating Subdivisions, then every Settling State and each Participating Subdivision affected by that modification, amendment, or alteration must assent in writing. Provided further that, in the event the modification, amendment, or alteration relates to injunctive relief, then such amendment, modification, or alteration of injunctive relief against Janssen will not be effective unless and until any Consent Judgment is modified by a court of competent jurisdiction, except as otherwise provided by the Injunctive Terms.

T.  *Termination.*

1.  Unless otherwise agreed to by Janssen and the Settling State in question, this Agreement and all of its terms (except subsection XIII.N and any other non-admissibility provisions, which shall continue in full force and effect) shall be canceled and terminated with respect to the Settling State, and the Agreement and all orders issued by the courts in the Settling State pursuant to the Agreement shall become null and void and of no effect if one or more of the following conditions applies:

    a.  A Consent Judgment approving this Agreement without modification of any of the Agreement's terms has not been entered as to the Settling State by a court of competent jurisdiction on or before one hundred eighty (180) days after the Effective Date; or

    b.  This Agreement or the Consent Judgment as to that Settling State has been disapproved by a court of competent jurisdiction to which it was presented for approval and/or entry (or, in the event of an appeal from or review of a decision of such a court to approve this Agreement and the Consent Judgment, by the court hearing such appeal or conducting such review), and the time to appeal from such disapproval has expired, or, in the event of an appeal from such disapproval, the appeal has been dismissed or the disapproval has been affirmed by the court of last resort to which such appeal has been taken and such dismissal or disapproval has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

2.  If this Agreement is terminated with respect to a Settling State and its Participating Subdivisions for whatever reason pursuant to subsection XIII.T.1, then:

    a.  An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date the Settling State signed this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that Janssen and the Settling State in question shall be in the same

*revised March 30, 2022*

position with respect to the statute of limitation as they were at the time the Settling State filed its action; and

b. Janssen and the Settling State and its Participating Subdivisions in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Janssen and the Settling State and its Participating Subdivisions in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

3. Unless Janssen and the Enforcement Committee agree otherwise, this Agreement, with the exception of the Injunctive Relief Terms that have their own provisions on duration, shall terminate as to all Parties as of the Payment Date for Payment Year 9, *provided* that Janssen has performed its payment obligations under the Agreement as of that date. Notwithstanding any other provision in this Agreement, all releases under this Agreement will remain effective despite any termination under this paragraph.

U. *Governing Law.* Except (1) as otherwise provided in the Agreement or (2) as necessary, in the sole judgment of the National Arbitration Panel, to promote uniformity of interpretation for matters within the scope of the National Arbitration Panel's authority, this Agreement shall be governed by and interpreted in accordance with the respective laws of the Settling State, without regard to the conflict of law rules of such Settling State, that is seeking to enforce the Agreement against Janssen or against which Janssen is seeking enforcement. Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Settlement Fund Escrow shall be governed by and interpreted in accordance with the law of the state where the escrow agent has its primary place of business.

*revised March 30, 2022*

## EXHIBIT J

## Janssen Predecessors and Former Affiliates

The following includes a non-exclusive list of Janssen's predecessors and former affiliates:

1. Janssen Pharmaceutica, Inc.
2. Janssen Pharmaceutica N.V.
3. Janssen-Cilag Manufacturing, LLC
4. Janssen Global Services, LLC
5. Janssen Ortho LLC
6. Janssen Products, LP
7. Janssen Research & Development, LLC
8. Janssen Supply Group, LLC
9. Janssen Scientific Affairs, LLC
10. JOM Pharmaceutical Services, Inc.
11. OMJ Pharmaceuticals, Inc.
12. Ortho-McNeil Finance Co.
13. Ortho-McNeil Pharmaceutical
14. Ortho-McNeil-Janssen Pharmaceuticals
15. Ortho-McNeil Pharmaceutical Services Division
16. Ortho-McNeil Neurologic
17. Patriot Pharmaceuticals, LLC
18. Pricara, Ortho-McNeil-Janssen Pharmaceuticals
19. Alza Corp.
20. Alza Development Corp.
21. Janssen Supply Chain, Alza Corp.
22. Noramco, Inc.
23. Tasmanian Alkaloids PTY LTD.

*revised March 30, 2022*

**EXHIBIT C**


**ATTORNEY GENERAL'S RELEASE OF OPIOID-RELATED CLAIMS
PURSUANT TO THE JANSSEN SETTLEMENT AGREEMENT**

**Attorney General's Release of Opioid-Related Claims Pursuant to the Janssen Settlement Agreement**

WHEREAS the Janssen Settlement Agreement dated July 21, 2021 (the "Agreement") provides in Section IV.A that, as of the Effective Date of the Agreement, Janssen and the related Released Entities will be released and forever discharged from all of the Releasors' Released Claims;[1] and

WHEREAS the Agreement provides in Section I.62 that Releasors who are releasing claims under Section IV.A include without limitation and to the maximum extent of the power of each Settling State's Attorney General to release Claims (a) the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in a Settling State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in this Agreement; and

WHEREAS the Agreement provides in Section IV.E that each Settling State's Attorney General expressly represents and warrants that he or she has, has obtained, or will obtain on or before the Effective Date, the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) his or her respective Settling State, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of his or her respective Settling State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license, and (4) any Participating Subdivisions.  For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor;

THEREFORE, pursuant to the foregoing provisions of the Agreement and without limitation and to the maximum extent of the power of the Attorney General, Janssen and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (a) the State of Florida and its Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of

---

[1] Capitalized terms used herein and defined in the Agreement have the meanings given to them in the Agreement.

the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in the State of Florida, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Florida or Subdivision in the State of Florida, whether or not any of them participate in the Agreement; and

THEREFORE, pursuant to the foregoing provisions of the Agreement and to the maximum extent of the State of Florida's power, Janssen and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (1) the State of Florida, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of the State of Florida's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license, and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State of Florida's Governor.

John M. Guard,
Chief Deputy Attorney General
by and through the authority
delegated to him by
Ashley Moody,
Attorney General of the State of Florida

Date: 4/26/22

*SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY
NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY
THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT*

# EXHIBIT 2

# IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
# IN AND FOR PASCO COUNTY, FLORIDA

STATE OF FLORIDA, OFFICE OF THE
ATTORNEY GENERAL, DEPARTMENT OF
LEGAL AFFAIRS,

        Plaintiff,

    v.

PURDUE PHARMA L.P., PURDUE PHARMA,
INC., THE PURDUE FREDERICK COMPANY,
INC., ENDO HEALTH SOLUTIONS INC.,
ENDO PHARMACEUTICALS INC., JANSSEN
PHARMACEUTICALS, INC., JOHNSON &
JOHNSON, CEPHALON, INC., TEVA
PHARMACEUTICALS USA, INC., ALLERGAN
FINANCE, LLC, ACTAVIS PHARMA, INC.,
ACTAVIS LLC, INSYS THERAPEUTICS, INC.,
AMERISOURCEBERGEN DRUG
CORPORATION, CARDINAL HEALTH, INC.,
MCKESSON CORPORATION,
MALLINCKRODT LLC, WALGREEN CO., CVS
HEALTH CORPORATION, and

CVS PHARMACY, INC.,

        Defendants.

Case No. 2018-CA-001438

---

## FINAL CONSENT JUDGMENT AND DISMISSAL WITH PREJUDICE

The State of Florida ("State") and McKesson Corporation, Cardinal Health, Inc.,

AmerisourceBergen Corporation and AmerisourceBergen Drug Corporation, together with the

subsidiaries thereof (collectively, *Settling Distributors*" and each a "*Settling Distributor*")

(together with the State, the "*Parties*," and each a "*Party*") have entered into a consensual

resolution of the above-captioned litigation (the "*Action*") pursuant to a settlement agreement entitled Distributor Settlement Agreement, dated as of July 21, 2021 (as subsequently updated) (the "*Agreement*"), a copy of which is attached hereto as Exhibit A. The Agreement shall become effective by its terms upon the entry of this Final Consent Judgment (the "*Judgment*") by the Court without trial or adjudication of any contested issue of fact or law, and without finding or admission of wrongdoing or liability of any kind.

**RECITALS:**

1.  Each Party warrants and represents that it engaged in arm's-length negotiations in good faith. In hereby executing the Agreement, the Parties intend to effect a good-faith settlement.

2.  The State has determined that the Agreement is in the public interest.

3.  Settling Distributors deny the allegations against them in the Action and that they have any liability whatsoever to the State, its Subdivisions, and/or (a) any of the State's or Subdivisions' departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, including its Attorney General and any person in her or his official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public.

4.  The Parties recognize that the outcome of the Action is uncertain and a final resolution through the adversarial process likely will require protracted litigation.

5.      The Parties agree to the entry of the injunctive relief terms pursuant to Exhibit P of the Agreement.

6.      Therefore, without any admission of liability or wrongdoing by Settling Distributors or any other Released Entities (as defined in the Agreement), the Parties now mutually consent to the entry of this Judgment and agree to dismissal of the claims with prejudice pursuant to the terms of the Agreement to avoid the delay, expense, inconvenience, and uncertainty of protracted litigation.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

In consideration of the mutual promises, terms, and conditions set forth in the Agreement, the adequacy of which is hereby acknowledged by all Parties, it is agreed by and between Settling Distributors and the State, and adjudicated by the Court, as follows:

1.      The foregoing Recitals are incorporated herein and constitute an express term of this Judgment.

2.      The Parties have entered into a full and final settlement of all Released Claims of Releasors against Settling Distributors (including but not limited to the State) and the Released Entities pursuant to the terms and conditions set forth in the Agreement.

3.      The "Definitions" set forth in Section I of the Agreement are incorporated by reference into this Judgment.  The State is a "Settling State" within the meaning of the Agreement. Unless otherwise defined herein, capitalized terms in this Judgment shall have the same meaning given to them in the Agreement.

4.      The Parties agree that the Court has jurisdiction over the subject matter of the Action and over the Parties with respect to the Action and this Judgment.  This Judgment shall not be construed or used as a waiver of any jurisdictional defense any Settling Distributor or any other Released Entity may raise in any other proceeding.

3

5.    The Court finds that the Agreement was entered into in good faith.

6.    The Court finds that entry of this Judgment is in the public interest and reflects a negotiated settlement agreed to by the Parties.  The Action is dismissed with prejudice, subject to a retention of jurisdiction by the Court as provided herein and in the Agreement.

7.    By this Judgment, the Agreement is hereby approved by the Court, and the Court hereby adopts the Agreement's terms as its own determination of this matter and the Parties' respective rights and obligations.

8.    The Court shall have authority to resolve disputes identified in Section VI.F.1 of the Agreement, governed by the rules and procedures of the Court.

9.    By this Judgment, the Distributors Florida State-Wide Opioid Settlement Agreement and Settlement Term Sheet, a copy of which is attached hereto as Exhibit B and as incorporated into the Agreement pursuant to Exhibit O of the Agreement, is hereby approved by the Court as the means by which relevant funds paid pursuant to the Agreement will be divided within the State, subject to the full acceptance by any Subdivision receiving such funds of the terms of the Agreement, including the releases provided therein.

10.    The Parties have satisfied the Condition to Effectiveness of Agreement set forth in Section VIII of the Agreement and the Release set forth in Sections XI.A, F, and G of the Agreement, as follows:

a.    The Attorney General of the State exercised the fullest extent of his or her powers to release Settling Distributors and all other Released Entities from all Released Claims pursuant to the release attached hereto as Exhibit C (the "*Release*").

b.    Settling Distributors have determined that there is sufficient State participation and sufficient resolution of the Claims of the Litigating Subdivisions in the Settling States to proceed with the Agreement.

c.    The Settlement Participation Form for each Initial Participating Subdivision in the State has been delivered to Settling Distributors.  As stated in the Settlement Participation Form, and for the avoidance of doubt, nothing in the Settlement

4

Participation Form executed by the Participating Subdivisions is intended to modify in any way the terms of the Agreement to which the Participating Subdivisions agree.  As stated in the Settlement Participation Form, to the extent the executed version of the Settlement Participation Form differs from the Agreement in any respect, the Agreement controls.

d.     Pursuant to Section VIII.B of the Agreement and the Settlement Participation Form, each Participating Subdivision in the State is dismissing with prejudice any Released Claims that it has filed against Settling Distributors and the Released Entities.

11.     <u>Release</u>.  The Parties acknowledge that the Release, which is incorporated by reference herein, is an integral part of this Judgment.  Pursuant to the Agreement and the Release and without limitation and to the maximum extent of the power of the State's Attorney General, Settling Distributors and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (a) the State and its Participating Subdivisions and any of their departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including the State's Attorney General, and any person in her or his official capacity whether elected or appointed to serve any of the foregoing, and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Special Districts in the State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State or any Subdivision in the State, whether or not any of them participate in the Agreement.  Pursuant to the Agreement and the Release and to the maximum extent of the State's power, Settling Distributors and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (1) the State, (2) all past and present executive

5

departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license, and (4) any Participating Subdivision. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Further, the provisions set forth in Section XI of the Agreement are incorporated by reference into this Judgment as if fully set forth herein. The Parties acknowledge, and the Court finds, that those provisions are an integral part of the Agreement and this Judgment, and shall govern the rights and obligations of all participants in the settlement. Any modification of those rights and obligations may be made based only on a writing signed by all affected parties and approved by the Court.

12. <u>Release of Unknown Claims.</u> The State expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

13. The State may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State expressly waived and fully, finally, and forever settled, released and discharged, through the Agreement and Release, any and all Released Claims that may exist as of the Effective Date but which the State

does not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would have materially affected the State's decision to enter into the Agreement.

14.    <u>Costs and Fees.</u>  The Parties will each bear their own costs and attorneys' fees except as otherwise provided in the Agreement.

15.    <u>No Admission of Liability</u>.  Settling Distributors are consenting to this Judgment solely for the purpose of effectuating the Agreement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Settling Distributors expressly deny.  No Settling Distributor or Released Entity admits that it caused or contributed to any public nuisance, and no Settling Distributor or Released Entity admits any wrongdoing that was or could have been alleged by the State, its Participating Subdivisions, or any other person or entity.  No part of this Judgment shall constitute evidence of any liability, fault, or wrongdoing by Settling Distributors or any other Released Entity.  The Parties acknowledge that payments made under the Agreement are not a fine, penalty, or payment in lieu thereof and are properly characterized as described in Section V.F of the Agreement.

16.    <u>No Waiver</u>.  This Judgment is entered based on the Agreement without trial or adjudication of any contested issue of fact or law or finding of liability of any kind.  This Judgment shall not be construed or used as a waiver of any Settling Distributor's rights, or any other Released Entity's right, to defend itself from, or make any arguments in, any other regulatory, governmental, private individual, or class claims or suits relating to the subject matter or terms of this Judgment. Notwithstanding the foregoing, the State may enforce the terms of this Judgment as expressly provided in the Agreement.

7

17.    No Private Right of Action.  This Judgment is not intended for use by any third party for any purpose, including submission to any court for any purpose, except pursuant to Section VI.A of the Agreement.  Except as expressly provided in the Agreement, no portion of the Agreement or this Judgment shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or Released Entity.  The State shall allow Participating Subdivisions in the State to notify it of any perceived violations of the Agreement or this Judgment.  No Settling State, including the State, may assign or otherwise convey any right to enforce any provision of the Agreement.

18.    Admissibility.  It is the intent of the Parties that this Judgment not be admissible in other cases against Settling Distributors or binding on Settling Distributors in any respect other than in connection with the enforcement of this Judgment or the Agreement.  For the avoidance of doubt, nothing herein shall prohibit Settling Distributors from entering this Judgment or the Agreement into evidence in any litigation or arbitration concerning (1) Settling Distributors' right to coverage under an insurance contract or (2) the enforcement of the releases provided for by the Agreement and this Judgment.

19.    Preservation of Privilege.  Nothing contained in the Agreement or this Judgment, and no act required to be performed pursuant to the Agreement or this Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

20.    Mutual Interpretation.  The Parties agree and stipulate that the Agreement was negotiated on an arm's-length basis between parties of equal bargaining power and was drafted jointly by counsel for each Party.  Accordingly, the Agreement is incorporated herein by reference

8

and shall be mutually interpreted and not construed in favor of or against any Party, except as expressly provided for in the Agreement.

21.     Retention of Jurisdiction.  The Court shall retain jurisdiction of the Parties for the limited purpose of the resolution of disputes identified in Section VI.F.1 of the Agreement.  The Court shall have jurisdiction over Participating Subdivisions in the State for the limited purposes identified in the Agreement.

22.     Successors and Assigns.  This Judgment is binding on each of Settling Distributor's successors and assigns.

23.     Modification.  This Judgment shall not be modified (by the Court, by any other court, or by any other means) without the written consent of the State and Settling Distributors, or as provided for in Section XIV.U of the Agreement.

So ORDERED this _____ day of _____, 2022.

ORIGINAL SIGNED

MAY 0 4 2022

KIMBERLY SHARPE BYRD
CIRCUIT JUDGE

_____
Honorable Kimberly Sharpe Byrd
Circuit Court Judge

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:


**MCKESSON CORPORATION**


By:  */s/ Spencer H. Silverglate*
Spencer H. Silverglate
Florida Bar No. 769223
CLARKE SILVERGLATE, P.A.
799 Brickell Plaza, Suite 900
Miami, FL 33131
ssilverglate@cspalaw.com
Telephone: (305) 377-0700
Facsimile: (305) 377-3001
Date: April 25, 2022


**CARDINAL HEALTH, INC.**


By: */s/  Michael S. Vitale*
Michael S. Vitale, Esq.
Florida Bar No. 17136
Primary Email: mvitale@bakerlaw.com
Secondary Email:  pkenaley@bakerlaw.com
  orlbakerdocket@bakerlaw.com
Lindy K. Keown, Esq.
Florida Bar No. 117888
Primary Email: lkeown@bakerlaw.com
Secondary Email: lbonvissuto@bakerlaw.com
BAKER & HOSTETLER LLP
SunTrust Center, Suite 2300
200 South Orange Avenue
Post Office Box 112
Orlando, Florida  32802-0112
Telephone:  407-649-4000
Facsimile:  407-841-0168


Date: March 25, 2022

10

**AMERISOURCEBERGEN CORPORATION
AND AMERISOURCEBERGEN DRUG
CORPORATION**

By: */s/ Steven C. Pratico*
Steven C. Pratico, Esq.
BUCHANAN INGERSOLL & ROONEY PC
401 E. Jackson Street, Suite 2400
Tampa, Florida 33602
Tel.: (813) 222-8180
Fla. Bar No. 539201
Email: steven.pratico@bipc.com
Secondary email: kara.bernstein@bipc.com

Date: April 26, 2022

**THE STATE OF FLORIDA**
**ASHLEY MOODY**
**Attorney General**

By: _____

Name: John Guard
       Chief Deputy Attorney General

Date: 4/26/22

## STATE OUTSIDE LITIGATION COUNSEL

**Kellogg, Hansen, Todd, Figel & Frederick,**
** P.L.L.C.**

By: _____

Name:  David C. Frederick

Date: May 3, 2022

**Drake Martin Law Firm, LLC**

By: _____

Name:  Drake Martin

Date:  May 4, 2022

## EXHIBIT A

## DISTRIBUTOR SETTLEMENT AGREEMENT

FINAL AGREEMENT 3.25.22

# DISTRIBUTOR SETTLEMENT AGREEMENT

# Table of Contents

**Page**

I.     Definitions ........................................................................................................ 1

II.    Participation by States and Condition to Preliminary Agreement ..................................... 13

III.   Injunctive Relief ............................................................................................. 13

IV.   Settlement Payments ....................................................................................... 13

V.    Allocation and Use of Settlement Payments ........................................................... 28

VI.   Enforcement ................................................................................................. 34

VII.  Participation by Subdivisions ............................................................................. 40

VIII. Condition to Effectiveness of Agreement and Filing of Consent Judgment ..................... 42

IX.   Additional Restitution ..................................................................................... 44

X.    Plaintiffs' Attorneys' Fees and Costs ................................................................... 44

XI.   Release ...................................................................................................... 44

XII.  Later Litigating Subdivisions ............................................................................. 49

XIII. Reductions/Offsets ......................................................................................... 53

XIV. Miscellaneous .............................................................................................. 54

EXHIBIT A Alleged Harms .................................................................................. A-1

EXHIBIT B Enforcement Committee Organizational Bylaws ........................................... B-1

EXHIBIT C Litigating Subdivisions List .................................................................. C-1

EXHIBIT D Later Litigating Subdivision Suspension and Offset Determinations .................... D-1

EXHIBIT E List of Opioid Remediation Uses ............................................................ E-1

EXHIBIT F List of States and Overall Allocation Percentages .......................................... F-1

EXHIBIT G Subdivisions Eligible to Receive Direct Allocations from the Subdivision
          Fund and Default Subdivision Fund Allocation Percentages ........................... G-1

EXHIBIT H Participation Tier Determination[1] ........................................................... H-1

EXHIBIT I Primary Subdivisions .......................................................................... I-1

FINAL AGREEMENT 3.25.22

EXHIBIT J Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities ......... J-1

EXHIBIT K Subdivision Settlement Participation Form ................................................................ K-1

EXHIBIT L Settlement Fund Administrator ................................................................................... L-1

EXHIBIT M Settlement Payment Schedule ................................................................................... M-1

EXHIBIT N Additional Restitution Amount Allocation ................................................................ N-1

EXHIBIT O Adoption of a State-Subdivision Agreement ............................................................. O-1

EXHIBIT P Injunctive Relief ......................................................................................................... P-1

EXHIBIT Q Illustrative Examples of Prepayments ....................................................................... Q-1

EXHIBIT R Agreement on Attorneys' Fees, Expenses and Costs ................................................ R-1

EXHIBIT S Agreement on the State Outside Counsel Fee Fund .................................................. S-1

EXHIBIT T Agreement on the State Cost Fund Administration ................................................... T-1

EXHIBIT U ABC IRS Form 1098-F ............................................................................................. U-1

EXHIBIT V Cardinal IRS Form 1098-F ....................................................................................... V-1

EXHIBIT W McKesson IRS Form 1098-F ................................................................................... W-1

EXHIBIT X Severity Factors ......................................................................................................... X-1

## DISTRIBUTOR SETTLEMENT AGREEMENT

This Settlement Agreement, dated as of July 21, 2021 (the "*Agreement*"), sets forth the terms of settlement between and among the Settling States, the Settling Distributors, and the Participating Subdivisions (as those terms are defined below).  Upon satisfaction of the conditions set forth in Section II and Section VIII, this Agreement will be binding on all Settling States, Settling Distributors, and Participating Subdivisions.  This Agreement will then be filed as part of Consent Judgments in the respective courts of each of the Settling States, pursuant to the terms set forth in Section VIII.

I.      **Definitions**

         For all sections of this Agreement except Exhibit E and Exhibit P, the following definitions apply:

         A.       "*Abatement Accounts Fund.*"  The component of the Settlement Fund described in Section V.E.

         B.       "*Additional Restitution Amount.*"  The amount available to Settling States listed on Exhibit N totaling $282,692,307.70.

         C.       "*Agreement.*"  This agreement, as set forth above.  For the avoidance of doubt, this Agreement is inclusive of all exhibits.

         D.       "*Alleged Harms.*"  The alleged past, present, and future financial, societal, and public nuisance harms and related expenditures arising out of the alleged misuse and abuse of Products, non-exclusive examples of which are described in the documents listed on Exhibit A, that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by the Settling Distributors.

         E.       "*Allocation Statute.*"  A state law that governs allocation, distribution, and/or use of some or all of the Settlement Fund amounts allocated to that State and/or its Subdivisions. In addition to modifying the allocation set forth in Section V.D.2, an Allocation Statute may, without limitation, contain a Statutory Trust, further restrict expenditures of funds, form an advisory committee, establish oversight and reporting requirements, or address other default provisions and other matters related to the funds.  An Allocation Statute is not required to address all three (3) types of funds comprising the Settlement Fund or all default provisions.

         F.       "*Annual Payment.*"  The total amount payable to the Settlement Fund Administrator by the Settling Distributors on the Payment Date each year, as calculated by the Settlement Fund Administrator pursuant to Section IV.B.1.e.  For the avoidance of doubt, this term does not include the Additional Restitution Amount or amounts paid pursuant to Section X.

         G.       "*Appropriate Official.*"  As defined in Section XIV.F.3.

         H.       "*Bankruptcy Code.*"  Title 11 of the United States Code, 11 U.S.C. § 101, et seq.

I.     *"Bar."* Either: (1) a law barring Subdivisions in a State from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full) or (2) a ruling by the highest court of the State (or, in a State with a single intermediate court of appeals, the intermediate court of appeals when not subject to further review by the highest court of the State) setting forth the general principle that Subdivisions in the State may not maintain any Released Claims against Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from the Annual Payments by Settling Distributors under this Agreement) shall not constitute a Bar.

J.     *"Case-Specific Resolution."* Either: (1) a law barring the Subdivision at issue from maintaining any Released Claims against any Released Entities (either through a direct bar or through a grant of authority to release claims and the exercise of such authority in full); or (2) a ruling by a court of competent jurisdiction over the Subdivision at issue that the Subdivision may not maintain any Released Claims at issue against any Released Entities, whether on the ground of this Agreement (or the release in it) or otherwise. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from the Annual Payments by Settling Distributors under this Agreement) shall not constitute a Case-Specific Resolution.

K.     *"Claim."* Any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

L.     *"Claim-Over."* A Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

M.     *"Compensatory Restitution Amount."* The aggregate amount paid or incurred by the Settling Distributors hereunder other than amounts paid as attorneys' fees and costs or identified pursuant to <u>Section V.B.2</u> as being used to pay attorneys' fees, investigation costs or litigation costs.

N.    *"Consent Judgment."* A state-specific consent judgment in a form to be agreed by the Settling States and the Settling Distributors prior to the Initial Participation Date that, among other things, (1) approves this Agreement and (2) provides for the release set forth in Section XI.A, including the dismissal with prejudice of any Released Claims that the Settling State has brought against Released Entities.

O.    *"Covered Conduct."* Any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Reference Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (1) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (2) the characteristics, properties, risks, or benefits of any Product; (3) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders placed with any Released Entity; or (4) diversion control programs or suspicious order monitoring; *provided, however,* that as to any Claim that a Releasor has brought or could bring, Covered Conduct does not include non-compliance with statutory or administrative supply security standards concerning cleanliness of facilities or stopping counterfeit products, so long as such standards apply to the storage and distribution of both controlled and non-controlled pharmaceuticals.

P.    *"Designated State."* New York.

Q.    *"Effective Date."* The date sixty (60) calendar days after the Reference Date.

R.    *"Enforcement Committee."* A committee consisting of representatives of the Settling States and of the Participating Subdivisions. Exhibit B contains the organizational bylaws of the Enforcement Committee. Notice pursuant to Section XIV.Q shall be provided when there are changes in membership or contact information.

S.    *"Final Order."* An order or judgment of a court of competent jurisdiction with respect to the applicable subject matter (1) which has not been reversed or superseded by a modified or amended order, is not currently stayed, and as to which any right to appeal or seek certiorari, review, reargument, stay, or rehearing has expired, and as to which no appeal or petition for certiorari, review, reargument, stay, or rehearing is pending, or (2) as to which an appeal has been taken or petition for certiorari, review, reargument, stay, or rehearing has been filed and (a) such appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay, or rehearing was sought, or (b) the time to appeal further or seek certiorari, review, reargument, stay, or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay, or rehearing is pending.

3

T.      *"Global Settlement Abatement Amount."* The abatement amount of $19,045,384,616.

U.      *"Global Settlement Amount."* The Global Settlement Amount is $21 billion, which shall be divided into the Global Settlement Abatement Amount, the Additional Restitution Amount, and the Global Settlement Attorney Fee Amount.

V.      *"Global Settlement Attorney Fee Amount."* The attorney fee amount of $1,671,923,077.

W.      *"Incentive Payment A."* The incentive payment described in <u>Section IV.F.1</u>.

X.      *"Incentive Payment B."* The incentive payment described in <u>Section IV.F.2</u>.

Y.      *"Incentive Payment C."* The incentive payment described in <u>Section IV.F.3</u>.

Z.      *"Incentive Payment D."* The incentive payment described in <u>Section IV.F.4</u>.

AA.      *"Incentive Payment Final Eligibility Date."* With respect to a Settling State, the date that is the earlier of (1) the fifth Payment Date, (2) the date of completion of opening statements in a trial of any action brought by a Subdivision in that State that includes a Released Claim against a Released Entity when such date is more than two (2) years after the Effective Date, or (3) two (2) years after the Effective Date in the event a trial of an action brought by a Subdivision in that State that includes a Released Claim against a Released Entity began after the Initial Participation Date but before two (2) years after the Effective Date.

BB.      *"Initial Participating Subdivision."* A Subdivision that meets the requirements set forth in <u>Section VII.D</u>.

CC.      *"Initial Participation Date."* January 26, 2022, as extended by written agreement of the Settling Distributors and the Enforcement Committee on December 22, 2021.

DD.      *"Injunctive Relief Terms."* The terms described in <u>Section III</u> and set forth in <u>Exhibit P</u>.

EE.      *"Later Litigating Subdivision."* A Subdivision (or Subdivision official asserting the right of or for the Subdivision to recover for alleged harms to the Subdivision and/or the people thereof) that: (1) first files a lawsuit bringing a Released Claim against a Released Entity after the Trigger Date; or (2) adds a Released Claim against a Released Entity after the Trigger Date to a lawsuit brought before the Trigger Date that, prior to the Trigger Date, did not include any Released Claims against a Released Entity; or (3) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a legislative Bar or legislative Case-Specific Resolution as of the Trigger Date, (b) such legislative Bar or legislative Case-Specific Resolution is subject to a Revocation Event after the Trigger Date, and (c) the earlier of the date of completion of opening statements in a trial in an action brought by a Subdivision in that State that includes a Released Claim against a Released Entity or one hundred eighty (180) days from the Revocation Event passes without a Bar or Case-Specific Resolution being implemented as to that Litigating Subdivision or the Litigating Subdivision's

Released Claims being dismissed; or (4) (a) was a Litigating Subdivision whose Released Claims against Released Entities were resolved by a judicial Bar or judicial Case-Specific Resolution as of the Trigger Date, (b) such judicial Bar or judicial Case-Specific Resolution is subject to a Revocation Event after the Trigger Date, and (c) such Litigating Subdivision takes any action in its lawsuit asserting a Released Claim against a Released Entity other than seeking a stay or dismissal.

FF.    *"Later Participating Subdivision."*  A Participating Subdivision that is not an Initial Participating Subdivision, but meets the requirements set forth in <u>Section VII.E</u>.

GG.    *"Litigating Subdivision."*  A Subdivision (or Subdivision official) that brought any Released Claim against any Released Entity prior to the Trigger Date; *provided, however,* that a Subdivision (or Subdivision official) that is a Prior Litigating Subdivision shall not be considered a Litigating Subdivision.  <u>Exhibit C</u> is an agreed list of all Litigating Subdivisions. <u>Exhibit C</u> will be updated (including with any corrections) periodically, and a final version of <u>Exhibit C</u> will be attached hereto as of the Reference Date.

HH.    *"National Arbitration Panel."*  The panel comprised as described in <u>Section VI.F.2.b</u>.

II.    *"National Disputes."*  As defined in <u>Section VI.F.2.a</u>.

JJ.    *"Net Abatement Amount."*  The Global Settlement Abatement Amount as reduced by the Tribal/W. Va. Subdivision Credit.

KK.    *"Net Settlement Prepayment Amount."*  As defined in <u>Section IV.J.1</u>.

LL.    *"Non-Litigating Subdivision."*  Any Subdivision that is neither a Litigating Subdivision nor a Later Litigating Subdivision.

MM.    *"Non-Participating Subdivision."*  Any Subdivision that is not a Participating Subdivision.

NN.    *"Non-Party Covered Conduct Claim."*  A Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

OO.    *"Non-Party Settlement."*  A settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

PP.    *"Non-Released Entity."*  An entity that is not a Released Entity.

QQ.    *"Non-Settling State."*  Any State that is not a Settling State.

RR.    *"Offset Cap."*  The per-State dollar amount which the dollar-for-dollar offset described in <u>Section XII.A</u> cannot exceed in a Payment Year, to be calculated by multiplying the amount of the relevant Annual Payment apportioned to the State and to its Subdivisions for that Payment Year by the percentage for the applicable Participation Tier as set forth in <u>Exhibit D</u>.

SS.　　　*"Opioid Remediation."* Care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures[1] except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of, including on those injured as a result of, the opioid epidemic. Exhibit E provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

TT.　　　*"Opioid Tax."* Any tax, assessment, license fee, surcharge or any other fee (other than a fixed prospective excise tax or similar tax or fee that has no restriction on pass-through) imposed by a State on a Settling Distributor on the sale, transfer or distribution of opioid products; *provided, however,* that neither the Excise Tax on sale of Opioids, Article 20-D of New York's Tax Law nor the Opioid Stewardship Act, Article 33, Title 2-A of New York's Public Health Law shall be considered an Opioid Tax for purposes of this Agreement.

UU.　　　*"Overall Allocation Percentage."* A Settling State's percentage as set forth in Exhibit F. The aggregate Overall Allocation Percentages of all States (including Settling States and Non-Settling States) shall equal one hundred percent (100%).

VV.　　　*"Participating Subdivision."* Any Subdivision that meets the requirements for becoming a Participating Subdivision under Section VII.B and Section VII.C. Participating Subdivisions include both Initial Participating Subdivisions and Later Participating Subdivisions.

WW.　　　*"Participation Tier."* The level of participation in this Agreement as determined pursuant to Section VIII.C using the criteria set forth in Exhibit H.

XX.　　　*"Parties."* The Settling Distributors and the Settling States (each, a *"Party"*).

YY.　　　*"Payment Date."* The date on which the Settling Distributors make the Annual Payment pursuant to Section IV.B.

ZZ.　　　*"Payment Year."* The calendar year during which the applicable Annual Payment is due pursuant to Section IV.B. Payment Year 1 is 2021, Payment Year 2 is 2022 and so forth. References to payment *"for a Payment Year"* mean the Annual Payment due during that year. References to eligibility *"for a Payment Year"* mean eligibility in connection with the Annual Payment due during that year.

AAA.　　　*"Preliminary Agreement Date."* The date on which the Settling Distributors are to inform the Settling States of their determination whether the condition in Section II.B has been satisfied. The Preliminary Agreement Date shall be no more than fourteen (14) calendar days after the end of the notice period to States, unless it is extended by written agreement of the Settling Distributors and the Enforcement Committee.

BBB.　　　*"Prepayment Notice."* As defined in Section IV.J.1.

---

[1] Reimbursement includes amounts paid to any governmental entities for past expenditures or programs.

CCC.    "*Primary Subdivision.*"  A Subdivision that is a General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government) with population over 10,000; *provided, however*, that as used in connection with Incentive Payment C, the population threshold is 30,000.  Attached as <u>Exhibit I</u> is an agreed list of the Primary Subdivisions in each State.

DDD.    "*Prior Litigating Subdivision*"  A Subdivision (or Subdivision official) that brought any Released Claim against any Released Entity prior to the Trigger Date and all such Released Claims were separately settled or finally adjudicated prior to the Trigger Date; *provided, however*, that if the final adjudication was pursuant to a Bar, such Subdivision shall not be considered a Prior Litigating Subdivision.  Notwithstanding the prior sentence, the Settling Distributors and the Settling State of the relevant Subdivision may agree in writing that the Subdivision shall not be considered a Prior Litigating Subdivision.

EEE.    "*Product.*"  Any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is:  (1) an opioid or opiate, as well as any product containing any such substance; or (2) benzodiazepine, carisoprodol, or gabapentin; or (3) a combination or "cocktail" of chemical substances prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates.  "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, or any variant of these substances or any similar substance.  Notwithstanding the foregoing, nothing in this section prohibits a Settling State from taking administrative or regulatory action related to benzodiazepine (including, but not limited to, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, and midazolam), carisoprodol, or gabapentin that is wholly independent from the use of such drugs in combination with opioids, *provided* such action does not seek money (including abatement and/or remediation) for conduct prior to the Effective Date.

FFF.    "*Reference Date.*"  The date on which the Settling Distributors are to inform the Settling States of their determination whether the condition in <u>Section VIII</u> has been satisfied. The Reference Date shall be no later than thirty (30) calendar days after the Initial Participation Date, unless it is extended by written agreement of the Settling Distributors and the Enforcement Committee.

GGG.    "*Released Claims.*"  Any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Reference Date.  Without limiting the foregoing, Released Claims include any Claims that have been asserted against a Settling Distributor by any Settling State or Litigating Subdivision in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of, or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by a State, Subdivision, or Releasor (whether or not

7

such State, Subdivision, or Releasor has brought such action or proceeding).  Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to this Agreement, whether or not such claims relate to Covered Conduct.  The Parties intend that this term, "Released Claims," be interpreted broadly.  This Agreement does not release Claims by private individuals.  It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law.  Released Claims is also used herein to describe claims brought by a Later Litigating Subdivision or other non-party Subdivision that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

HHH.       *"Released Entities."*  With respect to Released Claims, the Settling Distributors and (1) all past and present subsidiaries, divisions, predecessors, successors, and assigns (in each case, whether direct or indirect) of each Settling Distributor; (2) all past and present subsidiaries and divisions (in each case, whether direct or indirect) of any entity described in subsection (1); (3) the respective past and present officers, directors, members, trustees, and employees of any of the foregoing (each for actions that occurred during and related to their work for, or employment with, any of the Settling Distributors or the foregoing entities); (4) all past and present joint ventures (whether direct or indirect) of each Settling Distributor or its subsidiaries, including in any Settling Distributor or subsidiary's capacity as a participating member in such joint venture; (5) all direct or indirect parents and shareholders of the Settling Distributors (solely in their capacity as parents or shareholders of the applicable Settling Distributor with respect to Covered Conduct); and (6) any insurer of any Settling Distributor or any person or entity otherwise described in subsections (1)-(5) (solely in its role as insurer of such person or entity and subject to the last sentence of Section XI.C).  Any person or entity described in subsections (3)-(6) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity.  For the avoidance of doubt, CVS Health Corp., Walgreens Boots Alliance, Inc., and Walmart Inc. (collectively, the *"Pharmacies"*) are not Released Entities, nor are their direct or indirect past or present subsidiaries, divisions, predecessors, successors, assigns, joint ventures, shareholders, officers, directors, members, trustees, or employees (shareholders, officers, directors, members, trustees, and employees for actions related to their work for, employment with, or involvement with the Pharmacies) Released Entities.  Notwithstanding the prior sentence, any joint venture or past or present subsidiary of a Settling Distributor is a Released Entity, including any joint venture between a Settling Distributor or any Settling Distributor's subsidiary and a Pharmacy (or any subsidiary of a Pharmacy); *provided, however,* that any joint venture partner of a Settling Distributor or a Settling Distributor's subsidiary is not a Released Entity unless it falls within subsections (1)-(6) above.  Lists of Settling Distributors' subsidiaries, joint ventures, and predecessor entities are appended to this Agreement as Exhibit J.  With respect to joint ventures (including predecessor entities), only entities listed on Exhibit J are Released Entities.  With respect to wholly-owned subsidiaries (including predecessor entities), Exhibit J represents a good faith effort by the Settling Distributors to list all such entities, but any and all wholly-owned subsidiaries (including predecessor entities) of any Settling Distributor are Released Entities, whether or not they are listed on Exhibit J.  For the avoidance of doubt, any entity acquired, or joint venture entered into, by a Settling Distributor after the Reference Date is not a Released Entity.

III.       *"Releasors."*  With respect to Released Claims, (1) each Settling State; (2) each Participating Subdivision; and (3) without limitation and to the maximum extent of the

power of each Settling State's Attorney General and/or Participating Subdivision to release Claims, (a) the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts in a Settling State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in this Agreement.  The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision.  Each Settling State's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Participation Date) the authority set forth in Section XI.G.  In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Subdivision Settlement Participation Form referenced in Section VII providing for a release to the fullest extent of the Participating Subdivision's authority.

JJJ.     "*Revocation Event*."  With respect to a Bar, Settlement Class Resolution, or Case-Specific Resolution, a revocation, rescission, reversal, overruling, or interpretation that in any way limits the effect of such Bar, Settlement Class Resolution, or Case-Specific Resolution on Released Claims, or any other action or event that otherwise deprives the Bar, Settlement Class Resolution, or Case-Specific Resolution of force or effect in any material respect.

KKK.     "*Settlement Class Resolution*."  A class action resolution in a court of competent jurisdiction in a Settling State (that is not successfully removed to federal court) with respect to a class of Subdivisions in that State that (1) conforms with that Settling State's statutes, case law, and rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in that State and such order has become a Final Order; (3) is binding on all Non-Participating Subdivisions in that State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Subdivisions may not bring any Released Claims against any Released Entities, whether on the ground of this Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Settling Distributors other than those provided for in this Agreement, or contain any provision inconsistent with any provision of this Agreement.  If applicable state law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Subdivisions collectively representing more than one percent (1%) of the total population of that State opt out. In seeking certification of any Settlement Class, the applicable State and Participating Subdivisions shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case or for purposes unrelated to this Agreement.

LLL.     "*Settlement Fund*."  The interest-bearing fund established pursuant to this Agreement into which the Annual Payments are made under Section IV.

MMM.    "*Settlement Fund Administrator.*"  The entity that annually determines the Annual Payment (including calculating Incentive Payments pursuant to Section IV and any amounts subject to suspension, offset, or reduction pursuant to Section XII and Section XIII), annually determines the Participation Tier pursuant to Section VIII.C, administers the Settlement Fund, and distributes amounts into the Abatement Accounts Fund, State Fund, and Subdivision Fund pursuant to this Agreement.  The duties of the Settlement Fund Administrator shall be governed by this Agreement.  Prior to the Initial Participation Date, the Settling Distributors and the Enforcement Committee shall agree to selection and removal processes for and the identity of the Settlement Fund Administrator, and a detailed description of the Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Settlement Fund Administrator's fees and costs, all of which shall be appended to the Agreement as Exhibit L.

NNN.    "*Settlement Fund Escrow.*"  The interest-bearing escrow fund established pursuant to this Agreement to hold disputed or suspended payments made under this Agreement, and to hold the first Annual Payment until the Effective Date.

OOO.    "*Settlement Payment Schedule.*"  The schedule attached to this Agreement as Exhibit M.

PPP.    "*Settlement Prepayment.*"  As defined in Section IV.J.1.

QQQ.    "*Settlement Prepayment Reduction Schedule.*"  As defined in Section IV.J.1.

RRR.    "*Settling Distributors.*"  McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation (each, a "*Settling Distributor*").

SSS.    "*Settling State.*"  A State that has entered into this Agreement with all Settling Distributors and delivers executed releases in accordance with Section VIII.A.

TTT.    "*State.*"  With the exception of West Virginia, which has addressed its claims separately and is excluded from participation in this Agreement, the states, commonwealths, and territories of the United States of America, as well as the District of Columbia.  The 55 States are listed in Exhibit F.  Additionally, the use of non-capitalized "state" to describe something (*e.g.*, "state court") shall also be read to include parallel entities in commonwealths, territories, and the District of Columbia (*e.g.*, "territorial court").

UUU.    "*State Fund.*"  The component of the Settlement Fund described in Section V.C.

VVV.    "*State-Subdivision Agreement.*"  An agreement that a Settling State reaches with the Subdivisions in that State regarding the allocation, distribution, and/or use of funds allocated to that State and to its Subdivisions.  A State-Subdivision Agreement shall be effective if approved pursuant to the provisions of Exhibit O or if adopted by statute.  Preexisting agreements addressing funds other than those allocated pursuant to this Agreement shall qualify if the approval requirements of Exhibit O are met.  A State and its Subdivisions may revise a State-Subdivision Agreement if approved pursuant to the provisions of Exhibit O, or if such revision is adopted by statute.

WWW.    "*Statutory Trust*."  A trust fund established by state law to receive funds allocated to a Settling State's Abatement Accounts Fund and restrict any expenditures made using funds from such Settling State's Abatement Accounts Fund to Opioid Remediation, subject to reasonable administrative expenses.  A State may give a Statutory Trust authority to allocate one (1) or more of the three (3) types of funds comprising such State's Settlement Fund, but this is not required.

XXX.    "*Subdivision*."  Any (1) General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entities that provide municipal-type government), School District, or Special District within a State, and (2) any other subdivision or subdivision official or sub-entity of or located within a State (whether political, geographical or otherwise, whether functioning or non-functioning, regardless of population overlap, and including, but not limited to, Nonfunctioning Governmental Units and public institutions) that has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity.  "General Purpose Government," "School District," and "Special District" shall correspond to the "five basic types of local governments" recognized by the U.S. Census Bureau and match the 2017 list of Governmental Units.[2]  The three (3) General Purpose Governments are county, municipal, and township governments; the two (2) special purpose governments are School Districts and Special Districts.[3]  "Fire District," "Health District," "Hospital District," and "Library District" shall correspond to categories of Special Districts recognized by the U.S. Census Bureau.[4]  References to a State's Subdivisions or to a Subdivision "in," "of," or "within" a State include Subdivisions located within the State even if they are not formally or legally a sub-entity of the State; *provided*, *however*, that a "Health District" that includes any of the following words or phrases in its name shall not be considered a Subdivision:  mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

YYY.    "*Subdivision Allocation Percentage*."  The portion of a Settling State's Subdivision Fund set forth in Exhibit G that a Subdivision will receive pursuant to Section V.C or Section V.D if it becomes a Participating Subdivision.  The aggregate Subdivision Allocation Percentage of all Subdivisions receiving a Subdivision Allocation Percentage in each State shall equal one hundred percent (100%).  Immediately upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement,

---

[2] https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html

[3] *E.g.*, U.S. Census Bureau, "Technical Documentation:  2017 Public Use Files for State and Local Government Organization" at 7 (noting that "the Census Bureau recognizes five basic types of local governments," that three of those are "general purpose governments" (county governments, municipal governments, and township governments), and that the other two are "school district and special district governments"), https://www2.census.gov/programs-surveys/gus/datasets/2017/2017_gov_org_meth_tech_doc.pdf.

[4] A list of 2017 Government Units provided by the Census Bureau identifies 38,542 Special Districts and categorizes them by "FUNCTION_NAME."  "Govt_Units_2017_Final" spreadsheet, "Special District" sheet, included in "Independent Governments - list of governments with reference information," https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html.  As used herein, "Fire District" corresponds to Special District function name "24 – Local Fire Protection," "Health District" corresponds to Special District function name "32 – Health," "Hospital District" corresponds to Special District function name "40 – Hospitals," and "Library District" corresponds to Special District function name "52 – Libraries."  *See id.*

Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3) that addresses allocation from the Subdivision Fund, or upon any, whether before or after the Initial Participation Date, Exhibit G will automatically be amended to reflect the allocation from the Subdivision Fund pursuant to the State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3. The Subdivision Allocation Percentages contained in Exhibit G may not change once notice is distributed pursuant to Section VII.A, except upon the effectiveness of any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3 (or upon the effectiveness of an amendment to any State-Subdivision Agreement, Allocation Statute, Statutory Trust, or voluntary redistribution allowed by Section V.D.3) that addresses allocation from the Subdivision Fund. For the avoidance of doubt, no Subdivision not listed on Exhibit G shall receive an allocation from the Subdivision Fund and no provision of this Agreement shall be interpreted to create such an entitlement.

ZZZ. "*Subdivision Fund.*" The component of the Settlement Fund described in Section V.C.

AAAA. "*Subdivision Settlement Participation Form.*" The form attached as Exhibit K that Participating Subdivisions must execute and return to the Settlement Fund Administrator.

BBBB. "*Suspension Amount.*" The amount calculated as follows: the per capita amount corresponding to the applicable Participation Tier as set forth in Exhibit D multiplied by the population of the Later Litigating Subdivision.

CCCC. "*Suspension Cap.*" The amount calculated as follows: the suspension percentage corresponding to the applicable Participation Tier as set forth in Exhibit D multiplied by the amount of the relevant Annual Payment apportioned to the State of the Later Litigating Subdivision and to Subdivisions in that State in each year of the suspension.

DDDD. "*Suspension Deadline.*" With respect to a lawsuit filed by a Later Litigating Subdivision asserting a Released Claim, the deadline set forth in Exhibit D corresponding to the applicable Participation Tier.

EEEE. "*Threshold Motion.*" A motion to dismiss or equivalent dispositive motion made at the outset of litigation under applicable procedure. A Threshold Motion must include as potential grounds for dismissal any applicable Bar or the relevant release by a Settling State or Participating Subdivision provided under this Agreement and, where appropriate under applicable law, any applicable limitations defense.

FFFF. "*Tribal/W. Va. Subdivision Credit.*" The Tribal/W. Va. Subdivision Credit shall equal 2.58% of the Global Settlement Abatement Amount.

GGGG. "*Trigger Date.*" In the case of a Primary Subdivision, the Reference Date. In the case of all other Subdivisions, the Preliminary Agreement Date.

## II. Participation by States and Condition to Preliminary Agreement

A.  *Notice to States*.  On July 22, 2021 this Agreement shall be distributed to all States.  The States' Attorneys General shall then have a period of thirty (30) calendar days to decide whether to become Settling States.  States that determine to become Settling States shall so notify the National Association of Attorneys General and Settling Distributors and shall further commit to obtaining any necessary additional State releases prior to the Reference Date. This notice period may be extended by written agreement of the Settling Distributors and the Enforcement Committee.

B.  *Condition to Preliminary Agreement*.  Following the notice period set forth in Section II.A above, the Settling Distributors shall determine on or before the Preliminary Agreement Date whether, in their sole discretion, enough States have agreed to become Settling States to proceed with notice to Subdivisions as set forth in Section VII below.  If the Settling Distributors determine that this condition has been satisfied, and that notice to the Litigating Subdivisions should proceed, they will so notify the Settling States by providing notice to the Enforcement Committee and Settlement Fund Administrator on the Preliminary Agreement Date.  If the Settling Distributors determine that this condition has not been satisfied, they will so notify the Settling States by providing notice to the Enforcement Committee and Settlement Fund Administrator, and this Agreement will have no further effect and all releases and other commitments or obligations contained herein will be void.

C.  *Later Joinder by States*.  After the Preliminary Agreement Date, a State may only become a Settling State with the consent of the Settling Distributors, in their sole discretion.  If a State becomes a Settling State more than sixty (60) calendar days after the Preliminary Agreement Date, but on or before January 1, 2022, the Subdivisions in that State that become Participating Subdivisions within ninety (90) calendar days of the State becoming a Settling State shall be considered Initial Participating Subdivsions.  A State may not become a Settling State after January 1, 2022.

D.  *Litigation Activity*.  Following the Preliminary Agreement Date, States that determine to become Settling States shall make best efforts to cease litigation activity against Settling Distributors, including by jointly seeking stays or severance of claim against the Settling Distributors, where feasible, and otherwise to minimize such activity by means of agreed deadline extensions and agreed postponement of depositions, document productions, and motion practice if a motion to stay or sever is not feasible or is denied.

## III. Injunctive Relief

A.  *Injunctive Relief*.  As part of the Consent Judgment, the Parties agree to the entry of the injunctive relief terms attached in Exhibit P.

## IV. Settlement Payments

A.  *Settlement Fund*.  All payments under this Section IV shall be made into the Settlement Fund, except that, where specified, they shall be made into the Settlement Fund Escrow.  The Settlement Fund shall be allocated and used only as specified in Section V.

B.     *Annual Payments*.  The Settling Distributors shall make eighteen (18) Annual Payments, each comprised of base and incentive payments as provided in this Section IV, as well as fifty percent (50%) of the amount of any Settlement Fund Administrator costs and fees that exceed the available interest accrued in the Settlement Fund as provided in Section V.C.5, and as determined by the Settlement Fund Administrator as set forth in this Agreement.

1.     All data relevant to the determination of the Annual Payment and allocations to Settling States and their Participating Subdivisions listed on Exhibit G shall be submitted to the Settlement Fund Administrator no later than sixty (60) calendar days prior to the Payment Date for each Annual Payment.  The Settlement Fund Administrator shall then determine the Annual Payment, the amount to be paid to each Settling State and its Participating Subdivisions included on Exhibit G, and the amount of any Settlement Fund Administrator costs and fees, all consistent with the provisions in Exhibit L, by:

a.     determining, for each Settling State, the amount of base and incentive payments to which the State is entitled by applying the criteria under Section IV.D, Section IV.E, and Section IV.F;

b.     applying any suspensions, offsets, or reductions as specified under Section IV, Section XII, and Section XIII;

c.     applying any adjustment required as a result of prepayment or significant financial constraint, as specified under Section IV.J and Section IV.K;

d.     determining the amount of any Settlement Fund Administrator costs and fees that exceed the available interest accrued in the Settlement Fund, as well as the amounts, if any, of such costs and fees owed by Settling Distributors and out of the Settlement Fund pursuant to Section V.C.5;

e.     determining the total amount owed by Settling Distributors (including any amounts to be held in the Settlement Fund Escrow pending resolution of a case by a Later Litigating Subdivision as described in Section XII) to all Settling States and the Participating Subdivisions listed on Exhibit G; and

f.     the Settlement Fund Administrator shall then allocate, after subtracting the portion of any Settlement Fund Administrator costs and fees owed out of funds from the Settlement Fund pursuant to Section V.C.5, the Annual Payment pursuant to Section V.C and Section V.D among the Settling States, among the separate types of funds for each Settling State (if applicable), and among the Participating Subdivisions listed on Exhibit G.

2.     The Settlement Fund Administrator shall also apply the allocation percentages set forth in Section IV.I and determine for each Settling Distributor the amount of its allocable share of the Annual Payment.  For the avoidance of doubt, each Settling Distributor's liability for its share of the Annual Payment is several, and not joint.

3.      As soon as possible, but no later than fifty (50) calendar days prior to the Payment Date for each Annual Payment and following the determination described in Section IV.B.1 and Section IV.B.2, the Settlement Fund Administrator shall give notice to the Settling Distributors, the Settling States, and the Enforcement Committee of the amount of the Annual Payment (including the amount of the Settlement Fund to be allocated to the Settlement Fund Administrator in costs and fees pursuant to Section V.C.5), the amount to be received by each Settling State, the amount to be received by the separate types of funds for each Settling State (if applicable), and the amount to be received by each Settling State's Participating Subdivisions listed on Exhibit G.  The Settlement Fund Administrator shall also give notice to each Settling Distributor of the amount of its allocable share of the Annual Payment, including its allocable share of the amount of any Settlement Fund Administrator costs and fees that exceed the available interest accrued in the Settlement Fund pursuant to Section V.C.5.

4.      Within twenty-one (21) calendar days of the notice provided by the Settlement Fund Administrator, any party may dispute, in writing, the calculation of the Annual Payment (including the amount allocated for Settlement Fund Administrator costs and fees), or the amount to be received by a Settling State and/or its Participating Subdivisions listed on Exhibit G.  Such disputing party must provide a written notice of dispute to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and the Settling Distributors identifying the nature of the dispute, the amount of money that is disputed, and the Settling State(s) affected.

5.      Within twenty-one (21) calendar days of the sending of a written notice of dispute, any affected party may submit a response, in writing, to the Settlement Fund Administrator, the Enforcement Committee, any affected Settling State, and the Settling Distributors identifying the basis for disagreement with the notice of dispute.

6.      If no response is filed, the Settlement Fund Administrator shall adjust the amount calculated consistent with the written notice of dispute, and each Settling Distributor shall pay its allocable share of the adjusted amount, collectively totaling that year's Annual Payment, on the Payment Date.  If a written response to the written notice of dispute is timely sent to the Settlement Fund Administrator, the Settlement Fund Administrator shall notify the Settling Distributors of the preliminary amount to be paid, which shall be the greater of the amount originally calculated by the Settling Administrator or the amount that would be consistent with the notice of dispute, *provided*, *however*, that in no circumstances shall the preliminary amount to be paid be higher than the maximum amount of Base and Incentive Payments A and D for that Payment Year as set forth on Exhibit M.  For the avoidance of doubt, a transfer of suspended payments from the Settlement Fund Escrow pursuant to Section XII.A.2 does not count toward determining whether the amount to be paid is higher than the maximum amount of Base and Incentive Payments A and D for that Payment Year as set forth on Exhibit M.

7.      The Settlement Fund Administrator shall place any disputed amount of the preliminary amount paid by the Settling Distributors into the Settlement Fund Escrow and shall disburse any undisputed amount to each Settling State and its Participating

Subdivisions listed on Exhibit G within fifteen (15) calendar days of the Payment Date or at such later time as directed by each Settling State.

8.    Disputes described in this subsection shall be resolved in accordance with the terms of Section VI.F.

9.    For the avoidance of doubt, no Subdivision not listed on Exhibit G shall receive an allocation from the Subdivision Fund and no provision of this Agreement shall be interpreted to create such an entitlement.

C.    *Procedure for Annual Payment in Payment Years 1 and 2.*  The process described in Section IV.B shall not apply to Payment Years 1 and 2.  The procedure in lieu of Section IV.B.1 for Payment Years 1 and 2 is as set forth below:

1.    The Payment Date for Payment Year 1 is September 30, 2021.  *Provided* that the condition set forth in Section II.B has been satisfied, on or before such date, the Settling Distributors shall pay into the Settlement Fund Escrow the total amount of the base payment, Incentive Payment A for the Settling States (the amount specified in Exhibit M for Payment Year 1 reduced by the allocable share of any Non-Settling States), and the Settling Distributors' allocable share of the amount of any Settlement Fund Administrator costs and fees that exceed the available interest accrued in the Settlement Fund pursuant to Section V.C.5.  In the event that, in accordance with the terms of Section VIII.A, the Settling Distributors determine not to proceed with the Settlement, or the Settlement does not become effective for any other reason, the funds held in the Settlement Fund Escrow shall immediately revert to the Settling Distributors.  If the condition set forth in Section VIII.A is met, the Settlement Fund Administrator shall allocate the Annual Payment, after subtracting the portion of Settlement Fund Administrator costs and fees owed out of funds from the Settlement Fund pursuant to Section V.C.5, pursuant to Section V.C and Section V.D among the Settling States and their Participating Subdivisions listed on Exhibit G.  The portion of any Settlement Fund Administrator costs and fees owed out of funds from the Settlement Fund pursuant to Section V.C.5 shall be available to the Settlement Fund Administrator for the payment of such costs and fees immediately.  The remainder of the Annual Payment for Payment Year 1 shall be transferred by the Settlement Fund Administrator on the Effective Date from the Settlement Fund Escrow to the Settlement Fund and then to each Settling State and to its Initial Participating Subdivisions included on Exhibit G; *provided, however,* that for any Settling State where the Consent Judgment has not been entered as of the Effective Date, the funds allocable to that Settling State and its Participating Subdivisions included on Exhibit G shall not be transferred from the Settlement Fund Escrow or disbursed until ten (10) calendar days after the entry of the Consent Judgment in that State; and, *provided, further,* the Settlement Fund Administrator shall leave in the Settlement Fund Escrow funds allocated to Subdivisions included on Exhibit G that are not Initial Participating Subdivisions.  Should such a Subdivision become a Participating Subdivision between the Initial Participation Date and the Effective Date, the allocation for such Participating Subdivision shall be transferred to the Settlement Fund and paid to the Participating Subdivision at the same time as Initial Participating Subdivisions in that State are paid.

2.      The Payment Date for Payment Year 2 is July 15, 2022.  On or before such date, the Settling Distributors shall pay into the Settlement Fund the total amount of the base payment, Incentive Payment A for the Settling States (the amount specified in Exhibit M for Payment Year 2 reduced by the allocable share of any Non-Settling States), and the Settling Distributors' allocable share of the amount of any Settlement Fund Administrator costs and fees that exceed the available interest accrued in the Settlement Fund pursuant to Section V.C.5.  The portion of any Settlement Fund Administrator costs and fees owed out of funds from the Settlement Fund pursuant to Section V.C.5 shall be available to the Settlement Fund Administrator for the payment of such costs and fees immediately.  The Settlement Fund Administrator shall disburse the remaining amounts to each Settling State and to its Participating Subdivisions included on Exhibit G within fifteen (15) calendar days of the Payment Date or at such later time as directed by each Settling State.  If a Settling State enacts a legislative Bar after the Initial Participation Date, but before July 15, 2022, a Subdivision that meets the requirements for becoming a Participating Subdivision under Section VII prior to July 15, 2022 (but was not an Initial Participating Subdivision) shall be eligible to receive its allocated share (if any) for Payment Year 2, and it shall also receive any amounts allocated to it for Payment Year 1 from the Settlement Fund Escrow.

3.      Any amounts remaining in the Settlement Fund Escrow for allocations to Subdivisions listed on Exhibit G that have not become Participating Subdivisions after all payments for Payment Year 2 are disbursed shall be transferred to the Settlement Fund and disbursed to the appropriate sub-funds in each Settling State pursuant to Section V.D.5.

4.      Any disputes as to the allocation of the Annual Payments in Payment Years 1 and 2 shall be resolved pursuant to the process set forth in Section IV.B.3 through Section IV.B.8, except that in Payment Year 1, the Settlement Fund Administrator shall have until ten (10) calendar days after the Initial Participation Date to give notice of the amount to be received by each Settling State, the amount to be received by the separate types of funds for each Settling State (if applicable), and the amount to be received by each Initial Participating Subdivision in the Settling States that is listed on Exhibit G.

D.      *Payment Date for Subsequent Payment Years.*  The Payment Date for Payment Year 3 and successive Payment Years is July 15 of the third and successive years and the Annual Payment shall be made pursuant to the process set forth in Section IV.B, except that, with respect to Payment Year 3, Settling States shall have up to the Payment Date to become eligible for Incentive Payment A and thus avoid the reductions set forth in Section XIII.  If a Settling State enacts a Bar less than sixty (60) calendar days before the Payment Date for Payment Year 3, each Settling Distributor shall pay, within thirty (30) calendar days of the Payment Year 3 Payment Date, its allocable share, pursuant to Section IV.I, of the difference between the Annual Payment as calculated by the Settlement Fund Administrator and the amount that would have been owed had the Settlement Fund Administrator taken the Bar into account.

E.      *Base Payments.*  Subject to the suspension, reduction, and offset provisions set forth in Section XII and Section XIII, the Settling Distributors shall collectively make base

17

payments equal to fifty-five percent (55%) of the Net Abatement Amount multiplied by the aggregate Overall Allocation Percentage of the Settling States. These payments will be due in installments consistent with Exhibit M over the eighteen (18) Payment Years and as adjusted by the Settlement Fund Administrator pursuant to the provisions in Section IV, Section XII, and Section XIII.

     F.     *Incentive Payments.* Subject to the suspension, offset, and reduction provisions set forth in Section XII and Section XIII, the Settling Distributors shall collectively make potential additional incentive payments totaling up to a maximum of forty-five percent (45%) of the Net Abatement Amount multiplied by the aggregate Overall Allocation Percentage of the Settling States, with the actual amount depending on whether and the extent to which the criteria set forth below are met in each Settling State. The incentive payments shall be divided among four (4) categories, referred to as Incentive Payments A-D. Incentive Payments A-C will be due in installments over the eighteen (18) Payment Years, and Incentive Payment D will be due in installments over thirteen (13) years beginning with Payment Year 6. The total amount of incentive payments in an Annual Payment shall be the sum of the incentive payments for which individual Settling States are eligible for that Payment Year under the criteria set forth below. The incentive payments shall be made with respect to a specific Settling State based on its eligibility for that year under the criteria set forth below.

     1.     Incentive Payment A. Incentive Payment A shall be equal to forty percent (40%) of the Net Abatement Amount multiplied by the aggregate Overall Allocation Percentage of the Settling States, provided all Settling States satisfy the requirements of Incentive Payment A. Incentive Payment A will be due to a Settling State as part of the Annual Payment in each of the eighteen (18) Payment Years that a Settling State is eligible for Incentive Payment A and shall equal a total potential maximum of $7,421,605,477 if all States are eligible for all eighteen (18) Payment Years. Each Settling State's share of Incentive Payment A in a given year, *provided* that Settling State is eligible, shall equal the total maximum amount available for Incentive Payment A for that year as reflected in Exhibit M times the Settling State's Overall Allocation Percentage. Eligibility for Incentive Payment A is as follows:

     a.     For the Payment Years 1 and 2, all Settling States are deemed eligible for Incentive Payment A.

     b.     For each Payment Year other than Payment Years 1 and 2, a Settling State is eligible for Incentive Payment A if, as of sixty (60) calendar days prior to the Payment Date (except that in Payment Year 3, this date is as of the Payment Date), (i) there is a Bar in that State in full force and effect, (ii) there is a Settlement Class Resolution in that State in full force and effect, (iii) the Released Claims of all of the following entities are released through the execution of Subdivision Settlement Participation Forms, or there is a Case-Specific Resolution against such entities: all Primary Subdivisions, Litigating Subdivisions, School Districts with a K-12 student enrollment of at least 25,000 or .10% of a State's population, whichever is greater, and Health Districts and Hospital Districts that have at least one hundred twenty-five (125) hospital beds in one or more hospitals rendering services in that district; or (iv) a combination of

the actions in clauses (i)-(iii) has achieved the same level of resolution of Claims by Subdivisions (*e.g.*, a Bar against future litigation combined with full joinder by Litigating Subdivisions).  For the avoidance of doubt, subsection (iv) cannot be satisfied unless all Litigating Subdivisions are Participating Subdivisions or there is a Case-Specific Resolution against any such Subdivisions that are not Participating Subdivisions.  The Settling Distributors and the Enforcement Committee shall meet and confer in order to agree on data sources for purposes of this Section prior to the Preliminary Agreement Date.

c.      Notwithstanding Section IV.F.1.b, for each Payment Year other than Payment Years 1 and 2, a Settling State that is not eligible for Incentive Payment A as of the Incentive Payment Final Eligibility Date shall not be eligible for Incentive Payment A for that Payment Year or any subsequent Payment Years.

d.      If the Settling Distributors made a payment under Incentive Payment A solely on the basis of a Bar or Settlement Class Resolution in a Settling State and that Bar or Settlement Class Resolution is subsequently removed, revoked, rescinded, reversed, overruled, interpreted in a manner to limit the scope of the release, or otherwise deprived of force or effect in any material respect, that Settling State shall not be eligible for Incentive Payment A thereafter, unless the State requalifies for Incentive Payment A through any method pursuant to Section IV.F.1.b, in which case the Settling State shall be eligible for Incentive Payment A less any litigation fees and costs incurred by Settling Distributor in the interim, except that, if the re-imposition occurs after the completion of opening statements in a trial involving a Released Claim, the Settling State shall not be eligible for Incentive Payment A (unless this exception is waived by the Settling Distributors).

e.      In determining the amount of Incentive Payment A that Settling Distributors will pay in a Payment Year and each Settling State's share, if any, of Incentive Payment A for that Payment Year, the Settlement Fund Administrator shall:  (i) identify all Settling States that are eligible for Incentive Payment A; (ii) multiply the Overall Allocation Percentage for each such eligible Settling State by the maximum amount that Settling Distributors could owe with respect to Incentive Payment A for that Payment Year as listed on Exhibit M.  The amount calculated in (ii) shall be the amount allocated to a Settling State eligible for Incentive Payment A for that Payment Year and the aggregate of each such amount for Settling States eligible for Incentive Payment A shall be the amount of Incentive Payment A Settling Distributors are obligated to pay in that Payment Year, all such amounts subject to the suspension, offset, and reduction provisions in Section XII and Section XIII.

2.      Incentive Payment B.  Incentive Payment B shall be available to Settling States that are not eligible for Incentive Payment A for the applicable Payment Year. Incentive Payment B shall be equal to up to twenty-five percent (25%) of the Net Abatement Amount multiplied by the aggregate Overall Allocation Percentage of the

Settling States. Incentive Payment B will be due to a Settling State as part of the Annual Payment in each of the eighteen (18) Payment Years that a Settling State is eligible for Incentive Payment B and equal a total potential maximum of $4,638,503,423 if all States are eligible for all eighteen (18) Payment Years. Each Settling State's maximum share of Incentive Payment B in a given year shall equal the total maximum amount available for Incentive Payment B for that year as reflected in Exhibit M times the Settling State's Overall Allocation Percentage. Eligibility for Incentive Payment B is as follows:

      a.     A Settling State is not eligible for Incentive Payment B for a Payment Year for which it is eligible for Incentive Payment A.

      b.     Subject to Section IV.F.2.a, the amount of Incentive Payment B for which a Settling State is eligible in a Payment Year shall be a percentage of that State's maximum share of Incentive Payment B based on the extent to which (A) Litigating Subdivisions in the State are Participating Subdivisions or (B) there is a Case-Specific Resolution against Litigating Subdivisions in the State, collectively, "*Incentive B Eligible Subdivisions*." The percentage of the State's maximum share of Incentive Payment B that the State is eligible for in a Payment Year shall be determined according to the table below:

| Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population[5] | Incentive Payment B Eligibility Percentage |
|---|---|
| Up to 85% | 0% |
| 85%+ | 30% |
| 86+ | 40% |
| 91+ | 50% |
| 95+ | 60% |
| 99%+ | 95% |
| 100% | 100% |

---

[5] The "Percentage of Litigating Subdivision Population that is Incentive B Eligible Subdivision Population" shall be determined by the aggregate population of the Settling State's Litigating Subdivisions that are Incentive B Eligible Subdivisions divided by the aggregate population of the Settling State's Litigating Subdivisions. In calculating the Settling State's population that resides in Litigating Subdivisions, (a) the population of the Settling State's Litigating Subdivisions shall be the sum of the population of all Litigating Subdivisions in the Settling State, notwithstanding that persons may be included within the population of more than one Litigating Subdivision, and (b) the population that resides in Incentive B Eligible Subdivisions shall be the sum of the population of the Incentive B Eligible Subdivisions, notwithstanding that persons may be included within the population of more than one Incentive B Eligible Subdivision. An individual Litigating Subdivision shall not be included more than once in the numerator, and shall not be included more than once in the denominator, of the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit; *provided, however*, that for the avoidance of doubt, no Litigating Subdivision will be excluded from the numerator or denominator under this sentence unless a Litigating Subdivision otherwise counted in the denominator has the authority to release the Claims (consistent with Section XI) of the Litigating Subdivision to be excluded. For the avoidance of doubt, a Settling State in which the population that resides in Incentive B Eligible Subdivisions is less than eighty-five percent (85%) of the population of Litigating Subdivisions shall not be eligible for any portion of Incentive Payment B.

     c.    In determining the amount that Settling Distributors will pay in a Payment Year under Incentive Payment B and each Settling State's share of Incentive Payment B for that Payment Year, the Settlement Fund Administrator shall:  (i) identify all States that are eligible for Incentive Payment B because they are ineligible for Incentive Payment A; (ii) determine the Incentive Payment B eligibility percentage for each such Settling State; (iii) multiply the Incentive Payment B eligibility percentage for each such State by the Overall Allocation Percentage of that State; (iv) multiply the product from (iii) by the maximum amount that Settling Distributors could owe under Incentive Payment B for that Payment Year from Exhibit M.  The amount calculated in (iv) shall be the amount allocated to a Settling State eligible for Incentive Payment B for that Payment Year, and the aggregate of such amounts for Settling States eligible for Incentive Payment B shall be the amount paid for that Payment Year by Settling Distributors with respect to Incentive Payment B, all such amounts subject to the suspension, offset, and reduction provisions in Section XII and Section XIII.  If there are no Litigating Subdivisions in a Settling State, and that Settling State is otherwise eligible for Incentive Payment B, that Settling State will receive its full allocable share of Incentive Payment B.

     d.    A Settling State's eligibility for Incentive Payment B for a Payment Year shall be determined as of sixty (60) calendar days prior to the Payment Date for that Payment Year; *provided* that the percentage of Incentive Payment B for which a Settling State is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

    3.    <u>Incentive Payment C</u>.  Incentive Payment C shall be available to Settling States that are not eligible for Incentive Payment A for a Payment Year, including to Settling States that are also eligible for Incentive Payment B.  Incentive Payment C shall be equal to up to fifteen percent (15%) of the Net Abatement Amount multiplied by the aggregate Overall Allocation Percentage of the Settling States.  Incentive Payment C will be due to a Settling State as part of the Annual Payment in each of the eighteen (18) Payment Years that a Settling State is eligible for Incentive Payment C and equal a total potential maximum of $2,783,102,054 if all States are eligible for all eighteen (18) Payment Years. Each Settling State's maximum share of Incentive Payment C in a given year shall equal the total maximum amount available for Incentive Payment C for that year as reflected in Exhibit M multiplied by the Settling State's Overall Allocation Percentage.  Eligibility for Incentive Payment C is as follows:

     a.    A Settling State is not eligible for Incentive Payment C for a Payment Year in which it is eligible for Incentive Payment A.

     b.    Subject to Section IV.F.3.a, the amount of Incentive Payment C for which a Settling State is eligible in a Payment Year shall be a percentage of the State's maximum share of Incentive Payment C based on the extent to which (A) Non-Litigating Subdivisions that are Primary Subdivisions with a population

over 30,000 and Litigating Subdivisions in the State are Participating
Subdivisions or (B) there is a Case-Specific Resolution against Non-Litigating
Subdivisions that are Primary Subdivisions with a population over 30,000 and
Litigating Subdivisions in the State, collectively, "*Incentive C Eligible
Subdivisions.*" The percentage of the State's maximum share of Incentive
Payment C that the State is eligible for in a Payment Year shall be determined
according to the table below:

| Percentage of Relevant Subdivision Population that is Incentive C Eligible Population[6] | Incentive Payment C Eligibility Percentage |
|---|---|
| Up to 60% | 0% |
| 60%+ | 25% |
| 70%+ | 35% |
| 75%+ | 40% |
| 80%+ | 45% |
| 85%+ | 55% |
| 90%+ | 60% |
| 93%+ | 65% |
| 94%+ | 75% |
| 95+ | 90% |
| 98+ | 95% |
| 100% | 100% |

    c.    In determining the amount that Settling Distributors will pay in a
Payment Year under Incentive Payment C and each Settling State's share of
Incentive Payment C for that Payment Year, the Settlement Fund Administrator
shall:  (i) identify all States that are eligible for Incentive Payment C because they
are ineligible for Incentive Payment A; (ii) determine the Incentive Payment C
eligibility percentage for each such Settling State; (iii) multiply the Incentive
Payment C eligibility percentage for each such State by the Overall Allocation
Percentage of that State; (iv) multiply the product from (iii) by the maximum

---

[6] The "Percentage of Relevant Subdivision Population that is Incentive C Eligible Population" shall be determined
by the aggregate population of the Settling State's Incentive C Eligible Subdivisions divided by the aggregate
population of the Settling State's Non-Litigating Primary Subdivisions with a population over 30,000 and Litigating
Subdivisions ("*Incentive Payment C Subdivisions*"). None of the population figures shall include Prior Litigating
Subdivisions.  In calculating the Settling State's population that resides in Incentive Payment C Subdivisions, (a) the
population shall be the sum of the population of all Incentive Payment C Subdivisions in the Settling State,
notwithstanding that persons may be included within the population of more than one Incentive Payment C
Subdivision, and (b) the population that resides in Incentive C Eligible Subdivisions shall be the sum of the
population of the Incentive C Eligible Subdivisions, notwithstanding that persons may be included within the
population of more than one Incentive C Eligible Subdivision.  An individual Incentive Payment C Subdivision shall
not be included more than once in the numerator, and shall not be included more than once in the denominator, of
the calculation regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit.  For the
avoidance of doubt, a Settling State in which the population that resides in Incentive C Eligible Subdivisions is less
than sixty percent (60%) of the population of Incentive Payment C Subdivisions shall not be eligible for any portion
of Incentive Payment C.

amount that Settling Distributors could owe under Incentive Payment C for that Payment Year from Exhibit M.  The amount calculated in (iv) shall be the amount allocated to a Settling State eligible for Incentive Payment C for that Payment Year and the aggregate of such amounts for Settling States eligible for Incentive Payment C shall be the amount paid for that Payment Year by Settling Distributors with respect to Incentive Payment C, all such amounts subject to the suspension, offset, and reduction provisions in Section XII and Section XIII.  If there are no Litigating Subdivisions or Non-Litigating Subdivisions that are Primary Subdivisions with a population of more than 30,000 in a Settling State, and that Settling State is otherwise eligible for Incentive Payment C, that Settling State will receive its full allocable share of Incentive Payment C.

d.　　A Settling State's eligibility for Incentive Payment C for a Payment Year shall be determined as of sixty (60) calendar days prior to the Payment Date for that Payment Year; *provided* that the percentage of Incentive Payment C for which a Settling State is eligible as of the Incentive Payment Final Eligibility Date shall cap its eligibility for that Payment Year and all subsequent Payment Years.

4.　　Incentive Payment D.  Incentive Payment D shall be applied at Payment Year 6.  Incentive Payment D shall be equal to five percent (5%) of the Net Abatement Amount multiplied by the aggregate Overall Allocation Percentage of the Settling States.  Incentive Payment D will be due to a Settling State as part of the Annual Payment for each of thirteen (13) Payment Years (from Payment Year 6 to Payment Year 18) that any Settling State is eligible for Incentive Payment D and equal a total potential maximum of $927,700,685 if all States are eligible for all thirteen (13) Payment Years.  Each Settling State's share of Incentive Payment D in a given year shall equal the total maximum amount available for Incentive Payment D for that year as reflected in Exhibit M times the Settling State's Overall Allocation Percentage.  Eligibility for Incentive Payment D is as follows:

a.　　A Settling State is eligible for Incentive Payment D if there has been no Later Litigating Subdivision in that State that has had a Claim against a Released Entity survive more than six (6) months after denial in whole or in part of a Threshold Motion.

b.　　A Settling State's eligibility for Incentive Payment D shall be determined as of sixty (60) calendar days prior to the Payment Date.  If a Later Litigating Subdivision's lawsuit in that State survives more than six (6) months after denial in whole or in part of a Threshold Motion after that date, that State shall not be eligible for Incentive Payment D for the Payment Year in which that occurs and any subsequent Payment Year.

c.　　Notwithstanding Section IV.F.4, a Settling State can become re-eligible for Incentive Payment D if the lawsuit that survived a Threshold Motion is dismissed pursuant to a later motion on grounds included in the Threshold Motion, in which case the Settling State shall be eligible for Incentive Payment D

less any litigation fees and costs incurred by Settling Distributor in the interim, except that if the dismissal motion occurs after the completion of opening statements in such action, the Settling State shall not be eligible for Incentive Payment D.

      d.     For the avoidance of doubt, a Settling State may be eligible for Incentive Payment D whether or not it is eligible for Incentive Payments A-C.

      e.     In determining the amount of Incentive Payment D that Settling Distributors will pay in a Payment Year and each Settling State's share, if any, of Incentive Payment D for that Payment Year, the Settlement Fund Administrator shall:  (i) identify all Settling States that are eligible for Incentive Payment D; (ii) multiply the Overall Allocation Percentage for each such eligible Settling State by the maximum amount that Settling Distributors could owe with respect to Incentive Payment D for that Payment Year listed on Exhibit M; and (iii) subtract any litigation fees and costs allowed to be deducted pursuant to Section IV.F.4.c. The amount calculated in (iii) shall be the amount allocated to a Settling State eligible for Incentive Payment D for that Payment Year and the aggregate of each such amount for Settling States eligible for Incentive Payment D shall be the amount of Incentive Payment D Settling Distributors are obligated to pay in that Payment Year, all such amounts subject to the suspension, reduction, and offset provisions in Section XII and Section XIII.

      G.     *Reductions/Offsets*.  The base and incentive payments are subject to suspension, offset, and reduction as provided in Section XII and Section XIII.

      H.     *State-Specific Agreements*.  Notwithstanding any other provision of this Agreement or any other agreement, in the event that:  (1) the Settling Distributors enter into an agreement with any Settling State that resolves with finality such Settling State's Claims consistent with Section XI of this Agreement and such agreement has an effective date prior to the Effective Date of this Agreement (such agreement, a "*State-Specific Agreement*") and (2) pursuant to the terms of the State-Specific Agreement, any payments, or any portion thereof, made by the Settling Distributors thereunder are made in lieu of any payments (for the avoidance of doubt, including the Additional Restitution Amount), or any portion thereof, to be made under this Agreement and the Settling Distributors make such a payment pursuant to the State-Specific Agreement, then the Settling Distributors will reduce any payments allocable to such Settling State (whether made to the Settlement Fund Escrow or the Settlement Fund) made pursuant to this Agreement to the extent such amount was already paid pursuant to the terms of the State-Specific Agreement.

      I.     *Allocation of Payments among Settling Distributors*.  Payments due from the Settling Distributors under this Section IV, Section IX, and Section X will be allocated among the Settling Distributors as follows:  McKesson – 38.1%; Amerisource – 31.0%; Cardinal – 30.9%.  A Settling Distributor's sole responsibility for payments under this Agreement shall be to make its share of each payment.  The obligations of the Settling Distributors in this Agreement are several and not joint.  No Settling Distributor shall be responsible for any portion of another Settling Distributor's share.

J.       *Pre-payment Option.*

1.       Any Settling Distributor shall have the right, subject to the limitations set forth in Section IV.J.3, to prepay any base payment or incentive payment in whole or in part, without premium or penalty (a "*Settlement Prepayment*") by providing at least fourteen (14) calendar days prior written notice to the Settlement Fund Administrator and Enforcement Committee (a "*Prepayment Notice*"). Any Prepayment Notice shall specify: (a) the gross amount of the Settlement Prepayment (the "*Gross Settlement Amount*"), (b) the manner in which such Settlement Prepayment shall be applied to reduce such Settling Distributor's future share of Annual Payments (*i.e.*, to which future year(s) the allocable portion of an Annual Payment owed by such Settling Distributor the Settlement Prepayment should be applied) (such manner of application, a "*Settlement Prepayment Reduction Schedule*"), (c) the net present value of the Settlement Prepayment as of the Prepayment Date based on the Settlement Prepayment Reduction Schedule using a discount rate equal to the prime rate as published by the *Wall Street Journal* on the date of the Prepayment Notice plus 1.75% (such net present value amount, the "*Net Settlement Prepayment Amount*"), and (d) the date on which the prepayment will be made, which shall be no more than fifteen (15) calendar days after the date of the Prepayment Notice (the "*Prepayment Date*").

2.       On the Prepayment Date the Settling Distributor shall pay the Net Settlement Prepayment Amount to the Settlement Fund and such amount shall be used only as specified in Section V. Following such payment, all future portions of the Annual Payments allocated to the applicable Settling Distributor under Section IV.E and Section IV.F shall be reduced pursuant to the Settlement Prepayment Reduction Schedule, and the Exhibit M will be updated to give effect to such reduction, and going forward such updated schedule will be Exhibit M.

3.       A Settling Distributor's right to make prepayments shall be subject to the following limitations:

a.       Prepayments may apply to base payments or to both base and incentive payments.  If the prepayment applies to both base and incentive payments, the prepayments will apply proportionally across base and incentive payments.

b.       A Settling Distributor shall make no more than three (3) prepayments over the eighteen (18) year payment term.  A Settling Distributor shall not make more than one (1) prepayment in a five (5) year period and there shall not be prepayments made in the first two (2) Payment Years.

c.       Prepayments shall only be applied to one (1) or more of the three (3) Payment Years following the prepayment.

d.       The total amount of a prepayment of base payments after discounting calculations shall not be larger than the base payment for the Payment Year with the lowest Annual Payment amount affected by the prepayment.  The

total amount of a prepayment for both base payments and incentive payments shall not be larger than the base payment and anticipated incentive payment for the lowest Payment Year affected by the prepayment. The "anticipated incentive payment" for a future Payment Year shall reflect the incentives earned by each Settling State as of the time of the prepayment and any offsets or adjustments known at that time.

      e.     In a Payment Year against which there has been a prepayment, if the amount a Settling State is calculated to receive is greater than the amount prepaid prior to discounting calculations, the Settling Distributor shall pay the difference. If, in a Payment Year for which there has been a prepayment, the amount that a Settling State is calculated to receive is less than the amount calculated at the time of the prepayment, there shall be a credit for the difference to the Settling Distributor to be applied in the subsequent Payment Year(s), if any.

      f.     Prepayments shall be applied proportionately to all Settling States.

      4.     The Settling States may agree to a prepayment that does not apply these restrictions. Such a prepayment would need approval of Settling States representing at least ninety-five percent (95%) allocable share as measured by the allocations in Exhibit F; *provided, however*, that this provision does not limit or restrict any Settling State from negotiating its own prepayment with a Settling Distributor.

      5.     For illustrative purposes only, attached as Exhibit Q are examples showing a Settlement Prepayment, the related calculation of the Net Settlement Prepayment Amount, and the related adjustment to the Settlement Payment Schedule.

K.     *Significant Financial Constraint.*

      1.     A Settling Distributor's allocable share of the Annual Payment for a Payment Year may, at the election of such Settling Distributor, be deferred either (a) up to the amount by which that share plus such Settling Distributor's share of amounts payable under Section IX and Section X would exceed twenty percent (20%) of such Settling Distributor's total operating cash flow (as determined pursuant to United States generally accepted accounting principles) for its fiscal year that concluded most recently prior to the due date for that payment or (b) (i) up to twenty-five percent (25%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB or Baa2 or (ii) up to one hundred percent (100%) if, as of thirty (30) calendar days preceding that payment date, the company's credit rating from one or more of the three nationally recognized rating agencies is below BBB- or Baa3. If the reason for exceeding twenty percent (20%) of a Settling Distributor's total operating cash flow or the decrease in credit rating is substantially attributable to the incurrence of debt to fund post-settlement acquisitions or to the payment of dividends and/or share repurchases that together are of an amount that exceeds the total amount of those two items for the prior fiscal year, no deferral is available. A Settling Distributor shall not be allowed to defer payment for a

Payment Year if that Settling Distributor engaged in any share repurchases in the three fiscal quarters prior to the Payment Date for that Payment Year.

2.     If a Settling Distributor has reason to believe that it will not be able to pay some or all of its allocable share of the Annual Payment for a Payment Year, it shall provide at least ninety (90) calendar days' prior written notice to the Settlement Fund Administrator and Enforcement Committee (a "*Deferred Payment Notice*").  Any Deferred Payment Notice shall specify and include:  (a) the gross amount of the payments owed (including the estimated allocable portion of the Annual Payment, and amounts owed under Section IX and Section X, by the relevant Settling Distributor), (b) the amount that the Settling Distributor believes it will be unable to pay, (c) the accounting and audited financial documents upon which the Settling Distributor relied for making this determination, and (d) any other relevant information for the Enforcement Committee to consider.

3.     A Settling Distributor shall not utilize this provision during the first three (3) Payment Years.  If a Settling Distributor defers some or all of the payments due in a Payment Year pursuant to this Section IV.K, it shall not repurchase any shares, or fund new acquisitions with an acquisition price greater than $250 million, during the deferral period until the deferred amount is fully repaid with interest.  Any amounts deferred shall bear interest at an interest rate equal to the prime rate as published by the *Wall Street Journal* on the date of the Deferral Payment Notice plus 0.5%.

4.     The Settling Distributor shall pay all deferred amounts, including applicable interest on the next Payment Date.  If the amounts previously deferred (including interest) together with the Settling Distributor's share of all payments due for a Payment Year would allow for a deferral under Section IV.K.1, the Settling Distributor shall pay as much of the previously deferred amounts (including interest) as it can pay without triggering the ability to defer payment and may defer the remainder as permitted under (and subject to the restrictions of) this Section IV.K.

5.     Deferrals will apply proportionally across base payments and incentive payments.  For the avoidance of doubt, this Section IV.K applies fully to Payment Years after the first three (3) Payment Years, including the base payments and all incentive payments due pursuant to this Agreement during the Payment Year at issue.

6.     If a Settling Distributor could pay a portion of its allocable share of the Annual Payments due pursuant to this Agreement during a Payment Year without triggering this Section IV.K, the Settling Distributor shall be required to pay that portion as scheduled and only the excess would be subject to deferral at the election of the Settling Distributor (in whole or in part) as provided herein.

7.     The Settling Distributor shall pay any deferred amounts, including applicable interest on or before the date on which the payment is due for Payment Year 18.

## V.     Allocation and Use of Settlement Payments

A.     *Components of Settlement Fund.*  The Settlement Fund shall be comprised of an Abatement Accounts Fund, a State Fund, and a Subdivision Fund for each Settling State.  The payments made under Section IV into the Settlement Fund shall be initially allocated among those three (3) sub-funds and distributed and used as provided below.  Payments placed into the Settlement Fund do not revert back to the Settling Distributors.

B.     *Use of Settlement Payments.*

1.     It is the intent of the Parties that the payments disbursed from the Settlement Fund to Settling States and Participating Subdivisions be for Opioid Remediation, subject to exceptions that must be documented in accordance with Section V.B.2.  In no event may less than eighty-five percent (85%) of the Settling Distributors' maximum amount of payments pursuant to Section IV, Section IX, and Section X as set forth on Exhibit M over the entirety of all Payments Years (but not any single Payment Year) be spent on Opioid Remediation.

2.     While disfavored by the Parties, a Settling State or a Participating Subdivision set forth on Exhibit G may use monies from the Settlement Fund (that have not been restricted by this Agreement solely to future Opioid Remediation) for purposes that do not qualify as Opioid Remediation.  If, at any time, a Settling State or a Participating Subdivision set forth on Exhibit G uses any monies from the Settlement Fund for a purpose that does not qualify as Opioid Remediation, such Settling State or Participating Subdivision set forth on Exhibit G shall identify such amounts and report to the Settlement Fund Administrator and the Settling Distributors how such funds were used, including if used to pay attorneys' fees, investigation costs, litigation costs, or costs related to the operation and enforcement of this Agreement, respectively.  It is the intent of the Parties that the reporting under this Section V.B.2 shall be available to the public.  For the avoidance of doubt, (a) any amounts not identified under this Section V.B.2 as used to pay attorneys' fees, investigation costs, or litigation costs shall be included in the "*Compensatory Restitution Amount*" for purposes of Section VI.F and (b) Participating Subdivisions not listed on Exhibit G may only use monies from the Settlement Fund for purposes that qualify as Opioid Remediation.

C.     *Allocation of Settlement Fund.*

The allocation of the Settlement Fund allows for different approaches to be taken in different states, such as through a State-Subdivision Agreement.  Given the uniqueness of States and their Subdivisions, Settling States and their Subdivisions are encouraged to enter into State-Subdivision Agreements in order to direct the allocation of their portion of the Settlement Fund.  As set out below, the Settlement Fund Administrator will make an initial allocation to three (3) state-level sub-funds.  The Settlement Fund Administrator will then, for each Settling State and its Participating Subdivisions, apply the terms of this Agreement and any relevant State-Subdivision Agreement, Statutory Trust, Allocation Statute, or voluntary redistribution of funds as set out below before disbursing the funds.

1.    Base Payments. The Settlement Fund Administrator will allocate base payments under Section IV.D among the Settling States in proportion to their respective Overall Allocation Percentages. Base payments for each Settling State will then be allocated fifteen percent (15%) to its State Fund, seventy percent (70%) to its Abatement Accounts Fund, and fifteen percent (15%) to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in Section V.D.

2.    Incentive Payments. The Settlement Fund Administrator will treat incentive payments under Section IV.F on a State-specific basis. Incentive payments for which a Settling State is eligible under Section IV.F will be allocated fifteen percent (15%) to its State Fund, seventy percent (70%) to its Abatement Accounts Fund, and fifteen percent (15%) to its Subdivision Fund. Amounts may be reallocated and will be distributed as provided in Section V.D.

3.    Application of Adjustments. If a suspension, offset, or reduction under Section XII or Section XIII applies with respect to a Settling State, the suspension, offset, or reduction shall be applied proportionally to all amounts that would otherwise be apportioned and distributed to the State Fund, the Abatement Accounts Fund, and the Subdivision Fund for that State.

4.    Settlement Fund Administrator. Prior to the Initial Participation Date, the Settling Distributors and the Enforcement Committee will agree to a detailed mechanism consistent with the foregoing for the Settlement Fund Administrator to follow in allocating, apportioning, and distributing payments, which shall then be appended hereto as Exhibit L.

5.    Settlement Fund Administrator Costs. Any costs and fees associated with or arising out of the duties of the Settlement Fund Administrator as described in Exhibit L shall be paid from the interest accrued in the Settlement Fund Escrow and the Settlement Fund; *provided, however*, that if such accrued interest is insufficient to pay the entirety of any such costs and fees, Settling Distributors shall pay fifty percent (50%) of the additional amount and fifty percent (50%) shall be paid out of the Settlement Fund.

D.    *Settlement Fund Reallocation and Distribution.*

As set forth below, within a particular Settling State's account, amounts contained in the Settlement Fund sub-funds may be reallocated and distributed per a State-Subdivision Agreement or other means. If the apportionment of amounts is not addressed and controlled under Section V.D.1 and Section V.D.2, then the default provisions of Section V.D.4 apply. It is not necessary that a State-Subdivision Agreement or other means of allocating funds pursuant to Section V.D.1 and Section V.D.2 address all of the Settlement Fund sub-funds. For example, a Statutory Trust might only address disbursements from a Settling State's Abatement Accounts Fund.

1.    Distribution by State-Subdivision Agreement. If a Settling State has a State-Subdivision Agreement, amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under Section V.C shall be reallocated and

distributed as provided by that agreement. Any State-Subdivision Agreement entered into after the Preliminary Agreement Date shall be applied only if it requires: (a) that all amounts be used for Opioid Remediation, except as allowed by Section V.B.2, and (b) that at least seventy percent (70%) of amounts be used solely for future Opioid Remediation.[7] For a State-Subdivision Agreement to be applied to the relevant portion of an Annual Payment, notice must be provided to the Settling Distributors and the Settlement Fund Administrator at least sixty (60) calendar days prior to the Payment Date.

        2.      <u>Distribution by Allocation Statute</u>. If a Settling State has an Allocation Statute and/or a Statutory Trust that addresses allocation or distribution of amounts apportioned to such State's State Fund, Abatement Accounts Fund, and/or Subdivision Fund and that, to the extent any or all such sub-funds are addressed, requires (1) all amounts to be used for Opioid Remediation, except as allowed by Section V.B.2, and (2) at least seventy percent (70%) of all amounts to be used solely for future Opioid Remediation,[8] then, to the extent allocation or distribution is addressed, the amounts apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under Section V.C shall be allocated and distributed as addressed and provided by the applicable Allocation Statute or Statutory Trust. For the avoidance of doubt, an Allocation Statute or Statutory Trust need not address all three (3) sub-funds that comprise the Settlement Fund, and if the applicable Allocation Statute or Statutory Trust does not address distribution of all or some of these three (3) sub-funds, the applicable Allocation Statute or Statutory Trust does not replace the default provisions described in Section V.D.4 of any such unaddressed fund. For example, if an Allocation Statute or Statutory Trust that meets the requirements of this Section V.D.2 only addresses funds restricted to abatement, then the default provisions in this Agreement concerning allocation among the three (3) sub-funds comprising the Settlement Fund and the distribution of the State Fund and Subdivision Fund for that State would still apply, while the distribution of the applicable State's Abatement Accounts Fund would be governed by the qualifying Allocation Statute or Statutory Trust.

        3.      <u>Voluntary Redistribution</u>. A Settling State may choose to reallocate all or a portion of its State Fund to its Abatement Accounts Fund. A Participating Subdivision included on <u>Exhibit G</u> may choose to reallocate all or a portion of its allocation from the Subdivision Fund to the State's Abatement Accounts Fund or to another Participating Subdivision. For a voluntary redistribution to be applied to the relevant portion of an Annual Payment, notice must be provided to the Settling Distributors and the Settlement Fund Administrator at least sixty (60) calendar days prior to the Payment Date.

        4.      <u>Distribution in the Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust</u>. If <u>Section V.D.1</u> and <u>Section V.D.2</u> do not apply, amounts

---

[7] Future Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms.

[8] Future Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms.

apportioned to that State's State Fund, Abatement Accounts Fund, and Subdivision Fund under Section V.C shall be distributed as follows:

a.      Amounts apportioned to that State's State Fund shall be distributed to that State.

b.      Amounts apportioned to that State's Abatement Accounts Fund shall be distributed consistent with Section V.E. Each Settling State shall submit to the Settlement Fund Administrator a designation of a lead state agency or other entity to serve as the single point of contact for that Settling State's funding requests from the Abatement Accounts Fund and other communications with the Settlement Fund Administrator. The designation of an individual entity is for administrative purposes only and such designation shall not limit funding to such entity or even require that such entity receive funds from this Agreement. The designated entity shall be the only entity authorized to request funds from the Settlement Fund Administrator to be disbursed from that Settling State's Abatement Accounts Fund. If a Settling State has established a Statutory Trust then that Settling State's single point of contact may direct the Settlement Fund Administrator to release the State's Abatement Accounts Fund to the Statutory Trust.

c.      Amounts apportioned to that State's Subdivision Fund shall be distributed to Participating Subdivisions in that State included on Exhibit G per the Subdivision Allocation Percentage listed in Exhibit G. Section VII.I shall govern amounts that would otherwise be distributed to Non-Participating Subdivisions listed in Exhibit G. For the avoidance of doubt and notwithstanding any other provision in this Agreement, no Non-Participating Subdivision will receive any amount from the Settlement Fund, regardless of whether such Subdivision is included on Exhibit G.

d.      Special Districts shall not be allocated funds from the Subdivision Fund, except through a voluntary redistribution allowed by Section V.D.3. A Settling State may allocate funds from its State Fund or Abatement Accounts Fund for Special Districts.

5.      Restrictions on Distribution. No amounts may be distributed from the Subdivision Fund contrary to Section VII, *i.e.*, no amounts may be distributed directly to Non-Participating Subdivisions or to Later Participating Subdivisions to the extent such a distribution would violate Section VII.E through Section VII.H. Amounts allocated to the Subdivision Fund that cannot be distributed by virtue of the preceding sentence shall be distributed into the sub-account in the Abatement Accounts Fund for the Settling State in which the Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement described in Section V.D.1 or by an Allocation Statute or a Statutory Trust described in Section V.D.2.

E.      *Provisions Regarding the Abatement Accounts Fund.*

1.    State-Subdivision Agreement, Allocation Statute, and Statutory Trust Fund Provisions.  A State-Subdivision Agreement, Allocation Statute, or Statutory Trust may govern the operation and use of amounts in that State's Abatement Accounts Fund so long as it complies with the requirements of Section V.D.1 or Section V.D.2, as applicable, and all direct payments to Subdivisions comply with Section VII.E through Section VII.H.

2.    Absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust.  In the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust that addresses distribution, the Abatement Accounts Fund will be used solely for future Opioid Remediation[9] and the following shall apply with respect to a Settling State:

a.    *Regional Remediation.*

(i)    At least fifty percent (50%) of distributions for remediation from a State's Abatement Accounts Fund shall be annually allocated and tracked to the regional level.  A Settling State may allow the Advisory Committee established pursuant to Section V.E.2.d to define its regions and assign regional allocations percentages.  Otherwise, a Settling State shall (A) define its initial regions, which shall consist of one (1) or more General Purpose Subdivisions and which shall be designated by the state agency with primary responsibility for substance abuse disorder services employing, to the maximum extent practical, existing regions established in that State for opioid abuse treatment or other public health purposes; (B) assign initial regional allocation percentages to the regions based on the Subdivision Allocation Percentages in Exhibit G and an assumption that all Subdivisions included on Exhibit G will become Participating Subdivisions.

(ii)    This minimum regional expenditure percentage is calculated on the Settling State's initial Abatement Accounts Fund allocation and does not include any additional amounts a Settling State has directed to its Abatement Accounts Fund from its State Fund, or any other amounts directed to the fund.  A Settling State may dedicate more than fifty percent (50%) of its Abatement Accounts Fund to the regional expenditure and may annually adjust the percentage of its Abatement Accounts Fund dedicated to regional expenditures as long as the percentage remains above the minimum amount.

(iii)    The Settling State (A) has the authority to adjust the definition of the regions, and (B) may annually revise the percentages

---

[9] Future Opioid Remediation includes amounts paid to satisfy any future demand by another governmental entity to make a required reimbursement in connection with the past care and treatment of a person related to the Alleged Harms.

allocated to each region to reflect the number of General Purpose Subdivisions in each region that are Non-Participating Subdivisions.

b.      *Subdivision Block Grants.*  Certain Subdivisions shall be eligible to receive regional allocation funds in the form of a block grant for future Opioid Remediation.  A Participating Subdivision eligible for block grants is a county or parish (or in the case of States that do not have counties or parishes that function as political subdivisions, a city) that (1) does not contain a Litigating Subdivision or a Later Litigating Subdivision for which it has the authority to end the litigation through a release, bar or other action, (2) either (i) has a population of 400,000 or more or (ii) in the case of California has a population of 750,000 or more, and (3) has funded or otherwise managed an established health care or treatment infrastructure (*e.g.*, health department or similar agency).  Each Subdivision eligible to receive block grants shall be assigned its own region.

c.      *Small States.*  Notwithstanding the provisions of Section V.E.2.a, Settling States with populations under four (4) million that do not have existing regions described in Section V.E.2.a shall not be required to establish regions.  However, such a Settling State that contains one (1) or more Subdivisions eligible for block grants under Section V.E.2.c shall be divided regionally so that each block-grant eligible Subdivision is a region and the remainder of the state is a region.

d.      *Advisory Committee.*  The Settling State shall designate an Opioid Settlement Remediation Advisory Committee (the "*Advisory Committee*") to provide input and recommendations regarding remediation spending from that Settling State's Abatement Accounts Fund.  A Settling State may elect to use an existing advisory committee or similar entity (created outside of a State-Subdivision Agreement or Allocation Statute); *provided, however,* the Advisory Committee or similar entity shall meet the following requirements:

(i)      Written guidelines that establish the formation and composition of the Advisory Committee, terms of service for members, contingency for removal or resignation of members, a schedule of meetings, and any other administrative details;

(ii)      Composition that includes at least an equal number of local representatives as state representatives;

(iii)      A process for receiving input from Subdivisions and other communities regarding how the opioid crisis is affecting their communities, their abatement needs, and proposals for abatement strategies and responses; and

(iv)      A process by which Advisory Committee recommendations for expenditures for Opioid Remediation will be made to and considered by the appropriate state agencies.

     3.    <u>Abatement Accounts Fund Reporting</u>. The Settlement Fund Administrator shall track and assist in the report of remediation disbursements as agreed to among the Settling Distributors and the Enforcement Committee.

    F.    *Nature of Payment*. Each of the Settling Distributors, the Settling States, and the Participating Subdivisions acknowledges and agrees that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

    1.    It has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

    2.    (a) The Settling States and Participating Subdivisions sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions; (b) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by the Settling States and Participating Subdivisions; and (c) the portion of the Compensatory Restitution Amount received by each Settling State or Participating Subdivision is no greater than the amount of the Alleged Harms allegedly suffered by such Settling State or Participating Subdivision;

    3.    The payment of the Compensatory Restitution Amount by the Settling Distributors constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by the Settling Distributors;

    4.    The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the Settling States and Participating Subdivisions to the same position or condition that they would be in had the Settling States and Participating Subdivisions not suffered the Alleged Harms; and

    5.    For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to any Settling State or Participating Subdivision or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount is properly characterized as described in <u>Section V.F</u>, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, or other punitive assessments.

## VI.   Enforcement

    A.    *Enforceability*. This Agreement is enforceable only by the Settling States and the Settling Distributors; *provided, however*, that Released Entities may enforce <u>Section XI</u> and Participating Subdivisions listed on <u>Exhibit G</u> have the enforcement rights described in <u>Section VI.D</u>. Except to the extent allowed by the Injunctive Relief Terms, Settling States and Participating Subdivisions shall not have enforcement rights with respect to either the terms of

this Agreement that apply only to or in other States or any Consent Judgment entered into by another Settling State.  Participating Subdivisions shall not have enforcement rights against the Settling Distributors with respect to this Agreement or any Consent Judgment except that Participating Subdivisions listed on Exhibit G shall have enforcement rights as set forth herein as to payments that would be allocated to the Subdivision Fund or Abatement Accounts Fund pursuant to Section V; *provided, however*, that each Settling State shall allow Participating Subdivisions in such Settling State to notify it of any perceived violations of this Agreement or the applicable Consent Judgment.

    B.    *Jurisdiction.*  The Settling Distributors consent to the jurisdiction of the court in which each Settling State files its Consent Judgment, limited to resolution of disputes identified in Section VI.F.1 for resolution in that court.

    C.    *Specific Terms Dispute Resolution.*

    1.    Any dispute that is addressed by the provisions set forth in the Injunctive Relief Terms shall be resolved as provided therein.

    2.    In the event that Settling Distributors believe that the eighty-five percent (85%) threshold established in Section V.B.1 is not being satisfied, any Party may request that the Settling Distributors and Enforcement Committee meet and confer regarding the use of funds to implement Section V.B.1. The completion of such meet-and-confer process is a precondition to further action regarding any such dispute.  Further action concerning Section V.B.1 shall:  (i) be limited to the Settling Distributors seeking to reduce their Annual Payments by no more than five percent (5%) of the difference between the actual amount of Opioid Remediation and the eighty-five percent (85%) threshold established in Section V.B.1; (ii) only reduce Annual Payments to those Settling States and their Participating Subdivisions that are below the eighty-five percent (85%) threshold established in Section V.B.1; and (iii) not reduce Annual Payments restricted to future Opioid Remediation.

    D.    *State-Subdivision Enforcement.*

    1.    A Subdivision shall not have enforcement rights against a Settling State in which it is located with respect to this Agreement or any Consent Judgment except that a Participating Subdivision listed on Exhibit G shall have enforcement rights (a) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust with respect to intrastate allocation or (b) in the absence of a State-Subdivision Agreement, Allocation Statute, or Statutory Trust, to allegations that (i) the Settling State's use of Abatement Accounts Fund monies were not used for uses similar to or in the nature of those uses contained in Exhibit E; or (ii) a Settling State failed to pay funds directly from the Abatement Accounts Fund to a Participating Subdivision eligible to receive a block grant pursuant to Section V.E.2.b.

    2.    A Settling State shall have enforcement rights against a Participating Subdivision located in its territory (a) as provided for in a State-Subdivision Agreement, Allocation Statute, or Statutory Trust; or (b) in the absence of a State-Subdivision

Agreement, Allocation Statute, or Statutory Trust, to allegations that the Participating Subdivisions' uses of Abatement Accounts Fund monies were not used for purposes similar to or in the nature of those uses contained in Exhibit E.

3.     As between Settling States and Participating Subdivisions, the above rights are contractual in nature and nothing herein is intended to limit, restrict, change or alter any other existing rights under law.

E.     *Subdivision Distributor Payment Enforcement.*  A Participating Subdivision listed on Exhibit G shall have the same right as a Settling State pursuant to Section VI.2.a(v) to seek resolution regarding the failure by a Settling Distributor to make its allocable share of an Annual Payment in a Payment Year.

F.     *Other Terms Regarding Dispute Resolution.*

1.     Except to the extent provided by Section VI.C or Section VI.F.2, all disputes shall be resolved in either the court that entered the relevant Consent Judgment or, if no such Consent Judgment was entered, a state or territorial court with jurisdiction located wherever the seat of the relevant state government is located.

a.     State court proceedings shall be governed by the rules and procedures of the relevant forum.

b.     For the avoidance of doubt, disputes to be resolved in state court include, but are not limited to, the following:

(i)     disputes concerning whether expenditures qualify as Opioid Remediation;

(ii)     disputes between a Settling State and its Participating Subdivisions as provided by Section VI.D, except to the extent the State-Subdivision Agreement provides for other dispute resolution mechanisms. For the avoidance of doubt, disputes between a Settling State and any Participating Subdivision shall not be considered National Disputes;

(iii)     whether this Agreement and relevant Consent Judgment are binding under state law;

(iv)     the extent of the Attorney General's or other participating entity's authority under state law, including the extent of the authority to release claims;

(v)     whether the definition of a Bar, a Case-Specific Resolution, Final Order, lead state agency as described in Section V.D.4.b, Later Litigating Subdivision, Litigating Subdivision, or Threshold Motion have been met; and

(vi) all other disputes not specifically identified in <u>Section VI.C</u> or <u>Section VI.F.2</u>.

c. Any Party may request that the National Arbitration Panel provide an interpretation of any provision of the settlement that is relevant to the state court determination, and the National Arbitration Panel shall make reasonable best efforts to supply such interpretation within the earlier of thirty (30) calendar days or the time period required by the state court proceedings. Any Party may submit that interpretation to the state court to the extent permitted by, and for such weight provided by, the state court's rules and procedures. If requested by a Party, the National Arbitration Panel shall request that its interpretation be accepted in the form of an *amicus curiae* brief, and any attorneys' fees and costs for preparing any such filing shall be paid for by the requesting Party.

2. National Disputes involving a Settling State, a Participating Subdivision that has enforcement rights pursuant to <u>Section VI.A</u>, and/or a Settling Distributor shall be resolved by the National Arbitration Panel.

a. National Disputes are disputes that are not addressed by <u>Section VI.C</u>, and which are exceptions to <u>Section VI.F.1</u>'s presumption of resolution in state courts because they involve issues of interpretation of terms contained in this Agreement applicable to all Settling States without reference to a particular State's law. Disputes between a Settling State and any Participating Subdivision shall not be considered National Disputes. National Disputes are limited to the following:

(i) the amount of offset and/or credit attributable to Non-Settling States or the Tribal/W. Va. Subdivision Credit;

(ii) issues involving the scope and definition of Product;

(iii) interpretation and application of the terms "Covered Conduct," "Released Entities," and "Released Claims";

(iv) the allocation of payments among Settling Distributors as described in <u>Section IV.I</u>;

(v) the failure by a Settling Distributor to pay its allocable share of the Annual Payment or of the Additional Restitution Amount in a Payment Year, but for the avoidance of doubt, disputes between a Settling Distributor and a Settling State over the amounts owed only to that state that do not affect any other Settling State shall not be considered National Disputes;

(vi) the interpretation and application of the significant financial constraint provision in <u>Section IV.K</u>, including, without limitation, eligibility for and amount of deferrals for any given year, time for repayment, and compliance with restrictions during deferral term;

(vii)    the interpretation and application of the prepayment provisions as described in Section IV.J;

(viii)    the interpretation and application of any most-favored-nation provision in Section XIV.E;

(ix)    questions regarding the performance and/or removal of the Settlement Fund Administrator;

(x)    replacement of the Monitor, as provided in the Injunctive Relief Terms;

(xi)    disputes involving liability of successor entities;

(xii)    disputes that require a determination of the sufficiency of participation in order to qualify for Incentive Payments A, B, or C, as well as disputes over qualification for Participation Tiers;

(xiii)    disputes involving a Releasor's compliance with, and the appropriate remedy under, Section XI.B.I.A.3;

(xiv)    disputes requiring the interpretation of Agreement terms that are national in scope or impact, which shall mean disputes requiring the interpretation of Agreement terms that (i) concretely affect four (4) or more Settling States; and (ii) do not turn on unique definitions and interpretations under state law; and

(xv)    any dispute subject to resolution under Section VI.F.1 but for which all parties to the dispute agree to arbitration before the National Arbitration Panel under the provisions of this Section VI.F.2.

b.    The National Arbitration Panel shall be comprised of three (3) arbitrators.  One (1) arbitrator shall be chosen by the Settling Distributors, one (1) arbitrator shall be chosen by the Enforcement Committee with due input from Participating Subdivisions listed on Exhibit G, and the third arbitrator shall be agreed upon by the first two (2) arbitrators.  The membership of the National Arbitration Panel is intended to remain constant throughout the term of this Agreement, but in the event that replacements are required, the retiring arbitrator shall be replaced by the party that selected him/her.

c.    The National Arbitration Panel shall make reasonable best efforts to decide all matters within one hundred eighty (180) calendar days of filing, and in no event shall it take longer than one (1) year.

d.    The National Arbitration Panel shall conduct all proceedings in a reasonably streamlined process consistent with an opportunity for the parties to be heard.  Issues shall be resolved without the need for live witnesses where feasible,

and with a presumption in favor of remote participation to minimize the burdens on the parties.

e.       To the extent allowed under state law, a Settling State, a Participating Subdivision that has enforcement rights pursuant to Section VI.A, and (at any party's request) the National Arbitration Panel may certify to an appropriate state court any question of state law.  The National Arbitration Panel shall be bound by a final state court determination of such a certified question.  The time period for the arbitration shall be tolled during the course of the certification process.

f.       The arbitrators will give due deference to any authoritative interpretation of state law, including any declaratory judgment or similar relief obtained by a Settling State, a Participating Subdivision that has enforcement rights pursuant to Section VI.A, or Settling Distributor on a state law issue.

g.       The decisions of the National Arbitration Panel shall be binding on Settling States, Participating Subdivisions, Settling Distributors, and the Settlement Fund Administrator.  In any proceeding before the National Arbitration Panel involving a dispute between a Settling State and one or more Settling Distributors whose resolution could prejudice the rights of a Participating Subdivision(s) in that Settling State, such Participating Subdivision(s) shall be allowed to file a statement of view in the proceeding.

h.       Nothing herein shall be construed so as to limit or otherwise restrict a State from seeking injunctive or other equitable relief in state court to protect the health, safety, or welfare of its citizens.

i.       Each party shall bear its own costs in any arbitration or court proceeding arising under this Section VI.  The costs for the arbitrators on the National Arbitration Panel shall be divided and paid equally by the disputing sides for each individual dispute, e.g., a dispute between a Settling Distributor and Settling States/Participating Subdivisions shall be split fifty percent (50%) by the Settling Distributor and fifty percent (50%) by the Settling States/Participating Subdivisions that are parties to the dispute; a dispute between a Settling State and a Participating Subdivision shall be split fifty percent (50%) by the Settling State that is party to the dispute and fifty percent (50%) by any Participating Subdivisions that are parties to the dispute.

3.       Prior to initiating an action to enforce pursuant to this Section VI.F, the complaining party must:

a.       Provide written notice to the Enforcement Committee of its complaint, including the provision of the Consent Judgment and/or Agreement that the practice appears to violate, as well as the basis for its interpretation of the disputed provision.  The Enforcement Committee shall establish a reasonable process and timeline for obtaining additional information from the involved

parties; *provided, however,* that the date the Enforcement Committee establishes for obtaining additional information from the parties shall not be more than forty-five (45) calendar days following the notice. The Enforcement Committee may advise the involved parties of its views on the complaint and/or seek to resolve the complaint informally.

      b.    Wait to commence any enforcement action until thirty (30) calendar days after the date that the Enforcement Committee establishes for obtaining additional information from the involved parties.

      4.    If the parties to a dispute cannot agree on the proper forum for resolution of the dispute under the provisions of <u>Section VI.F.1</u> or <u>Section VI.F.2</u>, a committee comprising the Enforcement Committee and sufficient representatives of the Settling Distributors such that the members of the Enforcement Committee have a majority of one (1) member will determine the forum where the dispute will be initiated within twenty-eight (28) calendar days of receiving notification of the dispute relating to the proper forum. The forum identified by such committee shall be the sole forum for litigating the issue of which forum will hear the substantive dispute, and the committee's identification of such forum in the first instance shall not be entitled to deference by the forum selected.

      G.    *No Effect.* Nothing in this Agreement shall be interpreted to limit the Settling State's Civil Investigative Demand ("*CID*") or investigative subpoena authority, to the extent such authority exists under applicable state law and the CID or investigative subpoena is issued pursuant to such authority, and Settling Distributors reserve all of their rights in connection with a CID or investigative subpoena issued pursuant to such authority.

## VII.    Participation by Subdivisions

      A.    *Notice.* No later than fifteen (15) calendar days after the Preliminary Agreement Date, the Settling States, with the cooperation of the Settling Distributors, shall send individual written notice of the opportunity to participate in this Agreement and the requirements of participation to all Subdivisions in the Settling States that are (1) Litigating Subdivisions or (2) Non-Litigating Subdivisions listed on <u>Exhibit G</u>. The costs of the written notice to such Subdivisions shall be paid for by the Settling Distributors. The Settling States, with the cooperation of the Settling Distributors, may also provide general notice reasonably calculated to alert Non-Litigating Subdivisions in the Settling States to this Agreement, the opportunity to participate in it, and the requirements for participation. Such notice may include publication and other standard forms of notification, as well as notice to national state and county organizations such as the National Association of Counties and the National League of Cities. The notice will include that the deadline for becoming an Initial Participating Subdivision is the Initial Participation Date. Nothing contained herein shall preclude a Settling State from providing further notice to or otherwise contacting any of its Subdivisions about becoming a Participating Subdivision, including beginning any of the activities described in this paragraph prior to the Preliminary Agreement Date.

      B.    *Requirements for Becoming a Participating Subdivision—Non-Litigating Subdivisions.* A Non-Litigating Subdivision in a Settling State may become a Participating

Subdivision by returning an executed Subdivision Settlement Participation Form to the Settlement Fund Administrator specifying (1) that the Subdivision agrees to the terms of this Agreement pertaining to Subdivisions, (2) that the Subdivision releases all Released Claims against all Released Entities, (3) that the Subdivision agrees to use monies it receives, if any, from the Settlement Fund pursuant to the applicable requirements of Section V; *provided, however*, that Non-Litigating Subdivisions may only use monies originating from the Settlement Fund for purposes that qualify as Opioid Remediation, and (4) that the Subdivision submits to the jurisdiction of the court where the applicable Consent Judgment is filed for purposes limited to that court's role under this Agreement.  The required Subdivision Settlement Participation Form is attached as Exhibit K.

C.     *Requirements for Becoming a Participating Subdivision—Litigating Subdivisions/Later Litigating Subdivisions*.  A Litigating Subdivision or Later Litigating Subdivision in a Settling State may become a Participating Subdivision by returning an executed Subdivision Settlement Participation Form to the Settlement Fund Administrator and upon prompt dismissal with prejudice of its lawsuit.  A Settling State may require each Litigating Subdivision in that State to specify on the Subdivision Settlement Participation Form whether its counsel has waived any contingency fee contract with that Participating Subdivision and whether, if eligible, it intends to seek fees pursuant to Exhibit R.  The Settlement Fund Administrator shall provide quarterly reports of this information to the parties organized by Settling State.  A Litigating Subdivision or Later Litigating Subdivision may not become a Participating Subdivision after the completion of opening statements in a trial of the lawsuit it brought that includes a Released Claim against a Released Entity.

D.     *Initial Participating Subdivisions*.  A Subdivision qualifies as an Initial Participating Subdivision if it meets the applicable requirements for becoming a Participating Subdivision set forth in Section VII.B or Section VII.C by the Initial Participation Date.  All Subdivision Settlement Participation Forms shall be held in escrow by the Settlement Fund Administrator until the Reference Date.

E.     *Later Participating Subdivisions*.  A Subdivision that is not an Initial Participating Subdivision may become a Later Participating Subdivision by meeting the applicable requirements for becoming a Participating Subdivision set forth in Section VII.B or Section VII.C after the Initial Participation Date and by agreeing to be subject to the terms of a State-Subdivision Agreement (if any) or any other structure adopted or applicable pursuant to Section V.D or Section V.E.  The following provisions govern what a Later Participating Subdivision can receive (but do not apply to Initial Participating Subdivisions):

1.     Except as provided in Section IV.C, a Later Participating Subdivision shall not receive any share of any Annual Payment due before it became a Participating Subdivision.

2.     A Later Participating Subdivision that becomes a Participating Subdivision after July 15, 2022 shall receive seventy-five percent (75%) of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision prior to that date (unless the Later Participating Subdivision is subject to Section VII.E.3 or Section VII.E.4).

3.      A Later Participating Subdivision that, after the Initial Participation Date, maintains a lawsuit for a Released Claim(s) against a Released Entity and has judgment entered against it on every such Claim before it became a Participating Subdivision (other than a consensual dismissal with prejudice) shall receive fifty percent (50%) of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision prior to such judgment; *provided, however*, that if the Subdivision appeals the judgment and the judgment is affirmed with finality before the Subdivision becomes a Participating Subdivision, the Subdivision shall not receive any share of any base payment or incentive payments.

4.      A Later Participating Subdivision that becomes a Participating Subdivision while a Bar or Case-Specific Resolution involving a different Subdivision exists in its State shall receive twenty-five percent (25%) of the share of future base or incentive payments that it would have received had it become a Later Participating Subdivision without such Bar or Case-Specific Resolution.

F.      *No Increase in Payments*.  Amounts to be received by Later Participating Subdivisions shall not increase the payments due from the Settling Distributors.

G.      *Ineligible Subdivisions*.  Subdivisions in Non-Settling States and Prior Litigating Subdivisions are not eligible to be Participating Subdivisions.

H.      *Non-Participating Subdivisions*.  Non-Participating Subdivisions shall not directly receive any portion of any Annual Payment, including from the State Fund and direct distributions from the Abatement Accounts Fund; however, a Settling State may choose to fund future Opioid Remediation that indirectly benefits Non-Participating Subdivisions.

I.      *Unpaid Allocations to Later Participating Subdivisions and Non-Participating Subdivisions*.  Any base payment and incentive payments allocated pursuant to Section V.D to a Later Participating Subdivision or Non-Participating Subdivision that cannot be paid pursuant to this Section VII, including the amounts that remain unpaid after the reductions required by Section VII.E.2 through Section VII.E.4, will be allocated to the Abatement Accounts Fund for the Settling State in which the Subdivision is located, unless those payments are redirected elsewhere by a State-Subdivision Agreement or by a Statutory Trust.

**VIII.  Condition to Effectiveness of Agreement and Filing of Consent Judgment**

A.      *Determination to Proceed With Settlement*.

1.      The Settling States shall confer with legal representatives of the Participating Subdivisions listed on Exhibit G and inform the Settling Distributors no later than eighteen (18) calendar days prior to the Reference Date whether there is sufficient participation to proceed with this Agreement.  Within seven (7) calendar days of informing the Settling Distributors that there is sufficient participation to proceed, the Settling States will deliver all signatures and releases required by the Agreement to be provided by the Settling States to the Settling Distributors.

2.      If the Settling States inform Settling Distributors that there is sufficient participation, the Settling Distributors will then determine on or before the Reference Date whether there is sufficient State participation and sufficient resolution of the Claims of the Litigating Subdivisions in the Settling States (through participation under Section VII, Case-Specific Resolution(s) and Bar(s)) to proceed with this Agreement. The determination shall be in the sole discretion of the Settling Distributors and may be based on any criteria or factors deemed relevant by the Settling Distributors.

B.      *Notice by Settling Distributors.*  On or before the Reference Date, the Settling Distributors shall inform the Settling States of their determination pursuant to Section VIII.A.  If the Settling Distributors determine to proceed, the Parties will proceed to file the Consent Judgments and the obligations in the Subdivision Settlement Participation Forms will be effective and binding as of the Reference Date.  If the Settling Distributors determine not to proceed, this Agreement will have no further effect, any amounts placed in escrow for Payment Year 1, including funds referenced in Section IV.C.1, Section IX, Section X, and Exhibit M, shall be returned to the Settling Distributors, and all releases (including those contained in Subdivision Settlement Participation Forms) and other commitments or obligations contained herein or in Subdivision Settlement Participation Forms will be void.

C.      *Determination of the Participation Tier.*

1.      On July 1, 2022, as extended by written agreement of the Settling Distributors and the Enforcement Committee, *provided* that Settling Distributors determine to proceed with this Agreement, the Settlement Fund Administrator shall determine the Participation Tier.  The criteria used to determine the Participation Tier are set forth in Exhibit H.  Any disputes as to the determination of the Participation Tier shall be decided by the National Arbitration Panel.

2.      The Participation Tier shall be redetermined by the Settlement Fund Administrator annually as of the Payment Date, beginning with Payment Year 3, pursuant to the criteria set forth in Exhibit H.

3.      After Payment Year 6, the Participation Tier cannot move higher, unless this restriction is waived by the Settling Distributors.

4.      In the event that a Participation Tier redetermination moves the Participation Tier higher, and that change is in whole or in part as a result of the post-Reference Date enactment of a Bar and there is later a Revocation Event with respect to such Bar, then on the next Payment Date that is at least one hundred eighty (180) calendar days after the Revocation Event, the Participation Tier shall move down to the Participation Tier that would have applied had the Bar never been enacted, unless the Bar is reinstated or all Subdivisions affected by the Revocation Event become Participating Subdivisions within one hundred eighty (180) calendar days of the Revocation Event. This is the sole circumstance in which, on a nationwide basis, the Participation Tier can move down.

5.    In the event that there is a post-Reference Date Revocation Event with respect to a Bar that was enacted in a Settling State prior to the Reference Date, then, on the next Payment Date that is at least one hundred eighty (180) calendar days after the Revocation Event, unless the Bar is reinstated or all Subdivisions affected by the Revocation Event become Participating Subdivisions within one hundred eighty (180) calendar days of the Revocation Event, the Participation Tier shall decrease – solely for the State in which the Revocation Event occurred – to the Participation Tier commensurate with the percentage of Litigating Subdivisions in that State that are Participating Subdivisions and the percentage of Non-Litigating Subdivisions that are both Primary Subdivisions and Participating Subdivisions, according to the criteria set forth in Exhibit G, except that the calculations shall be performed as to that State alone. For the avoidance of doubt and solely for the calculation in this subparagraph, the Settling States Column of Exhibit H shall play no role.  This is the sole circumstance in which one Settling State will have a different Participation Tier than other Settling States.

6.    The redetermination of the Participation Tier under Section VIII.C.2 shall not affect payments already made or suspensions, offsets, or reductions already applied.

IX.    **Additional Restitution**

A.    *Additional Restitution Amount.*  Pursuant to the schedule set forth in Exhibit M and subject to the reduction specified in Section IX.B, the Settling Distributors shall pay an Additional Restitution Amount to the Settling States listed in Exhibit N.  Such funds shall be paid, on the schedule set forth on Exhibit M, on the Payment Date for each relevant Payment Year to such Settling States as allocated by the Settlement Fund Administrator pursuant to Exhibit N.

B.    *Reduction of Additional Restitution Amount.*  In the event that any Non-Settling States appear on Exhibit N, the amounts owed by Settling Distributors pursuant to this Section IX shall be reduced by the allocations set forth on Exhibit N for any such Non-Settling States.

C.    *Use of Funds.*  All funds paid as an Additional Restitution Amount shall be part of the Compensatory Restitution Amount, shall be used for Opioid Remediation, except as allowed by Section V.B.2, and shall be governed by the same requirements as specified in Section V.F.

X.    **Plaintiffs' Attorneys' Fees and Costs**

The Agreement on Attorneys' Fees, Expenses and Costs is set forth in Exhibit R and incorporated herein by reference.  The Agreement on the State Outside Counsel Fee Fund and Agreement on the State Cost Fund Administration are set forth in Exhibit S and Exhibit T, respectively, and are incorporated herein by reference.

XI.    **Release**

A.    *Scope.*  As of the Effective Date, the Released Entities are hereby released and forever discharged from all of the Releasors' Released Claims.  Each Settling State (for itself and its Releasors) and Participating Subdivision hereby absolutely, unconditionally, and irrevocably

covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever.  The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims.  This Agreement shall be a complete bar to any Released Claim.

     B.    *Claim-Over and Non-Party Settlement.*

        1.    It is the intent of the Parties that:

           a.    Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract), from other parties for their payment obligations under this Agreement;

           b.    the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

           c.    Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

           d.    the Agreement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

The provisions of this Section XI.B are intended to be implemented consistent with these principles.  This Agreement and the releases and dismissals provided for herein are made in good faith.

        2.    No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner; *provided* that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it.  For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

        3.    To the extent that, on or after the Reference Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from the Settling Distributors in Section XI.B.2, or a release

from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over.  The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4.     In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that described in Section XI.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in Section XI.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, the Released Entity shall be relieved of the prohibition in Section XI.B.2 with respect to that Non-Released Entity and that Releasor and the Settling Distributors shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by the Settling Distributors:

a.     Settling Distributors shall notify that Releasor of the Claim-Over within sixty (60) calendar days of the assertion of the Claim-Over or sixty (60) calendar days of the Effective Date of this Settlement Agreement, whichever is later;

b.     Settling Distributors and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that they are not required to pay more with respect to Covered Conduct than the amounts owed by Settling Distributors under this Agreement;

c.     That Releasor and Settling Distributors shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Settling Distributors under this Agreement.  Such steps may include, where permissible:

(i)     Filing of motions to dismiss or such other appropriate motion by Settling Distributors or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

(ii)     Reduction of that Releasors' Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(iii)     Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(iv)     Return of monies paid by Settling Distributors to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(v)     Payment of monies to Settling Distributors by that Releasor to ensure they are held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(vi)     Credit to the Settling Distributors under this Agreement to reduce the overall amounts to be paid under the Agreement such that they are held harmless from the Claim-Over; and

(vii)     Such other actions as that Releasor and Settling Distributors may devise to hold Settling Distributors harmless from the Claim-Over.

d.     The actions of that Releasor and Settling Distributors taken pursuant to paragraph (c) must, in combination, ensure Settling Distributors are not required to pay more with respect to Covered Conduct than the amounts owed by Settling Distributors under this Agreement.

e.     In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and the Settling Distributors may seek review by the National Arbitration Panel, provided that, if the parties agree, such dispute may be heard by the state court where the relevant Consent Judgment was filed.  The National Arbitration Panel shall have authority to require Releasors to implement a remedy that includes one or more of the actions specified in paragraph (c) sufficient to hold Released Entities fully harmless.  In the event that the Panel's actions do not result in Released Entities being held fully harmless, Settling Distributors shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Settling Distributors harmless from the Claim-Over.  For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Settling Distributors may have.

5.     To the extent that the Claim-Over is based on a contractual indemnity, the obligations under Section XI.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor.  Each Settling Distributor shall notify the Settling States, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entity asserts a Claim-Over arising out of contractual indemnity against it.

C.     *Indemnification and Contribution Prohibited.*  No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any

47

other theory, from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

     D.    *General Release.* In connection with the releases provided for in this Agreement, each Settling State (for itself and its Releasors) and Participating Subdivision expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any State or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent**. A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Settling State (for itself and its Releasors) and Participating Subdivision hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Settling States' decision to enter into this Agreement or the Participating Subdivisions' decision to participate in this Agreement.

     E.    *Assigned Interest Waiver.* To the extent that any Settling State has any direct or indirect interest in any rights of a third-party that is a debtor under the Bankruptcy Code as a result of a claim arising out of Covered Conduct by way of assignment or otherwise, including as a result of being the beneficiary of a trust or other distribution entity, to assert claims against a Settling Distributor (whether derivatively or otherwise), under any legal or equitable theory, including for indemnification, contribution, or subrogation, such Settling State waives the right to assert any such claim, or to receive a distribution or any benefit on account of such claim and such claim, distribution, or benefit shall be deemed assigned to such Settling Distributor.

     F.    *Res Judicata.* Nothing in this Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in this Agreement, and/or any Consent Judgment or other judgment entered on this Agreement, gives rise to under applicable law.

     G.    *Representation and Warranty.* The signatories hereto on behalf of their respective Settling States expressly represent and warrant that they have (or have obtained, or will obtain no later than the Initial Participation Date) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) their respective Settling States, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of their respective Settling State's past and present executive departments,

agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also for the purposes of clause (3), a release from a State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

H. *Effectiveness.* The releases set forth in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Settlement Fund or any portion thereof.

I. *Cooperation.* Releasors (1) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (2) will reasonably cooperate with and not oppose any effort by Settling Distributors to secure the prompt dismissal of any and all Released Claims.

J. *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, this Agreement does not waive, release or limit any criminal liability, Claims for liability under tax law, Claims under securities law by a State Releasor as investor, Claims against parties who are not Released Entities, Claims by private individuals, and any claims arising under this Agreement for enforcement of this Agreement.

## XII. Later Litigating Subdivisions

A. *Released Claims against Released Entities.* Subject to Section XII.B, the following shall apply in the event a Later Litigating Subdivision in a Settling State maintains a lawsuit for a Released Claim against a Released Entity after the Reference Date:

1. The Released Entity shall take ordinary and reasonable measures to defend the action, including filing a Threshold Motion with respect to the Released Claim. The Released Entity shall further notify the Settling State and Settlement Fund Administrator immediately upon notice of a Later Litigating Subdivision bringing a lawsuit for a Released Claim, and shall not oppose a Settling State's submission in support of the Threshold Motion.

2. The provisions of this Section XII.A.2 apply if the Later Litigating Subdivision is a Primary Subdivision (except as provided in Section XII.A.2.f):

a. If a lawsuit including a Released Claim survives until the Suspension Deadline for that lawsuit, the Settlement Fund Administrator shall calculate the Suspension Amount applicable to the next Payment due from the Settling Distributor(s) at issue and apportioned to the State of the Later Litigating Subdivision and to Subdivisions in that State; *provided, however,* that the Suspension Amount for a Payment Year cannot exceed the Suspension Cap. The

Suspension Amount shall be paid into the Settlement Fund Escrow account. If the Suspension Amount exceeds the Suspension Cap for that Payment Year, then the remaining amount will be paid into the Settlement Fund Escrow in the following Payment Year, subject to the Suspension Cap for that Payment Year, and so forth in each succeeding Payment Year until the entire Suspension Amount has been paid into the Settlement Fund Escrow or the Released Claim is resolved, as provided below, whichever comes first. A suspension does not apply during the pendency of any appeal dismissing the lawsuit for a Released Claim in whole.

b. If the Released Claim is resolved with finality without requirement of payment by the Released Entity, the placement of any remaining balance of the Suspension Amount into the Settlement Fund Escrow shall cease and the Settlement Fund Administrator shall immediately transfer amounts in the Settlement Fund Escrow on account of the suspension to the Settling State at issue and its Participating Subdivisions. The lawsuit will not cause further suspensions unless the Released Claim is reinstated upon further review, legislative action, or otherwise.

c. If the Released Claim is resolved with finality on terms requiring payment by the Released Entity, the Settlement Fund Administrator will transfer the amounts in the Settlement Fund Escrow on account of the suspension to the Settling Distributor(s) at issue necessary to satisfy the payment obligation of the Released Entity to the relevant Later Litigating Subdivision. If any balance remains in the Settlement Fund Escrow on account of the suspension after transfer of the amount necessary to satisfy the payment obligation, the Settlement Fund Administrator will immediately transfer the balance to the Settling State at issue and its Participating Subdivisions. If the payment obligation of the Released Entity to the relevant Later Litigating Subdivision exceeds the amounts in the Settlement Fund Escrow on account of the suspension, the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the excess amount against its obligation to pay its allocable share of Annual Payments that would be apportioned to the Settling State at issue and to its Subdivisions. The offset shall be applied as follows: first against the Settling Distributor's allocable share of the Annual Payment due in Payment Year 18, up to the Offset Cap for that Payment Year, with any remaining amounts above the Offset Cap applied against the Settling Distributor's allocable share of the Annual Payment due in Payment Year 17, up to the Offset Cap for that Payment Year, and so forth for each preceding Payment Year until the entire amount to be offset has been applied or no future Payment Years remain.

d. If the lawsuit asserting a Released Claim is resolved with finality on terms requiring payment by the Released Entity, and the Released Claim did not give rise to a suspension of any Settling Distributor's portion of any Annual Payments (*e.g.*, because it was resolved during Payment Years 1 or 2, during which all Settling States are deemed eligible for Incentive Payment A and thus no suspension of payments took place, as provided by Section XII.B), the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly

Offset Cap, for the amount paid.  The offset shall be applied against the relevant Settling Distributor's allocable portion of the Annual Payments starting in Payment Year 18 and working backwards as set forth in Section XII.A.2.c.  If the lawsuit for a Released Claim is otherwise resolved by the Released Entity, without the Settling Distributor filing a Threshold Motion despite an opportunity to do so, and the Released Claim did not give rise to a suspension of any Settling Distributor's portion of any Annual Payments, the Settling Distributor at issue shall not receive any offset for the amount paid.

e.      If more than one Primary Subdivision in a Settling State becomes a Later Litigating Subdivision, a single Suspension Cap applies and the total amounts deducted from the share of the Annual Payment allocated to the Settling State and its Participating Subdivisions in a given Payment Year cannot exceed the Suspension Cap.  For the avoidance of doubt, an individual Primary Subdivision shall not trigger more than one suspension regardless if it (or any of its officials) is named as multiple plaintiffs in the same lawsuit.

f.      This Section XII.A.2 shall not apply with respect to a Primary Subdivision that is either (i) a Later Litigating Subdivision under clause (3) of the definition of that term solely because a legislative Bar or legislative Case-Specific Resolution applicable as of the Reference Date is invalidated by judicial decision after the Reference Date or (ii) a Later Litigating Subdivision under clause (4) of the definition of that term.  Such a Primary Subdivision shall be treated as a General Purpose Government under Section XII.A.3.

3.      The terms of this Section XII.A.3 apply if a the Later Litigating Subdivision is not a Primary Subdivision (except for Primary Subdivisions referenced in Section XII.A.2.f) but is a General Purpose Government, School District, Health District or Hospital District:  if the Released Claim is resolved with finality on terms requiring payment by the Released Entity, the Settling Distributor at issue shall receive a dollar-for-dollar offset, subject to the yearly Offset Cap, for the amount paid against its portion of the obligation to make Annual Payments that would be apportioned to the Settling State at issue and to its Subdivisions.  The offset shall be applied as follows:  first against the relevant Settling Distributor's allocable share of the Annual Payment due in Payment Year 18, up to the Offset Cap for that Payment Year, with any remaining amounts above the Offset Cap applied against the Payment due in Payment Year 17, up to the Offset Cap for that Payment Year, and so forth for each preceding Payment Year until the entire amount to be offset has been applied or no future Payment Year remains.  If the Released Claim is resolved on terms requiring payment during the first two (2) Payment Years, in no case will any amounts be offset against the amounts due in Payment Years 1 and 2.

4.      In no event shall the total of Suspension Amounts and offsets pursuant to this Section applicable to a Settling State in a Payment Year for that Payment Year exceed the Offset Cap for that State.  If, in a Payment Year, the total of Suspension Amounts and offsets applicable to a Settling State exceeds the Offset Cap, the Suspension Amounts shall be reduced so that the total of Suspension Amounts and offsets equals the Offset Cap.

5.      For the avoidance of doubt, any offset pursuant to this <u>Section XII</u> in a Settling State that is not eligible for Incentive Payment A shall continue to apply even if the Settling State at issue subsequently becomes eligible for Incentive Payment A.

6.      "*Terms requiring payment*" shall mean (i) a final monetary judgment or (ii) a settlement; *provided* that the Released Entity sought the applicable State Attorney General's consent to the settlement and such consent was either obtained or unreasonably withheld.  Should the judgment or settlement resolve claims that are not Released Claims, the offset shall be for the Released Claims portion only, which shall be distinguishable in the judgment or settlement.

B.      *Exceptions.*

1.      <u>Section XII.A</u> shall not apply where the Settling State at issue meets the eligibility criteria for and is entitled to Incentive Payment A for the Payment Year at issue, except as expressly provided therein.  For the avoidance of doubt, because all Settling States are deemed eligible for Incentive Payment A for Payment Years 1 and 2 under <u>Section IV.F.1.c</u>, a suspension of Payments under <u>Section XII.A.2</u> shall not apply to any Settling States for those Payment Years.

2.      An offset under <u>Section XII.A.2</u> and <u>Section XII.A.3</u> shall not apply where the Later Litigating Subdivision opted out of a Settlement Class Resolution in the Settling State at issue that was in full force and effect in that Settling State as of the due date of the payment for Payment Year 2 and remains in full force and effect; *provided* that an offset relating to that Subdivision may apply under <u>Section XIII</u>.

3.      <u>Section XII.A</u> shall not apply where the Later Litigating Subdivision seeks less than $10 million, or so long as its total claim is reduced to less than $10 million, in the lawsuit for a Released Claim at issue.

4.      An offset under <u>Section XII.A.3</u> shall not apply where the applicable Participation Tier is Participation Tier 1 and the population of the Later Litigating Subdivision is under 10,000.

5.      If the applicable Participation Tier is Participation Tier 2 or higher, and the Later Litigating Subdivision has a population less than 10,000, the offset under <u>Section XII.A.3</u> shall only apply to amounts paid pursuant to a settlement or judgment that are over $10 million per case or resolution.  Any type of consolidated or aggregated or joined or class actions, however styled, shall be considered a single case, and any resolutions that occur within a sixty (60) calendar day period of each other and involve Later Litigating Subdivisions that share common counsel and/or are created by the same or related judgments, settlement agreements, or other instruments or are conditioned upon one another, shall be considered a single resolution.  For the avoidance of doubt, any such case or resolution shall have only a single $10,000,000 exemption from the offset under <u>Section XII.A.3</u>.

C.      *No Effect on Other Provisions.*  A suspension or offset under <u>Section XII.A</u> shall not affect the Injunctive Relief Terms or the Consent Judgment.

D.     *No Effect on Other States.*  A suspension or offset under <u>Section XII.A</u> applicable to one State shall not affect the allocation or payment of the Annual Payment to other Settling States.

## XIII.  Reductions/Offsets

A.     *Non-Settling States.*  Non-Settling States shall not be eligible for any payments or have any rights in connection with this Agreement.  Accordingly, the stated maximum dollar amounts of the payments specified in <u>Exhibit M</u> are reduced by the aggregate Overall Allocation Percentage of Non-Settling States as set forth in <u>Exhibit F</u>.

B.     *Offset Relating to Incentive Payment A.*  If a Settling State is not eligible for Incentive Payment A at the third Payment Date, the Settling Distributors shall receive an offset with respect to that State.[10]  The offset shall be the dollar amount difference between (1) the total amount of the Incentive Payment A due from the Settling Distributors on the Effective Date and on the Payment Date for Payment Year 2 allocated to that State and its Participating Subdivisions, and (2) the total amount of Incentive Payments B and C that would have been due from the Settling Distributors on the Effective Date and on the Payment Date for Payment Year 2 so allocated but for the State's deemed eligibility for Incentive Payment A.  The offset shall be applied in equal installments to reduce the Annual Payments for Payment Years 3 through 7 that would be apportioned to that State and to its Subdivisions, and shall remain applicable even if that State subsequently becomes eligible for Incentive Payment A.

C.     *Settlement Class Resolution Opt Outs.*  If a Settling State is eligible for Incentive Payment A on the basis of a Settlement Class Resolution, and a Primary Subdivision that opted out of the Settlement Class Resolution maintains a lawsuit asserting a Released Claim against a Released Entity, the following shall apply.  If the lawsuit asserting a Released Claim either survives a Threshold Motion or has an unresolved Threshold Motion fewer than sixty (60) calendar days prior to the scheduled start of a trial involving a Released Claim, and is resolved with finality on terms requiring payment by the Released Entity, the Settling Distributor at issue shall receive a dollar-for-dollar offset for the amount paid against its obligation to make remaining Incentive Payment A payments that would be apportioned to that State and to its Subdivisions.  For the avoidance of doubt, an offset shall not be applicable under this subsection if it is applicable under <u>Section XII.A</u> with respect to the Subdivision at issue.

D.     *Revoked Bar, Settlement Class Resolution, or Case-Specific Resolution.*  If the Settling Distributors made any Annual Payments that included any incentive payments earned as a result of the existence of a Bar, Settlement Class Resolution, or Case-Specific Resolution in a Settling State, and there is subsequently a Revocation Event with respect to that Bar, Settlement Class Resolution, or Case-Specific Resolution after the determination of the amount of such Annual Payment, the Settling Distributors shall receive a dollar-for-dollar offset against the portion of remaining Annual Payments that would be allocated to that State and its Participating Subdivisions.  This offset will be calculated as the dollar amount difference between (1) the total amount of incentive payments paid by the Settling Distributors by virtue of the Bar, Settlement

---

[10] For purposes of this provision, in determining whether a Settling State would not be eligible for Incentive Payment A for Payment Year 3, the criteria set forth in <u>Section IV.F.1.b</u> shall apply to that Payment Year.

Class Resolution, or Case-Specific Resolution subject to the Revocation Event and (2) the total amount of incentive payments that would have been due from the Settling Distributors during that time had the Bar, Settlement Class Resolution, or Case-Specific Resolution subject to the Revocation Event not been in effect. The amount of incentive payments that would have been due, referenced in clause (2) above, will be calculated one hundred eighty (180) calendar days after the Revocation Event; for purposes of calculating the amount of incentive payments that would have been due, any relevant Subdivision shall be included as a Participating Subdivision if: (1) its Released Claims are extinguished by any subsequent Bar, Settlement Class Resolution, or Case-Specific Resolution in effect as of the date of such calculation, or (2) it becomes a Participating Subdivision (in addition to all other Participating Subdivisions) prior to the date of such calculation.

     E.    *Certain Taxes.* Amounts paid by a Settling Distributor under an Opioid Tax in a Settling State in a Payment Year shall give rise to a dollar-for-dollar offset against that Settling Distributor's obligation to pay its share of the Annual Payment in that Payment Year that would be allocated to the taxing State or its Participating Subdivisions. If such amounts paid exceed that Settling Distributor's allocable share of the Annual Payment allocable to the taxing State or its Participating Subdivisions in that Payment Year, the excess shall carry forward as an offset against its allocable share of remaining Annual Payments that would be allocated to the taxing State or its Participating Subdivisions

     F.    *Not Subject to Suspension Cap or Offset Cap.* For the avoidance of doubt, neither the Suspension Cap nor the Offset Cap apply to the offsets and reductions set forth in this Section XIII.

## XIV.  Miscellaneous

     A.    *Population of General Purpose Governments.* The population figures for General Purpose Governments shall be the published U.S. Census Bureau's population estimates for July 1, 2019, released May 2020. These population figures shall remain unchanged during the term of this Agreement.[11]

     B.    *Population of Special Districts.* For any purpose in this Agreement in which the population of a Special District is used other than Section IV.F.1.b: (a) School Districts' population will be measured by the number of students enrolled who are eligible under the Individuals with Disabilities Education Act ("*IDEA*") or Section 504 of the Rehabilitation Act of 1973; (b) Health Districts' and Hospital Districts' population will be measured at twenty-five percent (25%) of discharges; and (c) all other Special Districts' (including Fire Districts' and Library Districts') population will be measured at ten percent (10%) of the population served. The Settling Distributors and the Enforcement Committee shall meet and confer in order to agree on data sources for purposes of this Section prior to the Preliminary Agreement Date.

---

[11] The estimates for counties and parishes were accessed at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-counties-total.html. The estimates for cities and towns can currently be found at https://www.census.gov/data/datasets/time-series/demo/popest/2010s-total-cities-and-towns.html.

C.    *Population Associated with Sheriffs.*  For any purpose in this Agreement in which the population associated with a lawsuit by a sheriff is used, the population will be measured at twenty percent (20%) of the capacity of the jail(s) operated by the sheriff.

D.    *No Admission.*  The Settling Distributors do not admit liability or wrongdoing. Neither this Agreement nor the Consent Judgments shall be considered, construed or represented to be (1) an admission, concession or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to the Settling Distributors.

E.    *Most-Favored-Nation Provision.*—Settling States.

1.    If, after the Reference Date, any Settling Distributor enters into any settlement agreement with any Non-Settling State that resolves Claims similar in scope to the Claims released by a Settling State under this Agreement on overall payment terms that are more favorable to such Non-Settling State than the overall payment terms of the Agreement (after due consideration of relevant differences in population or other appropriate factors), then the Settling States, individually or collectively, may elect to seek review, pursuant to Section XIV.E.3, of the overall payment terms of this Agreement and the Non-Settling State agreement so that such Settling State(s) may obtain, with respect to that Settling Distributor, overall payment terms at least as favorable as those obtained by such Non-Settling State.  *"Overall payment terms"* refers to consideration of all payment terms of the two agreements, taken together, including, but not limited to the amount of payments, the timing of payments, and conditions or contingencies on payments.

2.    For any settlement with a Non-Settling State involving Released Claims that is entered into after the Reference Date, Settling Distributors shall provide the Enforcement Committee with a copy of the settlement agreement or relevant consent judgment within thirty (30) calendar days of the consummation of such settlement.  The Enforcement Committee will promptly distribute such copy to all Settling States.

3.    In the event that one or more Settling State(s) believes that the overall payment terms of an agreement by a Settling Distributor with a Non-Settling State are more favorable to the Non-Settling State, when compared based on the totality of the considerations set forth in Section XIV.E.1, the Settling State(s) and the Settling Distributor shall engage in the following process:

a.    The Settling State(s) shall provide notice, within sixty (60) calendar days of the date on which a settlement agreement or consent judgment is provided to the Enforcement Committee, to the Settling Distributor of its (their) intent to seek revision of this Agreement to provide payment terms that are, on an overall basis, as favorable as those obtained by the Non-Settling State.  Such notice shall be confidential and not disclosed publicly to the extent allowed by law and shall state, in detail, the basis for the State's (States') belief that it (they) is entitled to a revision of the Agreement.

b.    The Settling Distributor shall, within thirty (30) calendar days, provide a response to the Settling State(s), explaining its position, in detail, as to whether the Settling State(s) is entitled to more favorable overall payment terms than those provided for in this Agreement.

c.    In the event the Settling State(s) and Settling Distributor do not reach agreement as to the application of Section XIV.E.1, the Settling State(s) may petition the National Arbitration Panel to seek a ruling from the Panel as to the applicability of Section XIV.E.1, provided that the Settling State(s) may seek such review only if at least five (5) Settling States co-sign the petition. The Panel shall consider submissions and argument by the parties pursuant to the procedures set forth in Section VI.F.2.

d.    The Settling State(s) and the Settling Distributor shall be bound by the determination of the National Arbitration Panel.

4.    This Section XIV.E does not apply to, and there is no ability of any Settling State to seek or obtain revision of this Agreement based on, any Non-Settling State agreement with any Settling Distributor that is entered into with: (a) a Non-Settling State after a date sixty (60) calendar days prior to the scheduled start date of a trial between any Settling Distributor and the Non-Settling State or any severed or bifurcated portion thereof, provided that, where, in order to complete a settlement, a Non-Settling State and a Settling Distributor jointly request an adjournment of the scheduled start date of a trial within sixty (60) days of that date, this exception will apply as if the trial date had not been adjourned; (b) a Non-Settling State that previously litigated to judgment a case related to opioids against any manufacturer, distributor, or pharmacy; or (c) a Non-Settling State that has obtained any court order or judicial determination that grants judgment (in whole or in part) against any Settling Distributor. For avoidance of doubt, the National Arbitration Panel shall have no power to review agreements described in this paragraph.

5.    This Section XIV.E does not apply to, and there is no ability of any Settling State to seek or obtain revision of this Agreement based on, any agreement between a Settling Distributor and (a) federally-recognized tribe(s) or (b) West Virginia subdivisions or (c) Non-Participating Subdivisions. This Section XIV.E will not apply to any agreement entered into more than eighteen (18) months after the Reference Date.

F.    *Tax Cooperation and Reporting.*

1.    Upon request by any Settling Distributor, the Settling States and Participating Subdivisions agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for the Settling Distributors to establish the statements set forth in Section V.F to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

2. Without limiting the generality of Section XIV.F.1, each Settling State and Participating Subdivision shall cooperate in good faith with any Settling Distributor with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

3. The Designated State, as defined in Section I.P as New York, on behalf of all Settling States and Participating Subdivisions, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "*Appropriate Official*"). The Designated State shall direct and ensure that the Appropriate Official timely (a) files (i) at the time this Agreement becomes binding on the Parties, an IRS Form 1098-F in the form attached as Exhibit U, Exhibit V, and Exhibit W with respect to each of the Settling Distributors and (ii) any legally required returns or amended returns with any applicable governmental authority, or any returns requested by the respective Settling Distributors, and (b) provides to each of the Settling Distributors a copy of (i) the IRS Form 1098-F filed with respect to such Settling Distributor and (ii) any legally required written statement pursuant to any applicable law and any other document referred to in clause (a)(ii) above. Any such form, return, or statement shall be prepared and filed in a manner fully consistent with Section V.F.

4. The Settling States and Participating Subdivisions agree that any return, amended return, or written statement filed or provided pursuant to paragraph 3, and any similar document, shall be prepared and filed in a manner consistent with reporting each Settling Distributor's portion of the Global Settlement Amount as the "Total amount to be paid" pursuant to this Agreement in Box 1 of IRS Form 1098-F and each Settling Distributor's portion of the Compensatory Restitution Amount as "Restitution/remediation amount" in Box 2 of IRS Form 1098-F, as reflected in the attached Exhibit U, Exhibit V, and Exhibit W. If the Designated State or Appropriate Official shall be required to file any return, amended return, or written statement contemplated by this Section XIV.F other than an IRS Form 1098-F in the form attached as Exhibit U, Exhibit V, and Exhibit W, the Designated State shall direct and ensure that the Appropriate Official provides to each Settling Distributor a draft of such return, amended return, or written statement in respect of such Settling Distributor no later than sixty (60) calendar days prior to the due date thereof and shall accept and reflect any reasonable comments of such Settling Distributor on the return, amended return, or written statement in respect of such Settling Distributor.

5. For the avoidance of doubt, neither the Settling Distributors nor the Settling States and Participating Subdivisions make any warranty or representation to any Settling State, Participating Subdivision, or Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

G. *No Third-Party Beneficiaries.* Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Settling State or Released Entity. No Settling State may assign or otherwise convey any right to enforce any provision of this Agreement.

H.    *Calculation.* Any figure or percentage referred to in this Agreement shall be carried to seven decimal places.

I.    *Construction.* None of the Parties and no Participating Subdivision shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

J.    *Cooperation.* Each Party and each Participating Subdivision agrees to use its best efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and the Consent Judgments to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or any Consent Judgment by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Consent Judgments.

K.    *Entire Agreement.* This Agreement, including its exhibits and any other attachments, embodies the entire agreement and understanding between and among the Parties and Participating Subdivisions relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

L.    *Execution.* This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement. One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof. One or more counterparts of this Agreement may be signed by electronic signature.

M.    *Good Faith and Voluntary Entry.* Each Party warrants and represents that it negotiated the terms of this Agreement in good faith. Each of the Parties and Participating Subdivisions warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion. The Parties and Participating Subdivisions state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

N.    *Legal Obligations.* Nothing in this Agreement shall be construed as relieving any Settling Distributor of the obligation to comply with all state and federal laws, regulations or rules, nor shall any of the provisions herein be deemed to be permission to engage in any acts or practices prohibited by such laws, regulations, or rules. Except with respect to the Injunctive Relief Terms, in the event of a conflict between this Agreement and any requirement or requirements of federal, state, or local laws, such that a Settling Distributor cannot comply with this Agreement without violating such a requirement or requirements, the Settling Distributor

shall document such conflicts and notify the Attorney(s) General of the relevant Settling State(s) that it intends to comply with the requirement or requirements to the extent necessary to eliminate the conflict.  With respect to the Injunctive Relief Terms, in the event of such a conflict, the procedures set forth in Section III.X of the Injunctive Relief Terms will be followed.

O.    *No Prevailing Party.*  The Parties and Participating Subdivisions each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties and Participating Subdivisions have reached a good faith settlement.  The Parties and Participating Subdivisions each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.  Nothing in the previous sentence shall modify, or be construed to conflict with, Section XIV.M.

P.    *Non-Admissibility.*  The settlement negotiations resulting in this Agreement have been undertaken by the Parties and by certain representatives of the Participating Subdivisions in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose.  This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement.

Q.    *Notices.*  All notices or other communications under this Agreement shall be in writing (including, but not limited to, electronic communications) and shall be given to the recipients indicated below:

For the Attorney(s) General:

Ashley Moody,
Attorney General
State of Florida
The Capitol,
PL-01
Tallahassee, FL 32399

Josh Stein, Attorney General
North Carolina Department of Justice
Attn: Daniel Mosteller
PO Box 629
Raleigh, NC 27602
Dmosteller@ncdoj.gov

For the Plaintiffs' Executive Committee:

Paul T. Farrell, Jr., Esq.
Farrell & Fuller, LLC

1311 Ponce de Leon Ave., Suite 202
San Juan, Puerto Rico  00907
paul@farrellfuller.com

Jayne Conroy
Simmons Hanly Conroy LLC
112 Madison Avenue, 7th Floor
New York, NY 10016-7416
JConroy@simmonsfirm.com

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
jrice@motleyrice.com

Peter Mougey
Levin Papantonio Rafferty
316 South Baylen St.
Pensacola, FL 32502
pmougey@levinlaw.com

Paul J. Geller
Robbins Feller Rudman & Dowd LLP
120 East Palmetto Park Road
Boca Raton, FL 33432
PGeller@rgrdlaw.com

For Settling Distributors:

Copy to AmerisourceBergen Corporation's attorneys at:
Attn:  Michael T. Reynolds
Cravath, Swaine & Moore
825 Eighth Avenue
New York, NY 10019
mreynolds@cravath.com

Copy to Cardinal Health, Inc.'s attorneys at:
Attn:  Jeffrey M. Wintner, Esq.
Attn:  Elaine P. Golin, Esq.
Attn:  JB Kelly, Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
JMWintner@wlrk.com

EPGolin@wlrk.com
JBKelly@wlrk.com

Copy to McKesson Corporation's attorneys at:
Attn: Thomas J. Perrelli
Jenner & Block LLP
1099 New York Ave., NW, Suite 900
Washington, D.C. 20001
tperrelli@jenner.com

Any Party or the Plaintiffs' Executive Committee may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this Section XIV.P.

R. *No Waiver.* The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties. The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

S. *Preservation of Privilege.* Nothing contained in this Agreement or any Consent Judgment, and no act required to be performed pursuant to this Agreement or any Consent Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party and Participating Subdivision agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

T. *Successors.*

1. This Agreement shall be binding upon, and inure to the benefit of, the Settling Distributors and their respective successors and assigns.

2. A Settling Distributor shall not, in one (1) transaction or a series of related transactions, sell or transfer U.S. assets having a fair market value equal to twenty-five percent (25%) or more of the consolidated assets of such Settling Distributor (other than sales or transfers of inventories, or sales or transfers to an entity owned directly or indirectly by such Settling Distributor) where the sale or transfer is announced after the Reference Date, is not for fair consideration, and would foreseeably and unreasonably jeopardize such Settling Distributor's ability to make the payments under this Agreement that are due on or before the third Payment Date following the close of a sale or transfer transaction, unless the Settling Distributor obtains the acquiror's agreement that it will be either a guarantor of or successor to the percentage of that Settling Distributor's remaining Payment Obligations under this Agreement equal to the percentage of the Settling Distributor's consolidated assets being sold or transferred in such transaction. Percentages under this section shall be determined in accordance with United States generally accepted accounting principles and as of the date of the Settling

Distributor's most recent publicly filed consolidated balance sheet prior to the date of entry into the sale or transfer agreement at issue. This <u>Section XIV.T</u> shall be enforceable solely by the Enforcement Committee, and any objection under this <u>Section XIV.T</u> not raised within twenty (20) calendar days of the announcement of the relevant transaction is waived. Any dispute under this <u>Section XIV.T</u> shall be a National Dispute as described in <u>Section VI.F.2</u> and must be raised exclusively with the National Arbitration Panel as described therein within twenty (20) calendar days of the announcement, and the sole remedy shall be an order enjoining the transaction.

3.     A Settling Distributor shall not, in one (1) transaction or a series of related transactions, sell or transfer (other than sales or transfers to an entity owned directly or indirectly by such Settling Distributor) more than twenty-five percent (25%) of the distribution centers within its Full-Line Wholesale Pharmaceutical Distribution Business (as that term is defined in the Injunctive Relief Terms) where the sale or transfer is announced after the Reference Date, unless the Settling Distributor obtains the acquiror's agreement that it will be bound by the Injunctive Relief Terms.

U.     *Modification, Amendment, Alteration.*  After the Reference Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by the Settling Distributor to which the modification, amendment, or alteration applies, if the change applies to less than all Settling Distributors, along with the signatures of at least thirty-seven of those then serving Attorneys General of the Settling States along with a representation from each Attorney General that either: (1) the advisory committee or similar entity established or recognized by that Settling State (either pursuant to <u>Section V.E.2.d,</u> by a State-Subdivision Agreement, or by statute) voted in favor of the modification, amendment or alteration of this Agreement including at least one member appointed by the Participating Subdivisions listed on <u>Exhibit G</u>; or (2) in States without any advisory committee, that 50.1% (by population) of the Participating Subdivisions listed on <u>Exhibit G</u> expressed approval of the modification, amendment, or alteration of this Agreement in a writing.

V.     *Termination.*

1.     Unless otherwise agreed to by each of the Settling Distributors and the Settling State in question, this Agreement and all of its terms (except <u>Section XIV.P</u> and any other non-admissibility provisions, which shall continue in full force and effect) shall be canceled and terminated with respect to the Settling State, and the Agreement and all orders issued by the courts in the Settling State pursuant to the Agreement shall become null and void and of no effect if one or more of the following conditions applies:

a.     a Consent Judgment approving this Agreement without modification of any of the Agreement's terms has not been entered as to the Settling State by a court of competent jurisdiction on or before one hundred eighty (180) calendar days after the Effective Date;

b.     this Agreement or the Consent Judgment as to that Settling State has been disapproved by a court of competent jurisdiction to which it was presented for approval and/or entry (or, in the event of an appeal from or review

of a decision of such a court to approve this Agreement and the Consent Judgment, by the court hearing such appeal or conducting such review), and the time to appeal from such disapproval has expired, or, in the event of an appeal from such disapproval, the appeal has been dismissed or the disapproval has been affirmed by the court of last resort to which such appeal has been taken and such dismissal or disapproval has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court); or

2. If this Agreement is terminated with respect to a Settling State for whatever reason pursuant to Section XIV.V.1, then:

a. an applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date the Settling State signed this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that the Settling Distributors and the Settling State in question shall be in the same position with respect to the statute of limitation as they were at the time the Settling State filed its action; and

b. the Settling Distributors and the Settling State in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that the Settling Distributors and the Settling State in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

3. Unless each of the Settling Distributors and the Enforcement Committee agrees otherwise, this Agreement, with the exception of the Injunctive Relief Terms that have their own provisions on duration, shall terminate as to all Parties as of the Payment Date for Payment Year 18, *provided* that all Settling Distributors that as of that date are not Bankrupt Settling Distributors have performed their Payment obligations under the Agreement as of that date. If fewer than all Settling Distributors that as of that date are not Bankrupt Settling Distributors have performed their Payment obligations under the Agreement as of that date, then the Agreement shall terminate as of that date as to any Settling Distributor that has performed its Payment obligations under the Agreement and the Agreement (a) shall terminate as to each of the remaining Settling Distributors that as of that date is not a Bankrupt Settling Distributor at such time as each performs its Payment obligations under the Agreement and (b) shall terminate as to all Parties at such time as all Settling Distributors that are not Bankrupt Settling Distributors have performed their Payment obligations under the Agreement. Notwithstanding any other provision in this Section XIV.V.3 or in this Agreement, all releases under this Agreement will remain effective despite any termination under this Section XIV.V.3.

W. *Governing Law.* Except (1) as otherwise provided in this Agreement or (2) as necessary, in the sole judgment of the National Arbitration Panel, to promote uniformity of interpretation for matters within the scope of the National Arbitration Panel's authority, this Agreement shall be governed by and interpreted in accordance with the respective laws of the

Settling State, without regard to the conflict of law rules of such Settling State, that is seeking to enforce the Agreement against Settling Distributor(s) or against which Settling Distributor(s) are seeking enforcement.  Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Settlement Fund Escrow shall be governed by and interpreted in accordance with the law of the state where the escrow agent has its primary place of business.

X.      *Bankruptcy.*  The following provisions shall apply if a Settling Distributor enters Bankruptcy (a Settling Distributor which does so and takes the actions, or is otherwise subjected to the actions, referred to in (i) and/or (ii) herein being referred to as a "*Bankrupt Settling Distributor*") and (i) the Bankrupt Settling Distributor's bankruptcy estate recovers, pursuant to 11 U.S.C. § 550, any payments made under this Agreement, or (ii) this Agreement is deemed executory and is rejected by such Settling Distributor pursuant to 11 U.S.C. § 365:

1.      In the event that both a number of Settling States equal to at least seventy-five percent (75%) of the total number of Settling States and Settling States having aggregate Overall Allocation Percentages as set forth on Exhibit F equal to at least seventy-five percent (75%) of the total aggregate Overall Allocation Percentages assigned to all Settling States deem (by written notice to the Settling Distributors other than the Bankrupt Settling Distributor) that the financial obligations of this Agreement have been terminated and rendered null and void as to such Bankrupt Settling Distributor (except as provided in Section XIV.X.1.a) due to a material breach by such Bankrupt Settling Distributor, whereupon, with respect to all Settling States:

a.      all agreements, all concessions, all reductions of Releasing Parties' Claims, and all releases and covenants not to sue, contained in this Agreement shall  immediately and automatically be deemed null and void as to such Bankrupt Settling Distributor; the Settling States shall be deemed immediately and automatically restored to the same position they were in immediately prior to their entry into this Settlement Agreement in respect to such Bankrupt Settling Distributor and the Settling States shall have the right to assert any and all claims against such Bankrupt Settling Distributor in the Bankruptcy or otherwise, subject to any automatic stay, without regard to any limits or agreements as to the amount of the settlement otherwise provided in this Agreement; *provided, however*, that notwithstanding the foregoing sentence, (i) all reductions of Releasing Parties' Claims, and all releases and covenants not to sue, contained in this Agreement shall remain in full force and effect as to all persons or entities other than the Bankrupt Settling Distributor itself; and (ii) in the event a Settling State asserts any Released Claim against a Bankrupt Settling Distributor after the rejection and/or termination of this Agreement with respect to such Settling Distributor as described in this Section XIV.X.1.a and receives a judgment, settlement or distribution arising from such Released Claim, then the amount of any payments such Settling State has previously received from such Bankrupt Settling Distributor under this Agreement shall be applied to reduce the amount of any such judgment, settlement or distribution (provided that no credit shall be given against any such judgment, settlement or distribution for any payment that such Settling State is required to disgorge or repay to the Bankrupt Settling Distributor's bankruptcy estate); and

FINAL AGREEMENT 3.25.22

b.      the Settling States may exercise all rights provided under the federal Bankruptcy Code (or other applicable bankruptcy or non-bankruptcy law) with respect to their Claims against such Bankrupt Settling Distributor subject to all defenses and rights of the Bankrupt Settling Distributor.

# EXHIBIT J

## Settling Distributors' Subsidiaries, Joint Ventures, and Predecessor Entities

### ABC

1. A.T. Pharma Consultancy FZC
2. AB Eurco Ltd
3. AB Financing, LLC
4. AB Finco Ltd
5. AB Nokco Ltd
6. AB Singapore Investments Pte. Ltd.
7. AB Specialty Solutions, LLC
8. ABBP International Company
9. ABSG Canada Holdings, Inc.
10. Access M.D. Inc.
11. AERO LINK Courier GmbH
12. Agri-Laboratories, LTD
13. Agstrata, LLC
14. AH Schweiz GmbH
15. AH UK Holdco 1 Limited
16. Alcura France
17. Alcura Health España, S.A.
18. Alcura UK Limited
19. Alliance Boots BV
20. Alliance Boots Schweiz Investments GmbH
21. Alliance Health Services, Inc.
22. Alliance Healthcare (Distribution) Limited
23. Alliance Healthcare Acores (f/k/a Proconfar, S.A.)
24. Alliance Healthcare Ecza Deposu Anonim Şirketi
25. Alliance Healthcare España Holdings, S.L.
26. Alliance Healthcare España S.A.
27. Alliance Healthcare France SA
28. Alliance Healthcare Group France SA
29. Alliance Healthcare Management Services (Nederland) B.V.
30. Alliance Healthcare Management Services Limited
31. Alliance Healthcare Nederland B.V.
32. Alliance Healthcare Norge AS
33. Alliance Healthcare Participações SGPS, unipessoal, Lda.
34. Alliance Healthcare Répartition
35. Alliance Healthcare Romania SRL
36. Alliance Healthcare S.A.
37. Alliance Healthcare s.r.o.
38. Alliance Healthcare s.r.o. Slovakia Branch
39. Alliance Healthcare Services France (f/k/a Alliance Healthcare Formation SAS)
40. Alliance Healthcare Technology Services Limited
41. Alliance Healthcare Turkey Holding A.S.
42. Alliance Healthcare Yatirim Holding Anonim Şirketi
43. Alliance Home Health Care, Inc.
44. Alliance UniChem IP Limited
45. Alloga (Nederland) B.V.
46. Alloga France SAS
47. Alloga Logifarma, S.A.
48. Alloga Logistica (España) S.L.
49. ALLOGA LOGISTICS ROMANIA SRL
50. Alloga Portugal - Armazenagem e Distribuicao Farmaceutica, Lda
51. Alloga UK Limited
52. AllyDVM, Inc.
53. Almus Farmaceutica, S.A.
54. Almus France
55. Almus Pharmaceuticals Limited
56. Almus, Lda.
57. Alphega SA
58. Ambulatory Pharmaceutical Services, Inc.
59. American Medical Distributors, Inc.
60. American Oncology Network, LLC
61. Amerisource Health Services Corporation
62. Amerisource Health Services, LLC
63. Amerisource Health Services, LLC d/b/a American Health Packaging
64. Amerisource Heritage Corporation
65. AmeriSource Heritage LLC
66. Amerisource Receivables Financial Corporation
67. Amerisource Sales Corporation
68. AmerisourceBergen Associate Assistance Fund
69. AmerisourceBergen BC, ULC
70. AmerisourceBergen Canada Corporation
71. AmerisourceBergen Canada GP LLC
72. AmerisourceBergen Canada GP, LLC
73. AmerisourceBergen Canada Holdings LP
74. AmerisourceBergen Consulting Services, Inc.

75. AmerisourceBergen Consulting Services, LLC
76. AmerisourceBergen Corporation
77. AmerisourceBergen Drug Corporation
78. AmerisourceBergen Foundation
79. AmerisourceBergen Global Holdings GmbH
80. AmerisourceBergen Global Investments S.a.r.l.
81. AmerisourceBergen Global Manufacturer Services GmbH
82. AmerisourceBergen Group GmbH
83. AmerisourceBergen Holding Corporation
84. AmerisourceBergen Integrated Services Offering, LLC
85. AmerisourceBergen International Holdings Inc.
86. AmerisourceBergen International Investments, LLC
87. AmerisourceBergen Luxembourg s.a.r.l.
88. AmerisourceBergen Services Corporation
89. AmerisourceBergen Sourcing, LLC
90. AmerisourceBergen Specialty Group Canada Corporation
91. AmerisourceBergen Specialty Group Canada Holdings, Inc.
92. AmerisourceBergen Specialty Group, Inc.
93. AmerisourceBergen Specialty Group, LLC
94. AmerisourceBergen Swiss Holdings GmbH
95. AmerisourceBergen Switzerland GmbH
96. AmerisourceBergen UK Holdings Ltd
97. Anderson Packaging, Inc.
98. AndersonBrecon Inc.
99. Animal Prescriptions Limited
100. Animalytix LLC
101. Apluspharma Ltd
102. Apotheek Hagi B.V.
103. Apotheek Lichtenvoorde B.V.
104. APS Acquisitions Corporation
105. APS Enterprises Holding Company, Inc.
106. Armila UAB
107. ASD Hemophilia Management, LLC
108. ASD Hemophilia Program, L.P.
109. ASD Specialty Healthcare, Inc.
110. ASD Specialty Healthcare, LLC
111. ASD Specialty Healthcare, LLC d/b/a ASD Healthcare
112. ASD Specialty Healthcare, LLC d/b/a Besse Medical
113. ASD Specialty Healthcare, LLC d/b/a Oncology Supply
114. Automed Technologies (Canada) Inc.
115. Automed Technologies (Canada) ULC
116. Automed Technologies, Inc.
117. BBC Laboratories
118. BBC Operating Sub, Inc.
119. BBC Packing Corporation
120. BBC Special Packaging, Inc.
121. BBC Transportation Co.
122. Beachcourse Limited
123. Bellco Drug Corp.
124. Bellco Health Corp.
125. Bergen Brunswig Corporation
126. Bergen Brunswig Drug Company
127. Bergen Brunswig Realty Services, Inc.
128. Bermuda Equity Holdings, Ltd.
129. Beverly Acquisition Corporation
130. Blue Hill II, Inc.
131. Blue Hill, Inc.
132. BluePoint Intellectual Property, LLC
133. Boots Nederland B.V.
134. Boots Norge AS
135. BP Pharmaceuticals Laboratories Unlimited Company
136. BPL Brasil Participacoes Ltda.
137. BPL Brazil Holding Company s.a.r.l.
138. BPL Brazil, LLC
139. BPL Group, LLC
140. BPL Pharmaceuticals Holding Unlimited Company
141. BPLH Ireland Company Dublin, Zug Branch
142. BPLH Ireland Unlimited Company
143. Brecon Holdings Limited
144. Brecon Pharmaceuticals Holdings Limited
145. Brecon Pharmaceuticals Limited
146. Bridge Medical, Inc.
147. Brownstone Pharmacy, Inc.
148. Bruin Acquisition Corp.
149. Burt's Pharmacy, LLC
150. Cameron Stewart Lifescience Canada Inc.
151. Cannes RJ Participacoes S.A.
152. Capstone Med, Inc.
153. Capstone Pharmacy of Delaware, Inc.
154. CDRF Parent LLC
155. CDRF Parent, Inc.
156. Centaur Services Limited
157. Centro Farmaceutico Asturiano, SA
158. Century Advertising Inc.
159. Chapin Drug Company
160. Choice Medical, Inc.
161. Clinical Outcomes Resource Application Corporation
162. Clinical Outcomes Resource Application, Inc.

163. CliniCare Concepts, Inc.
164. ClinPharm, L.L.C.
165. Committed Provider Services, LLC
166. Compuscript, Inc.
167. Computran Systems, Inc.
168. Corrections Pharmacies Licensing Company, L.L.C.
169. Corrections Pharmacies of California, LP
170. Corrections Pharmacies of Hawaii, LP
171. Corrections Pharmacies, L.L.C.
172. Cubex, LLC
173. Datapharm Sarl
174. DD Wholesale, Inc.
175. Dialysis Purchasing Alliance, Inc.
176. Directlog
177. Documedics Acquisition Co., Inc.
178. Drug Service, Inc.
179. Dunnington Drug, Inc.
180. Dunnington RX Services of Massachusetts, Inc.
181. Dunnington RX Services of Rhode Island, Inc.
182. Durr-Fillauer Medical, Inc.
183. Durvet, Inc.
184. Dymaxium Healthcare Innovations, Ltd.
185. Dymaxium Holdings, Ltd.
186. Dymaxium, Ltd.
187. Entel d.o.o.
188. Escalante Solutions, L.P.
189. Esko Itriyat Sanayi ve Ticaret Anonim Şirketi
190. Euro Registratie Collectief B.V.
191. European Physician Networks GmbH
192. Express Pharmacy Services, Inc.
193. Falcon Acquisition Sub, LLC
194. Family Center Pharmacy, Inc.
195. Feeders Advantage, LCC
196. General Drug Company
197. Goot Nursing Home Pharmacy, Inc.
198. Goot Westbridge Pharmacy, Inc.
199. Goot's Goodies, Inc.
200. Goot's Pharmacy & Orthopedic Supply, Inc.
201. Green Barn, Inc
202. H. D. Smith Holding Company
203. H. D. Smith Holdings, LLC
204. H. D. Smith Wholesale Drug Co.
205. H. D. Smith, LLC
206. HAI Acquisition, Inc.
207. HDS Solutions, LLC
208. Health Services Capital Corporation
209. Healthcare Prescription Services, Inc.
210. HealthForward Inc.
211. HealthQuest Partner II, L.P.
212. HealthTronics Data Solutions LLC
213. HealthTronics Data Solutions, LLC
214. HealthTronics Information Technology Solutions, Inc.
215. Hedef International Holdings BV
216. Home Medical Equipment Health Company
217. Hydra Pharm SPA
218. I.g.G. of America, Inc.
219. IHS Acquisition XXX, Inc.
220. Imedex, Inc.
221. Imedex, LLC
222. Independent Pharmacy Buying Group, Inc.
223. Innomar Pharmacy (BC) Inc.
224. Innomar Pharmacy (SK) Inc.
225. Innomar Pharmacy Inc.
226. Innomar Specialty Pharmacy, Inc.
227. Innomar Strategies Inc.
228. Innovation Cancer, Inc.
229. Insta-Care Holdings, Inc.
230. Insta-Care Pharmacy Services Corporation
231. Intake Initiatives Incorporated
232. IntegraConnect NewCo, LLC
233. Integrated Commercialization Solutions, Inc.
234. Integrated Commercialization Solutions, LLC
235. Integrated Health Systems Outcomes Coalition, LLC
236. Inteplex, Inc.
237. Interfill, LLC
238. International Oncology Network Solutions, Inc.
239. International Physician Networks, L.L.C.
240. International Rheumatology Network, L.L.C.
241. IntrinsiQ Holdings, Inc.
242. IntrinsiQ Specialty Solutions, Inc.
243. IntrinsiQ Tendler, Inc.
244. IntrinsiQ, LLC
245. J.M. Blanco, Inc.
246. James Brudnick Company, Inc.
247. K/S Instrument Corp.
248. KRP Investments, Inc.
249. Labpak Limited
250. LAD Drug Corporation
251. Leading Educational Research Network, LLC
252. Lexicon Pharmacy Services, L.L.C.
253. Liberty Acquisition Corp.
254. Libra C.V.
255. Los Angeles Drug Corporation
256. M.D.P. Properties, Inc.
257. Managed Care Network, Inc.
258. Marshall Reinardy LLC

FINAL AGREEMENT 3.25.22

259. Medical Health Industries, Inc.
260. Medical Initiatives, Inc.
261. Medidyne Corp.
262. Medselect Inc.
263. Memorial Pet Care, Inc.
264. Micro Technologies Canada Inc.
265. MWI Buying Group Limited (formerly St. Francis Limited)
266. MWI Supply (UK Acquisition) Limited
267. MWI Supply (UK Holdings) Limited
268. MWI Supply (UK) Limited
269. MWI Veterinary Supply Co.
270. MWI Veterinary Supply, Inc.
271. Nareks Ecza Deposu Ticaret Anonim Şirketi
272. Network for Medical Communication & Research Analytics, LLC
273. New Jersey Medical Corporation
274. Nexiapharma, SL
275. NMCR Holdings, Inc.
276. NMCR-Europe, LLC
277. Northeast Veterinary Supply Company, LLC
278. Oktal Pharma d.o.o
279. Oktal Pharma d.o.o
280. Oktal Pharma d.o.o [Zagreb]
281. Oktal Pharma d.o.o.
282. Oktal Pharma Hungary K.f.t.
283. Omni Med B, Inc.
284. OPH Oktal Pharma d.o.o
285. OTC Direct Limited
286. Paris Acquisition Corp.
287. Pharm Plus Acquisition, Inc.
288. Pharma One Corporation Limited
289. Pharmacy Corporation of America
290. Pharmacy Corporation of America - Massachusetts, Inc.
291. Pharmacy Healthcare Solutions, Ltd.
292. Pharmacy Review Services, Inc.
293. Pharmdata s.r.o.
294. PharMEDium Healthcare Corporation
295. PharMEDium Healthcare Holdings LLC
296. PharMEDium Healthcare Holdings, Inc.
297. PharMEDium Healthcare LLC
298. PharMEDium Pharmacy Services, LLC
299. PharMEDium R.E., LLC
300. PharMEDium Services, LLC
301. PharMerica Drug Systems, Inc.
302. PharMerica Technology Solutions, LLC
303. Pharmerica, Inc.
304. Pitango HealthTech Fund I, L.P.
305. Planet Software Limited
306. PMSI MSA Services, Inc.

307. PMSI, Inc.
308. PPSC USA, LLC
309. Premier Pharmacy, Inc.
310. Premier Source Diagnostics Inc.
311. Premier Source, LLC
312. Prescribe Wellness, LLC
313. Profarma Distribuidora de Produtos Farmaceuticos S.A.
314. Ramuneles Vaistine UAB
315. Reimbursement Education Network, LLC
316. Rightpak, Inc.
317. Rombro's Drug Center, Inc.
318. Roscoe Acquisition Corporation
319. S.R.P. (Services de la Répartition Pharmaceutique)
320. SecureDVM, LLC
321. Securos Europe GmbH
322. Silver Streak I, LLC
323. Skills in Healthcare France
324. Skills in Healthcare Pazarlama ve Tanitim Hizmetleri Anonim Şirketi
325. Skills in Healthcare Romania S.r.l.
326. Smart ID Works, LLC
327. Smith Medical Partners, LLC
328. Snipetjernveien 10 Norge AS
329. Solana Beach, Inc.
330. Southwest Pharmacies, Inc.
331. Southwestern Drug Corporation
332. SparkSense Analytics, Inc.
333. Specialty Advancement Network, LLC
334. Specialty Pharmacy of California, Inc.
335. Specialty Pharmacy, Inc.
336. Spielberg Acquisition Corp.
337. Spits B.V.
338. Stadt Solutions, LLC
339. Stephar B.V.
340. Strategic Pharmaceutical Solutions, Inc.
341. Swine Solutions Network, LLC
342. Taylor & Manno Asset Recovery, Inc.
343. Telepharmacy Solutions, Inc.
344. Terra-Lab d.o.o
345. The Allen Company
346. The Lash Group, Inc.
347. The Lash Group, LLC
348. TheraCom, L.L.C.
349. ThermoSecure Medical Equipment GmbH
350. TMESYS, Inc.
351. TrakCel Holding Company, Inc.
352. Trellis Healthcare Consulting, L.L.C.
353. Trellis Healthcare Consulting, LLC
354. True Blue Indemnity Company

FINAL AGREEMENT 3.25.22

355. United Company of Pharmacists SAE
356. Universal Packaging Systems, Inc.
357. US Bioservices Corporation
358. Valley Wholesale Drug Co., LLC
359. Value Apothecaries, Inc.
360. Vedco, Inc.
361. Vetbridge Animal Health, LLC
362. Vetbridge Product Development (NM-OMP) LLC
363. VetSpace Limited
364. VetSpace, Inc.
365. Vetswest Limited
366. W.C. International Limited
367. WBA Acquisitions Luxco 9 S.à.r.l.
368. Wight Nederland Holdco 2 B.V.
369. Wight Nederland Holdco 4 BV
370. WML, LLC
371. Woodglen Properties Limited
372. Woodglen Properties Limited Portugal Branch

373. World Courier (Aust) Pty. Ltd.
374. World Courier (Austria) GmbH
375. World Courier (Austria) GmbH – Serbia Branch
376. World Courier (Deutschland) GmbH
377. World Courier (Finland) Oy
378. World Courier (India) Private Limited
379. World Courier (Ireland) Limited
380. World Courier (Lithuania), UAB
381. World Courier (Malaysia) Sdn. Bhd.
382. World Courier (Norway) AS
383. World Courier (NZ) Limited
384. World Courier (Poland) Sp. Z.o.o.
385. World Courier (Shanghai) Co., Ltd Guangzhou Branch
386. World Courier (Shanghai) Co., Ltd.
387. World Courier (Shanghai) Co., Ltd., Beijing Branch
388. World Courier (Sweden) AB
389. World Courier (Switzerland) SA
390. World Courier (U.K.) Limited
391. World Courier Asia (Thailand) Co., Ltd.
392. World Courier Belgium s.a.
393. World Courier Bulgaria
394. World Courier Czech Republic s.r.o.
395. World Courier de Chile Limitada
396. World Courier de Colombia S.A.
397. World Courier de Espana, S.A.
398. World Courier de Mexico S.A. de C.V.
399. World Courier de Portugal, Lda.
400. World Courier de Uruguay S.A.

401. World Courier del Ecuador S.A.
402. World Courier del Peru S.A.
403. World Courier Denmark A/S
404. World Courier do Brasil Transportes Internacionais Ltda.
405. World Courier France S.A.R.L.
406. World Courier Ground (Europe) Limited
407. World Courier Ground, Inc.
408. World Courier Group Logistics, Inc.
409. World Courier Group S.a.r.l.
410. World Courier Group, Inc.
411. World Courier Group, Inc. Taiwan Branch
412. World Courier Hellas Limited Liability Company
413. World Courier Holland BV
414. World Courier Hong Kong Limited
415. World Courier Hungary Freight Forwarder and Service Provider Limited Liability Company
416. World Courier Israel Ltd.
417. World Courier Italia srl
418. World Courier K.K. Japan
419. World Courier Korea Co., Ltd.
420. World Courier Limited (Russia)
421. World Courier Logistics (Europe) Limited
422. World Courier Logistics (UK) Limited
423. World Courier Logistics, Inc.
424. World Courier Logistics, Inc. (DE)
425. World Courier Logistics, Inc. (NY)
426. World Courier Management Limited
427. World Courier Management, Inc.
428. World Courier of Canada Ltd
429. World Courier Operations Kenya Limited
430. World Courier Philippines – Representative Office
431. World Courier Romania S.R.L.
432. World Courier S.A.
433. World Courier Singapore Pte Ltd
434. World Courier Slovak Republic s.r.o.
435. World Courier South Africa (Proprietary) Limited
436. World Courier Tasimacilik ve Lojistik Hizmetleri Ticaret Limited Sirketi
437. World Courier Ukraine LLC
438. World Courier Venezuela, S.A.
439. World Courier Zagreb d.o.o.
440. World Courier, Inc.
441. World Courier, kurirske storitve,d.o.o.
442. World Customs Brokerage, Inc.
443. Xcenda (UK) Limited
444. Xcenda GmbH

FINAL AGREEMENT 3.25.22

445. Xcenda Switzerland GmbH
446. Xcenda, L.L.C.

447. ZU Vase Zdravije

FINAL AGREEMENT 3.25.22

## **Cardinal**

1. A+ Secure Packaging, LLC
2. Abilene Nuclear, LLC
3. Access Closure, Inc.
4. Acuity GPO, LLC
5. Aero-Med, Ltd.
6. Allegiance (BVI) Holding Co. Ltd.
7. Allegiance Corporation
8. Allegiance Healthcare (Labuan) Pte. Ltd.
9. Allegiance I, LLC
10. Allegiance Labuan Holdings Pte. Ltd.
11. API (Suppliers) Limited
12. AssuraMed Acquisition Corp.
13. AssuraMed Group, Inc.
14. AssuraMed Holding, Inc.
15. AssuraMed Intermediate Holding, Inc.
16. AssuraMed, Inc.
17. C. International, Inc.
18. Cardinal Distribution Holding Corporation - I
19. Cardinal Distribution Holding Corporation - II
20. Cardinal Health 100, Inc.
21. Cardinal Health 104 LP
22. Cardinal Health 105, Inc.
23. Cardinal Health 107, LLC
24. Cardinal Health 108, LLC
25. Cardinal Health 110, LLC
26. Cardinal Health 112, LLC
27. Cardinal Health 113, LLC
28. Cardinal Health 114, Inc.
29. Cardinal Health 115, LLC
30. Cardinal Health 116, LLC
31. Cardinal Health 118, LLC
32. Cardinal Health 119, LLC
33. Cardinal Health 121, LLC
34. Cardinal Health 122, LLC
35. Cardinal Health 123, LLC
36. Cardinal Health 124, LLC
37. Cardinal Health 125, LLC
38. Cardinal Health 126, LLC
39. Cardinal Health 127, Inc.
40. Cardinal Health 128, LLC
41. Cardinal Health 130, LLC
42. Cardinal Health 131, LLC
43. Cardinal Health 132, LLC
44. Cardinal Health 133, Inc.
45. Cardinal Health 2, LLC
46. Cardinal Health 200, LLC
47. Cardinal Health 201 Canada L.P.
48. Cardinal Health 201, Inc.
49. Cardinal Health 215, LLC
50. Cardinal Health 222 (Thailand) Ltd.
51. Cardinal Health 242, LLC
52. Cardinal Health 246, Inc.
53. Cardinal Health 247, Inc.
54. Cardinal Health 249, LLC
55. Cardinal Health 250 Dutch C.V.
56. Cardinal Health 251, LLC
57. Cardinal Health 252, LLC
58. Cardinal Health 253, LP
59. Cardinal Health 3, LLC
60. Cardinal Health 414, LLC
61. Cardinal Health 418, Inc.
62. Cardinal Health 5, LLC
63. Cardinal Health 500, LLC
64. Cardinal Health 524, LLC
65. Cardinal Health 529, LLC
66. Cardinal Health 6, Inc.
67. Cardinal Health 7, LLC
68. Cardinal Health 8, LLC
69. Cardinal Health Australia 503 Pty Ltd.
70. Cardinal Health Austria 504 GmbH
71. Cardinal Health Belgium 505 BVBA
72. Cardinal Health Canada Holdings Cooperatie U.A.
73. Cardinal Health Canada Inc.
74. Cardinal Health Capital Corporation
75. Cardinal Health Cardiology Solutions, LLC
76. Cardinal Health Chile Limitada
77. Cardinal Health Colombia S.A.S.
78. Cardinal Health Commercial Technologies, LLC
79. Cardinal Health Corporate Solutions, LLC
80. Cardinal Health D.R. 203 II Ltd.
81. Cardinal Health Denmark ApS
82. Cardinal Health do Brasil Ltda.
83. Cardinal Health Finance
84. Cardinal Health Finland Oy
85. Cardinal Health Foundation
86. Cardinal Health France 506 SAS
87. Cardinal Health Funding, LLC
88. Cardinal Health Germany 507 GmbH
89. Cardinal Health Germany Manufacturing GmbH
90. Cardinal Health Holding International, Inc.
91. Cardinal Health International Philippines, Inc.
92. Cardinal Health IPS, LLC
93. Cardinal Health Ireland 419 Designated Activity Company
94. Cardinal Health Ireland 508 Limited

J-7

FINAL AGREEMENT 3.25.22

95.  Cardinal Health Ireland Manufacturing Limited
96.  Cardinal Health Ireland Unlimited Company
97.  Cardinal Health Italy 509 S.r.l.
98.  Cardinal Health Japan G.K.
99.  Cardinal Health Korea Limited
100.  Cardinal Health Luxembourg 420 S.a.r.l.
101.  Cardinal Health Luxembourg 522 S.a.r.l.
102.  Cardinal Health Malaysia 211 Sdn. Bhd.
103.  Cardinal Health Malta 212 Limited
104.  Cardinal Health Managed Care Services, LLC
105.  Cardinal Health Medical Products India Private Limited
106.  Cardinal Health Mexico 244 S. de R.L. de C.V.
107.  Cardinal Health Mexico 514 S. de R.L. de C.V.
108.  Cardinal Health Middle East FZ-LLC
109.  Cardinal Health MPB, Inc.
110.  Cardinal Health Napoleon Holding, LLC
111.  Cardinal Health Netherlands 502 B.V.
112.  Cardinal Health Netherlands 525 Cooperatie U.A.
113.  Cardinal Health Netherlands 528 B.V.
114.  Cardinal Health Norway AS
115.  Cardinal Health P.R. 120, Inc.
116.  Cardinal Health P.R. 218, Inc.
117.  Cardinal Health P.R. 220, LLC
118.  Cardinal Health P.R. 436, Inc.
119.  Cardinal Health Panama, S. de R.L.
120.  Cardinal Health Pharmaceutical Contracting, LLC
121.  Cardinal Health Pharmacy Services, LLC
122.  Cardinal Health Poland Spolka z ograniczona odpowiedzialnoscia
123.  Cardinal Health Portugal 513, Unipessoal Lda.
124.  Cardinal Health Russia
125.  Cardinal Health Singapore 225 Pte. Ltd.
126.  Cardinal Health Spain 511 S.L.
127.  Cardinal Health Sweden 512 A.B.
128.  Cardinal Health Switzerland 515, GmbH
129.  Cardinal Health Systems, Inc.
130.  Cardinal Health Technologies Switzerland GmbH
131.  Cardinal Health Technologies, LLC
132.  Cardinal Health U.K. 418 Limited
133.  Cardinal Health U.K. 432 Limited
134.  Cardinal Health U.K. Holding Limited
135.  Cardinal Health U.K. International Holding LLP
136.  Cardinal Health, Inc.
137.  Cardinal MED Equipment Consulting (Shanghai) Co., Ltd.
138.  Cirpro de Delicias S.A. de C.V.
139.  Clinic Pharmacies III, LLC
140.  Clinic Pharmacies, LLC
141.  Community Pharmacy Enterprises, LLC
142.  Convertors de Mexico S.A. de C.V.
143.  Cordis (Shanghai) MED Devices Co., Ltd.
144.  Cordis Cashel Unlimited Company
145.  Cordis Corporation
146.  Cornerstone Rheumatology LP
147.  Covidien Manufacturing Solutions, S.A.
148.  Dutch American Manufacturers II (D.A.M. II) B.V.
149.  Ellipticare, LLC
150.  EPIC Insurance Company
151.  Especialidades Medicas Kenmex S.A. de C.V.
152.  Experience East, LLC
153.  Flexible Stenting Solutions, Inc.
154.  Frog Horned Capital, Inc.
155.  Generic Drug Holdings, Inc.
156.  GetOutcomes, LLC
157.  Griffin Capital, LLC
158.  HDG Acquisition, Inc.
159.  imgRx Healdsburg, Inc.
160.  imgRx Salud, Inc.
161.  imgRx SJ Valley, Inc.
162.  imgRx SLO, Inc.
163.  imgRx Sonoma, Inc.
164.  InnerDyne Holdings, Inc.
165.  Innovative Therapies, Inc.
166.  Instant Diagnostic Systems, Inc.
167.  InteCardia-Tennessee East Catheterization, LLC
168.  ITI Sales, LLC
169.  Kendall-Gammatron Limited
170.  Killilea Development Company, Ltd.
171.  Kinray I, LLC
172.  KPR Australia Pty. Ltd.
173.  KPR Switzerland Sales GmbH
174.  KPR U.S., LLC
175.  Leader Drugstores, Inc.
176.  Ludlow Technical Products Canada, Ltd.
177.  Marin Apothecaries
178.  Medicap Pharmacies Incorporated
179.  Medicine Shoppe Capital Corporation
180.  Medicine Shoppe International, Inc.
181.  Medicine Shoppe Internet, Inc.
182.  Mediquip Sdn. Bhd.
183.  Mirixa Corporation

FINAL AGREEMENT 3.25.22

184. MosaicGPO, LLC
185. mscripts Holdings, LLC
186. mscripts Systems India Private Limited
187. mscripts, LLC
188. Nippon Covidien Ltd.
189. One Cloverleaf, LLC
190. Outcomes Incorporated
191. Owen Shared Services, Inc.
192. Pharmacy Operations Of New York, Inc.
193. Pharmacy Operations, Inc.
194. Physicians Purchasing, Inc.
195. Pinnacle Intellectual Property Services, Inc.
196. Pinnacle Intellectual Property Services-International, Inc.
197. Quiroproductos de Cuauhtemoc S. de R.L. de C.V.
198. RainTree Administrative Services, LLC
199. RainTree Care Management, LLC
200. RainTree GPO, LLC
201. Ransdell Surgical, Inc.
202. Red Oak Sourcing, LLC
203. Renal Purchasing Group, LLC
204. RGH Enterprises, Inc.
205. RT Oncology Services Corporation
206. Rxealtime, Inc.
207. Sierra Radiopharmacy, L.L.C.
208. Sonexus Health Access & Patient Support, LLC
209. Sonexus Health Distribution Services, LLC
210. Sonexus Health Financial Solutions, LLC
211. Sonexus Health Pharmacy Services, LLC
212. Sonexus Health, LLC
213. TelePharm, LLC
214. The Harvard Drug Group, L.L.C.
215. Tianjin ITI Trading Company
216. Tradex International, Inc.
217. Traverse GPO, LLC
218. Wavemark Lebanon Offshore s.a.l.
219. Wavemark, Inc.
220. Red Oak Sourcing, LLC
221. API (Suppliers) Limited
222. Sierra Radiopharmacy, L.L.C.
223. Abilene Nuclear, LLC
224. InteCardia-Tennessee East Catheterization, LLC
225. Kendall-Gammatron Limited
226. Almus Pharmaceuticals USA LLC
227. Cardinal Health (H.K.) Co. Limited
228. Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
229. Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
230. Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
231. Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
232. Dalian Zhongda Pharmaceutical Company Limited
233. NaviHealth Holdings, LLC
234. Parch, L.L.C.
235. 6464661 Canada Inc.
236. Academy Of Managed Care Medicine, L.L.C.
237. Alaris Medical 1 (Suisse) Sarl
238. Alaris Medical New Zealand Limited
239. Allegiance Healthcare International GmbH
240. Allegiance Pro Inc.
241. Allied Healthcare Services, Inc.
242. Almus Pharmaceuticals Singapore Pte. Ltd.
243. Almus Pharmaceuticals USA LLC
244. American Threshold Industries, Inc.
245. Anoka, LLC
246. ARCH Collection Corporation
247. ARCH, S.A.
248. Armand Scott, LLC
249. Aurum Pharmaceuticals Limited
250. Behrens Inc.
251. Beijing Baiji Advanced Specialty Company Limited
252. Bellwether Oncology Alliance, Inc.
253. Bentley Merger Sub, LLC
254. Bindley Western Funding Corporation
255. Bindley Western Industries II Of Maine, Inc.
256. Biosigna GmbH Institut für Biosignalverarbeitung und Systemanalyse
257. Bird Products (Japan) Ltd.
258. Bird Products Corporation
259. Brighton Capital, Inc.
260. Buffalo Merger Corp.
261. BW Transportation Services, Inc.
262. Cardal II, LLC
263. Cardal, Inc.
264. Cardinal Florida, Inc.
265. Cardinal Health (Beijing) China Pharmaceutical Co., Ltd.
266. Cardinal Health (Beijing) Medical Trading Co., Ltd.
267. Cardinal Health (Beijing) Pharmacy Co., Ltd.
268. Cardinal Health (Chengdu) Pharmacy Co., Ltd.
269. Cardinal Health (China) Investment Co., Ltd.

270. Cardinal Health (Chongqing) Pharmaceutical Co., Ltd.
271. Cardinal Health (Chongqing) Pharmacy Co., Ltd.
272. Cardinal Health (H.K.) Co. Limited
273. Cardinal Health (Hubei) Pharmaceutical Co., Ltd.
274. Cardinal Health (L) Co., Ltd.
275. Cardinal Health (Liaoning) Pharmaceutical Co., Ltd.
276. Cardinal Health (P02296)
277. Cardinal Health (P04080)
278. Cardinal Health (Shanghai) Commercial and Trading Company Limited
279. Cardinal Health (Shanghai) Cosmetics Trading Co., Ltd.
280. Cardinal Health (Shanghai) Logistics Co., Ltd.
281. Cardinal Health (Shanghai) Pharmaceutical Co., Ltd.
282. Cardinal Health (Shanghai) Pharmacy Co., Ltd.
283. Cardinal Health (Shanxi) Pharmaceutical Co., Ltd.
284. Cardinal Health (Shenyang) Pharmacy Co., Ltd.
285. Cardinal Health (Sichuan) Pharmaceutical Co., Ltd.
286. Cardinal Health (Tianjin) Pharmaceutical Co., Ltd.
287. Cardinal Health (Wuxi) Pharmaceutical Co., Ltd.
288. Cardinal Health (WuXi) Pharmacy Co., Ltd.
289. Cardinal Health (Zhejiang) Pharmaceutical Co., Ltd.
290. Cardinal Health 101, Inc.
291. Cardinal Health 102, Inc.
292. Cardinal Health 103, Inc.
293. Cardinal Health 106, Inc.
294. Cardinal Health 109, Inc.
295. Cardinal Health 111, LLC
296. Cardinal Health 113, LLC
297. Cardinal Health 117, LLC
298. Cardinal Health 129, Inc.
299. Cardinal Health 208, Inc.
300. Cardinal Health 301, LLC
301. Cardinal Health 400, Inc.
302. Cardinal Health 401, Inc.
303. Cardinal Health 402, Inc.
304. Cardinal Health 403, Inc.
305. Cardinal Health 404, Inc.
306. Cardinal Health 405, Inc.
307. Cardinal Health 406, Inc.
308. Cardinal Health 406, LLC
309. Cardinal Health 407, Inc.
310. Cardinal Health 408, Inc.
311. Cardinal Health 409, Inc.
312. Cardinal Health 410, Inc.
313. Cardinal Health 411, Inc.
314. Cardinal Health 412, Inc.
315. Cardinal Health 413, Inc.
316. Cardinal Health 415, Inc.
317. Cardinal Health 416, Inc.
318. Cardinal Health 417, Inc.
319. Cardinal Health 419, LLC
320. Cardinal Health 420, LLC
321. Cardinal Health 421 Limited Partnership
322. Cardinal Health 421, Inc.
323. Cardinal Health 422, Inc.
324. Cardinal Health 501 Dutch C.V.
325. Cardinal Health Austria 201 GmbH
326. Cardinal Health Bermuda 224, Ltd.
327. Cardinal Health Brasil 423 Servicos Farmaceuticos Nucleares Ltda
328. Cardinal Health Canada 204, Inc.
329. Cardinal Health Canada 301, Inc.
330. Cardinal Health Canada 302, Inc.
331. Cardinal Health Canada 307, ULC
332. Cardinal Health Canada 403, Inc.
333. Cardinal Health Canada 437, Inc.
334. Cardinal Health Canada Inc.
335. Cardinal Health Canada LP
336. Cardinal Health Cayman Islands Holding Co. Ltd
337. Cardinal Health Cayman Islands Ltd.
338. Cardinal Health China Co., Ltd.
339. Cardinal Health D.R. 203 Limited
340. Cardinal Health Europe IT GmbH
341. Cardinal Health France 205 SAS
342. Cardinal Health France 309 SAS
343. Cardinal Health Germany 206 GmbH
344. Cardinal Health Germany 234 GmbH
345. Cardinal Health Germany 318 GmbH
346. Cardinal Health Hedan (Shenzhen) Pharmaceutical Co., Ltd.
347. Cardinal Health Hong Kong Limited
348. Cardinal Health I, Inc.
349. Cardinal Health Imaging, LLC
350. Cardinal Health India Private Limited
351. Cardinal Health International Ventures, Ltd.
352. Cardinal Health Ireland 406 Ltd.

353. Cardinal Health Ireland 527 General Partnership
354. Cardinal Health Italy 208 S.r.l.
355. Cardinal Health Italy 312 S.p.A.
356. Cardinal Health Lease Funding 2002A, LLC
357. Cardinal Health Lease Funding 2002AQ, LLC
358. Cardinal Health Lease Funding 2003A, LLC
359. Cardinal Health Lease Funding 2003AQ, LLC
360. Cardinal Health Lease Funding 2003B, LLC
361. Cardinal Health Lease Funding 2003BQ, LLC
362. Cardinal Health Lease Funding 2004A, LLC
363. Cardinal Health Lease Funding 2004AQ, LLC
364. Cardinal Health Luxembourg 523 S.a.r.l.
365. Cardinal Health Mauritius Holding 226 Ltd.
366. Cardinal Health Mexico 213, S.A. de C.V.
367. Cardinal Health Netherlands 238 BV
368. Cardinal Health Netherlands 526 B.V.
369. Cardinal Health Netherlands Financing C.V.
370. Cardinal Health Netherlands Holding B.V.
371. Cardinal Health New Zealand 313 Limited
372. Cardinal Health Norway 315 A/S
373. Cardinal Health P.R. 227, Inc.
374. Cardinal Health P.R. 409 B.V.
375. Cardinal Health PTS, Inc.
376. Cardinal Health PTS, LLC
377. Cardinal Health S.A. 319 (Proprietary) Limited
378. Cardinal Health Singapore 304
379. Cardinal Health Singapore 423 Pte. Ltd.
380. Cardinal Health Spain 219 S.L.U.
381. Cardinal Health Spain 239 SA
382. Cardinal Health Specialty Pharmacy, LLC
383. Cardinal Health Sweden 220 AB
384. Cardinal Health Sweden 314 AB
385. Cardinal Health Switzerland 221 Sarl
386. Cardinal Health Switzerland 317 Sarl
387. Cardinal Health Trading (Shanghai) Co., Ltd.
388. Cardinal Health U.K. 100 Limited
389. Cardinal Health U.K. 101 Limited
390. Cardinal Health U.K. 102 Limited
391. Cardinal Health U.K. 103 Limited
392. Cardinal Health U.K. 104 Limited
393. Cardinal Health U.K. 105 Limited
394. Cardinal Health U.K. 106 Limited
395. Cardinal Health U.K. 223 Limited
396. Cardinal Health U.K. 232 Limited
397. Cardinal Health U.K. 235 Limited
398. Cardinal Health U.K. 236 Limited
399. Cardinal Health U.K. 240 Limited
400. Cardinal Health U.K. 305 Limited
401. Cardinal Health U.K. 306 Limited
402. Cardinal Health U.K. 433 Limited
403. Cardinal Health U.K. 434 Limited
404. Cardinal Syracuse, Inc.
405. Cardinal.Com Holdings, Inc.
406. Care Fusion Development Private Limited
407. Care Fusion Incorporated
408. CareFusion 202, Inc.
409. CareFusion 203, Inc.
410. CareFusion 205, Inc.
411. CareFusion 206, Inc.
412. CareFusion 207, Inc.
413. CareFusion 209, Inc.
414. CareFusion 210, Inc.
415. CareFusion 211, Inc.
416. CareFusion 212, LLC
417. CareFusion 213, LLC
418. CareFusion 214, LLC
419. CareFusion 2200, Inc.
420. CareFusion 2201, Inc.
421. CareFusion 302, LLC
422. CareFusion 303, Inc.
423. CareFusion 304, LLC
424. CareFusion Australia 200 Pty Ltd.
425. CareFusion Australia 316 Pty Limited
426. CareFusion Australia 500 Pty Ltd
427. CareFusion Belgium 202 BVBA
428. CareFusion Brasil 231 Servico e Comercia de Productos Medicos Ltda
429. CareFusion Corporation
430. CareFusion EIT, LLC
431. CareFusion Iberia 308 S.L.U.
432. CareFusion Italy 237 Srl
433. CareFusion Italy 311 Srl
434. CareFusion Japan 228 K.K.
435. CareFusion Japan 233, Inc.
436. CareFusion Luxembourg 501 Sarl
437. CareFusion Manufacturing Ireland 241 Limited
438. CareFusion Manufacturing, LLC
439. CareFusion Netherlands 214 B.V.
440. CareFusion Netherlands 238 BV
441. CareFusion Netherlands 310 B.V.
442. CareFusion Netherlands 503 B.V.
443. CareFusion New Zealand 217 Limited
444. CareFusion New Zealand 313 Limited
445. CareFusion Resources, LLC
446. CareFusion Singapore 243 Pte. Ltd.
447. CareFusion Solutions, LLC
448. CareFusion U.K. 284 Limited
449. CareFusion U.K. 286 Limited
450. CareFusion U.K. 287 Limited

451. CareFusion U.K. 288 Limited
452. Cascade Development, Inc.
453. CCB, Inc.
454. CDI Investments, Inc.
455. Centralia Pharmacy, Inc.
456. Centricity, LLC
457. Chapman Drug Company
458. Chengdu Baiji Advanced Specialty Pharmacy Company Limited
459. Cheshire Merger Sub, Inc.
460. CMI Net, Inc.
461. College Park Plaza Associates, Inc.
462. Comprehensive Medical Imaging-Anaheim Hills, Inc.
463. Comprehensive Medical Imaging-Apple Valley, Inc.
464. Comprehensive Medical Imaging-Boynton Beach, Inc.
465. Comprehensive Medical Imaging-Downey, Inc.
466. Comprehensive Medical Imaging-Encino, Inc.
467. Comprehensive Medical Imaging-Fort Lauderdale, Inc.
468. Comprehensive Medical Imaging-Fremont, Inc.
469. Comprehensive Medical Imaging-Hesperia, Inc.
470. Comprehensive Medical Imaging-Huntington Beach, Inc.
471. Comprehensive Medical Imaging-Palm Springs, Inc.
472. Comprehensive Medical Imaging-Rancho Cucamonga, Inc.
473. Comprehensive Medical Imaging-Rancho Mirage, Inc.
474. Comprehensive Medical Imaging-Salisbury, Inc.
475. Comprehensive Medical Imaging-Sherman Oaks, Inc.
476. Comprehensive Medical Imaging-Tempe, Inc.
477. Comprehensive Medical Imaging-Van Nuys, Inc.
478. Comprehensive Medical Imaging-Victorville, Inc.
479. Comprehensive Medical Imaging-Westlake Village, Inc.
480. Comprehensive Open MRI-Carmichael, Inc.
481. Comprehensive Open MRI-Folsom, Inc.
482. Comprehensive Open MRI-Fullerton, Inc.
483. Comprehensive Open MRI-Laguna Hills, Inc.
484. Comprehensive Open MRI-Sacramento, Inc.
485. Comprehensive Reimbursement Consultants, Inc.
486. Consumer2patient, LLC
487. CR Medicap, Inc.
488. Curaspan Health Group, Inc.
489. Cytokine Pharmasciences, Inc.
490. Dalian Zhongda Pharmaceutical Company Limited
491. Daniels Pharmaceuticals Limited
492. DC Merger Corp
493. Denver Biomedical, Inc.
494. Desert PET, LLC
495. Dik Drug Company, LLC
496. Dik Medical Supplies, LLC
497. Discor Limited
498. Dismed Inc.
499. Dohmen Distribution Partners Southeast, L.L.C.
500. Dover Communications, LLC
501. Duquoin Pharmacy, Inc.
502. Dutch American Manufacturers (D.A.M.) B.V.
503. East Iowa Pharmacies, Inc.
504. EGIS Holdings, Inc.
505. Eldon Laboratories Limited
506. Ellicott Drug Company
507. EME Medical, Inc.
508. Enturia Canada ULC
509. Enturia de Mexico S. de R.L. de C.V.
510. Enturia Limited
511. Enturican, Inc.
512. EON Media Inc.
513. Eureka Merger Sub, Inc.
514. European Pharmaceuticals Group Ltd.
515. First Choice, Inc. Of Maine
516. Flower Merger Corp.
517. Futuremed Health Care Products Limited Partnership
518. Futuremed Healthcare Products Corporation
519. Futuremed Holdings General Partner Inc.
520. Fuzhou Baiji Pharmacy Company Limited
521. Gala Design, Inc.
522. Gelatin Products International, Inc.
523. Geodax Technology, Inc.
524. Glacier Corporation
525. Grand Avenue Pharmacy, Inc.
526. Graphic Holdings, Inc.
527. Griffin Group Document Management Services, Inc.

FINAL AGREEMENT 3.25.22

528. Guangzhou Baiji Advanced Specialty Pharmaceutical Chain Stores Company Limited
529. Guangzhou Baiji Drug Store Company Limited
530. Guangzhou City Kangwei Information Technology Company Limited
531. Guangzhou Ruixun Pharmaceutical Company Limited
532. Guizhou Yibai Medical Co., Ltd.
533. Hangzhou Baiji Advanced Specialty Drug Store Company Limited
534. Heartland Diagnostic Services, Inc.
535. HLS Advantage, LLC
536. Homecare (North-West) Limited
537. Humiston-Keeling, Inc.
538. IMI Of Boca Raton, Inc.
539. IMI Of Miami, Inc.
540. IMI Of North Miami Beach, Inc.
541. Inland Empire Regional Pet Center, LLC
542. InnerDyne, Inc.
543. Inpharm Nationwide Limited
544. InteCardia-Tennessee East Diagnostic, LLC
545. Intercare Holdings Limited
546. Intercare Investments Limited
547. Intercare Properties Plc
548. Iowa Falls Pharmacy, Inc.
549. IVAC Overseas Holdings LP
550. JakaMed AB AB
551. Jinan Baiji Drug Store Company Limited
552. JRG, Ltd.
553. Kendall Patient Recovery BVBA
554. Kinetic Surgical, LLC
555. Kinray, Inc.
556. Kinray, LLC
557. KPR Italia S.r.l.
558. KPR U.S., Inc.
559. Kunming Baiji Advanced Specialty Pharmacy Company Limited
560. Lake Charles Pharmaceutical Supply Company, LLC
561. Liaoning Longda Pharmaceutical Co., Ltd.
562. Liberty Communications Network, LLC
563. Ludlow Technical Products Corporation
564. Macarthy Group Trustees Limited
565. Macarthys Laboratories Limited
566. Macarthy's Limited
567. Marmac Distributors, Inc.
568. Martindale Pharma GmbH
569. Martindale Pharmaceuticals Limited
570. Medcon S.A.
571. MedEd Resources, LLC
572. Medesta Associates, LLC
573. Medical Concepts Development, Inc.
574. Medical Diagnostic Leasing, Inc
575. Medical Education Systems, LLC
576. Medical Media Communications, LLC
577. Medical Strategies, Inc.
578. MediQual Systems, Inc.
579. Meditrol Automation Systems, Inc.
580. Meditrol, Inc.
581. MedMined, Inc.
582. Mercury Merger Sub, LLC
583. Mesa Merger Corp.
584. MicroGas Limited
585. MicroMedical Deutschland GmbH
586. Microport Healthcare, LLC
587. Midland Pharmacies, Inc
588. Mississippi Medical Supply Cooperative, L.L.C.
589. MRI Equipment Partners, Ltd.
590. Mudhen Merger Corp.
591. Multi-Medica S.A.
592. Multipharm Limited
593. Nanjing Baiji Advanced Specialty Drug Store Company Limited
594. Nanning Baiji Advanced Specialty Pharmacy Company Limited
595. Nationwide Ostomy Supplies Limited
596. Navigator Health, Inc.
597. NaviHealth Holdings, LLC
598. NaviHealth SM Holdings, Inc.
599. NaviHealth, Inc.
600. Nexus Healthcare, Inc.
601. Nitric Bio Therapeudics, Inc.
602. Northern Michigan Supply Alliance, L.L.C.
603. Ohio Valley-Clarksburg, Inc.
604. Oncology Holdings, Inc.
605. Onpointe Medical Communications, LLC
606. Oval (Shanghai) Technologies, Inc.
607. Oval Technologies (H.K.) Pty Limited
608. Owen Healthcare Building, Inc.
609. Pacific Surgical Innovations, Inc.
610. Panther Merger Sub II, Inc.
611. Panther Merger Sub, Inc.
612. Parch, L.L.C.
613. Parch, L.L.C. State File
614. ParMed Pharmaceuticals, LLC
615. PatientScribe Inc.
616. PCI Acquisition I, Inc.
617. PCI Acquisition II, Inc.
618. PCI Services Holdings, Inc.

FINAL AGREEMENT 3.25.22

619. PCI Services III, Inc.
620. PCI/Acquisition III, Inc.
621. PCI/All Pack Holdings, Inc.
622. PCI/Delvco, Inc. State File
623. PCI/Tri-Line (Usa), Inc.
624. Pharmaceutical & Diagnostic Services, LLC
625. Pharmacy Service Corporation
626. Phillipi Holdings, Inc.
627. PHR Staffing, Inc.
628. Post-Acute Care Center For Research, LLC
629. Practicome Solutions, LLC
630. Princeton Diagnostic Isotopes, Inc.
631. Priority Healthcare Services Corporation
632. Procedure-Based Instrument Services, L.L.C.
633. Productos Urologos de Mexico S.A. de C.V.
634. Professional Health-Care Resources, Inc.
635. Pyxis Capital Corporation
636. Pyxis Funding II, LLC
637. Pyxis Funding, LLC
638. R Cubed, Inc.
639. R. P. Scherer Hardcapsule (West)
640. R.P. Scherer Inc.
641. R.P. Scherer Technologies, Inc.
642. Radiopharmacy Of Boise, Inc.
643. Radiopharmacy Of Northern California, Inc.
644. Renlar Systems, Inc.
645. RightCare Solutions, Inc.
646. Royal Merger Sub, Inc.
647. Scela, Inc.
648. Scriptline, Inc.
649. SensorMedics (Deutschland) GmbH
650. SensorMedics Corporation
651. Shanghai Baiwei Drug Store Company Limited
652. Shanghai Cardinal Baiwei Drug Store Co., Ltd.
653. Shanghai Jinyi Health Management Consultation Co., Ltd.
654. Shanghai Luoda Pharmaceutical Company Limited
655. Shenzhen Zhengdan Investment Company Limited
656. Simolo (GL) Limited
657. Sistemas Medicos ALARIS S.A. de C.V.
658. Snowden Pencer Holdings, Inc.
659. Snowden Pencer, Inc.
660. Solomons Company
661. Source Medical Corporation
662. SRX, Inc.
663. Strategic Implications International, LLC
664. Supplyline Technologies Limited
665. Surgical Carepair, L.L.C.
666. Surgical Instrument Repair Service, L.L.C.
667. Syncor Belgium SPRL
668. Syncor Diagnostics Bakersfield, LLC
669. Syncor Diagnostics Dallas, LLC
670. Syncor Diagnostics Encino, LLC
671. Syncor Diagnostics Fullerton, LLC
672. Syncor Diagnostics Laguna Hills, LLC
673. Syncor Diagnostics Plano, LLC
674. Syncor Diagnostics Sacramento, LLC
675. Syncor Financing Corporation
676. Syncor Italy srl
677. The Enright Group, Inc.
678. The Heron Corporation
679. The LVC Corporation
680. Tianjin Cardinal Pharmacy Co., Ltd.
681. Toledo Pharmacy Company
682. Tropic Merger Sub, Inc.
683. UroMed, Inc.
684. VIASYS Healthcare Ireland Limited
685. VIASYS Healthcare Island EHF
686. VIASYS Healthcare S.A.R.L.
687. VIASYS Holdings Inc.
688. VIASYS NeuroCare France SAS
689. VIASYS Polymer Products LLC
690. Virginia Imaging Center, LLC
691. Virginia Merger Corporation
692. Vistant Corporation
693. Vistant Holdings, Inc.
694. Vubiq Inc.
695. Wenzhou Xinte Pharmaceutical Co., Ltd.
696. West Hudson, Inc.
697. West Texas Nuclear Pharmacy Partners
698. Wholesale (PI) Limited
699. Williams Drug Distributors, Inc.
700. Wolf Merger Corp.
701. Wrangler Acquisition Sub, Inc.
702. Wuhan Baiji New & Special Drug Store Company Limited
703. Xiamen Cardinal Baiwei Drug Store Co., Ltd.
704. Xi'an Baiji Advanced Specialty Pharmacy Company Limited
705. Yorkshire Pharmacy, Inc.

FINAL AGREEMENT 3.25.22

## McKesson

1. "Aewige" ärztliche Wirtschaftsgesellschaft m.b.H., HG Wien
2. "die apoteeke in teesdorf" Mag. pharm. Gerda Kohlhauser KG, LG Wiener Neustadt
3. "Esplanade-Apotheke" Mag. pharm. Anna-Maria Köck KG, Landesgericht Wels
4. "Panther Apotheke" Mag. pharm. Sandra Krokos KG, Landesgericht Graz
5. 10101 Woodloch Forest LLC
6. 2012 DREAM LIMITED, England
7. 28CVR LIMITED, England
8. 3068312 Nova Scotia ULC
9. 3069163 Nova Scotia Limited
10. 3069164 Nova Scotia Limited
11. 30MC LIMITED, England
12. 701985 N.B. INC.
13. A C FERGUSON (CHEMIST) LIMITED, England
14. A. SUTHRELL (HAULAGE) LIMITED, England
15. A.F.M. Bergamo S.p.A., Italy
16. A.L.I. Holdings LLC
17. A.L.I. Imaging Systems Corp.
18. A.L.I. Technologies (International) LLC
19. AAH BUILDERS SUPPLIES LIMITED, England
20. AAH FURB PENSION TRUSTEE LIMITED, England
21. AAH Glass & Windows Limited, England
22. AAH Ireland, Dublin
23. AAH LIMITED, England
24. AAH Lloyds Insurance (IoM) Limited, Isle Of Man
25. AAH LLOYDS PENSION TRUSTEES LIMITED, England
26. AAH NOMINEES LIMITED, England
27. AAH ONE LIMITED, Scotland
28. AAH PHARMACEUTICALS LIMITED, England
29. AAH TWENTY FOUR LIMITED, Scotland
30. AAH TWENTY LIMITED, England
31. AAH TWENTY SIX LIMITED, England
32. ABG Apotheken-Beratungsgesellschaft mbH, Stuttgart
33. Access Health NZ Limited
34. AccessMed Holdings, Inc.
35. AccessMed, Inc. (AccessMed, LLC)
36. AccessMed, LLC
37. ACME DRUG CO. LIMITED, Scotland
38. ADDED MARKETING LIMITED, England
39. Adler Apotheke Krems Mag. Gabriele Denk KG, LG Krems an der Donau
40. Adler-Apotheke Mag.pharm. Ingrid Chvatal KG, LG Leoben
41. Admenta Beteiligungs GmbH, HG Wien
42. Admenta Denmark ApS, Copenhagen
43. Admenta Deutschland GmbH, Stuttgart
44. ADMENTA HOLDINGS LIMITED, England
45. ADMENTA ITALIA S.P.A., CCIAA di Bologna
46. ADMENTA PENSION TRUSTEES LIMITED, England
47. Admenta Sweden AB
48. ADMENTA UK LIMITED, England
49. Admenta Verwaltungs GmbH, HG Wien
50. AFM S.p.A., CCIAA di Bologna
51. AHLP PHARMACY LIMITED, England
52. ALCHEM (SOUTHERN) LIMITED, England
53. ALPE-ADRIA PHARMA farmacevtsko podjetje d.o.o., Ljubljana
54. Alphar Ayeneux, Belgium
55. Alphar Gilly DL, Belgium
56. Alphar Monceau sur Sambre, Belgium
57. Alphar Partners SA, Belgium
58. Alte Löwen-Apotheke Mag. pharm. Kristina Taubald KG, HG Wien
59. Alte Spora Apotheke Mag.pharm. Stephan Öhlzelt KG, LG St. Pölten
60. Amethyst Acquisition Corp.
61. Ancavion GmbH, AG Darmstadt
62. Ancillary Management Solutions, Inc.
63. Anton-Bruckner-Apotheke Mag.pharm. Christian Schwarzenbrunner KG, LG Linz
64. AOR Holding Company of Indiana, Inc. (AOR Holding Company of Indiana, LLC)
65. AOR Holding Company of Indiana, LLC
66. AOR Management Company of Alabama, Inc.
67. AOR Management Company of Arizona, Inc. (AOR Management Company of Arizona, LLC)

68. AOR Management Company of Arizona, LLC
69. AOR Management Company of Central Florida, Inc.
70. AOR Management Company of Florida, Inc.
71. AOR Management Company of Indiana, Inc. (AOR Management Company of Indiana, LLC)
72. AOR Management Company of Indiana, LLC
73. AOR Management Company of Kansas, Inc.
74. AOR Management Company of Missouri, Inc. (AOR Management Company of Missouri, LLC)
75. AOR Management Company of Missouri, LLC
76. AOR Management Company of Nevada, Inc.
77. AOR Management Company of New York, Inc.
78. AOR Management Company of North Carolina, Inc.
79. AOR Management Company of Ohio, Inc.
80. AOR Management Company of Oklahoma, Inc. (AOR Management Company of Oklahoma, LLC)
81. AOR Management Company of Oklahoma, LLC
82. AOR Management Company of Oregon, Inc.
83. AOR Management Company of Pennsylvania, Inc. (AOR Management Company of Pennsylvania, LLC)
84. AOR Management Company of Pennsylvania, LLC
85. AOR Management Company of South Carolina, Inc.
86. AOR Management Company of Texas, Inc.
87. AOR Management Company of Virginia, Inc. (AOR Management Company of Virginia, LLC)
88. AOR Management Company of Virginia, LLC
89. AOR of Indiana Management Partnership
90. AOR of Texas Management Limited Partnership
91. AOR of Texas Management, LLC
92. AOR Real Estate, Inc. (AOR Real Estate, LLC)
93. AOR Real Estate, LLC
94. AOR Synthetic Real Estate, Inc. (AOR Synthetic Real Estate, LLC)
95. AOR Synthetic Real Estate, LLC
96. AORIP, Inc.
97. AORT Holding Company, Inc. (AORT Holding Company, LLC)
98. AORT Holding Company, LLC
99. AORT LP, LLC
100. Aporana AS
101. Apotheke "Zum Bergmann" Mag.pharm. Sabine Tuttner KG, LG Leoben
102. Apotheke "Zur heiligen Dreifaltigkeit" Mag. pharm. Edith Schuller-Grundnig KG, Landesgericht Korneuburg
103. Apotheke "Zur Mutter Gottes" Mag. pharm. Karin Nozicka KG, HG Wien
104. Apotheke Atzgersdorf Mr. Hermann Latzin KG, Wien
105. Apotheke im Messepark Mag. pharm. Dietmar Purin KG, LG Feldkirch
106. Apotheke Niklasdorf Mag. pharm. Matthias Schöggl KG, LG Leoben
107. APOTHEKE U1 TROSTSTRASSE, Mag. pharm. Max Wellan KG, HG Wien
108. Apotheke Zum heiligen Antonius Mag. pharm. Walter Staschek KG, LG Wiener Neustadt
109. Apotheke zum heiligen Schutzengel Mag.pharm. Barbara Penz-Arzberger KG, Landesgericht Graz
110. Apotheke zum Patriarchen Mag. pharm. Brigitte Kölbl KG, HG Wien
111. Apotheke Zur hl. Dreifaltigkeit Mag. pharm. Doris Richter KG, LG Wiener Neustadt
112. Apotheke Zur Hütte Mag. pharm. Mrak KG, LG Leoben
113. Apovest AS
114. Apovest Drift AS
115. Art Acquisition Subsidiary, Inc.
116. Ascalon International, Inc.
117. ATLAS Travel Clinic Limited, England
118. Attentus Medical Sales, Incorporated (Attentus Medical Sales, LLC)
119. Attentus Medical Sales, LLC
120. Awarix, Inc.
121. Axis Medical Management, Inc.

FINAL AGREEMENT 3.25.22

122. AYRSHIRE PHARMACEUTICALS LIMITED, Scotland
123. AZIENDA FARMACEUTICA MUNICIPALE di Cremona S.p.A., CCIAA di Cremona
124. Azienda Farmacie Milanesi S.p.A., CCIAA di Milano
125. Babbingore Limited, Dublin
126. BAILLIESTON HEALTH CENTRE PHARMACY LIMITED, Scotland
127. Ballycane Pharmacy Limited, Ireland
128. BANNISTER & THATCHER LIMITED, England
129. BARCLAY PHARMACEUTICALS (ATHERSTONE) LIMITED, England
130. BARCLAY PHARMACEUTICALS LIMITED, England
131. BARLEY CHEMISTS HOLDINGS LIMITED, England
132. BARRY SHOOTER (ROMFORD) LIMITED, England
133. BDI Pharma, Inc. (BDI Pharma, LLC)
134. BDI Pharma, LLC
135. Beausejour Drugs Limited
136. BEAUTY CARE DRUGSTORES LIMITED, England
137. Beldere Corporation
138. BeneVi Health LLC (Biologics, Inc.)
139. BENU Apotheken B.V., Chamber of commerce Amsterdam
140. BENU Nederland BV, Kamer van Koophandel Amsterdam
141. BERKSHIRE MEDICAL SUPPLIES LIMITED, England
142. BETTERLIFEHEALTHCARE LIMITED, England
143. BIG PHARMA LIMITED, Scotland
144. Biologics, Inc.
145. Blackhall Pharmaceutical Distributors Limited
146. Blackhawk Development LLC
147. Blackstaff Pharmaceuticals Limited, England
148. Blomsterdalen Apotek AS
149. Blue Medical Supply, Inc. (McKesson Medical-Surgical Inc.)
150. Boad Seven, Inc.
151. BOFH Holdings Unlimited Company, Ireland
152. Bottomline Medical Solutions, LLC (Linear Holdings, LLC)
153. Breamor Pharmacy Limited, Ireland
154. Brevard Radiation Oncology, LLC
155. Brickyard Acquisition Inc. (Biologics, Inc.)
156. BRIDPORT MEDICAL CENTRE SERVICES LIMITED, England
157. Brocacef Groep N.V., Maarssen
158. Brockton Radiation Oncology, LLC
159. Brooklyn Radiation Oncology, LLC
160. Brukar Enterprises, Inc.
161. Bullet Acquisition Corporation
162. CAHILL MAY ROBERTS GROUP LIMITED, Dublin
163. California Golden State Finance Company
164. Camic Pharmacies Limited, Ireland
165. Canada Distribution Holdings Limited Partnership
166. Canada Retail Holdings Limited Partnership Societe en Commandite Gestion Detail Canada
167. Cancer Treatment Associates of Northeast Missouri, Ltd.
168. CARONET TRADING LIMITED, England
169. Carrollton Radiation Therapy Center, LLC
170. Cascade Medical Supply, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
171. Cavalier Acquisition Company LLC
172. CCCN NW Building JV, LLC
173. Celesio Business Services Ltd., Ireland
174. CENTRALE D`ADMINISTRATION DE BIENS IMMOBILIERS, Bobigny
175. CGSF Funding Corporation (CGSF Funding LLC)
176. CGSF Funding LLC
177. Chem Labs Limited, Dublin
178. CHNG Newco LLC
179. CHNG NewSub Inc.
180. City Properties, S.A.
181. Civiche Farmacie Desio S.p.A., Italy
182. Claimone, LLC (Linear Holdings, LLC)
183. ClaimSecure Inc. (SUCCESSOR)
184. CLARK CARE GROUP LIMITED, England
185. CLARK MUNRO LIMITED, Scotland
186. ClarusONE Sourcing Services LLP
187. Clinicians Database, L.L.C.
188. CMR Holdings Ltd, Dublin
189. Coleham, Dublin
190. Colorado Cancer Centers, LLC
191. Combined Enterprises Corporation

J-17

FINAL AGREEMENT 3.25.22

192. COMPANY CHEMISTS ASSOCIATION LIMITED, England
193. COMPTOIR MONEGASQUE DE BIOCHIMIE, Monaco
194. COMPTOIR PHARMACEUTIQUE MEDITERRANEEN, Monaco
195. CONSORZIO SERVIZI SALUTARI S.C.A. R.L., Italy
196. CookCo, Inc.
197. Cophana SA, Belgium
198. Corporation Groupe Pharmessor/Pharmessor Group Corporation (SUCCESSOR 10/01/2017)
199. Corporation of America
200. CoverMyMeds LLC
201. CoverMYMeds Specialty Pharmacy Holdings LLC
202. CoverMYMeds Specialty Pharmacy LLC
203. CPG Industries, Inc.
204. Crocker Plaza Company (Crocker Plaza LLC)
205. Crocker Plaza LLC
206. CROSS AND HERBERT (DEVON) LIMITED, England
207. CROSS AND HERBERT (HOLDINGS) LIMITED, England
208. CROSS AND HERBERT LIMITED, England
209. Crowley`s Blackrock Limited, Dublin
210. Cypress Import Brokerage LLC
211. Cypress Medical Products LLC
212. D & K Healthcare Resources LLC
213. D & K Healthcare Resources, Inc. (D & K Healthcare Resources LLC)
214. D & K Pharmacy Solutions, Inc.
215. D & K Receivables Corporation
216. D.F. O'Neill (Chemists) Ltd, Dublin
217. Dale Apotek AS
218. Danubia-Apotheke Mag. pharm. Barbara Sedelies KG, HG Wien
219. Dargle Pharmacies Holdings Limited, Ireland
220. DATACARE Datenpflege des Pharmagroßhandels Ges.m.b.H., HG Wien
221. DATAPHARM, Paris
222. Daytona Beach Radiation Oncology, LLC
223. DC Land Company
224. DCAZ Land Company
225. Delta Clinical Research, LLC
226. DEPOTRADE, Bobigny
227. Derm Vantage, LLC
228. Diana-Apotheke Dr. et Mag. pharm. Michaela Stipsits KG, LG Eisenstadt
229. Die Apotheke Ebenfurth, Mag.pharm. Beate Haage-Löwe KG, LG Wiener Neustadt
230. Dispensing Solutions Acquisition Corporation (DS Holdings, Inc.)
231. Dispensing Solutions, Inc. (Dispensing Solutions, LLC)
232. Dispensing Solutions, LLC (DS Holdings, Inc.)
233. Ditt Apotek Amfi Os AS
234. Ditt Apotek Rodberg AS
235. Ditt Apotek Sorumsand AS
236. Diversified Healthcare, LLC
237. Dix Bulles Pharma, Belgium
238. DLI Market Intelligence ApS, Denmark
239. DOL Pharmacy Limited, Ireland
240. Donnybrook Pharmacy Limited, Ireland
241. Downtown Los Angeles Radiation Oncology, LLC
242. DS Holdings, Inc. (DS Holdings, LLC)
243. DS Holdings, LLC (McKesson Medical-Surgical Top Holdings Inc.)
244. DSRX, Inc. (DS Holdings, Inc.)
245. Dublin 2016 Acquisition, LLC
246. Dublin Holdings Acquisitions, LLC (Vantage Oncology Holdings, LLC)
247. Dublin POS I Acquisition Corp. (POS I Corp.)
248. East Indy CC, LLC
249. ECLIPSE HEALTHCARE LIMITED, England
250. Edwards Medical Supply, Inc.
251. EM Acquisition Corporation
252. Emploi AS
253. Engel-Apotheke Mag. pharm. Susanne Zauner KG, LG Wiener Neustadt
254. Ephrata Diamond Spring Water Co.
255. ESCON (ST NEOTS) LIMITED, England
256. Espafarmed S.L., Belgium
257. EUROSANTE (Société en liquidation), Luxembourg
258. Evesland Limited, Dublin
259. EVOLUTION HOMECARE SERVICES LIMITED, England
260. EXPERT HEALTH LIMITED, England
261. Family Pharmacy @ Las Colinas LLC
262. Fana Apotek AS
263. FAR.CO.SAN S.p.A., CCIAA di Arezzo
264. FARILLON LIMITED, England

FINAL AGREEMENT 3.25.22

265. Farmacia Garbatella I S.r.l., Italy
266. Farmacie Comunali di Modena S.p.A., Italy
267. Farmacie Comunali di Padova S.p.A., Italy
268. Farmacie di Sassuolo S.p.A., Italy
269. Farmacie Pratesi Pratofarma S.p.A., CCIAA di Prato
270. FARMALVARION S.R.L. SOCIO UNICO, Italy
271. FASTPRO International, Inc.
272. Federal Medical Supplies, Inc. (McKesson Medical-Surgical Minnesota Supply Inc.)
273. Felview Limited, Dublin
274. First Aid Service, Inc.
275. First Choice Medical Supply Holding, Inc. (First Choice Medical Supply Holding, LLC)
276. First Choice Medical Supply Holding, LLC
277. First Choice Medical Supply, LLC
278. FIRTH & PILLING LIMITED, England
279. Flex-Master Technology Holdings, Inc.
280. Floriani-Apotheke Mag.pharm. Doris Leykauf KG, LG Graz
281. Foremost de Venezuela, S.A. (Forvensa)
282. Foremost Homes Hawaii, Ltd.
283. Foremost Iran Corporation
284. Foremost Shir, Inc.
285. Foremost Tehran, Inc.
286. FOSTER & PLUMPTON GROUP LIMITED, England
287. FOSTER & PLUMPTON LIMITED, England
288. Foundation For Opioid Response Efforts
289. G J MALEY LIMITED, Isle Of Man
290. G K CHEMISTS (GLOS) LIMITED, England
291. G K CHEMISTS LIMITED, England
292. GEHE Immobilien GmbH & Co. KG, Stuttgart
293. GEHE Immobilien Verwaltungs-GmbH, Stuttgart
294. GEHE Pharma Handel GmbH, Stuttgart
295. General Medical Inc.
296. GEORGE STAPLES (STOKE) LIMITED, England
297. Gerard Ryan Pharmacy (Clonmel) Limited, Dublin

298. GERSTHOFER-APOTHEKE Mag.pharm. Elisabeth Reisegger KG, HG Wien
299. Giardina Enterprises, Inc.
300. Glendale Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
301. Golden State Company, Ltd.
302. Golden State Corporate Services LLC
303. Golden State Insurance Company Limited
304. Golden State Milk Products Company
305. Goodman Manufacturing Company
306. Gorrys Pharmacy Limited, Ireland
307. Govitown Limited, Westmeath
308. GPL 2007 LIMITED, England
309. GRAEME PHARMACY (STIRLING) LIMITED, Scotland
310. GREENS PHARMACEUTICAL (HOLDINGS) LIMITED, England
311. Greenville Radiation Care, Inc.
312. Greystones Pharmacy Limited, Dublin
313. GROUPE PHR, France
314. Gulf South Medical Supply, Inc. (Gulf South Medical Supply, LLC)
315. Gulf South Medical Supply, LLC
316. Gwinnett Radiation Oncology, LLC
317. H THATCHER LIMITED, England
318. Haleston Enterprises Limited, Dublin
319. HBO & Company (VI), Inc.
320. HBO & Company of Georgia
321. HBOC Ventures, Inc.
322. HC Beteiligungsgesellschaft mbH, HG Wien
323. HDSC Acquisition Corp.
324. Health Data Sciences Corporation
325. Health Mart Atlas, LLC
326. Health Mart Systems, Inc.
327. HEALTH NEEDS LIMITED, England
328. HEALTHCLASS LIMITED, England
329. Heinz Management Co.
330. Helmard Holdings Limited, Dublin
331. HEP HealthQx Holdings, Inc. (McKesson Technologies Inc.)
332. Herba Chemosan Apotheker-AG, HG Wien
333. HERBERT FERRYMAN LIMITED, England
334. Hercules Parent LLC
335. Herz - Jesu Apotheke Mag. pharm. Marianne Keller KG, HG Wien

FINAL AGREEMENT 3.25.22

336. Herz Jesu Apotheke & Parfümerie Mag. pharm. Ingrid Heller KG, LG Feldkirch
337. HF Land Company
338. HFN of Northwest Florida, Inc.
339. HIGGINS & SON (CHEMISTS) LIMITED, England
340. HILL-SMITH (WARRINGTON) LIMITED, England
341. HisComp Co., Zee Medical Service Co.
342. HMS Acquisition Corp.
343. HOLLYFAR - Marcas e Comunicação, Unipessoal, Lda., Portugal
344. HOLMSCROFT HC LIMITED, Scotland
345. HOLON, S.A., Portugal
346. Honeybee Bridge LLC
347. HTP Inc. (HTP LLC)
348. HTP LLC
349. Hubertus-Apotheke Mag.pharm. E. Klettenhofer KG, HG Wien
350. HUSKY AQUISITION INC.
351. Hygeia Bottled Water, Inc.
352. HYWEL DAVIES (CAERPHILLY) LIMITED, England
353. IHA Corp.
354. Imagine Health, Inc.
355. INDEPENDENT PHARMACY CARE CENTRES (2008) LIMITED, England
356. Indian River Radiation Oncology, LLC
357. Infolab, LLC
358. Innovent Oncology, LLC
359. INSPIRON DISTRIBUTION LIMITED, England
360. Integrated Cancer Care, LLC
361. Integrated Pathology Services
362. IntelliClaim, Inc.
363. Inten GmbH, Stuttgart
364. Intercal, Inc.
365. International Dairy Engineering Co. of Asia, Inc.
366. InterQual Inc.
367. intraFUSION GP, LLC
368. Intrafusion Holding Corp.
369. intraFUSION Purchasing Network, LLC
370. intraFUSION Research Network, LLC
371. Inviva, McKesson Pharma Care Network Corporation / La Corporation Inviva, Reseau de soins pharmacologiques McKesson (SUCCESSOR)
372. Iowa Pharmaceutical Services, LLC
373. IPCC LIMITED, England
374. IPD Holdings, Inc.

375. J S DENT LIMITED, England
376. Bradbury (Surgical) Limited, Northern Ireland
377. J.G. Crowley Pharmacy Limited, Dublin
378. JACS, Inc.
379. Jaron, Inc.
380. Jeffersonville Radiation Technology, LLC
381. Jessheim Apotek AS
382. Jewett Drug Co.
383. Jewett Drug LLC
384. Johannes Apotheke Mag. pharm. Deutsch KG, LG Graz
385. JOHN BELL & CROYDEN LIMITED, England
386. JOHN HAMILTON (PHARMACEUTICALS) LIMITED, Scotland
387. Jupiter Acquisition Ltd.
388. Kairnbury, Dublin
389. Kathleen Properties Subdivision Association, Inc.
390. Keling Limited
391. Keltman Pharmaceuticals, Inc. (Linear Holdings, LLC)
392. Kemofarmacija, veletrgovina za oskrbo zdravstva, d.d., Ljubljana
393. Keystone/Ozone Pure Water Company
394. Kilshallow Limited, Dublin
395. KINGSWOOD CHEMISTS LIMITED, England
396. KINGSWOOD GK LIMITED, England
397. Kitco, Inc.
398. Knowledgeable Healthcare Solutions, Inc.
399. Kreuz-Apotheke KG, HG Wien
400. KWS & P, Inc
401. KWS & P/SFA, Inc.
402. KYLE & CARRICK HOLDINGS LIMITED, Scotland
403. Laboratoria Flandria NV, Belgium
404. Laboratory Supply Company
405. Labsco Holdings, Inc. (McKesson Medical-Surgical Inc.)
406. Leesburg Radiation Oncology, LLC
407. LEVELCROWN LIMITED, England
408. Liberty Real Estate NJ LLC
409. Lind-Apotheke Mag. pharm. Alexander Telesko KG, LG Klagenfurt
410. Linear Holdings, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
411. Linear Holdings, LLC (Linear Holdings, Inc.)

412. Linear Medical Solutions, LLC
413. LINFORD PHARMACIES LIMITED, England
414. LISEAPOTEKENE AS
415. Lissone Farmacie S.p.A., CCIAA di Monza e Brianza
416. LIVINGSTON HEALTH CENTRE (P.D) CO. LIMITED, Scotland
417. LKW, Inc.
418. LLOYDS CHEMISTS LIMITED, England
419. LLOYDS CHEMISTS RETAIL (NORTHERN) LIMITED, England
420. LLOYDS CHEMISTS RETAIL LIMITED, England
421. LLOYDS GROUP PROPERTIES LIMITED, England
422. Lloyds Pharmacy Clinical Homecare Limited, England
423. LLOYDS PHARMACY LIMITED, England
424. LLOYDS PROPERTIES LIMITED, England
425. LLOYDS Property Management Company Belgium S.A., Belgium
426. LLOYDS RETAIL CHEMISTS LIMITED, England
427. Lloyds Retail S.r.l., Socio Unico, Italy
428. LLOYDSFARMACIA ROMA 4 S.R.L., Italy
429. Lloydspharma Group S.A., Belgium
430. Lloydspharma S.A., Belgium
431. Lloydspharmacy Ireland Limited, Dublin
432. Lory Apotheke Mag. pharm. Karin Eichinger KG, HG Wien
433. LP Clinical Homecare Group Limited, England
434. LPL ONE LIMITED, England
435. M H GILL LIMITED, England
436. M PAYNE & CO LIMITED, England
437. Macfor International Finance Company
438. MACON Acquisition Corp.
439. Macro Helix LLC
440. Madison Acquisition Inc.
441. Marathon Acquisition Subsidiary, Inc.
442. Mariahilf-Apotheke Mag. pharm. Christoph Rücklinger KG, LG St. Pölten
443. Mariahilf-Apotheke Mag. pharm. Helga Mann KG, Landesgericht Graz
444. Marien-Apotheke Mag. pharm. Thomas Job KG, LG Eisenstadt

445. Marien-Apotheke, Mag.pharm. Eva Grabner KG, Landesgericht Korneuburg
446. Maryland First Aid Co., Inc.
447. MASTA Limited, England
448. Masters Drug Company, Inc.
449. MATIS Immobilien OHG, Stuttgart
450. Maurice F. Dougan Limited, Dublin
451. May Roberts Ltd, Dublin
452. MCK Acquisition Corp.
453. McK International Financial Holdings (Barbados) SRL
454. McKesson (Cayman Islands) Inc.
455. McKesson (Shanghai) Trading Company Limited
456. McKesson + Strategic Solutions ULC / Solutions Strategiques McKesson + ULC
457. McKesson Automation Systems Inc.
458. McKesson Belgium Holdings SPRL, Belgium
459. McKesson Canada Corporation/La Corporation McKesson Canada (SUCCESSOR)
460. McKesson Canada Finance IA ULC
461. McKesson Canada Finance IB ULC
462. McKesson Capital Funding Corp.
463. McKesson Capital Funding Corporation
464. McKesson Capital LLC
465. McKesson Central Fill LLC (McKesson Distribution Holdings LLC)
466. McKesson Contract Research Organization LLC
467. McKesson Cork Business Solutions Unlimited Company
468. McKesson Corporate Properties, Inc.
469. McKesson Corporation
470. McKesson Development Corp.
471. McKesson Distribution Holdings LLC
472. McKesson Drug Company LLC
473. McKesson Europe AG
474. McKesson Europe Holdings GmbH & Co. KGaA
475. McKesson Europe Holdings Verwaltungs GmbH
476. McKesson Financial Holdings II Unlimited Company
477. McKesson Financial Holdings Unlimited Company
478. McKesson Financing Trust III
479. McKesson Financing Trust IV
480. McKesson Foundation Inc.

481. McKESSON FRANCE HOLDINGS, Bobigny
482. McKesson France Retail, Bobigny B
483. McKesson Funding Company of Canada
484. McKesson Global Procurement & Sourcing Limited
485. McKesson Global Sourcing Limited
486. McKesson Global Sourcing Limited [Irish Branch]
487. McKesson Health Solutions Holdings LLC
488. McKesson Health Solutions LLC
489. McKesson Health Solutions Puerto Rico Inc.
490. McKesson Health Solutions Texas Inc.
491. McKesson High Volume Solutions Inc.
492. McKesson Information Solutions Finance S.a.r.l.
493. McKesson Information Solutions Holdings II S.a.r.l.
494. McKesson Information Solutions Holdings III S.a.r.l.
495. McKesson Information Solutions Holdings IV S.a.r.l.
496. McKesson Information Solutions Holdings V S.a.r.l.
497. McKesson Information Solutions III LLC
498. McKesson Information Solutions Inc. (McKesson Information Solutions LLC)
499. McKesson Information Solutions IV LLC
500. McKesson Information Solutions LLC
501. McKesson Information Solutions Topholdings S.a.r.l.
502. McKesson Information Solutions UK Limited
503. McKesson International Bermuda IP2A Limited
504. McKesson International Bermuda IP2B Unlimited
505. McKesson International Bermuda IP3A Limited
506. McKesson International Bermuda IP3B Unlimited (McKesson International Bermuda IP3A Limited)
507. McKesson International Bermuda IP4A Limited
508. McKesson International Bermuda IP4B Unlimited (McKesson International Bermuda IP4A Limited)
509. McKesson International Bermuda IP5A Limited
510. McKesson International Bermuda IP5B Unlimited (McKesson International Bermuda IP5A Limited)
511. McKesson International Bermuda Opco1A Limited
512. McKesson International Bermuda Opco1B Unlimited (McKesson International Bermuda Opco1A Limited)
513. McKesson International Bermuda Opco3A Limited
514. McKesson International Bermuda Opco3B Unlimited (McKesson International Bermuda Opco3A Limited)
515. McKesson International Bermuda Opco4A Limited
516. McKesson International Bermuda Opco4B Unlimited
517. McKesson International Finance III Limited (McKesson US Finance Corporation)
518. McKesson International Finance S.a.r.l.
519. McKesson International Holdings III S.a.r.l.
520. McKesson International Holdings IV S.a.r.l.
521. McKesson International Holdings S.a.r.l.
522. McKesson International Holdings Unlimited Company
523. McKesson International Holdings VI S.a.r.l.
524. McKesson International Holdings VII S.a.r.l.
525. McKesson International Investment Corp.
526. McKesson International Ireland I Limited
527. McKesson International LLC
528. McKesson International Malaysia Sdn Bhd
529. McKesson International S.a.r.l.
530. McKesson International Topholdings S.a.r.l.
531. McKesson Ireland Limited
532. McKesson Logistics Solutions
533. McKesson Medical Imaging Company Ltd. (predecessor)
534. McKesson Medical-Surgical FDT Inc.
535. McKesson Medical-Surgical Government Solutions LLC
536. McKesson Medical-Surgical Holdings Inc.
537. McKesson Medical-Surgical Inc.
538. McKesson Medical-Surgical Iowa Inc.

539. McKesson Medical-Surgical Iowa Supply Inc.
540. McKesson Medical-Surgical Maine Inc.
541. McKesson Medical-Surgical Manufacturing Inc.
542. McKesson Medical-Surgical MediMart Inc.
543. McKesson Medical-Surgical MediNet Inc.
544. McKesson Medical-Surgical Minnesota Inc. (McKesson Medical-Surgical Holdings Inc.)
545. McKesson Medical-Surgical Minnesota Supply Inc.
546. McKesson Medical-Surgical Supply Chain Services LLC
547. McKesson Medical-Surgical Top Holdings Inc.
548. McKesson Medication Management Holdings Inc.
549. McKesson Medication Management Virgin Islands Inc.
550. McKesson Norway Holdings AS
551. McKesson Pharmacy Optimization LLC
552. McKesson Pharmacy Systems Canada ULC
553. McKesson Pharmacy Systems LLC
554. McKesson Plasma and Biologics LLC
555. McKesson Prescription Drug Plan LLC
556. McKesson Property Company, Inc.
557. McKesson Purchasing Company LLC
558. McKesson Services Inc. (McKesson Services LLC)
559. McKesson Services LLC
560. McKesson Sourcing Services Inc.
561. McKesson Specialized Distribution Inc. / McKesson Distribution Specialisee Inc. (Successor)
562. McKesson Specialty Arizona Inc.
563. McKesson Specialty Care Distribution Corporation (McKesson Specialty Care Distribution LLC)
564. McKesson Specialty Care Distribution JV LLC
565. McKesson Specialty Care Distribution LLC
566. McKesson Specialty Corporation
567. McKesson Specialty Distribution LLC
568. McKesson Specialty Health Innovative Practice Services, LLC
569. McKesson Specialty Health Management Services LLC
570. McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC
571. McKesson Specialty Health Pharmaceutical & Biotech Solutions, LP (McKesson Specialty Health Pharmaceutical & Biotech Solutions, LLC)
572. McKesson Specialty Health Technology Products LLC
573. McKesson Specialty Pharmacy, LP (RxC Acquisition Company)
574. McKesson Specialty Prescription Services (Atlantic) Corporation/Corporation McKesson Services de Prescription Spécialisée (Atlantique)
575. McKesson Specialty Prescription Services (B.C.) Corporation
576. McKesson Specialty Prescription Services Corporation
577. McKesson SPS (Manitoba) Corporation
578. McKesson Strategic Services Limited
579. McKesson Technologies Inc.
580. McKesson Trading Company
581. McKesson Transportation Systems, Inc.
582. McKesson UK Finance I Limited
583. McKesson UK Finance II Limited
584. McKesson UK Finance V Limited
585. McKesson UK Holdings Limited
586. McKesson US Finance Corporation
587. McKesson US Holdings GP
588. McKesson Ventures LLC
589. McKesson Ventures Unlimited Company
590. McQueary Bros. Drug Company
591. McQueary Bros. Drug Company, LLC
592. McSweeney Dispensers 10 Limited, Ireland
593. McSweeney Dispensers 23 Limited, Ireland
594. MDD pharma N.V., Belgium
595. MED3000 Health Solutions Southeast
596. MED3000 RPG
597. Medaid Supply, Inc.
598. Medcon Telemedicine Technology, Inc.
599. Median Healthcare Services Unlimited Company, Ireland
600. Medical & Vaccine Products, Inc.
601. Medical Advisory Services for Travellers Abroad Limited, England
602. Medical Specialties Distributors Holdings, Inc. (MSD Parent Corporation)
603. Medical Specialties Distributors, LLC

604. Medical Specialties Holdings Corp. (Medical Specialties Holdings II Corp.)
605. Medical Specialties Holdings II Corp.
606. Medicentres Canada Inc. (SUCCESSOR)
607. Medicine Shoppe Atlantic Corporation
608. Medicine Shoppe Canada Corporation
609. Medicine Shoppe Canada Real Estate Corporation
610. MEDIMART LIMITED, England
611. MediVation, Inc.
612. MedVentive Inc.
613. MeMed CZ s.r.o., Praha
614. Menges Medizintechnik Schweiz AG, Sankt Gallen
615. Merlin Subsidiary Inc.
616. Merrick Healthcare Limited
617. Metabolic Healthcare Holdings Limited, England
618. Metabolic Healthcare Limited, England
619. Metropolitan Integrated Cancer Center, L.L.C.
620. MH/USON Radiation Management Company, LLC
621. MHD-USO General, LLC
622. MHD-USO Management Company, LP
623. MHS Connecticut LLC
624. Michigan Pharmaceutical Services, LLC
625. Mid-Atlantic Radiation Oncology LLC
626. Millennium Merger Corporation
627. Mohawk Liqueur Corporation
628. Mohren-Apotheke Mag. Christian Müller KG, LG Graz
629. Moore Medical LLC (McKesson Medical-Surgical Government Solutions LLC)
630. Mosaic Acquisition Corporation
631. MOUNT PHARMACY LIMITED, England
632. MSA Products LLC
633. MSD Acquisition Corp. (Medical Specialties Holdings Corp.)
634. MSD Parent Corporation (MSD Acquisition Corp.)
635. Multum Information Services, Inc.
636. MUNRO PHARMACY LIMITED, Scotland
637. MWPC Acquisition Corp.
638. MWPC Acquisition Corp. (PA)
639. My MHealth Limited, England & Wales
640. myhca, inc.
641. NARO, LLC
642. National Oncology Alliance, Inc.
643. Natureline, Dublin
644. NDC of Canada, Inc.
645. NDCHealth Corporation
646. NDCHealth Pharmacy Systems and Services, Inc.
647. Nebraska Pharmaceutical Services, LLC
648. Negatron, Inc.
649. Nensi d.o.o., Ljubljana
650. NERO GP, LLC
651. New Experimental Therapeutics of San Antonio, LLC
652. NEW KIRK PHARMACY LIMITED, Scotland
653. New Mexico Pharmaceutical Services, LLC
654. NewHealthCo, LLC
655. NexCura, LLC (McKesson Specialty Health Technology Products LLC)
656. Nibelungen-Apotheke Mag. pharm. Michaela Wachter KG, LG St. Pölten
657. Norsk Medisinaldepot AS
658. North Carolina Pharmaceutical Services, LLC
659. Northeast Pennsylvania Radiation Oncology, LP
660. Northern Arizona Oncology Centers, LLC
661. Northern Boulevard Radiation Oncology Management, LLC
662. Northern San Fernando Valley Radiation Oncology, LLC
663. Northstar Healthcare Holdings Limited
664. Northstar Healthcare Holdings Unlimited Company
665. Northstar Healthcare Limited
666. Northstar Healthcare Unlimited Company
667. Northstar International Holdings Limited
668. Northstar Rx LLC
669. Norvern Enterprises, Inc.
670. NR Direct, Inc. (McKesson Patient Care Solutions Inc.)
671. O`Leary Pharmacy (Lucan) Limited, Dublin
672. OCP FORMATION, Bobigny
673. OCP PORTUGAL, PRODUTOS FARMACÊUTICOS, S.A., Maia
674. OCP REPARTITION, Bobigny B
675. OCP, Bobigny
676. Oncology Holdings II, Inc.
677. Oncology Holdings, Inc.
678. Oncology Rehab Partners, LLC

679. Oncology Therapeutics Network Corporation
680. Oncology Today, LP
681. OnMark, Inc.
682. Optimed Health Limited, England & Wales
683. Orca Acquisition Corp.
684. Ørebekk Apotek AS
685. Oswald-Apotheke Mag. pharm. Ilse Pedevilla KG, LG Feldkirch
686. OTN Generics, Inc.
687. OTN Participant, Inc.
688. Outpatient Infusion Systems, Inc
689. Øygarden Apotek AS
690. P C Cahill & Company Limited, Dublin
691. P.L.C.E., Inc.
692. Packet Merger Sub Inc.
693. PALEMODA LIMITED, England
694. Palm Merger Sub, Inc.
695. Panther Acquisition Corporation
696. Panther-Apotheke Mag. pharm. Margarete Breyha KG., LG St. Pölten
697. Paracelsus-Apotheke Mag. pharm. Dr. Birgit Müller KG, Austria
698. Pathology Service Associates, LLC
699. Pathway Purchasing Network, LLC
700. Patient Account Management Services, Inc.
701. PAUL WHEELER LIMITED, England
702. PCB SA, Belgium
703. PEEL STREET PHARMACY LIMITED, England
704. peerVue, Inc. (DE)
705. peerVue, Inc. (NH)
706. Pemberton Marketing International Limited
707. Penn-Chem Corporation
708. PERILLA Grundstücks-Verwaltungsgesellschaft mbH & Co. KG, AG München
709. Per-Se Transaction Services, Inc.
710. PF2 McKesson Technologies Inc.
711. PF2 SpinCo Inc.
712. Pharma Belgium Belmedis SA, Belgium
713. PHARMA PARTNERS, Belgium
714. Pharma Services (NI) Limited, Northern Ireland
715. Pharmaceutical Distributors Federation Ireland Company Limited By Guarantee
716. Pharmaceutical Support Services, Inc.
717. Pharmacie Ananga-Talom, Belgium
718. Pharmacie de la Bascule, Belgium
719. PHARMACTIV DISTRIBUTION, Bobigny B
720. Pharmacy O`Riada Holdings Limited, Dublin
721. PHARMAGEN LIMITED, England
722. PHILIP GOODMAN LIMITED, England
723. PHR ANTILLES, FORT DE FRANCE
724. PhyServ Solutions, Inc.
725. Physician Micro Systems, Inc.
726. Physician Oncology Services Management Company, LLC
727. Physician Reliance Holdings, LLC
728. Physician Reliance Maryland, LP
729. Physician Reliance Network, Inc. (Physician Reliance Network, LLC)
730. Physician Reliance Network, LLC
731. Physician Reliance, L.P.
732. Physician Reliance, LLC
733. Physician Sales & Service Limited Partnership
734. Physician Sales & Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
735. Pindsle Apotek AS
736. PMLX Limited
737. POC Management Group, LLC (Dispensing Solutions, Inc.)
738. Podiatry Online, Inc.
739. Portico Systems of Delaware, Inc.
740. POS I Corp. (Dublin 2016 Acquisition, LLC)
741. Presbyterian Cancer Center-Dallas, LLC
742. Prescribing Support Services Limited, England & Wales
743. Prima Brands Limited, Northern Ireland
744. PRIMELIGHT LIMITED, England
745. Prismedica S.A.S.
746. PRN Physician Reliance, LLC
747. Pro-AvO GmbH, Deutschland
748. Proclaim, Inc. (McKesson Medical-Surgical MediMart Inc.)
749. PRODILAB, France
750. Providence Radiation Oncology Partners LLC
751. PSS China Sourcing Limited
752. PSS Global Holdings
753. PSS Global Sourcing China Business Trust
754. PSS Global Sourcing Hong Kong Limited

FINAL AGREEMENT 3.25.22

755. PSS Global Sourcing Limited [Hong Kong]
756. PSS HK 1 Limited
757. PSS Holding, Inc. (McKesson Medical-Surgical Inc.)
758. PSS Service, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
759. PSS Southeast Asia Limited
760. PSS World Medical, Inc.
761. PST Products, LLC
762. PST Services, Inc. (PST Products, LLC)
763. Purchasing Alliance for Clinical Therapeutics, LLC
764. R F FOSKETT & SON LIMITED, England
765. R GORDON DRUMMOND LIMITED, England
766. R/X Automation Solutions, LLC
767. Raabtal-Apotheke Mag.pharm. Karin Drawetz KG, Landesgericht Graz
768. Radiation Oncology Services of America, Inc.
769. Radiotherapy Clinic Holdings, LLC
770. Radiotherapy Clinics of Kentuckiana, LLC
771. Radiotherapy Clinics of Kentuckiana-2, LLC
772. Radius Data Solutions, LLC
773. Radius Reimbursement Services, LLC
774. Radunnco, Inc.
775. Rancare, Inc.
776. Randolph Home Care Inc.
777. Randolph Medical Inc.
778. RCOG Cancer Centers, LLC
779. Rebel Distributors Corp. (McKesson Medical-Surgical Top Holdings Inc.)
780. recucare GmbH, Stuttgart
781. recusana GmbH, Stuttgart
782. Regenbogenapotheke "Am Leberberg" Mag. pharm. Andreas Portisch KG, HG Wien
783. RelayHealth Corporation (McKesson Information Solutions LLC)
784. Renoir Acquisition Corporation
785. Renoir Acquisition Corporation (DE)
786. RESEAU SANTE, BREST
787. RetraceHealth, Inc.
788. Rexall Pharmacy Group Ltd.
789. Rexall/Pharma Plus Pharmacies (BC) Ltd.
790. Rexall/Pharma Plus Pharmacies (Sask) Ltd.
791. Rexall/Pharma Plus Pharmacies Ltd.
792. Riel, Inc.
793. Riverside Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
794. R-jet, Incorporated
795. RMCC Cancer Center, Inc. (RMCC Cancer Center, LLC)
796. RMCC Cancer Center, LLC
797. ROSA of Eastern Shore, LLC
798. ROSA of Georgia, LLC
799. ROSA of South Alabama, LLC
800. ROSA of Southern New Jersey, LLC
801. Roth Medical Services, Inc.
802. RPRS, LLC
803. RX Information Technology LLC
804. RxC Acquisition Company
805. RxCrossroads 3PL LLC
806. Ryle and De Lacy Pharmacies Limited, Ireland
807. S.K.U., Inc.
808. Salus-Apotheke Mag. pharm. Simone Gaigg KG, Salzburg
809. Salvator - Apotheke Mag. pharm. Gertrude Pölzl KG, LG Leoben
810. San Bruno Mountain Ltd., A California Limited Partnership
811. Sandviken Apotek AS
812. Sangers (Northern Ireland) Limited, Northern Ireland
813. SANOVA Pharma GesmbH, HG Wien
814. SAVORY & MOORE (JERSEY) LIMITED, Jersey
815. SAVORY & MOORE LIMITED, Scotland
816. SCHOLES (CHEMISTS) LIMITED, England
817. Schutzengelapotheke Neufeld Mag. Schweifer KG, LG Eisenstadt
818. Scrip Pak, LLC (Linear Holdings, LLC)
819. Script2U Holdings LLC
820. Script2U LLC
821. ScriptHero LLC
822. ScriptHero Pharmacy Holdings LLC
823. ScriptHero Pharmacy LLC
824. Select RX, LLC (Linear Holdings, LLC)
825. SelectPlus Oncology, LLC
826. Sens Arbeidsinkludering AS
827. Sens Eiendom AS
828. Sens Gruppen AS
829. Sens Utvikling AS

830. SERVICE DE LA REPARTITION PHARMACEUTIQUE, Paris
831. SF Valley Derm Equipment I, LLC
832. Sherman Oaks Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
833. Sherman Oaks Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
834. Shoup Properties, Inc.
835. SHS V Medtech Investments GmbH & Co. KG
836. Simply Medical LLC
837. SIVEM Pharmaceuticals ULC/SIVEM Produits Pharmaceutiques ULC
838. Six R Investments, Inc.
839. SOCIETE COOPERATIVE OUEST PARTAGE, BREST
840. SOCIETE D`ETUDES ET DE REALISATIONS INFORMATIQUES, Monaco
841. Sofarmex BVBA, Belgium
842. Sofiadis SCRL, Belgium
843. Soldier Acquisition Corporation
844. SOPI The Lough Limited, Ireland
845. SOPI Youghal Limited, Ireland
846. SourceTenn LLC
847. South Alabama Cancer Centers, LLC
848. South Bay Radiation Oncology, LLC
849. South Pacific Medical Inc.
850. Southeast Merger Corp.
851. Southeast Texas Cancer Centers, L.P.
852. Southern California Radiation Oncology, LLC
853. Spider Acquisition Corporation
854. Spirit Acquisition Corporation
855. Spring Valley Industries, LLC
856. St. Louis Pharmaceutical Services, LLC
857. St. Lucas-Apotheke Mag.pharm. Ilona Elisabeth Leitner KG, HG Wien
858. St. Markus Apotheke Dr. Elke Kramberger-Kaplan KG, LG Linz
859. St. Richard Apotheke Mag.pharm. Ursula Kohl KG, Landesgericht Korneuburg
860. Stadion-Apotheke Mag. pharm. Ulrike Grosser-Schmidt KG, LG St. Pölten
861. Stadt-Apotheke "Zur heiligen Barbara" Mag. pharm. Igor Mauritsch KG, Austria
862. Stadtapotheke Fürstenfeld Mag. pharm. Waltraud Maier KG, Landesgericht Graz
863. Stat RX USA, LLC (Linear Holdings, LLC)
864. STATIM FINANCE LIMITED, England
865. STEPHEN SMITH LIMITED, Guernsey
866. Sterling Medical Services, LLC (McKesson Patient Care Solutions Inc.)
867. STQ LLC
868. Strategic Health Alliance II, Inc.
869. Strategic Health Alliance Management Corp.
870. Strategic Sourcing Services LLC
871. Streator Radiation Oncology, LLC
872. Stubaital-Apotheke Mag.pharm. Christian Kernstock KG, LG Innsbruck
873. Summa Script LLC
874. Sund Apotek AS
875. SUPERFIELD LIMITED, England
876. Supplylogix LLC
877. T AND I WHITE LIMITED, England
878. T. Sheridan Sales & Marketing, Dublin
879. Tabor Apotheke Mag. pharm. Wolfram Schaden KG, LG Steyr
880. Targa Parent Holdings, LLC
881. TBC Products, Inc.
882. Temperature Controlled Pharmaceuticals Limited
883. Test Corporation changed 2 GM 3 AG
884. Test Entity - Corporation
885. Test Entity - Corporation (Glenette)
886. Test Entity - LLC (Anne)
887. Test Entity - LLC (Glenette)
888. Test Entity - LLC (Karen)
889. Test Entity - LLC (Melissa)
890. Test Entity - LP
891. Test Entity - Manager LLC
892. Test Entity - Member LLC
893. Test Entity - Parent Corporation
894. Texas Pharmaceutical Services, LLC
895. Texas Proton Therapy Center, LLC
896. The Oregon Cancer Centers, Ltd.
897. Theratech, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
898. Thriftymed, Inc. (McKesson Medical-Surgical Top Holdings Inc.)
899. THURNBY ROSE LIMITED, England
900. Titus Home Health Care LLC
901. Tjellesen Max Jenne A/S, Rodovre
902. Todin A/S, Denmark
903. TOPS Pharmacy Services, Inc.
904. Tower Radiation Technology, LLC
905. Tracer Enterprises LLC

FINAL AGREEMENT 3.25.22

906. Tri-State Radiation Oncology Centers, LLC
907. Tuna Acquisition Corp.
908. Tyler Radiation Equipment Leasing, LLC
909. Unicare Dispensers 16 Limited, Ireland
910. Unicare Dispensers 27 Limited, Ireland
911. Unicare Dispensers 5 Limited, Ireland
912. Unicare Pharmacy Group Limited, Dublin
913. United Drug (Wholesale) Limited
914. United Drug Distributors Ireland Limited
915. Unity Oncology, LLC
916. Urbani-Apotheke Mag. pharm. Bernhard Prattes KG, LG Graz
917. US Oncology Corporate, Inc.
918. US Oncology Holdings, Inc.
919. US Oncology Lab Services, LLC
920. US Oncology Pharmaceutical Services, LLC
921. US Oncology Pharmacy GPO, L.P.
922. US Oncology Reimbursement Solutions, LLC
923. US Oncology Research, Inc. (US Oncology Research, LLC)
924. US Oncology Research, LLC
925. US Oncology Specialty, LP
926. US Oncology, Inc.
927. USCITA LIMITED, England
928. USON Insurance Company
929. USON Risk Retention Group, Inc.
930. Utah Acquisition Corporation
931. Valley Equipment Company
932. Vantage Acquisition Company, LLC (Vantage Oncology, LLC)
933. Vantage Acquisition Finance, LLC (Vantage Oncology, LLC)
934. Vantage Cancer Care - Alabama, LLC (Vantage Cancer Care Networks, LLC)
935. Vantage Cancer Care - Indiana, LLC (Vantage Cancer Care Networks, LLC)
936. Vantage Cancer Care - New Mexico, LLC (Vantage Cancer Care Networks, LLC)
937. Vantage Cancer Care Network of Alabama, LLC (Vantage Cancer Care Networks, LLC)
938. Vantage Cancer Care Network of Indiana, LLC (Vantage Cancer Care Networks, LLC)
939. Vantage Cancer Care Network of New Mexico, LLC (Vantage Cancer Care Networks, LLC)
940. Vantage Cancer Care Networks, LLC
941. Vantage Cancer Centers of Georgia, LLC
942. Vantage Central Ohio Radiation Therapy, LLC
943. Vantage Equipment Acquisition, LLC
944. Vantage Exton Radiation Oncology, LLC
945. Vantage Medical Management Services, LLC
946. Vantage Mokena Radiation Oncology, LLC
947. Vantage Oncology - Brooklyn, LLC
948. Vantage Oncology Centers - Beverly Hills, LLC
949. Vantage Oncology Finance Co. (Vantage Oncology, LLC)
950. Vantage Oncology Holdings, LLC
951. Vantage Oncology LLC PAC Corporation
952. Vantage Oncology Physics, LLC
953. Vantage Oncology Treatment Centers - Brevard, LLC
954. Vantage Oncology Treatment Centers - Brockton, LLC
955. Vantage Oncology Treatment Centers - Central Florida, LLC (Vantage Oncology Treatment Centers, LLC)
956. Vantage Oncology Treatment Centers - Northern Arizona, LLC
957. Vantage Oncology Treatment Centers - Ohio, LLC (Vantage Oncology Treatment Centers, LLC)
958. Vantage Oncology Treatment Centers - San Antonio, LLC (Vantage Oncology Treatment Centers, LLC)
959. Vantage Oncology Treatment Centers - Tri-State, LLC
960. Vantage Oncology Treatment Centers, LLC
961. Vantage Oncology, LLC
962. Vantage Operational Support Services, LLC
963. Vantage Radiation Oncology Associates, LLC
964. Vantage San Antonio Radiation Oncology, LLC (Vantage Oncology Treatment Centers - San Antonio, LLC)
965. Vantage South Suburban Radiation Oncology, LLC
966. VC Services, Inc.
967. VEC GP, LLC
968. VerbalCare, LLC
969. Verdal Apotek AS
970. Very Important Products, Inc.

971. Visitacion Associates
972. Vitapharm, proizvodnja in trgovina farmacevtskih izdelkov d.o.o., Murska Sobota
973. Vitusapotek Jessheim Storsenter AS
974. Vitus-Apoteket Torvbyen Fredrikstad AS
975. VOTC-Queens, LLC
976. Vulcan Acquisition Subsidiary, Inc.
977. W H CHANTER LIMITED, England
978. W H GREEN (CHEMISTS) LIMITED, England
979. W JAMIESON (CHEMISTS) LIMITED, England
980. W.H.C.P. (DUNDEE) LIMITED, Scotland
981. Walsh Distribution, L.L.C.
982. Walsh Healthcare Solutions LLC
983. Walsh Healthcare Solutions, Inc.
984. Walsh Heartland, L.L.C.
985. Walsh Southwest L.L.C.
986. Well.ca ULC
987. West Florida Radiation Therapy, LLC
988. West Wholesale Drug Co.
989. WESTCLOSE LIMITED, England
990. Western Tumor Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
991. Westside LA Derm Equipment I, LLC
992. WFCC Radiation Management Company, LLC
993. Wickham Radiation Oncology, LLC (Vantage Oncology Treatment Centers, LLC)
994. Wiley Industries, LLC
995. Wilkes Barre Radiation Technology, LLC (Vantage Oncology Treatment Centers, LLC)
996. Wilkes-Barre Radiation Oncology, LLC
997. Windmill Realty, LLC
998. WOODSIDE PHARMACY (GLASGOW) LIMITED, Scotland
999. World Medical Government Solutions, LLC
1000. WorldMed Shared Services, Inc.
1001. WZ-WundZentren GmbH, AG Düsseldorf
1002. Ybbstal-Apotheke Mag.pharm. Adelheid Tazreiter KG, LG St. Pölten
1003. Zeepro, Inc.

<u>**EXHIBIT C**</u>

<u>**ATTORNEY GENERAL'S RELEASE OF OPIOID-RELATED CLAIMS
PURSUANT TO THE DISTRIBUTOR SETTLEMENT AGREEMENT**</u>

**Attorney General's Release of Opioid-Related Claims Pursuant to the Distributors Settlement Agreement**

WHEREAS the Distributors' Settlement Agreement dated July 21, 2021 (the "Agreement") provides in Section XI.A that, as of the Effective Date of the Agreement, the Settling Distributors and the related Released Entities will be released and forever discharged from all of the Releasors' Released Claims;[1] and

WHEREAS the Agreement provides in Section I.III that Releasors (as defined in the Agreement) who are releasing claims under Section XI.A include without limitation and to the maximum extent of the power of each Settling State's Attorney General to release Claims (a) the Settling State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts in a Settling State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in this Agreement; and

WHEREAS the Agreement provides in Section XI.G that each Settling State's Attorney General expressly represents and warrants that he or she has, or has obtained, the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) his or her respective Settling State, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of his or her respective Settling State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor;[ and

THEREFORE, pursuant to the foregoing provisions of the Agreement and without limitation and to the maximum extent of the power of the Attorney General, the Settling Distributors and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (a) the State of Florida and its Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities,

---

[1] Capitalized terms used herein and defined in the Agreement have the meanings given to them in the Agreement.

public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts in the State of Florida, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State of Florida or Subdivision in the State of Florida, whether or not any of them participate in the Agreement; and

THEREFORE, pursuant to the foregoing provisions of the Agreement and to the maximum extent of the State of Florida's power, the Settling Distributors and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (1) the State of Florida, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, and (3) any of the State of Florida's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State of Florida's Governor.

JOHN M. GUARD
CHIEF DEPUTY ATTORNEY GENERAL
BY AND THROUGH THE AUTHORITY
DELEGATED OT HIM BY
ASHLEY MOODY, ATTORNEY GENERAL
STATE OF FLORIDA

Date: 3/15/22

*SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT*

# EXHIBIT 3

Filing # 174093148 E-Filed 05/26/2023 02:57:34 PM

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

OFFICE OF THE ATTORNEY GENERAL,
DEPARTMENT OF LEGAL AFFAIRS,
STATE OF FLORIDA,

      Plaintiff,                     CASE NO.: 2022 CA 000541

v.

SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT,
      d/b/a Memorial Healthcare System, Inc.,
LEE MEMORIAL HEALTH SYSTEM,
      d/b/a Lee Health,
NORTH BROWARD HOSPITAL DISTRICT,
d/b/a Broward Health,
HALIFAX HOSPITAL MEDICAL CENTER,
d/b/a Halifax Health,
WEST VOLUSIA HOSPITAL AUTHORITY,
SCHOOL BOARD OF MIAMI-DADE COUNTY, and
SCHOOL BOARD OF PUTNAM COUNTY.

      Defendants.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
DENYING HALIFAX HOSPITAL MEDICAL CENTER'S MOTION FOR SUMMARY
JUDGMENT, AND DENYING SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT
AND LEE MEMORICAL HEALTH SYSTEM'S MOTION FOR CONTINUANCE OF
THE SUMMARY JUDGMENT HEARING AND SUMMARY FINAL JUDGMENT**

This case came for consideration after hearing on the Office of the Attorney General,

Department of Legal Affairs, State of Florida's ("Florida" or "Plaintiff")) Motion for Summary

Judgment and Supporting Memorandum of Law (Dkt. #111), Halifax Hospital Medical Center's

("Halifax") Motion for Summary Judgment (Dkt. #105), and Sarasota County Public Hospital

District's ("Memorial Healthcare") and Lee Memorial Health System's ("Lee Health") Motion

for Continuance of the Summary Judgment Hearing (Dkt. ##128, 134). No party disputes the

E-Filed and E-Served
by JA on ___ MAY 2 6 2023

damage wrought by the opioid epidemic in the State of Florida.  The question in this case is whether Florida can release its subdivision claims as part of its settlement with those that purportedly caused this epidemic.  After review of the motions, responses by each of the defendants, and argument of counsel, this Court concludes that Florida has the power to settle and release subdivisions' claims, based on the Florida Constitution, Florida Statutes, and the common law for the reasons stated below.  There is no genuine issue of any material fact, and Florida is entitled to judgment as a matter of law.  Accordingly, this Court will **GRANT** Florida's motion for summary judgment (Dkt. #111) on its claim and against the counterclaims filed by the defendants, **DENY** Halifax's motion for summary judgment (Dkt. #105), and **DENY** Memorial Healthcare's and Lee Health's motions for continuance (Dkt. ##128, 134).

## PROCEDURAL POSTURE

On or about June 13, 2022, Florida filed its Amended Complaint (Dkt. #45) against Defendants Halifax, Memorial Healthcare, Lee Health, North Broward Hospital District ("North Broward"), the School Board of Miami-Dade County ("SBMD"), and the School Board of Putnam County ("SBPC"),[1] seeking a declaratory judgment that Florida had the power to release and did release each of the defendants' claims in a series of settlements that Florida entered into related to its opioid litigation.  Just prior to the Amended Complaint being filed, on or about June 13, 2022, this Court granted (Dkt. #38) South Broward Hospital District's ("South Broward" and

---

[1] Almost all of these Defendants have separately sued distributors, manufacturers, or pharmacies in Florida or federal courts for alleged opioid-related harms.  Sarasota County Public Hospital District, Lee Memorial Health System, Putnam County School Board, and School Board of Miami-Dade brought suits in federal court that are now part of a pending multidistrict litigation.  *See Sarasota Mem. Healthcare Sys. v. Purdue Pharma L.P., et al.,* 1:18-op-46136-DAP; *Lee Health v. Actavis LLC, et al.,* 1:21-op-45092-DAP; *Putnam County School Board, et al. v. Cephalon, Inc., et al.,* 1:22-op-45025-DAP; *School Board of Miami-Dade County, Florida v. Endo Health Solutions Inc. et al.* 1:19-op-45913-DAP.  Halifax Hospital Medical Center and North Broward Hospital District sued in Florida state court.  *See Florida Health Sciences Center, Inc., et al. v. Richard Sackler, et al.,* CACE-19-018882.

2

collectively, Halifax, Memorial Healthcare, Lee Health, North Broward, South Broward, SBMD, and SBPC are referred to as "Defendants") Motion to Intervene as a Defendant in this matter. All Defendants answered the Amended Complaint (Dkt. ##51, 57, 60, 61, 64, & 73).  On or about July 5, 2022, North Broward filed a counterclaim against Florida (Dkt. #57), seeking a declaratory judgment that Florida did not have authority and did not release North Broward's claims and seeking recovery from Florida for allegedly taking North Broward's opioid claims. That same day, South Broward filed a counterclaim (Dkt. #60), seeking a declaratory judgment, seeking the imposition of a constructive trust against the State, and claiming that Florida had been unjustly enriched by the settlements.  Also, that same day, SBMD and SBPC filed counterclaims (Dkt. ## 61, 64), alleging that each were entitled to declaratory relief that Florida had no authority to preempt their claims with the settlements.  On or about July 15, 2022, Memorial Healthcare and Lee Health filed a counterclaim (Dkt.#73), seeking declaratory relief and asserting a takings claim against Florida.

On or about September 22, 2022, Halifax moved for summary judgment (Dkt. #105).  On or about November 4, 2022, Florida moved for summary judgment (Dkt. #104) and filed a Declaration of John M. Guard attaching voluminous exhibits, including the settlement agreements at issue in this case (Dkt.## 116-21, 151).  The Defendants filed responses (Dkt. ##134, 135, 137, 138, 139 141, 143) and affidavits opposing summary judgment (Dkt. ## 124-27, 129, 132-33, 140, 142, 144, 145).  On or about November 23, 2022, Lee Memorial moved to continue the summary judgment hearing (Dkt.#128), which Florida opposed (Dkt. #148).  On December 19, 2022, this Court held oral argument on the motions.  On April 6, 2023, this Court held a status conference and heard additional argument.

## **BACKGROUND**

The evidence in the record demonstrates that the opioid overuse has touched every part of the State of Florida. On May 3, 2017, then-Governor Rick Scott declared a public health emergency in the State.  In 2020, the Florida Medical Examiners Commission ("Commission") reported that there were 7,842 opioid-related deaths reported or almost twenty-one and a half opioid-related overdose deaths a day.[2]  In its 2021 interim report, the Commission reported 4,140 opioid-related deaths reported in the first half of 2021 or roughly twenty-three Floridians dying everyday of an opioid-related drug overdose.[3]

On May 15, 2018, Florida filed its initial complaint (the "Opioid Litigation") in the Sixth Judicial Circuit in and for Pasco County, Florida (the "State Court").  In its initial complaint of the Opioid Litigation, Florida brought claims against certain manufacturers and distributors who made and distributed opioids in the State of Florida.  The Complaint alleged violations of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Florida's Racketeer Influenced and Corrupt Organization Act ("Florida RICO"), public nuisance, and negligence.

On November 16, 2018, the Office of Attorney General amended its complaint in the Opioid Litigation and added claims against two pharmacy chains who dispensed opioids in Florida (collectively, all the Opioid Litigation defendants are referred to as the "Opioid Defendants"), alleging similar causes of action as those in the initial complaint.

After Florida filed its initial complaint, around one hundred Florida cities, counties, and other political subdivisions, including the Defendants in the instant action, filed separate lawsuits

---

[2]     https://www.fdle.state.fl.us/MEC/Publications-and-Forms/Documents/Drugs-in-Deceased-Persons/2020-Annual-Drug-Report-FINAL.aspx  (last viewed October 31, 2022); Declaration of John Guard, Ex. C.

[3]     https://www.fdle.state.fl.us/MEC/Publications-and-Forms/Documents/Drugs-in-Deceased-Persons/2021-Interim-Drug-Report-FINAL.aspx (last visited October 31, 2022); Declaration of John Guard, Ex. C.

against the Opioid Defendants and others, alleging similar claims as those raised by Florida.

After years of litigation and negotiation, the Attorney General finalized settlement agreements with (1) Johnson & Johnson (the "JJ Settlement");[4] (2) McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Drug Corporation (the "Distributor Settlement");[5] (3) Endo (the "Endo Settlement");[6] (4) CVS (the "CVS Settlement");[7] (5) Teva (the "Teva Settlement");[8] (6) Allergan (the "Allergan Settlement");[9] and (7) after almost four weeks of a jury trial, Walgreens (the "Walgreens Settlement")[10] (collectively, the JJ Settlement, the Distributor Settlement, the Endo Settlement, the CVS Settlement, the Teva Settlement, the Allergan Settlement, and the Walgreens Settlement are referred to collectively as the "Opioid Settlements").  The State Court subsequently entered Consent Judgments.

Each of the Opioid Settlements provided for a release of the subdivision claims.  For instance, The Distributor Settlement included in the definitions applicable to the release the following language:

> III. "Releasors." *With respect to Released Claims*, (1) each Settling State; (2) each Participating Subdivision; and (3) *without limitation and to the maximum extent of the power of each Settling State's Attorney General* and/or Participating Subdivision to release Claims, (a) *the Settling State's* and Participating Subdivision's *departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind* and attorneys, including its Attorney General, and any person in his or her official capacity whether elected or appointed to serve

---

[4]    *See* Declaration of John Guard, Ex. H.

[5]    *Id.*, Ex. G.

[6]    *Id.*, Ex. I.

[7]    *Id.*, Ex. L.

[8]    *Id.*, Ex. J.

[9]    *Id.*, Ex. K.

[10]    *Id.*, Ex. M.

any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) *any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Special Districts in a Settling State*, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to a Settling State or Subdivision in a Settling State, whether or not any of them participate in this Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. Each Settling State's Attorney General represents that he or she has or has obtained (or will obtain no later than the Initial Participation Date) the authority set forth in Section XI.G. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Subdivision Settlement Participation Form referenced in Section VII providing for a release to the fullest extent of the Participating Subdivision's authority.

Distributor Settlement at 8-9 (emphasis added).

## LEGAL STANDARD

Florida Rule of Civil Procedure 1.510(a) provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fla. R. Civ. P. 1.510(a). This rule is "applied in accordance with the federal summary judgment standard." *See id.*; *see also In re Amends. to Fla. Rule of Civ. Pro. 1.510*, 317 So.3d 72, 74 (Fla. 2021). Courts may grant summary judgment when, as here, "the only question a court must decide is a question of law." *Glob. Travel Int'l, Inc. v. Mount Vernon Fire Ins. Co.*, 2021 WL 6070579, at *1 (M.D. Fla. Dec. 21, 2021) (citing *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011)).

## DISCUSSION

### A. The Attorney General's Authority to Release Subdivisions' Claims

It is undisputed that the Defendants are political subdivisions of the State of Florida.

Attorney General executed the Opioid Settlements and those settlements release all of the opioid-related claims on behalf of Florida and all its political subdivisions.  The only remaining issue is the legal question whether the Attorney General has the authority to release subdivision claims.

The Florida Constitution declares that the Attorney General is a member of the Cabinet, and she "shall be the chief state legal officer." Fla. Const. Art IV, §§10(a), 10(b).  The Attorney General's duties extend to representing the interests of the State. Fla. Stat. §§ 16.01(4), (5) (stating that the Attorney General "[s]hall appear in and attend to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which *the state* may be a party, *or in anywise interested*, in the Supreme Court and district courts of appeal of this state"; and "[s]hall appear in and attend to such suits or prosecutions in any other of the courts of this state or in any courts of any other state or of the United States.")[11] (emphasis added).  "When occasion arises 'it is [her] duty to use means most effectual to the enforcement of the laws, and the protection of the people.' The Attorney General is the principal law officer of the state." *Thompson v. Wainwright,* 714 F.2d 1495, 1500 (11th Cir. 1983).

Critically, the Florida Statutes provide that the Attorney General "shall have and perform all powers and duties incident or usual to such office." Fla. Stat. § 16.01(7).  Florida courts have, repeatedly, interpreted this provision within its plain language and intent to mean that the Attorney General retains all of the historic, sovereign common law powers and duties to represent and protect the people of Florida and their interests. *See State ex rel. Shevin v. Exxon Corp.,* 526 F.2d 266, 270 (5th Cir. 1976):

---

[11]     *See, e.g., State ex rel. Boyles v. Fla. Parole & Prob. Comm'n,* 436 So.2d 207, 210 (Fla. 1st DCA 1983) ("In cases such as the one at bar, where the injury is to the public, the Attorney General has standing as a representative of the people.  The Attorney General, as chief law officer of the State, may appear in and attend to all suits or actions in which the State may be 'in anywise interested.' He is the 'people's attorney' and may properly intervene in a matter to represent the people in the courts.") (internal citations omitted).

> Finally, and most importantly, the Florida Supreme Court has consistently recognized the continuing existence of the Attorney General's common law powers. . . . This affirmation of the existence of the Attorney General's common law powers does not stand alone in Florida jurisprudence. It is echoed in case after case from *Gleason* to the 1972 decision in *State ex rel. Shevin v. Yarborough* . . . We conclude that there simply is no question that such powers exist.

"The Attorney General has the power and it is [her] duty among the many devolving upon [her] by the common law to prosecute all actions necessary for the protection and defense of the property and revenue of the state." *State ex rel Landis v. S.H. Kress & Co.,* 155 So.823, 827 (Fla. 1934). "As the chief law officer of the state, it is [her] duty, in the absence of express legislative restrictions to the contrary, to exercise all such power and authority as public interests may require from time to time." *Id.*

With respect to public nuisance-like claims, like the claims brought by the Defendant subdivisions, the Florida Supreme Court has been clear that it is the Attorney General's duty to abate and prevent nuisances. In *Kress*, the Florida Supreme Court stated that those common-law duties specifically include her duty "to prosecute all actions necessary for the protection and defense of the property and revenue of the state . . . to . . . prevent public nuisances . . . ." *Id.* Indeed, it is her duty "in the absence of express legislative restrictions to the contrary, to exercise all such power and authority as public interests may require from time to time." 155 So. at 827.

In addition to these broad grants of power, the legislature has made repeated grants of specific authority.[12] As is most relevant to this case, the legislature specifically granted the Attorney General authority to enforce consumer protection laws, including the authority to bring

---

[12]     In addition, the legislature has granted the Attorney General authority to pursue other actions, including: (1) false claims on the government (Fla. Stat. §68.082 (defining state for purposes of the false claims act as "the government of the state or any department, division, bureau, commission, regional planning agency, board, district, authority, agency, or other instrumentality of the state.); (2) antitrust claims (Fla. Stat. §542.27 ("The Attorney General is authorized to institute or intervene in civil proceedings ... on behalf of the state, its departments, agencies, and units of government"); (3) public nuisance claims (Fla. Stat. §§60.05, 60.06, 823.05).

an action "on behalf of one or more consumers or *governmental entities* for the actual damages caused by an act or practice in violation of this part." Fla. Stat. §501.207(1)(c) (emphasis added). Under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), the Attorney General is the enforcing authority in circumstances like this, because the violations alleged in the relevant opioid lawsuits in the state affect "more than one judicial circuit." Fla. Stat. § 501.203.[13]

Although the Attorney General's power may be limited by the Florida Legislature, absent an explicit statutory limitation, the Attorney General's undertakings are presumed to be lawful sovereign actions.[14] "As the chief law officer of the state, it is [her] duty, in the absence of express legislative restrictions to the contrary, to exercise all such power and authority as public interests may require from time to time." *Kress,* 155 So. at 827. "Their duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the Attorney General of specific powers; but in the absence of such legislative action, he typically may exercise all such authority as the public interest requires." *Shevin v. Exxon,* 526 F.2d. at 268. "And the attorney general has wide discretion in making the determination as to the public interest." *Id.* at 269.

The court in *Shevin v. Exxon* was presented with a related question to the question before this Court: whether the Attorney General may institute actions under federal law to recover

---

[13]    Moreover, the enforcing authority for matters affecting only one judicial circuit is *not* the Defendant subdivisions in this case—it is the applicable state attorney's office. *Id.*

[14]    Subdivisions' statutory authority to sue does not supersede the Attorney General's broad, sovereign common law powers, absent a clear legislative edict to the contrary. No such legislative edict exists in this case regarding any statutory claim; thus Defendants' claims were validly released by the Attorney General. Separately, where a subdivision may have concurrent statutory authority to bring claims, the Attorney General's claims are the superior claims, and as such she may release subdivisions' claims pursuant to a statewide settlement.

damages sustained by departments, agencies, and political subdivisions that have not

affirmatively authorized the Attorney General to bring suit for recovery on their behalf.  526

F.2d at 270.  The court stated the Attorney General retained the power, and indeed had the duty,

to "prosecute all actions necessary for the protection and defense of the property and the revenue

of the state."  *Id.*[15]  Additionally, the court analyzed whether the Attorney General could initiate

actions on behalf of state instrumentalities "without affirmative authorization" to recover

damages on those instrumentalities' behalf.  *Shevin,* 526 F.2d at 272.  The court concluded that

because it could find no legislation barring the Attorney General from bringing an action on

behalf of subdivisions without their consent, the Attorney General may act.  *Id.* at 273-74.

The First District Court of Appeal in *Barati v. State* considered a similar issue to the issue

presented in this case when it resolved whether the Attorney General had the power to dismiss an

action in which had not intervened. 198 So. 3d at 72.  In *Barati*, the Attorney General filed a

notice of voluntary dismissal in an action to which she was not a party, citing the Attorney

General's power to dismiss false claims suits under Florida Statutes §68.084(2)(a). *Id.* The First

District did not rely solely on the plain language of Section 68.084(2)(a) in endorsing the

Attorney General's assertion but concluded that the Attorney General had authority to dismiss

such an action in part based on "the constitutional authority of the executive branch vested in the

Attorney General of the State of Florida to act as the State's chief legal officer." *Id.* at 84.  The

court reasoned that "[c]onducting and terminating legal actions brought in the name of and for

the benefit of the State is the *sine qua non* of the State's chief legal officer." *Id.*

Similar to *Shevin* and *Barati*, it follows that, if the Attorney General has the power to

---

[15]     *See also id.* at n.10: "We must reject any argument by defendants that the right to 'prosecute' an action does not include the right to institute the action.  That term typically is used to refer, as a unit, to the institution and maintenance to a conclusion of a legal proceeding."

*bring litigation* on behalf of the people of Florida and its subdivisions, she must also be able to *settle litigation* on behalf of the people of Florida and its subdivisions—including the subordinate claims brought by Defendants. *See Abramson v. Fla. Psych. Ass'n*, 634 So.2d 610, 612 (Fla. 1994) ("[T]he power of a public body to settle litigation is incident to and implied from its power to sue and be sued."); *In re Certified Question,* 638 N.W.2d 409, 414 (Mich. 2002) ("[I]nherent in the Attorney General's authority to sue on behalf of a county in matters of state interest, is the Attorney General's authority to settle such a suit.  Given that the Attorney General has the authority to bring claims, it inevitably follows that the Attorney General has the authority to settle and release such claims.").

 The Defendants primarily rely on two Florida Supreme Court decisions: *Holland v. Watson,* 14 So. 2d 200 (Fla. 1943); *Watson v. Caldwell,* 27 So. 2d 524 (1946). In those cases, the Florida Supreme Court held that the statutorily created Board of Administration and Trustees of the Internal Improvement Fund were not required to allow the Attorney General to represent them in legal matters.  Here, however, the question is not whether the Attorney General can force an agency to retain the Attorney General directly as its attorney. It is whether the Attorney General, in a case in which she is concededly authorized to represent the State, may exercise litigation authority to settle claims on behalf of the people of Florida and its subdivisions. Neither *Holland* nor *Watson* cast doubt on that well established authority.

 Based on the foregoing authorities and given that the Defendants are subdivisions, this Court concludes that the Attorney General has the power to release claims, including the claims at issue in this case.  This Court further states that when there is conflict (or overlap) between sovereign state interests and insular subdivision interests, the sovereign's interest necessarily must be deemed to be superior because the State's interest subsumes, in its entirety, the

11

subdivision's interest.  "Local governments, including counties and municipalities, are creatures

of the State without any independent sovereignty." *Fried v. State*, 355 So. 3d 899, 908 (Fla.

2023). Allowing Defendants to continue pursuing their subordinate opioid claims threatens

Florida's sovereign interest in vindicating its citizens' rights—all of its citizens' rights—when

confronted with societal harms such as the opioid crisis.[16]  These are collective harms.  They do

not flow in an insular fashion to individual subdivisions—the harms cross city and county lines.

Indeed, the Opioid Settlements consider the pervasive harms caused by the opioid crisis and

apply a mixture of statewide and local solutions--a framework to which nearly all affected parties

(states and subdivisions alike) have agreed.  Defendants' continued pursuit of their opioid claims

in contravention of the Opioid Settlements jeopardizes the flow of tens of millions of dollars that

will aid in the abatement of the opioid epidemic throughout the State of Florida.  Accordingly,

this Court concludes that Florida is entitled to judgment as a matter of law because the Attorney

General had the authority to release the Defendants' claims and did, indeed, release the

Defendants' claims.

## B.  The Defendants' Counterclaims

This Court concludes that Florida is entitled to summary judgment against the

Defendants' counterclaims.  There is no genuine issue of any material fact, and Florida is entitled

to judgment as a matter of law on the Defendants' counterclaims.  Florida is entitled to summary

judgment on the Defendants' counterclaims seeking a declaratory judgment for the same reasons

as Florida is entitled to judgment on its claim for a declaratory judgment.  As to the takings

---

[16]      *See, e.g., United States v. City of Miami*, 614 F.2d 1322, 1332 (5th Cir. 1980) ("Unlike the
situations in which we fear that a party may be attempting [to] profit at the expense of unrepresented
individuals, e.g., class actions and shareholder derivative suits, we here have as plaintiff the government
department charged with seeing that the laws are enforced.  We therefore need not fear that the pecuniary
interests of the plaintiff and defendant will tempt them to agree to a settlement unfair to unrepresented
persons, but can safely assume that the interests of all affected have been considered."

claims, Florida is entitled to judgment because subdivisions cannot assert takings claims against the state that created them.  *City of Trenton v. New Jersey*, 262 U.S. 182 (1923); *also Bd. Of Levee Com'rs of the Orleans Levee Bd. v. Huls*, 852 F.2d 140, 142 (5th Cir. 1988) ("[A]s between the state and its agency, property is placed under the control of the agency for supervision and administration, the land to all practical intents and purposes being still the property of the state"); *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1254 (5th Cir. 1976) (rejecting civil rights lawsuit brought by the City of Safety Harbor, Florida, regarding the annexation of a portion of Safety Harbor for the City of Clearwater).[17]  South Broward's unjust enrichment and constructive trust claims also fail because they are barred by sovereign immunity[18] and fail as a matter of law.[19]

## C.  Lee Health's and Memorial Healthcare's Motions for Continuance

The Florida Rules of Civil Procedure were revised in 2021 to adopt the federal standards of summary judgment.  F.R.C.P. 1.510(a) (2022) ("The summary judgment standard provided for in this rule shall be construed and applied in accordance with the federal summary judgment standard.").  Under Florida Rule of Civil Procedure 1.510(d), a nonmovant seeking to delay

---

[17]     Florida's takings clause is coextensive with the Fifth Amendment's and may properly be analyzed with cases interpreting the Federal Constitution. *See, e.g., Chmielewski v. City of St. Pete Beach*, 890 F.3d 942, 949 (11th Cir. 2018) ("Because Florida follows federal takings law, we can look to cases brought under the Fifth Amendment to inform our analysis."); *St. Johns River Water Mgmt. Dist. v. Koontz*, 77 So. 3d 1220, 1222 (Fla. 2012) ("This Court has previously interpreted the takings clause of the Fifth Amendment and the takings clause of the Florida Constitution coextensively."), *rev'd on other grounds*, 570 U.S. 595 (2013); *Highlands–In–The–Woods, L.L.C. v. Polk Cty.*, 217 So. 3d 1175, 1180 (Fla. 2d DCA 2017) (holding "because [developer] did not establish an unconstitutional taking under the U.S. Constitution, it has failed to establish an unconstitutional taking under the Florida Constitution").

[18]     *See Lee Memorial Health System v. Hilderbrand*, 304 So. 3d 58, 62 (Fla. 2d DCA 2020) (concluding that sovereign immunity barred an unjust enrichment claim); *City of Fort Lauderdale v. Israel* 178 So. 3d 444, 447 (Fla. 4th DCA 2015) (holding that an unjust enrichment claim was barred "with no written contract" to defeat the [government entity's] sovereign immunity claim....").

[19]     *14th & Heinberg, LLC v. Terhaar and Cronley General Contractors, Inc.*, 43 So. 3d 877, 881 (Fla. 1st DCA 2010); *Williams v. Stanford*, 977 So. 2d 722, 730 (Fla. 1st DCA 2008) (citations omitted); *Est. of Kester v. Rocco*, 117 So. 3d 1196, 1201 (Fla. 1st DCA 2013).

consideration of a motion for summary judgment must *"show by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition..."* (emphasis added).[20]  Here, Lee Health and Memorial Healthcare have failed to meet the requirements of the new standard adopted by the Supreme Court of Florida for the continuance of a summary judgment hearing.  The facts that they seek in discovery will do nothing to help resolve a purely legal issue.  And I would deny the motions for a continuance in my discretion anyway, as it is in the public interest for this matter to be resolved as quickly as possible. Accordingly, this Court will deny Lee Health and Memorial Healthcare's Motions for Continuance.

It is therefore **ORDERED** and **ADJUDGED** that:

1.     Florida's motion for summary judgment (Dkt. #111) on its claim and against the counterclaims filed by the Defendants is **GRANTED.**

2.     Halifax's motion for summary judgment (Dkt. #105) is **DENIED.**

3.     Memorial Healthcare's and Lee Health's motions for continuance (Dkt. ##128, 134) are **DENIED.**

4.     A Summary Final Judgment is hereby entered in favor of Florida and against each of the Defendants on Florida's claim for a declaratory judgment.  The Attorney General had the power to release the Defendants' claims against the Opioid Defendants and any other entity released by the Opioid Settlements. The Defendants' claims against the Opioid Defendants and any other entity released by the Opioid Settlements were and are released.

5.     A Summary Final Judgment is hereby entered in favor of Florida and against Defendants North Broward, South Broward, SBMD, SBPC, Memorial Healthcare, and Lee Health on each of these Defendants' counterclaims for a declaratory judgment.

---

[20]     The applicable Rule provides that "[a] party may move for summary judgment at any time after the expiration of 20 days from the commencement of the action." Florida Rule of Civil Procedure 1.510(b).

14

6.      A Summary Final Judgment is hereby entered in favor of Florida and against Defendants Memorial Healthcare, Lee Health, and North Broward on each of these Defendants' counterclaims asserting a takings claim.

7.      A Summary Final Judgment is hereby entered in favor of Florida and against Defendant South Broward on its counterclaim for unjust enrichment.

8.      The motions to dismiss the takings claims are denied as moot.  The Clerk is directed to deny any other pending motion.

**DONE** and **ORDERED** in chambers in Tallahassee, Leon County, Florida this 26th day of April, 2023.

JOHN C. COOPER
CIRCUIT COURT JUDGE

Copies:

To all parties of record

15

*SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT*

# EXHIBIT 4

## IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
## IN AND FOR LEON COUNTY, FLORIDA

OFFICE OF THE ATTORNEY GENERAL,
DEPARTMENT OF LEGAL AFFAIRS,
STATE OF FLORIDA,

       Plaintiff,                       CASE NO.:  2022 CA 000541

v.

SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT
     d/b/a Memorial Healthcare System, Inc.,
LEE MEMORIAL HEALTH SYSTEM,
     d/b/a Lee Health,
NORTH BROWARD HOSPITAL DISTRICT,
     d/b/a Broward Health,
HALIFAX HOSPITAL MEDICAL CENTER,
     d/b/a Halifax Health, and
WEST VOLUSIA HOSPITAL AUTHORITY,
SCHOOL BOARD OF MIAMI-DADE COUNTY, and
PUTNAM COUNTY SCHOOL BOARD,

       Defendants.

_____/

## AMENDED COMPLAINT FOR DECLARATORY RELIEF

The Plaintiff, Office of the Attorney General, Department of Legal Affairs, State of

Florida (the "Attorney General"), alleges the following in support of its Amended Complaint

against the Defendants identified below:

## BACKGROUND

### A.  OPIOID EPIDEMIC AND SETTLEMENTS

1.    The State of Florida continues to suffer a devastating opioid crisis. In its November

2021 release, the United States Centers for Disease Control and Prevention (the "CDC")

estimated overdose deaths in the United States from opioids increased to 75,673 Americans in

the 12-month period ending in April 2021, up from 56,064 Americans the year before. https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm. The staggering increase in deaths can be seen in data related to Florida. The numbers of deaths in Florida rose from 5,638 opioid overdose deaths in the year ending January 2020 to 7,661 in January 2021. *Id.* An increase of almost 2,000 more Floridians died compared to the previous year. As of October 2021, the increased deaths are not subsiding; according to the last reported CDC data that the Attorney General could access, 7,617 Floridians died from opioid overdoses. https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm. These numbers, especially the most recent data, are likely less than the full carnage caused by the crisis as the CDC's own data notes that its data is underreporting deaths. 7,617 Floridians equates to almost 21 Floridians dying each and every day from an opioid overdose.

2.     Deaths only paint part of the horrific picture of the opioid epidemic. The societal, economic, and personal harms suffered by Floridians because of this epidemic are immeasurable and not fully calculable. Now more than ever, action needs to be taken to reverse the trend of death and destruction being caused by the plague of opioids.

3.     Relief is finally within reach. The State has executed seven historic settlements with (1) AmerisourceBergen Corp., Cardinal Health, Inc., and McKesson Corp. (collectively, referred to as the "Distributors" and the agreement as the "Distributor Settlement Agreement"); (2) Johnson & Johnson, Inc. and its subsidiaries (collectively, referred to as "J&J"); (3) Endo Pharmaceuticals Inc. and its affiliated companies (collectively, referred to as "Endo"); (4) CVS Pharmacy, Inc. and its subsidiaries (collectively, referred to as "CVS"); (5) Teva Pharmaceutical Industries, Ltd. and its related entities (collectively, referred to as "Teva"); (6) Allergan Finance, LLC, Allergan Sales, LLC, Allergan USA, Inc., and Allergan Ltd. (collectively, referred to as

2

"Allergan"); and (7) Walgreens Boots Alliance, Inc. and Walgreen Co. (collectively, referred to as "Walgreens") (together the agreements and documents reflecting all seven settlements are referred to as the "Settlement Agreements").

4.  The Settlement Agreements secure Florida more than $3.077 billion in opioid remediation plus an additional $84 million in opioid overdose reversal drugs.[1] If one were to include two bankruptcy plans of reorganization and other previously entered settlements, the total relief on behalf of Floridians for opioid treatment, prevention, and recovery is in excess of $3.5 billion. This relief is the second largest set of settlements that the State of Florida has in its history ever reached.[2]

**B. OPIOID INVESTIGATION AND LITIGATION HISTORY**

5.  In September 2017, the Attorney General began an investigation into the causes of the opioid epidemic. At that time, no Florida subdivision had sued an opioid manufacturer, distributor, or dispenser.

6.  In December 2017, the Attorney General sent out a notice requesting proposals from outside counsel to represent it in a possible lawsuit related to the opioid epidemic. Again, at that time, no Florida political subdivision had sued an opioid manufacturer, distributor, or dispenser.

7.  On May 16, 2018, the Attorney General filed suit in the Circuit Court in the Sixth Judicial Circuit in a case styled as *State of Florida v. Purdue Pharma L.P., et. al.*, case no. 2018-CA-001438. A copy of the Second Amended Complaint is attached as Exhibit "8" to this

---

[1]     The Settlement Agreements, copies of which are attached as Exhibits 1-7 and are incorporated herein by reference.

[2]     The Tobacco Settlement entered by Florida is the only settlement for more money.

Amended Complaint and is incorporated by reference herein.  Among other things, the original and amended complaints sought relief against manufacturers and distributors of opioid products. Eventually, the Attorney General added claims against two dispensers of opioids: (a) Walgreen Co.; and (b) CVS Pharmacy, Inc.

8.      After the filing of the Complaint by the Attorney General, dozens of subdivisions filed suit, asserting similar claims against the same or similar defendants alleging similar types of damages. Now, more than 90 political subdivisions have filed suit against similar defendants on similar claims seeking overlapping recoveries with the Attorney General action and with each other. In some instances, there are as many as four levels of government seeking similar relief for the *same* citizens. Florida is not unusual.  More than 3,000 opioid cases are pending across the nation.   https://www.msn.com/en-xl/money/other/road-to-us-opioid-settlements-has-been-long-and-complicated/ar-AAUjSXg.

9.      All the Florida subdivision cases were removed to federal court and subsequently transferred to a multi-district litigation panel in the United States District Court for the Northern District of Ohio (the "MDL") and stayed.   The Attorney General fully litigated her case, culminating in a five-week jury trial against one remaining defendant, Walgreens, before that action settled.   The Attorney General's counsel engaged in extensive discovery and motion practice, including producing millions of pages of documents, participating in more than 140 depositions, and litigating multiple motions for summary judgment and motions to exclude experts prior to the entry of the Settlement Agreements.

## C.  THE SETTLEMENTS

10.    Beginning in 2018 and continuing through July 2021, the Attorney General along with other attorneys general and members of the Plaintiffs Executive Committee for the MDL (the "PEC") negotiated with multiple defendants.

11.    On or about July 21, 2021, almost three years after negotiations began, the Attorney General, twelve other Attorneys General, and the PEC entered into settlement agreements with J&J and the Distributors. Subsequently, a total of forty-six states entered into the settlement agreements.

12.    In exchange for billions of dollars of relief, the Distributors and J&J demanded that the Attorney General, as the chief legal officer of the State of Florida, execute releases ("Release Provisions") that extinguish the Attorney General's claims and the subordinate claims of Florida subdivisions, including Defendants' claims.[3] In other words, the Attorney General has secured historic relief on behalf of the State and its subdivisions,[4] including Defendants, and has executed releases binding the State and its subdivisions, including Defendants, as a whole.

13.    In addition to the Release Provisions, the Distributors and J&J demanded that the Attorney General obtain sign-on from political subdivisions from both litigating and non-litigating subdivisions. Failure of subdivisions to sign-on has financial consequences for each

---

[3]      For purposes of this Amended Complaint for Declaratory Relief, any reference to Defendants' claims includes any claims within the definitions of "Released Claims" in the Settlement Agreements, which are attached and incorporated by reference herein. In general, the "Released Claims" include any claims that Defendants asserted, or could have asserted, against the entities relating to "Covered Conduct," which is a term that is also defined in the Settlement Agreements and broadly covers opioids-related conduct. All of Defendants' claims are "Released Claims" under the terms of the Settlement Agreements.

[4]      Under each of the Settlement Agreements, "Subdivisions" is a defined term that encompasses each Defendant named in this Action.

state.  In April 2021, in order to secure sign-on of subdivisions, the Attorney General negotiated a memorandum of understanding that subsequently became the Florida Opioid Allocation and Statewide Response Agreement.  A copy of the Florida Opioid Allocation and Statewide Response Agreement is attached as Exhibit "9" to this Amended Complaint and incorporated by reference herein.

14.     Between July 2021 and February 2022, the Attorney General obtained sign-ons to the Florida Opioid Allocation and Statewide Response Agreement from all of the litigating counties and cities (97 of them).

15.     On or about January 15, 2022, the Attorney General reached a settlement with Endo for $65 million, including $55 million for opioid remediation. Like the Distributor and J&J settlement agreements, the Endo settlement agreement required the Attorney General to release all subdivision claims and obtain subdivision sign-ons.  Between January 15, 2022 and March 26, 2022, all litigating counties and cities executed participation agreements (91) and an additional 72 non-litigating subdivisions joined the settlement.  Endo agreed to finalize the settlement.

16.     On or about March 30, 2022, CVS, Teva, and Allergan entered into settlement agreements with the Attorney General. Like the Distributor and J&J settlement agreements, the CVS, Teva, and Allergan settlement agreements required the Attorney General to release all subdivision claims and obtain subdivision sign-ons.  The sign-on process is ongoing.

17.     On or about May 4, 2022, following five weeks of a jury trial, Walgreens entered into a settlement agreement with the Attorney General.  Like the Distributor and J&J settlement agreements, the Walgreens Settlement Agreement required the Attorney General to release all subdivision claims and obtain subdivision sign-ons.  The sign-on process is ongoing.

## D.  THE ATTORNEY GENERAL'S POWER

18.    The Attorney General has the power to release Defendants' claims. Florida Courts have long recognized the Attorney General's ability to exercise Florida's sovereign authority as granted to her under common law and the Florida Constitution. Defendants, on the other hand, are administrative "creatures of the state" created as a matter of convenience to carry out certain functions at the local level.[5] Though Defendants have jurisdiction to bring certain legal claims, their authority flows only from the State, and where overlapping jurisdiction exists between the Attorney General and subdivisions (as is the case here), the Attorney General's claims are superior. In the absence of legislative action, the Attorney General's duties and powers include "all those exercised at common law" and "all such authority as the public interest requires." *State ex rel Shevin v. Exxon,* 526 F.2d.266, 268 (5th Cir. 1976). The Attorney General has "wide discretion in making the determination as to the public interest." *Id.* at 268-269. Indeed, even where a subordinate entity of the state is granted statutory authority to bring an action, the Attorney General may intervene as sovereign, or on behalf of the people of Florida, over objections by those subordinate entities. *See State ex rel Shevin v. Yarborough,* 257 So.2d 891 (Fla. 1972).

19.    These fundamental principles apply most crucially in matters of urgent public interest. Where the Attorney General has acted to protect the public health and welfare, as is the case in her landmark opioid litigation, Defendants' claims must not be allowed to imperil the

---

[5]        "Political subdivisions of States—counties, cities or whatever—never were and never have been considered as sovereign entities." *Reynolds v. Sims,* 377 U.S. 533, 575 (1964). Rather, they are "regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function," *Sailors v. Bd. of Educ.*, 387 U.S. 105, 107-08 (1967), and all local government authority is derived from the State. Political subdivisions are not sovereigns—they are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 607 (1991).

Attorney General's action and the relief she has secured for communities throughout the State. As chief legal officer of the State of Florida, the Attorney General has authority over litigation that raises statewide issues, which necessarily includes the power to bind the State as a whole and to release overlapping claims brought by units of local government such as Defendants. The Attorney General retains the power, and indeed has the duty, to "prosecute all actions necessary for the protection and defense of the property and the revenue of the state." *State ex rel Shevin v. Exxon*, 526 F.2d at 270.

20.     ***Immediate harm.*** Defendants—Subdivisions that have brought claims that are subordinate to the Attorney General's action—place the Attorney General's settlements in jeopardy and threaten to immediately devalue the relief available to those who have been impacted by the opioid crisis. Defendants' claims therefore imperil Florida's actions, as sovereign, to protect the safety and welfare of Florida citizens. Two Defendants—Sarasota County Public Hospital District and Lee Memorial Health System—sought to block the entry of the Attorney General's settlement with Endo Pharmaceuticals, jeopardizing the distribution of statewide relief and the implementation of sweeping injunctive terms. All Defendants, moreover, threaten the Attorney General's historic settlements with Distributors, J&J, Endo, CVS, Teva, Allergan, and Walgreens by continuing to press their subordinate claims, potentially resulting in a reduction of millions of dollars that would otherwise flow throughout Florida to abate the opioid crisis. Under the settlements, if Defendants continue to press their lawsuits into 2023, the funds available to Florida communities will be reduced.

21.     As a result, the Attorney General brings this action for declaratory relief to prevent the threat of immediate harm that will result if Defendants continue to press their subordinate claims. Absent the Court's intervention, the Attorney General—and the cities, counties,

8

subdivisions, and communities on whose behalf the Attorney General has secured relief—will suffer immediate injury in the form of reduced funds for opioids prevention, treatment, and recovery.

22.     The Attorney General respectfully requests that this Court enter a declaratory judgment holding that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions with the Settlement Agreements.

## JURISDICTION AND VENUE

23.     The Attorney General brings this action for declaratory relief pursuant to Chapter 86, Florida Statutes. This Court has jurisdiction over this action pursuant to Fla. Stat. §§ 86.011, 86.021, and 86.101.

24.     Venue is proper in the Second Judicial Circuit for Leon County pursuant to Fla. Stat. §§ 47.011 and 47.021. Venue is proper in the Second Judicial Circuit for Leon County because the cause of action arose in Leon County, Florida. Specifically, the Attorney General executed the Distributor Settlement Agreement and the J&J Settlement Agreement in Leon County. The Settlement Agreements will be administered and monitored in Leon County and the funds received under the Settlement Agreements will be directed to be disbursed through the qualified settlement funds in Leon County, Florida.  Additionally, State and Regional Funds will be disbursed by agencies residing in Leon County. Both Settlement Agreements include provisions releasing the Attorney General's claims, including any subordinate and duplicative claims brought by Defendants on behalf of the same cities, counties, and communities for whom the Attorney General has secured relief. The Attorney General brings this action to prevent the threat of immediate harm—which will be realized, in part, in Leon County—if

9

Defendants continue to press their subordinate and duplicative claims and to request a declaration that the Attorney General had the power to release, and did release, Defendants' claims through the execution of Settlement Agreements and Release Provisions in Leon County.

## PARTIES

25.    The Attorney General is the chief legal officer of the State of Florida and has broad constitutional, statutory, and common law authority to represent the interests of the State and its subdivisions, and to protect the public health, safety, and welfare of its citizens.

26.    Defendant Sarasota County Public Hospital District, d/b/a Sarasota Memorial Health Care System, is a community hospital chartered and organized under the laws of the State of Florida. It is located in and around Sarasota County, Florida.  It was re-created by Chapter 2003-359 and Amended by Chapter 2005-304, Laws of Florida. Sarasota County Public Hospital District filed a lawsuit against the opioid defendants after the Attorney General. Sarasota County Public Hospital District did not join the Settlement Agreements and has denied that the Attorney General has the authority to release its claims.

27.    Defendant Lee Memorial Health System, d/b/a/ Lee Health is a community hospital chartered and organized under the laws of the State of Florida. It is located in Lee County, Florida. It was recreated by Chapter 2000-439, Laws of Florida. Lee Health filed a lawsuit against the opioid defendants after the Attorney General.  Lee Health did not join the Settlement Agreements and has denied that the Attorney General has the authority to release its claims.

28.    Defendant North Broward Hospital District d/b/a Broward Health is a community hospital chartered and organized under the laws of the State of Florida. It is located in Broward

10

County, Florida.  It is a special independent taxing district created pursuant to Chapter 27438, Laws of Florida, Special Acts of 1951, as amended. Broward Health filed a lawsuit against the opioid defendants after the Attorney General.  Broward Health did not join the Settlement Agreements.

29.     Defendant Halifax Hospital Medical Center d/b/a Halifax Health is a legislatively chartered taxing healthcare organization. It is located in Volusia, Brevard, and surrounding counties. Halifax Health filed a lawsuit against opioid defendants after the Attorney General. Halifax Health did not join the Settlement Agreements.

30.     Defendant West Volusia Hospital Authority is a special taxing district established by the State to provide access to health care for the qualified indigent residents of the taxing district. It is located in Volusia County, Florida.  West Volusia Hospital Authority filed a lawsuit against the opioid defendants after the Attorney General. West Volusia Hospital Authority did not join the Settlement Agreements.

31.     Defendant School Board of Miami-Dade County is a school district for Miami-Dade County as defined in Florida Statutes § 1001.30. School Board of Miami-Dade County filed a lawsuit against the opioid defendants after the Attorney General. School Board of Miami-Dade County did not join the Settlement Agreements.

32.     Defendant Putnam County School Board is a school district for Putnam County as defined in Florida Statutes § 1001.30.  Putnam County School Board filed a lawsuit against the opioid defendants on May 27, 2022.  Putnam County School Board did not join the Settlement Agreements.

33.     Defendants have brought actions against opioid manufacturers, distributers, and dispensers. Each of these actions have been transferred to the Prescription Opioids Multidistrict

Litigation ("Opioid MDL"), Case No. 1:17-md-2804. Defendants' claims largely mirror those brought by the Attorney General and allege violations of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201 et seq.), RICO, public nuisance, and common law.

34.     Where jurisdiction to bring such claims overlaps, as is the case here, Defendants' actions are subordinate to the Attorney General's action.

## FACTUAL ALLEGATIONS

35.     The State of Florida is suffering from a devastating opioid crisis that has taken the lives of thousands of Floridians and destroyed thousands of families. Cities, counties, and communities across Florida have been tragically impacted, damaged, and broken. The Attorney General has taken legal action against opioids manufacturers, distributors, and dispensers for creating and exacerbating the opioids crisis and, most critically, has fought to secure funds that will remediate and abate the harms the crisis inflicted and continues to inflict.

36.     The Attorney General filed suit against opioid manufacturers, distributors, and dispensers of opioids in 2018, on behalf of the people and entities of Florida, as is her right to protect the people, health, and welfare of Florida, for causes of action including common-law claims (public nuisance, negligence, negligence *per se*, gross negligence, and civil conspiracy) and statutory claims (violations of the public nuisance statute, the Florida Deceptive and Unfair Trade Practices Act, and the Florida Racketeering Influenced Corrupt Organizations Act).

37.     During this time, Defendants filed lawsuits mirroring the Attorney General's action. These have been transferred into the Opioid MDL,[6] Case No. 1:17-md-2804. Defendants' claims mirror those brought by the Attorney General and allege violations of the Florida

---

[6]     Defendant Putnam County School Board filed its opioids lawsuit on May 27, 2022 and is likely to be transferred to the MDL.

12

Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201 et seq.), RICO, public nuisance, and common law. Where jurisdiction to bring such claims overlaps, as is the case here, Defendants' actions are subordinate to the Attorney General's action.

38.   The existence of thousands of lawsuits by political subdivisions nationwide has created an historically complex challenge for settling opioid-related claims. Absent the power of the Attorney General to release Defendants' claims, costs for all parties will rise, hindering judicial efficiency and frustrating the Attorney General's efforts to allocate relief in a manner that is based upon the needs of residents and communities throughout Florida.

39.   For nearly four years, the Florida Attorney General has negotiated with opioid manufacturers, distributors, and dispensers to provide the relief that the State of Florida and its citizens desperately need to be made whole and to abate the ongoing opioid crisis. Left unabated, the opioid epidemic will continue to threaten the health, safety, and welfare of Florida residents and communities. There is, as a result, an urgent need for resources, funding, and services that can treat and prevent the harms inflicted by the opioids crisis.

40.   Access to these urgently needed funds is finally within reach. The Attorney General has announced the historic Settlement Agreements.

41.   These Settlement Agreements secure relief for opioid treatment, prevention, and recovery services. Critically, these funds will be available to communities throughout Florida for a wide range of urgently needed services, such as prevention and educational programs, training, recovery support services, intervention, connections to care, and addiction treatment, among many others. The Settlement Agreements also secure desperately needed financial relief for subdivisions that have struggled under the weight of the opioid epidemic. Under the Attorney General's Settlement Agreements, this relief will be distributed to cities, counties, and

13

subdivisions throughout the State.  While none of the Settlement Agreements provide funds directly to the Defendants, each of the Settlement Agreements allow the State, the counties, and the cities to fund abatement-related programs at the Defendants, if Defendants participate in the Settlement Agreements.

42.    In exchange for this relief, the Attorney General, as the chief legal officer of the State of Florida, executed Release Provisions that extinguish the Attorney General's claims and subordinate claims, including Defendants' lawsuits, brought on behalf of the same cities, counties, communities, and subdivisions for whom the Attorney General has secured relief. In other words, the Attorney General has secured relief on behalf of the State and its subdivisions, including Defendants, and has executed a release binding the State and its subdivisions, including Defendants, as a whole.

43.    The Release Provision in the Distributor Settlement Agreement provides as follows:

> *Scope.* As of the Effective Date, the Released Entities are hereby released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims. This Agreement shall be a complete bar to any Released Claim.

44.    The term "Releasors" is a defined phrase in the Settlement Agreement that includes settling states, such as the State of Florida. Additionally, "without limitation and to the maximum extent of the power of" the Attorney General to release claims, all of the State's subdivisions, such as Defendants, are included within the definition of "Releasors." "Released Claims" is also

a defined phrase that includes any claims that have been asserted by litigating subdivisions, such as Defendants. Taken together, the execution of these Release Provisions by the Attorney General has released Defendants' subordinate claims against Amerisource Bergen, Cardinal Health, and McKesson.

45. The Release Provision in the J&J Settlement Agreement provides as follows:

*Scope.* As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims. The Release shall be a complete bar to any Released Claim.

46. The term "Releasors" is a defined phrase in the J&J Settlement Agreement that includes settling states, such as the State of Florida. Additionally, "without limitation and to the maximum extent of the power of" the Attorney General to release claims, all of the State's subdivisions, such as Defendants, are included within the definition of "Releasors." "Released Claims" is also a defined phrase that includes any claims that have been asserted by litigating subdivisions, such as Defendants. Taken together, the execution of these Release Provisions by the Attorney General has released Defendants' subordinate claims against Johnson & Johnson.

47. The Release Provision in the Endo Pharmaceuticals Settlement Agreement provides as follows:

**Scope.** On the Effective Date of the Release, Plaintiff and each Releasor shall be deemed to have fully, finally and forever released all Releasees from all Released Claims. Plaintiff, on behalf of itself and all other Releasors (whether or not they have signed this Agreement or the subdivision settlement participation form in

15

Exhibit D), hereby absolutely, unconditionally and irrevocably covenants not to bring, file, or claim, or to cause, assist, or permit to be brought, filed, or claimed, any Released Claims of any type in any forum whatsoever against Releasees. For the avoidance of doubt, Plaintiff agrees that this Settlement Agreement and the releases contained herein shall fully and completely resolve any past, present or future liability that any Releasee may have arising from, relating to or based on the Covered Conduct occurring prior to the Effective Date of the Release, whether in the Actions or otherwise. The releases provided for in this Agreement are intended by the Settling Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any and all Released Claims. This Settlement Agreement is, will constitute, and may be pleaded as a complete bar to any Released Claim asserted against Releasees, whether against Plaintiff, any Participating Subdivision, or any other Subdivision, including any Non-Joining Subdivision.

48. The term "Releasors" is a defined phrase in the Settlement Agreement that includes settling states, such as the State of Florida. Additionally, "without limitation and to the maximum extent of the power of" the Attorney General to release claims, all of the State's subdivisions, such as Defendants, are included within the definition of "Releasors." "Released Claims" is also a defined phrase that includes any claims that have been asserted by litigating subdivisions, such as Defendants. Taken together, the execution of these Release Provisions by the Attorney General has released Defendants' subordinate claims against Endo Pharmaceuticals.

49. Notably, every litigating city and county in Florida, more than 90 in total, is participating in the Settlement Agreement with Endo Pharmaceuticals—a landmark achievement that secures historic monetary relief for hundreds of subdivisions and communities throughout Florida, in addition to essential injunctive relief against Endo Pharmaceuticals.

50. The Settlement Agreements for CVS, Teva, Allergan, and Walgreens contain Release Provisions similar to the Endo Settlement Agreements.

51. However, despite these historic settlements and the urgent need to use the settlement funds to abate the opioid crisis, Defendants' copycat, subordinate lawsuits, which

16

replicate the allegations in the Attorney General's complaint and assert substantially identical factual allegations and the same relief already provided by the settlements, remain as an obstacle against robust, statewide relief to abate the opioid crisis.

52.  Defendants' lawsuits have placed the Attorney General's Settlement Agreements in jeopardy and threaten to immediately devalue the relief available to those who have been impacted by the opioid crisis. Defendants' claims therefore imperil the Attorney General's efforts to protect the safety and welfare of Florida citizens.

53.  Two Defendants—Sarasota County Public Hospital District and Lee Memorial Health System—sought to block the entry of the Attorney General's Settlement Agreement with Endo Pharmaceuticals in the Attorney General's opioids litigation, Case No. 2018-CA-001438. During trial, these Defendants sought to intervene in the Attorney General's litigation and, astonishingly, seek to stay the Attorney General's settlement with Endo Pharmaceuticals— potentially jeopardizing and delaying the distribution of statewide relief and the implementation of sweeping injunctive terms against Endo Pharmaceuticals. This speaks directly to the fundamental principles at stake in this Action: if only two administrative units of local government are permitted to place a *statewide* settlement—entered based upon the public interest and the needs of cities, counties, subdivisions, and communities throughout Florida—at risk, the Attorney General's efforts to protect the safety and welfare of Florida citizens and to abate the harms of the opioid crisis will be irrevocably damaged.

54.  All Defendants, moreover, threaten the Attorney General's historic Settlement Agreements by continuing to press their subordinate claims, potentially resulting in a reduction of millions of dollars that would otherwise flow throughout Florida to abate the opioid crisis.

17

55.     Defendants place the Attorney General's Settlement Agreements—which would otherwise swiftly deliver relief to the cities, counties, and subdivisions throughout Florida—in jeopardy and threaten to immediately devalue the relief available to those who have been impacted by the opioid crisis.

## COUNT ONE – DECLARATORY JUDGMENT

56.     The Attorney General repeats and realleges each and every allegation contained in paragraphs 1 – 55 and respectfully requests that this Court enter a declaratory judgment, in accordance with Fla. Stat. §§ 86.011, 86.021, 86.101, that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions.

57.     The Attorney General is in doubt as to her rights and obligations under the Settlement Agreements and Release Provisions with respect to whether the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions.

58.     The Attorney General has a justiciable question as to the existence or nonexistence of a right, status, immunity, power, or privilege—namely, whether the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions. This immunity, power, privilege, or right is dependent upon the facts or the law applicable to the facts.

59.     The Attorney General's "duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the Attorney General of specific powers; but in the absence of such legislative action, [she] typically may exercise all such authority as the public

18

interest requires. And the Attorney General has wide discretion in making the determination as to the public interest." *State ex rel Shevin v. Exxon,* 526 F.2d. at 268-69.

60.    Indeed, even where a subordinate entity of the state is granted statutory authority to bring an action, the Attorney General may intervene as sovereign, or on behalf of the people of Florida, over objections by those subordinate entities.  *See State ex rel Shevin v. Yarborough,* 257 So.2d 891 (Fla. 1972).

61.    Florida courts have held that the State (and by extension, the Attorney General) is the proper entity to negotiate and settle complex claims because of the inherent duty to consider and represent the interests of *all* constituents when negotiating binding settlements:

> Unlike the situations in which we fear that a party may be attempting [to] profit at the expense of unrepresented individuals, e.g., class actions and shareholder derivative suits, we here have as plaintiff the government department charged with seeing that the laws are enforced. We therefore need not fear that the pecuniary interests of the plaintiff and defendant will tempt them to agree to a settlement unfair to unrepresented persons, but can safely assume that the interests of all affected have been considered.

*United States v. City of Miami*, 614 F.2d 1322, 1332 (5th Cir. 1980).[7]

62.    There is a bona fide, actual, justiciable controversy existing between the Attorney General and Defendants and the Attorney General's action deals with a present, ascertained, or

---

[7]    *See also, e.g., Illinois v. Associated Milk Producers*, Inc., 351 F. Supp. 436, 440 (N.D. Ill. 1972) ("Justice and judicial economy is best served by having the largest governmental unit sue on behalf of all its parts rather than having multiple suits brought by various political subdivisions within the State."); *New Hampshire v. Dover*, 891 A.2d 524 (N.H. 2006) ("There is no reason for the Court to conclude, on the facts presented, that the State will not seek to obtain full compensation for all communities, including the Cities. While the compensation sought may not be the same as that which the cities would desire, a difference of that nature does not demonstrate an interest that is not properly represented by the State."); *Nash Cty. Bd. Of Ed. V. Biltmore Co.*, 640 F.2d 484, 494 (4th Cir. 1981) ("At common law, an attorney general, in the absence of some restriction on his powers by statute or constitution, has complete authority as the representative of the State or any of its political subdivisions to recover damages (whether under state or federal law) alleged to have been sustained by any such agency or political sub-divisions, even though those subdivisions may not have affirmatively authorized suit.").

ascertainable state of facts or present controversy as to a state of facts. Further, there is an actual, practical, and present need for declaratory relief. The Attorney General does not merely seek an advisory opinion from the Court or the answer to questions propounded from curiosity. Absent a declaration that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions, the Attorney General—and the cities, counties, and communities on whose behalf the Attorney General has secured relief—will suffer immediate injury in the form of severely reduced funds for opioids prevention, treatment, and recovery.

63. The Attorney General and Defendants have actual, present, adverse, and antagonistic interests in the subject matter, either in fact or law, of this action and the antagonistic and adverse interests are all before the court by proper process.

## **PRAYER FOR RELIEF**

WHEREFORE, the Attorney General respectfully requests that this Court enter a declaratory judgment, in accordance with Fla. Stat. §§ 86.011, 86.021, 86.101, that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL


John Guard (FBN 374600)
Chief Deputy Attorney General
John.Guard@myfloridalegal.com
Nicholas Niemiec (FBN 113045)
Assistant Attorney General

20

Nicholas.Niemiec@myfloridalegal.com
Gregory S. Slemp (FBN 478865)
Special Counsel for Litigation
Greg.Slemp@myfloridalegal.com
R. Scott Palmer (FBN 220353)
Chief of Complex Enforcement
Scott.Palmer@myfloridalegal.com
Colin Fraser (FBN 104741)
Assistant Attorney General
Colin.Fraser@myfloridalegal.com
Lee Istrail (FBN 119216)
Assistant Attorney General
Lee.Istrail@myfloridalegal.com

Henry Whitaker (FBN 1031175)
Solicitor General
Henry.Whitaker@myfloridalegal.com
Daniel Bell (FBN 1008587)
Deputy Solicitor General
Daniel.Bell@myfloridalegal.com
David Costello (FBN 1004952)
Assistant Solicitor General
David.Costello@myfloridalegal.com

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300

*Counsel for Plaintiff*