# Exhibit B

1            UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2               EASTERN DIVISION

3

    IN RE: NATIONAL      )
4   PRESCRIPTION        )  MDL No. 2804
    OPIATE LITIGATION    )
5   _____ )  Case No.
                      )  1:17-MD-2804
6                     )
    THIS DOCUMENT RELATES  )  Hon. Dan A.
7   TO: "Case Track Seven"  )  Polster

8
           THURSDAY, NOVEMBER 3, 2022
9
   HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
10          CONFIDENTIALITY REVIEW

11               – – –

12        Remote videotaped deposition of

13  Cameron McNamee, held at the location of the

14  witness in Columbus, Ohio, commencing at

15  9:03 a.m. Eastern Time, on the above date,

16  before Carrie A. Campbell, Registered

17  Diplomate Reporter, Certified Realtime

18  Reporter, Illinois, California & Texas

19  Certified Shorthand Reporter, Missouri,

20  Kansas, Louisiana & New Jersey Certified

21  Court Reporter.

22

23              – – –
         GOLKOW LITIGATION SERVICES
24           877.370.DEPS
           deps@golkow.com
25

```
 1                A P P E A R A N C E S :

 2

 3       MOTLEY RICE LLC
         BY:  MICHAEL E. ELSNER
 4            melsner@motleyrice.com
         28 Bridgeside Boulevard
 5       Charleston, South Carolina 29464
         (843) 216-9000
 6       Counsel for Plaintiffs

 7

 8       OHIO ATTORNEY GENERAL'S OFFICE
         BY:  HENRY APPEL
 9            henry.appel@ohioattorneygeneral.gov
         30 East Broad Street, 26th Floor
10       Columbus, Ohio  43215
         (800) 282-0515
11
         and
12
         STATE OF OHIO BOARD OF PHARMACY
13       BY:  JOSEPH KOLTAK
         77 South High Street, 17th Floor
14       Columbus, Ohio  43215
         Counsel for State of Ohio Board of
15       Pharmacy and Cameron McNamee

16

17       ZUCKERMAN SPAEDER LLP
         BY:  PAUL B. HYNES, JR.
18            phynes@zuckerman.com
         1800 M Street NW, Suite 1000
19       Washington, DC  20036-5807
         (202) 778-1800
20       Counsel for CVS Indiana, LLC, and
         CVS RX Services, Inc.
21

22

23

24

25
```

```
 1      BARTLIT BECK HERMAN PALENCHAR &
        SCOTT LLP
 2      BY:  ALEX J. HARRIS
             alex.harris@bartlitbeck.com
 3      1801 Wewatta Street, Suite 1200
        Denver, Colorado 80202
 4      (303) 592-3100
        Counsel for Walgreens
 5

 6
        JONES DAY
 7      BY:  PATRICIA OCHMAN
             pochman@jonesday.com
 8      901 Lakeside Avenue
        Cleveland, Ohio 44114-1190
 9      (216) 586-3939
        Counsel for Walmart
10

11
        SPERLING & SLATER
12      BY:  TREVOR SCHEETZ
             tscheetz@sperling-law.com
13      55 West Monroe Street, Suite 3200
        Chicago, Illinois  60603
14      (312) 641-3200
        Counsel for Meijer
15

16
        BOWLES RICE
17      BY:  FAZAL A. SHERE
             fshere@bowlesrice.com
18      600 Quarrier Street
        Charleston, West Virginia  25301
19      (304) 347-1100
        Counsel for Kroger
20

21
     ALSO PRESENT:
22        AMANDA UNTERREINER, paralegal, Motley
          Rice
23

24

25
```

```
 1    VIDEOGRAPHER:
              JUDY DIAZ,
 2            Golkow Litigation Services

 3

 4    TRIAL TECHNICIAN:
              GINA VELDMAN,
 5            Precision Trial Solutions

 6                        - - -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2                                            PAGE
    APPEARANCES...................................   2
 4  EXAMINATIONS

 5     BY MR. ELSNER..............................   9

 6     BY MR. HYNES.............................. 199

 7     BY MR. SCHEETZ............................ 237

 8     BY MR. HARRIS............................. 240

 9     BY MR. ELSNER............................. 242

10     BY MR. HYNES.............................. 252

11     BY MR. SCHEETZ............................ 258

12     BY MR. ELSNER............................. 259

13

14                      EXHIBITS

15     No.    Description                        Page

16   1      Notice of Videotaped Deposition       13
            of Ohio Board of Pharmacy
17          Representative Cameron McNamee

18   2      Strategies and policies to            18
            address the opioid epidemic:  A
19          case study of Ohio, Penm, et al.
            BOP_MDL252485 - BOP_MDL1252490
20
     3      State of Ohio Board of Pharmacy       24
21          Data & Statistics,
            BOP_MDL1689212 - BOP_MDL1689214
22
     4      E-mail(s) with attachment,            30
23          OBOP_0002207 - OBOP_0002305

24   5      Pharmacies miss half of dangerous     33
            drug combinations, Chicago
25          Tribune Online, December 15, 2016
```

| | 6 | How Chaos at Chain Pharmacies Is Putting Patients at Risk, New York Times, January 31, 2020 | 39 |
|---|---|---|---|
| | 7 | 2014 National Pharmacist Workforce Survey | 46 |
| | 8 | National Pharmacist Workforce Study 2019 | 50 |
| | 9 | E-mail(s), OBOP_0000727 - OBOP_0000728 | 61 |
| | 10 | State of Ohio Pharmacist Workload Advisory Committee Approved 4/20/2021, OBOP_0000112 - OBOP_0000288 | 65 |
| | 11 | Pharmacist Workload Advisory Survey, October 14, 2021, OBOP_0000067 - OBOP_0000106 | 107 |
| | 12 | E-mail(s), OBOP_0002720 - OBOP_0002898 | 110 |
| | 13 | State of Ohio Board of Pharmacy Pharmacist Workload Advisory Committee, Meeting Minutes, October 14, 2021, OBOP_0000064 - OBOP_0000065 | 116 |
| | 14 | State of Ohio, Board of Pharmacy, 2021 Pharmacist Workload Survey, OBOP_0000290 - OBOP_0000508 | 134 |
| | 15 | Pharmacist Workload Advisory Committee - Draft Policy Options with Feedback | 154 |
| | 16 | State of Ohio Board of Pharmacy, Rule for Stakeholder Feedback - Prohibition on the Use of Quotas, 10/11/2022 | 168 |
| | 17 | E-mail(s), OBOP_0001726 - OBOP_0001730 | 172 |

1    18        State Policies and Programs to        180
                Prevent Prescription Drug Abuse
2               and Overdose Deaths,
                BOP_MDL502176 - BOP_MDL502215
3
     19        E-mail(s),                            191
4               BOP_MDL843308 - BOP_MDL843319

5    20        E-mail(s),                            195
                BOP_MDL1229606 - BOP_MDL1229608
6
     21        E-mail(s),                            234
7               BOP_MDL007920 - BOP_MDL007926

8    22        OARRS 2017 Annual Report,             236
                BOP_MDL006281 - BOP_MDL006293
9
     23        Michael Elsner handwritten            259
10              demonstrative

11      (Exhibits attached to the deposition.)

12

13   CERTIFICATE.................................265

14   ACKNOWLEDGMENT OF DEPONENT..................267

15   ERRATA......................................268

16   LAWYER'S NOTES..............................269

17

18

19

20

21

22

23

24

25

```
 1              VIDEOGRAPHER:  We are now on

 2         the record.  My name is Judy Diaz.

 3         I'm a legal videographer for Golkow

 4         Litigation Services.

 5              Today's date is November 3,

 6         2022, and the time is 9:03 a.m.

 7              This remote video deposition is

 8         being held in the matter of opioid

 9         litigation, Track 7 cases.

10              The deponent is Cameron

11         McNamee.

12              All parties to this deposition

13         are appearing remotely and have agreed

14         to the witness being sworn in

15         remotely.

16              All counsel will be noted on

17         the stenographic record.

18              The court reporter is Carrie

19         Campbell who will now swear in the

20         witness.

21

22              CAMERON MCNAMEE,

23    of lawful age, having been first duly sworn

24    to tell the truth, the whole truth and

25    nothing but the truth, deposes and says on
```

1    behalf of the Plaintiffs, as follows:

2

3                DIRECT EXAMINATION

4    QUESTIONS BY MR. ELSNER:

5         Q.    Good morning, Mr. McNamee.  I'm

6    Michael Elsner.  I'm from the law firm of

7    Motley Rice, and I represent Montgomery

8    County.

9                How are you this morning?

10        A.    I'm good.

11        Q.    Great.

12              Can we start with having you

13    state your name for the record?

14        A.    Sure.

15              My name is Cameron McNamee.

16        Q.    And, Mr. McNamee, where do you

17    live?

18              MR. APPEL:  Mr. Elsner, would

19        you like me to make an appearance

20        representing Mr. McNamee?

21              MR. ELSNER:  Sure, that's fine.

22        I thought all the appearances were

23        just going to be noted on the

24        stenographic record.  But, of course.

25              MR. APPEL:  I just don't know

1          if it was noted.  Henry Appel,

2          principal Assistant Attorney General

3          with the Ohio Attorney General's

4          Office, 30 East Broad Street, 26th

5          Floor, Columbus, Ohio 43215.  I'm

6          representing the State of Ohio Board

7          of Pharmacy and Cameron McNamee.

8    QUESTIONS BY MR. ELSNER:

9          Q.     Thank you.

10         Mr. McNamee, where do you live,

11   sir?

12         A.     I live in Columbus, Ohio.

13         Q.     All right.  And where do you

14   work?

15         A.     I work at the State of Ohio

16   Board of Pharmacy.

17         Q.     Okay.  And how long have you

18   worked at the Ohio Board of Pharmacy?

19         A.     Since November of 2013.

20         Q.     And what is your position with

21   the Ohio Board of Pharmacy?

22         A.     Currently serve as the director

23   of policy and communication.

24         Q.     Okay.  And have you served in

25   that role since you joined the board in

1    November of 2013?

2         A.     Yes.  Although I was

3    promoted -- I initially started as the

4    legislative liaison, but my job duties were

5    essentially the same, but I was promoted a

6    couple of years into my position to the

7    director of -- {audio interruption}.

8         Q.     We lost your audio,

9    Mr. McNamee.

10        A.     Oh, I'm sorry.

11               Yes.  So I did, I started at

12   the legislative liaison and was promoted to

13   the director of policy and communications, I

14   believe, in 2016.

15        Q.     All right.  And can you

16   describe for us what your duties and

17   responsibilities are as the director of

18   policy and communications for the Ohio Board

19   of Pharmacy?

20        A.     Sure.

21               So I'm responsible for all

22   legislative activity of the board.  I'm also

23   responsible for managing external

24   communications and stakeholder relations, and

25   I'm also primarily responsible for drafting

 1   and shepherding rules through the legislative

 2   process.

 3        Q.     And before you joined the Ohio

 4   Board of Pharmacy, where did you work, sir?

 5        A.     I worked at the Ohio Department

 6   of Health.

 7        Q.     And what were your -- what was

 8   your position at the Ohio Department of

 9   Health?

10        A.     I was an injury policy

11   specialist, so I worked in the violence and

12   injury prevention program, specifically on

13   policies related to preventing injury and

14   including drug overdose.

15        Q.     All right.  And can you

16   describe for us your educational background?

17        A.     Sure.

18               I have a bachelor's in

19   government from Georgetown University and a

20   master's in public policy from Georgetown

21   University.

22        Q.     Okay.  Have you ever testified

23   before, Mr. McNamee?

24        A.     Yes, in a deposition.

25        Q.     Okay.  Have you otherwise

1    testified before governmental bodies and

2    institutions?

3           A.     Yes, before the legislature.

4           Q.     For the Ohio legislature?

5           A.     Yes.

6                  (McNamee Exhibit 1 marked for

7           identification.)

8    QUESTIONS BY MR. ELSNER:

9           Q.     Okay.  I'm going to mark as

10   Exhibit 1 MR 4245, and we'll display that on

11   the screen.  This will be Exhibit 1.

12                 Mr. McNamee, have you seen this

13   document before, sir?

14          A.     Yes.

15          Q.     Okay.  This is the notice for

16   the deposition today.

17                 And if we turn through the

18   notice, it lists particular topics upon which

19   you're going to offer testimony today.

20                 Have you reviewed those topics?

21          A.     Yes.

22          Q.     Okay.  And are you prepared

23   today to offer testimony on the Ohio -- on

24   behalf of the Ohio Board of Pharmacy related

25   to the topics in this notice?

1       A.      Yes.

2       Q.      Okay.  And to do that, did you

3   spend some time preparing to offer this

4   testimony today, learning what is contained

5   in these topics so that you could present a

6   fulsome picture of what the Ohio Board of

7   Pharmacy knows with respect to these topics?

8       A.      Yes.

9       Q.      Thank you.

10          Did you bring any documents

11  today to the deposition to have before you

12  while you were testifying?

13      A.      No.

14      Q.      Okay.  All right.  Mr. McNamee,

15  let's start with, could you tell us, what is

16  the Ohio Board of Pharmacy?

17          You can take this down, Gina.

18      A.      Sure.

19          So we're the single state

20  agency responsible for regulating the

21  practice of pharmacy as well as the

22  distribution of dangerous drugs.  We're also

23  responsible for conducting investigations

24  into criminal violations related to Ohio's

25  drug laws of 2925.  I also manage the state's

1    Controlled Substances Act, including all of

2    the drug schedules.

3         Q.     Is it true that the Ohio Board

4    of Pharmacy was established by the Ohio

5    legislature in 1884?

6         A.     Yes.

7                MR. HYNES:  Objection.

8    QUESTIONS BY MR. ELSNER:

9         Q.     I'm sorry, can you repeat the

10   answer?

11        A.     Yes.

12        Q.     Okay.  And, Mr. McNamee, who

13   appoints the members of the Ohio Board of

14   Pharmacy?

15        A.     The governor and then the

16   Senate confirms.

17        Q.     Okay.  And is the Ohio Board of

18   Pharmacy responsible for regulating the

19   practice of pharmacy in the state of Ohio?

20               MR. HYNES:  Objection.  Form.

21               THE WITNESS:  Yes.

22   QUESTIONS BY MR. ELSNER:

23        Q.     Okay.  What is the overarching

24   purpose of the Ohio Board of Pharmacy?

25        A.     So we're essentially there to

1  safeguard the public, as well as to, you

2  know, ensure the safe practice of pharmacy in

3  the state.

4      Q.    Okay.  And does that include

5  preventing the diversion of drugs?

6          MR. HYNES:  Objection.  Form.

7          THE WITNESS:  Yes.

8  QUESTIONS BY MR. ELSNER:

9      Q.    Would you agree that the board

10  exists and acts to protect the public?

11          MR. HYNES:  Objection.  Form.

12          MR. SCHEETZ:  And, Mike, can we

13      have an agreement that an objection

14      for one is an objection for all?

15          MR. ELSNER:  No, Trevor, I want

16      us all to object all day.  No, of

17      course.

18          MR. SCHEETZ:  I appreciate it.

19          MR. HARRIS:  I think that's

20      specifically in the deposition

21      protocol as well, that that rule

22      applies.

23          MR. SCHEETZ:  Great, thank you.

24  QUESTIONS BY MR. ELSNER:

25      Q.    Do you have the question in

1    mind, Mr. McNamee, or --

2          A.      Can you repeat the question,

3    please?

4          Q.      I'll do my best.  I forgot it

5    myself.

6                  Would you agree with me that

7    the board exists and acts to protect the

8    public?

9                  MR. HYNES:  Objection.  Form.

10                 THE WITNESS:  Yes.

11   QUESTIONS BY MR. ELSNER:

12         Q.      Okay.  Mr. McNamee, would you

13   agree with me that Ohio has suffered more

14   overdose deaths than most other states across

15   the country?

16                 MR. HYNES:  Objection.  Form.

17                 THE WITNESS:  Yes.

18   QUESTIONS BY MR. ELSNER:

19         Q.      In fact, you were involved in

20   the publication of an article in the Journal

21   of American Pharmacists Association.

22                 Do you recall that?

23   A.      Yes.

24                 MR. HYNES:  Objection.  Form

25         and scope.

1                    (McNamee Exhibit 2 marked for

2           identification.)

3    QUESTIONS BY MR. ELSNER:

4           Q.      I'm going to show you, and

5    we'll mark as Exhibit 2, MR 4242.  If you can

6    display that, please.

7                    Thank you.

8                    And, Mr. McNamee, is this the

9    article that you participated in writing?

10          A.      Yes.

11          Q.      Okay.  And the title of the

12   article is "Strategies and Policies to

13   Address the Opioid Epidemic:  A Case Study Of

14   Ohio."

15                   Is that right?

16          A.      Yes.

17          Q.      Okay.  And your name there is

18   the fourth contributor to the article.

19                   Is that right?

20          A.      Yes.

21          Q.      Maybe fifth.  There you are.

22                   MR. SCHEETZ:  Mike, just a very

23          quick objection from Meijer.  I don't

24          know if this was produced to us

25          previously, but we would object to the

1          use of any documents that weren't

2          produced to us.

3                But with that said, go ahead.

4                MR. ELSNER:  Yeah, I don't

5          really understand this objection.

6          It's produced by the Ohio Board of

7          Pharmacy in Track 7.  So if you're not

8          accessing the information that's

9          produced in the track, then you can't

10         waste our time with objections and

11         drive us off course today.

12               MR. SCHEETZ:  Is there an OBOP

13         stamp?  It says MR, right?

14               MR. ELSNER:  No, it says BOP on

15         the bottom of the document.

16               MR. SCHEETZ:  Well, we can't

17         see that on the screen.

18               MR. ELSNER:  All right.  Well,

19         there it is.

20    QUESTIONS BY MR. ELSNER:

21         Q.    All right.  Mr. McNamee, in the

22    beginning of the article, it says that Ohio

23    has the fifth highest rate of drug overdose

24    deaths in the United States.  If we go under

25    objective and setting on the bottom of the

1    page there.

2              Is that accurate, sir?

3              MR. HYNES:  Objection.  Form.

4              THE WITNESS:  That was accurate

5         at the time it was written, yes.

6    QUESTIONS BY MR. ELSNER:

7         Q.    Okay.  And was it accurate at

8    the time of -- that it was written, that the

9    unintentional drug overdose had become the

10   leading cause of death in Ohio?

11        A.    Yes.

12             MR. HYNES:  Objection.  Form.

13        And objection.  Scope.

14   QUESTIONS BY MR. ELSNER:

15        Q.    All right.  And that was as

16   of -- what was the date of the article, if

17   you recall when it was published?

18        A.    I believe it was -- well, it

19   says it was accepted in January of 2017.  So,

20   yeah, it was 2017 it was published.

21        Q.    Okay.  And is it true that in

22   2015 there were over 3,050 overdose deaths in

23   Ohio, and in 2014 there were an estimated

24   12,847 overdose events reversed by emergency

25   medical services with naloxone in Ohio?

```
 1                MR. HYNES:  Objection to form
 2        and scope.
 3                Mike, what topic is this
 4        responsive to?
 5                MR. ELSNER:  It's a document
 6        produced by the board, and we're
 7        authenticating it.
 8                MR. HYNES:  You said Topic
 9        Number 4 is limited to documents
10        produced in response to I guess the
11        subpoena, the notice, or is it a
12        different subpoena?
13                MR. ELSNER:  Well, it's in --
14        no, it's in response to the subpoena
15        and the notice.
16   QUESTIONS BY MR. ELSNER:
17        Q.    Sir, is my question right?
18                MR. HYNES:  List our objection
19        on scope grounds to the question on
20        the document.
21                MR. SCHEETZ:  Also, this is
22        Trevor Scheetz.  This was not produced
23        in Track 7 as far as I can tell, so
24        I'll make that same objection from
25        earlier.
```

1  QUESTIONS BY MR. ELSNER:

2      Q.    Mr. McNamee, are the statistics

3  that I just read correct?

4      A.    Yes, to the best of my

5  knowledge, the -- it is cited and it is

6  correct based on the cited sources in the --

7  in the document.

8      Q.    Okay.  And do you agree with me

9  that pharmacists have a unique role to play

10 in the front lines of the opioid epidemic?

11          MR. HYNES:  Objection.  Form.

12          MR. HARRIS:  Objection.

13          MR. HYNES:  Scope.

14          THE WITNESS:  Yes.

15 QUESTIONS BY MR. ELSNER:

16     Q.    Is it true, Mr. McNamee -- we

17 can take that down.

18          Is it true, Mr. McNamee, that

19 the Ohio Board of Pharmacy publishes

20 statistics from time to time on drug

21 overdoses in Ohio?

22          MR. HYNES:  Objection.  Form

23     and scope.

24          THE WITNESS:  No, that's not

25     correct.  The Ohio Department of

1       Health.

2  QUESTIONS BY MR. ELSNER:

3       Q.     Does the Ohio Board of Pharmacy

4  utilize statistics and incorporate those into

5  its publications?

6               MR. HYNES:  Objection.  Form

7          and scope.

8               THE WITNESS:  I mean, I would

9          say that we've -- we reference the

10         drug overdose crisis in some of our

11         documents, but in many of our -- in

12         our publications, we produce data

13         based on the -- {audio

14         interruption} -- and the drug overdose

15         deaths in the state.

16              MR. HYNES:  You cut out there.

17         Can you repeat that?

18              THE WITNESS:  So we do

19         reference the overdose death rates in

20         some of our materials, but primarily

21         our documents are related to -- or any

22         statistics that we produce are related

23         to our system, which is our PDMP.

24              MR. ELSNER:  I think we're

25         missing the last three or four words

1          of your answer, Mr. McNamee.

2                    THE WITNESS:  Sorry.  So we do

3          not produce documents -- or we do

4          not -- we do not normally reference or

5          incorporate a lot of the drug overdose

6          death statistics in our written

7          materials.  Normally we focus on

8          providing data from our PDMP, which is

9          OARRS, the Ohio Automated RX Reporting

10         System.

11                    (McNamee Exhibit 3 marked for

12         identification.)

13   QUESTIONS BY MR. ELSNER:

14         Q.    I want to mark as Exhibit 3

15   MR 3051.

16                    Mr. McNamee, was this a

17   document that was written by the Ohio Board

18   of Pharmacy in the regular course of its

19   business?

20                    MR. HYNES:  Objection.  Form

21         and scope.

22                    MR. ELSNER:  It's in the

23         notice.

24                    MR. HYNES:  Oh, it is.  I

25         apologize.  I'll retract that one,

1          Mike.

2                    THE WITNESS:  Yes.

3      QUESTIONS BY MR. ELSNER:

4          Q.      Okay.  And was this document

5      maintained by the board in the regular course

6      of its business?

7          A.      Yes.

8          Q.      And when the board publishes

9      information such as this, does it do its very

10     best to be accurate?

11                   MR. HYNES:  Objection.  Form.

12                   THE WITNESS:  Yes.

13     QUESTIONS BY MR. ELSNER:

14         Q.      Okay.  This document states

15     that 80.77 percent of Ohio's 2016 fatal

16     overdose decedents had a history of receiving

17     a prescription for a controlled substance in

18     OARRS.

19                   Is that accurate, sir?

20         A.      Yes, that is as reported to me

21     from our PDMP director.

22         Q.      Okay.  And when selected by

23     particular county, for Montgomery County,

24     85.5 percent of the fatal overdose decedents

25     had a history of receiving a prescription for

1    controlled substances in OARRS, correct?

2        A.    Yes.

3        Q.    Okay.  Is there a regulation,

4    sir, in the state of Ohio that requires

5    pharmacies in the state to have adequate

6    safeguards to practice pharmacy in a safe and

7    effective manner?

8              MR. HYNES:  Objection.  Form.

9              MR. HARRIS:  Object to form.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. ELSNER:

12        Q.    Okay.  And were there any

13    concerns within the Ohio Board of Pharmacy

14    regarding adequate safeguards and appropriate

15    staffing levels at pharmacies in the state?

16              MR. HYNES:  Objection.  Form.

17              THE WITNESS:  I can't

18        specifically answer on the board's

19        perspective.  I can answer from a

20        staff's perspective.

21    QUESTIONS BY MR. ELSNER:

22        Q.    What is the perspective from

23    the staff perspective?

24        A.    The staff perspective is that

25    there certainly was issues related to

1    staffing levels at pharmacies.

2         Q.     Okay.  And as a result of those

3    concerns, did the Ohio Board of Pharmacy

4    create and issue a workload survey to

5    pharmacists in Ohio?

6         A.     Yes.

7         Q.     Are you personally familiar

8    with the pharmacists workload survey

9    conducted by the Ohio Board of Pharmacy in

10   July of 2020?

11        A.     Yes.

12        Q.     And are you prepared to testify

13   as to that survey today?

14        A.     Yes.

15        Q.     Okay.  And you're prepared to

16   do so on behalf of the Ohio Board of Pharmacy

17   as its 30(b)(6) designee.

18               Is that true?

19        A.     Correct.

20        Q.     Okay.  Did you personally work

21   on the Ohio Board of Pharmacy's pharmacists

22   workload surveys?

23        A.     Yes.

24        Q.     Okay.  And what role did you

25   personally have with respect to the

1  pharmacists workload survey in Ohio?

2      A.      I primarily drafted it and

3  disseminated it and the results.

4      Q.      And did the board send a

5  request to all pharmacists working in Ohio to

6  complete the survey?

7      A.      Yes.

8      Q.      I want to -- and did the board

9  send this request pursuant to its authority

10 to regulate the practice of pharmacy in Ohio?

11             MR. HYNES:  Objection.  Form.

12             THE WITNESS:  Yes.

13 QUESTIONS BY MR. ELSNER:

14     Q.      Okay.  And did it do so in the

15 regular course of the board's business?

16             MR. HYNES:  Objection.  Form.

17             THE WITNESS:  Yes.

18 QUESTIONS BY MR. ELSNER:

19     Q.      Would you agree with me that

20 the purpose of the survey was to captivate --

21 I'm sorry, to capture the vital input

22 feedback from pharmacists across the state of

23 Ohio?

24             MR. HYNES:  Objection.  Form.

25             MR. HARRIS:  Objection.  Form.

1            THE WITNESS:  Yes.

2    QUESTIONS BY MR. ELSNER:

3        Q.     And what prompted the Ohio

4    Board of Pharmacy to issue the pharmacists

5    survey in 2020?

6        A.     So from the staff level, I

7    think we were getting more and more

8    complaints, you know, anecdotally, you know,

9    through calls or e-mails regarding staffing

10   levels.  There were also concerns about

11   delays in getting prescription fills.  So we

12   decided to deploy the survey to assess -- you

13   know, to get a better picture of what was

14   occurring in the entire pharmacy space.

15       Q.     And before creating the survey

16   and sending the survey out, in addition to

17   complaints from pharmacists and from

18   patients, did you do any research on any

19   complaints or any other surveys issued across

20   the country on this topic?

21            MR. HYNES:  Objection.  Form.

22            THE WITNESS:  We -- yeah, we

23        reached out to Missouri, who had

24        implemented a very similar survey, so

25        we sort of used that as the model.

```
 1                    (McNamee Exhibit 4 marked for

 2          identification.)

 3    QUESTIONS BY MR. ELSNER:

 4          Q.     Okay.  I would like you to pull

 5    out -- or display MR 4204, and we'll mark

 6    this as the next exhibit, which is Exhibit 4.

 7                    There should be a cover page to

 8    this.  I'm sorry, 4204, not 4202.  There

 9    should be a cover e-mail to this as well.

10                    MR. ELSNER:  Can we go off the

11          record for a minute?

12                    VIDEOGRAPHER:  The time right

13          now is 9:24 a.m.  We're off the

14          record.

15           (Off the record at 9:24 a.m.)

16                    VIDEOGRAPHER:  The time right

17          now is 9:26 a.m.  We're back on the

18          record.

19    QUESTIONS BY MR. ELSNER:

20          Q.     Mr. McNamee, we're going to

21    display now Exhibit 4, MR 4204.

22                    Sir, is this an e-mail that you

23    sent to Shawn Wilt on June 4, 2020?

24          A.     Yes.

25          Q.     And who is Shawn Wilt at this
```

1    time?

2                    What role did he play with the

3    board?

4         A.    He was either our vice

5    president or our president at the time or he

6    was coming into the president -- no, he was

7    our vice president of the board.

8         Q.    Okay.  And Mr. Wilt works for

9    Meijer, is that correct, or did at the time?

10        A.    Yes, that's correct.

11        Q.    And in the e-mail you sent to

12   him a proposed workload survey and some

13   background on national statistics and state

14   statistics.

15                    Is that true?

16        A.    Yes.

17        Q.    Okay.  And you mentioned to us

18   the results of a Missouri survey of

19   pharmacists.

20                    Did you include those results

21   to Mr. Wilt as well?

22        A.    Yes.

23        Q.    Okay.  And if we turn toward

24   the -- page 6 of the document, kind of

25   through the end, are these the results of the

1    Missouri survey?

2              And we can flip through the

3    pages if you need to do that.

4         A.    Yeah, that's the Missouri

5    survey.

6         Q.    Thank you.

7              In the background section on

8    page 2 of Exhibit 4, there's a document

9    examining pharmacists' workload.

10             Were you involved in the

11   creation of this document?

12        A.    Yes.

13        Q.    Okay.  And did you create this

14   document in the regular course of your

15   business for the Ohio Board of Pharmacy?

16        A.    Yes.

17        Q.    All right.  And is this a true

18   and accurate copy of the e-mail and

19   attachments that you sent to Mr. Wilt?

20        A.    Yes.

21        Q.    Okay.  In the first line of

22   this document, you indicate that nationwide

23   several media outlets have highlighted the

24   growing concern that the increasing demands

25   on pharmacist workload could be posing a risk

1    to patients.

2              Is that true?

3        A.     Yes, based on the cited sources

4    there.

5        Q.     Okay.  And the cited sources

6    include, in footnote 1, an article from The

7    Chicago Tribune entitled "Pharmacies Miss

8    Half of the Dangerous Drug Combinations."

9              Is that right?

10       A.     Yes.

11       Q.     Okay.  And did you review that

12   article?

13       A.     Yes.

14             (McNamee Exhibit 5 marked for

15        identification.)

16   QUESTIONS BY MR. ELSNER:

17       Q.     Okay.  And I'm going to display

18   that article for you.  If we could pull up

19   MR 849.  And we'll mark this as Exhibit 5.

20             GINA VELDMAN:  Mike, you said

21        849?

22             MR. ELSNER:  Yes, ma'am.

23             GINA VELDMAN:  Okay.  I don't

24        have an 849.

25             MS. UNTERREINER:  Gina, it's in

1           your e-mail.

2                 MR. ELSNER:  We can go off the

3           record for a few minutes.  Let us see

4           if we can --

5                 GINA VELDMAN:  I got it.  I got

6           it.  Just takes a minute to -- okay.

7    QUESTIONS BY MR. ELSNER:

8           Q.    Mr. McNamee, I've displayed for

9    you Exhibit 5.

10                Is this The Chicago Tribune

11   article that you reference in footnote 1 and

12   sent to Mr. Wilt?

13                MR. HYNES:  Objection to the

14          exhibit.

15                MR. ELSNER:  I'm sorry?

16                MR. HYNES:  Note our objection

17          to the exhibit, Mike.  It was

18          excluded --

19                MR. ELSNER:  No, I heard your

20          objection.  I didn't hear his answer.

21                THE WITNESS:  Yes, that's a --

22          that's a copy of the -- of the

23          article.

24   QUESTIONS BY MR. ELSNER:

25          Q.    Okay.  And, Mr. McNamee, what's

1  your understanding of what the Chicago

2  Tribune did in this study?

3      A.     So they looked at -- they

4  examined whether or not drug interactions

5  were flagged.  They also examined the sort

6  of -- they examined the squeeze that's being

7  put on the -- {audio interruption} --

8  including the need to meet certain quotas or

9  metrics.

10            So I think it did highlight

11  the -- it sort of provided an overview of

12  what was the current and the retail pharmacy

13  space.

14      Q.     Okay.  And if we look at the

15  fifth paragraph down here on the page, it

16  reads, "In the largest and most comprehensive

17  study of its kind, the Tribune tested 255

18  pharmacies to see how stores would dispense

19  dangerous drug pairs without warning

20  patients, and 52 percent of the pharmacies

21  sold the medications without mentioning the

22  potential interaction, striking evidence of

23  an industrywide failure that places millions

24  of consumers at risk."

25            Was this a concern at the Ohio

1    Board of Pharmacy at the staff level with

2    respect to pharmacists' workload in Ohio

3    potentially?

4              MR. HYNES:  Objection.  Form.

5              THE WITNESS:  Yeah, this is one

6         of the pieces of evidence that led the

7         staff to growing concern regarding

8         working conditions in pharmacies.

9    QUESTIONS BY MR. ELSNER:

10        Q.    And the article concluded in

11   the next paragraph that CVS dispensed

12   medications with no warning, according to

13   this study, 63 percent of the time, and that

14   Walgreens had dispensed the medications

15   without any warning 30 percent of the time.

16              Is that what the article

17   indicates?

18        A.    Yes, that's what the article

19   indicates.

20        Q.    Okay.  And if we go to the next

21   page on page 2, Walmart was also a component

22   of this study, and Walmart had failed

23   43 percent of these tests.

24              Is that what the article

25   indicates?

1      A.      Yes, that's what the article

2    indicates.

3      Q.      Okay.  And was there a concern

4    at the Ohio Board of Pharmacy that there

5    might be errors in dispensing as a result of

6    metrics and quota and the speed at which

7    pharmacists might be required to fill

8    prescriptions in their stores?

9              MR. HYNES:  Objection.  Form.

10             THE WITNESS:  Yes.  Yes, at the

11        staff level.

12    QUESTIONS BY MR. ELSNER:

13      Q.      Okay.  And you keep making a

14    distinction between the staff level and --

15    was there a different view between the staff

16    and between the actual board members of the

17    Ohio Board of Pharmacy?

18      A.      Well, you know, if you're

19    asking me if the board has taken a formal

20    position on, you know, certain aspects of,

21    you know, this issue, you know, they haven't

22    necessarily formally done it in open session.

23             But we've certainly been having

24    these discussions with them.  They've been

25    supportive of our efforts to examine this

1    issue.  However, they haven't sort of

2    formally stated that, you know, in open

3    session, in a meeting, that this is -- you

4    know, that this is concretely a significant

5    issue.

6              That being said, they have

7    allowed us to proceed in examining this

8    issue, recognizing that it is a problem, but

9    I just wanted to be clear that the board

10   makes formal statements in open session, and

11   nothing has been formalized in a -- in an

12   open meeting.

13        Q.    In Exhibit 5 -- I'm sorry,

14   Exhibit 4, which was your e-mail to Mr. Wilt,

15   you also reference another publication from

16   The New York Times on page 2 in footnote 2.

17              Is that correct?

18        A.    Yes, that's correct.

19        Q.    And is this another article

20   that you considered in determining whether to

21   create an issue -- a pharmacist workload

22   survey from the Ohio Board of Pharmacy?

23              MR. HYNES:  Objection.  Form.

24              THE WITNESS:  Yes, that's

25        correct.

1    QUESTIONS BY MR. ELSNER:

2        Q.    Okay.  And the title of this

3    article is "How Chaos at Chain Pharmacies is

4    Putting Patients At Risk."

5              Have you read this article,

6    sir?

7        A.    Yes.

8              (McNamee Exhibit 6 marked for

9         identification.)

10   QUESTIONS BY MR. ELSNER:

11       Q.    Okay.  I would like to pull

12   that out if we could, and we'll mark this as

13   Exhibit 6.  It's MR 4207.

14             And, Mr. McNamee, is Exhibit 6

15   The New York Times article that you

16   referenced in footnote 2?

17       A.    Yes, that is correct.

18       Q.    Okay.  And what is your overall

19   impression in having reviewed this New York

20   Times article and in sending it to Mr. Wilt

21   in 2020?

22       A.    So I -- you know, it was part

23   of a -- it was part of a -- it was

24   essentially an article that was provided in

25   order to justify moving forward with the

1  survey.  So we were trying to provide enough

2  evidence of what was going around in other

3  parts of the country to, you know, justify us

4  then assessing what was happening in Ohio.

5         Q.    Okay.  And if we turn to page 2

6  of the article, it states, "In letters to

7  state regulatory boards," in the second full

8  paragraph, "and in interviews with the New

9  York Times, many pharmacists at companies

10 like CVS, Rite Aid and Walgreens described

11 understaffed and chaotic workplaces where

12 they said it had become difficult to perform

13 their jobs safely, putting the public at risk

14 of medication errors."

15             Was this a concern to the Ohio

16 Board of Pharmacy and did it impact its

17 decision to issue the workload survey in

18 Ohio?

19             MR. HYNES:  Objection.  Form.

20             THE WITNESS:  So, yes, this is

21        an overarching concern.  Any time, you

22        know -- the goal is to obviously

23        create an environment where we're

24        reducing medication errors or

25        preventing them from happening.

1          So, yeah, it was a piece of the

2      evidence in order for us to move

3      forward with that survey.

4  QUESTIONS BY MR. ELSNER:

5      Q.      And had the Ohio Board of

6  Pharmacy received any complaints from

7  pharmacists related to understaffing?

8      A.      I have been told of complaints

9  from our complaints department who is sort of

10 bringing this issue to me periodically before

11 we issued the survey.  So it was -- it kind

12 of came in drips and drabs.

13     Q.      If we go to the next paragraph,

14 it states, "They struggle to fill

15 prescriptions, give flu shots, tend the

16 drive-through, answer phones, work the

17 register, counsel patients and call doctors

18 and insurance companies, they said, all while

19 racing to meet corporate performance metrics

20 that they characterize as unreasonable and

21 unsafe in an industry squeezed to do more

22 with less."

23          Did I read that correctly?

24     A.      Yes.

25     Q.      Okay.  And were you aware --

1    was the board aware that pharmacists in Ohio

2    were required at some pharmacies to conduct

3    multiple tasks like this and that their

4    performance was being measured by corporate

5    performance metrics?

6         A.     We were aware of the practice

7    of metrics.  We were not aware until we did

8    the survey of the impacts.

9         Q.     Okay.  We mentioned these two

10   articles, and if we would go back to

11   Exhibit 4.

12              In addition to the articles,

13   were there also other workplace surveys

14   conducted by other states and entities?

15        A.     Yes.

16        Q.     Okay.  And you had mentioned

17   the Missouri study that was conducted.  In

18   fact, it's attached to Exhibit 4.

19              There's also a reference here

20   to other states that conducted surveys,

21   Tennessee and Maryland, have also implemented

22   surveys.

23              Is that true?

24              MR. HYNES:  Objection.  Form.

25              THE WITNESS:  That is correct.

1    QUESTIONS BY MR. ELSNER:

2         Q.     Okay.  And did you review those

3    surveys?

4         A.     So we did reach out to them,

5    and we weren't able to get copies of their

6    surveys.  Missouri was the only -- was the

7    only state that provided us with their survey

8    and results.

9         Q.     All right.  You do summarize

10   the results of the survey that was conducted

11   in Missouri and sent that to Mr. Wilt in the

12   following paragraph just below this comment.

13            Do you see that?

14   A.     Yes.

15        Q.     Okay.  And is that a summary

16   that you helped create, sir?

17   A.     Yes.

18        Q.     Okay.  And the document here

19   states that "51.8 percent of respondents

20   either disagreed or strongly disagreed with

21   the following statement:  I have adequate

22   time to complete my job in a safe and

23   effective manner."

24            Is that what the survey

25   reflected?

1          A.     Yes.

2          Q.     And was this a concern of the

3    Ohio Board of Pharmacy for pharmacists in

4    Ohio?

5          A.     Well, this is the Missouri

6    data.  It was, again, one data point used to

7    justify us conducting our own survey.

8          Q.     Right.

9                 And that was my point, is that

10   this was the results of the Missouri survey,

11   and those results had an impact on the

12   board's decision to recommend issuing a

13   workplace survey in Ohio, correct?

14         A.     Yes.

15                MR. HYNES:  Objection.  Form.

16   QUESTIONS BY MR. ELSNER:

17         Q.     Okay.  Was there a concern at

18   the Ohio Board of Pharmacy that pharmacists

19   in Ohio might be in a similar position to

20   those pharmacists in Missouri in not having

21   enough time to safely and effectively

22   completely their work?

23                MR. HYNES:  Objection.  Form.

24                THE WITNESS:  Yes, that was a

25         concern.

1    QUESTIONS BY MR. ELSNER:

2         Q.    Okay.  Since this document was

3    drafted, did you have the opportunity or have

4    you reviewed any other workplace surveys

5    conducted by any other states?

6         A.    No.

7         Q.    Okay.  You also reference here

8    in the top of this document the national

9    pharmacy workforce study that was performed.

10              Did you review the results of

11   that study?

12        A.    Yes.

13        Q.    Okay.  And, in fact, you

14   summarized the results of that study for

15   Mr. Wilt in this document.

16              Is that true?

17        A.    Yes.

18              MR. HYNES:  Objection.  Form.

19   QUESTIONS BY MR. ELSNER:

20        Q.    And did this study also -- the

21   national workforce study, is that a study by

22   the American Pharmacists Association?

23              MR. HYNES:  Objection.  Form.

24              THE WITNESS:  Yes.

25

1  QUESTIONS BY MR. ELSNER:

2      Q.    Okay.  And did that study help

3  form the basis of your recommendation to

4  conduct a workplace survey in Ohio?

5            MR. HYNES:  Objection.  Form.

6            THE WITNESS:  Yes.

7            (McNamee Exhibit 7 marked for

8      identification.)

9  QUESTIONS BY MR. ELSNER:

10     Q.    If we could pull out MR 4244,

11  and we'll mark this as Exhibit 7.

12            This is the 2014 national

13  pharmacist workforce survey.

14            Did you review this,

15  Mr. McNamee, in your work at the Ohio Board

16  of Pharmacy?

17     A.    I did review this, although I

18  primarily reviewed the 2019.

19     Q.    Okay.  And we'll look at that

20  one as well.

21            If we could turn to -- hold on

22  one second.

23            If we can turn to page 62 of

24  the 2014 survey, which was marked as

25  Exhibit 7.

1                And the top paragraph there,

2    second sentence, it reads, "Overall,

3    66 percent of pharmacists in 2014 rated their

4    workload level at their place of practice as

5    high or excessively high."

6                Do you see that?

7    A.      Yes.

8    Q.      Did I read that correctly,

9    Mr. McNamee?

10                Are you following me?

11    A.      Yes.

12    Q.      Okay.  And if we go down to the

13    second paragraph, it says, "Across practice

14    settings, the highest proportions of

15    pharmacists rating their workload as high or

16    extremely high were in chain and mass

17    merchandiser pharmacy settings."

18                Is that correct?

19    A.      Yes.

20    Q.      I want to go through a little

21    terminology here.  When we say chain

22    pharmacies, what type of pharmacies are we

23    referring to there?

24                MR. HYNES:  Objection.  Form.

25                THE WITNESS:  I'm not a -- I

1          can only tell you what we mean in Ohio

2          when we say chain.  I can't

3          specifically tell you what AP -- or

4          the APhA indicated as chain.

5     QUESTIONS BY MR. ELSNER:

6          Q.      In Ohio how would you define

7     the chain pharmacy or what types of

8     pharmacies would be included in chains?

9          A.      Yeah.  So we break our

10    pharmacies down by independent, meaning one

11    store, and then we have small chain, which is

12    2 to 11 stores, and then we have large chain,

13    which is any company that has 12 or more

14    outlets in the state.

15             And so -- large -- I'm sorry.

16         Q.      No, no.  Go ahead and finish.

17    I didn't mean to interrupt you.

18         A.      And so those large chains do

19    include the larger companies like CVS,

20    Meijer, Giant Eagle, Walgreens, Rite Aid,

21    those folks.

22         Q.      Okay.  Thank you.

23             And if we go down to the bottom

24    of the page here in the last paragraph

25    starting in the second sentence, "In 2014,

1  pharmacists working in chain and mass

2  merchandiser settings indicated that their

3  current workload had a negative or very

4  negative effects on the time spent with

5  patients."

6          Did I read that correctly?

7  A.     Yes.

8  Q.     Okay.  "And additionally,

9  78 percent and 72 percent of pharmacists

10 working in chain and supermarket settings

11 respectively indicated negative or very

12 negative effects on the opportunity to take

13 adequate breaks."

14          Did I read that correctly as

15 well?

16 A.     Yes.

17 Q.     Was this a concern of the Ohio

18 Board of Pharmacy that pharmacists in Ohio

19 may be -- may also have limited abilities to

20 spend time with patients and limited

21 opportunities for breaks in a highly

22 stressful environment?

23          MR. HYNES:  Objection.  Form.

24          THE WITNESS:  Yes, based off of

25    the surveys that we saw in the other

1          states, certainly that was the case in

2          Ohio.

3                    (McNamee Exhibit 8 marked for

4          identification.)

5     QUESTIONS BY MR. ELSNER:

6          Q.      And you mentioned that you

7     reviewed the 2019 survey conducted by the

8     American Pharmacists Association.  I would

9     like to pull that out, and we'll mark that as

10    Exhibit 8.  That is 4205, MR 4205.

11                    Mr. McNamee, is Exhibit 8 the

12    national pharmacist workforce study that you

13    reviewed and referenced in your e-mail to

14    Mr. Wilt?

15         A.      Yes, that's correct.

16         Q.      Okay.  And the results from the

17    2019 survey were very similar to the results

18    of the 2014 survey.

19                    Is that true?

20                    MR. HARRIS:  Object to form.

21                    THE WITNESS:  Yes.

22    QUESTIONS BY MR. ELSNER:

23         Q.      Okay.  And, in fact, the -- if

24    we look -- and these pages are numbered a

25    little bit strange, but if we go to 3-ES --

1    oh, there we go.  There we go.

2              And we go to the second full

3    paragraph beginning with "overall in 2019."

4              It reads, "71 percent of

5    full-time actively practicing pharmacists

6    rated their workload level at their primary

7    place of employment as high or excessively

8    high, compared to 66 percent and 68 percent

9    of full-time pharmacists in 2014 and 2009

10   respectively."

11             Did I read that correctly?

12   A.     Yes.

13   Q.     Okay.  And then a few sentences

14   down starting with, "By primary employment

15   setting, the highest proportions of full-time

16   pharmacists rating their workload as high or

17   extremely high were chain and mass

18   merchandiser pharmacy settings."

19             Is that true?

20   A.     Yes.

21   Q.     Okay.  And is this, too, a

22   survey that the Ohio Board of Pharmacy relied

23   on in support of its decision to submit their

24   workload survey to pharmacists to Ohio?

25             MR. HYNES:  Objection.  Form.

```
 1                    THE WITNESS:  Yes.
 2    QUESTIONS BY MR. ELSNER:
 3         Q.     Okay.  If we go back to
 4    Exhibit 4 and we look at the second page
 5    again, you provided a summary in this
 6    document of the 2019 survey in the first
 7    three bullets in the document.
 8                    Is this a summary that you've
 9    created, Mr. McNamee?
10         A.     Yes.
11         Q.     Okay.  And in the second bullet
12    there you write, "The three most common
13    highly stressful job experiences or aspects
14    were having so much work to do that
15    everything cannot be done well, 43 percent
16    reporting highly stressful, working at
17    current staffing levels, and fearing that a
18    patient will be harmed by a medication
19    error."
20                    Did I read that correctly?
21         A.     Yes.
22         Q.     Okay.  And was this a concern
23    of the Ohio Board of Pharmacy that the stress
24    environment for pharmacists from other
25    surveys indicated that there could be
```

1    medication errors as a result?

2              MR. HYNES:  Objection.  Form.

3              THE WITNESS:  Yes.

4    QUESTIONS BY MR. ELSNER:

5         Q.    Okay.  And, in fact, you

6    provided a little chart at the end of -- in

7    the middle of Exhibit 4 on this page of the

8    number of errors that were reported in

9    dispensing.

10             Is that right?

11        A.    Those are the number of cases

12   that were opened as a result of an error in

13   dispensing or alleged error in dispensing.

14        Q.    Okay.  And the cases that are

15   opened, according to the code section here,

16   in order to open a case, it's required that

17   the event be for reckless behavior.

18             Is that right?

19             MR. HYNES:  Objection.  Form.

20             THE WITNESS:  Yes, or -- and

21        sometimes we get them by patient

22        complaint.  I would say patient

23        complaint is probably the primary

24        method by which we get our error in

25        dispensing cases, according to our

1          compliance department.

2     QUESTIONS BY MR. ELSNER:

3          Q.     And so if a pharmacist simply

4     made a simple mistake, would that rise to the

5     level of reckless behavior that would be

6     covered by the statute?

7          A.     No.

8          Q.     Okay.  So is the point that

9     you're making here is that the number of

10    errors that are in this chart are

11    underreporting the actual number of errors

12    that are occurring in the state of Ohio?

13               MR. HYNES:  Objection.  Form.

14               THE WITNESS:  Well, what I do

15          is I try to make -- I clarify that

16          there are potentially more errors out

17          there, but we only get reports from --

18          if a patient reports it to us or if it

19          meets that reckless standard.

20               So, in theory, yes, there could

21          be more errors that are not reported

22          to us.

23    QUESTIONS BY MR. ELSNER:

24          Q.     Okay.  Was there a worry that

25    pharmacists in the state of Ohio may not have

1   the time to adequately investigate and

2   perform their corresponding responsibilities

3   as a result of the stressful environment in

4   which they work and the metrics by which they

5   are measured?

6              MR. HYNES:  Objection.  Form.

7              MR. HARRIS:  Form.

8              THE WITNESS:  Yeah, based on

9       the data that we were evaluating.

10  QUESTIONS BY MR. ELSNER:

11      Q.    And you sent these proposed

12  questions that were going to be used in the

13  workload to Mr. Wilt on pages 3, 4 and 5 of

14  this document.

15              Is that true?

16      A.    Yes.

17      Q.    Is it fair to say that most of

18  the questions that are drafted here are posed

19  as a concern with patient safety?

20              MR. HYNES:  Objection.  Form.

21              THE WITNESS:  Yes, that was the

22      primary -- yeah, that was the primary

23      objective.

24  QUESTIONS BY MR. ELSNER:

25      Q.    And why did the board tie the

1    questions asked in the survey to patient

2    safety?

3         A.     Because it's tied to our

4    overall mission, and this -- the statute

5    we're using in order -- there's a statute

6    that we were operating under that --

7    regarding allowing pharmacists to practice in

8    a safe and effective manner.  And so that is

9    all related to patient safety.

10        Q.     Okay.  And so you weren't

11   simply asking pharmacists to complete the

12   survey generally, do you have enough time to

13   complete your job.  You tied many of those

14   questions to a specific point, that is, do

15   you have enough time to complete your job in

16   a safe and effective manner.

17               Was that true?

18               MR. HYNES:  Objection.  Form.

19               THE WITNESS:  Yes, and those

20        were all taken as -- a lot of those

21        were taken from the Missouri survey.

22   QUESTIONS BY MR. ELSNER:

23        Q.     Okay.  And was there an effort

24   here to try to determine how pharmacists

25   currently felt about their working

1    conditions; that is, you're not asking them

2    to historically tell us what they felt over

3    time, but what they feel at the moment that

4    they're completing the survey, was that the

5    intent?

6                    MR. HYNES:  Objection.  Form.

7                    THE WITNESS:  Yes.

8    QUESTIONS BY MR. ELSNER:

9         Q.     Okay.  Now, in addition to

10   providing these draft survey questions to

11   Mr. Wilt on the board, were these questions

12   shared with anyone else before they were

13   published?

14        A.     Yes.  They were --

15        Q.     Who was -- I'm sorry.  Please

16   continue.

17                    Who else did you share the

18   questions with?

19        A.     Yes, they were shared

20   internally, so with our compliance and

21   enforcement department, with my executive

22   director, Steve Schierholt, and also with the

23   governor's office as well.

24        Q.     Okay.  And did you do your very

25   best effort -- did the board do its very best

1    effort to try to write fair and unbiased

2    questions?

3                MR. HYNES:  Objection.  Form.

4                THE WITNESS:  Yes.

5    QUESTIONS BY MR. ELSNER:

6        Q.    And why was that important, to

7    try to write fair and unbiased questions?

8        A.    We were trying to obviously not

9    have any bias in our responses so we can make

10   sure that we were objectively capturing the

11   working conditions at the time the survey was

12   deployed.

13       Q.    Okay.  And do you feel -- and

14   does the board feel that these questions

15   adequately performed that objective?

16       A.    Yes.

17                MR. HARRIS:  Object to form.

18   QUESTIONS BY MR. ELSNER:

19       Q.    Okay.  Did you also share the

20   questions with Donald Sullivan?

21       A.    Yes.

22       Q.    Who is Donald Sullivan?

23       A.    He's a professor over at OSU

24   and also an expert that we sometimes turn to

25   for our cases, and so, you know, we're

1   talking about another issue and thought he

2   might be a good sounding board as well to get

3   sort of an external look at the survey.

4          Q.     And was he supportive of the

5   questions that you had issued in the survey?

6          A.     Yes.

7          Q.     Okay.  Did he have any

8   objections to the questions that you had

9   issued in the survey?

10         A.     I don't remember if he did.  I

11  don't think so.

12         Q.     Okay.  If he had an objection

13  to a question in the survey, would you have

14  considered changing the question?

15         A.     Potentially.

16         Q.     Did the board share the survey

17  questions with anyone else outside of the

18  governor's office, Mr. Sullivan and

19  compliance staff and others that you

20  mentioned?

21         A.     I don't recall if we ever

22  shared it beyond those folks.

23         Q.     Was the workload survey sent to

24  all pharmacists in Ohio?

25         A.     Yes.

1      Q.     And why did the board want to

2  send the survey to all pharmacists in Ohio?

3      A.     Because we wanted to accurately

4  capture the working conditions across the

5  state.

6      Q.     Okay.  And in sending the

7  survey to all pharmacists in Ohio, would that

8  have included pharmacists at Walgreens?

9      A.     Yes.

10     Q.     CVS?

11     A.     Yes.

12     Q.     Walmart?

13     A.     Yes.

14     Q.     Meijer?

15     A.     Yes.

16     Q.     Kroger?

17     A.     Yes.

18     Q.     Okay.  Was the survey sent

19  electronically or in paper form?

20     A.     Electronically.

21     Q.     Okay.  Why was the survey sent

22  electronically?

23     A.     That would -- just -- well, for

24  one, we didn't have the resources to send out

25  a paper survey, and, two, obviously, sending

```
 1   electronically would be the most efficient

 2   way to get responses.

 3               (McNamee Exhibit 9 marked for

 4        identification.)

 5   QUESTIONS BY MR. ELSNER:

 6        Q.     I would like to pull out

 7   MR 4247 and mark this as the next exhibit,

 8   which will be Exhibit 9.

 9               Do you recognize this document,

10   Mr. McNamee?

11        A.     Yes.

12        Q.     Okay.  And is this a draft of

13   the e-mail that was sent to pharmacists in

14   Ohio with the 2020 pharmacists workload

15   survey?

16        A.     Yes.

17        Q.     Does it appear accurate and

18   complete to you?

19        A.     Yes.

20        Q.     Okay.  Over what period of time

21   did pharmacists have to complete the workload

22   survey?

23        A.     I believe --

24        Q.     I'm not sure it's reflected on

25   the document, but...
```

1        A.      Yeah, I don't -- I don't recall

2   the specific dates.  I know they had a few

3   weeks to do it.  And that information should

4   be in the survey report itself.

5        Q.      Okay.  We'll look at that

6   later.  We can do something else, though, to

7   refresh your memory there.

8               Is the -- did the board make

9   steps to ensure that pharmacists only

10  completed one survey?

11              MR. HYNES:  Objection.  Form.

12              THE WITNESS:  Yes.

13  QUESTIONS BY MR. ELSNER:

14       Q.      How did the board do that?

15       A.      So we worked with the IT

16  department to create individualized links for

17  each -- for each licensee was sent an e-mail.

18       Q.      And were the surveys

19  conducted -- were the responses -- I'm sorry,

20  let me strike that.

21              Were the workload survey

22  responses anonymous, or did the pharmacists

23  have to identify their names?

24       A.      No, we made a concerted effort

25  to make sure that they could respond

1    anonymously.

2         Q.      Why did the board do that?

3         A.      We were concerned about any

4    retaliation from an employer.

5         Q.      And why did the board have a

6    concern about retaliation from employers?

7              Did you have some reason to

8    suggest that occurred historically?

9              MR. HYNES:  Objection.  Form.

10             THE WITNESS:  No, but we

11        certainly didn't want to get anybody

12        in trouble, and oftentimes people

13        don't realize how liberal our public

14        records laws are.  So in previous

15        surveys I've done for, let's say, our

16        medical marijuana control program,

17        folks have, you know, put their

18        information in there, like in the open

19        field comments and, you know, revealed

20        themselves as patients.  So we wanted

21        to make sure -- and they didn't

22        realize that was the case, so -- and

23        to make sure that, you know,

24        pharmacists weren't putting themselves

25        out there unnecessarily by, you know,

1           disclosing all of their information

2           with their comments.

3    QUESTIONS BY MR. ELSNER:

4           Q.     And, in fact -- and we'll look

5    at this later -- there was a question with

6    respect to whether or not pharmacists felt

7    that their employers may take retribution

8    against them for completing the survey.

9                 True?

10                MR. HYNES:  Objection.  Form.

11                THE WITNESS:  I'm sorry, could

12          you repeat that?

13   QUESTIONS BY MR. ELSNER:

14          Q.     I'll strike that.  We'll get to

15   it a little bit later.

16          A.     Okay.

17          Q.     Did the board believe that

18   providing anonymous responses to the survey

19   would provide more accurate and complete

20   responses?

21                MR. HYNES:  Objection.  Form.

22                THE WITNESS:  Yes.

23   QUESTIONS BY MR. ELSNER:

24          Q.     Why did the board believe that?

25          A.     I think generally that -- I --

1    just in general I feel like, you know, we

2    didn't want to put anyone in a -- in a

3    situation where they didn't feel comfortable

4    expressing themselves and the conditions that

5    they were working in, and so we didn't want

6    to put anybody -- anybody's career in

7    jeopardy.  So we felt like we would get more

8    honest and -- more honest responses if we

9    were to keep it anonymous.

10          Q.     Very good.

11               MR. ELSNER:  Why don't we go

12       off the record if we could.

13               VIDEOGRAPHER:  The time right

14       now is 10:05 a.m.  We're off the

15       record.

16        (Off the record at 10:05 a.m.)

17               VIDEOGRAPHER:  The time right

18       now is 10:19 a.m.  We're back on the

19       record.

20               (McNamee Exhibit 10 marked for

21       identification.)

22    QUESTIONS BY MR. ELSNER:

23          Q.     I'm going to mark MR 4202 as

24    the next exhibit.  It will be Exhibit 10.

25    It's P 511.  And I'm going to ask that we

1    turn to page 3 of the document.

2              Mr. McNamee, is this a true and

3    correct copy of the report issued by the Ohio

4    Board of Pharmacy disclosing the results of

5    the pharmacist workload survey?

6         A.    Yes.

7         Q.    And is this report accurate and

8    complete?

9              MR. HYNES:  Objection.  Form.

10             THE WITNESS:  Yes.

11   QUESTIONS BY MR. ELSNER:

12        Q.    Did the Ohio Board of Pharmacy

13   release this report to the public?

14        A.    Yes.

15        Q.    It bears the seal of the State

16   of Ohio.

17             Is that right?

18        A.    Yes.

19        Q.    Is it an official State of Ohio

20   government report?

21             MR. HYNES:  Objection.  Form.

22             THE WITNESS:  Yes.

23   QUESTIONS BY MR. ELSNER:

24        Q.    Okay.  And it's -- the results

25   of the survey are available on the board's

1    website today, true?

2                MR. HYNES:  Objection.  Form.

3                THE WITNESS:  Yes.

4    QUESTIONS BY MR. ELSNER:

5        Q.      Okay.  Who is responsible for

6    reviewing and analyzing the workload survey

7    results at the board?

8        A.      Myself, primarily.

9        Q.      And did you alter or change any

10   of the comments or any of the responses to

11   the survey?

12       A.      No.

13       Q.      Did you make any changes to the

14   workload submissions to the survey?

15                MR. HYNES:  Objection.  Form.

16                THE WITNESS:  No.

17   QUESTIONS BY MR. ELSNER:

18       Q.      Were there any instances

19   reported to you or to the board of fraud or

20   inappropriate conduct with respect to the

21   conduction -- with respect to conducting the

22   survey?

23                MR. HYNES:  Objection.

24                THE WITNESS:  No.

25

1    QUESTIONS BY MR. ELSNER:

2        Q.    Okay.  Do you believe that the

3    survey is accurate, complete and reliable?

4        A.    Yes.

5              MR. HYNES:  Objection.  Form.

6    QUESTIONS BY MR. ELSNER:

7        Q.    If a respondent included in

8    their response the name of their employer,

9    did the board keep those employer names in

10   the survey responses?

11       A.    Yes.

12       Q.    Okay.  Why did you decide to do

13   that?

14       A.    Well, essentially, there were

15   so many freeform comments that it would be

16   nearly impossible to remove all of that.

17              In addition, public records law

18   doesn't require us to redact that

19   information.

20              So it was -- it was just a

21   matter of being as transparent as possible

22   with the survey results.

23       Q.    Okay.  And was that a goal of

24   the Ohio Board of Pharmacy, to be as

25   transparent as possible with respect to the

1    results of the survey from pharmacists in

2    Ohio?

3                    MR. HYNES:  Objection.  Form.

4                    THE WITNESS:  Yes.  Yes.

5    QUESTIONS BY MR. ELSNER:

6        Q.      Before we go into the specific

7    results of the survey, I just from the outset

8    just like to ask, what was the reaction from

9    the board when you received the results of

10   this survey?

11                   What were your impressions

12   based on the feedback that you received from

13   the survey?

14                   MR. HYNES:  Objection.  Form.

15                   MS. OCHMAN:  Objection.

16                   THE WITNESS:  I mean, from my

17          personal reading of the survey, it was

18          very concerning to me, as well as to a

19          lot of the staff.

20   QUESTIONS BY MR. ELSNER:

21       Q.      What was it about the survey

22   responses that concerned you and the staff at

23   the Ohio Board of Pharmacy?

24       A.      Just the overwhelming consensus

25   of there being a significant problem,

1  particularly in the large chain setting, that

2  was -- that that really stood out to us as a

3  data point.

4      Q.    What particular problem in the

5  large chain setting was concerning to you?

6      A.    You know, issues regarding the

7  use of metrics, not feeling like they have

8  enough time or staffing levels.  You know,

9  many of the questions -- the results of the

10  questions, if you break them down by, you

11  know, pharmacy type, were concerning, and

12  particularly in that large chain setting.

13          And the freeform comments also

14  were -- you know, had some disturbing

15  revelations in them.

16      Q.    And did you review those

17  freeform comments?

18      A.    I can't say that I reviewed

19  every single one, but I did -- I did scroll

20  through it and try and read as much as I

21  could.

22      Q.    One of the questions that you

23  asked in the survey for each person taking

24  the survey was what type of pharmacy they

25  worked in.

1                    Is that true?

2          A.      Yes.

3          Q.      Okay.  And if we go to

4    question 10, which is on page 23.

5                    Does this break down the number

6    of respondents who worked at particular

7    pharmacy practice settings?

8          A.      Yes.

9          Q.      Why was it important to the

10   board to ask the respondent to identify their

11   practice site?

12         A.      Because not all practice sites

13   are the same.  So working in a hospital

14   setting or a nursing home is going to be

15   vastly different from working in a more

16   retail-facing setting.  So we wanted to be

17   able to capture or show the differences in

18   their responses based on setting type.

19         Q.      And a large number of the

20   respondents here, clearly more than half,

21   worked in either large chain standalone

22   pharmacies or large chain grocery store

23   establishments, true?

24                  MR. HYNES:  Objection.  Form.

25                  THE WITNESS:  Yes.

1  QUESTIONS BY MR. ELSNER:

2      Q.    Okay.  And in addition to

3  asking where the respondents worked, did you

4  also inquire about the length of service or

5  the amount of time they had worked in

6  pharmacies?

7      A.    Yes, I believe that was a

8  question on the survey.

9      Q.    And if we look at question 15

10  on page 31, if we could pull that up, are

11  these the responses to question 15?

12     A.    Yes.

13     Q.    Okay.  And it indicates, does

14  it not, that 63 percent of the -- of those

15  that had worked in the pharmacy, over

16  63 percent, had worked there for ten years or

17  more.

18             Is that fair?

19             MR. HYNES:  Objection.  Form.

20             THE WITNESS:  You said -- oh,

21         yes, it is -- yeah.  Yes, more than

22         63 percent.

23  QUESTIONS BY MR. ELSNER:

24     Q.    And only 10 percent of those

25  that completed the survey had been in

1    practice for three years or less, true?

2              MR. HYNES:  Objection.  Form.

3              THE WITNESS:  Yes, that's

4         correct.

5    QUESTIONS BY MR. ELSNER:

6         Q.    Okay.  So fair to say that a

7    majority of the people that completed the

8    survey had extensive experience working in a

9    pharmacy setting, fair?

10             MR. HARRIS:  Objection.  Form.

11             THE WITNESS:  Yes, they had ten

12        or more years of experience.

13   QUESTIONS BY MR. ELSNER:

14        Q.    Okay.  And I want to look

15   through a few of the questions, and I want to

16   start with question 1, which we're going to

17   pull up here.

18             And the question was, "I feel

19   that I have adequate time to complete my job

20   in a safe and effective manner," and it's

21   organized here by practice site.

22             True?

23        A.    Yes, that's correct.

24        Q.    And is this the first question

25   in the survey?

1      A.    Yes.

2      Q.    Okay.  And did you organize the

3  results of this survey and organize them by

4  practice site?

5      A.    Yes.

6      Q.    Okay.  And is it true that 511

7  of those working in a large chain standalone

8  pharmacy strongly disagreed with the

9  statement that they had adequate time to

10  complete their job?

11          MR. HYNES:  Objection.  Form.

12          THE WITNESS:  Yes.

13  QUESTIONS BY MR. ELSNER:

14      Q.    Okay.  And is it true that 500

15  of those responding to the survey who worked

16  in large chain standalone pharmacies

17  disagreed with the statement that they felt

18  that they had adequate time to complete their

19  job in a safe and effective manner?

20          MR. HYNES:  Objection.  Form.

21          THE WITNESS:  Yes.

22  QUESTIONS BY MR. ELSNER:

23      Q.    Okay.  So that's 1,011 of the

24  1,268 respondents to this question working in

25  large chain pharmacies, true?

1              MR. HYNES:  Objection.  Form.

2              THE WITNESS:  Yes.

3    QUESTIONS BY MR. ELSNER:

4         Q.    Okay.  And the percentage of

5    those pharmacists that either agreed -- I'm

6    sorry, that either strongly disagreed or

7    disagreed with the statement that they felt

8    they had adequate time to complete their job

9    in a safe and effective manner in the large

10   chain pharmacy setting was 8 -- was roughly

11   80 percent, true?

12             MR. HYNES:  Objection.  Form.

13             THE WITNESS:  Yeah, it was the

14        79.3 percent.

15   QUESTIONS BY MR. ELSNER:

16        Q.    So was it concerning to the

17   board staff that 80 percent of the

18   respondents thought that they didn't have

19   adequate time to complete their jobs in a

20   safe and effective manner?

21             MR. HYNES:  Objection.  Form.

22             THE WITNESS:  Yes.

23   QUESTIONS BY MR. ELSNER:

24        Q.    And why?

25        A.    Why was it concerning to us?

1      Q.     Yes.

2      A.     Well, certainly, you know, if

3   you've got 80 percent of pharmacists agreeing

4   on anything, it's concerning, but, you know,

5   particularly the fact that they felt like

6   they just didn't have enough time.  I mean,

7   that was -- that was pretty constant

8   throughout the survey responses, but it

9   certainly raised the concern of how this

10  would then impact patient safety.

11     Q.     Okay.  You also organized this

12  information by large chain grocers, correct?

13     A.     Yes.

14     Q.     And there were 628 of the

15  thousand respondents who identified as large

16  chain grocery pharmacists that responded that

17  they either strongly disagreed or disagreed

18  that they had adequate time to complete their

19  job in a safe and effective manner, true?

20          MR. HYNES:  Objection.  Form.

21          THE WITNESS:  Yes.

22  QUESTIONS BY MR. ELSNER:

23     Q.     Okay.  And as a result,

24  63 percent of those who responded in the

25  grocery store chain setting felt that they

1    didn't have adequate time to complete their

2    job in a safe and effective manner, true?

3                    MR. HYNES:  Objection.  Form.

4                    THE WITNESS:  Yes.

5    QUESTIONS BY MR. ELSNER:

6        Q.    Okay.  And did you have similar

7    concerns with respect to the large grocery

8    chain stores as you did with respect to the

9    chain pharmacies?

10                   MR. HYNES:  Objection.  Form.

11                   THE WITNESS:  Yes.

12   QUESTIONS BY MR. ELSNER:

13       Q.    Let's go to question 3, if we

14   could.

15                   And in question 3, the question

16   was, "I feel that my work environment has

17   sufficient pharmacist staffing that allows

18   for patient safety."

19                   Was that the third question of

20   the survey?

21       A.    Yes.

22       Q.    Okay.  And for large chain

23   standalone pharmacy respondents, 891 of the

24   1,268 pharmacists that answered the question

25   disagreed or strongly disagreed that their

1   environment had sufficient staffing to allow

2   for patient safety, true?

3              MR. HYNES:  Objection.  Form.

4              THE WITNESS:  Yes, sufficient

5        pharmacist staffing.

6   QUESTIONS BY MR. ELSNER:

7        Q.     Okay.  So 70 percent of the

8   pharmacists that worked in the large chain

9   standalone pharmacies thought that the

10  environment did not allow for sufficient

11  pharmacist staffing to create a safe patient

12  environment, true?

13       A.     Yes.

14             MR. HYNES:  Objection.  Form.

15             MS. GIANGIULIO:  Objection.

16       Form.

17  QUESTIONS BY MR. ELSNER:

18       Q.     If we look at the respondents

19  with respect to the large grocery store

20  chains, in this example, is it true that

21  64 percent of the pharmacists that completed

22  the survey working in large grocery store

23  chains thought that their environment did not

24  have sufficient staffing that allowed for

25  patient safety?

1          MR. HYNES:  Objection.  Form.

2          THE WITNESS:  Yeah, 63.8.

3   QUESTIONS BY MR. ELSNER:

4       Q.     And was this a concern of the

5   board, that respondents working in large

6   chain grocery stores and respondents working

7   in large chain pharmacies felt that they

8   didn't have sufficient pharmacist staffing to

9   allow for patient safety?

10          MR. HYNES:  Objection.  Form.

11          THE WITNESS:  Yes, this was --

12      this data -- these data points were

13      very concerning to us.

14   QUESTIONS BY MR. ELSNER:

15      Q.     And did the Board of Pharmacy

16   in the survey also ask about pharmacy

17   metrics?

18      A.     Yes.

19      Q.     What is your understanding of a

20   pharmacy metric?

21      A.     So my understanding of a

22   pharmacy metric is that certain companies

23   will assign, you know, a certain number of

24   immunizations that need to be given or you

25   need to meet your fill times in a certain

1   percentage or you need to make certain -- so

2   essentially doing a certain amount of

3   administrative duties, you know, per day to

4   meet a number set by, you know, corporate.

5        Q.     So the pharmacy metrics are not

6   set by individual pharmacists at each store;

7   they're set typically by the corporate

8   headquarters.

9              Is that true?

10             MR. HYNES:  Objection.  Form.

11             THE WITNESS:  My understanding

12        is that it's not -- it's not in

13        control of the pharmacist that's

14        working there.

15   QUESTIONS BY MR. ELSNER:

16        Q.     Okay.  If we go to question 6,

17   did the survey ask whether pharmacists felt

18   pressure by their employers or supervisors to

19   meet standards or metrics that may interfere

20   with safe patient care?

21        A.     Yes.

22        Q.     Okay.  And was it true that for

23   the large chain standalone pharmacies that

24   88 percent of those responding to the survey

25   thought that the metrics were -- may

1    interfere with safe patient care?

2              MR. HYNES:  Objection.  Form.

3              THE WITNESS:  Yeah, the

4        87.78 percent.

5    QUESTIONS BY MR. ELSNER:

6        Q.    Okay.  And if we look at the

7    large chain grocery store respondents, it was

8    slightly lower but somewhat similar response

9    of 73 percent, 72.8 percent of the

10   pharmacists that worked in the large chain

11   grocery pharmacies throughout -- thought that

12   metrics may interfere with safe patient care.

13             Is that true?

14             MR. HYNES:  Objection.  Form.

15             THE WITNESS:  Yes.  Yes.

16   QUESTIONS BY MR. ELSNER:

17       Q.    Now, were the results with

18   respect to this metrics question concerning

19   to you and members of the board?

20             MR. HYNES:  Objection.  Form.

21             THE WITNESS:  Yes.

22   QUESTIONS BY MR. ELSNER:

23       Q.    And why is that?

24       A.    Again, it has to do with the

25   ability to provide safe patient care, which

1   was the focus of the survey.

2        Q.     If we go to -- if we go to

3   question 7, did the board ask whether

4   pharmacists felt that the workload-to-staff

5   ratio allowed them to provide for patients in

6   a safe manner?

7        A.     Yes.

8        Q.     Okay.  And what did you mean

9   by -- or what did the board mean by workload

10  in this question?

11       A.     That the amount of work that

12  they had to the amount of staff that they had

13  allowed them to complete their tasks and do

14  so in a safe manner.  Again, getting back to

15  the patient safety nexus.

16       Q.     And is it true that the

17  responses here that 78 percent of --

18  78.47 percent of the pharmacists that worked

19  in large chain standalone pharmacies thought

20  that the workload-to-staff ratio was not

21  sufficient to provide patient care in a safe

22  manner?

23              MR. HYNES:  Objection.  Form.

24              THE WITNESS:  Yes, that's

25       correct.

1    QUESTIONS BY MR. ELSNER:

2        Q.     And if we go to the next slide,

3    which is the response for large grocery chain

4    pharmacists, did 63 percent of those

5    pharmacists, 62.6 percent of those

6    pharmacists in large chain grocery store

7    pharmacies think that the workload-to-staff

8    ratio was not sufficient to provide patient

9    care in a safe manner?

10            MR. HYNES:  Objection.  Form.

11            THE WITNESS:  Yes.

12   QUESTIONS BY MR. ELSNER:

13       Q.     Did you feel, in response to

14   the survey, that you were getting fairly

15   consistent results with respect to these

16   questions concerning workload, metrics and

17   safe patient care?

18            MR. HYNES:  Objection.  Form.

19            THE WITNESS:  Yes.  Yeah.  So

20       the numbers were pretty consistent.

21   QUESTIONS BY MR. ELSNER:

22       Q.     And we won't go through all the

23   various questions, but was it also true that

24   a number of pharmacists working in large

25   chain pharmacies and grocery stores also felt

1    that they didn't have sufficient time to take

2    breaks, such as a lunch break?

3                    MR. HYNES:  Objection.  Form.

4                    THE WITNESS:  Yes.

5    QUESTIONS BY MR. ELSNER:

6        Q.    Okay.  Why don't we look at

7    that response, if we could, and go to the

8    next slide.

9                    For large chain grocery stores,

10   roughly 58 percent of the pharmacists who

11   worked in that environment felt that they

12   were not given the opportunity to take lunch

13   or otherwise take breaks throughout the day.

14                   Is that true?

15                   MR. HYNES:  Objection.  Form.

16                   THE WITNESS:  Yes.

17   QUESTIONS BY MR. ELSNER:

18       Q.    Okay.  And with respect to

19   large chain grocery stores, that response

20   was -- I'm sorry, with respect to large chain

21   pharmacies, over 81 percent of pharmacists

22   felt that they worked -- strike that.

23                   With respect to large chain

24   pharmacies, 81 percent of the pharmacists

25   that responded to the survey thought that

1    they were not given an opportunity to take

2    lunch or otherwise take breaks throughout the

3    day.

4              Is that true?

5              MR. HYNES:  Objection.  Form.

6              THE WITNESS:  Yeah, for those

7         standalone pharmacies, that's correct.

8    QUESTIONS BY MR. ELSNER:

9         Q.    And was the failure to provide

10   adequate breaks to pharmacists a concern to

11   the Ohio Board of Pharmacy?

12             MR. HYNES:  Objection.  Form.

13             THE WITNESS:  Yes.  I think

14        it's concerning to us, because, again,

15        it gets back to the need to practice

16        effectively.

17   QUESTIONS BY MR. ELSNER:

18        Q.    And was there a fear among the

19   Ohio Board of Pharmacy that if pharmacists

20   didn't have adequate time to take breaks,

21   including a lunch break, that it might lead

22   to errors in the dispensing of medications?

23             MR. HYNES:  Objection.  Form.

24             THE WITNESS:  I think that

25        there's concern that, you know,

1          fatigue and not being able to take

2          breaks could, in fact, lead to harm.

3          So that was certainly a concern.

4    QUESTIONS BY MR. ELSNER:

5          Q.     I want to jump ahead here.

6                 Was there an effort to try to

7    determine how many prescriptions pharmacists

8    were filling in a particular hour?

9                 Was that one of the questions

10   that were asked by the survey?

11         A.     We did ask them about

12   prescription volume, yeah.

13         Q.     If we could show that question.

14                Actually, I think with respect

15   to this, if we could go to -- go back to

16   MR 4202 and look at page 28, Exhibit 10.

17                Mr. McNamee, does this chart

18   depict responses from pharmacists as to the

19   number of prescriptions that are processed by

20   hour?

21         A.     Yes.

22         Q.     Okay.  And did you compile this

23   chart based on the survey responses in the

24   pharmacists workload survey of 2020?

25         A.     Yes.

1       Q.      Okay.  And did you do your best

2    to make sure it was accurate and complete?

3       A.      Yes.

4       Q.      Okay.  Is it true that most of

5    the -- most of the pharmacists that responded

6    to the survey in large chain grocery stores

7    were filling between 26 and a hundred -- and

8    over a hundred prescriptions in an hour?

9               MR. HYNES:  Objection.  Form.

10              THE WITNESS:  Are you saying

11        the majority of the respondents?

12   QUESTIONS BY MR. ELSNER:

13       Q.      Yes.

14       A.      Yes, it appears that that is

15   the case.

16       Q.      And so if we do the math there,

17   798 of the thousand pharmacists from large

18   chain, grocery stores responded that they

19   were 80 percent -- roughly 80 percent

20   responded that they filled, on average,

21   between 26 and over a hundred prescriptions

22   an hour, true?

23              MR. HYNES:  Objection.  Form.

24              THE WITNESS:  Yes.

25

```
 1   QUESTIONS BY MR. ELSNER:

 2        Q.     And if we look at large chain

 3   standalones, between 26 and over a hundred

 4   prescriptions an hour, 77 percent of

 5   pharmacists responded that they filled that

 6   many prescriptions in an hour, true?

 7             MR. HYNES:  Objection.  Form.

 8             THE WITNESS:  Yes.

 9   QUESTIONS BY MR. ELSNER:

10        Q.     26 prescriptions in an hour,

11   that would be one prescription every

12   2.3 minutes.  And at 50 prescriptions an

13   hour, that would be one prescription every

14   1.2 minutes.  And at a hundred prescriptions

15   an hour, that would be one prescription every

16   36 seconds.

17             Was there a concern at the

18   board as to the number of prescriptions that

19   were being filled at large chain pharmacies

20   and large chain grocery stores in the state

21   of Ohio?

22             MR. HYNES:  Objection.  Form.

23             MS. OCHMAN:  Objection.  Form.

24             THE WITNESS:  Yes.

25
```

1    QUESTIONS BY MR. ELSNER:

2         Q.     And would you agree with me

3    that the processing of a prescription

4    includes all of the steps necessary in order

5    to fill a prescription, that is intake and

6    through the entire process, labeling, due

7    diligence on the prescription, if that's

8    necessary, including calling a doctor,

9    counting out the medication, checking the

10   count on the medication, putting the

11   medication in a -- in a -- in a bottle,

12   bagging the medication, are all of those

13   steps included in the processing of a

14   medication?

15              MR. HYNES:  Objection.  Form.

16              THE WITNESS:  Yes.

17              MR. HYNES:  And scope.

18   QUESTIONS BY MR. ELSNER:

19        Q.     Was there a concern at the Ohio

20   Board of Pharmacy that the number of

21   prescriptions that were being filled, the

22   staffing levels that existed in the pharmacy

23   and the metrics employed by large chain

24   pharmacies and large chain grocery stores

25   posed a risk to patient safety?

1                    MR. HYNES:  Objection.  Form.

2                    THE WITNESS:  Yes.

3     QUESTIONS BY MR. ELSNER:

4          Q.     And was there a risk -- I'm

5     sorry -- well, strike that.

6                    Did the survey also ask, for

7     those who felt that they were unable to

8     practice safely at their current pharmacy,

9     why they felt that way?

10         A.     Yes.

11         Q.     Let's turn to page 32 of

12    MR 4202, and question 16, this question asks,

13    "If you believe you are unable to practice

14    safely at your current pharmacy practice

15    site, please select the reason why."

16                   Was this the way the question

17    was framed in the workload survey?

18         A.     Yes.

19         Q.     And is it true that for the

20    majority of the respondents or the -- let me

21    strike that.

22                   Is it true that the two main

23    leading causes for their feeling about their

24    inability to practice safely at the pharmacy

25    was a result of the focus on metrics and

1    inadequate staff support?

2         A.    Yes.

3               MR. HYNES:  Objection.  Form.

4    QUESTIONS BY MR. ELSNER:

5         Q.    Okay.  And why did the board

6    ask this particular question in the survey?

7         A.    I think this is actually from

8    Missouri, so we wanted to -- I think we were

9    also trying to keep it as close to Missouri

10   so we can maybe compare results between

11   states, but I believe that this was -- this

12   was from the Missouri survey, so we kept it

13   in because we wanted to identify, you know,

14   what the specific issues were.  So, yeah,

15   that's why we kept it in the survey.

16        Q.    Okay.  And the third highest

17   here is also too many nonclinical duties such

18   as filling -- sorry, filing, prior

19   authorizations, making refill phone calls,

20   et cetera, true?

21        A.    Yes.

22        Q.    And were these concerns

23   expressed in this component of the survey

24   also consistent with the comments that were

25   received by the Ohio Board of Pharmacy in the

1    free comment section of the survey?

2         A.     Yes.

3         Q.     Okay.  Why did the board decide

4    to include a free comment section in addition

5    to asking these questions in the survey?

6         A.     I think we wanted to account

7    for anything that we weren't asking

8    specifically in the survey so -- and also,

9    you know, just being able to hear from the

10   pharmacists in their own words about what the

11   working conditions were like.  So we felt it

12   appropriate to include an open response

13   option or a freeform option.

14        Q.     And what was your reaction and

15   the reaction of the Ohio Board of Pharmacy

16   staff to the comment section of the survey

17   responses?

18        A.     Concerning.  Little

19   disheartening.

20        Q.     Why was it disheartening?

21        A.     You know, some of the comments

22   talked about how they dreaded going into the

23   practice of pharmacy because of the working

24   conditions, and it's always -- you know, it's

25   hard to hear people sort of talk about how,

1  you know, they had this dream and this goal

2  and it's turned out to be, you know, nothing

3  like they thought it would be.  So that was

4  disheartening.

5          But, again, they -- the

6  comments, you know, often were -- felt like a

7  cry for help in many -- in many regards.

8      Q.    Let's look at one.  If we turn

9  to MR 4202, page 34.

10          If we look here at the

11  highlighted portion, it reads, does it not,

12  "Two hours is too long for a single

13  pharmacist to work.  It's unsafe after about

14  an hour 10.  Eye fatigue, brain fatigue and

15  not as fresh and alert as at the beginning of

16  the shift.  Too many interruptions to focus

17  on just one task at a time.  Cannot immunize

18  and fill over 300 prescriptions a day with

19  one RPh."

20          Did I read that correctly?

21      A.    Yes.

22      Q.    It then reads, "Due to retail

23  setting looking for profits, focus is on

24  filling as much and as fast as possible.

25  Safe is not a concern for the large

1    companies.  Scheduling a break from 1:30 to 2

2    for lunch leaves a 12-hour pharmacist still

3    no dinner and no rest."

4              Is this an example of one of

5    the concerning responses that the Ohio Board

6    of Pharmacy received in response to the

7    workplace survey?

8              MR. HYNES:  Objection.  Form.

9              THE WITNESS:  Yes.

10   QUESTIONS BY MR. ELSNER:

11       Q.    Let me turn to page 36, and

12   there's two here on this page I would like to

13   focus on.  The first one is the sixth one

14   down starting with "additional workloads."

15             It reads, "Additional workloads

16   and additional duties have put in place an

17   unsafe and very stressful environment in the

18   chain pharmacy I worked at until last fall.

19   Management continues to add workload without

20   additional help.  We had a pharmacist leave

21   because she felt the work environment was

22   unsafe.  I felt more like a factory with

23   quotas than it did working in a pharmacy."

24             Is this another one of the

25   comments that were received in response to

1    the workplace survey?

2         A.    Yes.

3         Q.    Okay.  And was -- do you

4    believe that there were a significant number

5    of comments in response to the survey?

6              There weren't just a small

7    handful, true?

8              MR. HYNES:  Objection.  Form.

9              THE WITNESS:  Yes, there were a

10        significant amount of comments that we

11        received.

12   QUESTIONS BY MR. ELSNER:

13        Q.    Were you surprised by the large

14   number of comments that you received to the

15   survey?

16             MR. HYNES:  Objection.  Form.

17             THE WITNESS:  Yes.

18   QUESTIONS BY MR. ELSNER:

19        Q.    And were the comments generally

20   consistent with the results of the survey as

21   depicted in the numbers that we went through

22   at the beginning of this examination?

23             MR. HYNES:  Objection.  Form.

24             THE WITNESS:  Yeah, generally

25        they are consistent, the responses.

1   QUESTIONS BY MR. ELSNER:

2        Q.      If we go two down, it starts,

3   "After 20 years of working at the same retail

4   pharmacy and being asked to do more and more,

5   MTMs, vaccines, prescription sharing,

6   et cetera, with inadequate ancillary help, I

7   recently decided to step away from the

8   pharmacy completely.  My main, in all caps,

9   reason was because I did not feel safe.  The

10  environment was set up for me to fail, and it

11  was only a matter of time before I made a

12  horrific mistake."

13              Did I read that correctly?

14       A.      Yes.

15       Q.      And were comments like these a

16  concern at the Ohio Board of Pharmacy in

17  response to this survey?

18       A.      Yes.

19       Q.      And was there a concern at the

20  Ohio Board of Pharmacy that the workplace

21  condition with pharmacists in Ohio could

22  potentially be posing a danger to the public?

23              MR. HYNES:  Objection.  Form.

24              THE WITNESS:  Yes.

25

1    QUESTIONS BY MR. ELSNER:

2          Q.      There were also some specific

3    comments made by employees and former

4    employees of the defendants in this case.

5                  Is that true?

6          A.      Yes, we often found that

7    people, even if they went into settings that

8    were more conducive, like an independent,

9    they still answered on behalf of where they

10   used to work, which is a chain setting.

11         Q.      And we'll look at some of

12   those.

13                 And frequently in that -- in

14   the responses they commented that their

15   responses in the first part of the survey

16   would have been different had they answered

17   based on where they used to work versus where

18   they currently work, true?

19                 MR. HYNES:  Objection.  Form.

20                 THE WITNESS:  Yes.

21   QUESTIONS BY MR. ELSNER:

22         Q.      I'm sorry, I didn't hear the

23   response.

24         A.      Oh, I'm sorry.  Generally, yes.

25   Yeah.

1             Q.       If we look at 4202 on page 63,

2    top response, "I believe that every retail

3    pharmacist skips procedures and tries to find

4    the quickest way of doing something because

5    there is such a lack of staffing and the

6    staff that we do have is underpaid for the

7    type of stress they deal with.  District

8    managers quickly have an answer for

9    everything and do not realize that patient

10   care is at a loss.  Retail pharmacy has lost

11   touch of what it used to be in years past.

12   The" -- sorry, I can't quite read that on the

13   screen the way it's depicted -- "the amount

14   of corporate pressure put on managers does

15   not allow for quality patient care.  It took

16   Walgreens 100 years to finally implement a

17   lunch break pilot.  I received my first lunch

18   break last week in seven years, and I -- in

19   the seven years I have been a pharmacist."

20             Is this consistent with some of

21   the comments that you were referring to

22   earlier related to a breakdown in the

23   respondents' feelings about the practice of

24   pharmacy in Ohio?

25             MR. HYNES:  Objection.  Form.

1                MS. OCHMAN:  Objection to form.

2                THE WITNESS:  Yes.

3     QUESTIONS BY MR. ELSNER:

4          Q.      If we look at page 39, we look

5     at a comment related to CVS pharmacists.

6                And if we go to the second

7     comment there, "As a collective group of

8     several pharmacists and pharmacy managers, we

9     have expressed concerns to our district

10    managers with the hope that they would try to

11    accomplish changes to bring about a safer

12    work experience.  Instead, the opposite has

13    occurred, as we have now been faced with

14    additional cuts in technician and pharmacy

15    staffing, plus an increased push for

16    vaccinations and patient outreach.  CVS

17    continues to show a blatant disregard for

18    patient or employee safety as pharmacists are

19    not even allowed a formal meal break per

20    company policy."

21                Did I read that correctly?

22         A.      Yes.

23         Q.      And was this the concern of the

24    board, that large chain pharmacies like CVS

25    were inadequately staffed and not providing

1    for appropriate breaks?

2              MR. HYNES:  Objection.  Form.

3              THE WITNESS:  Yeah, I think

4         generally there was a concern across

5         all of the large chain settings based

6         on the data that we saw in the survey.

7    QUESTIONS BY MR. ELSNER:

8         Q.    And this person goes on, "They

9    continue to demand more from fewer people at

10   each store and stress money and sales over

11   patient health or safety.  Everything

12   expressed and revealed in The New York Times

13   article from the beginning of the year was,

14   in fact, true, has resumed, and has resumed

15   with a stronger presence and emphasis from

16   field management and corporate.  They are

17   going to get someone seriously injured or

18   worse in this state all for the sake of extra

19   profits."

20             Did I read that correctly?

21        A.    Yes.

22        Q.    I want to look also on page 39.

23   If we go down a little bit further, the

24   second to the last comment, "As a pharmacy

25   manager" -- second to the last one on the

1    page.

2              "As a pharmacy manager, it's

3    frightening how little control over staffing

4    I have.  It is all dictated by our corporate

5    office.  Although my name is on the

6    pharmacy's license, I truly am not the person

7    in charge when it comes to this aspect of

8    safely operating a pharmacy."

9              Did I read that correctly?

10   A.      Yes.

11   Q.      Did the board feel it was

12   important for the pharmacist in charge in the

13   pharmacies in Ohio to be in control of the

14   work environment at each of their pharmacies?

15             MR. HYNES:  Objection.  Form.

16             THE WITNESS:  Yes, that's the

17   expectation of our role.

18   QUESTIONS BY MR. ELSNER:

19   Q.      Okay.  And is this comment

20   consistent with the testimony you offered

21   earlier that corporate decisions were

22   impacting pharmacy practice at individual

23   pharmacies?

24             MR. HYNES:  Objection.  Form.

25             THE WITNESS:  Yes, and based

1          off of -- and that is based off of the

2          survey data, yes.

3     QUESTIONS BY MR. ELSNER:

4          Q.     And we talked about metrics a

5     little bit earlier when we were looking at

6     the numerical responses to the survey, and I

7     would just like to turn to page 47 of the

8     survey.

9               I want to focus on the seventh

10    comment that starts with "currently," but I

11    want to -- I want to go to the end of that

12    line where the respondent writes, "I do want

13    to point out" -- yeah -- "I do want to point

14    out several years ago I worked at CVS, and

15    that was the worst experience I had as a

16    retail pharmacist.  Too much focus on metrics

17    and each prescription ends up not being given

18    due attention.  Extreme workload, corporate

19    pressure, low staff resulted in pharmacist

20    having not even five minutes a day of ten

21    hours to eat.  It's time someone stopped CVS

22    making a factory out of pharmacy."

23               Did I read that correctly?

24          A.     Yes.

25          Q.     Okay.  Now, we've selected some

1    comments over the course of this examination.

2    I'm certainly not going to read them all.

3              Are these comments fairly

4    consistent across the respondents in the

5    survey, that people are expressing concern

6    about metrics, expressing concern about

7    workload and expressing a concern about

8    patient safety in the chain pharmacy and

9    chain grocery settings in Ohio?

10             MR. HYNES:  Objection.  Form.

11             MS. OCHMAN:  Objection to form.

12   QUESTIONS BY MR. ELSNER:

13        Q.    Mr. McNamee, I didn't hear your

14   answer.

15        A.    Oh, sorry.  Yes.

16        Q.    We had talked a little bit

17   earlier about former pharmacists, and this is

18   one example of someone who is in a different

19   environment now and commenting on where they

20   used to work.

21             I wanted to also look at

22   comment 86 -- comment on page 86 begins, "I

23   used to work for CVS Pharmacy" in the third

24   comment there.

25             "I used to work for CVS

1    Pharmacy.  My answers would be drastically

2    different if I were filling out this survey

3    from that perspective, instead of the job I

4    have now.  CVS did not give me an opportunity

5    for a break or time to eat lunch.  At CVS I

6    felt unsafe with the metric demands and the

7    short staffing ratios that corporate handed

8    down.  If I still worked for CVS, I had to

9    answer question 16 of the survey, and checked

10   every single box because I felt unsafe for

11   all of these reasons."

12           Does this response indicate

13   that the survey results numerically in the

14   beginning of the survey may have been higher

15   had the respondents answered with respect to

16   their former employment?

17           MR. HYNES:  Objection.  Form.

18           THE WITNESS:  Potentially;

19      although, you know, I can't -- I can't

20      speculate on sort of hypotheticals

21      there.

22   QUESTIONS BY MR. ELSNER:

23      Q.    At least for this respondent

24   and the response that we read just before

25   this that would be true, correct?

1                    MR. HYNES:  Objection.  Form.

2                    THE WITNESS:  Yes, if they were

3          answering based on their previous

4          employer, that would be the case,

5          correct.

6     QUESTIONS BY MR. ELSNER:

7          Q.     And if we look at page 86, at

8     the top of the page, a very similar response

9     from a former Walgreens pharmacist, "I used

10    to work at Walgreens up until this year.  If

11    I was still employed there, my answer would

12    be drastically different."

13                    True?

14         A.     Yes.

15         Q.     Okay.  And it reads, "I never

16    got a lunch break, a bathroom break or any

17    break.  I was forced to work unpaid hours,

18    had terrible staffing due to restrictions in

19    budget.  I worked with one other pharmacist,

20    and we would process over a thousand scripts

21    in a day."

22                    Did I read that correctly?

23         A.     Yes.

24         Q.     Okay.  And so this would be

25    another example of a pharmacist, if they had

1    answered the numerical section of the

2    response based on their prior employer versus

3    their current one, they would have indicated

4    an increase in the concerns we raised before,

5    true?

6              MR. HYNES:  Objection.  Form.

7              THE WITNESS:  Yes, that is

8         correct.

9    QUESTIONS BY MR. ELSNER:

10        Q.    Okay.  I want to look at

11   page 152, the very top response, and I want

12   to start with the second sentence beginning

13   with "this Kroger's -- "this is Kroger, and

14   the workload is unrealistic and unsafe.  The

15   work environment is creating a whole new

16   generation of sloppy pharmacists that are

17   sometimes flat-out dangerous.  We are timed

18   on every move we make.  Safety and ethics are

19   out the door."

20              Did I read that correctly?

21        A.    Yes.

22        Q.    "Retail pharmacy has

23   dramatically changed in the last five years

24   or so.  MTM" -- and then it -- "MTM outcomes

25   is definitely a positive thing, but it has

1    turned into a game of numbers in retail.

2    We're not taking care of the patient.  We're

3    taking care of profits, metrics, inventory

4    and the bottom line."

5                Is it true that the frustration

6    expressed by pharmacists in large chain

7    pharmacies -- standalone pharmacies was also

8    expressed by some respondents in large chain

9    grocery store settings?

10        A.    Yes.

11        Q.    After the survey, did you

12   prepare a presentation of the survey results

13   to share with -- well, did you prepare survey

14   results to share?

15        A.    Yes.  Yes.

16            (McNamee Exhibit 11 marked for

17        identification.)

18   QUESTIONS BY MR. ELSNER:

19        Q.    Okay.  I want to show you --

20   pull up MR 4210, and we'll mark this as the

21   next exhibit.  This is Exhibit 11.

22                Mr. McNamee, was this the

23   pharmacists workload survey results

24   PowerPoint that you put together for the

25   pharmacists workload advisory committee on

1    October 14, 2021?

2         A.    Yes.

3         Q.    Okay.  And did you prepare this

4    in the regular course of your business?

5         A.    Yes.

6         Q.    Okay.  And did you ensure --

7    did you make every effort to ensure that what

8    you were reporting here was accurate and

9    complete?

10        A.    Yes.

11        Q.    You conclude that some

12   information on the survey demographics?

13              If we turn to page 3, "The

14   survey was sent in July of 2020 to all

15   pharmacists working in Ohio.  It was sent to

16   11,588 pharmacists with 4,159 pharmacists

17   completing the survey."

18              Is that true?

19        A.    Yes.

20        Q.    Okay.  And did that reveal a

21   completion rate of 26.41 percent?

22              MR. HYNES:  Objection.  Form.

23              THE WITNESS:  Yes.

24   QUESTIONS BY MR. ELSNER:

25        Q.    And did the board feel that

1    that completion rate was sufficient to

2    publish these results and to create a

3    workload pharmacy committee as a result?

4                MR. HYNES: Objection. Form.

5                THE WITNESS: Yes.

6    QUESTIONS BY MR. ELSNER:

7       Q.     Okay. Were you -- and about

8    54 percent of the pharmacists you indicate

9    here working in large chain pharmacies,

10   standalone or large chain pharmacy grocers

11   responded to the survey.

12               Is that right?

13      A.     Yes.

14      Q.     Okay. And so when we're

15   talking about different practice locations,

16   would you agree that CVS would fall under the

17   standalone setting?

18      A.     Yes.

19      Q.     Okay. And Walgreens would also

20   be a standalone setting.

21      A.     Yes.

22      Q.     And Kroger would be a grocery

23   store -- grocery setting.

24               Is that true?

25      A.     Yes.

1          Q.      Okay.  And are Meijer and

2     Walmart, are they respondents in a grocery

3     store setting as well?

4          A.      Yes.

5          Q.      Or -- okay.

6                  Did the board have any concerns

7     about the reliability or adequacy of the

8     survey results?

9          A.      No.

10         Q.      And, in fact, the board felt

11    that the survey results were reliable enough

12    to share them with the governor of the state

13    of Ohio, true?

14                 MR. HYNES:  Objection.  Form.

15                 THE WITNESS:  Yes.  Yes.

16    QUESTIONS BY MR. ELSNER:

17         Q.      I'm about ready to go into a

18    new document.  Would you like me to press on,

19    or would you like to take a short break?

20         A.      I can go on.

21                 (McNamee Exhibit 12 marked for

22         identification.)

23    QUESTIONS BY MR. ELSNER:

24         Q.      Let's pull out MR 4209, which

25    we'll mark as Exhibit 12.

1                And, Mr. McNamee, do you

2    recognize Exhibit 12?

3        A.      Yes.

4        Q.      Okay.  And is this an e-mail

5    that you sent to the governor's office, the

6    subject being the workload survey and

7    proposed committee structure?

8        A.      Yeah.

9        Q.      Okay.  And was the purpose of

10   sharing this information with the governor's

11   office to seek permission for the creation of

12   the workload advisory committee?

13       A.      I think it was just to run any

14   concerns that we may have by them.  It's

15   not -- it wasn't necessarily asking for

16   permission, but just trying to identify if

17   they had any concerns about the board with

18   this -- with the way we wanted to proceed in

19   examining this issue.

20       Q.      And in revealing the results of

21   the survey to the governor's office, is it

22   true that you characterized those results as

23   striking?

24       A.      Possibly.  I don't recall.

25       Q.      If we go to page 7 -- 177 of

1    this document.  And we look under Issue in

2    the third paragraph here it says, "The data

3    revealed in this" -- sorry, just the third

4    paragraph there.

5                "The data revealed in this

6    survey is striking, appended to the document.

7    For example, almost half of the survey

8    respondents, 49 percent, indicated that they

9    did not have adequate time to complete their

10   job in a safe and effective manner.  The

11   survey also found that 57 percent of the

12   pharmacists reported they felt pressure by

13   their employer or supervisor to meet

14   standards or metrics that may interfere with

15   safe patient care."

16               Did I read that correctly?

17        A.    Yeah.

18        Q.    What did you mean here when you

19   used the word "striking" with respect to the

20   data responses to the workload survey?

21        A.    Essentially that there was --

22   you know, the data presented a considerable

23   issue, and so that's why it was -- it was

24   pretty striking to myself, as well as the

25   staff, when we reviewed it.

1        Q.     Okay.  And the -- you also

2   indicated to the governor's office the

3   regulatory rules with respect to pharmacy

4   practice that might be implicated and the

5   reason to support the creation of a

6   pharmacist workload advisory committee.

7              Is that true?

8              MR. HYNES:  Objection.  Form.

9              THE WITNESS:  Yes.

10  QUESTIONS BY MR. ELSNER:

11       Q.     Okay.  And let's look at

12  those -- are those rules that you thought may

13  be implicated contained at the top of this

14  document?

15       A.     Yes.

16       Q.     Okay.  And it reads there that,

17  "The State of Ohio Board of Pharmacy proposes

18  the creation of a pharmacist workload

19  advisory committee to ensure compliance with

20  the following Ohio laws and rules."

21              And then you -- and then you

22  cite two there.  The first, 4729.55, which

23  states, "Adequate safeguards are assured that

24  the applicant will carry on the business of a

25  terminal distributor of dangerous drugs in a

1    manner that allows the pharmacists and

2    pharmacy interns employed by the terminal

3    distributor to practice pharmacy in a safe

4    and effective manner."

5              Is that correct?

6       A.    Yes.

7       Q.    Okay.  And was there a concern

8    at the Ohio Board of Pharmacy based on the

9    results of the survey that there might be

10   pharmacies that were not in compliance

11   potentially with this code provision?

12             MR. HYNES:  Objection.  Form.

13             THE WITNESS:  Yes.

14   QUESTIONS BY MR. ELSNER:

15       Q.    And you also cite a second rule

16   here, that "the pharmacy appropriately" --

17   "shall be appropriately staffed to operate in

18   a safe and effective manner."

19             Was this also a concern at the

20   Ohio Board of Pharmacy, that there might be

21   pharmacies in Ohio, based on the results of

22   the pharmacists survey, that were not

23   operating in a safe and effective manner

24   based on inappropriate staffing levels?

25             MR. HYNES:  Objection.  Form.

```
 1              THE WITNESS:  Yes, based on the

 2      survey.

 3  QUESTIONS BY MR. ELSNER:

 4      Q.      Okay.  And based on the survey,

 5  and this obligation that the board holds to

 6  uphold these regulations, it was the

 7  recommendation of the board to create a

 8  workload advisory committee.

 9              Is that true?

10      A.      Yes.

11      Q.      Okay.  And you've looked at the

12  results of the Missouri survey.  You've

13  looked at the New York Times article.  You

14  looked at the Chicago Tribune article.  You

15  looked at survey results from the American

16  Pharmacists Association.

17              Were the results that you

18  received in Ohio consistent with the results

19  that you were reading about on a national

20  basis?

21              MR. HYNES:  Objection.  Form.

22              THE WITNESS:  Yes.

23  QUESTIONS BY MR. ELSNER:

24      Q.      Did the governor have any

25  objection to the creation of forming an
```

1    advisory committee?

2         A.    I can't speak for the governor,

3    but his staff didn't have any concerns.

4         Q.    Okay.  So the governor's office

5    didn't object to the creation of a pharmacist

6    workload advisory committee.

7              Is that true?

8         A.    No, they did not object.

9         Q.    Okay.  Did you receive any

10   feedback or response from the governor's

11   office in response to the survey results

12   which you provided to them?

13        A.    I don't believe so.  I think

14   they just said, "No, that's fine," and

15   just -- you know, they didn't have any

16   issues, I guess.

17        Q.    Okay.  Did any members of the

18   board have any objection to the creation of a

19   pharmacist workload committee?

20        A.    No, not that I recall.

21             (McNamee Exhibit 13 marked for

22        identification.)

23   QUESTIONS BY MR. ELSNER:

24        Q.    You -- we took a look at the

25   presentation that you showed during the

1    October 14, 2021, meeting.  If we can pull

2    out MR 4212.

3              Are these minutes of the

4    pharmacist workload advisory committee dated

5    October 14, 2021?

6         A.    Yes.

7         Q.    Okay.  And it lists here the

8    members of the workload advisory committee.

9              Is that true?

10        A.    Yes, those that were in

11   attendance.

12        Q.    Okay.  And do you participate

13   in committee meetings personally?

14        A.    Yes.

15        Q.    Okay.  And the members of the

16   advisory committee include a pharmacy manager

17   from Walmart.

18              Is that true?

19        A.    Yes.

20        Q.    And actually, two pharmacy --

21   and a pharmacy manager from Walgreens.

22              Is that right?

23        A.    Yes.

24        Q.    And a pharmacy tech from

25   Walmart.

```
 1          A.      Yes.

 2          Q.      And a vice president from

 3   Rite Aid.

 4          A.      Yes.

 5          Q.      Does it include John Long, the

 6   director of pharmacy regulatory affairs at

 7   CVS.

 8                  Is that right?

 9          A.      Yes.

10          Q.      And Ryan Davis, the health and

11   wellness leader from Kroger, true?

12          A.      Yes.

13          Q.      And so on the advisory

14   committee sit employees of some of the

15   defendants in this action, true?

16          A.      Yes.

17          Q.      Is it true that the National

18   Association of Chain Drug Stores made

19   recommendations to the board to fill three of

20   the seats on the advisory committee?

21                  MR. HYNES:  Objection.  Form.

22                  THE WITNESS:  Yes.

23   QUESTIONS BY MR. ELSNER:

24          Q.      And in response to that

25   request, they filled the seats with employees
```

1    of chain pharmacies, true?

2              MR. HYNES:  Objection.  Form.

3              THE WITNESS:  Yes.

4    QUESTIONS BY MR. ELSNER:

5         Q.    Okay.  And do you know which

6    ones?

7         A.    John Long, Bimal Dassani and I

8    believe Ryan Davis.

9         Q.    So Ryan Davis, who works at

10   Kroger; John Long who works at CVS.

11             And do you know who the third

12   person was?

13        A.    Bimal Dassani.

14        Q.    Bimal Dassani who works at Rite

15   Aid, true?

16        A.    Yes.

17        Q.    Okay.  Whose idea was it to ask

18   the National Association of Chain Drugstores

19   to select members of the advisory committee?

20        A.    It was the board's decision.

21        Q.    And are there members of the

22   Board of Pharmacy in Ohio that work for chain

23   drugstores in Ohio?

24        A.    Yes.

25        Q.    Which ones?

1        A.     Now or at the time that the

2   committee was created?

3        Q.     At the time of the committee

4   being formed.

5        A.     We had representation from the

6   chains.  We had representation from Meijer,

7   CVS and Walgreens.

8        Q.     And so it was those board

9   members who made the decision to ask the

10  National Association of Chain Drug Stores to

11  recommend members of this committee, true?

12             MR. HYNES:  Objection.  Form.

13             MR. HARRIS:  Object to form.

14             THE WITNESS:  They ultimately

15        blessed that idea; although we -- the

16        staff actually came up with that

17        recommendation.

18  QUESTIONS BY MR. ELSNER:

19        Q.     Okay.  So it was a staff

20  recommendation that the NACDS would recommend

21  members for the advisory committee.

22             Is that what --

23        A.     Yes, that the board ultimately

24  approved that staff recommendation.

25        Q.     And there's mention in the

1   minutes -- can we go back to MR 4210, if we

2   could, which is the presentation that you've

3   prepared?  It's Exhibit 11.

4           And is this a PowerPoint

5   presentation that you gave to the pharmacy

6   workload advisory survey -- sorry, let me

7   strike that.

8           Is this a presentation that you

9   gave to the pharmacist workload advisory

10  committee?

11      A.    Yes.

12      Q.    Okay.  If we could turn to --

13  well, let me ask you this.

14          One of the points you shared

15  with the committee was that the majority of

16  people in chain drugstores and grocery stores

17  did not feel safe voicing any workload

18  concerns with their employers.

19          Is that true?

20      A.    Yes, that's what the survey

21  revealed.

22      Q.    Okay.  And if we could turn to

23  page 10 of the PowerPoint deck.

24          And so the results of the

25  survey confirmed your fear that there might

1   be concerns about those responding to the

2   survey in retribution from their employers in

3   responding to the survey, correct?

4                 MR. HYNES:  Objection.  Form.

5                 MS. OCHMAN:  Objection.  Form.

6                 THE WITNESS:  Yes.

7   QUESTIONS BY MR. ELSNER:

8       Q.     And, in fact, this indicates

9   that for those in a large chain pharmacy

10  setting, 592 of the respondents strongly

11  disagreed that they felt safe voicing

12  workload concerns to their employer and 345

13  of those respondents disagreed.

14                True?

15      A.     Yes.

16      Q.     And similarly, for those

17  working in grocery stores, although at a much

18  lower level, 576 respondents either said that

19  they disagreed or strongly disagreed that

20  they felt safe voicing any workload concerns

21  to their employers.

22                Is that right?

23      A.     Yes.

24      Q.     If we turn --

25                MS. OCHMAN:  I'm sorry, court

1          reporter, did you catch the objection

2          by Mr. Hynes?

3                    MR. ELSNER:  I'm happy to have

4          his objection noted for the record.

5     QUESTIONS BY MR. ELSNER:

6          Q.     If we could turn to slide 34.

7                    Can you describe for me what

8     you're depicting here and why you put

9     together this component of the PowerPoint?

10         A.     Yes.  So this was an attempt to

11    break down some of the identified issues so

12    we can tackle them as a group.  So trying to

13    sort of separate them out into different

14    buckets to look at policies to address each

15    issue.

16                    So it was kind of a way to try

17    and organize the work of the committee at a

18    meeting.

19         Q.     And for each of these topics,

20    did you include a quote from the comments of

21    the survey so that those on the committee

22    would see some of the -- some of the comments

23    you're referring to as they relate to each

24    topic?

25                    MR. HYNES:  Objection.  Form.

1              THE WITNESS:  I believe I did.

2    QUESTIONS BY MR. ELSNER:

3         Q.    Okay.  And if we go to page 35,

4    bucket 1 is on scheduled breaks, and it

5    reads, "My largest concern is working a

6    13-hour shift as the only pharmacist that day

7    with no scheduled lunch breaks, and I often

8    feel guilty for sitting down for 15 minutes

9    to eat lunch and dinner throughout the day."

10             Did I read that correctly?

11        A.    Yes.

12        Q.    Okay.  Was there a reaction

13   from the board to the concern about scheduled

14   breaks as reflected in the responses of

15   pharmacists in the survey?

16             MR. HYNES:  Objection.  Form.

17             THE WITNESS:  There was no -- I

18        don't think there was a -- I don't

19        recall a specific reaction or

20        statement that they made in relation

21        to breaks.  So I can't speak

22        specifically to that.

23   QUESTIONS BY MR. ELSNER:

24        Q.    Were you aware before the

25   survey results came back and was the board's

1   staff aware that pharmacists were being asked

2   to work 13-hour shifts with no lunch breaks

3   or any other kinds of breaks?

4        A.     I can't -- I don't recall, you

5   know, hearing a specific time frame.  I do

6   know that I've heard, you know, anecdotally

7   that breaks are hard to come by, particularly

8   for, like, bathroom breaks or even eating

9   lunch.

10       Q.     And would you agree that that

11  failure to offer people an adequate break

12  poses a potential risk to patient safety?

13            MR. HYNES:  Objection.  Form.

14            MS. OCHMAN:  Objection.

15            THE WITNESS:  Potentially,

16       yeah.

17  QUESTIONS BY MR. ELSNER:

18       Q.     Okay.  And was that a concern

19  of the board?

20            MR. HYNES:  Objection.  Form.

21            THE WITNESS:  Yeah, any time

22       something would negatively impact

23       patient care, that's the concern of

24       the board.

25

1    QUESTIONS BY MR. ELSNER:

2         Q.     There was also a frustration

3    expressed with the various non-dispensing

4    duties, if we go to the next slide.

5              What is meant by non-dispensing

6    duties?

7         A.     So these are responsibilities

8    likes vaccinations or even medication therapy

9    management, essentially anything that doesn't

10   involve the actual dispensing of a

11   prescription drug.

12        Q.     And is it fair to say that in

13   the comments, the pharmacists reflected on

14   frustration with having to engage in a large

15   number of duties and responsibilities in the

16   practice of pharmacy that extended beyond

17   patient-centered health care?

18              MR. HARRIS:  Objection.  Form.

19              THE WITNESS:  Can you -- can

20        you qualify patient-centered health

21        care?

22              Because vaccines and MTM would

23        be considered patient-centered.

24   QUESTIONS BY MR. ELSNER:

25        Q.     Well, let's start with the

1    comment here.

2              The first comment here is, "The

3    pharmacy has gone away from a patient-

4    centered true health care profession.  It's

5    now like any other business with a focus on

6    doing as much as possible with as little help

7    as possible.  The focus on metrics only makes

8    things worse, and then add in non-dispensing

9    roles like vaccines and MTMs with their

10   metrics, and it adds more undue stress to an

11   already stressful profession."

12             True?

13   A.      Yeah, that's the statement we

14   received.

15   Q.      Okay.  And that's a statement

16   that was taken from the responses to the

17   survey.

18             Is that right?

19   A.      Yes.

20   Q.      Okay.  You're aware, are you

21   not, that there are other non-dispensing

22   duties that pharmacists in large chain

23   grocery stores and large chain pharmacies are

24   expected to also undertake, such as filing

25   and answering phone calls and generating

1   business and all sorts of other metrics and

2   business activities that are measured by

3   these companies.

4              Are you aware of that?

5              MR. HYNES:  Objection.  Form.

6              THE WITNESS:  Yes.

7   QUESTIONS BY MR. ELSNER:

8       Q.    If we go to bucket 3, there's a

9   mention here of pharmacist and technician

10  staffing.

11             Was that also a concern of the

12  board?

13             MR. HYNES:  Objection.  Form.

14             THE WITNESS:  Yes.

15  QUESTIONS BY MR. ELSNER:

16      Q.    And if we go to the bottom

17  comment there, "Because of a lack of support

18  staff, I generally spend about 80 percent of

19  my day doing tasks technicians are allowed to

20  do on type of pharmacists tasks, answering

21  phone calls, data entry, filling and ringing

22  out customers.  It is an unsafe environment

23  when I have to type most prescriptions I

24  check with no other eyes on them."

25             Do you see that?

1      A.      Yes.

2      Q.      And is that a comment from the

3  survey?

4      A.      Yes.

5      Q.      Okay.  And did the board feel

6  that there was a danger when pharmacists were

7  working by themselves and having to perform

8  all of these various functions not to have a

9  second set of eyes on the filling of

10  prescriptions in the pharmacy?

11            MR. HYNES:  Objection.  Form.

12            THE WITNESS:  I think generally

13       the data showed that there were --

14       there was a lack of adequate staffing,

15       which does negatively impact the

16       ability of a pharmacist to complete

17       all of those tasks safely.

18  QUESTIONS BY MR. ELSNER:

19      Q.      And you also identified for the

20  committee the fourth bucket on the next page,

21  which is metrics, and we've discussed that

22  before.

23            If we go to the bottom, it

24  reads, "Company focus on metrics makes the

25  current practice of pharmacy unsafe and

1    results in high-risk errors."

2              Was there a reaction from the

3    members of the committee to the comments

4    related to the use of metrics in retail chain

5    pharmacies and retail grocery chain

6    pharmacies -- chain grocery stores?

7              MR. HYNES:  Objection.  Form.

8              THE WITNESS:  I can't recall

9         specific comments.

10   QUESTIONS BY MR. ELSNER:

11        Q.    Was there a concern among the

12   staff level that metrics, as they're

13   currently being used in the pharmacy setting,

14   may pose a risk to patient health and safety

15   and may result in a risk of errors at the

16   pharmacy?

17        A.    Yes.

18        Q.    The next bucket describes

19   prescription volume.

20              Can you explain to us what that

21   means?

22        A.    That would mean the number of

23   prescriptions the pharmacist dispenses in a

24   given day.

25        Q.    And if we look at the first

1    comment, second sentence, "The quantity of

2    prescriptions expected of each pharmacist per

3    day is unsafe and unrealistic and mistakes

4    are made due to the speed with which

5    pharmacists must perform tasks to stay at

6    goal and keep their job."

7            Did I read that correctly?

8    A.    Yes.

9    Q.    And is that a response to the

10   survey from a pharmacist in Ohio?

11   A.    Yes.

12   Q.    Okay.  Was there a reaction

13   to -- from the workload committee concerning

14   prescription volume?

15           MR. HYNES:  Objection.  Form.

16           MS. OCHMAN:  Objection to form.

17           THE WITNESS:  So we were --

18       obviously there was some -- there was

19       some discussion in the committee

20       regarding all of these issues, but in

21       terms of prescription volume, I do

22       recall specifically because of COVID

23       that there were increasing concerns

24       among the committee members about

25       their ability to handle the

1          prescription volume.

2     QUESTIONS BY MR. ELSNER:

3          Q.     Okay.  There was a discussion

4     at this meeting related to a variety of

5     topics, some of which you highlight here, and

6     also a discussion about conducting a second

7     survey.

8                Is that true?

9          A.     Yes.

10         Q.     And did the board -- did the

11    board, in fact, create and disseminate a

12    second pharmacist's survey in Ohio?

13         A.     Yes.

14         Q.     Okay.  And were you involved in

15    the follow-up survey?

16         A.     Yes.

17                MR. ELSNER:  And why don't we

18         go off the record a minute.

19                VIDEOGRAPHER:  The time right

20         now is 11:36 a.m.  We're off the

21         record.

22          (Off the record at 11:36 a.m.)

23                VIDEOGRAPHER:  The time right

24         now is 11:50 a.m.  We're back on the

25         record.

1  QUESTIONS BY MR. ELSNER:

2      Q.    Mr. McNamee, is it true that

3  the -- well, did the Ohio Board of Pharmacy

4  send out any other additional surveys related

5  to workload issues in the state of Ohio?

6      A.    Yes.

7      Q.    And when did it do that?

8      A.    November of 2021.

9      Q.    Okay.  November of 2021, is

10  that what you said?

11      A.    Yes.

12      Q.    Okay.  And was the process used

13  for sending out the November 2021 survey the

14  same as the process used with the 2020

15  survey?

16      A.    We used a different method --

17  we used a different program to collect it,

18  but generally, yeah, it followed the same

19  parameters as our first survey.

20      Q.    Was the survey e-mailed to all

21  pharmacists in Ohio?

22      A.    Yes.

23      Q.    Was the survey anonymous in

24  2021 like it was in 2020?

25      A.    Yes.

1      Q.    Was the survey sent by a secure

2  electronic link in 2021 as it was in 2020?

3           MR. HYNES:  Objection.  Form.

4           THE WITNESS:  Yeah, the link

5       was sent out to the -- to the

6       pharmacist.

7  QUESTIONS BY MR. ELSNER:

8      Q.    Okay.  Was there any feedback

9  you received or evidence you received that

10  the results to the 2021 survey where there

11  was fraud or misconduct with respect to the

12  survey responses?

13           Sorry, I didn't hear you.

14      A.    No.

15      Q.    Okay.  And were you personally

16  involved in reviewing the responses to the

17  2021 survey?

18      A.    Yes.

19           (McNamee Exhibit 14 marked for

20       identification.)

21  QUESTIONS BY MR. ELSNER:

22      Q.    Okay.  I'm going to mark as the

23  next exhibit MR 4201, which is Exhibit 12 --

24  sorry, Exhibit 14.

25           Do you recognize this document,

1    Exhibit 14, Mr. McNamee?

2          A.      Yeah.

3          Q.      What is it?

4          A.      It's the results of our 2021

5    pharmacist workload survey.

6          Q.      Okay.  And are these the

7    official results of the survey?

8          A.      Yes.

9          Q.      And are the results accurate

10   and complete?

11         A.      Yes.

12         Q.      Are they publicly available?

13         A.      Yes.

14         Q.      Are they also contained on the

15   Board of Pharmacy's website?

16         A.      Yes.

17         Q.      Is this an official report from

18   the State of Ohio Board of Pharmacy?

19         A.      Yes.

20         Q.      In compiling the responses to

21   the survey and the comments, were there any

22   changes made or anything deleted before it

23   was published in Exhibit 14?

24         A.      Not that I can recall, no.

25         Q.      Okay.  Were there any comments

1    that you just completely omitted or threw out

2    or chose not to include in the response to

3    the survey?

4         A.    No.

5         Q.    Was there -- did you make any

6    efforts -- strike that.

7              Okay.  If we can turn to

8    page 4 -- sorry, page 3 of the survey, my

9    apologies.

10             Is it true that -- well, let me

11   ask this.

12             Who were the largest group of

13   respondents to the 2021 survey?

14        A.    Those are the representatives

15   from the large chain grocery and the large

16   chain standalone.

17        Q.    And would you agree -- well,

18   were the results of the 2021 survey

19   consistent or inconsistent with the results

20   of the 2020 survey?

21             MR. HYNES:  Objection.  Form.

22             MS. OCHMAN:  Objection.

23             THE WITNESS:  They were

24        consistent in that they continue to

25        show that there was an issue with

1          working conditions.

2    QUESTIONS BY MR. ELSNER:

3          Q.     And were there instances in

4    which the results of the 2021 survey were

5    worse than the 2020 survey?

6                 MR. HYNES:  Objection.  Form.

7                 THE WITNESS:  Yes.

8    QUESTIONS BY MR. ELSNER:

9          Q.     Let's look at one of the

10   responses.  If we start with question 2, and

11   if we -- sorry.  Actually, go to the next

12   page, on page 6.  In response to this

13   question -- I'm sorry, let's go a little

14   further to page 7, I'm sorry.

15                In response to the question, "I

16   feel I have adequate time to complete my job

17   in a safe and effective manner," how did the

18   respondents from the large chain grocery

19   stores respond?

20         A.     So a majority strongly

21   disagreed or disagreed.

22         Q.     Okay.  And so does that mean

23   that the majority of pharmacists who worked

24   in large chain grocery stores or big box

25   stores felt that they did not have adequate

1    time to complete their job in a safe and

2    effective manner?

3                    MS. OCHMAN:  Objection to form.

4                    MR. SCHEETZ:  Objection to

5        form.

6                    THE WITNESS:  Yeah, that's

7        correct.

8    QUESTIONS BY MR. ELSNER:

9        Q.      And how were the results for

10   the large chain standalone pharmacists, how

11   did those -- how did they respond to

12   question 2, "I have adequate time to complete

13   my job in a safe and effective manner"?

14       A.      The responses -- the majority

15   of the respondents noted either strongly

16   disagree or disagree.

17       Q.      Okay.  Now, were the results

18   with respect to these practice sites

19   consistent with results from other practice

20   sites that responded to the survey?

21       A.      No.

22       Q.      In what way were they

23   different?

24       A.      There were certain -- there

25   seemed to be an inverse in many of the

1   questions, so where the large chain

2   respondents would strongly disagree or

3   disagree, the independents would sort of be

4   on the flip side, and the majority of the

5   respondents would either agree or be neutral.

6   So there seemed to be an inverse compared to

7   some of the other practice settings.

8         Q.     If we look at the next page on

9   page 8, if you look at the responses from the

10  independent, small chain pharmacies, how did

11  they respond to this question about whether

12  they felt they had adequate time to complete

13  their job in a safe and effective manner?

14        A.     They were much more positive

15  about their response -- about their need to

16  complete their job in a safe and effective

17  manner.

18        Q.     Has the board tried to

19  determine what the reason for that is?

20               Why those working in

21  independent and small chain pharmacies felt

22  that they had adequate time to complete their

23  jobs, most of them, versus those who worked

24  in large chain grocery stores and

25  independent -- and large chain pharmacies who

1    felt that they did not have adequate time?

2                    MS. OCHMAN:  Objection to form.

3                    MR. HYNES:  Objection.  Form.

4                    THE WITNESS:  Yeah, you know, I

5          think that's sort of the ongoing work

6          that we're doing.  You know, I think

7          that there's a combination of factors

8          that the survey shows where, for

9          example, metrics are probably used

10         much more -- are deployed in, you

11         know, the larger retail settings as

12         opposed to hospitals or the

13         independent, small chain.

14                 So there are -- there are

15         certainly a number of factors that

16         could have showed -- that were

17         contributing to this.

18    QUESTIONS BY MR. ELSNER:

19         Q.     So one of the factors you

20    mentioned was metrics.

21                 Are there other differences

22    between prescriptions filled at independent,

23    small chain pharmacies versus the larger

24    chain pharmacies and grocery stores that

25    would impact the feelings about adequate time

1   to conduct their job in a safe and effective

2   manner?

3                MR. HYNES:  Objection.  Form.

4                MS. OCHMAN:  Objection to form.

5                THE WITNESS:  I mean, if you

6        look at the survey data, you know, you

7        see that the -- at least in the

8        independent, small chain, they felt

9        like they had more staffing, better

10       ratios.  I think that there were

11       better lines of communication in terms

12       of -- because obviously there's not a

13       corporate structure in an independent

14       or a small chain, or if there is, it's

15       much smaller.

16            So I think the number of

17       factors that were sort of revealed by

18       the survey showed the issues in the

19       large chain setting.

20   QUESTIONS BY MR. ELSNER:

21       Q.    Was there an examination of the

22   volume of prescriptions filled in large chain

23   pharmacies and large chain grocery stores

24   compared to independent pharmacies, and did

25   that have any impact, in the board's view, in

1  response to the survey related to whether

2  people felt they had adequate time to

3  complete their job in a safe and effective

4  manner?

5          MR. HYNES:  Objection.  Form.

6          THE WITNESS:  So I think that

7      we could look at the reported -- the

8      reported numbers that they indicated

9      in the survey and try and make an

10     informed decision about that.

11         But I think what was more

12     telling to us was some of the -- more

13     of these statements in regards to, you

14     know, how they're feeling in their

15     own -- how they're feeling in their

16     own practice setting.  Because you can

17     have one pharmacist that is very good

18     at their job and super efficient; you

19     may have one that may take a little

20     bit more time.

21         So in terms of numbers, it's --

22     you know, we didn't look solely at

23     numbers, but that was -- that did play

24     into a fact -- that did play into sort

25     of our overall assessment of the

1          working conditions.

2     QUESTIONS BY MR. ELSNER:

3          Q.     There were some new questions

4     in the second survey that we didn't see in

5     the first survey.

6               Is that true?

7          A.     Yes.

8          Q.     Why was it decided to include

9     some of these new questions on the survey?

10         A.     In talking with the committee

11    and as well as internally, we felt like some

12    of the questions in regards -- that the APhA

13    asked in their well-being survey would lend

14    itself to our survey.  So we added those

15    questions in at the end or incorporated them

16    into the survey.

17         Q.     So if we go to question 11,

18    which is on page 53 of the survey.

19               The question here was, "Please

20    respond to each statement based on your

21    experience over the last six months."

22               What were the responses in

23    large chain standalone pharmacies to this

24    question with respect to medication errors?

25         A.     So, the majority or more than a

1    majority of the respondents agreed or

2    strongly agreed to the statement "I have seen

3    an increase in medication errors."

4           Q.      And what was the response among

5    large chain pharmacy respondents, how many

6    responded that they felt burnt out because of

7    their work?

8           A.      Almost -- basic -- almost all,

9    a majority, well over a majority, a super

10   majority, I would say, felt that way.

11          Q.      It looks to me like less than

12   50 people answered that they didn't feel that

13   way in response to the question of whether

14   they felt burned out because of their work.

15              Is that fair?

16              MR. HYNES:  Objection.  Form.

17              THE WITNESS:  Yeah, there's --

18          there's -- there's only I would say a

19          handful of folks.

20   QUESTIONS BY MR. ELSNER:

21          Q.      And if we go to the next -- you

22   know, if we go to the next group of questions

23   there with respect to question 12 --

24   actually, let's skip that.

25              Were there -- oh, sorry, hold

1    on one second.

2              Yeah, I'm sorry, if we go to

3    question 12, which is on page 60, is this

4    another new question that was added to the

5    survey in 2021 that was not there in 2020?

6         A.    Yes, that's correct.

7         Q.    Okay.  And this is large chain

8    grocery store respondents when asked to rate

9    the level of satisfaction with their primary

10   place of employment.

11             How did they respond with

12   respect to stress levels?

13             MR. HYNES:  Objection.  Form.

14             THE WITNESS:  I would -- a

15        majority of them were either highly

16        dissatisfied or dissatisfied with

17        their level of stress.  A significant

18        number of folks.

19   QUESTIONS BY MR. ELSNER:

20        Q.    And if we go to the following

21   page and look at large standalone chains, how

22   did those respondents respond when asked

23   about their level of stress?

24             MR. HYNES:  Objection.  Form.

25             THE WITNESS:  So very

1    similarly, you know.  There were only

2    about 43 people who were either

3    neutral or satisfied or highly

4    satisfied, and I think there were

5    either highly dissatisfied or

6    dissatisfied.

7  QUESTIONS BY MR. ELSNER:

8    Q.    And did the board seek to ask

9  what impacted the feelings of stress levels

10  at large chain grocery stores and large chain

11  pharmacies?

12    A.    I'm sorry, can you repeat that?

13    Q.    Yes.

14    Did the board in the survey

15  also dig further into this question related

16  to stress and try to have respondents answer

17  why they were feeling that level of stress?

18    MR. HYNES:  Objection.  Form.

19    THE WITNESS:  Yes.

20  QUESTIONS BY MR. ELSNER:

21    Q.    If we turn to page --

22  question 13 on page 68.

23    How did those who worked in

24  large grocery stores respond to the amount of

25  stress at their job related to the amount of

1   volume of work that they have to do?

2           MR. HYNES:  Objection.  Form.

3           THE WITNESS:  55 percent said

4       it was a tremendous amount of stress

5       for them.

6   QUESTIONS BY MR. ELSNER:

7       Q.    And how many thought there was

8   a good deal of stress in that?

9       A.    Another 36 percent.

10      Q.    And how did respondents in

11  large chain grocery stores respond with

12  respect to whether they were short-staffed?

13      A.    Well over 68 percent said it

14  caused them a tremendous amount of stress and

15  another 22 percent said it caused them a good

16  deal of stress.

17      Q.    And if we look at the responses

18  from the large chain pharmacies on the

19  following page, were those results

20  inconsistent or consistent with the results

21  of the grocery store respondents?

22          MR. HYNES:  Objection.  Form.

23          THE WITNESS:  They appeared to

24      be quite similar in that the majority

25      of the respondents either said it

1          caused them a good deal of stress or a

2          tremendous amount of stress.

3     QUESTIONS BY MR. ELSNER:

4          Q.     Okay.  And is that true for

5     both the volume of work that they had to do

6     and being short-staffed?

7          A.     Yes.

8          Q.     Did the board in the 2021

9     survey offer opportunities for respondents to

10    offer comments?

11         A.     Yes.

12         Q.     Okay.  And were there a large

13    number of respondents who provided comments

14    to the 2021 survey?

15         A.     Yes.

16         Q.     Okay.  And did those comments

17    generally -- were they generally consistent

18    with the numerical scores that you calculated

19    in response to questions from the 2021

20    survey?

21              MR. HYNES:  Objection.  Form.

22              THE WITNESS:  Yes.

23    QUESTIONS BY MR. ELSNER:

24         Q.     I want to just pull up a couple

25    of those.  If we look at comment 6, which is

1    on page 95, it reads, "Begging for help.  We

2    are understaffed and overwhelmed.  We need

3    two pharmacists working to manage safely.  My

4    stress is unbearable and it is affecting

5    every aspect of my life.  I have been begging

6    for a lunch break for years.  I work 14 hours

7    a day without eating, and the job is

8    affecting my physical health, multiple kidney

9    stones, constant headaches.  Changes need to

10   occur in our profession so we can perform our

11   job in a safe manner and have an opportunity

12   to actually care for our patients."

13           Is this one of the comments

14   that was provided in response to the 2021

15   survey?

16       A.    Yes, it was.

17       Q.    Okay.  And was the board

18   concerned in response to the '21 -- 2021

19   comments related to staff pressures and being

20   understaffed, was that a concern of the

21   board?

22           MR. HYNES:  Objection.  Form.

23           THE WITNESS:  Yeah, I think

24       any -- I think any time, again, that

25       there's a concern that working

```
 1          conditions are impacting patient

 2          safety, the board is going to have a

 3          concern.

 4     QUESTIONS BY MR. ELSNER:

 5          Q.     And were these concerns also

 6     identified by respondents who worked for some

 7     of the defendant pharmacies in this case?

 8          A.     I -- if they're indicated in

 9     the comments, then, yes.

10          Q.     Why don't we --

11          A.     I believe some of them were

12     mentioned, but I can't tell you specifically.

13          Q.     Well, that's fair.

14               There are nearly a thousand

15     comments to this survey in 2021, true?

16          A.     There are -- yes, there's a

17     number of -- there's a large amount of

18     comments that we did receive.

19          Q.     If we look at comment 156 on

20     page 112, the very bottom there, "I've worked

21     at big box chains, Walmart, Rite Aid and CVS,

22     and workload, stress and treatment is

23     horrible.  They are poorly managed, require

24     too much for one pharmacist to handle and

25     only care about metrics.  They are
```

1    inadequately staffed, which greatly affects

2    patient care.  The board should be conducting

3    visits with these places and observe how

4    awful it really is."

5              Did I read that correctly?

6       A.    Yes.

7       Q.    And there's mention here of the

8    board, and there are other criticisms within

9    some of the comments about the board's

10   failure to take action that some pharmacists

11   felt the board should take to protect patient

12   safety, true?

13             MR. HYNES:  Objection.  Form.

14             THE WITNESS:  Yes.

15   QUESTIONS BY MR. ELSNER:

16      Q.    Okay.  And did you review some

17   of those comments?

18      A.    Yes.

19      Q.    And did you share those

20   comments with others working at the Ohio

21   Board of Pharmacy?

22      A.    I didn't share the specific

23   comments related to criticisms of the board,

24   but the survey comments were disseminated to

25   board staff and available for them to review.

1      Q.     Did anyone on the board

2  acknowledge that there were criticisms within

3  the survey of the board's failure to take

4  action to protect patient safety?

5              MR. HYNES:  Objection.  Form.

6              THE WITNESS:  I don't recall

7        having a conversation where that came

8        up.

9  QUESTIONS BY MR. ELSNER:

10     Q.     If we could look at comment 28.

11  It's on page 98.  It's the third from the

12  bottom.

13             It reads, "Not sure why the

14  state board is asking us to complete this

15  survey.  They've shown zero care about the

16  amount of workload being dumped on us by

17  upper management.  COVID has been the last

18  straw.  Not only do we have to deals with the

19  normal thousand" -- sorry, "thousand

20  prescription volume, but now we are made to

21  do 40 to 50 COVID vaccinations a day, 20 to

22  30 COVID tests a day.  Now it is flu season,

23  so add an additional 30 flu shots a day, all

24  while our tech hours are slashed on a monthly

25  basis.  Absolutely unacceptable.  State board

1   is fully aware of what is going on in the big

2   chains, Walgreens, CVS, Rite Aid, for years

3   but have done absolutely nothing to remedy

4   these problems.  The board continues to take

5   the side of big companies.  I am looking for

6   another job after 21 years as a pharmacist.

7   Shameful."

8                Were you aware -- is this one

9   of the comments that were made in response to

10  the 2021 survey?

11       A.     Yes.

12       Q.     The comment there at the

13  beginning, "Not sure why they're asking us to

14  complete this survey," had there been any

15  action taken by the Ohio Board of Pharmacy

16  after receiving the results of the 2020

17  survey and before seeking responses from

18  pharmacists in 2021 with respect to workplace

19  or workload activities in pharmacies?

20       A.     So they -- the response was us

21  forming this study committee to develop

22  policies and rules that we could enforce to

23  address some of the concerns that were raised

24  in the survey data.

25       Q.     And I appreciate that the board

1    created a committee, but had that committee

2    made any recommendations or policy changes

3    with respect to regulations of the practice

4    of pharmacy in Ohio between 2020 and 2021?

5         A.    No.  So the committee was

6    appointed in July of 2021, and our first

7    meeting was in October of 2021.

8         Q.    Okay.  And the pharmacist

9    workload committee, did they create a list of

10   policy issues and questions that they wanted

11   to examine?

12        A.    Yes.

13             MR. HYNES:  Objection.  Form.

14             THE WITNESS:  Yes, we did a

15        brainstorming session for potential

16        policy solutions based off of the

17        results of the survey data.

18             (McNamee Exhibit 15 marked for

19        identification.)

20   QUESTIONS BY MR. ELSNER:

21        Q.    Okay.  I want to pull out

22   MR 4217, and we'll mark this as the next

23   exhibit, which should be Exhibit 15.

24             Are these the draft policy

25   recommendations that were created by the

1    pharmacist workload advisory committee?

2         A.    Yes.

3         Q.    And were you involved in

4    creating this document, Mr. McNamee?

5         A.    Yes.

6         Q.    Okay.  And is it accurate and

7    complete to the best of your knowledge?

8         A.    Yes.

9         Q.    Okay.  Can you explain to us

10   what this document is?

11        A.    So what the committee did was

12   looking at the survey data and then conducted

13   a brainstorming exercise that included --

14   also included some policies from other --

15   that other states had been looking at or had

16   enacted.

17             So what we did is we put

18   together sort of a menu of options for the

19   board to consider, and then we distilled the

20   committee's comments down based on the

21   discussions we had over several meetings in

22   2021 and 2022, and then we also made sure to

23   put this out to the pharmacists to assess

24   their feedback on how this would improve

25   their working conditions, as well as included

1  feedback from some of our major stakeholders

2  that we normally work with, including the

3  National Association of Chain Drug Stores,

4  Ohio Association of Retail Merchants and Ohio

5  Pharmacists Association.

6      Q.    And the National Association of

7  Chain Drug Stores, those members include

8  groups, at least, of large chain drugstores

9  like Walgreens.

10          Is that fair?

11     A.    Yes.

12     Q.    Okay.  And the Ohio Retail

13  Merchants, who would be included in that

14  group of stakeholders?

15     A.    They basically -- they're the

16  state arm of NACDS in the state of Ohio.  So

17  they represent the same individuals.  They're

18  basically one and the same.

19     Q.    Okay.  And so I see here that

20  this document has ranks next to it.

21          What's the significance of

22  that?

23     A.    So a part of the committee

24  exercise, because we had such different -- or

25  various practice settings represented, it was

1    probably going to be difficult to sort of

2    come to some formalized consensus.

3              So what we did is we asked the

4    committee to also rank their -- the options

5    based on how they felt it would impact

6    pharmacists' working conditions.

7        Q.    Okay.  And does rank 1 mean

8    that it has a highest rank or the lowest?

9        A.    1 would be the highest rank

10   that the committee gave a recommendation.

11       Q.    Okay.  I want to look at some

12   of the responses here.  So if I just

13   understand the chart, the first column is

14   rank, and then the title, the type of change,

15   a description of what the change would be.

16       A.    Uh-huh.

17       Q.    And then some committee

18   comments.

19              Is that true?

20       A.    Yes.

21       Q.    Okay.  And then the pharmacists

22   survey, these are what pharmacists feel about

23   the provision.

24              Is that right?

25       A.    Yeah, we deployed this survey

1    in June to provide feedback on the draft

2    policy options.

3         Q.     Okay.

4         A.     And these are the results.

5         Q.     So this is a third survey that

6    was submitted to all pharmacists in Ohio.

7                Is that right?

8         A.     Yes.

9         Q.     Okay.  And did you follow the

10   same policies and procedures and protocol

11   with respect to the third survey as the first

12   two we've examined today?

13        A.     Yes.

14               MR. HARRIS:  Object to form.

15   QUESTIONS BY MR. ELSNER:

16        Q.     Were the responses anonymous?

17        A.     Yes.

18        Q.     And were they secure?

19        A.     Yes.

20        Q.     Was there any indication of

21   fraud or misconduct with responses to the

22   third survey?

23        A.     No.

24        Q.     Okay.  Can you explain to me

25   what the NACDS retail merchants column

1    reflects?

2         A.      So when we did the pharmacist

3    survey to assist the draft policy options

4    that the committee developed, we also then

5    sent out e-mails to the contacts at NACDS and

6    retail merchants and asked them to provide

7    feedback from their membership.  Similarly we

8    did with OPA as well as the American Society

9    of -- or the American Society of

10   Health-System Pharmacists, the Ohio chapter,

11   as well.

12        Q.      Okay.  Thank you.

13               I want to look at the responses

14   to some of the policy suggestions.

15               The second ranked policy

16   suggestion on page 4 is mandatory breaks and

17   rest periods.

18               Was that one of the policy

19   changes that was proposed?

20        A.      Yeah, that was one of the

21   policies that was discussed in the committee.

22        Q.      Okay.  And the pharmacists that

23   responded to the survey, were they supportive

24   of mandatory breaks and rest periods or not?

25        A.      Yes.

1      Q.     Okay.  And isn't it -- is it --

2  how did the NACDS and Ohio Retail Merchants,

3  the Ohio version of the NACDS, respond to

4  mandatory breaks and rest periods?

5      A.     They stated their opposition to

6  it.

7      Q.     Let me look at Item 10, which

8  is on page 12, which is managing touch points

9  and ancillary staffing.

10             Can you explain to us what this

11  policy is?

12      A.     Yes, so a lot of our

13  discussion -- or some of the discussion on

14  the committee centered around the fact that

15  pharmacies are very open and so you have

16  multiple touch points.  And so if you don't

17  have staff at every touch point, you're

18  jumping from, you know, touch point to touch

19  point.  So you've got drive-through, you've

20  got one cashier, you've got, you know,

21  another cashier on the other side of the

22  counter -- or on the opposite side.

23             And so the thought process was

24  is to -- the discussion centered around

25  giving some more autonomy to be able to shut

1   down certain touch points if staffing became

2   an issue where they couldn't be managed

3   properly to avoid distractions in the

4   pharmacy.

5        Q.     And who was it that you were

6   proposing to have more autonomy with respect

7   to those touch points?

8        A.     The pharmacists that are

9   working at the pharmacy.

10       Q.     Okay.  And were pharmacy staff

11   respondents in favor or not in favor of this

12   proposal?

13       A.     They were in favor.

14       Q.     Okay.  And did the NACDS and

15   its Ohio branch, were they in favor, did they

16   support it or did they not support it?

17            MR. HYNES:  Objection.  Form.

18            THE WITNESS:  No, they opposed

19       it.

20   QUESTIONS BY MR. ELSNER:

21       Q.     Let's look next at Item 11,

22   which is on the bottom of page 13, working

23   conditions and security.

24            And can you explain to me what

25   this policy provision is?

1          A.      Yes, so this one centered

2     around --

3          Q.      Go to the top of the next page,

4     too, that would be helpful, I think.

5          A.      Yes, this provision was based

6     off of a California provision called No

7     Pharmacist Left Behind, which requires any

8     open door pharmacy to be staffed by at least

9     one pharmacy and one technician, so kind of

10     creating a minimum staffing level, and so

11     that was what we had discussed in the

12     committee.

13          Q.      And were pharmacists in Ohio

14     that responded to the survey in favor of this

15     provision or not in favor of the provision?

16          A.      They were in favor.

17          Q.      And was the NACDS and its Ohio

18     branch in favor of the provision or were they

19     opposed?

20               MR. HYNES:  Objection.  Form.

21               THE WITNESS:  They were

22          opposed.

23     QUESTIONS BY MR. ELSNER:

24          Q.      So I believe you testified that

25     there was a provision like this in California

1    that was in effect and it's reflected in the

2    document.

3                Is that true?

4        A.     Yes, that's correct.

5        Q.     Okay.  So pharmacies -- large

6    chain pharmacies that were operating in

7    California were already operating under this

8    provision in California.

9                Is that fair?

10               MR. HYNES:  Objection.  Form.

11               THE WITNESS:  Yeah.  That's my

12        understanding, yes.

13   QUESTIONS BY MR. ELSNER:

14       Q.     Okay.  So even though it had

15   been in place in California and operational

16   there, and some of the pharmacies who have a

17   presence in California would be in compliance

18   with that, presumably, it was still being

19   opposed by the NACDS.

20               Is that true?

21               MR. HYNES:  Objection.  Form.

22               THE WITNESS:  Yes.

23   QUESTIONS BY MR. ELSNER:

24       Q.     Let's look at Item 13, the

25   report of understaffing.

1                    Can you describe for us what

2       this policy recommendation was?

3            A.     Yes.  So this recommendation

4       basically had to do with -- I'm sorry, it's

5       moving around on the screen here.

6                    This essentially had to do with

7       the ability to document and report staffing

8       situations.  So Oklahoma has the requirement

9       where there is a requirement to document

10      issues related to staffing and have that

11      available for board inspection.

12           Q.     Were you familiar with the

13      Oklahoma rule?

14                   Have you read that,

15      Mr. McNamee?

16           A.     Yeah, and I believe it's

17      included in the -- in the document as well.

18           Q.     Okay.  Were you aware of

19      whether that rule came as a result of any

20      conduct of a particular pharmacy that's a

21      defendant in this case?

22                   MR. HYNES:  Objection.  Form.

23                   THE WITNESS:  No.  I'm not

24           aware, no.

25

1    QUESTIONS BY MR. ELSNER:

2        Q.    Okay.  Did pharmacists that

3    responded to the third survey, were they in

4    favor of this policy provision or were they

5    opposed to it?

6        A.    A majority were in favor of it.

7        Q.    And how did the NACDS and its

8    Ohio chapter respond?  Were they in favor or

9    were they opposed to the provision?

10       A.    They were opposed.

11       Q.    Let's go to Item 14, limits on

12   working -- on hours worked.

13             Can you explain this policy

14   provision to us?

15       A.    Essentially this would put a

16   cap on the amount of time -- the shift a

17   pharmacist could work in pharmacy in a

18   24-hour period.

19       Q.    And did pharmacists in Ohio

20   that responded to the third survey support

21   this provision or were they opposed to it?

22       A.    They were in support of it.

23       Q.    And did the NACDS and its Ohio

24   branch oppose it or were they in support of

25   it?

```
 1                    MR. HYNES:  Objection.  Form.

 2                    THE WITNESS:  They opposed it.

 3    QUESTIONS BY MR. ELSNER:

 4         Q.      Let's turn to 15, which is on

 5    the next page at the bottom, mandatory dark

 6    hours.

 7                    What is that policy proposal?

 8         A.      So dark hours are essentially

 9    or would be if you had an open door pharmacy,

10    they would be -- while they're open, the

11    pharmacy itself could be open, but -- the

12    actual building itself could be open, but the

13    pharmacy department would be closed, but

14    there would still be staff there processing

15    prescriptions.

16                    So it's an effort to basically

17    remove any outside distractions and allow

18    pharmacists to catch up or make sure that

19    they've gotten all of their prescriptions

20    filled so they can, you know, better serve

21    their patients.

22         Q.      Did pharmacists think that this

23    would be helpful to the pharmacy practice or

24    were they opposed to it?

25         A.      They felt --
```

1                    MS. OCHMAN:  Objection.

2    QUESTIONS BY MR. ELSNER:

3        Q.      Could you repeat your answer,

4    sir?

5        A.      They said it would be helpful.

6        Q.      Okay.  And did the NACDS and

7    its Ohio chapter support this proposal or did

8    they oppose it?

9                    MR. HYNES:  Objection.  Form.

10                   THE WITNESS:  No, they opposed

11       it.

12   QUESTIONS BY MR. ELSNER:

13       Q.      If we turn to 16, metrics, we

14   had a discussion about metrics earlier.

15                   What was this policy proposal?

16       A.      So this would be based off of a

17   California law that essentially eliminated

18   the use of performance metrics in the

19   practice of pharmacy in the outpatient

20   setting.

21       Q.      And how did pharmacists respond

22   to this policy proposal?

23                   Were they in favor of the

24   proposal or were they against it?

25       A.      They were in favor of it.

1          Q.     And was it close or was it a

2    pretty large margin against it -- I mean, in

3    favor of it?

4          A.     This was the highest rated

5    policy option from the pharmacists survey.

6          Q.     And did the NACDS and its Ohio

7    chapter support it or did they oppose it?

8                 MR. HYNES:  Objection.  Form.

9                 THE WITNESS:  They opposed it.

10   QUESTIONS BY MR. ELSNER:

11         Q.     Now, in October of this year,

12   the Ohio Board of Pharmacy proposed a rule to

13   prohibit the use of quotas in the operation

14   of a pharmacy.

15                Is that true?

16         A.     Yes.

17         Q.     Sorry?

18         A.     Yes.

19                (McNamee Exhibit 16 marked for

20         identification.)

21   QUESTIONS BY MR. ELSNER:

22         Q.     Okay.  Can we pull MR 4255 and

23   mark that as the next exhibit?

24                Oh, sorry, this is not the

25   right document.  If we could go to 4255,

1    Exhibit 16.

2              Do you recognize this document,

3    Mr. McNamee?

4         A.    Yes.

5         Q.    And what is it?

6         A.    This is our notice for

7    stakeholder feedback on our rule to prohibit

8    the use of quotas.

9         Q.    You kind of got garbled at the

10   end.

11             Can you repeat your answer?

12        A.    Yes, this is our notice to our

13   stakeholders letting them know that they can

14   provide feedback on our proposed quota rule.

15        Q.    Okay.  And if we go to the next

16   page, is this the proposed quota rule that

17   the board was considering?

18        A.    Yes.

19        Q.    And was this proposed rule

20   agreed upon by all members of the board's

21   pharmacists workload advisory committee?

22        A.    No.  So this -- the actual rule

23   itself was drafted -- so the committee ended

24   its work in June of 2020 after we put

25   together that menu of options, and then we

1   put forth this rule based on the overwhelming

2   response from the pharmacists survey about

3   the policy options.

4          Q.     Okay.  And was this proposed

5   rule approved by the Ohio Board of Pharmacy?

6          A.     This rule was authorized to

7   move forward with the initial stakeholder

8   feedback process, which is the first step in

9   our rulemaking process.

10         Q.     Okay.  So it has yet to be

11  voted on by the Board of Pharmacy.  At this

12  stage, they approved it to be sent out for

13  comment.

14                Is that true?

15         A.     Yes.

16         Q.     Okay.  And can you describe for

17  us what the rule provides -- the proposed

18  rule provides?

19         A.     Yeah, so essentially this rule

20  was drafted to -- based off of the California

21  law, and essentially what it does is it

22  prohibits the uses of quotas, and quotas are

23  defined as a fixed number or formula related

24  to the duties of the pharmacy personnel

25  against which the pharmacy or its agent

1   measures or evaluates the number of times

2   either an individual performs tasks or

3   provides services while on duty.

4              And it includes sort of fixed

5   requirements related to prescriptions filled,

6   services rendered, which could be

7   vaccinations, programs offered, and then any

8   revenue obtained.  And so essentially it

9   prohibits the use of those quotas.

10             There are some exceptions,

11  obviously, you're looking at competence or

12  performance or any metric that is required by

13  state or federal law is still permitted.

14       Q.    Has the board issued any other

15  proposed rules in response to the pharmacists

16  workload surveys or the work of the

17  pharmacists workload advisory committee?

18       A.    Yes, we did issue a proposed

19  rule to allow pharmacy technicians to

20  administer vaccinations.

21       Q.    Okay.  Has it issued any other

22  proposed rules other than this proposed rule

23  before us in this exhibit and the rule to

24  permit technicians to administer vaccines?

25       A.    It hasn't, but we are -- in

1    subsequent meetings it is expected that we

2    will be issuing additional proposed rules.

3        Q.      Okay.  Were there any of the

4    proposed policies that we walked through in

5    the prior exhibit that the board has rejected

6    as moving forward with any kind of proposed

7    rule at this stage?

8        A.      No, not as of yet.  We

9    attempted to -- the technician vaccine

10   administration rule was the one that was most

11   highly ranked from the committee, which is

12   why we started with that one, and then the

13   metrics issue was most highly ranked by the

14   pharmacists in the survey, so that's why we

15   moved to that one.  And we're going to sort

16   of systematically move through and decide

17   whether to move on any of the other policy

18   options at future meetings.

19              (McNamee Exhibit 17 marked for

20       identification.)

21   QUESTIONS BY MR. ELSNER:

22       Q.      Okay.  I want to turn now to

23   MR 4218, and we'll mark this as the next

24   exhibit, which is Exhibit 17.  It looks like

25   this version of the exhibit doesn't have the

1    cover page.

2              But, Mr. McNamee, why don't I

3    just ask you, do you recognize what this

4    document is?

5        A.      Yeah, this is the notes -- this

6    is the draft notes from Jenni Wai's

7    presentation to a District 4 National

8    Association of Board of Pharmacy meeting

9    regarding our workload survey and our

10   advisory committee.

11       Q.      Okay.  And so the board felt

12   that the results of the survey were accurate

13   enough to share with the National Association

14   of the Board of Pharmacy.

15              Is that true?

16              MR. HYNES:  Objection.  Form.

17              THE WITNESS:  Yes, we were

18       getting questions about our surveys

19       from other states that were looking to

20       implement some of our surveys.

21   QUESTIONS BY MR. ELSNER:

22       Q.      And attached to this was the

23   actual PowerPoint survey.

24              Did you review the comments and

25   notes and the PowerPoint survey and provide

1    edits and suggestions?

2         A.    Yes.

3         Q.    Okay.  And is this an accurate

4    and complete -- and we'll get you the full

5    document to look at -- but is this an

6    accurate and complete version of the notes

7    and the PowerPoint presentation that you

8    reviewed?

9         A.    Yes.

10        Q.    And was this presentation given

11   to the National Association of the Board of

12   Pharmacy?

13        A.    Yes, at their District 4

14   meeting.

15        Q.    Okay.  I want to ask you about

16   one particular comment, and let me just go

17   through this point since we have it now.

18             This is the e-mail that you

19   sent attaching your comments and edits to the

20   talking points and the PowerPoint deck.

21             Is that right?

22        A.    Yes.

23        Q.    Okay.  And is it accurate and

24   complete?

25        A.    Yes.

1          Q.     Okay.  I want to go now to the

2   second page here.

3                 Talking about the comments with

4   respect to slide 3, and it says that "the

5   State of Ohio Board of Pharmacy had, for some

6   time, tried to stay out of employer and

7   employee relationship" -- and I think there's

8   a typo there, which I'm not sure what it

9   means -- "it's organization position to

10  address issues of employment conditions and

11  personnel issues.  However, in the last

12  three" -- oh, I'm sorry, let me start that

13  whole thing over.

14                Let me ask you about that

15  particular comment with respect to slide 3 in

16  the fourth paragraph.

17                It reads, "The State of Ohio

18  Board of Pharmacy had, for some time, tried

19  to stay out of employer and employee

20  relationship."

21                What does that mean?

22                MR. HYNES:  Objection.  Form.

23                THE WITNESS:  Yeah, I think, in

24      general, you know, there are -- there

25      are instances where it's -- it really

1          is a matter of, you know, between the

2          employee and the employer where it

3          doesn't bleed over into -- {audio

4          interruption} -- but so we're, I

5          think -- I think what Jenni was trying

6          to express was it becomes our -- it

7          becomes our issue when it does impact

8          patient safety and what she

9          highlighted in that piece in there.

10    QUESTIONS BY MR. ELSNER:

11          Q.     Okay.  And so is it generally

12    the view that the responsibility for

13    compliance with these regulations, a safe

14    work environment, proper staffing, is the

15    responsibility of the registrant, the

16    pharmacy?

17               MR. HYNES:  Objection.  Form.

18               MS. OCHMAN:  Objection.  Form.

19               THE WITNESS:  Yeah, under

20          4729.55, yes.

21    QUESTIONS BY MR. ELSNER:

22          Q.     So under the Ohio regulations,

23    and they're cited just below that in slide 4,

24    under those regulations, it is the pharmacy

25    that's responsible for complying with these

1    regulations.

2              Is that fair?

3              MR. HYNES:  Objection.  Form.

4              THE WITNESS:  Yeah, that's a

5        condition of their licensure.

6    QUESTIONS BY MR. ELSNER:

7        Q.    Okay.  And the Ohio Board of

8    Pharmacy doesn't dictate to CVS or Walgreens

9    or Meijer or Kroger how they're to comply

10   with these regulations.

11             Is that true?

12             MR. HYNES:  Objection.  Form.

13             THE WITNESS:  Yes, generally

14       they've -- it's not been the case

15       where we provide, you know, specific

16       specificity in terms of how to run

17       your business, so, yeah, that's --

18       that generally has been our stance.

19   QUESTIONS BY MR. ELSNER:

20       Q.    Okay.  And so up to this point

21   in time, going back to your comments on

22   slide 3, the board had stayed out of the

23   employee/employer relationship.

24             Is that true?

25             MR. HYNES:  Objection.  Form.

1              THE WITNESS:  Yes.

2    QUESTIONS BY MR. ELSNER:

3         Q.     And if we look at the comments

4    to slide 3 again, if we could.

5         A.     And can I clarify that?  We

6    stay out of the employee/employer

7    relationship until it becomes an issue of

8    public safety.  So obviously, if we suspend

9    somebody, suspend their license, we are

10   getting involved in the employee/employer

11   relationship.

12             So it's not -- I just wanted to

13   make it clear, that it's -- there are --

14   there is some -- we are involved in the

15   employee/employer relationship just as a

16   matter of regulators when it comes to people

17   violating the law.

18        Q.     Okay.  And but in this

19   instance, based on the results of the

20   workload survey, did the board feel that it

21   was obligated to step in in some way to

22   examine this issue based on its potential

23   impact on public safety?

24             MR. HYNES:  Objection.  Form.

25             THE WITNESS:  Yes.

```
 1    QUESTIONS BY MR. ELSNER:

 2        Q.     And is it -- and in response to

 3    those regulatory obligations and the board's

 4    duties, was it based on that authority --

 5    well, let me strike that.

 6               What is the authority that

 7    was -- that is the basis for the board to

 8    propose its rulemaking with respect to

 9    quotas?

10               MR. HYNES:  Objection.  Form.

11               THE WITNESS:  That would be

12        under 4729.55.

13    QUESTIONS BY MR. ELSNER:

14        Q.     Okay.  And if we could go down

15    to look at 40 -- the comments on slide 4.

16               And what is that responsibility

17    under 4729.55?

18               MR. HYNES:  Objection.  Form.

19               THE WITNESS:  So the provision

20        of the statute requires the terminal

21        distributor to have adequate

22        safeguards to allow the pharmacist and

23        pharmacy interns employed by that

24        pharmacy to practice in a safe and

25        effective manner.
```

1    QUESTIONS BY MR. ELSNER:

2         Q.    And is this the basis for other

3    proposed rules that you're considering at the

4    Ohio Board of Pharmacy with respect to the

5    regulation of pharmacy practice in Ohio?

6              MR. HYNES:  Objection.  Form.

7              THE WITNESS:  Yes, we would --

8         we would use -- you would use 4729.55

9         as the supporting statute for any

10        rules that we would promulgate on this

11        issue.

12             (McNamee Exhibit 18 marked for

13        identification.)

14   QUESTIONS BY MR. ELSNER:

15        Q.    I want to -- I want to, at this

16   point, Mr. McNamee, to just look at a few

17   documents that we referenced in the notice.

18             If we could pull out 4251 and

19   mark 4251, and we'll mark this as Exhibit 18.

20             Before I get there, though,

21   what is the -- what is the view of the Ohio

22   Board of Pharmacy staff today and the goals

23   of the staff on a going-forward basis with

24   respect to pharmacists workload issues?

25             MR. HYNES:  Objection.  Form.

1              MS. OCHMAN:  Objection to form.

2              THE WITNESS:  Yeah, so I think

3         the goal is to try and right size this

4         issue.  So we want to see our

5         policies -- any policies that we

6         implement have a noticeable impact on

7         survey responses, first and foremost,

8         and, you know, looking at other

9         metrics regarding patient safety.

10             So, you know, in the scenario

11        we want to -- we want to try and, you

12        know, restore some balance to the

13        working conditions of our licensees.

14   QUESTIONS BY MR. ELSNER:

15        Q.    Thank you.

16             MR. ELSNER:  Could we go off

17        the record a second?

18             VIDEOGRAPHER:  The time right

19        now is 12:46 p.m.  We're off the

20        record.

21         (Off the record at 12:46 p.m.)

22             VIDEOGRAPHER:  The time right

23        now is 12:59 p.m.  We're back on the

24        record.

25

1    QUESTIONS BY MR. ELSNER:

2         Q.     Mr. McNamee, I would like you

3    to take a look at MR 4251, which we'll mark

4    as Exhibit 18.  This is a PowerPoint deck

5    which bears your name.

6                Do you recognize this document,

7    sir?

8         A.     Yes.

9         Q.     And what is it?

10        A.     It's a presentation that myself

11   and my executive director gave regarding

12   policies and programs to prevent drug abuse

13   and overdose deaths.

14        Q.     Do you remember who you gave

15   the presentation to?

16        A.     I don't recall.

17        Q.     Okay.  Was this prepared by you

18   in the regular course of your duties with the

19   Ohio Board of Pharmacy?

20        A.     Yes.

21        Q.     And is it accurate and

22   complete?

23        A.     Yes.

24        Q.     I want to have you turn to --

25   let me ask, what is OARRS?

1      A.      OARRS stands for the Ohio

2    Automated RX Reporting System.  It's the

3    state's Prescription Drug Monitoring Program.

4      Q.      And what is a Prescription Drug

5    Monitoring Program?

6      A.      So a Prescription Drug

7    Monitoring Program collects -- at least our

8    prescription drug monitoring in Ohio collects

9    all dispensation of Schedule II through V

10   controlled substances, as well as gabapentin

11   and naltrexone, that are dispensed by

12   pharmacies, as well as personally furnished

13   by prescribers, and those are reported to a

14   centralized electronic database.  And the

15   purpose of the database is to improve -- to

16   identify any abhorrent behavior, like doctor

17   shopping, or to just better coordinate care

18   in terms of providing controlled substances

19   to patients.

20     Q.      Among its functions, does it

21   include a function to -- or a purpose to help

22   identify abuse and diversion of controlled

23   substance -- controlled substances?

24             MR. HYNES:  Objection.  Form.

25             THE WITNESS:  Yes.

1    QUESTIONS BY MR. ELSNER:

2         Q.     Do you know how long the OARRS

3    program has been in existence in Ohio?

4         A.     Yeah, it started operation in

5    October of 2006.

6         Q.     Okay.  And I want to have you

7    turn to page 7 of the document.

8                Can you describe for me what's

9    depicted here in page 7?

10        A.     Yes.  So this is an analysis

11   that was conducted by our PDMP administrator

12   taking a look at unintentional overdose

13   deaths and matching them to the OARRS data,

14   and they found that 70 percent of all of the

15   unintentional drug overdoses had at least one

16   prescription in OARRS for a controlled

17   substance that was dispensed after July 1 of

18   2013.

19               And then 30 percent -- 37

20   percent of those unintentional overdose

21   deaths that involved a prescription opioid

22   had at least one prescription for an opioid

23   within 30 days prior to their death.

24        Q.     And why was -- why were you

25   reporting on these statistics?

1                    Why was it important

2    information that you wanted to convey?

3         A.     I think it's important to

4    convey because I think a lot of times people

5    will -- people assume that there's no

6    opportunity for intervention for people who

7    are -- who may -- or who are going to

8    overdose.  So, for example, like they're

9    outside of the medical system.  But this kind

10   of shows that they had interaction with the

11   medical system and that there may be

12   opportunities for intervention to prevent

13   unintentional overdoses.

14        Q.     Okay.  I want to have you turn

15   to page 15 of this PowerPoint deck, and it's

16   entitled "Kroger Case Study."

17                    Can you describe for me what

18   this slide is depicting?

19        A.     Yeah, so we -- early in our --

20   in early, I want to say 2014, we received a

21   federal grant to essentially integrate our

22   prescription drug monitoring program into the

23   electronic dispensing software of both a

24   hospital system -- well, an EMR for a

25   hospital system and for a dispensing system,

1    which was Kroger.

2              So we highlighted an

3    integration essentially allowing the

4    pharmacist to check the PDMP without having

5    to leave their dispensing system, so it was

6    automatic.  And that resulted in -- you know,

7    this statistic provides the results of that

8    integration project, which showed that more

9    prescriptions were being checked than were

10   being dispensed, and one could infer that

11   that was because the pharmacists were --

12   because of the OARRS checks, were exercising

13   their corresponding responsibility and

14   denying patient scripts that may be

15   illegitimate or dangerous to their health.

16       Q.    And so in 2014, pharmacists at

17   Kroger had the capacity to check OARRS.

18              Is that true?

19       A.    Yes.

20       Q.    Okay.  But in order to do so,

21   they needed to move to a different computer

22   system to check.

23              Is that your understanding?

24              MR. HYNES:  Objection.  Form.

25              THE WITNESS:  Yeah, they had to

1        access it through a web portal.

2    QUESTIONS BY MR. ELSNER:

3        Q.    So they could integrate it

4    through their system, but they had to access

5    it through a separate web portal.

6              Is that right?

7              MR. HYNES:  Objection.  Form.

8              THE WITNESS:  Yes, they could

9        access it through the web portal.

10             This pilot study we did

11        integrated it into the actual

12        dispensing software, so there was no

13        need to hop into a different system to

14        check.

15    QUESTIONS BY MR. ELSNER:

16        Q.    Now, was it possible for all of

17    the pharmacies to integrate the system

18    directly into their software programs?

19        A.    Yes.

20             MR. HYNES:  Objection.  Form.

21    QUESTIONS BY MR. ELSNER:

22        Q.    So if CVS or Walgreens or

23    Walmart or Meijer decided to do this on their

24    own, were they able to do that?

25        A.    Conceivably, yes.

1            MR. HYNES:  Objection.  Form.

2   QUESTIONS BY MR. ELSNER:

3        Q.    And when the accessing the PDMP

4   was not integrated in 2014, less than

5   10 percent of the prescriptions for

6   controlled substances were checked in OARRS.

7            Is that what this slide

8   depicts?

9            MR. HYNES:  Objection.  Form.

10            THE WITNESS:  Yeah, about

11        9.95 percent of all controlled

12        substances were checked in OARRS by --

13        {audio interruption}.

14   QUESTIONS BY MR. ELSNER:

15        Q.    Sorry, could you repeat that

16   because you got a little garbled at the end?

17        A.    About 9.95 percent of

18   prescriptions dispensed were checked in

19   OARRS -- or controlled substances dispensed

20   were checked in OARRS.

21        Q.    Okay.  And that was by Kroger

22   in 2014, correct?

23        A.    Uh-huh.

24        Q.    Okay.  But if the system had

25   been integrated across all the chain

1    pharmacies, then that number conceivably

2    would have increased to having every

3    prescription checked through the PDMP.

4                   Is that true?

5                   MR. HYNES:  Objection.  Form.

6                   THE WITNESS:  Yeah, that would

7         have been an option for them.

8                   And just to clarify, we do

9         offer statewide -- {audio

10        interruption}.

11   QUESTIONS BY MR. ELSNER:

12        Q.    You do offer what?

13        A.    We do offer state -- in 2016,

14   the state decided to pay for statewide

15   integration, which began onboarding a number

16   of the pharmacies and prescribers around the

17   state.

18        Q.    And that's a -- that's a

19   service that the board offered starting in

20   2016.

21        A.    Yeah, that's a service, yeah,

22   that we pay for, uh-huh.

23        Q.    And are all of the defendant

24   pharmacies in this case fully integrated as

25   of 2016?

1        A.      I'm not aware of the status of

2    the defendant pharmacies.  I know that

3    there's about 83 percent of the state

4    pharmacies are integrated, but I'm not aware

5    of the -- each individual chain's status in

6    terms of integration.

7        Q.      Are you aware of any of the

8    chain pharmacy defendants in this case that

9    have refused or not accepted the integration?

10       A.      I'm not aware.  The only thing

11   I've heard is that because of, you know,

12   the system builds that they were allowed, you

13   know, they needed -- you know, they needed

14   some implementation time, you know.  So it

15   wasn't immediate when it was offered.  There

16   needed to be some build time.  But I wasn't

17   aware of anybody's refusal.

18       Q.      And prior to 2016, could the

19   chain pharmacies have otherwise purchased

20   this integration prior to receiving this

21   grant?

22              MR. HYNES:  Objection.  Form.

23              THE WITNESS:  Yeah, there's

24        a -- there was a product on the market

25          that we used that could have

1           availed -- they could have availed

2           themselves of, yes.

3   QUESTIONS BY MR. ELSNER:

4           Q.      And when was that product first

5   available, to your knowledge?

6           A.      I'm not sure when PMP Gateway

7   came out.  That would -- that's beyond my

8   knowledge, but I do know it was obviously

9   around in 2014.

10          Q.      Okay.  And that's called PMP

11  Gateway.

12                  Is that right?

13          A.      Yes.

14          Q.      And do you know the company

15  that provides that software?

16          A.      Yeah, so they were previously

17  known as Appriss, but now they're Bamboo

18  Health.

19          Q.      Okay.  Thank you.

20                  (McNamee Exhibit 19 marked for

21          identification.)

22  QUESTIONS BY MR. ELSNER:

23          Q.      If we could turn to 4252.  This

24  is Exhibit 19.

25                  Mr. McNamee, is this an e-mail

1    that you sent related to a work plan and

2    narrative on April 14, 2015?

3         A.    Yes.

4         Q.    Okay.  And did you send this

5    e-mail in the regular course of your business

6    at the Ohio Board of Pharmacy?

7         A.    Yes.

8         Q.    Okay.  And was the e-mail saved

9    and stored in the course of -- the regular

10   course of business at the Ohio Board of

11   Pharmacy?

12        A.    Yes.

13        Q.    Okay.  I would like you to turn

14   to page 3 -- one second -- and there's a

15   section at the bottom which talks about

16   expanding and improving proactive reporting.

17             Do you see that?

18        A.    Yes.

19        Q.    Can you describe for me what --

20   and it says, "Develop a proactive reporting

21   system, i.e., red flags, for OARRS users."

22             Can you describe for me what

23   that is?

24        A.    So what we wanted to do is when

25   you review an OARRS report, it is raw data,

1    and so what we wanted to do was to -- based

2    on previous overdose statistics and what we

3    know of the risk factors, we wanted to be

4    able to create some red flags that would

5    immediately alert, you know, that you

6    wouldn't have to sort of analyze the raw

7    data.  You could immediately see that there

8    might a problem, such as overlapping

9    therapies or high morphine equivalent dose,

10   those kind of things.  So we wanted to make

11   the system even more user friendly so that

12   people could identify any issues and address

13   them.

14        Q.     And when did this technology

15   first become available?

16        A.     So we ended up purchasing a --

17   an upgrade to our OARRS system called

18   NarxCare, which does provide overdose risk

19   scores.  I want to say that occurred in 2016.

20            So that provide -- that uses an

21   algorithm to assign risk factors, as well as

22   provides red flags on common risk factors,

23   like overlapping therapies and things of that

24   nature.

25        Q.     And was this technology

1    available before the board acquired it in

2    2016?

3         A.    No.

4              I -- I'm not -- I'm not sure.

5    I think NarxCare came out -- NarxCare was a

6    relatively new product, so I'm not -- I'm not

7    sure whether or not it was available prior to

8    us, you know, purchasing it for the state.

9         Q.    Do you believe that it's

10   important to use dispensing data to search

11   for signs of diversion and red flags?

12             MR. HYNES:  Objection.  Form

13        and scope.

14             THE WITNESS:  Yes, and in fact,

15        we do have data analysts and

16        special -- and agents that do look for

17        the -- that do look at the dispensing

18        data for those red flags as well.

19   QUESTIONS BY MR. ELSNER:

20        Q.    And would it be your

21   expectation that pharmacies should be using

22   their data to also be looking for red flags

23   of potential diversion?

24             MR. HYNES:  Objection.  Form

25        and scope.

1              THE WITNESS:  Yes, they have an

2       obligation under their corresponding

3       responsibility under both state and

4       federal law.

5              (McNamee Exhibit 20 marked for

6       identification.)

7  QUESTIONS BY MR. ELSNER:

8       Q.    I would like to have you now

9  look at MR 4250.  And this will be

10 Exhibit 20.

11             Do you recognize this document?

12      A.    An e-mail I sent to the

13 governor's cabinet opiate action team

14 coordinator.

15      Q.    And did you do that in the

16 regular course of your business at the Ohio

17 Board of Pharmacy?

18      A.    Yes.

19      Q.    And was it stored by the Ohio

20 Board of Pharmacy in the regular course of

21 its business?

22      A.    Yes.

23      Q.    Does it appear to you to be

24 accurate and complete?

25      A.    Yes.

1      Q.    I want to have you take a look

2   on page 3.  And there's a section here at the

3   bottom, Review of 2014 Unintentional Drug

4   Overdose Deaths Data.

5            Do you see that?

6   A.    Yes.

7      Q.    Okay.  And there's some

8   reporting here, which states that,

9   "42 percent of all unintentional drug

10  overdose deaths had a morphine equivalent

11  daily dose of 80-milligram or greater at some

12  point in the past."

13           Do you see that?

14  A.    Yes.

15     Q.    Okay.  And when this document

16  was compiled, did the board do its best to

17  make sure that this information was accurate

18  and complete?

19  A.    Yes.

20     Q.    Why did you feel it was

21  important to include this particular

22  parameter in reviewing unintentional drug

23  overdose deaths in 2014?

24  A.    So 80 MED was a standard that

25  the state set in terms of additional

1    requirements on prescribers for -- when

2    they're providing care using opioid

3    analgesics.

4              So it was -- we used the 80 MED

5    to -- you know, because that was already a

6    point where you had to do additional actions

7    as a provider -- prescriber in the state.  So

8    we wanted to highlight, you know, that that

9    is still very much a risk factor of exceeding

10   that 80 MED.  So we just wanted to reinforce

11   that 80 MED threshold that we had set in

12   state guidelines, I believe, at the time.

13        Q.     And beneath that, you offer

14   some statistics with respect to overdose

15   deaths that involve benzodiazepines.

16              Can you describe for me that

17   statistic and why you thought it was

18   important to include that?

19              MR. HYNES:  Objection.  Form.

20              THE WITNESS:  Yes.  So there's

21         always -- there's constantly a focus

22         on opioids, but I think what we wanted

23         to reiterate was the role that

24         benzodiazepines were playing,

25         particularly as central nervous system

```
 1          depressants.  They're often used in

 2          combination with other drugs to -- you

 3          know, to result in overdose.  So we

 4          wanted to also highlight

 5          benzodiazepine use because it was a

 6          contributor to unintentional overdose

 7          deaths.

 8  QUESTIONS BY MR. ELSNER:

 9          Q.     And how many people had -- or

10  what percentage of those who overdosed had a

11  benzodiazepine prescription within 30 days of

12  their death?

13          A.     That would be 44 percent of

14  unintentional deaths involving benzos.

15          Q.     You mentioned the combination

16  benzodiazepines with opioids.

17                 Is that a risk factor for

18  overdose?

19          A.     Yes.

20          Q.     And what statistics did you

21  have to share with respect to the number of

22  people who died of an overdose that had an

23  opioid and a benzodiazepine prescription?

24          A.     It was about 30 percent of all

25  unintentional drug overdose deaths.
```

1           MR. ELSNER:  Okay.  I think
2       I'm -- I think I've concluded my
3       examination, Mr. McNamee.  I want to
4       thank you for your time today.
5           MR. HYNES:  Go off the record.
6           VIDEOGRAPHER:  The time right
7       now is 1:19 p.m.  We're off the
8       record.
9        (Off the record at 1:19 p.m.)
10           VIDEOGRAPHER:  The time right
11       now is 1:42 p.m.  We're back on the
12       record.
13           CROSS-EXAMINATION
14   QUESTIONS BY MR. HYNES:
15       Q.    Good afternoon, Mr. McNamee.
16   My name is Paul Hynes.  I represent CVS.
17   Thank you for taking some time with us today.
18           I first want to just do some
19   quick questions on your background.
20           You mentioned you went to your
21   undergrad -- you got your undergraduate
22   degree from Georgetown.
23       A.    Yes.
24       Q.    What was that?
25       A.    Yes.

```
 1            Q.      We're having trouble hearing
 2   you.  I don't --
 3            A.      Give me one second.
 4                    Can you hear me now?
 5            Q.      Yes.  Thank you.
 6            A.      Yes.  So...
 7            Q.      Okay.  And that was in
 8   government?
 9            A.      Yes.
10            Q.      And a master's degree also from
11   Georgetown.
12            A.      Yes.
13            Q.      In public policy.
14            A.      Yes.
15            Q.      Do you have any -- hold any
16   other degrees?
17            A.      No.
18            Q.      So you do not have a degree in
19   pharmacy?
20            A.      No.
21            Q.      You don't have a degree in law?
22            A.      No.
23            Q.      Public health?
24            A.      No.
25            Q.      Math?
```

```
1        A.      No.

2        Q.      Statistics?

3        A.      No.

4        Q.      Science?

5        A.      No.

6        Q.      Study design?

7        A.      No.

8        Q.      Your work experience, I believe

9  you testified to Mr. Elsner that you worked

10 at the Ohio Department of Health before you

11 started work at the Ohio Board of Pharmacy.

12              Is that correct?

13       A.      Yes.

14       Q.      When did you work at the Ohio

15 Department of Health?

16       A.      That was from 2010 until I left

17 the board in 2013.

18       Q.      Okay.  Did you --

19       A.      I'm sorry, 2009.  Sorry, 2009

20 to 2013.

21       Q.      Did you work anywhere before

22 you worked at the Ohio Department of Health?

23       A.      Yeah, I worked for the Ohio

24 Senate.

25       Q.      And when was that?
```

1      A.      That was for the year 2008.

2      Q.      Any other employment?

3      A.      Oh, scratch that.  Sorry.

4  Time's getting away from me.

5              2009 is when I was in the

6  Senate, and then I went to health in 2010.

7      Q.      Okay.  Any other employment

8  besides what we've discussed?

9      A.      Prior to that, I was a Peace

10  Corps volunteer, and then prior to that, I

11  worked at the Embassy of the European Union

12  Delegation in Washington, DC.

13     Q.      Okay.  You understand -- do you

14  understand that you are here as what's called

15  a corporate representative of the Ohio Board

16  of Pharmacy?

17     A.      Yes.

18     Q.      And that's the capacity in

19  which you are testifying.

20              Do you understand that?

21     A.      Yes.

22     Q.      Okay.  What did you do to

23  prepare to testify as the corporate

24  representative of the Ohio Board of Pharmacy?

25     A.      So I had a meeting with Henry

1    Appel, our legal counsel, as well as Joe

2    Koltak, who is our in-house counsel, to

3    discuss deposition prep.

4              I did review some of the

5    documents.  And that was it.

6         Q.    Was that just one meeting?

7         A.    Yes.

8         Q.    And which documents did you

9    review?

10        A.    I reviewed the documents that

11   were sent over I want to say about two days

12   ago.  So not the complete set of documents

13   that we just reviewed, but the ones that were

14   provided.

15        Q.    Who were they provided by?

16        A.    I believe they were provided by

17   the -- by --

18        Q.    Sorry, we couldn't hear you

19   there.

20        A.    I'm pulling up the e-mail right

21   now.  I just want to -- they were provided by

22   Michael Elsner.

23        Q.    And how many documents were

24   provided by Michael Elsner?

25        A.    Let's see.  One second.

1                    We have seven documents.

2          Q.     Okay.

3                    MR. HYNES:  Mike, would you

4          mind forwarding us a copy of that

5          e-mail just so we have it for the

6          record?

7                    MR. ELSNER:  It was -- well, it

8          was an e-mail to his counsel; it was

9          not to the witness.  So I'll -- I

10         don't mind doing it.

11                   MR. HYNES:  Thank you.

12    QUESTIONS BY MR. HYNES:

13         Q.     Mr. McNamee, did you review any

14    other documents besides those seven

15    documents --

16         A.     I --

17         Q.     -- in preparing for the

18    deposition?

19         A.     I did -- I did take a look at

20    some of the survey documents on the website.

21         Q.     On the Ohio Board of Pharmacy

22    website?

23         A.     Yes, on the pharmacist workload

24    advisory committee website.

25         Q.     Okay.  And those are documents

1    about the survey conducted in 2020?

2         A.    And '21, yes.

3         Q.    And '21.

4               Okay.  Did you review any other

5    documents besides the seven attached to the

6    e-mail and the doc -- the documents about the

7    survey that are on the committee's website?

8         A.    No.

9         Q.    In preparing for this

10   deposition, did you interview any current or

11   former board members of the Ohio Board of

12   Pharmacy?

13        A.    No.

14        Q.    Did you interview any current

15   or former members of the workload advisory

16   committee?

17        A.    No.

18        Q.    Did you interview any Board of

19   Pharmacy agents who conduct inspections of

20   pharmacies?

21        A.    No.

22        Q.    Did you interview any Board of

23   Pharmacy staff in preparing for the

24   deposition today?

25        A.    No.

1      Q.      Did you review any inspection

2  reports of Ohio Board of Pharmacy inspections

3  of any of the defendant pharmacies?

4      A.      No.

5      Q.      Did you have any communications

6  with anyone besides Mr. Appel -- and I forget

7  the other lawyer's name -- for the Ohio Board

8  of Pharmacy about this deposition?

9      A.      The only one person would be

10  Sharon Maerten-Moore, who is our chief legal

11  counsel.

12      Q.      Any communications at all with

13  any plaintiffs' lawyers about the opioids

14  litigation?

15      A.      No.

16      Q.      When you were asked, in

17  response to Mr. Elsner's questions, whether

18  the board had concerns or whether the board

19  felt -- how the board felt about something,

20  was your answer limited to how the Board of

21  Pharmacy staff or I guess -- strike that.

22            Was it limited to what you,

23  Cameron McNamee, felt or had concerns about

24  with respect to those issues?

25            MR. ELSNER:  Objection.  Form.

1                    THE WITNESS:  When I said board

2          staff, I meant more than just myself

3          when referring to that.

4    QUESTIONS BY MR. HYNES:

5          Q.      And what was your basis for

6    knowing the knowledge or concerns of board

7    staff?

8          A.      I regularly meet with our chief

9    pharmacist, who heads up our compliance

10   department, every week, and we have also been

11   actively -- she is also a staff support

12   member on our -- on our pharmacist workload

13   advisory committee.  And I also speak to

14   our -- we have field staff meetings, so I get

15   to interact with the staff that way as well.

16                    And we did give a

17   presentation -- or we have touched on the

18   workload issue before in our field staff

19   meetings.

20         Q.      Okay.  Your questions were

21   limited to the board staff, were you

22   excluding the board itself, the members of

23   the Ohio Board of Pharmacy?

24                    MR. ELSNER:  Objection.

25                    THE WITNESS:  Yes.

1    QUESTIONS BY MR. HYNES:

2         Q.    You've mentioned staff -- you

3    referenced staffing complaints in response to

4    some questions.

5              Have you personally reviewed

6    any staffing complaints that the Ohio Board

7    of Pharmacy has received?

8         A.    No.  But I get -- that

9    information is communicated to me through,

10   Jenni, who is our chief pharmacist.

11        Q.    And you're aware that the Board

12   of Pharmacy conducts inspections of

13   pharmacies?

14        A.    Yes.

15        Q.    Have you ever reviewed any

16   inspection reports from those inspections?

17        A.    I have seen an inspection

18   report.  I have not reviewed specific

19   inspection reports related to working

20   conditions.

21        Q.    Do you know whether, as part of

22   a Board of Pharmacy -- a Board of Pharmacy

23   inspection, agents review staffing of a

24   pharmacy?

25        A.    I know that I -- there -- I'm

```
1   not sure if it's specific to question related

2   to staffing as it relates to general

3   inspections.  I am aware that when there is

4   an error in dispensing investigation/

5   inspection, they do look at working

6   conditions and --

7              COURT REPORTER:  And what?  I'm

8        sorry.

9              THE WITNESS:  And staffing

10       levels.

11  QUESTIONS BY MR. HYNES:

12       Q.    And have you ever -- did you

13  review any of those reports of those

14  investigations in connection with your

15  preparation for today's deposition?

16             MR. ELSNER:  Objection.

17             THE WITNESS:  No.

18  QUESTIONS BY MR. HYNES:

19       Q.    You were asked about a Chicago

20  Tribune article.

21             Do you remember that?

22       A.    Yes.

23       Q.    You had no involvement in the

24  study done by The Chicago Tribune.

25             Is that correct?
```

1          A.      Yes, I didn't have any

2   involvement.

3          Q.      You just read the article at

4   one point?

5          A.      Yes.

6          Q.      You were asked about a New York

7   Times article.

8                  Do you remember that?

9          A.      Yeah.

10         Q.      You weren't involved in

11  preparing that article, were you?

12         A.      No.

13         Q.      You just reviewed it at some

14  point.

15         A.      Yes.

16         Q.      Okay.  You were asked about

17  surveys done by the Missouri Board of

18  Pharmacy, I think the Tennessee Board of

19  Pharmacy and the Maryland Board of Pharmacy.

20                 Is that right?

21         A.      Yes.

22         Q.      Were you involved in preparing

23  those surveys?

24         A.      No.

25         Q.      You were also asked about a

1    2014 national survey of pharmacists, correct?

2         A.    Yes.

3         Q.    Were you involved in designing

4    or carrying out that survey?

5         A.    No.

6         Q.    You were asked about a 2019

7    national survey of pharmacists, correct?

8         A.    Yes.

9         Q.    Same question, were you

10   involved in designing or conducting that

11   survey?

12        A.    No.

13        Q.    Back to the Maryland survey --

14   I'm sorry, Missouri survey.

15              You said that, am I right, that

16   some of the questions in the 2020 survey by

17   the Ohio Board of Pharmacy, that some of

18   those questions were taken from the Missouri

19   Board of Pharmacy survey.

20              Is that correct?

21        A.    Yes.

22        Q.    Do you know who drafted those

23   questions for the Missouri Board of Pharmacy?

24        A.    Not specifically, no.

25        Q.    Are you able to tell us which

1    of the questions were taken from the Missouri

2    Board of Pharmacy survey?

3         A.    I mean, not -- I mean, yeah, I

4    could pull up the Missouri survey and do a

5    question-by-question analysis.

6         Q.    But sitting here today, you

7    don't remember?

8         A.    Not off the top of my head, I

9    don't know which questions are identical.  I

10   know a lot of them are or close to.

11        Q.    In your estimation, what

12   percentage of the questions were taken from

13   the Missouri Board of Pharmacy survey?

14             MR. ELSNER:  Objection.

15             THE WITNESS:  I want to say

16        probably 80 to 90 percent.

17   QUESTIONS BY MR. HYNES:

18        Q.    And were they taken word for

19   word?

20        A.    Some might have.

21        Q.    Okay.  And can you tell us what

22   sort of process the Missouri Board of

23   Pharmacy went through to craft those

24   questions?

25        A.    No.

1    Q.    You testified that the -- or

2  you were asked and I think you answered yes

3  that the board tried to write fair and

4  unbiased questions.

5         Is that -- do you remember

6  that?

7    A.    Yeah.

8    Q.    What did the board do to try to

9  write fair and unbiased questions?

10   A.    So I think, you know, we looked

11  at it from a staff perspective and, you know,

12  looking at what we were trying to accomplish,

13  and we felt that the Missouri survey did a

14  pretty good job of asking, you know, some

15  pretty objective questions.

16         And so we decided just to, you

17  know, not necessarily reinvent the wheel too

18  much and just simply adopt many of their

19  questions as we felt, you know, they were

20  fair and objective.

21   Q.    You said you looked at it from

22  a staff perspective.

23         Who looked at those questions?

24   A.    Our chief pharmacist, I believe

25  some folks in the compliance department,

1    myself, our executive director.  I want to

2    say our president and vice president also

3    were involved.

4         Q.     Is there any memo or work

5    product that reflects your and the staff's

6    analysis of those questions?

7         A.     I would say that a lot of

8    consultation we did, we did it via phone.  So

9    in my weekly meetings with our chief

10   pharmacist, they're remote meetings, so we --

11   we have those discussions there.

12        Q.     Did you consult with any survey

13   experts in either considering the Missouri

14   questions or in crafting your own questions?

15        A.     No.

16        Q.     You mentioned that one of the

17   third parties that you consulted was Donald

18   Sullivan.

19               Is that correct?

20        A.     Yes.

21        Q.     And who is Donald Sullivan?

22        A.     He's a professor at OSU, and

23   also he's an expert witness that is used a

24   lot in controlled substance diversion cases.

25   He's been around for a very long time, you

1  know, in the Ohio pharmacy space, so...

2      Q.      Sorry.  Go ahead.

3      A.      So, again, we wanted to bounce

4  the idea off of him as well.

5      Q.      And he's a pharmacist, correct?

6      A.      Yes.

7      Q.      Okay.  His degree is in

8  pharmacy?

9      A.      Uh-huh.

10      Q.      Is that a yes?

11      A.      Oh, sorry, yes, he is.

12      Q.      We need verbal answers.

13      A.      Yes.

14      Q.      For the questions that were not

15  borrowed from the Missouri Board of Pharmacy,

16  who drafted them?

17      A.      I did.

18      Q.      Did anyone assist you?

19      A.      Again, our chief pharmacist, we

20  kind of -- you know, she was a sounding board

21  for me.

22      Q.      And what was her name?

23              What was her name?  Is that

24  Jenni Wai?

25      A.      Jenni Wai, yes.

1      Q.    Did you consult with anyone

2  else about the survey questions that you

3  drafted?

4      A.    Well, again, it was circulated,

5  you know, for our director of compliance, our

6  executive director, the governor's office,

7  again, got a -- was able to -- was -- got a

8  peek at it.  So we had a few eyes on it.

9      Q.    And who gave you comments or

10  edits?

11          MR. ELSNER:  Objection.

12          THE WITNESS:  There weren't a

13      whole a lot of comments or edits,

14      really.  I think Jenni was mostly

15      my -- the person providing some

16      feedback based on what she's been

17      hearing.

18  QUESTIONS BY MR. HYNES:

19      Q.    You're aware that the response

20  rate of the first survey was 26 percent?

21      A.    Yes.

22      Q.    That the response rate of

23  the -- of the second survey was 20 percent?

24      A.    Yes.

25      Q.    What sort of things did you

1    guys do in the design of the survey to

2    account for nonresponse bias?

3            A.      Well, we made -- we made an

4    effort to at least ensure that we were re --

5    having the e-mails triggered to the

6    pharmacist multiple times if they hadn't

7    responded, but other than that, there wasn't

8    much in the way of planning for nonresponse

9    bias.

10           Q.      Did you consult any experts

11   about how to account for nonresponse bias?

12           A.      No.

13           Q.      Did you study the literature

14   about how to account for nonresponse bias?

15           A.      No.

16           Q.      Do you know whether the

17   Missouri Board of Pharmacy, in crafting its

18   questions, made any attempts to account for

19   nonresponse bias?

20           A.      I'm not aware.

21           Q.      The second survey that was

22   done, those questions, I think you said some

23   were borrowed from a national APhA survey.

24                   Is that correct?

25           A.      Yes.

1        Q.     And those were the questions

2   towards the end?

3        A.     Yes.

4        Q.     Okay.  And did the remainder of

5   the questions, how were those generated?

6        A.     The remainder of the questions

7   were the same questions we asked in 2020.

8        Q.     Okay.  And the ones that were

9   crafted by APhA, do you know who drafted

10  those questions?

11       A.     I'm not aware, no.

12       Q.     Do you know whether APhA made

13  any efforts to address bias in the crafting

14  of its questions?

15       A.     I'm not aware, no.

16       Q.     You mentioned a link that was

17  sent to pharmacists to complete the survey or

18  to ask them to complete the survey, correct?

19       A.     Yes.

20       Q.     We're going to talk about that

21  real quick.

22              And I believe you testified

23  that the link was designed so that a

24  pharmacist could only complete one survey.

25       A.     Yes.

1       Q.      And walk us through how that

2   works.

3       A.      So the specifics of it, we

4   worked with our IT department and they

5   developed sort of individualized links that

6   go to each licensee so they can only take the

7   survey once.

8       Q.      And were there any audits or

9   tests done to make sure that worked as

10  intended?

11      A.      No, I -- again, I just -- the

12  way that the process was developed was to

13  ensure that, so that's what we based our

14  decision on.

15      Q.      Okay.  But nothing was done

16  after the fact to make sure it worked?

17      A.      No, there were -- I mean, there

18  were no issues reported to us from the IT

19  folks.

20      Q.      No audits were done to ensure

21  that no pharmacist filled it out twice?

22      A.      No.

23      Q.      And who is the IT person who

24  developed this link or technology?

25      A.      Sure, his name is Jonathan

1    Brown.

2         Q.     And the individuals who

3    completed this survey -- so am I right that

4    the e-mail was sent to every individual who

5    was licensed with the Ohio Board of Pharmacy?

6         A.     Every individual that was

7    licensed in the state.  So we omitted the

8    nonresident pharmacists.

9         Q.     How did you do that?

10        A.     We based it on -- we required

11   them to report their place of employment,

12   their primary place of employment, and if

13   they had -- and I think we also omitted those

14   folks who were -- even if they didn't have

15   their primary place of employment on file, if

16   they were, you know, out of state, like in

17   Florida, those folks were also omitted.

18        Q.     Sorry, you said they were

19   omitted?

20        A.     Yes, they weren't -- they

21   didn't receive a link if they were -- if

22   their mailing address was out of state.

23        Q.     Okay.  So you based their

24   location on the information the board had on

25   file?

1     A.     Yes.

2     Q.     Okay.  As part of the survey,

3  you didn't ask them whether they do, in fact,

4  work in Ohio?

5     A.     No.

6     Q.     And it's possible -- is it

7  possible that the address that the board has

8  on file for a particular pharmacist is out of

9  date?

10     A.     I mean, it's always possible.

11  They are required by rule to give those

12  updates to us.

13     Q.     Were any audits or checks done

14  to make sure that only pharmacists working in

15  the state of Ohio completed the survey?

16     A.     Just -- we just based it off

17  the license data, so there were no audits.

18     Q.     Was any effort made to exclude

19  individuals who are licensed with the board

20  and residing in Ohio but who no longer work

21  on the bench?

22     A.     Can you repeat that?  Sorry,

23  you cut out a bit.

24     Q.     Was any effort made to exclude

25  from the survey licensees who reside in Ohio

1    but no longer work on the bench as practicing

2    pharmacists?

3         A.      The only thing we did was we --

4    I think we omitted pharmacist emeritus

5    status, so those are folks that are retired

6    but still maintain just sort of emeritus

7    license that doesn't allow them to practice.

8    But other than that, there was no effort to

9    separate those who are practicing from those

10   who weren't.

11        Q.      So an individual who works as a

12   field leader, for example -- in the field but

13   not as a pharmacist, as long as they're

14   licensed and have an Ohio address on file

15   with the board, they were eligible to

16   complete the survey.

17              Is that correct?

18        A.      Yes, and then that would be

19   reflected in the -- in the workplace

20   breakdowns that we did in the survey.

21        Q.      Was any effort made, by the

22   way, to audit the responses on workplace --

23   on a workplace setting?

24        A.      No.

25        Q.      So you took the respondent's

1   word for it?

2        A.     Yes.

3        Q.     Was there any consideration

4   given to conducting the survey in a different

5   manner, i.e., other than in an electronic

6   manner?

7        A.     No.

8        Q.     No.

9               And did you consult any experts

10  about the manner in which you conducted the

11  survey, sending the e-mail link?

12       A.     No.

13       Q.     The report that we looked at

14  for the survey, the reports with the graphs

15  and all that --

16       A.     Uh-huh.

17       Q.     -- who prepared the report,

18  those reports?

19       A.     I did.

20       Q.     Who compiled the numbers?

21       A.     I did.

22       Q.     Did anyone audit or check that

23  you got the numbers right?

24       A.     Yeah, I did it -- well, yes, so

25  I did my direct report was also -- she also

1    did a check to make sure.

2         Q.     And how did you -- how did you

3    compile the numbers?

4         A.     Well, we pulled them down from

5    the survey tool and then basically developed

6    the graphs and charts that way.

7         Q.     You say you pulled down from

8    the survey tool, but did that give you -- did

9    that compile --

10        A.     Yes, that gave us -- yeah, that

11   gave us the responses.

12        Q.     What's the name of that tool?

13        A.     It's a Microsoft -- I don't

14   know the name off the top of my head.  It's

15   a -- it's a proprietary tool that the State

16   has.  It's Business Intelligence, I think it

17   was.  It's a Microsoft Business Intelligence

18   software.

19        Q.     Okay.  And the comments, the

20   anonymous comments --

21        A.     Uh-huh.

22        Q.     -- you don't know the

23   identities of any of the individuals who gave

24   those comments, correct?

25        A.     No.

1      Q.      You don't know which pharmacies

2  they worked at, correct?

3      A.      No.

4              MR. ELSNER:  Objection.

5              THE WITNESS:  Well, unless they

6      identified themselves -- I mean,

7      identified that for me.

8  QUESTIONS BY MR. HYNES:

9      Q.      Well, even if they identified

10 themselves as working for CVS, you don't know

11 which CVS Pharmacy they worked at, do you?

12     A.      Correct.

13     Q.      You don't know, for example, if

14 they work at a CVS in Montgomery County or a

15 CVS in Cuyahoga County, correct?

16     A.      Yes, we wouldn't be able to

17 tell that from the survey data.

18     Q.      Okay.  And you haven't

19 validated any of the allegations or factual

20 assertions made in the comments, have you?

21     A.      No.

22     Q.      You were asked about the

23 composition of the workload advisory

24 committee.

25              Do you remember that?

1          A.     Yes.

2          Q.     Okay.  And about the

3    composition -- and that the composition of

4    that committee is roughly half of the members

5    are from large chains.

6                 Is that fair to say?

7          A.     Yes.

8          Q.     But, actually, a greater

9    percentage of the survey respondents were

10   from large chains, correct?

11         A.     Yes.

12         Q.     So would you agree that the --

13   that large chains are actually

14   underrepresented on the workload advisory

15   committee?

16                MR. ELSNER:  Objection.

17                THE WITNESS:  I mean, in terms

18         of the way we looked at it in terms of

19         representation was we wanted to make

20         sure that all aspects of the practice

21         of pharmacy were represented, while

22         also making sure we had a group that

23         was manageable.

24                So one of them we did defer to

25         the large chain settings, we still

1          wanted representation from

2          independents, long-term care,

3          hospitalists.  So we -- you know, in

4          that sense, it was -- we felt it was

5          representative of the entire field of

6          pharmacy practice.

7    QUESTIONS BY MR. HYNES:

8          Q.     So you feel that the

9    composition of the committee is

10   representative of the pharmacy practice in

11   Ohio?

12         A.     Yes.

13         Q.     Is that fair?

14                Okay.  You mentioned, I think,

15   that the committee had concerns about

16   prescription volume because of COVID.

17                Do you remember saying that?

18         A.     Yes.

19                MR. ELSNER:  Objection.

20                THE WITNESS:  In terms of the

21         dark hours.

22   QUESTIONS BY MR. HYNES:

23         Q.     Yeah, can you explain what you

24   meant by the because of COVID?

25         A.     Yeah.  So the dark hours

1   actually emanated from a process that Kroger

2   utilized during COVID where they did shut

3   down for several hours, you know, to

4   outside -- to outside customers so they could

5   catch up on their work, and so that was being

6   discussed as a potential avenue to help

7   pharmacists who were, you know, underwater

8   get ahead, get start -- get prepared for the

9   day, as well close out and make sure

10  everything is being done correctly.

11              So that was -- that was -- that

12  was where the dark hours kind of emanated

13  from, they resulted from COVID.  Or at least

14  the discussion resulted from something that

15  Kroger had done during COVID.

16       Q.    Okay.  The first -- both

17  surveys were done during COVID, correct?

18       A.    Yes.

19       Q.    The Board of Pharmacy -- the

20  Board of Pharmacy has not conducted a

21  workload -- did not conduct a workload survey

22  before COVID, correct?

23       A.    No.

24       Q.    Was any effort made in

25  designing the survey to account for the

1  effects of COVID?

2      A.    The only question we asked is

3  about harassment, because we knew that -- at

4  least from the -- some early conversations we

5  had with the pharmacist -- {audio

6  interruption} -- we just -- some discussions

7  with field staff that, you know, people were

8  a little irate with pharmacists, you know,

9  not being able to get their medication in

10  time.  So we did add some questions in the

11  '21 survey regarding, you know, harassment or

12  intimidation.  But nothing specifically

13  related to COVID.

14      Q.    Did the board consider asking

15  any questions about the impact of COVID on

16  staffing?

17      A.    No.

18      Q.    Some of the surveys that some

19  of the other -- some of the surveys that

20  other Boards of Pharmacy did ask about that,

21  right?

22      A.    I'm not aware.  You'll have to

23  ask them.

24      Q.    Excuse me?

25      A.    I said I'm not aware.  You'll

1   have to ask them.

2        Q.      Does the board have a position

3   on whether -- the board staff, excuse me,

4   have a position on whether COVID has had an

5   impact on pharmacy staffing in Ohio?

6        A.      Yes, I think generally the

7   consensus is that it exacerbated an already

8   underlying issue.

9        Q.      And how was that consensus

10  arrived at?

11       A.      You know, internal discussions

12  with senior staff.  We meet pretty regularly.

13       Q.      Give me one second.

14               Can we just pull up Exhibit 15

15  real quick?

16               I can share my screen.  There

17  it is.  Thank you.

18               I just have a very quick

19  question, Mr. McNamee.

20               To the far right, Mr. Elsner

21  asked you about several of these columns in

22  here, correct?

23       A.      Yes.

24       Q.      Okay.  The one on the far

25  right, I don't think you were asked about,

1  and it's titled "OPA."

2              Do you see that?

3      A.      Yes.

4      Q.      What does OPA stand for?

5              Is that the Ohio Pharmacists

6  Association?

7      A.      Yes, that's correct.

8      Q.      Okay.  So that's the -- that

9  column gives the Ohio Pharmacists

10  Association's position on each of these

11  issues.

12              Is that fair?

13      A.      Yes.  Yes.

14      Q.      You can take that down.  Thank

15  you very much.

16              You mentioned that the -- I

17  think you testified that the workforce

18  advisory committee ended its work.

19              Is that correct?

20      A.      Yes, the last meeting was in

21  June of this year.

22      Q.      So June of 2022 it ended its

23  work.

24      A.      Yes.

25      Q.      Okay.  Was the committee

1    disbanded?

2         A.    Yes.  I think formally the

3    board was -- they put it in resolution, we

4    haven't formally disbanded it, but the

5    communication out to the committee members is

6    that we've achieved our work.  We've...

7         Q.    Can we pull up Exhibit 17 real

8    quick?

9              Thank you.

10             If we go down to the next

11   page -- and thank you for doing this.  Thank

12   you.

13             Mr. McNamee, do you remember

14   this document?

15        A.    Yes.

16        Q.    Okay.  This was not prepared by

17   you, correct?

18        A.    No.

19        Q.    Okay.  It was prepared by Jenni

20   Wai.

21        A.    Yes.

22        Q.    Okay.  So the write-up under

23   slides 3 and 4, that was written by Jenni

24   Wai, not by you?

25        A.    Yes, that was written by -- it

1   was compiled by her, yes.

2        Q.      Thank you.

3                And can we go to Exhibit 20?

4   This is my last request on this for an

5   exhibit.

6                If we could just go to the

7   attachment.

8                The statistics here,

9   Mr. McNamee -- first of all, do you remember

10  this document?

11       A.      Yes.

12       Q.      Okay.  This is Exhibit 20.

13               The statistics in here, were

14  they compiled by you?

15       A.      They were provided to me by

16  Chad Garner, who is our director of OARRS,

17  but I compiled the document, yes.

18       Q.      Got it.

19               Okay.  But the numbers came

20  from Mr. Garner.

21       A.      Yes, they would have to.

22       Q.      All right.  You can take that

23  down.  Thank you.

24               This will be real quick.  I'm

25  just going to show you two documents.  I have

1    a couple of questions about them.

2              (McNamee Exhibit 21 marked for

3         identification.)

4    QUESTIONS BY MR. HYNES:

5         Q.    We'll mark this -- where are we

6    at in terms of exhibit numbers?

7              GINA VELDMAN:  Next one is 21.

8              MR. HYNES:  Thank you.

9    QUESTIONS BY MR. HYNES:

10        Q.    Mark this as 21.

11             Mike, I just sent a copy of

12   this to Amanda.

13             Mr. McNamee, can you see this

14   document?

15        A.    Yes.

16        Q.    And this is an e-mail from you,

17   correct?

18        A.    Uh-huh.

19        Q.    Okay.  And it's to Andrea

20   Boxill and Richard Massatti.

21        A.    Yes.

22        Q.    And who they are?

23        A.    Andrea Boxill was, at that

24   time, the director of governor's cabinet

25   opioid action team, and Rick Massatti was, at

1    the time, the state's substance -- the SOTA,

2    which is the state authority for -- to run

3    opioid treatment program.  So he was also in

4    the medical director's office at the Ohio

5    Department of Mental Health and Addiction

6    Services.

7        Q.    Okay.  And this e-mail was sent

8    on August 24, 2016, correct?

9        A.    Yes.

10       Q.    Any reason to think you didn't

11   see this e-mail?

12       A.    No.

13       Q.    Was this sent in the ordinary

14   course of your work at the Ohio Board of

15   Pharmacy?

16       A.    Yes.

17       Q.    And is this document or this

18   e-mail maintained by the Ohio Board of

19   Pharmacy?

20       A.    Yes.

21       Q.    And does the subject matter of

22   the e-mail concern matters that you have

23   knowledge of?

24       A.    Yes.

25            MR. ELSNER:  Objection.  Scope.

1                    (McNamee Exhibit 22 marked for

2          identification.)

3     QUESTIONS BY MR. HYNES:

4          Q.      And mark this as Exhibit 22.

5                  Mr. McNamee, do you see

6     Exhibit 22?

7          A.      Yes.

8          Q.      And this is a 2017 annual

9     report of the Ohio Board of Pharmacy -- the

10    2017 annual report on the OARRS system,

11    correct?

12         A.      Yes.

13         Q.      Okay.  And is this a document

14    that's prepared in the ordinary course of the

15    Board of Pharmacy's work?

16         A.      Yes.

17         Q.      Is it maintained by the Board

18    of Pharmacy in the regular course of

19    business?

20         A.      Yes.

21         Q.      And is it created by people who

22    have knowledge of the matters that are

23    discussed in the report?

24         A.      Yes.

25         Q.      Thank you.

1              MR. HYNES:  Subject to recross,

2        I have no further questions.

3              MR. SCHEETZ:  I can go next.

4              CROSS-EXAMINATION

5    QUESTIONS BY MR. SCHEETZ:

6        Q.     Good afternoon, Mr. McNamee.

7    My name is Trevor Scheetz.  I am a lawyer for

8    Meijer, and we appreciate you being here and

9    giving testimony today.

10             Forgive me, I'm getting over

11   whatever my kids are bringing home from

12   school now that we're back in person, but if

13   you ever can't hear me, please just raise

14   your hand or say something.

15             You have been asked several

16   questions today about workload surveys.  I

17   have just a few more for you.

18             Is it fair to say that for the

19   2021 survey, about three out of four Ohio

20   pharmacists did not respond?

21       A.     Yeah, the response rate, I

22   think, was around 20 percent.

23       Q.     And when I say 2021, I mean,

24   the one that was published in '21 that was

25   taken in '20.

1         A.      Oh, yes.  Yes.  That was around

2    25 percent, so, yeah.

3         Q.      As you sit here today, are you

4    able to say with certainty whether a Meijer

5    pharmacist responded to that survey?

6         A.      No, unless they mentioned it in

7    their freeform comments.

8         Q.      Are you able to say how many

9    Meijer pharmacists, if any, responded to that

10   survey?

11        A.      No.

12        Q.      And assuming one or more Meijer

13   pharmacists did respond to that survey, do

14   you know whether they indicated they agreed

15   or disagreed with any particular statement in

16   the survey?

17        A.      Again, we wouldn't be able to

18   know that.

19        Q.      Turning to the 2022 survey, is

20   it fair to say about four in five Ohio

21   pharmacists did not respond to that survey?

22        A.      Yes.

23        Q.      And again, can you say with

24   certainty whether a Meijer pharmacist

25   responded to that survey?

1      A.      No.

2      Q.      Can you say with certainty how

3  many Meijer pharmacists, if any, responded to

4  that survey?

5      A.      No.

6      Q.      And assuming one or more Meijer

7  pharmacists did respond to that survey, do

8  you know whether they indicated that they

9  agreed or disagreed with any particular

10  statement in the survey?

11      A.      I wouldn't know that.

12      Q.      Did you say you would not know

13  that?

14      A.      I would not know that, no.

15      Q.      Okay.  And if I could focus

16  your attention on the freeform comments you

17  talked about.

18              Counsel for Montgomery County

19  showed you several of those freeform comments

20  of the surveys.

21              Do you recall that?

22      A.      Yes.

23      Q.      None of those comments

24  mentioned Meijer, did they?

25      A.      No, not that I'm aware.

1              MR. SCHEETZ:  Okay.  I have no

2        further questions.  I want thank you

3        again for your time and for giving

4        testimony today.  Thanks so much.

5              CROSS-EXAMINATION

6   QUESTIONS BY MR. HARRIS:

7        Q.    I have just a few questions.

8              Hello, Mr. McNamee.  My name is

9   Alex Harris, and I represent Walgreens.

10              First, briefly circling back to

11   a question that Mr. Hynes asked you, do you

12   recall his questions about your educational

13   background and what degrees you do and do not

14   have?

15        A.    Yes.

16        Q.    And one of the questions he

17   asked you is whether or not you hold a degree

18   or have any training in survey design.

19              Do you remember that?

20        A.    Yes.

21        Q.    And your answer to that was no,

22   correct?

23        A.    Correct.

24        Q.    Just two more questions and

25   then I'll be done.

1          Mr. McNamee, the board's

2   decision to survey and report pharmacists'

3   opinions regarding workplace conditions was a

4   voluntarily decision, correct?

5          A.     Yes.

6          Q.     There's no specific statutory

7   or other legal obligation to conduct a report

8   on such a survey, correct?

9          A.     No.

10              MR. HARRIS:  Thank you.  That's

11         all I had.

12              MR. ELSNER:  Any other defense

13         counsel wish to question?

14              No?

15              Why don't we go off the record

16         for less than five minutes, just

17         collect my notes, and we'll ask you a

18         few questions and be done.

19              VIDEOGRAPHER:  The time right

20         now is 2:26 p.m.  We're off the

21         record.

22        (Off the record at 2:26 p.m.)

23              VIDEOGRAPHER:  The time right

24         now is 2:36 p.m.  We're back on the

25         record.

1                    REDIRECT EXAMINATION

2     QUESTIONS BY MR. ELSNER:

3          Q.    Mr. McNamee, the surveys

4     conducted by the Ohio Board of Pharmacy and

5     the results of those surveys, can they all be

6     explained because of COVID?

7                 Is that the reason that all the

8     pharmacists that responded to the survey

9     responded in the way that they did?

10                MR. HYNES:  Objection.  Form.

11                THE WITNESS:  No, I mean, if

12            you look at some of the comments,

13            they do indicate, you know, the

14            cutting of hours prior to the

15            pandemic.  And again, the pandemic

16            merely exacerbating underlying...

17    QUESTIONS BY MR. ELSNER:

18         Q.    So if you understand your

19    testimony correctly, there was an underlying

20    problem, and that was exacerbated by COVID.

21                Is that your testimony?

22                MR. HYNES:  Objection.  Form.

23                THE WITNESS:  That was with the

24            APhA survey, you know, it did indicate

25            that there were already existing

1          issues, and so certainly it's -- you

2          know, one could infer that COVID did

3          make things worse -- make an already

4          bad situation worse.

5    QUESTIONS BY MR. ELSNER:

6          Q.     Right.

7                 And we looked at that survey,

8    and the first survey disclosing those results

9    was in 2014, correct?

10         A.     Yes.

11         Q.     And the results there were

12   consistent with the results in 2019, and we

13   looked at that survey as well, correct?

14         A.     Yes.

15         Q.     Okay.  And we also looked at

16   The Chicago Tribune article, that occurred

17   before COVID, is that true?

18         A.     Yes.

19         Q.     And there had been complaints

20   that were received by the Ohio Board of

21   Pharmacy prior to 2020 related to workforce

22   issues, metrics and staffing problems and the

23   impact on patient safety.

24                Is that true?

25                MR. SCHEETZ:  Objection to

1          form.

2                    THE WITNESS:  Yeah, that's --

3          yes, that's as relayed to me by our

4          compliance and enforcement department.

5     QUESTIONS BY MR. ELSNER:

6          Q.      Thank you.

7                    Mr. Hynes asked you some

8     questions about how the survey was drafted

9     and was conducted.

10                   During this period of time, you

11    shared the questions of the survey with

12    the -- with Mr. Wilt, who was the president

13    of -- or vice president of the Ohio Board of

14    Pharmacy, correct?

15         A.      Yes.

16                   MR. HYNES:  Objection.  Form.

17    QUESTIONS BY MR. ELSNER:

18         Q.      And he worked at Meijer, a

19    defendant in this case, true?

20         A.      Yes.

21         Q.      And also serving at the board

22    of -- the Ohio Board of Pharmacy was

23    Ms. Jennifer Rudell who worked for CVS.

24                   Is that right?

25         A.      Yes.

1          Q.    Okay.  And then we looked --

2    and if we pull back up Exhibit 13, which is

3    MR 4212, we looked at the membership of the

4    pharmacists workload advisory committee, and

5    on that committee included representatives of

6    Walgreens, Walmart, CVS, Rite Aid and Kroger,

7    correct?

8          A.    Yes.

9          Q.    Was there any objection by any

10   of these individuals, the president or vice

11   president of the board or any member of the

12   board or any member of the pharmacists

13   workload advisory committee, to submitting

14   the first, second or third surveys that you

15   submitted?

16         A.    No.  In fact, the second set --

17   the second survey was at the request of

18   the -- {audio interruption}.

19         Q.    The second survey was at the

20   request of who?

21         A.    Was at the request of the

22   pharmacists workload advisory.

23         Q.    Okay.  So not only did they

24   appreciate the value of the survey responses

25   from the first survey, but the pharmacists

1    workload advisory committee, which was

2    comprised of employees Walgreens, Walmart,

3    CVS, Rite Aid and Kroger, advocated for a

4    second and third survey.

5                    Is that true?

6                    MR. HYNES:  Objection.  Form.

7                    THE WITNESS:  That was the

8          consensus of the committee of which

9          they are comprised, yes.

10   QUESTIONS BY MR. ELSNER:

11        Q.     Okay.  Thank you.

12                And you shared the results of

13   the first survey and the questions with the

14   governor of Ohio.

15                Is that right?

16        A.     Yes.

17        Q.     And did the governor's office

18   have any objection to the content of the

19   survey?

20        A.     They had no -- no, they had no

21   concerns with the way we addressing the

22   issue, including the survey and the

23   committee.

24        Q.     And you shared the results of

25   the survey with the governor's office.

1           Did they have any concerns

2    after the survey was conducted about the

3    manner in which it was conducted?

4           A.    No.

5           Q.    You also shared the results

6    with the NABP, the National Association for

7    the Board of Pharmacy, in a district meeting,

8    someone from your staff -- your office did.

9           Was there any objection from

10   the NABP to the survey and the way it was

11   conducted?

12          A.    Not to my knowledge.

13          Q.    Was there any objection from

14   outside experts that you consulted, the

15   professor from Ohio State University who you

16   had examine the survey questions?

17          MR. HYNES:  Objection.  Form.

18          THE WITNESS:  Not that I can

19      recall.

20   QUESTIONS BY MR. ELSNER:

21          Q.    Okay.  And you didn't write

22   these questions all by yourself.  You shared

23   the questions with members of the Ohio Board

24   of Pharmacy staff and sought their input.

25          Is that true?

1        MR. SCHEETZ:  Objection.

2    Leading.

3        THE WITNESS:  I did, yes,

4    including the board members --

5    including some of the board members.

6 QUESTIONS BY MR. ELSNER:

7    Q.    Okay.  So can you describe for

8 us who at the Ohio Board of Pharmacy you

9 shared the survey questions with?

10    A.    Our chief pharmacist, Jenni

11 Wai.  Our executive director, Steve

12 Schierholt.  Shawn Wilt, who was the vice

13 president at the time.  Jen Rudell, who was

14 the president at the time.  Our director of

15 compliance and enforcement, Eric Griffin.

16        And that's who I can remember

17 off the top of my head.

18    Q.    Before this deposition today,

19 has there been anyone that has criticized, to

20 your knowledge, the way that the Ohio Board

21 of Pharmacy conducted its three surveys

22 related to pharmacists' workload?

23        MR. HYNES:  Objection.  Form.

24        THE WITNESS:  I did receive one

25    e-mail from John Long regarding some

 1            of the wording of the questions.

 2    QUESTIONS BY MR. ELSNER:

 3        Q.      And John Long is with CVS.

 4                Is that right?

 5        A.      Yes, he indicated that he felt

 6    like they were leading, I believe, is the --

 7    was the feedback I -- the feedback I received

 8    from him.

 9        Q.      And did you receive -- did he

10    object to the survey being sent out?

11        A.      I don't think he objected to

12    the survey being sent out.  I think he just

13    provided some feedback about the concerns

14    about the question -- about some of the

15    questions.

16        Q.      Okay.  And did you review and

17    consider those concerns?

18        A.      We did; however, they were --

19    they were based on the 2022 survey, so for

20    the sake of consistency and being able to

21    compare responses, we felt keeping the

22    questions the same was -- would ultimately be

23    beneficial in analyzing the data.

24                Plus we didn't get any

25    responses back from anybody else about the --

1    about these questions, so, you know, it

2    wasn't -- it wasn't an overwhelming number --

3    the committee didn't sort of rise up and say

4    this is problematic.  It was just one member.

5         Q.     All right.  So there were a few

6    concerns raised by the CVS designee to the

7    pharmacists workload advisory committee.

8              Were there any other objections

9    from any of the other members of the

10   committee or any other board members?

11             MR. HYNES:  Objection.  Form.

12             THE WITNESS:  Not that I can

13        recall.

14             The only thing that's -- again,

15        the feedback that I believe Shawn

16        provided was just separating grocer

17        from standalone chains in order to

18        better sort of have -- to better

19        assess, you know, difference --

20        different pharmacy settings.

21   QUESTIONS BY MR. ELSNER:

22        Q.     Mr. McNamee, what is the

23   overall goal that the board had in sending

24   out this pharmacist workload survey?

25        A.     The overall goal was, one, to

1    assess where we are as a state, and, two,

2    depending on the responses, trying to come up

3    with some policy solutions to address these

4    issues.

5        Q.    And what is the board's

6    assessment as to where the state of pharmacy

7    practice is with respect to large chain

8    pharmacies and large chain grocery stores in

9    the state of Ohio based on the survey

10   questions?

11            MR. HYNES:  Form.

12            THE WITNESS:  Well, I can speak

13        to the survey data, and the board

14        hasn't made a formal statement or a

15        formal assessment in open session.

16            What I can say is, you know,

17        they do recommend the issues presented

18        to the pharmacy community and have

19        begun sort of approving some changes

20        to try and alleviate those pressures

21        that are on the pharmacists currently.

22   QUESTIONS BY MR. ELSNER:

23        Q.    And what's the purpose of

24   trying to alleviate some of those pressures

25   in the view of the Ohio State Board of

1    Pharmacy?

2         A.    I mean, ultimately it comes

3    down to protecting patient safety and health.

4    Both from ensuring reduction -- you know,

5    preventing errors from happening, but also

6    ensuring timely access to medications.

7                  MR. ELSNER:  All right.  Thank

8         you, Mr. McNamee.

9                  THE WITNESS:  Thank you.

10                 MR. HYNES:  I have some -- some

11        questions, but I'm happy to allow

12        someone else to go first.

13                 RECROSS-EXAMINATION

14   QUESTIONS BY MR. HYNES:

15        Q.    Okay.  Mr. McNamee, just a few

16   questions and we'll let you go.  I know

17   it's -- probably some other stuff.

18                 Would you agree it's hard to

19   measure the impact of COVID when you didn't

20   ask about it in the survey?

21                 MR. ELSNER:  Objection.

22                 THE WITNESS:  I -- in my

23        personal opinion, you know, I think

24        it was a factor in the responses, for

25        sure.

1          But, again, I don't think it

2      was -- it was the -- in its totality

3      the only reason why folks are not

4      happy with their workplace

5      environments and their stress levels.

6  QUESTIONS BY MR. HYNES:

7      Q.     All right, but you can't

8  quantify the impact, can you?

9          MR. ELSNER:  Objection.

10         THE WITNESS:  No.

11 QUESTIONS BY MR. HYNES:

12     Q.     For example, you could have

13 asked the pharmacists whether COVID had an

14 impact on workload and staffing, correct?

15     A.     Yes; although I think that

16 was -- yes, we could have.

17     Q.     Right.

18         And then you could have seen

19 how many -- what percentage of the

20 respondents answered yes to that question,

21 correct?

22     A.     Potentially, yes.

23     Q.     And you could have even asked

24 whether there were -- whether there were

25 concerns with workload and staffing before

1    COVID?

2         A.    That could have been a

3    possibility, yes.

4         Q.    Okay.  You didn't ask those

5    questions in the surveys?

6         A.    No.

7         Q.    Okay.  Mr. Elsner asked whether

8    you had shared the survey questions with

9    various individuals before they were sent

10   out.

11              Do you remember that?

12        A.    Yes.

13        Q.    He asked whether you shared

14   them with Mr. Wilt and Ms. Rudell, correct?

15        A.    Yes.

16        Q.    To your knowledge, do either of

17   them have any training or expertise in survey

18   design?

19        A.    No.

20        Q.    Okay.  He asked whether you

21   shared them -- shared the questions with some

22   of the BOP staff, and you said yes, correct?

23        A.    Yes.

24        Q.    Any of the individuals you

25   shared the questions with, do they have any

1    training or expertise in survey design?

2         A.    No.

3         Q.    He asked whether you shared the

4    questions for the second survey in advance

5    with members of the workload advisory

6    committee, correct?

7         A.    Yes.

8         Q.    Do any of them have any

9    training or expertise in survey design?

10         A.    I do not believe so.

11         Q.    Okay.  He asked about you

12    sharing the questions in advance with the

13    governor's office, correct?

14         A.    Yes.

15         Q.    To the best of your knowledge,

16    does anyone in the governor's office who you

17    shared the questions have any training or

18    expertise in survey design?

19         A.    To the best of my knowledge,

20    no.

21         Q.    Okay.  And then he asked you

22    about whether you shared the questions in

23    advance with anyone at NABP.

24              Do you remember that?

25         A.    Yes.

1        Q.     And to the best of your

2   knowledge, does anyone at NABP who you shared

3   the questions with have any training or

4   expertise in survey design?

5               MR. ELSNER:  Objection.

6               THE WITNESS:  Not that I'm

7       aware.

8   QUESTIONS BY MR. HYNES:

9        Q.     Okay.  Of all of those

10  individuals that -- of all of those

11  individuals or categories of folks that we

12  discussed, did any of them actually give you

13  comments or edits to the questions?

14       A.     The edits were -- again, we

15  were working off of the Missouri survey as

16  sort of the basis, so the edits were not very

17  substantial from what we initially circulated

18  via -- as an initial draft.

19       Q.     Okay.  So did anyone from the

20  governor's office give you comments or edits?

21       A.     No.

22       Q.     Anyone from NABP give you

23  comments or edits?

24       A.     No.

25       Q.     Anyone besides Mr. Long on the

1    workload advisory committee give you comments

2    or edits?

3         A.     Not that I can recall.

4         Q.     Mr. Wilt or Mr. Bell give you

5    comments or edits?

6         A.     Mr. Wilt did.

7         Q.     And, excuse me, who was the

8    person at Ohio State, professor?

9         A.     Donnie Sullivan.

10        Q.     Sullivan?

11        A.     Yeah.

12        Q.     Okay.  And, again, he's a

13   professor in pharmacy?

14        A.     Yes.

15        Q.     You're aware that Ohio State

16   has a department that is -- it's specifically

17   focused on survey design.

18        A.     Yes.

19        Q.     It's called the CHRR.

20               Is that right?

21        A.     That's -- I wouldn't know

22   specifically, no.

23        Q.     Okay.  But you didn't reach out

24   to these -- to that department about how to

25   conduct or design a survey?

1    A.    No.

2    Q.    Okay.  And, again, no other

3  third parties who were experts in survey

4  design were consulted in designing or

5  conducting the survey, correct?

6    A.    No.

7         MR. HYNES:  No further

8    questions.

9          RECROSS-EXAMINATION

10 QUESTIONS BY MR. SCHEETZ:

11   Q.    Just very quickly for Meijer.

12         Mr. McNamee, you testified that

13 Mr. Wilt, Shawn Wilt, gave you some feedback

14 on the survey questions you shared.

15   A.    Yeah.

16   Q.    I think you also told

17 Mr. Elsner that the feedback he gave you was

18 related to the suggestion to break out

19 grocery from standalone pharmacy.

20         Did I hear that correctly?

21   A.    Yes.

22   Q.    Were there any other comments

23 or edits from Mr. Wilt that you can recall?

24   A.    Not that I recall, no.

25         MR. SCHEETZ:  All right.  Thank

1          you again for your time.  I appreciate

2          it.

3                    THE WITNESS:  Sure.

4                    MR. HARRIS:  Nothing further

5          from me.

6                    MR. SHERE:  Nothing -- no

7          questions from Kroger.

8                    MR. HYNES:  Thank you again for

9          your time.

10                    MR. ELSNER:  Hey, I have just

11          two housekeeping matters.

12                    First, if we could mark the

13          demonstratives that I used in my

14          examination as Exhibit 23, which

15          depicted the math that was shown to

16          the witness.  I would like to do that,

17          if we could.

18                    (McNamee Exhibit 23 marked for

19          identification.)

20            FURTHER REDIRECT EXAMINATION

21    QUESTIONS BY MR. ELSNER:

22          Q.    Just one follow-up question.

23                    Mr. McNamee, the results of the

24    survey were published on the Ohio Board of

25    Pharmacy's website as you testified.

 1              Is that right?

 2       A.      Yes.

 3       Q.      Is it the expectation of the

 4  Board of Pharmacy that pharmacies, chain

 5  pharmacies and grocery store pharmacies,

 6  would review the results of the survey and

 7  take appropriate action?

 8              MR. HYNES:  Objection.

 9              Are you going re-redirect here?

10              MR. ELSNER:  It sounds like

11       what you were able to do in CT3.

12              MR. HYNES:  I don't think so.

13              MR. ELSNER:  It will be my only

14       question.

15  QUESTIONS BY MR. ELSNER:

16       Q.      Go ahead, Mr. McNamee.

17       A.      I don't think that -- I mean,

18  that was obviously -- that wasn't the primary

19  goal.  Obviously the primary goal was to, you

20  know, develop policy recommendations to

21  address these issues.  I don't think we were

22  under any illusion that it was going to

23  change behavior.

24              MR. ELSNER:  Thank you,

25       Mr. McNamee.

1           MR. SCHEETZ:  Before we go off

2      the record, we'll reserve all

3      objections to the demonstrative, but

4      let's put them in the record so we

5      have them.

6           MR. HYNES:  And, Mike, can you

7      send us that e-mail that he looked at

8      before the deposition?

9           MR. ELSNER:  Yeah, I'm going to

10     talk with counsel for the Board of

11     Pharmacy about that because it's

12     unclear to me -- I didn't communicate

13     with the witness, so I don't know what

14     the witness was shown and what the

15     witness wasn't shown.  So let me have

16     that communication, and then we'll

17     respond to you.

18          MR. HYNES:  Well, I think I --

19          MR. APPEL:  I can represent

20     that to you because I was the one that

21     communicated.  You forwarded documents

22     saying that you were, at the hearing,

23     going to be identifying certain

24     documents in order to -- you know,

25     that one of the -- you had like five,

1      six purposes of having the

2      deposition -- you know, having this

3      30(b)(6) witness.  One -- you know,

4      workplace survey was a big one, but

5      you also said you wanted someone to be

6      able to identify documents, and you

7      had identified some specific

8      documents.  So we wanted to make sure

9      that Mr. McNamee could come here and

10     tell you, yes, these are true and

11     accurate copies of documents

12     maintained by the State of Ohio Board

13     of Pharmacy.

14          So they -- I don't believe

15     there was anything that wasn't -- that

16     he wasn't asked about specifically.

17     And the purpose of doing this was to

18     make sure that he was aware of

19     documents that he would need to

20     authenticate in case there was

21     anything that he didn't know offhand

22     that he would be able to communicate

23     with some other -- with some third

24     party to -- you know, someone else at

25     the board to make sure that they're

1    right so we wouldn't have to have

2    someone else come and do another

3    deposition.

4         MR. HYNES:  Right.  And it's

5    not privileged.

6         MR. APPEL:  No, nothing

7    privileged.  It was all stuff that was

8    provided by the Board of Pharmacy, and

9    I -- I'm like 99 percent certain

10   everything had been provided by the

11   Board of Pharmacy and had the BOP

12   stamps in the bottom right-hand

13   corner, so they were already submitted

14   in the MDL.

15        And I'm pretty sure -- I will

16   say that I do not keep a tremendous

17   detailed list on everything that was

18   asked and not and which documents were

19   reviewed, but I -- my sense was that

20   all of them were identified -- were

21   shown to Mr. McNamee during the

22   hearing today -- or deposition today,

23   so he could identify them for your

24   proceedings going forward.

25        MR. HYNES:  Okay.  Thanks for

1          the explanation.

2                    MR. ELSNER:  Thank you very

3          much.

4                    MR. APPEL:  Mr. McNamee will

5          read.

6                    VIDEOGRAPHER:  The time right

7          now is 2:56 p.m.  We're off the

8          record.

9          (Deposition concluded at 2:56 p.m.)

10                   COURT REPORTER:  Does anyone

11         need a copy of the transcript?

12                   MR. HYNES:  CVS does, please.

13                   MS. OCHMAN:  Walmart, a final

14         draft only, please.

15                   MR. SHERE:  For Kroger, final

16         draft condensed with exhibits.

17                   MS. OCHMAN:  With exhibits,

18         too, for Walmart.

19                   MR. SCHEETZ:  And I'll talk to

20         my Meijer colleagues but nothing right

21         now.  Thank you.

22                   - - - - - - -

23

24

25

1                          CERTIFICATE

2              I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
3   Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
4   of the examination, Cameron McNamee, was duly
    sworn by me to testify to the truth, the
5   whole truth and nothing but the truth.

6              I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
7   testimony as taken stenographically by and
    before me at the time, place and on the date
8   hereinbefore set forth, to the best of my
    ability.
9
               I DO FURTHER CERTIFY that I am
10  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
11  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
12  that I am not financially interested in the
    action.
13


14
        _____
16      CARRIE A. CAMPBELL,
        NCRA Registered Diplomate Reporter
17      Certified Realtime Reporter
        California Certified Shorthand
18      Reporter #13921
        Missouri Certified Court Reporter #859
19      Illinois Certified Shorthand Reporter
        #084-004229
20      Texas Certified Shorthand Reporter #9328
        Kansas Certified Court Reporter #1715
21      New Jersey Certified Court Reporter
        #30XI00242600
22      Louisiana Certified Court Reporter
        #2021012
23      Notary Public


24


25

1                    INSTRUCTIONS TO WITNESS

2

3              Please read your deposition over

4    carefully and make any necessary corrections.

5    You should state the reason in the

6    appropriate space on the errata sheet for any

7    corrections that are made.

8              After doing so, please sign the

9    errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13             It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4          I,_____, do
   hereby certify that I have read the foregoing
5  pages and that the same is a correct
   transcription of the answers given by me to
6  the questions therein propounded, except for
   the corrections or changes in form or
7  substance, if any, noted in the attached
   Errata Sheet.

8

9

10

11

12  _____
    Cameron McNamee                    DATE
13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

1
                - - - - - - -

                  ERRATA

2
                - - - - - - -

3
PAGE     LINE    CHANGE

4
_____   _____   _____

5
_____   _____   _____

6
_____   _____   _____

7
_____   _____   _____

8
_____   _____   _____

9
_____   _____   _____

10
_____   _____   _____

11
_____   _____   _____

12
_____   _____   _____

13
_____   _____   _____

14
_____   _____   _____

15
_____   _____   _____

16
_____   _____   _____

17
_____   _____   _____

18
_____   _____   _____

19
_____   _____   _____

20
_____   _____   _____

21
_____   _____   _____

22
_____   _____   _____

23
_____   _____   _____

24
_____   _____   _____

25

```
 1                        _ _ _ _ _ _ _
                         LAWYER'S NOTES
 2                        _ _ _ _ _ _ _

 3      PAGE      LINE

 4      _____     _____      _____

 5      _____     _____      _____

 6      _____     _____      _____

 7      _____     _____      _____

 8      _____     _____      _____

 9      _____     _____      _____

10      _____     _____      _____

11      _____     _____      _____

12      _____     _____      _____

13      _____     _____      _____

14      _____     _____      _____

15      _____     _____      _____

16      _____     _____      _____

17      _____     _____      _____

18      _____     _____      _____

19      _____     _____      _____

20      _____     _____      _____

21      _____     _____      _____

22      _____     _____      _____

23      _____     _____      _____

24      _____     _____      _____

25
```