# Exhibit F

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

                   ~~~~~~~~~~~~~~~~~~~~

5

6      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
       OPIATE LITIGATION

7                                       Case No.
                                        17-md-2804

8

                                        Judge Dan Aaron
9      This Document Relates To:        Polster

10

11     Track Seven.

12                 ~~~~~~~~~~~~~~~~~~~~

13

14           Remote videotaped deposition of
                 JACK E. FINCHAM, Ph.D.

15

16

17                   May 24, 2023

18                    10:00 a.m.

19

20

21

22

23

24         Renee L. Pellegrino, RPR, CLR

25             (Appearing Remotely)

```
 1   REMOTE APPEARANCES:
 2   On behalf of Montgomery County:
         Motley Rice LLC
 3       MICHAEL E. ELSNER, ESQ.
         EBONY WILLIAMS BOBBITT, ESQ.
 4       LISA SALTZBURG, ESQ.
         28 Bridgeside Boulevard
 5       Mount Pleasant, South Carolina  29464
         (843) 216-9250
 6       melsner@motleyrice.com
         ebobbitt@motleyrice.com
 7       lsaltzburg@motleyrice.com
 8   On behalf of Kroger:
         Bowles Rice LLP
 9       GABRIELE WOHL, ESQ.
         JORDAN DYE, ESQ.
10       600 Quarrier Street
         Charleston, West Virginia  25301
11       (304) 347-1137
         gwohl@bowlesrice.com
12       jdye@bowlesrice.com
             - and -
13       Vory Sater Seymour & Pease
         JESSICA K. BAVERMAN, ESQ.
14       301 East 4th Street
         Suite 3500
15       Great American Tower
         Cincinnati, Ohio  45202
16       jkbaverman@vorys.com
         (513) 723-4092
17
     ALSO PRESENT:
18
         Kurt Henschel, Videographer
19
         Samantha Misischia, Motley Rice
20
         Amanda Unterreiner, Motley Rice
21
                     ~ ~ ~ ~ ~
22
23
24
25
```

1                    TRANSCRIPT INDEX

2

3    APPEARANCES ..............................2

4    INDEX OF EXHIBITS ........................4

5    INDEX OF OBJECTIONS ......................5

6

7    EXAMINATION OF JACK E. FINCHAM, Ph.D.:

8    BY MS. WOHL ..............................9

9    BY MR. ELSNER ..........................173

10

11   AFTERNOON SESSION ......................106

12

13   REPORTER'S CERTIFICATE .................191

14

15   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

16

17

18

19

20

21

22

23

24

25

1

2                        INDEX OF EXHIBITS

3

4      Number              Description              Marked

5

6    Exhibit 1     Expert Report of Jack E. Fincham,   24
                   Ph.D., R.Ph.

7

     Exhibit 2     Article Entitled "Response Rates    57

8                  and Responsiveness for Surveys,
                   Standards, and the Journal"

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               INDEX OF OBJECTIONS

2

3     Objection ......................................13
      Objection ......................................20
4     Objection ......................................22
      Objection ......................................25
5     Objection ......................................25
      Objection ......................................26
6     Objection ......................................31
      Objection ......................................32
7     Objection ......................................35
      Objection ......................................36
8     Objection ......................................37
      Objection ......................................37
9     Objection ......................................38
      Objection ......................................39
10    Objection ......................................40
      Objection ......................................42
11    Objection ......................................43
      Objection ......................................46
12    Objection ......................................47
      Objection ......................................48
13    Objection ......................................49
      Objection ......................................50
14    Objection ......................................51
      Objection ......................................52
15    Objection ......................................52
      Objection ......................................54
16    Objection ......................................55
      Objection ......................................56
17    Objection ......................................63
      Objection ......................................63
18    Objection ......................................66
      Objection ......................................68
19    Objection ......................................68
      Objection ......................................69
20    Objection ......................................70
      Objection ......................................71
21    Objection ......................................72
      Objection ......................................73
22    Objection ......................................75
      Objection ......................................76
23    Objection ......................................76
      Objection ......................................81
24    Objection ......................................83
      Objection ......................................86
25    Objection ......................................87

1          INDEX OF OBJECTIONS, CONT'D

2

3     Objection ....................................89
      Objection ....................................89
4     Objection ....................................90
      Objection ....................................91
5     Objection ....................................93
      Objection ....................................94
6     Objection ....................................96
      Objection ....................................96
7     Objection ....................................97
      Objection ....................................99
8     Objection ....................................99
      Objection ...................................101
9     Objection ...................................102
      Objection ...................................103
10    Objection ...................................104
      Objection ...................................106
11    Objection ...................................108
      Objection ...................................109
12    Objection ...................................109
      Objection ...................................110
13    Objection ...................................113
      Objection ...................................114
14    Objection ...................................115
      Objection ...................................116
15    Objection ...................................119
      Objection ...................................120
16    Objection ...................................122
      Objection ...................................122
17    Objection ...................................123
      Objection ...................................124
18    Objection ...................................124
      Objection ...................................124
19    Objection ...................................125
      Objection ...................................131
20    Objection ...................................132
      Objection ...................................132
21    Objection ...................................133
      Objection ...................................136
22    Objection ...................................141
      Objection ...................................142
23    Objection ...................................142
      Objection ...................................144
24    Objection ...................................148
      Objection ...................................149
25    Objection ...................................150

1                INDEX OF OBJECTIONS, CONT'D

2

3    Objection ...................................152

     Objection ...................................155

4    Objection ...................................155

     Objection ...................................156

5    Objection ...................................157

     Objection ...................................158

6    Objection ...................................159

     Objection ...................................160

7    Objection ...................................163

     Objection ...................................166

8    Objection ...................................167

     Objection ...................................167

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1              THE VIDEOGRAPHER:  We're on the

2    record at 10 a.m.  Today's date is May 24,

3    2023.  This is in the matter of National

4    Prescription Opiate Litigation.  The witness

5    today is located in Mount Pleasant, South

6    Carolina.

7              Please note that this deposition

8    is being conducted virtually by Veritext.  The

9    quality of recording depends on the quality of

10   camera and microphone and internet connection

11   of participants.  What is heard from the

12   witness and viewed on the screen is what will

13   be recorded.

14             Would counsel please state

15   appearances for the record and whom you

16   represent, beginning with the noticing

17   attorney?

18             MS. WOHL:  This is Gabriele Wohl

19   from Bowles Rice representing Kroger.

20             MR. ELSNER:  And this is Michael

21   Elsner from the law firm of Motley Rice on

22   behalf of Montgomery County.

23             MS. BAVERMAN:  Jessica Baverman

24   from the law firm of Vorys on behalf of

25   Kroger.

Page 9

1             MR. DYE:  This is Jordan Dye from

2     the law firm Bowles Rice for Kroger.

3             MS. BOBBITT:  Ebony Bobbitt with

4     Motley Rice for the Plaintiff.

5             MS. SALTZBURG:  And this is Lisa

6     Saltzburg with Motley Rice for the Plaintiff.

7             MR. ELSNER:  I believe my

8     paralegal -- one of my paralegals is also on

9     from Motley Rice.

10             THE REPORTER:  Can you give me the

11     name?

12             MR. ELSNER:  Sam Misischia and

13     Amanda Unterreiner.

14        JACK E. FINCHAM, Ph.D., of lawful age,

15     called for examination, being by me first duly

16     sworn, as hereinafter certified, deposed and

17     said as follows:

18        EXAMINATION OF JACK E. FINCHAM, Ph.D.

19     BY MS. WOHL:

20        Q.    Dr. Fincham, hello.

21        A.    Good morning.

22        Q.    How are you this morning?

23        A.    Very fine.  Hope you are, too.

24        Q.    Great.  Thank you.

25             And we are proceeding remotely.

1    Is there anyone in the room with you?

2         A.    Mr. Elsner is in the room and

3    that's it.

4         Q.    And I think you've been deposed

5    before; is that correct?

6         A.    That's correct.  Yes.

7         Q.    So you know kind of the ground

8    rules here, but if for any reason you don't

9    fully hear or understand a question that I ask

10   you, let me know so I can repeat it, okay?

11        A.    Very good.  Thank you.

12        Q.    And if you answer a question, then

13   I'll assume that you both heard and

14   understand; is that fair?

15        A.    Yes.

16        Q.    I try to take breaks about once an

17   hour.  If you need a break, just let me know

18   if I'm not getting to one, okay?

19        A.    Very good.  Thank you.

20        Q.    Dr. Fincham, is this the only

21   opioid case you've worked on?

22        A.    Yes, it is.

23        Q.    And when did Plaintiff's counsel

24   first reach out to you about writing a report?

25        A.    It was January of this year, 2023.

Page 11

1       Q.    And I was recently sent an invoice

2  of yours that logged your time through

3  February.  Have you been paid on that March

4  invoice?

5       A.    Yes, I have.

6       Q.    And have you spent any more hours

7  on this case since then?

8       A.    The total number of hours that

9  I've spent to date is 106, and that includes

10  what was in that initial billing spreadsheet.

11       Q.    And did you spend time preparing

12  for this deposition?

13       A.    Yes, I did.

14       Q.    How long?

15       A.    Probably 15 hours approximately.

16       Q.    Who did you meet with in preparing

17  for this deposition?

18       A.    I met with Mr. Elsner and two

19  paralegals, Amanda and Sam.

20       Q.    Did you review anything in your

21  preparation?

22       A.    Yes, I did.

23       Q.    What did you review?

24       A.    I reviewed my report, which I had

25  completed.  I reviewed both of the Ohio Board

Page 12

1   of Pharmacy surveys from 2020 and 2021.  I

2   reviewed Ms. Selzer's, Dr. Selzer's report as

3   well as her deposition, and other materials

4   that are listed in my report as far as the

5   references that I utilized.

6         Q.    Dr. Fincham, do you plan to

7   testify at trial in this case?

8         A.    Yes.

9         Q.    Can you tell me what exactly you

10  were asked to do here by Plaintiffs?

11        A.    I was asked to review the report

12  that Dr. Selzer has submitted analyzing the

13  2021 Ohio Board of Pharmacy survey of

14  pharmacists.

15        Q.    And just review it?  Were you

16  asked to rebut it?

17        A.    I was asked to review it and, as a

18  result of that review, I wrote my report.

19        Q.    Do you understand your report to

20  be a rebuttal of Dr. Selzer's opinions?

21        A.    I'm not sure I understand what a

22  rebuttal is per se.

23        Q.    Okay.  In what you've submitted, I

24  see a list of two cases that you've testified

25  in or been deposed in, and you mentioned that

1   you've served as an expert witness and have

2   been deposed in numerous cases over the last

3   20 years?

4         A.    Yes.   That's correct.

5         Q.    Let me ask, as an expert witness

6   were you ever asked to analyze the validity or

7   intent of a survey or questionnaire?

8         A.    Not to this point in time, no.

9         Q.    And were you ever asked to

10  critique another expert's or anyone's analysis

11  of a survey or questionnaire as an expert

12  witness?

13        A.    Not from a legal point of view,

14  no.

15        Q.    And what do you mean by that, "not

16  from a legal point of view"?

17        A.    Because I've reviewed surveys and

18  survey research for the past 40 years

19  thousands of times.

20        Q.    But not as an expert witness?

21              MR. ELSNER:  Objection.

22        A.    As an expert reviewer and as a

23  professional reviewer with credentials to

24  examine survey research and survey

25  methodology.

Page 14

1        Q.    Okay.  Just help me understand
2   your answer.  So I asked you if you were ever
3   asked to critique another expert's or anyone's
4   analysis of a survey or questionnaire.  You
5   said, I think, not from a legal standpoint.
6   What other standpoint would you have been
7   asked to critique an analysis of a survey or
8   questionnaire?
9        A.    As an academic professor reviewing
10  other individuals' work that were submitted
11  either for publication or as part of their
12  thesis or Master's degree submissions.
13       Q.    You cited two cases, and I want to
14  ask you about the Pamela Tackett case, which I
15  think was a criminal case.  Can you tell me
16  what your role in that case was?
17       A.    This was a case that was brought
18  against Ms. Tackett, who was in a car wreck on
19  an interstate highway in South Carolina, the
20  upstate area of South Carolina, and the wreck
21  involved the death of two highway patrolmen
22  and I was asked to comment on Ms. Tackett's
23  use of prescription medications as well as her
24  daily use of THC through marijuana smoking.
25       Q.    So what about the second case,

Page 15

1    Vanzant versus Hill's Pet Nutrition; what was

2    your role in that case?

3         A.    As an expert reviewing the FDA

4    processes that are involved when an item is

5    approved for use as a prescription or

6    over-the-counter item.

7         Q.    And you were an expert witness in

8    both of these cases, right?

9         A.    Yes, I was.

10        Q.    What was your expertise that you

11   relied on for your opinions in those cases?

12        A.    Okay.  Pertaining to the case in

13   South Carolina that involved the marijuana,

14   for 30 years I've been involved with the Food

15   and Drug Administration evaluating adverse

16   drug reactions and adverse drug experiences.

17            When I was at the University of

18   Mississippi, we received a grant from the Food

19   and Drug Administration to develop an online

20   ADR reporting, adverse drug reaction reporting

21   system, and as a result of that, I've been

22   asked to serve on numerous FDA committees.

23   Currently I serve on two.  One is the

24   Non-Prescription Drug Advisory Committee and

25   the other is the Psychotropic Medication

Page 16

1   Advisory Committee.  And based upon my
2   experience and work with adverse drug
3   reactions related to prescription medications
4   as well as, in this case, THC, I was retained
5   as an expert witness.
6           For the second case dealing with
7   Hill's Pet Food -- and there was a case in
8   Illinois, there was also a case in California.
9   And this was based upon my experience with the
10  Food and Drug Administration as a reviewer of
11  grants in the past that have been submitted by
12  academic researchers as well as my service on
13  the two committees that I just previously
14  mentioned.  I was retained because of my -- my
15  knowledge and expertise pertaining to the Food
16  and Drug Administration processes,
17  regulations, those kinds of things.
18      Q.    Now, did any of the expertise
19  required in either of those cases inform your
20  opinion in this case?
21      A.     I think that I rely upon my
22  experience over the course of my career
23  pertaining to lots of issues related to
24  medications, medication use, medication
25  misuse, so, most assuredly, I reviewed, for

Page 17

1  example, what the Drug Enforcement

2  Administration views as THC and the impacts of

3  marijuana as a Schedule I drug, and certainly

4  with the FDA looking at various types of

5  things pertaining to prescription medications,

6  over-the-counter medications, whether it's for

7  human use or animal use.

8       Q.    Any other cases where you have

9  been retained as an expert witness?

10       A.    There have been numerous cases

11  since the late 1990s.

12       Q.    And what was your area of

13  expertise in forming your opinions in those

14  cases?

15       A.    Again, it was related to adverse

16  drug reactions and the impacts of medications,

17  either positively or negative, upon health

18  outcomes.

19       Q.    Can you explain your area of

20  expertise as it pertains to your work in this

21  case?

22       A.    Okay.  It pertains to several

23  things.

24            First of all, my professional

25  experience as a licensed pharmacist since

Page 18

1   1975, and I'm continuously practicing my

2   profession each and every year.  So it's based

3   upon my experience as a pharmacist both in an

4   independent community setting as well as a

5   chain community setting, institutional

6   practice, and long-term care practice.  So

7   that's -- that's one component.

8              And, secondly, it relates to

9   adverse effects that pertain to the misuse of

10  medications, perhaps inappropriate

11  prescribing, inappropriate dispensing, those

12  kinds of things, the work environment of

13  pharmacists and pharmacies and how that

14  impacts patient safety.

15             So all those factors have been

16  part of my career since the 1980s.

17       Q.    What chain pharmacy do you have

18  experience with?

19       A.    At that point in time, it was a

20  Rite Aid pharmacy in greater Atlanta.  Robert

21  Thompson was the district manager for that

22  area and I practiced as a relief pharmacist on

23  weekends while I was a faculty member at the

24  University of Georgia College of Pharmacy.

25       Q.    What was the time period for that?

Page 19

1           A.     It would have been 1986 to 1989.

2                  One thing that I neglected to

3    mention, based upon your question -- excuse me

4    for going back, but it relates to survey

5    research and questionnaire design and

6    development.  And since the 1980s and my

7    graduate school education at the University of

8    Minnesota, I've been heavily involved in what

9    is termed field research.  It's not bench

10   science, it's not lab research, but it's field

11   research, patients in the -- in the healthcare

12   setting environment.

13                 So I've been involved with surveys

14   and surveying patients, surveying

15   practitioners since the 1980s.  So it's almost

16   45 years at this point in time.  I'm familiar,

17   through my training as well as expertise and

18   experience, in survey design and questionnaire

19   construction.

20           Q.     Have you ever worked with any

21   survey research organizations?

22           A.     No, I have not.

23           Q.     Have you ever authored any books

24   about survey research methods?

25           A.     Did you say books?  I'm sorry.

Page 20

1          Q.     Yes, books.

2          A.     Yes.  Several books that I have

3     authored, "Pharmacy and the U.S. Health Care

4     System" -- that's in its fourth edition right

5     now -- when dealing with pharmacists and

6     patient care issues, I deal in that book with

7     survey research and survey methodology.

8                 There's another book that was

9     published in 2007, "Patient Compliance Issues

10    and Opportunities," where I talk about how you

11    can assess patient compliance through survey

12    research and methodology.

13         Q.     How many surveys have you been

14    asked to design?

15                MR. ELSNER:  Objection.

16                You can answer if you know.

17         A.     I have published 70 papers dealing

18    with survey research, survey methodology, and

19    the outcomes of the research that I have

20    conducted.  Over and above those 70, I'm

21    involved -- I've been involved in probably 200

22    survey design and implementation processes.

23         Q.     When you say there's 70 where you

24    were dealing with survey research, did you

25    design the surveys that were involved in those

Page 21

1   research projects?

2          A.    Yes.  Each and every one of those

3   were designed by me with prior research and

4   examination of what the topic was, how it

5   should be addressed, and what the outcomes of

6   that research should be.

7          Q.    Have you ever designed a survey

8   with real world benchmarks?  And do you know

9   what I mean by that?

10         A.    Could you please elaborate what

11  you mean by real world benchmarks?

12         Q.    Where you were predicting behavior

13  and then you are actually able to see what

14  happened and compare what -- your predictions

15  from the survey with what actually happened.

16         A.    Yes.  I've done that numerous

17  times.

18         Q.    Can you give me some examples?

19         A.    I sure can.

20                Patient compliance with

21  medications, patient non-compliance with

22  medications, adverse drug reactions pertaining

23  to the use of medications, the use of tobacco

24  and tobacco cessation methods and methodology,

25  those types of things.

Page 22

1        Q.    And in those instances you're able

2   to take the real world outcomes and compare

3   them with the outcomes of the survey?

4        A.    That's correct, yes.  They were,

5   in fact, predictive-type studies for the most

6   part, but I also did field research studies

7   just assessing what general framework and

8   general components might be of the healthcare

9   system.

10       Q.    And those surveys that you

11  designed that had the real world benchmarks,

12  did you find that the results of your survey

13  accurately predicted what actually happened?

14             MR. ELSNER:  Objection.

15             You can answer.

16       A.    That's -- that's going to be an

17  answer that I have to respond to with 70

18  papers.  In some cases the predictions were

19  right on the money, some cases they weren't.

20  Regardless of what the outcome was, I

21  published the results.  I wasn't trying to

22  seek answer A, B or C.  I was trying to give

23  what an ethical outcome assessment was without

24  any type of bias involved.

25       Q.    Have you ever personally created

Page 23

```
 1   or administered a survey for pharmacists or
 2   pharmacy staff members?
 3          A.    Yes, I have, numerous times.
 4          Q.    And what are the nature of those
 5   surveys?
 6          A.    They were asking about their
 7   interactions with patients, asking about their
 8   satisfaction with their work environment.  So
 9   I've done that with pharmacists.  I've also
10   done it with physician assistants as well as
11   individuals that work within a managed care
12   environment.
13               MS. WOHL:  And I should have asked
14   before we started, but did you all get the box
15   of exhibits that I sent?  There were only
16   three.
17               MR. ELSNER:  Yes.
18          Q.    If you don't mind taking those out
19   at this point.  One of those should be your
20   report, and I just want to make sure that this
21   is the report that you authored and I have the
22   right one.
23               MR. ELSNER:  Are you talking about
24   tab 2 in the binder?
25               MS. WOHL:  Yeah.  I'm not super
```

Page 24

1   familiar with the tabs, but --

2              THE WITNESS:  I do have part of my

3   report in tab 2.  It does not list my

4   curriculum vitae, which was Exhibit 1 of that

5   document.

6              MS. WOHL:  Understood.  I'm going

7   to make this Exhibit 1 to the deposition.

8                    -   -   -   -   -

9              (Thereupon, Deposition Exhibit 1,

10             Expert Report of Jack E. Fincham,

11             Ph.D., R.Ph., was marked for

12             purposes of identification.)

13                   -   -   -   -   -

14      Q.    And if you could look at the

15   bottom of page 1, starting with the last

16   sentence and ending on page 2 of your report,

17   you state that in your pharmacy and public

18   health classes you taught research methods --

19   research design and methods courses that

20   involved research design, focusing on survey

21   research and questionnaire design.  Is that a

22   fair summary?

23      A.    Yes, it is.

24      Q.    Do you remember any of the

25   materials you created for those courses that

Page 25

1  addressed survey research and questionnaire

2  design?

3              MR. ELSNER:  Objection.

4              You can answer.

5      A.     I have thousands of pages of

6  reference materials that I utilized in

7  developing these courses.  I constantly made

8  sure that the data that I was presenting was

9  up to date and current, so I used literature

10  sources, I used textbook sources, and I used

11  examples of poorly designed questionnaires and

12  surveys.

13      Q.    Do you know roughly how many of

14  these college courses and, I guess, Master's

15  courses that you taught specifically covered

16  survey research and questionnaire design as

17  part of the course curriculum?

18              MR. ELSNER:  Objection.

19      A.    15 courses in four major colleges

20  and universities in the United States.

21      Q.    Are you currently teaching?

22      A.    Yes, I am.

23      Q.    And when was the last time you

24  taught a class that integrated survey research

25  and questionnaire design into the course

Page 26

1    curriculum?

2         A.    It would have been two years ago.

3         Q.    And we talked about this a second

4    ago.  On page 2 of your report you mention

5    that 70 of your 255 papers published in

6    medical journals have been the result of

7    questionnaire and survey research.  How did

8    you calculate that total of 70 for this

9    statement?

10        A.    Basically just counted the number

11   in that 200 -- it's not 260, but 255 published

12   papers that dealt with questionnaire research,

13   design and survey methodology.  I just simply

14   went through and numbered them.

15        Q.    Are each of these papers

16   integrating the results of questionnaires and

17   surveys?

18        A.    Yes, they are.

19        Q.    Of different -- are each of them

20   about a different survey?

21             MR. ELSNER:  Objection.

22             You can answer.

23        A.    I don't have total recall of the

24   entire components of each of these 70.  Some

25   of these were papers that were an additional

1  paper based upon a previously published study

2  that I did that looked at a survey and survey

3  methodology.  But I would say of the 70, 65 of

4  them I would estimate -- that's just an

5  estimate, please -- 65 would be independent

6  and mutually exclusive based upon the other

7  65.

8        Q.    In any of these publications did

9  you analyze the intent of the person or

10  organization conducting the survey or

11  questionnaire?

12        A.    I was the one that was doing the

13  conducting of the survey, so I thoroughly

14  analyzed what I was doing, why I was doing it,

15  and what the results were to be used for.

16        Q.    In any of your other publications

17  have you analyzed the intent of the purpose --

18  of the person or organization conducting the

19  survey or questionnaire?

20        A.    Yes, I have.

21        Q.    Do you recall any specific

22  examples?

23        A.    I'd have to go through those

24  250-some papers to tell you which ones.  I

25  don't have it at the tip of my tongue.

1      Q.    Are you currently a practicing

2   pharmacist?

3      A.    Yes, I am.  I'm licensed to

4   practice in the state of Colorado, and because

5   the federal government does not require a

6   specific license other than a state license,

7   I'm able to do things within a federal

8   capacity if and when I need to do so.  I'm

9   currently a volunteer with the Medical

10  Research Corps of Southern Arizona, and in

11  that capacity they allow me to use my Colorado

12  pharmacy license to practice at certain

13  components within areas where I am.

14     Q.    And when you're not in that

15  federal capacity -- I'm sorry.  Can you

16  explain the federal capacity practicing to me?

17     A.    All right.  The federal government

18  does not require that you have a pharmacy

19  license within a federal government component

20  agency.  So if you work within the VA system

21  or you work as a volunteer in some type of a

22  federal organization, you just have to have a

23  state pharmacy license.  It doesn't matter

24  what that state is or where that state is.  It

25  might be -- in my case I live in Arizona but

1    the state where I am licensed is the state of

2    Colorado.

3         Q.    And you mentioned an organization

4    that you volunteer with.  What is that?

5         A.    It's the Medical Reserve Corps of

6    Southern Arizona, and this is an organization

7    made up of nurses, pharmacists, physicians,

8    nurse practitioners, physician assistants that

9    provide care and services in a community

10   outreach type of setting.

11        Q.    And you practice pharmacy in

12   connection with that organization?

13        A.    Yes, I did.

14              Can I elaborate with a specific

15   example --

16        Q.    Yes.

17        A.    -- please?  Okay.

18              During the initiation of the COVID

19   vaccination process in Tucson, Arizona, one of

20   the major metropolitan healthcare hospitals in

21   Tucson, the Tucson Medical Center, set up what

22   was called a drive-thru vaccination clinic,

23   and they sought volunteers that had experience

24   in vaccine preparation, vaccine administration

25   that were credentialed in order to provide

Page 30

```
 1   vaccinations, and so I volunteered through the
 2   Tucson Medical Center drive-thru COVID
 3   vaccination process for six months.  I
 4   prepared individually 15,000 COVID
 5   vaccinations for administration.  So I worked
 6   three days a week eight hours a day for those
 7   three days to provide the preparation of those
 8   vaccinations, administer those vaccinations,
 9   and oversee the process to make sure that
10   sterile practicing was provided and that clean
11   and accurate administration was occurring.
12        Q.    And this was in Arizona?
13        A.    It was in Tucson, Arizona at the
14   Tucson Medical Center.
15        Q.    And where do you practice in the
16   state of Colorado, if you do?
17        A.    I have a license in the state of
18   Colorado.  I haven't practiced in Colorado
19   since we left Colorado for me to pursue
20   graduate studies at the University of
21   Minnesota in 1980, but I've been licensed for
22   48 years in the state of Colorado.
23        Q.    And other than your work with the
24   COVID vaccines, when was the last time you
25   dispensed medication as a pharmacist?
```

Page 31

1        A.    That was it.

2        Q.    And did you -- when you were

3  practicing as a pharmacist, were you

4  practicing -- you mentioned some experience

5  with Rite Aid.  Did you have other experience

6  in a pharmacy?

7        A.    Yes, I did.

8              MR. ELSNER:  Objection.

9              Just give me one second.

10             Just object to the form.

11             Go ahead.

12       A.    Upon graduation from pharmacy

13  school in 1975, we moved to western Colorado,

14  a city called Montrose, and at that -- in

15  Montrose I was a part-owner of a community

16  pharmacy and I was the pharmacist manager for

17  that pharmacy for five years.  And I also

18  practiced in a long-term care facility as a

19  consultant pharmacist for three nursing homes

20  in the Montrose County area.  So that's as an

21  independent pharmacy owner, pharmacy manager,

22  and practitioner.

23       Q.    And in your experience in the

24  independent pharmacy and the chain pharmacy,

25  did you dispense opioid medications?

Page 32

1          A.      I certainly did, yes.

2          Q.      And I take it the last time you

3    did that would have been in the 1980s?  Did

4    you say 1980 is the last year you practiced?

5                  MR. ELSNER:  Objection.

6                  Go ahead.

7          A.      It would have been in the 1990s,

8    late 1990s.  What I tried to do when I started

9    my academic career was each and every summer

10   or break period I wanted to work in a pharmacy

11   setting so I could keep current with what the

12   demands, current environment and practice

13   components might be, so I did that religiously

14   throughout my academic career.

15         Q.      So you practiced in a pharmacy

16   every summer.  What were the years that you

17   did that?

18         A.      Okay.  That would have been

19   through 2004, and then from 2004 until my

20   academic retirement, at least as a full

21   professor, in 2018, I would spend time in

22   pharmacies each and every year, whether it was

23   an independent, a chain or a community

24   pharmacy, to just see what was going on, how

25   it was being done, what some impacts might be

Page 33

1    upon the pharmacists.

2         Q.    So during those summers where you

3    were spending time in a pharmacy until 2004,

4    were you dispensing medication?

5         A.    I was observing the dispensing.  I

6    wasn't doing the actual dispensing myself.

7         Q.    Okay.  And then between 2004 and

8    2018, when you were spending time in

9    pharmacies, were you dispensing medication?

10        A.    No.

11        Q.    Are you still practicing

12   pharmacy -- are you a practicing pharmacist

13   right now?

14        A.    I consider myself to be a

15   pharmacist, and my current practice is I

16   provide medication-related coursework for

17   senior citizens through what's called the

18   University of Arizona OSHER, O-S-H-E-R,

19   Life-Long Learning Program.  I've done five

20   courses with that component.  I also interact

21   with faculty and students at the University of

22   Arizona College of Pharmacy.  In that capacity

23   I consider myself to be a practicing

24   pharmacist in how I perform my duties and

25   interactions with those individuals.

Page 34

1     Q.   But since you were giving out

2  COVID vaccines, have you dispensed medication

3  at a pharmacy or given vaccines at a pharmacy

4  setting?

5     A.   No, I have not.

6     Q.   Have you done anything in a

7  pharmacy setting since your work with the

8  Medical Reserve Corps in southern Arizona?

9     A.   Well, I'm still with the Medical

10  Reserve Corps, but recently I have not, no.

11     Q.   And when was the last time you did

12  work with them?

13     A.   It would have been 2022.

14     Q.   And have you ever served as an

15  expert witness in a case that concerned opioid

16  dispensing?

17     A.   Yes.

18     Q.   Which one was that?

19     A.   This was a case in Little Rock,

20  Arkansas, and it was a case involving the

21  misprescribing and administration of a

22  fentanyl dose to an infant child in the

23  medical center in Little Rock, Arkansas, and

24  the baby passed away and I was brought in to

25  speak to fentanyl administration, prescribing

Page 35

1    and dosing for pediatric populations.

2         Q.    And did you offer an opinion in

3    that case?

4         A.    Yes, I did.

5         Q.    Can you tell me the nature of that

6    opinion?

7         A.    The nature was that this was a

8    misprescribed fentanyl dose on the part of the

9    physician, and it -- it should not have been

10   dispensed by the pharmacy for administration

11   to the patient because of the problems

12   associated with how this dosing was calculated

13   and was to be administered.

14        Q.    Do you recall the pharmacy that

15   dispensed this medication?

16        A.    It was the medical center pharmacy

17   in Little Rock, Arkansas.

18        Q.    In your experience as an expert

19   witness, what kind of work have you done on

20   pharmacy practices and standards of care?

21             MR. ELSNER:  Objection.

22             Go ahead.

23        A.    There have been several cases that

24   involved pharmacy errors, misdispensing of

25   medications to patients, the wrong drug for

Page 36

1    the wrong patient at the wrong time, and I was

2    asked to provide input on what that was and

3    what the problems were in that dispensing and

4    administration process.

5            Q.    Anything else?

6            MR. ELSNER:  Objection.

7            Go ahead.

8        A.    No.

9        Q.    Have you ever been qualified as an

10   expert by a court?

11       A.    Yes, I have.

12       Q.    In which cases?

13       A.    I don't have the number of cases

14   at the tip of my tongue, but this goes back to

15   1996, and since 1996 through the present

16   there's probably been 20 to 25 cases that I've

17   been involved with and approved as an expert

18   witness.

19       Q.    Have you ever been proffered as an

20   expert witness but not qualified?

21       A.    No, I have not.

22       Q.    Has a court ever limited your

23   testimony?

24       A.    No, they have not.

25       Q.    Are you familiar with the 2022 CDC

1   guidelines for prescribing opioids for pain?

2        A.    Yes, I am.  I'm very familiar with

3   those guidelines.  I use those materials in

4   coursework that I present to doctor and

5   pharmacy students at several universities and

6   colleges of pharmacy in the United States.

7        Q.    Do you agree with the current

8   guidelines?

9              MR. ELSNER:  Objection.

10       A.    I can see where these guidelines

11  were important, why they were important, why

12  they need to be followed and how they can be

13  used by pharmacy practitioners in a practice

14  setting.

15       Q.    Is there anything in the current

16  guidelines that you don't agree with?

17             MR. ELSNER:  Objection.

18       A.    No, I do not.

19       Q.    Sorry.  You do not what?

20       A.    I do not disagree with any of the

21  current guidelines.

22             And just as a point of reference,

23  I was the first pharmacy faculty member in the

24  United States across the country to utilize

25  these guidelines in coursework in colleges of

Page 38

1    pharmacy in the pharmacy schools.

2         Q.    Turning to your report and the

3    Ohio Board of Pharmacy surveys, the Ohio Board

4    of Pharmacy repeatedly said that the 2020 and

5    2021 surveys were about working conditions; is

6    that right?

7                   MR. ELSNER:  Objection.

8         A.    In my estimation, respectfully,

9    please, that's a very limited view of what

10   they were looking at.

11        Q.    Okay.  Is it your opinion that

12   these surveys were about opioids?

13        A.    I'm sorry.  I didn't understand

14   your question.

15        Q.    Is it your opinion that these Ohio

16   Board of Pharmacy surveys were about opioids?

17        A.    They included components that

18   certainly embraced the problems associated

19   with opioid dispensing.

20        Q.    On page 5, if you could turn there

21   with me, of your report, at the beginning of

22   the last paragraph you write, "Over the last

23   20 years, there has been growing concern among

24   pharmacists, boards of pharmacy and trade

25   associations related to working conditions in

Page 39

1   retail chain and grocery store pharmacies."

2              Do you see that?

3        A.    Yes, I do.

4        Q.    And what complaints are you

5   referring to in this instance?

6        A.    Because state pharmacy boards are

7   public entities, they produce documents that

8   show what complaints have been made, by whom,

9   how many, those kinds of things, so that's

10  where that construct comes from.

11       Q.    Are you referring to any specific

12  complaints that you recall here?

13       A.    There have been numerous

14  complaints in each of the 50 states related to

15  this issue.

16       Q.    Have you reviewed complaints to

17  the state board of pharmacies in every -- each

18  of the 50 states?

19       A.    No, I have not.

20       Q.    Do you recall any specifically

21  about Kroger?

22              MR. ELSNER:  Objection.

23       A.    I'm not sure what -- if what I'm

24  going to answer is necessarily considered,

25  quote, unquote, complaint, but rulings and

Page 40

1  findings from court cases have indicated such
2  problems with dispensing of opioids in Kroger
3  pharmacies.
4      Q.    And what rulings and findings are
5  you talking about?
6      A.    Well, specifically in the state
7  where you're located this morning, West
8  Virginia settled with Kroger for 68 million
9  dollars.
10      Q.    And you would consider that a
11  ruling or a finding by a court?
12      A.    Yes, I would.
13      Q.    In what way?
14      A.    Well, I'm not an attorney, okay,
15  but when I see a settlement that's 68 million
16  dollars that Kroger paid, then that indicates
17  to me that it was a settlement.
18      Q.    I agree with you that it was a
19  settlement.  Does that settlement influence
20  your opinions -- does that settlement
21  influence your opinions in this case?
22          MR. ELSNER:  Objection.
23      A.    I looked at this particular case
24  that we're talking about this morning as an
25  independent viewer of what the particular

Page 41

1  situation was without trying to weigh in any

2  other factors from any other cases.

3      Q.    So when you wrote this sentence,

4  though, what -- I believe you just told me

5  there were numerous rulings and findings

6  pertaining to Kroger specifically.  What are

7  you referring to when you said that?

8      A.    Okay.  The association that

9  monitors each and every one of the 50 boards

10  of pharmacy in the United States is the

11  National Association of Boards of Pharmacy.

12  And NABP, again, it's a public entity and they

13  have reported findings, other types of things

14  pertinent to what I was writing in this

15  particular paragraph.

16      Q.    And specific to Kroger?

17      A.    I don't know specifically if

18  Kroger was identified, but large chain

19  community settings, which obviously includes

20  Kroger, would have been involved.

21      Q.    You also mention in this paragraph

22  DEA cases that have warned about pharmacies

23  utilizing metrics and other incentives.

24          Do you see that?

25      A.    Yes, I do.

Page 42

1          Q.     Which DEA cases are you referring
2    to?
3          A.     I'm not sure if I can identify a
4    specific case.
5          Q.     Any of them dealing with Kroger?
6               MR.  ELSNER:   Objection.
7          A.     I can't recall that off the top of
8    my head.
9          Q.     On page 8 of your report, the last
10   paragraph that starts out, "Organizations
11   conduct different types of surveys," the
12   second sentence there states that, "The Ohio
13   Board of Pharmacy conducted its surveys to
14   gather information about existing workload
15   conditions that required further study, and
16   not necessarily to understand what all Ohio
17   pharmacists believe."
18               Can you explain that sentence to
19   me?
20         A.     Yes.  I certainly can try.  It
21   goes back to what the particular survey was
22   supposed to be doing, okay.  And when you
23   construct a survey, you consider what is it
24   that you're trying to examine, how are you
25   going to examine it, and what are you going to

Page 43

1   use the results of that process or that

2   research to do.  And if you look at the study

3   that we're talking about in the state of Ohio

4   with workload conditions, it wasn't trying to

5   predict anything, it wasn't trying to estimate

6   what something might be.  It was just simply

7   understanding component field research to try

8   to look at what the general working conditions

9   were as stated by pharmacists that were

10  licensed to practice pharmacy in the state of

11  Ohio.  It wasn't trying to predict anything.

12  It was just to get a general sense of what the

13  state of practice components might be affected

14  by workplace environments.

15          Q.   Is it your opinion that this --

16  these surveys were not -- let me rephrase

17  that.

18               Is it your opinion that it was not

19  the purpose of the surveys to understand what

20  all Ohio pharmacists believed?

21               MR. ELSNER:  Objection.

22          A.   You couldn't conduct a survey to

23  analyze what all pharmacists consider.  This

24  was just to try to get a general sense of

25  workplace conditions that impacted patient

Page 44

```
 1   safety in the practice of pharmacy in these
 2   settings in Ohio.
 3        Q.    On page 10 of your report -- if
 4   you could flip there -- you talk about the
 5   response rate, and the last sentence of that
 6   top paragraph says, "In my opinion the
 7   response rates for pharmacists responding to
 8   the 2020 and 2021 survey was adequate and
 9   appropriate."
10             What do you mean by adequate and
11   appropriate here?
12        A.    And, again, what all this goes
13   back to is what the purpose of this survey was
14   for, okay.  And it wasn't to try to predict
15   anything.  It wasn't trying to estimate
16   anything other than what the working
17   conditions were in the state of Ohio for
18   pharmacists in the two years that this study
19   was conducted.
20             And if you look at the response
21   rate that you see in this study, it's very
22   similar to the response rates that you could
23   see in other state surveys, West Virginia,
24   Missouri, as well as national surveys that
25   were conducted by the American Association of
```

1   Pharmacists, the APhA studies, that looked at

2   workload conditions, working conditions,

3   working environment, and if you consider the

4   response rate in these Ohio studies with those

5   other studies that I just referenced, it's

6   very, very similar, if not the same.

7        Q.    You referenced three just now

8   surveys, in West Virginia, Missouri and

9   national.  When was there a West Virginia

10  Board of Pharmacy survey conducted?

11       A.    I do not recall.

12       Q.    Do you recall what the response

13  rate in that survey was?

14       A.    It was very similar.  I can't give

15  you the exact specificity of what the response

16  rate was, but it was very similar as far as

17  the percentage of respondents.

18       Q.    What was the West Virginia survey

19  about?

20       A.    Workload conditions in pharmacies.

21       Q.    And I looked through your

22  materials considered in your report and I'm

23  not sure I saw a West Virginia Board of

24  Pharmacy survey.  Do you think -- is that in

25  there?  Is that something you considered?

```
                                        Page 46
 1        A.    It's not something I considered.

 2   I just know that they did a study and I looked

 3   at the results but I didn't include it in the

 4   paper that I -- or the report I presented and

 5   prepared.

 6        Q.    Okay.  So you believe there is a

 7   study done but you're not sure when; is that

 8   right?

 9        A.    That's correct.

10        Q.    And you don't know the response

11   rate but you believe it was about 20 percent?

12        A.    It was more than that.  I can't

13   tell you exact percentage.

14        Q.    Do you know how much more than the

15   Ohio survey response rate it was?

16             MR. ELSNER:  Objection.

17        A.    No, I do not.

18        Q.    Now, the Missouri survey, that's

19   what you supplemented your report with

20   recently; is that right?

21        A.    That's correct.

22             MR. ELSNER:  That's not true,

23   actually, counsel.

24             MS. WOHL:  I'm sorry.  That was

25   Oregon.  Okay.  My mistake.
```

Page 47

1          Q.    Do you recall the year that the
2    Missouri Board of Pharmacy did a survey of
3    workload conditions?
4          A.    I can't give you the exact date,
5    but I think it was around 2014.
6          Q.    Was this part of your materials
7    considered?
8          A.    Yes, it was.
9          Q.    And do you recall the response
10   rate in the Missouri Board of Pharmacy survey?
11         A.    If you could give me a minute, I
12   could go to the exact spot and tell you.
13         Q.    Okay.
14         A.    It's footnote 117.  I have to look
15   at the exhibit to tell you what the date of
16   that survey was precisely.
17         Q.    Okay.  Do you recall the response
18   rate in the Missouri Board of Pharmacy survey?
19               MR. ELSNER:  Objection.
20         Q.    I'm sorry.  That's what I just
21   asked you, isn't it?
22               Okay.  And you also cited to a
23   national pharmacy workload survey?
24         A.    Yes.
25         Q.    And do you recall the year that

Page 48

1    the national survey was done?

2         A.    Again, I'd have to go to the

3    footnotes to pull up the exact date.  I don't

4    recall what the date was.  The Missouri Board

5    of Pharmacy survey was 2019.  That's on page

6    27, first paragraph, halfway down the page.

7         Q.    Can you recall the response rate

8    of the national board -- or the national

9    pharmacy survey?

10        A.    It was in the range of the 20

11   percentile.  I can't tell you exact amount.

12        Q.    Were there any other surveys that

13   you're referring to in this sentence on page

14   10?

15        A.    On page 10?

16        Q.    Yes, about similar surveys.

17              MR. ELSNER:  Objection.

18        A.    Where specifically on page 10 are

19   you referencing?

20        Q.    It's the last sentence on that

21   first paragraph, "Similar surveys assessing

22   the status of work environment for

23   pharmacists."

24        A.    Those are the ones that I'm

25   referring to.

1    Q.    Okay.  Do you agree that survey

2  response rates are a factor to consider in

3  determining the quality and validity of a

4  survey's results?

5    A.    I can't agree with that statement

6  as you stated it.

7    Q.    Would a higher response rate to

8  the Ohio Board of Pharmacy surveys have

9  yielded results that more accurately reflected

10  the opinions of all pharmacists in the state

11  of Ohio?

12         MR. ELSNER:  Objection.

13    A.    I can't answer that question

14  without elaborating.

15    Q.    In your opinion, do the Ohio Board

16  of Pharmacy surveys represent accurate

17  cross-sections of the Ohio pharmacists at the

18  time?

19    A.    That was not the purpose of the

20  study, to do that particular thing that you're

21  pointing out.

22    Q.    Regardless of a purpose, is it

23  your opinion that the surveys do represent

24  accurate cross-sections of all Ohio

25  pharmacists at the time?

Page 50

1           MR. ELSNER:  Objection.

2      A.    I can't agree with your premise

3  statement.

4      Q.    Are you familiar with the concept

5  of weighted data in surveys?

6      A.    Yes, I am.

7      Q.    Can you explain that to me?

8      A.    Okay.  That is a particular type

9  of study that's disparately different than

10  this survey and the intent of this survey.  A

11  weighted data survey would look at a survey

12  that was conducted to do some type of a

13  prediction and some type of an assessment from

14  a statistical point of view of the validity of

15  the data that was collected, and it might

16  include any number of factors that include

17  demographics, other types of things that you

18  can weigh in and use to assess whether or not

19  what you found is accurately representing what

20  it is that you wanted to find.  That's not the

21  purpose at all in any way, shape or form of

22  what the Ohio surveys were intended to do.  It

23  wasn't to be predictive, it wasn't to have any

24  kind of a statistical component associated

25  with it other than to look at the general

1   workplace conditions that impacted patient

2   safety in pharmacies in the state of Ohio.

3        Q.    You repeated this a couple times.

4   I want to make sure I've got this right.  The

5   Ohio Board of Pharmacy surveys were not meant

6   to represent the Ohio pharmacists at large?

7             MR. ELSNER:  Objection.

8        A.    You have to look at specifically

9   why these studies were conducted.  They were

10  conducted to look at general work conditions

11  as perceived by pharmacists that responded to

12  the survey.  It wasn't trying to predict

13  anything.  It was simply trying to assess what

14  the current situation was and factors that

15  impacted pharmacists and their ability to

16  practice pharmacy.

17       Q.    So, again, they were not meant to

18  represent the thoughts and feelings and

19  conditions of all Ohio pharmacists, correct?

20       A.    That was not the purpose of the

21  study, no.

22       Q.    So when you say the purpose of the

23  study was to understand general working

24  conditions of pharmacists, do you mean that it

25  was general working conditions of only the

Page 52

1    pharmacists who responded to the survey?

2              MR. ELSNER:  Objection.

3         A.    I can't agree with that statement.

4         Q.    Why not?

5         A.    Because that wasn't the purpose of

6    the study.  The purpose of the study was to

7    get a general assessment of workplace

8    conditions as perceived by pharmacists that

9    responded to the surveys.

10        Q.    So the assessment of workplace

11   conditions that the Ohio Board of Pharmacy got

12   out of this survey is limited to the

13   perceptions of the pharmacists who responded;

14   is that a correct statement?

15             MR. ELSNER:  Objection.

16        A.    I can't agree with that statement.

17        Q.    Why not?

18        A.    The use of the term "limited" is

19   confusing.  I think that you have to look at

20   the results that were found as they were

21   presented, both the Likert scale items with

22   the numerical value associated with them, a

23   percentage value associated with them, as well

24   as the verbal comments.

25        Q.    When you say you have to look at

Page 53

1   those, are you expressing that's why you can't

2   agree with that statement about the general

3   assessment?

4        A.   Could you please repeat your

5   question in its entirety?

6             MS. WOHL:  Could I have the court

7   reporter read that question back?

8                  (Recess had.)

9        Q.   That was the question.  Thank you.

10       A.   The purpose of the study was to

11  get an assessment of pharmacists' perception

12  of workplace conditions, and that's what they

13  responded to both in their Likert scale items

14  as well as their verbal responses.

15            THE WITNESS:  Would it be possible

16  to take a break, please?

17            MS. WOHL:  Yes.  Why don't we take

18  a ten-minute break.

19            THE VIDEOGRAPHER:  Going off the

20  record, 10:55.

21                 (Recess had.)

22            THE VIDEOGRAPHER:  On the record,

23  11:07.

24  BY MS. WOHL:

25       Q.   Dr. Fincham, I want to go back to

Page 54

1   the questions that we left off on and make

2   sure I understand what you're saying here.

3            You said a few times that the

4   purpose of the survey was to get a sense of

5   the general working conditions at Ohio

6   pharmacies; is that correct?

7       A.    Yes.

8       Q.    But do you agree with me that the

9   workplace conditions of the survey gives you a

10  sense of the conditions of the pharmacists who

11  responded?  Do you agree with that?

12           MR. ELSNER:  Objection.

13      A.    I think that you can take that at

14  face value, but you also have to realize that

15  there were data points that were collected,

16  but based upon how many years of experience

17  somebody had, where their practice site was,

18  whether it was in an institutional setting, an

19  independent setting, a large chain setting, a

20  food market-based pharmacy.  Those types of

21  demographic information items were collected.

22      Q.    Are you saying that because they

23  collected those demographic data information,

24  you can tell from the responses about

25  workplace conditions of pharmacists who did

1   not respond to the survey?

2         A.    You can't predict what somebody

3   didn't respond to, but what you can look at is

4   what was stated by those that did make an

5   opinion stated either through the Likert scale

6   responses or the verbal responses.

7         Q.    I think we agree on that point.

8               Dr. Fincham, you also talked about

9   the West Virginia settlement, and I want to go

10  back to that.

11              Where did you learn about the

12  Kroger settlement in West Virginia?

13        A.    Ms. Wohl, it was just simply an

14  online assessment of other lawsuits that have

15  been brought against various chain pharmacies,

16  and I just saw that online as a settlement

17  that was reached in the state of West Virginia

18  versus Kroger.

19        Q.    And does that settlement support

20  any of the opinions that you've made in this

21  report?

22              MR. ELSNER:  Objection.

23        A.    Ms. Wohl, I did not even consider

24  that report or that finding in the report that

25  I presented that we're looking at this

Page 56

1    morning.

2         Q.    Do you believe that, you know,

3    after the fact that it supports what you've

4    said in your report?

5              MR. ELSNER:  Objection.

6         A.    Again, I didn't look at that

7    report in its entirety.  I just simply saw the

8    dollar value and left it at that.  I didn't

9    pursue it any further.

10        Q.    Does it have any relevance to your

11   opinions in this report?

12        A.    I'd have to look at what it is

13   that was stated in that document to see

14   whether or not that it supported or didn't

15   support what it is that I wrote.  In my mind

16   it's just not pertinent to what we were

17   looking at here today.

18        Q.    I'm going to ask you to look at

19   what I think might be tab 1.  It's an article

20   you authored in 2008.

21              Do you see that?

22        A.    Yes.  I am there.

23        Q.    This is going to be our Deposition

24   Exhibit 2.

25                   -   -   -   -   -

Page 57

1     (Thereupon, Deposition Exhibit 2,

2     Article Entitled "Response Rates

3     and Responsiveness for Surveys,

4     Standards, and the Journal," was

5     marked for purposes of

6     identification.)

7      - - - - -

8  Q.  Am I right about that?  Is this a

9 2008 article you authored for the American

10 Journal of Pharmaceutical Education?

11  A.  Yes.  That was published at that

12 point in time.  It's been referenced by other

13 authors in refereed manuscripts over 1,500

14 times.

15  Q.  And you were the associate editor

16 of the American Journal of Pharmaceutical

17 Education at the time; is that right?

18  A.  Yes.  For ten years I was in that

19 capacity.

20  Q.  And under the heading Expectations

21 for Survey Response Rates, the first sentence

22 is, "There are now higher expectations for

23 survey response rates."

24    Do you see that?

25  A.  Yes, I do.

Page 58

1      Q.    And you've got below that
2  "Response rates approximating 60 percent for
3  most research should be the goal of
4  researchers," correct?
5      A.    That's correct.
6      Q.    And "For survey research intended
7  to represent all schools and colleges of
8  pharmacy, a response rate of 80 percent is
9  expected"?
10     A.    Yes.
11     Q.    You've also got under the last
12  full paragraph on that first page,
13  "Non-response bias is a deadly blow to both
14  the reliability and validity of survey study
15  findings"; is that right?
16     A.    Yes.
17     Q.    So for the Ohio 2021 Board of
18  Pharmacy pharmacists' workload survey, the
19  response rate was somewhere around 20 percent,
20  right?
21     A.    Yes.
22     Q.    And you believe that 20 percent is
23  a sufficient response rate to prove the
24  validity of that Ohio Board of Pharmacy
25  survey; is that right?

Page 59

1          A.    I do based upon what the purposes

2      of that study were.  And if you look at this

3      particular published paper that we're

4      referencing right now, this was focused on

5      academic researchers and schools and colleges

6      of pharmacy throughout the United States and

7      Canada that were publishing findings that were

8      to be predicted within a certain percentage of

9      what accurately might be assessed when you

10     look at a survey and the survey data and the

11     results.

12               So the types of studies that we're

13     looking at in this particular paper, that I'm

14     referencing in this paper, are night and day

15     different from the survey that was conducted

16     that was a field study in the state of Ohio.

17     So the studies that are referenced here in

18     this paper deal with specific predicting types

19     of questionnaire items rather than assessing

20     what the general framework of something might

21     be.

22               So the studies that are published

23     in the AJPE have to deal with predicting how

24     students are going to respond to a particular

25     course, how faculty are going to respond to a

Page 60

1  particular course.  So you do a defined

2  sample -- in some cases it's a weighted

3  sampling process that then you can look at and

4  see whether or not it was valid.

5            One of the factors you look at is

6  the response rate.  That's not what you do

7  with field studies that we're talking about

8  with the State of Ohio surveys.

9       Q.    Explain to me what a field study

10  is, please.

11       A.    A field study is conducted as a

12  general assessment of what factors are in an

13  environment, and we're looking, for example,

14  in the state of Ohio, what the pharmacists'

15  perception of their workplace conditions are.

16  And some of the demographics that were

17  obtained dealt with institutional practice,

18  chain pharmacy, food market-based pharmacy, et

19  cetera.  So it wasn't trying to predict

20  anything.  It was trying to just see what the

21  general field conditions were as perceived by

22  pharmacists of their working conditions.

23       Q.    In a field study like that is the

24  response rate unimportant?

25       A.    The response rate is not as

1    important as it is in a statistically focused,

2    parametrically designed study that looks at

3    specific statistics and statistical analyses,

4    et cetera.

5           Q.    So in those studies a response

6    rate of 60 to 80 percent is appropriate but in

7    field studies you would aim for a response

8    rate of 40 percent?

9           A.    That's a general assessment that I

10   would agree with, yes.

11          Q.    And do you know whether similar

12   experts in the survey field would agree with

13   that assessment, that field study response

14   rates should generally aim for a 20 percent

15   figure there?

16          A.    I can agree with that statement,

17   and I can look at the researchers that did.

18   For example, the APhA study, John Stomer from

19   the University of Minnesota.  He has published

20   numerous papers that deal with field

21   research-type topics.  And looking at the

22   response rates that we achieved here in Ohio

23   versus what was achieved in the national study

24   are very, very similar, and they're accepted,

25   they're considered to be valid in their

Page 62

1    design, in their analysis.

2         Q.    Responding to this Ohio Board of

3    Pharmacy survey, this was voluntary; is that

4    right?

5         A.    That's correct.

6         Q.    Doesn't the non-responsive rate at

7    least raise a question of whether the

8    pharmacists who chose to respond are different

9    in some way than those who chose not to

10   respond?

11        A.    I can't agree with that.

12        Q.    Why not?

13        A.    Because what the pharmacists

14   indicated in their Likert scale responses,

15   their satisfaction, dissatisfaction, et

16   cetera, were mirrored very closely in some of

17   the items that were listed in the verbal or

18   written responses that they provided.  And the

19   number of written responses in both the Ohio

20   surveys was really very, very large.  It's

21   rare to have that many people respond as they

22   did not only in the numbers that we're talking

23   about but within the framework of each

24   individual's response.  Some of these were

25   elaborately detailed paragraph after

Page 63

1    paragraph.

2          Q.    So what do those comments then,

3    the details that you're talking about, tell

4    you about the pharmacists who chose not to

5    respond to the survey?

6                MR. ELSNER:  Objection.

7          A.    I can only tell you what the

8    pharmacists that did respond verbalized, and

9    the quality of the components of what they

10   described was, to me as a pharmacist,

11   disturbing.  My blood boiled.  It was

12   absolutely disgraceful that pharmacists would

13   be put in this type of environment and have to

14   practice as they did with the constraints

15   under which they practiced.

16         Q.    So, to be clear, the responses

17   that you reviewed, do they to you indicate any

18   conditions or feelings that any of the Ohio

19   pharmacists who did not choose to respond to

20   the survey may have had?

21               MR. ELSNER:  Objection.

22         A.    I can only speak to what the

23   responses were that I read.

24         Q.    Thank you.

25         A.    And as a pharmacist, I'm going to

Page 64

1   reiterate, it was incredibly disturbing to see

2   my profession treated as these respondents

3   indicated that they had to practice, and the

4   stresses, the strains, the absolute astounding

5   negative conditions in which they were

6   expected to take care of patients.

7          Q.     Were these results surprising to

8   you?

9          A.     The results were not surprising

10  because I have taught in schools of pharmacy

11  about proper activities that pharmacists

12  should be participating in that they need to

13  be supervised with and for.  It wasn't

14  surprising that I saw it.  What was surprising

15  was the breadth and depth of the negative

16  aspects of these individuals' practice

17  environments.  It was disturbing to me as a

18  pharmacist.  You can call me lots of things.

19  The thing I am most proud of is I am a

20  pharmacist, and this was so disturbing that it

21  absolutely astounded me, the breadth and depth

22  of the negative aspects of these individuals'

23  expected practice environments.  I knew that

24  it would be bad, but I didn't expect it to be

25  this horribly bad.

Page 65

1      Q.    On page 8 of your report, you
2  state that responding pharmacists likely
3  viewed the surveys as a sincere effort by the
4  board to understand how pharmacists' workloads
5  impact patient safety, right?
6      A.    Yes.
7      Q.    And you note some of the written
8  comments that you've talked about, and you
9  note that some of them even requested that the
10 board take action to improve working
11 conditions and patient safety, right?
12     A.    Yes.
13     Q.    Is it possible that the
14 pharmacists who chose to respond to the survey
15 were more likely to be those pharmacists who
16 wanted the board to take action?
17     A.    I can't agree with that statement.
18 You don't know.
19     Q.    And you put throughout your report
20 comments that pharmacists chose to write
21 indicating their dissatisfaction with their
22 current work environment, right?
23     A.    Yes.
24     Q.    Is it possible that the
25 pharmacists who chose to take this survey were

Page 66

1   more likely to have complaints to voice about

2   their work environment than the pharmacists

3   who did not respond?

4           MR. ELSNER:  Objection.

5       A.    I can't agree with it.

6       Q.    Why not?

7       A.    You simply do no know.

8       Q.    Is it possible that many of the 80

9   percent of pharmacists who chose not to

10  respond to the survey simply did not have as

11  many complaints about their workload and

12  patient safety?

13      A.    You can't make that assessment.

14  They could be worse, they could be equal, they

15  could be better as to how they viewed their

16  environment.  They just simply did not choose

17  to verbally respond in writing.

18           To be honest with you, I don't

19  think that that needs to be the focus.  My

20  concern would be let's look at what these

21  individuals who did respond actually said from

22  a qualitative standpoint.

23      Q.    Thank you.

24      A.    You practice in an esteemed

25  environment, and when I was a dean -- when I

Page 67

1    wasn't a faculty member, when I was a dean

2    overseeing a thousand people, if one

3    individual would state some of the things that

4    were stated in some of these comments, it

5    would absolutely be all that I needed to do to

6    make a change.  And I'm not trying to put

7    myself in your position, but if somebody in

8    your firm -- for example, one of the women,

9    page 82 of the 2021 study, indicated that she

10   had been pregnant for 40 plus weeks, she

11   wasn't able to take a break to go to the

12   bathroom or to eat.  If that environment was

13   present at any place where I had worked in my

14   life, things would be done differently

15   immediately because of the severity of that.

16   It didn't matter whether this was one person

17   or ten persons that made this comment.  One

18   was all I would need to see.  And I'm not sure

19   what you would look at in your firm, but one

20   individual with these kinds of working

21   conditions would mean, in my estimation, to

22   make some changes immediately.

23        Q.    On page 10 you discuss

24   Dr. Selzer's comments on the proportion of

25   large chain grocery respondents, the

Page 68

1   proportion change between '20 and '21.  Do you

2   recall that?

3          A.    Yes.

4          Q.    And you actually say her analysis

5   is misleading.  Was there not a change in the

6   proportion of these types of respondents

7   between those two years?

8                MR. ELSNER:  Objection.

9          A.    The change was obviously there,

10  but the impact of that change and the

11  importance of that change in my mind just

12  wasn't important.

13         Q.    Okay.  But you do understand what

14  she's saying here about proportion, that the

15  respondent pool is made up of a larger

16  percentage of large chain grocer pharmacists

17  than it was in 2020?

18               MR. ELSNER:  Objection.

19         A.    I can't agree with her statistical

20  analysis.

21         Q.    About the proportion of the

22  respondent pool?

23         A.    The increase of 50 percent for

24  respondents in this study.

25         Q.    I'm sorry.  What was that?

Page 69

1      A.    I said that she states in that
2  paragraph that it was -- there was an increase
3  of 50 percent of respondents in this setting,
4  it was 24 percent of responding pharmacists in
5  2020 and 36 in 2021.  In fact, it's 71
6  individuals, an increase of about 7 percent.
7  So I don't agree with her statistical
8  findings.
9      Q.    But you agree with the numbers 24
10 percent and 36 percent, correct?
11           MR. ELSNER:  Objection.
12     A.    I'd have to go through and do the
13 calculation, which I didn't do.
14     Q.    Okay.  And your -- regardless of
15 the calculation being correct, your opinion
16 that the number of large chain grocer
17 respondents only had a seven-person change
18 over those two years and that makes that
19 change insignificant to the survey results?
20     A.    In my estimation, yes.
21     Q.    So the hard number, that
22 seven-person change, is the more important
23 number rather than those proportion numbers
24 that Dr. Selzer was looking at in your
25 opinion, right?

Page 70

1          A.     You said seven.  Do you mean 71?

2          Q.     Yeah.  I'm sorry.  71.

3          A.     That seven percent seems

4    irrelevant to me.

5          Q.     Okay.  You explain this increase

6    by citing the Ohio Board of Pharmacy annual

7    report for 2020 which says there were 1,000

8    new pharmacists in 2020.

9                 Do you see that?

10         A.     Okay.

11         Q.     And you actually say on the bottom

12   of page 10 had Dr. Selzer looked, she may have

13   begun to answer her other questions by

14   reviewing the annual reports.  What do you

15   mean by that?

16         A.     I think that she didn't analyze

17   why the survey was done, what was the purpose

18   of the study.  She didn't do that component.

19         Q.     And that -- I'm sorry.  Is that

20   your answer to what I'm asking here; had she

21   looked at these annual reports, she may have

22   begun to answer her other questions?

23                MR. ELSNER:  Objection.

24         A.     You know, I'm sorry.  I can't

25   predict what Dr. Selzer would or wouldn't do.

Page 71

1          Q.    I'm asking you what that sentence
2     in your report means when you say had
3     Dr. Selzer looked at these reports, she may
4     have begun to answer her other questions?
5          A.    That she needed to look at what
6     the survey purpose was, why was the survey
7     done, how was it to be administered, and what
8     were the results that were found to be used
9     for.
10          Q.    And you recall in her report that
11     she uses the Board of Pharmacy's own words in
12     terms of what the purpose of the survey is,
13     correct?
14          A.    Can you direct me to that part of
15     her report that you're referencing, please?
16          Q.    Yes.  Give me a second.  On page
17     46 of Dr. Selzer's report, if you have that --
18          A.    Yes, I do.
19          Q.    -- she cites Mr. McNamee's
20     testimony with regards to the purpose and
21     intent of the survey.
22          A.    Yes.
23          Q.    Do you disagree with any of that?
24               MR. ELSNER:  Objection.
25          A.    This is a verbatim statement of

1   what was stated by Mr. McNamee in his -- his

2   deposition.

3          Q.    Okay.  So you agree that that's

4   the purpose of the Ohio Board of Pharmacy

5   surveys?

6               MR. ELSNER:  Objection.

7          A.    The intent of the survey was to

8   capture vital feedback on pharmacists' working

9   conditions in the state.

10         Q.    Do you agree with that?

11         A.    Based upon my assessment of the

12  survey, I would agree with that.

13         Q.    Okay.  So you just told me that

14  Dr. Selzer did not analyze the purpose of the

15  survey, so what do you mean with that

16  criticism of her report?

17         A.    I'm referencing the fact that

18  she's looking at response rate as a key

19  component.  And if you look at a field study,

20  response rate is not a major factor that needs

21  to be considered.  What you need to consider

22  is the totality of the responses and the

23  perception of what you're trying to gather.

24  This was not to be in any way, shape or form

25  some type of an analytical prediction survey.

Page 73

1    It was an analytical field study only.

2          Q.    Is it part of your opinion in this

3    case, your written opinion, that this was a

4    field study and response rates are not as

5    important in field studies?

6                MR. ELSNER:  Objection.

7          A.    That's correct.

8          Q.    Can you point me to where in your

9    written report that appears?  And I ask

10   because I did not see anything about the

11   purpose and meaning of a field study in your

12   report.

13         A.    Do you want me to go through the

14   entire report to come up with the specific

15   item?  If that's the case, you're going to

16   have to give me some time to do that.

17         Q.    No, I don't think that's

18   necessary.  I just did a quick word find on

19   field study and didn't see it.  Is there

20   another term I should search for pinpointing

21   when you talk about that?

22         A.    The purpose of the study.

23         Q.    The purpose of the study.

24         A.    So when the Ohio Board constructed

25   this survey, they didn't say it was going to

Page 74

1    be a field study, but my assessment of what

2    was done, in my perception, my experience, in

3    my expertise, indicates that this is a field

4    study.  That's perhaps an academic, definitive

5    term that somebody like the Board of Pharmacy

6    didn't feel they needed to use.  They simply

7    needed to state what they were doing.  My view

8    of what this is is from the perspective of

9    somebody that studied and analyzed surveys and

10   survey research and questionnaire design my

11   entire career.

12        Q.    Can you turn to page 11 of your

13   report, please?  In the last page -- or the

14   last sentence of page 11 you state that in my

15   opinion, the Ohio Board of Pharmacy surveys

16   were valid and appropriate for their purpose

17   and use.  And you talked a lot about the

18   purpose, and I believe we have the Ohio Board

19   of Pharmacy's stated purpose of the surveys.

20   Can you explain to me what you mean by "use"

21   in that sentence?

22        A.    Okay.  Looking at what was the

23   purpose of the study, to get a general sense

24   of working conditions, all right?  And when I

25   say "use," then the Board of Pharmacy would

Page 75

1   choose to do what it is that they felt

2   necessary in response to what these surveys

3   found.  So what I'm trying to say was that

4   this survey was valid from the standpoint of

5   what it was intended to do, how it was to be

6   carried out, how it was administered, and then

7   the purpose and the use -- the use would

8   follow the purpose and the findings from what

9   they did.

10         Q.    Is it your opinion that the

11  purpose included finding out the working

12  conditions specific to dispensing opioids?

13              MR. ELSNER:  Objection.

14         A.    The purpose was looking at general

15  safety conditions that were applicable from

16  the perception of these pharmacists, and if

17  you look at their practice environment, one of

18  the key components of that practice

19  environment is the safe and appropriate

20  dispensing of opioid prescriptions.

21         Q.    Is there a difference in a

22  pharmacist's work when it comes to dispensing

23  opioids versus other prescription medication?

24         A.    There's additional requirements

25  that are put into play, yes.

1        Q.    Were any of the survey questions

2   specifically about dispensing opioids?

3               MR. ELSNER:  Objection.

4        A.    They weren't; however, the

5   assessment of their view of the safety of the

6   environment in which they practice, the

7   stresses that they were under would have a

8   definite impact on how opioids were safely or

9   unsafely dispensed in that environment.  So

10  they didn't have to ask a specific question

11  about opioids.  It was the general workplace

12  safety environment that resonated with me.

13       Q.    So opioid dispensing, what you're

14  saying, because it's part of the general

15  workload of a pharmacist, you can look at

16  these questions and responses and discern

17  pharmacists' attitudes and concerns with

18  respect to all aspects of pharmacist duties;

19  is that fair?

20              MR. ELSNER:  Objection.

21       A.    Could you repeat the question,

22  please?

23       Q.    Well, let me start here.  Opioid

24  dispensing is part of the general workload of

25  a pharmacist, correct?

1     A.     Yes.

2     Q.     And there's a lot of other duties

3  that are involved in the general workload of a

4  pharmacist, correct?

5     A.     Yes.

6     Q.     So these responses about general

7  workload and patient safety in the pharmacy

8  setting inform context of opioids and all

9  those other duties that a pharmacist has,

10 right?

11    A.     Yes.

12    Q.     And that's what you're saying

13 here; you're not saying that any one of these

14 answers is specific to conditions in

15 dispensing opioids, are you?

16    A.     I'm not saying that, but it's part

17 and parcel of the stress, pressure and safety

18 component of pharmacists and their need to do

19 that in a practice setting.

20    Q.     So one of the things -- sorry.  Go

21 ahead.

22    A.     One of the tables in my report

23 lists out, not inclusive, but some of the

24 items that pharmacists need to consider when

25 they are in a practice environment.  That

Page 78

1   happens to be Table 1.  And you go through

2   that list.  These are not separate, mutually

3   exclusive items.  These are items that work in

4   concert to make it even more difficult based

5   upon what you see as what the expectations are

6   in each and every one of these.  So it's not

7   additive.  It's synergistic.  One plus one

8   doesn't equal two.  One plus one might equal

9   ten as far as stress, strain, stress, et

10  cetera.

11       Q.   So one of the things Dr. Selzer, I

12  think, says in her report is that she can't

13  extrapolate from the questions and the results

14  information specific to opioid dispensing, but

15  are you disagreeing with her on that point and

16  you're saying you can do that?

17       A.   I'm disagreeing with Dr. Selzer's

18  assessment because, first of all, she might

19  have incredible expertise as a pollster.  She

20  has zero expertise in analyzing what goes on

21  within a pharmacy practice, what pharmacists

22  have to deal with.  She did not go into a

23  pharmacy, spend time to see what the

24  environment was or analyze what the

25  environment was.  To her that was

Page 79

1    inconsequential.  And, in my estimation,

2    that's absolutely crucial when you consider

3    what these results are.

4         Q.    But you don't think anyone just

5    looking at these survey results can interpret

6    them, do you; it's got to be somebody who

7    knows about pharmacy conditions and dispensing

8    regulations and opioid abuse and diversion?

9         A.    I disagree with that, and I

10   disagree with it based upon the verbal

11   responses that you see.  If you're a member of

12   the general public and you see a woman in a

13   practice setting that's pregnant telling

14   someone that she can't go to the bathroom,

15   that she can't take a lunch break, that she

16   might be a salaried employee but she has to

17   work 60 hours a week, I don't care what your

18   discipline is -- I don't care what your

19   profession or lack of profession is -- that

20   resonates with me if I read that.

21        Q.    You've mentioned that a couple of

22   times and I understand you're upset by that

23   comment.  Is that comment anecdotal or is it

24   representative of the response population?

25        A.    In my mind it doesn't make any

Page 80

1    difference if it's anecdotal or

2    representative.  I'm looking at this from a

3    qualitative standpoint that this individual

4    had the courage to walk away from an

5    environment because she didn't feel safe doing

6    it.  That's all I need to see.  I don't need

7    to know whether this is representative or

8    whatever.  I just need to look at it at face

9    value from a quality standpoint.  That's

10   disturbing to me.  It would be disturbing to

11   me if a general public person read this and

12   analyzed it.

13        Q.    If you could turn to page 14 of

14   your report.  The last sentence in that only

15   full paragraph in the middle of the page

16   starts out "For the Board."

17             Do you see that?

18        A.    Yes.

19        Q.    And you say, "For the board, the

20   question is not if pharmacies play a role in

21   opioid abuse and diversion but why they play a

22   role and whether enhanced regulations and

23   changes in corporate conduct may reduce the

24   risk of abuse and diversion."  What do you

25   mean by this?

1      A.    Okay.  I think that pharmacists

2  play a role in proper or improper opioid abuse

3  and diversion, and regulations that impact

4  patient safety would enhance their ability to

5  do things in a proper and professional manner

6  that they need to.

7      Q.    Are you saying that this is the

8  question that the Ohio Board of Pharmacy

9  sought to answer with their surveys?

10     A.    No.  It was just looking at what

11  the workplace safety was and how that impacts

12  this general specific component of workplace

13  safety.

14     Q.    So you're not saying that they

15  were trying to answer these specific questions

16  about opioids that you put in this sentence,

17  right?

18          MR. ELSNER:  Objection.

19     A.    In order to put this sentence in

20  proper context, I think you have to read the

21  entire paragraph and look at "The Ohio Board

22  also determined that 40 percent of those who

23  overdosed had a prescription for a

24  benzodiazepine within 90 days of death.  30

25  percent of all unintentional overdose deaths

Page 82

1  involved both an opioid and benzodiazepine

2  prescription."  All right.  So that background

3  puts in context what it is that you're trying

4  to just isolate into one sentence.  You have

5  to look at the entire context of that

6  paragraph.

7       Q.    And I'm not trying to be tricky

8  here by isolating and taking something out of

9  context, so, you know, I appreciate your

10 correction there.  I'm trying to figure out

11 how this relates to the surveys.

12      A.    The surveys were to get

13 pharmacists' perception of workload

14 environments, and their stresses, the strains

15 that they expressed both through their Likert

16 responses as well as the verbal responses

17 indicated that they were incredibly stressed

18 and overloaded; and if you consider those

19 facts and then look at opioids and opioid

20 dispensing, improper dispensing, it has a

21 dramatic direct impact on how safe that

22 process is.

23      Q.    You are making that connection

24 based on prior findings of the Board of

25 Pharmacy, is that right, or are you making

Page 83

1    that connection based on explicit connections

2    that the Board of Pharmacy made with the

3    survey?

4              MR. ELSNER:  Objection.

5         A.    I'm just basing my assessment on

6    the entire impact of what this paragraph is

7    indicating.

8         Q.    Okay.  You cite in your opinion

9    the CSA provision on corresponding

10   responsibility.  What is corresponding

11   responsibility of a pharmacist?

12        A.    If you look at the Controlled

13   Substances Act, that stipulated that drugs

14   were classified in Class I through Class V as

15   far as dangerous narcotics types of analgesics

16   and other types of products, okay.  And so

17   pharmacists have responsibilities for making

18   sure that only those prescriptions that can be

19   dispensed are dispensed, quantities are

20   limited in some of these cases, you have to

21   get a new prescription for each and every one

22   of a controlled substance II classification.

23   So that's what I'm referring to as added

24   responsibilities.  So it's not only a state

25   board of pharmacy stipulation but it's a Drug

Page 84

1    Enforcement Administration stipulation.  It's
2    a federal statute that comes into play, too.
3    So you've got two overlapping regulatory
4    agencies, the Board of Pharmacy and the Drug
5    Enforcement Administration, impacting what
6    pharmacists have to do when they dispense
7    these medications.
8         Q.    And what do pharmacists have to do
9    in order to fulfill their corresponding
10   responsibility?
11        A.    They have to follow to the letter
12   of the law which drugs can be dispensed, how
13   often they can be dispensed, how many times a
14   prescription can be refilled.  If it's a new
15   prescription for a Schedule II product, it has
16   to be a new prescription each and every time
17   that product is filled.  There are limits on
18   how many tablets, capsules, milliliters of
19   liquid that can be dispensed in some of these
20   cases.  How these products are ordered from a
21   wholesaler or from a manufacturer are
22   stipulated as far as specific forms and
23   documents that have to be provided.  So
24   there's documentation, there's recording after
25   the fact of what was done and why it was done.

Page 85

1    This all has to be done by the pharmacist.

2              And in the state of Ohio there's

3    the additional assessment through their

4    automated online system, the OARRS, that you

5    have to document each and every prescription

6    for an opioid in that system.

7         Q.    Have you ever heard of the term

8    "red flag"?

9         A.    Yes, I have.

10        Q.    What is that?

11        A.    Red flag is an indicator to a

12   pharmacist in a practice environment that they

13   need to look at several different things

14   pertaining to the dispensing of a particular

15   product.  And let me elaborate.

16              If you're looking, for example, at

17   the paragraph that we were just talking about,

18   if an opioid is prescribed along with a

19   benzodiazepine, that's a red flag.  Why is

20   that a red flag?  It's because the interaction

21   of those two drugs is not additive but it's

22   synergistic.  The impact of the drug with the

23   addition of another drug is much more intense

24   than either one of those drugs taken by

25   themselves.  So that's one of the items in a

Page 86

1    red flag.

2              The second would be is the patient

3    traveling a long distance either to the

4    prescriber to get the prescription or to the

5    pharmacy to get the prescription dispensed.

6    So it's the types of drugs, it's the distance

7    that the individual travels, how frequently

8    are they refilling or filling these

9    prescriptions.  That's another part of the red

10   flag process.

11             And, finally, are they simply

12   paying cash as opposed to using a credit card

13   or charging the item to an account.

14             So these items, again, are part of

15   what's called red flags, and these are Drug

16   Enforcement Administration red flags, they're

17   National Association of Boards of Pharmacy red

18   flags, and, in some cases, state red flag

19   components regarding the practice and

20   dispensing of these products.

21        Q.    These red flags that you named,

22   are these the only red flags or are they

23   examples of red flags?

24             MR. ELSNER:  Objection.

25             Go ahead.

Page 87

1          A.     They're simply examples.

2          Q.     And if a red flag is apparent in

3    an opioid or controlled substance

4    prescription, what duty does the pharmacist

5    have?

6          A.     The pharmacist can refuse to fill

7    it.  And in my practice in the past I have

8    done that.  I have refused to fill

9    prescriptions and I have contacted other

10   pharmacies in the area where I was practicing

11   to indicate that X and such person may be

12   trying to do X and such receipt of a

13   prescription.

14         Q.     Now, when a red flag is present,

15   does a pharmacist have to refuse to fill the

16   prescription?

17         A.     With due diligence and assessment,

18   the pharmacist shouldn't fill the

19   prescription, no.

20         Q.     Will something be a red flag in

21   one instance and perhaps not in another, like

22   the example of traveling long distance?

23              MR. ELSNER:  Objection.

24         A.     There might be an instance where

25   somebody is visiting a relative 200 miles away

Page 88

1    from home and they're in a situation where

2    they need to have a medication filled, so that

3    red flag wouldn't have the prominence of

4    somebody that's just doing this to obtain the

5    drug, period.

6         Q.    And in that instance should the

7    pharmacist dispense the opioid medication?

8         A.    With due diligence and analyzing

9    the situation thoroughly, talking with the

10   patient, assessing why they are getting the

11   prescription, where they're getting the

12   prescription, that can eliminate the

13   importance of that red flag.

14        Q.    And do pharmacists have to use

15   their independent judgment in evaluating what

16   is a red flag and how to handle it?

17        A.    Pharmacists have the ability to be

18   able to do that.  For example, in the state of

19   Ohio any pharmacist in any practice

20   environment can refuse to fill that type of a

21   prescription if they feel that it shouldn't be

22   filled.

23        Q.    Do you agree that pharmacists have

24   to employ clinical judgment and individualized

25   patient-centered decision-making in dispensing

Page 89

1   opioids?

2           MR. ARNOLD:  Objection.  It's

3   beyond the scope.

4       A.    Pharmacists use their clinical

5   judgment each and every minute of each and

6   ever hour of the practice time that they're in

7   their role as a pharmacist.

8       Q.    Is knowledge of pharmacy

9   regulations that you've talked about in your

10  report essential to being able to interpret

11  the Ohio Board of Pharmacy surveys?

12          MR. ELSNER:  Objection.

13      A.    They're related.  They are

14  intertwined.

15      Q.    And, in your opinion, does someone

16  with survey expertise also need expertise in

17  the survey subject matter to be able to

18  interpret the results of the survey?

19      A.    My assessment is if somebody is

20  evaluating a survey as an external reviewer,

21  if they don't know specific components of that

22  particular survey design and methodology, they

23  need to find out what that is through their

24  own research before they make any type of a

25  judgment.

Page 90

1        Q.    What do you mean by design and

2    methodology here when you say that?

3        A.    Okay.  In my estimation,

4    Dr. Selzer did not look completely at why this

5    Ohio Board of Pharmacy was being done.  She

6    didn't analyze the conduct of what it was

7    being done for.  She didn't understand

8    anything about the practice of pharmacy.  She

9    didn't go into a pharmacy to see how it was

10   practicing in a specific location.  In order

11   to make an evaluation -- this is my

12   estimation.  In order to make an evaluation of

13   a survey in that particular environment, you

14   need to find out all that you can to get more

15   educated on what the survey was designed to

16   do, how the items were collected, and how the

17   results were going to be used.

18       Q.    And her reliance on the stated

19   purpose of the Board of Pharmacy surveys was

20   insufficient in your opinion?

21            MR. ELSNER:  Objection.

22       A.    It was insufficient because she

23   didn't know anything about the practice of

24   pharmacy.

25       Q.    And is knowledge of all the

Page 91

```
 1    regulations and laws pertaining to dispensing
 2    and pharmacy practice necessary to be able to
 3    interpret the survey results or just some of
 4    the laws and regulations?
 5              MR. ELSNER:  Objection.
 6         A.    I think it's in some cases totally
 7    irrelevant.  If you consider the fact that
 8    workplace conditions are going to impact each
 9    of the items that were in Table 1 that we
10    referenced earlier in my report, that's what's
11    important.
12         Q.    Can you explain that to me?
13         A.    Okay.  Can we go to that
14    particular table in my report?
15         Q.    Sure.
16         A.    Table 1.  It's on page 32, okay.
17    And if you go down each of these items that
18    are listed, these are not some that you can
19    say, well, I'm going to do the first five but
20    I don't need to worry about the next five.
21    When you're in a practice environment, when
22    I've been in a practice environment, each and
23    every one of these impacts what I do and how I
24    do it.  They're vitally important to be able
25    to practice in a safe environment.
```

Page 92

1           And, again, let me point out this

2    is not to make me feel better about what I'm

3    doing.  That's not my purpose as a pharmacist.

4    My purpose as a pharmacist is to provide safe

5    and appropriate care for the most important

6    person in this process.  It's not me.  It's

7    not the physician.  It's not the supervisor

8    that I report to.  It's not my general

9    manager.  It is the patient.  And if you don't

10   have these in play, you're not going to be

11   able to help the most important person in this

12   equation, and that's the patient that you're

13   supposed to be providing safe, efficient and

14   appropriate care for.

15        Q.   Are you saying that the results of

16   this survey speak to each of those categories

17   in that table as to whether or not the

18   respondents had sufficient time or ability to

19   conduct their required tasks?

20        A.   To answer that question, I'm going

21   to look at what the responses that were Likert

22   scale items showed.  I'm looking at some of

23   the demographic items that were indicated,

24   whether your practice site was in an

25   institution, a chain or food market-based

1   pharmacy, how many hours a week did you work,

2   how long have you worked in that environment.

3   Okay.  You take those factors and you combine

4   them with the verbal responses and you look at

5   what's required in Table 1 -- this is not an

6   all-inclusive listing.  This is just some that

7   I wrote down, all right.  But you can't do

8   your practice as a pharmacist if these items

9   are not appropriately available to be

10  practiced in a safe and appropriate

11  environment for a pharmacist.

12         Q.    So, in your opinion, the survey

13  results spoke to each of these tasks that

14  you've written down here in Table 1?

15                MR. ELSNER:  Objection.

16         A.    If you look at the totality of the

17  surveys and the survey responses, I'm

18  reiterating that both the verbal responses

19  that were written, combined with the responses

20  that were tabulated in the Likert scale

21  component and the work environment, indicate

22  that these have a major impact on pharmacy

23  practice in the state of Ohio regardless of

24  where you practice.

25         Q.    So from your review of those

Page 94

1   demographics and survey results and written

2   results and Likert scale, are you able to say,

3   for instance, that the pharmacists who

4   responded were unable to monitor, inventory

5   and place orders to avoid shortages?

6        A.    I would respectfully request that

7   you just don't look at one of these items.

8   They're not mutually exclusive items.  They

9   are additive.  You can't look at one without

10  looking at the other 15.  You have to look at

11  them in total.

12       Q.    Okay.  So same question.  Can you

13  look at the survey results, the comments, the

14  demographics, the Likert scale results and

15  make the determination that pharmacists are

16  saying they cannot do any of the 15 things

17  that you put in Table 1?

18            MR. ELSNER:  Objection.

19       A.    To me it's not relevant whether

20  they can do one or two or three of these.

21  Some of these come into play each and every

22  time they dispense one medication.  Some of

23  them have applicability to only certain

24  medications.

25            If you look at, for example, the

Page 95

1    last four items, ability to focus, ability to

2    take breaks, 12-hour plus shifts, no

3    requirement for working unpaid hours, those

4    impact every single thing that you do as a

5    practicing pharmacist.

6              If you go back and look at

7    specific ones, like opioids, and the adequate

8    time to accurately verify prescriptions in the

9    second series of rows, that's pertinent to

10   opioid dispensing, okay, but you can't

11   appropriately take care of that one that I

12   just talked about if you don't have the

13   ability to focus, you can't take a break, if

14   you can't go to the bathroom for crying out

15   loud, and you work 12-hour shifts.  That's

16   absolutely unbelievable that somebody works

17   that many hours.  I don't care how bright you

18   are.  I don't care how efficient you are.  The

19   stress, strain and mental toll that that has

20   on people is incalculable.

21        Q.    Can you go to page 14 of your

22   opinion?  In the last sentence on that page,

23   leading into page 15, you talk about

24   pharmacists fulfilling controlled substance

25   obligations, and you state that "to suggest

Page 96

1    that patient safety does not encompass filling

2    dangerous opioid prescriptions ignores why and

3    how pharmacists protect patients."

4              Do you see that?

5         A.    Yes.

6         Q.    When you read Dr. Selzer's

7    opinion -- report, is she suggesting in her

8    report that patient safety does not encompass

9    filling certain prescriptions?

10             MR. ELSNER:  Objection.

11        A.    That's not what she said.

12        Q.    Okay.  Isn't she just saying that

13   you can't take the results of the survey and

14   draw conclusions about opioid dispensing from

15   them?  That's her opinion, correct?

16             MR. ELSNER:  Objection.

17        A.    I think her opinions are invalid

18   because she doesn't have any idea what it is

19   that she was assessing.  She didn't have any

20   understanding what a pharmacist was.  She

21   didn't have any understanding what pharmacists

22   do.  She hadn't been in a pharmacy to see what

23   their workplace environment is.  And I don't

24   think you can evaluate something unless you

25   have a thorough understanding of what it is

Page 97

```
 1    you're supposed to be evaluating.  And, again,
 2    I'm not trying to denigrate her ability as a
 3    pollster.  She's nationally recognized, isn't
 4    she?  But as to her ability, background to
 5    analyze a pharmacy or pharmacy component, she
 6    doesn't have the backroom -- background --
 7    excuse me -- experience or she didn't take the
 8    time to look at what she was supposed to look
 9    at in order to assess what was going on in
10    this survey.
11         Q.    But your opinion is that you can
12    draw conclusions about opioid dispensing from
13    these questions and results, right?
14         A.    Yes, I can.
15         Q.    Are you able to tell from the
16    survey that pharmacists are receiving
17    prescriptions for opioids that are not
18    legitimate?
19              MR. ELSNER:  Objection.
20         A.    I can't make that assessment
21    unless I look at each and every prescription
22    that was presented for proper filling.  What
23    can I -- what I can look at is the general
24    environment that these pharmacists were
25    expected to practice in, not being able to
```

Page 98

1    take a break, not being able to go to the

2    bathroom for crying out loud, you don't have

3    time to eat.  What if someone has diabetes and

4    they can't take a break or they can't eat?

5    How does that impact their metabolic state?

6    So those factors impinge directly on how they

7    can do what they're supposed to do in a safe

8    and effective environment, including the

9    dispensing of opioid and opioid prescriptions.

10          Q.    Are you able to tell from this

11   survey that pharmacists are filling opioid

12   prescriptions without conducting due

13   diligence?

14          A.    What I'm saying is based upon the

15   responses of pharmacists, they feel they don't

16   have time to do what they need to do to take

17   care of their patients that they're

18   responsible for taking care of, and that would

19   include opioid dispensing and opioid

20   prescriptions for patients.  They simply don't

21   have the time to do lots of things, including

22   due diligence of monitoring opioids and opioid

23   prescriptions.

24          Q.    But you can take the results of

25   this survey and state that the pharmacists who

Page 99

1   responded are filling opioid prescriptions

2   without conducting due diligence?

3            MR. ELSNER:  Objection.

4       A.   I can't make that statement and

5   that's not the purpose of my evaluation of the

6   surveys.

7       Q.   Are you able to tell from this

8   survey that pharmacists are dispensing opioid

9   prescriptions that are not for a legitimate

10  medical purpose?

11           MR. ELSNER:  Objection.

12      A.   I can't specifically state that,

13  but what I can see is there's a work

14  environment that makes lots of things unsafe,

15  including dispensing opioid prescriptions.  It

16  also includes monitoring patients, counseling

17  patients, preparing vaccinations for

18  administration, administering the

19  vaccinations, monitoring the patient after

20  they get a vaccination.  It's a combination of

21  several things that can potentially lead to

22  problems with all kinds of medications that

23  are being dispensed.

24      Q.   Not just opioid dispensing but

25  everything that falls under the duties of a

Page 100

1    pharmacist are impacted, correct?

2         A.    That's correct.

3              And I make that assessment based

4    upon the Likert responses as well as the

5    verbal responses that were presented.

6         Q.    If you were designing a survey to

7    pharmacists to find out about conditions

8    specific to dispensing opioid medications,

9    would you use these questions or would you use

10   questions that specifically talk about

11   opioids?

12        A.    I would look at specific questions

13   that were focused on opioids and opioid

14   dispensing.  If that was the purpose of the

15   study, I would, first of all, look at what's

16   been done before, why am I doing the study,

17   what questions am I going to ask, have these

18   types of questions been asked by other

19   researchers.  If they have, can I get their

20   approval and permission to reuse those

21   questions in a survey that I want to do?  And

22   then focus my responses to the data collected

23   based upon what it is that I was intending to

24   do.

25        Q.    You agree with me --

Page 101

1      A.    That's how I would design that
2    study.
3      Q.    You agree with me that that was
4    not the purpose of the Ohio Board of Pharmacy
5    surveys, right?
6          MR. ELSNER:  Objection.
7      A.    That was not the purpose of the
8    Ohio Board of Pharmacy surveys.
9      Q.    Can you look at page 15, footnote
10   61?  And this footnote is in reference to
11   Dr. Selzer's report where she ran some search
12   terms in the survey results and found
13   relatively few mentions of opioids and some
14   related terms, and you note in that footnote
15   that she did not run search terms for OARRS or
16   PDMP, which also implicate controlled
17   substances, correct?
18     A.    Yes.
19     Q.    Did you run these search terms in
20   the results of the pharmacy surveys?
21     A.    I did, but I can't tell you what
22   those factors were because I didn't include it
23   in my report.
24     Q.    Do you recall whether or not there
25   were significant mentions of both of those?

1      A.    Again, Ms. Wohl, it wouldn't be a

2  quantitative assessment on my part.  I would

3  look from a qualitative standpoint of what

4  each individual said in response to this

5  component and then see what perhaps an issue

6  might be that needs to be addressed.  It

7  wouldn't matter how many times it was

8  indicated.  If it was indicated once, that's

9  all I would need to see from a qualitative

10  review standpoint.

11      Q.    The significance of the terms that

12  are related to opioids that she ran, and also

13  OARRS and PDMP, is that if they appeared at

14  all, that is of significance in terms of

15  dispensing opioids in your opinion; is that

16  right?

17           MR. ELSNER:  Objection.

18      A.    What would be important to me

19  would be considering those specific

20  qualitative components in addition to the

21  other things that were indicated in responses,

22  either the Likert scale items, the demographic

23  items that were collected or the written

24  responses that were provided.

25      Q.    Let me ask one more question or

                                        Page 103

1   two more questions before we take a lunch

2   break here.

3                   If you could turn to page 26.  The

4   paragraph that starts out "Like the Ohio

5   survey."  Here you're talking about the

6   Missouri survey, and your second sentence

7   there says, "Yet, some pharmacists recognized

8   that the workload pressures they face impacted

9   their ability to dispense controlled substance

10  safely."  Are you talking about the responses

11  in the Missouri survey in that sentence?

12                  MR. ELSNER:  Objection.

13       A.    Both the surveys.

14       Q.    Okay.  You didn't cite anything

15  there.  Can you point me to the specific

16  pharmacist responses that you're talking

17  about?

18       A.    Again, it is in reference to

19  general assessment of workplace safety, the

20  pressures that they're under, the stressors

21  that they're under, the staffing that they

22  have, the inappropriate and insufficient

23  training of the staff that they have.  That is

24  part of the workload pressure that has no

25  doubt impact upon dispensing any product

Page 104

1    safely, including opioids or controlled

2    substances.

3         Q.    So you're not saying here the

4    pharmacists specifically recognized pressures

5    impacting dispensing controlled substances,

6    they just generally recognize workload

7    pressures that impact everything about their

8    pharmacy practice?

9         A.    What you just stated most

10   definitely impacts everything that they do

11   from a practice standpoint, including the

12   proper monitoring and dispensing of controlled

13   substances.

14        Q.    So, again, just to understand this

15   sentence, you're not stating here in this

16   sentence that respondents recognize workload

17   pressures specific to their ability to

18   dispense controlled substances safely, are

19   you?

20             MR. ELSNER:   Objection.

21        A.    I'm talking about their ability to

22   dispense anything, but when we're talking

23   about controlled substances, that has an added

24   weight to it.

25        Q.    Okay.  So you put controlled

Page 105

1  substances in there as an example, not as what

2  they're specifically recognizing?

3       A.    It's one example, but it's a

4  really important example because of what can

5  happen if they're not appropriately monitored.

6       Q.    Okay.  Just wanted to make sure I

7  understood that.

8            MS. WOHL:  Can we go off the

9  record?

10            THE VIDEOGRAPHER:  Off the record,

11  12:07.

12

13            (Luncheon recess taken.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 106

1                    - - - - -

2              AFTERNOON SESSION

3           THE VIDEOGRAPHER:  On the record,

4      12:46.

5              CONTINUED EXAMINATION OF

6              JACK E. FINCHAM, Ph.D.

7      BY MS. WOHL:

8         Q.    Welcome back, Dr. Fincham.

9         A.    Thank you.

10        Q.    I would like to start off our

11     post-lunch session with going back to the

12     purpose of the survey, which I think we've

13     said a few times, which is to assess the

14     general workload and work conditions at Ohio

15     pharmacies.  Is there anything about that I

16     didn't get right?

17        A.    No.  You did.

18        Q.    Now, you mentioned a couple of

19     times this morning the comment about the one

20     pregnant woman working 40 plus hours, and I

21     understand that is upsetting, but can you say

22     that that is a general working condition at

23     pharmacies in Ohio?

24           MR. ELSNER:  Objection.

25        A.    That was specific to that

Page 107

```
 1    individual's complaints, but, Ms. Wohl, if you
 2    would look at other verbal comments talking
 3    about the lack of breaks as being a real
 4    important factor in their work satisfaction,
 5    if you look at how they -- many people,
 6    including some Kroger pharmacists, talked
 7    about the negativity of metrics; having to
 8    have certain constraints placed upon how they
 9    can practice in a safe and effective
10    environment; the number of vaccines that they
11    had to give; the number of MTMs, medication
12    therapy management consultation, that they
13    have to provide.  In some cases in my mind
14    that just doesn't make sense, to put a time
15    limit.  When I've done MTMs, when I've done
16    medication therapy management evaluation, it
17    takes me at least 30 minutes per patient, so
18    if you have that as a determining metric, it's
19    going to compound things.
20             So it wasn't just that one
21    individual talking about her break situation.
22    There were lots of other comments from many
23    other pharmacists, and some of the pharmacists
24    didn't say that they worked at Kroger but no
25    doubt there were others that didn't list their
```

1   practice site that were Kroger pharmacists

2   that expressed those concerns.

3        Q.    Okay.  So is it your opinion,

4   sitting here today, that it is a general

5   working condition at Ohio pharmacies that

6   pharmacists are not provided with adequate

7   breaks?

8                MR. ELSNER:  Objection.

9        A.    It depends upon the particular

10  practice environment.  And if we look at the

11  wide range of respondents to both of these

12  surveys, there were pharmacists that practiced

13  in an institutional setting that didn't have

14  that concern, there were pharmacists in an

15  independent practice setting that didn't have

16  those concerns.  So there were some situations

17  where that was presented as being a real issue

18  and a dramatic influence on their ability to

19  practice, but it would depend upon the

20  particular focal point of what you're

21  examining, and that came through in the

22  different demographic components of practice

23  sites that came through in the study.

24        Q.    Is it a general condition at large

25  chain grocer pharmacies that pharmacists do

Page 109

1  not have adequate breaks in Ohio?

2       A.    Based upon what the survey results

3  were, I would answer that question yes, it's a

4  major concern.  It's not just grocery store

5  pharmacies.  It's major chain pharmacies

6  total.

7       Q.    If we could just be clear.  I

8  didn't ask major concern.  I'm asking if it's

9  a general condition.

10            MR. ELSNER:  Objection.

11       A.    And I guess I'm saying it's a

12  major concern because if it's a general

13  condition, to me that's majorly concerning.

14       Q.    So then the answer is yes, it

15  is -- you can say it is a general condition at

16  large chain grocers that pharmacists in Ohio

17  do not have enough breaks, time for breaks?

18            MR. ELSNER:  Objection.

19       A.    I can't make that -- that

20  statement.

21       Q.    So you find it concerning but you

22  can't say it is a general condition?

23       A.    Okay.  What I'm trying to say,

24  Ms. Wohl, is if you look at this from a

25  quantitative standpoint, you're looking at a

1   number X or a number Y; if you look at it from

2   a qualitative standpoint, if it impacts 10

3   percent or 20 percent of large chain store

4   grocery pharmacies, that's a significant

5   impact in my estimation.

6           Q.    Is it a general condition?

7                 MR. ELSNER:  Objection.

8           A.    I don't know if it's a general

9   condition or not, but it's a concerning factor

10  to me.

11          Q.    Okay.  You have criticized

12  Dr. Selzer as being unqualified to offer

13  analysis of the Ohio Board of Pharmacy

14  surveys.  My question to you is what

15  qualifications does somebody need to have to

16  form an opinion on these surveys or analyze

17  the results and methodology?

18          A.    If they don't have a particular

19  expertise in a defined area, such as pharmacy,

20  before they evaluate a survey to assess

21  pharmacists and workplace safety, they need to

22  do what they can do to try to get familiar

23  what the environment is, what is the major

24  concerns that might be apparent when you

25  consider the practice environment.  So you

1   don't have to be a pharmacist to be evaluating

2   a particular survey.  You have to have someone

3   that at least has an appreciation of what

4   pharmacy is and what the impacts might be on

5   patient safety.  And so if you look at -- if

6   she would have done research based upon what

7   were the other studies that have been done,

8   what did they show, what did they examine,

9   what kinds of questions did they ask, why did

10  they ask those questions, that gets at the

11  point of why this particular study was done in

12  the first place.  So I examined what they

13  wanted to look at, how they would ask the

14  questions and what they were going to do with

15  the results.

16       Q.   I heard a couple of different

17  answers to my question so I want to pinpoint

18  what it is I'm looking for here.  The

19  qualifications that you believe somebody needs

20  to have to form an opinion on these surveys,

21  analyze the results, the methodology, I heard

22  you say an expertise in pharmacies and then I

23  heard you say an appreciation of what pharmacy

24  is and patient safety.

25       A.   I don't think you have to have an

1   expertise in pharmacy to do the evaluation.  I
2   think you have to have an understanding of
3   what the practice environment is and what
4   factors may impinge upon the safe practice in
5   that environment.  You don't have to be a
6   pharmacist, but you have to have perhaps a
7   perception of what the concerns are based upon
8   what other studies have shown, what other
9   studies have examined, those types of things.
10          Q.    Will you give me some specifics
11   about the qualification that you stated of an
12   understanding of practicing pharmacy and the
13   factors involved?  What would somebody need to
14   do to become an expert or to have the
15   qualifications that we're talking about here?
16          A.    What is the practice environment
17   that you're examining?  What are the
18   responsibilities within that practice
19   environment?  So if you don't know much about
20   institutional pharmacy practice, can you
21   shadow a pharmacist in that environment to see
22   what it is he or she does?  The same thing in
23   a chain setting or a food market-based
24   pharmacy.  Just spend some time to try to get
25   an appreciation of what factors are impacting

Page 113

1   how that individual does their due diligent

2   responsibility to make sure the patients are

3   safe.

4        Q.    And, in your opinion, to be

5   qualified to draw conclusions on these

6   surveys, you would have to either be a

7   pharmacist or shadow a pharmacist; is that

8   fair?

9              MR. ELSNER:  Objection.

10       A.    That's not what I'm saying at all.

11  I'm simply saying if you shadow a pharmacist,

12  you might see what it is that they are doing

13  and what they need to do.  You don't have to

14  be an expert on examining what it is that they

15  do.  You just have to have an appreciation of

16  what's involved and what that means.

17       Q.    Okay.

18       A.    Let me give you an example.  What

19  about metrics?  So when you perhaps go into a

20  food market-based pharmacy and see that they

21  have to have so many vaccinations within a

22  defined period of time, ask them what they're

23  supposed to be doing in order to get approval

24  from their management.

25       Q.    What I'm trying to understand is

Page 114

1    the qualifications that you believe are

2    required to form an opinion on these.

3         A.    I would state it as qualifications

4    more than just simply an understanding of what

5    it is that's being examined.

6         Q.    So when you say Dr. Selzer is

7    unqualified to offer opinions on this survey,

8    what you're saying is she doesn't have the

9    requisite understanding of the subject matter?

10        A.    That's correct.

11        Q.    And specifically the pharmacy

12   subject matter, not the survey subject matter,

13   right?

14             MR. ELSNER:  Objection.

15        A.    It's the pharmacy subject matter,

16   which was the purpose of doing the survey in

17   the first place.

18        Q.    So when you are forming opinions

19   on the survey, are you using any of your

20   expertise related to surveys or are you just

21   relying on your pharmacy expertise?

22        A.    I'm using all of the above.  I'm

23   looking at what types of surveys I'm familiar

24   with, what I've done in the past, how I've

25   looked at others when they have viewed their

Page 115

1   research components.  So that comes into play.

2   But an additional factor is I've practiced in

3   environments that have been stressful where

4   there have been lots of impacts of what I do

5   and how I do it.  So that, in effect,

6   supplements my questionnaire and survey

7   research methodology with having some

8   understanding of exactly what's going on in a

9   particular pharmacy environment.

10          Q.    Of all the prior surveys that you

11  have experience in designing or analyzing, how

12  many of them have been field studies?

13               MR. ELSNER:  Objection.

14          A.    If you would look at the 70

15  studies that I talked about, the -- that have

16  specific full sight on questionnaire and

17  survey research, probably 15 of those 70 were

18  field-type studies.  And to elaborate, those

19  field-type studies were utilizing a service

20  that was available at the University of

21  Georgia called the Georgia poll.  And the

22  Georgia poll I used at least 15 times to

23  assess, in a field framework, what the lay of

24  the land might be.

25               For example, I looked at physician

Page 116

1    assistants; I looked at individual's choice of
2    using meta clinics, when those first came into
3    play as an alternative to going to a
4    physician's office or an emergency room.  So
5    the Georgia poll was focused on field-type
6    studies that weren't defined numbers and
7    percentages of people but were individuals
8    that were utilized in numerous instances by
9    numerous researchers at the University of
10   Georgia through what was called the Georgia
11   poll.
12        Q.    Would you consider yourself
13   unqualified to analyze survey results and
14   methodology that were in a subject outside of
15   pharmacy and medicine?
16              MR. ELSNER:  Objection.
17        A.    I would disagree with that because
18   I've examined other types of environments that
19   weren't specific for pharmacy per se or
20   medicine per se.
21              To give an example or two, I've
22   looked at managed care organizations, and so
23   I'm not an expert on the ins and outs of
24   everything about managed care, but I used my
25   survey research analytical methodology to look

1   at how I could examine several topics within a

2   managed care environment.  And I did the same

3   thing from a public health point of view in

4   public health studies that I did.  So they're

5   not disparate as far as A is never equal to B,

6   but public health is certainly a part of the

7   healthcare system, but I used expertise and

8   knowledge that I gained over the years through

9   research -- and I've, fortunately, had the

10  ability to do other types of research

11  endeavors -- to look at things that I don't

12  necessarily have everything that I need to

13  know about before I go into it.  I study it

14  very intently before I even attempt to do it.

15       Q.    Would you be able to look at a

16  survey that didn't have anything to do with

17  your pharmacy, medical, healthcare knowledge

18  and be able to offer an opinion on the

19  methodology and the design of that survey?

20       A.    I feel that I could, yes.  And if

21  I could give a rationale for doing that.  One

22  of the major references that I've used for 40

23  years is a series of books, articles and

24  treatises that have been written by a man

25  named Donald Dillman.  Donald Dillman is an

Page 118

```
 1   esteemed professor of sociology at the
 2   University of -- excuse me, at Washington
 3   State, and I've cited him in the report that I
 4   provided.  But Dr. Dillman's field of study is
 5   sociology, okay, but his techniques for
 6   analyzing a potential survey focus is what
 7   I've used in the course of my studies.  So I
 8   don't have to be an expert in everything, but
 9   I do have to have an understanding and
10   appreciation of what it is I'm trying to
11   assess and whether I have the ability to do
12   that before I even start to assess it.
13        Q.    Do you think that the COVID
14   pandemic put more pressure on pharmacists and
15   made their jobs more difficult?
16        A.    I think as a general rule, it made
17   everybody's job more difficult, but it
18   impacted healthcare professionals to a
19   significant degree, yes.
20        Q.    Is it possible that those
21   additional pressures were in the minds of
22   pharmacists when they responded to this Ohio
23   Board of Pharmacy survey?
24        A.    I think, again, you have to look
25   in total appreciation of what pharmacists have
```

Page 119

1    to deal with, not only the COVID component

2    with vaccinations, but the additional

3    vaccinations that they provide, and most

4    pharmacies now provide 15 or 20 different

5    types of vaccinations.  So COVID was crucial,

6    it was important, and it added to the

7    pressure, but those pressures were in

8    existence long before COVID came into play,

9    and that's been documented in the literature

10   going back to the 1960s.

11        Q.   Is it possible to know whether the

12   respondents to the survey were thinking about

13   COVID or opioid dispensing when they answered

14   the questions about patient safety and working

15   conditions?

16             MR. ELSNER:  Objection.

17        A.   Well, I think they considered all

18   of the factors when they answered these

19   questions.

20        Q.   And some of them specifically

21   commented about COVID and the pandemic, right?

22        A.   Yes, they did.

23        Q.   So we know that some pharmacists

24   were thinking specifically about COVID when

25   they took the survey, right?

Page 120

1      A.    I think you would have to have

2  that in the back of your mind.  Some

3  pharmacists responded very positively about

4  their work environment.  It wasn't all a

5  negative compilation of problems.  There were

6  people that were very satisfied with their

7  work environment and had a very good

8  understanding of what patient safety meant

9  where it is that they practiced.  Again, you

10  can't overgeneralize because there are a wide

11  range of responses that were provided.

12      Q.    You can't overgeneralize the

13  responses and generalize them to the working

14  conditions at all Ohio pharmacies, right?

15           MR. ELSNER:  Objection.

16      A.    That wasn't the intent or purpose

17  of the survey.  The survey wasn't to do any

18  kind of generalization.  It was just to do an

19  assessment of what the factors are from the

20  perception of a pharmacist.  And I think one

21  of the real positive components of this survey

22  and this whole methodology was it was

23  conducted by the Ohio Board of Pharmacy --

24  excuse me.  And the Ohio Board of Pharmacy has

25  oversight over each and every pharmacist and

1    pharmacy that was represented in the study

2    sample, so that gives a lot of validity to

3    pharmacists viewing how they were going to

4    respond.  They were hoping that what they were

5    going to say might make a difference in the

6    outcomes of how they practice their

7    profession.

8         Q.    Is that an assumption that you're

9    making or is that part of a scientific method

10   in analyzing surveys?

11        A.    It's a funded scientific method.

12   You're looking at who is doing the survey, why

13   does that individual or individuals or

14   organization that is doing the survey have

15   some credibility with who they're asking the

16   questions of, does it gives some validity and

17   reliability to the results that you find, and

18   I think in this case it certainly does.

19        Q.    Are you relying on any evidence

20   that suggests that a regulatory body issuing a

21   survey is going to garner more valid or

22   truthful responses from the survey

23   participants than another organization would?

24        A.    I think that if you look at the

25   studies that have been done that have been

1    published in the literature, those that come

2    from that type of organization have an

3    enhanced validity associated with them.

4         Q.    You say that Dr. Selzer is not a

5    pharmacist and doesn't have pharmacy

6    expertise, but you agree that she was not

7    asked to provide an opinion on the operation

8    of pharmacies, right?

9              MR. ELSNER:  Objection.

10        A.    But if she was to evaluate a

11   survey that was done to look at pharmacy

12   working conditions, she didn't have to be a

13   pharmacist, she didn't have to have pharmacy

14   expertise, but she should have had some type

15   of an appreciation of what the workplace

16   environment was for the different type

17   pharmacists that were going to be surveyed in

18   this particular series of surveys.

19        Q.    Did you get from her report that

20   her opinion was that opioid dispensing is not

21   part of the practice of pharmacy?  Does she

22   say that somewhere?

23              MR. ELSNER:  Objection.

24        A.    I don't believe she said that in

25   her report, no.

Page 123

1      Q.    And she wasn't asked to look at

2   the responses and decide whether or not she

3   thought they were concerning, did she -- was

4   she?

5             MR. ELSNER:  Objection.

6      A.    She should have looked at who was

7   being asked these questions, where they

8   practice, what the different types of practice

9   environments were.  And it wouldn't take

10  somebody a month to do this, okay.  It would

11  have taken a very defined short period of time

12  to at least get an assessment of what's the

13  metric, how does the metric impact what it is

14  that you do, what does the Ohio Controlled

15  Substance reporting system -- what does that

16  do, why is that in place.  You wouldn't have

17  to spend a month doing it.  You should at

18  least have an appreciation of what the

19  questions were being asked for and what the

20  respondents might be responding as a basis for

21  their responses.

22     Q.    You just told me what you think

23  she should have done, but what I asked you is

24  she wasn't asked to look at the responses and

25  decide whether or not she thought they were

Page 124

1    concerning, was she?

2              MR. ELSNER:  Objection.

3         A.    She was asked to evaluate the

4    survey, okay, and if she was asked to evaluate

5    the survey, she should have taken the

6    initiative to find out what it is that was

7    being sought in the survey, and she did not do

8    that.

9         Q.    She wasn't asked to form any

10   opinions about what metrics are and what it

11   means that pharmacists said metrics impact

12   patient safety, was she?

13             MR. ELSNER:  Objection.

14        A.    She wasn't asked that, but when

15   she read the responses that dealt with

16   metrics, why didn't she look at what a metric

17   is, why didn't she ask pharmacists how metrics

18   impact what they do and how they do it?  She

19   didn't take any effort to find out what that

20   concept meant, period.

21        Q.    And that would be part of a

22   methodology in understanding your survey

23   design?

24             MR. ELSNER:  Objection.

25        A.    In my estimation, that's what she

Page 125

1    should have done if she was going to evaluate

2    the worth, benefit and efficacy of a survey

3    that she was supposed to evaluate on its net

4    worth.

5         Q.    Was she evaluating it from a

6    pharmaceutical perspective or was she looking

7    at it from purely a survey expertise and a

8    survey design?

9              MR. ELSNER:  Objection.

10        A.    She was looking at this as a

11   pollster.  She didn't have the expertise in

12   survey research to do what she was asked to

13   do.  That doesn't mean that she isn't an

14   absolute authority on political polling.  That

15   wasn't what she was asked to do.  She was

16   asked to do something that she didn't have any

17   expertise in.  Before she responded that she

18   was going to do it or if she did do it, she

19   should have at least found out what are the

20   issues that might be impacting what it is this

21   survey is seeking to find.

22        Q.    Page 19 of your report -- if you

23   can go there -- you state that, "Where

24   difficult questions exist over whether to

25   dispense a controlled substance, corporate

```
                                          Page 126
 1   pharmacy policies and expectations in large
 2   chains conflict with pharmacists'
 3   corresponding responsibilities and due
 4   diligence duties"; is that right?
 5              MR. ELSNER:  Can you just tell us
 6   where you're at?  Sorry.
 7              MS. WOHL:  Yeah.  One second.
 8              In the middle of that first full
 9   paragraph, the question starts "Where
10   difficult questions exist."
11              MR. ELSNER:  Thank you.
12        Q.    And you bring in pharmacy policies
13   and expectations.
14              Do you see that?
15        A.    Yes, I do.
16        Q.    What corporate policies are you
17   talking about here?
18        A.    Talking about metrics.  How
19   quickly do you have to dispense a prescription
20   within tenths of a second, how many
21   prescriptions do you have to dispense in a
22   particular period of time, and are you
23   rewarded or not rewarded based upon how well
24   you meet these assigned capabilities that are
25   put on you by a national chain such as Kroger,
```

Page 127

 1   whose responsibilities and requirements don't

 2   change from Ohio to Pennsylvania.  They're

 3   exactly the same from state to state to state.

 4   So those expectations for metrics, for making

 5   sure that you have some people out the door

 6   within a defined period of time, that directly

 7   conflicts with pharmacists' due diligence

 8   capabilities.

 9            And it got to the point in some of

10   the responses from the Kroger pharmacists that

11   they had to alter their data to make it appear

12   like they were doing better than they were

13   supposed to be doing.  There was pressure at

14   the corporate level to do that.  That is

15   unbelievably unethical to put that kind of

16   pressure on a pharmacist, because if something

17   happens and that is found out, who's going to

18   be nailed?  It's going to be the pharmacist

19   that's going to be nailed.  They did this

20   wrong.  They did that wrong.  If somebody is

21   telling them they have to meet this quota,

22   they have to have this level of -- of

23   satisfaction, if they alter that, that's going

24   to impact everything that they do in the

25   future.  They can't even practice their

Page 128

1  profession if they're -- if they're found out

2  to have done that.

3              So those are the kinds of things

4  that I'm referring to here, to the large chain

5  expectations.  It's absolutely unbelievable

6  that you would expect somebody to get rid of a

7  patient, so to speak, within a defined period

8  of time and deal with your next patient.  What

9  if somebody in your family is 85 years of age

10  and they take ten medications and they get a

11  new prescription filled?  Are you supposed to

12  get them out the door in two minutes without

13  talking to them, listening to them, asking

14  them how you can help them?  That's what I'm

15  talking about when I mentioned that in this

16  paragraph.

17      Q.    I understand you're upset by these

18  comments.  Going back to the purpose of the

19  survey, can you tell by those Kroger-specific

20  comments that that is a general working

21  condition in Ohio?

22      A.    If you're looking at me to

23  quantify it and tell you how many did this, to

24  me that's irrelevant, if there's one

25  pharmacist, if there's two pharmacists, if

1   there's ten pharmacists.  And it wasn't just

2   Kroger pharmacists that said this.  It was --

3   all kinds of other individuals talked about

4   the impediments of metrics, whether you're

5   with Walgreens or CVS, Rite Aid, you name it.

6   It's deleterious.  It doesn't matter how many

7   there were.  What matters to me is that there

8   were any at all because that's going to impact

9   how you're going to take care of the most

10  important person in all this, and that's the

11  patient.

12       Q.    Which corporate policies did you

13  review when you came to this conclusion in

14  that sentence about corporate pharmacy

15  policies?

16       A.    I looked at some of the Kroger

17  requirements to get perhaps rated better, what

18  you had to do to get rated better.  You had to

19  make visits to physicians.  So many had to be

20  done.  You had to have so many filled within a

21  defined period of time.  You had to give so

22  many vaccinations.  This is counterproductive

23  to taking care of patients that need to be

24  taken care of on an individual basis.

25       Q.    Did you ask for any additional

Page 130

1   policies to look at?

2          A.    Those are all I needed to see,

3   Ms. Wohl, to see that there was something

4   wrong in the -- in the water.

5          Q.    Is there anything --

6          A.    I didn't need to see 15 other

7   things.  That's all I needed to see was this

8   worksheet that listed how you're supposed to

9   get evaluated better, and the fact that if you

10  didn't do it, you're supposed to make up the

11  data in Kroger to look better.

12         Q.    Do you know the date of the policy

13  that you reviewed?

14         A.    I don't know the specific date.

15  I'd have to -- I'd have to go through the

16  report to find it.

17         Q.    Do you know whether that policy

18  was in place at the time pharmacists responded

19  to this survey?

20         A.    I don't know.

21         Q.    Would that make a difference in

22  your estimation of these corporate policies?

23         A.    It would make no difference

24  whatsoever, because if the policy was in place

25  two years ago, five years ago, ten years ago,

Page 131

1    the pressure on that pharmacist as they've

2    been in that same environment is still going

3    to be there; how am I being evaluated, is this

4    policy going to change, is it going to alter

5    from year to year or month to month.  That's

6    in play, period, regardless of the time.

7    That's important to me.

8         Q.    So I understand that you have

9    opinions on Kroger's policies with respect to

10   metrics based on the document that reviewed,

11   the worksheet you're referring to; is that

12   right?

13              MR. ELSNER:   Objection.

14        A.    It's based on that as well as the

15   verbal comments, the written comments where

16   people talk about how deleterious metrics were

17   to their ability to practice in a safe

18   environment, the added pressure, the added

19   stress, the fact that they couldn't meet these

20   metrics, they couldn't take care of patients.

21   So it was a double negative component.

22        Q.    And I take it from your testimony

23   that your opinion is that you agree with those

24   comments made by the couple of Kroger

25   pharmacists about metrics, with respect to the

Page 132

1   metrics policies; is that right?

2        A.    I certainly agree with what they

3   said and how they said it, yes.  They had

4   absolutely no reason to lie.  They were

5   reporting this to somebody that oversees their

6   ability to practice their profession.  Why

7   would they lie about it?  They were trying to

8   get help.  They were trying to get things done

9   to make things better.  Why would they lie

10  about that?  Why would so many people lie

11  about that?

12       Q.    I'm not asking whether or not you

13  thought they were truthful.  I'm asking what

14  your opinion of Kroger's policies are.

15                MR. ELSNER:  Objection.

16       A.    I think the policies are

17  despicable.  They have absolutely no benefit

18  for patients at all.

19       Q.    And is there anything else that

20  you would need to review to form a more

21  certain opinion on Kroger's policies?

22                MR. ELSNER:  Objection.  Vague.

23       A.    Ms. Wohl, I would look at the

24  Likert responses on how they feel their

25  practice environment is unsafe, how they don't

Page 133

```
 1   have the staff that they need, the staff is
 2   constantly being diminished, the staff that is
 3   hired doesn't have the qualifications.  I'm
 4   not trying to criticize somebody that doesn't
 5   have qualifications.  I'm saying you don't put
 6   somebody in a position to take care of things
 7   if they don't have the qualifications to do
 8   that.  That's an incredible amount of
 9   pressure.  Why is that a pressure on
10   pharmacists?  Because I don't care how many
11   technicians you have and how capable they are
12   or incapable they are, everything that's done
13   by that technician, responsibility for making
14   sure that is safe, falls on who?  It falls on
15   the pharmacist that's there on duty, in charge
16   at that point in time.  So they have
17   incredible responsibility for their own
18   actions as well as every action that's done by
19   people that work with them that don't have the
20   pharmacy degree.
21        Q.    Do you have any opinions on any
22   other Kroger policies?
23             MR. ELSNER:  Objection.
24        A.    I sure do.
25             If you have a salary-based
```

Page 134

1  employee that has a 40-hour workweek but that

2  individual has to work 60 hours a week without

3  being paid in order to take care of patients,

4  there's something wrong with that policy.  If

5  you have somebody that is filling 300

6  prescriptions in a defined period of time

7  without help or assistance and you can't get

8  additional staff, you can't get additional

9  support, I certainly feel that that's an

10 inappropriate policy.  It doesn't matter if

11 it's focused simply on Kroger's.  It's CVS.

12 It's Walgreens.  It's Rite Aid.  Pick your

13 favorite chain.  That's what the problem is.

14 People are not getting the care that they need

15 in pharmacies.  But if you're looking at

16 Kroger specifically, having that kind of a

17 policy in place makes no sense whatsoever for

18 patient safety, which is what Kroger is

19 supposed to be all about.  It flies in the

20 face of what their, quote, unquote, focal goal

21 is.

22      Q.    Where are these policies you're

23 talking about?

24      A.    The policies were expanded upon by

25 individual pharmacists, okay.  It might not be

1  a written policy, but if you're a pharmacist
2  and you're trying to take care of patients and
3  you can't do it within 40 hours but you have
4  to do it in 60 hours, I don't care if Kroger
5  has a policy or not.  If that's the
6  expectation, that you want to take care of
7  people in a safe environment, you're going to
8  do it until you just can't do it anymore.  So
9  if you have somebody that's salary and they
10  work extra, pay them overtime, don't diminish
11  the staffing.  And many, many of the Kroger
12  pharmacists talked about diminished staffing,
13  cutting back on staff, inability to get extra
14  help.  That is to me -- whether or not it's a
15  written policy, it's a policy that people had
16  to abide by.
17         Q.    So you are looking at the survey
18  comments with respect to Kroger and
19  interpreting those as Kroger-wide policies?
20         A.    I'm looking at individual
21  responses that Kroger pharmacists made about
22  metrics, and those individual comments -- I
23  don't care if there were ten or 20 or 30, if
24  there were five of them, if there were four of
25  them, that indicates to me a concern.

Page 136

1          Q.    Does it indicate a corporate

2     policy?

3          A.    If people have metrics that they

4     can't abide by but they're imposed upon them,

5     that's a corporate policy.  You have to have

6     metrics in order to be evaluated positively.

7     And if you don't have those metrics, you're

8     supposed to make them up to look like you're

9     better than you actually are.

10          Q.    I understand your opinion on

11     Kroger's metrics, what you assume them to be,

12     but you mentioned two other policies, and one

13     is somebody having to work a 60-hour workweek

14     and another of somebody filling 300

15     prescriptions without staff.  What policies

16     are those?

17               MR. ELSNER:  Objection.  Asked and

18     answered.

19          A.    If you have metrics that you have

20     to fill prescriptions within a defined period

21     of time, and you have 300 prescriptions that

22     you have to fill and you don't have the

23     staffing and you don't have the support,

24     there's a policy there that needs to be fixed.

25     And the policy is that you expect people to do

1   too much with too little and do it real quick

2   or you're going to get docked.

3        Q.    Drawing these conclusions from the

4   comment section of these surveys, is this

5   typically how you analyze survey results?

6        A.    I'm sorry.  I didn't quite hear

7   the first part of your question.

8        Q.    I said drawing conclusions like

9   these from the survey comments, is this

10  typically how you analyze survey results?

11       A.    When I analyze survey results, I

12  look at every part of the survey; how it was

13  constructed, what it was supposed to measure,

14  and what the results are supposed to be used

15  for.  So when I looked at the written

16  comments, did they have any validity with what

17  people were saying in their Likert scale

18  responses.  So when they talked about unsafe

19  work conditions, not enough staffing, and then

20  you combine that with what I found and read in

21  the verbal comments, it gives credibility to

22  the entire survey.  It makes it valid.  It

23  makes it reliable.  I don't look at these

24  individually as item A or item B.  I look at

25  item A plus item B equals what.

1      Q.    If you can turn to page 20 of the

2   report.  At the top of the page there's a

3   sentence that starts out "Additionally," and

4   you state that "the pharmacy regulations and

5   practice standards apply the same to all

6   pharmacies."

7           Do you see that?

8      A.    Yes, I do.

9      Q.    What is your basis for this

10  comment?

11     A.    Okay.  If you look at what the

12  practice standards are for the practice of

13  pharmacy in an institutional setting, in a

14  long-term care setting, in an independent

15  retail pharmacy setting, the environments are

16  different, the practice components might be a

17  bit different, but the expectations regarding

18  regulatory components are the same, that you

19  have things happening in a safe and

20  appropriate manner.

21     Q.    You go on to say that "dispensing

22  work flows are similar no matter the

23  pharmacy."  What's your basis for that

24  comment?

25          A.    I'm sorry.  Where do you see that?

Page 139

1      Q.    At the end of that sentence that
2  begins "additionally," the last phrase is
3  "dispensing work flows are similar no matter
4  the pharmacy" on page 20.
5      A.    So what's supposed to happen when
6  a prescription is filled, so how is it
7  processed, how is it packaged, how is it
8  delivered to the patient, what is the patient
9  told about the medication.  If the work flow
10  expectations for that dispensing is done in a
11  community pharmacy or a chain setting or a
12  food market-based pharmacy or a hospital
13  outpatient setting, those regulations are
14  applicable across the board regardless of what
15  the environment is.  Those are state
16  regulations on how pharmacy needs to be
17  practiced in a particular state.  It doesn't
18  matter what the environment is.
19      Q.    So when you talk about work flow,
20  you're talking about the regulations and the
21  law that pharmacies have to follow when they
22  dispense, right?
23      A.    That's correct.
24      Q.    And is that also what you're
25  referring to when you talk about the

 1  standardization of large chain pharmacy work

 2  loads?

 3       A.    Where do you see that?

 4       Q.    That's the very next sentence,

 5  page 20.

 6       A.    And I think what I'm referring to

 7  there is how the respondents from the Likert

 8  scale standpoint responded if they were in a

 9  food market-based pharmacy or a large chain

10  environment versus independent pharmacists or

11  institutional practices.  So hospital

12  pharmacists wouldn't have this kind of concern

13  and they said I'm glad I don't work in a chain

14  or I'm glad I don't have those constraints.  I

15  have this ability to report to a supervisor

16  that there are unsafe working conditions and

17  that supervisor has to deal with the issue

18  rather than have it being ignored like you

19  might see in a chain environment.

20       Q.    What's your basis for saying that

21  you would see these concerns ignored in a

22  chain environment?

23       A.    Based upon what the verbal

24  responses were and the fact of the Likert

25  scale items where they indicated they didn't

1    have anybody that they could talk to about an
2    issue, A, B, C or D.
3         Q.    But we're talking about, when you
4    say that, the respondents were not making
5    generalizations as to all Kroger pharmacies or
6    Ohio pharmacies, right?
7                   MR. ELSNER:  Objection.
8         A.    Again, there are some pharmacists
9    in those pharmacy environments that were
10   perfectly satisfied with what they were doing.
11   I just think that because there was a concern
12   raised, on an average based on percentage of
13   respondents in Likert scale items, then you
14   couple in the verbal responses, that adds
15   validity and reliability to what the survey
16   was doing.
17                  MS. WOHL:  Can I have the last
18   question I asked read back, please?
19                       (Record read.)
20        Q.    Could you answer that,
21   Dr. Fincham.
22        A.    Again, that's not what I'm saying
23   because some individuals felt that they had a
24   really nice work environment.  There was a
25   separation -- you know, regardless of where

Page 142

```
 1   the individual practiced, they weren't all the
 2   same responses.
 3        Q.    Okay.  I think the answer to that
 4   question is no, you were not making
 5   generalizations.  I just wanted to make sure I
 6   understood what you were saying.
 7             MR. ELSNER:  Objection.  Strike
 8   the colloquy.  That's not a question to the
 9   witness and that's not what the witness said.
10        Q.    Okay.  I'll ask you again.  Can
11   you generalize the negative comments about
12   Kroger to all Kroger pharmacies?
13             MR. ELSNER:  Objection.
14        A.    My point is that if some
15   pharmacists in Kroger express this concern,
16   that should be a major concern for Kroger
17   corporate.  And, in fact, because of these two
18   studies, the 2021, the 2020 study done by the
19   Ohio Board of Pharmacy, what did Kroger do?
20   They did their own study of their own
21   pharmacists and the similar results were
22   found.  So, in my estimation, Kroger felt that
23   this was a significant issue that they needed
24   to look at within their own group of
25   pharmacies and pharmacists only.  So whether
```

Page 143

1    or not I generalized it, Kroger did.  They

2    felt they needed to analyze their environments

3    for their pharmacists.

4          Q.    In the next paragraph you quote

5    Dr. Selzer's opinion that it would be an

6    unsubstantiated leap to believe that the

7    answers to the survey questions reflect

8    pharmacists' specific concerns with dispensing

9    of opioids, and you follow that with it would

10   be an unsubstantiated leap to suggest that a

11   pharmacist would not have controlled

12   substances and opioids in mind when answering

13   these questions, right?

14         A.    That's correct.

15         Q.    Then you disagree with

16   Dr. Selzer's opinion that you cannot take the

17   results and -- from this survey and assume

18   that pharmacies -- pharmacists were talking

19   specifically about their concerns with

20   dispensing opioids?

21         A.    I don't agree with her statement.

22         Q.    Okay.  And you are saying there

23   that it's your opinion that they did have

24   opioid dispensing in mind when answering these

25   questions; is that right?

1    A.    That's one of many factors that

2  they had in mind.  If we go back to Table 1,

3  those factors are not mutually exclusive.

4  They're all inclusive of what pharmacists

5  consider when they practice on a day-to-day

6  basis, on an hour-to-hour basis.  It's

7  constantly impacting them in the back of their

8  mind.

9    Q.    So within Table 1 is a whole list

10  of things that's constantly impacting them in

11  the back of their mind that they would have in

12  mind when talking about their practice, but we

13  can't isolate any of those one tasks or duties

14  and say that these results were specific to

15  any one of those; is that right?

16          MR. ELSNER:  Objection.

17    A.    I don't know why you'd want to

18  separate those out, because the pharmacist

19  sure doesn't.  If they can't take a break, if

20  they can't go to the bathroom, how are they

21  going to do those other 15 items and do them

22  efficiently, effectively and with the focus of

23  the patient in mind.  If they can't have a

24  work break, if they can't eat lunch, if

25  they're a diabetic, how are they supposed to

Page 145

1   handle that stuff?  They can't.  So it's not

2   fair to just separate one thing out of

3   another.  All those factors impact them each

4   and every time each and every minute of their

5   practice site.  The biggest worry the

6   pharmacists have is am I going to make a

7   mistake that's going to hurt a patient, and

8   then, secondly, is that going to make my

9   ability to practice as a pharmacist impossible

10  because I'm going to be fired, I'm going to be

11  let go, I'm going to be released from my

12  responsibilities.  They think about that from

13  minute one to the last minute they leave the

14  door.

15      Q.   Am I correct in saying that

16  patient safety encompasses opioid dispensing

17  and, therefore, it's reasonable that

18  pharmacists would generally have all aspects

19  of patient safety in mind when answering

20  patient safety questions?

21      A.   I absolutely agree with that a

22  hundred percent.

23      Q.   So what I'm hung up here on is the

24  word "specific."  You know, specific to me

25  means isolating any one of those and saying

1    the comments and the answers are specific to

2    any one isolated task or duty.  Are you saying

3    that these comments and survey results reflect

4    specific concerns with opioid dispensing?

5         A.    They reflect all the concerns.

6    Included in those concerns is opioid

7    dispensing.  You can't separate that out from

8    the concern that pharmacists have.  If you

9    have metrics that you have so many

10   prescriptions that you have to fill and you

11   have a patient present with an opioid

12   prescription and you have to go through the

13   OARRS system, you have to look at whether or

14   not they traveled so many miles, you can't

15   separate it out, it's all inclusive, it

16   impacts everything they do each and every

17   minute of their practice day.

18        Q.    When Dr. Selzer talks about

19   breaking down survey results by demographics

20   and how that might be useful, it's your

21   opinion that that is not important here

22   because pharmacy is gender neutral; is that

23   right?

24        A.    That's absolutely how I feel, yes.

25        Q.    So it would be of no significance

Page 147

1  to you if more men than women answered in a

2  certain way in this survey?

3         A.    In my mind a pharmacist is a

4  pharmacist regardless of what their gender is

5  and their responsibilities are exactly the

6  same.

7         Q.    So as a survey expert, if the

8  majority of the complaints were from younger

9  pharmacists or male pharmacists, would that

10  have no significance to you?

11         A.    I think what was significant was

12  the demographics that they did measure, so how

13  long had somebody been in a practice

14  environment, how many years have they

15  practiced.  Those are the things that are

16  important to me.  Whether or not somebody was

17  25 or 65 doesn't have any impact whatsoever on

18  how they're supposed to do what it is they're

19  supposed to do to provide patient care and

20  patient-safe environments.

21         Q.    Is that your general view on

22  demographics of survey respondents in, you

23  know, the pharmaceutical area or just this one

24  specifically?

25                MR. ELSNER:  Objection.

Page 148

1          A.      We're talking about the practice

2     of pharmacy in the state of Ohio.  If we're

3     looking at dosing of men versus dosing of

4     women, dosing of somebody that's 85 versus

5     somebody that's 15, the demographics and age

6     and gender are really crucial, but if you're

7     talking about the practice of pharmacy, it

8     doesn't matter what somebody's gender is, it

9     doesn't matter how old they are.  The

10    responsibilities, the duties, the expectations

11    are exactly the same.  So it depends upon the

12    study and the type of study that you're

13    assessing.  And, again, I don't want to be

14    overly critical of Dr. Selzer, but she has no

15    idea of how pharmacy is practiced or what the

16    expectations are.  It doesn't mean she's not a

17    world class, famous expert on polling.  She

18    doesn't know anything about pharmacy so she

19    doesn't have the ability in my estimation to

20    make an evaluation of why demographics were

21    important.

22          Q.      We've covered some of this next

23    area in our talks about generalization and

24    whether or not you can take the survey results

25    and make conclusions about the

Page 149

1   non-respondents, but I want to ask it in these

2   terms.  You say that the question of whether

3   the results of this survey can be extrapolated

4   to all pharmacists is not very relevant,

5   correct?

6        A.    That wasn't the purpose of the

7   study, no, ma'am.

8        Q.    Okay.  So it is not relevant

9   whether the experience of the pharmacists who

10  responded to the survey represents the

11  experience -- the experiences of all

12  pharmacists in Ohio?

13            MR. ELSNER:  Objection.

14       A.    Again, the premise of the study

15  was to get an assessment of workplace safety

16  from the pharmacist's point of view.

17       Q.    Of general workplace conditions,

18  correct?

19       A.    All workplace conditions, yes.

20       Q.    On page 23 --

21            THE WITNESS:  Would it be possible

22  to take a break, please?

23            MS. WOHL:  Yes.  Let's take a

24  break.  We can go off the record.

25            THE VIDEOGRAPHER:  Off the record,

Page 150

1    1:37.

2                    (Recess had.)

3              THE VIDEOGRAPHER:  On the record,

4    1:47.

5    BY MS. WOHL:

6         Q.    Dr. Fincham, did you have any

7    experience with Kroger pharmacies prior to

8    reading the results of these surveys?

9         A.    No, I did not.

10         Q.    Have you ever known any pharmacist

11    who worked at Kroger?

12         A.    Yes, I do.

13         Q.    And what's the nature of your

14    relationship with them?

15         A.    Let me --

16              MR. ELSNER:  Objection.

17              Go ahead.

18         A.    When I was at the University of

19    Kansas School of Pharmacy as a dean, I

20    received a grant from the National Association

21    of Retail Druggists to evaluate pharmacists'

22    potential to enhance what it is they did and

23    how they might be reimbursed for that.  And

24    one of the groups that I wanted to include to

25    make sure that we were inclusive in the study

Page 151

1   design were pharmacists that worked at

2   Dillons, and Dillons is wholly subsidized by

3   Kroger, it's managed by Kroger.  At that point

4   in time the pharmacy director, Jane Siebert,

5   was monitoring pharmacy services within the

6   Dillons network, but still Kroger owned

7   Dillons.  So my impact through Jane Siebert,

8   the pharmacist that participated in the study,

9   was my interaction with Kroger pharmacists.

10              So I was also asked to speak to

11  the group of Kroger pharmacists that get

12  together on an annual basis, to talk to them

13  about the future of pharmacy.

14              So that's my interaction with a

15  Kroger subsidiary, but yet I considered it to

16  be Kroger pharmacies and pharmacists.

17       Q.    Can you tell me more about your

18  experience in getting together with Kroger

19  pharmacists to talk about the future of

20  pharmacy?

21       A.    At that time Ms. Siebert asked me

22  to come to speak to the pharmacy group about

23  what I perceived as the future of pharmacy and

24  the opportunities for supermarket-based

25  pharmacy to have a major impact in how

Page 152

1   pharmacy was practiced in the state of Kansas.

2        Q.    Did you form any opinions about

3   Kroger pharmacies or pharmacists during these

4   relationships?

5             MR. ELSNER:  Objection.

6        A.    I have a very positive view of

7   pharmacy and pharmacists, period, so I

8   welcomed the opportunity to work with those

9   Dillons pharmacists to help them realize that

10  the University of Kansas School of Pharmacy

11  was focused on them and their practice and to

12  do what I could to make their practice better

13  and enhanced.  So my view of Kroger

14  pharmacists through the Dillons group was very

15  positive.  It remains positive to this day.

16       Q.    On page 24 of your report --

17  actually, it's the bottom of 23 and then on to

18  24, that sentence.  "The Board's

19  characterization of the survey findings as

20  reliable and 'striking' should be given

21  substantial weight."

22             Do you see that?

23       A.    Yes, I do.

24       Q.    So, in your opinion, the

25  surveyor's findings are to be given

Page 153

1    substantial weight in analyzing the survey?

2         A.    That's the view of the Ohio Board

3    of Pharmacy, looking at this survey and the

4    results.

5         Q.    And I'm asking for your opinion.

6    What's the substantial weight that you're

7    talking about giving these -- this view?

8         A.    I think that the survey was valid,

9    it was reliable, and I based my assessment of

10   validity and reliability based upon other

11   studies that were done in different states as

12   well as the national survey of pharmacists'

13   working conditions.  They were very similar in

14   the outcomes.  Some of the questions were

15   virtually the same.  So the Kroger -- excuse

16   me.  The Ohio Board surveys were based upon

17   other work that had been done in other states

18   and it added, in my estimation, to the

19   validity and how important the results were.

20        Q.    Well, the substantial weight that

21   you're talking about here is the Board's

22   characterization of the survey findings as

23   reliable and striking, so it doesn't sound

24   like you're talking about these other surveys

25   but it's the board's own assessment of its

Page 154

1    survey is what you want to give substantial

2    weight.  Am I reading that correctly?

3         A.    Yes.  It's how the board viewed

4    the survey results in 2020 as well as 2021.

5         Q.    Okay.  So the fact that the Ohio

6    Board of Pharmacy found the surveys to be

7    reliable is a significant aspect of your own

8    conclusion that the surveys are indeed

9    reliable?

10        A.    It's one component of how I

11   assessed how reliable or valid the survey was,

12   yes.

13        Q.    The surveyor's own opinion of its

14   survey?

15        A.    That added to my ability to look

16   at this as being a valid and reliable series

17   of studies, yes.

18        Q.    And you also seem to be saying

19   that the Board's actions in response to the

20   survey validated the survey results; is that

21   correct?

22        A.    Yes.

23        Q.    So how would subsequent actions of

24   a surveyor make survey results more reliable?

25               MR. ELSNER:  Objection.

1      A.    Ms. Wohl, if we go back to how

2  surveys are initially constructed, you look at

3  what it is you're going to examine, you look

4  at what you're going to ask, and then you look

5  at how are the results going to be used.  And

6  so, in my view, looking at this from that

7  standpoint, when I see that the Board of

8  Pharmacy took the results of this survey and

9  started the process of trying to make

10 recommendations on improving pharmacy practice

11 indicates to me that this was a valid study,

12 it was a reliable study, and it was certainly

13 carried out from a design standpoint and a

14 construction standpoint in a very appropriate

15 manner.

16      Q.    So if the Board had not taken

17 actions in response to the survey, would that

18 have made the survey results less reliable?

19           MR. ELSNER:  Objection.

20      A.    That's a -- that's a question that

21 I really can't answer.  I can only talk about

22 what was done and how it was done and why that

23 made my assessment of this whole survey

24 process as being very, very valid.

25      Q.    Don't you need to make sure you

Page 156

1   have valid data before you take appropriate

2   actions?

3             MR. ELSNER:  Objection.

4        A.    I don't mean to be disrespectful.

5   That's a rhetorical question.  I don't know

6   what it is that you're trying to examine or

7   what you're talking about.  Can you be more

8   specific, please?

9        Q.    Well, let's say the data from the

10  survey is biased or unreliable in some way.

11  If the organizations are acting on biased

12  data, then they're making decisions on flawed

13  data, correct?

14       A.    And that's where Dr. Selzer and I

15  agree, that this was a series of valid

16  questions, it was appropriate for the Board to

17  do these surveys, there was no evidence

18  whatsoever that there was any bias or that

19  there was anything that was done to alter the

20  data to have it to -- to look different than

21  it was actually supposed to appear.

22       Q.    But my question is a little

23  different.  I guess what I'm asking here is

24  that you've got survey results that can't be

25  generalized to a broader population.  They are

Page 157

1    the results of the people who took the survey

2    and that's all.  If the Ohio Board of Pharmacy

3    is acting on survey results that are not

4    representative of a broader population, then

5    is the data or the action -- are the actions a

6    result of flawed data?

7                    MR. ELSNER:  Objection.

8            A.    I respectfully disagree with your

9    whole premise.  That's not the purpose of what

10   this study was intending to do.  It wasn't to

11   generalize pharmacy practice.  It wasn't to

12   generalize a specific region of the state of

13   Ohio.  It was simply to get an appreciation of

14   what the workplace environment and factors

15   impinging on patient safety were.  And the

16   Board took those results -- they didn't bias

17   those results.  They didn't alter those

18   results.  They looked at the results that were

19   both Likert scale in origin as well as the

20   verbal written responses and tried to make

21   recommendations based upon what those

22   particular studies found.  So how they

23   processed this through from start to finish in

24   my mind was very, very appropriate.

25                    And to amplify that, if this was

Page 158

1    looked at as something that was positive in

2    these two years, why would Kroger then do a

3    similar study if they didn't feel that this

4    had some validity and needed to be done and

5    needed to be expanded upon?  That adds to me

6    the whole issue of how this was really

7    credible.  It was important to Kroger, as well

8    it should be.

9         Q.    What exactly in your report here

10   is rebutting something that Dr. Selzer wrote?

11              MR. ELSNER:  Objection.

12        A.    I'm going to respectfully request

13   that you would have to go through this page by

14   page.  I was very specific in my assessment of

15   why Dr. Selzer was wrong in some of her

16   assessments.  And if you want me to go through

17   this page by page, I can certainly do that,

18   but basically she didn't review the policy

19   recommendations of the workload advisory

20   committee or other steps took in response to

21   the survey results.  This is on page 24.  She

22   should have done that.

23        Q.    Does that relate to an opinion

24   that she had that you are rebutting?  I know

25   you think that she should have done more.

Page 159

1                MR. ELSNER:  Whoa, whoa.  I'm
2    going to raise an objection.  I'm not sure
3    that's a question.
4         Q.    Okay.  Does that relate to an
5    opinion that she had that you are rebutting?
6    That is the question.
7         A.    And, again, respectfully, we can
8    go through this page by page and I can -- I
9    went through why I didn't agree with
10   Dr. Selzer.  It's no criticism of her as a
11   pollster.  It's just she didn't do what she
12   should have done to analyze these surveys.  So
13   her assessment of the survey in general was
14   totally inappropriate, it was wrong.
15        Q.    I don't think we need to go
16   through it page by page, but isolating what
17   you're saying here on page 24 of the things
18   that she did not do, like review the policy
19   recommendations of the workload advisory
20   committee or other steps that the Board of
21   Pharmacy took in response to the survey
22   results, you believe she should have done
23   those, correct?
24        A.    Yes.
25        Q.    So what part of her opinion

Page 160

1  relating to that are you rebutting?

2            MR. ELSNER:  Objection.  I'm

3  sorry.  I don't understand the question.

4            If you understand the question,

5  you can answer.  I don't understand it.

6       A.    I did not understand the question

7  and I don't think it's fair to expect me to

8  cherrypick one particular sentence in one

9  particular paragraph on page 24 and make my

10  assessment of why I think that what she did is

11  invalid.  It's the whole report, all the

12  pages --

13       Q.    Everything?

14       A.    -- that in my mind refute what

15  Dr. Selzer stated about this study and study

16  process.

17       Q.    At the end of your report, on page

18  30, in the middle of the second paragraph, if

19  I can draw your attention to a sentence there.

20       A.    What page?

21       Q.    Page 30.

22            You state that "The survey

23  information, when placed in the context of

24  regulatory obligations of controlled

25  substances, pharmacy practices and ongoing

Page 161

1   opioid epidemic, were persuasive."

2            So let me ask you first about

3   placing the survey information in specific

4   contexts.  You agree that it wasn't

5   specifically targeted to the regulatory

6   obligations of controlled substances, pharmacy

7   practice and opioid epidemic, correct?

8        A.    I agree with that.

9        Q.    Okay.  So you have to place it in

10  that context, and that's something you're able

11  to do with your pharmacy expertise; is that

12  right?

13       A.    And, respectfully, we could take

14  ongoing opioid epidemic out and talk about

15  dispensing cancer chemotherapy or dispensing

16  drugs that have known interactions with other

17  drugs.  So you could -- you could go through

18  any number of things and talk about why it was

19  persuasive.  But from the standpoint of

20  controlled substances, it certainly is

21  applicable.

22       Q.    And you sort of answered my next

23  question, which was you can put this

24  information into other contexts, correct?

25       A.    Yes, you can.

Page 162

1      Q.    And make assumptions and draw
2  conclusions; is that right?
3      A.    I'm not making an assumption.  I'm
4  basically concluding that that's the case.
5      Q.    Okay.  Dr. Selzer, in her report,
6  says that some pharmacists may have concerns
7  about opioids but this survey did not purport
8  to measure that.  Do you disagree with that?
9      A.    That's what Dr. Selzer said.
10      Q.    Do you disagree with what she is
11  saying there?
12      A.    Can you ask the question?  I'm
13  sorry.  I don't quite understand what you're
14  asking me.
15          MR. ELSNER:  She's asking you
16  whether you agree or disagree with her
17  opinion, but go ahead and ask the question
18  again.
19      Q.    Dr. Selzer says that some
20  pharmacists may have concerns about opioids
21  but the survey did not purport to measure
22  that.  Do you agree or disagree with that?
23      A.    I agree with that.
24      Q.    And she states that we cannot be
25  certain that the data reflect a larger pool

Page 163

1    than the pharmacists who responded.  Do you

2    agree or disagree with that?

3                MR. ELSNER:  Objection.

4         A.    I think we can agree with that.

5    We could also agree that there were

6    pharmacists that didn't respond that would

7    have had very similar responses, but that

8    wasn't the purpose of the study.

9         Q.    Explain that opinion to me, we can

10   agree that pharmacists who didn't respond had

11   very similar -- would have had very similar

12   responses.

13        A.    They could have had similar

14   responses.  They could have had dissimilar

15   responses.  That doesn't impact at all the

16   validity of this study, which was to get a

17   general perception of workplace safety and

18   conditions that impacted pharmacists' ability

19   to practice safely.

20        Q.    Okay.  I want to make sure I

21   understand that statement.  We don't know what

22   the pharmacists who did not respond would have

23   said, correct?  Is that what you're saying?

24        A.    That's correct.

25        Q.    Okay.  The Oregon Board of

Page 164

1   Pharmacy survey that was sent as a supplement

2   to the materials you considered, did you

3   consider this survey before you wrote the

4   opinion or in writing your opinion?

5         A.    It was after the fact.

6         Q.    And does this survey impact your

7   opinions?

8         A.    It -- do we have a copy of that

9   that I could examine?  I don't have a copy of

10  that in front of me.

11        Q.    Okay.  It didn't make it into the

12  exhibit folder.

13              MR. ELSNER:  We can make it --

14  since it was produced late, I'm happy to -- do

15  you want to go off the record for a minute?

16  We can pull that for him.

17              MS. WOHL:  Sure.

18              MR. ELSNER:  Do you want to do

19  that now?

20              MS. WOHL:  Yeah, let's go ahead

21  and do that.

22              THE VIDEOGRAPHER:  Off the record,

23  2:05.

24                  (Recess had.)

25              THE VIDEOGRAPHER:  On the record.

Page 165

1   BY MS. WOHL:

2        Q.    Dr. Fincham, do you have the

3   Oregon Board of Pharmacy survey in front of

4   you?

5        A.    Yes, I do.

6        Q.    And this was the supplement that

7   was sent to me as an additional material

8   considered by you; is that correct?

9        A.    Yes.

10        Q.    When did you first review this?

11        A.    I first saw it yesterday evening.

12        Q.    And how did you come across this?

13        A.    I was provided a copy here at the

14   firm.

15        Q.    By counsel?

16        A.    Yes.

17        Q.    And was the first time you

18   reviewed this document yesterday evening?

19        A.    That's correct.

20        Q.    Do you have any additional

21   opinions now that you've considered this

22   survey report?

23        A.    My opinions would remain the same

24   as I indicated in my report.

25        Q.    Does this Oregon survey or the

Page 166

1    report on it have any significance to your

2    opinions in this case?

3              MR. ELSNER:  Objection.

4         A.    I think it just indicates that the

5    findings of this survey done in 2011 are not

6    that different than what was found ten years

7    later in a different state.

8         Q.    And can you explain that

9    significance to me?

10        A.    I said that it really wasn't

11   significant from the data that was found in

12   this study versus what was found a decade

13   later.  The results are very, very similar.

14   This study did not have some of the

15   demographic components that the two surveys

16   that were reviewed for the State of Ohio had.

17   So when they talk about practice site, they

18   were very limited in what they indicated.

19   There were just three particular sites as

20   opposed to the study that was -- studies that

21   were done in Ohio.  They broke down the

22   practice site.  Here talking about the Table 3

23   on page 8, they just say community chain.

24   They don't break it down to food market-based

25   pharmacy, et cetera.

Page 167

1      Q.    The fact that you say -- as you

2  say, the results aren't that different between

3  this 2013 survey in Oregon and the Ohio 2020

4  and '21 surveys, does that have any bearing or

5  support of any of your opinions in your report

6  in this case?

7              MR. ELSNER:  Objection.

8      A.    And, again, I indicated I didn't

9  use this document in any way, shape or form in

10  the formation of my report and the writing of

11  such.

12     Q.    So it doesn't support your

13  opinions even after the fact, it is just an

14  ancillary document that you looked at?

15             MR. ELSNER:  Objection.

16     A.    I think I'm repeating myself, but

17  I think that this validates the findings that

18  were done in the Ohio study, the Missouri

19  study, and the national study that was done

20  several years after this by the American

21  Pharmaceutical Association.

22     Q.    And I apologize if you're

23  repeating yourself.  That is not what I heard

24  from your prior answer.  So this Oregon survey

25  validates the results of all the other surveys

1    that you mentioned in your report, including

2    the Ohio Board of Pharmacy survey?

3          A.    It adds validity to the findings,

4    yes.

5          Q.    And in what way?

6          A.    If you look at the qualitative

7    results, you know, the responses that are on

8    page 19, 20, talking about dissatisfaction

9    with the changing pharmacy profession, those

10   kinds of things -- if you look at the

11   quantitative result, it's really -- you

12   show -- again, this is just -- this is a

13   Likert scale of three items, okay, where you

14   have agree, neutral or disagree.  And, as a

15   survey design analytic person, you never use a

16   three-item scale.  You use a five-item scale,

17   where you have agree, strongly agree, neutral,

18   disagree or strongly disagree.  But, again,

19   that's a criticism of this particular study.

20   And if I would have used this study in the

21   report that I provided, I would have

22   specifically hammered in at the fact that you

23   don't use ever a three-item Likert scale when

24   evaluating somebody's opinion or assessment.

25          Q.    So you've got some issues with the

1  methodology of the Oregon survey but the

2  results still validate the other surveys that

3  you've mentioned?

4      A.   It validates my view that this has

5  acceptability compared to the Ohio studies are

6  the verbal written responses, okay.  I have

7  real concerns about how some of these metrics

8  were designed, how metrics -- excuse me, how

9  the questions were, which is a three-item

10  Likert scale.  That's never done.  That's

11  period, end of quotation.  It's never done.

12  That's been shown in the literature.  If you

13  look at one of the individuals that I quoted,

14  Donald Dillman from Washington State

15  University, he was a worldwide, renowned

16  expert on survey methodology.  He will

17  specifically hammer on the need to have more

18  than three Likert scale items as responses.

19  But the verbal responses, the written

20  responses, are similar in tone and structure

21  and nature.

22      Q.   Were any of them specific to

23  Kroger?

24      A.   I have no idea if there are Kroger

25  pharmacies in the state of Oregon, and I

Page 170

1   haven't looked at this in great detail.  Like

2   I said, I looked at this last night.  If I was

3   going to evaluate this, I would thoroughly

4   look at it rather than try to come up with

5   answers here after looking at it for ten

6   minutes here today.  That's not fair to me.

7        Q.    You all submitted this to me.  I'm

8   trying to figure out exactly what this

9   document is.

10       A.    What did you just say?

11            MR. ELSNER:  Whoa, whoa, whoa.  We

12  produced -- let me just clear the air a

13  second.  It was something that was provided to

14  Dr. Fincham.  He reviewed it.  We provided it

15  to you because it's something he considered.

16            It's completely fair game for her

17  to ask you questions about it because it's

18  something you considered.  She wants to know

19  whether you're going to rely on it at trial

20  and what you're going to say about it and how

21  it compares with everything else.

22            So I'm sorry about that, Ms. Wohl.

23  Please continue.

24       Q.    Do you need some time to look at

25  this report?  I don't have very many more

Page 171

1   questions on it.

2        A.    What specifically were you going

3   to ask me, and then I'll try to respectfully

4   kindly answer appropriately?

5             MS. WOHL:  Can I ask the reporter

6   to read back my last question on this report?

7                  (Record read.)

8        Q.    I was asking about what you know

9   about this survey, if there are any specific

10  comments to Kroger.

11       A.    And I don't know that.  I can't

12  say that.  I don't have any idea.

13       Q.    Do you know whether there were any

14  specific questions or comments specific to

15  opioids or the dispensing of controlled

16  substances?

17       A.    And, again, because I didn't look

18  at this report in my report, I have no idea

19  what's in it.

20       Q.    Okay.

21       A.    I didn't really review it last

22  night at all.

23       Q.    Okay.  I take it this is not

24  something you would be relying on to support

25  your opinions if we were to go to trial in

                                    Page 172

1   this case?

2        A.    What I would request respectfully

3   is the ability to look this over, and if I

4   need to change something in my report, I would

5   do so and indicate the sourcing for why I

6   wanted to change it.

7              MS. WOHL:  Okay.  Can we take a

8   five to ten-minute break?

9              MR. ELSNER:  Sure.

10             THE VIDEOGRAPHER:  Off the record,

11   2:22.

12                  (Recess had.)

13             THE VIDEOGRAPHER:  On the record.

14   BY MS. WOHL:

15        Q.    Dr. Elsner -- sorry.  Dr. Fincham.

16   I didn't mean to promote you.  Do you plan to

17   testify about any opinions that you have that

18   are not written in your report in this case?

19        A.    At this point I don't have

20   anything that -- that I would add, but that

21   doesn't mean that something might come up that

22   I'd want to add later on.

23        Q.    As we sit here today, there's

24   nothing that you would plan to amend in your

25   report?

Page 173

1          A.     No.

2                 MS. WOHL:  I don't have any

3      further questions for you.  Thank you.

4                 THE WITNESS:  Thank you for your

5      courtesy today.  I appreciate it.

6                 MR. ELSNER:  We're not quite done.

7      Don't compliment her too soon.

8          EXAMINATION OF JACK E. FINCHAM, Ph.D.

9      BY MR. ELSNER:

10         Q.     Dr. Fincham, I just have a few

11     questions that I just want to walk through

12     with you.

13                We talked a little bit about your

14     experience with designing surveys and

15     interpreting surveys.

16         A.     Yes.

17         Q.     And one thing that we -- that

18     didn't come out in the deposition is do you

19     serve as an editor or a referee for any

20     peer-reviewed journals?

21         A.     At this point in time I do, yes.

22     I've been asked probably six to eight times a

23     year to review a publication for potential

24     publication.  It's journals all over the

25     world.

1        Q.    Okay.  And just roughly, how many

2   journals have you served as an editor or

3   referee on?

4        A.    I would say 60 in total.  That's

5   an estimate.

6        Q.    Okay.  And in your role as an

7   editor or a referee of peer-reviewed work of

8   other professionals, have you examined survey

9   designs and interpreted survey results in that

10  role?

11       A.    Yes, I have.

12       Q.    Okay.  And do you have an estimate

13  as to how many times you've done that?

14       A.    I would say well over 250 times.

15       Q.    All right.  And within the context

16  of serving as an editor or referee for these

17  journals, has it been the practice that people

18  have relied upon your expertise in this area

19  to review articles that focus on particular

20  types of surveys, interpreting them and

21  developing them?

22       A.    That's certainly the case, yes.

23  I'm fortunate to be in that position, yes.

24       Q.    Okay.  And have any of those

25  articles that you've refereed or edited for

Page 175

1   peer review journals dealt with field studies?

2          A.    Yes, most certainly they have, and

3   not only in my capacity as a reviewer for

4   journals, but I'm also on several advisory

5   committees for the Canadian Institutes of

6   Health & Research, which is equivalent to our

7   United States NIH and AHRQ, but in that

8   capacity I've evaluated numerous surveys as

9   part of grant resubmission processes.

10         Q.    Thank you.

11               And have you ever been asked to

12  speak about survey design and the

13  interpretation of surveys?

14         A.    Yes, I have.  I've been fortunate

15  to have had those opportunities in Australia;

16  in Vietnam; in Scotland; in Glasgow at the

17  University of Strathclyde; in Aberdeen,

18  Scotland; in Turkey; and in the United

19  Kingdom, specifically Oxford.

20         Q.    Thank you.

21               Is the use of a field study a

22  reliable and professional form of surveys?

23         A.    Yes, it is.

24         Q.    Is it acceptable in the

25  professional field -- in your professional

Page 176

1   field of survey design and interpretation to

2   use a field study?

3        A.    It is most appropriate and it's

4   widely used, yes.

5        Q.    Okay.  Are there other experts in

6   the field that have interpreted and used field

7   studies as part of their work other than you?

8        A.    The individual that -- that I rely

9   upon, and it's not just me that relies upon

10  him, but it's Donald Dillman.  It's Washington

11  State University.  And in 1988 he wrote a book

12  called "The Total Design Method."  And in that

13  book -- it's a comprehensive, evaluative

14  document/book that looks at various types of

15  survey research methodologies, when it's

16  appropriate to use them, how they should be

17  used, and what the impact of those has been.

18  He's also followed up with additional books

19  that I've referenced in my report.  But Donald

20  Dillman is, in my estimation, the gold

21  standard reference point, and this is somebody

22  that I was involved with as a student at the

23  University of Minnesota in the research,

24  design and methods courses that I took there,

25  and Donald Dillman's book was priority number

1    one in those courses.

2         Q.    Okay.  In interpreting and

3    analyzing the Ohio Board surveys in this case,

4    did you rely upon the same methodology that

5    Dr. Dillman, Mr. Dillman used in his texts?

6         A.    Yes, I did, and that's basically

7    an assessment of why this study is being done,

8    what are you going to ask in the study or

9    what's the results of the study going to be

10   used for.

11            One of the key components that

12   Dr. Dillman stresses in his book is are the

13   questions that are asked understandable for

14   somebody that's going to be reviewing them, so

15   is the number of words, you know, that has ten

16   syllables, you know, out of line.  So it's

17   something that has to be understandable, there

18   has to be validity on the use of proper

19   grammar.  And, again, I focused on -- in the

20   last series of comments about -- he talks

21   about Likert scale and how many items you

22   should have, what are the benefits and risks

23   if you don't have a certain number of those

24   kinds of items, whether it's three, five,

25   seven, et cetera.  So he goes through that in

Page 178

1    great detail and explains why it's important.

2              In all of the things that I just

3    mentioned about Dr. Dillman he references

4    published works that have been published and

5    are published in the field of survey research

6    methodology and questionnaire design.

7         Q.    And in interpreting the questions

8    that were used in the Ohio Board of Pharmacy

9    surveys, did they meet the standards as

10   described by Dr. Dillman and as you've

11   expressed as being professional?

12        A.    They most certainly did, and

13   Dr. Selzer agreed with how the questionnaire's

14   items were designed as being appropriate, fair

15   and nicely done.

16        Q.    And do you have an opinion,

17   Dr. Fincham, as to whether or not the Ohio

18   Board of Pharmacy surveys were reliable and

19   appropriate for use in this context?

20        A.    I believe that they were entirely

21   appropriate based upon how they were designed,

22   what their intended purpose was to be, and how

23   they were reflective of other studies that had

24   been done.  So the Ohio group relied upon

25   survey questions that were done in Missouri as

Page 179

1   well as elsewhere as well as the national

2   study.  So that to me -- if you can use

3   previously approved and recognized questions

4   as being appropriate in your particular study,

5   that adds more reliability and validity to

6   what it is you're doing and the results that

7   you find.

8           Q.   Were there other signs of

9   reliability that you found in analyzing the

10  Ohio Board of Pharmacy surveys other than

11  comparing the survey to other surveys that

12  were conducted?

13          A.   I just think that from my

14  assessment, if you look at who was responding

15  to the questionnaire items and who was

16  administering the surveys, it was the Board of

17  Pharmacy that has oversight of all the

18  pharmacists in the state, the pharmacists knew

19  that when they were responding.  To me it

20  indicates that they were going to give

21  responses that were heartfelt and that they

22  hoped would make a difference in how their

23  profession was -- was practiced.

24          Q.   How many surveys did the Ohio

25  Board of Pharmacy send out in this context?

Page 180

1          A.     There was a study in 2020 as well

2     as 2021.

3          Q.     And how did the two studies

4     compare with one another?

5          A.     I think they were very, very

6     similar as far as their responses, and there

7     might have been some minor differences in the

8     number, but you don't have any idea of who

9     might have been a new pharmacist that wasn't

10    able to respond in 2020.  But if you look at

11    the percentages for the Likert scale items,

12    they're very, very similar, and most certainly

13    the verbal responses were similar.

14         Q.     And do the similarity of the

15    responses between the survey in 2020 and 2021

16    have any impact in your opinion as to the

17    reliability of the survey?

18         A.     They did have a major impact on

19    how I viewed them as being reliable and valid,

20    and to further validate it, the Ohio Board of

21    Pharmacy used these to make some policy

22    potential recommendations based upon what they

23    found.  That indicates to me that they felt it

24    was valid.

25         Q.     There seemed to be a suggestion

Page 181

1   from counsel from Kroger that we weren't sure

2   whether the only respondents to the survey

3   were disgruntled pharmacists.  Do you remember

4   that line of questioning?

5           A.    Yes.

6           Q.    Okay.  Do you agree that only --

7   are you able to tell one way or the other

8   whether the respondents to the survey were all

9   disgruntled pharmacists or not?

10          A.    If you look at the Likert scale

11  items that had five data points that they

12  could choose, strongly agree, agree, neutral,

13  disagree, strongly disagree -- if you look at

14  the range of responses, there were some people

15  that were perfectly very satisfied with what

16  the question was asking, and so I think the

17  range of responses indicates to me that it

18  wasn't just a negative response that was

19  provided, it was a valid response across the

20  board of people that were satisfied, highly

21  satisfied, et cetera, and that had some

22  variability based upon what the practice site

23  was.  And because there were numerous people

24  that were responding from different practice

25  sites that had the wide range of responses

Page 182

1    indicates to me that the questions were valid

2    and people felt comfortable answering them

3    based upon their work environment.

4         Q.    And did the outcome of the Ohio

5    Board of Pharmacy studies indicate a

6    difference based on how people felt about a

7    safe work environment based on whether they

8    worked in a grocery store setting versus other

9    types of job sites?

10        A.    If you look in general at the

11   chain environment, whether it is CVS,

12   Walgreens, those corporate chains, or food

13   market-based responses, they were very similar

14   and they were quite different than what you

15   saw in independent pharmacy practice as well

16   as the institutional practice.  There was more

17   dissatisfaction in general expressed by the

18   chain environment pharmacists, whether it was

19   food market-based or general chains.

20        Q.    And was there some indication

21   within the survey results as to why

22   pharmacists working in those environments felt

23   that way?

24        A.    If you look at the verbal written

25   responses, it validates the point that I guess

1    I was just trying to make, that people said

2    I'm glad I work in an institution and not in a

3    chain environment or I left the chain

4    environment to go work elsewhere because I

5    couldn't deal with the pressure, et cetera.

6         Q.    I think that you had mentioned

7    Kroger had done its own study, its own survey

8    of its pharmacist employees.  Did you review

9    those surveys?

10        A.    I did.

11        Q.    Do those survey results have any

12   impact one way or the other on how you felt

13   about the reliability of the Ohio Board of

14   Pharmacy?

15        A.    Because the results were very

16   similar in how the respondents both responded

17   to the Likert scale as well as the written

18   responses, that indicated to me that there was

19   validity in the studies that the Ohio Board

20   did exclusive of the Kroger study.

21        Q.    There was some demographic

22   information collected of respondents in the

23   Ohio Board of Pharmacy survey; is that right?

24        A.    Yes.

25        Q.    Can you give us some examples of

Page 184

1  those?

2          A.     Sure.

3                 Some examples would be practice

4  site, and I just referenced those,

5  independent, chain, grocery store pharmacy,

6  institutional practice, long-term care.  So

7  that's a demographic item.  Also, the number

8  of hours that were worked, the length of time

9  that you had been in a specific position, the

10  number of orders that you processed on -- in a

11  time period.  So those demographic items were

12  included.

13         Q.     And did you review the number of

14  hours worked or reported to have been worked

15  by pharmacists in the grocery store setting

16  versus other job sites?

17         A.     Yes, I did.

18         Q.     And what did you determine from

19  reviewing that data?

20         A.     It wasn't a surprise to me, but

21  it's still a bit of a shock in that there was

22  a widely different number of hours that

23  institutional pharmacists practiced and

24  community pharmacy owners practiced versus the

25  chain versus the food market-based pharmacies,

Page 185

1  and certainly the long-term care pharmacies

2  were much less as well.

3      Q.    And do you think there's any

4  bearing on the number of hours you work based

5  on -- compared to whether or not you feel

6  you're working in a safe work environment?

7      A.    I think as a general rule, the

8  more hours that you work, that just adds

9  incredible pressure to the work environment,

10  and it certainly impacts patient safety

11  because you just -- again, regardless of how

12  smart you are, how efficient you are, the

13  number of hours that you're in place has a

14  tremendous impact upon pharmacists and how he

15  or she carries out their responsibilities.

16      Q.    With respect to the number of

17  prescriptions filled in a shift, was that a

18  demographic piece of information that the

19  survey sought?

20      A.    It was, and it was -- in my

21  estimation -- it's my point of view, but it

22  was incredible the number of prescriptions

23  that were to be processed, and sometimes in a

24  defined period of time.

25      Q.    And was there a difference between

Page 186

1  job settings, between the number of
2  prescriptions you were to fill in a grocery
3  store setting versus other job settings?
4        A.    There was a vast difference.
5        Q.    In what way?
6        A.    In that the chain environment,
7  whether it's food marked-based or independent
8  chains, was much, much higher.  And another
9  factor that I didn't mention that was a
10 demographic point were the number of ancillary
11 personnel.  So pharmacy technicians varied
12 dramatically from site to site.
13       Q.    And do the number of prescriptions
14 that a pharmacist fills in a shift, does that,
15 in your opinion, have any impact on safe
16 patient care or safe work environment?
17       A.    It has a dramatic impact.
18       Q.    In what way?
19       A.    Just simply because of the number
20 that have to be processed.  And we went
21 through Table 1.  Some of those factors have
22 applicability to each and every one of those
23 prescriptions.  So if we're talking about
24 hundreds, 300s -- somebody mentioned a defined
25 period of time.  That's just an excessive

Page 187

1   workload.

2        Q.    Dr. Fincham, outside the context

3   of a pharmacy setting, are there any other

4   types of settings where there are surveys that

5   are done of workplace issues where they ask

6   about a safe work environment?

7        A.    There most certainly are, and just

8   some examples might be individuals that work

9   in a plant that manufactures automobiles or

10  manufactures computer components or any other

11  type of a commodity that might be produced.

12  There's very similar types of studies that

13  have been done.

14       Q.    And in all those studies do they

15  list all the specific concerns that an

16  employer -- that an employee might face in the

17  job site that might impact the safe or -- a

18  safe workplace?

19       A.    They are included, yes.

20       Q.    They're specifically included or

21  are they generally?

22       A.    They're specifically included.

23       Q.    There was a mention of -- of the

24  COVID epidemic and -- and its impact on the

25  survey results for the Ohio Board of Pharmacy.

Page 188

1    Had there been surveys that had been done
2    prior to the COVID period that also reflect
3    concerns by pharmacists about their working
4    conditions?
5            A.    There are.  And one example is the
6    Oregon study that was done in 2011.  So that
7    preceded by at least a decade the COVID impact
8    upon pharmacy practice.  The American
9    Pharmaceutical Association surveys that have
10   been done in subsequent years prior to the
11   COVID outbreak.  So those kinds of surveys
12   have been there.  They have been done because
13   there have been workplace issues that have
14   been in play long before COVID came into play.
15           Q.    And, Dr. Fincham, do you have an
16   opinion as to whether or not the surveys
17   conducted by the Ohio Board of Pharmacy met
18   the professional standards for conducting
19   surveys?
20           A.    They do, and it's based upon the
21   referencing that I previously alluded to, the
22   Dillman total design method of surveys from
23   the concept stage to the end stage, where you
24   look at what you're going to do with the data,
25   so it very much followed very appropriately

Page 189

1   what Dillon would outline in his outline for

2   decades.

3            MR. ELSNER:  Thank you, Dr.

4   Fincham.  I don't have any more questions at

5   this time.

6            MS. WOHL:  I don't have any

7   further questions.  Thank you for your time.

8            MR. ELSNER:  Thank you.

9            THE VIDEOGRAPHER:  Nothing else.

10  Going off the record, 2:49.

11

12       (Deposition concluded at 2:49 p.m.)

13                    - - - - -

14

15

16

17

18

19

20

21

22

23

24

25

Page 190

1  Whereupon, counsel was requested to give

2  instruction regarding the witness' review of

3  the transcript pursuant to the Civil Rules.

4

5              SIGNATURE:

6  Transcript review was requested pursuant to

7  the applicable Rules of Civil Procedure.

8

9              TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 191

1                REPORTER'S CERTIFICATE

2    The State of Ohio,      )

3                            ) SS:

4    County of Cuyahoga.    )

5

6             I, Renee L. Pellegrino, a Notary

7    Public within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, JACK E.

10   FINCHAM, Ph.D., was by me first duly sworn to

11   testify the truth, the whole truth and nothing

12   but the truth in the cause aforesaid; that the

13   testimony then given by the above referenced

14   witness was by me reduced to stenotypy in the

15   presence of said witness; afterwards

16   transcribed, and that the foregoing is a true

17   and correct transcription of the testimony so

18   given by the above referenced witness.

19             I do further certify that this

20   deposition was taken at the time and place in

21   the foregoing caption specified and was

22   completed without adjournment.

23

24

25

Page 192

1          I do further certify that I am not a

2   relative, counsel or attorney for either

3   party, or otherwise interested in the event of

4   this action.

5          IN WITNESS WHEREOF, I have hereunto

6   set my hand and affixed my seal of office at

7   Cleveland, Ohio, on this 6th day of June, 2023.

8

9

10

11

12

13

14   Renee L. Pellegrino, Notary Public

15   within and for the State of Ohio

16

17   My commission expires October 12, 2025.

18

19

20

21

22

23

24

25

```
                                                Page 193
 1                    Veritext Legal Solutions
                         1100 Superior Ave
 2                          Suite 1820
                      Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
     June 6, 2023
 5
     To: Michael E. Elsner, Esq.
 6
     Case Name: National Prescription Opiate Litigation - Track 7
 7
     Veritext Reference Number: 5894217
 8
     Witness:  Jack E. Fincham, Ph.D.       Deposition Date:  5/24/2023
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 194

1               DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 5894217
3      CASE NAME: National Prescription Opiate Litigation -
                  Track 7
       DATE OF DEPOSITION: 5/24/2023
4      WITNESS' NAME: Jack E. Fincham, Ph.D.
5           In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7           I have made no changes to the testimony
       as transcribed by the court reporter.
8
       _____          _____
9      Date                      Jack E. Fincham, Ph.D.
10          Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
               Statement; and
14         Their execution of this Statement is of
               their free act and deed.
15
           I have affixed my name and official seal
16
       this _____ day of_____, 20_____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25

```
 1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
         ASSIGNMENT REFERENCE NO: 5894217
 3       CASE NAME: National Prescription Opiate Litigation -
                   Track 7
         DATE OF DEPOSITION: 5/24/2023
 4       WITNESS' NAME: Jack E. Fincham, Ph.D.
 5         In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
 6       my testimony or it has been read to me.
 7         I have listed my changes on the attached
         Errata Sheet, listing page and line numbers as
 8       well as the reason(s) for the change(s).
 9         I request that these changes be entered
         as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11       as this Certificate, and request and authorize
         that both be appended to the transcript of my
12       testimony and be incorporated therein.
13       _____        _____
         Date                    Jack E. Fincham, Ph.D.
14
           Sworn to and subscribed before me, a
15       Notary Public in and for the State and County,
         the referenced witness did personally appear
16       and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18               in the appended Errata Sheet;
             They signed the foregoing Sworn
19               Statement; and
             Their execution of this Statement is of
20               their free act and deed.
21           I have affixed my name and official seal
22       this _____ day of_____, 20_____.
23           _____
             Notary Public
24
             _____
25           Commission Expiration Date
```

Page 196

1                          ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 5894217
3      PAGE/LINE(S) /          CHANGE          /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____       _____
20     Date                    Jack E. Fincham, Ph.D.
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24
                      _____
25                    Commission Expiration Date

**[& - 2023]**

| & | | | |
|---|---|---|---|
| **&** 2:13 175:6 | **12** 95:2,15 192:17 | **160** 7:6 | 138:1 139:4 140:5 168:8 |

**&**

**&** 2:13 175:6

**1**

**1** 4:6 24:4,7,9
24:15 56:19
78:1 91:9,16
93:5,14 94:17
144:2,9 186:21
**1,000** 70:7
**1,500** 57:13
**10** 8:2 44:3
48:14,15,18
67:23 70:12
110:2
**101** 6:8
**102** 6:9
**103** 6:9
**104** 6:10
**106** 3:11 6:10
11:9
**108** 6:11
**109** 6:11,12
**10:00** 1:18
**10:55** 53:20
**11** 74:12,14
**110** 6:12
**1100** 193:1
**113** 6:13
**114** 6:13
**115** 6:14
**116** 6:14
**117** 47:14
**119** 6:15
**11:07** 53:23

**12** 95:2,15
192:17
**120** 6:15
**122** 6:16,16
**123** 6:17
**124** 6:17,18,18
**125** 6:19
**12:07** 105:11
**12:46** 106:4
**13** 5:3
**131** 6:19
**132** 6:20,20
**133** 6:21
**136** 6:21
**14** 80:13 95:21
**141** 6:22
**142** 6:22,23
**144** 6:23
**148** 6:24
**149** 6:24
**15** 11:15 25:19
94:10,16 95:23
101:9 115:17
115:22 119:4
130:6 144:21
148:5
**15,000** 30:4
**150** 6:25
**152** 7:3
**155** 7:3,4
**156** 7:4
**157** 7:5
**158** 7:5
**159** 7:6

**160** 7:6
**163** 7:7
**166** 7:7
**167** 7:8,8
**17** 1:7
**173** 3:9
**1820** 193:2
**19** 125:22
168:8
**191** 3:13
**1960s** 119:10
**1975** 18:1
31:13
**1980** 30:21
32:4
**1980s** 18:16
19:6,15 32:3
**1986** 19:1
**1988** 176:11
**1989** 19:1
**1990s** 17:11
32:7,8
**1996** 36:15,15
**1:37** 150:1
**1:47** 150:4

**2**

**2** 3:3 4:7 23:24
24:3,16 26:4
56:24 57:1
**20** 5:3 13:3
36:16 38:23
46:11 48:10
58:19,22 61:14
68:1 110:3
119:4 135:23

138:1 139:4
140:5 168:8
194:16 195:22
196:22
**200** 20:21
26:11 87:25
**2004** 32:19,19
33:3,7
**2007** 20:9
**2008** 56:20
57:9
**2011** 166:5
188:6
**2013** 167:3
**2014** 47:5
**2018** 32:21
33:8
**2019** 48:5
**2020** 12:1 38:4
44:8 68:17
69:5 70:7,8
142:18 154:4
167:3 180:1,10
180:15
**2021** 12:1,13
38:5 44:8
58:17 67:9
69:5 142:18
154:4 180:2,15
**2022** 34:13
36:25
**2023** 1:17 8:3
10:25 192:7
193:4

**[2025 - 99]**

**2025** 192:17
**21** 68:1 167:4
**216-523-1313** 193:3
**216-9250** 2:5
**22** 5:4
**2227** 192:13
**23** 149:20 152:17
**24** 1:17 4:6 8:2 69:4,9 152:16 152:18 158:21 159:17 160:9
**25** 5:4,5 36:16 147:17
**250** 27:24 174:14
**25301** 2:10
**255** 26:5,11
**26** 5:5 103:3
**260** 26:11
**27** 48:6
**28** 2:4
**2804** 1:6,7
**29464** 2:5
**2:05** 164:23
**2:22** 172:11
**2:49** 189:10,12

**3**

**3** 166:22
**30** 15:14 81:24 107:17 135:23 160:18,21
**300** 134:5 136:14,21

**300s** 186:24
**301** 2:14
**304** 2:11
**31** 5:6
**32** 5:6 91:16
**347-1137** 2:11
**35** 5:7
**3500** 2:14
**36** 5:7 69:5,10
**37** 5:8,8
**38** 5:9
**39** 5:9

**4**

**4** 3:4
**40** 5:10 13:18 61:8 67:10 81:22 106:20 117:22 134:1 135:3
**42** 5:10
**43** 5:11
**44114** 193:2
**45** 19:16
**45202** 2:15
**46** 5:11 71:17
**47** 5:12
**48** 5:12 30:22
**49** 5:13
**4th** 2:14

**5**

**5** 3:5 38:20
**5/24/2023** 193:8 194:3 195:3

**50** 5:13 39:14 39:18 41:9 68:23 69:3
**51** 5:14
**513** 2:16
**52** 5:14,15
**54** 5:15
**55** 5:16
**56** 5:16
**57** 4:7
**5894217** 193:7 194:2 195:2 196:2

**6**

**6** 193:4
**60** 58:2 61:6 79:17 134:2 135:4 136:13 174:4
**600** 2:10
**61** 101:10
**63** 5:17,17
**65** 27:3,5,7 147:17
**66** 5:18
**68** 5:18,19 40:8 40:15
**69** 5:19
**6th** 192:7

**7**

**7** 69:6 193:6 194:3 195:3
**70** 5:20 20:17 20:20,23 22:17

26:5,8,24 27:3 115:14,17
**71** 5:20 69:5 70:1,2
**72** 5:21
**723-4092** 2:16
**73** 5:21
**75** 5:22
**76** 5:22,23

**8**

**8** 42:9 65:1 166:23
**80** 58:8 61:6 66:8
**81** 5:23
**82** 67:9
**83** 5:24
**843** 2:5
**85** 128:9 148:4
**86** 5:24
**87** 5:25
**89** 6:3,3

**9**

**9** 3:8
**90** 6:4 81:24
**91** 6:4
**93** 6:5
**94** 6:5
**96** 6:6,6
**97** 6:7
**99** 6:7,8

| a | | | |
|---|---|---|---|
| **a.m.** 1:18 8:2 | 95:16 128:5 | **actions** 133:18 | 179:5 185:8 |
| **aaron** 1:8 | 132:4,17 | 154:19,23 | **adequate** 44:8 |
| **aberdeen** | 145:21 146:24 | 155:17 156:2 | 44:10 95:7 |
| 175:17 | **abuse** 79:8 | 157:5 | 108:6 109:1 |
| **abide** 135:16 | 80:21,24 81:2 | **activities** 64:11 | **adjournment** |
| 136:4 | **academic** 14:9 | **actual** 33:6 | 191:22 |
| **ability** 51:15 | 16:12 32:9,14 | **actually** 21:13 | **administer** |
| 81:4 88:17 | 32:20 59:5 | 21:15 22:13 | 30:8 |
| 92:18 95:1,1 | 74:4 | 46:23 66:21 | **administered** |
| 95:13 97:2,4 | **acceptability** | 68:4 70:11 | 23:1 35:13 |
| 103:9 104:17 | 169:5 | 136:9 152:17 | 71:7 75:6 |
| 104:21 108:18 | **acceptable** | 156:21 | **administering** |
| 117:10 118:11 | 175:24 | **add** 172:20,22 | 99:18 179:16 |
| 131:17 132:6 | **accepted** 61:24 | **added** 83:23 | **administration** |
| 140:15 145:9 | **accordance** | 104:23 119:6 | 15:15,19 16:10 |
| 148:19 154:15 | 194:5 195:5 | 131:18,18 | 16:16 17:2 |
| 163:18 172:3 | **account** 86:13 | 153:18 154:15 | 29:24 30:5,11 |
| **able** 21:13 22:1 | **accurate** 30:11 | **addition** 85:23 | 34:21,25 35:10 |
| 28:7 67:11 | 49:16,24 | 102:20 | 36:4 84:1,5 |
| 88:18 89:10,17 | **accurately** | **additional** | 86:16 99:18 |
| 91:2,24 92:11 | 22:13 49:9 | 26:25 75:24 | **adr** 15:20 |
| 94:2 97:15,25 | 50:19 59:9 | 85:3 115:2 | **adverse** 15:15 |
| 98:1,10 99:7 | 95:8 | 118:21 119:2 | 15:16,20 16:2 |
| 117:15,18 | **achieved** 61:22 | 129:25 134:8,8 | 17:15 18:9 |
| 161:10 180:10 | 61:23 | 165:7,20 | 21:22 |
| 181:7 | **acknowledge** | 176:18 | **advisory** 15:24 |
| **above** 20:20 | 194:11 195:16 | **additionally** | 16:1 158:19 |
| 114:22 191:13 | **act** 83:13 | 138:3 139:2 | 159:19 175:4 |
| 191:18 193:17 | 194:14 195:20 | **additive** 78:7 | **affected** 43:13 |
| **absolute** 64:4 | **acting** 156:11 | 85:21 94:9 | **affixed** 192:6 |
| 125:14 | 157:3 | **address** 193:15 | 194:15 195:21 |
| **absolutely** | **action** 65:10,16 | **addressed** 21:5 | **aforesaid** |
| 63:12 64:21 | 133:18 157:5 | 25:1 102:6 | 191:12 |
| 67:5 79:2 | 192:4 | **adds** 141:14 | **afternoon** 3:11 |
| | | 158:5 168:3 | 106:2 |

**age** 9:14 128:9
  148:5
**agencies** 84:4
**agency** 28:20
**ago** 26:2,4
  130:25,25,25
**agree** 37:7,16
  40:18 49:1,5
  50:2 52:3,16
  53:2 54:8,11
  55:7 61:10,12
  61:16 62:11
  65:17 66:5
  68:19 69:7,9
  72:3,10,12
  88:23 100:25
  101:3 122:6
  131:23 132:2
  143:21 145:21
  156:15 159:9
  161:4,8 162:16
  162:22,23
  163:2,4,5,10
  168:14,17,17
  181:6,12,12
**agreed** 178:13
**ahead** 31:11
  32:6 35:22
  36:7 77:21
  86:25 150:17
  162:17 164:20
**ahrq** 175:7
**aid** 18:20 31:5
  129:5 134:12

**aim** 61:7,14
**air** 170:12
**ajpe** 59:23
**allow** 28:11
**alluded** 188:21
**alter** 127:11,23
  131:4 156:19
  157:17
**alternative**
  116:3
**amanda** 2:20
  9:13 11:19
**amend** 172:24
**american** 2:15
  44:25 57:9,16
  167:20 188:8
**amount** 48:11
  133:8
**amplify** 157:25
**analgesics**
  83:15
**analyses** 61:3
**analysis** 13:10
  14:4,7 62:1
  68:4,20 110:13
**analytic** 168:15
**analytical**
  72:25 73:1
  116:25
**analyze** 13:6
  27:9 43:23
  70:16 72:14
  78:24 90:6
  97:5 110:16
  111:21 116:13

137:5,10,11
  143:2 159:12
**analyzed** 27:14
  27:17 74:9
  80:12
**analyzing**
  12:12 78:20
  88:8 115:11
  118:6 121:10
  153:1 177:3
  179:9
**ancillary**
  167:14 186:10
**anecdotal**
  79:23 80:1
**animal** 17:7
**annual** 70:6,14
  70:21 151:12
**answer** 10:12
  14:2 20:16
  22:15,17,22
  25:4 26:22
  39:24 49:13
  70:13,20,22
  71:4 81:9,15
  92:20 109:3,14
  141:20 142:3
  155:21 160:5
  167:24 171:4
**answered**
  119:13,18
  136:18 147:1
  161:22
**answering**
  143:12,24

145:19 182:2
**answers** 77:14
  111:17 143:7
  146:1 170:5
**anybody** 141:1
**anymore** 135:8
**anyone's** 13:10
  14:3
**apha** 45:1
  61:18
**apologize**
  167:22
**apparent** 87:2
  110:24
**appear** 127:11
  156:21 194:11
  195:15
**appearances**
  2:1 3:3 8:15
**appeared**
  102:13
**appearing** 1:25
**appears** 73:9
**appended**
  195:11,18
**applicability**
  94:23 186:22
**applicable**
  75:15 139:14
  161:21 190:7
**apply** 138:5
**appreciate** 82:9
  173:5
**appreciation**
  111:3,23

112:25 113:15
118:10,25
122:15 123:18
157:13
**appropriate**
44:9,11 61:6
74:16 75:19
92:5,14 93:10
138:20 155:14
156:1,16
157:24 176:3
176:16 178:14
178:19,21
179:4
**appropriately**
93:9 95:11
105:5 171:4
188:25
**approval**
100:20 113:23
**approved** 15:5
36:17 179:3
**approximately**
11:15
**approximating**
58:2
**area** 14:20
17:12,19 18:22
31:20 87:10
110:19 147:23
148:23 174:18
**areas** 28:13
**arizona** 28:10
28:25 29:6,19
30:12,13 33:18

33:22 34:8
**arkansas** 34:20
34:23 35:17
**arnold** 89:2
**article** 4:7
56:19 57:2,9
**articles** 117:23
174:19,25
**asked** 12:10,11
12:16,17 13:6
13:9 14:2,3,7
14:22 15:22
20:14 23:13
36:2 47:21
100:18 122:7
123:1,7,19,23
123:24 124:3,4
124:9,14
125:12,15,16
136:17 141:18
151:10,21
173:22 175:11
177:13
**asking** 23:6,7
70:20 71:1
109:8 121:15
128:13 132:12
132:13 153:5
156:23 162:14
162:15 171:8
181:16
**aspect** 154:7
**aspects** 64:16
64:22 76:18
145:18

**assess** 20:11
50:18 51:13
97:9 106:13
110:20 115:23
118:11,12
**assessed** 59:9
154:11
**assessing** 22:7
48:21 59:19
88:10 96:19
148:13
**assessment**
22:23 50:13
52:7,10 53:3
53:11 55:14
60:12 61:9,13
66:13 72:11
74:1 76:5
78:18 83:5
85:3 87:17
89:19 97:20
100:3 102:2
103:19 120:19
123:12 149:15
153:9,25
155:23 158:14
159:13 160:10
168:24 177:7
179:14
**assessments**
158:16
**assigned**
126:24
**assignment**
194:2 195:2

196:2
**assistance**
134:7
**assistants**
23:10 29:8
116:1
**associate** 57:15
**associated**
35:12 38:18
50:24 52:22,23
122:3
**association**
41:8,11 44:25
86:17 150:20
167:21 188:9
**associations**
38:25
**assume** 10:13
136:11 143:17
**assumption**
121:8 162:3
**assumptions**
162:1
**assuredly**
16:25
**astounded**
64:21
**astounding**
64:4
**atlanta** 18:20
**attached** 195:7
**attempt** 117:14
**attention**
160:19

**[attitudes - board]**                                                    Page 6

| | | | |
|---|---|---|---|
| **attitudes**  76:17 | 144:11 155:1 | 144:6,6 151:12 | **better**  66:15 |
| **attorney**  8:17 | 171:6 193:15 | **bathroom** | 92:2 127:12 |
| 40:14 192:2 | **background** | 67:12 79:14 | 129:17,18 |
| **australia** | 82:2 97:4,6 | 95:14 98:2 | 130:9,11 132:9 |
| 175:15 | **backroom**  97:6 | 144:20 | 136:9 152:12 |
| **authored**  19:23 | **bad**  64:24,25 | **baverman**  2:13 | **beyond**  89:3 |
| 20:3 23:21 | **based**  16:1,9 | 8:23,23 | **bias**  22:24 |
| 56:20 57:9 | 18:2 19:3 27:1 | **bearing**  167:4 | 58:13 156:18 |
| **authority** | 27:6 54:16,20 | 185:4 | 157:16 |
| 125:14 | 59:1 60:18 | **beginning**  8:16 | **biased**  156:10 |
| **authorize** | 72:11 78:4 | 38:21 | 156:11 |
| 195:11 | 79:10 82:24 | **begins**  139:2 | **biggest**  145:5 |
| **authors**  57:13 | 83:1 92:25 | **begun**  70:13,22 | **billing**  11:10 |
| **automated** | 98:14 100:3,23 | 71:4 | **binder**  23:24 |
| 85:4 | 109:2 111:6 | **behalf**  2:2,8 | **bit**  138:17 |
| **automobiles** | 112:7,23 | 8:22,24 | 173:13 184:21 |
| 187:9 | 113:20 126:23 | **behavior**  21:12 | **blood**  63:11 |
| **available**  93:9 | 131:10,14 | **believe**  9:7 41:4 | **blow**  58:13 |
| 115:20 | 133:25 139:12 | 42:17 46:6,11 | **board**  11:25 |
| **ave**  193:1 | 140:9,23 | 56:2 58:22 | 12:13 38:3,3 |
| **average**  141:12 | 141:12 151:24 | 74:18 111:19 | 38:16 39:17 |
| **avoid**  94:5 | 153:9,10,16 | 114:1 122:24 | 42:13 45:10,23 |
| **b** | 157:21 166:24 | 143:6 159:22 | 47:2,10,18 |
| **b**  22:22 117:5 | 178:21 180:22 | 178:20 | 48:4,8 49:8,15 |
| 137:24,25 | 181:22 182:3,6 | **believed**  43:20 | 51:5 52:11 |
| 141:2 | 182:7,13,19 | **bench**  19:9 | 58:17,24 62:2 |
| **baby**  34:24 | 184:25 185:4 | **benchmarks** | 65:4,10,16 |
| **back**  19:4 | 186:7 188:20 | 21:8,11 22:11 | 70:6 71:11 |
| 36:14 42:21 | **basically**  26:10 | **benefit**  125:2 | 72:4 73:24 |
| 44:13 53:7,25 | 158:18 162:4 | 132:17 | 74:5,15,18,25 |
| 55:10 95:6 | 177:6 | **benefits**  177:22 | 80:16,19 81:8 |
| 106:8,11 | **basing**  83:5 | **benzodiazepine** | 81:21 82:24 |
| 119:10 120:2 | **basis**  123:20 | 81:24 82:1 | 83:2,25 84:4 |
| 128:18 135:13 | 129:24 138:9 | 85:19 | 89:11 90:5,19 |
| 141:18 144:2,7 | 138:23 140:20 | | 101:4,8 110:13 |

www.veritext.com                                                  888-391-3376

118:23 120:23
120:24 139:14
142:19 153:2
153:16 154:3,6
155:7,16
156:16 157:2
157:16 159:20
163:25 165:3
168:2 177:3
178:8,18
179:10,16,25
180:20 181:20
182:5 183:13
183:19,23
187:25 188:17
**board's** 152:18
153:21,25
154:19
**boards** 38:24
39:6 41:9,11
86:17
**bobbitt** 2:3 9:3
9:3
**body** 121:20
**boiled** 63:11
**book** 20:6,8
176:11,13,14
176:25 177:12
**books** 19:23,25
20:1,2 117:23
176:18
**bottom** 24:15
70:11 152:17
**boulevard** 2:4

**bowles** 2:8 8:19
9:2
**bowlesrice.c...**
2:11,12
**box** 23:14
**breadth** 64:15
64:21
**break** 10:17
32:10 53:16,18
67:11 79:15
95:13 98:1,4
103:2 107:21
144:19,24
149:22,24
166:24 172:8
**breaking**
146:19
**breaks** 10:16
95:2 107:3
108:7 109:1,17
109:17
**bridgeside** 2:4
**bright** 95:17
**bring** 126:12
**broader** 156:25
157:4
**broke** 166:21
**brought** 14:17
34:24 55:15

**c**

**c** 22:22 141:2
**ca** 193:25
**calculate** 26:8
**calculated**
35:12

**calculation**
69:13,15
**california** 16:8
**call** 64:18
**called** 9:15
29:22 31:14
33:17 86:15
115:21 116:10
176:12
**camera** 8:10
**canada** 59:7
**canadian** 175:5
**cancer** 161:15
**capabilities**
126:24 127:8
**capable** 133:11
**capacity** 28:8
28:11,15,16
33:22 57:19
175:3,8
**capsules** 84:18
**caption** 191:21
**capture** 72:8
**car** 14:18
**card** 86:12
**care** 18:6 20:3
20:6 23:11
29:9 31:18
35:20 64:6
79:17,18 92:5
92:14 95:11,17
95:18 98:17,18
116:22,24
117:2 129:9,23
129:24 131:20

133:6,10 134:3
134:14 135:2,4
135:6,23
138:14 147:19
184:6 185:1
186:16
**career** 16:22
18:16 32:9,14
74:11
**carolina** 2:5 8:6
14:19,20 15:13
**carried** 75:6
155:13
**carries** 185:15
**case** 1:7 10:21
11:7 12:7
14:14,15,16,17
14:25 15:2,12
16:4,6,7,8,20
17:21 28:25
34:15,19,20
35:3 40:21,23
42:4 73:3,15
121:18 162:4
166:2 167:6
172:1,18
174:22 177:3
193:6 194:3
195:3
**cases** 12:24
13:2 14:13
15:8,11 16:19
17:8,10,14
22:18,19 35:23
36:12,13,16

40:1 41:2,22
42:1 60:2
83:20 84:20
86:18 91:6
107:13
**cash** 86:12
**categories**
92:16
**cause** 191:12
**cdc** 36:25
**center** 29:21
30:2,14 34:23
35:16
**centered** 88:25
**certain** 28:12
59:8 94:23
96:9 107:8
132:21 147:2
162:25 177:23
**certainly** 17:3
32:1 38:18
42:20 117:6
121:18 132:2
134:9 155:12
158:17 161:20
174:22 175:2
178:12 180:12
185:1,10 187:7
**certificate** 3:13
191:1 195:11
**certification**
194:1 195:1
**certified** 9:16
**certify** 191:8,19
192:1

**cessation** 21:24
**cetera** 60:19
61:4 62:16
78:10 166:25
177:25 181:21
183:5
**chain** 18:5,17
31:24 32:23
39:1 41:18
54:19 55:15
60:18 67:25
68:16 69:16
92:25 108:25
109:5,16 110:3
112:23 126:25
128:4 134:13
139:11 140:1,9
140:13,19,22
166:23 182:11
182:18 183:3,3
184:5,25 186:6
**chains** 126:2
182:12,19
186:8
**change** 67:6
68:1,5,9,10,11
69:17,19,22
127:2 131:4
172:4,6 193:13
193:14 195:8
196:3
**changes** 67:22
80:23 193:12
194:7 195:7,9

**changing** 168:9
**characterizati...**
152:19 153:22
**charge** 133:15
**charging** 86:13
**charleston** 2:10
**chemotherapy**
161:15
**cherrypick**
160:8
**child** 34:22
**choice** 116:1
**choose** 63:19
66:16 75:1
181:12
**chose** 62:8,9
63:4 65:14,20
65:25 66:9
**cincinnati** 2:15
**cite** 83:8 103:14
**cited** 14:13
47:22 118:3
**cites** 71:19
**citing** 70:6
**citizens** 33:17
**city** 31:14
**civil** 190:3,7
194:5 195:5
**class** 25:24
83:14,14
148:17
**classes** 24:18
**classification**
83:22

**classified** 83:14
**clean** 30:10
**clear** 63:16
109:7 170:12
**cleveland** 192:7
193:2
**clinic** 29:22
**clinical** 88:24
89:4
**clinics** 116:2
**closely** 62:16
**clr** 1:24
**collected** 50:15
54:15,21,23
90:16 100:22
102:23 183:22
**college** 18:24
25:14 33:22
**colleges** 25:19
37:6,25 58:7
59:5
**colloquy** 142:8
**colorado** 28:4
28:11 29:2
30:16,18,18,19
30:22 31:13
**combination**
99:20
**combine** 93:3
137:20
**combined**
93:19
**come** 73:14
94:21 122:1
151:22 165:12

**[come - conditions]**

170:4 172:21
173:18
**comes** 39:10
75:22 84:2
115:1
**comfortable**
182:2
**comment** 14:22
67:17 79:23,23
106:19 137:4
138:10,24
**commented**
119:21
**comments**
52:24 63:2
65:8,20 67:4
67:24 94:13
107:2,22
128:18,20
131:15,15,24
135:18,22
137:9,16,21
142:11 146:1,3
171:10,14
177:20
**commission**
192:17 194:19
195:25 196:25
**commissioned**
191:8
**committee**
15:24 16:1
158:20 159:20
**committees**
15:22 16:13

175:5
**commodity**
187:11
**community**
18:4,5 29:9
31:15 32:23
41:19 139:11
166:23 184:24
**compare** 21:14
22:2 180:4
**compared**
169:5 185:5
**compares**
170:21
**comparing**
179:11
**compilation**
120:5
**complaint**
39:25
**complaints**
39:4,8,12,14,16
66:1,11 107:1
147:8
**completed**
11:25 191:22
193:15
**completely**
90:4 170:16
**compliance**
20:9,11 21:20
21:21
**compliment**
173:7

**component**
18:7 28:19
33:20 43:7
50:24 70:18
72:19 77:18
81:12 93:21
97:5 102:5
119:1 131:21
154:10
**components**
22:8 26:24
28:13 32:13
38:17 43:13
63:9 75:18
86:19 89:21
102:20 108:22
115:1 120:21
138:16,18
166:15 177:11
187:10
**compound**
107:19
**comprehensive**
176:13
**computer**
187:10
**concept** 50:4
124:20 188:23
**concern** 38:23
66:20 108:14
109:4,8,12
135:25 140:12
141:11 142:15
142:16 146:8

**concerned**
34:15
**concerning**
109:13,21
110:9 123:3
124:1
**concerns** 76:17
108:2,16
110:24 112:7
140:21 143:8
143:19 146:4,5
146:6 162:6,20
169:7 187:15
188:3
**concert** 78:4
**concluded**
189:12
**concluding**
162:4
**conclusion**
129:13 154:8
**conclusions**
96:14 97:12
113:5 137:3,8
148:25 162:2
**condition**
106:22 108:5
108:24 109:9
109:13,15,22
110:6,9 128:21
**conditions** 38:5
38:25 42:15
43:4,8,25
44:17 45:2,2
45:20 47:3

**[conditions - counseling]**

51:1,10,19,24
51:25 52:8,11
53:12 54:5,9
54:10,25 60:15
60:21,22 63:18
64:5 65:11
67:21 72:9
74:24 75:12,15
77:14 79:7
91:8 100:7
106:14 119:15
120:14 122:12
137:19 140:16
149:17,19
153:13 163:18
188:4
**conduct** 42:11
43:22 80:23
90:6 92:19
**conducted** 8:8
20:20 42:13
44:19,25 45:10
50:12 51:9,10
59:15 60:11
120:23 179:12
188:17
**conducting**
27:10,13,18
98:12 99:2
188:18
**conflict** 126:2
**conflicts** 127:7
**confusing**
52:19

**connection**
8:10 29:12
82:23 83:1
**connections**
83:1
**consider** 33:14
33:23 40:10
42:23 43:23
45:3 49:2
55:23 72:21
77:24 79:2
82:18 91:7
110:25 116:12
144:5 164:3
**considered**
39:24 45:22,25
46:1 47:7
61:25 72:21
119:17 151:15
164:2 165:8,21
170:15,18
**considering**
102:19
**constantly** 25:7
133:2 144:7,10
**constraints**
63:14 107:8
140:14
**construct** 39:10
42:23
**constructed**
73:24 137:13
155:2
**construction**
19:19 155:14

**consultant**
31:19
**consultation**
107:12
**cont'd** 6:1 7:1
**contacted** 87:9
**context** 77:8
81:20 82:3,5,9
160:23 161:10
174:15 178:19
179:25 187:2
**contexts** 161:4
161:24
**continue**
170:23
**continued**
106:5
**continuously**
18:1
**controlled**
83:12,22 87:3
95:24 101:16
103:9 104:1,5
104:12,18,23
104:25 123:14
125:25 143:11
160:24 161:6
161:20 171:15
**copy** 164:8,9
165:13
**corporate**
80:23 125:25
126:16 127:14
129:12,14
130:22 136:1,5

142:17 182:12
**corps** 28:10
29:5 34:8,10
**correct** 10:5,6
13:4 22:4 46:9
46:21 51:19
52:14 54:6
58:4,5 62:5
69:10,15 71:13
73:7 76:25
77:4 96:15
100:1,2 101:17
114:10 139:23
143:14 145:15
149:5,18
154:21 156:13
159:23 161:7
161:24 163:23
163:24 165:8
165:19 191:17
**correction**
82:10
**corrections**
193:12 195:17
**correctly** 154:2
**corresponding**
83:9,10 84:9
126:3
**counsel** 8:14
10:23 46:23
165:15 181:1
190:1,10 192:2
**counseling**
99:16

counted 26:10
counter 15:6
17:6
counterprodu...
129:22
country 37:24
county 2:2 8:22
31:20 191:4
194:10 195:15
couple 51:3
79:21 106:18
111:16 131:24
141:14
courage 80:4
course 16:22
25:17,25 59:25
60:1 118:7
courses 24:19
24:25 25:7,14
25:15,19 33:20
176:24 177:1
coursework
33:16 37:4,25
court 1:1 3:15
36:10,22 40:1
40:11 53:6
194:7
courtesy 173:5
covered 25:15
148:22
covid 29:18
30:2,4,24 34:2
118:13 119:1,5
119:8,13,21,24
187:24 188:2,7

188:11,14
created 22:25
24:25
credentialed
29:25
credentials
13:23
credibility
121:15 137:21
credible 158:7
credit 86:12
criminal 14:15
critical 148:14
criticism 72:16
159:10 168:19
criticize 133:4
criticized
110:11
critique 13:10
14:3,7
cross 49:17,24
crucial 79:2
119:5 148:6
crying 95:14
98:2
csa 83:9
current 25:9
32:11,12 33:15
37:7,15,21
51:14 65:22
currently 15:23
25:21 28:1,9
curriculum
24:4 25:17
26:1

custody 3:15
cutting 135:13
cuyahoga
191:4
cvs 129:5
134:11 182:11

**d**

d 141:2
daily 14:24
dan 1:8
dangerous
83:15 96:2
data 25:8 50:5
50:11,15 54:15
54:23 59:10
100:22 127:11
130:11 156:1,9
156:12,13,20
157:5,6 162:25
166:11 181:11
184:19 188:24
date 8:2 11:9
25:9 47:4,15
48:3,4 130:12
130:14 190:11
193:8 194:3,9
194:19 195:3
195:13,25
196:20,25
day 30:6 59:14
144:5,5 146:17
152:15 192:7
194:16 195:22
196:22

days 30:6,7
81:24 193:18
dea 41:22 42:1
deadly 58:13
deal 20:6 59:18
59:23 61:20
78:22 119:1
128:8 140:17
183:5
dealing 16:6
20:5,17,24
42:5
dealt 26:12
60:17 124:15
175:1
dean 66:25
67:1 150:19
dear 193:10
death 14:21
81:24
deaths 81:25
decade 166:12
188:7
decades 189:2
decide 123:2,25
decision 88:25
decisions
156:12
deed 194:14
195:20
deemed 193:19
defined 60:1
110:19 113:22
116:6 123:11
127:6 128:7

129:21 134:6
136:20 185:24
186:24
**definite** 76:8
**definitely**
104:10
**definitive** 74:4
**degree** 14:12
118:19 133:20
**deleterious**
129:6 131:16
**delivered** 139:8
**delivery** 190:9
190:11
**demands** 32:12
**demographic**
54:21,23 92:23
102:22 108:22
166:15 183:21
184:7,11
185:18 186:10
**demographics**
50:17 60:16
94:1,14 146:19
147:12,22
148:5,20
**denigrate** 97:2
**department**
193:22
**depend** 108:19
**depends** 8:9
108:9 148:11
**deposed** 9:16
10:4 12:25
13:2

**deposition** 1:14
8:7 11:12,17
12:3 24:7,9
56:23 57:1
72:2 173:18
189:12 191:20
193:8,11 194:1
194:3 195:1,3
**depth** 64:15,21
**described**
63:10 178:10
**description** 4:4
**design** 19:5,18
20:14,22,25
24:19,20,21
25:2,16,25
26:13 62:1
74:10 89:22
90:1 101:1
117:19 124:23
125:8 151:1
155:13 168:15
175:12 176:1
176:12,24
178:6 188:22
**designed** 21:3,7
22:11 25:11
61:2 90:15
169:8 178:14
178:21
**designing**
100:6 115:11
173:14
**designs** 174:9

**despicable**
132:17
**detail** 170:1
178:1
**detailed** 62:25
**details** 63:3
**determination**
94:15
**determine**
184:18
**determined**
81:22
**determining**
49:3 107:18
**develop** 15:19
**developing**
25:7 174:21
**development**
19:6
**diabetes** 98:3
**diabetic** 144:25
**difference**
75:21 80:1
121:5 130:21
130:23 179:22
182:6 185:25
186:4
**differences**
180:7
**different** 26:19
26:20 42:11
50:9 59:15
62:8 85:13
108:22 111:16
119:4 122:16

123:8 138:16
138:17 153:11
156:20,23
166:6,7 167:2
181:24 182:14
184:22
**differently**
67:14
**difficult** 78:4
118:15,17
125:24 126:10
**diligence** 87:17
88:8 98:13,22
99:2 126:4
127:7
**diligent** 113:1
**dillman** 117:25
117:25 169:14
176:10,20
177:5,5,12
178:3,10
188:22
**dillman's** 118:4
176:25
**dillon** 189:1
**dillons** 151:2,2
151:6,7 152:9
152:14
**diminish**
135:10
**diminished**
133:2 135:12
**direct** 71:14
82:21

**directly** 98:6
127:6
**director** 151:4
**disagree** 37:20
71:23 79:9,10
116:17 143:15
157:8 162:8,10
162:16,22
163:2 168:14
168:18,18
181:13,13
**disagreeing**
78:15,17
**discern** 76:16
**discipline**
79:18
**discuss** 67:23
**disgraceful**
63:12
**disgruntled**
181:3,9
**disparate** 117:5
**disparately**
50:9
**dispense** 31:25
84:6 88:7
94:22 103:9
104:18,22
125:25 126:19
126:21 139:22
**dispensed**
30:25 34:2
35:10,15 76:9
83:19,19 84:12
84:13,19 86:5

99:23
**dispensing**
18:11 33:4,5,6
33:9 34:16
36:3 38:19
40:2 75:12,20
75:22 76:2,13
76:24 77:15
78:14 79:7
82:20,20 85:14
86:20 88:25
91:1 95:10
96:14 97:12
98:9,19 99:8
99:15,24 100:8
100:14 102:15
103:25 104:5
104:12 119:13
122:20 138:21
139:3,10 143:8
143:20,24
145:16 146:4,7
161:15,15
171:15
**disrespectful**
156:4
**dissatisfaction**
62:15 65:21
168:8 182:17
**dissimilar**
163:14
**distance** 86:3,6
87:22
**district** 1:1,2
18:21

**disturbing**
63:11 64:1,17
64:20 80:10,10
**diversion** 79:8
80:21,24 81:3
**division** 1:3
**docked** 137:2
**doctor** 37:4
**document** 1:9
24:5 56:13
85:5 131:10
165:18 167:9
167:14 170:9
176:14
**documentation**
84:24
**documented**
119:9
**documents**
39:7 84:23
**doing** 27:12,14
27:14 33:6
42:22 74:7
80:5 88:4 92:3
100:16 113:12
113:23 114:16
117:21 121:12
121:14 123:17
127:12,13
141:10,16
179:6
**dollar** 56:8
**dollars** 40:9,16
**donald** 117:25
117:25 169:14

176:10,19,25
**door** 127:5
128:12 145:14
**dose** 34:22 35:8
**dosing** 35:1,12
148:3,3,4
**double** 131:21
**doubt** 103:25
107:25
**dr** 9:20 10:20
12:2,6,12,20
53:25 55:8
67:24 69:24
70:12,25 71:3
71:17 72:14
78:11,17 90:4
96:6 101:11
106:8 110:12
114:6 118:4
122:4 141:21
143:5,16
146:18 148:14
150:6 156:14
158:10,15
159:10 160:15
162:5,9,19
165:2 170:14
172:15,15
173:10 177:5
177:12 178:3
178:10,13,17
187:2 188:15
189:3
**dramatic** 82:21
108:18 186:17

| | | | |
|---|---|---|---|
| **dramatically** 186:12 | **dye** 2:9 9:1,1 | **effort** 65:3 124:19 | 70:23 71:24 72:6 73:6 |
| **draw** 96:14 97:12 113:5 160:19 162:1 | **e** | **eight** 30:6 173:22 | 75:13 76:3,20 81:18 83:4 |
| **drawing** 137:3 137:8 | **e** 1:14 2:3 3:7 4:6 9:14,18 24:10 33:18 106:6 173:8 191:9 193:5,8 194:4,9 195:4 195:13 196:20 | **either** 14:11 16:19 17:17 55:5 85:24 86:3 102:22 113:6 192:2 | 86:24 87:23 89:12 90:21 91:5 93:15 94:18 96:10,16 97:19 99:3,11 |
| **drive** 29:22 30:2 | | | 101:6 102:17 |
| **drug** 15:15,16 15:16,19,20,24 16:2,10,16 17:1,3,16 21:22 35:25 83:25 84:4 85:22,23 86:15 88:5 | **earlier** 91:10 **east** 2:14 **eastern** 1:3 **eat** 67:12 98:3 98:4 144:24 **ebobbitt** 2:6 **ebony** 2:3 9:3 | **elaborate** 21:10 29:14 85:15 115:18 **elaborately** 62:25 **elaborating** 49:14 **eliminate** 88:12 | 103:12 104:20 106:24 108:8 109:10,18 110:7 113:9 114:14 115:13 116:16 119:16 120:15 122:9 122:23 123:5 |
| **druggists** 150:21 | **edited** 174:25 **edition** 20:4 **editor** 57:15 | **elsner** 2:3 3:9 8:20,21 9:7,12 10:2 11:18 | 124:2,13,24 125:9 126:5,11 |
| **drugs** 83:13 84:12 85:21,24 86:6 161:16,17 | 173:19 174:2,7 174:16 **educated** 90:15 **education** 19:7 | 13:21 20:15 22:14 23:17,23 25:3,18 26:21 | 131:13 132:15 132:22 133:23 136:17 141:7 142:7,13 |
| **due** 87:17 88:8 98:12,22 99:2 113:1 126:3 127:7 | 57:10,17 **effect** 115:5 **effective** 98:8 107:9 | 31:8 32:5 35:21 36:6 37:9,17 38:7 39:22 40:22 | 144:16 147:25 149:13 150:16 152:5 154:25 |
| **duly** 9:15 191:7 191:10 | **effectively** 144:22 | 42:6 43:21 46:16,22 47:19 | 155:19 156:3 157:7 158:11 |
| **duties** 33:24 76:18 77:2,9 99:25 126:4 144:13 148:10 | **effects** 18:9 **efficacy** 125:2 **efficient** 92:13 | 48:17 49:12 50:1 51:7 52:2 52:15 54:12 | 159:1 160:2 162:15 163:3 164:13,18 166:3 167:7,15 |
| **duty** 87:4 133:15 146:2 | 95:18 185:12 **efficiently** 144:22 | 55:22 56:5 63:6,21 66:4 68:8,18 69:11 | 170:11 172:9 172:15 173:6,9 |

189:3,8 193:5
email  193:17
embraced
  38:18
emergency
  116:4
employ  88:24
employee  79:16
  134:1 187:16
employees
  183:8
employer
  187:16
enclosed
  193:11
encompass
  96:1,8
encompasses
  145:16
endeavors
  117:11
enforcement
  17:1 84:1,5
  86:16
enhance  81:4
  150:22
enhanced
  80:22 122:3
  152:13
entered  195:9
entire  26:24
  73:14 74:11
  81:21 82:5
  83:6 137:22
  194:5 195:5

entirely  178:20
entirety  53:5
  56:7
entities  39:7
entitled  4:7
  57:2
entity  41:12
environment
  18:12 19:12
  23:8,12 32:12
  45:3 48:22
  60:13 63:13
  65:22 66:2,16
  66:25 67:12
  75:17,19 76:6
  76:9,12 77:25
  78:24,25 80:5
  85:12 88:20
  90:13 91:21,22
  91:25 93:2,11
  93:21 96:23
  97:24 98:8
  99:14 107:10
  108:10 110:23
  110:25 112:3,5
  112:16,19,21
  115:9 117:2
  120:4,7 122:16
  131:2,18
  132:25 135:7
  139:15,18
  140:10,19,22
  141:24 147:14
  157:14 182:3,7
  182:11,18

183:3,4 185:6
  185:9 186:6,16
  187:6
environments
  43:14 64:17,23
  82:14 115:3
  116:18 123:9
  138:15 141:9
  143:2 147:20
  182:22
epidemic  161:1
  161:7,14
  187:24
equal  66:14
  78:8,8 117:5
equals  137:25
equation  92:12
equivalent
  175:6
errata  193:13
  193:18 195:7
  195:10,18
  196:1
errors  35:24
esq  2:3,3,4,9,9
  2:13 193:5
essential  89:10
esteemed  66:24
  118:1
estimate  27:4,5
  43:5 44:15
  174:5,12
estimation  38:8
  67:21 69:20
  79:1 90:3,12

110:5 124:25
  130:22 142:22
  148:19 153:18
  176:20 185:21
et  60:18 61:4
  62:15 78:9
  166:25 177:25
  181:21 183:5
ethical  22:23
evaluate  96:24
  110:20 122:10
  124:3,4 125:1
  125:3 150:21
  170:3
evaluated
  130:9 131:3
  136:6 175:8
evaluating
  15:15 88:15
  89:20 97:1
  111:1 125:5
  168:24
evaluation
  90:11,12 99:5
  107:16 112:1
  148:20
evaluative
  176:13
evening  165:11
  165:18
event  192:3
everybody's
  118:17
evidence
  121:19 156:17

**exact** 45:15
46:13 47:4,12
48:3,11
**exactly** 12:9
115:8 127:3
147:5 148:11
158:9 170:8
**examination**
3:7 9:15,18
21:4 106:5
173:8
**examine** 13:24
42:24,25 111:8
117:1 155:3
156:6 164:9
**examined**
111:12 112:9
114:5 116:18
174:8
**examining**
108:21 112:17
113:14
**example** 17:1
29:15 60:13
61:18 67:8
85:16 87:22
88:18 94:25
105:1,3,4
113:18 115:25
116:21 188:5
**examples** 21:18
25:11 27:22
86:23 87:1
183:25 184:3
187:8

**excessive**
186:25
**exclusive** 27:6
78:3 94:8
144:3 183:20
**excuse** 19:3
97:7 118:2
120:24 153:15
169:8
**executed**
195:10
**execution**
194:14 195:19
**exhibit** 3:15 4:6
4:7 24:4,7,9
47:15 56:24
57:1 164:12
**exhibits** 3:4 4:2
23:15
**exist** 125:24
126:10
**existence** 119:8
**existing** 42:14
**expanded**
134:24 158:5
**expect** 64:24
128:6 136:25
160:7
**expectation**
135:6
**expectations**
57:20,22 78:5
126:1,13 127:4
128:5 138:17
139:10 148:10

148:16
**expected** 58:9
64:6,23 97:25
**experience** 16:2
16:9,22 17:25
18:3,18 19:18
29:23 31:4,5
31:23 35:18
54:16 74:2
97:7 115:11
149:9,11 150:7
151:18 173:14
**experiences**
15:16 149:11
**expert** 4:6 13:1
13:5,11,20,22
15:3,7 16:5
17:9 24:10
34:15 35:18
36:10,17,20
112:14 113:14
116:23 118:8
147:7 148:17
169:16
**expert's** 13:10
14:3
**expertise** 15:10
16:15,18 17:13
17:20 19:17
74:3 78:19,20
89:16,16
110:19 111:22
112:1 114:20
114:21 117:7
122:6,14 125:7

125:11,17
161:11 174:18
**experts** 61:12
176:5
**expiration**
194:19 195:25
196:25
**expires** 192:17
**explain** 17:19
28:16 42:18
50:7 60:9 70:5
74:20 91:12
163:9 166:8
**explains** 178:1
**explicit** 83:1
**express** 142:15
**expressed**
82:15 108:2
178:11 182:17
**expressing** 53:1
**external** 89:20
**extra** 135:10,13
**extrapolate**
78:13
**extrapolated**
149:3

**f**

**face** 54:14 80:8
103:8 134:20
187:16
**facility** 31:18
**fact** 22:5 56:3
69:5 72:17
84:25 91:7
130:9 131:19

140:24 142:17
154:5 164:5
167:1,13
168:22
**factor** 49:2
72:20 107:4
110:9 115:2
186:9
**factors** 18:15
41:2 50:16
51:14 60:5,12
93:3 98:6
101:22 112:4
112:13,25
119:18 120:19
144:1,3 145:3
157:14 186:21
**facts** 82:19
**faculty** 18:23
33:21 37:23
59:25 67:1
**fair** 10:14
24:22 76:19
113:8 145:2
160:7 170:6,16
178:14
**falls** 99:25
133:14,14
**familiar** 19:16
24:1 36:25
37:2 50:4
110:22 114:23
**family** 128:9
**famous** 148:17

**far** 12:4 45:16
78:9 83:15
84:22 117:5
180:6
**favorite** 134:13
**fda** 15:3,22
17:4
**february** 11:3
**federal** 28:5,7
28:15,16,17,19
28:22 84:2
**feedback** 72:8
**feel** 74:6 80:5
88:21 92:2
98:15 117:20
132:24 134:9
146:24 158:3
185:5
**feelings** 51:18
63:18
**felt** 75:1 141:23
142:22 143:2
180:23 182:2,6
182:22 183:12
**fentanyl** 34:22
34:25 35:8
**field** 19:9,10
22:6 43:7
59:16 60:7,9
60:11,21,23
61:7,12,13,20
72:19 73:1,4,5
73:11,19 74:1
74:3 115:12,18
115:19,23

116:5 118:4
175:1,21,25
176:1,2,6,6
178:5
**figure** 61:15
82:10 170:8
**fill** 87:6,8,15,18
88:20 136:20
136:22 146:10
186:2
**filled** 84:17
88:2,22 128:11
129:20 139:6
185:17
**filling** 86:8
96:1,9 97:22
98:11 99:1
134:5 136:14
**fills** 186:14
**finally** 86:11
**fincham** 1:14
3:7 4:6 9:14,18
9:20 10:20
12:6 24:10
53:25 55:8
106:6,8 141:21
150:6 165:2
170:14 172:15
173:8,10
178:17 187:2
188:15 189:4
191:10 193:8
194:4,9 195:4
195:13 196:20

**find** 22:12
50:20 73:18
89:23 90:14
100:7 109:21
121:17 124:6
124:19 125:21
130:16 179:7
193:11
**finding** 40:11
55:24 75:11
**findings** 40:1,4
41:5,13 58:15
59:7 69:8 75:8
82:24 152:19
152:25 153:22
166:5 167:17
168:3
**fine** 9:23
**finish** 157:23
**fired** 145:10
**firm** 8:21,24
9:2 67:8,19
165:14
**first** 9:15 10:24
17:24 37:23
48:6,21 57:21
58:12 78:18
91:19 100:15
111:12 114:17
116:2 126:8
137:7 161:2
165:10,11,17
191:10
**five** 31:17
33:19 91:19,20

130:25 135:24
168:16 172:8
177:24 181:11
**fixed** 136:24
**flag** 85:8,11,19
85:20 86:1,10
86:18 87:2,14
87:20 88:3,13
88:16
**flags** 86:15,16
86:18,21,22,23
**flawed** 156:12
157:6
**flies** 134:19
**flip** 44:4
**flow** 139:9,19
**flows** 138:22
139:3
**focal** 108:20
134:20
**focus** 66:19
95:1,13 100:22
118:6 144:22
174:19
**focused** 59:4
61:1 100:13
116:5 134:11
152:11 177:19
**focusing** 24:20
**folder** 164:12
**follow** 75:8
84:11 139:21
143:9
**followed** 37:12
176:18 188:25

**follows** 9:17
**food** 15:14,18
16:7,10,15
54:20 60:18
92:25 112:23
113:20 139:12
140:9 166:24
182:12,19
184:25 186:7
**footnote** 47:14
101:9,10,14
**footnotes** 48:3
**foregoing**
191:16,21
194:13 195:18
**form** 31:10
50:21 72:24
110:16 111:20
114:2 124:9
132:20 152:2
167:9 175:22
**formation**
167:10
**forming** 17:13
114:18
**forms** 84:22
**fortunate**
174:23 175:14
**fortunately**
117:9
**forward** 193:15
**found** 50:19
52:20 71:8
75:3 101:12
125:19 127:17

128:1 137:20
142:22 154:6
157:22 166:6
166:11,12
179:9 180:23
**four** 25:19 95:1
135:24
**fourth** 20:4
**framework**
22:7 59:20
62:23 115:23
**free** 194:14
195:20
**frequently** 86:7
**front** 164:10
165:3
**fulfill** 84:9
**fulfilling** 95:24
**full** 32:20 58:12
80:15 115:16
126:8
**fully** 10:9
**funded** 121:11
**further** 42:15
56:9 173:3
180:20 189:7
191:19 192:1
**future** 127:25
151:13,19,23

**g**

**gabriele** 2:9
8:18
**gained** 117:8
**game** 170:16

**garner** 121:21
**gather** 42:14
72:23
**gender** 146:22
147:4 148:6,8
**general** 22:7,8
43:8,12,24
50:25 51:10,23
51:25 52:7
53:2 54:5
59:20 60:12,21
61:9 74:23
75:14 76:11,14
76:24 77:3,6
79:12 80:11
81:12 92:8
97:23 103:19
106:14,22
108:4,24 109:9
109:12,15,22
110:6,8 118:16
128:20 147:21
149:17 159:13
163:17 182:10
182:17,19
185:7
**generalization**
120:18 148:23
**generalizations**
141:5 142:5
**generalize**
120:13 142:11
157:11,12
**generalized**
143:1 156:25

**generally**  61:14
  104:6 145:18
  187:21
**georgia**  18:24
  115:21,21,22
  116:5,10,10
**getting**  10:18
  88:10,11
  134:14 151:18
**give**  9:10 21:18
  22:22 31:9
  45:14 47:4,11
  71:16 73:16
  107:11 112:10
  113:18 116:21
  117:21 129:21
  154:1 179:20
  183:25 190:1
  190:10
**given**  34:3
  152:20,25
  191:13,18
**gives**  54:9
  121:2,16
  137:21
**giving**  34:1
  153:7
**glad**  140:13,14
  183:2
**glasgow**  175:16
**go**  27:23 31:11
  32:6 35:22
  36:7 47:12
  48:2 53:25
  55:9 67:11

69:12 73:13
  77:20 78:1,22
  79:14 86:25
  90:9 91:13,17
  95:6,14,21
  98:1 105:8
  113:19 117:13
  125:23 130:15
  138:21 144:2
  144:20 145:11
  146:12 149:24
  150:17 155:1
  158:13,16
  159:8,15
  161:17 162:17
  164:15,20
  171:25 183:4
**goal**  58:3
  134:20
**goes**  36:14
  42:21 44:12
  78:20 177:25
**going**  19:4
  22:16 24:6
  32:24 39:24
  42:25,25 53:19
  56:18,23 59:24
  59:25 63:25
  73:15,25 90:17
  91:8,19 92:10
  92:20 97:9
  100:17 106:11
  107:19 111:14
  115:8 116:3
  119:10 121:3,5

121:21 122:17
  125:1,18
  127:17,18,19
  127:23 128:18
  129:8,9 131:2
  131:4,4 135:7
  137:2 144:21
  145:6,7,8,10,10
  145:11 155:3,4
  155:5 158:12
  159:2 170:3,19
  170:20 171:2
  177:8,9,14
  179:20 188:24
  189:10
**gold**  176:20
**good**  9:21
  10:11,19 120:7
**government**
  28:5,17,19
**graduate**  19:7
  30:20
**graduation**
  31:12
**grammar**
  177:19
**grant**  15:18
  150:20 175:9
**grants**  16:11
**great**  2:15 9:24
  170:1 178:1
**greater**  18:20
**grocer**  68:16
  69:16 108:25

**grocers**  109:16
**grocery**  39:1
  67:25 109:4
  110:4 182:8
  184:5,15 186:2
**ground**  10:7
**group**  142:24
  151:11,22
  152:14 178:24
**groups**  150:24
**growing**  38:23
**guess**  25:14
  109:11 156:23
  182:25
**guidelines**  37:1
  37:3,8,10,16,21
  37:25
**gwohl**  2:11

**h**

**h**  33:18
**halfway**  48:6
**hammer**
  169:17
**hammered**
  168:22
**hand**  192:6
**handle**  88:16
  145:1
**happen**  105:5
  139:5
**happened**
  21:14,15 22:13
**happening**
  138:19

happens  78:1
127:17
happy  164:14
hard  69:21
head  42:8
heading  57:20
health  17:17
20:3 24:18
117:3,4,6
175:6
healthcare
19:11 22:8
29:20 117:7,17
118:18
hear  10:9 137:6
heard  8:11
10:13 85:7
111:16,21,23
167:23
heartfelt
179:21
heavily  19:8
hello  9:20
help  14:1 92:11
128:14 132:8
134:7 135:14
152:9
henschel  2:18
hereinafter
9:16
hereunto  192:5
higher  49:7
57:22 186:8
highly  181:20

highway  14:19
14:21
hill's  15:1 16:7
hired  133:3
home  88:1
homes  31:19
honest  66:18
hope  9:23
hoped  179:22
hoping  121:4
horribly  64:25
hospital  139:12
140:11
hospitals  29:20
hour  10:17
89:6 95:2,15
134:1 136:13
144:6,6
hours  11:6,8,15
30:6 79:17
93:1 95:3,17
106:20 134:2
135:3,4 184:8
184:14,22
185:4,8,13
human  17:7
hundred
145:22
hundreds
186:24
hung  145:23
hurt  145:7

**i**

idea  96:18
148:15 169:24
171:12,18
180:8
identification
24:12 57:6
identified
41:18
identify  42:3
ignored  140:18
140:21
ignores  96:2
ii  83:22 84:15
illinois  16:8
immediately
67:15,22
impact  65:5
68:10 76:8
81:3 82:21
83:6 85:22
91:8 93:22
95:4 98:5
103:25 104:7
110:5 123:13
124:11,18
127:24 129:8
145:3 147:17
151:7,25
163:15 164:6
176:17 180:16
180:18 183:12
185:14 186:15
186:17 187:17
187:24 188:7

impacted  43:25
51:1,15 100:1
103:8 118:18
163:18
impacting  84:5
104:5 112:25
125:20 144:7
144:10
impacts  17:2
17:16 18:14
32:25 81:11
91:23 104:10
110:2 111:4
115:4 146:16
185:10
impediments
129:4
impinge  98:6
112:4
impinging
157:15
implementati...
20:22
implicate
101:16
importance
68:11 88:13
important
37:11,11 61:1
68:12 69:22
73:5 91:11,24
92:5,11 102:18
105:4 107:4
119:6 129:10
131:7 146:21

147:16 148:21
153:19 158:7
178:1
**imposed** 136:4
**impossible**
145:9
**improper** 81:2
82:20
**improve** 65:10
**improving**
155:10
**inability**
135:13
**inappropriate**
18:10,11
103:22 134:10
159:14
**incalculable**
95:20
**incapable**
133:12
**incentives**
41:23
**include** 46:3
50:16,16 98:19
101:22 150:24
**included** 38:17
75:11 146:6
184:12 187:19
187:20,22
193:13
**includes** 11:9
41:19 99:16
**including** 98:8
98:21 99:15

104:1,11 107:6
168:1
**inclusive** 77:23
93:6 144:4
146:15 150:25
**inconsequent...**
79:1
**incorporated**
195:12
**increase** 68:23
69:2,6 70:5
**incredible**
78:19 133:8,17
185:9,22
**incredibly** 64:1
82:17
**independent**
18:4 27:5
31:21,24 32:23
40:25 54:19
88:15 108:15
138:14 140:10
182:15 184:5
186:7
**index** 3:1,4,5
4:2 5:1 6:1 7:1
**indicate** 63:17
87:11 93:21
136:1 172:5
182:5
**indicated** 40:1
62:14 64:3
67:9 82:17
92:23 102:8,8
102:21 140:25

165:24 166:18
167:8 183:18
**indicates** 40:16
74:3 135:25
155:11 166:4
179:20 180:23
181:17 182:1
**indicating**
65:21 83:7
193:13
**indication**
182:20
**indicator** 85:11
**individual** 67:3
67:20 80:3
86:7 102:4
107:21 113:1
121:13 129:24
134:2,25
135:20,22
142:1 176:8
**individual's**
62:24 107:1
116:1
**individualized**
88:24
**individually**
30:4 137:24
**individuals**
14:10 23:11
33:25 64:16,22
66:21 69:6
116:7 121:13
129:3 141:23
169:13 187:8

**infant** 34:22
**influence** 40:19
40:21 108:18
**inform** 16:19
77:8
**information**
42:14 54:21,23
78:14 160:23
161:3,24
183:22 185:18
**initial** 11:10
**initially** 155:2
**initiation** 29:18
**initiative** 124:6
**input** 36:2
**ins** 116:23
**insignificant**
69:19
**instance** 39:5
87:21,24 88:6
94:3
**instances** 22:1
116:8
**institutes** 175:5
**institution**
92:25 183:2
**institutional**
18:5 54:18
60:17 108:13
112:20 138:13
140:11 182:16
184:6,23
**instruction**
190:2,10

**[insufficient - kinds]** Page 22

**insufficient**
90:20,22
103:22
**integrated**
25:24
**integrating**
26:16
**intended** 50:22
58:6 75:5
178:22
**intending**
100:23 157:10
**intense** 85:23
**intent** 13:7
27:9,17 50:10
71:21 72:7
120:16
**intently** 117:14
**interact** 33:20
**interaction**
85:20 151:9,14
**interactions**
23:7 33:25
161:16
**interested**
192:3
**internet** 8:10
**interpret** 79:5
89:10,18 91:3
**interpretation**
175:13 176:1
**interpreted**
174:9 176:6
**interpreting**
135:19 173:15

174:20 177:2
178:7
**interstate**
14:19
**intertwined**
89:14
**invalid** 96:17
160:11
**inventory** 94:4
**invoice** 11:1,4
**involved** 14:21
15:4,13,14
19:8,13 20:21
20:21,25 22:24
24:20 35:24
36:17 41:20
77:3 82:1
112:13 113:16
176:22
**involving** 34:20
**irrelevant** 70:4
91:7 128:24
**isolate** 82:4
144:13
**isolated** 146:2
**isolating** 82:8
145:25 159:16
**issue** 39:15
102:5 108:17
140:17 141:2
142:23 158:6
**issues** 16:23
20:6,9 125:20
168:25 187:5
188:13

**issuing** 121:20
**item** 15:4,6
73:15 86:13
137:24,24,25
137:25 168:16
168:16,23
169:9 184:7
**items** 52:21
53:13 54:21
59:19 62:17
77:24 78:3,3
85:25 86:14
90:16 91:9,17
92:22,23 93:8
94:7,8 95:1
102:22,23
140:25 141:13
144:21 168:13
169:18 177:21
177:24 178:14
179:15 180:11
181:11 184:11

**j**

**jack** 1:14 3:7
4:6 9:14,18
24:10 106:6
173:8 191:9
193:8 194:4,9
195:4,13
196:20
**jane** 151:4,7
**january** 10:25
**jdye** 2:12
**jessica** 2:13
8:23

**jkbaverman**
2:16
**job** 118:17
182:9 184:16
186:1,3 187:17
**jobs** 118:15
**john** 61:18
**jordan** 2:9 9:1
**journal** 4:8
57:4,10,16
**journals** 26:6
173:20,24
174:2,17 175:1
175:4
**judge** 1:8
**judgment**
88:15,24 89:5
89:25
**june** 192:7
193:4

**k**

**k** 2:13
**kansas** 150:19
152:1,10
**keep** 32:11
**key** 72:18 75:18
177:11
**kind** 10:7 35:19
50:24 120:18
127:15 134:16
140:12
**kindly** 171:4
**kinds** 16:17
18:12 39:9
67:20 99:22

**[kinds - listed]** Page 23

111:9 128:3
129:3 168:10
177:24 188:11
**kingdom**
175:19
**knew** 64:23
179:18
**know** 10:7,10
10:17 20:16
21:8 25:13
41:17 46:2,10
46:14 56:2
61:11 65:18
66:7 70:24
80:7 82:9
89:21 90:23
110:8 112:19
117:13 119:11
119:23 130:12
130:14,17,20
141:25 144:17
145:24 147:23
148:18 156:5
158:24 163:21
168:7 170:18
171:8,11,13
177:15,16
**knowledge**
16:15 89:8
90:25 117:8,17
**known** 150:10
161:16
**knows** 79:7
**kroger** 2:8 8:19
8:25 9:2 39:21

40:2,8,16 41:6
41:16,18,20
42:5 55:12,18
107:6,24 108:1
126:25 127:10
128:19 129:2
129:16 130:11
131:24 133:22
134:16,18
135:4,11,18,19
135:21 141:5
142:12,12,15
142:16,19,22
143:1 150:7,11
151:3,3,6,9,11
151:15,16,18
152:3,13
153:15 158:2,7
169:23,24
171:10 181:1
183:7,20
**kroger's** 131:9
132:14,21
134:11 136:11
**kurt** 2:18

**l**

**l** 1:24 191:6
192:14
**lab** 19:10
**lack** 79:19
107:3
**land** 115:24
**large** 41:18
51:6 54:19
62:20 67:25

68:16 69:16
108:24 109:16
110:3 126:1
128:4 140:1,9
**larger** 68:15
162:25
**late** 17:11 32:8
164:14
**law** 8:21,24 9:2
84:12 139:21
**lawful** 9:14
**laws** 91:1,4
**lawsuits** 55:14
**lay** 115:23
**lead** 99:21
**leading** 95:23
**leap** 143:6,10
**learn** 55:11
**learning** 33:19
**leave** 145:13
**left** 30:19 54:1
56:8 183:3
**legal** 13:13,16
14:5 193:1
196:1
**legitimate**
97:18 99:9
**length** 184:8
**letter** 84:11
193:19
**level** 127:14,22
**license** 28:6,6
28:12,19,23
30:17

**licensed** 17:25
28:3 29:1
30:21 43:10
**lie** 132:4,7,9,10
**life** 33:19 67:14
**likely** 65:2,15
66:1
**likert** 52:21
53:13 55:5
62:14 82:15
92:21 93:20
94:2,14 100:4
102:22 132:24
137:17 140:7
140:24 141:13
157:19 168:13
168:23 169:10
169:18 177:21
180:11 181:10
183:17
**limit** 107:15
**limited** 36:22
38:9 52:12,18
83:20 166:18
**limits** 84:17
**line** 177:16
181:4 193:13
195:7 196:3
**liquid** 84:19
**lisa** 2:4 9:5
**list** 12:24 24:3
78:2 107:25
144:9 187:15
**listed** 12:4
62:17 91:18

**[listed - make]**                                          Page 24

130:8 195:7,17
**listening**
128:13
**listing** 93:6
195:7
**lists** 77:23
**literature** 25:9
119:9 122:1
169:12
**litigation** 1:6
8:4 193:6
194:3 195:3
**little** 34:19,23
35:17 137:1
156:22 173:13
**live** 28:25
**llc** 2:2
**llp** 2:8
**loads** 140:2
**located** 8:5
40:7
**location** 90:10
**logged** 11:2
**long** 11:14 18:6
31:18 33:19
86:3 87:22
93:2 119:8
138:14 147:13
184:6 185:1
188:14
**look** 24:14 43:2
43:8 44:20
47:14 50:11,25
51:8,10 52:19
52:25 55:3

56:6,12,18
59:2,10 60:3,5
61:17 66:20
67:19 71:5
72:19 75:17
76:15 80:8
81:21 82:5,19
83:12 85:13
90:4 92:21
93:4,16 94:7,9
94:10,13,25
95:6 97:8,8,21
97:23 100:12
100:15 101:9
102:3 107:2,5
108:10 109:24
110:1 111:5,13
115:14 116:25
117:11,15
118:24 121:24
122:11 123:1
123:24 124:16
130:1,11
132:23 136:8
137:12,23,24
138:11 142:24
146:13 154:15
155:2,3,4
156:20 168:6
168:10 169:13
170:4,24
171:17 172:3
179:14 180:10
181:10,13
182:10,24

188:24
**looked** 27:2
40:23 45:1,21
46:2 70:12,21
71:3 114:25
115:25 116:1
116:22 123:6
129:16 137:15
157:18 158:1
167:14 170:1,2
**looking** 17:4
38:10 55:25
56:17 59:13
60:13 61:21
69:24 72:18
74:22 75:14
79:5 80:2
81:10 85:16
92:22 94:10
109:25 111:18
114:23 121:12
125:6,10
128:22 134:15
135:17,20
148:3 153:3
155:6 170:5
**looks** 61:2
176:14
**lot** 74:17 77:2
121:2
**lots** 16:23
64:18 98:21
99:14 107:22
115:4

**loud** 95:15 98:2
**lsaltzburg** 2:7
**lunch** 79:15
103:1 106:11
144:24
**luncheon**
105:13

**m**

**ma'am** 149:7
**madam** 193:10
**made** 25:7 29:7
39:8 55:20
67:17 68:15
83:2 118:15,16
131:24 135:21
155:18,23
194:7
**major** 25:19
29:20 72:20
93:22 109:4,5
109:8,12
110:23 117:22
142:16 151:25
180:18
**majority** 147:8
**majorly** 109:13
**make** 23:20
24:7 30:9 51:4
54:1 55:4
66:13 67:6,22
78:4 79:25
89:24 90:11,12
92:2 94:15
97:20 99:4
100:3 105:6

107:14 109:19
113:2 121:5
127:11 129:19
130:10,21,23
132:9 136:8
142:5 145:6,8
148:20,25
150:25 152:12
154:24 155:9
155:25 157:20
160:9 162:1
163:20 164:11
164:13 179:22
180:21 183:1
**makes** 69:18
99:14 134:17
137:22,23
**making** 82:23
82:25 83:17
88:25 121:9
127:4 133:13
141:4 142:4
156:12 162:3
**male** 147:9
**man** 117:24
**managed** 23:11
116:22,24
117:2 151:3
**management**
107:12,16
113:24
**manager** 18:21
31:16,21 92:9
**manner** 81:5
138:20 155:15

**manufacturer**
84:21
**manufactures**
187:9,10
**manuscripts**
57:13
**march** 11:3
**marijuana**
14:24 15:13
17:3
**marked** 4:4
24:11 57:5
186:7
**market** 54:20
60:18 92:25
112:23 113:20
139:12 140:9
166:24 182:13
182:19 184:25
**master's** 14:12
25:14
**material** 165:7
**materials** 12:3
24:25 25:6
37:3 45:22
47:6 164:2
**matter** 8:3
28:23 67:16
89:17 102:7
114:9,12,12,15
129:6 134:10
138:22 139:3
139:18 148:8,9
**matters** 129:7

**mcnamee** 72:1
**mcnamee's**
71:19
**md** 1:7
**mdl** 1:6
**mean** 13:15
21:9,11 44:10
51:24 67:21
70:1,15 72:15
74:20 80:25
90:1 125:13
148:16 156:4
172:16,21
**meaning** 73:11
**means** 71:2
113:16 124:11
145:25
**meant** 51:5,17
120:8 124:20
**measure**
137:13 147:12
162:8,21
**medical** 26:6
28:9 29:5,21
30:2,14 34:8,9
34:23 35:16
99:10 117:17
**medication**
15:25 16:24,24
30:25 33:4,9
33:16 34:2
35:15 75:23
88:2,7 94:22
107:11,16
139:9

**medications**
14:23 16:3,24
17:5,6,16
18:10 21:21,22
21:23 31:25
35:25 84:7
94:24 99:22
100:8 128:10
**medicine**
116:15,20
**meet** 11:16
126:24 127:21
131:19 178:9
**melsner** 2:6
**member** 18:23
37:23 67:1
79:11
**members** 23:2
**men** 147:1
148:3
**mental** 95:19
**mention** 19:3
26:4 41:21
186:9 187:23
**mentioned**
12:25 16:14
29:3 31:4
79:21 106:18
128:15 136:12
168:1 169:3
178:3 183:6
186:24
**mentions**
101:13,25

**met** 11:18
188:17
**meta** 116:2
**metabolic** 98:5
**method** 121:9
121:11 176:12
188:22
**methodologies**
176:15
**methodology**
13:25 20:7,12
20:18 21:24
26:13 27:3
89:22 90:2
110:17 111:21
115:7 116:14
116:25 117:19
120:22 124:22
169:1,16 177:4
178:6
**methods** 19:24
21:24 24:18,19
176:24
**metric** 107:18
123:13,13
124:16
**metrics** 41:23
107:7 113:19
124:10,11,16
124:17 126:18
127:4 129:4
131:10,16,20
131:25 132:1
135:22 136:3,6
136:7,11,19

146:9 169:7,8
**metropolitan**
29:20
**michael** 2:3
8:20 193:5
**microphone**
8:10
**middle** 80:15
126:8 160:18
**midwest**
193:17 196:1
**miles** 87:25
146:14
**milliliters**
84:18
**million** 40:8,15
**mind** 23:18
56:15 68:11
79:25 107:13
120:2 143:12
143:24 144:2,8
144:11,12,23
145:19 147:3
157:24 160:14
**minds** 118:21
**minnesota** 19:8
30:21 61:19
176:23
**minor** 180:7
**minute** 47:11
53:18 89:5
145:4,13,13
146:17 164:15
172:8

**minutes** 107:17
128:12 170:6
**mirrored** 62:16
**misdispensing**
35:24
**misischia** 2:19
9:12
**misleading**
68:5
**misprescribed**
35:8
**misprescribing**
34:21
**mississippi**
15:18
**missouri** 44:24
45:8 46:18
47:2,10,18
48:4 103:6,11
167:18 178:25
**mistake** 46:25
145:7
**misuse** 16:25
18:9
**money** 22:19
**monitor** 94:4
**monitored**
105:5
**monitoring**
98:22 99:16,19
104:12 151:5
**monitors** 41:9
**montgomery**
2:2 8:22

**month** 123:10
123:17 131:5,5
**months** 30:3
**montrose** 31:14
31:15,20
**morning** 9:21
9:22 40:7,24
56:1 106:19
**motley** 2:2,19
2:20 8:21 9:4,6
9:9
**motleyrice.com**
2:6,6,7
**mount** 2:5 8:5
**moved** 31:13
**mtms** 107:11
107:15
**mutually** 27:6
78:2 94:8
144:3

**n**

**nabp** 41:12
**nailed** 127:18
127:19
**name** 9:11
129:5 193:6
194:3,4,15
195:3,4,21
**named** 86:21
117:25 191:9
**narcotics** 83:15
**national** 1:6
8:3 41:11
44:24 45:9
47:23 48:1,8,8

61:23 86:17
126:25 150:20
153:12 167:19
179:1 193:6
194:3 195:3
**nationally** 97:3
**nature** 23:4
35:5,7 150:13
169:21
**necessarily**
39:24 42:16
117:12
**necessary**
73:18 75:2
91:2
**need** 10:17 28:8
37:12 64:12
67:18 72:21
77:18,24 80:6
80:6,8 81:6
85:13 88:2
89:16,23 90:14
91:20 98:16
102:9 110:15
110:21 112:13
113:13 117:12
129:23 130:6
132:20 133:1
134:14 155:25
159:15 169:17
170:24 172:4
**needed** 67:5
71:5 74:6,7
130:2,7 142:23
143:2 158:4,5

**needs** 66:19
72:20 102:6
111:19 136:24
139:16
**negative** 17:17
64:5,15,22
120:5 131:21
142:11 181:18
**negativity**
107:7
**neglected** 19:2
**net** 125:3
**network** 151:6
**neutral** 146:22
168:14,17
181:12
**never** 117:5
168:15 169:10
169:11
**new** 70:8 83:21
84:14,16
128:11 180:9
**nice** 141:24
**nicely** 178:15
**night** 59:14
170:2 171:22
**nih** 175:7
**non** 15:24
21:21 58:13
62:6 149:1
**northern** 1:2
**notarized**
193:14
**notary** 191:6
192:14 193:25

194:10,18
195:15,23
196:23
**note** 8:7 65:7,9
101:14 193:12
**noticing** 8:16
**number** 4:4
11:8 26:10
36:13 50:16
62:19 69:16,21
69:23 107:10
107:11 110:1,1
161:18 176:25
177:15,23
180:8 184:7,10
184:13,22
185:4,13,16,22
186:1,10,13,19
193:7,13
**numbered**
26:14
**numbers** 62:22
69:9,23 116:6
195:7
**numerical**
52:22
**numerous** 13:2
15:22 17:10
21:16 23:3
39:13 41:5
61:20 116:8,9
175:8 181:23
**nurse** 29:8
**nurses** 29:7

**nursing** 31:19
**nutrition** 15:1

**o**

**o** 33:18
**oarrs** 85:4
101:15 102:13
146:13
**object** 31:10
**objection** 5:3,3
5:4,4,5,5,6,6,7
5:7,8,8,9,9,10
5:10,11,11,12
5:12,13,13,14
5:14,15,15,16
5:16,17,17,18
5:18,19,19,20
5:20,21,21,22
5:22,23,23,24
5:24,25 6:3,3,4
6:4,5,5,6,6,7,7
6:8,8,9,9,10,10
6:11,11,12,12
6:13,13,14,14
6:15,15,16,16
6:17,17,18,18
6:19,19,20,20
6:21,21,22,22
6:23,23,24,24
6:25 7:3,3,4,4,5
7:5,6,6,7,7,8,8
13:21 20:15
22:14 25:3,18
26:21 31:8
32:5 35:21
36:6 37:9,17

[objection - ongoing]                                            Page 28

| | | | |
|---|---|---|---|
| 38:7 39:22 | 155:19 156:3 | 54:5 58:17,24 | 40:14 41:8 |
| 40:22 42:6 | 157:7 158:11 | 59:16 60:8,14 | 42:22 44:14 |
| 43:21 46:16 | 159:2 160:2 | 61:22 62:2,19 | 46:6,25 47:13 |
| 47:19 48:17 | 163:3 166:3 | 63:18 70:6 | 47:17,22 49:1 |
| 49:12 50:1 | 167:7,15 | 72:4 73:24 | 50:8 68:13 |
| 51:7 52:2,15 | **objections** 3:5 | 74:15,18 81:8 | 69:14 70:5,10 |
| 54:12 55:22 | 5:1 6:1 7:1 | 81:21 85:2 | 72:3,13 74:22 |
| 56:5 63:6,21 | **obligations** | 88:19 89:11 | 81:1 83:8,16 |
| 66:4 68:8,18 | 95:25 160:24 | 90:5 93:23 | 90:3 91:13,16 |
| 69:11 70:23 | 161:6 | 101:4,8 103:4 | 93:3 94:12 |
| 71:24 72:6 | **observing** 33:5 | 106:14,23 | 95:10 96:12 |
| 73:6 75:13 | **obtain** 88:4 | 108:5 109:1,16 | 103:14 104:25 |
| 76:3,20 81:18 | **obtained** 60:17 | 110:13 118:22 | 105:6 108:3 |
| 83:4 86:24 | **obviously** | 120:14,23,24 | 109:23 110:11 |
| 87:23 89:2,12 | 41:19 68:9 | 123:14 127:2 | 113:17 118:5 |
| 90:21 91:5 | **occurring** | 128:21 141:6 | 123:10 124:4 |
| 93:15 94:18 | 30:11 | 142:19 148:2 | 134:25 138:11 |
| 96:10,16 97:19 | **october** 192:17 | 149:12 153:2 | 142:3,10 |
| 99:3,11 101:6 | **offer** 35:2 | 153:16 154:5 | 143:22 149:8 |
| 102:17 103:12 | 110:12 114:7 | 157:2,13 | 154:5 159:4 |
| 104:20 106:24 | 117:18 | 166:16,21 | 161:9 162:5 |
| 108:8 109:10 | **office** 116:4 | 167:3,18 168:2 | 163:20,25 |
| 109:18 110:7 | 192:6 | 169:5 177:3 | 164:11 168:13 |
| 113:9 114:14 | **official** 194:15 | 178:8,17,24 | 169:6 171:20 |
| 115:13 116:16 | 195:21 | 179:10,24 | 171:23 172:7 |
| 119:16 120:15 | **ohio** 1:2 2:15 | 180:20 182:4 | 174:1,6,12,24 |
| 122:9,23 123:5 | 11:25 12:13 | 183:13,19,23 | 176:5 177:2 |
| 124:2,13,24 | 38:3,3,15 | 187:25 188:17 | 181:6 |
| 125:9 131:13 | 42:12,16 43:3 | 191:2,7 192:7 | **old** 148:9 |
| 132:15,22 | 43:11,20 44:2 | 192:15 193:2 | **once** 10:16 |
| 133:23 136:17 | 44:17 45:4 | **okay** 10:10,18 | 102:8 |
| 141:7 142:7,13 | 46:15 49:8,11 | 12:23 14:1 | **ones** 27:24 |
| 144:16 147:25 | 49:15,17,24 | 15:12 17:22 | 48:24 95:7 |
| 149:13 150:16 | 50:22 51:2,5,6 | 29:17 32:18 | **ongoing** 160:25 |
| 152:5 154:25 | 51:19 52:11 | 33:7 38:11 | 161:14 |

**online** 15:19
55:14,16 85:4
**operation**
122:7
**opiate** 1:6 8:4
193:6 194:3
195:3
**opinion** 16:20
35:2,6 38:11
38:15 43:15,18
44:6 49:15,23
55:5 69:15,25
73:2,3 74:15
75:10 83:8
89:15 90:20
93:12 95:22
96:7,15 97:11
102:15 108:3
110:16 111:20
113:4 114:2
117:18 122:7
122:20 131:23
132:14,21
136:10 143:5
143:16,23
146:21 152:24
153:5 154:13
158:23 159:5
159:25 162:17
163:9 164:4,4
168:24 178:16
180:16 186:15
188:16
**opinions** 12:20
15:11 17:13

40:20,21 49:10
55:20 56:11
96:17 114:7,18
124:10 131:9
133:21 152:2
164:7 165:21
165:23 166:2
167:5,13
171:25 172:17
**opioid** 10:21
31:25 34:15
38:19 75:20
76:13,23 78:14
79:8 80:21
81:2 82:1,19
85:6,18 87:3
88:7 95:10
96:2,14 97:12
98:9,9,11,19,19
98:22 99:1,8
99:15,24 100:8
100:13 119:13
122:20 143:24
145:16 146:4,6
146:11 161:1,7
161:14
**opioids** 37:1
38:12,16 40:2
75:12,23 76:2
76:8,11 77:8
77:15 81:16
82:19 89:1
95:7 97:17
98:22 100:11
100:13 101:13

102:12,15
104:1 143:9,12
143:20 162:7
162:20 171:15
**opportunities**
20:10 151:24
175:15
**opportunity**
152:8
**opposed** 86:12
166:20
**order** 29:25
81:19 84:9
90:10,12 97:9
113:23 134:3
136:6
**ordered** 84:20
**orders** 94:5
184:10
**oregon** 46:25
163:25 165:3
165:25 167:3
167:24 169:1
169:25 188:6
**organization**
27:10,18 28:22
29:3,6,12
121:14,23
122:2
**organizations**
19:21 42:10
116:22 156:11
**origin** 157:19
**osher** 33:18

**outbreak**
188:11
**outcome** 22:20
22:23 182:4
**outcomes** 17:18
20:19 21:5
22:2,3 121:6
153:14
**outline** 189:1,1
**outpatient**
139:13
**outreach** 29:10
**outs** 116:23
**outside** 116:14
187:2
**overdose** 81:25
**overdosed**
81:23
**overgeneralize**
120:10,12
**overlapping**
84:3
**overloaded**
82:18
**overly** 148:14
**oversee** 30:9
**overseeing** 67:2
**oversees** 132:5
**oversight**
120:25 179:17
**overtime**
135:10
**own** 71:11
89:24 133:17
142:20,20,24

153:25 154:7
154:13 183:7,7
**owned** 151:6
**owner** 31:15,21
**owners** 184:24
**oxford** 175:19

**p**

**p.m.** 189:12
**packaged**
139:7
**page** 24:15,16
26:4 38:20
42:9 44:3 48:5
48:6,13,15,18
58:12 65:1
67:9,23 70:12
71:16 74:12,13
74:14 80:13,15
91:16 95:21,22
95:23 101:9
103:3 125:22
138:1,2 139:4
140:5 149:20
152:16 158:13
158:14,17,17
158:21 159:8,8
159:16,16,17
160:9,17,20,21
166:23 168:8
193:13,15
195:7 196:3
**pages** 25:5
160:12
**paid** 11:3 40:16
134:3

**pain** 37:1
**pamela** 14:14
**pandemic**
118:14 119:21
**paper** 27:1 46:4
59:3,13,14,18
**papers** 20:17
22:18 26:5,12
26:15,25 27:24
61:20
**paragraph**
38:22 41:15,21
42:10 44:6
48:6,21 58:12
62:25 63:1
69:2 80:15
81:21 82:6
83:6 85:17
103:4 126:9
128:16 143:4
160:9,18
**paralegal** 9:8
**paralegals** 9:8
11:19
**parametrically**
61:2
**parcel** 77:17
**part** 14:11
18:16 22:6
24:2 25:17
31:15 35:8
47:6 71:14
73:2 76:14,24
77:16 86:9,14
102:2 103:24

117:6 121:9
122:21 124:21
137:7,12
159:25 175:9
176:7 195:9
**participants**
8:11 121:23
**participated**
151:8
**participating**
64:12
**particular**
40:23,25 41:15
42:21 49:20
50:8 59:3,13
59:24 60:1
85:14 89:22
90:13 91:14
108:9,20
110:18 111:2
111:11 115:9
122:18 126:22
139:17 157:22
160:8,9 166:19
168:19 174:19
179:4
**party** 192:3
**passed** 34:24
**past** 13:18
16:11 87:7
114:24
**patient** 18:14
20:6,9,11
21:20,21 35:11
36:1 43:25

51:1 65:5,11
66:12 77:7
81:4 86:2
88:10,25 92:9
92:12 96:1,8
99:19 107:17
111:5,24
119:14 120:8
124:12 128:7,8
129:11 134:18
139:8,8 144:23
145:7,16,19,20
146:11 147:19
147:20 157:15
185:10 186:16
**patients** 19:11
19:14 23:7
35:25 64:6
96:3 98:17,20
99:16,17 113:2
129:23 131:20
132:18 134:3
135:2
**patrolmen**
14:21
**pay** 135:10
**paying** 86:12
**pdmp** 101:16
102:13
**pease** 2:13
**pediatric** 35:1
**peer** 173:20
174:7 175:1
**pellegrino** 1:24
191:6 192:14

pennsylvania
  127:2
people   62:21
  67:2 95:20
  107:5 116:7
  120:6 127:5
  131:16 132:10
  133:19 134:14
  135:7,15 136:3
  136:25 137:17
  157:1 174:17
  181:14,20,23
  182:2,6 183:1
perceived
  51:11 52:8
  60:21 151:23
percent   46:11
  58:2,8,19,22
  61:6,8,14 66:9
  68:23 69:3,4,6
  69:10,10 70:3
  81:22,25 110:3
  110:3 145:22
percentage
  45:17 46:13
  52:23 59:8
  68:16 141:12
percentages
  116:7 180:11
percentile
  48:11
perception
  53:11 60:15
  72:23 74:2
  75:16 82:13

112:7 120:20
  163:17
perceptions
  52:13
perfectly
  141:10 181:15
perform   33:24
period   18:25
  32:10 88:5
  113:22 123:11
  124:20 126:22
  127:6 128:7
  129:21 131:6
  134:6 136:20
  152:7 169:11
  184:11 185:24
  186:25 188:2
permission
  100:20
person   27:9,18
  67:16 69:17,22
  80:11 87:11
  92:6,11 129:10
  168:15
personally
  22:25 194:11
  195:15
personnel
  186:11
persons   67:17
perspective
  74:8 125:6
persuasive
  161:1,19

pertain   18:9
pertaining
  15:12 16:15,23
  17:5 21:22
  41:6 85:14
  91:1
pertains   17:20
  17:22
pertinent   41:14
  56:16 95:9
pet   15:1 16:7
ph.d.   1:14 3:7
  4:6 9:14,18
  24:11 106:6
  173:8 191:10
  193:8 194:4,9
  195:4,13
  196:20
pharmaceutical
  57:10,16 125:6
  147:23 167:21
  188:9
pharmacies
  18:13 32:22
  33:9 39:1,17
  40:3 41:22
  45:20 51:2
  54:6 55:15
  80:20 87:10
  106:15,23
  108:5,25 109:5
  109:5 110:4
  111:22 119:4
  120:14 122:8
  134:15 138:6

139:21 141:5,6
  142:12,25
  143:18 150:7
  151:16 152:3
  169:25 184:25
  185:1
pharmacist
  17:25 18:3,22
  28:2 30:25
  31:3,16,19
  33:12,15,24
  63:10,25 64:18
  64:20 76:15,18
  76:25 77:4,9
  83:11 85:1,12
  87:4,6,15,18
  88:7,19 89:7
  92:3,4 93:8,11
  95:5 96:20
  100:1 103:16
  111:1 112:6,21
  113:7,7,11
  120:20,25
  122:5,13
  127:16,18
  128:25 131:1
  133:15 135:1
  143:11 144:18
  145:9 147:3,4
  150:10 151:8
  180:9 183:8
  186:14
pharmacist's
  75:22 149:16

| | | | |
|---|---|---|---|
| **pharmacists** | 121:3 122:17 | 34:3,7 35:10 | 122:5,11,13,21 |
| 12:14 18:13 | 124:11,17 | 35:14,16,20,24 | 126:1,12 |
| 20:5 23:1,9 | 126:2 127:7,10 | 37:5,6,13,23 | 129:14 133:20 |
| 29:7 33:1 | 128:25 129:1,2 | 38:1,1,3,4,16 | 138:4,13,15,23 |
| 38:24 42:17 | 130:18 131:25 | 38:24 39:6 | 139:4,11,12,16 |
| 43:9,20,23 | 133:10 134:25 | 41:10,11 42:13 | 140:1,9 141:9 |
| 44:7,18 45:1 | 135:12,21 | 43:10 44:1 | 142:19 146:22 |
| 48:23 49:10,17 | 140:10,12 | 45:10,24 47:2 | 148:2,7,15,18 |
| 49:25 51:6,11 | 141:8 142:15 | 47:10,18,23 | 150:19 151:4,5 |
| 51:15,19,24 | 142:21,25 | 48:5,9 49:8,16 | 151:13,20,22 |
| 52:1,8,13 | 143:3,8,18 | 51:5,16 52:11 | 151:23,25 |
| 53:11 54:10,25 | 144:4 145:6,18 | 54:20 58:8,18 | 152:1,7,10 |
| 58:18 60:14,22 | 146:8 147:9,9 | 58:24 59:6 | 153:3 154:6 |
| 62:8,13 63:4,8 | 149:4,9,12 | 60:18,18 62:3 | 155:8,10 157:2 |
| 63:12,19 64:11 | 150:21 151:1,9 | 64:10 70:6 | 157:11 159:21 |
| 65:2,4,14,15,20 | 151:11,16,19 | 72:4 74:5,15 | 160:25 161:6 |
| 65:25 66:2,9 | 152:3,7,9,14 | 74:25 77:7 | 161:11 164:1 |
| 68:16 69:4 | 153:12 162:6 | 78:21,23 79:7 | 165:3 166:25 |
| 70:8 72:8 | 162:20 163:1,6 | 81:8 82:25 | 168:2,9 178:8 |
| 75:16 76:17 | 163:10,18,22 | 83:2,25 84:4 | 178:18 179:10 |
| 77:18,24 78:21 | 179:18,18 | 86:5,17 89:8 | 179:17,25 |
| 81:1 82:13 | 181:3,9 182:18 | 89:11 90:5,8,9 | 180:21 182:5 |
| 83:17 84:6,8 | 182:22 184:15 | 90:19,24 91:2 | 182:15 183:14 |
| 88:14,17,23 | 184:23 185:14 | 93:1,22 96:22 | 183:23 184:5 |
| 89:4 94:3,15 | 188:3 | 97:5,5 101:4,8 | 184:24 186:11 |
| 95:24 96:3,21 | **pharmacy**  12:1 | 101:20 104:8 | 187:3,25 188:8 |
| 97:16,24 98:11 | 12:13 18:17,20 | 110:13,19 | 188:17 |
| 98:15,25 99:8 | 18:24 20:3 | 111:4,23 112:1 | **pharmacy's** |
| 100:7 103:7 | 23:2 24:17 | 112:12,20,24 | 71:11 74:19 |
| 104:4 107:6,23 | 28:12,18,23 | 113:20 114:11 | **phone**  193:3 |
| 107:23 108:1,6 | 29:11 31:6,12 | 114:15,21 | **phrase**  139:2 |
| 108:12,14,25 | 31:16,17,21,21 | 115:9 116:15 | **physician** |
| 109:16 110:21 | 31:24,24 32:10 | 116:19 117:17 | 23:10 29:8 |
| 118:14,22,25 | 32:15,24 33:3 | 118:23 120:23 | 35:9 92:7 |
| 119:23 120:3 | 33:12,22 34:3 | 120:24 121:1 | 115:25 |

**physician's** 116:4

**physicians** 29:7 129:19

**pick** 134:12

**piece** 185:18

**pinpoint** 111:17

**pinpointing** 73:20

**place** 67:13 94:5 111:12 114:17 123:16 130:18,24 134:17 161:9 185:13 191:20

**placed** 107:8 160:23

**placing** 161:3

**plaintiff** 9:4,6

**plaintiff's** 10:23

**plaintiffs** 12:10

**plan** 12:6 172:16,24

**plant** 187:9

**play** 75:25 80:20,21 81:2 84:2 92:10 94:21 115:1 116:3 119:8 131:6 188:14 188:14

**pleasant** 2:5 8:5

**please** 8:7,14 21:10 27:5 29:17 38:9 53:4,16 60:10 71:15 74:13 76:22 141:18 149:22 156:8 170:23 193:11 193:11

**plus** 67:10 78:7 78:8 95:2 106:20 137:25

**point** 13:8,13 13:16 18:19 19:16 23:19 37:22 50:14 55:7 57:12 73:8 78:15 92:1 103:15 108:20 111:11 117:3 127:9 133:16 142:14 149:16 151:3 172:19 173:21 176:21 182:25 185:21 186:10

**pointing** 49:21

**points** 54:15 181:11

**policies** 126:1 126:12,16 129:12,15 130:1,22 131:9 132:1,14,16,21 133:22 134:22

134:24 135:19 136:12,15

**policy** 130:12 130:17,24 131:4 134:4,10 134:17 135:1,5 135:15,15 136:2,5,24,25 158:18 159:18 180:21

**political** 125:14

**poll** 115:21,22 116:5,11

**polling** 125:14 148:17

**pollster** 78:19 97:3 125:11 159:11

**polster** 1:9

**pool** 68:15,22 162:25

**poorly** 25:11

**population** 79:24 156:25 157:4

**populations** 35:1

**position** 67:7 133:6 174:23 184:9

**positive** 120:21 152:6,15,15 158:1

**positively** 17:17 120:3

136:6

**possible** 53:15 65:13,24 66:8 118:20 119:11 149:21

**post** 106:11

**potential** 118:6 150:22 173:23 180:22

**potentially** 99:21

**practice** 18:6,6 28:4,12 29:11 30:15 32:12 33:15 37:13 43:10,13 44:1 51:16 54:17 60:17 63:14 64:3,16,23 66:24 75:17,18 76:6 77:19,25 78:21 79:13 85:12 86:19 87:7 88:19 89:6 90:8,23 91:2,21,22,25 92:24 93:8,23 93:24 97:25 104:8,11 107:9 108:1,10,15,19 108:22 110:25 112:3,4,16,18 112:20 121:6 122:21 123:8,8 127:25 131:17

132:6,25 138:5
138:12,12,16
144:5,12 145:5
145:9 146:17
147:13 148:1,7
152:11,12
155:10 157:11
161:7 163:19
166:17,22
174:17 181:22
181:24 182:15
182:16 184:3,6
188:8
**practiced** 18:22
30:18 31:18
32:4,15 63:15
93:10 108:12
115:2 120:9
139:17 142:1
147:15 148:15
152:1 179:23
184:23,24
**practices** 35:20
140:11 160:25
**practicing** 18:1
28:1,16 30:10
31:3,4 33:11
33:12,23 87:10
90:10 95:5
112:12
**practitioner**
31:22
**practitioners**
19:15 29:8
37:13

**preceded** 188:7
**precisely** 47:16
**predict** 43:5,11
44:14 51:12
55:2 60:19
70:25
**predicted**
22:13 59:8
**predicting**
21:12 59:18,23
**prediction**
50:13 72:25
**predictions**
21:14 22:18
**predictive** 22:5
50:23
**pregnant** 67:10
79:13 106:20
**premise** 50:2
149:14 157:9
**preparation**
11:21 29:24
30:7
**prepared** 30:4
46:5
**preparing**
11:11,16 99:17
**prescribed**
85:18
**prescriber** 86:4
**prescribing**
18:11 34:25
37:1
**prescription**
1:6 8:4 14:23

15:5,24 16:3
17:5 75:23
81:23 82:2
83:21 84:14,15
84:16 85:5
86:4,5 87:4,13
87:16,19 88:11
88:12,21 97:21
126:19 128:11
139:6 146:12
193:6 194:3
195:3
**prescriptions**
75:20 83:18
86:9 87:9 95:8
96:2,9 97:17
98:9,12,20,23
99:1,9,15
126:21 134:6
136:15,20,21
146:10 185:17
185:22 186:2
186:13,23
**presence**
191:15
**present** 2:17
36:15 37:4
67:13 87:14
146:11
**presented** 46:4
52:21 55:25
97:22 100:5
108:17
**presenting** 25:8

**pressure** 77:17
103:24 118:14
119:7 127:13
127:16 131:1
131:18 133:9,9
183:5 185:9
**pressures**
103:8,20 104:4
104:7,17
118:21 119:7
**previously**
16:13 27:1
179:3 188:21
**prior** 21:3
82:24 115:10
150:7 167:24
188:2,10
**priority** 176:25
**probably** 11:15
20:21 36:16
115:17 173:22
**problem**
134:13
**problems** 35:11
36:3 38:18
40:2 99:22
120:5
**procedure**
190:7 194:5
195:5
**proceeding**
9:25
**process** 29:19
30:3,9 36:4
43:1 60:3

82:22 86:10
92:6 155:9,24
160:16
**processed**
139:7 157:23
184:10 185:23
186:20
**processes** 15:4
16:16 20:22
175:9
**produce** 39:7
**produced**
164:14 170:12
187:11
**product** 84:15
84:17 85:15
103:25
**production**
193:15,17,22
**products** 83:16
84:20 86:20
**profession** 18:2
64:2 79:19,19
121:7 128:1
132:6 168:9
179:23
**professional**
13:23 17:24
81:5 175:22,25
175:25 178:11
188:18
**professionals**
118:18 174:8
**professor** 14:9
32:21 118:1

**proffered**
36:19
**program** 33:19
**projects** 21:1
**prominence**
88:3
**promote**
172:16
**proper** 64:11
81:2,5,20
97:22 104:12
177:18
**proportion**
67:24 68:1,6
68:14,21 69:23
**protect** 96:3
**proud** 64:19
**prove** 58:23
**provide** 29:9,25
30:7 33:16
36:2 92:4
107:13 119:3,4
122:7 147:19
**provided** 30:10
62:18 84:23
102:24 108:6
118:4 120:11
165:13 168:21
170:13,14
181:19
**providing**
92:13
**provision** 83:9
**psychotropic**
15:25

**public** 24:17
39:7 41:12
79:12 80:11
117:3,4,6
191:7 192:14
194:10,18
195:15,23
196:23
**publication**
14:11 173:23
173:24
**publications**
27:8,16
**published** 20:9
20:17 22:21
26:5,11 27:1
57:11 59:3,22
61:19 122:1
178:4,4,5
**publishing** 59:7
**pull** 48:3
164:16
**purely** 125:7
**purport** 162:7
162:21
**purpose** 27:17
43:19 44:13
49:19,22 50:21
51:20,22 52:5
52:6 53:10
54:4 70:17
71:6,12,20
72:4,14 73:11
73:22,23 74:16
74:18,19,23

75:7,8,11,14
90:19 92:3,4
99:5,10 100:14
101:4,7 106:12
114:16 120:16
128:18 149:6
157:9 163:8
178:22
**purposes** 24:12
57:5 59:1
**pursuant** 190:3
190:6
**pursue** 30:19
56:9
**put** 63:13 65:19
67:6 75:25
81:16,19 94:17
104:25 107:14
118:14 126:25
127:15 133:5
161:23
**puts** 82:3

**q**

**qualification**
112:11
**qualifications**
110:15 111:19
112:15 114:1,3
133:3,5,7
**qualified** 36:9
36:20 113:5
191:8
**qualitative**
66:22 80:3
102:3,9,20

110:2 168:6
**quality** 8:9,9
49:3 63:9 80:9
**quantify**
128:23
**quantitative**
102:2 109:25
168:11
**quantities**
83:19
**quarrier** 2:10
**question** 10:9
10:12 19:3
38:14 49:13
53:5,7,9 62:7
76:10,21 80:20
81:8 92:20
94:12 102:25
109:3 110:14
111:17 126:9
137:7 141:18
142:4,8 149:2
155:20 156:5
156:22 159:3,6
160:3,4,6
161:23 162:12
162:17 171:6
181:16
**questioning**
181:4
**questionnaire**
13:7,11 14:4,8
19:5,18 24:21
25:1,16,25
26:7,12 27:11

27:19 59:19
74:10 115:6,16
178:6 179:15
**questionnaire's**
178:13
**questionnaires**
25:11 26:16
**questions** 54:1
70:13,22 71:4
76:1,16 78:13
81:15 97:13
100:9,10,12,17
100:18,21
103:1 111:9,10
111:14 119:14
119:19 121:16
123:7,19
125:24 126:10
143:7,13,25
145:20 153:14
156:16 169:9
170:17 171:1
171:14 173:3
173:11 177:13
178:7,25 179:3
182:1 189:4,7
**quick** 73:18
137:1
**quickly** 126:19
**quite** 137:6
162:13 173:6
182:14
**quota** 127:21
**quotation**
169:11

**quote** 39:25
134:20 143:4
**quoted** 169:13

**r**

**r** 33:18
**r.ph.** 4:6 24:11
**raise** 62:7
159:2
**raised** 141:12
**ran** 101:11
102:12
**range** 48:10
108:11 120:11
181:14,17,25
**rare** 62:21
**rate** 44:5,21
45:4,13,16
46:11,15 47:10
47:18 48:7
49:7 58:8,19
58:23 60:6,24
60:25 61:6,8
62:6 72:18,20
**rated** 129:17,18
**rates** 4:7 44:7
44:22 49:2
57:2,21,23
58:2 61:14,22
73:4
**rather** 59:19
69:23 140:18
170:4
**rationale**
117:21

**reach** 10:24
**reached** 55:17
**reaction** 15:20
**reactions** 15:16
16:3 17:16
21:22
**read** 53:7 63:23
79:20 80:11
81:20 96:6
124:15 137:20
141:18,19
171:6,7 194:5
194:6,12 195:5
195:6,17
**reading** 150:8
154:2 193:19
**real** 21:8,11
22:2,11 107:3
108:17 120:21
137:1 169:7
**realize** 54:14
152:9
**really** 62:20
105:4 141:24
148:6 155:21
158:6 166:10
168:11 171:21
**reason** 10:8
132:4 193:14
195:8 196:3
**reasonable**
145:17
**rebut** 12:16
**rebuttal** 12:20
12:22

**rebutting**
  158:10,24
  159:5 160:1
**recall** 26:23
  27:21 35:14
  39:12,20 42:7
  45:11,12 47:1
  47:9,17,25
  48:4,7 68:2
  71:10 101:24
**receipt** 87:12
  193:18
**received** 15:18
  150:20
**receiving** 97:16
**recently** 11:1
  34:10 46:20
**recess** 53:8,21
  105:13 150:2
  164:24 172:12
**recognize**
  104:6,16
**recognized**
  97:3 103:7
  104:4 179:3
**recognizing**
  105:2
**recommendat...**
  155:10 157:21
  158:19 159:19
  180:22
**record** 8:2,15
  53:20,22 105:9
  105:10 106:3
  141:19 149:24

  149:25 150:3
  164:15,22,25
  171:7 172:10
  172:13 189:10
  195:9
**recorded** 8:13
**recording** 8:9
  84:24
**red** 85:8,11,19
  85:20 86:1,9
  86:15,16,17,18
  86:21,22,23
  87:2,14,20
  88:3,13,16
**reduce** 80:23
**reduced** 191:14
**referee** 173:19
  174:3,7,16
**refereed** 57:13
  174:25
**reference** 25:6
  37:22 101:10
  103:18 176:21
  193:7 194:2
  195:2
**referenced** 45:5
  45:7 57:12
  59:17 91:10
  176:19 184:4
  191:13,18
  194:11 195:15
**references** 12:5
  117:22 178:3
**referencing**
  48:19 59:4,14

  71:15 72:17
  188:21
**referring** 39:5
  39:11 41:7
  42:1 48:13,25
  83:23 128:4
  131:11 139:25
  140:6
**refilled** 84:14
**refilling** 86:8
**reflect** 143:7
  146:3,5 162:25
  188:2
**reflected** 49:9
**reflective**
  178:23
**refuse** 87:6,15
  88:20
**refused** 87:8
**refute** 160:14
**regarding**
  86:19 138:17
  190:2,11
**regardless**
  22:20 49:22
  69:14 93:23
  131:6 139:14
  141:25 147:4
  185:11
**regards** 71:20
**region** 157:12
**regulations**
  16:17 79:8
  80:22 81:3
  89:9 91:1,4

  138:4 139:13
  139:16,20
**regulatory** 84:3
  121:20 138:18
  160:24 161:5
**reimbursed**
  150:23
**reiterate** 64:1
**reiterating**
  93:18
**relate** 158:23
  159:4
**related** 16:3,23
  17:15 33:16
  38:25 39:14
  89:13 101:14
  102:12 114:20
**relates** 1:9 18:8
  19:4 82:11
**relating** 160:1
**relationship**
  150:14
**relationships**
  152:4
**relative** 87:25
  192:2
**relatively**
  101:13
**released** 145:11
**relevance**
  56:10
**relevant** 94:19
  149:4,8
**reliability**
  58:14 121:17

141:15 153:10
179:5,9 180:17
183:13
**reliable**  137:23
152:20 153:9
153:23 154:7,9
154:11,16,24
155:12,18
175:22 178:18
180:19
**reliance**  90:18
**relied**  15:11
174:18 178:24
**relief**  18:22
**relies**  176:9
**religiously**
32:13
**rely**  16:21
170:19 176:8
177:4
**relying**  114:21
121:19 171:24
**remain**  165:23
**remains**  152:15
**remember**
24:24 181:3
**remote**  1:14 2:1
**remotely**  1:25
9:25
**renee**  1:24
191:6 192:14
**renowned**
169:15
**repeat**  10:10
53:4 76:21

**repeated**  51:3
**repeatedly**  38:4
**repeating**
167:16,23
**rephrase**  43:16
**report**  4:6
10:24 11:24
12:2,4,11,18,19
23:20,21 24:3
24:10,16 26:4
38:2,21 42:9
44:3 45:22
46:4,19 55:21
55:24,24 56:4
56:7,11 65:1
65:19 70:7
71:2,10,15,17
72:16 73:9,12
73:14 74:13
77:22 78:12
80:14 89:10
91:10,14 92:8
96:7,8 101:11
101:23 118:3
122:19,25
125:22 130:16
138:2 140:15
152:16 158:9
160:11,17
162:5 165:22
165:24 166:1
167:5,10 168:1
168:21 170:25
171:6,18,18
172:4,18,25

176:19
**reported**  41:13
184:14
**reporter**  3:15
9:10 53:7
171:5 194:7
**reporter's**  3:13
191:1
**reporting**
15:20,20
123:15 132:5
**reports**  70:14
70:21 71:3
**represent**  8:16
49:16,23 51:6
51:18 58:7
**representative**
79:24 80:2,7
157:4
**represented**
121:1
**representing**
8:19 50:19
**represents**
149:10
**request**  94:6
158:12 172:2
195:9,11
**requested**  65:9
190:1,6,10
**require**  28:5,18
**required**  16:19
42:15 92:19
93:5 114:2
193:25

**requirement**
95:3
**requirements**
75:24 127:1
129:17
**requisite**  114:9
**research**  13:18
13:24 19:5,9
19:10,11,21,24
20:7,12,18,19
20:24 21:1,3,6
22:6 24:18,19
24:20,21 25:1
25:16,24 26:7
26:12 28:10
43:2,7 58:3,6
61:21 74:10
89:24 111:6
115:1,7,17
116:25 117:9
117:10 125:12
175:6 176:15
176:23 178:5
**researchers**
16:12 58:4
59:5 61:17
100:19 116:9
**reserve**  29:5
34:8,10
**resonated**
76:12
**resonates**  79:20
**respect**  76:18
131:9,25
135:18 185:16

**respectfully**
38:8 94:6
157:8 158:12
159:7 161:13
171:3 172:2
**respond**  22:17
55:1,3 59:24
59:25 62:8,10
62:21 63:5,8
63:19 65:14
66:3,10,17,21
121:4 163:6,10
163:22 180:10
**responded**
51:11 52:1,9
52:13 53:13
54:11 94:4
99:1 118:22
120:3 125:17
130:18 140:8
149:10 163:1
183:16
**respondent**
68:15,22
**respondents**
45:17 64:2
67:25 68:6,24
69:3,17 92:18
104:16 108:11
119:12 123:20
140:7 141:4,13
147:22 149:1
181:2,8 183:16
183:22

**responding**
44:7 62:2 65:2
69:4 123:20
179:14,19
181:24
**response**  4:7
44:5,7,20,22
45:4,12,15
46:10,15 47:9
47:17 48:7
49:2,7 57:2,21
57:23 58:2,8
58:13,19,23
60:6,24,25
61:5,7,13,22
62:24 72:18,20
73:4 75:2
79:24 102:4
154:19 155:17
158:20 159:21
181:18,19
**responses**
53:14 54:24
55:6,6 62:14
62:18,19 63:16
63:23 72:22
76:16 77:6
79:11 82:16,16
92:21 93:4,17
93:18,19 98:15
100:4,5,22
102:21,24
103:10,16
120:11,13
121:22 123:2

123:21,24
124:15 127:10
132:24 135:21
137:18 140:24
141:14 142:2
157:20 163:7
163:12,14,15
168:7 169:6,18
169:19,20
179:21 180:6
180:13,15
181:14,17,25
182:13,25
183:18
**responsibilities**
83:17,24
112:18 126:3
127:1 145:12
147:5 148:10
185:15
**responsibility**
83:10,11 84:10
113:2 133:13
133:17
**responsible**
98:18
**responsive**  62:6
**responsiveness**
4:8 57:3
**resubmission**
175:9
**result**  12:18
15:21 26:6
157:6 168:11

**results**  22:12
22:21 26:16
27:15 43:1
46:3 49:4,9
52:20 59:11
64:7,9 69:19
71:8 78:13
79:3,5 89:18
90:17 91:3
92:15 93:13
94:1,2,13,14
96:13 97:13
98:24 101:12
101:20 109:2
110:17 111:15
111:21 116:13
121:17 137:5
137:10,11,14
142:21 143:17
144:14 146:3
146:19 148:24
149:3 150:8
153:4,19 154:4
154:20,24
155:5,8,18
156:24 157:1,3
157:16,17,18
157:18 158:21
159:22 166:13
167:2,25 168:7
169:2 174:9
177:9 179:6
182:21 183:11
183:15 187:25

**retail** 39:1
138:15 150:21
**retained** 3:15
16:4,14 17:9
**retirement**
32:20
**returned**
193:18
**reuse** 100:20
**review** 11:20
11:23 12:11,15
12:17,18 93:25
102:10 129:13
132:20 158:18
159:18 165:10
171:21 173:23
174:19 175:1
183:8 184:13
190:2,6 193:12
194:1 195:1
**reviewed** 11:24
11:25 12:2
13:17 16:25
39:16 63:17
130:13 131:10
165:18 166:16
170:14 173:20
174:7
**reviewer** 13:22
13:23 16:10
89:20 175:3
**reviewing** 14:9
15:3 70:14
177:14 184:19

**rewarded**
126:23,23
**rhetorical**
156:5
**rice** 2:2,8,19,20
8:19,21 9:2,4,6
9:9
**rid** 128:6
**right** 15:8 20:4
22:19 23:22
28:17 33:13
38:6 46:8,20
51:4 57:8,17
58:15,20,25
59:4 62:4 65:5
65:11,22 69:25
74:24 77:10
81:17 82:2,25
93:7 97:13
101:5 102:16
106:16 114:13
119:21,25
120:14 122:8
126:4 131:12
132:1 139:22
141:6 143:13
143:25 144:15
146:23 161:12
162:2 174:15
183:23
**risk** 80:24
**risks** 177:22
**rite** 18:20 31:5
129:5 134:12

**robert** 18:20
**rock** 34:19,23
35:17
**role** 14:16 15:2
80:20,22 81:2
89:7 174:6,10
**room** 10:1,2
116:4
**roughly** 25:13
174:1
**rows** 95:9
**rpr** 1:24
**rule** 118:16
185:7
**rules** 10:8
190:3,7 194:5
195:5
**ruling** 40:11
**rulings** 39:25
40:4 41:5
**run** 101:15,19

**s**

**s** 33:18 193:15
195:8,8 196:3
**safe** 75:19 80:5
82:21 91:25
92:4,13 93:10
98:7 107:9
112:4 113:3
131:17 133:14
135:7 138:19
147:20 182:7
185:6 186:15
186:16 187:6
187:17,18

**safely** 76:8
103:10 104:1
104:18 163:19
**safety** 18:14
44:1 51:2 65:5
65:11 66:12
75:15 76:5,12
77:7,17 81:4
81:11,13 96:1
96:8 103:19
110:21 111:5
111:24 119:14
120:8 124:12
134:18 145:16
145:19,20
149:15 157:15
163:17 185:10
**salaried** 79:16
**salary** 133:25
135:9
**saltzburg** 2:4
9:5,6
**sam** 9:12 11:19
**samantha** 2:19
**sample** 60:2
121:2
**sampling** 60:3
**sater** 2:13
**satisfaction**
23:8 62:15
107:4 127:23
**satisfied** 120:6
141:10 181:15
181:20,21

saw 45:23
55:16 56:7
64:14 165:11
182:15
saying 54:2,22
68:14 76:14
77:12,13,16
78:16 81:7,14
92:15 94:16
96:12 98:14
104:3 109:11
113:10,11
114:8 133:5
137:17 140:20
141:22 142:6
143:22 145:15
145:25 146:2
154:18 159:17
162:11 163:23
says 44:6 70:7
78:12 103:7
162:6,19
scale 52:21
53:13 55:5
62:14 92:22
93:20 94:2,14
102:22 137:17
140:8,25
141:13 157:19
168:13,16,16
168:23 169:10
169:18 177:21
180:11 181:10
183:17

schedule 17:3
84:15
school 19:7
31:13 150:19
152:10
schools 38:1
58:7 59:5
64:10
science 19:10
scientific 121:9
121:11
scope 89:3
scotland
175:16,18
screen 8:12
se 12:22 116:19
116:20
seal 192:6
194:15 195:21
search 73:20
101:11,15,19
second 14:25
16:6 26:3 31:9
42:12 71:16
86:2 95:9
103:6 126:7,20
160:18 170:13
secondly 18:8
145:8
section 137:4
sections 49:17
49:24
see 12:24 21:13
32:24 37:10
39:2 40:15

41:24 44:21,23
56:13,21 57:24
60:4,20 64:1
67:18 70:9
73:10,19 78:5
78:23 79:11,12
80:6,17 90:9
96:4,22 99:13
102:5,9 112:21
113:12,20
126:14 130:2,3
130:6,7 138:7
138:25 140:3
140:19,21
152:22 155:7
seek 22:22
seeking 125:21
seem 154:18
seemed 180:25
seems 70:3
selzer 12:12
69:24 70:12,25
71:3 72:14
78:11 90:4
110:12 114:6
122:4 146:18
148:14 156:14
158:10,15
159:10 160:15
162:5,9,19
178:13
selzer's 12:2,2
12:20 67:24
71:17 78:17
96:6 101:11

143:5,16
send 179:25
senior 33:17
sense 43:12,24
54:4,10 74:23
107:14 134:17
sent 11:1 23:15
164:1 165:7
sentence 24:16
41:3 42:12,18
44:5 48:13,20
57:21 71:1
74:14,21 80:14
81:16,19 82:4
95:22 103:6,11
104:15,16
129:14 138:3
139:1 140:4
152:18 160:8
160:19
separate 78:2
144:18 145:2
146:7,15
separation
141:25
series 95:9
117:23 122:18
154:16 156:15
177:20
serve 15:22,23
173:19
served 13:1
34:14 174:2
service 16:12
115:19

services   29:9
  151:5
serving   174:16
session   3:11
  106:2,11
set   29:21 192:6
setting   18:4,5
  19:12 29:10
  32:11 34:4,7
  37:14 54:18,19
  54:19 69:3
  77:8,19 79:13
  108:13,15
  112:23 138:13
  138:14,15
  139:11,13
  182:8 184:15
  186:3 187:3
settings   41:19
  44:2 186:1,3
  187:4
settled   40:8
settlement
  40:15,17,19,19
  40:20 55:9,12
  55:16,19
seven   1:11
  69:17,22 70:1
  70:3 177:25
several   17:22
  20:2 35:23
  37:5 85:13
  99:21 117:1
  167:20 175:4

severity   67:15
seymour   2:13
shadow   112:21
  113:7,11
shape   50:21
  72:24 167:9
sheet   193:13
  195:7,10,18
  196:1
shift   185:17
  186:14
shifts   95:2,15
shock   184:21
short   123:11
shortages   94:5
show   39:8
  111:8 168:12
showed   92:22
shown   112:8
  169:12 193:16
siebert   151:4,7
  151:21
sight   115:16
signature   190:5
  192:13 193:14
signed   194:13
  195:18
significance
  102:11,14
  146:25 147:10
  166:1,9
significant
  101:25 110:4
  118:19 142:23
  147:11 154:7

  166:11
signing   193:19
signs   179:8
similar   44:22
  45:6,14,16
  48:16,21 61:11
  61:24 138:22
  139:3 142:21
  153:13 158:3
  163:7,11,11,13
  166:13 169:20
  180:6,12,13
  182:13 183:16
  187:12
similarity
  180:14
simply   26:13
  43:6 51:13
  55:13 56:7
  66:7,10,16
  74:6 86:11
  87:1 98:20
  113:11 114:4
  134:11 157:13
  186:19
sincere   65:3
sincerely
  193:21
single   95:4
sir   193:10
sit   172:23
site   54:17 92:24
  108:1 145:5
  166:17,22
  181:22 184:4

  186:12,12
  187:17
sites   108:23
  166:19 181:25
  182:9 184:16
sitting   108:4
situation   41:1
  51:14 88:1,9
  107:21
situations
  108:16
six   30:3 173:22
smart   185:12
smoking   14:24
sociology   118:1
  118:5
solutions   193:1
  196:1
somebody
  54:17 55:2
  67:7 74:5,9
  79:6 87:25
  88:4 89:19
  95:16 110:15
  111:19 112:13
  123:10 127:20
  128:6,9 132:5
  133:4,6 134:5
  135:9 136:13
  136:14 147:13
  147:16 148:4,5
  176:21 177:14
  186:24
somebody's
  148:8 168:24

| | | | |
|---|---|---|---|
| **soon**  173:7 | 95:7 100:8,12 | **spending**  33:3 | **started**  23:14 |
| **sorry**  19:25 | 102:19 103:15 | 33:8 | 32:8 155:9 |
| 28:15 37:19 | 104:17 106:25 | **spent**  11:6,9 | **starting**  24:15 |
| 38:13 46:24 | 115:16 116:19 | **spoke**  93:13 | **starts**  42:10 |
| 47:20 68:25 | 128:19 130:14 | **spot**  47:12 | 80:16 103:4 |
| 70:2,19,24 | 143:8 144:14 | **spreadsheet** | 126:9 138:3 |
| 77:20 126:6 | 145:24,24 | 11:10 | **state**  8:14 |
| 137:6 138:25 | 146:1,4 156:8 | **ss**  191:3 | 24:17 28:4,6 |
| 160:3 162:13 | 157:12 158:14 | **staff**  23:2 | 28:23,24,24 |
| 170:22 172:15 | 161:3 169:22 | 103:23 133:1,1 | 29:1,1 30:16 |
| **sort**  161:22 | 171:9,14,14 | 133:2 134:8 | 30:17,22 39:6 |
| **sought**  29:23 | 184:9 187:15 | 135:13 136:15 | 39:17 40:6 |
| 81:9 124:7 | **specifically** | **staffing**  103:21 | 43:3,10,13 |
| 185:19 | 25:15 39:20 | 135:11,12 | 44:17,23 49:10 |
| **sound**  153:23 | 40:6 41:6,17 | 136:23 137:19 | 51:2 55:17 |
| **sources**  25:10 | 48:18 51:8 | **stage**  188:23,23 | 59:16 60:8,14 |
| 25:10 | 76:2 99:12 | **standard** | 65:2 67:3 72:9 |
| **sourcing**  172:5 | 100:10 104:4 | 176:21 | 74:7,14 83:24 |
| **south**  2:5 8:5 | 105:2 114:11 | **standardization** | 85:2 86:18 |
| 14:19,20 15:13 | 119:20,24 | 140:1 | 88:18 93:23 |
| **southern**  28:10 | 134:16 143:19 | **standards**  4:8 | 95:25 98:5,25 |
| 29:6 34:8 | 147:24 161:5 | 35:20 57:4 | 99:12 114:3 |
| **speak**  34:25 | 168:22 169:17 | 138:5,12 178:9 | 118:3 125:23 |
| 63:22 92:16 | 171:2 175:19 | 188:18 | 127:3,3,3 |
| 128:7 151:10 | 187:20,22 | **standpoint** | 138:4 139:15 |
| 151:22 175:12 | **specificity** | 14:5,6 66:22 | 139:17 148:2 |
| **specific**  27:21 | 45:15 | 75:4 80:3,9 | 152:1 157:12 |
| 28:6 29:14 | **specifics** | 102:3,10 | 160:22 166:7 |
| 39:11 41:16 | 112:10 | 104:11 109:25 | 166:16 169:14 |
| 42:4 59:18 | **specified** | 110:2 140:8 | 169:25 176:11 |
| 61:3 73:14 | 191:21 | 155:7,13,14 | 179:18 191:2,7 |
| 75:12 76:10 | **spend**  11:11 | 161:19 | 192:15 194:10 |
| 77:14 78:14 | 32:21 78:23 | **start**  76:23 | 195:15 |
| 81:12,15 84:22 | 112:24 123:17 | 106:10 118:12 | **stated**  43:9 |
| 89:21 90:10 | | 157:23 | 49:6 55:4,5 |

**[stated - subsidized]**

56:13 67:4
72:1 74:19
90:18 104:9
112:11 160:15
**statement** 26:9
49:5 50:3 52:3
52:14,16 53:2
61:16 65:17
71:25 99:4
109:20 143:21
163:21 194:13
194:14 195:19
195:19
**states** 1:1 25:20
37:6,24 39:14
39:18 41:10
42:12 59:6
69:1 153:11,17
162:24 175:7
**stating** 104:15
**statistical**
50:14,24 61:3
68:19 69:7
**statistically**
61:1
**statistics** 61:3
**status** 48:22
**statute** 84:2
**stenotypy**
191:14
**steps** 158:20
159:20
**sterile** 30:10
**stipulated**
83:13 84:22

**stipulation**
83:25 84:1
**stomer** 61:18
**store** 39:1
109:4 110:3
182:8 184:5,15
186:3
**strain** 78:9
95:19
**strains** 64:4
82:14
**strathclyde**
175:17
**street** 2:10,14
**stress** 77:17
78:9,9 95:19
131:19
**stressed** 82:17
**stresses** 64:4
76:7 82:14
177:12
**stressful** 115:3
**stressors**
103:20
**strike** 142:7
**striking** 152:20
153:23
**strongly** 168:17
168:18 181:12
181:13
**structure**
169:20
**student** 176:22
**students** 33:21
37:5 59:24

**studied** 74:9
**studies** 22:5,6
30:20 45:1,4,5
51:9 59:12,17
59:22 60:7
61:5,7 73:5
111:7 112:8,9
115:12,15,18
115:19 116:6
117:4 118:7
121:25 142:18
153:11 154:17
157:22 166:20
169:5 175:1
176:7 178:23
180:3 182:5
183:19 187:12
187:14
**study** 27:1
42:15 43:2
44:18,21 46:2
46:7 49:20
50:9 51:21,23
52:6,6 53:10
58:14 59:2,16
60:9,11,23
61:2,13,18,23
67:9 68:24
70:18 72:19
73:1,4,11,19,22
73:23 74:1,4
74:23 100:15
100:16 101:2
108:23 111:11
117:13 118:4

121:1 142:18
142:20 148:12
148:12 149:7
149:14 150:25
151:8 155:11
155:12 157:10
158:3 160:15
160:15 163:8
163:16 166:12
166:14,20
167:18,19,19
168:19,20
175:21 176:2
177:7,8,9
179:2,4 180:1
183:7,20 188:6
**stuff** 145:1
**subject** 89:17
114:9,12,12,15
116:14
**submissions**
14:12
**submitted**
12:12,23 14:10
16:11 170:7
**subscribed**
194:10 195:14
196:21
**subsequent**
154:23 188:10
**subsidiary**
151:15
**subsidized**
151:2

| | | | |
|---|---|---|---|
| **substance** | **supervisor** 92:7 | 142:5 144:19 | 71:6,6,12,21 |
| 83:22 87:3 | 140:15,17 | 150:25 155:25 | 72:7,12,15,25 |
| 95:24 103:9 | **supplement** | 159:2 163:20 | 73:25 74:10 |
| 123:15 125:25 | 164:1 165:6 | 164:17 172:9 | 75:4 76:1 79:5 |
| **substances** | **supplemented** | 181:1 184:2 | 83:3 89:16,17 |
| 83:13 101:17 | 46:19 | **surprise** 184:20 | 89:18,20,22 |
| 104:2,5,13,18 | **supplements** | **surprising** 64:7 | 90:13,15 91:3 |
| 104:23 105:1 | 115:6 | 64:9,14,14 | 92:16 93:12,17 |
| 143:12 160:25 | **support** 55:19 | **survey** 12:13 | 94:1,13 96:13 |
| 161:6,20 | 56:15 134:9 | 13:7,11,18,24 | 97:10,16 98:11 |
| 171:16 | 136:23 167:5 | 13:24 14:4,7 | 98:25 99:8 |
| **substantial** | 167:12 171:24 | 19:4,18,21,24 | 100:6,21 |
| 152:21 153:1,6 | **supported** | 20:7,7,11,18,18 | 101:12 103:5,6 |
| 153:20 154:1 | 56:14 | 20:22,24 21:7 | 103:11 106:12 |
| **sufficient** 58:23 | **supports** 56:3 | 21:15 22:3,12 | 109:2 110:20 |
| 92:18 | **supposed** 42:22 | 23:1 24:20 | 111:2 114:7,12 |
| **suggest** 95:25 | 92:13 97:1,8 | 25:1,16,24 | 114:16,19 |
| 143:10 | 98:7 113:23 | 26:7,13,20 | 115:6,17 |
| **suggesting** 96:7 | 125:3 127:13 | 27:2,2,10,13,19 | 116:13,25 |
| **suggestion** | 128:11 130:8 | 42:21,23 43:22 | 117:16,19 |
| 180:25 | 130:10 134:19 | 44:8,13 45:10 | 118:6,23 |
| **suggests** 121:20 | 136:8 137:13 | 45:13,18,24 | 119:12,25 |
| **suite** 2:14 | 137:14 139:5 | 46:15,18 47:2 | 120:17,17,21 |
| 193:2 | 144:25 147:18 | 47:10,16,18,23 | 121:12,14,21 |
| **summary** 24:22 | 147:19 156:21 | 48:1,5,9 49:1 | 121:22 122:11 |
| **summer** 32:9 | **sure** 12:21 | 50:10,10,11,11 | 124:4,5,7,22 |
| 32:16 | 21:19 23:20 | 51:12 52:1,12 | 125:2,7,8,12,21 |
| **summers** 33:2 | 25:8 30:9 | 54:4,9 55:1 | 128:19 130:19 |
| **super** 23:25 | 39:23 42:3 | 57:21,23 58:6 | 135:17 137:5,9 |
| **superior** 193:1 | 45:23 46:7 | 58:14,18,25 | 137:10,11,12 |
| **supermarket** | 51:4 54:2 | 59:10,10,15 | 137:22 141:15 |
| 151:24 | 67:18 83:18 | 61:12 62:3 | 143:7,17 146:3 |
| **supervised** | 91:15 105:6 | 63:5,20 65:14 | 146:19 147:2,7 |
| 64:13 | 113:2 127:5 | 65:25 66:10 | 147:22 148:24 |
| | 133:14,24 | 69:19 70:17 | 149:3,10 |

152:19 153:1,3
153:8,12,22
154:1,4,11,14
154:20,20,24
155:8,17,18,23
156:10,24
157:1,3 158:21
159:13,21
160:22 161:3
162:7,21 164:1
164:3,6 165:3
165:22,25
166:5 167:3,24
168:2,15 169:1
169:16 171:9
174:8,9 175:12
176:1,15 178:5
178:25 179:11
180:15,17
181:2,8 182:21
183:7,11,23
185:19 187:25
**survey's** 49:4
**surveyed**
122:17
**surveying**
19:14,14
**surveyor**
154:24
**surveyor's**
152:25 154:13
**surveys** 4:8
12:1 13:17
19:13 20:13,25
22:10 23:5

25:12 26:17
38:3,5,12,16
42:11,13 43:16
43:19 44:23,24
45:8 48:12,16
48:21 49:8,16
49:23 50:5,22
51:5 52:9 57:3
60:8 62:20
65:3 72:5 74:9
74:15,19 75:2
81:9 82:11,12
89:11 90:19
93:17 99:6
101:5,8,20
103:13 108:12
110:14,16
111:20 113:6
114:20,23
115:10 121:10
122:18 137:4
150:8 153:16
153:24 154:6,8
155:2 156:17
159:12 166:15
167:4,25 169:2
173:14,15
174:20 175:8
175:13,22
177:3 178:9,18
179:10,11,16
179:24 183:9
187:4 188:1,9
188:11,16,19
188:22

**sworn** 9:16
191:10 194:10
194:13 195:14
195:18 196:21
**syllables**
177:16
**synergistic**
78:7 85:22
**system** 15:21
20:4 22:9
28:20 85:4,6
117:7 123:15
146:13

**t**

**tab** 23:24 24:3
56:19
**table** 78:1 91:9
91:14,16 92:17
93:5,14 94:17
144:2,9 166:22
186:21
**tables** 77:22
**tablets** 84:18
**tabs** 24:1
**tabulated**
93:20
**tackett** 14:14
14:18
**tackett's** 14:22
**take** 10:16 22:2
32:2 53:16,17
54:13 64:6
65:10,16,25
67:11 79:15
93:3 95:2,11

95:13 96:13
97:7 98:1,4,16
98:24 103:1
123:9 124:19
128:10 129:9
131:20,22
133:6 134:3
135:2,6 143:16
144:19 148:24
149:22,23
156:1 161:13
171:23 172:7
**taken** 85:24
105:13 123:11
124:5 129:24
155:16 191:20
**takes** 107:17
**talk** 20:10 44:4
73:21 95:23
100:10 131:16
139:19,25
141:1 151:12
151:19 155:21
161:14,18
166:17
**talked** 26:3
55:8 65:8
74:17 89:9
95:12 107:6
115:15 129:3
135:12 137:18
173:13
**talking** 23:23
40:5,24 43:3
60:7 62:22

**[talking - thousands]**

63:3 85:17
88:9 103:5,10
103:16 104:21
104:22 107:2
107:21 112:15
126:17,18
128:13,15
134:23 139:20
141:3 143:18
144:12 148:1,7
153:7,21,24
156:7 166:22
168:8 186:23
**talks** 146:18
148:23 177:20
**targeted** 161:5
**task** 146:2
**tasks** 92:19
93:13 144:13
**taught** 24:18
25:15,24 64:10
**teaching** 25:21
**technician**
133:13
**technicians**
133:11 186:11
**techniques**
118:5
**tell** 12:9 14:15
27:24 35:5
46:13 47:12,15
48:11 54:24
63:3,7 97:15
98:10 99:7
101:21 126:5

128:19,23
151:17 181:7
**telling** 79:13
127:21
**ten** 53:18 57:18
67:17 78:9
128:10 129:1
130:25 135:23
166:6 170:5
172:8 177:15
**tenths** 126:20
**term** 18:6
31:18 52:18
73:20 74:5
85:7 138:14
184:6 185:1
**termed** 19:9
**terms** 71:12
101:12,14,15
101:19 102:11
102:14 149:2
**testified** 12:24
**testify** 12:7
172:17 191:11
**testimony**
36:23 71:20
131:22 191:13
191:17 194:6,7
195:6,9,12
**textbook** 25:10
**texts** 177:5
**thank** 9:24
10:11,19 53:9
63:24 66:23
106:9 126:11

173:3,4 175:10
175:20 189:3,7
189:8
**thc** 14:24 16:4
17:2
**therapy** 107:12
107:16
**thesis** 14:12
**thing** 19:2
49:20 64:19
95:4 112:22
117:3 145:2
173:17
**things** 16:17
17:5,23 18:12
21:25 28:7
39:9 41:13
50:17 64:18
67:3,14 77:20
78:11 81:5
85:13 94:16
98:21 99:14,21
102:21 107:19
112:9 117:11
128:3 130:7
132:8,9 133:6
138:19 144:10
147:15 159:17
161:18 168:10
178:2
**think** 10:4 14:5
14:15 16:21
45:24 47:5
52:19 54:13
55:7 56:19

66:19 70:16
73:17 78:12
79:4 81:1,20
91:6 96:17,24
106:12 111:25
112:2 118:13
118:16,24
119:17 120:1
120:20 121:18
121:24 123:22
132:16 140:6
141:11 142:3
145:12 147:11
153:8 158:25
159:15 160:7
160:10 163:4
166:4 167:16
167:17 179:13
180:5 181:16
183:6 185:3,7
**thinking**
119:12,24
**thirty** 193:18
**thompson**
18:21
**thorough** 96:25
**thoroughly**
27:13 88:9
170:3
**thought** 123:3
123:25 132:13
**thoughts** 51:18
**thousand** 67:2
**thousands**
13:19 25:5

**three** 23:16
  30:6,7 31:19
  45:7 94:20
  166:19 168:13
  168:16,23
  169:9,18
  177:24
**time** 11:2,11
  13:8 18:19,25
  19:16 25:23
  30:24 32:2,21
  33:3,8 34:11
  36:1 49:18,25
  57:12,17 73:16
  78:23 84:16
  89:6 92:18
  94:22 95:8
  97:8 98:3,16
  98:21 107:14
  109:17 112:24
  113:22 123:11
  126:22 127:6
  128:8 129:21
  130:18 131:6
  133:16 134:6
  136:21 145:4
  151:4,21
  165:17 170:24
  173:21 184:8
  184:11 185:24
  186:25 189:5,7
  191:20
**times** 13:19
  21:17 23:3
  51:3 54:3

57:14 79:22
  84:13 102:7
  106:13,19
  115:22 173:22
  174:13,14
**tip** 27:25 36:14
**tobacco** 21:23
  21:24
**today** 8:5 56:17
  108:4 170:6
  172:23 173:5
**today's** 8:2
**together**
  151:12,18
**told** 41:4 72:13
  123:22 139:9
**toll** 95:19
**tone** 169:20
**tongue** 27:25
  36:14
**took** 119:25
  155:8 157:1,16
  158:20 159:21
  176:24
**top** 42:7 44:6
  138:2
**topic** 21:4
**topics** 61:21
  117:1
**total** 11:8 26:8
  26:23 94:11
  109:6 118:25
  174:4 176:12
  188:22

**totality** 72:22
  93:16
**totally** 91:6
  159:14
**tower** 2:15
**track** 1:11
  193:6 194:3
  195:3
**trade** 38:24
**training** 19:17
  103:23
**transcribed**
  191:16 194:7
**transcript** 3:1
  190:3,6,9,11
  193:11,12
  194:5,12 195:5
  195:11,17
**transcription**
  191:17
**traveled** 146:14
**traveling** 86:3
  87:22
**travels** 86:7
**treated** 64:2
**treatises**
  117:24
**tremendous**
  185:14
**trial** 12:7
  170:19 171:25
**tricky** 82:7
**tried** 32:8
  157:20

**true** 46:22
  191:16
**truth** 191:11,11
  191:12
**truthful** 121:22
  132:13
**try** 10:16 42:20
  43:7,24 44:14
  110:22 112:24
  170:4 171:3
**trying** 22:21,22
  41:1 42:24
  43:4,5,11
  44:15 51:12,13
  60:19,20 67:6
  72:23 75:3
  81:15 82:3,7
  82:10 87:12
  97:2 109:23
  113:25 118:10
  132:7,8 133:4
  135:2 155:9
  156:6 170:8
  183:1
**tucson** 29:19
  29:21,21 30:2
  30:13,14
**turkey** 175:18
**turn** 38:20
  74:12 80:13
  103:3 138:1
**turning** 38:2
**two** 11:18
  12:24 14:13,21
  15:23 16:13

26:2 44:18
68:7 69:18
78:8 84:3
85:21 94:20
103:1 116:21
128:12,25
130:25 136:12
142:17 158:2
166:15 180:3
**type** 22:5,24
28:21 29:10
50:8,12,13
61:21 63:13
72:25 88:20
89:24 115:18
115:19 116:5
122:2,14,16
148:12 187:11
**types** 17:4
21:25 41:13
42:11 50:17
54:20 59:12,18
68:6 83:15,16
86:6 100:18
112:9 114:23
116:18 117:10
119:5 123:8
174:20 176:14
182:9 187:4,12
**typically** 137:5
137:10

**u**

**u.s.** 20:3
**unable** 94:4

**unbelievable**
95:16 128:5
**unbelievably**
127:15
**under** 57:20
58:11 63:15
76:7 99:25
103:20,21
**understand**
10:9,14 12:19
12:21 14:1
38:13 42:16
43:19 51:23
54:2 65:4
68:13 79:22
90:7 104:14
106:21 113:25
128:17 131:8
136:10 160:3,4
160:5,6 162:13
163:21
**understandable**
177:13,17
**understanding**
43:7 96:20,21
96:25 112:2,12
114:4,9 115:8
118:9 120:8
124:22
**understood**
24:6 105:7
142:6
**unethical**
127:15

**unimportant**
60:24
**unintentional**
81:25
**united** 1:1
25:20 37:6,24
41:10 59:6
175:7,18
**universities**
25:20 37:5
**university**
15:17 18:24
19:7 30:20
33:18,21 61:19
115:20 116:9
118:2 150:18
152:10 169:15
175:17 176:11
176:23
**unpaid** 95:3
**unqualified**
110:12 114:7
116:13
**unquote** 39:25
134:20
**unreliable**
156:10
**unsafe** 99:14
132:25 137:18
140:16
**unsafely** 76:9
**unsubstantiat...**
143:6,10
**unterreiner**
2:20 9:13

**upset** 79:22
128:17
**upsetting**
106:21
**upstate** 14:20
**use** 14:23,24
15:5 16:24
17:7,7 21:23
21:23 28:11
37:3 43:1
50:18 52:18
74:6,17,20,25
75:7,7 88:14
89:4 100:9,9
167:9 168:15
168:16,23
175:21 176:2
176:16 177:18
178:19 179:2
**used** 25:9,10,10
27:15 37:13
71:8 90:17
115:22 116:24
117:7,22 118:7
137:14 155:5
168:20 176:4,6
176:17 177:5
177:10 178:8
180:21
**useful** 146:20
**uses** 71:11
**using** 86:12
114:19,22
116:2

**utilize** 37:24
**utilized** 12:5
  25:6 116:8
**utilizing** 41:23
  115:19

**v**

**v** 83:14
**va** 28:20
**vaccination**
  29:19,22 30:3
  99:20
**vaccinations**
  30:1,5,8,8
  99:17,19
  113:21 119:2,3
  119:5 129:22
**vaccine** 29:24
  29:24
**vaccines** 30:24
  34:2,3 107:10
**vague** 132:22
**valid** 60:4
  61:25 74:16
  75:4 121:21
  137:22 153:8
  154:11,16
  155:11,24
  156:1,15
  180:19,24
  181:19 182:1
**validate** 169:2
  180:20
**validated**
  154:20

**validates**
  167:17,25
  169:4 182:25
**validity** 13:6
  49:3 50:14
  58:14,24 121:2
  121:16 122:3
  137:16 141:15
  153:10,19
  158:4 163:16
  168:3 177:18
  179:5 183:19
**value** 52:22,23
  54:14 56:8
  80:9
**vanzant** 15:1
**variability**
  181:22
**varied** 186:11
**various** 17:4
  55:15 176:14
**vast** 186:4
**verbal** 52:24
  53:14 55:6
  62:17 79:10
  82:16 93:4,18
  100:5 107:2
  131:15 137:21
  140:23 141:14
  157:20 169:6
  169:19 180:13
  182:24
**verbalized** 63:8
**verbally** 66:17

**verbatim** 71:25
**verify** 95:8
**veritext** 8:8
  193:1,7 196:1
**veritext.com.**
  193:17
**versus** 15:1
  55:18 61:23
  75:23 140:10
  148:3,4 166:12
  182:8 184:16
  184:24,25
  186:3
**videographer**
  2:18 8:1 53:19
  53:22 105:10
  106:3 149:25
  150:3 164:22
  164:25 172:10
  172:13 189:9
**videotaped**
  1:14
**vietnam** 175:16
**view** 13:13,16
  38:9 50:14
  74:7 76:5
  117:3 147:21
  149:16 152:6
  152:13 153:2,7
  155:6 169:4
  185:21
**viewed** 8:12
  65:3 66:15
  114:25 154:3
  180:19

**viewer** 40:25
**viewing** 121:3
**views** 17:2
**virginia** 2:10
  40:8 44:23
  45:8,9,18,23
  55:9,12,17
**virtually** 8:8
  153:15
**visiting** 87:25
**visits** 129:19
**vitae** 24:4
**vital** 72:8
**vitally** 91:24
**voice** 66:1
**voluntary** 62:3
**volunteer** 28:9
  28:21 29:4
**volunteered**
  30:1
**volunteers**
  29:23
**vory** 2:13
**vorys** 8:24
**vorys.com** 2:16

**w**

**waived** 193:19
**walgreens**
  129:5 134:12
  182:12
**walk** 80:4
  173:11
**want** 14:13
  23:20 51:4
  53:25 55:9

73:13 100:21
111:17 135:6
144:17 148:13
149:1 154:1
158:16 163:20
164:15,18
172:22 173:11
**wanted**  32:10
  50:20 65:16
  105:6 111:13
  142:5 150:24
  172:6
**wants**  170:18
**warned**  41:22
**washington**
  118:2 169:14
  176:10
**water**  130:4
**way**  40:13
  50:21 62:9
  72:24 147:2
  156:10 167:9
  168:5 181:7
  182:23 183:12
  186:5,18
**we've**  106:12
  148:22
**week**  30:6
  79:17 93:1
  134:2
**weekends**
  18:23
**weeks**  67:10
**weigh**  41:1
  50:18

**weight**  104:24
  152:21 153:1,6
  153:20 154:2
**weighted**  50:5
  50:11 60:2
**welcome**  106:8
**welcomed**
  152:8
**went**  26:14
  159:9 186:20
**west**  2:10 40:7
  44:23 45:8,9
  45:18,23 55:9
  55:12,17
**western**  31:13
**whatsoever**
  130:24 134:17
  147:17 156:18
**whereof**  192:5
**whoa**  159:1,1
  170:11,11,11
**wholesaler**
  84:21
**wholly**  151:2
**wide**  108:11
  120:10 135:19
  181:25
**widely**  176:4
  184:22
**williams**  2:3
**witness**  8:4,12
  13:1,5,12,20
  15:7 16:5 17:9
  24:2 34:15
  35:19 36:18,20

53:15 142:9,9
149:21 173:4
190:2 191:9,14
191:15,18
192:5 193:8,11
194:1,4,11
195:1,4,15
**witness'**  193:14
**wohl**  2:9 3:8
  8:18,18 9:19
  23:13,25 24:6
  46:24 53:6,17
  53:24 55:13,23
  102:1 105:8
  106:7 107:1
  109:24 126:7
  130:3 132:23
  141:17 149:23
  150:5 155:1
  164:17,20
  165:1 170:22
  171:5 172:7,14
  173:2 189:6
**woman**  79:12
  106:20
**women**  67:8
  147:1 148:4
**word**  73:18
  145:24
**words**  71:11
  177:15
**work**  14:10
  16:2 17:20
  18:12 23:8,11
  28:20,21 30:23

32:10 34:7,12
35:19 48:22
51:10 65:22
66:2 75:22
78:3 79:17
93:1,21 95:15
99:13 106:14
107:4 120:4,7
133:19 134:2
135:10 136:13
137:19 138:22
139:3,9,19
140:1,13
141:24 144:24
152:8 153:17
174:7 176:7
182:3,7 183:2
183:4 185:4,6
185:8,9 186:16
187:6,8
**worked**  10:21
  19:20 30:5
  67:13 93:2
  107:24 150:11
  151:1 182:8
  184:8,14,14
**working**  38:5
  38:25 43:8
  44:16 45:2,3
  51:23,25 54:5
  60:22 65:10
  67:20 72:8
  74:24 75:11
  95:3 106:20,22
  108:5 119:14

（頁頭ナビ）

120:13 122:12
128:20 140:16
153:13 182:22
185:6 188:3
**workload**
42:14 43:4
45:2,20 47:3
47:23 58:18
66:11 76:15,24
77:3,7 82:13
103:8,24 104:6
104:16 106:14
158:19 159:19
187:1
**workloads**  65:4
**workplace**
43:14,25 51:1
52:7,10 53:12
54:9,25 60:15
76:11 81:11,12
91:8 96:23
103:19 110:21
122:15 149:15
149:17,19
157:14 163:17
187:5,18
188:13
**works**  95:16
178:4
**worksheet**
130:8 131:11
**workweek**
134:1 136:13
**world**  21:8,11
22:2,11 148:17

173:25
**worldwide**
169:15
**worry**  91:20
145:5
**worse**  66:14
**worth**  125:2,4
**wreck**  14:18,20
**write**  38:22
65:20
**writing**  10:24
41:14 66:17
164:4 167:10
**written**  62:18
62:19 65:7
73:3,9 93:14
93:19 94:1
102:23 117:24
131:15 135:1
135:15 137:15
157:20 169:6
169:19 172:18
182:24 183:17
**wrong**  35:25
36:1,1 127:20
127:20 130:4
134:4 158:15
159:14
**wrote**  12:18
41:3 56:15
93:7 158:10
164:3 176:11

| x |
| --- |
| **x**  87:11,12 |
| 110:1 |

| y |
| --- |

**y**  110:1
**yeah**  23:25
70:2 126:7
164:20
**year**  10:25 18:2
32:4,22 47:1
47:25 131:5,5
173:23
**years**  13:3,18
15:14 19:16
26:2 30:22
31:17 32:16
38:23 44:18
54:16 57:18
68:7 69:18
117:8,23 128:9
130:25,25,25
147:14 158:2
166:6 167:20
188:10
**yesterday**
165:11,18
**yielded**  49:9
**younger**  147:8

| z |
| --- |

**zero**  78:20

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.