*SETTLED DEFENDANTS' MOTION TO DISMISS CLAIMS FILED BY
NON-PARTICIPATING FLORIDA SUBDIVISIONS AS RELEASED BY
THE ATTORNEY GENERAL PURSUANT TO SETTLEMENT*

# EXHIBIT 4

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

OFFICE OF THE ATTORNEY GENERAL,
DEPARTMENT OF LEGAL AFFAIRS,
STATE OF FLORIDA,

        Plaintiff,                           CASE NO.:  2022 CA 000541

v.

SARASOTA COUNTY PUBLIC HOSPITAL DISTRICT
        d/b/a Memorial Healthcare System, Inc.,
LEE MEMORIAL HEALTH SYSTEM,
        d/b/a Lee Health,
NORTH BROWARD HOSPITAL DISTRICT,
        d/b/a Broward Health,
HALIFAX HOSPITAL MEDICAL CENTER,
        d/b/a Halifax Health, and
WEST VOLUSIA HOSPITAL AUTHORITY,
SCHOOL BOARD OF MIAMI-DADE COUNTY, and
PUTNAM COUNTY SCHOOL BOARD,

        Defendants.
_____/

**AMENDED COMPLAINT FOR DECLARATORY RELIEF**

The Plaintiff, Office of the Attorney General, Department of Legal Affairs, State of

Florida (the "Attorney General"), alleges the following in support of its Amended Complaint

against the Defendants identified below:

**BACKGROUND**

**A.  OPIOID EPIDEMIC AND SETTLEMENTS**

1.    The State of Florida continues to suffer a devastating opioid crisis. In its November

2021 release, the United States Centers for Disease Control and Prevention (the "CDC")

estimated overdose deaths in the United States from opioids increased to 75,673 Americans in

the 12-month period ending in April 2021, up from 56,064 Americans the year before. https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2021/20211117.htm.  The staggering increase in deaths can be seen in data related to Florida.  The numbers of deaths in Florida rose from 5,638 opioid overdose deaths in the year ending January 2020 to 7,661 in January 2021. *Id.* An increase of almost 2,000 more Floridians died compared to the previous year.  As of October 2021, the increased deaths are not subsiding; according to the last reported CDC data that the Attorney General could access, 7,617 Floridians died from opioid overdoses. https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm.  These numbers, especially the most recent data, are likely less than the full carnage caused by the crisis as the CDC's own data notes that its data is underreporting deaths.  7,617 Floridians equates to almost 21 Floridians dying each and every day from an opioid overdose.

2.     Deaths only paint part of the horrific picture of the opioid epidemic. The societal, economic, and personal harms suffered by Floridians because of this epidemic are immeasurable and not fully calculable. Now more than ever, action needs to be taken to reverse the trend of death and destruction being caused by the plague of opioids.

3.     Relief is finally within reach. The State has executed seven historic settlements with (1) AmerisourceBergen Corp., Cardinal Health, Inc., and McKesson Corp. (collectively, referred to as the "Distributors" and the agreement as the "Distributor Settlement Agreement"); (2) Johnson & Johnson, Inc. and its subsidiaries (collectively, referred to as "J&J"); (3) Endo Pharmaceuticals Inc. and its affiliated companies (collectively, referred to as "Endo"); (4) CVS Pharmacy, Inc. and its subsidiaries (collectively, referred to as "CVS"); (5) Teva Pharmaceutical Industries, Ltd. and its related entities (collectively, referred to as "Teva"); (6) Allergan Finance, LLC, Allergan Sales, LLC, Allergan USA, Inc., and Allergan Ltd. (collectively, referred to as

"Allergan"); and (7) Walgreens Boots Alliance, Inc. and Walgreen Co. (collectively, referred to as "Walgreens") (together the agreements and documents reflecting all seven settlements are referred to as the "Settlement Agreements").

4.      The Settlement Agreements secure Florida more than $3.077 billion in opioid remediation plus an additional $84 million in opioid overdose reversal drugs.[1] If one were to include two bankruptcy plans of reorganization and other previously entered settlements, the total relief on behalf of Floridians for opioid treatment, prevention, and recovery is in excess of $3.5 billion. This relief is the second largest set of settlements that the State of Florida has in its history ever reached.[2]

## B.  OPIOID INVESTIGATION AND LITIGATION HISTORY

5.      In September 2017, the Attorney General began an investigation into the causes of the opioid epidemic. At that time, no Florida subdivision had sued an opioid manufacturer, distributor, or dispenser.

6.      In December 2017, the Attorney General sent out a notice requesting proposals from outside counsel to represent it in a possible lawsuit related to the opioid epidemic. Again, at that time, no Florida political subdivision had sued an opioid manufacturer, distributor, or dispenser.

7.      On May 16, 2018, the Attorney General filed suit in the Circuit Court in the Sixth Judicial Circuit in a case styled as *State of Florida v. Purdue Pharma L.P., et. al.*, case no. 2018-CA-001438. A copy of the Second Amended Complaint is attached as Exhibit "8" to this

---

[1]      The Settlement Agreements, copies of which are attached as Exhibits 1-7 and are incorporated herein by reference.

[2]      The Tobacco Settlement entered by Florida is the only settlement for more money.

3

Amended Complaint and is incorporated by reference herein.  Among other things, the original and amended complaints sought relief against manufacturers and distributors of opioid products. Eventually, the Attorney General added claims against two dispensers of opioids: (a) Walgreen Co.; and (b) CVS Pharmacy, Inc.

8.      After the filing of the Complaint by the Attorney General, dozens of subdivisions filed suit, asserting similar claims against the same or similar defendants alleging similar types of damages. Now, more than 90 political subdivisions have filed suit against similar defendants on similar claims seeking overlapping recoveries with the Attorney General action and with each other. In some instances, there are as many as four levels of government seeking similar relief for the *same* citizens. Florida is not unusual.  More than 3,000 opioid cases are pending across the nation.   https://www.msn.com/en-xl/money/other/road-to-us-opioid-settlements-has-been-long-and-complicated/ar-AAUjSXg.

9.      All the Florida subdivision cases were removed to federal court and subsequently transferred to a multi-district litigation panel in the United States District Court for the Northern District of Ohio (the "MDL") and stayed.  The Attorney General fully litigated her case, culminating in a five-week jury trial against one remaining defendant, Walgreens, before that action settled.  The Attorney General's counsel engaged in extensive discovery and motion practice, including producing millions of pages of documents, participating in more than 140 depositions, and litigating multiple motions for summary judgment and motions to exclude experts prior to the entry of the Settlement Agreements.

## C.  THE SETTLEMENTS

10.    Beginning in 2018 and continuing through July 2021, the Attorney General along with other attorneys general and members of the Plaintiffs Executive Committee for the MDL (the "PEC") negotiated with multiple defendants.

11.    On or about July 21, 2021, almost three years after negotiations began, the Attorney General, twelve other Attorneys General, and the PEC entered into settlement agreements with J&J and the Distributors. Subsequently, a total of forty-six states entered into the settlement agreements.

12.    In exchange for billions of dollars of relief, the Distributors and J&J demanded that the Attorney General, as the chief legal officer of the State of Florida, execute releases ("Release Provisions") that extinguish the Attorney General's claims and the subordinate claims of Florida subdivisions, including Defendants' claims.[3] In other words, the Attorney General has secured historic relief on behalf of the State and its subdivisions,[4] including Defendants, and has executed releases binding the State and its subdivisions, including Defendants, as a whole.

13.    In addition to the Release Provisions, the Distributors and J&J demanded that the Attorney General obtain sign-on from political subdivisions from both litigating and non-litigating subdivisions. Failure of subdivisions to sign-on has financial consequences for each

---

[3]      For purposes of this Amended Complaint for Declaratory Relief, any reference to Defendants' claims includes any claims within the definitions of "Released Claims" in the Settlement Agreements, which are attached and incorporated by reference herein. In general, the "Released Claims" include any claims that Defendants asserted, or could have asserted, against the entities relating to "Covered Conduct," which is a term that is also defined in the Settlement Agreements and broadly covers opioids-related conduct. All of Defendants' claims are "Released Claims" under the terms of the Settlement Agreements.

[4]      Under each of the Settlement Agreements, "Subdivisions" is a defined term that encompasses each Defendant named in this Action.

state.  In April 2021, in order to secure sign-on of subdivisions, the Attorney General negotiated a memorandum of understanding that subsequently became the Florida Opioid Allocation and Statewide Response Agreement.  A copy of the Florida Opioid Allocation and Statewide Response Agreement is attached as Exhibit "9" to this Amended Complaint and incorporated by reference herein.

14.    Between July 2021 and February 2022, the Attorney General obtained sign-ons to the Florida Opioid Allocation and Statewide Response Agreement from all of the litigating counties and cities (97 of them).

15.    On or about January 15, 2022, the Attorney General reached a settlement with Endo for $65 million, including $55 million for opioid remediation. Like the Distributor and J&J settlement agreements, the Endo settlement agreement required the Attorney General to release all subdivision claims and obtain subdivision sign-ons.  Between January 15, 2022 and March 26, 2022, all litigating counties and cities executed participation agreements (91) and an additional 72 non-litigating subdivisions joined the settlement.  Endo agreed to finalize the settlement.

16.    On or about March 30, 2022, CVS, Teva, and Allergan entered into settlement agreements with the Attorney General. Like the Distributor and J&J settlement agreements, the CVS, Teva, and Allergan settlement agreements required the Attorney General to release all subdivision claims and obtain subdivision sign-ons.  The sign-on process is ongoing.

17.    On or about May 4, 2022, following five weeks of a jury trial, Walgreens entered into a settlement agreement with the Attorney General.  Like the Distributor and J&J settlement agreements, the Walgreens Settlement Agreement required the Attorney General to release all subdivision claims and obtain subdivision sign-ons.  The sign-on process is ongoing.

## D.  THE ATTORNEY GENERAL'S POWER

18.    The Attorney General has the power to release Defendants' claims. Florida Courts have long recognized the Attorney General's ability to exercise Florida's sovereign authority as granted to her under common law and the Florida Constitution. Defendants, on the other hand, are administrative "creatures of the state" created as a matter of convenience to carry out certain functions at the local level.[5] Though Defendants have jurisdiction to bring certain legal claims, their authority flows only from the State, and where overlapping jurisdiction exists between the Attorney General and subdivisions (as is the case here), the Attorney General's claims are superior. In the absence of legislative action, the Attorney General's duties and powers include "all those exercised at common law" and "all such authority as the public interest requires." *State ex rel Shevin v. Exxon,* 526 F.2d.266, 268 (5th Cir. 1976). The Attorney General has "wide discretion in making the determination as to the public interest." *Id.* at 268-269. Indeed, even where a subordinate entity of the state is granted statutory authority to bring an action, the Attorney General may intervene as sovereign, or on behalf of the people of Florida, over objections by those subordinate entities. *See State ex rel Shevin v. Yarborough,* 257 So.2d 891 (Fla. 1972).

19.    These fundamental principles apply most crucially in matters of urgent public interest. Where the Attorney General has acted to protect the public health and welfare, as is the case in her landmark opioid litigation, Defendants' claims must not be allowed to imperil the

---

[5]      "Political subdivisions of States—counties, cities or whatever—never were and never have been considered as sovereign entities." *Reynolds v. Sims,* 377 U.S. 533, 575 (1964). Rather, they are "regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function," *Sailors v. Bd. of Educ.,* 387 U.S. 105, 107-08 (1967), and all local government authority is derived from the State. Political subdivisions are not sovereigns—they are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion." *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 607 (1991).

Attorney General's action and the relief she has secured for communities throughout the State. As chief legal officer of the State of Florida, the Attorney General has authority over litigation that raises statewide issues, which necessarily includes the power to bind the State as a whole and to release overlapping claims brought by units of local government such as Defendants.  The Attorney General retains the power, and indeed has the duty, to "prosecute all actions necessary for the protection and defense of the property and the revenue of the state." *State ex rel Shevin v. Exxon*, 526 F.2d at 270.

20.    ***Immediate harm.*** Defendants—Subdivisions that have brought claims that are subordinate to the Attorney General's action—place the Attorney General's settlements in jeopardy and threaten to immediately devalue the relief available to those who have been impacted by the opioid crisis. Defendants' claims therefore imperil Florida's actions, as sovereign, to protect the safety and welfare of Florida citizens. Two Defendants—Sarasota County Public Hospital District and Lee Memorial Health System—sought to block the entry of the Attorney General's settlement with Endo Pharmaceuticals, jeopardizing the distribution of statewide relief and the implementation of sweeping injunctive terms. All Defendants, moreover, threaten the Attorney General's historic settlements with Distributors, J&J, Endo, CVS, Teva, Allergan, and Walgreens by continuing to press their subordinate claims, potentially resulting in a reduction of millions of dollars that would otherwise flow throughout Florida to abate the opioid crisis. Under the settlements, if Defendants continue to press their lawsuits into 2023, the funds available to Florida communities will be reduced.

21.    As a result, the Attorney General brings this action for declaratory relief to prevent the threat of immediate harm that will result if Defendants continue to press their subordinate claims. Absent the Court's intervention, the Attorney General—and the cities, counties,

8

subdivisions, and communities on whose behalf the Attorney General has secured relief—will suffer immediate injury in the form of reduced funds for opioids prevention, treatment, and recovery.

22.    The Attorney General respectfully requests that this Court enter a declaratory judgment holding that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions with the Settlement Agreements.

<u>**JURISDICTION AND VENUE**</u>

23.    The Attorney General brings this action for declaratory relief pursuant to Chapter 86, Florida Statutes. This Court has jurisdiction over this action pursuant to Fla. Stat. §§ 86.011, 86.021, and 86.101.

24.    Venue is proper in the Second Judicial Circuit for Leon County pursuant to Fla. Stat. §§ 47.011 and 47.021. Venue is proper in the Second Judicial Circuit for Leon County because the cause of action arose in Leon County, Florida. Specifically, the Attorney General executed the Distributor Settlement Agreement and the J&J Settlement Agreement in Leon County. The Settlement Agreements will be administered and monitored in Leon County and the funds received under the Settlement Agreements will be directed to be disbursed through the qualified settlement funds in Leon County, Florida.  Additionally, State and Regional Funds will be disbursed by agencies residing in Leon County. Both Settlement Agreements include provisions releasing the Attorney General's claims, including any subordinate and duplicative claims brought by Defendants on behalf of the same cities, counties, and communities for whom the Attorney General has secured relief. The Attorney General brings this action to prevent the threat of immediate harm—which will be realized, in part, in Leon County—if

9

Defendants continue to press their subordinate and duplicative claims and to request a declaration that the Attorney General had the power to release, and did release, Defendants' claims through the execution of Settlement Agreements and Release Provisions in Leon County.

## **PARTIES**

25.    The Attorney General is the chief legal officer of the State of Florida and has broad constitutional, statutory, and common law authority to represent the interests of the State and its subdivisions, and to protect the public health, safety, and welfare of its citizens.

26.    Defendant Sarasota County Public Hospital District, d/b/a Sarasota Memorial Health Care System, is a community hospital chartered and organized under the laws of the State of Florida. It is located in and around Sarasota County, Florida.  It was re-created by Chapter 2003-359 and Amended by Chapter 2005-304, Laws of Florida. Sarasota County Public Hospital District filed a lawsuit against the opioid defendants after the Attorney General. Sarasota County Public Hospital District did not join the Settlement Agreements and has denied that the Attorney General has the authority to release its claims.

27.    Defendant Lee Memorial Health System, d/b/a/ Lee Health is a community hospital chartered and organized under the laws of the State of Florida. It is located in Lee County, Florida. It was recreated by Chapter 2000-439, Laws of Florida. Lee Health filed a lawsuit against the opioid defendants after the Attorney General.  Lee Health did not join the Settlement Agreements and has denied that the Attorney General has the authority to release its claims.

28.    Defendant North Broward Hospital District d/b/a Broward Health is a community hospital chartered and organized under the laws of the State of Florida. It is located in Broward

10

County, Florida. It is a special independent taxing district created pursuant to Chapter 27438, Laws of Florida, Special Acts of 1951, as amended. Broward Health filed a lawsuit against the opioid defendants after the Attorney General. Broward Health did not join the Settlement Agreements.

29.     Defendant Halifax Hospital Medical Center d/b/a Halifax Health is a legislatively chartered taxing healthcare organization. It is located in Volusia, Brevard, and surrounding counties. Halifax Health filed a lawsuit against opioid defendants after the Attorney General. Halifax Health did not join the Settlement Agreements.

30.     Defendant West Volusia Hospital Authority is a special taxing district established by the State to provide access to health care for the qualified indigent residents of the taxing district. It is located in Volusia County, Florida. West Volusia Hospital Authority filed a lawsuit against the opioid defendants after the Attorney General. West Volusia Hospital Authority did not join the Settlement Agreements.

31.     Defendant School Board of Miami-Dade County is a school district for Miami-Dade County as defined in Florida Statutes § 1001.30. School Board of Miami-Dade County filed a lawsuit against the opioid defendants after the Attorney General. School Board of Miami-Dade County did not join the Settlement Agreements.

32.     Defendant Putnam County School Board is a school district for Putnam County as defined in Florida Statutes § 1001.30. Putnam County School Board filed a lawsuit against the opioid defendants on May 27, 2022. Putnam County School Board did not join the Settlement Agreements.

33.     Defendants have brought actions against opioid manufacturers, distributers, and dispensers. Each of these actions have been transferred to the Prescription Opioids Multidistrict

11

Litigation ("Opioid MDL"), Case No. 1:17-md-2804. Defendants' claims largely mirror those brought by the Attorney General and allege violations of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201 et seq.), RICO, public nuisance, and common law.

34.    Where jurisdiction to bring such claims overlaps, as is the case here, Defendants' actions are subordinate to the Attorney General's action.

## FACTUAL ALLEGATIONS

35.    The State of Florida is suffering from a devastating opioid crisis that has taken the lives of thousands of Floridians and destroyed thousands of families. Cities, counties, and communities across Florida have been tragically impacted, damaged, and broken. The Attorney General has taken legal action against opioids manufacturers, distributors, and dispensers for creating and exacerbating the opioids crisis and, most critically, has fought to secure funds that will remediate and abate the harms the crisis inflicted and continues to inflict.

36.    The Attorney General filed suit against opioid manufacturers, distributors, and dispensers of opioids in 2018, on behalf of the people and entities of Florida, as is her right to protect the people, health, and welfare of Florida, for causes of action including common-law claims (public nuisance, negligence, negligence *per se*, gross negligence, and civil conspiracy) and statutory claims (violations of the public nuisance statute, the Florida Deceptive and Unfair Trade Practices Act, and the Florida Racketeering Influenced Corrupt Organizations Act).

37.    During this time, Defendants filed lawsuits mirroring the Attorney General's action. These have been transferred into the Opioid MDL,[6] Case No. 1:17-md-2804. Defendants' claims mirror those brought by the Attorney General and allege violations of the Florida

---

[6]    Defendant Putnam County School Board filed its opioids lawsuit on May 27, 2022 and is likely to be transferred to the MDL.

12

Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201 et seq.), RICO, public nuisance, and common law. Where jurisdiction to bring such claims overlaps, as is the case here, Defendants' actions are subordinate to the Attorney General's action.

38. The existence of thousands of lawsuits by political subdivisions nationwide has created an historically complex challenge for settling opioid-related claims. Absent the power of the Attorney General to release Defendants' claims, costs for all parties will rise, hindering judicial efficiency and frustrating the Attorney General's efforts to allocate relief in a manner that is based upon the needs of residents and communities throughout Florida.

39. For nearly four years, the Florida Attorney General has negotiated with opioid manufacturers, distributors, and dispensers to provide the relief that the State of Florida and its citizens desperately need to be made whole and to abate the ongoing opioid crisis. Left unabated, the opioid epidemic will continue to threaten the health, safety, and welfare of Florida residents and communities. There is, as a result, an urgent need for resources, funding, and services that can treat and prevent the harms inflicted by the opioids crisis.

40. Access to these urgently needed funds is finally within reach. The Attorney General has announced the historic Settlement Agreements.

41. These Settlement Agreements secure relief for opioid treatment, prevention, and recovery services. Critically, these funds will be available to communities throughout Florida for a wide range of urgently needed services, such as prevention and educational programs, training, recovery support services, intervention, connections to care, and addiction treatment, among many others. The Settlement Agreements also secure desperately needed financial relief for subdivisions that have struggled under the weight of the opioid epidemic. Under the Attorney General's Settlement Agreements, this relief will be distributed to cities, counties, and

13

subdivisions throughout the State. While none of the Settlement Agreements provide funds directly to the Defendants, each of the Settlement Agreements allow the State, the counties, and the cities to fund abatement-related programs at the Defendants, if Defendants participate in the Settlement Agreements.

42. In exchange for this relief, the Attorney General, as the chief legal officer of the State of Florida, executed Release Provisions that extinguish the Attorney General's claims and subordinate claims, including Defendants' lawsuits, brought on behalf of the same cities, counties, communities, and subdivisions for whom the Attorney General has secured relief. In other words, the Attorney General has secured relief on behalf of the State and its subdivisions, including Defendants, and has executed a release binding the State and its subdivisions, including Defendants, as a whole.

43. The Release Provision in the Distributor Settlement Agreement provides as follows:

> *Scope.* As of the Effective Date, the Released Entities are hereby released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims. This Agreement shall be a complete bar to any Released Claim.

44. The term "Releasors" is a defined phrase in the Settlement Agreement that includes settling states, such as the State of Florida. Additionally, "without limitation and to the maximum extent of the power of" the Attorney General to release claims, all of the State's subdivisions, such as Defendants, are included within the definition of "Releasors." "Released Claims" is also

14

a defined phrase that includes any claims that have been asserted by litigating subdivisions, such as Defendants. Taken together, the execution of these Release Provisions by the Attorney General has released Defendants' subordinate claims against Amerisource Bergen, Cardinal Health, and McKesson.

45.     The Release Provision in the J&J Settlement Agreement provides as follows:

*Scope.* As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. Each Settling State (for itself and its Releasors) and Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Settling State and its Attorney General to release claims. The Release shall be a complete bar to any Released Claim.

46.     The term "Releasors" is a defined phrase in the J&J Settlement Agreement that includes settling states, such as the State of Florida. Additionally, "without limitation and to the maximum extent of the power of" the Attorney General to release claims, all of the State's subdivisions, such as Defendants, are included within the definition of "Releasors." "Released Claims" is also a defined phrase that includes any claims that have been asserted by litigating subdivisions, such as Defendants. Taken together, the execution of these Release Provisions by the Attorney General has released Defendants' subordinate claims against Johnson & Johnson.

47.     The Release Provision in the Endo Pharmaceuticals Settlement Agreement provides as follows:

**Scope**. On the Effective Date of the Release, Plaintiff and each Releasor shall be deemed to have fully, finally and forever released all Releasees from all Released Claims. Plaintiff, on behalf of itself and all other Releasors (whether or not they have signed this Agreement or the subdivision settlement participation form in

15

Exhibit D), hereby absolutely, unconditionally and irrevocably covenants not to bring, file, or claim, or to cause, assist, or permit to be brought, filed, or claimed, any Released Claims of any type in any forum whatsoever against Releasees. For the avoidance of doubt, Plaintiff agrees that this Settlement Agreement and the releases contained herein shall fully and completely resolve any past, present or future liability that any Releasee may have arising from, relating to or based on the Covered Conduct occurring prior to the Effective Date of the Release, whether in the Actions or otherwise. The releases provided for in this Agreement are intended by the Settling Parties to be broad and shall be interpreted so as to give the Releasees the broadest possible bar against any and all Released Claims. This Settlement Agreement is, will constitute, and may be pleaded as a complete bar to any Released Claim asserted against Releasees, whether against Plaintiff, any Participating Subdivision, or any other Subdivision, including any Non-Joining Subdivision.

48.     The term "Releasors" is a defined phrase in the Settlement Agreement that includes settling states, such as the State of Florida. Additionally, "without limitation and to the maximum extent of the power of" the Attorney General to release claims, all of the State's subdivisions, such as Defendants, are included within the definition of "Releasors." "Released Claims" is also a defined phrase that includes any claims that have been asserted by litigating subdivisions, such as Defendants. Taken together, the execution of these Release Provisions by the Attorney General has released Defendants' subordinate claims against Endo Pharmaceuticals.

49.     Notably, every litigating city and county in Florida, more than 90 in total, is participating in the Settlement Agreement with Endo Pharmaceuticals—a landmark achievement that secures historic monetary relief for hundreds of subdivisions and communities throughout Florida, in addition to essential injunctive relief against Endo Pharmaceuticals.

50.     The Settlement Agreements for CVS, Teva, Allergan, and Walgreens contain Release Provisions similar to the Endo Settlement Agreements.

51.     However, despite these historic settlements and the urgent need to use the settlement funds to abate the opioid crisis, Defendants' copycat, subordinate lawsuits, which

replicate the allegations in the Attorney General's complaint and assert substantially identical factual allegations and the same relief already provided by the settlements, remain as an obstacle against robust, statewide relief to abate the opioid crisis.

52.   Defendants' lawsuits have placed the Attorney General's Settlement Agreements in jeopardy and threaten to immediately devalue the relief available to those who have been impacted by the opioid crisis. Defendants' claims therefore imperil the Attorney General's efforts to protect the safety and welfare of Florida citizens.

53.   Two Defendants—Sarasota County Public Hospital District and Lee Memorial Health System—sought to block the entry of the Attorney General's Settlement Agreement with Endo Pharmaceuticals in the Attorney General's opioids litigation, Case No. 2018-CA-001438. During trial, these Defendants sought to intervene in the Attorney General's litigation and, astonishingly, seek to stay the Attorney General's settlement with Endo Pharmaceuticals—potentially jeopardizing and delaying the distribution of statewide relief and the implementation of sweeping injunctive terms against Endo Pharmaceuticals. This speaks directly to the fundamental principles at stake in this Action: if only two administrative units of local government are permitted to place a *statewide* settlement—entered based upon the public interest and the needs of cities, counties, subdivisions, and communities throughout Florida—at risk, the Attorney General's efforts to protect the safety and welfare of Florida citizens and to abate the harms of the opioid crisis will be irrevocably damaged.

54.   All Defendants, moreover, threaten the Attorney General's historic Settlement Agreements by continuing to press their subordinate claims, potentially resulting in a reduction of millions of dollars that would otherwise flow throughout Florida to abate the opioid crisis.

55. Defendants place the Attorney General's Settlement Agreements—which would otherwise swiftly deliver relief to the cities, counties, and subdivisions throughout Florida—in jeopardy and threaten to immediately devalue the relief available to those who have been impacted by the opioid crisis.

## COUNT ONE – DECLARATORY JUDGMENT

56. The Attorney General repeats and realleges each and every allegation contained in paragraphs 1 – 55 and respectfully requests that this Court enter a declaratory judgment, in accordance with Fla. Stat. §§ 86.011, 86.021, 86.101, that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions.

57. The Attorney General is in doubt as to her rights and obligations under the Settlement Agreements and Release Provisions with respect to whether the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions.

58. The Attorney General has a justiciable question as to the existence or nonexistence of a right, status, immunity, power, or privilege—namely, whether the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions. This immunity, power, privilege, or right is dependent upon the facts or the law applicable to the facts.

59. The Attorney General's "duties and powers typically are not exhaustively defined by either constitution or statute but include all those exercised at common law. There is and has been no doubt that the legislature may deprive the Attorney General of specific powers; but in the absence of such legislative action, [she] typically may exercise all such authority as the public

18

interest requires. And the Attorney General has wide discretion in making the determination as to

the public interest." *State ex rel Shevin v. Exxon,* 526 F.2d. at 268-69.

     60.    Indeed, even where a subordinate entity of the state is granted statutory authority

to bring an action, the Attorney General may intervene as sovereign, or on behalf of the people of

Florida, over objections by those subordinate entities.  *See State ex rel Shevin v. Yarborough,* 257

So.2d 891 (Fla. 1972).

     61.    Florida courts have held that the State (and by extension, the Attorney General) is

the proper entity to negotiate and settle complex claims because of the inherent duty to consider

and represent the interests of *all* constituents when negotiating binding settlements:

> Unlike the situations in which we fear that a party may be attempting [to] profit at the expense of unrepresented individuals, e.g., class actions and shareholder derivative suits, we here have as plaintiff the government department charged with seeing that the laws are enforced. We therefore need not fear that the pecuniary interests of the plaintiff and defendant will tempt them to agree to a settlement unfair to unrepresented persons, but can safely assume that the interests of all affected have been considered.

*United States v. City of Miami*, 614 F.2d 1322, 1332 (5th Cir. 1980).[7]

     62.    There is a bona fide, actual, justiciable controversy existing between the Attorney

General and Defendants and the Attorney General's action deals with a present, ascertained, or

---

[7]    *See also, e.g., Illinois v. Associated Milk Producers*, Inc., 351 F. Supp. 436, 440 (N.D. Ill. 1972) ("Justice and judicial economy is best served by having the largest governmental unit sue on behalf of all its parts rather than having multiple suits brought by various political subdivisions within the State."); *New Hampshire v. Dover*, 891 A.2d 524 (N.H. 2006) ("There is no reason for the Court to conclude, on the facts presented, that the State will not seek to obtain full compensation for all communities, including the Cities. While the compensation sought may not be the same as that which the cities would desire, a difference of that nature does not demonstrate an interest that is not properly represented by the State."); *Nash Cty. Bd. Of Ed. V. Biltmore Co.*, 640 F.2d 484, 494 (4th Cir. 1981) ("At common law, an attorney general, in the absence of some restriction on his powers by statute or constitution, has complete authority as the representative of the State or any of its political subdivisions to recover damages (whether under state or federal law) alleged to have been sustained by any such agency or political sub-divisions, even though those subdivisions may not have affirmatively authorized suit.").

19

ascertainable state of facts or present controversy as to a state of facts. Further, there is an actual, practical, and present need for declaratory relief. The Attorney General does not merely seek an advisory opinion from the Court or the answer to questions propounded from curiosity. Absent a declaration that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions, the Attorney General—and the cities, counties, and communities on whose behalf the Attorney General has secured relief—will suffer immediate injury in the form of severely reduced funds for opioids prevention, treatment, and recovery.

63. The Attorney General and Defendants have actual, present, adverse, and antagonistic interests in the subject matter, either in fact or law, of this action and the antagonistic and adverse interests are all before the court by proper process.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, the Attorney General respectfully requests that this Court enter a declaratory judgment, in accordance with Fla. Stat. §§ 86.011, 86.021, 86.101, that the Attorney General had the power to release, and did release, Defendants' subordinate claims through the execution of Settlement Agreements and Release Provisions.

Respectfully submitted,

Ashley Moody
ATTORNEY GENERAL


John Guard (FBN 374600)
Chief Deputy Attorney General
John.Guard@myfloridalegal.com
Nicholas Niemiec (FBN 113045)
Assistant Attorney General

20

Nicholas.Niemiec@myfloridalegal.com
Gregory S. Slemp (FBN 478865)
Special Counsel for Litigation
Greg.Slemp@myfloridalegal.com
R. Scott Palmer (FBN 220353)
Chief of Complex Enforcement
Scott.Palmer@myfloridalegal.com
Colin Fraser (FBN 104741)
Assistant Attorney General
Colin.Fraser@myfloridalegal.com
Lee Istrail (FBN 119216)
Assistant Attorney General
Lee.Istrail@myfloridalegal.com

Henry Whitaker (FBN 1031175)
Solicitor General
Henry.Whitaker@myfloridalegal.com
Daniel Bell (FBN 1008587)
Deputy Solicitor General
Daniel.Bell@myfloridalegal.com
David Costello (FBN 1004952)
Assistant Solicitor General
David.Costello@myfloridalegal.com

Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300

*Counsel for Plaintiff*