**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*The Montgomery County Board of County Commissioners et al. v. Cardinal Health, Inc., et al.*, Case No. 1:18-op-46326-DAP ("Track Seven") | **MDL No. 2804**<br><br>**Case No. 17-md-2804**<br><br>**Judge Dan Aaron Polster** |

### MONTGOMERY COUNTY'S RESPONSE IN OPPOSITION TO KROGER'S MOTION TO EXCLUDE THE OPINIONS OF REBUTTAL EXPERT DR. JACK E. FINCHAM

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

BACKGROUND ............................................................................................................... 3

    A.    The BoP Surveys and the Expert Reports Concerning Them ................................3

    B.    Dr. Fincham and His Report ................................................................................5

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT ................................................................................................................... 9

    A.    Dr. Fincham Is Qualified to Offer His Opinions ..................................................9

    B.    Dr. Fincham's Opinion that the BoP Surveys Collected Sufficient and
Reliable Information to Identify Concerns about Kroger's Dispensing of
Opioids is Reliable and Admissible. ...................................................................10

        1.    Dr. Fincham's Opinions Are Neither in Conflict Nor Irrelevant ..............10

        2.    Dr. Fincham Applied Standard, Well-Accepted Methodologies to
Analyze the Data in the Surveys ...........................................................12

    C.    Dr. Fincham's Opinions about the Methodology of the Surveys Are
Reliable and Admissible ....................................................................................13

CONCLUSION ................................................................................................................ 17

# TABLE OF AUTHORITIES

**CASES**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ................................................................................................. 1, 13

*Franklin Resources, Inc. v. Franklin Credit Management Corp.*,
  95 CIV. 7686 (CSH), 1997 WL 543086 (S.D.N.Y. Sept. 4, 1997) ......................... 17

*Hurt v. Commerce Energy, Inc.*,
  No. 1:12-CV-00758, 2015 WL 410703 (N.D. Ohio Jan. 29, 2015) ......................... 16

*In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litigation*,
  337 F. Supp. 3d 728 (S.D. Ohio 2015) ................................................................... 13

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................. 9, 10

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
  452 F. Supp. 2d 772 (W.D. Mich. 2006) ................................................................. 17

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*,
  502 F.3d 504 (6th Cir. 2007) .................................................................................. 17

*Navarro v. Procter & Gamble Co.*,
  1:17-CV-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021) ............................... 12, 13

*United States v. L.E. Cooke Co.*,
  991 F.2d 336 (6th Cir.1993) ................................................................................... 14

**OTHER AUTHORITIES**

1 Modern Scientific Evidence § 7:6 (2022-2023 ed.) .................................................. 11

**RULES**

FED. R. EVID. 702 ............................................................................................................ 1

FED. R. EVID. 401……………………………………………………………………...17

Plaintiff Montgomery County (the "County") respectfully submits this Response in Opposition to Defendant Kroger's Motion seeking to exclude the opinions of rebuttal expert witness Dr. Jack E. Fincham under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The County disclosed Dr. Fincham as a rebuttal expert to respond to the opinions of Kroger's expert, Dr. J. Ann Selzer, with respect to the usefulness of two surveys conducted by the Ohio Board of Pharmacy ("BoP") in understanding the role of pharmacists and pharmacies in opioid abuse and diversion. Dr. Selzer opined that the survey results were not relevant to the issues in this case and were not a valid test of pharmacists opinions with respect to the role that pharmacies and pharmacists play in opioid abuse and diversion. In rebuttal, Dr. Fincham assessed Dr. Selzer's opinions and the BoP surveys. He found numerous flaws in Dr. Selzer's analysis and concluded that the surveys "collected sufficient and reliable information from those Ohio pharmacists working in large chain grocery store settings that, when placed in the context of the opioid epidemic, identify serious concerns about the safe and effective dispensing of opioids among other medications." Doc. 5070-5 (Fincham Rpt.) at 5. Kroger now asks the Court to exclude Dr. Fincham's testimony and thus preclude Plaintiff from responding to Dr. Selzer's opinions.

Kroger offers three main critiques of Dr. Fincham's proposed testimony. [1] None has merit. First, Kroger purports to discern a contradiction between, on the one hand, Dr. Fincham's opinion that the BoP surveys provide useful and relevant insights about opioid dispensing, and, on the other hand, Dr. Fincham's concession that the surveys were not designed to elicit information specific

---

[1] In addition to its critiques of Dr. Fincham's opinions, Kroger suggests – although it does not explicitly argue – that Dr. Fincham may be unqualified to offer his opinions.  That suggestion is without merit because, as discussed below, Dr. Fincham has extensive experience specific both to pharmacy practice and to the design and analysis of research surveys.

to the opioid epidemic. As discussed below, there is no contradiction. The value of the surveys, which provide useful information about the safety of dispensing practices at grocery chain pharmacies generally, is not limited to the specific purpose for which they were designed. Dr. Fincham explicitly recognizes this in explaining how he was able to draw inferences about opioid dispensing. More generally, Kroger is wrong to contend that surveys not specifically designed to elicit information about opioids are necessarily irrelevant to opioid dispensing.  The insights of the surveys with respect to the dispensing environment, and the impact of that environment on safe dispensing, apply to all prescriptions dispensed: Kroger pharmacies did not suddenly acquire additional pharmacists or reduced workloads every time a customer with an opioid prescription appeared. Dr. Fincham is uniquely qualified to offer an expert opinion explaining how the Ohio BoP surveys relate to the dispensing of controlled substances including opioids.

Second, Kroger argues that Dr. Fincham's methodology was improper because Dr. Fincham did not conduct his own statistical analysis. Kroger goes so far as to claim that Dr. Fincham has *no* methodology to support his opinions. But Dr. Fincham's methodology is documented in his report and also extensively discussed in his deposition. It is the same methodology that he has used in his peer-reviewed publications; rather than find flaws in this methodology, Kroger simply ignores it. Further, Kroger's claim that Dr. Fincham was required to perform his own statistical analysis of the BoP survey data is entirely unsupported.  While it may be necessary for those conducting a survey to perform statistical analysis – which the BoP, as the entity conducting the survey, did – it is not necessary for Dr. Fincham, in reviewing the survey results to re-do that analysis. Kroger cites no authority that supports its contrary position. It also

ignores the calculations he performed in rebutting Dr. Selzer's analysis. *See* Fincham Rpt. at 10-11 (discussing 7% increase in respondents from large grocery store setting).

Finally, Kroger argues that the results of the BoP surveys cannot be generalized to the entire population of Ohio pharmacists. This argument should be rejected for two reasons. First, Dr. Fincham confirmed that the results of the BoP surveys were not anomalies by comparing them to the results of multiple other similar surveys (some with quite large sample sizes) that received similar responses. Second, Kroger's use of the term "generalizability" is both misleading and unhelpful. Because Dr. Fincham is using the survey results to draw conclusions about the dispensing environment at grocery chain pharmacies, it is not necessary, for the reliability or the helpfulness of his opinions, that every single pharmacist in Ohio agree with the views reflected in the surveys. It is sufficient that a large enough number of pharmacists identified problems with workload and safety for Dr. Fincham to conclude that surveys are relevant to whether the dispensing of opioids was affected by unsafe workplace practices. In this sense, the survey results are broadly applicable to show something beyond the views of the specific responders, even if they they do not permit inferences about the views of every pharmacist or even a specific percentage of pharamcists.

Dr. Fincham's opinions are essential to rebutting Dr. Selzer's mistaken opinions and presenting the jury with a fair portrait of the surveys. Because none of Kroger's arguments provides a basis to exclude Dr. Fincham's opnions, the motion should be denied in its entirey.

## BACKGROUND

### A.    The BoP Surveys and the Expert Reports Concerning Them

In 2020 and 2021, the BoP conducted surveys of Ohio pharmacists regarding their workload and working conditions (together, the "BoP Workload Surveys"). The BoP conducted these surveys to address its concerns that pharmacies in Ohio were not in compliance with state

regulations that require a "safe and effective workplace" for pharmacies and pharmacists.[2] The surveys were designed to elicit information about workload and dispensing conditions at Ohio pharmacies generally, rather than with respect to the dispensing of particular prescriptions. The survey responses disclosed significant concerns on the part of pharmacists about the dispensing conditions at their pharmacies.

On December 12, 2022, Kroger disclosed Dr. Selzer as an expert for the purpose of opining on the usefulness of the 2021 survey "in understanding the role of pharmacists and pharmacies in opioid abuse and diversion." Mtn. at 3. Because the 2021 survey referenced and used the same methodology as the 2020 survey, her opinions implicate both surveys. *See* Exhibit A (Selzer Dep.) at 175:21-176:11. Based on a comparison of the surveys with the complaint in this case, Dr. Selzer opined that the survey questions and comments "do not relate to the complaint" because they were not specifically directed to a bullet point list that Dr. Selzer created as a purported summary of the key "elements" of the pleading and because they did not make sufficient use of specific search terms that she identified. Doc. 5070-4 at 7 (Selzer Rpt.) at 7-9. She further opined that the 2021 survey was not "a valid test of pharmacists' opinions or attitudes on how their work is related to opioid abuse and diversion," which, in her view, meant that it also could not "give insight into the perceived role pharmacists and pharmacies play in opioid abuse and diversion." *Id*. at 3.

On February 17, 2022, the County disclosed Dr. Fincham's rebuttal report to respond to Dr. Selzer's opinions. (As the Court is aware, the County determined that a rebuttal expert was needed based on Dr. Selzer's deposition, which occurred on January 20, 2023.)  This Court denied

---

[2] Doc. 5070-2 (McNamee Dep.) at 55:17-56:9 and Doc 5070-1 (2020 Survey); Fincham Rpt. at 8-9.

a motion to strike Dr. Fincham's report as untimely and later entered a stipulated briefing schedule for any *Daubert* motion regarding this rebuttal expert. *See* Doc. 5028. This motion followed.

**B.      Dr. Fincham and His Report**

Dr. Fincham holds a bachelor's degree in Pharmacy from the University of Nebraska, a Ph.D in Social and Administrative Pharmacy from the University of Minnesota, and a post-graduate certificate degree in Health Economics within the Heath Economics Research Unit from the University of Aberdeen, Aberdeen, Scotland. He has taught pharmacy students the skills necessary to practice pharmacy in both outpatient community pharmacy (including dispensing and promotion good pharmacy practices) and health care systems practice. He has also taught research design and methods courses for both master's and Ph.D. students in colleges of pharmacy and public health. In these graduate level courses in colleges of pharmacy and public health he has taught research methods courses that involved research design focusing on survey research and questionnaire design. These courses also involved the use of statistical analytic techniques, both qualitative and quantitative in nature. He has also served as an advisor for Master and PhD students whose theses involved questionnaire design, survey research methods, and data analysis. Fincham Rpt. at 1-2.

Dr. Fincham has published 255 papers in refereed journals focused on pharmacy, medicine, public health, nursing, adverse drug reactions (pharmacoepidemiology), health care economics (pharmacoeconomics), health outcomes, and related disciplines. His papers have written have been cited by other authors in published papers a total of 3,414 times; his author h-index is 23 and his author i10-index is 48. A total of 70 of his refereed publications have been the result of questionnaire and survey research; these manuscripts have been published in national and international peer reviewed journals. Two of these publications written on survey research and methods have been cited by other authors 1,500 times.  Because of his expertise in research design

5

and methods and outcomes research and subsequent publication, he has been asked to serve as an external portfolio reviewer for well over 100 individuals seeking promotion and tenure at academic colleges of pharmacy, medicine, and public health in the United States. *Id.* at 2-3.

In his February 17, 2023 rebuttal report, Dr. Fincham criticized Dr. Selzer's methodology and analysis, and disagreed with her conclusions about the BoP surveys. He opined:

> [T]he Ohio Board of Pharmacy surveys collected sufficient and reliable information from those Ohio pharmacists working in large chain grocery store settings that, when placed in the context of the opioid epidemic, identify serious concerns about the safe and effective dispensing of opioids among other medications.

Fincham Rpt. at 5. He further concluded that "the 2020 and 2021 pharmacy workload surveys conducted by the Ohio Board of Pharmacy are valid and reliable," that "[a]nalyzing the survey results and pharmacists' comments highlight how pharmacy work environments impact dispensing and patient safety," and that:

> The survey information, when placed in the context of regulatory obligations of controlled substances, pharmacy practice and the ongoing opioid epidemic, were persuasive. Data from the surveys indicates that pharmacists working in large chain grocery stores believe their employers' policies and procedures, workload tasks, metrics and staffing levels in their workplace impact patient safety.

*Id.* at 30.

Dr. Fincham's report explains in detail that, as he succinctly stated in his deposition, Dr. Selzer did not "do what she should have done to analyze" the BoP Workload surveys. Doc. 5070-6 (Fincham Dep.) at 159:10-14. He explained that "[o]rganizations conduct different types of surveys for different purposes," and evaluating the validity of the survey requires answering "several questions," the most important of which are "what is the purpose that the survey, why is it important to administer the survey, and how will the survey results be used." Fincham Rpt. at 8, 11. Dr. Fincham explains, among other things, that Dr. Selzer failed to take into account the function of an "analytical field study," which differs from that of a "prediction survey." Fincham

Dep. at 72:7-73:1, 75:14-76:12, 78:11-25, 124:4-8.[3] "Understanding the purpose of the survey and how it is to be used is critical to determining whether the results of the survey are reliable for the purposes that the survey was being conducted." Fincham Rpt. at 12.

Dr. Fincham's report articulates how applying the methodology he has used and studied for years contradicts Dr. Selzer's opinions and concludes that "the surveys conducted by the Ohio Board of Pharmacy were valid and appropriate especially when evaluated for their purpose and use." Fincham Rpt. at 11. As noted above, he opines that "the Ohio Board of Pharmacy surveys collected sufficient and reliable information from those Ohio pharmacists working in large chain grocery store settings that, when placed in the context of the opioid epidemic, identify serious concerns about the safe and effective dispensing of opioids among other medications." *Id*. at 5. The survey gathered significant evidence that patient safety was at risk, which evidence was of sufficient credibility and quantity for the BoP to act to protect patients. *Id.* at 13.

In his detailed report, Dr. Fincham notes areas of agreement between himself and Dr. Selzer, *see id*. at 9, and important indicia of reliability and validity in the survey that Dr. Selzer ignored, *see id*. at 22-29. He addresses, for example, the BoP's finding that the surveys were reliable, *id*. at 23-24[4] and the absence of any request from the BoP workload advisory committee,

---

[3] Admittedly, Dr. Selzer did not try to analyze why the BoP conducted the survey, as this was "not [her] assignment." Selzer Dep. at 96:20-22.

[4] The BoP, which shared the survey with all pharmacists across Ohio because it wanted to accurately capture working conditions across the state, believes the survey is accurate, complete and reliable. McNamee Dep. at 59:23-60:5, 68:2-4. The 2020 survey results were "very concerning" to McNamee and the BoP staff, due to the "overwhelming consensus of there being a significant problem, particularly in the large chain setting" regarding the issue of metrics and perceived lack of time and adequate staffing levels. *Id.* at 69:11-70:12; *see also id.* at 70:13-15, 79:4-13, 80:22-82:1, 84:23-91:2, 92:14-24 (concern at BoP regarding potential danger to the public from workplace conditions). Generally, the data revealed to the BoP a concern across of all of the large chain settings, and the BoP formed an advisory committee in response. *Id.* at 100:23-101:6, 102:25-103:15, 111:9-114:6.

*id*. at 24-25. Dr. Fincham also calculated that 34% of respondents to the 2021 survey, and 41% of respondents to the 2020 survey, felt strongly enough to leave written comments, a "significant number" in his opinion, and concluded that the comments expressed "extremely strong and consistent views." *Id*. at 22; Fincham Dep. at 62:13-63:1 (describing the "very, very large" number of written responses, which included responses that were quite lengthy, as "rare"). Additionally, part of the scientific method in analyzing surveys is to consider whether the organization doing the survey has credibility among the respondents, which the BoP, as the regulator in this area, does. Fincham Dep. at 120:20-122:3; *see also* Fincham Rpt. at 8 (noting importance of fact that responses were to a survey from the pharmacists' regulator). Because a "method of proven value for survey research validity assessment is to compare results from one survey to similar surveys that are assessing the same issues," Dr. Fincham did so and opined as to their consistency, discussing, among others, a survey conducted by the American Pharmacist Association ("APhA"). Fincham Rpt. at 25-29. Overall, he opined that the surveys were "valid and reliable" and concluded that they "utilized appropriate survey design and research techniques and methodology consistent with the Board's goals." *Id.* at 30 (further opining as to the persuasive nature of the survey information).[5]

## LEGAL STANDARD

This Court previously set forth the legal standards in its *Track One Daubert Order Regarding Dr. Meredith Rosenthal* at 1–10 (Doc. 2495), referenced in *Daubert* rulings in Track 7. *See* Doc. 5031 at 1; Doc. 5051 at 3. "A touchstone of this analysis is whether the proffered expert 'basing testimony upon professional studies or personal experience, employs in the courtroom the

---

[5] Use of previously approved and recognized questions, as the BoP did here, also adds validity to the survey. Fincham Dep. at 178:20-179:7.

same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" Doc. 2495 at 6-7 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

## ARGUMENT

### A.     Dr. Fincham Is Qualified to Offer His Opinions

Although Kroger does not directly challenge Dr. Fincher's qualifications, it nonetheless suggests that Dr. Fincham may be unqualified when it contends that he "has never been asked to analyze the validity or intent of a survey or questionnaire." Doc. 5070 at 4. What Kroger fails to acknowledge is that, although Dr. Fincham has not been asked to do such analysis *as an expert witness in litigation*, he has in fact analyzed the validity of various surveys in connection with numerous peer-reviewed published articles. Fincham Dep. at 27:8-20. As detailed in his report and deposition testimony, Dr. Fincham has "published 70 papers dealing with survey research, survey methodology, and the outcomes of the research," and has been involved in hundreds more related to "survey design and implementation processes." *Id.* at 20:13-22. He has "personally created or administered a survey for pharmacists or pharmacy staff members" on "numerous" occasions. *Id.* at 22:25-23:3. He has examined survey designs and interpreted survey results well over 250 times in his role as editor or referee of peer reviewed journals. *Id.* at 173:17-175:2. In fact, during ten years as associate editor of the American Journal of Pharmaceutical Education, any questions raised about survey research would be referred to him. Fincham Rpt. at 2; Fincham Dep. at 174:15-23. He also evaluated numerous surveys as part of several advisory committees for Canada's equivalent of the United States National Institutes of Health and Agency for Healthcare Research and Quality. Fincham Dep. at 175:2-10.[6]

---

[6] As a professor, Dr, Fincham teaches on research methods and research design, concerning which he has amassed "thousands of pages of reference materials." *Id.* at 24:14-25:12 (further stating that he "constantly" endeavors to keep his presentations "up to date and current"); *see also* Fincham

As noted above, Dr. Fincham is also a licensed pharmacist with significant experience, as well as the author of numerous publications related to pharmacy, public health, pharmacoepidemiology, health care economics, and related disciplines. Fincham Rpt. at 1-4. He has authored several books dealing with survey research and survey methodology, including "Pharmacy and the U.S. Health Care System." Fincham Dep. at 19:23-20:12. He bases his opinion on his application of his extensive experience and education and review of case-related materials. Fincham Rpt. at 4; *see also, e.g.*, Fincham Dep. at 114:22-115:9. Kroger's suggestion that Dr. Fincham lacks experience or expertise in evaluating survey design merely because he has not offered expert witness testimony on this topic should thus be rejected. *See Kumho Tire*, 526 U.S. at 152.

**B.    Dr. Fincham's Opinion that the BoP Surveys Collected Sufficient and Reliable Information to Identify Concerns about Kroger's Dispensing of Opioids is Reliable and Admissible.**

**1.    Dr. Fincham's Opinions Are Neither in Conflict Nor Irrelevant**

Kroger's first argument, that Dr. Fincham's opinions about the purpose for which the BoP surveys were designed are in conflict, is simply wrong: Dr. Fincham's agreement that the surveys "did not purport to measure pharmacists concerns about opioids" in no way conflicts with his opinion that what *was* measured – pharmacists' concerns about safe dispensing of all medications – provides important insight about "the safe and effective dispensing of opioids among other medications."  *See* Fincham Rpt. at 5.  Kroger's manufactured "conflict" turns on the entirely unsupported proposition that pharmacists' concerns about safe dispensing of medications

---

Rpt. at 2 (discussing role in teaching "statistical analysis techniques, both qualitative and quantitative in nature"). He also has critiqued analysis of surveys as an academic professor reviewing submissions for publication and as part of academic work (thesis and masters degree requirements). Fincham Dep. at 14:1-12.

generally would somehow *not* apply to the dispensing of highly dangerous drugs such as opioids. Dr. Fincham expressly rejected this argument in his Report,  explaining that the dangers of these drugs make the concerns *especially* important and applicable in this area. *See* Fincham Rpt. at 14-15 (stating that "dispensing controlled substances is potentially the most dangerous aspect of pharmacy practice," and discussing the unreasonableness of suggesting "that patient safety would not encompasses filling dangerous opioid prescriptions").

Still, Kroger insists that the surveys provide no information rrelevant to Plaintiff's claims simply because they were not specifically designed for that purpose. Kroger's sole support for this contention is its assertion that "surveys not conducted specifically in preparation for, or in response to, litigation may sometimes provide important information, but they frequently ask irrelevant questions, unrelated to the issue in controversy."  Doc. 5070 at 7, *quoting* 1 Mod. Sci. Evidence § 7:6 (2022-2023 ed.). As this quotation shows, the very authority Kroger cites recognizes that such surveys *may* provide important information. Further, Kroger does not explain why the information gathered *in these particular surveys* about safe dispensing practices would not be relevant to the dispensing of opioids. That *some* surveys offered in *some* cases may be irrelevant to the issues in contention in no way shows that to be the case here. Rather, in this case, Dr. Fincham made the entirely reasonable inference that the concerns of pharmacists about the dispensing environment in their stores "*when placed in the context of the opioid epidemic*," identify serious concerns about the safe and effective dispensing of opioids. Fincham Rpt. at 5 (emphasis added). Kroger offers nothing to suggest that this inference is unreliable or improper, nor that it conflicts in any way with Dr. Fincham's acknowledgment about the more general purpose for which the surveys were originally designed. Kroger asks this Court to draw the entirely unsupported inference that problems with workload and safety at a pharmacy magically disappear

11

when the pharmacist is dispensing controlled substances. But there is no support for this contention – and, even if there were, it would go to the weight, not the admissibility, of Dr. Fincham's opinion that the concerns of pharmacists about a generally unsafe pharmacy environment provide relevant information about the environment in which opioids are dispensed.

### 2. Dr. Fincham Applied Standard, Well-Accepted Methodologies to Analyze the Data in the Surveys

Kroger also attacks Dr. Fincham's methodology in analyzing the data in the surveys, but its argument ignores the methodology that Dr. Fincham used, which he described in his report and in further detail in his deposition. *See* Fincham Rpt. at 4, 10-11 (outlining basis for opinions and citing literature in disclosing opinions); Fincham Dep. at 114:22-115:9, 117:20-118:12, 176:5-177:10, 178:2-6, & 188:15-189:2 (discussing methodology). Dr. Fincham used the same methods to analyze the BoP Workload Surveys that he does outside the litigation context. In so doing, he drew from "books, articles and treatises" that he describes as the "gold standard" for survey analysis techniques pertinent to his opinions here. Fincham Dep. at 117:20-118:12, 176:5-177:10, 178:2-6, 188:15-189:2. Thus, it is simply not true that only Dr. Fincham's "*ipse dixit*" connects the data in the BoP surveys to the facts of this case.

Kroger confuses the issue when, relying on *Navarro v. Procter & Gamble Co.*, 1:17-CV-406, 2021 WL 868586 (S.D. Ohio Mar. 8, 2021), it contends that Dr. Fincham's analysis is defective because he did not perform his own statistical analysis. But *Navarro* addresses how an expert *conducting* a study should go about interpreting the results. Dr. Fincham did not conduct the BoP studies. Rather, he analyzed the BoP's surveys and conclusions (based on BoP's statistical analysis) to determine if the surveys provided helpful information about dispensing and to assess whether Dr. Selzer's critique of the surverys was valid. Kroger makes no argument that the workload surveys themselves employed improper methods or failed to follow any applicable,

12

accepted statistical methods in presenting the data. *See, e.g.*, Selzer Dep. at 92:11-22, 94:4-7. In fact, even Dr. Selzer agrees that the 2021 survey "is a valid attempt to understand workplace issues among licensed pharmacists working in Ohio." Selzer Rpt. at 4. Moreover, to the extent it has any bearing on this case at all, *Navarro* contradicts Kroger's contentions. There, the district court held that "objections as to an expert's interpretation of the [survey] data, go to" the "weight," of his testimony "not its admissibility." *Id.* at *14 (cleaned up) (distinguishing between objections to survey methods and opinions about survey results, and quoting *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 746 (S.D. Ohio 2015)). Neither *Navarro* nor Kroger's unsupported attacks on Dr. Fincham's methodology provide any basis to exclude his opinions.

## C.     Dr. Fincham's Opinions about the Methodology of the Surveys Are Reliable and Admissible

Kroger contests the reliability and helpfulness of Dr. Fincham's opinions about the extent to which the survey results "were generalizable to the entire population of Ohio pharmacists." Doc. 5070 at 10-11, but its arguments cannot withstand scrutiny.

At the outset, the County notes that Kroger's argument pertains, at least in part, to the methodology of the BoP Workload surveys, not to *Dr. Fincham's* methodology in assessing that methodology. In effect, Kroger is challenging Dr. Fincham's *conclusion* that the BoP methodology was sound. But this is not a proper subject of a *Daubert* challenge. *See Daubert*, 509 U.S. at 595 (Rule 702 inquiry focuses "on principles and methodology, not on the conclusions they generate").[7] If Dr. Fincham's methodology in assessing the BoP's methodology was sound, there

---

[7] *See also* Doc. 2495 at 3 ("challenges to the accuracy of an expert's conclusions or factual basis generally 'bear on the weight of the evidence rather than on its admissibility'") (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)).

is no basis to exclude the conclusion he reaches, however much Kroger and its expert may disagree with that conclusion.

But even on its own terms, Kroger's argument fails. Kroger's primary argument is that because the BoP did not select the sample of pharmacists who responded to its survey, the results cannot be "generalized." But the issue is not whether the survey results can be "generalized," by which Kroger appears to mean whether all pharmacists would give the same responses, but rather whether the surveys are sufficiently representsative and reliable for him to draw conlusions about the overall dispensing environment in supermarket pharmacies. Dr. Fincham addressed concerns about whether the responses to the BoP surveys were in some way unrepresentative when he discussed several other surveys that *confirmed* the results of the BoP survey. First, Dr. Fincham considered the results of a similar Board of Pharmacy survey in Missouri. *See* Fincham Rpt. at 25-27. He found that the Missouri survey, which posed highly similar questions, resulted in highly similar responses and that the "comparison of Missouri and Ohio survey results confirmed the growing trend that workload demands are affecting patient safety." *Id.* at 25-26. Next, Dr. Fincham looked at the results of surveys conducted by the American Pharmacist Association (APhA), as noted above. He noted that one of the strengths of the APhA survey was its large sample size. He found that "[t]he consistency between the responses in the APhA surveys and the Ohio Board of Pharmacy survey reinforces the validity and reliability of the Ohio survey results." *Id.* at 28. He found the same to be true of a study published in 2021 by Clabaugh *et al*.  As Dr. Fincham explains:

> In both the APhA/NASPA and the Clabaugh study on workplace pharmacy issues, the authors validate the creditability and reliability of the studies' similar findings on the basis of larger sample sizes and mixed survey designs. *These statements in both documents reinforce the validity of the Ohio Board of Pharmacy survey.*

*Id.* (emphasis added).

14

Finally, Dr. Fincham considered a survey that Kroger itself conducted of its pharmacists:

> Kroger asked its pharmacists whether "overall, there is adequate staffing at my pharmacy that allows safe patient care?" 41% of Kroger pharmacists responded that they strongly disagreed and 35% disagreed. As a result, 76% felt staffing was inadequate for safe patient care. Additionally, 80% of Kroger respondents felt physically exhausted and 76% felt emotionally exhausted because of their work. 77% felt that the workload did not allow them to get everything done in a safe, satisfactory manner." *These responses are similar to the Ohio Board of Pharmacy survey findings for large chain grocery sites.*

*Id.* at 29 (footnotes omitted). Dr. Fincham's comparison of the BoP surveys to these other surveys supports his conclusion that surveys are sufficiently representative and reliable to "identify serious concerns about the safe and effective dispensing of opioids," *id.* at 2, in supermarket chain pharmacies and, in particular, at Kroger pharmacies. The conclusion is further supported by the fact that the BoP itself believed that the surveys provided important information about the dispensing environment, and took steps to address the concerns raised by the studies. *See* Fincham Rpt. at 13; McNamee Dep. at 100:23-101:6, 102:25-103:15, 111:9-114:6.

Kroger ignores this strong support for the reliability of Dr. Fincham's opinions, insisting instead that the only relevant question is whether the survey results are "generalizable" to "all pharmacists working in large chain grocery stores in Ohio." Doc. 5070 at 11. But as noted above, Dr. Fincham need not offer such an opinion, and in fact, repeatedly explained at his deposition that he was *not* so opining. Rather, he explained, for example, that the BoP survey sought to obtain "a *general sense of workplace conditions* that impacted patient safety in the practice of pharmacy in these settings in Ohio." Fincham Dep. at 43:23-44:2 (emphasis added); *see also, e.g.*, *id.* at 42:20-43:14, 51:8-53:14, 74:4-11; Fincham Rpt. at 9 (citing goals of BoP Workload Surveys and opining about the "striking" results received). It is not necessary for *every* pharmacist to agree in order for the survey results to provide accurate, reliable, and useful insight. *See* Fincham Rpt. at 22 ("The alarming numbers of pharmacists who worked in a large grocery store setting who reported

15

concerns about patient safety and workplace conditions which interfered with safe and effective pharmacy practice make the results both meaningful and important to a board charged with keeping the public safe through the enforcement of pharmacy regulations."). For this reason, Kroger is simply wrong in its assertion that because Dr. Fincham does not contend that the survey results can be applied with equal force to every pharmacist, his testimony is inadmissible or unhelpful. Rather, his testimony is useful – indeed, critical-- to provide the jury with a balanced view of the Ohio BoP Workload Surveys' regulatory purpose and the context of pharmacy professionals' responses in the large grocery store setting in Ohio.

*Hurt v. Commerce Energy, Inc.*, No. 1:12-CV-00758, 2015 WL 410703 (N.D. Ohio Jan. 29, 2015), cited by Kroger on this issue, is not to the contrary. In *Hurt*, a statistician with no expertise in survey design used a lawyer-conducted survey without doing any "analysis to determine whether the survey was reliable" before using it to extrapolate class-wide damages. *Id.* at *5.  The fundamental distinction between *Hurt* and this case is that, because *Hurt* was a class action, the expert opinion was a damages extrapolation that turned on the assumption that *each plaintiff* had suffered the same damages as the plaintiffs who had responded to the survey.  *See id.* at *3 (expert extrapolated from survey results to determine damages owed to each person). The court found no support for this assumption and several reasons to doubt that it was true. *See id.* *5. But in this case, it is not necessary for the BoP or Dr. Fincham to show that the results are equally applicable to all pharmacists in order to conclude that the survey results have something helpful to say about working conditions and dispensing practices at chain supermarket pharmacies. As noted above, Dr. Fincham used the survey results to draw conclusions about the overall environment for dispensing at grocery chain pharmacies. He also applied his survey expertise to assess the reliability and validity of the survey itself. In this context, the large number of pharmacists with

similar complaints, as well as the confirming results of similar surveys, are sufficient for Dr. Fincham to conclude that the surveys do identify serious and widely-shared concerns about the safety of dispensing practices at these pharmacies, even if not every pharmacist would agree or identify the same problems.

Finally, it bears noting that even if there were methodological flaws in the BoP surveys (for which there is no evidence – indeed, even Dr. Selzer does not identify any such flaws), one of the very cases on which Kroger relies for its attack on the BoP survey notes that "almost all surveys are subject to some sort of criticism," and "courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006), *aff'd*, 502 F.3d 504 (6th Cir. 2007).[8] Dr. Selzer has offered opinions about these surveys. Dr. Fincham's opinions responding to her are grounded in sound methodology and are reliable. Any flaws in the underlying surveys go the weight, not the admissibility, of his rebuttal opinions.

## CONCLUSION

For the reasons set forth above, the County respectfully requests that Kroger's Motion be denied.

---

[8] *See also, e.g.*, *Franklin Res., Inc. v. Franklin Credit Mgmt. Corp.*, 95 CIV. 7686 (CSH), 1997 WL 543086, at *5 (S.D.N.Y. Sept. 4, 1997) ("A survey is admissible in evidence if it tends 'to make the existence of any fact that is of consequence to the action more probable or less probable than it would be without the evidence'" and "inadmissible only if it is so flawed that it lacks all relevance.") (quoting FED. R. EVID. 401). The admissibility of the surveys is not at issue here, and the County reserves the right to brief that issue in full.

Dated: July 5, 2023                          Respectfully submitted


                                             */s/ Peter H. Weinberger*
                                             Peter H. Weinberger (0022076)
                                             SPANGENBERG SHIBLEY & LIBER
                                             1001 Lakeside Avenue East, Suite 1700
                                             Cleveland, OH 44114
                                             (216) 696-3232
                                             (216) 696-3924 (Fax)
                                             pweinberger@spanglaw.com
                                             *Plaintiffs' Liaison Counsel*

                                             Linda Singer
                                             Elizabeth Smith
                                             MOTLEY RICE LLC
                                             401 9th Street NW
                                             Suite 630
                                             Washington, DC 20004
                                             (202) 386-9626
                                             lsinger@motleyrice.com
                                             esmith@motleyrice.com
                                             *Attorneys for Plaintiff Montgomery County*

                                             Michael Elsner
                                             Lisa Saltzburg
                                             MOTLEY RICE LLC
                                             28 Bridgeside Blvd.
                                             Mount Pleasant, SC 29464
                                             (843) 216-9000
                                             melsner@motleyrice.com
                                             lsaltzburg@motleyrice.com
                                             *Attorneys for Plaintiff Montgomery County*

                                             Mathias H. Heck, Jr.
                                             MONTGOMERY COUNTY
                                             PROSECUTING ATTORNEY
                                             301 West Third Street
                                             P.O. Box 972
                                             Dayton, Ohio 45422
                                             Telephone: (937) 225-5599
                                             Fax Number: (937) 225-4822
                                             E-mail: heckm@mcohio.org
                                             *Attorney for Plaintiff Montgomery County*

18

Ward C. Barrentine
Chief Assistant Prosecuting Attorney –
Civil Division
MONTGOMERY COUNTY
PROSECUTOR'S OFFICE
301 West Third Street
4th Floor, Suite 461
Dayton, Ohio 45422
Telephone: (937) 496-7797
E-mail: BarrentinW@mcohio.org
*Attorney for Plaintiff Montgomery County*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of July, 2023, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF System. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF Systems.

*/s/ Peter H. Weinberger*
Peter H. Weinberger