# EXHIBIT
# A

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3                          - - -

 4    _____
                                    :
 5    IN RE: NATIONAL PRESCRIPTION : MDL No. 2804
      OPIATE LITIGATION            :
 6                                 : Case No. 17-md-2804
      THIS DOCUMENT RELATES TO:    :
 7    "Case Track Seven"           : Judge Dan Aaron Polster
      _____:
 8

 9               Friday, January 20, 2023

10               HIGHLY CONFIDENTIAL
         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
11

12

13          Remote videotaped deposition of

14    J. ANN SELZER, Ph.D., commencing at 9:02 a.m., on the

15    above date, before Carol A. Kirk, Registered Merit

16    Reporter, Certified Shorthand Reporter, and Notary

17    Public.

18

19

20

21

22

23              GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
24                  Deps@golkow.com
```

```
 1          R E M O T E   A P P E A R A N C E S

 2                      - - -

 3   On behalf of the Plaintiffs:

 4          MOTLEY RICE LLC
            BY:  MICHAEL E. ELSNER, ESQUIRE
 5               melsner@motleyrice.com
            28 Bridgeside Boulevard
 6          Mount Pleasant, South Carolina  29464
            843-216-9250
 7

 8   On behalf of the Defendant, The Kroger Company:

 9          BOWLES RICE LLP
            BY:  GABRIELE WOHL, ESQUIRE
10               gwohl@bowlesrice.com
                 AARON RACHLIN, ESQUIRE
11               aaronrachlin@bowlesrice.com
            600 Quarrier Street
12          Charleston, West Virginia  25301
            304-347-1100
13

14

15   ALSO PRESENT:

16          Gina Veldman, Trial Tech
            Bill Geigert, Videographer
17          Amanda Unterreiner, Motley Rice
            Michael Hall, Motley Rice
18

19

20

21

22

23

24
```

```
 1                  INDEX TO EXAMINATION

 2   WITNESS                                    PAGE

 3   J. ANN SELZER, PH.D

 4       CROSS-EXAMINATION BY MR. ELSNER           6
         REDIRECT EXAMINATION BY MS. WOHL         232
 5       RECROSS-EXAMINATION BY MR. ELSNER        237

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1                    INDEX TO EXHIBITS

2    SELZER          DESCRIPTION                      PAGE

3    Exhibit 1       Document titled "Appendix,        18
                     Selzer Review of Comments, 2021
4                    Survey," Bates-stamped MR
                     4371_000001 through 49
5
     Exhibit 3       Evaluation of 2021 Pharmacist     55
6                    Workload Survey Conducted by
                     the State of Ohio Board of
7                    Pharmacy in Support of Case
                     1:18-op-46326-DAP, Montgomery
8                    County, Ohio Litigation

9    Exhibit 4       Pharmacist Workload Advisory      97
                     Committee, Approved 4/20/2021,
10                   Bates-stamped MR 4202_000001
                     through 177
11
     Exhibit 5       Article titled "Exploring the    163
12                   Regional Effects of Rising
                     Health Insurance Costs on
13                   Consumers, Bates-stamped MR
                     4373_000001 through 24
14
     Exhibit 6       Document titled "Iowa State      199
15                   Planning Grant, 2005 Final
                     Report to the Secretary"
16
     Exhibit 7       2021 Pharmacist Workload         218
17                   Survey, Bates-stamped MR
                     4201_000001 through 219
18

19

20

21

22

23

24

```
 1                        - - -

 2              P R O C E E D I N G S

 3                        - - -

 4            THE VIDEOGRAPHER:  Good morning.

 5      We are now on the record.  My name is

 6      Bill Geigert.  I'm a videographer for

 7      Golkow Litigation Services.

 8              Today's date is January 20, 2023,

 9      and the time is 9:02 a.m.

10              This remote video deposition is

11      being held in the matter of the National

12      Prescription Opiate Litigation in the

13      United States District Court, Northern

14      District of Ohio, Eastern Division.

15              The deponent is J. Ann Selzer,

16      Ph.D.

17              All parties to this deposition are

18      appearing remotely and have agreed to

19      the witness being sworn in remotely.

20              Due to the nature of remote

21      reporting, please pause briefly before

22      speaking to ensure all parties are heard

23      completely.

24              All counsel will be noted on the
```

1              stenographic record.

2                     The court reporter is Carol Kirk,

3              and she will now swear in the witness.

4                      - - -

5                     J. ANN SELZER, PH.D

6    being by me first duly sworn, as hereinafter

7    certified, deposes and says as follows:

8                     CROSS-EXAMINATION

9    BY MR. ELSNER:

10             Q.    Good morning, Dr. Selzer.  My name

11   is Michael Elsner.  I'm from the law firm of

12   Motley Rice, and I represent Montgomery County.

13                   How are you this morning?

14             A.    I'm great.

15             Q.    Great.  Well, happy Friday.  I'm

16   the only person standing between your weekend,

17   so I'm sorry for that, but we'll get through

18   this as best we can.

19                   Can you just tell us your full

20   name for the record.

21             A.    Jane Ann Selzer.

22             Q.    And have you used any other names

23   professionally, a maiden name, for instance?

24             A.    I'm sorry?

1          Q.    Have you used any other names

2    professionally in your professional work?

3          A.    I didn't hear the end of what you

4    said.

5          Q.    A maiden name, for instance.

6          A.    A maiden name.  No.  I am -- I go

7    by J., first initial J. Ann Selzer

8    professionally.

9          Q.    Okay.  Great.  Thank you so much.

10               And where do you live?

11         A.    I live in Des Moines, Iowa.

12         Q.    And how long have you lived there?

13         A.    Since -- off and on, but for the

14    last time since 1987, December of 1987.

15         Q.    And are you originally from Iowa?

16         A.    I'm not.

17         Q.    Where are you from originally?

18         A.    I was born in Minnesota, and I

19    grew up in Kansas.

20         Q.    We're doing this, obviously, today

21    by Zoom.  And can you tell me where you're

22    located today during this deposition?  Where are

23    you?

24         A.    I'm in our -- the Selzer & Company

1    offices in West Des Moines.

2         Q.    And is anyone in the room with

3    you?

4         A.    There's no one in the room with

5    me.

6         Q.    Okay.  Other than the box of

7    documents that we sent to you, do you have any

8    other documents or materials, notes or anything

9    else in front of you?

10        A.    I have a printed version of the

11   report I submitted and the appendix.  I have no

12   other notes.

13        Q.    Okay.  And your version of the

14   report and the appendix, do you have any notes

15   in there?  Have you tagged certain pages?

16        A.    I have tagged the page that had to

17   do with -- and I can show it to you if that

18   helps.

19             The number of respondents, the

20   number of people that the surveys were sent to

21   and their response rate.

22        Q.    Okay.  And what page is that?  Is

23   that the appendix or is that --

24        A.    I've tagged it both places.  It's

1    on page 13 of the report.  And it's, you know,

2    in a better format in the appendix on page X-15.

3              Q.    Thank you.

4                    Any other notes or tags or --

5              A.    No.

6              Q.    Okay.  What about electronic

7    devices?  Do you have any cell phones or other

8    devices that you have with you?

9              A.    I have a cell phone.

10             Q.    Okay.

11             A.    That's it.

12             Q.    I just ask that during the course

13   of my questioning and answering that you don't

14   refer to anything on your cell phone.

15             A.    No, I will not.  I'm covering it

16   up.

17             Q.    I never thought I had to ask that

18   question, but I did.  So now we -- it's like so

19   many things in life.  Sometimes you have more

20   questions than you thought you'd need.

21                   How is it that you were hired to

22   serve as an expert witness in this case?

23             A.    I received an inquiry from a

24   person that I had worked with long, long ago on

1    something completely different who had been

2    asked if he knew someone who was an expert in

3    survey research, and he -- do you need to know

4    his name?

5         Q.    I'm guessing it's John Schneider.

6    Is that right?

7         A.    John Schneider, that's correct.

8    And he -- I indicated that perhaps I would be

9    interested, and then I was contacted by

10   Aaron Boone, and we had conversations, and it

11   went from there.

12        Q.    Okay.  And when did Mr. Schneider

13   reach out to you?

14        A.    In late November.

15        Q.    All right.  And when were you

16   retained to work in this matter?

17        A.    The very last week, or perhaps

18   even last days, of November.

19        Q.    And what was your assignment?

20        A.    My assignment was to review a

21   survey that had been conducted by the State of

22   Ohio Board of Pharmacy, and with the specific

23   assignment to review, and to report and offer

24   opinions on what it would have to say about

1   pharmacists and pharmacies and their role in

2   opioid diversion and abuse.

3          Q.    And were you asked to study or

4   offer an opinion as to the methodology of the

5   survey or the reliability of the survey?

6          A.    Yes.  That would be a part of a

7   review of the survey.

8          Q.    Okay.  Have you ever served as an

9   expert witness before?

10         A.    Yes.

11         Q.    In what circumstances?

12         A.    It was a survey that had been

13  proposed in terms of certifying a class of

14  former and current employees of an organization.

15  And my assignment was to say, "Here's what they

16  propose to do.  Is it feasible to do this?"  And

17  what is my opinion about the value of such a

18  survey.

19         Q.    All right.  And who was it that

20  hired you?  Who was the client?

21         A.    I don't know that I can disclose

22  that.  I'm still under the nondisclosure

23  agreement from that project.

24         Q.    Well, were you publicly offered as

1   an expert witness in this case, or were you just

2   doing a consulting role?

3          A.    I wrote a report.  And on the

4   basis of the report, there was no further need

5   for my services.

6          Q.    Did you -- were you deposed?

7          A.    No.

8          Q.    Was there a determination by the

9   court in that case whether you were qualified or

10  not to serve as an expert?  Did it reach that

11  point?

12         A.    I do not believe it reached that

13  point.

14         Q.    And what state was the case

15  pending in?

16         A.    I don't know that I remember.

17         Q.    How long ago was this?

18         A.    This would have been ten years

19  ago, so 2013.

20         Q.    Okay.  So I think under the

21  federal rules, you're required to -- well, I

22  guess it's in cases where you testified as an

23  expert.

24                So you did not offer trial

1    testimony; is that correct?

2              A.    I was not asked to.  Correct.

3              Q.    Is this the only circumstance in

4    which you've served as an expert witness in the

5    past?

6              A.    Qualified, yes; that is, I was a

7    witness to a court proceeding in which my client

8    and the survey I conducted for them was being

9    questioned.  And I answered questions from a

10   judge under oath about that.

11             Q.    And where did that occur?

12             A.    That was here in Iowa.

13             Q.    Got it.  Okay.

14                   And what was the case and who was

15   the client?

16             A.    The client was IPERS, which is the

17   Iowa Public Employee Retirement System.  And

18   they had been required from -- by the state

19   legislature to conduct a survey of their members

20   about the location of a new headquarters.  They

21   were sued by Hy-Vee, which is a grocery store

22   chain.  And, as I said, I gave testimony.

23             Q.    How do you spell that grocery

24   store chain?

```
1              A.    H-y-V-e-e.

2              Q.    What was the outcome of the case?

3              A.    I don't -- well, the outcome of

4    the -- of my testimony was that I was found

5    credible and that the judge suggested that --

6    well, I don't actually know what happened.  The

7    case went away.  So my client was vindicated,

8    and they built the headquarters where my survey

9    suggested.

10             Q.    Understood.

11             A.    The will of their membership.

12             Q.    And were you serving as an expert

13   witness in that case or as a fact witness?

14             A.    That's why I said qualified, yes.

15   I was explaining the work I had done.  I don't

16   remember -- this was longer ago.  This was more

17   like 2008, possibly 2004.  I'm sorry.

18   I remember that I did remote testimony because

19   it was caucus day; therefore, it was either in

20   2004 or 2008.

21             Q.    It was a pretty rough day for you

22   in terms --

23             A.    Well, that's a day you just sit

24   and wait, so ...
```

```
 1              Q.    Oh, I see.  Okay.  All right.

 2                    And were you deposed in that case

 3    before you offered trial testimony?

 4              A.    No.

 5              Q.    Do you remember where the case was

 6    pending or did you -- I know you testified

 7    remotely.  But do you know what courthouse?

 8              A.    In Sheraton.  And you want to --

 9    you'd like to know what county that is?  I'm not

10    going to get the county right.  It's south of

11    Des Moines, closer to the Missouri border.

12              Q.    Thank you.

13                    Any other cases where you've

14    testified as a fact witness or an expert

15    witness?

16              A.    No.

17              Q.    And by "testify," I mean both by

18    deposition or at trial.

19              A.    Okay.  So I did represent myself

20    in district court against a former landlord.

21              Q.    Okay.

22              A.    So I was both the questioner and

23    the respondent in that case.

24              Q.    Did you win?
```

```
1          A.     I did.

2          Q.     Okay.

3          A.     I was advised to retire

4   undefeated.

5          Q.     Probably good advice.

6                 Have you been retained by any

7   other pharmacy in this matter to evaluate the

8   Ohio Board of Pharmacy survey?

9          A.     No.

10         Q.     Have you been hired by any

11  pharmacies to evaluate any issues with respect

12  to the opioid litigation, other than Kroger?

13         A.     No.

14         Q.     How do you know John Schneider?

15         A.     John Schneider was a colleague of

16  my brother-in-law at the University of Iowa.

17  And I was working on an expansive program of

18  research on sort of reforming health insurance

19  before it was fashionable.  And I had the idea

20  to see if we could measure the drag on the Iowa

21  economy of the 15 percent per year increases in

22  health insurance that companies were paying on

23  behalf of their employees.

24                And John Schneider is a health
```

1    economist.  And we connected and chatted a bit.

2    And he did that analysis, which was part of the

3    report that we submitted.

4         Q.    And when he reached out to you

5    work on this case, how did he describe what the

6    case was to you?

7         A.    In the shortest possible terms.

8    Somebody had asked him if he knew an expert in

9    survey research, and my name came up.

10        Q.    And have you read Mr. Schneider's

11   report in this case?

12        A.    No.

13        Q.    Have you read any other expert

14   reports in this case?

15        A.    No.

16        Q.    And that includes both the

17   plaintiff and defendant experts; is that true?

18        A.    Correct.

19        Q.    Okay.  I want to -- in the

20   appendix to your report --

21        A.    I'm sorry.  The terminology is

22   going to be maybe a little funny.  I read two

23   depositions, but not any reports that those

24   people would have submitted.

1          Q.    Right.  I'm sorry.  I'm familiar.

2     Those are -- that's the deposition of

3     Mr. McNamee from the Ohio Board of Pharmacy; is

4     that right?

5          A.    That's right.

6          Q.    And Mr. Davis who works at Kroger;

7     is that right?

8          A.    That's right.

9          Q.    Okay.  Well, your answer was

10    correct.  Neither are serving as an expert

11    witness.  And I wasn't trying to trick you, but

12    I appreciate your clarification.

13               And is that the only testimony

14    that you've read in the case?

15          A.    As far as I recall.

16                    - - -

17        (Selzer Deposition Exhibit 1 marked.)

18                    - - -

19    BY MR. ELSNER:

20          Q.    Okay.  And I want to turn to your

21    appendix, which we'll mark as Exhibit 1 to the

22    deposition.  It's MR 4371, if you'd like to pull

23    it out.  And I want to ask you a few questions

24    about your CV, which starts at the end, as you

1    know, page X-44, X-45, pages 44 and 45 of the

2    appendix.

3           A.    Yeah.  Do you need me to pull the

4    document out of your file?

5           Q.    I do not.  It's really there for

6    your benefit if you feel like there's something

7    you'd like to look at.  I will assure you it

8    goes much quicker if you don't pull it out each

9    time.  But I'm happy to give you that

10   opportunity if you'd ever like to take it, okay?

11          A.    Very good.

12          Q.    All right.  First, Ms. Selzer, is

13   this your -- is this your resumé?

14          A.    Yes.

15          Q.    Okay.  And is it accurate and

16   complete?

17          A.    There is one thing that is

18   missing, which are the years that I mentioned in

19   the report itself when I worked for

20   Peter D. Hart Research Associates between 1985

21   and 1987.

22          Q.    All right.  And what work did you

23   do for them?

24          A.    I was a senior research analyst.

1   It's a polling firm in Washington, D.C.

2          Q.    Any other errors or corrections

3   you'd like to make in your resumé?

4          A.    No.

5          Q.    Anything you omitted in the resume

6   other than the correction you just made?

7          A.    Well, I've lived a long and happy

8   life, so surely there are things that are

9   omitted.  But that are relevant, no.

10         Q.    Thank you.

11               You know, I noticed something in

12  your resumé, which is a little uncommon for me.

13  You and I have something in common.  We both

14  studied at the University of Reading in England.

15  I don't know that I've met someone

16  professionally that's done that, so ...

17         A.    Likewise.

18         Q.    -- fates have aligned.

19               You have a master's and a Ph.D. in

20  communication theory and research; is that

21  right?

22         A.    That's right.

23         Q.    Okay.  And can you tell me, what

24  is that?

```
 1            A.    That is a discipline that looks at

 2   language and symbol systems and how we create

 3   meaning and how we attempt to create meaning in

 4   the receivers of our messages.  And it sort of

 5   stretches into -- some of it is psychology, some

 6   of it is sociology, some of it is linguistics.

 7   But it's a discipline that came out of really

 8   public speaking, public address, and ways of

 9   understanding how it actually works.

10            Q.    Were you required to complete a

11   dissertation for your doctorate degree?

12            A.    Yes.

13            Q.    And what was that on?

14            A.    It was about the gender gap in

15   presidential elections between 1964 and 19 --

16   sorry.  1960 and 1984 -- sorry.  1960 and 1980.

17   And so looking at the -- using the University of

18   Michigan databases of election surveys research

19   and tracking the gender gap and postulating as

20   to why the gender gap might have become a bigger

21   deal over time.

22            Q.    And for your master's degree, did

23   you have to write a thesis for your master's

24   degree?
```

1      A.    No.

2      Q.    What percentage of your work would

3  you characterize as work in politics, that is,

4  analyzing polling in politics versus the other

5  work that you do?

6      A.    It depends on if it's an election

7  year, as you can imagine.  I think it's easily

8  half.  And I'm gauging that not in terms of the

9  hours that are spent but in terms of the revenue

10  to my company, that that's -- that's my best

11  guess.

12      Q.    When was it that you got

13  interested in politics and polling?

14      A.    Well, I was interested in data

15  from an early time in my life.  So I anticipated

16  when I went to university that I would be

17  involved in some way with gathering data.  I had

18  an interest there.

19            After my third year of coursework

20  in my dissertation -- in my doctoral program,

21  I was awarded a congressional fellowship in

22  women's studies and went to Washington for a

23  year and worked on Capitol Hill.

24            And so I obviously was interested

1    in politics before, but that really cemented

2    that I'm interested in gathering data.  I'm

3    interested in politics that equals polling.

4          Q.    And you're considered one of the

5    best political pollsters in Iowa, true?

6          A.    Not just Iowa.

7          Q.    The whole country?

8          A.    May I boldly say.

9          Q.    If you're not going to say it

10   during your deposition, you're rarely given the

11   opportunity.

12         A.    I am considered one of the best,

13   if not the best, pollster in Iowa.  We've worked

14   nationally and beyond Iowa borders.

15         Q.    And that same distinction applies

16   nationally, true?

17         A.    It does.

18         Q.    Okay.  And there have been

19   numerous, numerous articles written about you

20   and your polling activities, true?

21         A.    That's true.

22         Q.    And you appear on national

23   programs, CNN, all sorts of different channels,

24   to discuss polling in politics; is that fair?

1          A.     That's true.

2          Q.     And is that how you're best known?

3          A.     I am best known as an election

4     pollster, let me put it that way.

5          Q.     Okay.  Have you ever published any

6     articles related to survey designs and

7     reliability of surveys?

8          A.     When I was on the staff of the

9     Des Moines Register, I was assigned to edit a

10    book for newspaper researchers about survey

11    methodology.  And I contributed chapters to

12    that, as well as edited chapters that would have

13    dealt with those issues.  This would have been,

14    as you can see from my resumé, prior to 1992.

15         Q.     And is that a peer-reviewed

16    publication?

17         A.     It was a book that was published

18    by the International Newspaper Marketing

19    Association.

20         Q.     And I think I saw it here.  Is it

21    on your CV?  I thought I did, but I'm having

22    trouble finding it.

23         A.     Well, it would be under, you

24    know -- I don't know that it is on that.  I'm

1   not -- I'm not an academic, so I'm not required

2   to publish in order to advance my career.  And

3   so it's not important to me to do so.  I talk

4   about survey methodologies, but ...

5        Q.   But you haven't published on it

6   aside from serving as an editor to this one

7   particular publication and contributing to some

8   of the chapters; is that fair?

9        A.   In terms of publications, that's

10  fair.

11       Q.   Okay.  And that's what I'm asking.

12            What's the title of that book?

13       A.   Probably Newspaper Marketing

14  Research, a primer.

15       Q.   And do you recall what chapters

16  you contributed to?

17       A.   I contributed to a chapter on

18  sampling.  I heavily edited a chapter on

19  questionnaire design.  And I contributed a

20  chapter on analysis.

21       Q.   Okay.  Other than -- and what was

22  the year that this was published?

23       A.   Previous to 1992.

24       Q.   Do you have --

```
1              A.    1990, 1991.

2              Q.    Okay.  All right.  Understood.

3                    Any other publications on survey

4    design and the reliability of surveys?

5              A.    Could you repeat that question?

6              Q.    Any other publications other than

7    this one that we just mentioned on the survey

8    design and reliability of surveys?

9              A.    Not that I can remember.

10             Q.    Okay.  Are there any other

11   publications that you've written in any

12   peer-reviewed journals or books that have been

13   peer-reviewed?

14             A.    I wrote, while I was a graduate

15   student, an article that was peer-reviewed.  Not

16   on this topic.

17             Q.    What was the topic?

18             A.    The topic -- this was for the

19   Journal of Mass Communication or something.  It

20   was a study of a -- the newspaper coverage of a

21   murder trial in Kansas and an analysis using

22   Kenneth Burke's techniques of who is the agent

23   and who is the patient and explaining why it was

24   a surprise verdict from the jury, given what the
```

1    newspaper coverage was.

2              We got the transcript from the

3    trial and were able to do a rhetorical analysis

4    of that.  I had a coauthor on that who was

5    trained as a rhetorician.

6         Q.   Okay.  And I see on the screen

7    that there's a reference to that where you had

8    received a grant for that work.  Is that true?

9         A.   That's right.  From the Kaltenborn

10   Foundation.  That's correct.

11        Q.   And that work was in 1983; is that

12   right?

13        A.   Yes.

14        Q.   Okay.  Have you ever taught any

15   courses on the subject of surveys or the design

16   of surveys, the reliability of surveys?

17        A.   There have been sections of

18   courses that I've taught that include covering

19   those areas.

20        Q.   And where did you teach these

21   courses?

22        A.   I was on the faculty of

23   Drake University here in Des Moines for a year

24   working -- and it would have been the -- only in

1   the fall semester.  I was working with the

2   capstone course for the public relations

3   department.  And the fall semester was devoted

4   to research.

5          Q.    And I see here that looks like it

6   was in the fall of 2007, spring of 2008?

7          A.    That's right.

8          Q.    Okay.  Any other -- any other

9   courses that you taught on those subjects?

10         A.    Courses in universities?

11         Q.    Yes.

12         A.    No.

13         Q.    Are there other courses that you

14  taught outside of universities on survey design

15  and the reliability of surveys?

16         A.    We would have covered those

17  topics.  I was on the faculty of the newspaper

18  research council when I was on the staff of the

19  Des Moines Register and for a few years beyond

20  that.  And we would bring in newcomers, new

21  newspaper researchers, and teach them about

22  research methods.  And it would have covered

23  those things.

24         Q.    Have you ever conducted any

```
 1    surveys for any pharmacies?

 2          A.    No.

 3          Q.    Have you conducted any surveys for

 4    any Board of Pharmacy?

 5          A.    No.

 6          Q.    Have you conducted any surveys of

 7    pharmacists on behalf of any trade

 8    organizations?

 9          A.    No.

10          Q.    Have you ever done any survey work

11    with respect to employment-related issues?

12          A.    Can you be more specific?

13          Q.    Well, I'm looking for parallels

14    between the survey you examined here from the

15    Ohio Board of Pharmacy and workplace conditions

16    and any other surveys you conducted which are

17    similar to that.

18          A.    I'm looking at my list of selected

19    clients here trying to recall if any of these

20    were employee surveys.

21          Q.    And just for the record, you're

22    looking at pages 48 and 49 --

23          A.    That's right.

24          Q.    -- of your appendix?
```

1          A.     That's right.

2                 I cannot confirm that any of these

3     were surveys of employees, that I can recall.

4          Q.     Were there any surveys done for

5     any of these institutions related to workplace

6     attitudes, feelings, sentiments?

7          A.     So the one that I see here that

8     might fall into that category is under

9     "Miscellaneous," the "Equality in the Courts

10    Task Force," which included survey -- was

11    conducted -- paid for, sponsored, by the Iowa

12    Bar Association.

13                And we looked at surveys of

14    attorneys, surveys of court personnel, and I

15    think judges as well, so three surveys to take a

16    look at those issues.

17         Q.     When was that done?

18         A.     That would have been roughly 1992,

19    '93.

20         Q.     Okay.  Was it published?

21         A.     There was a -- there was a task

22    force report which was published and included,

23    among other -- this was one piece of what they

24    were doing.

1          Q.    Anything -- I'm sorry.  Go ahead.

2          A.    Sorry.

3                It was part of the report.

4          Q.    I understand.  Okay.

5                Any other surveys related to

6     workplace issues for any of these clients or any

7     other clients?

8          A.    Not that I recall.

9          Q.    Okay.  This list that you've put

10    together on pages 48 and 49 that we've displayed

11    for you here, is this a list of all of your

12    clients that have compensated you for work?

13         A.     It is a selected list, but it is

14    by far the vast majority.

15         Q.    All right.  And by "selected," are

16    there any health care companies, pharmaceutical

17    companies, or pharmacies that you've left off

18    the list?

19         A.    No.

20         Q.    Okay.  All right.  Now, this

21    listing, did you actually provide surveys for

22    each of these clients, or were there -- or was

23    there other work that you were hired to perform

24    for them?

1        A.      There was other work.  Some

2   clients we would do focus groups for them, and

3   sometimes in-depth interviewing for them.

4   Sometimes there's just consulting that they've

5   got, you know, a corpus of research and they

6   want me and my staff to figure out what's useful

7   in it and write a report about that.

8        Q.      Okay.  I see here that you have

9   GlaxoSmithKline listed under "Health."

10       A.      Yes.

11       Q.      What type of work did you perform

12  for them?

13       A.      This was around the 2008 caucuses.

14  And they approached us to find out about whether

15  the caucus going electric could be activated to

16  be involved with talking about health care and

17  health care reform.

18       Q.      Okay.  All right.  Dr. Selzer, you

19  are not a licensed pharmacist; is that true?

20       A.      That's true.

21       Q.      Have you ever worked in a

22  pharmacy?

23       A.      No.

24       Q.      Do you have any experience with

1    the practice of pharmacy?

2         A.    No.

3         Q.    Okay.

4         A.    Beyond being a customer.

5         Q.    One thing I didn't see on your

6    list was any kind of political campaigns.

7              Have you been hired by political

8    campaigns to perform either surveys or polling?

9         A.    I do not work for candidates who

10   are running for office or political parties.

11        Q.    What about political action

12   committees?

13        A.    It is rare, and I do my best to

14   find a different way of being paid.

15        Q.    Explain that to me.

16        A.    I just don't wish to have what

17   appears to be a conflict of interest.

18        Q.    So you've done some work for

19   political action committees, but you haven't

20   been compensated by political action committees;

21   is that fair?

22        A.    I would say the work that I did

23   was for the 501(c)(3) that had an affiliated

24   501(c)(4), but the work was for the issues that

1    they were interested in.

2         Q.    All right.  What political action

3    committees, 501(c)(3)s, have you done work for?

4         A.    Well, I would distinguish them.

5    I do work for the Environmental Law and Policy

6    Center and they have a 501(c)(4), but my work is

7    for the policy side of the organization.

8         Q.    What is the hourly rate that you

9    charge for your work doing polling-related work

10   or, for instance, the work of this Environmental

11   Law and Policy Center?

12        A.    I do not work on -- I work on a

13   per project fee rather than an hourly rate, so

14   it's very rare -- while I have some clients that

15   want something relatively short and prefer to do

16   it by an hourly rate, it is -- the vast majority

17   of the work I give a price.  They say yes or no.

18        Q.    If the Ohio Board of Pharmacy

19   hired you to conduct the survey, give us an

20   estimate as to what you would have charged the

21   Ohio Board of Pharmacy for that work.

22             MS. WOHL:  Objection to form.

23        Q.    I'm sorry.  In a deposition like

24   this -- I apologize.  I forgot you haven't done

1    this a lot.

2              From time to time I may ask a

3    question and counsel for Kroger might offer an

4    objection.  Even though they've objected, you

5    still need to answer the question, unless she

6    tells you that you're not to answer the

7    question, which she hasn't done yet, okay?

8         A.    It is very hard for me to answer

9    the question as you asked it because it presumes

10   that I would have used this methodology and that

11   I wouldn't have done something different, so ...

12        Q.    I'm not asking you to presume you

13   would have done it the way the Ohio Board of

14   Pharmacy had done it.  I want you to presume you

15   would have done it the way you professionally

16   thought it should have been done.  I'm just

17   trying to get a sense of what you earn for this

18   type of work.

19        A.    So the ballpark I can give you is

20   that there are very few projects that we do

21   these days that is less than $50,000.

22        Q.    And so given the scope of what the

23   Ohio Board of Pharmacy wanted to do, not what

24   they did, but the intent behind what they wanted

1    to do, and given the size of the pharmacist

2    community in Ohio and the issues that they

3    wanted to address, do you think it would have

4    been at $50,000, or is it closer to $100,000?

5    What is your best estimate as to what you would

6    have charged for that work?

7              MS. WOHL:  Objection to form.

8              Go ahead.

9         A.    And that's -- without having

10   gotten out my bid spreadsheet and sort of

11   figured out how we were going to get the work --

12   the data collected, that's a big piece of it.

13   I can't give you a very good answer beyond what

14   I've already said.

15        Q.    How would you have suggested that

16   the data be collected --

17             MS. WOHL:  Objection to form.

18        Q.    -- if not by e-mail and the way

19   that the Ohio Board of Pharmacy did it?

20        A.    I have given that very little

21   thought, so ...

22        Q.    Okay.  So when you're offering an

23   opinion, an expert opinion, in this case, you're

24   not going to be offering an opinion how you

1   would have conducted the survey?

2          A.    I was not assigned to do that.

3   That's correct.

4          Q.    Okay.  And you're not going to

5   offer that opinion to the jury, correct?

6          A.    I have done -- I have not done the

7   mental preparation that I would need to do to

8   answer that.

9          Q.    Okay.  But it would be at least

10  $50,000, correct?

11         A.    I would say that that is sort of

12  the common starting point for clients.

13         Q.    Fair to say that that rate,

14  $50,000, to conduct a survey prices some

15  organizations and entities out of your services?

16         A.    That's correct.

17         Q.    Okay.  And, in fact, many --

18  I would guess -- and you tell me -- many state,

19  you know, entities don't have the budget to

20  afford a $50,000-plus survey; is that fair?

21         A.    I do not know what they have

22  available or not.

23         Q.    Have any of your previous surveys

24  done any work with respect to prescription drug

1    dispensing?

2           A.    No.

3           Q.    What about drug overdoses?

4           A.    No.

5           Q.    What about addiction and/or

6    dependency on either licit or illicit

7    substances?

8           A.    No.

9           Q.    Any surveys on controlled

10   substances like opioids?

11          A.    No.

12          Q.    Have you done any work with

13   opioids at all?

14          A.    No.

15          Q.    Any work with respect to the

16   opioid epidemic?

17          A.    I pause there because sometimes

18   when we're doing polling, there might be a

19   question about how big a problem as part of a

20   list of things.  I do not recall that it -- that

21   that topic was a major area of exploration for

22   any of the polling work I've done.

23          Q.    Can you give us some examples of

24   when the opioid epidemic may have been included

1    in a list of concerns, as you just described?

2          A.    And to be clear, I'm not saying

3    I remember that it specifically was, but I want

4    to be clear that it might have been.  So it

5    could have been for some polling work that I did

6    for Bloomberg News.  They might have been

7    interested in that.

8                It could have been for the

9    Des Moines Register Iowa poll.  It could have

10   been for other polling work I did for the

11   Indianapolis Star, the Detroit Free Press, that

12   we would be looking at a host of "Here are some

13   concerns and how concerned -- you know, is this

14   a big deal or a little deal in your community,"

15   that kind of thing, and it would have been

16   lumped with education, health care, other sorts

17   of things.

18         Q.    Do you have a specific memory of

19   any of the polls specifically listing this as an

20   item?

21         A.    I do not.

22         Q.    I saw a list of the Iowa Chronic

23   Care Consortium.

24         A.    Yes.

1          Q.     Can you describe for us the work

2    that you did for them.

3          A.     Yes.  I had served on the Board of

4    the Iowa Chronic Care Consortium, which was

5    looking at ways to make changes in protocols for

6    health care in order to reduce repeat

7    hospitalizations.  And we did a couple of

8    studies looking at people who had been through

9    the program and getting feedback on how it had

10   worked for them.

11         Q.     And did any of those issues

12   concern controlled substances?

13         A.     Not to my recollection.

14         Q.     When was that done?

15         A.     I'm looking at my resumé here.  So

16   I was on the Board between 2007 and 2014.  The

17   work would have been done toward the end of that

18   tenure, so 2013.  It would be a reasonable

19   estimate.

20         Q.     I notice that you had listed a

21   grocery store as one of your customers; is that

22   true?

23         A.     That's true.

24         Q.     What grocery store was that?

```
 1            A.    Fairway.

 2            Q.    And that's a regional grocery

 3    store in Iowa; is that true?

 4            A.    It is.  It's based in Iowa.  It

 5    now has stores in adjacent states.

 6            Q.    What are the ways that a grocery

 7    store like Fairway have used surveys as part of

 8    their business?

 9            A.    So I was approached to help them

10    as they were entering markets outside of Iowa

11    where they didn't have the name.  They had 100

12    stores in Iowa, and so when they would open a

13    new store, it was not -- it was common for the

14    new community to already be familiar with Iowa.

15                  So they wanted to find out what

16    they could learn about their image, about

17    their -- the perception of their assets to

18    customers and their vulnerabilities to

19    customers.

20                  And so I proposed a research

21    program, and we did that, and I've done some

22    follow-up research for them from time to time.

23            Q.    Are you aware of businesses like

24    grocery stores using surveys to seek customer
```

1   satisfaction?

2          A.    I'm aware of entities that are

3   business-to-consumer based wanting to collect

4   data on customers.

5          Q.    Including grocery stores, right?

6          A.    Including grocery stores.

7          Q.    Okay.  And I would assume you

8   wouldn't characterize those surveys as meeting

9   rigorous academic standards in the way they're

10  conducted?

11                Is that a fair assessment, or am I

12  misplaced?

13                MS. WOHL:  Objection to form.

14         A.    I can't speak to every survey that

15  grocery stores have conducted about whether they

16  meet rigorous scientific methodology.

17         Q.    Well, the customer surveys that

18  you're familiar with, are these phone-in

19  surveys?  What type of surveys do these

20  service-based industries --

21         A.    I can speak to the work I did for

22  Fairway, which included some focus groups.  And

23  that included two surveys in two different

24  counties that we took a look at.  And those

1    would have been my standard methodology by

2    telephone to a random selection of the

3    community.

4          Q.    Okay.  Are you familiar with

5    surveys conducted by businesses with respect to

6    customer satisfaction -- you know, sometimes you

7    might get on a receipt, at the bottom it says

8    "Please participate in this customer survey to

9    tell us about how you felt about the service you

10   received today."

11              Are you familiar with those kinds

12   of surveys?

13         A.    I'm familiar as a consumer, the

14   same way that anybody -- any other consumer

15   would be.

16         Q.    Okay.  You've never done one of

17   those surveys yourself, have you?

18         A.    That's correct.

19         Q.    Have you analyzed any of those

20   types of survey data?

21         A.    I have not.

22         Q.    Have you participated in one?

23         A.    Hardly ever.

24         Q.    Fair to say most people don't?

1          A.     I have no idea.

2          Q.     I noticed, before we just move

3     from your CV, that you -- one of your perhaps

4     earlier jobs, maybe your first, at least on the

5     CV, related to providing jury research and

6     consulting for trial attorneys; is that right?

7          A.     That's right.

8          Q.     Okay.  Can you explain that

9     experience to me, what it was that you did.

10         A.     So I was the research manager for

11    a litigation support firm here in West

12    Des Moines, and we did work of many different

13    kinds for our clients.  So we might do a

14    community attitude survey to get a feel for what

15    the jury pool was thinking.  We did change of

16    venue surveys to figure out how much might be

17    known.  There were trial simulations as well.

18         Q.     Okay.  Did you help pick juries?

19         A.     I did not help pick juries.

20         Q.     Was this work that you did for a

21    single firm, or is this work you did for several

22    law firms?

23         A.     During this -- during my short

24    tenure there, it was for several law firms.

```
 1              Q.    Do you recall the name of the law

 2    firm that you did the most work for during that

 3    time?

 4              A.    Sidley Austin.

 5              Q.    Fair to say that most of the

 6    clients of the firm were for defense firms?

 7              A.    I was not there long enough to

 8    have figured out the ratio of plaintiff to

 9    defense.

10              Q.    Okay.  What is your hourly rate in

11    this case?

12              A.    $300.

13              Q.    And do you offer a different

14    hourly rate for testimony?

15              A.    $500.

16              Q.    And how did you come up with these

17    rates?

18              A.    I had one client who did the

19    occasional projects with me that were on an

20    hourly rate.  And the last time that was

21    requested of us, I went back and looked at some

22    previous invoices and realized I had been

23    charging $200 an hour since 2007, and I thought

24    it was time to update.
```

1           Q.    Okay.  All right.  And why do you

2    charge a different rate for testimony versus

3    writing your report?

4           A.    It's a different preparation.

5    It's a different skillset to have to be ready to

6    do that, and it's more of my time.

7           Q.    And today for the testimony you're

8    offering this morning and throughout today, is

9    that at the $500 an hour rate?

10          A.    I would presume it is.  I'm under

11   oath.

12          Q.    I just wasn't sure if it was trial

13   testimony or all testimony.  That's why I asked.

14                You hired someone to work with you

15   on the report; is that true?

16          A.    I have staff --

17          Q.    And --

18          A.    -- who assisted me.

19          Q.    I'm sorry.  Please go ahead.

20          A.    I have an assistant who assisted

21   in all of the work that I do.

22          Q.    Okay.  And is that Michelle

23   Yeoman?

24          A.    It is.

1          Q.    Okay.  And what type of work does

2    she do for your company?

3          A.    Whatever I tell her.  So for this

4    project, it would have been helping gather some

5    materials, helping put my sources in

6    bibliographic form.  She proofreads everything

7    that I do.

8                We have professional conversations

9    about the content.  So she's a good sounding

10   board, having read all of my work for the past

11   14, 15 years.

12               So as needed, projects assigned as

13   needed.

14         Q.    And what is her background and

15   experience?

16         A.    She has been with my firm for at

17   least 15 years, and beyond that, it's easy to

18   lose count of how many years.  And I trained

19   her.  So she did not have research experience

20   before she came to my firm.

21         Q.    Is she a college graduate?

22         A.    She is a college graduate.

23         Q.    What was her degree in?

24         A.    I believe her major was in English

1  with a minor in religious studies.  It has come

2  in very handy from time to time.

3          Q.    I've learned that myself in my own

4  professional experience.

5                And did she do any of the work

6  reviewing and analyzing the comments that were

7  contained in the surveys?

8          A.    She repeated the work I had done

9  in terms of doing searches for particular words.

10 There she replicated what I had done to be sure

11 I caught every instance.  And she was able to

12 figure out how to count how many comments were

13 in the 2020 survey because they didn't include

14 in their spreadsheet any identification for

15 respondent numbers.

16         Q.    Okay.  But she didn't count the

17 survey responses for the 2021 surveys; is that

18 right?

19         A.    Didn't need to because there was a

20 column in the spreadsheet that listed that.  She

21 also created the data tables that you see that

22 are in the report comparing the 2020 and the

23 2021 surveys.

24         Q.    Okay.  And was she responsible for

1    the slides in the appendix --

2            A.    Yes.

3            Q.    -- putting those together?  Okay.

4                  Any other work she performed?

5            A.    That covers as much of it as I can

6    recall.

7                  MR. ELSNER:  I'm going to mark as

8            the next exhibit, Exhibit 2, the invoice

9            you submitted, which is MR 4372, or

10           displayed on the screen for you as well.

11           This will be Exhibit 2.

12                 MS. WOHL:  Mike, I could actually

13           use a break, if you don't mind, if we're

14           getting into a new exhibit, just a

15           really quick one.

16                 MR. ELSNER:  Sure.  We can take

17           that down.  We'll go off the record.

18                 THE VIDEOGRAPHER:  Off the record,

19           9:54.

20                 (Recess taken.)

21                 THE VIDEOGRAPHER:  We are back on

22           the record at 10:00 a.m.

23   BY MR. ELSNER:

24           Q.    Dr. Selzer, we marked as Exhibit 2

1    the invoice which is on the screen.  It's also

2    MR 4372.

3              Is this the invoice that you

4    submitted for your work in this matter?

5         A.    Yes.

6         Q.    Okay.  Is this the only invoice

7    that you submitted?

8         A.    Yes.

9         Q.    Okay.  It indicates here that you

10   began work on November 29, 2022 on the second

11   page of the invoice.

12             Does that sound about right to

13   you?

14        A.    Yes.

15        Q.    Okay.  And then your report was

16   submitted on December -- or your last billing

17   entry was December 8, 2022; is that right?

18        A.    That's right.

19        Q.    Okay.  And does this encompass all

20   of the time and the work that you performed to

21   submit your expert report in this case?

22        A.    Yes.

23        Q.    I noticed that in your description

24   of the work that you did, there's a reference to

1    reading -- checking an old report.

2              Can you describe for me what that

3    means.

4         A.    Yes.  We -- you asked me

5    previously about any work I had done as

6    providing expert opinion, and I -- that was

7    about ten years ago, in 2013, and I went back to

8    review what I had done there for two reasons.

9              One, it was helpful to -- because

10   I don't do this as part of my regular work -- to

11   review how I established what my expertise was

12   and to update that, and to review what sources

13   I found useful and to figure out what would be

14   useful for this particular project and to see if

15   I could pull up those sources and just learn

16   from past work that I had done.

17        Q.    Okay.  It wasn't a report that

18   related in any way to any work with respect to

19   the Ohio Board of Pharmacy survey or opioids in

20   general, true?

21        A.    That's correct.

22        Q.    Okay.  And which case was this?

23   Was this the case where you were serving as a

24   testifying expert but didn't give a deposition,

1    or is this the case where you were qualified and

2    did offer trial testimony?

3            A.    Neither of those.  This was the

4    case where I was hired to review a proposed

5    survey that would be used to qualify a class for

6    a class action lawsuit of former and current

7    employees.  And I wrote a report, and that was

8    the end of the work that I needed to do.

9            Q.    Can you give us -- tell us how

10   much time you've spent working on the case since

11   December 8, 2022?

12           A.    Until this week, I would say

13   minimal.

14           Q.    What happened this week?

15           A.    In preparing for today.

16           Q.    How much time did you prepare for

17   today's testimony?

18           A.    I don't have my time sheet in

19   front of me.  But obviously I reread the report,

20   reread the appendix, those sorts of activities,

21   to get ready for it.

22           Q.    What's your best estimate of the

23   amount of time that you've spent in January to

24   get ready for your testimony today?

1           A.    I would -- you know, I'm a

2    researcher.  I like to check the data.

3           Q.    10 hours, 20 hours, 30?

4           A.    I would say 20, but it could be

5    10.  It feels -- it lives in your brain, and not

6    all of those are billable hours, so ...

7           Q.    Yes.  I mention that to my

8    partners all the time.

9                 How many times did you meet with

10   counsel to prepare for today's testimony?

11          A.    We met via Zoom earlier this

12   week --

13          Q.    For how long?

14          A.    -- to look at the technology that

15   would be needed.

16                Again, I don't have time sheets in

17   front of me.  That would have been the majority

18   of the time.

19          Q.    When was that?  What day this

20   week?

21          A.    Tuesday, I believe.

22          Q.    Okay.  And who was present for

23   that prep session?  Was Ms. Wohl present?

24          A.    Yes.

1          Q.    Anyone else?

2          A.    There was another person from her

3    firm.  It was somebody I had not been familiar

4    with.

5          Q.    Okay.  So that was on Tuesday.

6    How long did that last?

7          A.    I'm going to say two hours.

8          Q.    All right.  And then did you meet

9    via Zoom any other day this week, other than

10   Tuesday?

11         A.    I don't believe so.

12         Q.    Any conference calls this week to

13   prep?

14         A.    We chatted this morning just to

15   make sure, again, that everything was the way it

16   was supposed to be, that I had not opened the

17   box, to be sure that I didn't have any notes in

18   the room, that sort of thing.

19         Q.    Okay.  Did you meet with anyone

20   from Kroger to prepare your testimony today?

21         A.    No.

22         Q.    Did you meet with anyone from

23   Kroger to prepare your expert report?

24         A.    No.

1          Q.    Had you otherwise met or discussed

2    the case with anyone from Kroger?

3          A.    No.

4          Q.    Outside the materials that are

5    cited in your report and the report itself and

6    the appendix, did you review any other documents

7    to prepare to testify today?

8          A.    The one item that was not -- that

9    was inadvertently left off of my sources list

10   was the long form complaint, and I did read

11   that.

12         Q.    Anything else?

13         A.    No.

14                      - - -

15       (Selzer Deposition Exhibit 3 marked.)

16                      - - -

17   BY MR. ELSNER:

18         Q.    Okay.  Thank you.

19               I'm going to mark as Exhibit 3 a

20   copy of your report, and it's MR 4370.  If you'd

21   like to look at that or you can look at your

22   version that you have before you.  We'll also

23   display it on the screen.

24               First, let's start, is this a copy

1    of the expert report that you've offered in this

2    case?

3              And we'll mark it as Exhibit 3.

4         A.    Yes.

5         Q.    And is that your signature on the

6    front?

7         A.    It is.

8         Q.    Does this report contain all of

9    the opinions you intend to offer in the case?

10        A.    Yes.

11        Q.    Is there anything, sitting here

12   today, that you'd like to change or alter about

13   anything that's written in the report?

14        A.    No.

15        Q.    Okay.  Didn't discover any errors

16   as you were preparing for your deposition?

17        A.    I saw -- I saw a typo or two.

18        Q.    Anything substantive?

19        A.    I did not see anything

20   substantive.

21        Q.    Okay.  Do you intend to offer any

22   opinions outside what you've written in this

23   report?

24        A.    I do not.

1      Q.    Is there any material that you

2  wish you had in drafting the report but that you

3  didn't have?

4      A.    My assignment was to evaluate the

5  survey.  So I don't -- so no.

6      Q.    Okay.  Did you have enough time to

7  put your report together?  It looks like you

8  were hired on November 29th, and you had to

9  issue a report, and your last billing date was

10  December 8th, true?

11      A.    That's true.

12      Q.    Did you have enough time to do the

13  work that you did?

14      A.    Yes.

15      Q.    Would you have preferred to have

16  more time?

17      A.    I don't know that there would have

18  been added value beyond the typo situation.

19      Q.    All right.  Did you write the

20  report?

21      A.    I did.

22      Q.    Are these your words?

23      A.    They are.

24      Q.    Did anyone else write any part of

1   the report?

2         A.    Well, I cite sources, but did I

3   assign anybody to write any part of this report?

4   No.

5         Q.    Your assistant didn't write any

6   part of it?

7         A.    No.

8         Q.    Okay.  On page 17 of your report,

9   you have a list of "Sources" and "References."

10          Do you see that?

11        A.    Yes.

12        Q.    Okay.  And are these all of the

13  sources and references that you relied upon in

14  drafting your report?

15        A.    As I mentioned earlier, this list

16  does not include the long form complaint in this

17  case, and I did read that.

18        Q.    Other than the complaint that was

19  filed in this case, are there any other

20  materials that you relied upon to form the basis

21  of your opinions here?

22        A.    No.

23        Q.    Is there anything you considered

24  but decided not to rely upon in writing your

1    report?

2              A.    Yes.

3              Q.    What was that?

4              A.    These would have been different

5    publications of -- and specifically with regard

6    to survey methodology, and so I -- rather than

7    including them all, I chose the one or two that

8    were the most germane and most succinct.  But I

9    did look at other things.

10             Q.    The sources that you relied upon,

11   are any of those sources from peer-reviewed

12   publications?

13             A.    The sources that are listed here

14   beyond the State of Ohio Board of Pharmacy

15   surveys themselves and the depositions are not

16   the kind of publication that would be

17   peer-reviewed.

18                   So I don't believe they were.

19             Q.    So is it your opinion, then, that

20   the literature with respect to offering opinions

21   concerning survey design and the reliability of

22   surveys is not contained in peer-reviewed

23   journals?

24                   MS. WOHL:  Objection to form.

1          A.    The articles that are cited here

2   are often textbook sorts of things that are --

3   that peer-reviewed journals are sort of looking

4   at how things are moving forward in terms of

5   methodology or applying methodology.

6                So someone explaining, for

7   example, generalized ability, that -- it's not

8   meaningful to put that in a peer-reviewed

9   journal.  That's not where it would appear.

10         Q.    Okay.  So my question is, is the

11  survey results and reliability, that there's not

12  peer-reviewed journal material on that subject?

13               Is that what your testimony is?

14               MS. WOHL:  Objection to form.

15         A.    My testimony is I am not widely

16  versed in peer-reviewed journals not being an

17  academic where I would be required to be

18  publishing in peer-reviewed journals.

19               So I can't speak for the entire

20  field.  I wouldn't go looking to peer-reviewed

21  journals if what I want are people discussing

22  common concepts and survey research.

23         Q.    So the sources that you relied

24  upon that you thought were most relevant with

1    respect to the opinions you had to offer based

2    on your experience and expertise were the

3    references that you cite here?

4              A.    That's correct.

5              Q.    And those are generally not

6    peer-reviewed sources, true?

7              A.    That's correct.

8              Q.    Okay.  You mentioned that you

9    found them in books, but I didn't see a book,

10   but I might have missed it.  Was there a

11   particular book that you relied on in forming

12   your opinions?

13             A.    There was not a particular book.

14   There were books that I consulted that are in my

15   modest research methods library here at my

16   office.

17                   The easiest way these days to go

18   about finding things as they may appear in books

19   is to Google it.  So the second reference there,

20   by the fact that the name of the source is in

21   italics signifies to me that that, indeed, was a

22   book.

23             Q.    Are you talking --

24             A.    About how I accessed it, but

1    that's not how I accessed it.

2           Q.    I see.  All right.  So you believe

3    that this was an extract of a book?

4           A.    Yes, as I believe the

5    bibliographic entry indicates.

6           Q.    Okay.  And you're talking here

7    about the second source under References,

8    "Errors in Survey Research and their Threat to

9    Validity and Reliability"?

10          A.    That's right.

11                It would be similar for under

12   Sources, the Frank Newport chapter out of the

13   book, "Where America Stands."  "Where America

14   Stands" would be a book, and here was the

15   chapter.

16          Q.    I see.  All right.  And so your

17   methodology here was to basically Google certain

18   topics and themes and then look for particular

19   articles that discuss those.  And then you

20   selected some of those to rely upon to as the

21   basis of your opinions here.

22                Is that fair?

23          A.    That's fair.

24          Q.    Is there anything that you relied

1    upon in forming the basis of your opinions here

2    that is not listed in the report, other than the

3    long form complaint?

4          A.    No.

5          Q.    When did you read the long form

6    complaint?

7          A.    I would say -- you want a date?

8          Q.    No, just give me a rough idea.  It

9    was over the course of just a few weeks you did

10   the report, right?

11         A.    That's correct.

12         Q.    Oh, I see it here.  You spent an

13   hour reading it on December 3rd in Exhibit 2.

14               Does that sound about right to

15   you?

16         A.    That sounds about right to me.

17         Q.    Okay.  It's a pretty quick read in

18   an hour.  Did you read the whole thing?

19         A.    Did I read every single word?

20   I don't know that I did, but I read -- I looked

21   at every page.

22         Q.    Fair to say you skimmed it?

23         A.    The parts that appear in my report

24   where I'm pulling from paragraphs, this would

1    be -- this was the genesis of the idea to do a

2    terminology search in the comments.

3              Give me a moment.  I'll see if

4    I can pull that page number up.

5         Q.    You're talking about page 8 of

6    your report?

7         A.    Yes, page 8 of my report, and the

8    bottom of page 7, making specific references to

9    paragraph numbers.  This was what I found most

10   helpful.  But as I say, I looked at -- I likely

11   looked at every page.

12        Q.    So you're talking about pages 7

13   and 8 of Exhibit 3, your report in the case?

14        A.    That's right.

15        Q.    And you have a list of shorthand,

16   I guess, little summaries or descriptors of what

17   you thought certain allegations were in the

18   complaint --

19        A.    Yes.

20        Q.    -- that you're relating to this

21   topic?

22        A.    The topics that were related to

23   the allegations.

24        Q.    Right.  Okay.

1                    And these are the ones that you

2    located in your hour-long search, correct?

3          A.    Yes.  That was part of the result

4    of that, taking a look at that.

5                    MR. ELSNER:  All right.  We can

6               take that down for a second.

7    BY MR. ELSNER:

8          Q.    I just have some general questions

9    for you.  I just want to get an understanding of

10   what your basis of knowledge is on certain

11   topics.

12                   Would you agree with me that

13   there's an opioid epidemic in the United States?

14         A.    Are you asking me for a

15   professional opinion on that or as an ordinary

16   person who reads newspapers and news magazines

17   and watches news shows?

18         Q.    Let's do both.

19                   MS. WOHL:  Objection.

20         Q.    Are you able to offer an expert

21   opinion that there's an opioid epidemic or there

22   is not an opioid epidemic in the United States

23   or in Ohio?

24                   MS. WOHL:  Objection.

1            A.    I don't have the expertise in

2    opioid, period.  So in terms of what constitutes

3    an epidemic, I don't know that I have the

4    knowledge to say that's the right word as far as

5    there.

6                 I have heard it mentioned before.

7    On the consumer side, as a member of an informed

8    public, I hear that term.

9            Q.    Okay.  And any reason to

10   believe -- based on your understanding, do you

11   believe there is an opioid epidemic in the

12   United States?

13                MS. WOHL:  Objection to form.

14           A.    This is a matter of what I'm

15   exposed to through my own consumption of news.

16   As I said, I've heard the terminology used.

17   I don't have a professional idea of what

18   constitutes an epidemic.  So --

19           Q.    What's your just lay general sense

20   with the materials that you've reviewed and

21   read?  Do you believe that there's an opioid

22   epidemic in the U.S.?

23                MS. WOHL:  Objection to form.

24           A.    Are you asking professionally, or

1    are you asking me personally?

2          Q.    I'm asking you personally.

3                MS. WOHL:  Objection to form.

4          A.    Personally I am aware of changes

5    in laws and regulations regarding the

6    prescribing of opioids, and it's -- I have no

7    reason to think there isn't a problem in terms

8    of overprescribing.

9          Q.    So your understanding and belief

10   with respect to the opioid epidemic is that it's

11   caused by overprescribing of medications?

12               MS. WOHL:  Objection to form.

13         A.    I would say that's part of it.

14   I do not know beyond that which I would have

15   personal observation of.

16         Q.    Okay.  And this isn't an area that

17   you've studied at all, opioid --

18         A.    I have not studied this at all.

19         Q.    Okay.  And you haven't examined

20   how many people in the United States have been

21   impacted by the opioid epidemic?

22         A.    I have not studied that at all.

23         Q.    Have you looked at any surveys or

24   studies of the number of people impacted by the

1    opioid epidemic in the United States?

2          A.    Not to my recollection.

3          Q.    What about in the State of Ohio?

4    Did you look at any surveys or studies related

5    to --

6          A.    I did not.

7          Q.    Okay.  And you didn't rely on any

8    of those types of materials to form the basis of

9    your opinions here; is that true?

10         A.    Correct.

11         Q.    Okay.  What about Montgomery

12   County?  What do you know about Montgomery

13   County?  Do you know how many people live there?

14         A.    I do not.

15         Q.    Have you ever been there?

16         A.    Not to my knowledge, but I've been

17   to Ohio, so ...

18         Q.    Well, we'll start -- that's a

19   start.

20               Do you know any of the major

21   cities in Montgomery County?

22         A.    I don't.  But I might, but I don't

23   know it by the name of the county.

24         Q.    Have you looked at any of the data

1  related to the number of people in Montgomery

2  County that overdosed as a result of

3  prescription opioids?

4          A.    I have not sought that out.  To

5  the extent that that was included in the long

6  form complaint, I would have read it there.

7          Q.    But other than the complaint, you

8  haven't done any work to determine how many

9  people have overdosed in Montgomery County; is

10  that fair?

11          A.    That's fair.

12          Q.    Okay.  And you didn't look in

13  preparing your expert opinions here with respect

14  to the impact of the opioid epidemic in Ohio,

15  true?

16          A.    That was not my assignment, so I

17  did not do it.

18          Q.    And you didn't review any

19  documents from the Ohio Board of Pharmacy or the

20  coroner's office or other public health

21  literature about the impact of the opioid

22  epidemic in Ohio; is that true?

23          A.    I only reviewed the surveys from

24  the Ohio Board of Pharmacy.

1          Q.    Now, some experts in this case

2     have offered opinions and data concerning the

3     number of opioids that have been dispensed in

4     Ohio.

5                Are you familiar with how many

6     opioids have been dispensed in Ohio?

7                MS. WOHL:  Objection to form.

8          Q.    What about --

9          A.    That is not my area of expertise.

10    No.

11         Q.    Okay.  And you didn't look to see

12    how many opioids had been dispensed in

13    Montgomery County; is that true?

14         A.    That's true.

15         Q.    Okay.  And you didn't look to see

16    how many opioids had been dispensed by Kroger,

17    correct?

18         A.    Again, I want to clarify.  When

19    you say "look to see," did I go out and search

20    for that information?  And I said it might have

21    been -- it might have appeared in the long form

22    complaint, but I did not go and look for it.  It

23    was not part of my assignment.

24         Q.    Okay.  If we look and just talk in

1    general about your report, which we've marked as

2    Exhibit 3, is it fair to say that you've kind of

3    divided the report into two parts?

4              One is the survey relevant to the

5    litigation, and then secondly you discuss some

6    potential challenges regarding the methodology

7    of the survey.

8              Is that a fair characterization of

9    the two types of opinions you generally offer?

10   A.    That is a fair characterization.

11   Q.    I want to start with the relevance

12   part.  And you say on page 2 of your report --

13   and I'm happy to have you take a look at it --

14   that -- hold on one second.  You've been asked

15   about your professional opinion concerning the

16   usefulness of -- this is on page 2.  We're

17   displaying page 4.  I'm sorry.

18             MR. ELSNER:  I'm sorry.  2 at the

19        bottom, 4 at the top.  Sorry, Gina.

20   BY MR. ELSNER:

21   Q.    In the second paragraph under the

22   "Executive Summary," it reads, "I've been asked

23   for my professional opinion of the usefulness of

24   this survey in understanding the role of

1   pharmacists and pharmacies in opioid abuse and

2   diversion."

3              Do you see that?

4         A.    I do.

5         Q.    Okay.  And so was that what you

6   were asked to do?

7         A.    Yes.

8         Q.    Okay.  And then your conclusion

9   is, "This survey does not provide data on that

10  topic.  It's not a survey about pharmacists' and

11  pharmacies' role in opioid abuse and diversion."

12             Is that your opinion?

13        A.    It is.

14        Q.    Okay.  And I think you also said

15  that the pharmacists' concerns about patient

16  safety generally, that you didn't feel that you

17  could extract that to specific concerns about

18  dispensing opioids, and that those are

19  unsubstantiated; is that true?

20             MS. WOHL:  Objection to form.

21        A.    My opinion is the data do not

22  support that conclusion.

23        Q.    And the basis for that is that

24  there are no questions about opioids, right?

1          A.     That's part of my -- of what I'm

2    taking into account.

3          Q.     And there are no questions about

4    patient requests for controlled substances?

5          A.     That's right.

6          Q.     Okay.  And so it's on the basis of

7    the fact that those types of questions weren't

8    asked, you concluded that it would be an

9    unsubstantiated leap to believe that the answers

10   related to the survey concerned opioids, true?

11         A.     True.

12         Q.     Is it your opinion that no

13   correlation can be made between the results of

14   the survey and Ohio pharmacists' views on safely

15   dispensing medications, including opioids?

16         A.     Well, the word "correlation" is a

17   technical statistical term, and these data do

18   not -- did not offer a way to correlate these

19   findings with something that was not in the

20   survey, which were any questions about opioid

21   abuse.

22         Q.     Okay.  So it's your opinion that

23   in order to answer the question of whether

24   dispensing -- whether the safety -- let me

1    strike all that.  Let's start over.  That was

2    pretty messy.

3                   It's your opinion that the safety

4    concerns expressed by the survey respondents

5    cannot be tied to opioids because there was not

6    a question about opioids, nor a question about

7    requests for controlled substances from

8    patients; is that right?

9         A.    That's partially right.  We did an

10   additional analysis of the comments that some

11   pharmacists typed in with the idea that this

12   might reveal sort of the unstated subtext of

13   what the pharmacists were thinking about.

14                  And we found relatively few

15   comments, including the word "opioid," and my

16   report goes through other things that we

17   searched for in order to see if there were --

18   there was sufficient evidence from what they

19   volunteered, that they had opioid abuse on their

20   minds as they were answering questions about

21   patient safety.

22        Q.    And so in your mind, if they had

23   opioid abuse on their minds, then they would

24   have included a comment about it.

1                    Is it possible that they had

2     controlled substances on their minds but didn't

3     list that in the comment?

4                    MS. WOHL:  Objection to form.

5          A.    It is possible.  But looking at

6     these data and what I had in front of me, the

7     percentage of pharmacists who included a comment

8     about opioids was less than 1 percent.  So some

9     had opioid abuse on their mind.  It wasn't none.

10    But it was a very small number.

11         Q.    And did you review each comment,

12    or did you use search terms to identify specific

13    comments?

14         A.    We searched for a number of terms

15    in order to find it.  There were over 1,000

16    respondents making comments, and often those

17    comments were full and long paragraphs.  So it

18    was a lot to read through.

19         Q.    So you didn't read every comment,

20    true?

21         A.    I read many comments.

22         Q.    I'm sorry.

23         A.    Not every single comment.

24         Q.    I'm going to ask you a specific

1   question, and I need a specific response.

2            If your lawyer at the end wants to

3   ask you some comments and drown it out, then she

4   will have plenty of time to do that, okay?

5        A.   Okay.

6        Q.   You didn't read every comment for

7   the 2020 and 2021 workplace surveys, true?

8        A.   True.

9        Q.   And the comments you read, those

10  were identified by using search terms; is that

11  right?

12       A.   That's right.

13       Q.   Okay.  And are the search terms

14  that you used the search terms that you identify

15  in the report?

16       A.   Yes.

17       Q.   Did you use any other search terms

18  that are not included in the report?

19       A.   No.

20            Let me correct that.  We -- I did

21  search for "danger," and in assessing the

22  context for that, it was -- first of all, it was

23  a much larger number than any other search term

24  that I looked for, and I found it wasn't useful.

1          Q.    You searched for "danger," and did

2    you review all the comments that triggered

3    danger, or did you just see that the results

4    were too broad and stopped?

5          A.    I reviewed some of the comments,

6    not all of them.

7          Q.    Roughly how many?

8          A.    Sorry?

9          Q.    Roughly how many?

10         A.    A couple of dozen, three dozen,

11   four dozen.

12         Q.    And it wasn't helpful because of

13   why?

14         A.    Because it didn't lead me to find

15   anything that was on their mind that would have

16   related to the terms that were more related to

17   the complaint.  There were discussions of

18   danger.

19              It was similar to what happened

20   when I researched for abuse, that there were

21   more pharmacists who mentioned abuse in the

22   context of they felt abused as an employee

23   rather than opioid abuse.

24         Q.    If we turn to pages 8 and 9 of

1   your report, there's a bulleted list of the

2   search terms at the bottom of 8 and the top of

3   9.

4              Other than "danger," is this a

5   full list of the search terms that you used?

6        A.    Yes.

7        Q.    Who selected the terms to search

8   for?

9        A.    I did.

10        Q.    And how did you make this

11   selection?

12        A.    From -- right above that on page 8

13   and a little bit at the bottom of page 7 are the

14   phrases and language that I pulled from the long

15   form complaint.

16        Q.    So you pulled some phrases from

17   the complaint, and you used that as the basis to

18   craft search terms, and then you reviewed the

19   comments which were triggered by a search term;

20   is that right?

21        A.    That's right.

22        Q.    Okay.  And then the comments

23   that -- the number of hits that -- well, let me

24   strike that.

1                  Did you include the term "OARRS,"

2    O-A-R-R-S, as a search term?

3           A.    I did not.

4           Q.    Do you know what that is?

5           A.    I couldn't tell you here today.

6           Q.    Did you search for "controlled

7    substances"?

8           A.    Yes.  And I believe that's in the

9    bullet list on page 9.

10                 Three respondents in the 2020

11   survey.  Right.

12          Q.    And did you just do these searches

13   from the 2020 survey, or did you also do

14   searches of the comments from the 2021 survey?

15          A.    So the comments that are listed

16   next to the bullet point are from the 2021

17   survey.  And then below are -- we replicated

18   that search from the previous survey.

19          Q.    And when you did these searches,

20   did you -- so did you just search "controlled

21   substance," or did you search "control" with any

22   kind of asterisk or something that would

23   indicate control, controlled, controlling, all

24   of those variations?

1          A.    I'm showing you the search terms

2    that I used.

3          Q.    Okay.  So there weren't any --

4    there wasn't any way that you searched the

5    comments with any kind of ability to determine

6    whether all the variations of a particular word

7    might be used?  You used the search terms just

8    as they're written in the report, correct?

9          A.    That's correct.

10         Q.    Did the survey distinguish between

11   controlled substances and non-controlled

12   substances?

13         A.    The survey did not address

14   controlled substances or uncontrolled

15   substances.

16         Q.    So when the survey used the phrase

17   "safe and effective," did it exclude controlled

18   substances, in your mind?

19         A.    In my mind, it did not exclude,

20   but it did not exclude many other topics related

21   to safety.

22         Q.    Such as?

23         A.    In terms of whether the work hours

24   and the scheduling and the opportunity to take

1    breaks, whether those were problematic.  And

2    many other things related to the topic of the

3    survey, which was workplace issues.

4         Q.    Do you believe that there's a

5    connection between a safe and effective

6    workplace and the dispensing of a controlled

7    substance?

8         A.    I do not know.

9         Q.    You do not know; is that right?

10        A.    That's correct.

11        Q.    And the reason for that is you're

12   not a pharmacist, correct?

13        A.    That's correct.

14        Q.    Okay.  So when someone -- so when

15   a pharmacist responds that they don't feel that

16   they have a safe and effective workplace, you

17   don't know whether what they're referring to is

18   a safe opportunity to dispense controlled

19   substances, correct?

20        A.    Again, the reason to do the search

21   was to have one way into what was in the mind of

22   the pharmacist.  Very few made the connection

23   to -- the word "opioid" was included in very

24   few.

1          Q.    Well, maybe they all did, and it's

2    just well-known among pharmacists that the real

3    concern with a safe and effective workplace is

4    the dispensing of controlled substances, and

5    certainly opioids in the height of the opioid

6    epidemic would be on every pharmacist's mind.

7    Is that possible?

8               MS. WOHL:  Objection to form.

9          A.    I don't believe the data support

10   that claim.

11         Q.    And the reason that the data don't

12   support the claim is because the respondents who

13   offered comments didn't specifically use the

14   word "opioid" or "controlled substance" or

15   "controlled medication" more than a handful of

16   times; is that correct?

17              MS. WOHL:  Objection to form.

18         A.    That's correct, plus there were no

19   questions that specifically mentioned opioid in

20   order to see if there were a connection there.

21         Q.    So is it your opinion that there's

22   no connection between this survey and the opioid

23   epidemic or the dispensing of opioids except in

24   the instances in which a few people responded

1    about opioids; is that true?

2              MS. WOHL:  Objection to form.

3         A.    I'm saying that any claim that

4    this survey represents, attitudes among

5    pharmacists toward opioid abuse or diversion is

6    not -- is not found in the data itself.

7         Q.    And so in your opinion, that

8    connection does not exist, correct?

9              MS. WOHL:  Objection to form.

10        A.    My opinion is these data do not

11   support that claim.  There may be other data

12   that would support that claim.  It's not in this

13   corpus of data.

14        Q.    In order to offer your opinions in

15   this case, did you make any effort to understand

16   the tasks and the responsibilities that a

17   pharmacist must perform?

18        A.    No.

19        Q.    And so you've never looked at all

20   the various tasks that a pharmacist must do

21   every day in their job; is that fair?

22        A.    That was not my assignment.  And,

23   no, I did not do that.

24        Q.    Okay.  Do you have any

1    understanding of the dangers of dispensing

2    controlled substances like opioids?

3              MS. WOHL:  Objection to form.

4         A.    I have no professional exposure to

5    that.

6         Q.    Did you ask for any information

7    from Kroger or from counsel about the dangers of

8    opioids in the dispensing of controlled

9    substances?

10        A.    No.  That was not my assignment.

11        Q.    Do you know what a Schedule II

12   controlled substance is?

13        A.    Not specifically.

14        Q.    Do you know what the requirements

15   are for a pharmacist in dispensing a controlled

16   substance?

17        A.    I have no professional knowledge

18   of that.

19        Q.    Do you know that a pharmacist --

20   do you know whether a pharmacist must determine

21   whether there's a legitimate medical purpose to

22   dispense a medication?

23        A.    I have no professional knowledge

24   of that.

1          Q.    Would you agree with me that there

2    are pressures on pharmacists to make sure that

3    when they're dispensing medications, they're

4    doing so safely?

5          A.    I have no professional knowledge

6    of that.

7          Q.    Okay.  So you don't know -- you

8    don't know what the pressures are on pharmacists

9    at all in receiving a controlled substance

10   prescription and evaluating it and determining

11   whether to fill that prescription or not; is

12   that true?

13              MS. WOHL:  Objection to form.

14         A.    I have no professional knowledge

15   of that.

16         Q.    Do you understand that a

17   pharmacist that dispenses a medication, such as

18   an opioid, that if done incorrectly, it could

19   lead to overdose and death?

20              MS. WOHL:  Objection to form.

21         A.    The questions you're asking are

22   outside my area of professional expertise.  So,

23   no, I have no professional knowledge of that.

24         Q.    And in order to form the basis of

1    your opinions in this case, you didn't review

2    any information about opioids and controlled

3    substances, true?

4            A.    True.

5            Q.    And you didn't look at the tasks

6    and the workload that a pharmacist has to

7    perform when dispensing controlled substances,

8    correct?

9            A.    That is not my assignment.

10   Correct.

11           Q.    And you didn't look at what due

12   diligence must be performed, what tasks must be

13   performed by a pharmacist before they determine

14   whether it's safe to dispense a medication,

15   correct?

16           A.    Correct.

17           Q.    What is the Ohio Board of

18   Pharmacy?

19           A.    My understanding, it is the

20   licensing agency for pharmacists who wish to

21   work or are working in the State of Ohio.

22           Q.    Do you know whether the Ohio State

23   of Board of Pharmacy is tasked with enforcing

24   laws that govern the legal distribution and

1    practice of pharmacy in the State of Ohio which

2    includes preventing diversion of drugs?

3              Are you aware of that?

4              MS. WOHL:  Objection to form.

5    A.    What I would know about the State

6    of Ohio Board of Pharmacy would have been in

7    Mr. McNamee's deposition.  And because some of

8    that was not relevant to my assignment, while I

9    might have been exposed to what he said was

10   their purpose, that wasn't anything I needed in

11   order to do the assignment I was given.

12        Q.    So you didn't think it was

13   relevant to your assignment to know what the

14   scope of the responsibilities are of the Ohio

15   Board of Pharmacy; is that fair?

16        A.    That's fair.

17        Q.    Okay.  And would you agree with me

18   that pharmacists responding to the survey were

19   offering responses to their regulator?

20              Do you know that?

21        A.    From some of the comments who --

22   they vary specifically, sometimes said, this

23   deserves -- you know, the Board should take a

24   look at this.  So that's the only way that I

1    know.

2         Q.    Okay.  So you don't know that

3    pharmacists in Ohio are regulated by the Ohio

4    Board of Pharmacy; is that fair?

5         A.    No.  I believe I said that that is

6    the licensing agency.

7         Q.    Okay.  And so -- and not just the

8    licensing agency, but it's the regulator,

9    meaning that pharmacists, in responding to a

10   survey issued by the Ohio Board of Pharmacy, are

11   responding to the body that regulates them.

12              Do you agree with that?

13              MS. WOHL:  Objection to form.

14         A.    I have no reason to disagree with

15   it.

16         Q.    Okay.  But you don't know -- you

17   didn't consider whether the responses to the

18   survey were more or less reliable because the

19   pharmacist was responding to the person that

20   regulates their license; is that fair?

21         A.    What comes to my mind would be the

22   response rate in terms of the proportion of

23   pharmacists who were invited to take part in

24   this survey who actually did, which was about

1   20 percent for the 2020 survey.  It was slightly

2   higher the year before that.

3              So they apparently had no

4   authority to require the pharmacists to provide

5   input back to them.  So I don't know if that's

6   helpful or not, but in terms of what is their

7   mindset and that this was the regulator that

8   they were talking to, I don't know that that's a

9   meaningful opinion that I would form or need to.

10       Q.    And you didn't in your report,

11  correct?

12       A.    That's correct.

13       Q.    Okay.  And I guess what I'm

14  asking -- and I'm not really sure if when you --

15  let me ask it this way:  When you were analyzing

16  the -- and you spent about -- was it about two

17  weeks on the report; is that fair?

18       A.    Roughly.

19       Q.    So you spent from a couple days

20  after Thanksgiving to the first week of

21  December, the 8th of December, true?

22       A.    True.

23       Q.    Okay.  So in that two-week period,

24  did you have in your mind, and did it factor

1   into any of your opinions, that the respondents

2   were responding to the regulator of the

3   practice?

4           Was that something that you

5   considered in forming your opinions here?

6       A.   No.

7       Q.   Okay.  And, in fact, the only

8   reason that you knew that they were responding

9   to their regulator is because there were a

10  couple people in the comments that pointed out,

11  "Hey, you know, the Ohio Board of Pharmacy

12  should take more action here."

13          True?

14      A.   It might not be the only way.

15  Again, the deposition of Mr. McNamee may have

16  included information about this being a

17  regulatory agency, but it wasn't meaningful to

18  my -- to forming my opinions about the survey.

19      Q.   Okay.  So the question of whether

20  they were responding to the regulator or not was

21  not something that you offer an opinion about

22  one way or the other?

23      A.   That's right.

24      Q.   And it wasn't something you

1   considered in forming the basis of your opinions

2   here?

3          A.    That's right.

4          Q.    Do you have any reason to believe

5   that there was any fraud conducted with respect

6   to the survey?

7          A.    From what I reviewed, I had no

8   thought that this -- the survey results that I

9   was reviewing were the product of fraud.  I had

10  no way -- I had no way to know.

11         Q.    Well, there was some testimony

12  from the Ohio Board of Pharmacy, a 30(b)(6)

13  deposition.  They claim that there was no fraud,

14  and you're not aware of any evidence of fraud?

15         A.    Right.  I believe Mr. McNamee

16  testified that this was complete and accurate,

17  and that's what I would know.

18         Q.    And do you have any reason to

19  dispute that?

20         A.    I have no knowledge of any fraud.

21         Q.    And you're not going to offer any

22  kind of opinions that the survey was conducted

23  fraudulently?

24         A.    I have -- I offer my opinion on

1   some methodological concerns that would sort of

2   inform whether this survey is representative of

3   the full complement of licensed pharmacists

4   working in Ohio, but I -- those are not opinions

5   that I offered that those methodological

6   problems were the outcome of fraud.

7           Q.   Okay.  I feel you're combating me

8   a little bit on the issue, and I -- what I'm

9   trying to understand is where your challenges

10  are and where they aren't.

11              So are you willing to agree with

12  me that you haven't seen evidence of fraud,

13  you're not going to offer any evidence that

14  there was fraud, and that's not the basis of

15  your criticisms, correct?

16          A.   That's correct.  Thank you.  Thank

17  you.

18          Q.   And you're not going to suggest

19  that somebody manipulated the data at the Ohio

20  Board of Pharmacy.

21              There's no evidence of that, true?

22          A.   No evidence that I saw.

23          Q.   Okay.  And is it -- do you believe

24  that the Ohio Board of Pharmacy was honestly

1    trying to understand how pharmacists felt about

2    the workplace and the conditions in which they

3    worked?

4            A.    That is their stated intent.  Yes.

5            Q.    Do you have any reason to dispute

6    it?

7            A.    I don't have any reason to dispute

8    it.

9            Q.    Do you think the Board would do

10   that, would try to manipulate the results of the

11   survey in any kind of way?

12               MS. WOHL:  Object to the form.

13           A.    I do not know the members of the

14   Board individually.

15           Q.    Okay.  So it's possible, in your

16   mind, that you think the Ohio Board of Pharmacy

17   could have manipulated the data?

18               MS. WOHL:  Objection to form.

19           A.    That's not -- I'm not -- I'm

20   saying I don't know.  It's not in the data as I

21   saw it.  There wasn't -- no red flags came up

22   for me that says, "Oh, we've got some fraud

23   going on here."

24           Q.    Okay.  And there was no red flag

1    that you saw with respect to manipulation of the

2    data or changed answers to any of the questions?

3            A.    I saw no evidence of that.

4            Q.    In fact, the survey was issued,

5    according to the Board, to comply with Ohio

6    rules and laws, true?

7            A.    I believe that's true.

8            Q.    You put it in your report, right?

9    If you look at page 4 of your report, you list

10   them, true?

11           A.    True.

12                 MR. ELSNER:  If we could pull up

13           MR 4370.006.  This is Exhibit 3.

14   BY MR. ELSNER:

15           Q.    And if you look there, just above

16   "Content of the survey questions," there are

17   various regulations that are cited under

18   "Purpose."

19                 Do you see that?

20           A.    Yes.

21           Q.    Okay.  And one of the purposes or

22   one of the regulations require that there are

23   adequate safeguards under 4729.55.  "Adequate

24   safeguards are assured that the applicant will

1    carry on the business of a terminal distributor

2    of dangerous drugs in a manner that allows

3    pharmacists and pharmacy interns employed by the

4    terminal distributor to practice pharmacy in a

5    safe and effective manner."

6                Do you see that?

7        A.    I do.

8        Q.    And you understand that one of the

9    purposes of the survey was to determine whether

10   pharmacists felt that they had an employment

11   place that was safe and effective to dispense

12   medications?

13       A.    There were questions specifically

14   about that.  Yes.

15       Q.    Yes.  And many of the questions

16   actually adopt that exact language, a safe and

17   effective manner, true?

18       A.    True.

19       Q.    And it comes right from the

20   regulation, right?

21       A.    That part.  Yes.

22       Q.    And if we look at 4729:5-5-02 just

23   beneath it, "The pharmacy shall be appropriately

24   staffed to operate in a safe and effective

1    manner."

2              Correct?

3       A.    Yes.

4       Q.    And that's the same type of

5    language that it was before it was adopted in

6    many of the questions offered in this survey,

7    true?

8       A.    True.

9       Q.    And you're aware from documents

10   from the Board of Pharmacy and the testimony of

11   Mr. McNamee, that the Board had received

12   complaints from pharmacists in Ohio regarding

13   their workplace conditions?

14              Were you aware of that?

15      A.    It was not top of my -- not top of

16   my memory from Mr. McNamee's deposition.  I was

17   looking specifically for information regarding

18   how the survey was conducted and what the

19   content of the survey was.

20      Q.    Did you try to analyze why the

21   Board conducted the survey?

22      A.    That was not my assignment.

23      Q.    Did you think it was important to

24   know why the Board conducted the survey?

1         A.    The report from the 2020 survey

2    explained what it was, was their purpose.

3         Q.    When you say "the report from the

4    2020 survey," you mean the overarching report?

5         A.    When they were delivering the

6    data.  And it's there on this page slightly

7    higher.  At the very top of the page.  "The

8    purpose of the advisory committee is to promote

9    patient safety," and committee recommendations

10   that are there.

11              The intent of the survey above

12   that was to capture vital information on

13   pharmacists' working conditions in the state.

14              MR. ELSNER:  Why don't we pull out

15        and mark as the next exhibit MR 4202,

16        which is Exhibit 4.

17                   - - -

18        (Selzer Deposition Exhibit 4 marked.)

19                   - - -

20   BY MR. ELSNER:

21        Q.    Is this the document that you're

22   referring to?

23        A.    Yes.

24        Q.    And it lists the statutory -- or

1    the regulations that we just described at the

2    top; is that right?

3              A.    That's right.

4              Q.    Okay.  And it describes the intent

5    of the survey under the Issue section at the end

6    of the first paragraph was to capture feedback

7    on pharmacists' working conditions in the state;

8    is that true?

9              A.    That's true.

10             Q.    The end of the first paragraph

11   under "Issue."

12                   Is that right?

13             A.    That's right.

14             Q.    Okay.  And you see under that, the

15   "capturing this data is important as

16   pharmacists' working conditions have been

17   identified as a concern among licensees, state

18   regulators (several of which have issued similar

19   surveys), and national organizations."

20                   Do you see that?

21             A.    I do.

22             Q.    Okay.  And so you see here that

23   concern among licensees, meaning pharmacists and

24   pharmacies, have expressed concern about working

1    conditions.

2              Do you agree with that?

3         A.    That's what this says.

4         Q.    You don't have any reason to

5    dispute that; is that right?

6         A.    I have no reason to dispute that.

7         Q.    And are you aware that other

8    regulators, other Boards of Pharmacy across the

9    United States, have issued similar surveys which

10   have identified similar working condition

11   concerns in pharmacies in their states?

12        A.    That's what this says.  And I have

13   no reason to dispute it.

14        Q.    Did you review any of those other

15   surveys?

16        A.    I attempted to find this 2019

17   survey, and -- or there was one in one state,

18   and either couldn't find an adequate summary of

19   it or it was not as formal as the survey from

20   the State of Ohio.

21        Q.    Okay.  So you didn't review the

22   survey conducted by the Missouri Board of

23   Pharmacy; is that right?

24        A.    I believe that's the state

1    I attempted to find, and I did not find it

2    useful to my analysis.

3         Q.    And what you looked at was what?

4    A summary of that survey?

5         A.    To even find what questions were

6    asked.  It wasn't -- they said they had relied

7    on it, and I couldn't see anything that was

8    helpful.

9         Q.    So when you reviewed Mr. McNamee's

10   deposition from the Ohio Board of Pharmacy, did

11   you review the exhibits to the deposition?

12        A.    I did not.

13        Q.    Were you provided --

14        A.    Beyond the survey reports that I

15   was taking a look at.

16        Q.    Okay.  So you didn't -- were you

17   provided the exhibits to the deposition, or just

18   the deposition transcript?

19        A.    My memory is just the transcript.

20        Q.    Okay.  And whether you were

21   provided them or not, you didn't review the

22   exhibits to Mr. McNamee's deposition other than

23   the Ohio Board of Pharmacy survey results; is

24   that right?

1         A.    That's correct.

2         Q.    Okay.  So -- all right.  So you

3    haven't looked at Board of survey results from

4    any other state.  You saw some document about

5    something about the Missouri Board of Survey but

6    not the actual survey results.

7                Did you look at any survey results

8    conducted by any other national associations of

9    pharmacists or any other national groups?

10        A.    No.

11        Q.    Okay.  So you've never compared

12   the results of the Ohio Board of Pharmacy survey

13   to any other surveys conducted by any other

14   states or by any other national organizations;

15   is that fair?

16        A.    That's fair.

17        Q.    Okay.  Now, there were also --

18   there were also national articles which

19   discussed the sentiments of pharmacists working

20   in pharmacies around the country and whether

21   they felt that they had adequate time to perform

22   their jobs and whether the metrics that were

23   imposed on them or provided by their employer

24   impacted patient care.

1          Have you reviewed any of those

2   articles?

3          A.    No.

4          MS. WOHL:  Objection to form.

5          Q.    Okay.  So one of those articles

6   was from the Chicago Tribune.  You did not

7   review that article; is that true?

8          MS. WOHL:  Objection to form.

9          A.    I may have -- I didn't -- I did

10  not use that article in writing this report.  It

11  wasn't germane.

12         Q.    And did you review it?

13         A.    I don't remember, but maybe.  It

14  rings a little faint bell.

15         Q.    What about the New York Times

16  article?  Did you review the New York Times

17  article on workplace safety issues and

18  understaffing?

19         A.    I would have the same answer to

20  it.  It may be that I browsed it, but it was

21  not -- it did not form -- it didn't provide a

22  basis for forming the opinion on this survey.

23         Q.    Okay.  And it's not included as a

24  list of any of the sources or references that

1   you relied upon, true?

2          A.    That's right.  Correct.

3          Q.    Were you aware that those national

4   articles formed the basis for the Ohio Board of

5   Pharmacy deciding to issue a pharmacist workload

6   survey?

7          A.    I have no reason to think they did

8   or they did not.

9          Q.    You're just unaware one way or the

10  other, correct?

11         A.    Correct.

12         Q.    And you didn't review them for

13  that purpose, if you looked at them at all,

14  true?

15         A.    They were -- reviewing them would

16  have been outside of what I was assigned to do.

17         Q.    Do you have any reason to dispute

18  the reasonableness of the Ohio Board of

19  Pharmacy's decision to issue a workplace survey?

20         A.    I'm sorry.  Can you --

21         Q.    Was it reasonable, in your

22  opinion, for the Ohio Board of Pharmacy to issue

23  a workplace survey to pharmacists?

24         A.    Yes.

1          Q.    Was it appropriate?

2          A.    They thought it was appropriate.

3          Q.    Do you have any reason to believe

4    that it's not appropriate?

5          A.    I do not.

6          Q.    Do you have any reason to believe

7    that the Ohio Board of Pharmacy was not seeking

8    truthful answers to the survey that they

9    submitted?

10         A.    I have no reason to believe they

11   were not wanting truthful answers.

12         Q.    Do you believe that the Ohio Board

13   of Pharmacy was crafting questions to obtain

14   unfair results?

15         A.    Can you be more specific of what

16   you mean by "unfair results"?

17         Q.    Where they tried to obtain a

18   desired outcome.  Were the questions biased?

19   Were they unfair to the person answering the

20   questions?

21         A.    I'd like to refer to some of those

22   questions, if I may.  So that's on page 4, and

23   it goes through page 7.

24              My opinion was that these would

1    not be examples of leading questions that would

2    be designed to create opinions rather than to

3    capture opinions.

4           Q.    And I thought that was your view,

5    because I didn't see with respect to the

6    criticisms that you offer of the survey any

7    particular criticism with the questions that

8    were asked, true?

9           A.    That's right.

10          Q.    And so that's one of the things

11   you did look at, though, was to determine are

12   these questions biased or fair or suggestive of

13   a particular answer?

14          A.    That's right.

15          Q.    And that wasn't a criticism that

16   you had of the survey?

17          A.    That's correct.

18          Q.    Okay.  Now, in response to the

19   survey -- and we saw this on the top of the

20   document we were just looking at -- the Ohio

21   Board of Pharmacy established the Pharmacist

22   Workload Advisory Committee.

23                Do you see that?

24          A.    I do.

1        Q.    Okay.  And do you know what that

2   committee is?

3        A.    I only know of it through the

4   testimony of Mr. Davis.

5        Q.    And you've never looked at the

6   notes or agendas or any of the other information

7   about what the workload advisory committee has

8   done for the Board of Pharmacy; is that true?

9        A.    That's correct, I have not.

10        Q.    Have you examined any of the steps

11   that the Board of Pharmacy has taken in Ohio in

12   response to the survey results they received?

13        A.    No.

14        Q.    The Ohio Board of Pharmacy has

15   taken certain steps and made certain

16   regulatory -- they've had certain regulatory

17   discussions about steps that could be taken.

18   And they did so on the basis of the results of

19   the survey that they received, both the 2020 and

20   2021 survey.

21              Is that appropriate, in your mind,

22   for the Board of Pharmacy to have done that?

23              MS. WOHL:  Objection to form.

24        A.    You're asking me if it's

1    appropriate that once they had conducted a

2    survey and gotten data, to take action on the

3    basis of what they feel they learned from the

4    survey?

5         Q.   Yes.

6         A.   Yes.  It's common.

7         Q.   And in this case, was it

8    appropriate?

9              MS. WOHL:  Objection to form.

10        A.   It would depend on what the steps

11   were.  So I don't have a broad -- I can't speak

12   to the appropriateness of the steps they took.

13        Q.   Well, you're aware that the Ohio

14   Board of Pharmacy conducted two surveys, right?

15        A.   That's right.

16        Q.   And so based on the results of the

17   first survey, they decided that there was enough

18   concern to conduct a second survey.

19             Do you believe that that was

20   appropriate?

21             MS. WOHL:  Objection to form.

22        A.   It's their prerogative.  So it's

23   not inappropriate.  That's how I would look at

24   it.

 1          Q.    Do you believe that the results of

 2     the first survey in 2020 were so unreliable that

 3     it wouldn't have been appropriate for the Board

 4     to issue a second survey in 2021?

 5          A.    I don't know what the reasoning

 6     was in order to do the second survey.  What I

 7     note is that there were a couple of questions

 8     that were asked in the second survey that were

 9     not part of the first, so that got a little bit

10     more depth in terms of attitudes toward their

11     satisfaction with their primary place of

12     employment.

13                This is on page 6 of my report.

14     Question 12 deals with that.

15                And question 13 was about the

16     level of stress.  So there -- they were -- my

17     opinion would be they were looking for greater

18     depth that would help explain the answers they

19     got to the first survey.

20          Q.    And while there were new questions

21     asked, largely many of the questions were repeat

22     questions, true?

23          A.    Yes.

24          Q.    And so at least the members of the

1   board didn't feel that the questions that were

2   asked or the results that they received were so

3   unreliable that they wouldn't ask the same kind

4   of questions again, true?

5           MS. WOHL:  Objection to form.

6       A.    The reason to do a second survey

7   could -- I don't know if they were thinking that

8   these results were not reliable, but they may

9   have been looking for change over time.  That's

10  another reason that clients sometimes do repeat

11  surveys.

12      Q.    And in this case, the results

13  confirmed the results of the first survey

14  largely, true?

15          MS. WOHL:  Objection to form.

16      A.    Well, I'm going to look at my

17  appendix that we've created the tables and

18  PowerPoint to compare those two.  In some cases,

19  they changed the wording slightly and so there

20  wasn't an ability to do a direct comparison.

21              There were some differences over

22  time, but was there a flip-flop in terms of --

23  it was more the strength of the opinions that

24  were offered rather than the direction, if I can

1    put it that way.

2           Q.    All right.  So just by way of

3    example -- and you're in the appendix.  If we

4    turn to, for instance, X-19, which is

5    MR 4371_19.  This is just one example.

6               So the way that you've done this

7    is that you've indicated what the response was

8    in 2020 and what the response was in 2021,

9    correct?

10          A.    You might go to the page just

11   before that, which is representative of all

12   respondents, right?

13          Q.    I prefer -- your lawyer might

14   prefer I talk about every one, but I want to

15   start with talking about the grocery store large

16   chain responses.

17              And in this case, the response

18   difference from 2020 to 2021 was that there were

19   actually more people that strongly disagreed or

20   disagreed with an environment has sufficient

21   pharmacist staffing to allow for safe patient

22   care, correct?

23          A.    Correct.

24          Q.    But if we go to the page before,

1    as you had requested, page 18, and we're looking

2    among all respondents, we also saw that number

3    increased from 2020 to 2021.  So the results

4    actually not only confirmed it but showed things

5    were getting worse, true?

6              MS. WOHL:  Objection to form.

7         A.    I would agree that there's more

8    intensity there.  There's also fewer who agree

9    with that.

10             Q.    Yes.

11             MS. WOHL:  I'm ready for a break

12        when you've got a stopping point.

13             MR. ELSNER:  Yeah.  Let me just do

14        a couple more of these just to finish

15        this one out, if we could.

16             Actually, we can cover some of

17        those at a later time.  Why don't we

18        take a break.  That's fine.

19             THE VIDEOGRAPHER:  Going off the

20        record at 11:10 a.m.

21             (Recess taken.)

22             THE VIDEOGRAPHER:  We are back on

23        the record at 11:19 a.m.

24

1    BY MR. ELSNER:

2          Q.    Dr. Selzer, do you believe that

3    the results of the second survey, which in many

4    cases showed either a consistent or kind of

5    increasing concern among pharmacists, added to

6    the reliability of the responses to the first

7    survey in any way?

8          A.    The definition of "reliability" is

9    doing the same survey the same way and getting

10   similar responses.  And to the extent that there

11   are similar responses, that's evidence that this

12   is reliable getting the same thing.

13               In some cases, there's a change

14   over time between the two, and the unanswered

15   question is what is accounting for the

16   difference there.

17         Q.    Do you mean a difference in the

18   response to the question, that it showed some

19   inconsistency or unreliability with respect to

20   the responses of the first survey?

21         A.    It shows, in some cases, a change.

22   And so the question -- as a methodologist, I'm

23   going to say, "Well, what were the differences

24   between the two surveys, or what do we know

1   about the response rate?"

2              And I do discuss that in the

3   report, that there was a difference in response

4   rate, that the first survey had a higher

5   response rate of, I believe, 26 percent, and the

6   second survey was 20 percent, that there had

7   been a change in terms of the number of

8   invitations that were sent so that they -- it

9   went -- the second survey went to about 1,000

10  fewer pharmacists.  And there's no explanation

11  about why there would have been fewer

12  invitations sent.  So one could speculate this

13  way or that about that.

14              And there was a difference -- and

15  I'm looking at page 14 of my report -- that the

16  makeup of the respondent pool was different in a

17  couple of areas there, that there were fewer

18  respondents who classified their work setting as

19  a hospital.

20              And they changed from -- in the

21  earlier survey, they'd had inpatient and

22  outpatient separated out, which I added the two

23  together.  There are fewer of those pharmacists

24  responding and more responding from large chain

1    grocery big box stores.

2              So whether the difference that we

3    see in how questions were answered was a result

4    in change over time or a change in the

5    respondent pool, we don't know.

6         Q.    So the focus of your answer has

7    been on who received the survey and who

8    responded to the survey.  But my question is

9    on -- is the actual responses to the survey.

10             Do the responses of the second

11   survey -- are they -- do they largely confirm

12   the results of the responses to the first

13   survey?

14             MS. WOHL:  Objection to form.

15        A.    Let me take a look here.

16             As I said, there were some cases

17   where there were -- we didn't get identical

18   responses.  So that raises the question of,

19   well, why are -- why are we not getting

20   identical responses if we ask the same questions

21   to the same respondent population.

22             So in some cases --

23        Q.    Do you really mean identical?

24   I mean, I wouldn't imagine you could ever get an

1    identical response.

2           A.    Within the margin of error, we

3    would -- it's not uncommon.  We do surveys all

4    the time and sort of look at what happens with

5    the demographics, and there -- some of these

6    differences are beyond what we would expect to

7    see unless there's --

8           Q.    Can you give me an example.

9           A.    -- unless there's meaningful

10   change that's happening there.

11          Q.    Can you give me an example.

12          A.    An example of?

13          Q.    You said there's a question where

14   there's a meaningful difference in the response,

15   and I'm asking which questions.

16          A.    So I'm looking at page X-28 in the

17   appendix.

18          Q.    Okay.

19          A.    And I would say here is an example

20   of no meaningful change between the first time

21   that this was -- the first time data were

22   gathered and the second time data were gathered.

23          Q.    Okay.  So with respect to this

24   question on 28, the question is, "I feel

1    pressure by my employer or supervisor to meet

2    standards or metrics that may interfere with

3    safe patient care."

4                   And this is the respondents among

5    large chain grocer/big box respondents.

6                   And 42 respondents in 2020 said

7    they strongly -- 42 percent in 2020 said they

8    strongly agreed that they feel this pressure,

9    40 percent in 2021.

10                  You consider that a consistent

11   response, correct?

12          A.    I do.  I do.

13          Q.    And then 31 percent agree with it,

14   not strongly, but agree with it in 2020, and

15   33 percent in 2021.

16                  So in 2020, 73 percent of those

17   that worked in large chain big box grocery

18   stores felt that their employers were pressuring

19   them to meet standards or metrics that might

20   interfere with safe patient care, true?

21          A.    That's correct.

22          Q.    Okay.  And then that response in

23   2021 was 73 percent felt that way among those

24   respondents from that category or group,

```
 1    correct?

 2         A.    That's correct.

 3         Q.    All right.  So that's a consistent

 4    response, true?

 5         A.    That's right.

 6         Q.    What's an inconsistent response or

 7    an anomaly?

 8         A.    So I'm looking, just to stay in

 9    that same neighborhood, X-30.  And what you see

10    on the disagree side there is a shift both that

11    there are more disagreeing and that there's a

12    greater intensity in terms of the disagreement

13    that's there.

14         Q.    And it's not showing the opposite

15    results, right?  It's not showing --

16         A.    That's right.

17         Q.    -- in the past in 2020, most

18    people agreed that the workload ratio was fine,

19    and now there's a problem, correct?

20         A.    That's right.

21         Q.    People just feel more strongly

22    about the workload ratio in 2021 who are

23    responding than in 2020, true?

24         A.    That's -- I agree with that.
```

1          Q.    Okay.  And you think that's an

2    anomaly in the data, that that makes the data

3    unreasonable?

4          A.    No, I don't.  The question is did

5    the second survey confirm the first survey.

6    And, again, I'm going to have a technical

7    understanding and definition of what we mean by

8    "confirm," that the findings are -- that in

9    terms of -- remember, the frame you've given me

10   is reliability, and that means you get the same

11   response.

12         Q.    Okay.  But you don't disagree that

13   the results of the survey, whether in 2020 or

14   2021, that most respondents felt that the staff

15   ratio did not provide pharmacists to provide

16   safe and effective care for patients, correct?

17         A.    That's correct.  I'm just looking

18   up whether --

19         Q.    And that intensified between 2020

20   and 2021.  It got worse, according to the

21   respondents?

22               (Court reporter clarification.)

23         Q.    And in 2021 the responses to that

24   particular question, the feelings about

1    pharmacists about that staffing ratio, grew

2    worse, true?

3            A.    There was more disagreement with

4    the statement, that's correct.

5            Q.    Okay.  Any other anomalies you

6    want to point me to or changes that would

7    indicate that the survey results were unreliable

8    between the first and second survey --

9            A.    No.

10           Q.    -- to the responses?

11           A.    No.

12           Q.    So I didn't really see any.

13                 Are there any?

14                 And you don't highlight that in

15    your report as a concern, true?

16           A.    That's correct.

17           Q.    You do write in the report on

18    page 4 -- and it's page 4, 6.  In the first full

19    paragraph, "The State of Ohio Board of Pharmacy

20    2021 survey is a valid attempt to understand

21    workplace issues among licensed pharmacists

22    working in Ohio."

23                 What do you mean by it's "a valid

24    attempt to understand workplace issues among

1   licensed physicians working in Ohio"?

2           A.    Licensed pharmacists.

3           Q.    Licensed pharmacists.  Yeah.

4           A.    It means that what they set out to

5   do was to understand workplace issues.  They

6   created questions, they designed questions that

7   were designed to get to workplace issues, and

8   it's a reasonable attempt at it.

9           Q.    Okay.  And it's reasonable enough

10  that the Board would take some action with

11  respect to the responses, correct?

12              MS. WOHL:  Objection to form.

13          A.    I have no knowledge if they did or

14  did not take action, so --

15          Q.    Okay.  What made this -- what

16  made -- what, in your opinion, makes it a valid

17  attempt to do this?  What makes it valid?

18          A.    That what they said they were

19  going to do was to ask questions about workplace

20  issues, and that's what they constructed.

21          Q.    So they wanted to get to the heart

22  about how pharmacists feel about their working

23  conditions; is that true?

24          A.    That's right.

1        Q.    And the questions that they asked

2   were fair to understand that; is that right?

3        A.    Reasonably fair.

4        Q.    Okay.  And there's -- and the

5   responses that they received and the questions

6   that they asked were fair questions to get to

7   the heart of that question, correct?

8        A.    Reasonably fair.  Yes.

9        Q.    And the responses that they got

10  were reasonable for them to take action with

11  respect to it?  It would be -- you don't know

12  what action they took, but if they took action,

13  you wouldn't think that that would be

14  unreasonable to do based on what you've seen of

15  the survey; is that fair?

16       A.    That's fair, with the caveat that

17  I had some methodological concerns.

18       Q.    Right.  And that's what I'm really

19  trying to get at.

20            Are those methodical concerns so

21  significant that you think that the entire

22  survey results are totally unreliable and

23  shouldn't have been reviewed, analyzed, or

24  considered at all by the Board?

```
1                    MS. WOHL:  Objection to form.

2           Q.    Can you say your answer again.

3           A.    No.

4           Q.    In fact, you're aware that Kroger

5    had one of its employees sit on the pharmacist

6    workload committee who considered the results of

7    the survey and whether to conduct a second

8    survey, correct?

9           A.    Is that Mr. Davis?

10          Q.    Right.

11          A.    I'm loosely aware of that.

12          Q.    Well, you read his deposition,

13   right?

14          A.    I did.

15          Q.    And you're aware that he sits on

16   the workplace advisory committee?

17          A.    I am.

18          Q.    Are you aware of any objections

19   that he framed with respect to the survey?

20          A.    What I recall is that he was --

21   his response to the survey results was to wish

22   for additional information before deciding if

23   there was a concern that warranted future steps.

24          Q.    And as a result, they took a
```

1    second survey, correct?

2               MS. WOHL:  Objection to form.

3         A.    They took a second survey.

4         Q.    And are you aware of Kroger

5    objecting, other than through your testimony in

6    this litigation, to the results of the -- to the

7    Ohio pharmacy workload survey?

8         A.    I have no knowledge of that.

9         Q.    Okay.  You're not knowledgeable of

10   any objections Mr. Davis had to the survey

11   results other than he wanted more data, correct?

12        A.    I am not -- that's correct.

13        Q.    And are you aware that the

14   governor of the State of Ohio was informed about

15   the results of the survey?

16        A.    I don't know that I'm aware.

17        Q.    Are you aware that the governor of

18   the State of Ohio did not offer any objection to

19   the survey or the way the survey was used?

20        A.    I do not know.

21        Q.    The pharmacist workload committee

22   drafted policy options with feedback and various

23   regulatory proposals.

24               Have you reviewed those?

 1          A.    I have not.

 2          Q.    Do you know that the pharmacist

 3   workload committee based its regulatory

 4   proposals on the responses to the survey from

 5   pharmacists who responded to the 2020 and 2021

 6   survey?

 7          A.    I'm not aware of that.

 8          Q.    Is it appropriate, in your mind,

 9   for the Ohio Board of Pharmacy to have done

10   that?

11                MS. WOHL:  Objection to form.

12          A.    I would -- I would prefer to use

13   the word "reasonable" for them to do it.

14          Q.    Why do you prefer to use the word

15   "reasonable"?

16          A.    Well, appropriate implies that

17   there's some external measure of what would and

18   would not be appropriate.  Reasonable, does it

19   make sense that they did it.

20          Q.    So you think it makes sense --

21          A.    It makes sense they did it.

22                Sorry?

23          Q.    You think it makes sense that they

24   used these results to craft some regulatory

1   proposals; is that fair?

2          A.   Yes.

3          Q.   Would you have done it if you sat

4   on the Board?

5               MS. WOHL:  Objection to form.

6          A.   I don't know.

7          Q.   You don't know?

8          A.   I don't know.

9          Q.   Are they so unreasonable that you

10  don't think that they should be used at all in

11  terms of helping out with best practices in

12  Ohio?

13              MS. WOHL:  Objection to form.

14         A.   I have given that question no

15  thought before right now.

16         Q.   So in all this work you did and

17  the work that you've done in preparing for the

18  deposition, it never occurred to you whether you

19  thought the results -- just 50,000-foot view --

20  the results of this are so unreliable that no

21  one should have ever used this as a basis to

22  take any further action?

23              MS. WOHL:  Objection.

24         Q.   Do you have an opinion one way or

1    the other on that?

2                    MS. WOHL:  Objection to form.

3           A.    It is not my opinion, and I

4    believe I state it, that it was a reasonable

5    thing for them to take action.

6           Q.    Was it reasonable for them to send

7    a request to all pharmacists in Ohio to respond

8    to the survey?  Was that a reasonable way to go

9    about eliciting responses?

10          A.    That method is called a census.

11   So rather than draw a sample, they chose to

12   attempt to contact every pharmacist who is

13   licensed and working in Ohio to participate in

14   the survey.

15          Q.    Was it reasonable to do this as a

16   census as opposed to a survey?

17                    MS. WOHL:  Objection.

18          A.    As opposed to a sample, I think

19   you mean.

20                    Yes, because it's a relatively

21   small meaningful universe to them, meaning it's

22   not 100,000.  It's not a million.  And I believe

23   it also showed the wish to gather as much data

24   as possible.

1          Q.    And that's a potential advantage

2    of a census type survey as opposed to a sample,

3    correct?

4          A.    Well, the advantage is the -- sort

5    of the rhetorical ability to say we've reached

6    out to every pharmacist.  The difficulty is in

7    the response rate, which is what you want is to

8    represent every pharmacist.

9                And when you have a response rate

10   of 20 percent, then it raises a question of

11   whether your findings actually do generalize

12   beyond the people who answered to represent the

13   full complement of pharmacists licensed in the

14   State of Ohio.

15         Q.    And we're going to get to the --

16   we're going to get to that point on methodology

17   in a few minutes.  I want to ask a couple more

18   questions just on relevance before we get there.

19               Do you know whether the greatest

20   danger in a pharmacy is dispensing controlled

21   substances?

22         A.    I do not know.

23         Q.    Do you know that when a pharmacist

24   is expressing concerns about safe patient care,

1   whether that includes the dispensing of

2   controlled substances or not?

3          A.    I would assume it includes any

4   number of factors.  And one could be related to

5   dispensing controlled substances, but not

6   exclusively.

7          Q.    So you believe it could be

8   expressing that concern, but you're not sure; is

9   that true?

10         A.    We have no way to quantify what

11  proportion were thinking about that when they

12  answered the questions.

13         Q.    Do you know what policy Kroger

14  applies with respect to the dispensing of

15  controlled substances?

16         A.    I do not.

17         Q.    I want to ask a few questions

18  about metrics.  We looked at one of those

19  questions a few minutes ago in the survey

20  results.

21                What is or what are pharmacy

22  metrics?

23         A.    I'm sorry?

24         Q.    What are pharmacy metrics?

1          A.    I don't know what you're

2     referencing.

3          Q.    Okay.  So if we look at question 6

4     in your report, 4370.007 on page 5, question 6

5     asks the pharmacist, "I feel pressure by my

6     employer or supervisor to meet" -- sorry.

7     Question 6.  "I feel pressure by my employer or

8     supervisor to meet standards or metrics that may

9     interfere with safe patient care."

10               My question is, what are pharmacy

11    metrics?

12         A.    My only knowledge of what they

13    might be referring to would have come from

14    comments that some of the pharmacists offered.

15    I have no independent knowledge of what pharmacy

16    metrics are.

17         Q.    Do you know what types of metrics

18    pharmacists are measured by at Kroger and other

19    pharmacies?

20         A.    What I know is what was mentioned

21    by some pharmacists in their comments.

22         Q.    Is that the only basis of your

23    knowledge?

24         A.    That is the only basis of my

1    knowledge.

2         Q.     Prior to doing your work in this

3    case, have you ever heard of pharmacy metrics

4    before?

5         A.     Those two words, I do not believe

6    I've ever heard put together.

7         Q.     Okay.  Do you agree one way or the

8    other whether compensation policies based on

9    prescription volume could influence the

10   dispensing of medications?

11             MS. WOHL:  Objection to form.

12        A.     I have no professional knowledge

13   of that.

14        Q.     So in this question when they ask,

15   "I feel pressure by my employer or supervisor to

16   meet metrics or standards that may interfere

17   with safe patient care," other than what you

18   read in the comments which triggered on your

19   search terms, you don't know what any of those

20   standards or metrics are, correct?

21        A.     I do not have a complete list of

22   what standards or metrics they might be

23   referencing there.  I am aware that there were

24   some pharmacists that chose to comment on

1    metrics.

2          Q.    Yeah, let's look at one.  Let's

3    pull up MR 4202 from the 2020 survey on

4    page 109.  It's Exhibit 4.  If you could go to

5    4202_000109.  It's the very last comment.

6               Are you with me?

7          A.    I am.

8          Q.    Okay.  And I'm just going to blow

9    this up a little bit.

10               And it reads, does it not,

11   "Metrics are the worst part of retail pharmacy

12   because they supersede anything of actual

13   importance, including safety.  Kroger pharmacy

14   publicly states that the most important thing is

15   patient safety, but where are the metrics

16   measuring it?"

17               Are you aware that -- did you read

18   this comment?

19         A.    Yeah, I did.  It had the word

20   "Kroger" in it.  That was one of our search

21   terms.

22         Q.    Okay.  So you were aware that the

23   metrics that Kroger was using didn't include any

24   metrics which measure patient safety, correct?

1            MS. WOHL:  Objection to form.

2        A.    I am aware that one person, one

3    pharmacist, typed that answer.  I'm not aware of

4    whether that exists in the real world or not.

5        Q.    Well, you're also aware of how

6    many people responded to that question about

7    metrics.  And we just looked at the fact that it

8    was over 70 percent working in large chain and

9    grocery store settings, correct?

10        A.    Correct.

11        Q.    So this comment confirms the

12    result of the statistics that we looked at in

13    some way that, in fact, pharmacists feel that

14    metrics are interfering with patient safety,

15    true?

16            MS. WOHL:  Objection to form.

17        A.    Let me just go back to that

18    particular chart, if you don't mind.

19            Can you advise me of what page in

20    my appendix?

21        Q.    I think you referred to it -- to

22    this earlier.  It's MR 4371, page 28.

23            We can jump there if it's helpful.

24    It's on the screen.

1          Do you see it?

2          A.     Uh-huh.

3          Q.     So when asked this question,

4     "I feel pressure by my employer or supervisor to

5     meet standards or metrics that may interfere

6     with safe patient care," in 2020, 74 percent of

7     the respondents either strongly agreed or agreed

8     with that statement, true?

9          A.     That's true.

10          Q.     So it wasn't one pharmacist in the

11    whole State of Ohio that felt that way?  At

12    least with respect to people who worked in large

13    chain grocery stores and large chain pharmacies,

14    in fact, 73 percent of those that responded felt

15    that way, correct?

16          MS. WOHL:  Objection to form.

17          A.     The difficulty I'm having

18    answering your question is you're trying to tie

19    one person's comment back to these data.  And I

20    would say the comment may be an example of a

21    finding from these data, but we did not have a

22    way of knowing the way that commenting

23    pharmacist answered this question.

24          So I'm reluctant to say that

1   this -- that that's confirmatory.

2          Q.    Do you agree that when someone

3   provides a written comment to a survey, that it

4   reinforces or it makes more reliable the result

5   of the statistics in the survey as a general

6   matter?

7          A.    The commenting on the survey has

8   nothing to do with the technical definition of

9   reliability.

10         Q.    Does it -- the fact of the number

11  of people who issue comments reflect on how

12  strongly people felt about these issues?

13         A.    It is a minority of the

14  pharmacists who completed the survey who

15  commented.  So you've got -- you've got a

16  response bias there in terms of who does and who

17  does not comment.  So trying to generalize from

18  comments is not appropriate.

19         Q.    So in your mind, the fact that a

20  pharmacist took the time to write this

21  particular comment about the metrics doesn't

22  make the fact that 73 percent of the pharmacists

23  who responded to the survey in this setting,

24  both in 2020 and 2021, more reliable or less

1    reliable; is that right?

2         A.    It doesn't -- it's apples and

3    oranges.  The comments do one thing, and the

4    survey does another.  Again, without being --

5    without knowing how that respondent answered the

6    question, you just -- it would be inappropriate

7    to make that claim.

8         Q.    If we go back to the particular

9    metric response that we were looking at.  This

10   person goes on to write that -- and this is just

11   across from "SMART format," about three lines

12   down from the last highlight.  It begins, "The

13   idea that all metrics exist is astounding."

14              Do you see where I'm at?

15        A.    Yes.

16        Q.    "It seems that some are inversely

17   proportional to patient safety.  For example,

18   decreased wait times means less time spent on

19   filling a prescription and other tasks impacting

20   how quickly that script can process so our

21   patients don't have to wait a few minutes

22   longer.

23              "Metrics have made pharmacy into a

24   fast food like scenario.  And we get scolded by

1    the patients and corporate alike if they have to

2    wait longer.  We are not treated like health

3    care professionals in a health care setting

4    focused on patient safety.  We are treated like

5    a burger flipper trying to get out the next meal

6    as quickly as possible hoping no harm comes of

7    undercooked meat."

8              Did I read that correctly?

9         A.    Yes.

10        Q.    Do you believe that this

11   pharmacist felt that there was a correlation or

12   connection between the metrics and a safe work

13   environment and the dispensing of medications?

14             MS. WOHL:  Objection to form.

15        A.    Well, I'm reading it again to see

16   if this pharmacist referenced dispensing.  So I

17   don't know that that is -- that I would say

18   that's what this is about.  This is about how

19   fast they have to fill prescriptions.

20        Q.    And they say in the line there,

21   "It seems" -- it says, "The idea that all these

22   metrics exist is astounding."

23             Do you see that?

24        A.    Yes.

1          Q.    "And it seems that some are

2    inversely proportional to patient safety."

3                What do you think the pharmacist

4    is talking about there of causing the patient to

5    have to wait?  What are they waiting on?

6                MS. WOHL:  Objection to form.

7          A.    Yeah, I think we need to back up

8    to what your initial question was.

9          Q.    I'm happy with this one.

10               What is it that you think that the

11   pharmacist -- that the patient is waiting on

12   that this pharmacist is concerned about patient

13   safety?  What is it the pharmacist do you think

14   is doing that may impact patient safety by

15   causing the patient to wait?

16               MS. WOHL:  Objection to form.

17         A.    I have no knowledge of what they

18   might be doing that causes patients to wait.

19         Q.    So you don't really know at all

20   what they're referring to as to why it would be

21   inversely proportional to patient safety if

22   they're feeling pressure to fill the

23   prescription quicker?

24         A.    I don't know what they mean by

1    "patient safety," and I don't -- I don't know

2    what it is that is beyond -- that their

3    metrics -- I have no professional knowledge of

4    what their performance strategies are like.

5           Q.    How did you feel when you read

6    this comment with respect to how the pharmacist

7    feels?  How did it make you feel?

8                 MS. WOHL:  Objection to form.

9           A.    This particular comment?  I mean,

10   I read a lot of comments.  So I saw that there

11   are some pharmacists who have concerns.

12          Q.    Yeah.  But I'm asking how those

13   concerns made you feel, if anything.

14                MS. WOHL:  Objection to form.

15          A.    I don't know that I have an answer

16   to that.  I don't know how to characterize it or

17   that I would.  You know, in my work, I read a

18   lot of comments, so ...

19          Q.    Did you know, just in having your

20   prescriptions filled, that some pharmacists are

21   measured on their performance to a tenth of a

22   second?

23          A.    I did not know.

24                MS. WOHL:  Objection.

```
 1            Q.    Did you know that pharmacists have

 2   felt that this type of performance metrics makes

 3   them anxious and makes them worried about

 4   patient safety?

 5                  MS. WOHL:  Objection to form.

 6            A.    I did not know.

 7            Q.    As a customer, does this concern

 8   you?

 9                  MS. WOHL:  Objection to form.

10            A.    I do not know that this is germane

11   to my pharmacist and my experience there.

12            Q.    Okay.  Overall -- not just this

13   particular comment, but overall, were you

14   surprised by the comments that you read in the

15   pharmacist survey?

16            A.    Surprised.

17                  Again, it's not uncommon for me to

18   read comments in surveys.  So I don't know what

19   you're trying to get at here.

20            Q.    Did it surprise you or did you

21   expect that pharmacists would have these kinds

22   of comments about their work conditions?

23                  MS. WOHL:  Objection to form.

24            A.    I did not know what to expect.  So
```

1    the comments are the comments.  They are what

2    they are.  They're a corpus of data as far as

3    I'm concerned.

4         Q.    So these survey results to you are

5    just -- it's just data to analyze?  It

6    doesn't -- it doesn't make you concerned one way

7    or the other about the work that the pharmacists

8    are doing and the pressure that they're feeling?

9         A.    It was not my assignment to figure

10   that out.  Professionally that's outside of my

11   role.

12        Q.    The Ohio Board of Pharmacy, you'd

13   agree that they're specialists in the field of

14   pharmacy in a way that you're not, true?

15        A.    That's right.

16        Q.    They described these results to

17   the governor of the State of Ohio as startling.

18             Did that surprise you?

19             MS. WOHL:  Objection to form.

20        A.    I don't know how to answer your

21   questions about being startled or surprised.  It

22   is what it is.

23        Q.    Did you factor the fact -- did you

24   consider that the Ohio Board of Pharmacy

1    specialists in the area of pharmacy in Ohio

2    considered these results and the comments

3    startling when offering your expert opinions

4    here?

5              MS. WOHL:  Objection to form.

6         A.    So the -- what you're referencing

7    was outside of my purview.  What I read in

8    Mr. Davis' deposition is that when you asked --

9    or someone asked whether he was concerned, he

10   said -- he was very careful to say he would need

11   more information, that it wasn't enough to just

12   look at the numbers and have -- and form an

13   opinion based there.

14        Q.    Now, that's the Kroger employee

15   said that he just wanted more data.  He wasn't

16   concerned, right?

17             MS. WOHL:  Objection to form.

18        Q.    That's who you were referring to,

19   the Kroger employee, the health and wellness

20   director for Kroger?

21        A.    He was pushing back on using the

22   word "concerned" to describe his reaction to it.

23        Q.    Right.  But I'm just verifying,

24   you mean the Kroger employee, though, right?

```
 1          A.    Mr. Davis.

 2          Q.    Yes, who worked for Kroger,

 3   correct?

 4          A.    Yes.

 5          Q.    But that wasn't what Mr. McNamee

 6   said from the Ohio Board of Pharmacy, which is

 7   who I asked you about.

 8          A.    Oh, I'm sorry.

 9          Q.    His response was that it was

10   startling, the results, correct?

11          A.    I don't recall that part of his

12   deposition.

13          Q.    And Mr. McNamee doesn't work for

14   Kroger, right?

15          A.    Unless something has changed.

16   Correct.

17          Q.    Did you review Kroger's

18   compensation policies?

19          A.    I did not.

20          Q.    Are you aware that their policies

21   provided increased compensation based on a

22   variety of metrics, such as whether wait times

23   are accomplished, the number of prescriptions

24   filled, customer satisfaction?
```

```
1                    Were you aware of that?

2                    MS. WOHL:  Objection to form.

3          A.    Sorry.

4                    I have no knowledge of Kroger's

5    compensation policies.

6          Q.    Okay.  And no one from Kroger

7    shared that with you to perform your analysis?

8          A.    No.

9          Q.    Okay.  Are you aware that Kroger's

10   performance policies set certain sales

11   expectations for pharmacists?

12                   Were you aware of that?

13                   MS. WOHL:  Objection to form.

14         A.    I'm unaware of Kroger policies.

15         Q.    Okay.  So I just want to make sure

16   I understand.  Do you believe that whether a

17   pharmacist believes they work in an environment

18   that allows for safe patient care, that that has

19   no bearing on the dispensing of opioids and

20   controlled substances?

21                   MS. WOHL:  Objection to form.

22         A.    My job was to look at the data

23   before me.  So what I believe did not inform my

24   analysis.
```

1          Q.    Yeah, but your opinion is that --

2     is that the issue of whether a pharmacist, in

3     responding to the survey, thought that they were

4     providing a safe and effective work environment

5     was not impacted by the dispensing of controlled

6     substances?

7                 You couldn't make that connection,

8     correct?

9                 MS. WOHL:  Objection to form.

10         A.    The data do not substantiate that

11    connection.

12         Q.    And you don't think there's any

13    connection between them at all, true?

14                MS. WOHL:  Objection to form.

15         A.    I'm saying we don't know.  We

16    don't have proper data to support that claim.

17         Q.    And is it your opinion that the

18    only way that could have been accomplished was

19    if they had specifically asked about opioids?

20                MS. WOHL:  Objection to form.

21         A.    That would give it content

22    validity; that is, if that's what they wanted to

23    know, then they would ask questions about that.

24         Q.    So there were questions about

1    whether a pharmacist had time to take a lunch

2    break.  And do you think that has any connection

3    with safely dispensing controlled substances?

4            A.    I don't know.

5            Q.    Well, why would -- strike that.

6                  But is it fair to say that you

7    don't have enough experience in the practice of

8    pharmacy to know how the impact of staffing

9    levels or metrics or workload or workflow would

10   bear on the dispensing of controlled substances;

11   is that fair?

12           A.    That's fair.  I have no experience

13   working in a pharmacy.

14                 MR. ELSNER:  Okay.  It's about --

15           why don't we go off the record real

16           quick.

17                 THE VIDEOGRAPHER:  Off the record

18           at 12:00 p.m.

19                      - - -

20                 (Thereupon, at 12:00 p.m. a luncheon

21   recess was taken until 12:45 p.m.)

22                      - - -

23

24

1                    Friday Afternoon Session
                     January 20, 2023
2                    12:45 p.m.

3                          - - -

4              THE VIDEOGRAPHER:  We are back on

5         the record at 12:45.

6    BY MR. ELSNER:

7         Q.    Good afternoon.  Dr. Selzer, one

8    of the questions that you set out to answer --

9    and if you want to look at it, you're welcome

10   to -- on page 11 of your report, and that is

11   whether the survey responses should be

12   understood to reflect an accurate view of all

13   licensed pharmacists working in Ohio; is that

14   right?

15        A.    That's right.

16        Q.    Okay.  In order for the survey

17   results to be useful, must they reflect the

18   views of all pharmacists in Ohio?

19        A.    No.

20        Q.    Why not?

21        A.    The idea of a survey is to

22   weigh -- collect the opinions of a few and that

23   they would stand for the universe, that's the

24   ideal, and there are methods that you can employ

1    to get you closer there.  But that's not to say

2    that the findings by themselves, however their

3    flaws might be, aren't useful.

4          Q.    Okay.  So the results of the

5    survey tell us something about how pharmacists

6    in Ohio feel about their workplace and workload,

7    correct?

8          A.    That's correct.

9          Q.    Okay.  And there could be some

10   usefulness of that, regardless of whether it

11   meets every methodical test, to be able to

12   extrapolate those results to every pharmacist in

13   Ohio, true?

14         A.    That's right.

15         Q.    Okay.  And, in fact, you have --

16   you've gone through the report and identified

17   for us some of the information that's conveyed

18   with respect to certain questions on page 10

19   and 11, true?

20         A.    That's right.

21         Q.    Okay.  And you concluded that

22   without regard to whether or not the respondent

23   pool is reflective of a cross-section of all

24   licensed pharmacists in Ohio, there are specific

1    questions that are answered by the data, true?

2           A.    I'm going to sort of step back

3    from -- that's a pretty hard bar that you're

4    putting there.

5                 The reason that I'm qualifying

6    this is that we have a response rate of

7    20 percent.  And it could be that the other

8    80 percent would not feel the same as this

9    20 percent, and we don't know.

10                And we don't -- we didn't have a

11   way to know whether there was response bias in

12   that particular types of pharmacists or

13   pharmacists with particular views were more

14   likely to respond to this.

15                That's not uncommon in most

16   surveys.  That's a -- that's -- there are whole

17   conferences held on the subject of non-response.

18                So with that caveat, there are

19   some findings that are persuasive.

20          Q.    Okay.  And we're going to talk

21   about the response rate in a few minutes.

22                But on page 9 of your report under

23   D, summary of the survey data, you write, do you

24   not, that "Without regard to whether the

1    respondent pool is reflective of a cross-section

2    of all licensed pharmacists working in Ohio,

3    here are the questions the data answer."

4              Correct?

5         A.    I'm saying here are answers, yes.

6         Q.    Here are questions the data

7    answers, correct?  And the answers are, a

8    majority of pharmacists express concern about

9    having enough time for patient care.

10              The answer to that is true,

11   correct?

12        A.    That's right.

13        Q.    If we go on to page 10, the

14   question is, "Do a majority express concern that

15   they have adequate staffing by pharmacists to

16   allow for safe patient care?"

17              And the answer is "Yes," correct?

18        A.    Yes.

19        Q.    In fact, 68 percent of the

20   respondents felt that way, and 39 percent of

21   that 68 percent strongly felt that way, true?

22        A.    True.

23        Q.    The next question that the survey

24   answers is, "Do a majority express concern that

1    they have adequate staffing by pharmacy

2    technicians to allow for safe patient care?"

3              And the answer is "Yes," correct?

4         A.    Correct.

5         Q.    75 percent of the respondents felt

6    that their work environment did not have

7    sufficient pharmacy technician staffing to allow

8    for safe patient care, right?

9         A.    Right.

10        Q.    So it wasn't just a majority; it

11   was 75 percent of those that responded?

12        A.    That's right.

13        Q.    Similarly, there were concerns

14   expressed about the workload-to-staff ratios,

15   correct?

16        A.    Yes.

17        Q.    And in that circumstance,

18   72 percent disagree, including 37 who strongly

19   disagreed with the statement, "I feel that the

20   workload-to-staff ratio allows me to provide for

21   patients in a safe and effective manner."

22              Correct?

23        A.    Correct.

24        Q.    And you also agree that the survey

1   does answer, from the respondents, "Do a

2   majority express concern about taking on

3   additional services without additional

4   staffing?"

5           Correct?

6       A.   Correct.

7       Q.   And in this case, it wasn't just a

8   majority, it was 88 percent of the respondents

9   agreed, true?

10      A.   True.

11      Q.   And do you know what all the

12  additional services are that have been added to

13  the responsibility of pharmacists, that they

14  would have considered in answering this

15  question?

16      A.   The question wording itself speaks

17  to immunizations and testing.

18      Q.   Right.  And it says "et cetera."

19  Do you know what the et cetera would mean?

20      A.   I do not know.

21      Q.   Did you make any effort to learn

22  what other additional services and tasks that

23  pharmacists were expected to undertake?

24      A.   No.

```
1              Q.    Did you make any effort to

2    determine what additional services and tasks

3    pharmacists had to undertake versus what they

4    previously had to do?

5              A.    No.

6              Q.    And then there was also a question

7    in the 2021 survey about whether a majority

8    feared voicing workload concerns to their

9    employers.

10                   And the answer was that, yes, they

11   did, true?

12             A.    True.

13             Q.    In fact, 72 percent felt that --

14   72 percent disagreed with the statement, "I feel

15   safe voicing any workload concerns to my

16   employer."

17                   Correct?

18             A.    Right.

19             Q.    And 37 percent of that 72 percent

20   felt that very strongly, true?

21             A.    Right.

22             Q.    Does the -- did you consider the

23   fear that respondents might have about voicing

24   workload concerns when looking at the response
```

1   rate to the survey?

2          A.    The deposition of Mr. McNamee made

3   clear that these were -- that the surveys were

4   sent in a way that permitted the pharmacist to

5   respond anonymously without their name attached,

6   as would be common.

7          Q.    Okay.  And that was a positive

8   thing about the survey, correct?

9          A.    Yes.

10         Q.    Because it would be more likely

11  that people would answer more honestly if their

12  employers and others didn't know who they were

13  and how they were responding, true?

14         A.    That's right.

15         Q.    Okay.  And so -- but you'd agree

16  with me that anyone that thinks they get an

17  e-mail and they're responding to a survey, that

18  there's a fear that someone might be able to

19  orchestrate who they are and trace it back to

20  them, correct?

21              MS. WOHL:  Objection to form.

22         A.    I don't know.

23         Q.    You never considered that, in all

24  the work you've done in polling and surveys,

1   when you say it's anonymous that people might

2   be -- that there's some people that might be

3   concerned that they'd be able to figure it out?

4           A.    It would be speculation on my part

5   to say whether that happens or doesn't happen.

6           Q.    You never studied it?

7           A.    Our methods are to keep that from

8   happening, so that's -- that's our mindset.

9           Q.    And the reason you're keeping it

10  from happening is because you fear people won't

11  be -- won't respond or won't really be honest in

12  their responses if they think that somebody may

13  be able to determine who they are, right?

14          A.    That's right.

15          Q.    But when you were considering the

16  response rate here, did you factor in one way or

17  the other the fact that those who responded to

18  the survey -- and these are the ones who

19  responded -- that 72 percent feared or worried

20  about voicing workload concerns to their

21  employers?

22              Did you factor that in?

23              MS. WOHL:  Objection to form.

24          A.    Factor that into what?

1          Q.    The response rate to the survey.

2          A.    No.

3          Q.    And I think that's not really

4    exactly what the question was, right?  You've

5    kind of reframed it here.  You framed it, on

6    page 10, is "Do a majority fear voicing workload

7    concerns to their employers?"  That's what

8    you've written just above the last bullet on

9    page 10, correct?

10         A.    Correct.

11         Q.    But the real question was, if we

12   go back to your appendix on X-36, "Do I feel

13   safe" -- I guess we go to 35 if we want to look

14   at comparing -- doing a comparison.  "Do I feel

15   safe voicing any workload concerns to my

16   employer?"

17               True?

18         A.    That's the wording of the

19   question.  Yes.

20         Q.    But you changed the wording of the

21   question to just "Do they fear."  Safe, to me,

22   seems even stronger, right, than fear?

23               MS. WOHL:  Objection to form.

24         A.    I didn't hear a question there.

1          Q.    Well, do you agree with me, that

2    "safe" seems stronger --

3          A.    I don't know that "safe" or

4    "fear" -- I don't know what the intensity factor

5    relationship would be.

6          Q.    Okay.  Why did you change "safe"

7    to "fear"?

8          A.    I don't have an answer for you.

9          Q.    And that was a question that

10   wasn't asked in the 2020 survey but was asked in

11   the 2021 survey.  Or maybe it was asked in both.

12   I thought it wasn't, but --

13         A.    There's comparison data there.

14         Q.    Yes, it does appear there is.

15   Okay.

16               And one of the issues that you

17   discuss in the -- I guess in the general

18   sections of your report, is the survey, does it

19   have a meaningful universe of people who are

20   responding.

21               I assume that there's no argument

22   here that "all pharmacists in Ohio" is a

23   meaningful universe for a response to the

24   survey; is that true?

1          A.    There was some qualification that

2    they reside in Ohio.

3          Q.    And other than that, was there any

4    other -- I mean, you'd agree with me that by

5    selecting licensed pharmacists in Ohio, who

6    reside in Ohio, that's a meaningful universe to

7    ask these questions to, correct?

8          A.    Given that the sponsor of this is

9    the State of Ohio Board of Pharmacy, yes.

10         Q.    Okay.  I'm just trying to figure

11   out where we have some agreement and where we

12   don't.

13               Now, you do quibble with the fact

14   that, you know, it could be that some

15   pharmacists receive this that don't have a

16   license at the moment, true?

17         A.    Where is it that you see that?

18         Q.    I think it's on page 3 of your

19   report.  There was "no effort to remove those

20   who are licensed but not practicing"?

21         A.    I believe that came from

22   Mr. McNamee's deposition.

23         Q.    Okay.

24         A.    So there was some quibble about

1    whether they needed to be practicing as opposed

2    to just living in Ohio with a valid license.

3         Q.    And do you believe that

4    pharmacists that are licensed but not

5    necessarily practicing when they complete the

6    survey might be an important source of

7    information?

8         A.    I do not know.

9         Q.    They could be or couldn't be?  You

10   have no idea, correct?

11        A.    No idea.  I have no idea how many

12   would be -- would fit that criteria.

13        Q.    Does failing to identify or

14   distinguish between those who are practicing or

15   not invalidate the survey results, in your

16   opinion?

17             MS. WOHL:  Objection to form.

18        A.    There's -- it raises a question.

19   So on its own does it invalidate?  No.  But it

20   raises a question that would lead one to search

21   for an answer to that.

22        Q.    Let's talk a little bit about

23   response rates.  I think when you kind of first

24   mention response rates, you say it's true that

1   many modern surveys have low response rates,

2   correct?

3          A.   Yes.

4          Q.   Okay.  And what are the typical

5   response rates for surveys in the modern

6   setting?

7          A.   Well, it is highly related to what

8   the method of contact is.  So a telephone

9   survey, for example, where you're calling

10  random -- randomly generated phone numbers or

11  even calling from a voter list where you might

12  have a name attached to a phone number, those

13  response rates are in the low single digits,

14  industry-wide.

15         Q.   Okay.  And so the fact that the

16  response rates had a low single digit, doesn't

17  render the study necessarily unreliable,

18  correct?

19         A.   Correct.

20         Q.   And we discussed the fear of

21  retribution or feeling unsafe about reporting

22  working conditions to their employer being about

23  72, 73 percent of those that responded to the

24  survey.  Did you factor in at all the amount of

1   time that pharmacists felt they had to safely

2   perform their jobs in evaluating the response

3   rate to the survey here?

4           A.    No.

5           Q.    Would you agree with me that

6   logically if a pharmacist doesn't think they

7   have enough time to safely perform their job

8   duties, that it might impact the number of

9   people who have the time to respond to the Ohio

10  Board of Pharmacy survey?

11          A.    I don't know.

12          Q.    You don't think that's a logical

13  conclusion to make?

14          A.    Well, given that there were

15  significant -- over 1,000 pharmacists completing

16  the survey who typed in quite long comments

17  adding to the time, I can't say -- I can't say

18  anything about the people who did not respond to

19  the survey and why that might have been.

20          Q.    Okay.  Do you think it's

21  relevant -- the fact that so many respondents

22  responded that they didn't feel that they had

23  adequate time to safely perform their jobs, do

24  you think that's relevant to evaluating the

1   response rate to the Ohio Board of Pharmacy

2   survey?

3          A.    As I would say, on its own, it's

4   just a single data point that describes the

5   data.  On its own, it's not an invalidator.

6   I look for other things that would try to

7   explain or would be sort of in that basket of

8   concerns about the survey methodology.

9          Q.    Okay.  But you didn't think that

10  was important enough to study or to conclude or

11  to see if it had any impact; is that fair?

12              MS. WOHL:  Objection to form.

13         A.    That would be outside of my

14  assignment.

15         Q.    Well, were you asked not to do

16  that?

17         A.    There were lots of things I wasn't

18  asked to do.

19         Q.    Well, there's something where

20  you're affirmatively asked to do a thing.  In

21  this assignment, were there certain things that

22  you were asked not to evaluate?

23         A.    No.

24         Q.    So no one told you, "Hey, don't

1    look at reasons that the response rates to the

2    survey may be low," correct?

3         A.    No.  And to qualify, I'm not

4    saying that this is exceptionally low by

5    industry standards.  So it's not a red flag in

6    and of itself.

7              It's worth noting that the

8    response rate changed between the two surveys.

9              And it's worth noting that this

10   was sponsored by the licensing organization,

11   that there was a professional relationship

12   between the sponsor and the respondents, and we

13   tend to think that would increase the response

14   rate because they would wish to have their voice

15   heard.  That's, I know, the theory behind survey

16   research, period.

17        Q.    Okay.  So you're not going to

18   offer an opinion that the response rate in and

19   of itself was so low that it would discredit the

20   survey?

21        A.    That's right.

22        Q.    Okay.  And, in fact, you've done

23   surveys where the response rate is lower than

24   the response rates in these surveys, true?

1          A.     Yes.

2          Q.     And the study that you referred to

3    with Mr. Schneider, in that case, the response

4    rate was 17 percent, true?

5          A.     I'm sorry.  The survey I referred

6    to with Mr. Schneider?

7          Q.     Let me pull it up for you.  Why

8    don't we mark it.  We'll do it MR 4373.

9               MR. ELSNER:  Mark it as Exhibit 6

10         [sic].

11                        - - -

12         (Selzer Deposition Exhibit 5 marked.)

13                        - - -

14   BY MR. ELSNER:

15         Q.     Is this the article that you

16   published with Mr. Schneider?

17         A.     I don't know that I've seen it in

18   this format.

19         Q.     Well, take a look at it if you

20   need to.

21         A.     I'll take it on face value that it

22   is.

23         Q.     I don't think anyone is trying to

24   trick you.

1                    Did you publish an article with

2    Mr. Schneider regarding the health insurance

3    cost on consumers in Iowa?

4            A.    Well, as you can see,

5    John Schneider was the lead author, along with

6    another academic there.  They were using our

7    data in order to write this article, but I was

8    not a coauthor in terms of writing this article.

9            Q.    Okay.  If you turn to page -- what

10   we've marked as 4373_5 of this document, which

11   is page 127 of the publication.  This talks

12   about the methods of how the survey was

13   conducted, and it indicates that the response

14   rate to the survey was 17 percent, correct?

15           A.    I'm looking for it.

16                 Yes.

17           Q.    Okay.  And this is the survey that

18   you conducted that you were responsible for,

19   correct?

20           A.    Yes.

21           Q.    And that 17 percent didn't render

22   the survey unreliable in any kind of way, true?

23           A.    This survey was using random digit

24   dial telephone numbers as our sample frame.  And

1    today, the typical response rates for that

2    methodology are in the low single digits.

3              So this was done back in 2005.

4    17 percent doesn't surprise me as being on the

5    high side, although in Iowa, we get a little bit

6    better response rates than we might other

7    places.

8              So it's neither high nor low nor

9    certainly not disqualifying.

10         Q.    And I think that what you would

11   like to see -- what you would like to have seen

12   in the Ohio Board of Pharmacy survey results

13   were demographics in order to weigh the data; is

14   that true?

15         A.    Demographics or other meaningful

16   metrics that describe the full universe, the

17   full complement of licensed pharmacists

18   practicing in Ohio.

19         Q.    And some of the things you

20   mentioned were age, the gender, the geographic

21   region of the respondents, along with their --

22   how many were in particular areas of practice;

23   is that right?

24         A.    That's right.

1          Q.    Am I missing any?

2          A.    I think those are the ones

3    I mentioned.

4          Q.    Okay.  But you do recognize that

5    the Board did collect certain demographic

6    information related to the respondents, true?

7          A.    I do not know.

8          Q.    Well, we know -- we at least know

9    how many respondents identified as having worked

10   in a chain pharmacy, a large chain grocery store

11   or an independent pharmacy or hospital setting,

12   correct?

13         A.    We know from a question that they

14   asked of the respondent, not from anything they

15   would have in their records of how they would

16   characterize the setting, their workplace

17   setting.

18         Q.    Right.  But for those who

19   responded to the survey, we know how many

20   responses they received from those who worked in

21   a large chain pharmacy or a grocery store

22   setting or a hospital, true?

23         A.    So this sounds like a small

24   detail.  This is self-reported.  It didn't

1    come -- it's not out of the licensing database

2    for these pharmacists.  This is self-reported.

3          Q.    Do you believe, though, because

4    it's self-reported that pharmacists may

5    incorrectly answer what area of practice they

6    practice in?

7          A.    I'm saying that there are -- it's

8    a bit like party ID.  When we ask you to

9    self-identify what your party is, it may be

10   different from how you're registered.

11              Now, that could be a wide

12   variation here.  But what one person thought was

13   Other, another person might have said was

14   Independent, that there's no necessary

15   conformity to those things.

16         Q.    Wait a second.

17              Do you think that the person

18   answering a survey result before a primary in

19   Iowa about whether or not they are a republican

20   or not would generate the same accurate

21   information as a request to a pharmacist from

22   their regulator asking them to identify their

23   primary area of practice?

24         A.    My point is saying, what -- these

1   words were provided --

2         Q.    Whoa, whoa.  Yes or no first, and

3   then you can tell me your point.

4               MS. WOHL:  Objection.

5         A.    I don't know how to answer that

6   question.

7         Q.    You don't -- okay.

8               So the answer to my question is,

9   no, you do not know whether the accuracy rate of

10  a person in Iowa right before a primary being

11  asked to identify their party affiliation about

12  whether they're a republican or a democrat or an

13  independent is more or less reliable than a

14  pharmacist being asked by their regulator what

15  their primary area of practice is?

16        A.    So there are two parts to this.

17  And let me break them apart.

18              Reliable means would they answer

19  the same way if we asked them again.  And

20  there's a fair amount of blurriness that happens

21  with party identification.  So the word

22  "reliability" there is not one that I would want

23  to use.

24              The second part of your question

1    is, I think, trying to get at whether the

2    distribution by primary practice settings would

3    give -- that if a pharmacist would give the same

4    answer -- that everyone was thinking about the

5    same thing when they filled in mail order, when

6    they filled in other, when they filled in

7    independent.

8              It's a question of definitions.

9    And the respondent was allowed to define for

10   themselves what that is rather than pull from

11   the database of licensees where it is that

12   they're working.

13             And maybe that doesn't exist, but

14   it's -- my point being that we don't know what

15   the full universe looks like in terms of

16   workplace settings.

17        Q.   So let's look at what the actual

18   question is.

19             If you look at question 10 at 4202

20   on page 23.  And they've been asked in

21   question 10, "What is your primary practice

22   site?"

23             And then it provides a definition

24   of these; grocer, large change grocer more than

1   12 locations.

2          Do you see that?

3     A.    I do.

4     Q.    Do you think that a pharmacist, in

5   answering that question, would be confused as to

6   whether they work for a grocery store with more

7   than 12 locations or do they work as an

8   inpatient in a hospital or a mail order

9   pharmacy, or a long-term care facility?

10    A.    So I agree that there is some

11  effort to define these things.  What I see in

12  the data was a difference between the first

13  survey and the second survey in how people were

14  responding to that.  So that raises a question

15  as to whether these definitions were, in fact,

16  clear.

17          And I think you're showing me from

18  2020, is that right, not from 2021?  Because

19  I think 2020 they didn't compute the

20  percentages.

21    Q.    This is 2020.  Yeah.

22          So I guess my second question is,

23  I'm a little surprised by -- I can understand

24  how somebody might vacillate between being a

1    republican or an independent or a democrat

2    depending on the election cycle and who's

3    running and how I feel about all sorts of

4    things.

5                     But are you saying that that same

6    vacillation would occur among pharmacists

7    defining what kind of practice area they work

8    in?  I mean, it's not really opinion based, is

9    it?  It's where you work.

10          A.     Right.  So I don't know what to do

11   here with the 344 who include VA, nuclear, or

12   prefer not to say.  I don't know what proportion

13   of those prefer not to say.

14                    And I think the point with regard

15   to the report is that there were differences,

16   meaningful differences, between 2020 and 2021 in

17   how that question was answered.

18          Q.     Well, but there could be things

19   that account for that.  And I think what I'm

20   hearing you assume is that people didn't

21   understand how to define their practice area.

22                    MS. WOHL:  Objection to form.

23          Q.     Am I right?

24          A.     I'm saying that I looked at this,

1   because in theory, this might have been a way to

2   adjust the data from year one to year two so

3   that both were a more accurate reflection of a

4   cross-section of pharmacists.

5          Q.    Is 1,000 respondents who responded

6   to this survey working in -- who identified as

7   having worked in a grocery -- large chain

8   grocery store, like a Kroger, is that a

9   significant number of respondents?

10          A.    Well, "significant" has a very

11   particular meaning in my world.  Is it --

12   because the actual number of -- we don't know

13   how many people working for large chains like

14   Kroger were sent a survey to be -- to respond to

15   it.  We don't know what portion of that universe

16   answered this question.

17                It could be a smaller number.  It

18   could be a bigger number than the overall

19   average.  We don't know.

20          Q.    I guess independent of the

21   methodology, is responses from 1,000 people who

22   work in that practice setting useful to

23   understand how at least 1,000 people in the

24   grocery store setting feel about their

1    workplace?

2           A.    So the science of survey research

3    is that you want to build the data so that you

4    can look at a relatively small group of people

5    and generalize it.

6                 And so the science behind that has

7    to do with, well, how did you choose these

8    people?  And was there a random selection

9    involved, or was there a reason why some would

10   respond and some wouldn't respond?  Is there a

11   response error?  Is the response biased there?

12                So all on its own, people think,

13   "Well, you get 1,000 people, it's going to mean

14   something."  And the survey research answer is

15   that is not necessarily.  Not if it's -- not if

16   it's not a well-stirred pot, as George Gallup

17   used to say.  He said, "You don't have to eat

18   the entire pot, but you need to pull a

19   representative spoonful from a well-stirred

20   pot."

21                And we have no information to

22   gauge whether that thousand does or does not

23   represent an accurate cross-section of all

24   pharmacists working at large chains and grocery

1   stores.

2         Q.    And so you don't know the answer

3   one way or the other?  You can't say that the

4   study is not reliable, correct?

5         A.    I missed the end of your question.

6   Could you repeat?

7         Q.    You don't have the statistics to

8   know one way or the other?  It very well could

9   be that this is an adequate cross-section of all

10  pharmacists working in a large chain grocery

11  store setting, true?

12        A.    In Ohio.  That's right.

13        Q.    Yes, in Ohio.

14              Okay.  And then -- and the survey

15  also captured other data points, not just

16  practice site.  It also captured what their role

17  is in the pharmacy, true?

18        A.    I don't recall.

19        Q.    Can we go to the next page.

20  "What's your primary role in your work

21  environment?"  Am I a staff pharmacist, am a

22  responsible person, a manager, am I'm a floater?

23              Do you know what a floater is?

24        A.    I have a general idea.

1                    Again, my question would be, is

2       this -- this appears to be from the 2020 survey

3       in that there are not percentages there.  If

4       that question were not asked in the 2021 survey

5       and that was my assignment, then I made no

6       opinion about this.

7            Q.    I'm confused then.  You were

8       assigned only to analyze the 2021 survey, not

9       the 2020 survey?

10           A.    That was my assignment.  I needed

11      to look at the 2020 survey because there was

12      very little explanation for how the survey was

13      conducted in the 2021 survey.

14           Q.    So all the opinions you're

15      offering here really only relate to the results

16      of the 2021 survey, not the 2020 survey at all?

17           A.    No, in that they were both

18      conducted in the same way.  But the only way

19      that I learned how the 2021 survey was conducted

20      was to assess the 2020 survey.

21           Q.    What was your specific assignment

22      in terms of analysis of the 2020 survey?

23           A.    Well, when I discovered on my own

24      that there wasn't any description of the

1   methodology, I alerted the attorneys to say,

2   "There's no methodology here.  Oh, wait a

3   second.  There's reference to this 2020 survey.

4   Let me take a look at that."

5              And they said, "Okay."

6         Q.    Oh.  So they only shared with you

7   the results of the 2021 survey initially, and

8   you had to ask them to send you the 2020 survey;

9   is that right?

10        A.    Or I was able to find it on my

11  own.  Yeah.

12        Q.    Oh.  So they may not have even

13  provided it to you?  You may have had to

14  research that on your own; is that right?

15        A.    I believe that's my recollection,

16  that I initiated that.  That was going to be

17  required in order for me to comment at all on

18  the 2021 survey, because there was no

19  description of method in the report.  This is a

20  follow-up to the 2020 survey.

21        Q.    Did you ask them why they didn't

22  send you the results of the 2020 survey?

23        A.    I did not have time.

24        Q.    You didn't have time to ask them?

1          A.     I moved forward on getting the

2   work done.

3          Q.     Did anyone ever tell you Kroger

4   conducted a survey of their own pharmacists

5   asking many of these same or similar questions?

6          A.     I have heard that recently.

7          Q.     They didn't share the results of

8   that survey with you?

9          A.     They did not.

10          Q.     Did they tell you that that survey

11   existed?

12          A.     Recently.

13          Q.     Recently when?  Today?

14          A.     This week.

15          Q.     All right.  So they had you do all

16   this work, analyzing the Ohio Board of Pharmacy

17   survey to say we're not sure if it's reliable,

18   but they didn't even tell you that they did a

19   survey themselves of pharmacists until this

20   week?

21          A.     That's correct.

22          Q.     Don't you think it would have been

23   important to know what Kroger pharmacists felt

24   about these questions?

1          A.    In terms of the assignment I was

2   given and that I didn't know about it, no.

3          Q.    Are you worried they're hiding

4   stuff from you?

5                MS. WOHL:  Objection; form.

6          A.    No.

7          Q.    I am.

8                All right.  So they gave you the

9   2021 survey, but didn't give you the 2020

10  survey, true?

11         A.    Correct.

12         Q.    And they did a survey internally

13  of Kroger pharmacists that you've heard about,

14  but they haven't given you the results of that

15  survey for you to review it, true?

16         A.    I don't know that the word

17  "they" -- who you're referring to there.

18         Q.    Well, Kroger, Bowles Rice, the

19  lawyers that you work with, whomever.

20         A.    You said, "They conducted."

21         Q.    Kroger conducted a survey of its

22  own pharmacists.

23         A.    Correct.  The attorneys did not --

24         Q.    Were you aware of that?

1          A.     The attorneys did not make me

2     aware of that --

3          Q.     Would that have been helpful to

4     you --

5          A.     -- until recently.

6          Q.     -- in analyzing the results of how

7     Kroger pharmacists felt about their workplace,

8     to have access to that information?

9          A.     In order to what?  In order to

10    evaluate this survey?

11         Q.     In order to evaluate how Kroger

12    pharmacists felt about their work conditions.

13         A.     That was not my assignment.

14         Q.     Well, you said that the result of

15    this survey couldn't be extrapolated to Kroger

16    pharmacists, true?

17         A.     I said there was not sufficient

18    data that made it clear when and how many

19    respondents were talking about Kroger beyond --

20         Q.     And all along they had a survey

21    where they knew what the Kroger responses were,

22    and they didn't tell you, true?

23              MS. WOHL:  Objection to form.

24         A.     My analysis was of this survey.

1          Q.    Ma'am, answer my question.

2                All along they had -- they had

3    information about how Kroger pharmacists felt

4    about their working conditions, and they did not

5    share that with you, correct?

6                MS. WOHL:  Objection to form.

7          A.    I can say they did not share that

8    with me.  That's correct.

9          Q.    And sitting here today, you still

10   don't know what the results of that survey are,

11   or surveys?

12         A.    That's correct.

13         Q.    Do you know how many surveys they

14   conducted?

15         A.    I do not.

16         Q.    Did you ask?

17         A.    I did not.

18         Q.    All right.  If we look at

19   page 24 -- and I appreciate that you didn't --

20   I guess you didn't study this.  But they

21   captured information about the role that a

22   pharmacist worked in their workplace, true?

23         A.    That's what I'm seeing on the

24   screen.

1          Q.     Right.  But you're seeing it for

2     the first time with me, correct?

3          A.     I would have seen this in the 2020

4     report.  I don't know that it was included in

5     the 2021.  So we wouldn't have a comparison

6     chart.

7          Q.     Did you consider the demographics

8     that they collected in the 2021 survey in

9     forming your opinions in this case with respect

10    to the primary role of the pharmacist or the

11    pharmacy staff in the workplace?

12         A.     So this is self-reported primary

13    role in their work environment.  And we have no

14    benchmark for the full universe to know if this

15    is representative of all licensed pharmacists in

16    Ohio.

17                That's my -- that's my concern

18    about how I would normally, and most survey

19    researchers of a particular caliber, would go

20    about ensuring that their respondent base looks

21    like the population of interest.

22         Q.     Do you think people may --

23         A.     So on it's own --

24         Q.     -- not know what their role is?

```
 1                 MR. ELSNER:  Objection.  Let her

 2          finish.

 3          Q.    I'm sorry.  I didn't mean to speak

 4   over you.  Go ahead.

 5                 Let me back up and do this a

 6   little bit broader.

 7                 I'll ask it this way:  There's

 8   certain demographic information that's

 9   self-reported in the 2020 survey.

10                 Dr. Selzer, did you consider the

11   responses to those survey questions in looking

12   at the demographics of those who responded to

13   the 2020 survey?

14          A.    And when you say "looking at the

15   demographics," what do you mean by

16   "demographics"?

17          Q.    Well, the first demographic is

18   their primary practice site on page 23 here,

19   134.  Yes or no, did you consider this --

20          A.    I don't know what you mean by

21   "consider this."

22          Q.    Did you consider how many people

23   responded and identified as having worked in a

24   particular practice site when considering the
```

1    results of the survey?

2              MS. WOHL:  Objection to form.

3         A.    So the reason I would look at this

4    is to have a question in my mind as whether this

5    represents the real world proportionally or not.

6    Is it skewed toward one particular group here?

7              So I'm looking at whether, taken

8    together, this distribution looks like the full

9    complement, does it match the meaningful

10   universe.  This was an opportunity of some data

11   that could have been used to adjust the data

12   where it's too many of one kind and not enough

13   of another to make it look like an accurate

14   cross-section.

15             So it informed my concern that the

16   data were not weighted.  To my knowledge, there

17   was no discussion of weighting.  So I assumed

18   that the data were not weighted in order to

19   address for known response bias or error.

20        Q.    Did you ask Kroger if they had

21   data -- or counsel for Kroger if they had data

22   of how many people in Ohio worked in these

23   various practice sites?

24        A.    I did not.

1          Q.    Did you ask -- did you look at any

2    outside sources, Bureau of Labor Statistics or

3    any other third-party sources, to determine

4    whether -- how many people worked in these

5    various practice sites in Ohio?

6          A.    I did not.

7          Q.    Now, you've done that in other

8    surveys, right, where you weren't sure what the

9    results of the survey were, so you would look at

10   census data to make that comparison as an

11   external source, correct?

12         A.    When I am the primary

13   investigator, yes.  My job was to evaluate the

14   work that was done, not to redo work that was

15   done.

16         Q.    I know, but part of your

17   evaluation -- the answer might exist in those

18   data sets, correct?

19         A.    Well, I didn't have the data set,

20   so I don't know what was there and what wasn't

21   there.  All I know is that their method didn't

22   include any information that these data were

23   used to make adjustments or whether -- I don't

24   know what the Ohio Board of Pharmacy has in its

1  database that could have been used to bring

2  these answers into alignment with a known

3  distribution.

4        Q.    And counsel for Kroger didn't ask

5  the Board of Pharmacy that question at

6  Mr. McNamee's deposition, right?

7              MS. WOHL:  Objection to form.

8        A.    I don't recall that there was any

9  discussion of weighting in Mr. McNamee's

10  deposition.

11        Q.    And you didn't ask Kroger if it

12  had information about practice site, true?

13        A.    I did not.

14        Q.    And you didn't do any external

15  research, as you might have done if you were the

16  investigator, to determine if this accurately

17  reflects a meaningful number of people by

18  practice site, true?

19        A.    I was not the principal

20  investigator for this.  So there are many things

21  I would have done differently.

22        Q.    Okay.  In the next one -- I'm

23  going to ask -- I don't know that we need this

24  colloquy with respect to each of these, but I

1  want you to go through them.  I want to make

2  sure I understand.

3              So the next thing that they

4  captured was information about the pharmacist's

5  role, or the person responding to the survey,

6  their role in the pharmacy.

7              Did you consider they used

8  self-reported responses on the next page?

9       A.    Again, did I consider?  I don't

10  know what the real world -- and, you know, that

11  they didn't convert these to percentages.  You

12  know, I can eyeball things pretty well.  But I

13  don't know the extent to which this does or does

14  not reflect the actual distribution of licensed

15  pharmacists in Ohio.  I don't know what to make

16  of this.

17       Q.    And you didn't do any research to

18  figure out whether it did or didn't, correct?

19       A.    I did not.

20       Q.    Okay.  And it also asks how many

21  shifts the person responding to this survey

22  worked on the next slide.

23              Did you consider that?

24       A.    Again, I think because it --

1   I don't think these were asked in the 2021

2   survey, because I don't have comparative data on

3   this.  Again, I wouldn't know what to make of it

4   really.

5          Q.    I guess my point is, is it would

6   be important to know, would it not, of those

7   responding to the survey how long they worked,

8   what job they had in the pharmacy, what kind of

9   practice setting they were in.  All of these

10  seem, to me, that they'd be important questions

11  that you'd want to know in evaluating the

12  responses to the survey, true?

13         A.    Well, what is important to know is

14  whether this is a valid representation of all

15  pharmacists in Ohio.  And I was not provided

16  data that would allow me to say, "Hey, this

17  looks about right," or "This is way off."

18  I don't know.

19               So if I'm looking to say whether

20  you can use these -- the data that were

21  collected to extend beyond the findings that are

22  here, I don't know.

23         Q.    It also asks on page 31 here,

24  question 15, "How many years have you been a

1   pharmacist?"

2            Do you think this would be an

3   important question to know from respondents?

4        A.    Important how?

5        Q.    To see if there's a meaningful

6   cross-section or cross-people who were working

7   in the pharmacy?

8        A.    It's only meaningful if I know

9   what the answers are for the full complement.

10       Q.    Meaning how many people out of the

11  people who responded to the survey also worked

12  less than three years or more than 30 years?

13            Is that what you mean?

14       A.    Well, are these not survey

15  responses that you're showing me?  These are

16  self -- these are answers they gave themselves?

17       Q.    These are answers they gave

18  themselves.

19       A.    So what's meaningful is what's

20  true in the real world.  And on its own, I do

21  not know whether this is what's true for the

22  full complement of pharmacists in the State of

23  Ohio.

24       Q.    Do you think a pharmacist

1    answering this survey would lie about whether

2    they worked less than three years or more than

3    30?

4           A.    I'm saying that because

5    100 percent of the pharmacists didn't answer

6    this question, that I cannot say with confidence

7    that this is the proper distribution.  We don't

8    know.  It may be something that the licensing

9    board has in their database, but that data were

10   not offered, those data.

11          Q.    So when you say you would want to

12   know the gender or the sex of the person

13   responding to the survey, it's not that you want

14   to know the gender or sex of the person

15   responding to the survey based on how they

16   report it.  You'd actually want to know based on

17   what -- on what?  What the pharmacy believes

18   their gender or sex is, the pharmacy

19   association?

20          A.    I need both.  I need both.

21   Because if it's 60/40 -- you can choose which

22   way that's going to be -- in one and 75/25 in

23   the other, then I need to bring one into

24   alignment with the other in order for it to

1    reflect a proper cross-section.

2         Q.    But that assumes that what your

3    objective is, is to understand what every --

4    whether the results of the survey are indicative

5    of how every other pharmacist in the state

6    feels, correct?

7         A.    That is the goal of survey

8    research, to talk to a relative few and project

9    it -- generalize it to the full complement of

10   your meaningful universe.

11        Q.    Why would knowing the gender or

12   sex of the respondent -- or would it -- be more

13   important than knowing how many years they

14   worked in the pharmacy or what type of pharmacy

15   setting they work in or how many hours in a

16   shift that they work given the context of the

17   questions that are being asked in the survey?

18             MS. WOHL:  Objection to form.

19             Go ahead.

20        A.    I'm not saying it would be more

21   important.

22        Q.    In fact, I think to know whether

23   or not you have enough time to safely perform

24   your duties, I mean, my sense of -- I'd rather

1    know if someone's been doing this job for

2    30 years or doing it for two weeks, right?

3              MS. WOHL:  Objection to form.

4         A.    I don't know how to answer that.

5    I don't know that that's more important.  The

6    goal in my even talking about these sorts of

7    demographics, if you will, are what do we know

8    for sure that represents everybody.  And then

9    how does -- how does our dataset compare to

10   that.

11             And then using a statistical

12   procedure called weighting, where some people

13   you give them a little bit more and some people

14   you give a little bit less, that corrects for

15   the response bias, you can -- you have greater

16   confidence after that procedure that your

17   respondent pool does reflect all pharmacists in

18   the State of Ohio.

19        Q.    But because you're not a

20   pharmacist and because you're not with the Ohio

21   Board of Pharmacy, to you, each of these data

22   points are just data points.  And so to you

23   whether someone is a male or a female or whether

24   someone's been working for less than three years

1    or more than 30 years, it's just one other data

2    point?  You can't evaluate which one is more

3    important or less and more in this setting,

4    true?

5          A.    Well, I'm evaluating what they

6    reported out.  And they didn't report out cross

7    tabs, for example, by these different segments.

8                So in terms of analyzing -- I

9    mean, it gives another tool to the principal

10   investigator for how they can understand where

11   there are -- where issues are of greater concern

12   or less concern.

13               But overall, again, the idea --

14   and age and sex are common -- commonly used to

15   adjust data files.  So that's why I mentioned

16   those.  But there were other opportunities

17   potentially that would have helped bring this

18   respondent pool into a demographic alignment, if

19   you will, to look like the overall -- and they

20   didn't do it, and, therefore, we don't know.

21         Q.    We do know that the reporting on

22   the survey, the results of the survey, were

23   organized by what practice setting the

24   pharmacist was in, correct?

1          A.     Correct.

2          Q.     And, frankly, to determine how

3     people working in a large grocery store chain

4     like a Kroger might feel about their pharmacy

5     setting, it's not really so important to know

6     how many people identified as having worked in a

7     long-term care facility, true?

8               MS. WOHL:  Objection to form.

9          A.     True.

10         Q.     And so --

11         A.     Important in a different way, I'll

12    say.

13         Q.     It's important if you're only

14    concerned about the global but not concerned

15    about the specific pharmacist working in a

16    particular sector, correct?

17         A.     It's not the way I would phrase

18    the concern that's there.  And, again, I wasn't

19    hired to be the analyst for this.  So there's

20    lots of different ways to slice and dice data to

21    define the meaning of it.

22         Q.     When you say "hired to be the

23    analyst," what type of work is that?  What are

24    you referring to?

1          A.     That would be looking at what the

2    overall findings say and then to dissect whether

3    there are certain subgroups who have different

4    opinions, who are aligned in a different way, to

5    get a more rich understanding of why the data

6    look like they do, not just what the data say.

7          Q.     So you can't offer an opinion as

8    to why pharmacists in a large chain grocery

9    store setting, why their responses to whether

10   they feel that there's adequate staffing to

11   allow for safe patient care is worse than those

12   who work in a small chain pharmacy or in mail

13   order, correct?

14          MS. WOHL:  Objection to form.

15          A.     Correct.

16          Q.     So if we pull up 4202, if we go to

17   .00013 on page 124, this kind of displays that,

18   right?

19          So with respect to the question,

20   "I feel that my work environment has sufficient

21   pharmacy technician staffing that allows for

22   safe patient care by practice site," those who

23   disagreed or strongly disagreed in a large

24   grocery store sector is significantly higher

1   than those who responded that way in the small

2   chain pharmacy, correct?

3          A.    But lower than those in the large

4   chain standalone.

5          Q.    Correct.

6                But you're not going to offer an

7   opinion on the analysis of that difference,

8   correct?

9          A.    As to what would explain it?

10  That's correct, I'm not here to do that.

11         Q.    Okay.  And you haven't made any

12  effort to determine that?  You weren't asked to

13  do that?  You're not going to offer any opinions

14  on that, correct?

15         A.    Correct.

16         Q.    And so that -- the answer to

17  breaking things out in this way might be very

18  important to the Ohio Board of Pharmacy, but you

19  wouldn't know why, true?

20         A.    I know that they didn't do it.

21         Q.    Well, they did do it.  We're

22  looking at the responses right here.

23         A.    This is one breakout that they

24  did.  Right.

1            But as I mentioned before, there

2    was a difference in the proportion of

3    respondents who fit into a couple of these

4    categories.  And I have no -- they offered no

5    explanation for why that would have changed

6    actually rather dramatically from the first

7    survey to the second survey.

8            Q.    Right.  And there could be --

9    there could be reasons that they know that you

10   don't, and no one ever asked them from Kroger

11   that --

12           A.    That's right.

13           Q.    -- correct.

14           A.    That's right.

15           Q.    It could be a lot of people just

16   got fed up of working in large chain stores and

17   moved to a different environment, true?

18           A.    It actually -- it went the

19   opposite way.  There was a higher proportion in

20   the second survey working in large chain grocery

21   big box stores, an increase of -- this is on

22   page 14 of my report.  It was an increase of 50

23   percent.

24           Q.    I'm going to ask the questions,

1    though.

2            If we go to page 11 of this study,

3    it wasn't the only question that they broke out

4    by practice group.  In fact, they broke them all

5    out by practice group.

6        A.   That's correct.

7        Q.   Here's another example.  "I feel

8    that my work environment has sufficient pharmacy

9    staffing that allows for safe patient care, by

10   practice site."

11           Correct?

12       A.   That's right.

13       Q.   Okay.  So, in fact, all the

14   questions to the 2020 survey were broken out in

15   this way, true?

16       A.   Yes, to my memory.

17       Q.   And -- okay.  Before I thought you

18   testified that they only did it one time.  So

19   I just want to be clear that you were aware that

20   they've done it with respect to all of these

21   questions.

22       A.   Correct.

23       Q.   Okay.  And it very well could be

24   you're willing to concede that it might be very

1    important to pharmacists and very important to

2    the Ohio Board of Pharmacy to know why in a

3    large chain grocery store sector there were so

4    many more people who felt they didn't have

5    sufficient staffing for safe patient care than

6    in the small chain pharmacy setting, correct?

7              MS. WOHL:  Objection to form.

8         A.    Yes, but fewer than the large

9    chain.  So it supplies a context.

10         Q.    It does.  But I'd say that those

11    in the large chain grocery store are much closer

12    to the large chain standalone stores like CVS

13    and Walgreens compared to Kroger and Giant Eagle

14    than they are to the small independent chain

15    pharmacies, true?

16              MS. WOHL:  Objection to form.

17         A.    True.

18         Q.    Do you know whether they track

19    metrics in small independent pharmacies versus

20    in large chain grocery stores?

21         A.    No.

22         Q.    Do you know anything about the

23    practices and the differences in the practices

24    between pharmacists in a small chain pharmacy

```
 1    versus a large chain grocery store?

 2            A.    No.

 3                  MR. ELSNER:  We've been going

 4            quite a bit.  Maybe we could take a

 5            quick break and go off the record.

 6                  THE VIDEOGRAPHER:  Going off the

 7            record at 1:47.

 8                  (Recess taken.)

 9                  THE VIDEOGRAPHER:  We are back on

10            the record at 2:05 p.m.

11                  MR. ELSNER:  A quick housekeeping

12            matter.  I had marked MR 4373, which is

13            the article by Schneider, "Exploring the

14            Regional Effects of Rising Health

15            Insurance Costs on Consumers," that

16            should be Exhibit 5.

17                  And then I'd like you to display

18            MR 4374, which is -- we'll mark this

19            Exhibit 6.

20                           - - -

21            (Selzer Deposition Exhibit 6 marked.)

22                           - - -

23    BY MR. ELSNER:

24            Q.    And this is the "Iowa State
```

1   Planning Grant, 2005 Final Report to the

2   Secretary."

3            And if you notice on the second

4   page here, there's an acknowledgment to your

5   company in recognition that you designed the

6   survey of Iowa consumers and participated in the

7   analysis of the results.

8            Do you see that, Dr. Selzer?

9        A.   I do.

10       Q.   Okay.  And this is the study that

11  Mr. Schneider analyzed and that was done for the

12  State of Iowa, true?

13       A.   That's correct.

14       Q.   Okay.  There's a question I wanted

15  to ask you about.  If you turn to page 14 of

16  this document, Exhibit 6.

17            TRIAL TECH:  What page?

18            MR. ELSNER:  14.  It's point 2 --

19       00021 in the document.

20  BY MR. ELSNER:

21       Q.   Ma'am, before you get there,

22  although I don't think it's really that

23  important necessarily, but there's some

24  statistics that are there, the percentage of

1    people that responded in a certain way.

2              And then there's this section on

3    "Interpretation."  And that's where the focus of

4    my question is.  And it says, "Embedded in these

5    data is an unmistakable irony that as insured

6    Iowans make sacrifices to pay for increasing

7    health care costs, they're taking on greater

8    risk and increasing their personnel financial

9    vulnerability by saving less, increasing their

10   level of personal debt, reducing the scope of

11   their health insurance protection, and reducing

12   other forms of insurance coverage.  However,

13   each of these elements has potential negative

14   consequences for the household and the larger

15   society."

16              Did I read that correctly?

17        A.    I believe you did.

18        Q.    Okay.  Now, you didn't ask the

19   respondents in the survey a question about this

20   irony, true?

21        A.    To be clear, I am not remembering

22   if I authored these words on this page or if it

23   was my client, Anne Kinzel, who was responsible

24   for the state planning grant who wrote this,

1  so ...

2          Q.    Okay.  My question's different.

3                My question is, did you ask a

4  question in the survey about this unmistakable

5  irony?

6          A.    Well, this is an -- this is

7  labeled "Interpretation" because it is an

8  interpretation that goes beyond what specific

9  data points there are there to tell what the

10  story is.  So we didn't ask any questions that

11  had the word "irony" in them.

12          Q.    Right.  And let me ask my

13  question -- well, I guess you eventually

14  answered it.

15                So you didn't ask a specific

16  question about this, but you were able to

17  interpret this irony from the results of the

18  survey that was given or someone was, Ms. Kinzel

19  or someone else, correct?

20          A.    Like I said, this is 2007, I

21  believe, and I've not reviewed this.  So I don't

22  have in my mind exactly what questions we did or

23  did not ask.  And if I need to take a moment to

24  pull this document out of the packet, I can do

1   that.

2          Q.    If it's helpful, I'm happy to have

3   you take a look, but I think you -- I think you

4   answered my question that you didn't ask this

5   specific question.

6          A.    About irony?

7          Q.    About irony, right.

8          A.    Irony would be something we

9   interpreted from findings that are articulated

10  later.

11                What, again, was the number here?

12  42 --

13          Q.    Sorry.  4374, Exhibit 6.

14                The simple point I'm making is, is

15  that often one can interpret information from

16  survey results even if the survey does not ask

17  the specific question of the respondent, true?

18          A.    That the analysis makes

19  connections that seem meaningful and are

20  supported by the data.  That's what analysis is.

21          Q.    And oftentimes the person that's

22  going to perform that analysis, it's best that

23  they have some understanding of the underlying

24  facts or profession of those respondents who are

 1    comprised of the survey, true?

 2           A.    Sometimes.

 3                 MS. WOHL:  Object to form.

 4           Q.    Sorry?

 5           A.    Sometimes.  Sometimes there isn't

 6    a need for in-depth information about the

 7    respondical [sic] under study.

 8           Q.    Sure.

 9                 But in this case with the Ohio

10    Board of Pharmacy, do you think that it would be

11    helpful to have analysis performed by an actual

12    pharmacist who's familiar with the metrics,

13    familiar with the workload conditions, familiar

14    with the tasks that a pharmacist has to perform

15    to safely perform their job?

16                 MS. WOHL:  Objection to form.

17                 Sorry.  Go ahead.

18           A.    It would depend on the individual

19    pharmacist who might be doing that.  Two

20    pharmacists might go at it very differently.

21    Just because they happen to be pharmacists, they

22    might not have the same approach to data.  So

23    I can't answer that that would be helpful or

24    not.

1          Q.    Do you think that you're --

2          A.    In some cases, it might be.   In

3    some cases, it might not be.

4          Q.    Are you qualified, Ms. Selzer, to

5    analyze and offer an opinion as to the specific

6    metrics, the specific actions that a pharmacist

7    must take in filling a controlled substance

8    prescription to evaluate and analyze the

9    responses with respect to patient safety?

10         A.    Can you repeat that because there

11   was sort of -- the second half didn't flow from

12   the first half of where I thought you were

13   going.

14              MR. ELSNER:  I'll ask the reporter

15         to read it back, please.

16              (Record read back as follows:

17              "Question:  Are you qualified,

18         Ms. Selzer, to analyze and offer an

19         opinion as to the specific metrics, the

20         specific actions that a pharmacist must

21         take in filling a controlled substance

22         prescription to evaluate and analyze the

23         responses with respect to patient

24         safety?")

1      A.    No.

2      Q.    Thank you.

3            You had mentioned a couple of

4      times today -- I think you keep wanting to pull

5      me back to this discussion about population of

6      respondents and how there's a variation.  I know

7      you've wanted to talk about that, so let's talk

8      about that a second.

9            MR. ELSNER:  And I'm done with

10           this document, Gina.

11     BY MR. ELSNER:

12     Q.    You don't know whether there has

13     been a change in the number of pharmacists that

14     work in particular sectors in Ohio between 2000

15     and 2001, true?

16     A.    I do not know.

17     Q.    Okay.  So it very well could be

18     that even though there's a population difference

19     with respect to responses in particular practice

20     settings, that that could, in fact, reflect an

21     accurate shift in the number of pharmacists

22     working in those sections, true?

23     A.    It could.  I don't know.

24     Q.    And it could be that there might

1    have been more people who were sent a survey in

2    2020 than 2021, because it could be that a

3    number of pharmacists resigned from their

4    position of working in a pharmacy in Ohio as a

5    result of all the pressures they were under in

6    their work environment, true?

7              MS. WOHL:  Objection to form.

8         A.    It's one of many potential -- I'm

9    not seeing you on the screen, by the way, sir.

10   I don't know if that's intentional.

11        Q.    No, not by me.

12             MR. ELSNER:  Why don't we go off

13        the record for a second.

14             THE VIDEOGRAPHER:  Off the record

15        at 2:15.

16             (Discussion off the record.)

17             THE VIDEOGRAPHER:  We are back on

18        the record at 2:18.

19   BY MR. ELSNER:

20        Q.    Dr. Selzer, I think your ultimate

21   conclusion is that you're not saying that the

22   results of the survey don't accurately reflect

23   the views of all pharmacists in Ohio.  You would

24   just like to have more data to verify whether

1    that's true or not; is that right?

2           A.    That's correct.

3           Q.    Okay.  And with respect to how

4    many pharmacists were working in Ohio in 2020

5    versus 2021 and whether there have been any

6    shifts in terms of primary areas of practice

7    within the field of pharmacy in Ohio, you didn't

8    obtain any data or look at any data from any

9    third-party source, correct?

10          A.    That's correct.

11          Q.    Okay.  So you haven't looked at

12   any data that the Ohio Board of Pharmacy might

13   or might not have, true?

14          A.    True.

15          Q.    And you haven't looked at any data

16   that Kroger may or may not have, fair?

17          A.    Fair.

18          Q.    And you haven't looked at any

19   labor statistics or any other publicly available

20   publications concerning, you know, pharmacists

21   in Ohio and what their job sites are and how

22   many are currently working, true?

23          A.    True.

24          Q.    Now, if you were the investigator

1   in a survey, you would have done those tasks; is

2   that right?

3          A.    I would have worked with my

4   client, who I would presume would have these

5   data easily available to find out what all they

6   might have that could be useful to me.

7          Q.    Okay.  I want to move now and

8   discuss again some information about the

9   comments.  I believe that, you know, you

10  testified that the comments ran several hundred

11  pages, correct?

12         A.    I don't remember the exact number

13  of pages.

14         Q.    Well, I think you just referred to

15  it in your testimony as several hundred.

16               Does that sound right?

17               MS. WOHL:  Objection to form.

18         A.    I don't remember the number of

19  pages.  I have the number of people who

20  responded, which was 1,223, to the 2021 survey.

21         Q.    And how many responded to the 2020

22  survey?

23         A.    1,412, 1,412.

24         Q.    What percentage of the respondents

1    to the 2020 survey offered a comment?

2        A.    Well, I should get my calculator

3    out.

4        Q.    Does 34 percent sound about right?

5        A.    Really, I should get my

6    calculator.  I'm trained not to do that just off

7    the top of my head.  So if you tell me what

8    you've used as a numerator and a denominator, I

9    can validate that yes or no.

10        Q.    Well, we looked at the total

11    number of responses to each survey, and then we

12    calculated the number of comments.

13        A.    So on the 2020 survey --

14    I don't -- there were -- yeah, this is -- it's

15    confusing because they have a publication date,

16    as well as the date that it was conducted.  So

17    the most recent survey, there were 2,969

18    respondents.  And as I mentioned, there were

19    1,223 who commented.

20        Q.    Right.  And so for the 2021

21    survey, that would be about 41 percent, correct?

22        A.    Yeah.  It's a little -- it's

23    certainly more than 33 percent, but I don't know

24    how close it is to 40 percent, without a

1  calculator.

2          Q.    That's 41 percent.  Originally we

3  were asking you about the 2020 survey.  And for

4  that, there were 4,159 responses, and 1,412

5  wrote comments.

6          A.    That's correct.

7          Q.    And that's about 34 percent.

8                Sound about right?

9          A.    That sounds about right.

10         Q.    Assuming those percentages are

11 right, is that a significant number of people

12 providing a comment to a survey?

13         A.    That would vary widely with the

14 survey and what kind of comments were requested.

15 There is no industry standard for what

16 proportion of respondents typically comment when

17 invited.

18         Q.    There is none?

19                What's the -- how many -- have you

20 ever done a survey that asks people how they

21 felt about different things and then offered an

22 opportunity for a comment?

23         A.    We try not to, so very rarely.  In

24 a very particular circumstance.

1          Q.    Why not?

2          A.    Because open-ended comments are

3    difficult to analyze and say what they mean.  So

4    there's all sorts of things that are affecting

5    what they write and who writes, and very little

6    commonality across comments.

7                So you want to sort of extract

8    meaning, and you end up with little single

9    percentage points of people who mentioned this

10   or people who mentioned this, and it doesn't end

11   up being useful.  And it's very expensive in a

12   telephone interview to offer time up for people

13   to just start talking.

14         Q.    What about in an interview -- in a

15   survey like this, an electronic survey?

16         A.    Right.  In a survey like this,

17   it's understandable certainly for somebody to go

18   through, but it would be here a massive

19   undertaking to try to code the comments and say,

20   "Okay.  Well, among these people who commented,

21   23 percent talked about this, this, or the other

22   thing."

23                And I think our little exercise

24   with searching shows that you don't get very

1    much conformity across comments.

2              For this, which is a Board talking

3    to its licensees, that would potentially have

4    more utility, but it's on an anecdotal basis.

5    So as a researcher, anecdotal, not as helpful.

6         Q.    Did you actually compare all the

7    survey comments to see if there was a consistent

8    response that pharmacists did not feel that they

9    had adequate staffing to perform their duties in

10   a safe and effective manner?

11        A.    We -- no.

12        Q.    So there wasn't really an

13   effort -- and I appreciate there wasn't a lot of

14   time -- to go through all the comments from

15   these surveys to see if there were consistent

16   responses among the comments, correct?

17        A.    On any topic.  The closed-ended

18   questions I think were clear about where they

19   stood on having enough time.  So there wouldn't

20   have been a need to look to the comments to get

21   a feel for that.

22        Q.    Have you ever conducted a survey

23   electronically like this where you sought

24   comments from respondents?

1          A.    Yes.

2          Q.    And what was the response rate or

3   the number of people who provided a comment

4   versus the number of people who completed the

5   survey?

6          A.    Off the top of my head, I cannot

7   tell you.

8          Q.    Do you think it reached

9   40 percent?

10         A.    It could have.  The survey I'm

11  thinking about was conducted on behalf of one of

12  my clients among its clients.  So they were

13  interested on a client-by-client basis in what

14  they might comment in addition to the questions

15  we asked.

16         Q.    It seemed to me, in reviewing the

17  comments, that pharmacists who provided a

18  comment felt very strongly about their views.

19               Did you get that impression in

20  reviewing the comments?

21         A.    Certainly some, and maybe most.

22  There was some strong language in some of the

23  comments.

24         Q.    And did you evaluate the strength

1    or passion contained in the survey comments when

2    considering the overall survey results?  Did it

3    have any factor in your analysis?

4            A.    No.

5            Q.    Do you agree with me that a

6    pharmacist who admits in a survey of having made

7    mistakes when dispensing, adds creditability to

8    their response?

9            A.    To their response what?  To the

10   closed-ended questions?

11           Q.    Well, both to the closed-ended

12   questions and to the comment.  The fact that

13   they would admit to their regulator that they

14   made an error in the dispensing of a medication,

15   does that make their response more or less

16   credible or have no bearing, in your opinion?

17           A.    Well, it is common that an

18   utterance against interest tends to be credible.

19   So I don't disbelieve them as an individual, but

20   that's -- I don't know that I care as a

21   researcher.  That wasn't part of the analysis

22   that I did.

23           Q.    You did review the comments with

24   respect to Kroger.  And I want to show you one

1    of them here, if we could, MR 4202, comment 152.

2    This is in Exhibit 4.

3          A.    If it mentions -- well, go ahead.

4          Q.    Go ahead.

5          A.    Well, I was just trying to be

6    helpful, which I've been instructed not to be.

7                But this is from 2020 -- the 2020

8    survey with no identification of respondent

9    numbers.  And for the ones that we pulled, we

10   included a respondent number for the ones that

11   we pulled, which we would have pulled for

12   Kroger, so ...

13         Q.    Okay.  Hold on one second.  I'm

14   just going to pull it out here.

15               I'm going to refer you to the top

16   comment here, and it begins, "The monthly report

17   names each pharmacist, and those on the bottom

18   had to write an action plan, but those who have

19   100 percent success and unrealistic numbers

20   never get questioned.  This is Kroger, and the

21   workload is unrealistic and unsafe.

22               "The work environment is creating

23   a whole new generation of sloppy pharmacists

24   that are sometimes flat-out dangerous.  We are

1    timed on every move we make.  Safety and ethics

2    are out the door."

3              Did you review this comment?

4         A.    Yes.  And it's included in the

5    report.

6         Q.    And it references here that

7    "I hope the Board of Pharmacy makes every

8    pharmacy close for lunch, like Nevada, and you

9    must leave the pharmacy during that time.  If we

10   don't have to leave, then we will work up

11   working through it, and I say this is Kroger.

12   Please do something to help us, our patients,

13   please."

14             Did you look across the comments

15   in the surveys to determine how many pleas there

16   were of help to the pharmacy board to take some

17   kind of action with respect to metrics,

18   understaffing, and safe patient care?

19        A.    No.

20        Q.    Were you aware that Kroger

21   pharmacists, before reading these comments, were

22   not able to take a lunch break at the time these

23   surveys were taken?

24        A.    Not specifically.

1       Q.    Do you agree with me that this

2    particular comment makes reference to unsafe

3    workload conditions?

4       A.    It refers to the experience of

5    this pharmacist -- the report of this pharmacist

6    in things that are potentially unsafe.  Yes.

7       Q.    And this is consistent with

8    responses of other pharmacists in large chain

9    grocery stores, some 73 percent of which felt

10   that the staffing levels were inadequate and did

11   not permit safe patient care, correct?

12           MS. WOHL:  Objection to form.

13      A.    There was a question asked about

14   that, and the responses indicated that that was

15   a majority response who felt that staffing

16   levels led to unsafe practices.

17      Q.    Okay.  And if I could have you

18   turn to comment 1 in the 2022 survey, which

19   we'll mark as the next -- sorry.  2021 survey

20   which we'll mark as the next exhibit, MR 4201.

21   This is Exhibit 7.

22                    - - -

23       (Selzer Deposition Exhibit 7 marked.)

24                    - - -

1    BY MR. ELSNER:

2            Q.    This is comment 1 on page

3    4201.00095.  It's the very first response of the

4    2021 survey comment?

5                  It reads, "I had to quit my job at

6    Kroger after almost 15 years because I felt like

7    I could no longer safely use my license.

8    Division leaders and management will do

9    everything in their power to ignore you.  When I

10   quit, my division leader for Kroger acknowledged

11   that stress and workload were higher than ever,

12   then accepted my resignation without any attempt

13   to fix any of the problems."

14                  Were you aware and have you done

15   any kind of analysis to determine how many

16   people in the survey commented that they felt

17   unsafe and that their license were at risk given

18   the work conditions that they were operating

19   under?

20           A.    We did not do that analysis.

21           Q.    You did review this particular

22   comment because it referenced Kroger, correct?

23           A.    That's right.

24           Q.    You described the workplace survey

1  conducted by the Ohio Board of Pharmacy in your

2  report as "ordinary workplace challenges,"

3  correct?

4       A.    What page are you on?

5       Q.    Page 2, last line of the first

6  paragraph, under the "Executive Summary."

7             MR. ELSNER:  It's .004, Gina.  Oh,

8       sorry.  We're MR 4370, Exhibit 3.

9       A.    I'm searching for the word

10  "ordinary."  Can you help me with that?

11       Q.    Absolutely.

12             The first sentence under Executive

13  Summary.  "As described in the 2020 study, this

14  survey is about workload, stress, job

15  responsibility, and ordinary workplace

16  challenges."

17             Do you see that?

18       A.    I do.

19       Q.    Do you believe that the comments

20  to the surveys in 2021 and 2022 reflect ordinary

21  workplace challenges?

22       A.    It includes ordinary workplace

23  challenges.

24       Q.    How would you describe the results

1   of the survey if not just ordinary workplace

2   challenges?

3           A.    Well, I might not understand your

4   question.  It's -- I cite right after that

5   that -- quoting from the State Board -- State of

6   Ohio Board of Pharmacy that "The intent was to

7   capture feedback on pharmacists' working

8   conditions in the state."

9               That's what they set out to do.

10          Q.    Okay.  And would you agree with me

11  that the working conditions expressed by the

12  pharmacists who responded to the survey in the

13  comments reflected something far more serious

14  than ordinary workplace challenges?

15              MS. WOHL:  Objection to form.

16          A.    Yeah, I don't know.

17          Q.    Well, you've read at least the

18  Kroger comments.  And this particular comment

19  that we looked at, number 1, "I had to quit my

20  job because I felt like I could no longer safely

21  use my license," does that sound like an

22  ordinary workplace challenge to you?

23              MS. WOHL:  Objection to form.

24          A.    That is anecdotal as a single

1  pharmacist.  So I can't speak -- I can't

2  generalize from that one to say this is a survey

3  about extraordinary workplace challenges.

4        Q.    Well, does it feel like an -- is

5  it an extraordinary workplace challenge, in your

6  opinion, for this particular pharmacist?

7              MS. WOHL:  Objection to form.

8        A.    You're asking me to comment on a

9  single pharmacist's comment.  Is that -- do I

10  have that correct?

11        Q.    We're going to start there.

12        A.    Start there.  This is a pharmacist

13  with -- who quit a job over things that were

14  problematic.

15        Q.    So problematic that they felt they

16  could no longer safely use their license in that

17  work environment.  That, to me, doesn't sound

18  like an ordinary workplace.  It seems like an

19  extraordinary problem in a workplace.

20              Would you agree with that?

21              MS. WOHL:  Objection to form.

22        A.    Compared to what?  This is the way

23  a researcher thinks.  So what other industries

24  might there be people giving up -- fearing for

1  their license?  I don't know.  So I don't know

2  whether to -- that that's the bigger problem or

3  common across other industries.  I do not know.

4        Q.    Well, how does it compare to those

5  in individual pharmacies as opposed to chain

6  pharmacies?

7        A.    We don't separate the comments by

8  whether they're at a large chain or whether

9  they're at a small chain or independent.  We

10  have no --

11        Q.    Do you see any independent

12  pharmacy comments in the comments that you read

13  that were concerned about losing their license

14  because they worked in an unsafe place?

15            MS. WOHL:  Objection to form.

16        A.    I don't know, because the comments

17  were not coded according to what workplace was

18  there.  This person, this pharmacist,

19  volunteered that information.

20        Q.    Now, I'm showing you one example,

21  but we've looked at several today, and there are

22  many in there.

23            MR. ELSNER:  Let's pull another

24            one.  If we go back to the 2020 survey,

1        page 97.

2              Sorry .0097, MR 4202, Exhibit 4.

3              TRIAL TECH:  What were the last

4        two digits?

5              MR. ELSNER:  97.

6    BY MR. ELSNER:

7        Q.    Dr. Selzer, if you look at the

8    first comment there, "I've only worked for

9    Kroger since November of 2019, and in the last

10   two to three months, our tech and pharmacist

11   hours have been cut to a ridiculously unsafe

12   level.  I've voiced my concerns to my bosses,

13   and their response is we need to 'earn' more

14   hours with more clinical work."

15              Do you know what that means, "earn

16   more hours with more clinical work"?

17       A.    No, I do not.

18       Q.    It says, "Our store is 20 percent

19   busier than last year and we're the fastest

20   growing Kroger pharmacy in the area, but they do

21   not care.  All they care about is metrics, ready

22   rates, and MTMs."

23              Do you know what a "ready rate"

24   is?

```
 1              A.    I do not.

 2              Q.    Do you know what an "MTM" is?

 3              A.    I may have read something in some

 4      other comment, but I don't recall.

 5              Q.    -- "that we have no time to do.

 6      I hope you at the Board actually do something

 7      and make changes in our industry.  These chains

 8      are out of control, and no one has the guts to

 9      stop them.

10                    "The physical and mental health of

11      our pharmacists and techs are being severely

12      damaged, and the risk to patient health is at an

13      all-time high.  Something needs to be done to

14      save our profession.  I would like my job

15      again -- I would like to like my job again."

16                    Do you see that?

17              A.    I do.

18              Q.    And you read this comment,

19      correct?

20              A.    I did.

21              Q.    Is this an ordinary workplace

22      challenge, in your opinion?

23              A.    I don't know what is the reason

24      for this extraordinary -- I would say it seems
```

1    extraordinary, but I don't know that I can

2    identify the reason.

3            Q.    The reason why it's extraordinary,

4    or the reason why this pharmacist is upset?

5            A.    The reason why the pharmacist is

6    feeling that it's a ridiculously unsafe level.

7            Q.    Okay.  Well, he has some clues

8    here.  One is, "I voiced my concerns to my

9    bosses, and their response is we need to 'earn'

10   more hours with more clinical work."

11               But you don't know what that

12   means, right?

13           A.    That's right.

14           Q.    And then his other response is,

15   "My store is 20 percent busier than it was last

16   year and we're the fastest growing pharmacy in

17   the area, but they don't care."

18               Do you know what that means?

19           A.    I have an idea.  It's what is

20   the -- what is it that is the antecedent for

21   this.  And that's not the question you've asked

22   me, so I'm a little bit without an answer for

23   you.

24           Q.    And the unsafe level is also

1    reflected in the third comment.  "All they care

2    about is metrics, ready rates, and MTMs that we

3    have no time to do."

4              But you don't know what the

5    metrics are, right?

6         A.    That's right.

7         Q.    And you don't know what the ready

8    rates are?

9         A.    That's right.

10        Q.    And you don't know -- or if you

11   did at one time, you don't now remember what

12   MTMs are, right?

13        A.    That's right.

14        Q.    And then there's a plea to the

15   Board to make changes to the industry in this

16   comment, true?

17        A.    True.

18        Q.    And does that seem to you like a

19   common workplace challenge?

20        A.    Again, this is a single pharmacist

21   saying this, and so does that mean that the bulk

22   of the pharmacists were thinking along those

23   lines?  I don't know.

24              So, again, the temptation is to

1    take one person and say that's reflecting

2    everybody.  And as a researcher, I'm trained not

3    to do that.

4            Q.    And you didn't analyze how many

5    people in their comments also requested that the

6    Board of Pharmacy make changes to the industry,

7    true?

8            A.    I did not.

9            Q.    And we've looked at least one or

10   two of those, so it's not just one.

11               It says also, "The physical and

12   mental health of your pharmacists and techs are

13   being severely damaged, and the risk to patient

14   health is at an all-time high."

15               Does that sound like an ordinary

16   workplace challenge to you?

17           A.    Again, a single person saying this

18   doesn't define the whole survey as whether the

19   majority of the questions asked were about

20   ordinary workplace issues.

21           Q.    Did you analyze how many comments

22   from pharmacists to the survey reflected

23   concerns about their personal health and their

24   patient's health?

1          A.    We did not do a search on

2    "health."

3          Q.    So you don't know how many

4    pharmacists responded in the same way, that they

5    feel both physically and mentally at health risk

6    because of their work, correct?

7          A.    The answer is I don't know.  That

8    was not my assignment.

9          Q.    You didn't do that search?

10         A.    That was not my assignment.

11         Q.    Well, you didn't take it to be

12   your assignment?  You didn't do that search,

13   correct?

14         A.    It is not my assignment.  My

15   assignment was to look at the role of

16   pharmacists and pharmacies in opioid diversion

17   and abuse.

18         Q.    And you do not believe there's a

19   correlation or a connection between the physical

20   and mental health of the pharmacist and the risk

21   to the patient's health being at an all-time

22   high?  There's no connection between that and

23   opioids or controlled substances, true?

24              MS. WOHL:  Objection.

1      A.    There is no connection in the data

2  presented to me.  There is no data connection

3  between those.

4      Q.    There's no connection because you

5  don't know what all of the job responsibilities

6  are, the metrics, and the requirements that each

7  pharmacist must perform in doing their job

8  responsibilities, correct?

9          MS. WOHL:  Objection to form.

10     A.    I think my answer is correct.

11 There is a question about metrics that we've

12 already discussed.

13          MR. ELSNER:  Can you read my

14          question back?

15          (Record read back as follows:

16          "Question:  There's no connection

17          because you don't know what all of the

18          job responsibilities are, the metrics,

19          and the requirements that each

20          pharmacist must perform in doing their

21          job responsibilities, correct?"

22     A.    Would you like me to reanswer the

23 question?

24     Q.    Yes, please.

1          A.    The question before was about a

2   connection between what are the things they're

3   talking about in terms of metrics and how that

4   would relate to opioid abuse.

5               And my answer is that we have no

6   data driven connection between those.  It may

7   exist in the real world.  These data do not

8   provide evidence of it.  Could exist, might not

9   exist, but the data do not connect these things.

10         Q.    And you don't know, in reading the

11  response to this comment, whether this comment

12  reflects a concern about dispensing of

13  pharmaceuticals, correct?

14         A.    I don't believe there's

15  mentioned -- the word "dispensing," I don't

16  believe, correct me if I'm mistaken, is in this

17  comment.

18         Q.    Okay.  And because the word

19  "dispensing" isn't there and "opioid" isn't

20  there and "controlled substances" isn't there,

21  there's no data that you can analyze, you cannot

22  review this comment to make a determination that

23  it has any connection with opioids and

24  controlled substances, true?

1          A.    True.

2                MR. ELSNER:  Let's go off the

3          record.

4                THE VIDEOGRAPHER:  Off the record

5          at 2:49.

6                (Recess taken.)

7                THE VIDEOGRAPHER:  We are back on

8          the record at 2:58 p.m.

9                MR. ELSNER:  Thank you very much,

10         Dr. Selzer.  I don't have any further

11         questions at this time.

12               I'm now going to pass the witness.

13                    - - -

14               REDIRECT EXAMINATION

15    BY MS. WOHL:

16         Q.    Hi, Dr. Selzer.

17         A.    Hello.

18         Q.    I do have a couple of questions

19    for you.

20               First, we heard some questions

21    about the difference between the respondents in

22    their primary practice settings in the 2020 and

23    2021 survey.

24               Do you recall that line of

1    questioning?

2         A.    I do.

3         Q.    Would you turn to page 14 of your

4    report, please.

5         A.    Yes.

6         Q.    Is Figure 1 a comparison of how

7    the respondents of each survey responded to

8    their primary practice settings and where they

9    reported they worked?

10        A.    Yes.

11        Q.    And with respect to the large

12   chain grocer, big box stores, what is -- is

13   there something notable about the difference

14   between the 2020 respondents and 2021

15   respondents?

16        A.    Yes.  This is -- this is a

17   difference that would fall outside of any margin

18   of error that might be computed here, so your

19   eye is naturally drawn to it.  And it was

20   24 percent who said that was their primary

21   practice setting in the earlier survey.

22             And the next year, that had grown

23   to 36 percent.  That's a 12-point difference,

24   which is half of the 24 from the earlier year.

1    So a 50 percent increase in the pharmacists

2    responding to this survey who were practicing in

3    large chain grocer, big box stores.

4                 And for the others, with the

5    exception of hospitals which had a decrease of

6    I think 26, 27 percent fewer, saying that they

7    were practicing in hospitals.  The other

8    categories are pretty similar.  So that was

9    noteworthy.

10                And I don't know if one or the

11   other is correct or if neither is, or if both,

12   that that was real change.

13        Q.    But it's possible in looking at

14   this data that people were actually leaving one

15   practice setting and going to the large chain

16   grocer or big box store?

17                MR. ELSNER:  Objection.

18        A.    They could be leaving one, but

19   it's a different respondent pool.  So it goes to

20   the question of whether the distribution is

21   accurate or whether that it reflects real

22   change, and we don't know.

23        Q.    Are you aware -- let me ask you

24   this:  The 2020 and 2021 surveys, these were

1    performed in the midst of the global Corona

2    virus pandemic, correct?

3                    MR. ELSNER:  Objection.

4         A.    That would be consistent with the

5    dates.

6         Q.    Are you aware of added pressures

7    that the pandemic created for health care

8    professionals, including pharmacists?

9         A.    I'm not professionally aware.

10        Q.    Anecdotally or in, you know, just

11   what you've heard or read are you aware?

12        A.    Anecdotally, yes.

13        Q.    Now, just as we can't include or

14   exclude the fact that, you know, opioid

15   dispensing may have been on pharmacists' minds

16   in performing this survey or filling out this

17   survey, is that also true of COVID?

18        A.    Yes, with the caveat that we

19   performed a word search across a number of

20   categories looking at the substance of the

21   complaint and the language that was used there

22   to see how many pharmacists were referencing

23   those issues and those concerns.

24                    And just by way of -- the numbers

1  were relatively small, maybe two, maybe six,

2  maybe twelve respondents might have mentioned

3  any of these, but the researchers are always

4  asking "Compared to what?"

5           So we did a search on COVID in the

6  2021 survey, and that it appeared in comments

7  345 times.  So a far different incidence of that

8  than we found for any of the opioid-related

9  searches that we did.

10     Q.    So the questions, none of them

11  specifically mention COVID or opioids or

12  controlled substances, but the comments,

13  particularly with respect to COVID and pandemic,

14  did; is that right?

15     A.    That's right.  So that gave me

16  sort of a control group to say if the survey has

17  minimal support that pharmacists had opioid

18  diversion and abuse on their mind, how does that

19  compare to COVID.

20           And there's more evidence that --

21  there were more pharmacists who mentioned COVID

22  in the course of their comments.  And so that

23  helped me sort of think about the relative

24  absence of comments mentioning opioid diversion

1    or abuse.

2         Q.    So at least with respect to the

3    commenters, would you say that COVID or the

4    pandemic -- COVID was on the minds of those

5    people who offered up comments more than any of

6    the other terms related to opioid diversion and

7    dispensing that you searched?

8              MR. ELSNER:  Objection.

9         A.    That I searched, correct.

10             MS. WOHL:  Could we go off the

11        record.

12             THE VIDEOGRAPHER:  Off the record

13        at 3:04 p.m.

14             (Recess taken.)

15             THE VIDEOGRAPHER:  We are back on

16        the record at 3:07 p.m.

17             MS. WOHL:  Dr. Selzer, I do not

18        have any further questions for you.

19                  - - -

20             RECROSS-EXAMINATION

21    BY MR. ELSNER:

22        Q.    Dr. Selzer, just a quick one or

23    two follow-ups.

24             With respect to the respondents

1   and your chart on page 14 of your report that

2   you were just referring to, you're looking here

3   at the percentage changes in the large chain

4   grocery store responses between 2020 and 2021,

5   correct?

6          A.    That's right.

7          Q.    Okay.  So what you're doing is

8   you're comparing the total number of people who

9   responded to the surveys each year to how many

10  identified as having worked in a large chain

11  grocery store, even though they could be lying,

12  true?

13         A.    I'm sorry.  What was the last past

14  part?  Could you repeat?

15         Q.    That was kind of a joke.

16               What you did here was you compared

17  the number of total respondents to the 2020

18  survey and what percentage of those respondents

19  identified as having worked in a large chain

20  grocery store, and then did the same thing for

21  2021, correct?

22         A.    That's right.

23         Q.    You didn't actually look at the

24  number of actual respondents who identified as

1    having worked in a large chain grocery store,

2    correct?

3             A.    I would have had that data in

4    2020.  I don't believe I had the raw numbers for

5    2021.  I might be mistaken.

6             Q.    If you look at MR 4202, page 23,

7    Exhibit 4.

8             MR. ELSNER:  Sorry, Gina.  4202.

9    BY MR. ELSNER:

10            Q.    You see here that the responses to

11   the question "What is your primary practice

12   site," Large Chain Grocer is 1,000, correct?

13            A.    That's right.

14            Q.    Okay.  So we know the number for

15   2020 is 1,000.

16            MR. ELSNER:  Could we go back to

17            the large chain part of her report on

18            page 14, Gina.  It's Exhibit 3, page 16.

19            There it is.  All right.  Could we

20            blow that up a bit.

21   BY MR. ELSNER:

22            Q.    So the actual number of people who

23   responded and identified as working in a large

24   chain grocery store in 2020 was 1,000.

1                    MR. ELSNER:  Can we write 1,000

2            next to that 24 percent.

3                    Does that exceed our capacity to

4            do that, Gina?

5                    TRIAL TECH:  Let me see if I can

6            get that.  Keep going.  And you want

7            1,000 near the 24?

8                    MR. ELSNER:  Yes, ma'am.

9                    TRIAL TECH:  Okay.

10                    MR. ELSNER:  Perfect.  Thank you.

11   BY MR. ELSNER:

12            Q.    And then if we look at the 2021

13   results on page 4, which is 4201, large chain

14   grocery box store pharmacists identified

15   themselves that way 1,071, correct?

16            A.    I'm not seeing it on what she's

17   showing.  There it is.

18                    Okay.

19            Q.    So by that 36 percent, we should

20   write 1,071.

21                    So the number of people that

22   actually changed between 2020 and 2021 was an

23   addition of 71 people, correct?

24            A.    This only makes sense in the

1    context of how many respondents overall were

2    there.  And at the bottom of the chart, you see

3    that the end in 2020 was 4,154, and it was a

4    smaller respondent base.

5                    So this is why you do this, which

6    is that it's the proportion of those who

7    answered the survey that is what's meaningful

8    here.  And this is why I've tried to make clear

9    the importance of this, is that in terms of the

10   distribution of the responding pharmacists by

11   their primary practice settings, we don't know

12   if the distribution in 2020 is more accurate to

13   the real world or that the distribution in 2021

14   is more accurate as a proportion of the

15   responding pharmacists.

16                   Whether there were more or less

17   doesn't really matter if you've got only about a

18   third -- if you've got a third less roughly

19   responding in the second year as before.

20           Q.     That's only in comparison with the

21   total universe.  The actual number of people

22   that identified as working in a large chain

23   grocery store setting is only increased 71

24   people total, not some 50 percent, correct?

1          A.    No, that's not correct.  The

2     proportion of those responding were 1,000 of

3     4,000 and some in 2020.  In 2021, it was roughly

4     1,000 out of about 3,000 responding.

5               So that's the context for

6     understanding the rule.  You had in the 2020

7     survey a more prominent -- I'm sorry -- a less

8     prominent response base among those who said

9     they were working in large chain stores.

10              It's bigger.  It's more -- the

11    final results, the overall results, are informed

12    more in the second survey by those working in

13    that setting.  And if we knew what was true in

14    the real world, we could have adjusted it.

15         Q.    Well, all of your assumptions are

16    assuming that what matters is the total

17    universe, but if you're focused only on the

18    responses in the large chain grocery store

19    setting, then the number of people who responded

20    is fairly similar, and we can analyze those

21    results fairly consistently between the 2020 and

22    the 2021 survey, correct?

23         A.    This is not the way researchers

24    would think about that.

1          Q.    Well, I mean, I don't understand

2    why not.  If I want to know how many people in a

3    large chain grocery store were concerned about

4    having adequate staff to complete their job, why

5    would it matter how many in a small chain

6    grocery store felt, or in a hospital, or in a

7    long-term care facility?

8               It wouldn't matter would it?

9          A.    In that particular instance, it

10   wouldn't.  But the bigger question is, within

11   that group, what are the demographic

12   distributions.

13              So we didn't know if 1,000 one

14   year are identical virtually to the 1,071 in the

15   second year.  We don't know if there were other

16   things that were influencing that difference in

17   response rate.  So you can't just take 1,000

18   here, 1,000 there, and say they're equivalent.

19   Researchers would not do that.

20         Q.    What is the difference in the

21   response rate between 2020 and 2021 for those

22   who worked in large chain grocery stores?

23         A.    In the response rate?  Well, I

24   think you -- I think I would need to do some

1    higher mathematics here and algebra potentially.

2              What this is showing, and I think

3    most clearly, is that the people in that

4    category made up a higher proportion of people

5    answering than they did before.

6         Q.    Yeah, but that's only -- okay.

7    But that might be true --

8         A.    I'm sorry.  The --

9         Q.    -- but the actual number of people

10   who responded between one survey and the next

11   was very consistent in terms of the numbers,

12   true?

13        A.    But the point is fewer responded,

14   so they are disproportionally potentially

15   overrepresented in the second year than the

16   first year.  And because we do not know how many

17   people from large chain grocery stores -- box

18   stores were invited to the survey, that would be

19   our denominator for calculating the response

20   rate using the 1,000 or 1,071, but that's

21   unknown.  We don't know that.

22        Q.    Why do you assume that there were

23   more people who were sent the survey that worked

24   in a large chain grocery store when the number

1   of people that actually responded are so similar

2   between 2020 and 2021?

3          A.    Because the actual number of

4   people who responded at all is different between

5   the two surveys.

6          Q.    But that shows that there was a

7   disproportionate number of people that responded

8   in other practice areas, not in the large chain

9   pharmacy setting, because we know the actual

10  number of respondents is only 71 apart, correct?

11         A.    Which is a meaningless number,

12  because we don't know if that's a bigger

13  response rate overall of the 20 percent or a

14  smaller response rate.  We don't have the data

15  to make that calculation.  You want to say 1,000

16  is 1,000, and I say only -- you can only

17  understand that in the context of what

18  proportion of all respondents they make up,

19  so --

20         Q.    Unless I'm only concerned --

21               MS. WOHL:  Let her finish.

22         Q.    Please continue, Dr. Selzer.

23         A.    So in 2020, those working in the

24  bigger box stores and grocers were a smaller

1    proportion of all than they were in 2021.  The

2    fact that they happened to be equal numbers is

3    coincidental.

4              The importance of it is that there

5    was a difference between the two surveys, and

6    potentially a meaningful difference.  We don't

7    know why this is, how it came to be.  The report

8    is silent on it.  But it's true that the 2021

9    survey has more representation from this group

10   proportionately than the previous survey.

11        Q.    But not in actual numbers.  And if

12   what we're really concerned about is the

13   responses of those who worked in a large chain

14   grocery store like Kroger, who's the defendant

15   in this case, then the more relevant factor is,

16   is the number of respondents between 2020 and

17   2021 significantly different, and the answer to

18   that is no, correct?

19        A.    That's not correct.

20              The point is that's only part of

21   the story.  This is a story about what data we

22   have and what data we do not have.

23              So within that category, there

24   might have been differences in terms of who

1    responded by the position that they served in,

2    by how many hours a week they worked, by how

3    many years they've been there.  We don't know.

4    So we don't know if they -- if this 1,000 is

5    identical to this 1,000 in meaningful ways.  We

6    do not know.

7          Q.    From the data, can you determine

8    that more individuals, pharmacists, working in

9    the large chain grocery store setting, more than

10   71, actually received and responded to the

11   survey?

12         A.    We do not know that.

13         Q.    It could be the exact same, except

14   for a 71-percent difference, correct?

15         A.    That were invited?  Is it --

16         Q.    Not that were invited.  It shows

17   that participated.

18         A.    I think I need you to repeat that

19   question.

20         Q.    Well, you don't know how many

21   people who work in a large chain grocery store

22   setting were invited to participate in the

23   survey in 2020 or 2021, correct?

24         A.    That's correct.

1        Q.    So that number could be exactly

2    the same?  It's possible, correct?

3        A.    It's possible.

4        Q.    I'm sorry?

5        A.    It's possible.

6        Q.    And, in fact, the only thing we do

7    know is that 1,000 people responded in 2020, and

8    1,000 people responded in -- 1,071 responded in

9    2021 and identified themselves as having worked

10   in a large chain big box store, correct?

11       A.    Correct.

12       Q.    And that is not a 50 percent

13   difference between the two, is it?

14       A.    No.  It's a 50 -- sorry.

15   50 percent, 36 percent compared to 24 percent.

16   It is a proportionate difference of 50 percent.

17   It's 12 percentage points difference.

18       Q.    But that's in comparison with all

19   the respondents, not in comparison with only

20   those who identified themselves as large chain

21   grocery stores.

22       A.    But, again, what is meaningful

23   about this is that there's a difference in

24   distribution here.  And what we do not have is

1    information on any other differences across

2    categories or within the one category that might

3    be meaningful.  We don't know.

4          Q.    We do know that in 2021, there

5    were 509 pharmacists who responded to the survey

6    who worked in a large chain grocery box store

7    that felt that their work environment did not

8    have sufficient pharmacy staffing to allow for

9    safe patient care, true?

10          A.    I don't have the 509.

11          Q.    It's right on the screen.

12          A.    The strongly disagree.  Okay.

13          Q.    And we do also know that 369

14    people disagreed that they had sufficient

15    pharmacy staffing to allow for safe patient

16    care, correct?

17                MR. ELSNER:  Sorry.  The one above

18          it.

19          A.    Yes.

20          Q.    And so we know at least for the

21    strongly disagree and disagree, that there are

22    at least that many pharmacists in the State of

23    Ohio who work in large chain grocery stores who

24    felt that there was not sufficient staffing for

1    safe patient care, correct?

2          A.    Correct.

3          Q.    And that in and of itself is a

4    piece of data that is meaningful, true?

5          A.    True.

6          Q.    And, in fact, knowing that over

7    800 different pharmacists that are working in a

8    grocery store setting feel that they don't have

9    enough staff to safely care for the patients in

10   the State of Ohio is a data point that might be

11   relevant to the Ohio Board of Pharmacy, true?

12         A.    True.

13         Q.    And you don't know if it's

14   relevant or not; is that right?

15         A.    It said "might," so it might.

16         Q.    And you, because that's outside

17   your expertise, don't know whether that is a

18   meaningful number or not, correct?

19              MS. WOHL:  Objection to form.

20         A.    You're looking at the raw numbers,

21   and I would look at the percentages.  And even

22   so, it's a large percentage.  It's nearly half

23   who say strongly disagree.

24         Q.    And regardless of whether you look

1  at the percentages or if you look at the raw

2  numbers.  But if you look at the raw numbers,

3  that's over 800 pharmacists who are dispensing

4  thousands and thousands of medications in the

5  State of Ohio who feel that the environment in

6  which they're working is unsafe to the patients,

7  true?

8         A.    I would say that's the answer

9  that's given here.

10              MR. ELSNER:  Thank you,

11         Dr. Selzer.  I don't have any further

12         questions.

13              MS. WOHL:  I do not have any

14         further questions.

15              Dr. Selzer will read and sign.

16              MR. ELSNER:  Thank you very much.

17              THE VIDEOGRAPHER:  With no

18         additional questions, that concludes

19         today's deposition.  The time is

20         3:25 p.m.

21              MR. RACHLIN:  Carol, can I get a

22         draft copy of the transcript?

23              THE COURT REPORTER:  Of course.

24              (Signature reserved.)

```
 1                    - - -

 2              Thereupon, at 3:25 p.m., on

 3    Friday, January 20, 2023, the deposition was

 4    concluded.

 5                    - - -

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                      CERTIFICATION

 2

 3          I, Carol A. Kirk, Registered Merit Reporter and

 4    Certified Shorthand Reporter, do hereby certify that

 5    prior to the commencement of the examination,

 6    J. ANN SELZER was duly remotely sworn by me to testify

 7    to the truth, the whole truth, and nothing but the

 8    truth.

 9          I DO FURTHER CERTIFY that the foregoing is a

10    verbatim transcript of the testimony as taken

11    stenographically by me at the time, place, and on the

12    date hereinbefore set forth, to the best of my

13    ability.

14          I DO FURTHER CERTIFY that I am neither a

15    relative nor an employee nor attorney nor counsel of

16    any of the parties to this action, and that I am

17    neither a relative nor employee of such attorney or

18    counsel, and that I am not financially interested in

19    the action.

20

21

22    _____

      Carol A. Kirk, RMR, CSR
23    Notary Public

24
```

```
 1                  DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:  National Prescription Opioid Litigation
                    Case Track 7
 5

 6        DECLARATION UNDER PENALTY OF PERJURY

 7

 8        I declare under penalty of perjury that I

 9   have read the entire transcript of my deposition taken

10   in the captioned matter or the same has been read to

11   me, and the same is true and accurate, save and except

12   for changes and/or corrections, if any, as indicated

13   by me on the DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if still

15   under oath.

16

17                        _____
                          J. ANN SELZER
18

19   SUBSCRIBED AND SWORN TO

20   before me this _____ day

21   of _____, A.D. 20___

22
                    _____
23                  Notary Public

24
```

```
 1                 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23
     SIGNATURE_____DATE:_____
24        J. ANN SELZER
```