# Appendix B

## ALLERGAN TRIBAL OPIOID SETTLEMENT AGREEMENT

### I.    OVERVIEW

This Allergan Settlement Agreement (this "*Agreement*") dated as of December 16, 2022 sets forth the terms of settlement between and among the TLC, Participating Tribes, and Allergan (in each case as defined below), to take effect as of the Effective Date (as defined below).

### II.    DEFINITIONS

Unless otherwise specified, the following definitions apply:

A.    "*Abatement Fund*" or "*TAFT VII*" means the Tribal Abatement Fund Trust VII, a Delaware Statutory Trust to be formed in accordance with the Tribal Abatement Fund Trust VII Trust Agreement, which shall provide for distributions to Participating Tribes to be used for Opioid Remediation.

B.    "*Affiliated Company(ies)*" means (1) when used with respect to AbbVie Inc. ("AbbVie") all of the entities listed in Exhibit G-1; (2) when used with respect to Allergan all of the entities listed in Exhibit G-2; and (3) additionally shall include other entities owned now or in the past either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents, but only to the extent those other entities played any role relating to Covered Conduct and/or Released Claims during the period when they were owned either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents.

C.    "*Agreement*" means this Allergan Tribal Settlement Agreement, inclusive of all Exhibits.

D.    "*Alleged Harms*" means the alleged past, present, and future financial or societal and related expenditures arising out of the alleged misuse and abuse of opioid products, non-exclusive examples of which are described in the documents listed on Exhibit B, that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by Allergan.

E.    "*Allergan*" means Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a/ Watson Pharmaceuticals, Inc.) and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc). *Allergan* does not include Teva Pharmaceuticals Industries Ltd. ("*Teva Ltd.*"), Teva Pharmaceuticals USA, Inc. ("*Teva USA*"), Cephalon, Inc. ("*Cephalon*"), Actavis LLC (f/k/a Actavis Inc.) ("*Actavis LLC*"), Watson Laboratories, Inc. ("*Watson*"), Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) ("*Actavis Pharma*"), Actavis Elizabeth LLC ("*Actavis Elizabeth*"), Actavis Kadian LLC ("*Actavis Kadian*"), Actavis Laboratories FL,

1

Inc. (f/k/a Watson Laboratories, Inc. - Florida) ("*Actavis Labs FL*"), Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc. - Utah) ("*Actavis Labs UT*"), Actavis Mid Atlantic LLC ("*Actavis Mid*"), Actavis South Atlantic LLC ("*Actavis South*"), Actavis Totowa LLC ("*Actavis Totowa*"), or Anda, Inc. ("*Anda*").

F.  "*Allergan Settlement Trust*" means the interest-bearing fund established by the MDL Court in MDL No. 2804 into which all payments by Allergan will be made and which shall be administered by the Special Master.

G.  "*Attorney Fee Fund*" means a segregated fund within the Allergan Settlement Trust set aside to pay attorneys' fees and reimburse attorneys' costs in accordance with Section VII of this Agreement.

H.  "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative, claim, request, assessment, charge, covenant, damage, debt, lien, loss, fine, penalty, restitution, reimbursement, disgorgement, expenses, judgment, right, obligation, dispute, suit, contract, controversy, agreement, parens patriae claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever. Claim does not include any individuals' personal injury or wrongful death cause of action.

I.  "*Claim Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

J.  "*Compensatory Restitution Amount*" means the aggregate amount of payments by Allergan hereunder other than amounts paid as attorneys' fees and reimbursement of costs or identified pursuant to Section IV as being directed to the Attorney Fee Fund.

K.  "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, service, work, misstatement, misleading statement, or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence,

2

statement, error, omission, breach of duty, conduct, event, transaction, agreement, service, work, misstatement, misleading statement, or other activity) arising from or relating in any way to (a) the availability, discovery, research, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, relabeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, procedure, or advocacy relating to any Product or class of Products, including, but not limited to, any unbranded or branded promotion, marketing, or advertising, unbranded information, patient support or assistance, educational programs, consultancy, research, or other programs, campaigns, lobbying, or grants, sponsorships, charitable donations, or other funding relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product or class of Products; (c) the monitoring, reporting, disclosure, non-monitoring, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product or class of Products; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, a precursor or component of Product, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate of Product; and/or (e) diversion control programs or suspicious order monitoring related to any Product. The foregoing is not intended to apply to claims alleging contamination of products.

L.    "*Divested Actavis Generic Entity(ies)*" means Actavis LLC, Watson, Actavis Pharma, Actavis Elizabeth, Actavis Kadian, Actavis Labs FL, Actavis Labs UT, Actavis Mid, Actavis South, and Actavis Totowa.

M.    "*Divested Entity(ies)*" means those companies listed on Exhibit G-3, which includes Divested Actavis Generic Entities.

N.    "*Effective Date*" means the date that the TLC delivers (or causes to be obtained and delivered) to Allergan the Tribal Participation Forms signed by 95% of Litigating Tribes, as determined by the Tribal Allocation Voting Percentages set forth in Exhibit C to this Agreement.

O.    "*Eligible Entities*" has the meaning set forth in Section VI.E.

P.    "*Later Litigating Tribe*" means a Tribe (or Tribe official asserting the right of or for the Tribe to recover for alleged harms to the Tribe and/or its members thereof) that is not a Litigating Tribe and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date.

Q.     "*Litigating Tribe*" means a Tribe (or Tribe official asserting the right of or for the Tribe to recover for Alleged Harms to the Tribe and/or its members thereof) that brought any Released Claims against any Released Entities as set forth on Exhibit A-1.

R.     "*MDL Court*" means United States District Court for the Northern District of Ohio Eastern Division.

S.     "*Non-Litigating Tribes*" means those Tribes as set forth on Exhibit A-2 that are not Litigating Tribes.

T.     "*Non-Participating Tribe*" means any Tribe that does not execute a Tribal Participation Form within three years of the Effective Date of this Agreement or any Tribe that, within three years of the Effective Date of this Agreement, affirmatively opt-outs of this settlement and provides written notice to the Special Master, the TLC and Allergan of its intent to litigate its Claims against Allergan.

U.     "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

V.     "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

W.     "*Non-Released Entity*" means an entity that is not a Released Entity.

X.     "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of the opioid abuse crisis, including on those injured as a result of the opioid abuse crisis. Schedule B of the TAFT VII TDP provides a list of programs, services and activities that qualify as expenditures for Opioid Remediation. In addition, Schedule D of the TAFT VII TDP provides a non-exhaustive list of Tribal Abatement Strategies that also qualify as expenditures for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

Y.     "*Participating Tribe*" means any Tribe that executes a Tribal Participation Form and uploads the Tribal Participation Form on the Portal within three years of the Effective Date.

Z.     "*Parties*" means Allergan, the TLC, and Participating Tribes (each, a "*Party*").

AA.    "*Portal*" means the Tribal Opioid Settlement Portal at which (a) the Tribal Participation Agreements shall be received and maintained by the TLC for review and approval by Allergan and (b) the information related to the Tribal Allocation Distribution Percentage shall be maintained.

4

BB.  "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, gabapentin, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, "*Product*" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "*Product*" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, pentazocine, propoxyphene, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "*Product*" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence. Further, "Product(s)" includes, but is not limited to, the following: (a) Anexsia, Bancap HC, Combunox, Dilaudid, Dilaudid HP, Duradyne, Esgic with Codeine, Fiorinal with Codeine, Fioricet with Codeine, Kadian, Lorcet, Lorcet Plus, Maxidone, MoxDuo, Norco, Procet, Reprexain, Vicodin, Vicodin ES, Vicodin HP, and Vicoprofen, and any type, version, strength, or dosage of the foregoing; and (b) Aspirin + butalbital + caffeine + codeine phosphate, Fentanyl citrate injection, Fentanyl citrate tablet, Fentanyl transdermal, Homatropine methylbromide + hydrocodone bitartrate, Hydrocodone + acetaminophen, Hydrocodone + ibuprofen, Hydromorphone tablet, Meperidine hydrochloride injection, Meperidine hydrochloride tablet, Morphine sulfate capsule, Morphine sulfate injection, Morphine sulfate tablet, Oxycodone, Oxycodone + acetaminophen, Oxycodone + aspirin, Oxycodone + hydrochloride, Oxycodone + ibuprofen, Oxymorphone tablet, Tramadol hydrocholoride, and any type, version, strength, or dosage of the foregoing..

CC.  "*Released Claim(s)*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the Tribes in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of, or in any way relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or proceedings, or in any comparable action or proceeding brought by the Tribes or any other Releasors (whether or not such Tribes or other Releasors has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. "Released Claims" shall be interpreted broadly. This Agreement does not release Claims by

private individuals. Claims by private individuals shall be treated in accordance with applicable law. Without limiting the foregoing, Released Claims is also used herein to describe Claims brought or maintained by a Later Litigating Tribe or any other Releasor that would have been Released Claims if they had been brought by a Releasor against a Released Entity before the Effective Date.

DD. "*Released Entities*" means Allergan and (1) all of Allergan's past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, agents (all of the foregoing solely in their capacity as such with respect to the Released Claims), and insurers (solely in their role as insurers, if any, with respect to the Released Claims), including, but not limited to, (a) AbbVie and (b) Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates) but solely as to the branded opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Products before August 2, 2016; (2) any person or entity to the extent, and only to the extent, that such person or entity may have a Claim based on such person or entity having a business relationship with Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies, including, but not limited to, for contractual indemnity, equitable or implied indemnity, contribution, comparative fault, reimbursement, or apportionment (including, but not limited to, the respective past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, partners, manufacturers, contractors, agents, and insurers (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (1), including Abbott Laboratories and Abbott Laboratories Inc. ("Abbott"), provided that, for avoidance of doubt, Abbott is not a Released Entity for purposes of Claims related to OxyContin, Purdue Pharma, or Purdue Pharma Inc.; and (ii) Halo Pharmaceuticals, Inc., Shionogi Inc., Mikart, LLC, PDI, Inc., TMS Health, LLC, National Health Information Network, Inc., Ventiv Commercial Services, LLC, inVentiv Commercial Services, LLC, UPS Supply Chain Solutions, Inc., and King Pharmaceuticals, Inc., and their respective past and current parents, subsidiaries, and affiliates) against Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies relating to any Covered Conduct, Products, class of Products, and/or Released Claims arising from such business relationship; and (3) the respective past and present employees, officers, directors, members, shareholders, partners, trustees, contractors, consultants, and agents (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (1) and (2). Notwithstanding the foregoing (and subject to certain provisions, including, but not limited to, the Non-Party Settlement at Section III.B.3 and the Set-Off at Section IX below), Released Entities shall exclude Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates, but not Allergan and other Released Entities), but solely as to: (i) their generic opioid

6

drugs that are Products, and/or (ii) the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products for which Releasors have also sought to hold Allergan (and/or other Released Entities) liable. For the avoidance of doubt, any entity acquired, or joint venture entered into by Allergan after the Reference date is not a Released Entity.

EE.     "*Releasor(s)*" means (1) each Participating Tribe; and (2) without limitation and to the maximum extent of the power of each Participating Tribe to release Claims, (a) the Participating Tribe's departments, agencies, divisions, boards, commissions, subdivisions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, emergency services districts, school districts, healthcare districts, hospital districts, sheriffs and law enforcement districts, library districts, coroner's offices, and public transportation authorities of the Participating Tribe, including those with the regulatory authority to enforce tribal controlled substances acts or the authority to bring Claims related to Covered Conduct seeking money (including abatement (or remediation and/or restitution)) or revoke a pharmaceutical distribution license, and (c) any person or entity acting in a parens patriae, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief, including but not limited to, fines, penalties, or punitive damages, on behalf of or generally applicable to the general public with respect to a Participating Tribe whether or not any of them participate in the Agreement. Each Participating Tribe represents that it has or has obtained (or will obtain no later than the Effective Date) the authority set forth in the Representation and Warranty subsection of Section III.D.

FF.     "*Settlement Fund Escrow*" means the interest-bearing escrow fund established pursuant to Docket No. 4215 in MDL No. 2804.

GG.     "*Special Master*" means David R. Cohen appointed by the MDL Court in MDL No. 2804, or his successor.

HH.     "*TAFT VII Directors*" or "the *Directors*" means the individuals Mary Smith, Dean Kevin Washburn and Kathy Hannan, or their successors, appointed by the MDL Court in MDL No. 2804.

II.     "*TAFT VII Trust Agreement*" means the Tribal Abatement Fund Trust IV Trust Agreement, to be effective as of the Effective Date in substantially in the form attached hereto as Exhibit D.

JJ.     "*TAFT VII TDP*" means the Trust Distribution Procedures set forth as Exhibit 4 of the TAFT VII Trust Agreement.

KK.  "*TLC*" means the Tribal Leadership Committee appointed by the Court in MDL No. 2804.

LL.  "*Tribal Allocation Appointees*" means David R. Cohen and Layn Phillips appointed by the MDL Court. They have set the procedures by which the inter-tribal allocation will be completed and are in the process of jointly determining the final inter-tribal allocation resulting in each Tribe's Tribal Allocation Distribution Percentage for this settlement and for all other settlements between the TLC, the manufacturers, distributors, and pharmacies.

MM.  "*Tribal Allocation Distribution Percentage*" means a Tribe's percentage as determined by the Tribal Allocation Appointees pursuant to Section V.D.. The aggregate Tribal Allocation Distribution Percentages of all Tribes shall equal 100%.

NN.  "*Tribal Opioid Abatement Report*" means an annual report on the Approved Tribal Opioid Abatement Uses, as required under Section 2.5 of the TAFT VII Trust Agreement.

OO.  "*Tribal Participation Form*" means the form attached hereto as Exhibit E.

PP.  "*Tribe*" or "*Tribes*" means one or more Eligible Entity set forth on Exhibit A-1 or Exhibit A-2 of this Agreement.

## III.  RELEASE

A.  *Scope*. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. Each Participating Tribe (for itself and its Releasors) will absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in this Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of each Releasor to release claims. The releases shall be a complete bar to any Released Claim**.**

B.  *Claim Over and Non-Party Settlement*.

    1.  *Statement of Intent.* It is the intent of the Parties that:

        a.  Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

        b.  the payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out

8

of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

c.    Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.    the Settlement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

e.    The provisions of this subsection are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2.    *Contribution/Indemnity Prohibited*. No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third party vendor, trade association, distributor, or health care practitioner, *provided,* that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering any amounts owed pursuant to insurance contracts. However, and notwithstanding the foregoing, this provision shall not preclude any Released Entity from seeking indemnification, contribution, or any other theory from and against Teva Ltd., Pfizer Inc., King Pharmaceuticals, Inc., and Alpharma Inc., and/or each of their respective past and current parents, subsidiaries, and/or affiliates.

3.    *Non-Party Settlement*. To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Allergan in the first sentence of Section III.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement. For the avoidance of any doubt, Non-Released Entities include, but are not limited to, Teva Ltd., Teva USA, Divested Actavis Generic Entities or other Divested Entities, and Anda (including for subsection III.B.4 below).

9

4. *Claim-Over.* In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection III.B.2, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party Settlement as provided in subsection III.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Allergan shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Agreement by Allergan:

a. Allergan shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Agreement, whichever is later;

b. Allergan and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay more with respect to Covered Conduct than the amounts owed by Allergan under this Agreement;

c. That Releasor and Allergan shall take steps sufficient and permissible under applicable law to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Allergan under this Agreement. Such steps may include, where permissible:

i. Filing of motions to dismiss or such other appropriate motion by Allergan or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

ii. Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor may obtain, or has authority to control from such Non-Released Entity;

iii. Placement into the Settlement Fund Escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

iv. Return of monies paid by Allergan under this Agreement to the Settlement Fund Escrow not yet distributed to Releasors

10

to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

v.     Payment of monies to Allergan by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor may obtain, or has authority to control from such Non-Released Entity;

vi.     Credit to Allergan under this Agreement to reduce the overall amounts to be paid under the Agreement such that it is held harmless from the Claim-Over; and

vii.     Such other actions as that Releasor and Allergan may devise to hold Allergan harmless from the Claim Over.

d.     The actions of that Releasor and Allergan taken pursuant to paragraph (c) must, in combination, ensure Allergan is not required to pay more with respect to Covered Conduct than the amounts owed by Allergan under this Agreement.

e.     In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Allergan may seek review by the Court. In the event that the Court's actions do not result in Released Entities being held fully harmless, Allergan shall have a claim for breach of this Agreement by Releasors, with the remedy being payment of sufficient funds to hold Allergan harmless from the Claim-Over. For the avoidance of doubt, the prior sentence does not limit or eliminate any other remedy that Allergan may have.

5.     To the extent that the Claim-Over is based on a contractual indemnity, the obligations under subsection III.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold or promoted Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Allergan shall notify the Participating Tribes, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

6.     *General Release*. In connection with the releases provided for in this Agreement, each Participating Tribe (for itself and its Releasors) expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

11

>**General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Participating Tribe (for itself and its Releasors) hereby expressly waives and fully, finally, and forever settles, releases, and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence, or through no fault whatsoever, and which, if known, would materially affect the Participating Tribes' decision to enter into the Agreement or the Participating Tribes' decision to participate in the Agreement.

C.  *Res Judicata*. Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any stipulation of dismissal with prejudice or judgment entered on the Agreement, gives rise to under applicable law.

D.  *Representation and Warranty*. The signatories hereto on behalf of the Participating Tribes expressly represent and warrant that they have authority to enter this agreement on behalf of the Participating Tribes and that the Participating Tribes will obtain on or before the Effective Date (or have obtained) the authority to settle and release, to the maximum extent of the Tribe's power, all Released Claims of (1) their respective Participating Tribes; and (2) all Releasors of their respective Participating Tribes.

E.  *Effectiveness*. The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Allergan Settlement Trust or any portion thereof, or by the enactment of future laws, or by any seizure of the Allergan Settlement Trust or any portion thereof.

F.  *Cooperation*. Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

G.  *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release, or limit any criminal liability, claims for any outstanding liability under any tax or securities law, claims

against parties who are not Released Entities, claims by private individuals, and any claims arising under this Agreement for enforcement of this Agreement.

## IV. MONETARY RELIEF AND PAYMENTS

### A. Structure of Payments

1. All payments under this Section IV shall be made into the Allergan Settlement Trust. The payments in the Allergan Settlement Trust shall be allocated and used only as specified in Section V of this Agreement.

2. Allergan shall pay a maximum total of $70,945,809.89, inclusive of all attorneys' fees and costs ("Total Payment").

3. Releasors represent that fifty-six percent (56%) of the Total Payment constitutes consideration for the settlement of Claims involving, arising from, or related to generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016 that the Releasors are asserting or might otherwise assert or could assert that Allergan (or any other Released Entity) is directly or indirectly and/or jointly or severally liable, including but not limited to, based on parent or control liability or a substantially similar theory. Releasors represent that forty-four percent (44%) of the Total Payment constitutes consideration for the settlement of Claims involving, arising from, or related to branded opioid drugs that are Products of or attributable to Allergan or any other Released Entity (including but not limited to branded opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and the other Divested Entities related to those branded opioid drugs that are Products before August 2, 2016) that the Releasors are asserting or might otherwise assert or could assert against Allergan or any other Released Entity, of which seventy-seven percent (77%) is specifically involving, arising from, or related to Kadian® (including but not limited to Kadian manufactured, distributed, marketed, and/or sold from 1997 through 2008 by King Pharmaceuticals, Inc. and/or Alpharma Inc.).

4. The Total Payment is the full and maximum extent of any monies owed by Allergan (and/or the other Released Entities), subject to Section V, and includes all attorneys' fees, expenses, and cost payments.

5. The Total Payment, subject to the reductions described in Section V, shall be broken down as follows:

   a. A payment of $64,496,190.81 to the Allergan Settlement Trust, pursuant to wire instructions to be provided, for the purpose of

remediation and restitution (the "*Compensatory Restitution Amount*"). These funds will be paid to the Tribal Settlement Trust and allocated to the TAFT VII and Attorney Fee Fund in accordance with the schedule set forth in Exhibit H-2.

b.      A payment of $6,449,619.08 to the Allergan Settlement Trust, pursuant to wire instructions to be provided, to be distributed to Counsel representing attorneys' fees, expenses, and costs (the "*Tribes Fees and Costs Amount*"). These funds will be paid to the Tribal Settlement Trust and allocated by the Special Master to the Attorney Fee Fund in accordance with the schedule set forth in Exhibit H-1.

6.      Allergan's payment into the Allergan Settlement Trust includes the amount necessary to comply with the Ongoing Common Benefit Order (Dkt. #4428) in *In re National Prescription Opiate Litigation*, case no. 1:17-md-2804, pending in the United States District Court for the Northern District of Ohio Eastern Division (the "Ongoing Common Benefit Order"). The Special Master shall hold the amount necessary to ensure compliance with the Ongoing Common Benefit Order until further order by the MDL Court. It is expressly understood that Allergan's Payment into the Allergan Settlement Trust under IV.A.5 fulfills its obligations under the Ongoing Common Benefit Order.

7.      AbbVie agrees to satisfy the obligations to make the payments due in this Section IV if for any reason Allergan fails to fulfill its payment obligations under Section IV.

B.    **Payment Schedule**

1.      On or before the Effective Date, the TLC shall provide to Allergan the Tribal Participation Forms signed by 95% of Litigating Tribes, as determined by the Tribal Allocation Voting Percentages set forth in Exhibit C to this Agreement ("*Participation Requirement*"). For the Agreement to become effective, the TLC must satisfy the Participation Requirement within two years of signing this agreement, unless Allergan, in its sole discretion, extends the deadline for doing so. Each Tribe will decide whether to become a Participating Tribe for both this Agreement and the Teva Tribal Settlement Agreement, or neither. However, if Teva enters bankruptcy prior to the Effective Date, Eligible Entities can choose to only join this Agreement.

2.      Provided that the Participation Requirement is satisfied, and the necessary W-9 form is provided to Allergan and Allergan's Bank Verification Form process is completed at least 21 days before payment is due, Allergan shall pay the Total Payment on the schedule outlined in Exhibit H.

C.   **Remediation and Restitution**

1.   The Parties agree that, unless otherwise required by law, the Compensatory Restitution Amount shall be directed to remediation and restitution of harms allegedly caused by Allergan. The Parties also agree that the purpose of the Compensatory Restitution Amount is for Allergan to pay over to the Participating Tribes monies to remediate the harms allegedly caused by Allergan or to provide restitution for such Alleged Harms that were previously incurred, none of which amount constitutes a fine or penalty. The TLC, by signing this agreement, and each Participating Tribe, by signing the Tribal Participation Forms (in the form annexed as Exhibit E), certify that: (1) the entity suffered harm allegedly caused by Allergan; (2) the payments to be received by the entity from Allergan represent an amount that is less than or equal to the actual monetary damage allegedly caused by Allergan; and (3) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Allergan and/or to provide restitution for such Alleged Harms that were previously incurred (i.e. Opioid Remediation).

2.   The Special Master shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the Effective Date occurs. On the Form 1098-F, the Special Master shall identify the Compensatory Restitution Amount as remediation and restitution amounts. The TLC shall also, on or before January 31 of the year following the calendar year in which the Effective Date occurs, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Allergan.

V.   **ALLOCATION AND USE OF SETTLEMENT FUNDS**

A.   *Components of Settlement Fund.* Subject to Section V.B.3, the Allergan Settlement Trust shall be comprised of funds earmarked for Opioid Remediation, and for the Attorney Fee Fund as set forth in Section V.B.

B.   *Use of Settlement Payments.*

1.   The Special Master shall transfer funds from the Allergan Settlement Trust within 21 days after receiving each of the annual payments of funds, as follows: 85% of such funds shall be paid to TAFT VII for distribution to Participating Tribes to use for Opioid Remediation in accordance with the TAFT VII Trust Agreement and the TAFT VII TDP; and 15% of such funds shall be set aside by the Special Master for the Attorney Fee Fund subject to Section VII to pay attorneys' fees and litigation costs.

2.   The TAFT VII Directors shall set aside and hold back the funds allocable to each of the following Tribes proportionate to the Tribe's Tribal Allocation Distribution Percentage:

a. A Non-Litigating Tribe that has not become a Participating Tribe at the time of such distribution, and the provisions of Section VI shall apply with respect to such Non-Litigating Tribe.

b. A Litigating Tribe that has not become a Participating Tribe at the time of such distribution, and the provisions of Section VI shall apply with respect to such Litigating Tribe.

3. The Special Master shall deduct the costs and expenses incurred in the administration of the Allergan Settlement Trust out of the interest accrued on the Settlement Trust and thereafter from the principal of the Settlement Trust.

4. In no event may less than 85% of Allergan's Compensatory Restitution Payments to the Allergan Settlement Trust be spent on Opioid Remediation. The Parties acknowledge and agree that the payments disbursed to the Tribes from TAFT VII in accordance with this Section V and Schedules B and D of the TAFT VII TDP are exclusively for Opioid Remediation.

C. *Duties and Expenses of the Directors*.

1. The Directors shall have the duties set forth in this Agreement and in the TAFT VII Trust Agreement. For the avoidance of doubt, the Directors will have duties and responsibilities comparable to those the same individuals exercise as trustees as set forth in the proposed Tribal Abatement Fund Trust Agreement filed 08/23/21 (Doc. 3634) with the Fifteenth Plan Supplement under the Eighth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (the "*Purdue Plan*"), confirmed by the Bankruptcy Court in *In re Purdue Pharma L.P.,* No. 19-23649 (RDD) (S.D.N.Y) (without regard to the effectiveness of any other orders, documents, agreements or similar authorities that may otherwise be applicable to the Purdue Plan).

2. Any expenses, costs and fees associated with or arising out of the duties of the Directors shall be paid out of interest accrued on the Abatement Fund and from the principal in the Abatement Fund should such interest prove insufficient.

D. *Duties and Expenses of Tribal Allocation Appointees.*

1. David R. Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees are responsible to jointly determine the final inter-tribal allocation resulting in each Tribe's Tribal Allocation Distribution Percentage for this settlement and for all other settlements between the TLC, the manufacturers, distributors, and pharmacies. The final Tribal Allocation Distribution Percentages shall govern the distributions to Participating Tribes in accordance with this Section V. For the avoidance of doubt, such procedures include:

16

a.   Each Participating Tribe shall have had the right to meaningfully participate in the final allocation process and a right to be heard prior to entry of the final allocation order specific to this opioid crisis.

b.   The Directors shall provide notice of the settlement to the unrepresented tribes. The Directors shall coordinate with Special Master David Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees to set forth the procedures by which notice is provided.

c.   Unrepresented Participating Tribes shall have the same rights as the represented tribes within the settlement allocation process.

d.   Allergan acknowledges and expressly agrees that it has no role whatsoever in the inter-tribal allocation.

2.   Any expenses, costs and fees associated with or arising out of the duties of David R. Cohen and Layn Phillips in their capacities as Tribal Allocation Appointees (including expenses of retaining experts or other professionals to assist them on allocation issues including BrownGreer and trust counsel), shall be agreed to by the Special Master consistent with Section V and paid out of the interest accrued on the Settlement Fund Escrow and, after the Effective Date, from the interest accrued on the Allergan Settlement Trust. Thereafter, all such expenses, costs and fees shall be paid from the principal of that portion of the Allergan Settlement Trust which, under Paragraph IV.B.1, will be allocated to and paid to TAFT VII, provided that, the Special Master may estimate the amount necessary to pay such allocation-related expenses, costs and fees reasonably expected to be incurred for one year after the Effective Date and reserve that amount from payment to TAFT VII, to be held by the Allergan Settlement Trust to cover such allocation-related expenses, costs and fees for one year after the Effective Date, following which the balance, if any, remaining of any such reserved amount shall be paid to TAFT VII.

E.   *Treatment of Non-Participating Tribes.*

1.   <u>Non-Litigating Tribes</u>. Non-Litigating Tribes shall have a period of three years after the Effective Date to execute a Tribal Participation Form. If a Non-Litigating Tribe executes a Tribal Participation Form within three years after the Effective Date, it shall receive the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage from the Abatement Fund. If a Non-Litigating Tribe does not execute a Tribal Participation Form within three years after the Effective Date, the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage will be reallocated

17

and paid to all Participating Tribes pro rata at the end of the three year period following the Effective Date, provided however that if a Non-Litigating Tribe does not execute a Tribal Participation Form within three years after the Effective Date but files Released Claims against one or more Released Entities anytime in that same three-year period, the amount (including accumulated holdback amounts) allocable to its Tribal Allocation Distribution Percentage shall revert to Allergan, to be paid to Allergan within sixty (60) days after the third anniversary of the Effective Date.

2.    <u>Litigating Tribes</u>. Any Litigating Tribe that does not execute a Tribal Participation Form within three years after the Effective Date of this Agreement or any Litigating Tribe that affirmatively opt-outs of this settlement and provides written notice to the Special Master, the TLC and Allergan of its intent to litigate any Released Claims against any Released Entities shall forego its right to participate in distributions contemplated by this Agreement, in which case the amount (including accumulated holdback amounts) allocated to such Litigating Tribe shall revert to Allergan, to be paid to Allergan within sixty (60) days after the third anniversary of the Effective Date.

F.    *Provisions Regarding Abatement Fund.*

1.    The funds distributed by TAFT VII to each Participating Tribe shall be used for Opioid Remediation.

2.    The TAFT VII Directors shall, in consultation with the TLC, design and implement a system of annual reporting by Participating Tribes relating to Opioid Remediation expenditures made using funds received from TAFT VII. The TAFT VII Directors shall provide an annual Tribal Opioid Abatement Report to Allergan and the Special Master, which annual report may be filed by the Special Master, in his discretion, with the MDL Court.

G.    *Nature of Payment.*

1.    Allergan and the TLC acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

a.    Allergan has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

b.    Tribes sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) as damages for the Alleged Harms allegedly suffered by the Tribes;

c.    By executing the Tribal Participation Form, the Participating Tribes acknowledge that: (a) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms

allegedly suffered by the Participating Tribes; and (b) the portion of the Compensatory Restitution Amount received by each Participating Tribe is no greater than the amount of the Alleged Harms allegedly suffered by such Participating Tribe;

d.    The payment of the Compensatory Restitution Amount by Allergan constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by Allergan. The payment of the Compensatory Restitution Amount by Allergan constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A) for alleged damage or harm (as compensation for alleged damage or harm arising out of alleged bodily injury) allegedly caused by Allergan;

e.    The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the Participating Tribes to the same position or condition that they would be in had the Participating Tribes not suffered the Alleged Harms;

f.    For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to any Participating Tribe, or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount is properly characterized as described in Section V.G.e, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, other punitive assessments, or attorneys' fees; and

g.    The Muscogee (Creek) Nation, on behalf of all Participating Tribes (the "Form 1098-F Filer") shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering this Agreement becomes binding. On the Form 1098-F, the Form 1098-F Filer shall identify the entire Compensatory Restitution Amount received by the Form 1098-F Filer as remediation/restitution. The Form 1098-F Filer shall also, on or before January 31 of the year following the calendar year in which the order entering this Agreement becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Allergan.

2.    *Tax Reporting and Cooperation*.

19

a. Each Participating Tribe shall cooperate in good faith with Allergan with respect to any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

b. The Muscogee (Creek) Nation shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulation Section 1.6050X-1(f)(1)(ii)(B).

c. For the avoidance of doubt, neither Allergan, the TLC, any Tribe, or counsel to any of the foregoing make any warranty or representation as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

## VI.  PARTICIPATION BY TRIBES

A. *Presentation of Aggregated Settlement Offer, Informed Consent and Compliance with Ethical Rules*. The TLC negotiated the terms of this Agreement with Allergan through a judicially supervised mediation. The TLC believes the gross settlement amount and term of years to be reasonable and recommend moving forward to present this Agreement and informed consent documentation to all Litigating Tribes identified on Exhibit A-1 and all Non-Litigating Tribes identified on Exhibit A-2 and if applicable, to their counsel. Allergan, the Released Entities, and the TLC recognize the ultimate decision to settle rests with each Tribe. The TLC will work with all counsel to present the proposed aggregate settlement and allocation procedures to all Tribes and will use best efforts to secure 100% participation.

B. *Notice to Unrepresented Tribes*. The Directors shall provide notice of the settlement to each Non-Litigating Tribe, each of which shall have the same rights as the Litigating Tribes to determine the final Tribal Allocation Distribution Percentage for that Tribe.

C. *Tribal Participation Form*. Attached hereto as Exhibit E is the Tribal Participation Form. A Tribe's executed Participation Form is evidence of its status as a Party to this Agreement, and the executed Participation Forms and their terms are incorporated herein by reference. Each Tribe will decide whether to become a Participating Tribe for both this Agreement the the Teva Tribal Settlement Agreement, or neither. However, if Teva enters bankruptcy prior to the Effective Date, Eligible Entities can choose to only join this Agreement.

D. *Dismissal of Claims*. Each Participating Tribe, either directly or through its counsel, shall provide a dismissal with prejudice of all Released Claims by that Tribe against Released Entities. Dismissal of a Litigating Tribe's complaint against Released Entities shall be filed only upon the occurrence of the Effective Date. The Parties will coordinate a streamlined dismissal process with the MDL Court that will allow for a bulk filing of the agreed dismissal.

E.    *Eligible Entities*. Exhibit A-1 and A-2 together set forth all entities eligible to participate in this Agreement ("*Eligible Entities*"):

    1.    Each entity listed on Exhibit A-1 is either (1) a federally recognized tribe that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and that has filed an opioid case in MDL No. 2804 or in a case pending in State court, or (2) a "tribal organization," as defined in 25 U.S.C. § 5304(I), or an "inter-tribal consortium," as defined in 25 U.S.C. § 5381(a)(5), that provides health care pursuant to contracts/compacts with the Indian Health Service, and that has filed an opioid case in MDL No. 2804 or in a case pending in State court. Exhibit A-1 includes the filing docket number and counsel of record for the listed entity. Each entity listed on Exhibit A-1 is entitled to participate in the settlement.

    2.    Exhibit A-2 includes entities that are federally recognized tribes that the U.S. Secretary of the Interior acknowledges as an Indian Tribe, as provided in the Federally Recognized Tribe List Act of 1994, 25 U.S.C. § 5130, and that have not filed an opioid case in MDL No. 2804 or in a case pending in State court. Exhibit A-2 also includes Alaska Native "tribal organizations," as defined in 25 U.S.C. § 5304(I) and "inter-tribal consortia," as defined in 25 U.S.C. § 5381(a)(5), that provide health care pursuant to contracts/compacts with the Indian Health Service, and that have not filed an opioid case in MDL No. 2804 or in a case pending in State court. Each entity listed on Exhibit A-2 is entitled to participate in the settlement.

F.    *Calculating Tribal Allocation Voting Percentages for Tribal Health Organizations and Inter-Tribal Consortia.*

    1.    <u>In Alaska</u>: For purposes of determining whether the 95% participation threshold of Litigating Tribes has been met, the full amount of the Tribal Allocation Voting Percentage as listed on Exhibit C shall be used for each litigating Alaska Tribal Health Organization, litigating Alaska inter-tribal consortium, or litigating Alaska Tribe which is participating in the settlement. In the event that a litigating Alaska Tribe which is not listed in Exhibit C, and which is a member of a listed Alaska Tribal Health Organization or Alaska inter-tribal consortium, affirmatively decides not to participate in the settlement, then the Tribal Allocation Voting Percentage, as computed pursuant to the footnote set forth in Exhibit C, of that non-participating Alaska Tribe shall be calculated and deducted from the Tribal Allocation Voting Percentage of its Tribal Health Organization or inter-tribal consortium for purposes of determining whether the 95% participation threshold has been met.

    2.    <u>Outside of Alaska</u>: Litigating Tribal Health Organizations and inter-tribal consortia outside of Alaska have no Tribal Allocation Voting Percentage

listed on Exhibit C and accordingly their participation in the settlement shall not count toward the 95% participation threshold.

## VII.  PLAINTIFFS' ATTORNEYS' FEES AND COSTS

A.  The procedures to allocate and disburse the Attorney Fee Fund to Litigating Tribes' counsel shall be the subject of a separate document to which Allergan and the Released Entities shall not be parties. Any costs incurred in allocating and disbursing the Attorney Fee Fund shall be borne by the Attorney Fee Fund.

B.  An attorney representing the Participating Tribes may not receive any payment from the Attorney Fee Fund unless such attorney presents this settlement to each tribal opioid client in good faith and uses best efforts to secure participation as set forth in Paragraph VI.A above.

C.  For the avoidance of doubt, the TLC shall propose and receive approval from the MDL Court for any funds to be paid to the Common Benefit Fund, as defined in Judge Polster's May 9, 2022 Order (ECF No. 4428), such that Allergan is under no obligation to hold back any funds for any Common Benefit Assessment. Any funds owed to the Common Benefit Fund shall be paid from the Attorney Fee Fund.

D.  Allergan agrees that attorneys representing Participating Tribes have timely reached a settlement for Released Claims with Allergan and/or Released Entities, such that these attorneys may be eligible for Common Benefit Fund consideration as set forth in Exhibit R of the Global Settlement.

## VIII.  DISPUTE RESOLUTION

A.  Any disputes arising out of this Agreement shall be heard before Judge Dan Aaron Polster, United States District Judge for the Northern District of Ohio, or another judge presiding over MDL No. 2804.

## IX.  SET-OFF

A.  The Parties recognize that some of the Participating Tribes are pursuing Claims against Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates. If any of them achieves a judgment by verdict, judicial decision, or means other than settlement against any of Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates, each plaintiff listed above shall represent and agree that any payment(s) that the Participating Tribes or their counsel receives from Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates reflects the amount over and above 56% of the amount they or their counsel received from the Allergan Settlement Agreement that each

and all of them deem to reflect a fair overall settlement value for liability attributable to the generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and/or other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016.

B.    The Participating Tribes may reach a settlement agreement with Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates that resolves some or all of their respective Claims. In that event, the Releasors represent and agree that any payment(s) that the Participating Tribes or their counsel receives from Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates reflects the amount over and above 56% of the amount they or they counsel received from the Allergan Settlement Agreement that each and all of them deem to reflect a fair overall settlement value for liability attributable to the generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and/or other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016. In any such settlement agreement with Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates, the Participating Tribes agree that the agreed settlement amount reflects the value the parties to the agreement deem a fair settlement value over and above the payments made or due to be paid under the Allergan Settlement Agreement for generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or relate to the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016.

## X.    MISCELLANEOUS

A.    *No Admission*. Allergan does not admit liability or wrongdoing. This Agreement shall not be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to Allergan.

B.    *Third-Party Beneficiaries*. Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not a Participating Tribe or Released Entity. For the avoidance of doubt, each Participating Tribe shall be a third-party beneficiary of this Agreement, to the extent it is not a Party to this Agreement. No Participating Tribe may assign or otherwise convey any right to enforce any provision of this Agreement and no entity except the TLC shall have the right to enforce any provision of this Agreement on behalf of all Participating Tribes. Nothing in this

Agreement extends to the TLC or Participating Tribes the authority to enforce injunctive terms provided in state-court consent judgments implementing Allergan's national settlement with state and local governments, which shall be enforceable only as provided therein; however, Allergan acknowledges that said injunctive terms apply equally on tribal and non-tribal lands within a State.

C.    *Construction*. None of the Parties and no Tribe shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

D.    *Cooperation*. Each Party agrees to use its best efforts and to cooperate with the other Parties to cause this Agreement to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement by any other person, and will support the integrity and enforcement of the terms of this Agreement.

E.    *Entire Agreement*. This Agreement, its Exhibits and any other attachments, embodies the entire agreement and understanding between and among the Parties relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

F.    *Execution.* This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement. One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall constitute an original counterpart hereof. One or more counterparts of this Agreement may be signed by electronic signature.

G.    *Good Faith and Voluntary Entry*. Each Party warrants and represents that it negotiated the terms of this Agreement in good faith. Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion. The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

H.    *No Prevailing Party*. The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the

24

Parties have reached a good faith settlement. The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

I.      *Non-Admissibility*. The settlement negotiations resulting in this Agreement have been undertaken by the Parties in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose. This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement.

J.      *Notices*. All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For the Tribal Leadership Committee:

> Lloyd Miller / Don Simon / Whitney Leonard
> Sonosky, Chambers, Sachse, Miller & Monkman, LLP
>
> Geoffrey Strommer / Caroline Mayhew /
> Edmund Goodman
> Hobbs, Straus, Dean & Walker, LLP
>
> Tara Sutton / Tim Purdon
> Robins Kaplan LLP
>
> Lynn Sarko
> Keller Rohrback, L.L.P.
>
> Roe Frazer
> Frazer PLC
>
> Peter Mougey
> Levin Papantonio Rafferty
>
> Scott Gilbert
> Gilbert LLP
>
> Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
> Lieff Cabraser Heimann & Bernstein LLP
>
> Jane Joseph / Steve Skikos
> Skikos, Crawford, Skikos & Joseph LLP

25

For Allergan:

> Office of General Counsel
> One North Waukegan Road
> North Chicago, IL 60064
>
> Copy to Allergan's attorneys at:
>
> James F. Hurst, P.C.
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, IL 60654
> james.hurst@kirkland.com

> Any Party or the TLC may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this subsection.

K.    *No Waiver*. The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties. The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

L.    *Preservation of Privilege*. Nothing contained in this Agreement, and no act required to be performed pursuant to this Agreement, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

M.    *Successors*. This Agreement shall be binding upon, and inure to the benefit of, Allergan and its respective successors and assigns. Allergan shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to Allergan's obligations under this Agreement.

N.    *Modification, Amendment, Alteration*. After the Effective Date, any modification, amendment, or alteration of this Agreement by the Parties shall be binding only if evidenced in writing signed by Allergan along with the signatures of the Tribal Leadership Committee.

O.    *Termination*.

1.    Unless otherwise agreed to by Allergan and the Tribe in question, this Agreement and all of its terms shall be canceled and terminated with respect to the Tribe, and the Agreement shall become null and void and of no effect if one or more of the following conditions applies:

26

a.  The Tribe in question does not sign the Tribal Participation Form; or

b.  An insufficient number of Tribes sign the Tribal Participation Form.

2.  If this Agreement is terminated with respect to the Tribes, then:

a.  An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date of this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that Allergan and the Participating Tribe in question shall be in the same position with respect to the statute of limitation as they were at the time the Participating Tribe filed its action; and

b.  Allergan and the Participating Tribe in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Allergan and the Tribe in question shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

3.  Unless Allergan and the TLC agree otherwise, this Agreement shall terminate as to all Parties as of the final payment date, provided that Allergan has performed its payment obligations under this Agreement as of that date.

P.  *Governing Law.* Except (1) as otherwise provided in the Agreement or (2) as necessary, in the sole judgment of Judge Polster or another district judge of the U.S. District Court for the Northern District of Ohio supervising MDL No. 2804, to promote uniformity of interpretation for matters, this Agreement shall be governed by and interpreted in accordance with the respective laws of the State of Ohio without regard to the conflict of law rules of such State. Notwithstanding any other provision in this subsection on governing law, the United States District Court for the Northern District of Ohio shall retain jurisdiction to enforce this Agreement. Notwithstanding any other provision in this subsection on governing law, any disputes relating to the Settlement Fund Escrow shall be governed by and interpreted in accordance with the law of the State where the escrow agent has its primary place of business.

**For the Tribal Leadership Committee:**

Lloyd Miller / Don Simon / Whitney Leonard
Sonosky, Chambers, Sachse, Miller & Monkman, LLP

27

_____
Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____
Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____
Lynn Sarko
Keller Rohrback, L.L.P.


_____
Roe Frazer
Frazer PLC


_____
 Peter Mougey
Levin Papantonio Rafferty


_____
Scott Gilbert
Gilbert LLP


_____
Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____
Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

28

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker,

Tara Sutton / Tim Purdon
Robins Kaplan LLP


Lynn Sarko
Keller Rohrback, L.L.P.


Roe Frazer
Frazer PLC


Peter Mougey
Levin Papantonio Rafferty


Scott Gilbert
Gilbert LLP


Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____      12/21/2022

Lynn Sarko
Keller Rohrback, L.L.P.


_____

Roe Frazer
Frazer PLC


_____

 Peter Mougey
Levin Papantonio Rafferty


_____

Scott Gilbert
Gilbert LLP


_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

28

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

Tara Sutton / Tim Purdon
Robins Kaplan LLP

Lynn Sarko
Keller Rohrback, L.L.P.

Roe Frazer
Frazer PLC

Peter Mougey
Levin Papantonio Rafferty

Scott Gilbert
Gilbert LLP

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

28

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____

Lynn Sarko
Keller Rohrback, L.L.P.


_____

Roe Frazer
Frazer PLC

_____

 Peter Mougey
Levin Papantonio Rafferty


_____

Scott Gilbert
Gilbert LLP


_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP


_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP


_____

Lynn Sarko
Keller Rohrback, L.L.P.


_____

Roe Frazer
Frazer PLC


_____

 Peter Mougey
Levin Papantonio Rafferty


_____

Scott Gilbert
Gilbert LLP


_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP


_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

_____

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

_____

Tara Sutton / Tim Purdon
Robins Kaplan LLP

_____

Lynn Sarko
Keller Rohrback, L.L.P.

_____

Roe Frazer
Frazer PLC

_____

Peter Mougey
Levin Papantonio Rafferty

_____

Scott Gilbert
Gilbert LLP

_____

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP

_____

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

28

Geoffrey Strommer / Caroline Mayhew /
Edmund Goodman
Hobbs, Straus, Dean & Walker, LLP

Tara Sutton / Tim Purdon
Robins Kaplan LLP

Lynn Sarko
Keller Rohrback, L.L.P.

Roe Frazer
Frazer PLC

Peter Mougey
Levin Papantonio Rafferty

Scott Gilbert
Gilbert LLP

Elizabeth J. Cabraser / Dan Drachler / Eric B. Fastiff
Lieff Cabraser Heimann & Bernstein LLP

Jane Joseph / Steve Skikos
Skikos, Crawford, Skikos & Joseph LLP

28

**For Allergan and AbbVie:**

By: _____          Date: _12/16/2022_

    Scott T. Reents
    Executive Vice President, Chief Financial Officer of AbbVie Inc.
    Chief Financial Officer, Allergan Limited
    Treasurer, Allergan Finance, LLC
    1 North Waukegan Road
    North Chicago, IL 60064
    *On Behalf of Allergan and AbbVie*