**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | CASE NO. 1:17-MD-2804 |
| THIS DOCUMENT RELATES TO: | ) ) ) | JUDGE POLSTER |
| *All Cases* | ) ) ) ) ) | ORDER REGARDING SUBPOENA FOR UPDATED ARCOS DATA |

As explained in the Court's *Order Regarding ARCOS Subpoena*, the Plaintiffs Executive Committee ("PEC") has submitted a letter-motion seeking to enforce a subpoena it served upon the United States Drug Enforcement Administration ("DEA") for production of updated ARCOS data; and DEA submitted a letter-response. *See* (docket no. 5072) (attaching the two letters). The Court then invited "any MDL defendant who wishes to file a position statement regarding the issues raised" by the two letters to do so, *id.* at 1, and various defendants did. *See* docket nos. 5092 (Costco), 5093 (AmerisourceBergen, McKesson, and Cardinal), 5094 (14 non-litigating "Remaining Defendant" families), 5095 (Publix and Kroger), 5096 (CVS, Walgreens, and Walmart), and 5105 (N.C. Mutual Wholesale Drug). The PEC then filed a reply, *see* docket no. 5109. Also, the Attorneys General from New York, California, Delaware, Illinois, Oregon, and Virginia submitted a joint position statement, *see* docket no. 5111.

Having considered carefully the parties' positions, and for the reasons stated below, the Court now **GRANTS** the PEC's motion to enforce the subpoena. The Court directs the PEC and

DEA to meet and confer and come to agreement regarding the timing and format of this production, as discussed further in Section II.D, below. The PEC and DEA will promptly bring any disagreements regarding data production to Special Master Cohen for resolution.

I. **Background.**

ARCOS – which stands for Automation of Reports and Consolidated Orders System – is "an automated, comprehensive drug reporting system [overseen by DEA] which monitors the flow of DEA controlled substances [such as opioids] from [1] their point of manufacture through [2] commercial distribution channels to [3] point of sale or distribution at the dispensing/retail level."[1] Put more simply, ARCOS tracks every single opioid pill from its point of manufacture, through the distribution chain, to its destination at a doctor's office, hospital or pharmacy. ARCOS does not track to which patients these opioid pills are ultimately dispensed – there are other databases that do that.

Given what ARCOS does, the importance of ARCOS data to this multidistrict litigation cannot be overstated. Beginning over five years ago, plaintiffs in this MDL claimed that opioid manufacturers and distributors jointly created a public nuisance by, among other things, producing, shipping, and marketing opioid pills far in excess of what society needed or could safely use, ultimately causing national opioid addiction rates and related public ills to skyrocket. To prove their claims, one of the first discovery efforts plaintiffs undertook was to seek ARCOS data. DEA and defendants fought hard against production of ARCOS data, including entreaties that any production the Court did order be protected from public disclosure.

---

[1] Quoted language found at https://www.deadiversion.usdoj.gov/arcos/ (July 9, 2023).

The Court resolved this dispute in early 2018, concluding that "[d]iscovery of precisely which manufacturers sent which drugs to which distributors, and which distributors sent which drugs to which pharmacies and doctors, is critical not only to all of plaintiffs' claims, but also to the Court's understanding of the width and depth of this litigation." *First ARCOS Order* at 8 (docket no. 233); *see also id.* at 6 (to pursue their claims, plaintiffs need to know "(a) which manufacturers (b) sold what types of pills (c) to which distributors; [and] (d) which distributors (e) sold what types of pills (f) to which retailers (g) in what locations"). The Court also chose a data cut-off date of 2014, to ensure that exposure of the data would not interfere with any ongoing law enforcement proceeding. Ultimately, the Court ruled DEA had to produce ARCOS data regarding 14 opioid drugs "for the entire United States, for the period of January 1, 2006 through December 31, 2014." *Second ARCOS Order* at 2 (docket no. 397). The Court gave DEA a 17-day deadline to complete production of this discovery. *Id.*[2]

Although the Court rejected in 2018 all of DEA's "12 different objections to Plaintiffs' subpoena" for ARCOS data, *First ARCOS Order* at 13 (docket no. 233), the Court did agree with DEA that the data should not be made public; accordingly, the Court ordered that the ARCOS data would be governed by a protective order and "[n]o person shall disclose the data or allow use of the data except as necessary for a submission to the court or at trial," *id.* at 22. The Washington Post

---

[2] More specifically, the Court first ordered DEA to produce ARCOS data for four opioid drugs in six states, and gave DEA a 9-day deadline. *See First ARCOS Order* at 9 (docket no. 233). DEA met this deadline. *See* docket no. 247. The Court later ordered DEA to produce ARCOS data for the same four opioid drugs for the rest of the country, and gave DEA a 17-day deadline. *See Second ARCOS Order* at 2 (docket no. 397). DEA completed this task in only 10 days. *See* docket no. 468. Finally, the Court ordered DEA to produce ARCOS data for 10 additional opioid drugs for the entire country, and directed production to occur "as soon as reasonably possible . . . on a rolling basis." *Third ARCOS Order* at 2 (docket no. 668). DEA finished producing virtually all of this data in about 3 weeks. *See* docket nos. 552, 695, 766, & 898.

3

and other media companies appealed this latter ruling, however, and won: the Sixth Circuit reversed, concluding "the ARCOS data and the insight it will provide into the opioid epidemic should be brought to light." *In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919, 938 (6th Cir. 2019); *see id.* at 926 (agreeing with this Court that ARCOS data "provid[es] invaluable, highly-specific information regarding historic patterns of opioid sales").

Subsequent events have proved that requiring public production of the ARCOS data was both wise and monumental. ARCOS data has provided "essential" and "indispensable" structural undergirding to virtually every aspect of this MDL, both in litigation and in settlement – including "enabling the parties to file and amend complaints, design discovery, bring and defend motions, develop damages and abatement models, inform experts, prepare for trial, and engage in meaningful settlement discussions." *Pharmacy Settlement Order* at 19 (docket no. 5088). Defendants in opioid cases have so far settled for over $55 Billion, and it is fair to say none of this would have been possible without production of the ARCOS data.

Now, five years after DEA produced the ARCOS data for the period of 2006 through 2014, plaintiffs seek to have it updated through 2019.[3] The Court concludes this request is both reasonable and necessary, pursuant to Fed. R. Civ. P. 26(b)(1).

## II. Analysis.

As occurred in 2018, DEA and all defendants unanimously object to production of the

---

[3] Specifically, "the PEC seeks complete transactional data for all prescription buprenorphine, codeine, dihydrocodeine, fentanyl, hydrocodone, hydromorphone, levorphanol, meperidine, methadone, morphine, opium powdered, oxycodone, oxymorphone, and tapentadol transactions in all states and territories in the United States for the period of January 1, 2015 through December 31, 2019." Docket no. 5072-2 at 1 (DEA Letter to Special Master Cohen (June 15, 2023)).

subpoenaed, updated ARCOS data. The objections DEA and defendants raise are largely the same as those they voiced in 2018; and the objections fail now for the essentially the same reasons. The Court addresses each objection below.

### A. Relevance.

Whether the ARCOS data is relevant is, of course, the touchstone of the Court's analysis. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."). As explained in the background section above, ARCOS data is not merely relevant to the claims and defenses of the parties in this MDL, it is "invaluable," "essential," and "indispensable" to the litigation. Indeed, in 2018, even though "DEA and the defendants [initially] argued successfully the ARCOS data was not necessary for settlement," "DEA and defendants also ***conceded*** the data was ***relevant and necessary to litigation***." *First ARCOS Order* at 7 (docket no. 233); *see id.* at 7-8 ("it is certain that all of the detailed information in the database is necessary for ***litigation***, as the defendants recognized") (emphasis in original). In fact, it is fairly obvious that information detailing which entities made and shipped which opioids where and in what amounts is, at the very least, "relevant" to national opioids litigation.

Nonetheless, DEA and defendants now argue again – though somewhat half-heartedly – that the updated ARCOS data plaintiffs now seek is not relevant. For example, DEA notes that, in 2018, the Court undertook a relevance analysis, ordered production of tranches of ARCOS data in three separate Orders, and stated in the third Order that "[t]his directive for release of additional ARCOS

data will be the last one made by the MDL Court." *Third ARCOS Order* at 2 (docket no. 668); *see* footnote 2, above.  This statement, however, was simply a warning to the parties that the Court would not then continue ordering piecemeal enlargements of ARCOS data production.  With its three Orders, the Court ultimately required DEA to produce in 2018 certain data fields for 14 specific opioid drugs for a defined time period,[4] and the Court instructed the parties not to come knocking yet again soon with incremental requests for additional information.  Notably, the PEC heeded this warning and subsequently sought data regarding other drugs only from the Pharmacy Defendants and not from DEA. *See Order Regarding Pharmacy Data Production* (docket no. 3106) (Special Master ordering production of 34 fields of transactional dispensing data for relevant opioid drugs and also 14 types of benzodiazapines and 4 muscle relaxants, "because it is known that patients receiving all three of these drugs together are more likely to be opioid addicts engaged in 'doctor shopping' and in presentation of questionable or suspicious prescriptions").

In any event, the Court's "last one" statement in 2018 simply addressed immediate circumstances and was certainly not meant to ban permanently any request for updated ARCOS data, especially a request made five years later.  Moreover, the PEC is correct that the Court and parties did not and could not account for "unforeseeable delays," like the pandemic, such that five years have passed "without resolution or bellwether development of cases against PBM [defendants] and [many dozens of] Tier 2 and 3 Defendants." Docket no. 5109 at 7.  Claims brought by hospitals, third-party payors, and other categories of plaintiffs also remain pending against all defendants,

---

[4]  *See First ARCOS Order* at 15 (docket no. 233) (ordering production of "data related only to all prescription oxycodone, hydrocodone, hydromorphone, and fentanyl transactions, including combination products"); *id.* at 4 (listing the specific ARCOS data fields requested by the PEC, and the requested time period); *Third ARCOS Order* at 2 (docket no. 668) (ordering production of the same data fields for another 10 opioid drugs).

including those who characterize themselves as having "settled." *See, e.g.*, docket no. 5093 at (Big Three Distributors call themselves "Settled Distributor Defendants," and argue ARCOS data should not be produced from "parties that already have settled," even though claims in hundreds of MDL cases remain pending against them).

Beyond asserting the Court "already concluded" in 2018 that additional ARCOS data would never be relevant, both DEA and defendants argue that production of updated 2015-2019 ARCOS data is simply not necessary and even counterproductive, especially with regard to settlement. For example, DEA observes "the PEC has repeatedly established liability and market share with ARCOS data in its possession," and asserts the PEC "has not demonstrated how additional ARCOS data would meaningfully alter that prior analysis." Docket no. 5072-2 at 4. Similarly, 14 non-litigating "Remaining Defendants" assert that "Plaintiffs can use the [ARCOS] data they already have to advance any resolution efforts with Remaining Defendants, just as they did with previous defendants," and observe plaintiffs have successfully negotiated settlements *without* updated ARCOS data as recently as the past several months. Docket no. 5094 at 2. Remaining Defendants go so far as to assert production of updated ARCOS data would "only disrupt and delay any resolution efforts," because: (1) all parties would have to undertake "costly efforts to review and interpret the data, including through retained experts;" (2) the parties would then "need to devote resources toward resolving disagreements about the meaning of the [new] data;" and (3) this "process would divert significant time and resources and undoubtedly delay the prospect of any meaningful resolution discussion by many months." *Id.* at 2-3. Other defendants echo these

themes.[5]

As an initial matter, the Court in 2018 rejected defendants' argument that, just because ARCOS data may not be **necessary** for **settlement**, it is also **irrelevant** to **litigation**. *First ARCOS Order* at 7-8 (docket no. 233). Under Fed. R. Civ. P. 26 and Fed. R. Evid. 401, discovery may be relevant even if, as defendants assert, its production somehow works to slow settlement negotiations.

Moreover, the arguments by DEA and defendants that updated ARCOS data is irrelevant to any ongoing litigation in this MDL are simply not tenable. The Sixth Circuit agreed in 2019 that ARCOS data was "invaluable," 927 F.3d at 926. It is not possible that the same information, when updated to be more complete, can morph from "invaluable" and "essential" to "irrelevant." Indeed, having presided over discovery and trial in numerous bellwether cases, the Court is certain the PEC is correct that "updated ARCOS data detailing the prescription opioid supply through 2019 is relevant and *increasingly* important to current MDL cases for which trial will commence in or after 2024." Docket no. 5109 at 2 (emphasis added). As the PEC explains:

> Several Defendants nonetheless try to freeze Plaintiffs' claims going forward to be based solely on the 2006 to 2014 prescription opioid supply without regard to how supply in intervening years bears on claims of a continuing public nuisance in and after 2024. These arguments cannot be squared with the Federal Rules of

---

[5] *See* docket no. 5095 at 1-2 (Publix and Kroger contend that: (1) "the absence of ARCOS data from 2015-2019 had no apparent effect on CVS'[s], Walgreens', and Walmart's ability to settle claims on a national scope;" and (2) "Publix does not believe the ARCOS Data from 2015-2019 would provide any benefit to the ongoing settlement negotiations between Publix and the PEC or plaintiffs more generally. Indeed, Publix believes the introduction of such data would unnecessarily prolong the negotiations at a minimum."); docket no. 5096 at 2 (CVS, Walgreens, and Walmart contend that: (1) "the national settlements reached with CVS, Walgreens, Walmart and other major defendants were reached without such data," and (2) "the PEC did not seek or purport to need updated ARCOS data in the Track 3 trial, which concluded in May 2022"); docket no. 5092 at 2 (Costco contends plaintiffs "already have access to nearly a decade of ARCOS data, and they have used it to successfully resolve dozens of cases, including through numerous settlements reached in the last several months").

> Evidence, under which "[e]vidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. Here, if the 2015 to 2019 ARCOS data shows that the prescription opioid supply contracted while illicit opioid use was increasing, this would provide more support for Plaintiffs' theory that earlier-period prescription supply drove later-period illicit-use. Alternatively, if the 2015 to 2019 ARCOS data shows that the prescription supply held steady or increased and may have continued to fuel addiction, this too would bear on the non-settled Defendants' liability for the continuing nuisance based on their manufacturing, distribution, and/or dispensing conduct, particularly if these Defendants expanded their market presence during this period. In no event can Defendants and DEA force Plaintiffs to fly blind as to how the 2015 to 2019 prescription supply bears on their claims of a continuing public nuisance in and after 2024. The 2015 to 2019 prescription opioid supply is plainly relevant to Plaintiffs' claims.

*Id.* at 3 (footnote omitted).

Further, State Attorneys General from New York, California, Delaware, Illinois, Oregon, and Virginia all joined to "write[] in support of the PEC's motion to enforce the [updated ARCOS] subpoena," stating that "this data would be invaluable to [their own] ongoing opioid-related litigation and investigations." Docket no. 5111 at 1. The Attorneys General explain they support the PEC's request because, among other reasons, "data obtained from ARCOS is complete, comprehensive, objective, and reliable in a way that information procured [from defendants or third parties] by subpoena often falls short." *Id.* at 2. In other words, the data is highly relevant to their parallel litigation. The Attorneys General also second the PEC's observations that: (1) to date, "access to ARCOS has played no small part in effective investigations and litigations, as well as successful non-litigation resolutions that have benefitted all parties by efficiently reaching comprehensive settlements;" and (2) updating the ARCOS data will provide "a tool to evaluate and develop [still-existing] investigations and [ongoing] claims that [the States] and other Opioids

9

Litigation plaintiffs already have, in a way that is far more efficient and reliable than other means such as individual subpoenas – to the benefit of plaintiffs, defendants, and courts alike." *Id.*

Ultimately, "MDL Plaintiffs continue to have claims against certain national retail pharmacy chains, as well as 'Tier 2' and 'Tier 3' opioid manufacturers, distributors and dispensers and PBM Defendants." Docket no. 5072-1 at 2 (referring to smaller manufacturer-, distributor- and dispenser-defendants that, unlike larger "Tier 1" defendants, have not settled). Based on its own experience, the Court must agree with the PEC that "2015 to 2019 transactional ARCOS data is as relevant to the cases against these Defendants being litigated in 2023 as the earlier-period data was relevant, by DEA's own admission, to cases against other Defendants that were being litigated five years ago in 2018." *Id.* Indeed, it would make no sense to ask a jury to determine in, say, 2024 whether a defendant is contributing to an ***ongoing*** public nuisance, but deny the parties access to ARCOS data newer than 10 years old.

In sum, the Court soundly rejects the contention by DEA and defendants that it should deny the PEC's request for discovery of updated ARCOS data because the subpoenaed information is not relevant to MDL cases.

B.  **Competitive Harm and Diversion.**

The "Big Three Distributor" defendants – AmeriSourceBergen, Cardinal, and McKesson – repeat two arguments they made in 2018. First, they assert that "the public release of the ARCOS data – which is the compilation of their and other companies' customer-by-customer controlled substances transactional data – can result in competitive harm to them and hamper their anti-diversion efforts." Docket no. 5093 at 6. But the Big Three Distributor defendants do not support

this bare assertion with any proof (or even any suggestion) that they actually suffered competitive harm after the ARCOS data was publicly released in 2018. Apparently, this Court was correct in its 2018 holding that the claim of competitive harm "was conclusory" and that "market data over three years old carrie[s] no risk of competitive harm." *First ARCOS Order* at 17 (docket no. 233). Also correct was the Sixth Circuit's observation that the "ARCOS data does not contain sensitive information like trade secrets, and the age of the data makes the risk of anticompetitive harm slight and speculative." *In re National Opiate Prescription Litig.*, 927 F.3d at 937. Given that the PEC's subpoena asks for production of ARCOS data only through 2019, this Court again easily overrules defendants' objection premised upon alleged competitive harm.

The second assertion that both DEA and the Big Three Distributors repeat from 2018 is that honoring the PEC's request will force production of "law enforcement confidential data." Docket no. 5093 at 5; *see* docket no. 5072-2 at ECF 18 ("disclosure of 2018 and 2019 data, in particular, may undermine DEA's ongoing diversion efforts"). Both this Court and the Sixth Circuit rejected the same assertion in 2018. *See First ARCOS Order* at 16 (docket no. 233) ("Given that the most recent data is over three years old, it is untenable that exposure of the data will actually or meaningfully interfere with any ongoing enforcement proceeding."); *In re National Opiate Prescription Litig.*, 927 F.3d at 937 ("DEA's stated law enforcement interests do not seem very weighty"); *id.* at 935 (finding unconvincing "the DEA's vague assertion that disclosing the ARCOS data 'would undermine DEA's mission of investigating and prosecuting misconduct involving controlled substances,'" especially since the data "is at least four years old"). Moreover, the six State Attorneys General insist that release of updated ARCOS data will actually ***improve*** law enforcement, *see* docket no. 5111 at 1-2, even though DEA already provides them with semi-annual

reports based on ARCOS data "for their use in state law enforcement efforts," *see* docket no. 5072-2 at 17, ¶19.  Again, given that the PEC seeks updated ARCOS data only through 2019, this Court easily overrules any objection premised upon law enforcement interests.

### C.  Amending Complaints.

The 14 "Remaining Defendants" also object that "production of updated ARCOS data would be counterproductive, because Plaintiffs have said they will use the data to amend their MDL complaints and to file new lawsuits."  Docket no. 5094 at 3.  These defendants assert this Court has stated a "goal . . . to narrow claims, eliminate parties, and resolve cases where possible;" therefore, "[a]llowing Plaintiffs to access new data they intend to use to further *expand* the MDL would be counterproductive."  *Id.* at 4 (emphasis in original).  Other defendants voice the same concerns.[6]

Defendants are correct that, if Plaintiffs seek to amend complaints years after their cases were filed and made part of this MDL, it will raise some real concern.  *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 842 (6th Cir. 2020) (granting mandamus relief where this MDL Court granted a motion to amend the complaint "more than 10 months after discovery had closed");

---

[6] *See* docket no. 5095 at 4 (Publix and Kroger: "Any attempt by the PEC to utilize the ARCOS Data from 2015-2019 to add additional parties or claims to this 'mature' MDL that is effectively closed to new matters would improperly move the MDL further away from an efficient resolution.  Moreover, there is no legitimate argument that new ARCOS data from 2015-2019 would actually illuminate new parties or claims that could not have been brought previously."); docket no. 5092 at 4 (Costco: "adding new claims now is flatly inconsistent with the Court's stated goal of 'winnow[ing] and resolv[ing] remaining cases and claims,' Dkt. 4742, and the JPML's conclusion that the drawbacks of adding additional claims to the MDL outweigh the benefits. * * * Plaintiffs should not be permitted to hijack a process that was designed to cull the remaining claims and turn it into one that could dramatically expand the scope and duration of the MDL."); docket no. 5093 at 6 (Big Three Distributors: "if the Court were to entertain a motion by the PEC to amend any particular complaint, the PEC certainly does not need more recent ARCOS data to do so vis-à-vis Settled Distributor Defendants").

*compare* docket no. 4747 at 2 (Sixth Circuit denying mandamus relief where this MDL Court granted a motion to amend the complaint in a case after it was selected as a bellwether and before discovery began, but noting "the order went right to the edge of the district court's discretion under Rule 16"). Defendants are also correct that allowing amendment of complaints based on updated ARCOS data might "be at cross-purposes to any resolution process." Docket no. 5094 at 4.

But that issue is not before the Court. In its letter-motion, the PEC did ***not*** argue it needed updated ARCOS data in order to amend complaints or file new cases. Rather, the PEC argued only that updated ARCOS data was necessary for and relevant to ongoing litigation, as well as useful in settlement efforts, both of which assertions are certainly true. Plaintiffs may or may not later move for amendment of complaints based on updated ARCOS data. If they do, the Court will rule on those motions based on the Federal Rules of Civil Procedure, the arguments and case-law provided in the parties' briefs, and the guidance provided by the Sixth Circuit in its above-cited mandamus rulings. Ultimately, however, the possibility that the PEC ***might*** use updated ARCOS data in the future as a basis to move to amend complaints is extraneous to the Court's analysis under Rule 26(b)(1).

### D.     Undue Burden.

Next, DEA insists that, even if the requested discovery is "relevant to any party's claim or defense," the Court should still deny the PEC's motion because the updated ARCOS data is not "proportional to the needs of the case," and "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Regarding proportionality, DEA argues that, "notwithstanding that this Court and the Sixth Circuit found the previous tranche of data relevant,

13

the PEC has a continuing obligation to establish why *this* set of evidence is relevant" and meaningfully advances the analysis derived from the 2018 ARCOS production. Docket no. 5072-2 at 3.

The Court agrees, and concludes the PEC has met this obligation. As the PEC and the Attorneys General explain, their existing claims for public nuisance "remain[] ripe for litigation so long as the nuisance persists—which there can be no doubt that [plaintiffs claim] it does—such that all industry actors who have caused, contributed to, or maintained the nuisance remain properly subject to investigation or suit." Docket no. 5111 at 2; *see* docket no. 5109 at 5 ("Plaintiffs' claims against Unsettled Defendants alleging a ***continuing*** public nuisance now are over five years removed from the ARCOS Orders and nearly ten years removed from the produced data.") (emphasis added).[7] In other words: the more recent the ARCOS data, the more relevant it is to a claim of ***ongoing*** public nuisance.

In sum: there remain many dozens of defendants in thousands of MDL cases; plaintiffs in those cases assert claims that these remaining defendants have caused and are continuing to cause an ongoing public nuisance; and the centrality of ARCOS data to those nuisance claims makes the PEC's request proportionate to the needs of those cases.

DEA also asserts that production of the requested data is unduly burdensome because the

---

[7] Even DEA believes at least one MDL defendant was continuing to cause a public nuisance as of two months ago. *See Morris & Dickson Co., LLC; Decision and Order, docket no. 18-31*, 88 Fed. Reg. 34523 (May 30, 2023) ("the Agency finds substantial record evidence that [Morris & Dickson's] continued registration is inconsistent with the public interest in light of the long-term, egregious failures of Respondent in its responsibility as a distributor to maintain effective controls against diversion of controlled substances. Furthermore, the Agency finds that Respondent has failed to demonstrate that the Agency should continue to entrust it with its controlled substance registrations."). *See also* https://www.npr.org/2023/05/26/1178372700/dea-morris-dickson-drug-distributor-license-opioid-crisis.

subpoena demands production in 30 days, and the requested ARCOS data needs to be extracted from the database, converted to Excel, validated using a 44-step algorithm, reviewed, and corrected where necessary. Docket no. 5072-2 at 4-5. DEA posits it will take five full-time employees an entire month to do this, and its Reports Analysis Unit only has 16 employees. *Id.* at 5. DEA notes this Court "must quash or modify a subpoena that: (i) fails to allow a reasonable time to comply; * * * or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(i, iv).

In this instance, the Court will modify the subpoena, not quash it. The PEC told DEA from the start that it "would be happy to work with you to establish a reasonable schedule for disclosure of the requested data." Docket no. 5072-1 at 7. More recently, the PEC "committ[ed] to working cooperatively with DEA to streamline the production process while ensuring proper validation," docket no. 5109 at 8, and suggested a "staged production by DEA as it did in 2018," with data rolled out over 35 days, docket no. 5072-1 at 3. The Court is confident DEA and PEC can work out an agreed schedule for production. Indeed, after hearing DEA's position in 2018, DEA produced nine years' worth of ARCOS data in native format in only 10 days.[8] The PEC is currently asking for only five years' worth of data over 35 days, so this seems quite reasonable.

Moreover, DEA made the same "undue burden" objection in 2018, but it was "mooted by DEA's giving the data to Plaintiffs in native format, and shifting the burden and expense of data mining and extraction to Plaintiffs – DEA need not produce any [Excel] spreadsheets at all. * * * The expense and effort of examining the data then falls on Plaintiffs." *First ARCOS Order* at 18 (docket no. 233). The PEC and DEA can and should agree to a similar process now, so that DEA's

---

[8] *See* footnote 2, above.

burden is minimized while still ensuring the PEC obtains fully usable information.[9]

Publix and Kroger assert that "the subpoena expands the scope of drugs for which data is sought beyond those at issue in the MDL to date." Docket no. 5095 at 1 n.1. It is not clear what this means, as it appears that the current request is for the same data fields and the same drugs that were produced in 2018. In any event, that is what the Court now orders: DEA shall produce the same geographic, product, and informational scope of ARCOS data now as it did in 2018, and in the same "native" format, but for the years 2015 to 2019. With these modifications to the PEC's subpoena, the burden on DEA is not undue.

### E. Scope and Use.

Defendants offer two final fall-back arguments, saying that – if the Court does decide to order production of updated ARCOS data – the Court should narrow the scope and use of the data.

Regarding data scope, for example, CVS, Walgreens, and Walmart argue that, "[a]t a minimum, the Court should limit the production of ARCOS data to the narrowed-scope of opioids agreed to in Track 3 known as the 'MDL 8" instead of the broader scope of opioids requested by the PEC, which is not limited to Schedule II opioids." Docket no. 5096 at 2-3. Taking a different tack, the "Big Three Distributor" defendants argue that, "if the Court does order the production of

---

[9] Also, the Court questions the averment of DEA Unit Chief June Howard that DEA would need to – or even could – convert ARCOS data to Excel format, *see* docket no. 5072-2 at 14-15, ¶¶8 & 11. An Excel worksheet can handle a maximum of 1,048,576 rows and 16,384 columns. *See* https://spreadsheeto.com/rows-columns-limit/. The 2018 ARCOS data production contained over **500 million** transaction records, each containing 34 fields. *See* docket no. 3007-13 at 8-10 (McCann expert report). The updated ARCOS data requested by the PEC clearly exceeds the capacity of an Excel spreadsheet. In any event, Ms. Howard also oversaw the ARCOS data production in 2018, *see* docket no. 5072-2 at 13, ¶2, so she should be familiar with the protocols used then and can pursue similar protocols now, to ensure minimal burden to employees in her Reports Analysis Unit.

additional ARCOS data, it should expressly exclude data relating to [the Big Three Distributors]." Docket no. 5093 at 7.  The Court declines these entreaties now for the same reason it denied similar requests in 2018: "it is certain that *all* of the detailed information in the database is necessary for litigation, as the defendants recognized.  Discovery of precisely which manufacturers sent which drugs to which distributors, and which distributors sent which drugs to which pharmacies and doctors, is critical . . . to all of plaintiffs' claims." *First ARCOS Order* at 7-8 (docket no. 233) (emphasis added); *see id.* at 14-15 (rejecting DEA's argument that ARCOS data related to non-parties should not be produced).  This "critical" information includes, for example, data showing which of the Big Three distributors sent what opioids when to a remaining pharmacy defendant.  Without data related to all relevant drugs and all relevant participants in the opioid marketplace, the parties (and any jury) will obtain only a garbled factual picture of the matter at issue.  It also bears noting that a complete picture may be just as helpful to a given defendant as to a given plaintiff.

Regarding data use, Publix and Kroger note that expert discovery is closed in the Track 7 bellwether case, and it would be unfair to re-open expert discovery to account for updated ARCOS data.  The Court agrees.  The Court expects to suggest remand of the Track 7 case for trial in the transferor court fairly soon; it is too late for the parties to incorporate updated ARCOS data into that trial.

Publix and Kroger note further that fact discovery is set to close on August 4, 2023 in the bellwether cases in Tracks 8, 9, and 10, and plaintiffs' expert reports are due September 25, 2023.  Docket no. 4932.  Kroger and Publix assert that, given how long it may take for the ARCOS data to be produced, validated, and analyzed, "it is unclear when in the process of expert disclosures . . . [this process] would [finish], which could cause a raft of scheduling disputes and issues including,

17

ultimately, significantly pushing back the time frame for remands and trial." Docket no. 5095 at 3.

Whether this is a real problem, however, depends on how long it will take the PEC (as it did in 2018) to receive, process, validate, and make available to all parties the updated ARCOS data. It is possible the PEC can finish this process quickly enough that all parties will have access to all ARCOS data in plenty of time for plaintiffs to incorporate it into timely expert reports, and defendants to timely respond; or perhaps only a short extension of time will be necessary; or perhaps the parties can agree to initial expert reports that can then be supplemented. The PEC processed the 2018 ARCOS data very quickly.[10] The Court will decide this issue after the process plays out further and it obtains more information. In any event, the full scope of updated ARCOS data will be fully available to other litigants in future cases.

### III.  Conclusion.

For the reasons and to the extent stated above, the PEC's motion to enforce the subpoena served upon DEA for production of updated ARCOS data is **GRANTED**. The PEC and DEA will meet and confer and come to agreement regarding details of the timing and format of this production. As a general matter, this production should mirror what occurred in 2018, shall be made as soon as reasonably possible, and should include a process of "rolling out" the data, if that will

---

[10] DEA produced the first tranche of ARCOS data on April 20, 2018, *see* docket no. 247, and the PEC had processed and analyzed the data by April 25, 2018 (three business days later) to the point it could identify defendants by market share and amend complaints, *see* docket nos. 296, 301, & 302.

hasten delivery. The PEC and DEA will promptly bring any disagreements regarding data production to Special Master Cohen for resolution.

      **IT IS SO ORDERED.**

                                                          */s/ Dan Aaron Polster*
                                                          **DAN AARON POLSTER**
                                                          **UNITED STATES DISTRICT JUDGE**

**Dated:** July 14, 2023