# APPENDIX B

**ALLERGAN WEST VIRGINIA STATEWIDE OPIOID SETTLEMENT AGREEMENT**

## I.    OVERVIEW

This Allergan West Virginia Statewide Opioid Settlement Agreement ("Agreement") sets forth the terms and conditions of a settlement agreement between and among the State of West Virginia, for itself and Releasors, and Allergan (collectively, "the Parties") to resolve opioid-related Claims against Allergan and the other Released Entities.

The Parties have agreed to the below terms for the sole purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, regulation, or ordinance, or of any other matter of fact or law, or of any fault, liability, or wrongdoing, all of which Allergan and the other Released Entities expressly deny. Neither Allergan nor any other Released Entity admits that it caused or contributed to any public nuisance, and neither Allergan nor any other Released Entity admits any wrongdoing that was or could have been alleged by any Releasor. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Allergan or any other Released Entity. No part of this Agreement is intended for use by any Third Party for any purpose, including submission to any court for any purpose.

This Agreement resolves as to Allergan, among other things, the lawsuit captioned *State of West Virginia ex rel. Patrick Morrisey, Attorney General v. Teva Pharmaceutical Industries, LTD., et al.*, Civil Action No. 19-C-104 BNE (W. Va. Cir. Ct. Boone County) (the "West Virginia AG Action"), pending within *In re: Opioid Litigation*, Civil Action No. 21-C-9000 MFR (W. Va. Cir. Ct. Kanawha County), Actions brought by Releasors, and any actions or proceedings that could have been brought by Releasors.

## II.    DEFINITIONS

A.    "*Actions*" means the West Virginia AG Action and any lawsuit by a Local Government asserting any Released Claim against one or more Released Entities.

B.    "*Affiliated Company(ies)*" (1) when used with respect to AbbVie Inc. ("AbbVie") shall mean all of the entities listed in **Exhibit H**; (2) when used with respect to Allergan shall mean all of the entities listed in **Exhibit I**; and (3) additionally shall include other entities owned now or in the past either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents, but only to the extent those other entities played any role relating to Covered Conduct, Products, class of Products, and/or Released Claims during the period when they were owned either wholly or partially and either directly or indirectly by either AbbVie or Allergan and/or each of their respective past parents. The Parties intend this definition to cover each and every entity that is now or was ever part of AbbVie and/or Allergan and/or each of their past parents' corporate

1

families to the extent they ever played any role relating to Covered Conduct, Products, class of Products, and/or Released Claims.

C. "*Agreement*" means this agreement together with the exhibits thereto.

D. "*Allergan*" means Allergan Finance, LLC (f/k/a Actavis, Inc., which, in turn, was f/k/a Watson Pharmaceuticals, Inc.), Allergan Sales, LLC, Allergan USA, Inc., and Allergan Limited (f/k/a Allergan plc, which, in turn, was f/k/a Actavis plc). Allergan does not include Teva Pharmaceuticals Industries Ltd. ("Teva Ltd."), Teva Pharmaceuticals USA, Inc. ("Teva USA"), Cephalon, Inc. ("Cephalon"), Actavis LLC (f/k/a Actavis Inc.) ("Actavis LLC"), Watson Laboratories, Inc. ("Watson"), Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) ("Actavis Pharma"), Actavis Elizabeth LLC ("Actavis Elizabeth"), Actavis Kadian LLC ("Actavis Kadian"), Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc. - Florida) ("Actavis Labs FL"), Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc. - Utah) ("Actavis Labs UT"), Actavis Mid Atlantic LLC ("Actavis Mid"), Actavis South Atlantic LLC ("Actavis South"), Actavis Totowa LLC ("Actavis Totowa"), or Anda, Inc. ("Anda").

E. "*Bar*" means any of (1) a final, unappealable ruling by the highest court of the State setting forth the general principle that no Releasors in the State (other than the State) may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law setting forth the general principle that no Releasors in the State (other than the State) may maintain Released Claims against Released Entities (either through a direct bar or through a grant of authority to the State to release claims and that authority being exercised in full pursuant to this Agreement or otherwise); or (3) a final, unappealable Settlement Class Resolution in the State with full force and effect. A ruling, law, or Settlement Class Resolution that is conditioned or predicated upon payment by a Released Entity (apart from payment of the Total Payment) shall not constitute a Bar.

F. "*Case-Specific Resolution(s)*" means either (1) a law barring specified Releasors from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to the State to release claims and that authority being exercised in full pursuant to this Agreement or otherwise); (2) a final, unappealable ruling by a court of competent jurisdiction over a particular Releasor that has the legal effect of barring that Releasor from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) a release consistent with **Section VII** below. A law, ruling, or release that is conditioned or predicated upon payment by a Released Entity (apart from payment of the Total Payment) shall not constitute a Case-Specific Resolution.

2

G.    *"Claim(s)"* with respect to Covered Conduct, as defined herein below, means any past, present, or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative or indemnity claim, request, assessment, charge, covenant, damage, debt, lien, loss, fine, penalty, restitution, reimbursement, disgorgement, expenses, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, including, but not limited to, relating to and arising from the alleged historic or continuing opioid-related overdose, abuse, crisis, epidemic, or injuries, whether legal, equitable, statutory, regulatory, or administrative, whether arising under federal, state, or local common law, statute, regulation, guidance, ordinance, or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen, or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, costs, or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

H.    *"Class I Local Government"* means a Local Government that is a Class I city as that term is defined in W. Va. Code § 8-1-3(1) (i.e., population greater than 50,000).

I.    *"Class II Local Government"* means a Local Government that is a Class II city as that term is defined in W. Va. Code § 8-1-3(2) (i.e., population greater than 10,000 and not in excess of 50,000).

J.    *"Class III Local Government"* means a Local Government that is a Class III city as that term is defined in W. Va. Code § 8-1-3(3) (i.e., population greater than 2,000 and not in excess of 10,000).

K.    *"Class IV Local Government"* means a Local Government that is a Class IV town or village as that term is defined in W. Va. Code § 8-1-3(4) (i.e., population of 2,000 or less).

L.    *"Common Benefit Fund Commissioner"* means the Honorable Christopher C. Wilkes, acting with the authority granted to him pursuant to the Court's Order Authorizing Common Benefit Fund and Appointing Common Benefit Fund Commissioner, dated October 4, 2021 (Transaction ID 66985632), and the Court's Order Establishing Common Benefit Fund, dated November 4, 2021 (Transaction ID 67071292).

M. "*Consent Judgment*" means a consent decree, order, judgment, or similar action. In connection with this Agreement, the Parties have agreed to the entry of the Consent Judgment attached hereto as **Exhibit F** as soon as practicable after the Participation Date, which provides for, among other things, the release set forth below, the Court's approval of the Litigation Cost Amount, the dismissal with prejudice of all Released Claims that the State has brought against Released Entities, and the dismissal with prejudice of all other Actions pending before the Court, on the terms and conditions specified herein.

N. "*Counsel*" means a private solo practitioner, multi-attorney law firm, or other legal representative of the State or a Local Government.

O. "*Court*" means the panel overseeing the mass litigation proceeding captioned *In re Opioid Litigation*, Civil Action No. 19-C-9000 (W. Va. Cir. Ct. Kanawha County).

P. "*Covered Conduct*" means any and all actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, service, work, misstatement, misleading statement, or other activity or inactivity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, service, work, misstatement, misleading statement, or other activity or inactivity of any kind whatsoever) arising from or relating in any way to (1) the discovery, research, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, relabeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating policies or procedures relating to, any Product, or class of Products, or any system, plan, policy, procedure, or advocacy relating to any Product, or class of Products, including, but not limited to, any unbranded or branded promotion, marketing, or advertising, Unbranded Information, patient support or assistance, educational programs, consultancy, research, or other programs, campaigns, Lobbying, or grants, sponsorships, charitable donations, or other funding relating to any Product, or class of Products; (2) the characteristics, properties, risks, or benefits of any Product, or class of Products; (3) the monitoring, reporting, disclosure, non-monitoring, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product, or class of Products; (4) the purchasing, selecting, acquiring, disposing of, breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, repackaging, supplying, distributing, converting, selling of, or otherwise engaging in any activity relating to a precursor or component of Product, or class of Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug

4

substances, or any related intermediate of Product, or class of Products; and/or (5) diversion control programs or suspicious order monitoring related to any Product, or class of Products.

Q.  "*Divested Actavis Generic Entity(ies)*" means Actavis LLC, Watson, Actavis Pharma, Actavis Elizabeth, Actavis Kadian, Actavis Labs FL, Actavis Labs UT, Actavis Mid, Actavis South, and Actavis Totowa.

R.  "*Divested Entity(ies)*" means those companies listed on **Exhibit J**, annexed hereto (which includes Divested Actavis Generic Entities).

S.  "*Effective Date*" means the date on which this Agreement is executed by the State and Allergan.

T.  "*Finality*" means (1) the Agreement and the Consent Judgment have been approved and entered by the Court as to Allergan, including the release of all Released Claims against Released Entities as provided in this Agreement; and (2) (a) the time for appeal or to seek review of or permission to appeal from such approval and entry has expired; or (b) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described above have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

U.  "*Later Litigating Releasor*" means an entity that would be a Releasor if it joined this Agreement (or official asserting the right of or for such an entity to recover for alleged harms to the entity and/or the people thereof) that is not a Litigating Local Government as of the Effective Date and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date. It may also include a Litigating Local Government whose Claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Effective Date when such Litigating Local Government takes any affirmative step in its lawsuit other than seeking a stay or removal.

V.  "*Litigating Local Government*" means a Local Government (or Local Government official asserting the right of or for the Local Government to recover for alleged harms to the Local Government and/or the people thereof) that brought any Released Claims against one or more Released Entities on or before the Effective Date that were not separately resolved prior to that date. **Exhibit A** includes Litigating Local Governments identified by the Parties as of the Effective Date but is subject to amendment in the event it proves to be incomplete and other entities

5

that satisfy the definition for "Litigating Local Governments" are subsequently identified.

W.    "*Litigation Cost Amount*" has the meaning specified in **Section III** below.

X.    "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

Y.    "*Local Government*" means a formal and legally recognized sub-entity of the State that provides general governance for a defined area, including a county, city, town, village, or similar entity, including as further described in W. Va. Code §§ 7-1-1 et seq., and §§ 8-1-1 et seq. A list of counties and lists of Class I, II, III and IV Local Governments are attached as **Exhibit B**. Historic, non-functioning sub-entities of the State are not Local Governments, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, parens patriae, or any other capacity.

Z.    "*Non-Litigating Local Government*" means a Local Government that is neither a Litigating Local Government nor a Later Litigating Local Government.

AA.   "*Non-Participating Local Government*" means a Local Government that is not a Participating Local Government.

BB.   "*Participating Local Government*" means a Local Government that signs the Election and Release Form annexed as **Exhibit C** and meets the requirements for becoming a Participating Local Government under **Section VIII (B) or (C)**.

CC.   "*Participation Date*" means the date by which Local Governments must elect to participate in this Agreement and become Participating Local Governments. The Participation Date shall be 120 days after the date of execution of this Agreement. The Parties may alter the Participation Date by mutual written agreement.

DD.   "*Product(s)*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: (1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and (2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. "Product(s)" includes

6

but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, diazepam, estazolam, quazepam, alprazolam, clonazepam, oxazepam, flurazepam, triozolam, temazepam, midazolam, carisoprodol, gabapentin, any variant of these substances, or any similar substance. "Product(s)" also includes any natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence. Further, "Product(s)" includes, but is not limited to, the following: (a) Anexsia, Bancap HC, Combunox, Dilaudid, Dilaudid HP, Duradyne, Esgic with Codeine, Fiorinal with Codeine, Fioricet with Codeine, Kadian, Lorcet, Lorcet Plus, Maxidone, MoxDuo, Norco, Procet, Reprexain, Vicodin, Vicodin ES, Vicodin HP, and Vicoprofen, and any type, version, strength, or dosage of the foregoing; and (b) Aspirin + butalbital + caffeine + codeine phosphate, Fentanyl citrate injection, Fentanyl citrate tablet, Fentanyl transdermal, Homatropine methylbromide + hydrocodone bitartrate, Hydrocodone + acetaminophen, Hydrocodone + ibuprofen, Hydromorphone tablet, Meperidine hydrochloride injection, Meperidine hydrochloride tablet, Morphine sulfate capsule, Morphine sulfate injection, Morphine sulfate tablet, Oxycodone, Oxycodone + acetaminophen, Oxycodone + aspirin, Oxycodone + hydrochloride, Oxycodone + ibuprofen, Oxymorphone tablet, Tramadol hydrocholoride, and any type, version, strength, or dosage of the foregoing.

EE.   "*Qualified Settlement Fund*" means the West Virginia Qualified Settlement Fund contemplated by this Agreement, into which the Total Payment shall be paid, and which shall be established under the authority and jurisdiction of the Court in accordance with the requirements of 26 C.F.R. § 1.468B-l.

FF.   "*Qualified Settlement Fund Administrator*" means the Administrator appointed to administer the Qualified Settlement Fund under the authority and jurisdiction of the Court. The duties of the Qualified Settlement Fund Administrator shall be governed by this Agreement and the terms of the West Virginia First Memorandum of Understanding. The identity of the Qualified Settlement Fund Administrator and a detailed description of the Qualified Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Qualified Settlement Fund Administrator's fees and costs, will be set forth in a separate document to be prepared by the Parties and filed with the Court to establish the fund and will be attached later to this Agreement.

GG.   "*Released Claim(s)*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date, whether known or unknown, suspected or unsuspected,

7

asserted or unasserted, in law or in equity, that Releasors, whether directly, representatively, derivatively, or in any other capacity, have, including all past and present civil, derivative, regulatory, administrative, or any other claims Releasors may have under any applicable state, federal, regulatory, or administrative law or statute relating to any Covered Conduct prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by Releasors in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of, or in any way relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or proceedings, or in any comparable action or proceeding brought by Releasors, Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that "Released Claims" be interpreted broadly. For the avoidance of doubt and without limiting the foregoing, Released Claims is also used herein to describe Claims brought or maintained by entities in the future that would have been Released Claims if they had been brought by a Releasor against a Released Entity before the Effective Date.

HH.  "*Released Entity(ies)*" means Allergan and (1) all of Allergan's past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, agents (all of the foregoing solely in their capacity as such with respect to the Released Claims), and insurers (solely in their role as insurers, if any, with respect to the Released Claims), including, but not limited to, (a) AbbVie and (b) Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates) but solely as to the branded opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Products before August 2, 2016; (2) the respective past and present direct or indirect parents, subsidiaries, divisions, joint ventures, predecessors, successors, affiliates, business units, assigns, partners, manufacturers, contractors, agents, and insurers (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (1), including Abbott Laboratories and Abbott Laboratories Inc.; (3) the respective past and present employees, officers, directors, members, shareholders, partners, trustees, contractors, consultants, and agents (all of the foregoing solely in their capacity as such with respect to the Released Claims) of any of the foregoing in (1) and (2); and (4) any person or entity to the extent, and only to the extent, that such person or entity may have a Claim based on such person or entity having a business relationship with Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies, including, but not limited to, for

8

contractual indemnity, equitable or implied indemnity, contribution, comparative fault, reimbursement, or apportionment (including, but not limited to, Halo Pharmaceuticals, Inc., Shionogi Inc., Mikart, LLC, PDI, Inc., TMS Health, LLC, National Health Information Network, Inc., Ventiv Commercial Services, LLC, inVentiv Commercial Services, LLC, UPS Supply Chain Solutions, Inc., and King Pharmaceuticals, Inc., and their respective past and current parents, subsidiaries, and affiliates) against Allergan or AbbVie and/or any of Allergan or AbbVie's Affiliated Companies relating to any Covered Conduct, Products, class of Products, and/or Released Claims arising from such business relationship. Notwithstanding the foregoing (and subject to certain provisions, including, but not limited to, the Non-Party Settlement at **Section VII (B)(3)** and the Set-Off at **Section XI** below), Released Entities shall exclude Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates, but not Allergan and other Released Entities), but solely as to: (i) their generic opioid drugs that are Products, and/or (ii) the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products for which Releasors have also sought to hold Allergan (and/or other Released Entities) liable.

II. "*Releasor(s)*" means (1) the State of West Virginia; (2) each Participating Local Government; and (3) without limitation and to the maximum extent of the power of the State of West Virginia's Attorney General and Participating Local Governments to release Claims: (a) the State's and each Participating Local Government's departments, agencies, divisions, boards, commissions, Local Governments, instrumentalities of any kind and attorneys and any person in their official capacity, whether elected or appointed to lead or serve any of the foregoing and any agency, person, or entity claiming by or through any of the foregoing, including those with the regulatory authority to enforce state and federal controlled substances acts or the authority to bring Claims related to Covered Conduct seeking money (including abatement (or remediation and/or restitution)) or revoke a pharmaceutical distribution license, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, water districts, law enforcement districts, emergency services districts, school districts, public hospitals, highway authorities, conservation districts, development authorities, reclamation districts, recreation districts, economic development authorities, housing authorities, sanitary districts, solid waste authorities, urban mass transportation authorities, and any other person or entity that performs services at the direction of the State and/or one or more Participating Local Governments and (c) any person or entity acting in a *parens patriae,* sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to Releasors. The exclusion of a specific reference to a type of entity in this definition shall not

9

be construed as meaning that the entity is not a Local Government. In addition to being a Releasor as provided herein, a Participating Local Government shall also provide an Election and Release Form providing for a release to the fullest extent of the Participating Local Government's authority, which is attached as **Exhibit C** to the Agreement.

JJ. "*Remediation Amount*" has the meaning specified in **Section III** below.

KK. "*Settlement Class Resolution(s)*" means a class action resolution in a court of competent jurisdiction in the State with respect to a class of Releasors in the State (collectively, the "*Settlement Class*") that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in the State and has become finally adjudicated (including an exhaustion of appeals); (3) is binding on all Releasors in the State (other than opt outs as permitted under the next sentence); (4) provides that all such Releasors may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Allergan other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Non-Participating Local Governments collectively representing 1% or more of the total population of all of the State's Local Governments opt out. In seeking certification of any Settlement Class, the State and applicable Participating Local Governments shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

LL. "*State*" means the State of West Virginia, acting by and through its Attorney General.

MM. "*Third Party(ies)*" means any person or entity other than Allergan or a Releasor.

NN. "*Unbranded Information*" means any information that does not identify a specific branded or generic product.

## III.  CONSIDERATION TO BE PROVIDED BY ALLERGAN

A.  **Monetary Payment**

10

1.      Allergan shall pay a maximum total of $51.2 million, inclusive of all attorneys' fees and costs ("Total Payment"). $22 million of the Total Payment shall be considered a "Base Payment" and $29.2 million shall be considered a "Premium Payment" which accounts for the unique circumstances of this settlement, including (among other things) that this settlement is occurring after seven weeks of trial and near the submission of the case to the judge, available data that West Virginia is the epicenter of the opioid crisis, and the joint and several liability legal rulings in the Action affirmed by the Supreme Court of Appeals of West Virginia. Releasors represent that fifty-six percent (56%) of the Total Payment constitutes consideration for the settlement of Claims involving, arising from, or related to generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016 that the Releasors are asserting or might otherwise assert or could assert that Allergan (or any other Released Entity) is directly or indirectly and/or jointly and/or severally liable, including but not limited to, based on parent or control liability or a substantially similar theory. Releasors represent that forty-four percent (44%) of the Total Payment constitutes consideration for the settlement of Claims involving, arising from, or related to branded opioid drugs that are Products of or attributable to Allergan or any other Released Entity (including but not limited to branded opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and the other Divested Entities related to those branded opioid drugs that are Products before August 2, 2016) that the Releasors are asserting or might otherwise assert or could assert against Allergan or any other Released Entity, of which seventy-seven percent (77%) is specifically involving, arising from, or related to Kadian® (including but not limited to Kadian manufactured, distributed, marketed, and/or sold from 1997 through 2008 by King Pharmaceuticals, Inc. and/or Alpharma Inc.). The Total Payment is the full and maximum extent of any monies owed by Allergan (and/or the other Released Entities), subject to **Section XII**, and includes all attorneys' fees, expenses, and cost payments. The Total Payment shall be broken down as follows:

a.      A payment of $45.30 million to the Qualified Settlement Fund, pursuant to wire instructions to be provided, to be distributed pursuant to the West Virginia First Memorandum of Understanding, attached hereto as **Exhibit D** for the sole purposes of remediation and restitution (the "Remediation Amount"); and

11

b.   A payment of $5.90 million to the Qualified Settlement Fund, pursuant to wire instructions to be provided, to be distributed to Counsel representing attorneys' fees, expenses, and costs (the "Litigation Cost Amount") as approved by the Court.

c.   Attorney fees will be handled through an agreement between the Attorney General's Office and counsel, subject to political subdivision participation and review and orders of the Court and the West Virginia Mass Litigation Panel, in particular regarding how Local Government fees are handled.   Allergan shall not be responsible for making payments for any attorneys' fees and costs, beyond amounts specified in this Agreement, including but not limited to any attorneys' fees and costs due as a consequence of this Agreement into any common benefit fund. Thus in the event any court orders payment into a common benefit fund, the money will be paid out of the Total Payment, and Allergan shall not be responsible for making any payment beyond the Total Payment.

2.   AbbVie agrees to satisfy the obligations to make the payments due in this **Section III** if for any reason Allergan fails to fulfill its payment obligations under **Section III**.

B.   **Payment Schedule**

1.   On or before the Participation Date, the State shall provide to Allergan Election and Release Forms (in the form annexed as **Exhibit C**) demonstrating that each of the following have become Participating Local Governments: (a) counties representing at least 96% of the State's population, (b) at least 96% of the population of Litigating Local Governments, and (c) at least 96% of the population of Non-Litigating Local Governments that are classified in the W. Va. Code § 8-1-3 as Class I and II cities and towns (i.e., with populations of 10,000 or more) ("Participation Requirement").

2.   Provided that the Participation Requirement is satisfied and the necessary W-9 form is provided to Allergan and Allergan's Bank Verification Form process is completed at least 21 days before payment is due, Allergan shall pay the Total Payment in six equal, annual installments of $8.533 million over five years on June 15th (or the next business day if June 15th is not a business day) of each year from June 2022 through June 2027. In addition, Allergan shall not be required to pay (a) the first annual payment to be paid in June 2022 until thirty (30) days after this Agreement is fully executed and the State dismisses its Action with prejudice through entry of the

12

Consent Judgment and (b) the second annual payment to be paid in June 2023 or any subsequent payments unless and until the Participation Requirement in **Section III(B)(1)** above is met and required releases are obtained and delivered to Allergan and all Participating Local Governments dismiss their respective cases against Allergan and other Released Entities with prejudice or are enjoined by the enactment of a Bar.

3.  The Qualified Settlement Fund Administrator shall place the Litigation Cost Amount and the Remediation Amount into separate sub-funds within the Qualified Settlement Fund pending their disbursement as provided in this Agreement.

C.  **Consent Judgment**

1.  As soon as practicable following the Participation Date, the State shall file in the Court a proposed Consent Judgment substantially in the form of **Exhibit F** The Consent Judgment shall include the injunctive terms set forth in **Section E** and provide for the Court's approval of the Litigation Cost Amount and the dismissal with prejudice, as to Allergan and all other Released Parties, of the West Virginia AG Action and the Actions of Participating Local Governments pending before the Court. The Consent Judgment shall further provide that, notwithstanding the dismissal, the Court shall retain jurisdiction for purposes of enforcing compliance with the injunctive terms and determining the allocation of the Litigation Cost Amount as provided in **Section IX**. The Parties shall confer and agree as to the final form and time of filing of the Consent Judgment prior to its filing with the Court.

D.  **Remediation and Restitution**

1.  The Parties agree that, unless otherwise required by law, Allergan's payment pursuant to **Section III(A)(1)(a)** above shall be directed to remediation and restitution of harms allegedly caused by Allergan. The Parties also agree that the purpose of the payment pursuant to **Section III(A)(1)(a)** above is for Allergan to pay over to the State and Participating Local Governments monies to remediate the harms allegedly caused by Allergan or to provide restitution for such alleged harms that were previously incurred, none of which amount constitutes a fine or penalty. The State, by signing this agreement, and each Participating Local Government, by signing the Election and Release Forms (in the form annexed as **Exhibit C**), certify that: (1) the entity suffered harm allegedly caused by Allergan; (2) the payments to be received by the entity from Allergan represent an amount that is less than or equal to the actual monetary damage allegedly

13

caused by Allergan; and (3) the entity shall use such payments for the sole purpose of remediating the harm allegedly caused by Allergan and/or to provide restitution for such alleged harms that were previously incurred.

2. The Qualified Settlement Fund Administrator shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering the Consent Judgment becomes binding. On the Form 1098-F, the Qualified Settlement Fund Administrator shall identify such payments from Allergan pursuant to **Section III(A)(1)(a)** as remediation and restitution amounts. The State shall also, on or before January 31 of the year following the calendar year in which the order entering the Consent Judgment becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Allergan.

## IV. INTRA-STATE ALLOCATION AND DISBURSEMENT OF REMEDIATION AMOUNT

A. Within a reasonable time after entry of the Consent Judgment, subject to the limitations set forth in **Section IX** below, the Qualified Settlement Fund Administrator shall allocate and distribute the Remediation Amount to the State and Participating Local Governments to abate or reimburse for the abatement of the impact of any alleged Covered Conduct in the State and Participating Local Governments as provided in this Agreement and the West Virginia First Memorandum of Understanding, attached as **Exhibit D**. No Later Litigating Local Government that becomes a Participating Local Government shall receive such funds until its claim is dismissed with prejudice.

B. Allergan shall have no duty, liability, or influence of any kind with respect to the apportionment of the Remediation Amount or use of the Remediation Amount beyond as set forth in **Section III(D)**. The State and the Participating Local Governments specifically represent, however, that any such apportionment and use shall be made in accordance with all applicable laws.

## V. INJUNCTIVE RELIEF

A. The State and Allergan agree that the injunctive relief specified in **Exhibit E** shall be included in the Consent Judgment.

## VI. CESSATION OF LITIGATION ACTIVITIES

A. In anticipation of finalizing this Agreement, a stay has been entered by the Court with respect to the State's Claims against Allergan in the West Virginia AG Action.

It is the Parties' intent that this stay shall remain in place and that any and all other litigation activities in the Actions relating to Claims against Allergan and other Released Entities shall immediately cease as of the Effective Date, and that Claims against Allergan and other Released Entities shall not be included in the trial of any Action against any other defendant.

## VII.  RELEASE AND DISMISSAL

A.  *Scope.* As of the Effective Date, the Released Entities will be released and forever discharged from all of the Released Claims of the Releasors. The State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any claim, demand, liability, or relief of any kind or character whatsoever (including any Claim) as a result of, arising out of, or relating in any way to Released Claims and extend to the full extent of the power of the State, its Attorney General, and each Participating Local Government to release any and all Released Claims. The release shall be a full, final, and complete bar to any Released Claim. Releasors agree to not seek any further claim, demand, liability, or relief of any kind or character whatsoever (including any Claim), including injunctive relief, from the Released Entities for any and all Covered Conduct of any kind whatsoever related to any of their Products, or class of Products, including by or related to the Divested Actavis Generic Entities and/or other Divested Entities (and their respective past and current parents, subsidiaries, and affiliates, including but not limited to Teva Ltd., Teva USA, and their subsidiaries and affiliates), but solely as to the branded opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and other Divested Entities and the operation of the Divested Actavis Generic Entities and other Divested Entities related to those branded opioid drugs that are Products before August 2, 2016. Notwithstanding the foregoing, the releases provided for in this Agreement specifically exclude any Claims by Releasors against Divested Actavis Generic Entities and other Divested Entities (and their respective past and current parents, subsidiaries, and/or affiliates, including but not limited to Teva Ltd., Teva USA and their subsidiaries and affiliates, but not Allergan and its Released Entities), but solely as to: (i) their generic opioid drugs that are Products, and/or (ii) the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products for which Releasors have also sought to hold Allergan (and/or other Released Entities) liable. Nothing in this Agreement shall release or impair any Claims against Teva Ltd., Teva USA, Cephalon, or Anda, except to the extent

15

expressly set forth in this Agreement, including but not limited to the judgment set-off set forth in **Section XI**.

B.    **Claim-Over and Non-Party Settlement**

    1.    *Statement of Intent.* It is the intent of the Parties that:

        a.    Released Entities shall not seek contribution or indemnification (other than pursuant to an insurance contract and **Section VII (B)(2)** below) from other parties for their payment obligations under this Agreement;

        b.    The payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving Released Claims (or conduct that would be Covered Conduct if engaged in by a Released Entity), and each Releasor expressly waives its right to seek reallocation to the Released Entities pursuant to W. Va. Code § 55-7-13C(d) of any amount that the Releasor is unable to collect from any other party held to be liable to the Releasor;

        c.    Claims by Releasors against other parties shall not result in additional payments by Released Entities, whether through contribution, indemnification, or any other theory or means; and

        d.    It is expressly understood and agreed that the Parties have entered into this Agreement in good faith. In accordance with the Supreme Court of Appeals of West Virginia's decisions in *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.,* 182 W. Va. 597, 390 S.E.2d 796 (1990), and *Smith v. Monongahela Power Co.,* 189 W. Va. 237, 429 S.E.2d 643 (1993), it is the intent of the Releasors and the Released Entities that by making this good faith settlement of a disputed matter, the Released Entities are hereby relieved from any liability for Released Claims under any theory of Claim-Over (as defined in **Section VII (B)(4)**).

        e.    The provisions of this **Section VII(B)** are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2. *Contribution/Indemnity Prohibited.* No Released Entity shall seek to recover any portion of any payment made under this Agreement from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, Third Party vendor, trade association, distributor, or health care practitioner based on indemnification, contribution, or any other theory, *provided, however*, that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim Over (as defined in **Section VII (B)(4)**) against it and/or that asserts any other form of action against it arising out of or related to Products, class of Products, or Covered Conduct, as well as any amounts owed pursuant to insurance contracts. However, and notwithstanding the foregoing or any other section in this Agreement, this provision shall not preclude any Released Entity from seeking indemnification, contribution, or any other theory from and against Teva Ltd., Pfizer Inc., King Pharmaceuticals, Inc., and Alpharma Inc., and/or each of their respective past and current parents, subsidiaries, and/or affiliates.

3. *Non-Party Settlement.* To the extent that, on or after the Effective Date, any Releasor settles any Claims arising out of or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) it may have against any entity that is not a Released Entity (a "Non-Released Entity") that is, as of the Effective Date, a defendant in the multi-district litigation *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio) ("MDL") or in the West Virginia coordinated litigation *In re: Opioid Litigation*, Civil Action No. 21-C-9000 MFR (W. Va. Cir. Ct. Kanawha County) and provides a release to such non-Released Entity (i.e. a "Non-Party Settlement"), including in any bankruptcy proceeding or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from any Released Entity in the first sentence of **Section VII (B)(2)**, or a release from such non-Released Entity in favor of the Released Entities (in a form and scope equivalent to the releases contained herein) of any Claim-Over as defined in **Section VII (B)(4)** under which any Released Entity may be liable to pay any part of such Non-Party Settlement, compensate the non-Released Entity for any part of such Non-Party Settlement, or otherwise be liable to such non-Released Entity. The obligation to seek to obtain the prohibition and/or release required by this subsection is a material term of this Agreement. The sole remedy for a Releasor's failure to include such a provision in a Non-Party Settlement shall be the application of **Section VII (B)(4)** below. Non-

17

Released Entities include, but are not limited to, Teva Ltd., Teva USA, Divested Actavis Generic Entities or other Divested Entities, and Anda (including for **Section VII (B)(4)** below).

4.  *Claim Over*. It is expressly understood and agreed that the Parties have entered into this Agreement in good faith. In the event that any Releasor has not obtained, or is unable to obtain, a prohibition on any contribution or indemnity as set forth in **Section VII (B)(2)** in a settlement with a non-Released Entity of a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), or if a Releasor obtains a judgment against a non-Released Entity with respect to a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), or if a Releasor files against a non-Released Entity a Claim in bankruptcy involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), then:

a.  The State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) agrees that, if a Releasor asserts a Claim involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) against any non-Released Entity and such non-Released Entity in turn successfully asserts a Claim against a Released Entity relating to the same on the basis of contribution, indemnity, or other claim-over on any theory (a "*Claim-Over*"), the Releasor shall reduce its Claim and any judgment or settlement it may obtain against such non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law and to fully hold the Released Entity harmless from such Claim-Over. For purposes of this provision, successful assertion of a Claim means either (a) a final monetary judgment; *provided* that the State of West Virginia Attorney General had notice of and opportunity to intervene in the proceeding giving rise to such judgment or (b) a settlement; *provided* that the Released Entity sought the State of West Virginia Attorney General's consent to the settlement and such consent was either obtained or unreasonably withheld. Should the judgment or settlement against the Released Entity resolve claims that are not Claim-Over claims, the reduction of the Claim and judgment or settlement shall be for the Claim-Over portion only, which shall be distinguishable in the judgment or settlement.

18

b.   Each Releasor, with respect to any proceeding to which it is a party, shall not unreasonably withhold consent to and (if it is a party in the proceeding) shall join in any motion by any of the Released Entities to dismiss any Claim-Over on the grounds that this Agreement moots or otherwise extinguishes any such Claim-Over. In the foregoing circumstance, in which a non-Released Entity asserts a Claim against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory, the Released Entity will take reasonable and necessary steps to defend against the Claim and will consent to the intervention of any Releasor seeking to defend against such Claim.

5.   Allergan shall notify the State of West Virginia Attorney General, to the extent permitted by applicable law, in the event that any non-Released Entity asserts a Claim-Over claim arising out of a Claim involving Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity) against any Released Entities.

C.   *Broad Release.* In connection with the releases provided for in this Agreement, Releasors expressly waive, release, acquit, and forever discharge to the fullest extent permitted by law and any and all provisions, rights, and benefits conferred by any law of the State or principle of common law which would exclude from the scope of the Released Claims any Claims that a Releasor does not know or suspect to exist in the Releasor's favor as of the Effective Date that, if known by the Releasor, would have materially affected the State's or any Participating Local Government's decision to provide the general release contemplated by this Section VII.C. A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Local Governments' decision to participate in the Agreement.

D.   *Cooperation.* Each Releasor (for itself and its Releasors) (1) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (2) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal with prejudice of any and all Released Claims. The State also shall use its best efforts to secure releases consistent with this Agreement from all Local Governments identified in **Exhibit**

19

**B** and shall use its best efforts to secure the prompt dismissal with prejudice of any and all Released Claims, whether asserted before or after the Effective Date.

E.   *Res Judicata and Collateral Estoppel.* Nothing in the Agreement shall be deemed to reduce the scope of the res judicata, collateral estoppel, or claim or issue preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment or ruling entered related to the Agreement, gives rise to under applicable law.

F.   *Representation and Warranty.* Each Releasor (for itself and its Releasors) expressly represents and warrants that it will, on or before the Effective Date, have (or have obtained) the authority to settle and release, without limitation and to the maximum extent of its power, all Released Claims of itself and its Releasors, including but not limited to the following: (1) the State and Participating Local governments, (2) the State's and each Participating Local Government's (a) departments, agencies, divisions, boards, commissions, Local Government, instrumentalities of any kind and attorneys, and any person in their official capacity, whether elected or appointed to lead or serve any of the foregoing and any agency, person, or entity claiming by or through any of the foregoing, including those with the regulatory authority to enforce state and federal controlled substances acts or the authority to bring Claims related to Covered Conduct seeking money (including abatement (or remediation and/or restitution)) or revoke a pharmaceutical distribution license, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, water districts, law enforcement districts, emergency services districts, school districts, public hospitals, highway authorities, conservation districts, development authorities, reclamation districts, recreation districts, economic development authorities, housing authorities, sanitary districts, solid waste authorities, urban mass transportation authorities, and any other person or entity that performs services at the direction of the State and/or one or more Participating Local Governments and (c) any person or entity acting in a *parens patriae,* sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to Releasors, whether or not any of them participate in the Agreement.

G.   *Effectiveness.* The releases provided for in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

H.  *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release, or limit any criminal liability, Claims for any outstanding liability under any tax or securities or antitrust laws, Claims against parties who are not Released Entities, Claims asserted by individuals for damages for any alleged personal injuries arising out of their own use of any Product, and any Claims arising under the Agreement for enforcement of the Agreement.

I.  *Dismissal of Actions.* The State and Participating Local Governments with Actions pending before the Court as of the Effective Date shall have their Claims against Allergan and any other Released Entities dismissed with prejudice as part of the Consent Judgment to be entered pursuant to **Section III(C)**. Participating Local Governments with Actions pending in other courts as of the Effective Date shall dismiss (or if necessary move to dismiss) their Actions as to Allergan and any other Released Entities within thirty (30) days of the Effective Date. Any Later Litigating Local Government that becomes a Participating Local Government after the Effective Date shall dismiss (or if necessary move to dismiss) its Action(s) as to Allergan and any other Released Entities within seven (7) business days of the date on which the Later Litigating Local Government executes its Election and Release Form attached as **Exhibit C**. All dismissals required by this Agreement shall be with prejudice and with each party to bear its own costs. Further, within 15 days after the Participation Date, the State and Allergan will jointly request that the Court sever all claims of Non-Participating Local Governments against Allergan and other Released Entities and place them on an inactive docket, if not already on an inactive docket.

## VIII.  PARTICIPATION BY LOCAL GOVERNMENTS

A.  *Notice.* As soon as practicable after the Effective Date, the State shall send notice to all Local Governments in the State eligible to participate in the settlement and the requirements for participation. Such notice may include publication, email, and other standard forms of notification.

B.  *Requirements for Becoming a Participating Local Government: Litigating or Later Litigating Local Governments.* A Litigating Local Government or Later Litigating Local Government may become a Participating Local Government either by (1) by executing an Election and Release Form attached as **Exhibit C** specifying (a) that the Local Government agrees to the terms of this Agreement pertaining to Participating Local Governments, (b) that the Local Government releases all Released Claims against all Released Entities, and (c) that the Local Government submits to the jurisdiction of the Court for purposes limited to the Court's role under the Agreement; or (2) having its claims extinguished by operation of law or released by the State's Office of the Attorney General.

21

C.   *Requirements for Becoming a Participating Local Government: Non-Litigating Local Governments.* A Non-Litigating Local Government may become a Participating Local Government either (1) by executing an Election and Release Form attached as **Exhibit C** specifying (a) that the Local Government agrees to the terms of this Agreement pertaining to Participating Local Governments, (b) that the Local Government releases all Released Claims against all Released Entities, and (c) that the Local Government submits to the jurisdiction of the Court for purposes limited to the Court's role under the Agreement; or (2) by having their claims extinguished by operation of law or released by the State's Office of the Attorney General.

D.   *Non-Participating Local Governments.* Non-Participating Local Governments shall be ineligible to receive any direct portion of the Total Payment. Any portion of the Remediation Amount and Litigation Cost Amount that would be directly allocable to a Non-Participating Local Government under the West Virginia First Memorandum of Understanding if it were a Participating Local Government shall be withheld from any distribution of the Remediation Amount and Litigation Cost Amount; the funds so withheld shall remain in the Qualified Settlement Fund for 150 days from the date the Qualified Settlement Fund Administrator first distributes any portion of the Remediation Amount and Litigation Cost Amount to Participating Local Governments, or unless and until the Non-Participating Local Government has satisfied the requirements of **Section VIII(C)** and thereby has become a Participating Local Government, whichever occurs sooner. If, at the conclusion of the 150-day period, the Non-Participating Local Government has failed to satisfy the requirements of **Section VIII(C)** and therefore has failed to become a Participating Local Government, then the Remediation Amount and Litigation Cost Amount allocable to that Non-Participating Local Government shall be reallocated and used as provided in the West Virginia First Memorandum of Understanding.

E.   *Representation With Respect Local Government Participation.* The State represents and warrants for itself that it has a good faith belief that (a) all Litigating Local Governments, and (b) all Non-Litigating Local Governments that are Class I or II Local Governments, will become Participating Local Governments. Further, the State shall use its best efforts to secure the participation by all Local Governments within the State, including all Litigating Local Governments and all Non-Litigating Local Governments. To the extent any Local Governments do not become Participating Local Governments, the West Virginia Attorney General shall take all appropriate steps to resolve any remaining Claims by such Local Governments against Allergan and other Released Entities, which may include seeking the enactment of a legislative Bar, pursuit of a judicial Bar or Settlement Class Resolution, or pursuit of a Case-Specific Resolution. The State acknowledges the materiality of the representations in this section.

22

F.  *Representation With Respect to State Abatement Claims.* The State represents and warrants that the Remediation Amount shall be used to fund opioid abatement and treatment activities throughout the State, and that the Agreement is intended to release any and all Claims for abatement within the State. The State acknowledges the materiality of the foregoing representation and warranty.

G.  *Representation With Respect to Claims by Later Litigating Releasors.* The State and Participating Local Governments represent and warrant that, if any Later Litigating Releasor pursues any Released Claim(s) against one or more Released Entities after the Effective Date of the Agreement, the State and/or the Participating Local Government will take appropriate steps to cease the litigation, including, but not limited to, seeking dismissal with prejudice of such action as to such Released Entities as soon as reasonably possible. Depending on the facts and circumstances, the State and/or the Participating Local Government may seek a judicial Bar or Case-Specific Resolution, including, but not limited to, dismissal with prejudice, among other ways, by intervening in such action to move to dismiss or otherwise terminate the Later Litigating Releasor's Claims in the action or by commencing a declaratory judgment or other action that establishes a judicial Bar or Case Specific Resolution to the Later Litigating Releasor's Claims.

H.  *Required Case Management Order.* Concurrently with the State's submission of the Consent Judgment, the Parties shall jointly present and recommend the Case Management Order annexed hereto as **Exhibit G** to the Court for immediate entry, which is applicable only to Non-Participating Local Governments (including Later Litigating Local Governments).

IX.  **DISBURSEMENT OF LITIGATION COST AMOUNT**

A.  Attorney fees will be handled through an agreement between the Attorney General's Office and counsel, subject to political subdivision participation and review and orders of the Court, in particular regarding how Local Government fees are handled.  Allergan shall not be responsible for making payments for any attorneys' fees and costs beyond amounts specified in this Agreement.

B.  To be eligible for any award from the Litigation Cost Amount, Counsel must, subject to any ruling by the West Virginia Mass Litigation Panel, certify to each of the following in an application submitted to the Common Benefit Fund Commissioner pursuant to this **Section IX**:

1.  Counsel has no present intent to represent or participate in the representation of any Later Litigating Local Government or any Releasor with respect to

23

Released Claims against Released Entities.

2.   Counsel will not charge or accept any referral fees for any Released Claims brought against Released Entities.

3.   Counsel does not have a Claim for attorneys' fees, costs, or expenses related to a Non-Participating Local Government.

4.   Notwithstanding the forgoing, nothing in this **Section IX** is intended to operate as a "restriction" on the right of any attorney to practice law within the meaning of the West Virginia Rules of Professional Conduct or any equivalent provision of any other jurisdiction's rules of professional conduct.

## X.   ENFORCEMENT AND DISPUTE RESOLUTION

A.   The terms of the Agreement and Consent Judgment will be enforceable solely by Allergan and the State. Participating Local Governments shall not have enforcement rights against Allergan with respect to the Agreement or the Consent Judgment except as to payments that would be allocated under the West Virginia First Memorandum of Understanding for Local Government use. The State of West Virginia shall establish a process for Participating Local Governments to notify it of any perceived violations of the Agreement or West Virginia Consent Judgment.

B.   Allergan and other Released Entities consent to the jurisdiction of the Court, in which the Consent Judgment is filed, solely for the resolution of disputes arising out of this Agreement and the Consent Judgment.

C.   The parties to a dispute hereunder shall promptly meet and confer in good faith to resolve any dispute prior to any filing or presentation to the Court.

D.   If the State believes Allergan is not in compliance with any terms of this Agreement (including the Injunctive Relief attached as **Exhibit E**), then the State shall (i) provide written notice to Allergan specifying the reason(s) why the State believes Allergan is not in compliance with the Agreement; and (ii) allow Allergan at least thirty (30) days to attempt to cure such alleged non-compliance (the "*Cure Period*"). In the event the alleged non-compliance is cured within the Cure Period, Allergan shall not have any liability for such alleged non-compliance. The State may not commence a proceeding to enforce compliance with this Agreement before the expiration of the Cure Period.

E.   In the event of a conflict between the requirements of the Agreement and any other law, regulation, or requirement such that Allergan (or any other Released Entities)

24

cannot comply with the law, regulation, or requirement without breaching the terms of the Agreement or being subject to adverse action, including fines and penalties, Allergan shall document such conflicts and notify the State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Allergan's discovery of the conflict. Allergan shall comply with the terms of the Agreement to the fullest extent possible without violating the law, regulation, or requirement.

XI.    **SET-OFF**

A.    The Parties recognize that the State of West Virginia and the Participating Local Governments are pursuing Claims against Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates. If any of them achieves a judgment by verdict, judicial decision, or means other than settlement against any of Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates (including but not limited to the West Virginia AG Action), each plaintiff listed above shall give the liable defendant(s) listed above a set-off equal to the amount they received from the $25.368 million payment due under this Agreement (or 56% of the Total Payment of $45.30 million) from any and all monetary remedies awarded on all Claims (including but not limited to the West Virginia AG Action) from the portion of the judgment attributable to the generic opioid drugs that are Products distributed and/or sold by Divested Actavis Generic Entities and/or other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and/or other Divested Entities related to those generic opioid drugs that are Products. The foregoing judgment set-off provision is without prejudice to the position of any Party hereto regarding whether any such judgment set-off is or is not required under West Virginia law. The Parties are agreeing to the judgment set-off provision to facilitate a settlement, and the agreement shall apply even if a court orders that such a set-off is not required by West Virginia law. Notwithstanding the foregoing, this settlement shall not apply to Anda.

B.    The State and/or the Participating Local Governments may reach a settlement agreement with Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates that resolves some or all of their respective Claims (including but not limited to the West Virginia AG Action). In that event, the Releasors represent and agree that any payment(s) that the State or the other Participating Local Governments receive from Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities, and/or each of their respective parents, subsidiaries, and/or affiliates reflects the amount over and

above $25.368 million (or 56% of the Total Payment of $45.30 million) that each and all of them deem to reflect a fair overall settlement value for liability attributable to the generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or attributable to the operation of the Divested Actavis Generic Entities and/or other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016. The State and the Participating Local Governments represent and warrant that the agreed settlement amount between and among the State, the Participating Local Governments, Teva Ltd., Teva USA, Cephalon, Divested Actavis Generic Entities, and/or other Divested Entities and/or each of their respective parents, subsidiaries, and/or affiliates, the agreed settlement amount reflects the value the parties to the agreement deem a fair settlement value over and above the payments made or due to be paid under the Allergan West Virginia Statewide Opioid Settlement Agreement for generic opioid drugs that are Products distributed and/or sold before August 2, 2016 by Divested Actavis Generic Entities and/or other Divested Entities and/or relate to the operation of Divested Actavis Generic Entities and other Divested Entities related to those generic opioid drugs that are Products before August 2, 2016.

## XII.  MOST-FAVORED NATION

A.  If, after this settlement, there is a collective nationwide resolution of substantially all claims against Allergan brought by states, counties, municipalities and/or local governments (a "Public Global Resolution") then the State and Allergan agree that the net present value ("NPV") (calculated with a 7% discount rate) of the Total Payment to be received by the State and its Local Governments under this settlement (excluding $5.9 million in fees and costs as outlined in **Section III(A)(1)(b)** above) shall be no less favorable than the NPV (calculated with a 7% discount rate) of the consideration the State and its Local Governments would have received based on an allocation share of 2.25% of the total cash allocated to remediation and restitution (excluding payments to tribes and attorneys' fees and costs) in the Public Global Resolution, considering the same level of participation of Local Governments and other required participation requirements of the Public Global Resolution. Any additional monies due to the State and its Local Governments shall be paid on the same payment schedule as delineated in the Public Global Resolution. By way of example, assume Allergan reaches a Public Global Resolution of $X billion in cash to be used for remediation and restitution purposes, exclusive of payments to tribes, attorneys' fees and costs, and before any deductions are taken for prior settlements of public entities and trial wins against public entities. If 2.25% times $X (on an NPV basis calculated with a 7% discount rate) is higher than the $45.30 million paid under this settlement for remediation and restitution as outlined in **Section III(A)(1)(a)** above (on an NPV basis calculated with a 7% discount rate) and all participation requirements of the Public

26

Global Resolution are satisfied for a full allocation, then Allergan would pay West Virginia the excess amount on the schedule specified in the Public Global Resolution.

## XIII.  MISCELLANEOUS

A.  *No Admission of Liability.* Allergan has agreed to the terms of this Agreement solely for the purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, regulation, or ordinance, or of any other matter of fact or law, or of any fault, liability, or wrongdoing, all of which Allergan and the other Released Entities expressly deny. Neither Allergan nor any other Released Entity admits that it caused or contributed to any public nuisance, and neither Allergan nor any other Released Entity admits any wrongdoing that was or could have been alleged by any Releasor. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Allergan or any other Released Entity. No part of this Agreement is intended for use by any Third Party for any purpose, including submission to any court for any purpose.

B.  *Use of Agreement as Evidence.* Neither this Agreement nor any acts performed or documents executed pursuant to or in furtherance of this Agreement is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault, or omission of a Released Entity in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. Neither this Agreement nor any acts performed or documents executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Agreement, and except that a Released Entity may file this Agreement in any action in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good-faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim or to support a claim for contribution and/or indemnification.

C.  *Voluntary Settlement.* This Agreement was negotiated in good faith and at arm's-length over several months, and the exchange of the Remediation Amount and Litigation Cost Amount for the releases set forth herein is agreed to represent appropriate and fair consideration.

D.  *Federal, State and Local Laws Prevail.* Nothing in this Agreement shall be construed to authorize or require any action by Allergan or other Released Entities in violation of applicable federal, state, local, or other laws, rules, regulations, or guidance.

27

E.  *No Third-Party Beneficiaries.* Except as to Released Entities, nothing in this Agreement is intended to or shall confer upon any third party any legal or equitable right, benefit, or remedy of any nature whatsoever.

F.  *Binding Agreement.* This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto.

G.  *Choice of Law.* The terms of this Agreement shall be governed by the laws of the State of West Virginia.

H.  *No Conflict Intended.* The headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Agreement. The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms. Further, the terms "and" and "or" should be interpreted as "and/or," and the term "including" shall be interpreted as "including, but not limited to."

I.  *Construction.* The Parties agree and stipulate that this Agreement was negotiated on an arm's-length basis between parties of equal bargaining power.  This Agreement has been drafted jointly by counsel for each of the Parties.  Accordingly, this Agreement shall be mutually interpreted and not construed in favor of or against any of the Parties.

J.  *Right to Address Allegations Related to Litigation.* Nothing in the Agreement shall be construed to limit or impair any party's ability to:

1.  Communicate its positions and/or respond to media inquiries concerning litigation, investigations, or other proceedings or matters relating to Allergan, other Released Entities, or their respective Products, or class of Products.

2.  Maintain a website explaining its litigation positions and responding to allegations concerning Allergan, other Released Entities, or its or their Products.

K.  *No Waiver.* This Agreement is agreed upon without finding of liability of any kind and shall not be construed or used as a waiver or limitation of any defense otherwise available (including, but not limited to, jurisdictional defenses) to Allergan or any other Released Entity in any action or any other proceeding.  This Agreement shall not be construed or used as a waiver of any Released Entity's right to defend itself from, or make any legal or factual arguments in, any other regulatory, governmental, private party, or class claims or suits relating to the subject matter or terms of this Agreement.  For the avoidance of doubt, nothing in this Agreement

28

is intended to or shall be construed to prohibit any Released Entity in any way whatsoever from taking legal or factual positions with regard to any Products in defense of litigation or other legal proceedings.

L.   *No Private Right of Action.* No part of this Agreement shall create a private right of action for any Third Party or confer any right to any Third Party for violation of any federal or state statute, not shall it be used as an admission of liability or wrongdoing in any subsequent proceeding.

M.   *Modification.* This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Allergan may contact the West Virginia Attorney General for purposes of coordinating this process.

N.   *Entire Agreement.* This Agreement and its exhibits represent the full and complete terms of the settlement entered into by the Parties hereto.

O.   *Counterparts.* This Agreement may be executed in counterparts, and an email, facsimile, or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

P.   *Severability.* If any provision of this agreement—excepting **Section III(A)** (Consideration to be Provided by Allergan), **Section III(D)** (Remediation and Restitution), **Section VII** (Release and Dismissal), **Section VIII** (Participation by Local Governments), and **Section IX** (Disbursement of Litigation Cost Amount)— were for any reason held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Settlement Agreement.

Q.   *Notice.* All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

> For Allergan:
>
> Office of General Counsel
> One North Waukegan Road
> North Chicago, IL 60064
>
> Copy to Allergan's attorneys at:
>
> James F. Hurst, P.C.
> Kirkland & Ellis LLP

300 North LaSalle
Chicago, IL 60654
james.hurst@kirkland.com

For the West Virginia Attorney General:

Ann L. Haight, Deputy Attorney General
Abby G. Cunningham, Assistant Attorney General
The Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
Ann.L.Haight@wvago.gov
Abby.G.Cunningham@wvago.gov

30

**Approved:**

By: _____           Date: 09/28/2022

Scott T. Reents
Senior Vice President, Chief Financial Officer of AbbVie Inc.
Chief Financial Officer, Allergan Limited
Treasurer, Allergan Finance, LLC
1 North Waukegan Road
North Chicago, IL 60064
*On Behalf of Allergan and AbbVie*

By: _____           Date: 9/29/22
Patrick Morrisey, Attorney General

**Allergan West Virginia State-Wide Opioid Settlement Exhibits**

Exhibit A - List of litigating local governments .......................................................................... A-1

Exhibit B - List of West Virginia Counties, Cities, Towns and Villages .................................... B-1

Exhibit C - West Virginia Local Government Release Form ...................................................... C-1

Exhibit D - West Virginia First Memorandum of Understanding .............................................. D-1

Exhibit E - Injunctive Relief ..................................................................................................... E-1

Exhibit F - Consent Judgment ................................................................................................... F-1

Exhibit G - Case Management Order .......................................................................................... G-1

Exhibit H - AbbVie Inc. Entities ................................................................................................ H-1

Exhibit I - Allergan Entities ....................................................................................................... I-1

Exhibit J - Divested Entities ....................................................................................................... J-1

## EXHIBIT A

## LIST OF LITIGATING LOCAL GOVERNMENTS AS OF THE EXECUTION DATE[1]

### Counties

Barbour County
Berkeley County
Boone County
Braxton County
Brooke County
Cabell County
Calhoun County
Clay County
Doddridge County
Fayette County
Gilmer County
Grant County
Greenbrier County
Hancock County
Hardy County
Harrison County
Jackson County
Jefferson County
Kanawha County
Lewis County
Lincoln County
Logan County
Marion County
Marshall County
Mason County
McDowell County
Mercer County
Mineral County
Mingo County
Monongalia County
Monroe County
Morgan County
Nicholas County
Ohio County
Pendleton County

---

[1]    This list is subject to amendment in the event it proves to be incomplete and other entities that satisfy the definition for "Litigating Local Governments" are subsequently identified.

A-1

Pleasants County
Pocahontas County
Preston County
Putnam County
Randolph County
Ritchie County
Roane County
Taylor County
Tucker County
Tyler County
Upshur County
Wayne County
Webster County
Wetzel County
Wirt County
Wood County

## Cities, Towns, and Villages

Addison (Webster Springs)
Barboursville
Beckley
Belington
Belle
Bluefield
Buckhannon
Ceredo
Chapmanville
Charles Town
Charleston
Chesapeake
Clarksburg
Clendenin
Delbarton
Dunbar
Eleanor
Elizabeth
Fairmont
Fort Gay
Gauley Bridge
Gilbert
Glasgow
Glenville
Grafton
Granville
Hamlin

Harrisville
Huntington
Hurricane
Junior
Kenova
Kermit
Logan
Madison
Man
Matewan
Milton
Montgomery
Moundsville
Mullens
Nitro
Oceana
Parkersburg
Philippi
Point Pleasant
Princeton
Quinwood
Rainelle
Ravenswood
Richwood
Ripley
Romney
Rupert
Smithers
Sophia
South Charleston
Spencer
St. Albans
St. Marys
Star City
Summersville
Sutton
Vienna
Weirton
Welch
West Hamlin
White Sulphur Springs
Whitesville
Williamson
Williamstown
Winfield

**EXHIBIT B**

**LIST OF WEST VIRGINIA COUNTIES, CITIES, TOWNS, AND VILLAGES**

**Counties**

Barbour County
Berkeley County
Boone County
Braxton County
Brooke County
Cabell County
Calhoun County
Clay County
Doddridge County
Fayette County
Gilmer County
Grant County
Greenbrier County
Hampshire County
Hancock County
Hardy County
Harrison County
Jackson County
Jefferson County
Kanawha County
Lewis County
Lincoln County
Logan County
Marion County
Marshall County
Mason County
McDowell County
Mercer County
Mineral County
Mingo County
Monongalia County
Monroe County
Morgan County
Nicholas County
Ohio County
Pendleton County
Pleasants County
Pocahontas County
Preston County
Putnam County
Randolph County

Raleigh County
Ritchie County
Roane County
Summers County
Taylor County
Tucker County
Tyler County
Upshur County
Wayne County
Webster County
Wetzel County
Wirt County
Wood County
Wyoming County

## Class II Local Governments

Charleston
Huntington
Beckley
Clarksburg
Fairmont
Martinsburg
Morgantown
Parkersburg
South Charleston
St. Albans
Vienna
Weirton
Wheeling

## Class III Local Governments

Barboursville
Bethlehem
Bluefield
Bridgeport
Buckhannon
Charles Town
Chester
Dunbar
Elkins
Fayetteville
Follansbee
Grafton

Hinton
Hurricane
Kenova
Keyser
Kingwood
Lewisburg
Madison
Milton
Moorefield
Moundsville
New Martinsville
Nitro
Oak Hill
Paden City
Petersburg
Philippi
Pleasant Valley
Point Pleasant
Princeton
Ranson
Ravenswood
Ripley
Shinnston
Spencer
Summersville
Welch
Wellsburg
Weston
Westover
White Sulphur Springs
Williamson
Williamstown
Winfield

## Class IV Local Governments

Addison (Webster Springs)
Albright
Alderson
Anawalt
Anmoore
Ansted
Athens
Auburn
Bancroft
Barrackville

Bayard
Beech Bottom
Belington
Belle
Belmont
Benwood
Berkeley Springs (Bath)
Bethany
Beverly
Blacksville
Bolivar
Bradshaw
Bramwell
Brandonville
Bruceton Mills
Buffalo
Burnsville
Cairo
Camden-on-Gauley
Cameron
Capon Bridge
Carpendale
Cedar Grove
Ceredo
Chapmanville
Chesapeake
Clay
Clearview
Clendenin
Cowen
Danville
Davis
Davy
Delbarton
Durbin
East Bank
Eleanor
Elizabeth
Elk Garden
Ellenboro
Fairview
Falling Spring (Renick)
Farmington
Flatwoods
Flemington
Fort Gay

Franklin
Friendly
Gary
Gassaway
Gauley Bridge
Gilbert
Glasgow
Glen Dale
Glenville
Grant Town
Grantsville
Granville
Hambleton
Hamlin
Handley
Harman
Harpers Ferry
Harrisville
Hartford City
Hedgesville
Henderson
Hendricks
Hillsboro
Hundred
Huttonsville
Iaeger
Jane Lew
Junior
Kermit
Keystone
Kimball
Leon
Lester
Logan
Lost Creek
Lumberport
Mabscott
Man
Mannington
Marlinton
Marmet
Mason
Masontown
Matewan
Matoaka
McMechen

Meadow Bridge
Middlebourne
Mill Creek
Mitchell Heights
Monongah
Montgomery
Montrose
Mount Hope
Mullens
New Cumberland
New Haven
Newburg
North Hills
Northfork
Nutter Fort
Oakvale
Oceana
Parsons
Paw Paw
Pax
Pennsboro
Peterstown
Piedmont
Pine Grove
Pineville
Poca
Pratt
Pullman
Quinwood
Rainelle
Reedsville
Reedy
Rhodell
Richwood
Ridgeley
Rivesville
Romney
Ronceverte
Rowlesburg
Rupert
Salem
Sand Fork
Shepherdstown
Sistersville
Smithers
Smithfield

Sophia
St. Marys
Star City
Stonewood
Sutton
Sylvester
Terra Alta
Thomas
Thurmond
Triadelphia
Tunnelton
Union
Valley Grove
War
Wardensville
Wayne
West Hamlin
West Liberty
West Logan
West Milford
West Union
White Hall
Whitesville
Windsor Heights
Womelsdorf (Coalton)
Worthington

**Exhibit C**

## WEST VIRGINIA LOCAL GOVERNMENT
## ELECTION AND RELEASE FORM

This Election and Release Form for West Virginia Participating Local Governments resolves opioid-related Claims against Allergan and other Released Entities under the terms and conditions set forth in the Allergan West Virginia Statewide Opioid Settlement Agreement executed on _____, 2022 (the "Agreement"), the provisions of which are hereby incorporated by reference in their entirety. Upon executing this Election and Release Form, a Participating Local Government agrees that, in exchange for the consideration described in the Agreement, the Participating Local Government is bound by all the terms and conditions of the Agreement. By executing this Election and Release Form, the Participating Local Government submits to the jurisdiction of the panel overseeing the mass litigation proceeding captioned *In re: Opioid Litigation,* Civil Action No. 19-C-9000, in the Circuit Court of Kanawha County, West Virginia (the "Court"). To the extent the Participating Local Government has asserted Claims against Allergan or Released Entities in Actions that are pending before the Court, the Participating Local Government hereby grants all necessary right and authority to the West Virginia Attorney General to seek dismissal of the Participating Local Government's Action through the submission of the Consent Judgment as contemplated in the Agreement. If the Participating Local Government's Action is pending in another court as of the Effective Date, the Participating Local Government hereby agrees to dismiss (or if necessary move to dismiss) that Action as to Allergan and any other Released Entities within seven (7) business days of the Effective Date.


Dated: _____

[WEST VIRGINIA LOCAL GOVERNMENT]


By:_____
[NAME, TITLE]
[ADDRESS]
[TELEPHONE]
[EMAIL ADDRESS]

## Exhibit D

[WEST VIRGINIA FIRST MEMORANDUM OF UNDERSTANDING]

### WEST VIRGINIA FIRST
### MEMORANDUM OF UNDERSTANDING

#### General Principles

Whereas, the people of the State of West Virginia, its Local Governments and communities, have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and,

Whereas, certain Local Governments, through their elected representatives and counsel, and the State, through its Attorney General, are separately engaged in litigation seeking to hold Pharmaceutical Supply Chain Participants accountable for the public harms caused by their misfeasance, nonfeasance, and malfeasance; and

Whereas, the State, through its Attorney General, and its Local Governments share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance, and malfeasance throughout the State of West Virginia;

#### Terms

The State and its Local Governments and communities, subject to the completion of formal documents effectuating the Parties' agreements, enter into this Memorandum of Understanding ("MOU") relating to the allocation and use of the proceeds of Settlements and Judgments described herein.

**A.    Definitions**

As used in this Memorandum of Understanding:

1.    "Approved Purpose(s)" shall mean evidence-based strategies, programming and/or services used to expand the availability of treatment for individuals affected by substance use disorders and/or addiction, to develop, promote and provide evidence-based substance use prevention strategies, to provide substance use avoidance and awareness education, to engage in enforcement to curtail the sale, distribution, promotion or use of opioids and other drugs, to decrease the oversupply of licit and illicit opioids and to support recovery from addiction to be performed by qualified providers as is further set forth in Exhibit A and Paragraph B(3) below.

2.    "Court" is the West Virginia Mass Litigation Panel.

3.    "Foundation Share" shall mean Opioid Funds allocated to the Foundation from any settlement or judgment.

4.  "Judgment" shall mean a final judgment or verdict in favor of any of the Parties in a judicial proceeding pending in either state or federal court (including Bankruptcy Court) which resolves legal or equitable claims regarding opioids against a Pharmaceutical Supply Chain Participant. Judgment shall not include any judgment on the claims of Cabell County and the City of Huntington which were previously tried in the United States District Court for the Southern District of West Virginia, or any judgment on any claims asserted by the State against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust laws, state criminal laws, or claims asserted pursuant to W. Va. Code § 9-7-6(c) or for Medicaid reimbursement.

5.  "Local Government(s)" shall mean all counties, cities, villages, and towns located within the geographic boundaries of the State.

6.  "Local Government Share" or "LG Share" shall mean Opioid Funds allocated directly to Local Governments from any settlement or judgment.

7.  "Regional Share Calculation" shall mean each Region's share of Opioid Funds which shall be calculated by summing the individual percentage shares of the Local Governments set forth in Exhibit C for all of the subdivisions in the entire Region as defined in Exhibit B.

8.  "Net Opioid Fund" is the Opioid Fund less the Opioid Seed Fund payment.

9.  "Opioid Funds" shall mean monetary amounts obtained through a Settlement or Judgment as defined in this Memorandum of Understanding.

10.  "Pharmaceutical Supply Chain" shall mean the process and channels through which opioids are manufactured, marketed, promoted, distributed, or dispensed.

11.  "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, including but not limited to those persons or entities identified as Defendants in the matter captioned In re: Opioid Litigation, MDL 2804 pending in the United States District Court for the Northern District of Ohio, the proceedings before the West Virginia Mass Litigation Panel, styled In Re: Opioid Litigation, Civil Action No. 19-C-9000, and relates to conduct occurring prior to the date of this agreement. For the avoidance of doubt, the term Pharmaceutical Supply Chain Participant includes any parent or subsidiary company of any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, and any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, that seeks or has sought protection under the United States Bankruptcy Code.

12. "Settlement" shall mean the negotiated resolution by any of the Parties, of legal or equitable claims regarding opioids against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the Parties. It does not include the Settlements the State and/or the West Virginia Attorney General entered into with any Pharmaceutical Supply Chain Participant prior to December 1, 2021. For the avoidance of doubt McKinsey is included. Settlement shall not include the claims of Cabell County and the City of Huntington, which were previously tried in the United States District Court for the Southern District of West Virginia or settlement of any claims asserted by the State and/or the West Virginia Attorney General against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust laws, state criminal laws, or claims asserted pursuant to W. Va. Code, § 9-7-6(c) or for Medicaid reimbursement.

13. "State Share" shall mean Opioid Funds allocated to the State from any settlement or judgment.

14. "The Parties" shall mean the State and the Local Governments.

15. "Regions" shall mean the division of the Local Governments into six (6) separate areas as set forth in Exhibit B.

16. "The State" shall mean the State of West Virginia acting through its Attorney General.

17. "West Virginia Seed Fund" shall be funded as set forth in Paragraph B(2)(a). The funds are available for use in proper creation and documentation of the West Virginia Opioid Foundation and to fund their start-up work, and subsequent operation.

**B.    Settlement and Judgment Proceeds**

1. The Parties shall organize a private, nonstock, nonprofit corporation for the purposes of receiving and distributing West Virginia Opioid Funds as set forth in Section C. of this MOU ("Opioid Foundation").

2. The Parties shall allocate all Opioid Funds as follows:

   a. Subject to relevant approvals, the State shall pay into the West Virginia Seed Fund the $10,000,000 received from McKinsey & Company as a result of the February 3, 2021, consent judgment with the State.

   b. All other Opioid Funds covered by the agreement shall be allocated as set forth below:

      i.    24.5% of the Net Opioid Funds shall be allocated as LG Shares. These LG Shares shall be allocated amongst the Local Governments using the default percentages set forth in Exhibit C. Each county and its inclusive municipalities must either: (a) ratify the default allocation; (b) reach an agreement altering the default allocation; or (c) submit to binding arbitration before Judge Christopher Wilkes (WVMLP Special Master) whose decision will be final and non-app ealabl e.

      ii.    The Foundation will receive 72.5% of the Net Opioid Funds ("Foundation Share").

      iii.    The State shall receive 3% of the Net Opioid Funds ("State Share"), by and through the Attorney General, to be held in escrow for expenses incurred related to opioid litigation. If the 3% is not spent by December 31, 2026, then 1% goes to Local Governments and 2% goes to the Opioid Foundation.

3.    All Net Opioid Funds, regardless of allocation, shall be used in a manner consistent with the Approved Purposes definition. The LG Share may be used as restitution for past expenditures so long as the past expenditures were made for purposes that would have qualified or were consistent with the categories of Approved Purposes listed in Exhibit A. Prior to using any portion of the LG Share as restitution for past expenditures, a Local Government shall pass a resolution or take equivalent governmental action detailing and explaining its use of the funds for restitution. Moreover, up to one-half of the LG Share may be used to provide restitution for monies that were previously expended on opioid abatement activities, including law enforcement and regional jail fees.

4.    In the event a Local Government merges, dissolves, or ceases to exist, the relevant shares for that Local Government shall be redistributed equitably based on the composition of the successor Local Government. If a Local Government for any reason is excluded from a specific Settlement or Judgment, the allocation percentage for that Local Government shall be redistributed among the participating Local Governments for that Settlement or Judgment.

5.    If the LG Share is less than $500, then that amount will instead be distributed to the county in which the Local Government lies to allow practical application of the abatement remedy.

6.    Funds obtained that are unrelated to any Settlement or Judgment with a Pharmaceutical Supply Chain Participant, including those received via grant, bequest, gift, or the like, may be directed to the Opioid Foundation and disbursed as set forth below.

7.    The Foundation Share shall be used for the benefit of the people of West Virginia consistent with the by-laws of the Foundation documents and this MOU.

8.  Nothing in this MOU alters or changes the Parties' rights to pursue their own claims in litigation, subject to Paragraph E. Rather, the intent of this MOU is to join the Parties together regarding the distribution of the proceeds of settlements with or judgements against Pharmaceutical Supply Chain Participants for the benefit of all West Virginians and ensure that settlement monies are spent consistent with the Approved Purposes set forth in Exhibit A.

9.  Any settlement, judgment and/or other remedy arising out of *City of Huntington v. AmerisourceBergen Drug Corporation, et al.* (Civil Action No. 3:17-01362) and/or *Cabell County Commission v. AmerisourceBergen Drug Corporation, et al.* (Civil Action No. 3:17-01665) pending in the United States District Court for the Southern District of West Virginia (Faber, J.) ("CT2") is specifically excluded from this MOU.

## C.  The Opioid Foundation

1.  The Parties shall create a private section 501(c)(3) Opioid Foundation ("Foundation") with a governing board ("Board"), a panel of experts ("Expert Panel"), and such other regional entities as may be necessary for the purpose of receiving and disbursing Opioid Funds and other purposes as set forth both herein and in the documents establishing the Foundation. The Foundation will allow Local Governments to take advantage of economies of scale and will partner with the State to increase revenue streams.

2.  Each Region shall create their own governance structure, ensuring that all Local Governments have input and equitable representation regarding regional decisions including representation on the board and selection of projects to be funded from the Regional Share Calculation. The Expert Panel may consult with and may make recommendations to Regions on projects, services and/or expenses to be funded. Regions shall have the responsibility to make decisions that will allocate funds to projects, services and/or expenses that will equitably serve the needs of the entire Region.

3.  Board Composition

The Board will consist of 11 members comprising representation as follows:

a. To represent the interests of the State, five appointees of the governor, subject to confirmation by the Senate. The five appointees are intended to be limited to one from any given Region. If special circumstances are shown, this provision may be waived by a vote of four of the six Local Government members.

b. To represent the interests of the Local Governments, six members, with one member selected from each Region. The Local Governments in each Region shall make the selection of the board member to represent their region.

4.    Board terms will be staggered three-year terms. Board members may be reappointed.

5.    Board members shall serve as fiduciaries of the Foundation separate and distinct from any representational capacity of the entity appointing the Board Member. Members of any regional governing structure shall likewise serve as fiduciaries of their Region separate and distinct from any representational capacity of the entity appointing the member.

6.    Members of the board should have expertise in a variety of disciplines, such as substance abuse treatment, mental health, law enforcement, pharmacology, finance, and healthcare policy and management. Drawing Board members from these disciplines will help to ensure that the Board will make appropriate and prudent investments in order to meet short-term and long-term goals.

7.    Six members of the Board shall constitute a quorum. Members of the Board may participate in meetings by telephone or video conference or may select a designee to attend and vote if the Board member is unavailable to attend a board meeting.

8.    The Foundation shall have an Executive Director appointed by the Attorney General after consultation with the Board. The Board may reject the Attorney General's selection of the Executive Director only on the affirmative vote of eight members of the board. The Executive Director shall have at least six years' experience in healthcare, finance and management and will be responsible for the management, organization, and preservation of the public/private partnership's records. The Executive Director may be removed by the Board upon the concurrence of the votes of three-fourths of the members of the Board. The Executive Director shall have the right to attend all Board meetings unless otherwise excused but shall vote only in the event of a tie.

9.    The Board shall appoint the Expert Panel. The Expert Panel should include experts in the fields of substance abuse treatment, mental health, law enforcement, pharmacology, finance, and healthcare policy and management. The purpose of the Expert Panel is to assist the Board in making decisions about strategies for abating the opioid epidemic in local communities around the state. The Executive Director and any member of the Board shall have the right to attend all meetings of the Expert Panel.

10.   The governance of the Board and the criteria to be established for disbursement of funds shall be guided by the recognition that expenditures should insure the efficient and effective abatement of the opioid epidemic, the enforcement of laws to curb the use of opioids, and the prevention of future addiction and substance misuse based upon an intensity and needs basis. All expenditures must be consistent with the categories of Approved Purposes as set forth in Exhibit A hereto.

11.   Disbursement of Foundation Share by the Board

a.   The Foundation Board shall develop and approve procedures for the disbursement of Opioid Funds of the Foundation consistent with this Memorandum of Understanding.

b.   Funds for statewide programs, innovation, research, and education may also be expended by the Foundation from the Foundation Share, from the State Share (as directed by the State), or from sources other than Opioid Funds as provided below.

c.   The Foundation shall spend 20% of its annual budget in the six regions during the Foundation's first seven years of funding to be divided according to each Region's fixed Regional Share Calculation. After seven years, all regional spending will be as set forth in Section 11(d), below. Regions may, after consulting with the Expert Panel, expend the sums received under this Section 11(c) for any Approved Purposes.

d.   After the Regional Shares are distributed as set forth in Section 11(c), the Disbursement of Funds from the Foundation Share approved for disbursement by the Board for Approved Purposes shall be disbursed based on an evidence-based evaluation of need after consultation with the Expert Panel. The Parties do not intend to require any specific regional allocation of the Foundation Share other than those distributed pursuant to Paragraph 11(c).

e.   Regions may collaborate with other Regions to submit joint proposals.

f.   The proposed procedures shall set forth the role of the Expert Panel in advising the Regions and the Board concerning disbursements of Opioid Funds of the Foundation as set forth in this MOU.

g.   Within 90 days of the first receipt of any Opioid Funds and annually thereafter, the Board, after receiving counsel from its investment advisors and Expert Panel, shall determine the amount and timing of Foundation funds to be distributed annually. In making this determination, the Board shall consider: (a) Pending requests for Opioid Funds from communities, entities, or regions; (b) the total Opioid Funds available; (c) the timing of anticipated receipts of future Opioid Funds; (d) non-Opioid funds received by the Foundation; (e) investment income; and (f) long-term financial viability of the Foundation. The Foundation may disburse its principal and interest with the aim towards an efficient, expeditious abatement of the Opioid crisis considering long term and short-term strategies.

12.   The Foundation, Expert Panel, and any other entities under the supervision of the Foundation, including the Regions, shall operate in a transparent manner. Meetings

should be open. All operations of the Foundation and all Foundation supervised entities, including the Regions, shall be subject to audit and review by the Attorney General and/or other appropriate State officials.

13. Each Local Government shall submit an annual financial report to the Foundation no later than April 30 of each year specifying the amounts spent on Approved Purposes within the Region during the previous fiscal year. A report for each Region shall be prepared no later than thirty days thereafter. Each Region's report shall incorporate the information disclosed in each Local Government's annual report generated pursuant to Section B(4), above. Each Region's report shall specify (i) the amount of Opioid Funds received, (ii) the amount of Opioid Funds disbursed or applied during the previous fiscal year, broken down by categories of Approved Uses (indicating the name of the recipient, the amount awarded, a description of the use of the award, and disbursement terms), and (iii) impact information measuring or describing the progress of the Approved Use strategies.

14. The Foundation shall publish a consolidated report detailing annual financial expenditures within 15 days of the last day of the state fiscal year covered by the report.

15. The Foundation shall consult with a professional investment advisor to adopt a Foundation investment policy that will seek to assure that the Foundation's investments are appropriate, prudent, and consistent with best practices for investments of public funds. The investment policy shall be designed to meet the Foundation's long and short-term goals.

16. The Foundation and any Foundation supervised entity may receive funds including stocks, bonds, real property, government grants, private-sector donations, and cash in addition to the proceeds of the Litigation. These Non-Opioid additional funds shall be subject only to the limitations, if any, contained in the individual award, grant, donation, gift, bequest, or deposit consistent with the mission of the Foundation.

## D. Payment of Attorneys' Fees and Litigation Expenses

Payment of all Attorneys' Fees and Litigation Expenses shall be awarded consistent with the orders of the Court and upon recommendation of Judge Christopher Wilkes (WVMLP Special Master). Such award shall be final and non-appealable.

## E. Authority to Negotiate and Announcing Resolution of Claims

1. The Court has established three case tracks.

   a. Manufacturers and Pharmacy claims are to be coordinated by the office of Attorney General Morrisey and his designated counsel. The Attorney General shall retain the authority over resolution of those claims after

consultation and coordination with Local Governments subject to Court approval.

b. The Distributor Claims are to be coordinated by Co-Lead Counsel Paul Farrell, Jr. and Robert Fitzsimmons. The Co-Leads shall retain the authority over resolution of those claims after consultation and coordination with Local Governments and their counsel and the Attorney General and his designated counsel.

2. If there is any resolution of any claim before the Court, it will be announced and presented to the Court jointly by the Attorney General and the Local Governments for Approval.

## F. Amendments

The Parties agree to make such amendments as necessary to implement the general principles of this MOU.

## EXHIBIT A

## SCHEDULE A - CORE STRATEGIES

The Parties shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("**Core Strategies**).[1]

### A. NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES

1. Expand training for first responders, schools, community support groups and families; and

2. Increase distribution to individuals who are uninsured or whose insurance does not cover the needed services.

### B. MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT

1. Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

### C. PREGNANT & POSTPARTUM WOMEN

1. Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for women and co-occurring Opioid Use Disorder ("OUD") and other substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established by the Opioid Abatement Foundation.

3. Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

### D. EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME

1. Expand comprehensive evidence-based treatment and recovery support for NAS babies;

2. Expand services for better continuation of care with infant-need dyad; and

3. Expand long-term treatment and services for medical monitoring of NAS babies and their families.

### E. EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES

1. Expand services such as on-call teams to begin MAT in hospital emergency departments;

2. Expand warm hand-off services to transition to recovery services;

3. Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4. Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5. Hire additional social workers or other behavioral health workers to facilitate expansion above.

### F. TREATMENT FOR INCARCERATED POPULATION

1. Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2. Increase funding for jails to provide treatment to inmates with OUD.

### G. PREVENTION PROGRAMS

1. Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2. Funding for evidence-based prevention programs in schools;

3.      Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.      Funding for community drug disposal programs; and

5.      Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

### H.    EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.

### I.    LAW ENFORCEMENT

1.      Funding for law enforcement efforts to curtail the sale, distribution, promotion or use of opioids and other drugs to reduce the oversupply of licit and illicit opioids, including regional jail fees.

### J.    RESEARCH

Research to ameliorate the opioid epidemic and to identify new tools to reduce and address opioid addiction. Holistically seek to address the problem from a supply, demand, and educational perspective. Ensure tools exist to provide law enforcement with appropriate enforcement to address needs.

## SCHEDULE B - APPROVED USES

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:[2]

### PART ONE: TREATMENT

### A.     TREAT OPIOID USE DISORDER (OUD)

1. Support treatment of Opioid Use Disorder (OUD) and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUB/MH conditions.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support intervention, treatment, and recovery services, offered by qualified professionals and service providers, including but not limited to faith-based organizations or peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established by the Opioid Abatement Foundation.

specialists, including telementoring to assist community-based providers in rural or underserved areas.

9.     Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10.    Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SLTD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

11.    Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

12.    Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

13.    Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2.     Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, case management, and connections to community-based services.

3.     Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage and support non-profits, faith-based communities, and community coalitions to support, house, and train people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact with and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

Exhibit A - 6

C.   **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have - or are at risk of developing - OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OLTI treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

Exhibit A - 7

11.     Expand warm hand-off services to transition to recovery services.

12.     Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.     Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage and support non-profits and the faith-based community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

### D.      ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

a.      Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

b.      Active outreach strategies such as the Drug Abuse Response Team (DART) model;

c.      "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

d.      Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

e.      Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

     f.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OLTD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison, have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.     Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.     Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, case management, or other services offered in connection with any of the strategies described in this section.

## E.    ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women — or women who could become pregnant — who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and childcare services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services — Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain

Exhibit A - 10

from the U.S. Centers for Disease Control and Prevention, or other recognized Best Practice guidelines, including providers at hospitals (academic detailing).

2.  Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3.  Continuing Medical Education (CME) on appropriate prescribing of opioids.

4.  Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5.  Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a.  Increase the number of prescribers using PDMPs;

    b.  Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c.  Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6.  Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7.  Increase electronic prescribing to prevent diversion or forgery.

8.  Educate Dispensers on appropriate opioid dispensing.

## G.   PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Fund media campaigns to prevent opioid misuse.

2.  Corrective advertising or affirmative public education campaigns based on evidence.

3.  Public education relating to drug disposal.

Exhibit A - 11

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction — including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage and support non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

**H.      PREVENT OVERDOSE DEATHS AND OTHER OPIOID-RELATED INJURIES**

Support efforts to prevent or reduce overdose deaths or other opioid-related injuries through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, and community outreach workers, persons being released from jail or prison, or other members of the general public.

2.    Public health entities providing free naloxone to anyone in the community.

3.    Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.    Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.    Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.    Public education relating to emergency responses to overdoses.

7.    Public education relating to immunity and Good Samaritan laws.

8.    Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

10.   Support mobile units that offer or provide referrals to treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

11.   Support screening for fentanyl in routine clinical toxicology testing.


## PART THREE: OTHER STRATEGIES

### I.   **FIRST RESPONDERS**

In addition to items in Section C, D and H relating to first responders, support the following:

1.    Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

### J.   **LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

Exhibit A - 13

1.  Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing negative outcomes related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.  A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.  Invest in infrastructure or staffing at government, law enforcement, or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of reducing the oversupply of opioids, preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.  Provide resources to staff government oversight and management of opioid abatement programs.

## K.  TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or networking programs and services to improve the capability of government, law enforcement, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.  RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

Exhibit A - 14

1.  Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2.  Research non-opioid treatment of chronic pain.

3.  Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4.  Research on novel prevention efforts such as the provision of fentanyl test strips.

5.  Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6.  Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7.  Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8.  Qualitative and quantitative research regarding public health risks within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9.  Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## M.    LAW ENFORCEMENT

Ensure appropriate resources for law enforcement to engage in enforcement and possess adequate equipment, tools, and manpower to address complexity of the opioid problem.

Exhibit A - 15

# EXHIBIT B.
# OPIOID REGIONAL MAP

**Region 1**
Brooke, Hancock, Ohio
Marshall and Wetzel Counties

**Region 2**
Grant, Hampshire, Hardy,
Mineral, Berkeley, Jefferson,
Pendleton and Morgan Counties

**Region 3**
Wood, Tyler, Pleasants,
Ritchie, Wirt, Calhoun,
Roane, and Jackson Counties

**Region 4**
Monongalia, Braxton, Lewis
Harrison, Marion, Preston,
Taylor, Tucker, Barbour,
Randolph, Gilmer, Doddridge
and Upshur Counties



**Region 5**
Cabell, Clay, Boone, Kanawha,
Lincoln, Logan, Putnam, Mason,
Mingo, and Wayne Counties

**Region 6**
Fayette, Monroe, Raleigh, Summers,
Nicholas, Webster, Greenbrier,
Pocahontas, Mercer, Wyoming, and
McDowell Counties

Exhibit C (Allocations to Subdivisions)

**Allocation to West Virginia Counties and Municipalities (NOT Including Cabell County and Huntington)**

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0191% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0037% |
| ANAWALT TOWN | MCDOWELL | 0.0008% |
| ANMOORE TOWN | HARRISON | 0.0083% |
| ANSTED TOWN | FAYETTE | 0.0024% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0002% |
| BARBOUR COUNTY | BARBOUR | 0.3900% |
| BARBOURSVILLE VILLAGE | CABELL | 0.4372% |
| BARRACKVILLE TOWN | MARION | 0.0016% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0068% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.7259% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0355% |
| BELLE TOWN | KANAWHA | 0.0411% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0076% |
| BERKELEY COUNTY | BERKELEY | 3.5839% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0020% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVI LLE TOWN | MONONGALIA | 0.0003% |
| BLUEFIELD CITY | MERCER | 0.1794% |
| BOLIVAR TOWN | JEFFERSON | 0.0058% |
| BOONE COUNTY | BOONE | 3.1744% |
| BRADSHAW TOWN | MCDOWELL | 0.0012% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.5244% |
| BRIDGEPORT CITY | HARRISON | 0.0761% |
| BROOKE COUNTY | BROOKE | 1.0924% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1667% |
| BUFFALO TOWN | PUTNAM | 0.0009% |
| BURNSVILLE TOWN | BRAXTON | 0.0029% |
| CABELL COUNTY | CABELL | 0.0000% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1767% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0003% |
| CAMERON CITY | MARSHALL | 0.0021% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0024% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0008% |
| CEREDO CITY | WAYNE | 0.1678% |
| CHAPMANVI LLE TOWN | LOGAN | 0.1592% |
| CHARLES TOWN CITY | JEFFERSON | 0.2924% |
| CHARLESTON CITY | KANAWHA | 6.7218% |
| CHESAPEAKE TOWN | KANAWHA | 0.0180% |
| CHESTER CITY | HANCOCK | 0.0077% |
| CLARKSBURG CITY | HARRISON | 1.1365% |
| CLAY COUNTY | CLAY | 0.3373% |
| CLAY TOWN | CLAY | 0.0001% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0257% |
| COWEN TOWN | WEBSTER | 0.0012% |
| DANVILLE TOWN | BOONE | 0.0012% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0006% |
| DELBARTON TOWN | MINGO | 0.0517% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2312% |
| DUNBAR CITY | KANAWHA | 0.2917% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0144% |
| ELIZABETH TOWN | WIRT | 0.0048% |
| ELK GARDEN TOWN | MINERAL | 0.0007% |
| ELKINS CITY | RANDOLPH | 0.0321% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAI RMONT CITY | MARION | 0.6852% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.6411% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1828% |
| FLATWOODS TOWN | BRAXTON | 0.0007% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0123% |
| FORT GAY TOWN | WAYNE | 0.0324% |
| FRANKLIN TOWN | PENDLETON | 0.0014% |
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0012% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| GASSAWAY TOWN | BRAXTON | 0.0024% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0531% |
| GILBERT TOWN | MINGO | 0.0728% |
| GILMER COUNTY | GILMER | 0.1919% |
| GLASGOW TOWN | KANAWHA | 0.0016% |
| GLEN DALE CITY | MARSHALL | 0.0050% |
| GLENVILLE TOWN | GILMER | 0.0169% |
| GRAFTON CITY | TAYLOR | 0.4640% |
| GRANT COUNTY | GRANT | 0.3394% |
| GRANT TOWN TOWN | MARION | 0.0109% |
| GRANTSVILLE TOWN | CALHOUN | 0.0012% |
| GRANVILLE TOWN | MONONGALIA | 0.1649% |
| GREENBRIER COUNTY | GREENBRIER | 1.4386% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0703% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0869% |
| HANCOCK COUNTY | HANCOCK | 1.6106% |
| HANDLEY TOWN | KANAWHA | 0.0007% |
| HARDY COUNTY | HARDY | 0.2815% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0095% |
| HARRISON COUNTY | HARRISON | 1.3251% |
| HARRISVILLE TOWN | RITCHIE | 0.0045% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.4106% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 0.0000% |
| HURRICANE CITY | PUTNAM | 0.2140% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0006% |
| JACKSON COUNTY | JACKSON | 0.8319% |
| JANE LEW TOWN | LEWIS | 0.0010% |
| JEFFERSON COUNTY | JEFFERSON | 1.7496% |
| JUNIOR TOWN | BARBOUR | 0.0036% |
| KANAWHA COUNTY | KANAWHA | 3.6016% |
| KENOVA CITY | WAYNE | 0.2064% |
| KERMIT TOWN | MINGO | 0.0294% |
| KEYSER CITY | MINERAL | 0.0078% |
| KEYSTONE CITY | MCDOWELL | 0.0018% |
| KIMBALL TOWN | MCDOWELL | 0.0020% |
| KINGWOOD CITY | PRESTON | 0.0046% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0310% |
| LEWIS COUNTY | LEWIS | 0.4053% |
| LEWISBURG CITY | GREENBRIER | 0.3917% |
| LINCOLN COUNTY | LINCOLN | 1.3818% |
| LOGAN CITY | LOGAN | 0.4429% |
| LOGAN COUNTY | LOGAN | 3.7315% |
| LOST CREEK TOWN | HARRISON | 0.0001% |
| LUMBERPORT TOWN | HARRISON | 0.0027% |
| MABSCOTT TOWN | RALEIGH | 0.0512% |
| MADISON CITY | BOONE | 0.0578% |
| MAN TOWN | LOGAN | 0.0025% |
| MANNINGTON CITY | MARION | 0.0030% |
| MARION COUNTY | MARION | 1.0540% |
| MARLINTON TOWN | POCAHONTAS | 0.0009% |
| MARMET CITY | KANAWHA | 0.0061% |
| MARSHALL COUNTY | MARSHALL | 0.8648% |
| MARTINSBURG CITY | BERKELEY | 3.5343% |
| MASON COUNTY | MASON | 1.3496% |
| MASON TOWN | MASON | 0.0028% |
| MASONTOWN TOWN | PRESTON | 0.0008% |
| MATEWAN TOWN | MINGO | 0.0718% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 3.2036% |
| MCMECHEN CITY | MARSHALL | 0.0079% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0005% |
| MERCER COUNTY | MERCER | 0.3738% |
| MIDDLEBOURNE TOWN | TYLER | 0.0003% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1485% |
| MINERAL COUNTY | MINERAL | 0.8526% |
| MINGO COUNTY | MINGO | 2.9452% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0028% |
| MONONGALIA COUNTY | MONONGALIA | 1.4987% |
| MONROE COUNTY | MONROE | 0.5766% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.1004% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0092% |
| MORGAN COUNTY | MORGAN | 0.7095% |
| MORGANTOWN CITY | MONONGALIA | 0.1330% |
| MOUNDSVI LLE CITY | MARSHALL | 0.3175% |
| MOUNT HOPE CITY | FAYETTE | 0.0918% |
| MULLENS CITY | WYOMING | 0.3675% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0034% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| NEW HAVEN TOWN | MASON | 0.0057% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0019% |
| NEWBURG TOWN | PRESTON | 0.0012% |
| NICHOLAS COUNTY | NICHOLAS | 0.2115% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2710% |
| NORTH HILLS TOWN | WOOD | 0.0016% |
| NORTHFORK TOWN | MCDOWELL | 0.0006% |
| NUTTER FORT TOWN | HARRISON | 0.1025% |
| OAK HILL CITY | FAYETTE | 0.3993% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.3269% |
| OHIO COUNTY | OHIO | 0.5595% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0073% |
| PARKERSBURG CITY | WOOD | 1.7126% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0019% |
| PAX TOWN | FAYETTE | 0.0083% |
| PENDLETON COUNTY | PENDLETON | 0.1789% |
| PENNSBORO CITY | RITCHIE | 0.0004% |
| PETERSBURG CITY | GRANT | 0.0012% |
| PETERSTOWN TOWN | MONROE | 0.0014% |
| PHILIPPI CITY | BARBOUR | 0.0919% |
| PIEDMONT TOWN | MINERAL | 0.0007% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1284% |
| PLEASANT VALLEY CITY | MARION | 0.0011% |
| PLEASANTS COUNTY | PLEASANTS | 0.1406% |
| POCA TOWN | PUTNAM | 0.0003% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3759% |
| POINT PLEASANT CITY | MASON | 0.1406% |
| PRATT TOWN | KANAWHA | 0.0014% |
| PRESTON COUNTY | PRESTON | 0.8811% |
| PRINCETON CITY | MERCER | 4.6088% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.7741% |
| QUINWOOD TOWN | GREENBRIER | 0.0182% |
| RAINELLE TOWN | GREENBRIER | 0.0266% |
| RALEIGH COUNTY | RALEIGH | 5.5343% |
| RANDOLPH COUNTY | RANDOLPH | 0.7294% |
| RANSON CORPORATION | JEFFERSON | 0.0234% |
| RAVENSWOOD CITY | JACKSON | 0.0959% |
| REEDSVILLE TOWN | PRESTON | 0.0007% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0014% |
| RICHWOOD CITY | NICHOLAS | 0.0103% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| RIDGELEY TOWN | MINERAL | 0.0027% |
| RIPLEY CITY | JACKSON | 0.0921% |
| RITCHIE COUNTY | RITCHIE | 0.2018% |
| RIVESVI LLE TOWN | MARION | 0.0010% |
| ROANE COUNTY | ROANE | 0.5653% |
| ROMNEY CITY | HAMPSHIRE | 0.0614% |
| RONCEVERTE CITY | GREENBRIER | 0.0960% |
| ROWLESBURG TOWN | PRESTON | 0.0024% |
| RUPERT TOWN | GREENBRIER | 0.0073% |
| SALEM CITY | HARRISON | 0.0042% |
| SAND FORK TOWN | GILMER | 0.0003% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0088% |
| SHINNSTON CITY | HARRISON | 0.1066% |
| SISTERSVILLE CITY | TYLER | 0.2085% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0383% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0409% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.9750% |
| SPENCER CITY | ROANE | 0.0646% |
| ST. ALBANS CITY | KANAWHA | 0.4843% |
| ST. MARYS CITY | PLEASANTS | 0.0623% |
| STAR CITY TOWN | MONONGALIA | 0.0414% |
| STONEWOOD CITY | HARRISON | 0.0478% |
| SUMMERS COUNTY | SUMMERS | 0.3559% |
| SUMMERSVILLE CITY | NICHOLAS | 1.6957% |
| SUTTON TOWN | BRAXTON | 0.0210% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0431% |
| TERRA ALTA TOWN | PRESTON | 0.0015% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1255% |
| TUNNELTON TOWN | PRESTON | 0.0006% |
| TYLER COUNTY | TYLER | 0.0204% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.5108% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2838% |
| WAR CITY | MCDOWELL | 0.0020% |
| WARDENSVILLE TOWN | HARDY | 0.0013% |
| WAYNE COUNTY | WAYNE | 2.3586% |
| WAYNE TOWN | WAYNE | 0.0356% |
| WEBSTER COUNTY | WEBSTER | 0.3765% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.3728% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
| --- | --- | --- |
| WELCH CITY | MCDOWELL | 0.1195% |
| WELLSBURG CITY | BROOKE | 0.0069% |
| WEST HAMLIN TOWN | LINCOLN | 0.0380% |
| WEST LIBERTY TOWN | OHIO | 0.0025% |
| WEST LOGAN TOWN | LOGAN | 0.0162% |
| WEST MILFORD TOWN | HARRISON | 0.0015% |
| WEST UNION TOWN | DODDRIDGE | 0.0007% |
| WESTON CITY | LEWIS | 0.0096% |
| WESTOVER CITY | MONONGALIA | 0.0094% |
| WETZEL COUNTY | WETZEL | 0.4889% |
| WHEELING CITY | OHIO/MARSHALL | 1.0692% |
| WHITE HALL TOWN | MARION | 0.0028% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1585% |
| WHITESVILLE TOWN | BOONE | 0.0148% |
| WILLIAMSON CITY | MINGO | 0.3916% |
| WILLIAMSTOWN CITY | WOOD | 0.0567% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WI NFIELD TOWN | PUTNAM | 0.0307% |
| WIRT COUNTY | WIRT | 0.1075% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0010% |
| WOOD COUNTY | WOOD | 1.0924% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 4.0024% |

**Totals**                                                       **100.0000%**

Exhibit C (Allocations to Subdivisions)

Allocation to West Virginia Counties and Municipalities (Including Cabell County and Huntington)

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0174% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0034% |
| ANAWALT TOWN | MCDOWELL | 0.0007% |
| ANMOORE TOWN | HARRISON | 0.0076% |
| ANSTED TOWN | FAYETTE | 0.0022% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0001% |
| BARBOUR COUNTY | BARBOUR | 0.3541% |
| BARBOURSVI LLE VILLAGE | CABELL | 0.3969% |
| BARRACKVILLE TOWN | MARION | 0.0015% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0062% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.3824% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0322% |
| BELLE TOWN | KANAWHA | 0.0373% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0070% |
| BERKELEY COUNTY | BERKELEY | 3.2534% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0018% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVILLE TOWN | MONONGALIA | 0.0002% |
| BLUEFIELD CITY | MERCER | 0.1629% |
| BOLIVAR TOWN | JEFFERSON | 0.0053% |
| BOONE COUNTY | BOONE | 2.8817% |
| BRADSHAW TOWN | MCDOWELL | 0.0011% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.4761% |
| BRIDGEPORT CITY | HARRISON | 0.0694% |
| BROOKE COUNTY | BROOKE | 0.9916% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1513% |
| BUFFALO TOWN | PUTNAM | 0.0008% |
| BURNSVI LLE TOWN | BRAXTON | 0.0026% |

Revised 9/29/2020

1 /

7

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| CABELL COUNTY | CABELL | 3.2406% |
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1604% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0002% |
| CAMERON CITY | MARSHALL | 0.0019% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0022% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0007% |
| CEREDO CITY | WAYNE | 0.1523% |
| CHAPMANVILLE TOWN | LOGAN | 0.1445% |
| CHARLES TOWN CITY | JEFFERSON | 0.2655% |
| CHARLESTON CITY | KANAWHA | 6.1020% |
| CHESAPEAKE TOWN | KANAWHA | 0.0163% |
| CHESTER CITY | HANCOCK | 0.0070% |
| CLARKSBURG CITY | HARRISON | 1.0317% |
| CLAY COUNTY | CLAY | 0.3062% |
| CLAY TOWN | CLAY | 0.0000% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0233% |
| COWEN TOWN | WEBSTER | 0.0011% |
| DANVILLE TOWN | BOONE | 0.0011% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0005% |
| DELBARTON TOWN | MINGO | 0.0469% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2099% |
| DUNBAR CITY | KANAWHA | 0.2648% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0131% |
| ELIZABETH TOWN | WIRT | 0.0043% |
| ELK GARDEN TOWN | MINERAL | 0.0006% |
| ELKINS CITY | RANDOLPH | 0.0293% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAIRMONT CITY | MARION | 0.6220% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.4898% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1659% |
| FLATWOODS TOWN | BRAXTON | 0.0006% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0112% |
| FORT GAY TOWN | WAYNE | 0.0294% |
| FRANKLIN TOWN | PENDLETON | 0.0013% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0011% |
| GASSAWAY TOWN | BRAXTON | 0.0022% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0482% |
| GILBERT TOWN | MINGO | 0.0661% |
| GILMER COUNTY | GILMER | 0.1742% |
| GLASGOW TOWN | KANAWHA | 0.0015% |
| GLEN DALE CITY | MARSHALL | 0.0045% |
| GLENVILLE TOWN | GILMER | 0.0153% |
| GRAFTON CITY | TAYLOR | 0.4212% |
| GRANT COUNTY | GRANT | 0.3081% |
| GRANT TOWN TOWN | MARION | 0.0099% |
| GRANTSVILLE TOWN | CALHOUN | 0.0011% |
| GRANVI LLE TOWN | MONONGALIA | 0.1497% |
| GREENBRIER COUNTY | GREENBRIER | 1.3059% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0638% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0793% |
| HANCOCK COUNTY | HANCOCK | 1.4621% |
| HANDLEY TOWN | KANAWHA | 0.0006% |
| HARDY COUNTY | HARDY | 0.2555% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0086% |
| HARRISON COUNTY | HARRISON | 1.2029% |
| HARRISVI LLE TOWN | RITCHIE | 0.0041% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.3727% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 5.9777% |
| HURRICANE CITY | PUTNAM | 0.1943% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0005% |
| JACKSON COUNTY | JACKSON | 0.7552% |
| JANE LEW TOWN | LEWIS | 0.0009% |
| JEFFERSON COUNTY | JEFFERSON | 1.5882% |
| JUNIOR TOWN | BARBOUR | 0.0032% |
| KANAWHA COUNTY | KANAWHA | 3.2694% |
| KENOVA CITY | WAYNE | 0.1874% |
| KERMIT TOWN | MINGO | 0.0267% |
| KEYSER CITY | MINERAL | 0.0072% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| KEYSTONE CITY | MCDOWELL | 0.0016% |
| KIMBALL TOWN | MCDOWELL | 0.0019% |
| KINGWOOD CITY | PRESTON | 0.0042% |
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0281% |
| LEWIS COUNTY | LEWIS | 0.3679% |
| LEWISBURG CITY | GREENBRIER | 0.3556% |
| LINCOLN COUNTY | LINCOLN | 1.2544% |
| LOGAN CITY | LOGAN | 0.4020% |
| LOGAN COUNTY | LOGAN | 3.3874% |
| LOST CREEK TOWN | HARRISON | 0.0000% |
| LUMBERPORT TOWN | HARRISON | 0.0025% |
| MABSCOTT TOWN | RALEIGH | 0.0465% |
| MADISON CITY | BOONE | 0.0525% |
| MAN TOWN | LOGAN | 0.0023% |
| MANNINGTON CITY | MARION | 0.0028% |
| MARION COUNTY | MARION | 0.9568% |
| MARLINTON TOWN | POCAHONTAS | 0.0008% |
| MARMET CITY | KANAWHA | 0.0055% |
| MARSHALL COUNTY | MARSHALL | 0.7851% |
| MARTINSBURG CITY | BERKELEY | 3.2084% |
| MASON COUNTY | MASON | 1.2251% |
| MASON TOWN | MASON | 0.0026% |
| MASONTOWN TOWN | PRESTON | 0.0007% |
| MATEWAN TOWN | MINGO | 0.0652% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 2.9082% |
| MCMECHEN CITY | MARSHALL | 0.0072% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0004% |
| MERCER COUNTY | MERCER | 0.3393% |
| MIDDLEBOURNE TOWN | TYLER | 0.0002% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1348% |
| MINERAL COUNTY | MINERAL | 0.7740% |
| MINGO COUNTY | MINGO | 2.6736% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0026% |
| MONONGALIA COUNTY | MONONGALIA | 1.3605% |
| MONROE COUNTY | MONROE | 0.5234% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.0912% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0084% |
| MORGAN COUNTY | MORGAN | 0.6441% |
| MORGANTOWN CITY | MONONGALIA | 0.1213% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| MOUNDSVILLE CITY | MARSHALL | 0.2882% |
| MOUNT HOPE CITY | FAYETTE | 0.0834% |
| MULLENS CITY | WYOMING | 0.3336% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0031% |
| NEW HAVEN TOWN | MASON | 0.0052% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0018% |
| NEWBURG TOWN | PRESTON | 0.0011% |
| NICHOLAS COUNTY | NICHOLAS | 0.1920% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2460% |
| NORTH HILLS TOWN | WOOD | 0.0015% |
| NORTHFORK TOWN | MCDOWELL | 0.0005% |
| NUTTER FORT TOWN | HARRISON | 0.0930% |
| OAK HILL CITY | FAYETTE | 0.3625% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.2967% |
| OHIO COUNTY | OHIO | 0.5079% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0067% |
| PARKERSBURG CITY | WOOD | 1.5547% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0017% |
| PAX TOWN | FAYETTE | 0.0076% |
| PENDLETON COUNTY | PENDLETON | 0.1624% |
| PENNSBORO CITY | RITCHIE | 0.0003% |
| PETERSBURG CITY | GRANT | 0.0011% |
| PETERSTOWN TOWN | MONROE | 0.0013% |
| PHILIPPI CITY | BARBOUR | 0.0834% |
| PIEDMONT TOWN | MINERAL | 0.0006% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1165% |
| PLEASANT VALLEY CITY | MARION | 0.0010% |
| PLEASANTS COUNTY | PLEASANTS | 0.1276% |
| POCA TOWN | PUTNAM | 0.0002% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3412% |
| POINT PLEASANT CITY | MASON | 0.1276% |
| PRATT TOWN | KANAWHA | 0.0013% |
| PRESTON COUNTY | PRESTON | 0.7999% |
| PRINCETON CITY | MERCER | 4.1839% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.6105% |
| QUI NWOOD TOWN | GREENBRIER | 0.0165% |
| RAINELLE TOWN | GREENBRIER | 0.0241% |
| RALEIGH COUNTY | RALEIGH | 5.0240% |
| RANDOLPH COUNTY | RANDOLPH | 0.6622% |
| RANSON CORPORATION | JEFFERSON | 0.0214% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| RAVENSWOOD CITY | JACKSON | 0.0870% |
| REEDSVI LLE TOWN | PRESTON | 0.0006% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0013% |
| RICHWOOD CITY | NICHOLAS | 0.0093% |
| RIDGELEY TOWN | MINERAL | 0.0024% |
| RIPLEY CITY | JACKSON | 0.0836% |
| RITCHIE COUNTY | RITCHIE | 0.1832% |
| RIVESVILLE TOWN | MARION | 0.0009% |
| ROANE COUNTY | ROANE | 0.5132% |
| ROMNEY CITY | HAMPSHIRE | 0.0557% |
| RONCEVERTE CITY | GREENBRIER | 0.0871% |
| ROWLESBURG TOWN | PRESTON | 0.0022% |
| RUPERT TOWN | GREENBRIER | 0.0066% |
| SALEM CITY | HARRISON | 0.0038% |
| SAND FORK TOWN | GILMER | 0.0002% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0080% |
| SHINNSTON CITY | HARRISON | 0.0968% |
| SISTERSVILLE CITY | TYLER | 0.1893% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0348% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0371% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.8851% |
| SPENCER CITY | ROANE | 0.0586% |
| ST. ALBANS CITY | KANAWHA | 0.4397% |
| ST. MARYS CITY | PLEASANTS | 0.0565% |
| STAR CITY TOWN | MONONGALIA | 0.0376% |
| STONEWOOD CITY | HARRISON | 0.0434% |
| SUMMERS COUNTY | SUMMERS | 0.3231% |
| SUMMERSVILLE CITY | NICHOLAS | 1.5393% |
| SUTTON TOWN | BRAXTON | 0.0191% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0391% |
| TERRA ALTA TOWN | PRESTON | 0.0014% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1140% |
| TUNNELTON TOWN | PRESTON | 0.0005% |
| TYLER COUNTY | TYLER | 0.0185% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.4637% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2577% |

Revised 9/29/2020

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| WAR CITY | MCDOWELL | 0.0018% |
| WARDENSVILLE TOWN | HARDY | 0.0012% |
| WAYNE COUNTY | WAYNE | 2.1411% |
| WAYNE TOWN | WAYNE | 0.0323% |
| WEBSTER COUNTY | WEBSTER | 0.3418% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.2462% |
| WELCH CITY | MCDOWELL | 0.1085% |
| WELLSBURG CITY | BROOKE | 0.0063% |
| WEST HAMLIN TOWN | LINCOLN | 0.0345% |
| WEST LIBERTY TOWN | OHIO | 0.0023% |
| WEST LOGAN TOWN | LOGAN | 0.0147% |
| WEST MILFORD TOWN | HARRISON | 0.0014% |
| WEST UNION TOWN | DODDRIDGE | 0.0006% |
| WESTON CITY | LEWIS | 0.0088% |
| WESTOVER CITY | MONONGALIA | 0.0086% |
| WETZEL COUNTY | WETZEL | 0.4438% |
| WHEELING CITY | OHIO/MARSHALL | 0.9706% |
| WHITE HALL TOWN | MARION | 0.0025% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1439% |
| WHITESVILLE TOWN | BOONE | 0.0134% |
| WILLIAMSON CITY | MINGO | 0.3555% |
| WILLIAMSTOWN CITY | WOOD | 0.0515% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WINFIELD TOWN | PUTNAM | 0.0279% |
| WIRT COUNTY | WIRT | 0.0976% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0009% |
| WOOD COUNTY | WOOD | 0.9917% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 3.6334% |

| Totals | | 100.0000% |
|---|---|---|

**Exhibit E**

**INJUNCTIVE RELIEF**

Allergan does not currently manufacture, sell, or promote any Opioids or Opioid Products. As provided below, Allergan shall not manufacture, sell, or promote any Opioids or Opioid Products in or for distribution in the State. However, the Parties acknowledge that certain Opioids or Opioid Products sold by Allergan prior to 2021 may still be circulating in the marketplace outside the possession and control of Allergan and the same is not a breach of any terms within this Agreement.

A.    **Definitions**

1.    The definitions set forth in the Agreement apply to this Exhibit.

2.    For purposes of this **Exhibit E** only, *Allergan* means Allergan Finance, LLC, Allergan Limited, and AbbVie Inc., and each of their respective parents (as applicable), subsidiaries, successors, affiliates, and officers, directors, employees, representatives, and agents under the control of the foregoing.

B.    **Compliance Duration**

1.    **Exhibit E** of this Agreement shall be effective until March 3, 2032 and is limited to conduct in the United States that involves or affects the State.

2.    Nothing in this Agreement shall relieve Allergan of its independent obligation to fully comply with the laws of the State before or after expiration of the injunction period specified in this subsection.

C.    **Ban on Selling and Manufacturing Opioids**

1.    Allergan shall not manufacture or sell any Opioids or Opioid Products for distribution in the State. Allergan represents that Kadian® and Norco® were voluntarily discontinued by the end of 2020 and that the last inventory shipped will expire on or before June 30, 2023.

D.    **Ban on Promotion**

1.    Allergan shall not engage in promotion of Opioids or Opioid Products, including but not limited to, by:

a.    Employing or contracting with sales representatives, Health Care Providers, any Third Party, or other persons to promote Opioids or Opioid Products to (i) Health Care Providers, (ii) patients, (iii) third-party payors (e.g., any entity, other than an individual, that

E-1

pays or reimburses for the dispensing of prescription medicines, including but not limited to manage care organizations and pharmacy benefit managers), or (iv) persons involved in determining formulary access or treatment guidelines to promote Opioids or Opioid Products;

        b.     Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for promotion of Opioids or Opioid Products; and

        c.     Creating or distributing promotional materials (such as advertisements) that promote Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, guides, websites or internet advertisements, social media accounts or networks, and providing hyperlinks, engaging in internet search engine optimization, or otherwise directing internet traffic by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet to promote Opioids or Opioid Products.

        2.     Notwithstanding **Section D(1)** directly above, Allergan may engage in other conduct, including but not limited to the following:

        a.     Maintain a corporate website that includes Opioid Products on company's list of products that contains principally the following content: the FDA-approved package insert, medication guide, and labeling;

        b.     Maintain a product website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

        c.     Provide factual information about Opioid Products sold by Allergan prior to 2021 which may still be circulating in the marketplace outside the possession and control of Allergan (including but not limited to an Opioid Product's NDC, SKU, or other relevant information such as formulation, package size, dosage, or pricing);

        d.     Provide or collect information or support the provision or collection of information as expressly required by law or any state or federal government agency with jurisdiction in West Virginia (including but not limited to collecting and/or reporting adverse events related to Opioid Products);

        e.     Provide the following by mail, electronic mail, on or through Allergan's corporate or product websites, or through other electronic or digital methods: FDA-approved package insert, medication guide, and labeling for Opioid Products, or other prescribing information for Opioid Products that are published or approved by a state or federal government agency with jurisdiction in West Virginia;

        f.     Provide scientific and/or medical information to a Health Care Provider consistent with FDA standards, rules, regulations, and/or guidance, including, but not limited to, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical*

*or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

      g.    Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved package insert, medication guide, and labeling for Opioid Products, to speak with a licensed Health Care Provider without describing the safety or effectiveness of any Opioid Product or naming any specific Health Care Provider, or to speak with their health insurance carrier regarding coverage of an Opioid Product;

      h.    Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with FDA standards, rules, regulations, and/or guidance, including, but not limited to, FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

      i.    Conduct or provide financial support or In-Kind Support for bona fide scientific research; and

      j.    Draft, publish, or provide financial support or In-Kind Support for bona fide scientific publications.

      3.    Promotion of Treatment of Pain to promote Opioids or Opioid Products

      a.    Allergan shall not promote the Treatment of Pain with or by referring directly to Opioids or Opioid Products (including with Unbranded Information) or with the intent and purpose of promoting Opioids or Opioid Products.

      b.    Allergan shall not promote the concept that pain is undertreated to promote Opioids or Opioid Products.

      c.    For the avoidance of doubt, this **Section D** is not intended and shall not be interpreted to prohibit any and all discussions or references to Opioids or Opioid Products when doing so is not to promote Opioids or Opioid Product, including, for example, if certain patient populations, such as those with a history of abuse of Opioids or Opioid Products, are identified as having a higher prevalence of other conditions, such as Hepatitis C, or being appropriate candidates for treatment of those other conditions.

**E.    No Financial Reward or Discipline Based on Volume of Opioid Product Sales**

      1.    Allergan shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products; and

      2.    Allergan shall not offer or pay any remuneration (including any compensation or rebate), directly or indirectly, to any person in return for the prescribing, sale,

use, or distribution of an Opioid Product (except to the extent a pre-existing contractual or legal requirement exists related to Opioid Products sold by Allergan before 2021).

**F.      Ban on Funding/Grants to Third Parties**

1.      Allergan shall not directly or indirectly provide financial support or In-Kind Support to any Third Party regarding conduct that promotes Opioids or Opioid Products, including educational programs, brochures, newsletters, pamphlets, journals, books, guides, websites, or social media accounts or networks that promote Opioids or Opioid Products, but excluding financial support otherwise required by the Agreement, a court order, a federal or state agency (e.g., FDA-approved Risk Evaluation and Mitigation Strategy (REMs)), or a federal or state law or regulation.

2.      Allergan shall not directly or indirectly provide financial support or In-Kind Support to any Third Party for medical education programs with the intent and purpose of promoting Opioids or Opioid Products.

3.      Allergan shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group related to conduct that promotes Opioids or Opioid Products.

4.      Allergan shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of promoting Opioids or Opioid Products.

5.      Allergan shall not use, assist, or employ any Third Party to engage in any activity that Allergan itself would be prohibited from engaging in pursuant to the Agreement.

6.      Allergan shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids or Opioid Products.

7.      Allergan shall play no role in appointing persons to the board, or hiring persons to the staff, of any Third Party that primarily engages in conduct that promotes Opioids or Opioid Products. For avoidance of doubt, nothing in this paragraph shall prohibit Allergan from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or board member at any such Third Party.

**G.      Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1.      Allergan shall comply with all applicable State laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, provided that nothing in this paragraph requires Allergan to violate federal law or regulations, including but not limited to:

        a.      West Virginia State Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

        b.      West Virginia State Consumer Protection Laws; and

        c.      West Virginia State laws, regulations, and guidelines related to the prescribing, distribution, and disposal of Opioid Products.

### H. Clinical Data Transparency

1. Allergan agrees to make available to an independent Third-Party data center or platform owner (e.g., Vivli) anonymized clinical data generated from Allergan-sponsored Phase II-IV interventional clinical studies—regardless of whether that data was submitted to a regulatory authority (e.g., FDA)—for branded opioid drugs that are Opioids or Opioid Products that have received an initial marketing authorization from a regulatory authority to the extent Allergan conducts a reasonable, good faith investigation to locate any such data and it is in Allergan's possession. For the avoidance of doubt, anonymized clinical data includes:

        a.      Full analyzable data set(s) (including individual participant-level data de-identified);

        b.      The clinical study report(s) redacted for commercial or personal identifying information;

        c.      The full protocol(s) (including the initial version, final version, and all amendments); and

        d.      Full statistical analysis plan(s) (including all amendments and documentation for additional work processes); and Dataset Specifications, which describe the available dataset variables (such as age, race, blood pressure, lab values, etc.).

2. The independent Third Party will facilitate the disclosure of such clinical data to qualified researchers with a bona fide scientific research proposal as reviewed and approved by an independent review panel for scientific merit consistent with the panel's assessment criteria and pursuant to an agreed upon data use agreement.

3. Allergan shall not interfere with decisions made by the staff or reviewers associated with the independent Third-Party data center or platform owner.

4. Allergan shall bear all costs for making clinical data available pursuant to **Section H** of this Agreement.

### I. Compliance Deadlines

1. Allergan must be in full compliance with the provisions included in **Exhibit E** of this Agreement within 180 days after the Effective Date. Nothing herein shall be construed as permitting or requiring Allergan to avoid existing legal obligations.

**Exhibit F**

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**IN RE: OPIOID LITIGATION**                    **CIVIL ACTION NO. 21-C-9000 MFR**

### THIS DOCUMENT APPLIES TO:

STATE OF WEST VIRGINIA ex rel.
PATRICK MORRISEY, Attorney General,

        Plaintiff,

v.                                                    Civil Action No. 19-C-104 BNE

TEVA PHARMACEUTICAL INDUSTRIES, LTD., et al.,

        Defendants.

### CONSENT JUDGMENT

Plaintiff, the State of West Virginia ("Plaintiff"), brought the above-captioned action against Defendants Allergan Finance, LLC, Allergan Sales, LLC, and Allergan USA, Inc. (collectively, "Allergan"), among others, alleging that Allergan violated West Virginia law by deceptively marketing opioid pain medications so as to overstate their efficacy and downplay the associated risk of addiction, which resulted in a public nuisance in West Virginia; that Allergan violated the law by failing to monitor, report and not ship allegedly suspicious orders of opioid pain medications; and that Allergan violated the West Virginia Consumer Credit and Protection Act, W. Va. Code §§ 46A-1-101 et seq. (the "West Virginia AG Action").

In addition, numerous governmental entities in West Virginia, including counties, cities, towns and villages ("Local Governments") have brought separate lawsuits ("Actions") in various forums against Allergan, among others. These Actions assert claims that arise out of or relate to alleged conduct that is substantially similar to or overlaps with the conduct alleged in the West Virginia AG Action (the "Covered Conduct").

Allergan denies the allegations in the West Virginia AG Action and other Actions and maintains that it has no liability whatsoever to Plaintiff or to any Local Government or other governmental entity (whether such governmental entity has brought or is a party to another Action or not). Plaintiff and Allergan (the "Parties"), by their respective counsel, have agreed to a resolution of the West Virginia AG Action on the terms set out in the Allergan West Virginia Statewide Opioid Settlement Agreement ("Agreement," attached to this judgment), which include the entry of this Consent Judgment (and the injunctive terms incorporated herein) by the Court without trial or finding of admission or wrongdoing or liability of any kind. Furthermore, under the Agreement, the West Virginia AG has agreed to obtain releases on behalf of Litigating Local Governments as well as Non-Litigating Local Governments as specified in the Agreement. The intention of the Parties is to resolve and release Claims of the West Virginia AG and Local Governments, whether asserted previously or in the future, that arise out of or relate to the Covered Conduct. Unless otherwise specified, capitalized terms used herein shall have the meanings specified in the Agreement.

NOW THEREFORE, without trial or adjudication of any issue of fact or law presented in the West Virginia AG Action or the other Actions, without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, and upon the Parties' consent, IT IS HEREBY ORDERED AS FOLLOWS:

## I.    PARTIES

1.    Defendant Allergan Finance, LLC is a Nevada limited liability company headquartered in Madison, New Jersey.

2.    Defendant Allergan Sales, LLC is a Delaware limited liability company headquartered in Irvine, California.

F-2

3.      Defendant Allergan USA, Inc. is a Delaware corporation headquartered in Madison, New Jersey.

4.      Plaintiff has the authority to act in the public interest and on behalf of the people of West Virginia.

## II.      JURISDICTION

5.      This Court has jurisdiction over the Parties and the subject matter of this action.

## III.      AGREEMENT

6.      The Parties have agreed to resolution of the West Virginia AG Action under the terms of their Agreement, which is attached hereto as [**Exhibit A**]. This Consent Judgment summarizes and gives effect to those terms. In the event of a conflict between the terms of the Exhibits and this summary document, the terms of the Agreement shall govern.

## IV.      FINANCIAL TERMS

7.      Pursuant to the terms of the Parties' Agreement, Allergan shall pay a total of $51.20 million (the "Total Payment") into the Qualified Settlement Fund as specified in the Agreement, consisting of a Remediation Amount ($45.30 million) which will be allocated in accordance with the West Virginia First Memorandum of Understanding to fund opioid abatement and treatment activities throughout the State, and a Litigation Cost Amount ($5.90 million) to be available to reimburse the reasonable fees, costs and expenses incurred by the State and Litigating Local Governments (or their respective counsel) in connection with their Claims against Allergan in the Actions.

8.      Through the entry of this Consent Judgment, the Court finds that each of the Total Payment, the Remediation Amount and the Litigation Cost Amount were negotiated in good faith, are fair and are in the in the best interests of the State, the Local Governments and their respective citizens.

## V. INJUNCTIVE TERMS

9.      The Parties have agreed that Allergan shall be subject to the injunctive terms set forth in **Exhibit E** to their Agreement. Those agreed injunctive terms are expressly incorporated into and are given full force and effect by this Consent Judgment, and Allergan shall comply with the injunctive terms within 180 days of entry of this Consent Judgment.

10.     Compliance with injunctive terms may be enforced in this Court consistent with the terms specified in the injunctive provisions set forth in the Parties' Agreement.

## VI. RELEASES AND DISMISSAL WITH PREJUDICE

11.     Plaintiff and Allergan have agreed to the Release of certain Claims as provided in **Section VII** of the Agreement. Such Releases are given in good faith and upon entry of this Consent Judgment shall be effective as to all Releasors.

12.     The State's Claims against Allergan and other Released Entities are hereby DISMISSED WITH PREJUDICE, with each Party to bear its own costs except as specified in the Agreement.

13.     Further, as a condition precedent to the Agreement becoming Effective, all Participating Local Governments were required to execute an Election and Release Form (**Exhibit C** to the Agreement), through which those Participating Local Governments agreed to be bound by all terms and conditions of the Agreement, including but not limited to the Release of certain Claims provided in **Section VII** of the Agreement. Such Releases are given in good faith and upon entry of this Consent Judgment shall become effective (a) as to all Litigating Local Governments that have asserted Claims against Allergan as part of any Actions pending before the Court and that have become Participating Local Governments, and (b) as to all Non-Litigating Local Governments that, as of the date of this Consent Judgment, have become Participating Local Governments pursuant to **Section VII** of the Agreement.

14.     The Claims of all Participating Litigating Local Governments that have been asserted against Allergan and other Released Entities in Actions pending before this Court are hereby DISMISSED WITH PREJUDICE, with each party to bear its own costs except as specified in the Agreement.[2]

## VII.    MISCELLANEOUS

15.     This Court retains jurisdiction to enforce the terms of this Consent Judgment. The parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court. This Consent Judgment may be modified only by order of this Court.

16.     This Consent Judgment shall remain in full force and effect through March 3, 2032, at which time Allergan's obligations under the Consent Judgment shall expire.

17.     Entry of this Consent Judgment is in the public interest.

IT IS SO ORDERED, ADJUDGED AND DECREED, this _____ day of [INSERT MONTH] 2022.

_____

---

[2]     Prior to finalizing and submitting the Consent Judgment to the Court, the Parties will agree upon, and attach as an exhibit to this Consent Judgment, a list of all Actions to be dismissed by the Court.

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

FOR STATE OF WEST VIRGINIA

PATRICK MORRISEY
ATTORNEY GENERAL


By:    _____
       [to come]

Date:  _____

[Additional approvals on subsequent pages]

COUNSEL FOR DEFENDANTS ALLERGAN FINANCE, LLC, ALLERGAN SALES, LLC, AND ALLERGAN USA, INC.

By: _____

Tim J. Yianne (WVSB #8623)
Patricia M. Bello (WVSB #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLP
Chase Tower, 707 Virginia Street E., Suite 1400
Charleston, WV 25301
Telephone:    (304) 553 0166
Facsimile:    (304) 343 1805
Email:        tim.yianne@lewisbrisbois.com
Email:        patricia.bello@lewisbrisbois.com

**Exhibit G**

**This Document Applies to All Cases**

IN THE CIRCUIT COURT OF KANAWHA
COUNTY, WEST VIRGINIA

| | |
|---|---|
| IN RE: OPIOID LITIGATION | CIVIL ACTION NO. 19-C-9000 |

**CASE MANAGEMENT ORDER**

This Case Management Order ("CMO") shall apply to all Non-Participating Litigating

Local Governments and future plaintiffs in this Mass Litigation proceeding (collectively,

"Plaintiffs"). As used herein, "Defendants" refers to Allergan Finance, LLC, Allergan Sales,

LLC, and Allergan USA, Inc., as well as any other "Released Entity" as that term is defined in

the Allergan West Virginia Statewide Opioid Settlement Agreement executed on _____,

2022 (the "Agreement"). As used herein, "Non-Participating Litigating Local Governments"

refers to Litigating Local Governments that brought any "Released Claims," as that term is

defined in the Agreement, against Allergan, and have not elected to participate in the Agreement.

Good cause appearing, it is ordered as follows:

**I.    PLAINTIFFS' REQUIREMENT TO PRODUCE CERTAIN SPECIFIED
        INFORMATION ABOUT THEIR CLAIMS**

**A.    Plaintiffs' Production Requirements.** Each Plaintiff shall serve the following

documents and/or information upon counsel for Defendants within ninety (90) days of the entry

of this Order or, in the case of any Plaintiff that commences an action or is added as a party to an

existing action after the entry of this Order, within ninety (90) days of commencing or being

added to such action:

1.      **Fact Sheet.** Each Plaintiff shall serve upon the Defendants a completed copy of the Fact Sheet attached as Exhibit 1 to this Case Management Order. The completed Fact Sheet shall include a Certification (in the form contained in Exhibit 1) in which the Plaintiff declares under penalty of perjury that all information provided in the Fact Sheet is complete, true and accurate and that the Plaintiff has provided all required documents and information.

2.      **Record Production.**

a.      Each Plaintiff shall produce all records establishing the existence of any alleged public nuisance within the Plaintiff's territory or borders, including a definition of the alleged nuisance and evidence to support its existence and scope.

b.      Each Plaintiff shall produce all records supporting any claim for "abatement" relief, including a categorization and itemization of any requested abatement relief, evidence to support each component of such relief, and the geographic area as to which such relief is requested.

c.      Each Plaintiff shall produce all records supporting any claim for damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages. To the extent a Plaintiff argues that such alleged damages have already been incurred, the Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement. To the extent the Plaintiff argues that such alleged damages will be incurred in the future, the Plaintiff shall produce all evidence supporting any allegation that future damages are likely to be incurred and the amounts in which Plaintiff contends such alleged damages are likely to be incurred, and records reflecting whether such

future alleged damage will be paid or reimbursed through a grant, insurance or other third party source.

d.     For any relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that have made or will make the expenditures, when and how long those entities have made or will make the expenditures, and the nature of the expenditures, including how they have addressed or will address any and all alleged harms. Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

e.     Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly inappropriate prescriptions shall identify the specific prescriptions alleged to have been inappropriate, to whom and by whom the specific prescriptions alleged to have been inappropriate were written, the pharmacy(ies) that filled each specific prescription alleged to have been inappropriate, whether the Plaintiff was reimbursed for any or all of the specific prescriptions alleged to have been inappropriate, and the Plaintiff's basis for identifying the specific prescriptions alleged to have been inappropriate.

3.     **Affidavit.** An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit 1 to this Case Management Order; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO. If any of the documents or records described in this section do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

4.      **Expert Reports.** Each Plaintiff shall serve on counsel for Defendants a case-specific expert report or reports executed by one or more qualified expert(s), under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report"). Each Case-Specific Expert Report shall include all matter required to comply with West Virginia Rule of Civil Procedure 26, West Virginia law, and at least:

a.      *Plaintiff's Information.* The Plaintiff's name;

b.      *Expert's Information.* The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

c.      *Records.* All records reviewed by the expert in preparation of the Case-Specific Expert Report;

d.      *Reliance Materials.* All materials relied on by the expert in preparation of the Case-Specific Expert Report;

e.      *Locations.* If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how Plaintiff has been affected by any alleged public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

f.      *Subjects of Report(s).* The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to opine, including but not limited to the following:

G-4

      i.      Whether the records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

      ii.      Whether the records reviewed by the expert(s) indicate the existence of any alleged nuisance and, if so, the nature of the alleged nuisance;

      iii.      Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that allegedly wrongful conduct;

      iv.      An opinion explaining the basis for any contention that the Plaintiff incurred damages caused by the Defendants' alleged conduct;

      v.      An opinion explaining the basis for any contention that the Defendants' alleged conduct forming the basis for the Plaintiff's claims is continuing;

      vi.      An opinion explaining the basis for any contention that any relief sought would "abate" any alleged public nuisance;

      vii.      An opinion explaining how the alleged public nuisance identified by the expert differs from and is not subsumed within the alleged public nuisance addressed by the Agreement; and

      viii.      An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

**B.      Deadline to comply.**

1.      For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by **Section 1(A)** shall be produced within ninety (90) days of the entry of this CMO, if its claims have not been dismissed with prejudice by that date.

2.      For any Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by **Section 1(A)** shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

3.      All litigation deadlines applicable to Defendants in a given case shall be stayed until the Plaintiff in that case has produced the items required by **Section 1(A)**.

**C.      Failure to comply.**

1.      *Notice of Non-Compliance and Opportunity to Cure.* If any Plaintiff fails to comply with any provision of this Order, including the requirement to provide each and every fact, record and expert opinion required to be produced pursuant to **Section 1(A)** of this Order, Plaintiff shall have sixty (60) days to cure its non-compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiffs complaint, shall be held in abeyance.

2.      *Failure to Cure.* If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiffs claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

3.      *Extensions of Time.* The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order. During the period wherein non-

compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

## II.    DISCOVERY ON STATUTE OF LIMITATIONS AND OTHER TIME-BASED DEFENSES

A.    Each Plaintiff must, within the time frames established by **Section 1(B)**, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information:

1.    the date the Plaintiff first learned of the harms alleged in its complaint;

2.    how the Plaintiff first learned of the harms alleged in its complaint;

3.    the date the Plaintiff first learned of each aspect of the Defendants' alleged conduct;

4.    how the Plaintiff first learned of each aspect of the Defendants' alleged conduct;

5.    the date the Plaintiff first learned that the harms alleged in its complaint may be related to each aspect of Defendants' alleged conduct;

6.    how the Plaintiff first learned the harms alleged in its complaint may be related to Defendants' alleged conduct;

7.    the date the Plaintiff first spoke to or corresponded with an attorney about the harms alleged in the Plaintiff's complaint, the Defendants' alleged conduct, and/or potential litigation in this matter; and

8.    the date the Plaintiff first retained counsel in connection with this matter.

**B.** Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

### III. Case-Specific Discovery and Related Dispositive Motion Practice

**A.** If a Plaintiff complies with the production requirements outlined above in Sections I and II, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and motions to exclude expert testimony, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

**B.** During such discovery, the Parties are permitted to serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition. If a Plaintiff serves any written discovery upon Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery. The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendant at this time. No other depositions may be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

C.     If a case survives the Defendant's summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues. Discovery with regard to any other defendants will be addressed at this time as well. The filing and briefing of summary judgment motions and motions to exclude expert testimony after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and motions to exclude expert testimony after completing full fact and expert discovery. The Court's use of the term "non-duplicative'' is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or motions to exclude expert testimony concerning witnesses addressed in motions to exclude expert testimony filed at the conclusion of the expedited discovery period.

D.     The foregoing provisions do not preclude Defendants from filing non- duplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.


Dated: _____        _____

                                                  Lead Presiding Judge

## EXHIBIT 1

IN THE CIRCUIT COURT OF KANAWHA
COUNTY, WEST VIRGINIA

| | |
|---|---|
| IN RE: OPIOID LITIGATION | CIVIL ACTION NO. 19-C-9000 |

## FACT SHEET

Plaintiff (also referred to as "You" throughout) shall provide information responsive to the questions set forth below. You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your case. Plaintiff shall supplement its responses if it learns that they are incomplete or incorrect in any material respect.

**PLAINTIFF:**

_____

Case caption and number:

_____

Contact attorney name for:

_____

Firm:

_____

Telephone number:

_____

E-mail address:

_____

Description of any other entities or citizens on whose behalf You purport to seek relief in this lawsuit:

I.  **CLAIM INFORMATION**

    A.    **Injuries, Damages, and Persons with Relevant Knowledge:**

        1.    To the best of Your knowledge, for each Defendant You name, identify the approximate date (i.e., month and year) when You claim You were first injured and began to incur damages as a result of the Defendant's alleged conduct. This request is not designed to require an expert evaluation.

        2.    Please identify each category of damages or monetary relief that You allege, including all injunctive relief that You seek.

        3.    Are You seeking in Your lawsuit any monetary damages based on Your payment for allegedly improper opioid prescription claims?

            Yes____No ____

        4.    Have You or has anyone acting on Your behalf had any communication, oral or written, with any Defendants or their representatives, other than communications through Your attorneys?

            Yes____No____Don't Know__

            **If yes, please identify the date(s), method(s), and nature of the communication(s).**

        5.    Have You been involved in opioid-related civil litigation in the past?

            Yes____No____Don't Know __

            **If yes, please identify the date(s), jurisdiction(s), case name(s) and partie(s).**

        6.    List Your Departments or Divisions and the current head of each Department/Division for the period for which You seek damages or other relief.

        7.    Identify by name, title, and dates of employment Your current employees or representatives with knowledge concerning

            a.    Prescription Opioids and their:

                i.    abuse,

                ii.    use,

                iii.    misuse,

                iv.    diversion, and/or,

          v.        Your residents' addiction to Prescription Opioids

   b.     Other opioids and their:

          i.        possession,

          ii.       abuse,

          iii.     illegal sale, or

          iv.     Your residents' addition to other opioids

8.     Identify the person(s) who held the following position(s) or their equivalent, for the period for which You seek damages or other relief:

   a.     Mayors

   b.     City councilmembers

   c.     County commissioners

   d.     County supervisors

   e.     County executives

   f.     Chief health officers

   g.     Auditors

   h.     Recorders

   i.     Sheriffs or Police Chiefs

   j.     Coroners or Medical Examiners

   k.     Treasurers

   l.     Chief accountants

   m.     Chief financial officers

   n.     Correctional facility supervisors

   o.     Wardens

   p.     Heads of Department of Public Health

   q.     Fire chiefs

   r.     Directors of Emergency Medical Services

9.      Identify Your annual budget and the actual expenditures You made for the period for which You seek damages or other relief with respect to each category of damages You claim. For each of the following categories, please also indicate the sources of said funds, the fund balances at the beginning of each year, and applicable rules regarding fund balances, if any, as to the following:

     a.      Law enforcement expenditures

     b.      EMS expenditures

     c.      Fire department/protection expenditures

     d.      Court expenditures

     e.      Prison/corrections/incarceration expenditures

     f.      Substance abuse treatment expenditures

     g.      Public health expenditures

     h.      Child/family services

     i.      Workers compensation

     j.      Health insurance

10.      Identify any grant, donation, or other funding designated for or allocated to addressing issues related to Prescription Opioids.

**B.      Claim-Specific Information**

1.      Identify each physician, other healthcare provider, Pharmacist, or Pharmacy within Your boundaries who, based on information reasonably available to You, has been the target of a law enforcement or administrative investigation You conducted concerning the physician's, provider's, or Pharmacy/ist's prescribing or dispensing of Prescription Opioids for the period for which You seek damages or other relief (this request is only intended to pertain to closed investigations). See also Section II, question 3.

2.      Do You now or have You ever identified, tracked, or otherwise have in Your possession, custody, or control, information concerning physicians or other healthcare providers who wrote Medically Unnecessary Opioid prescriptions in or for patients residing within Your geographical boundaries?

     Yes____ No ____

3.    Do You now or have You ever identified, tracked, or otherwise have in Your possession, custody, or control, information concerning any Suspicious Orders for Prescription Opioids?

    Yes____No____

4.    Do You now or have You ever identified, tracked, or otherwise have in Your possession, custody, or control, information concerning counterfeit Prescription Opioids?

    Yes____No____

5.    Do You now or have You ever identified, tracked, or otherwise have in Your possession, custody, or control, information concerning the distribution, sale, or supply of opioids other than Prescription Opioids?

    Yes____No____

6.    Based on information reasonably available to You: (a) provide the number of overdose deaths of Your residents for the period for which You seek damages or other relief on a year-by-year basis; (b) for each such death, identify the substance(s) (including, for Prescription Opioids, the active ingredient, whether the medication was brand or generic, and the company that marketed the specific medication) on which Your resident overdosed; and (c) identify the basis for this determination (e.g., medical examiner report, toxicology lab reports).

7.    Did You ever notify any State or Federal agency (e.g., Board of Pharmacy, Department of Medicaid, Department of Public Safety, Drug Enforcement Agency, etc.) of suspected wrongful conduct related to Prescription Opioids for the period for which You seek damages or other relief. If yes, please identify the date of the notification, the subject of the conduct, and the general nature of the suspected wrongdoing.

    Yes____No____

8.    Identify every medical insurance plan or carrier, behavioral health carriers, or workers' compensation program used for any of Your employees for the period for which You seek damages or other relief. For each response, please provide the following information:

    a.    Name(s) of the Medical Insurance Plan or Carrier, Behavioral Health Carrier, and/or Worker's Compensation Program

    b.    Relevant Time Period(s) for which You seek Damages or other Relief

    c.    Name(s) and Title of Individuals Who Oversaw Program

9.      Identify every Pharmacy Benefit Manager and other third-party administrator You used for the period for which You seek damages or other relief. For each response, please provide the following information:

      a.      Name(s) of the Pharmacy Benefit Manager and/or Other Third-Party Administrator

      b.      Relevant Time Period(s) for which You Seek Damages or Other Relief

      c.      Name(s) and Title of Individuals who Oversaw Program

**C.      Opioid-Related Services and Programs:**

For the following questions, please provide information for the period for which YOU seek damages or other relief.

1.      Have You formed or participated in an Opioid Task Force or other program or group to address opioid use, misuse, abuse, addiction, or diversion? If yes, provide the name, members for the period for which You seek damages or other relief, dates of operation, budget, and source(s) of funding.

2.      Have You had or provided funding for any disposal program for Prescription Opioids or other substances? If yes, describe the program and provide the name, dates, and administrator(s) of the program.

3.      Have You had or provided funding for any needle exchange program? If yes, provide the name, dates, and administrator(s) of the program.

4.      Have You operated or funded any addiction treatment programs related to Prescription Opioids? If yes, provide the name and dates.

5.      Have You provided or funded any drug abuse prevention or education programs related to Prescription Opioids? If yes, provide the name of the program(s), dates of operation, sources of development (e.g., was program developed by federal government, academic institution, private foundation, etc.), how Your program was implemented, costs of implementation/operation, and sources of funding.

**II.      DOCUMENTS**

Please produce the following documents for the period for which You seek damages or other relief, to the extent that these documents are in Your possession, custody, or control.

1.      Documents You maintain that refer or relate to the volume or amount of Prescription Opioids in Your geographical boundaries that were

      a.      prescribed,

      b.      dispensed,

      c.      sold,

      d.      distributed,

      e.      diverted, or

      f.      abused

2. Documents you maintain that refer or relate to the volume or amount of non-Prescription Opioids distributed, sold, or supplied in Your geographical boundaries.

3. Meeting agendas for any City Council, County Commission, County Health Board/Commission, or their equivalent that reference opioids or related topics.

4. To the extent that You identified any physician, healthcare provider, Pharmacist, or Pharmacy in response to questions I.B.l above, please provide that investigation file for those physicians, healthcare providers, Pharmacists, or Pharmacies.

5. Documents referring or relating to the economic impact of opioid abuse and/or misuse in Your geographical boundaries.

6. Any detailed data sets such as, but not limited to, reports of hospital admissions or call logs, that You intend to use to demonstrate Your damages or other relief sought.

**III.**   **CERTIFICATION**

I declare under penalty of perjury that all of the information provided in this [County] Fact Sheet is complete, true, and correct to the best of my knowledge and information, and that I have provided all of the documents required to be produced that are reasonably accessible to me and/or my attorneys, to the best of my knowledge

_____     _____     _____

Signature                    Print Name                  Date

## Exhibit H

**[List of AbbVie Inc. Entities]**

## List Of Subsidiaries

The following is a list of subsidiaries of AbbVie Inc. as of December 31, 2021. AbbVie is not a subsidiary of any other corporation.

| Domestic Subsidiaries | Incorporation |
|---|---|
| AbbVie Aviation LLC | Illinois |
| AbbVie Biopharmaceuticals LLC | Delaware |
| AbbVie Bioresearch Center Inc. | Delaware |
| AbbVie Biotech Ventures Inc. | Delaware |
| AbbVie Biotherapeutics Inc. | Delaware |
| AbbVie Domestic Holdings Inc. | Delaware |
| AbbVie Endocrine Inc. | Delaware |
| AbbVie Endocrinology Inc. (d/b/a Pharmacy Solutions) | Delaware |
| AbbVie Finance Corporation | Delaware |
| AbbVie Finance LLC | Delaware |
| AbbVie Global Inc. | Delaware |
| AbbVie Global Holdings Inc. | Delaware |
| AbbVie Holdco Inc. | Delaware |
| AbbVie Holdings Inc. | Delaware |
| AbbVie International Inc. | Delaware |
| AbbVie Investments Inc. | Delaware |
| AbbVie Pharma Inc. | Delaware |
| AbbVie Pharmaceuticals LLC | Delaware |
| AbbVie Products LLC | Georgia |

| | |
|---|---|
| AbbVie Purchasing LLC | Delaware |
| AbbVie Resources Inc. | Delaware |
| AbbVie Resources International Inc. | Delaware |
| AbbVie Respiratory LLC | Delaware |
| AbbVie Sales Inc. | Delaware |
| AbbVie Services Inc. | Delaware |
| AbbVie Stemcentrx LLC | Delaware |
| AbbVie Subsidiary LLC | Delaware |
| AbbVie US Holdings LLC | Delaware |
| AbbVie US LLC | Delaware |
| AbbVie Ventures LLC | Delaware |
| Aeropharm Technology, LLC | Delaware |
| AGN International Inc. | Delaware |
| AGN Kythera, LP | Delaware |
| AGN Labs LLC | Delaware |
| AGN LLC | Delaware |
| AGN Sundry, LLC | Delaware |
| Allergan Akarna LLC | Delaware |
| Allergan Finance, LLC | Nevada |
| ALLERGAN FINCO 2 INC. | Delaware |
| ALLERGAN FINCO INC. | Delaware |
| Allergan GI Corp | Delaware |

| | |
|---|---|
| Allergan GP Holding LLC | Delaware |
| Allergan Holdco US, Inc. | Delaware |
| Allergan Holdings B1, Inc. | Delaware |
| Allergan Holdings, Inc. | Delaware |
| Allergan, Inc. | Delaware |
| Allergan Laboratories, LLC | Delaware |
| Allergan Lending 2 LLC | Delaware |
| Allergan Lending LLC | Delaware |
| Allergan Pharma Inc. | Delaware |
| Allergan Property Holdings, LLC | Delaware |
| Allergan Puerto Rico Holdings, Inc. | Delaware |
| Allergan Sales Puerto Rico, Inc. | California |
| Allergan Sales, LLC (d/b/a Allergan; d/b/a Bioscience Laboratories) | Delaware |
| Allergan Therapeutics LLC | Delaware |
| Allergan USA, Inc. (d/b/a Pacificom / Pacific Communications) | Delaware |
| Allergan W.C. Holding Inc. | Delaware |
| Anterios, Inc. | Delaware |
| Aptalis Pharma US, Inc. | Delaware |
| AqueSys, Inc. | Delaware |
| BioDisplay Technologies, Inc. | Illinois |
| Bonti, Inc. | Delaware |

| | |
|---|---|
| Cearna Aesthetics, Inc. | Delaware |
| Chase Pharmaceuticals Corporation | Delaware |
| Del Mar Indemnity Company LLC | Hawaii |
| Durata Holdings, Inc. | Delaware |
| Durata Therapeutics, Inc. | Delaware |
| Durata Therapeutics U.S. Limited | Delaware |
| Eden Biodesign, LLC | Delaware |
| Envy Medical, Inc. | Delaware |
| Exemplar Pharma, LLC | Delaware |
| Foresight Vision5, Inc. | Delaware |
| Fremont Holding L.L.C. | Delaware |
| Furiex Pharmaceuticals LLC | Delaware |
| IEP Pharmaceutical Devices, LLC | Delaware |
| Keller Medical, Inc. | Delaware |
| Knoll Pharmaceutical Company | New Jersey |
| KOS Pharmaceuticals, Inc. | Delaware |
| Life Properties Inc. | Delaware |
| LifeCell Corporation | Delaware |
| MAP Pharmaceuticals, LLC | Delaware |
| Mavupharma, Inc. | Delaware |
| MPEX Pharmaceuticals, Inc. | Delaware |

| | |
|---|---|
| Naurex Inc. | Delaware |
| Oculeve, Inc. | Delaware |
| Organics L.L.C. | Delaware |
| Pacific Pharma, Inc. | Delaware |
| Pharmacyclics LLC | Delaware |
| Pharmax Holding Limited | Delaware |
| Repros Therapeutics Inc. | Delaware |
| Rowell Laboratories, Inc. | Minnesota |
| RP Merger Sub, Inc. | Delaware |
| Sapphire Merger Sub, Inc. | Delaware |
| Silicone Engineering, Inc. | California |
| Soliton Inc. | Delaware |
| Suffolk Merger Sub, Inc. | Delaware |
| TeneoOne, Inc. | Delaware |
| Tobira Therapeutics, Inc. | Delaware |
| Topokine Therapeutics, Inc. | Delaware |
| Transderm, Inc. | Delaware |
| Unimed Pharmaceuticals, LLC | Delaware |
| Venice Subsidiary LLC | Delaware |
| Vicuron Pharmaceuticals LLC | Delaware |
| Vitae Pharmaceuticals, LLC | Delaware |
| Warner Chilcott Leasing Equipment Inc. | Delaware |

| | |
|---|---|
| Warner Chilcott Sales (US), LLC | Delaware |
| Zeltiq A LLC | Delaware |
| Zeltiq Aesthetics, Inc. | Delaware |
| Zeltiq International, LLC | Delaware |

| Foreign Subsidiaries | Incorporation |
|---|---|
| AbbVie S.A. | Argentina |
| Allergan Productos Farmaceuticos S.A. | Argentina |
| Allergan Australia Pty Limited | Australia |
| Elastagen Pty Ltd | Australia |
| Kythera Biopharmaceuticals Australia Pty Ltd | Australia |
| AbbVie Pty Ltd | Australia |
| AbbVie GmbH | Austria |
| AbbVie Bahamas Ltd. | Bahamas |
| AbbVie SA | Belgium |
| Allergan N.V. | Belgium |
| Odyssea Pharma SPRL | Belgium |
| AbbVie Ltd | Bermuda |
| AbbVie Biotechnology Ltd | Bermuda |
| AbbVie Finance Limited | Bermuda |
| AbbVie Global Enterprises Ltd. | Bermuda |
| AbbVie Holdings Unlimited | Bermuda |
| Allergan Development Ventures I, LP | Bermuda |
| Allergan Holdings B Ltd. | Bermuda |
| Allergan Holdings B2, Ltd. | Bermuda |
| Kythera Holdings Ltd | Bermuda |
| Warner Chilcott Holdings Company II, Limited | Bermuda |

| | |
|---|---|
| Warner Chilcott Holdings Company III, Limited | Bermuda |
| Warner Chilcott Limited | Bermuda |
| AbbVie d.o.o. | Bosnia |
| AbbVie Farmacêutica Ltda. | Brazil |
| Allergan Productos Farmaceuticos Ltda. | Brazil |
| AbbVie EOOD | Bulgaria |
| Allergan Bulgaria EOOD | Bulgaria |
| AbbVie Corporation | Canada |
| AbbVie Holdings Corporation | Canada |
| Allergan Inc. | Canada |
| Aptalis Pharma Canada ULC | Canada (Alberta) |
| Allergan Holdings C, Ltd. | Cayman Islands |
| Allergan Overseas Holding | Cayman Islands |
| Pharmacyclics Cayman Ltd. | Cayman Islands |
| Stemcentrx Cayman Ltd. | Cayman Islands |
| AbbVie Productos Farmacéuticos Limitada | Chile |
| Allergan Laboratorios Limitada | Chile |
| AbbVie Pharmaceutical Trading (Shanghai) Co., Ltd. | China |
| Allergan (Chengdu) Medical Aesthetics Clinic Co., Ltd. | China |
| Allergan Information Consulting (Shanghai) Co., Ltd. | China |
| Allergan Medical Device (Shanghai) Co., Ltd. | China |

| | |
|---|---|
| AbbVie S.A.S. | Colombia |
| Allergan de Colombia S.A. | Colombia |
| Allergan Costa Rica S.R.L. | Costa Rica |
| AbbVie d.o.o. | Croatia |
| AbbVie Limited | Cyprus |
| AbbVie s.r.o. | Czech Republic |
| Allergan CZ, s.r.o. | Czech Republic |
| AbbVie A/S | Denmark |
| Allergan ApS | Denmark |
| AbbVie, S.R.L. | Dominican Republic |
| AbbVie L.L.C. | Egypt |
| AbbVie OÜ | Estonia |
| AbbVie Oy | Finland |
| Allergan Finland Oy | Finland |
| AbbVie SAS | France |
| Allergan France SAS | France |
| Allergan Holdings France SAS | France |
| Allergan Industrie SAS | France |
| Eurand France S.A.S. | France |
| Forest Holdings France S.A.S. | France |
| AbbVie Biotechnology GmbH | Germany |
| AbbVie Deutschland GmbH & Co. KG | Germany |

| | |
|---|---|
| AbbVie Komplementär GmbH | Germany |
| AbbVie Pharmaceuticals GmbH | Germany |
| AbbVie Real Estate Management GmbH | Germany |
| Allergan GmbH | Germany |
| AbbVie (Gibraltar) Holdings Limited | Gibraltar |
| AbbVie (Gibraltar) Limited | Gibraltar |
| AbbVie Pharmaceuticals Societe Anonyme | Greece |
| Allergan Hellas Pharmaceuticals S.A. | Greece |
| AbbVie, Socieded Anonima | Guatemala |
| AbbVie Limited | Hong Kong |
| Allergan Hong Kong Limited | Hong Kong |
| AbbVie Gyogyszerkereskedelmi Korlatolt Felelossegu Tarsasag | Hungary |
| Allergan Hungary Kft. | Hungary |
| Allergan Healthcare India Private Limited | India |
| Allergan India Private Limited* | India |
| AbbVie International Holdings Unlimited Company | Ireland |
| AbbVie Ireland Holdings Unlimited Company | Ireland |
| AbbVie Ireland Unlimited Company | Ireland |
| AbbVie Limited | Ireland |
| AbbVie Manufacturing Management Unlimited Company | Ireland |

| | |
|---|---|
| Allergan Botox Unlimited Company (In voluntary liquidation) | Ireland |
| Allergan Equities Unlimited Company | Ireland |
| Allergan Furiex Ireland Limited (In voluntary liquidation) | Ireland |
| Allergan Holdings Unlimited Company | Ireland |
| Allergan Ireland Holdings Unlimited Company | Ireland |
| Allergan Ireland Limited | Ireland |
| Allergan Limited | Ireland |
| Allergan Pharma Limited | Ireland |
| Allergan Pharmaceuticals Holdings (Ireland) Unlimited Company (In voluntary liquidation) | Ireland |
| Allergan Pharmaceuticals International Limited | Ireland |
| Allergan Pharmaceuticals Ireland Unlimited Company | Ireland |
| Allergan Services International, Unlimited Company | Ireland |
| Allergan WC Ireland Holdings Limited | Ireland |
| Forest Laboratories Ireland Limited | Ireland |
| Fournier Laboratories Ireland Limited | Ireland |
| Pharmacyclics (Europe) Limited | Ireland |
| Tosara Exports Limited (In voluntary liquidation) | Ireland |
| Warner Chilcott Intermediate (Ireland) ULC | Ireland |
| Zeltiq Ireland International Holdings Unlimited Company | Ireland |
| Zeltiq Ireland Unlimited Company | Ireland |
| AbbVie Biopharmaceuticals Ltd. | Israel |

| | |
|---|---|
| Allergan Israel Ltd. | Israel |
| Marbelle Threads Ltd. | Israel |
| AbbVie S.r.l. | Italy |
| Allergan S.p.A. | Italy |
| Aptalis Pharma S.r.l. | Italy |
| AbbVie GK | Japan |
| Allergan International YK | Japan |
| Allergan Japan KK | Japan |
| Allergan K.K. | Japan |
| Allergan NK | Japan |
| AbbVie Ltd | Korea, South |
| Allergan Korea Ltd. | Korea, South |
| AbbVie SIA | Latvia |
| AbbVie UAB | Lithuania |
| Allergan Baltics, UAB | Lithuania |
| AbbVie Biotherapeutics S.àr.l. | Luxembourg |
| AbbVie Holdings S.à r.l. | Luxembourg |
| AbbVie Global S.à r.l. | Luxembourg |
| Allergan AHI S.à r.l. | Luxembourg |
| Allergan Capital 2 S.à r.l. | Luxembourg |
| Allergan Capital S.à r.l. | Luxembourg |
| Allergan Europe S.à r.l. | Luxembourg |

| | |
|---|---|
| Allergan Finance S.à r.l. | Luxembourg |
| Allergan Funding SCS | Luxembourg |
| Allergan Global S.à r.l. | Luxembourg |
| Allergan Holdings S.à r.l. | Luxembourg |
| Allergan International Holding S.à r.l. | Luxembourg |
| Allergan Luxembourg International S.à r.l. | Luxembourg |
| Allergan WC 1 S.à r.l. | Luxembourg |
| Allergan WC 2 S.à r.l. | Luxembourg |
| AbbVie Sdn. Bhd. | Malaysia |
| Allergan Malaysia Sdn Bhd | Malaysia |
| Allergan Malta Holding Limited | Malta |
| Allergan Malta II Limited | Malta |
| Allergan Malta Limited | Malta |
| AbbVie Farmacéuticos, S.A. de C.V. | Mexico |
| Allergan Servicios Profesionales, S. de R.L. de C.V. | Mexico |
| Allergan, S.A. de C.V. | Mexico |
| AbbVie B.V. | Netherlands |
| AbbVie Central Finance B.V. | Netherlands |
| AbbVie Enterprises B.V. | Netherlands |
| AbbVie Finance B.V. | Netherlands |
| AbbVie Ireland NL B.V. | Netherlands |

| | |
|---|---|
| AbbVie Japan Holdings B.V. | Netherlands |
| AbbVie Logistics B.V. | Netherlands |
| AbbVie Nederland Holdings B.V. | Netherlands |
| AbbVie Pharmaceuticals B.V. | Netherlands |
| AbbVie Research B.V. | Netherlands |
| AbbVie Venezuela B.V. | Netherlands |
| AbbVie Venezuela Holdings B.V. | Netherlands |
| Allergan B.V. | Netherlands |
| Aptalis Holding B.V. | Netherlands |
| Aptalis Netherlands B.V. | Netherlands |
| Forest Finance B.V. | Netherlands |
| Warner Chilcott Nederland B.V. | Netherlands |
| AbbVie Limited | New Zealand |
| Allergan New Zealand Limited | New Zealand |
| AbbVie AS | Norway |
| Allergan AS | Norway |
| AbbVie, S. de R.L. | Panama |
| Allergan Healthcare Philippines, Inc. | Philippines |
| AbbVie Polska Sp. z o.o. | Poland |
| AbbVie Sp. z o.o. | Poland |
| Allergan Sp. z o.o. | Poland |
| AbbVie, L.da | Portugal |

| | |
|---|---|
| AbbVie Promoção, L.da | Portugal |
| AbbVie Corp | Puerto Rico |
| Knoll LLC | Puerto Rico |
| AbbVie S.R.L. | Romania |
| AbbVie Trading S.R.L. | Romania |
| Allergan S.R.L. | Romania |
| AbbVie Limited Liability Company | Russia |
| Allergan C.I.S. S.a.r.l. | Russia |
| Allergan Saudi Arabia LLC* | Saudi Arabia |
| Allergan d.o.o. Beograd | Serbia |
| AbbVie Operations Singapore Pte. Ltd. | Singapore |
| AbbVie Pte. Ltd. | Singapore |
| Allergan Singapore Pte. Ltd. | Singapore |
| AbbVie Holdings s.r.o. | Slovakia |
| AbbVie s.r.o. | Slovakia |
| Allergan SK s.r.o. | Slovakia |
| AbbVie Biofarmacevtska druzba d.o.o. | Slovenia |
| AbbVie (Pty) Ltd. | South Africa |
| Allergan Pharmaceuticals (Proprietary) Limited | South Africa |
| AbbVie Spain, S.L. | Spain |
| Allergan S.A. | Spain |

| | |
|---|---|
| AbbVie AB | Sweden |
| Allergan Norden AB | Sweden |
| AbbVie AG | Switzerland |
| AbbVie Biopharmaceuticals GmbH | Switzerland |
| Allergan AG | Switzerland |
| Pharmacyclics Switzerland GmbH | Switzerland |
| VarioRaw Percutive S.à r.l. | Switzerland |
| Warner Chilcott Pharmaceuticals S à rl | Switzerland |
| Allergan Pharmaceuticals Taiwan Co. Ltd. | Taiwan |
| AbbVie Ltd. | Thailand |
| Allergan (Thailand) Limited | Thailand |
| AbbVie Sarl | Tunisia |
| AbbVie Tıbbi İlaçlar Sanayi ve Ticaret Limited Şirketi | Turkey |
| Allergan Ilaclari Ticaret Anonim Sirketi | Turkey |
| Allergan Ukraine LLC | Ukraine |
| Allergan Middle East Limited | United Arab Emirates |
| AbbVie Australasia Holdings Limited | United Kingdom |
| AbbVie Biotherapeutics Limited | United Kingdom |
| AbbVie Investments Limited | United Kingdom |
| AbbVie Ltd | United Kingdom |
| AbbVie Trustee Company Limited | United Kingdom |
| AbbVie UK Holdco Limited | United Kingdom |

| | |
|---|---|
| Akarna Therapeutics, Limited | United Kingdom |
| Allergan Holdco UK Limited | United Kingdom |
| Allergan Holdings Limited | United Kingdom |
| Allergan Limited | United Kingdom |
| Lifecell EMEA Limited (In voluntary liquidation) | United Kingdom |
| Renable Pharma Ltd. | United Kingdom |
| Zeltiq Limited (In voluntary liquidation) | United Kingdom |
| AbbVie S.A. | Uruguay |
| AbbVie Pharmaceuticals SCA. | Venezuela |

* Ownership of such subsidiary is less than 100% by AbbVie or an AbbVie subsidiary

**Exhibit I**

**[SEE EXHIBIT H]**

## Exhibit J

**[List of Divested Entities]**

## Schedule 4.6(c) - Transferred Group

*Ownership interest of Seller Parent and its Subsidiaries is 100% unless otherwise indicated.*

|  | **Company Name** | **Jurisdiction of Incorporation** |
|---|---|---|
| 1. | Warner Chilcott Company, LLC | Puerto Rico |
| 2. | Warner Chilcott (Ireland) Limited | Ireland |
| 3. | Warner Chilcott Finance LLC. | Delaware |
| 4. | Warner Chilcott Australia Pty. Ltd. | Australia |
| 5. | Warner Chilcott Pharmaceuticals B.V.B.A. | Belgium |
| 6. | Warner Chilcott France SAS | France |
| 7. | Warner Chilcott Italy S.r.l. | Italy |
| 8. | Actavis Pharma Iberia S.L. (f/k/a Warner Chilcott Iberia S.L.) | Spain |
| 9. | Robin Hood Holdings Ltd. | Malta |
| 10. | Paomar plc | Cyprus |
| 11. | Actavis Pharma Pty Ltd. | Australia |
| 12. | Makoff R&D Laboratories, Inc. | California |
| 13. | R&D Pharmaceutical, Inc. | California |
| 14. | R&D Ferriecit Capital Resources, Inc. | California |
| 15. | R&D Research & Development Corp. | California |
| 16. | R&D New Media Services, Inc. | California |
| 17. | Royce Laboratories, Inc. | Florida |
| 18. | Royce Research Group, Inc. | Florida |
| 19. | Royce Research & Development Limited Partnership I | Florida |
| 20. | The Rugby Group, Inc. | New York |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | **Company Name** | **Jurisdiction of Incorporation** |
|---|---|---|
| 21. | Watson Laboratories, Inc. Ohio | New York |
| 22. | Rugby Laboratories, Inc. | New York |
| 23. | Changzhou Siyao Pharmaceuticals Co., Ltd. (25%) | China |
| 24. | Watson Pharmaceuticals (Asia) Ltd. | BVI |
| 25. | WP Holdings, Ltd. | BVI |
| 26. | Watson Pharmaceuticals, China Ltd | BVI |
| 27. | Med All Enterprise Consulting (Shanghai) Co. Ltd. | China |
| 28. | Nicobrand Limited | Northern Ireland |
| 29. | Watson Pharmaceuticals International Ltd. | BVI |
| 30. | Watson Diagnostics, Inc. | Delaware |
| 31. | Actavis Laboratories NY, Inc. | New York |
| 32. | Circa Pharmaceuticals West, Inc. | California |
| 33. | Circa Sub | New York |
| 34. | Andrx LLC | Delaware |
| 35. | Andrx South Carolina I, Inc. | South Carolina |
| 36. | Andrx Pharmaceuticals (Mass), Inc. | Florida |
| 37. | Andrx Pharmaceuticals Equipment #1, LLC | Florida |
| 38. | Andrx Pharmaceuticals (NC) Inc. | Florida |
| 39. | Andrx Pharmaceuticals, (NC) Equipment LLC | Delaware |
| 40. | SR Six, Inc. | Florida |
| 41. | RxAPS, Inc. | Florida |
| 42. | Andrx Pharmaceuticals Sales and Marketing, Inc. | Florida |
| 43. | Actavis Laboratories FL, Inc. | Florida |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_TX_00037737

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 44. | Watson Management Corporation | Florida |
| 45. | Watson Therapeutics, Inc. | Florida |
| 46. | Andrx Pharmaceuticals, LLC | Delaware |
| 47. | Andrx Labs LLC | Delaware |
| 48. | Andrx Laboratories (NJ) Inc. | Delaware |
| 49. | Watson Cobalt Holdings, LLC | Delaware |
| 50. | Watson Manufacturing Services, Inc. | Delaware |
| 51. | Natrapac, Inc. | Utah |
| 52. | Coventry Acquisition, LLC | Delaware |
| 53. | Cobalt Laboratories, LLC | Delaware |
| 54. | Watson Pharma Private Ltd. | India |
| 55. | Watson Laboratories, LLC | Delaware |
| 56. | Actavis Puerto Rico Holdings Inc. | Delaware |
| 57. | Actavis US Holding LLC | Delaware |
| 58. | Actavis LLC | Delaware |
| 59. | Actavis South Atlantic LLC | Delaware |
| 60. | Actavis Elizabeth LLC | Delaware |
| 61. | Actavis Kadian LLC | Delaware |
| 62. | Actavis Mid Atlantic LLC | Delaware |
| 63. | Actavis Totowa LLC | Delaware |
| 64. | Actavis Pharmaceuticals NJ, Inc. | Delaware |
| 65. | Watson Laboratories, Inc. | Connecticut |
| 66. | Watson Laboratories, Inc. – Arizona | Delaware |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_TX_00037738

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 67. | Schein Bayer Pharmaceutical Services, Inc. | Delaware |
| 68. | Schein Pharmaceutical International, Inc. | Delaware |
| 69. | Schein Pharmaceutical Ltd | Bermuda |
| 70. | Marsam Pharma, LLC | Delaware |
| 71. | MSI, Inc. | Delaware |
| 72. | Actavis Holding 2 Sàrl | Luxembourg |
| 73. | Actavis Services (Asia) Ltd. | Malta |
| 74. | Arrow Laboratories, Ltd. | Malta |
| 75. | Arrow Supplies, Ltd.* | Malta |
| 76. | Marrow Pharmaceuticals Research & Development Co Ltd. (50%) | China |
| 77. | Actavis S.à.r.l. | Luxembourg |
| 78. | "Specifar" | Greece |
| 79. | Alet | Greece |
| 80. | Ascent Pharmahealth Pty Ltd | Australia |
| 81. | Actavis Australia Pty Ltd | Australia |
| 82. | Ascent Australia Pty Ltd | Australia |
| 83. | Actavis Pty Ltd | Australia |
| 84. | Ascent Pharma Pty Ltd. | Australia |
| 85. | Ascent Pharmahealth Asia Pte Ltd | Singapore |
| 86. | Drug Houses of Australia Pte Ltd. | Singapore |
| 87. | Ascent Pharmahealth Hong Kong Ltd. | Hong Kong |
| 88. | Actavis Sdn. Bhd. | Malaysia |
| 89. | Arrow Group ApS | Denmark |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| | *Company Name* | *Jurisdiction of Incorporation* |
|---|---|---|
| **90.** | Arrow ApS | Denmark |
| **91.** | Makewhey Products Pty. Ltd.** | South Africa |
| **92.** | Actavis Holdings South Africa (Pty) Ltd. | South Africa |
| **93.** | Actavis Pharma (Pty) Ltd. | South Africa |
| **94.** | Actavis (Pty) Ltd. | South Africa |
| **95.** | Scriptpharm Marketing (Pty) Ltd | South Africa |
| **96.** | Referral-Net (Pty) Ltd.* | South Africa |
| **97.** | Spear Pharmaceuticals (Pty) Ltd | South Africa |
| **98.** | Pharmascript Pharmaceuticals Ltd. (64.8%) | South Africa |
| **99.** | Arrow Pharma Tender (Pty) Ltd.** (65%) | South Africa |
| **100.** | Zelphy 1308 (Pty) Ltd. | South Africa |
| **101.** | Arrowblue Produtos Farmaceuticos SA | Portugal |
| **102.** | Bowmed Ltd | UK |
| **103.** | Selamine Ltd. | Ireland |
| **104.** | Seeker Investments Ltd. | BVI |
| **105.** | SC Pharma (Pty) Ltd. (25%) | Australia |
| **106.** | Willow Pharmaceuticals Pty Ltd. | Australia |
| **107.** | Medis Pharma Pty Ltd | Australia |
| **108.** | Eremad Pty Ltd. | Australia |
| **109.** | Arrow Läkemedel AB | Sweden |
| **110.** | Arrow Generics Ltd. | UK |
| **111.** | Arrow No 7 Ltd | UK |
| **112.** | Breath Ltd | UK |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_TX_00037740

| Company Name | Jurisdiction of Incorporation |
|---|---|
| **113.** Soosysoo Ltd. (50%)** | BVI |
| **114.** Actavis New Zealand Limited | New Zealand |
| **115.** Watson Laboratories, S. de R.L. de C.V | Mexico |
| **116.** Actavis Pharma Company | Canada |
| **117.** Abri Pharmceuticals Company | Canada |
| **118.** Actavis Pharma Holding 4 ehf. (APH4) | Iceland |
| **119.** Actavis Pharma Holding 5 ehf. (APH5) | Iceland |
| **120.** Actavis Group ehf. | Iceland |
| **121.** Actavis Group PTC ehf. | Iceland |
| **122.** Actavis Dutch Holding BV | Netherlands |
| **123.** LLC Actavis | Russia |
| **124.** Actavis Ilaclari AS # | Turkey |
| **125.** Actavis ehf. | Iceland |
| **126.** Medis ehf. | Iceland |
| **127.** Medis Pharma France SAS | France |
| **128.** Medis-Danmark A/S.* | Denmark |
| **129.** Actavis Ireland Ltd. | Ireland |
| **130.** Actavis Italy S.p.A. | Italy |
| **131.** Actavis Isle of Man Ltd. | Isle of Man |
| **132.** Actavis Nordic A/S | Denmark |
| **133.** Actavis Oy | Finland |
| **134.** UAB Actavis Baltics | Lithuania |
| **135.** Actavis Holding AB | Sweden |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER     ALLERGAN_TX_00037741

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 136. | Actavis AB | Sweden |
| 137. | Actavis Holding Germany GmbH | Germany |
| 138. | Medis Pharma GmbH | Germany |
| 139. | Actavis A/S | Denmark |
| 140. | Actavis Norway AS | Norway |
| 141. | Actavis, S. de. R.L. de C.V. | Mexico |
| 142. | Actavis Pharma S. de R.L. de C.V. | Mexico |
| 143. | Actavis Hungary Kft. | Hungary |
| 144. | Arrow Pharm (Malta) Ltd. | Malta |
| 145. | Medis Pharma BV | Netherlands |
| 146. | PharmaPack International B.V. | Netherlands |
| 147. | Actavis Polska Sp. z.o.o. | Poland |
| 148. | Actavis International Ltd. | Malta |
| 149. | Actavis Malta Ltd. | Malta |
| 150. | Actavis Export International Ltd. | Malta |
| 151. | Actavis Ltd. (Note: 1 share owned by Dr. Vella) | Malta |
| 152. | Actavis GmbH | Austria |
| 153. | Actavis Holdings UK Ltd. | UK |
| 154. | Actavis Holdings UK II Ltd. | UK |
| 155. | Actavis UK Ltd. | UK |
| 156. | Warner Chilcott Acquisition Limited | UK |
| 157. | Chilcott UK Limited | Northern Ireland |
| 158. | Warner Chilcott Research Laboratories Ltd. | Northern Ireland |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_TX_00037742

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 159. | Warner Chilcott UK Limited | Northern Ireland |
| 160. | Warner Chilcott Pharmaceuticals UK Limited | UK |
| 161. | Millbrook (NI) Limited | Northern Ireland |
| 162. | Auden Mckenzie Holdings Ltd. | UK |
| 163. | Auden Mckenzie (Pharma Division) Ltd. | UK |
| 164. | NRIM Ltd. | UK |
| 165. | Lime Pharma Ltd. | UK |
| 166. | D3 Pharma Ltd. (38%) | UK |
| 167. | Actavis d.o.o. Belgrade | Serbia |
| 168. | Lotus Laboratories Private Ltd. | India |
| 169. | Actavis Ukraine LLC | Ukraine |
| 170. | Zdravlje AD | Serbia |
| 171. | Actavis Switzerland AG | Switzerland |
| 172. | Oncopharma AG | Switzerland |
| 173. | Sindan Pharma SRL | Romania |
| 174. | Actavis SRL | Romania |
| 175. | Actavis CZ a.s. | Czech Republic |
| 176. | Actavis S.r.o. | Slovak Republic |
| 177. | Biovena Pharma Sp. z.o.o. | Poland |
| 178. | Actavis (Cyprus) Ltd. | Cyprus |
| 179. | Actavis Operations EOOD | Bulgaria |
| 180. | Balkanpharma Troyan AD (98.32%) | Bulgaria |
| 181. | Balkanpharma Dupnitsa AD (98.05%) | Bulgaria |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_TX_00037743

| | *Company Name* | *Jurisdiction of Incorporation* |
|---|---|---|
| 182. | Balkanpharma Security EOOD | Bulgaria |
| 183. | Balkanpharma Healthcare International (Cyprus) Ltd.* | Cyprus |
| 184. | Actavis EAD | Bulgaria |
| 185. | Actavis Istanbul Ilac Sanayive Ticaret Ltd. Sirketi | Turkey |
| 186. | Actavis (MEEA) FZE | UAE |
| 187. | Actavis Farmacêutica Limitada | Brazil |
| 188. | Actavis Holding Asia BV | Netherlands |
| 189. | Actavis Hong Kong Limited | Hong Kong |
| 190. | China Medicinal & Chemical Industrial Development Group Ltd. (10% interest) | Hong Kong |
| 191. | Actavis Pharma Development Centre Private Ltd. | India |
| 192. | Actavis Pharma Private Ltd. | India |
| 193. | PT Actavis Indonesia | Indonesia |
| 194. | Actavis KK | Japan |
| 195. | Actavis (Asia Pacific) Pte. Ltd. | Singapore |
| 196. | Silom Medical Co., Ltd | Thailand |
| 197. | Silom Medical International Co., Ltd. | Thailand |
| 198. | Forest Laboratories UK Ltd. | UK |
| 199. | Pharmax Ltd. | UK |
| 200. | Forest Pharma BV | Netherlands |
| 201. | Forest Laboratories Osterreich GmbH | Austria |
| 202. | Forest Laboratories France S.A.S. | France |
| 203. | Forest Laboratories Deutschland GmbH | Germany |

LA_LAN01:289784.8A
OC\2075745.21

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

ALLERGAN_TX_00037744

| | Company Name | Jurisdiction of Incorporation |
|---|---|---|
| 204. | Forest Laboratories Italy S.r.L. | Italy |
| 205. | Forest Laboratories Spain, SL | Spain |
| 206. | Axcan France (Invest) SAS | France |
| 207. | Aptalis Pharma SAS | France |
| 208. | Forest Tosara Ltd. | Ireland |
| 209. | Actavis Laboratories UT, Inc. | Delaware |
| 210. | Watson Laboratories, Inc. | Nevada |
| 211. | Actavis Pharma, Inc. | Delaware |
| 212. | Arrow International Ltd. | Malta |
| 213. | Allergan UK Group Ltd. | UK |
| 214. | Actavis Finance ehf. | Iceland |
| 215. | Actavis Holdco US, Inc. | Delaware |

\*     In Liquidation     \*\*     De-Registered