UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) | MDL 2804 |
| | ) | Case No. 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | ) ) | Judge Dan Aaron Polster |
| *PBM Cases* | ) ) | |
| | ) ) | **ORDER** |

Before the Court is Defendant OptumRX, Inc.'s and Defendant Express Scripts, Inc.'s (the "PBMs") Motion to Disqualify Special Master Cohen. Docket no. 5196. Special Master Cohen filed an affidavit in response to the PBMs' motion. Docket no. 5198. Plaintiffs filed a response. Docket no. 5207. The PBMs filed a reply. Docket no. 5214. For the reasons below the PBMs' motion is **DENIED**.

### Introduction

Special Master Cohen was selected by the Court at the outset of this MDL upon the recommendation of both Plaintiffs and Defendants. He and his team have done incredible work over nearly six years in assisting the Court in managing both the litigating and settlement tracks of what has been called the most complex litigation in history. He has been particularly valuable as a discovery and privilege special master, and he has been called upon to issue countless legal rulings. While both Plaintiffs and Defendants have exercised their right to appeal a number of these rulings to the Court, no party has ever even hinted that Special Master Cohen has been biased

or prejudiced against them. Indeed, all the other major litigating defendants and the PEC agreed just a few days ago that Special Master Cohen should oversee all the global tribal settlements. *See* Motion for Proposed Agreed Order Designating Special Master Pursuant to Global Tribal Opioid Settlement Agreements, docket no. 5211.

## Background

On Monday, August 28, 2023, at 12:50 PM, in response to having received and reviewed emailed status reports, Special Master Cohen inadvertently replied to all recipients with personal notes intended only for himself. Motion Ex. A at 1, docket no. 5196-2. At 1:12 PM (22 minutes later) upon realizing his error, Special Master Cohen attempted to claw back the email containing his mental impressions by requesting that the parties "discard and disregard" the prior email. Motion Ex. B at 1, docket no. 5196-3. On Tuesday, August 29, 2023, at 5:43 PM, counsel for OptumRx, on behalf of both PBM defendants, replied to Special Master Cohen that they "cannot agree to your request to discard or disregard it." Motion Ex. C at 4, docket no. 5196-4.

Instead, during an August 30, 2023 status conference, the PBMs asked the Court to disqualify Special Master Cohen. *See* Motion Ex. D at 37:13–45:25, docket no. 5196-5. During that conference, the Court stated it would not disqualify the Special Master. The Court made clear that the Special Master's email "doesn't in any way, shape, or form indicate that he's biased or prejudice[d against] anything," *id.* at 38:18–20, and that "[i]t's up to Special Master Cohen whether he recuses himself." *Id.* at 41:17–18. On September 7, 2023, in response to a request from the PBMs to voluntarily disqualify himself, Special Master Cohen declined to recuse. Motion Ex. C at 1, docket no. 5196-4. The PBMs then filed the instant motion to disqualify the Special Master.

2

**The Special Master's Private Thoughts Were Privileged Judicial Deliberations**

Special Master Cohen's email, which consisted entirely of his own mental impressions, personal notes, and private musings about the submitted status reports, was unquestionably a privileged judicial deliberative memorandum to himself. As such, it is an improper basis upon which to even raise an argument about perceived partiality.

In the American legal system, "it is essential that a lawyer work with a certain degree of privacy." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). "It is no exaggeration to say that the integrity of judicial proceedings depends on the inviolability of internal deliberation." U.S. Supreme Court, *Statement of the Court Concerning the Leak Investigation* 1 (Jan. 19, 2023) (*available at* https://www.supremecourt.gov/publicinfo/press/Dobbs_Public_Report_January_19_2023.pdf.). The sacrosanct character of an attorney's personal thoughts and mental impressions is also reflected in our Federal Rules of Evidence and our Federal Rules of Civil Procedure. *See* Fed. R. Evid. 502(b) (non-waiver of privilege when privileged material is inadvertently produced); Fed. R. Civ. P. 26(b)(5)(B) (providing for clawback of inadvertently produced privileged material).

For the judicial system to function, judges must view the arguments presented to them with an appropriate degree of skepticism. If judges were subject to accusations of bias and potential disqualification based solely on private, skeptical thoughts about a party's position, there could be no judges. Therefore, disqualification based on the appearance of partiality under 28 U.S.C. §455(a) must be based on a judge's outward conduct, not his or her private thoughts.[1]

---

[1] The law applicable to judges applies equally to special masters, who serve in a quasi-judicial capacity. *See* Fed. R. Civ. P. 53(a)(2); *see also* Motion at 9 (citing *Guardian Pipeline, LLC v. 950.80 Acres of Land*, 525 F.3d 554, 556 (7th Cir. 2008).

This common-sense premise is illustrated in the cases cited by the PBMs. For example, in

*Ligon v. City of New York*, the Second Circuit reached the following conclusion:

> We emphasize at the outset that we make no findings of misconduct, actual bias, or actual partiality on the part of Judge Scheindlin. Following our review of the record, however, we conclude that her ***conduct while on the bench***, which appears to have resulted in these lawsuits being filed and directed to her, in conjunction with her ***statements to the media*** and the resulting stories published while a decision on the merits was pending and while public interest in the outcome of the litigation was high, might cause a reasonable observer to question her impartiality. For this reason, her disqualification is required by section 455(a).

736 F.3d 118, 124 (2d Cir. 2013) (per curiam), *vacated in part on other grounds*, 743 F.3d 362

(2d Cir. 2014) (emphasis added); *see also In re Nat'l Prescription Opiate Litig.*, 2019 WL

7482137, at *2 (6th Cir. Oct. 10, 2019) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34,

112 (D.C. Cir. 2001)) ("A judge improperly comments on the merits of a case when he ***publicly***

***'disclose[s]*** his views on the factual and legal matters at the heart of the case[,] . . . the credibility

of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy,

and so forth.") (emphasis added).

Here, the PBMs repeatedly and misleadingly attempt to convert the Special Master's

private thoughts into public comments by referring to his email as "remarks." *See, e.g.*, Reply at

5. They were not. Because the PBMs do not and cannot identify any conduct or public statements

by the Special Master that could conceivably appear biased, they rely instead on his private mental

impressions to which they ought not have had access and should have destroyed at Special Master

Cohen's request. *See* CMO-2 at 25, ¶54, docket no. 441 ("If a Party ***or non-Party*** discovers that it

has produced Privileged Information, it shall promptly notify the Receiving Party of the production

in writing, shall identify the produced Privileged Information by Bates range where possible, and

*may demand that the Receiving Party return or destroy the Privileged Information*.") (emphasis added).[2]

In their reply, the PBMs assert that Special Master Cohen never asserted a claim of privilege over his email. However, the Court finds that by: (1) quickly sending a follow-up email stating that his email was for "[his] own files, and not to counsel," and (2) clearly following a procedure similar to that for inadvertent production of privileged information set forth in this Court's protective order, the Special Master asserted privilege over his email. No magic words were necessary, and the Special Master's follow-up email can only be construed as a claim of privilege and an invocation of the clawback provision of CMO-2. Further, paragraph 54 of the Court's protective order also places a burden on a receiving party. It states: "In the event that a Receiving Party receives information that it believes *is subject to a good faith claim of privilege* by the Designating Party, the Receiving Party shall immediately refrain from examining the information and shall promptly notify the Designating Party in writing that the Receiving Party possesses potentially Privileged Information." *Id.* at 25, ¶54. Although the Court's protective order does not expressly apply to the Special Master, it describes a standard of professional conduct in a very closely analogous situation that the PBMs could have and should have followed. The PBMs chose not to.

---

[2] Presumably, the PBMs will, at some point in these proceedings, want to take advantage of this common claw-back provision provided by the Court's protective order. It seems hypocritical, therefore, for the PBMs not to extend a similar courtesy to the Special Master. The Court also notes that, were the email from opposing counsel rather than the Special Master, and the PBMs responded that not only would they not allow counsel to claw back their inadvertent disclosure but intended to use it to attempt to gain some tactical advantage in ligation, such conduct could be the subject of a motion for sanctions.

The PBMs also assert that the Special Master waived the privilege by filing an affidavit on the docket addressing the contents of the email and discussing the issue with a reporter. However, the timeline of events belies their argument. The PBMs, themselves, elected to discuss the emails in a conference on the record—the transcript of which is publicly available—on August 30, 2023, before the Special Master ***privately*** presented the parties with his affidavit on September 7, 2023 and after he attempted to claw the private notes back. The PBMs also excerpted the Special Master's email in their publicly filed motion on September 19, 2023, which occurred before either the September 20, 2023 news article or the Special Master filed his updated affidavit on the public docket on September 21, 2023. Moreover, it does not appear the Special Master "spoke to the press" about the substance of his email, as the PBMs assert in their Reply. *Compare* Reply at 6–9, *with* Reply Ex. B at 2 (explaining that Special Master Cohen "deferred to his affidavit in lieu of commenting" to the press). Regardless, none of these assertions change the fundamental character of the inadvertently emailed private notes from mental impressions to judicial conduct.

### No Reasonable Observer Could Question the Special Master's Impartiality

As this Court stated on the record during the August 30th conference, there is simply no merit to the PBM's allegation of bias: real, implied, or perceived. From the opening phrase of the Special Master's email, "Notes on D's position," it is clear to any but the most unreasonable observer that the email: (1) contained Special Master Cohen's private mental impressions, and (2) were abbreviated notes lacking full context.

In their motion, the PBMs spend a good deal of attention on one passage from the Special Master's email in particular—that the PBMs "knew a lot."[3] Despite the ink dedicated to this passage, the PBMs never explain how a reference to the amount of information they may or may not have about the opioid crisis might be perceived as prejudgment of the merits of any claim or defense in any case before this Court. These conclusory allegations are insufficient to demonstrate even a perception of bias.

The PBMs also imply that the Special Master's use of the word "knew" suggests a specific *mens rea*. *See* Motion at 11 (citing to multiple paragraphs of one of Plaintiffs' complaints that contain *mens rea* language). This tortured construction of Special Master Cohen's five-word parenthetical strains credulity. It takes out of context three words of the Special Master's email that itself lacks context because it was intended as a personal note to himself. "Knowing a lot" and "knowingly behaving in way that could subject a person to liability" are fundamentally different and easily distinguishable, even to a lay reader. Attempts to apply linguistic canons of construction to a person's shorthand notes is a fool's errand. No reasonable observer could possibly construe Special Master Cohen's language as demonstrating a disqualifying bias against the PBMs.

Just as the PBMs read too much into the phrase "knew a lot," they do the same with virtually every other word of the Special Master's email. For example, they take the word "amendment" from the first line ("whether amendment is allowed") and conclude that what the Special Master really means is: "the Court should 'just allow' the PEC to amend thousands of

---

[3] In its response, the PEC alludes to preliminary research, and whether such research is proper. Response at 4. The Court disagrees with this characterization of the Special Master's affidavit. The affidavit makes clear that the only research Special Master Cohen has done into the PBMs is to carefully review cited references contained in status reports submitted earlier to the Court. This does not constitute independent research and is entirely proper. *See* Affidavit ¶13 at 3–4.

complaints without any briefing." Reply at 6 (emphasis added). That is simply not a reasonable interpretation. Courts "must be careful not to rewrite what the judge has said and render unreasonable the clearest and most obvious reading of the language." *United States v. Antar*, 53 F.3d 568, 577 (3d Cir. 1995), *overruled in part on other grounds*, *Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001).

The Court has never considered setting thousands of bellwether trials against PBMs, nor amendment of thousands of cases. In fact, the Court has explicitly told the parties it would allow amendments only of the small number of cases eventually selected as bellwethers and would do so because the Sixth Circuit has already ruled on that issue. *See, e.g.*, Motion Ex. D at 6:4–7 ("the Sixth Circuit has clearly said that because of my initial order[, . . .] plaintiffs could amend complaints ***if a case is selected as a bellwether***.") (emphasis added) (referring to *In re: Nat'l Prescription Opiate Litig.*, Case No. 21-4051, 2022 WL 20701236, at *2 (6th Cir. Nov. 10, 2022) (MDL docket no. 4747) (holding that, because "[this MDL Court's] scheduling order allowed plaintiffs to amend whenever their case was selected as a bellwether, . . . the scheduling order did not clearly violate Rule 16 because it provided some limit (when a case was selected as a bellwether).");  *see also id.* at 12:24 (the Court stating: "conversely, to say that the plaintiffs should go ahead and amend complaints in hundreds of cases, that doesn't make sense").

Similarly, the PBMs take exception to the Special Master's thoughts on the best number of bellwether cases, insisting his comments show he is trying to "coerce" them into global settlement. Motion at 12; Reply at 6. In fact, the note more probably suggests the opposite: that Special Master Cohen was concerned with premature single-case settlements that would short-circuit the bellwether process. The most obvious interpretation of Special Master Cohen's note—that he

"think[s] we need 4 bellwethers, not 2 [because] it is too easy for Ds to buy off 2 Ps,[4] avoiding any global resolution"—is simply that if there are only two bellwether cases and both settle, the parties will be left with no live cases and insufficient data to meaningfully engage in global settlement discussions. As to "buying off" plaintiffs, it is public knowledge that Defendants that settle bellwethers in this MDL have paid a huge premium (*e.g.*, in the Track 1 bellwether in October 2019, four defendants paid a total of $235.4 million, many multiples of what the bellwether plaintiffs would have received under the subsequent global settlements).

The Special Master's note is not a prejudgment of the merits of any claim and carries no hint of coercion. As the Sixth Circuit held earlier in this case, "[Judge Polster] pushed for settlement not because he had prejudged the case, but because that was the most expedient way to conclude the dispute. Judges in complex litigation are encouraged to pursue and facilitate settlement early in a variety of ways." *In re Nat'l Prescription Opiate Litig.*, Case No. 19-3935, 2019 WL 7482137, at *3 (6th Cir. Oct. 10, 2019) (citing *Bell v. Johnson*, 404 F.3d 997, 1006 (6th Cir. 2005), and Manual on Complex Litigation § 13.1, pp. 167−68 (4th ed. 2004)). As of today, there have been over a dozen global settlements announced, totaling approximately $55 billion.

Ultimately, Special Master Cohen's private notes, when read objectively as a whole, demonstrate his even-handedness. It is notable that the PBMs ignore the Special Master's statements that **favor** the PBMs' positions. *See, e.g.*, Motion Ex. A at 1 ("I have some sympathy for the PBMs' argument . . ..."); *id.* ("let PBMs [add third parties] as they wish"); *see also* Affidavit ¶14 at 4. The Sixth Circuit has refused to read a judge's statements stripped of context in that way.

---

[4] Obviously, if the Special Master knew his notes would become the subject of public scrutiny, he might have chosen a more diplomatic phrase than "to buy off," but it is not this Court's role (nor that of the PBMs) to police the manner in which the Special Master makes notes for himself.

*See In re Nat'l Prescription Opiate Litig.*, Case No. 19-3935, 2019 WL 7482137, at *3 (6th Cir. Oct. 10, 2019). ("Read in isolation, Judge Polster's statements to the press and in court might call into question his impartiality. ***But we must take his statements in context.***") (emphasis added). Reading Special Master Cohen's email as a whole, the Court finds it represents an even-handed consideration of the matters before the Court.

Finally, it is not clear what the PBMs hope to gain through this motion. Should Special Master Cohen be disqualified from doing any further work on PBM cases, the Court will suggest to the JPML that it immediately remand all of these cases from the MDL, rather than attempt to proceed without the assistance of a special master. The Court's present intention is to retain jurisdiction over the PBM bellwethers to oversee discovery and dispositive motions, and then to request remand when they are trial ready. This is the procedure the Court has employed for all other bellwethers in this MDL. It saves the parties the enormous time and expense of litigating the same issues in front of four different judges and risking inconsistent rulings. And it spares each of those four busy judges a great deal of extra work. It is only with the assistance of Special Master Cohen and his team that the Court would have the capacity to handle the great burden entailed in managing discovery and motion practice in four very complicated bellwether cases.

The PBMs cursorily offer the possibility of replacing the Special Master. *See* Motion at 3 n.1. However, it would take years for any new master to review and familiarize themselves with the MDL docket, the Court's rulings, the discovery rulings, the procedural history, the parties, the settlements, and many other elements of this mature and extraordinarily complex MDL. Attempting to introduce a new special master, even just to the PBMs' portion of this MDL, would only complicate and delay these MDL proceedings.

## Conclusion

Accordingly, for the reasons described above, the Court finds that Special Master Cohen's personal notes should have been protected rather than exploited; and regardless, no reasonable observer could question the Special Master's impartiality based on his inadvertently circulated email. The PBMs' motion to disqualify the Special Master is **DENIED**. The PBMs are ordered to discard and disregard the Special Master's email as he requested.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster  October 10, 2023**
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**

11