# APPENDIX B

EFiled:  Jan 18 2023 12:21PM EST
Transaction ID 68915677



## TEVA/WEST VIRGINIA STATE-WIDE OPIOID
## SETTLEMENT AGREEMENT

### I.   OVERVIEW

This Agreement sets forth the terms and conditions of a West Virginia State-wide Opioid Settlement including entry of a Consent Judgment (hereinafter, "Consent Judgment") between and among the State (defined herein) and Teva (defined herein) (collectively, "the Parties") to resolve Claims, defined herein, against Teva;

This Agreement and the associated Consent Judgment resolve the litigation as to Teva in *State of West Virginia ex rel. Patrick Morrisey, Attorney General v. Teva Pharmaceutical Industries, Ltd., et al.,* Civil Action No. 19-C-104 BNE (W. Va. Cir. Ct. Boone County) (the "West Virginia AG Action"), pending within *In re: Opioid Litigation,* Civil Action No. 21-C-9000 MFR (W. Va. Cir. Ct. Kanawha County), and Actions brought by Participating Local Governments.

### II.   DEFINITIONS

A.   "*Actions*" means the West Virginia AG Action and any lawsuit by a Local Government asserting any Released Claim against one or more Released Entities.

B.   "*Agreement*" and "*Settlement Agreement*" mean this settlement agreement together with the Exhibits thereto.

C.   "*Bar*" means (1) a ruling by the highest court of the State setting forth the general principle that no Local Governments in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Local Governments in the State from maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect. For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payment of the Settlement Amount) shall not constitute a Bar.  A Bar shall constitute 100% Local Government Participation.

D.   "*Case-Specific Resolution*" means either (1) a law barring specified Local Governments from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (2) a ruling by a court of competent jurisdiction over a particular Local Government that has the legal effect of barring the Local Government from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) a release consistent with Section VII below. For the avoidance of doubt, a law, ruling, or release that is conditioned or predicated upon a post-Effective Date

payment by a Released Entity (apart from payment of the Settlement Amount) shall not constitute a Case-Specific Resolution.

E.  *"Claim"* means any past, present, or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state, or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen, or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs, or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

F.  *"Claim-Over"* means a Claim asserted by any entity that is not a Releasor against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to Claims arising out of or related to Covered Conduct.

G.  *"Class I Local Government"* means a Local Government that is a Class I city as that term is defined in W. Va. Code § 8-1-3(1).

H.  *"Class II Local Government"* means a Local Government that is a Class II city as that term is defined in W. Va. Code § 8-1-3(2).

I.  *"Class III Local Government"* means a Local Government that is a Class III city as that term is defined in W. Va. Code § 8-1-3(3).

J.  *"Class IV Local Government"* means a Local Government that is a Class IV town or village as that term is defined in W. Va. Code § 8-1-3(4).

K.  *"Common Benefit Fund Commissioner"* means the Honorable Christopher C. Wilkes, acting with the authority granted to him pursuant to the Court's Order Authorizing Common Benefit Fund and Appointing Common Benefit Fund Commissioner, dated October 4, 2021 (Transaction ID 66985632), and the Court's Order Establishing Common Benefit Fund, dated November 4, 2021 (Transaction ID 67071292).

L.     "*Consent Judgment*" means a consent decree, order, judgment, or similar action; in connection with this Agreement, the Parties have agreed to the entry of the Consent Judgment attached hereto as Exhibit G, which provides for, among other things, the release set forth below, the Court's approval of the Litigation Cost Amount, the dismissal with prejudice of any Released Claims that the State has brought against Released Entities, and the dismissal with prejudice of all other Actions pending before the Court, on the terms and conditions specified herein.

M.     "*Counsel*" means a solo practitioner, multi-attorney law firm, or other legal representative of the State or a Local Government.

N.     "*Court*" means the panel overseeing the mass litigation proceeding captioned *In re Opioid Litigation*, Civil Action No. 19-C-9000 (W. Va. Cir. Ct. Kanawha County).

O.     "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) arising from or relating in any way to (a) the availability, discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

P.     "*Effective Date*" means the date on which this Agreement is executed by the State and Teva.

Q. *"Finality"* means:

    1.    the Agreement and the Consent Judgment have been approved and entered by the Court as to Teva, including the release of all Released Claims against Released Entities as provided in this Agreement; and

    2.    (a) the time for appeal or to seek review of or permission to appeal from such approval and entry has expired; or (b) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described above have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

R. *"Initial Participation Date"* means the date by which Local Governments must join to become initial Participating Local Governments. The Initial Participation Date shall be June 14, 2023. The Parties may alter the Initial Participation Date by mutual written agreement.

S. *"Later Litigating Local Government"* means a Local Government (or Local Government official asserting the right of or for the Local Government to recover for alleged harms to the Local Government and/or the people thereof) that is not a Litigating Local Government as of the Effective Date and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Effective Date. It may also include a Litigating Local Government whose Claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Effective Date, when such Litigating Local Government takes any affirmative step in its lawsuit other than seeking a stay or removal.

T. *"Litigating Local Government"* means a Local Government (or Local Government official asserting the right of or for the Local Government to recover for alleged harms to the Local Government and/or the people thereof) that brought any Released Claims against one or more Released Entities on or before the Effective Date that were not separately resolved prior to that date. Exhibit B includes Litigating Local Governments identified by the Parties as of the Effective Date but is subject to amendment in the event it proves to be incomplete and other entities that satisfy the definition for "Litigating Local Governments" are subsequently identified.

U. *"Litigation Cost Amount"* has the meaning specified in Section III.A below.

V.      *"Local Government"* means a formal and legally recognized sub-entity of the State that provides general governance for a defined area, including a county, city, town, village, or similar entity, as further described in W. Va. Code §§ 7-1-1 *et seq.*, and §§ 8-1-1 *et seq.*  A list of counties, and lists of Class I, II, III and IV Local Governments, are attached as Exhibit C.  Historic, non-functioning sub-entities of the State are not Local Governments, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae,* or any other capacity.

W.      *"Non-Litigating Local Government"* means a Local Government that is neither a Litigating Local Government nor a Later Litigating Local Government.

X.      *"Non-Participating Local Government"* means a Local Government that is not a Participating Local Government.

Y.      *"Participating Local Government"* means a Local Government that signs the Election and Release Form annexed as Exhibit D and meets the requirements for becoming a Participating Local Government under subsection VIII.A or VIII.C.

Z.      *"Plaintiff"* means the State of West Virginia, acting by and through its Attorney General.

AA.     *"Product"* means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, *"Product"* does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. *"Product"* includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone, naltrexone, oxycodone, oxymorphone, pentazocine, propoxyphene, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. *"Product"* also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

BB.     *"Qualified Settlement Fund"* means the West Virginia Qualified Settlement Fund contemplated by this Agreement, into which the Settlement Amount shall be paid

and which shall be established under the authority and jurisdiction of the Court in accordance with the requirements of 26 C.F.R. § 1.468B-1.

CC.     *"Qualified Settlement Fund Administrator"* means the Administrator appointed to administer the Qualified Settlement Fund under the authority and jurisdiction of the Court. The duties of the Qualified Settlement Fund Administrator shall be governed by this Agreement. The identity of the Qualified Settlement Fund Administrator and a detailed description of the Qualified Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Qualified Settlement Fund Administrator's fees and costs, will be set forth in a separate document to be prepared by the Parties and filed with the Court to establish the fund and be attached later to this Agreement.

DD.     *"Released Claims"* means any and all Claims raised or that could have been raised that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. *"Released Claims"* include any Claims that have been asserted against the Released Entities by the State or any of its Litigating Local Governments in any federal, state, or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of, or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by the State, any of its Local Governments, or any Releasor (whether or not such State, Local Government, or Releasor has brought such action or proceeding). Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct. The Parties intend that *"Released Claims"* be interpreted broadly. This Agreement does not release Claims by private individuals or private entities for damages for any alleged personal injuries arising out of their own use of any opioid product. It is the intent of the Parties that such Claims be treated in accordance with applicable law. For the avoidance of doubt, this Agreement does not release claims asserted in *State of Connecticut, et al. v. Aurobindo Pharma USA, Inc.,* et al., Civil Action No. 17-CV-3768 (E.D. Pa.) or *State of Connecticut, et al. v. Teva Pharmaceuticals USA, Inc., et al.,* Civil Action No. 19-CV-2407 (E.D. Pa.). Released Claims is also used herein to describe Claims brought by a Later Litigating Local Government or other non-party Local Government that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

EE.     *"Released Entities"* means: (i) Teva; (ii) all of its respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures (but excluding joint venture partners), predecessors, successors, assigns and insurers (in their capacity as such); and (iii) the past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys and insurers of each of the

6

foregoing entities and persons referenced in clauses (i) through (iii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims. Released entities includes, but is not limited to, named defendants Teva Pharmaceuticals USA, Inc., Cephalon, Inc., Watson Laboratories, Inc., Warner Chilcott Company, LLC, Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.), Actavis South Atlantic LLC, Actavis Elizabeth LLC, Actavis Mid Atlantic LLC, Actavis Totowa LLC, Actavis LLC, Actavis Kadian LLC, Actavis Laboratories UT, Inc. (f/k/a Watson Laboratories, Inc.-Salt Lake City), Actavis Laboratories FL, Inc. (f/k/a Watson Laboratories, Inc.-Florida) and also includes Anda, Inc. and each of its current and former corporate parents, direct and indirect subsidiaries, predecessors, successors, affiliates, agents and current and former employees, officers and directors and any current or former related companies. A non-exclusive list of Teva's current subsidiaries, divisions, affiliates, and joint ventures released under clause (ii) is attached as Exhibit I. Exhibit I represents a good faith effort by Teva to list its current subsidiaries, divisions, affiliates, and joint ventures, but entities that fall within the scope of clause (ii) (including predecessor entities) of Teva are Released Entities, whether or not they are listed on Exhibit I.

FF.   "*Releasors*" means (1) the State; (2) each Participating Local Government; and (3) without limitation and to the maximum extent of the power of the State's Attorney General and/or each Participating Local Government to release Claims, (a) the State's and each Participating Local Government's departments, agencies, divisions, boards, commissions, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, public service districts, unincorporated districts, water districts, law enforcement districts, emergency services districts, school districts, highway authorities, conservation districts, development authorities, reclamation districts, recreation districts, economic development authorities, housing authorities, sanitary districts, solid waste authorities, urban mass transportation authorities, and any other person or entity that performs services at the direction of the State and/or one or more Participating Local Governments and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State or Local Governments in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Local Government. In addition to being a Releasor as provided herein, a Participating Local Government shall also provide an Election and Release Form (in the form attached as Exhibit D to this Agreement) providing for a release to the fullest extent of the Participating Local Government's authority. The State's

Attorney General represents that he or she has or has obtained the authority set forth in Section VII.F.

GG.   "*Remediation Amount*" has the meaning specified in Section III.B.1.a below.

HH.   "*Settlement Amount*" means the aggregate total sum to be paid pursuant to this Agreement by or on behalf of Teva as specified in Section III.B below. Except as provided in Section X and Section XII.C below, Teva shall not be called upon to make any payments pursuant to this Agreement in addition to the amount set forth in Section III.B below.

II.   "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in the State with respect to a class of Local Governments in the State that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in the State and has achieved Finality; (3) is binding on all Non-Participating Local Governments in the State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Local Governments may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Teva other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement. If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Local Governments collectively representing 1% or more of the State's population opt out. In seeking certification of any Settlement Class, the State and applicable Local Governments shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought. Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

JJ.   "*Settlement Product*" means "Naloxone Hydrochloride Nasal Spray" (4 mg strength) that is listed in Teva's then-current generics catalog, which can be viewed at www.tevagenerics.com, and is provided to the State as part of the settlement, at no cost as set forth in Section III.C and Exhibit A.

KK.   "*State*" means the State of West Virginia, including all of its executive departments, agencies, divisions, boards, commissions, instrumentalities and officers, including the Attorney General.

LL.   "*Teva*" means (i) Teva Pharmaceutical Industries Ltd.; (ii) all of its respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint

8

ventures, predecessors, successors, assigns, and insurers (in their capacity as such); and (iii) all of the foregoing respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys, and insurers of the foregoing entities and persons referenced in clauses (i) and (ii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims.

III.   **CONSIDERATION TO BE PROVIDED BY TEVA**

A.   *Monetary Payment.*  Teva shall not be required to pay the first annual payment set out below until this Agreement is fully executed and the Consent Judgment has been entered. On or before the Initial Participation Date, the State shall provide to Teva Election and Release Forms (in the form annexed as Exhibit D) demonstrating that (1) counties representing at least 96% of the State's population, (2) at least 96% of the population of Litigating Local Governments, and (3) at least 96% of the population of Non-Litigating Local Governments that are classified in the W. Va. Code 8-1-3 as Class I or Class II Local Governments have become Participating Local Governments. Teva shall not be required to pay the second annual payment or any subsequent payments unless and until the required Releases are obtained by the State and delivered to Teva and all Participating Local Governments have dismissed their respective cases against Teva and other Released Entities with prejudice, or the enactment of a statutory or other Bar against litigation.

B.   *Settlement Amount Payments.*

1.   Teva shall make fifteen (15) annual payments to West Virginia for a total sum of $83,331,000 (the "Settlement Amount"), consisting of:

a.   $75,404,450 (the "Remediation Amount") to be paid over a period of 15 years and allocated in accordance with subsection III.B.1.c below; and

b.   $7,926,550 (the "Litigation Cost Amount") to be disbursed as provided in Section IX below.

c.   The Settlement Amount shall be paid into the Qualified Settlement Fund as follows, subject to the provisions of Section III.B.2:

(i)   Within twenty-one (21) days after the later of (1) the date the Consent Judgment has been entered, or (2) the date the Qualified Settlement Fund has been established under the authority and jurisdiction of the Court and Teva has received from the West Virginia Attorney General a W-9 and wire

9

instructions for the Qualified Settlement Fund, Teva shall pay the sum of $25,251,818;

(ii)    On or before June 15, 2023, Teva shall pay the sum of $10,100,727;

(iii)    On or before June 15, 2024, Teva shall pay the sum of $2,525,182;

(iv)    On or before June 15, 2025 Teva shall pay the sum of $2,525,182

(v)    On or before June 15, 2026, Teva shall pay the sum of $2,525,182;

(vi)    On or before June 15, 2027, Teva shall pay the sum of $2,525,182;

(vii)    On or before June 15, 2028, Teva shall pay the sum of $2,525,182;

(viii)    On or before June 15, 2029, Teva shall pay the sum of $2,525,182;

(ix)    On or before June 15, 2030, Teva shall pay the sum of $2,525,182;

(x)    On or before June 15, 2031, Teva shall pay the sum of $2,525,182;

(xi)    On or before June 15, 2032, Teva shall pay the sum of $2,525,182;

(xii)    On or before June 15, 2033, Teva shall pay the sum of $2,525,182;

(xiii)    On or before June 15, 2034, Teva shall pay the sum of $7,575,545;

(xiv)    On or before June 15, 2035, Teva shall pay the sum of $7,575,545; and

(xv)    On or before June 15, 2036, Teva shall pay the sum of $7,575,545.

2. The State will use its best efforts to secure participation by all Local Governments within West Virginia. If by the Initial Participation Date, the conditions of Section III.A have not been met, the annual payments that are due following this date shall be suspended, provided that:

a. Following a suspension of payments, West Virginia may receive the scheduled annual payment for a specific payment year or any subsequent payment years by meeting the conditions of Section III.A.  The conditions of Section III.A must be met and the Election and Release Forms for Participating Local Governments must be provided within 90 days after a scheduled payment date for any specific payment year.

C. *Settlement Product*.

1. Teva shall provide Settlement Product to the State, for a period of ten (10) years at no cost to the State. Settlement Product shall be supplied by Teva USA to one facility per order to be designated by the State as more fully described in Exhibit A. The Parties agree that the total Wholesale Acquisition Cost ("WAC") value of the Settlement Product to be provided under this Agreement is $27,000,000.

a. In response to changing public health needs, the State may request to adjust the amount of its Settlement Product ordered in a given year, in which case the Parties shall meet and confer to discuss in good faith reasonable efforts to adjust orders and accommodate the State's request.

2. If by the Initial Participation Date, the conditions of Section III.A have not been met, the maximum Settlement Product that the State may order through this agreement shall be reduced by a percentage point number commensurate with the percentage point difference between 100% and the population of Participating Local Governments as a percentage of the population of all Local Governments.  Following a reduction in the maximum amount of Settlement Product the State may order, West Virginia may restore the amount of Settlement Product it may order for a specific year or any subsequent years by meeting the conditions of Section III.A and providing Teva the Election and Release Forms within 90 days after the scheduled order for any specific year.

D. *Consent Judgment*. As soon as practicable following execution of the Agreement, the State shall file in the Court a proposed Consent Judgment substantially in the form of Exhibit G. The Consent Judgment shall include the injunctive terms set forth in Exhibit F and provide for the Court's approval of the Litigation Cost

Amount and the dismissal with prejudice, as to Teva and all other Released Parties, of the West Virginia AG Action and the Actions of Participating Local Governments pending before the Court. The Consent Judgment shall further provide that, notwithstanding the dismissal, the Court shall retain jurisdiction for purposes of enforcing compliance with the injunctive terms and determining the allocation of the Litigation Cost Amount as provided in Section IX. The Parties shall confer and agree as to the final form and time of filing of the Consent Judgment prior to its filing with the Court.

## IV. INTRA-STATE ALLOCATION AND DISBURSEMENT OF REMEDIATION AMOUNT

A. Within a reasonable time after entry of the Consent Judgment, subject to the limitations set forth in Section VIII.D below, the Qualified Settlement Fund Administrator shall allocate and distribute the Remediation Amount to the State and Participating Local Governments to abate the impact of any alleged Covered Conduct in the State as provided in this Agreement and the West Virginia First Memorandum of Understanding, attached as Exhibit E.

B. Teva shall have no duty, liability, or influence of any kind with respect to the apportionment and use of the Remediation Amount. Plaintiff specifically represents, however, that any such apportionment and use shall be made in accordance with all applicable laws

## V. INJUNCTIVE RELIEF

A. The State and Teva agree to the injunctive relief as specified in Exhibit F.

## VI. CESSATION OF LITIGATION ACTIVITIES

A. In anticipation of finalizing this Agreement, a stay has been entered by the Court with respect to trial of the State's Claims against Teva in the West Virginia AG Action. It is the Parties' intent that this stay shall remain in place until the Effective Date, that any and all other litigation activities in the Actions relating to Claims against Teva shall immediately cease as of the Effective Date, and that Claims against Teva shall not be included in the trial of any Action against any other defendant.

## VII. RELEASE AND DISMISSAL

A. *Scope*. As of the Effective Date, the Released Entities shall be released and forever discharged from all of the Releasors' Released Claims. The State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to

12

otherwise seek to establish liability for any Released Claims for Covered Conduct against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability arising from or relating in any way to the Released Claims and extend to the full extent of the power of the State, its Attorney General, and each Releasor to release claims. The Release shall be a complete bar to any Released Claim.

B.  *Claim Over and Non-Party Settlement.*

    1.  *Statement of Intent.* It is the intent of the Parties that:

        a.  The payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), and each Releasor expressly waives its right to seek reallocation to Teva pursuant to W. Va. Code § 55-7-13C(d) of any amount that the Releasor is unable to collect from any other party held to be liable to the Releasor;

        b.  Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

        c.  It is expressly understood and agreed that the Parties have entered into this Agreement in good faith. In accordance with the Supreme Court of Appeals of West Virginia's decisions in *Board of Education of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W. Va. 597, 390 S.E.2d 796 (1990), and *Smith v. Monongahela Power Co.*, 189 W. Va. 237, 429 S.E.2d 643 (1993), it is the intent of the Releasors and the Released Entities that by making this good faith settlement of a disputed matter, the Released Entities are hereby relieved from any liability for Covered Conduct under any Claim-Over theory.

        d.  The provisions of this subsection VII.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

    2.  *Contribution/Indemnity Prohibited.* No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital,

pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3. *Non-Party Settlement.* To the extent that any Releasor enters into a Non-Party Settlement involving or relating to Covered Conduct, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include) in the Non-Party Settlement, unless prohibited from doing so under applicable law, a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Teva in subsection VII.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4. *Claim-Over.* In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection VII.B.2 (including in any bankruptcy proceeding), and such Non-Released Entity asserts a Claim-Over against a Released Entity related to the Released Claims, that Releasor and Teva shall take the following actions to ensure that the Released Entities do not pay more with respect to the Released Claims to Releasors or to Non-Released Entities than the amounts owed under this Settlement Agreement by Teva:

   a. Teva shall notify that Releasor of the Claim-Over within sixty (60) days of the assertion of the Claim-Over or sixty (60) days of the Effective Date of this Settlement Agreement, whichever is later.

   b. Teva and that Releasor shall meet and confer concerning any additional appropriate means by which to ensure that the Released Entities are not required to make any payment with respect to Covered Conduct (beyond the amounts that will already have been paid by Teva under this Settlement Agreement).

   c. That Releasor and Teva shall take steps sufficient and permissible under West Virginia law to hold Released Entities harmless from the Claim-Over with respect to Released Claims and ensure

Released Entities are not required to make any payment with respect to the Released Claims (beyond the amounts and product provisions owed by Teva under this Settlement Agreement). Such steps may include, where permissible, filing of motions to dismiss or such other appropriate motion by Teva or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration or such other reasonable actions that ensure Teva is not required to pay more to Releasors with respect to Released Claims than the amounts owed or product provided by Teva under this Agreement.

d. For the removal of doubt, Teva's payment and provision obligations under this agreement shall not be disrupted or delayed in the event of a Claim-Over, except by agreement of the parties to this Agreement.

C. *General Release*. In connection with the releases provided for in the Agreement, the State (for itself and its Releasors), and each Participating Local Government (for itself and its Releasors) expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of the State or principle of common law which would exclude from the scope of the Released Claims any Claims that a Releasor does not know or suspect to exist in the Releasor's favor as of the Effective Date that, if known by the Releasor, would have materially affected the State's or any Participating Local Government's decision to provide the general release contemplated by this Section VII.C. A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Local Governments' decision to participate in the Agreement.

D. *Cooperation*. Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will, consistent with the Attorney General's authority, reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims. The State shall use its best efforts to secure releases consistent with this Section from all Local Governments.

E. *Res Judicata*. Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the

15

Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

F.   *Representation and Warranty.* The State's Attorney General expressly represents and warrants that he will, on or before the Initial Participation Date, have (or have obtained) the authority to settle and release Claims of (1) the State, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and/or federal controlled substances acts, and (3) any of the State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G.   *Effectiveness.* The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Qualified Settlement Fund or any portion thereof, or by the enactment of future laws, or by any seizure of the Qualified Settlement Fund or any portion thereof.

H.   *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by individuals for damages for any alleged personal injuries arising out of their own use of any opioid product and any claims arising under the Agreement for enforcement of the Agreement.

## VIII.   PARTICIPATION BY LOCAL GOVERNMENTS

A.   *Requirements for Becoming a Participating Local Government: Litigating or Later Litigating Local Governments.* A Litigating Local Government or Later Litigating Local Government may become a Participating Local Government either by (1) executing an Election and Release Form (Exhibit D) and upon prompt dismissal of its Action; or (2) having its claims extinguished by operation of law or released by the State's Office of the Attorney General.

B.   *Notice.* As soon as practicable after the Effective Date, Plaintiff shall send notice to all Local Governments in the State eligible to participate in the settlement and

16

the requirements for participation. Such notice may include publication, email, and other standard forms of notification.

C.  *Requirements for Becoming a Participating Local Government: Non-Litigating Local Governments.* A Non-Litigating Local Government may become a Participating Local Government either (1) by executing an Election and Release Form (Exhibit D) specifying (a) that the Local Government agrees to the terms of this Agreement pertaining to Participating Local Governments, (b) that the Local Government releases all Released Claims against all Released Entities, and (c) that the Local Government submits to the jurisdiction of the Court for purposes limited to the Court's role under the Agreement or (2) by having their claims extinguished by operation of law or released by the State's Office of the Attorney General.

D.  *Non-Participating Local Governments.* Non-Participating Local Governments shall be ineligible to receive any direct portion of the Settlement Amount. Any portion of the Remediation Amount that would be directly allocable to a Non-Participating Local Government under the West Virginia First Memorandum of Understanding if it were a Participating Local Government shall be withheld from any distribution of the Remediation Amount; the funds so withheld shall remain in the Qualified Settlement Fund for 150 days from the date the Qualified Settlement Fund Administrator first distributes any portion of the Remediation Amount to Participating Local Governments, or unless and until the Non-Participating Local Government has satisfied the requirements of Section VIII.C (i.e., has become a Participating Local Government), whichever occurs sooner. If, at the conclusion of the 150 day period, the Non-Participating Local Government has failed to satisfy the requirements of Section VIII.C (i.e., has failed to become a Participating Local Government), then the amount allocable to that Non-Participating Local Government shall be reallocated and used as provided in the West Virginia First Memorandum of Understanding.

E.  *Representation With Respect to Local Government Participation.* The State represents and warrants that it has a good faith belief that both (a) all Litigating Local Governments, and (b) all Non-Litigating Local Governments that are Class I or II Local Governments, will become Participating Local Governments. Further, the State will use its best efforts to secure participation by all Local Governments within the State, including all Litigating Local Governments and all Non-Litigating Local Governments. To the extent any Local Governments do not become Participating Local Governments, the West Virginia Attorney General shall take all appropriate steps to resolve any remaining Claims by such Local Governments against Teva and Released Entities, which may include seeking the enactment of a legislative Bar or pursuit of a Settlement Class Resolution. The State acknowledges the materiality of the foregoing representation and warranty.

17

F.  *Representation With Respect to State Abatement Claims.* The State represents and warrants that the Remediation Amount shall be used to fund opioid abatement and treatment activities throughout the State, and that the Settlement is intended to release any and all Claims for abatement within the State. The State acknowledges the materiality of the foregoing representation and warranty.

G   *Representation With Respect to Claims by Later Litigating Local Governments.* The State represents and warrants that, if any Later Litigating Local Government brings any Released Claim(s) against any Released Entity after the Effective Date, the State will take appropriate steps to cease the litigation as soon as reasonably possible. Depending on facts and circumstances, such steps may include intervening in the Action to move to dismiss or otherwise terminate the Local Government's Claims as to the Released Entities in the Action, commencing a declaratory judgment or other action that establishes a Bar to the Local Government's Claims as to the Released Entities, or other means.

H.  Concurrently with Plaintiff's submission of the Consent Judgment per Section III.D above, the Parties will jointly ask the Court to enter the Case Management Order annexed hereto as Exhibit H, which is applicable only to Non-Participating Local Governments and Later Litigating Local Governments.

## IX.  ATTORNEY FEES, COSTS AND EXPENSES; DISBURSEMENT OF LITIGATION COST AMOUNT

A.  Attorney fees will be handled through an agreement between the Attorney General's Office and counsel, and under the oversight of the Common Benefit Fund Commissioner, subject to political subdivision participation and review and orders of the Court, in particular regarding how political subdivision fees are handled. Teva shall not be responsible for making payments for attorneys' fees and costs beyond amounts specified in this Agreement.

B.  Nothing in this Section IX shall require any payment by Teva beyond the Settlement Amount, nor shall Teva have any responsibility or authority regarding the allocation of the Litigation Cost Amount, except that the Common Benefit Fund Commissioner and/or the Court may receive information from Teva as to (1) the identity of Participating, Non-Participating, Litigating, Later Litigating, and Non-Litigating Local Governments, and (2) such other information as Teva may voluntarily elect to provide.

## X.  BANKRUPTCY

A.  *Bankruptcy.* Nothing in this Agreement shall preclude the State or any Participating Local Government from receiving a distribution from a potential bankruptcy of Teva to the extent that the State or Participating Local Government has a right to

receive a payment or distribution in accordance with this Agreement. Subject to the terms of this Agreement (including all releases, covenants and payment terms contained herein), all of the State's and the Participating Local Governments' rights with respect to any bankruptcy case of Teva are specifically reserved by the State and the Participating Local Governments. If for any reason, the State or any Participating Local Government must remit any portion of the Settlement Amount to a bankruptcy court or other party as a result of the commencement of a case with respect to Teva under Title 11 of the United States Code (the "Bankruptcy Code") then Teva shall make such payment to the State as soon as reasonably practicable.

If, at any time after payment of the Settlement Amount, a claim is made against the State for the return of any of the consideration paid by or on behalf of Teva under this Agreement, and if the State returns any portion of such consideration, either pursuant to the direction of a court or as a consequence of a voluntary settlement of such claim, then the State may vacate any satisfaction of the claim, reinstate its claim for amount so returned (the "Repayment Claim") against Teva and commence or reinstate an action to recover the Repayment Claim, plus interest thereon at 7% interest from the date of such return to the date of repayment, together with any costs and expenses, including attorneys' fees, incurred in defending against such claim or in seeking recovery of the Repayment Claim.

## XI.   **ENFORCEMENT AND DISPUTE RESOLUTION**

A.   *Enforceability.*   The terms of the Agreement and the West Virginia Consent Judgment will be enforceable solely by the State of West Virginia and Teva. Participating Local Governments shall not have enforcement rights against Teva with respect to the Agreement or West Virginia Consent Judgment except as to payments that would be allocated under the West Virginia First Memorandum of Understanding for Local Government use. The State of West Virginia shall establish a process for Participating Local Governments to notify it of any perceived violations of the Agreement or West Virginia Consent Judgment.

B.   *Jurisdiction.* Teva consents to the jurisdiction of the Court for the limited purpose of enforcing this Agreement and the West Virginia Consent Judgment.

C.   *Dispute Resolution.* The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, the dispute shall be resolved in the Court.

## XII.   **MISCELLANEOUS**

A.   *No Admission of Liability.* The Settling Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between Teva and Plaintiff and between the Released Entities and all Releasors. Teva is entering into

this Settlement Agreement solely for the purposes of settlement, to resolve the West Virginia AG Action and all Actions and Released Claims and thereby avoid significant expense, inconvenience, and uncertainty. Teva denies the allegations in the West Virginia AG Action and the other Actions and denies any civil or criminal liability in the West Virginia AG Action and the other Actions. Nothing contained herein may be taken as or deemed to be an admission or concession by Teva of: (1) any violation of any law, regulation, or ordinance; (2) any fault, liability, or wrongdoing; (3) the strength or weakness of any Claim or defense or allegation made in the West Virginia AG Action, in any other Action, or in any other past, present or future proceeding relating to any Covered Conduct or any Product; or (4) any other matter of fact or law. Nothing in this Settlement Agreement shall be construed or used to prohibit any Released Entity from engaging in the manufacture, marketing, licensing, distribution or sale of branded or generic opioid medications or any other Product in accordance with applicable laws and regulations.

B.  *Use of Agreement as Evidence.* Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement: (1) is or may be deemed to be or may be used as an admission or evidence relating to any matter of fact or law alleged in the West Virginia AG Action or the other Actions, the strength or weakness of any Claim or defense or allegation made in those cases, or any wrongdoing, fault, or liability of any Released Entities; or (2) is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault or omission of Released Entities in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal. Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Agreement, and except that Released Entities may file this Agreement in any action in order to support a defense or counterclaim based on principles of *res judicata,* collateral estoppel, release, good-faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim or to support a claim for contribution and/or indemnification.  For the avoidance of any doubt, nothing herein shall prohibit Teva from entering this Agreement into evidence in any litigation or arbitration concerning Teva's right to coverage under an insurance contract.

C.  *Voluntary Settlement.* This Settlement Agreement was negotiated in good faith and at arm's-length over several months, and the exchange of the Remediation Amount and Litigation Cost Amount for the releases set forth herein is agreed to represent appropriate and fair consideration.

D.  *Taxes.* Each of the Parties acknowledges, agrees, and understands that it is its intention that, for purposes of Section 162(f) of the Internal Revenue Code, the

provision of the Settlement Amount and the Settlement Product by Teva (other than amounts directed to attorneys' fees and costs) constitutes restitution for harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law. The Parties acknowledge, agree and understand that, other than the amounts directed to attorneys' fees and costs, no other portion of the Settlement Amount and/or Settlement Product represents reimbursement to the State, any Participating Local Government or other person or entity for the costs of any investigation or litigation, and no portion of the Settlement Amount and/or Settlement Product represents or should properly be characterized as the payment of fines, penalties, or other punitive assessments, and furthermore, the combined value of the Settlement Amount and the Settlement Product fully constitutes remedial costs for harms allegedly caused by the potential violation of law by Teva. The State and every Participating Local Government shall complete and file Form 1098-F with the Internal Revenue Service, identifying the Settlement Amount and the Settlement Product (other than amounts directed to attorney fees and costs) as remediation/restitution amounts, and shall furnish Copy B of such Form 1098-F to Teva and shall otherwise fully comply with the requirements of Section 162(f) and Section 6050X of the Internal Revenue Code and all treasury regulations relating to those provisions of the Internal Revenue Code.  Teva makes no warranty or representation to the State or any Participating Local Government as to the tax consequences of the Settlement Amount or the Settlement Product or any portion thereof.

E.   *Federal, State and Local Laws Prevail.* Nothing in this Agreement shall be construed to authorize or require any action by Teva in violation of applicable federal, state, or other laws.

F.   *No Third-Party Beneficiaries.* Except as to Released Entities, nothing in this Settlement Agreement is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever.

G.   *Binding Agreement.* This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto.

H.   *Choice of Law.* Any dispute arising from or in connection with this Settlement Agreement shall be governed by West Virginia law without regard to its choice-of-law provisions.

I.   *No Conflict Intended.* The headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Agreement. The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms.

J.     *No Party Deemed to be the Drafter.* None of the Parties hereto shall be deemed to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

K.     *Most Favored Nation.* If, after this settlement, there is a collective nationwide resolution of substantially all claims against Teva brought by states, counties, municipalities and/or local governments (a "Public Global Resolution") then the State and Teva agree that the net present value ("NPV") (calculated with a 7% discount rate) of the Settlement Amount to be received by the State and its Local Governments under this settlement (excluding $7,926,550 in fees and costs as outlined in Paragraph 1 above) shall be no less favorable than the net present value (calculated with a 7% discount rate) of the consideration the State and its Local Governments would have received based on an allocation share of 2.25% of the total cash allocated to remediation and restitution (excluding payments to tribes and attorneys' fees and costs) in the Public Global Resolution, considering the same level of participation of Local Governments and other required participation requirements of the Public Global Resolution. Any additional monies due to the State and its Local Governments under this Most Favored Nations clause shall be paid on the same payment schedule as delineated in the Public Global Resolution.

        1.     By way of example only, assume Teva reaches a Public Global Resolution of $XX billion in cash to be used for remediation and restitution purposes, exclusive of payments to tribes, attorneys' fees and costs, and before any deductions are taken for prior settlements of public entities. If 2.25% of $XX billion (on an NPV basis calculated with a 7% discount rate) is higher than the $75,404,450 paid under this settlement for remediation and restitution as outlined in Paragraph 1 above (on an NPV basis calculated with a 7% discount rate) and all participation requirements of the Public Global Resolution are satisfied for a full allocation, then Teva would pay West Virginia the excess amount on the schedule specified in the Public Global Resolution.

L.     *Modification.* This Agreement may be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court. Modifications must be in writing and agreed to by all of the Parties to be enforceable.

M.     *Waiver.* Any failure by any party to this Agreement to insist upon the strict performance by any other party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Judgment.

22

N.  *Entire Agreement.* This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto, except as provided herein. Except as described in Section XII.B, above, in any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

O.  *Counterparts.* This Agreement may be executed in counterparts, and a facsimile or .pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

P.  *Severability.* In the event any one or more provisions of this Settlement Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Settlement Agreement.

Q.  *Notice.* All notices under this Agreement shall be provided to the following via email and Overnight Mail:

> *For Defendant:*
>
> Teva Pharmaceuticals
> Attn: General Counsel's Office
> 400 Interpace Parkway
> Parsippany, NJ 07054
>
> *Copy to Teva's attorneys at:*
>
> Eric W. Sitarchuk
> Morgan, Lewis & Bockius LLP
> 1701 Market Street
> Philadelphia, PA 19103-2921
> eric.sitarchuk@morganlewis.com
>
> Rebecca J. Hillyer
> Morgan, Lewis & Bockius LLP
> 1701 Market Street
> Philadelphia, PA 19103-2921
> rebecca.hillyer@morganlewis.com
>
> *For the Attorney General:*
>
> Vaughn T. Sizemore
> Deputy Attorney General
> Office of the Attorney General
> P.O. Box 1789

23

Charleston, WV 25326
vaughn.t.sizemore@wvago.gov

Abby G. Cunningham
Assistant Attorney General
Office of the Attorney General
P.O. Box 1789
Charleston, WV 25326
abby.g.cunningham@wvago.gov

**APPROVED:**

DATED: 9.16.22                    DATED: 9/19/22

TEVA                              THE STATE OF WEST VIRGINIA

                                  PATRICK MORRISEY
                                  ATTORNEY GENERAL

By: _____         By: _____
Name: David M. Stark              Name: Patrick Morrisey
                                  Title: Attorney General
                                  *Attorney for the State of West Virginia*

24

Teva West Virginia State-Wide Opioid Settlement Exhibits

**Exhibit A** State Plan for Acceptance and Delivery of Settlement Product ......................... A-1

**Exhibit B** List of Litigating Local Governments as of the Execution Date ....................... B-1

**Exhibit C** List of West Virginia Counties, Cities, Towns, and Villages ............................. C-1

**Exhibit D** West Virginia Local Government Election and Release Form ......................... D-1

**Exhibit E** West Virginia First Memorandum of Understanding ........................................ E-1

**Exhibit F** Injunctive Relief ............................................................................................. F-1

**Exhibit G** Consent Judgment .......................................................................................... G-1

**Exhibit H** Case Management Order .................................................................................. H-1

**Exhibit I** Teva's Subsidiaries, Affiliates, and Joint Ventures .......................................... I-1

**Exhibit A**
**State Plan for Acceptance and Delivery of Settlement Product**

**Orders to TEVA USA**

The Office of the Attorney General, or his designee, on behalf of the State, shall have the right to place periodic orders, not to exceed four (4) quarterly orders per year, to Teva USA for fulfillment of Settlement Product over a period of ten (10) years from the Effective Date, subject to Teva's good faith and reasonable efforts to meet the logistical requirements necessary to commence manufacturing of the needed increase in kits.

Orders submitted to Teva USA on behalf of the State pursuant to this Settlement Agreement shall in all respects be processed and filled by Teva USA as though such orders had been submitted by Teva USA's regular paying customers except to the extent inconsistent with the terms of the Settlement Agreement and the terms herein.

The total volume of Settlement Product requested shall not exceed the following quantity during a twelve-month period:

- Naloxone Hydrochloride Nasal Spray (4 mg dosage): 25,000 kits (2 devices per kit) (to be ordered only in batches of 25,000 kits or 12,500 kits, unless otherwise agreed to by the Parties).

The Parties agree that the total WAC value of the Settlement Product to be provided under this Agreement is $27,000,000, and that for purposes of this Agreement the WAC value per kit is $125. Teva agrees to provide up to 216,000 kits at no cost to the State over the ten (10) year period of this Agreement.

The Settlement Product order from the State shall be in writing and directed to Teva USA's affiliate Anda, Inc., 2915 Weston Road, Weston, FL 33331, Attention: Patrick Cochrane, patrick.cochrane@andanet.com and Anthony Mihelich, anthony.mihelich@andanet.com. Each Settlement Product order must identify the quantity of the Settlement Product, the available annual amount remaining for fulfillment, and the total quantity of Settlement Product delivered by Teva USA as of the date of the order. The total value of orders placed by the State shall not exceed $27,000,000 at the agreed WAC value of $125 per kit. Teva may reject any order that if fulfilled would cause the total value of all Settlement Product delivered to the State to exceed this amount, in which case Teva shall have no obligation to fulfill or deliver the order, and the State shall reduce the order to an amount that does not exceed $27,000,000 total for all orders by the State.

Teva USA shall respond to the State's order request within seven (7) calendar days confirming the order. Teva USA will use its good faith efforts to ship the order directly to the facility designated by the State within six (6) months of the order at no cost to the State and shall provide the State with estimated delivery dates for receipt of the Settlement Product. Notwithstanding the foregoing, for each order from the State following the initial order, Teva USA agrees that it will use its good faith efforts to ship Settlement Product to the facility designated by the State within ninety (90) days of the order.

For purposes of this State Plan for Acceptance and Delivery of Settlement Product, the term "Force Majeure Event" means any event reasonably beyond the control of the Parties, including wars, hostilities, revolution, riots, civil commotion, national emergency, unavailability of supplies, epidemics, fire, flood, earthquake, force of nature, explosion, terrorist act, embargo, or any act of God, or any law, proclamation, regulation, ordinance, or other act or order of any court or governmental authority. In the event of a Force Majeure Event or other inability to supply any order made by the State for Settlement Product, Teva USA shall promptly provide written notice to the State. Teva USA and the State shall meet and confer within seven (7) days of such written notice to establish a good faith plan to resolve any inability to supply as quickly as reasonably possible.

**Delivery to State-Designated Facility**

Delivery of the Settlement Product shall occur no more than five (5) business days after the shipment date. Should delivery within this deadline not occur, Teva USA agrees to notify the State in writing and to work in good faith to resolve shipping or delivery issues that may arise.

Shipping shall occur in the same manner that Teva USA regularly ships this Settlement Product and any damages to the Settlement Product or other shipping damages or liability arising prior to receipt of the Settlement Product by the State shall be fully the responsibility of Teva USA. Should damage to Settlement Product occur during shipping, Teva USA agrees to re-ship the amount damaged promptly and at no cost to the State.

The State shall designate one location per order for delivery. In writing and no later than the State's initial Settlement Product order, the State will designate the facility or agency in West Virginia that will receive the Settlement Product on behalf of the State. The State reserves the right to designate a different delivery location within West Virginia during the pendency of this Settlement Agreement at its discretion.

Should the State determine that an alternate state facility or agency will receive the Settlement Product during the pendency of the settlement, the State shall notify Teva USA and its affiliate Anda, Inc. in writing through the Settlement Product order.

The State agrees to receive the Settlement Product in a location with appropriate storage accommodations and will comply with all applicable state and federal laws surrounding receipt of the Settlement Product.

The State shall inspect the Settlement Product within five (5) business days upon arrival at the state facility. If the State identifies damages to the Settlement Product during the inspection, Teva USA agrees to work in good faith to replace the damaged Settlement Product promptly.

Delivery of the Settlement Product is complete when Teva USA delivers all kits of a particular order to the state facility and when both parties or their designees sign an invoice confirming the amount of kits of Settlement Product received by the State.

**Distribution by State**

The State intends to distribute the Settlement Product to law enforcement agencies, first responders, and healthcare professionals throughout West Virginia. ("Recipients"). The time, place, and manner of distribution of the Settlement Product by the State will be determined solely by the State. The State will require appropriate training on proper use of the Settlement Product by Recipients.

The State retains the right to alter its distribution plan according to the State's needs, including the right to store the Settlement Product at a state facility for any length of time. The State may distribute the Settlement Product as it deems best to address the opioid-related public health crisis in West Virginia, and alteration of distribution to Recipients shall be at the sole discretion of the State without regard to the preferences or recommendations of Teva USA.

**Exhibit B**
**List of Litigating Local Governments as of the Execution Date**

*List is subject to amendment in the event it proves to be incomplete and other entities that satisfy the definition for "Litigating Local Governments" are subsequently identified.*

## Counties

Barbour County
Berkeley County
Boone County
Braxton County
Brooke County
Cabell County
Calhoun County
Clay County
Doddridge County
Fayette County
Gilmer County
Grant County
Greenbrier County
Hancock County
Hardy County
Harrison County
Jackson County
Jefferson County
Kanawha County
Lewis County
Lincoln County
Logan County
Marion County
Marshall County
Mason County
McDowell County
Mercer County
Mineral County
Mingo County
Monongalia County
Monroe County
Morgan County
Nicholas County
Ohio County
Pendleton County
Pleasants County
Pocahontas County
Preston County

Putnam County
Raleigh County
Randolph County
Ritchie County
Roane County
Summers County
Taylor County
Tucker County
Tyler County
Upshur County
Wayne County
Webster County
Wetzel County
Wirt County
Wood County
Wyoming County

**Cities/Towns/Villages**

Addison (Webster Springs)
Barboursville
Beckley
Belington
Belle
Bluefield
Buckhannon
Ceredo
Chapmanville
Charles Town
Charleston
Chesapeake
Clarksburg
Clendenin
Delbarton
Dunbar
Eleanor
Elizabeth
Fairmont
Fort Gay
Gauley Bridge
Gilbert
Glenville
Grafton
Granville
Hamlin
Harrisville

Huntington
Hurricane
Junior
Kenova
Kermit
Logan
Madison
Man
Matewan
Milton
Montgomery
Moundsville
Mullens
Nitro
Oceana
Parkersburg
Philippi
Point Pleasant
Princeton
Quinwood
Rainelle
Ravenswood
Richwood
Ripley
Romney
Rupert
Smithers
Sophia
South Charleston
Spencer
St. Albans
St. Mary's
Star City
Summersville
Sutton
Vienna
Wayne
Weirton
Welch
West Hamlin
White Sulphur Springs
Whitesville
Williamson
Williamstown
Winfield

**Exhibit C**
**List of West Virginia Counties, Cities, Towns, and Villages**

<u>**Counties**</u>

Barbour County
Berkeley County
Boone County
Braxton County
Brooke County
Cabell County
Calhoun County
Clay County
Doddridge County
Fayette County
Gilmer County
Grant County
Greenbrier County
Hampshire County
Hancock County
Hardy County
Harrison County
Jackson County
Jefferson County
Kanawha County
Lewis County
Lincoln County
Logan County
Marion County
Marshall County
Mason County
McDowell County
Mercer County
Mineral County
Mingo County
Monongalia County
Monroe County
Morgan County
Nicholas County
Ohio County
Pendleton County
Pleasants County
Pocahontas County
Preston County
Putnam County
Raleigh County

Randolph County
Ritchie County
Roane County
Summers County
Taylor County
Tucker County
Tyler County
Upshur County
Wayne County
Webster County
Wetzel County
Wirt County
Wood County
Wyoming County

**Class II Cities**

Beckley
Charleston
Clarksburg
Fairmont
Huntington
Martinsburg
Morgantown
Parkersburg
South Charleston
St. Albans
Vienna
Weirton
Wheeling

**Class III Cities**

Bethlehem
Bluefield
Bridgeport
Buckhannon
Charles Town
Chester
Dunbar
Elkins
Fayetteville
Follansbee
Grafton
Hinton

Hurricane
Kenova
Keyser
Kingwood
Lewisburg
Madison
Milton
Moorefield
Moundsville
New Martinsville
Nitro
Oak Hill
Paden City
Petersburg
Philippi
Pleasant Valley
Point Pleasant
Princeton
Ranson
Ravenswood
Ripley
Shinnston
Spencer
Summersville
Welch
Wellsburg
Weston
Westover
White Sulphur Springs
Williamson
Winfield

## **Class IV Towns and Villages**

Addison (Webster Springs)
Albright
Alderson
Anawalt
Anmoore
Ansted
Athens
Auburn
Bancroft
Barrackville
Bath (Berkeley Springs)
Bayard

Beech Bottom
Belington
Belle
Belmont
Benwood
Bethany
Beverly
Blacksville
Bolivar
Bradshaw
Bramwell
Brandonville
Bruceton Mills
Buffalo
Burnsville
Cairo
Camden-On-Gauley
Cameron
Capon Bridge
Carpendale
Cedar Grove
Ceredo
Chapmanville
Chesapeake
Clay
Clearview
Clendenin
Cowen
Danville
Davis
Davy
Delbarton
Durbin
East Bank
Eleanor
Elizabeth
Elk Garden
Ellenboro
Fairview
Falling Spring (Renick)
Farmington
Flatwoods
Flemington
Fort Gay
Franklin
Friendly

Gary
Gassaway
Gauley Bridge
Gilbert
Glasgow
Glen Dale
Glenville
Grant Town
Grantsville
Granville
Hambleton
Hamlin
Handley
Harman
Harpers Ferry
Harrisville
Hartford City
Hedgesville
Henderson
Hendricks
Hillsboro
Hundred
Huttonsville
Iaeger
Jane Lew
Junior
Kermit
Keystone
Kimball
Leon
Lester
Logan
Lost Creek
Lumberport
Mabscott
Man
Mannington
Marlinton
Marmet
Mason
Masontown
Matewan
Mcmechen
Meadow Bridge
Middlebourne
Mill Creek

Mitchell Heights
Monongah
Montgomery
Montrose
Mount Hope
Mullens
New Cumberland
New Haven
Newburg
North Hills
Northfork
Nutter Fort
Oakvale
Oceana
Parsons
Paw Paw
Pax
Pennsboro
Peterstown
Piedmont
Pine Grove
Pineville
Poca
Pratt
Pullman
Quinwood
Rainelle
Reedsville
Reedy
Rhodell
Richwood
Ridgeley
Rivesville
Romney
Ronceverte
Rowlesburg
Rupert
Salem
Sand Fork
Shepherdstown
Sistersville
Smithers
Smithfield
Sophia
St. Mary's
Star City

Stonewood
Sutton
Sylvester
Terra Alta
Thomas
Thurmond
Triadelphia
Tunnelton
Union
Valley Grove
War
Wardensville
Wayne
West Hamlin
West Liberty
West Logan
West Milford
West Union
White Hall
Whitesville
Williamstown
Windsor Heights
Womelsdorf (Coalton)
Worthington

**Exhibit D**
**West Virginia Local Government Election and Release Form**

| | |
|---|---|
| Local Government: | |
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

      The Local Government identified above, in order to obtain and in consideration for the benefits provided to the Local Government pursuant to the Teva West Virginia State-Wide Opioid Settlement ("Teva Agreement"), and acting through the undersigned authorized official, hereby elects to participate in the Teva Agreement, release all Released Claims against all Released Entities, and agrees as follows.

1. The Local Government is aware of and has reviewed the Teva Agreement, understands that all terms in this Participation Form have the meanings defined therein, and agrees that by signing this Participation Form, the Local Government elects to participate in the Teva Agreement and become a Participating Local Government as provided therein.

2. The Local Government shall, within 7 days of the execution of this Participation Form, secure the dismissal with prejudice of any Released Claims that it has filed.

3. The Local Government agrees to the terms of the Teva Agreement pertaining to Local Governments as defined therein.

4. By agreeing to the terms of the Teva Agreement and becoming a Releasor, the Local Government is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the effective date.

5. The Local Government agrees to use any monies it receives through the Teva Agreement solely for the purposes provided therein.

6. The Local Government submits to the jurisdiction of the panel overseeing the mass litigation proceeding captioned *In re: Opioid Litigation*, Civil Action No. 19-C-9000, in the Circuit Court of Kanawha County, West Virginia, for resolving disputes to the extent provided in the Teva Agreement.

7. The Local Government has the right to enforce the Teva Agreement as provided therein.

8. The Local Government, as a Participating Local Government, hereby becomes a Releasor for all purposes in the Teva Agreement, and along with all departments, school districts, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity elected or appointed to serve any of the

D-1

foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority. As a Releasor, the Local Government hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Teva Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Local Government to release claims. The Teva Agreement shall be a complete bar to any Released Claim.

9. The Local Government hereby takes on all rights and obligations of a Participating Local Government as set forth in the Teva Agreement.

10. In connection with the releases provided for in the Teva Agreement, each Local Government expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of the State or principle of common law which would exclude from the scope of the Released Claims any Claims that a Releasor does not know or suspect to exist in the Releasor's favor as of the Effective Date that, if known by the Releasor, would have materially affected the State's or any Participating Local Government's decision to provide the general release contemplated by this Section VII.C. A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Local Governments' decision to participate in the Agreement.

11. Nothing herein is intended to modify in any way the terms of the Teva Agreement, to which Local Government hereby agrees. To the extent this Participation Form is interpreted differently from the Teva Agreement in any respect, the Teva Agreement controls.

12. This Participation Form is conditioned on the Local Government identified above entering into the *West Virginia First Memorandum of Understanding*, which governs the allocation of the opioid settlement funds made under the Teva Agreement. The *West Virginia First Memorandum of Understanding* is specific to and only pertains to the Teva Agreement. The effective date of this Participation Form shall be the date on which the State and the Local Government identified above enter into a *West Virginia First Memorandum of Understanding*. In the event that the State does not enter into a *West Virginia First Memorandum of Understanding* with the Local Government identified above, this Participation Form shall be null and void and shall confer no rights or obligations on the State, the Released Entities, or the Local Government.

I have all necessary power and authorization to execute this Participation Form on behalf of the Local Government.

Signature: _____

Name: _____

Title: _____

Date: _____

**Exhibit E**
**West Virginia First Memorandum of Understanding**

# WEST VIRGINIA FIRST
# MEMORANDUM OF UNDERSTANDING

## General Principles

Whereas, the people of the State of West Virginia, its Local Governments and communities, have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and,

Whereas, certain Local Governments, through their elected representatives and counsel, and the State, through its Attorney General, are separately engaged in litigation seeking to hold Pharmaceutical Supply Chain Participants accountable for the public harms caused by their misfeasance, nonfeasance, and malfeasance; and

Whereas, the State, through its Attorney General, and its Local Governments share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance, and malfeasance throughout the State of West Virginia;

## Terms

The State and its Local Governments and communities, subject to the completion of formal documents effectuating the Parties' agreements, enter into this Memorandum of Understanding ("MOU") relating to the allocation and use of the proceeds of Settlements and Judgments described herein.

**A.**     **Definitions**

As used in this Memorandum of Understanding:

1.     "Approved Purpose(s)" shall mean evidence-based strategies, programming and/or services used to expand the availability of treatment for individuals affected by substance use disorders and/or addiction, to develop, promote and provide evidence-based substance use prevention strategies, to provide substance use avoidance and awareness education, to engage in enforcement to curtail the sale, distribution, promotion or use of opioids and other drugs, to decrease the oversupply of licit and illicit opioids and to support recovery from addiction to be performed by qualified providers as is further set forth in Exhibit A and Paragraph B(3) below.

2.     "Court" is the West Virginia Mass Litigation Panel.

3.     "Foundation Share" shall mean Opioid Funds allocated to the Foundation from any settlement or judgment.

4.   "Judgment" shall mean a final judgment or verdict in favor of any of the Parties in a judicial proceeding pending in either state or federal court (including Bankruptcy Court) which resolves legal or equitable claims regarding opioids against a Pharmaceutical Supply Chain Participant. Judgment shall not include any judgment on the claims of Cabell County and the City of Huntington which were previously tried in the United States District Court for the Southern District of West Virginia, or any judgment on any claims asserted by the State against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust laws, state criminal laws, or claims asserted pursuant to W. Va. Code § 9-7-6(c) or for Medicaid reimbursement.

5.   "Local Government(s)" shall mean all counties, cities, villages, and towns located within the geographic boundaries of the State.

6.   "Local Government Share" or "LG Share" shall mean Opioid Funds allocated directly to Local Governments from any settlement or judgment.

7.   "Regional Share Calculation" shall mean each Region's share of Opioid Funds which shall be calculated by summing the individual percentage shares of the Local Governments set forth in Exhibit C for all of the subdivisions in the entire Region as defined in Exhibit B.

8.   "Net Opioid Fund" is the Opioid Fund less the Opioid Seed Fund payment.

9.   "Opioid Funds" shall mean monetary amounts obtained through a Settlement or Judgment as defined in this Memorandum of Understanding.

10.   "Pharmaceutical Supply Chain" shall mean the process and channels through which opioids are manufactured, marketed, promoted, distributed, or dispensed.

11.   "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, including but not limited to those persons or entities identified as Defendants in the matter captioned In re: Opioid Litigation, MDL 2804 pending in the United States District Court for the Northern District of Ohio, the proceedings before the West Virginia Mass Litigation Panel, styled In Re: Opioid Litigation, Civil Action No. 19-C-9000, and relates to conduct occurring prior to the date of this agreement. For the avoidance of doubt, the term Pharmaceutical Supply Chain Participant includes any parent or subsidiary company of any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, and any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, that seeks or has sought protection under the United States Bankruptcy Code.

12.     "Settlement" shall mean the negotiated resolution by any of the Parties, of legal or equitable claims regarding opioids against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the Parties. It does not include the Settlements the State and/or the West Virginia Attorney General entered into with any Pharmaceutical Supply Chain Participant prior to December 1, 2021. For the avoidance of doubt McKinsey is included. Settlement shall not include the claims of Cabell County and the City of Huntington, which were previously tried in the United States District Court for the Southern District of West Virginia or settlement of any claims asserted by the State and/or the West Virginia Attorney General against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust laws, state criminal laws, or claims asserted pursuant to W. Va. Code, § 9-7-6(c) or for Medicaid reimbursement.

13.     "State Share" shall mean Opioid Funds allocated to the State from any settlement or judgment.

14.     "The Parties" shall mean the State and the Local Governments.

15.     "Regions" shall mean the division of the Local Governments into six (6) separate areas as set forth in Exhibit B.

16.     "The State" shall mean the State of West Virginia acting through its Attorney General.

17.     "West Virginia Seed Fund" shall be funded as set forth in Paragraph B(2)(a). The funds are available for use in proper creation and documentation of the West Virginia Opioid Foundation and to fund their start-up work, and subsequent operation.

## B.     Settlement and Judgment Proceeds

1.     The Parties shall organize a private, nonstock, nonprofit corporation for the purposes of receiving and distributing West Virginia Opioid Funds as set forth in Section C. of this MOU ("Opioid Foundation").

2.     The Parties shall allocate all Opioid Funds as follows:

a.     Subject to relevant approvals, the State shall pay into the West Virginia Seed Fund the $10,000,000 received from McKinsey & Company as a result of the February 3, 2021, consent judgment with the State.

b.     All other Opioid Funds covered by the agreement shall be allocated as set forth below:

      i.     24.5% of the Net Opioid Funds shall be allocated as LG Shares. These LG Shares shall be allocated amongst the Local Governments using the default percentages set forth in Exhibit C. Each county and its inclusive municipalities must either: (a) ratify the default allocation; (b) reach an agreement altering the default allocation; or (c) submit to binding arbitration before Judge Christopher Wilkes (WVMLP Special Master) whose decision will be final and non-appealable.

      ii.    The Foundation will receive 72.5% of the Net Opioid Funds ("Foundation Share").

      iii.   The State shall receive 3% of the Net Opioid Funds ("State Share"), by and through the Attorney General, to be held in escrow for expenses incurred related to opioid litigation. If the 3% is not spent by December 31, 2026, then 1% goes to Local Governments and 2% goes to the Opioid Foundation.

3.    All Net Opioid Funds, regardless of allocation, shall be used in a manner consistent with the Approved Purposes definition. The LG Share may be used as restitution for past expenditures so long as the past expenditures were made for purposes that would have qualified or were consistent with the categories of Approved Purposes listed in Exhibit A. Prior to using any portion of the LG Share as restitution for past expenditures, a Local Government shall pass a resolution or take equivalent governmental action detailing and explaining its use of the funds for restitution. Moreover, up to one-half of the LG Share may be used to provide restitution for monies that were previously expended on opioid abatement activities, including law enforcement and regional jail fees.

4.    In the event a Local Government merges, dissolves, or ceases to exist, the relevant shares for that Local Government shall be redistributed equitably based on the composition of the successor Local Government. If a Local Government for any reason is excluded from a specific Settlement or Judgment, the allocation percentage for that Local Government shall be redistributed among the participating Local Governments for that Settlement or Judgment.

5.    If the LG Share is less than $500, then that amount will instead be distributed to the county in which the Local Government lies to allow practical application of the abatement remedy.

6.    Funds obtained that are unrelated to any Settlement or Judgment with a Pharmaceutical Supply Chain Participant, including those received via grant, bequest, gift, or the like, may be directed to the Opioid Foundation and disbursed as set forth below.

7.    The Foundation Share shall be used for the benefit of the people of West Virginia consistent with the by-laws of the Foundation documents and this MOU.

8.     Nothing in this MOU alters or changes the Parties' rights to pursue their own claims in litigation, subject to Paragraph E. Rather, the intent of this MOU is to join the Parties together regarding the distribution of the proceeds of settlements with or judgements against Pharmaceutical Supply Chain Participants for the benefit of all West Virginians and ensure that settlement monies are spent consistent with the Approved Purposes set forth in Exhibit A.

9.     Any settlement, judgment and/or other remedy arising out of *City of Huntington v. AmerisourceBergen Drug Corporation, et al.* (Civil Action No. 3:17-01362) and/or *Cabell County Commission v. AmerisourceBergen Drug Corporation, et al.* (Civil Action No. 3:17-01665) pending in the United States District Court for the Southern District of West Virginia (Faber, J.) ("CT2") is specifically excluded from this MOU.

## C.     The Opioid Foundation

1.     The Parties shall create a private section 501(c)(3) Opioid Foundation ("Foundation") with a governing board ("Board"), a panel of experts ("Expert Panel"), and such other regional entities as may be necessary for the purpose of receiving and disbursing Opioid Funds and other purposes as set forth both herein and in the documents establishing the Foundation. The Foundation will allow Local Governments to take advantage of economies of scale and will partner with the State to increase revenue streams.

2.     Each Region shall create their own governance structure, ensuring that all Local Governments have input and equitable representation regarding regional decisions including representation on the board and selection of projects to be funded from the Regional Share Calculation. The Expert Panel may consult with and may make recommendations to Regions on projects, services and/or expenses to be funded. Regions shall have the responsibility to make decisions that will allocate funds to projects, services and/or expenses that will equitably serve the needs of the entire Region.

3.     Board Composition

The Board will consist of 11 members comprising representation as follows:

a. To represent the interests of the State, five appointees of the governor, subject to confirmation by the Senate. The five appointees are intended to be limited to one from any given Region. If special circumstances are shown, this provision may be waived by a vote of four of the six Local Government members.

b. To represent the interests of the Local Governments, six members, with one member selected from each Region. The Local Governments in each Region shall make the selection of the board member to represent their region.

4.  Board terms will be staggered three-year terms. Board members may be reappointed.

5.  Board members shall serve as fiduciaries of the Foundation separate and distinct from any representational capacity of the entity appointing the Board Member. Members of any regional governing structure shall likewise serve as fiduciaries of their Region separate and distinct from any representational capacity of the entity appointing the member.

6.  Members of the board should have expertise in a variety of disciplines, such as substance abuse treatment, mental health, law enforcement, pharmacology, finance, and healthcare policy and management. Drawing Board members from these disciplines will help to ensure that the Board will make appropriate and prudent investments in order to meet short-term and long-term goals.

7.  Six members of the Board shall constitute a quorum. Members of the Board may participate in meetings by telephone or video conference or may select a designee to attend and vote if the Board member is unavailable to attend a board meeting.

8.  The Foundation shall have an Executive Director appointed by the Attorney General after consultation with the Board. The Board may reject the Attorney General's selection of the Executive Director only on the affirmative vote of eight members of the board. The Executive Director shall have at least six years' experience in healthcare, finance and management and will be responsible for the management, organization, and preservation of the public/private partnership's records. The Executive Director may be removed by the Board upon the concurrence of the votes of three-fourths of the members of the Board. The Executive Director shall have the right to attend all Board meetings unless otherwise excused but shall vote only in the event of a tie.

9.  The Board shall appoint the Expert Panel. The Expert Panel should include experts in the fields of substance abuse treatment, mental health, law enforcement, pharmacology, finance, and healthcare policy and management. The purpose of the Expert Panel is to assist the Board in making decisions about strategies for abating the opioid epidemic in local communities around the state. The Executive Director and any member of the Board shall have the right to attend all meetings of the Expert Panel.

10. The governance of the Board and the criteria to be established for disbursement of funds shall be guided by the recognition that expenditures should insure the efficient and effective abatement of the opioid epidemic, the enforcement of laws to curb the use of opioids, and the prevention of future addiction and substance misuse based upon an intensity and needs basis. All expenditures must be consistent with the categories of Approved Purposes as set forth in Exhibit A hereto.

11.     Disbursement of Foundation Share by the Board

a.      The Foundation Board shall develop and approve procedures for the disbursement of Opioid Funds of the Foundation consistent with this Memorandum of Understanding.

b.      Funds for statewide programs, innovation, research, and education may also be expended by the Foundation from the Foundation Share, from the State Share (as directed by the State), or from sources other than Opioid Funds as provided below.

c.      The Foundation shall spend 20% of its annual budget in the six regions during the Foundation's first seven years of funding to be divided according to each Region's fixed Regional Share Calculation. After seven years, all regional spending will be as set forth in Section 11(d), below. Regions may, after consulting with the Expert Panel, expend the sums received under this Section 11(c) for any Approved Purposes.

d.      After the Regional Shares are distributed as set forth in Section 11(c), the Disbursement of Funds from the Foundation Share approved for disbursement by the Board for Approved Purposes shall be disbursed based on an evidence-based evaluation of need after consultation with the Expert Panel. The Parties do not intend to require any specific regional allocation of the Foundation Share other than those distributed pursuant to Paragraph 11(c).

e.      Regions may collaborate with other Regions to submit joint proposals.

f.      The proposed procedures shall set forth the role of the Expert Panel in advising the Regions and the Board concerning disbursements of Opioid Funds of the Foundation as set forth in this MOU.

g.      Within 90 days of the first receipt of any Opioid Funds and annually thereafter, the Board, after receiving counsel from its investment advisors and Expert Panel, shall determine the amount and timing of Foundation funds to be distributed annually. In making this determination, the Board shall consider: (a) Pending requests for Opioid Funds from communities, entities, or regions; (b) the total Opioid Funds available; (c) the timing of anticipated receipts of future Opioid Funds; (d) non-Opioid funds received by the Foundation; (e) investment income; and (f) long-term financial viability of the Foundation. The Foundation may disburse its principal and interest with the aim towards an efficient, expeditious abatement of the Opioid crisis considering long term and short-term strategies.

12.     The Foundation, Expert Panel, and any other entities under the supervision of the Foundation, including the Regions, shall operate in a transparent manner. Meetings

should be open. All operations of the Foundation and all Foundation supervised entities, including the Regions, shall be subject to audit and review by the Attorney General and/or other appropriate State officials.

13.    Each Local Government shall submit an annual financial report to the Foundation no later than April 30 of each year specifying the amounts spent on Approved Purposes within the Region during the previous fiscal year. A report for each Region shall be prepared no later than thirty days thereafter. Each Region's report shall incorporate the information disclosed in each Local Government's annual report generated pursuant to Section B(4), above. Each Region's report shall specify (i) the amount of Opioid Funds received, (ii) the amount of Opioid Funds disbursed or applied during the previous fiscal year, broken down by categories of Approved Uses (indicating the name of the recipient, the amount awarded, a description of the use of the award, and disbursement terms), and (iii) impact information measuring or describing the progress of the Approved Use strategies.

14.    The Foundation shall publish a consolidated report detailing annual financial expenditures within 15 days of the last day of the state fiscal year covered by the report.

15.    The Foundation shall consult with a professional investment advisor to adopt a Foundation investment policy that will seek to assure that the Foundation's investments are appropriate, prudent, and consistent with best practices for investments of public funds. The investment policy shall be designed to meet the Foundation's long and short-term goals.

16.    The Foundation and any Foundation supervised entity may receive funds including stocks, bonds, real property, government grants, private-sector donations, and cash in addition to the proceeds of the Litigation. These Non-Opioid additional funds shall be subject only to the limitations, if any, contained in the individual award, grant, donation, gift, bequest, or deposit consistent with the mission of the Foundation.

## D. Payment of Attorneys' Fees and Litigation Expenses

Payment of all Attorneys' Fees and Litigation Expenses shall be awarded consistent with the orders of the Court and upon recommendation of Judge Christopher Wilkes (WVMLP Special Master). Such award shall be final and non-appealable.

## E. Authority to Negotiate and Announcing Resolution of Claims

1.    The Court has established three case tracks.

    a.    Manufacturers and Pharmacy claims are to be coordinated by the office of Attorney General Morrisey and his designated counsel. The Attorney General shall retain the authority over resolution of those claims after

consultation and coordination with Local Governments subject to Court approval.

b.   The Distributor Claims are to be coordinated by Co-Lead Counsel Paul Farrell, Jr. and Robert Fitzsimmons. The Co-Leads shall retain the authority over resolution of those claims after consultation and coordination with Local Governments and their counsel and the Attorney General and his designated counsel.

2.   If there is any resolution of any claim before the Court, it will be announced and presented to the Court jointly by the Attorney General and the Local Governments for Approval.

## F. Amendments

The Parties agree to make such amendments as necessary to implement the general principles of this MOU.

## EXHIBIT A

## SCHEDULE A - CORE STRATEGIES

The Parties shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("Core Strategies).[1]

### A. NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES

    1.    Expand training for first responders, schools, community support groups and families; and

    2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed services.

### B. MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT

    1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

    2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

    3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

    4.    Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

### C. PREGNANT & POSTPARTUM WOMEN

    1.    Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

    2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women and co-occurring Opioid Use Disorder ("OUD") and other substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established by the Opioid Abatement Foundation.

3.   Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

**D.   EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME**

1.   Expand comprehensive evidence-based treatment and recovery support for NAS babies;

2.   Expand services for better continuation of care with infant-need dyad; and

3.   Expand long-term treatment and services for medical monitoring of NAS babies and their families.

**E.   EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.   Expand services such as on-call teams to begin MAT in hospital emergency departments;

2.   Expand warm hand-off services to transition to recovery services;

3.   Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.   Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5.   Hire additional social workers or other behavioral health workers to facilitate expansion above.

**F.   TREATMENT FOR INCARCERATED POPULATION**

1.   Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.   Increase funding for jails to provide treatment to inmates with OUD.

**G.   PREVENTION PROGRAMS**

1.   Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.   Funding for evidence-based prevention programs in schools;

Exhibit A - 2

3.  Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.  Funding for community drug disposal programs; and

5.  Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

**H.**   **EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.**

**I.**   **LAW ENFORCEMENT**

1.  Funding for law enforcement efforts to curtail the sale, distribution, promotion or use of opioids and other drugs to reduce the oversupply of licit and illicit opioids, including regional jail fees.

**J.**   **RESEARCH**

Research to ameliorate the opioid epidemic and to identify new tools to reduce and address opioid addiction. Holistically seek to address the problem from a supply, demand, and educational perspective. Ensure tools exist to provide law enforcement with appropriate enforcement to address needs.

## SCHEDULE B - APPROVED USES

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:[2]

### PART ONE: TREATMENT

A. **TREAT OPIOID USE DISORDER (OUD)**

1. Support treatment of Opioid Use Disorder (OUD) and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUB/MH conditions.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support intervention, treatment, and recovery services, offered by qualified professionals and service providers, including but not limited to faith-based organizations or peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8. Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established by the Opioid Abatement Foundation.

Exhibit A - 4

specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SLTD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

11. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

12. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

13. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B. SUPPORT PEOPLE IN TREATMENT AND RECOVERY

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4.    Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5.    Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6.    Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7.    Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8.    Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9.    Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10.   Engage and support non-profits, faith-based communities, and community coalitions to support, house, and train people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11.   Training and development of procedures for government staff to appropriately interact with and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12.   Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13.   Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions.

14.   Create and/or support recovery high schools.

15.   Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

**C.**  **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have - or are at risk of developing - OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OLTI treatment.

2. Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as on-call teams to begin MAT in hospital emergency departments.

6. Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11.     Expand warm hand-off services to transition to recovery services.

12.     Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.     Develop and support best practices on addressing OUD in the workplace.

14.     Support assistance programs for health care providers with OUD.

15.     Engage and support non-profits and the faith-based community as a system to support outreach for treatment.

16.     Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.      ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

   a.     Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

   b.     Active outreach strategies such as the Drug Abuse Response Team (DART) model;

   c.     "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

   d.     Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

   e.     Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

       f.     Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.     Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.     Support treatment and recovery courts that provide evidence-based options for persons with OLTD and any co-occurring SUD/MH conditions.

4.     Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.     Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison, have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.     Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.     Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, case management, or other services offered in connection with any of the strategies described in this section.

**E.**    <u>**ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**</u>

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.     Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women — or women who could become pregnant — who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

Exhibit A - 9

2. Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3. Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4. Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6. Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Enhanced family supports and childcare services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10. Support for Children's Services — Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

## PART TWO: PREVENTION

**F. PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain

from the U.S. Centers for Disease Control and Prevention, or other recognized Best Practice guidelines, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

    a. Increase the number of prescribers using PDMPs;

    b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

## G.   PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction — including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage and support non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    PREVENT OVERDOSE DEATHS AND OTHER OPIOID-RELATED INJURIES

Support efforts to prevent or reduce overdose deaths or other opioid-related injuries through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, and community outreach workers, persons being released from jail or prison, or other members of the general public.

Exhibit A - 12

2.    Public health entities providing free naloxone to anyone in the community.

3.    Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.    Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.    Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.    Public education relating to emergency responses to overdoses.

7.    Public education relating to immunity and Good Samaritan laws.

8.    Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.    Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

10.   Support mobile units that offer or provide referrals to treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

11.   Support screening for fentanyl in routine clinical toxicology testing.

## PART THREE: OTHER STRATEGIES

**I.    FIRST RESPONDERS**

In addition to items in Section C, D and H relating to first responders, support the following:

1.    Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.    Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.    LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing negative outcomes related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.   A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.   Invest in infrastructure or staffing at government, law enforcement, or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of reducing the oversupply of opioids, preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.   Provide resources to staff government oversight and management of opioid abatement programs.

## K.   TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.   Provide funding for staff training or networking programs and services to improve the capability of government, law enforcement, community, and not-for-profit entities to abate the opioid crisis.

2.   Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.   RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

Exhibit A - 14

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## M.   LAW ENFORCEMENT

Ensure appropriate resources for law enforcement to engage in enforcement and possess adequate equipment, tools, and manpower to address complexity of the opioid problem.

Exhibit A - 15

# EXHIBIT B.
# OPIOID REGIONAL MAP



**Region 1**
Brooke, Hancock, Ohio
Marshall and Wetzel Counties

**Region 2**
Grant, Hampshire, Hardy,
Mineral, Berkeley, Jefferson,
Pendleton and Morgan Counties

**Region 3**
Wood, Tyler, Pleasants,
Ritchie, Wirt, Calhoun,
Roane, and Jackson Counties

**Region 4**
Monongalia, Braxton, Lewis
Harrison, Marion, Preston,
Taylor, Tucker, Barbour,
Randolph, Gilmer, Doddridge
and Upshur Counties

**Region 5**
Cabell, Clay, Boone, Kanawha,
Lincoln, Logan, Putnam, Mason,
Mingo, and Wayne Counties

**Region 6**
Fayette, Monroe, Raleigh, Summers,
Nicholas, Webster, Greenbrier,
Pocahontas, Mercer, Wyoming, and
McDowell Counties

Exhibit C (Allocations to Subdivisions)

Allocation to West Virginia Counties and Municipalities (NOT Including Cabell County and Huntington)

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0191% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0037% |
| ANAWALT TOWN | MCDOWELL | 0.0008% |
| ANMOORE TOWN | HARRISON | 0.0083% |
| ANSTED TOWN | FAYETTE | 0.0024% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0002% |
| BARBOUR COUNTY | BARBOUR | 0.3900% |
| BARBOURSVILLE VILLAGE | CABELL | 0.4372% |
| BARRACKVILLE TOWN | MARION | 0.0016% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0068% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.7259% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0355% |
| BELLE TOWN | KANAWHA | 0.0411% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0076% |
| BERKELEY COUNTY | BERKELEY | 3.5839% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0020% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVILLE TOWN | MONONGALIA | 0.0003% |
| BLUEFIELD CITY | MERCER | 0.1794% |
| BOLIVAR TOWN | JEFFERSON | 0.0058% |
| BOONE COUNTY | BOONE | 3.1744% |
| BRADSHAW TOWN | MCDOWELL | 0.0012% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.5244% |
| BRIDGEPORT CITY | HARRISON | 0.0761% |
| BROOKE COUNTY | BROOKE | 1.0924% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1667% |
| BUFFALO TOWN | PUTNAM | 0.0009% |
| BURNSVILLE TOWN | BRAXTON | 0.0029% |
| CABELL COUNTY | CABELL | 0.0000% |

Revised 9/29/2020

1 /

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1767% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0003% |
| CAMERON CITY | MARSHALL | 0.0021% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0024% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0008% |
| CEREDO CITY | WAYNE | 0.1678% |
| CHAPMANVILLE TOWN | LOGAN | 0.1592% |
| CHARLES TOWN CITY | JEFFERSON | 0.2924% |
| CHARLESTON CITY | KANAWHA | 6.7218% |
| CHESAPEAKE TOWN | KANAWHA | 0.0180% |
| CHESTER CITY | HANCOCK | 0.0077% |
| CLARKSBURG CITY | HARRISON | 1.1365% |
| CLAY COUNTY | CLAY | 0.3373% |
| CLAY TOWN | CLAY | 0.0001% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0257% |
| COWEN TOWN | WEBSTER | 0.0012% |
| DANVILLE TOWN | BOONE | 0.0012% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0006% |
| DELBARTON TOWN | MINGO | 0.0517% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2312% |
| DUNBAR CITY | KANAWHA | 0.2917% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0144% |
| ELIZABETH TOWN | WIRT | 0.0048% |
| ELK GARDEN TOWN | MINERAL | 0.0007% |
| ELKINS CITY | RANDOLPH | 0.0321% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAIRMONT CITY | MARION | 0.6852% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.6411% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1828% |
| FLATWOODS TOWN | BRAXTON | 0.0007% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0123% |
| FORT GAY TOWN | WAYNE | 0.0324% |
| FRANKLIN TOWN | PENDLETON | 0.0014% |
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0012% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| GASSAWAY TOWN | BRAXTON | 0.0024% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0531% |
| GILBERT TOWN | MINGO | 0.0728% |
| GILMER COUNTY | GILMER | 0.1919% |
| GLASGOW TOWN | KANAWHA | 0.0016% |
| GLEN DALE CITY | MARSHALL | 0.0050% |
| GLENVILLE TOWN | GILMER | 0.0169% |
| GRAFTON CITY | TAYLOR | 0.4640% |
| GRANT COUNTY | GRANT | 0.3394% |
| GRANT TOWN TOWN | MARION | 0.0109% |
| GRANTSVILLE TOWN | CALHOUN | 0.0012% |
| GRANVILLE TOWN | MONONGALIA | 0.1649% |
| GREENBRIER COUNTY | GREENBRIER | 1.4386% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0703% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0869% |
| HANCOCK COUNTY | HANCOCK | 1.6106% |
| HANDLEY TOWN | KANAWHA | 0.0007% |
| HARDY COUNTY | HARDY | 0.2815% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0095% |
| HARRISON COUNTY | HARRISON | 1.3251% |
| HARRISVILLE TOWN | RITCHIE | 0.0045% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.4106% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 0.0000% |
| HURRICANE CITY | PUTNAM | 0.2140% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0006% |
| JACKSON COUNTY | JACKSON | 0.8319% |
| JANE LEW TOWN | LEWIS | 0.0010% |
| JEFFERSON COUNTY | JEFFERSON | 1.7496% |
| JUNIOR TOWN | BARBOUR | 0.0036% |
| KANAWHA COUNTY | KANAWHA | 3.6016% |
| KENOVA CITY | WAYNE | 0.2064% |
| KERMIT TOWN | MINGO | 0.0294% |
| KEYSER CITY | MINERAL | 0.0078% |
| KEYSTONE CITY | MCDOWELL | 0.0018% |
| KIMBALL TOWN | MCDOWELL | 0.0020% |
| KINGWOOD CITY | PRESTON | 0.0046% |

Revised 9/29/2020

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0310% |
| LEWIS COUNTY | LEWIS | 0.4053% |
| LEWISBURG CITY | GREENBRIER | 0.3917% |
| LINCOLN COUNTY | LINCOLN | 1.3818% |
| LOGAN CITY | LOGAN | 0.4429% |
| LOGAN COUNTY | LOGAN | 3.7315% |
| LOST CREEK TOWN | HARRISON | 0.0001% |
| LUMBERPORT TOWN | HARRISON | 0.0027% |
| MABSCOTT TOWN | RALEIGH | 0.0512% |
| MADISON CITY | BOONE | 0.0578% |
| MAN TOWN | LOGAN | 0.0025% |
| MANNINGTON CITY | MARION | 0.0030% |
| MARION COUNTY | MARION | 1.0540% |
| MARLINTON TOWN | POCAHONTAS | 0.0009% |
| MARMET CITY | KANAWHA | 0.0061% |
| MARSHALL COUNTY | MARSHALL | 0.8648% |
| MARTINSBURG CITY | BERKELEY | 3.5343% |
| MASON COUNTY | MASON | 1.3496% |
| MASON TOWN | MASON | 0.0028% |
| MASONTOWN TOWN | PRESTON | 0.0008% |
| MATEWAN TOWN | MINGO | 0.0718% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 3.2036% |
| MCMECHEN CITY | MARSHALL | 0.0079% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0005% |
| MERCER COUNTY | MERCER | 0.3738% |
| MIDDLEBOURNE TOWN | TYLER | 0.0003% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1485% |
| MINERAL COUNTY | MINERAL | 0.8526% |
| MINGO COUNTY | MINGO | 2.9452% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0028% |
| MONONGALIA COUNTY | MONONGALIA | 1.4987% |
| MONROE COUNTY | MONROE | 0.5766% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.1004% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0092% |
| MORGAN COUNTY | MORGAN | 0.7095% |
| MORGANTOWN CITY | MONONGALIA | 0.1330% |
| MOUNDSVI LLE CITY | MARSHALL | 0.3175% |
| MOUNT HOPE CITY | FAYETTE | 0.0918% |
| MULLENS CITY | WYOMING | 0.3675% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0034% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| NEW HAVEN TOWN | MASON | 0.0057% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0019% |
| NEWBURG TOWN | PRESTON | 0.0012% |
| NICHOLAS COUNTY | NICHOLAS | 0.2115% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2710% |
| NORTH HILLS TOWN | WOOD | 0.0016% |
| NORTHFORK TOWN | MCDOWELL | 0.0006% |
| NUTTER FORT TOWN | HARRISON | 0.1025% |
| OAK HILL CITY | FAYETTE | 0.3993% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.3269% |
| OHIO COUNTY | OHIO | 0.5595% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0073% |
| PARKERSBURG CITY | WOOD | 1.7126% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0019% |
| PAX TOWN | FAYETTE | 0.0083% |
| PENDLETON COUNTY | PENDLETON | 0.1789% |
| PENNSBORO CITY | RITCHIE | 0.0004% |
| PETERSBURG CITY | GRANT | 0.0012% |
| PETERSTOWN TOWN | MONROE | 0.0014% |
| PHILIPPI CITY | BARBOUR | 0.0919% |
| PIEDMONT TOWN | MINERAL | 0.0007% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1284% |
| PLEASANT VALLEY CITY | MARION | 0.0011% |
| PLEASANTS COUNTY | PLEASANTS | 0.1406% |
| POCA TOWN | PUTNAM | 0.0003% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3759% |
| POINT PLEASANT CITY | MASON | 0.1406% |
| PRATT TOWN | KANAWHA | 0.0014% |
| PRESTON COUNTY | PRESTON | 0.8811% |
| PRINCETON CITY | MERCER | 4.6088% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.7741% |
| QUINWOOD TOWN | GREENBRIER | 0.0182% |
| RAINELLE TOWN | GREENBRIER | 0.0266% |
| RALEIGH COUNTY | RALEIGH | 5.5343% |
| RANDOLPH COUNTY | RANDOLPH | 0.7294% |
| RANSON CORPORATION | JEFFERSON | 0.0234% |
| RAVENSWOOD CITY | JACKSON | 0.0959% |
| REEDSVI LLE TOWN | PRESTON | 0.0007% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0014% |
| RICHWOOD CITY | NICHOLAS | 0.0103% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| RIDGELEY TOWN | MINERAL | 0.0027% |
| RIPLEY CITY | JACKSON | 0.0921% |
| RITCHIE COUNTY | RITCHIE | 0.2018% |
| RIVESVI LLE TOWN | MARION | 0.0010% |
| ROANE COUNTY | ROANE | 0.5653% |
| ROMNEY CITY | HAMPSHIRE | 0.0614% |
| RONCEVERTE CITY | GREENBRIER | 0.0960% |
| ROWLESBURG TOWN | PRESTON | 0.0024% |
| RUPERT TOWN | GREENBRIER | 0.0073% |
| SALEM CITY | HARRISON | 0.0042% |
| SAND FORK TOWN | GILMER | 0.0003% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0088% |
| SHINNSTON CITY | HARRISON | 0.1066% |
| SISTERSVILLE CITY | TYLER | 0.2085% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0383% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0409% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.9750% |
| SPENCER CITY | ROANE | 0.0646% |
| ST. ALBANS CITY | KANAWHA | 0.4843% |
| ST. MARYS CITY | PLEASANTS | 0.0623% |
| STAR CITY TOWN | MONONGALIA | 0.0414% |
| STONEWOOD CITY | HARRISON | 0.0478% |
| SUMMERS COUNTY | SUMMERS | 0.3559% |
| SUMMERSVILLE CITY | NICHOLAS | 1.6957% |
| SUTTON TOWN | BRAXTON | 0.0210% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0431% |
| TERRA ALTA TOWN | PRESTON | 0.0015% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1255% |
| TUNNELTON TOWN | PRESTON | 0.0006% |
| TYLER COUNTY | TYLER | 0.0204% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.5108% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2838% |
| WAR CITY | MCDOWELL | 0.0020% |
| WARDENSVILLE TOWN | HARDY | 0.0013% |
| WAYNE COUNTY | WAYNE | 2.3586% |
| WAYNE TOWN | WAYNE | 0.0356% |
| WEBSTER COUNTY | WEBSTER | 0.3765% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.3728% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| WELCH CITY | MCDOWELL | 0.1195% |
| WELLSBURG CITY | BROOKE | 0.0069% |
| WEST HAMLIN TOWN | LINCOLN | 0.0380% |
| WEST LIBERTY TOWN | OHIO | 0.0025% |
| WEST LOGAN TOWN | LOGAN | 0.0162% |
| WEST MILFORD TOWN | HARRISON | 0.0015% |
| WEST UNION TOWN | DODDRIDGE | 0.0007% |
| WESTON CITY | LEWIS | 0.0096% |
| WESTOVER CITY | MONONGALIA | 0.0094% |
| WETZEL COUNTY | WETZEL | 0.4889% |
| WHEELING CITY | OHIO/MARSHALL | 1.0692% |
| WHITE HALL TOWN | MARION | 0.0028% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1585% |
| WHITESVILLE TOWN | BOONE | 0.0148% |
| WILLIAMSON CITY | MINGO | 0.3916% |
| WILLIAMSTOWN CITY | WOOD | 0.0567% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WINFIELD TOWN | PUTNAM | 0.0307% |
| WIRT COUNTY | WIRT | 0.1075% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0010% |
| WOOD COUNTY | WOOD | 1.0924% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 4.0024% |

| **Totals** | | **100.0000%** |

Exhibit C (Allocations to Subdivisions)

Allocation to West Virginia Counties and Municipalities (Including Cabell County and Huntington)

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0174% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0034% |
| ANAWALT TOWN | MCDOWELL | 0.0007% |
| ANMOORE TOWN | HARRISON | 0.0076% |
| ANSTED TOWN | FAYETTE | 0.0022% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0001% |
| BARBOUR COUNTY | BARBOUR | 0.3541% |
| BARBOURSVI LLE VILLAGE | CABELL | 0.3969% |
| BARRACKVILLE TOWN | MARION | 0.0015% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0062% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.3824% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0322% |
| BELLE TOWN | KANAWHA | 0.0373% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0070% |
| BERKELEY COUNTY | BERKELEY | 3.2534% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0018% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVILLE TOWN | MONONGALIA | 0.0002% |
| BLUEFIELD CITY | MERCER | 0.1629% |
| BOLIVAR TOWN | JEFFERSON | 0.0053% |
| BOONE COUNTY | BOONE | 2.8817% |
| BRADSHAW TOWN | MCDOWELL | 0.0011% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.4761% |
| BRIDGEPORT CITY | HARRISON | 0.0694% |
| BROOKE COUNTY | BROOKE | 0.9916% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1513% |
| BUFFALO TOWN | PUTNAM | 0.0008% |
| BURNSVI LLE TOWN | BRAXTON | 0.0026% |

Revised 9/29/2020

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| CABELL COUNTY | CABELL | 3.2406% |
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1604% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0002% |
| CAMERON CITY | MARSHALL | 0.0019% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0022% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0007% |
| CEREDO CITY | WAYNE | 0.1523% |
| CHAPMANVILLE TOWN | LOGAN | 0.1445% |
| CHARLES TOWN CITY | JEFFERSON | 0.2655% |
| CHARLESTON CITY | KANAWHA | 6.1020% |
| CHESAPEAKE TOWN | KANAWHA | 0.0163% |
| CHESTER CITY | HANCOCK | 0.0070% |
| CLARKSBURG CITY | HARRISON | 1.0317% |
| CLAY COUNTY | CLAY | 0.3062% |
| CLAY TOWN | CLAY | 0.0000% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0233% |
| COWEN TOWN | WEBSTER | 0.0011% |
| DANVILLE TOWN | BOONE | 0.0011% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0005% |
| DELBARTON TOWN | MINGO | 0.0469% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2099% |
| DUNBAR CITY | KANAWHA | 0.2648% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0131% |
| ELIZABETH TOWN | WIRT | 0.0043% |
| ELK GARDEN TOWN | MINERAL | 0.0006% |
| ELKINS CITY | RANDOLPH | 0.0293% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAIRMONT CITY | MARION | 0.6220% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.4898% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1659% |
| FLATWOODS TOWN | BRAXTON | 0.0006% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0112% |
| FORT GAY TOWN | WAYNE | 0.0294% |
| FRANKLIN TOWN | PENDLETON | 0.0013% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0011% |
| GASSAWAY TOWN | BRAXTON | 0.0022% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0482% |
| GILBERT TOWN | MINGO | 0.0661% |
| GILMER COUNTY | GILMER | 0.1742% |
| GLASGOW TOWN | KANAWHA | 0.0015% |
| GLEN DALE CITY | MARSHALL | 0.0045% |
| GLENVILLE TOWN | GILMER | 0.0153% |
| GRAFTON CITY | TAYLOR | 0.4212% |
| GRANT COUNTY | GRANT | 0.3081% |
| GRANT TOWN TOWN | MARION | 0.0099% |
| GRANTSVILLE TOWN | CALHOUN | 0.0011% |
| GRANVILLE TOWN | MONONGALIA | 0.1497% |
| GREENBRIER COUNTY | GREENBRIER | 1.3059% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0638% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0793% |
| HANCOCK COUNTY | HANCOCK | 1.4621% |
| HANDLEY TOWN | KANAWHA | 0.0006% |
| HARDY COUNTY | HARDY | 0.2555% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0086% |
| HARRISON COUNTY | HARRISON | 1.2029% |
| HARRISVILLE TOWN | RITCHIE | 0.0041% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.3727% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 5.9777% |
| HURRICANE CITY | PUTNAM | 0.1943% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0005% |
| JACKSON COUNTY | JACKSON | 0.7552% |
| JANE LEW TOWN | LEWIS | 0.0009% |
| JEFFERSON COUNTY | JEFFERSON | 1.5882% |
| JUNIOR TOWN | BARBOUR | 0.0032% |
| KANAWHA COUNTY | KANAWHA | 3.2694% |
| KENOVA CITY | WAYNE | 0.1874% |
| KERMIT TOWN | MINGO | 0.0267% |
| KEYSER CITY | MINERAL | 0.0072% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| KEYSTONE CITY | MCDOWELL | 0.0016% |
| KIMBALL TOWN | MCDOWELL | 0.0019% |
| KINGWOOD CITY | PRESTON | 0.0042% |
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0281% |
| LEWIS COUNTY | LEWIS | 0.3679% |
| LEWISBURG CITY | GREENBRIER | 0.3556% |
| LINCOLN COUNTY | LINCOLN | 1.2544% |
| LOGAN CITY | LOGAN | 0.4020% |
| LOGAN COUNTY | LOGAN | 3.3874% |
| LOST CREEK TOWN | HARRISON | 0.0000% |
| LUMBERPORT TOWN | HARRISON | 0.0025% |
| MABSCOTT TOWN | RALEIGH | 0.0465% |
| MADISON CITY | BOONE | 0.0525% |
| MAN TOWN | LOGAN | 0.0023% |
| MANNINGTON CITY | MARION | 0.0028% |
| MARION COUNTY | MARION | 0.9568% |
| MARLINTON TOWN | POCAHONTAS | 0.0008% |
| MARMET CITY | KANAWHA | 0.0055% |
| MARSHALL COUNTY | MARSHALL | 0.7851% |
| MARTINSBURG CITY | BERKELEY | 3.2084% |
| MASON COUNTY | MASON | 1.2251% |
| MASON TOWN | MASON | 0.0026% |
| MASONTOWN TOWN | PRESTON | 0.0007% |
| MATEWAN TOWN | MINGO | 0.0652% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 2.9082% |
| MCMECHEN CITY | MARSHALL | 0.0072% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0004% |
| MERCER COUNTY | MERCER | 0.3393% |
| MIDDLEBOURNE TOWN | TYLER | 0.0002% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1348% |
| MINERAL COUNTY | MINERAL | 0.7740% |
| MINGO COUNTY | MINGO | 2.6736% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0026% |
| MONONGALIA COUNTY | MONONGALIA | 1.3605% |
| MONROE COUNTY | MONROE | 0.5234% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.0912% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0084% |
| MORGAN COUNTY | MORGAN | 0.6441% |
| MORGANTOWN CITY | MONONGALIA | 0.1213% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| MOUNDSVILLE CITY | MARSHALL | 0.2882% |
| MOUNT HOPE CITY | FAYETTE | 0.0834% |
| MULLENS CITY | WYOMING | 0.3336% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0031% |
| NEW HAVEN TOWN | MASON | 0.0052% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0018% |
| NEWBURG TOWN | PRESTON | 0.0011% |
| NICHOLAS COUNTY | NICHOLAS | 0.1920% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2460% |
| NORTH HILLS TOWN | WOOD | 0.0015% |
| NORTHFORK TOWN | MCDOWELL | 0.0005% |
| NUTTER FORT TOWN | HARRISON | 0.0930% |
| OAK HILL CITY | FAYETTE | 0.3625% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.2967% |
| OHIO COUNTY | OHIO | 0.5079% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0067% |
| PARKERSBURG CITY | WOOD | 1.5547% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0017% |
| PAX TOWN | FAYETTE | 0.0076% |
| PENDLETON COUNTY | PENDLETON | 0.1624% |
| PENNSBORO CITY | RITCHIE | 0.0003% |
| PETERSBURG CITY | GRANT | 0.0011% |
| PETERSTOWN TOWN | MONROE | 0.0013% |
| PHILIPPI CITY | BARBOUR | 0.0834% |
| PIEDMONT TOWN | MINERAL | 0.0006% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1165% |
| PLEASANT VALLEY CITY | MARION | 0.0010% |
| PLEASANTS COUNTY | PLEASANTS | 0.1276% |
| POCA TOWN | PUTNAM | 0.0002% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3412% |
| POINT PLEASANT CITY | MASON | 0.1276% |
| PRATT TOWN | KANAWHA | 0.0013% |
| PRESTON COUNTY | PRESTON | 0.7999% |
| PRINCETON CITY | MERCER | 4.1839% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.6105% |
| QUI NWOOD TOWN | GREENBRIER | 0.0165% |
| RAINELLE TOWN | GREENBRIER | 0.0241% |
| RALEIGH COUNTY | RALEIGH | 5.0240% |
| RANDOLPH COUNTY | RANDOLPH | 0.6622% |
| RANSON CORPORATION | JEFFERSON | 0.0214% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| RAVENSWOOD CITY | JACKSON | 0.0870% |
| REEDSVI LLE TOWN | PRESTON | 0.0006% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0013% |
| RICHWOOD CITY | NICHOLAS | 0.0093% |
| RIDGELEY TOWN | MINERAL | 0.0024% |
| RIPLEY CITY | JACKSON | 0.0836% |
| RITCHIE COUNTY | RITCHIE | 0.1832% |
| RIVESVILLE TOWN | MARION | 0.0009% |
| ROANE COUNTY | ROANE | 0.5132% |
| ROMNEY CITY | HAMPSHIRE | 0.0557% |
| RONCEVERTE CITY | GREENBRIER | 0.0871% |
| ROWLESBURG TOWN | PRESTON | 0.0022% |
| RUPERT TOWN | GREENBRIER | 0.0066% |
| SALEM CITY | HARRISON | 0.0038% |
| SAND FORK TOWN | GILMER | 0.0002% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0080% |
| SHINNSTON CITY | HARRISON | 0.0968% |
| SISTERSVILLE CITY | TYLER | 0.1893% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0348% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0371% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.8851% |
| SPENCER CITY | ROANE | 0.0586% |
| ST. ALBANS CITY | KANAWHA | 0.4397% |
| ST. MARYS CITY | PLEASANTS | 0.0565% |
| STAR CITY TOWN | MONONGALIA | 0.0376% |
| STONEWOOD CITY | HARRISON | 0.0434% |
| SUMMERS COUNTY | SUMMERS | 0.3231% |
| SUMMERSVILLE CITY | NICHOLAS | 1.5393% |
| SUTTON TOWN | BRAXTON | 0.0191% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0391% |
| TERRA ALTA TOWN | PRESTON | 0.0014% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1140% |
| TUNNELTON TOWN | PRESTON | 0.0005% |
| TYLER COUNTY | TYLER | 0.0185% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.4637% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2577% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| WAR CITY | MCDOWELL | 0.0018% |
| WARDENSVILLE TOWN | HARDY | 0.0012% |
| WAYNE COUNTY | WAYNE | 2.1411% |
| WAYNE TOWN | WAYNE | 0.0323% |
| WEBSTER COUNTY | WEBSTER | 0.3418% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.2462% |
| WELCH CITY | MCDOWELL | 0.1085% |
| WELLSBURG CITY | BROOKE | 0.0063% |
| WEST HAMLIN TOWN | LINCOLN | 0.0345% |
| WEST LIBERTY TOWN | OHIO | 0.0023% |
| WEST LOGAN TOWN | LOGAN | 0.0147% |
| WEST MILFORD TOWN | HARRISON | 0.0014% |
| WEST UNION TOWN | DODDRIDGE | 0.0006% |
| WESTON CITY | LEWIS | 0.0088% |
| WESTOVER CITY | MONONGALIA | 0.0086% |
| WETZEL COUNTY | WETZEL | 0.4438% |
| WHEELING CITY | OHIO/MARSHALL | 0.9706% |
| WHITE HALL TOWN | MARION | 0.0025% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1439% |
| WHITESVILLE TOWN | BOONE | 0.0134% |
| WILLIAMSON CITY | MINGO | 0.3555% |
| WILLIAMSTOWN CITY | WOOD | 0.0515% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WINFIELD TOWN | PUTNAM | 0.0279% |
| WIRT COUNTY | WIRT | 0.0976% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0009% |
| WOOD COUNTY | WOOD | 0.9917% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 3.6334% |

**Totals**      **100.0000%**

**Exhibit F**
**Injunctive Relief**

I.    **Definitions Specific to this Exhibit**

    A.    "Cancer-Related Pain Care" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

    B.    "End-of-Life Care" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

    C.    "Downstream Customer Data" shall mean transaction information that Teva collects relating to its direct customers' sales to downstream customers, including chargeback data tied to Teva providing certain discounts, "867 data" and IQVIA data.

    D.    "Health Care Provider" shall mean any U.S.-based physician or other health care practitioner who is licensed to provide health care services and/or prescribe pharmaceutical products and any medical facility, practice, hospital, clinic or pharmacy.

    E.    "Including but not limited to", when followed by a list or examples, shall mean that list or examples are illustrative instances only and shall not be read to be restrictive.

    F.    "In-Kind Support" shall mean payment or assistance in the form of goods, commodities, services, or anything else of value.

    G.    "Lobby" and "Lobbying" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied in that particular state or locality. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

    H.    "Opioid(s)" shall mean all natural, semi-synthetic, or synthetic chemicals that interact with opioid receptors and act like opium. For the avoidance of doubt, the term Opioid shall not include the opioid antagonists naloxone or naltrexone.

    I.    "Opioid Product(s)" shall mean all current and future medications containing Opioids approved by the U.S. Food & Drug Administration ("FDA") and listed by the Drug Enforcement Administration ("DEA") as Schedule II, III, or IV pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone, buprenorphine, or other substances when used exclusively to treat opioid abuse, addiction, or overdose; or

(ii) raw materials, immediate precursors, and/or active pharmaceutical ingredients ("APIs") used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

J.   "OUD" shall mean opioid use disorder defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5), as updated or amended.

K.   "Promote," "Promoting," "Promotion," and "Promotional" shall mean dissemination of information or other practices intended or reasonably anticipated to increase sales or prescriptions, or that attempts to influence prescribing practices of Health Care Providers in the United States.

L.   "Qualified Researcher" shall mean any researcher holding a faculty appointment or research position at an institution of higher education, a research organization, a nonprofit organization, or a government agency.

M.   "Suspicious Order" shall have the same meaning as provided by the Controlled Substances Act, 21 U.S.C. §§ 801-904, and the regulations promulgated thereunder and analogous West Virginia state laws and regulations.

N.   "Teva" means Teva Pharmaceuticals USA, Inc. ("Teva USA"); Cephalon, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; Warner Chilcott Co., LLC; Actavis South Atlantic LLC; Actavis Elizabeth LLC; Actavis Mid Atlantic LLC; Actavis Totowa LLC; Actavis Kadian LLC; Actavis Laboratories UT, Inc. f/k/a Watson Laboratories Inc.-Salt Lake City; and Actavis Laboratories FL, Inc. f/k/a Watson Laboratories, Inc.-Florida.

O.   "Third Party" shall mean any person or entity other than Teva or a government entity.

P.   "Treatment of Pain" shall mean the provision of therapeutic modalities to alleviate or reduce pain.

Q.   "Unbranded Information" shall mean any information that does not identify a specific branded or generic product(s).

II.   **Injunctive Relief**

A.   General Provisions

    1.   Teva shall not make any written or oral statement about Opioids or any Opioid Product that is false, misleading, and/or deceptive as defined under the law of West Virginia.

    2.   Teva shall not represent that Opioids or any Opioid Products have approvals, characteristics, uses, benefits, or qualities that they do not have.

B.    <u>Ban on Promotion</u>

    1.    Teva shall not engage in the Promotion of Opioids or Opioid Products including, but not limited to, by:

        a.    Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers, patients, or persons involved in determining the Opioid Products included in formularies;

        b.    Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

        c.    Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs relating to Opioids or Opioid Products;

        d.    Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

        e.    Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

        f.    Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; or

        g.    Engaging in Internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an Internet search or otherwise be more visible or more accessible to the public on the Internet.

    2.    Notwithstanding subsection II.B.1 directly above, Teva may:

        a.    Maintain a corporate website;

        b.    Maintain a website that contains principally the following content for any Opioid Product: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

c. Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in the state where the information is provided. Teva may, in relation to its expressly required participation in the Transmucosal Immediate Release Fentanyl ("TIRF") Risk Evaluation and Mitigation Strategy ("REMS") Program, remain involved in the preparation of materials and training concerning the process for enrollment in the TIRF REMS Program;

d. Provide the following by mail, electronic mail, on or through Teva's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in the state where the information is provided;

e. Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011), as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009), as updated or amended by the FDA;

f. Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g. Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h. Provide information relating solely to the pricing of any Opioid Product;

F-4

i.  Provide information, through a product catalog or similar means, related to an Opioid or Opioid Product, including, without limitation, pricing information, weight, color, shape, packaging size, type, reference listed drug, National Drug Code ("NDC") label, and such other descriptive information (including information set forth in a standard Healthcare Distribution Alliance Form or technical data sheet and the FDA approval letter) sufficient to identify the products available, to place an order for a product, and to allow the product to be loaded into a customer's inventory and ordering system or Third Party pricing compendia;

j.  Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved REMS program or other federal or state law or regulation applicable in the state where the program is provided through an independent Third Party, which shall be responsible for the continuing medical education program's content without the participation of Teva;

k.  Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Teva as the source of the information; and

l.  Provide rebates, discounts, and other customary pricing adjustments to DEA-registered customers and contracting intermediaries, such as Buying Groups, Group Purchasing Organizations, and Pharmacy Benefit Managers, except as prohibited by Section II.G.

3.  Teva shall not engage in the following specific Promotional activity relating to any products indicated for the treatment of Opioid-induced side effects (for the avoidance of doubt, "Opioid-induced side effects" does not include addiction to Opioids or Opioid Products):

a.  Employing or contracting with sales representatives or other persons to Promote products indicated for the treatment of Opioid-induced side effects to Health Care Providers or patients;

b.  Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote products indicated for the treatment of Opioid-induced side effects;

c.  Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote products indicated for the treatment of Opioid-induced side effects; or

F-5

       d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote products indicated for the treatment of Opioid-induced side effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

    4.     Notwithstanding subsection II.B.3 directly above, Teva may Promote products for the treatment of Opioid-induced side effects (i) so long as such Promotion does not associate the product with Opioids or Opioid Products, or (ii) where such Promotion concerns a product's indication to reverse overdoses and/or treat Opioid addiction. Nothing herein shall prevent Teva from linking to the FDA label associated with a product.

    5.     Treatment of Pain

       a.      Teva shall not, either through Teva or through Third Parties, engage in Promotion of the Treatment of Pain in a manner that encourages the utilization of Opioids or Opioid Products.

       b.      Teva shall not, either through Teva or through Third Parties, Promote the concept that pain is undertreated in a manner that encourages the utilization of Opioids or Opioid Products.

       c.      Teva shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or otherwise Promotes Opioids or Opioid Products.

    6.     Notwithstanding subsection II.B.5 directly above, Teva may Promote or provide educational information about the Treatment of Pain with non-Opioid products or therapies, including Promoting or providing educational information about such non-Opioid products or therapies as alternatives to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

C.    <u>No Financial Reward or Discipline Based on Volume of Opioid Sales</u>

    1.     Teva shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products. For the avoidance of doubt, this provision shall not prohibit financial incentives (*e.g.*, customary raises or bonuses) based on the performance of the overall company or business segment, as measured by EBITDA, revenue, cash flow, or other similar financial metrics.

    2.     Teva shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to or from any person in return for the

prescribing, sale, or use of an Opioid Product. For the avoidance of doubt, this provision shall not prohibit rebates or chargebacks to the extent permitted by other sections of this Consent Judgment.

3.     Teva's compensation policies and procedures shall be designed to ensure compliance with this Consent Judgment and other legal requirements.

D.     <u>Ban on Funding/Grants to Third Parties</u>

1.     Teva shall not, directly or indirectly, provide financial support or In-Kind Support to any Third Party for Promotion of or education about Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6). For the avoidance of doubt, this provision does not prohibit support expressly allowed by this Consent Judgment or required by a federal or state agency.

2.     Teva shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids or Opioid Products.

3.     Teva shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects (subject to subsections II.B.2, 4 and 6).

4.     Teva shall not use, assist, or employ any Third Party to engage in any activity that Teva itself would be prohibited from engaging in pursuant to this Consent Judgment.

5.     Teva shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or reasonably foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

6.     Teva shall not compensate or provide In-Kind Support to Health Care Providers (other than Teva employees) or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payers, *i.e.*, any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers. Nothing in this provision, however, prohibits Teva from using independent contractors who operate under the direction of Teva to provide information to a payor, formulary committee, or other similar entity as permitted in subsection II.B.2 provided that any such persons are bound by the terms of this Consent Judgment. Nor does this provision prohibit the payment of customary rebates or other

pricing concessions to third-party payers, including state Medicaid programs, as part of an overall pricing agreement.

7.  No officer or executive management-level employee of Teva may concurrently serve as a director, board member, employee, agent, or officer of any entity other than Teva Pharmaceutical Industries Ltd. or a direct or indirect wholly-owned subsidiary thereof, that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-related side effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or executive management-level employee of Teva from concurrently serving on the board of a hospital.

8.  Teva shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products indicated for the treatment of Opioid-induced side effects. For the avoidance of doubt, nothing in this paragraph shall prohibit Teva from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or board member at any such entity.

9.  For the avoidance of doubt:

    a.  Nothing in this Section II.D shall be construed or used to prohibit Teva from providing financial or In-Kind Support to:

        (i)   medical societies and patient advocate groups, who are principally involved in issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose; or

        (ii)  universities, medical institutions, or hospitals, for the purpose of addressing, or providing education on, issues relating to (I) the treatment of OUD; (II) the prevention, education and treatment of opioid abuse, addiction, or overdose, including medication-assisted treatment for opioid addiction; and/or (III) rescue medications for opioid overdose;

        (iii) the American Medical Association (AMA), the American Cancer Society (ACS) or any other medical society solely dedicated to cancer treatment; or

        (iv)  trade associations including, without limitation, PhRMA (Pharmaceutical Research and Manufacturers of America), HDA (Healthcare Distribution Alliance), AAM (Association for Accessible Medications), PCMA (Pharmaceutical Care

F-8

Management Association), and NACDS (National Association of Chain Drug Stores), or successor organizations to any of the foregoing.

b.   The prohibitions in this Section II.D shall not apply to engagement with Third Parties based on activities related to (i) medications with an FDA-approved label that lists only the treatment of opioid abuse, addiction, dependence and/or overdose as their "indications and usage," to the extent they are sold to addiction treatment facilities; (ii) raw materials, APIs and/or immediate precursors used in the manufacture or study of Opioids or Opioid Products, but only when such materials, APIs and/or immediate precursors are sold or marketed exclusively to DEA registrants or sold outside the United States or its territories; or (iii) education warning about drug abuse or promoting prevention or treatment of drug misuse.

c.   Teva will be in compliance with subsections II.D.2 and II.D.3 with respect to support of an individual Third Party to the extent that the State of West Virginia determines that such support does not increase the risk of the inappropriate use of Opioids and that Teva has not acted for the purpose of increasing the use of Opioids.

E.   Lobbying Restrictions

1.   Teva shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

a.   encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids; or

b.   pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.   Teva shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

a.   The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

b.   The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

c. The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

d. The limitation of initial prescriptions of Opioids to treat acute pain;

e. The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

f. The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

g. Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

h. The implementation or use of Opioid drug disposal systems.

3. Teva shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of prescription drug monitoring programs ("PDMPs"), including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4. Notwithstanding the foregoing restrictions in subsections II.E.1-3, the following conduct is not restricted:

a. Lobbying against the enactment of any provision of any state, federal, municipal, or county taxes, fees, assessments, or other payments;

b. Challenging the enforcement of, or suing for declaratory or injunctive relief with respect to legislation, rules or regulations referred to in subsection II.E.1;

c. Communications made by Teva in response to a statute, rule, regulation, or order requiring such communication;

d. Communications by a Teva representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as a result of a mandatory order or subpoena commanding that person to testify;

e. Responding, in a manner consistent with this Consent Judgment, to an unsolicited request for the input on the passage of legislation or

the promulgation of any rule or regulation when such request is submitted in writing specifically to Teva from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation;

    f.    Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections II.E.1-3, so long as Teva does not support specific portions of such legislation or regulation covered by subsection II.E.1 or oppose specific portions of such legislation or regulation covered by subsections II.E.2-3;

    g.    Communicating with a federal or state agency in response to a Federal Register or similar notice or an unsolicited federal or state legislative committee request for public comment on proposed legislation;

    h.    Responding to requests from the DEA, the FDA, or any other federal or state agency, and/or participating in FDA or other agency panels at the request of the agency; and

    i.    Participating in meetings and other proceedings before the FDA, FDA advisory committee or other FDA committee in connection with the approval, modification of approval, or oversight of Teva's own products.

5.    Teva shall provide notice of the prohibitions in Section II.E to all employees engaged in Lobbying; incorporate the prohibitions in Section II.E into trainings provided to Teva employees engaged in Lobbying; and certify that it has provided such notice and trainings to Teva employees engaged in Lobbying.

F.    <u>Monitoring and Reporting of Off-Label Use</u>

1.    Teva shall monitor for off-label prescribing of its brand Opioid Products in the United States as provided for in the TIRF REMS Program.

2.    Upon request of one of the following, Teva shall provide the requestor with the data and analysis described in Subsection II.F.1, to be used for law enforcement, counter-detailing, academic or medical research, or public health and other non-commercial purposes: West Virginia Attorney General or other law enforcement agency, West Virginia medical board, West Virginia board of pharmacy, Qualified Researchers, medical and pharmacy directors of health systems or clinics, medical associations, and other public health officials, including but not limited to city health authorities, county medical directors, and West Virginia public health authorities.

3. Teva shall provide the data and analysis described in Subsection VI.E.1 in chart format, including breakdown of prescriptions by year, diagnosis, and county.

G. <u>Ban on High Dose Opioids.</u>

1. After any related commercial commitments existing on the Effective Date of the Release have expired, Teva shall not manufacture, promote, or distribute any oxycodone pill that exceeds 40 milligrams.

H. <u>Ban on Prescription Savings Programs</u>

1. Teva shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product. This does not preclude Teva from offering discounts or rebates to commercial partners on entire portfolios of products, including providing discounts, coupons, rebates, or other methods for use by retail chain pharmacies, such as CVS, Walgreens, Rite Aid and the like.

2. Teva shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (*e.g.*, free trial prescriptions) for any Opioid Product.

I. <u>Monitoring and Reporting of Direct and Downstream Customers.</u>

1. Teva shall operate an effective monitoring and reporting system in compliance with federal law, that shall include processes and procedures that:

a. Utilize all reasonably available transaction information to identify a Suspicious Order of an Opioid Product by a direct customer;

b. Utilize all reasonably available Downstream Customer Data to identify whether a downstream customer poses a material risk of diversion of an Opioid Product;

c. Utilize all information Teva receives that bears upon a direct customer's or a downstream customer's diversion activity or potential for diversion activity, including reports by Teva's employees, customers, Health Care Providers, law enforcement, state, tribal, or federal agencies, or the media; and

d. Upon request (unless otherwise required by law), report to the West Virginia Attorney General or State controlled substances regulatory agency any direct customer or downstream customer in West Virginia identified as part of the monitoring required by (a)-(c),

above, and any customer relationship in such State terminated by Teva relating to diversion or potential for diversion. These reports shall include the following information, to the extent known to Teva:

(i)   The identity of the downstream registrant and the direct customer(s) identified by Teva engaged in the controlled substance transaction(s), to include each registrant's name, address, business type, and DEA registration number;

(ii)   The dates of reported distribution of controlled substances by direct customers to the downstream registrant during the relevant time period;

(iii)   The drug name, drug family or NDC and dosage amounts reportedly distributed;

(iv)   The transaction or order number of the reported distribution; and

(v)   A brief narrative providing a description of the circumstances leading to Teva's conclusion that there is a risk of diversion.

2.   Teva shall not provide to any direct customer an Opioid Product to fill an order identified as a Suspicious Order unless Teva investigates and finds that the order is not suspicious.

3.   Upon request, Teva shall provide cooperation and assistance to any federal, state or local law enforcement investigations of potential diversion or suspicious circumstances involving Opioid Products, including criminal law enforcement agencies, drug control agencies, professional licensing boards, and Attorney General's offices.

4.   Teva agrees that it will refrain from providing an Opioid Product directly to a retail pharmacy or Health Care Provider.

J.   Miscellaneous Terms

1.   To the extent that any provision in this Consent Judgment conflicts with federal or relevant state law or regulation, the requirements of the law or regulation will prevail. To the extent that any provision in this Consent Judgment is in conflict with federal or relevant state law or regulation such that Teva cannot comply with both the law or regulation and the provision of this Consent Judgment, Teva may comply with such law or regulation.

2.   Teva will enter into this Consent Judgment solely for the purpose of settlement, and nothing contained therein may be taken as or construed to

be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Teva expressly denies. No part of this Consent Judgment, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Teva. This Consent Judgment is not intended for use by any Third Party for any purpose, including submission to any court for any purpose.

3.      For the avoidance of doubt, this Consent Judgment shall not be construed or used as a waiver or limitation of any defense otherwise available to Teva in any action, and nothing in this Consent Judgment shall be construed or used to prohibit Teva in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in litigation or other legal or administrative proceedings.

4.      Nothing in this Consent Judgment shall be construed to limit or impair Teva's ability (a) to communicate its positions and respond to media inquiries concerning litigation, investigations, reports, or other documents or proceedings relating to Teva or its Opioid Products, or (b) to maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products.

5.      Nothing in this Consent Judgment shall prohibit Teva from divesting any Opioid or Opioid Product, in each case, including providing technical development services, transferring know-how and patents, and/or providing such other support services in connection therewith.

6.      This Consent Judgment applies to the manufacture, sales, Promotion, marketing and distribution by Teva within the United States and its territories or involving Health Care Providers.

7.      Upon the request of the Attorney General of the State of West Virginia, Teva shall provide the Attorney General of the State of West Virginia with copies of the following, within 30 days of the request:

   a.      Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Teva's Opioid Product(s); and

   b.      Warning or untitled letters issued by the FDA regarding Teva's Opioid Product(s) and all correspondence between Teva and the FDA related to such letters.

8.      The parties by stipulation may agree to a modification of this Consent Judgment; provided that the parties may jointly agree to a modification only by a written instrument signed by or on behalf of both Teva and the Attorney General of the State of West Virginia.

9. If, after the Effective Date of the Release, Teva enters into any collective resolution of substantially all opioid claims brought by states, counties, and municipalities (a "Global Resolution") that contains injunctive relief terms that are more favorable than the terms of this Consent Judgment, then this Consent Judgment will be revised to contain such more favorable injunctive relief terms. Teva shall provide the State a copy of any Other State Settlement within thirty (30) days of its effective date.

K. Compliance with State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product

1. Subject to subsection II.G.1 above, Teva shall continue to comply with all applicable state laws and regulations that relate to the sale, Promotion, distribution, and disposal of Opioids or Opioid Products, including but not limited to:

   a. West Virginia Uniform Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

   b. West Virginia Consumer Protection Laws; and

   c. West Virginia laws and regulations related to opioid prescribing, distribution, and disposal.

III. **Clinical Data Transparency**

A. Data to Be Shared

1. Teva shall continue to share truthful and balanced summaries of the results of all Teva-Sponsored Studies through its publicly available website (*see* https://www.tevapharm.com/teva-clinical-trials):

   a. "Teva-Sponsored Studies" means pre-marketing clinical research and post-marketing clinical research that Teva "takes responsibility for and initiates" as "sponsor," as "sponsor" is defined in 21 C.F.R. § 312.3(b), and that involves an intervention with human subjects with an Opioid Product.

   b. The summaries may include redactions to protect personal identifying information, trade secret and confidential commercial information, and information that may provide a road map for defeating a product's abuse-deterrent properties.

2. With respect to any Teva-Sponsored Studies relating to any new Teva Opioid Product or new indication for an existing Teva Opioid Product, Teva shall, within 6 months after regulatory approval or 18 months after study completion, whichever occurs later, make the following clinical data that is reasonably accessible and in its possession, custody, and control available

F-15

through a third-party data archive that makes clinical data available to Qualified Researchers with a bona fide scientific research proposal:

a.    Fully analyzable data set(s) (including individual de-identified participant-level data);

b.    The clinical study report(s) redacted for commercial or personal identifying information;

c.    The full protocol(s) (including the initial version, final version, and all amendments); and

d.    Full statistical analysis plan(s) (including all amendments and documentation for additional work processes).

e.    Data related to Investigator Sponsored Studies are not subject to the requirements in Section III.

B.    <u>Third-Party Data Archive</u>

1.    The third-party data archive referenced above shall have a panel of reviewers with independent review authority to determine whether the researchers are qualified, whether a research application seeks data for bona fide scientific research, and whether a research proposal is complete.

2.    The panel may exclude research proposals with a commercial interest.

3.    Teva shall not interfere with decisions made by the staff or reviewers associated with the third-party data archive.

4.    Any data sharing agreement with a Qualified Researcher who receives shared data via the third-party data archive shall contain contact information for Teva's pharmacovigilance staff. Every agreement shall require the lead Qualified Researcher to inform Teva's pharmacovigilance staff within 24 hours of any determination that research findings could bear on the risk-benefit assessment regarding the product. The lead Qualified Researcher may also share findings bearing on the risk-benefit assessment regarding the product with regulatory authorities. Teva's pharmacovigilance staff shall take all necessary and appropriate steps upon receipt of such safety information, including but not limited to notifying the appropriate regulatory authorities or the public.

5.    Teva shall bear all costs for making data and/or information available to the third-party data archive.

IV. **Compliance**

    A.    Compliance Duration

        1.    Sections II and III of this Exhibit shall be effective for 15 years from the Effective Date of the Release.

        2.    Nothing in this Consent Judgment shall relieve Teva of its independent obligation to fully comply with the laws of the State of West Virginia after expiration of the 13-year period specified in this subsection.

    B.    Compliance Deadlines

        1.    Teva must be in full compliance with the provisions included in this Consent Judgment by the Effective Date of the Release. Nothing herein shall be construed as permitting Teva to avoid existing legal obligations.

V. **Enforcement**

    A.    If the State believes that Teva is not in compliance with any term of this Final Consent Order, then the State shall:

        1.    Provide written notice specifying the reason(s) why the State believes Teva is not in compliance with this Final Consent Order; and

        2.    Allow Teva at least thirty (30) days to attempt to cure such alleged non-compliance (the "Cure Period").

    B.    The State may not commence a proceeding to enforce compliance with this Final Consent Order before the expiration of the Cure Period, provided that the State may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

    C.    Teva agrees to venue for any proceedings related to this paragraph in the Court in which the State of West Virginia files this Consent Judgment.

**Exhibit G**
**Consent Judgment**

IN THE CIRCUIT COURT OF THE TWENTY-FIFTH JUDICIAL CIRCUIT

IN AND FOR BOONE COUNTY, STATE OF WEST VIRGINIA

STATE OF WEST VIRGINIA, OFFICE OF
THE ATTORNEY GENERAL, *ex rel.* Patrick
MORRISEY, ATTORNEY GENERAL,

      Plaintiff,

v.                                   No. 21-C-9000 MFR

TEVA PHARMACEUTICAL INDUSTRIES,
LTD.., et al.,

      Defendants.

## CONSENT JUDGMENT

      This Consent Judgment resolves the litigation as to Teva in *State of West Virginia ex rel.*

*Patrick Morrisey, Attorney General v. Teva Pharmaceutical Industries, Ltd., et al.,* Civil Action

No. 19-C-104 BNE (W. Va. Cir. Ct. Boone County) (the "West Virginia AG Action"), pending

within *In re: Opioid Litigation*, Civil Action No. 21-C-9000 MFR (W. Va. Cir. Ct. Kanawha

County), and Actions brought by Participating Local Governments.

      Teva denies the allegations in the West Virginia AG Action and other Actions and claims

to have no liability whatsoever to Plaintiff or to any Subdivision or other governmental entity

(whether such governmental entity has brought or is a party to another Action or not).  Plaintiff

and Teva (the "Parties"), by their counsel, have agreed to a resolution of the West Virginia AG

Action ("Agreement," attached to this judgment) and the entry of this Consent Judgment

(including the injunctive terms incorporated herein) by the Court without trial or finding of

admission or wrongdoing or liability of any kind.  Furthermore, under the Agreement, and as

effectuated in this Consent Judgment, the West Virginia AG is exercising its authority to act in the public interest and release its own Claims as well as those of all Subdivisions, whether asserted previously or in the future, that arise out of or relate to the Covered Conduct. Unless otherwise specified, capitalized terms used herein shall have the meanings specified in the Agreement.

NOW THEREFORE, without trial or adjudication of any issue of fact or law presented in the West Virginia AG Action or the other Actions, without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, and upon the Parties' consent, IT IS HEREBY ORDERED AS FOLLOWS:

## I.  FINDINGS

1.  For purposes of this proceeding only, this Court has jurisdiction over the Parties and the subject matter of this action. This Judgment/Order shall not be construed or used as a waiver of any jurisdictional defense in any other proceeding.

2.  The terms of this Judgment/Order shall be governed by the State of West Virginia.

3.  Entry of this Judgment/Order is in the public interest and reflects the negotiated agreement among the Parties.

4.  The Parties have agreed to resolve the issues resulting from the Covered Conduct (as defined below) by entering into this Judgment/Order.

5.  Teva (as defined below) is entering into this Judgment/Order solely for the purpose of settlement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, which Teva expressly denies. No part of this Judgment/Order, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Teva.

G-2

6.      This Judgment/Order shall not be construed or used as a waiver or limitation of any defense otherwise available to Teva in any other action, or of Teva's right to defend itself from, or make any arguments in, any other regulatory, governmental, private individual, or class claims or suits relating to the subject matter or terms of this Judgment/Order.  This Judgment/Order is made without trial or adjudication of any issue of fact or law or finding of liability of any kind.  Notwithstanding the foregoing, the Signatory Attorney General may file an action to enforce the terms of this Judgment/Order.

7.      No part of this Judgment/Order shall create a private cause of action or confer any right to any third party for violation of any federal or state statute except that the Attorney General may file an action to enforce the terms of this Judgment/Order.  It is the intent of the Parties that this Judgment/Order shall not be binding or admissible in any other matter, including but not limited to, any investigation or litigation, other than in connection with the enforcement of this Judgment/Order.  This Judgment/Order is not enforceable by any persons or entities besides the Attorney General, Teva, and this Court.

8.      Plaintiff has the authority to act in the public interest and on behalf of the people of West Virginia as the people's attorney.

9.      The Parties have agreed to resolution of the West Virginia AG Action under the terms of their Agreement, which is attached hereto as <u>Exhibit A</u>.  This Consent Judgment/Order summarizes and gives effect to those terms.  In the event of a conflict between the terms of the Exhibits and this summary document, the terms of the Agreement shall govern.

## II.     DEFINITIONS

The following definitions shall be used in construing this Judgment/Order:

A.    *"Agreement"* means the settlement agreement between the State of West Virginia and Teva attached to this Consent Judgment/Order as Exhibit A.

B.    *"Covered Conduct"* means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement, or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) arising from or relating in any way to (a) the availability, discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to, any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting, or non-disclosure to federal, state, or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic, or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

C.     *Effective Date*" means the date on which the Agreement is executed by the State and Teva.

D.     "*Teva*" means (i) Teva Pharmaceutical Industries Ltd.; (ii) all of its respective past and present direct or indirect parents, subsidiaries, divisions, affiliates, joint ventures, predecessors, successors, assigns, and insurers (in their capacity as such); and (iii) all of the foregoing respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, employees, agents, attorneys, and insurers of the foregoing entities and persons referenced in clauses (i) and (ii) above for actions or omissions that occurred during and related to their work for, or employment with, any of the foregoing entities with respect to the Released Claims.

E.     "*Parties*" means Teva and the Attorney General of West Virginia.

F.     "*Attorney General*" means the Attorney General of West Virginia, or his/her authorized designee.

G.     "*Settlement Product*" means "Naloxone Hydrochloride Nasal Spray" (4 mg strength) that is listed in Teva's then-current generics catalog, which can be viewed at www.tevagenerics.com, and is provided to the State as part of the settlement, at no cost as set forth in Section III.C and Exhibit A.

H.     "*State*" means the State of West Virginia, including all of its executive departments, agencies, divisions, boards, commissions, instrumentalities and officers, including the Attorney General.

### III.    CONSIDERATION TO BE PROVIDED BY TEVA

A.  Under the terms set out more fully in the Agreement, and upon satisfaction of the requirements and conditions set out therein, Teva shall make fifteen (15) annual payments to West Virginia for a total sum of $83,331,000 (the "Settlement Amount"), consisting of:

1.    $75,404,450 (the "Remediation Amount") to be paid over a period of 15 years and allocated in accordance with subsection III.B.1.c of the Agreement; and

2.    $7,926,550 (the "Litigation Cost Amount") to be disbursed as provided in Section IX of the Agreement.

3.    The Settlement Amount shall be paid into the Qualified Settlement Fund as follows, subject to the provisions of Section III.B.2 of the Agreement:

a.    Within twenty-one (21) days after the later of (1) the date this Consent Judgment has been entered, or (2) the date the Qualified Settlement Fund has been established under the authority and jurisdiction of the Court and Teva has received from the West Virginia Attorney General a W-9 and wire instructions for the Qualified Settlement Fund, Teva shall pay the sum of $25,251,818;

b.    On or before June 15, 2023, Teva shall pay the sum of $10,100,727;

c.    On or before June 15, 2024, Teva shall pay the sum of $2,525,182;

d.    On or before June 15, 2025 Teva shall pay the sum of $2,525,182

e.    On or before June 15, 2026, Teva shall pay the sum of $2,525,182;

f.    On or before June 15, 2027, Teva shall pay the sum of $2,525,182;

g.    On or before June 15, 2028, Teva shall pay the sum of $2,525,182;

G-6

h.  On or before June 15, 2029, Teva shall pay the sum of $2,525,182;

i.  On or before June 15, 2030, Teva shall pay the sum of $2,525,182;

j.  On or before June 15, 2031, Teva shall pay the sum of $2,525,182;

k.  On or before June 15, 2032, Teva shall pay the sum of $2,525,182;

l.  On or before June 15, 2033, Teva shall pay the sum of $2,525,182;

m.  On or before June 15, 2034, Teva shall pay the sum of $7,575,545;

n.  On or before June 15, 2035, Teva shall pay the sum of $7,575,545; and

o.  On or before June 15, 2036, Teva shall pay the sum of $7,575,545

B.  Teva shall provide Settlement Product to the State, for a period of ten (10) years at no cost to the State. Settlement Product shall be supplied by Teva USA to one facility per order to be designated by the State as more fully described in the Exhibits to the Agreement. The Parties agree that the total Wholesale Acquisition Cost ("WAC") value of the Settlement Product to be provided under this Agreement is $27,000,000.

C.  The Parties' Agreement provides that on or before the Initial Participation Date, the State shall provide to Teva Election and Release Forms (in the form annexed as Exhibit D) demonstrating that (1) counties representing at least 96% of the State's population, (2) at least 96% of the population of Litigating Local Governments, and (3) at least 96% of the population of Non-Litigating Local Governments that are classified in the W. Va. Code 8-1-3 as Class I or Class II Local Governments have become Participating Local Governments. Teva shall not be required to pay the second annual payment or any subsequent payments unless and until the required Releases are obtained by the State and delivered to Teva and all Participating Local Governments have

dismissed their respective cases against Teva and other Released Entities with prejudice, or the enactment of a statutory or other Bar against litigation.

### IV.    INJUNCTIVE TERMS

10.    The Parties have agreed that Teva shall be subject to the injunctive terms set forth in Exhibit __ to their Agreement.  Those agreed injunctive terms are expressly incorporated into and are given full force and effect by this Consent Judgment, and Teva shall comply with the injunctive terms as of the entry of this Consent Judgment.

11.    Compliance with injunctive terms may be enforced in this Court consistent with the terms specified in the injunctive provisions set forth in the Parties' Agreement.

### V.    RELEASES AND DISMISSAL WITH PREJUDICE

12.    Plaintiff and Teva have agreed to the Release of the Released Claims as provided in Section VII of the Agreement.  Such Releases are given in good faith and upon entry of this Consent Judgment shall be effective as to all Releasors.

13.    Plaintiff's Claims against Teva are hereby DISMISSED WITH PREJUDICE, with each Party to bear its own costs except as specified in the Agreement.

### VI.    MISCELLANEOUS

14.    This Court retains jurisdiction to enforce the terms of this Consent Judgment/Order.

15.    The parties may jointly seek to modify the terms of this Consent Judgment/Order, subject to the approval of this Court.  This Consent Judgment/Order may be modified only by order of this Court.


IT IS SO ORDERED, ADJUDGED AND DECREED in _____, _____, West Virginia, this __ day of ____2022.

G-8

_____
Honorable

**Exhibit H**

## THIS DOCUMENT APPLIES TO ALL CASES

IN THE CIRCUIT COURT OF KANAWHA
COUNTY, WEST VIRGINIA

| IN RE: OPIOID LITIGATION | **CIVIL ACTION NO. 19-C-9000** |

## CASE MANAGEMENT ORDER

This Case Management Order ("CMO") shall apply to all Non-Participating Litigating
Local Governments and future plaintiffs in this Mass Litigation proceeding (collectively,
"Plaintiffs"). As used herein, "Defendants" refers to Teva, as well as any other "Released Entity"
as that term is defined in the Teva West Virginia State-Wide Opioid Settlement Agreement dated
_____ (the "Settlement Agreement"). As used herein, "Non-Participating Litigating
Local Governments" refers to Litigating Local Governments that brought any "Released Claims,"
as that term is defined in the Settlement Agreement, against Teva Defendants, and have not elected
to participate in the Settlement Agreement.

Good cause appearing, it is ordered as follows:

A. **Plaintiffs' Requirement to Produce Certain Specified Information About
   Their Claims**

   1. **Plaintiffs' Production Requirements.** Each Plaintiff shall serve the
following documents and/or information upon counsel for Defendants within ninety (90) days of
the entry of this Order or, in the case of any Plaintiff that commences an action or is added as a
party to an existing action after the entry of this Order, within ninety (90) days of commencing or
being added to such action:

(a)      **Fact Sheet.** Each Plaintiff shall serve upon the Defendants a completed copy of the Fact Sheet attached as Exhibit 1 to this Case Management Order. The completed Fact Sheet shall include a Certification (in the form contained in Exhibit **1)** in which the Plaintiffs declares under penalty of perjury that all information provided in the Fact Sheet is complete, true and accurate and that the Plaintiff has provided all required documents and information.

(b)      **Record Production.**

(i)      Each Plaintiff shall produce all records establishing the existence of any alleged public nuisance within the Plaintiff's territory or borders, including a definition of the alleged nuisance and evidence to support its existence and scope.

(ii)      Each Plaintiff shall produce all records supporting any claim for "abatement" relief, including a categorization and itemization of any requested abatement relief, evidence to support each component of such relief, and the geographic area as to which such relief is requested.

(iii)      Each Plaintiff shall produce all records supporting any claim for damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages. To the extent a Plaintiff argues that such alleged damages have already been incurred, the Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement. To the extent the Plaintiff argues that such alleged damages will be incurred in the future, the Plaintiff shall produce all evidence supporting any allegation that future damages are likely to be incurred and the amounts in which Plaintiff contends

H-2

such alleged damages are likely to be incurred, and records reflecting whether such future alleged damage will be paid or reimbursed through a grant, insurance or other third party source.

        (iv)    For any relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that have made or will make the expenditures, when and how long those entities have made or will make the expenditures, and the nature of the expenditures, including how they have addressed or will address any and all alleged harms. Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

        (v)    Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly inappropriate prescriptions shall identify the specific prescriptions alleged to have been inappropriate, to whom and by whom the specific prescriptions alleged to have been inappropriate were written, the pharmacy(ies) that filled each specific prescription alleged to have been inappropriate, whether the Plaintiff was reimbursed for any or all of the specific prescriptions alleged to have been inappropriate, and the Plaintiff's basis for identifying the specific prescriptions alleged to have been inappropriate.

        (c)    **Affidavit.** An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit 1 to this Case Management Order; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO. If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d)    **Expert Reports.** Each Plaintiff shall serve on counsel for Defendants a case-specific expert report or reports executed by one or more qualified expert(s), under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report"). Each Case-Specific Expert Report shall include all matter required to comply with West Virginia Rule of Civil Procedure 26, West Virginia law, and at least:

(i)    *Plaintiff's Information.* The Plaintiff's name;

(ii)    *Expert's Information.* The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) years, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii)    *Records.* All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv)    *Reliance Materials.* All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v)    *Locations.* If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how Plaintiff has been affected by any alleged public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi)    *Subjects of Report(s).* The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to opine, including but not limited to the following:

(1)    Whether the records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)    Whether the records reviewed by the expert(s) indicate the existence of any alleged nuisance and, if so, the nature of the alleged nuisance;

(3)    Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that allegedly wrongful conduct;

(4)    An opinion explaining the basis for any contention that the Plaintiff incurred damages caused by the Defendants' alleged conduct ;

(5)    An opinion explaining the basis for any contention that the Defendants' alleged conduct forming the basis for the Plaintiff's claims is continuing;

(6)    An opinion explaining the basis for any contention that any relief sought would "abate" any alleged public nuisance;

(7)    An opinion explaining how the alleged public nuisance identified by the expert differs from and is not subsumed within the alleged public nuisance addressed by the Settlement Agreement; and

(8)    An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

2.    Deadline to comply.

(a)     For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced within ninety (90) days of the entry of this CMO, if its claims have not been dismissed with prejudice by that date.

(b)     For any Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

(c)     All litigation deadlines applicable to Defendants in a given case shall be stayed until the Plaintiff in that case has produced the items required by Section B.1.

3.     Failure to comply.

(a)     *Notice of Non-Compliance and Opportunity to Cure.* If any Plaintiff fails to comply with any provision of this Order, including the requirement to provide each and every fact, record and expert opinion required to be produced pursuant to Section A.1 of this Order, Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

(b)     *Failure to Cure.* If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

H-6

(c)      *Extensions of Time.* The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

**B.      <u>Discovery on Statute of Limitations and Other Time-Based Defenses</u>**

1.      Each Plaintiff must, within the time frames established by Section A.2, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information:

(a)      the date the Plaintiff first learned of the harms alleged in its complaint;

(b)      how the Plaintiff first learned of the harms alleged in its complaint;

(c)      the date the Plaintiff first learned of each aspect of the Defendants' alleged conduct;

(d)      how the Plaintiff first learned of each aspect of the Defendants' alleged conduct;

(e)      the date the Plaintiff first learned that the harms alleged in its complaint may be related to each aspect of Defendants' alleged conduct;

(f)      how the Plaintiff first learned the harms alleged in its complaint may be related to Defendants' alleged conduct;

(g)      the date the Plaintiff first spoke to or corresponded with an attorney about the harms alleged in the Plaintiff's complaint, the Defendants' alleged conduct, and/or potential litigation in this matter; and

        (h)     the date the Plaintiff first retained counsel in connection with this matter.

     2.     Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

     C.     <u>**Case-Specific Discovery and Related Dispositive Motion Practice**</u>

     1.     If a Plaintiff complies with the production requirements outlined above in Sections A and B, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that: (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and motions to exclude expert testimony, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

     2.     During such discovery, the Parties are permitted to serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition. If a Plaintiff serves any written discovery upon Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery. The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendant at this time. No other depositions may

be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

3. If a case survives the Defendant's summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues. Discovery with regard to any other defendants will be addressed at this time as well. The filing and briefing of summary judgment motions and motions to exclude expert testimony after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and motions to exclude expert testimony after completing full fact and expert discovery. The Court's use of the term "non-duplicative" is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or motions to exclude expert testimony concerning witnesses addressed in motions to exclude expert testimony filed at the conclusion of the expedited discovery period.

4. The foregoing provisions do not preclude Defendants from filing non-duplicative dispositive motions, including motions relating to personal jurisdiction.


SO ORDERED.

Dated: _____        _____

                                Lead Presiding Judge



_____

**Exhibit I**
**Teva's Subsidiaries, Affiliates, and Joint Ventures**

The following includes a non-exclusive list of Teva's current subsidiaries, affiliates, and joint ventures:

1. 10009474 Canada Inc.
2. 1453350 Ontario Inc.
3. 9985247 Canada Inc.
4. Abic Investment (1959) Ltd.
5. Abic Ltd.
6. AbZ-Pharma GmbH
7. Actavis d.o.o. Belgrade
8. Actavis Dutch Holding B.V.
9. Actavis Elizabeth LLC
10. Actavis Finance LLC
11. Actavis Group PTC ehf.
12. Actavis Holdco US, Inc.
13. Actavis Kadian LLC
14. Actavis Laboratories FL, Inc.
15. Actavis Laboratories UT, Inc.
16. Actavis Limited
17. Actavis LLC
18. Actavis Mid Atlantic LLC
19. Actavis Pharma S. de R.L. de C.V.
20. Actavis Pharma, Inc.
21. Actavis Pharmaceuticals NJ, Inc.
22. Actavis Puerto Rico Holdings Inc.
23. Actavis South Atlantic LLC
24. Actavis Totowa LLC
25. Actavis Ukraine LLC
26. Actavis US Holding LLC
27. Anda Holdco Corp.
28. Anda Marketing, Inc.
29. Anda Pharmaceuticals, Inc.
30. Anda Puerto Rico Inc.
31. Anda Veterinary Supply, Inc.
32. Anda, Inc.
33. Andrx LLC
34. Anesta LLC
35. Arana Therapeutics, Inc.
36. Asaph II B.V.
37. Assia Chemical Industries Ltd.
38. Auspex Pharmaceuticals, Inc.
39. Balkanpharma Dupnitsa AD
40. Barr International Services, Inc.
41. Barr Laboratories, Inc.
42. Barr Pharmaceuticals, LLC
43. Cephalon (UK) Limited
44. Cephalon Australia (VIC) Pty Ltd
45. Cephalon Clinical Partners, LP
46. Cephalon Development Corporation
47. Cephalon LLC
48. CIMA Labs Inc.
49. Circa Pharmaceuticals West, Inc.
50. Cobalt Laboratories LLC
51. Copper Acquisition Corp.
52. Coventry Acquisition, LLC
53. Cupric Holding Co. LLC
54. Cybear, LLC
55. Doral Manufacturing, Inc.
56. East End Insurance, Ltd
57. FEI Products, LLC
58. Gecko Health Innovations, Inc.
59. GeminX Pharmaceuticals Canada, Inc
60. Genchem Pharma LLC
61. Goldline Laboratories, Inc.
62. Inmobiliaria Lemery, S.A. de C.V.
63. INSPIRE INCUBATOR, LIMITED PARTNERSHIP
64. IVAX (Bermuda) Ltd.
65. IVAX Argentina S.A.
66. IVAX Far East, Inc.
67. IVAX Holdings C.I.
68. IVAX International B.V.
69. IVAX Laboratories Puerto Rico, Inc.
70. IVAX LLC
71. IVAX Pharmaceuticals B.V.

72. IVAX Pharmaceuticals Caribe, Inc.
73. IVAX Pharmaceuticals Mexico, S.A. de C.V.
74. IVAX Pharmaceuticals NV, LLC
75. IVAX Pharmaceuticals, LLC
76. IVAX Specialty Chemicals Sub, LLC
77. IVAX UK Limited
78. Kilburn B.V.
79. Laboratorio Chile, S.A.
80. Laboratorios Davur S.L.U.
81. Labrys Biologics, Inc.
82. Lemery S.A. de C.V.
83. Limited Liability Company "Teva Ukraine"
84. Maancirkel Holding B.V.
85. Marsam Pharmaceuticals LLC
86. Med All Enterprise Consulting (Shanghai) Co.,Limited
87. Mepha Investigação, Desenvolvimento e Fabricação Farmacêutica, Lda.
88. Mepha Pharma AG
89. Mepha Schweiz AG
90. Merckle GmbH
91. MicroDose Therapeutx, Inc.
92. MORIAH BIOTECHNOLOGY LTD
93. Norton (Waterford) Limited
94. Norton Healthcare (1998) Limited
95. Norton Healthcare Limited
96. Novopharm Holdings, Inc.
97. NT Pharma Canada Ltd.
98. Nupathe Inc.
99. Nuvelution TS Pharma, Inc.
100. Odyssey Pharmaceuticals, Inc.
101. Oncotest Teva Ltd
102. Orvet UK
103. Patient Services and Solutions, Inc.
104. Pharma de Espana, Inc.
105. Pharmachemie (Proprietary) Limited
106. Pharmachemie B.V.
107. PharmaPlantex Limited
108. Pharmatrade S.A.
109. PharmNovo LLC
110. Plantex Ltd.

111. PLIVA d.o.o. SARAJEVO
112. PLIVA HRVATSKA d.o.o.
113. PLIVA Ljubljana d.o.o.
114. Pliva Real Estate GmbH
115. PLIVA SKOPJE d.o.o.
116. PLIVA, Inc.
117. Plus Chemicals, branch of Teva Pharmaceutical International GmbH
118. PT Actavis Indonesia
119. Rakepoll Holding B.V.
120. ratiopharm - Comercio e Industria de Produtos Farmaceuticos, Lda.
121. ratiopharm Arzneimittel Vertriebs-GmbH
122. ratiopharm España S.A.
123. ratiopharm GmbH
124. ratiopharm Immobilienverwaltung GmbH & Co. KG
125. ratiopharm Kazakhstan LLP
126. Representaciones E Investigaciones Medicas S.A. - also called RIMSA
127. Rise Healthcare Ltd
128. Royce Research and Development Limited Partner I
129. Salomon, Levin & Elstein Ltd.
130. Sicor de México S.A. de C.V.
131. Sicor Inc.
132. Sicor Società Italiana Corticosteroidi S.r.l.
133. Sindan-Pharma Srl
134. TAGCO Incorporated
135. TAPI Puerto Rico, Inc.
136. Teva API B.V.
137. Teva API Inc.
138. TEVA API INDIA Private Limited
139. Teva API Japan LTD.
140. Teva API Services Mexico, S.de R.L. de C.V.
141. Teva B.V.
142. Teva Biopharmaceuticals USA, Inc.
143. Teva Biotech GmbH
144. Teva Branded Pharmaceutical Products R&D, Inc.
145. Teva Canada Innovation G.P. - S.E.N.C.

I-2

146. TEVA CANADA LIMITED / TEVA CANADA LIMITEE
147. Teva Capital Services Switzerland, branch of Teva Pharmaceuticals International GmbH
148. Teva Czech Industries s.r.o.
149. Teva Denmark A/S
150. Teva Digital Health, Inc.
151. Teva Farmaceutica Ltda
152. Teva Finance Holding B.V.
153. Teva Finance Services II B.V.
154. Teva Finance Services LLC
155. Teva Finland Oy
156. Teva Global Products Limited Partnership
157. Teva GmbH
158. Teva Health GmbH
159. Teva Healthcare India Private Limited
160. Teva Holdco US, Inc.
161. Teva Holdings GK
162. Teva Holdings Ltd.
163. Teva İlaçları Sanayi ve Ticaret Anonim Şirketi
164. Teva India Private Limited
165. TEVA INVERSIONES Y EXPORTACIONES SpA
166. Teva Investments (Pty) Ltd.
167. Teva Israel Ltd
168. Teva İstanbul İlaç San. Ve Tic. Ltd. Şti
169. Teva Italia S.r.l.
170. Teva Laboratoires
171. Teva Limited Liability Company
172. Teva Logistics Services B.V.
173. Teva Medical (Marketing) Ltd.
174. Teva Medical Ltd.
175. Teva Nechasim Ltd.
176. Teva Nederland B.V.
177. Teva Neuroscience, Inc.
178. Teva Norway AS (f.k.a. ratiopharm Norway AS)
179. TEVA OPERATIONS POLAND SPÓŁKA z OGRANICZONĄ ODPOWIEDZIALNOŚCIĄ
180. Teva Parenteral Medicines, Inc.

181. TEVA PERU S.A.
182. Teva Pharma - Produtos Farmacêuticos Lda
183. Teva Pharma (MS) Pty Ltd
184. Teva Pharma (New Zealand) Limited
185. Teva Pharma AG
186. Teva Pharma Australia Pty Ltd
187. Teva Pharma B.V.
188. Teva Pharma Belgium N.V.
189. Teva Pharma EAD
190. Teva Pharma Holdings Limited
191. Teva Pharma Iceland
192. Teva Pharma S.L.U.
193. TEVA PHARMA UK LIMITED
194. Teva Pharmaceutical and Chemical Industries India Private Limited
195. Teva Pharmaceutical Finance Company B.V.
196. Teva Pharmaceutical Finance Company LLC
197. Teva Pharmaceutical Finance IV B.V.
198. Teva Pharmaceutical Finance IV, LLC
199. Teva Pharmaceutical Finance Netherlands II B.V.
200. Teva Pharmaceutical Finance Netherlands III B.V.
201. Teva Pharmaceutical Finance Netherlands IV B.V.
202. Teva Pharmaceutical Finance V B.V.
203. Teva Pharmaceutical Finance V, LLC
204. Teva Pharmaceutical Finance VI, LLC
205. Teva Pharmaceutical Industries Ltd.
206. Teva Pharmaceutical Information Consulting (Shanghai) Co., Ltd.
207. Teva Pharmaceutical Investments Singapore Pte. Ltd
208. Teva Pharmaceutical R&D LP
209. TEVA Pharmaceutical Works Private Limited Company
210. Teva Pharmaceuticals Australia Pty Ltd
211. Teva Pharmaceuticals Colombia S.A.
212. Teva Pharmaceuticals CR, s.r.o.
213. Teva Pharmaceuticals Curacao N.V.
214. Teva Pharmaceuticals Europe B.V.
215. Teva Pharmaceuticals Finance Netherlands B.V.

216. Teva Pharmaceuticals International GmbH
217. TEVA Pharmaceuticals Mexico S.A. de C.V.
218. Teva Pharmaceuticals Panama, S.A
219. Teva Pharmaceuticals Polska spółka z
      ograniczoną odpowiedzialnością
220. Teva Pharmaceuticals S.R.L.
221. TEVA Pharmaceuticals Slovakia s.r.o.
222. Teva Pharmaceuticals USA, Inc.
223. Teva Pharmaceuticals, Inc.
224. Teva Puerto Rico LLC
225. Teva Respiratory, LLC
226. Teva Sales and Marketing, Inc.
227. Teva Santé SAS
228. Teva Sweden AB
229. Teva Takeda Pharma Ltd.
230. Teva Takeda Yakuhin Ltd.
231. Teva UK Holdings Limited
232. Teva UK Limited
233. TEVA Uruguay S.A.
234. Teva Women's Health, LLC
235. Tevamiri Limited
236. TEVAPHARM INDIA PRIVATE LTD.
237. TEVCO Incorporated
238. TPI U.S. Holdings, Inc.
239. Transpharm Logistik GmbH
240. UAB Teva Baltics
241. Valmed Pharmaceutical, Inc.
242. Watson Laboratories, Inc.
243. Watson Laboratories, Inc.
244. Watson Laboratories, LLC
245. Watson Management Corporation