## Walmart West Virginia State-Wide Opioid
## Settlement Agreement

**I.**     **OVERVIEW**

This Settlement Agreement dated as of September 20, 2022 sets forth the terms and conditions of a settlement between and among the State of West Virginia (defined herein) and Walmart (defined herein) (collectively, "the *Parties*") to resolve opioid-related Claims (defined herein) against Walmart.

Walmart has agreed to the below terms for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Walmart expressly denies. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Walmart. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

This Agreement resolves as to Walmart, among other things, the lawsuit captioned *State of West Virginia ex rel. Patrick Morrisey, Attorney General* v. *Walmart, Inc. f/k/a Wal-Mart Stores Inc.*, Civil Action No. 20-C-132 PNM (W. Va. Cir. Ct. Putnam County) (the "*West Virginia AG Action*"), pending within *In re: Opioid Litigation,* Civil Action No. 21-C-9000 (W. Va. Cir. Ct. Kanawha County), and Actions brought and/or claims possessed by Participating Local Governments (defined herein).

**II.**     **DEFINITIONS**

A.     "*Actions*" means the West Virginia AG Action and any lawsuit by a Local Government asserting any Released Claim against one or more Released Entities.

B.     "*Alleged Harms*" means the alleged past, present, and future financial, societal, and related expenditures arising out of the alleged misuse and abuse of opioid products, non-exclusive examples of which are described in the documents listed on Exhibit A, including those State or Local Government expenditures that have allegedly arisen as a result of the physical and bodily injuries sustained by individuals suffering from opioid-related addiction, abuse, death, and other related diseases and disorders, and that have allegedly been caused by Walmart.

C.     "*Agreement*" and "*Settlement Agreement*" mean this settlement agreement together with the Exhibits thereto.

D.     "*Bar*" means (1) a ruling by the highest court of the State setting forth the general principle that no Local Governments in the State may maintain Released Claims against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; (2) a law barring Local Governments in the State from maintaining or asserting Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is

1

exercised in full); or (3) a Settlement Class Resolution in the State with full force and effect.  For the avoidance of doubt, a law or ruling that is conditioned or predicated upon payment by a Released Entity (apart from payment of the Settlement Sum) shall not constitute a Bar.

E.     "*Case-Specific Resolution*" means either (1) a law barring specified Local Governments from maintaining Released Claims against Released Entities (either through a direct bar or through a grant of authority to release claims and that authority is exercised in full); or (2) a ruling by a court of competent jurisdiction over a particular Local Government that has the legal effect of barring the Local Government from maintaining any Released Claims at issue against Released Entities, whether on the ground of the Agreement (or the release in it) or otherwise; or (3) a release consistent with Section VII below.  For the avoidance of doubt, a law, ruling, or release that is considered or predicated upon a post-Effective Date payment by a Released Entity (apart from payment of the Settlement Sum) shall not constitute a Case-Specific Resolution.

F.     "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, abatement, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

G.     "*Class I Local Government*" means a Local Government that is a Class I city as that term is defined in W. Va. Code § 8-1-3(1).

H.     "*Class II Local Government*" means a Local Government that is a Class II city as that term is defined in W. Va. Code § 8-1-3(2).

I.     "*Class III Local Government*" means a Local Government that is a Class ID city as that term is defined in W. Va. Code § 8-1-3(3).

J.     "*Class IV Local Government*" means a Local Government that is a Class IV town or village as that term is defined in W. Va. Code § 8-1-3(4).

K.    "*Common Benefit Fund Commissioner*" means the Honorable Christopher C. Wilkes, acting with the authority granted to him pursuant to the Court's Order Authorizing Common Benefit Fund and Appointing Common Benefit Fund Commissioner, dated October 4, 2021 (Transaction ID 66985632), and the Court's Order Establishing Common Benefit Fund, dated November 4, 2021 (Transaction ID 67071292).

L.    "*Consent Judgment*" means a consent decree, order, judgment, or similar action; in connection with this Agreement, the Parties have agreed to the entry of the Consent Judgment attached hereto as Exhibit F, which provides for, among other things, the release set forth below, the Court's approval of the Litigation Cost Amount, the dismissal with prejudice of any Released Claims that the State has brought against Released Entities, and the dismissal with prejudice of all other Actions pending before the Court, on the terms and conditions specified herein.

M.    "*Counsel*" means a solo practitioner, multi-attorney law firm, or other legal representative of the State or a Local Government.

N.    "*Court*" means the panel overseeing the mass litigation proceeding captioned *In re Opioid Litigation,* Civil Action No. 21-C-9000 (W. Va. Cir. Ct. Kanawha County).

O.    "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) in any line of business arising from or relating in any way to a Product, including without limitation: (1) the distribution, dispensing, delivery, monitoring, reporting, supply, sale, prescribing, physical security, warehousing, health insurance or prescription-drug coverage, purchases, reimbursement, discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, or use or abuse of a Product; orders, prescriptions, formularies, guidelines, payments or rebates for a Product; policies, practices and/or operating procedures, statements, contracts, health or prescription drug insurance, health or prescription-drug claim administration, health or prescription-drug benefit administration, health or prescription-drug claim adjudication, health or prescription-drug plan design, data and sales thereof, and any other act or failure to act relating to a Product; and any system, plan, policy or advocacy relating to any Product; (2) the characteristics, properties, risks or benefits of any Product; (3) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders, prescriptions related to a Product; (4) the purchasing, selling, acquiring, disposing of, importing, exporting, handling, processing, packaging, supplying, distributing, converting, or otherwise engaging in any activity relating to a Product; and (5) controls against diversion, corresponding responsibility, and suspicious order monitoring related to any Product.  For avoidance of doubt, products other than

3

Products are not included in Covered Conduct.  This definition shall not preclude the Attorney General from bringing antitrust, overpricing, or kickback claims of general applicability, the allegations of which (i) include prescription pharmaceutical products generally and are not specific or limited to Products and (ii) do not in any way concern, relate to, or arise from the nature and characteristics of Products; the use, misuse, abuse or diversion of, or addiction to, Products and/or the potential thereof; any alleged oversupply of Products; the legality, legitimacy and/or appropriateness of any prescriptions for Products and/or the legality, legitimacy and/or appropriateness of any dispensing of Products; asserted violations of state or federal controlled substances laws; or any alleged direct or indirect effects or harms resulting from any of the above.

P.     "*Effective Date*" means the date on which Walmart makes the payment described in Section III.A.

Q.     "*Execution Date*" means the date on which this Agreement is executed by the last Party to do so.

R.     "*Finality*" means:

   1.     the Agreement and the Consent Judgment have been approved and entered by the Court as to Walmart, including the release of all Released Claims against Released Entities as provided in this Agreement; and

   2.     (a) the time for appeal or to seek review of or permission to appeal from such approval and entry has expired; or (b) in the event of an appeal, the appeal has been dismissed or denied, or the approval and entry described above have been affirmed in all material respects (to the extent challenged in the appeal) by the court of last resort to which such appeal has been taken and such dismissal or affirmance has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

S.     "*Global Settlement*" means any agreement resolving substantially all litigation and claims brought or threatened to be brought by multiple other states and political subdivisions against Walmart, including without limitation claims against Walmart in the multi-district litigation *In re: Nationwide Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio) and related state court prescription opiate litigation.

T.     "*Later Litigating Local Government*" means a Local Government (or Local Government official asserting the right of or for the Local Government to recover for Alleged Harms to the Local Government and/or the people thereof) that is not a Litigating Local Government as of the Execution Date and that files a lawsuit bringing a Released Claim against a Released Entity, or that adds such a claim to a pre-existing lawsuit, after the Execution Date.  It may also include a Litigating Local Government whose Claims were resolved by a judicial Bar or Case-Specific Resolution which is later revoked following the Execution Date, when such

4

Litigating Local Government takes any affirmative step in its lawsuit other than seeking a stay or removal.

U.  "*Litigating Local Government*" means a Local Government (or Local Government official asserting the right of or for the Local Government to recover for Alleged Harms to the Local Government and/or the people thereof) that brought any Released Claims against one or more Released Entities on or before the Execution Date that were not separately resolved prior to that date.  Exhibit B includes Litigating Local Governments identified by the Parties as of the Execution Date but is subject to amendment in the event it proves to be incomplete and other entities that satisfy the definition for "Litigating Local Governments" are subsequently identified.

V.  "*Litigation Cost Amount*" has the meaning specified in Section III.A below.

W.  "*Local Government*" means a formal and legally recognized sub-entity of the State that provides general governance for a defined area, including a county, city, town, village, or similar entity, as further described in W. Va. Code§§ 7-1-1 *et seq.*, and §§ 8-1-1 *et seq*. A list of Counties, and lists of Class I, II, III and IV Local Governments, are attached as Exhibit C. Historic, non-functioning sub-entities of the State are not Local Governments, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity. For the avoidance of doubt, "Local Government" does not include special districts or school boards.

X.  "*Non-Litigating Local Government*" means a Local Government that is neither a Litigating Local Government nor a Later Litigating Local Government.

Y.  "*Non-Participating Local Government*" means a Local Government that is not a Participating Local Government.

Z.  "*Participation Date*" means one hundred twenty (120) days after the Execution Date.

AA.  "*Participating Local Government*" means a Local Government that signs the Election and Release Form annexed as Exhibit D and meets the requirements for becoming a Participating Local Government under subsection VIII.A or VIII.C.

BB.  "*Plaintiff*" means the State of West Virginia, acting by and through its Attorney General.

CC.  "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance.  "Product" also includes: (1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and (2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or

5

dispensed to be used together that includes opioids or opiates.  For the avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates.  "Product" shall include, but is not limited to, any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, or any variant of these substances or any similar substance.

DD.     "*Qualified Settlement Fund*" means the West Virginia Qualified Settlement Fund contemplated by this Agreement, into which the Settlement Sum shall be paid and which shall be established under the authority and jurisdiction of the Court in accordance with the requirements of 26 C.F.R. § 1.468B-1.

EE.     "*Qualified Settlement Fund Administrator*" means the Administrator appointed to administer the Qualified Settlement Fund under the authority and jurisdiction of the Court.  The duties of the Qualified Settlement Fund Administrator shall be governed by this Agreement.  The identity of the Qualified Settlement Fund Administrator and a detailed description of the Qualified Settlement Fund Administrator's duties and responsibilities, including a detailed mechanism for paying the Qualified Settlement Fund Administrator's fees and costs, will be set forth in a separate document to be prepared by the Parties and filed with the Court to establish the fund and be attached later to this Agreement.

FF.     "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct and/or Alleged Harms occurring prior to the Effective Date.  Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Litigating Local Governments in any federal, state or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct and/or Alleged Harms, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by West Virginia or any of its Local Governments, or any Releasors (whether or not West Virginia or such Local Government or Releasor has brought such action or proceeding).  Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct.  The Parties intend that "Released Claims" be interpreted broadly.  This Agreement does not release Claims by private individuals.  While the State takes no position on the availability of such defenses, in any action arising from or relating to such Claims or the Covered Conduct, nothing in this Agreement either approves, disapproves, or disallows the Released Entities from asserting as a defense or otherwise arguing that the Remediation Amount required herein serves as partial or full relief for personal injuries or for other legal or equitable claims or demands asserted by private individuals or others.  It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law.  Released Claims is also used herein to describe Claims brought by a Later Litigating Local Government or other non-party Local

6

Government that would have been Released Claims if they had been brought by a Releasor against a Released Entity prior to the Execution Date.

GG.  "*Released Entities*" means Walmart and (1) all of Walmart's past and present direct or indirect parents, subsidiaries, affiliates, divisions, predecessors, successors, and assigns; (2) the past and present direct or indirect subsidiaries, affiliates, divisions, and joint ventures, of any of the foregoing; (3) all of Walmart's insurers (solely in their role as insurers of Walmart with respect to the Released Claims); (4) all of Walmart's, and all of the entities' described in subsection (1), past and present joint ventures (solely in their capacity as joint ventures of the entities described in subsection (1)); and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, joint venturers, trustees, agents, and employees of any of the foregoing (for actions that occurred during and related to their work for, or partnership or employment with, Walmart).  Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause with respect to Released Claims and shall not be a Released Entity with respect to its conduct in any other capacity.  An illustrative list of Released Entities is annexed to this Agreement as Exhibit H.

HH.  "*Releasors*" means (1) the State; (2) each Participating Local Government; and (3) without limitation and to the maximum extent of the power of the State's Attorney General and/or each Participating Local Government to release Claims, (a) the State's and each Participating Local Government's departments, agencies, divisions, boards, commissions, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, public service districts, unincorporated districts, water districts, law enforcement districts, emergency services districts, highway authorities, conservation districts, development authorities, reclamation districts, recreation districts, economic development authorities, housing authorities, sanitary districts, solid waste authorities, urban mass transportation authorities, and any other person or entity that performs services at the direction of the State and/or one or more Participating Local Governments, and (c) any person or entity acting in a *parens patriae*, sovereign, quasisovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State or Local Governments in the State, whether or not any of them participate in the Agreement.  The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Local Government.  In addition to being a Releasor as provided herein, a Participating Local Government shall also provide an Election and Release Form (in the form attached as Exhibit D to this Agreement) providing for a release to the fullest extent of the Participating Local Government's authority. The State's Attorney General represents that he or she has or has obtained the authority set forth in Section VII.F.

II.  "*Remediation Amount*" has the meaning specified in Section III.A below.

JJ.  "*Settlement Class Resolution*" means a class action resolution in a court of competent jurisdiction in the State with respect to a class of Local Governments in the State that (1) conforms with the State's statutes, case law, and/or rules of procedure regarding class actions; (2) is approved and entered as an order of a court of competent jurisdiction in the State and has achieved Finality; (3) is binding on all Non-Participating Local Governments in the State (other than opt outs as permitted under the next sentence); (4) provides that all such Non-Participating Local Governments may not bring Released Claims against Released Entities, whether on the ground of the Agreement (or the releases herein) or otherwise; and (5) does not impose any costs or obligations on Walmart other than those provided for in the Agreement, or contain any provision inconsistent with any provision of the Agreement.  If applicable State law requires that opt-out rights be afforded to members of the class, a class action resolution otherwise meeting the foregoing requirements shall qualify as a Settlement Class Resolution unless Local Governments collectively representing 1% or more of the State's population opt out.  In seeking certification of any Settlement Class, the State and applicable Local Governments shall make clear that certification is sought solely for settlement purposes and shall have no applicability beyond approval of the settlement for which certification is sought.  Nothing in this Agreement constitutes an admission by any Party that class certification would be appropriate for litigation purposes in any case.

KK.  "*Settlement Sum*" means the aggregate total sum to be paid pursuant to this Agreement by or on behalf of Walmart and all Released Entities as specified in Section III.A below.  Neither Walmart nor any Released Entities shall be called upon to make any payments pursuant to this Agreement in addition to the amount set forth in Section III.A below.

LL.  "*State*" means the State of West Virginia, including all of its executive departments, agencies, divisions, boards, commissions, instrumentalities and officers, including the Attorney General.

MM.  "*Walmart*" means Walmart, Inc. ("*Walmart*" or "*Defendant*").

## III.  <u>CONSIDERATION TO BE PROVIDED BY WALMART</u>

A.  *Monetary Payment.*  The Settlement Sum is $65,070,000, reflecting a substantial premium for the State given the unique facts and circumstances associated with the Actions, including without limitation the imminent trial date and the impact of opioid abuse and misuse in the State.  The Settlement Sum shall be inclusive of (1) the "*Litigation Cost Amount*" attributable to reimbursement of the State's and Participating Local Governments' reasonable attorney fees, costs, and expenses incurred through the Execution Date in connection with their Claims against Walmart in the Actions, and to be disbursed as provided in Section IX below; and (2) the "*Remediation Amount*" attributable to the Alleged Harms, which shall be

used to fund opioid abatement and treatment activities throughout the State and disbursed as provided in Section IV below.  For the avoidance of doubt, the Remediation Amount equals the aggregate amount paid or incurred by Walmart hereunder other than amounts that constitute the Litigation Cost Amount.  The Qualified Settlement Fund Administrator shall place the Litigation Cost Amount and the Remediation Amount into separate sub-funds within the Qualified Settlement Fund pending their disbursement as provided in this Settlement Agreement.  On or before the Participation Date, the State shall provide to Walmart Election and Release Forms (in the form annexed as Exhibit D) demonstrating that (1) at least 96% of the population of Litigating Local Governments, (2) at least 96% of Counties, and (3) at least 96% of the population of Non-Litigating Local Governments as of the Participation Date that are Class I or Class II Local Governments have become Participating Local Governments (collectively, the "*Participation Threshold*").  For the avoidance of doubt, the requirement that Walmart pay the Settlement Sum pursuant to this Agreement shall become binding only upon the State's provision to Walmart of Election and Release Forms demonstrating that it has met the Participation Threshold.

B.    *Timeline for Settlement Sum Allocation and Payment.*  Provided that the State has met the Participation Threshold, within three (3) business days of the earliest of either Walmart's receipt of Election and Release Forms demonstrating that the Participation Threshold has been met or the Participation Date, the Parties shall jointly file with the Court a request that the Court determine what portion of the Settlement Sum constitutes the Litigation Cost Amount.  If the Court has not issued an order regarding the portion of the Settlement Sum that constitutes the Litigation Cost Amount by February 13, 2023, the Parties will meet and confer and will agree by February 20, 2023 on an allocation as between the Remediation Amount and the Litigation Cost Amount, subject to revision by the Court.  If the Parties agree on an allocation as between the Remediation Amount and the Litigation Cost Amount and the Court later orders a different allocation as between the Remediation Amount and the Litigating Cost Amount, the State agrees to cooperate with Walmart in preparing any tax forms reasonably requested by Walmart, including but not limited those set out in Section XI.D.  Walmart shall, within fifteen (15) days after the occurrence of (1) the Participation Date; (2) the Court issuing a ruling determining what portion of the Settlement Sum constitutes the Litigation Cost Amount or an agreement by the Parties on such allocation, whichever comes first; (3) Walmart's receipt of Election and Release Forms demonstrating that the Participation Threshold has been met; and (4) the date the Qualified Settlement Fund has been established under the authority and jurisdiction of the Court and Walmart has received from the West Virginia Attorney General a W-9 and wire instructions for the Qualified Settlement Fund, pay into the Qualified Settlement Fund the total sum of $65,070,000 (the "*Settlement Sum*"), subject to the Withholding (as defined in Section III.C).

C.    *Withholding.*  Any Local Government that (1) does not sign an Election and Release Form by the Participation Date and that (2) has not had its Claims against Released Entities as defined herein extinguished by release, operation of law or released by

the State's Office of the Attorney General will be deemed a Non-Participating Local Government.  Walmart shall be entitled to withhold from the Settlement Sum, and shall have no obligation to pay, the amount corresponding to the aggregate payments that would have been payable to Non-Participating Local Governments as of the Participation Date as calculated in accordance with the West Virginia Intrastate Allocation Formula, annexed to this Agreement as Exhibit I (the "*Withholding*").

D.      *Consent Judgment.*  As soon as practicable following the Effective Date, Plaintiff shall file in the Court a proposed Consent Judgment substantially in the form of Exhibit F.  The Consent Judgment shall provide for the dismissal with prejudice, as to Walmart and all other Released Entities, of the West Virginia AG Action and the Actions of Participating Local Governments pending before the Court.  The Consent Judgment shall further provide that, notwithstanding the dismissal, the Court shall retain jurisdiction to (1) determine the allocation of the Litigation Cost Amount as provided in Section IX, and (2) enter an Amended Consent Judgment imposing injunctive terms that match but do not exceed the injunctive terms imposed in any executed Global Settlement, as set out in Section V.A.  The Parties shall confer and agree as to the final form and time of filing of the Consent Judgment and any amended Consent Judgment prior to its filing with the Court.

## IV.    INTRA-STATE ALLOCATION AND DISBURSEMENT OF REMEDIATION AMOUNT

A.      When the appropriate Orders are issued, the Qualified Settlement Fund Administrator shall allocate and distribute the Remediation Amount to the State and Participating Local Governments as provided in the Order of the Panel and the West Virginia First Memorandum of Understanding, attached as Exhibit E.  For the avoidance of doubt, the Qualified Settlement Fund Administrator shall not allocate or distribute any of the Remediation Amount to any Non-Participating Local Government.

B.      Walmart shall have no duty, liability, or influence of any kind with respect to the apportionment and use of the Remediation Amount.   Plaintiff specifically represents, however, that any such apportionment and use shall be made in accordance with this Agreement and all applicable laws, unless otherwise ordered by the Court.

## V.     INJUNCTIVE RELIEF

A.      The State and Walmart agree that the Consent Judgment shall provide that the Court shall retain jurisdiction to enter an Amended Consent Judgment imposing injunctive terms that match but do not exceed the injunctive terms imposed in any executed Global Settlement.  If there is no Global Settlement within one year of the Effective Date, then the State may elect within three years of the Effective Date and upon 90 days' notice to Walmart for the injunctive terms attached as Exhibit F to CVS's settlement agreement with the Florida Attorney General to apply instead.

## VI.   <u>CESSATION OF LITIGATION ACTIVITIES</u>

A.   It is the Parties' intent that any and all litigation activities in the Actions relating to Claims against Walmart shall immediately cease as of the Execution Date, and that Claims against Walmart shall not be included in the trial of any action against any other defendant. The State shall use best efforts to cause Litigating Local Governments to cease all activities in accordance with the foregoing understanding.

## VII.   <u>RELEASE AND DISMISSAL</u>

A.   *Scope*.  As of the Effective Date, (1) the Released Entities shall be, and hereby are, released and forever discharged from all of the Releasors' Released Claims, and (2) the State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) shall be deemed to have absolutely, unconditionally, and irrevocably released, discharged, waived, and covenanted not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for, any Released Claims against any Released Entity in any forum whatsoever.  The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any and all liability and expense arising from or relating in any way to the Released Claims and extend to the full extent of the power of the State, its Attorney General, and each Releasor to release claims.  The Release shall be, and is, a complete bar to any Released Claim.

B.   *Claim-Over and Non-Party Settlement*

1.   *Statement of Intent.*  It is the intent of the Parties that:

a.   Released Entities shall not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

b.   The payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity), and each Releasor expressly waives its right to seek reallocation to Walmart pursuant to W. Va. Code § 55-7-13C(d) of any amount that the Releasor is unable to collect from any other party held to be liable to the Releasor;

c.   Claims by Releasors against non-Parties shall not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.   It is expressly understood and agreed that the Parties have entered into this Agreement in good faith.  In accordance with the Supreme Court of Appeals of West Virginia's decisions in *Board of*

11

*Education of McDowell County v. Zando, Martin & Milstead, Inc.*,
182 W. Va. 597, 390 S.E.2d 796 (1990), and *Smith v.
Monongahela Power Co.*, 189 W. Va. 237, 429 S.E.2d 643 (1993),
it is the intent of the Releasors and the Released Entities that by
making this good faith settlement of a disputed matter, the
Released Entities are hereby relieved from any liability for
Covered Conduct of a non-Party under any theory, including on
the basis of contribution, indemnity or other claim-over (a "*Claim-
Over*").

e.   The provisions of this subsection VII.B are intended to be
implemented consistent with these principles.  This Agreement and
the releases and dismissals provided for herein are made in good
faith.

2.   *Contribution/Indemnity Prohibited.*   No Released Entity shall seek to
recover for amounts paid under this Agreement based on indemnification,
contribution, or any other theory from a manufacturer, pharmacy, hospital,
pharmacy benefit manager, health insurer, third-party vendor, trade
association, distributor, or health care practitioner, provided that a Released
Entity shall be relieved of this prohibition with respect to any entity that
asserts a Claim-Over against it.  For the avoidance of doubt, nothing herein
shall prohibit a Released Entity from recovering amounts owed pursuant to
insurance contracts.

3.   *Non-Party Settlement.*   To the extent that any Releasor enters into a Non-
Party Settlement involving or relating to Covered Conduct, including in any
bankruptcy case or through any plan of reorganization (whether
individually or as a class of creditors), the Releasor will include (or in the
case of a Non-Party Settlement made in connection with a bankruptcy case,
will cause the debtor to include) in the Non-Party Settlement, unless
prohibited from doing so under applicable law, a prohibition on contribution
or indemnity of any kind substantially equivalent to that required from
Walmart in subsection VII.B.2, or a release from such Non-Released Entity
in favor of the Released Entities (in a form equivalent to the releases
contained in this Agreement) of any Claim-Over.  The obligation to obtain
the prohibition and/or release required by this subsection is a material term
of this Agreement.

4.   *Claim-Over.*   In the event that any Releasor obtains a judgment with respect
to Non-Party Covered Conduct against a Non-Released Entity that does not
contain a prohibition like that in subsection VII.B.2, or any Releasor files a
Non-Party Covered Conduct Claim against a non-Released Entity in
bankruptcy or a Releasor is prevented for any reason from obtaining a
prohibition/release in a Non-Party Settlement as provided in subsection
VI.B.3, and such Non-Released Entity asserts a Claim-Over against a
Released Entity, Walmart and that Releasor shall meet and confer

12

concerning any additional appropriate means by which to ensure that the Released Entities are not required to make any payment with respect to Covered Conduct (beyond the amounts that will already have been paid by Walmart under this Settlement Agreement).

C.     *General Release.*  In connection with the releases provided for in the Agreement, the State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of the State or principle of common law which would exclude from the scope of the Released Claims any Claims that a Releasor does not know or suspect to exist in the Releasor's favor as of the Effective Date that, if known by the Releasor, would have materially affected the State's or any Participating Local Government's decision to provide the general release contemplated by this Section VII.C.  A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors) and each Participating Local Government (for itself and its Releasors) expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Local Governments' decision to participate in the Agreement.

D.     *Cooperation.*  Releasors (a) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (b) will cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

E.     *Res Judicata.*  Nothing in the Agreement shall be deemed to reduce the scope of the *res judicata* or claim preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

F.     *Representation and Warranty.*  The State's Attorney General expressly represents and warrants that it will, on or before the Participation Date, have (or have obtained) the authority to settle and release Claims of (1) the State, (2) all past and present executive departments, agencies, divisions, boards, commissions and instrumentalities of the State with the regulatory authority to enforce state and/or federal controlled substances acts, and (3) any of the State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation or suspension of a license to distribute or dispense controlled substances or to operate as a wholesale distributor or pharmacy.  For the purposes of clause (3) above,

executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor (including without limitation the West Virginia Board of Pharmacy, the West Virginia Board of Medicine, the West Virginia Department of Health and Human Resources, the West Virginia Office of Health Facility Licensure and Certification, the West Virginia Office of the Insurance Commissioner, and the West Virginia Public Employees Insurance Agency). Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

G.    *Effectiveness.*  The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the State, any Local Government, or any other Releasors.  Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the Settlement Sum or any portion thereof, or by the enactment of future laws, or by any seizure of the Settlement Sum or any portion thereof.

H.    *Non-Released Claims.*  Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims not related to Covered Conduct that are not asserted in any proceeding to be dismissed pursuant to the Agreement, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by individuals for damages for any alleged personal injuries arising out of their own use of a Product, and any Claims arising under the Agreement for enforcement of the Agreement.  While the State takes no position on the availability of such defenses, in any action arising from or relating to the Covered Conduct, the Released Entities may assert as a defense or otherwise argue that the Remediation Amount required herein serves as partial or full relief for personal injuries or for other legal or equitable claims or demands asserted by private individuals or others.

I.    *Dismissal of Actions.*  The State and Participating Local Governments with Actions pending before the Court as of the Effective Date shall have their Claims against Walmart and any other Released Entities dismissed as part of the Consent Judgment to be entered pursuant to Section III.D above.  Participating Local Governments with Actions pending in other courts as of the Effective Date shall dismiss (or if necessary move to dismiss) their Actions as to Walmart and any other Released Entities within seven (7) business days of the Effective Date.  All dismissals required by this Agreement shall be with prejudice and with each Party to bear its own costs.

## VIII.  PARTICIPATION BY LOCAL GOVERNMENTS

A.    *Requirements for Becoming a Participating Local Government: Litigating or Later Litigating Local Governments.*  A Litigating Local Government or Later Litigating Local Government may become a Participating Local Government prior to the Participation Date either by (1) executing an Election and Release Form (Exhibit

D); or (2) having its claims extinguished by operation of law or released by the State's Office of the Attorney General.

B.   *Notice.*  As soon as practicable after the announcement of the Agreement, Plaintiff shall send notice to all Local Governments in the State eligible to participate in the settlement and the requirements for participation.  Such notice may include publication, email, and other standard forms of notification.

C.   *Requirements for Becoming a Participating Local Government: Non-Litigating Local Governments.*  A Non-Litigating Local Government may become a Participating Local Government prior to the Participation Date either (1) by executing an Election and Release Form (Exhibit D) specifying (a) that the Local Government agrees to the terms of this Agreement pertaining to Participating Local Governments, (b) that the Local Government releases all Released Claims against all Released Entities, and (c) that the Local Government submits to the jurisdiction of the Court for purposes limited to the Court's role under the Agreement, or (2) by having their claims extinguished by operation of law or released by the State's Office of the Attorney General.

D.   *Representation With Respect to Local Government Participation.*  The State represents and warrants that it has a good faith belief that (a) all Litigating Local Governments, (b) all Counties, and (c) all Non-Litigating Local Governments that are Class I or II Local Governments, will become Participating Local Governments. The State acknowledges the materiality of the foregoing representation and warranty.  Further, the State will use its best efforts to secure participation by all Local Governments within the State, including all Litigating Local Governments and all Non-Litigating Local Governments.  To the extent any Local Governments do not become Participating Local Governments, the West Virginia Attorney General shall take all appropriate steps to resolve any remaining Claims by such Local Governments against Walmart, which may include seeking the enactment of a legislative Bar or pursuit of a Settlement Class Resolution.

E.   *Representation With Respect to State Abatement Claims.*  The State represents and warrants that the Remediation Amount being paid in this Agreement for Alleged Harms shall be used to fund opioid abatement and treatment activities throughout the State, and that the Settlement is intended to release any and all Claims for abatement within the State.  The State acknowledges the materiality of the foregoing representation and warranty.

F.   *Representation With Respect to Claims by Later Litigating Local Governments.* The State represents and warrants that, if any Later Litigating Local Government brings any Released Claim(s) against any Released Entity after the Execution Date, the State will take appropriate steps to cease the litigation as soon as reasonably possible.  Depending on facts and circumstances, such steps may include intervening in the Action to move to dismiss or otherwise terminate the Later Litigating Local Government's Claims as to the Released Entities in the Action, commencing a declaratory judgment or other action that establishes a Bar to the

Later Litigating Local Government's Claims as to the Released Entities, or other means.

G.     Non-Participating Local Governments shall be ineligible to receive any portion of the Settlement Sum.

H.     Concurrently with Plaintiff's submission of the Consent Judgment per Section III.D above, the Parties will jointly ask the Court to enter the Case Management Order annexed hereto as Exhibit G, which is applicable only to Non-Participating Local Governments and Later Litigating Local Governments.

## IX.  ATTORNEY FEES, COSTS AND EXPENSES; DISBURSEMENT OF LITIGATION COST AMOUNT

A.     Counsel for any Participating Local Government may submit applications to the Common Benefit Fund Commissioner seeking an allocation from the Litigation Cost Amount for reasonable attorney fees, costs and/or expenses, if any, including MDL Participation Fees, incurred by it prior to the Execution Date in connection with the Actions against Walmart.  The State may submit applications to the Common Benefit Fund Commissioner or may otherwise petition the Court for an award of reasonable attorney fees, costs and/or expenses to be paid from the Litigation Cost Amount.

B.     The Parties recognize that the goal of this Agreement is one hundred percent (100%) participation by Local Governments.  In determining the allocation among Counsel of the Common Benefit Fund, the Common Benefit Fund Commissioner shall consider such factors as whether the Counsel and his or her clients have contributed to increasing (or reducing) the payments awarded to the State through participation and whether the Counsel represents any Non-Participating Local Governments and/or any Later Litigating Local Governments.  It is the Parties' expectation and intent that no portion of the Litigation Cost Amount will be distributed to Counsel for attorney fees, costs and/or expenses incurred in connection with the representation of any Non-Participating Local Government and/or any Later Litigating Local Governments, and the State agrees that it will not take any positions to the contrary before the Court, except to the extent it is part of the consideration of Common Benefit fees or cost.

C.     The Common Benefit Fund Commissioner shall recommend, subject to the Court's review upon request, an allocation of the Litigation Cost Amount among the various Counsel who submitted applications in accordance with Section IX.A.  Such allocations shall be subject to the limitations and conditions set forth in this Agreement, the provisions of the West Virginia First Memorandum of Understanding, West Virginia law, and the Orders of the Court.  Any objections to the Common Benefit Fund Commissioner's recommended allocation shall be resolved by the Court.

D.    Notwithstanding provisions herein, an attorney may include any work done or time spent on the implementation of, or in furtherance of completion of, this Settlement Agreement prior to or after the Effective Date in a fee request or application. In the event the total amount of fees, costs, and expenses awarded pursuant to this Section IX is less than the Litigation Cost Amount, the remainder shall be added to the Remediation Amount and distributed as provided in this Agreement and the West Virginia First Memorandum of Understanding.

E.    For the avoidance of doubt, nothing in this Section IX shall require any payment by Walmart beyond the Settlement Sum, nor shall Walmart have any responsibility or authority regarding the allocation of the Litigation Cost Amount, except that the Common Benefit Fund Commissioner and/or the Court may receive information from Walmart as to (1) the identity of Participating, Non-Participating, Litigating, Later Litigating, and Non-Litigating Local Governments, and (2) such other information as Walmart may voluntarily elect to provide.

F.    The Litigation Cost Amount is intended to compensate Counsel for the State and Participating Local Governments for reasonable attorney fees, costs and/or expenses, if any, including MDL Participation Fees paid on behalf of Participating Local Governments, incurred by them prior to the Execution Date in connection with the Actions against Walmart, whether those Actions were filed in state or federal court.

G.    No portion of the Litigation Cost Amount may be allocated on the basis of attorney fees, costs, or expenses incurred (1) after the Execution Date, (2) in connection with the representation of Non-Participating Local Governments, or non-governmental persons or entities, or (3) in connection with Claims against persons or entities other than the Released Entities.

H.    To be eligible for any award from the Litigation Cost Amount, Counsel must certify each of the following in an application submitted pursuant to this Section IX:

1.    The fees, costs, and/or expenses sought are for work performed or costs or expenses incurred by such Counsel before the Execution Date in connection with representing the State and/or one or more Participating Local Government(s) in connection with Claims against Walmart concerning the Covered Conduct.

2.    No portion of the fees, costs, or expenses sought is for work performed or costs or expenses incurred in connection with representing a Non-Participating Local Government.

3.    Counsel will accept the allocation awarded by the Court and will not seek the payment of fees, costs, or expenses from any Participating Local Government in connection with this Settlement or the Released Claims.

17

4.      Counsel will not assert, and instead expressly waives, any right to collect a contingency fee from any Participating Local Government related to the payments made by Walmart.

5.      Counsel has notified each West Virginia Local Government represented by such Counsel of the amount(s) sought in the application.

6.      Counsel has no present intent to represent or participate in the representation of any Later Litigating Local Government or any Releasor with respect to Released Claims against Released Entities.

7.      Counsel will not charge or accept any referral fees for any Released Claims brought against Released Entities.

8.      Counsel will not engage in any advertising or solicitation related to Released Claims against Released Entities.

9.      Counsel does not have a Claim for fees, costs or expenses related to a Later Litigating Local Government, except any Common Benefit Fee as allowed by Court Order.

10.     Counsel believes the Settlement Agreement to be fair and has made and will make best efforts to recommend that each of his or her Local Government clients become Participating Local Governments.

11.     Counsel submits to the jurisdiction of the Court for purposes of the application, knowingly and expressly agrees to be bound by the determination of the Court with respect to allocation of the Litigation Cost Amount, and waives the ability to appeal that determination.

I.      If it is later determined that any certification made in support of an application pursuant to this Section IX is false, Counsel that submitted the application shall promptly repay to the Qualified Settlement Fund all amounts previously paid to that Counsel from the Litigation Cost Amount.  Any such forfeited amount shall be added to the Remediation Amount and distributed as provided in this Agreement and the West Virginia First Memorandum of Understanding.

## X.      ENFORCEMENT AND DISPUTE RESOLUTION

A.      This Agreement shall only be enforceable by Walmart and the State.

B.      If either the State or Walmart believes the other is not in compliance with any term of this Agreement, then that Party shall (1) provide written notice to the other Party specifying the reason(s) why it believes the other is not in compliance with the Agreement; and (2) allow the other Party at least thirty (30) days to attempt to cure such alleged non-compliance (the "*Cure Period*").  In the event the alleged non-compliance is cured within the Cure Period, the other Party shall not have any liability for such alleged non-compliance.  In the event of a dispute regarding

whether a Party has cured its non-compliance within the Cure Period, Walmart and the State shall meet and confer within thirty (30) days after the conclusion of the Cure Period to attempt to resolve the dispute.  If the dispute is not resolved, the Parties may bring an action to enforce the terms of the Agreement in Court.  The Parties consent to the jurisdiction of the Court for the limited purpose of resolution of disputes identified in this Section X.

## XI.    **MISCELLANEOUS**

A.    *No Admission of Liability.*  The Parties intend the Settlement as described herein to be a final and complete resolution of all disputes between Walmart and Plaintiff and between the Released Entities and all Releasors.  Walmart is entering into this Settlement Agreement solely for the purposes of settlement and to resolve the West Virginia AG Action, all Actions and Released Claims and thereby avoid significant expense, inconvenience and uncertainty.  Walmart denies the allegations in the West Virginia AG Action and the other Actions and denies any civil or criminal liability in the West Virginia AG Action and the other Actions.  Nothing contained herein may be taken as or deemed to be an admission or concession by Walmart of: (1) any violation of any law, regulation, or ordinance; (2) any fault, liability, or wrongdoing; (3) the strength or weakness of any Claim or defense or allegation made in the West Virginia AG Action, in any other Action, or in any other past, present or future proceeding relating to any Covered Conduct; or (4) any other matter of fact or law.  Nothing in this Settlement Agreement shall be construed or used to prohibit any Released Entity from engaging in the manufacture, marketing, licensing, distribution, dispensing, or sale of branded or generic opioid medications or any other Product in accordance with applicable laws and regulations.

B.    *Use of Agreement as Evidence.*  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement: (1) is or may be deemed to be or may be used as an admission or evidence relating to any matter of fact or law alleged in the West Virginia AG Action or the other Actions, the strength or weakness of any Claim or defense or allegation made in those cases, or any wrongdoing, fault, or liability of any Released Entities; or (2) is or may be deemed to be or may be used as an admission or evidence relating to any liability, fault or omission of Released Entities in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal.  Neither this Agreement nor any act performed or document executed pursuant to or in furtherance of this Agreement shall be admissible in any proceeding for any purpose, except to enforce the terms of the Agreement, and except that Released Entities may file this Agreement in any action or proceeding (1) involving a determination regarding insurance coverage, (2) involving a determination of the taxable income or tax liability of any Released Entities; (3) in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good-faith settlement, judgment bar or reduction or on any other theory of claim preclusion or issue preclusion or similar defense or counterclaim; (4) to support a claim for contribution and/or indemnification; or (5) to support any other argument or defense by a Released Entity that the Settlement Agreement provides

19

full or partial compensation for asserted harms or otherwise satisfies the relief sought.

C.  *Voluntary Settlement.*  This Settlement Agreement was negotiated in good faith and at arm's-length over several months, and the exchange of the Remediation Amount and Litigation Cost Amount for the releases set forth herein is agreed to represent appropriate and fair consideration.

D.  *Nature of Payment.*  Each of the Parties acknowledges, agrees, and understands that the State and Participating Local Governments sought restitution and remediation within the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i), (ii) as damages for the Alleged Harms allegedly suffered by the State and Participating Local Governments.  Each of the Parties acknowledges, agrees, and understands that the Remediation Amount is no greater than the amount, in the aggregate, of the harms allegedly suffered by the State and Participating Local Governments.  Each of the Parties acknowledges, agrees, and understands that it is its intention that, for purposes of Section 162(f) of the Internal Revenue Code, the entirety of the Remediation Amount paid by Walmart constitutes restitution and remediation for damage or harm allegedly caused by Walmart in order to restore, in whole or in part, the State, Participating Local Governments, and persons to the same position or condition that they would be in had the State, Participating Local Governments, and persons not suffered the Alleged Harms, and constitutes restitution and remediation for damage or harm allegedly caused by the potential violation of a law and/or is an amount paid to come into compliance with the law.  For the avoidance of doubt, "restitution" as used herein has the meaning of 26 U.S.C. § 162(f)(2)(A) and 26 C.F.R. § 1.162-21(e)(4)(i), (ii); "restitution" as used herein does not refer to the disgorgement of ill-gotten gains.  The Parties acknowledge, agree, and understand that no portion of the Remediation Amount represents the disgorgement of any allegedly ill-gotten gains.  The Parties acknowledge, agree, and understand that only the Litigation Cost Amount represents reimbursement to the State, any Participating Local Government or other person or entity for the costs of any investigation or litigation; that no portion of the Remediation Amount represents reimbursement to the State, any Participating Local Government or any other person or entity for the costs of any investigation or litigation; and that no portion of the Remediation Amount represents or should properly be characterized as the payment of fines, penalties, punitive damages, or any damages relating to intentional injury.  The State and Participating Local Governments acknowledge, agree and understand that Walmart intends to allocate the cost of the Remediation Amount among the Released Entities using a reasonable basis.  The State shall complete and file, on behalf of the State and every Participating Local Government, Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the Agreement becomes binding, as described in Paragraph III.A of the Agreement.  On the Form 1098-F, the State shall identify the Remediation Amount as restitution/remediation amounts and shall furnish Copy B of such Form 1098-F to Walmart.  Alternatively, if reasonably requested by Walmart, the State and every Participating Local Government shall each complete

and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the Agreement becomes binding, as described in Paragraph III.A of the Agreement. On the Form 1098-F, the State and each Participating Local Government shall identify the Remediation Amount as restitution/remediation amounts and shall furnish Copy B of such Form 1098-F to Walmart.  Neither Walmart nor the State makes any warranty or representation as to the tax consequences of the Remediation Amount or the Litigation Cost Amount or any portion thereof.

E.    *Federal, State and Local Laws Prevail.*   Nothing in this Agreement shall be construed to authorize or require any action by Walmart in violation of applicable federal, state, or other laws.

F.    *No Third-Party Beneficiaries.*   Except as to Released Entities, nothing in this Settlement Agreement is intended to or shall confer upon any third party any legal or equitable right, benefit or remedy of any nature whatsoever.

G.    *Binding Agreement.*   This Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto and to the Released Entities.

H.    *Choice of Law.*   Any dispute arising from or in connection with this Settlement Agreement shall be governed by West Virginia law without regard to its choice-of-law provisions.

I.    *No Conflict Intended.*   The headings used in this Agreement are intended for the convenience of the reader only and shall not affect the meaning or interpretation of this Agreement.  The definitions contained in this Agreement or any Exhibit hereto are applicable to the singular as well as the plural forms of such terms.

J.    *No Party Deemed to be the Drafter.*   None of the Parties hereto shall be deemed to be the drafter of this Agreement or any provision hereof for the purpose of any statute, case law or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.

K.    *Modification.*   This Agreement may only be modified by a written agreement of the Parties or, in the case of the Consent Judgment, by court proceedings resulting in a modified judgment of the Court.  For purposes of modifying this Agreement or the Consent Judgment, Walmart may contact the West Virginia Attorney General for purposes of coordinating this process.  Modifications must be in writing to be enforceable.

L.    *Waiver.*   Any failure by any Party to this Agreement to insist upon the strict performance by any other Party of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement, and such Party, notwithstanding such failure, shall have the right thereafter to insist upon the specific performance of any and all of the provisions of this Agreement.

M.    *Entire Agreement.*  This Agreement represents the full and complete terms of the settlement entered into by the Parties hereto.  In any action undertaken by the Parties, no prior versions of this Agreement and no prior versions of any of its terms may be introduced for any purpose whatsoever.

N.    *Counterparts.*  This Agreement may be executed in counterparts, and a facsimile or pdf signature shall be deemed to be, and shall have the same force and effect as, an original signature.

O.    *Severability.*  In the event any one or more immaterial provisions of this Settlement Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Settlement Agreement.  Material provisions are those in Sections III, V, VII, and VIII of this Agreement.

P.    *Notice.*  All notices under this Agreement shall be provided to the following via email and Overnight Mail:

> *Walmart*:
>
> Karen Roberts
> Executive Vice President and General Counsel
> Walmart, Inc.
> 702 S.W. 8th Street
> Bentonville, AR 72716
> Karen.Roberts@walmartlegal.com
>
> *Copy to Walmart's attorneys*:
>
> David W. Ogden
> Charles C. Speth
> Wilmer Cutler Pickering Hale and Dorr LLP
> 1875 Pennsylvania Avenue, NW
> Washington, DC 20006
> David.Ogden@wilmerhale.com
> Charles.Speth@wilmerhale.com
>
> *For the State*:
>
> Vaughn T. Sizemore
> Deputy Attorney General
> Office of the Attorney General
> P.O. Box 1789
> Charleston, WV 25326
> vaughn.t.sizemore@wvago.gov
>
> Abby G. Cunningham
> Assistant Attorney General

Office of the Attorney General
P.O. Box 1789
Charleston, WV 25326
abby.g.cunningham@wvago.gov

**APPROVED:**

Date: 9-20-2022

Date: 9-20-2022

WALMART

By: _____
    Name: Charles Speth
    Title:  WilmerHale, Counsel for Walmart

THE STATE OF WEST VIRGINIA

By: _____
    Name: Patrick Morrisey
    Title: Attorney General

23

**APPROVED:**

WALMART

Date: 9/23/2022 _____

By: _Robert C Balfe_____
    Name:
    Title:

## Exhibit A

## Alleged Harms

The following expert reports that were filed in connection with the case captioned *In re Opioid Litigation,* Civil Action No. 21-C-9000 (W. Va. Cir. Ct. Kanawha County) provide non-exclusive examples of Alleged Harms:

1. Expert report of Dr. G. Caleb Alexander dated December 9, 2021.

2. Expert report of Dr. R. Corey Waller dated June 3, 2022.

3. Expert Report of David T. Courtwright, Ph.D. dated June 6, 2022.

4. Expert report of Professor David Cutler dated June 6, 2022.

5. Expert report of Dr. Rahul Gupta dated June 6, 2022 ("State's Adoption of the August 25, 2021 Disclosure and Report of Dr. Rahul Gupta").

6. Expert report of Dr. Katherine Keyes dated June 6, 2022 ("State's Adoption of the December 10, 2021 Report of Katherine Keyes, PhD").

7. Expert Report of Gordon Smith, MB, ChB (MD equivalent), MPH dated June 6, 2022.

**Exhibit B**

**LIST OF LITIGATING LOCAL GOVERNMENTS AS OF THE
EXECUTION DATE**

*List is subject to amendment in the event it proves to be incomplete and other entities that
satisfy the definition for "Litigating Local Governments" are subsequently identified.*

Addison a/k/a Webster Springs
Barbour County
Barboursville
Beckley
Belington
Berkeley County
Brooke County
Buckhannon
Cabell County
Calhoun County
Ceredo
Chapmanville
Charles Town
Charleston
Charleston
Clarksburg
Clay County
Clendenin
County Commission of Mineral County
County Commission of Monroe County
Delbarton
Doddridge County
Dunbar
Eleanor
Elizabeth
Fairmont
Fayette County
Fort Gay
Gauley Bridge
Gilbert
Glenville
Grafton
Granville
Greenbrier County
Hamlin
Hancock County
Hardy County
Harrison County
Harrisville

Huntington
Huntington
Huntington
Hurricane
Jackson County
Jefferson County
Junior
Kanawha County
Kenova
Kenova
Kermit
Lewis County
Lincoln County
Logan
Logan County
Man
Marion County
Marshall County
Mason County
Matewan
McDowell County
Mercer County
Milton
Mingo County
Monongalia County
Montgomery
Moundsville
Mullens
Nicholas County
Oceana
Ohio County
Parkersburg
Philippi
Pleasants County
Point Pleasant
Preston County
Princeton
Quinwood
Rainelle
Raleigh County
Randolph County
Ravenswood
Richwood
Ripley
Ritchie County
Roane County

Rupert
Saint Albans
Smithers
Sophia
Spencer
St. Mary's
Summersville
Taylor County
The County Commission of Grant County
Tucker County
Tyler County
Upshur County
Vienna
Wayne County
Webster County
Weirton
Welch
West Hamlin
Wetzel County
White Sulphur Springs
Williamson
Williamstown
Winfield
Wirt County
Wood County

## Exhibit C

**LIST OF WEST VIRGINIA COUNTIES, CITIES, TOWNS AND VILLAGES**

**<u>Counties</u>**

Barbour County
Berkeley County
Boone County
Braxton County
Brooke County
Cabell County
Calhoun County
Clay County
Doddridge County
Fayette County
Gilmer County
Grant County
Greenbrier County
Hampshire County
Hancock County
Hardy County
Harrison County
Jackson County
Jefferson County
Kanawha County
Lewis County
Lincoln County
Logan County
Marion County
Marshall County
Mason County
McDowell County
Mercer County
Mineral County
Mingo County
Monongalia County
Monroe County
Morgan County
Nicholas County
Ohio County
Pendleton County
Pleasants County
Pocahontas County
Preston County
Putnam County
Randolph County

Raleigh County
Ritchie County
Roane County
Summers County
Taylor County
Tucker County
Tyler County
Upshur County
Wayne County
Webster County
Wetzel County
Wirt County
Wood County
Wyoming County

**Class II Cities**

Beckley
Charleston
Clarksburg
Fairmont
Huntington
Martinsburg
Morgantown
Parkersburg
South Charleston
St. Albans
Vienna
Weirton
Wheeling

**Class III Cities**

Bethlehem
Bluefield
Bridgeport
Buckhannon
Charles Town
Chester
Dunbar
Elkins
Fayetteville
Follansbee
Grafton
Hinton
Hurricane
Kenova

Keyser
Kingwood
Lewisburg
Madison
Milton
Moorefield
Moundsville
New Martinsville
Nitro
Oak Hill
Paden City
Petersburg
Philippi
Pleasant Valley
Point Pleasant
Princeton
Ranson
Ravenswood
Ripley
Shinnston
Spencer
Summersville
Welch
Wellsburg
Weston
Westover
White Sulphur Springs
Williamson
Winfield

**<u>Class IV Towns and Villages</u>**
Addison (Webster Springs)
Albright
Alderson
Anawalt
Anmoore
Ansted
Athens
Auburn
Bancroft
Barrackville
Bath (Berkeley Springs)
Bayard
Beech Bottom
Belington
Belle

Belmont
Benwood
Bethany
Beverly
Blacksville
Bolivar
Bradshaw
Bramwell
Brandonville
Bruceton Mills
Buffalo
Burnsville
Cairo
Camden-On-Gauley
Cameron
Capon Bridge
Carpendale
Cedar Grove
Ceredo
Chapmanville
Chesapeake
Clay
Clearview
Clendenin
Cowen
Danville
Davis
Davy
Delbarton
Durbin
East Bank
Eleanor
Elizabeth
Elk Garden E
Ellenboro
Fairview
Falling Spring (Renick)
Farmington
Flatwoods
Flemington
Fort Gay
Franklin
Friendly
Gary
Gassaway
Gauley Bridge

Gilbert
Glasgow
Glen Dale
Glenville
Grant Town
Grantsville
Granville
Hambleton
Hamlin
Handley
Harman
Harpers Ferry
Harrisville
Hartford City
Hedgesville
Henderson
Hendricks
Hillsboro
Hundred
Huttonsville
Iaeger
Jane Lew
Junior
Kermit
Keystone
Kimball
Leon
Lester
Logan
Lost Creek
Lumberport
Mabscott
Man
Mannington
Marlinton
Marmet
Mason
Masontown
Matewan
McMechen
Meadow Bridge
Middlebourne
Mill Creek
Mitchell Heights
Monongah
Montgomery

Montrose
Mount Hope
Mullens
New Cumberland
New Haven
Newburg
North Hills
Northfork
Nutter Fort
Oakvale
Oceana
Parsons
Paw Paw
Pax
Pennsboro
Peterstown
Piedmont
Pine Grove
Pineville
Poca
Pratt
Pullman
Quinwood
Rainelle
Reedsville
Reedy
Rhodell
Richwood
Ridgeley
Rivesville
Romney
Ronceverte
Rowlesburg
Rupert
Salem
Sand Fork
Shepherdstown
Sistersville
Smithers
Smithfield
Sophia
St. Marys
Star City
Stonewood
Sutton
Sylvester

Terra Alta
Thomas
Thurmond
Triadelphia
Tunnelton
Union
Valley Grove
War
Wardensville
Wayne
West Hamlin
West Liberty
West Logan
West Milford
West Union
White Hall
Whitesville
Williamstown
Windsor Heights
Womelsdorf (Coalton)
Worthington

**EXHIBIT D**

**WEST VIRGINIA LOCAL GOVERNMENT
ELECTION AND RELEASE FORM**

This Election and Release Form for West Virginia Participating Local Governments resolves opioid-related Claims against Walmart under the terms and conditions set forth in the Walmart West Virginia State-Wide Opioid Settlement Agreement executed on September [_], 2022 (the "Agreement"), the provisions of which are here incorporated by reference in their entirety.  Upon executing this Election and Release Form, a Participating Local Government agrees that, in exchange for the consideration described in the Agreement, the Participating Local Government is bound by all the terms and conditions of the Agreement.  By executing this Election and Release Form, the Participating Local Government submits to the jurisdiction of the panel overseeing the mass litigation proceeding captioned *In re: Opioid Litigation,* Civil Action No. 21-C-9000 (W. Va. Cir. Ct. Kanawha County) (the "Court").  To the extent the Participating Local Government has asserted Claims against Walmart in Actions that are pending before the Court, the Participating Local Government hereby grants all necessary right and authority to the West Virginia Attorney General to seek dismissal of the Participating Local Government's Action through the submission of the Consent Judgment as contemplated in the Agreement.  If a Participating Local Government's Action is pending in another court as of the Effective Date, the Participating Local Government hereby agrees to dismiss (or if necessary move to dismiss) that Action as to Walmart and any other Released Entities within seven (7) business days of the Effective Date.

Dated:_____

[WEST VIRGINIA LOCAL GOVERNMENT]


By:_____
[NAME, TITLE]
[ADDRESS]
[TELEPHONE]
[EMAIL ADDRESS]

**EXHIBIT E**

**West Virginia First Memorandum of Understanding**

**WEST VIRGINIA FIRST**
**MEMORANDUM OF UNDERSTANDING**

### General Principles

Whereas, the people of the State of West Virginia, its Local Governments and communities, have been harmed by misfeasance, nonfeasance and malfeasance committed by certain entities within the Pharmaceutical Supply Chain; and,

Whereas, certain Local Governments, through their elected representatives and counsel, and the State, through its Attorney General, are separately engaged in litigation seeking to hold Pharmaceutical Supply Chain Participants accountable for the public harms caused by their misfeasance, nonfeasance, and malfeasance; and

Whereas, the State, through its Attorney General, and its Local Governments share a common desire to abate and alleviate the impacts of that misfeasance, nonfeasance, and malfeasance throughout the State of West Virginia;

### Terms

The State and its Local Governments and communities, subject to the completion of formal documents effectuating the Parties' agreements, enter into this Memorandum of Understanding ("MOU") relating to the allocation and use of the proceeds of Settlements and Judgments described herein.

**A.      Definitions**

As used in this Memorandum of Understanding:

1.      "Approved Purpose(s)" shall mean evidence-based strategies, programming and/or services used to expand the availability of treatment for individuals affected by substance use disorders and/or addiction, to develop, promote and provide evidence-based substance use prevention strategies, to provide substance use avoidance and awareness education, to engage in enforcement to curtail the sale, distribution, promotion or use of opioids and other drugs, to decrease the oversupply of licit and illicit opioids and to support recovery from addiction to be performed by qualified providers as is further set forth in Exhibit A and Paragraph B(3) below.

2.      "Court" is the West Virginia Mass Litigation Panel.

3.      "Foundation Share" shall mean Opioid Funds allocated to the Foundation from any settlement or judgment.

4.  "Judgment" shall mean a final judgment or verdict in favor of any of the Parties in a judicial proceeding pending in either state or federal court (including Bankruptcy Court) which resolves legal or equitable claims regarding opioids against a Pharmaceutical Supply Chain Participant. Judgment shall not include any judgment on the claims of Cabell County and the City of Huntington which were previously tried in the United States District Court for the Southern District of West Virginia, or any judgment on any claims asserted by the State against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust laws, state criminal laws, or claims asserted pursuant to W. Va. Code § 9-7-6(c) or for Medicaid reimbursement.

5.  "Local Government(s)" shall mean all counties, cities, villages, and towns located within the geographic boundaries of the State.

6.  "Local Government Share" or "LG Share" shall mean Opioid Funds allocated directly to Local Governments from any settlement or judgment.

7.  "Regional Share Calculation" shall mean each Region's share of Opioid Funds which shall be calculated by summing the individual percentage shares of the Local Governments set forth in Exhibit C for all of the subdivisions in the entire Region as defined in Exhibit B.

8.  "Net Opioid Fund" is the Opioid Fund less the Opioid Seed Fund payment.

9.  "Opioid Funds" shall mean monetary amounts obtained through a Settlement or Judgment as defined in this Memorandum of Understanding.

10. "Pharmaceutical Supply Chain" shall mean the process and channels through which opioids are manufactured, marketed, promoted, distributed, or dispensed.

11. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, including but not limited to those persons or entities identified as Defendants in the matter captioned In re: Opioid Litigation, MDL 2804 pending in the United States District Court for the Northern District of Ohio, the proceedings before the West Virginia Mass Litigation Panel, styled In Re: Opioid Litigation, Civil Action No. 19-C-9000, and relates to conduct occurring prior to the date of this agreement. For the avoidance of doubt, the term Pharmaceutical Supply Chain Participant includes any parent or subsidiary company of any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, and any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution or dispensing of an opioid analgesic, that seeks or has sought protection under the United States Bankruptcy Code.

12.     "Settlement" shall mean the negotiated resolution by any of the Parties, of legal or equitable claims regarding opioids against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the Parties. It does not include the Settlements the State and/or the West Virginia Attorney General entered into with any Pharmaceutical Supply Chain Participant prior to December 1, 2021. For the avoidance of doubt McKinsey is included. Settlement shall not include the claims of Cabell County and the City of Huntington, which were previously tried in the United States District Court for the Southern District of West Virginia or settlement of any claims asserted by the State and/or the West Virginia Attorney General against a Pharmaceutical Supply Chain Participant arising under federal or state antitrust laws, state criminal laws, or claims asserted pursuant to W. Va. Code, § 9-7-6(c) or for Medicaid reimbursement.

13.     "State Share" shall mean Opioid Funds allocated to the State from any settlement or judgment.

14.     "The Parties" shall mean the State and the Local Governments.

15.     "Regions" shall mean the division of the Local Governments into six (6) separate areas as set forth in Exhibit B.

16.     "The State" shall mean the State of West Virginia acting through its Attorney General.

17.     "West Virginia Seed Fund" shall be funded as set forth in Paragraph B(2)(a). The funds are available for use in proper creation and documentation of the West Virginia Opioid Foundation and to fund their start-up work, and subsequent operation.

## B.     Settlement and Judgment Proceeds

1.     The Parties shall organize a private, nonstock, nonprofit corporation for the purposes of receiving and distributing West Virginia Opioid Funds as set forth in Section C. of this MOU ("Opioid Foundation").

2.     The Parties shall allocate all Opioid Funds as follows:

     a.     Subject to relevant approvals, the State shall pay into the West Virginia Seed Fund the $10,000,000 received from McKinsey & Company as a result of the February 3, 2021, consent judgment with the State.

     b.     All other Opioid Funds covered by the agreement shall be allocated as set forth below:

i.    24.5% of the Net Opioid Funds shall be allocated as LG Shares. These LG Shares shall be allocated amongst the Local Governments using the default percentages set forth in Exhibit C. Each county and its inclusive municipalities must either: (a) ratify the default allocation; (b) reach an agreement altering the default allocation; or (c) submit to binding arbitration before Judge Christopher Wilkes (WVMLP Special Master) whose decision will be final and non-app ealabl e.

ii.    The Foundation will receive 72.5% of the Net Opioid Funds ("Foundation Share").

iii.    The State shall receive 3% of the Net Opioid Funds ("State Share"), by and through the Attorney General, to be held in escrow for expenses incurred related to opioid litigation. If the 3% is not spent by December 31, 2026, then 1% goes to Local Governments and 2% goes to the Opioid Foundation.

3.    All Net Opioid Funds, regardless of allocation, shall be used in a manner consistent with the Approved Purposes definition. The LG Share may be used as restitution for past expenditures so long as the past expenditures were made for purposes that would have qualified or were consistent with the categories of Approved Purposes listed in Exhibit A. Prior to using any portion of the LG Share as restitution for past expenditures, a Local Government shall pass a resolution or take equivalent governmental action detailing and explaining its use of the funds for restitution. Moreover, up to one-half of the LG Share may be used to provide restitution for monies that were previously expended on opioid abatement activities, including law enforcement and regional jail fees.

4.    In the event a Local Government merges, dissolves, or ceases to exist, the relevant shares for that Local Government shall be redistributed equitably based on the composition of the successor Local Government. If a Local Government for any reason is excluded from a specific Settlement or Judgment, the allocation percentage for that Local Government shall be redistributed among the participating Local Governments for that Settlement or Judgment.

5.    If the LG Share is less than $500, then that amount will instead be distributed to the county in which the Local Government lies to allow practical application of the abatement remedy.

6.    Funds obtained that are unrelated to any Settlement or Judgment with a Pharmaceutical Supply Chain Participant, including those received via grant, bequest, gift, or the like, may be directed to the Opioid Foundation and disbursed as set forth below.

7.    The Foundation Share shall be used for the benefit of the people of West Virginia consistent with the by-laws of the Foundation documents and this MOU.

8. Nothing in this MOU alters or changes the Parties' rights to pursue their own claims in litigation, subject to Paragraph E. Rather, the intent of this MOU is to join the Parties together regarding the distribution of the proceeds of settlements with or judgements against Pharmaceutical Supply Chain Participants for the benefit of all West Virginians and ensure that settlement monies are spent consistent with the Approved Purposes set forth in Exhibit A.

9. Any settlement, judgment and/or other remedy arising out of *City of Huntington v. AmerisourceBergen Drug Corporation, et al.* (Civil Action No. 3:17-01362) and/or *Cabell County Commission v. AmerisourceBergen Drug Corporation, et al.* (Civil Action No. 3:17-01665) pending in the United States District Court for the Southern District of West Virginia (Faber, J.) ("CT2") is specifically excluded from this MOU.

## C. The Opioid Foundation

1. The Parties shall create a private section 501(c)(3) Opioid Foundation ("Foundation") with a governing board ("Board"), a panel of experts ("Expert Panel"), and such other regional entities as may be necessary for the purpose of receiving and disbursing Opioid Funds and other purposes as set forth both herein and in the documents establishing the Foundation. The Foundation will allow Local Governments to take advantage of economies of scale and will partner with the State to increase revenue streams.

2. Each Region shall create their own governance structure, ensuring that all Local Governments have input and equitable representation regarding regional decisions including representation on the board and selection of projects to be funded from the Regional Share Calculation. The Expert Panel may consult with and may make recommendations to Regions on projects, services and/or expenses to be funded. Regions shall have the responsibility to make decisions that will allocate funds to projects, services and/or expenses that will equitably serve the needs of the entire Region.

3. Board Composition

   The Board will consist of 11 members comprising representation as follows:

   a. To represent the interests of the State, five appointees of the governor, subject to confirmation by the Senate. The five appointees are intended to be limited to one from any given Region. If special circumstances are shown, this provision may be waived by a vote of four of the six Local Government members.

   b. To represent the interests of the Local Governments, six members, with one member selected from each Region. The Local Governments in each Region shall make the selection of the board member to represent their region.

4.      Board terms will be staggered three-year terms. Board members may be reappointed.

5.      Board members shall serve as fiduciaries of the Foundation separate and distinct from any representational capacity of the entity appointing the Board Member. Members of any regional governing structure shall likewise serve as fiduciaries of their Region separate and distinct from any representational capacity of the entity appointing the member.

6.      Members of the board should have expertise in a variety of disciplines, such as substance abuse treatment, mental health, law enforcement, pharmacology, finance, and healthcare policy and management. Drawing Board members from these disciplines will help to ensure that the Board will make appropriate and prudent investments in order to meet short-term and long-term goals.

7.      Six members of the Board shall constitute a quorum. Members of the Board may participate in meetings by telephone or video conference or may select a designee to attend and vote if the Board member is unavailable to attend a board meeting.

8.      The Foundation shall have an Executive Director appointed by the Attorney General after consultation with the Board. The Board may reject the Attorney General's selection of the Executive Director only on the affirmative vote of eight members of the board. The Executive Director shall have at least six years' experience in healthcare, finance and management and will be responsible for the management, organization, and preservation of the public/private partnership's records. The Executive Director may be removed by the Board upon the concurrence of the votes of three-fourths of the members of the Board. The Executive Director shall have the right to attend all Board meetings unless otherwise excused but shall vote only in the event of a tie.

9.      The Board shall appoint the Expert Panel. The Expert Panel should include experts in the fields of substance abuse treatment, mental health, law enforcement, pharmacology, finance, and healthcare policy and management. The purpose of the Expert Panel is to assist the Board in making decisions about strategies for abating the opioid epidemic in local communities around the state. The Executive Director and any member of the Board shall have the right to attend all meetings of the Expert Panel.

10.     The governance of the Board and the criteria to be established for disbursement of funds shall be guided by the recognition that expenditures should insure the efficient and effective abatement of the opioid epidemic, the enforcement of laws to curb the use of opioids, and the prevention of future addiction and substance misuse based upon an intensity and needs basis. All expenditures must be consistent with the categories of Approved Purposes as set forth in Exhibit A hereto.

11.     Disbursement of Foundation Share by the Board

    a.     The Foundation Board shall develop and approve procedures for the disbursement of Opioid Funds of the Foundation consistent with this Memorandum of Understanding.

    b.     Funds for statewide programs, innovation, research, and education may also be expended by the Foundation from the Foundation Share, from the State Share (as directed by the State), or from sources other than Opioid Funds as provided below.

    c.     The Foundation shall spend 20% of its annual budget in the six regions during the Foundation's first seven years of funding to be divided according to each Region's fixed Regional Share Calculation. After seven years, all regional spending will be as set forth in Section 11(d), below. Regions may, after consulting with the Expert Panel, expend the sums received under this Section 11(c) for any Approved Purposes.

    d.     After the Regional Shares are distributed as set forth in Section 11(c), the Disbursement of Funds from the Foundation Share approved for disbursement by the Board for Approved Purposes shall be disbursed based on an evidence-based evaluation of need after consultation with the Expert Panel. The Parties do not intend to require any specific regional allocation of the Foundation Share other than those distributed pursuant to Paragraph 11(c).

    e.     Regions may collaborate with other Regions to submit joint proposals.

    f.     The proposed procedures shall set forth the role of the Expert Panel in advising the Regions and the Board concerning disbursements of Opioid Funds of the Foundation as set forth in this MOU.

    g.     Within 90 days of the first receipt of any Opioid Funds and annually thereafter, the Board, after receiving counsel from its investment advisors and Expert Panel, shall determine the amount and timing of Foundation funds to be distributed annually. In making this determination, the Board shall consider: (a) Pending requests for Opioid Funds from communities, entities, or regions; (b) the total Opioid Funds available; (c) the timing of anticipated receipts of future Opioid Funds; (d) non-Opioid funds received by the Foundation; (e) investment income; and (f) long-term financial viability of the Foundation. The Foundation may disburse its principal and interest with the aim towards an efficient, expeditious abatement of the Opioid crisis considering long term and short-term strategies.

12.     The Foundation, Expert Panel, and any other entities under the supervision of the Foundation, including the Regions, shall operate in a transparent manner. Meetings

should be open. All operations of the Foundation and all Foundation supervised entities, including the Regions, shall be subject to audit and review by the Attorney General and/or other appropriate State officials.

13. Each Local Government shall submit an annual financial report to the Foundation no later than April 30 of each year specifying the amounts spent on Approved Purposes within the Region during the previous fiscal year. A report for each Region shall be prepared no later than thirty days thereafter. Each Region's report shall incorporate the information disclosed in each Local Government's annual report generated pursuant to Section B(4), above. Each Region's report shall specify (i) the amount of Opioid Funds received, (ii) the amount of Opioid Funds disbursed or applied during the previous fiscal year, broken down by categories of Approved Uses (indicating the name of the recipient, the amount awarded, a description of the use of the award, and disbursement terms), and (iii) impact information measuring or describing the progress of the Approved Use strategies.

14. The Foundation shall publish a consolidated report detailing annual financial expenditures within 15 days of the last day of the state fiscal year covered by the report.

15. The Foundation shall consult with a professional investment advisor to adopt a Foundation investment policy that will seek to assure that the Foundation's investments are appropriate, prudent, and consistent with best practices for investments of public funds. The investment policy shall be designed to meet the Foundation's long and short-term goals.

16. The Foundation and any Foundation supervised entity may receive funds including stocks, bonds, real property, government grants, private-sector donations, and cash in addition to the proceeds of the Litigation. These Non-Opioid additional funds shall be subject only to the limitations, if any, contained in the individual award, grant, donation, gift, bequest, or deposit consistent with the mission of the Foundation.

## D. Payment of Attorneys' Fees and Litigation Expenses

Payment of all Attorneys' Fees and Litigation Expenses shall be awarded consistent with the orders of the Court and upon recommendation of Judge Christopher Wilkes (WVMLP Special Master). Such award shall be final and non-appealable.

## E. Authority to Negotiate and Announcing Resolution of Claims

1. The Court has established three case tracks.

    a. Manufacturers and Pharmacy claims are to be coordinated by the office of Attorney General Morrisey and his designated counsel. The Attorney General shall retain the authority over resolution of those claims after

consultation and coordination with Local Governments subject to Court approval.

    b.    The Distributor Claims are to be coordinated by Co-Lead Counsel Paul Farrell, Jr. and Robert Fitzsimmons. The Co-Leads shall retain the authority over resolution of those claims after consultation and coordination with Local Governments and their counsel and the Attorney General and his designated counsel.

2.    If there is any resolution of any claim before the Court, it will be announced and presented to the Court jointly by the Attorney General and the Local Governments for Approval.

## F. Amendments

The Parties agree to make such amendments as necessary to implement the general principles of this MOU.

## EXHIBIT A

### SCHEDULE A - CORE STRATEGIES

The Parties shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies (**"Core Strategies).**[1]

**A. <u>NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES</u>**

    1.    Expand training for first responders, schools, community support groups and families; and

    2.    Increase distribution to individuals who are uninsured or whose insurance does not cover the needed services.

**B. <u>MEDICATION-ASSISTED TREATMENT ("MAT") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT</u>**

    1.    Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

    2.    Provide education to school-based and youth-focused programs that discourage or prevent misuse;

    3.    Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

    4.    Treatment and Recovery Support Services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

**C.    <u>PREGNANT & POSTPARTUM WOMEN</u>**

    1.    Expand Screening, Brief Intervention, and Referral to Treatment ("SBIRT") services to non-Medicaid eligible or uninsured pregnant women;

    2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for women and co-occurring Opioid Use Disorder ("OUD") and other substance Use Disorder ("SUD")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established by the Opioid Abatement Foundation.

3.     Provide comprehensive wrap-around services to individuals with Opioid Use Disorder (OUD) including housing, transportation, job placement/training, and childcare.

**D.**     **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME**

1.     Expand comprehensive evidence-based treatment and recovery support for NAS babies;

2.     Expand services for better continuation of care with infant-need dyad; and

3.     Expand long-term treatment and services for medical monitoring of NAS babies and their families.

**E.**     **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

1.     Expand services such as on-call teams to begin MAT in hospital emergency departments;

2.     Expand warm hand-off services to transition to recovery services;

3.     Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

4.     Provide comprehensive wrap-around services to individuals in recovery including housing, transportation, job placement/training, and childcare; and

5.     Hire additional social workers or other behavioral health workers to facilitate expansion above.

**F.**     **TREATMENT FOR INCARCERATED POPULATION**

1.     Provide evidence-based treatment and recovery support including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.     Increase funding for jails to provide treatment to inmates with OUD.

**G.**     **PREVENTION PROGRAMS**

1.     Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.     Funding for evidence-based prevention programs in schools;

Exhibit A - 2

3.  Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.  Funding for community drug disposal programs; and

5.  Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

## H.  EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE.

## I.  LAW ENFORCEMENT

1.  Funding for law enforcement efforts to curtail the sale, distribution, promotion or use of opioids and other drugs to reduce the oversupply of licit and illicit opioids, including regional jail fees.

## J.  RESEARCH

Research to ameliorate the opioid epidemic and to identify new tools to reduce and address opioid addiction. Holistically seek to address the problem from a supply, demand, and educational perspective. Ensure tools exist to provide law enforcement with appropriate enforcement to address needs.

## SCHEDULE B - APPROVED USES

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:[2]

### PART ONE: TREATMENT

A.  **TREAT OPIOID USE DISORDER (OUD)**

1.  Support treatment of Opioid Use Disorder (OUD) and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2.  Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUB/MH conditions.

3.  Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4.  Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5.  Support intervention, treatment, and recovery services, offered by qualified professionals and service providers, including but not limited to faith-based organizations or peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6.  Treatment of trauma for individuals with OUD (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7.  Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

8.  Training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs. Priorities will be established by the Opioid Abatement Foundation.

Exhibit A - 4

specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

   Scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SLTD or mental health conditions, including but not limited to training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

11. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

12. Dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

13. Development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B. **SUPPORT PEOPLE IN TREATMENT AND RECOVERY**

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage and support non-profits, faith-based communities, and community coalitions to support, house, and train people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Training and development of procedures for government staff to appropriately interact with and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

Exhibit A - 6

C.  **CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)**

Provide connections to care for people who have - or are at risk of developing - OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.  Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OLTI treatment.

2.  Fund Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3.  Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Expand services such as on-call teams to begin MAT in hospital emergency departments.

6.  Training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10.  Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

Exhibit A - 7

11.    Expand warm hand-off services to transition to recovery services.

12.    Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13.    Develop and support best practices on addressing OUD in the workplace.

14.    Support assistance programs for health care providers with OUD.

15.    Engage and support non-profits and the faith-based community as a system to support outreach for treatment.

16.    Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

**D.**    **ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    a.    Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    b.    Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    c.    "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    d.    Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    e.    Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

      f.      Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2.      Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3.      Support treatment and recovery courts that provide evidence-based options for persons with OLTD and any co-occurring SUD/MH conditions.

4.      Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

5.      Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison, have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.      Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.      Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, case management, or other services offered in connection with any of the strategies described in this section.

**E.**      **ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome (NAS), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women — or women who could become pregnant — who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.    Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.    Training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.    Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.    Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

6.    Child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7.    Enhanced family supports and childcare services for parents with OUD and any co-occurring SUD/MH conditions.

8.    Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9.    Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including but not limited to parent skills training.

10.   Support for Children's Services — Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

PART TWO: PREVENTION

**F.    PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.    Fund medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain

Exhibit A - 10

from the U.S. Centers for Disease Control and Prevention, or other recognized Best Practice guidelines, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   a. Increase the number of prescribers using PDMPs;

   b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

   c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

**G.     PREVENT MISUSE OF OPIOIDS**

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Fund media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

Exhibit A - 11

4.      Drug take-back disposal or destruction programs.

5.      Fund community anti-drug coalitions that engage in drug prevention efforts.

6.      Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction — including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

7.      Engage and support non-profits and faith-based communities as systems to support prevention.

8.      Fund evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9.      School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10.     Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11.     Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12.     Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.    **PREVENT OVERDOSE DEATHS AND OTHER OPIOID-RELATED INJURIES**

Support efforts to prevent or reduce overdose deaths or other opioid-related injuries through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1.      Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, and community outreach workers, persons being released from jail or prison, or other members of the general public.

2.   Public health entities providing free naloxone to anyone in the community.

3.   Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4.   Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.   Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.   Public education relating to emergency responses to overdoses.

7.   Public education relating to immunity and Good Samaritan laws.

8.   Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.   Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

10.  Support mobile units that offer or provide referrals to treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

11.  Support screening for fentanyl in routine clinical toxicology testing.

### PART THREE: OTHER STRATEGIES

**I.    FIRST RESPONDERS**

In addition to items in Section C, D and H relating to first responders, support the following:

1.   Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2.   Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

**J.    LEADERSHIP, PLANNING AND COORDINATION**

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing negative outcomes related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2.  A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3.  Invest in infrastructure or staffing at government, law enforcement, or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of reducing the oversupply of opioids, preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4.  Provide resources to staff government oversight and management of opioid abatement programs.

## K.  TRAINING

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1.  Provide funding for staff training or networking programs and services to improve the capability of government, law enforcement, community, and not-for-profit entities to abate the opioid crisis.

2.  Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

## L.  RESEARCH

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations including individuals entering the criminal justice system, including but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring (ADAM) system.

8. Qualitative and quantitative research regarding public health risks within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.

## M.   LAW ENFORCEMENT

Ensure appropriate resources for law enforcement to engage in enforcement and possess adequate equipment, tools, and manpower to address complexity of the opioid problem.

Exhibit A - 15

# EXHIBIT B.
# OPIOID REGIONAL MAP



**Region 1**
Brooke, Hancock, Ohio Marshall and Wetzel Counties

**Region 2**
Grant, Hampshire, Hardy, Mineral, Berkeley, Jefferson, Pendleton and Morgan Counties

**Region 3**
Wood, Tyler, Pleasants, Ritchie, Wirt, Calhoun, Roane, and Jackson Counties

**Region 4**
Monongalia, Braxton, Lewis Harrison, Marion, Preston, Taylor, Tucker, Barbour, Randolph, Gilmer, Doddridge and Upshur Counties

**Region 5**
Cabell, Clay, Boone, Kanawha, Lincoln, Logan, Putnam, Mason, Mingo, and Wayne Counties

**Region 6**
Fayette, Monroe, Raleigh, Summers, Nicholas, Webster, Greenbrier, Pocahontas, Mercer, Wyoming, and McDowell Counties

Exhibit C (Allocations to Subdivisions)

Allocation to West Virginia Counties and Municipalities (NOT Including Cabell County and Huntington)

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0191% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0037% |
| ANAWALT TOWN | MCDOWELL | 0.0008% |
| ANMOORE TOWN | HARRISON | 0.0083% |
| ANSTED TOWN | FAYETTE | 0.0024% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0002% |
| BARBOUR COUNTY | BARBOUR | 0.3900% |
| BARBOURSVILLE VILLAGE | CABELL | 0.4372% |
| BARRACKVILLE TOWN | MARION | 0.0016% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0068% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.7259% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0355% |
| BELLE TOWN | KANAWHA | 0.0411% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0076% |
| BERKELEY COUNTY | BERKELEY | 3.5839% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0020% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVILLE TOWN | MONONGALIA | 0.0003% |
| BLUEFIELD CITY | MERCER | 0.1794% |
| BOLIVAR TOWN | JEFFERSON | 0.0058% |
| BOONE COUNTY | BOONE | 3.1744% |
| BRADSHAW TOWN | MCDOWELL | 0.0012% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.5244% |
| BRIDGEPORT CITY | HARRISON | 0.0761% |
| BROOKE COUNTY | BROOKE | 1.0924% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1667% |
| BUFFALO TOWN | PUTNAM | 0.0009% |
| BURNSVILLE TOWN | BRAXTON | 0.0029% |
| CABELL COUNTY | CABELL | 0.0000% |

Revised 9/29/2020

1 /

7

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1767% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0003% |
| CAMERON CITY | MARSHALL | 0.0021% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0024% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0008% |
| CEREDO CITY | WAYNE | 0.1678% |
| CHAPMANVI LLE TOWN | LOGAN | 0.1592% |
| CHARLES TOWN CITY | JEFFERSON | 0.2924% |
| CHARLESTON CITY | KANAWHA | 6.7218% |
| CHESAPEAKE TOWN | KANAWHA | 0.0180% |
| CHESTER CITY | HANCOCK | 0.0077% |
| CLARKSBURG CITY | HARRISON | 1.1365% |
| CLAY COUNTY | CLAY | 0.3373% |
| CLAY TOWN | CLAY | 0.0001% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0257% |
| COWEN TOWN | WEBSTER | 0.0012% |
| DANVILLE TOWN | BOONE | 0.0012% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0006% |
| DELBARTON TOWN | MINGO | 0.0517% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2312% |
| DUNBAR CITY | KANAWHA | 0.2917% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0144% |
| ELIZABETH TOWN | WIRT | 0.0048% |
| ELK GARDEN TOWN | MINERAL | 0.0007% |
| ELKINS CITY | RANDOLPH | 0.0321% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAI RMONT CITY | MARION | 0.6852% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.6411% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1828% |
| FLATWOODS TOWN | BRAXTON | 0.0007% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0123% |
| FORT GAY TOWN | WAYNE | 0.0324% |
| FRANKLIN TOWN | PENDLETON | 0.0014% |
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0012% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| GASSAWAY TOWN | BRAXTON | 0.0024% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0531% |
| GILBERT TOWN | MINGO | 0.0728% |
| GILMER COUNTY | GILMER | 0.1919% |
| GLASGOW TOWN | KANAWHA | 0.0016% |
| GLEN DALE CITY | MARSHALL | 0.0050% |
| GLENVILLE TOWN | GILMER | 0.0169% |
| GRAFTON CITY | TAYLOR | 0.4640% |
| GRANT COUNTY | GRANT | 0.3394% |
| GRANT TOWN TOWN | MARION | 0.0109% |
| GRANTSVILLE TOWN | CALHOUN | 0.0012% |
| GRANVILLE TOWN | MONONGALIA | 0.1649% |
| GREENBRIER COUNTY | GREENBRIER | 1.4386% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0703% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0869% |
| HANCOCK COUNTY | HANCOCK | 1.6106% |
| HANDLEY TOWN | KANAWHA | 0.0007% |
| HARDY COUNTY | HARDY | 0.2815% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0095% |
| HARRISON COUNTY | HARRISON | 1.3251% |
| HARRISVILLE TOWN | RITCHIE | 0.0045% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.4106% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 0.0000% |
| HURRICANE CITY | PUTNAM | 0.2140% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0006% |
| JACKSON COUNTY | JACKSON | 0.8319% |
| JANE LEW TOWN | LEWIS | 0.0010% |
| JEFFERSON COUNTY | JEFFERSON | 1.7496% |
| JUNIOR TOWN | BARBOUR | 0.0036% |
| KANAWHA COUNTY | KANAWHA | 3.6016% |
| KENOVA CITY | WAYNE | 0.2064% |
| KERMIT TOWN | MINGO | 0.0294% |
| KEYSER CITY | MINERAL | 0.0078% |
| KEYSTONE CITY | MCDOWELL | 0.0018% |
| KIMBALL TOWN | MCDOWELL | 0.0020% |
| KINGWOOD CITY | PRESTON | 0.0046% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0310% |
| LEWIS COUNTY | LEWIS | 0.4053% |
| LEWISBURG CITY | GREENBRIER | 0.3917% |
| LINCOLN COUNTY | LINCOLN | 1.3818% |
| LOGAN CITY | LOGAN | 0.4429% |
| LOGAN COUNTY | LOGAN | 3.7315% |
| LOST CREEK TOWN | HARRISON | 0.0001% |
| LUMBERPORT TOWN | HARRISON | 0.0027% |
| MABSCOTT TOWN | RALEIGH | 0.0512% |
| MADISON CITY | BOONE | 0.0578% |
| MAN TOWN | LOGAN | 0.0025% |
| MANNINGTON CITY | MARION | 0.0030% |
| MARION COUNTY | MARION | 1.0540% |
| MARLINTON TOWN | POCAHONTAS | 0.0009% |
| MARMET CITY | KANAWHA | 0.0061% |
| MARSHALL COUNTY | MARSHALL | 0.8648% |
| MARTINSBURG CITY | BERKELEY | 3.5343% |
| MASON COUNTY | MASON | 1.3496% |
| MASON TOWN | MASON | 0.0028% |
| MASONTOWN TOWN | PRESTON | 0.0008% |
| MATEWAN TOWN | MINGO | 0.0718% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 3.2036% |
| MCMECHEN CITY | MARSHALL | 0.0079% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0005% |
| MERCER COUNTY | MERCER | 0.3738% |
| MIDDLEBOURNE TOWN | TYLER | 0.0003% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1485% |
| MINERAL COUNTY | MINERAL | 0.8526% |
| MINGO COUNTY | MINGO | 2.9452% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0028% |
| MONONGALIA COUNTY | MONONGALIA | 1.4987% |
| MONROE COUNTY | MONROE | 0.5766% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.1004% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0092% |
| MORGAN COUNTY | MORGAN | 0.7095% |
| MORGANTOWN CITY | MONONGALIA | 0.1330% |
| MOUNDSVILLE CITY | MARSHALL | 0.3175% |
| MOUNT HOPE CITY | FAYETTE | 0.0918% |
| MULLENS CITY | WYOMING | 0.3675% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0034% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
| --- | --- | --- |
| NEW HAVEN TOWN | MASON | 0.0057% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0019% |
| NEWBURG TOWN | PRESTON | 0.0012% |
| NICHOLAS COUNTY | NICHOLAS | 0.2115% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2710% |
| NORTH HILLS TOWN | WOOD | 0.0016% |
| NORTHFORK TOWN | MCDOWELL | 0.0006% |
| NUTTER FORT TOWN | HARRISON | 0.1025% |
| OAK HILL CITY | FAYETTE | 0.3993% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.3269% |
| OHIO COUNTY | OHIO | 0.5595% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0073% |
| PARKERSBURG CITY | WOOD | 1.7126% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0019% |
| PAX TOWN | FAYETTE | 0.0083% |
| PENDLETON COUNTY | PENDLETON | 0.1789% |
| PENNSBORO CITY | RITCHIE | 0.0004% |
| PETERSBURG CITY | GRANT | 0.0012% |
| PETERSTOWN TOWN | MONROE | 0.0014% |
| PHILIPPI CITY | BARBOUR | 0.0919% |
| PIEDMONT TOWN | MINERAL | 0.0007% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1284% |
| PLEASANT VALLEY CITY | MARION | 0.0011% |
| PLEASANTS COUNTY | PLEASANTS | 0.1406% |
| POCA TOWN | PUTNAM | 0.0003% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3759% |
| POINT PLEASANT CITY | MASON | 0.1406% |
| PRATT TOWN | KANAWHA | 0.0014% |
| PRESTON COUNTY | PRESTON | 0.8811% |
| PRINCETON CITY | MERCER | 4.6088% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.7741% |
| QUINWOOD TOWN | GREENBRIER | 0.0182% |
| RAINELLE TOWN | GREENBRIER | 0.0266% |
| RALEIGH COUNTY | RALEIGH | 5.5343% |
| RANDOLPH COUNTY | RANDOLPH | 0.7294% |
| RANSON CORPORATION | JEFFERSON | 0.0234% |
| RAVENSWOOD CITY | JACKSON | 0.0959% |
| REEDSVILLE TOWN | PRESTON | 0.0007% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0014% |
| RICHWOOD CITY | NICHOLAS | 0.0103% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| RIDGELEY TOWN | MINERAL | 0.0027% |
| RIPLEY CITY | JACKSON | 0.0921% |
| RITCHIE COUNTY | RITCHIE | 0.2018% |
| RIVESVILLE TOWN | MARION | 0.0010% |
| ROANE COUNTY | ROANE | 0.5653% |
| ROMNEY CITY | HAMPSHIRE | 0.0614% |
| RONCEVERTE CITY | GREENBRIER | 0.0960% |
| ROWLESBURG TOWN | PRESTON | 0.0024% |
| RUPERT TOWN | GREENBRIER | 0.0073% |
| SALEM CITY | HARRISON | 0.0042% |
| SAND FORK TOWN | GILMER | 0.0003% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0088% |
| SHINNSTON CITY | HARRISON | 0.1066% |
| SISTERSVILLE CITY | TYLER | 0.2085% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0383% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0409% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.9750% |
| SPENCER CITY | ROANE | 0.0646% |
| ST. ALBANS CITY | KANAWHA | 0.4843% |
| ST. MARYS CITY | PLEASANTS | 0.0623% |
| STAR CITY TOWN | MONONGALIA | 0.0414% |
| STONEWOOD CITY | HARRISON | 0.0478% |
| SUMMERS COUNTY | SUMMERS | 0.3559% |
| SUMMERSVILLE CITY | NICHOLAS | 1.6957% |
| SUTTON TOWN | BRAXTON | 0.0210% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0431% |
| TERRA ALTA TOWN | PRESTON | 0.0015% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1255% |
| TUNNELTON TOWN | PRESTON | 0.0006% |
| TYLER COUNTY | TYLER | 0.0204% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.5108% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2838% |
| WAR CITY | MCDOWELL | 0.0020% |
| WARDENSVILLE TOWN | HARDY | 0.0013% |
| WAYNE COUNTY | WAYNE | 2.3586% |
| WAYNE TOWN | WAYNE | 0.0356% |
| WEBSTER COUNTY | WEBSTER | 0.3765% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.3728% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| WELCH CITY | MCDOWELL | 0.1195% |
| WELLSBURG CITY | BROOKE | 0.0069% |
| WEST HAMLIN TOWN | LINCOLN | 0.0380% |
| WEST LIBERTY TOWN | OHIO | 0.0025% |
| WEST LOGAN TOWN | LOGAN | 0.0162% |
| WEST MILFORD TOWN | HARRISON | 0.0015% |
| WEST UNION TOWN | DODDRIDGE | 0.0007% |
| WESTON CITY | LEWIS | 0.0096% |
| WESTOVER CITY | MONONGALIA | 0.0094% |
| WETZEL COUNTY | WETZEL | 0.4889% |
| WHEELING CITY | OHIO/MARSHALL | 1.0692% |
| WHITE HALL TOWN | MARION | 0.0028% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1585% |
| WHITESVILLE TOWN | BOONE | 0.0148% |
| WILLIAMSON CITY | MINGO | 0.3916% |
| WILLIAMSTOWN CITY | WOOD | 0.0567% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WI NFIELD TOWN | PUTNAM | 0.0307% |
| WIRT COUNTY | WIRT | 0.1075% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0010% |
| WOOD COUNTY | WOOD | 1.0924% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 4.0024% |
| **Totals** | | **100.0000%** |

Exhibit C (Allocations to Subdivisions)

Allocation to West Virginia Counties and Municipalities (Including Cabell County and Huntington)

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0174% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0034% |
| ANAWALT TOWN | MCDOWELL | 0.0007% |
| ANMOORE TOWN | HARRISON | 0.0076% |
| ANSTED TOWN | FAYETTE | 0.0022% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0001% |
| BARBOUR COUNTY | BARBOUR | 0.3541% |
| BARBOURSVI LLE VILLAGE | CABELL | 0.3969% |
| BARRACKVILLE TOWN | MARION | 0.0015% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0062% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.3824% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0322% |
| BELLE TOWN | KANAWHA | 0.0373% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0070% |
| BERKELEY COUNTY | BERKELEY | 3.2534% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0018% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVILLE TOWN | MONONGALIA | 0.0002% |
| BLUEFIELD CITY | MERCER | 0.1629% |
| BOLIVAR TOWN | JEFFERSON | 0.0053% |
| BOONE COUNTY | BOONE | 2.8817% |
| BRADSHAW TOWN | MCDOWELL | 0.0011% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.4761% |
| BRIDGEPORT CITY | HARRISON | 0.0694% |
| BROOKE COUNTY | BROOKE | 0.9916% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1513% |
| BUFFALO TOWN | PUTNAM | 0.0008% |
| BURNSVI LLE TOWN | BRAXTON | 0.0026% |

Revised 9/29/2020

1 /

7

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| CABELL COUNTY | CABELL | 3.2406% |
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1604% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0002% |
| CAMERON CITY | MARSHALL | 0.0019% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0022% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0007% |
| CEREDO CITY | WAYNE | 0.1523% |
| CHAPMANVILLE TOWN | LOGAN | 0.1445% |
| CHARLES TOWN CITY | JEFFERSON | 0.2655% |
| CHARLESTON CITY | KANAWHA | 6.1020% |
| CHESAPEAKE TOWN | KANAWHA | 0.0163% |
| CHESTER CITY | HANCOCK | 0.0070% |
| CLARKSBURG CITY | HARRISON | 1.0317% |
| CLAY COUNTY | CLAY | 0.3062% |
| CLAY TOWN | CLAY | 0.0000% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0233% |
| COWEN TOWN | WEBSTER | 0.0011% |
| DANVILLE TOWN | BOONE | 0.0011% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0005% |
| DELBARTON TOWN | MINGO | 0.0469% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2099% |
| DUNBAR CITY | KANAWHA | 0.2648% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0131% |
| ELIZABETH TOWN | WIRT | 0.0043% |
| ELK GARDEN TOWN | MINERAL | 0.0006% |
| ELKINS CITY | RANDOLPH | 0.0293% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAIRMONT CITY | MARION | 0.6220% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.4898% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1659% |
| FLATWOODS TOWN | BRAXTON | 0.0006% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0112% |
| FORT GAY TOWN | WAYNE | 0.0294% |
| FRANKLIN TOWN | PENDLETON | 0.0013% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0011% |
| GASSAWAY TOWN | BRAXTON | 0.0022% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0482% |
| GILBERT TOWN | MINGO | 0.0661% |
| GILMER COUNTY | GILMER | 0.1742% |
| GLASGOW TOWN | KANAWHA | 0.0015% |
| GLEN DALE CITY | MARSHALL | 0.0045% |
| GLENVILLE TOWN | GILMER | 0.0153% |
| GRAFTON CITY | TAYLOR | 0.4212% |
| GRANT COUNTY | GRANT | 0.3081% |
| GRANT TOWN TOWN | MARION | 0.0099% |
| GRANTSVILLE TOWN | CALHOUN | 0.0011% |
| GRANVI LLE TOWN | MONONGALIA | 0.1497% |
| GREENBRIER COUNTY | GREENBRIER | 1.3059% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0638% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0793% |
| HANCOCK COUNTY | HANCOCK | 1.4621% |
| HANDLEY TOWN | KANAWHA | 0.0006% |
| HARDY COUNTY | HARDY | 0.2555% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0086% |
| HARRISON COUNTY | HARRISON | 1.2029% |
| HARRISVI LLE TOWN | RITCHIE | 0.0041% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.3727% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 5.9777% |
| HURRICANE CITY | PUTNAM | 0.1943% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0005% |
| JACKSON COUNTY | JACKSON | 0.7552% |
| JANE LEW TOWN | LEWIS | 0.0009% |
| JEFFERSON COUNTY | JEFFERSON | 1.5882% |
| JUNIOR TOWN | BARBOUR | 0.0032% |
| KANAWHA COUNTY | KANAWHA | 3.2694% |
| KENOVA CITY | WAYNE | 0.1874% |
| KERMIT TOWN | MINGO | 0.0267% |
| KEYSER CITY | MINERAL | 0.0072% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| KEYSTONE CITY | MCDOWELL | 0.0016% |
| KIMBALL TOWN | MCDOWELL | 0.0019% |
| KINGWOOD CITY | PRESTON | 0.0042% |
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0281% |
| LEWIS COUNTY | LEWIS | 0.3679% |
| LEWISBURG CITY | GREENBRIER | 0.3556% |
| LINCOLN COUNTY | LINCOLN | 1.2544% |
| LOGAN CITY | LOGAN | 0.4020% |
| LOGAN COUNTY | LOGAN | 3.3874% |
| LOST CREEK TOWN | HARRISON | 0.0000% |
| LUMBERPORT TOWN | HARRISON | 0.0025% |
| MABSCOTT TOWN | RALEIGH | 0.0465% |
| MADISON CITY | BOONE | 0.0525% |
| MAN TOWN | LOGAN | 0.0023% |
| MANNINGTON CITY | MARION | 0.0028% |
| MARION COUNTY | MARION | 0.9568% |
| MARLINTON TOWN | POCAHONTAS | 0.0008% |
| MARMET CITY | KANAWHA | 0.0055% |
| MARSHALL COUNTY | MARSHALL | 0.7851% |
| MARTINSBURG CITY | BERKELEY | 3.2084% |
| MASON COUNTY | MASON | 1.2251% |
| MASON TOWN | MASON | 0.0026% |
| MASONTOWN TOWN | PRESTON | 0.0007% |
| MATEWAN TOWN | MINGO | 0.0652% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 2.9082% |
| MCMECHEN CITY | MARSHALL | 0.0072% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0004% |
| MERCER COUNTY | MERCER | 0.3393% |
| MIDDLEBOURNE TOWN | TYLER | 0.0002% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1348% |
| MINERAL COUNTY | MINERAL | 0.7740% |
| MINGO COUNTY | MINGO | 2.6736% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0026% |
| MONONGALIA COUNTY | MONONGALIA | 1.3605% |
| MONROE COUNTY | MONROE | 0.5234% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.0912% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0084% |
| MORGAN COUNTY | MORGAN | 0.6441% |
| MORGANTOWN CITY | MONONGALIA | 0.1213% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| MOUNDSVILLE CITY | MARSHALL | 0.2882% |
| MOUNT HOPE CITY | FAYETTE | 0.0834% |
| MULLENS CITY | WYOMING | 0.3336% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0031% |
| NEW HAVEN TOWN | MASON | 0.0052% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0018% |
| NEWBURG TOWN | PRESTON | 0.0011% |
| NICHOLAS COUNTY | NICHOLAS | 0.1920% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2460% |
| NORTH HILLS TOWN | WOOD | 0.0015% |
| NORTHFORK TOWN | MCDOWELL | 0.0005% |
| NUTTER FORT TOWN | HARRISON | 0.0930% |
| OAK HILL CITY | FAYETTE | 0.3625% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.2967% |
| OHIO COUNTY | OHIO | 0.5079% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0067% |
| PARKERSBURG CITY | WOOD | 1.5547% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0017% |
| PAX TOWN | FAYETTE | 0.0076% |
| PENDLETON COUNTY | PENDLETON | 0.1624% |
| PENNSBORO CITY | RITCHIE | 0.0003% |
| PETERSBURG CITY | GRANT | 0.0011% |
| PETERSTOWN TOWN | MONROE | 0.0013% |
| PHILIPPI CITY | BARBOUR | 0.0834% |
| PIEDMONT TOWN | MINERAL | 0.0006% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1165% |
| PLEASANT VALLEY CITY | MARION | 0.0010% |
| PLEASANTS COUNTY | PLEASANTS | 0.1276% |
| POCA TOWN | PUTNAM | 0.0002% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3412% |
| POINT PLEASANT CITY | MASON | 0.1276% |
| PRATT TOWN | KANAWHA | 0.0013% |
| PRESTON COUNTY | PRESTON | 0.7999% |
| PRINCETON CITY | MERCER | 4.1839% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.6105% |
| QUINWOOD TOWN | GREENBRIER | 0.0165% |
| RAINELLE TOWN | GREENBRIER | 0.0241% |
| RALEIGH COUNTY | RALEIGH | 5.0240% |
| RANDOLPH COUNTY | RANDOLPH | 0.6622% |
| RANSON CORPORATION | JEFFERSON | 0.0214% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
| --- | --- | --- |
| RAVENSWOOD CITY | JACKSON | 0.0870% |
| REEDSVILLE TOWN | PRESTON | 0.0006% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0013% |
| RICHWOOD CITY | NICHOLAS | 0.0093% |
| RIDGELEY TOWN | MINERAL | 0.0024% |
| RIPLEY CITY | JACKSON | 0.0836% |
| RITCHIE COUNTY | RITCHIE | 0.1832% |
| RIVESVILLE TOWN | MARION | 0.0009% |
| ROANE COUNTY | ROANE | 0.5132% |
| ROMNEY CITY | HAMPSHIRE | 0.0557% |
| RONCEVERTE CITY | GREENBRIER | 0.0871% |
| ROWLESBURG TOWN | PRESTON | 0.0022% |
| RUPERT TOWN | GREENBRIER | 0.0066% |
| SALEM CITY | HARRISON | 0.0038% |
| SAND FORK TOWN | GILMER | 0.0002% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0080% |
| SHINNSTON CITY | HARRISON | 0.0968% |
| SISTERSVILLE CITY | TYLER | 0.1893% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0348% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0371% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.8851% |
| SPENCER CITY | ROANE | 0.0586% |
| ST. ALBANS CITY | KANAWHA | 0.4397% |
| ST. MARYS CITY | PLEASANTS | 0.0565% |
| STAR CITY TOWN | MONONGALIA | 0.0376% |
| STONEWOOD CITY | HARRISON | 0.0434% |
| SUMMERS COUNTY | SUMMERS | 0.3231% |
| SUMMERSVILLE CITY | NICHOLAS | 1.5393% |
| SUTTON TOWN | BRAXTON | 0.0191% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0391% |
| TERRA ALTA TOWN | PRESTON | 0.0014% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1140% |
| TUNNELTON TOWN | PRESTON | 0.0005% |
| TYLER COUNTY | TYLER | 0.0185% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.4637% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2577% |

Revised 9/29/2020

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| WAR CITY | MCDOWELL | 0.0018% |
| WARDENSVILLE TOWN | HARDY | 0.0012% |
| WAYNE COUNTY | WAYNE | 2.1411% |
| WAYNE TOWN | WAYNE | 0.0323% |
| WEBSTER COUNTY | WEBSTER | 0.3418% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.2462% |
| WELCH CITY | MCDOWELL | 0.1085% |
| WELLSBURG CITY | BROOKE | 0.0063% |
| WEST HAMLIN TOWN | LINCOLN | 0.0345% |
| WEST LIBERTY TOWN | OHIO | 0.0023% |
| WEST LOGAN TOWN | LOGAN | 0.0147% |
| WEST MILFORD TOWN | HARRISON | 0.0014% |
| WEST UNION TOWN | DODDRIDGE | 0.0006% |
| WESTON CITY | LEWIS | 0.0088% |
| WESTOVER CITY | MONONGALIA | 0.0086% |
| WETZEL COUNTY | WETZEL | 0.4438% |
| WHEELING CITY | OHIO/MARSHALL | 0.9706% |
| WHITE HALL TOWN | MARION | 0.0025% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1439% |
| WHITESVILLE TOWN | BOONE | 0.0134% |
| WILLIAMSON CITY | MINGO | 0.3555% |
| WILLIAMSTOWN CITY | WOOD | 0.0515% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WINFIELD TOWN | PUTNAM | 0.0279% |
| WIRT COUNTY | WIRT | 0.0976% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0009% |
| WOOD COUNTY | WOOD | 0.9917% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 3.6334% |

**Totals** — **100.0000%**

<u>**EXHIBIT F**</u>

**IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA**

**IN RE: OPIOID LITIGATION**              **CIVIL ACTION NO. 21-C-9000**

**THIS DOCUMENT APPLIES TO:**

STATE OF WEST VIRGINIA ex rel.
PATRICK MORRISEY, Attorney General,

         Plaintiff,

      v.                                        Civil Action No. 20-C-132 PNM

WALMART, Inc., f/k/a/ Wal-Mart Stores
Inc.,

        Defendant.

**<u>CONSENT JUDGMENT</u>**

Plaintiff, the State of West Virginia, ex rel. Patrick Morrisey, Attorney General

("Plaintiff"), brought the above-captioned action against Defendant Walmart Inc. ("Walmart"),

alleging, among other things, that Walmart violated West Virginia law by failing to monitor,

report, and not ship allegedly suspicious orders of opioid pain medications, filling prescriptions

for opioid pain medications that allegedly were suspicious or were not written for a legitimate

medical purpose, and by failing to implement effective controls and procedures to guard against

diversion of opioid pain medications; that the foregoing conduct caused a public nuisance in

West Virginia; and that Walmart violated the West Virginia Consumer Credit and Protection

Act, W. Va. Code §§ 46A-1-101 et seq. (the "West Virginia AG Action").

In addition, numerous governmental entities in West Virginia, including counties, cities,

towns and villages ("Local Governments") have brought separate lawsuits ("Actions") in various

forums against Walmart and certain of its affiliates, among others.  These Actions assert claims

that arise out of or relate to alleged conduct that is substantially similar to or overlaps with the conduct alleged in the West Virginia AG Action (the "Covered Conduct").

      Walmart denies the allegations in the West Virginia AG Action and other Actions and maintains that it has no liability whatsoever to Plaintiff or to any Local Government or other governmental entity (whether such governmental entity has brought or is a party to another Action or not).  Plaintiff and Walmart (the "Parties"), by their respective counsel, have agreed to a resolution of the West Virginia AG Action on terms set out in the Walmart West Virginia State-Wide Opioid Settlement Agreement ("Agreement," attached to this judgment), which include the entry of this Consent Judgment by the Court without trial or finding of admission or wrongdoing or liability of any kind.  Furthermore, under the Agreement, the West Virginia AG has agreed to obtain releases on behalf of Litigating Local Governments as well as Non-Litigating Local Governments as specified in the Agreement.  The intention of the Parties is to resolve and release all Claims of the West Virginia AG and Local Governments, whether asserted previously or in the future, that arise out of or relate to the Covered Conduct as specified in the Agreement.  Unless otherwise specified, capitalized terms used herein shall have the meanings specified in the Agreement.

      NOW THEREFORE, without trial or adjudication of any issue of fact or law presented in the West Virginia AG Action or the other Actions, without this Consent Judgment constituting evidence against or admission by anyone with respect to any issue of fact or law, and upon the Parties' consent, IT IS HEREBY ORDERED AS FOLLOWS:

## I.     PARTIES

      1.     Defendant Walmart is a Delaware corporation with its principal place of business in Arkansas.

2.      Plaintiff has the authority to act in the public interest and on behalf of the people of West Virginia.

## II.      JURISDICTION

3.      This Court has jurisdiction over the Parties and the subject matter of this action.

## III.      AGREEMENT

4.      The Parties have agreed to resolution of the West Virginia AG Action under the terms of their Agreement, which is attached hereto as Exhibit 1.  This Consent Judgment summarizes and gives effect to those terms.  In the event of a conflict between the terms of the Agreement and this summary document, the terms of the Agreement shall govern.

## IV.      FINANCIAL TERMS

5.      Pursuant to the terms of the Parties' Agreement, Walmart paid the sum of $[●] (the "Settlement Sum") into the Qualified Settlement Fund as specified in the Agreement, consisting of (1) a Remediation Amount to be allocated in accordance with the West Virginia First Memorandum of Understanding to fund opioid abatement and treatment activities throughout the State and (2) a Litigation Cost Amount to be available to reimburse the reasonable fees, costs and expenses incurred by the State and Litigating Local Governments (or their respective counsel) in connection with their Released Claims against Walmart in the Actions.  The Settlement Sum reflects a substantial premium for the State given the unique facts and circumstances associated with the Actions, including without limitation the imminent trial date and the impact of opioid abuse and misuse in the State.

6.      Through the entry of this Consent Judgment, the Court finds that the Settlement Sum was negotiated in good faith, is fair and is in the in the best interests of the State, the Local Governments and their respective citizens.

## V.      INJUNCTIVE TERMS

7.     The Parties' Agreement on injunctive terms is set forth in Section V of the Agreement.  The Parties agree that the Court shall retain jurisdiction to enter an Amended Consent Judgment imposing injunctive terms in accordance with the Agreement, and that the Parties shall confer and agree as to the final form and time of filing of such Amended Consent Judgment prior to its filing with the Court.  The Parties further agree that compliance with injunctive terms may be enforced in this Court consistent with the terms to be specified in the injunctive provisions set forth in the Amended Consent Judgment.

## VI.     RELEASES AND DISMISSAL WITH PREJUDICE

8.     Plaintiff and Walmart have agreed to the Release of certain claims as provided in Section VII of the Agreement.  Such releases are given in good faith and upon entry of this Consent Judgment shall be effective as to all Releasors (as defined in the Agreement).

9.     Plaintiff's Claims against Walmart are hereby DISMISSED WITH PREJUDICE, with each Party to bear its own costs except as specified in the Agreement.

10.     Further, as a condition precedent to the Agreement becoming Effective, all Participating Local Governments were required to execute an Election and Release Form (Exhibit D to the Agreement), through which those Participating Local Governments agreed to be bound by all terms and conditions of the Agreement, including but not limited to the Release of certain claims provided in Section VII of the Agreement.  Such Releases are given in good faith and upon entry of this Consent Judgment shall become effective (a) as to all Litigating Local Governments that have asserted Claims against Walmart as part of any Actions pending before the Court and (b) as to all Non-Litigating Local Governments that, as of the date of this Consent Judgment, have become Participating Local Governments pursuant to Section VIII of the Agreement.

11.     The Claims of all Litigating Local Governments that have been asserted against Walmart in Actions pending before this Court are hereby DISMISSED WITH PREJUDICE, with each party to bear its own costs except as specified in the Agreement.[1]

## VII.    MISCELLANEOUS

12.     This Court retains jurisdiction to enforce the terms of this Consent Judgment and any Amended Consent Judgment.  The Parties may jointly seek to modify the terms of this Consent Judgment, subject to the approval of this Court.  This Consent Judgment may be modified only by order of this Court.

13.     Entry of this Consent Judgment is in the public interest.

**IT IS SO ORDERED, ADJUDGED AND DECREED, this_ day of [INSERT MONTH] 2022.**


_____

JOINTLY APPROVED AND
SUBMITTED FOR ENTRY:

FOR STATE OF WEST VIRGINIA

PATRICK MORRISEY
ATTORNEY GENERAL

By: _____
    [to come]

Date: _____

COUNSEL FOR DEFENDANT WALMART INC.

By: _____
    [to come]

---

[1] Prior to finalizing and submitting the Consent Judgment to the Court, the Parties will agree upon, and attach as an exhibit to this Consent Judgment, a list of all Actions to be dismissed by the Court.

<u>**EXHIBIT G**</u>

<u>**T**HIS **D**OCUMENT **A**PPLIES TO **A**LL **C**ASES</u>

IN THE CIRCUIT COURT OF KANAWHA
COUNTY, WEST VIRGINIA

| | |
|---|---|
| IN RE:  OPIOID LITIGATION | CIVIL ACTION NO. 21-C-9000 |

<u>**CASE MANAGEMENT ORDER**</u>

This Case Management Order ("CMO") shall apply to all Non-Participating Litigating

Local Governments and future plaintiffs in this Mass Litigation proceeding (collectively,

"Plaintiffs").  As used herein, "Defendants" refers to Walmart Inc. as well as any other

"Released Entity" as that term is defined in the Walmart West Virginia State-Wide Opioid

Settlement Agreement dated September __, 2022 (the "Settlement Agreement").  As used herein,

"Non-Participating Litigating Local Governments" refers to Litigating Local Governments that

brought any "Released Claims," as that term is defined in the Settlement Agreement, against

Defendants, and have not elected to participate in the Settlement Agreement.

Good cause appearing, it is ordered as follows:

A.      <u>**Plaintiffs' Requirement, to Produce, Certain, Specified, Information, About**</u>
<u>**Their Claims**</u>

       1.      **Plaintiffs' Production Requirements.**  Each Plaintiff shall serve the

following documents and/or information upon counsel for Defendants within ninety (90) days of

the entry of this Order or, in the case of any Plaintiff that commences an action or is added as a

party to an existing action after the entry of this Order, within ninety (90) days of commencing or

being added to such action:

(a)    **Fact Sheet.**  Each Plaintiff shall serve upon the Defendants a completed copy of the Fact Sheet attached as Exhibit 1 to this Case Management Order.  The completed Fact Sheet shall include a Certification (in the form contained in Exhibit 1) in which the Plaintiff declares under penalty of perjury that all information provided in the Fact Sheet is complete, true and accurate and that the Plaintiff has provided all required documents and information.

(b)    **Record Production.**

(i)    Each Plaintiff shall produce all records establishing the existence of any alleged public nuisance within the Plaintiff's territory or borders, including a definition of the alleged nuisance and evidence to support its existence and scope.

(ii)    Each Plaintiff shall produce all records supporting any claim for "abatement" relief, including a categorization and itemization of any requested abatement relief, evidence to support each component of such relief, and the geographic area as to which such relief is requested.

(iii)    Each Plaintiff shall produce all records supporting any claim for damages, including a categorization and itemization of claimed damages and calculations and evidence for each component of such damages.  To the extent a Plaintiff argues that such alleged damages have already been incurred, the Plaintiff shall also specify whether the alleged amounts were paid or reimbursed through a grant, insurance, or other third-party source and provide records evidencing such payment or reimbursement.  To the extent the Plaintiff argues that such alleged damages will be incurred in the future, the Plaintiff shall produce all evidence supporting any allegation that future damages are likely to be incurred and the amounts in which Plaintiff contends

such alleged damages are likely to be incurred, and records reflecting whether such future alleged damage will be paid or reimbursed through a grant, insurance or other third party source.

(iv)     For any relief involving the expenditure of money, including expenditures for the provision of services, each Plaintiff shall specify the entities that have made or will make the expenditures, when and how long those entities have made or will make the expenditures, and the nature of the expenditures, including how they have addressed or will address any and all alleged harms.  Each Plaintiff shall produce all documents relied upon in identifying or calculating the claimed relief.

(v)     Each Plaintiff seeking any form of relief based directly or indirectly upon allegedly inappropriate prescriptions shall identify the specific prescriptions alleged to have been inappropriate, to whom and by whom the specific prescriptions alleged to have been inappropriate were written, the pharmacy(ies) that filled each specific prescription alleged to have been inappropriate, whether the Plaintiff was reimbursed for any or all of the specific prescriptions alleged to have been inappropriate, and the Plaintiff's basis for identifying the specific prescriptions alleged to have been inappropriate.

(c)     **Affidavit.**  An affidavit signed by each Plaintiff and its counsel (i) attesting that the Plaintiff has complied with all requirements of the Fact Sheet attached as Exhibit 1 to this Case Management Order; (ii) attesting that records have been collected in compliance with this CMO; and (iii) attesting that all records collected have been produced pursuant to this CMO.  If any of the documents or records described in this Section B do not exist, the signed affidavit by the Plaintiff and its counsel shall state that fact and the reasons, if known, why such materials do not exist.

(d) **Expert Reports.** Each Plaintiff shall serve on counsel for Defendants a case-specific expert report or reports executed by one or more qualified expert(s), under oath, and subject to the penalties of perjury (a "Case-Specific Expert Report"). Each Case-Specific Expert Report shall include all matter required to comply with West Virginia Rule of Civil Procedure 26, West Virginia law, and at least:

(i) Plaintiff's Information. The Plaintiff's name;

(ii) *Expert's Information.* The name, professional address, and curriculum vitae of the expert, including a list of all publications authored by the expert within the preceding ten (10) yeans, and the foundation for the expert's opinion in relation to the expert's professional experience;

(iii) *Records.* All records reviewed by the expert in preparation of the Case-Specific Expert Report;

(iv) *Reliance Materials.* All materials relied on by the expert in preparation of the Case-Specific Expert Report;

(v) *Locations.* If the Plaintiff is asserting a public nuisance claim, the location(s) where the Plaintiff alleges a public nuisance exists, including with specificity how Plaintiff has been affected by any alleged public nuisance and copies of documents relied upon, if any, as evidence of such alleged effect.

(vi) *Subjects of Report(s).* The Case-Specific Expert Report(s) must collectively include all matters on which the expert(s) intend to opine, including but not limited to the following:

(1)     Whether the records reviewed by the expert(s) indicate that the Plaintiff suffered any injury or damage and, if so, the nature of the alleged injury or damage;

(2)     Whether the records reviewed by the expert(s) indicate the existence of any alleged nuisance and, if so, the nature of the alleged nuisance;

(3)     Whether the Plaintiff's records reviewed by the expert(s) indicate that Defendants engaged in any wrongful conduct and, if so, the nature of that allegedly wrongful conduct;

(4)     An opinion explaining the basis for any contention that the Plaintiff incurred damages caused by the Defendants' alleged conduct;

(5)     An opinion explaining the basis for any contention that the Defendants' alleged conduct forming the basis for the Plaintiff's claims is continuing;

(6)     An opinion explaining the basis for any contention that any relief sought would "abate" any alleged public nuisance;

(7)     An opinion explaining how the alleged public nuisance identified by the expert differs from and is not subsumed within the alleged public nuisance addressed by the Settlement Agreement; and

(8)     An opinion quantifying the relief requested by the Plaintiff, including any "abatement" relief, damages, and statutory penalties, with specific calculations and evidence for each component of such relief, prepared and sworn/affirmed to by such expert and subject to the penalties of perjury.

**2.      Deadline to comply.**

(a) For each Plaintiff with claims pending against Defendants as of the entry of this CMO, the items required by Section B.1 shall be produced within ninety (90) days of the entry of this CMO, if its claims have not been dismissed with prejudice by that date.

(b) For any Plaintiff with claims newly filed in or transferred to this proceeding against Defendants after the entry of this CMO, the items required by Section B.1 shall be produced no later than ninety (90) days after the case is filed in or transferred to this proceeding.

(c) All litigation deadlines applicable to Defendants in a given case shall be stayed until the Plaintiff in that case has produced the items required by Section B.1.

3. **Failure to comply.**

(a) *Notice of Non-Compliance and Opportunity to Cure.* If any Plaintiff fails to comply with any provision of this Order, including the requirement to provide each and every fact, record and expert opinion required to be produced pursuant to Section A. I of this Order, Defendants shall provide Plaintiff written notice of such non-compliance ("Notice of Non-Compliance") specifying the non-compliance. Upon receipt of a Notice of Non-Compliance, Plaintiff shall have sixty (60) days to cure its non-compliance specified in the Notice of Non-Compliance. During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

(b) *Failure to Cure.* If, after the passage of sixty (60) days of service of a Notice of Non-Compliance, a Plaintiff fails to cure its non-compliance, upon application by the Defendants, the Plaintiff's claims, as well as any derivative claim(s), will be dismissed with prejudice as against Defendants.

(c)     ***Extensions of Time.***  The Court, on motion and for good cause shown, may order an extension of the time to comply with this Order.  During the period wherein non-compliance has not yet been cured, all litigation deadlines applicable to Defendants, including without limitation deadlines for discovery or to file and serve a pleading or motion responsive to a Plaintiff's complaint, shall be held in abeyance.

### B.     <u>Discovery on Statute of Limitations and Other Time-Based Defenses</u>

1.     Each Plaintiff must, within the time frames established by Section A.2, serve upon counsel for the Defendants an affidavit signed by the Plaintiff and its counsel providing the following information:

(a)     the date the Plaintiff first learned of the harms alleged in its complaint;

(b)     how the Plaintiff first learned of the harms alleged in its complaint;

(c)     the date the Plaintiff first learned of each aspect of the Defendants' alleged conduct;

(d)     how the Plaintiff first learned of each aspect of the Defendants' alleged conduct;

(e)     the date the Plaintiff first learned that the harms alleged in its complaint may be related to each aspect of Defendants' alleged conduct;

(f)     how the Plaintiff first learned the harms alleged in its complaint may be related to Defendants' alleged conduct;

(g)     the date the Plaintiff first spoke to or corresponded with an attorney about the harms alleged in the Plaintiff's complaint, the Defendants' alleged conduct, and/or potential litigation in this matter; and

(h)    the date the Plaintiff first retained counsel in connection with this matter.

2.    Defendants are permitted to serve written discovery on each Plaintiff related to these topics (and others), and each Plaintiff must respond to the discovery prior to any depositions related to these topics, provided that the Plaintiff shall have at least thirty (30) days to respond to such discovery.

### C.    Case-Specific Discovery and Related Dispositive Motion Practice

1.    If a Plaintiff complies with the production requirements outlined above in Sections A and B, then the Parties, as applicable, shall submit a proposed Scheduling Order to the Court that:  (a) grants the Parties one-hundred and eighty (180) days from the entry of the Scheduling Order to conduct discovery on issues raised by the productions; and (b) sets a briefing schedule that gives the Parties forty-five (45) days from the close of discovery for the Parties to submit summary judgment motions and motions to exclude expert testimony, twenty-eight (28) days for responses, and twenty-eight (28) days for replies.

2.    During such discovery, the Parties are permitted to serve written discovery related to the issues raised by the productions specific to the Plaintiff and take the depositions of both fact and expert witnesses for the Plaintiff for up to seven hours each, with counsel for Defendants questioning first at each deposition.  If a Plaintiff serves any written discovery upon Defendants, the Parties shall meet and confer about an appropriate deadline for responding to such discovery, which deadline shall be at least sixty (60) days after service of such discovery.  The Court's use of the term "specific to the Plaintiff" is intended to express the Court's intention not to permit additional "generic" discovery against the Defendants at this time.  No other depositions

may be taken during the expedited discovery period absent prior leave granted by the Court upon a showing of good cause.

3. If a case survives the Defendants' summary judgment motions, the Court will set a Case Management Conference to determine whether any non-duplicative discovery is necessary and to discuss other case management issues.  Discovery with regard to any other defendants will be addressed at this time as well.  The filing and briefing of summary judgment motions and motions to exclude expert testimony after the expedited discovery discussed above shall not prejudice or otherwise foreclose the opportunity for any Party or other defendant to file later, non-duplicative summary judgment and motions to exclude expert testimony after completing full fact and expert discovery.  The Court's use of the term "non-duplicative" is intended to express the Court's intention not to permit later summary judgment motions concerning topics addressed in summary judgment motions filed at the conclusion of the expedited discovery period or motions to exclude expert testimony concerning witnesses addressed in motions to exclude expert testimony filed at the conclusion of the expedited discovery period.

4. The foregoing provisions do not preclude Defendants from filing nonduplicative dispositive motions, including motions relating to personal jurisdiction.

SO ORDERED.

Dated: _____                    _____

Lead Presiding Judge

**Exhibit H**

**Illustrative List of Released Entities**

Walmart Inc. (f/k/a Wal-Mart Stores)
Wal-Mart
Wal-Mart Stores, Inc.
Wal-Mart Stores East
Wal-Mart Stores East, LP
Wal-Mart Stores East, Inc.
Wal-Mart Stores East, LLC f/k/a Wal-Mart Stores East Inc.
Wal-Mart Stores East d/b/a Wal-Mart Pharmacy Warehouse #45
Wal-Mart Stores East d/b/a Walmart Pharmacy Warehouse #46
Wal-Mart Stores East, LP d/b/a Wal-Mart Pharmacy Warehouse #45
Wal-Mart Stores East, LP d/b/a Walmart Pharmacy Warehouse #46
Wal-Mart Pharmacy
Wal-Mart Pharmacy Warehouse #45
Wal-Mart Pharmacy Warehouse #46
Wal-Mart Pharmacy 10-5296
Wal-Mart Pharmacy Wholesale
Wal-Mart Stores Texas, LLC
Wal-Mart Property Company
Wal-Mart Real Estate Business Trust
Wal-Mart.com USA, L.L.C.
Sam's West, Inc.
Sam's East, Inc.
Sam's Property Company
Sam's Real Estate Business Trust
Wal-Mart de Mexico, S.A.B. de C.V.
Wal-Mart Canada Corp.
Flipkart Private Limited
Flipkart Walmart Chile S.A.
Walmart Chile
Massmart Holdings Ltd.
Qomolangma Holdings Ltd.
WSE Investment LLC
WSE Management LLC

**Exhibit I**

**West Virginia Intrastate Allocation Formula**

Exhibit C (Allocations to Subdivisions)

Allocation to West Virginia Counties and Municipalities (Including Cabell County and Huntington)

| Government Name | County | WV Share (%) |
|---|---|---|
| ADDISON TOWN | WEBSTER | 0.0174% |
| ALBRIGHT TOWN | PRESTON | 0.0001% |
| ALDERSON TOWN | GREENBRIER/MONROE | 0.0034% |
| ANAWALT TOWN | MCDOWELL | 0.0007% |
| ANMOORE TOWN | HARRISON | 0.0076% |
| ANSTED TOWN | FAYETTE | 0.0022% |
| ATHENS TOWN | MERCER | 0.0003% |
| AUBURN TOWN | RITCHIE | 0.0001% |
| BANCROFT TOWN | PUTNAM | 0.0001% |
| BARBOUR COUNTY | BARBOUR | 0.3541% |
| BARBOURSVI LLE VILLAGE | CABELL | 0.3969% |
| BARRACKVILLE TOWN | MARION | 0.0015% |
| BATH (BERKELEY SPRINGS) TOWN | MORGAN | 0.0062% |
| BAYARD TOWN | GRANT | 0.0000% |
| BECKLEY CITY | RALEIGH | 3.3824% |
| BEECH BOTTOM VILLAGE | BROOKE | 0.0003% |
| BELINGTON TOWN | BARBOUR | 0.0322% |
| BELLE TOWN | KANAWHA | 0.0373% |
| BELMONT CITY | PLEASANTS | 0.0002% |
| BENWOOD CITY | MARSHALL | 0.0070% |
| BERKELEY COUNTY | BERKELEY | 3.2534% |
| BETHANY TOWN | BROOKE | 0.0005% |
| BETHLEHEM VILLAGE | OHIO | 0.0018% |
| BEVERLY TOWN | RANDOLPH | 0.0008% |
| BLACKSVILLE TOWN | MONONGALIA | 0.0002% |
| BLUEFIELD CITY | MERCER | 0.1629% |
| BOLIVAR TOWN | JEFFERSON | 0.0053% |
| BOONE COUNTY | BOONE | 2.8817% |
| BRADSHAW TOWN | MCDOWELL | 0.0011% |
| BRAMWELL TOWN | MERCER | 0.0003% |
| BRANDONVILLE TOWN | PRESTON | 0.0001% |
| BRAXTON COUNTY | BRAXTON | 0.4761% |
| BRIDGEPORT CITY | HARRISON | 0.0694% |
| BROOKE COUNTY | BROOKE | 0.9916% |
| BRUCETON MILLS TOWN | PRESTON | 0.0002% |
| BUCKHANNON CITY | UPSHUR | 0.1513% |
| BUFFALO TOWN | PUTNAM | 0.0008% |
| BURNSVI LLE TOWN | BRAXTON | 0.0026% |

Revised 9/29/2020

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| CABELL COUNTY | CABELL | 3.2406% |
| CAIRO TOWN | RITCHIE | 0.0002% |
| CALHOUN COUNTY | CALHOUN | 0.1604% |
| CAMDEN-ON-GAULEY TOWN | WEBSTER | 0.0002% |
| CAMERON CITY | MARSHALL | 0.0019% |
| CAPON BRIDGE TOWN | HAMPSHIRE | 0.0022% |
| CARPENDALE TOWN | MINERAL | 0.0002% |
| CEDAR GROVE TOWN | KANAWHA | 0.0007% |
| CEREDO CITY | WAYNE | 0.1523% |
| CHAPMANVILLE TOWN | LOGAN | 0.1445% |
| CHARLES TOWN CITY | JEFFERSON | 0.2655% |
| CHARLESTON CITY | KANAWHA | 6.1020% |
| CHESAPEAKE TOWN | KANAWHA | 0.0163% |
| CHESTER CITY | HANCOCK | 0.0070% |
| CLARKSBURG CITY | HARRISON | 1.0317% |
| CLAY COUNTY | CLAY | 0.3062% |
| CLAY TOWN | CLAY | 0.0000% |
| CLEARVIEW VILLAGE | OHIO | 0.0001% |
| CLENDENIN TOWN | KANAWHA | 0.0233% |
| COWEN TOWN | WEBSTER | 0.0011% |
| DANVILLE TOWN | BOONE | 0.0011% |
| DAVIS TOWN | TUCKER | 0.0002% |
| DAVY TOWN | MCDOWELL | 0.0005% |
| DELBARTON TOWN | MINGO | 0.0469% |
| DODDRIDGE COUNTY | DODDRIDGE | 0.2099% |
| DUNBAR CITY | KANAWHA | 0.2648% |
| DURBIN TOWN | POCAHONTAS | 0.0001% |
| EAST BANK TOWN | KANAWHA | 0.0008% |
| ELEANOR TOWN | PUTNAM | 0.0131% |
| ELIZABETH TOWN | WIRT | 0.0043% |
| ELK GARDEN TOWN | MINERAL | 0.0006% |
| ELKINS CITY | RANDOLPH | 0.0293% |
| ELLENBORO TOWN | RITCHIE | 0.0003% |
| FAIRMONT CITY | MARION | 0.6220% |
| FAIRVIEW TOWN | MARION | 0.0007% |
| FALLING SPRING TOWN | GREENBRIER | 0.0000% |
| FARMINGTON TOWN | MARION | 0.0002% |
| FAYETTE COUNTY | FAYETTE | 1.4898% |
| FAYETTEVILLE TOWN | FAYETTE | 0.1659% |
| FLATWOODS TOWN | BRAXTON | 0.0006% |
| FLEMINGTON TOWN | TAYLOR | 0.0000% |
| FOLLANSBEE CITY | BROOKE | 0.0112% |
| FORT GAY TOWN | WAYNE | 0.0294% |
| FRANKLIN TOWN | PENDLETON | 0.0013% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| FRIENDLY TOWN | TYLER | 0.0000% |
| GARY CITY | MCDOWELL | 0.0011% |
| GASSAWAY TOWN | BRAXTON | 0.0022% |
| GAULEY BRIDGE TOWN | FAYETTE | 0.0482% |
| GILBERT TOWN | MINGO | 0.0661% |
| GILMER COUNTY | GILMER | 0.1742% |
| GLASGOW TOWN | KANAWHA | 0.0015% |
| GLEN DALE CITY | MARSHALL | 0.0045% |
| GLENVILLE TOWN | GILMER | 0.0153% |
| GRAFTON CITY | TAYLOR | 0.4212% |
| GRANT COUNTY | GRANT | 0.3081% |
| GRANT TOWN TOWN | MARION | 0.0099% |
| GRANTSVILLE TOWN | CALHOUN | 0.0011% |
| GRANVI LLE TOWN | MONONGALIA | 0.1497% |
| GREENBRIER COUNTY | GREENBRIER | 1.3059% |
| HAMBLETON TOWN | TUCKER | 0.0001% |
| HAMLIN TOWN | LINCOLN | 0.0638% |
| HAMPSHIRE COUNTY | HAMPSHIRE | 0.0793% |
| HANCOCK COUNTY | HANCOCK | 1.4621% |
| HANDLEY TOWN | KANAWHA | 0.0006% |
| HARDY COUNTY | HARDY | 0.2555% |
| HARMAN TOWN | RANDOLPH | 0.0002% |
| HARPERS FERRY TOWN | JEFFERSON | 0.0086% |
| HARRISON COUNTY | HARRISON | 1.2029% |
| HARRISVI LLE TOWN | RITCHIE | 0.0041% |
| HARTFORD CITY TOWN | MASON | 0.0001% |
| HEDGESVILLE TOWN | BERKELEY | 0.0001% |
| HENDERSON TOWN | MASON | 0.0002% |
| HENDRICKS TOWN | TUCKER | 0.0001% |
| HILLSBORO TOWN | POCAHONTAS | 0.0001% |
| HINTON CITY | SUMMERS | 0.3727% |
| HUNDRED TOWN | WETZEL | 0.0001% |
| HUNTINGTON CITY | CABELL/WAYNE | 5.9777% |
| HURRICANE CITY | PUTNAM | 0.1943% |
| HUTTONSVILLE TOWN | RANDOLPH | 0.0000% |
| IAEGER TOWN | MCDOWELL | 0.0005% |
| JACKSON COUNTY | JACKSON | 0.7552% |
| JANE LEW TOWN | LEWIS | 0.0009% |
| JEFFERSON COUNTY | JEFFERSON | 1.5882% |
| JUNIOR TOWN | BARBOUR | 0.0032% |
| KANAWHA COUNTY | KANAWHA | 3.2694% |
| KENOVA CITY | WAYNE | 0.1874% |
| KERMIT TOWN | MINGO | 0.0267% |
| KEYSER CITY | MINERAL | 0.0072% |

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| KEYSTONE CITY | MCDOWELL | 0.0016% |
| KIMBALL TOWN | MCDOWELL | 0.0019% |
| KINGWOOD CITY | PRESTON | 0.0042% |
| LEON TOWN | MASON | 0.0000% |
| LESTER TOWN | RALEIGH | 0.0281% |
| LEWIS COUNTY | LEWIS | 0.3679% |
| LEWISBURG CITY | GREENBRIER | 0.3556% |
| LINCOLN COUNTY | LINCOLN | 1.2544% |
| LOGAN CITY | LOGAN | 0.4020% |
| LOGAN COUNTY | LOGAN | 3.3874% |
| LOST CREEK TOWN | HARRISON | 0.0000% |
| LUMBERPORT TOWN | HARRISON | 0.0025% |
| MABSCOTT TOWN | RALEIGH | 0.0465% |
| MADISON CITY | BOONE | 0.0525% |
| MAN TOWN | LOGAN | 0.0023% |
| MANNINGTON CITY | MARION | 0.0028% |
| MARION COUNTY | MARION | 0.9568% |
| MARLINTON TOWN | POCAHONTAS | 0.0008% |
| MARMET CITY | KANAWHA | 0.0055% |
| MARSHALL COUNTY | MARSHALL | 0.7851% |
| MARTINSBURG CITY | BERKELEY | 3.2084% |
| MASON COUNTY | MASON | 1.2251% |
| MASON TOWN | MASON | 0.0026% |
| MASONTOWN TOWN | PRESTON | 0.0007% |
| MATEWAN TOWN | MINGO | 0.0652% |
| MATOAKA TOWN | MERCER | 0.0002% |
| MCDOWELL COUNTY | MCDOWELL | 2.9082% |
| MCMECHEN CITY | MARSHALL | 0.0072% |
| MEADOW BRIDGE TOWN | FAYETTE | 0.0004% |
| MERCER COUNTY | MERCER | 0.3393% |
| MIDDLEBOURNE TOWN | TYLER | 0.0002% |
| MILL CREEK TOWN | RANDOLPH | 0.0000% |
| MILTON TOWN | CABELL | 0.1348% |
| MINERAL COUNTY | MINERAL | 0.7740% |
| MINGO COUNTY | MINGO | 2.6736% |
| MITCHELL HEIGHTS TOWN | LOGAN | 0.0010% |
| MONONGAH TOWN | MARION | 0.0026% |
| MONONGALIA COUNTY | MONONGALIA | 1.3605% |
| MONROE COUNTY | MONROE | 0.5234% |
| MONTGOMERY CITY | FAYETTE/KANAWHA | 0.0912% |
| MONTROSE TOWN | RANDOLPH | 0.0001% |
| MOOREFIELD TOWN | HARDY | 0.0084% |
| MORGAN COUNTY | MORGAN | 0.6441% |
| MORGANTOWN CITY | MONONGALIA | 0.1213% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| MOUNDSVILLE CITY | MARSHALL | 0.2882% |
| MOUNT HOPE CITY | FAYETTE | 0.0834% |
| MULLENS CITY | WYOMING | 0.3336% |
| NEW CUMBERLAND CITY | HANCOCK | 0.0031% |
| NEW HAVEN TOWN | MASON | 0.0052% |
| NEW MARTINSVILLE CITY | WETZEL | 0.0018% |
| NEWBURG TOWN | PRESTON | 0.0011% |
| NICHOLAS COUNTY | NICHOLAS | 0.1920% |
| NITRO CITY | KANAWHA/PUTNAM | 0.2460% |
| NORTH HILLS TOWN | WOOD | 0.0015% |
| NORTHFORK TOWN | MCDOWELL | 0.0005% |
| NUTTER FORT TOWN | HARRISON | 0.0930% |
| OAK HILL CITY | FAYETTE | 0.3625% |
| OAKVALE TOWN | MERCER | 0.0001% |
| OCEANA TOWN | WYOMING | 0.2967% |
| OHIO COUNTY | OHIO | 0.5079% |
| PADEN CITY CITY | WETZEL/TYLER | 0.0067% |
| PARKERSBURG CITY | WOOD | 1.5547% |
| PARSONS CITY | TUCKER | 0.0005% |
| PAW PAW TOWN | MORGAN | 0.0017% |
| PAX TOWN | FAYETTE | 0.0076% |
| PENDLETON COUNTY | PENDLETON | 0.1624% |
| PENNSBORO CITY | RITCHIE | 0.0003% |
| PETERSBURG CITY | GRANT | 0.0011% |
| PETERSTOWN TOWN | MONROE | 0.0013% |
| PHILIPPI CITY | BARBOUR | 0.0834% |
| PIEDMONT TOWN | MINERAL | 0.0006% |
| PINE GROVE TOWN | WETZEL | 0.0002% |
| PINEVILLE TOWN | WYOMING | 0.1165% |
| PLEASANT VALLEY CITY | MARION | 0.0010% |
| PLEASANTS COUNTY | PLEASANTS | 0.1276% |
| POCA TOWN | PUTNAM | 0.0002% |
| POCAHONTAS COUNTY | POCAHONTAS | 0.3412% |
| POINT PLEASANT CITY | MASON | 0.1276% |
| PRATT TOWN | KANAWHA | 0.0013% |
| PRESTON COUNTY | PRESTON | 0.7999% |
| PRINCETON CITY | MERCER | 4.1839% |
| PULLMAN TOWN | RITCHIE | 0.0001% |
| PUTNAM COUNTY | PUTNAM | 1.6105% |
| QUINWOOD TOWN | GREENBRIER | 0.0165% |
| RAINELLE TOWN | GREENBRIER | 0.0241% |
| RALEIGH COUNTY | RALEIGH | 5.0240% |
| RANDOLPH COUNTY | RANDOLPH | 0.6622% |
| RANSON CORPORATION | JEFFERSON | 0.0214% |

Exhibit C (Allocations to Subdivisions)

| Government Name | County | WV Share (%) |
|---|---|---|
| RAVENSWOOD CITY | JACKSON | 0.0870% |
| REEDSVILLE TOWN | PRESTON | 0.0006% |
| REEDY TOWN | ROANE | 0.0000% |
| RHODELL TOWN | RALEIGH | 0.0013% |
| RICHWOOD CITY | NICHOLAS | 0.0093% |
| RIDGELEY TOWN | MINERAL | 0.0024% |
| RIPLEY CITY | JACKSON | 0.0836% |
| RITCHIE COUNTY | RITCHIE | 0.1832% |
| RIVESVILLE TOWN | MARION | 0.0009% |
| ROANE COUNTY | ROANE | 0.5132% |
| ROMNEY CITY | HAMPSHIRE | 0.0557% |
| RONCEVERTE CITY | GREENBRIER | 0.0871% |
| ROWLESBURG TOWN | PRESTON | 0.0022% |
| RUPERT TOWN | GREENBRIER | 0.0066% |
| SALEM CITY | HARRISON | 0.0038% |
| SAND FORK TOWN | GILMER | 0.0002% |
| SHEPHERDSTOWN TOWN | JEFFERSON | 0.0080% |
| SHINNSTON CITY | HARRISON | 0.0968% |
| SISTERSVILLE CITY | TYLER | 0.1893% |
| SMITHERS CITY | FAYETTE/KANAWHA | 0.0348% |
| SMITHFIELD TOWN | WETZEL | 0.0001% |
| SOPHIA TOWN | RALEIGH | 0.0371% |
| SOUTH CHARLESTON CITY | KANAWHA | 0.8851% |
| SPENCER CITY | ROANE | 0.0586% |
| ST. ALBANS CITY | KANAWHA | 0.4397% |
| ST. MARYS CITY | PLEASANTS | 0.0565% |
| STAR CITY TOWN | MONONGALIA | 0.0376% |
| STONEWOOD CITY | HARRISON | 0.0434% |
| SUMMERS COUNTY | SUMMERS | 0.3231% |
| SUMMERSVILLE CITY | NICHOLAS | 1.5393% |
| SUTTON TOWN | BRAXTON | 0.0191% |
| SYLVESTER TOWN | BOONE | 0.0003% |
| TAYLOR COUNTY | TAYLOR | 0.0391% |
| TERRA ALTA TOWN | PRESTON | 0.0014% |
| THOMAS CITY | TUCKER | 0.0002% |
| THURMOND TOWN | FAYETTE | 0.0000% |
| TRIADELPHIA TOWN | OHIO | 0.0003% |
| TUCKER COUNTY | TUCKER | 0.1140% |
| TUNNELTON TOWN | PRESTON | 0.0005% |
| TYLER COUNTY | TYLER | 0.0185% |
| UNION TOWN | MONROE | 0.0006% |
| UPSHUR COUNTY | UPSHUR | 0.4637% |
| VALLEY GROVE VILLAGE | OHIO | 0.0001% |
| VIENNA CITY | WOOD | 0.2577% |

Revised 9/29/2020

**Exhibit C (Allocations to Subdivisions)**

| Government Name | County | WV Share (%) |
|---|---|---|
| WAR CITY | MCDOWELL | 0.0018% |
| WARDENSVILLE TOWN | HARDY | 0.0012% |
| WAYNE COUNTY | WAYNE | 2.1411% |
| WAYNE TOWN | WAYNE | 0.0323% |
| WEBSTER COUNTY | WEBSTER | 0.3418% |
| WEIRTON CITY | HANCOCK/BROOKE | 1.2462% |
| WELCH CITY | MCDOWELL | 0.1085% |
| WELLSBURG CITY | BROOKE | 0.0063% |
| WEST HAMLIN TOWN | LINCOLN | 0.0345% |
| WEST LIBERTY TOWN | OHIO | 0.0023% |
| WEST LOGAN TOWN | LOGAN | 0.0147% |
| WEST MILFORD TOWN | HARRISON | 0.0014% |
| WEST UNION TOWN | DODDRIDGE | 0.0006% |
| WESTON CITY | LEWIS | 0.0088% |
| WESTOVER CITY | MONONGALIA | 0.0086% |
| WETZEL COUNTY | WETZEL | 0.4438% |
| WHEELING CITY | OHIO/MARSHALL | 0.9706% |
| WHITE HALL TOWN | MARION | 0.0025% |
| WHITE SULPHUR SPRINGS CITY | GREENBRIER | 0.1439% |
| WHITESVILLE TOWN | BOONE | 0.0134% |
| WILLIAMSON CITY | MINGO | 0.3555% |
| WILLIAMSTOWN CITY | WOOD | 0.0515% |
| WINDSOR HEIGHTS VILLAGE | BROOKE | 0.0001% |
| WINFIELD TOWN | PUTNAM | 0.0279% |
| WIRT COUNTY | WIRT | 0.0976% |
| WOMELSDORF (COALTON) TOWN | RANDOLPH | 0.0009% |
| WOOD COUNTY | WOOD | 0.9917% |
| WORTHINGTON TOWN | MARION | 0.0003% |
| WYOMING COUNTY | WYOMING | 3.6334% |

**Totals**                                                    **100.0000%**