# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | **MDL NO. 2804** |
| **THIS DOCUMENT RELATES TO**: | **Case No. 17-MD-2804** |
| *City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 (Track 12) | **Judge Dan Aaron Polster** |
| *Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13) | |
| *City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14) | |
| *County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | |

## MEMORANDUM SUPPORTING OPTUMRX, INC.'S
## <u>MOTION TO DISQUALIFY MOTLEY RICE</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...................................... 1

BACKGROUND ........................................................................................................... 4

    A.    Motley Rice used government subpoenas to investigate OptumRx. ..................... 4

    B.    Motley Rice is pursuing opioid litigation against OptumRx on behalf of other clients. ................................................................................................................... 7

LEGAL STANDARD .................................................................................................... 8

ARGUMENT ................................................................................................................. 9

    I.    THE COURT SHOULD DISQUALIFY MOTLEY RICE BECAUSE ITS REPRESENTATION OF PLAINTIFFS IN OPIOID CASES AGAINST OPTUMRX VIOLATES THE OHIO RULES OF PROFESSIONAL CONDUCT. ................................................................................................................... 9

        A.    Ethics rules have long forbidden lawyers from misusing government powers for private gain. .......................................................................... 10

        B.    Ohio Rule 1.11 safeguards against the same sort of unethical misuse of information by current or former government lawyers. ............................ 13

        C.    Motley Rice is violating Rule 1.11(c). ..................................................... 13

        D.    Disqualification is required because Motley Rice cannot unlearn what it learned through government service. ....................................................... 18

    II.    DISQUALIFICATION WILL NOT PREJUDICE THE BELLWETHER PLAINTIFFS BECAUSE OTHER FIRMS ON THE PLAINTIFFS' EXECUTIVE COMMITTEE WILL CONTINUE TO REPRESENT THEM. ..... 19

CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago*,
   283 F. Supp. 464 (D. Minn. 1968) .........................................................................10, 11, 12, 13

*City of Independence v. Williams*,
   No. 19-op-45371 (N.D. Ohio).......................................................................................3, 7

*City of Rochester v. Purdue Pharma, L.P.*,
   No. 19-op-45853 (N.D. Ohio)....................................................................................3, 7, 17

*County of Webb v. Purdue Pharma, L.P.*,
   No. 18-op-45175 (N.D. Ohio).........................................................................................3

*Gen. Motors Corp. v. New York*,
   501 F.2d 639 (2d Cir. 1974)........................................................................................12, 13

*Gordon v. Dadante*,
   No. 1:05-CV-2726, 2009 U.S. Dist. LEXIS 76425 (N.D. Ohio Aug. 26, 2009).................8, 9

*Government of Puerto Rico v. Eli Lilly & Co.*,
   No. SJ2023CV00319 (P.R. Super. Ct.)..............................................................................7

*Hamrick v. Union Township*,
   81 F. Supp. 2d 876 (S.D. Ohio 2000) ...............................................................................8

*Handelman v. Weiss*,
   368 F. Supp. 258 (S.D.N.Y. 1973).................................................................................12, 13

*Hawai'i ex rel. Lopez v. CaremarkPCS Health, L.L.C.*,
   No. 1:23-cv-00464 (D. Haw.)............................................................................................7

*Hilo Metals Co. v. Learner Co.*,
   258 F. Supp. 23 (D. Haw. 1966) ....................................................................................12, 13

*In re Nat'l Prescription Opiate Litig.*,
   No. 1:17-md-2804, 2019 U.S. Dist. LEXIS 46065 (N.D. Ohio Mar. 19, 2019)............2, 15, 19

*Kronberg v. LaRouche*,
   No. 1:09-cv-947, 2010 U.S. Dist. LEXIS 35097 (E.D. Va. Apr. 9, 2010) .............................18

*Lincoln County v. Sackler*,
   No. 20-op-45069 (N.D. Ohio)........................................................................................3, 7

*Seaman Corp. v. Zurich Am. Ins. Co.*,
   643 F. Supp. 3d 790 (N.D. Ohio 2022).................................................................................8

*SK Handtool Corp. v. Dresser Indus., Inc.*,
    619 N.E.2d 1282 (Ill. App. Ct. 1993) ...................................................................19

*Tucker v. George*,
    569 F. Supp. 2d 834 (W.D. Wis. 2008) ...............................................................19

*United States v. Standard Oil Co.*,
    136 F. Supp. 345 (S.D.N.Y. 1955) (Kaufman, J.) ..............................................11

*United States v. Villaspring Health Care Ctr., Inc.*,
    No. 3:11-43, 2011 U.S. Dist. LEXIS 129933 (E.D. Ky. Nov. 7, 2011) ................16

## RULES

Local Rule 83.7(a) ......................................................................................................9

Ohio R. Prof'l Conduct 1.11 ............................................................................... *passim*

## STATUTES

Chi. Mun. Code § 2-25-090 .......................................................................................14

D.C. Code § 2-534 ...................................................................................................14

D.C. Code § 28-3910 .............................................................................................6, 14

Haw. Rev. Stat. § 28-2.5 ..........................................................................................14

Haw. Rev. Stat. § 480-18 .........................................................................................14

Haw. Rev. Stat. § 661-22 .........................................................................................14

5 Ill. Comp. Stat. 140/7 .......................................................................................14, 15

## OTHER AUTHORITIES

Editorial Board, *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022),
    https://www.wsj.com/articles/the-tort-bars-legal-double-dipping-illinois-insulin-
    attorney-general-plaintiff-attorneys-11669127620 ...................................................1

*Opioid Litigation*, Motley Rice, https://www.motleyrice.com/public-client/opioid-
    litigation (last visited Dec. 14, 2023) .........................................................................8

*Opioid MDL*, Motley Rice (Jan. 5, 2018), https://www.motleyrice.com/news/opioid-mdl-
    joe-rice-appointed-co-lead ..........................................................................................8

*Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client
    (last visited Dec. 14, 2023) .........................................................................................8

**INTRODUCTION AND
SUMMARY OF THE ARGUMENT**

With increasing regularity, State Attorneys General are partnering with private lawyers, deputizing them as Special Assistant Attorneys General to investigate businesses. The new title empowers the private lawyers to wield state authority in securing pre-litigation discovery and attempting to force settlement, which they stand to collect a portion of. The States get to transfer litigation risk to private lawyers while preserving their opportunity to recover damages in cases they would not have otherwise pursued. The private lawyers get to cloak themselves in government power without the corresponding limits on personal financial benefits that apply to fulltime government prosecutors.

But some private lawyers are not satisfied with those arrangements. They go further. They take the information and insights gained from their government investigations of companies and weaponize that knowledge against the same companies in separate private litigation for other clients and their own financial gain. That practice should alarm anyone concerned with preventing abuses of government power. It should also raise serious red flags for courts, which enforce ethical rules in civil litigation. The Rules of Professional Conduct prohibit the practice, but that can get lost amid the proliferation of what the Wall Street Journal has dubbed "unholy alliance[s]" between private lawyers and state prosecutors.[1]

States across the country, including Ohio, have adopted Rules of Professional Conduct that prevent former or existing government lawyers from taking on private representations in which they could use the confidential information that they learned during government service. Those

---

[1] Editorial Board, *The Tort Bar's Legal Double Dipping*, Wall St. J. (Dec. 9, 2022), https://www.wsj.com/articles/the-tort-bars-legal-double-dipping-illinois-insulin-attorney-general-plaintiff-attorneys-11669127620 (criticizing "unholy alliance[s]" between State Attorneys General and plaintiffs' lawyers).

rules exist to protect against abuses of government power and the erosion of the public trust. The concerns are so grave that the Rules prohibit a former lawyer from even taking on a representation in which they *could* use confidential government information to their opponent's material disadvantage even if they would not use the information in the litigation.

Ohio Rule of Professional Conduct 1.11(c) prohibits a lawyer "having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee" from representing "a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person." This Court is no stranger to Rule 1.11(c): It has already enforced it in this MDL to disqualify a former government lawyer from representing a defendant. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804, 2019 U.S. Dist. LEXIS 46065 (N.D. Ohio Mar. 19, 2019).

Motley Rice has violated, and continues to violate, Rule 1.11(c) and should be disqualified. State Attorneys General and city prosecutors—including Hawaii, the District of Columbia, and Chicago—deputized Motley Rice to lead investigations into OptumRx and other pharmacy benefit managers (PBMs). Armed with governmental power, Motley Rice served sweeping subpoenas on OptumRx demanding wide swaths of confidential business records and testimony. Each subpoena required OptumRx to produce its confidential documents *directly to Motley Rice*. Facing those government subpoenas, OptumRx produced thousands of pages of confidential information detailing how OptumRx operates its PBM business, including information about how OptumRx develops the formularies (lists of drugs that a health plan can choose to cover) and clinical programs that it offers clients and how it negotiates with pharmaceutical manufacturers for discounts (rebates) off prescription drugs. At that point, the ethics rules prohibited Motley Rice

from taking on any representation as private lawyers in which they *could* (not *would*) use the confidential information to OptumRx's material disadvantage.

Instead, with that confidential information in hand as a roadmap, Motley Rice has turned to litigating opioid and other drug-pricing cases against OptumRx and other PBMs on behalf of various private and public clients. Motley Rice now represents the plaintiffs in the four bellwether cases against PBMs in this MDL. *See City of Independence v. Williams*, No. 19-op-45371 (N.D. Ohio); *Lincoln County v. Sackler*, No. 20-op-45069 (N.D. Ohio); *City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 (N.D. Ohio), *County of Webb v. Purdue Pharma, L.P.*, No. 18-op-45175 (N.D. Ohio). The plaintiffs' legal theories in those cases (unfounded as they are) focus on how OptumRx developed the formularies and clinical programs that it offered clients and how it negotiated with opioid manufacturers for rebates off prescription opioids. In other words, the legal theories overlap with the topics on which Motley Rice lawyers obtained confidential information through their government service.

OptumRx does not challenge the government's authority to investigate, but it is unethical for Motley Rice to extract confidential information from OptumRx by wielding government power and then, after obtaining the information, to represent other clients in private litigation against OptumRx in which the firm's lawyers could use confidential or competitively sensitive information acquired through government service. *See* Hooker Decl. Exhibit N (Montgomery/Muchman Report) at 1–2, 17–35. The ethical violations do not turn on Motley Rice's intentions (good or bad) or even on whether the firm's lawyers use the confidential information at all. Under the Rules of Professional Conduct, it is enough that Motley Rice *could* use the confidential information gained through government service in the separate opioid

litigations against OptumRx. In those circumstances, the ethics rules require disqualification.[2] The Court should disqualify Motley Rice.[3]

## BACKGROUND

**A.      Motley Rice used government subpoenas to investigate OptumRx.**

In April 2021, the Hawaii Attorney General appointed Motley Rice LLC as Special Deputy Attorney General. Linda Singer and Joe Rice signed the engagement agreement on Motley Rice's behalf. *See* Hooker Decl. Exhibit A (Haw. Engagement Agmt.) After that appointment, on October 15, 2021, the Hawaii Attorney General issued an investigative subpoena to OptumRx. Through the subpoena, Motley Rice sought documents and communications spanning at least a decade relating to various aspects of OptumRx's business, including formulary development, rebate negotiations with pharmaceutical manufacturers, and financial information relating to OptumRx's contractual relationships with pharmaceutical manufacturers. *See* Hooker Decl. Exhibit B (Haw. Subpoena). The subpoena directed OptumRx to deliver the documents to "Special Deputy Attorney General Linda Singer, Motley Rice LLC." *Id.* at 1.

Before producing documents in response to the subpoena, OptumRx negotiated a confidentiality agreement with Hawaii. The State agreed that Motley Rice could not rely "on Confidential Material in pursuing information or claims in any other matters outside of its

---

[2] As we have discussed in earlier submissions, Motley Rice approached OptumRx's parent company United Healthcare in 2018 about representing United *as a plaintiff* in opioid litigation—making United a prospective Motley Rice client under Ohio Rule of Professional Conduct 1.18. But unlike with its exercise of government authority in investigating OptumRx, Motley Rice did not obtain confidential information about OptumRx or its parent company through those efforts to represent United, so this motion is not based on that outreach.

[3] OptumRx is filing this motion at the earliest possible time in the bellwether litigations. At earlier hearings, the PEC asked the Court to require OptumRx to file any disqualification motions before the Court had established PBM bellwethers, but the Court agreed with OptumRx's counsel that OptumRx needed to wait until after the Court established PBM bellwethers to file any disqualification motion.

representation of the OAG." Hooker Decl. Exhibit C (Haw. Conf. Agmt.) ¶ 2. Relying on that agreement, OptumRx began producing confidential documents directly to Motley Rice. On June 8, 2022, OptumRx produced to Motley Rice approximately 68,310 pages of unredacted, commercially sensitive information. *See* Hooker Decl. Exhibit D (June 8, 2022 Letter from Allison Caplis to Linda Singer). The production contained OptumRx's confidential internal documents, including documents relating to opioid and non-opioid medications, covering wide swaths of OptumRx's business operations. The documents covered, for instance, formulary development, rebate negotiations with drug manufacturers, and clinical and formulary offerings to clients. They included charters, policies, and other materials from OptumRx's business strategy and formulary placement committees as well as emails from custodians relating to those and other aspects of OptumRx's business. *See* Caplis Decl. ¶ 7; Hooker Decl. ¶¶ 7–8. On September 1, 2022, OptumRx produced another round of confidential material to Motley Rice. In addition to the more-than 68,000 pages of documents, OptumRx produced commercially sensitive data, including certain of OptumRx's rebate-related data and consumer transaction level data. *See* Hooker Decl. Exhibit E (Sept. 1, 2022 Letter from Allison Caplis to Linda Singer); Caplis Decl. ¶ 8. The lion's share of the information that OptumRx produced to Hawaii is not available to the public and is OptumRx's sensitive commercial material. *See* Caplis Decl. ¶ 9; Hooker Decl. ¶ 9. With that information in hand, Hawaii (represented by Motley Rice) sued OptumRx and two other PBMs in October 2023, claiming that certain of the PBMs' business practices violate Hawaii law.

Motley Rice's pre-litigation discovery efforts were not limited to Hawaii. The District of Columbia Attorney General hired Linda Singer to assist with an investigation into and potential litigation against PBMs for possible violations of consumer protection law and the False Claims Act. *See* Hooker Decl. Exhibit F (D.C. Engagement Letter). On December 28, 2020, with Motley

Rice's help, the D.C. Attorney General issued an investigative subpoena to OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits." Hooker Decl. Exhibit G (D.C. Subpoena) at 1. The Attorney General demanded that OptumRx produce broad categories of information, including a list of the manufacturers from whom OptumRx received the largest payments by various types, payments manufacturers made to OptumRx, documents related to payment negotiations, and documents related to formulary development and coverage. *Id.* at 9–12. The subpoena directed OptumRx "[p]ursuant to D.C. Code § 28-3910, and by the authority vested in the Attorney General for the District of Columbia" to produce its confidential documents "to the attention of: Linda Singer Motley Rice LLC." *Id.* at 1.

As with the Hawaii subpoena, OptumRx negotiated a confidentiality agreement that prevented Motley Rice from using the confidential information that its lawyers obtained through the D.C. subpoena outside of the firm's work for the District of Columbia. *See* Hooker Decl. Exhibit H (D.C. Conf. Agmt.) ¶ 2. OptumRx again produced confidential information directly to Motley Rice, including the same more-than 68,000 pages of documents produced to Hawaii, certain of OptumRx's rebate-related data and consumer transaction level data, and rebate information for various manufacturers—many of which are parties in this MDL. *See* Hooker Decl. Exhibit I (July 13, 2021 Letter from Michelle Kisloff to Linda Singer), Exhibit J (Sept 10, 2021 Letter from Michelle Kisloff to Linda Singer), Exhibit K (Nov. 24, 2021 Letter from Michelle Kisloff to Linda Singer); Caplis Decl. ¶¶ 12–15; Hooker Decl. ¶¶ 7–9.

The same happened in Chicago. Motley Rice also represented the City of Chicago in an investigation into OptumRx. In November 2018, Chicago issued an investigative subpoena to OptumRx demanding information about various aspects of OptumRx's PBM business, including contracts with pharmacies and certain clients. Hooker Decl. Exhibit L (Chicago Subpoena).

6

OptumRx and Chicago negotiated a confidentiality agreement that Mimi Liu of Motley Rice executed as Chicago's "Special Assistant Corporation Counsel." Hooker Decl. Exhibit M (Chicago Conf. Agmt.). In response to Chicago's subpoena, OptumRx produced confidential material, including prescription claims data and related documents. *See* Grant Decl. ¶¶ 7–8.

**B.**     **Motley Rice is pursuing opioid litigation against OptumRx on behalf of other clients.**

Motley Rice and its attorneys now represent private plaintiffs suing OptumRx in this MDL, including the four bellwether plaintiffs (*City of Rochester*, *City of Independence*, *Webb County*, and *Lincoln County*). The theories that Motley Rice presses against OptumRx in the bellwethers relate to many of the same aspects of OptumRx's business that the firm investigated as government lawyers. In the MDL cases, for instance, Motley Rice alleges that the formularies and clinical programs that OptumRx and Express Scripts offered their clients should have placed additional limits on opioid prescriptions while also contending that the "PBMs collude with Manufacturers who pay fees in the form of rebates, administrative fees and other, in order to ensure good placement on the formulary." *City of Rochester*, Compl. ¶ 47; *see also, e.g., id.* ¶¶ 46, 1074. Those allegations are false, but in any event, the information that Motley Rice received through government investigations relate to those same aspects of the PBMs' business operations— including formulary and clinical development, rebate negotiations, and client relationships.[4]

Although much about Motley Rice's alliances with state governments remains unknown, the firm does not try to hide those alliances. It advertises them. Motley Rice's website touts the firm's role as both an investigator and private plaintiff, advertising that "Motley Rice's Public Client practice is dedicated to supporting public entities in investigations and litigation" and has

---

[4] Linda Singer and Motley Rice also represent Hawaii and Puerto Rico in lawsuits against OptumRx related to insulin pricing. *See Hawai'i ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, No. 1:23-cv-00464 (D. Haw.); *Government of Puerto Rico v. Eli Lilly & Co.*, No. SJ2023CV00319 (P.R. Super. Ct.).

"the resources and experience in complex litigation and resolutions to assist government lawyers." *Public Client Litigation Area*, Motley Rice, https://www.motleyrice.com/public-client (last visited Dec. 14, 2023). Motley Rice's opioid work is "[l]ed by member attorney Linda Singer, a former Attorney General for the District of Columbia," and the firm "is lead counsel for the first jurisdictions to file complaints in the most recent wave of litigation against pharmaceutical companies regarding the opioid crisis." *Opioid Litigation*, Motley Rice, https://www.motleyrice.com/public-client/opioid-litigation (last visited Dec. 14, 2023). Ms. Singer has assumed a prominent role on the plaintiffs' side, acting as the co-chair of the MDL's Manufacturer/Marketing Committee. Motley Rice co-founder Joe Rice serves as co-lead counsel and a member of the Plaintiffs' Executive Committee (PEC). *See Joe Rice Appointed Co-Lead for Opioid MDL*, Motley Rice (Jan. 5, 2018), https://www.motleyrice.com/news/opioid-mdl-joe-rice-appointed-co-lead.

## LEGAL STANDARD

The Court has inherent authority to disqualify counsel. *See Gordon v. Dadante*, No. 1:05-CV-2726, 2009 U.S. Dist. LEXIS 76425, at *28–29 (N.D. Ohio Aug. 26, 2009) (collecting cases). "Courts have broad discretion when ruling on motions to disqualify, but that discretion is not unfettered." *Seaman Corp. v. Zurich Am. Ins. Co.*, 643 F. Supp. 3d 790, 795 (N.D. Ohio 2022).

"When considering the disqualification of an attorney, 'the courts must balance the interests of the public in the proper safeguarding of the judicial process together with the interests of each party to the litigation.'" *Gordon*, 2009 U.S. Dist. LEXIS 76425, at *29 (quoting *Hamrick v. Union Township*, 81 F. Supp. 2d 876, 878 (S.D. Ohio 2000)).

> On the one hand, because a motion to disqualify is often tactically motivated, and can be disruptive to the litigation process, it is a drastic measure that is generally disfavored. . . . At the same time, *the paramount concern* must be the preservation of public trust both in the scrupulous administration of justice and in the integrity of the

> bar. . . . [A]lthough a court must be on guard against abuse, it should
> not weigh the competing issues with hair-splitting nicety but, in the
> proper exercise of its supervisory power over the members of the
> bar and with a view of preventing the appearance of impropriety . . .
> resolve all doubts in favor of disqualification.

*Id.* at \*30–31 (emphasis added) (citation and quotation marks omitted). "'Although a party's right to counsel of her choice is important, it is secondary in importance to preserving the integrity of the judicial process, maintaining the public confidence in the legal system and enforcing the ethical standards of professional conduct.'" *Id.* at \*31 (citation omitted). Accordingly, "any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification." *Id.* (citation and quotation marks omitted).

## <u>ARGUMENT</u>

Private lawyers who serve as government lawyers must play by the rules that apply to government lawyers. Motley Rice's lawyers have not played by those rules, so they must be disqualified.

## I.   THE COURT SHOULD DISQUALIFY MOTLEY RICE BECAUSE ITS REPRESENTATION OF PLAINTIFFS IN OPIOID CASES AGAINST OPTUMRX VIOLATES THE OHIO RULES OF PROFESSIONAL CONDUCT.

Local Rule 83.7(a) binds attorneys practicing before the Northern District of Ohio to Ohio's Rules of Professional Conduct. Ohio Rule of Professional Conduct 1.11(c) sets out the rule that Motley Rice is violating:

> Except as law may otherwise expressly permit, a lawyer having
> information that the lawyer knows is confidential government
> information about a person acquired when the lawyer was a public
> officer or employee, may not represent a private client whose
> interests are adverse to that person in a matter in which the
> information could be used to the material disadvantage of that
> person. As used in this rule, the term "confidential government
> information" means information that has been obtained under
> governmental authority and that, at the time this rule is applied, the
> government is prohibited by law from disclosing to the public or has
> a legal privilege not to disclose and that is not otherwise available

9

> to the public. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom.

Rule 1.11(c) disqualifies Motley Rice and its attorneys from pursuing claims against OptumRx on behalf of private clients when the firm could use the confidential information that it acquired wielding government power to OptumRx's material disadvantage. Given the overlap between Motley Rice's investigations and plaintiffs' theories in the opioid cases, there is no question that Motley Rice *could* use the confidential government information to OptumRx's material disadvantage in this litigation. And because Motley Rice could use the confidential government in that way, Rule 1.11(c) requires disqualification.

Rule 1.11(c) embodies and strengthens ethical principles and policy considerations that have long applied across the country. In the next section, we trace the evolution of those principles.

### A. Ethics rules have long forbidden lawyers from misusing government powers for private gain.

From its first publication through today, the American Bar Association's Rules of Professional Conduct have precluded private lawyers from doing what Motley Rice attempts here. *E.g.*, Canons of Prof'l Ethics, Canon 36 (Am. Bar Ass'n 1928) ("A lawyer, having once held office or having been in the public employ, should not after his retirement accept employment in connection with any matter which he has investigated or passed upon while in such office or employ."). The judiciary has enforced those ethical rules by disqualifying government lawyers attempting to misuse their offices to benefit themselves and their other clients in civil litigation.

Take, for example, *Allied Realty of St. Paul, Inc. v. Exchange National Bank of Chicago*, 283 F. Supp. 464 (D. Minn. 1968), *aff'd*, 408 F.2d 1099 (8th Cir.), *cert. denied*, 396 U.S. 823 (1969). There, the district court disqualified a former government lawyer from litigating civil claims against corporate executives whom the lawyer had criminally prosecuted in his previous

10

role as a government lawyer. *Id.* at 465, 470. The lawyer had resigned as an Assistant United States Attorney to enter private practice. Once in private practice, the lawyer secured an appointment as a "Special Assistant United States Attorney" to assist in the government's criminal prosecution and trial. *Id.* at 465. After the criminal trial, the lawyer was retained to assist a receiver in an action to set aside a claimed fraudulent mortgage that had been challenged in the criminal trial. *Id.* at 465–66. The court rejected the lawyer's representation of the receiver, holding that an attorney who investigated a particular matter as a government lawyer may not "avail himself, after his government service, of a private legal retainer which involves not just his experience, knowledge, and expertise acquired while in the government employ, but involves the use of his knowledge of a particular case or proceeding." *Id.* at 467.

The *Allied Realty* court canvassed case law, bar association opinions, and treatises to explain the many ethical policy reasons requiring that result. It explained, for instance, the need to prevent the misuse of "coercive" state power that may lead private parties "to divulge information that could be used in a civil action." *Id.* at 469.

> If the lawyer making the approach does so under sanction or color of official power, he thereby more certainly disqualifies himself from later participation as counsel in any civil litigation having its basis in or connected with the occurrence previously investigated as to its potential criminal aspects.
>
> ***A prosecutor cannot profit by information gained in the course of performance of his duties as a public official. Public policy forbids[it]***.

*Id.* (emphasis added) (citation omitted). The court highlighted the importance "of preventing 'even the appearance that the government servant may take a certain stand in the hope of later being privately employed to uphold or upset what he had done.'" *Id.* (quoting *United States v. Standard Oil Co.*, 136 F. Supp. 345 (S.D.N.Y. 1955) (Kaufman, J.)).

*Allied Realty* relied on *Hilo Metals Co. v. Learner Co.*, 258 F. Supp. 23 (D. Haw. 1966), as "highly persuasive authority." 283 F. Supp. at 468. In *Hilo Metals*, a Department of Justice lawyer had investigated alleged antitrust violations by companies in the scrap metal industry and later pursued a private antitrust action against those same companies. 258 F. Supp. at 25. The district court disqualified the lawyer, viewing the private litigation "as a continuation by a private litigant of the criminal action involving monopolization instituted by the United States." *Id.* at 27.

*Handelman v. Weiss*, 368 F. Supp. 258 (S.D.N.Y. 1973), is cut from the same cloth. There, the plaintiffs' lawyer in a federal securities civil action had been previously appointed to assist a quasi-governmental entity in the liquidation and recovery of funds under federal investor-protection laws. *Id.* at 260. The court disqualified the attorney and his firm. Focusing on the information and insights that the lawyer gained from government service, the court explained that the lawyer had an advantage in the civil action because of his previous government service. It warned that, absent disqualification, "[n]ot only would attorneys be tempted to subordinate their official duties to their private goals, but confidence in the integrity of the attorneys selected by [the government] would be destroyed." *Id.* at 264. The court also explained that if former government lawyers could litigate using information and insights gained through government service, "the public confidence in the integrity of the judicial process would be undermined." *Id.*

The next year, the Second Circuit reversed a district court and disqualified a plaintiffs' lawyer in a contingency-fee antitrust suit by the City of New York against General Motors because the lawyer had previously investigated GM in similar matters as a DOJ attorney. *See Gen. Motors Corp. v. New York*, 501 F.2d 639, 648–52 (2d Cir. 1974). Writing for the court, Judge Kaufman rejected the argument that disqualification was unnecessary because the lawyer remained on the same side of the matter: "[T]here lurks great potential for lucrative returns in following into private

12

practice the course already charted with the aid of governmental resources." *Id.* at 650. "Where the overlap of issues is so plain, and the involvement while in Government employ so direct, the resulting appearance of impropriety must be avoided through disqualification." *Id.* at 652.

**B.**     **Ohio Rule 1.11 safeguards against the same sort of unethical misuse of information by current or former government lawyers.**

Ohio Rule 1.11 encapsulates and builds on the ethical principles and policy considerations underpinning the longstanding ABA cannons and the *Allied Realty*, *Hilo Metals*, *Weiss*, and *General Motors* disqualifications. *See* Montgomery/Muchman Report at 18–22. The Rule forbids a former or existing government lawyer from taking on a representation in which they "could" use information learned during their government service to the material disadvantage of their adversary in the private litigation. Because the potential for misuse is so acute, the concerns so grave, even the possibility that the government attorney *could use* confidential government information is enough to require disqualification under Ohio Rule 1.11.

**C.**     **Motley Rice is violating Rule 1.11(c).**

By representing plaintiffs in opioid cases against OptumRx, Motley Rice is violating Ohio Rule 1.11(c). Motley Rice is suing OptumRx in contingency-fee cases as private lawyers on behalf of clients challenging many of the same practices that Motley Rice lawyers investigated in their capacity as government lawyers.

**1.**     **Motley Rice obtained confidential government information through its government service.**

The information that Motley Rice gathered using government subpoenas qualifies as "confidential government information" under Rule 1.11(c) because (1) the "information" was "obtained under governmental authority," (2) each "government is prohibited by law from disclosing [it] to the public," and (3) the information "is not otherwise available to the public." Ohio R. Prof'l Conduct 1.11(c).

13

*First*, Motley Rice obtained information "under governmental authority." Acting as a Special Deputy Attorney General in Hawaii, Linda Singer exercised coercive investigative power uniquely vested in the government to issue a subpoena under Hawaii Revised Statutes §§ 28-2.5, 480-18, and 661-22 (Haw. Subpoena at 1) "in connection with an investigation . . . into certain business practices related to the provision of pharmacy benefits management services" (Haw. Conf. Agmt. ¶ 1). In the District of Columbia, Motley Rice issued a subpoena to OptumRx under a D.C. statute that sets forth the D.C. Attorney General's investigatory powers, including the power to "compel production of records, books, papers, contracts, and other documents." D.C. Code § 28-3910; *see also* D.C. Subpoena at 1. Similarly, the Chicago subpoena issued in an investigation under a municipal code section prohibiting "any act of consumer fraud, unfair method of competition, or deceptive practice while conducting any trade or business in the city." Chi. Mun. Code § 2-25-090(a); *see also* Chicago Subpoena at 1.

*Second*, the information produced under the subpoenas constitutes "confidential government information" because Hawaii, D.C., and Chicago are prohibited by law from disclosing the information and documents to the public. *E.g.*, Haw. Rev. Stat. § 480-18(j) ("While in the possession of the custodian, no such evidence so produced shall be available for examination . . . by any individual other than a duly authorized representative of the office of the attorney general."); D.C. Code § 2-534(a)(1) (protecting from public disclosure "[t]rade secrets and commercial or financial information obtained from outside the government, to the extent that disclosure would result in substantial harm to the competitive position of the person from whom the information was obtained"); 5 Ill. Comp. Stat. 140/7(g) (protecting from public disclosure "[t]rade secrets and commercial or financial information obtained from a person or business where the trade secrets or commercial or financial information are furnished under a claim that they are

proprietary, privileged, or confidential, and that disclosure of the trade secrets or commercial or financial information would cause competitive harm to the person or business"); *see also* Montgomery/Muchman Report at 24–32.

The confidentiality agreements that Motley Rice executed with OptumRx before OptumRx produced documents under the investigatory subpoenas confirm as much. The Hawaii agreement limits Motley Rice's disclosure of confidential information to certain state employees and Motley Rice employees (*see* Haw. Conf. Agmt. ¶ 4) and requires that they use that information "solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public" (*id.* ¶ 2). Motley Rice also agreed "not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State." *Id*. The D.C. and Chicago agreements include similar language. *See* D.C. Conf. Agmt. ¶¶ 4, 8–10; Chicago Conf. Agmt. ¶¶ 3–4, 9, 11.

*Third*, the information that Motley Rice gathered using the government subpoenas also qualifies as confidential government information because it is not "otherwise available to the public." Ohio R. Prof'l Conduct 1.11(c). In response to various government subpoenas, OptumRx produced—directly to Motley Rice—a wide range of proprietary and competitively sensitive information including information related to its formulary development, business strategies, negotiations and rebate agreements with pharmaceutical manufacturers, and closely guarded financial data that is not publicly available. There can be no question that the information OptumRx produced is the sort of "confidential government information" that Rule 1.11(c) is concerned with. *See, e.g.*, Montgomery/Muchman Report at 24–32; *In re Nat'l Prescription Opiate Litig.*, 2019 U.S. Dist. LEXIS 46065, at *74 ("information concern[ing] the inadequate staffing levels, funding

deficiencies, strategies, initiatives, operations, and allocation of resources" constituted confidential government information); *United States v. Villaspring Health Care Ctr., Inc.*, No. 3:11-43, 2011 U.S. Dist. LEXIS 129933, at *18 (E.D. Ky. Nov. 7, 2011) (disqualifying lawyer under Kentucky's identical Rule 1.11(c) and concluding that "strategic insights, such as [the disqualified lawyer's] knowledge of the strengths and weaknesses of the evidence compiled against [the investigated company]," constituted confidential government information).

> **2.    Motley Rice could use the confidential information acquired through government service in these opioid cases against OptumRx.**

Armed with OptumRx's confidential information acquired under coercive investigatory subpoenas, Motley Rice now *could* use that confidential information to OptumRx's material disadvantage in the bellwethers. That requires disqualification.

Motley Rice's government investigations of OptumRx focused on the same aspects of OptumRx's business that now feature in Motley Rice's private litigation efforts. Here are some examples of the subpoena requests, which focused on OptumRx's rebate negotiations, formulary development and clinical analysis, and financial data related to rebates:

- "Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments." Haw. Subpoena, Request 5; D.C. Subpoena, Request 4.

- "Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments." Haw. Subpoena, Request 6; D.C. Subpoena, Request 5.

- "Produce all agreements and Documents reflecting or related to agreements with Manufacturers or any entity or individual affiliated with any Manufacturer related to Payments." Haw. Subpoena, Request 12; D.C. Subpoena, Request 10.

- "Produce all Documents sufficient to Identify the ten Manufacturers from which You have directly or indirectly received the largest Payments (as determined by the total dollar amount of Payments) per year from 2010-2021." Haw. Subpoena, Request 1; *see also* D.C. Subpoena, Request 1.

As the investigatory subpoenas directed, OptumRx produced materials responsive to those requests directly to Motley Rice attorneys in their capacity as government-appointed lawyers and Special Deputy Attorneys General. The materials included rebate agreements with manufacturers, custodial documents concerning OptumRx's formulary decisions and internal business operations, documents and information relating to OptumRx's development and offering of formulary and clinical products to its clients, and detailed rebate data relating to various drug manufacturers— including multiple opioid manufacturers. *See* Caplis Decl. ¶¶ 7–9, 12–15; Grant Decl. ¶¶ 7–8; Hooker Decl. ¶¶ 7–9. All those materials are confidential and competitively sensitive.

Motley Rice's liability theories in the bellwether cases focus on many of those same aspects of OptumRx's business. Take, for example, the complaint in *City of Rochester*. There, Motley Rice's client alleges that OptumRx colluded with drug manufacturers to flood the market with opioids because drug manufacturers paid rebates to OptumRx in exchange for placing the manufacturers' opioids in favorable positions on OptumRx's formulary offerings. *See, e.g.*, *City of Rochester*, Compl. ¶ 47 ("PBMs collude with Manufacturers who pay fees in the form of rebates, administrative fees and other, in order to ensure good placement on the formulary to the financial benefit of the PBMs."); *id.* ¶ 1074 ("Each of the participants . . . received substantial revenue from the scheme, in the form of . . . rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place on a formulary or otherwise made opioids available for improper use— all in an effort to maximize profits.").[5] The other bellwether complaints contain similar allegations.

---

[5] *See also, e.g.*, *id.* ¶ 42 ("PBMs control, through their formularies, which drugs go where and how they are paid for."); *id.* ¶ 1093 ("The Manufacturer Defendants knowingly and intentionally financially incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse."); *id.* ¶ 45 ("PBMs' complicity in the overall fraudulent scheme is purposeful given the nature of the financial arrangements between PBMs and drug manufacturers and others in the supply chain. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater

The confidential information that OptumRx produced to Motley Rice lawyers in their service as government lawyers provide the firm with a roadmap for litigating against OptumRx on those aspects of its business.

At the December 1, 2023 hearing before this Court, the PEC confirmed on the record that their claims in these opioid cases focus on many of the same business practices that Motley Rice lawyers targeted during their government service. The PEC argued that the PBMs should produce materials from non-opioid "governmental investigations" around the country because "the investigations are broad enough to include opioid—their conduct vis-à-vis opioid scripts and formularies associated with opioids." Dkt. 5265 at 24:12–25:4. In other words, the PEC argued that government investigations about PBM business practices overlap with these opioid lawsuits and that the PEC has every intention of using information from those investigations to OptumRx's material disadvantage in these cases.

> **D.     Disqualification is required because Motley Rice cannot unlearn what it learned through government service.**

Ohio Rule of Professional Conduct 1.11(c)—and the common law ethical traditions on which those rules are founded—preclude a lawyer who has received confidential information about a company through government service to then advance related claims against that company in a private capacity. The Rules are not concerned only with the free flow of *documents* between cases. Instead, Rule 1.11(c) prevents a former government lawyer from using *knowledge* gleaned from their work as a government lawyer. *See* Ohio R. Prof'l Conduct 1.11 cmt. 8; *see also Kronberg v. LaRouche*, No. 1:09-cv-947, 2010 U.S. Dist. LEXIS 35097, at *10–11 (E.D. Va. Apr. 9, 2010) (focus is on "attorney's possession of actual knowledge of confidential information").

---

utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements that would slow down flow.").

Through their work as government lawyers, Motley Rice learned confidential, competitively sensitive information about OptumRx's structure, committees, clinical and business processes, data, negotiations with manufacturers, and interactions with clients. Motley Rice could use that knowledge in the opioid bellwethers against OptumRx in any number of ways—including by refining plaintiffs' liability theories and allegations, pressing for additional documents in targeted areas based on earlier learnings, using earlier learnings to seek discovery of additional or different custodians or data, and so on. Given the overlap between the investigations and this litigation, the possibilities are endless. There is no way for Motley Rice lawyers to unlearn what they learned while wielding government power. *See* Montgomery/Muchman Report at 29–35.

That is why Rule 1.11(c) does not prohibit the *use* of "confidential governmental information" in later private litigation; it prohibits the *entire representation*. *See* Ohio R. Prof'l Conduct 1.11(c) ("may not represent a private client"). Under Rule 1.11(c), the Court must disqualify Motley Rice.[6]

## II.    DISQUALIFICATION WILL NOT PREJUDICE THE BELLWETHER PLAINTIFFS BECAUSE OTHER FIRMS ON THE PLAINTIFFS' EXECUTIVE COMMITTEE WILL CONTINUE TO REPRESENT THEM.

Although courts must enforce the canons of legal ethics, that need is balanced with the potential "use of disqualification motions as a tactical weapon in litigation." *SK Handtool Corp. v. Dresser Indus., Inc.*, 619 N.E.2d 1282, 1288 (Ill. App. Ct. 1993). That risk does not exist here.

---

[6] Under Rule 1.11(c), "[a] firm with which that lawyer is associated may undertake or continue representation in the matter *only* if the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom." *Id.* (emphasis added). The term "screened" means "the isolation of a lawyer from *any participation* in a matter." *Tucker v. George*, 569 F. Supp. 2d 834, 839 (W.D. Wis. 2008) (emphasis added). Screening is not an option here. Motley Rice's entire "Public Client" practice group, including Linda Singer, received confidential information through government service that they could use against OptumRx in private litigation. And Linda Singer, Joe Rice, and others from Motley Rice's Public Client group have already begun participating in the four bellwethers. *See In re Nat'l Prescription Opiate Litig.*, 2019 U.S. Dist. LEXIS 46065, at *76 (disqualifying firm "to the same extent" as lead lawyer).

OptumRx complied with the earlier Motley Rice-led government investigations. And it gave notice of its intent to file this disqualification motion as soon as it became clear that Motley Rice would represent bellwether plaintiffs. This motion is not a tactic. It is grounded in ethical concerns that are legitimate and legitimately held.

And no remedy other than disqualification will resolve the conflict. It would be impossible for Motley Rice's lawyers *not* to use what they learned through their service as government investigators for their clients' and their own benefit. *See* Montgomery/Muchman Report at 32–35. On the other hand, disqualification will not prejudice the bellwether plaintiffs. The bellwether cases are in their early stages, and plaintiffs already have numerous other firms on the PEC representing them.[7]

## **CONCLUSION**

Ohio law and the Rules of Professional Conduct prevent Motley Rice from representing private clients in litigation against OptumRx when they obtained confidential government information about OptumRx while serving as government investigators and could use that information to OptumRx's material disadvantage. The Court should disqualify Motley Rice from representing plaintiffs in opioid litigations against OptumRx.

December 15, 2023.

Respectfully submitted,

  */s/ Brian D. Boone*
Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End

---

[7] Other PEC firms include Barrett Law Group, P.A.; Lieff Cabraser Heimann & Bernstein, LLP; Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.; Crueger Dickinson LLC; The Dugan Law Firm, APLC; Robbins Geller Rudman & Dowd LLP; McHugh Fuller Law Group; Weisman Kennedy & Berris Co., LPA; Lanier Law Firm; Levin Papantonio, Thomas, Mitchell, Rafferty & Proctor, PA; Weitz & Luxenberg, P.C.; Keller Rohrback; Napoli Shkolnik PLLC; Seeger Weiss LLP; Baron & Budd, P.C.; and Morgan & Morgan.

1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel.: (704) 444-1000
brian.boone@alston.com

William H. Jordan
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com

*Attorneys for OptumRx, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 15, 2023, a copy of the foregoing was served on all counsel of record by filing the same with the Court's ECF system.

*/s/ Brian D. Boone*
Brian D. Boone