# Exhibit F

to Declaration of Matthew Hooker

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**



# LETTER CONTRACT

December 1, 2020

Linda Singer
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

> RE: Letter Contract Number DCCB-2021-F-0008
> Outside Counsel for Pharmacy Benefit Managers
> Litigation

Dear Ms. Singer:

This is a letter contract between the Office of the Attorney General for the District of Columbia and the law firm Motley Rice LLP, hereinafter referred to as "Contractor", wherein Contractor agrees to provide legal services on a contingency fee basis to assist in the investigation of and possible litigation against Pharmacy Benefit Managers for potential violations of District law, including the District's consumer protection and false claims act statutes, as described in the Statement of Work (Attachment 1).

    (a)    This letter contract is contingency fee contract. The District's liability for payment to Contractor under the letter contract occurs only when Contractor obtains monetary recovery during performance of the letter contract and the proceeds are deposited into the appropriate District account. The Contractor shall be entitled to receive expenses and a contingency fee of 12.5% of the net recovery if the matter is resolved pre complaint or15% of the net recovery if the matter is resolved after the filing of a complaint up to and including $999,000.00. Net Recovery is defined as any settlement or judgment amount minus the actual costs incurred by Motley Rice, including payments for the time of any experts and contract attorneys engaged for document review. Motley Rice will agree to first seek its usual and customary fees and costs from the targets of the investigation and/or the defendants before collecting a contingency fee. The maximum liability under the letter contract is $999,000.00. If no recovery is realized and deposited to the District's account, Contractor shall receive no fee, compensation or reimbursement of costs and expenses. In no event shall the amount paid under this letter contract or any extension thereof exceed (50%) of the total definitized contract amount.

2023-FOIA-01530-00000086

(b)   Contractor agrees to immediately begin performance of this letter contract under the
Statement of Work, Attachment 1. Contractor agrees to timely submit to the Contracting
Officer requested documents or information reasonably necessary to obtain Council of
the District of Columbia (Council) approval of the definitized contract. Approval by the
Council and award by the Contracting Officer are required to definitize the contingency-
fee contract. Prior to Council approval of the definitized contract, no payments shall be
due to Contractor.

(c)   The District intends to definitize a final contingency-fee contract within the period of 120
days from date of award of this letter contract, at which time this letter contract shall merge
with the definitized contract. The parties hereby agree that the contingency fee shall not
exceed 12.5% of the net recovery if the matter is resolved pre complaint; and 15% of the net
recovery if the matter is resolved after the filing of a complaint against Pharmacy Benefit
Managers plus agreed-upon reimbursable costs.  Before expiration of the 120 days, the
Contracting Officer may authorize an additional time period extension in accordance with 27
DCMR § 5028.1(e).  If the District does not definitize the contingency-fee contract within
120 days of the date of award of this letter contract or any extension thereof, this letter
contract is automatically terminated.

(d)   If for any reason the District and the Contractor are unable to definitize the letter
contract within the period of the letter contract as specified, the letter contract is
automatically cancelled without recourse or liability between the District and the
Contractor.

Contractor shall perform under this letter contract pursuant to the following documents that
are hereby incorporated by reference into this letter contract and listed in order of priority:

1)   The Letter Contract;

2)   Statement of Work (Attachment 1)

3)   Government of the District of Columbia Standard Contract Provisions for Use with
Supplies and Services Contracts (July 2010) (available at www.ocp.dc.gov click on
"Required Solicitation Attachments").

4)   Provision regarding Ethical Obligations and Legal Conflicts of Interest (Attachment 2)

5)   D.C. Bar Legal Ethics Committee Opinion No. 268 https://www.dcbar.org/bar-
resources/legal- ethics/opinions/opinion268.cfm#.XHfvoFV57lA.email (Attachment 3)

SIGNED AND ACCEPTED FOR THE CONTRACTOR BY:

*Linda Singer /AS*                        **12/1/2020**

Linda Singer                                      Date
Motely Rice LLC

2023-FOIA-01530-00000087

Letter Contract No. DCCB-2021-F-0008                                    Page 3 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation

SIGNED AND ACCEPTED FOR THE DISTRICT OF COLUMBIA BY:

_____                    _____12/1/20_____

Gena Johnson                                        Date
Contracting Officer

2023-FOIA-01530-00000088

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

## STATEMENT OF WORK

**1.      SCOPE:**

The Office of the Attorney General for the District of Columbia engages the Contractor to assist the Public Advocacy Division with an investigation and potential litigation against Pharmacy Benefit Managers for violations of District law.

**OAG will retain sole authority at all times to direct the litigation in all respects, including but not limited to whether and when to initiate litigation, against whom actions will be taken, the claims to be brought in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.**

**2.      DEFINITIONS/GLOSSARY**

These terms when used in this Contract have the following meanings:

**2.1     Attorney's fees** – Any fees recovered by the District for counsel's representation as part of any cause of action that provides a basis for such an award.

**2.2     Contractor** – the entity to whom this Contract is awarded.

**2.3     Gross Recovery** — the total recovery for the District as a result of Contractor's representation of the District whether by settlement, arbitration award, court judgment following trial or appeal, or otherwise. "Gross recovery" shall include, without limitation, the following: the present value of any monetary payments to be made to the District. "Gross recovery" may come from any source, including, but not limited to, adverse parties to the Action and/or their insurance carriers and/or any third party, whether or not a party to the Action.  Notwithstanding any other provision in this agreement, in no event will the District be required to pay legal fees out of any fund other than monies recovered in this litigation.

**2.4     OAG --** The Office of the Attorney General for the District of Columbia. OAG represents the District of Columbia and other District agencies in litigation, including consumer protection litigation.  OAG has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for protecting the public interest.

**2.5     Other Direct Costs** – all costs for goods and services necessary for the potential investigation and litigation against pharmacy benefit managers or any other potentially liable parties.

Page 1 of 8

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

3.    **BACKGROUND**

Pharmacy Benefit Managers ("PBMs") and other third-party administrators of health plans' prescription drug programs play an integral role in setting the prices paid for prescription drugs. The District seeks outside counsel to conduct an investigation to determine if the conduct of PBMs or related entities violate the District's consumer protection or false claims act laws. If any violations of law are confirmed, outside counsel will also assist with litigation concerning those violations.

4.    **REQUIREMENTS**

4.1    The Contractor shall perform legal services that include, but are not limited to the following:

4.1.1    Assist OAG with the investigation of potential violations of law by Pharmacy Benefit Managers.

4.1.2    If violations of law are identified as a result of the investigation, conduct litigation against Pharmacy Benefit Managers. Contractor shall assist in all phases of these investigations and litigations, including:

 a.  Preparation of complaint(s), filing complaint(s), service of summons;

 b.  Responding to motions, including motions to dismiss;

 c.  Drafting motions, including drafting motions for summary judgment, other dispositive motions, and any other appropriate motions on behalf of the District;

 d.  Drafting and responding to discovery requests propounded on the District or OAG;

 e.  Tracking documents obtained in discovery;

 f.  Coordinating litigation with other states and the federal government to promote, to the extent beneficial, a unified approach to litigation;

 g.  Taking depositions, defending depositions, preparing witnesses for depositions;

 h.  Responding to motions for summary judgment or other dispositive pretrial motions;

 i.  Consulting with experts necessary to analyze and develop the District's case;

 j.  Identifying experts to testify on behalf of the District;

 k.  Preparing expert witnesses for deposition or trial testimony;

 l.  Preparing legal arguments on motions practice;

 m. Handling discovery disputes;

 n.  Representing the District in trial or any settlement negotiations;

 o.  Representing the District in responding to pretrial motions;

2023-FOIA-01530-00000090

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

      p.  Representing the District in any appeal of any judgment or verdict rendered in the action, and if applicable, any remand from appeal.

**4.1.3**  Advise OAG on the conduct of the case and on strategy and tactics for each phase of the case.

**4.1.4**  **FOIA Assistance.** Third parties may submit FOIA requests to OAG regarding this matter. OAG will notify Contractor of the FOIA request and Contractor shall electronically provide, within five business days, all records responsive to the FOIA request. In addition, Contractor shall make all records regarding this matter available for examination and review by OAG, upon request. Contractor shall be entitled to reimbursement of costs for searching and copying records as set forth in Standard Contract Provision No. 34, Freedom of Information Act.

**4.1.5**  Provide monthly or other regular status reports to the Contract Administrator.

**4.1.6**  Provide legal services, advice, and consultation to OAG for this litigation in a manner consistent with accepted standards of practice in the legal profession. The Attorney General shall have final authority over all aspects of this litigation. The litigation may be commenced, conducted, settled, approved and ended only with the express approval and signature of the Attorney General. The Attorney General, at his sole discretion, has the right to appoint a designated assistant ("designated assistant") to oversee the litigation, which appointment the Attorney General may modify at will.

**4.1.7**  Provide legal services to the Attorney General subject to the approval of the Attorney General for the purposes of seeking injunctive relief, monetary relief, and other relief against all entities in this litigation.

**4.1.8**  Coordinate the provision of legal services with the Attorney General or his designated assistant, other personnel of OAG, and such others as the Attorney General may appoint. All substantive pleadings, motions, briefs, and other material which may be filed with the court shall first be approved by the Attorney General and provided to his office in draft form in a reasonable and timely manner for review. Regular status meetings may be held as requested by the Attorney General or his designated assistant.

**4.1.9**  Communicate with District entities through OAG unless authorized by OAG to communicate directly with those entities.

**4.1.10**  Render services pursuant to this Contract as an independent contractor. Neither Contractor nor any employee of Contractor shall be regarded as employed by, or as an employee of OAG.

**4.2**    **Direct Cost Limitations/Requirements**

    The Contractor shall provide notice and obtain approval from OAG prior to engaging expert witnesses or other consultants.

2023-FOIA-01530-00000091

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

**4.3      Key Personnel for the Contract are listed below:**

Paige Boggs, Attorney at Law
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
pboggs@motleyrice.com

**4.4      Kickoff Meeting**

The Contractor shall be available for an in-person kickoff meeting within seven (7) business days from date of award.

**5.      INSURANCE**

A. GENERAL REQUIREMENTS. The Contractor at its sole expense shall procure and maintain, during the entire period of performance under this contract, the types of insurance specified below. The Contractor shall have its insurance broker or insurance company submit a Certificate of Insurance to the CO giving evidence of the required coverage prior to commencing performance under this contract. In no event shall any work be performed until the required Certificates of Insurance signed by an authorized representative of the insurer(s) have been provided to, and accepted by, the CO. All insurance shall be written with financially responsible companies authorized to do business in the District of Columbia or in the jurisdiction where the work is to be performed, or by surplus lines insurers and have an A.M. Best Company rating of A- / VII or higher. Should the Contractor decide to engage a subcontractor for segments of the work under this contract, then, prior to commencement of work by the subcontractor, the Contractor shall submit in writing the name and brief description of work to be performed by the subcontractor on the Subcontractors Insurance Requirement Template provided by the CA, to the Office of Risk Management (ORM). ORM will determine the insurance requirements applicable to the subcontractor and promptly deliver such requirements in writing to the Contractor and the CA. The Contractor must provide proof of the subcontractor's required insurance to prior to commencement of work by the subcontractor. If the Contractor decides to engage a subcontractor without requesting from ORM specific insurance requirements for the subcontractor, such subcontractor shall have the same insurance requirements as the Contractor.

All required policies except professional liability insurance shall contain a waiver of subrogation provision in favor of the Government of the District of Columbia.

The Government of the District of Columbia shall be included in all policies required hereunder to be maintained by the Contractor and its subcontractors (except for workers' compensation, cyber liability and professional liability insurance) as an additional insured for claims against The Government of the District of Columbia relating to this contract, with the understanding that any affirmative obligation imposed upon the insured

Page 4 of 8

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

Contractor or its subcontractors (including without limitation the liability to pay premiums) shall be the sole obligation of the Contractor or its subcontractors, and not the additional insured. The additional insured status under the Contractor's and its subcontractors' Commercial General Liability insurance policies shall be effected using the ISO Additional Insured Endorsement form CG 20 10 11 85 (or CG 20 10 07 04 **and** CG 20 37 07 04) or such other endorsement or combination of endorsements providing coverage at least as broad and approved by the CO in writing. All of the Contractor's and its subcontractors' liability policies (except for workers' compensation, cyber liability and professional liability insurance) shall be endorsed using ISO form CG 20 01 04 13 or its equivalent so as to indicate that such policies provide primary coverage (without any right of contribution by any other insurance, reinsurance or self-insurance, including any deductible or retention, maintained by an Additional Insured) for all claims against the additional insured arising out of the performance of this Statement of Work by the Contractor or its subcontractors, or anyone for whom the Contractor or its  subcontractors may be liable. These policies shall include a separation of insureds clause applicable to the additional insured.

If the Contractor and/or its subcontractors maintain broader coverage and/or higher limits than the minimums shown below, the District requires and shall be entitled to the broader coverage and/or the higher limits maintained by the Grantee and subcontractors.

1. Commercial General Liability Insurance ("CGL") - The Contractor shall provide evidence satisfactory to the CO with respect to the services performed that it carries a CGL policy, written on an occurrence (not claims-made) basis, on Insurance Services Office, Inc. ("ISO") form CG 00 01 04 13 (or another occurrence-based form with coverage at least as broad and approved by the CO in writing), covering liability for all ongoing and completed operations of the Contractor, including ongoing and completed operations under all subcontracts, and covering claims for bodily injury, and death of any persons, injury to or destruction of property, including loss of use resulting therefrom, personal and advertising injury, and including coverage for liability arising out of an Insured Contract (including the tort liability of another assumed in a contract) and acts of terrorism (whether caused by a foreign or domestic source). Such coverage shall have limits of liability of not less than $1,000,000 each occurrence, a $2,000,000 general aggregate (including a per location or per project aggregate limit endorsement, if applicable) limit, and a $1,000,000 personal and advertising injury limit.

OAG should collect, review for accuracy and maintain all warranties for goods and services.

2. Automobile Liability Insurance - The Contractor shall provide evidence satisfactory to the CO of commercial (business) automobile liability insurance written on ISO form CA 00 01 10 13 (or another form with coverage at least as broad and approved by the CO in writing) including coverage for all owned, hired, borrowed and non-owned vehicles and equipment used by the Contractor, with minimum per accident limits equal to the greater of (i) the limits set forth in the Contractor's commercial

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

automobile liability policy or (ii) $1,000,000 per occurrence combined single limit for
bodily injury and property damage.

3. Workers' Compensation Insurance - The Contractor shall provide evidence
satisfactory to the CO of Workers' Compensation insurance in accordance with the
statutory mandates of the District of Columbia or the jurisdiction in which the
contract is performed.

Employer's Liability Insurance - The Contractor shall provide evidence satisfactory
to the CO of employer's liability insurance as follows: $500,000 per accident for
injury; $500,000 per employee for disease; and $500,000 for policy disease limit.

All insurance required by this paragraph 3 shall include a waiver of subrogation
endorsement for the benefit of Government of the District of Columbia.

4. Cyber Liability Insurance - The Contractor shall provide evidence satisfactory to the
Contracting Officer of Cyber Liability Insurance, with limits not less than $5,000,000
per occurrence or claim, $5,000,000 aggregate. Coverage shall be sufficiently broad
to respond to the duties and obligations as is undertaken by Contractor in this
agreement and shall include, but not limited to, claims involving infringement of
intellectual property, including but not limited to infringement of copyright,
trademark, trade dress, invasion of privacy violations, information theft, damage to or
destruction of electronic information, release of private information, alteration of
electronic information, extortion and network security. The policy shall provide
coverage for breach response costs as well as regulatory fines and penalties as well as
credit monitoring expenses with limits sufficient to respond to these obligations.

5. Professional Liability Insurance (Errors & Omissions) - The Contractor shall provide
Professional Liability Insurance (Errors and Omissions) to cover liability resulting
from any error or omission in the performance of professional services under this
Contract. The policy shall provide limits of $5,000,000 per claim or per occurrence
for each wrongful act and $5,000,000 annual aggregate. The Contractor warrants that
any applicable retroactive date precedes the date the Contractor first performed any
professional services for the Government of the District of Columbia and that
continuous coverage will be maintained or an extended reporting period will be
exercised for a period of at least ten years after the completion of the professional
services. In the unlikely event the Contractor dissolves its limited liability company
during that ten year period, the Contractor agrees to purchase tail coverage for two
years post-dissolution to the extent available in the insurance market.

6. Commercial Umbrella or Excess Liability - The Contractor shall provide evidence
satisfactory to the CO of commercial umbrella or excess liability insurance with
minimum limits equal to the greater of (i) the limits set forth in the Contractor's

2023-FOIA-01530-00000094

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

umbrella or excess liability policy or (ii) $15,000,000 per occurrence and $15,000,000 in the annual aggregate, following the form and in excess of General Liability, Employer's Liability and Automobile Liability policies. All of these liability coverages must be scheduled under the umbrella and/or excess policy. The insurance required under this paragraph shall be written in a form that annually reinstates all required limits. Coverage shall be primary to any insurance, self-insurance or reinsurance maintained by the District and the "other insurance" provision must be amended in accordance with this requirement and principles of vertical exhaustion.

B. PRIMARY AND NONCONTRIBUTORY INSURANCE
The insurance required herein shall be primary to and will not seek contribution from any other insurance, reinsurance or self-insurance including any deductible or retention, maintained by the Government of the District of Columbia.

C. DURATION. Except for professional liability insurance, which has specific extended coverage set out in paragraph 5 above the Contractor shall carry all required insurance until all contract work is accepted by the District of Columbia and shall carry listed coverages for ten years for construction projects following final acceptance of the work performed under this contract and two years for non-construction related contracts.

D. LIABILITY. These are the required minimum insurance requirements established by the District of Columbia. However, the required minimum insurance requirements provided above will not in any way limit the contractor's liability under this contract.

E. CONTRACTOR'S PROPERTY. Contractor and subcontractors are solely responsible for any loss or damage to their personal property, including but not limited to tools and equipment, scaffolding and temporary structures, rented machinery, or owned and leased equipment. A waiver of subrogation shall apply in favor of the District of Columbia.

F. MEASURE OF PAYMENT. The District shall not make any separate measure or payment for the cost of insurance and bonds. The Contractor shall include all of the costs of insurance and bonds in the contract price.

G. NOTIFICATION. The Contractor shall provide the CO with thirty (30) days prior written notice in the event of coverage and/or limit changes or if the policy is canceled prior to the expiration date shown on the certificate and ten (10) days prior written notice in the event of non-payment of premium. The Contractor will also provide the CO with an updated Certificate of Insurance should its insurance coverages renew during the contract.

H. CERTIFICATES OF INSURANCE. The Contractor shall submit certificates of insurance giving evidence of the required coverage as specified in this section prior to commencing work. Certificates of insurance must reference the corresponding contract number. Evidence of insurance shall be submitted to:

2023-FOIA-01530-00000095

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

### The Government of the District of Columbia

### And mailed to the attention of:

Gena Johnson
400 6th Street NW
Washington, DC 20001
202-247-6448
Gena.johnson@dc.gov

The CO may request and the Contractor shall promptly deliver updated certificates of insurance, endorsements indicating the required coverages, and/or certified copies of the insurance policies. If the insurance initially obtained by the Contractor expires prior to completion of the contract, renewal certificates of insurance and additional insured and other endorsements shall be furnished to the CO within five working days following expiration of all such initial insurance. For all coverage required to be maintained after completion, an additional certificate of insurance evidencing such coverage shall be submitted to the CO on an annual basis as the coverage is renewed (or replaced).

I.  DISCLOSURE OF INFORMATION. The Contractor agrees that the District may disclose the name and contact information of its insurers to any third party which presents a claim against the District for any damages or claims resulting from or arising out of work performed by the Contractor, its agents, employees, servants or subcontractors in the performance of this contract.

J.  CARRIER RATINGS. All Contractor's and its subcontractors' insurance required in connection with this contract shall be written by insurance companies with an A.M. Best Insurance Guide rating of at least A- VII (or the equivalent by any other rating agency).

2023-FOIA-01530-00000096

## 1.  ETHICAL OBLIGATIONS AND LEGAL CONFLICTS OF INTEREST

1.1  An attorney-client relationship will exist between the District and any attorney who performs work under the contract, as well as between the District and the firm of any attorney who performs work under the contract.  The D.C. Rules of Professional Conduct (RPC) and the ethical rules of any other jurisdiction in which work is performed are binding on the Contractor.  The parties agree that the District may have a contractual cause of action based on violation of such rules, in addition to any other remedies available.

1.2  In addition to the prohibitions contained in the RPC and the ethical rules of any other jurisdiction in which work is performed, the Contractor agrees that it shall recognize that in the performance of the contract it may receive certain information submitted to the District government on a proprietary basis by third parties, information which relates to potential or actual claims against the District government, or information which relates to matters in dispute or litigation.  Unless the District consents to a particular disclosure, the Contractor shall use such information exclusively in the performance of the contract and shall forever hold inviolate and protect from disclosure all such information, except disclosures required by applicable law or court order. The Contractor also agrees that, to the extent it is permitted to disclose such information, it will make such disclosures only to those individuals who need to know such information in order to perform required tasks in their official capacity and will restrict access to such information to such individuals.

1.3  Before any contractor can be retained to perform legal services under the contract, on behalf of the District government, the Attorney General for the District of Columbia must review and waive all actual or potential direct and indirect conflicts of interest pursuant to RPC 1.6, 1.7, 1.8, 1.9 and 1.10.  After notice of its selection, each prospective contractor shall provide the Attorney General with the following: (1) a written statement that there exists no Rule 1.7(a) direct conflict of interest regarding the work to be performed under the contract; (2) a written description of all actual or potential conflicts of interest regarding the work to be performed under the contract that require waiver pursuant to Rule 1.7(b) because the contractor represents another client in a matter adverse to any of the following: (i) the District government agency or instrumentality to be represented under the contract; (ii) the District government as a whole; or (iii) any other agency or instrumentality of the District government (for this purpose, under D.C. Bar Legal Ethics Committee Opinion No. 268, a representation of a private client against a discrete government agency or instrumentality can have government-wide implications and thus constitute a representation adverse to the government as a whole pursuant to the RPC); and (3) a written description of all representations of clients who are or will be adverse to the District government with regard to the work to be performed under the contract, whether or not such representations are related to the matter for which the work is to be performed under the contract.

1.4    The Attorney General generally does not grant prospective conflict of interest waivers, except in certain *pro bono* matters. Thus, in addition to the prohibitions contained in the RPC and the ethical rules of any other jurisdiction in which work is performed under the contract, without the consent of the Attorney General, the Contractor shall not represent any party other than the District in any disputes, negotiations, proceedings or litigation adverse to any agency or instrumentality of the District government or the District government as a whole, including, but not limited to, matters related to the work to be performed under the Contract. The Contractor shall notify the Attorney General immediately, in writing, of any potential conflicts of interest (as defined in the RPC) that arise during the period that the Contractor is performing work under the contract. The Attorney General makes every attempt to be reasonable in deciding whether or not to consent to a conflict of interest and usually makes this decision promptly after receiving notice and sufficient information regarding the conflict. If the Attorney General does not waive a conflict of interest, the Contractor shall undertake immediate action to eliminate the source of any such conflict of interest.

1.5    Before any contractor can be retained pursuant to the contract, the Attorney General for the District of Columbia must review all actual, direct and potential conflicts of interest on behalf of the District government in light of D.C. Bar Rules of Professional Conduct ("RPC") 1.6, 1.7, 1.8, 1.9 and 1.10. Each prospective contractor shall provide the Attorney General with written notice of all actual or potential direct and indirect conflicts of interest in which the Contractor represents (or may represent) another client with interests adverse to the District government agency to be represented as well as against the District government as a whole. For this purpose, under D.C. Bar Legal Ethics Committee Opinion No. 268, attached as Attachment 2 hereto, a representation of a private client against a discrete government agency can have government-wide implications and thus qualify under the RPC as being against the government as a whole, including the individual agency that the private firm represents. In that situation, the private firm would be required to notify the Attorney General of the existence of a conflict under RPC 1.7 and obtain consent to such representation and waiver of the conflict. The Attorney General makes every attempt to be reasonable in deciding whether or not to consent to a conflict and usually makes this decision promptly after receiving notice of the conflict.

**Ethics Opinion 268**

## Conflict of Interest Issues Where Private Lawyers Provide Volunteer Legal Assistance to the D.C. Corporation Counsel; Reconsideration of Opinion 92

Under the D.C. Rules of Professional Conduct, a lawyer may give volunteer legal assistance to the D.C. Corporation Counsel and continue simultaneously to represent private clients against the City and its agencies, as long as the requirements of Rule 1.7 are met. Under Rule 1.7(b)(1), a lawyer who wishes to represent a private client against the same City government client that she is representing while working for the Corporation Counsel on an unrelated matter, may do so if she obtains the informed consent of both her private client and her City government client. Similarly, the lawyer may agree to volunteer her services t o represent the same City government client that she or her firm are opposing on behalf of a private client in an unrelated matter, if both clients consent after full disclosure. Client notification and consent are not required, however, where the lawyer is not opposing her own City government client but some other agency of the City that is not her client.

The City government client is not always the City as a whole, but may be more narrowly defined as one of the City's constituent agencies. The identity of the government client for conflict of interest purposes will be established in the first instance between the lawyer and responsible government officials in accordance with the general precepts of client autonomy embodied in Rule 1.2. In agreeing to undertake a particular representation, the lawyer must take steps to recognize and respect the reasonable expectation of her other clients, protected by Rule 1.7, that they will receive a conflict-free representation.

Even if Rule 1.7(b)(1) does not apply, because the lawyer's government client is not considered the same government entity she is opposing on behalf of private parties, Rule 1.7(b)(2)-(4) may require that the lawyer obtain client consent if her representation of one client will be or is likely to be "adversely affected" by her representation of the other, or if the independence of her professional judgment will be or is likely to be adversely affected by her responsibilities to third parties or by her own personal interests.

**Applicable Rules**

- Rule 1.2 (Scope of Representation)
- Rule 1.7 (Conflict of Interest: General Rule)

**Inquiry**

The Committee has been asked to reconsider several conclusions of D.C. Bar Opinion 92 (1980) ("Propriety of Private Attorneys Handling Municipal Cases on a Pro Bono Basis"). Opinion 92 examined the ethical propriety, under the D.C. Code of Professional Responsibility, of a program in which "private attorneys acting on a pro bono basis would assist the City in managing its severely crowded civil docket."[1] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote1)** The Committee opined in Opinion 92 that the program would be ethically permissible as long as certain conditions were met. The inquirer has asked the Committee to reconsider the continuing validity of two of those conditions, given the intervening adoption in 1991 of the D.C. Rules of Professional Conduct.[2] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote2)** The two conditions in question are as follows:

2023-FOIA-01530-00000099

1. A lawyer or firm performing volunteer representational work for the City or any of its agencies may simultaneously represent a private party against the City or any of its agencies only with full disclosure to and consent of both the City and the private party; and.

2. Under no circumstances may a lawyer or firm volunteer to represent a particular agency of the City government while at the same time handling a private matter involving the same agency, or another matter that is or appears to be "closely related," even with client consent.

## Summary of Conclusions

For reasons discussed more fully in Part I below, the Committee believes that the conclusion in paragraph 2 above is no longer mandated under the Rules of Professional Conduct. Thus a lawyer may represent a particular City government agency in a matter at the same time she is opposing that agency on behalf of a private client in an unrelated matter, as long as she makes full disclosure to and obtains the consent of both the City government agency and the private client. See Rule 1.7(b)(1) and 1.7(c). Moreover, as explained in Part II below, we disagree with the assumption of Opinion 92 that the entire City and all of its constituent agencies must always and necessarily be considered the lawyer's client for conflict of interest purposes. Thus, a lawyer may under certain circumstances perform services for a particular City agency client without having to notify and obtain the consent of private clients that she is representing against another City agency that is not considered the same client. Nevertheless, even if Rule 1.7(b)(1) does not apply because the lawyer is not opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to notify and seek the consent of one or both clients if her representation of one would substantially interfere with her representation of the other, or if her independent judgment in either client's behalf would be adversely affected by her responsibilities to a third party or by her own personal interests.

## Discussion

### I. Prohibited Representation of Private Parties Against Particular City Agencies or in Particular Matters

Opinion 92 imposed an absolute prohibition against a lawyer's representing a private party against the same particular City agency for which she is performing volunteer services, or in a matter "closely related" to the one she is handling for the City. This absolute prohibition was derived from the "appearance of impropriety" standard of Canon 9 rather than the "conflict of interest" rules of Canon 5. The "appearance" standard was dropped entirely from the Rules of Professional Conduct, and the conflict of interest rules provide that conflicts may generally be waived by the client. See Rule 1.7(b) and (c). Under the current rules, the only conflict that cannot be relieved by client consent is the one that arises where a lawyer seeks to take "adverse" positions on behalf of two different clients in the same matter. See Rule 1.7(a). We therefore conclude that the absolute prohibition on opposing one's own City agency client set forth in paragraph 2 above is no longer applicable.

While a conflict under Rule 1.7(b)(1) would arise if the volunteer lawyer attempted to represent a private client against the City in one matter at the same time she (or one of her partners) was representing the City for the Corporation Counsel in another matter, since the lawyer would in effect be opposing her own client, that conflict could in most circumstances be cured by making full disclosure to both affected clients and obtaining their consent. Thus, a lawyer may represent a private party against a City government agency while simultaneously representing that same City agency in an unrelated matter, as long as both the private client and the agency client are informed of the existence and nature of the lawyer's conflict and do not object to the continued representation. See Rule 1.7(b)(1) & (c). See also Rule 1.7(b)(2)-(4). A lawyer may not, however, represent both the City and a private client in the same matter if they are adverse to each other in that matter, even if both clients consent. See Rule 1.7(a).

The fact that the lawyer is volunteering her services to the City, as opposed to serving under a paid retainer, is irrelevant to these conclusions, as it is to the conclusions reached in the remainder of this opinion.

2023-FOIA-01530-00000100

## II. Conflicts of Interest Where Volunteer Services Are Performed for the City or One of Its Agencies

We now address the holding of Opinion 92 based on the then-applicable conflict of interest rules, described in numbered paragraph 1 above. Opinion 92 construed the conflict of interest provisions of the former Code, derived from Canon 5, to permit a lawyer to participate in the Corporation Counsel's volunteer program "notwithstanding his or her involvement in other matters affecting the City," as long as two conditions were met: first, it must be "obvious" that the lawyer can adequately represent "both the interests of the City and his or her other private clients;" and, second, "each affected client must consent to the multiple representation after full disclosure."

## A. Defining the Client for Conflict of Interest Purposes

Before turning to an analysis of how the current conflict of interest rules apply in this situation, we must deal with one important threshold issue, involving an unexamined assumption made by the drafters of Opinion 92 about the identity of the City government client. That assumption is that the client of the volunteer lawyer working for the Corporation Counsel is always and necessarily "the City" as a whole rather than one or more of the City's constituent agencies.[3] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote3) This definition of the government client gives the conflict rules a considerably broader application and effect than they would have if the City government client were more narrowly defined. Under Rule 1.7(b)(1), a lawyer may not take a position in a matter on behalf of one client that is adverse to a position taken in the same matter by another client (not represented by her) unless she obtains consent from both clients.[4] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote4) If the client of the volunteer lawyer is the City as a whole, as opposed to one or more of its constituent agencies, Rule 1.7(b)(1) would require the lawyer to obtain consent to the City representation from each and every one of the private clients that she is currently representing against the City or any of its agencies, and from the City to each and every adverse private representation the lawyer may currently be involved in against it or any of its agencies, without regard to whether there is any real possibility that the substantive concerns animating the conflicts rules are implicated.[5] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote5)

Concerned that the breadth of this definition of the City government client will effectively discourage, if not preclude, private law firms from volunteering to assist the Corporation Counsel, the inquirer has asked the Committee to consider whether the volunteer lawyer's client may be defined as a particular City agency as opposed to the City as a whole, so as to ameliorate the sweeping requirement of notice and consent imposed by Rule 1.7(b)(1) read in the light of Opinion 92. We agree with the inquirer that the definition of the City government client contained in Opinion 92 is too broad, and that the City government client may sometimes be defined as narrowly as a single agency. As discussed more fully below, we also believe that the identity of the City government client depends upon a number of discrete considerations and must be decided on a case-by-case basis.

Simply as a matter of common sense it seems apparent that the client of the volunteer lawyer will not always be the entire City, but may sometimes be a smaller part of it. Much like a large modern corporation, the District of Columbia government is a complex and many-faceted entity that sometimes acts through its individual constituent parts (like the subsidiaries of a corporation) and sometimes acts as a single entity, depending upon the particular facts and circumstances. Sometimes a legal matter or issue is relevant only to a single City agency and is of no substantial interest to other agencies or the City as a whole. Sometimes a matter or issue directly affects or is otherwise significant to a number of agencies or the overall City government. In some situations the broad set of interests at stake will be apparent at the outset; in others the broader concerns may emerge during the course of the representation.

Whatever general principles about client identity in the government context can be drawn from our common sense analysis of the governmental interests implicated by particular cases, at bottom

the identity of the City government client (like the identity of the corporate client) is not primarily a question of legal ethics. The identity of the government (or corporate) client for all ethical purposes is established in the first instance between the lawyer and responsible public (or corporate) officials in accordance with the general precepts of client autonomy embodied in Rule 1.2.[6] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote6) Cf. ABA Formal Opinion 95-390 ("Conflicts of 6 Interest in the Corporate Family Context") (a corporate client may specify, when engaging a lawyer, whether or not "the corporate client expects some or all of its affiliates to be treated as clients for purposes of Rule 1.7").

The ethics rules provide at least one important limitation on what a lawyer can agree to with a client under Rule 1.2, and that is her other clients' right to be protected from conflicts of interest under Rule 1.7. In agreeing to represent a particular government client, a lawyer must take into account the countervailing rights of her other clients whose interests may be adversely affected by this new representation to know of and object to it—just as she must consider the similar rights of the new government client to know of and be able to object to any conflicting existing representations. In working with officials who are authorized to speak for the government client to define the scope of the representation (and hence the identity of the government client for conflict of interest purposes), the lawyer may defer to the government client's wishes only as long as she is able to fulfill her basic responsibilities to her other clients under Rule 1.7, including in particular her obligation not to take a position adverse to them on behalf of another client without their consent. This is the basic right secured to every client by Rule 1.7(b)(1).

The lawyer may not, by agreeing to a narrow definition of the government client, seek to defeat the reasonable expectation of her other clients, arising from and protected by Rule 1.7(b), that they will get a conflict-free representation from their lawyer. Accordingly, the volunteer lawyer must assure herself that the definition of the government client ultimately arrived at in discussions with authorized government officials both recognizes and respects her private clients' right to object when their lawyer proposes to represent interests directly adverse to their own. Her government client has the same right to object to any potentially conflicting private representations.

Thus, we believe that the lawyer who wishes to perform volunteer work for the Corporation Counsel's Office has an obligation to work with that office to develop a clear understanding of the scope of her representation of the City, and to make certain that the agreed upon definition of the government client is a reasonable one in light of all the facts and circumstances, including in particular each of her clients' right to know about, and to give or withhold consent to, her representation of adverse interests.

Ideally, the identity of the government client should be specifically agreed upon between the volunteer lawyer and the government officials who are authorized to speak for the client at the outset of the representation, and committed to writing. In those instances where the identity of the client is not clearly defined, it may be inferred from the reasonable understandings and expectations of the lawyer and those officials. These in turn may be gleaned from such functional considerations as the organizational structure of the City and the extent to which its constituent parts are related in form and function, and from the facts and circumstances of the particular matter at issue in the representation—including the general importance of the matter to the City as a whole and to other particular components whose programs or activities are not directly involved.

There may be situations in which it can be agreed at the outset that the volunteer lawyer will represent only a single City agency in a relatively discrete matter (e.g., a particular contract) or in a relatively discrete category of cases (e.g., child abuse and neglect cases). In such a case, the lawyer would be free to agree to take on a private representation in which she would be opposing another City agency on an unrelated matter, without having to notify or obtain the consent of either her existing government client or her new private client. That is the easiest case. Another fairly clear case is the one in which the volunteer lawyer represents a City agency in a matter that plainly

has City-wide impact or public importance, so that it can fairly be said to implicate the interests of the City generally. In such a case, it would be unreasonable not to regard the lawyer's client as the City as a whole, and she therefore could not undertake a private representation against any City agency without informing and obtaining the consent of the City and, subsequently, the private client. There are dozens of permutations on these basic scenarios, in which the general City-wide interest is sometimes clear and sometimes not so clear. However, the mere fact that a matter is captioned "X v. District of Columbia" is not dispositive of the identity of the government client. Rather, as noted previously, the answer depends upon the reasonable understanding reached between the volunteer lawyer and responsible public officials based upon all relevant facts and circumstances. Of course, as with all representations, the lawyer must be alert to the need to deal with any conflicts that may arise during the course of the representation.[7] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote7)

The Corporation Counsel—as chief legal officer for the District and controller of its litigation—asserts that he has legal responsibility for determining the identity of the City government client for purposes of the conflict of interest rules. The Corporation Counsel has indicated his intention to issue guidelines for dealing with conflict issues posed by the volunteer program, that will address the identity of the client and the circumstances in which the District will waive any potential conflicts. We expect that these guidelines, when issued, will be useful to volunteer lawyers not only in determining what kinds of legal assistance they may give to the Corporation Counsel without creating a conflict with their existing private representations, but also in determining the scope of any conflicts. The guidelines may also be useful in determining what new private clients or matters a lawyer may subsequently take on in light of her responsibilities to her City government client(s).

In summary, we conclude that the Rules of Professional Conduct do not identify the City government client, and for the most part provide only general guidance for the lawyer and responsible government officials in reaching an understanding in this regard. The one clear limitation on the lawyer in this context derived from the ethics rules is her other clients' reasonable expectation that they will be allowed to object to their lawyer's representation of interests that would impinge upon her ability to zealously represent their own. Thus we believe that the private lawyer who wishes to perform volunteer work for the Corporation Counsel's office must work with that office to develop a clear understanding of the scope of her representation of the City, and hence the identity of the government client for conflicts purposes, and must take steps to protect all of her clients' right to know about and withhold consent to their lawyer's representation of interests that are adverse to their own.

**B. Applicable Conflict of Interest Rules**
Assuming that the relevant City government client has been identified, it remains to explain how the current conflict of interest rules apply in this situation.

**1. Direct Conflicts Under Rule 1.7(b)(1)**
As noted, Rule 1.7(b)(1) prohibits a lawyer from taking a position on behalf of one client that is directly adverse to a position taken by another client in the same matter (represented of course in this matter by another lawyer) without the consent of both clients. *See* note 4, *supra*. Thus, if a lawyer wishes to undertake a volunteer representation of a particular City agency that she or her firm is already opposing on behalf of a private client, the lawyer may do so only if she informs both the private client and the new City agency client of the "existence and nature of the possible conflict and the possible adverse consequences of such representation," and they give their consent.[8] (/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote8) Rule 1.7(c)(1). The conflicts of each lawyer in a firm are imputed to all other lawyers in the firm. Rule 1.10.

For example, if a volunteer lawyer is considering taking on a matter for the Corporation Counsel that involves defense of a suit brought against the Mayor and/or the City Council, or a suit

attacking some City-wide program or regulation (so that the client must be deemed to be the City as a whole), the lawyer must make full disclosure to and seek consent from each of her firm's private clients who have matters pending against the City or any of its agencies. She must also inform the Corporation Counsel of any conflicting private representations being pursued by her or by other lawyers in her firm. Conversely, if a volunteer lawyer is working on a City-wide matter and is then asked to represent a private party against the City or one of its agencies, she must inform the Corporation Counsel and seek his consent. Consent must also be 8 obtained from the new client.

On the other hand, Rule 1.7(b)(1) does not apply, and client notification and consent are not required, if a lawyer is not opposing her own City government client but some other agency of the City that is not her client. For example, if a lawyer hired to defend a program or action of a particular City agency, such as the Housing Department, were representing only the Housing Department in this matter, she would be required to disclose the fact of her Housing Department representation and seek consent from those of her firm's private clients who had matters pending against the Housing Department or against the City as a whole.[9] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote9)** But she would not be required to disclose her Housing Department representation to private clients who had matters pending against other particular City agencies whose functions were unrelated to the Housing Department and that otherwise had no interest in the issues involved in the Housing Department representation and would be unaffected by its outcome.

Thus, in a case where a lawyer is representing the City as a whole, she is obliged to obtain the City's consent before opposing one of its constituent agencies, as well as the consent of any of her private clients who have interests adverse to the City (or, of course, the particular agency she would be representing). Similarly, if the lawyer is representing a private client against the City as a whole, she must obtain the private client's consent before undertaking any City government representation, even one involving a discrete agency program with no functional or programmatic relationship to the City-wide matter she is otherwise involved in. The only situation in which the lawyer may cabin her conflict and avoid having to conduct a broad canvass of all clients with City-related business is where both her public and her private representations involve discrete agency programs with no City-wide implications.

## 2. Indirect Conflicts Under Rule 1.7(b)(2)-(4)
Even if Rule 1.7(b)(1) does not apply because the lawyer's City government client is not considered to be the same City client that she is opposing, her representation of a City agency may still raise an "indirect" conflict of interest under subsections (2) through (4) of Rule 1.7(b) if it "interferes in some substantial way with the representation of another" client. D.C. Bar Opinion 265 (1996) ("Positional Conflicts"). This would as a practical matter result in the same need to determine that both clients could be adequately served, and then to make full disclosure to and obtain the consent of "each affected client" to the multiple representation. Under Subsections (2) and (3) of Rule 1.7(b), if the lawyer believes that her representation of the City agency "will be or is likely to be adversely affected" by her representation of a private client, or vice versa, the lawyer must obtain the consent of the affected client or clients. Under subsection (4), client consent must be obtained if the lawyer believes that the independence of her professional judgment on behalf of a client "will be or reasonably may be adversely affected" by her responsibilities to a third party or by her own personal interests.

In contrast to the situation involving a direct conflict under Rule 1.7(b)(1), where disclosure and informed consent are mandatory once it is apparent that the lawyer will be opposing her own client, a lawyer has some discretion in deciding whether an indirect conflict under Rule 1.7(b)(2)-(4) exists. Whether a particular volunteer representation will "adversely affect" the lawyer's representation of another client (or vice versa) depends upon the particular facts and circumstances and is in the first instance essentially a matter for the lawyer to decide. Likewise,

the existence of a conflict arising from the lawyer's responsibilities to third parties or her own personal interests is primarily a question of fact. The lawyer may decide that she should make disclosure to and seek consent from one client but need not do so from the other.

The "adverse effect" inquiry under subsections (2) through (4) is primarily a functional one, generally involving both the relative importance of the representation to the respective clients or to their lawyers and the directness of the adverseness between them. It may require inquiry into the nature of the issues, the amount of money at stake, and the likelihood that either client would otherwise be substantially and foreseeably affected by the outcome of the other's matter. Sometimes, the "adverse effect" inquiry will also involve the particular role the volunteer lawyer is expected to play in the matter, and the "intensity and duration" of her relationship with the lawyers she is opposing. *Cf.* Formal Opinion 1996-3 of the Committee on Professional and Judicial Ethics of The Association of the Bar of the City of New York (1996)(conflicts of interest where one lawyer represents another lawyer).

Without attempting to exhaust the kinds of situations that would give rise to an adverse effect under Rule 1.7(b)(2)-(4), we offer the following examples to illustrate the kinds of circumstances that in this Committee's view could require a lawyer to obtain consent from one or both clients under these provisions. 1) A volunteer lawyer whose firm is handling a matter for private clients against one City agency, and who is subsequently asked by the Corporation Counsel to defend another City agency in a matter whose outcome will have a substantial and foreseeable impact on the outcome of the firm's private clients' matter, may be required to obtain one or both clients' consent. 2) A volunteer lawyer who represents one City agency and wishes to make certain arguments about that agency's authority that are inconsistent with arguments she is making on behalf of a private client against another City agency in an unrelated matter, may be required to obtain consent from one or both clients if the success of her arguments on behalf of one client "will, in some foreseeable and ascertainable sense, adversely effect the lawyer's effectiveness on behalf of the other" client. *See* Opinion 265, *supra.* 3) A volunteer lawyer performing work for one City agency who wishes to take a leading role representing a private party in a controversial matter involving another City agency should anticipate having to obtain consent from both clients if she believes it likely that one representation will have an adverse effect on the independence of her professional judgment or her credibility in the other. 4) A volunteer lawyer who works closely and for extended periods of time with full-time Corporation Counsel lawyers, or is closely supervised by Corporation Counsel lawyers, may find it difficult to exercise independent professional judgment in opposing the same lawyers with whom she is working or who are supervising her, and in such a situation she may decide that she should not accept a private representation in which she would be opposing her colleagues, without notifying and seeking the consent of both the Corporation Counsel and her private client.[10] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote10)**

The above examples are not intended to be exhaustive, but merely to suggest the possibilities for "indirect" conflicts to develop in the context of a volunteer program such as the one described in Opinion 92.

**Conclusion**
The conclusion of Opinion 92 that, under the former Code of Professional Responsibility, a lawyer may never oppose a City agency that she is also representing on behalf of another client in an unrelated matter, is no longer mandated by the Rules of Professional Conduct. Under Rule 1.7(b)(1), a lawyer may oppose her own City government client on behalf of a private client in an unrelated matter as long as she makes clear the nature of the conflict to both clients and obtains their consent.

Moreover, we believe that in certain limited situations a lawyer may represent a City agency without having to notify or obtain the consent of private clients that she is representing against

other discrete City agencies. Opinion 92's apparent assumption that the client of the Corporation Counsel lawyer is always and necessarily the City as a whole is incorrect, and in any event has no foundation in the ethics rules. The rules contemplate that the identity of the City government client for conflict of interest purposes will be decided on a case-by-case basis between the lawyer and responsible government officials, taking into account the reasonable expectation of the lawyer's other clients that they will receive a conflict-free representation. Their decision will generally be based on functional considerations derived from the structure and relationship of the government entities involved and from the facts and circumstances of the particular matter at issue in the representation. Even if the lawyer would not be opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to obtain client consent if her representation of one client would interfere in some substantial way with her representation of the other, or if the independence of her judgment in either client's behalf would be compromised by her responsibilities to or interests in a third party or by her own personal interests, including her personal and professional relationships with the lawyers on the other side.

October 1996

1. Under the program described in Opinion 92, private law firms were encouraged to donate the services of attorneys to assist the Corporation Counsel in a variety of legal matters, generally on a part-time basis. This program reportedly yielded little by way of relief for the Corporation Counsel's Office, at least in part because of the conditions on lawyer participation (particularly the requirement of obtaining waivers from other clients) set forth in Opinion 92. In 1992, a second and more formal effort was made to encourage lawyers from private firms to volunteer their services to the City, this time by granting them a special dispensation from the imputation rule. The amendments enacted in that year to Rule 1.10 and 1.11 provided that conflicts resulting from one lawyer's voluntary service to the Corporation Counsel need not be imputed to all other lawyers in her firm. See Rule 1.10(e) and Comment [19]; Rule 1.11(h) and Comments [12] and [13]. (The 1992 amendments to Rules 1.10 and 1.11 were made permanent in 1994 and extended to the D.C. Financial Control Board in 1996). According to the commentary to Rule 1.10, this special dispensation from the imputation rule depends upon the volunteer lawyer's working full-time for the Corporation Counsel (there must be a "temporary cessation" of a volunteer lawyer's practice with the firm, "so that during that period the lawyer's activities which involve the practice of law are devoted fully to assisting the Office of the Corporation Counsel"). Thus, when a private lawyer is detailed full-time to the Corporation Counsel's Office under the so-called "Rule 1.10 program," her firm will not be regarded as representing the City, and will not need to alert and obtain consent from those of its clients who "might reasonably consider the representation of its interests to be adversely affected" by the firm's representation of the City. See Comment [7] to Rule 1.7. (It follows by necessary implication that where a lawyer is volunteering for the City on a less than full-time basis, or does not otherwise meet the requirements of a "Rule 1.10 detail," the conflicts resulting from her government service are imputed to all lawyers in her firm." We understand that the Rule 1.10 program has attracted few volunteers, and has accordingly provided no more benefit for the Corporation Counsel's Office than did the pre-1992 part-time details discussed in Opinion 92.

2. Amendments to the Rules issued by the D.C. Court of Appeals on October 16, 1996, make a number of revisions to the text and commentary of Rule 1.7, none of which affect the conclusions of this opinion. We would note, however, the extensive attention paid in new Comments [13]-[18] to conflicts of interest where the client is a "corporation, partnership, trade organization or other organization-type client." While not directly applicable to situations in which the client is a governmental entity, cf. Comment [7] to Rule 1.13, we believe this discussion may provide a useful supplement to the discussion of conflicts under Rule 1.7(b)(2)-(4) in Part II B(2), infra.

2023-FOIA-01530-00000106

3. Opinion 92 does not say in so many words that the client of the volunteer lawyer is always and necessarily the entire City for Canon 5 conflict of interest purposes. Nevertheless, this has been the generally accepted interpretation of the opinion since its issuance more than 16 years ago, and there appears to be little support in the text for a contrary position. Moreover, the fact that the absolute bar under the "appearance" standard of Canon 9 is clearly applicable only to representations involving particular City agencies if further evidence that the drafters of Opinion 92 intended a very broad definition of the City client for conflict of interest purposes.

4. Where a conflict arises under Rule 1.7(b)(1) because the lawyer is opposing her own client on behalf of another client, both clients are presumed to be "potentially affected" under Rule 1.7(c)(1) and both must therefore consent to the representation after full disclosure.

5. Opinion 92 advises a firm wishing to participate in the Corporation Counsel's volunteer program to "send a standardized letter to all clients identified as having present or potential future dealings with the City, describing the program and explaining in general how the judgment of the firm's attorneys might or might not be affected by the firm's participation in the program." This suggests an even broader application for the condition, requiring the lawyer to obtain consent from clients with present or potential City business without regard to whether the lawyer or her firm is actually representing the client in connection with that City business. We see no basis in the current rules for such an expansive reading of the conflict of interest rules. Even in a case when the entire City is considered the lawyer's client, consent must be obtained only from clients who the lawyer is currently representing against the City (or one of its agencies) or those who have actually asked her so to represent them.

6. We do not regard the definition of the government client contained in Rule 1.6(i) ("the client of the government lawyer is the agency that employs the lawyer") as dispositive for conflict of interest purposes. And, there is no indication that this or any other a priori definition of the government client was intended to apply in this context in the otherwise thorough consideration of the "government lawyer" issue by the Sims Committee in 1988. See Report by the District of Columbia Bar Special Committee on Government Lawyers and the Model Rules of Professional Conduct (1989).

7. The provisions of Rule 1.7(d) (1996 amendment) govern conflicts arising after the representation commences that are "not reasonably foreseeable at the outset of a representation." As we read this provision, it subjects such unforeseeable late-arising conflicts to the provisions of Rule 1.7(b)(2) through (4) only, and not to those of Rule 1.7(b)(1).

8. The government client can generally decide what information it needs or wants about the volunteer lawyer's potentially conflicting representations, in the context of deciding its own identity. Thus, the process of self-definition functions for the government client as a way of consenting to the volunteer lawyer's conflicting private representations to which it would be entitled to object if it chose to define its identity more broadly. In this fashion, the government client may decide that it has no interest in knowing about any conflicts that might otherwise be imputed to the volunteer lawyer under Rule 1.10 by virtue of representations by other lawyers in her firm.

9. Given the decision-making structure of government entities, we believe that the conflicts of the City are necessarily attributed to its constituent parts, and that the conflicts of the constituent parts of the City are necessarily attributed to the City as a whole—though the conflicts of one of the City's constituent agencies may or may not be attributed to other City agencies.

10. Because this conflict is in the nature of a personal conflict, as opposed to one derived from the lawyer's representation of another client, we doubt that it would be imputed to other lawyers in the firm. See ABA Formal Opinion 96-400 ("Job Negotiations with Adverse Firm or Party") (Rule 1.10 "cannot be construed so broadly as to require that all lawyers in a firm be presumed to share their colleague's personal interest in joining the opposing firm in a matter," though each lawyer must

2023-FOIA-01530-00000107

individually evaluate whether his "'responsibilities to . . . a third person'—i.e., his colleague—or his own interest in his colleague's interest, may materially limit the representation.")

2023-FOIA-01530-00000108