# Exhibit N

## Part 1 of 2

to Declaration of Matthew Hooker

## ASSIGNMENT

Ms. Montgomery and Ms. Muchman were asked by OptumRx, Inc.'s counsel to prepare a report on the application of Rule 1.11(c) to the proceedings against OptumRx in the Opioid MDL.

## COMPENSATION

Both experts are being compensated at a rate of $500 an hour.

## SUMMARY OF OPINIONS

I.  **Rule 1.11(c) applies to lawyers serving as both current and former government officers and employees as well as to lawyers serving in part-time government positions.**

When lawyers obtain confidential information from a third-party under government authority and later could use that confidential information to the material disadvantage of the third party, precedent and policy support the conclusion that the protections of Rule 1.11(c) applies. This is true regardless of whether the lawyer is/was a current or former, full or part-time, lawyer serving in a government position at the time the lawyer used government authority to obtain the information.

II.  **Singer and Motley Rice possess the type of confidential government information protected under Rule 1.11(c).**

Rule 1.11(c) protects "information about a person" acquired when the lawyer was a government employee, meaning it protects confidential information of a third-party, not of the lawyer's client, the government. The Rule defines confidential government information as "information obtained under government authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public." The information that Singer and Motley Rice obtained pursuant to government authority, to wit, various subpoenas, was and still

1

is, protected by confidentiality agreements prohibiting its disclosure outside of the matters at issue and is not available to the public.

## III.     The protection of confidential government information can be waived only by the third party, and OptumRx has not waived the protection.

In this case, because the confidential information belongs to OptumRx and production was compelled under government authority and protected by confidentiality agreements, only OptumRx can waive the confidentiality protections.

## IV.     Singer and Motley Rice have actual knowledge of the "confidential government information" that was provided to the firm pursuant to the government's authority, through government subpoenas, and the confidential information obtained is disqualifying.

Singer and Motley Rice issued government subpoenas in their capacity as government lawyers and obtained confidential government information about OptumRx. The information at issue was produced directly to Linda Singer and the Motley Rice firm, so the firm has actual knowledge of its content.

## V.     Singer and Motley Rice could use the confidential government information to OptumRx's material disadvantage.

The Rule requires only that the information *could be* used to the material disadvantage of OptumRx. A review of the subpoenaed information and the allegations in the bellwether complaints shows the underlying facts and issues are similar, which could provide plaintiffs with a roadmap of OptumRx's business operations to its material disadvantage.

## PROFESSIONAL BACKGROUNDS

### Background of Sari W. Montgomery

Ms. Montgomery has been licensed to practice law in Illinois since 1994 and is a partner in the firm of Robinson, Stewart, Montgomery & Doppke LLC in Chicago, Illinois. Since 2010, her private practice has focused on matters involving legal ethics and professional responsibility,

including defending lawyers in disciplinary investigations and prosecutions at trial and on appeal before the Attorney Registration and Disciplinary Commission ("ARDC") and the Illinois Supreme Court, representing judges in disciplinary actions before the Illinois Judicial Inquiry Board, advising lawyers, law firms, government agencies, and law-related businesses on ethical issues and obligations, representing bar applicants in Character and Fitness proceedings, and providing expert testimony.

Previously, Ms. Montgomery served as Litigation Counsel and Senior Litigation Counsel at the ARDC from 1994 to 2004. During her tenure at the ARDC, she investigated hundreds of complaints filed against lawyers and prosecuted dozens of formal disciplinary cases before the Hearing Board of the ARDC and the Illinois Supreme Court, including numerous cases involving conflicts of interest.

In Ms. Montgomery's current practice since 2010, she has represented hundreds of clients in ARDC investigations, including many involving conflicts of interest. In addition, she has advised dozens of lawyers, law firms, and government agencies on issues related to conflicts of interest. Over the past twenty-nine years, Ms. Montgomery has also presented extensively on various conflict of interest topics.

In addition to serving as ARDC counsel and engaging in private practice, Ms. Montgomery is an Adjunct Professor of Legal Ethics at Northwestern University Pritzker School of Law and has lectured extensively on all manner of ethics and professional responsibility issues at local, state and national levels including, but not limited to: ABA Lawyers Professional Liability Committee; Association of Professional Responsibility Lawyers (APRL); National Organization of Bar Counsel (NOBC); National Association of Retail Collection Attorneys; the Illinois State Bar Association (ISBA); Illinois Institute of Continuing Legal Education (IICLE), Practising Law

3

Institute (PLI); New York State Bar Association; National Academy of Continuing Legal Education (NACLE); Chicago Bar Association; Lake County Bar Association; and the Illinois Public Defender Association.

Ms. Montgomery has also co-authored book chapters and articles on professional responsibility topics including: ethics of using social media in jury selection (ABA GP/Solo Magazine); ethics in jury selection (IICLE); the disciplinary process in Illinois (IICLE); in-house counsel admission (ISBA); and uniform standards for imposing lawyer sanctions (ABA). Since 2022, she has published a quarterly ethics column in Business of Law Digest. In 2022, she was also appointed to the Editorial Board for Law360 Legal Ethics.

Ms. Montgomery has served as an appointed member of, and special advisor to, the ABA Standing Committee on Professional Regulation since 2019. One of the services that Committee provides is to confidentially consult with the highest court of a requesting jurisdiction on how to improve the system of lawyer regulation in that jurisdiction. Ms. Montgomery has twice been selected to participate as part of a four-person team to perform such consultations.

Ms. Montgomery currently serves as the Treasurer and elected member of the Board of Directors for the Association of Professional Responsibility Lawyers (APRL) and has previously served that organization as a member of the Programming Committee and as the liaison to the ABA Committee on Professional Regulation.

Since 2008, Ms. Montgomery has been appointed to serve as a member and past Chair of the ISBA Standing Committee on Professional Conduct, which is charged with drafting ethics opinions for the benefit of the Association's 30,000 members. She has also served on several other ethics-related special committees and task forces by appointment of the ISBA President. Additionally, she is a member of the Chicago Bar Association Committee on Professional

Responsibility and Committee on the Unauthorized Practice of Law and Multi-jurisdictional practice.

Since 2018, Ms. Montgomery has been designated as a "Subject Matter Expert" for the Multistate Professional Responsibility Exam (MPRE) by the National Conference of Bar Examiners (NCBE). As such, she has drafted and edited questions for the MPRE on behalf of the NCBE related to the law of lawyering, legal malpractice, and all aspects of the Rules of Professional Conduct, including conflicts of interest. In 2023, Ms. Montgomery was appointed to the Drafting Committee for the MPRE, which is charged with reviewing and editing all potential test items and selecting items which will appear on the MPRE.

A copy of Ms. Montgomery's Curriculum Vitae is attached as **Appendix A**.

**Background of Wendy J. Muchman**

Ms. Muchman has been licensed to practice law in Illinois since 1981. In 2021, she was licensed in Colorado where she is currently inactive. For most of her career, her area of practice has been concentrated in litigation and professional responsibility work.

Between 1981 and 1989, Ms. Muchman worked in private practice where her practice included plaintiffs personal injury matters as well as insurance defense work. Between 1989 and 2019, Ms. Muchman was employed in the litigation division of the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC), the branch of the Illinois Supreme Court responsible for investigating and prosecuting Illinois attorneys for professional misconduct for violations of the Illinois Rules of Professional Conduct. The last and longest tenured position she held at the ARDC was Chief of Litigation and Professional Education.

In Ms. Muchman's work at the ARDC, she reviewed and investigated thousands of requests for investigation of Illinois lawyers and made decisions about what to investigate and prosecute.

She handled her own case load and supervised the litigation lawyers and staff, assisting others in the process of these investigations. Although a vast majority of investigations are closed without formal action, every year a percentage of the matters are prosecuted in public hearings. Ms. Muchman personally prosecuted innumerable cases and had a role in the prosecution of hundreds of other attorney discipline matters. The violations alleged in the matters she handled included, among others, lack of communication, conflicts of interest, and excessive fees.

During Ms. Muchman's career at the ARDC, she presented hundreds of continuing legal education speeches to various lawyer groups, government agencies, bar associations, and judicial programs. Many of the presentations related to conflicts of interest issues. She answered hundreds of calls as part of the ARDC Ethics Inquiry Program, responding to lawyers' questions about ethical issues posed as hypotheticals including issues on conflicts of interest.

In Ms. Muchman's last few years at the ARDC, she had a leadership role in developing the Illinois Supreme Court's Proactive Management-Based Regulation (PMBR) program which was launched in January 2017. She worked on several modules including one on informed consent. PMBR is designed to build better lawyers through education.

Since approximately 2000, Ms. Muchman has taught legal ethics at Northwestern Law now known as Northwestern University Pritzker School of Law. She started as an adjunct, and is currently a Professor of Practice. She teaches and develops the law school's varied curriculum of ethics related courses. The Legal Ethics courses she teaches are graduation requirements. Every semester, a significant part of the curriculum in all the courses involves conflicts of interest.

For many years, Ms. Muchman has been active in various National and State Bar Associations where she serves on committees with a focus on legal ethics and professional responsibility. She is currently an appointed member of the ABA Standing Committee on Ethics

6

and Professional Responsibility (ABASCEPR). The ABASCEPR has the authority to advise and assist professional organizations and courts regarding the interpretation of statements of the ethical standards of the profession such as the Model Rules of Professional Conduct and to express and publish its opinions on proper professional conduct.

Since 2018, Ms. Muchman is designated as a "Subject Matter Expert" for the Multistate Professional Responsibility Exam (MPRE) by the National Conference of Bar Examiners (NCBE). In that capacity she has drafted and edited questions for the MPRE on behalf of the NCBE related to the law of lawyering, legal malpractice, and all aspects of the Rules of Professional Conduct, including conflicts of interest.

Ms. Muchman's Curriculum Vitae is attached as **Appendix B.**

## MATERIALS REVIEWED

A list of the materials reviewed and relied upon as the basis for our opinion is attached as **Appendix C.**

## FACTS CONSIDERED

Motley Rice is acting as Plaintiffs' co-lead counsel in the MDL matters designated as bellwether cases, namely *City of Rochester v. Purdue Pharma L.P., et. al.,* Case No. 1:19-op-45853 DAP (originally filed in the U.S. District Court for the Western District of New York), *County of Webb, Texas v. Purdue Pharma, L.P., et. al.,* Case No. 1:18-op-45175 DAP (originally filed in the U.S. District Court for the Southern District of Texas), *City of Independence, Missouri v. Williams, et. al.,* Case No. 1:19-op-45371 DAP (originally filed in the U.S. District Court for the Eastern District of Missouri), and *Lincoln County v. Richard S. Sackler, M.D., et.al.,* Case No. 1:20-op-45069 (originally filed in the U.S. District Court for the Eastern District of Missouri).

## City of Chicago Subpoena

In 2018, the City of Chicago Law Department hired Motley Rice as outside counsel to investigate OptumRx and its practices. As part of its investigation, on November 8, 2018, Motley Rice, on behalf of the City of Chicago Law Department, served an investigative subpoena on OptumRx related to alleged consumer fraud and deceptive practices. Before responding to the subpoena, OptumRx negotiated a confidentiality agreement which was executed on behalf of the City of Chicago by Special Assistant Corporation Counsel, Mimi Liu, an attorney with Motley Rice. *See* Confidentiality Agreement dated February 19, 2019, attached as **Exhibit One**. The Confidentiality Agreement provided, in pertinent part, as follows:

> Both the Confidential Documents and the information contained therein shall be treated as confidential, shall not be disclosed except as provided in this Agreement, and shall not be made available to persons other than those described below.[1] All information produced or made available for inspection and copying by [OptumRx], including but not limited to information contained in documents or in correspondence between counsel, will be used solely in furtherance of the Investigation and any subsequent litigation brought by the City of Chicago against [OptumRx] that is directly related to this Investigation and *will be used for no other purpose whatsoever* without the prior written consent from [OptumRx] or by a court order or other applicable law.
>
> * * *
>
> *No Motley Rice LLC attorney, contractor, paralegal, or expert adverse to [OptumRx] in other matters shall have access to any Confidential Documents or information contained therein relating to this Investigation*. . .The City of Chicago and its outside counsel in this Investigation shall not share, disclose, or discuss Confidential Documents or the information contained therein with any Motley Rice attorneys, paralegals, contractors, or experts adverse to [OptumRx] in another matter. (*Emphasis supplied*).

---

[1] As relevant here, the persons permitted to have access to the documents produced by OptumRx pursuant to the City of Chicago subpoena included the City of Chicago's Law Department and outside counsel in connection with the Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against [OptumRx], namely Motely Rice attorneys Linda Singer, Mimi Liu, and Paige Boggs, and other lawyers, contractors or paralegals working on the Investigation brought by the City of Chicago against [OptumRx], *See* **Exhibit One**, ¶3(a).

*See* **Exhibit One.** In reliance on the confidentiality agreement, OptumRx produced its confidential material, including prescription claims data and related documents, to the City of Chicago Law Department through the City's counsel, Motley Rice.

**District of Columbia Subpoena**

Subsequently, on or about December 1, 2020, the Office of the Attorney General of the District of Columbia ("DC OAG") engaged Linda Singer and Motley Rice LLP[2] to assist the Public Advocacy Division with an investigation of, and potential litigation against, OptumRx and other Pharmacy Benefit Managers ("PBMs") into potential violations of consumer protection law and the False Claims Act related to the PBM's alleged role in setting prices for prescription drugs. The agreement between Linda Singer and the DC OAG provided, in part, that Singer agreed to provide legal services to the Government of the District of Columbia through the Office of the Attorney General. *See* Engagement Letter Agreement ("Engagement Letter") between Linda Singer and DC OAG dated December 1, 2020, attached as **Exhibit Two.** The services contemplated by the Engagement Letter encompassed "assist[ing] in all phases of these investigations and litigations," in particular and as relevant to this opinion: drafting and responding to discovery requests; tracking documents obtained in discovery; responding to FOIA requests; coordinating litigation with other states and the federal government to promote a unified approach to litigation; handling discovery disputes; and advising the DC OAG on the conduct of the case and on strategy and tactics for each phase of the case. *Id.* at pp. 5-6.

The Engagement Letter further provided, in pertinent part:

[Singer recognizes that] in the performance of the contract [she] may receive certain information submitted to the District government on a proprietary basis by third

---

[2] Because Linda Singer was engaged as an attorney with Motley Rice LLP, all future references to Ms. Singer should be read to include her firm, Motley Rice LLC.

parties, information which relates to potential or actual claims against the District government, or information which relates to matters in dispute or litigation. Unless the District consents to a particular disclosure, [Singer] shall use such information exclusively in the performance of the contract and shall forever hold inviolate and protect from disclosure all such information, except disclosures required by applicable law or court order. . .[T]o the extent [Singer] is permitted to disclose such information, [she] will make such disclosures only to those individuals who need to know such information in order to perform required tasks in their official capacity and will restrict access to such information to such individuals.

*See* **Exhibit Two** at p. 12.

On December 28, 2020, "[b]y the authority vested in the Attorney General for the District of Columbia," the DC OAG issued an investigative subpoena to OptumRx regarding "the negotiation of prescription drug rebates and the administration of prescription drug benefits which required OptumRx to produce documents to "Linda Singer Motley Rice LLC" directly. *See* Government of the District of Columbia Office of the Attorney General Subpoena dated December 28, 2020, attached as **Exhibit Three.** The subpoena demanded that OptumRx produce broad categories of information, including a list of the manufacturers from whom OptumRx received the largest payments by various types, payments manufacturers made to OptumRx, documents related to payment negotiations, and documents related to formulary coverage. *Id.*

Because the information demanded by the subpoena included highly confidential and trade secret information, OptumRx and the DC OAG entered into a confidentiality agreement that specifically prohibited Singer and Motley Rice from using any confidential information they obtained using government power outside of their work for the District of Columbia. *See* Confidentiality Agreement between DC OAG and OptumRx dated July 1, 2021, attached as **Exhibit Four**. Specifically, the Confidentiality Agreement defined "Confidential Information" as:

[D]ocumentary and/or tangible information of any type, kind or character that contains (a) Information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade

secret or commercial financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company.

*See* Exhibit Four at ¶2. In addition, the Confidentiality Agreement provided that OptumRx would designate any item or document containing Confidential Information as "Confidential" on the document or information produced to the State. *Id.* The Confidentiality Agreement further stated that:

> [A]ll persons and entities signing a copy of the Addendum [to the Confidentiality Agreement] agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, *not to use Confidential Information in connection with any other matter*, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree[s] with the designation. OAG outside counsel [Singer and Motley Rice] further agrees not to rely on Confidential Material in pursuing information or claims *in any other matters outside of its representation of the OAG.* (*Emphasis supplied*).

*Id.* The Confidentiality Agreement was signed by Linda Singer as "Counsel for the Attorney General for the District of Columbia." *Id.* at pp.8-9.

In reliance on these provisions of the Confidentiality Agreement, OptumRx produced its properly marked Confidential Information to Singer and Motley Rice as directed by the subpoena, including its rebate totals from 2016 to 2020 for its "top ten" manufacturers, many of which are parties to the MDL litigation. *See* Production letter from OptumRx's counsel, Michelle Kisloff to Linda Singer dated July 13, 2021, attached as **Exhibit Five**. To date, counsel for the DC OAG has not challenged OptumRx's designation of the documents OptumRx marked as "Confidential" pursuant to the definition in the Confidentiality Agreement.

**State of Hawai'i Subpoena**

In or before May of 2021, the Attorney General for the State of Hawai'i ("HI OAG") appointed Linda Singer of Motley Rice LLC as a Special Deputy Attorney General for the State of Hawai`i. On October 15, 2021, the HI OAG served an investigative subpoena on OptumRx

related to an investigation under the Hawai'i statute barring false claims and deceptive trade practices. *See* HI OAG Subpoena Duces Tecum No. 2021-052 dated October 15, 2021, attached as Exhibit Six. The subpoena's fifteen requests sought documents and communications relating to the administration of pharmacy benefit services for Hawai'i consumers, and pharmaceutical copay clawbacks, deductibles, coinsurance, or copays that affected Hawai'i consumers. *Id.* The subpoena further required OptumRx to deliver the responsive documents directly to "Special Deputy Attorney General Linda Singer, Motley Rice LLC." *Id.*

Before producing documents in response to the subpoena, OptumRx and the HI OAG entered into a Confidentiality Agreement that contained the identical provisions enumerated above with regard to the Confidentiality Agreement entered into between OptumRx and the DC OAG. *See* Confidentiality Agreement between the State of Hawai'i Department of the Attorney General and OptumRx ("HI Confidentiality Agreement") dated May 18, 2022, attached as Exhibit Seven. The HI Confidentiality Agreement was also signed by Linda Singer, Motley Rice LLC as "Counsel for the State of Hawai'i Department of the Attorney General."

Again, in reliance upon the HI Confidentiality Agreement, OptumRx began producing its properly marked Confidential Information responsive to the subpoena, as directed to Singer and Motley Rice. Specifically, on June 8, 2022, OptumRx produced 68,310 pages of unredacted, commercially sensitive information. *See* Production letter from Counsel for OptumRx, Allison Caplis, to Linda Singer at Motley Rice dated June 8, 2022, attached as Exhibit Eight. The documents produced pursuant to this subpoena contained OptumRx's highly sensitive internal documents, including its rebate agreements and negotiations with drug manufacturers, as well as charters, policies, and meeting minutes from OptumRx's business strategy committees.

In addition, on September 9, 2022, OptumRx, again relying on the HI Confidentiality Agreement, produced another round of Confidential Information to Singer and Motley Rice in their capacity as Special Deputy Attorney General for Hawai'i. *See* Production letter from OptumRx counsel, Allison Caplis, to Linda Singer dated September 1, 2022, attached as **Exhibit Nine.**

The vast majority of the Confidential Information that OptumRx produced to both the DC and HI OAG is not available to the public because those materials are among OptumRx's most sensitive commercial documents which it would not have otherwise produced were it not compelled to do so by OAG subpoenas, and if the information was not protected by the Confidentiality Agreements. As such, Singer and Motley Rice had access to Confidential Information to which they would not otherwise be entitled if not for Singer's and Motley Rice's status as Counsel for the City of Chicago, DC OAG and Special Deputy Attorney General for the State of Hawai'i.

On October 5, 2023, the State of Hawai-i, represented by Motley Rice, filed suit against OptumRx. *See State of Hawaii v. CaremarkPCS Health LLC et al.,* No. 1:23-cv-00464 (D. Hawaii). The allegations contained in that suit derive directly from the Confidential Information OptumRx provided to Singer and Motley Rice.

**<u>MDL Opioid Cases</u>**

On January 4, 2023, Singer and Motley Rice LLC filed suit against OptumRx in the opioid MDL on behalf of other clients whom they represent as private clients of Motley Rice LLC, and not in their capacity as government lawyers. *See, e.g., County of Summit, Ohio v. Express Scripts, Inc. et al.,* No. 1:23-op-45001 (N.D. Ohio Jan. 4, 2023); *California ex rel. Harrison v. Express*

*Scripts, Inc.*, No. 2:23-cv-08570, ECF 1-1 at ¶¶ 16–17, 28–29 (C.D. Cal. Oct. 11, 2023). Motley Rice also serves as co-lead counsel for plaintiffs in the bellwether cases.

Motley Rice's co-founder, Joe Rice, serves as co-lead counsel and a member of the Plaintiffs' Executive Committee ("PEC") for the MDL. *See Joe Rice Appointed Co-Lead for Opioid MDL,* Motley Rice (Jan. 5, 2018), https://www.motleyrice.com/news/opioid-mdl-joe-rice-appointed-co-lead ("Motley Rice co-founder Joe Rice has been appointed co-lead counsel in the National Prescription Opiate Litigation being coordinated in the Northern District of Ohio. Currently there are approximately 200 lawsuits filed in Federal court involving more than 50 defendants and hundreds of governmental claimants."). The following announcement appears on Motley Rice's website: "Led by member attorney Linda Singer, a former Attorney General for the District of Columbia, Motley Rice is lead counsel for the first jurisdictions to file complaints in the most recent wave of litigation against pharmaceutical companies regarding the opioid crisis." *Opioid Litigation*, Motley Rice, https://www.motleyrice.com/public-client/opioid-litigation (last visited Oct. 3, 2023). The firm's website further emphasizes that "Motley Rice attorneys have and continue to play a leading role in helping state and local governments combat the opioid crisis through comprehensive research and litigation." *Id.*

Other statements on the firm's website explain, "Motley Rice attorneys, including Linda Singer who leads the firm's Public Client practice, have been at the forefront of the growing opioid MDL, and serve as lead counsel for the first jurisdictions to file claims in the recent wave of cases targeting the opioid industry – the City of Chicago and Santa Clara County, [both in 2014]." *Id.* Motley Rice's representation has expanded to include multiple states, counties, cities, and towns, including Alaska, Kentucky, Montana, South Carolina and New Hampshire. *Joe Rice Appointed Co-Lead for Opioid MDL,* Motley Rice website.

The Confidential Information Singer and Motley Rice obtained pursuant to subpoena in their role as government lawyers, and which is subject to confidentiality agreements, could be used in the bellwether cases currently pending in the Northern District of Ohio in which Motley Rice is now counsel. Singer and Motley Rice are actively pursuing claims against OptumRx focused on the aspects of OptumRx's business that are discussed in the many Confidential documents on topics including payments, financial arrangements, formularies placements and rebates that were produced pursuant to government subpoena in the government investigations in the City of Chicago, District of Columbia, and Hawai'i investigations and which documents were all subject to Confidentiality Agreements prohibiting their use outside of those specific representations. The bellwether cases significantly overlap the information demanded by the government subpoenas. For example, the complaint in *City of Rochester v. Purdue Pharma L.P., et. al., supra,* includes the following allegations:

- PBMs' complicity in the overall fraudulent scheme is purposeful given the nature of the financial arrangements between PBMs and drug manufacturers and others in the supply chain. Drug manufacturers compete for PBM formulary placement (preferred placement results in greater utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements that would slow down flow. ¶45

- PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies. These incentives include the payment of rebates by Manufacturers Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits. ¶46

- PBMs collude with Manufacturers who pay fees in the form of rebates, administrative fees and other, in order to ensure good placement on the formulary to the financial benefit of the PBMs. This leads to more prescriptions and more pills available to the general public, many of which find their way to the black market. ¶47

- PBMs not only control the majority of this country's prescriptions through their formularies, they generate massive profits from that work. ¶48

- Each of the participants in the opioid promotion enterprise described herein received substantial revenue from the scheme, in the form of sales for Manufacturer Defendants, sales and kickbacks for Distributor Defendants who reached particular monthly goals, and rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place on a formulary or otherwise made opioids available for improper use—all in an effort to maximize profits. ¶1074

- The Manufacturer Defendants knowingly and intentionally financially incentivized the PBM Defendants to place their opioids on the PBMs formularies irrespective of medical necessity, resulting in widespread and unnecessary overuse. ¶1093

The Confidential documents that Singer and Motley Rice received relate to those allegations, including rebate agreements, custodial documents negotiating drug rebates, and documents related to OptumRx's internal formulary and business processes.  And while some of those documents may not mention opioids specifically, they provide Motley Rice with a roadmap into OptumRx's inner workings and are relevant to the allegations against OptumRx in the opioid MDL. As such, it is foreseeable that Singer and Motley Rice will use the information they obtained through their role as government attorneys to the benefit of their private clients in the MDL bellwether cases.

## APPLICABLE RULE

Ohio Rule of Professional Conduct 1.11(c), entitled Special Conflicts of Interest for Former and Current Government Officers and Employees, provides:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer *knows* is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this rule, the term "confidential government information" means information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public. A *firm* with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely *screened* from any participation in the matter and is apportioned no part of the fee therefrom.[3] (*Emphasis supplied*).

## OPINIONS

### Introduction

The title of Rule 1.11, "Special Conflicts of Interest for Former & Current Government Officers and Employees," explains that the Rule applies to both former and current government officers and employees.[4] The conflict provisions of the Rule, paragraphs 1.11 (a), (b) and (d), by the specific language of those respective provisions, apply explicitly to lawyers who "*formerly* served as a public officers or employees of the government,"[5] and to lawyers who are "*currently*

---

[3] OH ST RPC Rule 1.11 (c).

[4] OH ST RPC Rule 1.11; Local Rule Civil Procedure of the Northern District of Ohio 83.7 provides: "Professional Conduct and Attorney Discipline (a) Standards for Professional Conduct. Attorneys admitted to practice in this Court shall be bound by the ethical standards of the Ohio Rules of Professional Conduct adopted by the Supreme Court of the State of Ohio, so far as they are not inconsistent with federal law (see LR 83.5(b) and (f))."

[5] OH ST RPC Rule 1.11(a) and (b). *See also*, OH ST RPC Rule 1.11, Historical and Statutory Notes, Official Cmt. 2.

serving as a public officer or employee."[6] The Rule applies to lawyers who serve as part-time or full-time government officers or employees.[7]

### Rule 1.11(c)

The purpose of Rule 1.11(c) is to protect confidential information of third parties obtained by lawyers serving as public officers and employees.[8] The Rule serves to prevent an "unfair advantage [from accruing] to the other [private] client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service."[9] Except as permitted by law, Rule 1.11(c) prohibits lawyers from using knowledge, gained in confidence while a public employee, to benefit a client in their private practice, thereby protecting the justice system from even the appearance of government overreach.[10] As will be discussed below, in this case the use of government information is not allowed by law.

---

[6] OH ST RPC Rule 1.11(d).

[7] *See, e.g.,* Oh. Adv. Op. 14-002, (8/8/2014)(p.3)(The Rule does not differentiate between part-time and full-time lawyers who are government officers and employees.); Rhode Island Supreme Court Ethics Advisory Panel ("EAP") Op. 2016-03 (4/28/2016)(Applying the rule in the context of a part-time municipal court judge who was also a lawyer in private practice.); Nebraska Ethics Advisory Opinion for Lawyers No. 22-01(Applying Rule 1.11(c) to a part-time county attorney and disqualifying him from representing clients in family law matters where child support is at issue due to his access to a state run database with information about individual's financial status and past earnings where the information was considered confidential under statute.)

[8] Rules 1.11(a), (b) and (d) are the conflict of interest provisions of Rule 1.11 and are not the basis for this opinion.

[9] OH ST RPC Rule 1.11 (c), Cmt. 4.

[10] *See* footnotes 12 and 14, *See also,* Robert H. Aronson, Washington Survey, *An Overview of the Law of Professional Responsibility: The Rules of Professional Conduct Annotated and Analyzed,* 61 Wash. L. Rev. 823,853 (1986).

**History of the provision**

Rule 1.11 was originally titled "Successive Government and Private Employment."[11] At first, the Rule limited its protections to former government lawyers and was adopted to address conflicts of interest arising out of the "revolving door" of lawyers moving between government service and private sector employment.[12] It is now well established that these policy concerns apply equally to part- and full-time, as well as current and former lawyers serving as government officers or employees. While some authorities suggest that the Rule "appears" to apply to former lawyers, the predominant interpretation is that the Rule applies to both "current" and "former"[13] government lawyers. The Ethics 2000 Commission's expansion of the Rule's application reflects the importance the Commission placed on the even-handed application of the Rules. Specifically, the Commission recommended expanding the Rule's scope to address conflicts for lawyers *currently and formerly* representing the government, as well as those transitioning between government agencies, while maintaining the concerns about protecting information the current or former government lawyer acquired under the power of government authority. (*Emphasis supplied*). Thus, at the recommendation of the Ethics 2000 Commission, the ABA House of Delegates adopted the Rule renamed as "Special Conflicts of Interest for Former and Current Government Officers and Employees."[14]

---

[11]Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-2013, p. 288 (2013).

[12]Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-2013, p. 279 (2013);

[13]*See, e.g.,* Oh. Adv. Op. 14-002 (8/8/2014), 2014 WL 4084471(Noting that the Rule appears to apply to only to former government lawyers while emphasizing the importance of protecting confidential government information regardless of the lawyer's employment status.) *See also,* fn. 22 below.

[14]Garwin, A Legislative History: The Development of the ABA Model Rules of Professional Conduct 1983-2013, p. 288 (2013);

Even under the now superseded Code of Professional Responsibility, when the Rule applied only to lawyers formerly employed by the government, the policy concerns supporting the Rule required protection of third parties' information from misuse by those lawyers, regardless of whether the lawyer was currently or formerly employed in a government position.[15] That public policy has long forbidden the exploitation of government power by lawyers who acquire information in their government role, and then seek to use that information in their private capacity.[16] When lawyers abuse information acquired under government authority, it disadvantages the adverse party both "economically and strategically,"[17] and contributes to the

---

https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/e2k_migated/10_85rem.pdf at 40.

[15] *See* OH Adv. Op. 2006-6 (Ohio Bd.Com.Griev.Disp.) 2006 WL 2000109 (A county child support enforcement attorney (CSEA) may not represent the state against a party where that staff attorney participated as a CSEA hearing officer, due to concerns about the "appearance of impropriety" and "conduct prejudicial to the administration of justice" [caused in part by the sharing of confidential information.]) *Rhode Island Supreme Court Ethics Advisory Panel Op.* 2016-03 (4/28/2016)(Applying the rule in the context of a *part-time* municipal court judge who was also a lawyer in private practice, the opinion concluded that "the language of Rule 1.11 describes successive government and private employment, but the rationale of the Rule applies as well to concurrent government and private employment.").

[16] *See, e.g.,* OH ST RPC Rule 1.11, Historical and Statutory Notes, Ed. Note: "Rule 1.11 is analogous to former DR 9-101." DR 9-101 provided as follows:

DR 9-101. Avoiding Even the Appearance of Impropriety. (A) A lawyer shall not accept private employment in a matter upon the merits of which he has acted in a judicial capacity. (B) A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee. (C) A lawyer shall not state or imply that he is able to influence improperly or upon irrelevant grounds any tribunal, legislative body, or public official. [Effective: October 5, 1970.]

[17] *Allied Realty of St. Paul, Inc. v. Exchange Nat'l Bank,* 1968 U.S. Dist. Lexis 7832, **14.

appearance of impropriety[18] caused where a lawyer, who is a "[government officer or employee], profits by information gained in the course of performance of his duties as a public official."[19]

"It is not the fact that a former government employee brings into a later proceeding a knowledge of the procedures and substantive law of an agency that gives rise to a conflict of interest. Rather it is the situation where a former government lawyer brings into a proceeding on behalf of a *private client*[20] a personal knowledge of particular background facts and data that creates a

---

[18] Canon 36 of the old Canons of Professional Responsibility was intended to espouse the "appearance of evil" doctrine. The language of Canon 9 the Code of Professional Responsibility and DR(-101(B) superseded that doctrine with the concept of "appearance of impropriety." [The appearance of evil doctrine and the appearance of impropriety have subsequently been replaced by more specific conflict rules and were eventually superseded by the current language of Rule 1.11.] Significantly, however, courts have long been concerned to "avoid the manifest possibility that…[a former Government lawyer's] actions as a public legal official might be influenced (or open to the charge that [the lawyer] had been influenced) by the hope of later being employed privately to uphold or upset what [the lawyer] had done." *General Motors Corp. v New York,* 501 F. 2d. 639,649,650-653 (2nd Cir.1974). For example, fifty years ago, a Court disqualified a former Department of Justice Anti-trust Division lawyer based upon his participation in the investigative and preparatory work in the same matter (based in part on the similarity of allegations in the complaint) and rejected counsel's arguments that he had merely switched sides to represent a different governmental entity. The court found that his lucrative contingent fee contract and use of information learned under government authority warranted disqualification on the grounds that it created an impermissible appearance of impropriety. *See e.g., General Motors Corp. v New York,* 501 F. 2d. 639,649,650-653 (2nd Cir.1974); *see also,* ABA Formal Op. 342 (1975)(considering under the now superseded ABA Canons the disqualification issues of former government lawyers and balancing the need to attract lawyers to government service while "discouraging government lawyers from handling particular assignments in such a way as to encourage their own future employment in regard to those particular matters after leaving government service.")

[19] *See*, e.g., *Allied Realty of St. Paul, Inc. v. Exchange Bank,* 283 F. Supp. 464, *13 (1968); *General Motors Corp. v New York,* 501 F. 2d. 639, 649, 650-653.

[20] Although Singer and Motley Rice represent public entities in their private practice, they are not government actors in that capacity, nor do they have the authority to wield the power of the government in that role. Thus, Rule 1.11(c) prohibits them from using information they previously obtained under government authority in this matter. *See* ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 342 (Nov. 24, 1975) (explaining that "'private employment' refers to employment as a private practitioner and noting that "this position is not in conflict with *General Motors Corp. v. City of New York*, 501 F.2d 639 (2d Cir. 1974), where the lawyer for the municipality was privately retained, and the appellate court held that this employment constituted 'private employment' within the meaning of DR 9-101(B)."

conflict of interest demanding that the lawyer not undertake the representation of the private client. (*Emphasis supplied*). Where successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client."[21] The term "private client" as used in the Rule means any client the lawyer represents in a private capacity, rather than in the capacity of a government employee.[22]

I.    **It is our opinion that Rule 1.11(c) applies to lawyers serving as both current and former government officers and employees as well as to lawyers serving in part-time government positions.**

The rule reads, "a lawyer having information about a person acquired *when* the lawyer *was* a public officer or employee." (*Emphasis supplied*).When viewed in the context of the Rule's title and purpose, that language is better explained as when the lawyer *is or was* a public officer or employee since that reading is consistent with the purpose of the rule as well as the majority of interpretations.[23] Ethics opinions recognize that Paragraph (c) applies to any "lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee." Lawyers possessing "confidential government

---

[21] OH ST RPC Rule 1.11(c), Cmt. 4; *See also, In re Nat'l Prescription Opiate Litig.,* 2019 WL 1274555*6 (03/20/2019. N.D. Ohio, E.D.)

[22] *See* fn. 20, *supra.*

[23] *See, e.g.,* Rhode Island Supreme Court Ethics Advisory Panel ("EAP") Op. 2016-03 (4/28/2016)(Applying the rule in the context of a *part-time* municipal court judge who was also a lawyer in private practice, the opinion concludes that "the language of Rule 1.11 describes successive government and private employment, but the rationale of the Rule *applies as well to concurrent government and private employment*."(*Emphasis supplied*). This concept is not new. The 2016 opinion refers back to the same explanation of the rationale of Rule 1.11 in a 1996 EAP Op. 96-13 (7/11/1996). The fact that the Rhode Island EAP reached this conclusion using an earlier version of Rule 1.11 entitled "Successive Government and Private employment" is further evidence that the provision applies to both current and former public officers or employees, since the Rule's title is "Special Conflicts of Interest for *Former and Current* Government Officers and Employees." (*Emphasis supplied*). *See also,* Oh. Adv. Op. 14-002 (8/8/2014), 2014 WL 4084471(Also applying Rule 1.11 to part-time and full-time government officers or employees.)

information" include those still employed, as well as those formerly employed by the government.[24] The need to restrict the misuse of confidential government information for the benefit of private clients exists whether the lawyer is currently or formerly employed by the government and even if the employment is part-time.[25] Rule 1.11(c) is not limited by its terms to either current or former government officers and employees, and thus clearly applies to both.

The conclusion that Rule 1.11(c) applies equally to lawyers who currently serve or formerly served as government officers whether full or part-time is well supported.[26] Ethics opinions have long recognized the importance of not allowing lawyers to gain an improper advantage by reason of the lawyer's public office, and to prevent public suspicion about a private client gaining an improper advantage.[27]

---

[24] *Supra* fn. 23.

[25] Oh. Adv. Op. 14-002 (8/8/2014), 2014 WL 4084471 (Considering whether lawyers in part-time prosecutor's law firm are permitted to represent criminal defendants in cases against the state or municipal corporations represented by the prosecutor. The opinion notes Rule 1.11 applies to part-time and full-time lawyers. "While the Rule *appears* to apply only to former government lawyers," the importance of protecting confidential information of third-parties [criminal defendants] requires screening.) (*Emphasis supplied*). We believe a better interpretation of Rule 1.11(c) is that it applies to current and former government lawyers.) Regardless, it is clear that this opinion recognizes the important policy reasons behind protection of confidential government information as it requires screening which has not occurred in this case.

[26] *See, e.g.*, Nebraska Ethics Advisory Opinion for Lawyers No. 22-01 (Applying Rule 1.11(c) to a part-time county attorney and disqualifying him from representing clients in family law matters where child support is at issue due to his access to a state run database with information about individual's financial status and past earnings where the information was considered confidential under statute.); N.Y. State Op. 1169 (2019), *citing,* N.Y.S. Op. 431 (1976); N.Y.S. Op. 1170 (2019)(Explaining that Rule 1.11(c) applies to a lawyer who wants to run for the position of Town Supervisor and might disqualify him from representing a person in any matter in which he gains confidential government information as a result of the Town Supervisor position, when that information could be used to a person's material disadvantage, even where he did not work on the matter and came across the information by happenstance. ¶¶16-17); OH ST RPC Rule 1.11(c), Cmt. 4.

[27] *Id.*

The comments to the Rules of Professional Conduct also explain the Rules' intent. Comment 4 to Rule 1.11(c) notes that, "This Rule represents a balancing of interests,"[28] between preventing abuse of the power of government office while balancing the ability of lawyers "*presently or formerly* employed by a government agency"[29] to transfer to and from government jobs. (*Emphasis supplied*). Regardless of that balance, "where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special the special benefit" of the other client,"[public or private.][30] The lawyer "should not be in a position where the benefit to the other [private] client might affect performance of the lawyer's professional functions on behalf of the government."[31] The Rule serves to protect the importance of the public trust in the impartiality of government lawyers. In addition, it is improper to allow a client to accrue "unfair advantage… by reason of access to confidential government information about the client's adversary only obtainable through government lawyer's service."[32] Comment 4, as well as other authority, illustrate that the rule applies to Singer and Motley Rice given their position as government attorneys.

## II.   It is our opinion that Singer and Motley Rice possess the type of confidential government information protected under 1.11(c).

Under Rule 1.11(c), confidential government information is described as "information about a person." In this context "person" means information of a third-party and differs from "confidential information" of the government client.[33] For government lawyers, the client is the government, whose information is protected pursuant to other confidentiality rules such as Rules

---

[28] OH ST RPC Rule 1.11(c), Cmt. 4.

[29] OH ST RPC Rule 1.11(c), Cmt. 4.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] *Id.*

1.6, 1.8(b), 1.9(c), as well as other regulations and statutes.[34] On the other hand, Rule 1.11(c) does not protect the lawyer's client—the government—but rather a third party who is not, and has never been, the lawyer's client.

Rule 1.11(c) defines confidential government information as "information obtained under government authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public."[35] Obtaining information under government authority includes information produced pursuant to subpoena. Authorities agree that the definition of confidential government information is quite broad, including basically everything except information that is required to be disclosed under the Freedom of Information Act.[36]

The definition of confidential government information has three elements[37] all of which are satisfied in this matter. First, the information must be gathered under "government authority," such as a subpoena. Second, once having received the information, the government is prohibited from making it available to outsiders because of a statutory or other legal prohibition against disclosure, or a privilege not to disclose. Finally, the information must not be readily available to the public.

In this matter, the confidential government information was produced pursuant to government subpoenas and is subject to the protection of the confidentiality agreements signed by Motley Rice's and OptumRx's lawyers. The confidentiality agreements designated any information marked as Confidential by OptumRx as protected under that agreement. For example,

---

[34] OH ST RPC Rule 1.11 (c) Cmt. 4.
[35] OH ST RPC Rule 1.11(c).
[36] *Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, §16.12 (Fourth Edition, 2021-1 Supp. 2014).
[37] *Id.*

the D.C. Confidentiality Agreement provided in pertinent part that the parties agreed "*not to use* [the] *Confidential Information in connection with any other matter*, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree[s] with the designation. OAG outside counsel [Linda Singer and Motley Rice] further agrees not to rely on Confidential Material in pursuing information or claims *in any other matters outside of its representation of the OAG."* (*Emphasis supplied*).

Comment 4 to Rule 1.11 discussed above, illustrates how Singer's representing clients in her capacity as a private attorney in litigation, where the confidential government information that Singer previously acquired about OptumRx through her appointment as Assistant Attorney General can be used to OptumRx's material disadvantage, is in direct contravention of the Rule's confidentiality provisions. Specifically, the *City of Rochester* Complaint, *supra*, one of the bellwether cases, includes allegations relating to the OptumRx's revenues, incentives, profits and formularies, information related to which was in the possession of Singer and Motley Rice as a result of OptumRx's production of the materials under government subpoenas and confidentiality agreements. Much of this confidential information would not have been produced by OptumRx without the compulsory nature of the government subpoenas issued, or the assurances in confidentiality agreement(s), that the confidential information would not be used for any private purpose. *See* Exhibits 1, 4 and 7.

As an example, the Chicago confidentiality agreement specifically provides that the information produced by OptumRx "will be used for no other purpose whatsoever without the prior written consent from [OptumRx] or by a court order or other applicable law, and that the City of Chicago and its outside counsel [Motley Rice] in this Investigation shall not share, disclose, or discuss Confidential Documents or the information contained therein with any Motley Rice

attorneys, paralegals, contractors, or experts adverse to [OptumRx] in another matter. (*Emphasis supplied*).

Importantly, Singer has never challenged any of the Confidentiality designations nor has OptumRx consented to the use of the materials in any other matter aside from the original government investigations in which the materials were produced. The Hawai'i and D.C. Confidentiality Agreements provided that information marked as Confidential was defined as: *"Confidential Information" as "documentary and/or tangible information of any type, kind or character that contains (a) Information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; (b) trade secret or commercial financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company." See* Exhibits Four and Seven, ¶ 2.

The vast majority of the Confidential Information that OptumRx produced to Chicago, DC or Hawai'i is not available to the public because those materials are some of OptumRx's most sensitive commercial documents which it would not have otherwise produced were it not compelled to do so by government subpoenas, and if the information was not protected by the Confidentiality Agreements. It is clear that the information at issue is not public, rather it is proprietary and is generally not produced pursuant to routine discovery requests. If and when it is produced, it is pursuant to a protective order. Therefore, all three criteria for the test of confidential government information are established in this case.

In some instances, for example D.C., even the engagement letter provided for the confidentiality of the information Singer and Motley Rice obtained. The pertinent language states:

> [Singer recognizes that] in the performance of the contract [she] may receive certain information submitted to the District government on a proprietary basis by third parties, information which relates to potential or actual claims against the District government, or information which relates to matters in dispute or litigation. Unless

the District consents to a particular disclosure, [Singer] shall use such information *exclusively in the performance of the contract and shall forever hold inviolate and protect from disclosure all such information, except disclosures required by applicable law or court order*. . .[T]o the extent [Singer] is permitted to disclose such information, [she] will make such disclosures only to those individuals who need to know such information in order to perform required tasks in their official capacity and will restrict access to such information to such individuals. *(Emphasis supplied).*

Accordingly, Singer is prohibited from using the information that she received from OptumRx in her capacity as a government officer or employee in conjunction with her representation of *any other client* through her private law practice, including but not limited to, the plaintiffs in the bellwether cases.[38]

## III.  It is our opinion that in this matter the protection of confidential government information can only be waived by the third party and OptumRx has not waived the protection.

Rule 1.11(c) "applies to *any* matter in which confidential information acquired in government [under government authority] could be used to the disadvantage of a private third party."[39] Because the Rule protects information of a third party, the government cannot waive the protection of the Rule.[40] It can only be waived by the third party, here OptumRx, and OptumRx has not waived the confidentiality protections for that information.

For example, a lawyer serving in the Department of Justice, who had major responsibility for prosecuting a federal antitrust action against a certain company could not later act as special

---

[38] *See* fn. 18, *supra*.

[39] *The Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, Ch.16 ¶16.14 (Fourth Edition, 2021-1 Supp. 2014).

[40] *See* Pa. Ethics Op. 94-132 (1994)(Former government lawyer who obtains confidential information while employed by the Department of Justice may not represent a client in a matter in which she was involved as a government lawyer, even with government consent.); S.C. Ethics Op. 97-41 (1998) (Former special prosecutor for solicitor's office may represent victims in civil suit against criminal defendant being prosecuted by solicitor's office if solicitor's office consents, unless she had access to confidential information that could lead to unfair advantage.)

counsel for a municipal corporation to file a lawsuit against the same company based on the same course of conduct."[41] Although the government [City of New York] in that case consented, the company [General Motors Corp.] objected. The court disqualified the lawyer, in reliance upon the old Code of Professional Conduct and the general rule against creating "the appearance of impropriety," finding that "Rule 1.11(c) adopts the same position explicitly but under a more direct rubric."[42] *General Motors Corp. v City of New York,* 501 F. 2d 639 (2nd Cir 1974). Thus, in these matters, only OptumRx can consent to the use of its confidential information, production of which was compelled by government authority and is protected by confidentiality agreements. OptumRx has not done so.

### IV. It is our opinion that Singer and Motley Rice have actual knowledge of the "confidential government information" that was provided to the firm pursuant to the government's authority, through a government subpoena, and that the confidential information obtained is disqualifying.

Rule 1.11(c) applies to disqualify a lawyer only when the lawyer has *actual knowledge* of the information and does not apply when information merely could be imputed to the lawyer.[43] It is undisputed in this case that OptumRx's confidential information, produced pursuant to a government subpoena and confidentiality agreement, was produced directly to Linda Singer. Thus, the actual knowledge standard is met.

In a similar matter, this Court disqualified a private defense lawyer who was formerly a government attorney, on the basis that her receipt of non-public information relating to damages

---

[41] *The Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, Ch.16 ¶16.13(Fourth Edition, 2021-1 Supp. 2014).

[42] *The Law of Lawyering,* Hazard, Hodes, Jarvis and Thompson, Ch.16 ¶16.13(Fourth Edition, 2021-1 Supp. 2014).

[43] OH ST RPC Rule 1.11(c), Cmt. 8; "Division (c) operates only when the lawyer in question has knowledge of the information, which means actual knowledge; it does not operate with respect to information that merely could be imputed to the lawyer."

while she was employed by the government could materially prejudice the opponent's case and was a basis for disqualification under Rule 1.11(c).[44] Specifically, this Court's March 2019 opinion and order in *In re: National Prescription Opiate Litigation,* MDL 2804, is instructive. In that case, plaintiffs' counsel, who were representing various government entities, filed a motion for the disqualification of the private defense counsel who was representing a pharmaceutical company. The defense counsel at issue was a former First Assistant U.S. Attorney, and then U.S. Attorney, who chaired the Heroin and Opioid Task Force. In that case, the plaintiff argued that while defense counsel served as a government attorney, she had received confidential government information through her role as the head of the Opioid Task Force. Although defense counsel and her client denied those allegations, the Court granted, in part, plaintiffs' motion to disqualify.[45]

In finding that the information provided by the Department of Justice and shared with the Task Force was confidential, this Court considered that the information was provided "in a spirit of confidence and trust" and would not have been shared had counsel not been with the U.S. Attorney's Office.[46] This Court further concluded that the confidential information may go to the heart of the plaintiff's damages claims, and the information, if used by the defendant, would "materially prejudice" the plaintiffs. As such, the court disqualified counsel from all cases initiated by the City of Cleveland and Cuyahoga County. Likewise, the court disqualified defense counsel's

---

[44] *In re National Prescription Opiate Litig.* 2019 WL 1274666, *5 (Under 1.11(c) the court disqualified a former Executive Assistant United States' Attorney from participation as plaintiff's private counsel in portions of the Opioid MDL litigation, where that attorney had previously received confidential government information shared in the "spirit of confidence and trust" that could now materially disadvantage the third-party.)
[45] *Id.,* at *1.
[46] *Id.,* at *5.

firm from any litigation brought by those parties, finding that the conflict was imputed to the firm because timely screening was no longer available almost two years later.[47]

Other courts have disqualified former government lawyers for gaining confidential information that provided strategic insights into the opponent's case. For example, in *United States v. Villaspring Health Care Ctr. Inc.*, Civ. No. 3:11-43-DCR, 2011 WL 5330790, 2011 BL 285930 (E.D. Ky. Nov 7, 2011), a former state assistant attorney general, who was now in private practice, was disqualified from representing a health care facility in a federal False Claims Act case because, as a government attorney, he investigated, but did not charge, the same health care facility for criminal abuse and neglect. The court held that, while investigating health care facility as an assistant attorney general, the lawyer gained "strategic insights such as the knowledge of the strengths and weaknesses of the evidence compiled against [the facility],"[48] which was confidential government information requiring his disqualification.[49]

Courts have also considered confidential government information that constitutes a "roadmap" to require disqualification.[50] Thus, even when twenty years had passed and the former government lawyer did not remember the information and would not rely on it, the lawyer's "lack of memory does not insulate him from the reach of Rule 1.11(c) and does not undo his actual knowledge." Although after twenty years some of the information was in the public record, because some was still classified, the court found "[a]t the very least, the lawyer surely has a mental roadmap concerning the defendant and his activities that was shaped at least in part by his access to confidential government information."[51] The court further found that the lawyer's access to

---

[47] *In re National Prescription Opiate Litig., 2019 WL 1274666 *5.*
[48] *United States v. Villaspring Health Care Ctr. Inc.* 2011 WL 5330790 *6.
[49] *Id.*
[50] *Kronenberg v. LaRouche* 2010 WL 1443934, *4.
[51] *Id.*

confidential government information "about a variety of relevant topics obtained as a result of his extended role in prosecuting the defendant. . . could be used to the material disadvantage" of one or more of the defendants and, therefore, disqualified counsel.[52] In so doing, the court considered the importance of the "overarching need to preserve the integrity of the judicial system" and "to avoid the appearance of impropriety that may compromise the public perception of the judicial process."[53]

Motley Rice has received confidential government information through government subpoenas in connection with its appointment as government officers as follows:

- in 2018 in connection with its work on behalf of the City of Chicago Law Department;
- in 2020 in connection with its work as Attorney General for the District of Columbia; and
- in 2021 in connection with its work as Special Deputy Attorney General for Hawai'i.

In each of these instances, Motley Rice, as government lawyers, directly received confidential information provided pursuant to a government subpoena and protected by confidentiality agreements. The standard for actual knowledge is clearly established.

## V.  It is our opinion that Singer and Motley Rice could use the confidential government information to OptumRx's material disadvantage.

The Rule requires only that the confidential government information *could be* used to the material disadvantage of OptumRx.[54] A comparison of the information obtained by government subpoena in the Chicago, Hawai'i and D.C. matters, with the allegations of the bellwether complaints, clearly illustrates that Singer and Motley Rice collected information through their

---

[52] *Kronenberg v. LaRouche* 2010 WL 1443934, *5.
[53] *Id.*
[54] OH ST RPC Rule 1.11 (c)(Emphasis supplied).

power as government officers and could use that information to the material disadvantage of OptumRx in their capacity as a private law firm representing other clients.[55]

For instance, as government lawyers for Hawai'i and D.C. Motley Rice subpoenaed "Rebate payment data and information from manufacturers, including emails and communications, financial analyses. A review of the complaints in the bellwether matters illustrate how Motley Rice could use the confidential government information obtained. The *City of Rochester* complaint, *supra,* alleges that Optum Rx "received significant payments from manufacturers in exchange for formulary management, colluded with Manufacturers to place opioids on formularies with preferred status and without limits in exchange for rebates and, since 2014, payments to PBMs by manufacturers as rebates or fees to ensure the formulary placement of their drugs have risen by 16% per annum, and now constitute 40% or more of branded prescription drug costs." See *City of Rochester* complaint ¶¶19, 20, 22.

Singer and Motley Rice are actively pursuing claims against OptumRx that are focused on the aspects of OptumRx's business discussed in the many confidential documents produced in the Chicago, Hawai`i, and District of Columbia, investigations. All of those documents were subject to the Confidentiality Agreements prohibiting their use outside of those specific representations. As another example, in the Hawai'i matter, the government, through Motley Rice, subpoenaed documents regarding the identity of the ten manufacturers from which OptumRx received the largest payments in the years 2010-2021. Correspondingly, the *City Rochester* complaint alleges:

- Each of the participants in the opioid promotion enterprise described herein received substantial revenue from the scheme, in the form of sales for Manufacturer Defendants, sales and kickbacks for Distributor Defendants who reached particular monthly goals, and rebates or other financial incentives for PBM Defendants who placed opioids in a preferred place on a formulary or otherwise made opioids available for improper use—all in an effort to maximize profits. ¶1074; and,

---

[55] *See* fn. 20, *supra.*

- PBMs require, and receive, incentives from Manufacturer Defendants to keep certain drugs on and off formularies. These incentives include the payment of rebates by Manufacturers Defendants to PBMs based on utilization, bonuses for moving product and hitting volume targets, and the payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not transparent to anyone, including those who in good faith hire PBMs to manage their benefits. ¶46.

The standard under the Rule is only that the information *could be used.* OptumRx need not establish that the information actually has been used by Motley Rice. At minimum, the information demanded by the subpoenas issued under government authority and produced to Motley Rice pursuant to that authority, gave Motley Rice a roadmap and strategic insights that could assist them in representing the plaintiffs in this litigation.[56] An example of why this violates Rule 1.11(c) is the *LaRouche* case, where the court held that neither the lawyer's lack of memory caused by the passage of twenty years, nor his lack of access to the information at issue, were enough to insure that the defendant would not be materially disadvantaged by the lawyer's mental roadmap resulting from his previous exposure to the defendant's confidential government information.[57]

In this situation the information was recently obtained by Singer and Motley Rice, unlike the passage of twenty years in the *LaRouche* case. Further, even if Singer and Motley Rice no longer have access to the information obtained while working for the government, like the lawyer in *LaRouche,* they are still deemed to have knowledge of OptumRx's confidential information which they obtained as government lawyers because it was produced directly to Motley Rice. This abuse of confidential government information collected pursuant to government subpoena is exactly what Rule 1.11(c) is designed to prevent. Allowing Singer and Motley Rice to use the information they gained wielding the power of government authority to the advantage of their

---

[56] *United States v. Villaspring Health Care Ctr. Inc.*, Civ. No. 3:11-43-DCR, 2011 WL 5330790, 2011 BL 285930.
[57] *Kronenberg v. LaRouche,* 2010 WL 1443934, *3, *4.

current clients represented by their private law firm, could materially disadvantage OptumRx and, therefore, violates Rule 1.11(c).

Respectfully submitted,

*Wendy Muchman*

Wendy Muchman

*Sari W. Montgomery*

Sari W. Montgomery

Date: December 14, 2023

Appendix A

# Sari W. Montgomery   |   Curriculum Vitae

33 N. Dearborn St., Ste. 1420, Chicago, IL 60604 | (847) 217-3524 | smontgomery@rsmdlaw.com

## Current Position

| | |
|---|---|
| **Partner** | *2019 – Present* |
| **Of Counsel** | *2010-2018* |

*Robinson, Stewart, Montgomery & Doppke LLC* (Formerly Robinson Law Group, LLC), Chicago, Illinois

- Represent attorneys in disciplinary investigations, hearings and appeals before the Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois and the Illinois Supreme Court;
- Represent judges in investigations pending before the Illinois Judicial Inquiry Board;
- Represent bar applicants in admissions proceedings before the Illinois Board of Admissions to the Bar, the Committee on Character and Fitness, and the Illinois Supreme Court;
- Provide consulting services and opinion letters to law firms, attorneys, government agencies, and law related business in diverse practice areas regarding legal ethics and professional responsibility issues;
- Provide opinions as an expert witness regarding legal ethics and fee issues; and
- Manage day-to-day operations of law firm including human resources, benefits, payroll, and financial reporting.

| | |
|---|---|
| **Adjunct Professor** | **2023 - Present** |

*Northwestern University Pritzker School of Law*, Chicago, Illinois

- Teach required course on legal ethics and professional responsibility.

## Prior Professional Experience

| | |
|---|---|
| **Adjunct Professor** | *2006 - 2011* |

*Loyola University Chicago of Law*, Chicago, Illinois

- Taught a full-year course on legal writing and research to first-year law students.

| | |
|---|---|
| **Litigation and Senior Litigation Counsel** | *1994 - 2004* |

*Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC)*

- Conducted hundreds of investigations and prosecuted more than fifty disciplinary cases before the Hearing Board of the Attorney Registration and Disciplinary Commission.
- Extensive motion practice before the Hearing Board of the Attorney Registration and Disciplinary Commission and the Illinois Supreme Court.
- Supervised and trained designated counsel and support staff.

- Assisted Administrator in developing and implementing agency-wide strategy for prosecuting the first cases in Illinois involving the unauthorized practice of law in numerous practice settings.

**Contract Attorney**                                                                          *2005*
*Lake County Public Defender, Lake County, Illinois*
- Represented juveniles in misdemeanor and felony delinquency proceedings.
- Represented parents in DCFS proceedings.

## Education, Licenses, and Professional Memberships

**University of Chicago**, Chicago, Illinois, *BA in Public Policy Studies*                *1991*

**Loyola University Chicago School of Law**, Chicago, Illinois, *Juris Doctor*            *1994*

**Loyola University School of Law Program in International Law,** *Rome, Italy*          *1992*

**Illinois Supreme Court**, *Admitted*                                                      *1994*

**United States District Court for the Northern District of Illinois,** *Admitted, General Bar*   *1994*

**American Bar Association Center for Professional Responsibility**, *Member*   *2012 - Present*

*Appointed as Special Advisor to Standing Committee on Professional Regulation*   *2022 -2024*
*Appointed to Standing Committee on Professional Regulation*                      *2019 - 2022*
- Selected to participate in consultations conducting 360° evaluations of state lawyer regulatory systems at the request of applicable state Supreme Courts.
- Member, Sub-Committee on Proactive Management Based Regulation (PMBR)
- Member, Joint Sub-Committee on Revisions to ABA Model Rule 1.2(d)

**Association of Professional Responsibility Lawyers (APRL)**, *Member*          *2012 - Present*
- Treasurer                                                                       **2023-2024**
- Elected to Board of Directors                                                   *2020 - Present*
- Conference Planning Committee                                                   *2019 – 2020*
                                                                                 *2023-2024*
- Appointed as APRL Liaison to ABA Committee on Professional Regulation          *2018 - 2019*

**Illinois State Bar Association (ISBA)**, *Member*                              *1994 - Present*
*Appointed to Committee on Professional Conduct*                                 *2008 - Present*
- Past Chair, Committee on Professional Conduct                                   *2014 - 2015*
- Participate in drafting new ethics opinions for benefit of 30,000 member association. Comment on legislation and rule proposals impacting professional conduct issues. Reviewed

all pre-2010 ISBA ethics opinions for consistency with 2010 Illinois Rules of Professional Conduct.
- Member of Ethics 20/20 Sub-Committee which reviews all proposals from ABA Ethics 20/20 Committee and makes recommendations for adoption in Illinois.

*Appointed to President's Special Committee on Alternative Business Structures*

*Appointed to lead-generation working group to assess ethical implications of various lead-generation business models.*

*Appointed to President's Special Committee on the ARDC Matching Services Study*
- Review ARDC Matching Services Study and formulate recommendations to ISBA Board of Governors to be presented to ARDC and Illinois Supreme Court.

*Appointed to President's Special Committee on Collaborative Law*
- Draft proposed legislation and changes to Supreme Court Rules to facilitate the collaborative law process in a manner consistent with the Rules of Professional Conduct.

**Chicago Bar Association**, *Member*                                    *1994 - Present*
- Member, Committee on Professional Responsibility
- Member, Committee on Unauthorized Practice and Multidisciplinary Practice

**Chicago Council of Lawyers,** *Member*                               *2020 - Present*
- Member, Committee on Access to Justice

**Lake County Bar Association,** *Member*                              *2022-Present*

**Association of Women Attorneys of Lake County,** *Member*           *2022-Present*

## Publications

Sari W. Montgomery, Know When to 'Just Say No,' Business of Law Digest (BridgeTower Media, Sept. 26, 2023—ongoing ethics columnist).

Sari W. Montgomery, The Promise and Pitfalls of ChatGPT, Business of Law Digest (BridgeTower Media, July 5, 2023—ongoing ethics columnist).

Sari W. Montgomery, Legal Ethics: You Have Inadvertently Received Privileged Information from Opposing Counsel, Now What?, Business of Law Digest (BridgeTower Media, March 28, 2023—ongoing ethics columnist).

Lucian T. Pera, Mark Armitage, Lydia Lawless, Ronald Minkoff, Sari W. Montgomery, Wendy Muchman, Lynda Shely, Time to Renew America's Lawyer Discipline System, Bloomberg Lawyers' Manual on Professional Conduct (Bloomberg Law, Feb. 2023).

Sari W. Montgomery, The Dos and Don'ts of Using Social Media in Jury Selection, GP Solo, Volume 40, No. 1 (American Bar Association, Solo, Small Firm, General Practice Division, Jan./Feb. 2023).

Sari W. Montgomery, James A. Doppke, Jr., Stephanie Stewart, Ch. 7, Ethical Considerations in Jury Trials, Inside & Outside the Jury Box (IICLE®, 2023).

Sari W. Montgomery, Legal Ethics: How to Avoid Discipline When You've Made a Mistake, Business of Law Insider (BridgeTower Media, December 20, 2022—ongoing ethics columnist).

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Stephanie Stewart, Ch. 13, Disciplinary Liability, ATTORNEY'S LEGAL LIABILITY (IICLE®, 2021).

Sari Montgomery, Scott Kozlov, Nancy Vincent, A Cautionary Tale for In-house Counsel, Illinois Bar Journal, Volume 107, Number 7. (ISBA, 2019).

Contributing Author, Annotated Standards for Imposing Lawyer Sanctions, 2d Ed. (American Bar Association Center for Professional Responsibility, 2019).

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Ch. 9, Ethical Considerations in Jury Trials, Inside & Outside the Jury Box (IICLE®, 2019).

Mary Robinson, Sari W. Montgomery, James A. Doppke, Jr., Ch. 13, Disciplinary Liability, ATTORNEY'S LEGAL LIABILITY (IICLE®, 2018).

## Additional Professional Activities and Awards

Subject Matter Expert/Drafting Committee Member (2024-present), Multistate Professional Responsibility Examination (MPRE), National Conference of Bar Examiners, 2018-Present
- Draft, edit and review questions for the Multistate Professional Responsibility Examination

Editorial Advisory Board Member, Law360 Legal Ethics, 2022-2023

Fellow, American Bar Foundation, 2021-Present

Pro Bono Service Award, Illinois Lawyers' Trust Fund of Illinois, 2019

Provide informal ethics opinions as membership benefit to Illinois Creditors' Bar Association.

Trained Intervenor, Illinois Lawyers Assistance Program, 2003.

## Volunteer and Community Activities

**Deerfield Public Schools District 109 Board of Education**     ***Elected 2013 - 2025***
Deerfield Public Schools is a Pre-K-8 District located in North Suburban Chicago with approximately 2,800 students, over 400 employees, $64 million annual budget, and seven facilities.

*President, Board of Education*     ***2021 - Present***

*Secretary, Board of Education*     ***2015 - 2021***

*Chair,* Executive Development and Negotiations Committees; Past Chair, Finance Committee; Past Member, Policy Committee; Past Board Member Representative, COVID-19 Task Force.

**Township District 113 Caucus**     ***2018 - 2022***
*Member,* Non-Partisan organization that vets candidates for local public high school district.

**Deerfield Public Schools District 109 Caucus**     ***2010 - 2012***
 *Member*, Non-Partisan organization that vets candidates for local Pre-K-8 public school district.

**Community Family Center, Highland Park, Illinois**     ***2009 - 2019***
*Secretary, Board of Directors*

*Member, Board of Directors*     ***2006 - 2019***

**Highland Park Community Early Childhood Center, Highland Park, Illinois**     ***2002 - 2010***
*Member, Treasurer, Vice-President, President, Board of Directors*     ***2002 - 2010***

*Secretary Board of Directors*     ***2013 – 2017***

## Presentations and Speaking Engagements

Panelist, Special Industry Roundtable: Changing Rules for the Unauthorized Practice of Law and the Effect on the LPL Insurance Industry, American Bar Association National Legal Malpractice Conference, September 2023.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, September 2023.

Panelist, Generative AI and the Legal Profession: "Ask the Experts," Lemme Law firm Best Practices Forum, September 2023.

Panelist, Exploring the Next Frontier: Generative AI and the Challenges of New Technologies, Association of Professional Responsibility Lawyers Annual Meeting, August 2023, Denver, CO.

Panelist, Ethics Issues of Bots Practicing Law, Practising Law Institute, June 2023.

Panelist, Changing 5.5—In Our Lifetimes?, Chicago Bar Association Legal Ethics One-and-Done Professional Responsibility Overview, June 2023.

Speaker, Tips on What to Expect and How to Respond to an ARDC Inquiry, Lake County Bar Association, May 2023.

Panelist, Lawyer Mobility: Risks and Rewards, Joint Meeting of the Association of Professional Responsibility Lawyers and the Law Society of England and Wales, April 2023, Washington, D.C.

Speaker, Ethical Issues in Advanced Licensing, Practising Law Institute, April 2023.

Panelist, UPL: Anachronism or Necessary Regulation, American Bar Association National Legal Malpractice Conference, April 2023, San Juan, Puerto Rico.

Moderator, Bots Practicing Law: Where is the Line?, Association of Professional Responsibility Lawyers Mid-Year Meeting, February 2023, New Orleans, LA.

Moderator, Bots Practicing Law: Where is the Line?, American Bar Association UPL School, October 2022.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2022.

Panelist, Changing 5.5—In Our Lifetimes? (Part 2 of 2), Association of Professional Responsibility Lawyers Annual Meeting, August 2022.

Panelist, First Amendment—Choose Your Own Adventure, National Organization of Bar Counsel Annual Meeting, August 2022.

Panelist, Ethics of Lawyer Transitions, Chicago Bar Association, June 2022.

Panelist, Regulating Lawyers: Will We See 5.5 Changes in this Decade? (Part 1 of 2), Association of Professional Responsibility Lawyers Mid-Year Meeting, February 2022.

Panelist, The Exhilarating World of Material Adversity and Other Adrenaline-Charged Conflict of Interest Discussions, National Organization of Bar Counsel Mid-Year Meeting, February 2022.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2021.

Co-Presenter, Basic Skills Course, Illinois State Bar Association, June 2021.

Speaker, Advanced Licensing: IP Ethics Issues, Practising Law Institute, May 2021, April 2022.

Panelist, Technology and Ethics: What Every Lawyer Should Know, New York State Bar Association, April 2021.

Speaker, Landscape of Regulatory Innovation and Reform Efforts, ABA Bar Leadership Institute, March 2021.

Panelist, Guess What! Your Online Mediation is Not Confidential, ABA Section of Litigation, December 2020.

Panelist, 2020 Tech Summit: Pajamas & Professionalism: Standards and Ethics for New Surroundings, New Tech and New Social Media Users, New York State Bar Association Tech Summit, November 2020.

Panelist, Be Prepared: Practical Advice and Ethical Considerations for Succession Planning, Mergers and Acquisitions, Closures and Retirement, National Collectors Bar Association, September 2020.

Facilitator, UIC School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2020.

Co-Presenter, Ethical Issues Update; Defending/Avoiding Ethics Investigation; Ethics and Technology Use in Legal Practice, Practising Law Institute Ethics Marathon, July 2020.

Moderator, Social Media Issues: Addressing Negative Online Reviews, Geo-Fencing and More, Including What is Permitted vs. Practical, and the Malpractice Carrier's Perspective, Association of Professional Responsibility Lawyers Mid-Year Meeting, Austin, Texas, February 2020.

Co–Presenter, When Practice Collides with the Rules: Ethical Issues in the Collections Practice, Illinois Collections Bar Association, February 2020.

Panelist, Unauthorized Practice – Crossing Borders, Chicago Bar Association, November 2019.

Moderator, Why Do People Lie and Why Should We Care? The Movie, The Director, and Legal Ethics, Association of Professional Responsibility Lawyers Annual Meeting, San Francisco, CA, 2019.

Facilitator, DePaul University School of Law Professionalism Orientation, Illinois Supreme Court Commission on Professionalism, August 2019.

Panelist, Professional Responsibility Implications of Evolving Technology and Other Emerging Trends, ABA Lawyers' Professional Liability Young Professionals Event, 2019.

Speaker, Legal Ethics 101: Avoiding Common Mistakes and Conducting Your Practice with Honesty and Integrity, National Academy of Continuing Legal Education, 2019.

Panelist, Basic Skills for New Lawyers Series, Ethical Dilemmas for New Attorneys, Illinois State Bar Association, 2018.

Panelist, NOBC Ethics Roundtable (presented on Cryptocurrency, Email Tracking Software, and Of Counsel Relationships), National Organization of Bar Counsel Annual Meeting, Chicago, Illinois, 2018.

Speaker, Multijurisdictional Practice: How to Cross Borders Without Crossing Ethical Lines, Practising Law Institute Ethics Marathon, 2018.

Panelist, Secret of the Citation Act and Tips for Enforcing Judgments: Professional Rules v. Collection Practice: Know and Avoid the Conflicts, Illinois State Bar Association, 2018.

Panelist, Basic Enforcement of Judgments: Ethical Issues in Collection Practice, Illinois Institute of Continuing Legal Education, 2018.

Panelist, the Adjudicator's Perspective – A Peek Behind the Curtain, National Organization of Bar Counsel Mid-Year Meeting, Vancouver, British Columbia, 2018.

Speaker, The Ethical Defender: Conflict of Interest and Other "Hot Button" Ethical Issues in Public Defense, Illinois Public Defender Association Fall Meeting, 2017.

Panelist, Ethics of Limited Scope Representation, Chicago Bar Foundation Limited Scope Representation Seminar, 2017.

Panelist, Ethics and Technology, Illinois Legal Aid Advocates Conference, 2017.

Speaker, Limited Scope Representation: When Less is More, Illinois State Bar Association, 2016.

Panelist, Ethical Pitfalls for Attorneys Managing Multi-State Practices, National Association of Retail Collection Attorneys Annual Meeting, 2016.

Speaker, Tips on What to Expect and How to Respond to an ARDC Inquiry, North Suburban Bar Association, 2015.

Speaker, Legal Ethics 2013: Hot Topics in Technology and Communication, Lorman Education Services, 2013.

Speaker, Ethical Issues in Collection Practice, Illinois Creditors' Bar Association, 2011.

Panelist, Ethical Issues in Collection Practice: Where Professional Rules Conflict with the Realities of the Collection Process, National Association of Retail Collection Attorneys Annual Meeting, 2011.

Speaker, Illinois' New Rules of Professional Conduct: A Comprehensive Overview, Illinois State Bar Association Mid-Year Meeting, 2009.

Speaker, Illinois' New Rules of Professional Conduct: An Initial Overview, Illinois State Bar Association, 2009.

Panelist, Sex, Death and Money: A Discussion of Self-dealing Conflicts of Interest, National Organization of Bar Counsel Mid-Year Meeting, San Antonio, TX, 2004.

Panelist, Mentoring of Less Experienced or Newer Assistant Bar Counsel, National Organization of Bar Counsel Mid-Year Meeting, San Diego, CA, 2001.

Panelist, Defending a Case Before the ARDC: From the "Letter" to the Final Order, Chicago Bar Association, 1997.

## Expert Engagements

*Ansur America Insurance Co. v. Borland, et. al.,* Case No. 3:21-CV-0059, U.S. District Court, Southern District of Illinois (Plaintiff expert re: conflict of interest, competence, communication—Disclosures/Report submitted, deposed, matter pending).

*Confidential*, Pre-litigation disqualification matter involving government investigation into industry. (Defense/target expert re: conflicts of interest—Report submitted, matter closed).

*Fredman v. Andrew David Bell, and Spain, Spain & Varnet, P.C.,* Case No. 2019L007867, Circuit Court of Cook County (Plaintiff expert re: conflicts of interest—Disclosures submitted, deposed, matter settled/dismissed).

*Guidish v. Guidish, et.al.,* Case No. 2018 CH 7270, Circuit Court of Cook County. (Plaintiff expert re: conflicts of interest—Report submitted, currently pending).

*John v. Wheaton College*, Case No. 2011L000995, Circuit Court of DuPage County. (Expert for Plaintiff/Counter-Defendant re: reasonableness of attorneys' fees claimed as discovery sanction—Report submitted, deposed, matter settled/dismissed).

*Basista, et.al. v. Alms,* Case No. 16 L 004795, Circuit Court of Cook County. (Plaintiff expert re: fiduciary duties owed by attorney for estate—Disclosures submitted, deposed, matter settled).

# Appendix B

# Wendy Muchman

Wendy Muchman is a Professor of Practice at Northwestern University Pritzker School of Law. Since 2000 she has developed and taught classes in Professional Responsibility, including the standard ABA required course in Legal Ethics. The courses she teaches include *Legal Ethics and Professional Responsibility; Legal Ethics for the Government and Public Sector Lawyer; Legal Ethics for the Business Lawyer; Legal for the Global Practitioner*, *ITA Ethics,* (an experiential class for students interested in litigation,) and a survey class in *Legal Ethics*. She also co-teaches a course, *Professional Responsibility in Legal Writing*. Other courses she has developed and taught include: *The Law of Whistleblowing; Historical Perspectives on Ethical Lawyering*, an experiential course, *Ethics in Motion* and *A.I., Technology and Ethics*. For many years, she taught *Ethics* in the MSL program at Northwestern.

Teaching and other Awards: Outstanding Professor of a Small Class (2022-2023). *The Last Lecture,* an award presented to the faculty member selected by the graduating students (2021-2022); the *Robert Childres Award* presented annually to the faculty member selected by the student body as the year's most outstanding teacher (2019-2020); *Outstanding Professors of a Small Class* (*2018-2019),* with Professor Mary Foster. She was appointed the Harry. B. Reese Teaching Professor of Practice (2020-2021).

Ms. Muchman presents regularly on varied issues of Professional Responsibility.  Some recent examples include:
- Fall 2023: Ethical Issues in AI: A Modern-Day Trojan Horse: Garrett Corporate Counsel Institute
- Spring 2023: Ethics in the Rear View Mirror: ABA National Conference on Professional Responsibility;
- Fall 2022: 61st Annual Garrett Corporate Counsel Institute: Navigating Ethical Issues in the Wake of a Cyber Breach;
- Winter 2022: Regulating Lawyers. Will we see changes to Rule 5.5 in this Decade? Association of Professional Responsibility Lawyers Conference
- Spring 2022: The 15th Annual Sedona Institute Conference: The Ethics of Virtual and Hybrid Practice;
- Summer 2021: National Organization of Bar Counsel Annual Meeting: Dissecting Communication Obligations in our Multicultural Multigenerational World;
- Fall 2020: Loyola Women in Law Conference (keynote speaker): The Realities of Reporting Unethical Conduct Directed Toward Women Lawyers;
- Fall 2019: 58th Annual Garrett Corporate Counsel Institute: Lessons Learned from Bad Blood: Secrets and Lies in a Silicon Valley Startup;
- Spring 2019: ABA National Conference on Professional Responsibility: Harassment and Discrimination in the Rule 8.4(g) and #MeToo Era;

- Spring 2018: ABA National Conference on Professional Responsibility: Aggravating and Mitigating Factors in Attorney Discipline Cases;
- February 2016: National Organization of Bar Counsel: Breaking (it Down) Bad: The Science of Money Laundering;
- April 2016: Annual Garrett Corporate Counsel Institute: Ethics in the Corporate Setting;
- May 2014, Annual Garrett Corporate Counsel Institute: A roundtable discussion on pitfalls of emerging technology and other ethical issues.

Between 1989 and 2019 she was employed as a bar regulator at the Illinois Attorney Registration and Disciplinary Commission of the Supreme Court of Illinois (ARDC), where she most recently served as Chief of Litigation and Professional Education. She investigated and prosecuted innumerable lawyer disciplinary cases including the lawyer-client improper sexual relations cases (see e.g. *In re Rinella,* 175 Ill.2d 504, 677 N.E.2d 909 (1997) and *In re Paul M. Weiss,* M.R. 2754, 2008PR00116 (11/17/2012)), as well as cases involving allegations of civility, conversion, billing fraud, conflicts of interest, and public corruption. Her job responsibilities at the ARDC included supervision and training of the litigation attorneys and staff as well as presenting workshops regarding professional responsibility and disciplinary law to various national and state bar association groups, law firms, government agencies, judges, and law schools. Over the course of the past two decades Ms. Muchman has presented hundreds of different professional responsibility workshops on a state and national level.

Ms. Muchman has extensive experience in various bar association groups focusing on Professional Responsibility.  For the year 2020-2021, Ms. Muchman was Immediate Past President of the National Organization of Bar Counsel (NOBC) and served the NOBC in numerous leadership roles since 2013.

Ms. Muchman is currently serving a three-year appointment as a member of the American Bar Association (ABA) Standing Committee and Ethics and Professional Responsibility(SECPR). The Standing Committee on Ethics and Professional Responsibility has authority to advise and assist professional organizations and courts regarding the interpretation of statements of ethical standards of the professions such as the Model Rules of Professional Conduct and to express and publish its opinions on proper professional conduct.

Ms. Muchman also serves as the Immediate past Chair of the ABA Government and Public Lawyers Division where commencing in 2012, she was an elected member-at-large to the Council and in 2018 was elected to the Board.  Since 2019 she is a member of the ABA Working Group for Evaluation and Development of a Model Code of Conduct for Judicial Law Clerks.

Since 2019 she serves as an appointed member to the ABA Center for Professional Responsibility Conference Planning Committee. Other work for the ABA Center for Professional Responsibility includes in 2018, Ms. Muchman, with the assistance of a Northwestern law student, Alexander Bai, served as a chapter author to update the First

Edition of the ABA Annotated Standards for Imposing Lawyer Sanctions which was published in Spring 2019 as the second edition.  She co-authored with Daniel Linna, *Ethical Obligations to Protect Client Data when Building Artificial Intelligence Tools: Wigmore Meets AI*, The Professional Lawyer, Vol 27 No. 1 (Oct. 2020). Other publications include a quarterly column *Ethics Corner* in the ABA GPSLD *Pass it On.*

Other articles on professional responsibility topics authored by Ms. Muchman include: for the ABAGPSLD magazine: effective lawyer communications with clients; responsibilities of prosecutors; and on the anti-harassment and discrimination rule. For the ABA Business law section: an article on mixed purpose communications and attorney client privilege, business or legal advice.

Ms. Muchman has been engaged as an expert on matters including:

> For the plaintiff in matter on excessive attorney's fees and conflicts of interest-report submitted, deposition taken, matter settled.
> For the defense as an expert on conflict of interest issues, report submitted, matter concluded.
> For the defense as an expert responding to a motion for sanctions relating to litigation issues.  Report submitted, no sanctions issued.
> For the prosecution expert on issues of prosecutor's disclosure obligations, conflicts of interest and lawyer's obligations to withdraw.  Report submitted. Matter pending.

In 2022 she served on the Sedona Conference Working Group 12-Trade Secrets, Ethics Brainstorming Group.

In 2019-2020, she served as a member of the Chicago Bar Association Task Force on the Sustainable Practice of Law & Innovation on the subcommittee of the Plain Language Ethics Rules.

Since 2018 Ms. Muchman has served the National Conference of Bar Examiners as a subject matter expert for the Multistate Professional Responsibility Exam.

Other teaching experience includes courses at Chicago Kent College of Law where she taught intensive trial advocacy and a course she developed, Ethics and Advocacy. She coached the student trial team for a national ethics trial competition for two years resulting in a fourth place and a first-place finish. Teaching award: Adjunct Professor of the Year in 2013-2014.

She is a faculty member for the National Institute for Trial Advocacy (NITA) for regional and national trial advocacy, and deposition programs, as well as various law firm training workshops, and has served as a team leader for the Midwest Regional Trial Program.

In 2013 she was selected to participate as a fellow in the National Institute for Teaching Ethics and Professional Responsibility.

Between 2009 and 2011 she served as the Vice-Chair, then Chair, of the Chicago Bar Association Committee on Professional Responsibility.

Prior to 1989 when she started her employment at the ARDC, Ms. Muchman litigated in the state and federal courts. Areas of practice included insurance litigation, civil rights, age discrimination, aviation defense work.

She received her JD from DePaul University College of Law and her BA from the University of Illinois, Champaign/Urbana.

Appendix C

Appendix C

1. Hawaii Subpoena (October 15, 2021 Department of the AG State of Hawaii subpoena to OptumRx, Inc.)

2. Hawaii Confidentiality Agreement (May 18, 2022 confidentiality agreement between the Department of the AG State of Hawaii and OptumRx, Inc.)

3. June 8, 2022 Production Letter (Hogan Lovells' production letter to Linda Singer and Paige Boggs in response to October 15, 2021 Hawaii Subpoena)

4. September 1, 2022 Production Letter (Hogan Lovells' production letter to Linda Singer and Paige Boggs in response to October 15, 2021 Hawaii Subpoena)

5. DC Letter Contract (December 1, 2020 letter contract between the DC AG and Motley Rice)

6. DC Subpoena (December 28, 2020 Government of the DC AG subpoena to OptumRx, Inc.)

7. DC Confidentiality Agreement (July 1, 2021 confidentiality agreement between the DC AG and OptumRx, Inc.)

8. Confidentiality Agreement City of Chicago and OptumRx et al

9. July 13, 2021 Production Letter (Hogan Lovells' production letter to Linda Singer and Paige Boggs in response to December 28, 2020 DC Subpoena)

10. September 10, 2021 Production Letter (Hogan Lovells' production to Linda Singer and Paige Boggs in response to December 28, 2020 DC Subpoena)

11. November 24, 2021 Production Letter (Hogan Lovells' production to Linda Singer and Paige Boggs in response to December 28, 2020 DC Subpoena)

12. Factual summary covering Hawaii, D.C., and Chicago subpoenas.

13. Redacted complaint in *County of Summit, Ohio v. Express Scripts, Inc. et al.,* No. 1:23-op-45001 (N.D. Ohio Jan. 4, 2023)

14. Complaints in *City of Rochester v. Purdue Pharma L.P., et. al.,* Case No. 1:19-op-45853 DAP (originally filed in the U.S. District Court for the Western District of New York), *County of Webb, Texas v. Purdue Pharma, L.P., et. al.,* Case No. 1:18-op-45175 DAP (originally filed in the U.S. District Court for the Southern District of Texas), *City of Independence, Missouri v. Williams, et. al.,* Case No. 1:19-op-45371 DAP (originally filed in the U.S. District Court for the Eastern District of Missouri), and *Lincoln County v. Richard S. Sackler, M.D., et.al.,* Case No. 1:20-op-45069 (originally filed in the U.S. District Court for the Eastern District of Missouri).

15. Transcript of 2/6/19 proceedings of Motion to Disqualify in *in re Nat'l Prescription Opiate Litigation* 1:17-MD-2804-DAP, Doc. No. 1354

16. 2/6/19 Letter from US Attorneys re: Motion to Disqualify Carole Rendon, Case No. 1:17-MD-2804-DAP, Doc. No. 1342

Various legal research, including research cited in the expert report.