# Exhibit N

## Part 2 of 2
to Declaration of Matthew Hooker

# Exhibit 1

LAW DEPARTMENT
CITY OF CHICAGO

| | |
|---|---|
| IN THE MATTER OF | ) |
| | ) |
| UNITED HEALTHCARE SERVICES, INC., | ) |
| UNITEDHEALTHCARE INSURANCE | ) |
| COMPANY, UNITEDHEALTHCARE OF | ) |
| ILLINOIS, INC., and OPTUMRX, INC. | ) |
| | ) |
| COPAY CLAWBACKS | ) |

### CONFIDENTIALITY AGREEMENT

The City of Chicago is conducting a confidential investigation into alleged violations of § 2-25-090 of the Municipal Code of Chicago, including but not limited to potential acts of consumer fraud, deceptive practices, and/or conduct constituting unlawful practices under the Illinois Consumer Fraud and Deceptive Business Practices Act relating to prescription drug copay clawbacks, ("Investigation") and has requested documents and information from United HealthCare Services, Inc., UnitedHealthCare Insurance Company, UnitedHealthCare of Illinois, Inc. and OptumRx, Inc. (collectively, "United"), some of which may be confidential and/or proprietary. To preserve and maintain the confidentiality of certain documents to be produced or made available for inspection and copying by United, the parties have agreed as follows:

1. When used in this Agreement, the word "documents" means all written material, data maintained in electronic or digital format, and all other tangible items. Except as otherwise indicated below, documents marked or otherwise designated by United as "Confidential" or "Highly Confidential" that are or have been produced or made available for inspection and copying by United, to the City of Chicago's attorneys, consultants, agents, or experts, shall be given confidential treatment as described in this Agreement. United shall

Exhibit 1

mark as Confidential those documents that it reasonably and in good faith believes contain confidential or proprietary or otherwise sensitive non-public business information, information implicating an individual's legitimate expectation of privacy, or "protected health information" as defined in 45 C.F.R. §§ 160.103 and 164.501. United shall mark as "Highly Confidential" those documents that it reasonably and in good faith believes are so highly sensitive that disclosure to the public or a competitor could result in significant competitive or commercial disadvantage. (Together, those documents designated "Confidential" and "Highly Confidential" are considered "Confidential Documents").

2.     Both the Confidential Documents and the information contained therein shall be treated as confidential, shall not be disclosed except as provided in this Agreement, and shall not be made available to persons other than those described below. All information produced or made available for inspection and copying by United, including but not limited to information contained in documents or in correspondence between counsel, will be used solely in furtherance of the Investigation and any subsequent litigation brought by the City of Chicago against United that is directly related to this Investigation and will be used for no other purpose whatsoever without the prior written consent from United or by a court order or other applicable law. To the extent that the City of Chicago initiates litigation that is directly related to this Investigation following the Investigation, this Confidentiality Agreement will continue until the court enters a protective order that supersedes it.

3.     Documents designated "Confidential" and any information contained therein shall not be shown, disseminated or disclosed to any person other than the following persons, except upon the prior written consent of United or by a court order:

Exhibit 1

a.  The City of Chicago's Law Department and outside counsel in connection with the Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against United, namely Linda Singer, Mimi Liu, and Paige Boggs of Motley Rice LLC, and any lawyers, contractors, or paralegals working on this Investigation or any subsequent litigation directly related to the Investigation brought by the City of Chicago against United with Ms. Singer, Ms. Liu, and Ms. Boggs, with the exception that no attorney, contractor, or paralegal adverse to United in other matters will work on the Investigation or have access to Confidential Documents or attorney work product pertaining to the Investigation;

b.  City employees outside of the Law Department who have a need to know the information in furtherance of the Investigation;

c.  Experts and consultants retained by the City of Chicago in connection with this Investigation and any subsequent litigation directly related to the Investigation brought by the City of Chicago against United;

d.  Any person who authored, modified, sent, or received, a particular Confidential Document and who the City of Chicago interviews or conducts a sworn statement of as part of the Investigation;

e.  A third-party employed for the sole purpose of arranging for the copying or storage of the documents pursuant to this Agreement (i.e., a copy service).

Exhibit 1

4. Access to documents designated "Highly Confidential" shall be limited to those persons listed in paragraphs 3(a), (c), (d), and (e), except upon the prior written consent of United or by a court order.

5. Persons and entities described in any paragraphs 3(a) through 3(e), above, who receive any Confidential Documents or any information contained therein under the terms of this Agreement shall not further disseminate any such Confidential Documents or information contained therein, unless it is disseminated to another person or entity described in paragraph 3(a)-(e) above.

6. All copies, whether digital or hard copy, of any Confidential Documents produced or made available for inspection and copying shall be subject to the terms of this Agreement.

7. Before being given access to any of the Confidential Documents or any information contained therein, each person described in paragraphs 3(b)-(e) above who is neither a participant nor a counsel in the Investigation, shall be advised of the terms of this Agreement, shall be given a copy of this Agreement, and shall sign a document substantially similar to Exhibit A attached hereto, thereby acknowledging and agreeing to be bound by the terms of this Agreement.

8. No Motley Rice LLC attorney, contractor, paralegal, or expert adverse to United in other matters shall have access to any Confidential Documents or information contained therein relating to this Investigation and his/her electronic access to such Documents and information shall be restricted by permissions and any hard copies of Confidential Documents will be maintained in such a way that persons adverse to United in another matter (including other Motley Rice attorneys, paralegals, contractors, or experts) cannot review or access the hard

Exhibit 1

copies unless otherwise agreed to by the parties or by court order. The City of Chicago and its outside counsel in this Investigation shall not share, disclose, or discuss Confidential Documents or the information contained therein with any Motley Rice attorneys, paralegals, contractors, or experts adverse to United in another matter. For purposes of enforcement of this Agreement, The City of Chicago's outside counsel submit themselves to the jurisdiction of the U.S. District Court for the Northern District of Illinois or the Circuit Court of Cook County.

9.      If the City of Chicago deems it necessary to use or disclose Confidential Documents or any information contained therein in connection with any court submission, it shall either first obtain the prior written consent of United or the City of Chicago's papers, including but not limited to memoranda, affidavits, and exhibits that contain or reference information contained in Confidential Documents, shall be filed with the Confidential Documents and information redacted. Copies to the court and to counsel of record can be unredacted, but shall note each place where the documents contain confidential information subject to the protections of this Agreement.

10.      In the event that United inadvertently produces or discloses any document or information produced in this Investigation without intending to waive a claim that it is confidential, such production or disclosure shall not be a waiver, in whole or in part, of a claim of confidentiality as to any such document or information.  United shall, promptly upon discovery of its oversight, provide written notice of the error and substitute appropriately designated documents. The City of Chicago shall confirm the designation of the specified documents and information, as "Confidential," or "Highly Confidential" within ten (10) days of receipt of United's notice and shall make reasonable efforts to retrieve such improperly designated documents from persons not entitled to receive them and, upon receipt of the

Exhibit 1

substitute documents, shall sequester, return or destroy the improperly designated original production.

11.     If the City or any of its departments receives a request under the Illinois Freedom of Information Act ("FOIA"), subpoena, or court order, or has an obligation under other applicable law that it believes requires disclosure of a portion or all of the Confidential Documents, the City shall notify United upon receipt of such request, subpoena, order, or recognition of an obligation imposed by law as to afford United the opportunity to take steps to prevent disclosure. The City acknowledges  that the Confidential Documents may be exempt from disclosure under Section 7(1)(g) of FOIA, 5 ILCS 140/7(1)(g), because they contain trade secrets or commercial or financial information, the disclosure of which would cause competitive harm to United. In addition, some data or materials may be exempt from disclosure under FOIA for other reasons. The City will use its best efforts to prevent the release of such information under FOIA; provided, however, that nothing in this Confidentiality Agreement shall be read to conflict with the City or any of its departments' duties to comply with the law, including FOIA. In the event of a dispute between United and the City as to whether a portion or all of the Confidential Documents must be disclosed, United and the City shall make a good faith attempt to resolve such dispute through negotiation.  In any such negotiation, each party will provide a good-faith explanation regarding the basis of its belief as to why the Confidential Documents may or may not be held confidential.  If the parties are unable to resolve the dispute, the City will not release the Confidential Documents until an order requiring the disclosure has been entered in a judicial proceeding in which United has been given the opportunity to intervene to demonstrate that the Confidential Documents in fact may be withheld, unless United provides its written consent to disclosure and/or fails to intervene in the judicial proceeding.

Exhibit 1

12.    By entering into this Agreement, the parties do not intend in any way to limit any protections provided to United information afforded by any applicable state or federal laws or regulations.

13.    This Agreement shall be binding upon the parties to this Investigation and their counsels of record, and all persons and entities signing a copy of the attached Exhibit A, and upon their attorneys, employees and agents. All parties so bound by this Agreement agree to promptly notify United in writing of any unauthorized use or disclosure of Confidential Documents or any information contained therein of which they become aware.

14.    Nothing in this Agreement constitutes a finding or admission that any Confidential Document is in fact confidential or otherwise not subject to disclosure. In the event of a dispute as to the propriety or correctness of the designation as a Confidential Document, the parties shall attempt to resolve the dispute by negotiation. In any such negotiation, each party will provide a good-faith explanation regarding the basis of its belief as to the confidentiality of the Confidential Document.

/ / /

Exhibit 1

Dated this 19th day of February, 2019.

Mimi Liu
MOTLEY RICE LLC
401 9th Street NW, Suite 1001
Washington, D.C. 20004
as Special Assistant Corporation Counsel


DORSEY & WHITNEY LLP

By
Michelle S. Grant (311170)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868
grant.michelle@dorsey.com

Attorneys for United Healthcare Services,
Inc., UnitedHealthCare Insurance Company,
UnitedHealthCare of Illinois, Inc., and
OptumRx, Inc.

Exhibit 1

## EXHIBIT A

The undersigned hereby acknowledges that he/she has been advised of the terms of the Confidentiality Agreement, has been given a copy of the Confidentiality Agreement, and acknowledges and agrees to be bound by the terms of the Confidentiality Agreement.

Name: _____

Job Title: _____

Employer: _____

Business Address: _____

_____

_____

_____

Date: _____

Signature: _____

Exhibit 1

# Exhibit 2

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Office of the Attorney General



---

## LETTER CONTRACT

December 1, 2020

Linda Singer
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

> RE: Letter Contract Number DCCB-2021-F-0008
> Outside Counsel for Pharmacy Benefit Managers
> Litigation

Dear Ms. Singer:

This is a letter contract between the Office of the Attorney General for the District of Columbia and the law firm Motley Rice LLP, hereinafter referred to as "Contractor", wherein Contractor agrees to provide legal services on a contingency fee basis to assist in the investigation of and possible litigation against Pharmacy Benefit Managers for potential violations of District law, including the District's consumer protection and false claims act statutes, as described in the Statement of Work (Attachment 1).

(a) This letter contract is contingency fee contract. The District's liability for payment to Contractor under the letter contract occurs only when Contractor obtains monetary recovery during performance of the letter contract and the proceeds are deposited into the appropriate District account. The Contractor shall be entitled to receive expenses and a contingency fee of 12.5% of the net recovery if the matter is resolved pre complaint or 15% of the net recovery if the matter is resolved after the filing of a complaint up to and including $999,000.00. Net Recovery is defined as any settlement or judgment amount minus the actual costs incurred by Motley Rice, including payments for the time of any experts and contract attorneys engaged for document review. Motley Rice will agree to first seek its usual and customary fees and costs from the targets of the investigation and/or the defendants before collecting a contingency fee. The maximum liability under the letter contract is $999,000.00. If no recovery is realized and deposited to the District's account, Contractor shall receive no fee, compensation or reimbursement of costs and expenses. In no event shall the amount paid under this letter contract or any extension thereof exceed (50%) of the total definitized contract amount.

---

400 Sixth Street NW, Suite 2000, Washington, DC 20001, (202) 727-3400, Fax (202) 730-0484

Exhibit 2

2023-FOIA-01530-00000086

Letter Contract No. DCCB-2021-F-0008                                      Page 2 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation

(b)  Contractor agrees to immediately begin performance of this letter contract under the
Statement of Work, Attachment 1. Contractor agrees to timely submit to the Contracting
Officer requested documents or information reasonably necessary to obtain Council of
the District of Columbia (Council) approval of the definitized contract. Approval by the
Council and award by the Contracting Officer are required to definitize the contingency-
fee contract. Prior to Council approval of the definitized contract, no payments shall be
due to Contractor.

(c)  The District intends to definitize a final contingency-fee contract within the period of 120
days from date of award of this letter contract, at which time this letter contract shall merge
with the definitized contract. The parties hereby agree that the contingency fee shall not
exceed 12.5% of the net recovery if the matter is resolved pre complaint; and 15% of the net
recovery if the matter is resolved after the filing of a complaint against Pharmacy Benefit
Managers plus agreed-upon reimbursable costs.  Before expiration of the 120 days, the
Contracting Officer may authorize an additional time period extension in accordance with 27
DCMR § 5028.1(e).  If the District does not definitize the contingency-fee contract within
120 days of the date of award of this letter contract or any extension thereof, this letter
contract is automatically terminated.

(d)  If for any reason the District and the Contractor are unable to definitize the letter
contract within the period of the letter contract as specified, the letter contract is
automatically cancelled without recourse or liability between the District and the
Contractor.

Contractor shall perform under this letter contract pursuant to the following documents that
are hereby incorporated by reference into this letter contract and listed in order of priority:

1)  The Letter Contract;

2)  Statement of Work (Attachment 1)

3)  Government of the District of Columbia Standard Contract Provisions for Use with
Supplies and Services Contracts (July 2010) (available at www.ocp.dc.gov click on
"Required Solicitation Attachments").

4)  Provision regarding Ethical Obligations and Legal Conflicts of Interest (Attachment 2)

5)  D.C. Bar Legal Ethics Committee Opinion No. 268 https://www.dcbar.org/bar-
resources/legal- ethics/opinions/opinion268.cfm#.XHfvoFV57lA.email (Attachment 3)

SIGNED AND ACCEPTED FOR THE CONTRACTOR BY:

*Linda Singer /AS*                    **12/1/2020**
Linda Singer                          Date
Motely Rice LLC

Exhibit 2

Letter Contract No. DCCB-2021-F-0008                                     Page 3 of 3
Outside Counsel for Pharmacy Benefit Managers Litigation


SIGNED AND ACCEPTED FOR THE DISTRICT OF COLUMBIA BY:

_____                    12/1/20
                                             _____
Gena Johnson                                 Date
Contracting Officer


Exhibit 2

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

## STATEMENT OF WORK

1. **SCOPE:**

   The Office of the Attorney General for the District of Columbia engages the Contractor to assist the Public Advocacy Division with an investigation and potential litigation against Pharmacy Benefit Managers for violations of District law.

   **OAG will retain sole authority at all times to direct the litigation in all respects, including but not limited to whether and when to initiate litigation, against whom actions will be taken, the claims to be brought in said litigation, approval and/or rejection of settlements and the amount and type of damages to be requested.**

2. **DEFINITIONS/GLOSSARY**

   These terms when used in this Contract have the following meanings:

   2.1 **Attorney's fees** – Any fees recovered by the District for counsel's representation as part of any cause of action that provides a basis for such an award.

   2.2 **Contractor** – the entity to whom this Contract is awarded.

   2.3 **Gross Recovery** — the total recovery for the District as a result of Contractor's representation of the District whether by settlement, arbitration award, court judgment following trial or appeal, or otherwise. "Gross recovery" shall include, without limitation, the following: the present value of any monetary payments to be made to the District. "Gross recovery" may come from any source, including, but not limited to, adverse parties to the Action and/or their insurance carriers and/or any third party, whether or not a party to the Action. Notwithstanding any other provision in this agreement, in no event will the District be required to pay legal fees out of any fund other than monies recovered in this litigation.

   2.4 **OAG** -- The Office of the Attorney General for the District of Columbia. OAG represents the District of Columbia and other District agencies in litigation, including consumer protection litigation. OAG has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for protecting the public interest.

   2.5 **Other Direct Costs** – all costs for goods and services necessary for the potential investigation and litigation against pharmacy benefit managers or any other potentially liable parties.

Exhibit 2

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

## 3. BACKGROUND

Pharmacy Benefit Managers ("PBMs") and other third-party administrators of health plans' prescription drug programs play an integral role in setting the prices paid for prescription drugs. The District seeks outside counsel to conduct an investigation to determine if the conduct of PBMs or related entities violate the District's consumer protection or false claims act laws. If any violations of law are confirmed, outside counsel will also assist with litigation concerning those violations.

## 4. REQUIREMENTS

**4.1** The Contractor shall perform legal services that include, but are not limited to the following:

**4.1.1** Assist OAG with the investigation of potential violations of law by Pharmacy Benefit Managers.

**4.1.2** If violations of law are identified as a result of the investigation, conduct litigation against Pharmacy Benefit Managers. Contractor shall assist in all phases of these investigations and litigations, including:

    a. Preparation of complaint(s), filing complaint(s), service of summons;

    b. Responding to motions, including motions to dismiss;

    c. Drafting motions, including drafting motions for summary judgment, other dispositive motions, and any other appropriate motions on behalf of the District;

    d. Drafting and responding to discovery requests propounded on the District or OAG;

    e. Tracking documents obtained in discovery;

    f. Coordinating litigation with other states and the federal government to promote, to the extent beneficial, a unified approach to litigation;

    g. Taking depositions, defending depositions, preparing witnesses for depositions;

    h. Responding to motions for summary judgment or other dispositive pretrial motions;

    i. Consulting with experts necessary to analyze and develop the District's case;

    j. Identifying experts to testify on behalf of the District;

    k. Preparing expert witnesses for deposition or trial testimony;

    l. Preparing legal arguments on motions practice;

    m. Handling discovery disputes;

    n. Representing the District in trial or any settlement negotiations;

    o. Representing the District in responding to pretrial motions;

Exhibit 2

2023-FOIA-01530-00000090

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

      p.  Representing the District in any appeal of any judgment or verdict rendered in the action, and if applicable, any remand from appeal.

**4.1.3**  Advise OAG on the conduct of the case and on strategy and tactics for each phase of the case.

**4.1.4**  **FOIA Assistance.**  Third parties may submit FOIA requests to OAG regarding this matter.  OAG will notify Contractor of the FOIA request and Contractor shall electronically provide, within five business days, all records responsive to the FOIA request.  In addition, Contractor shall make all records regarding this matter available for examination and review by OAG, upon request. Contractor shall be entitled to reimbursement of costs for searching and copying records as set forth in Standard Contract Provision No. 34, Freedom of Information Act.

**4.1.5**  Provide monthly or other regular status reports to the Contract Administrator.

**4.1.6**  Provide legal services, advice, and consultation to OAG for this litigation in a manner consistent with accepted standards of practice in the legal profession. The Attorney General shall have final authority over all aspects of this litigation. The litigation may be commenced, conducted, settled, approved and ended only with the express approval and signature of the Attorney General. The Attorney General, at his sole discretion, has the right to appoint a designated assistant ("designated assistant") to oversee the litigation, which appointment the Attorney General may modify at will.

**4.1.7**  Provide legal services to the Attorney General subject to the approval of the Attorney General for the purposes of seeking injunctive relief, monetary relief, and other relief against all entities in this litigation.

**4.1.8**  Coordinate the provision of legal services with the Attorney General or his designated assistant, other personnel of OAG, and such others as the Attorney General may appoint. All substantive pleadings, motions, briefs, and other material which may be filed with the court shall first be approved by the Attorney General and provided to his office in draft form in a reasonable and timely manner for review. Regular status meetings may be held as requested by the Attorney General or his designated assistant.

**4.1.9**  Communicate with District entities through OAG unless authorized by OAG to communicate directly with those entities.

**4.1.10**  Render services pursuant to this Contract as an independent contractor.  Neither Contractor nor any employee of Contractor shall be regarded as employed by, or as an employee of OAG.

**4.2**    **Direct Cost Limitations/Requirements**

    The Contractor shall provide notice and obtain approval from OAG prior to engaging expert witnesses or other consultants.

Page 3 of 8

Exhibit 2

2023-FOIA-01530-00000091

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

**4.3    Key Personnel for the Contract are listed below:**

Paige Boggs, Attorney at Law
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004
pboggs@motleyrice.com

**4.4    Kickoff Meeting**

The Contractor shall be available for an in-person kickoff meeting within seven (7) business days from date of award.

**5.    INSURANCE**

A.  GENERAL REQUIREMENTS.  The Contractor at its sole expense shall procure and maintain, during the entire period of performance under this contract, the types of insurance specified below.  The Contractor shall have its insurance broker or insurance company submit a Certificate of Insurance to the CO giving evidence of the required coverage prior to commencing performance under this contract.  In no event shall any work be performed until the required Certificates of Insurance signed by an authorized representative of the insurer(s) have been provided to, and accepted by, the CO. All insurance shall be written with financially responsible companies authorized to do business in the District of Columbia or in the jurisdiction where the work is to be performed, or by surplus lines insurers and have an A.M. Best Company rating of A- / VII or higher. Should the Contractor decide to engage a subcontractor for segments of the work under this contract, then, prior to commencement of work by the subcontractor, the Contractor shall submit in writing the name and brief description of work to be performed by the subcontractor on the Subcontractors Insurance Requirement Template provided by the CA, to the Office of Risk Management (ORM). ORM will determine the insurance requirements applicable to the subcontractor and promptly deliver such requirements in writing to the Contractor and the CA. The Contractor must provide proof of the subcontractor's required insurance to prior to commencement of work by the subcontractor. If the Contractor decides to engage a subcontractor without requesting from ORM specific insurance requirements for the subcontractor, such subcontractor shall have the same insurance requirements as the Contractor.

All required policies except professional liability insurance shall contain a waiver of subrogation provision in favor of the Government of the District of Columbia.

The Government of the District of Columbia shall be included in all policies required hereunder to be maintained by the Contractor and its subcontractors (except for workers' compensation, cyber liability and professional liability insurance) as an additional insured for claims against The Government of the District of Columbia relating to this contract, with the understanding that any affirmative obligation imposed upon the insured

Page 4 of 8

Exhibit 2

2023-FOIA-01530-00000092

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

Contractor or its subcontractors (including without limitation the liability to pay premiums) shall be the sole obligation of the Contractor or its subcontractors, and not the additional insured.  The additional insured status under the Contractor's and its subcontractors' Commercial General Liability insurance policies shall be effected using the ISO Additional Insured Endorsement form CG 20 10 11 85 (or CG 20 10 07 04 **and** CG 20 37 07 04) or such other endorsement or combination of endorsements providing coverage at least as broad and approved by the CO in writing.  All of the Contractor's and its subcontractors' liability policies (except for workers' compensation, cyber liability and professional liability insurance) shall be endorsed using ISO form CG 20 01 04 13 or its equivalent so as to indicate that such policies provide primary coverage (without any right of contribution by any other insurance, reinsurance or self-insurance, including any deductible or retention, maintained by an Additional Insured) for all claims against the additional insured arising out of the performance of this Statement of Work by the Contractor or its subcontractors, or anyone for whom the Contractor or its  subcontractors may be liable.  These policies shall include a separation of insureds clause applicable to the additional insured.

If the Contractor and/or its subcontractors maintain broader coverage and/or higher limits than the minimums shown below, the District requires and shall be entitled to the broader coverage and/or the higher limits maintained by the Grantee and subcontractors.

1. <u>Commercial General Liability Insurance ("CGL")</u> - The Contractor shall provide evidence satisfactory to the CO with respect to the services performed that it carries a CGL policy, written on an occurrence (not claims-made) basis, on Insurance Services Office, Inc. ("ISO") form CG 00 01 04 13 (or another occurrence-based form with coverage at least as broad and approved by the CO in writing), covering liability for all ongoing and completed operations of the Contractor, including ongoing and completed operations under all subcontracts, and covering claims for bodily injury, and death of any persons, injury to or destruction of property, including loss of use resulting therefrom, personal and advertising injury, and including coverage for liability arising out of an Insured Contract (including the tort liability of another assumed in a contract) and acts of terrorism (whether caused by a foreign or domestic source). Such coverage shall have limits of liability of not less than $1,000,000 each occurrence, a $2,000,000 general aggregate (including a per location or per project aggregate limit endorsement, if applicable) limit, and a $1,000,000 personal and advertising injury limit.

OAG should collect, review for accuracy and maintain all warranties for goods and services.

2. <u>Automobile Liability Insurance</u> - The Contractor shall provide evidence satisfactory to the CO of  commercial (business) automobile liability insurance written on ISO form CA 00 01 10 13 (or another form with coverage at least as broad and approved by the CO in writing) including coverage for all owned, hired, borrowed and non-owned vehicles and equipment used by the Contractor, with minimum per accident limits equal to the greater of (i) the limits set forth in the Contractor's commercial

Exhibit 2

2023-FOIA-01530-00000093

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

automobile liability policy or (ii) $1,000,000 per occurrence combined single limit for bodily injury and property damage.

3. <u>Workers' Compensation Insurance</u> - The Contractor shall provide evidence satisfactory to the CO of Workers' Compensation insurance in accordance with the statutory mandates of the District of Columbia or the jurisdiction in which the contract is performed.

<u>Employer's Liability Insurance</u> - The Contractor shall provide evidence satisfactory to the CO of employer's liability insurance as follows:  $500,000 per accident for injury; $500,000 per employee for disease; and $500,000 for policy disease limit.

All insurance required by this paragraph 3 shall include a waiver of subrogation endorsement for the benefit of Government of the District of Columbia.

4. <u>Cyber Liability Insurance</u> - The Contractor shall provide evidence satisfactory to the Contracting Officer of Cyber Liability Insurance, with limits not less than $5,000,000 per occurrence or claim, $5,000,000 aggregate.  Coverage shall be sufficiently broad to respond to the duties and obligations as is undertaken by Contractor in this agreement and shall include, but not limited to, claims involving infringement of intellectual property, including but not limited to infringement of copyright, trademark, trade dress, invasion of privacy violations, information theft, damage to or destruction of electronic information, release of private information, alteration of electronic information, extortion and network security.  The policy shall provide coverage for breach response costs as well as regulatory fines and penalties as well as credit monitoring expenses with limits sufficient to respond to these obligations.

5. <u>Professional Liability Insurance (Errors & Omissions)</u> - The Contractor shall provide Professional Liability Insurance (Errors and Omissions) to cover liability resulting from any error or omission in the performance of professional services under this Contract. The policy shall provide limits of $5,000,000 per claim or per occurrence for each wrongful act and $5,000,000 annual aggregate. The Contractor warrants that any applicable retroactive date precedes the date the Contractor first performed any professional services for the Government of the District of Columbia and that continuous coverage will be maintained or an extended reporting period will be exercised for a period of at least ten years after the completion of the professional services. In the unlikely event the Contractor dissolves its limited liability company during that ten year period, the Contractor agrees to purchase tail coverage for two years post-dissolution to the extent available in the insurance market.

6. <u>Commercial Umbrella or Excess Liability</u> - The Contractor shall provide evidence satisfactory to the CO of commercial umbrella or excess liability insurance with minimum limits equal to the greater of (i) the limits set forth in the Contractor's

Page 6 of 8

Exhibit 2

2023-FOIA-01530-00000094

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

umbrella or excess liability policy or (ii) $15,000,000 per occurrence and
$15,000,000 in the annual aggregate, following the form and in excess of General
Liability, Employer's Liability and Automobile Liability policies. All of these
liability coverages must be scheduled under the umbrella and/or excess policy. The
insurance required under this paragraph shall be written in a form that annually
reinstates all required limits. Coverage shall be primary to any insurance, self-
insurance or reinsurance maintained by the District and the "other insurance"
provision must be amended in accordance with this requirement and principles of
vertical exhaustion.

B. PRIMARY AND NONCONTRIBUTORY INSURANCE
The insurance required herein shall be primary to and will not seek contribution from any
other insurance, reinsurance or self-insurance including any deductible or retention,
maintained by the Government of the District of Columbia.

C. DURATION. Except for professional liability insurance, which has specific extended
coverage set out in paragraph 5 above the Contractor shall carry all required insurance
until all contract work is accepted by the District of Columbia and shall carry listed
coverages for ten years for construction projects following final acceptance of the work
performed under this contract and two years for non-construction related contracts.

D. LIABILITY. These are the required minimum insurance requirements established by the
District of Columbia. However, the required minimum insurance requirements provided
above will not in any way limit the contractor's liability under this contract.

E. CONTRACTOR'S PROPERTY. Contractor and subcontractors are solely responsible
for any loss or damage to their personal property, including but not limited to tools and
equipment, scaffolding and temporary structures, rented machinery, or owned and leased
equipment. A waiver of subrogation shall apply in favor of the District of Columbia.

F. MEASURE OF PAYMENT. The District shall not make any separate measure or
payment for the cost of insurance and bonds. The Contractor shall include all of the costs
of insurance and bonds in the contract price.

G. NOTIFICATION.  The Contractor shall provide the CO with thirty (30) days prior
written notice in the event of coverage and/or limit changes or if the policy is canceled
prior to the expiration date shown on the certificate and ten (10) days prior written notice
in the event of non-payment of premium. The Contractor will also provide the CO with
an updated Certificate of Insurance should its insurance coverages renew during the
contract.

H. CERTIFICATES OF INSURANCE. The Contractor shall submit certificates of
insurance giving evidence of the required coverage as specified in this section prior to
commencing work. Certificates of insurance must reference the corresponding contract
number. Evidence of insurance shall be submitted to:

Page 7 of 8

Exhibit 2

Attachment 1 to Letter Contract DCCB-2021-F-0008
Pharmacy Benefit Managers Investigation

### The Government of the District of Columbia

### And mailed to the attention of:

Gena Johnson
400 6th Street NW
Washington, DC 20001
202-247-6448
Gena.johnson@dc.gov

The CO may request and the Contractor shall promptly deliver updated certificates of insurance, endorsements indicating the required coverages, and/or certified copies of the insurance policies. If the insurance initially obtained by the Contractor expires prior to completion of the contract, renewal certificates of insurance and additional insured and other endorsements shall be furnished to the CO within five working days following expiration of all such initial insurance. For all coverage required to be maintained after completion, an additional certificate of insurance evidencing such coverage shall be submitted to the CO on an annual basis as the coverage is renewed (or replaced).

I. DISCLOSURE OF INFORMATION. The Contractor agrees that the District may disclose the name and contact information of its insurers to any third party which presents a claim against the District for any damages or claims resulting from or arising out of work performed by the Contractor, its agents, employees, servants or subcontractors in the performance of this contract.

J. CARRIER RATINGS. All Contractor's and its subcontractors' insurance required in connection with this contract shall be written by insurance companies with an A.M. Best Insurance Guide rating of at least A- VII (or the equivalent by any other rating agency).

Exhibit 2

2023-FOIA-01530-00000096

## 1.    ETHICAL OBLIGATIONS AND LEGAL CONFLICTS OF INTEREST

1.1    An attorney-client relationship will exist between the District and any attorney who performs work under the contract, as well as between the District and the firm of any attorney who performs work under the contract. The D.C. Rules of Professional Conduct (RPC) and the ethical rules of any other jurisdiction in which work is performed are binding on the Contractor. The parties agree that the District may have a contractual cause of action based on violation of such rules, in addition to any other remedies available.

1.2    In addition to the prohibitions contained in the RPC and the ethical rules of any other jurisdiction in which work is performed, the Contractor agrees that it shall recognize that in the performance of the contract it may receive certain information submitted to the District government on a proprietary basis by third parties, information which relates to potential or actual claims against the District government, or information which relates to matters in dispute or litigation. Unless the District consents to a particular disclosure, the Contractor shall use such information exclusively in the performance of the contract and shall forever hold inviolate and protect from disclosure all such information, except disclosures required by applicable law or court order. The Contractor also agrees that, to the extent it is permitted to disclose such information, it will make such disclosures only to those individuals who need to know such information in order to perform required tasks in their official capacity and will restrict access to such information to such individuals.

1.3    Before any contractor can be retained to perform legal services under the contract, on behalf of the District government, the Attorney General for the District of Columbia must review and waive all actual or potential direct and indirect conflicts of interest pursuant to RPC 1.6, 1.7, 1.8, 1.9 and 1.10. After notice of its selection, each prospective contractor shall provide the Attorney General with the following: (1) a written statement that there exists no Rule 1.7(a) direct conflict of interest regarding the work to be performed under the contract; (2) a written description of all actual or potential conflicts of interest regarding the work to be performed under the contract that require waiver pursuant to Rule 1.7(b) because the contractor represents another client in a matter adverse to any of the following: (i) the District government agency or instrumentality to be represented under the contract; (ii) the District government as a whole; or (iii) any other agency or instrumentality of the District government (for this purpose, under D.C. Bar Legal Ethics Committee Opinion No. 268, a representation of a private client against a discrete government agency or instrumentality can have government-wide implications and thus constitute a representation adverse to the government as a whole pursuant to the RPC); and (3) a written description of all representations of clients who are or will be adverse to the District government with regard to the work to be performed under the contract, whether or not such representations are related to the matter for which the work is to be performed under the contract.

Exhibit 2

2023-FOIA-01530-00000097

1.4     The Attorney General generally does not grant prospective conflict of interest waivers,
        except in certain *pro bono* matters. Thus, in addition to the prohibitions contained in
        the RPC and the ethical rules of any other jurisdiction in which work is performed
        under the contract, without the consent of the Attorney General, the Contractor shall not
        represent any party other than the District in any disputes, negotiations, proceedings or
        litigation adverse to any agency or instrumentality of the District government or the
        District government as a whole, including, but not limited to, matters related to the
        work to be performed under the Contract. The Contractor shall notify the Attorney
        General immediately, in writing, of any potential conflicts of interest (as defined in the
        RPC) that arise during the period that the Contractor is performing work under the
        contract. The Attorney General makes every attempt to be reasonable in deciding
        whether or not to consent to a conflict of interest and usually makes this decision
        promptly after receiving notice and sufficient information regarding the conflict. If the
        Attorney General does not waive a conflict of interest, the Contractor shall undertake
        immediate action to eliminate the source of any such conflict of interest.

1.5     Before any contractor can be retained pursuant to the contract, the Attorney General for
        the District of Columbia must review all actual, direct and potential conflicts of interest
        on behalf of the District government in light of D.C. Bar Rules of Professional Conduct
        ("RPC") 1.6, 1.7, 1.8, 1.9 and 1.10. Each prospective contractor shall provide the
        Attorney General with written notice of all actual or potential direct and indirect
        conflicts of interest in which the Contractor represents (or may represent) another client
        with interests adverse to the District government agency to be represented as well as
        against the District government as a whole. For this purpose, under D.C. Bar Legal
        Ethics Committee Opinion No. 268, attached as Attachment 2 hereto, a representation
        of a private client against a discrete government agency can have government-wide
        implications and thus qualify under the RPC as being against the government as a
        whole, including the individual agency that the private firm represents. In that situation,
        the private firm would be required to notify the Attorney General of the existence of a
        conflict under RPC 1.7 and obtain consent to such representation and waiver of the
        conflict. The Attorney General makes every attempt to be reasonable in deciding
        whether or not to consent to a conflict and usually makes this decision promptly after
        receiving notice of the conflict.

Exhibit 2

2023-FOIA-01530-00000098

**Ethics Opinion 268**

## Conflict of Interest Issues Where Private Lawyers Provide Volunteer Legal Assistance to the D.C. Corporation Counsel; Reconsideration of Opinion 92

Under the D.C. Rules of Professional Conduct, a lawyer may give volunteer legal assistance to the D.C. Corporation Counsel and continue simultaneously to represent private clients against the City and its agencies, as long as the requirements of Rule 1.7 are met. Under Rule 1.7(b)(1), a lawyer who wishes to represent a private client against the same City government client that she is representing while working for the Corporation Counsel on an unrelated matter, may do so if she obtains the informed consent of both her private client and her City government client. Similarly, the lawyer may agree to volunteer her services t o represent the same City government client that she or her firm are opposing on behalf of a private client in an unrelated matter, if both clients consent after full disclosure. Client notification and consent are not required, however, where the lawyer is not opposing her own City government client but some other agency of the City that is not her client.

The City government client is not always the City as a whole, but may be more narrowly defined as one of the City's constituent agencies. The identity of the government client for conflict of interest purposes will be established in the first instance between the lawyer and responsible government officials in accordance with the general precepts of client autonomy embodied in Rule 1.2. In agreeing to undertake a particular representation, the lawyer must take steps to recognize and respect the reasonable expectation of her other clients, protected by Rule 1.7, that they will receive a conflict-free representation.

Even if Rule 1.7(b)(1) does not apply, because the lawyer's government client is not considered the same government entity she is opposing on behalf of private parties, Rule 1.7(b)(2)-(4) may require that the lawyer obtain client consent if her representation of one client will be or is likely to be "adversely affected" by her representation of the other, or if the independence of her professional judgment will be or is likely to be adversely affected by her responsibilities to third parties or by her own personal interests.

**Applicable Rules**

- Rule 1.2 (Scope of Representation)
- Rule 1.7 (Conflict of Interest: General Rule)

**Inquiry**
The Committee has been asked to reconsider several conclusions of D.C. Bar Opinion 92 (1980) ("Propriety of Private Attorneys Handling Municipal Cases on a Pro Bono Basis"). Opinion 92 examined the ethical propriety, under the D.C. Code of Professional Responsibility, of a program in which "private attorneys acting on a pro bono basis would assist the City in managing its severely crowded civil docket."[1] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote1)** The Committee opined in Opinion 92 that the program would be ethically permissible as long as certain conditions were met. The inquirer has asked the Committee to reconsider the continuing validity of two of those conditions, given the intervening adoption in 1991 of the D.C. Rules of Professional Conduct.[2] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote2)** The two conditions in question are as follows:

Exhibit 2

2023-FOIA-01530-00000099

1. A lawyer or firm performing volunteer representational work for the City or any of its agencies may simultaneously represent a private party against the City or any of its agencies only with full disclosure to and consent of both the City and the private party; and.
2. Under no circumstances may a lawyer or firm volunteer to represent a particular agency of the City government while at the same time handling a private matter involving the same agency, or another matter that is or appears to be "closely related," even with client consent.

## Summary of Conclusions

For reasons discussed more fully in Part I below, the Committee believes that the conclusion in paragraph 2 above is no longer mandated under the Rules of Professional Conduct. Thus a lawyer may represent a particular City government agency in a matter at the same time she is opposing that agency on behalf of a private client in an unrelated matter, as long as she makes full disclosure to and obtains the consent of both the City government agency and the private client. *See* Rule 1.7(b)(1) and 1.7(c). Moreover, as explained in Part II below, we disagree with the assumption of Opinion 92 that the entire City and all of its constituent agencies must always and necessarily be considered the lawyer's client for conflict of interest purposes. Thus, a lawyer may under certain circumstances perform services for a particular City agency client without having to notify and obtain the consent of private clients that she is representing against another City agency that is not considered the same client. Nevertheless, even if Rule 1.7(b)(1) does not apply because the lawyer is not opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to notify and seek the consent of one or both clients if her representation of one would substantially interfere with her representation of the other, or if her independent judgment in either client's behalf would be adversely affected by her responsibilities to a third party or by her own personal interests.

## Discussion

### I. Prohibited Representation of Private Parties Against Particular City Agencies or in Particular Matters

Opinion 92 imposed an absolute prohibition against a lawyer's representing a private party against the same particular City agency for which she is performing volunteer services, or in a matter "closely related" to the one she is handling for the City. This absolute prohibition was derived from the "appearance of impropriety" standard of Canon 9 rather than the "conflict of interest" rules of Canon 5. The "appearance" standard was dropped entirely from the Rules of Professional Conduct, and the conflict of interest rules provide that conflicts may generally be waived by the client. *See* Rule 1.7(b) and (c). Under the current rules, the only conflict that cannot be relieved by client consent is the one that arises where a lawyer seeks to take "adverse" positions on behalf of two different clients *in the same matter. See* Rule 1.7(a). We therefore conclude that the absolute prohibition on opposing one's own City agency client set forth in paragraph 2 above is no longer applicable.

While a conflict under Rule 1.7(b)(1) would arise if the volunteer lawyer attempted to represent a private client against the City in one matter at the same time she (or one of her partners) was representing the City for the Corporation Counsel in another matter, since the lawyer would in effect be opposing her own client, that conflict could in most circumstances be cured by making full disclosure to both affected clients and obtaining their consent. Thus, a lawyer may represent a private party against a City government agency while simultaneously representing that same City agency in an unrelated matter, as long as both the private client and the agency client are informed of the existence and nature of the lawyer's conflict and do not object to the continued representation. *See* Rule 1.7(b)(1) & (c). *See also* Rule 1.7(b)(2)-(4). A lawyer may not, however, represent both the City and a private client in the same matter if they are adverse to each other in that matter, even if both clients consent. *See* Rule 1.7(a).

The fact that the lawyer is volunteering her services to the City, as opposed to serving under a paid retainer, is irrelevant to these conclusions, as it is to the conclusions reached in the remainder of this opinion.

Exhibit 2

2023-FOIA-01530-00000100

## II. Conflicts of Interest Where Volunteer Services Are Performed for the City or One of Its Agencies

We now address the holding of Opinion 92 based on the then-applicable conflict of interest rules, described in numbered paragraph 1 above. Opinion 92 construed the conflict of interest provisions of the former Code, derived from Canon 5, to permit a lawyer to participate in the Corporation Counsel's volunteer program "notwithstanding his or her involvement in other matters affecting the City," as long as two conditions were met: first, it must be "obvious" that the lawyer can adequately represent "both the interests of the City and his or her other private clients;" and, second, "each affected client must consent to the multiple representation after full disclosure."

### A. Defining the Client for Conflict of Interest Purposes

Before turning to an analysis of how the current conflict of interest rules apply in this situation, we must deal with one important threshold issue, involving an unexamined assumption made by the drafters of Opinion 92 about the identity of the City government client. That assumption is that the client of the volunteer lawyer working for the Corporation Counsel is always and necessarily "the City" as a whole rather than one or more of the City's constituent agencies.[3] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote3)** This definition of the government client gives the conflict rules a considerably broader application and effect than they would have if the City government client were more narrowly defined. Under Rule 1.7(b)(1), a lawyer may not take a position in a matter on behalf of one client that is adverse to a position taken in the same matter by another client (not represented by her) unless she obtains consent from both clients.[4] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote4)** If the client of the volunteer lawyer is the City as a whole, as opposed to one or more of its constituent agencies, Rule 1.7(b)(1) would require the lawyer to obtain consent to the City representation from each and every one of the private clients that she is currently representing against the City or any of its agencies, and from the City to each and every adverse private representation the lawyer may currently be involved in against it or any of its agencies, without regard to whether there is any real possibility that the substantive concerns animating the conflicts rules are implicated.[5] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote5)**

Concerned that the breadth of this definition of the City government client will effectively discourage, if not preclude, private law firms from volunteering to assist the Corporation Counsel, the inquirer has asked the Committee to consider whether the volunteer lawyer's client may be defined as a particular City agency as opposed to the City as a whole, so as to ameliorate the sweeping requirement of notice and consent imposed by Rule 1.7(b)(1) read in the light of Opinion 92. We agree with the inquirer that the definition of the City government client contained in Opinion 92 is too broad, and that the City government client may sometimes be defined as narrowly as a single agency. As discussed more fully below, we also believe that the identity of the City government client depends upon a number of discrete considerations and must be decided on a case-by-case basis.

Simply as a matter of common sense it seems apparent that the client of the volunteer lawyer will not always be the entire City, but may sometimes be a smaller part of it. Much like a large modern corporation, the District of Columbia government is a complex and many-faceted entity that sometimes acts through its individual constituent parts (like the subsidiaries of a corporation) and sometimes acts as a single entity, depending upon the particular facts and circumstances. Sometimes a legal matter or issue is relevant only to a single City agency and is of no substantial interest to other agencies or the City as a whole. Sometimes a matter or issue directly affects or is otherwise significant to a number of agencies or the overall City government. In some situations the broad set of interests at stake will be apparent at the outset; in others the broader concerns may emerge during the course of the representation.

Whatever general principles about client identity in the government context can be drawn from our common sense analysis of the governmental interests implicated by particular cases, at bottom

Exhibit 2

the identity of the City government client (like the identity of the corporate client) is not primarily a question of legal ethics. The identity of the government (or corporate) client for all ethical purposes is established in the first instance between the lawyer and responsible public (or corporate) officials in accordance with the general precepts of client autonomy embodied in Rule 1.2.[6] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote6)** Cf. ABA Formal Opinion 95-390 ("Conflicts of 6 Interest in the Corporate Family Context") (a corporate client may specify, when engaging a lawyer, whether or not "the corporate client expects some or all of its affiliates to be treated as clients for purposes of Rule 1.7").

The ethics rules provide at least one important limitation on what a lawyer can agree to with a client under Rule 1.2, and that is her other clients' right to be protected from conflicts of interest under Rule 1.7. In agreeing to represent a particular government client, a lawyer must take into account the countervailing rights of her other clients whose interests may be adversely affected by this new representation to know of and object to it—just as she must consider the similar rights of the new government client to know of and be able to object to any conflicting existing representations. In working with officials who are authorized to speak for the government client to define the scope of the representation (and hence the identity of the government client for conflict of interest purposes), the lawyer may defer to the government client's wishes only as long as she is able to fulfill her basic responsibilities to her other clients under Rule 1.7, including in particular her obligation not to take a position adverse to them on behalf of another client without their consent. This is the basic right secured to every client by Rule 1.7(b)(1).

The lawyer may not, by agreeing to a narrow definition of the government client, seek to defeat the reasonable expectation of her other clients, arising from and protected by Rule 1.7(b), that they will get a conflict-free representation from their lawyer. Accordingly, the volunteer lawyer must assure herself that the definition of the government client ultimately arrived at in discussions with authorized government officials both recognizes and respects her private clients' right to object when their lawyer proposes to represent interests directly adverse to their own. Her government client has the same right to object to any potentially conflicting private representations.

Thus, we believe that the lawyer who wishes to perform volunteer work for the Corporation Counsel's Office has an obligation to work with that office to develop a clear understanding of the scope of her representation of the City, and to make certain that the agreed upon definition of the government client is a reasonable one in light of all the facts and circumstances, including in particular each of her clients' right to know about, and to give or withhold consent to, her representation of adverse interests.

Ideally, the identity of the government client should be specifically agreed upon between the volunteer lawyer and the government officials who are authorized to speak for the client at the outset of the representation, and committed to writing. In those instances where the identity of the client is not clearly defined, it may be inferred from the reasonable understandings and expectations of the lawyer and those officials. These in turn may be gleaned from such functional considerations as the organizational structure of the City and the extent to which its constituent parts are related in form and function, and from the facts and circumstances of the particular matter at issue in the representation—including the general importance of the matter to the City as a whole and to other particular components whose programs or activities are not directly involved.

There may be situations in which it can be agreed at the outset that the volunteer lawyer will represent only a single City agency in a relatively discrete matter (e.g., a particular contract) or in a relatively discrete category of cases (e.g., child abuse and neglect cases). In such a case, the lawyer would be free to agree to take on a private representation in which she would be opposing another City agency on an unrelated matter, without having to notify or obtain the consent of either her existing government client or her new private client. That is the easiest case. Another fairly clear case is the one in which the volunteer lawyer represents a City agency in a matter that plainly

Exhibit 2

2023-FOIA-01530-00000102

has City-wide impact or public importance, so that it can fairly be said to implicate the interests of the City generally. In such a case, it would be unreasonable not to regard the lawyer's client as the City as a whole, and she therefore could not undertake a private representation against any City agency without informing and obtaining the consent of the City and, subsequently, the private client. There are dozens of permutations on these basic scenarios, in which the general City-wide interest is sometimes clear and sometimes not so clear. However, the mere fact that a matter is captioned "X v. District of Columbia" is not dispositive of the identity of the government client. Rather, as noted previously, the answer depends upon the reasonable understanding reached between the volunteer lawyer and responsible public officials based upon all relevant facts and circumstances. Of course, as with all representations, the lawyer must be alert to the need to deal with any conflicts that may arise during the course of the representation.[7] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote7)**

The Corporation Counsel—as chief legal officer for the District and controller of its litigation—asserts that he has legal responsibility for determining the identity of the City government client for purposes of the conflict of interest rules. The Corporation Counsel has indicated his intention to issue guidelines for dealing with conflict issues posed by the volunteer program, that will address the identity of the client and the circumstances in which the District will waive any potential conflicts. We expect that these guidelines, when issued, will be useful to volunteer lawyers not only in determining what kinds of legal assistance they may give to the Corporation Counsel without creating a conflict with their existing private representations, but also in determining the scope of any conflicts. The guidelines may also be useful in determining what new private clients or matters a lawyer may subsequently take on in light of her responsibilities to her City government client(s).

In summary, we conclude that the Rules of Professional Conduct do not identify the City government client, and for the most part provide only general guidance for the lawyer and responsible government officials in reaching an understanding in this regard. The one clear limitation on the lawyer in this context derived from the ethics rules is her other clients' reasonable expectation that they will be allowed to object to their lawyer's representation of interests that would impinge upon her ability to zealously represent their own. Thus we believe that the private lawyer who wishes to perform volunteer work for the Corporation Counsel's office must work with that office to develop a clear understanding of the scope of her representation of the City, and hence the identity of the government client for conflicts purposes, and must take steps to protect all of her clients' right to know about and withhold consent to their lawyer's representation of interests that are adverse to their own.

**B. Applicable Conflict of Interest Rules**
Assuming that the relevant City government client has been identified, it remains to explain how the current conflict of interest rules apply in this situation.

**1. Direct Conflicts Under Rule 1.7(b)(1)**
As noted, Rule 1.7(b)(1) prohibits a lawyer from taking a position on behalf of one client that is directly adverse to a position taken by another client in the same matter (represented of course in this matter by another lawyer) without the consent of both clients. *See* note 4, *supra*. Thus, if a lawyer wishes to undertake a volunteer representation of a particular City agency that she or her firm is already opposing on behalf of a private client, the lawyer may do so only if she informs both the private client and the new City agency client of the "existence and nature of the possible conflict and the possible adverse consequences of such representation," and they give their consent.[8] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote8)** Rule 1.7(c)(1). The conflicts of each lawyer in a firm are imputed to all other lawyers in the firm. Rule 1.10.

For example, if a volunteer lawyer is considering taking on a matter for the Corporation Counsel that involves defense of a suit brought against the Mayor and/or the City Council, or a suit

Exhibit 2

attacking some City-wide program or regulation (so that the client must be deemed to be the City as a whole), the lawyer must make full disclosure to and seek consent from each of her firm's private clients who have matters pending against the City or any of its agencies. She must also inform the Corporation Counsel of any conflicting private representations being pursued by her or by other lawyers in her firm. Conversely, if a volunteer lawyer is working on a City-wide matter and is then asked to represent a private party against the City or one of its agencies, she must inform the Corporation Counsel and seek his consent. Consent must also be 8 obtained from the new client.

On the other hand, Rule 1.7(b)(1) does not apply, and client notification and consent are not required, if a lawyer is not opposing her own City government client but some other agency of the City that is not her client. For example, if a lawyer hired to defend a program or action of a particular City agency, such as the Housing Department, were representing only the Housing Department in this matter, she would be required to disclose the fact of her Housing Department representation and seek consent from those of her firm's private clients who had matters pending against the Housing Department or against the City as a whole.[9] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote9)** But she would not be required to disclose her Housing Department representation to private clients who had matters pending against other particular City agencies whose functions were unrelated to the Housing Department and that otherwise had no interest in the issues involved in the Housing Department representation and would be unaffected by its outcome.

Thus, in a case where a lawyer is representing the City as a whole, she is obliged to obtain the City's consent before opposing one of its constituent agencies, as well as the consent of any of her private clients who have interests adverse to the City (or, of course, the particular agency she would be representing). Similarly, if the lawyer is representing a private client against the City as a whole, she must obtain the private client's consent before undertaking any City government representation, even one involving a discrete agency program with no functional or programmatic relationship to the City-wide matter she is otherwise involved in. The only situation in which the lawyer may cabin her conflict and avoid having to conduct a broad canvass of all clients with City-related business is where both her public and her private representations involve discrete agency programs with no City-wide implications.

### 2. Indirect Conflicts Under Rule 1.7(b)(2)-(4)

Even if Rule 1.7(b)(1) does not apply because the lawyer's City government client is not considered to be the same City client that she is opposing, her representation of a City agency may still raise an "indirect" conflict of interest under subsections (2) through (4) of Rule 1.7(b) if it "interferes in some substantial way with the representation of another" client. D.C. Bar Opinion 265 (1996) ("Positional Conflicts"). This would as a practical matter result in the same need to determine that both clients could be adequately served, and then to make full disclosure to and obtain the consent of "each affected client" to the multiple representation. Under Subsections (2) and (3) of Rule 1.7(b), if the lawyer believes that her representation of the City agency "will be or is likely to be adversely affected" by her representation of a private client, or vice versa, the lawyer must obtain the consent of the affected client or clients. Under subsection (4), client consent must be obtained if the lawyer believes that the independence of her professional judgment on behalf of a client "will be or reasonably may be adversely affected" by her responsibilities to a third party or by her own personal interests.

In contrast to the situation involving a direct conflict under Rule 1.7(b)(1), where disclosure and informed consent are mandatory once it is apparent that the lawyer will be opposing her own client, a lawyer has some discretion in deciding whether an indirect conflict under Rule 1.7(b)(2)-(4) exists. Whether a particular volunteer representation will "adversely affect" the lawyer's representation of another client (or vice versa) depends upon the particular facts and circumstances and is in the first instance essentially a matter for the lawyer to decide. Likewise,

Exhibit 2

2023-FOIA-01530-00000104

the existence of a conflict arising from the lawyer's responsibilities to third parties or her own personal interests is primarily a question of fact. The lawyer may decide that she should make disclosure to and seek consent from one client but need not do so from the other.

The "adverse effect" inquiry under subsections (2) through (4) is primarily a functional one, generally involving both the relative importance of the representation to the respective clients or to their lawyers and the directness of the adverseness between them. It may require inquiry into the nature of the issues, the amount of money at stake, and the likelihood that either client would otherwise be substantially and foreseeably affected by the outcome of the other's matter. Sometimes, the "adverse effect" inquiry will also involve the particular role the volunteer lawyer is expected to play in the matter, and the "intensity and duration" of her relationship with the lawyers she is opposing. *Cf.* Formal Opinion 1996-3 of the Committee on Professional and Judicial Ethics of The Association of the Bar of the City of New York (1996)(conflicts of interest where one lawyer represents another lawyer).

Without attempting to exhaust the kinds of situations that would give rise to an adverse effect under Rule 1.7(b)(2)-(4), we offer the following examples to illustrate the kinds of circumstances that in this Committee's view could require a lawyer to obtain consent from one or both clients under these provisions. 1) A volunteer lawyer whose firm is handling a matter for private clients against one City agency, and who is subsequently asked by the Corporation Counsel to defend another City agency in a matter whose outcome will have a substantial and foreseeable impact on the outcome of the firm's private clients' matter, may be required to obtain one or both clients' consent. 2) A volunteer lawyer who represents one City agency and wishes to make certain arguments about that agency's authority that are inconsistent with arguments she is making on behalf of a private client against another City agency in an unrelated matter, may be required to obtain consent from one or both clients if the success of her arguments on behalf of one client "will, in some foreseeable and ascertainable sense, adversely effect the lawyer's effectiveness on behalf of the other" client. *See* Opinion 265, *supra*. 3) A volunteer lawyer performing work for one City agency who wishes to take a leading role representing a private party in a controversial matter involving another City agency should anticipate having to obtain consent from both clients if she believes it likely that one representation will have an adverse effect on the independence of her professional judgment or her credibility in the other. 4) A volunteer lawyer who works closely and for extended periods of time with full-time Corporation Counsel lawyers, or is closely supervised by Corporation Counsel lawyers, may find it difficult to exercise independent professional judgment in opposing the same lawyers with whom she is working or who are supervising her, and in such a situation she may decide that she should not accept a private representation in which she would be opposing her colleagues, without notifying and seeking the consent of both the Corporation Counsel and her private client.[10] **(/bar-resources/legal-ethics/opinions/opinion268.cfm#footnote10)**

The above examples are not intended to be exhaustive, but merely to suggest the possibilities for "indirect" conflicts to develop in the context of a volunteer program such as the one described in Opinion 92.

**Conclusion**
The conclusion of Opinion 92 that, under the former Code of Professional Responsibility, a lawyer may never oppose a City agency that she is also representing on behalf of another client in an unrelated matter, is no longer mandated by the Rules of Professional Conduct. Under Rule 1.7(b)(1), a lawyer may oppose her own City government client on behalf of a private client in an unrelated matter as long as she makes clear the nature of the conflict to both clients and obtains their consent.

Moreover, we believe that in certain limited situations a lawyer may represent a City agency without having to notify or obtain the consent of private clients that she is representing against

Exhibit 2

1   ///       1       //   1   1   //   1   1   260   /       2/20/2010

other discrete City agencies. Opinion 92's apparent assumption that the client of the Corporation Counsel lawyer is always and necessarily the City as a whole is incorrect, and in any event has no foundation in the ethics rules. The rules contemplate that the identity of the City government client for conflict of interest purposes will be decided on a case-by-case basis between the lawyer and responsible government officials, taking into account the reasonable expectation of the lawyer's other clients that they will receive a conflict-free representation. Their decision will generally be based on functional considerations derived from the structure and relationship of the government entities involved and from the facts and circumstances of the particular matter at issue in the representation. Even if the lawyer would not be opposing her own client, she may be required by Rule 1.7(b)(2)-(4) to obtain client consent if her representation of one client would interfere in some substantial way with her representation of the other, or if the independence of her judgment in either client's behalf would be compromised by her responsibilities to or interests in a third party or by her own personal interests, including her personal and professional relationships with the lawyers on the other side.

October 1996

1. Under the program described in Opinion 92, private law firms were encouraged to donate the services of attorneys to assist the Corporation Counsel in a variety of legal matters, generally on a part-time basis. This program reportedly yielded little by way of relief for the Corporation Counsel's Office, at least in part because of the conditions on lawyer participation (particularly the requirement of obtaining waivers from other clients) set forth in Opinion 92. In 1992, a second and more formal effort was made to encourage lawyers from private firms to volunteer their services to the City, this time by granting them a special dispensation from the imputation rule. The amendments enacted in that year to Rule 1.10 and 1.11 provided that conflicts resulting from one lawyer's voluntary service to the Corporation Counsel need not be imputed to all other lawyers in her firm. See Rule 1.10(e) and Comment [19]; Rule 1.11(h) and Comments [12] and [13]. (The 1992 amendments to Rules 1.10 and 1.11 were made permanent in 1994 and extended to the D.C. Financial Control Board in 1996). According to the commentary to Rule 1.10, this special dispensation from the imputation rule depends upon the volunteer lawyer's working full-time for the Corporation Counsel (there must be a "temporary cessation" of a volunteer lawyer's practice with the firm, "so that during that period the lawyer's activities which involve the practice of law are devoted fully to assisting the Office of the Corporation Counsel"). Thus, when a private lawyer is detailed full-time to the Corporation Counsel's Office under the so-called "Rule 1.10 program," her firm will not be regarded as representing the City, and will not need to alert and obtain consent from those of its clients who "might reasonably consider the representation of its interests to be adversely affected" by the firm's representation of the City. See Comment [7] to Rule 1.7. (It follows by necessary implication that where a lawyer is volunteering for the City on a less than full-time basis, or does not otherwise meet the requirements of a "Rule 1.10 detail," the conflicts resulting from her government service are imputed to all lawyers in her firm." We understand that the Rule 1.10 program has attracted few volunteers, and has accordingly provided no more benefit for the Corporation Counsel's Office than did the pre-1992 part-time details discussed in Opinion 92.

2. Amendments to the Rules issued by the D.C. Court of Appeals on October 16, 1996, make a number of revisions to the text and commentary of Rule 1.7, none of which affect the conclusions of this opinion. We would note, however, the extensive attention paid in new Comments [13]-[18] to conflicts of interest where the client is a "corporation, partnership, trade organization or other organization-type client." While not directly applicable to situations in which the client is a governmental entity, cf. Comment [7] to Rule 1.13, we believe this discussion may provide a useful supplement to the discussion of conflicts under Rule 1.7(b)(2)-(4) in Part II B(2), infra.

Exhibit 2

3. Opinion 92 does not say in so many words that the client of the volunteer lawyer is always and necessarily the entire City for Canon 5 conflict of interest purposes. Nevertheless, this has been the generally accepted interpretation of the opinion since its issuance more than 16 years ago, and there appears to be little support in the text for a contrary position. Moreover, the fact that the absolute bar under the "appearance" standard of Canon 9 is clearly applicable only to representations involving particular City agencies if further evidence that the drafters of Opinion 92 intended a very broad definition of the City client for conflict of interest purposes.

4. Where a conflict arises under Rule 1.7(b)(1) because the lawyer is opposing her own client on behalf of another client, both clients are presumed to be "potentially affected" under Rule 1.7(c)(1) and both must therefore consent to the representation after full disclosure.

5. Opinion 92 advises a firm wishing to participate in the Corporation Counsel's volunteer program to "send a standardized letter to all clients identified as having present or potential future dealings with the City, describing the program and explaining in general how the judgment of the firm's attorneys might or might not be affected by the firm's participation in the program." This suggests an even broader application for the condition, requiring the lawyer to obtain consent from clients with present or potential City business without regard to whether the lawyer or her firm is actually representing the client in connection with that City business. We see no basis in the current rules for such an expansive reading of the conflict of interest rules. Even in a case when the entire City is considered the lawyer's client, consent must be obtained only from clients who the lawyer is currently representing against the City (or one of its agencies) or those who have actually asked her so to represent them.

6. We do not regard the definition of the government client contained in Rule 1.6(i) ("the client of the government lawyer is the agency that employs the lawyer") as dispositive for conflict of interest purposes. And, there is no indication that this or any other a priori definition of the government client was intended to apply in this context in the otherwise thorough consideration of the "government lawyer" issue by the Sims Committee in 1988. See Report by the District of Columbia Bar Special Committee on Government Lawyers and the Model Rules of Professional Conduct (1989).

7.The provisions of Rule 1.7(d) (1996 amendment) govern conflicts arising after the representation commences that are "not reasonably foreseeable at the outset of a representation." As we read this provision, it subjects such unforeseeable late-arising conflicts to the provisions of Rule 1.7(b) (2) through (4) only, and not to those of Rule 1.7(b)(1).

8. The government client can generally decide what information it needs or wants about the volunteer lawyer's potentially conflicting representations, in the context of deciding its own identity. Thus, the process of self-definition functions for the government client as a way of consenting to the volunteer lawyer's conflicting private representations to which it would be entitled to object if it chose to define its identity more broadly. In this fashion, the government client may decide that it has no interest in knowing about any conflicts that might otherwise be imputed to the volunteer lawyer under Rule 1.10 by virtue of representations by other lawyers in her firm.

9. Given the decision-making structure of government entities, we believe that the conflicts of the City are necessarily attributed to its constituent parts, and that the conflicts of the constituent parts of the City are necessarily attributed to the City as a whole—though the conflicts of one of the City's constituent agencies may or may not be attributed to other City agencies.

10. Because this conflict is in the nature of a personal conflict, as opposed to one derived from the lawyer's representation of another client, we doubt that it would be imputed to other lawyers in the firm. See ABA Formal Opinion 96-400 ("Job Negotiations with Adverse Firm or Party") (Rule 1.10 "cannot be construed so broadly as to require that all lawyers in a firm be presumed to share their colleague's personal interest in joining the opposing firm in a matter," though each lawyer must

Exhibit 2

individually evaluate whether his "'responsibilities to . . . a third person'—i.e., his colleague—or his own interest in his colleague's interest, may materially limit the representation.")

Exhibit 2

2023-FOIA-01530-00000108

# Exhibit 3



US POSTAGE
$ 007.20°
DEC 28 2020
02 1P
0002114238
MAILED FROM ZIP CODE 20004

FIRST-CLASS

CERTIFIED MAIL®

7016 3010 0000 2493 7076

**MotleyRice** llc

ATTORNEYS AT LAW

401 9th St. NW, Suite 1001
Washington, DC 20004

ADDRESS SERVICE REQUESTED



OptumRx, Inc.
c/o CT Corporation System, Registered Agent
1015 15th St. NW
Suite 1000
Washington, D.C. 20005

Exhibit 3

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### OFFICE OF THE ATTORNEY GENERAL



**Karl A. Racine**
**Attorney General**

**Office of Consumer Protection**

**SUBPOENA**

In the Matter of                                          **DEMAND FOR PRODUCTION**
OptumRx, Inc.                                            **OF DOCUMENTS**

To:            OptumRx, Inc.

Serve On:      CT Corporation System, Registered Agent
               1015 15th St. NW
               Suite 1000
               Washington, D.C. 20005

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

The Office of the Attorney General for the District of Columbia is investigating whether OptumRx, Inc. may have violated one or more of the provisions of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*, in connection with the negotiation of prescription drug rebates and the administration of prescription drug benefits.

Pursuant to D.C. Code § 28-3910, and by the authority vested in the Attorney General for the District of Columbia, you are hereby required to produce the documents and information requested below, on or before January 27, 2021, to the attention of:

               Linda Singer
               Motley Rice LLC
               401 9th St. NW, Suite 1001
               Washington, DC 20004

Questions regarding this subpoena should be directed to Assistant Attorney General Wendy J. Weinberg at 202-724-1342, wendy.weinberg@dc.gov.

Exhibit 3

## INSTRUCTIONS

A.  In each instance in which a document is produced in response to a Request, the current version should be produced together with all earlier versions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions, as well as the time period that each version was used by You.

B.  The Subpoena calls for all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents were prepared (*e.g.*, your company employees, contractors, vendors, distributors, service providers, competitors, or others).

C.  These Requests specifically include production of electronically stored information ("ESI").

1.  General Instructions. A cover letter will accompany each production, identifying each piece of media (hard drive, thumb drive, DVD, CD, or FTP), the production date, production volume, and the Bates range of the production. Data will be produced on hard drive, thumb drive, DVD, CD, or FTP. Label all media with the following:

   a.  Case number
   b.  Production date
   c.  Production volume
   d.  Bates range
   e.  Media volume number (1 of X, 2 of X, etc.), if applicable.

2.  Production Format for Electronically Stored Information. Production of all ESI is requested in either original native file format or as searchable image files, using production numbering as described below. Before being produced, all parent-level email and loose-file (non-email) ESI should be de-duplicated across all custodians and shared network drives based on MD5 hash value. Individual email attachments should not be separately de-duplicated. All ESI should be produced with a metadata field listing all custodians where duplicate documents were found. For ESI production in image format, if any documents cannot be reasonably be converted to readable images, the information should be produced in native format or some other reasonably usable format, and image production should include a placeholder image for each such unconverted or unreadable document setting forth the original filename and extension.

3.  Production of Email. If produced in native format, email should be produced as individual, parent level, HTML files, and attachments to emails should sequentially follow their parent emails and be produced in native format as separate files. If produced in searchable image format, parent emails and their attachments should be produced as separate, contiguous documents.

2

Exhibit 3

4.  <u>Production of Spreadsheets</u>. Spreadsheets should be produced in native format if stored in that manner, and each native file should be named with a document production number as described below. If a spreadsheet contains privileged information, you may produce it as imaged ESI, with the privileged information redacted, provided that You make reasonable efforts in applying page layout settings to maximize document readability. Images of spreadsheets that contain multiple worksheets should be produced with worksheet names indicated in a header or footer. To the extent that print-outs or images of all or part of a spreadsheet were also maintained in the ordinary course of business in static form (*e.g.*, as a pdf attachment), those documents should be produced as images to the extent such production is not duplicative.

5.  <u>Production of Database Information</u>. Relevant information from a database should be produced as a report or data table, either in a static image format or in a popular database application, such as an Microsoft Access database.

6.  <u>Production of ESI Commentary and Tracked Changes</u>. Microsoft Word, Microsoft Excel, and similar file formats that provide for comments or tracked changes should be produced in a manner in which all comments and tracked changes are preserved, accessible, and viewable in their original color format. Such production may be in native format.

7.  <u>Production of Paper Documents</u>. Scanned paper document production must have natural, logical document breaks and should include, where available, copies of file folders, envelopes, or labels or other identifying marks on the containers in which the documents were maintained. All scanned paper documents should be produced with OCR text in a corresponding TXT file.

8.  <u>Image Production Format</u>. Searchable images should be produced as separate documents in either single-page Group IV TIFF format or multi-page PDF format, at least 300 DPI resolution, with corresponding TXT files. Imaged ESI should maintain all color properties, and scanned paper images should provide color when content of the document contains more than one color.

9.  <u>Document Production Numbering</u>. Each page of all images produced (whether hard-copy documents or ESI) must be clearly labeled with an indelible, legible, unique Bates number identifier electronically "burned" onto the image. Reasonable steps shall be taken to place the Bates number or confidentiality designation at a location that does not obscure any content from the source document. There shall be no other branding placed on the document image, except to identify redactions due to privilege. To the extent possible, documents and ESI shall be Bates numbered consecutively, maintaining all parent/child relationships as well as the order of the parent emails and corresponding attachments.

Exhibit 3

10. <u>Load Files and Metadata</u>. All native format and searchable image format production must include one or more CSV or Summation load files that associate each document and its Bates number with its corresponding TXT file, and that include the following original and processed metadata fields:

For all imaged documents (ESI and scanned):

> BegDoc
> EndDoc
> ParentID
> AttachmentIDs
> BegAttach
> EndAttach

For all ESI (native and imaged):

> FileName
> Extension
> Author
> DateCreated
> TimeCreated
> DateLastMod
> TimeLastMod
> MD5Hash
> Custodian
> DupCustodians

For all email:

> MailTo
> MailFrom
> CC
> BCC
> Subject
> DateAndTimeSent
> DateAndTimeReceived
> TimeZone
> IntMsgID
> Conversation
> ConversationIndex
> ParentID
> AttachmentIDs
> BegAttach
> EndAttach

4

Exhibit 3

If production in the requested form is not reasonably available or practical, office personnel at the undersigned law firm are available to discuss compatible alternatives.

11. <u>Production Load Files.</u> Two Load/Unitization files shall accompany all productions. All productions containing images must include an image load file that is in .LOG or .OPT format. For any productions containing native files, the metadata .DAT file should contain a NATIVELINK field that contains the path/link to each native file generated during production. The native files should be named with their corresponding bates numbers. All productions should include a metadata load file (.DAT file) containing all agreed upon metadata production fields and the delimiters should be standard Concordance delimiters:

a. Column Delimiter:  þ      (020)
b. Field Delimiter:  þ    (254)
c. New Line Delimiter:  ®    (174)
d. Multi-Entry Delimiter: ;      (059)

The following ASCII delimiters are also acceptable:

e. Column Delimiter:      ^    (094)
f. Field Delimiter:  |      (124)
g. New Line Delimiter:  ~    (126)
h. Multi-Entry Delimiter: ;      (059)

The first line of the .DAT file must contain the field names to each corresponding metadata field. The name of the data load file should mirror the name of the delivery volume and the volume names should be consecutive. If foreign language/Unicode text exists, the .DAT file shall contain the appropriate encoding to enable preservation of the document's original language.

12. <u>Searchable Files.</u>  (.TXT). Document level, searchable text files shall be provided for all production documents and be maintained in separate TEXT directories. All text files should be named with their corresponding bates numbers. The metadata .DAT file should contain a TEXTPATH field that contains the path/link to each corresponding text file generated during production. If foreign language/Unicode text exists, the .TXT files shall contain the appropriate encoding to enable preservation of the document's original language.

13. <u>Privileged Documents.</u>  If any responsive document is withheld under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document that you have withheld:

a. the name of each author, writer, sender, creator, or initiator of such document;
b. the name of each recipient, addressee, or party for whom such document was intended;

      c.      the date of such document, or an estimate thereof if no date appears on the
document;

      d.      the general subject matter of the document; and

      e.      the claimed grounds for withholding the document, including—but not
limited to—the nature of any claimed privilege and grounds in support.

14.    <u>Duty to Preserve Documents.</u>  All documents and/or other data which relate to the
subject matter or requests of this subpoena must be preserved. Any destruction
involving such documents must cease, even if it is your normal or routine course of
business to delete or destroy such documents or data and even if you believe such
documents or data are privileged or otherwise need not be produced.

15.    <u>Duty to Supplement.</u>  All document requests are continuing in nature so as to require
the supplementary production if you obtain further responsive documents or
information. You are also required to amend your responses to the requests
contained within this subpoena if you discover that the previous response was
incorrect or incomplete.

16.    <u>Certification.</u>  The person to whom the Subpoena is directed or, if it is directed to an
entity, any person having knowledge of the facts and circumstances relating to the
production, must certify that the response to this Subpoena is true and complete, and
that all documents produced were records of regularly conducted business activity.
This certification must be made on the form declaration included with this
Subpoena.

17.    <u>Notice of Rights.</u>  Any person to whom a subpoena has been issued under the
Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.* may exercise
the privileges enjoyed by all witnesses, including moving to quash or modify the
subpoena in the Superior Court of the District of Columbia on grounds including:
(1) the Attorney General failed to follow or satisfy the procedures set forth in this
section for the issuance of a subpoena; or (2) any grounds that exist under statute or
common law for quashing or modifying a subpoena. In the case of refusal to obey a
subpoena issued under this section, the Attorney General may petition the Superior
Court of the District of Columbia for an order requiring compliance. Any failure to
obey the order of the court may be treated by the court as contempt.

## DEFINITIONS

A.    "All" shall be construed to include the collective as well as the singular and shall mean
"each," "any," and "every."

B.    "Any" shall be construed to mean "any and all."

C.    "Benefits Consultant" shall mean any organization providing advisory services pertaining
to the pharmacy benefit of a health insurance product or the administration of such a
benefit.

6

Exhibit 3

D.  "Communications" shall mean and refer to any exchange of information by any means of transmissions, sending or receipt of information of any kind by or through any means including, but not limited to, verbal expression, gesture, writings, documents, language (machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or other "text" messages, messages on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones, "smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm or by any other means. It also includes, without limitation, all originals and copies of inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands, complaints, press, publicity or trade releases and the like that are provided by you or to you by others.

E.  "Document(s)" shall mean any writing or any other tangible thing, whether printed, recorded (in audio, video, electronically or by any other means), reproduced by any process, or written or produced by hand, including, but not limited to, letters, memoranda, notes, opinions, books, reports, studies, agreements, statements, communications (including inter-company and intra-company communications), correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other "text" messages, posted information, messages, chat logs on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), logs, bookkeeping entries, summaries or records of personal conversations, diaries, calendars, telephone messages and logs, forecasts, photographs, images, tape recordings, models, statistical statements, graphs, laboratory and engineering reports, notebooks, charts, plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, lists of clients or customers or suppliers, reports or summaries of interviews, opinions or reports of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of any document and revisions of drafts of any document, and any other similar paper or record. The terms also include a copy of a document where the copy is not exactly the same as the original. The terms also include emails and other documents made or stored in electronic form, whether kept on computers, computer tapes, disks or drives, including Cloud storage, of any type, or other media upon which information may be recorded.

F.  "Identify" means:

1.  When used in connection with a person, provide that person's name, current residential address and telephone number, job title, and current business address and telephone number.  (If current information is not available, provide last-known address and telephone number.)

2.  When used in connection with a Document, provide the nature of the Document, its title, physical description, date, author, its current location, and identification of the current custodian.

7

Exhibit 3

3. When used in connection with an oral communication, provide the nature of that communication, the parties to it, the date, place and substance of that communication, and the identification of any document concerning it.

G. "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

H. "Manufacturer(s)" shall mean a manufacturer of prescription drugs.

I. "Payer(s)" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients including an employer (self-insured), a third-party administrator or administrative-services only health insurer (for themselves or on behalf of their clients), or a health insurance company.

J. "Payment(s)" shall mean any transfer of money, goods, or services You received directly or indirectly from any Manufacturer. It includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above.

K. "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that administers prescription drug benefits on behalf of a Payer.

L. "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

M. "You" or "Your" refers to the person(s) or business entity(s) to whom this Subpoena is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2010 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

8

Exhibit 3

## REQUESTS FOR DOCUMENTS AND INFORMATION

These requests are limited to documents and information relating to the District of Columbia, including, but not limited to, documents and information that may be national or regional in scope that apply to the District of Columbia.

1.    Produce all Documents sufficient to Identify the ten Manufacturers from which You have directly or indirectly received the largest Payments (as determined by the total dollar amount of Payments) per year from 2010-2020. Per the definitions listed above, the term Payments includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above. Include the following in Your response:

    a.    The name of the Manufacturer making Payments; and
    b.    The total amount per year of the Payments.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

2.    Produce all Documents sufficient to Identify the Payments made by each Manufacturer identified in response to Request 1 per year from 2010-2020. Aggregate payments of the same type per year. For example, all administrative fees for 2010 can be combined as one Payment. Include the following for each Payment in Your response:

    a.    A description of the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);
    b.    The amount of each Payment;
    c.    A description of any service You performed relating to the Payment;
    d.    A description of any product or information You sold relating to the Payment;
    e.    The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;
    f.    The amount of the Payment You shared with a Payer or any other entity or individual; and
    g.    The amount of the Payment You retained.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

9

Exhibit 3

3.   Produce all Documents reflecting or related to the negotiation of the Payments identified in Your response to Request 2.

4.   Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments.

5.   Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments.

6.   Produce all Documents sufficient to Identify the gross amount You paid to the Manufacturers identified in response to Request 1 per year from 2010-2020 for prescription drugs.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

7.   Produce all Documents sufficient to Identify all direct or indirect Payments (*e.g.*, product based, volume based, or other Payments) You made to any Benefits Consultant working on behalf of a Payer, including:

   a.   The name of the Benefits Consultant;
   b.   The name of the Payer for whom the Benefits Consultant worked;
   c.   The date of the Payment;
   d.   The amount of the Payment; and
   e.   A description of the Payment (*e.g.*, product based, volume based, or other Payments).

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

8.   Produce all Documents reflecting or related to direct or indirect Payments for Humira and every insulin product (including branded and authorized generics).

9.   Produce all Documents sufficient to Identify all direct or indirect Payments You received relating to Humira and every insulin product (including branded and authorized generics). Include in Your response, for each Payment:

   a.   The date of the Payment;
   b.   The time period which the Payment relates to;
   c.   The name of the Manufacturer making the Payment;
   d.   The amount of the Payment;
   e.   A description the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts,

10

Exhibit 3

sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);

f. The name of the prescription drug relating to the Payment;
g. The list price for the prescription drug relating to the Payment;
h. The gross amount You paid for the prescription drug;
i. The number of units of the prescription drug You purchased relating to the Payment;
j. A description of any service You performed relating to the Payment;
k. The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;
l. The amount of the Payment You shared with a Payer or any other entity or individual; and
m. The amount of the Payment You retained.
n. Beneficiary cost sharing requirement (fixed copayment, coinsurance)
o. Amount paid by the beneficiary
p. Total Amount paid to the pharmacy (including dispensing fee)
q. Post-purchase price adjustment of the prescription drug sale price
r. Other price agreements or guarantees related to the prescription drug.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

10. Produce all agreements and Documents reflecting or related to agreements with Manufacturers or any entity or individual affiliated with any Manufacturer related to Payments.

11. Produce all Documents sufficient to Identify all departments and individuals involved in negotiations or agreement with Manufactures related to the purchase, coverage, promotion or sale of prescription drugs, including, but not limited to, the following:

a. the name of each department or individual;
b. the date each department was formed and (if applicable) dissolved;
c. the title(s) each individual has or had;
d. the name of the department(s) for which each individual works or worked
e. the relevant duties and responsibilities each individual has or had;
f. the dates of employment for each individual; and
g. the last known contact information for each individual who no longer works for You.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

12. Produce all Documents reflecting or related to Communications relating to negotiations or agreements relating to Payments, including the target level of Payments or the impact of Payment levels on your Profits, or the value of any Payments to Your revenue or profits.

11

Exhibit 3

13. Produce the personnel files for each individual identified in Your response to Request 11 including, but not limited to, any performance evaluations and disciplinary actions.

14. Produce all Documents reflecting or related to Your projections or analyses relating to: (a) the value of Payments; (b) whether and how Payments are passed on to consumers (c) how Payments impact Your profitability; (d) how Payments impact Your bargaining power in negotiations with Manufacturers and/or Payers; (e) the impact or practice of classifying Payments in certain ways (*e.g.*, classifying a Payment as a rebate rather than a fee or vice-versa); and/or (f) the relationship between Payments and list prices.

15. Produce all Documents reflecting or related to the results of any audit (including both internal and third-party audits) relating to Your practices involving Payments, including, but not limited to, Your classification of any fees or rebates.

16. Produce all Documents You relied upon when testifying before Congress about the pricing of prescription drugs.

17. Produce all Documents relating to legislation or proposed legislation that could impact the Payments You receive, including, but not limited to, the proposed elimination of the safe harbor provision in 42 CFR 1001.952(h).

18. Produce all Documents relating to any research or study You commissioned that examines Payments made to pharmacy benefit managers from Manufacturers.

19. Produce all Documents reflecting or relating to any complaints or concerns You received relating to Your practices involving Payments, including, but not limited to, any complaints You received from Manufacturers, Payers, whistleblowers, and consumers.

20. Produce all Documents sufficient to Identify all lawsuits filed against You relating to Your practices involving Payments, including, but not limited to, any lawsuits that allege You overcharged Payers and/or consumers for prescription drugs and/or that there is a relationship between the Payments You receive and the increase in list price of prescription drugs.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

21. Produce all Documents produced in any government investigation or any litigation relating to Your practices involving Payments.

22. Produce all settlement agreements or judgments relating to Your practices involving Payments.

Exhibit 3

Dated: December 28, 2020

KARL A. RACINE
Attorney General for the District of Columbia

Issued:  *Jimmy Rock*

JIMMY ROCK
Assistant Deputy Attorney General
Public Advocacy Division

BENJAMIN M. WISEMAN
Director, Office of Consumer Protection
Public Advocacy Division

WENDY J. WEINBERG
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, N.W., 10th Floor
Washington, D.C. 20001
(202) 724-1342 | wendy.weinberg@dc.gov

13

Exhibit 3

## FORM OF CERTIFICATE OF COMPLIANCE

I/We have knowledge of the facts and circumstances relating to the production of the information and documents required by the Subpoena to OptumRx, Inc. I/We do hereby certify that all information and documents required by the Subpoena that are in the possession, custody, or control of OptumRx, Inc. have been submitted to the designated representative named therein or to the District of Columbia Office of Attorney General.

If any information or documentary material otherwise responsive to this Subpoena has been withheld on the basis of objection or privilege, these objections or claims of privilege have been stated in lieu of production.

Signature: _____

Title: _____

SWORN TO before me this _____ day of _____ 2021.

_____
NOTARY PUBLIC

14

Exhibit 3

Exhibit 4

## CONFIDENTIALITY AGREEMENT

IT IS HEREBY AGREED BY AND BETWEEN the Office of the Attorney General for the District of Columbia ("OAG"), and OptumRx, Inc. ("OptumRx" or "the Company"), through their respective counsel, that:

1.    This Confidentiality Agreement is being entered into in connection with an investigation being conducted by the OAG and OAG outside counsel ("Investigation"), and the production of any documents or information by OptumRx in response to a subpoena issued by OAG dated December 28, 2020 in connection with the Investigation (the "Subpoena"). Neither OptumRx nor OAG waives any objections it has to the Subpoena or the response to the Subpoena by entering into this Confidentiality Agreement. This Agreement shall be binding upon OAG and OptumRx ("parties," referred to singularly as a "Party"), undersigned OAG outside counsel and OptumRx outside counsel, and all persons and entities signing a copy of the Addendum Regarding Undertaking of Confidentiality attached at Exhibit A ("Addendum").

2.    "Confidential Information" means any documentary and/or tangible information of any type, kind or character that contains (a) information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade secret or commercial or financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company. To designate a document or information as "Confidential Information," OptumRx shall stamp or place the word "Confidential" on the document or item of information produced to OAG. All copies, whether digital or hard copy, of any "Confidential Information" produced or made available for inspection and copying shall be subject to the terms of this Agreement. Any interview, deposition or testimony of OptumRx in connection with the Investigation shall presumptively be treated as Confidential Information and subject to this Agreement for a period of 15 days after a transcript is received by counsel for the parties. At or before the end of such 15-day period, by written notification to undersigned counsel, OptumRx may designate any portion(s) of the interview, deposition, or testimony as "Confidential Information." If OptumRx fails to designate any portion of the interview, deposition, or testimony

Exhibit 4

as "Confidential Information," after the expiration of the 15-day period, that portion(s) shall be treated as non-confidential.  In designating documents or information as "Confidential Information," OptumRx will make such designation only as to those documents and information that it in good faith believes contain Confidential Information.  The OAG, OAG outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree with the designation.  OAG outside counsel further agrees not to rely on Confidential Material in pursuing information or claims in any other matters outside of its representation of the OAG.

3.     This Agreement shall not preclude any Party from bringing before a court of competent jurisdiction, at any time, the question of whether any particular information is properly designated as "Confidential Information."  In its request for relief from the Court, the Party disputing the designation of any information shall identify the information that it believes is not properly designated.  The Party asserting the proprietary of any designation has the burden to defend the designation.   Prior to bringing any motion, the Parties shall meet and confer in good faith to attempt to resolve the dispute.  If the dispute cannot be resolved, the Parties shall treat the information consistent with its designation until a ruling by the court.  In the event litigation stems from this Investigation, the Parties will meet and confer at the appropriate time regarding a protective order that will supersede this Agreement.  In the event the Parties cannot agree on a protective order, it shall be OptumRx's duty to seek a protective order.

4.     In addition to any applicable protections provided to such materials under D.C. Code § 2-534(a) or other applicable law, OAG and undersigned OAG outside counsel may disclose Confidential Information only as follows:

(a)     to employees, interns, and staff of the OAG;

(b)     to agents, consultants, or experts of the OAG, who are

Exhibit 4

bound by this agreement and who agree to be bound by the terms of this agreement by signing the Addendum;

(c)  other law enforcement agencies provided they agree in writing to be bound and comply with this agreement;

(d)  to any witness in the investigation (not to include disclosures to expert witnesses of the OAG, which are covered under Section 4(b)), during an interview by the OAG or during transcribed or otherwise recorded proceedings conducted by the OAG, as long as the OAG reasonably believes that disclosure is necessary to further the investigation;

(e)  to any person identified as having received, or who is otherwise known to have received, the document or information;

(f)  if the Company first gives written consent to such disclosure;

(g)  any person who, at the time of the disclosures, is either employed by OptumRx or retained by OptumRx in connection with this investigation;

(h)  if the information was obtained independently of the Company even if such information was also produced by the Company, unless that information was obtained from a source known by OAG and/or OAG outside counsel to be bound by a confidentiality obligation to the Company.

Exhibit 4

(i) Motley Rice LLC attorneys (other than undersigned OAG outside counsel), paralegals, contractors, staff, or experts working on behalf of OAG in connection with the Investigation who agree to be bound by the terms of this Agreement by signing the Addendum.

5.     With respect to the disclosures authorized by paragraph 4(d) or 4(e), the OAG shall not permit the person or the person's counsel to retain a copy of the Confidential Information unless the OAG reasonably believes that retention is necessary to further the investigation and the person has signed the Addendum.

6.     With respect to the disclosures authorized by paragraph 4(i), the OAG and OAG outside counsel shall not share, disclose, or discuss Confidential Information with any Motley Rice LLC attorney, paralegal, contractor, or staff who is not a member of the firm's Public Client practice group, and shall limit access to Confidential Information to members of that practice group. The OAG and OAG outside counsel are agreeing to this term solely for purposes of the investigation stage and are not consenting to or agreeing to waive any right to object to this or any similar term in any stipulated protective order following litigation.

7.     Any document or information that may contain Confidential Information that has been inadvertently produced without being designated as Confidential Information shall not be a waiver, in whole or in part, of a claim of confidentiality as to any such document or information. OptumRx may designate the inadvertently produced document or information as "Confidential Information" by written notice to OAG within a reasonable time following discovery of the inadvertent production. Unless the OAG challenges the designation pursuant to paragraph 3, the OAG shall confirm the designation of the Confidential Information within ten (10) days of receipt of notice from OptumRx, and shall make reasonable efforts to retrieve such improperly designated documents from persons not entitled to receive them.

Exhibit 4

8. The OAG and/or OAG outside counsel shall not attach documents or information designated as "Confidential Information" to any filing with a court or administrative tribunal ("OAG filing") unless OAG and/or OAG outside counsel complies with one of the following provisions:

(i) resolves any dispute with OptumRx regarding designation of such documents or information as "Confidential Information;"

(ii) files the documents or information designated "Confidential Information" with a court or administrative tribunal conditionally under seal; following the OAG filing, the confidentiality or non-confidentiality of documents or information will be determined by the terms of a protective order entered in the case either by stipulation or order, or by the absence of any such order (i.e. if OptumRx takes no action to seek a protective order within ten (10) days of the OAG filing, the documents or information attached to the OAG filing will be deemed non-confidential); or

(iii) notifies OptumRx at least ten (10) days in advance that OAG or OAG outside counsel intends to attach materials designated "Confidential Information" in the OAG filing, provided that OAG or OAG outside counsel shall not attach such documents or information designated "Confidential Information" until either:

(a) the court or administrative tribunal rules on OptumRx's request for a protective order or in camera treatment in favor of disclosure of the documents or information designated Confidential Information; or

(b) OptumRx has not sought such order within

Exhibit 4

the ten (10) day period of time which OAG or OAG outside
counsel provided to OptumRx for it to seek such order.

9.     In the event that the OAG receives a written request from a person or entity for
Confidential Information under District of Columbia Freedom of Information Act, D.C. Code §§
2-531 through 2-540, and the OAG determines in good faith that disclosure of Confidential
Information is required, the OAG  will provide 10 business days advance notice before any
production in response to such a request so that the Company is afforded an opportunity to obtain
a court order prohibiting or limiting such disclosure and/or requiring the recipient(s) of such
Confidential Information to take steps to maintain the confidentiality thereof.  During the pendency
of this Investigation the OAG agrees that it will, pursuant to § 2-534(a) of the Freedom of
Information Act, deny public inspection of the records the Company produces in response to the
Subpoena.  Both during and after the pendency of the investigation, the OAG will also deny
inspection of any Confidential Information to the extent authorized by the District of Columbia's
Freedom of Information Act. To the extent the OAG disagrees with the designation of documents
or information as Confidential Information and determines in good faith that it must be disclosed
under the District of Columbia Freedom of Information Act, OAG will provide the Company with
at least 10 business days advance notice of the production.

10.     If any person or entity possessing designated Confidential Information is
subpoenaed in another civil action or civil proceeding or served with a document demand or other
civil legal process that requests production of designated Confidential Information ("civil
process"), and the OAG determines in good faith that the Confidential Information must be
disclosed , the OAG  shall, to the extent permitted by law, court rule, and court order, inform
OptumRx within 15 days of receiving notice of the civil process.  Any notice to OptumRx shall be
made to: John Kokkinen, Senior Associate General Counsel – Optum Litigation, via electronic
mail at john.kokkinen@optum.com, and to Michelle Kisloff, Hogan Lovells, via electronic mail
at michelle.kisloff@hoganlovells.com.

Exhibit 4

11.     If documents or information subject to a claim of attorney-client privilege or work product immunity or any other privilege or immunity are inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such documents or information as provided under applicable law, including Federal Rule of Evidence 502, DC Superior Court Civil Rule 25(b)(5)(C), or any other District of Columbia or State counterpart or similar rule.  If OptumRx has inadvertently produced documents or information subject to a claim of immunity or privilege, the Parties shall follow the so-called "clawback" provisions of Federal Rule of Civil Procedure 26(b)(5)(B), DC Superior Court Civil Rule 26(b)(5)(B),  or any other District of Columbia or State counterpart or similar rule.

12.     At the conclusion of the Investigation, or the final conclusion of all litigation in connection with the Investigation, if any is initiated, upon written request, all documents produced by the Company, including all Confidential Information, shall be promptly returned to the Company or destroyed.  The OAG shall not be required to return or destroy copies of documents marked as "Confidential" that are not readily accessible, such as copies on computer system backup tapes or in email archives. In addition, upon written request, OAG shall notify persons pursuant to paragraphs 4(b), (c), (d), (e), (f), or (i) of the Company's request under this subsection. At the Company's request, OAG shall confirm that it has complied with its obligation under this subsection.

13. Nothing contained in this Agreement shall alter or limit the obligations of the OAG under District of Columbia law, including the District of Columbia's Freedom of Information Act, D.C. Code to §§ 2-531 *et seq.* Nothing in this Agreement shall be construed to waive applicable protections under D.C. Code § 2-534(a) for any materials produced in response to the Subpoena, regardless of whether such materials are designated "Confidential Information."

14. This Agreement shall apply to all documents and information produced pursuant to this Investigation, including any amendments to the Subpoena.

Dated: 7/1/2021

Exhibit 4

OptumRx

By:

_John Kokkinen_
Attorneys for the Company

Counsel for OptumRx

By:

_____
Michelle Kisloff
Hogan Lovells US LLP

Office of the Attorney General for the
District of Columbia

/s/ Benjamin Wiseman
Benjamin Wiseman, Director
Office of Consumer Protection
Public Advocacy Division

Counsel for the Attorney General for the
District of Columbia

By:

/s/ Linda Singer
Linda Singer
Motley Rice LLC

/s/ Paige Boggs
Paige Boggs
Motley Rice LLC

Exhibit 4

OptumRx

By:

_____
Attorneys for the Company


Counsel for OptumRx

By:

_____
Michelle Kisloff
Hogan Lovells US LLP


Office of the Attorney General for the District of Columbia

_____
Benjamin Wiseman, Director
Office of Consumer Protection
Public Advocacy Division


Counsel for the Attorney General for the District of Columbia

By:

_____
Linda Singer
Motley Rice LLC


_____
Paige Boggs
Motley Rice LLC

Exhibit 4

**ADDENDUM REGARDING**

**UNDERTAKING OF CONFIDENTIALITY**

By signing this acknowledgement, I certify that I have read the Confidentiality Agreement to which this acknowledgement is attached ("Agreement") in its entirety, I fully understand the obligations under the Agreement, and I hereby agree that _____ [insert name of person or entity] will be bound by its terms to the extent permitted by law.

DATE:_____

NAME: _____

SIGNATURE: _____

Exhibit 4

# Exhibit 5



Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004-1109
T  +1 202-637-5600
F  +1 202-637-5910
www.hoganlovells.com

July 13, 2021

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Wendy J. Weinberg
Assistant Attorney General
Office of Consumer Protection
Public Advocacy Division
Office of the Attorney General
400 Sixth Street, NW, 10th Floor
Washington, DC 20001

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

**Re:      Subpoena to OptumRx, Inc. Dated December 28, 2020**

Dear Wendy, Linda and Paige:

With this letter and accompanying document, which will be provided via a secure link, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its first production in response to the Subpoena dated December 28, 2020, as clarified by our various telephone calls (the "Subpoena").  For ease of reference, this production has been Bates-numbered OPTUM1220_0000001 – OPTUM1220_0000002.

This production includes information responsive to Request 1.  Per our telephone and email communications  on February 5 and February 26, 2021, the enclosed document provides, by year, for 2016-2020, the total rebates associated with prescriptions filled at pharmacies in the District of Columbia for the ten manufacturers from whom Optum has received the largest such rebates.

\*          \*          \*

The enclosed document contains or constitutes confidential business information, records, and/or trade secrets of Optum and we have branded it "CONFIDENTIAL" and are producing it pursuant to our July 1, 2021 Confidentiality Agreement with the Office of the Attorney General for the District of Columbia.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Brussels  Caracas  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Moscow  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rio de Janeiro  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Ulaanbaatar  Warsaw  Washington DC  Associated offices: Budapest  Jakarta  Shanghai FTZ  Zagreb.  Business Service Centers:  Johannesburg  Louisville.  Legal Service Center: Birmingham.  For more information see www.hoganlovells.com

Exhibit 5

July 13, 2021

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum. Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed document.


Sincerely,

/s/

Michelle A. Kisloff
Partner
Michelle.kisloff@hoganlovells.com
D 202-637-6631

cc:      Allison J. Caplis

Exhibit 5

# Exhibit 6

## DEPARTMENT OF THE ATTORNEY GENERAL
## STATE OF HAWAI'I

**IN RE INVESTIGATION OF:**

**OPTUMRX, INC.**

**SUBPOENA DUCES TECUM**

**AG Subpoena No. 2 0 2 1 - 0 5 2**

## SUBPOENA DUCES TECUM

TO:  OPTUMRX, INC.
c/o The Corporation Company, Inc.
1136 Union Mall, STE 301
Honolulu, HI 96813

**YOU ARE HEREBY COMMANDED,** pursuant to the laws of the State of Hawai'i, including Haw. Rev. Stat. §§ 28-2.5, 480-18, and 661-22, to deliver and turn over to the Department of the Attorney General, State of Hawai'i, all documents and information requested in Attachment A in accordance with the instructions and definitions contained therein within thirty (30) days after service of this Subpoena.  You may deliver the documents and information to Hawai'i Special Deputy Attorney General Linda Singer, Motley Rice LLC, 401 9th Street NW, Suite 1001, Washington, DC 20004.

**TAKE NOTICE** that the Attorney General deems the documents requested by this Subpoena to be relevant and material to an investigation and inquiry undertaken in the public interest.

**TAKE FURTHER NOTICE that you are to continue and/or immediately implement a litigation hold** preserving all documents relating to the subject matter hereof, as set forth in Attachment A, but not limited to the specific documents demanded therein. (Additional subpoenas may follow.)

**TAKE FURTHER NOTICE** that Your disobedience of this Subpoena, by failing to deliver the documents and information requested in the attached Schedule on the date, time, and place stated above or on any agreed upon adjourned date or time, may subject You to penalties and other lawful punishment.

**YOU ARE HEREBY REQUESTED** not to disclose the existence of this Subpoena while this investigation is pending. Disclosure of this Subpoena may impede a confidential investigation being conducted by the Attorney General.

Exhibit 6

OBEDIENCE to this subpoena may be enforced by the Circuit Court of the First Circuit.

DATED:     Honolulu, Hawaii on the <u>15th</u> day of October, 2021

[ X ]  If this box is checked, it may not be
       necessary to appear in person. To make
       other arrangements, please call

                                        for  _Holly Shikada_____
                                                **ATTORNEY GENERAL**
                                                **STATE OF HAWAII**

Contact Person: Deputy Attorney General David D. Day
Telephone Number: (808) 586-1346

2

Exhibit 6

RETURN OF SERVICE

Received this subpoena at _____ on _____ and

on _____ at _____ ,

I served it on the within named by delivering a copy _____ .


Dated _____


_____
Signature of Serving Officer


**RECIPIENT'S RIGHTS**

**You have been served with an investigative subpoena issued by the Attorney General of the State of Hawaii in accordance with section 28-2.5, Hawaii Revised Statutes, to appear at the time and place specified, to give sworn testimony, and, if indicated, to bring certain materials with you. Attendance is required only in the county in which the subpoena is served or such other place as may be agreed upon by you and the issuing authority. If the subpoena is served in a county other than that in which you reside, are employed or transact business, the Department of the Attorney General shall bear the expense of travel as provided by the rules of the court.**

**If you disobey this subpoena, the Attorney General may apply to the circuit court in the county in which you reside or are located to compel obedience. Prior to the date on which you are commanded to appear, you may move the circuit court to quash or modify the subpoena if compliance would be unreasonable or oppressive or violate any privilege you may be entitled to exercise in a court proceeding.**

Exhibit 6

## ATTACHMENT "A"

## INSTRUCTIONS

A.    In each instance in which a document is produced in response to a Request, the current version should be produced together with all earlier versions, or predecessor documents serving the same function during the relevant time period, even though the title of earlier documents may differ from current versions, as well as the time period that each version was used by You.

B.    The Subpoena Duces Tecum calls for all described documents in your possession, custody or control without regard to the person or persons by whom or for whom the documents were prepared (*e.g.*, your company employees, contractors, vendors, distributors, service providers, competitors, or others).

C.    These Requests specifically include production of electronically stored information ("ESI").

    1.    <u>General Instructions</u>. A cover letter will accompany each production, identifying each piece of media (hard drive, thumb drive, DVD, CD, or FTP), the production date, production volume, and the Bates range of the production. Data will be produced on hard drive, thumb drive, DVD, CD, or FTP. Label all media with the following:

        a.    Case number
        b.    Production date
        c.    Production volume
        d.    Bates range
        e.    Media volume number (1 of X, 2 of X, etc.), if applicable.

    2.    <u>Production Format for Electronically Stored Information</u>. Production of all ESI is requested in either original native file format or as searchable image files, using production numbering as described below. Before being produced, all parent-level email and loose-file (non-email) ESI should be de-duplicated across all custodians and shared network drives based on MD5 hash value. Individual email attachments should not be separately de-duplicated. All ESI should be produced with a metadata field listing all custodians where duplicate documents were found. For ESI production in image format, if any documents cannot be reasonably be converted to readable images, the information should be produced in native format or some other reasonably usable format, and image production should include a placeholder image for each such unconverted or unreadable document setting forth the original filename and extension.

    3.    <u>Production of Email</u>. If produced in native format, email should be produced as individual, parent level, HTML files, and attachments to emails should

4

Exhibit 6

sequentially follow their parent emails and be produced in native format as separate files. If produced in searchable image format, parent emails and their attachments should be produced as separate, contiguous documents.

4. <u>Production of Spreadsheets</u>. Spreadsheets should be produced in native format if stored in that manner, and each native file should be named with a document production number as described below. If a spreadsheet contains privileged information, you may produce it as imaged ESI, with the privileged information redacted, provided that You make reasonable efforts in applying page layout settings to maximize document readability. Images of spreadsheets that contain multiple worksheets should be produced with worksheet names indicated in a header or footer. To the extent that print-outs or images of all or part of a spreadsheet were also maintained in the ordinary course of business in static form (*e.g.*, as a pdf attachment), those documents should be produced as images to the extent such production is not duplicative.

5. <u>Production of Database Information</u>. Relevant information from a database should be produced as a report or data table, either in a static image format or in a popular database application, such as an Microsoft Access database.

6. <u>Production of ESI Commentary and Tracked Changes</u>. Microsoft Word, Microsoft Excel, and similar file formats that provide for comments or tracked changes should be produced in a manner in which all comments and tracked changes are preserved, accessible, and viewable in their original color format. Such production may be in native format.

7. <u>Production of Paper Documents</u>. Scanned paper document production must have natural, logical document breaks and should include, where available, copies of file folders, envelopes, or labels or other identifying marks on the containers in which the documents were maintained. All scanned paper documents should be produced with OCR text in a corresponding TXT file.

8. <u>Image Production Format</u>. Searchable images should be produced as separate documents in either single-page Group IV TIFF format or multi-page PDF format, at least 300 DPI resolution, with corresponding TXT files. Imaged ESI should maintain all color properties, and scanned paper images should provide color when content of the document contains more than one color.

9. <u>Document Production Numbering</u>. Each page of all images produced (whether hard-copy documents or ESI) must be clearly labeled with an indelible, legible, unique Bates number identifier electronically "burned" onto the image. Reasonable steps shall be taken to place the Bates number or confidentiality designation at a location that does not obscure any content from the source document. There shall be no other branding placed on the document image, except to identify redactions due to privilege. To the extent possible, documents

5

Exhibit 6

and ESI shall be Bates numbered consecutively, maintaining all parent/child relationships as well as the order of the parent emails and corresponding attachments.

10. Load Files and Metadata. All native format and searchable image format production must include one or more CSV or Summation load files that associate each document and its Bates number with its corresponding TXT file, and that include the following original and processed metadata fields:

For all imaged documents (ESI and scanned):

> BegDoc
> EndDoc
> ParentID
> AttachmentIDs
> BegAttach
> EndAttach

For all ESI (native and imaged):

> FileName
> Extension
> Author
> DateCreated
> TimeCreated
> DateLastMod
> TimeLastMod
> MD5Hash
> Custodian
> DupCustodians

For all email:

> MailTo
> MailFrom
> CC
> BCC
> Subject
> DateAndTimeSent
> DateAndTimeReceived
> TimeZone
> IntMsgID
> Conversation
> ConversationIndex
> ParentID

6

Exhibit 6

> AttachmentIDs
> BegAttach
> EndAttach

If production in the requested form is not reasonably available or practical, office personnel at the undersigned law firm are available to discuss compatible alternatives.

11.  Production Load Files. Two Load/Unitization files shall accompany all productions. All productions containing images must include an image load file that is in .LOG or .OPT format. For any productions containing native files, the metadata .DAT file should contain a NATIVELINK field that contains the path/link to each native file generated during production. The native files should be named with their corresponding bates numbers. All productions should include a metadata load file (.DAT file) containing all agreed upon metadata production fields and the delimiters should be standard Concordance delimiters:

| | | | |
|---|---|---|---|
| a. | Column Delimiter: | (020) | |
| b. | Field Delimiter:       þ | (254) | |
| c. | New Line Delimiter: | ® | (174) |
| d. | Multi-Entry Delimiter: | ; | (059) |

The following ASCII delimiters are also acceptable:

| | | | |
|---|---|---|---|
| e. | Column Delimiter: ^ | (094) | |
| f. | Field Delimiter:        \| | (124) | |
| g. | New Line Delimiter: | ~ | (126) |
| h. | Multi-Entry Delimiter: | ; | (059) |

The first line of the .DAT file must contain the field names to each corresponding metadata field. The name of the data load file should mirror the name of the delivery volume and the volume names should be consecutive. If foreign language/Unicode text exists, the .DAT file shall contain the appropriate encoding to enable preservation of the document's original language.

12.  Searchable Files.  (.TXT). Document level, searchable text files shall be provided for all production documents and be maintained in separate TEXT directories. All text files should be named with their corresponding bates numbers. The metadata .DAT file should contain a TEXTPATH field that contains the path/link to each corresponding text file generated during production. If foreign language/Unicode text exists, the .TXT files shall contain the appropriate encoding to enable preservation of the document's original language.

13.  Privileged Documents.  If any responsive document is withheld under any claim of privilege, provide a detailed privilege log that contains at least the following information for each document that you have withheld:

7

Exhibit 6

a.   the name of each author, writer, sender, creator, or initiator of such document;

b.   the name of each recipient, addressee, or party for whom such document was intended;

c.   the date of such document, or an estimate thereof if no date appears on the document;

d.   the general subject matter of the document; and

e.   the claimed grounds for withholding the document, including—but not limited to—the nature of any claimed privilege and grounds in support.

14.   <u>Duty to Preserve Documents.</u>  All documents and/or other data which relate to the subject matter or requests of this Subpoena Duces Tecum must be preserved. Any destruction involving such documents must cease, even if it is your normal or routine course of business to delete or destroy such documents or data and even if you believe such documents or data are privileged or otherwise need not be produced.

15.   <u>Duty to Supplement.</u>  All document requests are continuing in nature so as to require the supplementary production if you obtain further responsive documents or information. You are also required to amend your responses to the requests contained within this Subpoena Duces Tecum if you discover that the previous response was incorrect or incomplete.

## **<u>DEFINITIONS</u>**

A.   "All" shall be construed to include the collective as well as the singular and shall mean "each," "any," and "every."

B.   "Any" shall be construed to mean "any and all."

C.   "Benefits Consultant" shall mean any organization providing advisory services pertaining to the pharmacy benefit of a health insurance product or the administration of such a benefit.

D.   "Communications" shall mean and refer to any exchange of information by any means of transmissions, sending or receipt of information of any kind by or through any means including, but not limited to, verbal expression, gesture, writings, documents, language (machine, foreign, or otherwise) of any kind, computer electronics, email, SMS, MMS or other "text" messages, messages on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), shared applications from cell phones, "smartphones," netbooks and laptops, sound, radio, or video signals, telecommunication, telephone, teletype, facsimile, telegram, microfilm or by any other means. It also includes, without limitation, all originals and copies of inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings,

Exhibit 6

notices, requests, responses, demands, complaints, press, publicity or trade releases and the like that are provided by you or to you by others.

E.     "Document(s)" shall mean any writing or any other tangible thing, whether printed, recorded (in audio, video, electronically or by any other means), reproduced by any process, or written or produced by hand, including, but not limited to, letters, memoranda, notes, opinions, books, reports, studies, agreements, statements, communications (including inter-company and intra-company communications), correspondence, telegrams, email, instant messages, chat logs, SMS, MMS or other "text" messages, posted information, messages, chat logs on "social networking" sites (including, but not limited to, Facebook, Google+, MySpace and Twitter), logs, bookkeeping entries, summaries or records of personal conversations, diaries, calendars, telephone messages and logs, forecasts, photographs, images, tape recordings, models, statistical statements, graphs, laboratory and engineering reports, notebooks, charts, plans, drawings, minutes, bylaws, resolutions, records of conferences, expressions or statements of policy, lists of persons attending meetings or conferences, lists of clients or customers or suppliers, reports or summaries of interviews, opinions or reports of negotiations, brochures, pamphlets, advertisements, circulars, trade letters, press releases, drafts of any document and revisions of drafts of any document, and any other similar paper or record. The terms also include a copy of a document where the copy is not exactly the same as the original. The terms also include emails and other documents made or stored in electronic form, whether kept on computers, computer tapes, disks or drives, including Cloud storage, of any type, or other media upon which information may be recorded.

F.     "Hawaiʻi state program" includes the Hawaii Employer-Union Health Benefits Trust Fund and Hawaii's Medicaid program, known as Med-QUEST.

G.     "Identify" means:

   1.     When used in connection with a person, provide that person's name, current residential address and telephone number, job title, and current business address and telephone number.  (If current information is not available, provide last-known address and telephone number.)

   2.     When used in connection with a Document, provide the nature of the Document, its title, physical description, date, author, its current location, and identification of the current custodian.

   3.     When used in connection with an oral communication, provide the nature of that communication, the parties to it, the date, place and substance of that communication, and the identification of any document concerning it.

9

Exhibit 6

H.  "Including" is used merely to emphasize that a request for certain types of documents or information should not be construed as limiting the request in any way.

I.  "Manufacturer(s)" shall mean a manufacturer of prescription drugs.

J.  "Payer(s)" shall mean any organization that pays or insures health or medical expenses on behalf of beneficiaries or recipients including an employer (self-insured), a third-party administrator or administrative-services only health insurer (for themselves or on behalf of their clients), or a health insurance company.

K.  "Payment(s)" shall mean any transfer of money, goods, or services You received directly or indirectly from any Manufacturer. It includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above.

L.  "Pharmacy benefit manager(s)" or "PBM(s)" shall mean any organization that administers prescription drug benefits on behalf of a Payer.

M.  "Relating to" shall mean directly or indirectly mentioning or describing, concerning, referring to, regarding, evidencing, setting forth, identifying, memorializing, created in connection with or as a result of, commenting on, embodying, evaluating, analyzing, tracking, reflecting or constituting, in whole or in part, a stated subject matter.

N.  "You" or "Your" refers to the person(s) or business entity(s) to whom this Subpoena Duces Tecum is directed as reflected on the first page. With respect to corporations or other business entities, these terms also shall be deemed to include all owners, officers, agents and employees thereof, and any predecessor, successor, parent, subsidiary, division, d/b/a and affiliated companies or other entities.

## RELEVANT TIME PERIOD

The relevant time period, unless otherwise indicated in a specific request, is from January 1, 2010 to the present. The time limits should not be construed as date limits; for example, if a policy or document in effect during the relevant time period was created before the relevant time period, then documents dating back to the starting date of the policy must be produced.

## REQUESTS FOR DOCUMENTS AND INFORMATION

These requests are limited to documents and information relating to Hawaiʻi, including, but not limited to, documents and information that may be national or regional in scope that apply to Hawaiʻi.

10

Exhibit 6

1. Produce all Documents sufficient to Identify the ten Manufacturers from which You have directly or indirectly received the largest Payments (as determined by the total dollar amount of Payments) per year from 2010-2021. Per the definitions listed above, the term Payments includes, but is not limited to, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above. Include the following in Your response:

   a. The name of the Manufacturer making Payments; and
   b. The total amount per year of the Payments.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

2. Produce all Documents sufficient to Identify the Payments made by each Manufacturer identified in response to Request 1 per year from 2010-2021. Aggregate payments of the same type per year. For example, all administrative fees for 2010 can be combined as one Payment. Include the following for each Payment in Your response:

   a. A description of the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);
   b. The amount of each Payment;
   c. A description of any service You performed relating to the Payment;
   d. A description of any product or information You sold relating to the Payment (*e.g.*, name of medications and volume purchased);
   e. The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;
   f. The amount of the Payment You shared with a Payer or any other entity or individual; and
   g. The amount of the Payment You retained.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

3. For all Hawai'i state programs, produce documents sufficient to Identify the amount of Payments returned to the State or Medicaid managed care organization and the amount of Payments retained by You and a description of the Payments (*e.g.*, rebate, administrative fees).

11

Exhibit 6

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

4. Produce all Documents reflecting or related to the negotiation of the Payments identified in Your response to Request 2 and 3.

5. Produce all Communications with Manufacturers related to formulary coverage for any prescription drug for which You received Payments.

6. Produce all financial and medical analyses related to the inclusion or exclusion of prescription drugs for which You received Payments.

7. Produce all Documents sufficient to Identify the gross amount paid for prescription drugs manufactured by the Manufacturers identified in response to Request 1 per year from 2010-2021 for prescription drugs.

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

8. Produce all Documents sufficient to Identify all direct or indirect Payments (*e.g.*, product based, volume based, or other Payments) You made to any Benefits Consultant working on behalf of a Payer, including:

   a. The name of the Benefits Consultant;
   b. The name of the Payer for whom the Benefits Consultant worked;
   c. The date of the Payment;
   d. The amount of the Payment; and
   e. A description of the Payment (*e.g.*, product based, volume based, or other Payments).

   *In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

9. Produce all Documents reflecting or related to direct or indirect Payments for Humira and every insulin product (including branded and authorized generics).

10. Produce all Documents sufficient to Identify all direct or indirect Payments You received relating to Humira and every insulin product (including branded and authorized generics). Include in Your response, for each Payment:

    a. The date of the Payment;
    b. The time period which the Payment relates to;
    c. The name of the Hawai'i state program relating to the claim (if applicable);
    d. The name of the Manufacturer making the Payment;
    e. The amount of the Payment;

12

Exhibit 6

f.      A description the Payment (*e.g.*, statutory rebate payments, supplemental rebate payments, other rebate payments, research and development, administrative fees, distribution fees, service fees (rebate or non-rebate related), procurement fees, data access fees, chargeback fees, promotional payments, cash product discounts, sales volume related payments of any type not described above, and non-sales volume related payments of any type not described above);

g.      The name of the prescription drug relating to the Payment;

h.      The list price for the prescription drug relating to the Payment;

i.      The gross amount You paid for the prescription drug;

j.      The number of units of the prescription drug You purchased relating to the Payment;

k.      A description of any service You performed relating to the Payment;

l.      The name of the Payer or any other entity or individual with whom You shared any portion of the Payment;

m.      The amount of the Payment You shared with a Payer or any other entity or individual; and

n.      The amount of the Payment You retained.

o.      Beneficiary cost sharing requirement (fixed copayment, coinsurance)

p.      Amount paid by the beneficiary

q.      Total Amount paid to the pharmacy (including dispensing fee)

r.      Post-purchase price adjustment of the prescription drug sale price

s.      Other price agreements or guarantees related to the prescription drug.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

11.      Produce all price lists, including any maximum allowable cost lists, applicable to the prescription drugs identified in Your response to Request 10 that relate to any Hawai'i state program (*e.g.*, EUTF, Medicaid).

12.      Produce all agreements and Documents reflecting or related to agreements with Manufacturers or any entity or individual affiliated with any Manufacturer related to Payments.

13.      Produce all Documents sufficient to Identify all departments and individuals involved in negotiations or agreement with Manufactures related to the purchase, coverage, promotion or sale of prescription drugs, including, but not limited to, the following:

a.      the name of each department or individual;

b.      the date each department was formed and (if applicable) dissolved;

c.      the title(s) each individual has or had;

d.      the name of the department(s) for which each individual works or worked

e.      the relevant duties and responsibilities each individual has or had;

f.      the dates of employment for each individual; and

Exhibit 6

g. the last known contact information for each individual who no longer works for You.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

14. Produce all Documents reflecting or related to Communications relating to negotiations or agreements relating to Payments, including the target level of Payments or the impact of Payment levels on your Profits, or the value of any Payments to Your revenue or profits.

15. Produce all Documents reflecting or related to Your projections or analyses relating to: (a) the value of Payments; (b) whether and how Payments are passed on to consumers (c) how Payments impact Your profitability; (d) how Payments impact Your bargaining power in negotiations with Manufacturers and/or Payers; (e) the impact or practice of classifying Payments in certain ways (*e.g.*, classifying a Payment as a rebate rather than a fee or vice-versa); and/or (f) the relationship between Payments and list prices.

16. Produce all Documents reflecting or related to the results of any audit (including both internal and third-party audits) relating to Your practices involving Payments, including, but not limited to, Your classification of any fees or rebates.

17. Produce all Documents You relied upon when testifying before Congress about the pricing of prescription drugs.

18. Produce all Documents relating to legislation or proposed legislation that could impact the Payments You receive, including, but not limited to, the proposed elimination of the safe harbor provision in 42 CFR 1001.952(h).

19. Produce all Documents relating to any research or study You commissioned that examines Payments made to pharmacy benefit managers from Manufacturers.

20. Produce all Documents reflecting or relating to any complaints or concerns You received relating to Your practices involving Payments, including, but not limited to, any complaints You received from Manufacturers, Payers, whistleblowers, and consumers.

21. Produce all Documents sufficient to Identify all lawsuits filed against You relating to Your practices involving Payments, including, but not limited to, any lawsuits that allege You overcharged Payers and/or consumers for prescription drugs and/or that there is a relationship between the Payments You receive and the increase in list price of prescription drugs.

*In lieu of providing actual documents, You may provide a narrative response containing the requested information.*

14

Exhibit 6

22.     Produce all Documents produced in any government investigation or any litigation relating to Your practices involving Payments.

23.     Produce all settlement agreements or judgments relating to Your practices involving Payments.

15

Exhibit 6

Exhibit 7

## <u>CONFIDENTIALITY AGREEMENT</u>

IT IS HEREBY AGREED BY AND BETWEEN the State of Hawaiʻi Department of the Attorney General ("State") and OptumRx, Inc. ("OptumRx" or "the Company"), through their respective counsel, that:

1.      This Confidentiality Agreement is being entered into in connection with an investigation being conducted by the State and the State's outside counsel into certain business practices related to the provision of pharmacy benefits management services ("Investigation"), and the production of any documents or information by OptumRx in response to a subpoena issued by the State dated October 15, 2021 in connection with the Investigation (the "Subpoena").  Neither OptumRx nor the State waives any objections it has to the Subpoena or the response to the Subpoena by entering into this Confidentiality Agreement.  This Agreement shall be binding upon the State and OptumRx ("Parties," referred to singularly as a "Party"), undersigned outside counsel for the State and OptumRx's outside counsel, and all persons and entities signing a copy of the Addendum Regarding Undertaking of Confidentiality attached at Exhibit A ("Addendum").

2.      "Confidential Information" means any documentary and/or tangible information of any type, kind or character that contains (a) information of a personal nature where the public disclosure thereof would constitute a clearly unwarranted invasion of personal privacy; or (b) trade secret or commercial or financial information, to the extent disclosure would result in substantial harm to the competitive position of the Company.  To designate a document or information as "Confidential Information," OptumRx shall stamp or place the word "Confidential" on the document or item of information produced to the State.  All copies, whether digital or hard copy, of any "Confidential Information" produced or made available for inspection and copying shall be subject to the terms of this Agreement.  Any interview, deposition or testimony of OptumRx in connection with the Investigation shall presumptively be treated as Confidential Information and subject to this Agreement for a period of 15 days after a transcript is received by counsel for the Parties.  At or before the end of such 15-day period, by written notification to undersigned counsel,

Exhibit 7

OptumRx may designate any portion(s) of the interview, deposition, or testimony as "Confidential Information." If OptumRx fails to designate any portion of the interview, deposition, or testimony as "Confidential Information," after the expiration of the 15-day period, that portion(s) shall be treated as non-confidential. In designating documents or information as "Confidential Information," OptumRx will make such designation only as to those documents and information that it in good faith believes contain Confidential Information. The State, the State's outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement, except as required by law or court order. The State's outside counsel further agrees not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State.

3. This Agreement shall not preclude any Party from bringing before a court of competent jurisdiction, at any time, the question of whether any particular information is properly designated as "Confidential Information." In its request for relief from the Court, the Party disputing the designation of any information shall identify the information that it believes is not properly designated. The Party making the designation has the burden to defend the designation. Prior to bringing any motion, the Parties shall meet and confer in good faith to attempt to resolve the dispute. If the dispute cannot be resolved, the Parties shall treat the information consistent with its designation until a ruling by the court. In the event litigation stems from this Investigation, the Parties will meet and confer at the appropriate time regarding a protective order that will supersede this Agreement. In the event the Parties cannot agree on a protective order, it shall be OptumRx's duty to seek a protective order.

4. In addition to any applicable protections provided to such materials under Hawaiʻi Uniform Information Practices Act, HRS §§ 92F-13 and 14 or other applicable law, the State and undersigned outside counsel for the State may disclose Confidential Information only as follows:

2

Exhibit 7

(a)     to employees, interns, and staff of the State who are working on the Investigation;

(b)     to agents, consultants, or experts of the State, who are working on the Investigation and are bound by this agreement and who agree to be bound by the terms of this agreement by signing the Addendum;

(c)     other law enforcement agencies when an employee of the Hawai'i Department of the Attorney General determines it is appropriate to disclose Confidential Information to those agencies provided they agree in writing to be bound and comply with this Agreement;

(d)     to any witness in the Investigation (not to include disclosures to expert witnesses of the State, which are covered under Section 4(b)), during an interview by the State or during transcribed or otherwise recorded proceedings conducted by the State, as long as the State reasonably believes that disclosure is necessary to further the Investigation;

(e)     to any person identified as having received, or who is otherwise known to have received, the document or information;

(f)     if the Company first gives written consent to such disclosure;

(g)     any person who, at the time of the disclosures, is either employed by OptumRx or retained by OptumRx in connection with this Investigation;

(h)     if the information was obtained independently of the Company from a source that (1) does not request confidential treatment for the information and (2) the State believes in good-faith does not have a duty of confidentiality with respect to the information, whether arising from

3

Exhibit 7

contract or any other legal source;

(i)    Motley Rice LLC attorneys (other than the State's undersigned outside counsel), paralegals, contractors, staff, or experts working on behalf of the State in connection with the Investigation who agree to be bound by the terms of this Agreement by signing the Addendum.

5.    With respect to the disclosures authorized by paragraph 4(d) or 4(e), the State shall not permit the person or the person's counsel to retain a copy of the Confidential Information unless the State reasonably believes that retention is necessary to further the Investigation and the person has signed the Addendum.

6.    With respect to the disclosures authorized by paragraph 4(i), the State and the State's outside counsel shall not share, disclose, or discuss Confidential Information with any Motley Rice LLC attorney, paralegal, contractor, or staff who is not a member of the firm's Public Client practice group, and shall limit access to Confidential Information to members of that practice group.  The State and the State's outside counsel are agreeing to this term solely for purposes of the investigation stage and are not consenting to or agreeing to waive any right to object to this or any similar term in any stipulated protective order in connection with litigation.

7.    Any document or information that may contain Confidential Information that has been inadvertently produced without being designated as Confidential Information shall not be a waiver, in whole or in part, of a claim of confidentiality as to any such document or information. OptumRx may designate the inadvertently produced document or information as "Confidential Information" by written notice to the State within a reasonable time following discovery of the inadvertent production.  Unless the State challenges the designation pursuant to paragraph 3, the State shall confirm the designation of the Confidential Information within ten (10) days of receipt of notice from OptumRx, and shall make reasonable efforts to retrieve such improperly designated documents from persons not entitled to receive them.

4

Exhibit 7

8.     The State and/or the State's outside counsel shall not attach documents or information designated as "Confidential Information" to any filing with a court or administrative tribunal ("State filing") unless the State and/or the State's outside counsel complies with one of the following provisions:

(a)     resolves any dispute with OptumRx regarding designation of such documents or information as "Confidential Information;"

(b)     files the documents or information designated "Confidential Information" with a court or administrative tribunal conditionally under seal; following the State filing, the confidentiality or non-confidentiality of documents or information will be determined by the terms of a protective order entered in the case either by stipulation or order, or by the absence of any such order (i.e. if OptumRx takes no action to seek a protective order within ten (10) days of the State filing, the documents or information attached to the State filing will be deemed non-confidential); or

(c)     notifies OptumRx at least ten (10) days in advance that the State or the State's outside counsel intends to attach materials designated "Confidential Information" in the State filing, provided that the State or the State's outside counsel shall not attach such documents or information designated "Confidential Information" until either:

i.     the court or administrative tribunal rules on OptumRx's request for a protective order or in camera treatment in favor of disclosure of the documents or information designated Confidential Information; or

5

Exhibit 7

      ii.      OptumRx has not sought such order within the ten (10) day period of time which the State or the State's outside counsel provided to OptumRx for it to seek such order.

9.      In the event that the State receives a written request from a person or entity for Confidential Information under the Hawaiʻi Uniform Information Practices Act, HRS §§ 92F-1 *et seq.*, either during or after the pendency of the Investigation and the State determines in good faith that disclosure of Confidential Information is required and that no exemption reasonably applies, the State will provide ten (10) business days advance notice before any disclosure in response to such a request so that the Company is afforded an opportunity to obtain a court order prohibiting or limiting such disclosure and/or requiring the recipient(s) of such Confidential Information to take steps to maintain the confidentiality thereof.  Any notice to OptumRx under this paragraph or paragraph 10 shall be made to: John Kokkinen, Senior Associate General Counsel – Optum Litigation, via electronic mail at john.kokkinen@optum.com and to Allison Caplis, Hogan Lovells, via electronic mail at allison.caplis@hoganlovells.com.

10.      If any person or entity possessing designated Confidential Information is subpoenaed in another civil action or civil proceeding or served with a document demand or other civil legal process that requests production of designated Confidential Information ("civil process"), and the State determines in good faith that the Confidential Information must be disclosed, the State  shall, to the extent permitted by law, court rule, and court order, inform OptumRx within 15 days of receiving notice of the civil process.

11.      If documents or information subject to a claim of attorney-client privilege or work product immunity or any other privilege or immunity are inadvertently produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any claim of privilege or work-product immunity for such documents or information as provided under applicable law, including Federal Rule of Evidence 502 or any Hawaiʻi counterpart or similar rule.

6

Exhibit 7

If OptumRx has inadvertently produced documents or information subject to a claim of immunity or privilege, the Parties shall follow the so-called "clawback" provisions of Federal Rule of Civil Procedure 26(b)(5)(B) or any other Hawai'i counterpart or similar rule.

12.    At the conclusion of the investigation, or the final conclusion of all litigation if any is initiated, all documents produced by the Company, including all Confidential Information, shall be retained by the State pursuant to Hawai'i public records laws and policies, with the limitations of use of Confidential Information described in Paragraph 2 remaining in full effect.   All documents in the possession of Motley Rice that OptumRx produced and designated as "Confidential" during the course of this Investigation shall be returned to the State or OptumRx, or destroyed within 30 days, and Motley Rice shall so certify in writing.

13.    Nothing contained in this Agreement shall alter or limit the obligations of the State under Hawai'i law, including the Hawai'i Uniform Information Practices Act, HRS §§ 92F-1 *et seq.*

14.    This Agreement shall apply to all documents and information produced by the Company to the State pursuant to this Investigation, including any amendments to the Subpoena.

Exhibit 7

Dated: 05/18/2022

**OPTUM RX**

By: _____
      Attorneys for the Company


**STATE OF HAWAI'I**
**DEPARTMENT OF THE ATTORNEY GENERAL**


Counsel for the State of Hawai'i Department of the Attorney General

By:


_____

Linda Singer
Motley Rice LLC



_____

Paige Boggs
Motley Rice LLC

8

Exhibit 7

Dated:

**OPTUM RX**

By: _____

      Attorneys for the Company

**STATE OF HAWAIʻI**
**DEPARTMENT OF THE ATTORNEY GENERAL**

By: _____

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813
mana.moriarty@hawaii.gov

Counsel for the State of Hawaiʻi Department of the Attorney General

By: _____

Linda Singer
Motley Rice LLC

_____

Paige Boggs
Motley Rice LLC

9

Exhibit 7

**ADDENDUM REGARDING**

**UNDERTAKING OF CONFIDENTIALITY**


By signing this acknowledgement, I certify that I have read the Confidentiality Agreement to which this acknowledgement is attached ("Agreement") in its entirety, I fully understand the obligations under the Agreement, and I hereby agree that _____ [insert name of person or entity] will be bound by its terms to the extent permitted by law.


DATE:_____


NAME: _____


SIGNATURE: _____

Exhibit 7

Exhibit 8



Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, MD 21202
T  +1 410 659 2700
F  +1 410 659 2701
www.hoganlovells.com

June 8, 2022

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813

Linda Singer
Paige Boggs
Motley Rice LLC
401 9ᵗʰ St. NW, Suite 1001
Washington, DC 20004

Re:      **Subpoena to OptumRx, Inc. Dated October 15, 2021**

Dear Mana, Linda and Paige:

With this letter and accompanying document, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its first production in response to the Subpoena dated October, 15, 2021, as clarified by our various telephone calls (the "Subpoena").  Per our discussion with Paige on June 3, 2022, Optum is producing herein the documents that Optum previously produced to the Minnesota Attorney General's Office pursuant to a Civil Investigative Demand served upon OptumRx, Inc. in 2017.  These documents are branded with the same Bates-numbers as were provided to the Minnesota Attorney General's Office: Optum-MNAG-0000000001 - Optum-MNAG-0000068310.

*      *      *

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and are being produced in reliance on Paige's assertions during our June 3, 2022 discussion, that the State of Hawaiʻi will treat the documents previously produced to Minnesota as confidential pursuant to the State of Hawaiʻi's May 18, 2022 confidentiality agreement with Optum even if the confidentiality designations on the production images are worded slightly differently (e.g., "confidential" vs. "highly confidential").

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum.  Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently,

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia.  "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in:  Alicante  Amsterdam  Baltimore  Beijing  Birmingham  Boston  Brussels  Colorado Springs  Denver  Dubai  Dusseldorf  Frankfurt  Hamburg  Hanoi  Ho Chi Minh City  Hong Kong  Houston  Johannesburg  London  Los Angeles  Luxembourg  Madrid  Mexico City  Miami  Milan  Minneapolis  Monterrey  Munich  New York  Northern Virginia  Paris  Perth  Philadelphia  Rome  San Francisco  São Paulo  Shanghai  Silicon Valley  Singapore  Sydney  Tokyo  Warsaw  Washington, D.C.  Associated Offices:  Budapest  Jakarta  Riyadh  Shanghai FTZ  Ulaanbaatar.  Business Service Centers:  Johannesburg  Louisville.  Legal Services Center:  Berlin.  For more information see www.hoganlovells.com

Exhibit 8

- 2 -                                                        June 8, 2022

Optum does not agree to any expansion of the scope of your request. Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.

Sincerely,

*Allison J Caplis*

Allison J. Caplis
Counsel
allison.caplis@hoganlovells.com
D 410-659-2784

Exhibit 8

Exhibit 9



Hogan Lovells US LLP
Harbor East
100 International Drive
Suite 2000
Baltimore, MD 21202
T  +1 410 659 2700
F  +1 410 659 2701
www.hoganlovells.com

September 1, 2022

**BY ELECTRONIC MAIL AND SECURE FILE TRANSFER**

Mana Moriarty
Department of the Attorney General
State of Hawaiʻi
425 Queen St.
Honolulu, HI 96813

Linda Singer
Paige Boggs
Motley Rice LLC
401 9th St. NW, Suite 1001
Washington, DC 20004

Re:     **Subpoena to OptumRx, Inc. Dated October 15, 2021**

Dear Mana, Linda and Paige:

With this letter and accompanying documents, OptumRx, Inc. (hereinafter "Optum," or "the Company") makes its second production in response to the Subpoena dated October 15, 2021, as clarified by our various telephone calls (the "Subpoena"). For ease of reference, this production has been labeled OPTUM1021_002 and has been Bates-numbered OPTUM1021_0000001-0000002.

This production includes a spreadsheet of the rebates, administrative fees, and price protection fees submitted by Optum to manufacturers of insulin products, and the amounts collected from those manufacturers, with respect to insulin prescriptions filled at pharmacies in the State of Hawaiʻi for which claims were submitted from Q1 2016 - Q3 2021. This production also includes a spreadsheet of transaction level data with respect to insulin prescriptions filled at pharmacies in the State of Hawaiʻi for which claims were submitted from Q1 2016 - Q3 2021.[1] Per our discussions, these spreadsheets do not include PHI; as such the transactions have been assigned scrambled claim numbers for ease of linking the two spreadsheets.[2]

\*          \*          \*

---

[1]     Per your request, we included the following fields in addition to Total Member Paid: (1) Flat Copay (CLT_FLAT_COPAY_AMT); (2) Co-insurance (CO_INSURANCE_AMT); and (3) Deductible (CLT_ATTRIB_TO_DED_AMT). We note, however, that those more granular fields may not add up to the Total Member Paid in every instance.

[2]     As discussed, we are producing two separate spreadsheets as the requested data is maintained in different systems.

Hogan Lovells US LLP is a limited liability partnership registered in the District of Columbia. "Hogan Lovells" is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP, with offices in: Alicante Amsterdam Baltimore Beijing Birmingham Boston Brussels Colorado Springs Denver Dubai Dusseldorf Frankfurt Hamburg Hanoi Ho Chi Minh City Hong Kong Houston Johannesburg London Los Angeles Luxembourg Madrid Mexico City Miami Milan Minneapolis Monterrey Munich New York Northern Virginia Paris Perth Philadelphia Rome San Francisco São Paulo Shanghai Silicon Valley Singapore Sydney Tokyo Warsaw Washington, D.C. Associated Offices: Budapest Jakarta Riyadh Shanghai FTZ Ulaanbaatar. Business Service Centers: Johannesburg Louisville. Legal Services Center: Berlin. For more information see www.hoganlovells.com

Exhibit 9

- 2 -                                                       September 1, 2022

The enclosed documents contain or constitute confidential business information, records, and/or trade secrets of Optum and we have branded them "CONFIDENTIAL" and are producing them pursuant to our May 18, 2022 Confidentiality Agreement with the State of Hawai'i Department of the Attorney General.

The submission of the enclosed materials does not waive, nor is it intended to waive, any rights, privileges, or immunities of Optum with respect to this matter, including any applicable attorney-client privilege, protection provided under the work-product doctrine, or other privilege or immunity that may exist.  In the event of any inadvertent production of privileged materials, Optum requests that the government refrain from reviewing such materials and return the same promptly to Optum.  Moreover, to the extent that non-responsive documents, pages, or information have been produced inadvertently, Optum does not agree to any expansion of the scope of your request.  Optum expressly reserves any applicable privileges and immunities to which it is entitled under the law.

Please call me if you have any questions about any aspect of this letter or the enclosed documents.

Sincerely,

*Allison J Caplis*

Allison J. Caplis
Counsel
allison.caplis@hoganlovells.com
D 410-659-2784

Exhibit 9