**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>**THIS DOCUMENT RELATES TO**:<br><br>*City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 (Track 12)<br><br>*Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13)<br><br>*City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14)<br><br>*County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | **MDL NO. 2804**<br><br>**Case No. 17-MD-2804**<br><br>**Judge Dan Aaron Polster** |

**REPLY BRIEF SUPPORTING OPTUMRX, INC.'S**
**MOTION TO DISQUALIFY MOTLEY RICE**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

    I.    MOTLEY RICE COULD USE THE CONFIDENTIAL INFORMATION THAT IT ACQUIRED THROUGH ITS GOVERNMENT INVESTIGATIONS TO OPTUMRX'S MATERIAL DISADVANTAGE IN OPIOID LITIGATION. ................................................................................. 3

        A.    Motley Rice could use the information that it acquired through its government investigations to OptumRx's material disadvantage in opioid litigation. ................................................................................................. 4

        B.    DR-22 is irrelevant. ......................................................................................... 7

        C.    Motley Rice's contention that investigation materials reproduced in civil discovery cease to be "confidential government information" is wrong and would render the Rule a dead letter. ....................................... 8

    II.    MOTLEY RICE ACQUIRED CONFIDENTIAL GOVERNMENT INFORMATION AS A "PUBLIC OFFICER" THAT IT NOW SEEKS TO USE TO ADVANCE THE INTERESTS OF ITS "PRIVATE CLIENTS." ......... 12

CONCLUSION ....................................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Courier-Journal v. Marshall*,
  828 F.2d 361 (6th Cir. 1987) ................................................................................................9

*Davis v. Southern Bell Telephone & Telegraph Co.*,
  149 F.R.D. 666 (S.D. Fla. 1993) ..........................................................................................11

*Doe 1 v. Francis*,
  2006 U.S. Dist. LEXIS 105036 (N.D. Fla. May 8, 2006) ....................................................11

*Gen. Motors Corp. v. New York*,
  501 F.2d 639 (2d Cir. 1974) .................................................................................................10

*Hilo Metals Co. v. Learner Co.*,
  258 F. Supp. 23 (D. Haw. 1966) ..........................................................................................12

*Kronberg v. LaRouche*,
  2010 U.S. Dist. LEXIS 35097 (E.D. Va. Apr. 9, 2010) .......................................................10

*Prugh v. Hilltrux Tank Lines, Inc.*,
  2023 U.S. Dist. LEXIS 25164 (N.D. Ohio Feb. 14, 2023) ....................................................4

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984) .................................................................................................................9

*United States v. Villaspring Health Care Ctr., Inc.*,
  2011 U.S. Dist. LEXIS 129933 (E.D. Ky. Nov. 7, 2011) ....................................................10

**RULES**

Ohio R. Prof'l Conduct 1.11(c) ........................................................................................... *passim*

Ohio R. Prof'l Conduct 1.11(c), cmt. 4 .......................................................................................12

**STATUTES**

28 U.S.C. § 1746 ............................................................................................................................4

D.C. Code § 2-534(a)(1) ................................................................................................................9

Haw. Rev. Stat. § 480-18(j) ...........................................................................................................9

Ill. Comp. Stat. 140/7(g) ................................................................................................................9

**OTHER AUTHORITIES**

O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*,
  Bloomberg Law (Jan. 23, 2024), http://tinyurl.com/4rhtcchx ..................................................1

Restatement (Third) of the Law Governing Lawyers § 133, cmt. d.............................................11

Wall Street Journal Editorial Board, *Double Dipping in Opioid Lawsuits*, Wall. St. J.
  (Jan. 1, 2024), http://tinyurl.com/5n6ts6ds ................................................................................1

## INTRODUCTION

Motley Rice has a problem. Rule 1.11(c) prohibits lawyers who use government power to acquire confidential information from representing another client in a matter in which the lawyers could use that confidential information to their opponent's material disadvantage. Yet Motley Rice has convinced state and local governments to appoint its lawyers as deputy attorneys general to lead investigations into companies only to turn around and represent new clients in lawsuits in which Motley Rice can use the fruits of those investigations against the same companies. That practice violates the ethics rules.[1]

Motley Rice has remarkably little to say in its defense. It doesn't deny that its lawyers served as deputized attorneys general for Hawaii, D.C., and Chicago. It doesn't deny that it used government subpoena power to demand confidential information from OptumRx—including thousands of pages of documents describing OptumRx's negotiations with drug manufacturers, formulary development, clinical programs, and internal business operations. It doesn't deny that it signed agreements acknowledging that the produced information was confidential or that the subpoena statutes prohibited it from disclosing the information to the public. It doesn't deny that its investigations gave it strategic insight into OptumRx's operations. It doesn't offer its own expert or rebut Professor Muchman and Ms. Montgomery's expert opinion that Motley Rice is violating Rule 1.11(c)—a violation that they opine is clear-cut. *See* Suppl. Expert Rpt. at 10 ("We do not believe that this is a close call.").

Instead, Motley Rice argues that it should not be disqualified because it will not use the subpoenaed information to OptumRx's "material disadvantage" in this MDL. According to the firm, the subpoenaed documents and information either (i) don't concern opioids and are

---

[1] OptumRx is not the only one troubled by Motley Rice's conduct. *See* Wall Street Journal Editorial Board, *Double Dipping in Opioid Lawsuits*, Wall. St. J. (Jan. 1, 2024), http://tinyurl.com/5n6ts6ds; O.H. Skinner, *States Hiring Outside Lawyers Need to Ask Who Else They Represent*, Bloomberg Law (Jan. 23, 2024), http://tinyurl.com/4rhtcchx.

immaterial or (ii) concern opioids and must be produced anyway under Discovery Ruling No. 22 (DR-22). Motley Rice is wrong on both counts. As described in Matthew Hooker's supplemental declaration, the subpoenaed information *does* include thousands of pages of material about opioids and opioid manufacturers. But as important, it also includes a stockpile of documents that are not specific to any prescription drug but nonetheless provide a wide-ranging view into OptumRx's overall business strategies, including about rebate negotiations, formulary development, clinical programs, and client relationships. These opioid litigations focus on the very same aspects of OptumRx's business, so Motley Rice undoubtedly could use that information to OptumRx's material disadvantage in the litigations. When the shoe was on the other foot and the PEC successfully moved this Court to disqualify an opposing defense lawyer, the PEC argued that "[i]t is *undoubtedly* a material disadvantage for Plaintiffs to be deposed by someone with an intimate and detailed knowledge of the inner workings of many of the matters directly at issue in this case." Dkt. 1305-1 at 20. Yet Motley Rice now asks this Court to reject the same argument because it threatens the firm's involvement in opioid litigation against OptumRx.

And DR-22 is irrelevant. None of the subpoenaed documents is subject to DR-22 because they were not produced in opioid investigations. And even if they were, Rule 1.11(c) would still require disqualification. Confidential information remains confidential even if produced under DR-22. Indeed, by invoking DR-22, an order that requires defendants in certain circumstances to turn over documents and information that MDL plaintiffs can then use against those defendants, Motley Rice confirms that it is violating Rule 1.11(c).

As a fallback, Motley Rice argues that the subpoenaed information will cease to be "confidential government information" if it later obtains the same material in the MDL through traditional discovery. But obtaining information through civil discovery does not make the information publicly available; parties often produce confidential discovery in civil litigation only

2

once a court has entered a protective order shielding the information from the public, as this Court has done. *See* Dkt. 441. Beyond that, the Rule would be drained of all meaning if former government lawyers could erase their ethical stain simply by serving discovery requests targeted at the same documents and information that they first acquired by exercising government power.

\* \* \*

Motley Rice now calls OptumRx a "recidivist corporate wrongdoer" (Opp. 1), but it was not long ago that the firm sought to represent OptumRx's parent company in this MDL. By trying to represent parties suing OptumRx after the firm previously investigated OptumRx about the same aspects of its business, Motley Rice looks past its own ethical obligations. But there was a time when Motley Rice saw the ethical problem clearly. Although it now argues that defendants do not "get to choose which lawyers can sue them" (*id.*), it once recognized that the Rules of Professional Conduct do in fact limit which lawyers can accept a representation, telling this Court that a client's right to a zealous advocate "doesn't mean that every client is entitled to zealous advocacy by every lawyer no matter what the circumstances are." Dkt. 1354 at 116. The bellwether plaintiffs are entitled to an advocate and today have dozens of lawyers from multiple firms representing them. But under Rule 1.11(c), Motley Rice cannot remain among that army of lawyers.

## ARGUMENT

I. **MOTLEY RICE COULD USE THE CONFIDENTIAL INFORMATION THAT IT ACQUIRED THROUGH ITS GOVERNMENT INVESTIGATIONS TO OPTUMRX'S MATERIAL DISADVANTAGE IN OPIOID LITIGATION.**

Motley Rice argues that the confidential information its lawyers acquired as government investigators is not disqualifying because the documents are either (i) unrelated to opioids and thus immaterial or (ii) related to opioids and thus subject to DR-22. Both arguments are wrong. The subpoenaed information includes thousands of documents that describe OptumRx's work relating to opioids and opioid manufacturers. It also includes a wide range of non-product-specific

3

documents that describe how OptumRx's business operates. And contrary to Motley Rice's assertion, those documents are not subject to DR-22 because they were not produced in an "opioid-related" investigation. The bottom line: Motley Rice's government work gave the firm access to confidential information about OptumRx unavailable to any other party in this litigation.

Alternatively, Motley Rice argues that the ethical concerns would vanish if it obtained the same information through traditional discovery. But that sort of workaround is exactly what Rule 1.11(c) seeks to prevent. The argument flies in the face of Rule 1.11(c)'s text, dishonors the Rule's policy concerns, and, if accepted, would render the Rule meaningless.

### A. Motley Rice could use the information that it acquired through its government investigations to OptumRx's material disadvantage in opioid litigation.

Motley Rice contends that it shouldn't be disqualified because the subpoenaed documents have "little to no relevance" to opioid litigation. Opp. 7. Citing Paige Boggs's *un*sworn attorney declaration,[2] Motley Rice claims that "[a]lthough the Hawai'i subpoena was not limited to any specific prescription drug, Optum produced in response only documents and information related to insulin drugs." *Id.* at 3 (citing Boggs Decl. ¶ 15). That is false.

In Hawaii and D.C., OptumRx produced to Motley Rice more than 10,000 unredacted documents (approximately 68,000 pages) previously produced to the Minnesota Attorney General

---

[2] Ms. Boggs did not make her declaration "under penalty of perjury," so it is not admissible evidence that this Court can consider in deciding OptumRx's motion. *See Prugh v. Hilltrux Tank Lines, Inc.*, 2023 U.S. Dist. LEXIS 25164, at *4 n.2 (N.D. Ohio Feb. 14, 2023); 28 U.S.C. § 1746. Regardless, multiple statements in her unsworn declaration are false at worst or misleading at best. For instance, Ms. Boggs claims that she no longer has physical access to the documents that OptumRx produced in the D.C. investigation (Boggs Decl. ¶ 10), but she is careful to avoid mentioning that she and the rest of the firm continue to have physical access to those same documents through OptumRx's productions in the Hawaii investigation. And her statement says nothing about the *information* that she and others learned from the documents. Ms. Boggs does not purport to—and could never—testify about what others at Motley Rice learned through the investigations, never mind about how what those other lawyers learned shaped their thinking and strategy about OptumRx.

4

under a 2017 civil investigative demand. That production was not restricted to "only documents and information related to insulin drugs," as Motley Rice and Ms. Boggs contend. An index search of the production shows that 3,835 documents (or more than 35% of the total production) include information about OxyContin, Opana, Nucynta, Duragesic, Subsys, Actiq, or Fentora—the branded opioid products mentioned in Motley Rice's proposed amended complaints. Hooker Suppl. Decl. ¶ 13(c); *see also* Dkt. 5296-2 ¶ 57; Dkt. 5296-3 ¶ 57; Dkt. 5296-4 ¶ 57; Dkt. 5296-5 ¶ 57. Approximately 2,400 documents (22% of the production) include information about generic opiates (hydrocodone, oxycodone, fentanyl, hydromorphone, morphine, methadone, tapentadol, or oxymorphone). Hooker Suppl. Decl. ¶ 13(d). More than 2,000 documents include information about the opioid manufacturers named in the bellwether proposed amended complaints, including at least 1,375 documents that mention Purdue. *Id.* ¶¶ 13(b), (e).

Citing again to the *un*sworn Boggs declaration, Motley Rice asserts that the "investigation documents . . . mostly address billing transactions for other types of drugs in other jurisdictions." Opp. 7 (citing Boggs Decl. ¶¶ 6–7). That too is false. As Ms. Boggs acknowledges, the subpoenas sought "documents and information that may be national . . . in scope." Boggs Decl. ¶¶ 6, 9, 14. In fact, the subpoenaed documents included national-level documents including:

- slide decks and spreadsheets for OptumRx's Business Implementation Committee's (BIC) monthly meetings describing the BIC's analysis for numerous drugs, including opioids (Hooker Suppl. Decl. ¶¶ 15(b), (c));

- slide decks from OptumRx's Industry Relations (IR) team containing hundreds of slides analyzing formulary and rebate strategy (including projected financial scenarios) for numerous drugs, including opioids (*id.* ¶ 15(d));

- manufacturer intelligence sheets for numerous manufacturers, including opioid manufacturers Purdue, Johnson & Johnson, and Teva (*id.* ¶ 15(e)); and

- rebate agreements with drug manufacturers, including non-insulin manufacturers like Bayer, Biogen, Boehringer Ingelheim, Bristol-Myers Squibb, AstraZeneca, Johnson & Johnson, Merck, Novartis, and Teva (*id.* ¶ 15(a)).

5

Motley Rice is also wrong that a document is "immaterial" (Opp. 2, 7) if it does not mention opioids. The subpoenaed documents included a wide range of confidential documents not specific to a particular prescription drug but that nonetheless provide insight into wide swaths of OptumRx's business. They included things like:

- custodial emails and attachments showing how OptumRx employees negotiate with drug manufacturers, develop formulary offerings, and serve OptumRx clients (Hooker Suppl. Decl. ¶ 15(i));

- documents addressing strategies across OptumRx's business that discuss OptumRx's approach to rebate negotiations, formulary management models, utilization management bundles, and annual timeline to create drug formularies through committee review (*id.* ¶ 15(f));

- slide decks analyzing OptumRx's rebate initiatives, organizational goals and milestones, and anticipated amendments to manufacturer contracts (*id.*); and

- documents outlining OptumRx's approach to contracting with prescription drug manufacturers, including price protection in rebate contracts, lowest-net-cost strategies, and other competitively sensitive information (*id.*).

Documents like those and others outlined in Matthew Hooker's supplemental declaration (*see id.* ¶¶ 15(a)–(i)) give Motley Rice an employee's-eye view of the very aspects of OptumRx's business that the bellwether plaintiffs challenge. They make it easier for Motley Rice to litigate the bellwether cases in many ways, from refining allegations and legal theories to developing litigation strategy to crafting search terms to designing discovery requests to identifying custodians and witnesses to preparing for depositions to preparing expert reports. Those are just some examples; Motley Rice "could use" the confidential information in any number of other ways.

Motley Rice faults OptumRx for "incant[ing] Rule 1.11(c)'s 'could be used' language" in describing the Rule's requirements. Opp. 10. But the PEC had no problem applying the Rule as written in 2019 when it wanted a defense lawyer disqualified. This is what it told the Court then:

> [T]he rule does not require a showing that the confidential information has in fact been used to the material disadvantage of the adverse party. Thus, even if Ms. Rendon has arguably not yet used her confidential knowledge to disadvantage the

6

> Plaintiffs, given that discovery is ongoing the risk is still very real. The Court should disqualify Ms. Rendon to avoid even the potential for her using confidential information.

Dkt. 1305-1. The same "very real" risk exists here, and the Court should disqualify Motley Rice to "avoid even the potential for [its] using confidential information" against OptumRx. *Id.*

**B.     DR-22 is irrelevant.**

Motley Rice next argues that even if OptumRx produced opioid-related information in the investigations, there is "zero possibility" that the information could disadvantage OptumRx because "DR-22 requires Optum to reproduce all opioid-related investigation documents to all Plaintiffs' counsel in this MDL." Opp. 6–7. Motley Rice faults OptumRx for "ignor[ing] DR-22 altogether in its motion." *Id.* at 10. But no one should be talking about DR-22 because it has nothing to do with this motion.

By its terms, DR-22 requires reproduction in the MDL only of documents previously produced in any "government investigation . . . *regarding the marketing, sales, distribution or dispensing of Opioids.*" Dkt. 2576 at 4 (emphasis added). As Special Master Cohen has repeatedly explained, DR-22 covers only documents produced in "opioid-related" investigations (Dkt. 3291 at 2) or in an "opioid-related forum" (Dkt. 3699 at 4). Motley Rice concedes that the Hawaii, D.C., and Chicago investigations were not opioid related and in fact tries to convince the Court that opioid documents were not among the productions. Ms. Boggs even argues that the subpoenas "did not reference any opioid drug by name or opioids generally." Boggs Decl. ¶¶ 6, 9, 14. Because those were not opioid-related investigations, DR-22 does not apply.

Accordingly, Motley Rice is wrong when it claims that, because of DR-22, "every other Plaintiffs' lawyer has the same access and can make the same uses of" the information that OptumRx produced under the government subpoenas. Opp. 2; *see also id.* at 9–11. That is false. No other plaintiff's lawyer has "the same access and can make the same uses of" the documents

and information that OptumRx produced to Hawaii, D.C., and Chicago. Motley Rice has that information only because its lawyers wielded government authority to acquire it before later turning around and suing OptumRx as a contingency-fee private litigator.

Even if DR-22 applied, it would not cure the ethical problems with Motley Rice's involvement. Confidential government information remains confidential government information even if reproduced under DR-22. And Motley Rice's argument that any material disadvantage recedes as *more* plaintiffs' lawyers gain access to the same confidential information makes no sense. There are many other textual and policy reasons why any hypothetical future production in civil discovery does not exempt Motley Rice from Rule 1.11(c), but we discuss those below because there is nothing more to say about DR-22. It is irrelevant.

**C.   Motley Rice's contention that investigation materials reproduced in civil discovery cease to be "confidential government information" is wrong and would render the Rule a dead letter.**

Motley Rice next argues that the subpoenaed information is not "confidential government information" because the firm could eventually obtain the same information through civil discovery. *See* Opp. 2 ("the subpoenaed information is not 'confidential government information' . . . because it is discoverable" in the MDL). Rule 1.11(c)'s text refutes that interpretation. The argument is also absurd: Rule 1.11(c) would be meaningless if former government lawyers could erase their ethical violations by re-requesting copies of documents that they first learned about through their government work.

First, the Rule's text. Rule 1.11(c) defines "confidential government information" as "information that [1] has been obtained under governmental authority and that, [2] at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that [3] is not otherwise available to the public." Ohio R. Prof'l Conduct 1.11(c). The information that Motley Rice learned through its government work qualifies

8

as confidential government information under that definition. As government investigators wielding state power, Motley Rice obtained tens of thousands of pages of confidential information about OptumRx's business and product offerings. Hooker Decl. ¶¶ 7–9; Hooker Suppl. Decl. ¶¶ 13–16; Caplis Decl. ¶¶ 5–15; Grant Decl. ¶¶ 5–8. Hawaii, D.C., and Chicago are prohibited by law from publicly disclosing the documents and information obtained through those subpoenas. *E.g.*, Haw. Rev. Stat. § 480-18(j); D.C. Code § 2-534(a)(1); 5 Ill. Comp. Stat. 140/7(g). OptumRx also produced the documents under confidentiality agreements that prohibit disclosure to the public or use in any other matter. *See* Haw. Conf. Agmt. ¶¶ 2, 4; D.C. Conf. Agmt. ¶¶ 4, 8–10; Chicago Conf. Agmt. ¶¶ 3–4, 9, 11. The documents are not available to any party in the MDL, let alone "otherwise available to the public."

Motley Rice's argument to the contrary is remarkable. In effect, the firm is arguing that confidential information would cease to be confidential if the firm could later use document requests in civil discovery to sweep the same material into the MDL. But documents are not "public" simply because they are produced in a lawsuit subject to a confidentiality agreement. *See, e.g.*, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) (materials obtained through civil discovery are not "a traditionally public source of information"); *Courier-Journal v. Marshall*, 828 F.2d 361, 364 (6th Cir. 1987) ("pretrial discovery . . . ordinarily proceeds as a private interchange between the parties, the fruits of which are not presumptively public"). Motley Rice's "interpretation" also ignores Rule 1.11(c)'s temporal requirement. Lawyers must apply Rule 1.11(c) *before* accepting a representation—not midway through the litigation after documents are produced. *See* Ohio R. Prof'l Conduct 1.11(c); Suppl. Expert Rpt. at 2–3. No matter what unfolds later in discovery, Motley Rice violated Rule 1.11(c) when it agreed to represent opioid plaintiffs suing OptumRx because, at that time, it possessed information (i) that was "obtained under

9

government authority," (ii) that the government was "prohibited by law from disclosing to the public," and (iii) that was "not otherwise available to the public," and the firm could use that information to OptumRx's material disadvantage in opioid litigation. Ohio R. Prof'l Conduct 1.11(c).

Motley Rice's self-serving interpretation also contradicts every policy that Rule 1.11(c) serves. Motley Rice hopes to solve its problem by shuffling around documents, yet the Rule does not limit its application to "documents." The Rule is concerned with confidential "information," which includes "strategic insights" and "mental roadmap[s]" that can be developed from the investigation. *See United States v. Villaspring Health Care Ctr., Inc.*, 2011 U.S. Dist. LEXIS 129933, at *18 (E.D. Ky. Nov. 7, 2011) ("Melton has confidential government information in the form of strategic insights, such as his knowledge of the strengths and weaknesses of the evidence compiled against Villaspring."); *Kronberg v. LaRouche*, 2010 U.S. Dist. LEXIS 35097, at *16 (E.D. Va. Apr. 9, 2010) ("At the very least, Markham surely has a mental roadmap concerning LaRouche and his activities that was shaped at least in part by his access to confidential government information."). Motley Rice formed those strategic insights and roadmaps over many years as it has investigated OptumRx and combed through its confidential business records with the power of the state behind it. It is precisely in that situation that Rule 1.11(c) prevents the representation because the lawyer has "great potential for lucrative returns in following into private practice the course [it] already charted with the aid of governmental resources." *Gen. Motors Corp. v. New York*, 501 F.2d 639, 650 (2d Cir. 1974).

Motley Rice never addresses *Villaspring*, and it acknowledges *Kronberg* only in a footnote without responding to its substance. Opp. 11 n.6. But Motley Rice relied on both cases when it asked this Court to apply Rule 1.11(c) to disqualify a defense lawyer. Dkt. 1320 at 2, 4, 6, 9, 11.

10

And Motley Rice does not contend at all with the policy concerns outlined in *General Motors* (or any other cases OptumRx cited).³

The few cases it does cite are inapposite and easily distinguished. *In re Domestic Air Transportation Antitrust Litigation* stands for the unremarkable proposition that investigation documents *may* be discoverable in later cases. 142 F.R.D. 354, 355–56 (N.D. Ga. 1992). It says nothing of the ethical problem when a lawyer "begin[s] proceedings as a government agent with a view to obtaining a subsequent advantage in private practice, such as be filing a complementary action for a subsequent private client." Restatement (Third) of the Law Governing Lawyers § 133, cmt. d. And the facts in *Davis v. Southern Bell Telephone & Telegraph Co.*, 149 F.R.D. 666 (S.D. Fla. 1993) are the opposite of this case. There, the lawyer filed the private litigation *before* assisting a state investigation. *Id.* at 674. As a result, the then-applicable Florida rule—entitled "*Successive* Government and Private Employment"—did not apply.⁴ *Id.* Ohio Rule 1.11(c) is not limited to "successive" representations, but Motley Rice's post-investigation representation of opioid plaintiffs would qualify as successive in any event. The subpoenaed documents in *Davis* were also produced in parallel with the investigation, meaning the lawyer did not have advance access to confidential government information to map out its civil litigation strategy or to determine which documents to ask for in civil discovery. *Id.* Here, by contrast, Motley Rice has had years to use the fruits of its government investigations to develop its strategy for attacking OptumRx in private litigation. That is precisely what Rule 1.11(c) was designed to prohibit.

---

³ Motley Rice's only response to *General Motors* is to distinguish the New York rule because it references "private employment" instead of "private client." Opp. 15 n.8. But, as we explain below, the comments to Rule 1.11(c) confirm that "private client" encompasses any entity ("public or private") that the lawyer represents in a private practice.

⁴ *Doe 1 v. Francis*, 2006 U.S. Dist. LEXIS 105036, at *29 (N.D. Fla. May 8, 2006) also involved Florida's "successive" representation rule in a situation where the lawyer was engaged in two matters in parallel.

## II. MOTLEY RICE ACQUIRED CONFIDENTIAL GOVERNMENT INFORMATION AS A "PUBLIC OFFICER" THAT IT NOW SEEKS TO USE TO ADVANCE THE INTERESTS OF ITS "PRIVATE CLIENTS."

Motley Rice cannot deny that it was a "public officer" when it served the investigation subpoenas on OptumRx, so the firm argues that the bellwether plaintiffs are not "private clients" because they are "government" entities. Opp. 14. That argument ignores what Rule 1.11(c)'s drafters said on the issue. It also ignores the Rule's central purpose. Suppl. Expert Rpt. at 4–8.

Rule 1.11(c)'s drafters confirmed that the term "private client" encompasses both "public or private" entities so long as they are advancing private interests: "[W]here the successive clients are a government agency and another client, *public or private*, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." Ohio R. Prof'l Conduct 1.11(c), cmt. 4 (emphasis added). So long as Motley Rice's first client was a "government agency" (a fact that Motley Rice does not dispute), the Rule applies to the firm's representation of the second client "public or private." *Id.*; *see also* Suppl. Expert Rpt. at 5–6.

Rule 1.11(c) recognizes the difference between *representing a government* in civil litigation and *acting as the government* in an investigation. In private civil litigation, a lawyer's access to documents and information is limited by discovery rules that apply to all civil litigants, even if the client is a government entity. But "when an attorney conducts an investigation under color of office, he may have a coercive effect on persons he questions," which "in turn might lead these persons to divulge information which could be used against them later in a civil action." *Hilo Metals Co. v. Learner Co.*, 258 F. Supp. 23, 28 (D. Haw. 1966). The Rule prevents a lawyer from obtaining information under coercive government authority and then later, in private practice, representing clients in cases where the information learned through government service could disadvantage the adverse party. It makes no difference whether the private-practice client is an individual, a company, or, as here, a local government.

12

Without an expert of its own, Motley Rice resorts to mischaracterizing OptumRx's experts' opinions. Motley Rice quotes from Professor Muchman and Ms. Montgomery's report where they explain that private lawyers are not "government actors" when they represent public entities in civil litigation because they do not "have the authority to wield the power of the government in that role." Opp. at 16 (citing Dkt. 5276-18 at 21 n.20). Motley Rice suggests that those remarks are a concession that Motley Rice was somehow not a government actor when it was deputized as a Special Assistant Attorney General and served investigatory subpoenas on OptumRx. *Id.* But that is the opposite of what Professor Muchman and Ms. Montgomery said. They distinguished between Motley Rice as a government actor (when it acted "through [its] appointment as Assistant Attorney General") and as a private lawyer ("in [its] capacity as a private attorney in litigation"). Dkt. 5276-18 at 26. Rule 1.11(c) is concerned with situations just like this one, when a lawyer who received confidential information in an official government capacity later represents another client in private practice in a matter in which the lawyer could use the information learned through government service against the adverse party. Suppl. Expert Rpt. at 6–8. In those circumstances, the Rule prohibits the private representation.

## CONCLUSION

Motley Rice's decision to lead government investigations into OptumRx's business had consequences. Under Rule 1.11(c), Motley Rice cannot now represent plaintiffs suing OptumRx in a lawsuit where it could use the information acquired through its government investigations to OptumRx's material disadvantage. Motley Rice violated Rule 1.11(c) by accepting the representation of the bellwether plaintiffs, so it should be disqualified.

February 5, 2024.                                      Respectfully submitted,

                                                       */s/ Brian D. Boone*
                                                       Brian D. Boone
                                                       **ALSTON & BIRD LLP**

13

Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel.: (704) 444-1000
brian.boone@alston.com

William H. Jordan
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com

*Attorneys for OptumRx, Inc.*

14

## **CERTIFICATE OF SERVICE**

I certify that on February 5, 2024, a copy of the foregoing was served on all counsel of record by filing the same with the Court's ECF system.

                                                                  */s/ Brian D. Boone*
                                                                   Brian D. Boone