```
 1                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3
      IN RE:                        ) Case No. 1:17-md-2804
 4                                  )
      NATIONAL PRESCRIPTION         )
 5    OPIATE LITIGATION,            )
                                    ) Monday, February 12, 2024
 6                                  )

 7

 8

 9

10            TRANSCRIPT OF MOTION HEARING PROCEEDINGS

11              HELD VIA ZOOM VIDEOCONFERENCE

12          BEFORE THE HONORABLE DAN AARON POLSTER

13               UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20
      Official Court Reporter:   Gregory S. Mizanin, RDR, CRR
21                               United States District Court
                                 801 West Superior Avenue
22                               Court Reporters 7-189
                                 Cleveland, Ohio 44113
23                               216.357.7036
                                 gregory_mizanin@ohnd.uscourts.gov
24

25      Proceedings recorded by mechanical stenography; transcript
            produced with computer-aided transcription.
```

```
1      APPEARANCES:

2
       For the Plaintiffs:
3

4              PETER H. WEINBERGER, ESQ.
               Spangenberg, Shibley & Liber, LLP
5              1001 Lakeside Ave. East, Suite 1700
               Cleveland, Ohio 44114
6              216.696.3232

7

8              JOSEPH F. RICE, ESQ.
               Motley Rice
9              28 Bridgeside Blvd.
               Mount Pleasant, SC 29464
10             800.768.4026

11

12             LINDA J. SINGER, ESQ.
               Motley Rice
13             401 9th Street NW, Suite 630
               Washington, DC 20004
14             800.768.4026

15

16             ANDREA BIERSTEIN, ESQ.
               Simmons Hanley Conroy
17             112 Madison Avenue, 7th Floor
               New York, NY 10016
18             212.257.8482

19

20

21

22

23

24

25
```

```
 1    APPEARANCES (continued):

 2
      For Defendant Express Scripts:
 3

 4          ELLISON WARD MERKEL, ESQ.
            Quinn Emanuel Urquhart & Sullivan
 5          51 Madison Avenue, 22nd Floor
            New York, NY 10010
 6          212.849.7000

 7
      For Defendant OptumRx:
 8

 9          BRIAN D. BOONE, ESQ.
            Alston & Bird
10          1120 South Tryon Street, Suite 300
            Charlotte, North Carolina 28203
11          704.444.1106

12
      ALSO PRESENT:
13

14          Carrie Roush, Law Clerk
            Corey McCardle, Courtroom Deputy
15          David Cohen, Special Master
            Michael Borden
16          A. Scott Loge

17

18

19

20

21

22

23

24

25
```

1          MONDAY, FEBRUARY 12, 2024

2                    - - -

3          (Proceedings commenced at 2:06 p.m.)

4                    - - -

5          THE COURT:  All right.  This is a hearing in

6    MDL number 2804 on two pending motions, OptumRx's motion to

7    disqualify Motley Rice and the PEC's motion to amend their

8    complaints against the PBMs.

9          I've obviously read all the pleadings.  I had a few --

10   I had a few questions, some were factual, some pertain to

11   the implication of any ruling I make, and I thought rather

12   than guessing I would invite all responses from our able

13   counsel.  So we'll start with the motion to disqualify

14   Motley Rice.

15         Motley Rice's response doesn't specifically

16   acknowledge the details of the relationship you had with the

17   three public entities, Chicago, Hawaii, and DC.  Optum says

18   that Motley Rice was actually appointed as special AG, you

19   know, a public -- serving as public officials.  The response

20   just talks about representing those two cities and state.

21         Can Motley Rice specifically -- I want to know

22   specifically what the arrangement was, so I'd like to know

23   the specifics of the arrangement; the way you were

24   compensated; the duration; and in particular, is at least

25   one of those or any of them continuing till the present, or

1      is it all in the past?

2                        MS. SINGER:  This is Linda Singer, Your Honor,

3      from Motley Rice.  I'll respond to the questions.

4           So Motley Rice was engaged as outside counsel in each

5      of those matters.

6           In Hawaii, that is an ongoing representation.  Hawaii

7      is in litigation against three PBMs at the moment related to

8      the pricing of drugs.  We are paid in each of the matters on

9      a contingent fee basis, although they differ in each matter.

10          In Hawaii, as outside counsel, we are designated as

11     special assistant attorney general for purposes of that

12     representation.

13          In DC and Chicago we carry no moniker, but, again, we

14     are outside counsel for the purposes of that matter.  In DC

15     and Chicago, both of those matters had been terminated.

16          And I would add that each of the contracts contains a

17     provision that indicates that our work is done subject to

18     the control and supervision of the attorney general's

19     office, which maintains control of each of the

20     investigations in litigation.

21                        THE COURT:  Well --

22                        MR. BOONE:  Your Honor, if I may --

23                        THE COURT:  Let me just stay with -- I mean --

24     all right.

25          Linda, you issued subpoenas in some or all of these.

1    I mean, I was a former prosecutor.  Private lawyers can't --

2    I mean, they can issue, you know, requests for admission,

3    interrogatories, et cetera.  You know, you don't issue

4    subpoenas.  Government attorneys issue subpoenas to have

5    records produced to them.  I mean -- so are you saying you

6    were not -- you had no appointment as a special assistant AG

7    or a public official in DC and Chicago, you were purely

8    outside counsel like you have been to hundreds of other --

9    in hundreds of other cities and counties?

10                   MS. SINGER:  In each jurisdiction we are

11   appointed as outside counsel with certain authorities

12   subject to the office of supervision.  Only in Hawaii, to my

13   knowledge, are we designated a special assistant attorney

14   general.  That's not obviously an employment or a paid

15   position.  In each of those cases decisions have to be made

16   by the office so that the subpoenas or civil investigative

17   demands -- they go by different names -- were signed by each

18   of the public entities, and that decision to issue a CID has

19   to be made or approved by the public entity.  We don't have

20   that authority.

21                   MR. BOONE:  Your Honor, but in each case

22   Motley Rice was wielding government authority.  I'm looking

23   at the state of Hawaii agreement here, it's an exhibit to --

24                   THE COURT:  Well, the state of Hawaii, they

25   were -- they have a designation, there's no question that

1    they were performing public functions.  They were designated

2    to perform public functions, and Hawaii's ongoing.

3         All right.  There is a -- one of the things, which

4    Motley Rice did not address in its response, it's

5    highlighted in the expert reports that Optum filed.  There

6    are confidentiality agreements, all right, that specifically

7    preclude Motley Rice from using any of the material,

8    confidential information in connection with any other

9    matter, and not to use it involving -- in any other matter

10   relating to Optum.  And so Motley Rice didn't -- I need you

11   to address that because you haven't addressed how that

12   impacts your involvement in other litigation matter

13   involving Optum.

14              MS. SINGER:  Your Honor, I'm sorry that we

15   didn't respond and left you with questions, but let me speak

16   to that specifically.

17        So the information that was produced by OptumRx -- and

18   to be clear, these subpoenas were issued to all of the PBMs,

19   so Express Script, OptumRx in Chicago.  Not the other PBMs

20   in Chicago, but Caremark, OptumRx, and Express Script all

21   received the same subpoena from the DC attorney general and

22   the Hawaii attorney general.  None of those documents were

23   shared with any other client of Motley Rice.  None of them

24   have been produced into the MDL, and none of them have been

25   made available to others.

1          I can tell you -- and I want to be crystal clear -- we

2      did not put in place a formal wall because we consulted with

3      ethics counsel, believed that because they were all public

4      matters, no wall was needed, but functionally no attorney

5      who had access to any document that was produced by OptumRx

6      in any of these matters has been involved in any way in the

7      CT-12 through 15 cases.

8                  MR. BOONE:  Except that Ms. Singer's on the

9      line with us today.

10                  THE COURT:  Well, that's what I was going to

11      ask, Linda.  I mean, you seem to be involved in both.  I

12      don't know about anyone else, but, I mean, you clearly were

13      involved in DC, Hawaii, and you're clearly involved in these

14      cases.

15                  MS. SINGER:  And I don't -- I didn't mean to

16      comply otherwise.  What I'm saying is that I never had

17      access to these documents.  I've not seen them.  The

18      complaint filed by Hawaii, which is the only complaint filed

19      as a result of those investigations, does not reference

20      opioids or any opioid-related documents, and I personally

21      haven't seen any of them.  I want to be clear, it's our

22      legal position that, again, none of that matters.

23                  THE COURT:  Well, I disagree with that.  I

24      think it matters, I mean, considerably because this

25      public/private distinction you've made I don't think is the

1    case.  There's two issues, one to me is the overriding

2    principle that a public official -- a public employee cannot

3    have any involvement whatsoever in a private capacity with

4    any -- any investigation that he or she took place in or any

5    litigation that he or she took part in as a public official,

6    right?  I understood that.  I was a public employee for 22

7    years.  So that's overriding principle number 1.

8            And then you've got this additional provision about

9    that you can't use any of the documents in any other matter

10   involving OptumRx, and so --

11                   MR. BOONE:  Your Honor, if I may.

12           Ms. Singer said the investigations were limited to

13   pricing.  That's just not true.  They received thousands of

14   documents about opioids.  They received thousands of

15   documents about opioid manufacturers, about medications,

16   formulary development, clinical programs, client

17   relationships, business strategies, you name it, that is the

18   stuff of these bellwethers.  So what she's saying is just

19   not true.

20                   MS. SINGER:  That's not what --

21                   THE COURT:  I don't know what the stuff of the

22   bellwethers are yet because we haven't litigated it.  The

23   plaintiffs have made very, very broad allegations in the

24   complaints, proposed complaints, so --

25                   MS. SINGER:  And I want to be clear, Your

1    Honor, I did not say that there weren't opioid-related

2    documents that were produced.  I think OptumRx has been

3    specific about that in its pleadings.  The subpoena spoke

4    generally, both in Hawaii and DC, to prescription drugs in

5    certain requests, and Optum has indicated that its

6    production included...

7               (Unclear speech; clarification requested by

8               court reporter.)

9               MS. SINGER:  Documents that referenced

10    opioids.  So, you know, that's OptumRx's position.  What I

11    said was that Hawaii's complaint --

12               THE COURT:  All right.  I'm also concerned --

13    I mean, you said that these documents were essentially

14    confidential, they hadn't -- have not been produced in the

15    opioid litigation, whether or not they will be produced,

16    then we won't know.  They might be, they might not be.  But

17    they haven't yet been produced, so --

18               MS. SINGER:  And, Your Honor, on that point,

19    if I may.

20        You know, OptumRx has taken the position that -- that

21    its production, as Mr. Boone just said, include thousands of

22    documents related to opioids.  And I think we lay out in our

23    opposition -- and I know Your Honor doesn't want us to

24    repeat that -- that those materials are subject then to

25    DR 22.  And Your Honor affirmed that order, expanded it to

1      all bellwethers.  The fact that those documents have not

2      been produced in this litigation I think is actually a

3      failure of OptumRx's because by its own description of these

4      documents, they should have been produced into the MDL in

5      2021 when the documents were produced in the state

6      investigations.

7                      MR. BOONE:  Your Honor, I'm not going to

8      repeat what we said in our briefing, but DR 22 really has

9      nothing to do with anything here.  That order --

10                     THE COURT:  Well, it might have because if you

11     had produced them, they'd already been produced, all right?

12     So it would not be confidential, everyone would have them.

13                     MR. BOONE:  Well, they would still be

14     confidential because they would have been designated

15     confidential.  Just because they're produced in discovery,

16     doesn't make them not confidential, doesn't make them

17     public.

18                     THE COURT:  But the point is Motley Rice would

19     have no knowledge that anyone else doesn't have, okay?

20     They -- everyone else would know the documents as well as

21     Mr. Boone, so at the moment -- at the moment the only -- it

22     appears the only people who really know about the contents

23     of the documents are, of course, OptumRx and whatever --

24     whichever lawyers from Motley Rice have worked on those

25     matters.

1      MR. BOONE:  And, Your Honor, you must apply

2   the ethical rule now, not after discovery of course, but

3   just going back to DR 22, it applies only to investigations

4   focused on opioids.  They have said the other investigations

5   were not focused on opioids, and yet we produced tons of

6   material about opioids in those investigations.  So those

7   things can be true and, in fact, are true in this case.

8      MS. SINGER:  And, Your Honor, I think, first

9   of all, the definition of confidential government

10  information is the definition of confidential government

11  information as used in 1.11, and that's the definition that

12  controls.  We gave the Court or cited to the Court *Davis*

13  *versus Southern Bell* on that point, and discovery materials

14  have not been considered by the courts to be that kind of

15  confidential government information.  So I think that's the

16  first point.

17     THE COURT:  Well, what about this specific

18  confidentiality agreement that covers any Motley Rice

19  attorney from in any way using -- using the documents or any

20  knowledge derived from them in any other litigation

21  pertaining to Optum?  I mean, this is clearly other

22  litigation pertaining to Optum.

23     MS. SINGER:  Yes, but we didn't use any of

24  the --

25     THE COURT:  But we don't know that.  We

1    don't -- it's in the firm's knowledge, okay?  No one knows

2    what you're going to use.  You're the only ones who know the

3    contents of the documents.  By saying "you," I mean, the

4    firm.

5                      MS. SINGER:  No.  Understood, Your Honor.

6          And I think that this is an important point of

7    distinction under both the case law and Your Honor's prior

8    disqualification ruling, which is there is a finite set of

9    documents here, they are the kinds of documents that OptumRx

10   chose to produce in response to a CID.  There have been no

11   other investigation that was conducted here, no other

12   conferrals as happened in *Villaspring* and -- I am forgetting

13   the other case that OptumRx relies on, but it will come to

14   me in a second.

15         In those cases as in the case of Attorney Rendon, the

16   information that was available to the attorney whose

17   disqualification was sought was not known or knowable.  It

18   was a big issue, for instance, in the *LaRouche* case, that

19   the lawyer couldn't separate what was produced in discovery

20   and what was classified or redacted, so there was no way to

21   parse that.

22         Here there is a precise existing body of documents,

23   all of which we assert are covered under DR 22 and, by

24   OptumRx's own position, would be relevant and responsive to

25   discovery requests.  So there's no knowledge that Motley

1     Rice has -- no information or documents that isn't either

2     identifiable or subject to discovery either through DR 22 or

3     otherwise in the MDL.

4                    THE COURT:  Well, what does that

5     confidentiality agreement mean then in this context?

6                    MS. SINGER:  It means that we cannot produce

7     those documents publicly, we can't just put them in a

8     complaint and make them publicly.  We can't share them with

9     attorneys outside of the case.  But certainly the fact that

10    OptumRx produced these materials in response to government

11    CIDs doesn't forever insulate them from discovery.  And, in

12    fact, DR 22 operates in the opposite direction.  It requires

13    that to be shared.

14                    MR. BOONE:  Your Honor, Motley Rice also

15    agreed that they would not use the confidential information

16    anywhere else.  It wasn't just about producing it anywhere

17    else.

18                    THE COURT:  All right.  I mean -- it says they

19    can't use it in any other litigation -- any other matters

20    pertaining to OptumRx.  It's very, very broad, so --

21                    MR. WEINBERGER:  Well, Your Honor --

22                    THE COURT:  What does that mean?

23                    MR. BOONE:  I would argue that it means what

24    it says.

25                    THE COURT:  I'm asking Motley Rice.

1          What does it mean?  What does it mean to you?

2                     MS. SINGER:  Your Honor, I did my best to

3     explain.  It means that we can't take those documents, for

4     instance, and use them without authorization in other

5     litigation.  However, if they are produced or produceable in

6     those other cases, we are not bound to look the other way.

7     They are not forever insulated from our knowledge.

8                     THE COURT:  I'm not sure of that.

9          All right.  What about the basic principle that a

10    public -- a government lawyer cannot be involved in --

11    subsequently in a private capacity in any investigation or

12    litigation which he participated as a government lawyer?

13         I've always subscribed to that.  Do you think that's

14    not the case?  And if so, how -- what limitations would you

15    put?

16                     MS. SINGER:  So we of course take 1.11

17    seriously.  And I come out of government as well, Your

18    Honor.  Not only is it what we do in our work in the public

19    client group, but Rule 1.11 is very specific that it's about

20    the transition from public to private.  And I think it's

21    interesting, if you look at the language of Rule 1.11, it

22    speaks only to public to private.

23         Comment 4 to Rule 1.11 says it recognizes that there

24    is -- there can be an issue where a lawyer moves -- there

25    may be a perception or a coercion problem or appearance

1    where a lawyer moves from public to another client, private

2    or public.  But the drafters of the rule did not include

3    public or private in the text of the rule itself.

4         And then what it says was that in the circumstances

5    laid out in the rule where it's -- where there's not a --

6    and I'm sorry, I am talking myself in a circle here -- but

7    the rule itself speaks only public to private -- I'm

8    sorry -- public to private.  That's not the case here.

9    That's the advice we got from ethics counsel.

10                  THE COURT:  Well, wait a minute.

11        You were a public -- you still are, your firm is still

12   a public -- you're a public lawyer.  Special assistant AG

13   for Hawaii.  Okay?  You are private counsel here, all right?

14   You're private counsel, you're representing -- you're

15   outside counsel, not a public -- not a government lawyer.

16   You're just a plain, regular outside counsel on a --

17   presumably a contingency arrangement with the entities that

18   are filing these cases.

19                  MS. SINGER:  We have the same relationship,

20   Your Honor, with the government employee -- the government

21   clients we represent in the MDL that we represent in the --

22                  THE COURT:  Well, you can't -- you can't -- if

23   all you were was -- if you were simply Linda, the same

24   outside counsel for Chicago and Hawaii and DC as you are

25   with the, you know, cities and counties who were -- who, you

1     know, are bellwether plaintiffs here, we wouldn't have this

2     motion.  There would be -- you know, you could have as many

3     clients as you want.  Optum has no -- you know -- can't tell

4     you which private clients to represent.

5                    MS. SINGER:  Well, Chicago's a perfect

6     example, Your Honor.  It's a subdivision client, right?  We

7     exercised certain authority that lawyers can exercise for

8     clients subject to their approval and control.  We couldn't

9     have gone to Hawaii and just issued a CID.  Only the state

10    attorney general could approve or direct that decision.  We

11    don't exercise that power on our own as Motley Rice.

12                    MR. BOONE:  But that doesn't -- not --

13    government lawyers --

14                    THE COURT:  Right.  That's the point.  You

15    were at least a quasi-public lawyer for those two and you

16    were an actual public lawyer, and your firm still is an

17    actual public lawyer for Hawaii.

18                    MS. SINGER:  And we represent government

19    public clients in the opioid MDL which we had --

20                    THE COURT:  Right.  But that's -- that's

21    private representation.  That's standard private

22    representation.

23         And, again, if your representation of these three

24    entities, Hawaii, DC, Chicago, had been the same -- and, you

25    know, I'm losing -- I've forgotten the entities in the

1      bellwethers -- all right -- if it was the same as that, we

2      wouldn't be here on this motion.  The motion wouldn't have

3      been filed.  There would be no predicate for it.

4                     MS. SINGER:  Again, I can't speak to --

5                     THE COURT:  All right.  I'm going to have to

6      just decide it myself, but, you know, I -- I guess I'm -- I

7      can't understand why you don't see that there is a

8      difference between your work for these -- your firm's work

9      for these three entities and your work for all of your other

10     clients, and particularly the four -- you know, the four

11     bellwether clients that you're representing.

12                     MS. SINGER:  And, Your Honor, I don't mean to

13     suggest other than we regard them all as public clients

14     subject to the highest ethical responsibilities.  These

15     bellwethers in the MDL are seeking public remedies like

16     abatement, right?  That's not a remedy available to a

17     private client.  We see it as a straight line.

18                     MR. WEINBERGER:  Your Honor --

19                     THE COURT:  They're public clients because

20     they're public -- I'm sorry -- they're public entities,

21     they're all public entities, but the point is your -- when

22     you're acting as a -- as a special AG exercising state power

23     that is different from when you're outside counsel, all

24     right?  There is a difference.  And what we're trying to

25     decide here is whether that difference precludes you from

1    now being involved in -- as just outside counsel against the

2    PBMs in these four bellwethers.  That's what I got to

3    decide.  And there's lots of other lawyers.  I mean,

4    happily, we have plenty of other very well-qualified

5    plaintiffs lawyers, so the cases aren't going to be changed

6    or derailed or repeated or delayed in any way if I make that

7    decision, but I --

8                   MS. SINGER:  And, Your Honor --

9                   MR. WEINBERGER:  Linda, can I interject for

10   just a second?

11        This is Pete Weinberger, for the record.

12        Your Honor, the -- what has happened here is that

13   Motley Rice representing governmental entities are -- now

14   also represent the bellwethers that are governmental

15   entities.  That's a far cry from the Rendon case that you

16   decided where a U.S. attorney -- assistant U.S. attorney who

17   was involved in the opioid task force with the city and

18   counties in northeastern Ohio changes to the other side and

19   represents one of the manufacturers.

20        In this case --

21        Where there was, without any doubt, prejudice.

22        In this case there's no showing of any material

23   prejudice, even assuming what Mr. Boone and his client are

24   stating in their brief, because the fact is is that they

25   either produced documents in response to the subpoenas

1       issued by Hawaii, DC, and Chicago that are either irrelevant

2       to this litigation or they are relevant.  And if they're

3       relevant, they're ultimately discoverable.

4            So I don't -- I mean, I understand the Court's concern

5       about the distinction because they were, you know, appointed

6       in this special role by Hawaii, but, I mean, every one of us

7       in this litigation represents multiple subdivisions and

8       governmental entities.  And so this is a far cry from

9       somebody going from representing the government as -- either

10      as in official capacity or as an outside counsel and then

11      switching sides and representing, you know, a private person

12      or a private corporation.

13                  MR. BOONE:  And, Your Honor --

14                  MS. SINGER:  If I may just add to what Pete

15      was saying just a --

16                  (Unreportable crosstalk.)

17                  THE COURT:  We can only have one person

18      speaking at a time.

19                  MR. BOONE:  If I can just interject.

20         In Hawaii, Motley Rice was the government.

21                  THE COURT:  Well, that's the point.  You see,

22      the situation with Ms. Rendon was different.  Obviously it

23      involved one side to the other.  It was as much the

24      appearance as anything else.  I never determined that

25      Ms. Rendon had actually obtained anything confidential which

1      she might be using against the City of Cleveland.  It was as

2      much the appearance of it because she had -- she had been on

3      their side involving in -- in a lot of private -- private

4      matters concerning the opioid -- the opioid crisis on the

5      side of the city, all right?  And now she was going to be

6      appearing against the city in a specific litigation, and

7      I -- it was much as that it didn't look right.

8           And I'm -- you know, I had the same concern here.

9      Again, the -- you can represent anyone you want, but this

10     is -- but Motley Rice's involvement -- certainly with Hawaii

11     and it looks like with the other two were not as -- just as

12     outside counsel, they were government -- quasi-government

13     appointees.  In the case of Hawaii, an express appointment;

14     and the other two, maybe tacit.  But exercising --

15     exercising official power, all right?  And I just think --

16     that's what troubles me.  And I think the confidentiality

17     agreement that Motley Rice executed is extremely broad, and

18     I think it does cover -- cover this litigation.

19          And the problem is these -- whether the documents

20     should have been produced or not, I don't know, but they

21     haven't.  They haven't been produced yet.

22          So, all right, I'm just going to --

23               MS. SINGER:  Your Honor, if I can --

24               THE COURT:  -- make the decision however I

25     make it, and that will be that.

1           MS. SINGER:  Can I just respond to a couple of

2      points, points of information?

3           One, again, we were outside -- we are outside counsel

4      to Hawaii, we were outside counsel to DC and Chicago in

5      those capacities.  That is not like being an independent

6      counsel that the USDOJ deputized, for instance, to

7      investigate the President.  We can't do anything without the

8      authorization or control of the attorney general's office.

9           THE COURT:  I understand that, but, see,

10     that's different --

11          (Unreportable crosstalk.)

12          THE COURT:  All right.  The four clients --

13     four clients you're representing in these bellwethers, all

14     right, you're not -- you're not exercising any public

15     function, all right?  You're outside counsel.  Obviously you

16     check with your client, and if your client says don't do

17     this, you know, you could defy them, all right?

18          But the point is it's a -- you know, you're not

19     exercising any public function, you're not issuing

20     government subpoenas, you're not -- you're not getting

21     documents -- government documents aren't being produced to

22     you in a confidential manner, all right?  Doesn't work that

23     way.  Everything's immediately made public -- or, you know,

24     in the MDL repository -- any documents that are produced.

25          MS. SINGER:  And, Your Honor --

1          THE COURT:  And in the other litigation it was

2     a different relationship, that's my point.  And you really

3     haven't spoken to whether that matters.  I think you're

4     basically saying it doesn't, that it's the same as just

5     regular outside counsel.

6          MS. SINGER:  I'm saying that Rule 1.11, Your

7     Honor, speaks to private clients.  It doesn't speak to civil

8     litigation or private --

9          THE COURT:  But the point is, Ms. Singer, this

10    wasn't really your client.  You're saying -- I mean, you're

11    saying it's some sort of a hybrid, it was just -- it was the

12    same as a contingency client because you were being paid on

13    a contingency arrangement, which seems odd -- which seems

14    odd to be a public -- a sort of a quasi-public official but

15    being paid on a contingency arrangement.

16         MS. SINGER:  I think that's actually really

17    important -- it is a cornerstone of how AGs -- and I say

18    this as a former attorney gen -- are able to carry out their

19    functions and level the playing fields with large

20    corporations in high-stakes complex civil litigation going

21    back to tobacco.  And Your Honor knows as well as anybody

22    the important role that outside counsel have played to

23    states and subdivisions in achieving the results we have in

24    this case, and we feel very proud of that and humble and

25    grateful for the chance to do it and mindful of our ethical

1    responsibilities throughout.

2        But, again, 1.11 speaks to private client.  I do think

3    that Your Honor can resolve this on the question of

4    confidential government information.  And it is very

5    different than the prior disqualification where, as Your

6    Honor will recall, police captain testified that he provided

7    information to the U.S. attorney confidentially inside bars

8    that it was in the -- in the context of a trusted

9    relationship where he shared things that he wouldn't have,

10   right?  That was not either identifiable or discovered

11   material.  In fact, like *Kronberg* and *Villaspring*, it

12   couldn't be identified.  That's very different.  And DOJ

13   even weighed in to say that she had access to confidential

14   information.

15       The fact that OptumRx hasn't produced these documents

16   yet is we think a failing of OptumRx under DR 22.  It should

17   have been produced already, they will certainly --

18                THE COURT:  Just so it's clear, because I want

19   to move on, I'm just -- I'll decide it, and however I decide

20   it, I'll decide it -- are you basically saying that

21   there's -- there are no differences in what you can and

22   can't do --

23                MS. SINGER:  No.

24                THE COURT:  -- based on whether -- based on

25   whether you're retained by a city or county as outside

1    counsel or whether you are a deputy attorney general or a

2    deputy city counsel?

3                    MS. SINGER:  Of course not, Your Honor.  I'm

4    sorry if that's the --

5                    THE COURT:  Well, then what are the --

6                    MS. SINGER:  Attorneys general have different

7    authorities than most subdivisions.

8                    THE COURT:  Well, what are the differences in

9    terms of your subsequent -- your subsequent work?  That's

10   the point.  That's what I'm trying to get at.

11       What differences -- what limitations?  Are there any

12   additional limitations on your subsequent work as a lawyer,

13   who you can represent, what litigation you can be in?

14                    MS. SINGER:  We can't use confidential

15   government information obtained in the course of the

16   representation of a public entity in litigation for private

17   clients.  That's the limit of --

18                    THE COURT:  Okay.  Well, that's -- at the

19   moment --

20                    MR. BOONE:  Your Honor --

21                    THE COURT:  At the moment you got confidential

22   government information on OptumRx.  Whether you can use it

23   or not, I don't know because I don't even know exactly what

24   it is.  But that's the concern.  You got it.  Your firm has

25   it.

1           MS. SINGER:  We have a set of documents, all

2      of which are discovery materials, discovered -- in fact,

3      OptumRx had previously produced them to Minnesota and then

4      reproduced them subsequently to attorneys general.

5           But it can't be the rule either, Your Honor, because

6      1.11 speaks to a balancing test, right?  And there's the --

7      the interest in preserving the appearance and fact of

8      fairness to the entity being investigated or subject to

9      litigation, but there's also the interest in lawyers being

10     able to work from government and go on to do other important

11     and meaningful cases.  That is an explicit goal of the rule

12     as well.  And that's why the comment specifically speaks, as

13     Mr. Weinberger said, to prejudice and a balancing of

14     interest.  And there is an interest in government being able

15     to get access to these lawyers.

16          And the rule that OptumRx is proposing here would mean

17     that if you've litigated against a defendant in a public

18     capacity, if we were special counsel to DOJ in a tax case

19     or -- you know, I've represented the State of Nevada in

20     litigation against Bank of America, that because I gained

21     insights into their business model or strategies, that I

22     would be forever precluded from litigating against Bank of

23     America.  The confidentiality agreement --

24          THE COURT:  Well, I don't think they're taking

25     that point -- they're making that point, that you could

1     never -- never litigate any case against OptumRx on any

2     other subject.

3          I mean, am I right, Mr. Boone?

4          If that's your argument, that's way too --

5               MR. BOONE:  That's right, Your Honor.  What

6     we're saying --

7               (Unreportable crosstalk.)

8               MR. BOONE:  What we're saying is that Motley

9     Rice investigated OptumRx using government power, they were

10    the government, they cannot now sue OptumRx on related

11    issues.  That's what we're saying.

12              THE COURT:  Well, that's the point.  It's

13    related.  So I'll just have to decide if it's closely-enough

14    related, all right?  That seems to me if it's -- if it's

15    completely unrelated, you know, if it was a tax case, we

16    wouldn't be here.  Or if we were, I would have decided it

17    already.  I wouldn't have needed this discussion, all right?

18         So it's -- the question is is it closely-enough

19    related, so I'll have to figure that out and --

20              MR. WEINBERGER:  Your Honor, one other

21    thing -- one other thing that the -- I want to get -- I

22    would like to give a little context to this because I think

23    what's happening here is -- is a broader concern, and that

24    is that any time somebody is employed by a state attorney

25    general as private counsel, if the rule is such that you

1    can't then, you know, turn around and represent other

2    governmental entities against that defendant, that is

3    exactly what the U.S. Chamber of Commerce and these

4    defendants are attempting to do.

5        There is a move afoot -- and this is part of it, Your

6    Honor -- in trying to curtail the rights of state and cities

7    and counties to retain outside counsel who are prepared to

8    represent them on a contingent fee and are prepared -- as we

9    were and did in this case -- to fund the litigation under

10   circumstances where the governmental entities cannot afford

11   under their budgets to pay either hourly fees or litigation

12   expenses, and -- and, you know, if you grant this motion,

13   Your Honor --

14               THE COURT:  Peter, here, I applaud you for

15   doing that, and, again, if we were -- if Motley Rice was

16   just I'll call conventional outside counsel for Chicago and

17   Hawaii and DC, there would be no motion, or if there was, I

18   would have just denied it out of hand, okay?

19       The concern is this sort of a hybrid where you're

20   being -- you're being paid as like conventional outside

21   counsel, but you're exercising government power.  I wasn't

22   aware that that existed until this motion was filed.

23               MR. WEINBERGER:  But, Your Honor, I haven't

24   heard --

25               THE COURT:  That's what --

1           MR. WEINBERGER:  I haven't heard Optum say

2   they'd produce something in -- to Hawaii or these other two

3   entities because they were subpoenas from an attorney

4   general that they, you know, wouldn't have produced had they

5   been involved in litigation with one of the cities and

6   counties that we represent.  I mean, that's -- that's the

7   rub.  The --

8           THE COURT:  Well, they would have produced --

9   they would have produced those documents to the attorney

10  general had Motley Rice not been deputized, all right?  The

11  AG would have subpoenaed them, and they would have produced

12  them to the AG, all right?  But the AG wouldn't be in

13  here --

14          MR. WEINBERGER:  But the scope of the --

15          MR. BOONE:  Your Honor --

16          THE COURT:  Let's move --

17          (Unreportable crosstalk.)

18          MR. BOONE:  If I can bring something up --

19          THE COURT:  I will make my decision, and that

20  will be that.  I'm not sure how helpful this has been, but

21  I've asked the questions I've asked, and I'll make a

22  decision.  All right.  And I want to leave some time for the

23  other motion.  All right.

24          MR. RICE:  Your Honor?

25          THE COURT:  Yes.

1          MR. RICE:  Just a factual point.

2      Everybody keeps saying "issued the subpoenas."  It's

3  my understanding that the government lawyers, the AG's

4  office, issued the subpoenas, got the documents, and we were

5  their outside counsel helping them analyze the documents.

6          THE COURT:  Well, no, Joe.  I -- I thought

7  that you --

8          MR. BOONE:  That's not true, Your Honor.  They

9  were the government.

10          THE COURT:  -- your office issued the

11  subpoenas -- issued the subpoenas as special AGs, that you

12  were exercising government authority, that the state or the

13  city deputized you.  All right?

14          MS. SINGER:  Just to be precise, so you have

15  the facts, each of the public entities signed and issued the

16  CIDs, the documents were delivered to Motley Rice, but the

17  subpoenas were issued by the government entities.

18          MR. BOONE:  But, Your Honor, in Hawaii they

19  already admitted they were special deputy attorney

20  general -- attorneys general.  In Chicago they were special

21  assistant corporate counsel.  In DC they were appointed by

22  authority vested in the attorney general.  That's in the

23  record.  They were exercising government authority in each

24  case.  I can't believe they're even arguing to the contrary.

25          THE COURT:  I -- again, what -- this has not

1    been particularly helpful because I think each side staked

2    out extreme positions, and I'm going to have to parse it

3    through, all right?

4        You know, Optum just wants to throw Motley Rice off

5    because I think you want to throw them off, all right?

6    Motley Rice wants to stay on, and Motley Rice is saying

7    there's really no -- that -- that the label that they had

8    doesn't really matter.  All right?  They were just outside

9    counsel and --

10                    MR. BOONE:  Your Honor, look, we have --

11                    THE COURT:  I'm going to move on --

12                    MR. BOONE:  Both of our experts have said that

13   this is not a close case.  They both said that.  They're on

14   the line today.  I mean, I...

15       With that, I won't say anything else.

16                    THE COURT:  All right.  Well, again, maybe

17   it's my fault this has not been particularly helpful.  I'll

18   make my decision.

19       All right.  The other motion, I don't want to spend a

20   lot of time on this.  I got just a few questions.

21       There was something in the PEC's brief that I did not

22   understand.  Let me go back a bit.

23       If I had learned from my pharmacy case, pharmacies

24   have a corresponding responsibility with the physician to

25   make sure that the prescription is issued for a valid

1    medical purpose and it is not -- it is not being diverted,

2    sold, otherwise misused by the particular patient.

3         My question is for a mail-order pharmacy, what state

4    regulates a mail-order pharmacy?

5         Well, I should go back.

6         Does a mail-order pharmacy have the same corresponding

7    responsibility that a brick-and-mortar pharmacy has?

8              MR. WEINBERGER:  The answer is yes, Your

9    Honor.  They are a pharmacy, they're required to be

10   registered under the CSA, and they have all the

11   responsibilities -- they have the corresponding

12   responsibility just like a brick and mortar --

13             THE COURT:  All right.  Well, who -- which

14   state -- which state regulates a mail-order pharmacy?

15             MR. WEINBERGER:  I believe they have to be

16   registered in any state where they -- where -- to which the

17   drug is dispensed.

18             MS. BIERSTEIN:  Your Honor, this is Andrea

19   Bierstein.

20        If I can add, I would say that I believe in the

21   complaint we -- in the proposed complaints for each

22   plaintiff, we alleged that the mail-order pharmacies are

23   registered with the state board of pharmacy in the relevant

24   state in each of the complaints.

25             THE COURT:  So the state -- plaintiffs believe

1      that the pharmacy -- mail-order pharmacy has to be

2      registered in each state to which it sends --

3                     (Unreportable crosstalk.)

4                     MS. BIERSTEIN:  Yes, Your Honor.

5                     MR. WEINBERGER:  Do not forget, you're talking

6      about two different registrations, Your Honor.  You're

7      talking about the federal registrations under the DEA

8      regulations --

9                     THE COURT:  Well, I know the federal is --

10                    MR. WEINBERGER:  -- under the CSA and the

11     state boards of pharmacy.

12                    THE COURT:  All right.

13         Did the PBMs agree that when -- your mail-order

14     pharmacies had to be registered in each state to which you

15     mailed prescriptions?

16                    MS. MERKEL:  We agree with that, Your Honor.

17     Speaking on behalf -- on behalf of Express Scripts, and

18     that's key reason why we think essentially what these claims

19     against the mail-order pharmacies are doing is rehashing a

20     lot of what's already been covered and introducing a lot of

21     complex arguments and issues associated with those

22     responsibilities vis-à-vis a pharmacy that simply don't

23     apply to PBMs.  PBMs are not DEA registrants.  They're not

24     registrants.  They don't dispense prescription drugs and

25     so --

1          THE COURT:  Well, wait a minute.  I thought

2     you do -- I thought your pharmacies do dispense --

3          MS. MERKEL:  The pharmacies do, but that's a

4     separate entity from the PBM.  Express Scripts itself is not

5     a registrant with the DEA or --

6          THE COURT:  All right.  Then --

7          MR. WEINBERGER:  Your Honor, there's one

8     other -- can I just --

9          THE COURT:  All right.  I'm going to move on.

10          MR. WEINBERGER:  There's one other important

11     point, Your Honor, if I...

12          So what we know.  So take -- set aside the whole issue

13     of their dispensing this as mail-order pharmacies.  We know

14     that at the point of dispensing by, say, a CVS, if that

15     patient is insured by an entity that uses, say, for example,

16     Optum, at the point of dispensing, the computer system

17     notifies the PBM, and the PBM does their own DUR, their own

18     investigation before issuing a -- before allowing payment.

19     So in effect they are involved -- even setting aside their

20     mail-order pharmacies, they are involved in the dispensing

21     process because they're doing their own individual patient

22     and doctor analysis with respect to that prescription.

23          THE COURT:  I was going to get to that.

24     There's a statement in the plaintiff's brief that the

25     original complaints -- the existing complaints, 40

1    amendments contain in-network dispensing claims.  Is that

2    what you're referring to?  I mean, is that what an

3    in-network -- I mean --

4                    MS. BIERSTEIN:  Yes, Your Honor.

5         This is Andrea Bierstein again.

6         So an in-network claim is when the PBM is operating as

7    a PBM, it contracts with a network of pharmacies so that

8    when the plan beneficiary goes to fill a prescription, the

9    pharmacy, because it has a relationship with the PBM, it can

10   just take the co-pay, and the PBM handles everything else on

11   the back end.

12        So part of that relationship with the in-network

13   pharmacies, the PBMs provide this drug utilization review

14   service, so they insert themselves into the dispensing

15   process even when they are not the dispenser.  So that's why

16   we say that in the original complaints, because we were

17   looking at their role in the dispensing process for their

18   in-network pharmacies, dispensing was already in the case,

19   even though we hadn't specifically focused on the PBM as

20   dispenser.  That's a different relationship.  But they were

21   already involved in --

22                    THE COURT:  All right.  This is what -- this

23   is what I'll call typical PBM work, which is they contract

24   with insurers to -- to administratively handle claims, and

25   part of what they do is determine if -- you know, if the

1    claims are valid, if -- drug -- et cetera.  So -- but that's

2    not dispensing the prescriptions themselves, that would be

3    mail-order dispensing.  So --

4                   MR. BOONE:  And --

5                   (Unreportable crosstalk.)

6                   MS. BIERSTEIN:  It's not dispensing -- Your

7    Honor, but it's not the relationship with the TPP, with the

8    payor in that instance that we're focusing on, it's the

9    separate relationship with the in-network pharmacy, that is

10   they have a relationship with the payor, but then they go

11   and contract with the pharmacy as well, and they say to the

12   pharmacy, "We're going to make your life easy.  You don't

13   have to check with the insurer and figure out what the

14   coverage is and figure out if this person should be getting

15   this drug.  We, the PBM, will do that for you."

16       And it's part of their role as PBM to smooth the

17   transaction between the beneficiary and the insurer -- is

18   for them to contract separately with the pharmacy.  So

19   that's why it is standard PBM work, but it's not -- doesn't

20   grow out of only the relationship with the insurer, it grows

21   out of the independent contracts that they enter into with

22   network pharmacies when they say, "Let us help you with your

23   dispensing.  We'll point out utilization review problems.

24   We will make your dispensing easier."

25                   THE COURT:  All right.  But, again --

1          MS. BIERSTEIN:  That's the --

2          THE COURT:  -- the -- is part of that what

3    I'll call traditional PBM work?

4          MS. BIERSTEIN:  Yes.

5          THE COURT:  Is the PBM supposed to look at the

6    red flags that we dealt with in Track 3?

7       I guess I'm asking the PBMs that.  Is part of your

8    traditional PBM work that Ms. Bierstein has just

9    described -- which obviously you do, and I was very familiar

10   with -- do you do red-flag analysis of individual

11   prescriptions?

12         MS. MERKEL:  What we do is provide essentially

13   that -- it was built into Ms. Bierstein's description of it,

14   it's on the back end we will provide the services that they

15   contracted with us to provide.  So we are doing essentially

16   claims processing and claims analysis on the back end.  We

17   are not interfacing directly with any patients.

18      So we are not the ones who determine to dispense the

19   drugs.  We are essentially providing data that can be

20   consulted by our clients according to the information that

21   our other clients have told us to make available to them.

22   So it's categorically a different role --

23         THE COURT:  I --

24         (Unreportable crosstalk.)

25         MR. WEINBERGER:  Didn't get an answer to your

1     question --

2                     MR. BOONE:  Your Honor, so the CSA and

3     pharmacy regulations do not apply to that aspect of the

4     PBM's business.  No one outside of the PEC calls that

5     dispensing.  I've never heard it actually.

6                     THE COURT:  All right.

7                     MR. WEINBERGER:  Your Honor, the answer is --

8     the answer is exactly what you saw in the front -- in the

9     pharmacy cases where we utilized -- we said to the -- we

10    said that the pharmacies had an obligation to utilize the

11    data they had to determine whether or not there were any red

12    flags and to ensure that those red flags get, you know, due

13    diligence before and get resolved before there is

14    dispensing -- that is very --

15                    THE COURT:  All right.  That --

16                    MR. WEINBERGER:  That is very much what the

17    PBM does when they -- through their computer or by phone,

18    that there's a patient at the pharmacy, the pharmacist is

19    determining whether or not to fill, and one of the things

20    they have to do is check with the insurance.  And the PBM

21    acts as that conduit, that go-between.  And we know because

22    we already have the documents that demonstrate this, we know

23    that they use their data to determine whether or not the

24    data reflects any red flags.  And -- and our --

25                    MS. BIERSTEIN:  Your Honor, if I can add to

1    what Mr. Weinberger's saying.

2         What you would see in our complaint is an allegation

3    about something called concurrent DUR, concurrent drug

4    utilization review.  Concurrent DUR happens at the moment of

5    dispensing.  So the analysis the PBM is doing is not simply

6    after-the-fact later analytics, "oh, in retrospect I see a

7    red flag," although that is part of it because they have the

8    data, they can see the red flags.

9         But the concurrent DUR puts them in the business of --

10   now the pharmacy can't offload its responsibility

11   altogether.  They still have the corresponding

12   responsibility.  But the PBM in providing CDUR, concurrent

13   drug utilization review, says, "We're going to help you with

14   this red flag analysis because our data will show some red

15   flags, and our data can give the pharmacist guidance on

16   whether or not to fill."

17        So I think the answer is -- are they involved in red

18   flags in their role as PBM, I think the answer is yes.

19   Whether or not --

20                  THE COURT:  But do the PBMs agree with that?

21   What I'm --

22                  MR. BOONE:  No, Your Honor.  Those programs we

23   offered to our clients.  They are not required by the CSA,

24   they're not required by any state pharmacy regulation.

25                  MR. WEINBERGER:  Well, Your Honor, if --

1              MR. BOONE:  It's actually --

2              MR. WEINBERGER:  We're at the stage for a

3     motion for leave to amend.

4              THE COURT:  What I --

5              (Unreportable crosstalk.)

6              MR. WEINBERGER:  Subject to a motion to

7     dismiss or a summary judgment, that's for later on.

8              THE COURT:  Hold it.

9         I'm just trying to find out if it matters, okay?

10        The parties -- I mean, the key issue to me is whether

11    I allow the plaintiffs to include traditional pharmacy

12    dispensing claims for the PBMs as mail-order pharmacies,

13    okay?  And I have -- up until today I thought there was a

14    clear distinction between what the PBMs do as traditional

15    PBM work, which is what is -- we've just been talking about,

16    interfacing, administering claims, and serving -- just

17    like -- just like the brick-and-mortar pharmacy, only

18    filling prescriptions by mail, all right?  As a pharmacist,

19    all right?

20        But the discussion I just heard suggests there really

21    isn't a difference and that it's all, you know, maybe two

22    sides of the same coin.  In which case, even if I don't

23    allow the -- even if I don't allow the amendments, the PBMs

24    may bring in all the -- the major national pharmacies into

25    this case, try to bring them in as third-party defendants so

1    that it really, you know -- I can't keep them out, so it

2    doesn't really matter, you know -- might as well include the

3    dispensing claims because they're going to be in no matter

4    what.

5              MR. BOONE:  Well, Your Honor, there is --

6    there is a difference between dispensing on the one hand and

7    PBM services on the other.  They're trying to blur the lines

8    between those to suit their own purposes, but there's a

9    clear distinction.

10             THE COURT:  Are you --

11             MS. MERKEL:  I just want to --

12             MS. BIERSTEIN:  We're not saying --

13             (Unreportable crosstalk.)

14             THE COURT:  Hold it.

15        Let me put it to you, Mr. Boone, and whoever else

16   for -- you know, with I guess Ms. Merkel, whoever it is for

17   Express Scripts, all right?

18        You've already said that if I allowed -- if I allow

19   the complaints to include mail-order dispensing claims,

20   you're going to move to bring in many other pharmacies, all

21   right?  And the plaintiffs have said, "Oh, you know, they

22   weren't in Track 3, so they won't be in here."  Well, they

23   weren't in Track 3 because the Track 3 defendants chose not

24   to bring them in.  I told them they could have.  So I'll let

25   you bring them in.

1          Are you telling me you will not move to bring them in

2     if I limit -- if I don't allow the amendments for mail-order

3     pharmacies and I just leave the allegations for, you know,

4     the in-network dispensing claims that are there in the

5     existing complaints?

6               MR. BOONE:  I would need to talk to my client

7     about that, Your Honor.  But as I understand it, the answer

8     would be no.  If you don't allow dispensing claims against

9     OptumRx and Express Scripts, I very seriously doubt that

10    we're going to try to implead as defendants other

11    pharmacies.

12              MS. MERKEL:  Yeah.  I would give the same

13    answer, Your Honor.  We think it's significantly less likely

14    that we would need to bring other parties into the claims,

15    and I think an important distinction --

16              THE COURT:  Maybe less likely, but that's

17    hedging it because the point is if they're --

18              MS. MERKEL:  We need to --

19              THE COURT:  As I see it, the only reason why I

20    would not allow them in is because I don't want to turn

21    these bellwethers into Track 3, you know, number 2.  We've

22    been there, we've done that, all right?  So we don't need it

23    again.

24              MS. MERKEL:  And that's exactly what we're

25    concerned would happen, Your Honor.

1          And the additional factor here is that, you know,

2     these mail-order pharmacy entities that we're talking about

3     have something like less than one percent combined of the

4     relevant market share of dispensing.  We understand we've

5     been selected as PBMs to serve as bellwether defendants in

6     PBM cases, but we absolutely would be looking to share the

7     burden of acting as defendants in dispensing cases if we're

8     going to be essentially relitigating all of the issues from

9     Track 3.

10         MS. BIERSTEIN:  Your Honor, if I could just

11    respond to that briefly.

12         I understand the Court may not want to try another

13    case against a dispenser because, as you've said, you've

14    been through that, and that's a down-the-road issue.  And at

15    the -- to the extent that they are in discovery as a

16    dispenser may also be a down-the-road issue.  But if we

17    can't amend our complaint to include claims against them as

18    dispensers, then we may not have -- we likely will not have

19    an opportunity to preserve that claim at all, and in the

20    same way, Your Honor, that CVS and Walgreens and Walmart

21    were in litigation in CT3 as both distributors and

22    dispensers.

23         Now, the Court could have chosen to say, "I'm only

24    going to hear the dispensing side," but the Court would not

25    have forced us to abandon our claims against them as

1      distributors, even if the Court had chosen to stay or sever

2      those claims.  So we're at a very early stage, this is just

3      can we plead the claim.

4          Your Honor may decide we can plead it.  And then after

5      the motions to dismiss flesh out the contours of what the

6      legal theories are, you may say, "Here's what we're going to

7      actively litigate.  Here's what we're going to go forward

8      on."  The judge who tries these may say, "I don't want to

9      try that part of the case.  It's already been done.  We know

10     what that looks like."  But we haven't done it against these

11     defendants, and our clients have claims against them.

12         And for Your Honor to deny them their only shot or

13     what is likely their only shot to pursue a claim they have

14     against this defendant that is -- that they have the ability

15     to bring because administratively in the MDL it may not be a

16     convenient time to hear it, I think it's mixing up two

17     things.  Your Honor has all that administrative authority to

18     manage the case, but right now we're just looking to have

19     the opportunity to get our claims on file and preserve them,

20     and then we'll figure out and Your Honor will figure out how

21     it makes sense to proceed in this litigation.

22                 MR. BOONE:  Your Honor, on the question that

23     you asked, I can speak to my client, and I think we could

24     give you a definitive answer by the end of the week.

25                     THE COURT:  All right.  Well, I...

1          MR. BOONE:  But I suspect that the answer is

2     going to be no, we're not going to try to bring in

3     pharmacies as defendants if there are no dispensing claims

4     against OptumRx's home delivery pharmacy -- mail-order

5     pharmacy.

6          THE COURT:  I'm just trying -- I'm not sure if

7     there's -- it may be so interrelated that there's no

8     meaningful way to separate them even for discovery.  I don't

9     know.

10          MS. MERKEL:  I just don't think that's true,

11     Your Honor.  I mean, I think the really important

12     distinction, even if the PBM entities are sort of -- they're

13     in the computer with the pharmacist and the pharmacist can

14     consult information as part of the CDUR process that was

15     being described previously, there's always a pharmacy

16     standing between the PBM and the patient who gets the drug.

17     That's a really important distinction.

18          So the services that we provide to pharmacies are

19     services that can be litigated in these bellwethers, they're

20     classic PBM services, but it's not that -- they don't have

21     the same obligation and the -- the action of dispensing a

22     drug is always intermediated by a pharmacy that has the

23     obligation under its state and federal, you know,

24     registrations to be the dispenser of those drugs, and

25     so it's --

```
 1                    THE COURT:  I understand that, but say
 2       you're in -- say you're in a given community, all right?  I
 3       mean, what a PBM does, what they learn, what they know in
 4       one aspect to their business they can apply to the other,
 5       so --
 6                    MS. MERKEL:  Well --
 7                    THE COURT:  I mean, we -- and they --
 8                    MR. WEINBERGER:  And that --
 9                    THE COURT:  Both sides --
10                    MR. WEINBERGER:  That ignores -- that ignores
11       the fact that the one -- the really important issue that
12       they are dealing with is whether or not to pay for the drug.
13       I mean --
14                    MS. MERKEL:  Yeah, but that's a classic --
15       that's a classic PBM service.  I mean, we're happy to --
16                    MR. WEINBERGER:  And not --
17                    (Unreportable crosstalk.)
18                    MS. MERKEL:  Your Honor acknowledged this at
19       the December 1st hearing, it's -- we can take discovery into
20       what we learned from our mail-order pharmacy business, and
21       to the extent that that informed what we were doing as a
22       PBM, you know, I'll preview to you that those were operated
23       as very separate businesses, but that is a categorically
24       different situation, giving some discovery into that topic
25       from actually litigating and adjudicating the liability of
```

1    the pharmacy entities' claw dispensers who have that DEA

2    registration, have that state registration, would be dealing

3    with the exact same legal issues that were at play in

4    Track 3 that would not be at play in this bellwether

5    litigation unless these claims are added to the amended

6    complaint.

7          So we think the legal complexity is significant, and

8    it's just categorically different between a PBM and a

9    pharmacy, mail-order or otherwise.

10               MS. BIERSTEIN:  Your Honor, if I could make

11   two --

12               THE COURT:  All right.  I think I -- again,

13   the issue is whether or not I allow the complaints to be

14   amended.  That decision doesn't dictate whether any of them

15   are going to be tried as any of these claims -- what claims

16   will be actually tried if there are trials --

17               MS. MERKEL:  And we did make a --

18               THE COURT:  -- decisions --

19               (Unreportable crosstalk.)

20               MS. MERKEL:  I'm sorry, Your Honor.

21         We did make an application to sever and stay the

22   claims in the alternative.  We think they shouldn't be

23   added, but we think it's important to the extent, you know,

24   we're dealing with this now to sever the claims now because

25   we have an already very aggressive discovery schedule that

1    we've agreed to.  We're working very hard to move forward

2    with that.  But we think if these additional issues are

3    brought into the case, they're going to delay the case from

4    day one.

5         And so we're concerned that the progress of discovery

6    is going to be significantly bogged down by having these

7    additional issues in the complaint.  That's why we argue

8    that it's important to the extent these claims are going to

9    be allowed in, and we don't think they should be, that they

10    be severed and stayed, so they're not progressing on the

11    same track and we're not spending, you know, significant

12    amounts of time dealing with essentially pharmacy discovery

13    as opposed PBM discovery.

14         THE COURT:  Well, I can deal with -- I can

15    deal with that down the road.  The plaintiffs might have to

16    make some tradeoffs, all right?  They're the ones who want

17    the cases to proceed expeditiously, and so if there's a

18    tradeoff between -- you know, if it takes another six, nine

19    months, if we fully discover and investigate dispensing

20    claims or -- might have to make that decision, all right?

21    But I don't have to make that now because I don't know

22    what -- you know, what the facts are.  But we may get there.

23         So I understand the issue is whether or not the

24    plaintiffs can make the claims in their complaints -- amend

25    the claims to include that -- dispensing claims, mail-order

1     dispensing claims.

2                     MR. BOONE:  Your Honor, they're also trying to

3     add what I'll call *Mackenzie*-type claims against Optum

4     Insight, which is not a PBM.  And we think that's improper

5     for all the reasons we set out in our briefing.  And I won't

6     repeat those arguments here.

7          Same goes for the cash card entities.  I mean, in

8     fact --

9                     (Unclear speech; clarification requested by

10                    court reporter.)

11                    MR. BOONE:  So they're trying to include ten

12    entities.  Only one is a PBM, OptumRx.  The others are data

13    companies, and they have *Mackenzie*-type claims, they have

14    cash card claims, they have nothing to do with PBM services,

15    nothing to do with dispensing claims, and so they should be

16    out too.

17                    MR. WEINBERGER:  Your Honor --

18                    THE COURT:  All right.  Do the plaintiffs want

19    to speak to ones that include those?

20                    MR. WEINBERGER:  Your Honor, the way that

21    these companies are organized we believe is directly related

22    to the -- our ability to discover how these various entities

23    are intertwined and relate directly then to their activities

24    associated with opioids.  And, again, at the end of

25    discovery, if we find that these entities do not provide

1    information or are not involved in some way in -- in

2    creating this opioid epidemic, they will obviously be out.

3    But for purposes now, as you've said multiple times, it's

4    only whether or not we can name them in the complaint and

5    under the allegations that we had set forth.

6              THE COURT:  Well, I should just say that the

7    plaintiff's RICO claims, whether they can prove them or not,

8    are that the PBMs conspired with the manufacturers to help

9    push and promote these opioids, that they were safe and

10   effective, knowing that they weren't.  I mean, that's a

11   *Mackenzie*-type claim.  That was the allegation against

12   Mackenzie.  Well -- so they can certainly make those claims,

13   whether they can prove them or not, that's not the issue

14   now.

15        All right.  I think I got a pretty good understanding.

16   I guess I want to -- either -- anyone else from my group

17   have a question that they don't think I asked or didn't ask

18   it in a clear way?

19              MR. COHEN:  I do not, Judge.  Thank you.

20              THE COURT:  Okay.  All right.

21              MR. BORDEN:  Thank you.  No, Judge.

22              THE COURT:  Okay.

23        All right.  Well, I appreciate everyone's time and

24   helping me think these things through.  And I'll make my

25   decisions as expeditiously as I can because I know both

1      motions are important to all sides.

2            Okay.  Thank you very much.

3                  (Proceedings concluded at 3:16 p.m.)

4

5

6                  **C E R T I F I C A T E**

7

8         I certify that the foregoing is a correct transcript

9      of the record of proceedings in the above-entitled matter

10     prepared from my stenotype notes.

11                  */s/ Gregory S. Mizanin        February 13, 2024*
12                  GREGORY S. MIZANIN, RDR, CRR              DATE

13

14

15

16

17

18

19

20

21

22

23

24

25