# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION  ) ) ) | MDL NO. 2804 |
| THIS DOCUMENT RELATES TO:  ) ) | Case No. 1:17-md-2804 |
| *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)  ) ) ) | JUDGE DAN AARON POLSTER |
| *Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13)  ) ) ) | |
| *City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14)  ) ) ) | |
| *County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15)  ) ) ) | |

## [PROPOSED] PLAINTIFFS' AND PEC'S SUR-REPLY IN OPPOSITION TO OPTUMRX'S MOTION TO DISQUALIFY MOTLEY RICE

With its Reply to Plaintiffs' and the PEC's Joint Opposition to the Motion to Disqualify Motley Rice, Defendant OptumRx filed a new expert report and a new fact declaration presenting new factual matter that was not part of the Motion record when Plaintiffs filed their Opposition and that is material to the issues before the Court. Plaintiffs hereby address and respond to this new factual material.

### A. Supplemental Expert Report on Public Office and Private Client

Optum's experts—attorney Sari W. Montgomery and Law Professor Wendy Muchman—opine in response to Plaintiffs' legal arguments that, in its representations of Hawaiʻi, the District of Columbia, and the City of Chicago, "Motley Rice gathered information exercising the power of a government lawyer" and yet also that "[w]hile representing governments [as Plaintiffs herein] in their private practice, Motley Rice is not acting as a government lawyer." ECF 5300-2 at 5. This

opinion—that Motley Rice was acting as a government officer in the former and representing private clients in the latter—is contradicted by the factual record regarding those legal relationships.  As laid out below, the applicable statutes and agreements establish that Motley Rice is not a public officer or employee and that Rule 1.11 does not apply to its representations.

Ohio Rule of Professional Conduct 1.11(c)'s prohibitions are triggered only when a lawyer possesses confidential government information "acquired when the lawyer was a public officer or employee."  The Court recognized as much at the hearing on February 12, 2024:  "[I]f Motley Rice was just I'll call conventional outside counsel for Chicago and Hawaii and DC, there would be no motion, or if there was, I would have just denied it out of hand."  Tr. 28:15-28.

Motley Rice was not a public employee or officer when it represented Hawaiʻi.  The civil investigation and related litigation were undertaken pursuant to a single retainer agreement.  ECF 5276-5 (Hawaiʻi-Motley Rice Retainer) at A1-1 ("Investigation") and A1-2 ("Litigation").  The Retainer states that Motley Rice is to perform "Special Deputy Attorney General Services," *id.* at 1, but also makes clear that Motley Rice is an "independent contractor" and its employees and agents "***are not by reason of this Agreement, agents or employees of the State for any purpose[.]***" *Id.* at GC-1 (emphasis added).[1]  The Retainer also contains the limitation that Motley Rice is subject to the State's control in performing both the civil investigation and subsequent litigation. *Id.* at A1-2 to A1-3, ¶¶ I.1, II.1.[2]  Optum's experts are simply wrong—Motley Rice was neither a public officer nor an employee of the State; regardless of the label, Motley Rice was retained and acted as *private counsel for a public client*.

---

[1] *See also* ECF 5276-10 (DC-Motley Rice Retainer) at 3, ¶ 4.1.10 ("Neither Contractor nor any employee of Contractor shall be regarded as employed by, or as an employee of OAG.").
[2] *See also* ECF 5276-10 (DC-Motley Rice Retainer) at 3, ¶¶ 4.1.6 and 4.1.8 (Attorney General's final authority and control); Declaration of Wendy J. Weinberg, Senior Assistant Attorney General, ¶¶ 4-6 (describing content and exercise of DC Retainer government control provisions).

2

The applicable state statutory provisions also make clear that special deputy attorney generals like Motley Rice are not State employees and do not hold the powers of the Attorney General.  The Hawaiʻi Attorney General may appoint deputies, who are employees of the Attorney General and "exercise any and all duties or powers by law required of or conferred upon the attorney general."  Haw. Rev. Stat. 28-8(a).  But, unlike outside counsel, the deputies/employees cannot "engage in the private practice of law, nor accept any fees or emoluments other than their official salaries for any legal services."  Haw. Rev. Stat. 28-10.  The Hawaiʻi Attorney General also may retain outside counsel, denoted "special deputies," but the scope of their duties and power is limited by what "the attorney general may specify in their several appointments."  Haw. Rev. Stat. 28-8(b). Thus, unlike full-time deputies/employees who may exercise the power of the State, outside counsel who are special deputies are limited to the powers provided in their appointment.  Therefore, they are not covered by Rule 1.11(c).

Here, it is clear that Motley Rice was not serving as an officer or employee of the Hawaiʻi Attorney General with respect to the Optum subpoena.  The Hawaiʻi-Motley Rice Retainer (ECF 5276-5) did not authorize Motley Rice to issue civil investigation subpoenas.  *See also* Declaration of John H. Price, Supervising Deputy Attorney General ("Price Decl."), ¶ 6.  Accordingly, Hawaiʻi issued its Subpoena (ECF 5276-6) to Optum under the Attorney General's name and designated Deputy Attorney General David D. Day as contact.  *Id.* at 2.[3]  Motley Rice never had or exercised State power as a public officer or employee with respect to the subpoena; rather, it assisted the State in its exercise of its own powers to carry out investigations and enforce the law.[4]

---

[3] *See also* ECF 5276-11 (DC Subpoena) at 13 (signed by Assistant Deputy Attorney General).
[4] Indeed, a robust body of law establishes that government's powers cannot be delegated to private counsel, but permits the use of private counsel subject to supervision and control by government lawyers, as here, who exercise the government's authority. *See, e.g., County of Santa Clara v.*

3

The Retainer agreements between the City of Chicago and Motley Rice also underscore that, in representing government clients in both civil investigations and litigation, *including opioid bellwether litigation*, Motley Rice is not a government officer or employee. In Chicago's civil investigation and potential litigation of Optum's copay clawbacks and gag clauses, Motley Rice likewise was subject to the City's control. *See* Declaration of Stephen J. Kane, Deputy Corporation Counsel ("Kane Decl.), ¶¶ 4-7 and Ex. A (Copay Clawbacks Retainer), ¶¶ 16-17. Similarly, Motley Rice was subject to the City's control, in its representation of Chicago as an opioid litigation bellwether plaintiff, where, as explained below, the City also issued civil investigative demands. *See* Kane Decl., ¶¶ 8-10 and Ex. B (Motley Rice Opioid Retainer), ¶¶ 12-13. The same provisions also governed the private law firm Cohen Milstein Sellers and Toll's representation of the City of Chicago in both the civil investigation and initiation of litigation of opioid claims. *See* Kane Decl., ¶¶ 11-13 and Ex. C (Cohen Milstein Opioid Retainer), ¶¶ 11-12.[5]

Importantly, and under circumstances similar to this case, the U.S. District Court for the Northern District of Illinois (Alonso, J.) rejected the opioid manufacturer defendants' motion to disqualify Cohen Milstein from representing Chicago in opioid litigation based on its work in conducting the civil investigation. *City of Chicago v. Purdue Pharma LP*, 2015 WL 920719 (N.D.

---

*Superior Court*, 235 P.3d 21, 36 (Cal. 2010) ("[R]etention of private counsel on a contingent-fee basis is permissible in [public nuisance] cases if neutral, conflict-free government attorneys retain the power to control and supervise the litigation."); *State of Rhode Island v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 475 (R.I 2008) ("[T]he Attorney General is not precluded from engaging private counsel pursuant to a contingent fee agreement in order to assist in certain civil litigation, so long as the Office of Attorney General retains **absolute and total control over all critical decision-making** in any case in which such agreements have been entered into.") (emphasis in original); *State of W. Va. ex rel. Discover Fin'l Servs., Inc. v. Nibert*, 744 S.E.2d 625, 640 (W. Va. 2013) ("In this proceeding, the Chief Deputy Attorney General is counsel of record with the special assistant attorneys general. Most importantly, in both *Santa Clara* and the instant case, private attorneys are subject to supervision by government attorneys.").

[5] Cohen Milstein represented Chicago when Linda Singer was a partner at that firm. Representation of the City then transitioned to Motley Rice.

4

Ill. March 2, 2015). The court rejected the defendants' argument that the representation violated the Chicago Ethics Ordinance, finding that Cohen Milstein was not a "City official" for purposes of the Ordinance in performing work on the opioid investigation and litigation. *Id.* at *4 ("Cohen was neither elected nor appointed to the City's Law Department, and thus by the plain language of the Ordinance ***is not a City official***.") (emphasis added); *see also State v. Nibert, supra*, 744 S.E.2d at 634 ("[U]nder the definition of 'employee' provided by W. Va. Code § 6B-1-3(d) . . . of the West Virginia Governmental Ethics Act, a private attorney appointed as a special assistant attorney general is not an employee of the Office of the Attorney General.").[6]

The court in *City of Chicago* also held that Cohen Milstein's representation of the City in the opioid civil investigation and litigation did not violate the defendants' due process rights because the firm was subject to the City's control under the Retainer. 2015 WL 920719, at *4-6 ("Because the City retains control over the investigation and litigation of this case, its retention of Cohen does not violate defendants' due process rights."). Optum and its experts thus are simply wrong in contending that Motley Rice is anything but private counsel for the City of Chicago in both the copay clawbacks investigation and the opioid investigation and bellwether litigation. Rule 1.11(c) does not apply to these representations.

---

[6] The government ethics statute applied in *Nibert* defined a public "employee" as "any person in the service of another under any contract of hire," W. Va. Code § 6B-1-3(d), which the Court held requires payment of "wages or a salary" by the government. 744 S.E.2d at 633. The analogous government ethics statutes in Hawai'i and the District of Columbia are the same in substance. *See* Haw. Rev. Stat. §84-3 ("'Employee' means any nominated, appointed, or elected officer or employee of the State . . . and employees under contract to the State."); D.C. Code § 1-1161.01(18) ("'Employee' means, unless otherwise apparent from the context, a person who performs a function of the District government and who receives compensation for the performance of such services . . . ."). Moreover, as discussed, both the Hawai'i and the DC Retainers state specifically that Motley Rice and its lawyers are not government employees. ECF 5276-5 (Hawai'i) at GC-1, ¶¶ 2.a-b; ECF 5276-10 (DC) at 3, ¶ 4.1.10. Optum and its experts ignore these statutes and Retainer provisions in asserting that Motley Rice is a "public officer or employee" under Rule 1.11(c).

5

Optum is also wrong in separately arguing that the opioid PBM Bellwether Plaintiffs herein are "private clients" under Rule 1.11(c). Instead, they are public governmental entities. Each Plaintiff is empowered and restrained by state laws addressing local government powers.[7] This Court has recognized the importance of a government plaintiff's unique public enforcement authorities in public nuisance abatement actions like these. *See* ECF 2519 (CT1 Order denying motion to exclude expert opinions on abatement) at 2 ("In a traditional public nuisance case, a municipal entity who is harmed by the maintenance of a nuisance will give notice to and ask the offending party to abate the nuisance."). Rule 1.11(c) applies only to a lawyer's separate representation of a "private client," not a public government client as here.

The Rule distinguishes a government client from a private client in its comments, which recognize that the Rule "represents a balancing of interests." Ohio R. Prof'l Conduct 1.11(c), cmt. 4. The comments identify the possible disadvantage that may result from a lawyer's access to information "obtainable *only* through the lawyer's government service" (which, as shown below *is not* the case here), but also recognize a government client's "legitimate need to attract qualified lawyers as well as to maintain high ethical standards." *Id.* (emphasis added); *see also* Expert Declaration of Nathan Crystal ("Crystal Expert Decl.") at 8-9 (interpreting Rule 1.11(c) to make all CID productions "confidential government information" would make it difficult for

---

[7] The Bellwether Plaintiffs—like Hawai'i, DC, and Chicago—all are public entities subject to laws governing public, not private, entities. *See, e.g.*, N.Y. [General City] Law § 19.1 (2005) (Rochester) (enumerating general powers of cities in New York); Mo. Rev. Stat. § 49.650.1 (2023) (Lincoln County) (governing authority of Missouri counties without charter form of government); Mo. Rev. Stat. § 82.010.2 (2023) (City of Independence) (laws governing Missouri cities with charter ("Home Rule") government); Tex. [Local Gov't] § 231.001 (County of Webb) (zoning authority of Texas counties).

6

governments to obtain private law firm representation).[8]  The Rule balances these interests by regulating a lawyer's separate representation of a "private client," but not of other government clients.[9]  Since the Bellwether Plaintiffs are not private clients, Rule 1.11(c) does not apply.

### B. The Documents Optum Produced to Hawaiʻi and the District of Columbia are Covered by DR-2 and DR-22 and Optum Should Have Reproduced Them in This MDL Beginning in 2021.

Optum's fact declarant, attorney Matthew P. Hooker, provides an overview of the contents of the Hawaiʻi and District of Columbia investigation documents at issue that demonstrates that DR-2, DR-22, and their related orders required that Optum identify and produce these documents to all Plaintiffs in this litigation up to three years ago.[10]

The supplemental declaration describes the processes and results of index searches Attorney Hooker performed across the Hawaiʻi and DC documents (referred to therein as the "Minnesota Documents").  ECF 5300-1 (Suppl. Hooker Decl.), ¶¶ 13-15.  Attorney Hooker found

---

[8] Optum's draconian interpretation of the Rule 1.11 would frustrate the balancing of interests that the rule was designed to serve.  As Hawaiʻi Supervising Deputy Attorney General, John H. Price, explains, services performed by private law firms have been essential to his Office's ability to carry out its mission to protect the State's consumers in the face of serious resource constraints.  Price Decl., ¶¶ 9-11; *see also* Kane Decl., ¶ 14 (City of Chicago).  This often involves retained private counsel whose relevant experience includes service as counsel for other government clients in matters involving the same defendants.  Price Decl., ¶ 12.

[9] Indeed, in negotiating the Chicago, DC, and Hawaiʻi investigations' confidentiality agreements, Optum recognized that the appropriate dividing line for counsel for a government client's use of civil investigation documents is the same as under Rule 1.11—between other public entity clients and private clients.  *See* Supplemental Declaration of Elizabeth Paige Boggs ("Suppl. Boggs Decl."), ¶¶ 12-20 (describing negotiation of Chicago-Optum Confidentiality Agreement, where Optum first sought to prohibit Motley Rice attorneys from working on any other matter involving Optum's drug billing, including other government representations; Chicago refused this limitation; and the parties agreed to a limitation prohibiting sharing with counsel in a private class action); *id.*, ¶ 18 (describing comparable terms in DC and Hawaiʻi investigations of Optum permitting sharing with counsel in other public client representation matters).

[10] DR-2 requires Optum to identify "*every* prior production in *any* earlier . . . investigation . . . that touches upon the marketing or distribution of opioids, *without exception*."  ECF 693 at 7 (emphases in original).

7

that 3,835 of the Minnesota Documents (35.2% of the total) hit on one or more of the search terms/brand-name opioid drugs "OxyContin," "Opana," "Nucynta," "Duragesic," "Subsys," "Actiq," or "Fentora."  *Id.*, ¶ 13.c.  He also found that 2,403 of the Minnesota Documents (22.1%) hit on one or more of the search terms/generic opioid drug names "hydrocodone," "oxycodone," "fentanyl," "hydromorphone," "morphine," "methadone," "tapentadol," or "oxymorphone."  *Id.*, ¶ 13.d.  And he found that 1,375 of the Minnesota Documents (12.6%) hit on the search term "Purdue," the manufacturer of OxyContin.  *Id.*, ¶ 13.b.

It is beyond dispute, therefore, that thousands of the subpoenaed investigation documents (at least 35% of the total) address opioid drugs.  DR-22 required Optum to produce all documents in "any . . . government investigation . . . regarding the marketing, sales, distribution, or dispensing of Opioids."  ECF 2576 (DR-22) at 4.  A government investigation of a PBM that interfaces with marketers, sellers, and dispensers of opioids where over 35% of produced documents address brand-name opioids *is an investigation "regarding" opioid marketing, sales, and/or dispensing*.  Optum thus was required to identify and produce all of the investigation documents years ago.

Optum argues that "[n]one of the subpoenaed documents is subject to DR-22 because they were not produced in opioid investigations."  Reply at 2.  This is incorrect as to DR-22, DR-2, and the Court's related Orders.  DR-2 requires "every defendant to produce to plaintiffs, …, a list of every prior production in *any* earlier litigation, investigation or administrative action that **touches upon** the marketing or distribution of opioids, *without exception.*"  ECF 693 at 7 (italics in original; emphasis added).  DR-22 and its clarifying Orders apply this requirement to every defendant in this litigation, including Optum.  ECF 3333 (Order reaffirming DR-22, applicable to "*All Cases*").

Since Optum's supplemental declaration demonstrates that 35% of its documents produced pursuant to the Hawai'i and DC subpoenas involve brand-name opioids, these are investigations

8

"regarding" opioids under DR-22, and ones that most certainly "involve" or "touch upon" and are not "tangential[]" to opioid marketing and distribution under DR-2 and this Court's related orders. *See* ECF 232 *(*CMO-1) (MDL Defendants "shall review documents previously produced pursuant to any civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities *involving the marketing or distribution of opioids* and shall produce to the PEC non-privileged documents relevant to the claims in this MDL proceeding."); ECF 2712 at 2 ("[T]he obligation posted by DR-22 relates only to discovery 'relevant to the claims in this MDL proceeding.'"); ECF 3700 (Walmart Sanctions Order) at 6-7 ("Rather, asserts Walmart, '[t]he primary issues in the [Delaware] actions were the shareholders' desire for records concerning potential governance failures and/or potential corporate mismanagement by Walmart's board of directors and senior management.' Walmart's argument is not even colorable. The 'primary issue' in the Delaware actions is Walmart's potential governance failures and/or potential corporate mismanagement' **regarding the distribution and dispensing of opioids**. The Delaware lawsuits do not address abstract management in the ether.") (emphasis added). So too here, the Hawai'i and District of Columbia drug pricing investigations did not address drug pricing in the ether; they addressed pricing practices that included "formulary coverage for any prescription drug for which [Optum] received Payments," including "Rebate" payments. ECF 5276-6 (Hawai'i Subpoena) at 12, Request 5; *id.* at 10, Definition J (defining "Payments" to include "rebate payments"). Since the investigations covered pricing practices Optum applied to opioids, Optum was and still is required to produce all the investigation documents to all counsel in this MDL.

Had Optum timely complied with this Court's Orders and identified and produced these documents, Motley Rice and other Plaintiffs' (and defense) counsel in the MDL would have the

9

same access to the same documents.  Optum's arguments to the contrary—that the government investigation documents are so central to this litigation as to give Motley Rice a "roadmap" of Optum's business practices at issue, Reply at 4, and yet conversely also are so tangential that they need not be produced under DR-22, *id.* at 2, 4, 7—are fundamentally inconsistent and cannot be reconciled.  Optum must produce these documents to all counsel.

Alternatively, Optum's failure to identify or produce these documents for years after these investigations occurred and DR-2 and DR-22 required that it do so should be deemed a waiver of Optum's right to argue now that the investigation documents relate to claims in this MDL so that Motley Rice's access could cause it disadvantage.[11]

Motley Rice's access to documents that clearly must be produced to all counsel in this MDL does not *and cannot* cause Optum any material disadvantage under Rule 1.11(c).  For this additional reason, the motion to disqualify should be denied.

> C.  **The Supplemental Fact Declaration Identifies Documents *Already Produced* in This MDL, So That Optum Cannot Show a Material Disadvantage.**

Even if Motley Rice were considered a government employee representing a private client for purposes of Rule 1.11(c), Optum still would have the burden of demonstrating that its prior production of documents in response to the subpoenas "could be used to the material disadvantage of" Optum.  That simply is not the case here.

In its Reply, Optum argues that "[t]here are many other textual and policy reasons why *any hypothetical future production* in civil discovery does not exempt Motley Rice from Rule 1.11(c) . . . ."  Reply at 8 (emphasis added).  This statement is materially misleading, if not outright false.

---

[11] *See City of Cleveland v. Ameriquest Mortg. Securities, Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (argument is waived by prior inconsistent argument or action).

10

The Supplemental Hooker Declaration reveals that ***Optum already has produced over 900 of the government investigation documents at issue to <u>all</u> Plaintiffs' counsel***.

Attorney Hooker identified by bates number 1,116 of the 10,885 drug-pricing government investigation documents (the "Minnesota Documents").  ECF 5300-1 (Suppl. Hooker Decl.), ¶¶ 7, 14-15.  With this bates number identification, Motley Rice utilized search tools that compare a document's hash values—numerical sequences that operate like digital fingerprints—to identify documents that were included *both* among the Minnesota documents Attorney Hooker specifically identified *and* in Optum's document production in this litigation in the Jefferson County case, which were subsequently produced in the MDL.  Suppl. Boggs Decl., ¶ 6.

The results of this search show that Optum already has produced 903 of the Minnesota Documents into this litigation.  Suppl. Boggs Decl., ¶ 9.a.[12]  These 903 documents are available to all Plaintiffs' counsel *right now*.  Whatever "strategic insights" and "mental roadmaps," Reply at 10, may be divined from these documents may be divined by all Plaintiffs' counsel *right now* (and through the balance of the production, when Optum complies with the Court's Orders).  Optum therefore cannot carry its burden of demonstrating that it could be materially disadvantaged.

Moreover, there is every reason to believe that many more of the Minnesota Documents also have already been produced to Plaintiffs' counsel.  As discussed, Motley Rice was able to

---

[12] Of the remaining Minnesota documents Attorney Hooker identified by bates number, 126 are rebate agreements with insulin drug manufacturers and 82 others also are documents of types Optum produced to Jefferson County and reproduced to the MDL (48 "BIC output report grids" involving formulary placement; 13 slide decks addressing formulary and rebate strategy; 10 Business Improvement Committee ("BIC") meeting slide decks; 6 intelligence sheets on drug manufacturers; and 5 slide decks from quarterly rebate roundtable meetings).  *See* Suppl. Boggs Decl., ¶¶ 10-11.  The remaining 4 documents contain high-level Optum business discussions.  *Id.*, ¶ 11.  All of these documents must be reproduced under DR-22, which again requires reproduction of "all" documents produced in a government investigation regarding marketing, sales, or dispensing of opioids, ECF 2576 at 4, which these investigations plainly were.

11

perform the hash-value search just on the 1,116 Minnesota Documents that Attorney Hooker identified by bates number. However, Attorney Hooker also represented that a far larger number—at least 3,835--of the Minnesota Documents, which are not identified by bates number, address brand-name opioid drugs, generic opioid drugs, opioid drug manufacturers, and/or opioids as a class of drugs. ECF 5300-1 (Suppl. Hooker Decl.), ¶¶ 13.a-e. But Motley Rice could not perform a hash-value search of that larger collection.

Since Optum already has produced to all Plaintiffs' counsel at least 903, and possibly thousands more, of the government investigation documents at issue, these documents are not confidential government information and Motley Rice's access to them cannot cause Optum material disadvantage. *See* Ohio R. Prof'l Conduct 1.11 cmt. 4 ("[U]nfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary *obtainable only through the lawyer's government service*.") (emphasis added); *Davis v. Southern Bell Tel. and Tel. Co.*, 149 F.R.D. 666, 674 (S.D. Fla. 1993) (CID material available through discovery is not "confidential government information" that unfairly disadvantages a party); Crystal Expert Decl. at 9-13 (consistent with Rule 1.11's objectives, private information otherwise obtainable through discovery should not be treated as confidential government information). The information here is obtainable *and was obtained* by Plaintiffs through discovery. It therefore is not confidential government information and there is no possible disadvantage to Optum.

## **CONCLUSION**

For all of the reasons set forth, Optum's Motion to Disqualify Motley Rice should be denied. Plaintiffs and the PEC are mindful of the Court's comments that the February 12th hearing was not helpful to the Court in terms of the factual evidence presented. If the Court deems that

what is now presented in this Sur-Reply requires further inquiry or clarification, or believes that further oral argument would be helpful, Plaintiffs and the PEC request an in-court hearing to accomplish the same. Such a hearing could include creating a further record regarding the nature and extent of the production of the documents at issue in order to properly assess Optum's claim of any possible "material disadvantage" under Rule 1.11(c).

Dated: February 20, 2024          Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR 00907
(304) 654-8281
paul@farrellfuller.com

*MDL Plaintiffs' Co-Lead Counsel*


*s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (fax)
pweinberger@spanglaw.com

*MDL Plaintiffs' Liaison Counsel*

13

## **CERTIFICATE OF SERVICE**

   I hereby certify that on February 20, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

            *s/ Peter H. Weinberger*
            Peter H. Weinberger (0022076)