## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **MDL NO. 2804** |
| THIS DOCUMENT RELATES TO: | ) ) ) | **Case No. 1:17-md-2804** |
| *City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12) | ) ) ) | **JUDGE DAN AARON POLSTER** |
| *Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13) | ) ) ) | |
| *City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14) | ) ) ) | |
| *County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | ) ) ) | |

## EXPERT DECLARATION OF NATHAN M. CRYSTAL IN OPPOSITION TO OPTUMRx'S MOTION TO DISQUALIFY MOTLEY RICE

### I. Expert Qualifications

- I have taught professional responsibility and related subjects for more than 50 years. I am currently Adjunct Professor of Professional Responsibility at NYU School of Law and Class of 1969 Professor of Professional Responsibility and Contract Law Emeritus at the University of South Carolina School of Law.

- I am the author or coauthor of three books on Professional Responsibility and Legal Ethics, including PROFESSIONAL RESPONSIBILITY: PROBLEMS OF PRACTICE AND THE PROFESSION (Wolters Kluwer 8th ed. 2024) (with Professor Grace Giesel), which is used in law schools throughout the country, along with numerous articles in this field and the ANNOTATED SOUTH CAROLINA RULES OF PROFESSIONAL CONDUCT (2020 ed.).  I have

written a bimonthly column on legal ethics for the *South Carolina Lawyer* entitled "Ethics Watch" for 15 years. These columns are available through Lexis and Westlaw.

- I am one of the founding members of Crystal & Giannoni-Crystal, LLC, a law firm with offices in Charleston, New York City, Washington, DC, and Atlanta, which focuses on lawyers' ethics and professional responsibility (along with international law). Our website is www.cgcfirm.com.

- I have served as an ethics consultant to and expert witness for lawyers and law firms for more than 50 years. I have provided expert opinions, expert affidavits and reports, and expert testimony (trial or deposition) in hundreds of cases in various jurisdictions, including New York, Washington, DC, Kentucky, Indiana, and South Carolina.

- I have represented lawyers in disciplinary matters in many cases, principally in South Carolina and New York on a wide variety of issues.

- I have delivered more than 100 speeches, presentations, and continuing legal education programs to law firms, bar organizations, and other groups, both in South Carolina and nationally. My most recent presentation on February 2nd was as a panelist at the mid-year meeting of APRL (the Association of Professional Responsibility Lawyers) speaking about First Amendment rights of lawyers.

- I have served as a member of the New York City Bar Ethics Advisory Committee and the South Carolina Bar Ethics Advisory Committee, where I was chair from 2002-2003.

- I have been selected by my peers for inclusion in *The Best Lawyers in America*© since 2015 in the fields of Ethics and Professional Responsibility Law.

- I am a member of the bars of the District of Columbia, Georgia, New York, South Carolina, and Massachusetts (retired). My complete resume is attached as an Exhibit.

## II. Materials Reviewed

In preparing this declaration I have reviewed the transcript of the hearing before Judge Polster on February 12, 2024, along with all of the filings in the case regarding the motion for disqualification.

## III. Standards Applicable to this Disqualification Motion

In forming my opinions, I have taken into account the standards applicable to disqualification  motions. This Court in *In re Nat'l Prescription Opiate Litig.,* 2019 U.S. Dist LEXIS 46065 (N.D. Ohio 2019 March 20, 2019) ("*Opiate Litig.*"), noted that motions to disqualify counsel are "disfavored" and should not be ordered unless "absolutely necessary." Accordingly, in determining whether Rule 1.11 has been violated, the Court held that a narrow interpretation of the rule is appropriate. *Opiate Litig.* at *72.  Similarly, the court in *Kronberg v. LaRouche*, 2010 U.S. Dist. LEXIS 35097 (E.D. Va. Apr. 9, 2010), one of the principal cases on which OptumRx relies in its disqualification motion, stated that disqualification of an attorney is "is a serious matter which cannot be based on imagined scenarios of conflict, and the moving party has a high standard of proof to meet in order to prove that counsel should be disqualified." (emphasis added).  *Id.* at *5.  The court in *United States v. Villaspring Health Care Ctr., Inc.,* Civil Action No. 3:11-43-DCR, 2011 U.S. Dist. LEXIS 129933 (E.D. Ky. Nov. 7, 2011), another of the major cases on which OptumRx relies, also emphasized the strict standards that apply to a disqualification motion:

> Disqualification is a "drastic measure" that the Court should hesitate to impose, because it serves to "separate[] a party from the counsel of his choice with immediate and measurable effect."

> "The extreme sanction of disqualification should only be utilized when there is a reasonable possibility that some specifically identifiable impropriety actually occurred, and where the public interest in requiring professional conduct by an

attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *Villaspring Health Care Ctr., Inc.,* at \*5 (citations omitted)

*Villaspring Health Care Ctr., Inc.,* also applies another principle that is significant in this case: focus on substance over form. The court in interpreting the meaning of "matter" in Rule 1.11 held that substance rather than form was the focus of the inquiry. *Id.* at \*13.

In interpreting Rule 1.11, a mechanical, strict application of the rule is inappropriate. Instead, interpretation of the rule requires a balancing of interests. Comment 4 to Ohio Rule of Prof. Conduct 1.11 ("ORPC 1.11) states:

> <u>This rule represents a balancing of interests.</u> On the one hand, where the successive clients are a government agency and another client, public or private, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client. A lawyer should not be in a position where benefit to the other client might affect performance of the lawyer's professional functions on behalf of the government. Also, unfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service. <u>On the other hand, the rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government. The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards.</u> Thus a former government lawyer is disqualified only from particular matters in which the lawyer participated personally and substantially. The provisions for screening and waiver in division (b) are necessary to prevent the disqualification rule from imposing too severe a deterrent against entering public service. (emphasis added).

In addition to the standards for interpretation of the rule, disqualification motions are founded in equitable factors and are discretionary with the Court. The Sixth Circuit in *General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704 (6th Cir. 1982), held that decisions to disqualify counsel involve a balancing of three interests:

> (a) the interest of the public in the proper safeguarding of the judicial process;
> (b) the interest of the defendants; and
> (c) the interest of the plaintiffs. *Id.* at 711.

Accord *Kronberg* at *5 (employing a balancing test to decide disqualification motion focusing on "a party's right to retain counsel of her choice, the substantial hardship that could result from disqualification, and 'the public perception of and the public trust in the judicial system.'"  See also *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.,* No. 2:18-cv-00151-DCN, 2020 U.S. Dist. LEXIS 145193, at *1 (D.S.C. Aug. 13, 2020) (emphasizing that the decision to disqualify is discretionary with the court, rejecting "overly-mechanical adherence to disciplinary canons at the expense of litigants' rights freely to choose their counsel," cautioning that disqualification motions can be used for strategic reasons, and recognizing the high standard of proof required to justify disqualification). *Id.* at *4.

### IV. Rule 1.11(c) Does Not Apply to Motley Rice's Representation of Plaintiffs in MDL Bellwether Litigation Against OptumRx

 The opinions set forth below confirm many of the opinions I rendered to Motley Rice when OptumRx first raised the issue of disqualification under ORPC 1.11(c).

**ORPC 1.11(c) states:**

(c) Except as law may otherwise expressly permit, a lawyer having information that the lawyer *knows* is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this rule, the term "confidential government information" means information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public. A *firm* with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is timely *screened* from any participation in the matter and is apportioned no part of the fee therefrom. (emphasis added).

A.  In its representation of Hawaii, the District of Columbia, and the City of Chicago Motley Rice was not a "public officer or employee."

 In all of the cases relied on by OptumRx, the lawyer who obtained confidential governmental information was a public employee, typically a US attorney. That was true in *Gen.*

*Motors Corp. v. New York*, 501 F.2d 639 (2d Cir. 1974); in *In re Nat'l Prescription Opiate Litig.,* 2019 U.S. Dist LEXIS 46065 (N.D. Ohio 2019); in *Kronberg v. LaRouche*, 2010 U.S. Dist. LEXIS 35097 (E.D. Va. Apr. 9, 2010), and in *United States v. Villaspring Health Care Ctr., Inc.*, Civil Action No. 3:11-43-DCR, 2011 U.S. Dist. LEXIS 129933 (E.D. Ky. Nov. 7, 2011) (former assistant Kentucky AG).  Motley Rice and its attorneys are clearly not government employees; rather they are independent contractors representing governmental clients.  OptumRx does not cite any cases applying 1.11(c) to lawyers representing government entities pursuant to engagements like the ones Motley Rice had with Hawaii, the District of Columbia, and the City of Chicago.  See *Doe v. Francis,* 2006 U.S. Dist. Lexis 105036 (N.D. Fl. 2006) where the court stated: "Surely, an attorney in private practice who merely *represents* a government agency does not qualify as a 'public officer.'" *Id.* at *29 (emphasis in original).

To come within the scope of 1.11(c) OptumRx claims that Motley Rice was exercising governmental power, particularly in the issuance of CIDs (civil investigative demands). However, that is factually incorrect. As Motley Rice shows in its Sur-Reply all of the CIDs were issued by the Attorney Generals of Hawaii, the District of Columbia, and the City of Chicago. Motley Rice did not issue and did not have the authority to issue CIDs.  The fact that Motley Rice received the information produced by OptumRx in response to the CIDs does not make it a governmental employee. See *Berkeley Cty. Sch. Dist. v. HUB Int'l Ltd.,* No. 2:18-cv-00151-DCN, 2020 U.S. Dist. LEXIS 145193, at *1 (D.S.C. Aug. 13, 2020) (lawyer who obtained grand jury testimony with consent of government was not disqualified under Rule 1.11 because he was not a public official or public employee).

It is true that in Hawaii Motley Rice was designated as a "Special Deputy Attorney General" and in Chicago as "Special Assistant Corporation Counsel," but those designations did

not give it governmental authority, which remained with the Attorney General of Hawaii and Corporate Counsel in Chicago. Motley Rice did not issue any CIDs for Hawaii or the City of Chicago under these designations. Any claim by OptumRx that this type of designation alone is sufficient to make Motley Rice a public official exalts form over substance, which is inconsistent with how Rule 1.11 should be applied in the context of a disqualification motion. See cases discussed under Standards for Disqualification Motion.

 B.  <u>Rule 1.11(c) does not apply to Motley Rice's representation of plaintiffs in the bellwether cases because the plaintiffs are government entities and Rule 1.11(c) only applies to representation of a private client.</u>

Rule 1.11(c) applies to a former government attorney's subsequent representation of a "private client." In this case all of the plaintiffs in the bellwether cases are government entities, not private clients. It is true that Motley Rice is representing these clients under contingency fee agreements, but it is common today for government entities to hire outside counsel under contingency fee agreements; that fact alone cannot turn a government entity into a private client. Further, the representation of these clients will be subject to government controls and the governmental rules and regulations governing selection and use of outside counsel, none of which would apply if they were private clients.

OptumRx may argue that Rule 1.11(c) applies if the subsequent representation is of either a private or a government client. However, the problem with that argument is that the text of rule only refers to subsequent representation of a private client.  It would have been easy to draft the rule to cover any client, or to draft a rule that focused on *the lawyer's* private status (like Rule 1.11(d)(2)(i) does) rather than the *client's* private status, but the drafters did not do so. They did not draft a rule that covers representation of another government client because they recognized that "[t]he government has a legitimate need to attract qualified lawyers as well as to maintain

high ethical standards."  ORPC Conduct 1.11, cmt. 4.  OptumRx may point to language in comment 5 that contemplates representation of a subsequent government client, but that comment does not mention Rule 1.11(c), but instead deals with conflicts of interest. In addition, the Ohio Rules, like the ABA Model Rules, state: "The comments are intended as guides to interpretation, but the <u>text of each rule is authoritative</u>." Scope ¶21 (emphasis added).

        C.    <u>Motley Rice did not receive "confidential government information."</u>

Rule 1.11(c) defines "confidential government information" as:

> information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public.

OptumRx and its experts apply the definition in syllogistic manner: (1) Was the information obtained under government authority? Yes, it was obtained through government issued CIDs. (2) Is the government prohibited by law from disclosing the information or does it have a legal privilege not to disclose the information? Yes, citing certain statutes.[1] (3) Is the information "otherwise available to the public"?  No according to OptumRx because the public cannot demand the information from the government.

The problem with this argument is that all information produced in response to government-issued CIDs becomes confidential government information because the public cannot obtain this information, and when combined with the broad interpretation of "public official" adopted by OptumRx and its experts, leads to either of two consequences: (1) Firms like Motley Rice will be reluctant to take on representation of

---

[1] Whether the statutes cited by Optum prohibit disclosure of information received by the government might be questioned because at least some of the statutes appear to be exceptions to the applicable Freedom of Information Act that exempt from production (rather than prohibit disclosure) of trade secret information, but my opinion does not turn on this point.

government entities in civil investigations and related litigation out of concern that they may be disqualified from representing other clients in matters that are related to the civil investigation and related litigation. (2) If they do accept such public representation, they will face the risk of disqualification from representing other government entities in civil litigation related to prior investigations in which the firm was involved. Either consequence is "bad" as a matter of public policy because it increases the difficulty of government entities obtaining qualified private counsel who are willing to take the risk of these cases on a contingent fee basis. Comment 4 to ORPC 1.11 expresses the public policy to support the ability of governments to attract qualified counsel:

> [T]he rules governing lawyers presently or formerly employed by a government agency should not be so restrictive as to inhibit transfer of employment to and from the government. The government has a legitimate need to attract qualified lawyers as well as to maintain high ethical standards.

In my opinion, the term "otherwise available to the public" should be interpreted in a balanced way that serves the purpose of Rule 1.11, which is to prevent unfair treatment of parties who supplied information to a government without unduly interfering with the ability of governmental entities to retain counsel to represent their interests both in civil investigations and related litigation. More specifically, this means that if the information in question could be obtained through discovery in civil cases the information is otherwise available to the public. *Davis v. Southern Bell T & T Co.,* 149 F.R.D. 666 (S.D. Fl. 1993) and *Doe v. Francis,* 2006 U.S. Dist. Lexis 105036 (N.D. Fl. 2006), both accept this interpretation of the term "otherwise available to the public." In *Davis* the court stated:

> As part of its investigation, the State issued CIDs to various parties. Southern Bell contends that the responses these CIDs

constitute confidential government information and that the contractor attorneys have obtained these responses in violation of rule 1.11(b). However, the affidavit of Anne Bingaman, one of the contractor attorneys, indicates Southern Bell produced these responses pursuant to routine discovery requests. Southern Bell has submitted no counter evidence to rebut Ms. Bingaman's affidavit. Moreover, CID response have been held to be subject to compulsory discovery. See In re Domestic Air Transp. Antitrust Litigation, 142 F.R.D. 354 (N.D.Ga.1992) (plaintiffs in class action involving possible price fixing were entitled to copies of any CID depositions taken by Department of Justice which were in defendants' possession). The Court concludes that the CID materials at issue in the instant case were "otherwise available" within the meaning of rule 1.11(e) and that the materials therefore do not constitute confidential information for purposes of rule 1.11(b). *Id. at 674.*

Similarly, the court in *Doe* stated:

[T]he government information allegedly possessed by Plaintiffs' counsel was not "confidential" government information. Defendants admitted at the evidentiary hearing that all tangible government information allegedly possessed by Plaintiffs' counsel was also available to Defendants. In fact, the tangible information - the tapes, the property seized, etc. - was *created* or owned by Defendants themselves. Moreover, it is undisputed that the information available to the government in the forfeiture proceedings was subject to a discovery request by Defendants. Defendants do not deny that they made such a discovery request and that they obtained or could have obtained the same tangible information allegedly possessed by  counsel. *Id.* at *30-*31.

The court in *Doe* went on to discuss the meaning of accessible to the "public." The court concluded that the meaning must be read consistently with the overall purpose of the rule, which was to prevent a lawyer from exploiting public office for the benefit of a private client. In addition, the lawyer's private client could gain an unfair advantage because of access to confidential government information. *Id.* at *31-*32. Neither of these purposes is involved in this case.

There is no evidence that Motley Rice used its position as special attorney general to obtain information to benefit its opioid clients. In fact, any information that Motley Rice

obtained about opioid matters was incidental to its requests for information regarding price fixing, which was the crux of its claims on behalf of Hawaii, the District of Columbia, and the City of Chicago. There is also no evidence that the information Motley Rice obtained through the CIDs would give its opioid clients an unfair advantage. The Plaintiffs Executive Committee in the MDL would seek the same information from OptumRx in the bellwether cases. In fact, the PEC could use the CIDs or government subpoenas that Motley Rice used in its representation of Hawaii, the District of Columbia, and the City of Chicago as a basis for drafting its discovery requests since CIDs (as distinguished from the information produced in response to a CID) are not "confidential government information" under Rule 1.11(c). In addition, OptumRx already has the information so there is no "information disparity" resulting from Motley Rice's representation as special attorney general.

The "discoverable" standard for "otherwise available" does not make the concept of "confidential government information" a nullity. Many examples of nondiscoverable and therefore confidential government information exist. The paradigm case is information obtained by government lawyers in criminal investigations; such information generally cannot be obtained through civil discovery or other legal means. The same is true with regard to grand jury proceedings, which are not available to the public. The same is true with regard to national security information. The same is true with regard to information obtained by government attorneys in handling civil matters through informal contacts. This was the situation in *Opiate Litig.* decided by this Court. In that case the former US Attorney for the Northern District of Ohio, Carole Rendon, was the Chair of the Opioid Task Force that brought together a diverse group of stakeholders involved in dealing with the opioid crisis. After leaving the USAO, Ms.

Reardon joined the BakerHostetler firm and began representing Endo, one of the defendants in the MDL. Plaintiffs in the MDL include the City of Cleveland and Cuyahoga County.

The plaintiffs moved to disqualify Ms. Reardon under Ohio RPC 1.11(a) and (c).  The Court found that Rule 1.11(a) did not apply because the work of the task force and the MDL opioid were not the same "matter." *Opiate Litig.*at *72.  See also ORPC 1.11(e)(1).

However, the Court found that Ms. Rendon was disqualified under Rule 1.11(c) because she had acquired confidential government information that if used by Endo could materially prejudice Cleveland and Cuyahoga county.  *Opiate Litig.* at*75.

The *Opiate Litig.* case is distinguishable from the Motley Rice case in a number of respects. First, the information acquired by Ms. Rendon was clearly "nonpublic" information:

> Cuyahoga County and Cleveland law enforcement officials shared <u>nonpublic information</u> with Ms. Rendon and her direct reports as a result of the cooperation among federal, state, and local law enforcement agencies in combatting the opioid crisis. <u>This information was conveyed primarily in meetings (e.g. "sidebars") and communications arising out of the Task Force, and was shared in a spirit of confidence and trust.</u> The information concerned the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources at the county and local levels for dealing with the opioid crisis. *Opiate Litig.* at *74. (emphasis added).

> The Court

> placed considerable significance upon the affidavit and hearing testimony of Commander Gingell. . . ("I would not have shared that same information with Ms. Rendon, had it not been for the fact that Ms. Rendon was a member of the U.S. Attorney's Office.") . . . ("I think we have done a lot through . . . the Opiate Task Force to glue those relationships [between local and federal agencies] together, but I think something like this, I think a lot of people feel betrayed, myself included."). *Id.* at *77-*78 (citations to declarations and testimony omitted).

Second, in *Opiate Litig.* the Court had asked the Justice Department to conduct an independent investigation into the Rendon matter, and the Justice Department reported to the

12

Court that it concluded that Ms. Rendon had received nonpublic information. There has not been, nor is there any need for, such an independent investigation in this case.

> D. The confidentiality agreements between OptumRx and Hawaii, the District of Columbia, and the City of Chicago do not transform the information produced by OptumRx into "confidential government information" under ORPC 1.11.

As part of its production in response to CIDs (subpoenas) issued by the State of Hawaii, the District of Columbia, and the City of Chicago, OptumRx and these governmental bodies entered into confidentiality agreements, which can be found in the following Exhibits to OptumRx's Motion to Disqualify Motley Rice: Exhibit C (Hawaii), Exhibit H (District of Columbia), Exhibit M (City of Chicago). These agreements are binding  on the government bodies and also on Motley Rice. I have reviewed these agreements, and they appear to me to be fairly standard confidentiality agreements commonly used in litigation.

Rule 1.11(c) and a confidentiality agreement have a number of important differences. First, the scope of the Rule and the standard confidentiality agreement are different. Rule 1.11(c) applies to "confidential government information," while the standard confidentiality agreement applies to information designated as confidential in accordance with the procedures established by the agreement. Obviously, confidentiality agreements are designed to protect the confidentiality of information that has been produced, but that does not make the information produced "confidential government information."  Rule 1.11(c) has its own definition of protected information. Second, several exceptions to the Rule apply, including the "otherwise available to the public" and the "no material prejudice" exceptions. Confidentiality agreements contain their own exceptions, which are different from the exceptions in the Rule.  Third, and perhaps most important for this case, is that the possibility that a lawyer "could" violate a confidentiality agreement is not the basis for disqualification, while Optum claims that the

13

possibility that Motley Rice "could" use confidential government information against it is a basis of disqualification. To the best of my knowledge Motley Rice has not violated any of the confidentiality agreements between Hawaii, the District of Columbia, the City of Chicago and Optum.

Confidentiality agreements and Rule 1.11(c) are different obligations each subject to their own terms. The existence of a confidentiality agreement does not affect the analysis under Rule 1.11(c), which is governed by the terms of the Rule, not the confidentiality agreement.

E. <u>Any information that Motley Rice obtained while representing Hawaii, the District of Columbia, and the City of Chicago is highly unlikely to be to the material disadvantage of Optum.</u>

Optum and its experts place a great deal of emphasis on the word "could" in Rule 1.11, claiming that the word shows that the possibility of use of Motley Rice's use of confidential governmental information in the bellwether litigation is sufficient to disqualify the firm under Rule 1.11(c). In my opinion, this broad claim is inconsistent with the balancing of interests called for by the Rule. See comment 4 to Rule 1.11. Instead, a more natural interpretation and one that does respect the balancing of interests under the Rule is that the word "could" should be interpreted to mean "reasonably likely." Cf. *Goins v. Angelone*, 226 F.3d 312, 325-26 (4th Cir. 2000) (polygraph result could be material within meaning of the *Brady* rule only if it would be "reasonably likely" to affect the result).

However, regardless of how the word "could" is interpreted, in my opinion OptumRx could not be materially prejudiced by Motley Rice's knowledge of the productions made by OptumRx in response to the CIDs (subpoenas) issued in the investigations by Hawaii, the District of Columbia, and the City of Chicago. I have reviewed the CIDs in these cases: Exhibit B (Hawaii); Exhibit G (District of Columbia); Exhibit L (City of Chicago). The CIDs are very

similar to the types of requests for production that are normally found in major litigation. If these CIDs had never been issued, in my opinion it is almost certain that very similar discovery requests would have been made in bellwether litigation against OptumRx.  In fact, as discussed in section B above, the PEC could use the CIDs or government subpoenas that Motley Rice used in its representation of Hawaii, the District of Columbia, and the City of Chicago as a basis for drafting its discovery requests since CIDs (as distinguished from the information produced in response to a CID) are not "confidential government information" under Rule 1.11(c).  There is also no reason to think that OptumRx would make different responses to discovery requests in the bellwether cases than it made to the investigative CIDs. If the requests and responses are likely to be very similar, it is difficult to see how OptumRx suffered material prejudice from Motley Rice's knowledge of the production in response to the CIDs.

OptumRx cannot suffer material prejudice due to information disparity or surprise because OptumRx knows exactly the information Motley Rice has, namely what it produced. Here also this case is distinguishable from *Opiate Litig.* because in that case Cleveland and Cuyahoga County could not determine the information Ms. Rendon possessed because the information was not subject to formal production and occurred primarily in sidebars and other communications in connection with the Task Force activities over a period of time. In addition, the Court in *Opiate Litig.* found that the information Ms. Rendon received was "materially prejudicial" because it went to the "heart of Plaintiffs' damages claims." *Opiate Litig.* at *75.   In this case OptumRx is only making vague claims of prejudice claiming that Motley Rice now has a "roadmap" of how to handle the case.  OptumRx's Reply Brief at 10.  Such vague, speculative allegations do not come close to meeting the standard for disqualification especially because OptumRx has a high burden of proof to meet.

Finally, Optum cannot suffer material prejudice by virtue of Motley Rice's knowledge of the productions it made in investigations by Hawaii, the District of Columbia, and the City of Chicago because the Court has ordered production of this material as part of the MDL and compliance with this order is independent of any knowledge that Motley Rice may have of these documents.  See the exhaustive discussion of the issue in Motley Rice's Sur-Reply Brief at pages 8-11.  In addition, Optum has already produced many of these documents, undermining its claim of material prejudice flowing from Motley Rice's representation of Hawaii, the District of Columbia, and the City of Chicago.  Motley Rice's Sur-Reply Brief at 11-12.  Because it is my opinion that none of the documents produced by Optum were confidential government information, I do not also address the facts in the Boggs declaration regarding the documents already produced in the MDL.

  F. <u>The Cases Relied on by OptumRx are Fundamentally Distinguishable from this Case.</u>

*Kronberg v. LaRouche*, 2010 U.S. Dist. LEXIS 35097 (E.D. Va. Apr. 9, 2010), is distinguishable from this case in a number of material respects. First, the attorney in that case was a former prosecutor and therefore a public employee.  Motley Rice attorneys are not public employees, and as discussed above, in my opinion, they are not public officials under Rule 1.11(c). Second, the attorney *Kronberg* conceded that he possessed confidential governmental information.  In this case, as discussed above, Motley Rice denies that it possesses confidential governmental information, and the interpretation of the concept "confidential government information" is an issue in the case. OptumRx and its experts argue for a broad interpretation of the concept. In my opinion, as discussed above, a narrower interpretation is more consistent with the balancing approach required in interpreting Rule 1.11(c). Third, in *Kronberg*  the defendants argued that they did not

and could not know the confidential information possessed by the attorney, and he was unable to distinguish between the confidential and nonconfidential information he knew. *Kronberg* at *12, n 6.  In this case, OptumRx knows exactly the information that it claims was confidential since it produced the information.  Fourth, the attorney in *Kronberg* was a former prosecutor and the confidential information he possessed came from his prosecution of the defendant LaRouche.  Obviously, information possessed by a prosecutor in connection with a criminal prosecution is confidential government information. Such information, unlike the information in this case, is not available through discovery.  Finally, the court in *Kronberg* emphasized that it was basing its decision on the appearance of impropriety. The Court focused on the fact that the attorney was a former prosecutor and referred to cases in which prosecutors switched sides. *Kronberg* at *19, n.9.  This case is the polar opposite of *Kronberg*. Motley Rice is not a former prosecutor with nonpublic information, and it is not switching sides. Instead, Motley Rice is continuing or the same side of opioid litigation seeking recovery on behalf of other governmental bodies.  In my opinion this is the opposite of an appearance of impropriety**.**

*United States v. Villaspring Health Care Ctr., Inc.,* Civil Action No. 3:11-43-DCR, 2011 U.S. Dist. LEXIS 129933 (E.D. Ky. Nov. 7, 2011), is also fundamentally distinguishable from this case. The attorney in that case was a former Kentucky prosecutor who had investigated Villaspring for criminal abuse and neglect at a nursing home. At the conclusion of the investigation the lawyer recommended against prosecution. The attorney left the Kentucky AG's office and joined a private firm that was defending Villaspring in a Federal False Claims Act case. The United States moved

to disqualify the attorney and his firm, and the Court granted the motion under both

1.11(a)(2) and 1.11(c).  *Villaspring Health Care Ctr.,* like *Kronberg,* is clearly

distinguishable from this case.  First, the attorney in that case clearly had been a public

employee.  Second, the information the attorney acquired was in a criminal investigation,

which is also information not available to the public. In addition, the information came

from interviews and evaluation of the evidence of criminal conduct that had been

developed against Villaspring, including, as with attorney Rendon, confidential

conversations with other government officials.  *Villaspring Health Care Ctr.* at *18.  The

production in this case is purely documentary.

    *Gen. Motors Corp. v. New York*, 501 F.2d 639 (2d Cir. 1974), is also materially

distinguishable from this case. First, that case arose under the Code of Professional

Responsibility (the predecessor to the Model Rules that apply in Ohio),  which had a very

different version of the rule dealing with government lawyers. Second, the

disqualification in that case was based on the equivalent of ORPC 1.11(a)(2) rather than

Rule 1.11(c), which is involved in this case.  Finally, the attorney in that case was a

former government antitrust lawyer, so there was no question that he was a public

employee.

### V. Denial of the Motion to Disqualify
### is an Appropriate Exercise of Judicial Discretion in this Case

    The PEC that represents the bellwether plaintiffs consist of a number of law firms, which

include Motley Rice, each with their unique skills and competencies. Loss of any one of these

firms could be damaging to the plaintiffs' cases. Since negotiated settlements are possible,

involvement of counsel with recognized negotiation ability is an important factor in evaluating

whether the public interest would be harmed by disqualification of a firm. Moreover,

disqualification of a firm may lead to delay of these cases as roles and assignments are restructured.

Moreover, these are Bellwether cases, not ordinary litigation, so the outcome of these cases will influence settlement and other aspects of other cases in the MDL. It is in the public interest to have the most capable, knowledgeable counsel handling these cases. Motley Rice's selection as counsel for these cases shows that it meets that standard. As co-lead counsel, Motley Rice has been chosen by the Court because of its expertise in opioid litigation.

The defendant has an interest in the fair resolution of claims against it, and an interest in not being subject to material prejudice resulting from the use against it of information it provided to governments that Motley Rice represented pursuant to CIDs issued by Motley Rice's governmental clients in investigations on behalf of Hawaii, the District of Columbia, and the City of Chicago.  However, as discussed above, the information that defendant seeks to protect by disqualifying Motley Rice is not confidential governmental information and defendant would not suffer material prejudice as a result of the use of such information because the information is subject to production in discovery and much of the information that Optum uses as the basis of its disqualification motion has already been produced and/or is required to be produced by orders in the MDL The information defendant claims to be confidential governmental information is the type of information that would be sought in ordinary private litigation so its use does create unfairness, and it can be protected from harm from further disclosure outside the MDL by a standard confidentiality agreement.

The plaintiffs have a substantial interest in being represented by experienced counsel and that choice should not be overridden unless absolutely necessary.  As discussed above neither the public interest nor the interests of defendants support overriding of plaintiffs' choice of counsel.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2024.

_____

Signature

# EXHIBIT A

**Curriculum Vitae of Nathan M. Crystal**
Crystal & Giannoni-Crystal, LLC
6 Marbel Lane
Charleston, South Carolina 29403-6504
Office telephone: 1-843-202-0090
Direct line: 803-331-2826
fax: 1-202-951-9427
email: nmcrystal@cgcfirm.com

1. *Education*

(a) B.S., University of Pennsylvania, 1968
(b) J.D., Emory Law School, 1971 (with honors)
(c) L.L.M., Harvard Law School, 1976

2. *Employment*

(a) Adjunct Professor of Professional Responsibility, NYU School of Law, 2015-
(b) Founding Member and Managing Attorney, Crystal & Giannoni-Crystal, LLC, with offices in Charleston; New York City; Washington, DC; and Atlanta, GA, 2011-
(c) Class of 1969 Professor Emeritus of Professional Responsibility and Contract Law, University of South Carolina, 2008-
(d) Distinguished Research Scholar, Charleston School of Law, 2012-2014
(e) Distinguished Visiting Professor of Law, Charleston School of Law, 2008-2012
(f) Class of 1969 Professor of Professional Responsibility and Contract Law, University of South Carolina, 1999-2008
(g) Roy Webster Professor of Professional Responsibility and Contract Law, University of South Carolina, 1991-1999
(h) Associate Dean and Professor of Law, University of South Carolina, 1987-1992
(i) Professor of Law, University of South Carolina, 1982-1987
(j) Associate Professor of Law, University of South Carolina, 1979-82
(k) Assistant Professor of Law, University of South Carolina, 1976-79
(l) Director of Legal Methods Program, Harvard Law School, 1975-76
(m) Teaching Fellow, Harvard Law School, 1974-75
(n) Associate, Nall, Miller & Cadenhead, Atlanta, Georgia, 1971-74

3. *Courses Taught*: Contracts, Criminal Procedure, International Business Transactions, Mass Torts, Professional Responsibility, Sales, Taxation, Uniform Commercial Code. I have also taught a seminar, Lawyers and Justice, in the Honors College at the University of South Carolina
.

4.    *Publications*

## BOOKS

PROFESSIONAL RESPONSIBILITY: PROBLEMS OF PRACTICE AND THE PROFESSION (Aspen Law & Business, 8th ed. 2024) with Grace M. Giesel (University of Louisville School of Law), app. 600 pp. (first edition published by Little Brown & Co. 1996). The book is used at more than 30 schools around the country.

Teacher's Manual to accompany Professional Responsibility: Problems of Practice and the Profession, app. 300 pages.

PROBLEMS IN CONTRACT LAW: CASES AND MATERIALS (with Charles L. Knapp, Harry G. Prince, Joshua M. Silverstein, and Danielle K. Hart (Aspen Law & Business 10th ed. forthcoming 2023) 1200p. The book is used at more than 80 law schools around the country. Our publisher tells us that it is either the first or second most widely adopted contracts book in the country.

RULES OF CONTRACT LAW: SELECTIONS FROM THE UNIFORM COMMERCIAL CODE, THE CISG, THE RESTATEMENT (SECOND) OF CONTRACTS, AND THE UNIDROIT PRINCIPLES, with Material on Contract Drafting (with Charles L. Knapp, Harry G. Prince, Joshua M. Silverstein, and Danielle K. Hart) (Aspen Law & Business, 2023 ed.), 300 p.

Teacher's Manual to accompany Problems in Contract Law (with Charles L. Knapp, Harry G. Prince, Joshua M. Silverstein, and Danielle K. Hart) (Aspen Law & Business 10th ed. 2023), app. 300 pages.

ANNOTATED SOUTH CAROLINA RULES OF PROFESSIONAL CONDUCT (S.C. Bar 2020 ed.) app. 500 p. periodic updates posted online at http://www.scbar.org/CLE/AnnotatedSCRulesofProfessionalConduct.aspx

AN INTRODUCTION TO PROFESSIONAL RESPONSIBILITY (Aspen Law & Business, 1998), 529 pages.

## MAJOR ARTICLES

 Deciding Difficult Questions of Professional Ethics: A Model of Nuanced Decision-making (forthcoming in the Pittsburgh Law Rev. 2024)

Choice of Law and Risk Management for Conflicts of Interest, 16 Char. L. Rev. 1 (2022) (with Francesca Giannoni-Crystal)

Choice of Law in Lawyers' Engagement Agreements, 121 Penn. St. L. Rev. 683 (2017)

Using Occam's Razor to Solve International Attorney-Client Privilege Choice of Law Issues: An Old Solution to a New Problem, 41 N.C. Journal of Int'l L. & Comm. Regulation 276 (2016) (with Francesca Giannoni-Crystal)

"Something's got to give" - Cloud Computing, as applied to lawyers – comparative approach US and EU and practical proposals to overcome differences (with Francesca Giannoni-Crystal), Opinio Juris in Comparitone, Vol. I, n.I (2014)

Should Lanterns [of Rule 11] Shine, the Holy Face [of Forum Selection Clause Challenges] ... Would Wither up, in Intern. Litig. Vol. 29, issue #1 (June 2013) (with Francesca Giannoni-Crystal)

Inadvertent Production of Privileged Information in Discovery in Federal Court: The Need for Well-Drafted Clawback Agreements, 64 S. Car. L. Rev. 581 (2013)

*"One, No one and One Hundred Thousand".* . . Which Ethical Rule to Apply? Conflict of Ethical Rules in International Arbitration (with Francesca Giannoni-Crystal), 32 Mississippi C. L. Rev. 283 (2013)

Enforceability of Forum Selection Clauses: A "Gallant Knight" Still Seeking Eldorado, (with Francesca Giannoni-Crystal), 8 S.C. J. Int'l. L. & Bus 203 (2012)

Understanding *Akzo Nobel*: A Comparison of the Status of In-House Counsel, the Scope of the Attorney-Client Privilege, and Discovery in the U.S. and Europe, (with Francesca Giannoni-Crystal), *Global Jurist*: Vol. 11: Iss. 1 (Topics) (2011), Article 1, http://www.bepress.com/gj/vol11/iss1/1

Contract Enforceability During Economic Crisis: Legal Principles and Drafting Solutions, (with Francesca Giannoni-Crystal), *Global Jurist*: Vol. 10: Iss. 3 (Advances) (2010), Article 3, http://www.bepress.com/gj/vol10/iss3/art3

Ethical Responsibility and Legal Liability of Lawyers for Failure to Institute or Monitor Litigation Holds, 43 Akron L. Rev. 715 (2010)

Using the Concept of a "Philosophy of Lawyering" in Teaching Professional Responsibility, 51 St. Louis L. J. 1235 (2007)

Enforceability of Advance Waivers of Conflicts of Interest, 38 St. Mary's L.J. 859 (2007)

False Testimony by Criminal Defendants: Still Unanswered Ethical and Constitutional Questions, 2003 Ill. L. Rev. 1529

History of Efforts to Define Lawyers' Professional Obligations in OXFORD COMPANION TO AMERICAN LAW (Oxford University Press 2002)
Core Values: False and True, 70 Fordham L. Rev. 747 (2001) (listed in the Social Science Network Electronic Library)

The Incompleteness of the Model Rules and the Development of Professional Standards, 52 Mercer L. Rev. 839 (2001)

Developing a Philosophy of Lawyering, 14 Notre Dame J.L. Ethics & Pub. Poly 75 (2000)

The Lawyer's Duty to Disclose Material Facts in Contract or Settlement Negotiations, 87 Ky. L.J. 1055 (1998-1999) (reprinted in the *Defense Law Journal*; listed in the Social Science Network Electronic Library)

Limitations on Zealous Representation in an Adversarial System, 32 Wake Forest L. Rev. 671 (1997) (listed in the Social Science Network Electronic Library)

Scienter in Professional Liability Cases (with Professor John Freeman), 42 So. Car. L. Rev. 783 (1991)

Disqualification of Counsel for Unrelated Matter Conflicts of Interest, 4 Geo. J. Leg. Ethics 273 (1990)

An Empirical View of Relational Contracts Under Article Two of the Uniform Commercial Code, 1988 N.Y.U. Ann. Sur. of Am. Law 293

Confidentiality under the Model Rules of Professional Conduct, 30 Kan. L. Rev. 215

(1982) Consumer Product Warranty Litigation in South Carolina, 31 So. Car. L. Rev. 293

(1980) Ethical Problems in Marital Practice, 30 S. Car. L. Rev. 321 (1979)

Codification and the Rise of the Restatement Movement, 54 Wash. L. Rev. 239 (1979)

### SHORTER ARTICLES

"Ethics Watch" columns (bimonthly) for The South Carolina Lawyer. I have written more than 60 articles since I began writing this column in 2008. See www.nathancrystal.com for a list of many of the articles.

## OTHER PUBLICATIONS

Essay on Teaching Methodologies for Professional Responsibility in TEACHING THE LAW SCHOOL CURRICULUM by Steven Friedland and Gerald Hess (Carolina Academic Press 2004)

South Carolina Legal Ethics (with Professor Robert M. Wilcox of USC Law School), published on the Internet and in CD rom as part of the American Legal Ethics Library sponsored by Cornell Law School, app. 150 pages.

Litigation Ethics: Course Material for Continuing Education ch. 5, Contacts with Employees and Misdirected Communications (ABA Sec. of Litig. 2000) (with Rebecca Laffitte)South Carolina Rules of Professional Conduct: Conflicts of Interest, South Carolina Lawyer (March/April 1991)

South Carolina Rules of Professional Conduct: Provisions on Confidentiality, South Carolina Lawyer (Sept./Oct. 1990)

South Carolina Rules of Professional Conduct: Provisions on Legal Fees and Client Relations, South Carolina Lawyer (March/April 1990)

The Malpractice Implications of Specialization, Transcript (Nov. 1988)

Is Any Code of Ethics Really Necessary?, Virginia Law Weekly (Feb. 11, 1983)

5. ***Other Scholarly Activities***

   (a)  Organizer of Conference on the Commercialization of the Legal Profession held in Charleston, South Carolina in May, 1993. The papers and proceedings from the conference are published in 45 S.C.L. Rev. #5 (1994).

   (b)  Co-chaired with Professor Charles Knapp of N.Y.U. Law School "Conference on Contract Law: From Theory to Practice," held at N.Y.U. Law School in May, 1988. The proceedings of the conference were published in the N.Y.U. Annual Survey of American Law.

   (c)  Organizer of Charles Knowlton Law and Liberal Arts Interdisciplinary Seminar at the University of South Carolina. Speakers in the series: Professor Jarislav Pelikan (Yale), Professor Ronald Dworkin (N.Y.U. and Oxford), Professor Stephen Jay Gould (Harvard), Professor Richard Epstein (Chicago), Professor Lani Guinier (Pennsylvania), Professor Garry Wills (Northwestern University), Professor Maria Rosa Menocal (Yale); Professor G. Edward White (Virginia); Professor Martha Nussbaum (Chicago); Professor Eric Kandel (Columbia). I have also been a member of two other distinguished speaker committees at the

University: The Schoeman Lectureship, cosponsored by the Law School and the Philosophy Department, and the Solomon/Tenenbaum Lecture Series.

6.    ***Visitorships and Lectures, Appointments, Professional Activities, Speeches, General Public Service, and University Service***

## VISITORSHIPS AND LECTURES

Distinguished Professor, Tianjin University, Tianjin China, July 2011

Distinguished Lecturer, University of Arkansas, Little Rock, October 2008

Visiting Professor of Law, University of Luiss, Rome, Fall 2006

Parsons Visiting Scholar, University of Sydney, Australia, Summer 2006

Visiting Professor of Law, Scuola Superiore, Pisa, Italy, Spring 2005

Visiting Professor, Charleston School of Law, Charleston, SC, Summers 2005, 2006, 2007, 2008

Distinguished Visiting Professor of Law, Suffolk Law School, Fall 2003

Visiting Professor of Law, Hastings College of Law, Fall 2001

Visiting Professor of Law, Florida State College of Law, Summer, 2001

Distinguished Lecturer, University of Indiana, Indianapolis School of Law, April 2001

## APPOINTMENTS

Member, New York City Bar Ethics Advisory Committee, 2015-2017

Appointed by President of South Carolina Bar as Chair of the bar International Law Committee, 2013-2017

Appointed by President of South Carolina Bar as Chair of the bar's Ethics Advisory Committee, 2002-2003

Hearing Examiner for Southern Association of Colleges and Schools, 1999-

Chapter 11 Examiner appointed by the United States Bankruptcy Court for the District of South Carolina in In re TJN, Inc. (1994) and In Re Seabrook Island Ocean Club Chapter 11 (1990)

Retained (pro bono) by the South Carolina Bar to draft and present the Bar's petition to the South Carolina Supreme Court seeking adoption of the South Carolina Rules of Professional Conduct, 1989. The Supreme Court adopted the new rules effective September 1, 1990.

## PROFESSIONAL ACTIVITIES

Director, Center for Law, the Legal Profession and Public Policy, University of South Carolina Law School, 1991-1999

Reporter for special committee formed by the South Carolina Law Institute to draft a proposed statute to regulate lobbying, 1990. I drafted a report and proposed legislation for the committee. The work of the committee influenced changes in South Carolina government ethics laws.

South Carolina Bar representative on the Board of Palmetto Legal Services, Inc. 1990-1996

Member, South Carolina Bar Professional Responsibility Committee, for a number of years

Member, South Carolina Ethics Advisory Committee, 1981-85; 1993-. While a member of the committee, I have authored or coauthored a number of ethics advisory opinions. Appointed as Chair 2002-2003

Conceived plan for and initiated Law School's voluntary pro bono program. While I take credit for the idea of the program, the success of the program is attributable to the untiring efforts of its director, Pam Robinson.

## SPEECHES

Frequent lecturer on matters of professional ethics at continuing legal education seminars. I speak an average of two-three times a year to both national and state organizations, including the following:

American Bar Association Center for Professional Responsibility
American Bar Association Family Law Section
American Bar Association Intellectual Property Section
American Bar Association International Law Section
American Board of Professional Liability Attorneys
Conference of Federal and State Appellate Staff Attorneys
Corporate Counsel Seminars sponsored by Jackson, Lewis, Schnitzler & Krupman
In-house law firm ethics seminars for a number of major firms in the state
Law School programs including ones sponsored by Georgia, Illinois, Mercer, Pittsburgh, and Suffolk
Mealy's Conference on Toxic Torts
Nelson Mullins Center on Professionalism
North Carolina and South Carolina Assn. of Patent, Copyright, and Trademark lawyers

Practicing Law Institute
Primerus
Protection and Advocacy for People with Disabilities, Inc.
Rand Institute
Southeastern Association of American Law Schools
South Carolina Bankruptcy Law Assn.
South Carolina Defense Lawyers Assn.
South Carolina Health Lawyers Assn.
South Carolina Trial Lawyers Assn.
United States Department of Justice
Various bar association groups including the South Carolina Bar and the Georgia Bar
In addition, I have spoken frequently at CLE sessions organized by a number of firms
throughout the state.

## GENERAL PUBLIC SERVICE

Chair, Committee for Concert in Celebration of 50th Anniversary of State of Israel, Koger
Center, March 31, 1998

Cofounder and Treasurer, Montessori Elementary School of Columbia (1983-1994) and
Montessori Middle School of Columbia (1989-1999)

Member of Board of Directors and Board of Education of Beth Shalom Synagogue, for a number
of years

## UNIVERSITY SERVICE

I served on the University of South Carolina Tenure and Promotions committee, Conflict of
Interest Committee, and as a faculty senator. In addition, as noted above, I have served on
several committees that bring speakers to the University.

7.      ***Honors***

(a)  Selected by his peers for inclusion in *The Best Lawyers in America*© since 2015  in
the fields of Ethics and Professional Responsibility Law.
(b)  Selected for 2014 Leadership in Law Award by the South Carolina Lawyers
Weekly.
(c)  Outstanding Faculty Publication Award, University of South Carolina: 2000,
1999 (with Professor Richard Seamon), 1994, 1988 (with Professor Patrick Hubbard)
(d)  Outstanding Faculty Member Award, University of South Carolina, 2005-06,
1982-83 (with Professor Eldon Wedlock).
(e) G.G. Dowling Award, University of South Carolina, 2004, presented to the faculty
member who best exhibits integrity, scholarship, and concern for others
(f) Order of the Coif

(g) Who's Who in American Law
(h) Editor-in-Chief, Journal of Public Law (now Emory Law Journal), 1970-71

8.    ***Consulting***

As a practicing lawyer, I have represented lawyers and law firms and served as an expert witness in cases involving professional ethics, including disqualification, malpractice, and disciplinary matters. I have been selected to arbitrate legal disputes and have been appointed as special counsel to investigate and make recommendations on issues of contract law and professional ethics. My firm, Crystal & Giannoni-Crystal, LLC, focuses its practice on professional ethics, international transactions, business law, and data privacy.  For information about the firm, see www.cgcfirm.com. My partner, Francesca Giannoni-Crystal, and I are cofounders of www.technethics.com, a website devoted to issues of technology and professional ethics.

I have appeared as counsel or cocounsel in the following reported cases:

    Fidrych v. Marriott International, Inc., 952 F.3d 124 (4th Cir. 2020)
    Rubashkin v. United States, #11-1203 (Supreme Court 2012) (on behalf of
Amicus Curiae, The Aleph Institute and the National Association of Criminal Defense
Lawyers)
    Hall's Reclamation, Inc. v. APAC Carolina, Inc., 103 F.3d 117 (4th Cir. 1996)
( opinion available at 1996 WL 726857)
    In re Bowen, 469 S.E.2d 46 (S.C. 1996)
    In re Jennings, 468 S.E.2d 869 (S.C. 1996)
    Home Ins. Co. v. Bowers, 39 F.3d 1177 (4th Cir. 1995)
    Rutherford v. Rutherford, 414 S.E.2d 157 (S.C. 1992), rev'g, 401 S.E.2d (S.C.
App. 1991) (pro bono)
    In re Bell, 405 S.E.2d 825 (S.C. 1991)
    In re Bowers, 400 S.E.2d 134 (S.C. 1991) (pro bono)
    In re Rentiers, 374 S.E. 2d 672 (S.C. 1988)
    In re Warner, 335 S.E.2d 90 (S.C. 1985)
    In re Delgado, 306 S.E.2d 591 (1983), cert. denied, 464 U.S. 1057 (1984) (amicus
curiae on behalf of the National Association of Criminal Defense Lawyers)
    Tuloka Affiliates, Inc. v. Moore, 268 S.E.2d 293 (S.C. 1980) (pro bono)
    Fortson v. Weeks, 208 S.E.2d 68 (Ga. 1974) (amicus curiae)
    Willis v. American National Stores, 350 F. Supp. 173 (N.D.Ga. 1972) (pro bono)

Other significant unreported litigation includes:
    Husain v. WHP Workflow Solutions LLC, 2:14-cv-01836-DCN (D.S.C. 2014)
    Karnofsky v. Massachusetts Mutual Life, Ins. Co., No. 17-1328 (4th Cir. 2017)
    Peterson v. Islamic Republic of Iran, 10-cv-4518 (S.D.N.Y. 2018) (Objections to report
of special master on behalf of Intervenor Colleen Delaney)

I have also appeared in unreported cases before the United States Court of

Appeals for the District of Columbia, the Georgia Supreme Court, the South Carolina Commission of Lawyer Conduct and the Supreme Court in disciplinary matters, and disciplinary bodies in the state of New York.

9.   ***Bar Memberships***
     (a) Georgia, 1972)
     (b) Massachusetts, 1976 (retired)
     (c) South Carolina, 1980
     (d) New York, 2012
     (e) District of Columbia, 2015

January 2024