# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL NO. 2804 |
| THIS DOCUMENT RELATES TO: | Case No. 17-MD-2804 |
| *City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 (Track 12) | Judge Dan Aaron Polster |
| *Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13) | |
| *City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14) | |
| *County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | |

## RESPONSE TO PLAINTIFFS' AND PEC'S SUR-REPLY REGARDING OPTUMRX, INC.'S MOTION TO DISQUALIFY MOTLEY RICE

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

    I.      MOTLEY RICE WAS A "PUBLIC OFFICER" WHEN IT INVESTIGATED OPTUMRX ON BEHALF OF HAWAII, D.C., AND CHICAGO, AND THE BELLWETHER PLAINTIFFS ARE MOTLEY RICE'S "PRIVATE CLIENTS." ........................................................................... 3

           A.      In investigating OptumRx, Motley Rice's attorneys wielded authority that they could not have wielded *but for* their special role as government lawyers ................................................................. 4

           B.      Motley Rice's representation of the bellwether plaintiffs is the same as any other private-client representation. .................................... 8

    II.     DR-22 IS (STILL) IRRELEVANT. ................................................................... 10

    III.    THAT PORTIONS OF SOME INVESTIGATION PRODUCTIONS MIGHT HAVE ALREADY BEEN PRODUCED IN THIS MDL CHANGES NOTHING. ....................................................................................... 12

    IV.    MOTLEY RICE'S APPROACH WOULD DESTROY RULE 1.11(c) ............... 14

CONCLUSION ..................................................................................................................... 19

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*City of Chicago v. Purdue Pharma L.P.*,
  2015 WL 920719 (N.D. Ill. Mar. 2, 2015)............................................................6

*County of Santa Clara v. Superior Court*,
  235 P.3d 21 (Cal. 2010) ......................................................................................6

*Gordon v. Dadante*,
  2009 WL 2732827 (N.D. Ohio Aug. 26, 2009) ..............................................18, 19

*In re Nat'l Prescription Opiate Litig.*,
  2019 WL 1274555 (N.D. Ohio Mar. 19, 2019) ..............................................16, 18

*In re Nat'l Prescription Opiate Litig.*,
  2021 WL 320754 (N.D. Ohio Feb. 1, 2021) .........................................................4

*Kronberg v. LaRouche*,
  2010 WL 1443934 (E.D. Va. Apr. 9, 2010) ..................................................17, 18

*Merrill v. King*,
  2022 WL 18402555 (E.D. Mich. Dec. 21, 2022) ...................................................4

*Reynolds v. Commissioner*,
  861 F.2d 469 (6th Cir. 1988) ...............................................................................11

*State ex rel. Discover Fin. Servs., Inc. v. Nibert*,
  744 S.E.2d 625 (W. Va. 2013).............................................................................6

*State v. Lead Indus. Ass'n*,
  951 A.2d 428 (R.I. 2008).....................................................................................6

*United States v. Villaspring Health Care Ctr., Inc.*,
  2011 WL 5330790 (E.D. Ky. Nov. 7, 2011)..................................................17, 18

**RULES**

Ohio R. Prof'l Conduct 1.11 ..................................................................................... passim

**OTHER AUTHORITIES**

ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 (Feb. 28, 2024)............................ passim

## <u>INTRODUCTION</u>

Motley Rice tries to do in its "sur-reply" what it couldn't do in its initial opposition—explain away the firm's clear and ongoing violation of Rule 1.11(c). It rehashes old arguments. It improperly offers new ones—some of which this Court already rejected at the hearing. It introduces an "expert" after the hearing parroting Motley Rice's briefs instead of offering independent expert analysis. But no matter how hard it tries, Motley Rice cannot change Rule 1.11(c)'s plain language or the policies animating the Rule. So it instead tries to dismantle the Rule.

But Rule 1.11(c)'s ethical standard remains, and it requires Motley Rice's disqualification. Motley Rice wielded government power when it investigated OptumRx. It obtained confidential information about OptumRx through those investigations. Now it is litigating against OptumRx in private civil litigation where it can use that confidential information to OptumRx's material disadvantage. This Court has already applied Rule 1.11(c) to disqualify a former government lawyer whose participation in meetings discussing initiatives to combat the opioid crisis gave her a strategic advantage in opioid litigation. The grounds for disqualifying Motley Rice under Rule 1.11(c) are even clearer: Motley Rice lawyers—including Linda Singer—gathered confidential information about OptumRx as deputized special attorneys general through coercive government subpoenas. The firm cannot un-know that information. What it can do is use that information against OptumRx in this litigation. Rule 1.11(c) exists precisely to prevent that result.

That was clear before the American Bar Association's Standing Committee on Ethics and Professional Responsibility issued Formal Opinion 509. But that ABA opinion only further confirms that Motley Rice has violated Rule 1.11(c). The ABA opinion contradicts every argument advanced by Motley Rice and its proposed expert. It confirms that private-practice attorneys qualify as public officials when they accept "special" government appointments. It confirms that

public entities like the bellwether plaintiffs qualify as "private clients" under Rule 1.11(c) when they press claims in civil litigation against parties like OptumRx. And it confirms that confidential government information includes any information that the government obtains that is protected from public disclosure.

And yet, even in the face of that opinion, Motley Rice refuses to concede. Instead, it responds to that new authority by peddling a remarkable interpretation of the opinion that would render Rule 1.11(c) a nullity. Misconstruing the ABA opinion and ignoring all the other authorities and common sense, Motley Rice argues that the firm has *no* confidential government information about OptumRx from its investigations because it can obtain the same information in discovery. That is neither what the Rule says nor what it means. Rule 1.11(c) would be meaningless if former government lawyers could avoid the ethical concerns simply by serving discovery to obtain the information they learned about through their government investigations. Under the legal ethics regime that Motley Rice imagines, up is down and left is right because applying the rules in the normal way threatens the firm's business model.

Rule 1.11(c) does not turn on whether the lawyer represents plaintiffs or defendants or whether the lawyer is a skilled advocate with good intentions. The Rule protects the integrity of the judicial process, and it applies when a lawyer obtains information through government power that it can use to advance private litigation. As OptumRx's two ethics experts—one of whom is on the ABA's Standing Committee on Ethics and Professional Responsibility—explained, "[t]here can be no more obvious violation of Rule 1.11(c)" than Motley Rice's violation here. Muchman/Montgomery 2nd Suppl. Report at 1; *see also* Dkt. 5300-2 (Muchman/Montgomery Suppl. Report) at 10 ("We do not believe that this is a close call.").

## ARGUMENT

I.     **MOTLEY RICE WAS A "PUBLIC OFFICER" WHEN IT INVESTIGATED OPTUMRX ON BEHALF OF HAWAII, D.C., AND CHICAGO, AND THE BELLWETHER PLAINTIFFS ARE MOTLEY RICE'S "PRIVATE CLIENTS."**

In its initial opposition, Motley Rice did not dispute that it was a "public officer or employee" within Rule 1.11(c)'s meaning when it investigated OptumRx. But now, Motley Rice argues that it was *not* acting in a governmental capacity when it investigated OptumRx as deputy attorneys general and that those were just ordinary outside-counsel arrangements. At the same time, it claims that its representation of the bellwether plaintiffs in this MDL *is* unique and not an ordinary private representation. Yes, Motley Rice now argues that investigating a company while wielding special governmental power is no different from any other "outside counsel" role but that representing a county or city in civil litigation is something special, not a traditional, private representation. As the Court recognized at the hearing, that argument is incorrect.[1] In Formal Opinion 509, the American Bar Association's Standing Committee on Ethics and Professional Responsibility confirmed what has always been true: "Rule 1.11(c) applies . . . to lawyers in private practice who are appointed to be special prosecutors and continue to represent private clients," and "the term 'private client' also includes *public* entities and officials whom the lawyer represents in private practice." ABA Comm. on Ethics & Prof'l Resp., Formal Op. 509 at 8 (Feb. 28, 2024), https://www.americanbar.org/content/dam/aba/administrative/professional_ responsibility/ethics-opinions/aba-formal-opinion-509.pdf.

---

[1] In the Court's words, "I can't understand why you [Motley Rice] don't see that there is a difference between your work for these -- your firm's work for these three entities and your work for all of your other clients, and particularly the four -- you know, the four bellwether clients that you're representing." Dkt. 5312 at 18:6–11.

    **A.**    **In investigating OptumRx, Motley Rice's attorneys wielded authority that they could not have wielded *but for* their special role as government lawyers.**

In its initial opposition, Motley Rice did not question that it was a "public officer or employee" when it investigated OptumRx on behalf of Hawaii, D.C., and Chicago. Now Motley Rice argues that when it investigated OptumRx on behalf of those governments, it was "not a public officer or employee and . . . Rule 1.11 does not apply to its representations." Dkt. 5320-1 (Sur-Reply) at 2.

As an initial matter, Motley Rice has waived its right to challenge its status as a public officer by not contesting the point in earlier briefing. *See, e.g.*, *Merrill v. King*, 2022 WL 18402555, at *5 n.6 (E.D. Mich. Dec. 21, 2022) ("[A]rguments made for the first time in a reply (or sur-reply) brief are generally considered waived."); *In re Nat'l Prescription Opiate Litig.*, 2021 WL 320754, at *11 (N.D. Ohio Feb. 1, 2021) ("Plaintiffs provide no explanation for why their alternative request is made for the first time in their reply brief . . . Accordingly, Defendants are correct that Plaintiffs waived this argument.").

In any case, Motley Rice's new argument is wrong. The firm tries to use language from its retainer agreements to suggest that it was nothing more than an "independent contractor" for those governments. Sur-Reply at 2–4. And it points to declarations from government employees in Hawaii, D.C., and Chicago explaining that those governments retained ultimate control over Motley Rice's investigations. Dkts. 5320-2, 5320-3, 5320-4. Because it was subject to those governments' ultimate control, Motley Rice argues, it cannot be a "public officer." Sur-Reply at 2–4. Motley Rice made a similar argument at the hearing, but the Court rejected it. The Court recognized that there was "no question that they [Motley Rice] were performing public functions." Dkt. 5312 at 6:25–7:1; *see also id.* at 16:11–13, 17:20–22 (recognizing that Motley Rice's service was as a "public lawyer" for Hawaii and engaged in a "standard private representation" in the

bellwether litigations); *id.* at 18:21–23 ("as a special AG exercising state power that is different from when you're outside counsel"). As an appointed special deputy attorney general, Motley Rice exercised government authority that is different in kind from a private lawyer's role in civil litigation.

Motley Rice's attempt to minimize its power as government investigators elevates form over substance. It is undisputed that Motley Rice was appointed "Special Deputy Attorney General" in Hawaii and "Special Assistant Corporation Counsel" for Chicago to investigate OptumRx. *See* Dkts. 5276-6 at 1, 5276-17 at 9, 5322-1. Those governmental appointments endowed the firm with authority *to act as the government* in those investigations. Motley Rice has already admitted that it served the government subpoenas on OptumRx. Dkt. 5288 (Opp.) at 3 ("As counsel for Hawaiʻi, *Motley Rice served* a subpoena on Optum . . . ." (emphasis added)); *id.* at 4 ("As counsel for DC, *Motley Rice served* a subpoena on Optum . . . ." (emphasis added)). The D.C. subpoena was mailed to OptumRx *in a Motley Rice envelope*. *See* Dkt. 5276-11. Motley Rice negotiated with OptumRx over the scope of the subpoenas, the timing of OptumRx's responses, and the terms of the confidentiality agreements. *See* Caplis Suppl. Decl. ¶¶ 5–9, 11–14; Grant Suppl. Decl. ¶¶ 5–6, 8. And OptumRx made its productions *to Motley Rice*. *See* Dkt. 5276-2 (Caplis Decl.) ¶¶ 5, 7–8, 10, 12–14; Dkts. 5276-8, 5276-9, 5276-13, 5276-14, 5276-15.

Motley Rice's expert shrugs off those facts, arguing that the firm is immunized from ethical responsibilities because the investigative subpoenas issued in the names of the Attorneys General. Dkt. 5320-5 (Crystal Report) at 6–7. But that is always true, even when a full-time deputy attorney general handles an investigation; they, like Motley Rice, qualify as government lawyers even if the Attorney General or their boss "issues" the subpoena or retains ultimate authority over the investigation. Whatever title Motley Rice had or whatever language was in the retainers or

5

whoever signed the subpoenas, Motley Rice investigated OptumRx by wielding government authority—authority that it could not have wielded *but for* the authority that those governments vested in the firm. Motley Rice admits as much. *See* Sur-Reply at 3 ("[Motley Rice] assisted the State in its exercise of its own powers to carry out investigations and enforce the law."). Its lawyers are not exempt from the ethical rules because they received their government power by special appointment. *See* ABA Formal Op. 509 at 8 ("Rule 1.11(c) applies, for example, to lawyers in private practice who are appointed to be special prosecutors and continue to represent private clients . . . ."); Muchman/Montgomery Suppl. Report at 2 ("The information that Motley Rice acquired about OptumRx was *obtained under government authority*."); *id.* at 5 ("The Rule applies *precisely because* Motley Rice gathered information exercising the power of a government lawyer . . . .").

The cases Motley Rice cites are of no help. *Santa Clara*, *Lead Industries Association*, and *Nibert* all involved the propriety of contingency-fee arrangements to compensate outside counsel to governments in *regular civil litigation*. *See County of Santa Clara v. Superior Court*, 235 P.3d 21, 25–26 (Cal. 2010); *State v. Lead Indus. Ass'n*, 951 A.2d 428, 474–80 (R.I. 2008); *State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 744 S.E.2d 625, 630–40 (W. Va. 2013). And *City of Chicago* considered whether Chicago could outsource its investigatory authority to an outside attorney, whether that outside attorney was a "city official" under the city's ethics code, and whether contingency-fee compensation was allowed. *See City of Chicago v. Purdue Pharma L.P.*, 2015 WL 920719, at *1–6 (N.D. Ill. Mar. 2, 2015). Those cases have nothing to say about Rule 1.11(c) generally or about its implications for Motley Rice's situation specifically.

Motley Rice and its expert complain that OptumRx's textual and principled approach to Rule 1.11(c) is "draconian" and "would make it difficult for governments to obtain private law

firm representation." Sur-Reply at 6–7, 6 n.7 (quoting Crystal Report at 8–9). Not so. As the Court recognized at the hearing, Rule 1.11(c) bars a representation only in which the confidential government information could be used to the party's material disadvantage: "[I]f it's completely unrelated, . . . we wouldn't be here." Dkt. 5312 at 27:8–19. It is not much to ask a lawyer vested with government power to refrain from later suing the target of the investigation in a private lawsuit in which the lawyer could use the information learned through the investigation against the target. On the contrary, it is the bare minimum that the ethics rules have long demanded.

Motley Rice's contrary position is dangerous. If accepted, it would give free rein to private lawyers to seek out special appointments so they can use government power for their own private profit. According to Motley Rice, so long as a private lawyer negotiates a retainer agreement with the right set of "magic words" about the lawyer serving as an "independent contractor" and the government head's retaining oversight—which again is always true even when a full-time deputy attorney general or Assistant U.S. Attorney handles an investigation under their manager's authority—the private lawyer leading the investigation for the government can do whatever she wants with the confidential government information she obtains, including using it against the investigation target in later private litigation to enrich the lawyer and the lawyer's new client. That is not how the ethical rules work for lawyers wielding government power.[2] *See also* Ohio R. Prof'l Conduct 1.11, cmt. 4 (emphasizing the need for government lawyers "to maintain high ethical standards").

---

[2] Contrary to Motley Rice's argument, the Rule is not limited to full-time W-2 employees; it governs any "public officer"—including those that also have employment outside the government. A private lawyer who is appointed to serve a public function cannot avoid the ethical rules by labeling itself a "contractor" and specifying that the government retains ultimate control over its work. *See* ABA Formal Op. 509 at 7 ("Rule 1.11(c) applies . . . also to lawyers currently serving as public officers . . . who, outside their government service, represent private clients.").

It is not an overstatement to say that Motley Rice invites this Court to destroy Rule 1.11(c). It asks the Court to empower lawyers to avoid Rule 1.11(c) altogether by structuring their "outside counsel" agreements a certain way so they can use government power to gain unfettered access to confidential information about parties and then use that information against those same parties for private gain. That is a perverse, corrupt result that this Court should not endorse.

**B.      Motley Rice's representation of the bellwether plaintiffs is the same as any other private-client representation.**

Motley Rice again argues that because the bellwether plaintiffs are local governments, they cannot be "private clients." Sur-Reply at 6–7. That argument finds no support in any source. It ignores both the *purpose* of Rule 1.11(c) and the *guidance* from the rule's drafters. Rule 1.11(c) was designed to eliminate "the risk" that governmental power "might be used for the special benefit" of another client. Ohio R. Prof'l Conduct 1.11, cmt. 4. As Rule 1.11(c)'s drafters recognized, that risk exists regardless of whether the second client is "public or private." *Id.* If that were not enough, the ABA in its recent formal opinion confirmed that "the term 'private client' [in Rule 1.11(c)] also includes *public* entities and officials whom the lawyer represents in private practice, if those clients are not legally entitled to employ the confidential information." ABA Formal Op. 509 at 9–10 ("[T]here is no less need to protect against the misuse of confidential government information on behalf of a *public* entity . . . ."). In representing the bellwether plaintiffs, Motley Rice is acting no differently from any other attorney representing a client in private civil litigation.

---

[3] There can be no dispute that the bellwether plaintiffs "are not legally entitled to [use] the confidential information" (ABA Formal Op. 509 at 9–10) that Motley Rice acquired through its government investigations. The information was provided to Motley Rice subject to confidentiality agreements that strictly prevent Motley Rice from sharing that information with the bellwether plaintiffs or using the information in other matters. The fact that some of the same documents may later be produced in this case does not legally entitle the bellwether plaintiffs to use in opioid litigation the confidential government information that Motley Rice acquired *in the investigations*.

Motley Rice's expert argues that Rule 1.11(c) focuses solely on "the *client's* private status," not "*the lawyer's* private status." Crystal Report at 7. He cites no support for that opinion—because there is none. It also contradicts the Rule's purpose, which is "to prohibit lawyers from transforming government knowledge into private benefit." Muchman/Montgomery Suppl. Report at 6 (citation and quotation marks omitted). It also ignores Comment 4 to the rule, which explains that the second client can be *any* "client, public or private." Ohio R. Prof'l Conduct 1.11 cmt. 4.; *see also* ABA Formal Op. 509 at 9–10; Muchman/Montgomery Suppl. Report at 5–6 ("'Private client,' as used in Rule 1.11(c), means *any* client, including a government entity, whom the lawyer represents while practicing law at an entity other than the government, such as a law firm. . . . The history of and policy reasons for the Rule, as well as precedent, clearly establish that any other interpretation of the term 'private client' subverts the Rule's purpose . . . .").

Motley Rice argues that the bellwether plaintiffs, as local subdivisions, are uniquely situated because they perhaps can seek broader abatement remedies in public-nuisance suits. Sur-Reply at 6. But as the Court already observed at the hearing, Motley Rice is "not exercising any public function" in representing the bellwether plaintiffs: "You're outside counsel. . . . you're not issuing government subpoenas, . . . government documents aren't being produced to you in a confidential manner." Dkt. 5312 at 22:14–22; *see also id.* at 16:13–18 ("You [Motley Rice] are private counsel here, all right? You're private counsel, you're representing – you're outside counsel, not a public -- not a government lawyer. You're just a plain, regular outside counsel on a -- presumably a contingency arrangement with the entities that are filing these cases."). As this Court recognized, there is an obvious difference between *acting as the government* in an investigation and *representing a government* in civil litigation. The bellwether plaintiffs are

"private clients" under Rule 1.11(c) because Motley Rice is not exercising any government power in representing them.

*       *       *

When Motley Rice investigated OptumRx for Hawaii, D.C., and Chicago, it was exercising government power and functioning as a public officer. In the MDL, Motley Rice is representing clients in private litigation and is no different from a run-of-the-mill, private-practice attorney. That is a textbook violation of Rule 1.11(c).

## II.    DR-22 IS (STILL) IRRELEVANT.

The parties have already briefed DR-22's bearing on Motley Rice's ethics violations. *See* Opp. at 6–11; Dkt. 5300 (Reply) at 7–11. Nothing in Motley Rice's sur-reply changes the analysis. DR-22's plain language and this Court's and Special Master Cohen's rulings confirm that DR-22 encompasses only investigations "regarding the marketing, sales, distribution or dispensing of Opioids." Dkt. 2576 (DR-22) at 4. The Hawaii, D.C., and Chicago investigations did not "regard[] the marketing, sales, distribution or dispensing of Opioids," so DR-22 does not apply.

DR-22 has no bearing on the ethical issues. OptumRx has not produced in this MDL the lion's share of the information from the three government investigations, and Motley Rice was required to apply Rule 1.11(c) *before* it agreed to represent plaintiffs in opioid litigation against OptumRx. Speculating about what might or might not happen in MDL discovery in the future doesn't bear on Rule 1.11(c)'s operation.

In any case, DR-22 and every order interpreting it confirm that it requires the reproduction only of documents that were first produced in other *opioid-related* lawsuits, investigations, and public hearings. Special Master Cohen has explained that "[i]f a Defendant produces discovery in another *opioid-related forum*, that Defendant must promptly produce those discovery materials to the MDL Repository." Dkt. 3699 at 4 (emphasis added). In another order, Special Master Cohen

10

wrote that "defendants are obligated to produce to the MDL Repository documents they earlier produced in any *opioid-related* 'closed federal government investigation.'" Dkt. 3291 at 2 (emphasis added). The PEC itself has acknowledged that DR-22 is limited to "opioid-related" matters. Dkt. 5265 at 24:23–24 (at a December 1, 2023 hearing, Pete Weinberger conceded: "I realize that the [DR-22] ruling talks about *opioid-related investigations*" (emphasis added)).

Motley Rice has already represented that its earlier government-sponsored investigations of OptumRx were *not* opioid-related. In its opposition, Motley Rice told the Court that the investigations concerned alleged "overbilling for insulin"—not the "promotion and dispensing of opioids." Opp. at 1. And Ms. Boggs declared under oath that the three governmental subpoenas "did not reference any opioid drug by name or opioids generally." Dkt. 5302-1 (Boggs Decl.) ¶¶ 6, 9, 14. Even Motley Rice's thirteenth-hour expert argues that the "crux of [the] claims" in those investigations was "price fixing," not opioid misuse. Crystal Report at 10–11.[4] Given those admissions, Motley Rice cannot now argue the opposite—that its investigations concerned opioid marketing, distribution, or dispensing within the scope of DR-22. *Cf. Reynolds v. Commissioner*, 861 F.2d 469, 472 (6th Cir. 1988) (judicial estoppel exists "to protect the courts from the perversion of judicial machinery," including preventing parties from "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." (citations omitted)). Regardless, Motley Rice's previous position is the truth, as confirmed by two supplemental declarations from OptumRx's lawyers who attest that neither Motley Rice nor any other government lawyer ever suggested that the investigations were regarding the "marketing, sales, distribution or dispensing of [o]pioids." *See* Caplis Suppl. Decl. ¶¶ 10, 12; Grant Suppl. Decl. ¶ 7.

---

[4] Even though Motley Rice led the investigations and has had OptumRx's confidential government information for years now, the firm never suggested that DR-22 applies to those investigations until OptumRx moved to disqualify the firm.

Motley Rice's new position seems to be that DR-22 applies to *any* document referencing opioids that is produced in *any* litigation, investigation, or public hearing—even if the litigation, investigation, or hearing did not itself concern the "marketing, sales, distribution, or dispensing of [o]pioids." Neither this Court nor Special Master Cohen has ever suggested that DR-22 applies in such a sweeping manner. DR-22, by its plain terms, applies only to cases, investigations, and hearings "regarding the marketing, sales, distribution, or dispensing of [o]pioids." DR-22 at 4; Dkt. 2712 (Amendment to DR-22). Motley Rice's approach would effectively require defendants to review every document they have ever produced in any legal proceeding to assess its potential relevance to this case. No defendant has ever been subject to such an expansive standard, which would violate the Federal Rules of Civil Procedure and due process. In any case, the contours of DR-22 are irrelevant to Motley Rice's ongoing ethics violation because the confidential government information that Motley Rice had access to extends well beyond OptumRx's document productions in the investigations: It covers all non-public information that Motley Rice gathered in those investigations.

## III.  THAT PORTIONS OF SOME INVESTIGATION PRODUCTIONS MIGHT HAVE ALREADY BEEN PRODUCED IN THIS MDL CHANGES NOTHING.

Motley Rice next argues that because *some* of the documents that it gathered in the investigations have also been produced in the MDL, that means that *none* of the information that Motley Rice obtained through its investigations can be "confidential government information" that could be used to OptumRx's material disadvantage under Rule 1.11(c). Sur-Reply at 10–12; Dkt. 5320-6 (Boggs Suppl. Decl.) ¶¶ 6–11. That argument is meritless.[5]

---

[5] OptumRx has never claimed that *none* of the documents produced in the investigations were produced in this MDL. Mr. Hooker's supplemental declaration identified non-exhaustive examples of the types of documents produced to counter Motley Rice's and Ms. Boggs's earlier false claims that the productions related only to insulin, did not contain opioid-related information, and contained minimal confidential information. *See* Dkt. 5300-1 (Hooker Suppl. Decl.) ¶¶ 10–19. Ms.

If anything, Motley Rice's analysis of the documents produced to Hawaii and D.C. proves OptumRx's point. Taking Ms. Boggs's supplemental declaration on its face, she concedes that at least hundreds of the Minnesota Attorney General documents (that were produced to Hawaii and D.C. subject to confidentiality provisions) have *not* been produced in this MDL. Boggs Suppl. Decl. ¶¶ 9(c), 10. And she explains exactly why those unproduced documents could be used to OptumRx's material disadvantage. They include rebate agreements with drug manufacturers (providing a window into OptumRx's negotiations across its business), Business Implementation Committee grids "that contain detailed information about formulary placement for drugs and related internal recommendations and decisions," "slide decks from OptumRx's Industry Relations team analyzing formulary and rebate strategy for numerous drugs including insulins and opioids," and other "high-level documents that discuss OptumRx's rebate strategy, formulary management, and drug pricing generally." *Id.* ¶ 10. OptumRx already explained how those types of documents (and others) "give Motley Rice an employee's-eye view of the very aspects of OptumRx's business that the bellwether plaintiffs challenge." Reply at 6. Under Rule 1.11(c), the question is simply whether the information *could* be used to OptumRx's material disadvantage. Motley Rice's own evidence shows that very real risk.

Ms. Boggs also admits that her analysis was limited to documents produced in the Hawaii and D.C. investigations that Mr. Hooker cited specifically in his supplemental declaration. *See* Boggs Suppl. Decl. ¶¶ 8, 11. Motley Rice says nothing about the *thousands* of other documents produced in the government investigations except to speculate that maybe some of them have also been produced in the MDL. As explained above, the 903 documents that Motley Rice claims were

---

Boggs's supplemental declaration is effectively a recognition that her first declaration was incorrect.

produced in the MDL (*id.* ¶ 9(a)) represent a sliver of the total information and documents that Motley Rice obtained across the three investigations. *See also* Caplis Decl. ¶¶ 8–9, 12, 14–15; Dkt. 5276-3 (Grant Decl.) ¶¶ 7–8. Many of those documents may not concern opioids specifically (and thus may not be subject to discovery in opioid litigation) but nonetheless provide a window into OptumRx's business that help Motley Rice tailor its claims against OptumRx.

## IV. MOTLEY RICE'S APPROACH WOULD DESTROY RULE 1.11(c).

Motley Rice presses an interpretation of Rule 1.11(c) that would render the rule meaningless, proposing a regime under which virtually no information—except perhaps the nuclear codes and other classified materials (*see* Crystal Report at 11)—could ever qualify as confidential government information. The Court should reject Motley Rice's interpretation.

Motley Rice's expert claims that "if the information in question could be obtained through discovery in civil cases," then that information is "otherwise available to the public" and not confidential government information. Crystal Report at 9. As OptumRx already explained (*see* Reply at 8–11), that interpretation contradicts the Rule's text and policy. Just about all information could be obtained, one way or another, by a litigant through civil discovery. That interpretation of "otherwise publicly available" would swallow the rule.

In its request for leave to file supplemental authority, Motley Rice turns Formal Opinion 509's discussion of "confidential government information" inside out. Motley Rice quotes this language from the opinion:

> Rule 1.11(c) does not apply to all information obtained under government authority, but only to information that, at the time the Rule is applied, . . . is not otherwise publicly available. Whether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact. So is the question of whether the information "could be used to [the person's] material disadvantage."

ABA Formal Op. at 4 (footnotes omitted). Motley Rice seizes on the words "can be obtained through routine discovery," arguing that "the investigation documents at issue are not confidential government information and that Motley Rice's access cannot materially disadvantage Optum when all Plaintiffs' counsel can access these documents through discovery." Dkt. 5338 at 2. That position finds no support in the ABA opinion. None. And Motley Rice conveniently omits the word "routine." It is clear from the surrounding discussion that "routine" in the ABA opinion does not extend to documents produced under a protective order or confidentiality agreement that prevents their public disclosure. It instead means generally available to the public—whether through a FOIA request or through the internet—and not subject to any sort of confidentiality treatment. *See* Muchman/Montgomery 2nd Suppl. Report at 5 ("Routine discovery does *not* include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced pursuant to Confidentiality Agreements signed by government lawyers."). Even inasmuch as it is subject to discovery in this case, the information that is the subject of OptumRx's motion does not qualify as "routine" discovery.

The footnotes surrounding the sentence Motley Rice cites confirm that Motley Rice's reading is incorrect. Footnote 13, for example, explains that the "conceptualization of 'confidential government information' [in Rule 1.11(c)] is analogous to the definition of 'nonpublic information' in 5 C.F.R. § 2635.703(b)," which "defines 'nonpublic information' as information that an employee obtains due to Federal employment and that he knows or reasonably should know: '(1) Is routinely exempt from disclosure under 5 U.S.C. 552 [FOIA] or is protected from disclosure by statute, Executive order or regulation; (2) Is designated as confidential by an agency; or (3) has not actually been disseminated to the general public and is not authorized to be made available to the public on request.'" ABA Formal Op. 509 at 4 n.13. Here, the information that

OptumRx produced to Motley Rice qualifies as confidential government information because it is exempt from FOIA disclosure and Motley Rice is forbidden by the confidentiality agreements from publicizing the information.

OptumRx's experts, one of whom is a member of the ABA Standing Committee on Ethics and Professional Responsibility, refute Motley Rice's attempt to distort Formal Opinion 509. They explain that Motley Rice's "interpretation and application of the Rule would render the protections of Rule 1.11(c) meaningless" because "recipients of investigatory subpoenas would have no protection from that sort of government overreach if government lawyers could simply avoid Rule 1.11(c) altogether by merely requesting the information through discovery in a later case." Muchman/Montgomery 2nd Suppl. Report at 7. OptumRx's experts also explain that the judicial authorities cited in the ABA opinion—including this Court's opinion disqualifying Ms. Rendon under Rule 1.11(c)—confirm that the possibility of acquiring the same or similar information in discovery does not make information publicly available. *Id.* at 5–6.

This Court has already reached the same conclusion. When disqualifying Endo's lawyer under Rule 1.11(c), this Court described Ms. Rendon's access to "nonpublic information" concerning "the inadequate staffing levels, funding deficiencies, strategies, initiatives, operations, and allocation of resources" that "may go to the heart of Plaintiffs' damages claims." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4–5 (N.D. Ohio Mar. 19, 2019). The fact that Ms. Rendon could have asked deponents to testify about the same information shared during task force meetings did not save Ms. Rendon from disqualification.

The facts here are even worse. Motley Rice acquired more confidential government information than Ms. Rendon received—about OptumRx's financial and business "strategies, initiatives, [and] operations" (*id.* at *4) and more—but it did so through coercive government

subpoenas rather than "sidebar" conversations. Although the counties may have shared information with Ms. Rendon "in a spirit of confidence and trust" (*id.*), OptumRx's productions were strictly protected by written confidentiality agreements. And unlike Motley Rice, Ms. Rendon lacked ongoing access to the confidential government information and would have had to draw from her memory. Motley Rice has had information and documents in hand for years, giving it a clear roadmap to draft its complaint, craft discovery requests, tailor search terms and custodians, and otherwise prosecute this litigation.

And this Court's decision to disqualify Ms. Rendon is no outlier. There are many other examples of courts disqualifying former government lawyers for possessing information that could easily have been later obtained in civil discovery. *See, e.g.*, *United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011) (confidential government information included information "obtained from interviews with former employees"); *Kronberg v. LaRouche*, 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010) (confidential government information included details about "the structure of [defendant's] organizations generally, the role of other individuals who worked with [defendant] . . . , the relationship among the Defendants, and [defendant's] other activities *that may be admissible under Fed.R.Evid. 608(b) or otherwise*" (emphasis added)). There is nothing suggesting that the ABA committee intended its reference to "routine" discovery to write Rule 1.11(c) out of existence. On the contrary, the whole point of the ABA opinion is to emphasize that circumstances like exist here violate the Rule.

In any case, by fixating on specific documents, Motley Rice misses the forest for the trees. Rule 1.11(c) speaks of confidential government *information*—not just documents—that a government lawyer obtains from whatever source. OptumRx's document productions are just one part of the confidential information that Motley Rice acquired as government investigators. For

example, under its retention agreement with Hawaii, Motley Rice was required to "submit a report" labeled "attorney-client privilege/work-product communication" that described, among other things, "the facts or data considered in formulating the report," a "complete statement of investigative findings and the bases of such findings," "an analysis of the propriety of the PBMs' billing practices," and "a recommendation on whether or not to proceed with civil litigation against any PBM." Dkt. 5276-5 at A1-1. Everything in that report—which required Motley Rice to detail its "mental roadmap" and "strategic insights" for litigation (*Villaspring*, 2011 WL 5330790, at *6; *Kronberg*, 2010 WL 1443934, at *4)—constitutes confidential government information that is unavailable to the public but available to Motley Rice only by virtue of its role as a government investigator.[6] And OptumRx wasn't the only subpoena recipient in those investigations. *See* Dkt. 5288-4 (Boggs Decl. Ex. D) ¶ 18; Opp. at 1. Any other confidential information about OptumRx that Motley Rice obtained or created during its government investigations qualifies as confidential government information under the Rule.

*     *     *

There is no doubt that Motley Rice is violating Rule 1.11(c). The firm's ethical violations are clear-cut and, as OptumRx's experts have explained, not even a "close call." Muchman/Montgomery Suppl. Report at 10. But even if there were some doubt on that score, "any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification." *Gordon v. Dadante*, 2009 WL 2732827, at *6 (N.D. Ohio Aug. 26, 2009) (citation and quotation marks omitted). This Court has already disqualified a defense-side lawyer on far less egregious facts. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *4–5. It

---

[6] If OptumRx (or any third party) subpoenaed Motley Rice for those investigation materials, Motley Rice would claim that any number of laws or privileges (attorney-client privilege, attorney work product, investigative privilege) prevent their disclosure. Those investigation-related files are obviously not "publicly available."

18

should disqualify Motley Rice to confirm that the rules apply to everyone, plaintiffs' counsel and defense counsel alike.

## **CONCLUSION**

Ohio's ethical rules are designed to eliminate the risk that power vested in the government "might be used for the special benefit of [an] other client." Ohio R. Prof'l Conduct 1.11, cmt. 4. Motley Rice wielded government power to investigate OptumRx and, in the process, obtained information that it can use to OptumRx's material disadvantage in this litigation. It is this Court's duty "to preserv[e] the integrity of the judicial process, maintain[] the public confidence in the legal system and enforce[e] the ethical standards of professional conduct." *Gordon*, 2009 WL 2732827, at *6 (citation and quotation marks omitted). Under Rule 1.11(c), that requires Motley Rice's disqualification.

March 6, 2024.

Respectfully submitted,

*/s/ Brian D. Boone*
Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel.: (704) 444-1000
brian.boone@alston.com

William H. Jordan
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com

*Attorneys for OptumRx, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on March 6, 2024, a copy of the foregoing was served on all counsel of record by filing the same with the Court's ECF system.

*/s/ Brian D. Boone*
Brian D. Boone