# Exhibit A

to 2nd Supplemental Declaration of Matthew Hooker

## ASSIGNMENT AND SUMMARY OF SUPPLEMENTAL OPINIONS

Since we issued our February 4, 2024, Supplemental Expert Report, the PEC has submitted two additional filings that bear on our opinions. First, on February 20th, the PEC filed a sur-reply brief along with more than 100 pages of supplemental materials. Among the materials attached to the sur-reply is an Expert Declaration of Nathan M. Crystal, who responds to our earlier opinions concerning the scope and application of Rule 1.11(c). Second, on March 1st, the PEC filed a notice of supplemental authority that alerts the Court to a new Formal Opinion 509 that was issued by the American Bar Association's Standing Committee on Ethics and Professional Responsibility on February 28, 2024. *See* American Bar Association, Standing Committee on Ethics and Professional Responsibility, Formal Opinion 509, *Disqualification to Prevent the Misuse of "Confidential Government Information.*"

Counsel for OptumRx has asked us to respond to the PEC's new submissions. As we discuss further below, Motley Rice and its expert misconstrue and mischaracterize Rule 1.11(c), our prior opinions, and ABA Formal Opinion 509. Their interpretation of Rule 1.11(c) would render the Rule inapplicable in almost all circumstances and create countless opportunities for government lawyers to abuse government power to enrich themselves—which is precisely what Rule 1.11(c) seeks to avoid. Here, Motley Rice entered into contracts with the government to use government authority to investigate OptumRx, obtained information with government subpoenas, and agreed to protect the information OptumRx produced by signing broad Confidentiality Agreements. Then, after receiving OptumRx's confidential information, Motley Rice has turned around and sued OptumRx in its *private* capacity in a case where it can use the same information it obtained under government authority and pursuant to Confidentiality Agreements to OptumRx's material disadvantage. There can be no more obvious violation of Rule 1.11(c) as explained below.

1

## ADDITIONAL MATERIALS REVIEWED

We reviewed the Plaintiffs' sur-reply to OptumRx's motion to disqualify, Plaintiffs' notice of supplemental authority, and additional research as cited in this supplemental opinion.

## SUPPLEMENTAL OPINIONS

I.      **ABA Opinion 509 Establishes that Motley Rice is Violating Rule 1.11(c).**

    A.   **ABA Opinion 509 establishes that Motley Rice received confidential government information from OptumRx.**

On February 28, 2024, the ABA's Standing Committee on Ethics and Professional Responsibility issued Formal Opinion 509 to resolve confusion that has arisen in recent years over Rule 1.11(c)'s application in certain circumstances. The ABA Opinion reaffirms the strong protections that Rule 1.11(c) provides to third parties against the misuse of confidential information in the hands of lawyers exercising government power. It directly addresses several of the questions that OptumRx's motion to disqualify Motley Rice raises.

First, Motley Rice argues information OptumRx produced is not "confidential government information." This argument is wrong. In arguing that the information OptumRx produced is not "confidential government information," the PEC cherry picks one sentence from ABA Op. 509 which reads, "Whether the information is publicly available-*e.g.* whether it can be obtained through routine discovery—will be a question of fact." Motley Rice claims that this sentence somehow means that anything OptumRx produced to Motley Rice in response to government subpoenas and pursuant to confidentiality agreements is no longer protected under Rule 1.11(c) if Motley Rice could ask for the same in discovery. PEC misses the entire point.  Their dangerous interpretation eviscerates the protections that Rule 1.11(c) is intended to provide to the confidential information OptumRx produced. In making its argument, PEC conveniently omits any mention of the ABA Opinion's Footnote 13 that immediately precedes that sentence and demonstrates that the

information OptumRx produced to Motley Rice pursuant to government subpoenas, while Motley Rice was acting as government lawyers, would certainly not be publicly available or obtainable "through routine discovery." Specifically, in defining confidential government information, Footnote 13 provides:

> This conceptualization of "confidential government information" is analogous to the definition of "nonpublic information" in 5 C.F.R. §2635.703(b) ("Use of nonpublic information"). This regulation stipulates that a federal government employee "*shall not* engage in a financial transaction using nonpublic information *or allow the improper use of nonpublic information to further his own private interest or that of another[.]* Section 2635.703(b) defines "nonpublic information" as information that an employee obtains due to Federal employment and that he knows or reasonably should know: "(1) Is routinely exempt from disclosure under 5 U.S.C. §552 or is protected from disclosure by statute, Executive order or regulation; (2) Is designated as confidential by an agency; or (3) *has not actually been disseminated to the general public and is not authorized to be made available to the public on request*." (*Emphasis supplied*).

ABA Formal Op. 509 at p.4.

Clearly, the information OptumRx produced to Motley Rice while Motley Rice was acting as government lawyers is routinely exempt from disclosure by the FOIA statute, 5 U.S.C. §552. In addition, the information has been designated as confidential by an agency by virtue of Motley Rice's signature on the confidentiality agreements it entered into on behalf of the government entities which specifically state that all documents marked confidential by OptumRx will be considered confidential unless the government objects, which it did not.[1] The majority of the information OptumRx produced pursuant to Motley Rice's government authority in serving a civil investigative demand,[2] including vast amounts of proprietary and trade secret information, has

---

[1] *See* Supplemental Report at p. 9; *see also, e.g.,* Dkt. No. 5276-18 at 11, 26.

[2] "Information meets the 'governmental authority' test if it was acquired through a search warrant, a civil investigative demand ("CID"), a wiretap, a government informant, a government investigator showing a badge, any request on government letterhead, or even an oral request from a government official with power to act on the information (or to punish the refusal to supply the information." Simon's New York Rules of Professional Conduct Annotated §1.11:30 (July 2023 Update).

never been disseminated to the general public and is not authorized to be made available to the public on request. *See e.g.* Declaration of Matthew Hooker, explaining that only .38% of the Minnesota documents produced by OptumRx are publicly available.[3] According to OptumRx's declarants (and now, even the recent declaration from Motley Rice attorney Paige Boggs)[4] it is clear that the documents and information that OptumRx produced to Motley Rice in the investigations includes a vast amount of proprietary information, trade-secrets, and highly sensitive commercial information concerning OptumRx's formulary decisions and negotiations with drug manufacturers. That information is exempt from disclosure under FOIA (5 U.S.C. § 552) and not otherwise available to the public. Motley Rice is not authorized to disseminate that information. Indeed, the documents and information were produced subject to negotiated confidentiality agreements preventing their disclosure *or use* in other matters.

Thus, the information OptumRx produced to Motley Rice pursuant to its government authority, is by definition precisely the kind of "confidential government information" that the Committee opined Rule 1.11(c) was designed to protect.

**B. The Proprietary and Confidential Information OptumRx produced pursuant to Confidentiality Agreements is not "routine" discovery, such as was contemplated by the use of the phrase in ABA Opinion 509.**

In its most recent filing, PEC tries to argue that pursuant to ABA Formal Op. 509, the information Motley Rice obtained from OptumRx is "routine discovery," thus it cannot be confidential government information. The PEC cites to the following language from Formal Opinion 509 in support of that proposition:

> Further, Rule 1.11(c) does not apply to all information obtained under government authority, but only to information that, at the time the Rule is applied, the government is legally prohibited from disclosing to the public or has a legal privilege not to disclose if the

---

[3] Doc #: 5300-1 Pages 628119,628128 at ¶8 and ¶ 17.
[4] *See, e.g.,* Doc # 5320-6.

> information is not otherwise publicly available.[13] Whether government information is publicly available—e.g., whether it can be obtained through routine discovery—will be a question of fact.

ABA Formal Opinion 509 at 4–5 (fn. 13 internal). The PEC argues that the phrase "whether [the information] can be obtained through routine discovery," means that a current or former government lawyer is not disqualified under Rule 1.11(c) if the confidential government information acquired through government service can also be obtained in civil discovery. That interpretation would render the Rule meaningless.

Although the information that OptumRx produced in response to the CIDs may eventually be subject to the PEC's discovery requests, OptumRx would still have the right to assert confidentiality protections, just as it did under the Confidentiality Agreements the government signed prior to production in the underlying investigations. The information is not "routine discovery." The plain language meaning of "routine" is "unremarkable" or "conventional."[5] Routine discovery does *not* include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced pursuant to Confidentiality Agreements signed by government lawyers.

For instance, Formal Opinion 509 favorably cites this Court's opinion disqualifying Endo's attorney, Ms. Rendon, noting that she participated in meetings where county employees shared confidential information in the "spirit of confidence and trust." ABA Formal Opinion 509 at 4 n.14 (citing *In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555 (N.D. Ohio 2019). But the type of information that Ms. Rendon learned during opioid task force meetings could also have been sought in discovery, including through document discovery and depositions. The same is true for the other opinions cited favorably in Formal Opinion 509. For example, Formal Opinion 509 cites

---

[5] https://www.thesaurus.com/browse/routine.

*United States v. Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *6 (E.D. Ky. Nov. 7, 2011), noting that in that case, the government lawyer was disqualified where he gained "strategic insights" from "interviewing [the] facility's former employees." The lawyer could have conducted those same interviews as depositions and obtained the same information, but that did not prevent disqualification. Similarly, in *Kronberg v. LaRouche,* 2010 WL 1443934, at *4 (E.D. Va. Apr. 9, 2010), the government lawyer was disqualified for knowing things like the "structure" of the business and "the role of other individuals" who worked for the business—information that could, of course, also have been gleaned through civil discovery.

As OptumRx explains in the declaration of Matthew Hooker, 68,310 pages of the information it produced is marked "PROPRIETARY AND CONFIDENTIAL."[6] As such, OptumRx would certainly object to producing much of the proprietary and confidential information in response to any civil discovery request in the MDL litigation and, therefore, it is not "routine" discovery.

Other examples of information that might *eventually be discoverable* which PEC might want to call "routine" discovery but are still considered confidential government information, include "information [a lawyer, also a police officer,] acquired that was non-public employment reviews of non-public discipline of police officers,"[7] or "information [a government lawyer] acquired as a Town Supervisor,"[8] or "information [a government lawyer acquired] from a state-run database with information about individuals' financial status and past earnings."[9]

---

[6] Doc # 5300-1 PageID # 628119, ¶ 8.
[7] N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op.  1187 (2020).
[8] N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op.  1169 (2019) (applying Rule 1.11(c) even if the Town Supervisor did not work on the matter and came across the information by happenstance).
[9] Nebraska Ethics Advisory Opinion for Lawyers No. 22-01 (applying Rule 1.11(c) to a part time county attorney and disqualifying him from representing clients in family law matters where child support is at issue due to his access to a state-run database with information about individual's financial status and past earnings.)

Another type of information that might be discoverable but by law must be kept confidential is a tax return.[10] Taxpayers provide information to the IRS and by law it must be kept confidential. Thus, a lawyer working for the IRS, in a representational capacity or not, who obtains information about a taxpayer's tax returns, may not later represent any client in private practice whose interests are adverse to the person to whom the confidential information pertains if the information could be used to the material disadvantage of that person. The information about the person's tax returns might eventually be obtainable through a discovery request, but the taxpayer would still have the right to attempt to protect the confidentiality of that information.

Thus, the fact that the PEC may *request* in discovery the same information OptumRx produced in the government investigations does not automatically transform OptumRx's confidential information into nonconfidential routine discovery. The precise purpose of Rule 1.11(c) is to protect those who comply with government demands for information by ensuring that government lawyers with access to the information will not try to benefit by leveraging the fruits of their investigation as private lawyers for private clients.

Under the PEC's theory, recipients of investigatory subpoenas would have no protection from that sort of government overreach if government lawyers could simply avoid Rule 1.11(c) altogether by merely requesting the information through discovery in a later case. Mindful that the purpose of Rule 1.11(c) is to protect those who comply with government demands for information from government overreach, the mere fact that Motley Rice may now *request* OptumRx's information through civil discovery does not make the information "routine" discovery. If accepted, that interpretation and application of the Rule would render the protections of Rule 1.11(c) meaningless.

---

[10] Professional Responsibility, Examples and Explanations, 6th Edition, W. Bradley Wendell (2020) p. 431.

**C. Confidential government information is defined as information not otherwise available to the public, which is exactly the type of information that Motley Rice obtained from OptumRx.**

Mr. Crystal and the PEC further incorrectly assert that if the information in question could be obtained through civil discovery, then the information is, by definition, "otherwise available to the public," and thus is not confidential government information. This argument is also wrong.

Rule 1.11(c) defines confidential government information as "information that has been obtained under governmental authority and which at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public."[11] The concept of "not otherwise available to the public" is broadly defined, meaning "if the public cannot obtain this information then it meets this element."[12] Thus, for example, "if the information is available on the internet, or in public archives or upon request at a government agency [only then] does it not satisfy this element" and not qualify as confidential government information.[13] Further, the protections of 1.11(c) extend to information "obtained under government authority" even where a lawyer learned the information in a nonrepresentational capacity,[14] including situations in which "the lawyer did no work at all on a matter and came across the confidential government information by chance, or over lunch, or by overhearing a conversation involving other government lawyers…"[15]

As discussed above and in our earlier expert reports, PEC cannot escape the reality that the definition of confidential government information is quite broad, "excluding little more than what the government is *required* to disclose, which is chiefly information not falling under any FOIA

---

[11] Rule 1.11(c).
[12] See Supp. Report a p. 8; and Simon's New York Rules of Professional Conduct Annotated §1.11:30 (July 2023 Update).
[13] See Supp. Rep. at p 9, fn. 29; Simon's New York Rules of Professional Conduct Annotated §1.11:30. (July 2023 Update).
[14] ABA Formal Op. 509 at 4. (Citations omitted.)
[15] Simon's New York Rules of Professional Conduct Annotated §1.11:27 (July 2023 Update).

exemption."[16] The concept of confidential government information is borrowed from federal statutes with rigorous protections against government employees misusing confidential information obtained during their employment.[17]

There can be no dispute that the bellwether plaintiffs "are not legally entitled to [use] the confidential information"[18] that Motley Rice acquired through its government investigations. The information was provided to Motley Rice subject to confidentiality agreements that strictly prevent Motley Rice from sharing that information with the bellwether plaintiffs or using the information in other matters. The fact that some of the same documents may later be produced in the case does not legally entitle the bellwether plaintiffs to use information OptumRx produced to other government entities in the government investigations.

This case is not a circumstance where the law permits Motley Rice to use OptumRx's information.

A reading of the full ABA Opinion 509 makes it clear that its purpose is to clarify the situations in which Rule 1.11(c) applies; not to gut the Rule's protections as the PEC and its expert would do. PEC cannot pluck words out of context to narrow the scope of Rule 1.11(c) in a manner that would render the rule meaningless.

## II. Motley Rice must be bound by the confidentiality agreements they signed as government lawyers.

The PEC and their expert want this Court to ignore the clear language of the Confidentiality Agreements Motley Rice signed. Those agreements protect the documents from use in "any other matter," "prohibit disclosure to the public," and provide that Motley Rice agrees "not to rely on

---

[16] Op. at p. 25, fn.36, Supplemental Op. at p. 8, fn. 28; *Law of Lawyering, Hazard, Hodes, Jarvis, and Thompson* § 16.12 (Fourth Edition, 2021-1 Supp. 2014).
[17] ABA Formal Op. 509 at p.4, fn 14 citing to cases including *In re National Prescription Opiate Litigation.*
[18] ABA Formal Op. 509 at 9-10

Confidential Material in pursuing information or claims in *any other matters outside its representation of OAG*."[19] Mr. Crystal describes the confidentiality agreements as "fairly standard confidentiality agreements," "designed to protect the confidentiality of the information produced," but then asks this Court to ignore *any* impact of the plain language of those agreements when considering the ultimate issue of whether or not the information subject to them is confidential government information. As this Court noted in *In re Opiate Litig., "*In community relationships, just as in personal relationships, years of trust can be undone in a very short period of time."[20] To allow Motley Rice to avoid the consequences of Confidentiality Agreements it signed under the auspices of government authority would disincentivize parties from cooperating with the government, destroy the trust of parties who would otherwise cooperate, and render any such future agreements meaningless.

The references to the *Opiate Litig.* case in Mr. Crystal's opinion actually prove OptumRx's position. Mr. Crystal correctly notes that the information in that case was conveyed in the "spirit of confidence and trust" and would "not have been shared but for the fact" of the lawyer's position in the U.S. Attorneys' office.[21]  Likewise in this case, OptumRx agreed to cooperate with the governments in the "spirit of confidence and trust," and also protected by Confidentiality Agreements that it had every right to believe are binding on Motley Rice. OptumRx has established in the declarations of Matthew Hooker that the information it produced is "not otherwise available to the public."[22] The PEC's attempt to contort the ABA Opinion and ignore the protections of the

---

[19] *See* Supplemental Report at p. 9; See, e.g., Dkt. No. 5276-18 at 11, 26.
[20] *Opiate Litig. *5
[21] Doc #: 5320-5 Page ID #:629136; citing to *Opiate Litig.* at *74, *77-78.
[22] Doc # 5300-1 PageID # 628119, ¶ 8.

Rule, as well as the plain language of the Confidentiality Agreements signed in this case, is inappropriate and contrary to Rule 1.11(c).

### III. The Information that Motley Rice obtained as government lawyers "*could be* used to the *material disadvantage*" of OptumRx which is the standard under Rule 1.11(c).

Completely disregarding the standard set out in Rule 1.11(c) and without citing any authority or evidence, Mr. Crystal speculates that the information Motley Rice obtained while representing Hawai'i, the District of Columbia and the City of Chicago is "highly unlikely to be [used] to the material disadvantage of OptumRx."[23] He even goes so far as to rely on a case applying the *Brady* rule [M.R. 3.8(d)], which applies to prosecutors in criminal cases and has nothing to do with this case.[24] Specifically, M.R. 3.8(d) applies the completely different standard of "*tends to negate the guilt of the accused*," instead of the standard articulated in Rule 1.11(c), that the confidential government information "*could be used to the material disadvantage of*" the party.[25] Mr. Crystal's attempts to rewrite the language of Rule 1.11(c) to suit Motley Rice's purpose is inappropriate.

As we have discussed repeatedly in our prior reports, the aim of Rule 1.11(c) is to prevent government lawyers from transforming government knowledge into a private benefit. "To carry out this purpose to maximum effect," the provision applies when the information "*could be*" used against a person to their material disadvantage.[26] OptumRx need only establish that the information

---

[23] Doc # 5320-5, PageID #: 629138.
[24] *See* Doc #5320-5, PageID # 629138 citing to *Goins v. Angelone,* 226 F. 3d 312, 325-6 (4ᵗʰ Cir.)
[25] *Id*., The standard in Model Rule 3.8(d) also known as the *Brady* rule, requires prosecutors to make timely disclosure to the defense of all evidence or information known to the prosecutor that *tends to* negate the guilt of the accused or mitigates the offense…" There are many policy reasons why Rule 3.8(d) uses the words "*tends to*" and 1.11(c) uses the word *"could,"* but those reasons need not be discussed here since Rule 1.11(c) uses the word *"could."*
[26] *See* Simons NY Rules of Prof. Conduct §1.11:28 (Dec. 2021).

*could be* used to its material disadvantage, not that the information "has been used," "will be used" or even is "highly unlikely" to be used, as Mr. Crystal suggests.

The threshold of *could be* is purposely lower than the standards suggested by Mr. Crystal in order to accomplish the Rule's objectives, and it applies "whether or not the government lawyer intends to use it or does not use it in fact."[27]  Applying the Rule's "*could be used*" language, the N.Y. State Bar Association Committee on Professional Ethics Committee concluded that if a police-officer lawyer is aware of confidential government information such as unfavorable employment reviews of non-public discipline imposed upon another police officer who is a witness in a traffic court matter against the police officer-lawyer's private client, and if that information "could be used to the material disadvantage of the officer-witness in plea negotiations or for impeachment purposes, then the police officer-lawyer may not represent the traffic court defendant in that matter."[28]

In a further attempt to rewrite the language of Rule 1.11(c), Mr. Crystal also speculates that the information Motley Rice obtained while working as government lawyers cannot cause OptumRx to suffer "material prejudice."[29]  Mr. Crystal uses the words "material prejudice" at least four times in his declaration.[30]  However, no matter how many times Mr. Crystal misstates the standard, that does not change the actual language or meaning of Rule 1.11(c), which requires only that the information "could be used to the *material disadvantage*" of OptumRx.[31]

OptumRx is not required to show material prejudice for the Court to grant this motion under Rule 1.11(c).  Again, the Rule's clear language requires only that OptumRx show that the

---

[27] Id.; See also N.Y. State 1169 and 1170 (2019).
[28] N.Y. State Bar Ass'n Comm. on Prof'l Ethics Op.  1187 (2020).
[29] Doc #:5320-5, PageID #: 629140.
[30] Doc #:5320-5, PageID #: 629140 pp 15 and 16.
[31] Although in the *Opiate Litig* opinion, the Court did make a single reference to "material prejudice, the Court correctly applied the "*material disadvantage*" standard of the Rule in granting the disqualification motion. *In re* Opiate Litig. at *5, 6.

"information *could be* used to its *material disadvantage*."  (*Emphasis added.*) As we have noted, "material disadvantage," as defined by courts, includes information that provides "strategic insights of the strengths and weaknesses of the evidence,"[32] or "a roadmap."[33]

## IV. When Motley Rice attorneys perform investigations for government agencies wielding the power of the government, they are serving as public officers or employees for purposes of Rule 1.11(c).

The PEC's sur-reply and the expert declaration of Nathan Crystal filed in opposition to OptumRx's Motion to Disqualify incorrectly conclude that, "In its representation of Hawaii, the District of Columbia and the City of Chicago, Motley Rice was not a 'public officer or employee.'"[34] Not only do they misconstrue the precedent cited by OptumRx, but they also misapprehend the import of the cases they cite in support of their own proposition.

### A. Motley Rice was acting as, and was under the complete control of, the government, therefore it was serving as public officers or employees for purposes of Rule 1.11(c).

The PEC bases its conclusion that Motley Rice was merely an independent contractor, and not a public officer or employee, on the fact that the contracts Motley Rice signed with the governmental agencies as Special Deputy AG in Hawai'i, Special Assistant AG in DC, and Special Assistant Corporation Counsel for the City of Chicago, provide that the governmental entity, and not Motley Rice, retains complete control over civil investigations and litigation. However, whether or not the governmental entity retains control over the contract attorney's work is not determinative of whether the contract attorneys are acting as "public officers or employees" for purposes of Rule 1.11(c). Rather, the test is whether the "public officer or employee" acquired actual knowledge of confidential government information that was only obtainable through the

---

[32] *Villaspring Health Care Ctr., Inc.*, 2011 WL 5330790, at *6.
[33] *Kronberg v. LaRouche,* 2010 WL 1443934, at *4.
[34] Doc #: 5320-5, PageID #:629129.

lawyer's "government service."[35] Here, contrary to the PEC's argument, Motley Rice had access to OptumRx's confidential government information (i.e., the documents OptumRx produced, unredacted, in response to the CIDs) that was only obtainable in its unredacted form by virtue of Motley Rice's "government service," regardless of whether Motley Rice or the government entity controlled the representation. These Governmental entities cannot give Motley Rice the titles of a government lawyer (i.e., "*Special Assistant Corporation Counsel*" and "*Special Deputy Attorney General*") and the power to act under their complete control, including to serve government subpoenas, gather information, negotiate on the government's behalf, and sign confidentiality agreements on the government's behalf, and then try to avoid the fact that Motley Rice was acting with the power of the government.

Motley Rice lawyers were "government officers or employees" in their conduct of the various governmental investigations in this case, and OptumRx had every reason to believe that Motley Rice was acting with governmental authority.[36] Motley Rice is bound by the government authority it exercised, and Rule 1.11(c) applies to Motley Rice in this case. The objective of Rule 1.11(c) is to "prevent the lawyer's improper use of his or her official position."[37]  To accept the PEC's argument that Motley Rice is not bound by the government authority it exercised is illogical and eviscerates the purpose of Rule 1.11(c).

**B. The policy argument that no lawyers will represent the government if this motion prevails is speculative, unsupported, and contrary to reality.**

Mr. Crystal opines, largely based upon his own opinion and policy preferences and without authority, that Motley Rice did not receive confidential government information, asserting that to

---

[35] *See, e.g.,* Model Rule 1.11, cmts. 4, 8.
[36] *See e.g. Exh. 1, 3,6 to OptumRx Expert Report;* Doc. # 5276-18.
[37] ABA Formal Opinion 509, "Disqualification to Prevent the Misuse of 'Confidential Government Information,'" February 28, 2024, at p.2 (citations omitted).

interpret the rule otherwise will thwart the ability of government authorities to retain qualified counsel to represent their interests in both civil investigations and related litigation. That argument is meritless—not to mention insulting to government lawyers.[38] Many lawyers ably serve the government for many years of their careers without the windfall of massive fees.[39] Further, the policy reasons behind the Rule have long been established as seeking to avoid an overly deterrent effect on the government's recruitment of manpower requiring the lawyer to abandon the use of his professional skills.[40] Nowhere does that policy imply that lawyers should receive the windfall of large fees through the improper use of confidential government information for the benefit of clients in their private practice. In our experience, many lawyers willingly represent the government for the standard hourly rates that most outside special assistants receive.

### C. The cases cited by Plaintiffs are inapplicable.

In support of the PEC's argument that Motley Rice was merely an independent contractor, and not a "public officer or employee," their expert relies on cherry-picked sentences from two separate cases, *Doe v. Francis,* 2006 U.S. Dist. Lexis 105036 (N.D. Fl. 2006) and *Berkley Cty. Sch. Dist. v. HUB Int'l Ltd.,* No. 2:18-cv-00151-DCN, 2020 U.S. Dist. LEXIS 145193 (D.S.C. Aug 13, 2020). However, the PEC's expert ignores the principle that, in disqualification motions, it is essential to analyze the facts on a case-by-case basis.  Specifically, Mr. Crystal relies upon a single sentence from an order in *Doe v. Francis* for the proposition that, "an attorney who merely represents a government agency does not qualify as a 'public officer,'" and thus [superseded]

---

[38] Both Ms. Montgomery and Professor Muchman spent years of their careers employed as government lawyers.
[39] *See e.g. General Motors Corp. v. New York,* where 50 years ago, the court found that the former government lawyer's lucrative contingent fee contract and use of information learned under government authority warranted disqualification on the grounds that it created an impermissible appearance of impropriety. OptumRx Expert Op. p. 21, fn 18.
[40] ABA Formal Op. 342 (1975) fn. 4.

Florida Rule 1.11(b),[41] protecting confidential information in successive employment situations, does not apply.[42] The facts in *Doe* are distinguishable.  In *Doe,* the plaintiffs' counsel merely represented the Bay County Sheriff's Office in forfeiture proceedings but were not deputized or under the Sheriff's control and direction. Thus, the court concluded the then-existing Rule did not apply because they were not acting as "public officials," but rather merely as private attorneys representing a government agency.

Mr. Crystal's reliance on the Court's language in *Doe* is misplaced. Motley Rice's lawyers were not "merely representing a government agency," Motley Rice was the government. As the PEC and its expert go to great lengths to point out, under the contracts that Motley Rice signed with each governmental agency, the firm was bound to follow the government's direction and obtain consent for virtually any action it took on the government's behalf, such that they were essentially subservient to the government agencies.

Further, in citing to *Doe,* Mr. Crystal conveniently omits the part of the Court's order that analogizes the "public officer or employee" role to a "master-servant relationship," much like the relationship between Motley Rice and the government agencies.[43] The *Doe* order recites that most attorneys would not characterize themselves as "servants" at the complete "control and direction" of their clients because attorneys are "paid by their clients to determine the manner and means by which the product is accomplished so that their clients do not have to."[44] In contrast, Motley Rice *affirmatively argues that it was* a servant to several government masters, arguing that those government masters maintained "*sole and absolute discretion to authorize* [Motley Rice]" to

---

[41] Florida Rule 1.11(b) was superseded in 2006 and related to successive representation and protection of confidential government information. *See* footnote 10 of OptumRx Supplemental Opinion, Dkt. No. 5300-2.
[42] *Doe* at *29.
[43] ABA Formal Op. 342(1975) notes that the "Disciplinary Rules of Canon 5 bring into professional regulation, and with some specificity, the ancient maxim that one cannot serve two masters." Op. 342 at p. 1, and fn. 7.
[44] Id.

perform any acts related to the investigation as well as *"final authority"* over all aspects of the firm's work.[45] Even under Mr. Crystal's framework, Motley Rice qualifies as government lawyers.

The other disqualification order that Mr. Crystal relies on, *Berkley Cty. Sch. Dist. v. HUB Int'l Ltd.,* No. 2:18-cv-00151-DCN, 2020 U.S. Dist. LEXIS 145193 (D.S.C. Aug 13, 2020), is also factually distinguishable and equally inapplicable.  Again, the PEC's expert relies upon a single sentence from the case for the proposition that Motley Rice is not a "public official or employee." In *Berkley,* the court declined to disqualify, "a lawyer who obtained grand jury testimony with consent of government…under Rule 1.11 because he was not a public official or public employee."[46] All of the parties in that case, including the defendants who filed the Motion to Disqualify and their expert (who also happened to be Mr. Crystal), agreed that the lawyer in that case was acting as private counsel, and not as a "public official or employee," but defendants argued that 1.11(c) should still apply "in *principle*."

The facts in *Berkley* are distinguishable and do not support the PEC's position.  Unlike Motley Rice, the district's attorney in *Berkley,* was not a designated "Special Assistant Corporation Counsel" or "Special Assistant Attorney General," nor was there any relationship, contractual or otherwise, between him and any government agency. There is no discussion of his role with the Government other than as a private attorney on whose behalf the State petitioned for and received access to, some confidential Grand Jury materials.  He was not acting under the control of the government or even on behalf of the government, but purely as a private attorney representing a private client. Thus, the PEC's and Mr. Crystal's reliance on *Berkley* is misplaced.

---

[45] *See* PEC Surreply Doc #: 5320-5, PageID #:629129; Doc #:5320-4, PageID#:629106 ¶5 & 12; Doc #: 5320-2, PageID#:629100 ¶4.
[46]  Doc # 5320-5, PageID #: 629130.

## V.    The Bellwether Plaintiffs are Motley Rice's Private Clients.

The PEC's expert opines that "Rule 1.11(c) applies to a former government attorney's *subsequent* representation of a 'private client'" and that "the plaintiffs in these [bellwether] cases are government entities so they cannot be private clients."[47] This opinion, for which no authority is cited, is incorrect on two counts.

First, it is now well-established that, unlike the predecessor Rule which was titled, "Successive Government and Private Employment," Rule 1.11(c), now titled "Special Conflicts of Interest for Former and Current Government Officers and Employees," "applies equally to a full or part time lawyer who currently serves or who formerly served as a public officer or employee."[48] As an example, the New York State Bar Association's Ethics Committee applied Rule 1.11(c) to a lawyer who contemplated serving concurrently as town supervisor and maintaining a private law practice.[49] The Committee concluded Rule 1.11(c) would apply to a lawyer concurrently employed by the government and maintaining a private law practice and would act to disqualify the lawyer from representing clients in his private law practice in instances where the lawyer possessed confidential government information that could be used to the material disadvantage of the third party who produced the information to the government.[50]

ABA Opinion 509 also discusses the meaning of the words "private client" and specifically notes that the term "private client" includes "*public* entities and officials whom the lawyer represents in private practice if those clients are not legally entitled to employ the confidential information."[51] Citing to *General Motors*, 501 F. 2d 639, (1975), ABA Opinion 509 notes there is

---

[47] Doc # 5320-5, PageID #: 629131.
[48] ABA Formal Op. 509 at p. 5.
[49] ABA Formal Op. 509 at 7; citing N.Y. State Bar Ethics Op. 1169(2019).
[50] *Id.*
[51] ABA Formal Op. 509 at 8. (Citations omitted.)

no less need to protect against the misuse of confidential government information on behalf of a *public* entity than there is on behalf of a private entity, when either are not entitled to use that information.[52] In reaching the conclusion that the words "private client" refer to the lawyer's status as a "private practitioner," and not to the type of *client*, ABA Opinion 509 considers the long-standing policy articulated in ABA Formal Opinion 342 (1975), which states, "[I]f one underlying consideration is to avoid the situation where government lawyers may be tempted to handle assignments so as to encourage their own future employment in regard to those matters, the danger is that a lawyer may attempt to derive undue financial benefit from fees in connection with subsequent employment."[53]  In this case, Motley Rice stands to recover substantial fees from its private representation of government entities using the information it obtained while wielding the power of the government, which is exactly the type of abuse the Rule's protections are designed to prevent.

## VI.  Mr. Crystal's attempt to distinguish the *Kronberg and Villaspring* cases is misguided.

In trying to distinguish *Kronberg,* Mr. Crystal argues that the former government lawyer was unable to distinguish between the confidential and nonconfidential information he knew, and then analogizes that to the fact that OptumRx knows exactly what it produced.  The problem with this argument is that it is comparing apples and oranges. The former government lawyer in *Kronberg* was disqualified because *he* could not distinguish between confidential and nonconfidential information of a third party, not that he could not distinguish the difference between *his own* information. Of course, OptumRx knows what it produced. That is not the point. Rule 1.11(c) differs from the ordinary confidentiality rules (e.g., Rule 1.6, Rule 1.8(b) and Rule

---

[52] ABA Formal Op. 509 at p. 9.
[53] *Id.,* at p. 8.

1.9(c)) which protect a *client's* confidential information.[54]  The clear objective of Rule 1.11(c) is to "'prevent the lawyer's improper use of his or her official position' and to protect *others* [including third parties like OptumRx,] from the exploitation of confidential government information, acquired by the lawyer while serving as a public officer or employee."[55]

Mr. Crystal's attempts to further distinguish *Kronberg* by arguing that Motley Rice was not a public officer or employee and that the information produced by OptumRx was not confidential government information have been addressed above.

Finally, attempting to distinguish *Villaspring,* Mr. Crystal argues that, because the attorney acquired information in a criminal investigation it is different from the information in this case which is "purely documentary."[56] In determining to disqualify the former government lawyer in *Villaspring*, the court considered that the attorney "gained strategic insights such as knowledge of the strengths and weaknesses of the evidence" by interviewing the facility's former employees. As explained in the declaration of Matthew Hooker, 68,310 pages of the information that OptumRx produced is marked "PROPRIETARY AND CONFIDENTIAL."[57] Motley Rice's knowledge of that proprietary and confidential information, which was produced directly to it while it wielded the power of the government, at the very least, *could* materially disadvantage OptumRx because it provides strategic insights into the strengths and weakness of the OptumRx's evidence.

---

[54] See ABA Formal Op. 509 at p. 2.
[55] ABA Formal Op. 509 at p. 2 (emphasis added); see also fn. 4.
[56] Doc # 5320-5 PageID # 629142.
[57] Doc # 5300-1 PageID # 628119, ¶ 8.

Dated: March 5, 2024

_____
Wendy J. Muchman

Sari Montgomery