# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | **MDL 2804** |
| | **Case No. 1:17-md-2804** |
| THIS DOCUMENT RELATES TO: | |
| | **Judge Dan Aaron Polster** |
| *All PBM Cases* | |
| | **ORDER DENYING OPTUMRX'S MOTION TO DISQUALIFY MOTLEY RICE** |

Before the Court is a motion filed by OptumRx, a Pharmacy Benefit Manager ("PBM") defendant, to disqualify plaintiff law firm Motley Rice. Docket no. 5276. The parties provided the Court with numerous briefs on the issue, as well as expert opinions, and the Court held oral argument.[1] Having considered carefully the important issues raised, the Court now concludes the motion must be **DENIED**. The Court's reasoning is set forth below.

---

[1] The parties' submissions include: OptumRx's motion (docket no. 5276); opinions from OptumRx ethics experts Sari W. Montgomery and Wendy J. Muchman (docket no. 5276-18); Motley Rice's response (docket no. 5288); OptumRx's reply (docket no. 5300); supplemental expert opinions from OptumRx's experts (docket no. 5300-2); Motley Rice's surreply (docket no. 5320-1); opinions from Motley Rice ethics expert Nathan M. Crystal (docket no. 5320-5); OptumRx's motion for reconsideration (docket no. 5322); Motley Rice's submission of supplemental authority (docket no. 5338-1); OptumRx's response to the surreply (docket no. 5341); second supplemental expert opinions from OptumRx's experts (docket no. 5341-2); Express Scripts' submission of additional evidence in support of OptumRx's motion; (docket no. 5351); and Motley Rice's response to Express Scripts' submission (docket no. 5360). The Court also received oral argument on the motion. *See* docket no. 5312 (Hrg. Tr.).

Regarding docket no. 5351, although the Court granted leave to file and has considered Express Scripts' new evidence, Express Scripts' request to join OptumRx's disqualification motion is **denied** as untimely. *See* docket no. 5268 at 1 ("If either PBM defendant chooses to file a motion to disqualify plaintiffs' counsel, it must do so no later than 12:00PM on Friday, December 15, 2023."). Express Scripts has possessed for many years the evidence it now cites as the basis for seeking disqualification, and wholly ignores in its motion the Court's three-month-old deadline.

**Factual Background**

On April 8, 2013, long before this Opioid MDL was constituted, the City of Chicago retained Linda Singer, then of the law firm of Cohen Milstein, as "Special Assistant Corporation Counsel . . . to represent it in the investigation and litigation of potential claims regarding fraudulent marketing of opioid drugs" ("Chicago Opioid Investigation"). Surreply Exh. C (docket no 5320-4 at 17).

Four and a half years later, the Judicial Panel on Multidistrict Litigation formed the Opioid MDL on December 5, 2017. On January 4, 2018, the Court appointed Joseph F. ("Joe") Rice, of the law firm Motley Rice, as co-lead counsel for the Plaintiffs' Executive Committee ("PEC"). *See* docket no. 37. OptumRx became a defendant in the opioid litigation three weeks later, on January 25, 2018. *See* docket no. 5196-1 (OptumRx acknowledging that the first opioid lawsuit filed against it was *County of Webb v. Purdue Pharma, L.P.,* case no. 1:18-op-45175). *County of Webb*—which was recently selected as an MDL bellwether case—was transferred into the MDL on February 12, 2018. *See* Conditional Transfer Order Eight (docket no. 126). Brian D. Boone, counsel for OptumRx, noticed his appearance on April 30, 2018. *See* Notice of Appearance (docket no. 350).

On September 6, 2018, the City of Chicago retained Motley Rice as "Special Assistant Corporation Counsel . . . to represent it in the investigation and litigation of potential claims" relating to copay clawbacks. Surreply Exh. A (docket no. 5320-4 at 6). This "Chicago Copay Investigation" was a separate matter from the "Chicago Opioid Investigation" mentioned above.[2] However, at about this time, Ms. Singer transferred from Cohen Milstein to Motley Rice, and

---

[2] The Chicago Opioid Investigation included the opioid-related conduct of many different defendants, including PBMs. The Chicago Copay Investigation related specifically to PBM conduct.

retained her City of Chicago client. Therefore, on September 13, 2018, Motley Rice assumed

representation of the City of Chicago in the Chicago Opioid Investigation, as well. *See* Surreply

Exh. B (docket no. 5320-4 at 12).

On November 8, 2018, Motley Rice served a subpoena on OptumRx, seeking documents

related to the Chicago Copay Investigation. *See* Motion Exh. L (docket no. 5276-16). On February

19, 2019, OptumRx, the City of Chicago, and Motley Rice entered into a confidentiality agreement

regarding Investigation documents produced by OptumRx. *See* Motion Exh. M (docket no. 5276-

17). The agreement provides, in relevant part:

> All information produced or made available for inspection and copying by
> [OptumRx], including but not limited to information contained in documents or in
> correspondence between counsel, will be used solely in furtherance of the
> Investigation and any subsequent litigation brought by the City of Chicago against
> [OptumRx] that is directly related to this Investigation and will be used for no other
> purpose whatsoever without the prior written consent from [OptumRx] or by a court
> order or other applicable law.

*Id.* at 3.

On December 1, 2020, Motley Rice entered into a contract with Washington D.C. to "assist

in the investigation of and possible litigation against Pharmacy Benefits Managers for potential

violations of District Law" related to the PBMs' "integral role in setting the prices paid for

prescription drugs." Motion Exh. F at 2, 6 (docket no. 5276-10). On December 28, 2020, Motley

Rice served a subpoena on OptumRx seeking documents related to that "D.C. Price Investigation."

*See* Motion Exh. G (docket no. 5276-11). On July 1, 2021, OptumRx, the District of Columbia,

and Motley Rice entered into a confidentiality agreement regarding Investigation documents

produced by OptumRx. *See* Motion Exh. H. (docket no. 5276-12). The agreement provides, in

relevant part:

> The OAG, OAG outside counsel, and all persons and entities signing a copy of the
> Addendum agree to use Confidential Information solely in connection with the
> Investigation and any litigation that may arise therefrom, not to use Confidential

Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement provided that the OAG agree with the designation. OAG outside counsel further agrees not to rely on Confidential Material in pursuing information or claims in any other matters outside of its representation of the OAG.

*Id.* at 3.

On April 29, 2021, Motley Rice entered into an "Agreement For Special Deputy Attorney General Services" with the State of Hawaii to assist in its investigation into "the billing practices of pharmacy benefits managers," including OptumRx and others, "that provide services" in the State. Motion Exh. A at 2 (docket no. 5276-5). On October 15, 2021, Motley Rice served a subpoena on OptumRx on behalf of the State seeking documents related to that "Hawaii Billing Investigation." *See* Motion Exh. B (docket no. 5276-6). On May 18, 2022, OptumRx, the State of Hawaii, and Motley Rice entered into a confidentiality agreement regarding Investigation documents to be produced by OptumRx. *See* Motion Exh. C. (docket no. 5276-7). The agreement provides, in relevant part:

The State, the State's outside counsel, and all persons and entities signing a copy of the Addendum agree to use Confidential Information solely in connection with the Investigation and any litigation that may arise therefrom, not to use Confidential Information in connection with any other matter, and not to disclose any Confidential Information to any party or the public, except as provided by this Agreement, except as required by law or court order. The State's outside counsel further agrees not to rely on Confidential Information in pursuing information or claims in any other matters outside of its representation of the State.

*Id.* at 3.

Motley Rice asserts that, despite the titles conferred upon it by Chicago, Washington, D.C., and Hawaii in their retainer agreements—such as "Special Assistant Corporation Counsel" and "Special Deputy Attorney General Services"—the agreements are clear that Motley Rice was: (1) an independent contractor, (2) not an agent or employee of the governmental entity, and (3) subject to the governmental entity's control in performing the civil investigation. *See* Surreply at 2

4

(describing Hawaii agreement). Motley Rice asserts that, "regardless of the label, Motley Rice was retained and acted as *private counsel for a public client*." *Id.* (emphasis in original). But it is clear that, by virtue of these titles and positions, Motley Rice was able to wield some level of **government** authority. It served pre-litigation government investigative subpoenas and received documents in response on behalf of its government clients.

OptumRx now contends that Motley Rice, through its work for the governments of Chicago, Washington D.C., and Hawaii in their separate Investigations, obtained "confidential government information" about OptumRx that could be used to OptumRx's material disadvantage in the Opioid MDL. OptumRx seeks "to disqualify the law firm Motley Rice and its attorneys from participating in any pending or future proceedings involving OptumRx or its parents or affiliates." Motion at 1 (docket no. 5276). OptumRx asserts disqualification is necessary to protect the information it produced to Motley Rice in response to the government subpoenas. As explained below, however, disqualifying Motley Rice will not protect that information, which is otherwise discoverable and which OptumRx should have already produced in the MDL.

**Legal Standard**

This Court has the inherent authority to disqualify counsel in order to preserve the integrity of the adversary process and maintain the respectability of the profession. *See Gordon v. Dadante*, 2009 WL 2732827, at *5 (N.D. Ohio Aug. 26, 2009). The "moving party bears the burden of establishing the need for disqualification." *Id.* (quoting *Nilavar v. Mercy Health Sys.*, 143 F.Supp.2d 909, 912 (S.D. Ohio 2001)).

This MDL Court has previously addressed a motion for disqualification of counsel, and stated as follows:

"Motions to disqualify are viewed with 'disfavor' and disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'" *In re Valley-Vulcan Mold Co.*, 237 B.R. 322, 337 (B.A.P. 6th Cir. 1999), *aff'd*, 5 F. App'x 396 (6th Cir. 2001) (quoting *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993)). "The United States Court of Appeals for the Sixth Circuit now looks to the codified Rules of Professional Conduct for guidance in determining whether an attorney should be disqualified from representing a client based on a conflict of interest." *O'Brien v. Brunner*, No. 2:15-CV-2803, 2016 WL 1059683, at *3 (S.D. Ohio Mar. 17, 2016) (internal quotations omitted). In other words, a Court should not disqualify a party's chosen counsel absent, at the very least, a showing by the movant that the attorney violated an ethics rule. Absent a violation, the appearance of impropriety cannot, by itself, be the sole ground to disqualify an attorney. *See id.* (finding that the appearance of impropriety standard, which still applies to the disqualification of a judicial officer, "does not exist in order to remove a litigant's chosen counsel.").

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 1274555, at *2 (N.D. Ohio Mar. 20, 2019).

"A violation of the Rules of Professional Conduct may, but does not always, require disqualification." *Seaman Corp. v. Zurich Am. Ins. Co.*, 643 F. Supp. 3d 790, 795 (N.D. Ohio 2022) (citing *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002) ("a violation of the rules of professional ethics does not automatically necessitate disqualification of an attorney"), and *Centimark Corp. v. Brown Sprinkler Serv., Inc.*, 620 N.E.2d 134, 137 (11th Dist. 1993) ("a violation of the Code of Professional Responsibility alone should not result in a disqualification, unless disqualification is found to be absolutely necessary")).

"Even though 'motions to disqualify may be legitimate and necessary under certain circumstances,' courts view them 'with extreme caution for they can be misused as techniques of harassment.'" *Id.* (quoting *SST Castings*, 250 F.Supp.2d at 865–66; and citing *Kitchen v. Aristech Chem.*, 769 F.Supp. 254, 256 (S.D. Ohio 1991) (noting that "the ability to deny one's opponent the services of his chosen counsel is a potent weapon")). "Thus, courts are 'sensitive to the competing public interests of requiring professional conduct by an attorney and of permitting a

party to retain counsel of [its] choice.'" *Id.* (quoting *O'Brien*, 2016 WL 1059683, at *2); *see also SST Castings*, 250 F.Supp.2d at 866 (explaining "Ohio courts have held that a litigant's right to 'select counsel of choice should be limited only when representation poses a significant risk of a violation of the Canons of the Code of Professional Responsibility'") (internal quotations omitted).

**Timing**

OptumRx filed its motion to disqualify on December 15, 2023, but the issue was on the Court's radar much earlier. In December of 2022, the Court stated its intention to set PBM bellwether cases. OptumRx wrote a letter to the Court on March 10, 2023, urging the Court to limit the scope of any such case and also arguing that: (1) "the [entire MDL] PEC [made up of 21 law firms] has an intractable conflict that prevents it from spearheading litigation against Express Scripts and OptumRx;" and (2) "[t]he Cicala Law Firm and Motley Rice have irreconcilable ethical conflicts that prevent them from pressing claims against OptumRx." Letter from Brian Boone at 5. OptumRx wrote that it "reserves its right to—and intends to—move to disqualify" all of these law firms. *Id*. at 5, 7.

The Court scheduled a status conference on March 22, 2023 to discuss, among other things, how and when the disqualification issue should be addressed. OptumRx argued that disqualification should only be raised in the context of a specific bellwether case—not in the abstract, or "MDL-wide." Plaintiffs' position was that disqualification should be presented to the Court as quickly as possible, so the parties could select bellwether cases that were not affected by the potential disqualification. OptumRx's position won, and briefing and argument was deferred until after the bellwether cases were selected. OptumRx ultimately filed its motion seeking disqualification only of Motley Rice, and not of any of the other law firms mentioned in its letter.

The Court now notes that none of the four PBM bellwether cases come from Motley Rice's inventory.[3] It is unclear, then, why OptumRx believed it needed to wait to file its disqualification motion, if it always intended to move to disqualify Motley Rice as MDL co-lead counsel for all PBM cases, and even though Motley Rice is not named counsel for any bellwether PBM plaintiff.

If OptumRx always intended to move to disqualify Motley Rice as MDL co-lead counsel, then the Court finds the timing of OptumRx's motion somewhat troubling. OptumRx notes it filed its motion "at the earliest possible time *in the bellwether litigations*." Motion at 4 n.3 (emphasis added). That is true. In the March 22, 2023 status conference, the Court agreed with OptumRx and expressly deferred considering, in any way, OptumRx's potential disqualification motion outside the context of a specific bellwether case, which had at that time not yet been selected. However, OptumRx does not explain its failure to raise the issue prior to March of 2023.[4]

And OptumRx certainly knew how to timely raise the issue; indeed, it acted much more quickly in a virtually identical context in other litigation. Specifically, in June of 2022, OptumRx received an investigative subpoena from the Illinois Attorney General ("AG") seeking information about insulin pricing. *See* Mar. 10, 2023 Letter from Brian Boone, Exh. 1 at 3.[5] The Illinois

---

[3] The four PBM bellwether cases, listed here, show plaintiffs are represented by a combination of eight different private law firms (including four PEC firms and the Cicala firm); but none of those firms are Motley Rice: (1) *City of Rochester, NY v. Purdue Pharma, L.P.*, case no. 19-op-45853 ("Track 12"), (2) *Lincoln County, MO v. Richard Sackler, M.D.*, case no. 20-op-45069 ("Track 13"); *City of Independence, MO v. Williams*, case no. 19-op-45371 ("Track 14"); and *County of Webb, TX v. Purdue Pharma, L.P.*, case no. 18-op-45175 ("Track 15"). Motley Rice does represent other plaintiffs against OptumRx, *see, e.g., County of Summit, Ohio v. Express Scripts, Inc.*, case no. 23-op-45001. But OptumRx is not asking for disqualification of Motley Rice only in those PBM cases where it represents the plaintiff; it seeks disqualification of Motley Rice in its role as MDL co-lead counsel, an issue that could have been teed up at least a year ago and possibly over four years ago.

[4] As explained further below, the Court is not concerned with the time between: (1) when OptumRx first raised the issue with the Court (March 2023), and (2) when the motion was filed (December 2023). The Court is aware it permitted OptumRx to defer filing its motion until bellwether cases were selected. The Court is concerned, however, about the five-year period between: (1) when OptumRx first became aware of the potential conflict (February 2018), and (2) when it first raised the issue with the Court (March 2023).

[5] This Exhibit 1 is a memorandum filed by OptumRx in support of disqualification of (among others) lawyers from the Cicala Law Firm in Illinois state court litigation.

subpoena directed OptumRx to produce documents to a lawyer whom OptumRx believed had virtually identical conflicts to those it now asserts against Motley Rice in the present motion. *Id.* After receiving the subpoena—but before responding to it—OptumRx alerted the Illinois AG to the potential conflicts. *Id.* at 6. No informal resolution was reached on the issue, so the Illinois AG filed a petition for enforcement of the subpoena. *Id.* OptumRx then moved to disqualify the allegedly conflicted lawyers from enforcing the subpoena. *Id.* To repeat, OptumRx moved for disqualification ***before it even responded to the subpoena***. The Illinois AG voluntarily dismissed the petition, mooting the issue. *See People v. OptumRx, Inc.*, Dec. 15, 2022 Dismissal Order; *see also* Mar. 10, 2023 Ltr. at 6.

In this case, OptumRx became aware that Joe Rice and his firm, Motley Rice, had been designated co-lead counsel at least as early as February 12, 2018, when the first case against OptumRx was transferred into the MDL. OptumRx was also undoubtedly aware that Motley Rice was a part of the MDL PEC when OptumRx's counsel sat across the table from Joe Rice during several negotiations held before this Court on December 5, 2018, February 13, 2019, and June 18, 2019.[6] As noted above, these Opioid MDL meetings were occurring at the same time that OptumRx received the subpoena in the Chicago Copay Investigation (November 18, 2018) and negotiated its confidentiality agreement (February 19, 2019).

Nothing before this Court suggests OptumRx even attempted to oppose Motley Rice being retained as outside counsel for the Chicago, Washington D.C., or Hawaii Investigations mentioned above, or to challenge the subpoenas issued by Motley Rice on those governmental entities' behalf—as it did for the substantively identical Illinois AG investigation. Instead, OptumRx

---

[6] These negotiations resulted in the PBMs agreeing to voluntarily offer formularies that complied with the 2016 guidelines promulgated by the Centers for Disease Control and Prevention ("CDC") for prescribing opioids for chronic pain. *See* docket no. 1848.

produced documents in response to those investigations. Indeed, not only did OptumRx ***not*** raise potential conflicts with the governments of Chicago, Washington D.C., or Hawaii, it also did not raise potential conflicts with this Court until March 2023—more than four years after it could have raised its concerns, and then only after the Court had turned its focus to resolving claims made against the PBMs.[7]

Because of the gravity and import of OptumRx's motion against Motley Rice, the Court addresses below in full the merits of OptumRx's assertions. However, given that disqualification is a "potent weapon" that can be deployed strategically, and in light of the timeline described above, the Court examines the motion with "extreme caution." *See SST Castings*, 250 F. Supp. 2d at 865–66 (motions to disqualify counsel "should be viewed with extreme caution for they can be misused as techniques of harassment.") (quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 722 (7th Cir.1982)). Ohio Rule of Professional Conduct 1.11, upon which OptumRx bases its present motion, requires a balancing of interests, and the timing of OptumRx's motion weighs on that balance.

**Analysis**

OptumRx moves to disqualify Motley Rice under Ohio Rule of Professional Conduct 1.11(c).  This Rule provides:

> Except as law may otherwise expressly permit, a lawyer having information that the lawyer ***knows*** is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client

---

[7] The Court notes that the other PBM defendant in the PBM bellwether cases, Express Scripts, was identically situated to OptumRx throughout all of these background events, but did not file its own disqualification motion at all. Express Scripts did seek to join OptumRx's Motion very late in the briefing, but this request is denied. *See* footnote 1.

whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person.

Ohio R. Prof. Conduct 1.11(c) (emphasis in original). Rule 1.11 "represents a balancing of interests" between: (a) the government's ability to obtain representation from qualified attorneys, while (b) mitigating the risk that a lawyer could abuse governmental authority such that "unfair advantage could accrue to [another] client by reason of access to confidential government information about the client's adversary obtainable *only* through the lawyer's government service." Ohio R. Prof. Conduct 1.11, Cmt. 4 (emphasis added). If the rule is interpreted too broadly, it could discourage qualified lawyers from entering government service. If interpreted too narrowly, it could incentivize abuses of governmental power and erode public trust in the government.

The Court examines below whether and how this Rule applies in the circumstances of this case. In particular, the Court addresses: (a) whether Motley Rice was a "public officer or employee" when it helped Chicago, Washington D.C., and Hawaii with their Investigations; (b) whether Motley Rice obtained "confidential government information" about OptumRx through those Investigations; and (c) whether Motley Rice could use any such information to the "material disadvantage" of OptumRx.

### A.    Public Officer or Employee

The parties dispute whether Motley Rice was a "public officer or employee" when it was retained by the governments of Chicago, Washington D.C., and Hawaii to conduct investigations into OptumRx. The parties also dispute whether the public-entity clients Motley Rice represents in the MDL are "private clients" for the purposes of Rule 1.11(c). The Court agrees with OptumRx on both points.

11

Motley Rice argues it was not an agent or employee of any of the three governments, while conducting their respective Investigations, because the retainer agreements it entered with those entities state it was an independent contractor, subject to the governmental entity's control. *See* Surreply at 2 (describing Hawaii agreement). In support, Motley Rice identifies specific language in its retainer agreement with Hawaii: "[Motley Rice attorneys] are not by reason of this Agreement, agents or employees of the State for any purpose." *Id.*

This argument elevates form over substance, glossing over the role Motley Rice really played and the powers it deployed. The language of the retainer agreement cannot change what Motley Rice actually did. The unavoidable fact is that, when Motley Rice ***served government subpoenas*** and received documents in response—even if it was acting on behalf of those governmental entities under a contingent fee, independent contractor agreement—it had been granted authority to wield the power of the government. In that way, Motley Rice was acting as a public officer. Whether Motley Rice was technically a public officer or employee, under the strict legal definition used by the hiring governmental entity or the terms of its contract, cannot alter the reality that Motley Rice gained access to information ***pursuant to governmental authority***. Thus, the Court agrees with OptumRx that Motley Rice was acting as a public officer or employee.

Motley Rice further asserts its MDL clients, like Summit County, are public government entities, and therefore not "private clients." Motley Rice is wrong. Motley Rice's MDL clients are both public government entities ***and*** private clients. Comment 4 to Rule 1.11 is clear that whether a client is a public or private ***entity*** is immaterial to whether it is a private ***client***. The Comment states that, "where the successive clients are a government agency and another client, ***public or private***, the risk exists that power or discretion vested in that agency might be used for the special benefit of the other client." Ohio R. Prof. Conduct 1.11, Cmt. 4 (emphasis added). In other words,

12

a public entity may be a law firm's private client. Further, ABA Formal Opinion 509, which discusses Rule 1.11, is clear that the dispositive question in determining whether a client is a "private client" is the client's entitlement, *vel non*, to use confidential government information the client's lawyer obtained elsewhere:

> [T]here is no less need to protect against the misuse of confidential government information on behalf of a public entity that differs from the one to whom the information belongs and that is not entitled to use the information.
>
> Accordingly, a lawyer who served as a public officer or employee, and who obtained confidential government information about a person while working for the government, would be subject to the Rule when the lawyer, in private employment, represents ***any client*** that is not entitled to use the information.

ABA Opinion at 9 (emphasis added) (docket no. 5338-1).

Put simply, Motley Rice represents public government entities in this MDL in its private practice. The Rule is concerned with (for example) Motley Rice misusing confidential information it obtained during its Chicago Copay Investigation on behalf of its MDL client, Summit County. Summit County is a public entity, but it is a "private client" for the purpose of the Rule.[8] And because Summit County is not Chicago, it is normally not entitled to benefit from confidential information Chicago's lawyers gained during official pursuit of their Chicago Investigation, even though Summit County and Chicago are both public entities.[9]

---

[8] The Court understands that one of the dual purposes of Rule 1.11 is to ensure governments can retain qualified legal representation. The Court further recognizes that a broad ruling—that the types of representations engaged in by Motley Rice's Public Client practice constitute public employment—will impose some deterrence against this type of public service. The Court concludes, however, that the appropriate balance is still maintained. Lawyers wishing to enter this type of quasi-governmental arrangement and use governmental authority will have to be circumspect with how they wield that power and the conflicts such power might create. And, as described in the sections that follow, the Court takes a narrower view of the remaining issues.

[9] As explained below, however, under the unique facts of this case, the Court's "MDL Repository Orders" created a mechanism that provided all MDL plaintiffs, including Summit County, access to "documents previously produced pursuant to any civil investigation" that are "relevant to the claims in this MDL proceeding." CMO-1 at 15 (¶ 9.k.ii.).

The two roles Motley Rice has played for Chicago—public "Special Assistant Corporation Counsel" and also private MDL Counsel—are overlapping but different. The Court is very uncomfortable with the malleability of this quasi-government-employment configuration. With this arrangement, Motley Rice attempts to act simultaneously as a public employee and not a public employee, as fits its need. If private outside counsel, like Motley Rice, intends to enter agreements where it has the power to wield (and potentially abuse) government power, then it needs to adhere to all the same rules to which government lawyers are subject. Motley Rice and all other law firms should carefully take this into account going forward.

All of that said, the Court concludes that disqualification of Motley Rice is unnecessary and inappropriate in the circumstances of this case, for the reasons discussed below.

### B.      Confidential Government Information

A lawyer is in breach of Rule 1.11(c) only if the "lawyer ha[s] information that the lawyer **knows** is confidential government information." Ohio R. Prof. Conduct 1.11(c) (emphasis in original). The Rule defines "confidential government information" as "information that has been obtained under governmental authority and that, at the time this rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and that is not otherwise available to the public." *Id.*

ABA Formal Opinion 509 sheds some light on what it means for information to be "not otherwise available to the public." As an initial matter, "Rule 1.11(c) does not apply to all information obtained under government authority." ABA Opinion at 4. Rather, "[w]hether government information is publicly available—*e.g.*, whether it can be obtained through ***routine discovery***—will be a question of fact." *Id.* (emphasis added).

OptumRx's experts define "routine discovery" to exclude all the documents OptumRx produced in response to the government Investigation subpoenas. These experts assert that "[t]he plain language meaning of 'routine' is 'unremarkable' or 'conventional.' Routine discovery does not include information subject to a protective order, such as proprietary or trade secret information, nor does it include information produced pursuant to Confidentiality Agreements signed by government lawyers." Second supp. report at 5 (docket no. 5341-2).

But these experts provide no support for the proposition that "routine discovery" does not or cannot encompass confidential information produced under a protective order. In fact, in this Court's experience, production of confidential information under a protective order happens in more civil cases than not—it is routine.  Perhaps recognizing the weakness of their definition, the experts add the word "nonconfidential" to the ABA Opinion's plain text. *See id.* at 7 ("the fact that the PEC may request in discovery the same information OptumRx produced in the government investigations does not automatically transform OptumRx's confidential information into *nonconfidential* **routine discovery**.") (emphasis added).

The Court rejects the experts' unsupported definition. To the contrary, Federal Rule of Civil Procedure 26(b)(1) defines "the scope of discovery" that is allowed in every case, which is the most natural understanding of "routine discovery." In other words, discovery that is within the normal scope set forth in Rule 26 is "routine discovery;" and discovery that is beyond the normal scope of the Rule is not "routine discovery." With that understanding, Rule 26(b)(1) defines the routine scope of discovery in civil litigation as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the

importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

Rule 26 only **prevents** discovery of information that is privileged or subject to protection as trial-preparation material. *See, e.g.,* Fed. R. Civ. P. 26(b)(3)(A) ("Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative"); 26(b)(4)(B-D) (precluding discovery of certain materials related to experts). Rule 26 also **limits** discovery in several ways, but those limits may be overcome in certain non-routine circumstances, pursuant to judicial discretion.

Notably, confidential information is not among the limitations to the Rule. Instead, Rule 26 provides a mechanism for the Court to protect a party's trade secret or other confidential information that is otherwise subject to routine discovery. *See* Fed. R. Civ. P. 26(c)(1)(G) ("A party or any person from whom discovery is sought may move for a protective order. . . . The court may, for good cause, issue an order . . . requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way.). It is clear, therefore, that information considered confidential by a party is nonetheless subject to "routine" discovery and may be protected, as required, by party agreement or at the Court's discretion, pursuant to Rule 26(c). A protective order or confidentiality agreement does not make discovery non-routine, it just protects the information from public view until the information becomes part of a trial record.  Moreover, it is common knowledge that information produced in discovery and marked by the owner as "confidential" often is not. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 927 F.3d 919 (6th Cir. 2019) (ruling that great swaths of information marked confidential by defendants must be unredacted and removed from under seal). Whether an attorney

is in breach of Rule 1.11(c) cannot depend simply on whether they received information *marked* as confidential; it must actually *be* "confidential government information."

In conformity with this analysis, at least one Federal District Court has concluded that responses to a state civil investigation demand ("CID") are subject to compulsory discovery, concluding: "the CID materials at issue in the instant case were 'otherwise available' within the meaning of rule 1.11(e) and . . . the materials therefore do not constitute confidential information for purposes of rule 1.11(b)." *Davis v. S. Bell Tel. & Tel. Co.*, 149 F.R.D. 666, 674 (S.D. Fla. 1993).

The new evidence submitted by Express Scripts also supports the Court's analysis. Express Scripts identifies "a document subpoena served on Express Scripts by the City of Chicago on November 25, 2013, in the matter of *In re Chronic Opioid Therapy Marketing Practices*." Express Scripts Motion at 2 (docket no. 5351-1). The subpoena was served on behalf of Chicago by Linda Singer, appointed as Special Assistant Corporation counsel for the City. "Express Scripts collected and produced confidential documents and information to Ms. Singer in response to this Subpoena. These documents were designated 'Confidential' and included contracts with Purdue and meeting minutes for Express Scripts' Pharmacy & Therapeutics Committee relating to prescription opioids." *Id.* at 2–3.

On April 11, 2018, this Court ordered that all documents previously produced in *City of Chicago v. Purdue Pharma L.P.*, Case No. 14-CV-04361 (N.D. Ill.) "shall be deemed produced to all Plaintiffs in MDL 2804 and shall be made immediately available to the PEC by any parties or counsel in possession of same." CMO-1 at 15 (¶ 9.k.i.) (docket no. 232). The City of Chicago produced the subpoenaed Express Scripts documents into the MDL Repository on June 8, 2018. *See* Opposition to Express Scripts Motion at 2 (docket no. 5360). Neither Express Scripts nor the

17

City of Chicago objected to the subpoenaed documents being produced into the MDL.  The Court can only conclude that neither party believed those documents contained any "confidential government information," even though they were marked "confidential."

In contrast, governments can and do obtain information that is certainly *not* routinely discoverable. "This includes information obtained pursuant to a grand jury subpoena, a search warrant, a regulatory subpoena, or other government power." ABA Opinion at 4; *cf. Davis*, 149 F.R.D. at 674-75 (suggesting that, if the State of Florida's hired outside counsel had seen grand jury materials, disqualification might have been appropriate, but there was no evidence this had occurred). Motley Rice's expert also identifies other types of government information not routinely discoverable under the federal rules: "information obtained by government lawyers in criminal investigations, . . . grand jury proceedings, . . . national security information, . . . [and] information obtained . . . through informal contacts." Crystal Rpt. at 11. Further, governments maintain information that is subject to a recognized legal privilege, such as the attorney-client privilege or the work product doctrine, that is not routinely discoverable.

The Court cannot conclude that the subject of a government investigation can turn all its business information produced in response to a CID into "confidential government information" simply by designating it as confidential when they produce it. This is why the ABA Opinion explains that "[w]hether government information is publicly available—*e.g.*, whether it can be obtained through routine discovery—*will be a question of fact*." ABA Opinion at 4 (emphasis added).

Here, OptumRx asserts (or at least strongly implies) that *all* the information Motley Rice gathered under government subpoena qualifies as confidential government information. *See* Motion at 13. OptumRx paints with a broad brush and fails to distinguish between documents it

18

would produce in routine discovery (perhaps covered by a protective order) and other information that might legitimately be deemed true, confidential government information. On the facts presented, OptumRx fails to show Motley Rice obtained confidential government information, and therefore OptumRx fails to meet the "heavy burden" and "high standard of proof" required to disqualify counsel. *See In re Valley-Vulcan*, 237 B.R. at 337 ("[T]he party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified," because "[a]lthough a party has no right to specific counsel, 'a party's choice of counsel is entitled to substantial deference.'") (citations omitted).

### C.      Material Disadvantage

Motley Rice asserts its work on the Chicago, Washington D.C., and Hawaii Investigations cannot and did not cause any prejudice to OptumRx because, at all times, once OptumRx produced its responsive Investigation documents to Motley Rice, it was required to also produce the same documents into the MDL—thereby making those documents available to all plaintiffs' counsel. Thus, Motley Rice cannot now use any of the information it obtained from OptumRx during the Investigations to the material disadvantage of OptumRx; the information is (or should be) already known by other plaintiff firms.

The Court agrees.  To explain why, the Court sets forth the following chronicle.

### 1.      MDL Discovery Repository

The Opioid MDL is one of the most complicated collections of cases in history.  *See* Sara Randazzo, *Opioid-Addiction Litigation Heads to Complex Trial*, Wall Street Journal (Oct. 20, 2019) (the first Opioid MDL trial "is part of what has been called the largest and most complex

civil case in the nation's history"). Litigation in the MDL has been proceeding for over six years, and the Court has set forth important procedures to promote the coordination and consolidation of these knotty cases. These procedures place obligations on all parties in the MDL—both plaintiffs and defendants. For example, plaintiffs must submit fact sheets, and have had their cases dismissed with prejudice for failing to do so. *See* docket nos. 4985, 4986, and 5340. Defendants also have obligations. One of the longest-running and broadest is a standing obligation to produce documents and other discovery into the MDL Discovery Repository.

Specifically, on April 11, 2018, this Court entered its very first case management order ("CMO-1"). Docket no. 232. In CMO-1, the Court created the framework for what would come to be called the MDL Discovery Repository (or "MDL Repository"). The Court set forth a broad directive that "***all Defendants*** shall review documents previously produced pursuant to ***any*** civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities involving the marketing or distribution of opioids and shall produce to the [MDL Repository] non-privileged documents ***relevant to the claims in this MDL proceeding***." CMO-1 at 15 (¶ 9.k.ii.) (emphasis added). CMO-1 applied (and continues to apply) to "all cases;" thus, its requirements unambiguously obligate OptumRx.

During the years following issuance of CMO-1, in a series of orders and discovery rulings,[10] the Court clarified and expanded the scope of the MDL Repository requirement. First, Special Master Cohen clarified that the MDL Repository obligation was intended to be ***comprehensive***. *See* Discovery Ruling No. 2 ("DR-2") at 6 (docket no. 693) ("The [] language in CMO-1 was meant to be comprehensive."). Although DR-2 allowed that "defendants need not

---

[10] Formal discovery rulings made by the Special Master are deemed orders of the Court. *See* docket no. 69 at 4–5 ("Absent timely objection, the orders, findings, reports, rulings, and recommendations of the Special Masters shall be deemed approved, accepted, and ordered by the Court, unless the Court explicitly provides otherwise.").

produce discovery of prior productions made in cases, such as patent litigation, that only tangentially address[] marketing and distribution of opioids," the Ruling made clear that, "[i]f a defendant produced discovery in *any* prior litigation that involved the marketing or distribution of opioids, that discovery must be produced in the MDL." *Id.* at 6 (emphasis in original).

The Special Master went on to order "***every*** defendant to produce to plaintiffs . . . a list of ***every*** prior production in ***any*** earlier litigation, investigation, or administrative action that ***touches upon*** the marketing or distribution of opioids, ***without exception***." *Id.* at 7 (emphasis in original).[11]

Later, Special Master Cohen issued Discovery Ruling No. 22 ("DR-22"). Docket no. 2576. In DR-22, the Special Master ruled that the obligation of all defendants to produce documents into the MDL Repository is ***"ongoing"***—it was not limited only to documents previously produced as of the date of CMO-1.[12] *See id.* at 4. DR-22 also extended the obligation beyond only "marketing or distribution of opioids," stating the requirement applied as well to information "regarding the marketing, sales, distribution, or dispensing of Opioids or Opioid Products." *Id.*

After DR-22 expanded and clarified the MDL Repository obligation, the United States Department of Justice ("DOJ") sought an amendment to clarify that the broad scope of the requirements did not apply to pending or ongoing federal government investigations, or non-public federal government hearings. Agreeing with the DOJ, the Special Master amended DR-22 to carve out those two specific circumstances related to the ***federal*** government. *See* docket no. 2712. Notably, the DR-22 amendment expressly did not carve out any state or local government

---

[11] Special Master Cohen later amended DR-2 on other grounds. *See* Discovery Ruling Three (docket no. 762). Objections to the two discovery rulings were deemed moot or otherwise overruled by the Court. *See* docket no. 868.

[12] In DR-22, the Special Master also more explicitly defined the types and categories of documents that must be produced into the MDL Repository. For example, CMO-1 required production of "documents previously produced pursuant to any civil investigation, litigation, and/or administrative action by federal (including Congressional), state, or local government entities." CMO-1 at 15. DR-22 expanded that to include production of "all sworn statements, testimony, video-taped testimony, written responses and discovery, expert reports, and other documents and discovery that [a defendant] produce[s] in any court case, government investigation, or government hearing." DR-22 at 4.

investigations. *See id.* at 2 n.1 ("No State Attorney General has asked to limit production in the MDL of discovery provided by Defendants responsive to CIDs; moreover, defendants have, in fact, produced such discovery in the MDL."). Further, the Special Master added additional provisions to the basic MDL Repository obligation, including the following:

> Nothing in this Order shall preclude Plaintiffs from requesting from Defendants any document that they produce or disclose in any criminal or civil action filed by a governmental entity, even if the same document was previously provided by the Defendant to the government entity during the course of a government investigation.

*Id.* at 3. This provision made clear that production of documents in response to a government investigation does not inoculate those documents from routine discovery.

Finally, the Special Master reemphasized what was first stated in CMO-1: the obligations imposed by the MDL Repository orders extend to any discovery "relevant to the claims in this MDL proceeding." *Id.* at 2; CMO-1 at 15. Thus, to the extent the claims in the MDL have evolved, so too have the defendants' obligations related to the MDL Repository.

DR-22 and its DOJ amendment nominally applied only to "Track Two Cases," which created confusion among MDL defendants regarding the reach of the rulings' applicability to other bellwether tracks or cases. To alleviate the confusion, the Court clarified that "Discovery Ruling No. 22 ***shall*** apply to ***all*** defendants in ***all*** MDL cases." Docket no. 3178 at 2 (emphasis added).[13]

---

[13] There is no question that the Court has the authority under the MDL Statute to create broadly applicable discovery rulings to "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. *See also In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020) ("An MDL court has broad discretion to create efficiencies and avoid duplication—of both effort and expenditure—across cases within the MDL."); *In re Korean Air Lines Co., Ltd.*, 642 F.3d 685, 700 (9th Cir. 2011) ("In discretionary matters going to the phasing, timing, and coordination of the cases, the power of the MDL court is at its peak.").

The caption of Court's MDL Repository Order, docket no. 3178, unfortunately contained a typo, indicating that—despite the plain text of the order itself—it was only applicable to "Track One-B Cases" rather than "All Cases." This typo was identified and corrected in the Special Master's order refusing to vacate DR-22. *See* docket no. 3291 at 1 n.2. The Court later overruled an objection by the pharmacy defendants and upheld the Special Master's order declining to vacate DR-22. *See* docket no. 3333.

Finally, in a ruling on a motion to compel discovery and for sanctions, the Special Master clarified, yet again, that the scope of the discovery obligation under CMO-1 and DR-22 encompasses *any* litigation where a defendants' conduct at issue, and the documents produced therein, relate to the opioid-related claims in the MDL.[14] *See* docket no. 3700 at 5–8 (finding "not even colorable" defendant's argument that shareholder lawsuits regarding "potential governance failures and/or potential corporate mismanagement" premised upon the failure "to flag and stop the diversion of opioid prescriptions" did not relate to claims in the MDL).

As noted earlier, OptumRx has been a defendant in this MDL since February 12, 2018. Thus, all of the Repository Orders[15] discussed above have long imposed their obligations on OptumRx (and also Express Scripts and every other defendant).

### 2.      OptumRx's MDL Repository Obligation

OptumRx asserts that, if the MDL Repository obligation applies to any document produced in any litigation, investigation, or public hearing that is relevant to the claims in this MDL proceeding, then it would "effectively require defendants to review every document they have ever produced in any legal proceeding to assess its potential relevance to this case." Response to Surreply at 12. That is basically correct. This ongoing requirement has applied to all MDL defendants for years, and as far as the Court knows, all other defendants have met it (although

---

[14] Certain defendants also challenged the scope of DR-22 when they argued they should not be required to produce to the MDL Repository discovery produced in non-MDL litigation in non-bellwether states. The Court rejected this narrow reading of DR-22, as well. *See* docket no. 3667, *objection overruled and SM ruling affirmed* docket no. 3711.

[15] The following documents thus comprise the "Repository Orders": CMO-1 (docket no. 232); DR-2 (docket no. 698), DR-3 (docket no. 762); DR-22 (docket no. 2576); DOJ Amendment to DR-22 (docket no. 2712); Repository Order (docket no. 3178); *Nunc Pro Tunc* Modification to DR-22 (docket no. 3291), *affirmed-in-part and reversed-in-part* (docket no. 3333); FL Dispensing Data Order (docket no. 3667), *affirmed* (docket no 3711); and Sanctions Order (docket no. 3700).

sometimes after objection). The requirement is authorized by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(e)(1)(B) ("A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response . . . as ordered by the Court.").

Thus, since the inception of this MDL, OptumRx has been obligated to "review documents previously produced . . . involving the marketing or distribution or opioids." CMO-1 at 15. It has been obligated to produce to plaintiffs a list of *every* prior production that "touches upon the marketing or distribution of opioids." DR-2 at 7 (emphasis added). And it has been required to examine *all* non-MDL discovery productions to determine whether they: (1) "only tangentially address[] marketing and distribution of opioids," and so need not be re-produced into the MDL, *see* DR-2 at 6; or instead (2) "relate to core issues in this MDL," or are "relevant to the claims in this MDL proceeding," and so must be re-produced into the MDL, *see* Sanctions Order at 6 and CMO-1 at 15.  Finally, OptumRx is required not to read its obligations narrowly, but instead deem them "comprehensive." *See* DR-2 at 6.

Here, OptumRx concedes that the prior productions it made in response to the Chicago, Washington D.C., and Hawaii Investigations relate to core issues in this MDL, and are relevant to claims in this MDL proceeding. *See* Motion at 5 ("The production contained OptumRx's confidential internal documents, ***including documents relating to opioid*** and non-opioid medications, covering wide swaths of OptumRx's business operations.") (emphasis added); Reply at 2 ("the subpoenaed information ***does include thousands of pages of material about opioids*** and opioid manufacturers.") (emphasis added). OptumRx ***may*** have been able to argue, at the time it responded to the Investigations, that its productions only tangentially addressed opioids and so need not be re-produced into the MDL pursuant to the MDL Repository Orders. But, given the

concessions above, that position is no longer tenable. Those prior productions are plainly relevant to the claims in this MDL proceeding and must be re-produced into the MDL Repository in their entirety. Indeed, regardless of what OptumRx believed about the substance of those investigations, their existence should have been provided to Plaintiffs pursuant to DR-2 and DR-22, since they at least "touched upon" the marketing or distribution of opioids. *See* DR-2 at 7 ("The Special Master now **ORDERS** *every* defendant to produce to plaintiffs, on or before July 10, 2018, a list of *every* prior production in *any* earlier litigation, investigation, or administrative action that touches upon the marketing or distribution of opioids, *without exception*.") (emphasis in original); DR-22 at 4 (stating the obligations were "ongoing"). At that time, Plaintiffs could have litigated whether the productions were tangential to or relevant to their opioid claims in the MDL. OptumRx's failure to comply with DR-2 deprived Plaintiffs of that opportunity.

Because OptumRx now ***knows*** (and has for some time) that the documents it produced in the government Investigations relate to the claims in this MDL, they are and have been required to re-produce them into the MDL, pursuant to the Court's Repository Orders. (The same is true for Express Scripts.) And as explained below, because OptumRx should have already produced those documents into the MDL, thereby making them available for all plaintiffs, there can be no material disadvantage to OptumRx arising from Motley Rice's service as MDL co-lead counsel.

### 3.      Material Disadvantage

To be plain: OptumRx is required (and has been required) to re-produce into the MDL Repository the documents it produced in response to the subpoenas issued in the Chicago Copay Investigation, the D.C. Price Investigation, and the Hawaii Billing Investigation.

OptumRx asserts that the confidentiality agreements Motley Rice entered into on behalf of its government clients prevent the use of those documents in other matters, including the Opioid MDL. But the confidentiality agreements neither convert OptumRx's confidential documents into confidential government information (as described above), nor prevent their use in the Opioid MDL. The Chicago and Hawaii confidentiality agreements each contain language expressly permitting the documents' use pursuant to a court order. *See* Motion Exh. M (docket no. 5276-17 at 3) ("information "will be used for no other purpose whatsoever without . . . a court order"); Motion Exh. C. (docket no. 5276-7 at 3) (parties agree "not to disclose any Confidential Information . . . except as required by . . . court order").

The D.C. Price Investigation confidentiality agreement does not contain the "court order" exception.  But the parties' briefs show the documents OptumRx produced to Washington, D.C. were the same documents it produced to Hawaii. *See* Response at 4 ("Optum also produced the same documents concerning insulin pricing [to D.C.] that it previously had produced to the Minnesota Attorney General, and later produced to Hawaii") (citations omitted); Response to Surreply at 13 (discussing "the Minnesota Attorney General documents (that were produced to Hawaii and D.C. subject to confidentiality provisions)").

The MDL Repository Orders require OptumRx to produce the Investigation documents in the MDL, where all other plaintiffs' attorneys can use them.  It is obvious that Motley Rice's possession and knowledge of the Investigation documents cannot, by itself, cause a material disadvantage to OptumRx, when every other plaintiff's attorney also has them.  No further analysis is necessary.[16]

---

[16] OptumRx's experts miss the import of DR-22. They state that "Plaintiffs' argument that DR-22 requires Defendants to produce documents previously produced pursuant to government subpoena is ***inaccurate***." 1st Supplemental Rpt. at 8 (emphasis added). In fact, that is precisely what DR-22 requires defendants to do. The experts also opine that "confidential government information produced under DR-22 does not lose its status as confidential—

### D.      The Court's Prior Ruling

OptumRx notes that this Court earlier entered an order disqualifying a defense attorney pursuant to Rule 1.11(c). OptumRx argues that the same logic the Court used then, requires disqualification of Motley Rice now. Before concluding, the Court explains why this is incorrect.

In the earlier situation, a former U.S. Attorney, while still in her position with the government, worked closely with the Track One bellwether plaintiffs on an opioid task force, the entire goal of which was to ***prevent*** diversion of opioids. In task force meetings, the plaintiffs voluntarily and informally shared nonpublic government information with the U.S. Attorney. After leaving the U.S. Attorney's Office, the lawyer took a position in private practice representing one of the Track One bellwether defendants, which was accused of ***promoting*** diversion of opioids.

There are significant factual differences between the prior situation and the present one. First, although the Court did not disqualify the former U.S. Attorney under Rule 1.11(a)—which prevents a government lawyer from "switching sides" in the same matter—there was enough of a concern about "side switching" that it was the primary basis on which plaintiffs moved to disqualify the attorney.[17] There is no side-switching element to the present motion.  Second, the prior situation presented unique public policy issues—that is, even the appearance of side-switching risked ongoing friction between federal and local government officials. Those issues are entirely absent here.  Third, as it related to Rule 1.11(c) (the rule upon which the Court ultimately based its decision), there was simply no doubt that the former U.S. Attorney had obtained

---

that information can be designated as such under the protective orders that govern the MDL." *Id.* This misses the point. The Court's existing protective order, docket no. 441, will of course appropriately protect the Investigation documents from public scrutiny once re-produced in the MDL. What re-production of Investigative documents into the MDL Repository does, however, is make those documents available to all plaintiffs' counsel. The experts do not address this point at all.

[17] The Court ultimately concluded that the opioid task force and the opioid MDL were not the same matter within the context of Rule 1.11, and thus disqualification under Rule 1.11(a) was inappropriate.

confidential government information. *See* docket no. 1458-1. As discussed above, OptumRx has not shown Motley Rice obtained confidential government information.

Finally, the Court only disqualified the former U.S. Attorney (and her firm) from the Track One case—a single case among thousands of MDL cases. The Court expressly did not disqualify the attorney "from serving in a leadership capacity in the Opioid MDL or participating in any trial involving claims by other cities and counties." Docket no. 1458 at 11. In the present case, Motley Rice is co-lead counsel for the PEC and has a role, in that capacity, in every single case in the MDL. OptumRx asks this Court to deprive all litigants that are suing PBMs of Motley Rice's considerable experience with complex litigation generally and this MDL specifically. *See* docket no. 34 at 8–9 (appointing Joe Rice as co-lead counsel of the PEC in January 2018 and listing more than 40 prior MDLs in which he served in a leadership role).

A litigant's right to counsel of their choice, including MDL co-lead counsel, should only be limited in exceptional circumstances. *See SST Castings, Inc.*, 250 F. Supp. at 866 ("a litigant's right to 'select counsel of choice should be limited only when representation poses a significant risk of a violation of the Canons of the Code of Professional Responsibility.'") (citations omitted); *In re Valley-Vulcan*, 237 B.R. at 337 ("disqualification is considered a 'drastic measure which courts should hesitate to impose except when absolutely necessary.'"). In the prior situation, plaintiffs carried their heavy burden of showing disqualification of the defense attorney was necessary. OptumRx has not carried its burden of showing that necessity here.

**Conclusion**

There is room for blame on both sides in the present disagreement. OptumRx had an opportunity to raise the disqualification issue long ago. Further, OptumRx has not been meeting

its MDL Repository obligations *in full* for some time, even after being repeatedly reminded and asked to do so by plaintiffs. The Court frowns on this continued recalcitrance and will brook it no further; and warns OptumRx against pursuing this approach generally as discovery goes forward.

At the same time, Motley Rice's successive and simultaneous work representing private clients, and also wearing the mantle of authority of a public entity, poses a serious "risk … that power or discretion vested in [Motley Rice] might be used for the special benefit of [their private] client," or create a conflict of interest.  Rule 1.11(c), Cmts. 4, 5.  The Court frowns on this activity as well, and warns firms against taking this risk in the future.  There is a real difference between a law firm's representation of a governmental entity as a private client and a law firm's wielding the authority of that government. The facts happen to work in favor of Motley Rice in this case: were it not for the standing Repository obligations, and the nature of the Investigation materials OptumRx produced, the Court's discussion and analysis in this Order might have been different.

The Court realizes this issue feels deeply personal to both sides.  With this Order, the Court seeks to strike all of the necessary balances: Rule 1.11's balance between promoting government service and mitigating abuses of power; the balance between upholding the integrity of the profession and a party's right to its chosen counsel; and the balance between retaining important institutional MDL knowledge and the parties being able to work with each other collegially.

The Court ends by asking the parties to move past this issue and direct their energies toward reaching a resolution of their cases. For the reasons stated, OptumRx's Motion to Disqualify Motley Rice is **DENIED**.

**IT IS SO ORDERED.**

 **/s/ Dan Aaron Polster  March 18, 2024**
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**