UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*City of Rochester v. Purdue Pharma, L.P.*, No. 19-op-45853 (Track 12)<br>*Lincoln County v. Richard Sackler, M.D.*, No. 20-op-45069 (Track 13)<br>*City of Independence, Missouri v. Williams*, No. 1:19-op-45371 (Track 14)<br>*County of Webb v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | Case No.: 17-MD-2804<br><br>Judge: Dan Aaron Polster<br><br>**PBM DEFENDANTS' OBJECTION TO THE SPECIAL MASTER'S RULING REGARDING TEMPORAL SCOPE OF DOCUMENT DISCOVERY** |

In accordance with Federal Rule of Civil Procedure 53 and the Appointment Order (ECF No. 69),[1] the Express Scripts and OptumRx Defendants ("**PBM Defendants**") object to the Special Master's ruling—made on the record before a court reporter at the March 28, 2024 discovery conference—on Agenda Items 344 and 345 requiring the PBM Defendants to produce document discovery back to January 1, 1996 (the "**Order**"). The Order is contrary to Federal Rule of Civil Procedure 26(b), which provides that parties may obtain discovery only if it is "proportional to the needs of the case." Plaintiffs have not shown that discovery back to 1996 would be proportional. The Order is also inconsistent with the Court's prior discovery rulings for other bellwether defendants and imposes a broader temporal scope and greater burden on the PBM Defendants than *any* prior defendant in the MDL.

---

[1] The Appointment Order provides that "any party may file an objection to an order, finding, report, ruling, or recommendation by the Special Masters," including "any formal order, finding, report, ruling, or recommendation on the record before a court reporter," within 21 calendar days. Appointment Order at 4. Here, the Special Master ordered that objections to his orders made on the record at the March 28 discovery conference be filed within 11 calendar days, by April 8, 2024. *See* Mar. 28 Hr'g Tr. 156:2–10, ECF No. 5378. This objection is therefore timely.

During the course of the MDL, this Court and the Special Master have repeatedly weighed the burden (to defendants) and the relevance (to plaintiffs) of a temporal scope predating 2006. *See, e.g.*, Dkt. 693, 762, 3055. Those prior discovery rulings consistently establish January 1, 2006, as the appropriate temporal start date for document discovery, with limited exceptions. As far as the PBM Defendants are aware, *no* prior defendant has been required to produce *all* documents back to 1996.

Plaintiffs rely almost exclusively on the mere existence of a contractual relationship between the PBM Defendants and Purdue Pharma to justify a temporal scope dating back nearly 30 years for *all* document discovery. But even Purdue was required to produce only *OxyContin-related* discovery back to the 1990s. Dkt. 693 at 10. Other discovery in Purdue's possession was not subject to that same temporal scope. Likewise, the distributor and retail pharmacy defendants, who, like the PBMs, either contracted with Purdue or were alleged to have engaged in a conspiracy with Purdue (or both), were ordered to produce only a narrow category of documents pre-dating 2006—Suspicious Order Reports. All other discovery for those defendants was cut off at 2006. Dkt. 693 at 11-13. This temporal scope was consistent with the scope of DEA ARCOS data and transactional data, which the Court limited to 2006 forward. Dkt. 3055 at 3–4. Ordering the PBM Defendants to produce *all* document discovery back to 1996 is a marked departure from prior rulings endeavoring to "provid[e] plaintiffs with evidence they need but no more than that, and with as little burden on defendants as this measure allows." Dkt. 693 at 10.

Ordering discovery back to 1996 across the board will necessarily impose on the PBM Defendants incredible burden and expense to search for such materials—a burden and expense that are greater than any other defendant in the entire MDL has faced and that far outweigh any benefit to Plaintiffs. Yet the PBM Defendants do not believe that ordering an additional ten years

2

of document discovery back to 1996 will yield significant volumes of relevant material; for many of the PBM Defendant entities, the available documentation may not even approach 2006. On balance, this sweeping discovery ruling fails the standard for discovery set forth in Federal Rule of Civil Procedure 26(b) because it is not proportional to the needs of the case.

For these reasons and those explained below, the PBM Defendants respectfully request that the Court sustain their objection to the Order and issue an order establishing a temporal scope for document discovery beginning on January 1, 2006.

## BACKGROUND

On December 29, 2023, Plaintiffs issued their initial set of discovery requests to the PBM Defendants, and requested that the PBM Defendants produce discovery dating back to January 1, 1996. The PBM Defendants objected to that temporal scope, but engaged with Plaintiffs in a good faith meet and confer process to see if the parties could reach a reasonable compromise. While the PBM Defendants initially took the position that the temporal scope of documents should extend back twelve years—to 2012—they ultimately agreed to a temporal scope dating back to 2006 in the spirit of compromise and to remain consistent with this Court's prior discovery rulings. Express Scripts also agreed to produce contracts with opioid manufacturers dating back to 1996 to the extent they were reasonably accessible. Plaintiffs refused to accept that compromise. On March 7, 2024, Plaintiffs wrote to the Special Master seeking his assistance in resolving the impasse between Plaintiffs and the PBM Defendants regarding the temporal scope of document discovery.

On March 18, 2024, the PBM Defendants submitted their position papers to the Special Master regarding temporal scope and other topics. The PBM Defendants explained the undue burden of a temporal scope dating back 28 years, the lack of consistency with prior discovery rulings, and the marginal relevance of these dated materials.

3

On March 28, 2024, Special Master Cohen held oral argument on this dispute. Mar. 28 Hr'g Tr. (ECF No. 5378) ("**Tr.**") 101:9–108:11, 116:8–25, 140:6–149:7. At the conclusion of the hearing, the Special Master ordered that the PBM Defendants must search for and produce all documents back to 1996. *Id.* 149:9–150:16; 156:13–157:3.

## LEGAL STANDARD

The Court reviews the Special Master's conclusions *de novo*. Fed. R. Civ. P. 53(f)(3)–(4); *see also* Appointment Order at 5.

Federal Rule of Civil Procedure 26(b) requires that the scope of discovery must be "proportional to the needs of the case," taking into account "whether the burden or expense of the proposed discovery outweighs its likely benefit." "[R]elevancy alone does not permit unlimited discovery on an issue." *Curtiss v. Charter Commc'ns, Inc.*, 2022 WL 2209435, at *3 (N.D. Ohio June 21, 2022). Following the amendments to Rule 26 in 2015, "[it] is now the power—and *duty*— of the district courts actively to manage discovery and to limit discovery that exceeds its proportional and proper bounds." *Helena Agri-Enters., LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 274 (6th Cir. 2021) (emphasis in original). Discovery is not proportional to the needs of the case where a party's theory of the sought information's relevance is based on mere speculation. *See id.* at 273 (affirming denial of discovery request where party "offer[ed] no explanation" how the request "would have uncovered material information for its claim").

## ARGUMENT

Requiring the PBM Defendants to produce documents dating back to January 1, 1996, would not be proportional to the needs of the case under Rule 26 and is inconsistent with prior orders regarding temporal scope in the MDL. Plaintiffs have not offered any explanation for why it is proportional to the needs of the case to have a much broader temporal scope of document

4

discovery for the PBM Defendants than for any other defendant group, especially in the face of the extraordinary burden that the expanded scope imposes.

I. **PLAINTIFFS' ALLEGATIONS DO NOT JUSTIFY A TEMPORAL SCOPE DATING TO 1996.**

    A. **Plaintiffs Have Not Alleged That They Were Injured By The PBM Defendants' Actions In The 1990s**

Plaintiffs' Amended Complaints, which are identical in most respects, do not support a temporal scope dating back to January 1, 1996. Instead, Plaintiffs repeatedly allege that the opioid crisis first affected their communities "two decades" ago in the early-to-mid 2000s. *See, e.g.*, Webb Amend. Compl. ¶ 33 ("As a direct result of the PBM Defendants' and Purdue's coordinated efforts, opioid use and abuse escalated to epidemic levels by the mid-2000s . . . . Plaintiff has been dealing with the public health crisis caused by the PBM Defendants' misconduct for the past two decades."); Rochester Amend. Compl. ¶ 33 (same); Independence Amend. Compl. ¶ 33 (same); Lincoln County Amend. Compl. ¶ 33 (same). Plaintiffs' complaints do not allege any injury or damage to their communities in the 1990s.

In fact, Plaintiffs do not allege that the PBM Defendants engaged in *any* wrongdoing in 1996. *See* Webb Amend. Compl. ¶ 16 ("Prior to 1997, the PBM Defendants had recognized the dangers of opioids and had installed various routine controls on quantity and access."); Rochester Amend. Compl. ¶ 16 (same); Independence Amend. Compl. ¶ 16 (same); Lincoln County Amend. Compl. ¶ 16 (same). Far from alleging "collusion" with opioid manufacturers in 1997, Plaintiffs allege that the PBM Defendants were warning doctors about the risks of opioid medications— much to the chagrin of Purdue. *See* Webb Amend. Compl. ¶ 243 ("In January 1997, Purdue received notice from 'pain clinic doctors' that Medco was sending letters to prescribers because of a 'concern[] about abuse potential' in patients taking OxyContin for chronic non-malignant pain."); Rochester Amend. Compl. ¶ 258 (same); Independence Amend. Compl. ¶ 16 (same); Lincoln

5

County Amend. Compl. ¶ 242 (same). In fact, they allege that OptumRx's predecessor entity, Prescription Solutions, "refused to put OxyContin on its commercial formularies in 1997." Independence Amend. Compl. ¶ 251; Lincoln County Amend. Compl. ¶ 249 (same) Rochester Amend. Compl. ¶ 265 (same).

Plaintiffs further allege that in 2003, the PBM Defendants—rather than conspiring with Purdue—were in fact publicly voicing concerns about the risks of Oxycontin:

> [I]n 2003, an Express Scripts employee gave a presentation at a 2003 conference in which that employee, while discussing OxyContin, stated, "This is a narcotic. All narcotics are addictive. In addition, this is a controlled release narcotic, so when someone would crush it up and either ingest it or inject it there was a potential for serious injury or even death."

Webb Amend. Compl. ¶ 389; Rochester Amend. Compl. ¶ 404 (same); Independence Amend. Compl. ¶ 390 (same); Lincoln County Amend. Compl. ¶ 388 (same). Neither these nor Plaintiffs' other allegations support a burdensome temporal scope dating back to 1996.

      **B.**    **Plaintiffs' Collusion Allegations Do Not Justify Discovery Back To 1996**

Plaintiffs' argument is based almost entirely on their allegations of collusion between the PBM Defendants and Purdue Pharma. The PBM Defendants categorically deny they colluded or conspired with Purdue Pharma, but even assuming the allegations are true for purposes of this discovery dispute, they do not justify document discovery back to 1996.

During the March 28 hearing, Plaintiffs anchored their temporal scope arguments on rebate agreements between the PBM Defendants or their predecessors and Purdue. Rebate agreements are a standard tool in the pharmaceutical industry to make medications more affordable. *See, e.g.*, *In re EpiPen*, 44 F.4th 959, 994–95 (10th Cir. 2022). According to the PEC, these collusion allegations and contracts justify treating the PBM Defendants as equivalent to the manufacturers (and, specifically, Purdue) for discovery purposes. But Plaintiffs made this same argument in Track

6

1, and the Special Master did not impose a blanket temporal scope dating back to the 1990s for all defendants.

In Track 1, the *Summit County* plaintiffs alleged a "conspiracy among Marketing Defendants" that included a "collective marketing scheme to increase opioid prescriptions, sales, revenues and profits" and "the creation of Front Groups." *County of Summit v. Purdue et al.,* Amend. Compl. ¶¶ 746–759 (Dkt. 513). Summit County further alleged a "conspiracy among all Defendants" in which manufacturers, distributors, and retail pharmacies "agreed among themselves to increasing the supply of opioids and fraudulently increasing the quotas that governed the manufacture and supply of prescription opioids [in order to] increase sales, revenue, and profit from their opioid products." *Id.* at 760–766; *see also* Dkt. 1203 at 21–22 (ruling that Summit County adequately pled conspiracy). And it is common knowledge that the distributor and retail pharmacy defendants were distributing and dispensing OxyContin and other opioids during the period from 1996 to 2006. Indeed, the MDL Repository holds many contracts and contract award notifications between Purdue and distributor defendants from the 1990s or early 2000s. *See, e.g.*, PKY180203278 (April 2000 Purdue-McKesson OxyContin Bid Award Notification); PKY180199965 (May 2000 Purdue-McKesson OxyContin Bid Award Notification); PKY180203277 (July 2000 Purdue-McKesson OxyContin Bid Award Notification); PKY180201225 (November 2000 Purdue-McKesson OxyContin Bid Award Notification); PKY180202969 (July 2001 Purdue-McKesson OxyContin Bid Award Notification); PKY180330242 (2000 Purdue-McKesson consulting contract for opioid-related studies; PKY180201925 (2002 Purdue-Cardinal Health GPO OxyContin pricing agreement). Yet those contracts did not justify discovery going back to 1996 for the distributor defendants.

7

Under Plaintiffs' current logic, the "conspiracy" alleged in Track 1 between Purdue, the other manufacturers, distributors, and retail pharmacies should have led the Special Master to rule that *all* defendants should produce *all* discovery back to January 1, 1996. But the Special Master appropriately tailored discovery for each defendant group. Only Purdue had to produce OxyContin-related discovery back to 1996, based on the launch date of that product. Other manufacturers produced discovery back to one year prior to the introduction of particular opioids that they manufactured. And the distributor and pharmacy defendants had to produce documents only back to 2006, with the exception of Suspicious Order Reports. These rulings were the product of properly weighing the relevance (to plaintiffs) and the heavy burden (to defendants) in producing decades-old discovery. The same tailored approach should be taken for discovery of the PBM Defendants. A collusion theory based on the industry-standard practice of rebate agreements does not justify an extra ten years' worth of document discovery.

## II. PRIOR DISCOVERY RULINGS ESTABLISHED A TEMPORAL BASELINE OF JANUARY 1, 2006; THE SAME SHOULD APPLY HERE.

As the Special Master previously recognized when determining the temporal scope for the Track 1 cases, "the earlier the cut-off date for document production, the more burdensome is the discovery request on defendants, and potentially the less relevant." Dkt. 693 ("DR-2"). At that time, in 2018, the Court established a discovery cut-off of January 1, 2006, for most discovery, and permitted an earlier temporal scope only for targeted categories of discovery. *Id*.

Manufacturer defendants were required to produce discovery "with a cut-off date of one year prior to the launch date of the opioid product in question;" and transactional data and Suspicious Order Reports with a cut-off date of January 1, 1996. *See* DR-2 at 10. Thus, Purdue was required to produce OxyContin-specific discovery back to 1995, but it would only have to produce discovery relating to Hyslinga ER and Xartemis XR back to 2013. *Id*. The manufacturers

8

were also required to produce transactional data and Suspicious Order Reports back to January 1, 1996. *Id*. at 10–11.

Distributor defendants were required to "produce transactional data and Suspicious Order Reports with a cut-off date of January 1, 1996." *Id.* at 11. The Special Master ruled that "the discovery cut-off for all other discovery is January 1, 2006." *Id.*

In DR-3, the Special Master initially established a discovery cut-off for the retail pharmacy defendants equivalent to the discovery period for the distributor defendants. *See* Dkt 762 ("DR-3") at 8. The retail pharmacies were ordered to produce transactional data and Suspicious Order Reports with a cut-off date of January 1, 1996, but the cut-off date for all other discovery was January 1, 2006. *See* Dkt 762 ("DR-3") at 8.

Then, in 2019, this Court "weighed the burdens and benefits" of data discovery and agreed with the retail pharmacy defendants that "the burden of producing transactional data older than 2006 becomes excessive." Dkt. 3055 at 3–4. The Court explained that a temporal scope back to January 1, 2006, was "proportional to the needs of the case" under Rule 26(b)(1) since it was congruent with DEA ARCOS data, which also dated back to 2006. *Id*.

In the Case Management Order for the PBM Bellwethers, this Court stated that it "intends to adhere to all formal rulings made in the prior MDL tracks." Dkt. 5282 at 3. The Court has since confirmed that prior discovery rulings "presumptively apply" to the PBMs. Feb. 28, 2024 Tr. (Dkt. 5337) at 14:6–20. As the Court explained to the parties during the February 28 conference:

> But you always have the opportunity to – if you feel that a prior ruling – for example, if there's a new case, a Sixth Circuit case, Supreme Court case, whatever, that suggests what [the Court] did was unlawful, of course you bring it to [the Court's] attention. If you think that the facts and the circumstances of the PBMs are significantly different than those that say the ruling was in the context of distributors, then absolutely you have right to point out to me why there should be some change with respect to [OptumRx] and/or Express Scripts.

Feb. 28, 2024 Tr. (Dkt. 5337) at 14:10–24.

9

While the PBM Defendants believe that a temporal scope dating back 18 years—to 2006—is extremely burdensome, they have nonetheless agreed to produce documents back to 2006 to be consistent with the Court's prior rulings on temporal scope and avoid an unnecessary discovery dispute. Plaintiffs, meanwhile, have not presented any new law, facts, or circumstances to justify imposing a greater temporal scope on the PBM Defendants than was imposed on distributors or retail pharmacies. Instead, the Plaintiffs have advanced the same types of collusion arguments used when arguing for a longer temporal scope for distributor and retail pharmacy defendants. This Court and the Special Master rejected those arguments back then, and should reject them here too.

### III.   A TEMPORAL SCOPE DATING TO 1996 MUST BE REJECTED AS UNDULY BURDENSOME AND NOT PROPORTIONAL TO THE NEEDS OF THE CASE.

The lengthy discovery timeframe demanded by Plaintiffs—28 years—would place an undue burden on the PBM Defendants that is not proportional to the needs of the case and is unjustified by Plaintiffs' allegations.

A discovery cut-off prior to 2006 for all documents would be inconsistent with the discovery produced by nearly all other MDL defendants and broader than the discovery that was ordered for even Purdue. This means that the PBM Defendants will likely need to seek pre-2006 discovery from distributors, manufacturers, and retail pharmacies in order to prepare their defenses for trial and to paint the full picture of any activities in the pre-2006 time frame. This would further increase the burden on the PBM Defendants, potentially delay discovery, and undermine the efficiencies of having an MDL in the first place. The Court has repeatedly sought to streamline litigation by remaining consistent in its rulings and by permitting parties to leverage discovery already produced by other litigants into the MDL Repository.

Fact discovery in the only other PBM opioid case to proceed to that stage of litigation—*Jefferson County*—had a discovery cut-off of 2006. This cutoff period was modeled after the

Special Master's temporal scope rulings for the distributors and retail pharmacies and a balancing of the burden and relevance for the similar opioid claims brought in that case. Requiring the PBM Defendants to now search, identify, and collect documents from nearly 30 years ago (an additional 10 years of discovery) would require extensive time and resources, and would be incredibly difficult to accomplish in the expedited fact discovery schedule set by the Court. And there is no guarantee that those searches will yield the volume and type of discovery that could justify the burden. The PBM Defendants are nearly certain it will not. Ordering document discovery back to 1996 is also likely to have other ripple effects that will increase the burden on the PBM Defendants. For example, Plaintiffs may then demand that the PBM Defendants prepare corporate representatives under Rule 30(b)(6) to testify about information going back to 1996, with very few documents available to prepare those witnesses to testify. This balance is not what Rule 26 contemplates.

A temporal scope baseline of 2006 is proportional to the needs of the case and will not unduly prejudice Plaintiffs. As Plaintiffs have made clear in their Amended Complaints and their briefing on this issue, they have access to thousands of documents produced by Purdue and placed into the MDL Repository many years ago with which to make their case for collusion or conspiracy. To the extent the PBM Defendants even have relevant documents for the 1996–2006 time period, these documents would likely be duplicative or cumulative of the materials Plaintiffs already have. Plaintiffs will therefore suffer minimal prejudice if the discovery cut-off is set to 2006.

Finally, Plaintiffs allege that the public nuisance created by the PBM Defendants is "ongoing" and has caused a "continuous injury over many years." Webb Amend. Compl. ¶ 691; Rochester Amend. Compl. ¶ 692 (same); Independence Amend. Compl. ¶ 694 (same); Lincoln

County Amend. Compl. ¶ 702 (same). This means that a temporal scope dating back to 2006 would cover most if not all of the time period during which Plaintiffs allege they have been injured. Given the marginal relevance of additional document discovery prior to 2006 and the incredible burden to the PBM Defendants of searching for and collecting this discovery, the Court should determine that a temporal scope prior to 2006 is excessive and not proportional to the needs of the case.

## CONCLUSION

For these reasons, this Court should overrule the Special Master's Order establishing a temporal scope for document discovery dating back to January 1, 1996, and should instead order that the temporal scope begins on January 1, 2006.

Dated: April 8, 2024

/s/ Brian D. Boone
Brian D. Boone
**ALSTON & BIRD LLP**
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704) 444-1000
brian.boone@alston.com

William H. Jordan
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com

*Attorneys for OptumRx Defendants*

/s/ Jonathan G. Cooper
Michael J. Lyle
Jonathan G. Cooper
Matthew K. Wasserman
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I St. NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8000
mikelyle@quinnemanuel.com
jonathancooper@quinnemanuel.com
matthewwasserman@quinnemanuel.com

Sage R. Vanden Heuvel
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
865 S. Figueroa St., 10th Floor
Los Angeles, CA 90017
Tel: (213) 443-3000
sagevandenheuvel@quinnemanuel.com

*Attorneys for Express Scripts Defendants*