# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | **MDL No. 2804** |
| **THIS DOCUMENT RELATES TO:** | **Case No. 1:17-md-2804** |
| *PBM Bellwether Cases* | **Judge Dan Aaron Polster** |

## THE EXPRESS SCRIPTS PBM DEFENDANTS AND OPTUMRX, INC.'S OBJECTION TO THE SPECIAL MASTER'S ORDER REGARDING THE GEOGRAPHIC SCOPE OF PBM DATA TO BE PRODUCED

In accordance with the Appointment Order (ECF No. 69), the Express Scripts PBM Defendants[1] and OptumRx, Inc. (together with the Express Scripts PBM Defendants, the **PBM Defendants**), object to the Special Master's March 28 ruling on Agenda Item 342 requiring the production of statewide PBM data for the states of Texas, New York, and Missouri.[2]

Plaintiffs' request for statewide PBM data is neither relevant nor proportional to the needs of each PBM bellwether case. Plaintiffs do not (and cannot) seek recovery for any statewide harm because the bellwether jurisdiction plaintiffs comprise only a sliver of their respective states' populations. Plaintiffs instead argue that they need statewide PBM data to run certain "red flag" analyses, in particular a "red flag" for patients traveling more than 25 miles to a prescriber or pharmacy. But the PBM Defendants have already agreed to produce PBM data spanning far greater

---

[1] The Express Scripts PBM Defendants are Express Scripts, Inc., Medco Health Solutions, Inc., and Express Scripts Administrators, LLC.

[2] The Appointment Order provides that "any party may file an objection to an order, finding, report, ruling, or recommendation by the Special Masters," including "any formal order, finding, report, ruling, or recommendation on the record before a court reporter," within 21 calendar days. Appointment Order at 4. Here, Special Master Cohen ordered that objections to his orders made on the record at the March 28 discovery conference be filed within 11 calendar days, by April 8, 2024. *See* Mar. 28 Hr'g Tr. 35:9–36:3, 84:16–18, 156:2–10 (ECF No. 5378). This objection is therefore timely.

than a 25-mile radius for each bellwether jurisdiction. They offered to produce data for prescriptions filled in each bellwether jurisdiction, *plus* prescriptions filled at pharmacies in each bellwether jurisdiction's contiguous in-state counties. In other words, Plaintiffs can run their "red flag" analyses without statewide data. On top of that, OptumRx offered to produce data that would allow Plaintiffs to identify all residents of each bellwether jurisdiction who filled a prescription opioid at a pharmacy elsewhere in the bellwether state (regardless of prescriber location). Plaintiffs rejected those offers, revealing that their "red flag" argument is simply cover to obtain voluminous statewide data that are not relevant to their claims.

Meanwhile, the burden of producing statewide PBM data, and the percentage that is wholly irrelevant to each plaintiff bellwether jurisdiction, is great. Unlike retail pharmacy dispensing data, which the Court previously ordered should be produced on a statewide basis,[3] PBM data is different because PBMs adjudicate claims for prescription drugs dispensed at thousands of pharmacies in a given state, including most major retail chains, grocery stores, local chains, and mom-and-pop pharmacies. Dispensing data from a single retail pharmacy chain's one or two hundred retail stores in a state is magnitudes smaller than PBM data, which spans a state's several thousand pharmacies, including those in major cities far outside each bellwether jurisdiction.

And contrary to Plaintiffs' contention that the PBM Defendants just need to "hit a couple buttons," the process of collecting, analyzing, and producing PBM data is a time-consuming endeavor that becomes even more time consuming as the relevant geographic area expands. The Express Scripts PBM Defendants have submitted the declaration of Al DeCarlo, its Vice President of Market Analytics, who considered a geographic scope of the bellwether jurisdiction and its

---

[3] The PBM Defendants do not oppose producing statewide dispensing data for their affiliated mail-order pharmacies. This objection pertains to PBM data.

contiguous in-state counties and concluded that producing PBM data stored on decommissioned archive systems and physical floppy disks dating back to 2006—as Special Master Cohen has ordered—would take approximately 12 to 16 weeks, but would take even longer if the relevant geographic area is expanded. *See* Ex. 1 (excerpt of DeCarlo Decl.). And Kevin Hoskins, OptumRx's Director of Business Analytics, has similarly submitted a declaration explaining that pulling and producing PBM data for Plaintiffs' request of more than 4,300 fields (an outrageous number) would take at least seven months based on a geographic scope limited to each bellwether jurisdiction and its contiguous in-state counties—and would take *even longer* if the geographic scope covered the entirety of each bellwether state. *See* Ex. 2 ¶¶ 4, 12 (Hoskins Decl.). And those estimates don't include time for processing and preparing the data for production—just the process for extracting the requested data. *Id.* ¶ 11. Production of PBM data on a statewide basis would necessarily derail the current case schedule, which requires the PBM Defendants to complete their production of data by June 14.

For these reasons and those explained below, the PBM Defendants respectfully request that the Court sustain their objection and issue an order defining the appropriate geographic scope for the production of PBM data as each bellwether jurisdiction and its contiguous in-state counties.

## BACKGROUND

On October 27, 2023, the Court selected four cases filed against the PBM defendants to go forward as PBM bellwethers, which the Court later assigned to the following case tracks: *City of Rochester, New York v. Purdue Pharma, L.P.*, No. 19-op-45853 (Track 12); *Lincoln County, Missouri v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13); *City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14); and *County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15). Orders (ECF Nos. 5231, 5268).

On March 11, 2024, Plaintiffs asked Special Master Cohen to help resolve disputes between Plaintiffs and the PBM Defendants regarding the scope of PBM data to be produced. On geographic scope, Plaintiffs requested that Special Master Cohen order PBM data to be produced on a statewide basis for the states of Texas, New York, and Missouri.

On March 18, 2024, the PBM Defendants submitted their position papers to Special Master Cohen on the appropriate geographic scope for the production of PBM data, among other topics. The PBM Defendants explained that the appropriate geographic scope for PBM data is each bellwether jurisdiction and its contiguous in-state counties. That geographic scope is consistent with the geographic scope ordered in the only PBM case in the country to have proceeded through fact discovery, *Jefferson County, Missouri v. Dannie E. Williams, M.D., et al.*, Case No. 20JE-CC00029 (Mo. Cir. Ct.).

On March 28, 2024, Special Master Cohen heard oral argument on the geographic scope of PBM data to be produced. Mar. 28 Hr'g Tr. (**Tr.**) 37:14–69:1 (ECF No. 5378). He ordered that PBM data must be produced statewide in the three states. *Id.* 153:2–154:1.

On April 4, 2024, counsel for OptumRx submitted a compromise offer to address Plaintiffs' desire to receive PBM data related to their "red flag" analyses. *See* Ex. 3 at 1 (Apr. 4, 2024 Email from B. Springer to J. Gaddy). As part of a compromise offer, OptumRx offered to produce PBM data for in-scope prescriptions processed for residents of each bellwether jurisdiction who filled prescriptions at any pharmacy in the bellwether state, including pharmacies outside of the bellwether jurisdiction and contiguous in-state counties. *See id.* That offer would include any in-scope opioid prescriptions where individuals traveled *to* the bellwether jurisdiction to fill a prescription, as well as opioid prescriptions filled by bellwether residents anywhere within the

state and would include prescriptions written by any doctor in the country. Plaintiffs rejected that compromise offer. *See id.* (Apr. 5, 2024 Email from J. Gaddy to B. Springer).

### LEGAL STANDARD

The Court reviews the Special Master's conclusions *de novo.* Fed. R. Civ. P. 53(f)(3)–(4); *see also* Appointment Order at 5.

"The proponent of a motion to compel discovery bears the initial burden of proving the information sought is relevant." *Curtiss v. Charter Commc'ns, Inc.*, 2022 WL 2209435, at *1 (N.D. Ohio June 21, 2022) (citing *O'Malley v. NaphCare Inc.*, 311 F.R.D. 461, 463 (S.D. Ohio 2015)). However, "relevancy alone does not permit unlimited discovery on an issue." *Id.* at *3. Rather, the scope of discovery must be proportional to the needs of the case. Fed. R. Civ. P. 26(b). "Instead of facilitating costly and delay-inducing efforts to look under every stone in an e-discovery world populated by many stones," Rule 26(b) "'crystalizes the concept of reasonable limits on discovery through increased reliance on the common-sense concept of proportionality.'" *Helena Agri-Enters. v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021) (quoting John G. Roberts, Jr., 2015 Year-End Report on the Federal Judiciary 6 (2015)). "It is now 'the power—and *duty*—of the district courts actively to manage discovery and to limit discovery that exceeds its proportional and proper bounds.'" *Id.* (quoting *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 306 (S.D. Ind. 2016)).

In the context of this MDL, the Sixth Circuit has held that defining the scope of discovery generally, and the geographic scope of data production specifically, requires the Court to determine "the needs of the particular case in which the discovery is ordered," such that "every case in an MDL (other than cases for which there is a consolidated complaint) retains its individual character." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 841, 846 (6th Cir. 2020).

# ARGUMENT

## I. Statewide PBM data is neither relevant nor proportional to the needs of each PBM bellwether case.

Producing statewide PBM data would be vastly disproportional to the needs of the four PBM bellwether cases. The plaintiff jurisdictions at issue in the PBM bellwether cases contain only a sliver of their states' populations[4] and opioid dosage units purchased,[5] as shown below:

- Track 12 Plaintiff City of Rochester, New York, contains approximately **1.1%** of New York's population and **3.3%** of opioid dosage units purchased in New York;

- Track 13 Plaintiff Lincoln County, Missouri, contains approximately **1%** of Missouri's population and **0.7%** of opioid dosage units purchased in Missouri;

- Track 14 Plaintiff City of Independence, Missouri, contains approximately **2%** of Missouri's population and **2.9%** of opioid dosage units purchased in Missouri; and

- Track 15 Plaintiff Webb County, Texas, contains approximately **0.9%** of Texas's population and **0.3%** of opioid dosage units purchased in Texas.

In other words, requiring the PBM Defendants to produce statewide data in the PBM bellwether cases would cover 30–100 times more people and opioid dosage units than in the bellwether jurisdictions. Such a mismatch between the geographic scope of the case (two small cities and two small counties) and the geographic scope of the requested data (three large states) is wildly disproportionate to "the needs of the particular case." *In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 846. And not just that. An order compelling statewide PBM data has no relation to the claims brought by each bellwether plaintiff. A statewide data production would, for example, require the Express Scripts PBM Defendants and OptumRx to produce data for millions of residents of New York City who live more than 250 miles away from the City of Rochester and to

---

[4] Based on publicly available population data from the U.S. Census Bureau. https://www.census.gov/quickfacts/fact/table/.

[5] Based on publicly available ARCOS data showing purchases of MDL-8 opioid units.

produce data for millions of residents of Dallas who live more than 400 miles away from Webb County, Texas.

The obvious disproportionality of Plaintiffs' statewide PBM data request is supported by initial analysis of the available data. For example, OptumRx's PBM data for MDL-8 opioids dispensed by pharmacies in Webb County and the contiguous in-state counties accounts for just **0.4%** of all OptumRx MDL-8 opioid claims dispensed in Texas from 2010 to 2019. Plaintiffs ask OptumRx to produce data for the remaining **99.6% of Texas** when the plaintiff jurisdiction accounts for **less than one half of one percent** of OptumRx's MDL-8 claims in Texas.

The disproportionality is magnified by the extra burden that producing statewide PBM data poses. The Express Scripts PBM Defendants submitted to the Special Master a declaration by Al DeCarlo, its Vice President of Market Analytics, explaining the burden of collecting, restoring, and producing data. *See* Ex. 1. According to Mr. DeCarlo, collecting, restoring, and producing PBM data dating back to 2006—as Special Master Cohen has ordered—would take approximately 12 to 16 weeks given that such data are stored on floppy disks or cold storage databases that are no longer in use, assuming that the relevant geographic scope remained the bellwether jurisdiction and its contiguous in-state counties. *Id.* ¶¶ 5–6, 12. As explained by Mr. DeCarlo, collecting, restoring, and producing these data would require the PBMs to identify the relevant data based on the members covered and the pharmacies located in the relevant geographic area. *Id.* ¶¶ 8–10. Mr. DeCarlo stated in his declaration that this process would take even longer if the geographic scope is expanded to be statewide. *Id.* ¶¶ 8–10, 12. OptumRx likewise submits a declaration from its Director of Business Analytics, Kevin Hoskins, who explained that "querying and extracting data for a larger geographic region (such as an entire state) will increase the complexity of the data pull and increase the time associated with completing the data pull." Ex. 2 ¶ 12.

The burden—and disproportionality—of statewide PBM data production extends not just to PBM data, but also to related materials, like client contracts and formulary documents. Expanding to statewide PBM data in each bellwether case would increase the list of individual health plans and dramatically increase the burden on the PBM Defendants by drawing in client contracts and materials that do not relate to the bellwether jurisdictions.

Plaintiffs do not offer any reason why a statewide geographic scope is proportional to the needs of each particular PBM bellwether case. Rather, Plaintiffs argue that they need data from a geographic scope large enough to run their "red flag" criteria across claims adjudicated by the PBMs showing when an opioid was dispensed to a patient who traveled more than 25 miles to visit a prescriber or pharmacy. Although the PBM Defendants dispute the relevance of these criteria and reject Plaintiffs' characterization of them as "red flags," a geographic scope for PBM data that includes the bellwether jurisdiction and its contiguous in-state counties more than satisfies this alleged "need" because the PBM Defendants' proposed geographic scopes for each of the PBM bellwether cases extend more than 25 miles.[6] For example, Laredo, Texas (the largest city in Webb County, Texas) is nearly 70 miles from Cotulla, Texas (in neighboring La Salle County), nearly 80 miles from San Diego, Texas (in neighboring Duval County), and more than 100 miles from Eagle Pass, Texas (in neighboring Maverick County). Prescriptions filled in each of those locations—and dozens of other cities outside of Webb County—would be captured by the PBM Defendants' proposed geographic scope.

---

[6] The bellwether jurisdictions and their contiguous in-state counties are: Track 12 (City of Rochester and Monroe County, NY); Track 13 (Lincoln County, Pike County, Montgomery County, Warren County, and Saint Charles County, MO); Track 14 (City of Independence and Jackson County, MO); and Track 15 (Webb County, Maverick County, Dimmit County, La Salle County, McMullen County, Duval County, Zapata County, and Jim Hogg County, TX).

Indeed, even when OptumRx offered to compromise by extending the geographic scope to include PBM data for residents of bellwether jurisdictions who filled prescriptions at pharmacies *anywhere in the State*, Plaintiffs still refused. *See* Ex. 3 at 1.

None of the arguments proffered by Plaintiffs at the March 28 discovery conference support the production of PBM data on a statewide basis. Plaintiffs argued that without statewide data, they could not identify "the most egregious" examples of prescriber or pharmacy shopping, *see* Tr. 40:1–42:5, but that's not true. If Plaintiffs accepted OptumRx's offer, they would receive data for any bellwether resident who traveled anywhere in each bellwether state to fill an opioid prescription. Beyond that, Plaintiffs will still be able to present evidence of alleged prescriber or pharmacy shopping in the PBM data for the bellwether jurisdiction and its contiguous in-state counties.  Plaintiffs' arguments in support of statewide data are also at odds with their claimed theory of liability—that they "will not seek to prove that any individual prescription was improper" but instead they contend that "Defendants' conduct improperly increased the overall or aggregate use of opioids." *See, e.g.*, Ex. 4 (City of Independence, Missouri fact sheet); *see also id.* at Instruction 3 ("All the responses in this Fact Sheet or an amendment thereto are binding upon Plaintiffs as if they were contained in answers to interrogatories."). Plaintiffs' liability theory is fatally flawed, but putting that aside, Plaintiffs' professed need for statewide PBM data is at odds with that theory. Production of PBM data that spans not only each entire bellwether jurisdiction where a nuisance is alleged to have occurred but also the contiguous in-state counties will more than satisfy Plaintiffs' stated need for "overall or aggregate" data. Anything broader would be disproportionate to the needs of the case.

## II.    The Court's prior rulings regarding geographic scope are distinguishable.

The fact that a statewide geographic scope for *other* types of data may have been ordered in *other* cases against *other* groups of Defendants in this MDL is not enough to support a statewide

geographic scope in these particular cases. *See In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 841, 846. Nonetheless, the Court's prior rulings on the geographic scope for those data production are distinguishable because they considered the burdens to retail pharmacies—not PBMs—of producing statewide data for a much smaller number of pharmacy retail locations than would apply to the PBM Defendants' data. They also were cases where the bellwether plaintiffs represented a larger portion of their respective states and were more representative of the other pending cases in this MDL, such that the discovery produced would be relevant to multiple other cases. Here, the disproportionality of producing statewide data is at least an order of magnitude greater that it was in those prior cases. The Court's prior rulings, therefore, do not justify applying the same statewide geographic scope in the PBM bellwether cases.

*First*, the PBM bellwether cases are differently situated than the Track 1B cases—where the Court initially ordered the statewide production of transactional data—because Track 1B plaintiffs Summit and Cuyahoga Counties, Ohio, represented a far greater swath of the state's population and opioid dosage units purchased than the PBM bellwether plaintiffs do in their respective states. Track 1B included two plaintiffs, both from the state of Ohio, which collectively contained over **15%** of Ohio's population and nearly **13%** of opioid dosage units purchased in Ohio. In other words, the statewide data in Track 1B was only about 6 or 7 times the size of the plaintiffs' population and opioid dosage units. Here, as noted above, statewide PBM data in the PBM bellwether cases would be 30 to over 100 times the size of the Plaintiffs' population and opioid dosage units. Even under the Court's prior orders, statewide PBM data would be disproportionate to the needs of these four cases.

*Second*, the type of data at issue here makes Plaintiffs' statewide PBM data request even more disproportionate to the needs of the case. It is one thing to order a pharmacy to produce

transactional data for all of its retail locations in a given state, but something completely different—by many orders of degree—to order a PBM, which adjudicates claims for prescription drugs dispensed at thousands of pharmacies, including pharmacy chains, grocery stores, local chains, and mom-and-pops, to produce its transactional data for all opioid claims it adjudicated in a given state, including many in major cities (such as Dallas and New York City) that are hundreds of miles from the bellwether jurisdictions. For example, the Court previously ruled that the Track 3 defendants had to produce their transactional data for the entire state of Ohio. *See* June 17, 2020 Order (ECF No. 3341). In practice, that meant Track 3 defendant Walmart, for example, had to produce its transactional data for the roughly 170 retail stores it maintains in Ohio, assuming each of those stores included a dispensing pharmacy. *See* https://corporate.walmart.com/about/location-facts/united-states/ohio (showing 170 retail stores in Ohio). By contrast, PBMs adjudicate claims for prescription drugs, including opioids, that are dispensed at thousands of pharmacies in any given state. The burden, therefore, of producing statewide data for a PBM cannot be equated to that of a retail pharmacy.

PBM data is also different from pharmacy transactional data because PBM data reflect PBM client relationships and clients' unique pharmacy benefits—not just information about products, prescribers, and pharmacies. Unlike a chain pharmacy, whose data Plaintiffs might have argued required statewide production to capture application of national policies, PBM data reflect PBM clients' selection of plan-specific benefits that are applied the same way to process a plan member's claim whether or not it is filled in the bellwether jurisdiction. Those benefits are subject to individual contracts and may vary widely for different types of clients, ranging from unions to local governments, small businesses, or larger companies. If Plaintiffs want to understand the impact of the PBM Defendants' clients' formulary decisions, then the data for production should

reflect the benefit plans *in those communities*. Instead, Plaintiffs seek statewide data that would reflect thousands of client relationships and distinct plans far beyond the scope of their jurisdictions and contiguous in-state counties.

At the March 28 hearing, Plaintiffs argued that producing statewide PBM data was as simple as "hit[ting] a couple buttons," Tr. 45:9–17, and that "[p]ulling [data] from five counties to the entire state does not make a material difference on the burden," *id.* 43:4–5. But that is attorney argument untethered to and directly contradicted by the record, as explained in Mr. DeCarlo's and Mr. Hoskins' declarations.

Plaintiffs also argued at the March 28 hearing that PBMs "tout[ ] the fact that they are data rich," *id.* 44:16–25, and "[a]ll we're asking for is exact replicas of what they've packaged, what they've harvested, what they've produced over the years," *id.* 64:18–21. But that is not true. Plaintiffs are asking for much more than that by requesting hundreds or thousands of data fields from which the PBM Defendants have never produced data. The Express Scripts PBM Defendants have explained to Plaintiffs during multiple meet-and-confers that they use a uniform set of roughly **40** data fields for producing data in litigation and for purposes of generating reports or publications. However, Plaintiffs are demanding that the Express Scripts PBM Defendants produce data for over **400** data fields. With respect to OptumRx, Plaintiffs have requested over **4,300** data fields, many of which are not even claims data and have never been pulled or provided in any case or client relationship. Reducing this complex request to a push of a button simply ignores the evidence in the record. As OptumRx has explained, the process for extracting the requested data for production would take at least seven months. *See* Ex. 2 ¶¶ 4, 11 (explaining that just pulling the data for the bellwether jurisdictions alone would take at least seven months). Therefore, far from simply asking for "exact replicas" of the data the PBM Defendants use in the ordinary course

of business, Plaintiffs are requesting data that will take a tremendous amount of time and effort to produce.

     *Third*, although the Court must consider the needs of only each particular PBM bellwether case and not other cases in the MDL (*see In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 841), even if the Court were to consider other MDL cases, any efficiency gained from requiring the statewide production of PBM data is minimal to non-existent given that only six other New York cases, three other Missouri cases, and *no* other Texas cases have been brought against the PBM Defendants in the MDL.

     In conclusion, Plaintiffs do not satisfy their burden of showing that a statewide geographic scope for the production of PBM data is proportional to the needs of the PBM bellwether cases. The PBM Defendants respectfully request that the Court sustain their objection and issue an order defining the appropriate geographic scope for the production of PBM data as the bellwether jurisdiction and its contiguous in-state counties.

Dated: April 8, 2024

/s/ Brian D. Boone
Brian D. Boone
**ALSTON & BIRD LLP**
Vantage South End
1120 South Tryon Street, Suite 300
Charlotte, NC 28203
Tel: (704) 444-1000
brian.boone@alston.com

William H. Jordan
**ALSTON & BIRD LLP**
1201 West Peachtree Street NW, Suite 4900
Atlanta, GA 30309
Tel.: (404) 881-7000
bill.jordan@alston.com

*Attorneys for Defendant OptumRx, Inc.*

/s/ Jonathan G. Cooper
Jonathan G. Cooper
Michael J. Lyle
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1300 I St. NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8000
jonathancooper@quinnemanuel.com
mikelyle@quinnemanuel.com

*Attorneys for Express Scripts, Inc., Medco
Health Solutions, Inc., and Express Scripts
Administrators, LLC*