UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION**<br><br>This document relates to:<br><br>*City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)<br><br>*Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13)<br><br>*City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14)<br><br>*County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | **MDL No. 2804**<br><br>**Case No. 17-md-2804**<br><br>**Judge Dan Aaron Polster** |

**PLAINTIFFS' RESPONSE TO
PBM DEFENDANTS' OBJECTION TO THE SPECIAL MASTER'S RULING
REGARDING TEMPORAL SCOPE OF DOCUMENT DISCOVERY**

PBM Bellwether Plaintiffs request this Court over-rule the *PBM Defendants' Objection To The Special Master's Ruling Regarding Temporal Scope Of Document Discovery* (ECF 5394) (Filed: 04/08/24). Special Master Cohen held a discovery hearing on March 28, 2024 (ECF 5378) setting the ***temporal scope*** of discovery dating back to January 1, 1996. The PEC supports the ruling. The PBMs object. The *Appointment Order* (ECF 69) requires a *de novo* review.

FRCP 26(b)(1) states: "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative

access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." This Court previously addressed the temporal scope of discovery in relation to the manufacturers, distributors and dispensers of prescription opioids. *Discovery Ruling No. 2* (Doc. #693) (Filed: 06/30/2018); *Discovery Ruling No. 3* (Doc. #762) (Filed: 07/17/2018). The Court is tasked with applying the same analysis to the PBM bellwether cases. This Court previously set the temporal scope of discovery for Purdue Pharma with a cut-off date of one year prior to the launch date. *Discovery Ruling No. 2* (fn 5: "Purdue's Oxycontin was approved by the FDA in December of 1995"). Because of the historic relationships between Purdue Pharma and the PBM defendants, a discovery start date of January 1, 1996, is reasonable for the reasons stated below.

The PEC alleges the PBM defendants and Purdue Pharma engaged in deep and intertwined relationships related to OxyContin, as early as January 1, 1996. These relationships go far beyond mere rebate agreements, as suggested by the PBMs. In addition to rebate agreements, the PEC discovered documents, produced by Purdue Pharma, which depict longstanding <u>direct</u> relationships between the PBMs and Purdue Pharma. See PEC position papers submitted to the Special Master on February 7, 2024 (attached as <u>Exhibit 1</u>), March 7, 2024 (attached as <u>Exhibit 2</u>) and March 11, 2024 (attached as <u>Exhibit 3</u>). The PBM defendants' objection neither mentions the underlying record, which supports the Special Master's ruling, nor refutes the PEC's factual assertions proffered for the record. Of particular relevance, the PEC directs the attention of the Court to a contractual agreement between Purdue Pharma and Express Scripts, dated April 4, 1997, which includes the following provision:

> <u>Quarterly Review Meetings</u>: PBM shall, upon [Purdue Pharma's] request, meet every quarter with PPLP's Account Executive to review, among other things:

> l)formulary listings; 2) communications since the last meeting; 3) new Plans; 4) non-compliant Plans; 5) market share of Products; 5) utilization trends for Products; 7) contract exclusions; 8) Product information; 9) new PPLP programs, products, or literature; and 10) any other issues or concerns of PPLP or PBM as appropriate. At this quarterly review, strategies or programs to increase compliance of non-compliant Plans may be developed. Either PPLP or PBM may request additional meetings as desired and mutually agreed upon.

PDD1701198993, at ¶6 (PLLP is shorthand for Purdue Pharma) (attached as Exhibit 4[1]). This document was not produced by Express Scripts. The PEC discovered this document by culling the MDL Repository for productions from other defendants. This document is one of many which depict service agreements between Purdue Pharma and the PBMs, specifically related to OxyContin, dating back to at least 1996, which continued and evolved until Purdue Pharma filed bankruptcy. See also *Rochester Amnd. Compl.,* ¶266 (internal Purdue Pharma memo dated May 4, 1997, indicating "Medco would like to move forward with Purdue in partnering for pain management into the future") (PPLPC025000003668). Another undisclosed document reveals a Purdue Pharma presentation to Express Scripts, dated April 24, 2001, related to OxyContin "hotspots" and debunking media hysteria related to overdoses. See Purdue Pharma's "Situation Review for Express Scripts" (PPLPC035000005854) (attached as Exhibit 5). This document placed Express Scripts on actual notice of an impending opioid epidemic as early as 2001.

This Court has held that "even decades-old procedures, polices, and actions may be highly relevant to show important background, and even the actual causes, of the current tidal wave of opioid use in the United States." *Discovery Ruling No. 3* (Doc. #762) (Filed: 07/17/2018). Express Scripts' dealings with Purdue Pharma during the nascent stages of the opioid epidemic is highly

---

[1] Exhibit 4, Exhibit 5 and Exhibit 6 were produced by Purdue Pharma into the MDL Repository and designated as confidential. The PEC received permission to publish these documents from counsel for Purdue Pharma and IMS with certain redactions of personal information. The PBMs were placed on notice of our intention to publish these documents and did not object.

relevant and discovery from this time period is proportional to the needs of the case. The PEC has demanded transparency and visibility throughout the procedural history of MDL2804, both in offensive and defensive discovery, which justifies a temporal scope of 1996.

The PEC's position on temporal scope is even stronger in relation to the Optum defendants.[2] Documents produced by Purdue Pharma—not Optum—reveal that Purdue began negotiations to place OxyContin on the OptumRx national formulary (through its predecessor Prescription Solutions) as early as 1998. PDD1701095132.[3] Most disturbingly, the MDL Repository reveals that OptumInsight (through its predecessor Ingenix) prepared a white paper in 2002 for Purdue Pharma for purposes of "medical education" which includes messages of "pseudoaddiction" (p.14), argues that "[i]f a physician prescribes a pain medication in good faith, anyone who leaves that physician's care with an addiction probably already had a problem when the treatment began" (p.14), asserts that patients with prolonged opioid therapy "do not usually develop addictive behavior" (p.14), suggests that "behaviors that may suggest addiction sometimes are simply a reflection of unrelieved pain" (p.14), states that "patients can take increasing doses of opioids, as pain persists, without serious side effects" (p.15) and, incredibly, states as fact that "opioids taken for intractable pain do not have a ceiling dosage" (p.15). See Ingenix Medical

---

[2] Visibility into the Optum family tree is becoming clearer as organization charts trickle into the MDL Repository and connections are made from publicly available documents. There exists a holding company for several "sister" corporations including OptumRx and OptumInsight. OptumRx was formerly incorporated as Prescription Solutions before it was rebranded. OptumInsight was formerly incorporated as Ingenix before it was rebranded.

[3] This document was produced by Purdue Pharma and designated as confidential. The document refers to the Pharmaceutical and Therapeutics Committee (P&T Committee) which is the subject of an ongoing discovery dispute. The parties continue to meet and confer regarding a modified protective order related to the disclosure of the names of P&T Committee members, hence this document will not be placed in the public record. The PEC will submit the document for *in camera* review if necessary.

4

Education "*Chronic Pain Management*" (October 1, 2002) (PPLPC000014773) (attached Exhibit 6).  The existence of this document is prima facie evidence in support of the PEC's position on temporal scope and directly refutes the position taken by Optum.

The importance of the recent discovery of "*Chronic Pain Management*" in the MDL Repository cannot be understated.  In the context of this discovery dispute regarding temporal scope, OptumRx submitted a position paper to Special Master Cohen arguing that a "handful" of pre-2006 purported studies does not justify a broader temporal scope.  See OptumRx position paper to SM Cohen (March 18, 2024) (March 26, 2024) (designated CONFIDENTIAL- ATTORNEY EYES ONLY[4]).  Optum omitted reference to *Chronic Pain Management*.  The PEC seeks to expand the record beyond the factual allegations in the complaint through the discovery process.  The PEC asserts that two Optum sister corporations, operating side-by-side under the same corporate umbrella, promoted wide-scale use of opioids and simultaneously profited through rebates on every pill sold to its customer base across the nation.  These allegations are serious and, if proven through the discovery process, will dramatically shape the trial of this matter.  Optum will not open this door without judicial intervention.

The PBM defendants' mantra that they were passive witnesses to the opioid epidemic is a false narrative.  The PBMs were active participants in the early stages of the Purdue Pharma story and profited greatly throughout the opioid epidemic through rebates and administrative fees paid by Purdue Pharma and other opioid manufacturers.  For these reasons, the PEC requests this Court order the temporal scope of discovery to relate back to January 1, 1996.

---

[4] The PEC is unsure how to reference submissions from a party to the Special Master designated as CONFIDENTIAL – ATTORNEY EYES ONLY.  This Court has authority and the means to access the submissions proffered to the Special Master.

5

Dated:  April 15, 2024						Respectfully submitted,

                                          Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
1311 Ponce de Leone Ave., Suite 202
San Juan, PR  00907
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

*/s/Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## **CERTIFICATE OF SERVICE**

    I hereby certify that on April 15, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

                                          */s/Peter H. Weinberger*
                                            Peter H. Weinberger