# EXHIBIT 2



**LEVIN PAPANTONIO RAFFERTY**

Proctor | Buchanan | O'Brien
Barr | Mougey | P.A.

| | | | |
|---|---|---|---|
| KIMBERLY LAMBERT ADAMS | BRENTON J. GOODMAN | CARISSA PHELPS (LICENSED ONLY IN CALIFORNIA) | LEFFERTS L. MABIE, JR. (1925-1996) |
| BRIAN H. BARR | CHELSIE L. GREEN | A. RENEE PRESTON | D.L. MIDDLEBROOKS (1926-1997) |
| BRANDON L. BOGLE | ROBERT M. LOEHR | PAGE A. POERSCHKE (LICENSED ONLY IN ALABAMA) | DAVID H. LEVIN (1928-2002) |
| W. TROY BOUK | M. JUSTIN LUSKO | MARK J. PROCTOR | STANLEY B. LEVIN (1938-2009) |
| WESLEY A. BOWDEN | NEIL E. McWILLIAMS, JR. | TROY A. RAFFERTY | FREDRIC G. LEVIN (1937-2021) |
| VIRGINIA M. BUCHANAN | PETER J. MOUGEY | MATTHEW D. SCHULTZ | LEO A. THOMAS (1934-2021) |
| J. CALEB CUNNINGHAM | TIMOTHY M. O'BRIEN | W. CAMERON STEPHENSON | RETIRED: |
| SARAH SHOEMAKE DOLES (LICENSED ONLY IN MISSOURI AND ILLINOIS) | MIKE PAPANTONIO | THOMAS A. TAYLOR | M. ROBERT BLANCHARD |
| | SARA T. PAPANTONIO | REBECCA K. TIMMONS | MARTIN LEVIN |
| LAURA S. DUNNING (LICENSED ONLY IN ALABAMA) | CHRISTOPHER G. PAULOS | CHRISTOPHER V. TISI (LICENSED ONLY IN WASHINGTON, D.C. AND MARYLAND) | CLAY MITCHELL |
| | EMMIE J. PAULOS | | OF COUNSEL: |
| JAN K. DURRANI | MADELINE E. PENDLEY | BRETT VIGODSKY | WILLIAM F. CASH III |
| JEFF R. GADDY | ALYSON M. PETRICK (LICENSED ONLY IN MISSOURI AND WASHINGTON D.C.) | HILARY WOOD | C. ANDREW CHILDERS |
| RACHAEL R. GILMER | | | ROSS M. GOODMAN |
| | | | BEN W. GORDON, JR. |
| | | | LARUBY MAY |
| | | | WILLIAM B. YOUNG, JR. |

March 7, 2024

***VIA EMAIL***
ESI Defense Counsel
esi-opioids@quinnemanuel.com

Olga,

    This letter follows up on ESI's temporal scope proposal discussed on our February 21, 2024 meet and confer and the parties' related correspondence and provides the PEC's position.

    Thank you for walking through your proposed time frames. The discussion helped us understand the factors informing ESI's position that the time frame for discovery should be narrower than a baseline of 1996 to present. As promised, we have carefully considered each of your proposals and weighed them against the evidence of ESI's various roles related to the creation and fueling of the opioid epidemic. After consideration and review of the evidence, we still maintain that **1996 is the appropriate beginning temporal period for most of Plaintiffs' Initial Discovery Requests**.

    While we are willing to agree on later start dates where appropriate, **January 1, 1996 is our baseline position**. The Court's rulings found in DR 2 and DR 3 establish that the relevant time period for discovery for claims based on manufacturer's sale and promotion of prescription opioids is one year before product was launched.[1] Thus, for Purdue the relevant time period began in 1995, one year prior to the release of OxyContin. The same analysis underpinning the manufacturer temporal scope rulings applies to the PBMs because of their early, extensive, and varied work with and for the manufacturers' opioid products at issue in this litigation.

***ESI's Collusion with Opioid Manufacturers to Create and Expand the Opioid Market Dates Back to the Mid-1990's***

    As alleged, ESI was deeply imbedded with Purdue and the other opioid manufacturers dating back to at least the release OxyContin. For example, in 1996 Medco initially recognized

---

[1] During the February 28 status conference, Judge Polster confirmed and reconfirmed that the previous rulings in this case apply to the PBM Defendants *See, e.g.*, 2/28/2024 Tr. at 14:6-9.

OxyContin's potential for abuse. Indeed, Medco installed strict quantity limits (80 mg/day)[2] in 1996 and sent letters to prescribers stating that it would not pay for prescriptions for non-cancer pain treatment ("Medco prescriber letters").[3] Because Medco was one of its largest customers, Purdue recognized the Medco prescriber letters were an existential threat to Purdue's business and set forth to convince Medco that OxyContin would be profitable for the PBM.[4]

Purdue's plan worked. Starting in 1997, Purdue and Medco worked hand in hand to expand the opioid market for "not only cancer pain, but for chronic non-malignant pain" using Medco data and interventions.[5] During this same time period, Medco also worked "behind the scenes" with Purdue to persuade several of Medco's largest clients (including PBM Defendant Optum's affiliate insurer UHC) to lift any utilization management ("UM") restrictions they were contemplating in order to increase OxyContin sales, beginning in the late 1990s.[6] Medco made critical UM decisions—such as doubling its OxyContin quantity limit in 1997 and then again a few years later (to an astonishing 320mg/day).[7] Documents related to both Medco's initial resistance to OxyContin in 1996 and subsequent whole-hearted endorsement in 1997 are unquestionably relevant to our case.

The evidence establishes that Express Scripts worked in partnership with Purdue to draft an OxyContin introductory article that was then published in the Express Scripts newsletter later that year. The article was used to inform and educate the over 5,000 Express Scripts physicians who write schedule II & III narcotics.[8] In 1997, Purdue signed its first pharmaceutical rebate contract with Express Scripts for OxyContin.[9]

---

[2] PDD1715057333 [PBM Bellwether Plaintiff Webb County, Texas' 12/15/2023 Supplemental And Amended Allegations To Be Added To The Second Amended Complaint (Dkt. 5296-5) ("Webb Compl") at ¶ 19]

[3] E513_00006452; E513_00045035; [Webb Cmpl ¶ 19]

[4] E513_00045035; [Webb Cmpl ¶¶ 21, 247, 249]

[5] E513_00022558 (in 1997 Medco partnered with Purdue to develop an OxyContin "switch program" and Purdue recognized that "Medco is a huge customer and the potential gain from this effort could dwarf that of many other opportunities."); PKY180313267; PKY180314568; PKY180313884 (In 1999, Medco procured training for its pharmacists from Purdue's speaker consultants regarding chronic pain management and the use of OxyContin); PPLPC012000064369 (In 2003, Medco worked with Purdue to develop educational programs to "stave off any formulary restrictions," and to disseminate Purdue created "educational" materials advocating for OxyContin use for chronic pain and downplaying the risks of addiction); [Webb Cmpl ¶¶ 301-304, 315-320]

[6] PPLPC029000064034 ("Ed [Adamcik of Medco) says that the reason they have been able to keep various clients from placing a PA on Oxy[Contin] has been the value of the rebates to them . . . [Medco] has had a special arrangement with Purdue for several years . . ."); PPLPC012000067648 ("I do see tremendous value in the data that Ed (Adamcik of Medco) is willing to provide. . . We have eliminated many attempts to [prior authorizations] and place [quantity limits] on product through this type of process."); PPLPC029000087372 (Medco convinced UHC to double proposed quantity limit on Oxy); [Webb Cmpl ¶¶ 25, 302-305]

[7] PDD1715057333. PPLPC012000064369; [Webb Cmpl ¶¶ 253, 658]

[8] PPLPC035000002485

[9] PDD1701198993

Likewise, OxyContin was approved for placement on Express Scripts's formulary in the first quarter of 1996. From the beginning, Purdue recognized the vital importance of favorable Express Scripts formulary placement to the success of OxyContin.[10] Further, similar to Medco, in the 1990s and early 2000s Express Scripts also worked directly with Purdue on numerous programs to disseminate "educational" materials targeting patients, dispensers, and high prescribers of OxyContin advocating for opioids in chronic pain treatment and downplaying the risks of addiction, as well as the Purdue Indigent Patient Assistance Program ("IPAP") to increase demand, establish goodwill with prescribers, and provide public-relations benefits).[11] In fact, by 2000, because Express Scripts was doing so much business with and work for Purdue, it caused Richard Sackler to question employees about the "huge" charges from Express Scripts.[12] In that same 2000 email chain, a Purdue employee explained that the amount was so high because it combined the $500,000 in IPAP charges with "rebates to their PBM side".[13] In 2001, Purdue contracted with Express Scripts for "Professional Services". These services included "Physician Education Programs" where Express Scripts used its proprietary database to identify the top 1,900 physicians with the highest prescribing rates in order to distribute these educational materials.[14] These joint efforts were (at least in part) prompted by Express Scripts' desire to "squelch the anti-OxyContin pushback from their clients (Managed Care Organizations and Employer Groups) due in large part to the national media attention OxyContin is receiving."[15]

Express Scripts engaged in these actions, even though it knew as early as 2001 that OxyContin use was being attributed to overdose deaths. For example, in 2001, Purdue gave a presentation to Express Scripts detailing a "Situation Review" of OxyContin. That presentation referenced certain OxyContin "hot spots" like Huntington, West Virginia and St. Louis, Missouri where OxyContin use was rampant.[16]

In sum, Plaintiffs have alleged—and thousands of documents produced by the opioid manufacturers confirm—that Express Scripts and Medco were engaged in misconduct that contributed to opioid epidemic since at least 1996. While Plaintiffs could have made the case for an earlier time period, we believe 1996 is a reasonable starting time given the evidence and is

---

[10] PKY181315989 (1998 Purdue letter discussing the advantages of preferred status on Express Scripts formularies); E01_00026278 (Purdue email discussing Express Scripts and Medco granting OxyContin preferred formulary status "This is a huge opportunity for us."); [Webb Cmpl ¶¶ 246-247, 249, 261-263]

[11] PPLPC029000040033; PDD8801134968; PPLPC036000005058; PPLPC021000012726; PPLPC028000124995; PPLPC029000016774; PPLPC029000020703; PPLPC009000021695; PPLPC036000005057; PPLPC029000045118; PPLPC028000031679; [Webb Cmpl ¶¶ 315-316, 319-320, 322-326]

[12] PDD8801109760

[13] *Id.*

[14] PPLPC035000006501; [Webb Cmpl ¶ 325]

[15] PPLPC029000040033; [Webb Cmpl ¶¶ 28, 324]

[16] PPLPC035000005854

proportional to the needs of the case. The temporal scope for ESI's discovery should thus begin January 1, 1996.

Of course, Plaintiffs concede that not every request seeks discovery analogous to the manufacturer discovery under DR 2 and DR 3, and, according, the 1996 temporal period may not necessarily apply to every request. For example, Plaintiffs' Requests 16 and 17 seek contracts and communications with opioid distributors. ESI has represented that it only has such documents in its role as a Mail Order Pharmacy. If that is true, Plaintiffs agree that 2006 would be an appropriate beginning temporal period for the majority of that discovery, consistent with the Court's prior rulings on the temporal scope for Pharmacy Defendant discovery.[17]

***ESI's Flawed Positions Underpinning Its Proposed Abbreviated Temporal Periods***

Based on our discussion, it appears ESI's proposed narrower time frames are based on a few misapprehensions. First, ESI appears to be misaligning itself more with distributors and pharmacies than with manufacturers. As discussed above, the evidence shows that ESI's role in bringing about the opioid epidemic is much more analogous with that of the manufacturers – particularly since, dating back to the 1990s, ESI not only was responsible for the placement and handling of opioids on its formularies, but ESI and/or its subsidiaries also had various business dealings with, contracted with, and worked for multiple manufacturers (e.g., Purdue) *specific to those manufacturers' opioid products* (e.g., OxyContin). The same reasons which informed the manufacturer-related temporal scope rulings contained in Discovery Ruling ("DR") 2 and DR 3 are applicable to the PBMs here.

Second, ESI's temporal scope positions also appear to conflate relevancy questions with various conclusory burden arguments. For example, ESI's argument that the 2006-time frame applicable to distributor and pharmacy discovery should be revised to 2012 if applied to PBMs is based entirely upon a misplaced and artificial burden argument. By way of example, the pharmacy defendants to whom that 2006-time frame applied either are still in litigation in the MDL or only reached settlements in the last few years, such that they, too, have been required to produce documents spanning nearly 20 years. Another example of ESI's improper conflation of burden and relevancy is ESI's effort to apply certain hard temporal cut offs based largely on the availability of the most accessible forms of electronic data. While an appropriate showing of burden may inform narrower discovery of certain categories of documents, an unsupported claim of burden should not be used to preemptively cut off a relevant time period across the board.

---

[17] A known exception to this limit would be evidence of Express Scripts's roles regarding Patient Assistant Programs. Plaintiffs allege that since at least 1996 Express Scripts and/or its subsidiaries played multiple roles in Purdue's and Endo's respective patient assistance programs ("PAP"), roles which were not just limited to operating as the mail order pharmacies for these programs. ESI's involvement in the PAP is more closely related to ESI's role in working with manufacturers to facilitate opioid sales and marketing. Thus, for distributor contracts and communications related to ESI's work involving the PAP, the temporal scope should begin in 1996.

With respect to discovery related to opioid use and abuse, ESI appears to be laboring under a misapprehension that the relevant timeframe should be cabined to a timeframe beginning in the "late 2000s" when the term "opioid epidemic" became more widely known. As we discussed, ESI had insider knowledge akin to that of the manufacturers regarding the risks and dangers of opioids, and yet, like the manufacturers, ESI worked to promote and facilitate widespread prescription opioid use. These facts took place well before the "late 2000s" time frame ESI posited as being relevant to opioid use and abuse discovery.

Additionally, though we appreciate that you have offered to go back to 1996 to search for responsive documents to two discovery requests which seek communications and contracts with manufacturers (Requests 14 and 15), we cannot accept your requirement that we only pursue electronic discovery and forego any paper discovery in exchange for that offer. Many key documents and communications may only exist in paper format given the timeframe at issue.

*Next Steps*

After significant attempts to find common ground, it appears that the parties are at an impasse. To that end, we would like to schedule a meeting with Special Master Cohen to discuss these temporal scope disputes.

Sincerely,

Laura S. Dunning

cc: PEC and Bellwether Counsel
Special Master Cohen