# EXHIBIT 3

**SIMMONS HANLY CONROY**
A NATIONAL LAW FIRM

SIMMONSFIRM.COM
(800) 479-9533

March 11, 2024

VIA EMAIL

Special Master David Cohen
2240 Chagrin Blvd., Suite 300
Cleveland, OH 44122
David@SpecialMaster.Law

Re:     *PEC Position Paper on Optum Defendants Temporal Scope Discovery Dispute*

Dear Special Master Cohen,

The PEC and OptumRx have reached an impasse regarding the temporal scope for OptumRx's discovery responses and production.[1]  Plaintiffs believe that 1996 to the present is the appropriate temporal period for discovery in this case.  OptumRx has taken the position that 2012 is the appropriate start date for most of Plaintiffs' requests.  While OptumRx has indicated that there may be some requests for which they would search for and produce documents that pre-date 2012, they have categorically refused to search for and produce any documents back to 1996.

OptumRx's position is untenable, as it ignores the time period surrounding the allegations in Plaintiffs' complaints.  Plaintiffs allege, among other things, that OptumRx colluded "with Purdue Pharma and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees" and that they colluded with and aided and abetted "Purdue Pharma and other opioid manufacturers in the fraudulent and deceptive marketing and oversupply of opioids."[2]  This conduct is intertwined with the conduct of the manufacturers.  Thus, the timeframe for OptumRx's discovery responses should be aligned with the manufacturer timeframe established in DR 2 and DR 3, which is one year before the opioid was launched.  For Purdue's OxyContin, the relevant time period begins in 1995, one year prior to the product's release. 1996 is, therefore, the appropriate start of the temporal period for Plaintiffs' discovery requests.

Manufacturer productions to the MDL are replete with examples of OptumRx, then known as Prescription Solutions (a/k/a RxSolutions), engaging in rebate negotiations with and entering

---

[1] The parties have engaged in at least two meet and confers and have exchanged numerous written correspondence on this issue, including but not limited to, Plaintiffs' February 13, 2024 deficiency letter; Defendants' February 28, 2024, March 1, 2024, and March 6, 2024 responses thereto; and Plaintiffs' March 5, 2024 and March 11, 2024 letters summarizing the aforementioned meet and confers.

[2] Plaintiff Webb County, Texas' 12/15/2023 Supplemental and Amended Allegations to Be Added to the Second Amended Complaint (Doc #:5296-5) ("Webb Compl." at ¶ 3).

*We stand for our clients.*

HEADQUARTERS
One Court Street
Alton, IL 62002
TEL: (618) 259-2222
FAX: (618) 259-2251

NEW YORK
112 Madison Avenue
New York, NY 10016
TEL: (212) 784-6400
FAX: (212) 213-5949

CHICAGO
230 W. Monroe
Suite 2221
Chicago, IL 60606
TEL: (312) 759-7500
FAX: (312) 759-7516

SAN FRANCISCO
455 Market
Suite 1150
San Francisco, CA 94105
TEL: (415) 536-3986
FAX: (415) 537-4120

LOS ANGELES
100 N. Sepulveda Blvd.
Suite 1350
El Segundo, CA 90245
TEL: (310) 322-3555
FAX: (310) 322-3655

ST. LOUIS
231 S. Bemiston
Suite 525
St. Louis, MO 63105
TEL: (800) 479-9533

into rebate agreements with Purdue Pharma as far back as 1995 and entering into research study agreements with Purdue beginning in 1999.  Further, documents demonstrate that the collusion between OptumRx's sister company, OptumInsight (f/k/a Ingenix), and Purdue to develop studies that would support the false claim that opioids were not addictive began in 2000, at the latest.[3]

**OptumRx (f/k/a Prescription Solutions) began its partnership with Purdue Pharma in 1995.**

OptumRx has confirmed that Prescription Solutions was "rebranded" as OptumRx in 2011 and that OptumRx's discovery responses include or will include Prescription Solutions documents and information. In 1995, Prescription Solutions entered into an agreement with Purdue for rebate payments for Purdue opioids.[4]  While the 1995 agreement was limited to rebates for Purdue's "Company Products" dispensed to members of Prescription Solution health plans,[5] in 1996 Purdue announced the addition of OxyContin to its product line and wrote to Prescription Solutions to include 80 mg OxyContin in the parties' existing contract.[6]  In 1997, the Purdue rebate sheet included rebates for OxyContin in various strengths,[7] as did the Pharmaceutical Rebate Agreement between the parties in 1998.[8]  In 1999, a Purdue Account Executive noted that Prescription Solutions' contract would expire later that year and that the company wanted Purdue to provide increased rebates or an "educational grant" of $100K for each year of the two-year contract.[9]

These rebate agreements incentivized Prescription Solutions to provide reimbursement for OxyContin prescriptions, even those prescriptions that fell outside of Purdue's own liberal guidelines and encouraged OxyContin prescribing.  In 2001, Prescription Solutions and Janssen conducted a study of the prescribing patterns for OxyContin, MS Contin, and Duragesic from 1997 to 1999.  The study found that Prescription Solutions provided reimbursement for OxyContin and Duragesic during this time, that it was reimbursing prescriptions for non-malignant pain, and that it was reimbursing prescriptions whose amounts exceeded the manufacturers' labels for these drugs.[10]

Prescription Solutions' agreements with Purdue during this time were not limited to rebate agreements.  A June 1997 "Prescription Solutions Purdue Pharma L.P. Business Plan" describes a partnership between the two companies where Purdue would provide "educational materials, in-service programs, speaker/lecture programs" and "tools and materials to help with the assessment of better pain management," while Prescription Solutions would provide "target audiences and . .

---

[3] While counsel for OptumRx has taken the position in meet and confer calls that it is not prepared to discuss whether the other named UnitedHealth Group entities' proposed temporal scope will begin in 2012, Plaintiffs anticipate that these entities will respond in lockstep with OptumRx on this issue or will otherwise not agree to Plaintiffs' timeframe of 1996 to present. Counsel for the UHG Defendants has taken the position that they are not required to answer discovery on behalf of UnitedHealth Group and the other entities named in Plaintiffs' Complaints until March 21, 2024, provided that Plaintiffs enter into (and the Court adopts) a proposed stipulation preserving the UHG entities' jurisdictional defenses.
[4] PKY180310826.
[5] Id.
[6] PKY180454999.
[7] PKY180241332.
[8] PKY180420372.
[9] PKY180315847.
[10] See JAN-TXMED-00222827.

. data that will ensure a successful program."[11]   In 1999, Prescription Solutions told Purdue that they were "opened [*sic*] to working with Purdue and . . . [having Purdue] submit a proposal/guidelines . . . [Purdue] would like to implement" in the study.[12]   Later that year, Prescription Solutions approached Purdue, offering to conduct a retrospective study "to assess utilization patterns for pain medication."[13]

By December of 2000, Prescription Solutions and Purdue were negotiating a Master Services Agreement, that would "govern the general terms of the working relationship between Purdue and Prescription Solutions."[14]   Pursuant to this Master Agreement, Prescription Solutions would perform services for Purdue in accordance with Project Specification Orders.[15]   The first Project Specification Order was for a "Low Back Pain Analgesic Use, Usual Care Study" that would be co-authored by Purdue and Prescription Solutions researcher, Jeff White.

## OptumInsight's collusion with Purdue began in the early 2000s.

From the early 2000s at the latest, OptumInsight (f/k/a Ingenix) worked with Purdue to generate clinical studies, educational materials, and marketing programs that would convince patients, prescribers, payors, and the public that long term opioid use was appropriate for the treatment of chronic pain and that opioids were not addictive.[16]   As late as 2000, UnitedHealth Group ("UHG"), through its subsidiary OptumInsight, was pitching Purdue on ways that it might partner with Purdue to leverage UHG data to create studies, marketing messages, develop algorithms, and provide regulatory support so as to simultaneously downplay opioids' addictive properties and expand their use and availability throughout the country.[17]   For example, in 2000 and 2001, OptumInsight worked with Purdue to develop algorithms and studies to identify chronic pain patients.[18]   In 2000, OptumInsight developed a study that would mine UnitedHealthcare ("UHC") data to develop "the chronic pain patient identification algorithm."[19]   In 2001, OptumInsight contracted with Purdue to conduct a study called "Profiling the OxyContin Patient," which also utilized UHC data.[20]   The goal of the study was to assist Purdue in shifting formulary discussions with PBMs and health plans.[21]   Purdue funded the study, in part, to counter the focus in the market on "recent cases of diversion that have raised issues regarding the appropriateness of product utilization" and "premium pricing" of OxyContin.[22]

---

[11] PDD8801285481.

[12] PKY180315847.

[13] PPLPC029000008826; PPLPC029000008828.

[14] PPLPC037000006203.

[15] PPLPC037000006205.

[16] OptumInsight, Inc., (f/k/a Ingenix, Inc.) is a subsidiary of UnitedHealth Group and is a named Defendant in the PBM tracks.

[17] PPLPC031000022448.

[18] PPLPC028000016640; Webb Compl. at ¶343.

[19] PPLPC028000016640.

[20] PKY181047060.

[21] Id.

[22] Id.

March 11, 2024
Page 4

OptumInsight's work with Purdue continued in 2002, when OptumInsight created a "Chronic Pain Management" program which would be used to "educate" UHC providers, and whose goal was to "optimize patient care in the treatment of chronic pain."[23]  The program included statements such as, "patients with chronic pain treated over extended periods of time may develop tolerance and physical dependence, but these patients do not become addicted."[24]

These are only a few examples of the many studies and programs that OptumInsight and Purdue worked on in their efforts to expand the market for OxyContin.  Their partnership continued through the early 2000s until at least 2015.

In sum, Plaintiffs' allegations and the documents produced by manufacturers demonstrate that the appropriate time period for discovery is 1996 forward.

Respectfully submitted,

/s/ *Laura S. Fitzpatrick*

Laura S. Fitzpatrick

cc:    All Counsel of Record (via e-mail)

---

[23] PPLPC035000015628; Webb Compl. at ¶344.
[24] PPLPC035000015628.

4