# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*City of Rochester v. Purdue Pharma L.P.*, No. 19-op-45853 (Track 12)<br><br>*Lincoln County v. Richard S. Sackler, M.D.*, No. 20-op-45069 (Track 13)<br><br>*City of Independence, Missouri v. Williams*, No. 19-op-45371 (Track 14)<br><br>*County of Webb, Texas v. Purdue Pharma, L.P.*, No. 18-op-45175 (Track 15) | MDL No. 2804<br><br>Case No. 1:17-md-2804<br><br>JUDGE DAN AARON POLSTER |

## PLAINTIFFS' OPPOSITION TO PBM DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S ORDER REGARDING THE GEOGRAPHIC SCOPE OF <u>PBM DATA TO BE PRODUCED</u>

The Court should overrule the PBM Defendants' Objection to the Order Regarding Geographic Scope of Discovery. Dkt. # 5395.  Statewide PBM data is relevant and discoverable because, as Rule 26 permits, it is reasonably likely to lead to the discovery of admissible evidence. In fact, the data itself is likely admissible into evidence. Further, requiring production of statewide data is consistent with the Court's prior orders regarding dispensing and ARCOS data, and the PBM Defendants have failed to demonstrate any real burden that is disproportionate to the need and relevancy of the information sought.

**Procedural Background**

After receiving written submissions and hearing oral arguments from the parties, Special Master Cohen issued a ruling that the appropriate geographic scope for PBM data is statewide. Pursuant to Fed. R. Civ. P. 53, the PBM Defendants have objected to this ruling. The ruling of the Special Master was correct, and the Special Master did not abuse his discretion. Therefore, the ruling should be adopted in its entirety.[1]

In addressing the Defendants' significant lapses in providing necessary discovery, Special Master Cohen undertook a thorough procedure. This involved comprehensive written submissions,[2] meet and confers among the involved parties, an in-person hearing, and thorough deliberation. This process spanned nearly two months, ensuring a diligent and exhaustive examination of the matter at hand.

As to the geographic scope of discovery of the PBM Defendants' claims data, the Special Master struck a compromise, consistent with prior orders in this case, requiring that Defendants produce claims data on a statewide basis for all three states in which there are bellwether cases. Defendants objected to this ruling, largely because of the alleged burden of searching and producing statewide PBM data. Yet the Special Master expressly considered the Defendants' burden concerns, weighed those against the need and relevancy of the discovery, and issued a ruling that is well within the bounds of his discretionary authority.

---

[1] This Court's Appointment Order provides: "As provided in Rule 53(f)(4, 5), the Court shall decide de novo all objections to conclusions of law made or recommended by the Special Masters; and the Court shall set aside a ruling by the Special Masters on a procedural matter only for an abuse of discretion." ECF No. 69 at 5.

[2] Defendants' filings provide this Court with some of the relevant correspondence with the Special Master. Rather than provide additional copies of these documents, in order to complete the record, Plaintiffs submit a Mar. 11, 2024, email from J. Gaddy to Cohen (Exhibit A) and the transcript of the March 28th hearing (Exhibit B).

**Argument**

Rule 26 authorizes discovery of:

any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26. The rule further notes that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." "[T]he scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad." *Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (citing *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389 (6th Cir. 1998)). This well-established standard applies here, and *Helena Agri-Enters. v. Great Lakes Grain, LLC*, 988 F.3d 260, 273 (6th Cir. 2021), cited by PBM Defendants, does not hold to the contrary. In that case, the court upheld a lower court denial of additional discovery, holding that it would not outweigh the "proportionality" concerns implicated by the delay and cost generated by continued discovery. *Id.* at 273. To the extent this analysis applies, it supports affirming the Special Master's ruling.

The discovery required by the Special Master is undoubtedly relevant. Plaintiffs' complaints allege that PBM Defendants' ability to analyze data relating to drug utilization and prescribing patterns across millions of members and, by their own description, billions of claims in diverse geographic locations and thereby to identify problem patterns and other red flags, not just in the bellwether jurisdictions but through the United States, could and should have guided their actions. Plaintiffs' complaints further allege that rather than use this extensive data to limit problematic opioid utilization or investigate outlier prescribers, Defendants sold the data and even partnered with drug manufacturers to promote opioids. Further, at times, certain PBM defendants used their data to identify high prescribers of opioids and target them with materials filled with myths about the use of

3

opioids to overcome the resistance doctors had to prescribing dangerous opioids. The statewide data called for by the Special Master's Ruling on the geographic scope of discovery is thus relevant to the claims set forth in the complaints.

The discovery required by the Ruling is certainly proportional to the issues of this case, which seeks remedy for the most significant man-made public health crisis in modern history. Rule 26 requires that proportionality be assessed with reference to "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26.  Defendants do not contest most of the proportionality factors. They do not, and could not, disagree that the issues at stake in this action are of the utmost importance. Similarly, the amount in controversy—the amounts needed to address the opioid epidemic—are large by any conceivable measure. The information sought is in the exclusive possession of the Defendants, which are substantial, for-profit corporations with annual revenues exceeding $100 billion; Plaintiffs, by contrast, are municipal entities whose already limited resources have been further taxed by the need to address the public health crisis in their communities. The discovery being sought—detailed claims information about opioid utilization, adjudication, prescribing and dispensing patterns during the period that the epidemic was created—is fundamental to resolution of the questions raised in this case.

The remaining issue is one of burden.  Defendants insist that the scope of claims data ordered is too burdensome and have submitted declarations documenting that alleged burden. First, the PBM Defendants' core business involves data mining, organization and delivery of services revolving around the data.

For example, in a publicly-available video presentation in 2017, OptumRx's David Beshara talked to a group of healthcare professionals about OptumRx's nascent opioid management programs

4

which, per Mr. Beshara's presentation, were targeted at, among other things, "minimizing early exposure" and "reducing inappropriate supply." In the presentation (which as of April 12, 2024 at 2:30 p.m. EST could be viewed online at this link: https://www.optumlabs.com/events/opioid-insights-day-2017/domain1.html), at approximately the 20-minute mark of the video, Mr. Beshara identifies these goals and asks, "how do we do this?"

> He then provides a specific data driven answer to his own question:
>
> Starting with pharmacy and medical data: *I have billions of claims. Literally, billions of claims.* Every claim that we go through, goes through an algorithm. This is all happening in real time at the pharmacy. When you go to the pharmacy, in micro-seconds, I know if my patients are on a concurrent Benzo, I know what the dose is, I know what the days supply is, I know what other drugs you're taking, and I can have real time POS [point of sale] edits[3] going through making sure everything is happening appropriately.
>
> Then we take it and we put it into a rules engine. What do we want to be happening at the pharmacy level? Does that pharmacy – do we want to stop that claim? Do we want to pay for that claim? Do we want to reduce supply? Do we want to make sure we have an intervention with the physician? Do we want to send a letter to the patient? Lot of different ways we can intervene. We can engage in many different ways. So the first engagement we look at is the claim itself. So as we go into this rules engine, if that claim is not in alignment with CDC guidelines, we can physically stop that claim.
>
> After we allow that claim to pay, we can also then look at things in aggregate. *I can take my billions of claims, medical and pharmacy, and say, "do I see patterns"?* Is there anything happening from a pattern standpoint where I can look at a patient, a physician, and look at them retrospectively? We can intervene with them live, one on one, peer to peer, or we can intervene with them from a letter standpoint. … As you begin to compile that data, if you see patterns that are constantly looking for exceptions, you can address those.

These public statements, among others, highlight that any claims of burden must be assessed in light of the fact that PBMs publicly tout their data expertise – "real time" data analysis and access to "literally billions of claims" – as one of their salient distinguishing factors.

---

[3] POS, or point of sale, edits are rules (such as quantity limits, etc.) implemented by PBMs that govern the adjudication of claims in real time as the retail pharmacy (the "point of sale") is dispensing the prescription drug to the patient member.

5

Second, to the extent a statewide geographic scope increases any burden, that burden must be weighed against the magnitude of the crisis the Defendants are alleged to have created and the scale of profits Defendants are alleged to have earned while doing so.

PBM Defendants also argue that Plaintiffs have not offered any reason why a statewide geographic scope is proportional to the needs of each particular PBM bellwether case. To the contrary, in their written submissions as their arguments to the Special Master, Plaintiffs have set out that the red flag analysis, which Plaintiffs have employed in prior case tracks, looks for patients who traveled more than 25 miles to visit a pharmacy (pharmacy shoppers) as well as patients who traveled more than 25 miles to visit their prescriber (doctor shoppers).  PBM Defendants argue that the appropriate geographic scope for PBM data is each bellwether jurisdiction and its contiguous in-state counties and that this extends to area greater than 25 miles.[4]  What PBM Defendants fail to grasp is that the most egregious examples of this test show patients who travelled extremely long distances, sometimes hundreds of miles, to find either a doctor that would prescribe them opioids or a pharmacy that would fill their prescription.  This is why in prior tracks, Plaintiffs initially sought nationwide data. Plaintiffs have maintained—and continue to believe— that the information sought should be produced on a nationwide basis. However, consistent with the historical rulings of this MDL, including DR-2 and Dkt. 3371, here Plaintiffs sought claims, rebate, administrative fee, and mail order dispensing data on a statewide basis for bellwether states. *See* Ex. A (Mar. 11, 2024, email from J. Gaddy to Cohen).

In addition, it is clear from documents produced by the PBMs that they analyze their own data on national and statewide levels. For example, Express Scripts published a 2014 report entitled

---

[4] OptumRx points to an offer OptumRx made after the Special Master Cohen's ruling in which OptumRx offered to extend the geographic scope to include PBM data for residents of bellwether jurisdictions who filled prescriptions at pharmacies anywhere in the State. Plaintiffs did not accept this offer, which was only offered by OptumRx, for a number of reasons, including that it does not cover both of the tests that Plaintiffs run.

"Nation in Pain" containing statewide and national analysis of opioid usage. In the introduction to the report, Express Scripts described its methodologies as follows:

> To gain a deeper understanding of these concerns [regarding opioid prescribing], Express Scripts conducted an in-depth examination of more than 36 million de-identified pharmacy claims from 6.8 million insured Americans of all ages who filled at least one prescription for an opioid to treat short-term or longer-term pain from 2009 through 2013. Prevalence, utilization and costs were evaluated during the five-year study period, including assessments of trends according to age, gender and geography. The research also looked at users prescribed opioids in combination with other medications. The analysis looked at both short-term use and longer-term use of opiate pain medicines; however, the majority of this report focuses on longer-term opioid use given the clinical complexities, and the risks of drug dependence and addiction commonly associated with longer-term opioid treatment.
>
> For the purposes of this research, short-term users were defined as patients who were prescribed an opiate pain medication for a total supply of 30 days or less within a one-year period. Longer -term users were defined as those prescribed an opiate pain medication for more than a 30-day supply in a one-year period.
>
> The analysis assessed the amount of medication used by patients by examining three metrics: number of prescriptions filled, days' supply (the number of days of medication per prescription), and the morphine equivalent dose (MED).

*See* https://www.express-scripts.com/corporate/drug-trend-report/nation-pain-us-opioid-trends.

Thus, requiring the PBMs to produce statewide data is not imposing any burden on them that they do not already take on themselves, including in the opioid context.

Moreover, it may be impossible to bring Defendants to account for the harm they have caused if they are not required to provide the evidence in their possession establishing their misconduct. Having wreaked havoc on Plaintiffs' communities and created a public health crisis of such scale, Defendants cannot now argue that they should be shielded from discovery of their actions because it is "too burdensome" to disclose.

Defendants state that discovery as required under the Ruling cannot be completed in the time allotted.[5] Defendants have not supported their statewide discovery burden assertions with any concrete evidence or data. Other than arguing that the data is significantly larger statewide than in the four bellwether jurisdictions – which is obvious and hardly a new fact – the defendants have provided the court with no information describing the difference in the quantity of statewide data versus their proposed jurisdiction plus contiguous in-state counties.  Nor have defendants quantified the difference in expense of producing this data on a statewide basis versus their jurisdiction limited proposal. It is rather a fictionalized argument untethered to any real information that the court could use to analyze the claimed burden.

This argument also ignores the modern-day PBM business model, which tracks sales and customer information every day across the nation, and then uses that data to make forecasts and business decisions on an ongoing basis.

Further, on numerous prior occasions in this MDL, defendants' attempts to geographically narrow their production has resulted in additional discovery disputes and motions practice, often delaying the production rather than simply turning over the entire data set. Even if the defendants were to provide evidence that the statewide data for the three bellwether states would result in a significant expense, that number would pale in comparison to the billions of dollars these defendants generated from opioid sales, let alone the cost of the epidemic to the bellwethers.

---

[5] Express Scripts PBM Defendants estimate it would take approximately 12 to 16 weeks to collect, restore and produce PBM data for the bellwether jurisdictions and their contiguous in-state counties. *See* Def. Ex. 1 ¶¶ 5–6, 12.  Similarly, OptumRx claims that "querying and extracting data for a larger geographic region (such as an entire state) will increase the complexity of the data pull and increase the time associated with completing the data pull." See Def. Ex. 2 ¶ 12.  The current deadline for data production is June 14, 2024.  *See* Dkt. 5282.

**Conclusion**

The PBM Defendants complain that the Special Master's Ruling fails to impose an appropriate geographic limitation on discovery because it requires the production of statewide data when the Plaintiffs comprise only a small subset of that data. This argument is not new. Defendants in prior tracks argued that discovery should have been limited to the Plaintiffs' jurisdiction. *See* Dkt # 785; 786; 3383. This Court has consistently ruled statewide data was appropriate. *See* Dkt. # 868; 3389.

For the reasons laid out above, and in the extensive previous briefing and correspondence on this subject, Plaintiffs respectfully request that this Court reject Defendants' objections to the Ruling on geographic scope and permit the relevant and proportional discovery ordered by the Special Master to proceed without further delay.

Dated: April 17, 2024               Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
270 Munoz Rivera Avenue, Suite 201
San Juan, PR 00918
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

<i>s/Peter H. Weinberger</i><br>
Peter H. Weinberger (0022076)<br>
SPANGENBERG SHIBLEY &LIBER<br>
1001 Lakeside Avenue East, Suite 1700<br>
Cleveland, OH 44114<br>
(216) 696-3232<br>
(216) 696-3924 (Fax)<br>
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 17, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

<i>s/Peter H. Weinberger</i><br>
Peter H. Weinberger