# EXHIBIT B

1

1          IN THE DISTRICT COURT OF THE UNITED STATES
              FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3

    IN RE:                  Case No. 1:17-md-2804
4   NATIONAL PRESCRIPTION     Cleveland, Ohio
    OPIATE LITIGATION
5                   March 28, 2024
                    9:36 a.m.
6

7

8                 - - - - -

9

10      TRANSCRIPT OF DISCOVERY CONFERENCE PROCEEDINGS

11                 BEFORE THE

12        SPECIAL MASTER DAVID R. COHEN.

13

14                 - - - - -

15

16

17

18

19

20

   Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
21                  7-189 U.S. Court House
                  801 West Superior Avenue
22                  Cleveland, Ohio  44113
                  216-357-7087
23                  Susan_Trischan@ohnd.uscourts.gov

24

25

 1    APPEARANCES:

 2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                   Paul T. Farrell, Jr., Esq.
 3                                 Joseph F. Rice, Esq.
                                   Peter J. Mougey, Esq.
 4                                 Mildred Conroy, Esq.
                                   Salvatore C. Badala, Esq.
 5                                 Linda J. Singer, Esq.
                                   Laura Fitzpatrick, Esq.
 6                                 Jayne Conroy, Esq.
                                   Maria Fleming, Esq.
 7                                 Anthony D. Irpino, Esq.
                                   Anthony J. Majestro, Esq.
 8                                 Josh Wackerly, Esq.
                                   Joanne Cicala, Esq.
 9

10    For Defendants OptumRx:      D. Andrew Hatchett, Esq.
                                   Emily C. McGowan, Esq.
11                                 Caroline R. Strumph, Esq.
                                   Bradley Harder, Esq.
12                                 Kimberly Chemerinsky, Esq.

13
      For Defendants Express
14    Scripts:                     Jonathan G. Cooper, Esq.
                                   Matthew K. Wasserman, Esq.
15                                 Sage R. Vanden Heuvel, Esq.
                                   Haley Plourde-Cole, Esq.
16

17
      Proceedings recorded by mechanical stenography;
18    transcript produced by computer-aided transcription.

19

20

21

22

23

24

25

THURSDAY, MARCH 28, 2024, 9:36 A.M.

1

2          SPECIAL MASTER COHEN:  Good morning,
3    everybody.

4          If I haven't met you, I'm David Cohen.

09:36:50  5          Welcome to Cleveland.  It's a sunny day,
6    not what we usually get, so enjoy it.

7          All right.  So first of all, we've got an
8    open phone line.  People are listening and they are muted
9    to us.  They are not muted to each other, which means
09:37:06 10   that if you hear kids and dogs screaming in the
11   background, it's because somebody on the phone hasn't
12   muted themselves.  And everybody on the phone can talk to
13   each other, but we're not going to hear you.

14          Both for people on the phone and also for
09:37:23 15   our court reporter Sue Trischan, if you would speak into
16   the microphone, that would be great.

17          Also, Sue is very good and knows some of
18   you but not all of you, and I don't either, and so if
19   every time you would identify yourselves for the record,
09:37:39 20   I think that would be helpful for the transcript and for
21   everybody here.

22          So thank you all for coming.  It was a
23   little bit of short notice, but it felt like we had
24   enough to talk about that it made sense to get together.
09:37:50 25   Some of you folks can actually look each other in the

1    eye, see who it is that you're talking to when you're

2    arguing on the phone when I'm not around, and maybe make

3    some progress that way.

4            So what my plan is today is to go through

09:38:08  5    all of the agenda issues, not in the order they are

6    listed.

7            I may rule on some of them.  I make take

8    some of them under advisement.  I may give you some

9    suggestions on how you can go forward.

09:38:27 10            And we'll probably take lunch, you know,

11    12:00, 12:30, depending on how it goes.  Is everybody

12    flying out today?  Everybody flying out this afternoon?

13    What's the earliest flight that people have to get to?

14            3:00 o'clock?

09:38:45 15            MR. BADALA:  11:00 o'clock.

16            SPECIAL MASTER COHEN:  1:00 o'clock, is

17    that what you said?  You're going to miss your flight.

18            I imagine we won't last until 2:30, I'm

19    guessing that it won't take that long, but we'll see.  So

09:38:57 20    hopefully that gets everybody to where they need to be.

21            Okay.  So with that, we'll get started.

22            The first thing I want to talk about is

23    DR-22.  This is a bit of a cleanup, I think.

24            My sense is that after the Judge issued his

09:39:15 25    recent order on the motion to disqualify Motley Rice,

1    that his discussion of DR-22 was clarifying.

2              And so I don't care who goes first, but if

3    somebody could tell me where that is and whether there

4    are any issues that still need to get mopped up.

09:39:40  5              MR. FARRELL:  I don't care --

6              SPECIAL MASTER COHEN:  If no one talks, I'm

7    going to assume everything is happy and fun.

8              MR. FARRELL:  I don't think everything is

9    happy and fun, but I think it's on the direction.  This

09:39:48 10   is Paul Farrell on behalf of the plaintiffs.

11             So we believe that or the PEC takes the

12   position that the order from Judge Polster on the

13   disqualification motion sets forth the obligations under

14   DR-22 as it applies to the PBM litigation.

09:40:13 15             So DR-22, as the order references, is more

16   than just a single discovery ruling.  It incorporates

17   rulings that came before and rulings that came after,

18   some of which were adopted in formal orders from Judge

19   Polster.

09:40:36 20             We'd also note that the order includes a

21   specific reference that unappealed orders from you,

22   Special Master Cohen, in the history of this litigation

23   has force and effect as if issued from the bench.

24             So we believe that the expectations from

09:40:58 25   DR-22 are now made clear.

1        With regard to Express Scripts and its

2    family of defendants, we believe that they have

3    identified and, as of March 15th, uploaded their complete

4    response to DR-22.

09:41:19    5        I'm unaware, sitting here today, that there

6    is anything in addition that they -- that Express Scripts

7    has not uploaded to the server.

8        That being said, as we are getting ongoing

9    notices that they are continuing their duty and

09:41:38   10    recognizing the obligation runs forward, so to the extent

11    that the PEC can identify additional areas of DR-22,

12    we'll continue that process.

13        Optum, the Optum family defendants, I

14    believe in their most recent correspondence which has

09:41:59   15    been within maybe even this week, I believe they have,

16    while withholding or reserving their right to appeal the

17    disqualification motion, I believe that they have

18    presently acknowledged they intend to comply with DR-22.

19        They have acknowledged that there are

09:42:19   20    additional documents that need to be disclosed, and that

21    they are in the process of complying with DR-22 and that

22    it will take some time.

23        So presently, other than the fact that they

24    need additional time to comply, I don't think the debate

09:42:39   25    any more is whether they must comply.

1

2          MS. SINGER:  Can I add one point to that?

3          Pete, you can still sit.

4          Linda Singer for the plaintiffs.

09:43:02  5          The only thing I would add, Special Master

6     Cohen, to Paul's report is the PEC has asked, pursuant to

7     prior discovery orders, that there be a list of DR-22

8     applicable matters which would allow us to evaluate fully

9     whether they are complete.

09:43:19 10          SPECIAL MASTER COHEN:  Okay.  So from the

11    plaintiffs' description, my sense is there is nothing for

12    me to resolve.

13          That's why I am here is to resolve

14    disputes, and I don't think I'm hearing anything that you

09:43:28 15   are suggesting I need to do, except turn to the

16    defendants and say, "Does that sound right and do you

17    think that you're going to get to where you need to get

18    to pretty quickly?"

19          MR. COOPER:  Special Master Cohen, this is

09:43:41 20   Jonathan Cooper for the Express Scripts defendants.

21          I think, in answer to your question, I

22    agree.  I don't believe there's a live dispute on this

23    issue right now.

24          To update Mr. Farrell's comments, we did

09:43:54 25   make an additional DR-22 production just this morning, so

1   obviously I don't expect the plaintiffs to have had a

2   chance to look at that yet.

3           And I do want to make clear, we are, in

4   light of Judge Polster's ruling last week, we are going

09:44:06  5   back, we have gone back and actively looking to see if

6   there are any additional productions in our possession

7   that should be produced under DR-22.

8           So that process is ongoing right now.

9           Like I believe I said this in an e-mail

09:44:20  10   last week, we're aiming to try to complete that within

11   the next, I believe, two-and-a-half weeks from this

12   point.

13          Obviously we understand the obligation's

14   ongoing, so if we learn more down the line, we will

09:44:32  15   produce those promptly once we learn about them.

16          SPECIAL MASTER COHEN:  Thank you.

17          MR. HATCHETT:  This is Andrew Hatchett for

18   the Optum defendants.

19          With respect to DR-22, at the time of the

09:44:44  20   disqualification motion, the only matters that I'm aware

21   of that were in dispute as to whether or not they were

22   within the scope of DR-22 were the three Motley Rice-lead

23   investigations that we identified in those papers.

24          Everything else that we are in the process

09:45:00  25   of producing or have produced, I think that we had always

1    agreed were subject to DR-22.  It's just a process for

2    rolling those out.

3              With respect to the three Motley Rice

4    investigations -- so that was the Hawaii, the D.C. and

5    the Chicago investigations -- in response to Judge

6    Polster's order, we are preparing to produce those

7    materials.

8              Some of them have been produced.  I think

9    the only ones that we're missing today are the documents

10   related to the City of Chicago investigation.  We did not

11   have those in our possession, and so we are gathering

12   those from the counsel that lead those investigations and

13   are preparing them for production.

14             As we said in the e-mail, and as

15   Mr. Farrell accurately summarized, you know, we do

16   disagree with the discussion of DR-22 as it relates to

17   the three Motley Rice-lead investigations.

18             Our concern is that, you know, those

19   investigations are investigations that the plaintiff, the

20   PEC, has said were not opioid-related.  We have

21   acknowledged that opioid documents were found in those

22   productions.

23             Documents -- and when I say "opioid

24   documents," I just mean it could be a spreadsheet that

25   references a ton of drugs, including an opioid.  It could

1    be a document that references a lot of manufacturers and

2    includes Purdue.  There are issues in those documents

3    that may relate to the issues in this case, but the

4    investigations themselves were not opioid-related.

09:46:24  5              And so --

6              SPECIAL MASTER COHEN:  All right.  So let

7    me touch on that real quick.

8              The Court's orders, which included my

9    orders, were, let's call it, imprecise, which is to say

09:46:38 10   that they weren't consistent.

11             Sometimes the Court said "Opioid-related

12   investigations" and sometimes the Court said "Documents

13   that are related to opioids."

14             And it was the -- I think it was the

09:46:52 15  shareholders suits that Walmart ended up getting

16   sanctioned where the Court made very clear, look, we're

17   talking about documents.  So it doesn't matter if it's an

18   opioid-related investigation.  It could be an

19   insulin-related investigation as a hypothetical, but if

09:47:06 20  in the insulin-related investigation there are documents

21   that are opioid-related, and even if you didn't realize

22   it at the time for good reason, but it becomes clear like

23   it is now that there are opioid-related documents in a

24   nonopioid-related investigation, those have to be

09:47:22 25  produced under DR-22.

1      That's my view.  I think that's the Court's

2   view.  I think that's the view that you all should take

3   going forward.

4      So I just want to be clear that every time

09:47:32  5   you refer to -- and maybe you're not doing it on purpose,

6   right?  But every time you refer to opioid-related

7   investigation, it causes dissonance.

8      That's not what we're talking about any

9   more.

09:47:43  10      MR. HATCHETT:  So we definitely understand

11   that to be what Judge Polster said in his order.

12      That is, I think, something that we have

13   concerns about, but we do understand that to be what the

14   order says.

09:47:52  15      I think the reason that we have concerns

16   about it is because, you know, the company over the years

17   has been involved in hundreds -- I mean, I don't know,

18   thousands of lawsuits.

19      And so, I mean, there's a question of is

09:48:02  20   there a burden now on an obligation for us to go into the

21   production files of every litigation we've ever been

22   involved in to assess whether or not there's a document

23   in that production file that discusses opioids, and then

24   produce it?

09:48:15  25      And then there's the second question of say

09:48:28

1  we have a patent litigation and so that patent litigation

2  has nothing to do with opioids, and an opioid document

3  was referenced in that production, do we now have an

4  obligation to reproduce the entirety of the production

5  file from the patent litigation?  Or is it just that we

6  pull out the opioid-related documents?

7          So as we understand the Court's order with

8  respect to the three Motley Rice insulin investigations,

9  even though the investigations themselves were not

09:48:41 10  focused on opioids and even though many, many documents,

11  probably the majority of the documents have nothing to do

12  with any issue in this case -- I mean, I think the

13  Chicago investigation was about false claims; I don't

14  know all the details -- but unrelated to opioids, and so

09:48:59 15  we now understand that we are being required to produce

16  those documents into the MDL because a document or some

17  documents in those investigations related to opioids.

18          And so the result would be an enormous

19  volume of documents that have nothing to do with any

09:49:13 20  issue in this case that are now being swept into the

21  Court's order, so I don't know if you can provide clarity

22  on that aspect.

23          But with respect to where we are today, we

24  are complying with the Court's order and producing all

09:49:25 25  documents from the Hawaii, D.C. and Chicago

1    investigations, notwithstanding our objection that that

2    is well beyond what should be ordered in the MDL and is

3    beyond what Rule 26 would contemplate or require, but

4    we're going to comply with the order.

09:49:40  5              SPECIAL MASTER COHEN:  Thank you.

6              So again, I don't think there's anything

7    for me to resolve.

8              I appreciate your asking me for

9    clarification.  I'm a little reluctant to do that because

09:49:48 10   I think the Judge was trying to do that with his order.

11             I will say that with regard to patent

12   litigation, there was an order somewhere that

13   specifically said patent litigation is not -- doesn't

14   count; don't worry about patent litigation.

09:50:00 15             The problem, and I get that -- I get what

16   you're saying, right?  Where you're sitting is, "Who

17   knows how many productions we've had in the past however

18   many years.  Now we have to go back through them all?"  I

19   get that.

09:50:19 20             There are some, though, that you can

21   probably think, "Yeah, this one we should probably look

22   at" and some that you can think, "It's probably not going

23   to be an issue."

24             I mean, so you're going to have to do

09:50:28 25   triage.  You're going to have to look at the ones that

1 are most likely to be at issue in this case.

2 I think you do need to create a list for

3 the plaintiffs, as the Judge has suggested, both of you,

4 and that shouldn't take too long, right?  I mean,

09:50:41 5 obviously it's going to take longer to produce documents

6 than to create lists, and so you should do that quickly.

7 Part of the DR-22 analysis, in fact a lot

8 of the DR-22 analysis was you've already produced it;

9 it's not much of a burden to reproduce.  It's not like

09:50:58 10 you're going back and finding documents.

11 And so when you say that, "Chicago has a

12 lot of documents that we don't even think are relevant,"

13 well, plaintiffs probably disagree to some extent.

14 And it's the fact that you are reproducing

09:51:11 15 documents already produced that makes it actually easier

16 to just give all of Chicago over instead of going through

17 it and figuring out which -- it's actually more

18 burdensome to go through Chicago and figure out, "Well,

19 which are the opioid-related documents?  And then we'll

09:51:26 20 get into arguments over what those are with plaintiffs."

21 It's easier just to give them all over.

22 So I'm kind of riffing on what you're

23 saying, but I do understand that that creates a tricky

24 thing for defendants.  And so my suggestion, the way to

09:51:41 25 come at that is just to be realistic and look at those

1    prior productions that you've made that are more likely

2    to have something, some documents in them that are

3    opioid-related and some that aren't.

4                    MR. HATCHETT:  Yeah.

09:51:57  5          And that's helpful, you know, with respect

6    to identifying investigations.

7                    I would say that with respect to the three

8    Motley Rice investigations, those are not investigations

9    that prior to the Court's order or that even the

09:52:09  10   disqualification fight we would have identified.

11                   It was not until, I mean, candidly, there

12   was a declaration that was put in in connection with that

13   disqualification motion that basically said, "There were

14   no opioid documents that were included in those

09:52:22  15   investigations."  That was the PEC's declaration; a

16   Motley Rice attorney said that.

17                   And so then we said, "Is that true?"

18                   So then we started looking through the

19   contents of those investigations, and only because they

09:52:34  20   said there were no opioid documents in there did we look

21   and find out, oh, in fact, there were a bunch of opioid

22   documents in the investigations.

23                   And so that's -- I think when I talk about

24   the burden, one of the difficulties is there's a burden

09:52:47  25   of the reproduction side, but there's also a burden on

1    the identification side.

2              And so if it is, in fact, requiring us to

3    go through the production files of a bunch of litigations

4    that we wouldn't have otherwise listed because on their

09:53:00  5    face they don't relate to opioid-related issues, that

6    becomes an enormous burden.

7              And what I hear from this Special Master

8    this morning or from you this morning is that we can take

9    a realistic approach to this, and so if at first glance

09:53:16 10   we look at it and we don't have the reason to believe

11   that there's going to be opioid documents related to a

12   patent case or a tax case or some other unrelated

13   litigation, that we don't have a burden to go through and

14   analyze the production files, to pull out opioid-related

09:53:30 15   documents.

16             But our objection isn't just burden.  I

17   mean, so when we talk about the City of Chicago, I would

18   say of the three investigations that we identified, it

19   was the most attenuated as it relates to opioids.

09:53:41 20             So the real issue came from a set of

21   documents that were first produced to the Minnesota

22   Attorney General in an insulin-related investigation.

23   Those were reproduced in Hawaii, reproduced in D.C.

24   Actually, I don't believe they were reproduced in

09:53:57 25   Chicago.

1          And so now in Chicago we're actually

2     producing -- we're going to be producing several thousand

3     documents, literally none of which I believe are relevant

4     to any issue in this case.

09:54:06  5          And so it becomes not just a burden issue,

6     it becomes a relevance concern.  And so we are concerned

7     that the Court's order has required us to produce, by

8     drawing in litigations that are not facially about

9     opioids, a large volume of documents that truly are

09:54:24  10    irrelevant.

11          And you can imagine why a defendant in a

12    case --

13          SPECIAL MASTER COHEN:  You get to bury them

14    with documents that they're going to have to go through

09:54:32  15    and find nothing, so that's --

16          MR. HATCHETT:  Well, you can understand

17    that a defendant dealing with --

18          SPECIAL MASTER COHEN:  I've got you.

19          MR. HATCHETT:  -- you know, class action

09:54:39  20    plaintiffs' attorneys is not eager to turn over a bunch

21    of documents --

22          SPECIAL MASTER COHEN:  No.

23          MR. HATCHETT:  -- that are unrelated to the

24    issues that are cited or identified in their complaint.

09:54:46  25          But that's where we are.  I don't believe

 1   that there's a live issue for Your Honor to resolve.  We

 2   have very serious reservations about the order, but we

 3   are going to comply with it.

 4                SPECIAL MASTER COHEN:  I appreciate that.

 5   Thank you.

 6                MR. FARRELL:  Can the PEC respond?  We have

 7   a couple things to say about this.

 8                SPECIAL MASTER COHEN:  Very briefly, only

 9   because we have a lot to talk about, and this is one of

10   the things that there's nothing for me to resolve.

11                MR. FARRELL:  No, based on the statements,

12   there is something for you to resolve.

13                SPECIAL MASTER COHEN:  Go ahead.

14                MR. FARRELL:  So, number one, I'm not going

15   to get into the rhetoric of the Motley Rice

16   investigations or the other language that has triggered

17   animosity between the sides.

18                We're not asking them to produce irrelevant

19   information.  What we're asking them to do is to comply

20   with your orders, and that is for them, the obligation is

21   on them to identify investigations, hearings, deposition

22   transcripts, pleadings, discovery, that relate to what

23   we're doing here today, so that this, this entity, this

24   MDL serves as the document repository.

25                That is an order that we want you to

1    enforce and tell them they need to identify.  This isn't

2    go fish where we go and say, "Hey, we found an opioid

3    overutilization hearing in Congress that you didn't tell

4    us about."

09:56:10    5        So I get it when there's patent and

6    peripheral information, but when these set of defendants

7    receive inquiries from the United States Senate on opioid

8    overutilization, that is something that should have been

9    disclosed up front.

09:56:27   10        So, number one, is we're asking you to

11    enforce the portion of the order that the obligation is

12    on the defendants to produce a list of those

13    investigations that they believe are related to or comply

14    with the DR-22.

09:56:46   15        That's number one.

16        SPECIAL MASTER COHEN:  Right, which I think

17    I just did.

18        Go ahead.

19        MR. FARRELL:  Then number two is that we

09:56:52   20    also want this to apply to all of the Optum defendants.

21        So part of the, I believe, Express Scripts

22    has acknowledged that it will be responding on behalf of

23    DR-22 on behalf of all of its corporate defendants named

24    in this case.

09:57:09   25        I do not believe we're there yet with

1   Optum.

2              MR. HATCHETT:  At this time we're not aware

3   of any for the other nine defendants.

4              I mean, nine of them just responded to

09:57:23 5   discovery for the first time seven days ago, and so for

6   those I'm not currently aware of anything that would be

7   subject to DR-22.

8              We will -- we will continue to review it.

9              With respect to the -- one thing I do want

09:57:33 10   to clarify.

11              With respect to the Motley Rice

12   investigations, I said we're complying with the Court's

13   order.

14              One of the things I think we clarified in

09:57:40 15   our e-mail is that they have requested those documents

16   independent through discovery requests, and so I think

17   technically we would say that we were providing them in

18   the context of those discovery requests as opposed to the

19   Court's order.

09:57:50 20              It's kind of a wash either way, but for

21   purposes of preserving the objection.

22              SPECIAL MASTER COHEN:  As long as they end

23   up in the repository.

24              MR. HATCHETT:  Understood.

09:57:58 25              SPECIAL MASTER COHEN:  So, I mean, look,

1   the Judge has tried to be very clear.

2            I think you understand the obligation.

3            I get that the plaintiffs

4   are -- have -- are sensitive about it.  Ultimately, if

09:58:08 5   there is something that's in the heartland that you don't

6   list and produce, then you're going to get spanked.  So I

7   think I'm not going to worry about it because I think you

8   understand that.

9            I think that's all I need to say at this

09:58:21 10  point.

11           Okay.  All right.  Let's go to the next

12  issue.  I want to talk about, for about a

13  minute-and-a-half, what is Agenda Item 347, that is the

14  defendants' failure to comply with the Facts Sheet order.

09:58:39 15           The reason I'm bringing this up next is

16  because, like DR-22, I don't think there's anything for

17  me to resolve.

18           My reading of the parties' submissions is

19  that you all are doing what you're supposed to do, and

09:58:51 20  maybe there's a little bit of an argument about when you

21  started and when you're going to finish, but I don't

22  think there's anything for me to say except that you need

23  to do what you have said you're going to do and are in

24  the process of doing.

09:59:03 25           Is there anything more that I need to say

1    about that?

2              Okay.  All right.

3              MR. BADALA:  I'm sorry, Special Master

4    Cohen, I wanted to make just one point about it.

09:59:16  5              One thing that we're looking for

6    clarification is defendants responded that they're going

7    to abide by the order and actually submit a Fact Sheet,

8    which they haven't.

9              But which defendants will they be

09:59:27 10    submitting Fact Sheets for?  Will they be submitting

11    Optum for all of the parties, and then an Express Scripts

12    for all of the parties, or will they submit for each one

13    of the parties that's in this litigation?

14              MR. COOPER:  Your Honor, Jonathan Cooper

09:59:41 15    for Express Scripts.

16              We're putting together the full defendant

17    Fact Sheet for all of the Express Scripts defendants in

18    these cases.

19              MR. HARDER:  Brad Harder for the Optum

09:59:54 20    defendants.

21              We're doing the same for all of the

22    entities listed in your letter, Sal.

23              MR. BADALA:  Thank you.

24              MR. FARRELL:  That was Sal Badala on behalf

10:00:07 25    of the plaintiffs.

1          SPECIAL MASTER COHEN:  Okay.  The next one

2     I want to address is Agenda Item 343.  This is the scope

3     of the opioid drugs to be produced.

4                And, you know, the essential argument, as I

10:00:19  5     read it, is what I call the MDL-8 versus also the

6     additional three, the additional three being codeine,

7     Tramadol and Buprenorphine.

8                So I think I want to start with plaintiffs.

9     And I don't know who's going to talk about this one, but

10:00:46 10     so in your letter you explain how there are documents

11     which I looked at that talk about, for example, Tramadol

12     and you assert/suggest that those documents show that the

13     PBMs knew that Tramadol was a drug that there was an

14     issue about; that they had internal rules about making

10:01:11 15     sure that Tramadol was looked at carefully, red flagged

16     and so on, but that they didn't do it and, therefore,

17     that that is relevant to your case.

18                And so they should -- "they," the

19     PBM -- should produce documents that have to do with

10:01:29 20     Tramadol.  Same to some extent with codeine.  Same to

21     some extent with Buprenorphine.

22                The PBMs respond that, "We've done the

23     MDL-8 from the beginning.  There were attempts by

24     plaintiffs earlier to add other drugs, which the Court

10:01:48 25     said no to, and that the burden of producing those

1    additional three drug documents and data is high and

2    isn't worth the -- the squeeze isn't worth the juice.

3    And moreover, it would require a lot more third party

4    discovery of defendants who have already settled:

10:02:17  5    Manufacturers, pharmacies and distributors."

6                    And so I have a few questions.

7                    One is the plaintiffs did not respond, that

8    I saw, in any way to the assertion by the PBMs that it

9    would -- it would thus require third party discovery.

10:02:38 10                    You never touched on it, and that goes to

11   burden.

12                    At the same time besides that kind of

13   simple description, we're going to have to do third party

14   discovery on these other guys.  I don't really know what

10:02:53 15   that means or why you would have to do it, so that's part

16   of what I want to hear and anything else you want to add.

17                    Obviously I've read it.  You don't need to

18   repeat things that I've read, but I would like to hear

19   your positions.

10:03:05 20                    MR. IRPINO:  Yeah, I didn't

21   understand -- Anthony Irpino for PEC.

22                    I didn't understand why third party

23   discovery was required, but I think as a more basic issue

24   is we were addressing, and have been addressing, the data

10:03:23 25   and pulling the data and running those searches.

1       So when we had the meet and confer, it was,

2  hey, just tell us what is the burden to pull the data for

3  these three additional drugs.  And there was nothing, no

4  burden.

10:03:42  5       Then it gets bootstrapped onto, "Well, if

6  we run data for these document -- for these other drugs,

7  then it's going to be all these other documents."

8       And we never even got to that point from

9  our perspective.  We were just focused on the data.  It's

10:04:01  10  data that gets run within these entities for purposes of,

11  you can call it, CDUR or Current Drug Utilization Review

12  as part of point of sale, as part of their programs that

13  they run for these pharmacies, to say, "Hey, look, you've

14  got Tramadol in here, you've got Buprenorphine combined

10:04:25  15  with this."

16       So that's where we were coming from on it.

17  And quite candidly, we thought we spelled it out fairly

18  well in terms of the various documents.  And we've got

19  plenty of others, if you need, to address the fact that

10:04:39  20  they actually used this in practice.

21       So from our perspective, they made this

22  data relevant as part of their practices, and so that's

23  where we're coming from on that.

24       SPECIAL MASTER COHEN:  Well, except that

10:04:50  25  it's not going to stop at data.  It's clearly going to --

1  you're not going to just want data on those three

2  additional drugs, you're going to want documents as to

3  those three as well.

4              In fact, you've cited them in your letters.

10:05:03  5  And so to the extent you want to make your case when it

6  comes time to a jury that part of what they didn't do are

7  Tramadol reviews, you're going to need documents.

8              And so let's get to documents.  They're

9  saying that that's going to increase the burden and get

10:05:19 10  to, you know, into third parties.

11              So what about that?

12              MR. IRPINO:  Well, I still to this day

13  don't understand the third party and why that's going to

14  involve third parties, and it just has never been

10:05:31 15  explained, as best I can understand it, and it certainly

16  was never a topic on our meet and confer.

17              But aside from that, then -- I still

18  haven't heard even with respect to documents, "Well, how

19  many additional hits are you getting, what are we talking

10:05:46 20  about, what's the scope," if we're going to go to

21  documents.

22              I mean, data is an important component of

23  it.  And our experts can review that data and be able to

24  opine on it, but if we go to the document aspect of it, I

10:05:59 25  haven't heard anything, I haven't seen any specifics as

1     to that burden, and I don't know what it is.

2            SPECIAL MASTER COHEN:  Okay.  Let's have

3     defendants try and explain to you.

4            MR. WASSERMAN:  This is Matthew Wasserman

10:06:15   5     for Express Scripts.

6            SPECIAL MASTER COHEN:  Could you pull the

7     mic a little closer?

8            MR. WASSERMAN:  Matthew Wasserman for

9     Express Scripts.

10:06:23 10            To your question, Special Master Cohen,

11     about what third party discovery we night need to take,

12     if the plaintiffs' theory here is that the marketing, the

13     distribution of these three drugs led to an opioid

14     crisis, there right now in the record is no evidence, no

10:06:40 15     discovery about how these drugs were marketed,

16     distributed or dispensed because none of the prior

17     defendants had these drugs as in scope.

18            So if the PBM defendants need to defend

19     themselves and say why we weren't responsible for the

10:06:55 20     marketing, why we weren't responsible for the

21     distribution, we would have to go back to those

22     defendants and understand how were they marketing and

23     dispensing these drugs.

24            Same is true with third parties.  The DEA,

10:07:11 25     for a couple of these drugs, didn't Schedule them until

```
           1   later in time.  Codeine was available over the counter

           2   until 2018.  That's all going to require discovery about

           3   why DEA chose to do what it did, and then how the

           4   manufacturers and the distributors responded.

10:07:30   5             Same is true for prescribers.  There's no

           6   evidence in the record, no discovery thus far on the

           7   prescribing habits surrounding these three drugs.

           8             So we were just talking about DR-22 and the

           9   efficiencies gained.  Well, the efficiencies gained of an

10:07:50  10   MDL and having this pot of discovery to rely on doesn't

          11   exist here.  There is no discovery on these three drugs.

          12             And if the PBMs are going to be blamed for

          13   an opioid crisis as it relates to these three drugs, we

          14   think we need -- we might need discovery from other

10:08:09  15   defendants and other third parties.

          16             MR. HATCHETT:  Your Honor, this is Andrew

          17   Hatchett for the Optum defendants.

          18             I agree with everything that Mr. Wasserman

          19   said.  In terms of individual burden, you know, data, of

10:08:26  20   course, as you pointed out, does eventually lead to

          21   documents and it goes from there.

          22             At this point in the discovery negotiations

          23   we've proposed 39 custodians.

          24             We don't have all our data ready to run

10:08:39  25   search inquiries to figure out exactly how many documents
```

1    are going to hit on these products.  The plaintiffs have

2    sent back a list of 81 additional custodians they would

3    like us to consider adding.  I don't know what number we

4    are going to land on, but it's going to be, you know,

10:08:52  5    several dozen custodians in the case.

6              I don't know what the numbers will look

7    like when they map out.  We can obviously get to that at

8    some point.  We're not there and able to document that

9    burden.

10:09:01 10             But the notion that there will be limited

11    or no burden is going to be plainly false.  I think we

12    will see that when we get into the documents and start

13    applying, if we were forced to apply these sort of search

14    terms to that broad range of documents.

10:09:19 15             MR. WASSERMAN:  Special Master Cohen, if I

16    could add one more thing.  This is Matt Wasserman again.

17             The idea that because the PBMs were

18    discussing the risks associated with these drugs in their

19    documents thereby makes them relevant is a false premise.

10:09:35 20             First off --

21             SPECIAL MASTER COHEN:  It makes them

22    discoverable; maybe not relevant.

23             MR. WASSERMAN:  Well, it could apply to any

24    defendant and any drug.

10:09:43 25             In fact, the PEC has cited previously

1    documents internally that the pharmacies had discussing

2    different drugs.

3                        That didn't open the MDL-8 and expand it.

4                        And they had these documents before they

10:10:01  5    filed their 300-page amended complaint, and they don't

6    mention codeine at all.  They don't mention Tramadol at

7    all.

8                        They cite tons of documents, Purdue

9    documents.  They cite our own documents that we've

10:10:16 10    produced in the Jefferson County litigation.

11                        They didn't put that in their 300 pages of

12    amended complaint, so we think it's -- it doesn't make it

13    relevant or even entitled to discovery because they

14    didn't allege in their complaint that these three drugs,

10:10:36 15    that we were a substantial contributor to an opioid

16    crisis because of these three drugs.

17                        SPECIAL MASTER COHEN:  Yeah, I'm not sure

18    that mentioning it explicitly in a complaint is what

19    decides this.

10:10:46 20                        So, Anthony, here's what concerns me about

21    the additional three.

22                        So codeine is a Schedule II.  Tramadol is a

23    Schedule III.  Codeine was over the counter for quite a

24    long time.  That's different from the MDL-8.

10:11:28 25                        Then you've got Buprenorphine.  I don't

1   even know what Schedule it is.  I think it's not a

2   Schedule II, but it's a rescue drug, and so the fact

3   that, as mentioned in your -- in somebody's letter, the

4   plaintiffs' letter, the Buprenorphine prescription rates

10:11:43   5   skyrocketed is probably because it's being prescribed as

6   a treatment, as a rescue drug.

7               And so you get to trial and now you've got

8   to explain codeine, which is making things that are

9   really complex even more complex.  You have to explain

10:12:00   10   Tramadol.  You have to explain Buprenorphine.  It makes

11   it more difficult.  And here's the kicker:  I doubt that

12   it's going to make a difference in whether you prove your

13   case.

14               You're either going to win or lose on the

10:12:15   15   MDL-8, and the addition of that other data is hard for me

16   to believe that that's going to change, change what

17   happens.

18               MR. IRPINO:  Well, I don't disagree that

19   certainly the MDL-8 is highly relevant.

10:12:32   20               What I would say is in terms of the data,

21   it informs a significant amount as to volume and

22   location.

23               And so as we spelled out in the briefs or

24   letters, some of these drugs, Special Master, I mean

10:12:53   25   Tramadol in terms of volume, in each of the Bellwether

1    counties, is a top three narcotic.

2              I mean, we didn't make up these numbers.  I

3    mean, that -- those are what the numbers are.

4              And so we also didn't just randomly select

10:13:10  5    these drugs.  There was rhyme and reason behind it.

6              The rhyme and reason both stem from

7    defendants' documents and how they were tracking these

8    drugs and how they were treating these drugs, as well as

9    the numbers with respect to those drugs.

10:13:25 10              So that's why a lot of our focus was on the

11    data.  At least give us the data so our experts can at

12    least analyze that and talk about these drugs in the

13    context of the epidemic.

14              MR. WASSERMAN:  Special Master Cohen, if I

10:13:43 15    can respond to that.

16              This is Matt Wasserman again.

17              So on the volume point, I think there's a

18    conflict between what the plaintiffs allege in their

19    complaint and what they're saying now.

10:13:53 20              In their complaint, they're alleging that

21    the PBMs sort of forced people to take more addictive

22    opioids and made it harder to go to less addictive

23    alternatives.

24              So the fact now that the PEC wants to cite

10:14:09 25    the fact that these three Schedule III or IV drugs which

1    the DEA says are -- have a lower potential for abuse,

2    have a lower risk of dependence, the fact that they were

3    becoming more prescribed in the 2015 to 2019 period,

4    which is where the PEC pulls this data from from ARCOS,

10:14:30   5    actually runs counter to their allegation that the PBMs

6    were targeting more addictive drugs and sending people

7    there.

8            And then on the second point for the data

9    being very important, when you look at something like

10:14:44  10   codeine, which was available over the counter until 2018,

11   people were not going to the pharmacy and running codeine

12   prescriptions through their pharmacy benefit.  They were

13   going to the shelf and taking it off the shelf.

14           SPECIAL MASTER COHEN:  Codeine is off the

10:15:04  15   table.  That's for sure not going to happen.

16           MR. WASSERMAN:  Okay.

17           So for Buprenorphine, exactly to your

18   point -- and again it goes along with volume -- the PEC

19   cites the fact that Buprenorphine prescriptions have gone

10:15:17  20   up a lot in the last few years.

21           Well, that's because it's a medication

22   drug.  It's a drug to help people with opioid use

23   disorder.

24           And Tramadol, a Schedule IV drug which the

10:15:33  25   DEA says has a low potential for abuse, if those

1    prescriptions are also going up, it's the same, same

2    reasoning applies, that people are potentially leaving

3    the more addictive Schedule II drugs and going to the

4    less addictive Schedule IIIs or IVs.

5            So we don't think that the plaintiffs can

6    have it both ways with the allegations in their complaint

7    that the PBMs are driving people to more addictive

8    opioids, but then cite the fact that less addictive

9    opioid prescriptions are going up.

10           SPECIAL MASTER COHEN:  One second, please.

11           Tramadol is a Schedule III, isn't it?

12           MR. WASSERMAN:  Tramadol, I believe, is

13    Schedule IV.

14           SPECIAL MASTER COHEN:  I believe Tramadol

15    is III and Buprenorphine is IV, or maybe I'm wrong?

16           MR. WASSERMAN:  I think they are switched.

17           SPECIAL MASTER COHEN:  Thank you.

18           MR. WASSERMAN:  And just to the point

19    about, you know, the similarity between codeine and

20    Buprenorphine, I believe you already considered

21    Buprenorphine in your January 27th, 2020 discovery

22    ruling.  That was with the pharmacies.

23           But you have the same thing where it was

24    introduced decades ago, codeine and Buprenorphine, in the

25    late 1960s, so if the plaintiffs are alleging an opioid

1   crisis that began in the '90s, you're now talking about a

2   drug that had been on the market for 30 years prior to

3   that.

4                    SPECIAL MASTER COHEN:  Mr. Irpino.

10:17:26   5                    MR. IRPINO:  Just here to answer questions.

6                    I think we've put in our briefs and I think

7   we've established why this is important, but I think

8   particularly for Tramadol.  And that's --

9                    SPECIAL MASTER COHEN:  So I guess I should

10:17:40  10   explain something procedural at this juncture which is

11   that if you go back and look at my appointment order, it

12   says that, you know, there are different ways that I

13   could rule.

14                    One of them is informally, and then if

10:17:53  15   somebody doesn't like it they can ask for me to formalize

16   that, which I've done many times in writing.

17                    The other thing it says, though, is -- and

18   I haven't done it very often -- is that I can rule on the

19   record and that stands as the ruling, and so if somebody

10:18:07  20   doesn't like it and they want to file an objection, it's

21   the ruling in front of the court reporter that serves as

22   the ruling to be objected to.

23                    And so I just want to let you know that

24   that's what's happening here today.

10:18:17  25                    That any rulings I do make on the record

1   are ones that, if you don't like, you would object to

2   that and not to something later that I put out in

3   writing, unless I do add something in writing later.

4           So the ruling that I'm issuing right now on

10:18:33 5   this is that I am concluding that the additional three

6   data is not going to be produced.  I think that the

7   burden does exceed the benefit in this case.

8           I think that it's going to lead to,

9   frankly, confusion at trial.  I think that especially

10:18:56 10   with respect to Buprenorphine and codeine, that it makes

11   very little sense for that additional data.

12           The Tramadol, frankly, was one that I

13   waffled on, but I do think that because it is a Schedule

14   IV or a Schedule III drug, actually doesn't matter, and

10:19:13 15   not a Schedule II like all of the rest of the MDL-8

16   drugs, and also that I just really do not believe that

17   the additional data of Tramadol in particular is going to

18   make any difference on whether plaintiffs prevail or

19   defendants prevail in this MDL, that that kind of

10:19:33 20   clinches it for me.

21           Not to mention the third party discovery.

22   And I do believe that the necessity of third party

23   discovery does go to the measure of burden under Federal

24   Rule of Civil Procedure 26(b)(1).

10:19:46 25           So I'm going to rule in favor of the PBMs

1    with regard to the scope of the opioid drugs.

2                 At docket -- I'm actually not sure where

3    the plaintiffs wrote it, but in one of their submissions

4    here's what the plaintiffs write, and I'm quoting.

5                 "Defendants have agreed to produce

6    transactional data including claims data, rebate data,

7    administrative fee data and dispensing data from its

8    mail-order pharmacies for eight opioid drugs" -- then

9    they list them -- "and for the 14 Benzodiazepines and

10   four muscle relaxers included in Exhibit B to docket

11   3106."

12                That's all that's required.

13                Okay.

14                All right.  Next one I want to touch on is

15   Agenda Item Number 342, which is the geographic scope of

16   CMO data to be produced.

17                And in this one, part of what makes it

18   difficult is that, as I just mentioned, there are

19   different data sets, right?  We've got claims data, we've

20   got rebate data, we've got administrative fee data -- I'm

21   not even sure I understand fully what that is -- and then

22   mail-order dispensing data.

23                And the letters the parties have traded

24   suggest that PBMs are trying to parse that; that the

25   plaintiffs want all the data for all of the states, all

1   of those different kinds of data for all of the three

2   states that are at issue, and the PBMs come back and say,

3   "Well, as to certain kinds of data, we're willing to do

4   this, and for certain kinds of other data, we're willing

10:21:47  5   to do that."

6   And to be honest with you, keeping all of

7   that in my head has not been easy, and so I'm not sure

8   that it's in there.

9   Let me start with what I think we do need

10:21:59 10   to do, and that is that I think that for Missouri it's

11   going to be statewide.  We've got two different counties

12   or plaintiffs, one's a city I think, but we've got two

13   different counties and also a State Court case, and so

14   Missouri is going to be statewide.

10:22:20 15   My inclination, but I haven't quite decided

16   it yet, is that will be true as to all data, all of those

17   different kinds, and then I have some ideas what to do

18   with Rochester, New York and Webb County, Texas.

19   But first, I want to hear some explanation

10:22:44 20   from defendants why it shouldn't be statewide; if it

21   shouldn't be statewide, what it should be; and if you

22   want to parse out different kinds of data, you can

23   explain that to me, too.

24   The one thing I'll mention, though, is, in

10:23:02 25   fact, let me just start with this clarification question

 1   from the plaintiffs.

 2              One of the things that the plaintiffs have

 3   said is the reason we need this data is because we have a

 4   red flag analysis that is a 25-mile radius.  And so we

 5   need data at the very least, dispensing data and maybe

 6   other kinds of data, that is within 25 miles of, let's

 7   say, the borders of the counties at issue, whatever that

 8   means.

 9              Why do you need anything more than that?

10   Why do you need anything more than 25 miles?

11              MR. MOUGEY:  This is Peter Mougey for the

12   PEC.

13              We have repeatedly demonstrated the

14   numerous examples when we are looking at a city or a

15   county in a specific state where a resident lives that is

16   driving either across state lines or to the other end of

17   the state for a prescription, and then driving to

18   the -- an opposite side of the state to get that

19   prescription filled.

20              And if we go back to your initial order --

21   forgive me for the rabbit trail for a second, but I find

22   it interesting that defendants are relying on prior

23   orders when it suits them, and now here we are where

24   there's an example where they don't want to comply with

25   the prior orders which are statewide.

1          And the evidence has come in repeatedly in

2   trial and trial after trial that individuals are filling

3   scripts that were generated all over the state, and then

4   are getting scripts and then filling scripts sometimes

10:24:42  5   hundreds of miles away.

6          And by limiting the data to just the

7   contiguous counties, you lose all of the examples of

8   those individuals filling those scripts.  All you have is

9   the surrounding counties.

10:24:59 10          So, yes, you're right, 25 miles, if it

11   exceeds 25 miles, but the most egregious is what happens

12   if they are 200 miles away?

13          And so you limited us, because we made the

14   point that if a city or county is on the edge of a border

10:25:15 15   on a state, that they could drive over to the other state

16   just as easy, that you said, "No, we're going to stick to

17   the state."

18          That model has limited us and balanced the

19   burden argument, but keeping within the state allows us

10:25:30 20   to give the examples to the Court and the jury of those

21   egregious examples where they are hundreds of miles away.

22          SPECIAL MASTER COHEN:  So my recollection

23   at trial, though, is that there were maybe, you know, the

24   occasional example of something like what you said where

10:25:47 25   somebody went to Florida, you know, hundreds of miles

1    away but the red flag analysis was a 25-mile analysis and

2    that was the heart of your claim.

3              MR. MOUGEY:  It was no -- it was 25 miles

4    or more.

10:25:58  5              And I've tried two cases and there

6    were -- there were a tremendous number, more than one or

7    two numbers of examples.  We had examples that were

8    entered into evidence where they drove across the

9    state -- I'm sorry -- all the way from one end of the

10:26:14 10    state to the other to get a script, and then drove a few

11    more hours out of the way to get the scripts filled.

12              And so these have been important examples

13    in trying the case because they're the most egregious.

14    If you kind of look at this as a heat map and code the

10:26:32 15    pink to red, red being the most egregious examples,

16    running just the contiguous, the data from just the

17    contiguous counties, you lose the reddest of the red, you

18    lose the worst and most egregious examples that there is

19    no plausible explanation for a patient driving that far

10:26:50 20    to get a script and then driving a few hours out of the

21    way on the return home to fill the script and then

22    returning back to their hometown.

23              So it's more than 25 miles.

24              So by just confining, which I'm confident

10:27:00 25    is what the defendants are trying to do, they're taking

1    away the hottest of the hot; not the ones that I was

2    going to work and I just happened to go out of my way to

3    get the -- when I was at work and get the script filled.

4    You're talking about driving all the way across the

10:27:16  5    state.

6              So these have been important pieces in the

7    cases that we've tried.  These are your prior orders, and

8    that it's statewide.  We still don't -- we lose the

9    example of someone going across state lines, but that was

10:27:28 10   the -- that was the burden balance argument.

11             I would like to remind you how many times

12   we've heard the burden argument from the beginning, and

13   how difficult it was to pull these, the rest of the data.

14   And I know you've heard me make this argument before, but

10:27:46 15   if you're pulling data for five counties in a state,

16   what's the difference with pulling it for 15 or 20?

17             And we've heard the defendants argue that

18   that just isn't right, that it doesn't scale.

19             It does scale.  And, quite frankly, we've

10:27:59 20   heard how voluminous the state is and how difficult it is

21   to pull, and then lo and behold come to find out it's

22   produced on a hard drive that we get at Lowe's -- not

23   Lowe's; at whatever -- Circuit City, and we load it into

24   our databases, go have dinner and come back, and it's

10:28:19 25   loaded.

1          I mean, these are not, these are not data

2     sets that burden should be a material piece of your

3     decision making.  These are scalable decisions, data

4     pulls.  Pulling them from five counties to the entire

10:28:34  5     state does not make a material difference on the burden,

6     and it is a very important part of the hottest of the hot

7     red flags and the example is more than 25 miles.

8          SPECIAL MASTER COHEN:  Would you

9     trade -- would you trade, let's say, double contiguous

10:28:53 10     counties, you know, the contiguous counties and those

11     that are contiguous to those in the neighboring state?

12          Would you take that?

13          MR. MOUGEY:  I'd have to look at a map and

14     see where each of these, each of these cities or counties

10:29:09 15     that are Bellwethers, and I think the answer, I think the

16     answer would be no, and that we'd like to stick within

17     the state, because that brings different PDMP data into

18     effect, and I think it would complicate.

19          My suggestion is this is a recipe that's

10:29:24 20     worked, and it's -- you've already balanced this issue.

21     There was subsequent motions filed on this, on this

22     issue.

23          You heard argument on multiple times, and

24     requests for reconsideration, and this was the balance

10:29:42 25     you struck, which is just the state.

1       It's worked and it's been an important part

2   of the evidentiary process in the cases and, quite

3   frankly, I think the results, because a lot of the

4   results are eye-popping and they're powerful, they're

10:29:58   5   extremely powerful with these examples.

6       And I understand why the defendants don't

7   want the Court or juries or the fact finder to see this,

8   but these are extremely powerful examples of -- these

9   should have popped like a -- like a compliance Christmas

10:30:14  10   tree.

11       MR. WEINBERGER:  Can I just add something?

12   Do you mind, Peter?

13       MR. MOUGEY:  Of course not.

14       MR. WEINBERGER:  Special Master Cohen,

10:30:22  15   Peter Weinberger.

16       The other thing that's different about

17   these defendants, then, the manufacturers and

18   distributors and even the pharmacies until late in the

19   discovery phase on the pharmacy side is that these

10:30:35  20   defendants, going back 30 years in their documents, have

21   touted the fact that they are data rich and that the

22   decisions that they make and recommend in the wide

23   variety of screening drugs and putting drugs on formulary

24   lists and the like and predicting trends is based upon

10:31:04  25   the fact that they are data rich.

1          And not only are they data rich, but they

2     provide their data and sell their data as well as

3     promoting the fact that their decision-making is based

4     upon data.

10:31:22  5          And so for them, for -- and it's all over

6     their contracts.  It's all over their rebate contracts.

7     It's all over their PowerPoints.  It's all over their

8     online promotional materials.

9          And so for them to suggest now that there's

10:31:42 10    some significant burden as opposed to being able to, you

11    know, hit a couple buttons, turn on their algorithms and

12    produce these, this data, I would submit to you -- and

13    we're not -- we're not making the argument here -- this

14    is -- this is a set of defendants where, despite what the

10:32:00 15    Sixth Circuit may have said, we should be getting

16    nationwide data from them, but we're not there yet at

17    this point.

18          But certainly with respect to statewide

19    data, I can't believe that any factfinder would find this

10:32:16 20    to be burdensome based upon how they promote the way they

21    do business.

22          MR. MOUGEY:  May I, just to finish?

23          We asked for nationwide data before, and we

24    felt the baselines were extremely important and when

10:32:31 25    comparing specific Bellwethers to other Bellwethers.  And

Case: 1:17-md-02804-DAP Doc #: 5482 Filed: 03/27/24 47 of 161. PageID #: 634026

```
 1            one of the reasons why we settled on that particular,

 2            just the state and pursuant to your order, was that we

 3            could at least establish a baseline within the state.

 4                      But the point Pete's making is exactly

10:32:45  5   correct, and that different than the dispensers, the

 6            manufacturers and the distributors is the marketing pitch

 7            from the PBMs.

 8                      And Pete used the word "data rich," which I

 9            think is perfect, but to add to that is that the data

10:33:05 10   sets that they contracted with third parties to harvest

11            and pull data and then resell it is part of contract

12            after contract after contract.

13                      So I believe it's disingenuous to walk in

14            front of the Court and now say it's burdensome when their

10:33:22 15   business model is harvesting, pulling and producing data.

16                      And we're now getting just a little glimpse

17            behind the curtain, that we're looking at the Purdue docs

18            and just a little more specific as to what Pete alluded

19            to is that the contracts are replete with, "We are data

10:33:43 20   businesses.  We gather the data.  We organize the data.

21            And we sell the data, and we help you position your drugs

22            based on our data analysis."

23                      So to now say this is burdensome to pull

24            is -- I just -- it's disingenuous.

10:34:04 25                   At least the statewide data is where I
```

1   think we start.  My guess is, as Pete indicated, there

2   might be a time where we come back to the Court where

3   we're going to look at expanding that, but it would be an

4   absolute travesty at this point to narrow your prior

10:34:18  5   order anything less than statewide for a number of

6   reasons.

7              SPECIAL MASTER COHEN:  Okay.  Why don't I

8   hear from the defendants?

9              And I will add that I don't know if you're

10:34:27 10  familiar with history, but the data production was

11  originally ordered nationally; then went to regional; and

12  then ended up at state.

13             And so essentially you're arguing for a

14  much narrower provision than what the Court originally

10:34:44 15  had thought.  I just wanted to let you know the history.

16             MR. WASSERMAN:  That's right.

17             This is Matthew Wasserman for Express

18  Scripts.

19             I'll go through the three points that I

10:34:54 20  think the plaintiffs raised.

21             First, starting with them losing the worst

22  examples; second, we've heard this all before, it's been

23  decided before; and third, the burden.

24             So on the losing the examples, I think it's

10:35:08 25  a proportionality argument.  It's a burden versus

1    benefit.  And I just want to give a couple hypothetical

2    examples.

3              You're talking about City of Rochester, New

4    York with a population of 210,000 people.  You

5    want -- the plaintiffs want to find the person who

6    traveled from Rochester throughout the State of New York.

7              Well, you talk about New York City with a

8    population of eight-and-a-half million people so you have

9    hundreds of thousands, if not millions of additional

10   claims that would have to be produced to potentially find

11   that one, two, three people who traveled -- I was doing a

12   lot of Google mapping this morning -- 340 miles or

13   five-and-a-half hours.

14             And of course, it could also capture

15   legitimate travel, people who need to go to hospital

16   systems or specialists in the city to, you know, obtain

17   treatment.

18             Webb County is maybe even more egregious

19   because Texas is even a larger state.  Webb County has a

20   population under 300,000 people.  The largest city in

21   Texas, Houston, with a population of 2.2 million people,

22   that's 300 miles away.  That's a five-hour drive.

23             To produce all of Texas's data, millions

24   potentially claims, to find the one, two, three examples,

25   we just think the burden there far outweighs the benefit.

1           And when they say this has been all decided

2   before, I think there are three reasons why PBM data is

3   different.

4           PBM data is different than retail pharmacy

10:36:53  5   data because PBMs adjudicate claims for a network of

6   pharmacies.  They adjudicate claims for pretty much every

7   retail chain, grocery chain, mom and pop, local chain.

8           So an order here ordering the PBMs to

9   produce statewide data is essentially the equivalent of

10:37:16 10   ordering a single retail pharmacy chain like CVS to not

11   just produce its data for its physical retail locations

12   in that state, but to basically produce data for all of

13   its competitors, too.

14           There are thousands of pharmacies in these

10:37:34 15   states that the PBMs adjudicate claims for.  So we put an

16   example of Walmart had about 170 retail stores in Ohio.

17   An order telling Walmart to produce its data for those

18   170 stores is on a completely different order of

19   magnitude for a PBM that adjudicates claims across many

10:37:58 20   retail pharmacies totaling thousands.

21           And then second, I just want to point out

22   that in the Track 1B cases where you were talking Summit

23   and Cuyahoga, you had plaintiffs who represented a large

24   portion of the state's population.

10:38:16 25           SPECIAL MASTER COHEN:  Okay.  Let me stop

1     you there because you're just lucky that there aren't
2     thousands of cases, and that could be changed by allowing
3     a motion to amend.  That would change like that.
4                  So you're right, that part of the Court's
10:38:29  5     analysis, when it was addressing data scope, was that
6     there were all of these other cases filed in Ohio and,
7     therefore, it was relevant to those other cases and
8     eventually we're going to need it.
9                  That's equally true of PBMs except for a
10:38:47 10     moratorium on filing amended complaints, which the Court
11     has been approached to change.
12                  So I'm just telling you I'm not putting a
13     lot of weight on that aspect.
14                  MR. WASSERMAN:  Understood.
10:38:57 15                  I will just say I think it's worth
16     mentioning that these three plaintiffs are much smaller,
17     represent a much smaller population and a much smaller
18     distribution of opioid drugs purchased than Summit and
19     Cuyahoga Counties.
10:39:12 20                  I mean, Webb County, a population that is
21     less than one percent of Texas, to then order all of
22     Texas's state production, we think is not proportional.
23                  And I just want to hit on the last point
24     about burden, this idea that you just push a button.
10:39:34 25     Express Scripts submitted a declaration from Al DeCarlo,

1      our lead analytics person at Express Scripts.  It is not

2      that simple.  As you expand the geographic area, that

3      requires more queries to be run, that requires more data

4      to be analyzed, and this stuff takes time.

10:39:53   5                  So it is not as simple as just pressing a

6      button.

7                  We also are under a CMO deadline to finish

8      producing data in about 11 weeks from today, and

9      Mr. DeCarlo talks about, in his declaration, not only how

10:40:13  10      expanding the temporal scope potentially would require

11      more time, but also how expanding the geographic scope

12      would take more time.

13                  MS. McGOWAN:  Special Master Cohen, Emily

14      McGowan for OptumRx.

10:40:33  15                  You know, Mr. Mougey says we have a recipe

16      that's worked in the past, but we have really a new

17      ingredient here and that is the PBM data.

18                  The PBM claims and rebate data is not the

19      same as dispensing data.

10:40:48  20                  And to the generalized comments that these

21      are companies that are data rich and can simply press a

22      button and sell data, that is inaccurate with respect to

23      OptumRx.  That is not what's happening here.

24                  But I want to address something that has

10:41:04  25      not come up and I didn't hear Mr. Mougey or

1  Mr. Weinberger address it, which is really why are PBM

2  data different.

3  Completely agree with what Mr. Wasserman

4  said with respect to the fact that the data will reflect,

10:41:21  5  just in the Bellwether jurisdictions, just in those

6  contiguous counties or the contiguous county, dozens if

7  not well over a hundred unique pharmacy relationships.

8  That's just in the Bellwether

9  jurisdictions.

10:41:33  10  But the really unique thing about PBM data

11  is that it reflects client relationships.  PBMs are

12  serving client health plan sponsors, and that could be

13  anything from a local union, a Government entity, a

14  Medicare Advantage Plan, a wide range of clients.

10:41:55  15  And what the data will reflect are the

16  client decisions with respect to formulary plan and

17  design.

18  So unlike pharmacies where I can see a

19  theoretical argument that differences in how individual

10:42:10  20  pharmacies within a state dispensed a drug might matter

21  and might be worth looking at, that's really not the case

22  for PBMs.

23  A member who lives in Houston of the same

24  health plan that has a member in Webb County is going to

10:42:26  25  have their opioid claim adjudicated in the same way.

1      There's not going to be a difference because of where

2      they live.

3                    And if the case is really about the harm to

4      the Bellwether jurisdictions and the plaintiffs'

10:42:40  5    communities, then the data production should focus on the

6      clients who have concentrations of members who live in

7      those jurisdictions and fill their prescriptions in those

8      jurisdictions.

9                    And actually the example that Mr. Mougey

10:42:58 10    offered of the red flags he'd so like to see will be

11     captured in the data.

12                    Now, I agree with what Mr. Wasserman said

13     that producing an entire state's worth of data is

14     disproportional to find the one person who drove to

10:43:13 15    Manhattan when they live in Rochester, but if there were

16     people who were driving from Manhattan and filling

17     prescriptions in Rochester, every single one of those

18     would be captured by the data that would be produced for

19     Rochester.

10:43:25 20                    And if people are driving from Dallas and

21     Houston down to Webb County to fill opioid prescriptions,

22     it will also capture those trips.

23                    So I think those examples that he's

24     suggesting are so important will actually be captured in

10:43:41 25    the offer that we have made.

1          I also want to speak to this client

2     consideration.  It has a significant impact on other

3     discovery in this case.

4          So collecting for an entire state is going

10:43:57  5     to -- every single claim that will be produced will have

6     a client associated with it.

7          Just taking the Bellwether jurisdictions --

8     and again, these are rough and preliminary numbers -- but

9     based on our analysis, we're looking at over a thousand

10:44:13 10     unique plan carriers in just the Bellwether jurisdiction

11     and the contiguous counties, and well over a thousand

12     once you get outside of Webb County, which is much

13     smaller than the others.

14          So we have thousands of unique plan

10:44:29 15     carriers, thousands of plan designs before we even expand

16     to the state.  That's going to be amplified by many,

17     many, many thousands once we expand to the state, and

18     again then we're just moving further away from the actual

19     people who live in the jurisdictions where the plaintiffs

10:44:46 20     allege they suffered harm.

21          I do want to speak a little bit to

22     proportionality because with respect to New York and

23     Texas it's most significant.  And I hear what you've said

24     regarding Missouri, but with respect to Rochester --

10:44:59 25     again just speaking for OptumRx and just looking at very

1    preliminary numbers -- what a statewide ask would seek

2    would be producing data with the case of Rochester where

3    Rochester represents just 3.9 percent of the MDL-8

4    opioids that OptumRx has processed from 2010 to 2019.

10:45:22  5    3.9 percent in Rochester, and they're asking for the

6    entire State of New York, more than 95 percent of the

7    state.

8              In Webb it's even more pronounced, .4

9    percent of the opioid, MDL-8 opioids that OptumRx has

10:45:36  10   processed are associated with Webb County and the

11   contiguous counties, and they're asking for 99.6 percent

12   of the rest of the data, the rest of the state, without

13   showing really any connection between those prescriptions

14   and the harm that they allege they've suffered.

10:45:53  15             And so for those reasons, we think that the

16   production should be tailored under Rule 26 and

17   proportional to the case.

18             SPECIAL MASTER COHEN:  Thank you.

19             And I just want to make sure I understood

10:46:08  20   what you just said.

21             Are you saying that especially as to

22   certain data sets; for example, claims and rebates?

23             MS. McGOWAN:  Correct.  That is our

24   argument with respect to claims and rebate data.

10:46:20  25             For OptumRx, we are taking the position

1 that dispensing data for the home delivery pharmacy would

2 fall under the prior orders, and that we have offered to

3 produce that statewide.

4 PBM claims and rebate data are unique.

10:46:38 5 MR. MOUGEY:  May I respond?

6 SPECIAL MASTER COHEN:  Please.

7 MR. MOUGEY:  Peter Mougey.

8 SPECIAL MASTER COHEN:  And you don't need

9 to say that more than one person went to New York City --

10:46:46 10 I know you're going to say that -- or three.

11 MR. MOUGEY:  One of the reasons that we

12 wanted to start on the temporal scope was the

13 overwhelming nature of the documents that we're seeing

14 out of the Purdue production that have not been produced

10:47:05 15 by the defendants but we're seeing in the Purdue

16 production.

17 And I didn't think we would see this kind

18 of production and the type of admissions that we're

19 seeing in that production, again after Purdue was out of

10:47:21 20 this case.

21 And what we're seeing and why this is

22 important to tie this back into the PBMs, this wasn't a

23 Purdue-isolated marketing campaign to reeducate doctors

24 and prescribers on the importance of the treatment of

10:47:38 25 pain.

1          What we are seeing, not in an isolated

2     document but in documents after documents after

3     documents, are the PBMs acting in concert and

4     collaborating with Purdue and inventing the messaging,

10:47:59  5     for example --

6               MR. WEINBERGER:  Pseudoaddiction.

7               MR. MOUGEY:  Thank you.

8               -- pseudoaddiction.

9          And we have identified a memo that came

10:48:10 10    from the PBMs appearing to invent the pseudoaddiction in

11    conversations with Purdue participating in that messaging

12    to prescribers and dispensers, the players, the

13    checkpoints in the closed system.

14          And again not an isolated example, but the

10:48:33 15    reeducational campaign that came from the PBMs early on.

16               And why?  Purely financial.

17          And as we've laid out in the complaint, the

18    increasing caps of 80 to 160 to 320 milligrams a day is

19    being discussed in the context of rebates or kickbacks.

10:49:02 20    And I'm just going to read just a couple sentences off

21    some documents that isolating this, the data, back to the

22    state for just dispensing misses the entirety of the

23    impact that the PBMs had on the number of dosage units or

24    pills into our communities in that state.

10:49:25 25               It was a conscious decision to put profits

1    first, increase the daily amounts allowed to patients,

2    all discussed in the context of rebates.

3                For example, "We had concerns about adding

4    prior authorization to Embeda, OxyContin, Opana ER since

10:49:57 5    these are preferred products that are tied to significant

6    rebates.  By adding a prior authorization to these

7    products, we jeopardize any rebates we have contracted

8    with with the manufacturer.  Do you think we would be

9    able to attend and go to battle on this one?"

10:50:15 10                And the decisions that were --

11                SPECIAL MASTER COHEN:  What is that?

12                MR. HATCHETT:  Could I ask, do you have

13    copies of these documents that you could provide to

14    the --

10:50:24 15                SPECIAL MASTER COHEN:  Is that an e-mail?

16    What is that?

17                MR. MOUGEY:  It's an e-mail and it's Bates

18    Number OPTUMRX_JEFFCO_ 366595, and I'll wait.

19                MR. HATCHETT:  Were these cited in anything

10:50:41 20    provided to the Court in abeyance of today?

21                MS. FITZPATRICK:  Excuse me.  Laura

22    Fitzpatrick.

23                Excuse me.  Good morning.  Laura

24    Fitzpatrick for the PEC.

10:50:53 25                I don't believe these were.  We didn't

1    anticipate needing to use them.

2            I think we're, quite frankly, a little

3    surprised with the arguments that are being made with

4    respect to the relevance and importance of the PBM claims

10:51:05   5    data and other data.

6            I do have copies and am happy to give them

7    to you.

8            And for the record, Special Master Cohen

9    and the Court, these are documents, OptumRx documents

10:51:14 10    where you have the clinical relations folks, the folks

11    that are talking to the P & T committee members, okay,

12    talking about needing to go to battle with the industry

13    relations departments within their own company.

14            The industry relations is who's working

10:51:29 15    with Purdue to form these rebate contracts, you know, and

16    they're concerned about the lucrative nature of the

17    rebate and administrative fees.

18            MR. WASSERMAN:  Special Master Cohen, this

19    is Matthew Wasserman.

10:51:42 20            If I could just put a briefly fine point on

21    this.

22            Going back to the decision before you now,

23    should the PBMs have to produce statewide data in New

24    York and Texas --

10:51:55 25            MR. MOUGEY:  Special Master Cohen, I'm not

1    even finished.

2                    MR. WASSERMAN:  I'm sorry.  I'm sorry.

3                    SPECIAL MASTER COHEN:  I thought --

4                    MR. MOUGEY:  I would like to be able to

10:52:01 5    finish, if I could.

6                    SPECIAL MASTER COHEN:  Go ahead.

7                    MR. MOUGEY:  Thank you.

8                    MR. HATCHETT:  Sorry.

9                    Could we just pause until we get copies of

10:52:09 10   the documents?

11                   I suspect we will disagree that this would

12   be relevant to the scope of data question.

13                   (Pause.)

14                   MR. HATCHETT:  I'm sorry, I'll let him

10:52:51 15   finish his argument.

16                   I don't think that what's in these e-mails

17   is going to be relevant to the geographic scope of data

18   question, but I understand he's going to make the

19   argument, but we have copies of the documents now.

10:53:03 20                  SPECIAL MASTER COHEN:  Go ahead, Peter.

21                   MR. MOUGEY:  So the importance of these

22   types of documents is the impact and why statewide data

23   is important is the impact of the reeducation campaigns

24   that the PBMs were a material and important part of,

10:53:23 25   rolled out from their own computers and planned and

1          coordinated with Purdue and then implemented and

2          communicated with doctors and dispensers all over the

3          country.

4                     To be able to track the communication going

10:53:41   5     out, those specific doctors' increases in their script

6          writing and then ultimately the dispensing, to tie and

7          correlate that is going to be a key piece of this trial

8          to be able to tie and connect the material coming out of

9          the PBMs and the impact on that slope of opiates coming

10:54:08  10     into our communities starting back -- we're seeing

11         documents into the mid '90s, into the 2000s, tracking

12         that scope of or quantities of pills coming into our

13         communities and tying that into the marketing and

14         reeducation campaign.

10:54:25  15                I'm just going to read a couple more

16         sentences.

17                     SPECIAL MASTER COHEN:  What's the date of

18         this document?

19                     MR. MOUGEY:  There's a couple different

10:54:30  20     dates.

21                     There are documents, like '17, '18, '19 are

22         the documents that I have in front of me.

23                     SPECIAL MASTER COHEN:  2017?

24                     MR. MOUGEY:  Yes, sir.

10:54:38  25                And quite frankly, these are the kind of

1    documents date-wise temporal scope that were produced in

2    Jefferson that routinely mention, "We have been talking

3    about this for years."

4                    So we have snippets that we can see in '17,

10:54:56  5    '18, '19 because less than one percent of the documents

6    produced to date predate 2006.

7                    SPECIAL MASTER COHEN:  So what I'm

8    missing --

9                    MR. MOUGEY:  Yes.

10:55:03 10                    SPECIAL MASTER COHEN:  -- I think you

11    started out saying, "We want to talk about temporal."

12                    I get why this is addressing temporal, but

13    I'm missing a little bit -- I'm sorry, I'm missing the

14    geographic.

10:55:16 15                    MR. MOUGEY:  The geographic.

16                    SPECIAL MASTER COHEN:  Yes.

17                    MR. MOUGEY:  Because you'll be able to see

18    across the state as the baseline what we've done in every

19    single case to date has been taking the baseline in that

10:55:26 20    state and tracking the increase in the state.

21                    And to take little pieces of counties out

22    now, one of the arguments the defendants made earlier is

23    we might need to go third party other defendants on some

24    of the information.

10:55:42 25                    We have baselines already created in each

1    one of these states.  What caused the increase?  We know

2    to date it's been Purdue.  What we're finding out is it

3    was also the PBMs.

4              And we'll be able to track across the

5    state.  And in order to understand what that is, we have

6    to look at the baselines.  And so we can compare

7    apples-to-apples, we have state-to-state-to-state.  To

8    try to do something new and different now, you lose the

9    baselines.

10             So this coordinated effort by the PBMs, I'm

11   just going to give you one more example, "I would highly

12   suggest delaying the MED implementation" -- and MED

13   stands for Morphine Equivalent Dosing -- "on all clients

14   until 1/1/18 as we are doing with the new criteria."

15             Here's the key part.

16             "Purdue has a clause built into their

17   agreement that mandates all strengths be unrestricted."

18             This is 2017, 10, 11 years after the guilty

19   plea, and internally the PBMs are discussing, "So we

20   cannot sacrifice rebates on only the 80 milligram

21   strength here.  We would sacrifice rebates on all

22   OxyContin scripts."

23             So what we want to be able to do on the

24   data state-to-state is tie and correlate the messaging

25   that started from the earliest data sets we can get on a

1   state, compare the baselines, and be able to track across

2   the state the impact or the correlation of the

3   communications coming out of the PBM with the upward

4   slope coming -- and we can tie it back to those specific

5   doctors in deidentified patients.

6            And we're going to be able to see the

7   increases on the cap when it was 80, the cap when it was

8   160, the cap when it was 320.  We can put all of that

9   together.

10           We've already dealt with over two billion

11  lines of data on dispensing, distribution, transactional

12  data.  The data that we're asking for here is the PBM's

13  business model.

14           And we heard why that we're unique and

15  different than dispensers and manufacturers and the

16  distributors.  Absolutely they're different.  This is

17  their business, packaging and selling data.

18           All we're asking for is exact replicas of

19  what they've packaged, what they've harvested, what

20  they've produced over the years to show the impact they

21  had on our communities.

22           To restrict this now, like you said started

23  out as national, we ended up at state, and Judge Polster

24  in the mediations ordered statewide data, and I think it

25  was eight to 10 states for the mediations that failed.

                    This has been a consistent
state-to-state-to-state order out of this Court going
back several years.  And if there's anything unique about
the PBMs, there is even a stronger argument that the data
should be national, but that's for another day.

                    It certainly can't be less than a state.

                    MR. WEINBERGER:  And just a couple other
points.

                    Ms. McGowan stated that they adjudicate
claims for a whole network of pharmacies.

                    In the -- that's a very interesting point
and why the data is not only important, but actually
paints for us an even more accurate picture of what was
going on statewide or nationwide because if you recall,
Special Master Cohen, one of the arguments that Walgreens
made is that, "We didn't know what CVS was dispensing, we
didn't know what Walmart was dispensing," and Walmart and
CVS said the same thing.

                    And so we tried to get data sets from the
PDMPs and tried to analyze those so we could see what was
happening across the board.  But they said -- the
pharmacies said that "We didn't have -- we couldn't
visualize what was happening with respect to the other
pharmacies.  We couldn't visualize when John Smith was
going from CVS to Walgreens to Walmart.  We only had our

1   own data."

2                   Well, lo and behold guess who has all the

3   data?  These PBMs.  And so we are going to be able to,

4   from these data sets, we are going to be able to even

5   more accurately statistically analyze what they knew or

6   what they should have known with respect to the myriad of

7   potential red flags that they should have been looking at

8   at the time that they were authorizing insurance payments

9   as somebody's drugs were being dispensed.

10                  SPECIAL MASTER COHEN:  I'll let you respond

11  and then we'll take a 10-minute break.

12                  MR. WASSERMAN:  Thanks.  I promise to be

13  brief.  Matthew Wasserman.

14                  If we're looking at the proportionality,

15  the burden versus the benefit, I think I've explained why

16  the burden for the PBMs is different and more substantial

17  than the burden for the pharmacies.

18                  You're talking about a couple hundred

19  retail locations versus thousands of pharmacies

20  statewide.

21                  So then it's, all right, what is the need.

22  What do plaintiffs say they need statewide data for?

23                  The two things I heard, to run their red

24  flag analysis, and to make these arguments.  They can do

25  that with the data that we say we will provide for the

1    Bellwether jurisdictions and the contiguous counties.

2              They've defined the red flag as 25-mile

3    travel to a pharmacy or a prescriber.  They can run that

4    analysis.  They can make those arguments with the data

11:01:38  5    we're going to provide.

6              This new argument of, well, there were

7    pills flowing in and the PBMs could have stopped and they

8    didn't, they will be able to make those same arguments in

9    the Bellwether jurisdictions.

11:01:53  10             They have ARCOS data.  They know how many

11    pills were coming into the state.  They clearly have our

12    documents.  They can make the argument that the PBMs were

13    hiding their head in the sand or looking the other way.

14    And they can make those arguments in the Bellwether

11:02:10  15    jurisdictions looking at the contiguous counties.

16              The two reasons, the two needs that the

17    plaintiffs have put forth today do not justify statewide

18    data.

19              You can make the same arguments, which I'm

11:02:24  20    sure they will, just using the Bellwether jurisdictions

21    and the contiguous counties.

22              And when compared against the burden, we

23    would say it is not proportional to order statewide data.

24              MS. McGOWAN:  Emily McGowan for OptumRx.

11:02:40  25              First, OptumRx does not package or sell

1    data and we don't adjudicate claims for pharmacies.

2             We process claims dispensed at many

3    pharmacies for our clients.  And I didn't hear anything

4    that addressed the client-specific nature of the data and

5    the fact that if the alleged harm is in the plaintiffs'

6    communities as they say, then we should be focused on the

7    data that relate to clients who have concentrations of

8    members who live there and fill their prescriptions

9    there.

10            So, you know, distorting a couple of

11   rebate-related documents does not affect the geographic

12   arguments that we've made today.

13            MR. MOUGEY:  Twenty-five miles, 25 miles or

14   more.  I mean, I don't think they understand.

15            SPECIAL MASTER COHEN:  I got it.

16            MR. MOUGEY:  Just -- okay.

17            SPECIAL MASTER COHEN:  Okay.  It's 11:00

18   o'clock.

19            Why don't we take a 15-minute break, come

20   back at 11:15?  Smoke them if you've got them.

21            Thank you.

22            (Recess taken.)

23            SPECIAL MASTER COHEN:  I am not going to

24   issue a ruling at this moment on geographic scope.

25            I may issue it before we all leave here

1    today, but I need to reflect on that a little bit more.

2                    By the way, I should mention over here,

3    Scott Loge, he's on the team.  You all should say hello

4    to him at some point.  He was Judge Polster's law clerk

11:26:14 5    when this MDL came in, and has been working on it from

6    the very beginning, as have I.

7                    When I am not available, which will happen,

8    he's one of the folks that you can get in touch with.

9                    Okay.  So the next one I want to touch on

11:26:33 10   is Agenda Item Number 340.  This is the identity of the

11   P & T committee external members.

12                    Sue, that's P-ampersand-T, P & T committee

13   members.

14                    So the first thing that I want to ask is I

11:26:54 15   don't see any reason and didn't see any discussion, any

16   response by the PBMs to the suggestion from the

17   plaintiffs that members of that committee who are ex

18   officio who are no longer members shouldn't be

19   identified.

11:27:10 20                   MR. COOPER:  Thank you, Special Master.

21                    This is Jonathan Cooper for Express

22   Scripts.

23                    So we do object to releasing the names of

24   the former P & T members.  In our most recent submission,

11:27:28 25   we gave, I believe, at least two primary reasons to keep

1    them confidential.

2              One, to prevent lobbying, and that has less

3    relevance to the former officials or the former voting

4    members, but I'll get back to that.

11:27:39  5              SPECIAL MASTER COHEN:  I didn't see any

6    relevance to it, but go ahead.

7              MR. COOPER:  Well, just to address it,

8    sometimes former members become current members again,

9    and so if you look at the criteria that the P & T

11:27:50 10   committee uses for selecting members, one of the four

11   main criteria is former experience on P & Ts.  And

12   members can be reappointed.  Sometimes they're

13   reappointed consecutively; sometimes there can be a gap

14   in time.

11:28:02 15             But so once those names are out there, that

16   means if they are ever put back on that, that opens that

17   lobbying problem.

18             And then the second reason is, as we said

19   in our most recent submission, there's a severe chilling

11:28:17 20   effect on getting the most qualified doctors and

21   physicians to serve on P & Ts.  And if we're releasing

22   the former names, there's still going to be a chilling

23   effect there.

24             It may not be as great as releasing current

11:28:30 25   members, but there is still that chilling effect.

1           SPECIAL MASTER COHEN:  So what about the

2      fact that this MDL has been going on for coming up on

3      seven years?  We have protective orders that set out

4      provisions regarding confidentiality of different sorts

11:28:48  5      of the kind of protective orders, I'm sure you all have

6      had experience with, which includes, for example,

7      Attorneys Eyes Only and could even be circumscribed even

8      more than that.

9           What about addressing it that way?

11:29:01 10           MR. COOPER:  Yeah.

11           A couple points on that, Your Honor.

12           So, first, at least with the existing

13      protective orders in the case, as we noted in our

14      submission, they don't prevent information from becoming

11:29:11 15      public.

16           Judge Polster stated in his ruling last

17      week on the disqualification motion that protective

18      orders protect information until they are part of the

19      trial record and then, you know, it may be fair game for

11:29:23 20      the public.

21           The current protective orders in this case,

22      as I understand them, don't have any provisions

23      protecting information at trial.

24           So at least under the existing protective

11:29:33 25      orders, they would be, we believe, insufficient to

1   prevent irreparable harms we've laid out in our letters.

2               I would also note, and we put this in our

3   submission, that plaintiffs' counsel, in -- who have

4   access to information in the MDL have used that

11:29:49  5   information publicly in other cases and taken the

6   position that they don't need to comply with the MDL

7   protective orders.

8               And so again, we think there's a

9   significant risk of this information getting out there.

11:30:01  10              And even within the MDL, as we noted, it's

11  not clear at this point who even has access.  Right?

12              There are so many different, hundreds if

13  not thousands of lawyers, experts, consultants, not only

14  working on MDL cases, but thousands of MDL cases, but

11:30:16  15  also at this point my understanding is a lot of attorneys

16  in cases outside the MDL get access to the MDL

17  repository.

18              And so there's just a huge volume of people

19  who are getting access to this information, including

11:30:28  20  some of the very people who Express Scripts would be at

21  pains to prevent them from knowing this information so

22  that they couldn't improperly lobby the P & T members.

23              SPECIAL MASTER COHEN:  How do you respond

24  to the plaintiffs having pointed out that there is one

11:30:41  25  fellow who has it on his LinkedIn and they say there are

1       probably others and "We shouldn't have to run around and
2       find them"?
3                       MR. COOPER:  Right.
4                       So let me -- I think there's a really
5       important distinction here that needs to be brought out.
6                       So there's a big difference between Express
7       Scripts and Medco.
8                       So the examples, all the examples that the
9       plaintiffs use in their letter of P & T members not
10      having their identities confidential are about Medco, and
11      my understanding is Medco treated confidentiality
12      differently than Express Scripts.
13                      And Express Scripts, as we put in -- as
14      Mr. Andrew Behm put in the declaration that we submitted
15      on Tuesday, attested that to the best of our knowledge
16      Express Scripts has never voluntarily provided the
17      identities of Express Scripts's P & T members to anyone
18      other than the Government regulator CMS, which has strict
19      confidentiality provisions in place for just that reason
20      because they have to approve all the formularies that are
21      selected by Medicare Part D plans.  And as part of that
22      approval process, they want to confirm that the P & T has
23      people with certain specialties and things like that.
24                      And one other point on this, Special
25      Master, just to go back to your prior question about

1    protective orders.

2              The *In Re: Epipen Multi-District*

3    *Litigation* in Kansas, we cite, I think, four rulings from

4    that Court.  In that case there was a protective order,

5    and the plaintiffs made the exact same argument there as

6    here that, one, P & T members are relevant, we need to

7    know who is making the P & T decisions, we want to depose

8    them, we want to find out what they were thinking.

9              Two, there's a protective order in place,

10   and there was absolutely a protective order in that case

11   just this year, and that's sufficient.

12             And the Court there rejected those

13   arguments, and we gave you four separate rulings that

14   time and again rejected them on the ground that the

15   marginal benefit of getting these identities -- when we

16   have given access to and have agreed to provide more

17   discovery into the P & T committee -- so the marginal

18   benefit of getting that additional information about the

19   identities, when compared to the vast destructive effect

20   of providing that information, we would submit is not

21   proportional and warrants a protective order preventing

22   that kind of disclosure in discovery.

23             SPECIAL MASTER COHEN:  Do you mind if I go

24   to plaintiffs?

25             MR. COOPER:  Absolutely.

1          SPECIAL MASTER COHEN:  Mr. Irpino, you're

2     going to --

3          MR. IRPINO:  Yes, on behalf of the PEC.

4          SPECIAL MASTER COHEN:  Let me ask you a

11:33:08   5     question.

6          So explain to me what you hope to do with

7     the information that you would obtain if you get these

8     names.

9          MR. IRPINO:  Well, I will, but I know my

11:33:16  10     boss is going to -- is going to usurp me here.

11          MR. FARRELL:  This is Paul Farrell on

12     behalf of the PEC.

13          There's dominos to how my brain works and

14     the sequence of things, and this is a little out of the

11:33:36  15     sequence, but in general, what I have is I've taken a

16     real good look at the P & T policy from Optum and the

17     P & T policy from ESI.

18          We don't need to get into the merits of it,

19     but in general what it looks like is that there is a

11:34:00  20     committee that was formed at both of these companies

21     whose purpose was to review the safety and efficacy of

22     drugs.

23          And so at some point in time, OxyContin was

24     launched upon this planet and at some point in time the

11:34:20  25     members of the P & T committee reviewed the safety and

1    efficacy and the clinical guidelines related to what we

2    describe as pharmaceutical grade opium, and approved them

3    to be on national formularies.

4            Now, there are other committees within

11:34:41  5    these organizations, but we started at the P & T

6    committee to make a dive.

7            You know, we've talked about the breadth of

8    discovery and the depth of discovery, and so what we are

9    asking for is we're asking for you to allow us to perform

11:34:58 10    a deep dive on the role these companies had with Purdue

11    Pharma and its interactions with the placement of

12    OxyContin on formularies for both of these companies.

13            And so we think that the relevance of the

14    P & T committee, the comments that were made, the

11:35:19 15    discussions that were had with the P & T committee is of

16    absolute obvious relevance.

17            And, quite frankly, I want to depose the

18    members of the P & T committee that made the decision to

19    put unrestricted OxyContin on national formularies across

11:35:39 20    the country.

21            SPECIAL MASTER COHEN:  Well, so what about

22    staging it?

23            What about if you were to get the documents

24    with redacted names, and see what you see, and then come

11:35:53 25    back to me and say, "Look, here is the reason we need to

1    depose these folks and know who they are.  This is what

2    they said, this is what they did, this is the

3    interactions they had with other folks"?

4              In other words, the PBMs are pointing to

11:36:09  5    some legitimate reasons to keep this information

6    confidential.  You can make a face, but I think that's

7    true.

8              And so what about coming at it slowly?

9              MR. FARRELL:  So I'll --

11:36:22 10              SPECIAL MASTER COHEN:  I'm sorry, let me

11   add one other thing.

12              You know, I think in your letter you said,

13   for example, "We're concerned that some of them may have

14   been KOLs" or something like that.

11:36:36 15              Well, you could give me a list.  I'm making

16   this up, right?  You could give me a list of the people

17   you're concerned they might be or might have been friends

18   with, and I can get a list in camera of who they were and

19   look to see if there's any there there.

11:36:52 20              MR. FARRELL:  Yeah, in a vacuum, Special

21   Master, I don't mind taking this slower than we're

22   already taking it, you know.  I've expressed this, my

23   frustration with the process.

24              We don't have documents in this time frame.

11:37:11 25   We don't have some of these defendants acknowledging that

1    they're going to respond to discovery.  We have a family

2    defendant issue.  We have a temporal issue.  We have a

3    reliance upon DR-22 as discovery responses in this

4    litigation, but half of the documents are redacted

11:37:33  5    without privilege logs.

6              So we have so many different fundamental

7    problems.

8              What I'm really trying to do with these two

9    particular issues is use it as a platform to demonstrate

11:37:46 10    we have a temporal scope issue that we need resolved.

11             SPECIAL MASTER COHEN:  Right.

12             MR. FARRELL:  And we have a redaction issue

13    that we need resolved.

14             So I don't know why it is that they're so

11:37:58 15    skittish about the identities of their P & T committee

16    members because, despite what Express Scripts says, I can

17    tell you that it's in the public domain.

18             This isn't like you remember 2018 when the

19    DEA said that if we disclosed the identity of the

11:38:16 20    warehouses, there will be armed robberies in the streets?

21             SPECIAL MASTER COHEN:  Yes.

22             MR. FARRELL:  And we stood up and we showed

23    that it's on their websites.

24             So I get that there's some skittish remarks

11:38:27 25    or some skittish feelings about this, but I think, you

1    know, I don't mind starting with deidentified names if we

2    get the documents back to '95, '96.

3            I don't know.  They haven't produced them

4    anywhere in the country ever.

11:38:45   5        So what we've done is we've taken the ESI

6    policies and procedures and the Optum policies and

7    procedures for the P & T committee to understand what the

8    function of them, of these committees are, what work

9    product should have been seen, what work product should

11:39:06  10    have been generated, what intercommunications should have

11    had within the P & T committee, what

12    intracommunications -- other way

13    around -- intercommunications should have happened with

14    other committee members, and what information they relied

11:39:27  15    upon.

16            If I get to see that, I can make an

17    informed decision of you know what?  We don't need to

18    know their names.  We don't need to depose them.

19            But all that being said is we've protected

11:39:40  20    national security interests DEA data without breach.

21    We've been here for seven years and abided by your

22    protective order terms.  And just because they say it's

23    sensitive don't make it so, and it could apply to every

24    one of their committees.

11:39:57  25            All that being said is if you give us the

1     documents in the time frame that we're looking at for us

2     to review, maybe I can make a more informed decision on

3     why these names are top secret.

4              SPECIAL MASTER COHEN:  You want to correct

11:40:11 5    anything your boss said?

6              MR. IRPINO:  A lot of things, but no, I

7     don't want to correct.

8              I do want to add, I mean we see this kind

9     of scattergun of this is -- you know, the world is going

11:40:26 10   to come to an end if these names get out there.

11              And what I certainly agree with is that we

12    have held some of the deepest darkest secrets of some of

13    these various companies in this litigation for many

14    years.

11:40:38 15              And I just want to give you the example,

16    Special Master Cohen, of IQVIA, who their company is

17    going to come crashing down if that information got out.

18    And we worked out a deal, and we had an Attorneys Eyes

19    Only deal, and the information did not get out.

11:41:00 20              But it was a critical, fundamental issue

21    for us to get that information and to get that data, and

22    we used it.  We used it successfully, and we were able to

23    maintain the level of confidentiality that they needed

24    over it.

11:41:14 25              So I don't want to equate us knowing these

1    names with a *Washington Post/New York Times* article

2    containing the names.  It's just not the case.

3              Now, there was a point made about a big

4    difference between Medco and Express Scripts, and that's

5    fine.  So if that's the case, then as a baseline we

6    should get all the Medco names as a baseline.  But the

7    fact of the matter is we should get all the names because

8    there is a protective order in place, and these documents

9    are marked Attorneys Eyes Only.

10             That means something.  We are officers of

11   the Court.

12             We're pretending like this company is going

13   to come crashing down if the outside counsel get the

14   information.  And the fact of the matter is we have three

15   levels of confidentiality, Special Master:  Regular,

16   highly confidential, and Attorneys Eyes Only highly

17   confidential.

18             And these are all marked Attorneys Eyes

19   Only.  So you cannot have, as it was suggested, any of

20   these defendants see this information.

21             Their in-house counsel cannot see the

22   information.  Their outside counsel can, but not their

23   in-house counsel.  So you cannot even have in-house

24   counsel for these defendants see the documents.

25             So that's to begin with.

1          Uh-oh.

2          MR. FARRELL:  And I'll --

3          MR. IRPINO:  Boss time.

4          MR. FARRELL:  Without belaboring the point,

11:42:47  5   the one additional thing is they don't even treat it this

6    confidential within their own companies.  They allow

7    their member sponsors to sit in, and some of them

8    livestream their P & T committee.

9          SPECIAL MASTER COHEN:  Let me just go ahead

11:42:59 10   and rule because I already know where we're going to go.

11          So I want the parties to meet and confer

12   and figure out how it is that these names are going to be

13   unredacted.

14          If you think that the existing protective

11:43:12 15   order is somehow insufficient, as I recall there was a

16   suggestion by the plaintiffs that we can make a tighter

17   loop.  Maybe you can negotiate that, but the names are

18   going to get unredacted.

19          Having said that, that's a very different

11:43:28 20   question from whether somebody gets deposed, right?  So

21   the chilling effects that you're worried about, that

22   comes if somebody is forced to come and answer questions

23   from an attorney.

24          I'm not addressing that today.  That's a

11:43:43 25   different question.  And as Paul suggested, the necessity

1    of that may depend on the documents that are actually

2    produced.

3                    But I think the simple identity of these

4    folks is something that needs to be disclosed.  Documents

11:43:59 5    need to be unredacted with those names.

6                    And as I said, if you think that there's a

7    reason to create a fourth level of confidentiality that

8    is restricted only to lead counsel, for example, then you

9    can try and negotiate that.

11:44:17 10                    Okay?

11                    MR. IRPINO:  Thank you.

12                    MR. FARRELL:  One more thing, Special

13    Master Cohen.

14                    So my reading of both the ESI and Optum's

11:44:31 15    policies and procedures is that they don't consider the

16    P & T members to be employees.

17                    And so if there are P & T members that

18    whose names are in the public domain -- for instance,

19    many of Optum's defendants list them, their role on P & T

11:44:50 20    committees, in their medical literature -- and we've said

21    this out loud and now I'm saying it on the record, it, in

22    the absence of an Attorney-Client Privilege, it is our

23    intention to contact some of those former P & T members.

24                    And unless counsel for either Optum or ESI

11:45:08 25    claims that they represent those individuals, there's no

1    prohibition from us doing so.

2              SPECIAL MASTER COHEN:  Appreciate that you

3    said that.  I'll let you guys figure that out as you go

4    forward.

11:45:19  5              MR. COOPER:  Special Master Cohen, I

6    understand you've made your ruling.

7              Just to be clear, it's going to be

8    something we appeal.  Just so I can understand, are you

9    planning to issue any further ruling on this issue?

11:45:29 10    Especially given you said you want us to meet and confer.

11    I just want to make sure we are squared away on when we

12    need to lodge an appeal, because this is not something

13    that Express Scripts will accept.

14              SPECIAL MASTER COHEN:  Thank you for

11:45:40 15    raising that.  I'm glad you did.

16              Right.  So as I said before, anything that

17    I do by way of ruling today on the record is immediately

18    appealable.

19              The only question is the deadline.

11:45:54 20              It's a very thoroughly addressed issue in

21    your letters.

22              Is a week enough?

23              MR. COOPER:  A week to file an appeal, you

24    mean?

11:46:12 25              SPECIAL MASTER COHEN:  To file what would

 1    be an objection to my ruling.

 2                    MR. COOPER:  Right.

 3                    Would it be possible to have two weeks,

 4    Your Honor?

 5                    SPECIAL MASTER COHEN:  No.

 6                    MR. COOPER:  Okay.  Well, I guess we will

 7    do with a week then.

 8                    SPECIAL MASTER COHEN:  I would have given

 9    you 10 days.

10                    MR. COOPER:  That would have been a Sunday.

11                    MR. HATCHETT:  Special Master Cohen, so

12    this is Andrew Hatchett for OptumRx.

13                    We will likely join in the appeal with

14    Express Scripts.

15                    SPECIAL MASTER COHEN:  Objection.

16                    MR. HATCHETT:  But I have one other

17    clarification as to the informal order or order from the

18    bench.

19                    At the beginning of this you noted a

20    distinction between current P & T members and former

21    P & T members.

22                    At least with respect to your order today,

23    would you be willing to limit that to former P & T

24    members and not current P & T members?

25                    SPECIAL MASTER COHEN:  No.  Let's tee it

1   up.

2                   MR. HATCHETT:  Sorry, did you want us to go

3   to that question separately?  Sorry.

4                   SPECIAL MASTER COHEN:  Maybe I don't

11:47:14  5   understand what you're saying, but no, my ruling is that

6   both former and current need to be disclosed.

7                   MR. HATCHETT:  Okay.  Understood.

8                   SPECIAL MASTER COHEN:  Right.

9                   And so just -- and just being careful about

11:47:24 10   the language, you will be filing an objection to a formal

11   ruling because it is on the record.

12                   And the deadline is close of business one

13   week from today.

14                   MR. HATCHETT:  Understood.

11:47:35 15                   SPECIAL MASTER COHEN:  Okay?

16                   And obviously plaintiffs can respond.

17                   And that would be going to the Judge.

18                   Okay.  The next thing I have written down

19   is Agenda Item 348, which is the organizational charts

11:47:56 20   issue.

21                   So I was confounded before and I'm

22   confounded again.

23                   I was confounded before when other

24   defendants were very slow to produce organizational

11:48:12 25   charts, and I had to be very firm to make that happen.

1           And again I'm confounded.  It just doesn't

2   seem like something that should be all of that difficult

3   to produce, and so I guess I need to understand from the

4   defendants why that seems to be true.

11:48:32  5           And frankly, I just expect that you're

6   going to tell me that within a very short period of time,

7   all organizational charts from all family members for

8   each defendant will be produced in legible fashion so

9   that the plaintiffs can see who it is that played

11:48:49 10   different roles.

11           Because before that happens, you really

12   can't get at the custodian issue.  I'm really curious how

13   you've managed to get as far as you have without

14   organizational charts, but I can tell you I come to this

11:49:05 15   not understanding why it's taking so long to do something

16   that seems so simple.

17           MR. HATCHETT:  So this is Andrew Hatchett

18   again for the Optum and United defendants.

19           So I have a couple points that I will

11:49:16 20   explain because I do think it's helpful to have some

21   context and clarity on what the issues are and what the

22   challenges are.

23           From an objection standpoint, I want to

24   make very clear that we are not objecting to producing

11:49:26 25   organizational charts, so we have no objection.  We're

1    not standing on any objection related to the production

2    of organizational charts.

3                    SPECIAL MASTER COHEN:  Great.

4                    MR. HATCHETT:  We are also not withholding

11:49:37  5    any responsive organizational charts based on any sort of

6    objection.

7                    So I understand the Court's sentiment that

8    this -- or assumption that this would be a simple task.

9                    The plaintiffs also come at it with that

11:49:53  10   initial assumption.

11                    What I can tell you is that it is not as

12   simple as that would seem to be.

13                    So we have asked many key critical

14   employees in the company that would know if there were

11:50:06  15   organizational charts, whether we have organizational

16   charts kept in any sort of a central repository that

17   would be accessible and available.

18                    And the answer is repeatedly no.

19                    If you look at the organizational charts

11:50:19  20   that we have produced to date, you'll notice that across

21   the eight or nine, 21 pages of organizational charts that

22   we've produced, they all look very different, and that

23   reflects the fact that there is not a systemic

24   corporate-wide organizational chart structure that is

11:50:37  25   created or maintained in the ordinary course of business.

           1    Particularly not as you go back in time.

           2                    So there just is not a folder, a shared

           3    drive location called "Organizational charts" that you

           4    can go to and access organizational charts.

11:50:49   5                    What we have found as we interview people

           6    is that heads of departments, team leads will sometimes

           7    create organizational charts for various purposes.

           8                    So we find them in PowerPoint text.

           9                    Last -- yesterday we produced seven

11:51:04  10    industry relations handbooks from 2013 to 2017.  Those

          11    industry relations handbooks are -- there's hundreds of

          12    pages of documents, but within them there are

          13    organizational charts for those years 2013 to 2017 that

          14    cover our industry relations group, our rebate management

11:51:22  15    group, our clinical development group.

          16                    But those are kind of baked within those

          17    handbooks.  We haven't found them in another location.

          18                    We have found them where people have

          19    created them and put them in PowerPoint presentations as

11:51:36  20    they're talking about who their team is and various

          21    informal purposes, but we've had to effectively gather

          22    those through what amounts to a custodial collection.

          23                    SPECIAL MASTER COHEN:  Right.

          24                    MR. HATCHETT:  And so it does require going

11:51:48  25    to individuals asking them if they had them, gathering

1    them and collecting them and so --

2                    SPECIAL MASTER COHEN:  Let me interrupt,

3    I'm sorry, but let me ask you a question.

4                    It's the information, of course, that

11:51:58  5    matters; not the presentation, right?

6                    So maybe it occurs to me that the

7    information that the plaintiffs want, and you're willing

8    to give them, is being asked for in not the wrong way,

9    but not the best way, which is to say they've asked for

11:52:14 10    organizational charts.

11                   Well, those charts don't exist perhaps for

12    various reasons or they've been lost over time, so what

13    about a quick depo of folks in HR with their records?  I

14    mean, all of the information about who held what jobs

11:52:32 15    when has to be somewhere, and it's probably in HR.

16                   So we get the Director of HR to sit down

17    and explain it.

18                   MR. HATCHETT:  Yeah, I mean, so if you look

19    even on the -- so a couple things I want to also clarify,

11:52:46 20    and I'm going to come back to this.

21                   So just we produced the organizational

22    charts, the 21 pages that are attached to some of the

23    documents as part of this process of going around to key

24    leaders within groups and departments and talking to

11:53:02 25    people at the new defendants that have been added within

1    the last, you know, seven days or we responded to

2    discovery within the last seven days.

3              We are asking the same sorts of questions

4    and we have gathered some.

11:53:13  5              So within the next week we will be

6    producing several dozen additional organizational charts.

7    They all look different.  They come from different

8    sources, different places, but we have a substantial

9    additional number of organizational charts that we are

11:53:28 10    going to provide.

11              But one of the challenges, even if you look

12    at the ones that are in the record that we've produced,

13    the 21 pages, there are over 500 names identified even on

14    those organizational charts.

11:53:40 15              And so I can assure -- I haven't talked to

16    the HR Director myself, but I think it is very unlikely

17    that you're going to be able to go to an HR Director,

18    have them sit down and be able to explain to you who

19    these people are, what job functions they're serving, and

11:53:56 20    how it might relate to the issues in this case because

21    we're going to have a lot of people, a lot of names that

22    appear on organizational charts that really don't have

23    relevant information on the particular issues in this

24    case.

11:54:06 25              We obviously understand that our job as,

1      you know, attorneys acting in a professional manner with

2      candor toward the Court and candor towards our opposing

3      counsel is to help to identify who are the relevant

4      individuals, and so we are obviously working toward that.

5                  We are willing to provide information about

6      the individuals that we've identified.  We are -- you

7      know, we'll respond to questions and inquiries about it.

8                  We have produced to date from the Jefferson

9      County production it's more than 60,000 documents,

10     220,000 pages of material, that appears to have been used

11     by the plaintiffs to identify many of the other names.

12                 As discovery progresses, if they find that

13     we have missed some critical employee, obviously we will

14     engage.  There's actually a footnote in the CMO that

15     gives the right to, you know, bring that to our attention

16     and we will discuss individuals, if they think that we've

17     missed somebody.

18                 But we are working very hard to engage with

19     our clients to identify who the appropriate individuals

20     are and to identify those people, explain the functions

21     they serve, and why they would possess the relevant

22     responsive information.

23                 We are also trying to do that through

24     organizational charts.

25                 So again, we've produced some.  We are

1    producing more.  We just can't produce them out of a

2    folder.  It requires actually going to individuals,

3    asking what they have, gathering it, and what amounts to

4    a custodial collection.

5    11:55:30          And so when you're talking about a case

6    across 10 defendants, it is a divide and conquer for our

7    team, but we are on calls with the client daily

8    interviewing people, asking these questions.

9              We just are not able to gather them

10   11:55:42  overnight, and so we are doing it at warp speed, at the

11   speed that is the fastest that we can essentially.

12             SPECIAL MASTER COHEN:  Well, so as I said,

13   I'm happy to hear that the parties have identified some

14   custodians, are talking about who custodians are.

15   11:55:59          Organizational charts is a part of that

16   process, and the fact that they are slow in coming is

17   slowing it down perhaps a bit.

18             I don't want that to be slowed down.  I

19   appreciate very much your statement that you're, in good

20   11:56:14  faith, making efforts and are telling the Court and

21   you're telling the plaintiffs that you're trying to

22   provide information.

23             When I look at your discovery responses,

24   that is not the sense that I am getting.

25   11:56:24          There's some objections there that set my

1    teeth on edge so I'm sure it set the plaintiffs' teeth on

2    edge.  I haven't shown them to the Judge because I don't

3    want his teeth to be set on edge.

4                So I really suggest that you try and come

11:56:40    5    at some of those discovery responses in a different way,

6    and I think that this is one of them.

7                As I've said, I've dealt with this issue

8    before and I had to get firm, and all of a sudden charts

9    appear.

11:56:52    10    And like I said, I am going to make sure

11    that this information gets transferred over from the

12    defendants to the plaintiffs.  And if it happens, if it

13    has to be that 10 different companies' HR folks get

14    deposed, that's how it's going to happen.

11:57:08    15    So I'm just urging you to take that as

16    seriously as you say you are taking it, and to hurry and

17    get it done.

18                MR. HATCHETT:  Understood.

19                SPECIAL MASTER COHEN:  That's for everybody

11:57:17    20    there on the defense side.

21                Okay.

22                MS. SINGER:  Special Master Cohen, I have

23    just a point, if I can add to this.  Linda Singer for the

24    PEC.

11:57:34    25    So again I take in good faith the

1    representations that have been made, notwithstanding the

2    history here on this one, but the history is actually

3    important.

4             We have to identify these custodians, and I

11:57:48 5    know you get it so I'm not going to argue the other side

6    of this.

7             But I think there need to be deadlines.  I

8    think we need OptumRx -- and I assume this is true for

9    Express Scripts as well -- to respond to our

11:58:00 10    prioritization rather than theirs.

11             So if an org chart doesn't exist, if we

12    identify industry relations or clinical or another area

13    of the company or a time period, we do that because those

14    are the gaps we've identified so we can meet the Court's

11:58:16 15    deadline in identifying custodians for ourselves and not

16    relying exclusively on their selection.

17             So it would be helpful to get some guidance

18    from you that we need defendants to move on the

19    priorities we set within reasonable time frames.

11:58:34 20             MR. HATCHETT:  And I'm not familiar with

21    what Ms. Singer is referring to.

22             Obviously, if there are particular requests

23    for prioritization, we will engage with plaintiffs'

24    counsel in good faith to do that.

11:58:44 25             SPECIAL MASTER COHEN:  I'm going to leave

1     that to your meeting and conferring, but I think that the

2     defendants understand from what I've said that if -- I'm

3     not going to say how many days -- but if the issue is

4     reraised with me and I haven't seen very substantial

11:59:00   5     progress, they get the message.

6              So I think that's all I need to say at this

7     juncture.

8              MS. SINGER:  Thank you.

9              SPECIAL MASTER COHEN:  So the two biggies

11:59:16 10    that are left on the agenda are temporal scope, both of

11    documents and data.

12              I'm just trying to decide whether you all

13    want to go to lunch, or we should just keep going.

14              I see one lunch nodder.

11:59:32 15              MR. FARRELL:  I'd love to have some food.

16              SPECIAL MASTER COHEN:  Okay.

17              MR. FARRELL:  And caffeine.

18              SPECIAL MASTER COHEN:  It's just short of

19    straight up noon, so why don't we come back at 1:00

11:59:43 20    o'clock?

21              MR. WEINBERGER:  Is the cafeteria closed

22    downstairs.

23              SPECIAL MASTER COHEN:  I just got here and

24    I don't know.

11:59:51 25              Sue is nodding yes, so if you need food,

1    that means you are leaving the building, going through

2    the walkway to Tower City, and that's where the

3    restaurants are.

4                    MR. WEINBERGER:  Okay.

11:59:59  5                    SPECIAL MASTER COHEN:  Thank you, all.

6                    See you all at 1:00 o'clock.

7                    (Luncheon recess taken at 12:00 p.m.)

8                         -   -   -   -

9

13:03:23  10

11

12

13

14

13:03:24  15

16

17

18

19

20

21

22

23

24

25

THURSDAY, MARCH 28, 2024, 1:05 P.M.

SPECIAL MASTER COHEN:  Welcome back.

Okay.  So we'll pick up where we left off.

I have some miscellaneous stuff, but three agenda items with numbers which are 345, 344 and 341, all of which have to do with temporal scope of document production and temporal scope of data.

I've read these, and of course there's a long history of discussion -- everybody should have their phone away from microphones.

And as a general matter, depending on what kind of defendant you were and what kind of data we're talking, it ran back to either 2006 or 1996.

The defendants have suggested different dates for different sorts of data ranging from 2006 generally to 2009, 2014, et cetera.

The plaintiffs want it to run back much earlier, both as to documents and data.

So first of all, one of the things that the defendants say is, "We don't have the data."  If you don't have the data, you don't have the data.  That's beyond -- that doesn't need discussing.  You can't produce something that doesn't exist.

The question is what about the stuff you do have, how far back do you have to look for it?  And I'd

1    like to hear from the plaintiffs first to explain to me

2    why 2006 isn't far back enough, and maybe it is for some

3    of this and maybe it isn't for others.

4              But I'd also like you to noodle with this

13:10:37  5    question, which I just came up with during lunch, and

6    it's really -- it's really just kind of a bit of a game I

7    suppose, but if the totality -- if I conclude, which I

8    have not, excuse me, that the totality of the production

9    that you're asking the defendants to make geographically

13:10:57 10    and temporally together is too burdensome, then, you

11    know, choose your haircut.

12              Do you want it to be less broad

13    geographically but have it go as deep as you want

14    temporally, or would you rather forego documents and/or

13:11:20 15    data that goes back to 1996 in exchange for getting all

16    of the geographic you want?

17              It's just kind of a way for me to think

18    about, to hear what you have to say, to understand what's

19    more important to you, frankly.

13:11:35 20              I'm not saying I'm doing that.  I'm just

21    giving you something fun to have to answer.

22              MR. FARRELL:  I'll take the first crack at

23    this.  Paul Farrell for the PEC.

24              DR-2 and DR-3 was not a victory for the

13:11:54 25    plaintiffs.  It was a hotly contested, argumentative,

1    hostile debate with this courtroom sitting here, with

2    lawyers filled to the rim, and so the balance that you

3    struck we lived with, and we were able to create records

4    that we were largely successful with.

5    Bringing in new defendants who are using

6    that as some type of ceiling or default from which they

7    can argue about doesn't change the position that we

8    wanted more for a longer period of time, six or seven

9    years ago, and this is where we ended up.

10   So to quote one of my colleagues earlier,

11   the PBM defendants seem to be very quick to point out

12   your rulings in the past that are in their favor, and a

13   little slower to point out the rulings that we're asking

14   you to enforce.

15   So I understand why it's easy to find some

16   compromise between the disputes of geography and

17   temporal.  It's not that easy for us.

18   To succinctly state our geographic

19   statement, and you know this from the prior ARCOS data,

20   we need a denominator.  We need a baseline by which to

21   compare the local Bellwether.  And we asked for more.  We

22   asked for nationwide, and then it got slapped down to

23   regional, and then it got slapped down to state.

24   And I'm just not quite sure that you're

25   going to get us to concede that we go and change the

1    paradigm by which we've been measuring data for seven

2    years because the PBMs say that it's burdensome.

3              The DEA came in here and said it was

4    burdensome, and they burned a hard drive that Peter

13:14:03  5    Mougey and I dropped off and then went to the mall and

6    had Chinese, and by the time we got back from dinner we

7    had already uploaded the entire DEA database onto an R

8    drive.

9              So what I'm really here to discuss is the

13:14:19 10    temporal scope.  And I cannot articulate the temporal

11    scope.  I can name that tune in five documents or less,

12    and I can't -- I'm having a hard time.

13              Pete Weinberger and I had this discussion,

14    we're having a hard time really digesting how anybody can

13:14:39 15    make a legitimate argument that the claims we're bringing

16    against the PBMs don't go back as far as 1996.

17              Now, if this is a burden argument or if the

18    documents don't no longer exist, that's fine.  You can

19    answer that.  We can argue burden all day long.  We can

13:15:04 20    argue -- you can simply say they don't exist after

21    reasonable inquiry.

22              But for the initial DR-2 and DR-3 rulings

23    you made five years ago, you made a determination that

24    this is the time frame in which the claims are relevant.

13:15:21 25              So what I'd like to direct your attention

1   to, first --

2                   SPECIAL MASTER COHEN:  Just to be clear,

3   when you say I made, it was I and the Court made.

4                   Go ahead.

13:15:29  5         MR. FARRELL:  Yes.  That's a very important

6   point is that it was -- it was disputed between the

7   parties.  It was submitted to the discovery master.  The

8   discovery master made rulings.  Those rulings were then

9   asked for reconsideration.

13:15:45 10                  You reconsidered -- Special Master

11  reconsidered it, and cut everything in half basically,

12  and then it got appealed up to Judge Polster, and he

13  affirmed it all.

14                  So the first document that I would like you

13:16:00 15 to take a look at is a document that I've circulated and

16  used before, and I'm going to start with ESI just because

17  it's the cleanest.

18                  And this is a copy for the Court and for

19  the parties.  And it's the 1997 Purdue Pharma contract.

13:16:24 20                 MR. VANDEN HEUVEL:  Your Honor, this is

21  Sage Vanden Heuvel for Express Scripts.

22                  I just want to object to the fact that

23  plaintiffs did not include these documents in the set of

24  documents they provided to you for this hearing so.

13:16:34 25                 MR. FARRELL:  That's just not true.

1            This literally is the document that I

2    attached and sent to you that you complained wasn't ripe

3    enough to go in front of the Special Master, so this is

4    the document for eight weeks I've been saying establishes

13:16:48  5    the temporal scope.

6            And if you look at it, the reason this is

7    important is this is a document dated April of '97.  It's

8    the earliest I have found for Express Scripts.

9            And if you notice at the bottom right-hand

13:17:03 10    corner, this is not an Express Scripts document.  This is

11    a Purdue Pharma document.  We got this from the Purdue

12    archives.  All right.

13            So if you turn to Page 4 of the document --

14    and it's, for the record, it's Bates stamp P as in Papa

13:17:27 15    Delta Delta, PDD 1701198993, when you look at Paragraph 4

16    in the --

17            SPECIAL MASTER COHEN:  Sorry, 993 or 996?

18            MR. FARRELL:  Well, what you're looking at

19    is 996.

13:17:43 20            I was identifying for the record the front

21    page of the document.

22            SPECIAL MASTER COHEN:  Oh.  Go ahead.

23            MR. FARRELL:  Yes.

24            The document page that you're looking at is

13:17:50 25    996.

1           If you look in the top left-hand corner

2    where it says "Reimbursement," this is what we will begin

3    the dialogue of what you would expect to be the standard

4    rebate agreement.

13:18:03  5           All right.  This is what you would expect

6    to see is that you have Purdue Pharma contracting with

7    Express Scripts as early as '97 on rebate agreements.

8           Now, if you look down at 4.5 at the bottom

9    of the page, what you're going to find is 4.5.1, all the

13:18:23  10   way to 4.5.10, you're going to see specific data fields

11   that Purdue Pharma and Express Scripts contracted would

12   be shared from Express Scripts to Purdue Pharma.

13          You're going to see in the middle of Page 5

14   ending in 997, "PBMs shall provide overall total amounts

13:18:49  15   and quantities to be rebated, summarized by NDC number."

16          You're going to look on Page 7 ending in

17   Bates stamp 999, where there is a record retention policy

18   where it says, "The PBMs shall maintain complete and

19   accurate records relating to the prescribing, dispensing

13:19:17  20   and sale of products to members."

21          And then here's where this is -- this is a

22   question -- this is an issue that is of most importance

23   to the PEC.  Page 8, ending in Bates stamp 000,

24   Paragraph 6.1 is something different.

13:19:37  25          Paragraph 6.1 is not a rebate agreement.

1    Paragraph 6.1 is a different contractual obligation

2    between Purdue Pharma and Express Scripts to do something

3    else; for them to have quarterly meetings, for them to

4    engage in professional services.

13:19:58  5           And what I'll submit to you, Special Master

6    Cohen, is that as the years proceed between the date of

7    this document and the date the documents began produced

8    in the Jeff Co. litigation, this contract splits into

9    two:  Into a rebate agreement and into a professional

13:20:18  10   services agreement.

11           So part of our case is going to be to

12   explore the professional services between Express Scripts

13   and Purdue Pharma dating back to the launch of OxyContin

14   as earliest as we can find expressed in this '97

13:20:40  15   document.

16           And then the final thing I want to point

17   out to you about this as you flip to the latter pages is

18   this isn't tangential.  If you flip to Pages 11, 12 and

19   13, this is OxyContin.

13:20:56  20           It's not like we're getting off on some

21   tangent.  This is a contract between Express Scripts and

22   Purdue Pharma on OxyContin for professional services.

23           We believe it's relevant to the case.

24           The second document I'd like to bring your

13:21:13  25   attention to with Express Scripts --

1     SPECIAL MASTER COHEN:  Let's say that

2     that's sufficient for Express Scripts, just to move

3     things along, do you have something similar with Optum?

4     MR. FARRELL:  Yes.  I've got some really

13:21:27 5     good stuff on Express Scripts, but yeah.

6     Moving -- let's move on to Optum, and I'm

7     not going to burden you with the whole story.

8     Here's what has happened with Optum.  Optum

9     has a more complicated history of mergers and

13:21:46 10    acquisitions, so I'm not going to burden you with the

11    complex story.

12    Here's what I do know that happened.  I do

13    know that the prior OptumRx entity did not put OxyContin

14    on their formulary for a number of years.

13:22:03 15    I'm holding documents we purged

16    from -- now, none of these documents have come from

17    Optum.  I'm holding documents from the Purdue production

18    where Purdue is identifying the fact that their P & T

19    committee rejected OxyContin on their national formulary;

13:22:24 20    identified they only had two of the 11 votes, and

21    identified a plan going forward to try to reverse that

22    decision.

23    So we know as early as '96, '97 --

24    SPECIAL MASTER COHEN:  It's my

13:22:37 25    understanding you're saying Purdue knew who the 11 voters

```
          1    were?

          2                MR. FARRELL:  No question.

          3                SPECIAL MASTER COHEN:  On the P & T

          4    committee?

13:22:44  5                MR. FARRELL:  No question.

          6                SPECIAL MASTER COHEN:  Go ahead.

          7                MR. FARRELL:  I have it here in my hand.

          8                But now, that's not the real reason I think

          9    we go back further with Optum.

13:22:52 10                Optum at its parent level has -- there's

         11    two aspects to this.  Not only was Optum had its own

         12    rebate agreements and working as a PBM, but they also had

         13    a media, a marketing company, and it's called

         14    OptumInsight.  It's a sister company.

13:23:15 15                They produced, in 2002, a memorandum,

         16    OptumInsight, to Purdue Pharma on a management plan and a

         17    marketing plan for pseudoaddiction.

         18                MR. WEINBERGER:  That was actually Ingenix.

         19                MR. FARRELL:  That was Ingenix, the

13:23:44 20    predecessor.

         21                And I brought a copy if you want to see it.

         22    I brought a copy if they want to go through it.

         23                But as early as 2002, OptumInsight is

         24    working with all of the front groups that we've alleged

13:23:54 25    Purdue Pharma used to advance it, and the language that's
```

1    in this memo prepared by OptumInsight says that people in

2    pain can't get addicted, there's no ceiling to the amount

3    of opium pills you can give them, and that

4    pseudoaddiction is real.

13:24:18    5    The language in here goes so far -- I'll

6    just let the document speak for itself.  2002,

7    OptumInsight is working with Laura Randa King at Purdue

8    Pharma to develop the national rollout of the marketing

9    plan to respond to issues of addiction and OxyContin, and

13:24:38    10    they use it as a -- as a platform to launch this drug on

11    America.

12    SPECIAL MASTER COHEN:  Let's turn to data.

13    There are different flavors of data.  For

14    example, specifically pharmacies, it was 2006; not 1996.

13:25:04    15    A MALE SPEAKER:  I'm having trouble hearing

16    you.

17    SPECIAL MASTER COHEN:  Sorry.

18    Pharmacies, the pharmacy data date was

19    2006, not 1996, in the pharmacy case.

13:25:12    20    MR. MOUGEY:  Correct.

21    SPECIAL MASTER COHEN:  And so I wonder

22    whether, for example, there should be different dates for

23    the mail-order pharmacy data from the PBMs and the claims

24    rebate Admin data.

13:25:27    25    MR. MOUGEY:  Two or three weeks ago I think

1    I would have agreed with you that we could stick with the

2    2006.

3              But as we've pulled back the curtain on

4    these Purdue docs and starting to develop several

5    examples of what Paul just went through for the PBMs, I

6    don't see a reason to hook ourselves or hinge ourselves

7    to the prior dispensing or the ARCOS data.

8              One of the things that's always been

9    missing in this case, if you'll recall, was that 2006,

10   the first Congressional hearing on opiate OxyContin use

11   and abuse was in 2001.

12             And what we were always missing in this

13   case was kind of a baseline of where we started, so when

14   we had the data in 2006 we knew that there had already

15   been congressional hearings, there had already been open

16   investigations, and we couldn't really ever see exactly

17   what the baseline, where it started.

18             So we used public ARCOS going as far back

19   as we could.  I don't remember exactly, but it gave us

20   the upward trajectory or the upward slope.

21             But if the defendants, PBMs, are in

22   possession of data going back that far, whether it's in

23   data warehouses, whether it's on tapes that need to be

24   backed up, wherever it is, to really see the impact of

25   the examples that Paul just went through and others,

1    there's no credible argument for how that data is

2    not -- when I say the data, I'm talking generally from

3    all different buckets and categories -- how those aren't

4    relevant to these claims going back to 1996.

13:27:07  5                It -- it's square on point for what this

6    case is going to turn into is what, what the baseline was

7    back in 1996, and how that proceeded because of the type

8    of materials that we're walking through, the contracts,

9    the relationships, the studies on pseudoaddiction, you

13:27:27  10   name it, the rebates, it's all of these forces combine

11   and the impact on the number.

12                MR. WEINBERGER:  Can I just add something?

13                MR. MOUGEY:  Of course.

14                MR. WEINBERGER:  So the other thing is as

13:27:43  15   you know from the evidence that we brought to trial, we

16   can also use the data to analyze all sorts of patterns,

17   prescribing patterns, use patterns, et cetera.

18                In 2016, Optum, there's a document from

19   Optum Jeff Co. 359430 which was a PowerPoint that Optum

13:28:12  20   prepared that says as follows:  "UnitedHealth Group

21   through its Optum division has one of the largest health

22   care data sets in the nation and its own big data

23   analytics environment that is unmatched in health care."

24                Now, this PowerPoint is about --

13:28:35  25                MR. HATCHETT:  I'm sorry, we don't -- can

1    we pause just until we have a chance to get a copy of the

2    document?

3              MR. WEINBERGER:  And so this is -- now

4    they're responding to the epidemic.

13:28:43    5              MR. HATCHETT:  Sorry, Pete, can you hold on

6    one second until we have a chance to get a copy of the

7    document?

8              MS. MILDRED CONROY:  Laura, I got it.

9              MR. WEINBERGER:  I'm looking at 359446.

13:29:09   10    I'm reading from that.

11                 "Capitalizing on these assets, we are now

12    building predictive modeling capabilities that will allow

13    us much greater leverage in getting ahead of the

14    problems, i.e. the opioid problems, before it's too

13:29:30   15    late."

16              You can read the rest of it yourself, but

17    most importantly it says here, "We can use this same

18    analytical capability to more closely monitor patterns of

19    prescribing and dispensing at the physician and pharmacy

13:29:47   20    level.  We can identify -- when we identify outliers, we

21    can take appropriate action."

22              MR. HATCHETT:  I'm sorry, Pete, I can't see

23    on this document.

24              Do you have a date for this document?  Is

13:29:59   25    this one --

13:30:05

13:30:31

13:30:59

13:31:26

13:31:54

1          MR. WEINBERGER:  2016.

2          MR. HATCHETT:  2016, okay, great.

3          Thank you.

4          MR. WEINBERGER:  Yeah.

5          So again, you can read the rest.

6          So, you know, the case is about what is the

7    earliest point in time when they had data that should

8    have been sending signals to them that they had to change

9    behavior in terms of, you know, what's -- what scripts

10   they were approving for payments and, you know, across as

11   you've heard earlier, across a whole range of chain and

12   independent pharmacies?

13          And as the epidemic is heating up in 2001

14   and 2002 and 2003, all that prior data is needed to

15   compare how the numbers are changing and how their own

16   big data analytics should have been looking at that and

17   figuring out, "How are we contributing to this

18   oversupply."

19          So, you know, it's about notice.  It's

20   about foreseeability.  It's about when the reports

21   are -- and we've got documents that, from Purdue, where

22   they're informing the PBMs of -- or the PBMs are learning

23   of the problems with abuse and diversion, you know, from

24   news reports in 2001.

25          And yet, you know, we know that it took

1   them until 2016 or '17 when the CDC finally decided that

2   there had to be, you know, a change in the policies and

3   regulations relating to OxyContin and the other Class 2

4   opioids to realize, well, oh, by the way, maybe we have

13:32:26 5   the data and the analytics capabilities to do something

6   about this.

7         Well, we say they should have been doing

8   something about it going back to the early 2000s.

9         MR. FARRELL:  Let me make one final comment

13:32:41 10   before we pass it to our colleagues.

11         Special Master Cohen, you ordered the DEA

12   to turn over ARCOS data back to when they had it, and

13   that was 2006.

14         They appealed it, and Judge Polster

13:32:53 15   affirmed it.

16         The same thing happened with Cardinal

17   Health, McKesson and AmerisourceBergen, this Court

18   ordered them to produce the data they had back to when

19   they had it.

13:33:07 20         Cardinal Health's data went back to 2001.

21   They produced their data, their transactional data.

22   AmerisourceBergen, I think it was 2004, and McKesson was

23   sometime around the same time frame.

24         This Court has consistently held if you've

13:33:22 25   got the data, then produce it.

1          And so what I'm looking at in these

2    documents is they identified my hometown of Huntington,

3    West Virginia as a hot spot for OxyContin.  It's in this

4    document in 2001.  I want the data.  I want to see what

13:33:42  5    they were seeing when they identified my hometown as a

6    hot spot for OxyContin in 2001.

7          And if they have that data, then they

8    need -- they should be ordered to turn it over.

9          MR. HATCHETT:  I'm sorry, Special Master

13:33:58 10    Cohen.

11          Could I ask what document you're talking

12    about?

13          MR. MOUGEY:  I'll just bring that in for a

14    landing.

13:34:12 15          The preliminary assessments of when the

16    defendants had data back to are just that, they're

17    preliminary.

18          As fields continue to be produced as

19    recently as the last 48 hours, and I understand they are

13:34:24 20    continuing to perform due diligence, but what I don't

21    want the takeaway from Paul to be at this point is that

22    whatever we say at this point is the date that we have

23    the data is somehow a cutoff line.

24          I think that we've tied the data in as far

13:34:38 25    back now as '96 to these contracts.  That should be the

1    order.  And if they don't have it, they don't have it.

2              But to artificially right now draw the line

3    and say, "This is where the -- this is how long we have

4    back the data so that's what the order is going to say,"

13:34:54   5    we've -- the defendants have now demonstrated that

6    they've taken positions, for example, on data fields,

7    data fields -- I'm just making this up -- one through 10,

8    and then as recently as just in the last couple of days

9    said, "Well, we found 11 and 12."

13:35:08  10              So I believe that the order should be tied

11   back to the docs which is '96.

12              SPECIAL MASTER COHEN:  I understand.

13              MR. MOUGEY:  And then we can figure out how

14   long we have the data from there.

13:35:16  15              SPECIAL MASTER COHEN:  I think counsel

16   opposite was asking you for the document ID of the one

17   you were just referring to.

18              MS. MILDRED CONROY:  Yes.

19              MR. HATCHETT:  It was not one of the

13:35:26  20   documents that was under discussion.

21              You referred to this document like it was

22   the document that was in front of the Court.

23              MR. FARRELL:  I'll identify it for you

24   right now.

13:35:33  25              It's PPLPC, Papa Papa Lima Papa Charlie,

1    035000005854.  It's a presentation by Purdue Pharma to

2    Express Scripts, and on Page 6 of the presentation it

3    says, "OxyContin hot spots," and it's a map with dots.

4                And if you'd like, I can read into the

13:36:03  5    record all of the hot spots they identified, or it can be

6    just self-evident in the document itself.

7                SPECIAL MASTER COHEN:  Thank you.

8                Okay.  So let me turn to the PBMs.

9                You know, the plaintiffs are correct when

13:36:18 10    they recite the history -- and I'm sure you're familiar

11    with it -- of both geographic and temporal scope.  And,

12    you know, the Court weighed and reweighed and

13    re-reweighed what those scopes should be.

14                Circumstances are different because we've

13:36:36 15    got different defendants with different burdens and so on

16    and so forth.

17                Nonetheless, we're here in what is at least

18    analogous to a motion for reconsideration, and the point

19    being that all of those weighings were made carefully and

13:36:54 20    thoughtfully and, you know, the Court came to places

21    where it thinks the balance was properly measured.

22                And so what I think I need to hear for the

23    Court to move away from that is why things are

24    meaningfully different from what they have been so far

13:37:14 25    for the last six, seven years of this case.

 1              MR. WASSERMAN:  Sure.  So Matthew Wasserman

 2    for Express Scripts.

 3              I first want to make sure we're on the same

 4    page about the data.

13:37:24  5              The plaintiffs have only asked for data

 6    back to 2006.  That's all that's been briefed.  That's

 7    all that's been met and conferred on.  I went back and

 8    checked the agenda just to make sure I wasn't forgetting.

 9    It says, "Plaintiffs seek data back to 2006.  PBM

13:37:41 10    defendants seek later dates."

11              When it comes to the data, there are

12    differences for Express Scripts between the claims data

13    and then the rebate and Admin fee data.

14              So claims data, we've already agreed to

13:38:00 15    produce 2008 through 2019.  That's twelve years of data.

16              And I went back and looked at the pharmacy

17    orders that were on the docket in 2019.  The pharmacies

18    had argued, "We should only produce three years of data."

19    You and Judge Polster disagreed; ultimately ordered them

13:38:20 20    to produce nine years of data, 2006 to 2014.

21              We're already agreeing to produce twelve

22    years of claims data, 2008 through 2019.

23              We've laid out in our papers why pre-2014

24    data for Express Scripts is especially burdensome to

13:38:40 25    pull.  It has to do with the merger with Medco, the data

1    being put on systems that are archived and offline.

2                We said we will take that burden, we will

3    go back to 2008.

4                The two years under dispute for claims data

5    for Express Scripts are 2006 and 2007.  Those are the two

6    years we understand the plaintiffs want, and it's the two

7    years we say we can't give.

8                We put in a declaration from Al DeCarlo.

9    Those two years of claims data are on physical floppy

10   disks somewhere in our storage warehouse.  They would

11   take immense work, twelve to 16 weeks, as estimated by

12   Mr. DeCarlo, to collect; that's if we can even find the

13   flash -- the floppy disks, analyze and produce.

14                And of course, that time could get wider if

15   the geographic scope is expanded.

16                On top of that, the plaintiffs

17   are -- earlier mentioned, well, the PBMs advertise data

18   as packaged and sold, so they already have this at their

19   fingertips.

20                Well, in our negotiations about data

21   fields, which aren't currently before you, we've told the

22   PEC, "We have a set of 40-some-odd data fields that we

23   frequently use and produce to our clients."

24                They've come back and asked for 400 data

25   fields.  Those are data fields that have never been

| | |
|---|---|
| 1 | pulled before, ever, especially for something as far back |
| 2 | as 2006 and 2007. |
| 3 | So you compound the geographic burden and |
| 4 | the data field burden. |
| 13:40:27 5 | And then all we're asking for on claims |
| 6 | data is that we not be ordered to produce '06 and '07. |
| 7 | That's on claims data. |
| 8 | MR. HATCHETT:  I guess -- this is Andrew |
| 9 | Hatchett for Optum, before Matt continues. |
| 13:40:44 10 | In the plaintiffs' presentation I know |
| 11 | there was originally a question presented to them, and we |
| 12 | got into a lot of documents.  In the course of that |
| 13 | discussion, you know, for us we have 10 different |
| 14 | defendant entities.  We were provided one study proposal. |
| 13:40:58 15 | But we're presented with a lot of arguments |
| 16 | that conflate all of our defendant entities into one. |
| 17 | Also conflating the question of data and documents, but |
| 18 | we also are unique on data. |
| 19 | So I think it might be helpful to break |
| 13:41:11 20 | this up logically and let us respond to the data point |
| 21 | before we go into documents for Express Scripts, if that |
| 22 | makes sense, so that we can put data issues together. |
| 23 | MR. WASSERMAN:  Yeah, I just want to finish |
| 24 | on rebate and Admin fees so you have everything from |
| 13:41:25 25 | Express Scripts. |

1    MR. HATCHETT:  I'm sorry, I thought you

2 were done on data.

3    MR. WASSERMAN:  No problem.  No problem.

4    Okay.  So rebate and Admin fee, this data

13:41:33  5 is stored together.

6    You earlier asked, like, what is Admin fee.

7 It's basically, you know, a couple cent charge for each

8 transaction.  It's like a transactional charge for the

9 PBM to adjudicate the claim.

13:41:45 10    That data, we've asked to only produce from

11 2014 forward.  So whereas we're willing to go back to

12 2008 for claims data, rebate is 2014 forward.  And the

13 reason for that is because the rebate and Admin fee data,

14 which is stored together, is stored on a system called

13:42:08 15 Optim, which I know is confusing but it's O-P-T-I-M.

16    It is 50 terabytes of data.  It is

17 basically where everything from the company is stored

18 outside of the claims data.  And it's partitioned into

19 140-plus separate data sets.

13:42:30 20    What Mr. DeCarlo testified to in his

21 declaration, it would take at least six months to restore

22 that data and the reason is because unlike, say, an

23 active database where you can run queries across, when

24 you have 50 terabytes of data and it's partitioned 140

13:42:51 25 times, you would have to go into each one of those data

1    sets, all 140-plus of them, and run your queries for

2    geographic scope, run your queries for national drug

3    codes.

4                    It would take months to even determine the

13:43:10  5    size of the data that exists from pre-2014 for rebates

6    and Admin fee.  It would take another couple months just

7    to analyze that data and pull the data fields that

8    plaintiffs want, the geographic area that's been told.

9                    All of this is in the context of a June

13:43:32 10    14th deadline, which I know you know about, for us to

11    complete our data production.

12                    I don't want to understate the burden for

13    producing any pre-2014 data for on the claims data side.

14    It will take many weeks to do that for us because it is

13:43:51 15    restoring offline databases.

16                    But when it comes to rebate and Admin fee

17    from pre-2014, it would be at least a six-month process

18    to even restore that data, which would completely blow up

19    the schedule that's currently in place.

13:44:10 20                    And then I just, one last point on rebates.

21    We think there's a limited need for the rebate data

22    pre-2014.  This isn't a damages case.  They don't need to

23    go line-by-line, dollar-by-dollar, cent-by-cent to figure

24    out how many dollars of rebates did you take in, how many

13:44:31 25    did you share with your clients.

 1              They've already -- you've seen

 2   today -- made their argument about rebates.  They have

 3   the rebate contracts.  They're going to have all of our

 4   custodial documents talking about rebates in real-time.

13:44:48  5   You're going to have e-mails saying, "We got this much.

 6   We paid this much in this year at this time from this

 7   manufacturer for this drug."

 8              So they've already got the documents, the

 9   rebate arrangements that they need to stand up before the

13:45:03 10   Court, before a jury, to make the argument that you heard

 11   today.

 12              What they don't need is cent-by-cent for

 13   decades of every single claim that a rebate was paid on.

 14   They don't need that transactional data to tell their

13:45:23 15   story.

 16              So when you're looking at a six-month

 17   burden to restore rebate data from an offline system that

 18   is 50 terabytes and partitioned 140 times, compared to

 19   what limited benefit they would get in getting dollars

13:45:41 20   and cents out of it, if you can even make sense of that

 21   data, it's so old -- the data fields are going to be

 22   different; there's going to be a whole bunch of

 23   cross-referencing that Mr. DeCarlo explained in his

 24   declaration -- we say they already have what they need to

13:45:56 25   make their argument when it comes to the rebate data.

1      SPECIAL MASTER COHEN:  Let me stop and just

2   ask plaintiffs to respond to that.

3      MR. FARRELL:  So briefly, if you order the

4   documents back to '96, then perhaps he's right, those

13:46:12  5   documents will have e-mails that contain discussions in

6   summary details of the data sets that we're looking for.

7      But you haven't; the Court hasn't ordered

8   documents back to '96, and the defendants certainly

9   haven't agreed to documents back to '96, so that's part

13:46:28 10   of the equation.

11      MR. MOUGEY:  The second part of the

12   equation is getting that evidence, getting those

13   documents into evidence.

14      I think in this courtroom and in others

13:46:37 15   around the country, we have -- and I don't know what

16   documents we're talking about because I haven't seen them

17   yet, and maybe that's a step in this process that we need

18   to look at, but what are the documents that will give us

19   with specificity what those rebates are, who are they

13:46:53 20   from, and how do we get that into evidence, whereas the

21   data is much easier.

22      Now, that may be the easier step, but I'm

23   just anticipating as we sat in this courtroom and others

24   when we received objection after objection about trying

13:47:09 25   to get evidence in in front of -- with witnesses that

1    didn't have personal knowledge of a document potentially

2    because it's 20-something years old.

3                    That, that being said, does that mean that

4    we can't figure out a way to address that issue on

13:47:25  5    rebates?  And maybe that's a streamlined way to do it.  I

6    think we could certainly explore that.

7                    MS. McGOWAN:  Special Master Cohen, if I

8    could address OptumRx's PBM claims and rebate data, and

9    then others on the team can address the documents point.

13:47:46  10                   SPECIAL MASTER COHEN:  Please.

11                   MS. McGOWAN:  You know, as you said at the

12    outset we can't produce what we don't have, and that's

13    the situation that we're in.

14                    I actually am also quite surprised to hear

13:47:56  15    from the plaintiffs that they are seeking data before

16    2006 because I came to this meeting, after our meet and

17    confer process over the last several months, with the

18    understanding that they were seeking data from 2006

19    forward.

13:48:09  20                   But for PBM claims data, we have explained

21    since January that we are willing to query three systems.

22    One is a live system.  Two are legacy systems that are

23    still available, and that data on those systems is

24    available back to 2010.

13:48:27  25                   And after asking multiple resources within

1   the company, multiple times, multiple ways, we have never

2   heard that there is pre-2010 data.  And that has been

3   consistent.

4           We have even gone so far as to just ask the

13:48:43  5   system, "Do you have any pre-2010 data" so to speak, and

6   we identified one small pocket of pre-2010 data, and

7   described it in detail for the plaintiffs and would be

8   willing to produce from it for in scope drugs.

9           But we have not found a global source for

13:48:59 10   pre-2010 claims data, and at this point I have no reason

11   to believe that one exists.

12           On the rebate data, it's a similar

13   situation.  It's a different system.  We have employed a

14   similar approach.  We've asked multiple team leads,

13:49:14 15   multiple people who work with the data regularly, is

16   there any way to get data before 2010 or 2008 on the

17   catamaran side, and repeatedly we've heard the same

18   answers, "No, we have provided what we have.  It goes

19   back to 2010 or 2008.  We have offered that to the

13:49:30 20   plaintiffs."

21           We did identify a backup tape on the rebate

22   data system, and we had the team work very hard and very

23   quickly to restore it and see was there data that went

24   back before 2010.

13:49:43 25           Answer:  No.

1          So again, we cannot produce back before

2     what we have, and we have offered what we have.

3          On the mail-order dispensing system, we

4     have identified two systems:  An active system and an

13:49:57  5     archive.  We are willing to look in both of those

6     systems, and we believe that data go back to about 2011

7     in those systems.

8          To date, we have not identified a source of

9     pre-2011 data beyond learning that there was a legacy

13:50:12  10    system, but at this point I have talked to -- and I'm

11    going to underestimate here -- at least 10 people to say

12    where is it, what's on it, and could it be restored, and

13    I have not received an answer to that question that I

14    could report back here.

13:50:26  15         So to call that a preliminary assessment, I

16    think, underestimates the amount of work that we have

17    done to confirm what we have and to offer what we have to

18    the plaintiffs and what we could produce on the CMO

19    schedule.

13:50:44  20         MR. MOUGEY:  If I may add just a couple

21    points real quick.

22         It is preliminary.  And forgive my southern

23    colloquialism, but the proof is in the pudding.  And

24    we've heard repeatedly about all the work that we've

13:51:00  25    done, and I understand it's a big company and there's a

1    lot of different places to look, but we've heard

2    repeatedly, "This is the end, this is all we have."

3                    We're literally still getting new fields

4    within the last 48 hours.  We're still getting new data

13:51:15  5    additions.

6                    So I appreciate the continued follow-up,

7    but what we know today, and what we know two weeks from

8    now, and what we knew two weeks ago are materially

9    different.

13:51:26 10                    And the issue isn't if the order -- if the

11    order matches the evidence and -- when I say "The

12    evidence," the documents that we found to date -- that

13    clearly gets tied back to 1996.  And if we would have had

14    the tools to make these assessments earlier on, this

13:51:45 15    conversation could have had -- could have happened a

16    month-and-a-half ago.

17                    But that's not what's happened.  We've just

18    gotten access to some of these documents and understand

19    now what the temporal scope is a lot clearer than we did

13:51:57 20    two weeks ago.

21                    So my simple ask is to not tie a date

22    artificially to what supposedly we have right now, as

23    that's a moving target.

24                    SPECIAL MASTER COHEN:  I want to take a

13:52:12 25    break and go back and kind of just chew on this for a

1  minute.

2            So we'll take a little bit of a break.  But

3  before we do, I also want to ask a couple other questions

4  and make a couple other observations.

13:52:24  5            So while we're here, right, one of the, I

6  think, earlier -- but I don't really remember -- letters

7  from plaintiffs was a

8  discovery-request-by-discovery-request recitation of

9  where things stood.

13:52:42  10            And I believe that progress has been made

11  since then, but while we're altogether are there any

12  other topics that we should talk about now?

13            MR. HATCHETT:  I guess I want to clarify.

14            I know you said you were going to go back.

13:52:56  15            We have only so far presented our story as

16  it relates to data, so I know that there's documents and

17  data, and the plaintiffs have conflated the two in their

18  discussion.  We have different points that we would make

19  as to documents versus data.

13:53:11  20            So if that's part of what Your Honor -- the

21  Special Master is going to go back and think about, we

22  would like an opportunity to present the arguments we

23  would make on documents.

24            Of course, if you're looking at data, we

13:53:22  25  can come back and talk documents after our break.

1          SPECIAL MASTER COHEN:  No, there's been so

2   much that I forgot that I wanted to come back and give

3   you a chance to do that, but so we will in just a moment

4   before I go back and noodle.

13:53:33 5          But let me go back to the question I just

6   asked.  Are there any other topics that we should chat

7   about that you see on the horizon or that you're just

8   stuck on and we should talk about while we're all here

9   together?

13:53:47 10          MR. FARRELL:  Yeah, I think in general the

11   meet and confers with Express Scripts, they've

12   supplemented their discovery responses, and to the best

13   that I can say is there's a clear expectation or

14   understanding from the plaintiffs' perspective that ESI

13:54:09 15   understands what we're asking for, and that they're

16   looking forward to respond to those 35 discovery

17   requests.

18          Not so much with Optum.

19          So before we get to a discussion of

13:54:23 20   question-by-question-by-question whether or not we bring

21   a motion to compel, we really needed the bigger pictures

22   addressed:  That's the temporal scope, the geographic

23   scope, and then which defendants are going to answer.

24          Whether or not --

13:54:41 25          SPECIAL MASTER COHEN:  Let -- am I

1     interrupting?

2                    MR. FARRELL:  No.

3                    SPECIAL MASTER COHEN:  Let's talk about the

4     last one because that's actually something I wanted to

13:54:47  5     mention, and more particularly Judge Polster explicitly

6     asked that I mention, and that is so what he has said is

7     that the way these cases are going to get tried is that

8     Optum family entities are going to be referred to

9     collectively as Optum, and that ESI family entities are

13:55:11 10     going to be referred to collectively as ESI.

11                    The same thing was true with the

12     Bellwethers that we've already tried, right?  There

13     were -- I'm making it up -- you know, somewhere between

14     six and 60 CVS entities, and there were arguments over

13:55:29 15     reference at trial to one versus the other versus the

16     other.

17                    And the Judge said, "That's not how this is

18     happening.  CVS is going to be called CVS, and you all

19     have to figure it out."

13:55:41 20                    And the way it was figured out was

21     essentially, "We'll agree to dismiss without prejudice

22     all of those other" -- I think; I might be saying this

23     wrong -- "We'll agree to dismiss without prejudice all of

24     those other entities with the understanding that either,

13:55:53 25     A, there is a CVS entity that can pay anything that

1  becomes necessary, indemnification or whatever it is, and

2  so they don't need to be here and all of those other CVS

3  entities get dismissed.

4          That's good because SEC reporting now, you

13:56:14  5  don't have all of those entities being sued, and they

6  don't have to include that on their balance sheet as a

7  potential liability, all of the good reasons that there

8  are for getting rid of those entities.

9          You've got a parent who is saying, "Look,

13:56:30  10  if there is a verdict, we can pay it," which is what the

11  plaintiffs are really concerned about.  The discovery

12  still includes those folks.  And/or that if we have to

13  figure it out, we'll figure it out later.

14          In other words, for example, with TEVA,

13:56:46  15  they just filed a stipulation on the record in the -- I

16  think it's the hospital cases, saying,

17  "We'll -- let's -- let's get to a verdict if there's

18  going to be one.  If there's a verdict against TEVA, then

19  we'll go and litigate whether there's personal

13:57:08  20  jurisdiction against these other ones, but for now we

21  don't need to."  Right?

22          So that was a convoluted way of saying that

23  the Judge is extremely interested in having you all

24  figure out a way to get to a similar point so that -- and

13:57:25  25  I think you've partly done it; I think you're on the way

1    there -- so that all of the defendant entities are

2    responding to discovery; that there will be reference to

3    those families with a single term; and that -- it's the

4    discovery issue that I'm most concerned about -- that you

13:57:44    5    can figure out a way to get rid of those other entities

6    as a practical matter as we litigate so there's no fights

7    about who's answering.  It's just you all are answering.

8            That probably wasn't as clear as I wanted

9    it to be, but I hope you have a sense of what I'm trying

13:58:02    10    to get to.

11            MR. FARRELL:  Yes.

12            Special Master Cohen, you have the three

13    co-leads for the PEC here, so speaking on our behalf, we

14    are familiar with this practice and with CVS.

13:58:13    15            And I think the cleanest way is for me to

16    state affirmatively on the record -- obviously we would

17    need client consent -- is that if, for example, Express

18    Scripts, if Express Scripts Inc. would stipulate or if

19    the family of Express Scripts, the Evernorth and all the

13:58:32    20    others, would stipulate that they would defend the

21    allegations in the complaint in the name of Express

22    Scripts Inc., and that the parent companies would

23    indemnify and hold harmless any liability, meaning the

24    Express Scripts Inc. is not an underfunded subsidiary, we

13:58:49    25    would be interested in going forward with the dismissal

1   without prejudice of the parent companies, which for

2   whatever reporting purposes, benefit it is for the

3   Court's purpose, allows us to move forward with Express

4   Scripts Inc.

13:59:06  5         With regard to Optum, I think they're

6   probably in even a better situation because of their

7   tree, that we would -- we would be willing to enter into

8   discussions, and we've communicated this with counsel, to

9   stipulate to the dismissal of UHG as the parent, and have

13:59:26 10   Optum Inc., and if you don't want Optum Inc. as the

11   holding company, OptumRx as the representative group

12   to -- for purposes of the allegations in the complaint,

13   with an agreed dismissal without prejudice with the

14   understanding that the parent companies or the holding

13:59:47 15   company would indemnify and hold harmless any judgment

16   against OptumRx and OptumInsight.

17         Now, again, it's a little complex because

18   Optum is divided out into three different entities,

19   right, but we would be -- we would call it all the same,

14:00:03 20   whatever they want to name it, Optum.  They could get a

21   dismissal of their parent companies, defend in a single

22   name, and we would entertain that as well.

23         SPECIAL MASTER COHEN:  I don't need a

24   response.

14:00:14 25         I'm just telling you you guys need to work

1    it out.

2                    MR. COOPER:  Yes.  Special Master Cohen,

3    thank you.

4                    This is Jonathan Cooper for Express

14:00:20  5    Scripts.  And I understood we don't need to give a

6    response now, and obviously this is something we will

7    discuss with our client.

8                    I just do want to note for the record two

9    things.

14:00:29 10                    One is we're certainly open to streamlining

11   where we can without prejudice.  That said, I think there

12   are some differences here, at least with respect to

13   Express Scripts.  To give one example, Express Scripts

14   here and its family of entities is being sued in separate

14:00:44 15   capacities, for example, both as a PBM and as a

16   mail-order pharmacy.

17                    And there are different entities that do

18   those things and they have different legal obligations.

19                    And so I, you know, I think there could be

14:00:55 20   problems if you conflate those two into a single term

21   of -- and also conflating some of the obligations.

22                    So this is something we'll have to look

23   through, and we're happy to discuss it with the PEC and

24   try to work something out the best we can without

14:01:09 25   prejudice to our client.

1        SPECIAL MASTER COHEN:  I appreciate that.

2            I know the Judge is very anxious for that

3    to be addressed.

4            And, you know, you can be presented with a

14:01:20 5    possibility and find ways to get there or find ways not

6    to get there.  And so the Court appreciates your working

7    your very hardest to find ways to get there.

8            MR. HATCHETT:  So, Special Master, this is

9    Andrew Hatchett for the OptumRx defendants.

14:01:34 10            In -- I would agree that there are going to

11    be situations in this litigation, like the one that just

12    occurred, where it would make sense to use a single

13    moniker to describe the entities.

14            I think that on a more holistic standpoint,

14:01:53 15    we're not talking about a situation where it's only

16    OptumRx and two ultimate parents or two parents, an above

17    parent and an ultimate parent.

18            We also have cash card entities, we have

19    the OptumInsight defendants, we have OptumHealth.  There

14:02:09 20    are 10 different defendants.  Nine of them have moved to

21    dismiss based on a lack of personal jurisdiction.

22            We're engaging in discovery with respect to

23    those defendants under a stipulation and order that says

24    that we don't waive our jurisdictional defenses.

14:02:22 25            But the allegations that are directed, I

1    mean so today I guess when the plaintiffs were giving

2    their presentation, they would say things like "package

3    and sell data," which is not true.

4                And it's certainly not true for the PBM

14:02:35  5    entities, so the driving entity that was the, you know,

6    original defendant, OptumRx, which is why I say the

7    OptumRx defendants, is because that was the core

8    defendant in our family from the beginning.

9                And so as the amendments have happened and

14:02:49 10    other defendants have been added, they're referring to

11    entities that provide services that are very different

12    from PBM-related services.

13                And so there are going to be situations

14    where we believe it would be entirely inappropriate to

14:03:03 15    refer to those two entities collectively.

16                Obviously I don't think we have to resolve

17    for trial.  I mean, my understanding is that these trials

18    will be remanded to different Courts.  Judge Polster

19    won't try the cases.

14:03:16 20                And so maybe some of those things can work

21    out later.

22                I do think in the course of discovery there

23    will be opportunities to refer collectively to

24    defendants, but there may be situations where we need to

14:03:31 25    carve out the defendants separately and respond

1    separately for individual entities.

2              And so obviously we can brief those issues

3    in various contexts.

4              I understand the Court's desire to

14:03:43  5    streamline, and we support that and can get behind it,

6    but there are situations that I can envision where that

7    would result in a prejudice, and so we would need to

8    raise those as they occur.

9              MR. FARRELL:  Special Master Cohen, I think

14:03:52 10    that belies a fundamental obstacle moving forward.

11              CVS was sued as a pharmacy, CVS of Ohio,

12    CVS distribution facility, and the CVS parent company.

13              Different DEA regulations, different

14    purposes, different roles, different holding companies,

14:04:14 15    and we were able to work it out.

16              SPECIAL MASTER COHEN:  Yeah.

17              Look, I can tell you that the Judge,

18    Andrew, the Judge really wants this to be simplified as

19    much as possible.

14:04:24 20              He would prefer not to even deal with your

21    motions to dismiss on personal jurisdiction because it

22    can be worked out.  It has been before by other

23    defendants in other cases.

24              So I'm really urging you very, very, very

14:04:36 25    strongly, as strongly as I can -- if the Judge reads this

1    transcript he's going to see me saying this on his

2    behalf -- if you figure out how to minimize the number of

3    parties, come to agreements, so that even the

4    jurisdictional motions don't have to be addressed.  Okay?

14:04:54  5            I heard you.

6            MR. HATCHETT:  Certainly we would be happy

7    to engage with the plaintiffs on that.

8            I mean, if there are opportunities to

9    minimize the number of defendants that are involved in

14:05:02  10   the case, without making sure it's not to our prejudice

11   to do so, we will certainly do so.

12           SPECIAL MASTER COHEN:  Yeah, and the other

13   defendants might be able to help you explain how they got

14   there.

14:05:12  15           MR. HATCHETT:  And we have definitely

16   engaged in discussions I know with respect to the

17   ultimate parents.

18           I know that we have a wider range of

19   entities that are involved.  And if there are

14:05:22  20   opportunities to reach some sort of agreement that would

21   encompass the other entities as well, I certainly think

22   that, you know, we would be happy to engage in those

23   conversations.

24           SPECIAL MASTER COHEN:  Okay.  So before I

14:05:30  25   go back and noodle, you wanted to touch on other aspects

1    of what we were discussing.

2              MR. BADALA:  Special Master Cohen, just

3    before we get back into that, this should be

4    noncontroversial, but this is Salvatore Badala from

14:05:48 5   Napoli Shkolnik.

6              We've received back waivers of service from

7    ESI.  We haven't received them back from Optum.

8              We just want confirmation that they will be

9    signing those waivers of service for CT-12 through 15.

14:06:04 10  We've asked for confirmation as late as yesterday, but we

11   haven't received them back.

12             MS. McGOWAN:  Yes, Sal.

13             MR. BADALA:  Great.  Thank you.

14             MR. WASSERMAN:  So, Special Master, Matthew

14:06:17 15  Wasserman.

16             Before I hand it over to my colleague Sage

17   Vanden Heuvel to try his hardest to convince you on the

18   document temporal scope, just to put a quick pin on data

19   temporal scope I would just point you to Tab 341-S.

14:06:28 20            341-S, Pages 4 through 8, I think that

21   cleanly lays out what is actually in dispute with respect

22   to Express Scripts' data.  I know there's a lot of tabs,

23   a lot of years, a lot of categories, so I just wanted to

24   put that on your radar.

14:06:46 25            SPECIAL MASTER COHEN:  I'm sorry, you said

```
          1    34-S, and then what page?
          2               MR. WASSERMAN:  341-S, and it's Pages 4
          3    through 8 of that letter.
          4               SPECIAL MASTER COHEN:  Got it.
14:06:54  5               MR. WASSERMAN:  Thank you.
          6               MR.  VANDEN HEUVEL:  Your Honor, Sage
          7    Vanden Heuvel for Express Scripts.
          8               So I'm just going to be talking about the
          9    temporal scope of documents.
14:07:02 10               The plaintiffs stated that the burden issue
         11    of producing documents back to 1996, which is now 28
         12    years ago, is a separate issue, and that the key issue
         13    for the Court is just relevance.
         14               But under Rule 26, as this Court knows, the
14:07:21 15    Court has to weigh both the burden as well as the
         16    relevance, and determine whether this discovery is
         17    proportionate to the needs of the case.  And producing
         18    documents going back 20 to 30 years is extremely
         19    burdensome.
14:07:33 20               I know from working on this case the past
         21    several years, just getting documents from 2006 to 2010
         22    is extremely hard.  Getting documents from the early
         23    2000s to the '90s would be a monumental task.
         24               And the Court stated that this is
14:07:50 25    essentially a motion for reconsideration, and the
```

1   plaintiffs --

2             SPECIAL MASTER COHEN:  Analogous to.

3             MR. VANDEN HEUVEL:  Analogous.  Analogous

4   to it.

14:07:58 5             The plaintiffs have not put forth any new

6   law or circumstances that would justify giving the PBMs a

7   much greater temporal scope than the distributors or the

8   manufacturers.

9             SPECIAL MASTER COHEN:  Manufacturers were

14:08:08 10   back essentially to 1996.

11            MR. VANDEN HEUVEL:  Excuse me, the

12   distributors and the pharmacies.

13            The manufacturers had to produce discovery

14   back to one year before the relevant drugs were released,

14:08:18 15   so not every manufacturer had to produce drugs -- produce

16   discovery back to the '90s.

17            The plaintiffs have argued that essentially

18   Express Scripts was colluding with Purdue.

19            First of all, we disagree with that, you

14:08:34 20   know, that characterization.

21            This contract that they put before the

22   Court, a rebate agreement, you know, this was just a

23   standard rebate agreement that PBMs entered into with

24   many manufacturers in order to reduce the price of

14:08:48 25   FDA-approved drugs for their plan-sponsored clients.

1        You know, this is not collusion, this is

2    not conspiracy.  This is just an arm's length business

3    transaction.

4        And I would note that in Track 1 the

5    plaintiffs also argued that there was a conspiracy

6    between the manufacturers, there was a conspiracy between

7    the manufacturers and the distributors, as well as the

8    pharmacies.

9        They made that, those same allegations back

10   then.  And the Court didn't, as a result of that

11   allegation, determine that everyone had to produce

12   discovery back to 1996.

13       So I don't think that any different outcome

14   should happen here.  Just because they've alleged

15   conspiracy does not mean that the burden of producing

16   documents from 20 and 30 years ago is justified by those

17   allegations.

18       And by the way, these rebate agreements,

19   we've already agreed to produce those as far back as we

20   have them back to the 1996, if we have them.  So to the

21   extent that they think that there's a conspiracy or

22   collusion set forth in these contracts with Purdue, we're

23   willing to produce those.

24       But what the plaintiffs are asking here is

25   for a much greater burden to be put on the PBMs than was

1    put on almost any other defendant in the MDL, because

2    they're not limiting their discovery requests just to one

3    particular drug or one particular geographic area.  They

4    want us to produce all of our discovery for all of their

14:10:10  5    requests essentially back to 1996.

6            And we just don't see the relevance of

7    these allegations supporting such a burden.

8            Now, I'm not arguing that these allegations

9    are irrelevant.  I'm just saying that when you go back

14:10:26 10    further in time, based on the allegations set forth in

11    their complaints, it just becomes less relevant.

12            And they have plenty of discovery, both

13    from Purdue's documents that are in the MDL repository

14    that they've cited today and that they've noted in their

14:10:39 15    letters, to make their case regarding this collusion or

16    conspiracy allegation.

17            And they also have, you know, plenty of

18    documents from 2006 forward to make their case regarding

19    the PBMs' interactions with opioid manufacturers, the

14:10:57 20    PBMs' formulary design, the PBMs' utilization management

21    processes in order to make their case.

22            I don't think that there's any

23    justification for putting on that burden of producing

24    documents all the way back 28 years in this matter.

14:11:16 25            MS. STRUMPH:  And if I may for OptumRx,

1    this is Carolyn Strumph, I just want to build on what my

2    colleague at Express Scripts said with respect to OptumRx

3    specifically and the documents that plaintiffs' counsel

4    flagged earlier.

14:11:28  5            So the document that was shown that was a

6    rebate agreement between Prescription Solutions, which is

7    a predecessor entity to OptumRx, and Purdue Pharma, that

8    is just a rebate agreement.  That doesn't tell us

9    anything.  It's a contract.

14:11:43  10            And the fact of the existence of a contract

11    going back to a particular date does not necessarily

12    warrant the broadly sweeping discovery that plaintiffs

13    seek back nearly 30 years.

14            Also, Prescription Solutions around that

14:11:58  15    time was described in the same Purdue documents that were

16    cited in the PEC's position paper as a small

17    California-based PBM.

18            So none of the Bellwether jurisdictions are

19    in California.  And there's no evidence or even

14:12:12  20    allegation that this contract with a California-based PBM

21    back in the late 1990s somehow had some influence in the

22    Bellwether jurisdictions, which are not on the west

23    coast, which are largely in the middle of the country and

24    on the east coast.

14:12:27  25            SPECIAL MASTER COHEN:  Are you saying that

1    that contract isn't representative of what -- of what all

2    the other contracts were with every other jurisdiction?

3                    I mean, I think it's -- you're suggesting

4    that because it's a California contract it has nothing to

14:12:40  5    do with these cases.  That doesn't sound right to me.

6                    MS. STRUMPH:  And I'm sorry if I misspoke.

7                    I don't believe it's a California contract.

8                    What I'm saying is that the clients that

9    Prescription Solutions served around that time were

14:12:50  10   largely California-based clients, and so in order for any

11   rebate agreement that Prescription Solutions entered into

12   to have any effect on the Bellwether jurisdictions, there

13   would have had to be members of the health plan clients,

14   of Prescription Solutions health plan clients would have

14:13:09  15   to be members living in those Bellwether jurisdictions

16   who then, you know, processed prescriptions for opioids

17   at issue in the case.

18                    So the existence of the contract itself

19   does not tell us that there is any, any influence, any

14:13:21  20   impact in the Bellwether jurisdictions.

21                    And just one more point I want to raise.

22                    You know, we've talked a little bit about

23   the discovery that was ordered as to the distributor

24   defendants and the pharmacy defendants.

14:13:33  25                    And, of course, I don't represent a

1    distributor defendant so maybe I'm speaking a little bit

2    out of turn here, but I have to imagine that the entities

3    that physically move opioids around the country had a

4    relationship with drug manufacturers back in the 1990s.

14:13:47  5    I don't know what contracts they were, what

6    communications they had, what documents they exchanged,

7    but the fact of a document or a contract between

8    Prescription Solutions and Purdue Pharma or any other

9    drug manufacturer does not -- does not warrant discovery

14:14:03 10    going back so far.

11    It didn't for the distributor defendants,

12    who I'm certain had documents between them and the

13    various drug manufacturers dating back to the late 1990s.

14    But even then, discovery was ordered back only to 2006.

14:14:16 15    And we would ask for the same treatment

16    here.  There's no reason to treat the PBMs differently

17    from the distributor defendants at this time.

18    SPECIAL MASTER COHEN:  Okay.  Let's take

19    15.

14:14:30 20    It's call it 2:15.  We'll be back at 2:30.

21    MS. SINGER:  Special Master Cohen, Linda

22    Singer.

23    Will we have a chance to respond before you

24    issue your decision?

14:14:42 25    SPECIAL MASTER COHEN:  Let's do it now.

1        You've got just a minute or two.

2              MS. SINGER:  Hearing your excitement, I

3     will keep it short.

4              So I just want to respond on some of the

14:14:59 5     OptumRx points.

6              SPECIAL MASTER COHEN:  Trying to get you on

7     your plane.

8              MS. SINGER:  What?

9              SPECIAL MASTER COHEN:  I'm just trying to

14:15:04 10    get you on your plane.

11             MS. SINGER:  Thank you.

12             So in terms of OptumRx and temporal scope,

13    one of the things -- and I think Mr. Weinberger referred

14    to this earlier -- but I want to refer you back to your

14:15:18 15    own ruling, discovery ruling three, where you cite an

16    earlier decision, *In Re:  Welding Fume Products Liability*

17    *Litigation,* which I know you know well.

18             But in that order you reference the fact

19    that a document that tends to show, for example, that a

14:15:34 20    defendant knew in 1940 that exposure to the product was

21    dangerous and damaging was still relevant even though the

22    plaintiff in that case wasn't exposed until years later.

23             One of the documents that we referred to

24    from OptumRx, which is PPLPC 029000037059, is a document

14:15:57 25    in which a United employee talks about overpromotion of

1    opioids, abuse of OxyContin, a significant increase in

2    pharmacy trend and, most importantly, an increase in

3    patient morbidity and mortality, and asks what they're

4    doing to deal with that.

14:16:19  5         This defendant family had knowledge of

6    abuse, diversion, morbidity and mortality back to

7    19 -- to 2001, and yet continued to accept rebates and

8    enter into agreements to allow it to collect profits

9    related to opioids.

14:16:38  10         And they acknowledge their internal

11   discussions, the debates they were having, none of which

12   would be available through manufacture documents are

13   critical in this case and justify this scope of

14   discovery.

14:16:50  15         These defendants have been defendants in

16   this case through 2018; should have litigation holds in

17   place; and there's no additional burden.  They've gotten

18   a benefit from having been able to stand on the sidelines

19   for five years.

14:17:02  20         There are other documents.  I don't want to

21   belabor it, though.

22              MR. HATCHETT:  I just want to clarify that

23   the document that's been passed around is a communication

24   between Purdue and UnitedHealth Care; not UnitedHealth

25   Group or any of the defendants in the case.

1          UnitedHealth Care is actually not a

2     defendant.  It's actually a plaintiff in the case.

3          So they are citing a document between

4     Purdue and the plaintiffs; not a defendant.

14:17:23   5          Thank you.

6          SPECIAL MASTER COHEN:  Okay.  Now it is

7     2:15, so I'll see you at 2:30.

8          (Recess taken.)

9          SPECIAL MASTER COHEN:  So there is no

14:41:33  10     science to weighing all of the factors under Rule 26, the

11     relevancy of the information, the data, and the

12     documents, the burden on the defendants in producing

13     them, and there are different kinds of data and different

14     kinds of documents.

14:41:49  15          And the Court has weighed, like I said,

16     weighed these issues many times before with different

17     varieties of defendants, which makes all of it hard for

18     me.  But that's part of the job.

19          So I'm going to tell you where I've landed

14:42:08  20     on these issues, and I'm really just going to bottom line

21     it.  Maybe give a bit of an explanation, but most of the

22     explanation really comes down to things I've already

23     said, and I feel like I don't need to repeat them.

24          So with regard to documents as to both

14:42:25  25     Optum and ESI, those are going to go back to 1996.  It

1    comes down to the deep central relevance of all of those

2    documents.

3         There's been already enough of a showing

4    that there are documents that range back to that age that

14:42:49  5    are extremely relevant to the claims that have been made,

6    and I just think that it's appropriate for the defendants

7    to have to try and find those documents running back to

8    1996.

9         Now, I will say that part of the reason for

14:43:05  10    that is also that I accept your argument, Mr. Wasserman,

11    that it is the documents that would show things that they

12    don't need data for.  That argues for the production of

13    documents.  And as you'll see when I get to data, I

14    accept also, to some extent, that they don't need the

14:43:32  15    data if they get the documents.

16         So that's documents.

17         As for data, first talking about Optum,

18    Optum essentially says, "We have, for example, claims

19    data going back to 2010.  We don't have anything older

14:43:52  20    than that.  We've looked."

21         "Admin, you know, rebate and Admin, same

22    thing, we have it back to 2010 or 2008.  We don't have

23    anything older."

24         As I said, if you don't have it, you don't

14:44:07  25    have it.  But you're going to need to go and look for it

1    at least through 2006.  I want you to look for data going

2    back to 2006.  And if you find it as discovery

3    progresses, as documents are produced that reveal that

4    maybe there are, you know, pockets of data somewhere,

5    then you'll have to produce it.

6            It's happened before.  We've certainly seen

7    in this litigation parties find out that they were wrong

8    with their first understanding innocently because, you

9    know, there was a computer somewhere or whatever it is

10   that has data.

11           The baseline is the same for ESI with an

12   exception.

13           I understand that, you know, you say that

14   your claims data to 2008 is simple enough; it's going to

15   take some work to get it back to '06.  You need to do the

16   work for the claims data.

17           The dispensing data back to 2006, also.

18           With respect to the rebate and Admin data,

19   this is where I'm accepting your suggestion that, you

20   know, if it's going to take six months to reproduce that

21   data, to make that data available, then that's a pretty

22   big burden.

23           You need to produce that back to 2014, but

24   I'm leaving open whether you then have to produce it back

25   to 2006 to see what the documents show.

1          If it ends up that you are correct and that

2     the documents -- and when I say documents, I mean e-mails

3     and reports and contracts and everything else that is a

4     document; that isn't a set of numbers or, you know, a big

14:45:45  5     fat spreadsheet -- if those give the plaintiffs the

6     necessary information to make the arguments that they

7     seek to make regarding rebate and Admin, I'm not saying

8     that they -- I mean, the evidence might prove that they

9     can't make that argument at all, but you understand what

14:46:04 10     I'm saying, that that will be the end of the question.

11          But if that's not true, then the question

12     of whether rebate and Admin data before 2014 is produced

13     is still an open one.  At this time I'm not going to

14     order it.

14:46:22 15          And that is my ruling on all of those

16     issues.

17          One thing I'll close with is that I am

18     going to be out of the country between April 18th and May

19     1st, so as things come up, I'll be less available during

14:46:39 20     that period of time than normal.

21          You can reach out to Scott, and also

22     Michael Borden, who most of you know, if anything comes

23     up during that period of time.

24          MR. FARRELL:  Can we get an e-mail address?

14:47:01 25          SPECIAL MASTER COHEN:  Just one second.

1          Yeah, I'll get you that.

2          Scott reminded me that I'm doing this from

3     memory and forgot to talk about geographic scope.

4          So geographic scope is going to be

5     statewide in all three states.  I honestly tried hard to

6     figure out a way to make it something less than that and

7     still have it be fair, and I don't think it's possible.

8          As I've said, the question of geographic

9     scope has been addressed repeatedly, and we've kind of

10    come to an equipoise with respect to other defendants.

11    And plaintiffs are correct that they have consistently

12    asked for more and not received it.

13         The Court has made statements, both I and

14    Judge Polster have made statements that we think that a

15    regional and a national scope is not out of the question,

16    but we've landed on statewide.

17         And I think that the same analysis applies

18    here.  There are some differences around the edges, but

19    not enough of a difference to make a difference in the

20    ruling.

21         I do believe that statewide is an

22    appropriate geographic scope for all three states.

23         MR. FARRELL:  And to be clear -- this is

24    Paul Farrell -- you're talking about making, in essence,

25    a category two discovery for the claims data?

```
        1              SPECIAL MASTER COHEN:  Correct.

        2              MR. COOPER:  Special Master Cohen, Jonathan

        3    Cooper for Express Scripts.

        4              For all of the rulings from today, I know

14:48:49 5    we talked specifically about the P & T identities, but

        6    for all the other ones are you planning to issue any

        7    further opinions?

        8              And if not, is there a deadline for

        9    objections?

14:48:57 10             I don't know if there will be on other

       11    issues, but just to make that clear.

       12              SPECIAL MASTER COHEN:  Yes.  Thank you.

       13              So I thought about that, and to be honest I

       14    think that the Court and I have both written on all of

14:49:07 15   these questions before sufficiently, that we've discussed

       16    it sufficiently, and that your letters have been very

       17    thorough on all of these issues.

       18              And ultimately what I'm saying is that for

       19    the reasons expressed in the letters that support my

14:49:24 20   decisions, that's why I'm deciding the way I am.

       21              As for deadlines, you know, there's a lot

       22    there.  Again, it's been so thoroughly written up in

       23    letters that it doesn't seem to me that it's going to

       24    take a long time to create an objection.

14:49:44 25             In fact, what the parties have done before
```

1     sometimes is just file a pretty short objection and

2     append their letters, which the Court then reviews.

3            But I guess I'll ask you again, do you feel

4     like there's a time within which you can get something to

14:50:00  5     the Court, knowing that we are trying to get things

6     moving?

7            MR. COOPER:  So I can't speak -- I can

8     speak for Express Scripts, of course.

9            You know, given that there's been a series

14:50:12 10     of rulings, and it will take us a little bit of time, I

11     think, to digest them, could we have -- I know you

12     indicated before maybe 10 days would be appropriate.

13            Could we have the 10-day period maybe for

14     all objections to the rulings today, including the P & T

14:50:27 15     issue?

16            SPECIAL MASTER COHEN:  Well, especially

17     because I still think it would be appropriate for you

18     folks to chat about the P & T issue and the extent to

19     which maybe you can carve out more.

14:50:37 20            And, frankly, if the plaintiffs have the

21     evidence that they suggest they have, that they already

22     have got some of this information, maybe that changes

23     your thinking.

24            MR. COOPER:  Just to be clear, they don't

14:50:45 25     have it for Express Scripts is my understanding.  For

1    other PBMs maybe, but not Express Scripts.

2             SPECIAL MASTER COHEN:  So today is the

3    28th, so why don't we say that all objections are

4    due -- do you really -- I guess April 8th, right?  Is

14:51:01  5    that 10 days?

6             Am I reading that correctly?

7             MR. COOPER:  That's 11 days because 10 days

8    would be a Sunday.

9             SPECIAL MASTER COHEN:  That's fine.

14:51:08 10             April 8th.

11             MR. COOPER:  Thank you.

12             SPECIAL MASTER COHEN:  Thank you.

13             MR. VANDEN HEUVEL:  Your Honor, this is

14    Sage Vanden Heuvel for Express Scripts.

14:51:19 15             I just want a clarification on the temporal

16    scope of documents.

17             In your prior rulings you had, for example,

18    for the manufacturers, you'd required Purdue to produce

19    OxyContin-related documents back to, you know, 1996.

14:51:31 20             In your ruling today, my understanding from

21    the plaintiffs is the reason they wanted back to the '90s

22    is because of the relationship between the PBMs and

23    Purdue.

24             I'm curious whether your ruling today is

14:51:45 25    limited, could be limited to just OxyContin

1    Purdue-related documents, or whether it's just all

2    general discovery?

3                SPECIAL MASTER COHEN:  All documents.

4                MR. VANDEN HEUVEL:  Okay.

14:51:56 5          MR. FARRELL:  This is Paul Farrell again.

6                You said April 8th to serve objections, and

7    the time frame for us to respond or counter, the

8    nonobjecting party to respond?

9                SPECIAL MASTER COHEN:  Tell me what you

14:52:13 10   need.

11               MR. MOUGEY:  No.  No.  No.  Because you're

12   going out of town April 18th, right, out of the country?

13               SPECIAL MASTER COHEN:  The objections are

14   not coming to me.  They are coming to Judge Polster.

14:52:24 15          MR. MOUGEY:  Right.

16               I'm hoping that -- I'm just thinking, do we

17   want to have this run out.  I think we would rather have

18   this run its course with Special Master Cohen still here,

19   and I'm not the one drafting it, but wouldn't we want to

14:52:37 20   get this turned around?

21               MR. FARRELL:  Here's what we propose is 10

22   days to respond -- 10 days to lodge an objection.

23               And then are you going to allow a reply to

24   the response to the objection?

14:52:59 25          SPECIAL MASTER COHEN:  No.

1          MR. FARRELL:  So because we're basically

2     setting standards here.

3          So --

4          SPECIAL MASTER COHEN:  This is for this.

14:53:10  5          MR. FARRELL:  April 8th is the time for the

6     objection.

7          We will -- we will respond to the objection

8     by April 18th or sooner.

9          SPECIAL MASTER COHEN:  That's fine.

14:53:27  10          MR. HATCHETT:  I was going to say,

11     obviously we'll discuss with our client, discuss

12     internally about whether we will lodge objections.  We

13     understand the deadlines.

14          I mean, one thing to note, just to be

14:53:41  15     clear, given the age of the allegation, going back to

16     1996 may not result in a material volume of documents.

17          As we've looked back over time, for some of

18     our defendants, many of them, we just don't have

19     documents back that far, and so I don't want there to be

14:53:55  20     an assumption because we have gone back that far, that

21     therefore that means there's a trove of documents, but we

22     understand your order.

23          SPECIAL MASTER COHEN:  I've always said if

24     there is nothing to discover, then you can't produce it.

14:54:06  25     If there are no documents, you can't produce them.

```
            1                   The obligation is to look.

            2                   Thank you, all, for coming in.

            3                   Travel safe.

            4                   MR. MOUGEY:  I have a quick request.

14:54:19    5                   SPECIAL MASTER COHEN:  Sorry.

            6                   MR. MOUGEY:  Can we get something on the

            7        calendar before you go as kind of a catch -- catch-all

            8        issues that arise prior to April 18th for a Zoom?

            9                   SPECIAL MASTER COHEN:  Yes, you can.

14:54:29   10                   MR. MOUGEY:  Okay.  Do you want us just

           11        to -- do you want to give us a chance to -- do you want a

           12        chance to look at your calendar and give us a date, or do

           13        you want --

           14                   SPECIAL MASTER COHEN:  Well, what are you

14:54:38   15        talking about, a Zoom conference to discuss whatever

           16        comes up between now and then?

           17                   MR. MOUGEY:  Yes.

           18                   Because otherwise we will be in early May

           19        before we could circle back again.

14:54:47   20                   SPECIAL MASTER COHEN:  I think that's

           21        probably smart.

           22                   MR. MOUGEY:  Maybe we won't need it.

           23                   SPECIAL MASTER COHEN:  Tax day.  Might as

           24        well make it as pleasant as we can make it.  April 15th

14:55:37   25        at, let's say, 1:00 o'clock.
```

1       And to make that work, it will be the same

2   process where you're going to need to get materials to

3   Josh Gay who will collate them and get them to me in time

4   for me to read them.

5           So if we're talking April 15th, that should

6   probably be completed by the 11th so I'll have time to

7   read it.

8           MR. MOUGEY:  Thank you.

9           SPECIAL MASTER COHEN:  Okay.  Work

10  backwards from there.

11          Thanks, everybody.

12          Travel safe.

13          Michael@bordenadr.com.

14          Andrew.scott.loge@outlook.com.

15          (Proceedings concluded at 2:56 p.m.)

16              -  -  -  -

17          C E R T I F I C A T E

18          I certify that the foregoing is a correct

19  transcript from the record of proceedings in the

20  above-entitled matter.

21  **/s/Susan Trischan**
    /S/ Susan Trischan, Official Court Reporter
22  Certified Realtime Reporter
    7-189 U.S. Court House
23  801 West Superior Avenue
    Cleveland, Ohio 44113
24  (216) 357-7087

25