# EXHIBIT 16

 1                UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF OHIO

 3                      EASTERN DIVISION

 4

 5    IN RE: NATIONAL              )

 6    PRESCRIPTION OPIATE          ) MDL No. 2804

 7    LITIGATION                   ) Case No. 17-md-2804

 8                                 ) Judge Dan Aaron Polster

 9    THIS DOCUMENT RELATES TO:    )

10    Track Eight                  )

11

12           HIGHLY CONFIDENTIAL – SUBJECT TO FURTHER
                    CONFIDENTIALITY REVIEW
13

14            ZOOM VIDEOTAPED DEPOSITION OF

15                     FRED OTTOLINO

16                 (Taken by Plaintiffs)

17

18                   December 6, 2022

19

20                       9:04 a.m.

21        Deposition held via Zoom Videoconference

22

23    Reported by:

24    F. Renee Finkley, RPR, RMR, CRR, CLR, CCR-B-2289

25    (Via Videoconference)

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiffs:

 4        JAYNE CONROY, Esq. (Via Videoconference)

 5        LAURA FITZPATRICK, Esq. (Via Videoconference)

 6        ELLYN HURD, Esq. (Via Videoconference)

 7        Simmons Hanly Conroy

 8        112 Madison Avenue, 7th Floor

 9        New York, NY 10016

10        (212) 784-6400

11        JConroy@simmonsfirm.com

12        ehurd@simmonsfirm.com

13             and

14        SARAH BURNS, Esq. (Via Videoconference)

15        JO ANNA POLLOCK, Esq. (Via Videoconference)

16        Simmons Hanly Conroy

17        One Court Street

18        Alton, IL 62002

19        (618) 259-2222

20        sburns@simmonsfirm.com

21        jpollock@simmonsfirm.com

22

23

24

25
```

```
 1    APPEARANCES (continued):

 2

 3   On behalf of the Plaintiffs (continued):

 4        ERIN K. DICKINSON, Esq. (Via Videoconference)

 5        Crueger Dickinson, LLC

 6        4532 N Oakland Avenue

 7        Whitefish Bay, WI 53211

 8        (414) 210-3868

 9        ekd@cruegerdickinson.com

10            and

11        JONATHAN D. JAFFE, Esq.

12        Mayer Brown, LLP

13        Two Palo Alto Square

14        3000 El Camino Real

15        Palo Alto, California 9430618

16        (650) 331-2000

17        jjaffe@mayerbrown.com

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES (continued):

 2

 3    On behalf of Publix Supermarkets, Inc.:

 4         TIM HUDSON, Esq. (Via Videoconference)

 5         Barnes & Thornburg, LLP

 6         2121 N. Pearl Street

 7         Suite 700

 8         Dallas, TX 75201

 9         (214) 258-4188

10         tim.hudson@btlaw.com

11             and

12         FRANK MATTINGLY, Esq. (Via Videoconference)

13         MEREDITH THORNBURGH WHITE, Esq.

14           (Via Videoconference)

15         Barnes & Thornburg, LLP

16         11 South Meridian Street

17         Indianapolis, Indiana 46204

18         (317) 2316-6440

19         FMattingly@btlaw.com

20         meredith.white@btlaw.com

21

22

23

24

25
```

```
 1    APPEARANCES (continued):

 2

 3    Also Present:

 4         BILL GEIGERT (Via Videoconference)

 5         Videographer

 6

 7         WILLIAM HAMMOND (Via Videoconference)

 8         Publix in-house Counsel

 9

10         GINA VELDMAN (Via Videoconference)

11         Trial Technician

12

13         JULIE BOND (Via Videoconference)

14

15         MAURI LEVY (Via Videoconference)

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2

 3      WITNESS:   FRED OTTOLINO (Via Videoconference)

 4

 5  EXAMINATION                                  Page

 6       By Ms. Conroy                              9

 7

 8                       E X H I B I T S

 9

10  Exhibit No.        Description              Page

11  Exhibit No. 1  Letter from Ottolino to All

12                 Pharmacists, May 18, 2011     68

13  Exhibit No. 2  E-mail from Nicholson with

14                 attachment, 9/5/12            88

15  Exhibit No. 3  E-mail from Katenkamp to

16                 Ottolino, 11/29/16           101

17  Exhibit No. 4  Document containing Chapter 21,

18                 Sanitation                   126

19  Exhibit No. 5  Document containing Chapter 8,

20                 Regulations and Associated Publix

21                 Policies                     127

22  Exhibit No. 6  Document containing Chapter 8,

23                 Regulations and Associated Publix

24                 Policies                     132

25
```

```
 1                E X H I B I T S (continued)

 2

 3   Exhibit No.          Description                Page

 4   Exhibit No. 7  Document containing Chapter 8,

 5                  Regulations and Associated Publix

 6                  Policies                          134

 7   Exhibit No. 8  Organizational chart              148

 8   Exhibit No. 9  Organizational chart              150

 9   Exhibit No. 10 E-mail from Smith to Rusk with

10                  attachment, 11/21/18              156

11   Exhibit No. 11 Pharmacy weekly memo, 7/20/11     174

12   Exhibit No. 12 E-mail from Harris to

13                  Ottolino et al., with attachment,

14                  9/16/10                           178

15   Exhibit No. 13 Document from Zillgitt to

16                  Pharmacy Compliance Team,

17                  10/31/06                          182

18   Exhibit No. 14 E-mail chain commencing from

19                  Seid to Hewell et al., with

20                  attachment, 1/12/09               217

21   Exhibit No. 15 Personnel documents for

22                  Ottolino                          219

23

24

25
```

```
 1                  E X H I B I T S (continued)

 2

 3   Exhibit No.          Description                    Page

 4   Exhibit No. 16 E-mail from Hines to

 5                  Pharmacy Operations Managers

 6                  et al., with attachment,

 7                  3/11/13                              235

 8   Exhibit No. 17 Letter from McKesson to

 9                  Ottolino, with attachment,

10                  April 16, 2008                       238

11   Exhibit No. 18 E-mail chain commencing from

12                  DiGrazia to Ottolino et al.,

13                  with attachment, 6/10/15             252

14   Exhibit No. 19 Data Supply Agreement,

15                  April 19, 2010                       252

16   Exhibit No. 20 E-mail chain commencing from

17                  Eady to Kirkus, with

18                  attachment, 2/8/17                   262

19   Exhibit No. 21 E-mail from Shoemaker to

20                  Leonard at al, with attachment,

21                  2/3/17                               262

22

23

24

25
```

```
 1            THE VIDEOGRAPHER:  Good morning.  We are

 2       now on the record.  My name is Bill Geigert.

 3       I'm the videographer for Golkow Litigation

 4       Services.  Today's date is December 6th, 2022,

 5       and the time is 9:04 a.m.  This remote video

 6       deposition is being held in the matter of the

 7       National Prescription Opiate Litigation for the

 8       United States District Court, for the Northern

 9       District of Ohio, Eastern Division.

10            The deponent is Alfred Joseph Ottolino.

11       All parties to this deposition are appearing

12       remotely and have agreed to the witness being

13       sworn in remotely.  Due to the nature of remote

14       reporting, please pause briefly before speaking

15       to ensure all parties are heard completely.  All

16       counsel will be noted on the stenographic

17       record.  The court reporter is Renee Finkley,

18       and she will now swear in the witness.

19                      FRED OTTOLINO,

20  having been first duly sworn, was examined and

21  testified as follows:

22                      EXAMINATION

23  BY MS. CONROY:

24       Q.   Good morning, Mr. Ottolino.  My name is

25  Jayne Conroy, and I represent the plaintiffs in this
```

1    right?

2         A.    Uh-huh.

3         Q.    And where did you go from there?

4         A.    Then I was recruited to Winn Dixie down in

5    Florida, Jacksonville, Florida, in the same position,

6    VP of pharmacy.  And was there for not even a year.

7         Q.    How many pharmacies approximately did Winn

8    Dixie have at the time?

9         A.    I want to say between six and 700,

10   somewhere in that range.

11        Q.    You were there under a year, and then did

12   you go to Publix?

13        A.    Yes, ma'am, then I was recruited by

14   Publix.

15        Q.    So that was in 2004?

16        A.    2000 -- March of '04.

17        Q.    And tell me about that, what was your job

18   when you were first -- when you first started at

19   Publix?

20        A.    Same job I had through my whole career at

21   Publix, which was VP of pharmacy.

22        Q.    And back in 2004, approximately how many

23   pharmacies did Publix have?

24        A.    It was approximately the same, maybe a

25   little bit more, but quite frankly, it was a better

1    organization -- better run organization with more

2    potential.  So I made the leap into Publix in March

3    of '04.

4         Q.    And you remained at Publix until what

5    date?

6         A.    Through January -- to January of 2018.

7         Q.    So you were there from 2004 to the very

8    end of 2017, very beginning of 2018?

9         A.    Yes, ma'am.

10        Q.    Okay.  And they had -- when you started in

11   2004, Publix had roughly 600 to 700 pharmacies?

12        A.    Yeah.  I can't remember exactly but we

13   grew a lot over those almost decade and a half.  So

14   we were under -- I would say six to 700.  I can't

15   remember the exact number of locations.

16        Q.    And when you left in January of 2018,

17   ballpark, how many pharmacies were there?

18        A.    Well over 11, 1,200.

19        Q.    And when you started, how many states was

20   Publix, in with pharmacies, I'm talking about?

21        A.    We were in obviously Florida, Georgia,

22   Alabama, South Carolina, and Tennessee.  So we were

23   in five states.

24        Q.    And did the number of states grow during

25   your tenure there?

1    most part, yes, we had controls on all of our

2    inventories that were in the system.

3             So the anomaly would be something that the

4    pharmacy never dispensed before, some chemotherapy

5    drug.  The pharmacy would have to initiate that

6    process and set up those parameters.  Once that drug

7    was set up in the system, after sometime of the

8    utilization of the drug, then the system would go

9    ahead and assume those parameters and set a range for

10   that drug.

11        Q.    Okay.  And earlier this morning, when I

12   was asking you about whether Publix had certain

13   uniform procedures across the pharmacies, is this

14   sort of algorithm and the way that products were

15   ordered from the pharmacies, was that uniform across

16   the states where Publix had pharmacies?

17        A.    Yes, ma'am.

18        Q.    Now, would it be true to say that Publix

19   pharmacies dispensed controlled substances, including

20   C2s, for the entire time that you were the vice

21   president of pharmacy operations at Publix?

22        A.    Yes, they did.

23        Q.    Do you have any -- let me ask it this way.

24   Any reason to disagree that in 2016, the opioid

25   prescriptions at Publix were about 8 percent of its

1    pharmacist would need to explain to the supervision

2    why that increase is needed.

3              So that would happen from time to time,

4    because the store is growing.  I don't know this

5    specific store, excuse me, but to have that happen

6    twice in a quarter, again, stood out.  So it could

7    have been a new store that opened, because they

8    were -- what I don't know here is that they requested

9    it.  I don't know if that request was honored or not.

10   Q.    Do you know whether or not -- whether the

11   request was honored or not, or whether there was a

12   reason that that store needed to increase the amount

13   over their threshold, would that have been documented

14   anywhere, the reason?

15              MR. HUDSON:  Objection, form.

16              THE WITNESS:  The reason -- I don't know

17        where that would be documented, the rationale.

18        It's documented here that that occurred.  And I

19        guess I answered the first part of your question

20        in my previous statement, that it could have

21        been a new store.  It could be a new doctor into

22        an area, that has a different prescribing habit

23        that you have to change your inventory level.

24   Q.    (By Ms. Conroy)  No, I -- I understand

25   there could be a reason for it.  I'm just looking to

1  determine whether, when you are reviewing the report

2  with respect to that store, if -- let's say they had

3  another request for a threshold increase six months

4  from the date of these two requests, would there be

5  any documentation that they had had a request some

6  time ago, and maybe it would make sense if they were

7  a new store, and they were growing, or maybe there

8  would be some other reason.  Would there be some

9  documentation kept about the rationale for the -- for

10  the threshold increase?

11        MR. HUDSON:  Objection, form.

12        THE WITNESS:  Well, I'll tell you the

13     thinking through the process, other than volume

14     increase in a specific location, be it for a new

15     physician or a new store, would be the rationale

16     for an increase.  There were -- you know, what

17     else are you going to document, other than my

18     business is growing.

19     Q.    (By Ms. Conroy)  Well, would you document

20  if the request was denied?

21     A.    Well, that's why I'm trying to read.  It

22  doesn't say that in here.  I'm trying to read and

23  talk to you at the same time, so I apologize for my

24  slow reading ability.

25     Q.    Yeah.  And I'm not so concerned about this

1    particular store, or what may have happened here.

2    What I'm really trying to appreciate is when this

3    sort of thing would happen, would the rationale be

4    documented, so that people later on could take a look

5    if the question came up again?

6        A.    Well, it would be the same people that

7    would be involved in that process.  And regardless of

8    what happened in the past is not an indication of

9    what's happening currently.  So I might have had

10   increase because -- say, three years prior, because

11   Walgreen's closed their store down the street.  We

12   have all these new customers coming in.  And then the

13   same thing happens three years later, with CVS

14   closing or Albertson's, or somebody else closing a

15   pharmacy.

16           So there's going to be an increase again.

17   I think that there's limited value in what you're

18   recommending.  And it's more of a realtime situation

19   of what's occurring at that location.

20       Q.    Okay.  So as far as you know, the

21   rationale was not documented, but instead it was

22   evaluated on a case-by-case basis in realtime by

23   Publix?

24       A.    Again, the necessity to document why an

25   increase was requested is not impactful information.

1      Q.    Right.  You --

2      A.    Why would we spend resources in doing

3  that.  I guess I'm trying to understand why we would

4  want to do that?  There's no value in that.

5      Q.    So your -- it's your position that

6  documentation would not be valuable to you, would not

7  be impactful to you?

8      A.    I'm still trying to read the sentence, I'm

9  sorry.

10      Q.    Sure.

11      A.    So it's one store that made the two -- so

12  I understand that.  Yeah, so the thought process

13  varies, you know, what's the business environment or

14  growth that you're experiencing at that specific

15  time.

16      Q.    And so it would not be, if I understand

17  what you're telling me, to you it would -- as VP of

18  pharmacy operations, it would not be impactful two

19  years later if there was another request for an

20  increase, to have any documentation of the reason

21  that it might have occurred two years sooner?

22      A.    Again, I think that the only reason why

23  increase would be requested is because of growth, be

24  that being a new store, be that a competitor closed

25  down, be that a new -- a new doctor's office opening

1    that's addressed to you.

2        A.    Okay.  It reference a package.  It

3    explains the program.

4        Q.    Did you see in that second paragraph of

5    the letter to you, it says, the DEA is requiring that

6    McKesson and all wholesale distributors play an

7    expanded role in monitoring the order and

8    distribution of controlled substances.  Do you see

9    that?

10       A.    Yes, I do.

11       Q.    And Publix was also a wholesaler --

12   wholesale distributor of controlled substances to its

13   own stores, correct?

14            MR. HUDSON:  Objection, form.

15            THE WITNESS:  At this time in '08, we had

16       C3s through 5s in our warehouse.

17       Q.    (By Ms. Conroy)  And so you did not have

18   the new warehouse yet with the C2s, so you

19   were -- you were receiving your controlled substances

20   from other wholesale distributors?

21       A.    At this time in '08, our C2s came solely

22   through McKesson.

23       Q.    And at some point after 2008, Publix

24   itself became a wholesale distributor of C2s?

25       A.    Whenever we opened our -- our new

1  warehouse, excuse me, we had a C2 vault at that time

2  and then we distributed C2s to Publix pharmacies

3  only.  It was all internal.

4      Q.    And when you look at this, where it says

5  that the DEA is requiring McKesson and all wholesale

6  distributors play an expanded role in monitoring the

7  order and distribution of controlled substances,

8  that's not just limited to C2s, correct?

9      A.    It's limited to wholesale distributors.

10      Q.    Correct.  And wouldn't Publix be a

11  wholesale distributor of C2s, and at this time C3s

12  through 5s, those would be considered controlled

13  substances, correct?

14      A.    Yes, but we weren't wholesale.  We didn't

15  sell outside of our internal stores.

16      Q.    I see.  When you see wholesale

17  distributors, you believe that means only a company

18  that distributes to others, not to itself?

19      A.    Yeah, to other customer clients.  So we

20  weren't -- we weren't wholesale.  We didn't sell to

21  CVS or independents or Walgreen's.  It was all

22  internal when we eventually got there.

23      Q.    Do you believe you had -- that Publix had

24  a different obligation with respect to monitoring the

25  order and distribution of controlled substances of

1  C3s, C4s, C5s, because you were only distributing to

2  your own pharmacies?

3  MR. HUDSON: Objection, form.

4  THE WITNESS: The only thing I could say

5  is that whatever the law said, and whatever the

6  DEA prescribed, is what applied to us.

7  Q. (By Ms. Conroy) And --

8  A. So I don't know -- I don't know of a

9  different documentation for -- I think there were, I

10  guess, whatever they say is what we -- what we

11  complied with.

12  Q. Whatever DEA required?

13  A. Yeah, of course we were going to comply

14  with the DEA.

15  Q. Do you believe that DEA or the law made a

16  distinction between whether you were distributing to

17  your own pharmacies or to pharmacies that were not

18  owned by Publix?

19  MR. HUDSON: Objection, form.

20  THE WITNESS: So you'd have to ask the DEA

21  what their thought process is on that. I would

22  say by the wording in this document, it's

23  specifically -- they're obviously, I would say,

24  the DEA is trying to take care of the abuse of

25  prescription drugs, as it says in the first

1      line.

2           And specifically, it says in this document

3      that the DEA is requiring that McKesson and

4      other -- and all wholesale distributors play

5      expanded role monitoring the order and

6      distribution of controlled substances.

7           So I think that is a sign of the times.

8      This is what was happening.  The DEA wag trying

9      to help society live a better life.  Now, we

10     went, again, I would say above and beyond with

11     what obviously, in fairness, I didn't get a

12     chance to read the whole monitoring act that

13     McKesson sent out, but we obviously would comply

14     with this from retailers perspective, to help

15     McKesson comply with the DEA's request.

16          But we had other controls in place as I

17     mentioned before several times, that we had,

18     that weren't required by the DEA, that we put in

19     place as safeguards for our stores, to make sure

20     we do the right thing.

21     Q.   (By Ms. Conroy)  I understand that, but I

22     guess what I'm trying to understand is that, I take

23     it from your testimony that because -- because Publix

24     only distributed to its own pharmacies, your

25     understanding is that the law was different for them

1  with respect to monitoring the order and distribution

2  of controlled substances to its -- from its warehouse

3  to its own pharmacies?

4          MR. HUDSON:  Objection, form.

5          THE WITNESS:  That's something you have to

6      ask the DEA.

7      Q.   (By Ms. Conroy)  Well, no, I --

8      A.   What their intent was.  You asked me what

9  their intent was.  I can't tell you what their intent

10  was.

11      Q.   No, I'm not asking what their intent was.

12  I'm asking how you, at Publix, as vice president of

13  pharmacy operations, was interpreting the law with

14  respect to the monitoring of and distribution of

15  controlled substances.  Did you believe there was a

16  distinction in the law, did you at Publix believe

17  there was a distinction in the law between a

18  distributor who distributed only to its own

19  pharmacies versus someone who distributed to

20  pharmacies they didn't own?

21          MR. HUDSON:  Objection, form.

22      Q.   (By Ms. Conroy)  Is that a distinction

23  that you made?

24          MR. HUDSON:  Same -- same objection.

25          THE WITNESS:  I would say that whatever