# EXHIBIT 23

```
 1                  UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION


 3
       ------------------------------)
 4                                   )
       IN RE:  NATIONAL PRESCRIPTION ) MDL No. 2804
 5     OPIATE LITIGATION             )
                                     )
 6     ------------------------------) Case No. 1:17-MD-2804
                                     )
 7     THIS DOCUMENT RELATES TO:     )
                                     )
 8     Case Track 8                  ) Hon Dan A. Polster
                                     )
 9     ------------------------------)


10


11           VIDEOTAPED DEPOSITION OF CHRIS HEWELL
                   FRIDAY, NOVEMBER 4, 2022
12
                          - - -
13
            HIGHLY CONFIDENTIAL - SUBJECTIVE TO FURTHER
14                    CONFIDENTIALITY REVIEW


15                        - - -


16


17           Remote videotaped deposition of CHRIS

18     HEWELL, commencing at 9:00 a.m., on the above date,

19     before Juliana F. Zajicek, Registered Professional

20     Reporter, Certified Shorthand Reporter and Certified

21     Realtime Reporter.

22                        - - -

23              GOLKOW LITIGATION SERVICES
            877.370.3377 ph | 917.591.5672 fax
24                   Deps@golkow.com
```

```
 1                A P P E A R A N C E S :
                 (All Parties Appeared Remotely)
 2


 3    ON BEHALF OF THE PLAINTIFF:


 4         NAPOLI SHKOLNIK, PLLC
           270 Munoz Rivera Avenue, Suite 201
 5         Hato Rey, Puerto Rico 00918
           833-271-4502
 6         SALVATORE C. BADALA, ESQ.
           SBadala@NapoliLaw.com;
 7         JODI KLOCKENGA, ESQ.
           JKlockenga@NapoliLaw.com;
 8         MARIA FLEMING, ESQ.
           MFleming@NapoliLaw.com
 9


10         SIMMONS HANLY CONROY LLC
           112 Madison Avenue, 7th floor
11         New York, NY 10016
           212-784-6400
12         BY:  LAURA F. FITZPATRICK, ESQ.
                lfitzpatrick@simmonsfirm.com
13              ELLYN HURD, ESQ.
                ehurd@simmonsfirm.com
14


15    ON BEHALF OF THE KROGER COMPANY:


16         BOWLES RICE LLP
           600 Quarrier Street
17         Charleston, West Virginia 25301
           304-347-1701
18         BY:  MAURI LEVY, ESQ.
                maurilevy@bowlesrice.com
19


20


21


22


23


24
```

```
 1              A P P E A R A N C E S :
              (All Parties Appeared Remotely)
 2


 3   ON BEHALF OF PUBLIX SUPER MARKETS, INC.:

 4         BARNES & THORNBURG LLP
           11 South Meridian Street
 5         Indianapolis, Indiana 46204
           317-231-7501
 6         BY:  MEREDITH THORNBURGH WHITE, ESQ.
                meredith.white@btlaw.com
 7              MONICA R. BROWNEWELL SMITH, ESQ.
                mbrownewell@btlaw.com
 8              KARA KAPKE, ESQ.
                kara.kapke@btlaw.com
 9

10         BARNES & THORNBURG LLP
           2121 North Pearl Street, Suite 700
11         Dallas, Texas 75201
           214-258-4188
12         BY:  TIM HUDSON, ESQ.
                tim.hudson@btlaw.com
13


14


15
     ALSO PRESENT:
16

17         BILL HAMMOND, Senior Director,
           Regulatory Legal and Litigation at
18         Publix Super Markets

19
           JONATHAN JAFFE, Consultant
20

21         GINA VELDMAN, Trial/Exhibit Technician

22
     THE VIDEOGRAPHER:
23
           JAMES VONWIEGEN
24         Golkow Litigation Services
```

```
 1                       I N D E X

 2

 3   WITNESS:                                    PAGE:

 4    CHRIS HEWELL

 5         EXAM BY MR. BADALA...................   8

 6

 7                        * * * * *

 8

 9                     E X H I B I T S

10   CHRIS HEWELL EXHIBIT                 MARKED FOR ID

11   No. 1     Publix Super Markets, Inc.            34
               Supplemental Objections and
12             Responses to Plaintiff's
               Interrogatories to Chain Pharmacy
13             Defendants

14   No. 2     E-mail chain dated 10/1/2019;        109
               PUBLIX-MDLT8-00077173 - 188
15
     No. 3     E-mail chain dated 7/17/2015;        186
16             PUBLIX-MDLT8-00067262 - 307

17   No. 4     E-mail chain dated 9/23/2015;        200
               PUBLIX-MDLT8-00143498 - 514
18
     No. 5     Report of Investigation, Date        215
19             Prepared 07-21-2015;
               DEA-T711CC-00010761 - 775
20
     No. 6     Plea Agreement, USA vs. The Purdue   243
21             Frederick Company, Case No.
               1:07CR29; PLLTF_2804_000252605 -
22             805

23   No. 7     E-mail chain dated 1/12/2009;        247
               PPLPC004000187516 - 519
24
```

```
 1                    E X H I B I T S (Continued)

 2   CHRIS HEWELL EXHIBIT                 MARKED FOR ID

 3    No. 8     E-mail chain dated 5/1/2008;        257
                PUBLIX-MDLT8-00073491 - 492
 4
      No. 9     E-mail dated 5/23/2008              261
 5              w/attachment;
                PUBLIX-MDLT8-00073500 - 503
 6
      No. 10    McKesson document titled            264
 7              "Understand ARCOS Data" with
                handwritten notes;
 8              PUBLIX-MDLT8-00147213 - 242

 9    No. 11    Report of Investigation, Date       266
                Prepared 07-21-2015;
10              DEA-T711CC-00010761 - 775

11    No. 12    E-mail chain dated 9/4/2015;        273
                PUBLIX-MDLT8-00147625 - 627
12
      No. 13    Report of Investigation, Date       277
13              Prepared 03-17-2021;
                DEA-T711CC-00010900 - 905
14
      No. 14    E-mail chain dated 6/8/2020         281
15              w/attachment; ABDCMDL10851380 -
                392
16
      No. 15    E-mail dated 9/19/2012              285
17              w/attachment;
                PUBLIX-MDLT8-00065917 - 944
18
      No. 16    E-mail chain dated 03/28/2016;      296
19              Anda_Opioids_MDL_0000344122 - 123

20    No. 17    E-mail chain dated 04/04/2016;      301
                Anda_Opioids_MDL_0000343756 - 757
21
      No. 18    E-mail chain dated 05/03/2016;      303
22              Anda_Opioids_MDL_0000343326 - 327

23    No. 19    E-mail chain dated 5/1/2008;        307
                PUBLIX-MDLT8-00073491 - 492
24
```

```
 1                    E X H I B I T S (Continued)

 2   CHRIS HEWELL EXHIBIT                    MARKED FOR ID

 3     No. 20    E-mail chain dated 8/11/2015;        308
                 Anda_Opioids_MDL_0000335480 - 482
 4
       No. 21    E-mail chain dated 5/11/2016;        311
 5               Anda_Opioids_MDL_0000296241 - 244

 6     No. 22    Plaintiff's Demonstrative - Elmo     312
                 notes
 7
       No. 23    Plaintiff's Demonstrative -          314
 8               Exhibits 1-21

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1          THE VIDEOGRAPHER:  We are now on the record.  My

 2   names is James Vonwiegen.  I am a videographer for

 3   Golkow Litigation Services.

 4              Today's date is November 4th, 2022, and

 5   the time is 9:00 a.m.

 6              This remote video deposition is being held

 7   In the Matter of Opioid Litigation, Track 8.

 8              The deponent is Christopher Hewell.

 9              All parties to the deposition are

10   appearing remotely and have agreed to the witness

11   being sworn in remotely.

12              Due to the nature of remote reporting,

13   please pause briefly before speaking to ensure all

14   parties are heard completely.

15              Counsel will be noted on the stenographic

16   record.

17              The court reporter is Juliana Zajicek, and

18   will now swear in the witness.

19                  (WHEREUPON, the witness was duly

20                   sworn.)

21                  CHRIS HEWELL,

22   called as a witness herein, having been first duly

23   sworn, was examined and testified as follows:

24                  EXAMINATION
```

1    but at one time you said C-IIs.

2         A.    I was specifically referring to our CSOS

3    program.

4         Q.    But from 2012 to 2018, when the pharmacy

5    supervisors were only reviewing orders of interest or

6    flagged orders, were those only for C-IIs or was that

7    C-IIs and C-IIIs?

8         A.    From 2012 until 2016, there would have

9    only been for Schedule III through V because we

10   weren't shipping Schedule II controlled substances at

11   that time.  And then in 2016 it would have been for

12   Schedule II through V items of interest.

13        Q.    Now, before 2012, who was reviewing the

14   controlled substance orders?

15        A.    Those orders re -- were reviewed in our

16   systems.

17        Q.    Okay.  What system?

18        A.    Our Publix inventory management system.

19        Q.    PIMS is the other word?

20        A.    Yes.

21        Q.    So there wasn't an actual pharmacy

22   supervisor or a diversion person who was reviewing

23   flagged controlled substance orders prior to 2012?

24        MS. WHITE:  Objection to form.

1  held back, was that reported to the DEA?

2      MS. WHITE:  Objection to form.

3  BY THE WITNESS:

4      A.   No.

5  BY MR. BADALA:

6      Q.   Why not?

7      MS. WHITE:  Objection to form.

8  BY THE WITNESS:

9      A.   Since those orders weren't -- weren't

10  determined to be suspicious, if they weren't

11  determined to be suspicious, they weren't reported as

12  suspicious orders to the DEA.

13  BY MR. BADALA:

14      Q.   So would the pharmacy supervisor review an

15  order of interest and determine if it was a suspicious

16  order?

17      A.   Yes.

18      Q.   And then if a pharmacy supervisor

19  determined that an order of interest was a suspicious

20  order, what would be the next step?

21      A.   The next step would be, if they are in the

22  date range of 2012 to 2018, to notify the procurement

23  department that that order was suspicious.

24      Q.   Who at procurement would get that

1    notification?

2         A.    That would be me.

3         Q.    Okay.  How was that reported to you from

4    2012 to 2018?

5         MS. WHITE:  Objection to form.

6    BY THE WITNESS:

7         A.    Can you clarify what you mean, how it was

8    reported?

9    BY MR. BADALA:

10        Q.    Sure.

11              Was it an e-mail, was it a spreadsheet,

12   was it a phone call?  How did you get the suspicious

13   orders sent to you from the pharmacy supervisors?

14        MS. WHITE:  Objection to form.

15   BY THE WITNESS:

16        A.    The pharmacy supervisors would notify me

17   via e-mail, telephone.  It really wasn't specified.

18   BY MR. BADALA:

19        Q.    Okay.  When you got those suspicious

20   orders, what did you do next?

21        MS. WHITE:  Objection to form.

22   BY THE WITNESS:

23        A.    If it were -- if a suspicious order was

24   reported to me, it was my responsibility to notify the

1    pharmacy warehouse and the DEA.

2    BY MR. BADALA:

3        Q.    When you got that suspicious order, did

4    the pharmacy supervisors send you their due diligence

5    on the order?

6        MS. WHITE:  Objection to form.

7    BY THE WITNESS:

8        A.    If I were to receive a suspicious order,

9    they -- they could have sent me the in -- you know,

10   the initial rejected -- the -- the item level

11   rejection during that timeframe, 2012 to 2018.

12   BY MR. BADALA:

13       Q.    Was there ever an instance where you

14   reviewed a suspicious order that was determined to be

15   a suspicious order and you decided that it was not a

16   suspicious order?

17       A.    No.

18       Q.    How many suspicious orders were reported

19   to you between 2012 and 2018?

20       A.    No suspicious orders were reported to me

21   during that timeframe.

22       Q.    Not one?

23       A.    No.

24       Q.    And how many pharmacies did Publix have at

1    the present Publix has reported at least one

2    suspicious order?

3        A.    Yes.

4        Q.    More than one?

5        A.    Yes.

6        Q.    So more than ten?

7        A.    I don't -- I don't know.  I'm not aware.

8        Q.    So that never got you thinking that

9    something was wrong between 2012 and 2018 because

10   after 2018 Publix is reporting suspicious orders, but

11   2012 to 2018 there is not one suspicious order

12   reported, that didn't get you concerned?

13       A.    No.  We had a process.  We followed our

14   process and we had nothing to report those years.

15       Q.    Just because it was a process doesn't mean

16   that the process is working correctly, isn't that

17   right?

18       MS. WHITE:  Objection to form.

19   BY THE WITNESS:

20       A.    We had a process, we followed the process

21   and, again, I had nothing to report.

22   BY MR. BADALA:

23       Q.    Just going back, let's go to this

24   suspicious order, I want to make sure we can just

1   outline that -- this pretty quickly, but Publix's SOM

2   system, you mentioned that they've changed over time.

3           Can you tell me what the systems were as

4   far back as you can remember, starting with the first?

5       A.    Sure.  We had our PIM system.

6       Q.    What years was the PIM system, the Publix

7   SOM system?

8       A.    That was 2006 to around -- the original

9   PIM system was around 2006 to around 2012.

10      Q.    Okay.  After PIMS, what was the next

11  system?

12      A.    We had some enhancements in PIMS between

13  2012 and we used that from 2012 to 2016.

14      Q.    Can I write down enhanced PIMS, is that

15  the right way to phrase it?

16      A.    I am referring to it as enhanced PIMS.

17      Q.    You said that was 2012 to what?

18      A.    To 2016.

19      Q.    Was there, like, a third-party system with

20  this enhanced PIMS or was it just actual enhancements

21  to PIMS?

22      A.    It was -- there was no third-party

23  solution.

24      Q.    Okay.  What's the next system?

1      A.    E-Supply Link.

2      Q.    What years was that?

3      A.    2016 until about 2020.

4      Q.    Is that a third-party vendor?

5      A.    Yes.

6      Q.    Okay.  Next?

7      A.    2020 to present would be Order Insight.

8      Q.    That's another third-party vendor?

9      A.    Yes.

10     Q.    Okay.  Are we missing any?

11     A.    No.

12     Q.    What month did Order Insight go into

13 effect in 2020?

14     A.    I don't recall.  Again, that -- the

15 responsibility for suspicious order monitoring had

16 transitioned to our regulatory and compliance

17 department and it was piloted and ultimately rolled

18 out, I don't know what month that was.

19     Q.    Why switch from E-Supply to Order Insight?

20     A.    Order Insight provided us with some

21 additional functionality that we didn't have with

22 E-Supply Link.

23     Q.    Which additional functionalities were

24 they?

1     A.    Order Insight provides -- provides for

2   some additional scrutiny of orders in regards to

3   forecasted demand.  It's -- you know, there is daily

4   thresholds, weekly thresholds, monthly thresholds on a

5   rolling cadence, so provided some additional

6   functionality there.

7     Q.    Was Order Insight second half of 2020?

8     A.    I don't know.

9     Q.    Which systems were threshold-only based?

10  MS. WHITE:  Objection to form.

11  BY THE WITNESS:

12    A.    None of our systems were threshold-only

13  based, if we are talking about the entire suspicious

14  order monitoring system.  These systems were one

15  component of our suspicious order monitoring process.

16          If we are talking about the individual

17  system itself, the enhancement PIM system utilized a

18  threshold.

19  BY MR. BADALA:

20    Q.    And then we talked about this, but 2012 to

21  2018, no suspicious orders reported, right?

22    A.    Correct.

23    Q.    Did you have a file on your folder -- oh,

24  no, strike that, actually.

1      Q.    Sure.

2            If a Publix pharmacy manager tells the

3      pharmacy -- sorry, strike that.

4            If an e-mail notification goes out to the

5      pharmacy, the Publix pharmacy, and tells a pharmacy

6      they are approaching their threshold, in 2015 could

7      that pharmacy go to another distributor, like an Anda,

8      an Amerisource or a McKesson and get an opioid order

9      from that distributor?

10     A.    Potentially, but those orders would have

11     gone through a CSOS review process prior to being

12     approved.

13     Q.    Do you know the company Anda?

14     A.    Yes.

15     MS. WHITE:  Objection to -- objection to form.

16     BY MR. BADALA:

17     Q.    Does Publix do business with Anda related

18     to opioids?

19     A.    No, not currently.

20     Q.    Did they do business with Anda?

21     A.    Yes, we did business with Anda.

22     Q.    When did Publix stop doing opioid business

23     with Anda?

24     A.    If I recall, around 2016, maybe '17.

1    is that right?

2        MS. WHITE:  Object to form.

3    BY THE WITNESS:

4        A.    Pharmacies could only get products from an

5    approved vendor, and depending on what timeframe and

6    what type of product, there could have been

7    restrictions.

8    BY MR. BADALA:

9        Q.    Was there ever a time between 2006 and the

10   present where a Publix pharmacy could get opioids from

11   Anda as well as the Publix warehouse?

12       MS. WHITE:  Objection to form.

13   BY THE WITNESS:

14       A.    I believe during the time that we were

15   partnered with Anda, the opioids that we had stocked

16   at the pharmacy warehouse were minimal, since

17   hydrocodone, if I recall, had already been

18   rescheduled.  So maybe some Schedule V opioids in

19   addition to opioids coming from Anda.

20   BY MR. BADALA:

21       Q.    How were those orders placed from a Publix

22   pharmacy to a third party like a Cardinal, a McKesson,

23   or an Anda for opioids?

24       MS. WHITE:  Objection to form.

1    BY THE WITNESS:

2        A.    Can you be more specific about what type

3    of opioids?

4    BY MR. BADALA:

5        Q.    Yeah.  Well, how about this, what -- what

6    type of opioids did Anda, for example, supply to

7    Publix pharmacies?

8        A.    Most of -- in the timeframe that we --

9    that we just referenced until -- you know, we -- we

10   did not purchase Schedule II drugs from Anda after the

11   2016, 2017 range, but for the most part the types of

12   products that were ordered from Anda from, let's say,

13   2014 on were Schedule -- directly into our pharmacies

14   were Schedule II products.

15       Q.    Okay.  How would the pharmacy go about

16   placing that order to Anda?  I'm just kind of asking

17   for a system, if you can walk me through it, how that

18   Publix pharmacy can order a Schedule II from Anda

19   during that time period?

20       A.    So pharmacies during that time period

21   would have ordered Schedule II drugs through an

22   electric controlled substance ordering system.

23       Q.    What system was that?

24       A.    CSOS.

1      Q.    Okay.  What would happen -- so now it goes

2   into CSOS.

3            What happens next?

4      A.    Sure.  Let me take -- let me go back a

5   step.

6            When pharmacies ordered from Anda, they

7   were ordered on a pre-configured cadence or frequency.

8   Those orders would generate in our pharmacy dispensing

9   system Enterprise Rx.  Those orders were transmitted

10  via EDI to a CSOS system, a controlled substance

11  ordering system, where they were reviewed and approved

12  by a CSOS administrator and ultimately released for

13  fulfillment to Anda.

14     Q.    CSOS is not PIMS, is that right?

15     A.    That's correct.

16     Q.    So CSOS is not a SOM system at Publix?

17     MS. WHITE:  Object to form.

18  BY MR. BADALA:

19     Q.    Is that right?

20     MS. WHITE:  Oh, sorry.  Object to form.

21  BY THE WITNESS:

22     A.    CSOS is not necessarily a suspicious order

23  monitoring system, but it does provide Publix with

24  some oversight of C-II orders.

1  BY MR. BADALA:

2      Q.    Where these orders would be third parties,

3  these opioid orders, were they ever integrated into a

4  Publix SOM system?

5      MS. WHITE:  Object to form.

6  BY THE WITNESS:

7      A.    What -- can you explain what you mean by

8  integrated into a suspicious order monitoring system?

9  BY MR. BADALA:

10     Q.    Sure.

11           I'm a Publix pharmacy, I order oxycodone

12  from Anda and I order oxycodone from the Publix

13  warehouse.  How does the Publix sys- -- SOM system

14  know that I ordered from Publix -- from Anda that

15  controlled substances -- controlled substance as well

16  as from the Publix warehouse that controlled

17  substance?

18     MS. WHITE:  Objection to form.

19  BY THE WITNESS:

20     A.    When -- when -- how we integrated with

21  Order Insight, Order Insight evaluated all orders that

22  were transmitted to all suppliers.

23  BY MR. BADALA:

24     Q.    Okay.  So Order Insight, though, was

1   started in 2020, is that right?

2       A.    That's right.

3       Q.    So prior to that, the SOM systems did not

4   integrate those third-party orders with the Publix

5   warehouse orders, is that right?

6       MS. WHITE:  Object to form.

7   BY THE WITNESS:

8       A.    That's correct.  There was no -- E-Supply

9   Link didn't evaluate orders going to Anda or

10  AmerisourceBergen or McKesson.

11  BY MR. BADALA:

12      Q.    Okay.  The next one I'm going to show

13  you -- well, maybe I should ask you a question here.

14  Okay.

15          Do you remember speaking with the DEA in

16  2015?

17      MS. WHITE:  Object to form.

18  BY THE WITNESS:

19      A.    Can you be more specific about the date?

20  I think we talked to them on several occasions.

21  BY MR. BADALA:

22      Q.    It looks like sometime -- it looks like

23  it's about July of 2015.

24      A.    Yes, I think that aligns with the previous