# EXHIBIT 27

1          UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
2                 EASTERN DIVISION

3
     IN RE: NATIONAL          )
4    PRESCRIPTION             )    MDL No. 2804
     OPIATE LITIGATION        )
5    _____  )    Case No.
                              )    1:17-MD-2804
6                             )
     THIS DOCUMENT RELATES     )    Hon. Dan A.
7    TO: Case Track 8          )    Polster

8
              TUESDAY, NOVEMBER 15, 2022
9
     HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW

11                    - - -

12          Remote videotaped deposition of

13   Jillanne Smith, held at the location of the

14   witness in Lakeland, Florida, commencing at

15   10:19 a.m. Eastern Time, on the above date,

16   before Carrie A. Campbell, Registered

17   Diplomate Reporter, Certified Realtime

18   Reporter, Illinois, California & Texas

19   Certified Shorthand Reporter, Missouri,

20   Kansas, Louisiana & New Jersey Certified

21   Court Reporter.

22                    - - -
              GOLKOW LITIGATION SERVICES
23                 877.370.DEPS
                 deps@golkow.com
24

25

```
 1     R E M O T E    A P P E A R A N C E S :

 2

 3     SIMMONS HANLY CONROY
       BY:  LAURA FITZPATRICK
 4          lfitzpatrick@simmonsfirm.com
            SARAH BURNS
 5          sburns@simmonsfirm.com
            ELLYN HURD
 6          ehurd@simmonsfirm.com
       112 Madison Avenue, Seventh Floor
 7     New York, New York 10016
       (212) 784-6400
 8

 9     and

10

       NAPOLI SHKOLNIK, PLLC
11     BY:  SALVATORE C. BADALA
            sbadala@napolilaw.com
12          JODI KLOCKENGA
            JKlockenga@NapoliLaw.com
13     270 Munoz Rivera Avenue, Suite 201
       Hato Rey, Puerto Rico 00918
14     (833) 271-4502

15

       and
16

17     CRUEGER DICKINSON LLC
       BY:  ERIN K. DICKINSON
18          ekd@cruegerdickinson.com
       4532 North Oakland Avenue
19     Whitefish Bay, Wisconsin  53211
       (414) 210-3868
20     Counsel for Plaintiffs

21

22

23

24

25
```

```
 1       BARNES & THORNBURGH, LLP
         BY:   J.T. LARSON, JR.
 2             jtlarson@btlaw.com
               MEREDITH THORNBURGH WHITE
 3             meredith.white@btlaw.com
               KARA KAPKE
 4             kara.kapke@btlaw.com
         11 South Meridian Street
 5       Indianapolis, Indiana  46204
         (317) 236-1313
 6       Counsel for Publix Super Markets, Inc.

 7


 8

         BOWLES RICE LLP
 9       BY:   CHRISTOPHER J. FOX
               ChrisFox@bowlesrice.com
10       600 Quarrier Street
         Charleston, West Virginia  25301
11       (304) 520-5515
         Counsel for the Kroger Company
12


13
   ALSO PRESENT:
14
         BILL HAMMOND, Senior Director,
15       Regulatory Legal and Litigation at
         Publix Super Markets
16
         JONATHAN JAFFE, consultant
17
         GINA VELDMAN, trial technician,
18       Precision Trial Solutions

19

20   VIDEOGRAPHER:
           CHRIS RITONA,
21         Golkow Litigation Services

22                        - - -

23

24

25
```

```
 1                        INDEX

 2                                         PAGE

 3   APPEARANCES.................................  2

 4   EXAMINATIONS

 5     BY MS. FITZPATRICK........................  8

 6

 7                      EXHIBITS

 8     No.   Description                        Page

 9     1     America's Largest Private           20
             Companies, Forbes, printout
10
       2     Jillanne Smith personnel file,      50
11           PUBLIX-MDLT8-00145757 -
             PUBLIX-MDLT8-00146083
12
       3     E-mail(s),                         144
13           PUBLIX-MDLT8-00077173 -
             PUBLIX-MDLT8-00077188
14
       4     E-mail(s),                         160
15           PUBLIX-MDLT8-00071828 -
             PUBLIX-MDLT8-00071829
16
       5     Memo dated 7/31/18 from Karl       190
17           Zillgitt,
             PUBLIX-MDLT8-00147799 -
18           PUBLIX-MDLT8-00147800

19     6     E-mail(s),                         221
             PUBLIX-MDLT8-00071320 -
20           PUBLIX-MDLT8-00071327

21     7     E-mail(s),                         234
             PUBLIX-MDLT8-00130893 -
22           PUBLIX-MDLT8-00130895

23     8     E-mail(s),                         239
             PUBLIX-MDLT8-00096778 -
24           PUBLIX-MDLT8-00096780

25
```

| | | | |
|---|---|---|---|
| 1 | 9 | E-mail(s), | 250 |
| | | PUBLIX-MDLT8-00079714 – | |
| 2 | | PUBLIX-MDLT8-00079716 | |
| 3 | 10 | E-mail(s), | 287 |
| | | PUBLIX-MDLT8-00132692 – | |
| 4 | | PUBLIX-MDLT8-00132705 | |
| 5 | 11 | Hot Topics in Retail Pharmacy | 308 |
| | | Compliance, April 16, 2018, | |
| 6 | | PUBLIX-MDLT8-00071835 – | |
| | | PUBLIX-MDLT8-00071863 | |
| 7 | | | |
| | 12 | Compliance Update PowerPoint, | 321 |
| 8 | | Jillanne Smith, 10/11/2018 | |
| 9 | 13 | Compliance Update PowerPoint, | 324 |
| | | Jillanne Smith, 10/11/18, speaker | |
| 10 | | notes, | |
| | | PUBLIX-MDLT8-00119094 | |
| 11 | | | |
| | 14 | Chapter 8:  Regulations and | 379 |
| 12 | | Associated Publix Policies, | |
| | | PUBLIX-MDLT8-00003532 – | |
| 13 | | PUBLIX-MDLT8-00003571 | |
| 14 | 15 | Chapter 8:  Regulations and | 379 |
| | | Associated Publix Policies, | |
| 15 | | PUBLIX-MDLT8-00023196 – | |
| | | PUBLIX-MDLT8-00023236 | |
| 16 | | | |
| | 16 | Chapter 8:  Regulations and | 379 |
| 17 | | Associated Publix Policies, | |
| | | PUBLIX-MDLT8-00027405 – | |
| 18 | | PUBLIX-MDLT8-00027449 | |
| 19 | 17 | Chapter 21:  Sanitation, | 390 |
| | | PUBLIX-MDLT8-00011215 – | |
| 20 | | PUBLIX-MDLT8-00011245 | |
| 21 | 18 | Compliance PowerPoint, Jillanne | 394 |
| | | Smith, 4/3/19, | |
| 22 | | PUBLIX-MDLT8-00074569 | |
| 23 | 19 | Pharmacy Compliance – Prioritized | 408 |
| | | Areas of Focus, | |
| 24 | | PUBLIX-MDLT8-00119095 | |
| 25 | | | |

1    20         E-mail(s),                                    415
                PUBLIX-MDLT8-00072578 -
2               PUBLIX-MDLT8-00072579

3    21         Script/Storyboard, DEA Controlled             419
                Substance Prescriptions:
4               Legitimate or Fraudulent?,
                PUBLIX-MDLT8-00058475 -
5               PUBLIX-MDLT8-00058514

6    22         Satisfying DEA Standards When                 427
                Dispensing Controlled Substances
7               [2018 Update],
                PUBLIX-MDLT8-00058515 -
8               PUBLIX-MDLT8-00058588

9    23         Publix memo from Karl Zillgitt               436
                dated 10/31/06,
10              PUBLIX-MDLT8-00147694 -
                PUBLIX-MDLT8-00147800
11
     24         Cumulative # Red Flagged Rxs                 451
12              Filled At Publix Pharmacies
                (2006-May 2019)
13
     25         Cobb County:  Cumulative Deaths              451
14              (Any Opioid)

15   26         Laura Fitzpatrick handwritten                463
                demonstratives
16

17      (Exhibits attached to the deposition.)

18

19   CERTIFICATE..................................464

20   ACKNOWLEDGMENT OF DEPONENT...................466

21   ERRATA......................................467

22   LAWYER'S NOTES..............................468

23

24

25

```
 1              VIDEOGRAPHER:  We are now on
 2     the record.  My name is Chris Ritona.
 3     I'm the videographer with Golkow
 4     Litigation Services.
 5              Today's date is November 15,
 6     2022, and the time is approximately
 7     10:19 a.m. Eastern.
 8              This remote video deposition is
 9     being held in the matter of the
10     National Prescription Opiate
11     Litigation, MDL number 2804, US
12     District Court, for the Northern
13     District of Ohio, Eastern Division,
14     and the deponent today is Jillanne
15     Smith.
16              All parties to this deposition
17     are appearing remotely and have agreed
18     to the witness being sworn in
19     remotely.
20              Due to the nature of remote
21     reporting, please pause briefly before
22     speaking to ensure all parties are
23     heard completely.
24              All counsels' appearances will
25     be noted upon the stenographic record.
```

1          The court reporter today is

2     Carrie Campbell, and she will now

3     please swear in the witness.

4

5          JILLANNE SMITH,

6  of lawful age, having been first duly sworn

7  to tell the truth, the whole truth and

8  nothing but the truth, deposes and says on

9  behalf of the Plaintiffs, as follows:

10

11          DIRECT EXAMINATION

12  QUESTIONS BY MS. FITZPATRICK:

13     Q.    Ms. Smith, good morning.  My

14  name is Laura Fitzpatrick, and we met for the

15  first time just briefly a few minutes

16  remotely here via this Zoom link, right?

17     A.    Correct.

18     Q.    Okay.

19     A.    Good morning.

20     Q.    Good morning.

21          How are you doing this morning,

22  ma'am?

23     A.    I'm doing good.

24     Q.    Okay.  Ma'am, today -- well,

25  first let's -- let me get you to go ahead,

1    please, and state your name for the record,

2    please.

3           A.      Jillanne Smith.

4           Q.      And, ma'am, where do you

5    currently live?

6           A.      I live in Lakeland, Florida.

7           Q.      And have you lived there your

8    whole life, ma'am?

9           A.      No, I did not live here my

10   whole life.

11          Q.      All right.  Where did you live

12   before you lived in Lakeland?

13          A.      I lived in St. Petersburg, and

14   Tampa previous to that.

15          Q.      And previous to Tampa?

16          A.      I lived in Pennsylvania.

17          Q.      Okay.

18          A.      You're going way back now.

19          Q.      All right.  Are we to the point

20   yet -- have we gotten to where you were born

21   yet?

22          A.      No.

23          Q.      Okay.  So before Pennsylvania?

24          A.      New Hampshire.

25          Q.      Okay.  Before that?

1  manager, pharmacy compliance and regulatory

2  affairs.

3           Right?

4           MR. LARSON:  Object to form.

5           Go ahead, Jillanne.

6           THE WITNESS:  I was promoted

7     into the role.

8  QUESTIONS BY MS. FITZPATRICK:

9     Q.     Okay.  And so at least as of

10  the time that you're being evaluated here,

11  which is the -- April to March of 2019, as of

12  March of 2019, you're in that -- what we keep

13  calling the new role, which was the senior

14  manager of pharmacy compliance and regulatory

15  affairs, right?  That's what it says here?

16     A.     Correct.

17     Q.     Okay.  All right.  Now, they've

18  got all kind of stuff in this document, if we

19  can zoom back out, and if I have time, we'll

20  get back to some of it.  But it's got focus

21  areas, right?  You see SOM; we're going to

22  talk about that.  Centralized compliance;

23  we're going to talk about that a lot today.

24  Policy and procedures; we're going to talk

25  about that a lot today.  Training; we're

1    going to talk about that a lot today.

2                And then look at the bottom.

3    It says "Opiate legislation."

4                What was the opiate legislation

5    that was a focus area for you in this time

6    period?

7                MR. LARSON:  Object to form.

8                Go ahead, Jillanne.

9                THE WITNESS:  I'm -- I don't

10           remember specifically, but it would --

11           it would have been opiate regulations,

12           most likely.  But I don't -- I don't

13           remember specifically this evaluation.

14   QUESTIONS BY MS. FITZPATRICK:

15        Q.    Were these new regulations or

16   existing regulations?

17        A.    I'm unsure.  I don't -- I don't

18   recall there being new legislation at that

19   time when I was getting evaluated, so I'm

20   unsure.

21        Q.    Do you recall who was

22   evaluating you at this time, who would have

23   been your superior at the time?

24        A.    I think it would have been

25   Dain.

1        Q.      And that's Dain Rusk, right?

2  And the --

3        A.      Dain Rusk.

4        Q.      And the jury may or may not

5  have heard about Mr. Rusk at the time they

6  hear this testimony.  But tell the jury,

7  please, Mr. Rusk's title at Publix.

8        A.      VP, pharmacy operations.

9        Q.      All right.  And that was a role

10 that was previously held by Mr. Fred

11 Ottolino, right?

12       A.      That's correct.

13       Q.      Okay.  And that's as high as it

14 gets in the food chain when it comes to

15 Publix pharmacies, right, that position, VP

16 of pharmacy?

17       A.      Yes, they -- Dain reported to

18 the CFO.  He's reported to others higher up,

19 but that is the top of the pharmacy.

20       Q.      CFO of the whole company.  And

21 CFO, that stands for chief financial officer,

22 right?

23       A.      Correct.

24       Q.      All right.  And who was the

25 CFO, if you recall, at -- during this time

1    period, 2018, 2019?

2         A.    David Phillips.

3         Q.    And is Mr. Phillips still the

4    CFO of Publix?

5         A.    He is, as far as I know.

6         Q.    And was he the CFO of Publix

7    when you were reported to Mr. Ottolino?

8         A.    Yes.

9         Q.    For the whole time?  Or do you

10   recall when he came CFO?

11        A.    I would venture to say yes, but

12   it was -- it's a long time ago, so I don't --

13   I don't remember.

14        Q.    Now, given that Mr. Rusk is who

15   was -- would have been reviewing you here,

16   and we'll take a look to confirm that a

17   little bit later on in this document, but

18   would he be the one that might know a bit

19   more about what the opiate legislation here

20   that you-all -- that was a focus area for you

21   and that you were being reviewed on?

22        A.    Dain Rusk?  Is that your

23   question?

24        Q.    Yes, ma'am.

25        A.    Yes.

1      Q.     Okay.  So we'll have to talk to
2  Mr. Rusk about that.
3             Now, it's got some -- under
4  strategic objectives, you see it's got this
5  like L5, L4, P6, right?  Those are some
6  rating numbers, right?
7      A.     No.
8      Q.     What are those?
9      A.     Those tie to a strategic
10  dashboard.
11     Q.     And who comes up with that
12  strategic dashboard?  Because I've been
13  unable to find it.
14             Is it a strategic dashboard
15  that's been in place with Publix for as long
16  as you were there?
17     A.     Not -- is strategic -- so your
18  first question, who, it would be a
19  cross-functional team.
20             Your second question, has it
21  been in place the entire time I was there, I
22  don't recall when it initially came in place.
23  Definitely within the 25-plus years, but I
24  don't remember when.
25     Q.     Like, for example, in training,

1  that L3, you don't happen to remember what

2  the L3 means, do you?

3       A.     I don't remember.

4       Q.     Okay.  But each of those,

5  whether it's an L or a P, that correlates to

6  some type of measurement, performance metric,

7  right?

8              MR. LARSON:  Object to form.

9              Sorry, Jillanne.

10             Object to form.

11             Go ahead, Jillanne.

12             THE WITNESS:  Or objective.

13  QUESTIONS BY MS. FITZPATRICK:

14       Q.     Okay.  Thank you.

15             And we may see some more of

16  that later on.

17             Now, let's turn the page.

18  Let's go to the next page.  All right?  And

19  there's all kind of interesting information

20  in here, but I want to start, right, with at

21  the very top, strategic contributions.

22             You see that?  You see where I

23  am?

24       A.     I do.

25       Q.     All right.  We're going to blow

1    that up.

2            All right.  Now, this is

3    your -- you've given a 5.5, which is a -- on

4    a 1 to 9 scale, right?  You're given 5.5, and

5    your manager's comments, let's take a look at

6    those on your performance factors.

7            It states, "Jillanne works

8    diligently to develop and deliver on key

9    strategic objectives with the framework of

10   compliance."

11           Did I read that correctly?

12   A.      You did.

13   Q.      And then it says, "Jillanne was

14   thrusted into a new role in late last summer,

15   last year, in which in addition to oversight

16   of training, Jillanne assumed the new role of

17   managing and centralizing our compliance

18   efforts across the organization."

19           Did I read that correctly?

20   A.      You did.

21   Q.      All right.  Now, Gina let's

22   scoot back to -- well, let's see.  We don't

23   need to go back quite yet.  Let's wait one

24   second.

25           You see here -- ma'am, it's not

1   just my words that you were thrust into the

2   new role.  That's what your boss said at this

3   time, right?

4              MR. LARSON:  Object to form.

5              Go ahead, Jillanne.

6              THE WITNESS:  That's what he

7        wrote in this evaluation.

8   QUESTIONS BY MS. FITZPATRICK:

9        Q.    Right.  And he goes on to

10  say -- and again, this is in 2018.  He's

11  talking about you're thrust into this new

12  role, right?

13             He goes on to say that

14  "Jillanne was tasked with centralizing all of

15  pharmacy compliance and specifically focusing

16  on controlled substance reporting and

17  compliance."

18             Do you see that?

19       A.    I do.

20       Q.    That was a new focus for

21  Publix, right?

22             MR. LARSON:  Object to form.

23             Go ahead, Jillanne.

24             THE WITNESS:  No, not a new --

25       it was a focus for me, to centralize

1          pharmacy compliance.

2     QUESTIONS BY MS. FITZPATRICK:

3          Q.     It was a new job, right?

4          A.     Yeah.

5                 When you say that was a new

6     focus, can you clarify what you mean?

7          Q.     Well, previously Publix didn't

8     have anyone focused on controlled substance

9     reporting and compliance and the

10    centralization of that, did they?  That's why

11    it was a new position.  It didn't exist

12    before you.

13         A.     This was -- I think it's

14    important to clarify that this focus was on

15    centralizing.  We had functions in place for

16    sure.  They were decentralized.  So this was

17    centralizing them.  That's what I wanted to

18    clarify.

19         Q.     Thank you.

20                And we're going to look at what

21    happened when those functions weren't

22    centralized and why Publix all of the sudden

23    in 2018 realized it really needed to get

24    those functions centralized.  Okay?  We're

25    going to take a look at that.

1    QUESTIONS BY MS. FITZPATRICK:

2         Q.    And you also don't know whether

3    or not anyone was reporting them at all,

4    right?

5              MR. LARSON:  Same objections.

6    QUESTIONS BY MS. FITZPATRICK:

7         Q.    You don't know?

8              MR. LARSON:  Asked and

9         answered.

10             Go ahead.

11   QUESTIONS BY MS. FITZPATRICK:

12        Q.    They may or may not have been?

13        A.    I can't say that weren't, and I

14   can't say they were.  I mean, I don't have a

15   number.

16        Q.    Thank you.  You can't say they

17   were.  Thank you.

18             Next.  Prior to 2019, there

19   were no diversion analysts at Publix, right?

20   You agree?

21        A.    You're talking about a very

22   specific position, correct?  You're talking

23   about a specific position in my area?

24        Q.    Yes, ma'am.  Diversion analyst.

25   The -- yes, ma'am.

1    A.    And I do believe that they --

2  we hired our first ones during 2019.  I don't

3  have the exact date.  I don't remember that.

4  But it may have been 2018, late -- no, no, it

5  wouldn't have been.  2019.

6    Q.    So prior to 2019 --

7    A.    There were none that I know of,

8  no.

9    Q.    Okay.  And then --

10    A.    Sorry, I had to go through the

11  dates.

12    Q.    That's okay.  No.  No.  That's

13  okay.  I want you to take your time.  I want

14  this to be truthful and accurate.

15          And, ma'am, and that's -- in

16  2019, I believe, Publix -- and we may see

17  some of these -- the jury will see some of

18  these documents.  But Publix -- by the end of

19  2019, you-all had a total of two diversion

20  analysts, right, for the entire country?

21    A.    I think by then -- I'm sorry, I

22  don't remember the timeline.  We hired two

23  and then two more, and then Jennifer was

24  technically our first one.  I mean, and

25  her title didn't change, you know, until

1    sometime in 2019.  So there were five in

2    total.

3                 I don't remember the timeline

4    of the hiring, so I...

5        Q.    And we can look specifically at

6    some documents that'll give us that.  But --

7    and Ms. Warren, the jury will have heard that

8    Ms. Warren -- because you're right.  When

9    Ms. Warren started -- that's Jennifer.  When

10   she started working as a diversion analyst,

11   she already had a full-time job, right?

12       A.    What do you mean, she

13   already -- she --

14       Q.    Well, that's not -- that wasn't

15   her -- that wasn't the only thing she did all

16   day, right?  She had other responsibilities

17   as part of your compliance team?

18       A.    When we -- when we started our

19   work on centralizing and developing that

20   area, her -- she was in a compliance analyst

21   role.  I believe that was the official name

22   of the role.  And she was -- her priorities

23   were changed and were specifically on all

24   controlled substances work.

25       Q.    Right.

1        A.    So --

2        Q.    But her -- what I'm getting

3   at -- and Ms. Warren has already testified

4   about this.  But it wasn't her only job to

5   review -- as a diversion analyst to review

6   these suspicious orders -- excuse me, orders

7   of interest to determine if they were

8   suspicious.

9              She only spent a percentage of

10  her time doing that, right?  She had other

11  responsibilities?

12             MR. LARSON:  Object to form.

13             Go ahead, Jillanne.

14             THE WITNESS:  She probably had

15        some other responsibilities, as we all

16        do when we, you know, have a job.  But

17        that was her prime -- one of her

18        primary roles, and she spent a high

19        percentage of time on that.

20  QUESTIONS BY MS. FITZPATRICK:

21        Q.    Well, would you defer to

22  Ms. Warren's testimony on that subject, what

23  percentage of time she spent reviewing

24  suspicious orders?

25             MR. LARSON:  Same objection.

1          Form.

2                    Go ahead.

3                    THE WITNESS:  Was that a

4          question for me?

5     QUESTIONS BY MS. FITZPATRICK:

6          Q.     Yes, ma'am.

7                    Would you defer to her

8     testimony about what percentage of her time

9     was spent --

10         A.     I'm sorry.

11         Q.     -- reviewing orders of

12    interest?

13         A.     I don't have a percentage.

14    I --

15         Q.     Yes, ma'am.  You would defer to

16    her, right?

17         A.     Yeah.

18         Q.     Okay.

19                   And, ma'am, those two, total of

20    two, that for the first time were hired in

21    2019, those were the only two diversion

22    analysts for the whole country, right?

23         A.     For the whole country?

24         Q.     For Publix, yes, ma'am.

25         A.     For Publix, correct.

1          Q.     All Publix stores across the

2     country?

3                 MR. LARSON:  Object to form.

4                 THE WITNESS:  Right.

5     QUESTIONS BY MS. FITZPATRICK:

6          Q.     Okay.  And then at some point

7     in 2020 and 2021, a couple more were added,

8     such that today Publix has a grand total of

9     five diversion analysts for all stores across

10    the country.

11                Is that right?

12                MR. LARSON:  Objection to form.

13                Go ahead.  Sorry.  Sorry,

14         Jillanne.  Give me a second.

15                Object to form.

16                Go ahead.

17                THE WITNESS:  I'm not sure how

18         many we have today.

19    QUESTIONS BY MS. FITZPATRICK:

20         Q.     What about at the time that

21    you -- as of the time you retired in June?

22         A.     Well, remember, they reported

23    to another department for a good amount of

24    time before I retired, so I wasn't really

25    involved.  But when they left my area and

1   transitioned to the other area, there were

2   four diversion analysts and a manager --

3        Q.    Got it.

4        A.    -- for seven states.

5        Q.    And that would have been in

6   around 2021, right?

7        A.    Yes.  The transition was in

8   early -- first quarter 2021.

9        Q.    And we already talked about

10  this when we talked about Publix, but Publix

11  owns and operates roughly 1,200 pharmacies

12  around the country, right?

13       A.    Yeah.

14       Q.    So that's for all 1,200 of

15  those pharmacies?

16       A.    Yes.

17       Q.    As of 2021, there were four.

18             All right.  Next.  It took

19  Publix two years to replace the SOMS,

20  suspicious order monitoring system, it knew

21  was not working in 2018.

22       A.    Disagree.

23             MR. LARSON:  Object to form.

24  QUESTIONS BY MS. FITZPATRICK:

25       Q.    Let me rephrase that.

1  of did parallel.  You know, we put some

2  stores on the new -- and then we finished the

3  migration, I believe it was in 2020.  But,

4  again, I don't recall the exact timeline --

5       Q.     Right.

6       A.     -- of the transition.

7       Q.     It wasn't until 2020 that the

8  full transition had been made from

9  e-SupplyLink SOMS system being talked about

10  here and the one that was being talked about

11  in that memo as not working.  Wasn't until

12  2020 till that full transition was made over

13  to OrderInsite, right?

14            MR. LARSON:  Object to form.

15            Go ahead, Jillanne.

16            THE WITNESS:  Yeah, I feel -- I

17       think it was around 2020.  Is that

18       what you're asking me?  That's when

19       the transition took place.  I think

20       that's correct, it was sometime in

21       2020.

22  QUESTIONS BY MS. FITZPATRICK:

23       Q.     Yes, ma'am.

24            Now, in addition to this

25  failure, I want to also -- ma'am, you recall

1   implementation of two new applications and

2   extensive changes to the pharmacy ordering

3   process.  The two new applications for C-II

4   drugs include a controlled substance ordering

5   system and a suspicious order monitoring

6   system."

7               Do you see that?

8        A.    No, I do see that, uh-huh.

9        Q.    That's what they're talking

10  about here, suspicious order monitoring.  And

11  they talk about the fact that they've

12  identified a startup company, OrderInsite.

13              Do you see that?

14       A.    I see that, uh-huh.

15       Q.    And they say it "has a

16  potential to improve the supply chain;

17  however, initial analysis indicates that the

18  software is extremely immature and has a low

19  likelihood for success."

20              Do you see that?

21       A.    Yes.

22       Q.    And OrderInsite is a SOMS

23  system that Publix moved to in 2020 with some

24  pilot stores before that in 2018.  That's

25  what they moved to and still use today,

1   right?

2                   MR. LARSON:  Object to form.

3                   Go ahead.

4                   THE WITNESS:  I believe we're

5           still using it today.

6                   And I was just saying that this

7           was from 2016.  So several years

8           later, apparently, is when it was

9           decided to move to the OrderInsite

10          SOMS.

11  QUESTIONS BY MS. FITZPATRICK:

12          Q.    That's right, ma'am.  Despite

13  knowing since 2016 that it had a low

14  likelihood for success, that's the system

15  Publix went with, isn't it?

16                  MR. LARSON:  Object to form.

17                  Go ahead, Jillanne.

18                  THE WITNESS:  I mean, that was

19          an opinion back in 2016.

20  QUESTIONS BY MS. FITZPATRICK:

21          Q.    All right.  An opinion held by

22  Katenkamp and Fred Ottolino, who was as high

23  as it gets when it comes to pharmacy, right?

24  VP of the pharmacy, Fred Ottolino.

25                  MR. LARSON:  Object to form.

1    there's several things that come into play

2    there.

3         Q.    And --

4         A.    That's -- yeah.

5         Q.    I'm so sorry.  Go ahead.

6         A.    No, go ahead.

7         Q.    Publix -- unless there's a

8    state law requiring it, Publix does not

9    require its pharmacists to check PDMPs before

10   dispensing opioids, does it?

11        A.    It's -- we follow what the

12   state requirements are.  Or we did when I was

13   there.

14        Q.    Right.

15              So does that mean the answer to

16   my question is yes?  Unless a state law

17   requires pharmacists to check a PDMP before

18   dispensing a controlled substance, Publix

19   does not require its pharmacists to check the

20   PDMP?

21        A.    That would be correct.

22              MR. LARSON:  Object to form.

23              Go ahead.

24              Just give me a second,

25        Jillanne.