CONFIDENTIAL

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) ) ) | **CASE NO. 1:17-MD-2804** |
| **THIS DOCUMENT RELATES TO:** *"All Cases"* | ) ) ) ) | **David R. Cohen Randi S. Ellis Hon. David R. Herndon** |
| | ) ) ) | **FEE PANEL ORDER NO. 32:** ***PRELIMINARY* RECOMMENDED COMMON BENEFIT FEE AWARDS** |

## Prologue

Certain parties in this MDL entered into global Subdivision and Tribal Settlement Agreements with nine settling defendants.  Each Settlement Agreement provided that: (1) there would be a Common Benefit Fee Fund; (2) counsel could apply to receive Awards from those Fee Funds; and (3) the undersigned Fee Panel would recommend Award amounts to Judge Polster.

With this Order, the Fee Panel sets out its preliminary recommended Common Benefit Fee Awards.  The Panel's *preliminary* recommendations are shared here confidentially only with applicants at this time; the Panel will file its *final* recommendations on the MDL docket, after addressing any objections it may receive pursuant to Section VI of this Order, below.  The preliminary recommendations are listed in the **Award Chart** attached to the end of this Order.  The sections below explain the Panel's rationales.

## I.      Introduction.

In this multidistrict litigation, various species of plaintiff sued various species of defendant

CONFIDENTIAL

for allegedly fomenting an opioid epidemic in the United States.  The defendant species, which are all connected to the production and delivery of pharmaceutical opioids, include manufacturers, distributors, pharmacies, and pharmacy benefit managers.  The plaintiff species, which all claim they suffered various harms associated with increased societal opioid addiction rates, include cities and counties ("governmental Subdivisions," or "Subdivisions"), Indian Tribes, hospitals, third party payors, and individuals.

In July of 2021, the Subdivision plaintiffs reached global settlements with four of the defendants: manufacturer Janssen, and distributors Cardinal Health, McKesson, and AmerisourceBergen (n/k/a Cencora).  The operative Settlement Agreements each contained an "Exhibit R: Agreement on Attorneys' Fees, Costs, and Expenses."  In relevant part, Exhibit R provides that: (1) the settling defendants will create an "Attorney Fee Fund," which consists of two sub-funds – the "Contingent Fee Fund" and the "Common Benefit Fund;" (2) each defendant would deposit into the Common Benefit Fund an amount certain over a specific time period; and (3) the MDL Court would appoint a three-person "Fee Panel" to administer the Attorney Fee Fund.[1]  The MDL Court subsequently appointed the undersigned (Judge David R. Herndon (ret.), Randi S. Ellis, and David R. Cohen) as the constituents of the Fee Panel.  *See* docket no. 3828 at 8.

In November and December of 2022,  the Subdivision plaintiffs reached global settlements with five additional defendants: manufacturers Teva and Allergan, and pharmacies CVS, Walgreens,

---

[1]  *See* Distributors Settlement Agreement, Exhibit R §I.C-E & I at R‑1-2; §II.A.5 at R‑3; and §II.C.1 at R‑4.  All citations to Exhibit R in this Order are to the Distributors Settlement Agreement.  The Exhibit Rs in the other Settlement Agreements are largely (but not completely) identical, except for amounts.  For ease of reference, this Order refers to "Exhibit R" in the singular, but the discussion applies to all such Exhibit Rs collectively.  The Subdivision Settlement Agreements are all available at www.NationalOpioidSettlement.com, and their Exhibit Rs are all available at www.OpioidFeePanelDocuments.com.

CONFIDENTIAL

and Walmart. Each of these Settlement Agreements also contained a materially identical "Exhibit R."

In each Exhibit R, the Fee Panel is charged with "design[ing] the process and procedures for the allocation of fees pursuant to this Fee Agreement and the MDL Court's Order." Exhibit R §II.A.3 at R‑3. One of the principal obligations of the Fee Panel is to "determine the allocation of [Common Benefit] funds to eligible Attorneys." *Id.* §II.C.3 at R‑5.[2] Accordingly, the Fee Panel is charged with allocating all of the money in the various Common Benefit Funds established under the global Settlement Agreements between the Subdivisions and the nine above-listed defendants.

In addition to reaching global settlements with the Subdivisions, each of the nine settling defendants also reached global Settlement Agreements with Indian Tribes. The Tribal Settlement Agreements, however, did not include an "Exhibit R." Rather, the Tribal Agreements each addressed Attorney Fees by stating a certain percentage of the total settlement funds would be "set aside . . . for the Attorney Fee Fund," and "[t]he procedures to allocate and disburse the Attorney Fee Fund to Litigating Tribes' counsel [would then] be the subject of a separate document." *See, e.g.,* Janssen Tribal Settlement Agreement §IV.B.1 at 11; §VII.A at 18.[3] The "separate document" is *Tribal Contingency Fee Payment Order No. 1*, which provides that 7.5% of the total settlement amount under each Tribal Settlement Agreement would be set aside "for the Common Benefit Assessment as set forth in Judge Polster's May 9, 2022 Order (ECF No. 4428)." Docket no. 5258

---

[2] Exhibit R §I.B at R‑1 defines "Attorney" as "a solo practitioner, a multi-attorney law firm, or other legal representative of a Participating Subdivision." Virtually every Attorney that applied for a Common Benefit Fee Award was a multi-attorney law firm. The Panel refers below to all Attorneys as "applicants."

[3] The Tribal Settlement Agreements are all available at: www.TribalOpioidSettlements.com.

CONFIDENTIAL

¶8 at 4.  The Court subsequently ordered that these amounts should also be allocated to counsel by the Fee Panel, in conjunction with their allocation work under the Subdivision Settlement Agreements.  *See* docket no. 5285.  This made sense, because attorneys representing Tribes were allowed to apply for Common Benefit Fee Awards from the global Subdivision Settlement Agreements.  *See* Exhibit R §I.C.2.b at R‑5.

The upshot of all of this is that the Fee Panel is now charged with allocating a total of about $2.13 Billion in Common Benefit Fee Funds, pursuant to the global Subdivision and Tribal Settlement Agreements with the nine settling defendants.[4]  This Order explains the process and procedures the Fee Panel designed and undertook to allocate and determine Common Benefit Fee Awards.

As discussed below in Section VI, if an applicant disagrees with its Award, the applicant may

---

[4]  The following table shows the Common Benefit Fee amounts payable under each Settlement Agreement, and the time period over which the amount is paid.  These amounts do not account for reductions for administrative fees, increases due to interest payments, reductions due to less-than-100% plaintiff participation, possible non-payment by a defendant, and so on.

| Defendant | Subdivision Settlements | | Tribal Settlements | |
|---|---|---|---|---|
| | Common Benefit Amount | Number of Payment Years | Common Benefit Amount | Number of Payment Years |
| Janssen | $  184,615,385 | 7 | $  10,307,283 | 2 |
| AmerisourceBergen | $  240,369,231 | 7 | $  9,372,000 | 7 |
| McKesson | $  295,421,538 | 7 | $  11,518,491 | 7 |
| Cardinal Health | $  239,593,846 | 7 | $  9,341,768 | 7 |
| Teva | $  187,977,017 | 6 | $  8,189,586 | 6 |
| Allergan | $  105,069,253 | 4 | $  4,875,057 | 4 |
| CVS | $  300,369,566 | 5 | $  8,857,573 | 5 |
| Walgreens | $  338,239,505 | 7 | $  10,194,318 | 7 |
| Walmart | $  160,632,226 | 1 | $  5,355,656 | 1 |
| **Total** | **$ 2,052,287,567** | | **$  78,011,732** | |
| **Grand Total** | | | **$  2,130,299,299** | |

4

CONFIDENTIAL

file an objection with the Panel; and if the applicant disagrees with the Panel's ruling on its objection, the applicant may appeal its Award to the MDL Court.

## II.  The Factors Examined by the Fee Panel.

Exhibit R provides lengthy instructions on what factors the Fee Panel ***must*** assess when determining Common Benefit Fee Awards, as well as additional factors the Panel ***may*** assess.  For example, Exhibit R mandates that "the Fee Panel ***shall*** give significant weight to the extent to which (i) the Attorney and his or her clients have contributed to increasing (or reducing) the Initial Participation Tier achieved through participation in the Distributor Agreement; (ii) the Attorney and his or her clients have contributed to increasing (or reducing) the amounts achieved under Incentive Payments A-D through participation in the Distributor Agreement; and (iii) the Attorney and his or her clients have contributed to the potential triggering of any suspension, reduction, or offset of Payment amounts under the Distributor Agreement."  Exhibit R §II.C.4 at R‒5 (emphasis added). Similarly, Exhibit R provides the Panel "***will*** give consideration in regard to Common Benefit awards to the *Johnson* factors." (emphasis added).  *Id.* §II.H.3 at R‒13.[5]

In contrast, Exhibit R provides that the Panel "***may***" consider "[a]ny contingent fee agreements or other Fee Entitlement with Participating Subdivisions, enforcement of which, except

---

[5] The well-known *Johnson* factors are: (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

CONFIDENTIAL

for State Back-Stop Agreements, are waived in conjunction with the application." *Id.* §II.H.3.g at

R‑15 (emphasis added).  There are numerous other factors which "***may*** be applied," including: (1)

"[s]uccessful and unsuccessful motion practice in cases worked on by the [applicant];" (2) "[t]he

date of filing of any cases filed by the [applicant];" (3) "[o]btaining consolidation of the litigation

in the [applicant's] jurisdiction;" and (4) "[t]he number and population of entities represented by the

[applicant]." *Id.* §II.H.3.n-q at R‑16.

　　The Panel counts over 40 separate listed factors, several of which are repeated or overlap.[6]

Exhibit R also includes a catch-all provision, allowing the Panel to consider "[a]ny other factors that

the Fee Panel finds to be appropriate to consider after input from applicants to the Attorney Fee

Fund." *Id.* §II.H.3.x  at R‑17.  As to which are more important, Exhibit R states these "factors may

be applied and given relative weight in the Fee Panel's discretion." *Id.* §II.H.3.

　　To at least some extent, the Panel weighed evidence described by ***all*** of the factors listed in

Exhibit R.  This Order sets out a high-level view of a few of the factors the Panel examined.

Because the "standards and the law" governing Common Benefit Fee Awards are well-known, *In

re Oral Sodium Phosphate Sol.-Based Prod. Liab. Action*, 2010 WL 5058454, at *4 (N.D. Ohio Dec.

6, 2010) (Polster, J.), this Order does not recite them, and instead incorporates them by reference.[7]

---

[6]  Regarding repetition, for example, §II.H.3 of Exhibit R *requires* the Panel to apply the *Johnson* factors, but then goes on to list several of them as factors the Panel "*may*" apply.  *See, e.g.,* §II.H.3.a-d, h, & i at R‑15.  The Panel examined every factor listed in Exhibit R in its analysis.

[7]  For a recent discussion of applicable law, see *In re Flint Water Cases*, 583 F. Supp. 3d 911 (E.D. Mich. 2022); *see also In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907 (N.D. Ohio 2003), *affirmed*, 398 F.3d 778, 781 (6th Cir. 2005); *Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974).  *See also* 5 Newberg and Rubenstein on Class Actions §§ 15:62 *et seq.* (6th ed. 2022).

CONFIDENTIAL

## III.    Gathering Information.

To assess all the factors listed in Exhibit R, the Fee Panel needed to gather a great deal of information.  Some of this information was purely quantitative, such as the number of Subdivisions represented by the applicant, and the number of hours the applicant claimed it spent doing legal work that inured to the plaintiffs' common benefit.  Some of this information was purely qualitative, such as the skill required to perform the legal work, and the common benefit value it provided.  To gather all of the information it needed, the Panel undertook the following approach.

After the Subdivisions reached their first global settlements in July of 2021, the MDL Court entered an *Order Establishing Application Protocols for Reimbursement of Common Benefit Attorneys' Fees Under the Janssen and Distributors Settlement Agreements*.  Docket no. 4344 ("*Protocols Order*").  This *Order* noted that "the Fee Panel has developed protocols for submission and review of common benefit time and for the application for and awarding of attorneys' fees from the Settling Distributors and Janssen Common Benefit Fund," and it "approve[d] these protocols." *Id.* at 1.  The principal aspects of the protocols were that applicants had to submit: (1) Time Reports, and (2) Fee Applications.  In addition, the Panel engaged in various interviews.  Each of these is described below.

### A.    Time Reports.

The information required by the Time Reports was extensive.  The Panel employed counsel as an "MDL Billing Manager and Auditor" to design and review the process for reporting of time by applicants. The Auditor prepared a "Guide to Common Benefit Time Billing Under the Distributors and Janssen Settlement Agreements," which included detailed instructions, examples,

CONFIDENTIAL

and illustrations for completing the Time Report. The Guide made clear that each and every time entry required, among other things, a description of the level of attorney that performed the work (e.g. "Attorney 10-15 years"), a detailed description of the specific, single task performed (e.g., "prepare for and participate in call with expert Dr. Smith" – block billing was not permitted), and a categorization of the type of work (e.g., "Experts/Consultants" or "Tier 2 document review").

After receiving these reports, the Auditor identified non-compliant billing entries and provided notice to the applicant, pursuant to the audit process established by the Panel. Entries that were not corrected were not approved. In addition to not approving a time entry if it was insufficiently detailed, the Auditor also did not approve it if it was, among other things: (1) needlessly duplicative, or (2) not time that clearly inured to the common benefit, as opposed only to the applicant's own client(s). *See* docket no. 4344 at 5-7 (listing 16 reasons that time might not be approved).

As noted above, one important set of factors the Panel had to examine was the "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." *Davis v. Mut. Life Ins. Co. of New York*, 6 F.3d 367, 382 n.8 (6th Cir. 1993) (quoting Ohio R. Prof'l Cond. 1.5(a)(1)). The Auditor examined virtually *every time entry* submitted by each applicant. This was an arduous task, as the Panel ultimately received from 97 applicants a total of 3,454,681 hours of claimed common benefit time. Of this amount, 386,877 hours, or 11.2%, was eventually voluntarily withdrawn or not approved. The Panel reviewed *de novo* the Auditor's work, including the categorization of time based on the difficulty and novelty of the task – that is, identifying each time entry as being, for example, first tier document review, second tier document review, deposition preparation, taking of deposition, examining a witness at

CONFIDENTIAL

trial, and so on. This analysis was toilsome and time-consuming, but it helped provide a careful, accurate, thorough, and revealing insight into the total time and value of the performance of each applicant.

### B. Fee Applications.

In addition to the Time Reports, the Panel also required each applicant to submit a written Fee Application. Among other topics, the Fee Application asked the applicant to provide the following information:

- The percentage of time the applicant spent on opioid litigation, compared to the total time the applicant spent on all matters, during each year of the litigation.

- The identity of all Subdivisions and Tribes that the applicant represented, and the details on when and whether they participated in each settlement.

- Details regarding all of the applicant's employees and agents who performed common benefit work, including their: (1) name, (2) contact information, (3) number of years in practice, (4) total number of hours spent performing common benefit work, and (5) date of first employment by the applicant.

- Details of all expected opioid-related compensation of any kind, and any fee split arrangements with other counsel.

- A description of the extent to which the applicant's efforts contributed to increasing or reducing the Initial Participation Tier and Incentive Payments under the Settlement Agreements.

- An essay describing all the work the applicant did that inured to the common benefit of all plaintiffs. The essay directions specifically asked the applicant to:
  (1) describe the importance of the common benefit work performed with reference to 16 different work categories, including document review, data analysis, written discovery, motions and briefing, depositions, experts, trial work, and

9

settlement negotiation;

(2) discuss the extent to which the applicant: (a) took a leadership role, and (b) produced common benefit work-product that was used by others in parallel litigations; and

(3) "[p]rovide the Fee Panel with a basis to evaluate your Firm's work in light of the *Johnson* factors and related factors set out in [Exhibit R §II.H.3]."

- Up to ten references.

- A list of ***other*** plaintiffs' attorneys whom the applicant believed most contributed to the common benefit, and why. This list is discussed further below, in Section III.C.1 of this Order.

Moreover, due to the timing of the different settlements – four defendants settled in July of 2021, and five settled in November and December of 2022 – the Fee Panel provided applicants with the opportunity to submit ***two*** Fee Applications. Because the submission deadline for the first Application came before the latter five settlements, the Panel designed a second Application to receive updates on additional common benefit work that led to the second batch. The second Application allowed applicants an additional essay. Ultimately, then, the Panel was presented with nearly 3,000 pages of essay material, alone. Along with the Panel's interviews, these essays provided a broad and deep understanding of all of the qualitative factors listed in Exhibit R.

C. **Interviews.**

In addition to receiving Time Reports and Fee Applications, the MDL Court's *Protocols Order* provided that "[t]he Fee Panel may also conduct interviews with Fee Applicants at the discretion of the Fee Panel, to ask questions regarding information contained in the Fee Applications and the Auditor's Time Report." Docket no. 4344 at 8; *see also* Exhibit R §II.H.2 at R‑14-15 (the

10

CONFIDENTIAL

Panel may conduct "interviews with applicants and/or other counsel (including counsel for Settling Distributors) that the Fee Panel deems appropriate").  The Fee Panel pursued this option, conducting interviews with many individuals.  The interviews were of the following three different types.

### 1.    Interviews about Other Applicants.

As noted above, the Fee Application asked applicants to list *other* plaintiffs' attorneys whom the applicant believed most contributed to the common benefit, and why.  After reading these lists and narratives, the Fee Panel determined the topic merited further inquiry.  Accordingly, the Panel arranged to interview numerous attorneys who had leadership roles (e.g., members of the Plaintiffs Executive Committee ("PEC"), and heads of other plaintiff committees or teams), or who worked directly with many other applicants (e.g., members of a bellwether trial team); and interviewees were limited to telling the Fee Panel about the common benefit work of *other* applicants.  In addition to engaging in lengthy conversation, the Panel also asked these interviewees to fill out "report cards,"

CONFIDENTIAL

assigning grades ranging from A to G to other applicants, and adding any comments.[8]

These interviews and report cards, combined with the lists applicants included in their applications, provided the Panel with a wealth of highly relevant information about many of the qualitative Exhibit R factors.

### 2. Interviews with Applicants.

The Fee Panel then gave numerous applicants an opportunity to talk about their own common benefit work. Specifically, the Panel interviewed each applicant that claimed more than 4,000 hours of common benefit time, or about 42 of the 97 applicants. These interviews combined to provide the Panel with a comprehensive panorama, showing nearly all the work done in the MDL, who did it, the extent to which it did (or did not) inure to the common of all plaintiffs, and how it all fit together.

Equally important, these interviews gave the Panel a chance to ask clarifying questions and

---

[8] Interviewees were also given a "key" to applying the grades. A few representative grades are quoted below:

A = Was a senior leader providing maximum senior leadership effort in terms of intensity, consistency, and duration relative to all other common benefit counsel, taking primary responsibility for the entire litigation to accomplish the overarching common goals of all Plaintiffs, engaging in overall strategic planning since the inception of the litigation, organizing others and/or leading one or more teams of common benefit attorneys, providing consistent material common benefit contributions, virtually full-time for much of the litigation, and will likely continue to assume a key leadership role for several more years.

C = Was a leader taking primary responsibility to accomplish the overarching common goals of all Plaintiffs, was heavily relied upon by other Plaintiff Leaders, and provided consistent material common benefit contributions, full-time at times, from inception of the litigation.

F = Made isolated material common benefit contributions, but mostly "monitored" the material common benefit efforts of other firms and performed some document review.

G = Made no known material common benefit contribution to the litigation.

*See* docket no. 4344 at 9-10 (providing grade descriptions in a different order).

even to challenge applicants. This was necessary in order to expose counterproductive activity. One factor the Panel examined was the extent to which an applicant engaged in conduct that inured to the "common detriment" of the plaintiff Subdivisions and Tribes, or to the settlement process, itself.[9] Exhibit R repeatedly directs the Panel to assess this factor, and gives examples of such conduct: (1) "contribut[ing] to . . . reducing . . . the Initial Participation Tier;" (2) "contribut[ing] to . . . reducing . . . the amounts achieved under Incentive Payments A-D;" (3) "contribut[ing] to . . . the potential triggering of any suspension, reduction, or offset of Payment amounts;" (4) "representing a Non-Participating Subdivision;" (5) "[r]epresenting Later Litigating Subdivisions;" and (6) continued "litigating after the announcement of the [Settlement] Agreement, . . . potentially resulting [in] a common detriment to the settlement process." *See* §II.C.4 at R‑5 and §II.H.3.w at R‑16.

Other examples of inimical activity the Panel weighed include "non-team conduct" that made litigation or settlement more complicated, difficult, or expensive. Examples are: (1) advancing individual benefit at the expense of common benefit; (2) hoarding information; (3) engaging in needlessly obstructionist behavior; (4) pursuing actual or potential conflicts of interest; (5) initiating litigation after global settlements were announced; and (6) submitting excessive hours, especially for document review (discussed further below in Section IV.B.3). The Panel generally learned about such conduct through its own audits, investigations, and applicant interviews. Having gained this information beforehand, the Panel could then ask probing questions of applicants about themselves. This process provided the Panel with meaningful information about many of the qualitative Exhibit R factors.

---

[9] The concept of assessing "common detriment" when deciding attorney fee awards first appeared in the literature in a fee order issued by this Court. *See In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 910 n.1 (N.D. Ohio 2003).

CONFIDENTIAL

### 3.  Interviews of References.

As noted above, the Fee Application asked applicants to list up to ten references.  Often, these references were other applicants.  In order to systematize receipt of information from references, the Auditor created a master chart, so the Panel had a list of all references and all the applicants who had named them.  This allowed the Panel to ask each interviewee their opinion of all the applicants who had named them as a reference.  The process ensured that the Panel *actually asked* each applicant that was listed as a reference about each person who listed them.

This reference information was, as a general matter, not as useful as other information gained during interviews, but it still helped round out the Panel's understanding.

In addition to named references who were themselves applicants, numerous references were individuals who played important roles in the MDL but were otherwise strangers to the application process.  This included defense counsel, assistant attorneys general, state court litigators, client representatives, and so on.  The Panel arranged to interview many of these individuals as well, especially if they were named as references by more than one applicant. These individuals shared different and helpful perspectives and certainly added to the Panel's understanding of the extent to which applicants did work that inured to the plaintiffs' common benefit.

### 4.  Summarizing Interviews and References.

The amount of information the Panel gleaned from its interviews was massive.  It was important for the Panel not merely to gather this information, but to use it.  Thus, it is worth noting that the Panel collated and organized all of the interview and reference information, so that the Panel could review it "by applicant," alongside each applicant's Fee Application and associated Time

14

Reports.

In sum, the Fee Panel gathered *and made easily accessible to itself* an enormous amount of material reflecting thoroughly on all of the factors regarding which it must and may "give consideration in regard to Common Benefit awards." Exhibit R §II.H.3 at R‑15. The following Section describes some of the ways the Panel then used this information to determine its Common Benefit Fee Awards.

## IV.      Using the Information Gathered to Determine Common Benefit Fee Awards.

The leading treatise on attorney fee awards from common benefit funds explains the two most commonly-used approaches:

> Courts generally employ one of two methods in determining fee awards in common fund class action cases: the percentage method (which awards counsel a fee in relation to the benefit achieved for the class) or the lodestar method (which awards counsel a fee in relation to their hours and hourly billing rates). Today, many courts use a combination of these two approaches—a percentage approach with a lodestar cross-check.

5 Newberg and Rubenstein on Class Actions §15:63 (6th ed. 2022).

In this case, the percentage method was essentially undertaken by the settling parties, themselves, when they negotiated their settlement agreements. Specifically, each of the seven global Subdivision Settlement Agreements provides for certain amounts to be paid into an Attorney Fee Fund, which in turn consists of a Contingent Fee sub-fund and Common Benefit Fee sub-fund. As an example, the global Subdivision Settlement Agreement with Teva has a total value of $4.247 Billion; the Attorney Fee Fund has a value of $313.3 Million, or 7.4%; and the Common Benefit sub-fund has a value of $188.0 Million, which is 60% of the Attorney Fee Fund. The MDL Court

CONFIDENTIAL

approved the attorney fee fund percentages for each Settlement Agreement, *see, e.g.,* docket nos. 3828, 5079, & 5088; and those percentages are within the normal range of settlements of similar size.[10]

The Fee Panel's assignment is to recommend allocation of all of the money in the Common Benefit Fee Funds amongst the 97 applicants, based on the factors in Exhibit R. To do so, the Panel undertook a modified lodestar approach. As described more fully below, this approach involved calculating approved, normalized lodestars for each applicant, and then applying the Exhibit R factors to arrive at an individualized multiplier for each applicant.

### A. Approved, Normalized Lodestars.

Lodestars are made up of two components: the time billed, and the hourly rate. With their Time Reports mentioned above, each applicant submitted lodestar information – that is, (1) their time records for all claimed common benefit work, and (2) their stated hourly rates for each worker. Because the applicants took disparate approaches, however, the Panel took the following steps to convert each applicant's *submitted* lodestar information into an "approved, normalized lodestar."

First, as discussed in Section III.A above, the Panel did not approve certain time entries for a variety of reasons, including because the time did not actually inure to the common benefit of all plaintiffs. The overall average for all applicants of *un*approved time was material. The percent

---

[10] *See* Manual Complex Lit. §14.121 (4th ed. 2004) ("One court's survey of fee awards in class actions with recoveries exceeding $100 million found fee percentages ranging from 4.1% to 17.92%."); 5 Newberg and Rubenstein on Class Actions § 15:81 (6th ed. 2022) ("In one study, the average award for [class settlements] under $750,000 was 28.8%, while the average award for [class settlements] over $72.5 million was 18.4%; as the recoveries increased over $72.5 million, the [percentage decrease] continued, with recoveries up to $100 million receiving a 23.7% fee on average, while those with $1 billion or more received 13.7%.")

CONFIDENTIAL

unapproved on an individual basis ranged from 100% (none of the applicant's claimed time was actually common benefit time) to 0% (all of applicant's claimed time was actually common benefit time).[11]

Next, the Panel examined the hourly rates used by each applicant. These rates varied widely. For example, the rates applicants used for a paralegal ranged from $30 per hour to $535 per hour; the rates used for an attorney doing Tier-1 document review ranged from $44 per hour to $1,100 per hour; the rates used for an attorney with 5 years or less of experience ranged from $150 - $1,000 per hour; and the rates used for an attorney with 15 or more years of experience ranged from $150 - $1,800 per hour.

To address these disparities, the Panel "normalized" hourly rates for all applicants by establishing and applying ten standard rates, based on job description and/or years of attorney

---

[11] The sum of all applicants' approved lodestars is about $1.7 Billion. The total funds available for Common Benefit Fee Awards is about $2.13 Billion. This means the maximum possible aggregate lodestar multiplier is 1.25. *See* 5 Newberg and Rubenstein on Class Actions § 15:89 (6th ed. 2022) (listing three studies showing mean lodestar multipliers of 1.81, 1.42, and 1.48); Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Reports (March–April 2003) (a survey of common benefit fee awards in 1,120 class action cases showed that courts' effective multipliers averaged: (a) 3.89 across all 1,120 cases, (b) 4.50 across the 64 cases where the recovery exceeded $100 million, and (c) 2.97 across the 10 mass tort cases).

CONFIDENTIAL

experience. The standard rates the Panel established are shown in the following chart.[12]

| Attorney Level | Standardized Hourly Rate |
|---|---|
| Paralegal | $200 |
| Attorney Doc. Review Tier 1 | $150 |
| Attorney Doc. Review Tier 2 | $250 |
| Attorney Doc. Review – Plaintiff Production | $150 |
| Attorney 0-5 years | $385 |
| Attorney 5-10 years | $575 |
| Attorney 10-15 years | $700 |
| Attorney 15+ years | $925 |
| PEC Member | $1,100 |
| Senior PEC Member | $1,500 |

This normalization method worked to cap approved attorney rates, but did not augment an attorney's submitted rate (unless they were on the PEC). In other words, if an attorney with 12 years of experience used an hourly rate of $600, the Panel used this rate for the lodestar calculation; but if the same attorney used an hourly rate of $800, the Panel used the lower, standard rate of $700.

---

[12] The chosen standard rates were based on an examination of: (1) the median of all submitted rates, by attorney level and category of work performed; (2) the attorney fee information compiled in two recent MDLs by Professor William Rubenstein, *see In Re: Facebook, Inc. Consumer Privacy User Profile Litig.*, case no. 18-md-02843, docket no. 1140-6 (N.D. Cal. Oct. 3, 2023), and *Nat'l Veterans Legal Services Program v. United States of America*, case no. 16-cv-0745 (D.D.C. Aug. 28, 2023), docket no. 160-2; and (3) the Fitzpatrick Matrix, *see* https://www.justice.gov/usao-dc/page/file/1189846/download. Given the national nature of this MDL and the fact that the value of the work performed was independent of any attorney's locale, the Panel used the same normalized rates for all attorneys without regard to local market rates. Of course, the fact of normalization, itself, is much more important than the standard rates used for normalization. Given that the size of the pot of common benefit fees is fixed, such that the aggregate approved lodestar multiplier *must* be less than 1.25, fairness across applicants inheres in realistically standardizing their rates, whether low or high.

CONFIDENTIAL

The effect of hourly rate normalization overall, for all applicants, was to decrease the total of approved lodestars by 30.5%; but the decrease on an individual applicant basis ranged from 0.0% to 60.9%.

In sum, the Panel examined carefully both components of each applicant's lodestar, and then reduced both the time billed and the hourly rates where appropriate.  This process of calculating an "approved, normalized lodestar" ensures that the Panel's recommended Common Benefit Fee Awards: (1) are based only on work that truly inured to the common benefit; and (2) assigns similar value to similarly-situated counsel.

### B.  Applying the Exhibit R Factors to the Lodestar.

After determining each applicant's approved normalized lodestar, the Panel then considered all of the Exhibit R factors for each applicant.  By doing so, the Panel essentially undertook a multiplier analysis for each applicant, increasing each applicant's individual multiplier for some factors and decreasing it for others.

Although the Panel considered all Exhibit R factors, a few of them were more important than the rest.  The discussion below explains how the Panel assessed and applied a few of these weightier factors.  Ultimately, an applicant's Common Benefit Fee Award is explained and determined to a very high degree by: (1) the applicant's approved, normalized lodestar (as described in Section IV.A above), and (2) the handful of factors discussed below.  The other Exhibit R factors were less

CONFIDENTIAL

weighty in the Panel's analysis, or simply did not change most applicants' multipliers.[13]

### 1. Skill, Value, and Leadership.

The most important set of factors weighed by the Panel was: (a) the applicant's skill required to perform the legal work, (b) the depth and breadth and length of leadership the applicant showed, and (c) the common benefit value that the applicant's work provided. As described earlier in Section III, the Panel collected and methodically reviewed an enormous amount of information related to these qualitative factors. The Panel's consideration of all of this material was thorough, and the Panel's internal debate on the relative value of each applicant's work was vigorous. Specifically, each Panelist undertook review and analysis of all of the applications and other materials separately; and then divided applicants into general award-level groups, and then sub-divided again, and sometimes moved an applicant from one group to another, and then sub-divided again and again, to finally obtain their own rank-ordered list. The Panelists then came together and compared their results. The differences were surprisingly few. The Panel then worked together to sift its results further – discussed each applicant, reviewed all interview notes, surveyed "grades" and comments, examined time records, and shared different observations and perspectives.

Through this process, the Panel assessed in detail the intensity, consistency, sophistication, and duration of each applicant's efforts, the level of responsibility and organization it shouldered, the leadership it displayed, and the success of the strategic planning it undertook. As it went

---

[13] An example of a factor the Panel concluded did not carry much weight is the *Johnson* factor of "the nature and length of the [applicant's] professional relationship with its client[s]." An example of a factor that, while important, did not change the multiplier of virtually any applicant is the *Johnson* factor of "the undesirability of the cases," because this factor applies essentially equally to every applicant.

CONFIDENTIAL

applicant by applicant, the Panel reevaluated each individual applicant's contribution numerous times, both in isolation and in comparison with the work of all other applicants.

It was certainly both art and science to calibrate each applicant's multiplier based on the skill it displayed, the leadership it showed, and the litigation and settlement efforts it undertook to create the global settlement funds. In the end, the Panel is confident its assessments were honed by repeated review and comparison, discussion, and refinement.

2.     **"Other" Compensation.**

Another factor the Panel deemed very important is the total amount of compensation an applicant expects to receive for its work pursuing opioid claims, *other than* this Panel's Common Benefit Fee Award. This "other compensation" may include: (1) contingent fees payable in cases brought on behalf of Subdivisions and Tribes (whether through this MDL, in State court, or any other opioid litigation); (2) contingent fees payable in cases brought on behalf of States and other species of plaintiff (again, in State or federal court); (3) State court common benefit fees; (4) payments through State Back-Stops; and (5) any other compensation related to work on opioid cases.

That this "other compensation" factor is important is highlighted by Exhibit R, itself, which addresses the topic at least twice. The very first eligibility criterion listed in Exhibit R mandates an applicant must make a thorough disclosure of all expected compensation connected to opioid litigation:

> In connection with the process to be developed by the Fee Panel, ***any and all monies*** in attorney's fees, including referral fees, expenses paid, promises for payment, or any other Fee Entitlement, to any applicant in any opioid litigation shall be disclosed to the Fee Panel as a condition of participating in the Attorney Fee Fund and prior to an award from the Fee Panel. ***Any payment, expectation of payment or perceived***

> ***entitlement*** to participate in a State Back-Stop Agreement or any other agreement reached with a Settling State or any Subdivision or any other source regarding payment of fees must be disclosed to the Fee Panel. Similarly, ***any right to payment from any other fund***, for example a fund for payment to lawyers representing Settling States or Tribal Nations or Subdivisions shall be disclosed to the Fee Panel.

Exhibit R §II.G.1 at R‑11-12 (emphasis added).  And the same factor is identified again in §II.C.4 at R‑5:

> The Fee Panel may also consider additional fee recoveries the Attorney may potentially obtain, including, but not limited to, from State Back-Stop Agreements, representations of States or Tribal Nations, representations of other clients in opioids-related matters, or through the representation of Subdivision clients, whether they participated in the Distributor Agreement or not.

Underlying these provisions is the overarching ethical rule that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee."  Model Rules of Professional Conduct 1.5(a). Thus, the true measure of each applicant's compensation is not simply the ratio of their Common Benefit Fee Award to their normalized, approved lodestar.  Rather, the appropriate measure under Model Rule 1.5(a), and Exhibit R, is the Common Benefit Fee Award plus all other compensation.

On the flipside, the Panel also examined the amounts that applicants *could* have received, had they not waived their contingent fee contracts.  *See* Exhibit R §II.H.3.g at R‑15 and §II.H.3.q at R‑16.

Of course, the Panel did not apply a "one-to-one" reduction or increase of a recommended Common Benefit Fee Award based on the amounts of "other compensation" an applicant received or waived.  Rather, the Panel examined both the absolute amounts and the ratios of the following elements: (1) the applicant's approved, normalized lodestar; (2) the amount of "other compensation" the applicant expects to receive; and (3) the amount of "other compensation" the applicant was

22

CONFIDENTIAL

entitled to receive but waived.  The Panel then increased Common Benefit Fee Awards to applicants who received relatively small amounts of "other compensation" relative to their common benefit work, and decreased Common Benefit Fee Awards to applicants who received relatively large amounts of "other compensation."  This is appropriate because "other compensation" is to some degree also partial payment for common benefit efforts.

### 3.  Common Detriment, Firm Commitment, and Document Review.

The Panel also carefully examined the following factors.

### a.  Common Detriment.

As discussed above in Section III.C.2, the Panel considered the extent to which an applicant engaged in conduct that inured to the "common detriment" of the plaintiff Subdivisions and Tribes, or to the settlement process, itself.  Each applicant, of course, was and should be committed to the interests of its own clients.  And it is unavoidable that the many plaintiffs' attorneys working together in this MDL will have different opinions on litigation strategy, the sufficiency of proposed settlement terms, direction of leadership, and so on.  Indeed, a lone, dissenting opinion can inure to the common benefit by convincing others that a settlement offer can be improved, or that a different litigation tactic or approach should be pursued.  At some point, however, an attorney's pursuit of individualized interest can work to the detriment of the plaintiffs' common interest.  Examples are when an attorney does not merely voice a dissenting view, but obstructs all others unreasonably for not adopting it; or when an attorney seeks or obtains outsized benefits for their clients (and themselves), risking or actually causing costs to everyone else.

CONFIDENTIAL

### b.  Firm Commitment.

The Panel asked applicants, in their written applications, to "provide the estimated percentage of total billable time the Law Firm spent on Opioid Litigation, by year (that is, how much of the Law Firm's total billable time was spent on Opioid Litigation versus other matters)."  This question was directed at the fourth *Johnson* factor – the preclusion of other employment. Applicants' answers also provided a measure of the risk the applicant endured.  For example, the Panel took it into account if the applicant risked an unusually high percentage of time pursuing the novel public nuisance claims in this MDL, the outcome of which was far from guaranteed.  *See In re Sulzer*, 268 F. Supp.2d at 922 ("enhancement of the lodestar with a multiplier 'can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved'") (quoting *Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)).

Similarly, the Panel examined applicants' financial commitments to the litigation, including PEC assessments and other litigation expenses.  The applicants supplied these funds in support of global MDL claims without any guarantee of eventual reimbursement.  The Panel accounted for when an applicant fronted a substantial amount of funds to allow the litigation to progress.

### c.  Document Review.

The topic of document review ("doc-review") does not appear in any of the factors explicitly listed in Exhibit R. And assessing the value of time spent on doc-review is already a sub-part of the lodestar analysis.  Nonetheless, the Panel believed this topic deserved special attention in its analysis and multiplier evaluation.  Common benefit fee awards must be based only upon: (1) actual and

24

legitimate work performed, (2) that inured to the benefit of all plaintiffs, (3) at reasonable rates of compensation.    The  Panel  scrutinized  applicant's  doc-review  time  to  ensure  it  met  these requirements.

As  described  in  Section  IV.A,  when  the  Panel  calculated  each  applicant's  "approved, normalized lodestar," the Panel addressed doc-review time in two ways.  First, the Panel did not approve any such time if it did not inure to the common benefit.  As an example, doc-review time was not approved if the documents being reviewed were relevant only to an individual state court case and not the MDL generally.  The overall average of unapproved doc-review time for all applicants was 8.6%, but the percent unapproved on an individual basis ranged from 100% (none of the applicant's claimed doc-review time was actually common benefit time) to 0% (all of applicant's claimed doc-review time was actually common benefit time).

Second, the Panel normalized the hourly rates allowed for document review.  As noted earlier, doc-review hourly rates used by applicants ranged from $44 to $1,100.  The Panel normalized these rates at $150 for Tier 1 doc-review and $250 for Tier 2.

The  Panel  also  became  concerned  when  additional  audit  of  doc-review  time  of  some applicants revealed irregularities, including individual doc-reviewers who: (1) claimed grossly excessive time; (2) claimed an identical number of hours billed for many, many days in a row; and (3) submitted identical doc-review time to two different law firms.

To address these concerns, the Panel applied a small reduction to the multiplier of a few applicants.  The Panel considered but rejected the idea of docking any applicant for *all* of its doc-review time due to the irregularities mentioned above, although the Panel believes it was and remains within its discretion (and the Court's discretion) to do so.

25

CONFIDENTIAL

**D.      Summary.**

In sum, the Fee Panel examined vast amounts of qualitative and quantitative information in order to calculate for each individual applicant an approved, normalized lodestar, and then to apply the Exhibit R factors to determine for each applicant an individualized multiplier. The preliminary recommended Common Benefit Fee Awards listed in the **Award Chart** are the result of this effort.

**V.      Holdback.**

As described in the following Section, applicants have the right to object to the Panel's preliminary recommendations, and then the right to appeal the Panel's final recommendations to the MDL Court. The ultimate decision on each applicant's Common Benefit Fee Award will be made by the MDL Court.

To provide for the possibility of successful objection or appeal, the Panel has designated a 10% share of the Common Benefit Fee Funds as a *temporary* "holdback." If an applicant convinces the Panel and/or the MDL Court that it is appropriate to increase their recommended Award, then the Panel or the MDL Court may designate a portion of the "holdback" to make up this increase. The remaining holdback share will then be divided pro rata among all applicants, so all of the Common Benefit Fee Funds will be distributed.

Column 1 in the **Award Chart** shows each applicant's preliminary recommended Award. These will be the final awards if there are no objections or appeals and the 10% holdback is divided pro rata. Column 2 in the **Award Chart** shows each applicant's preliminary recommended Award after applying the 10% holdback.

CONFIDENTIAL

**VI.      Objection and Appeal.**

In its *Protocols Order* (docket no. 4344), the MDL Court set out the procedures for objecting to and appealing the Panel's recommended Common Benefit Fee Awards.  For the convenience of applicants, these procedures are reiterated below in relevant part, with the addition of deadlines and minor amendments.

**Award Chart**

The *Protocols Order* states that, "[a]fter deliberation, the Fee Panel shall issue their preliminary fee allocation recommendation in writing to all Fee Applicants. The preliminary fee allocation recommendation shall contain a list of all Fee Applicants and their corresponding fee allocations. (Thus, a Fee Applicant would see not only its own preliminary fee allocation recommendation, but also those of every other Fee Applicant.)" Docket no. 4344 at 9.

In the **Award Chart** at the end of this Order, the Fee Panel sets out its preliminary recommended Common Benefit Fee Awards.  As noted earlier, the Panel's *preliminary* recommendations are shared confidentially only with applicants at this time; the Panel will file its *final* recommendations on the MDL docket, after addressing any objections it may receive.

**Objections**

The *Protocols Order* states that "Fee Applicants shall have [at least] 30 days to submit to the Fee Panel confidential written objections to the Fee Panel's preliminary fee allocation recommendation."  *Id.* at 10.  The deadline for submission of objections to the Panel is **April 3, 2024.**

27

CONFIDENTIAL

The fee for an applicant to submit an objection is $50,000. Of this amount, (a) $50,000 will be refunded if the Panel concludes the objection is well-taken; (b) $25,000 will be refunded if the Panel overrules the objection; and (c) nothing will be refunded if the Panel deems the objection frivolous.

Objectors must submit a written objection, and shall then meet with the Panel in person at a time to be determined at the federal Courthouse in Cleveland[14] on **May 7 - 9, 2024**. Written objections may be submitted by logging into the Crosslink application and selecting "Object to Preliminary Fee Award" in the Preliminary Common Benefit Fee Award Recommendation task. Objectors must submit the required Notice of Objection Form and pay the administrative Objection Fee. Applicants who fail to fulfil all requirements will be deemed to have waived any objection.

The Panel will publish to all applicants a list of those applicants that submit an objection. The Panel may resolve an applicant's objection by increasing, decreasing, or leaving unchanged the applicant's preliminary recommended Award.

The Panel makes clear here that **an applicant may not appeal their award to the MDL Court unless they first timely submit and pursue an objection with the Panel**.

The *Protocols Order* continues as follows:

A Fee Applicant may only object to its own fee award. Fee Applicants filing a written objection shall include:

    A.     A statement that the fee allocation recommendation is disputed;

    B.     The basis and reasoning for the dispute, including a discussion of any applicable case law;

---

[14] Carl B. Stokes U.S. Court House, 801 West Superior Avenue, Cleveland, OH 44113.

CONFIDENTIAL

C.      A proposed resolution; and

D.      A request[15] to appear before the Fee Panel either via Zoom or in person, including the name(s) of the individuals who will be appearing on behalf of the Fee Applicant. If the objecting Fee Applicant requests to have more than two people from its firm in attendance at the hearing, the Fee Applicant must explain why each person's presence is necessary.

Upon receipt of the Fee Applicant's notice of objection, the Fee Panel shall provide written notice of receipt of the objection, the names of those individuals whom the Fee Panel has authorized to appear at the hearing on behalf of the Fee Applicant, and the date, time, and location (in-person or via Zoom) for the hearing.  The hearings shall be conducted in the presence of a court reporter.  The transcript shall be for the use of only the Fee Panel and the Court.  If the Fee Panel concludes the objection is frivolous or in bad faith, it may reduce the Fee Applicant's award.

Upon conclusion of all Fee Applicant objector hearings, the Fee Panel shall deliberate and file with the Court their final common benefit attorney fee allocation recommendations and shall provide notice to all Fee Applicants.

*Id.* at 10 (footnote omitted).

In compliance with the last paragraph quoted, the Panel will file on the MDL docket a copy of this Order and a chart showing its *final* recommended Common Benefit Fee Awards.

---

[15] As noted above, an in-person meeting with the Panel is *required* of any objector.  These meetings will be scheduled for May 7 - 9, 2024, at the federal Courthouse in Cleveland.

CONFIDENTIAL

**Information Available to Applicants during Objection or Appeal.**

The *Protocols Order* states that "[a]ll information exchanged between the Fee Panel and others (including Fee Applicants, Leadership Attorneys, the Fee Committee, or the Auditor) will be treated by all participants as confidential and will not be disclosed to any person other than members of the Fee Panel; and no member of the Fee Panel shall share with any lawyer information obtained from another Fee Application, any interview, or any related submission. None of the Fee Panel meetings, interviews, fee applications, or related submissions or materials, including the Auditor's reports, are subject to discovery." *Id.* at 8.

**Appeal of Fee Panel Allocation Recommendation**

The *Protocols Order* states that "[t]he Court will set forth, at the appropriate time, the process by which Fee Applicants may appeal to the Court the final fee allocation recommendation of the Fee Panel, including the deadline for filing notice with the Court. Any appeal of the Fee Panel's final fee allocation recommendation shall be reviewed by the Court under an abuse of discretion standard." *Id.* at 11; *see also* Exhibit R §II.B.4 at R‑4 ("Any appeal of an award of the Fee Panel from the Common Benefit Fund will be made to the MDL Court and be reviewed under an abuse of discretion standard.").

"The Court has plenary authority regarding the awarding of common benefit attorneys' fees and will make the final determination of an approved distribution of fees from the Fee Fund." *Protocols Order*, docket no. 4344 at 11.

**VII.    Conclusion.**

With this Order, the Fee Panel sets out its preliminary Common Benefit Fee Award recommendations associated with the global Subdivision and Tribal Settlement Agreements with nine defendants: Janssen; Cardinal Health; McKesson; AmerisourceBergen (n/k/a Cencora); Teva; Allergan; CVS; Walgreens; and Walmart.

The Panel's process involved gathering enormous amounts of relevant information, carefully weighing and re-weighing and applying the many relevant factors, and finally determining as carefully as it could the recommended Awards.  The process was extremely demanding and complex and required many, many difficult judgments.   The Panel is mindful of the *Johnson* court's prediction that "in all probability [the final fee award] decision will be totally satisfactory to no one."  *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 720 (5th Cir. 1974).

In sum, the preliminary awards shown in the Award Chart are calibrated carefully to reward each applicant's common benefit work with an appropriate allocation.  The Panel thanks the Court for its patience and trust.

/s/    *David R. Cohen*
*Randi S. Ellis*
*David R. Herndon*
**FEE PANEL**

**Dated:** February 29, 2024

31

# AWARD CHART

CONFIDENTIAL

| Rubris Claim No. | Firm | Preliminary Recommended Award | Preliminary Recommended Award After Holding Back 10% |
|---|---|---|---|
| CL-162475 | Andrus Anderson, LLP | 0.3231872% | 0.2908684% |
| CL-163974 | Baird, Mandalas, Brockstedt Federico Cardea, LLC | 0.0039408% | 0.0035467% |
| CL-166272 | Bertram & Graf, L.L.C. | 0.0017470% | 0.0015723% |
| CL-162481 | Blasingame, Burch, Garrard & Ashley, PC | 0.0239399% | 0.0215459% |
| CL-162565 | Boies Schiller Flexner LLP | 0.2508739% | 0.2257865% |
| CL-162684 | Boni, Zack & Snyder, LLC | 0.0000000% | 0.0000000% |
| CL-163969 | Brown Rudnick LLP | 0.0747140% | 0.0672426% |
| CL-166364 | Bryant Law Center | 0.0000000% | 0.0000000% |
| CL-162575 | Carella, Byrne, Cecchi, Olstein, Brody & Agnello P.C. | 1.8121368% | 1.6309231% |
| CL-162436 | Carey Danis & Lowe | 0.1574967% | 0.1417470% |
| CL-162476 | Casey Gerry Schenk Francavilla Blatt & Penfield LLP | 0.0786394% | 0.0707755% |
| CL-166361 | Cates Law Firm, LLC | 0.0000000% | 0.0000000% |
| CL-163666 | Chadwick and Associates, PLLC | 0.0003602% | 0.0003242% |
| CL-162577 | Cicala Law Firm PLLC | 0.2426002% | 0.2183402% |
| CL-162438 | Cohen & Malad, LLP | 0.1580404% | 0.1422364% |
| CL-163664 | Cohen Milstein Sellers & Toll PLLC | 0.2982140% | 0.2683926% |
| CL-162681 | Crueger Dickinson, LLC | 1.1861753% | 1.0675578% |
| CL-166362 | Danenhower Law Firm, LLC | 0.0000000% | 0.0000000% |
| CL-166271 | Dewsnup, King, Olsen, Worel, Havas, Mortensen, Milne | 0.0000000% | 0.0000000% |
| CL-164963 | Dicello, Levitt, Gutzler | 0.0000000% | 0.0000000% |
| CL-166274 | Dugan Law Firm | 0.2947796% | 0.2653017% |
| CL-162432 | Fields Han Cunniff PLLC | 0.1020146% | 0.0918131% |
| CL-162437 | Fitzsimmons Law Firm, PLLC | 0.1912015% | 0.1720814% |
| CL-166294 | Frazer PLC | 0.1822503% | 0.1640252% |
| CL-164721 | Friedman, Dazzio & Zulanas, P.C. | 0.0000000% | 0.0000000% |
| CL-163667 | Gilbert LLP | 0.2350367% | 0.2115330% |
| CL-163972 | Goldstein & Russell, P.C. | 0.0000000% | 0.0000000% |
| CL-163971 | Gray and White | 0.2131027% | 0.1917924% |
| CL-166273 | Hagens Berman Sobol Shapiro LLP | 0.1699187% | 0.1529268% |
| CL-162490 | Hendy Johnson Vaughn Emery | 0.0167537% | 0.0150783% |
| CL-163962 | Henrichsen Law Group | 0.0004323% | 0.0003891% |
| CL-166201 | Hobbs Straus Dean & Walker, LLP | 0.1815151% | 0.1633636% |
| CL-163970 | Holland Law Firm | 0.0099313% | 0.0089382% |
| CL-163539 | Irpino Law Firm | 2.3214457% | 2.0893012% |
| CL-166276 | Jinks, Crow & Dickson | 0.0188231% | 0.0169408% |
| CL-166385 | John Young Law Firm | 0.0025482% | 0.0022934% |
| CL-162474 | Kaufman & Canoles, P.C. | 0.0331392% | 0.0298253% |
| CL-163968 | Keating Muething & Klekamp PLL | 0.0541911% | 0.0487720% |
| CL-162480 | Keller Postman LLC | 0.0061968% | 0.0055771% |
| CL-162309 | Keller Rohrback L.L.P. | 3.0892947% | 2.7803653% |
| CL-162431 | Kopelowitz Ostrow Ferguson Weiselberg Gilbert | 0.0282051% | 0.0253846% |
| CL-166293 | Laborde Earles Law Firm | 0.0148275% | 0.0133448% |
| CL-165902 | Lanier Law Firm | 5.1777189% | 4.6599470% |
| CL-581156 | Law Offices of Travis R. Walker, P.A. | 0.0000000% | 0.0000000% |
| CL-163963 | Leger & Shaw | 0.0260039% | 0.0234035% |
| CL-162608 | Levin Sedran & Berman | 0.0000000% | 0.0000000% |
| CL-163554 | Lieff Cabraser Heimann & Bernstein, LLP | 5.8274087% | 5.2446679% |
| CL-166200 | Magleby Cataxinos & Greenwood | 0.0000000% | 0.0000000% |
| CL-166258 | Matthew Cate | 0.0000000% | 0.0000000% |
| CL-162693 | Mehri & Skalet | 0.0000000% | 0.0000000% |
| CL-163967 | Meyers & Flowers, LLC | 0.0000000% | 0.0000000% |
| CL-162571 | Milberg Coleman Bryson Phillips Grossman, LLC | 0.0051513% | 0.0046362% |

# AWARD CHART

## CONFIDENTIAL

| Rubris Claim No. | Firm | Preliminary Recommended Award | Preliminary Recommended Award After Holding Back 10% |
|---|---|---|---|
| CL-163957 | Miller Law Firm, P.C. | 0.5666557% | 0.5099901% |
| CL-166261 | Mitchell & Speights LLC | 0.0000000% | 0.0000000% |
| CL-163668 | Mooney Wieland PLLC | 0.0000000% | 0.0000000% |
| CL-162683 | Morgan & Morgan Complex Litigation Group | 2.3127565% | 2.0814809% |
| CL-171482 | Moskowitz Law Firm, PLLC | 0.0000000% | 0.0000000% |
| CL-162308 | Motley Rice LLC | 17.2008833% | 15.4807950% |
| CL-163537 | Napoli Shkolnik, PLLC | 8.6994105% | 7.8294695% |
| CL-162497 | National Consortium[1] | 11.8521678% | 10.6669510% |
| CL-162570 | Ochs Law Firm, LLP | 0.0151405% | 0.0136265% |
| CL-163960 | Oths, Heiser, Miller, Waigand & Clagg, LLC | 0.0004313% | 0.0003882% |
| CL-166275 | Phipps Ortiz Talafuse, PLLC | 0.0000000% | 0.0000000% |
| CL-163964 | Plevin & Gallucci Co, LPA | 0.6597969% | 0.5938172% |
| CL-166277 | Prince, Glover & Hayes | 0.0037483% | 0.0033734% |
| CL-163538 | Renne Public Law Group | 0.0101590% | 0.0091431% |
| CL-162435 | Robbins Geller Rudman & Dowd LLP | 8.4295703% | 7.5866132% |
| CL-162439 | Robins Kaplan LLP | 0.5709911% | 0.5138920% |
| CL-162312 | Robinson Calcagnie, Inc. | 0.7572711% | 0.6815440% |
| CL-164038 | Robles, Rael & Anaya P.C. | 0.0000000% | 0.0000000% |
| CL-165031 | Romano Law Group | 0.0000000% | 0.0000000% |
| CL-163954 | Sam Bernstein Law Firm PLLC | 0.0175846% | 0.0158262% |
| CL-163549 | Sanford Heisler Sharp, LLP | 0.0083353% | 0.0075018% |
| CL-162498 | Scott & Scott Attorneys at Law, LLP | 0.0878848% | 0.0790963% |
| CL-163973 | Seeger Weiss LLP | 3.4066059% | 3.0659453% |
| CL-163961 | Seif & McNamee, LLC | 0.0012196% | 0.0010977% |
| CL-162430 | Simmons Hanly Conroy, LLC | 11.8227800% | 10.6405020% |
| CL-162434 | Skikos, Crawford, Skikos & Joseph | 4.0252599% | 3.6227339% |
| CL-166363 | Smith & Fawer, LLC | 0.0000000% | 0.0000000% |
| CL-162310 | Sonosky, Chambers, Sachse, Miller, & Monkman, LLP | 0.7585733% | 0.6827160% |
| CL-162473 | Spangenberg Shibley & Liber | 1.3829504% | 1.2446553% |
| CL-163557 | Stranch, Jennings & Garvey, PLLC | 0.2954078% | 0.2658670% |
| CL-166292 | Taft Stettinius & Hollister LLP | 0.0585337% | 0.0526803% |
| CL-162682 | Tate Law Group, LLC. | 0.0060096% | 0.0054087% |
| CL-172149 | Texas PSC 1 | 0.8470293% | 0.7623264% |
| CL-163959 | von Briesen & Roper, s.c. | 0.0064650% | 0.0058185% |
| CL-164026 | Wagstaff & Cartmell, LLP | 0.7019139% | 0.6317225% |
| CL-162433 | Weisman Kennedy & Berris Co., LPA | 1.2252813% | 1.1027532% |
| CL-162313 | Weitz & Luxenberg, P.C. | 0.9149047% | 0.8234142% |
| CL-162576 | Wexler, Boley & Elgersma LLP | 0.3345951% | 0.3011356% |
| CL-166287 | Woelfel & Woelfel, LLP | 0.0769857% | 0.0692871% |
| CL-164027 | Zarzaur Law, LLC | 0.0825115% | 0.0742604% |
| CL-162477 | Zashin & Rich | 0.0462296% | 0.0416067% |

[1] The National Consortium is comprised of the following firms: Baron & Budd; Farrell & Fuller LLC; Hill, Peterson, Carper, Bee & Deitzler, PLLC; Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr and Mougey, P.A; and Powell & Majestro, PLLC.  These firms agreed  to receive a single award, to be split amongst them according to their own agreement.