1              IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
2                   EASTERN DIVISION

3                   - - - - -

4

5  IN RE:                  )
                        )
6  NATIONAL PRESCRIPTION OPIATE  ) Case No. 17-md-2804
                        )
7  LITIGATION.           )

8

9                   - - - - -

10

11      TRANSCRIPT OF PROCEEDINGS HAD BEFORE SPECIAL

12      MASTER DAVID R. COHEN, SPECIAL MASTER OF

13      SAID COURT, ON WEDNESDAY, JUNE 12TH, 2024,

14          COMMENCING AT 9:30 O'CLOCK A.M.

15                  - - - - -

16

17

18

19  Court Reporter:          GEORGE J. STAIDUHAR
                    801 W. SUPERIOR AVE.,
20                      SUITE 7-184
                    CLEVELAND, OHIO 44113
21                      (216) 357-7128

22                   - - - - -

23

24

25

1          P R O C E E D I N G S

2               SPECIAL MASTER:  Good morning, everybody.

3               (Chorus of good mornings.)

4               SPECIAL MASTER:  Welcome to Cleveland.  I

5      think I have said hello to everybody personally.  If I

6      haven't, I will later.

7                    So we are going to do this as casually as we

8      can given we are in the courtroom, and we are on the

9      record.

10                    If anybody needs to take a bathroom break,

11      they don't need to wait for a break.  They can just go to

12      the bathroom, which is outside on the left.  And we will

13      take a break every hour, hour-and-a-half.

14                    I know a lot of folks have plans to get out

15      of here and don't want to wait until dinner to do that,

16      so we will try and get through this as quickly as

17      possible and perhaps finish everything before we all go

18      to lunch together.

19                    My plan is to go through this agenda more or

20      less in order of presentation, but I will probably jump

21      around a little bit, partly because the agenda items

22      themselves sometimes interconnect.

23                    And I am also very happy to hear that the

24      parties have kind of come to what I am call a detente,

25      which is a little bit of a timeout, to let everybody

1    catch up with everybody else's demands and try and figure

2    out a way to go forward without a lot of sniping, with

3    the understanding though there are still going to be some

4    issues that will have to be ironed out after you spend

5    some time catching up.

6              By the way, today our court reporter is

7    George.  If you want a transcript, he is the one you will

8    ask, and to help George out, identify yourself before you

9    speak and also get in front of a microphone.

10   There are some on the tables.  There is also the podium.

11   I don't care where you speak, but get yourself in front

12   of a microphone so he can hear you.

13             Can you hear me, George?

14             COURT REPORTER:  Very well.  Thank you.

15             SPECIAL MASTER:  Okay.  So why don't we just

16   start winding our way through the agenda beginning with

17   item 371, the first -- excuse me, I am not on the first

18   page -- beginning with item 362.

19             The first agenda items on the list all have

20   to do with the city of Independence, and we begin with

21   the PBM Defendants describing it as their inability to

22   identify custodians and complete fact discovery based on

23   discovery responses.

24             I suggested that Independence -- it might be

25   a good idea for Independence to answer some of the

1    questions they hadn't, and they recently did so,

2    including with regard to a large extent to the

3    ransomware issues.

4              And so I really am just kind of looking for

5    some folks to bring me up to date on where things stand,

6    whether they see in the future or the extent to which

7    they see in the future any bottlenecks or obstacles on

8    that topic.

9              MS. VIEIRA:  I guess I will get started.

10   Olga Vieira for Express Scripts.

11             On this item, the ransomware attack, they

12   did answer many of our questions.  We did have some

13   follow-up questions.  I think you pointed some of those

14   out.

15             For example, we have been told that the 2014

16   e-mails have been destroyed or are gone, I guess, but we

17   really don't have the reason why.  So we are trying to

18   understand why that is.

19             Typically, in a ransomware attack, there is

20   a ransom to be paid, and if that's paid, you get back

21   your data.  So we are not understanding where the

22   disconnect is, what efforts were made to retain the data

23   or recover the data once it was taken or whatever it was,

24   and then where it went the from there.

25             So we just wanted some more specific answers

1    on that, and we can follow up with them in writing and

2    try to get more details there.

3            SPECIAL MASTER:  So separate from the

4    ransomware attack, do you feel things are on track

5    otherwise as far as being able to identify custodians

6    that you are making progress?  It seems like maybe you

7    haven't chosen every single one, but you have chosen

8    many.

9            Is that fair?

10           MS. VIEIRA:  Yes.  That's fair, and we are

11   working through it, and now the question becomes how far

12   back do they have documents for the documents that they

13   did have backups for, and we are just trying to get date

14   ranges there for that.

15           SPECIAL MASTER:  Okay.  And as far as the

16   ransomware issue -- and this is equally true to some

17   extent with the litigation hold.  I don't really care

18   very much about what happened; I just care where we are

19   going forward.

20           So it doesn't seem, unless you can convince

21   me otherwise -- we don't have to talk about all of this

22   now -- it doesn't seem that critical that Independence

23   explain everything that happened and exactly what they

24   paid and who the ransomer was and everything else.  The

25   question is where are we now?

1          And so I did send out the e-mail to

2    Independence yesterday that one question, which is, are

3    we talking e-mails that were lost and forever not

4    findable, or are they encrypted somewhere that

5    conceivably they could be found and decrypted?

6          I just want to know the state of play with

7    regard to what was ransomed, and I think that was just --

8    your letters say it was just e-mails.

9          Is that right?

10         MS. CICALA:  Yes.  Hi, Special Master Cohen.

11   Joann Cicala for Independence.  It was just e-mails.  Our

12   understanding is that the pre '14 -- pre-2014 e-mails

13   were destroyed; that they are not available, but we are

14   continuing to evaluate that to see if there is any hope

15   of recovering anything that was encrypted, but it is not

16   looking good.  It looks like those e-mails were destroyed

17   in the attack.

18         SPECIAL MASTER:  Okay.  So you let them know

19   you know there is a slight difference between destroyed

20   and gone forever and encrypted and maybe recoverable.  I

21   don't know if there is any real difference, but there is

22   some difference, and so you will let them know.

23         MS. CICALA:  We will.  We are not

24   optimistic, but we are working to get a final answer on

25   that.  It does appear they are gone.

1          MS. VIEIRA:  And if I may, the issue, the

2     reason why it is important to us, what happened is that

3     this happened in 2020, which was after the lawsuit was

4     filed.

5          So if back then there was a chance to

6     recover these e-mails and efforts were not made, then we

7     may have some remedies that we will seek from the Court.

8          SPECIAL MASTER:  So what would those be?

9          MS. VIEIRA:  I guess it depends on the

10    extent of their efforts, what the situation was.  We

11    don't have enough information yet to figure out if there

12    was spoliation or if there was just --

13         SPECIAL MASTER:  Assume the worst -- I don't

14    know what the worst is -- but assume that they knew there

15    was a problem, they didn't say it.  The bellwether

16    choosing process went forward with their knowledge of

17    that and your non knowledge of that, and now, there is

18    stuff that is irretrievably lost.

19         MS. VIEIRA:  I think that puts us in the

20    spoliation category similar to Lincoln where we will have

21    to see the extent of the information that was lost.  At

22    this point we know it is all pre-2014 e-mails.

23         When we get whatever documents do exist, we

24    will review them.  We will have to determine whether

25    there is some prejudice to the Defendants because e-mails

1   are gone.

2           SPECIAL MASTER:  So can you give me then --

3   and I am asking this of both Defendants any idea under --

4   I think it is Rule 37(e) -- what you would be requesting?

5   I mean, it could range from -- you could make it up

6   better than I.  I have probably seen that more.  What

7   kind of -- what kind of action from the Court or from the

8   Plaintiffs would you want to see?

9           MS. VIEIRA:  It is hard to say, but there is

10  certainly a negative inference regarding spoliation.

11  There could be potentially some remedies of striking

12  certain claims, certain claims dating back in time if

13  they don't have any to support.  For example, there is no

14  evidence to support that they were damaged pre-2014 or

15  that there was an epidemic pre-2014 or what the

16  consequences of the epidemic were pre-2014.

17          If they don't have that evidence, then they

18  should not be permitted to present claims regarding that,

19  and I am just -- I am speaking off the cuff.  We haven't

20  gotten that far yet.

21          SPECIAL MASTER:  That's fine.  And of

22  course, it is just e-mails.  So to say they would have no

23  evidence of it might be the reaching too far, but I

24  understand your point.

25          Do you want to address that?

1          MR. HARDER:  Your Honor, this is Brad Harder

2     for Optum Defendants; only to add, Special Master, that

3     it would be premature to probably get into too many

4     details about potential remedies until we understand the

5     scope of what has been lost or potentially spoliated.

6          MS. CICALA:  If I may --

7          SPECIAL MASTER:  Joann.

8          MS. CICALA:  -- thank you.  The use of the

9     word "spoliation" in this context is somewhat disturbing

10    to Plaintiffs because these e-mails were not -- these

11    e-mails were lost as a result of a ransomware attack.

12         So I think it is an additional step to

13    describe that as spoliation.  The County has provided a

14    chart at the end of May identifying date ranges for which

15    documents are available.

16         We believe that, as documents are produced

17    in Independence and fulsome productions are underway in

18    being made -- in fact, we have a team in Independence

19    this week pulling paper documents -- our belief is that

20    the most relevant evidence for Defendants will not be

21    contained in these pre-2014 e-mails.

22         And we think it would certainly be premature

23    to come to any conclusions.  We are certainly not hearing

24    that from the Special Master at this point.

25         So let us please continue the process of

1     making these productions and then evaluate whether there

2     are any implications or prejudices to the Defendants from

3     this isolated ransomware incident.

4                SPECIAL MASTER:  So I want you all to start

5     thinking now -- and we are going to come back to this

6     question before we leave today -- of when it is that the

7     Defendants will know enough to say "here is the

8     circumstance.  This is what we need."

9                That needs to get teed up quickly.  It can't

10    be the case that we wait six months until you ask for

11    what you ask for and the Court rules on it because we

12    just need to know the state of play much earlier than

13    that.

14               And I am thinking more like days than weeks

15    or months.  So I want you to start thinking about that,

16    and we will come back to it.

17               And that question is going to be equally

18    true for any other case, specifically the lit hold issue

19    with Rochester.  We need to know what it is that the

20    Defendants think is the problem and what they think they

21    need, if anything, in response to that.

22               MR. WEINBERGER:  Special Master Cohen, Peter

23    Weinberger on behalf of the PEC and the Plaintiffs.

24               I realize that Olga was just using an

25    example, but the notion that e-mails or lost e-mails

1    would have an impact on their ability to determine what

2    the consequence of this epidemic was to the City has

3    never ever in seven years been borne out by the evidence

4    that has been discovered from the bellwethers.

5              I mean, there is a tremendous amount of

6    public information about the epidemic, both nationally

7    and in cities like Independence.  There are obviously

8    people that can testify as to what effect it had on the

9    City.

10             And so while the epidemic may have been

11   mentioned in an e-mail or two or 50 or whatever, in no

12   way does it, to my recollection, has it ever impacted on

13   the Defendant's ability to defend this case as to whether

14   or not there was an epidemic in any individual

15   bellwether city or county.

16             So I realize that was just an example, but I

17   didn't want the record to be left without a comment from

18   us that we just haven't seen e-mails that in any way

19   really impact on whether an epidemic exists or not

20   because there is a lot of other independent information,

21   both publicly available and otherwise.

22             SPECIAL MASTER:  Right.  So I get that you

23   are both putting down markers.  The fact is, when it

24   comes time, you will make your arguments as to whether

25   there was prejudice and the extent of it, and if there

1    was prejudice, what that means for the case going

2    forward.  And those will be made to the Court and not me,

3    and the Court will decide it.

4              But as I say, I think we need to tee that

5    issue up sooner rather than later.  And I say, that's

6    partly because the Judge has so instructed.

7              MS. VIEIRA:  If I may, I think in order to

8    resolve it we just need some more answers.  The City put

9    out a press release when this happened, saying they were

10   thoroughly investigating it and had forensics in there

11   and all sorts of things.  We haven't seen any of that

12   documentation.

13             Initially, they told us there was a report

14   on the attack they were going to provide.  Then they told

15   us that a report didn't exist.  So that doesn't really

16   gel with the statements they made in the press, that

17   there was an investigation, so there should be some sort

18   of documentation and some correspondence, something,

19   about what happened and how it happened.

20             And then the second component is just

21   answers to what exactly happened to the 2014 e-mails and

22   any other harddrives.  I think they said that they are

23   still confirming that no other data was destroyed so just

24   a definitive answer on that and a definitive answer on

25   whether or not they ever had an opportunity to uncrypt

1    the file or recover the data and didn't do so.  Those

2    were the answers we would need.

3            SPECIAL MASTER:  Right.  So the more

4    information that Independence can produce, the better.

5    As I said, some of that doesn't matter, right?  Some of

6    it doesn't matter because we are where we are, and the

7    question is going forward what you have access to, what

8    was lost, and what does that mean?  How much did they pay

9    for the ransom, if any, and some of that doesn't matter.

10           That question, I think, doesn't matter as

11   much as what evidence is left and what was lost, how does

12   that affect the case.  But having said that, some of it

13   doesn't matter.  The more that Independence can produce

14   to Defendants and more quickly, the better.

15           MR. HATCHETT:  Special Master Cohen, this is

16   Andrew Hatchett for the United and Optum Defendants.

17           I think one of the issues, when you say some

18   of that doesn't matter, at this point, I actually don't

19   know all the facts either, and this is not something that

20   is my primary responsibility on this on our side of the

21   case.

22           My understanding is that they were under a

23   legal obligation to everybody to preserve documents at

24   the time the ransomware attack happened.  And so I have

25   never dealt with a ransomware attack in the context of

1      litigation, but if the ransom is a hundred dollars or a

2      thousand dollars and you understand you are a Plaintiff

3      in a litigation where you plan to seek far more than that

4      in damages, I would think that that might impact your

5      responsibilities in terms of how you should respond to a

6      ransomware attack.

7                    And I think the range of arguments that we

8      might present on this will depend on when the facts

9      actually are.  So that's why it is important for us to

10     understand the full range of the facts so we can marshal

11     those facts and see what kinds of arguments we have in

12     order to appropriately present our defenses on this

13     issue.

14                    On the issue of the relevance of the

15     e-mails, I would also just note, whether there is an

16     opioid crisis in the jurisdictions may be one question

17     but there is another question as to who was the cause of

18     that crisis.

19                    And so, of course, there may be e-mails that

20     are attributing causes to an opioid crisis that are very

21     different and have nothing to do with whether a pharmacy

22     benefit manager included an opioid on a formulary for a

23     payor or a health plan.

24                    And so it is important for us to be able to

25     have those e-mails and see what sort of things the

1    bellwhether counties attributing to be the cause of the

2    opioid epidemic are, and if that turns out to not be our

3    clients, that would be a very important and relevant

4    defense that we would make in the litigation.

5                SPECIAL MASTER:  Okay.  Everybody is putting

6    down markers, and I understand that.

7                Go ahead, Paul.

8                MR. FARRELL:  Paul Farrell on behalf of the

9    PEC.  We understand; we agree.  We are diligently working

10   through the problem.  We will make full disclosures, and

11   afterwards we fully expect the Defendants to raise the

12   issues with the Court.

13               MS. CICALA:  I will just add to Paul's

14   remarks.  We expect to have full answers to the

15   outstanding ransomware questions by the end of this

16   week.

17               SPECIAL MASTER:  Okay.  Thank you.  Let's go

18   on to the next agenda item please, which is No. 367, and

19   this one has to do essentially with data fields again.

20   This one deals essentially with data fields, and I am not

21   sure we need to spend very much time on this.

22               It looks like the parties were using their

23   detente to exchange information, so I will just ask if

24   there is anything that anybody feels I need to be told or

25   resolved today on this one.

1           MS. VIEIRA:  Nothing from the Defendants.

2           MS. CICALA:  Nothing from Plaintiffs.  Thank

3      you.

4           SPECIAL MASTER:  Okay.  Good to hear.  Let

5      me know if that changes.

6           Let me throw an idea out.  So

7      unsurprisingly, anybody who has been involved in this

8      litigation shouldn't be surprised at this or any

9      litigation.

10          Discovery takes longer than expected, even

11     when initially it is expected to take a long time, and

12     things come up like litigation holds and ransomware

13     attacks and more difficulty getting data than people

14     expected, which all suggests at some point -- and it has

15     already happened to some extent -- the parties are going

16     to say "hey, we need more time.  We need to push these

17     deadlines."

18          And also, the parties may think that

19     reorganizing the way discovery occurs might be a good

20     idea.  And so we can talk about this, or I can just float

21     the idea and let people think about it.  I just wonder if

22     it makes sense for some of these depos to start now, even

23     though discovery isn't finished.

24          So for example, let's say that you've each

25     identified half of your custodians and then you do the

1    custodial production for those custodians and you have

2    also done some or most or all of the non custodial

3    discovery of shared drives and so on and so forth, and it

4    is a case that, at least as to some of those deponents,

5    it is kind of ripe.  It is ready.  You are good to go for

6    those custodians.

7              And those custodians can answer some of the

8    open questions that remain, like who else is there?  What

9    other custodians are the best ones to chat with?  What

10   other sources of documents might there be?

11             And instead of being highly organized with

12   what happens first across every custodian, across every

13   category of discovery, maybe things can go in parallel

14   instead of entirely in sequence.

15             And so I will just stop there and ask, and

16   nobody has to respond to that unless somebody thinks

17   that's an especially good idea or bad idea.

18             MR. FARRELL:  This is Paul Farrell on behalf

19   of the PEC.

20             We have internally discussed -- and

21   obviously, this isn't the first iteration of the building

22   of a case in this MDL, so we have been through this

23   now -- what? -- 14 times.

24             From the Plaintiffs' perspective, we do

25   believe that some early depositions may be of some

1    benefit, but in order to be in that position to take the

2    deposition and create potentially a record for admission

3    of the testimony and documents into some record, we feel

4    like we need some more documents.

5            So that's the purpose of what our

6    discussions have been over the past week.  From our

7    perspective, there is a certain core set of documents

8    that we think will greatly aid the PEC in beginning that

9    process.

10           I fully anticipate that we will utilize Rule

11   30(b)(6) to try to clearly delineate and define some of

12   the early topics, and we may even do some record

13   custodial depositions to create records.

14           We are getting closer, but I think this next

15   three weeks will be a very big indicator of when we can

16   start taking those depositions.  I will point out that

17   there is a limitation on the number of depositions, and

18   as you know, both sides for the past seven years have

19   come back to you and asked for more.

20           And in general, when there is a rather

21   well-founded explanation and justification, you have

22   allowed more, but we are conscious of the fact that there

23   is a finite number of depositions, and not to bleed into

24   other subject matters is that we have several different

25   corporate entities within each family, and that weighs

1    heavily on us in determining when and who to start

2    deposing.

3                SPECIAL MASTER:  All right.  Well, I will

4    only suggest that I think the parties should start

5    thinking about being creative and not feel entirely

6    limited by the case management order that they first

7    negotiated and has been approved because the Court -- and

8    I am very open to figuring out ways to help you get

9    through this.

10               And sometimes a knot can be untangled by

11   going at it a different way, and that obviously, I think,

12   could benefit both sides; that instead of waiting for all

13   documents and deposing folks, maybe it makes sense to do

14   some depositions interleaved with that.

15               Okay.  Anybody else want to say anything, or

16   shall I jump to the next agenda item?

17               MS. VIEIRA:  This is Olga Vieira on behalf

18   of Express Scripts.

19               Our concern would be that depositions would

20   need to be reopened if documents had not been completely

21   produced before they were taken.  So that's something

22   that we want to definitely avoid, and that's why we are

23   trying to push out as many documents as possible.

24               Now, that would be the concern from our

25   perspective.

1          SPECIAL MASTER:  Yeah.  It is a very valid

2    concern and mine as well, and I don't want that to happen

3    and don't like it to happen.  It has happened before, but

4    I agree with you.

5          MR. MOUGEY:  Peter Mougey.  I think it is a

6    good idea for both sides, and I think we can manage the

7    problem with documents appearing later with taking

8    depositions after custodial files are complete.

9          Let me just raise two issues that we don't

10   have to decide today but I do believe are going to be

11   important, and one is the production of non custodial

12   documents.  And I think that issue needs to be addressed

13   here in the near future.

14         SPECIAL MASTER:  Well, 371 is the next

15   agenda item, so let's segue directly.

16         MR. MOUGEY:  So the non custodial documents,

17   at this point, we've have a timeline on the custodial

18   files.  There is a handful more custodians to be

19   identified after we get this first wave in from both

20   sides, but the non custodial, I think the parties need to

21   agree when the substantial completion is -- can be

22   accomplished.

23         So at this point, I think July 30th would be

24   enough time.  It is approximately 45 days to get the

25   non custodial documents produced, and I think that will

1     allow us enough time with the custodial files that are

2     completed.  Non custodial documents substantial

3     completion at the end of July would give us a good spring

4     board to start taking some depositions so we don't have

5     -- I mean, quite frankly, between the Defendants and if

6     we end up waiting until September-October to start taking

7     depositions, we are talking about -- I mean, we could be

8     approaching ten depositions a week from both sides.  I

9     mean, the pace is going to be untenable.

10          We are going to need to start taking

11    depositions earlier.

12          SPECIAL MASTER:  Well, from what I have

13    read, if I understand the non custodial document issues,

14    they are hard paper documents and stuff in Iron Mountain

15    and similar spots.

16          MR. MOUGEY:  Right.

17          SPECIAL MASTER:  They include, you know, old

18    documents that are on tapes, tapes or drives that would

19    have to be restored, and they include shared drives, and

20    there has been discussion about the difficulty with

21    running search terms across shared drives.

22          And there may be others, so I guess what I

23    would like to hear is the parties kind of have a colloquy

24    right now about the issues there, what the problems are,

25    how we can solve them, how long it will take.

1              MR. HATCHETT:  This is Andrew Hatchett for

2       the United and Optum Defendants.

3              So I think the current deadline for the

4       production of non custodial documents is actually in

5       December.  We had a deadline of July 12th for custodial

6       documents.

7              As you can imagine, given a July deadline

8       for custodial documents and a December deadline for

9       non custodial documents, we have overwhelmingly

10      prioritized the review and production of custodial

11      documents.  And we can talk about that.

12             Obviously, we haven't even finished

13      selecting custodians, and so that July 12th deadline, we

14      are engaged in negotiations and discussions and what to

15      do about that.  We haven't produced non custodial

16      documents that are isolated, the identifiable documents

17      that are responsive to certain requests.

18             So for example, contracts with Perdue where

19      you are able to go out and say this is a request for this

20      document, let's go find that document.  It is a

21      non custodial source.  We have reviewed and collected it,

22      but we also have to your point, shared drives that I

23      think --

24             SPECIAL MASTER:  I'm sorry.  You said tier

25      point?

1          MR. HATCHETT:  Sorry.  You mentioned sources

2     of non custodial, and one of those sources of non

3     custodial is documents that are found on a shared drive.

4          And so we collected those in very large

5     volumes, and you will have to apply the same sort of a

6     search protocol to them, search terms across the

7     non custodial sets that we collect.

8          But that has not just been a priority to

9     date because we have been prioritizing the review and

10    production of custodial documents.  I will tell you there

11    is no way we could complete a review and production of

12    non custodial documents by July 30th.

13          I am happy to have discussions separately

14    with the PEC separately as to whether something other

15    than the December deadline is achievable.  But I am not

16    prepared today to represent what that might be, but I

17    just want to explain that our review and production to

18    date has been focused on the custodial piece because of

19    the way the CMO deadlines are sequenced.

20          MR. MOUGEY:  Well, the December deadline is

21    the close of fact discovery.  Obviously, in my mind, that

22    means we are finished taking depositions by the end of

23    December.  I think it is December 24th.

24          To say the document deadline is December

25    24th, obviously, we need the documents in substantial

1    completion to start taking depositions.  So the thought

2    that shared files, shared drives, paper documents don't

3    need to be produced until the close of fact discovery, I

4    mean, there is no way that's an orderly -- the issue that

5    Olga identified with having to reopen depositions if we

6    wait until the close of fact discovery as a deadline for

7    the non custodial docs, we are going to have a mess.

8              MR. HATCHETT:  I actually agree on that.  I

9    looked at the wrong date, and I guess we don't have a

10   date for non custodial documents.  That's just the date

11   that popped up on my screen.

12             So certainly, we are not going to wait until

13   December to complete the review and production of

14   documents if that's the date for the end of that

15   discovery.

16             My point is, we are prioritizing custodial

17   documents, which was a July 12th deadline, and we are not

18   on pace to achieve non custodial by July 30th.

19             SPECIAL MASTER:  So look, right now I am

20   just trying to peer ahead in how to figure out how to

21   avoid issues, and it seems to me there are two things

22   that make sense.

23             One is to figure out, negotiate, discuss,

24   and figure out when you can set a deadline for

25   non custodial document production, substantial completion

1    that works for both sides, that allows depositions to go

2    forward because, of course, it is true.

3            That you all don't want to do depositions

4    when custodial document production isn't complete, and in

5    fact, that has been one of the very real reasons in the

6    past the Court has had to extend deadlines and reopen

7    depositions, which, as I said, I don't want to do.

8            Any prisoners coming out?  Wrong floor.

9    Maybe he is looking for somebody.

10           (Laughter.)

11           SPECIAL MASTER:  The other thing that has

12   come up many times before is, you know, especially across

13   shared drives by Defendants or non custodial productions,

14   that halfway through it or after everybody thought it was

15   over is that another source of non custodial document

16   production is identified.  The parties come to the Court,

17   and the Court says "yeah, you got to look at that," and

18   then we have got new documents and probably reopening

19   depositions.

20           So looking ahead, again, I am going to

21   suggest that the parties figure out a way to avoid that

22   by perhaps scheduling IT 30(b)(6)s fairly early, so that

23   an understanding can be reached mutually as to what will

24   be searched and that locating sources of documents that

25   should have been searched earlier doesn't happen.

1           That's just kind of a thought for everyone

2    to consider.

3           Paul?

4           MR. FARRELL:  I am hoping to give the Court

5    and maybe a status update thematically, big picture.

6           The PEC and both the PBMs have had a series

7    of conversations over the past week discussing this very

8    subject matter.

9           SPECIAL MASTER:  Good.

10          MR. FARRELL:  So both the parties have

11   exchanged Rule 33 and Rule 34 discovery requests,

12   non custodial documents.  And both sides are complaining

13   that the other hasn't produced everything yet, which

14   resulted in a series of questions back and forth of who

15   has what, what kind of drive, what kind of documents.

16          And we got to a point where both sides

17   agreed, you know what?  We need to stop asking each other

18   questions and start producing documents.

19          So that's why we have agreed to what I call

20   a detente till July 1st where both sides are going to

21   produce as many documents as they can.  We are going to

22   focus both sides or rolling out responsive documents.

23          We have also agreed that we are not going to

24   ask for more custodians right now.  We are going to take

25   the amount, number, and volume of custodians that have

1    been requested, and we are going to focus on rolling out

2    those custodial files.  And then we are going to get back

3    together and evaluate how many of our questions have been

4    answered by the production of documents.

5            And then we are going to reevaluate what is

6    needed next.  I fully anticipate that at the end of the

7    month both sides are going to have more questions.  Both

8    sides are going to identify deficiencies or gaps, and

9    that perhaps what we need to do at that point is begin

10   taking some depositions to establish it.

11           I just wanted to make sure that the Court

12   understands and the record is clear that we both

13   understand our obligations for non custodial production.

14   We both understand our obligations for custodial

15   productions.

16           The biggest obstacle or the biggest

17   impending deadline is this July 12 CMO deadline for the

18   completion of custodial productions.  I anticipate we

19   will be asking the Court to bump the -- to bump it

20   because we haven't finished designating custodians,

21   because we haven't gotten the documents to review and

22   identify documents.  I call it playing battleship right

23   now.

24           All that being said is that there is a

25   three-week window that we are attempting to roll out as

1    many bilaterally and then reassess where we are at.  I

2    have a good faith belief that Optum and ESI are going to

3    produce a substantial number of documents by the end of

4    the month.

5               I will represent to the Court the Plaintiffs

6    will be producing a substantial number of documents by

7    the end of the month, and then I think we will be in a

8    position to reassess the needs moving forward.

9               SPECIAL MASTER:  That's all good.  Look, if

10   the parties come to the Court -- and especially in

11   agreement and ask for a deadline to be bumped -- the

12   Court is highly likely to allow for that.

13              As the Defendants -- you may not have heard

14   me say this as many times as the Plaintiffs -- but I have

15   said it many times, and I will say it again, anytime the

16   parties come to the Court with an agreed order, agreed

17   motion, the Court is likely to grant it unless there is a

18   very good reason not to.

19              So you all come back and say "hey, we need

20   another month" or whatever it is to do something, the

21   Court will almost surely say that's fine.

22              But with regard to this in particular --

23   what I am thinking is, it would probably make sense for

24   you to come back and say "production of custodial

25   documents, we may need more time for production of

1    non custodial," what I would like to hear is "and we

2    intend to take these depos now because we are ready to"

3    if you can.

4              MR. MOUGEY:  One suggestion along those

5    lines -- and I want to clarify the July 12th, the parties

6    agreed that we are going to have almost all of the

7    custodial production accomplished by July 12th.  So if

8    there is a request for another window, it is because the

9    custodial documents are staged from both sides, not been

10   totally finalized at this moment.

11             But that was one of the reasons to hit the

12   pause button, to get the non custodial documents for the

13   custodians that have been identified.  I think at this

14   point, the Plaintiffs have, for example, ESI has a little

15   over 30.  Those will be produced by July 12th.

16             The other issue just as a suggestion for a

17   discussion point to collapse the timeline, to get the

18   depositions out and to avoid the issue that Olga

19   identified with reopening depositions are privilege logs.

20   The privilege logs at this point are 45 days after

21   substantial completion.

22             My suggestion is for both sides to look at

23   collapsing that, meaning that the privilege logs should

24   be produced on a rolling basis, and so therefore, we can

25   get the teams that are addressing those issues on that.

1    Quite frankly, I don't see any reason why we

2    shouldn't be producing privilege logs as documents roll

3    out.  And the 45 days, as we go further in time, that we

4    collapse that 45 days to much quicker as the custodial

5    productions are finalized, both custodial and

6    non custodial are finalized.

7    SPECIAL MASTER:  Let's talk about that

8    because that could be a real bottleneck and really lead

9    to --

10    MR. MOUGEY:  Yes.

11    SPECIAL MASTER:  -- again, the problem of

12    reopening depositions.

13    The Court has for the last seven years

14    addressed -- and I in particular -- have addressed

15    privilege log issues.  It is not surprising that folks,

16    both sides on privilege logs, that the Court later

17    concludes should have been produced and weren't

18    privileged or should have been produced under a

19    protective order instead of labeled as privileged.

20    And there is some stuff around the edges

21    some small stuff, but there are also sometimes whole

22    categories of documents.  And the Court has issued many,

23    many discovery rulings on privilege, which both sides

24    should reread and look at carefully so that problem is

25    minimized.

1          Having said all that, Peter, I guess I will

2   ask you if you have any specific suggestion on how we

3   navigate this so that we get through it more quickly.   I

4   certainly agree that we should try and do a rollout

5   instead of waiting as long as you can because you have a

6   deadline that allows it.

7          MR. MOUGEY:  The rollout would expedite

8   significantly.  I think the log, the privilege log would

9   be no later than a week, ten days after substantial

10  completion.

11         And if the privilege log is produced on a

12  rolling basis, we could collapse the 45 days to a week,

13  ten days.

14         SPECIAL MASTER:  Well, so explain how that

15  would work.  I am not sure I understand exactly what you

16  are saying.

17         MR. MOUGEY:  Well, we had detailed

18  discussions with ESI over the last week to ten days about

19  how they are performing the custodial production.  So it

20  is not linear.  It is not custodian by custodian.

21         So if we wait until substantial completion,

22  quite frankly, that will put us towards the end of

23  discovery.  Then you have 45 days.

24         So as documents are coming out, both

25  custodial and non custodial, if a document is put on a

1    privilege log, that privilege log on a weekly basis just

2    gets rolled out, so we can get the team addressing those

3    issues.

4              SPECIAL MASTER:  What's the current 45-day

5    deadline measured from?

6              MR. WEINBERGER:  Substantial completion.

7              MR. MOUGEY:  Substantial completion.

8              SPECIAL MASTER:  That can't work.  It has to

9    be -- at the very worst, it has to be 45 days from

10   production of the document --

11             MR. MOUGEY:  Right.

12             SPECIAL MASTER:  -- with a rolling review,

13   both sides.

14             MR. WEINBERGER:  So generally -- Peter

15   Weinberger -- generally what happens is on a Friday --

16   usually on Friday but not always -- there are letters

17   that are sent out from both sides that detail what the

18   productions are.  And one of the ways we could take care

19   of this issue is that for each production that is rolled

20   out a privilege log for that production would come out at

21   some point a week later, five days later, whatever,

22   whatever we can ultimately and practically do on both

23   sides.

24             SPECIAL MASTER:  I am not going to order

25   what that should be; I am ordering that you need to get

1    together and negotiate that.  And you have been doing a

2    good job lately of coming to agreement, but you need to

3    get together and negotiate that as soon as possible

4    because that can't be what is in current place.

5             MR. WEINBERGER:  And the other suggestion I

6    would have is Mr. Irpino and Ms. Robertson have been

7    handling this.

8             You know, they have a really good handle on

9    prior rulings of the Court if the Defendants are

10   interested in our calling out those rulings as opposed to

11   having to look at the docket or look at your prior e-mail

12   rulings.

13            I am sure we are happy to do that so that --

14   because we agree there are a lot of rulings that I think

15   will apply as we go forward.

16            SPECIAL MASTER:  Well, so I am sure it will

17   be trust but verified.  If Plaintiffs want to supply to

18   the Defendants the discovery rulings that have to do with

19   privilege that they think Defendant should be aware of,

20   then they should do so.  I assume that that would be done

21   in an effort to be helpful.

22            MR. FARRELL:  The other leg to this

23   discussion obviously is substantial completion of the

24   non custodial files.  So in order for this timeline to

25   work for fact discovery to close end of December, we have

1    got to push that non custodial substantial completion

2    date.

3           If it is not July 30th, it has got to be

4    close because, quite frankly, then we will have the

5    issues with the privilege log rolling after the

6    substantial completion date.  So we will talk to the

7    Defendants and see what's attainable, but it shouldn't be

8    too far after the July 12th date.

9           SPECIAL MASTER:  Okay.  Just so the

10   Defendants know what we have done before is essentially

11   to have bellwether documents, bellwether privilege log

12   documents, and you know often there are categories of

13   documents where each side can identify documents, a

14   set of documents for a ruling, and then apply those

15   rulings to other similar documents.  You will see that

16   that's reflected in the rulings that have been issued

17   before.

18          MR. HATCHETT:  This is Andrew Hatchett for

19   the United and Optum Defendants.

20          First, we are, of course, happy to discuss

21   with the Plaintiffs all of these issues, and we will be

22   following this conference, schedule a conference and

23   discuss with them deadlines, privilege log, and all of

24   those sorts of issues.

25          One observation I would make on the front

1    end is that, you know, without infinite resources every

2    aspect of discovery is a tradeoff, and creating privilege

3    logs, as everybody knows, is a time consuming and

4    burdensome exercise and reviewing documents that don't

5    call for privilege.

6              Sometimes you have documents that the entire

7    document is not privileged but just a portion of the

8    document is privileged, and that calls for redaction.

9              So documents that are put in a redaction

10   file, applying those redactions is -- I don't want to say

11   "exponentially," but it is significantly more time

12   consuming than just clearing a document through the

13   review cycle.

14             And so that does not call for redactions or

15   does not have a privilege concern.  And so as we are

16   going through the process -- I think I did on our last

17   teleconference -- that every production in every case I

18   have been involved in has been built to it, right?  They

19   build momentum as the production gets rolling and gets

20   going.

21             So in recent weeks, for the last several

22   weeks, we have been able to produce between 10 and 20,000

23   documents a week, and so our momentum is building.

24             We will certainly have these conversations,

25   but there will be a tradeoff.  If you have to stop and

1    then start dealing with the redaction pile and the

2    privilege pile and creating a privilege log, those are

3    people that are no longer available to review documents

4    first instance.

5              So there just has to be an understanding

6    that you can't keep the same pace with production while

7    stopping and also doing a privilege log on the side.

8              If you assign only three to four people to a

9     privilege log, then that's a really slow too, and you

10   are not building the log at significant speed.  But once

11   you clear all those people from the review pile and you

12   can put them all towards a privilege log, then you can

13   push it out a lot faster.

14             And so there is a tradeoff in all these

15   sorts of things and figuring out what the balance is and

16   how it works.  We have understood that the deadline --

17   there is a deadline right now, and it is 45 days after

18   substantial completion.

19             And so we have structured things toward

20   meeting that deadline.  We are happy to have the

21   conversations, but there will always be a tradeoff.

22             SPECIAL MASTER:  That's true, I agree.  And

23   I am sure that you can have that conversation with the

24   Plaintiffs and try and figure out the best foot forward.

25   There is no one perfect route.

1           All right.  In an effort to keep things

2    moving, let's move to agenda item 373.  I think we've

3    touched on that, which is the ransomware attack issue,

4    and we don't need to go back over that.

5           MS. VIEIRA:  Olga Vieira for Express

6    Scripts.

7           On this item, there were some specific list

8    of documents that we requested.  We had identified some

9    gaps in the production, and we had asked for follow-up I

10   believe the City has represented that they were looking

11   for those documents.

12          I will produce them by the end of the month,

13   and so I think there is nothing to be done here except to

14   wait to get those documents, and they are delineated in

15   our correspondence.

16          SPECIAL MASTER:  I think that's right, and

17   as I suggested earlier, the more transparent and fulsome

18   a response from Independence, the better.

19          So we will now jump to item No. 365.

20          MR. BADALA:  Special Master Cohen,

21   Salvatore Badala and Natalie Shkolnick for agenda item

22   365.

23          Myself and Mr. Gallucci spoke with

24   Ms. Perdomo and Mr. Springer about this.  We have just

25   made some pretty large productions in the past couple of

1      days.  They are looking at it.  Some of those documents

2      may be able to answer some of their questions.  At the

3      same time, we agreed that there are some questions that

4      we would get them answers to as quickly as possible.

5              One of them is the 11 new individuals.  We

6      will get them the titles, and the first e-mail year.

7      Trying to determine 200 or more per year, that may take a

8      little more time.  But I told Ms. Perdomo and

9      Mr. Springer that we would get them that quickly.

10             One of the other questions was the role and

11     responsibilities of the deputy mayor, mayor, special

12     assistant to the mayor and the mayor's liaison.  We will

13     work on getting them the answer to that.

14             And I think the other one was the department

15     that the neighborhood service centers fall under, we

16     would get them that as well.  And obviously, there's the

17     understanding that we made some substantial productions

18     the past week or so, so they are looking through those

19     documents that will help them if they need to identify

20     more custodians.

21             I will say we are at 28 custodians, which we

22     made a note of, and we had these 11 new individuals, and

23     we will get that information to them as well.

24             MS. PERDOMO:  Special Master Cohen, this is

25     Erica Perdomo on behalf of Express Scripts.  We did speak

1    earlier with Mr. Badala with respect to this agenda item,

2    and we look forward to receiving answers to some of these

3    questions.  We will send a follow-up e-mail with the

4    questions we want answered, but there were essentially

5    those that Mr. Badala just listed and some of the general

6    questions just requiring a more fulsome response to

7    interrogatory No. 1, which is requesting individuals with

8    relevant knowledge, which will further help us identify

9    custodians.

10                   Mr. Badala is correct, they have been

11   meeting substantial productions for multiple custodians

12   over the past couple of days, and so we look forward to

13   digging into that and hopefully having those custodial

14   productions shed some light on gaps and what's missing as

15   we are doing on both sides here.

16                   And you know, with respect to the questions

17   we did ask -- I know, Special Master Cohen, you had sent

18   an e-mail suggesting both sides would have to answer

19   those questions if we were posing those kinds of

20   questions, and I just didn't want to flag that.

21                   We modeled those questions off of questions

22   Defendants have answered from the PEC, trying to round

23   out the goose-gander.  So we appreciate Mr. Badala

24   answering those and to moving forward with custodian

25   identification and production in Rochester.

1      SPECIAL MASTER:  Okay.  Thanks.  Look it, it

2  seems you are making good progress there.

3      Let me give you all a tip, and this applies

4  both to your communications with each other and also to

5  the Court.  So sometimes what I will see are letters that

6  refer back to another letter.

7      "We answered this in the e-mail of X.  Go

8  and look at that."  And I appreciate that the parties are

9  being more and more responsive and giving each other more

10  and more information.  You should try and make it as easy

11  as you can for the other side and also for the Court to

12  find what it is you are trying to say.

13      So whenever you write a letter, for example,

14  to the Court or a motion to the Court and refer to an

15  exhibit, the exhibit should be one click away, not two,

16  one click away.  It should be attached or hyperlinked or

17  something like that.

18      Similarly, as I am going through all your

19  exhibits on this agenda and there is a letter that says

20  "we already answered this, go look at that," well, you

21  could have just cut and pasted it and made it easy for

22  the reader.

23      My point is, you should make it as easy for

24  the reader, for a document to understand what you are

25  trying to say, whether it is quoting the exhibit, making

1    the exhibit easily findable, which even in here is not.

2    So there is reference to an e-mail, and I have got to go

3    find it.  It just shortens the amount of time that

4    everybody, including the Court, needs to get what they

5    are trying to find.

6                    So I suggest that you really think about the

7    other side.  And instead of hide the ball, which

8    sometimes it looks like everybody is really trying to do

9    less so than they were, you don't do that.  You make it

10   easy to find the ball because that's going to make it

11   easier for everybody in this case, including the Court

12   and including you all just to find the information that

13   you are trying to locate.  So that's just a general

14   observation.

15                   You know, when I was a law clerk working for

16   the Judge and back before there was Westlaw and you would

17   actually have to go find a hard copy of a book and pull

18   it out, an F third or something like that, and there

19   would be a citation to a case and that's all, not even a

20   parenthetical, just CX, you have to realize that that

21   means that the law clerk, me, has to actually get up, go

22   find a book and open it to the page and find it whereas

23   you could have just given me the quote.

24                   And it is the same concept.  Make it really

25   easy for the reader to find what you are trying to give

1    them is a good tip for everything you write, whether

2    it is a letter to opposing counsel or a motion to the

3    Court.

4              MR. WEINBERGER:  This is Peter Weinberger.

5    One comment in response.

6              It is astounding to me how many documents

7    are with respect to each agenda item, and so what tends

8    to happens, both sides, both sides, number one, feel like

9    they need to make a record.

10             Number two, they need to respond as quickly

11   to the e-mail that just went out.

12             Number three, we have to do that to meet

13   deadlines to get it on the agenda.  And I think that, as

14   I have tried to get prepared for this hearing, I have

15   tried to appreciate what you have to go through in order

16   to look at all these documents.

17             It rings clear to me that the more we can

18   discuss this in our own conversations or Zooms as opposed

19   to sending letters back and forth, I think will be

20   helpful not only to get to the real issues that we can

21   succinctly bring to you or reach agreement.

22             And so hopefully, in the conversations that

23   we've had over the last ten days or so, we can reach the

24   point where we don't have to worry about papering each

25   other and then papering the Court with 20, 30, 40

1   documents on each agenda item.

2           SPECIAL MASTER:  Right.  These cases have an

3   arc.  They start one way and come to a middle and come to

4   an end.  This agenda was 5,713 pages.  I have read every

5   single one in detail.  Wink wink, nudge nudge.  I have

6   certainly read enough to understand it, and I hope that

7   comes through and to understand issues.

8           But it is true that at first the parties

9   don't know each other and feel like they need to write

10  CUIA letters, and eventually, they start talking, which

11  you have now started to do and trust each other a little

12  bit more, and hopefully that will increase, and then

13  there are other stages that come.

14          So nothing so far has surprised me about the

15  way this is happening, but I am glad to see that the

16  parties are starting to talk, and that's part of the

17  reason we are here, to facilitate that.

18          So again, try not to hide the ball is the

19  moral of the story.

20          MR. SPRINGER:  Special Master Cohen, this is

21  Brandon Springer for the Optum and United Defendants.

22          And we appreciate your remarks there, and I

23  think we can certainly work with the PEC to try to clean

24  up the agenda in advance of the next one because I think

25  there are a number of issues and documents that have

1  lingered on here, that need to and hopefully that will

2  make review cleaner going forward.

3        One thing just to add on top of what

4  Ms. Perdomo mentioned is just reiterating the point that,

5  you know, we appreciated your guidance on No. 365 and had

6  a good conversation with Mr. Badala about it this

7  morning.

8        And this is something that for months we

9  have been very candid with the PEC in answering a number

10  of incredibly detailed questions related to the selection

11  of custodians, and so we hope that that process is coming

12  to a close.

13        But we see this issue as essentially the

14  gander to the goose that had come before.  So appreciate

15  that.

16        SPECIAL MASTER:  Thank you.

17        MR. BADALA:  And Special Master Cohen, I

18  just want to add, that has been going on with the

19  Plaintiffs as well.  We have answered a lot of questions,

20  many, many questions over the past couple months to get

21  them the information.  That's why they made substantial

22  custodial selections of, at least I know, CT 12 and CT 13

23  and other case tracks as well.

24        SPECIAL MASTER:  Let's jump to 369, which is

25  law enforcement records.

1           MR. BADALA:  I have an update for that as

2     well if that's helpful.

3           SPECIAL MASTER:  Go ahead.

4           MR. BADALA:  We had a conversation again,

5     Ms. Perdomo, Mr. Springer, and Mr. Gallucci.  We spoke

6     about it.  We are going to get them the 11 files that

7     they selected, which will count toward a total number.

8           What the Defendants are going to look at is

9     what is the total sampling number they believe they are

10    going to need.  They are going to look at these 11 files

11    and then determine what that number is.  We just want to

12    put maybe a drop dead date where we either agree on what

13    that total number is, or we have a disagreement, and we

14    come to you for resolution on that.

15          SPECIAL MASTER:  When you say 11 files, what

16    do you mean exactly?

17          MR. BADALA:  We produce a spreadsheet with

18    about over 21,000 types of cases.  They selected -- the

19    Defendants selected 11 cases where they asked us to go

20    and get that case file so we can produce it.  So we

21    collected that.

22          We are going to produce that to them.  We

23    just want to make sure that counts.  So if the total

24    number is a hundred and I am not saying they are agreeing

25    to a hundred, but if there is a hundred, those 11 would

1    count towards that 100 if we came to an agreement or

2    whatever the Court orders if we can't come to an

3    agreement.

4              SPECIAL MASTER:  All right.  Well, I

5    appreciate all that.  That seems like an easy one to come

6    to agreement to, and I expect you will.  If not, I have a

7    magic eight ball that I will shake and come up with a

8    number.

9              MR. SPRINGER:  Special Master Cohen, this is

10   Brandon Springer for the of PBM Defendants on that.  We

11   agree with that.  For a little context, there were a few

12   discovery requests targeted to the city related to law

13   enforcement records.  And so the City produced a large

14   spreadsheet as Mr. Badala mentioned.  We don't think that

15   we need records from 21,000 case files.

16             But in order to understand how many we need,

17   we sent them a number of questions.  They responded to

18   that this past week, and we asked them to produce a

19   handful of files.  I think it was 11 from different years

20   to help us understand what might be in these files, to

21   help us understand how many we need going forward, and we

22   are happy to work with Mr. Badala and Mr. Gallucci in

23   kind of working towards a number there.

24             And if we can't reach agreement, we will let

25   you know.

1          SPECIAL MASTER:  Okay.  Thank you.  I don't

2     know if you need to get expert statistics involved, but

3     if you can come to an agreement, that would be terrific.

4          So agenda items 349, and there is another

5     one that is similar, frankly, I think these can come off

6     the agenda.  I know that you are working on it.  I know

7     that a another similar agenda item might come back on to

8     the agenda once you have a more concrete dispute.

9          But my understanding is the parties are

10    working on redactions and privilege logs as we discussed

11    so we can skip over that one.

12          MR. IRPINO:  Special Master, this is

13    Anthony Irpino for the PEC.  I would say we can remove

14    agenda items 349 and 364.

15          SPECIAL MASTER:  Thank you.  So we are now

16    jumping to agenda item 363, and we are beginning to talk

17    about Lincoln County.  So there were three subissues that

18    were discussed here.

19          One of them was the supplemental

20    interrogatories, the County's responses to those and

21    combined with that the production of documents, and there

22    were also law enforcement records.

23          It sounds like the parties are talking, and

24    you are making progress.  You just touched on that in

25    connection with Rochester, and so I think we don't need

1   to talk about any of that.  If you want to give me an

2   update, that's fine, but I am okay with an understanding

3   you guys are working on it.

4           Do we need anything more on that?

5           MR. HARDER:  Special Master Cohen, this is

6   Brad Harder for the PBM Defendants.  Yes, in general, I

7   think that's correct.

8           We expect to receive a number of additional

9   productions from the Plaintiffs on this issue, from

10  Lincoln County.  We saw the production they produced most

11  recently on Monday and late last week after we put this

12  item on the agenda.

13          We remain concerned about the pace and

14  volume of productions, but we understand based on

15  continuing negotiations that will continue a pace and

16  continue to increase in volume.

17          With respect to the arrest records similarly

18  situated, although not exactly the same, we understand

19  that Lincoln County is still working to produce

20  additional fields with respect to particular arrest

21  records for more recent in time records.  We understand

22  those are coming within two weeks.

23          There is a batch of earlier arrest records

24  from 1996 to 2006 and data pertaining to those records,

25  which we have not seen.  Lincoln County made

1    representations they were going to be able to produce it

2    weeks ago.  It sounds like it is still in process.

3            Just most recently on Monday, we heard from

4    them that it would be four to five weeks.  So we will

5    continue to look out for that, but those productions do

6    remain outstanding.

7            SPECIAL MASTER:  Okay.  Again, parties are

8    making progress.  Everybody wishes it would happen more

9    quickly.  Things do take time, and it doesn't sound like

10   there is anything I need to resolve.

11           Within agenda issue 365 is also the question

12   of spoliation and the lit hold that kind of comes up

13   under issue 370.  So we will discuss that a little bit

14   more thoroughly later.  Okay.

15           We have been at it an hour.  Let's take ten

16   minutes.  Everybody can take a stretch, and we will be

17   back at -- call it 10:50, 10 of.  Thank you.

18           (Recess had.)

19           SPECIAL MASTER:  Okay.  Picking up where we

20   left off, No. 348, I think we discussed that, and there

21   is nothing else to say.  I think we talked about that it

22   was on the transcript, and unless somebody thinks there

23   is something else on organizational charts, I am not

24   going to talk about it anymore.

25           MR. HATCHETT:  Special Master Cohen, this is

1    Andrew Hatchett for the United and Optum Defendants.  I

2    think we agreed last time that we could remove this from

3    the agenda, so I think it is an oversight that it is

4    still on.

5             SPECIAL MASTER:  Very good.  Moving onto

6    351.  The last time we spoke I know that the parties had

7    begun to chat about this.

8             Does anybody want to give me an update

9    status report?

10            MR. WEINBERGER:  This is Peter Weinberger

11   for the PEC.  We have -- let me take it by Defendant.

12   ESI and the Plaintiffs have exchanged drafts, including

13   one last night and Jonathan Cooper e-mailed me and wanted

14   to talk with me about it.  We haven't had a chance to do

15   that yet, so we are, I think, making progress.

16            And since our last conversation, we have had

17   conversations with Optum, with Brian Boone about their

18   response to our proposed stipulation, and we need to have

19   further conversations with him about that.

20            We are not -- I wouldn't describe us as

21   being close to agreement, but I think we have to talk

22   about a couple of issues with him, and so bottom line is

23   that we are in conversation.

24            SPECIAL MASTER:  All right.  Well, as I've

25   said before, this is probably the number one issue on the

1    Judge's agenda.  When we are altogether again in

2    Cleveland in two weeks, I am sure he is going to inquire

3    about that, and you heard what he said.

4            I won't try and paraphrase it about the

5    topics, so I will simply urge you to keep that on the top

6    of the list of things to continue discuss.

7            MR. HATCHETT:  Special Master Cohen, this is

8    Andrew Hatchett again for the United and Optum

9    Defendants.

10           And as Mr. Weinberger said, we have

11   exchanged draft stipulations and so far have not come to

12   an agreement.  I know that Mr. Farrell and Mr. Weinberger

13   -- or at least Mr. Weinberger and maybe Mr. Farrell also

14   have talked to Brian, and he is definitely leading those

15   discussions for our side.

16           What I can say, as we have said in the past,

17   we are certainly willing to work with the PEC on ways to

18   streamline the litigation.

19           The real sticking point for us is that we

20   cannot agree to a stipulation that would result in

21   collapsing the distinction between the different

22   entities.

23           And so I think one of the things that has

24   been discussed -- I believe by you, Special Master Cohen

25   -- is also examples in the pharmacy tracks, CVS.  So if

1    CVS had several pharmacies in a bellwether jurisdiction,

2    each was its own distinct legal entity, but they are all

3    pharmacies.  They are all functionally the same, and this

4    was an agreement to call them all CVS.

5              That's, at least, what I understand happened

6    with respect to certain pharmacies, the Defendants.  I

7    think our situation is definitely unique in this regard.

8              So we have ten different Defendant entities

9    in our corporate family that have been sued.  For years,

10   the case has been about Optum Rx.  So that's our pharmacy

11   benefit manager.

12             SPECIAL MASTER:  Let me interrupt you, and I

13   apologize, and I am interrupting you only because of the

14   length of the agenda and the time we have.  I have heard

15   most of what you said before.

16             I know what you are going to say more or

17   less, and that is all something that is going to have to

18   go in front of the Judge.  I understand your problems are

19   different than CVS, and I understand it might be more

20   difficult for you to negotiate this issue, but I can only

21   urge you to continue to do so, to continue to try and

22   come to a way to make this work.

23             I get that it is a little more complicated

24   than it has been in the past.  Ultimately, the Judge is

25   trying to make -- he is trying to put together a case

1    that is easily tried and easily understandable by a jury.

2    That's really the nub of it, and if you all can come to

3    an agreement on how to do that, that's the key.

4              MR. HATCHETT:  Certainly.  And you know

5    that's one of the things we raised in our opposition of

6    the motion for the leave to amend, was the manageability

7    concerns with adding all of these new Defendants.

8              I think in the Court's order allowing motion

9    for leave to amend it talked about severing.  That's what

10   had been done in a lot of other tracks.  If it was a

11   pharmacy track and you had Defendants that weren't

12   providing pharmacy services, they were severing in

13   that order, Judge Polster suggested severing was an

14   option.

15             What we can't do is we can't have a

16   situation where Optum insight that is not a PBM, it

17   doesn't provide PBM services, it doesn't offer

18   formularies or negotiate rebates, that we can't have a

19   case where a trial is introducing things related to Optum

20   insight and the services it provides and using that

21   activity to somehow impose liability on the PBM entity.

22   It just is very different from here is five pharmacies.

23   They are all under the same umbrella.

24             SPECIAL MASTER:  Well --

25             MR. HATCHETT:  So that's kind of our issue.

1    We are still working, we are still discussing.  I just

2    want to make sure the Court understands we don't view

3    ourselves as similar to multiple other pharmacies that

4    have been collapsed under the common name.

5                SPECIAL MASTER:  Okay.  There are different

6    ways to skin the cat, and so you may have to be more

7    creative.

8                But I have every bit of faith that you are

9    going to work as hard as you can to do that.

10               So I think agenda item No. 350, we can skip

11   over.  Anybody disagree?

12               Moving on to agenda item No. 364, same?  The

13   parties are working together, have come to enough of an

14   agreement that I don't think we need to talk about it or

15   get a status update on it.

16               Moving to 356 again, I think this kind of

17   falls under the heading of detente, and that the parties

18   are working toward moving through this, and I am happy to

19   receive a status update.  But again, I am not sure I need

20   one.

21               Does anybody feel they need to tell me about

22   something that I should know?

23               MR. FARRELL:  Judge, this is Paul Farrell.

24               As we said before, we clearly communicated

25   what our expectations are.  The Defendants have clearly

```
 1 │  communicated.  They understand they are going to spend
 2 │  the next several weeks trying to get through as many
 3 │  documents as possible, and then we will revisit the
 4 │  issue.
 5 │            SPECIAL MASTER:  Okay.  Is there any
 6 │  especially knotty issue or thorny problem there that
 7 │  anybody wants to bring up, or shall we just say let's
 8 │  move on?
 9 │            MR. FARRELL:  No.  When I say we clearly
10 │  communicated, I can tell you we had very blunt, open,
11 │  transparent discussions with each other.  There is no
12 │  lack of communication between us, and we do not believe
13 │  there is anything presently you can do other than
14 │  encourage us to continue to work harder.
15 │            SPECIAL MASTER:  Okay.  You are so
16 │  encouraged.
17 │            (Laughter.)
18 │            MR. HATCHETT:  I will second Mr. Farrell's
19 │  -- this is Andrew Hatchett -- I will second Mr. Farrell's
20 │  comments, that we are having very blunt and open
21 │  communications and making progress.
22 │            SPECIAL MASTER:  Good.  Very good.
23 │            Moving onto 357.
24 │            MR. HATCHETT:  This is Andrew Hatchett for
25 │  the United-Optum Defendant.
```

```
 1              I think this is wrapped up in the same --
 2              SPECIAL MASTER:  Same story.  Agreed.
 3              MR. GADDY:  Special Master Cohen, this is
 4   Jeff Gaddy for the PEC.  The same is true for 357, 358,
 5   and 359.
 6              SPECIAL MASTER:  Okay.  We will jump right
 7   over all those.  Thank you, Jeff.
 8              Agenda item 360, it sounded like the parties
 9   were talking about what the contents of a weekly
10   production tracker should be.  It was a new concept to
11   the Defendants I think.
12              The Plaintiffs had done this before, and
13   there was some discussion as to what should or shouldn't
14   be included.  I suspect that this may fall also under the
15   category of, if we are making progress and we will
16   continue to, with the Special Master's encouragement
17   we'll discuss this.
18              But anything we need to talk about?
19              MR. GADDY:  Jeff Gaddy again.  Yes and no.
20              We have agreed with the Defendants that no
21   party will utilize a production tracking chart until the
22   July 12th date in line with the standdown.  The one issue
23   that kind of remains in dispute over this production
24   tracker, I think the parties are pretty much aligned on
25   the types of materials that would be tracked and reported
```

1    on on a weekly basis.

2              The one issue shall that is important to the

3    Plaintiffs that seems to be in dispute is whether or not

4    the Defendants would provide updates on a custodian by

5    custodian basis or on groups of custodians.

6              Our proposal is consistent with what all the

7    other Defendants have done historically, which is

8    custodian by custodian updates, which is important for us

9    for many reasons, some of which we have touched on

10   earlier today, which include being able to project and

11   plan out depositions, keep everything efficient, know

12   when privilege logs will be coming in for certain

13   custodians, so we can plan out the rest of the year as

14   far as taking discovery in these cases.

15             We think this might be less of an issue

16   because now we've received some assurances from

17   Defendants that we will be getting full custodial file

18   productions by July 12th.

19             So we would think we would be able to have

20   that on a more custodian basis, but that is something

21   that is important to us.

22             I spoke briefly with Olga about it before we

23   started today, but that's something we could really use

24   some guidance from you on to the extent the Defendants

25   are going to continue to try not to provide that

1    information on a one-by-one basis.

2              MS. VIEIRA:  So if I may, Olga Vieira for

3    Express Scripts.

4              The issue, as we have explained to the PEC,

5    is that we are bringing all of the documents into a

6    relativity review platform and deduplicating them and

7    threading them, so we can expedite the review.

8              And when you do that, you lose the

9    custodian-by-custodian designation.  It is just all

10   glommed together.  When we spoke last week -- was it last

11   week already? -- about all of this, the PEC decided they

12   would prefer us to just go ahead and push out all of the

13   documents rather than trying to unwind what we had done,

14   which was to combine all of the documents for the review.

15             And so that was part of the detente that we

16   were speaking of where we were just pushing out the

17   review of everything all at once.  Going forward I

18   mentioned to Mr. Gaddy -- and I can continue to speak to

19   him about this -- if they want the custodian-by-custodian

20   tracker, then it would slow things down for us.

21             So we would have to manage the review a bit

22   differently, and that would just slow things down.  My

23   understanding is they don't want us to slow things down.

24   They want us to push forward as quickly as possible.

25             And so it is a tradeoff and we can continue

1    to have those conversations with more technology focused

2    discussions about why that is, but that was the

3    discussion we had last week and why we decided to just

4    push this off for a bit.

5              SPECIAL MASTER:  When you said you put them

6    into relativity and thread them --

7              MS. VIEIRA:  Correct.  So like the

8    conversations, so if the same e-mail that you sent that I

9    sent and somebody else sent it would all be one.  I

10   wouldn't be able to say I produced all of Special Master

11   Cohen's e-mails.  Ms. Vieira's e-mails are still delayed.

12   It is altogether.

13             So once we finish the production of

14   everything we have reviewed, we will say we are done or

15   substantially done, but it makes it very difficult to say

16   this is the bucket of custodial files for any one

17   individual because now they are all threaded together and

18   deduplicated.

19             SPECIAL MASTER:  Here is what I am going to

20   suggest.  I know the Plaintiffs use relativity also.

21   There are relativity experts on both side, and relativity

22   has their own experts.

23             So I am going to suggest that those three

24   groups of people, Plaintiffs, Defendants, and relativity

25   itself have conversations to see what the best way to go

1    forward is, and that it may be you just continue the way

2    you are with these threaded productions, which makes you

3    incapable, if I understand what you are saying, of doing

4    custodian-by-custodian trackers until a certain point in

5    time or for certain custodians and then change it going

6    forward.

7            But it sounds like what the issue there is

8    is the way relativity works and the way you are working

9    with it, and there are tradeoffs like Andrew said, and so

10   both sides are going to have to discuss which do you want

11   more?  Documents quick or production tracker?

12           MS. VIEIRA:  That's right.  And that's the

13   conversation we have been having, and that's what led to

14   us saying "let's just put a pause on this until we push

15   out as much of the custodial productions as we can on an

16   expedited basis, and then we will revisit on how to

17   proceed with additional custodians if more are chosen.

18           MR. FARRELL:  I am having trouble with the

19   tradeoff.  This isn't anyone's first rodeo.  We all

20   understand the issue and how the custodial files are

21   produced.

22           We understand that an update isn't iron

23   clad; that there are going to be issues that move around.

24   But an estimation on where we are with the custodial file

25   is on the tradeoff scale, I don't even think that moves

1    the needle to be able to tell someone how many documents

2    do I have left in a custodial file with the understanding

3    that there is a family of e-mails, and we get that.

4              But to give us an update is not difficult,

5    is not problematic, and we understand the nuances.  And

6    we started today off saying you guys should look at

7    taking some depositions quicker.  Those are the kind of

8    tools we need to figure out where we are so we can get

9    that stuff done, and that's not a significant --

10             SPECIAL MASTER:  You just used the word

11   "estimation."  Maybe that solves it.

12             MR. FARRELL:  It does.  It totally does.

13             SPECIAL MASTER:  Okay.  So both sides will

14   have that conversation, and if you explain "look, we

15   don't need 92.7 percent --

16             MR. FARRELL:  Right.

17             SPECIAL MASTER:  -- "all we need is yeah, we

18   mostly did it," then --

19             MR. FARRELL:  Hence, the term "subsolve it,"

20   hence the term "substantial completion."

21             I mean, it is explicit in the definition of

22   what we are trying to accomplish.

23             SPECIAL MASTER:  I don't know what the

24   production tracker language says.  I don't know what the

25   negotiation has been, but my suggestion is, you could

1    probably come to an agreement just by using the word

2    "estimation."  Maybe the PBMs now say "oh, yeah, we can

3    do that."

4              I suggest you continue to talk and to the

5    extent how relativity works, and what it gives you is

6    part of the issue.  You all know how to get through that

7    because you both use relativity, and you have relativity

8    experts.

9              I myself contact relativity to get reports.

10   I know some of what they can and cannot do.

11             MR. FARRELL:  We have Pete Weinberger who --

12             (Laughter.)

13             MS. VIEIRA:  Yeah, I think the issue is --

14             SPECIAL MASTER:  I am the guy that hits

15   reply, but don't look to me.

16             (Laughter.)

17             MS. VIEIRA:  -- the issue was the request

18   for an estimated percentage of review complete, custodian

19   by custodian, and that was the difficulty.

20             We had suggested something different and

21   something that we could more easily do.  And so we can

22   revisit that.  At the time that we were corresponding

23   about this on the agenda, we had not received the

24   bellwethers submission on what they would be willing to

25   track.

1          They have now provided that to us, but in

2   providing what they would be willing to track, they made

3   some notes about certain things that they won't produce

4   or not agreeing to produce.  So we will have to go back

5   and revisit.

6          The tracker shouldn't be used as a method of

7   responding to discovery and saying we are producing or we

8   won't produce this or we are going to produce this in

9   this way.

10          So we have some issues with their

11   suggestions, and we have not had a chance to talk about

12   it because I thought this was part of the detente that we

13   had been discussing for the week.

14          So now that it is not part of that, we will

15   continue those discussions and figure out where things

16   are.

17          SPECIAL MASTER:  I think it is part of a

18   detente, but I think also it is one of those issues when

19   the detente is more or less worked there, it is going to

20   be a remaining issue.  So you might as well keep your eye

21   on that and see if you can include it in your

22   discussions.

23          MR. GADDY:  And I think that's our point is,

24   we want is it to roll out on July 12th.  We told them a

25   couple times this is not intended to be a gotcha tool.

1    We are just trying to get information on estimates of

2    custodial records.

3              SPECIAL MASTER:  It sounds like you use the

4    tool for both sides, so I suggest that with my

5    encouragement you all continue to talk about this issue

6    and not simply kick it down the road and not think about

7    it.  Okay.

8              And if there is something I can do to

9    mediate that, I am happy to help.

10             Moving onto 368, extensions of certain

11   CMO deadlines, I think the essence of this was the

12   parties had largely come to agreement but might need to

13   talk about some additional deadline issues or get my

14   input.

15             So does anyone want to give me an update?

16             MR. FARRELL:  Yeah.  This is Paul Farrell

17   for the PEC.  So to be -- to summarize and see if we can

18   get this on the record and then move on, the PEC has

19   designated, I believe, 33 or so custodians of ESI and 32

20   or so of custodians of Optum.

21             The CMO deadline is July 12th for the

22   completion of custodial productions.  So we have advised

23   both PBMs that they can take minimum time of our

24   designations for those 33, and for those 32, we are

25   asking them to produce those custodial files.

1      So then we can go back and reevaluate what

2  additional custodians we want.  It did not make sense to

3  us to continue to designate more custodians when the

4  Defendants were already in the process of trying to roll

5  out productions.  It did not make sense to the PEC to

6  play battleship, guessing additional custodian names on

7  documents we haven't received yet.

8      So we have taken the position that we are

9  going to freeze this set of custodial requests and allow

10  the Defendants the remainder of the month to roll out as

11  many documents as they can and tell us where they are at.

12      So that by July 1st we can assess where it

13  is we are in the world knowing that there is a current

14  CMO deadline of July 12th.  I fully expect, the Court

15  should fully expect before July 12th the PEC hopefully

16  with a joint statement from the Defendants will be

17  providing an update to the Court of where we are at with

18  custodial productions and what we think is needed to take

19  the next step in custodial designation and custodial

20  production.

21      SPECIAL MASTER:  All that makes sense.  Does

22  either side want anything from me besides to make sure

23  that I know that?

24      MR. FARRELL:  If there was something that I

25  could think of for you to help assist the process, I

1    would certainly say so, and I think the Defendants would

2    say so.  But literally, I can't say any other combination

3    of words.

4            The Defendants have convinced us that they

5    have a substantial production, and we need to wait and

6    see what it looks like.

7            SPECIAL MASTER:  That's fine.  I am

8    comfortable with everybody's agreement.  I am comfortable

9    with the knowledge that you will come to me at some point

10    later and say "here is how we need to change things.

11    Here is how we need to amend things."

12            And I don't need to supply any suggestions

13    if you don't need them.  Are we all in agreement?

14            (No response.)

15            SPECIAL MASTER:  Hearing nothing, I assume

16    the answer is yes, and we will move onto -- I want to

17    skip over 370 for a minute.

18            Agenda item 372 is the last one on the

19    agenda, and again, I think this falls under the category

20    of you-are-working-on-it along with everything else, but

21    I am happy to hear again a status report and any

22    suggestions.

23            MR. HARDER:  Special Master Cohen, this is

24    Brad Harder for the Optum, United, and PBM Defendants.

25    Yes, that's right on 372.  We put this item on the agenda

1    when the agenda topics were due middle of last week.

2              At that point, we were concerned about the

3    pace of Rochester's and Lincoln's, particularly their

4    custodial productions given the July 12th deadline.

5              At that point, they had only produced or a

6    handful of custodians.  After having put this topic on

7    the agenda, both Plaintiffs were able to make another

8    production, and we understand from continuing

9    negotiations with them that there are more in process.

10             So at this point, the parties are continuing

11   to negotiate.  We will continue to assess.

12             SPECIAL MASTER:  Thank you.

13             MR. BADALA:  Special Master Cohen, just to

14   provide you an update on Rochester productions, we've

15   produced over a half million pages.  We produced from 21

16   of the 28 custodians.

17             The reason we haven't produced those other

18   seven is they were just identified on May 30th, but we

19   are collecting those and will get them back, so we can

20   run search terms and get through those productions.

21             So we have made substantial progress, but

22   obviously, we are going to continue to get those

23   productions out like we spoke about earlier.  And then

24   for Lincoln, they produced over 260 pages of documents,

25   and they are continuing to get out their productions as

1    well.

2                    MS. CICAIA:  Just very briefly, I will note

3    the agenda item here was I think Rochester and

4    Independence, pace of production, not Lincoln.

5                    But let me add to what Sal said about

6    Lincoln, and my apologies if I have the wrong agenda

7    number, but just to bring the Court and everyone up to

8    date on Lincoln, Lincoln has harvested 2.1 million pages.

9    We have 166,000 pages in production.  We produced 10,000

10   documents earlier this week.

11                   We are on pace to produce 15,000 by Friday

12   and we expect that pace for Lincoln to continue

13   thereafter as we move through these productions.

14                   In addition with Lincoln last week, we had a

15   team on site.  They identified 30 hard copy boxes dating

16   back to 1996.  All of those materials are being scanned

17   right now for review and will be promptly produced.

18                   With regard to Lincoln, also, we have

19   identified over 100 current and former employees.  The

20   Defendants have selected 32 as custodians, and we started

21   custodial productions.

22                   With regard to Independence, at the end of

23   May, May 28, the Defendants identified 25 I believe

24   custodians.  We started custodial productions yesterday

25   in Independence, producing from two, and we will be

1    continuing to make those productions.

2                We have, as I mentioned earlier, a team in

3    Independence this week, which will permit us to

4    accelerate overall Lincoln, both custodial and

5    non custodial productions as we move forward.

6                SPECIAL MASTER:  One second, please.

7                (Pause.)

8                SPECIAL MASTER:  Okay.  Thank you for the

9    summary of the document productions.

10               Again, I think both sides have agreed let's

11   focus on getting documents to each other, and it looks

12   like that's happening, and the hockey stick part of the

13   curve is being climbed by both sides, and so that's all

14   good.

15               So the last topic on the agenda is 370,

16   which is litigation holds, and then we can go to lunch.

17   Lunch isn't until 12:30.  I'm sure we can get there a

18   little early, but it also might be a be good idea as long

19   as you are all here in the same room to continue having

20   discussions about all of these items.  There is no reason

21   of not taking advantage of being together.

22               Here is what I would like to do.  With

23   regard to agenda item 370, so the parties have been

24   tentative about sharing information with each other on

25   this.  As I suggested earlier, I think that the question

1     of what the Defendants feel they need needs to be teed up

2     pretty quickly, and that may be negotiated or it may be

3     by way of motion to the Court or both, I have some

4     thoughts on that that I would like to share with the

5     parties independently.

6              That is to say, what I would like to do is

7     take, you know, five minutes to meet with the Plaintiffs

8     and talk about a few things and to meet with the

9     Defendants to talk about a few things, the same things in

10    kind of a mediative way.  I think I need the parties'

11    permission to do that, and so I am asking for it.

12             MR. FARRELL:  Yes, for the PEC.  We are

13    talking about the litigation hold?

14             SPECIAL MASTER:  Correct.

15             MR. HATCHETT:  So this is Andrew Hatchett

16    for the United and Optum Defendants.

17             You may be aware this has been a sensitive

18    issue for our side.  So this is something that I actually

19    need to confer with my client before I commit to.

20             SPECIAL MASTER:  That's fine.  So just to be

21    clear, we are talking about agenda item 370.  We are

22    talking about the PBM's desire to obtain information

23    regarding litigation holds, and to the extent there is a

24    dispute there, how those disputes might be resolved.

25             So you are welcome to chat with folks back

1    home, and if you let me know in the next 15 minutes, we

2    have got time for that.

3                   Thank you.

4                   MR. HATCHETT:  Are we going to take a break

5    now or finish what we can?

6                   SPECIAL MASTER:  Yeah.  I think this is the

7    last thing.

8                   MS. VIEIRA:  There is one thing, if I may.

9    Olga Vieira for Express Scripts.

10                  I just wanted to circle back for a second to

11   agenda item 368.  We had an issue there on data field,

12   and I just didn't want you to be surprised if it comes up

13   again.  We are trying to work it out.

14                  There is ten fields of data that Express

15   Scripts has asked the PEC to remove from consideration,

16   from production because they are archived, and it is

17   difficult to pull them.

18                  So we are pending their response, and we

19   have been in discussions on it, but if we can't agree, we

20   may need to revisit it --

21                  SPECIAL MASTER:  Okay.

22                  MS. VIEIRA:  -- in the near term.

23                  SPECIAL MASTER:  I have certainly had to do

24   -- I have had to make rulings on data fields before so --

25                  MS. VIEIRA:  We have agreed to substantially

1    everything, and we have agreed to these ten, but now we

2    discovered that they are archived, and it would be very

3    burdensome to produce them.

4             So we are hoping that we sufficiently

5    explained how they are already covered by other data

6    fields, and we may reach an agreement.  We are hopeful.

7             SPECIAL MASTER:  Okay.  Me, too.  Thank you.

8    All right.  So we will take a break.

9             MR. GADDY:  Special Master Cohen,

10   Jeff Gaddy.  I just want to put a placeholder down.

11            Today was the first time we heard from ESI

12   they were using e-mail threading.  I need to have a

13   conversation with them about that, and we will do that

14   quickly, but we need to make sure we understand what that

15   is.

16            There is some variations, so that they could

17   be pretty concerning as far as metadata being lost,

18   attachments to e-mails being lost, those types of things,

19   but I just want to make sure that the fact that that was

20   said today, I didn't want there to be agreement by

21   silence.  So I just wanted to put that on the record.

22            SPECIAL MASTER:  All right.  Well, we are

23   about to take a break, and you know where to reach them.

24   They are about ten feet away.

25            MR. HATCHETT:  Special Master Cohen, I don't

1  know, just before I try to reach my client, just so I

2  make sure I have all the information, is there anymore

3  information you could provide about what you are

4  contemplating during this session?

5            SPECIAL MASTER:  Yeah.  So in particular,

6  with Lincoln and less so with Independence and its

7  ransomware, but the PBMs have expressed concern about

8  discovery that has been lost and is no longer available,

9  Lincoln has set forth what it is doing to try and make

10  amends, right?

11            It is like "okay.  We didn't put a

12  litigation hold on when we should have for whatever

13  reason, which Franklin doesn't really interest me."  I

14  don't care whether it was counsel's fault or the client's

15  fault or whatever.  It didn't happen, right?  So stuff

16  has been lost that might have otherwise been producible.

17            And as I say, it appears from the letters

18  Lincoln is trying to make amends by doing its best to

19  recover stuff that has been lost, is offering to make

20  deponents available that don't count toward the deponent

21  count for the PBMs to get an understanding of everything

22  that the PBMs want to get an understanding of and so

23  forth.

24            The PBMs, I think, have continued to say

25  "well" -- and Olga may have said it just today -- "it may

1    be that we need something more.  It may be that we want

2    to ask the Court for X under Rule 37."

3              And I have -- and the parties I expect will

4    continue to confer, and the PBMs will get a better

5    understanding of exactly what went missing because of the

6    failure of the litigation hold to be put on timely and

7    the efforts that Lincoln is undertaking to correct that.

8              And I think that I may be able to offer

9    ideas to both sides that they will find a reasonable way

10   to come to agreement on that, which they are, of course,

11   free to ignore.

12             Does that answer your question?

13             MR. HATCHETT:  It does.  I know -- or in

14   part.  Obviously fully, no.

15             SPECIAL MASTER:  I am not sure -- I am going

16   to make it up as I go.

17             MR. HATCHETT:  Understood.  I know item 370,

18   which was not assigned to me to cover today for our team

19   but relates -- we have asked what the timing, the

20   confirmation of whether or not a litigation hold was put

21   in place for the three other bellwethers at the time that

22   they filed the litigation.  Is that correct?

23             I am going to let Brandon -- I just want to

24   make sure what we are seeking in 370 and see if that's

25   what you are also wanting to discuss.  So all right.

1    Brandon, take that.

2                    MR. SPRINGER:    Sure.   Brandon Springer for

3    Optum-United, the Defendants.

4                    The crux of our concern here -- and it stems

5    from what we have learned in Lincoln, right?   This is not

6    something we would pursue in an ordinary case, but given

7    what we've learned from the Lincoln County case, we have

8    concerns about whether counsel that was representing

9    other bellwethers, including the same counsel that is

10   representing Lincoln County, similarly failed to put in

11   place a litigation hold in those other cases.

12                   And so we don't even -- I think at its core,

13   what we are asking, is there a litigation hold in place

14   and, two, if so, when was it put in place?

15                   So I think if those questions are answered

16   satisfactorily, I don't know that we would need anything

17   more from those three bellwethers.

18                   But it is not clear to us, right, whether

19   even the discussion of Independence and the issue earlier

20   today, it is not even clear to us Independence was

21   preserving at the time of the ransomware so whether it

22   lost e-mails before that as a result of failure to

23   implement a litigation hold or whether it lost

24   information as ransomware.

25                   So I think those are pretty straight forward

1    questions that courts have held that that information, in

2    fact, of implementing a litigation hold and when is not

3    privileged.

4              Obviously, the content, who it went to,

5    those sorts of things can be privileged unless there is a

6    finding of spoliation, but I think as a threshold matter,

7    for us to have comfort that the four bellwhethers are

8    actually going to be valid cases that we can continue to

9    litigate, we need answers to those questions, so I am not

10   sure if that summarizes what our --

11             SPECIAL MASTER:  Thank you.  I understand.

12   The answer to your question is that, yes, all of that is

13   a part of what I would talk to the parties about, but it

14   is mostly focusing on the lit hold in the --

15             MR. HATCHETT:  The Lincoln issues.

16             SPECIAL MASTER:  -- Lincoln.  Thank you.

17   But I would address all of it.

18             MR. HATCHETT:  I can reach out to our

19   client.

20             SPECIAL MASTER:  Okay.  It is 11:30.  I will

21   come back out at 11:45.

22             Is that enough time you think for you to

23   reach out?

24             MR. HATCHETT:  Hopefully.

25             SPECIAL MASTER:  All right.  If not, we will

1    figure it out.  All right, everybody.  Thank you.

2                    (Recess had.)

3                    SPECIAL MASTER:  Okay.  We will go back on

4    the record.

5                    Andrew?

6                    MR. HATCHETT:  Yeah.  I'm sorry for the

7    delay.  It took a bit of phone tag to get ahold of our

8    client and talk to the people that we needed to talk to.

9                    We are not going to be in a position today

10   to consent to kind of an ex parte mediation-like

11   exchange.  I think that -- you know, I had conversations

12   with the PEC recently about that, and I know we raised

13   concerns to the Court in the past.

14                   But this is of particular client sensitivity

15   in this case as it relates to just ex parte

16   communications in general, and so we are just not going

17   to be in a position today to engage in them.

18                   SPECIAL MASTER:  Okay.  As I said in the

19   beginning, my thinking has been that I could suggest to

20   both sides some concepts that they could consider as they

21   continue to have discussions about agenda item 370 and

22   the effect of litigation hold issues and Lincoln and to a

23   lesser extent the issue of the ransomware in

24   Independence and also just the general questions in Webb

25   County and Rochester.

1           And I think that those ideas could be

2    helpful to both side, but without permission, I won't

3    give those ideas separately.

4           MR. HATCHETT:  So we certainly are open, and

5    we would love to have as much as you feel with engaging

6    on the record, on the transcript.

7           SPECIAL MASTER:  Right.

8           MR. HATCHETT:  So would be happy to have the

9    conversations.

10          SPECIAL MASTER:  Right.  So I have been

11   sitting here trying to think of how to share as much as I

12   can still with both sides about the topic.

13          MR. FARRELL:  Special Master Cohen, this is

14   Paul Farrell on behalf of the PEC.  Do you mind if I make

15   a statement for the record?

16          SPECIAL MASTER:  No.

17          MR. FARRELL:  You don't mind or --

18          SPECIAL MASTER:  No.  I do not mind.  Well,

19   I may mind.  It will depend on the statement.

20          MR. FARRELL:  On behalf of the PEC, Joe Rice

21   and Jane Conroy and myself as three co-leads, what we

22   would like to communicate and confirm on the record, as I

23   have confirmed privately with Brian Boone and with ESI

24   if they want to join it, if they have a problem with

25   Judge Polster's six year-old appointment order

1    designating expressly in written words the role of the

2    Special Master and communications with the parties, then

3    they need to stop threatening it.  They need to stop

4    arguing about it.

5              They need to stop sending me e-mails

6    about it, and they need to file a motion in front of

7    Judge Polster and ask him to change the order.

8              So this is not an improper ex parte request

9    you are making today.  It is you performing the function

10   that Judge Polster gave you and the other Special Master

11   six years ago.

12             So part of this rhetoric that I am trying to

13   avoid, that I am trying to get away from are false

14   threats.  If they have got a problem, file it.  If they

15   have got a problem with spoliation, file it.  If they

16   want to strike a bellwether, file it.

17             The mere talk of this, the argument about

18   this, the back and forth, it is exhausting.  We are done

19   with it.  There have to be consequences and ends to all

20   of these communications.

21             So I encourage that if you think there is

22   something improper I have done, file a rule motion, Rule

23   11 motion.  If you think there is improper ex parte, ask

24   the Judge to change the order.  But these discussions

25   aren't helpful, and they are not pushing the matter

1    forward, and we are taking steps backward instead of

2    forward.

3                   SPECIAL MASTER:  Okay.  I think that I

4    referred to a bunch of stuff that I was not thinking

5    about, but obviously, there is some background --

6                   MR. HATCHETT:  May I respond?  Can I

7    respond?

8                   SPECIAL MASTER:  Sure.

9                   MR. HATCHETT:  So, one, I don't believe that

10   the appointment order contemplates the sort of ex parte

11   communication that you are proposing, which I understand

12   why you asked for consent to participate in it, which we

13   are just unable to provide today.

14                  And we have other concerns more broadly

15   about what is or is not allowed in terms of ex parte

16   communications.

17                  And if we can assess that and we may need to

18   come to the Court to get clarity and file a motion on and

19   that's certainly something we are looking at, but I just

20   want to be clear my understanding is that the sort of

21   communication that you were engaging in and proposed to

22   us before our break is not something that would be

23   permissible under the current appointment order, which I

24   understand is why you wanted to confirm consent before

25   engaging in it.

1          SPECIAL MASTER:  So returning to the issue

2     at hand, here are some general thoughts I will share.

3          Just as a practical matter, given what has

4     occurred -- and I appreciate the Plaintiffs increasing

5     transparency with what occurred, that if the shoe had

6     been on the other foot, the Plaintiffs would have equally

7     been concerned and asked similar questions.

8          I am not going to order at this time that

9     the Plaintiffs answer any specific questions.  I am going

10    to point to my suggestion that fulsome responses seem to

11    help.  The litigation go forward and issues get resolved,

12    and so I will just leave it at that.

13         My sense is -- and I know there has been a

14    lot of conversations between the parties in addition to

15    what I have read, so these are kind of guesses on my

16    part -- I mean, let's take Webb County.

17         Webb County has said in writing we have

18    documents back to 1996, so regardless of what the

19    litigation hold question is and regardless what the

20    answer is, it sounds like from what Webb County is saying

21    you don't need to worry about it.  We have everything you

22    could have asked for.

23         On the other end of the spectrum, with

24    regard to Lincoln, as I said, my sense is that Lincoln

25    County recognizes that there was some sort of mistake and

1    it is doing everything it can to make amends.  It seems

2    to me that it might be in the PBM's best interests to

3    allow that to occur.

4             PBMs might even be in a better circumstance

5    by allowing the amends to be made than it would be if

6    there had been no mistake made.

7             For example, the PBMs have said "look, here

8    are all these folks you can depose.  You can ask them

9    anything you want about this issue, and we won't count it

10    towards your deposition limit."

11             Well, that seems like a pretty nice offer,

12    and so my suggestion is that the parties continue to

13    discuss this topic, continue to see whether they can come

14    to an agreement as to how to move the case forward.

15             You know, the Plaintiffs are saying, "look,

16    how about this?"  The Defendants should think seriously

17    about whether that cures the problem or whether they

18    think that something more is necessary in which case they

19    should ask the Plaintiffs for that.

20             And if still no negotiated resolution can be

21    reached, which I think I could help you reach, but that's

22    fine, you can try it without me, then the PBMs will have

23    to come to Court and ask for whatever else they think

24    they need.

25             But as I said earlier, all of that needs to

1    happen soon.  So what I am asking you now is, how long do

2    the parties think they need for that exchange of

3    information to occur and for continued discussions and

4    negotiations to go forward before the deadline for the

5    PBMs to come to the Court and ask for whatever it is they

6    think they need if they haven't already gotten it?

7                    And again, as I said earlier, that has

8    to be a question of days, not weeks.  I am asking both

9    sides.

10                   MR. FARRELL:  On behalf of the PEC, we think

11   that at the most by July 12th I think Lincoln County will

12   be in a position to have firmly identified whatever

13   spoliation deficits exist.

14                   So that's the representation that I think

15   from our perspective of what we have been able to collect

16   or reproduce.

17                   SPECIAL MASTER:  You said July 12th, right?

18                   MR. FARRELL:  I believe by July 12th.  What

19   I can tell you is this:

20                   There is not going to be an agreement as to

21   what the cure is, so what I recommend is that the PEC by

22   July 12 put in writing what Lincoln County's production

23   is, and deficit is related to the spoliation.

24                   And then let the Defendants make whatever

25   motion they want to in front of Judge Polster.  We

1    literally don't care what their remedy request is.  They

2    can put it in writing.  Go to the Judge.

3            If they want to disqualify the bellwhether,

4    file the motion.  If they want a spoliation instruction,

5    file the motion.  There is no point in discussing this

6    any further.

7            SPECIAL MASTER:  Why?

8            MR. FARRELL:  Because we are literally

9    identifying the deficit, telling them what is the hole,

10   here it is, it is a fact.

11           SPECIAL MASTER:  Well, if you've identified

12   a hole, that wouldn't have occurred but for the lit hold

13   failure.

14           MR. FARRELL:  Right.

15           SPECIAL MASTER:  Then that suggests that

16   there should be a remedy to them --

17           MR. FARRELL:  Perfect.

18           SPECIAL MASTER:  -- that you should be able

19   to offer that they may find acceptable.

20           MR. FARRELL:  It is never going to happen.

21   They are not going to take the hammer away.

22           The hammer is more valuable than the actual

23   pounding, so let them file their motion.  They don't want

24   to talk about it with you.  They don't want -- I am fine

25   with it.  We are big boys.  We have been doing this six,

1    seven years.  We understand the consequences.

2            All I got to say is, these things have life

3    cycles, and what comes around usually goes around.

4            SPECIAL MASTER:  That's true.

5            Any comments from the Defendants?

6            MS. VIEIRA:  Olga Vieira on behalf Express

7    Scripts.

8            I do think there is value to working things

9    out and trying to talk.  We have had a good successful

10   run in working things out in the past.

11           So I agree that we can give them a month to

12   get, you know, all of the stuff out, give us the answers

13   where they said they need to look into things.

14           There was a few things where they said they

15   need more time.  We will give them that time, and once we

16   have the full scope of the issue and the production, then

17   we can come back and either negotiate a resolution or

18   seek relief from the Court.  I think that's perfectly

19   fine.

20           SPECIAL MASTER:  Anything from Optum Rx?

21           MR. HATCHETT:  I agree.  And we are happy to

22   discuss it today or later with the Special Master.  There

23   is not an aversion to that; just we would like to be in

24   the courtroom.

25           SPECIAL MASTER:  I'm sorry.  Say that again.

1  I didn't understand it.

2  MR. HATCHETT:  We just want it to be in the

3  courtroom.  I just don't want to give the impression

4  that we are not willing to discuss it or have the

5  conversation here and they result in motion practice

6  before Judge Polster.

7  And if it does, you know, we will file that

8  and brief it and address it before the Judge.

9  SPECIAL MASTER:  So I guess what I would

10  still like to ask the Defendants is whether we can move

11  the July 12th date up.

12  MS. VIEIRA:  I think the July 12th date that

13  Mr. Farrell just referenced was for the Lincoln County to

14  give us all of the information that they promised, so I

15  guess that question should be for them, to get us answers

16  quicker than that.

17  MR. FARRELL:  We can try to get the answers

18  quicker than that.  It is a finite set of facts that we

19  are collecting.

20  SPECIAL MASTER:  What I have seen in the

21  letters, 90 percent of it has already been stated.

22  MR. FARRELL:  Right.

23  SPECIAL MASTER:  I mean, I can tell you

24  exactly -- that's overstating it -- I can tell you with

25  some precision what I believe it is that you cannot

1     recover just from the letters.  I know what it is you

2     cannot recover.

3               MR. FARRELL:  Agreed.

4               SPECIAL MASTER:  What it is you can, and I

5     know what it is, even if not recovered is probably not

6     all that important.

7               MR. FARRELL:  Agreed.

8               SPECIAL MASTER:  And that's just from these

9     letters.

10              So the reason I ask is because it is not up

11    to me.  It is going to be up to Judge Polster, and I

12    don't think he is going to want to push this off for

13    another four weeks.

14              MR. FARRELL:  Then let's take the letter and

15    the position we are in now, have them file their motion

16    this week on the record.

17              SPECIAL MASTER:  I'm sorry.  Say it again.

18              MR. FARRELL:  Let's have them file their

19    motion on the present record.

20              SPECIAL MASTER:  No.  I think --

21              MR. FARRELL:  See, that's our point.  We

22    have put in writing 90 percent of it.  The rest of the

23    10 percent isn't going to influence the outcome one way

24    or the other.

25              If they want a remedy, they need to go and

1     see the Judge because remember -- and I don't mean this

2     in a condescending way, this is supposed to be a

3     bellwhether, a representative case amongst 3,000

4     political subdivisions that have filed or are going to

5     file cases.

6                    And this is supposed to be representative.

7     So if they are asking for an enormous penalty, then I

8     don't know that it is now a representative case, or on

9     the other hand, if they go to the Judge and say here is

10    the deficit and the Judge says "I don't think this is a

11    meaningful deficit," then we move on and get past the

12    hammer and the threats.

13                   That's what I am trying to do.  I am trying

14    to resolve conflicts, especially ones that don't matter,

15    but more on the conflicts that do matter they need to get

16    resolved even more efficiently.

17                   SPECIAL MASTER:  Right.  So I am not going

18    to issue a deadline; I am going to suggest that Lincoln

19    County continue to produce information regarding what's

20    missing and not as quickly as possible because that is

21    going to go into both what it is the PBMs think they need

22    and what it is -- how it is the Court will assess

23    everything.  So you should continue to make that clear

24    for the PBMs.

25                   I mean, apparently, by July 12th, they would

1    have known every last bit of what is and isn't missing.

2            I am asking Lincoln County to clarify that

3    for the PBMs as much as possible, as soon as possible,

4    and as to what the deadline is, I will have to report

5    back to you what the Court thinks.

6            MR. FARRELL:  What I can represent to you

7    is, we will put in writing a final position statement,

8    designate this is our final position on factually what

9    the scope of the world is, and we will do so as fast as

10    we can, hopefully by the end of the month.

11            SPECIAL MASTER:  That's fine, and I am going

12    to suggest in addition to whatever it is you are going to

13    write, do it graphically.  I was actually thinking as I

14    read all of this, it would kind of help to see like a

15    venn diagram.

16            Here is what we have got.  Here is the piece

17    that is missing.  Here is what we have got over here.

18    Here is the piece that is missing.  It will just help the

19    Court understand it all

20            MR. HATCHETT:  This is Andrew Hatchett for

21    the United and Optum Defendants.

22            A few quick observations:  One is that

23    before we settle on a firm deadline, I would like an

24    opportunity -- it doesn't have to be today -- but to

25    confer with ESI.  One of the things you just discussed

1    was the potential need for a deposition.  That was

2    something we had not discussed with the PEC.

3              We have not been pushing for preliminary

4    depositions in any of these kind of issues yet, but you

5    mentioned an opportunity to discuss with co-defense

6    counsel to make sure if there is any fact discovery loops

7    that we need to ferret out before we are in a position to

8    file a motion.

9              And I think we could probably identify in

10   really short order whether something like that would be

11   necessary.

12             The other thing I want to point out is --

13   and I know Mr. Farrell said it may be this case is not

14   representative -- our concern is, in fact, that it is

15   representative.

16             And so I know there is potential motions for

17   leave to amend.  At this point, we don't know how many

18   Plaintiffs that are in the MDL that are going to seek to

19   amend their complaints to add claims against the PBM

20   Defendants.

21             But as the Court knows through the early

22   many years of this litigation, there were only 80 some

23   odd claims that asserted claims against PBMs, I mean,

24   just a tiny fraction of the cases.

25             But the overwhelming majority of those cases

1    were brought by the same counsel that represents Lincoln

2    County.  And so one of the things that we have asked is,

3    we would like to know whether those later potential

4    bellwether cases had a litigation hold in case, whether

5    they were preserving documents, and again, this goes to

6    the topic, I think it is 370, we would like to know

7    whether the other two bellwethers that are in this case

8    represented by the same counsel had a litigation hold in

9    place.

10            And obviously, the remedies that we might

11   seek vis-a-vis Lincoln County are going to be limited to

12   Lincoln County and the facts of that case.  That is, as

13   we look more broadly to the future of this MDL, those are

14   really important questions.

15            And I think there is reason to believe that

16   these concerns may be more sweeping, and that this case

17   may actually be representative of virtually all of the

18   eligible bellwethers that could be brought against these

19   PBMs at this stage.

20            MR. FARRELL:  On behalf of the PEC, I will

21   state on the record we are not answering your question on

22   behalf of all of the other Plaintiffs in the MDL, and if

23   you want that answer, file your motion.

24            MR. HATCHETT:  I may be wrong.  I think

25   that's the first time we have gotten a response to that

1    question.   It is not all Plaintiffs; it is just the

2    Plaintiffs that are represented by the counsel that

3    failed to institute the litigation hold.

4             It is just for Lincoln is our request at

5    this stage, but it is helpful to know that's the position

6    of the PEC, and we can evaluate and know what to do

7    moving forward.

8             SPECIAL MASTER:  Well, that's the position

9    the PEC has just announced.  But of course, it ignores

10   any Court ruling, and it also ignores what I suggested

11   earlier, which is that fulsome responses may help you get

12   past these knotty issues.

13            Did you have something to say Joann?  You

14   are standing there like you wanted to say something.

15            MS. CICALA:  There is so much I want to say,

16   but I think I will hold back addressing the unfortunate

17   and unnecessary slights baked into Mr. Hatchett's

18   speculation.

19            I do want to let the Court know that among

20   the information Lincoln will be able to provide to

21   Defendants this week, it is referenced in our June 9th

22   letter.

23            We have run the e-mail addresses of the

24   persons whose e-mails were deleted across all

25   departments, and we have a head count, and we will be

1    able to share that with the Defendants showing how many,

2    you know, showing how many individuals received e-mails

3    from the missing persons so to speak.  We can prioritize

4    the production of those e-mails in any fashion the

5    Defendants want so that they can engage in that review.

6            So I just wanted to let the Court and the

7    everyone know that head-count work is done, and we will

8    be able to share that this week.

9            SPECIAL MASTER:  Okay.  Well, I didn't

10   expect to get through today's hearing without some

11   tension.  It has appeared.

12           Look, that's the nature of this litigation.

13   Both sides are fighting hard for their respective

14   clients, and honestly, nothing that anybody has said

15   surprises me nor do I think anything anybody has said is

16   over the line or inappropriate.  Everybody has got their

17   position to stake out.  I do take heart from the fact

18   that the parties have been increasingly working today to

19   get through some of this stuff, and I am not without any

20   hope that they can't get past this issue either.

21           I think there is room for the parties to

22   figure out what to do about this in a way that makes

23   sense for both sides.  So I will leave it at that.  We

24   have now a date -- well, let me just before we adjourn --

25   is there anything else that anybody wants to raise about

1  anything at all?

2                    (No response).

3                    SPECIAL MASTER:  Thank you all for coming

4  in.  It is a beautiful day in Cleveland.  It is a

5  beautiful summer day.  There is a five-minute walk ahead

6  of us from here to Johnny's where we have lunch set up,

7  and if you absolutely can't make it, I understand

8  everybody is busy, and they have things to do.

9                    But I really would enjoy the opportunity for

10  us to break bread together and get to know all of you a

11  little bit better.  So I will be downstairs in about ten

12  minutes, and we can all make our way there.  Thank you,

13  all.

14                    (Hearing adjourned at 12:20 p.m.)

15                    - - - - -

16                    C E R T I F I C A T E

17                    I, George J. Staiduhar, Official Court

18  Reporter in and for the United States District Court,

19  for the Northern District of Ohio, Eastern Division,

20  do hereby certify that the foregoing is a true

21  and correct transcript of the proceedings herein.

22                    s/George J. Staiduhar
                       George J. Staiduhar,
23                    Official Court Reporter

24                    U.S. District Court
                       801 W. Superior Ave., Suite 7-184
25                    Cleveland, Ohio 44113
                       (216) 357-7128