# APPENDIX B

# JANSSEN WASHINGTON STATE-WIDE OPIOID SETTLEMENT AGREEMENT

## I.  Overview

This settlement agreement (the "*Agreement*") sets forth the terms and conditions of a settlement agreement between and among Janssen, the State of Washington, and Participating Subdivisions (as those terms are defined below). Janssen has agreed to the below terms for the sole purpose of settlement, and nothing herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of this Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. Unless the contrary is expressly stated, this Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

## II.  Definitions

Unless otherwise specified, the following definitions apply:

1.  "*Agreement*" means this agreement as set forth above, inclusive of all exhibits.

2.  "*Alleged Harms*" means the alleged past, present, and future financial, societal, and related expenditures arising out of the alleged misuse and abuse of opioid products, that have allegedly been caused by Janssen.

3.  "*Attorney*" means any of the following retained through a legal contract: a solo practitioner, multi-attorney law firm, or other legal representative of a Participating Subdivision.

4.  "*Claim*" means any past, present or future cause of action, claim for relief, cross-claim or counterclaim, theory of liability, demand, derivative claim, request, assessment, charge, covenant, damage, debt, lien, loss, penalty, judgment, right, obligation, dispute, suit, contract, controversy, agreement, *parens patriae* claim, promise, performance, warranty, omission, or grievance of any nature whatsoever, whether legal, equitable, statutory, regulatory or administrative, whether arising under federal, state or local common law, statute, regulation, guidance, ordinance or principles of equity, whether filed or unfiled, whether asserted or unasserted, whether known or unknown, whether accrued or unaccrued, whether foreseen, unforeseen or unforeseeable, whether discovered or undiscovered, whether suspected or unsuspected, whether fixed or contingent, and whether existing or hereafter arising, in all such cases, including but not limited to any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, absolute liability, strict liability, restitution, subrogation, contribution, indemnity, apportionment, disgorgement, reimbursement, attorney fees, expert fees, consultant fees, fines, penalties, expenses, costs or any other legal, equitable, civil, administrative, or regulatory remedy whatsoever.

1

5.     "*Claim Over*" means a Claim asserted by a Non-Released Entity against a Released Entity on the basis of contribution, indemnity, or other claim-over on any theory relating to a Non-Party Covered Conduct Claim asserted by a Releasor.

6.     "*Compensatory Restitution Amount*" means the aggregate amount of payments by Janssen hereunder other than amounts used for attorneys' fees and costs.

7.     "*Consent Judgment*" means a consent judgment in the form attached as Exhibit E.

8.     "*Court*" means the court to which the Agreement and the Consent Judgment are presented for approval and/or entry.

9.     "*Covered Conduct*" means any actual or alleged act, failure to act, negligence, statement, error, omission, breach of any duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity of any kind whatsoever from the beginning of time through the Effective Date (and any past, present, or future consequence of any such act, failure to act, negligence, statement, error, omission, breach of duty, conduct, event, transaction, agreement, misstatement, misleading statement or other activity) relating in any way to (a) the discovery, development, manufacture, packaging, repackaging, marketing, promotion, advertising, labeling, recall, withdrawal, distribution, delivery, monitoring, reporting, supply, sale, prescribing, dispensing, physical security, warehousing, use or abuse of, or operating procedures relating to any Product, or any system, plan, policy, or advocacy relating to any Product or class of Products, including but not limited to any unbranded promotion, marketing, programs, or campaigns relating to any Product or class of Products; (b) the characteristics, properties, risks, or benefits of any Product; (c) the reporting, disclosure, non-reporting or non-disclosure to federal, state or other regulators of orders for any Product placed with any Released Entity; (d) the selective breeding, harvesting, extracting, purifying, exporting, importing, applying for quota for, procuring quota for, handling, promoting, manufacturing, processing, packaging, supplying, distributing, converting, or selling of, or otherwise engaging in any activity relating to, precursor or component Products, including but not limited to natural, synthetic, semi-synthetic or chemical raw materials, starting active pharmaceutical ingredients, drug substances, or any related intermediate Products; or (e) diversion control programs or suspicious order monitoring related to any Product.

10.    "*Effective Date*" means January 22, 2024.

11.    "*Janssen*" means Johnson & Johnson, Johnson & Johnson Innovative Medicine, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc.

12.    "*Litigating Subdivision*" means a Subdivision (or Subdivision official asserting the right of or for the Subdivision or the State to recover for alleged harms to the Subdivision, the State, and/or the people thereof) that brought any Released Claims against any Released Entity on or before the Effective Date that were not separately

resolved prior to that date. A list of all Litigating Subdivisions known to the Parties is included in Exhibit F hereto.

13. "*Net Settlement Amount*" means the amount paid by Janssen into the Settlement Fund under subsection V.C. For the avoidance of doubt, the Net Settlement Amount does not include amounts paid for State Outside and Inside Counsel Fees and Costs pursuant to subsection IX.A.

14. "*Non-Litigating Subdivision*" means a Subdivision that is not a Litigating Subdivision.

15. "*Non-Party Covered Conduct Claim*" means a Claim against any Non-Released Entity involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity).

16. "*Non-Party Settlement*" means a settlement by any Releasor that settles any Non-Party Covered Conduct Claim and includes a release of any Non-Released Entity.

17. "*Non-Released Entity*" means an entity that is not a Released Entity.

18. "*Opioid Remediation*" means care, treatment, and other programs and expenditures (including reimbursement for past such programs or expenditures except where this Agreement restricts the use of funds solely to future Opioid Remediation) designed to (1) address the misuse and abuse of opioid products, (2) treat or mitigate opioid use or related disorders, or (3) mitigate other alleged effects of the opioid abuse crisis, including on those injured as a result of the opioid abuse crisis. Exhibit J provides a non-exhaustive list of expenditures that qualify as being paid for Opioid Remediation. Qualifying expenditures may include reasonable related administrative expenses.

19. "*Participating Subdivision*" means a Subdivision that meets the requirements for becoming a Participating Subdivision under Section VII.

20. "*Parties*" means Janssen and the State of Washington (each, a "*Party*").

21. "*Product*" means any chemical substance, whether used for medicinal or non-medicinal purposes, and whether natural, synthetic, or semi-synthetic, or any finished pharmaceutical product made from or with such substance, that is an opioid or opiate, as well as any product containing any such substance. It also includes: 1) the following when used in combination with opioids or opiates: benzodiazepine, carisoprodol, zolpidem, or gabapentin; and 2) a combination or "cocktail" of any stimulant or other chemical substance prescribed, sold, bought, or dispensed to be used together that includes opioids or opiates. For the avoidance of doubt, "Product" does not include benzodiazepine, carisoprodol, zolpidem, or gabapentin when not used in combination with opioids or opiates. "Product" includes but is not limited to any substance consisting of or containing buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, naloxone,

3

naltrexone, oxycodone, oxymorphone, tapentadol, tramadol, opium, heroin, carfentanil, any variant of these substances, or any similar substance. "Product" also includes any natural, synthetic, semi-synthetic or chemical raw materials, starting materials, finished active pharmaceutical ingredients, drug substances, and any related intermediate products used or created in the manufacturing process for any of the substances described in the preceding sentence.

22.     "*Released Claims*" means any and all Claims that directly or indirectly are based on, arise out of, or in any way relate to or concern the Covered Conduct occurring prior to the Effective Date. Without limiting the foregoing, "Released Claims" include any Claims that have been asserted against the Released Entities by the State or any of its Litigating Subdivisions in any federal, state or local action or proceeding (whether judicial, arbitral, or administrative) based on, arising out of or relating to, in whole or in part, the Covered Conduct, or any such Claims that could be or could have been asserted now or in the future in those actions or in any comparable action or proceeding brought by the State, any of its Subdivisions, or any Releasors (whether or not such State, Subdivision, or Releasor has brought such action or proceeding), provided the Covered Conduct occurs prior to the Effective Date. Released Claims also include all Claims asserted in any proceeding to be dismissed pursuant to the Agreement, whether or not such claims relate to Covered Conduct, provided the Covered Conduct occurs prior to the Effective Date. The Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private individuals. It is the intent of the Parties that Claims by private individuals be treated in accordance with applicable law. Released Claims is also used herein to describe Claims brought by a Subdivision or other non-party Subdivision after the Effective Date that would have been Released Claims if they had been brought by a Releasor against a Released Entity.

23.     "*Released Entities*" means Janssen and (1) all of Janssen's past and present direct or indirect parents, subsidiaries, divisions, predecessors, successors, assigns, including Noramco, Inc. and Tasmanian Alkaloids PTY. LTD.; (2) the past and present direct or indirect subsidiaries, divisions, and joint ventures, of any of the foregoing; (3) all of Janssen's insurers (solely in their role as insurers with respect to the Released Claims); (4) all of Janssen's, or of any entity described in subsection (1), past and present joint ventures; and (5) the respective past and present officers, directors, members, shareholders (solely in their capacity as shareholders of the foregoing entities), partners, trustees, agents, and employees of any of the foregoing (for actions that occurred during and related to their work for, or employment with, Janssen). Any person or entity described in subsections (3)-(5) shall be a Released Entity solely in the capacity described in such clause and shall not be a Released Entity with respect to its conduct in any other capacity. For the avoidance of doubt, the entities listed in Exhibit D are not Released Entities; and provided further that any joint venture partner of Janssen or Janssen's subsidiary is not a Released Entity unless it falls within subsections (1)-(5) above. A list of Janssen's present subsidiaries and affiliates is attached as Exhibit G. Janssen's predecessor entities include but are not limited to those entities listed on Exhibit A. For the avoidance of

4

doubt, any entity acquired, or joint venture entered into, by Janssen after the Effective Date is not a Released Entity.

24.     "*Releasors*" means (1) the State; (2) each Participating Subdivision; and (3) without limitation and to the maximum extent of the power of the State's Attorney General and/or Participating Subdivision to release the Claims, (a) the State's and Participating Subdivision's departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including its Attorney General, and any person in their official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Subdivisions in the State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, qui tam, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State or Subdivision in the State, whether or not any of them participate in the Agreement. The inclusion of a specific reference to a type of entity in this definition shall not be construed as meaning that the entity is not a Subdivision. In addition to being a Releasor as provided herein, a Participating Subdivision shall also provide the Settlement Participation Form referenced in Section VII providing for a release to the fullest extent of the Participating Subdivision's authority, which shall be attached as an exhibit to the Agreement. The State's Attorney General represents that he or she has or has obtained the authority set forth in the Representation and Warranty subsection of Section IV.

25.     "*Settlement Fund*" means the interest-bearing fund established under the Agreement into which all Net Settlement Amount payments by Janssen are made.

26.     "*Settlement Fund Administrator*" means the entity that calculates the allocation of payments under Section VI of this Agreement, and administers and distributes amounts from the Settlement Fund. A detailed description of the Settlement Fund Administrator's duties, including a detailed mechanism for paying the Settlement Fund Administrator's fees and costs, shall be appended to the Agreement as Exhibit I.

27.     "*Settlement Participation Form*" means the form attached as Exhibit B that Participating Subdivisions must execute and return to Janssen and the State of Washington, and which shall (1) make such Participating Subdivisions signatories to this Agreement, (2) include a full and complete release of any and of such Subdivision's claims, and (3) require the prompt dismissal with prejudice of any Released Claims that have been filed by any such Participating Subdivision.

28.     "*Special District*" means a formal and legally recognized sub-entity of the State that is authorized by State law to provide one or a limited number of designated

5

functions, including but not limited to school districts, fire districts, healthcare & hospital districts, and emergency services districts.

29.     "*State*" means the State of Washington.

30.     "*State Outside and Inside Counsel Fees and Costs*" means fees and costs of the Washington Attorney General's Office and State Outside Counsel.

31.     "*State Outside Counsel*" means Nix Patterson, LLP and Whitten Burrage, who were engaged by the Washington Attorney General's Office for *State of Washington v. Johnson & Johnson, et al.*, King County Superior Court, Cause No. 20-2-00184-8SEA.

32.     "*Subdivision*" means a formal and legally recognized sub-entity of the State that provides general governance for a defined area, including a county, city, town, village, or similar entity. Unless otherwise specified, "Subdivision" includes all functional counties and other functional levels of sub-entities of the State that provide general governance for a defined area. Historic, non-functioning sub-entities of the State are not Subdivisions, unless the entity has filed a lawsuit that includes a Released Claim against a Released Entity in a direct, *parens patriae*, or any other capacity. For purposes of this Agreement, the term Subdivision also includes Special Districts.

### III.    <u>Injunctive Relief</u>

As part of the Consent Judgment, the Parties agree to the injunctive relief terms attached as Exhibit C.

### IV.    <u>Release</u>

A.     *Scope*. As of the Effective Date, the Released Entities will be released and forever discharged from all of the Releasors' Released Claims. The State of Washington (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will, on or before the Effective Date, absolutely, unconditionally, and irrevocably covenant not to bring, file, or claim, or to cause, assist in bringing, or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Agreement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the State and its Attorney General to release claims. The Release shall be a complete bar to any Released Claim.

B.     *Claim Over and Non-Party Settlement*.

1.     *Statement of Intent.* It is the intent of the Parties that:

6

a.   Released Entities should not seek contribution or indemnification (other than pursuant to an insurance contract) from other parties for their payment obligations under this Agreement;

b.   The payments made under this Agreement shall be the sole payments made by the Released Entities to the Releasors involving, arising out of, or related to Covered Conduct (or conduct that would be Covered Conduct if engaged in by a Released Entity);

c.   Claims by Releasors against non-Parties should not result in additional payments by Released Entities, whether through contribution, indemnification or any other means; and

d.   The Agreement meets the requirements of the Uniform Contribution Among Joint Tortfeasors Act and any similar state law or doctrine that reduces or discharges a released party's liability to any other parties.

e.   The provisions of this subsection IV.B are intended to be implemented consistent with these principles. This Agreement and the releases and dismissals provided for herein are made in good faith.

2.   *Contribution/Indemnity Prohibited*. No Released Entity shall seek to recover for amounts paid under this Agreement based on indemnification, contribution, or any other theory from a manufacturer, pharmacy, hospital, pharmacy benefit manager, health insurer, third-party vendor, trade association, distributor, or health care practitioner, provided that a Released Entity shall be relieved of this prohibition with respect to any entity that asserts a Claim-Over against it. For the avoidance of doubt, nothing herein shall prohibit a Released Entity from recovering amounts owed pursuant to insurance contracts.

3.   *Non-Party Settlement*. To the extent that, on or after the Effective Date, any Releasor enters into a Non-Party Settlement, including in any bankruptcy case or through any plan of reorganization (whether individually or as a class of creditors), the Releasor will include (or in the case of a Non-Party Settlement made in connection with a bankruptcy case, will cause the debtor to include), unless prohibited from doing so under applicable law, in the Non-Party Settlement a prohibition on contribution or indemnity of any kind substantially equivalent to that required from Janssen in subsection IV.B.2, or a release from such Non-Released Entity in favor of the Released Entities (in a form equivalent to the releases contained in this Agreement) of any Claim-Over. The obligation to obtain the prohibition and/or release required by this subsection is a material term of this Agreement.

4.   *Claim-Over*. In the event that any Releasor obtains a judgment with respect to Non-Party Covered Conduct against a Non-Released Entity that does not contain a prohibition like that in subsection IV.B.3, or any Releasor files a Non-Party Covered Conduct Claim against a Non-Released Entity in bankruptcy or a Releasor is prevented for any reason from obtaining a prohibition/release in a Non-Party

7

Settlement as provided in subsection IV.B.3, and such Non-Released Entity asserts a Claim-Over against a Released Entity, that Releasor and Janssen shall take the following actions to ensure that the Released Entities do not pay more with respect to Covered Conduct to Releasors or to Non-Released Entities than the amounts owed under this Agreement by Janssen:

a.  Janssen shall notify that Releasor of the Claim-Over within thirty (30) days of the assertion of the Claim-Over or thirty (30) days of the Effective Date of this Agreement, whichever is later;

b.  Janssen and that Releasor shall meet and confer concerning the means to hold Released Entities harmless and ensure that it is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Agreement;

c.  That Releasor and Janssen shall take steps sufficient and permissible under the law of the State of the Releasor to hold Released Entities harmless from the Claim-Over and ensure Released Entities are not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement. Such steps may include, where permissible:

(1)  Filing of motions to dismiss or such other appropriate motion by Janssen or Released Entities, and supported by Releasors, in response to any claim filed in litigation or arbitration;

(2)  Reduction of that Releasor's Claim and any judgment it has obtained or may obtain against such Non-Released Entity by whatever amount or percentage is necessary to extinguish such Claim-Over under applicable law, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(3)  Placement into escrow of funds paid by the Non-Released Entities such that those funds are available to satisfy the Claim-Over;

(4)  Return of monies paid by Janssen to that Releasor under this Settlement Agreement to permit satisfaction of a judgment against or settlement with the Non-Released Entity to satisfy the Claim-Over;

(5)  Payment of monies to Janssen by that Releasor to ensure it is held harmless from such Claim-Over, up to the amount that Releasor has obtained, may obtain, or has authority to control from such Non-Released Entity;

(6)  Credit to Janssen under this Settlement Agreement to reduce the overall amounts to be paid under the Settlement Agreement such that it is held harmless from the Claim-Over; and

(7)     Such other actions as that Releasor and Janssen may devise to hold Janssen harmless from the Claim Over.

d.      The actions of that Releasor and Janssen taken pursuant to paragraph (c) must, in combination, ensure Janssen is not required to pay more with respect to Covered Conduct than the amounts owed by Janssen under this Settlement Agreement.

e.      In the event of any dispute over the sufficiency of the actions taken pursuant to paragraph (c), that Releasor and Janssen may seek review by the court that enters the Consent Judgment pursuant to Section X.

5.      To the extent that the Claim-Over is based on a contractual indemnity, the obligations under subsection IV.B.4 shall extend solely to a Non-Party Covered Conduct Claim against a pharmacy, clinic, hospital or other purchaser or dispenser of Products, a manufacturer that sold Products, a consultant, and/or a pharmacy benefit manager or other third-party payor. Janssen shall notify the State, to the extent permitted by applicable law, in the event that any of these types of Non-Released Entities asserts a Claim-Over arising out of contractual indemnity against it.

C.      *General Release*. In connection with the releases provided for in the Agreement, the State (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

**General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may thereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State (for itself and its Releasors) and each Participating Subdivision (for itself and its Releasors) will expressly waive and fully, finally, and forever settle, release and discharge, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the State's decision to enter into the Agreement or the Participating Subdivisions' decision to participate in the Agreement.

D.      *Res Judicata*. Nothing in the Agreement shall be deemed to reduce the scope of the res judicata or claim preclusive effect that the settlement memorialized in the Agreement, and/or any Consent Judgment or other judgment entered on the Agreement, gives rise to under applicable law.

E.    *Representation and Warranty*. The signatories hereto on behalf of the State expressly represent and warrant that they will obtain on or before the Effective Date (or have obtained) the authority to settle and release, to the maximum extent of the State's power, all Released Claims of (1) the State; (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts; (3) any of the State's past and present executive departments, agencies, divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license; and (4) any Participating Subdivisions. For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor. Also, for the purposes of clause (3), a release from the State's Governor is sufficient to demonstrate that the appropriate releases have been obtained.

F.    *Effectiveness*. The releases set forth in the Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the settlement funds or any portion thereof, or by the enactment of future laws, or by any seizure of the settlement funds or any portion thereof.

G.    *Cooperation*. Releasors (i) will not encourage any person or entity to bring or maintain any Released Claim against any Released Entity and (ii) will reasonably cooperate with and not oppose any effort by a Released Entity to secure the prompt dismissal of any and all Released Claims.

H.    *Non-Released Claims.* Notwithstanding the foregoing or anything in the definition of Released Claims, the Agreement does not waive, release or limit any criminal liability, Claims for any outstanding liability under any tax or securities law, Claims against parties who are not Released Entities, Claims by private individuals and any claims arising under the Agreement for enforcement of the Agreement.

## V.   <u>Monetary Relief and Payments</u>

A.    *Participation*. As consideration for the releases from the State and Participating Subdivisions provided in Section IV above and the Settlement Participation Forms specified in Section VII and Exhibit B below, the State represents and warrants that, subject to the holdback provision in subsection V.D below, it will obtain and deliver (or cause to be obtained and delivered) to Janssen, within one hundred ten (110) days after the Effective Date or such later date as the parties may agree, executed Settlement Participation Forms for all Litigating Subdivisions and all Non-Litigating Subdivisions listed on Exhibit F.

B.    *Conditions to Effectiveness of Agreement*. If the State is able to obtain and deliver executed Settlement Participation Forms for all Litigating Subdivisions listed on Exhibit F to Janssen within one hundred ten (110) days after the Effective Date or such later date as the parties may agree, this Agreement shall become effective. If the State is unable to obtain and

deliver executed Settlement Participation Forms for all Litigating Subdivisions listed on Exhibit F to Janssen within one hundred ten (110) days after the Effective Date or such later date as the parties may agree, this Agreement will have no further effect and all releases and other commitments or obligations contained herein will be void.

C.  *Remediation and Restitution Payments*. Within twenty-one (21) days after the effectiveness of this Agreement as provided for in subsection V.B above, Janssen shall pay into the Settlement Fund a Net Settlement Amount of $123,340,000, plus fees and costs payable to the Washington Attorney General set forth in subsection IX.A, subject to any holdback under subsection V.D below.

D.  *Holdback for Non-Litigating Subdivisions*. If, by the date this Agreement becomes effective as provided for in subsection V.B, any Non-Litigating Subdivision listed on Exhibit F has not executed a Settlement Participation Form or has not provided Janssen an acknowledgement that the Subdivision has no intention to file a lawsuit asserting Released Claims against Released Entities, then Janssen will hold back $6,167,000 from the Net Settlement Amount payment described in subsection V.B above, which Janssen will not pay to the Settlement Fund; provided, however, Janssen will pay the $6,167,000 to the Settlement Fund (1) within thirty (30) days of the date all remaining Non-Litigating Subdivision(s) listed on Exhibit F have executed a Settlement Participation Form and those Forms have been delivered to Janssen; or (2) within (30) days after the two-year anniversary of the Effective Date, if all such Non-Litigating Subdivisions on Exhibit F have not executed Settlement Participation Forms, and no such Non-Litigating Subdivision listed on Exhibit F has filed litigation asserting Released Claims within two years after the Effective Date.

## VI.  <u>Intra-State Allocation</u>

A.  Janssen's Net Settlement Amount payments to the Settlement Fund shall be allocated as follows:

    1.  Fifty percent (50%) to the State of Washington.

    2.  Fifty percent (50%) to the Participating Local Governments ("LG Share").

B.  The LG Share remainder shall be distributed to Participating Local Governments pursuant to the One Washington Memorandum of Understanding Between Washington Municipalities ("One Washington MOU"), which is attached as Exhibit H.

C.  BrownGreer PLC shall be the Settlement Fund Administrator and shall allocate and distribute payments in accordance with the terms of the One Washington MOU and this Agreement, including the detailed description of the Settlement Fund Administrator's duties attached as Exhibit I. As set forth in Exhibit I, the Settlement Fund Administrator's fees and costs shall be paid from the interest on the LG Share portion of the funds in the Settlement Fund between the date of Janssen's payment and the date of disbursement to the Subdivisions. If the aforementioned interest is insufficient to pay the full amount of the Settlement Fund Administrator's fees and costs, the remainder shall be paid by Janssen.

D.      Use of Net Settlement Amount.

      1.  It is the intent of the Parties that the payments disbursed from the Settlement Fund to the State and Participating Subdivisions listed in Exhibit F be for Opioid Remediation, subject to limited exceptions that must be documented in accordance with subsection VI.D.2. In no event may less than 85% of Janssen's Net Settlement Amount payment be spent on Opioid Remediation.

      2.  While disfavored by the Parties, the State or a Participating Subdivision listed on Exhibit F may use monies from the Settlement Fund for purposes that do not qualify as Opioid Remediation. If, at any time, the State or a Participating Subdivision listed on Exhibit F uses any monies from the Settlement Fund for a purpose that does not qualify as Opioid Remediation, the State or Participating Subdivision shall identify such amounts and report to the Settlement Fund Administrator and Janssen how such funds were used, including if used to pay attorneys' fees other than those provided for in subsection IX.B which shall be identified by BrownGreer, investigation costs, litigation costs, or costs related to the operation and enforcement of this Agreement. It is the intent of the Parties that the reporting under this subsection VI.D.2 shall be available to the public. For the avoidance of doubt, (a) any amounts not identified under this subsection VI.D.2 as used to pay attorneys' fees other than those provided for in subsection IX.A, investigation costs, or litigation costs shall be included in the "Compensatory Restitution Amount" for purposes of subsection XI.B and (b) Participating Subdivisions not listed on Exhibit F that receive monies from the Settlement Fund indirectly may only use such monies from the Settlement Fund for purposes that qualify as Opioid Remediation.

## VII.    Participation by Subdivisions

    A Subdivision may become a Participating Subdivision by returning an executed Settlement Participation Form to Janssen and the State and upon prompt dismissal of its legal action pursuant to the terms of this Agreement and the Settlement Participation Form.

## VIII.   Filing of Consent Judgment and Dismissals with Prejudice

    No later than 15 days from delivery to Janssen of Settlement Participation Forms for all Subdivisions listed on Exhibit F, the State and Janssen will proceed to file the Consent Judgment. No later than 30 days after receipt of Janssen's payments under Section V, the State and the Participating Subdivisions shall dismiss all actions asserting Released claims with prejudice.

## IX.     Attorney Fee and Cost Payments

A.      *State Outside and Inside Counsel Fees and Costs*. Janssen will pay the Washington Attorney General's Office $26,160,000.00 within twenty-one (21) days after the date this Agreement becomes effective as provided for in subsection V.B to reimburse the State for State Outside

and Inside Counsel Fees and Costs, which shall be used for any lawful purpose in the discharge of the Attorney General's duties at the sole discretion of the Attorney General.

B.      *Fees and Costs for Participating Litigating Subdivisions' Attorneys*. From the LG Share of the Settlement Fund, the Settlement Fund Administrator shall pay the Participating Litigating Subdivisions' attorneys their fees and costs pursuant to Paragraph D of the One Washington MOU and this Agreement.

C.      An Attorney for a Participating Litigating Subdivision may not receive any payment for attorney fees unless the Attorney represents that s/he has no present intent to represent or participate in the representation of any Subdivision or any Releasor with respect to Released Claims against Released Entities brought after the Effective Date.

## X.     <u>Enforcement and Dispute Resolution</u>

A.      The terms of the Agreement and Consent Judgment applicable to the State will be enforceable solely by the State and Janssen.

B.      Janssen consents to the jurisdiction of the Court in which the Consent Judgment is filed, limited to resolution of disputes identified in subsection X.D for resolution in the Court in which the Consent Judgment is filed.

C.      The parties to a dispute shall promptly meet and confer in good faith to resolve any dispute. If the parties cannot resolve the dispute informally, and unless otherwise agreed in writing, they shall follow the remaining provisions of this section to resolve the dispute.

D.      Disputes not resolved informally shall be resolved in the Court that entered the Consent Judgment.

## XI.     <u>Miscellaneous</u>

A.      *No Admission*. Janssen does not admit liability or wrongdoing. Neither this Agreement nor the Consent Judgment shall be considered, construed, or represented to be (1) an admission, concession, or evidence of liability or wrongdoing or (2) a waiver or any limitation of any defense otherwise available to Janssen.

B.      *Nature of Payment.* Janssen, the State, and the Participating Subdivisions acknowledge and agree that notwithstanding anything to the contrary in this Agreement, including, but not limited to, the scope of the Released Claims:

     1.      Janssen has entered into this Agreement to avoid the delay, expense, inconvenience, and uncertainty of further litigation;

     2.      The State and the Participating Subdivisions sought compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for the Alleged Harms allegedly suffered by the State and Participating Subdivisions;

3.     By executing this Agreement the State and the Participating Subdivisions certify that: (a) the Compensatory Restitution Amount is no greater than the amount, in the aggregate, of the Alleged Harms allegedly suffered by the State and Participating Subdivisions; and (b) the portion of the Compensatory Restitution Amount received by the State or Participating Subdivision is no greater than the amount of the Alleged Harms allegedly suffered by the State or Participating Subdivision;

4.     The payment of the Compensatory Restitution Amount by Janssen constitutes, and is paid for, compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) for Alleged Harms allegedly caused by Janssen;

5.     The Compensatory Restitution Amount is being paid as compensatory restitution (within the meaning of 26 U.S.C. § 162(f)(2)(A)) in order to restore, in whole or in part, the State and Participating Subdivisions to the same position or condition that they would be in had the State and Participating Subdivisions not suffered the Alleged Harms;

6.     For the avoidance of doubt: (a) no portion of the Compensatory Restitution Amount represents reimbursement to the State, any Participating Subdivision, or other person or entity for the costs of any investigation or litigation, (b) the entire Compensatory Restitution Amount is properly characterized as described in this subsection XI.B, and (c) no portion of the Compensatory Restitution Amount constitutes disgorgement or is properly characterized as the payment of statutory or other fines, penalties, punitive damages, other punitive assessments, or attorneys' fees; and

7.     The State, on behalf of all itself and Participating Subdivisions (the "Form 1098-F Filer") shall complete and file Form 1098-F with the Internal Revenue Service on or before February 28 (March 31 if filed electronically) of the year following the calendar year in which the order entering this Agreement becomes binding. On the Form 1098-F, the Form 1098-F Filer shall identify the entire Compensatory Restitution Amount received by the Form 1098-F Filer as remediation/restitution. The Form 1098-F Filer shall also, on or before January 31 of the year following the calendar year in which the order entering this Agreement becomes binding, furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Janssen.

C.     *Tax Reporting and Cooperation*.

1.     Upon request by Janssen, the State and Participating Subdivisions agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for Janssen to establish the statements set forth in subsection XI.B to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.

2.     Without limiting the generality of this subsection XI.C, the State and each Participating Subdivision shall cooperate in good faith with Janssen with respect to

any tax claim, dispute, investigation, audit, examination, contest, litigation, or other proceeding relating to this Agreement.

3. The State, on behalf of itself and Participating Subdivisions, shall designate one of its officers or employees to act as the "appropriate official" within the meaning of Treasury Regulations Section 1.6050X-1(f)(1)(ii)(B) (the "Appropriate Official").

4. For the avoidance of doubt, neither Janssen nor the State and Participating Subdivisions make any warranty or representation to any Settling jurisdiction or Releasor as to the tax consequences of the payment of the Compensatory Restitution Amount (or any portion thereof).

D. *No Third-Party Beneficiaries.* Except as expressly provided in this Agreement, no portion of this Agreement shall provide any rights to, or be enforceable by, any person or entity that is not the State or a Released Entity. The State may not assign or otherwise convey any right to enforce any provision of this Agreement.

E. *Calculation.* Any figure or percentage referred to in this Agreement shall be carried to seven decimal places.

F. *Construction.* None of the Parties and no Participating Subdivision shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning of this Agreement.

G. *Cooperation.* Each Party and each Participating Subdivision agrees to use its best efforts and to cooperate with the other Parties and Participating Subdivisions to cause this Agreement and the Consent Judgment to become effective, to obtain all necessary approvals, consents and authorizations, if any, and to execute all documents and to take such other action as may be appropriate in connection herewith. Consistent with the foregoing, each Party and each Participating Subdivision agrees that it will not directly or indirectly assist or encourage any challenge to this Agreement or the Consent Judgment by any other person, and will support the integrity and enforcement of the terms of this Agreement and the Consent Judgment.

H. *Entire Agreement.* This Agreement, its exhibits and any other attachments embodies the entire agreement and understanding between and among the Parties and Participating Subdivisions relating to the subject matter hereof and supersedes (1) all prior agreements and understandings relating to such subject matter, whether written or oral and (2) all purportedly contemporaneous oral agreements and understandings relating to such subject matter.

I. *Execution.* This Agreement may be executed in counterparts and by different signatories on separate counterparts, each of which shall be deemed an original, but all of which shall together be one and the same Agreement. One or more counterparts of this Agreement may be delivered by facsimile or electronic transmission with the intent that it or they shall

15

constitute an original counterpart hereof. One or more counterparts of this Agreement may be signed by electronic signature.

J.     *Good Faith and Voluntary Entry*. Each Party warrants and represents that it negotiated the terms of this Agreement in good faith. Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion. The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

K.     *No Prevailing Party.* The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement. The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

L.     *Non-Admissibility.* The settlement negotiations resulting in this Agreement have been undertaken by the Parties and by certain representatives of the Participating Subdivisions in good faith and for settlement purposes only, and no evidence of negotiations or discussions underlying this Agreement shall be offered or received in evidence in any action or proceeding for any purpose. This Agreement shall not be offered or received in evidence in any action or proceeding for any purpose other than in an action or proceeding arising under or relating to this Agreement.

M.     *Severability*. If any provision of this Agreement—excepting Section IV (Release), Section V (Monetary Relief and Payments), Section VII (Participation by Local Governments), Section IX (Attorney Fee and Cost Payments), Section XI.B (Nature of Payment), and Section XI.C (Tax Reporting and Cooperation)—were for any reason held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement.

N.     *Notices.* All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

      For Janssen:

      Charles C. Lifland
      Daniel R. Suvor
      O'Melveny & Myers LLP
      400 South Hope Street, 18th Floor Los Angeles, CA  90071
      Phone: (213) 430-6000
      clifland@omm.com
      dsuvor@omm.com

For the Attorney General:

Jeffrey G. Rupert
Martha Rodríguez López
Susan Llorens
Office of the Washington Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Jeffrey.Rupert@atg.wa.gov
Martha.RodriguezLopez@atg.wa.gov
Susan.Llorens@atg.wa.gov

and

Brad Beckworth
Drew Pate
Nix Patterson LLP
8701 Bee Caves Road, Building 1, Suite 500
Austin, Texas 78746
bbeckworth@nixlaw.com
dpate@nixlaw.com

Any Party may change or add the contact information of the persons designated to receive notice on its behalf by notice given (effective upon the giving of such notice) as provided in this subsection.

O.    *No Waiver*. The waiver of any rights conferred hereunder shall be effective only if made by written instrument executed by the waiving Party or Parties. The waiver by any Party of any breach of this Agreement shall not be deemed to be or construed as a waiver of any other breach, whether prior, subsequent, or contemporaneous, nor shall such waiver be deemed to be or construed as a waiver by any other Party.

P.    *Preservation of Privilege.* Nothing contained in this Agreement or any Consent Judgment, and no act required to be performed pursuant to this Agreement or any Consent Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

Q.    *Successors*. This Agreement shall be binding upon, and inure to the benefit of, Janssen and its respective successors and assigns. Janssen shall not sell the majority of its voting stock or substantially all its assets without obtaining the acquiror's agreement that it will constitute a successor with respect to Janssen's obligations under this Agreement.

R.    *Modification, Amendment, Alteration*. This Agreement may be modified, amended, or altered by a written agreement of the Parties or, in the case of the Consent Judgment, by

17

court proceedings resulting in a modified judgment of the Court. For purposes of modifying this Agreement or the Consent Judgment, Janssen may contact the Washington Attorney General to coordinate this process.

S.     *Termination.*

1.     Unless otherwise agreed to by Janssen and the State, this Agreement and all of its terms (except subsection XI.L and any other non-admissibility provisions, which shall continue in full force and effect) shall be canceled and terminated with respect to the State, and the Agreement and all orders issued by the Court pursuant to the Agreement shall become null and void and of no effect if one or more of the following conditions applies:

   a.     A Consent Judgment approving this Agreement without modification of any of the Agreement's terms has not been entered as to the State by a court of competent jurisdiction on or before one hundred eighty (180) days after Janssen's payment under Section V; or

   b.     This Agreement or the Consent Judgment has been disapproved by a court of competent jurisdiction to which it was presented for approval and/or entry (or, in the event of an appeal from or review of a decision of such a court to approve this Agreement and the Consent Judgment, by the court hearing such appeal or conducting such review), and the time to appeal from such disapproval has expired, or, in the event of an appeal from such disapproval, the appeal has been dismissed or the disapproval has been affirmed by the court of last resort to which such appeal has been taken and such dismissal or disapproval has become no longer subject to further appeal (including, without limitation, review by the United States Supreme Court).

2.     If this Agreement is terminated with respect to the State and its Participating Subdivisions for whatever reason pursuant to subsection XI.S.1, then:

   a.     An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date the State signed this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that Janssen and the State in question shall be in the same position with respect to the statute of limitation as they were at the time the State filed its action; and

   b.     Janssen and the State and its Participating Subdivisions shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Janssen and the State and its Participating Subdivisions shall be in the same position with respect to those actions and claims as they were at the time the action or claim was stayed or dismissed.

T.    *Governing Law.* Except as otherwise provided in the Agreement, this Agreement shall be governed by and interpreted in accordance with the laws of Washington, without regard to the conflict of law rules of Washington.

**Approved:**

Dated: *1-22-2024*

JOHNSON & JOHNSON, JOHNSON & JOHNSON INNOVATIVE MEDICINE, JANSSEN PHARMACEUTICALS, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC., AND JANSSEN PHARMACEUTICA INC. N/K/A JANSSEN PHARMACEUTICALS, INC.

By: _____

Marc Larkins
Corporate Secretary
Johnson & Johnson

Dated: _____

THE STATE OF WASHINGTON

By: _____

19

T.      *Governing Law.* Except as otherwise provided in the Agreement, this Agreement shall be governed by and interpreted in accordance with the laws of Washington, without regard to the conflict of law rules of Washington.

**Approved:**

Dated: _____

JOHNSON & JOHNSON, JOHNSON & JOHNSON INNOVATIVE MEDICINE, JANSSEN PHARMACEUTICALS, INC., ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN PHARMACEUTICALS, INC., AND JANSSEN PHARMACEUTICA INC. N/K/A JANSSEN PHARMACEUTICALS, INC.

By: _____
    Marc Larkins
    Corporate Secretary
    Johnson & Johnson

Dated: *1-22-2024*

ROBERT W. FERGUSON
Attorney General, State of Washington

By: _____
    Jeffrey Rupert
    Division Chief
    Office of the Attorney General

## EXHIBIT A

### Janssen Predecessors and Former Affiliates

The following includes a non-exclusive list of Janssen's predecessors and former affiliates:

1. Janssen Pharmaceutica, Inc.
2. Janssen Pharmaceutica N.V.
3. Janssen-Cilag Manufacturing, LLC
4. Janssen Global Services, LLC
5. Janssen Ortho LLC
6. Janssen Products, LP
7. Janssen Research & Development, LLC
8. Janssen Supply Group, LLC
9. Janssen Scientific Affairs, LLC
10. JOM Pharmaceutical Services, Inc.
11. OMJ Pharmaceuticals, Inc.
12. Ortho-McNeil Finance Co.
13. Ortho-McNeil Pharmaceutical
14. Ortho-McNeil-Janssen Pharmaceuticals
15. Ortho-McNeil Pharmaceutical Services Division
16. Ortho-McNeil Neurologic
17. Patriot Pharmaceuticals, LLC
18. Pricara, Ortho-McNeil-Janssen Pharmaceuticals
19. Alza Corp.
20. Alza Development Corp.
21. Janssen Supply Chain, Alza Corp.
22. Noramco, Inc.
23. Tasmanian Alkaloids PTY LTD.

**EXHIBIT B**

**Settlement Participation Form**

| Governmental Entity: | State: |
|---|---|
| Authorized Official: | |
| Address 1: | |
| Address 2: | |
| City, State, Zip: | |
| Phone: | |
| Email: | |

The governmental entity identified above ("Governmental Entity"), in order to obtain and in consideration for the benefits provided to the Governmental Entity pursuant to the Janssen Washington State-Wide Opioid Settlement Agreement dated January 22, 2024 ("Janssen Settlement"), and acting through the undersigned authorized official, hereby elects to participate in the Janssen Settlement, release all Released Claims against all Released Entities, and agrees as follows.

1. The Governmental Entity is aware of and has reviewed the Janssen Settlement, understands that all terms in this Election and Release have the meanings defined therein, and agrees that by this Election, the Governmental Entity elects to participate in the Janssen Settlement and become a Participating Subdivision as provided therein.

2. The Governmental Entity shall, within 30 days of the filing of the Consent Judgment, secure the dismissal with prejudice of any Released Claims that it has filed.

3. The Governmental Entity agrees to the terms of the Janssen Settlement pertaining to Subdivisions as defined therein.

4. By agreeing to the terms of the Janssen Settlement and becoming a Releasor, the Governmental Entity is entitled to the benefits provided therein, including, if applicable, monetary payments beginning after the Effective Date.

5. The Governmental Entity agrees to use any monies it receives through the Janssen Settlement solely for the purposes provided therein.

6. The Governmental Entity submits to the jurisdiction of the court where the Consent Judgment is filed for purposes limited to that court's role as provided in, and for resolving disputes to the extent provided in, the Janssen Settlement.

7. The Governmental Entity, as a Participating Subdivision, hereby becomes a Releasor for all purposes in the Janssen Settlement, including but not limited to all provisions of Section IV (Release), and along with all departments, agencies, divisions, boards, commissions, districts, instrumentalities of any kind and attorneys, and any person in their official capacity

elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, and any other entity identified in the definition of Releasor, provides for a release to the fullest extent of its authority. As a Releasor, the Governmental Entity hereby absolutely, unconditionally, and irrevocably covenants not to bring, file, or claim, or to cause, assist or permit to be brought, filed, or claimed, or to otherwise seek to establish liability for any Released Claims against any Released Entity in any forum whatsoever. The releases provided for in the Janssen Settlement are intended by the Parties to be broad and shall be interpreted so as to give the Released Entities the broadest possible bar against any liability relating in any way to Released Claims and extend to the full extent of the power of the Governmental Entity to release claims. The Janssen Settlement shall be a complete bar to any Released Claim.

8.  In connection with the releases provided for in the Janssen Settlement, each Governmental Entity expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.**  A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

A Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but each Governmental Entity hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims that may exist as of such date but which Releasors do not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would materially affect the Governmental Entities' decision to participate in the Janssen Settlement.

9.  This Settlement Participation Form shall be deemed effective as of the Effective Date of the Janssen Settlement.

10. Nothing herein is intended to modify in any way the terms of the Janssen Settlement, to which Governmental Entity hereby agrees. To the extent this Election and Release is interpreted differently from the Janssen Settlement in any respect, the Janssen Settlement controls.

I have all necessary power and authorization to execute this Election and Release on behalf of the Governmental Entity.

Signature: _____

Name: _____

Title: _____

Date: _____

**EXHIBIT C**

**Injunctive Relief**

A.    **Definitions Specific to this Exhibit**

1.    "*Cancer-Related Pain Care*" means care that provides relief from pain resulting from a patient's active cancer or cancer treatment as distinguished from treatment provided during remission.

2.    "*Janssen*" means Johnson & Johnson, Johnson & Johnson Innovative Medicine, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "Janssen"), including all of their subsidiaries, predecessors, successors, current officers, directors, employees, representatives, agents, affiliates, parents, and assigns acting on behalf of Janssen in the United States.

3.    "*End-of-Life Care*" means care for persons with a terminal illness or at high risk for dying in the near future in hospice care, hospitals, long-term care settings, or at home.

4.    "*Health Care Provider*" means any U.S.-based physician or other health care practitioner who is licensed to provide health care services or to prescribe pharmaceutical products and any medical facility, practice, hospital, clinic, or pharmacy.

5.    "*In-Kind Support*" means payment or assistance in the form of goods, commodities, services, or anything else of value.

6.    "*Lobby*" and "*Lobbying*" shall have the same meaning as "lobbying activities" and "lobbying contacts" under the federal lobbying disclosure act, 2 U.S.C. § 1602 *et seq.*, and any analogous state or local provisions governing the person or entity being lobbied. As used in this document, "Lobby" and "Lobbying" include Lobbying directly or indirectly, through grantees or Third Parties.

7.    "*Opioid(s)*" means all naturally occurring, synthetic, or semisynthetic substances that interact with opioid receptors and act like opium. For the avoidance of doubt, the term "Opioid(s)" does not include Imodium.

8.    "*Opioid Product(s)*" means all current and future medications containing Opioids approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II, III, or IV drugs pursuant to the federal Controlled Substances Act (including but not limited to buprenorphine, codeine, fentanyl, hydrocodone, hydromorphone, meperidine, methadone, morphine, oxycodone, oxymorphone, tapentadol, and tramadol). The term "Opioid Products(s)" shall not include (i) methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose; or (ii) raw materials, immediate precursors, and/or active

C-1

pharmaceutical ingredients (APIs) used in the manufacture or study of Opioids or Opioid Products, but only when such materials, immediate precursors, and/or APIs are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers.

9. "*OUD*" means opioid use disorder defined in the *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM–5)*, as updated or amended.

10. "*Product(s) for the Treatment of Opioid-Induced Side Effects*" means any over-the-counter or prescription remedy used to treat those side effects identified on the FDA label for any Opioid Product, except that, for purposes of the Agreement, Product(s) for the Treatment of Opioid-Induced Side Effects shall not include products that treat OUD or respiratory depression.

11. "*Promote*," "*Promoting*," "*Promotion*," and "*Promotional*" means dissemination of information or other practices intended or reasonably anticipated to increase sales, prescriptions, or that attempts to influence prescribing practices in the United States. These terms shall not include the provision of scientific information or data in response to unsolicited requests from Health Care Providers or payors as allowed in subsection C.2.e-h.

12. "*Third Party(ies)*" means any person or entity other than Janssen or a government entity.

13. "*Treatment of Pain*" means the provision of therapeutic modalities to alleviate or reduce pain.

14. "*Unbranded Information*" means any information that does not identify a specific branded or generic product.

## B.     Ban on Selling and Manufacturing Opioids

1. Janssen shall not manufacture or sell any Opioids or Opioid Products for distribution in the State of Washington. Janssen represents that prior to the Effective Date, it de-listed all of its Opioid Products and no longer ships any of them to or within the United States.

## C.     Ban on Promotion

1. Janssen shall not engage in Promotion of Opioids or Opioid Products including but not limited to, by:

   a. Employing or contracting with sales representatives or other persons to Promote Opioids or Opioid Products to Health Care Providers or patients, or to persons involved in determining the Opioid Products included in formularies;

b.     Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events for Promotion of Opioids or Opioid Products;

c.     Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs for Promotion of Opioids or Opioid Products;

d.     Creating, sponsoring, operating, controlling, or otherwise providing financial support or In-Kind Support to any website, network, and/or social or other media account for the Promotion of Opioids or Opioid Products;

e.     Creating, sponsoring, distributing, or otherwise providing financial support or In-Kind Support for materials Promoting Opioids or Opioid Products, including but not limited to brochures, newsletters, pamphlets, journals, books, and guides;

f.     Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Opioids or Opioid Products, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements; and

g.     Engaging in internet search engine optimization or other techniques designed to Promote Opioids or Opioid Products by improving rankings or making content appear among the top results in an internet search or otherwise be more visible or more accessible to the public on the internet.

2.     Notwithstanding subsection C.1 directly above, Janssen may:

a.     Maintain a corporate website;

b.     Maintain a website for any Opioid Product that contains principally the following content: the FDA-approved package insert, medication guide, and labeling, and a statement directing patients or caregivers to speak with a licensed Health Care Provider;

c.     Provide information or support the provision of information as expressly required by law or any state or federal government agency with jurisdiction in Washington;

d.     Provide the following by mail, electronic mail, on or through Janssen's corporate or product websites or through other electronic or digital methods: FDA-approved package insert, medication guide, approved labeling for Opioid Products, or other prescribing information for Opioid Products that are published by a state or federal government agency with jurisdiction in Washington;

e.     Provide scientific and/or medical information in response to an unsolicited request by a Health Care Provider consistent with the standards set forth in

C-3

the FDA's Draft Guidance for Industry, *Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices* (Dec. 2011) as updated or amended by the FDA, and Guidance for Industry, *Good Reprint Practices for the Distribution of Medical Journal Articles and Medical or Scientific Reference Publications on Unapproved New Uses of Approved Drugs and Approved or Cleared Medical Devices* (Jan. 2009) as updated or amended by the FDA;

f. Provide a response to any unsolicited question or request from a patient or caregiver, directing the patient or caregiver to the FDA-approved labeling or to speak with a licensed Health Care Provider without describing the safety or effectiveness of Opioids or any Opioid Product or naming any specific provider or healthcare institution; or directing the patient or caregiver to speak with their insurance carrier regarding coverage of an Opioid Product;

g. Provide Health Care Economic Information, as defined at 21 U.S.C. § 352(a), to a payor, formulary committee, or other similar entity with knowledge and expertise in the area of health care economic analysis consistent with standards set forth in the FDA's Draft Questions and Answers Guidance for Industry and Review Staff, *Drug and Device Manufacturer Communications With Payors, Formulary Committees, and Similar Entities* (Jan. 2018), as updated or amended by the FDA;

h. Provide information relating solely to the pricing of any Opioid Product;

i. Sponsor or provide financial support or In-Kind Support for an accredited or approved continuing medical education program required by either an FDA-approved Risk Evaluation and Mitigation Strategy (REMS) program or other federal or state law or regulation applicable in Washington through an independent Third Party, which shall be responsible for the program's content without the participation of Janssen; and

j. Provide information in connection with patient support information on co-pay assistance and managing pain in End-of-Life Care and/or Cancer-Related Pain Care relating to the use of Opioids for managing such pain, as long as the information identifies Janssen as the source of the information.

3. Janssen shall not engage in the Promotion of Products for the Treatment of Opioid-induced Side Effects, including but not limited to:

a. Employing or contracting with sales representatives or other persons to Promote Products for the Treatment of Opioid-induced Side Effects to Health Care Providers or patients;

b. Using speakers, key opinion leaders, thought leaders, lecturers, and/or speaking events to Promote Products for the Treatment of Opioid induced Side Effects;

C-4

    c.      Sponsoring, or otherwise providing financial support or In-Kind Support to medical education programs that Promote Products for the Treatment of Opioid-induced Side Effects;

    d.      Creating, sponsoring, or otherwise providing financial support or In-Kind Support for advertisements that Promote Products for the Treatment of Opioid-induced Side Effects, including but not limited to internet advertisements or similar content, and providing hyperlinks or otherwise directing internet traffic to advertisements.

4.      Notwithstanding subsection C, Janssen may Promote Products for the Treatment of Opioid-induced Side Effects so long as such Promotion does not associate the product with Opioids or Opioid Products.

5.      Treatment of Pain

    a.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the Treatment of Pain, except that Janssen may continue to Promote the Treatment of Pain with branded non-Opioids, including Tylenol and Motrin.

    b.      Janssen shall not, either through Janssen or through Third Parties, engage in any conduct that Promotes the concept that pain is undertreated, except in connection with Promoting the use of branded non-Opioids, including Tylenol and Motrin, for the Treatment of Pain.

    c.      Janssen shall not disseminate Unbranded Information, including Unbranded Information about a medical condition or disease state, that contains links to branded information about Opioid Products or that otherwise Promotes Opioids or Opioid Products.

6.      Notwithstanding subsection C.5 above:

    a.      Janssen may Promote or provide educational information about the Treatment of Pain with non-Opioids or therapies such as acetaminophen or non-steroidal anti-inflammatory drugs (NSAIDS), including Promoting or providing educational information about such non-Opioids or therapies as alternatives to Opioid use, or as part of multimodal therapy which may include Opioid use, so long as such non-Opioid Promotional or educational information does not Promote Opioids or Opioid Products.

    b.      Janssen may provide educational information about the Treatment of Pain related to medical procedures involving devices manufactured or sold by Janssen, including educational information about Opioids or Opioid Products, so long as such information does not Promote Opioids or Opioid Products.

7.  The Promotional conduct prohibited in subsection C is not prohibited insofar as it relates to the Promotion of Opioids or Opioid Products for Cancer-Related Pain Care or End-of-Life Care only, and so long as Janssen is identified as the sponsor or source of such Promotional conduct.

D.  **No Financial Reward or Discipline Based on Volume of Opioid Sales**

1.  Janssen shall not provide financial incentives to its sales and marketing employees or discipline its sales and marketing employees based upon sales volume or sales quotas for Opioid Products;

2.  Janssen shall not offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, to any person in return for the prescribing, sale, use, or distribution of an Opioid Product; and

3.  Janssen's compensation policies and procedures shall ensure compliance with the Agreement.

E.  **Ban on Funding/Grants to Third Parties**

1.  Janssen shall not directly or indirectly provide financial support or In-Kind Support to any Third Party that primarily engages in conduct that Promotes Opioids, Opioid Products, or Products for the Treatment of Opioid-induced Side Effects (subject to subsections C.2, 4, and 6), including educational programs or websites that Promote Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects, excluding financial support otherwise required by the Agreement, a court order, or by a federal or state agency.

2.  Janssen shall not create, sponsor, provide financial support or In-Kind Support to, or otherwise operate or control any medical society or patient advocacy group that primarily engages in conduct that Promotes Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects.

3.  Janssen shall not provide links to any Third Party website or materials or otherwise distribute materials created by a Third Party for the purpose of Promoting Opioids, Opioid Products, or products intended for the treatment of Opioid-induced side effects (subject to subsections C.2, 4, and 6).

4.  Janssen shall not use, assist, or employ any Third Party to engage in any activity that Janssen itself would be prohibited from engaging in pursuant to the Agreement. To the extent Janssen supports trade groups engaged in Lobbying, Janssen shall stipulate that such support not be used for any purpose prohibited by the Agreement.

5.  Janssen shall not enter into any contract or agreement with any person or entity or otherwise attempt to influence any person or entity in such a manner that has the purpose or foreseeable effect of limiting the dissemination of information regarding the risks and side effects of using Opioids.

C-6

6.   Janssen shall not compensate or support Health Care Providers or organizations to advocate for formulary access or treatment guideline changes for the purpose of increasing access to any Opioid Product through third-party payors, i.e., any entity, other than an individual, that pays or reimburses for the dispensing of prescription medicines, including but not limited to managed care organizations and pharmacy benefit managers.

7.   No officer or management-level employee of Janssen may concurrently serve as a director, board member, employee, agent, or officer of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects. For the avoidance of doubt, nothing in this provision shall preclude an officer or management-level employee of Janssen from concurrently serving on the board of a hospital.

8.   Janssen shall play no role in appointing persons to the board, or hiring persons to the staff, of any entity that primarily engages in conduct that Promotes Opioids, Opioid Products, or products for the treatment of Opioid-induced side effects. For avoidance of doubt, nothing in this paragraph shall prohibit Janssen from fully and accurately responding to unsolicited requests or inquiries about a person's fitness to serve as an employee or Board member at any such entity.

F.   **Lobbying Restrictions**

1.   Janssen shall not Lobby for the enactment of any federal, state, or local legislative or regulatory provision that:

   a.   Encourages or requires Health Care Providers to prescribe Opioids or sanctions Health Care Providers for failing to prescribe Opioids or failing to treat pain with Opioids;

   b.   Has the effect of limiting access to any non-Opioid alternative pain treatments; or

   c.   Pertains to the classification of any Opioid or Opioid Product as a scheduled drug under the Controlled Substances Act.

2.   Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision that supports:

   a.   The use of non-pharmacologic therapy and/or non-Opioid pharmacologic therapy to treat chronic pain over or instead of Opioid use, including but not limited to third party payment or reimbursement for such therapies;

   b.   The use and/or prescription of immediate release Opioids instead of extended release Opioids when Opioid use is initiated, including but not limited to third party reimbursement or payment for such prescriptions;

C-7

      c.        The prescribing of the lowest effective dose of an Opioid, including but not limited to third party reimbursement or payment for such prescription;

      d.        The limitation of initial prescriptions of Opioids to treat acute pain;

      e.        The prescribing and other means of distribution of naloxone to minimize the risk of overdose, including but not limited to third party reimbursement or payment for naloxone;

      f.        The use of urine testing before starting Opioid use and annual urine testing when Opioids are prescribed, including but not limited to third party reimbursement or payment for such testing;

      g.        Evidence-based treatment (such as using medication-assisted treatment with buprenorphine or methadone in combination with behavioral therapies) for OUD, including but not limited to third party reimbursement or payment for such treatment; or

      h.        The implementation or use of Opioid drug disposal systems.

3.      Janssen shall not Lobby against the enactment of any federal, state or local legislative or regulatory provision expanding the operation or use of PDMPs, including but not limited to provisions requiring Health Care Providers to review PDMPs when Opioid use is initiated and with every prescription thereafter.

4.      Notwithstanding the foregoing restrictions in subsections F.1-3, the following conduct is not restricted:

      a.        Challenging the enforcement of or suing for declaratory or injunctive relief with respect to legislation, rules, or regulations referred to in subsection F.1;

      b.        Communications made by Janssen in response to a statute, rule, regulation, or order requiring such communication;

      c.        Communications by a Janssen representative appearing before a federal or state legislative or administrative body, committee, or subcommittee as result of a mandatory order or subpoena commanding that person to testify;

      d.        Responding, in a manner consistent with the Agreement, to an unsolicited request for the input on the passage of legislation or the promulgation of any rule or regulation when such request is submitted in writing specifically to Janssen from a government entity directly involved in the passage of that legislation or promulgation of that rule or regulation; or

      e.        Lobbying for or against provisions of legislation or regulation that address other subjects in addition to those identified in subsections F.1-3, so long as the company does not support specific portions of such legislation or

regulation covered by subsection F.1 or oppose specific portions of such legislation or regulation covered by subsections F.2-3.

5.     Janssen shall provide notice of the prohibitions in subsection F to all employees engaged in Lobbying; shall incorporate the prohibitions in subsection F into trainings provided to Janssen employees engaged in Lobbying; and certify to the State of Washington that it has provided such notice and trainings to Janssen employees engaged in Lobbying.

G.     **Ban on Prescription Savings Programs**

1.     Janssen shall not directly or indirectly offer any discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

2.     Janssen shall not directly or indirectly provide financial support to any Third Party for discounts, coupons, rebates, or other methods which have the effect of reducing or eliminating a patient's co-payments or the cost of prescriptions (e.g., free trial prescriptions) for any Opioid Product.

3.     Janssen shall not directly or indirectly assist patients, Health Care Providers, or pharmacies with the claims and/or prior authorization process required for third-party payors to approve payment for any Opioid Product.

H.     **General Terms**

1.     Janssen shall not make any written or oral statement about Opioids or any Opioid Product that is unfair, false, misleading, or deceptive as defined under the law of Washington. For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

2.     Janssen shall not represent that Opioids or any Opioid Product(s) have approvals, characteristics, uses, benefits, or qualities that they do not have.  For purposes of this paragraph, "Opioid Product" shall also include methadone and other substances when used exclusively to treat opioid abuse, addiction, or overdose.

3.     For the avoidance of doubt, the Agreement shall not be construed or used as a waiver or limitation of any defense otherwise available to Janssen in any action, and nothing in the Agreement is intended to or shall be construed to prohibit Janssen in any way whatsoever from taking legal or factual positions with regard to any Opioid Product(s) in defense of litigation or other legal proceedings.

4.     Upon the request of the State of Washington Attorney General, Janssen shall provide the Washington Attorney General with copies of the following, within thirty (30) days of the request:

      a.      Any litigation or civil or criminal law enforcement subpoenas or Civil Investigative Demands relating to Janssen's Opioid Product(s); and

      b.      Warning or untitled letters issued by the FDA regarding Janssen's Opioid Product(s) and all correspondence between Janssen and the FDA related to such letters.

5.      The Agreement applies to conduct that results in the Promotion of Opioids or Opioid Products, or the Treatment of Pain inside the United States.

6.      Janssen will enter into the Agreement solely for the purpose of settlement, and nothing contained therein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Janssen expressly denies. No part of the Agreement, including its statements and commitments, shall constitute evidence of any liability, fault, or wrongdoing by Janssen. The Agreement is not intended for use by any third party for any purpose, including submission to any court for any purpose.

7.      Nothing in the Agreement shall be construed to limit or impair Janssen's ability to:

      a.      Communicate its positions and respond to media inquiries concerning litigation, investigations, reports or other documents or proceedings relating to Janssen or its Opioid Products.

      b.      Maintain a website explaining its litigation positions and responding to allegations concerning its Opioid Products, including the website, www.factsaboutourprescriptionopioids.com.

I.      **Compliance with All State Laws and Regulations Relating to the Sale, Promotion, and Distribution of Any Opioid Product**

1.      Janssen shall comply with all applicable state laws and regulations that relate to the sale, promotion, distribution, and disposal of Opioids or Opioid Products, including conduct permitted by subsection B.2, provided that nothing in this paragraph requires Janssen to violate federal law or regulations, including but not limited to:

      a.      Washington's Uniform Controlled Substances Act, including all guidance issued by the applicable state regulator(s);

      b.      Washington's Consumer Protection Act; and

      c.      Washington State laws, regulations, and guidelines related to opioid prescribing, distribution, and disposal.

J.      **Clinical Data Transparency**

1.    Janssen agrees to continue sharing clinical trial data under the Yale University Open Data Access (YODA) Project to allow researchers qualified under the program to access the company's propriety data under the terms of the project.

2.    In the event Yale University discontinues or withdraws from the YODA Project agreement with Janssen, Janssen shall make its clinical research data regarding Opioids and Opioid Products, and any additional clinical research data that Janssen sponsors and controls regarding Opioids and Opioid Products, available to an independent entity that is the functional equivalent of the YODA Project under functionally equivalent terms.

K.    **Enforcement**

1.    For the purposes of resolving disputes with respect to compliance with this Exhibit, should the State of Washington have a reasonable basis to believe that Janssen has engaged in a practice that violates a provision of this Exhibit subsequent to the Effective Date, the State of Washington shall notify Janssen in writing of the specific objection, identify with particularity the provision of the Agreement that the practice appears to violate, and give Janssen thirty (30) days to respond in writing to the notification; provided, however, that the State of Washington may take any action if the State believes that, because of the specific practice, a threat to health or safety of the public requires immediate action.

2.    Upon receipt of written notice, Janssen shall provide a good faith written response to the State's notification, containing either a statement explaining why Janssen believes it is in compliance with the provisions of this Exhibit of the Agreement, or a detailed explanation of how the alleged violation occurred and a statement explaining how Janssen intends to remedy the alleged breach. Nothing in this section shall be interpreted to limit the State of Washington's civil investigative demand ("CID") or investigative subpoena authority, to the extent such authority exists under applicable law, and Janssen reserves all of its rights in responding to a CID or investigative subpoena issued pursuant to such authority.

3.    The State of Washington may agree, in writing, to provide Janssen with additional time beyond thirty (30) days to respond to a notice provided under subsection L.1, above, without Court approval.

4.    Upon giving Janssen thirty (30) days to respond to the notification described above, the State shall also be permitted reasonable access to inspect and copy relevant, non-privileged, non-work product records and documents in possession, custody, or control of Janssen that relate to Janssen's compliance with each provision of the Agreement pursuant to the State of Washington's CID or investigative subpoena authority.

5.    The State of Washington may assert any claim that Janssen has violated the Agreement in a separate civil action to enforce compliance with the Agreement, or may seek any other relief afforded by law for violations of the Agreement, but only

after providing Janssen an opportunity to respond to the notification described in subsection L.1, above; provided, however, the State of Washington may take any action if the State believes that, because of the specific practice, a threat to the health or safety of the public requires immediate action.

6.    In the event of a conflict between the requirements of the Agreement and any other law, regulation, or requirement such that Janssen cannot comply with the law without violating the terms of the Agreement or being subject to adverse action, including fines and penalties, Janssen shall document such conflicts and notify the State of the extent to which it will comply with the Agreement in order to eliminate the conflict within thirty (30) days of Janssen's discovery of the conflict. Janssen shall comply with the terms of the Agreement to the fullest extent possible without violating the law.

7.    Janssen or the State may request that Janssen and the State meet and confer regarding the resolution of an actual or potential conflict between the Agreement and any other law, or between interpretations of the Agreement by different courts. Nothing herein is intended to modify or extend the jurisdiction of any single judicial authority as provided by law.

L.    **Compliance Duration**

1.    Subsections B-J of this Exhibit shall be effective for 8 years from the Effective Date.

2.    Nothing in this Agreement shall relieve Janssen of its independent obligation to fully comply with the laws of the State of Washington after expiration of the 8-year period specified in this subsection.

M.    **Compliance Deadlines**

1.    Janssen must be in full compliance with the provisions included this Agreement by the Effective Date. Nothing herein shall be construed as permitting Janssen to avoid existing legal obligations.

**EXHIBIT D**

**Non-Released Entities**

The following includes a non-exclusive list of non-Released Entities:

1. Actavis LLC
2. Actavis Pharma, Inc.
3. Allergan PLC
4. Allergan Finance, LLC
5. AmerisourceBergen Corporation
6. AmerisourceBergen Drug Corporation
7. Anda, Inc.
8. Cardinal Health, Inc.
9. Cephalon, Inc.
10. Collegium Pharmaceuticals
11. CVS Health Corp.
12. CVS Pharmacy, Inc.
13. Endo Pharmaceuticals Inc.
14. Endo Health Solutions Inc.
15. Mallinckrodt LLC
16. McKesson Corporation
17. McKinsey & Company Inc.
18. Par Pharmaceutical, Inc.
19. Par Pharmaceutical Companies, Inc.
20. Purdue Pharma L.P.
21. Purdue Pharma Inc.
22. SpecGx LLC
23. Teva Pharmaceuticals USA, Inc.
24. The Purdue Frederick Company
25. Walgreen Co.
26. Walgreens Boots Alliance, Inc.
27. Walmart Inc.
28. Watson Laboratories, Inc.

**EXHIBIT E**

**Template Consent Judgment**

| [CASE] | [COURT] |
|---|---|
| | C.A. NO.: |

**FINAL CONSENT JUDGMENT AND DISMISSAL WITH PREJUDICE**

The State of Washington ("*State*") and Johnson & Johnson, Johnson & Johnson Innovative Medicine, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., and Janssen Pharmaceutica, Inc. (collectively, "*Janssen*" or "*Defendants*") (together with the State, the "*Parties*," and each a "*Party*") have entered into a consensual resolution of the above-captioned litigation (the "*Action*") pursuant to a settlement agreement entitled Janssen Washington State-Wide Opioid Settlement Agreement, dated as of January 22, 2024 (the "*Agreement*"), a copy of which is attached hereto as Exhibit A. The entry of this Final Consent Judgment (the "*Judgment*") by the Court is made without trial or adjudication of any contested issue of fact or law, and without finding or admission of wrongdoing or liability of any kind.

**RECITALS:**

1.  Each Party warrants and represents that it engaged in arm's-length negotiations in good faith. In hereby executing the Agreement, the Parties intend to effect a good-faith settlement.

2.  The State has determined that the Agreement is in the public interest.

3.  Janssen denies the allegations against it and that it has any liability whatsoever to the State, its Subdivisions, and/or (a) any of the State's or Subdivisions' departments, agencies, divisions,

boards, commissions, districts, instrumentalities of any kind and attorneys, including its Attorney General and any person in his or her official capacity whether elected or appointed to serve any of the foregoing and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, and other Subdivisions, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public.

4.      The Parties recognize that the outcome of the Action is uncertain and a final resolution through the adversarial process likely will require protracted litigation.

5.      The Parties agree to the entry of the injunctive relief terms pursuant to Exhibit C of the Agreement.

6.      Therefore, without any admission of liability or wrongdoing by Janssen or any other Released Entities (as defined in the Agreement), the Parties now mutually consent to the entry of this Judgment and agree to dismissal of the claims with prejudice pursuant to the terms of the Agreement to avoid the delay, expense, inconvenience, and uncertainty of protracted litigation.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

In consideration of the mutual promises, terms, and conditions set forth in the Agreement, the adequacy of which is hereby acknowledged by all Parties, it is agreed by and between Defendants and the State, and adjudicated by the Court, as follows:

1.      The foregoing Recitals are incorporated herein and constitute an express term of this Judgment.

2.      The Parties have entered into a full and final settlement of all Released Claims of Releasors against Janssen (including but not limited to the State) and the Released Entities pursuant to the terms and conditions set forth in the Agreement.

3.      The "Definitions" set forth in Section II of the Agreement are incorporated by reference into this Judgment.  Unless otherwise defined herein, capitalized terms in this Judgment shall have the same meaning given to them in the Agreement.

4.      The Parties agree that the Court has jurisdiction over the subject matter of the Action and over the Parties with respect to the Action and this Judgment.  This Judgment shall not be construed or used as a waiver of any jurisdictional defense Janssen or any other Released Entity may raise in any other proceeding.

5.      The Court finds that the Agreement was entered into in good faith.

6.      The Court finds that entry of this Judgment is in the public interest and reflects a negotiated settlement agreed to by the Parties.  The Action is dismissed with prejudice, subject to a retention of jurisdiction by the Court as provided herein and in the Agreement.

7.      By this Judgment, the Agreement is hereby approved by the Court, and the Court hereby adopts the Agreement's terms as its own determination of this matter and the Parties' respective rights and obligations.

8.      The Court shall have authority to resolve disputes identified in Section X of the Agreement, governed by the rules and procedures of the Court.

9.      [By this Judgment, *the State-Subdivision Agreement] [name of state's agreement]*, a copy of which is attached hereto as Exhibit [X] and as incorporated into the Agreement, is hereby approved by the Court as the means by which relevant funds paid pursuant to the Agreement will be divided within the State, subject to the full acceptance by any Subdivision receiving such funds of the

E-3

terms of the Agreement, including the releases provided therein. [Add any state-specific language necessary for the effectiveness of the state-subdivision agreement.]]

10.     The Parties have satisfied all conditions to effectiveness of the Agreement.

11.     <u>Release</u>.  The Parties acknowledge that the Release in Section IV of the Agreement, which is incorporated by reference herein, is an integral part of this Judgment.  Pursuant to the Agreement and the Release and without limitation and to the maximum extent of the power of the State's Attorney General, Janssen and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (a) the State and its Participating Subdivisions and any of their departments, agencies, divisions, boards, commissions, Subdivisions, districts, instrumentalities of any kind and attorneys, including the State's Attorney General, and any person in his or her official capacity whether elected or appointed to serve any of the foregoing, and any agency, person, or other entity claiming by or through any of the foregoing, (b) any public entities, public instrumentalities, public educational institutions, unincorporated districts, fire districts, irrigation districts, water districts, law enforcement districts, emergency services districts, school districts, hospital districts and other Subdivisions in the State, and (c) any person or entity acting in a *parens patriae*, sovereign, quasi-sovereign, private attorney general, *qui tam*, taxpayer, or other capacity seeking relief on behalf of or generally applicable to the general public with respect to the State or any Subdivision in the State, whether or not any of them participate in the Agreement. Pursuant to the Agreement and the Release and to the maximum extent of the State's power, Janssen and the other Released Entities are, as of the Effective Date, hereby released from any and all Released Claims of (1) the State, (2) all past and present executive departments, state agencies, divisions, boards, commissions and instrumentalities with the regulatory authority to enforce state and federal controlled substances acts, (3) any of the State's past and present executive departments, agencies,

divisions, boards, commissions and instrumentalities that have the authority to bring Claims related to Covered Conduct seeking money (including abatement and/or remediation) or revocation of a pharmaceutical distribution license, and (4) any Participating Subdivision.  For the purposes of clause (3) above, executive departments, agencies, divisions, boards, commissions, and instrumentalities are those that are under the executive authority or direct control of the State's Governor.  The Parties acknowledge, and the Court finds, that those provisions are an integral part of the Agreement and this Judgment, and shall govern the rights and obligations of all participants in the settlement.  Any modification of those rights and obligations may be made based only on a writing signed by all affected parties and approved by the Court.

12.    <u>Release of Unknown Claims.</u>  The State expressly waives, releases, and forever discharges any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release that, if known by him or her, would have materially affected his or her settlement with the debtor or released party.

13.    The State may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims, but the State expressly waived and fully, finally, and forever settled, released and discharged, through the Agreement and Release, any and all Released Claims that may exist as of the Effective Date but which the State does not know or suspect to exist, whether through ignorance, oversight, error, negligence or through no fault whatsoever, and which, if known, would have materially affected the State's decision to enter into the Agreement.

14.    <u>Costs and Fees.</u>  The Parties will bear their own costs and attorneys' fees except as otherwise provided in the Agreement.

15.    <u>No Admission of Liability</u>.  Defendants are consenting to this Judgment solely for the purpose of effectuating the Agreement, and nothing contained herein may be taken as or construed to be an admission or concession of any violation of law, rule, or regulation, or of any other matter of fact or law, or of any liability or wrongdoing, all of which Defendants expressly deny.  No Defendant or Released Entity admits that it caused or contributed to any public nuisance, and no Defendant or Released Entity admits any wrongdoing that was or could have been alleged by the State, its Participating Subdivisions, or any other person or entity.  No part of this Judgment shall constitute evidence of any liability, fault, or wrongdoing by Defendants or any other Released Entity.  The Parties acknowledge that payments made under the Agreement are not a fine, penalty, or payment in lieu thereof.

16.    <u>No Waiver</u>.  This Judgment is entered based on the Agreement without trial or adjudication of any contested issue of fact or law or finding of liability of any kind.  This Judgment shall not be construed or used as a waiver of Janssen's right, or any other Released Entity's right, to defend itself from, or make any arguments in, any other regulatory, governmental, private individual, or class claims or suits relating to the subject matter or terms of this Judgment.  Notwithstanding the foregoing, the State may enforce the terms of this Judgment as expressly provided in the Agreement.

17.    <u>No Private Right of Action</u>.  This Judgment is not intended for use by any third party for any purpose, including submission to any court for any purpose, except pursuant to Section X of the Agreement.  Except as expressly provided in the Agreement, no portion of the Agreement or this Judgment shall provide any rights to, or be enforceable by, any person or entity that is not the State or Released Entity.  The State shall allow Participating Subdivisions in the State to notify it of any

perceived violations of the Agreement or this Judgment.  The State may not assign or otherwise convey any right to enforce any provision of the Agreement.

18.  <u>Admissibility</u>.  It is the intent of the Parties that this Judgment not be admissible in other cases against Defendants or binding on Defendants in any respect other than in connection with the enforcement of this Judgment or the Agreement.  For the avoidance of doubt, nothing herein shall prohibit Defendants from entering this Judgment or the Agreement into evidence in any litigation or arbitration concerning (1) Defendants' right to coverage under an insurance contract or (2) the enforcement of the releases provided for by the Agreement and this Judgment.

19.  <u>Preservation of Privilege</u>.  Nothing contained in the Agreement or this Judgment, and no act required to be performed pursuant to the Agreement or this Judgment, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege, and each Party agrees that it shall not make or cause to be made in any forum any assertion to the contrary.

20.  <u>Mutual Interpretation</u>.  The Parties agree and stipulate that the Agreement was negotiated on an arm's-length basis between parties of equal bargaining power and was drafted jointly by counsel for each Party.  Accordingly, the Agreement is incorporated herein by reference and shall be mutually interpreted and not construed in favor of or against any Party, except as expressly provided for in the Agreement.

21.  <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction of the Parties for the limited purpose of the resolution of disputes identified in Section X of the Agreement.  The Court shall have jurisdiction over Participating Subdivisions in the State for the limited purposes identified in the Agreement.

22.   <u>Successors and Assigns</u>.   This Judgment is binding on Defendants' successors and assigns.

23.   <u>Modification</u>.  This Judgment shall not be modified (by the Court, by any other court, or by any other means) without the consent of the State and Defendants, or as provided for in Section XI.R of the Agreement.

So ORDERED this _____ day of [[*]], 2024.

Enter:                                                    By Order:

_____          _____

**APPROVED, AGREED TO AND PRESENTED BY:**

[[SIGNATURE BLOCKS]]

## EXHIBIT F

### Litigating Subdivisions:

1. Anacortes City
2. Bainbridge Island City
3. Burlington City
4. Chelan County
5. Clallam County
6. Clark County
7. Everett City
8. Franklin County
9. Island County
10. Jefferson County
11. Kent City
12. King County
13. Kirkland City
14. Kitsap County
15. Kittitas County
16. La Conner School District
17. Lakewood City
18. Lewis County
19. Lincoln County
20. Mount Vernon City
21. Mount Vernon School District
22. Olympia City
23. Pierce County
24. San Juan County
25. Seattle City
26. Sedro-Woolley City
27. Sedro-Woolley School District
28. Skagit County
29. Snohomish County
30. Spokane City
31. Spokane County
32. Tacoma City
33. Thurston County
34. Vancouver City
35. Walla Walla County
36. Whatcom County
37. Whitman County

**Non-litigating Subdivisions:**

1. Aberdeen City
2. Adams County
3. Arlington City
4. Asotin County
5. Auburn City
6. Battle Ground City
7. Bellevue City
8. Bellingham City
9. Benton County
10. Bonney Lake City
11. Bothell City
12. Bremerton City
13. Burien City
14. Camas City
15. Centralia City
16. Cheney City
17. Covington City
18. Cowlitz County
19. Des Moines City
20. Douglas County
21. East Wenatchee City
22. Edgewood City
23. Edmonds City
24. Ellensburg City
25. Enumclaw City
26. Federal Way City
27. Ferndale City
28. Fife City
29. Gig Harbor City
30. Grandview City
31. Grant County
32. Grays Harbor County
33. Issaquah City
34. Kelso City
35. Kenmore City
36. Kennewick City
37. Klickitat County
38. Lacey City
39. Lake Forest Park City
40. Lake Stevens City
41. Liberty Lake City
42. Longview City
43. Lynden City
44. Lynnwood City

45. Maple Valley City
46. Marysville City
47. Mason County
48. Mercer Island City
49. Mill Creek City
50. Monroe City
51. Moses Lake City
52. Mountlake Terrace City
53. Mukilteo City
54. Newcastle City
55. Oak Harbor City
56. Okanogan County
57. Pacific County
58. Pasco City
59. Pend Oreille County
60. Port Angeles City
61. Port Orchard City
62. Poulsbo City
63. Pullman City
64. Puyallup City
65. Redmond City
66. Renton City
67. Richland City
68. Sammamish City
69. Seatac City
70. Shelton City
71. Shoreline City
72. Skamania County
73. Snohomish City
74. Snoqualmie City
75. Spokane Valley City
76. Stevens County
77. Sumner City
78. Sunnyside City
79. Tukwila City
80. Tumwater City
81. University Place City
82. Walla Walla City
83. Washougal City
84. Wenatchee City
85. West Richland City
86. Woodinville City
87. Yakima City
88. Yakima County

## EXHIBIT G

## List of Johnson & Johnson Subsidiaries

Johnson & Johnson, a New Jersey corporation, had the U.S. and international subsidiaries shown below as of January 1, 2023. Johnson & Johnson is not a subsidiary of any other entity.

| Name of Subsidiary | Jurisdiction |
|---|---|
| **U.S. Subsidiaries:** | |
| ABD Holding Company, Inc. | Delaware |
| ABIOMED R&D, Inc. | Delaware |
| ABIOMED, Inc. | Delaware |
| Acclarent, Inc. | Delaware |
| Actelion Pharmaceuticals US, Inc. | Delaware |
| Albany Street LLC | New Jersey |
| ALZA Corporation | Delaware |
| Alza Land Management, Inc. | Delaware |
| AMO Development, LLC | Delaware |
| AMO Manufacturing USA, LLC | Delaware |
| AMO Nominee Holdings, LLC | Delaware |
| AMO Sales and Service, Inc. | Delaware |
| AMO Spain Holdings, LLC | Delaware |
| Anakuria Therapeutics, Inc. | Delaware |
| AorTx, Inc. | Delaware |
| Aragon Pharmaceuticals, Inc. | Delaware |
| Asia Pacific Holdings, LLC | New Jersey |
| Atrionix, Inc. | California |
| AUB Holdings LLC | Delaware |
| Auris Health, Inc. | Delaware |
| BeneVir BioPharm, Inc. | Delaware |
| BioMedical Enterprises, Inc. | Texas |
| Biosense Webster, Inc. | California |
| Breethe, Inc. | Delaware |
| Centocor Biologics, LLC | Pennsylvania |
| Centocor Research & Development, Inc. | Pennsylvania |
| Cerenovus, Inc. | New Jersey |
| Coherex Medical, Inc. | Delaware |
| CoTherix Inc. | Delaware |
| CRES Holdings, Inc. | Delaware |
| CrossRoads Extremity Systems, LLC | Tennessee |

| | |
|---|---|
| CSATS, Inc. | Washington |
| DePuy Mitek, LLC | Massachusetts |
| DePuy Orthopaedics, Inc. | Indiana |
| DePuy Products, Inc. | Indiana |
| DePuy Spine, LLC | Ohio |
| DePuy Synthes Institute, LLC | Delaware |
| DePuy Synthes Products, Inc. | Delaware |
| DePuy Synthes Sales, Inc. | Massachusetts |
| DePuy Synthes, Inc. | Delaware |
| Dutch Holding LLC | Delaware |
| ECL7, LLC | Delaware |
| Ethicon Endo-Surgery, Inc. | Ohio |
| Ethicon Endo-Surgery, LLC | Delaware |
| Ethicon LLC | Delaware |
| Ethicon US, LLC | Texas |
| Ethicon, Inc. | New Jersey |
| Hansen Medical International, Inc. | Delaware |
| Hansen Medical, Inc. | Delaware |
| I.D. Acquisition Corp. | New Jersey |
| Janssen BioPharma, LLC | Delaware |
| Janssen Biotech, Inc. | Pennsylvania |
| Janssen Global Services, LLC | New Jersey |
| Janssen Oncology, Inc. | Delaware |
| Janssen Ortho LLC | Delaware |
| Janssen Pharmaceuticals, Inc. | Pennsylvania |
| Janssen Products, LP | New Jersey |
| Janssen Research & Development, LLC | New Jersey |
| Janssen Scientific Affairs, LLC | New Jersey |
| Janssen Supply Group, LLC | Pennsylvania |
| Janssen-Cilag Manufacturing, LLC | Delaware |
| Jevco Holding, Inc. | New Jersey |
| JJHC, LLC | Delaware |
| JNJ International Investment LLC | Delaware |
| JNTL (APAC) HoldCo 2 LLC | Delaware |
| JNTL (APAC) HoldCo LLC | Delaware |

| | |
|---|---|
| JNTL (Japan) HoldCo Inc. | Delaware |
| JNTL (Middle East) HoldCo LLC | Delaware |
| JNTL (Thailand) HoldCo LLC | Delaware |
| JNTL Consumer Health (Services) LLC | Delaware |
| JNTL HoldCo 2 LLC | Delaware |
| JNTL HoldCo 3 LLC | Delaware |
| JNTL HoldCo 4 LLC | Delaware |
| JNTL HoldCo 5 LLC | Delaware |
| JNTL HoldCo 6 LLC | Delaware |
| JNTL HoldCo 7 LLC | Delaware |
| JNTL HoldCo 8 LLC | Delaware |
| JNTL HoldCo LLC | Delaware |
| JNTL Holdings 2, Inc. | Delaware |
| JNTL Holdings 3, Inc. | Delaware |
| JNTL Holdings, Inc. | Delaware |
| Johnson & Johnson | New Jersey |
| Johnson & Johnson (Middle East) Inc. | New Jersey |
| Johnson & Johnson (Singapore) Holdco LLC | Delaware |
| Johnson & Johnson Consumer Inc. | Nevada |
| Johnson & Johnson Consumer Inc. | New Jersey |
| Johnson & Johnson Enterprise Innovation Inc. | Delaware |
| Johnson & Johnson Finance Corporation | New Jersey |
| Johnson & Johnson Gateway, LLC | New Jersey |
| Johnson & Johnson Health and Wellness Solutions, Inc. | Michigan |
| Johnson & Johnson Health Care Systems Inc. | New Jersey |
| Johnson & Johnson Innovation - JJDC, Inc. | New Jersey |
| Johnson & Johnson Innovation LLC | Delaware |
| Johnson & Johnson International | New Jersey |
| Johnson & Johnson Medical Devices & Diagnostics Group - Latin America, L.L.C. | Florida |
| Johnson & Johnson S.E., Inc. | New Jersey |
| Johnson & Johnson Services, Inc. | New Jersey |
| Johnson & Johnson Surgical Vision, Inc. | Delaware |
| Johnson & Johnson Urban Renewal Associates | New Jersey |

G-3

| | |
|---|---|
| Johnson & Johnson Vision Care, Inc. | Florida |
| JOM Pharmaceutical Services, Inc. | Delaware |
| Kenvue Inc. | Delaware |
| LTL Management LLC | North Carolina |
| McNeil Consumer Pharmaceuticals Co. | New Jersey |
| McNeil Healthcare LLC | Delaware |
| McNeil LA LLC | Delaware |
| McNEIL MMP, LLC | New Jersey |
| McNeil Nutritionals, LLC | Delaware |
| Medical Device Business Services, Inc. | Indiana |
| Medical Devices & Diagnostics Global Services, LLC | Delaware |
| Medical Devices International LLC | Delaware |
| MegaDyne Medical Products, Inc. | Utah |
| Mentor Partnership Holding Company I, LLC | Delaware |
| Mentor Texas GP LLC | Delaware |
| Mentor Texas L.P. | Delaware |
| Mentor Worldwide LLC | Delaware |
| Middlesex Assurance Company Limited | Vermont |
| Momenta Pharmaceuticals, Inc. | Delaware |
| NeoStrata Company, Inc. | Delaware |
| Netherlands Holding Company | Delaware |
| NeuWave Medical, Inc. | Delaware |
| Novira Therapeutics, LLC | Delaware |
| NuVera Medical, Inc. | Delaware |
| OMJ Pharmaceuticals, Inc. | Delaware |
| Omrix Biopharmaceuticals, Inc. | Delaware |
| Ortho Biologics LLC | Delaware |
| Ortho Biotech Holding LLC | Delaware |

| | |
|---|---|
| Patriot Pharmaceuticals, LLC | Pennsylvania |
| Peninsula Pharmaceuticals, LLC | Delaware |
| Percivia LLC | Delaware |
| preCARDIA, Inc. | Delaware |
| Princeton Laboratories, Inc. | Delaware |
| Prosidyan, Inc. | Delaware |
| Pulsar Vascular, Inc. | Delaware |
| Regency Urban Renewal Associates | New Jersey |
| Royalty A&M LLC | North Carolina |
| Rutan Realty LLC | New Jersey |
| Scios LLC | Delaware |
| SterilMed, Inc. | Minnesota |
| Synthes USA Products, LLC | Delaware |
| Synthes USA, LLC | Delaware |
| Synthes, Inc. | Delaware |
| TARIS Biomedical LLC | Delaware |
| TearScience, Inc. | Delaware |
| The Anspach Effort, LLC | Florida |
| The Vision Care Institute, LLC | Florida |
| Tibotec, LLC | Delaware |
| Torax Medical, Inc. | Delaware |
| Verb Surgical Inc. | Delaware |
| Vogue International LLC | Delaware |
| WH4110 Development Company, L.L.C. | Georgia |
| Zarbee's, Inc. | Delaware |

| | |
|---|---|
| **International Subsidiaries:** | |
| 3Dintegrated ApS | Denmark |
| Actelion Ltd | Switzerland |
| Actelion Pharmaceuticals Ltd | Switzerland |
| Actelion Pharmaceuticals Trading (Shanghai) Co., Ltd. | China |
| Actelion Treasury Unlimited Company | Ireland |

| | |
|---|---|
| AMO (Hangzhou) Co., Ltd. | China |
| AMO (Shanghai) Medical Devices Trading Co., Ltd. | China |
| AMO ASIA LIMITED | Hong Kong |
| AMO Australia Pty Limited | Australia |
| AMO Canada Company | Canada |
| AMO Denmark ApS | Denmark |
| AMO France | France |
| AMO Germany GmbH | Germany |
| AMO Groningen B.V. | Netherlands |
| AMO International Holdings Unlimited Company | Ireland |
| AMO Ireland | Cayman Islands |
| AMO Italy SRL | Italy |
| AMO Japan K.K. | Japan |
| AMO Netherlands BV | Netherlands |
| AMO Norway AS | Norway |
| AMO Puerto Rico Manufacturing, Inc. | Cayman Islands |
| AMO Singapore Pte. Ltd. | Singapore |
| AMO Switzerland GmbH | Switzerland |
| AMO United Kingdom, Ltd. | United Kingdom |
| AMO Uppsala AB | Sweden |
| Apsis | France |
| Backsvalan 6 Handelsbolag | Sweden |
| Beijing Dabao Cosmetics Co., Ltd. | China |
| Berna Rhein B.V. | Netherlands |
| Biosense Webster (Israel) Ltd. | Israel |
| C Consumer Products Denmark ApS | Denmark |
| Carlo Erba OTC S.r.l. | Italy |
| ChromaGenics B.V. | Netherlands |

| | |
|---|---|
| Ci:z. Labo Co., Ltd. | Japan |
| Cilag AG | Switzerland |
| Cilag GmbH International | Switzerland |
| Cilag Holding AG | Switzerland |
| Cilag Holding Treasury Unlimited Company | Ireland |
| Cilag-Biotech, S.L. | Spain |
| ColBar LifeScience Ltd. | Israel |
| Cordis de Mexico, S.A. de C.V. | Mexico |
| Corimmun GmbH | Germany |
| Debs-Vogue Corporation (Proprietary) Limited | South Africa |
| DePuy Hellas SA | Greece |
| DePuy International Limited | United Kingdom |
| DePuy Ireland Unlimited Company | Ireland |
| DePuy Mexico, S.A. de C.V. | Mexico |
| EES Holdings de Mexico, S. de R.L. de C.V. | Mexico |
| EES, S.A. de C.V. | Mexico |
| EIT Emerging Implant Technologies GmbH | Germany |
| Ethicon Endo-Surgery (Europe) GmbH | Germany |
| Ethicon Sarl | Switzerland |
| Ethicon Women's Health & Urology Sarl | Switzerland |
| Ethnor (Proprietary) Limited | South Africa |
| Ethnor del Istmo S.A. | Panama |
| Ethnor Farmaceutica, S.A. | Venezuela, Bolivarian Republic of |
| Finsbury (Development) Limited | United Kingdom |
| Finsbury (Instruments) Limited | United Kingdom |
| Finsbury Medical Limited | United Kingdom |
| Finsbury Orthopaedics International Limited | United Kingdom |
| Finsbury Orthopaedics Limited | United Kingdom |

| | |
|---|---|
| FMS Future Medical System SA | Switzerland |
| GATT Technologies B.V. | Netherlands |
| GH Biotech Holdings Limited | Ireland |
| Global Investment Participation B.V. | Netherlands |
| GMED Healthcare BV | Belgium |
| Guangzhou Bioseal Biotech Co., Ltd. | China |
| Hansen Medical Deutschland GmbH | Germany |
| Hansen Medical UK Limited | United Kingdom |
| Healthcare Services (Shanghai) Ltd. | China |
| Innomedic Gesellschaft für innovative Medizintechnik und Informatik mbH | Germany |
| J & J Company West Africa Limited | Nigeria |
| J&J Argentina S.A. | Argentina |
| J&J Pension Trustees Limited | United Kingdom |
| J&J Productos Medicos & Farmaceuticos del Peru S.A. | Peru |
| J.C. General Services BV | Belgium |
| Janssen Biologics (Ireland) Limited | Ireland |
| Janssen Biologics B.V. | Netherlands |
| Janssen Cilag Farmaceutica S.A. | Argentina |
| Janssen Cilag S.p.A. | Italy |
| Janssen Cilag SPA | Algeria |
| Janssen Cilag, C.A. | Venezuela, Bolivarian Republic of |
| Janssen Development Finance Unlimited Company | Ireland |
| Janssen Egypt LLC | Egypt |
| Janssen Farmaceutica Portugal Lda | Portugal |
| Janssen France Treasury Unlimited Company | France |
| Janssen Holding GmbH | Switzerland |
| Janssen Inc. | Canada |
| Janssen Irish Finance Unlimited Company | Ireland |

G-8

| | |
|---|---|
| Janssen Japan Treasury Unlimited Company | Japan |
| Janssen Korea Ltd. | Korea, Republic of |
| Janssen Mexico Treasury Unlimited Company | Ireland |
| Janssen Pharmaceutica (Proprietary) Limited | South Africa |
| Janssen Pharmaceutica NV | Belgium |
| Janssen Pharmaceutica S.A. | Peru |
| Janssen Pharmaceutical K.K. | Japan |
| Janssen Pharmaceutical Sciences Unlimited Company | Ireland |
| Janssen Pharmaceutical Unlimited Company | Ireland |
| Janssen R&D Ireland Unlimited Company | Ireland |
| Janssen Sciences Ireland Unlimited Company | Ireland |
| Janssen Vaccines & Prevention B.V. | Netherlands |
| Janssen Vaccines Corp. | Korea, Republic of |
| Janssen-Cilag | France |
| Janssen-Cilag (New Zealand) Limited | New Zealand |
| Janssen-Cilag A/S | Denmark |
| Janssen-Cilag AG | Switzerland |
| Janssen-Cilag Aktiebolag | Sweden |
| Janssen-Cilag AS | Norway |
| Janssen-Cilag B.V. | Netherlands |
| Janssen-Cilag d.o.o. Beograd | Serbia |
| Janssen-Cilag de Mexico S. de R.L. de C.V. | Mexico |
| Janssen-Cilag Farmaceutica Lda. | Portugal |
| Janssen-Cilag Farmaceutica Ltda. | Brazil |
| Janssen-Cilag GmbH | Germany |
| Janssen-Cilag International NV | Belgium |
| Janssen-Cilag Kft. | Hungary |
| Janssen-Cilag Limited | United Kingdom |

| | |
|---|---|
| Janssen-Cilag Limited | Thailand |
| Janssen-Cilag NV | Belgium |
| Janssen-Cilag OY | Finland |
| Janssen-Cilag Pharma GmbH | Austria |
| Janssen-Cilag Pharmaceutical S.A.C.I. | Greece |
| Janssen-Cilag Polska, Sp. z o.o. | Poland |
| Janssen-Cilag Pty Ltd | Australia |
| Janssen-Cilag S.A. | Colombia |
| Janssen-Cilag s.r.o. | Czech Republic |
| Janssen-Cilag, S.A. | Spain |
| Janssen-Cilag, S.A. de C.V. | Mexico |
| Janssen-Pharma, S.L. | Spain |
| J-C Health Care Ltd. | Israel |
| JJ Surgical Vision Spain, S.L. | Spain |
| JJC Acquisition Company B.V. | Netherlands |
| JJSV Belgium BV | Belgium |
| JJSV Manufacturing Malaysia SDN. BHD. | Malaysia |
| JJSV Norden AB | Sweden |
| JJSV Produtos Oticos Ltda. | Brazil |
| JNJ Global Business Services s.r.o. | Czech Republic |
| JNJ Holding EMEA B.V. | Netherlands |
| JNTL (APAC) HoldCo 3 Pte. Ltd. | Singapore |
| JNTL (APAC) HoldCo Pte. Ltd. | Singapore |
| JNTL (Malaysia) Sdn. Bhd. | Malaysia |
| JNTL (Puerto Rico) HoldCo GmbH | Switzerland |
| JNTL (Shanghai) Investment Co., Ltd. | China |
| JNTL (Switzerland) HoldCo GmbH | Switzerland |
| JNTL (UK) HoldCo Limited | United Kingdom |

G-10

| | |
|---|---|
| JNTL Consumer Health (Vietnam) Co. Ltd. | Vietnam |
| JNTL Consumer Health (Belgium) BV | Belgium |
| JNTL Consumer Health (Brazil) Ltda. | Brazil |
| JNTL Consumer Health (Czech Republic) s.r.o. | Czech Republic |
| JNTL Consumer Health (Dominican Republic), S.A.S. | Dominican Republic |
| JNTL Consumer Health (Finland) Oy | Finland |
| JNTL Consumer Health (France) SAS | France |
| JNTL Consumer Health (Hungary) Kft | Hungary |
| JNTL Consumer Health (India) Private Limited | India |
| JNTL Consumer Health (New Zealand) Limited | New Zealand |
| JNTL Consumer Health (Norway) AS | Norway |
| JNTL Consumer Health (Philippines) Inc. | Philippines |
| JNTL Consumer Health (Poland) sp. z o.o. | Poland |
| JNTL Consumer Health (Portugal) Limitada | Portugal |
| JNTL Consumer Health (Slovakia), s.r.o. | Slovakia |
| JNTL Consumer Health (Spain), S.L. | Spain |
| JNTL Consumer Health (Taiwan) Limited | Taiwan (Province of China) |
| JNTL Consumer Health General Services BV | Belgium |
| JNTL Consumer Health I (Ireland) Limited | Ireland |
| JNTL Consumer Health I (Switzerland) GmbH | Switzerland |
| JNTL Consumer Health II (Switzerland) GmbH | Switzerland |
| JNTL Consumer Health LLC | Egypt |
| JNTL Consumer Health Mexico, S. de R.L. de C.V. | Mexico |
| JNTL Consumer Health Middle East FZ-LLC | United Arab Emirates |

| | |
|---|---|
| JNTL Holdings B.V. | Netherlands |
| JNTL Ireland HoldCo 2 B.V. | Netherlands |
| JNTL Netherlands HoldCo B.V. | Netherlands |
| JNTL Turkey Tüketici Sağlığı Limited Şirketi | Turkey |
| Johnson & Johnson - Societa' Per Azioni | Italy |
| Johnson & Johnson (Angola), Limitada | Angola |
| Johnson & Johnson (Australia) Pty Ltd | Australia |
| Johnson & Johnson (Canada) Inc. | Canada |
| Johnson & Johnson (China) Investment Ltd. | China |
| Johnson & Johnson (Ecuador) S.A. | Ecuador |
| Johnson & Johnson (Egypt) S.A.E. | Egypt |
| Johnson & Johnson (Hong Kong) Limited | Hong Kong |
| Johnson & Johnson (Ireland) Limited | Ireland |
| Johnson & Johnson (Jamaica) Limited | Jamaica |
| Johnson & Johnson (Kenya) Limited | Kenya |
| Johnson & Johnson (Mozambique), Limitada | Mozambique |
| Johnson & Johnson (Namibia) (Proprietary) Limited | Namibia |
| Johnson & Johnson (New Zealand) Limited | New Zealand |

| | |
|---|---|
| Johnson & Johnson (Philippines), Inc. | Philippines |
| Johnson & Johnson (Private) Limited | Zimbabwe |
| Johnson & Johnson (Thailand) Ltd. | Thailand |
| Johnson & Johnson (Trinidad) Limited | Trinidad and Tobago |
| Johnson & Johnson (Vietnam) Co., Ltd | Vietnam |
| Johnson & Johnson AB | Sweden |
| Johnson & Johnson AG | Switzerland |
| Johnson & Johnson Bulgaria EOOD | Bulgaria |
| Johnson & Johnson China Ltd. | China |
| Johnson & Johnson Consumer (Hong Kong) Limited | Hong Kong |
| Johnson & Johnson Consumer (Thailand) Limited | Thailand |
| Johnson & Johnson Consumer B.V. | Netherlands |
| Johnson & Johnson Consumer Holdings France | France |
| Johnson & Johnson Consumer NV | Belgium |
| Johnson & Johnson Consumer Saudi Arabia Limited | Saudi Arabia |
| Johnson & Johnson Consumer Services EAME Ltd. | United Kingdom |
| Johnson & Johnson d.o.o. | Slovenia |
| Johnson & Johnson de Argentina S.A.C. e. I. | Argentina |
| Johnson & Johnson de Chile S.A. | Chile |
| Johnson & Johnson de Colombia S.A. | Colombia |
| Johnson & Johnson de Mexico, S.A. de C.V. | Mexico |
| Johnson & Johnson de Uruguay S.A. | Uruguay |
| Johnson & Johnson de Venezuela, S.A. | Venezuela, Bolivarian Republic of |
| Johnson & Johnson del Ecuador, S.A. | Ecuador |
| Johnson & Johnson Del Paraguay, S.A. | Paraguay |
| Johnson & Johnson del Peru S.A. | Peru |
| Johnson & Johnson do Brasil Industria E Comercio de Produtos Para Saude Ltda. | Brazil |
| Johnson & Johnson Dominicana, S.A.S. | Dominican Republic |
| Johnson & Johnson European Treasury Unlimited Company | Ireland |

G-13

| | |
|---|---|
| Johnson & Johnson Finance Limited | United Kingdom |
| Johnson & Johnson Financial Services GmbH | Germany |
| Johnson & Johnson for Export and Import LLC | Egypt |
| Johnson & Johnson Gesellschaft m.b.H. | Austria |
| Johnson & Johnson GmbH | Germany |
| Johnson & Johnson GT, Sociedad Anónima | Guatemala |
| Johnson & Johnson Guatemala, S.A. | Guatemala |
| Johnson & Johnson Hellas Commercial and Industrial S.A. | Greece |
| Johnson & Johnson Hellas Consumer Products Commercial Societe Anonyme | Greece |
| Johnson & Johnson Hemisferica S.A. | Puerto Rico |
| Johnson & Johnson Holding GmbH | Germany |
| Johnson & Johnson Holdings (Austria) GmbH | Austria |
| Johnson & Johnson Inc. | Canada |
| Johnson & Johnson Industrial Ltda. | Brazil |
| Johnson & Johnson Innovation Limited | United Kingdom |

G-14

| | |
|---|---|
| Johnson & Johnson International (Singapore) Pte. Ltd. | Singapore |
| Johnson & Johnson International Financial Services Unlimited Company | Ireland |
| Johnson & Johnson Irish Finance Company Limited | Ireland |
| Johnson & Johnson K.K. | Japan |
| Johnson & Johnson Kft. | Hungary |
| Johnson & Johnson Korea Selling & Distribution LLC | Korea, Republic of |
| Johnson & Johnson Korea, Ltd. | Korea, Republic of |
| Johnson & Johnson Limited | United Kingdom |
| Johnson & Johnson LLC | Russian Federation |
| Johnson & Johnson Luxembourg Finance Company Sarl | Luxembourg |
| Johnson & Johnson Management Limited | United Kingdom |
| Johnson & Johnson Medical (China) Ltd. | China |
| Johnson & Johnson Medical (Proprietary) Ltd | South Africa |
| Johnson & Johnson Medical (Shanghai) Ltd. | China |
| Johnson & Johnson Medical (Suzhou) Ltd. | China |
| Johnson & Johnson Medical B.V. | Netherlands |
| Johnson & Johnson Medical GmbH | Germany |

| | |
|---|---|
| Johnson & Johnson Medical Greece Single Member S.A. | Greece |
| Johnson & Johnson Medical Korea Ltd. | Korea, Republic of |
| Johnson & Johnson Medical Limited | United Kingdom |
| Johnson & Johnson Medical Mexico, S.A. de C.V. | Mexico |
| Johnson & Johnson Medical NV | Belgium |
| Johnson & Johnson Medical Products GmbH | Austria |
| Johnson & Johnson Medical Pty Ltd | Australia |
| Johnson & Johnson Medical S.A. | Argentina |
| Johnson & Johnson Medical S.p.A. | Italy |
| Johnson & Johnson Medical SAS | France |
| Johnson & Johnson Medical Saudi Arabia Limited | Saudi Arabia |
| Johnson & Johnson Medical Taiwan Ltd. | Taiwan (Province of China) |
| Johnson & Johnson Medical, S.C.S. | Venezuela, Bolivarian Republic of |
| Johnson & Johnson Medikal Sanayi ve Ticaret Limited Sirketi | Turkey |
| Johnson & Johnson MedTech (Thailand) Ltd. | Thailand |
| Johnson & Johnson Medtech Colombia S.A.S. | Colombia |
| Johnson & Johnson Middle East FZ-LLC | United Arab Emirates |
| Johnson & Johnson Morocco Societe Anonyme | Morocco |
| Johnson & Johnson Nordic AB | Sweden |
| Johnson & Johnson Pacific Pty Limited | Australia |
| Johnson & Johnson Pakistan (Private) Limited | Pakistan |
| Johnson & Johnson Panama, S.A. | Panama |
| Johnson & Johnson Personal Care (Chile) S.A. | Chile |
| Johnson & Johnson Pharmaceutical Ltd. | China |
| Johnson & Johnson Poland Sp. z o.o. | Poland |
| Johnson & Johnson Private Limited | India |
| Johnson & Johnson Pte. Ltd. | Singapore |

| | |
|---|---|
| Johnson & Johnson Pty. Limited | Australia |
| Johnson & Johnson Romania S.R.L. | Romania |
| Johnson & Johnson S.E. d.o.o. | Croatia |
| Johnson & Johnson Sante Beaute France | France |
| Johnson & Johnson SDN. BHD. | Malaysia |
| Johnson & Johnson Surgical Vision India Private Limited | India |
| Johnson & Johnson Taiwan Ltd. | Taiwan (Province of China) |
| Johnson & Johnson UK Treasury Company Limited | United Kingdom |
| Johnson & Johnson Ukraine LLC | Ukraine |
| Johnson & Johnson Vision Care (Australia) Pty Ltd | Australia |
| Johnson & Johnson Vision Care (Shanghai) Ltd. | China |
| Johnson & Johnson Vision Care Ireland Unlimited Company | Ireland |
| Johnson & Johnson Vision Korea, Ltd. | Korea, Republic of |
| Johnson & Johnson, Lda | Portugal |
| Johnson & Johnson, S.A. | Spain |
| Johnson & Johnson, S.A. de C.V. | Mexico |
| Johnson & Johnson, s.r.o. | Slovakia |
| Johnson & Johnson, s.r.o. | Czech Republic |

| | |
|---|---|
| Johnson and Johnson (Proprietary) Limited | South Africa |
| Johnson and Johnson Sihhi Malzeme Sanayi Ve Ticaret Limited Sirketi | Turkey |
| Johnson Y Johnson de Costa Rica, S.A. | Costa Rica |
| La Concha Land Investment Corporation | Philippines |
| McNeil AB | Sweden |
| McNeil Denmark ApS | Denmark |
| McNeil Healthcare (Ireland) Limited | Ireland |
| McNeil Healthcare (UK) Limited | United Kingdom |
| McNeil Iberica S.L.U. | Spain |
| McNeil Panama, LLC | Panama |
| McNeil Products Limited | United Kingdom |
| McNeil Sweden AB | Sweden |
| Medos International Sarl | Switzerland |
| Medos Sarl | Switzerland |
| Menlo Care De Mexico, S.A. de C.V. | Mexico |
| Mentor B.V. | Netherlands |
| Mentor Deutschland GmbH | Germany |
| Mentor Medical Systems B.V. | Netherlands |
| Momenta Ireland Limited | Ireland |
| NeoStrata UG (haftungsbeschränkt) | Germany |
| Neuravi Limited | Ireland |
| Obtech Medical Mexico, S.A. de C.V. | Mexico |
| OBTECH Medical Sarl | Switzerland |
| OGX Beauty Limited | United Kingdom |
| OMJ Holding GmbH | Switzerland |
| Omrix Biopharmaceuticals Ltd. | Israel |
| Omrix Biopharmaceuticals NV | Belgium |
| Orthospin Ltd. | Israel |
| Orthotaxy | France |
| Pharmadirect Ltd. | Canada |
| Pharmedica Laboratories (Proprietary) Limited | South Africa |
| Productos de Cuidado Personal y de La Salud de Bolivia S.R.L. | Bolivia |
| Proleader S.A. | Uruguay |

G-18

| | |
|---|---|
| PT Integrated Healthcare Indonesia | Indonesia |
| PT Johnson & Johnson Indonesia | Indonesia |
| PT Johnson and Johnson Indonesia Two | Indonesia |
| RespiVert Ltd. | United Kingdom |
| Review Manager Test Entity 2 | France |
| Serhum S.A. de C.V. | Mexico |
| Shanghai Elsker Mother & Baby Co., Ltd | China |
| Shanghai Johnson & Johnson Ltd. | China |
| Shanghai Johnson & Johnson Pharmaceuticals Ltd. | China |
| Sodiac ESV | Belgium |
| Spectrum Vision Limited Liability Company | Russian Federation |
| Spectrum Vision Limited Liability Company | Ukraine |
| Spectrum Vision Limited Liability Partnership | Kazakhstan |
| Surgical Process Institute Deutschland GmbH | Germany |
| Synthes Costa Rica S.C.R., Limitada | Costa Rica |
| SYNTHES GmbH | Germany |
| Synthes GmbH | Switzerland |
| Synthes Holding AG | Switzerland |
| Synthes Holding Limited | United Arab Emirates |
| SYNTHES Medical Immobilien GmbH | Germany |
| Synthes Medical Surgical Equipment & Instruments Trading LLC | United Arab Emirates |
| Synthes Produktions GmbH | Switzerland |
| Synthes Proprietary Limited | South Africa |
| Synthes S.M.P., S. de R.L. de C.V. | Mexico |
| Synthes Tuttlingen GmbH | Germany |
| UAB "Johnson & Johnson" | Lithuania |
| Vania Expansion | France |
| Vision Care Finance Unlimited Company | Ireland |
| Xian Janssen Pharmaceutical Ltd. | China |
| XO1 Limited | United Kingdom |

**<u>EXHIBIT H</u>**

**<u>One Washington Memorandum of Understanding between the Washington Municipalities</u>**

## ONE WASHINGTON MEMORANDUM OF UNDERSTANDING BETWEEN WASHINGTON MUNICIPALITIES

Whereas, the people of the State of Washington and its communities have been harmed by entities within the Pharmaceutical Supply Chain who manufacture, distribute, and dispense prescription opioids;

Whereas, certain Local Governments, through their elected representatives and counsel, are engaged in litigation seeking to hold these entities within the Pharmaceutical Supply Chain of prescription opioids accountable for the damage they have caused to the Local Governments;

Whereas, Local Governments and elected officials share a common desire to abate and alleviate the impacts of harms caused by these entities within the Pharmaceutical Supply Chain throughout the State of Washington, and strive to ensure that principals of equity and equitable service delivery are factors considered in the allocation and use of Opioid Funds; and

Whereas, certain Local Governments engaged in litigation and the other cities and counties in Washington desire to agree on a form of allocation for Opioid Funds they receive from entities within the Pharmaceutical Supply Chain.

Now therefore, the Local Governments enter into this Memorandum of Understanding ("MOU") relating to the allocation and use of the proceeds of Settlements described.

### A.    Definitions

As used in this MOU:

1.    "Allocation Regions" are the same geographic areas as the existing nine (9) Washington State Accountable Community of Health (ACH) Regions and have the purpose described in Section C below.

2.    "Approved Purpose(s)" shall mean the strategies specified and set forth in the Opioid Abatement Strategies attached as Exhibit A.

3.    "Effective Date" shall mean the date on which a court of competent jurisdiction enters the first Settlement by order or consent decree. The Parties anticipate that more than one Settlement will be administered according to the terms of this MOU, but that the first entered Settlement will trigger allocation of Opioid Funds in accordance with Section B herein, and the formation of the Opioid Abatement Councils in Section C.

4.    "Litigating Local Government(s)" shall mean Local Governments that filed suit against any Pharmaceutical Supply Chain Participant pertaining to the Opioid epidemic prior to September 1, 2020.

5. "Local Government(s)" shall mean all counties, cities, and towns within the geographic boundaries of the State of Washington.

6. "National Settlement Agreements" means the national opioid settlement agreements dated July 21, 2021 involving Johnson & Johnson, and distributors AmerisourceBergen, Cardinal Health and McKesson as well as their subsidiaries, affiliates, officers, and directors named in the National Settlement Agreements, including all amendments thereto.

7. "Opioid Funds" shall mean monetary amounts obtained through a Settlement as defined in this MOU.

8. "Opioid Abatement Council" shall have the meaning described in Section C below.

9. "Participating Local Government(s)" shall mean all counties, cities, and towns within the geographic boundaries of the State that have chosen to sign on to this MOU. The Participating Local Governments may be referred to separately in this MOU as "Participating Counties" and "Participating Cities and Towns" (or "Participating Cities or Towns," as appropriate) or "Parties."

10. "Pharmaceutical Supply Chain" shall mean the process and channels through which controlled substances are manufactured, marketed, promoted, distributed, and/or dispensed, including prescription opioids.

11. "Pharmaceutical Supply Chain Participant" shall mean any entity that engages in or has engaged in the manufacture, marketing, promotion, distribution, and/or dispensing of a prescription opioid, including any entity that has assisted in any of the above.

12. "Qualified Settlement Fund Account," or "QSF Account," shall mean an account set up as a qualified settlement fund, 468b fund, as authorized by Treasury Regulations 1.468B-1(c) (26 CFR §1.468B-1).

13. "Regional Agreements" shall mean the understanding reached by the Participating Local Counties and Cities within an Allocation Region governing the allocation, management, distribution of Opioid Funds within that Allocation Region.

14. "Settlement" shall mean the future negotiated resolution of legal or equitable claims against a Pharmaceutical Supply Chain Participant when that resolution has been jointly entered into by the Participating Local Governments. "Settlement" expressly does not include a plan of reorganization confirmed under Title 11of the United States Code, irrespective of the extent to which Participating Local Governments vote in favor of or otherwise support such plan of reorganization.

15. "Trustee" shall mean an independent trustee who shall be responsible for the ministerial task of releasing Opioid Funds from a QSF account to Participating Local Governments as authorized herein and accounting for all payments into or out of the trust.

16. The "Washington State Accountable Communities of Health" or "ACH" shall mean the nine (9) regions described in Section C below.

**B.      Allocation of Settlement Proceeds for Approved Purposes**

1. All Opioid Funds shall be held in a QSF and distributed by the Trustee, for the benefit of the Participating Local Governments, only in a manner consistent with this MOU. Distribution of Opioid Funds will be subject to the mechanisms for auditing and reporting set forth below to provide public accountability and transparency.

2. All Opioid Funds, regardless of allocation, shall be utilized pursuant to Approved Purposes as defined herein and set forth in Exhibit A. Compliance with this requirement shall be verified through reporting, as set out in this MOU.

3. The division of Opioid Funds shall first be allocated to Participating Counties based on the methodology utilized for the Negotiation Class in *In Re: National Prescription Opiate Litigation*, United States District Court for the Northern District of Ohio, Case No. 1:17-md-02804-DAP. The allocation model uses three equally weighted factors: (1) the amount of opioids shipped to the county; (2) the number of opioid deaths that occurred in that county; and (3) the number of people who suffer opioid use disorder in that county. The allocation percentages that result from application of this methodology are set forth in the "County Total" line item in Exhibit B. In the event any county does not participate in this MOU, that county's percentage share shall be reallocated proportionally amongst the Participating Counties by applying this same methodology to only the Participating Counties.

4. Allocation and distribution of Opioid Funds within each Participating County will be based on regional agreements as described in Section C.

**C.      Regional Agreements**

1. For the purpose of this MOU, the regional structure for decision-making related to opioid fund allocation will be based upon the nine (9) pre-defined Washington State Accountable Community of Health Regions (Allocation Regions). Reference to these pre-defined regions is solely for the purpose of

drawing geographic boundaries to facilitate regional agreements for use of Opioid Funds. The Allocation Regions are as follows:

- King County (Single County Region)
- Pierce County (Single County Region)
- Olympic Community of Health Region (Clallam, Jefferson, and Kitsap Counties)
- Cascade Pacific Action Alliance Region (Cowlitz, Grays Harbor, Lewis, Mason, Pacific, Thurston, and Wahkiakum Counties)
- North Sound Region (Island, San Juan, Skagit, Snohomish, and Whatcom Counties)
- SouthWest Region (Clark, Klickitat, and Skamania Counties)
- Greater Columbia Region (Asotin, Benton, Columbia, Franklin, Garfield, Kittitas, Walla Walla, Whitman, and Yakima Counties)
- Spokane Region (Adams, Ferry, Lincoln, Pend Oreille, Spokane, and Stevens Counties)
- North Central Region (Chelan, Douglas, Grant, and Okanogan Counties)

2.      Opioid Funds will be allocated, distributed and managed within each Allocation Region, as determined by its Regional Agreement as set forth below. If an Allocation Region does not have a Regional Agreement enumerated in this MOU, and does not subsequently adopt a Regional Agreement per Section C.5, the default mechanism for allocation, distribution and management of Opioid Funds described in Section C.4.a will apply. Each Allocation Region must have an OAC whose composition and responsibilities shall be defined by Regional Agreement or as set forth in Section C.4.

3.      King County's Regional Agreement is reflected in Exhibit C to this MOU.

4.      All other Allocation Regions that have not specified a Regional Agreement for allocating, distributing and managing Opioid Funds, will apply the following default methodology:

a.      Opioid Funds shall be allocated within each Allocation Region by taking the allocation for a Participating County from Exhibit B and apportioning those funds between that Participating County and its Participating Cities and Towns.  Exhibit B also sets forth the allocation to the Participating Counties and the Participating Cities or Towns within the Counties based on a default allocation formula. As set forth above in Section B.3, to determine the allocation to a county, this formula utilizes: (1) the amount of opioids shipped to the county; (2) the number of opioid deaths that occurred in that county; and (3) the number of people who suffer opioid use disorder in that county. To determine the allocation within a county, the formula utilizes historical federal data showing how the specific Counties and the Cities and Towns within the Counties have

made opioids epidemic-related expenditures in the past. This is the same methodology used in the National Settlement Agreements for county and intra-county allocations. A Participating County, and the Cities and Towns within it may enter into a separate intra-county allocation agreement to modify how the Opioid Funds are allocated amongst themselves, provided the modification is in writing and agreed to by all Participating Local Governments in the County. Such an agreement shall not modify any of the other terms or requirements of this MOU.

b.       10% of the Opioid Funds received by the Region will be reserved, on an annual basis, for administrative costs related to the OAC. The OAC will provide an annual accounting for actual costs and any reserved funds that exceed actual costs will be reallocated to Participating Local Governments within the Region.

c.       Cities and towns with a population of less than 10,000 shall be excluded from the allocation, with the exception of cities and towns that are Litigating Participating Local Governments. The portion of the Opioid Funds that would have been allocated to a city or town with a population of less than 10,000 that is not a Litigating Participating Local Government shall be redistributed to Participating Counties in the manner directed in C.4.a above.

d.       Each Participating County, City, or Town may elect to have its share re-allocated to the OAC in which it is located. The OAC will then utilize this share for the benefit of Participating Local Governments within that Allocation Region, consistent with the Approved Purposes set forth in Exhibit A. A Participating Local Government's election to forego its allocation of Opioid Funds shall apply to all future allocations unless the Participating Local Government notifies its respective OAC otherwise. If a Participating Local Government elects to forego its allocation of the Opioid Funds, the Participating Local Government shall be excused from the reporting requirements set forth in this Agreement.

e.       Participating Local Governments that receive a direct payment maintain full discretion over the use and distribution of their allocation of Opioid Funds, provided the Opioid Funds are used solely for Approved Purposes. Reasonable administrative costs for a Participating Local Government to administer its allocation of Opioid Funds shall not exceed actual costs or 10% of the Participating Local Government's allocation of Opioid Funds, whichever is less.

f.       A Local Government that chooses not to become a Participating Local Government will not receive a direct allocation of Opioid Funds. The portion of the Opioid Funds that would have been allocated to a Local Government that is not a Participating Local Government shall be

redistributed to Participating Counties in the manner directed in C.4.a above.

g.     As a condition of receiving a direct payment, each Participating Local Government that receives a direct payment agrees to undertake the following actions:

     i.     Developing a methodology for obtaining proposals for use of Opioid Funds.

     ii.     Ensuring there is opportunity for community-based input on priorities for Opioid Fund programs and services.

     iii.     Receiving and reviewing proposals for use of Opioid Funds for Approved Purposes.

     iv.     Approving or denying proposals for use of Opioid Funds for Approved Purposes.

     v.     Receiving funds from the Trustee for approved proposals and distributing the Opioid Funds to the recipient.

     vi.     Reporting to the OAC and making publicly available all decisions on Opioid Fund allocation applications, distributions and expenditures.

h.     Prior to any distribution of Opioid Funds within the Allocation Region, The Participating Local Governments must establish an Opioid Abatement Council (OAC) to oversee Opioid Fund allocation, distribution, expenditures and dispute resolution. The OAC may be a preexisting regional body or may be a new body created for purposes of executing the obligations of this MOU.

i.     The OAC for each Allocation Region shall be composed of representation from both Participating Counties and Participating Towns or Cities within the Region. The method of selecting members, and the terms for which they will serve will be determined by the Allocation Region's Participating Local Governments. All persons who serve on the OAC must have work or educational experience pertaining to one or more Approved Uses.

j.     The Regional OAC will be responsible for the following actions:

     i.     Overseeing distribution of Opioid Funds from Participating Local Governments to programs and services within the Allocation Region for Approved Purposes.

ii.      Annual review of expenditure reports from Participating Local Jurisdictions within the Allocation Region for compliance with Approved Purposes and the terms of this MOU and any Settlement.

iii.      In the case where Participating Local Governments chose to forego their allocation of Opioid Funds:

(i)  Approving or denying proposals by Participating Local Governments or community groups to the OAC for use of Opioid Funds within the Allocation Region.
(ii)  Directing the Trustee to distribute Opioid Funds for use by Participating Local Governments or community groups whose proposals are approved by the OAC.
(iii)  Administrating and maintaining records of all OAC decisions and distributions of Opioid Funds.

iv.      Reporting and making publicly available all decisions on Opioid Fund allocation applications, distributions and expenditures by the OAC or directly by Participating Local Governments.

v.      Developing and maintaining a centralized public dashboard or other repository for the publication of expenditure data from any Participating Local Government that receives Opioid Funds, and for expenditures by the OAC in that Allocation Region, which it shall update at least annually.

vi.      If necessary, requiring and collecting additional outcome-related data from Participating Local Governments to evaluate the use of Opioid Funds, and all Participating Local Governments shall comply with such requirements.

vii.      Hearing complaints by Participating Local Governments within the Allocation Region regarding alleged failure to (1) use Opioid Funds for Approved Purposes or (2) comply with reporting requirements.

5.     Participating Local Governments may agree and elect to share, pool, or collaborate with their respective allocation of Opioid Funds in any manner they choose by adopting a Regional Agreement, so long as such sharing, pooling, or collaboration is used for Approved Purposes and complies with the terms of this MOU and any Settlement.

6.      Nothing in this MOU should alter or change any Participating Local Government's rights to pursue its own claim. Rather, the intent of this MOU is to join all parties who wish to be Participating Local Governments to agree upon an allocation formula for any Opioid Funds from any future binding Settlement with one or more Pharmaceutical Supply Chain Participants for all Local Governments in the State of Washington.

7.      If any Participating Local Government disputes the amount it receives from its allocation of Opioid Funds, the Participating Local Government shall alert its respective OAC within sixty (60) days of discovering the information underlying the dispute. Failure to alert its OAC within this time frame shall not constitute a waiver of the Participating Local Government's right to seek recoupment of any deficiency in its allocation of Opioid Funds.

8.      If any OAC concludes that a Participating Local Government's expenditure of its allocation of Opioid Funds did not comply with the Approved Purposes listed in Exhibit A, or the terms of this MOU, or that the Participating Local Government otherwise misused its allocation of Opioid Funds, the OAC may take remedial action against the alleged offending Participating Local Government. Such remedial action is left to the discretion of the OAC and may include withholding future Opioid Funds owed to the offending Participating Local Government or requiring the offending Participating Local Government to reimburse improperly expended Opioid Funds back to the OAC to be re-allocated to the remaining Participating Local Governments within that Region.

9.      All Participating Local Governments and OAC shall maintain all records related to the receipt and expenditure of Opioid Funds for no less than five (5) years and shall make such records available for review by any other Participating Local Government or OAC, or the public. Records requested by the public shall be produced in accordance with Washington's Public Records Act RCW 42.56.001 *et seq*. Records requested by another Participating Local Government or an OAC shall be produced within twenty-one (21) days of the date the record request was received. This requirement does not supplant any Participating Local Government or OAC's obligations under Washington's Public Records Act RCW 42.56.001 *et seq*.

**D.  Payment of Counsel and Litigation Expenses**

1.      The Litigating Local Governments have incurred attorneys' fees and litigation expenses relating to their prosecution of claims against the Pharmaceutical Supply Chain Participants, and this prosecution has inured to the benefit of all Participating Local Governments. Accordingly, a Washington

Government Fee Fund ("GFF") shall be established that ensures that all Parties that receive Opioid Funds contribute to the payment of fees and expenses incurred to prosecute the claims against the Pharmaceutical Supply Chain Participants, regardless of whether they are litigating or non-litigating entities.

2.      The amount of the GFF shall be based as follows: the funds to be deposited in the GFF shall be equal to 15% of the total cash value of the Opioid Funds.

3.      The maximum percentage of any contingency fee agreement permitted for compensation shall be 15% of the portion of the Opioid Funds allocated to the Litigating Local Government that is a party to the contingency fee agreement, plus expenses attributable to that Litigating Local Government. Under no circumstances may counsel collect more for its work on behalf of a Litigating Local Government than it would under its contingency agreement with that Litigating Local Government.

4.      Payments from the GFF shall be overseen by a committee (the "Opioid Fee and Expense Committee") consisting of one representative of the following law firms: (a) Keller Rohrback L.LP.; (b) Hagens Berman Sobol Shapiro LLP; (c) Goldfarb & Huck Roth Riojas, PLLC; and (d) Napoli Shkolnik PLLC.  The role of the Opioid Fee and Expense Committee shall be limited to ensuring that the GFF is administered in accordance with this Section.

5.      In the event that settling Pharmaceutical Supply Chain Participants do not pay the fees and expenses of the Participating Local Governments directly at the time settlement is achieved, payments to counsel for Participating Local Governments shall be made from the GFF over not more than three years, with 50% paid within 12 months of the date of Settlement and 25% paid in each subsequent year, or at the time the total Settlement amount is paid to the Trustee by the Defendants, whichever is sooner.

6.      Any funds remaining in the GFF in excess of: (i) the amounts needed to cover Litigating Local Governments' private counsel's representation agreements, and (ii) the amounts needed to cover the common benefit tax discussed in Section C.8 below (if not paid directly by the Defendants in connection with future settlement(s), shall revert to the Participating Local Governments *pro rata* according to the percentages set forth in Exhibits B, to be used for Approved Purposes as set forth herein and in Exhibit A.

7.      In the event that funds in the GFF are not sufficient to pay all fees and expenses owed under this Section, payments to counsel for all Litigating Local Governments shall be reduced on a *pro rata* basis. The Litigating Local Governments will not be responsible for any of these reduced amounts.

8.      The Parties anticipate that any Opioid Funds they receive will be subject to a common benefit "tax" imposed by the court in *In Re: National Prescription Opiate Litigation*, United States District Court for the Northern District of Ohio, Case No. 1:17-md-02804-DAP ("Common Benefit Tax"). If this occurs, the Participating Local Governments shall first seek to have the settling defendants pay the Common Benefit Tax. If the settling defendants do not agree to pay the Common Benefit Tax, then the Common Benefit Tax shall be paid from the Opioid Funds and by both litigating and non-litigating Local Governments. This payment shall occur prior to allocation and distribution of funds to the Participating Local Governments. In the event that GFF is not fully exhausted to pay the Litigating Local Governments' private counsel's representation agreements, excess funds in the GFF shall be applied to pay the Common Benefit Tax (if any).

**E. General Terms**

1.      If any Participating Local Government believes another Participating Local Government, not including the Regional Abatement Advisory Councils, violated the terms of this MOU, the alleging Participating Local Government may seek to enforce the terms of this MOU in the court in which any applicable Settlement(s) was entered, provided the alleging Participating Local Government first provides the alleged offending Participating Local Government notice of the alleged violation(s) and a reasonable opportunity to cure the alleged violation(s). In such an enforcement action, any alleging Participating Local Government or alleged offending Participating Local Government may be represented by their respective public entity in accordance with Washington law.

2.      Nothing in this MOU shall be interpreted to waive the right of any Participating Local Government to seek judicial relief for conduct occurring outside the scope of this MOU that violates any Washington law. In such an action, the alleged offending Participating Local Government, including the Regional Abatement Advisory Councils, may be represented by their respective public entities in accordance with Washington law. In the event of a conflict, any Participating Local Government, including the Regional Abatement Advisory Councils and its Members, may seek outside representation to defend itself against such an action.

3.      Venue for any legal action related to this MOU shall be in the court in which the Participating Local Government is located or in accordance with the court rules on venue in that jurisdiction.  This provision is not intended to expand the court rules on venue.

4.      This MOU may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The Participating Local Governments approve the use of electronic signatures for execution of this MOU. All use of electronic signatures

shall be governed by the Uniform Electronic Transactions Act. The Parties agree not to deny the legal effect or enforceability of the MOU solely because it is in electronic form or because an electronic record was used in its formation. The Participating Local Government agree not to object to the admissibility of the MOU in the form of an electronic record, or a paper copy of an electronic document, or a paper copy of a document bearing an electronic signature, on the grounds that it is an electronic record or electronic signature or that it is not in its original form or is not an original.

5.      Each Participating Local Government represents that all procedures necessary to authorize such Participating Local Government's execution of this MOU have been performed and that the person signing for such Party has been authorized to execute the MOU.

**[Remainder of Page Intentionally Left Blank – Signature Pages Follow]**

**This One Washington Memorandum of Understanding Between Washington
Municipalities is signed this _____ day of _____, 2022 by:**

_____

**Name & Title** _____

**On behalf of** _____

4894-0031-1574, v. 2

# EXHIBIT A

# O P I O I D   A B A T E M E N T   S T R A T E G I E S

<div style="border:1px solid black; padding:10px; text-align:center;">

PART ONE: TREATMENT

</div>

## A.  <u>TREAT OPIOID USE DISORDER (OUD)</u>

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions, co-usage, and/or co-addiction through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including all forms of Medication-Assisted Treatment (MAT) approved by the U.S. Food and Drug Administration.

2. Support and reimburse services that include the full American Society of Addiction Medicine (ASAM) continuum of care for OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including but not limited to:

   a. Medication-Assisted Treatment (MAT);

   b. Abstinence-based treatment;

   c. Treatment, recovery, or other services provided by states, subdivisions, community health centers; non-for-profit providers; or for-profit providers;

   d. Treatment by providers that focus on OUD treatment as well as treatment by providers that offer OUD treatment along with treatment for other SUD/MH conditions, co-usage, and/or co-addiction; or

   e. Evidence-informed residential services programs, as noted below.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs (OTPs) to assure evidence-based, evidence-informed, or promising practices such as adequate methadone dosing.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction and for persons who have experienced an opioid overdose.

6. Support treatment of mental health trauma resulting from the traumatic experiences of the opioid user (e.g., violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (e.g., surviving family members after an overdose

1

or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support detoxification (detox) and withdrawal management services for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including medical detox, referral to treatment, or connections to other services or supports.

8. Support training on MAT for health care providers, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

10. Provide fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 (DATA 2000) to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

12. Support the dissemination of web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service-Opioids web-based training curriculum and motivational interviewing.

13. Support the development and dissemination of new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication-Assisted Treatment.

## B.    <u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>

Support people in treatment for and recovery from OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Provide the full continuum of care of recovery services for OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including supportive housing, residential treatment, medical detox services, peer support services and counseling, community navigators, case management, and connections to community-based services.

2. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

3. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including supportive housing, recovery housing, housing assistance programs, or training for housing providers.

4. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

5. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

6. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

7. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

8. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to manage the opioid user in the family.

9. Provide training and development of procedures for government staff to appropriately interact and provide social and other services to current and recovering opioid users, including reducing stigma.

10. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

## C.  CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have – or are at risk of developing – OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Support Screening, Brief Intervention and Referral to Treatment (SBIRT) programs to reduce the transition from use to disorders.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4.  Purchase automated versions of SBIRT and support ongoing costs of the technology.

5.  Support training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

6.  Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, or persons who have experienced an opioid overdose, into community treatment or recovery services through a bridge clinic or similar approach.

7.  Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction or persons that have experienced an opioid overdose.

8.  Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

9.  Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction or to persons who have experienced an opioid overdose.

10. Provide funding for peer navigators, recovery coaches, care coordinators, or care managers that offer assistance to persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction or to persons who have experienced on opioid overdose.

11. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

12. Develop and support best practices on addressing OUD in the workplace.

13. Support assistance programs for health care providers with OUD.

14. Engage non-profits and the faith community as a system to support outreach for treatment.

15. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

16. Create or support intake and call centers to facilitate education and access to treatment, prevention, and recovery services for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

17. Develop or support a National Treatment Availability Clearinghouse – a multistate/nationally accessible database whereby health care providers can list locations for currently available in-patient and out-patient OUD treatment services that are accessible on a real-time basis by persons who seek treatment.

## D. <u>ADDRESS THE NEEDS OF CRIMINAL-JUSTICE-INVOLVED PERSONS</u>

Address the needs of persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction who are involved – or are at risk of becoming involved – in the criminal justice system through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Support pre-arrest or post-arrest diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including established strategies such as:

    a. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative (PAARI);

    b. Active outreach strategies such as the Drug Abuse Response Team (DART) model;

    c. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    d. Officer prevention strategies, such as the Law Enforcement Assisted Diversion (LEAD) model;

    e. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative;

    f. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise and to reduce perceived barriers associated with law enforcement 911 responses; or

    g. County prosecution diversion programs, including diversion officer salary, only for counties with a population of 50,000 or less. Any diversion services in matters involving opioids must include drug testing, monitoring, or treatment.

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts for persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, but only if these courts provide referrals to evidence-informed treatment, including MAT.

4. Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction who are incarcerated in jail or prison.

5. Provide evidence-informed treatment, including MAT, recovery support, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction who are leaving jail or prison have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6. Support critical time interventions (CTI), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7. Provide training on best practices for addressing the needs of criminal-justice-involved persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, case management, or other services offered in connection with any of the strategies described in this section.

**E.**     **<u>ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME</u>**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, and the needs of their families, including babies with neonatal abstinence syndrome, through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Support evidence-based, evidence-informed, or promising treatment, including MAT, recovery services and supports, and prevention services for pregnant women – or women who could become pregnant – who have OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2. Provide training for obstetricians or other healthcare personnel that work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

3. Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with Neonatal Abstinence Syndrome get referred to appropriate services and receive a plan of safe care.

4. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

5. Offer enhanced family supports and home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, including but not limited to parent skills training.

6. Support for Children's Services – Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

<div style="border:1px solid black; text-align:center; padding:10px;">

PART TWO: PREVENTION

</div>

### F.   PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

2. Academic counter-detailing to educate prescribers on appropriate opioid prescribing.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Support enhancements or improvements to Prescription Drug Monitoring Programs (PDMPs), including but not limited to improvements that:

   a. Increase the number of prescribers using PDMPs;

   b. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs or by improving the interface that prescribers use to access PDMP data, or both; or

   c. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD.

6. Development and implementation of a national PDMP – Fund development of a multistate/national PDMP that permits information sharing while providing appropriate safeguards on sharing of private health information, including but not limited to:

   a. Integration of PDMP data with electronic health records, overdose episodes, and decision support tools for health care providers relating to OUD.

     b. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database.

7. Increase electronic prescribing to prevent diversion or forgery.

8. Educate Dispensers on appropriate opioid dispensing.

## G.    <u>PREVENT MISUSE OF OPIOIDS</u>

Support efforts to discourage or prevent misuse of opioids through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1. Corrective advertising or affirmative public education campaigns based on evidence.

2. Public education relating to drug disposal.

3. Drug take-back disposal or destruction programs.

4. Fund community anti-drug coalitions that engage in drug prevention efforts.

5. Support community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction – including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration (SAMHSA).

6. Engage non-profits and faith-based communities as systems to support prevention.

7. Support evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

8. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

9. Support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

10. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

11. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses or other school staff, to

address mental health needs in young people that (when not properly addressed) increase the risk of opioid or other drug misuse.

## H.    PREVENT OVERDOSE DEATHS AND OTHER HARMS

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based, evidence-informed, or promising programs or strategies that may include, but are not limited to, the following:

1.  Increase availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, opioid users, families and friends of opioid users, schools, community navigators and outreach workers, drug offenders upon release from jail/prison, or other members of the general public.

2.  Provision by public health entities of free naloxone to anyone in the community, including but not limited to provision of intra-nasal naloxone in settings where other options are not available or allowed.

3.  Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, and other members of the general public.

4.  Enable school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5.  Expand, improve, or develop data tracking software and applications for overdoses/naloxone revivals.

6.  Public education relating to emergency responses to overdoses.

7.  Public education relating to immunity and Good Samaritan laws.

8.  Educate first responders regarding the existence and operation of immunity and Good Samaritan laws.

9.  Expand access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

10.  Support mobile units that offer or provide referrals to treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

11.  Provide training in treatment and recovery strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction.

12.  Support screening for fentanyl in routine clinical toxicology testing.

---

PART THREE: OTHER STRATEGIES

---

## I.   FIRST RESPONDERS

In addition to items C8, D1 through D7, H1, H3, and H8, support the following:

1. Current and future law enforcement expenditures relating to the opioid epidemic.

2. Educate law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

## J.   LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, and coordination to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Community regional planning to identify goals for reducing harms related to the opioid epidemic, to identify areas and populations with the greatest needs for treatment intervention services, or to support other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A government dashboard to track key opioid-related indicators and supports as identified through collaborative community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K.   TRAINING

In addition to the training referred to in various items above, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Invest in infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, co-usage, and/or co-addiction, or implement other

strategies to abate the opioid epidemic described in this opioid abatement strategy list (e.g., health care, primary care, pharmacies, PDMPs, etc.).

**L.** **RESEARCH**

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

5. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (e.g. Hawaii HOPE and Dakota 24/7).

6. Research on expanded modalities such as prescription methadone that can expand access to MAT.

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|

**Adams County**

| | Adams County | 0.1638732475% |
|---|---|---|
| | Hatton | |
| | Lind | |
| | Othello | |
| | Ritzville | |
| | Washtucna | |
| | **County Total:** | 0.1638732475% |

**Asotin County**

| | Asotin County | 0.4694498386% |
|---|---|---|
| | Asotin | |
| | Clarkston | |
| | **County Total:** | 0.4694498386% |

**Benton County**

| | Benton County | 1.4848831892% |
|---|---|---|
| | Benton City | |
| | Kennewick | 0.5415650564% |
| | Prosser | |
| | Richland | 0.4756779517% |
| | West Richland | 0.0459360490% |
| | **County Total:** | 2.5480622463% |

**Chelan County**

| | Chelan County | 0.7434914485% |
|---|---|---|
| | Cashmere | |
| | Chelan | |
| | Entiat | |
| | Leavenworth | |
| | Wenatchee | 0.2968333494% |
| | **County Total:** | 1.0403247979% |

**Clallam County**

| | Clallam County | 1.3076983401% |
|---|---|---|
| | Forks | |
| | Port Angeles | 0.4598370527% |
| | Sequim | |
| | **County Total:** | 1.7675353928% |

*** - Local Government appears in multiple counties    B-1

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Clark County** | | |
| | Clark County | 4.5149775326% |
| | Battle Ground | 0.1384729857% |
| | Camas | 0.2691592724% |
| | La Center | |
| | Ridgefield | |
| | Vancouver | 1.7306605325% |
| | Washougal | 0.1279328220% |
| | Woodland*** | |
| | Yacolt | |
| | **County Total:** | 6.7812031452% |
| | | |
| **Columbia County** | | |
| | Columbia County | 0.0561699537% |
| | Dayton | |
| | Starbuck | |
| | **County Total:** | 0.0561699537% |
| | | |
| **Cowlitz County** | | |
| | Cowlitz County | 1.7226945990% |
| | Castle Rock | |
| | Kalama | |
| | Kelso | 0.1331145270% |
| | Longview | 0.6162736905% |
| | Woodland*** | |
| | **County Total:** | 2.4720828165% |
| | | |
| **Douglas County** | | |
| | Douglas County | 0.3932175175% |
| | Bridgeport | |
| | Coulee Dam*** | |
| | East Wenatchee | 0.0799810865% |
| | Mansfield | |
| | Rock Island | |
| | Waterville | |
| | **County Total:** | 0.4731986040% |
| | | |
| **Ferry County** | | |
| | Ferry County | 0.1153487994% |
| | Republic | |
| | **County Total:** | 0.1153487994% |

H-27

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Franklin County** | | |
| | Franklin County | 0.3361237144% |
| | Connell | |
| | Kahlotus | |
| | Mesa | |
| | Pasco | 0.4278056066% |
| | **County Total:** | 0.7639293210% |
| | | |
| **Garfield County** | | |
| | Garfield County | 0.0321982209% |
| | Pomeroy | |
| | **County Total:** | 0.0321982209% |
| | | |
| **Grant County** | | |
| | Grant County | 0.9932572167% |
| | Coulee City | |
| | Coulee Dam*** | |
| | Electric City | |
| | Ephrata | |
| | George | |
| | Grand Coulee | |
| | Hartline | |
| | Krupp | |
| | Mattawa | |
| | Moses Lake | 0.2078293909% |
| | Quincy | |
| | Royal City | |
| | Soap Lake | |
| | Warden | |
| | Wilson Creek | |
| | **County Total:** | 1.2010866076% |

H-28

*** - Local Government appears in multiple counties    B-3

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Grays Harbor County** | | |
| | Grays Harbor County | 0.9992429138% |
| | Aberdeen | 0.2491525333% |
| | Cosmopolis | |
| | Elma | |
| | Hoquiam | |
| | McCleary | |
| | Montesano | |
| | Oakville | |
| | Ocean Shores | |
| | Westport | |
| | **County Total:** | 1.2483954471% |
| | | |
| **Island County** | | |
| | Island County | 0.6820422610% |
| | Coupeville | |
| | Langley | |
| | Oak Harbor | 0.2511550431% |
| | **County Total:** | 0.9331973041% |
| | | |
| **Jefferson County** | | |
| | Jefferson County | 0.4417137380% |
| | Port Townsend | |
| | **County Total:** | 0.4417137380% |

*** - Local Government appears in multiple counties    B-4

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **King County** | | |
| | King County | 13.9743722662% |
| | Algona | |
| | Auburn*** | 0.2622774917% |
| | Beaux Arts Village | |
| | Bellevue | 1.1300592573% |
| | Black Diamond | |
| | Bothell*** | 0.1821602716% |
| | Burien | 0.0270962921% |
| | Carnation | |
| | Clyde Hill | |
| | Covington | 0.0118134406% |
| | Des Moines | 0.1179764526% |
| | Duvall | |
| | Enumclaw*** | 0.0537768326% |
| | Federal Way | 0.3061452240% |
| | Hunts Point | |
| | Issaquah | 0.1876240107% |
| | Kenmore | 0.0204441024% |
| | Kent | 0.5377397676% |
| | Kirkland | 0.5453525246% |
| | Lake Forest Park | 0.0525439124% |
| | Maple Valley | 0.0093761587% |
| | Medina | |
| | Mercer Island | 0.1751797481% |
| | Milton*** | |
| | Newcastle | 0.0033117880% |
| | Normandy Park | |
| | North Bend | |
| | Pacific*** | |
| | Redmond | 0.4839486007% |
| | Renton | 0.7652626920% |
| | Sammamish | 0.0224369090% |
| | SeaTac | 0.1481551278% |
| | Seattle | 6.6032403816% |
| | Shoreline | 0.0435834501% |
| | Skykomish | |
| | Snoqualmie | 0.0649164481% |
| | Tukwila | 0.3032205739% |
| | Woodinville | 0.0185516364% |
| | Yarrow Point | |
| | **County Total:** | 26.0505653608% |

H-30

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Kitsap County** | | |
| | Kitsap County | 2.6294133668% |
| | Bainbridge Island | 0.1364686014% |
| | Bremerton | 0.6193374389% |
| | Port Orchard | 0.1009497162% |
| | Poulsbo | 0.0773748246% |
| | County Total: | 3.5635439479% |
| | | |
| **Kittitas County** | | |
| | Kittitas County | 0.3855704683% |
| | Cle Elum | |
| | Ellensburg | 0.0955824915% |
| | Kittitas | |
| | Roslyn | |
| | South Cle Elum | |
| | County Total: | 0.4811529598% |
| | | |
| **Klickitat County** | | |
| | Klickitat County | 0.2211673457% |
| | Bingen | |
| | Goldendale | |
| | White Salmon | |
| | County Total: | 0.2211673457% |
| | | |
| **Lewis County** | | |
| | Lewis County | 1.0777377479% |
| | Centralia | 0.1909990353% |
| | Chehalis | |
| | Morton | |
| | Mossyrock | |
| | Napavine | |
| | Pe Ell | |
| | Toledo | |
| | Vader | |
| | Winlock | |
| | County Total: | 1.2687367832% |

*** - Local Government appears in multiple counties    B-6

## EXHIBIT B

| County | Local Government | % Allocation |
|--------|------------------|--------------|
| **Lincoln County** | | |
| | Lincoln County | 0.1712669645% |
| | Almira | |
| | Creston | |
| | Davenport | |
| | Harrington | |
| | Odessa | |
| | Reardan | |
| | Sprague | |
| | Wilbur | |
| | **County Total:** | 0.1712669645% |
| | | |
| **Mason County** | | |
| | Mason County | 0.8089918012% |
| | Shelton | 0.1239179888% |
| | **County Total:** | 0.9329097900% |
| | | |
| **Okanogan County** | | |
| | Okanogan County | 0.6145043345% |
| | Brewster | |
| | Conconully | |
| | Coulee Dam*** | |
| | Elmer City | |
| | Nespelem | |
| | Okanogan | |
| | Omak | |
| | Oroville | |
| | Pateros | |
| | Riverside | |
| | Tonasket | |
| | Twisp | |
| | Winthrop | |
| | **County Total:** | 0.6145043345% |
| | | |
| **Pacific County** | | |
| | Pacific County | 0.4895416466% |
| | Ilwaco | |
| | Long Beach | |
| | Raymond | |
| | South Bend | |
| | **County Total:** | 0.4895416466% |

H-32

*** - Local Government appears in multiple counties

## EXHIBIT B

| County | Local Government | % Allocation |
|---|---|---|
| **Pend Oreille County** | | |
| | Pend Oreille County | 0.2566374940% |
| | Cusick | |
| | Ione | |
| | Metaline | |
| | Metaline Falls | |
| | Newport | |
| | **County Total:** | 0.2566374940% |
| | | |
| **Pierce County** | | |
| | Pierce County | 7.2310164020% |
| | Auburn*** | 0.0628522112% |
| | Bonney Lake | 0.1190773864% |
| | Buckley | |
| | Carbonado | |
| | DuPont | |
| | Eatonville | |
| | Edgewood | 0.0048016791% |
| | Enumclaw*** | 0.0000000000% |
| | Fife | 0.1955185481% |
| | Fircrest | |
| | Gig Harbor | 0.0859963345% |
| | Lakewood | 0.5253640894% |
| | Milton*** | |
| | Orting | |
| | Pacific*** | |
| | Puyallup | 0.3845704814% |
| | Roy | |
| | Ruston | |
| | South Prairie | |
| | Steilacoom | |
| | Sumner | 0.1083157569% |
| | Tacoma | 3.2816374617% |
| | University Place | 0.0353733363% |
| | Wilkeson | |
| | **County Total:** | 12.0345236870% |
| | | |
| **San Juan County** | | |
| | San Juan County | 0.2101495171% |
| | Friday Harbor | |
| | **County Total:** | 0.2101495171% |

*** - Local Government appears in multiple counties

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Skagit County** | | |
| | Skagit County | 1.0526023961% |
| | Anacortes | 0.1774962906% |
| | Burlington | 0.1146861661% |
| | Concrete | |
| | Hamilton | |
| | La Conner | |
| | Lyman | |
| | Mount Vernon | 0.2801063665% |
| | Sedro-Woolley | 0.0661146351% |
| | **County Total:** | 1.6910058544% |
| | | |
| **Skamania County** | | |
| | Skamania County | 0.1631931925% |
| | North Bonneville | |
| | Stevenson | |
| | **County Total:** | 0.1631931925% |
| | | |
| **Snohomish County** | | |
| | Snohomish County | 6.9054415622% |
| | Arlington | 0.2620524080% |
| | Bothell*** | 0.2654558588% |
| | Brier | |
| | Darrington | |
| | Edmonds | 0.3058936009% |
| | Everett | 1.9258363241% |
| | Gold Bar | |
| | Granite Falls | |
| | Index | |
| | Lake Stevens | 0.1385202891% |
| | Lynnwood | 0.7704629214% |
| | Marysville | 0.3945067827% |
| | Mill Creek | 0.1227939546% |
| | Monroe | 0.1771621898% |
| | Mountlake Terrace | 0.2108935805% |
| | Mukilteo | 0.2561790702% |
| | Snohomish | 0.0861097964% |
| | Stanwood | |
| | Sultan | |
| | Woodway | |
| | **County Total:** | 11.8213083387% |

H-34

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Spokane County** | | |
| | Spokane County | 5.5623859292% |
| | Airway Heights | |
| | Cheney | 0.1238454349% |
| | Deer Park | |
| | Fairfield | |
| | Latah | |
| | Liberty Lake | 0.0389636519% |
| | Medical Lake | |
| | Millwood | |
| | Rockford | |
| | Spangle | |
| | Spokane | 3.0872078287% |
| | Spokane Valley | 0.0684217500% |
| | Waverly | |
| | **County Total:** | 8.8808245947% |
| | | |
| **Stevens County** | | |
| | Stevens County | 0.7479240179% |
| | Chewelah | |
| | Colville | |
| | Kettle Falls | |
| | Marcus | |
| | Northport | |
| | Springdale | |
| | **County Total:** | 0.7479240179% |
| | | |
| **Thurston County** | | |
| | Thurston County | 2.3258492094% |
| | Bucoda | |
| | Lacey | 0.2348627221% |
| | Olympia | 0.6039423385% |
| | Rainier | |
| | Tenino | |
| | Tumwater | 0.2065982350% |
| | Yelm | |
| | **County Total:** | 3.3712525050% |
| | | |
| **Wahkiakum County** | | |
| | Wahkiakum County | 0.0596582197% |
| | Cathlamet | |
| | **County Total:** | 0.0596582197% |

H-35

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Walla Walla County** | | |
| | Walla Walla County | 0.5543870294% |
| | College Place | |
| | Prescott | |
| | Waitsburg | |
| | Walla Walla | 0.3140768654% |
| | **County Total:** | 0.8684638948% |
| | | |
| **Whatcom County** | | |
| | Whatcom County | 1.3452637306% |
| | Bellingham | 0.8978614577% |
| | Blaine | |
| | Everson | |
| | Ferndale | 0.0646101891% |
| | Lynden | 0.0827115612% |
| | Nooksack | |
| | Sumas | |
| | **County Total:** | 2.3904469386% |
| | | |
| **Whitman County** | | |
| | Whitman County | 0.2626805837% |
| | Albion | |
| | Colfax | |
| | Colton | |
| | Endicott | |
| | Farmington | |
| | Garfield | |
| | LaCrosse | |
| | Lamont | |
| | Malden | |
| | Oakesdale | |
| | Palouse | |
| | Pullman | 0.2214837491% |
| | Rosalia | |
| | St. John | |
| | Tekoa | |
| | Uniontown | |
| | **County Total:** | 0.4841643328% |

*** - Local Government appears in multiple counties    B-11

**EXHIBIT B**

| County | Local Government | % Allocation |
|---|---|---|
| **Yakima County** | | |
| | Yakima County | 1.9388392959% |
| | Grandview | 0.0530606109% |
| | Granger | |
| | Harrah | |
| | Mabton | |
| | Moxee | |
| | Naches | |
| | Selah | |
| | Sunnyside | 0.1213478384% |
| | Tieton | |
| | Toppenish | |
| | Union Gap | |
| | Wapato | |
| | Yakima | 0.6060410539% |
| | Zillah | |
| | **County Total:** | 2.7192887991% |

H-37

# Exhibit C

## KING COUNTY REGIONAL AGREEMENT

King County intends to explore coordination with its cities and towns to facilitate a Regional Agreement for Opioid Fund allocation. Should some cities and towns choose not to participate in a Regional Agreement, this shall not preclude coordinated allocation for programs and services between the County and those cities and towns who elect to pursue a Regional Agreement. As contemplated in C.5 of the MOU, any Regional Agreement shall comply with the terms of the MOU and any Settlement. If no Regional Agreement is achieved, the default methodology for allocation in C.4 of the MOU shall apply.

**EXHIBIT I**

**Settlement Fund Administrator Terms**

I. **Definitions**

    A. This Settlement Fund Administrator Terms incorporates all defined terms in the Janssen Washington State-Wide Opioid Settlement Agreement ("Janssen Settlement Agreement"), unless otherwise defined herein, and shall be interpreted in a manner consistent with the Janssen Settlement Agreement.

II. **Establishment of the Settlement Fund Administrator**

    A. *Selection of the Settlement Fund Administrator.*

        i. Subject to the removal provisions under Section II.C below, BrownGreer PLC is hereby selected as the Settlement Fund Administrator.

        ii. Within thirty (30) calendar days of the Effective Date of the Janssen Settlement Agreement, unless such time is extended by written agreement of Janssen and the State, a contract shall be negotiated and finalized with BrownGreer PLC.

        iii. The terms of the Settlement Fund Administrator shall be for the duration of the Janssen Settlement Agreement or as otherwise specified in the contract executed with such entity, unless the Settlement Fund Administrator is removed pursuant to Section II.C below.

    B. *Governance of the Settlement Fund Administrator.*

        i. The Settlement Fund Administrator will act as an independent and neutral third party to determine the allocation of payments under Section VI.C of the Janssen Settlement Agreement; administer and disburse funds from the Settlement Fund; and perform other duties as described below and in the Janssen Settlement Agreement.

        ii. All parties to the Janssen Settlement Agreement are entitled to rely upon information received from the Settlement Fund Administrator, whether in oral, written, or other form.  No Party to the Janssen Settlement Agreement shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any party for or in connection with any action taken or not taken by the Settlement Fund Administrator.  In addition, no Party to the Janssen Settlement Agreement shall have any liability (whether direct or indirect, in contract or tort or otherwise) to any party for or in connection with any action taken or not taken by Janssen based on incorrect, inaccurate, incomplete or otherwise erroneous information or data provided by the Settlement Fund Administrator.  For the avoidance of doubt, nothing in this paragraph alters Sections I to XI of the Janssen Settlement Agreement or any of the exhibits thereto.

C.  *Removal of the Settlement Fund Administrator*.

    i.  The Settlement Fund Administrator may be removed for cause.  The contract with each entity shall describe the standards for removing that entity for cause.

    ii.  Disputes regarding the performance and/or removal of the Settlement Fund Administrator will be resolved in accordance with Section X of the Janssen Settlement Agreement.

D.  *Funding of the Settlement Fund Administrator*.

    i.  The costs and fees associated with or arising out of the duties of the Settlement Fund Administrator shall be paid from the interest accrued on the LG Share portion of the funds in the Settlement Fund between the date of Janssen's payment and the date of disbursement to the Subdivisions.  Should such interest prove insufficient, the remaining costs and fees of the Settlement Fund Administrator shall be paid by Janssen.  Payments will be made to the Settlement Fund Administrator within thirty (30) days after the initial disbursements to the State and the Subdivisions are completed, and if applicable, thirty (30) days after any holdback disbursement under Section V.D of the Janssen Settlement Agreement.

    ii.  There will be a cap on the costs and fees of the Settlement Fund Administrator, which shall be dependent on the scope of services, the number and timing of distributions from the Settlement Fund, and the Settlement Fund Administrator's reporting requirements.  The cap on fees and costs shall be specified in the contract executed with the Settlement Fund Administrator.

## III.  Calculation and Allocation of Payments

A.  *General Principles.*

    i.  This Section III is intended to implement the relevant provisions of Sections VI and IX.B of the Janssen Settlement Agreement, the exhibits thereto, and the One Washington Memorandum of Understanding Between Washington Municipalities (the "*One Washington MOU*").  To the extent this Section III conflicts with the Janssen Settlement Agreement and/or the exhibits thereto, the Janssen Settlement Agreement shall control.

    ii.  The Settlement Fund Administrator is entitled to rely upon information received from the Parties to the Janssen Settlement Agreement, whether in oral, written, or other form, for the purpose for which it was submitted, provided that such information is not disputed by another Party.

B.  *Establishment of Settlement Fund.*

    i.  The Settlement Fund Administrator shall establish a Settlement Fund, as defined in Section II.25 of the Janssen Settlement Agreement and subject to Section IV.B below.

C.  *Calculation of Allocations and Disbursement of Amounts from Settlement Fund.*

    i.  The Settlement Fund Administrator shall be responsible for calculating the allocation of Net Settlement Amount payments under Section VI of the Janssen Settlement Agreement and the One Washington MOU, as well as Participating Litigating Subdivisions' attorneys' fees and costs under Section IX.B of the Janssen Settlement Agreement and the One Washington MOU.

    ii.  If the Janssen Settlement Agreement becomes effective and Janssen pays the Net Settlement Amount into the Settlement Fund pursuant to Sections V.B and V.C of the Janssen Settlement Agreement (subject to any holdback under Section V.D of the Janssen Settlement Agreement), the Settlement Fund Administrator shall:

        1.  disburse or cause to be disbursed 50% of the Net Settlement Amount to the State, pursuant to Section VI.A.1 of the Janssen Settlement Agreement;

        2.  deposit 15% of the 50% LG Share of the Net Settlement Amount into a government fee subfund, pursuant to Section D of the One Washington MOU; and

        3.  allocate and disburse or cause to be disbursed the remainder of the LG Share of the Net Settlement Amount to Participating Subdivisions in accordance with Sections B.3 and B.4 of the One Washington MOU.

    iii.  The Settlement Fund Administrator, in cooperation with the Opioid Fee and Expense Committee as defined in the One Washington MOU, shall disburse or cause to be disbursed the monies in the government fee subfund according to the procedures set forth in Section D of the One Washington MOU.

    iv.  If Janssen pays the $6,167,000 holdback amount into the Settlement Fund pursuant to Section V.D of the Janssen Settlement Agreement, the Settlement Fund Administrator shall allocate, deposite, and disburse or cause to be disbursed such holdback payment according to the principles stated in Sections III.C.ii and III.C.iii above.

IV.  **Reporting Obligations**

A.  *Reporting of Non-Opioid Remediation Uses.*

    i.  The Settlement Fund Administrator shall set up a system to receive and preserve reports from the State States and Participating Subdivisions that have used monies from the Settlement Fund for purposes that do not qualify as Opioid Remediation, pursuant to Section VI.D of the Janssen Settlement Agreement.  The Settlement Fund Administrator will not require the State and Participating Subdivisions without any such uses of money to submit a report, and the Settlement Fund Administrator may

treat the failure to submit a report as confirmation that the State or Participating Subdivision had no such uses of money.

ii. The State and Participating Subdivisions shall report to the Settlement Fund Administrator and Janssen the amount of funds received from the Settlement Fund used for purposes that do not qualify as Opioid Remediation (pursuant to Section VI.D of the Janssen Settlement Agreement).  Such reports to the Settlement Fund Administrator and Janssen shall identify how such funds were used, including if used to pay attorneys' fees, investigation costs, litigation costs, or costs related to the operation and enforcement of the Janssen Settlement Agreement, respectively.  Such State or Participating Subdivision shall make such reports to the Settlement Fund Administrator and Janssen with respect to each six-month period ending on June 30 or December 31 of any year in which funds are received from the Settlement Fund.  Such State or Participating Subdivision shall make each such report within ninety (90) days of the end of the applicable six-month period.

iii. The Settlement Fund Administrator shall make the reporting under this Section IV.A available to the public.

iv. The Settlement Fund Administrator shall track and assist in the report of the amount of remediation disbursed or applied during each fiscal year, broken down by primary funded strategy category listed in Exhibit J of the Janssen Settlement Agreement (with any permissible common costs prorated among strategies).

v. Upon request by Janssen, the Settlement Fund Administrator shall agree to perform such further acts and to execute and deliver such further documents as may be reasonably necessary for Janssen to establish the statements set forth in Section XI.B of the Janssen Settlement Agreement to the satisfaction of their tax advisors, their independent financial auditors, the Internal Revenue Service, or any other governmental authority, including as contemplated by Treasury Regulations Section 1.162-21(b)(3)(ii) and any subsequently proposed or finalized relevant regulations or administrative guidance.  Nothing herein shall be read to conflict with or limit the Parties' obligations under Sections XI.B and XI.C of the Janssen Settlement Agreement.

B. *Qualified Settlement Fund Treatment.*

i. Janssen and the Settlement Fund Administrator shall agree that the Settlement Fund is intended to be classified as a "qualified settlement fund" within the meaning of Treasury regulations Section 1.468B-1, *et seq.* (and corresponding or similar provisions of state, local, or foreign law, as applicable).  The Settlement Fund Administrator or any independent certified public accounting firm selected by Janssen to serve as administrator of the Settlement Fund for tax purposes (the "Tax Administrator") shall not take any action or tax position inconsistent with such treatment.  The Settlement Fund shall be treated as a qualified

settlement fund from the earliest date possible, and Janssen and the Settlement Fund Administrator shall agree to any relation-back election required to treat the Settlement Fund as a qualified settlement fund from the earliest date possible.

ii. The Settlement Fund Administrator or the Tax Administrator shall serve as administrator of the Settlement Fund for tax purposes.  The Settlement Fund Administrator or Tax Administrator shall (i) obtain federal and state taxpayer identification numbers for the Settlement Fund and provide the same to Janssen and the Settlement Fund Administrator, (ii) be responsible for all tax reporting, withholding and filing requirements for the Settlement Fund, (iii) provide instructions to Janssen and the Settlement Fund Administrator for the release of sufficient funds from the Settlement Fund to pay all taxes owed by the Settlement Fund in accordance with Treasury regulations Section 1.468B-2 and any applicable state, local or other tax laws, and (iv) send copies of all such tax filings and returns to Janssen and the Settlement Fund Administrator.  Janssen and the Settlement Fund Administrator shall provide such cooperation and information as the Tax Administrator may reasonably request in performing the responsibilities set forth in this Section IV.

## EXHIBIT J

### List of Opioid Remediation Uses

**Schedule A**
**Core Strategies**

States and Qualifying Block Grantees shall choose from among the abatement strategies listed in Schedule B. However, priority shall be given to the following core abatement strategies ("*Core Strategies*").[1]

**A.** **NALOXONE OR OTHER FDA-APPROVED DRUG TO REVERSE OPIOID OVERDOSES**

Expand training for first responders, schools, community support groups and families; and

Increase distribution to individuals who are uninsured or whose insurance does not cover the needed service.

**B.** **MEDICATION-ASSISTED TREATMENT ("*MAT*") DISTRIBUTION AND OTHER OPIOID-RELATED TREATMENT**

1. Increase distribution of MAT to individuals who are uninsured or whose insurance does not cover the needed service;

2. Provide education to school-based and youth-focused programs that discourage or prevent misuse;

3. Provide MAT education and awareness training to healthcare providers, EMTs, law enforcement, and other first responders; and

4. Provide treatment and recovery support services such as residential and inpatient treatment, intensive outpatient treatment, outpatient therapy or counseling, and recovery housing that allow or integrate medication and with other support services.

---

[1] As used in this Schedule A, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

C. **PREGNANT & POSTPARTUM WOMEN**

    1.     Expand Screening, Brief Intervention, and Referral to Treatment ("*SBIRT*") services to non-Medicaid eligible or uninsured pregnant women;

    2.     Expand comprehensive evidence-based treatment and recovery services, including MAT, for women with co-occurring Opioid Use Disorder ("*OUD*") and other Substance Use Disorder ("*SUD*")/Mental Health disorders for uninsured individuals for up to 12 months postpartum; and

    3.     Provide comprehensive wrap-around services to individuals with OUD, including housing, transportation, job placement/training, and childcare.

D. **EXPANDING TREATMENT FOR NEONATAL ABSTINENCE SYNDROME ("*NAS*")**

    1.     Expand comprehensive evidence-based and recovery support for NAS babies;

    2.     Expand services for better continuum of care with infant-need dyad; and

    3.     Expand long-term treatment and services for medical monitoring of NAS babies and their families.

E. **EXPANSION OF WARM HAND-OFF PROGRAMS AND RECOVERY SERVICES**

    1.     Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments;

    2.     Expand warm hand-off services to transition to recovery services;

    3.     Broaden scope of recovery services to include co-occurring SUD or mental health conditions;

    4.     Provide comprehensive wrap-around services to individuals in recovery, including housing, transportation, job placement/training, and childcare; and

    5.     Hire additional social workers or other behavioral health workers to facilitate expansions above.

**F.     TREATMENT FOR INCARCERATED POPULATION**

1.     Provide evidence-based treatment and recovery support, including MAT for persons with OUD and co-occurring SUD/MH disorders within and transitioning out of the criminal justice system; and

2.     Increase funding for jails to provide treatment to inmates with OUD.

**G.     PREVENTION PROGRAMS**

1.     Funding for media campaigns to prevent opioid use (similar to the FDA's "Real Cost" campaign to prevent youth from misusing tobacco);

2.     Funding for evidence-based prevention programs in schools;

3.     Funding for medical provider education and outreach regarding best prescribing practices for opioids consistent with the 2016 CDC guidelines, including providers at hospitals (academic detailing);

4.     Funding for community drug disposal programs; and

5.     Funding and training for first responders to participate in pre-arrest diversion programs, post-overdose response teams, or similar strategies that connect at-risk individuals to behavioral health services and supports.

**H.     EXPANDING SYRINGE SERVICE PROGRAMS**

1.     Provide comprehensive syringe services programs with more wrap-around services, including linkage to OUD treatment, access to sterile syringes and linkage to care and treatment of infectious diseases.

**I.     EVIDENCE-BASED DATA COLLECTION AND RESEARCH ANALYZING THE EFFECTIVENESS OF THE ABATEMENT STRATEGIES WITHIN THE STATE**

**Schedule B**
**Approved Uses**

Support treatment of Opioid Use Disorder (OUD) and any co-occurring Substance Use Disorder or Mental Health (SUD/MH) conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

| PART ONE:  TREATMENT |
|---|

## A. <u>TREAT OPIOID USE DISORDER (OUD)</u>

Support treatment of Opioid Use Disorder ("*OUD*") and any co-occurring Substance Use Disorder or Mental Health ("*SUD/MH*") conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:[2]

1. Expand availability of treatment for OUD and any co-occurring SUD/MH conditions, including all forms of Medication-Assisted Treatment ("*MAT*") approved by the U.S. Food and Drug Administration.

2. Support and reimburse evidence-based services that adhere to the American Society of Addiction Medicine ("*ASAM*") continuum of care for OUD and any co-occurring SUD/MH conditions.

3. Expand telehealth to increase access to treatment for OUD and any co-occurring SUD/MH conditions, including MAT, as well as counseling, psychiatric support, and other treatment and recovery support services.

4. Improve oversight of Opioid Treatment Programs ("*OTPs*") to assure evidence-based or evidence-informed practices such as adequate methadone dosing and low threshold approaches to treatment.

5. Support mobile intervention, treatment, and recovery services, offered by qualified professionals and service providers, such as peer recovery coaches, for persons with OUD and any co-occurring SUD/MH conditions and for persons who have experienced an opioid overdose.

6. Provide treatment of trauma for individuals with OUD (*e.g.*, violence, sexual assault, human trafficking, or adverse childhood experiences) and family members (*e.g.*, surviving family members after an overdose or overdose fatality), and training of health care personnel to identify and address such trauma.

7. Support evidence-based withdrawal management services for people with OUD and any co-occurring mental health conditions.

---

[2] As used in this Schedule B, words like "expand," "fund," "provide" or the like shall not indicate a preference for new or existing programs.

8. Provide training on MAT for health care providers, first responders, students, or other supporting professionals, such as peer recovery coaches or recovery outreach specialists, including telementoring to assist community-based providers in rural or underserved areas.

9. Support workforce development for addiction professionals who work with persons with OUD and any co-occurring SUD/MH conditions.

10. Offer fellowships for addiction medicine specialists for direct patient care, instructors, and clinical research for treatments.

11. Offer scholarships and supports for behavioral health practitioners or workers involved in addressing OUD and any co-occurring SUD/MH or mental health conditions, including, but not limited to, training, scholarships, fellowships, loan repayment programs, or other incentives for providers to work in rural or underserved areas.

12. Provide funding and training for clinicians to obtain a waiver under the federal Drug Addiction Treatment Act of 2000 ("*DATA 2000*") to prescribe MAT for OUD, and provide technical assistance and professional support to clinicians who have obtained a DATA 2000 waiver.

13. Disseminate web-based training curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service–Opioids web-based training curriculum and motivational interviewing.

14. Develop and disseminate new curricula, such as the American Academy of Addiction Psychiatry's Provider Clinical Support Service for Medication–Assisted Treatment.

## B. <u>SUPPORT PEOPLE IN TREATMENT AND RECOVERY</u>

Support people in recovery from OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the programs or strategies that:

1. Provide comprehensive wrap-around services to individuals with OUD and any co-occurring SUD/MH conditions, including housing, transportation, education, job placement, job training, or childcare.

2. Provide the full continuum of care of treatment and recovery services for OUD and any co-occurring SUD/MH conditions, including supportive housing, peer support services and counseling, community navigators, case management, and connections to community-based services.

3. Provide counseling, peer-support, recovery case management and residential treatment with access to medications for those who need it to persons with OUD and any co-occurring SUD/MH conditions.

4. Provide access to housing for people with OUD and any co-occurring SUD/MH conditions, including supportive housing, recovery housing, housing assistance programs, training for housing providers, or recovery housing programs that allow or integrate FDA-approved mediation with other support services.

5. Provide community support services, including social and legal services, to assist in deinstitutionalizing persons with OUD and any co-occurring SUD/MH conditions.

6. Support or expand peer-recovery centers, which may include support groups, social events, computer access, or other services for persons with OUD and any co-occurring SUD/MH conditions.

7. Provide or support transportation to treatment or recovery programs or services for persons with OUD and any co-occurring SUD/MH conditions.

8. Provide employment training or educational services for persons in treatment for or recovery from OUD and any co-occurring SUD/MH conditions.

9. Identify successful recovery programs such as physician, pilot, and college recovery programs, and provide support and technical assistance to increase the number and capacity of high-quality programs to help those in recovery.

10. Engage non-profits, faith-based communities, and community coalitions to support people in treatment and recovery and to support family members in their efforts to support the person with OUD in the family.

11. Provide training and development of procedures for government staff to appropriately interact and provide social and other services to individuals with or in recovery from OUD, including reducing stigma.

12. Support stigma reduction efforts regarding treatment and support for persons with OUD, including reducing the stigma on effective treatment.

13. Create or support culturally appropriate services and programs for persons with OUD and any co-occurring SUD/MH conditions, including new Americans.

14. Create and/or support recovery high schools.

15. Hire or train behavioral health workers to provide or expand any of the services or supports listed above.

## C.  CONNECT PEOPLE WHO NEED HELP TO THE HELP THEY NEED (CONNECTIONS TO CARE)

Provide connections to care for people who have—or are at risk of developing—OUD and any co-occurring SUD/MH conditions through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

J-6

1. Ensure that health care providers are screening for OUD and other risk factors and know how to appropriately counsel and treat (or refer if necessary) a patient for OUD treatment.

2. Fund SBIRT programs to reduce the transition from use to disorders, including SBIRT services to pregnant women who are uninsured or not eligible for Medicaid.

3. Provide training and long-term implementation of SBIRT in key systems (health, schools, colleges, criminal justice, and probation), with a focus on youth and young adults when transition from misuse to opioid disorder is common.

4. Purchase automated versions of SBIRT and support ongoing costs of the technology.

5. Expand services such as navigators and on-call teams to begin MAT in hospital emergency departments.

6. Provide training for emergency room personnel treating opioid overdose patients on post-discharge planning, including community referrals for MAT, recovery case management or support services.

7. Support hospital programs that transition persons with OUD and any co-occurring SUD/MH conditions, or persons who have experienced an opioid overdose, into clinically appropriate follow-up care through a bridge clinic or similar approach.

8. Support crisis stabilization centers that serve as an alternative to hospital emergency departments for persons with OUD and any co-occurring SUD/MH conditions or persons that have experienced an opioid overdose.

9. Support the work of Emergency Medical Systems, including peer support specialists, to connect individuals to treatment or other appropriate services following an opioid overdose or other opioid-related adverse event.

10. Provide funding for peer support specialists or recovery coaches in emergency departments, detox facilities, recovery centers, recovery housing, or similar settings; offer services, supports, or connections to care to persons with OUD and any co-occurring SUD/MH conditions or to persons who have experienced an opioid overdose.

11. Expand warm hand-off services to transition to recovery services.

12. Create or support school-based contacts that parents can engage with to seek immediate treatment services for their child; and support prevention, intervention, treatment, and recovery programs focused on young people.

13. Develop and support best practices on addressing OUD in the workplace.

14. Support assistance programs for health care providers with OUD.

15. Engage non-profits and the faith community as a system to support outreach for treatment.

16. Support centralized call centers that provide information and connections to appropriate services and supports for persons with OUD and any co-occurring SUD/MH conditions.

## D. **ADDRESS THE NEEDS OF CRIMINAL JUSTICE-INVOLVED PERSONS**

Address the needs of persons with OUD and any co-occurring SUD/MH conditions who are involved in, are at risk of becoming involved in, or are transitioning out of the criminal justice system through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1. Support pre-arrest or pre-arraignment diversion and deflection strategies for persons with OUD and any co-occurring SUD/MH conditions, including established strategies such as:

    1. Self-referral strategies such as the Angel Programs or the Police Assisted Addiction Recovery Initiative ("*PAARI*");

    2. Active outreach strategies such as the Drug Abuse Response Team ("*DART*") model;

    3. "Naloxone Plus" strategies, which work to ensure that individuals who have received naloxone to reverse the effects of an overdose are then linked to treatment programs or other appropriate services;

    4. Officer prevention strategies, such as the Law Enforcement Assisted Diversion ("*LEAD*") model;

    5. Officer intervention strategies such as the Leon County, Florida Adult Civil Citation Network or the Chicago Westside Narcotics Diversion to Treatment Initiative; or

    6. Co-responder and/or alternative responder models to address OUD-related 911 calls with greater SUD expertise.

2. Support pre-trial services that connect individuals with OUD and any co-occurring SUD/MH conditions to evidence-informed treatment, including MAT, and related services.

3. Support treatment and recovery courts that provide evidence-based options for persons with OUD and any co-occurring SUD/MH conditions.

4. Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are incarcerated in jail or prison.

J-8

5.  Provide evidence-informed treatment, including MAT, recovery support, harm reduction, or other appropriate services to individuals with OUD and any co-occurring SUD/MH conditions who are leaving jail or prison or have recently left jail or prison, are on probation or parole, are under community corrections supervision, or are in re-entry programs or facilities.

6.  Support critical time interventions ("*CTI*"), particularly for individuals living with dual-diagnosis OUD/serious mental illness, and services for individuals who face immediate risks and service needs and risks upon release from correctional settings.

7.  Provide training on best practices for addressing the needs of criminal justice-involved persons with OUD and any co-occurring SUD/MH conditions to law enforcement, correctional, or judicial personnel or to providers of treatment, recovery, harm reduction, case management, or other services offered in connection with any of the strategies described in this section.

**E.  ADDRESS THE NEEDS OF PREGNANT OR PARENTING WOMEN AND THEIR FAMILIES, INCLUDING BABIES WITH NEONATAL ABSTINENCE SYNDROME**

Address the needs of pregnant or parenting women with OUD and any co-occurring SUD/MH conditions, and the needs of their families, including babies with neonatal abstinence syndrome ("*NAS*"), through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, those that:

1.  Support evidence-based or evidence-informed treatment, including MAT, recovery services and supports, and prevention services for pregnant women—or women who could become pregnant—who have OUD and any co-occurring SUD/MH conditions, and other measures to educate and provide support to families affected by Neonatal Abstinence Syndrome.

2.  Expand comprehensive evidence-based treatment and recovery services, including MAT, for uninsured women with OUD and any co-occurring SUD/MH conditions for up to 12 months postpartum.

3.  Provide training for obstetricians or other healthcare personnel who work with pregnant women and their families regarding treatment of OUD and any co-occurring SUD/MH conditions.

4.  Expand comprehensive evidence-based treatment and recovery support for NAS babies; expand services for better continuum of care with infant-need dyad; and expand long-term treatment and services for medical monitoring of NAS babies and their families.

5.  Provide training to health care providers who work with pregnant or parenting women on best practices for compliance with federal requirements that children born with NAS get referred to appropriate services and receive a plan of safe care.

J-9

6. Provide child and family supports for parenting women with OUD and any co-occurring SUD/MH conditions.

7. Provide enhanced family support and child care services for parents with OUD and any co-occurring SUD/MH conditions.

8. Provide enhanced support for children and family members suffering trauma as a result of addiction in the family; and offer trauma-informed behavioral health treatment for adverse childhood events.

9. Offer home-based wrap-around services to persons with OUD and any co-occurring SUD/MH conditions, including, but not limited to, parent skills training.

10. Provide support for Children's Services—Fund additional positions and services, including supportive housing and other residential services, relating to children being removed from the home and/or placed in foster care due to custodial opioid use.

> PART TWO:  PREVENTION

## F. **PREVENT OVER-PRESCRIBING AND ENSURE APPROPRIATE PRESCRIBING AND DISPENSING OF OPIOIDS**

Support efforts to prevent over-prescribing and ensure appropriate prescribing and dispensing of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding medical provider education and outreach regarding best prescribing practices for opioids consistent with the Guidelines for Prescribing Opioids for Chronic Pain from the U.S. Centers for Disease Control and Prevention, including providers at hospitals (academic detailing).

2. Training for health care providers regarding safe and responsible opioid prescribing, dosing, and tapering patients off opioids.

3. Continuing Medical Education (CME) on appropriate prescribing of opioids.

4. Providing Support for non-opioid pain treatment alternatives, including training providers to offer or refer to multi-modal, evidence-informed treatment of pain.

5. Supporting enhancements or improvements to Prescription Drug Monitoring Programs ("*PDMPs*"), including, but not limited to, improvements that:

    1. Increase the number of prescribers using PDMPs;

    2. Improve point-of-care decision-making by increasing the quantity, quality, or format of data available to prescribers using PDMPs, by improving the interface that prescribers use to access PDMP data, or both; or

    3. Enable states to use PDMP data in support of surveillance or intervention strategies, including MAT referrals and follow-up for individuals identified within PDMP data as likely to experience OUD in a manner that complies with all relevant privacy and security laws and rules.

6. Ensuring PDMPs incorporate available overdose/naloxone deployment data, including the United States Department of Transportation's Emergency Medical Technician overdose database in a manner that complies with all relevant privacy and security laws and rules.

7. Increasing electronic prescribing to prevent diversion or forgery.

8. Educating dispensers on appropriate opioid dispensing.

## G. PREVENT MISUSE OF OPIOIDS

Support efforts to discourage or prevent misuse of opioids through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Funding media campaigns to prevent opioid misuse.

2. Corrective advertising or affirmative public education campaigns based on evidence.

3. Public education relating to drug disposal.

4. Drug take-back disposal or destruction programs.

5. Funding community anti-drug coalitions that engage in drug prevention efforts.

6. Supporting community coalitions in implementing evidence-informed prevention, such as reduced social access and physical access, stigma reduction—including staffing, educational campaigns, support for people in treatment or recovery, or training of coalitions in evidence-informed implementation, including the Strategic Prevention Framework developed by the U.S. Substance Abuse and Mental Health Services Administration ("*SAMHSA*").

7. Engaging non-profits and faith-based communities as systems to support prevention.

8. Funding evidence-based prevention programs in schools or evidence-informed school and community education programs and campaigns for students, families, school employees, school athletic programs, parent-teacher and student associations, and others.

9. School-based or youth-focused programs or strategies that have demonstrated effectiveness in preventing drug misuse and seem likely to be effective in preventing the uptake and use of opioids.

10. Create or support community-based education or intervention services for families, youth, and adolescents at risk for OUD and any co-occurring SUD/MH conditions.

11. Support evidence-informed programs or curricula to address mental health needs of young people who may be at risk of misusing opioids or other drugs, including emotional modulation and resilience skills.

12. Support greater access to mental health services and supports for young people, including services and supports provided by school nurses, behavioral health workers or other school staff, to address mental health needs in young people that (when not properly addressed) increase the risk of opioid or another drug misuse.

## H.   PREVENT OVERDOSE DEATHS AND OTHER HARMS (HARM REDUCTION)

Support efforts to prevent or reduce overdose deaths or other opioid-related harms through evidence-based or evidence-informed programs or strategies that may include, but are not limited to, the following:

1. Increased availability and distribution of naloxone and other drugs that treat overdoses for first responders, overdose patients, individuals with OUD and their friends and family members, schools, community navigators and outreach workers, persons being released from jail or prison, or other members of the general public.

2. Public health entities providing free naloxone to anyone in the community.

3. Training and education regarding naloxone and other drugs that treat overdoses for first responders, overdose patients, patients taking opioids, families, schools, community support groups, and other members of the general public.

4. Enabling school nurses and other school staff to respond to opioid overdoses, and provide them with naloxone, training, and support.

5. Expanding, improving, or developing data tracking software and applications for overdoses/naloxone revivals.

6. Public education relating to emergency responses to overdoses.

7. Public education relating to immunity and Good Samaritan laws.

8. Educating first responders regarding the existence and operation of immunity and Good Samaritan laws.

9. Syringe service programs and other evidence-informed programs to reduce harms associated with intravenous drug use, including supplies, staffing, space, peer support services, referrals to treatment, fentanyl checking, connections to care, and the full range of harm reduction and treatment services provided by these programs.

10. Expanding access to testing and treatment for infectious diseases such as HIV and Hepatitis C resulting from intravenous opioid use.

11. Supporting mobile units that offer or provide referrals to harm reduction services, treatment, recovery supports, health care, or other appropriate services to persons that use opioids or persons with OUD and any co-occurring SUD/MH conditions.

12. Providing training in harm reduction strategies to health care providers, students, peer recovery coaches, recovery outreach specialists, or other professionals that provide care to persons who use opioids or persons with OUD and any co-occurring SUD/MH conditions.

13. Supporting screening for fentanyl in routine clinical toxicology testing.

---

| PART THREE:  OTHER STRATEGIES |
| --- |

---

## I.  FIRST RESPONDERS

In addition to items in section C, D and H relating to first responders, support the following:

1. Education of law enforcement or other first responders regarding appropriate practices and precautions when dealing with fentanyl or other drugs.

2. Provision of wellness and support services for first responders and others who experience secondary trauma associated with opioid-related emergency events.

## J.  LEADERSHIP, PLANNING AND COORDINATION

Support efforts to provide leadership, planning, coordination, facilitations, training and technical assistance to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, the following:

1. Statewide, regional, local or community regional planning to identify root causes of addiction and overdose, goals for reducing harms related to the opioid epidemic, and areas and populations with the greatest needs for treatment intervention services, and to support training and technical assistance and other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

2. A dashboard to (a) share reports, recommendations, or plans to spend opioid settlement funds; (b) to show how opioid settlement funds have been spent; (c) to report program or strategy outcomes; or (d) to track, share or visualize key opioid- or health-related indicators and supports as identified through collaborative statewide, regional, local or community processes.

3. Invest in infrastructure or staffing at government or not-for-profit agencies to support collaborative, cross-system coordination with the purpose of preventing

J-13

overprescribing, opioid misuse, or opioid overdoses, treating those with OUD and any co-occurring SUD/MH conditions, supporting them in treatment or recovery, connecting them to care, or implementing other strategies to abate the opioid epidemic described in this opioid abatement strategy list.

4. Provide resources to staff government oversight and management of opioid abatement programs.

## K. <u>TRAINING</u>

In addition to the training referred to throughout this document, support training to abate the opioid epidemic through activities, programs, or strategies that may include, but are not limited to, those that:

1. Provide funding for staff training or networking programs and services to improve the capability of government, community, and not-for-profit entities to abate the opioid crisis.

2. Support infrastructure and staffing for collaborative cross-system coordination to prevent opioid misuse, prevent overdoses, and treat those with OUD and any co-occurring SUD/MH conditions, or implement other strategies to abate the opioid epidemic described in this opioid abatement strategy list (*e.g.*, health care, primary care, pharmacies, PDMPs, etc.).

## L. <u>RESEARCH</u>

Support opioid abatement research that may include, but is not limited to, the following:

1. Monitoring, surveillance, data collection and evaluation of programs and strategies described in this opioid abatement strategy list.

2. Research non-opioid treatment of chronic pain.

3. Research on improved service delivery for modalities such as SBIRT that demonstrate promising but mixed results in populations vulnerable to opioid use disorders.

4. Research on novel harm reduction and prevention efforts such as the provision of fentanyl test strips.

5. Research on innovative supply-side enforcement efforts such as improved detection of mail-based delivery of synthetic opioids.

6. Expanded research on swift/certain/fair models to reduce and deter opioid misuse within criminal justice populations that build upon promising approaches used to address other substances (*e.g.*, Hawaii HOPE and Dakota 24/7).

7. Epidemiological surveillance of OUD-related behaviors in critical populations, including individuals entering the criminal justice system, including, but not limited to approaches modeled on the Arrestee Drug Abuse Monitoring ("*ADAM*") system.

8. Qualitative and quantitative research regarding public health risks and harm reduction opportunities within illicit drug markets, including surveys of market participants who sell or distribute illicit opioids.

9. Geospatial analysis of access barriers to MAT and their association with treatment engagement and treatment outcomes.