# EXHIBIT 3



June 9, 2024

**VIA EMAIL**
esi-opioids@quinnemanuel.com
Optum.opioid.team@alston.com

Re: *In re: National Prescription Opiate Litigation*, MDL No. 2804 (N.D. Ohio), *Lincoln County v. Richard Sackler, M.D.*, No. 20-op-45069 ("Track 13"); Discovery Letter

Counsel,

I write on behalf of Plaintiff Lincoln County (the "County") in response to the Express Scripts and Optum Defendants' ("Defendants") letter dated May 21, 2024 regarding the County's retention of emails for former employees. This supplements the information the County provided in its May 28, 2024 letter and provides an updated, comprehensive summary of the County's efforts to restore or replace relevant discovery. The County is willing to continue to meet and confer with Defendants to transparently answer any remaining questions relating to the scope of any document deletion and the County's ongoing efforts to remediate this issue.

## I. THE COUNTY'S EFFORTS TO RESTORE OR REPLACE POTENTIALLY RELEVANT DISCOVERY

### 1. The County Identified Sixteen Potentially Relevant Employees Who Left County Employment Between October 22, 2018 and February 29, 2024

The County has identified sixteen potentially relevant employees who left County employment between October 22, 2018 (when the County first retained outside counsel in this matter) and February 29, 2024 (when the County instituted a litigation hold) and for whom the County no longer has email files:[1]

1. Michael Pirtle, Emergency Services (911) Director (2005-2019)
2. Kelly Walters, Coroner (2015-2019)
3. Deputy Coroner, James Johnson (2015-2021)
4. Deputy Coroner, Brandon Phelps (2021-2023)
5. Deputy Coroner, Brian Reed (2014-2019)
6. Deputy Coroner, Kevin Schell (2021)
7. Crystal Hall, County Clerk (2011-2022)
8. Daniel Colbert, Presiding Commissioner (2011-2018)

[1] Seven former employees in this list (Michael Pirtle, Brian Reed, Daniel Colbert, Mason McNail, Bradley Beeman, and Emma Eplin) left County employment between October 22, 2018 and October 30, 2019 and were not captured in the County's initial search which focused on the October 31, 2019 (when the County filed this lawsuit) and February 29, 2024 period. The County believes the current list represents the universe of potentially relevant employees who left County employment during the at-issue time period for whom the County did not retain emails.

9. Jay Gourley, Project Coordinator (2015-2019)
10. John Cottle, Sheriff (2013-2020)
11. Michael Lang, Undersheriff (1996-2020)
12. Mason McNail, Narcotics Detective (2011-2020)
13. Bradley Beeman, Narcotics Detective (2015-2021)
14. Emma Eplin, Emergency Management Services Director (2015-2019)
15. James Sharp, Emergency Management Services Director (2018-2021)
16. Adam Stanek, Emergency Management Services Director (2018-2023)

**2. The County's Comprehensive Search Efforts**

As we have discussed in prior letters and previous meet and confers, the County has engaged - and continues to engage- in substantial efforts to restore the deleted email files for these sixteen former employees and/or, critically, to replace the information the emails likely contained through alternate discovery, including sending a team of attorneys and paralegals to Lincoln County for onsite investigation of alternative production sources. The County has interviewed employees from every relevant department and has had extensive conversations with the County's IT vendor. It has also performed comprehensive reviews of the County's electronic and paper files. While onsite, the County's team collected over thirty boxes of hard copy documents that are currently being scanned and uploaded for review. The County is also in the process of collecting or otherwise copying the hard drive used by Sheriff Cottle. The County is also in possession of and reviewing the servers containing the user files for every former employee who is missing emails; and the County is also reviewing non-custodial files for any information regarding these persons.

To date, the County has not found any physical back up files. However, the County has searched all servers hosted by each County department and located the following backup email files:

- <u>Crystal Hall</u>
  - E:\USERS\Clerk10\Old Clerk Files\Outlook Files\Outlook Data File - Crystal.pst
  - E:\USERS\Clerk10\Old Clerk Files\Outlook Files\Outlook Data File - Crystal(2).pst
  - E:\USERS\Clerk10\Old Clerk Files\Outlook Files\chall@lcclerk.com.pst
  - E:\USERS\Clerk10\Old Clerk Files\Outlook Files\chall@lcclerk.com - Crystal.pst

- <u>Dan Colbert</u>
  - E:\USERS\DanColbert\Outlook Files\dcolber@lcclerk.com.pst
  - E:\MIT\Documents\AppData\Local\Microsoft\Outlook\dcolbert@lcclerk.com.pst
  - E:\MIT\Documents\Outlook\dcolbert@lcclerk.com (1).ost

The email files for Ms. Hall contain her emails from September 16, 2011-February 1, 2012 (3,011 emails in total). The email files for Daniel Colbert contain his emails from January 21, 2011-August 14, 2014 (14,150 emails in total).

The County also identified the hard drives from the computers used by James Sharp and Adam Stanek who were the County's Emergency Management Agency ("EMA") Directors. The County no longer believes the EMA will have responsive or relevant discovery given the scope of its responsibilities however the County will still review these hard drives for same.

In addition, the County is able to pull emails to or from the relevant former employees (including emails where the relevant former employes are copied) from other employees' email files. In order to perform this search, the County upgraded the Microsoft Outlook licensing for the following twelve (12) relevant departments:

1. Ambulance District
2. Fire Protection District
3. Health Department
4. Project Coordinator
5. Emergency Management Agency
6. Clerk's Office
7. 911 District
8. Auditor
9. Coroner
10. Resource Board
11. Sheriff's Office
12. Public Administrator

These licenses gave the County the ability to search each former employee's email address across all relevant departments. Thus, for example, when the County searches former Coroner Kelly Walters' email address, the search will pull emails to or from Kelly Walters(including emails where Ms. Walters was copied) that are contained in the email files of ***any current employee in any relevant department***.[2] The County is currently running hit reports for each relevant former employee and expects to provide that information this week.

The County will produce all responsive, non-privileged emails it has restored or otherwise recovered for the at-issue former employees without counting the former employees as designated custodians.

Moreover, as the County describes in detail below, the County's investigation has determined that, in many cases, the County departments themselves—not the individual former employees listed above—possess the most relevant and responsive documents in this case. For example, this subset of email deletion does not affect, arrest records from 1996 to the present. Those records are maintained by the Sheriff's Office, not the individual Sheriff and the County is producing them.

---

[2] The Health Department is the only relevant department that has emails for both current and former employees. The other relevant departments only have emails for current employees.

The subset of email deletions also does not affect the critical Coroners' records. The County has coroner reports in electronic and hard copy formats going back to 1996. It is producing all of those.

The subset of email deletions does not affect the County's financial statements. It has those in electronic and hard copy from 1996 to the present and is producing them. The deletions do not affect the County Commissioner meeting minutes or records. The County has those in electronic and hard copy format back to 1996 and is producing them. The subset of email deletion does not affect third party audits or budgets. The County is producing both from hard copy and electronic records back to 1996. In short, each of the departments in which the former employees worked still possess non-email electronic documents stored on common drive (*e.g.*, SharePoint) and paper documents, which the County is reviewing and producing.

The County intends to produce a large subset of these documents in the shortest possible term and even without review (subject to clawback). This immediate production will include coroner reports, agenda and meeting minutes of the County Commission from 1996-2013 (agendas and meeting minutes from 2014-2024 have already been produced), audits, budgets, and financial statements.

The County will also make best efforts to facilitate the depositions of these former employees and will agree that the PBM Defendants' depositions of these employees will not count against their allotted number of depositions.

The County genuinely believes that the key information needed by Defendants to prepare their defenses and otherwise work up the case exist in these non-custodial sources, and that the emails of the at-issue former employees do not contain significant amounts of unique, relevant knowledge that cannot be obtained from the primary documents, other custodians, or through depositions of the former and current employees. The County also believes that its ongoing review of other employee emails and the hit reports it will produce this week will permit further constructive evaluation.

### 3. Summary of Search Efforts for Each Potentially Relevant Former Employees

The County's assessment relating specifically to each potentially-relevant former employee is as follows:

**Emergency Services Department (911)**
**(Michael Pirtle, Director)**

Michael Pirtle was the Director of the Emergency Services Department (911) from March 4, 2005 through December 31, 2019. The County is in the process of searching for and pulling any emails to or from Mr. Pirtle that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week.

The Emergency Services Department's most relevant information is contained in its record management system called Calico Computer Aided Dispatch ("CAD"), which includes reports of 911 calls from 2007 to the present. The CAD reports will include any information germane to individual 911 calls. The County is pulling pull CAD data from 2007 to present relating to police and ambulance dispatch. The Sheriff's Office also has an interactive Spotlight Crime Tracker based on CAD data that is publicly available, https://lincoln-county-sheriffs-office-missouri-lcsomo.hub.arcgis.com/pages/spotlight-crime-tracker. It includes a Drug Crimes tracker which provides a comprehensive look at the patterns of drug crimes from 2022 and 2023.

In addition, the County will produce numerous documents relating to the overall structure and organization of the Emergency Services Department. In 2020, the Emergency Services Department separated from the County and became an independent organization. From 1996-2019, any business relating to the Emergency Services Department would have been handled by the County Commission. Thus, it would be reflected in the County Commission's agendas/meeting minutes, budgets, financial statements, and/or audits—all of which the County is producing for the full temporal period. The Emergency Services Department has its own meeting minutes and agendas from 2020-present, which the County will also produce.

**Coroner's Office**
**(Kelly Walters, Coroner)**
**(James Johnson, Brandon Phelps, Brian Reed, and Kevin Schell, Deputy Coroners)**

Kelly Walters was the Coroner from 2015-2019. As described above, the County is in the process of searching for and pulling any emails to or from Ms. Walters that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week.

James Johnson, Brandon Phelps, Brian Reed, and Kevin Schell were Deputy Coroners from September 3, 2015-June 30, 2021; October 1, 2021-December 31, 2023; May 1, 2014-August 31, 2019; and July 1, 2021-September 30, 2021, respectively. The County is in the process of searching for and pulling any emails to or from the deputy coroners that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week. The County previously ran a more limited search against the email files it had for potential custodians and pulled 312 emails from the shared email address that the deputy coroners used (deputycoroner@lincolncountycoroner.com) from 2021-2023.

The Deputy Coroner is responsible for assisting the Coroner and responding to calls when the Coroner is unavailable. Beginning in September 2019, the Coroner used a shared email address (coroner@lincolncountycoroner.com), which covers some of the period during which James Johnson served as a Deputy Coroner and the entire period that Brandon Phelps and Kevin Schell served as a Deputy Coroner. In 2021, Stephanie Wahoski became the first Chief Deputy Coroner. Since that time, she has used the email address (chiefdeputycoroner@lincolncountycoroner.com), which also covers some of the period during which James Johnson served as a Deputy Coroner and the entire period that Brandon Phelps and Kevin Schell served as a Deputy Coroner. Based on the County's interview of Ms. Wahoski, the County expects the Coroner and Chief Deputy

Coroner's emails (which it is producing) to significantly overlap with the Deputy Coroner's emails and therefore will serve as suitable alternate custodians for the Deputy Coroners.

The most relevant information held by the Coroner's Office is contained in coroner reports, which are comprehensive summaries of each death the Coroner's Office has investigated and typically includes related documents, such as (where applicable) death certificates, autopsy reports, and police incident reports. From 2021 through the present, the Coroner's Office has used a record management system called Medicolegal Death Investigation Log ("MDI Log"). MDI Log contains all coroner reports from 2021 through the present. Prior to 2021, the Coroner's Office kept hard copy files of coroner reports. The County collected 24 boxes worth of hard copy files of coroner reports dating back to 1996. They are currently in the process of being scanned and uploaded for review. The County will produce all relevant coroner reports from 1996 to the present. In addition, because the Coroner's Office is part of the County, significant information relating to the Coroner's Office would be reflected in the County Commission's agendas, meeting minutes, budgets, financial statements, and/or audits—all of which the County will produce for the full temporal period.

**County Clerk**
**(Crystal Hall)**

Crystal Hall was the County Clerk from September 1, 2011-December 31, 2022. As described above, the County located backup files on the County Clerk's electronic server that contain Ms. Hall's email files. The County is still analyzing the contents of these files and will provide updates this week regarding the size and date range of the emails contained therein. The County is also in the process of searching for and pulling any emails to or from Ms. Hall that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week. The County previously ran a more limited search against the email files it had for potential custodians and pulled over 29,000 emails to or from Ms. Hall ranging from 2011-2022.

The County also has offered Mike Krueger, the Chief Deputy County Clerk from 2011 to present as a custodian. The County has interviewed Mr. Krueger and believes he is a suitable alternate custodian for Ms. Hall since he handles most of the day-to-day business relating to the Clerk's Office and was employed by the County during the same period as Ms. Hall.

The most relevant documents from the County Clerk's Office will be the documents it maintains for the County, including the agendas and minutes for the County Commission, and the budgets, audits, and financial statements for the County. The County is producing these documents from 1996 to present.

**County Commission**
**(Daniel Colbert)**

Dan Colbert was the Presiding Commissioner from 2011-2018. As described above, the County located backup files on the County Clerk's electronic server that contain Mr. Colbert's

email files. The County is still analyzing the contents of these files and will provide updates this week regarding the size and date range of the emails contained therein. The County is also in the process of searching for and pulling any emails to or from Mr. Colbert that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week.

The County Clerk's Office is responsible for keeping accurate records of all orders, rules, and proceedings of the Lincoln County Commission. Thus, most of the business of the County Commission goes through the County Clerk's Office. The County therefore believes the Chief Deputy Clerk it has offered, Mr. Krueger (see above; note tenure 2011- present) is a suitable alternate custodian. Mr. Krueger's email will likely capture communications relating to the business of the Commissioners generally.

From the County Clerk's Office, the County will produce meeting minutes and agenda for the County Commission from 1996-present and budgets, audits, and financial statements from 1996 to present. These documents will reflect any action the County Commission considered or took during the entire temporal period.

**Project Coordinator**
**(Jay Gourley)**

Jay Gourley was the Project Coordinator from 2015-2019. As described above, the County is in the process of searching for and pulling any emails to or from Mr. Gourley that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week. The County previously ran a more limited search against the email files it had for potential custodians and pulled 2,516 emails to or from Mr. Gourley ranging from 2015-2019.

The Project Coordinator is responsible for managing the RFP and bidding process for county contracts. All County contracts must be approved by the County Commission. Thus, the County Clerk's Office would have records relating to each contract. The County therefore believes that once again, Chief Deputy Clerk Mike Krueger who has been in his position for over 13 years is a suitable custodian. Mr. Krueger handles most of the day-to-day business relating to the County Commission.

The most relevant documents the Project Coordinator has likely relate to County contracts. Once an RFP process is complete and/or a contract is signed, the Project Coordinator gives those records to the County Clerk's Office. Based on the County's interview with current Project Coordinator Robert Henebry, it is the County's understanding that Mr. Gourley's non-email electronic files are on the shared drives of the County Clerk's Office and any relevant hard copy files would be in the possession of the County Clerk's Office. The County is producing health plan information and contracts (including bids) from 2012 to the present, which the County believes includes any relevant contract that Mr. Gourley worked on when we served as the Project Coordinator.

**Sheriff's Office**
**(John Cottle, Sheriff and Michael Lang, Undersheriff)**
**(Bradley Beeman and Mason McNail, Narcotics Detectives)**

John Cottle served as the Sheriff from January 1, 2013-December 31, 2020 and Michael Lang served as Undersheriff from October 9, 1996-December 31, 2020. As described above, the County is in the process of searching for and pulling any emails to or from Sheriff Cottle and Officer Lang that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week. The County previously ran a more limited search against the email files it had for potential custodians and pulled nearly 15,000 emails to or from Sheriff Cottle ranging from 2014-2020 and nearly 3,000 emails to or from Officer Lang ranging from 2014-2020. The County also recovered numerous non-email documents on the Sheriff's Office's electronic server for Sheriff Cottle and Sheriff Cottle's original hard drive that the County will search.

Bradley Beeman and Mason McNail served as Detectives in the Narcotics Division from October 8, 2015-March 5, 2021 and November 1, 2011-December 31, 2020, respectively. As described above, the County is in the process of searching for and pulling any emails to or from Detectives Beeman and McNail that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week.

In addition, the County has also offered—and Defendants accepted—Jodi Mauzy as a custodian. She is the Business Manager for the Sheriff's Office and has been there since 2000. Based on the County's interview of Ms. Mauzy, we believe she is a suitable alternate custodian for these individuals because she has been at the Sheriff's Office since 2000 and is involved in much of the day-to-day business of the Sheriff's Office.

Moreover, the most relevant information the Sheriff's Office possesses is contained in its police incident reports. Any information germane to individual incidents will be contained in the police incident reports. During the temporal period, the Sheriff's Office has used various record management systems. From 1996-2014, it used Lotus Notes. From 2014-2021, it used Caliber, and from 2021 through the present, it has used CARES. Each police incident report is contained in the relevant record management system. The County will produce spreadsheets identifying each closed incident report relating to narcotics from 1996 to present. In addition, because the Sheriff's Office is part of the County, any business relating to the Sheriff's Office would be reflected in the County Commission's agendas, meeting minutes, budgets, financial statements, and/or audits—all of which the County is producing for the full temporal period.

**Emergency Management Services**
**(Former Directors Emma Epplin, James Sharp, and Adam Stanek)**

Emma Epplin, James Sharp, and Adam Stanek served as the Director of the Emergency Management Services ("EMS") Department from October 5, 2015-January 25, 2019, August 16,

2018-July 21, 2023, and March 1, 2018-March 9, 2021, respectively. The County initially believed the EMS Department may have possessed relevant documents but it no longer believes that to be the case. Based on the County's interview of Acting Director Quentin Laws, the County understands that the EMA Department responds to mass disasters (*e.g.*, tornados, floods) If the EMA is dispatched to an incident, that information would be recorded in the Emergency Service Department's CAD files. The EMS Department does assist with grant applications; however, grant documents are kept by the County Auditor. The County will produce documents relating to grants that concern opioids from 2014 to the present from the County Auditor's Office.

Nonetheless, as described above, the County is in the process of searching for and pulling any emails to or from Emma Epplin, James Sharp, and Adam Stanek that are contained in the email files of other employees in relevant County departments. The County expects to provide a hit count this week. The County previously ran a more limited search against the email files it had for potential custodians and pulled over 11,000 emails to or from James Sharp ranging from 2018-2021 and over 9,000 emails to or from Adam Stanek ranging from 2018-2023. The County also located the hard drives used by James Sharp and Adam Stanek.

To the extent Defendants still believe these custodians are relevant, the County will search and produce any responsive, non-privileged documents that hit upon agreed search terms that the County can pull from the custodial files of Emma Epplin, James Sharp, and Adam Stanek.

## II. DEFENDANTS' QUESTIONS REGARDING LINCOLN COUNTY'S DOCUMENT RETENTION

### 1. When did the County begin investigating the allegations set forth in its Complaint?

The County objects to this question to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

Subject to and without waiving the County's objections, the County began investigating the allegations set forth in its Complaint on or shortly after October 22, 2018, when it retained counsel, the NGK Law Firm of St. Louis, to represent it in litigation against those who contributed to the Opioid Crisis.

### 2. When did the County first retain counsel to represent it on the matters alleged in the Complaint?

The County responded to this question in its May 28, 2024 letter. *See also* the County's response to Question 1.

### 3. Why did the County not place a litigation hold on the County's documents at the time it began investigating its potential claims?

The County objects to this question to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

Subject to and without waiving the County's objections, the County states as follows:

The County began investigating its potential claim when it retained outside counsel in this matter. At that time, the County's outside counsel had a good faith belief that the relevant documents would be preserved as a matter of practice. After this case was selected as a bellwether, the County's outside counsel entered into co-counsel agreements with additional firms. The additional firms either mistakenly believed a litigation hold was in place or began representing the County around the time the litigation hold issue was discovered.

**4. Why did the County not place a litigation hold on the County's documents at the time it decided to file this lawsuit?**

The County objects to this question to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

Subject to and without waiving the County's objections, the County refers to its response to Question 3.

**5. Why did the County not place a litigation hold on the County's documents at the time it filed this lawsuit?**

The County objects to this question to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

Subject to and without waiving the County's objections, the County again refers to its response to Question 3.

**6. Why was a litigation hold put in place on February 29, 2024, and not at any time prior to that date?**

The County objects to this question to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

Subject to and without waiving the County's objections, the County refers to its response to Question 3 and further states that in the course of responding to Defendants' discovery requests, the County discovered it no longer had emails for a subset of former employees. After not being able to locate a litigation hold, the County issued a notice.

**7. Whose decision was it to place the litigation hold on February 29, 2024?**

The County objects to this question, which seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

The County is willing to engage transparently with Defendants on the scope of any document deletion and how those documents can be restored or replaced. But an inquiry into counsels' actions is not appropriate, impermissibly invades attorney-client privileged and work-product protected information, and has no relevance to efforts to address the situation.

**8. For each of the County's former employees for whom emails and/or custodial files have been deleted, what is the exact date when the emails and files were deleted?**

As the County stated in its May 28, 2024 letter, the County's customary document retention practice is to delete the email files of former employees approximately thirty days after their departure. The County interviewed its IT vendor and does not believe deletion logs exist.

**9. What is the scope of the litigation hold the County put into place on February 29, 2024?**

The County responded to this question in its May 28, 2024 letter.

**10. Why did the County not inform the PBM Defendants of the destruction of this evidence in its responses to discovery or during our months of discussion regarding appropriate custodians?**

The County responded to this question in its May 28, 2024 letter.

**11. Please identify all employees or former employees whose custodial files have been destroyed since 2019, including but not limited to any of the employees from the departments previously identified as relevant to this lawsuit.**

The County responded to this question in its May 28, 2024 letter but has since discovered additional information in regard to former employees who left County employment between October 22, 2018 (when the County retained outside counsel) and October 30, 2019 (the day before the County filed this lawsuit).

Below is a list of the titles held by employees from relevant departments who left County employment between October 22, 2018 and February 29, 2024 (when the County instituted a litigation hold). The County has highlighted the positions it believes are relevant to this litigation and identified the individuals who held those positions.

| **911 - EMERGENCY SERVICES DEPARTMENT** |
| --- |
| 911 Director (Michael Pirtle) |
| 911 Mapping |
| 911 Supervisor |
| 911 Training OFC |

| Dispatcher |
|---|
| **CORONER'S OFFICE** |
| Coroner (Kelly Walters) |
| Deputy Coroner (James Johnson, Brandon Phelps, Brian Reed, and Kevin Schell - also shared email address deputycoroner@lincolncountycoroner.com) |
| **COUNTY CLERK'S OFFICE** |
| Administrative Assistant |
| County Clerk (Crystal Hall) |
| County Clerk Staff |
| Intern |
| Election Staff |
| Public Information Coordinator |
| Temporary Staff |
| **COUNTY COMMISSION** |
| Presiding Commissioner (Daniel Colbert) |
| **COUNTY AUDITOR'S OFFICE** |
| Deputy Auditor |
| **PROJECT COORDINATOR** |
| Part Time Project Coordinator Administrative Assistant |
| Project Coordinator (Jay Gourley) |
| **SHERIFF'S OFFICE** |
| Bailiff |
| Captain-Detective |
| Crime Investigations Division ("CID") Admin |
| CID Captain |
| Clerical |
| Clerical - Records |
| Community Service Officer |
| Corporal- Patrol Division |
| Corrections - Lieutenant-Training |
| Corrections - Training/Compliance |
| Correction Officer |
| Corrections Shift Sergeant |
| Corrections Transport Officer |
| County Sheriff (John Cottle) |
| Crime Prevention |
| Deputy |
| Detective - Narcotics (Mason McNail and Bradley Beeman) |
| Detective - Task Force - Internet Crimes |
| Evidence Tech |
| Fleet Manager |
| I.T. |
| Jail Administrator |

| Jail Training Coordinator |
|---|
| Major |
| Nurse |
| Part time CID |
| Part-Time Evidence Recorder |
| Patrol |
| Patrol Deputy |
| Patrol Captain |
| Patrol Sergeant |
| Patrol Staff Sergeant |
| Property Crimes Detective |
| Records |
| Records Clerk |
| School Resource Officer |
| Shift Sergeant |
| Shift Sergeant- Corrections |
| Staff Sergeant-Corrections |
| Transport Lieutenant |
| Transport Officer |
| Transport Supervisor |
| Undersheriff (Michael Lang) |
| **TREASURER'S OFFICE** |
| Deputy Treasurer |

Below is a list of the titles held by employees from non-relevant departments who left County employment between October 22, 2018 and February 29, 2024. This list also includes departments that the County believes are not appropriate custodians, such as the Prosecuting Attorney's Office (because emails from this office will, by definition, be comprised almost exclusively of privileged information). Although the County no longer believes the Emergency Management Services Department is relevant to this litigation, the County identified the Directors who left during the at-issue period since the parties previously discussed that position.

| **ASSESSOR'S OFFICE** |
|---|
| Assessor Staff |
| **BRIDGE AND GROUNDS - COURT HOUSE** |
| Custodial |
| Maintenance |
| Part time Maintenance |
| **COLLECTOR'S OFFICE** |
| Collector |
| Collector staff |
| Part time Collector Staff |
| **COURT ADMINISTRATOR** |
| ADR |

| **ECONOMIC DEVELOPMENT DEPARTMENT** |
|---|
| Director |
| **EMERGENCY MANAGEMENT SERVICES** |
| Director (Emma Epplin, James Sharp, Adam Stanek) |
| Staff |
| **GENERAL COUNTY GOVERNMENT** |
| Telephone Operator |
| Temporary Staff |
| **JUVENILE** |
| Juvenile Officer |
| **RECORDER'S OFFICE** |
| clerical |
| Recorder |
| Recorder Clerk |
| Staff |
| **ROAD & BRIDGE DEPARTMENT** |
| Arm Cutter |
| Asphalt |
| Driver/Grader |
| driver/laborer |
| driver/road maintenance |
| flagger/seasonal staff |
| Grader |
| Highway Mechanic |
| Highway Staff |
| Highway Supervisor |
| Seasonal Staff |
| Seasonal/Flagger |
| Signs |
| Truck Driver/Asphalt |
| **PROSECUTING ATTORNEY'S OFFICE** |
| Assistant Prosecuting |
| clerical/secretary |
| Felony Asst Prosecutor |
| Investigator |
| Legal |
| legal assistant |
| Receptionist |
| Staff |
| Prosecutor |
| Receptionist |
| Victim Advocate |

To the extent Defendants disagree with the County assessments of the relevant positions, the County is willing to meet and confer with Defendants.

**12. Have any non-custodial files or information responsive to any one of the PBM Defendants' requests for production or interrogatories been destroyed between 2019 and the present?**

The County responded to this question in its May 28, 2024 letter. In addition, the County does not believe any non-custodial files or information responsive to any of the PBM Defendants' requests for production or interrogatories have been destroyed between October 22, 2018 and the present. The subset of deletion appears limited to email files of former employees.

**13. Who at the County believed a litigation hold was issued at the beginning of this litigation?**

The County objects to this question to the extent it seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine.

Subject to and without waiving the County's objections, the County incorporates its response to Question 3.

**14. What back up files have been searched, when and by whom? When were these back up files created, what do they contain, and for what time period?**

The County responded to this question in its May 28, 2024 letter but has since learned new information upon conducting additional investigation. *See* the County's Efforts to Restore or Replace Relevant Discovery (*supra*, Section I).

In addition, the County further states:

The search for backup files was largely conducted by the County's IT vendor with guidance and assistance from County employees and outside counsel where necessary.

**15. What is the date range for the emails recovered for Sheriff Cottle? How many years of emails were destroyed? What is the volume of destroyed emails that you are unable to recover? How many of the recovered emails are external facing?**

The County responded to this question in its May 28, 2024 letter but has since gained new information. *See* the County's Efforts to Restore or Replace Relevant Discovery (*supra*, Section I). In addition, the County further states:

The County initially believed it had a backup file from the Sheriff's Office that contained Sheriff Cottle's email. The County recently learned that was not the case. The County has not found any backup files that contain Sheriff Cottle's emails. All of the "restored" emails the County

previously identified were emails to or from Sheriff Cottle that the County pulled from the email files of current employees of the Sheriff's Office.

**16. Who are the other potential custodians and alternate custodians you identified?**

The County responded to this question in its May 28, 2024 letter but has since gained new information. *See* the County's Efforts to Restore or Replace Relevant Discovery (*supra*, Section I).

**17. What non-email records did you gather?**

The County identified the non-email records it gathered in its Potential Custodian and Predecessors Chart and Department Chart, which the County updated on June 6, 2024.

**18. Are all of the 3,000 emails you recovered for Sheriff Cottle? Besides those emails, have you recovered any external emails to or from any of the former employees identified?**

Please see the County's Efforts to Restore or Replace Relevant Discovery (*supra*, Section I) and the County's response to Question 15.

**19. Confirm that you have stopped the automatic deletion of emails or files of employees who leave the County and when you notified IT to stop the automatic deletion.**

The County confirmed in it May 28, 2024 letter that the automatic deletion of emails or files of employees who leave the County has stopped.

**20. What is the basis of your belief that the at-issue former employees do not possess significant, unique, relevant documents if you have not been able to recover the documents that have been destroyed?**

The County responded to this question in its May 28, 2024 letter. *See also* the County's Efforts to Restore or Replace Relevant Discovery (*supra*, Section I).

**21. How are records transmitted to the County Clerk? How does the County Clerk receive sunshine requests and other requests for documents?**

The County Clerk's Office receives hard copy records through the mail or in-person. It receives electronic records through email and then typically saves those records on its shared server. The County Clerk typically receives sunshine requests in the same way. The County will search sunshine requests and produce any relevant sunshine requests and responses thereto.

* * *

The County reserves the right to amend or supplement its response if it learns additional information during the course of it ongoing efforts.

Sincerely,

/s/ *Joanne Cicala*
Joanne Cicala

cc: PBM@listserv.motleyrice.com
CT12-15_PBM_PLAINTIFFS_DD_TEAM@LISTSERV.MOTLEYRICE.COM