<pre>
 1                  IN THE DISTRICT COURT OF THE UNITED STATES
                      FOR THE NORTHERN DISTRICT OF OHIO
 2                              EASTERN DIVISION


 3
        IN RE:                          Case No. 1:17-md-2804
 4      NATIONAL PRESCRIPTION           Cleveland, Ohio
        OPIATE LITIGATION
 5                                      July 23, 2024
                                        2:03 p.m.
 6

 7

 8                              - - - - -

 9

10          TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE DAN A. POLSTER,

12              UNITED STATES DISTRICT JUDGE.

13

14                              - - - - -

15

16

17

18

19  Official Court Reporter: Susan Trischan,RMR,CRR,FCRR,CRC
                              7-189 U.S. Court House
20                            801 West Superior Avenue
                              Cleveland, Ohio  44113
21                            216-357-7087
                              Susan_Trischan@ohnd.uscourts.gov
22

23

24

25
</pre>

```
1    APPEARANCES:

2    For the Plaintiffs:          Peter H. Weinberger, Esq.
                                  Paul T. Farrell, Jr., Esq.
3                                 Peter J. Mougey, Esq.
                                  Joanne Cicala, Esq.
4
                                  Joseph F. Rice, Esq.
5                                 Mildred Conroy, Esq.
                                  Linda J. Singer, Esq.
6                                 Hunter J. Shkolnik, Esq.
                                  Laura Fitzpatrick, Esq.
7                                 Jayne Conroy, Esq.
                                  Salvatore C. Badala, Esq.
8                                 Maria Fleming, Esq.
                                  Frank L. Gallucci, III, Esq.
9                                 Paulina do Amaral, Esq.
                                  Andrea Bierstein, Esq.
10                                Mark P. Pifko, Esq.
                                  Pearl Robertson, Esq.
11                                Michael Elsner, Esq.
                                  Kevin Sharp, Esq.
12
     For Defendants OptumRx:      Bradley M. Smyer, Esq.
13                                Brian Boone, Esq.
                                  Emily C. McGowan, Esq.
14                                Nadia Hasan, Esq.
                                  Caroline R. Strumph, Esq.
15

16   For Defendants Express
     Scripts:                     Jonathan G. Cooper, Esq.
17                                Olga Vieira, Esq.
                                  Erica Perdomo, Esq.
18                                Matthew K. Wasserman, Esq.
                                  Ashley Rothe, Esq.
19

20   ALSO PRESENT:                Special Master David Cohen

21

22   Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.
23

24

25
```

<u>TUESDAY, JULY 23, 2024, 2:03 P.M.</u>

1

2          THE COURT:  Okay.  Please be seated.

3          We're here on a status conference in the

4   Opioid MDL, I guess it's 2804, particularly the four

5   Bellwethers involving the PBMs.

6          And this is probably -- this is how the

7   courtroom used to be for the MDLS, the MDL in 2018 and

8   '19.  We used to meet every month or two like this in

9   person.  It's actually good to be able to do it again, so

10  I don't take it for granted.

11         So I appreciate everyone being here.

12         There are really two things I mainly wanted

13  to cover.

14         The first is fairly simple.

15         I appreciate everyone's hard work in

16  streamlining what I call the multiple entities.  The

17  plaintiffs sued multiple entities associated with

18  OptumRX, multiple entities associated with Express

19  Scripts, and I urged the parties to do what we did in

20  Track Three with the pharmacies, Walgreen, Walmart, CVS.

21  Again, there were multiple entities, and we got it down

22  so in the trial it was just Walmart, Walgreens, CVS.

23         The parties worked hard.  We've got two

24  entities for Express Scripts.  I guess one as the PBM,

25  and one that is a mail-order pharmacy.

1          We have three Optum entities, and two of

2     them are OptumInsight Inc. and OptumInsight Life Sciences

3     Inc.

4          And my question is, is there any way we can

14:05:51  5     get it down to two?  Because my concern is, if every,

6     every time a lawyer, a witness in that trial -- and it's

7     not going to be my trial; it's someone else -- has to

8     remember to say, you know, "OptumInsight Inc." or

9     "OptumInsight Life Sciences, Inc.," they are going to be

14:06:15 10     all balled up and the jury's going to get confused.

11          And so my question is whether, whether

12     there's any way, because it appears that those two

13     entities do similar work, and so is there a way we

14     can -- we can get down to two for Optum rather than

14:06:36 15     three?

16          MR. BOONE:  Your Honor, Brian Boone for

17     OptumRX.

18          I think we can get it down to two.

19          THE COURT:  All right.  Thank you,

14:06:45 20     Mr. Boone.

21          Because I, you know, I couldn't go through

22     a six-week trial and, you know, remember if I've got

23     OptumInsight Inc., OptumInsight Life Sciences Inc., okay,

24     so I would -- thank you.

14:06:59 25          If you can work on that, if there's a way

1    to do it, then I think with two, you know, it makes sense

2    because the jury will need to understand, all right, the

3    PBMs have a PBM function, they have a mail-order pharmacy

4    function, here's the PBM, here's the mail-order pharmacy,

14:07:17  5    and there will be separate instructions on that.

6                    All right.  Good.  That was simple.

7                    Next one probably won't be so simple.

8                    It's what we do with the Bellwethers and

9    the issue that surfaced about the litigation holds.

14:07:34  10                    My first question is about Webb County.

11    Plaintiffs say they believe there was a litigation hold

12    early on in Webb County.  The defendants say

13    categorically there was not.

14                    Now, I mean, so what's -- what's the deal?

14:07:55  15                    MS. CICALA:  Your Honor, if I may, Joanne

16    Cicala for Webb County.

17                    The Court may have misapprehended what we

18    have said in our papers.

19                    Webb County has acknowledged that a

14:08:04  20    litigation hold was not issued when the case was filed.

21                    THE COURT:  Okay.

22                    MS. CICALA:  Webb County has also said,

23    Your Honor, that there was a formal decision in the

24    County made prior to the commencement of litigation in

14:08:16  25    2017 to "Save all ESI," electronically stored

1    information, and all of our work to date, Your Honor,

2    confirms that that is the case.

3              There is no destruction of ESI in Webb

4    since before the case was filed.  There is no destruction

14:08:34  5    of custodial files in Webb, Your Honor.

6              THE COURT:  All right.  Do the PBMs have

7    any information to the contrary?

8              MR. SMYER:  Yes, Your Honor.

9              This is Brad Smyer with Alston & Bird on

14:08:53 10    behalf of OptumRX.

11              THE COURT:  All right.

12              MR. SMYER:  Although Webb County denies

13    that it deleted evidence, it still, in its latest

14    filings, cannot explain serious gaps for large swaths of

14:09:05 15    e-mails related to its employees and officials.

16              It can't explain why those, those e-mails

17    are missing, who deleted them, when that was done or why.

18              It's apparently reviewing backup tapes to

19    try to recover other information that was deleted or has

14:09:20 20    been lost, and has recently even disclosed that the

21    county cannot find e-mails for its sheriff from 2011 on.

22              So, Your Honor, we do have serious concerns

23    about the type of evidence that is missing and Webb

24    County's preservation efforts, and we don't think it

14:09:41 25    should be treated any different than the others who have

1  admitted to the spoliation issues.

2          MR. COOPER:  And, Your Honor, this is

3  Jonathan Cooper from Express Scripts.

4          THE COURT:  Okay.

14:09:51  5          MR. COOPER:  Just to add on to what counsel

6  for Optum said, I'd just like to emphasize this issue of

7  backup tapes, which was just revealed to the PBM

8  defendants last week, is especially concerning.

9          Ordinarily a party would not ever go to

14:10:03 10  backup tapes unless documents were destroyed, from at

11  least their ordinary retention place.

12          And the County has said it's indexing 3,000

13  backup tapes, which we submit indicates that it's highly

14  likely documents were destroyed and they're doing their

14:10:19 15  best to salvage it.

16          But there are significant questions about

17  what's on the backup tapes, what could be salvaged, would

18  they cover everything that was potentially deleted.  All

19  of these kinds of questions we have have been unanswered,

14:10:30 20  and that's why we've suggested a 30(b)(6) deposition so

21  we can start trying to get answers to some of these

22  questions.

23          THE COURT:  All right.  Well, look --

24          MS. CICALA:  If I may respond, Your Honor.

14:10:42 25          THE COURT:  Okay.

1          MS. CICALA:  On May 30th, defendants

2     inquired of Webb County as to 30 individuals.

3               Twenty-six of those individuals had left

4     the County before this case started.  Some of them a

14:10:59 5     decade or so before.

6               For those 26 individuals, two weeks later

7     we let defendants know, Webb let them know that it was

8     researching what information it had available for them.

9               That was on June 14th.

14:11:16 10               On July 5th, Webb County provided an update

11     to the defendants regarding these former employees.

12               In that update, Your Honor, Webb County

13     explained that it had -- as anyone would do in this

14     circumstance for former employees who have left long ago

14:11:33 15     before the case was filed -- reviewed its records

16     management and its archived files.

17               And among those, it found 3,000 tapes, and

18     among those 3,000 tapes, which we've had a team on-site

19     reviewing, we found a collection of tapes that have PST

14:11:52 20     files.

21               This archive --

22               THE COURT:  What's a PST file?

23               MS. CICALA:  PST files may be e-mails, Your

24     Honor.

14:11:59 25               And we have relayed to defendants that

1    these tapes may include documents and e-mails pertaining

2    to some of these former employees who left the County

3    before litigation was ever filed.

4                 The proposition that former employee

14:12:16  5    records or records of any kind might be archived and

6    stored in some other facility is heartily controversial.

7                 I notice that defendants have cited a case

8    from 2014, 10 years ago, talking about how backup tapes

9    are typically maintained for disaster recovery.

14:12:36 10                 I would suggest that their perspective is

11    antiquated, and the fact that Webb County has a robust

12    document management system and available tapes is

13    evidence of its commitment to preservation.

14                 And I would again note that we're talking

14:12:53 15    about employees who left the County before the lawsuit

16    was even filed.

17                 So respectfully, Your Honor, Webb County

18    submits there's nothing controversial at all about the

19    fact that they are reviewing their archives for old

14:13:03 20    records.

21                 We are aware, for example, Your Honor, that

22    both defendants have former employees where they have

23    said that they would not be suitable custodians because

24    they don't have records.

14:13:13 25                 So none of this is spoliation, Your Honor.

1          This is all ordinary course --

2          THE COURT:  No one keeps -- no one keeps

3     everything forever so, I mean, even a litigation hold is

4     what you would reasonably expect.

14:13:25 5          So, all right.

6          MR. SMYER:  Your Honor, if I may, Brad

7     Smyer.

8          THE COURT:  So Webb -- the point is Webb

9     County has represented that it has kept, you know, that

14:13:41 10    it had in place a, you know, a document preservation

11    since 2017.

12         All right.  So, you know, the case was

13    filed, when?  In 2018 or '19?

14         MS. CICALA:  January of '18, Your Honor.

14:13:55 15         THE COURT:  Okay.  It was filed in January

16    of '18, so they've represented that there was a document

17    preservation policy in place.

18         So that's -- whether it was perfect or not,

19    you know, no policy is perfect.

14:14:17 20         So the problem seems to be in Lincoln

21    County and the City of Independence.

22         All right.  Going through a whole lot of

23    discovery and then briefing on the motion for sanctions,

24    this is all, in my view, wasted time by both parties and

14:14:49 25    the Court, and no one has time or money to waste.

1       The purpose of the Bellwethers was, first,

2  to let the defendants tee up whatever motions they wanted

3  to, and then to look at the documents and get the

4  witnesses and find out what the facts are, and, if

5  necessary, try a few cases so both sides could see, all

6  right, is there a real case against the PBMs, what do

7  jurors think about them, and hopefully lead towards some

8  resolution.

9       And time and effort spent on, you know,

10  what's there and what's missing and what to do about it

11  is a complete waste.  It doesn't -- it doesn't get us

12  closer to any knowledge.

13       So I'm not interested in doing it, and I

14  wouldn't think the parties are.  So it seems to me that

15  the reason I directed the plaintiffs a few weeks ago to

16  determine, of the other approximately 80 PBM cases,

17  whether litigation holds were in place, was to see

18  if -- if it was viable to come up with other Bellwethers,

19  replacement Bellwethers.

20       And the plaintiffs responded that in most

21  of these other cases, counsel gave a timely directive to

22  put a litigation hold in place.

23       Now, the plaintiffs said they haven't taken

24  the second step to determine if the City or County

25  actually followed their lawyer's instruction, but the

1    instruction was given.  So we have a potential to pick

2    other cases.

3                    And the problem I see with this, if we stay

4    with Lincoln County and City of Independence, I don't

5    think we're going to know whether and to what extent

6    either of the PBMs was prejudiced until we get almost to

7    trial or in trial.

8                    We're way in front of that now.  To know

9    what documents aren't there, whose documents they were,

10   whether there's any way to retrieve them from another

11   source, how important those witnesses are, no one can

12   know now.

13                   And, you know, to have a motion for

14   sanctions based on conjecture, I'm not interested in that

15   and I'm not in a position to do it.

16                   And conversely, to wait until the eve of

17   trial to know where we are makes no sense either because

18   if it would turn out the defendants are really seriously

19   prejudiced, it wouldn't be fair to have the trial at all.

20                   And conversely, if we have a trial and the

21   Court determines it's appropriate to give a spoliation

22   instruction, well, fine, I give that and that's the kiss

23   of death to the plaintiffs.  And so the defendants are

24   likely to win, but the plaintiffs will say, "Heck, we had

25   one hand tied behind our back; we're ignoring your

1    victory."

2                    So it accomplishes nothing.

3                    So the Court, I think we're much better off

4    just saying, all right, we need two other Bellwethers,

14:18:34  5    and, you know, that's what we'll do.  We'll identify two

6    others.

7                    Lincoln County was a defense pick and City

8    of Independence was a plaintiffs' pick, so my

9    recollection is we had each side identified four cases

14:18:58 10    and then each side got two challenges, and that's how we

11    ended up with the four we have.

12                    Is that right?

13                    MR. BOONE:  That's correct, Your Honor.

14                    THE COURT:  Okay.  So here we'd be

14:19:10 15    identifying two cases each, and each side would have a

16    strike.

17                    Now, if we do that, I'm suggesting that

18    when we identify the four, we have the four, two and two,

19    before we do anything further, the plaintiffs would then

14:19:31 20    take the second step of ensuring that with those four,

21    the client, the City or County, followed the lawyer's

22    instruction and actually did put a litigation hold in

23    place, because there's no point starting if they say,

24    "Well, yeah, we got the instruction but we didn't really

14:19:54 25    follow it," because we'll be back in the same place.

1           And then we'll have two more, and, you

2    know, we'll obviously come up with a workable discovery

3    schedule for those, and the other two can continue the

4    same schedule they're on.

14:20:13   5           And I'm -- my staff and I are going through

6    the motions, and we will decide everything.  If they're

7    fully briefed, we'll decide them.

8           And then for these two new cases, the only

9    motions we'll need is anything specific to those two

14:20:29 10    entities.  We won't need the general motions.  Whatever

11    rulings I make will apply.

12           And obviously, if I grant the defendants'

13    motion to dismiss, that may end up -- end the whole

14    thing, we won't need any other cases.  But assuming I

14:20:47 15    don't, defendants still may want to raise case-specific

16    issues, legal issues on those two new ones.

17           So, you know, I've given a lot of thought

18    about that.  You know, I was thinking, all right, both

19    sides agree, if we keep -- keep these two, you know, the

14:21:11 20    ones we have, we have to have, you know, discovery on

21    Lincoln, Lincoln County and City of Independence as to

22    what was done, who did it, what, et cetera, and, you

23    know, go through all of that.

24           But at the end of the day, I -- I just

14:21:29 25    don't think it's a good use of anyone's resources.

1          So that's my proposal.

2          And then if we do that, I think I'm going

3   to have to deal with the fact that because of what either

4   counsel did or didn't do or the clients did or didn't do

5   in those two entities, Lincoln County, City of

6   Independence, the defendants will have spent a lot of

7   time and money doing case-specific discovery that they

8   wouldn't have otherwise had to do.  And I think some

9   compensation to, you know, recouping those expenses would

10  be appropriate.

11          And, you know, I -- again, a lot of the

12  discovery was general discovery that would have had to be

13  done.  Okay?  But discovery based specifically on those

14  personnel and those people and those specific entities,

15  well, wouldn't have had to be done and is now going to

16  have to be done for new entities, and I think there

17  should be some compensation.

18          I have no idea how many -- you know, how

19  much time we're talking about, but that's my proposal.

20  And I'd like to hear what people react.

21          I mean, no one -- I don't think anyone has

22  proposed that.  People proposed various things, and I

23  mean both sides had agreed that the defendants should be

24  allowed to take discovery in these two entities to try

25  and determine what exactly's missing and then figure out,

1    you know, what degree of prejudice and what to do about

2    it.

3                    But again, I think all that is

4    time-consuming, expensive.  It would clearly put the

14:23:17  5    litigation on hold.

6                    Both sides agree we'd have to pause the

7    litigation for those two counties, and I don't know where

8    we would get to.  And my concern is we'd get what I'll

9    call compromised cases that neither side, maybe both

14:23:36 10    sides, but at least one side would feel at the end of the

11    day it wasn't a real -- it wasn't a clean case.

12                    And so they wouldn't draw the conclusions

13    that I would want them to draw from a Bellwether.

14                    So those are my thoughts.  So what does

14:23:57 15    anyone think about it?

16                    MR. SMYER:  Your Honor, Brad Smyer for

17    OptumRX.

18                    We obviously don't think that, as you could

19    see from our papers and for the reasons I won't repeat,

14:24:07 20    we don't think that severing these as Bellwethers is an

21    appropriate resolution because it saddles the defendants

22    with the costs and burden of the plaintiffs' misdeeds.

23                    I do --

24                    THE COURT:  No, I said -- wait a minute.

14:24:24 25    Wait a minute.

1          I said that there should be some

2     compensation for your time on case-specific discovery;

3     not general discovery.

4          You would have to do -- you know, everyone

14:24:36    5     would have had to do that for any county or city, but the

6     time you spent -- well, there haven't been a lot of

7     depositions, right?

8          MR. WEINBERGER:  There have been none.

9     None, Your Honor.

14:24:47   10          THE COURT:  Okay.  Well, but the time you

11    spent, you know, securing and going through and

12    analyzing, you know, documents pertaining only to Lincoln

13    County and City of Independence that you wouldn't

14    have -- wouldn't have had to get or analyze but-for the

14:25:11   15    fact that those were the Bellwethers, all right, I think

16    some compensation should be appropriate.

17          Okay?  So I'm -- I factored that in.  I

18    think you're right.

19          MR. COOPER:  Your Honor, this is Jonathan

14:25:29   20    Cooper for Express Scripts.

21          From our perspective, Webb County needs to

22    be counted among Lincoln County and City of Independence

23    for several reasons.

24          First, I think the representations of the

14:25:43   25    Court are at odds with some of the representations made

1    to defendants.

2                    In particular, what the plaintiffs have

3    said is they had a retention policy, a standard retention

4    policy which many organizations and businesses have.

14:25:55  5             They did not -- and they've admitted

6    this -- did not have a litigation hold in place until

7    last -- until two months ago, six years after the lawsuit

8    was filed.

9                    So if that case were to proceed, I can tell

14:26:06 10   you we would give no credence to any result in that case.

11   It would be a useless Bellwether because we have

12   significant concerns that they have destroyed evidence,

13   and they have refused to answer questions about that,

14   about gaps in e-mails, about missing documents from

14:26:22 15   custodians.

16                    THE COURT:  Well, wait.  You haven't

17   deposed anyone.

18                    MR. COOPER:  We've asked for that, to be

19   given that opportunity to try to pin down answers to our

14:26:31 20   unanswered questions, Your Honor.

21                    And Your Honor indicated, for example, that

22   choosing a replacement Bellwether from some of the

23   nonBellwether cases where counsel have said they've given

24   an instruction but there's no evidence they actually

14:26:42 25   implemented a litigation hold would be useless, it's

         1    exactly the same thing with Webb County; that even if

         2    there was some document retention policy generally,

         3    they've admitted they didn't implement a litigation hold

         4    until 2024, May of 2024.

14:26:55  5              And so we have significant concerns that it

         6    would be a useless Bellwether if it were to proceed.

         7              And so any -- the way that Lincoln and City

         8    of Independence are going to be treated, we would submit

         9    should be the same for Webb County.

14:27:08 10              THE COURT:  What about Optum?

        11              I mean, are you saying, you know, whatever

        12    happens in Webb County, you're not -- you're going to

        13    just write off as a -- you know, ignore the result?

        14              MR. SMYER:  We have similar concerns about

14:27:21 15    that, Your Honor.

        16              I mean, the PEC's filing yesterday suggests

        17    that these concerns may be pervasive among all cases.

        18              They couldn't state whether any litigation

        19    hold had ever been instituted for those cases.  And so as

14:27:36 20    it stands now we don't -- we can't see any principled

        21    distinction between Lincoln, Independence, Webb or any

        22    case at this point.

        23              MR. WEINBERGER:  Your Honor, can I address

        24    on behalf of the plaintiffs?

14:27:52 25              THE COURT:  Yeah.

1          Well, there's no way for me to reconcile

2     this, but yes, go ahead.

3               MR. WEINBERGER:  So fundamentally we agree

4     with the Court that no system of retention is perfect.

14:28:02  5          And I just want to point out to the Court

6     that with respect to the discovery that we've propounded

7     to the defendants, we are really still at the infancy

8     stage of receiving documents.  Eighty percent of the

9     documents that we've been after since December just came

14:28:26 10   through within the last 30 days.

11              So, you know, we are not at the point yet

12    of figuring out what we got and what's missing.

13              And to the extent that the defendants want

14    to scrutinize our production, that's fine, but understand

14:28:52 15   that they're going to be on the receiving end.

16              THE COURT:  Here, I'm just deciding --

17              MR. WEINBERGER:  I understand.

18              THE COURT:  The parties agree -- agree

19    we're not going to go ahead with City of Independence and

14:29:04 20   Lincoln County.

21              The question is what do we do about Webb?

22              MR. WEINBERGER:  Right.  Right.

23              So here's -- so, I mean, we're prepared to

24    put up a witness for Webb to do a 30(b)(6) on document

14:29:15 25   retention where they can ask questions and determine

1    whether what we've said is correct.

2                    I do have a suggestion on top of what you

3    have proposed, Your Honor, and that is this:  I think we

4    should move forward with Rochester and Webb, and not

14:29:44  5    necessarily select two additional Bellwethers

6    immediately, but rather wait for us to file our motion

7    for leave to amend to add additional cases against the

8    PBMs.

9                    And that's due next Monday, and obviously,

14:30:07  10    there's responsive pleadings that will occur.

11                    And to the extent that the Court grants us

12    motion for leave and we file those amended complaints,

13    then we have a whole set of new cases from which to

14    select, but at the same time we're moving forward

14:30:29  15    diligently on two Bellwethers in accordance with the

16    schedule that's been set.

17                    And it is the case that with respect to the

18    current inventory of cases against the PBMs, the largest

19    majority of those cases are -- were filed by nonPEC

14:30:59  20    members.

21                    And that's in no way disparaging Ms. Cicala

22    or her firm or the co-counsel that have handled those

23    cases, but, you know, I can tell you that with respect to

24    the cases that we're going to move to amend to add the

14:31:16  25    PBMs, most of those cases or many of those cases are PEC

1    cases where we are confident that the litigation hold

2    issues do not exist.

3              And so, you know, I think that's a

4    reasonable way to potentially pursue two more

5    Bellwethers.

6              Frankly, we're of the mind that two

7    Bellwethers are probably enough.  But I understand from

8    the very beginning you wanted four, and if that's -- if

9    that's remains to be the case, this is a way that I would

10   suggest that we handle that.

11             THE COURT:  Well, maybe I thought we wanted

12   four in case we run into some problems, which we have.

13             MR. WEINBERGER:  Right.

14             THE COURT:  That may have been part of my

15   thinking.

16             MR. WEINBERGER:  Right.

17             Well, I hate to say "It is what it is," but

18   it is what it is.

19             So I -- on the issue of compensation, as I

20   said, there are no depositions that have been taken, and,

21   you know, to the extent that there's compensation to be

22   paid, you know, I would argue that, well, they have to

23   meet the Rule 37 standards, but I also understand, Your

24   Honor, that you have the discretion --

25             THE COURT:  Rule 11 standard.

23

```
 1                    I mean, I think there should be --
 2                    MR. WEINBERGER:  I understand.
 3                    THE COURT:  I mean, I am satisfied that
 4        this was -- I would say it's not intentional, but
14:33:04 5        whatever, the fact that it was not -- no one checked,
 6        that was the problem.
 7                    MR. WEINBERGER:  We wish it would be
 8        otherwise.
 9                    THE COURT:  All right.
14:33:11 10                   MR. WEINBERGER:  Your Honor.
11                    THE COURT:  The fault is on the plaintiffs
12        for -- I mean, put aside the way beginning, once these
13        cases were identified as potential Bellwethers and then
14        selected -- for not checking and then starting.
14:33:26 15                   So I believe it is appropriate to
16        compensate the defendants for the time that they spent on
17        what I'll call case-specific discovery that they wouldn't
18        have otherwise had to do.
19                    Well, they had to do because they were
14:33:44 20       Bellwethers, but they've now have scrapped and it's
21        largely useless is the point.  It's largely useless.
22                    I won't say completely.  You always learn
23        something.  But it's largely useless because it was only
24        devoted to Webb and -- not Webb -- to Lincoln County and
14:34:04 25       Independence.
```

1                    So I'm inclined to do that.

2                    So the plaintiffs have suggested we don't

3       select more Bellwethers right now.

4                    Well, so what do the defendants think?

14:34:19  5          I mean, again I -- I have a -- I don't know

6       for sure, but I think in the back of my mind I was

7       worried that if we only had two and we had problems, you

8       know, stuff happens in litigation as we all know, that we

9       might end up with none or just one.

14:34:37 10          So, you know, I'm not wedded to picking two

11      more right now.  I don't think it's imperative.

12                   What do the defendants think?

13                   MR. COOPER:  Your Honor, for Express

14      Scripts, this is Jonathan Cooper.

14:34:53 15          THE COURT:  Or if you want to think about

16      it a little, I mean you don't have to -- I wasn't going

17      to pick them right today anyway.

18                   MR. BOONE:  Yes, for OptumRX, I think we

19      want to think about it and talk to our client.

14:35:04 20          THE COURT:  Well, why don't you think about

21      it?

22                   As I said, I can go either way.  You know,

23      my inclination was to pick two others.  The plaintiffs

24      said we ought to delay, and if we pick them, wait and

14:35:16 25      see; maybe expand the pool.

1            Now that that process is, I think -- yeah,

2     they will be filing their motions next week.  I extended

3     the 22nd to the 29th, that's next Monday, so I, you know,

4     I can go either way on that.

5            I'm not wedded to picking them right now.

6                 MR. COOPER:  Your Honor, a few initial

7     suggestions on your proposal.

8                 THE COURT:  Okay.

9                 MR. COOPER:  First, I heard Mr. Weinberger

10    say that Webb County is prepared to put forward a

11    30(b)(6) deponent.

12                 We believe that would be important to

13    determining whether it should remain a Bellwether.

14                 THE COURT:  All right.

15                 MR. COOPER:  So I think that's something

16    that should go ahead.

17                 THE COURT:  All right. Well, that's fine.

18                 Again, I don't want -- I don't want Webb

19    County to be in limbo, uncertain status, indefinitely.

20                 I just don't think it's -- it's just not

21    good.  Either -- either we'll determine that they have,

22    they retained, you know, almost all of the important

23    documents, or they didn't.

24                 And if they did, I think we should keep

25    them in.  And if they didn't, for whatever reason, I

1    think they should be out.

2                        Does anyone disagree with that?

3                        MS. CICALA:  No, Your Honor.

4                        Webb is happy to put up a witness for that

14:36:35  5    purpose.

6                        MR. COOPER:  And, Your Honor, we submit

7    that should not count against the case management order.

8                        THE COURT:  No, it's not counting.  This is

9    special.  No one's disputing that.

14:36:45 10                        MR. COOPER:  Second, Your Honor, we would

11    suggest that we get real answers to your Court's order,

12    to the order you issued about whether litigation holds

13    have actually been implemented by all the pending PBM

14    cases because we couldn't, to your point previously, we

14:36:59 15    wouldn't want to choose alternative Bellwethers from

16    cases that haven't implemented litigation holds.

17                        THE COURT:  Well --

18                        MR. COOPER:  Your Honor already ordered

19    that.  It wasn't provided.  We would submit it should be

14:37:11 20    provided, those answers.

21                        THE COURT:  All right.  Well, I agree.  I

22    agree that now I think I'll give a time frame for the

23    plaintiffs to actually determine whether or not.

24                        And I did put in an order for the motions,

14:37:24 25    the motions to amend, that sometime before -- well before

1    the defendants have to respond, counsel is going to have

2    to certify whether they put one in.  So we won't have

3    that, you know, up in the air.

4              So, all right.

5              MR. COOPER:  And, Your Honor, one more

6    point if I may.

7              THE COURT:  Yes.

8              MR. COOPER:  As we propose in our papers,

9    as an initial step we would submit that the schedule for

10   Rochester, which is two months ahead of the schedule for

11   Webb County, should be pushed back by those two months to

12   give the extra time needed to take this discovery and

13   figure out these issues and determine if new Bellwethers

14   should happen because our concern would be if new

15   Bellwethers are selected, we don't want our witnesses

16   having to sit for multiple separate depositions for

17   multiple separate Bellwethers.

18              And so it makes sense to us for efficiency

19   reasons to have all Bellwethers proceed on the same pace

20   as --

21              THE COURT:  Well, the point is we --

22              MR. WEINBERGER:  Your Honor, that doesn't

23   make any sense.

24              We're taking -- we're taking discovery

25   that's generally applicable to all the Bellwethers.  I

1    mean, there may be a deposition or two --

2              THE COURT:  Right.  Right.

3              MR. WEINBERGER:  -- that's specific to a

4    Bellwether that we're taking offensively, but, you know,

14:38:41  5    we're working up the PBM cases against these defendants.

6              And as we did, as we did in most of the

7    other Bellwethers, except for some, a few

8    jurisdiction-specific cases, they were cases that applied

9    to -- depositions applied generally.

14:39:00 10              THE COURT:  I want Rochester -- I want

11    Rochester to keep going forward.

12              Webb County, I wouldn't schedule a whole

13    lot of depositions for Webb County until we determine if

14    it's going to go forward.

14:39:11 15              Let's do the 30(b)(6), and then we'll need

16    to reconvene in some way.  We don't need to all come into

17    Cleveland to figure out, you know, the question is should

18    it stay as a Bellwether or should it be moved aside.

19              MS. CICALA:  Your Honor.

14:39:29 20              THE COURT:  So let's set some time frame.

21              MS. CICALA:  Your Honor, may I be heard on

22    one point with regard to Webb?

23              THE COURT:  Yes.  Yes.

24              MS. CICALA:  I understand the defendants

14:39:41 25    have concerns and I understand from them why they have

 1   concerns.

 2              I'll look forward to the 30(b)(6) which

 3   will confirm Webb's formal decision in the middle of 2017

 4   to save all ESI, and that is, indeed, what we have

 5   discovered and what we're producing to the defendants.

 6              THE COURT:  Well, that's the key is whether

 7   they -- whether they really followed that.  If they did,

 8   then there shouldn't be a problem.

 9              MS. CICALA:  Indeed, Your Honor.

10              THE COURT:  If they didn't, well then

11   there's a problem.

12              MS. CICALA:  Indeed.

13              And Webb has, and so it shall be

14   substantiated through the 30(b)(6).

15              THE COURT:  All right.

16              MS. CICALA:  But I did want to make a

17   remark regarding timing, Your Honor.

18              Webb has made numerous productions to the

19   defendants of almost half a million pages.

20              Webb is on track to meet all deadlines in

21   the CMO so there's no reason to slow Webb down.  I just

22   wanted to offer that for the Court that Webb is prepared

23   to proceed full press.

24              And, yes, there are a few outstanding

25   questions we have to defendants, just as there are

1    questions -- answers that we're waiting for from

2    defendants in discovery.

3              That's the ordinary push and pull, as you

4    work through your issues.  We're waiting to hear about

14:40:46  5    gaps in custodial files on the defense side, just as

6    they're waiting to hear information from Webb about these

7    former employees that I had mentioned earlier.

8              So some of this is the ordinary course,

9    Your Honor.  And the good news is that we are on track to

14:41:02 10    meet the deadlines in the CMO, so there really is no need

11    to disrupt Webb in that regard.

12              THE COURT:  Well, I was just saying we

13    shouldn't have a lot of depositions of Webb personnel,

14    other than the 30(b)(6), until we confirm that it's

14:41:15 15    staying in.

16              So when -- ballpark, when do you want to do

17    the 30(b)(6) deposition?  I don't need the exact date,

18    but just, you know, time frame, when are you

19    contemplating doing that?

14:41:32 20              MR. BOONE:  I'd say within a month, Your

21    Honor.

22              THE COURT:  That seems reasonable.

23              So why don't we -- okay.  I'll say by

24    August 23rd.

14:41:50 25              Does that seem reasonable for everyone to

1    do that?

2                    Do you want to do it a week later?  I

3    certainly think by the end of August.  You want to make

4    it August 30th?  You know --

14:42:03  5             MR. COOPER:  That's fine for Express

6    Scripts, Your Honor.

7                    MR. BOONE:  Yes.  Same for OptumRX.

8                    THE COURT:  All right.  We'll say August,

9    August 30th deadline for the 30(b)(6).

14:42:16 10             You might not want to do it the 30th, which

11    I think is the Friday before Labor Day, but it's a

12    convenient deadline.

13                    And then it seems to me the parties should,

14    you know, digest what, you know, what comes out of that

14:42:45 15   deposition and then confer and suggest to the Court how

16    to proceed.

17                    And I hope that you'll have some clarity

18    one way or another that, you know -- and again, I want

19    everyone to be realistic.

14:43:01 20             The idea is not to waste time and to have a

21    case that neither side is going to really accept the

22    results.  All right?

23                    That doesn't -- that serves no purpose.  If

24    the Express Scripts and OptumRX says that, you know,

14:43:21 25   "We're not going to -- we're not going to accept the

```
 1    results as meaning anything," then why do it?  Why do it?

 2                      I mean, if you -- you know, if you win,

 3    they won't accept it.  If they win, you won't.  Why

 4    bother?

 5                      And, you know, so if -- I'm hoping both

 6    sides will agree that either you're confident that they

 7    did what they were supposed to do and OptumRX and Express

 8    Scripts are going to be able to get the documents that

 9    they need to get to defend themselves, then we should go

10    forward.

11                      And if there's doubt about that, and then

12    we shouldn't, we shouldn't go forward with them.  And I

13    want the plaintiffs to look at it that way.

14                      So what's a reasonable time for you to, you

15    know, evaluate what you learn and confer and make a

16    recommendation to the Court?

17                      MR. BOONE:  We'd suggest two weeks, Your

18    Honor.

19                      THE COURT:  That seems -- how does that

20    sound to the plaintiffs?

21                      MS. CICALA:  That's fine, Your Honor.

22                      THE COURT:  All right.  That seems pretty

23    good to me.

24                      So that's Friday, the 13th, but so be it.

25                      Why don't you just send -- send a joint
```

1    status report?  And I guess no reason why it can't be

2    filed.  File a joint status report, say, by 3:00 p.m.,

3    3:00 p.m. on Friday, the 13th, as to your recommendation

4    as to what to do about Webb.

14:45:06  5          And if it's joint, if you both agree,

6    I'll -- I will unquestionably approve it.  If you don't

7    agree, I'll have to figure something out.

8          But I'm strongly urging both sides to look

9    at this fairly and objectively because the plaintiffs

14:45:26 10  have no interest in winning a case that the defendants

11   won't count or won't -- I mean won't -- how should I put

12   it -- won't consider as of much value or weight.  You

13   have no, no reason to do it.

14          So I think that's what we'll do.

14:45:52 15         And, oh, and, all right, Peter, what's a

16   reasonable time for you or, you know, counsel or

17   whatever, to ascertain for -- it's not all 80 because

18   there were some that litigation holds weren't -- there

19   were no instructions so, you know, forget those.

14:46:22 20         The ones where litigation hold instructions

21   were given, to determine if the client followed it.

22          MR. WEINBERGER:  So, Your Honor, all right,

23   I don't have it right in front of me, but you set a time

24   frame on the new cases, and I think it's sometime in

14:46:42 25  September.

```
 1              For some reason September 22nd stands out
 2    to me.
 3              THE COURT:  Something like that.
 4              MR. WEINBERGER:  And I would --
 5              THE COURT:  That's about 60 days.
 6              We'll take --
 7              MR. FARRELL:  Judge, this is Paul Farrell.
 8              THE COURT:  Right.
 9              MR. FARRELL:  Not to belabor or get into
10    the weeds on this, but your initial order asked the PEC
11    to determine, of the 70 cases or so, whether or
12    not -- and the language in the order says, "A litigation
13    hold was implemented."
14              That seems to be a verbiage that has caused
15    some disagreement between the plaintiffs and the
16    defendants; respectful disagreements, healthy
17    disagreements.
18              What the PEC was able --
19              THE COURT:  You know, obviously, Paul,
20    there's a two-step process.
21              It can't be implemented unless someone
22    asked them to, and so it would require a request or a
23    directive by counsel, and then the client actually doing
24    it.
25              MR. FARRELL:  So addressing that, what the
```

1    PEC did for the 70 or so cases is asked counsel that very

2    question.

3                    THE COURT:  Right.

4                    MR. FARRELL:  What we got back from those

14:48:06  5    cases is answers that are in our report.

6                    THE COURT:  Right.

7                    MR. FARRELL:  I would like --

8                    THE COURT:  But you don't -- but the

9    answers, the answers were "This is when the instructions

14:48:17  10    were given, but we don't know if the clients followed

11    them."

12                    MR. FARRELL:  So that's ultimately my

13    point.

14                    From the PEC perspective, these aren't our

14:48:29  15    clients.

16                    THE COURT:  Right.

17                    MR. FARRELL:  We're asking other lawyers --

18                    THE COURT:  Right.

19                    MR. FARRELL:  -- whether or not they

14:48:34  20    implemented -- or whether or not they issued it.

21                    THE COURT:  Right.

22                    MR. FARRELL:  And then for them to

23    determine whether or not their clients implemented it, is

24    a level of inquiry that we don't necessarily have control

14:48:46  25    over and requires some type of forensic investigation

1    that, respectfully, sir, goes beyond the parameters of a

2    Plaintiff Fact Sheet and gets us into some discovery that

3    gives the PEC concern.

4                Now, I say all that with the caveat that I

14:49:05  5    understand what you're objective is.  Your objective is

6    to identify potential Bellwether replacements, and not

7    necessarily engage in --

8                THE COURT:  Right.

9                MR. FARRELL:  -- other discovery.

14:49:19 10                But if we're not --

11                THE COURT:  And avoid having this mess

12    again.

13                MR. FARRELL:  But if we're not going to

14    replace the two Bellwethers and we're going to proceed

14:49:26 15    with the two that we have, then what I might suggest --

16                THE COURT:  No, but remember, Paul, we

17    might only have one.

18                MR. FARRELL:  Yes, sir.

19                THE COURT:  I don't think we should just

14:49:33 20    have one.  Okay?

21                MR. FARRELL:  Okay.

22                THE COURT:  I don't -- I mean, I don't

23    think it's good to have only one.

24                MR. FARRELL:  I agree.

14:49:40 25                THE COURT:  Okay.  So we may have to -- we

1    may have to --

2                      MR. FARRELL:  So what I'm respectfully

3    suggesting is that if we are to do this exercise of this

4    abbreviated forensic examination of the pending cases

14:49:56  5    from the same law firms, then we're going to be back in

6    the same boat.

7                      What I would ask that you consider is that

8    we wait and determine where we are with Webb County

9    before we go further down the line expending resources on

14:50:12 10    what "implementation" means and whether or not, on a

11    case-by-case-by-case basis, not only was the litigation

12    hold issued, but whether or not and to what degree it was

13    implemented.

14                      That's an enormous undertaking that I would

14:50:31 15    assume would take place on remand with most of the bulk

16    of the inventory.

17                      But I do understand you want to make sure

18    if we replace, we replace meaningfully.

19                      THE COURT:  Right.

14:50:42 20                      MR. FARRELL:  And it seems as if we have

21    a -- we can set this out in a timed way.

22                      I would like to make one proffer for the

23    Court instead of -- if we need to put a pleading in.

24                      The defendants have identified, I believe,

14:50:55 25    seven cases that were not on the list of whether or not

1    lit holds were issued.

2              Our analysis -- it came in last night -- is

3    that six of the seven that they identified, we received

4    notes from those lawyers that they did not have PBM

14:51:14  5    claims.  We're going to follow-up on that.

6              And then the final one is the City of

7    Huntington, and as you recall that's CT Two.  That case

8    was remanded and is not technically in the MDL any

9    longer.

14:51:29  10             So that's kind of my update for the Court.

11             MR. COOPER:  Your Honor, this is Jonathan

12   Cooper.

13             Just a couple quick points in response to

14   Mr. Farrell.

14:51:37  15             First, the City of Huntington case that was

16   listed in our notice is different than Track Two.  There

17   were separate City of Huntington cases that were filed.

18             So the one we listed has a different case

19   number than Track Two, so I believe it is still

14:51:50  20   technically before this Court.

21             And the other point we wanted to note is

22   that the order of this Court and the question the PBM

23   defendants asked this Court to order was not getting into

24   all the details of was the litigation hold implemented

14:52:03  25   for every single potential custodian and every single

1    department.

2              THE COURT:  Right.

3              MR. COOPER:  It was was a litigation hold

4    implemented.  That's a much more basic question.  It's

14:52:12  5  straightforward.

6              THE COURT:  Yeah, I'm not -- I'm not asking

7    you to go to counsel and have that counsel go to every

8    single potential witness and look through every file, but

9    clearly someone at the City or County either gave

14:52:29 10  directives to put it in place or not.

11              And if they did, presumably, you know, most

12    people, good will, followed it.

13              Now, I'm sure not every single person did

14    it a hundred percent, but they, you know -- but if there

14:52:47 15  isn't anyone at that City or County who gave that order,

16    well, then, that would be the answer.

17              So I think, you know, Peter and Paul, I

18    think that that would not be too onerous an inquiry for a

19    lawyer to go back to, you know, the Law Director -- say

14:53:05 20  the Law Director, who is likely to have done it, and say,

21    "All right, did you do it?"

22              MR. FARRELL:  We understand, we agree, and

23    we will comply.

24              THE COURT:  Okay.

14:53:13 25              MR. WEINBERGER:  And the date was September

1    9th for the newly filed cases, for the motion for leave,

2    just for your information, Your Honor.

3                    THE COURT:  All right.  So what do

4    you -- you know, in terms of making that inquiry, having

14:53:30  5    each of the lawyers for the -- I don't know, the ones

6    where on your list, Peter, there was a, you know,

7    timely -- timely notice by counsel to go back and have

8    that lawyer contact his client and say, "All right, did

9    you follow my directives and direct your people to put it

14:53:52 10    in place:  Yes or no?"

11                    MR. FARRELL:  Yes, we will go back to those

12    lawyers and ask them that specific question.

13                    THE COURT:  All right.  So when -- you tell

14    me what's a reasonable response for that?

14:54:03 15                    MR. FARRELL:  Three weeks.

16                    THE COURT:  Seems fine.

17                    So that's August 13th.  Okay.

18                    So I guess it would be

19    supplementing -- supplementing this chart, and really all

14:54:32 20    you need to do is put another column.

21                    We'll call it "Complied."  You know,

22    something like that.  That says, you know -- or the

23    notice date is -- that means notice by the counsel,

24    right?  That means notice by the counsel.

14:54:53 25                    And, I don't know, what do we want to call

1    it?  "Implementation date by client" or something like

2    that?  And the implementing would be, you know, the Law

3    Director giving the directive on, you know, to everyone

4    to keep their documents.

14:55:13  5                    So --

6                    MR. FARRELL:  How about just

7    "Implementation confirmed."

8                    THE COURT:  "Implementation confirmed."

9                    And if that's blank, then we know that that

14:55:22 10    wouldn't be a good Bellwether case.

11                    MR. COOPER:  And we need the date, Your

12    Honor, to be sure.

13                    THE COURT:  Yes, the implementation

14    confirmed and a date.

14:55:30 15                    MR. COOPER:  Yes.

16                    THE COURT:  So just add a column.  All

17    right?

18                    MR. SMYER:  And the other thing, Your

19    Honor, just a small point on that exhibit.

14:55:36 20                    It's not a simple -- I agree it's a simple

21    addition of a field there, but it's not limited to

22    situations where the fee engagement letter had a timely

23    representation to the respective plaintiffs.

24                    That wouldn't necessarily limit the field

14:55:56 25    to the universe.  It would apply to everybody.

1          Whether or not that language, that formal

2     language was included in an engagement letter has really

3     nothing to do with whether the hold was implemented,

4     which is what we're talking about here.

5          So I just --

6          THE COURT:  I don't care what's in an

7     engagement letter.

8          MR. SMYER:  Right.  That's precisely

9     what --

10          THE COURT:  What "Implementation confirmed"

11     would mean that the Mayor, the County Executive, the Law

12     Director, whatever, sent a directive to personnel, you

13     know, "We've got this lawsuit; you've got to keep

14     documents."

15          MR. SMYER:  I totally agree with Your

16     Honor.

17          That's what they have provided is what's in

18     the engagement letter.  That's why it's not sufficient

19     under the Court's order, and that's why the Court is

20     ordering that now.  I get that.

21          I'm just saying that would apply to every

22     person on that list.

23          It wouldn't be limited to ones where they

24     had said that they've provided such counsel, counsel

25     provided an instruction to the plaintiff on such and such

1    date because that still is not relevant to whether or not

2    the hold was implemented.

3                   MR. WEINBERGER:  I'm sorry, I'm not --

4                   THE COURT:  I'm not following that at all.

5                   All I'm asking them to do is add a column

6    where the client, you know, confirms that we got

7    the -- we got the directive from counsel and we

8    implemented it.

9                   Okay?

10                   And by implementing it, sending out an

11   order directed to my -- you know, people in that City,

12   County, you know, "We've got this lawsuit and we're

13   directed to keep documents," and the date they sent that

14   directive.

15                   And if that's blank, then we know we don't

16   want to pick that case because, although the counsel did

17   it, the follow-through didn't happen, and you are not

18   likely to find the documents you need.

19                   So that's the purpose of that.

20                   All right.  By August 13th.

21                   All right.  And then we'll, you know, take

22   things from there one step at a time.

23                   All right.  Those were the two matters

24   on -- that I wanted to cover.

25                   It's always dangerous to, you know, open

1    things up because you never know where it goes, but we've

2    got a lot of smart people here and they've worked hard,

3    and if there's something else that either side feels that

4    I should know about and maybe do something about, or that

14:58:20  5    you want to discuss, you know, I don't have anything

6    else.

7                        I blocked in the rest of the day on this.

8                        MR. MOUGEY:  Your Honor, Peter Mougey.

9                        Under the discussion category --

14:58:32 10                        THE COURT:  Right.

11                        MR. MOUGEY:  -- I make just a suggestion to

12    the Court and Special Master and the defendants, that we

13    had -- I think it was about a month ago, whatever, we

14    were here a month, month-and-a-half ago on discovery

14:58:46 15    issues in front of Special Master Cohen, and there was a

16    stand-down essentially for the last month or so to get

17    production.

18                        And I think about 80 percent of the

19    production -- that's rough, but about 80 percent of the

14:58:58 20    production as measured by pages has come in the last four

21    to six weeks.

22                        There are a number of issues, I think going

23    both ways, that are still unaddressed.

24                        My suggestion, Your Honor, for both sides

14:59:14 25    would be to reframe where we were a month,

1    month-and-a-half ago on Special Master Cohen's docket or

2    agenda from both sides -- I'm going to suggest a week

3    from today -- and set another conference in front of

4    Special Master Cohen for the next, you know, two to

14:59:38  5    three, four weeks to address the standing items that

6    are -- have yet to be finalized.

7               And my thought, Your Honor, as we get into

8    August, the close of discovery is -- I think it's

9    December, I don't know, 23rd, 24th, something along those

14:59:56  10    lines, last week of December -- that we have a lot of

11    work to do with depositions, both sides.

12               And my guess is they're going to have

13    dozens, we're going to have dozens of each defendant, and

14    in order to get this accomplished over the coming months

15:00:10  15    we've got to get some of these issues addressed.

16               We've come a long way, both sides have.  I

17    think the stand-down has helped make significant

18    progress, but I think we need to keep the momentum going.

19               And to have another conference with

15:00:25  20    everybody here to address those outstanding issues, I

21    think is vital to ensure we hold the deadlines.

22               So like I said, start off -- I think we

23    should have everything in front of Special Master Cohen,

24    if it meets with his approval, by -- I'm just going to

15:00:40  25    suggest -- Wednesday of next week.  That gives everybody

1    a week.

2                    Most of these issues from both sides have

3    been standing for some time.  I think there's not a lot

4    of new issues.

15:00:48  5                    And then set a -- another hearing for a

6    couple weeks out, back up here, to get those issues

7    addressed so we can keep this momentum moving.

8                    We've made progress, but we've got a lot of

9    work to do, and I think that goes both ways.

15:01:03 10                    THE COURT:  Well, that seems like a good

11   suggestion.

12                    I want to commend both sides.  I mean, I

13   was concerned that things were getting -- let's put it

14   this way -- too much like a lopsided hockey game in the

15:01:19 15   third period, and I wanted to cool things down.

16                    And I thought, you know, having

17   face-to-face conferences like we used to would be

18   helpful.

19                    So I think, you know, the last one we did

15:01:34 20   by Zoom, but I think the parties have been working more

21   cooperatively, so the enterprise moves forward, and I

22   want to commend everyone because I knew everyone could do

23   it.

24                    So that sounds like a good approach.

15:01:48 25                    Special Master Cohen's here.  No one

1    expected everything would go away.  Some things probably

2    have.

3              So, you know, after the meeting, if you

4    want to talk to him, both sides, and figure out, you may

15:02:02  5    be able to schedule something.  Whatever, whatever works.

6              But I agree with, you know, move things

7    forward.

8              And obviously if there's something that

9    requires a formal ruling by him, you know, you may come

15:02:15 10   to me, too.  I understand that.  So that's a good, good

11   idea.

12             Any other thoughts or suggestions?

13             MR. BOONE:  Nothing else from OptumRX, Your

14   Honor.

15:02:33 15   MR. COOPER:  Nothing from Express Scripts,

16   Your Honor.

17             THE COURT:  Okay.

18             MR. FARRELL:  Nothing from the PEC.

19             Thank you.

15:02:39 20   THE COURT:  Okay.  Anything, my group, that

21   I forgot?  I mean, I had a short list so I didn't forget

22   anything on my list, and Item 3 was to ask for anything

23   else.

24             So, all right.  Well, again, I hope no one

15:02:56 25   had any real difficulty getting here, given the, you

1   know, the -- what was that?  -- you know, the Microsoft

2   problem.

3                   Airlines are still having problems today

4   because I know people are still hung up, not getting out

15:03:14  5   or not getting where they are.

6                   I hope that gets resolved, and I hope no

7   one had too much undue problem getting here, but I

8   appreciate everyone coming.

9                   Again, I think there's a real benefit to

15:03:26 10   periodic in-person meetings.

11                   We had them what, Peter, every couple

12   months in 2018 and '19, we had a very large gathering,

13   and we -- I would meet with smaller groups.  I met

14   sometimes, you know, defendant by defendant.

15:03:47 15                   I mean, at that time we had maybe 18

16   defendants or something we were dealing with.  So it was

17   more complicated.  But it was -- I think it was good

18   having everyone be here face-to-face getting to know each

19   other.

15:04:03 20                   So I encourage people to stick around a

21   little, talk to each other.

22                   I mean, I don't know everyone who is here,

23   that's for sure, there's some new people, but again I

24   appreciate everyone coming in and hope everyone has safe

15:04:15 25   travels getting back.

1    MR. WEINBERGER:  Thank you, Your Honor.

2    (Proceedings concluded at 3:04 p.m.)

3                    -   -   -   -

4              C E R T I F I C A T E

5         I certify that the foregoing is a correct

6    transcript from the record of proceedings in the

7    above-entitled matter.

8

9

10

11   **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
12   Certified Realtime Reporter

13   7-189 U.S. Court House
     801 West Superior Avenue
14   Cleveland, Ohio 44113
     (216) 357-7087
15

16

17

18

19

20

21

22

23

24

25