UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL NO. 2804<br><br>Case No. 17-MD-2804<br><br>Judge Dan Aaron Polster |

DECLARATION OF PETER J. MOUGEY
IN SUPPORT OF THE OMNIBUS MOTIONS FOR LEAVE TO AMEND TO ADD DEFENDANTS

**DECLARATION**

1. My name is Peter J. Mougey, and I have personal knowledge of the matters set forth in this Declaration.

2. I am a member of PEC in the above styled MDL, and, since the inception of the MDL, I have overseen the PEC's analysis of the DEA produced ARCOS data, including analysis of the data informing certain of the Motions for Leave to Amend being filed with the Court today, July 29, 2024.

3. The ARCOS data contains records of transactions, including transaction records documenting the shipments of opioids from manufacturers to distributors and from distributors to dispensaries nationwide.

4. The DEA has produced ARCOS data to the PEC and into the MDL in multiple waves, falling into two temporal tranches.

5. The first tranche of DEA produced ARCOS data provides data regarding opioid transactions dating from January 1, 2006 through December 31, 2014. This 2006-2014 ARCOS data contains records of approximately 500,709,504 transactions.

6. The DEA produced the 2006-2014 ARCOS data into the MDL over the course of four months in 2018.

7. The second tranche of produced ARCOS data provides data regarding opioid transactions dating from January 1, 2015 through December 31, 2019. The 2015-2019 data contains records of approximately 360,859,701 transactions

8. The DEA produced the raw 2015-2019 ARCOS data to the PEC on August 14, 2023. Before August 14, 2023, the DEA had only produced 2006-2014 ARCOS data.

9. The ARCOS data is complex and voluminous. Because of this complexity and volume, analysis of and computations from the ARCOS data require expert assistance and cannot reasonably be performed by anyone who does not have significant data processing experience. As demonstrated by this Court's rulings on Motion in Limine and *Daubert* regarding the PEC's data expert and his analysis, the PEC's data experts and specialists have these necessary skill sets.

10. As each wave of ARCOS data has been produced, the PEC has worked with its consulting data experts and data specialists to analyze the data.

11. The PEC's analysis of the ARCOS data, performed with the assistance of the PEC's data experts and specialists, allowed the PEC to determine the opioid market share for manufacturers and distributors and the opioid market share for dispensers.

12. Through its analysis, the PEC determined the distributor of each opioid shipped into each county in the United States during the produced ARCOS time periods. From that information, the PEC derived each distributor's market share.

13. The PEC was also able to perform an analysis of the data about the opioids shipped to determine the manufacturer for each opioid shipped into each county in the United States during the produced ARCOS time periods. From that information, the PEC derived each manufacturer's market share.

14. Although the ARCOS data does not contain dispensing data, it does identify the dispensers to whom each distribution shipment was sent. By aggregating all of the shipments for which a pharmacy chain was a distribution recipient in a particular jurisdiction, the PEC, working with its data experts and specialists, was able to determine the quantity of opioids the pharmacy chain had received. From that information, the PEC was able to calculate each dispenser's opioid market share by assuming that whatever a pharmacy chain received, it eventually dispensed.

15. The Court has instructed the PEC to make specific reports from the 2006-2014 ARCOS publicly available at various times.

16. In November 2018, the Court ordered the PEC to provide to parties in the MDL, including plaintiffs whose cases had already been transferred into the MDL, certain reports to utilize for purposes of amending complaints to add new parties. Doc. #1106. The PEC was now required and permitted to provide a report that, with respect to manufacturers and distributors, would identify entities with more than 5% market share in the relevant jurisdiction for at least three of the nine years covered by the ARCOS data.

Under the terms of this order, the PEC did not provide plaintiffs with information about manufacturers or distributors who did not have at least a 5% market share in three of the nine years covered by the data and thus plaintiffs who received the PEC's reports had no opportunity to consider whether to name such entities as defendants. The only information that the PEC was permitted to provide about dispensers was a pharmacy's presence in the jurisdiction; no dispensing market share information was provided at this time. The PEC was not, at this time, permitted by the Court to provide summary market share information regarding a pharmacy's comprehensive receipt of opioids from distributors.

17. On April 12, 2019, the Court issued a new and expanded Protective Order regarding disclosure of the ARCOS data and reports therefrom. Doc. # 1545. This Protective Order permitted disclosure of reports based on the ARCOS data, including reports disclosing the volume of opioids shipped to individual pharmacies during the 2006-2014 ARCOS time period.

18. In May 2019, the PEC filed a notice of ARCOS disclosure, informing all parties to the MDL, including plaintiffs, that various reports summarizing the ARCOS data were available to parties who executed the then in place ARCOS protective order. Included among the reports the PEC was now permitted to create and share with plaintiffs who executed the Protective Order were reports summarizing the total amount of opioids shipped to individual pharmacies within a county.

19. Additionally, per Court Order, the full set of 500,709,803 ARCOS transactions from 2006-2014 became publicly available in stages as the Court lifted

protective orders for specific date ranges of data. On July 15, 2019, the Court lifted the previously applicable protective order as to January 1, 2006 – December 31, 2012 ARCOS data and the PEC promptly made that data public. Doc. # 1854. On January 24, 2020, the Court lifted the previously applicable protective order as to January 1, 2013 – December 31, 2014 raw ARCOS data. Doc. # 3080. Following that Order, the PEC made that data public as well. Doc. #3259.

20. The PEC has worked to perform the same types of analyses on the 2015-2019 ARCOS data as performed on the earlier ARCOS data sets. Upon receipt of the raw 2015-2019 ARCOS data, the PEC analyzed this updated data (which now included the 2015-2019 data), again with assistance from the PEC's data experts and data specialists.

21. On September 12, 2023, pursuant to Court instructions, the PEC provided the plaintiffs in the MDL updated information for their jurisdictions. This was the first time that plaintiffs had access to data about the volume of opioid shipments into their jurisdictions after December 31, 2014.

22. The PEC's analysis of the updated ARCOS data revealed that, for certain manufacturer and distributor defendants, and for certain jurisdictions in which they operated, opioid market share had increased from not exceeding 5% in any three of the nine years covered by the 2006-2014 ARCOS time period to 5% or above across the later 2015-2019 ARCOS time period.

23. The PEC's analysis of ARCOS data additionally revealed information about certain pharmacies having dispensing market share over the full 2006-2019 time period which was not available from the earlier 2006-2014 ARCOS data set.

24. In support of the Motions to Amend, the PEC has provided the Court with reports demonstrating these updated analyses with respect to certain plaintiffs seeking to amend their complaints.

25. In my role on the PEC, in addition to overseeing analysis of ARCOS data, I have also overseen analysis of the geographically limited dispensing data produced by certain defendants in the pharmacy bellwether cases, including, *inter alia,* that produced in the CT3 and CT4 bellwether cases.

26. The dispensing data produced by pharmacy defendants contains certain dispensing data fields and has only been produced for the jurisdictions related to the pharmacy bellwether plaintiffs. For example, in CT3, the dispensing defendants produced dispensing data limited to the State of Ohio.

27. The data and pharmacy experts retained by the PEC in these pharmacy bellwether cases have implemented certain dispensing "red flags" tests that raised or should have raised a reasonable suspicion as to the validity of the prescriptions for controlled substances. The PEC's retained experts have operationalized algorithms that could be processed through the produced dispensing data in those cases to identify prescriptions which would have been flagged under those dispensing red flag test.

28. This "red flag" data analysis can only be performed on dispensing data produced by the defendants in the pharmacy bellwether cases which contains the specific fields necessary to process the "red flag" algorithms.

29.     The ARCOS data discussed above does not, even in its public form, contain the dispensing information necessary to perform this prescription level "red-flag" analyses.

30.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 29, 2024, in Pensacola, Florida.

Date: July 29, 2024

Respectfully submitted,

_____
Peter J. Mougey, Esq.