# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF OHIO

# EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| See cases listed in Exhibit A | |

### Omnibus Motion for Leave to Amend to Add Albertsons Defendants and Memorandum of Law in Support

3070255.1

### INTRODUCTION

In accordance with this Court's Order dated May 23, 2024, Doc. #5455, the Plaintiffs listed in Exhibit A ("Amending Plaintiffs") hereby move for leave to amend their operative complaints pursuant to Federal Rules of Civil Procedure 15 and 16 to add the Albertsons Defendants[1] beyond the deadline for amendment of pleadings set forth in this Court's case management orders and submit this Memorandum of Law in support thereof.  If permitted to amend, Plaintiffs here would supplement their existing pleadings with claims substantially similar to those asserted against pharmacies in the Supplemental and Amended Allegations filed in the CT9 bellwether in *Tarrant County v. Purdue Pharma, LP, et al,* No. 1:18-op-45274-DAP, Doc. #3789 July 14, 2021) (adjusted for the law of their particular jurisdiction), and add additional defendant specific facts, including those detailed herein.   None of the Amending Plaintiffs have sued Albertsons in their currently operative pleadings.

---

[1] Amending Plaintiffs seek to add as defendants Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Albertson's LLC; Safeway, Inc.;) United Supermarkets L.L.C. d/b/a The United Family; Randall's Food & Drug LP Randall's Food & Drug LP, and Acme Markets, Inc. d/b/a Sav-On Pharmacy. Albertsons Companies, Inc. f/k/a AB Acquisition LLC is a Delaware corporation with its principal place of business in Boise, Idaho.  New Albertsons L.P. f/k/a New Albertson's, Inc. is a Delaware corporation with its principal place of business in Boise, Idaho. Albertson's LLC is a Delaware limited liability company with its principal place of business in Boise, Idaho. Safeway, Inc. is a Delaware corporation with its principal place of business in Pleasanton, California. United Supermarkets L.L.C. d/b/a The United Family, is a Texas limited liability company with its principal place of business in Boise, Idaho. Randall's Food & Drug LP is a Delaware limited partnership with its principal place of business in Boise, Idaho. Acme Markets, Inc. d/b/a Sav-On Pharmacy is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. This motion refers to these Defendants collectively as "Albertsons."

Leave should be granted for three reasons.  First, as more fully described below, the most recent ARCOS data obtained from the federal Drug Enforcement Administration shows that, for the period of 2006-2019, Albertsons had a *dispensing* market share of 5% or more in each of the Amending Plaintiff's jurisdictions.  ARCOS information on volume and market share for dispensers in *any* year was not available to the Amending Plaintiffs with respect to Albertsons prior to May 7, 2019, when expanded reports containing dispensing market share information created from the 2006-2014 ARCOS data were made available to MDL Plaintiffs who signed a protective order.  Doc. #1612.  This disclosure was well after the deadline for many of these plaintiffs to amend their pleadings under the applicable case management orders in this MDL.[2]  Second, prior to the CMO deadline for amendment, sufficient information about the improper dispensing practices of the chain pharmacies like Albertsons was not known, since discovery into the dispensing practices of chain pharmacies had not been undertaken.  Indeed, no dispensing data from Albertsons was produced anywhere until July 9, 2021 when Albertsons produced raw dispensing data for the State of New Mexico *only* in *State of New Mexico, ex rel., Hector Balderas, Attorney General, v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541 ("*New Mexico ex rel. Balderas*").  And, third, discovery in *New Mexico ex rel. Balderas* has uncovered information about Albertsons' conduct that was not

---

[2] MDL plaintiffs were required to amend their pleadings by the later of:  (1) March 16, 2019 or (2) 90 days after transfer into the MDL.  Doc. # 1106. The latest transferred Amending Plaintiff was Pennington County, South Dakota v. Mylan Pharmaceuticals, Inc. et a, No. 1:21-op-45048-DAP, which was transferred into the MDL on April 4, 2021, making its amendment deadline July 8, 2021.

publicly available until very recently.  The information about Albertsons' distribution and dispensing practices was not available to the Amending Plaintiffs until depositions from *New Mexico ex rel. Balderas*  were produced in the MDL on April 22 and 29, 2022, and uploaded to the MDL repository on April 23 and 30, 2022.  These grounds establish that, even with the exercise of due diligence, the Amending Plaintiffs could not have met the deadline for adding Albertsons because the information on which they are basing their claims was not available to them. Thus, even with the exercise of due diligence, the Amending Plaintiffs could not have met the deadline for adding Albertsons because the information on which they are basing their claims was not reasonably available to them.

Because they could not, even with due diligence, have met the deadline to amend their complaints to add these claims against Albertsons, and because, as discussed below, Albertsons will not be prejudiced by these amendments, this Court should find that each of the Amending Plaintiffs has shown "good cause" within the meaning of Rule 16, and that amendment is proper under Rule 15, and should grant their motions to amend their pleadings to add  Albertsons.

FACTUAL BACKGROUND

The facts pertaining generally to the procedural history of these cases and the deadlines set by the Court for the amendment of pleadings are set forth in the PEC's Roadmap Overview for Motions for Leave to Amend ("PEC Roadmap"), which Amending Plaintiffs incorporate herein and to which the Court is respectfully referred.

*Facts Pertaining to Albertsons*

In an amended complaint, Amending Plaintiffs would plead, among others,  the

3

facts that follow.  Albertsons is a one of the largest food and drug retailers in the United States.  It currently operates stores in 35 states and Washington D.C. under 20 different banners such as Albertsons, Acme, Safeway, Tom Thumb, Carrs, Haggen, Jewel-Osco, Kings Food Markets, Market Street, Pavilions, Randalls, Shaw's, Star Market, Vons, United Supermarkets, Andronico's Community Market, Amigos, Lucky Stores, and Balducci's Food Lovers Market.  Of the over 2,200 stores Albertsons operates, approximately 1,700 have pharmacies.  Albertsons ranked 53 on the latest Fortune 500 list and had revenues of over $79 billion in 2023.

The scope of Albertsons' dereliction of its CSA duties only became known after depositions conducted in *New Mexico ex rel. Balderas* case were uploaded to the MDL repository pursuant to DR22 on April 23 and 30, 2022.[3]  Those depositions have revealed numerous and pervasive failures by Albertsons to comply with its CSA duties both as a distributor and as a dispenser of opioids.[4]  A summary of the some of the facts developed

---

[3] These depositions include:  Deposition of Bobbie Riley, taken January 24, 2022 (uploaded April 23, 2022); Deposition of Lori Hooper, taken February 17, 2022 (uploaded April 23, 2022); Deposition of David Beck, taken February 18, 2022 (uploaded April 30, 2022); Rule 30(b)(6) Deposition of David Beck, taken March 1, 2022 (uploaded April 30, 2022); Deposition of Lynette Berggren, taken February 23, 2022 (uploaded April 30, 2022); Deposition of David Carrick, February 15, 2022 (uploaded April 23, 2022); Deposition of Jessica Covaci, taken February 9, 2022 (uploaded April 23, 2022); Deposition of Anthony Provenzano, taken February 10, 2022 (uploaded April 23, 2022); Rule 30(b)(6) Deposition of Jessica Covaci, taken March 2, 2022 (uploaded April 30, 2022); Rule 30(b)(6) Deposition of Anthony Provenzano, taken March 10, 2022 (uploaded April 30, 2022) and Deposition of Pete Ridsdale, taken February 22, 2022 (uploaded April 30, 2022).  Lichter Dec. at ¶4.

[4] While Albertsons did produce some documents into the MDL prior to producing some deposition transcripts, the plaintiffs in the MDL had none of the critical contextual information for those documents until review of the deposition transcripts. Those transcripts provided details, for example, as to when and how certain written policies were actually implemented and carried out, how gaps in written policies were filled with

in these depositions follows.

*As a distributor of opioids*:

Albertsons self-distributed Schedule III, IV, and V opioids from 2006 – 2008 then stopped distributing all drugs from 2009 to 2012, and finally resumed distribution in 2013, distributing Schedule II, III, IV, and V opioids until 2016 when the company ended its drug distribution activity.  Exhibit B, Declaration of Jay Lichter at ¶5a.

Albertsons never designed or operated an adequate suspicious order monitoring system (SOMS) and never reported a single suspicious order to the DEA in all the time it self-distributed opioids from 2006 - 2008 and 2013 - 2016 to its pharmacies across the country.  Lichter Dec. at ¶¶5b, 5h. Even though Albertsons knew that the CSA requires suspicious order monitoring, throughout the entire time it self-distributed opioids, Albertsons lacked detailed operational SOMS policies and failed to provide adequate training and guidance to those charged with suspicious order monitoring duties.  *Id.* at ¶5c.

The policy that Albertsons had in place from 2002 - 2008 failed to identify orders of unusual frequency or orders that substantially deviated from a normal ordering pattern, even though the CSA requires that distributors' SOM systems identify such orders.  *Id.* at ¶5d.  Albertsons also did not require that suspicious orders be reported to the DEA.  *Id.*  In fact, Anthony Provenzano, who has been Albertsons' Vice President of Pharmacy Compliance and Government Affairs since 2015, testified that, as of 2020, he

---

informal policies, and how employees acted despite the presence of written policies. Lichter Dec. at ¶4 n.1.

believed Albertsons had no duty to report suspicious orders to the DEA. *Id.*

Albertsons did not have any training associated with its SOMS process between 2002 - 2008, nor did it provide written criteria to help distribution center employees identify suspicious orders. *Id.* at ¶5e. Instead, Albertsons employees used their "gut feeling" if an order did not look right to them. If a distribution center employee's gut feeling alerted him that an order was somehow unusual, he would inform a supervisor who then called the pharmacy to verify the order. *Id.* The only purpose of the call was to confirm the accuracy of the order and ask the pharmacy if the order was a mistake. *Id.*

When Albertsons resumed distribution in 2013, it used the same "gut feeling" approach to identifying suspicious orders and added a new threshold-based system. *Id.* at ¶5f. This new system still did not detect orders of usual frequency or orders that deviated substantially from a normal pattern. *Id.* Instead, Albertsons' system tracked a pharmacy's prior 10-12 orders and a report would then give the average of those prior orders, as well as identify the number that was greater than 20% of those orders. Distribution Center employees would call stores if an order was greater than 10 bottles and over 100% of the prior order average. *Id.* Just as in 2006-2008, the only purpose of the calls was to confirm the order was not in error, and no other meaningful investigation was conducted. *Id.*

Albertsons never provided formal training or written documents to guide its employees when making the phone calls to pharmacies. *Id.* All orders were shipped in full unless the pharmacist specifically told the Distribution Center that the order was submitted in error. *Id.* The Distribution Center engaged in no other investigation. The

Distribution Center call logs were sent to Albertsons' Compliance Group for additional review, but any calls or investigations done by that group would have been done *after* the orders were already shipped.  *Id*. at ¶5g.  The Compliance Group never updated the Distribution Center with any additional information it obtained from any specific pharmacies.  *Id.*

Because of these lax policies, Albertsons *never* identified a single order as suspicious, never cancelled, rejected, or refused to ship an order on the grounds that it was suspicious, and never reported a single order as suspicious to the DEA.  *Id*. at ¶5h. In addition, Albertsons permitted its pharmacies to supplement their orders by ordering controlled substances from third party vendors without oversight, allowing Albertsons pharmacies to avoid having their controlled substance orders be monitored or otherwise questioned.  *Id*.

*As a dispenser of opioids*:

As noted in the PEC Roadmap, the dispensing case against the chain pharmacies was only uncovered later in the litigation.  The Amending Plaintiffs incorporate the Corrected Roadmap Br. herein and respectfully refer the Court that history.  The discovery undertaken with respect to Albertsons in New Mexico confirmed that the failures to address red flag prescriptions described in the PEC Roadmap with respect to Walgreens, Walmart, and CVS were also rampant in Albertsons' dispensing of opioids.

Similarly, the depositions taken in New Mexico exposed the same kinds of systematic failures revealed in the prior dispensing cases.  Albertsons had no meaningful dispensing policies or procedures that addressed red flags prior to 2013, only began to

3070255.1

adopt a compliance program to prevent diversion in 2018, and even as of 2022 did not require that its pharmacists investigate or resolve red flags. Lichter Dec. at ¶6a. Instead, Albertsons pressured its pharmacists through quotas and bonus plans to fill opioid prescriptions. *Id*. Albertsons also failed to provide its pharmacists with the data and tools necessary to fulfill their corresponding responsibility duties, including but not limited to, providing their pharmacists with access to dispensing data as well as any analysis of that data as it relates to red flags. *Id*. at ¶6b. In addition, Albertsons had no systems in place to monitor key opioid dispensing patterns or trends, or to document or track suspicious patients or prescribers. *Id*.

Specifically, Albertsons' first informal dispensing policy, in 2013 (which like all of Albertsons' dispensing policies was national in scope), provided no direct requirement for pharmacists to identify and resolve red flags, or even to confirm the legitimacy of questionable prescriptions. *Id*. at ¶6c. In 2016, Albertsons incorporated red flags into its formal policies for the first time but did not require that its pharmacists take specific steps to verify the legitimacy of controlled substance prescriptions; instead, it included five options pharmacists "may consider" to verify the legitimacy of a prescription with red flags. David Carrick, one of Albertsons' District Pharmacy Managers in New Mexico, testified that even as of 2022, Albertsons did not require its pharmacists to investigate or resolve red flags when dispensing opioid prescriptions. *Id*. at ¶6d.

Meanwhile, Albertsons consistently prioritized pharmacy profits over patient safety and pressured its pharmacists to fill all prescriptions presented to them. *Id*. at ¶6e. For instance, Albertsons provided its pharmacists with specific prescription volume

targets for their stores and directly tied pharmacist bonus calculations and subsequent payouts for pharmacy staff to the number of prescriptions dispensed, including controlled substances.  *Id*. Albertsons thus incentivized its pharmacists to fill as many prescriptions as possible, rather than rewarding instances of conducting due diligence, resolving red flags, or refusing problematic prescriptions.  *Id*.

At the corporate level, Albertsons had no system in place at any time to monitor or track red flag information documented by its pharmacists, outside of District Pharmacy Managers occasionally visiting stores to review prescriptions in certain circumstances.  *Id*. at ¶6f.  For example, Albertsons did not require its pharmacists to document anything prior to filling a controlled substance prescription, including their use of a state's prescription drug monitoring program.  *Id*. Similarly, Albertsons did not require its pharmacists to take any steps – including documenting their reasoning or informing corporate supervisors – when they refused to fill a prescription.  *Id*. Albertsons also never had a system in place to monitor or track prescribers with histories of writing illegitimate prescriptions, patients with histories of presenting illegitimate prescriptions, or instances in which pharmacists refused to fill certain prescriptions.  *Id*.

In addition, Albertsons does not maintain any single, specific place for pharmacists to document measures taken to determine the legitimacy of a prescription. *Id*. at ¶6g. Instead, pharmacists may document that information in several ways or places, including on hard copy prescriptions, electronic prescription fields, the electronic patient profile, or the electronic "fill notes" section.  *Id*. As a result, pharmacists interested in

checking prior notes for particular patients are faced with a confused, muddled system that does not support that effort.  *Id.*

The depositions that contain this information were only made available to MDL plaintiffs in late April 2022 when the New Mexico depositions were uploaded to the MDL repository.  *Id.* at ¶9.

Additionally, as other bellwether case tracks have progressed in this litigation, it has been typical for those tracks to result in settlements with the key defendants.  Most of those settlements have been "global" in nature, meaning that the settlements cover not only the specific bellwether plaintiff, but also the other hundreds or thousands of subdivisions with claims against the settling defendant.  While those discussions have necessarily been confidential, after more than a year of settlement discussions with Albertsons, those discussions are now at an impasse.  The Amending Plaintiffs have reasonably waited to see if those settlement discussions would bear fruit.

*The Current Motion*

On May 24, 2024, this Court granted the PEC's motion to lift the moratorium on motion practice to allow non-bellwether MDL plaintiffs to seek leave to amend their pleadings in order to add defendants they had not previously named.  The Amending Plaintiffs – none of whom previously sued Albertsons – now seek leave to amend to add claims against Albertsons based on three grounds.

First, Amending Plaintiffs whose amendment deadline expired before the PEC's release of ARCOS data in 2019 seek to amend based on data that is now available to them about the extent of Albertsons' dispensing in their jurisdiction.  Second, all Amending

3070255.1

Plaintiffs seek leave to amend based on the discovery of new facts regarding the improper dispensing practices of the chain pharmacies like Albertsons, which was not previously known prior to the discovery and proceedings in CT3, CT4, and in the case brought by the State of New Mexico. *See* Corrected Roadmap Br. at 18-22. As set forth in the PEC Roadmap, it was not until after the amendment deadlines for Amending Plaintiffs had all passed that sufficient information was available to bring pharmacy dispensing claims. Third, the depositions that were made public in April of 2022 provide further information about Albertsons' misconduct in their distribution and dispensing practices.

Each Amending Plaintiff is a jurisdiction in which Albertsons has a 5% or greater market share as a dispenser (dosage unit or MME) over the entire ARCOS period of 2006-2019. The jurisdiction-specific facts pertaining to each Amending Plaintiff's jurisdiction claims are shown on Exhibit A. The Amending Plaintiffs seek to assert the same causes of action against Albertsons arising out of its role as a dispenser of controlled substances that they asserted against the same category of defendants – chain pharmacies – in their currently operative complaints, adding dispensing allegations from the currently operative CT9 complaint as set forth above.

As described below, none of the Amending Plaintiffs could have met the existing deadline for amendment with respect to Albertsons because the information on which they seek to base their claims was not available by the applicable deadline to amend. Moreover, as discussed below, amendment of these cases to include Albertsons will not prejudice those defendants because the Amending Plaintiffs' actions have all been stayed since the CMO amendment deadline passed.

3070255.1

LEGAL STANDARD

The legal standards applicable to this motion are set forth in the PEC's Roadmap Overview for Motions for Leave to Amend, which Amending Plaintiffs incorporate by reference herein and to which the Court is respectfully referred.

ARGUMENT

I.  **THE AMENDING PLAINTIFFS HAVE "GOOD CAUSE" TO AMEND THE SCHEDULING ORDER TO ADD ALBERTSONS AS A DEFENDANT**

   A.  **Despite Their Diligence, the Amending Plaintiffs Could Not Meet the Original Deadline with Respect to Albertsons**

The Amending Plaintiffs meet the diligence test for amending the scheduling order to permit amended pleadings:  the information on which they seek to based their amended pleadings was not available until September 2023, well after the deadline for any plaintiff to amend had passed.  *See Rapp v. Forest City Techs., Inc.*, No. 1:20-cv-2059, 2021 WL 4713394, at *3–4 (N.D. Ohio June 17, 2021) ("Because this evidence was not reasonably available to Rapp until well after the deadline date passed, Rapp could not reasonably have met the deadline despite due diligence."); *Fijalkowski v. Belmont Cnty. Bd. of Comm'rs*, No. 2:17-cv-195, 2018 WL 1835444, at *2 (S.D. Ohio Apr. 18, 2018) ("New information can constitute good cause under Rule 16(b)."); *Joseph v. Joseph*, No. 1:16-cv-465, 2017 WL 5953119, at *2 (S.D. Ohio Jan. 10, 2017) (finding good cause existed when "the documents upon which the proposed amendment [was] largely based were not produced until more than two months after the . . . motion to amend deadline").   For Amending Plaintiffs with an amendment deadline before May 7, 2019, there was no data whatsoever available about Albertsons' market share as a dispenser of opioids.  That is because ARCOS data does not contain dispensing information.  Thus, even after the DEA

12

began producing that data in 2018, expert analysis was required to determine, from the distribution data that was provided, what a particular pharmacy's dispensing market share was. *See* Corrected Roadmap Br. at 21-22; Mougey Dec. at ¶ 14. But the PEC was originally not permitted to disclose the results of this analysis. Rather, prior to May 7, 2019, the Amending Plaintiffs were provided only with the identity of the pharmacies who dispensed *any* amount of opioids in their jurisdiction; the PEC was precluded from providing plaintiffs with the amounts of opioids sent to pharmacies by other distributors. *See* Doc. 1106. As a result, Amending Plaintiffs were unable to determine the extent of Albertsons' dispensing activities in their jurisdictions at any time prior to May 7, 2019, when the PEC made available for the first time dispensing market share information for the period 2006-2014. Doc. 1612. Updated information, showing the extent of Albertsons' dispensing in each jurisdiction through 2019 did not become available until 2023.

These facts support a finding of "good cause" for each Amending Plaintiff with an amendment deadline prior to release of ARCOS market share data in 2019 to amend its complaint to add Albertsons. *See Salerno v. Fam. Heritage Life Ins. Co. of Am.*, 2024 WL 2235772, at *2 (N.D. Ohio May 17, 2024) ("Sixth Circuit courts regularly grant leave for a party to amend its pleadings when discovery "apparently confirmed [the party's] suspicions so that the company could assert [additional] claims."); *see also Rapp* 2021 WL 4713394, at *3–4; *Fijalkowski*, 2018 WL 1835444, at *2; *Joseph*, 2017 WL 5953119, at *2.

While the ARCOS data made available in 2019 is by itself sufficient to constitute good cause, the development of the cases against pharmacy dispensers, including Albertsons, in the previous pharmacy bellwethers provides an additional basis to allow

13

the amendments. Prior to CT1B/CT3, MDL plaintiffs did not pursue dispensing claims – indeed, the lead bellwether plaintiffs in CT1 expressly disclaimed them. No discovery was undertaken on dispensing claims against chain pharmacies until the after the CT3 amendments. Without this discovery, especially the dispensing data disclosing "red flag" prescriptions, Amending Plaintiffs had no reason to undertake the considerable time and expense of prosecuting dispensing claims against large corporations, such as Albertsons. Once liability based on the dispensing theories was confirmed by both the CT3 jury verdict and further discovery and by verdicts in the other pharmacy cases in jurisdictions across the county, Amending Plaintiffs possessed the necessary information to bring the dispensing claims against Albertsons.

Finally, the extensive discovery revealed in the depositions taken in *New Mexico ex rel. Balderas* provides good cause for all the Amending Plaintiffs to amend to bring in Albertsons. Amending Plaintiffs did not have access to the extensive evidence of Albertsons' malfeasance detailed above until April 2022 when they were made available in the MDL.

The fact that the information on which the proposed amended pleading will be based was not available until months or years after the amendment deadlines shows that the Amending Plaintiffs could not, even with the exercise of diligence, have met the original CMO deadlines. This is sufficient to meet the "diligence" prong of the "good cause" analysis. *See Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003); *see also J&R Passmore, LLC v. Rice Drilling D, LLC*, No. 2:18-cv-1587, 2024 WL 111661, *2 (S.D. Ohio January 10, 2024) ("Diligence can be established when the information supporting an

14

amendment is not disclosed until after the amendment deadline set in the scheduling order.”); *Rapp* 2021 WL 4713394, at *3–4; *Fijalkowski*, 2018 WL 1835444, at *2; *Joseph*, 2017 WL 5953119, at *2.[5]

This Court has held that a diligent plaintiff may reasonably wait for the fruits of discovery to identify additional defendants.  *O'Neal v. Denn-Ohio, LLC*, No. 3:19-cv-280, 2020 WL 210801, at *2 (N.D. Ohio Jan. 14, 2020); *Hammock v. Rogers*, No. 1:17-cv-1939, 2018 WL 8414482, at *6 (N.D. Ohio Dec. 17, 2018) (good cause shown where plaintiff's "ability to name new parties was somewhat hamstrung by the amount of time it took to get the names of the proposed additional defendants through discovery"); *York v. Lucas Cnty., Ohio*, No. 3:13 cv 1335, 2015 WL 2384096, at *4 (N.D. Ohio May 19, 2015) (plaintiff was sufficiently diligent in waiting to obtain the names of new defendants in discovery "rather than to take a shotgun approach and seek dismissal of unnecessary parties later"). Given the limited nature of information concerning the chain pharmacies' (including Albertsons') market share and dispensing practices prior to the deadline in CMO1, none of the Amending Plaintiffs lacked diligence in waiting to seek leave to amend until the facts demonstrating the full basis of claims against them became available.

---

[5] The PEC moved this Court to lift the moratorium on motion practice to allow MDL plaintiffs to seek leave to amend on April 22, 2024.. *See* Doc. #5411. That the Amending Plaintiffs did not seek leave to amend before that time does not indicate a lack of diligence because, as described above, all a showing of "good cause" under Rule 16 requires is an explanation of why the party could not, even with the exercise of diligence, have met the original deadline.  The passage of additional time after that is relevant to the question of prejudice to the opposing party, *see* Point I-B, *infra*, but not to the reason the Amending Plaintiffs could not have met the CMO1 amendment deadlines in the first place.

**B.**     **Albertsons Will Not Suffer Any Undue Prejudice If Plaintiffs Are Permitted to Amend**

It is clear that Albertsons will not suffer any prejudice from the filing of the amended complaints at issue here.  That is because each of the Amending Plaintiffs' cases has been stayed since the original deadline for the filing of amended pleadings.  There has been no discovery, no motion practice, no litigation of any kind.  Albertsons will be in the exact same position, with respect to each of the Amending Plaintiffs' cases, that it would have been in had the cases been stayed with Albertsons already in them.  *See Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir. 1994) (among the factors considered in assessing prejudice from a delayed amended pleading are "whether the assertion of the new claim or defense would. . . require the opponent to expend significant additional resources to conduct discovery and prepare for trial [or] significantly delay the resolution of the dispute. . . .").  *Cf. Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (where discovery and dispositive motion deadlines had passed, and a motion for summary judgment had been filed, amendment to add a different claim would create significant prejudice to defendants); *Fraker v. Marysville Exempted Vill. Sch.*, 696 F. Supp. 2d 887, 893 (S.D. Ohio 2010) (plaintiff could not amend to add new defendants after close of discovery and briefing of motion for summary judgment; new defendants would be "severely prejudiced if they were added at this late juncture, having been deprived of their right to conduct discovery and file dispositive motions").[6]

_____

[6] *Cf. In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838 (6th Cir. 2020) (precluding amendment of scheduling order where defendants had been subject to discovery and

This is especially true because Albertsons has known for years that it was a defendant in some cases before this Court.  In that circumstance, the need to defend additional cases does not constitute undue prejudice.  *See In re Nat'l Prescription Opiate Litig.*, 2022 WL 20701236 (6th Cir. Nov. 10, 2022) (litigation costs of being named in additional cases not undue prejudice because defendants knew that they could face these costs from the time they were added to the MDL.")  Nor could Albertsons rely on the number of cases in this MDL in which it was named to estimate the likely scope of its liability.   In most instances, for governmental plaintiffs, the primary claim is for abatement of a public nuisance, and the underlying nuisance of the opioid epidemic is an ongoing condition such that, with respect to most jurisdictions, the statute of limitations does not bar the claim.  Consequently, Albertsons has always known that governmental entities – whether plaintiffs in this MDL or not – could file new cases against it.

Indeed, if leave to amend is not granted, the Amending Plaintiffs can simply file their claims against Albertsons in new stand-alone cases.  Thus, the question is not *whether* the new claims against Albertsons will be brought; the question is *where* these claims will be brought.  The issue, then, is whether these claims arising from the same opioid crisis are coordinated for discovery and management with other claims against the same defendant and/or the same category of defendant.  In this context, Rule 1's command that the Federal Rules be construed and administered to secure the "just, speedy, and inexpensive determination of every action and proceeding" counsels in favor

---

briefing on substantive motions, and where plaintiffs had previously disavowed claims they later sought to add).

17

of permitting the addition of Albertsons. In any event, Albertsons cannot demonstrate that it will be prejudiced by having the claims against it coordinated in these proceedings rather than scattered around the country. *See* 28 U.S.C. § 1407 (actions may be transferred and coordinated upon determination such transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions."); *In Re: National Prescription Opiate Litigation*, MDL No. 2804, Transfer Order at 3 (J.P.M.L. Dec. 5, 2017) (finding that centralization and coordination of opioid cases "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.").

Because the Amending Plaintiffs have shown both diligence and lack of prejudice, this Court should find "good cause" under Rule 16 to amend the scheduling order to permit the filing of amending pleadings against Albertsons.

## II. AMENDMENT OF THE PLEADINGS IS PROPER UNDER RULE 15

The requirements of Rule 15 are also satisfied. Under Rule 15, "the court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). Because the Rule 16 standard is recognized to be more "stringent," *see Landstar Ranger, Inc. v. City of Delaware, Ohio*, No. 2:22-CV-02008, 2022 WL 7322274, at *4 (S.D. Ohio Oct. 13, 2022), and to set a "higher threshold," *see J&R Passmore*, 2024 WL 111661, at *1, a party that can establish diligence and lack of prejudice under Rule 16 can generally satisfy the broader, more liberal standard of Rule 15. In this case, leave to amend should be granted in the interests of justice.

Only two of the Rule 15 factors – bad faith and futility of amendment -- are not

subsumed within the Rule 16 "good cause" analysis.  *See Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005) (identifying "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment" as factors to be considered under Rule 15).[7]  Neither is applicable here. As noted above, the Amending Plaintiffs seek to add claims against Albertsons similar to those they have asserted against other pharmacies – and similar to claims this Court previously found sufficiently stated to preclude dismissal under Rule 12.  Nor is there – or could there be – any suggestion of bad faith with respect to any of the Amending Plaintiffs.  Because the Amending Plaintiffs have shown good cause under Rule 16 and because it is in the interest of justice to permit them to amend their pleadings to add Albertsons, the requirements of Rule 15 are also satisfied.

CONCLUSION

For the foregoing, reasons, this Court should grant leave to all of the Amending Plaintiffs to amend their complaints in order to add Albertsons.

Dated:  July 30, 2024                                    Respectfully submitted,

                                                                    Jayne Conroy
                                                                    SIMMONS HANLY CONROY
                                                                    112 Madison Avenue, 7th Floor

---

[7] A finding of sufficient diligence will satisfy the requirement that there was no undue delay; lack of notice and undue prejudice both fall within the prejudice analysis of Rule 16. Repeated failures to cure deficiencies would presumably negate good cause, but in any event is entirely inapplicable here, as the Amending Plaintiffs have not previously attempted to cure deficiencies, nor have any deficiencies in their pleadings been identified.

New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
270 Munoz Rivera Avenue, Suite 201
San Juan, PR  00918
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

20

**CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*
Peter H. Weinberger

21

3070255.1