UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br>See cases listed in Exhibit A | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

DECLARATION IN SUPPORT OF
OMNIBUS MOTIONS FOR LEAVE TO AMEND TO ADD ALBERTSONS DEFENDANTS AND
MEMORANDUM OF LAW IN SUPPORT

## DECLARATION

1. My name is Jay M. Lichter, and I have personal knowledge of the matters set forth in this Declaration.

2. I am currently an attorney with Baron & Budd, P.C., a member of the Plaintiffs' Executive Committee in M.D.L. 2804. I have served, with others, as counsel of record for plaintiffs in M.D.L. 2804 along with plaintiffs in state court actions. I was one of the lead attorneys charged with working up the case against the Albertsons defendants, both in M.D.L. 2804 and in state court in New Mexico on behalf of the State of New Mexico and its Attorney General, in *State of New Mexico, ex rel., Hector Balderas, Attorney General, v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541.

3. I am familiar with the discovery proceedings in M.D.L. 2804 and in *New Mexico ex rel. Bladeras*. No discovery in M.D.L. 2804 was conducted with respect to

Albertsons prior to May 2021, after Albertsons was made a bellwether defendant in CT9 (Tarrant County).

4. In New Mexico, the most significant discovery in the Albertsons case occurred as part of the depositions of Albertsons employees.[1] The following depositions were uploaded into the M.D.L repository pursuant to DR 22:

Deposition of Lori Hooper, taken February 17, 2022 (uploaded April 23, 2022);

Deposition of Bobbie Riley, taken January 24, 2022 (uploaded April 23, 2022);

Deposition of David Beck, taken February 18, 2022 (uploaded April 30, 2022);

Rule 30(b)(6) Deposition of David Beck, taken March 1, 2022 (uploaded April 30, 2022);

Deposition of Lynette Berggren, taken February 23, 2022 (uploaded April 30, 2022);

Deposition of David Carrick, February 15, 2022 (uploaded April 23, 2022)

Deposition of Jessica Covaci, taken February 9, 2022 (uploaded April 23, 2022);

Deposition of Anthony Provenzano, taken February 10, 2022 (uploaded April 23, 2022);

Rule 30(b)(6) Deposition of Jessica Covaci, taken March 2, 2022 (uploaded April 30, 2022);

---

[1] While Albertsons did produce some documents into the MDL prior to producing some deposition transcripts, the MDL Plaintiffs had none of the critical contextual information for those documents until review of the deposition transcripts. Those transcripts provided details, for example, as to when and how certain written policies were implemented and carried out, how gaps in written policies were filled with informal policies, and how employees acted despite the presence of written policies.

Rule 30(b)(6) Deposition of Anthony Provenzano, taken March 10, 2022 (uploaded April 30, 2022); and

Deposition of Pete Ridsdale, taken February 22, 2022 (uploaded April 30, 2022).

5.  These depositions revealed a number of previously undisclosed and significant facts concerning Albertsons' distribution of opioids including:

a. Albertsons self-distributed Schedule III, IV, and V opioids from 2006 to 2008, stopped distributing all drugs from 2009 to 2012, and resumed distribution in 2013, distributing Schedule II, III, IV, and V opioids until 2016 when the company ended its drug distribution activity.

b. Albertsons never designed or operated an adequate suspicious order monitoring system (SOMS) and never reported a single suspicious order to the DEA in all the time it self-distributed opioids from 2006-2008 and 2013-2016 to its pharmacies across the country.

c. Even though Albertsons knew that the CSA requires suspicious order monitoring, it self-distributed opioids from 2006-2008 and 2013-2016, lacked detailed operational SOMS policies and failed to provide adequate training and guidance to those charged with suspicious order monitoring duties.

d. From 2002-2008, Albertsons failed to identify orders of unusual frequency or orders that substantially deviated from a normal ordering pattern, even though the CSA requires that distributors' SOM systems identify such orders. Albertsons also did not require that suspicious orders be reported to the DEA. In fact, Anthony Provenzano, who has been Albertsons' Vice President of Pharmacy Compliance and Government Affairs since 2015, testified that, as of 2020, he believed Albertsons had no duty to report suspicious orders to the DEA.

e. Albertsons did not provide any employee training associated with its SOMS process between 2002-2008, nor did it provide written criteria to help distribution center employees identify suspicious orders. Instead, Albertsons employees used their "gut feeling" if an order did not look right to them. If a distribution center employee's gut feeling alerted him that an order was somehow unusual, he would inform a supervisor who then called the pharmacy to verify the order. The only purpose of the call was to confirm the accuracy of the order and ask the pharmacy if the order was a mistake.

  f. When Albertsons resumed distribution in 2013, it used the same "gut feeling" approach to identifying suspicious orders and added a new threshold-based system. This new system still did not detect orders of usual frequency or orders that deviated substantially from a normal pattern. Instead, Albertsons' system tracked a pharmacy's prior 10-12 orders and a report would then give the average of those prior orders, as well as identify the number that was greater than 20% of those orders. Distribution Center employees would call stores if an order was greater than 10 bottles and over 100% of the prior order average. Just as in 2006-2008, the only purpose of the calls was to confirm the order was not in error, and no other meaningful investigation was conducted. Albertsons never provided formal training or written documents to guide its employees when making the phone calls to pharmacies. All orders were shipped in full unless the pharmacist specifically told the Distribution Center that the order was submitted in error. The Distribution Center engaged in no other investigation.

  g. The Distribution Center call logs were sent to Albertsons' Compliance Group for additional review, but any calls or investigations done by that group would have been done *after* the orders were already shipped. The Compliance Group never updated the Distribution Center with any additional information it obtained from any specific pharmacies.

  h. Because of these lax policies, Albertsons *never* identified a single order as suspicious, never cancelled, rejected, or refused to ship an order on the grounds that it was suspicious, and never reported a single order as suspicious to the DEA. In addition, Albertsons permitted its pharmacies to supplement their orders by ordering controlled substances from third party vendors without oversight, allowing Albertsons pharmacies to avoid having their controlled substance orders be monitored or otherwise questioned.

6. These depositions also revealed a number of previously undisclosed and significant facts concerning Albertsons' dispensing of opioids including:

  a. Albertsons had no meaningful dispensing policies or procedures that addressed red flags prior to 2013, only began to adopt a compliance program to prevent diversion in 2018, and even as of 2022 did not require that its pharmacists investigate or resolve red flags. Instead, Albertsons pressured its pharmacists through quotas and bonus plans to fill opioid prescriptions.

b. Albertsons failed to provide its pharmacists with the data and tools necessary to fulfill their corresponding responsibility duties, including but not limited to, providing their pharmacists with access to dispensing data as well as any analysis of that data as it relates to red flags of diversion. In addition, Albertsons had no systems in place to monitor key opioid dispensing patterns or trends, or to document or track suspicious patients or prescribers.

c. Albertsons' first informal dispensing policy, in 2013 (which like all of Albertsons' dispensing policies was national in scope), provided no direct requirement for pharmacists to identify and resolve red flags, or even to confirm the legitimacy of questionable prescriptions.

d. In 2016, Albertsons incorporated red flags into its formal policies for the first time, but did not require that its pharmacists take specific steps to verify the legitimacy of controlled substance prescriptions; instead, it included five options pharmacists "may consider" to verify the legitimacy of a prescription with red flags. David Carrick, one of Albertsons' District Pharmacy Managers in New Mexico, testified that even as of 2022, Albertsons did not require its pharmacists to investigate or resolve red flags when dispensing opioid prescriptions.

e. Albertsons consistently prioritized pharmacy profits over patient safety and pressured its pharmacists to fill all prescriptions presented to them. Albertsons provided its pharmacists with specific prescription volume targets for their stores and directly tied pharmacist bonus calculations and subsequent payouts for pharmacy staff to the number of prescriptions dispensed, including controlled substances. Albertsons thus incentivized its pharmacists to fill as many prescriptions as possible, rather than rewarding instances of conducting due diligence, resolving red flags, or refusing problematic prescriptions.

f. At the corporate level, Albertsons had no system in place at any time to monitor or track red flag information documented by its pharmacists, outside of District Pharmacy Managers occasionally visiting stores to review prescriptions in certain circumstances. For example, Albertsons did not require its pharmacists to document anything prior to filling a controlled substance prescription, including their use of a state's prescription drug monitoring program. Similarly, Albertsons did not require its pharmacists to take any steps – including documenting their reasoning or informing corporate supervisors – when they refused to fill a prescription. Albertsons also never had a system in place to monitor or track prescribers with histories of writing illegitimate prescriptions,

patients with histories of presenting illegitimate prescriptions, or instances in which pharmacists refused to fill certain prescriptions.

      g.    Albertsons does not maintain any single, specific place for pharmacists to document measures taken to determine the legitimacy of a prescription. Instead, pharmacists may document that information in several ways or places, including on hard copy prescriptions, electronic prescription fields, the electronic patient profile, or the electronic "fill notes" section. As a result, pharmacists interested in checking prior notes for particular patients are faced with a confused, muddled system that does not support that effort.

    7.    Albertsons first produced dispensing (as opposed to distribution) data in New Mexico on July 9, 2021. This was the first time dispensing data from Albertsons was produced anywhere in the opioid litigation.

    8.    In an amended Complaint, Plaintiffs would plead these and other facts revealed in the New Mexico discovery against Albertsons.

    9.    None of this information was known to Amending Plaintiffs prior to the New Mexico depositions being uploaded to the MDL in late April 2022.

I declare that the foregoing is true and accurate to the best of my knowledge and understanding under penalty of perjury of the laws of the United States of America.

                     By:  *Jay Lichter*
                            Jay M. Lichter