**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF OHIO**

**EASTERN DIVISION**

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL 2804 |
| | Case No. 17-md-2804 |
| *This document relates to:* | Hon. Dan Aaron Polster |
| See cases listed in Exhibit 1 | |

**CORRECTED ROADMAP OVERVIEW FOR MOTIONS FOR LEAVE TO AMEND**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

THE MOTIONS ............................................................................................................. 2

LEGAL STANDARDS APPLICABLE TO ALL MOTIONS ..................................................... 5

AMENDMENT DEADLINES AND ARCOS DATA ........................................................ 10

THE DEVELOPMENT OF CHAIN PHARMACY DISPENSING CLAIMS ............................ 16

3070049.8

## TABLE OF AUTHORITIES

**Cases**

*Andretti v. Boria Performance Indus., Inc.,*
    426 F.3d 824 (6th Cir. 2006) ...................................................................................6

*Broach v. City of Cincinnati,*
    244 F. App'x 729 (6th Cir. 2007) ............................................................................6

*Brumbalough v. Camelot Care Ctrs., Inc.,*
    427 F.3d 996 (6th Cir. 2005) .................................................................................10

*Burke v. Ohio Dep't of Rehab. & Correction,*
    No. 2:21-cv-48, 2023 WL 4199108 (S.D. Ohio June 26, 2023) ..........................10

*Century Indem. Co. v. Begley Co.,*
    323 F.R.D. 237 (E.D. Ky. 2018) .............................................................................9

*City and County of San Francisco v. Purdue Pharma LP, et al.,*
    620 F. Supp.3d 936 (N.D. Cal. 2022) ...............................................................19, 20

*Cooke v. AT&T Corp.,*
    No. 2:05-CV-374, 2007 WL 188568 (S.D. Ohio Jan. 22, 2007) ...........................7

*Deloitte Tax LLP v. Murray,*
    No. 1:20-cv-2487, 2022 WL 44661 (N.D. Ohio Jan. 4, 2022) ...........................7, 9

*Dietrich v. W. Ohio Reg'l Treatment and Habilitation Ctr.,*
    No. 3:23 CV 1188, 2024 WL 1638917 (N.D. Ohio Apr. 16, 2024) ......................7

*Fijalkowski v. Belmont Cnty. Bd. of Comm'rs,*
    No. 2:17-cv-195, 2018 WL 1835444 (S.D. Ohio Apr. 18, 2018) .........................8

*Garza v. Lansing Sch. Dist.,*
    972 F.3d 853 (6th Cir. 2020) ..................................................................................5

*Hammock v. Rogers,*
    No. 1:17-cv-1939, 2018 WL 8414482 (N.D. Ohio Dec. 17, 2018) .......................9

*Inge v. Rock Fin. Corp.,*
    281 F.3d 613 (6th Cir. 2002) ..................................................................................6

*J&R Passmore, LLC v. Rice Drilling D, LLC,*
    No. 2:18-CV-1587, 2024 WL 111661 (S.D. Ohio Jan. 10, 2024) .........................8

*Joseph v. Joseph,*
    No. 1:16-cv-465, 2017 WL 5953119 (S.D. Ohio Jan. 10, 2017) ..........................8

*Korn v. Paul Revere Life Ins. Co.,*
    382 F. App'x 443 (6th Cir. 2010) ............................................................................7

*Landstar Ranger, Inc. v. City of Delaware, Ohio,*
No. 2:22-CV-02008, 2022 WL 7322274 (S.D. Ohio Oct. 13, 2022) .....................................9

*Leary v. Daeschner,*
349 F.3d 888 (6th Cir. 2003) ........................................................................7, 8, 10

*In re Nat'l Prescription Opiate Litig.,*
589 F. Supp. 3d 790 (N.D. Ohio 2022).............................................................19, 20

*In re Nat'l Prescription Opiate Litig.,*
956 F.3d 838 (6th Cir. 2020) ..................................................................6, 7, 17, 18

*In re Nat'l Prescription Opiate Litig.,*
No. 1:17-MD-2804, 2022 WL 4099669 (N.D. Ohio Aug. 22, 2022) ...............................19

*NOCO Company v. Lapidus,*
No. 21-cv-900, 2022 WL 1803039 (N.D. Ohio June 2, 2022) .......................................8, 9

*O'Neal v. Denn-Ohio, LLC,*
No. 3:19-cv-280, 2020 WL 210801 (N.D. Ohio Jan. 14, 2020) .........................................9

*Permasteelisa CS Corp. v. Airolite Co.,*
LLC, No. 2:06-cv-0569, 2007 WL 1683668 (S.D. Ohio June 8, 2007) .............................10

*Rapp v. Forest City Techs., Inc.,*
No. 1:20-cv-2059, 2021 WL 4713394 (N.D. Ohio June 17, 2021) ....................................8

*Russell v. City of Bellevue,*
No. 3:20 CV 2859, 2021 WL 1517921 (N.D. Ohio Apr. 16, 2021) ....................................7

*S. Elec. Health Fund v. Heritage Mut. Ins. Co.,*
147 F. App'x 497 (6th Cir. 2005) ........................................................................6

*Salerno v. Fam. Heritage Life Ins. Co. of Am.,*
No. 1:23-cv-01419, 2024 WL 2235772 (N.D. Ohio May 17, 2024) ...................................8

*Tesone v. Empire Mktg. Strategies,*
942 F.3d 979 (10th Cir. 2019) ...........................................................................6

*Vanderbilt Univ. v. DiNardo,*
174 F.3d 751 (6th Cir. 1999) ............................................................................6

*York v. Lucas Cnty., Ohio,*
No. 3:13 cv 1335, 2015 WL 2384096 (N.D. Ohio May 19, 2015)....................................10

*Yukech v. Cal. Transp., LLC,*
No. 2:20-CV-5804, 2022 WL 15523495 (S.D. Ohio Oct. 27, 2022) ..................................9

**Court Rules**

Fed. R. Civ. P. 15(a)(2) ..................................................................................10

Fed. R. Civ. P. 16(b)......................................................................................6

iii

Fed. R. Civ. P. 16(b)(4) ................................................................................................6

Fed. R. Civ. P. 16(e) ....................................................................................................6

**Treatises**

Charles Alan Wright, *et al.*, 6A FED. PRAC. & PROC. § 1522.2
    (3d ed.) ...................................................................................................................6

3 James Wm. Moore, MOORE'S FEDERAL PRACTICE - Civil § 16.14[1]
    (3d ed. 2019) ...................................................................................................6, 7

## INTRODUCTION

Pursuant to this Court's order dated May 23, 2024, Doc. #5455, various plaintiffs ("Amending Plaintiffs")[1] are filing motions for leave to amend their pleadings to add one or more of 14 defendant families.[2] As directed by the Court, plaintiffs are filing one omnibus motion and memorandum of law for each defendant family, for a total of 14 motions.[3]  The PEC here provides the Court with a Roadmap Overview of those motions. The PEC believes that this Roadmap Overview will assist the Court in a variety of ways. First, given the number of motions, an overview of what is being filed and how the groups of plaintiffs have structured their motions, will provide the Court with critical information, including the universe of defendants involved, each defendant's role in the opioid supply, and where certain information can be most easily found.  Second, rather than burden the Court with 14 identical "Legal Standards" sections, 14 identical discussions of the relevant deadlines for the amendment of pleadings, and 14 identical discussions of the availability of ARCOS data, the PEC here provides that information once in this Roadmap Overview.  Each brief incorporates and references that material,

---

[1] See plaintiffs listed in Exhibit 1.

[2] Based on joint requests from both the PEC and defendants, this Court has extended the deadline for plaintiffs to amend to add the following defendants: Amneal, Apotex, Associated Pharmacies, Bloodworth, Dakota Drug, Hikma, Indivior, JM Smith, Louisiana Wholesale, Morris and Dickson, Mylan, N. Carolina Wholesale, the Sacklers, Sandoz, Sun, SuperValu, and Zydus.  Consequently, plaintiffs are not moving to amend with respect to these defendants at this time.

[3] The motions are "omnibus" in that one motion is being filed "for all" plaintiffs with respect to each defendant family. But, as described below, different groups of plaintiffs are making each motion; not all moving plaintiffs seek to add defendants from all 14 families.

1

but the Court need only read it once and can find it in a centralized place.  Finally, this Roadmap Overview provides the PEC an opportunity to explain to the Court how plaintiffs have complied with the Court's directives with respect to these motions and to suggest how the next step in the process may most easily proceed.

## THE MOTIONS

Plaintiffs seek leave to amend their respective complaints to add 14 defendant families. The 14 defendants, and the category into which each falls, are:

| Defendant | Category |
|---|---|
| Ahold Delhaize | Pharmacy |
| Albertsons | Pharmacy |
| Alvogen | Manufacturer |
| Aurolife | Manufacturer |
| Costco | Pharmacy |
| Discount Drug Mart (DDM) | Pharmacy |
| ExpressScripts | PBM |
| KVK-Tech | Manufacturer |
| Lupin | Manufacturer |
| OptumRx | PBM |
| Publix | Pharmacy |
| Target | Pharmacy |
| Tris | Manufacturer |
| Winn-Dixie | Pharmacy |

The Court has directed that each motion provide certain information: "(1) a list of all cases seeking to add that defendant; (2) any plaintiff-specific factual allegations pertinent to each individual case; (3) any jurisdiction-specific claims the plaintiff seeks to add to (or dismiss from) each individual case; and (4) good cause for the proposed amendments, stating with particularity the reasons amendment should be permitted in each individual case." Doc. #5455 at 2.  Plaintiffs have complied with this directive, as follows.  First, the list of plaintiffs filing each motion is provided in an exhibit to that

motion.  Second, the exhibit not only identifies the plaintiff's name and case docket number, but also provides relevant plaintiff-specific information as needed to support the motion, including the State where plaintiff is located; the County in which it is located; and, where applicable, market share information for the subject defendant in both dosage units ("DU") and morphine milligram equivalents ("MME").  (For manufacturer defendants, the market share information is provided as shown in both the original and the updated ARCOS data. For pharmacy defendants, as explained below, the market share data is shown in the aggregate for the entire period, 2006-2019.)  *See* Declaration of Peter Mougey, ¶ 23.  Where other facts are relevant, they are provided in a declaration.

With respect to the jurisdiction-specific claims to be asserted by each plaintiff, the PEC proposes that any plaintiff granted leave to amend will proceed as the bellwether plaintiffs have done in amending their pleadings: each Amending Plaintiff will file supplemental and amended allegations that will add to, but not supersede or replace, that plaintiff's existing operative pleading. Each motion therefore identifies a bellwether pleading for that defendant or a similarly-situated defendant (that is, a pleading already in use in this MDL) that the Amending Plaintiffs plan to base their supplemental and amended allegations and claims for relief upon.  The jurisdiction-specific claims, and the basis for them, are in the underlying operative pleading originally filed by each plaintiff, which will remain operative even when supplemented by the additional allegations and claims.

Finally, with respect to the reasons amendment should be permitted in each case, the memorandum of law for each motion groups the plaintiffs for purposes of discussion

(for example, different applicable deadlines for leave to amend). Because the plaintiffs in each motion are, for the most part, similarly situated (e.g., with respect to market share and access to ARCOS data), and because the variations that need to be addressed are relatively few, the memoranda do not repetitively discuss each plaintiff separately. Rather, the memoranda discuss circumstances that demonstrate good cause for all plaintiffs, or for all plaintiffs in a particular subset, and the exhibits allow the Court to determine how each argument applies to each plaintiff, so that individualized determinations can be made for each plaintiff-defendant combination.

The Court further directed that lead counsel for each plaintiff sign each motion to indicate that both counsel and client are prepared to proceed if the case is selected as a bellwether. The exhibit attached to each motion identifies for each plaintiff the relevant counsel *who have already agreed to sign the statement required by the Court*, but for logistical reasons, the PEC proposes that the actual signed documents be provided along with a proposed order applicable to each plaintiff, if any, granted leave to amend with respect to any defendant. The PEC envisions that such proposed orders will be of great assistance to the Court by gathering in one place, for each plaintiff, every defendant as to whom it has been granted leave and the claims it seeks to assert against those defendants. Because the proposed orders will be submitted for each *plaintiff* (unlike the motions and memoranda, which are one-per-defendant), the PEC believes that signed statements of counsel for each plaintiff can most easily be submitted with the proposed order, so that counsel need sign only one statement for each client, applicable to any defendants to be included in that plaintiff's amended pleading.

4

Finally, the PEC notes that although the Legal Standards section and the history of the ARCOS data and the amendment deadlines would have presented the greatest problem of duplication or repetition – and for that reason is providing those sections only once, in this Roadmap Overview – certain other portions of the various briefs do overlap. For example, the arguments pertaining to the lack of prejudice to each defendant reflect some variation among the defendants, but because the arguments turn to some extent on the common circumstance that each of the cases at issue has been stayed for approximately five or six years, there is unavoidably some amount of repetition in those sections. Similarly, the Rule 15 arguments in each brief draw on the same case law and common circumstances, such as the posture of the cases, so there, too, there is some amount of repetition across the briefs. The PEC hopes that by submitting this Roadmap Overview, it has minimized the amount of duplicative/repetitive material that is being submitted to the Court and asks for the Court's understanding where such duplication was unavoidable.

## Legal Standards Applicable to All Motions

The Court may grant leave to amend a complaint past the date set forth in the scheduling order only upon a showing of "good cause." *See Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 879 (6th Cir. 2020) (citing *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002)); *see also* Fed. R. Civ. P. 16(b)(4). "Good cause" is "a flexible concept, and trial courts have considerable discretion in determining what kind of showing satisfies this . . . good cause standard." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 988 (10th Cir. 2019) (quoting 3 James Wm. Moore, Moore's Federal Practice - Civil § 16.14[1][b] (3d ed.

2019)); *see also Broach v. City of Cincinnati*, 244 F. App'x 729, 734 (6th Cir. 2007).  Rule 16's "use of the good-cause standard, rather than allowing modification only in cases of manifest injustice as is done for other pretrial orders, indicates that there may be more flexibility in allowing some relief." Charles Alan Wright, *et al.*, 6A FED. PRAC. & PROC. § 1522.2 (3d ed.). *See also* Fed. R. Civ. P. 16(b), (e) advisory committee's note to 1983 amendment ("Since the scheduling order is entered early in the litigation, this standard seems more appropriate than a 'manifest injustice' or 'substantial hardship' test . . .). "What constitutes good cause sufficient to justify the modification of a scheduling order necessarily varies with the circumstances of each case." Charles Alan Wright, *et al.*, 6A Fed. Prac. & Proc. § 1522.2 (3d ed.).  The "good cause" standard must be met in each case for which leave to amend is granted. *In re Nat'l Prescription Opiate Litig.*, 956 F.3d 838, 844 (6th Cir. 2020). A grant of leave to amend is reviewed for abuse of discretion.  *S. Elec. Health Fund v. Heritage Mut. Ins. Co.*, 147 F. App'x 497, 504 (6th Cir. 2005) (citing *Vanderbilt Univ. v. DiNardo*, 174 F.3d 751, 758 n.3 (6th Cir. 1999)).

Courts consider two factors in assessing "good cause":  the diligence of the party seeking leave to amend and undue prejudice to the opposing side. *See Andretti v. Boria Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2006); *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003); *see also In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 844.  Both elements must be satisfied.  *See Korn v. Paul Revere Life Ins. Co.*, 382 F. App'x 443, 450 (6th Cir. 2010) (absence of prejudice alone does not demonstrate "good cause").  The moving party must explain why it did not meet the deadline in the scheduling order.  *Id.* Unfairness to the moving party if leave is denied may also be a consideration.  *See Cooke*

6

*v. AT&T Corp.*, No. 2:05-CV-374, 2007 WL 188568, at *2 (S.D. Ohio Jan. 22, 2007) (citing 3 Moore's Federal Practice, ¶ 16.14[1][c] at 16-72.1).

Courts in the Sixth Circuit have recognized that "[a]n assertion of 'good cause' is likely meritorious when the moving party can show it has been generally diligent, the need for more time was neither foreseeable nor its fault, and refusing to grant the continuance would create a substantial risk of unfairness to that party." *Dietrich v. W. Ohio Reg'l Treatment and Habilitation Ctr.*, No. 3:23 CV 1188, 2024 WL 1638917, at *10 (N.D. Ohio Apr. 16, 2024) (quoting *Cooke*, 2007 WL 188568, at *2); *accord Russell v. City of Bellevue*, No. 3:20 CV 2859, 2021 WL 1517921, at *3 (N.D. Ohio Apr. 16, 2021); *see also Deloitte Tax LLP v. Murray*, No. 1:20-cv-2487, 2022 WL 44661, at *1 (N.D. Ohio Jan. 4, 2022) (citing 3 MOORE'S FED. PRAC. ¶ 16.14(1)(a) (3d ed. 2014) (identifying as factors for consideration in the "good cause" analysis: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) the potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure the prejudice)).

The "diligence" analysis itself is multi-factorial. Where the moving party learned of the facts supporting its proposed amendment *after* the amendment deadline, diligence will generally be found. *See, e.g., Leary*, 349 F.3d at 907 ("[M]odification is permitted under Rule 16 if Plaintiffs can demonstrate 'good cause' for their failure to comply with the original schedule, by showing that despite their diligence they could not meet the original deadline."); *Salerno v. Fam. Heritage Life Ins. Co. of Am.*, No. 1:23-cv-01419, 2024 WL 2235772, at *2 (N.D. Ohio May 17, 2024) ("Sixth Circuit courts regularly grant leave for a party to amend its pleadings when discovery 'apparently confirmed [the party's]

7

suspicions so that the company could assert [additional] claims.'"); *see also Rapp v. Forest City Techs., Inc.*, No. 1:20-cv-2059, 2021 WL 4713394, at *3–4 (N.D. Ohio June 17, 2021) ("Because this evidence was not reasonably available to Rapp until well after the deadline date passed, Rapp could not reasonably have met the deadline despite due diligence."); *Fijalkowski v. Belmont Cnty. Bd. of Comm'rs*, No. 2:17-cv-195, 2018 WL 1835444, at *2 (S.D. Ohio Apr. 18, 2018) ("New information can constitute good cause under Rule 16(b)."); *Joseph v. Joseph*, No. 1:16-cv-465, 2017 WL 5953119, at *2 (S.D. Ohio Jan. 10, 2017) (finding good cause existed when "the documents upon which the proposed amendment [was] largely based were not produced until more than two months after the . . . motion to amend deadline"). By contrast, the movant's possession of the relevant facts prior to the deadline is not dispositive; it is, rather, a factor that, although it tends to show a lack of diligence, may be outweighed by other circumstances. *NOCO Company v. Lapidus*, No. 21-cv-900, 2022 WL 1803039, at *2 (N.D. Ohio June 2, 2022) (other factors outweighed the timing of when plaintiff was in possession of the relevant information); *J&R Passmore, LLC v. Rice Drilling D, LLC*, No. 2:18-CV-1587, 2024 WL 111661, at *2 (S.D. Ohio Jan. 10, 2024) (same); *Yukech v. Cal. Transp., LLC*, No. 2:20-CV-5804, 2022 WL 15523495, at *1 (S.D. Ohio Oct. 27, 2022) ("Notably, a plaintiff's 'possession of relevant information prior to the amendment deadline is only one factor tending to show a lack of diligence.'") (quoting *NOCO*, 2022 WL 1803039, at *2); *Landstar Ranger, Inc. v. City of Delaware, Ohio*, No. 2:22-CV-02008, 2022 WL 7322274, at *3 (S.D. Ohio Oct. 13, 2022) ("First, the Court is not persuaded by the City's argument that Landstar's lack of diligence is evident because the information was available when the original Complaint was drafted and at various dates

8

thereafter.").

Relevant other factors may include settlement discussions, development of evidence during discovery, and, more generally, circumstances beyond the movant's control.  *See Deloitte Tax LLP*, 2022 WL 44661, at *5 (timing of motion for leave to amend was the result of a breakdown in settlement negotiations, not a tactical decision or carelessness); *Century Indem. Co. v. Begley Co.*, 323 F.R.D. 237, 241 (E.D. Ky. 2018) (finding good cause even though proposed amendments did not stem from new information where parties had explored "extrajudicial solutions to this dispute"); *O'Neal v. Denn-Ohio, LLC*, No. 3:19-cv-280, 2020 WL 210801, at *2 (N.D. Ohio Jan. 14, 2020) ("The due diligence requirement does not impose on a plaintiff the burden to exhaust all avenues to discover information that may serve as the basis of a claim. Instead, Plaintiffs were entitled to presume they would discover this kind of information the way many litigants routinely do, through discovery."); *Hammock v. Rogers*, No. 1:17-cv-1939, 2018 WL 8414482, at *6 (N.D. Ohio Dec. 17, 2018) (information learned in discovery); *York v. Lucas Cnty., Ohio*, No. 3:13 cv 1335, 2015 WL 2384096, at *4 (N.D. Ohio May 19, 2015) (same); *Permasteelisa CS Corp. v. Airolite Co.*, LLC, No. 2:06-cv-0569, 2007 WL 1683668, at *2 (S.D. Ohio June 8, 2007) (circumstances beyond party's control); *Burke v. Ohio Dep't of Rehab. & Correction*, No. 2:21-cv-48, 2023 WL 4199108, at *3 (S.D. Ohio June 26, 2023) (same).

Once a party seeking leave to file an amended pleading beyond the deadline in the scheduling order has satisfied the Rule 16 "good cause" standard, it must also show that amendment is proper under Rule 15.  *See Leary*, 349 F.3d at 909.  Under Rule 15, "the court should freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).

"In deciding whether to grant a motion to amend, courts should consider undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996, 1001 (6th Cir. 2005).

## AMENDMENT DEADLINES AND ARCOS DATA

The plaintiffs seeking leave to amend to add various defendants each filed actions that were either commenced in this Court or were transferred to this Court for centralization and coordination by the Judicial Panel on Multi-district Litigation ("JPML").  As described in detail herein, pursuant to various case management orders of this Court, the deadline for amending a complaint without leave of Court in this MDL was the later of March 16, 2019, or 90 days after the date a case was transferred into the MDL.  Because the last case transferred by the JPML was transferred in April 2022, the last deadline to amend for any plaintiff was in July 2022.  For certain defendants, no plaintiff seeking leave to amend was transferred into the MDL beyond a certain date identified in the motion applicable to that defendant.  For such defendants, the last date by which any plaintiff could have amended without leave of Court may thus be earlier than July 2022.  Such dates are identified in the motion where relevant.

These deadlines are significant, as each plaintiff must demonstrate why it could not meet its applicable deadline, despite its diligence.  Arguments in the various motions thus reference what information was or was not available before March 16, 2019, and at various other times when all, or particular groups of, plaintiffs seeking to amend were

10

transferred into the MDL. The history of these deadlines, and the role of the ARCOS data in setting those deadlines, is as follows:

On April 11, 2018, this Court entered CMO1, which set various deadlines, established the first tracks, and precluded all discovery and motion practice in cases other than those designated as bellwethers, unless permitted by further order of the Court. Except as set forth below, none of the plaintiffs now seeking leave to amend their pleadings have been selected as bellwether plaintiffs in any of the case tracks in this MDL.[4]  Thus, each of the relevant actions been effectively stayed since 2018.[5]

CMO1 set May 25, 2018, as the deadline for plaintiffs to amend their pleadings without leave of Court.  Doc. #232.  Thereafter, the Court twice extended the deadline, *see* Doc. #739 (July 13, 2018) and Doc. #1106 (Nov. 8, 2018), setting an ultimate deadline of the later of March 16, 2019, or 90 days after the date of transfer into the MDL, for plaintiffs other than bellwether plaintiffs, to amend their pleadings. Doc. #1106.[6]

The impetus for extending the deadline to amend pleadings was the disclosure, by the DEA, of data from its Automation of Reports and Consolidated Orders System

---

[4] Although some of the Amending Plaintiffs were designated as briefing bellwethers in CMO1, their opportunity to amend based on their bellwether status expired on April 25, 2018, Doc. #232 at 3, before the general deadline detailed below.  As a result, the fact that they were designated as briefing bellwethers does not alter the good cause analysis here.

[5] As described below, cases transferred into the MDL after the date of CMO1 have been stayed since their date of transfer, with the exception of a 90-day window to amend

[6] Although the original impetus for extending the deadline was the availability of ARCOS data from the Drug Enforcement Administration, on January 18, 2019, this Court specifically held that the extension of the deadline to amend pleadings was not limited to amendments relating to ARCOS data, but rather included matters "both relying on and beyond ARCOS data."  Doc. #1282.

(ARCOS) for the period 2009-2014. As described by this Court, ARCOS

> is an automated, comprehensive drug reporting system overseen by DEA which monitors the flow of DEA controlled substances such as opioids from [1] their point of manufacture through [2] commercial distribution channels to [3] point of sale or distribution at the dispensing/retail level. Put more simply, ARCOS tracks every single opioid pill from its point of manufacture, through the distribution chain, to its destination at a doctor's office, hospital or pharmacy.

Doc. #5115 at 2. This Court has described the ARCOS data as "essential," and "indispensable" to the litigation, *see* Doc. #5115 at 5, and noted that it had been "extremely informative" in identifying the proper defendants. Doc. #397 at 1.[7]

On April 11, 2018, this Court ordered the DEA to produce ARCOS data for the period of January 1, 2006, through December 31, 2014, for the six states in which it had designated bellwether cases: Ohio, West Virginia, Illinois, Alabama, Michigan, and Florida. *See* Doc. #233. The Court chose 2014 as the cutoff date "to ensure that exposure of the data would not interfere with any ongoing law enforcement proceeding." Doc. #5115 at 3. The data was subject to a protective order and could not be made public. *Id.* On May 8, 2018, having found the ARCOS data invaluable for the identification of parties responsible for the opioids that had flooded the six bellwether jurisdictions, the Court expanded the scope of ARCOS production. It ordered the DEA to produce ARCOS data for the period January 1, 2006, through December 31, 2014, for the entire United States.

---

[7] *See also* Doc. #233 at 8 (describing ARCOS data as "relevant and necessary" to litigation of plaintiffs' claims and explaining that "[d]iscovery of precisely which manufacturers sent which drugs to which distributors, and which distributors sent which drugs to which pharmacies and doctors, is critical not only to all of plaintiffs' claims, but also to the Court's understanding of the width and depth of this litigation").

*See* Doc. #397.  The Court ordered the DEA to complete this production no later than May 25, 2018.  *Id.*  As was the case before, the data was subject to protective order and not made public.  *Id.*

After the DEA produced ARCOS data for the relevant period, it became clear that the data was incomplete as it did not include information for all of the relevant substances. Accordingly, on June 26, 2018, the Court ordered the DEA to provide ARCOS data for the remaining substances for the period January 1, 2006, through December 31, 2014, for the entire United States.  Doc. #668.  Production was to be made on a rolling basis.  The restrictions on disclosure of the data remained in place. *Id.*

On July 13, 2018, the Court extended the deadline for plaintiffs to amend their complaints.  Doc. #739.  The Court recognized that, although one of the main purposes for which it ordered disclosure of the ARCOS data was to allow plaintiffs to identify parties responsible for the opioid epidemic in their jurisdictions and name them in their amended complaints, given the actual timeline on which the data was produced, plaintiffs would not be in a position to analyze the ARCOS data and use it to identify new defendants before the May 25, 2018 deadline for amending pleadings.  *Id.*  The Court ordered the PEC to provide by July 19, 2018, "a report derived from the ARCOS data that lists, for every county, all manufacturers, distributors, and pharmacies that contributed directly to the presence of opioids in that county."  *Id.*[8]  MDL plaintiffs would then have

---

[8] The Order directed that the report prepared by the PEC "shall not reveal any data regarding the *amounts or types of opioids* distributed in the counties, rather, the report shall set forth only the *identity* of entities that manufactured, distributed, or sold opioids in the counties." Doc. #739 (emphasis in original)

3070049.8

until November 16, 2018, to amend their complaints.  *Id.*

In November 2018, the Court modified the procedure regarding the ARCOS data and again extended the deadline.  Doc. #1106.  The PEC was now required to provide a report that, with respect to manufacturers and distributors, would identify only those entities with more than 5% market share in the relevant jurisdiction for at least three of the nine years covered by the ARCOS data. Under the terms of this order, plaintiffs were not provided information about manufacturers or distributors who did not have at least a 5% market share in three of the nine years covered by the data and thus had no opportunity to consider whether to name such entities as defendants. Moreover, the ARCOS data did not include dispensing data and, as a result, the only information that was provided about dispensers was their presence in the jurisdiction; no dispensing market share information was provided.[9]

In the November 2018 order, Plaintiffs were given until March 16, 2019, or 90 days beyond the date of transfer if later, to amend their complaints.  *Id.*  This was the last extension of the deadline to amend without leave of Court.

On May 7, 2019, the PEC notified plaintiffs in the MDL that it would make

---

[9] Some pharmacy chains not only dispense but also distribute (or at one time distributed) opioids to their own stores.  The ARCOS information provided by the PEC pursuant to the Court's November 2018 order identified any pharmacy chain that had 5% market share or more *as a distributor* in a particular plaintiff's jurisdiction.  Pharmacy chains with less than 5% market share as distributors were not identified as such, although they may have been identified as dispensers with no information about market share.  The PEC notes, however, that a pharmacy chain's market share as a distributor was of little use in identifying dispensing market share, because pharmacy chain stores also receive opioids from independent distributors.

available to plaintiffs who signed a protective order certain analyses of ARCOS data, including the PEC's computation of dispensing market share for the period 2006-2014. *See* Doc. #1612; *see also* Doc. #1545. The March 16, 2019, deadline for amendment had already passed before the PEC made this information available.  And the information was still not available to the public at that time.  On July 15, 2019, the Court lifted its protective order with respect to ARCOS data for the period January 1, 2006, through December 31, 2012.  Doc. #1845.  At that point, ARCOS data through 2012 became publicly available.  The deadline for amending pleadings had already passed by then. Subsequently, on November 5, 2019, the Court lifted its protective order with respect to the ARCOS data for the period 2013-2014, making that data publicly available as well. Doc. #2909.

On July 14, 2023, this Court granted the PEC's motion to enforce a subpoena it served on the DEA seeking production of updated ARCOS data for the period of 2015 to 2019.  Doc. #5115.  The DEA produced the raw updated data to the PEC on August 14, 2023.  The PEC, with the assistance of its consulting experts, analyzed the data and, on September 12, 2023, provided the plaintiffs in the MDL the updated information for their jurisdictions.  This was the first time that plaintiffs had access to data about the volume of opioid shipments into their jurisdictions after December 31, 2014.  Plaintiffs then used this data to determine whether additional entities, beyond those they already named as defendants, were in fact among those responsible for the continuing opioid crisis in their jurisdictions.

As discussed in the memoranda of law supporting specific motions, the updated

3070049.8

ARCOS data revealed that, in many jurisdictions in which, prior to 2015, certain manufacturer defendants had had market shares below 5%, these defendants had *increased* their market share in the period 2015-2019 and thus had market shares above 5% during this later period.  This new data therefore allowed plaintiffs to identify jurisdictions where these manufacturer defendants sold a significant quantity of opioids in the period 2015-2019 based on information that was not previously available.  Moreover, as discussed below, the PEC was able to use the updated ARCOS data to make market share calculations for pharmacies in their capacity as dispensers for the period 2006-2019.  *See infra* at pp. 20-21; *see also* Mougey Dec. ¶ 14.

## THE DEVELOPMENT OF CHAIN PHARMACY DISPENSING CLAIMS

The facts and legal theories underlying the dispensing claims against the chain pharmacies had not been developed at the time these cases were filed or subject to amendment under the CMO.

The complaints in the CT1 cases initially did not include any claims against any chain pharmacies, but instead asserted claims against certain manufacturers and distributors of prescription opioids.  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 841. After being selected as bellwethers, the CT1 plaintiffs amended their complaints "asserting claims against the Pharmacies as 'distributors' of pharmaceuticals to their own retail pharmacies."  *Id.* at 841-42.  Although the CT1 amended pleadings potentially encompassed both distribution and dispensing claims, during the briefing of motions to dismiss, the CT1 Plaintiffs expressly disclaimed any intention to bring any claims against the pharmacies as "dispensers" of prescription opioids.  *Id.*

16

As a result of that disclaimer, there was no discovery in CT1 directed towards claims the CT1 plaintiffs had against any pharmacy as a dispenser of opioids as those claims were expressly disclaimed.  *See id.* at 845.   Ultimately, the claims against the CT1 non-pharmacy distributors settled in October 2019.  By that time, the deadline to amend complaints for plaintiffs already in the MDL had passed.  As noted above, the ARCOS data and the reports prepared by the PEC in accordance with the Court's orders had provided no information about dispensing.

Following the settlements of the claims asserted in CT1, the Court in a November 19, 2019, order (Doc. #2940) instructed the CT1 Plaintiffs to amend their complaints to bring dispensing claims against the CT1 chain pharmacy defendants in what was then known as CT1B.  *In re Nat'l Prescription Opiate Litig.*, 956 F.3d at 842.  Thereafter, the Court (for the first time) ordered the production of national dispensing data.  *Id.*  These orders, however, were stayed by the Sixth Circuit, *id.,* which, on April 15, 2020, granted mandamus vacating the order allowing the CT1B amended complaints which added dispensing claims.  *Id.*

Following the Sixth Circuit mandamus order, on April 30, 2020, this Court created a new bellwether track (CT3) for which plaintiffs Lake and Trumbull Counties amended their complaints to clearly assert both dispensing and distribution claims.  Doc. #3282.  The CT3 amended complaints were filed on May 15, 2020, against a number of chain pharmacies.  Docs. #3295, 3296.  Discovery in CT3 began in June 2020.  Doc. #3325.

In the course of that discovery, and in the discovery in CT4, which had been remanded by this Court to the district court in San Francisco so that the case could

proceed on a parallel track, the pharmacy defendants provided detailed dispensing data for their stores in the relevant jurisdictions. In CT3, defendants produced their dispensing data for the State of Ohio; in CT4, the dispensing data was produced for nine counties in the San Francisco Bay Area. Plaintiffs' experts then analyzed the dispensing data, identifying prescriptions with "red flags" suggestive of diversion that were filled by defendants without any apparent diligence having been performed. On September 1, 2021, this Court entered an order denying the summary judgment motions filed by two of the CT3 dispensing defendants. Doc. #3913. The CT3 cases then proceeded to a jury trial on liability beginning on September 29, 2021. Doc. #3984. During trial, the CT3 Plaintiffs abandoned their distribution claims and proceeded to verdict only on their dispensing claims. *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 822 (N.D. Ohio 2022). On November 23, 2021, at the conclusion of Phase I of the Track Three bellwether trial, a jury found for the CT3 plaintiffs, finding defendants liable for creating a public nuisance based on their dispensing conduct. *See In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2022 WL 4099669, at *1 (N.D. Ohio Aug. 22, 2022). The CT4 case was tried to the court in San Francisco and resulted in a judgment for the plaintiff. *See City and County of San Francisco v. Purdue Pharma LP, et al.*, 620 F. Supp.3d 936 (N.D. Cal. 2022) (Breyer, J.) (CT4).

The dispensing discovery was vital to the claims the CT3 and CT4 plaintiffs presented at trial. Using that data, plaintiffs presented expert testimony that the pharmacies dispensed hundreds of thousands of prescriptions with "red flags" that raised or should have raised a reasonable suspicion as to the validity of the prescriptions

for controlled substances.  *See, e.g., In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d at 799-800 (describing testimony of Craig McCann and Carmen Catizone with respect to CVS); *City and County of San Francisco*, 620 F. Supp.3d. at 979-986 (same).  This analysis was crucial to the findings of liability in both cases.  *See In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d at 796 (plaintiffs were able to show that the chain pharmacies dispensed "large quantities of highly addictive drugs in the Counties, while repeatedly failing to take legally-required, effective measures to identify and resolve 'red flags' prior to dispensing"); *City and County of San Francisco*, 620 F. Supp.3d. at 998 ("Plaintiff proved that Walgreens engaged in unreasonable conduct by dispensing hundreds of thousands of red flag opioid prescriptions without due diligence . . . .").

Moreover, the information produced in discovery in CT3 and CT4 and revealed in the trials of those cases belied the claims of the national chain pharmacies that they were merely filling legitimate prescriptions written by physicians.  CT3 revealed that all three of the largest national chain pharmacies knew that they lacked sufficient policies to ensure compliance with their responsibility under federal law to assure the prescriptions they dispense are for a legitimate medical purpose.  Discovery and trial in CT3 also revealed that the defendant chain pharmacies each failed to assure compliance with the inadequate policies they did have, and, instead, incentivized their pharmacists to ignore their obligations under federal law.  *See In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d at 797-99 (CVS); *id.* at 11-13 (Walgreens); *id.* at 115-18 (Walmart).  Discovery in subsequent bellwether cases against both the CT3 defendants and other chain pharmacy defendants (in CT7 – CT11) expanded the knowledge base and confirmed that the

dispensing failures were not limited to the defendant pharmacies in the CT3 and CT4 counties.

The dispensing data allowed plaintiffs generally to understand what proof in a dispensing case would look like, but the actual data available was limited to what was produced by the CT3 and CT4 defendants in those actions.  There is no central repository or public dispensing data.  Plaintiffs would need to rely on other information to add new dispenser defendants before they could obtain, in discovery from those additional defendants, the relevant dispensing data

The updated ARCOS data, however, allowed the PEC to make a calculation of a dispenser's market share for the full period 2006 through 2019.  Although ARCOS does not collect information about dispensing, it does identify the dispensers to whom each distribution shipment was sent.  By aggregating all of the shipments for which a pharmacy chain was a distribution recipient in a particular jurisdiction, it is possible to determine the quantity of opioids the pharmacy chain had received; the market share can then be calculated by assuming that whatever a pharmacy chain received, it eventually dispensed.  This computation requires complex analysis of the ARCOS data.  As described in the Declaration of Peter Mougey, the PEC was able to perform this analysis with assistance from a consulting expert.  Mougey Dec. ¶ 9.  The PEC's calculation of the dispensing market share for these defendants allowed plaintiffs to identify dispensers in their jurisdiction with significant market share over the period 2006-2019.  (ARCOS does not, even in its public form, contain the dispensing information necessary to perform the "red-flag" analyses that, as described above, were central to proving claims against

pharmacies in CT3 and CT4.  *See* Mougey Dec. ¶ 29.)

Now, armed with the knowledge that the failures of chain pharmacies to meet their legal obligations as dispensers of controlled substances apparently was both industry-wide and nationwide, with the ARCOS data demonstrating that several chain pharmacies have significant dispensing market share in their jurisdictions, and now provided with an opportunity to do so, Amending Plaintiffs seek to add certain chain pharmacy defendants, specifically, Ahold Delhaize (which operates Food Lion and Giant supermarkets and pharmacies among others), Albertsons, Costco, DDM, Publix, Target, and Winn-Dixie.

Dated:  August 1, 2024                                    Respectfully submitted,

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
270 Munoz Rivera Avenue, Suite 201
San Juan, PR 00918
(304)654-8281
paul@farrellfuller.com

*Plaintiffs' Co-Lead Counsel*

21

*/s/ Peter H. Weinberger*
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY &LIBER
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system.  Copies will be served upon counsel of record by, and may be obtained through, the Court CM/ECF system.

*/s/ Peter H. Weinberger*
Peter H. Weinberger

22