```
                                                        Page 1
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION
 3    IN RE NATIONAL                 )
      PRESCRIPTION OPIATE            )
 4    LITIGATION                     )
                                     )
 5    THIS DOCUMENT RELATES TO:      ) MDL No. 2804
      Track Nine: Tarrant            )
 6    County, Texas                  ) Case No. 17-md-2804
                                     )
 7    (Case No.                      ) Judge Dan Aaron Polster
      (1:18-op-45274-DAP)             )
 8                                   )
      TARRANT COUNTY,                )
 9                                   )
        Plaintiff,                   )
10                                   )
         v.                          )
11                                   )
      PURDUE PHARMA L.P.,            )
12    et al.,                        )
                                     )
13      Defendants.                  )
14    *******************************************************
15             ORAL AND VIDEOTAPED DEPOSITION OF
16                        G.K. MAENIUS
17       AS 30(B)(6) REPRESENTATIVE FOR TARRANT COUNTY
18                     FEBRUARY 29, 2024
19    *******************************************************
20
21
22
23
24
25
```

1  ORAL AND VIDEOTAPED DEPOSITION OF G.K. MAENIUS,
2  AS 30(B)(6) REPRESENTATIVE FOR TARRANT COUNTY, produced
3  as a witness at the instance of the Defendants, and duly
4  sworn, was taken in the above-styled and numbered cause
5  on the 29th day of February, 2024, from 9:41 a.m. to
6  7:32 p.m., before Julie C. Brandt, RMR, CRR, and CSR in
7  and for the State of Texas, reported by machine
8  shorthand at Veritext Legal Solutions, 300 Throckmorton
9  Street, Suite 1600, Fort Worth, Texas, pursuant to the
10  Federal Rules of Civil Procedure.

Page 14

1    your verbal, oral sworn testimony topics 3, 4, 5, 6, 7,
2    8 and 9.  Is that your understanding?
3             I'm not trying to evaluate your quick recall
4    of those topics and agreements between counsel, but you
5    do understand that you're here to --
6        A.   Yes, I do.
7        Q.   -- address a discrete number of topics?
8        A.   Yes.
9        Q.   And when you look at topics 3, 4, 5, 6, 7, 8
10   and 9, are you prepared to address those topics?
11       A.   To the best of my ability, yes.
12       Q.   Okay.  Now what is your understanding of being
13   a 30(b)(6) designee for Tarrant County today?
14       A.   So my understanding is that I am not an expert
15   witness, but I can provide factual information as it
16   relates to how opioids and -- and everything that's
17   included in opioids distribution has impacted Tarrant
18   County and some of the environments that we see in
19   Tarrant County that are -- that may cause opioid
20   addiction or at least diversion of opioid medications.
21       Q.   Okay.  Let me direct your attention to topic
22   number 3.
23       A.   Yes, sir.
24       Q.   Topic number 3 states, Tarrant County's
25   knowledge, as a nonexpert, of illicit opioid and

Page 15

1  prescription opioid sources, supply, division, use or
2  abuse, and addiction in the geographic area of Tarrant
3  County, and the basis for that knowledge.  Correct?
4       A.   Yes.
5       Q.   It goes on to say, This topic is not intended
6  to elicit testimony on the granular details of
7  particular case files or analyses.  But to the extent
8  any such case files or analyses form the basis for the
9  County's knowledge on this topic, the witness shall be
10 prepared to identify them.  Correct?
11      A.   Yes.
12      Q.   Do you have any personal knowledge as it
13 relates to topic 3?
14      A.   When you say personal knowledge, would you
15 clarify that, please?
16      Q.   There's certain knowledge that perhaps you're
17 prepared to present as the representative of the County
18 that perhaps you've learned through your preparation for
19 this deposition.  Aside from that knowledge, did you
20 have -- did you acquire knowledge in the course and
21 scope of your duties as county administrator about that
22 particular topic?
23      A.   Yes.
24      Q.   Okay.  And what is that knowledge?
25           MR. JANUSH:  Objection, form.

Page 20

1  you refer to the prescription drugs -- prescription
2  opioids, correct?
3       A.   Yes.
4       Q.   -- do you have any personal knowledge -- and
5  we'll come to your 30(b)(6) knowledge.
6            Do you have any personal knowledge connecting
7  that narrative that you've recounted to Albertsons or
8  any of its affiliates specifically?
9       A.   No, I do not.
10      Q.   Okay.  And you referred to the diversion of
11 prescription opioids.
12      A.   Yes.
13      Q.   Do you have any personal knowledge relating to
14 that diversion arising from or relating to Albertsons or
15 any of its affiliates in Tarrant County?
16      A.   So, not specifically Albertsons, but there was
17 a significant diversion of medications, or at least
18 prescriptions of medications, that probably should have
19 been caught at the pharmaceutical level or at the
20 pharmacy level.  And again, the availability of -- of
21 counterfeit drugs at the very beginning was not nearly
22 as substantial as it is now.  So, there's -- there's
23 just a very few ways to get those type of medications,
24 you know.
25      Q.   And to be clear, the availability of

Page 21

1  counterfeit drugs, that's an issue separate from your
2  complaints as it relates to the pharmacy's activities,
3  correct?
4      A.   Yes, to the extent -- to the extent that
5  counterfeit drugs now have become less expensive and --
6  and so -- so it's my understanding that people simply
7  don't start using opioids by buying counterfeit drugs.
8  There has to be an initial source, and they build into
9  that, and finally it becomes a financial issue where
10 that -- if they're hooked on the drugs and they need to
11 get it, they're going to go try to find drugs that are
12 either easily available or at a lower cost, depending on
13 if they can actually afford those drugs.
14     Q.   And as you sit here, you can't identify a
15 pharmacy or a pharmacist -- strike that.
16          You can't identify an Albertsons pharmacy or
17 an Albertsons pharmacist who you believe specifically
18 contributed to this narrative that you've recounted,
19 correct?
20          MR. JANUSH:  Objection, beyond the scope
21 of -- of the notice.
22     Q.   (BY MR. WAHBY)  You can answer.
23     A.   So would you ask the question again?
24     Q.   As you sit here, you can't identify an
25 Albertsons pharmacy or affiliated pharmacy or an

Page 22

1  Albertsons pharmacist who contributed to the narrative
2  that you've recounted, correct?
3       A.  Not to my knowledge, and that's really not
4  something that -- that I would have firsthand knowledge
5  on anyway since -- in my position as a county
6  administrator, even as the head of the Crime Commission
7  and some of the things that I was doing with the
8  Governor's Office prior to that, dealing with -- with
9  narcotics and organized crime.
10         The -- I was never into the investigative
11  element of a case, where that I would see the field
12  notes or even read the indictments that would come from,
13  you know, either the US Attorney's Office or the
14  Criminal District Attorney's Office.  So I do not have
15  any detailed information about anything specifically
16  related to Albertsons, and that's the reason why.
17      Q.  Okay.  As you look at topic number 3, who do
18  you believe in Tarrant County would have the most
19  knowledge on this topic?
20      A.  It would probably be the -- the -- our task
21  force leaders.  Our federal DEA would probably have a
22  substantial amount of information, since the DEA is
23  specifically charged with enforcing the Controlled
24  Substance Act of '70.  And in that particular act
25  itself, there are responsibilities that the

Page 187

1  particular, or do you just -- are you testifying that
2  you generally believe that's how it would be done?
3      A.   I'm talking about the conversations that I had
4  with Chief Bond and -- and -- because I asked him that
5  question specifically, you know, if you do those type of
6  investigations, and he says we do -- whenever we are
7  notified of those, that they report -- they -- they hand
8  that off to DEA, because -- and I'll go back to it --
9  the Controlled Substances Act.  That is -- that is the
10 purview of DEA since that's a federal act.  And, you
11 know, the -- the abuses by -- by the manufacturers and
12 the doctors and the pharmacies fall well within the
13 jurisdictional responsibility of DEA.
14     Q.   And did you ask Chief Bond about any
15 investigation of any Tom Thumb or Albertsons pharmacy or
16 pharmacists?
17     A.   Not specifically -- not specifically of Tom
18 Thumb or Albertsons.
19     Q.   Did you ask him about any --
20     A.   No.
21     Q.   -- any pharmacy in particular?
22     A.   No, I did not.
23     Q.   So you can't identify a pharmacy or a
24 pharmacist who is either -- who was investigated in
25 connection with any prescription opioids?

Page 188

1       A.   No, I cannot.
2       Q.   Do you know if Tarrant County has collected
3  any data regarding the diversion of prescription
4  opioids?
5       A.   I don't know if they have or not.
6       Q.   Do you know if Tarrant County has prosecuted
7  any doctors for crimes related to prescribing
8  prescription opioids?
9       A.   I don't know that they've prosecuted anyone or
10 not.
11      Q.   What's your under -- what's your expectation
12 as to how Tarrant County will seek to redress any issues
13 in the county relating to filling prescriptions for
14 opioids at pharmacies in Tarrant County?
15           MR. JANUSH:  Objection.  Give me a
16 second.  I don't really understand this question.
17        Do you?  Here.
18           MR. WAHBY:  Is that -- I'm having a hard
19 time.  Are you saying "objection, form"?  Are we just --
20           MR. JANUSH:  I can't even --
21           MR. WAHBY:  So, like, it would be
22 "objection, form."  I can't really tell.
23           MR. JANUSH:  I -- I'm going to -- this is
24 the most unintelligible question of the day, so --
25           MR. WAHBY:  So -- so what we do when --

Page 280

1             REPORTER'S CERTIFICATE

2             The undersigned Certified Shorthand Reporter

3    licensed in the State of Texas does hereby certify:

4             I am authorized to administer oaths or

5    affirmations, and prior to being examined, the witness

6    was duly administered an oath by me.

7             I am not a relative or employee or attorney or

8    counsel of any of the parties, nor am I a relative or

9    employee of such attorney or counsel, nor am I

10   financially interested in the outcome of this action.

11            I am the deposition officer who

12   stenographically recorded the testimony in the foregoing

13   deposition, and the foregoing transcript is a true

14   record of the testimony given by the witness.

15            Before completion of the deposition, review of

16   the transcript [X] was [ ] was not requested.  If

17   requested, any changes made by the deponent (and

18   provided to the reporter) during the period allowed are

19   appended hereto.

20            In witness whereof, I have subscribed my name

21   this 12th day of March, 2024.

22                    *Julie C. Brandt*

23

24            Julie C. Brandt, CSR, RMR, CRR

25            TX CSR No. 4018, Exp. 10/31/25