Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF OHIO
 3                       EASTERN DIVISION
 4
 5   IN RE: NATIONAL PRESCRIPTION    )
     OPIATE LITIGATION               )
 6                                   )  MDL No. 2804
     THIS DOCUMENT RELATES TO:       )  Case No. 17-md-2804
 7                                   )
     Track Eight: Cobb County, Georgia )
 8   Case No. 1:18-op-45817          )
                                     )
 9   COBB COUNTY,                    )
                                     )
10           Plaintiff,              )
                                     )
11              vs.                  )
                                     )
12   PURDUE PHARMA, L.P., et al.,    )
                                     )
13           Defendants.             )
14
15
16
17             VIDEOTAPED DEPOSITION OF
18           CARMEN CATIZONE, MS, RPh, DPh
19                  Chicago, Illinois
20              Thursday, May 30th, 2024
21
22
23
24   REPORTED BY:  GREG S. WEILAND, CSR, RMR, CRR
25   JOB NO.:      6693118
```

Page 58

```
 1               THE WITNESS:  Both.
 2   BY MS. WHITE:
 3        Q.   Both, okay.
 4        A.   And if I can explain.
 5        Q.   Sure.
 6        A.   The 14 red flags in Dr. McCann's report
 7   was the directions to a person who analyzes data.
 8               The presentation in my report where some
 9   of those red flags were linked under a particular
10   heading is how, as an expert, and how the practice
11   of pharmacy and how a pharmacist would encounter
12   those red flags within those headings.
13               And so that presentation would be
14   different than the directions I would give to
15   someone analyzing the data that would have no idea
16   what I'm talking about or what the data would be.
17               And so there is a difference in how
18   they're presented, but they both refer to the same
19   things, and those red flags have always been a part
20   of pharmacy practice.
21        Q.   Do you remember last week when Albertson's
22   counsel asked you about the 25-mile rule, for
23   example?
24        A.   I remember her asking, but go ahead.
25        Q.   And my memory is that you said the
```

Page 72

1              That would be the same for the
2         pharmacists.
3    BY MS. WHITE:
4         Q.   Where would an independent pharmacist go
5    to look for a list of red flags that would be
6    applicable in Georgia?
7         A.   Same places that a corporate and chain
8    pharmacist would go to:  The federal law, state law,
9    guidance provided by the DEA, guidance provided by
10   the State Board of Pharmacy, and then information,
11   their trade association, if they're a member of the
12   National Community Pharmacists Association would
13   provide to members as well.
14        Q.   Is that NCPA?
15        A.   Yes, it is.
16        Q.   Okay.  Now going back to 2006.
17             In 2006, could an independent pharmacist
18   in Georgia, looking for guidance on red flags, have
19   found that list of 14 red flags written down
20   anywhere?
21        A.   The list written, as this is, no.
22        Q.   Today could an independent pharmacist in
23   Georgia, looking for guidance on red flags, find
24   that list of 14 red flags written down anywhere?
25        A.   Yes.

Page 100

1  the flag exists.
2      Q.   That's not my question.
3           Does the flag exist when it's presented,
4  if the pharmacist knows it's less than 25 miles?
5           MR. ELSNER:  Objection.
6           THE WITNESS:  I wouldn't be a red flag if
7      it was less than 25 miles.
8  BY MS. WHITE:
9      Q.   Okay.  My understanding of your prior
10 testimony would mean that you do not have an opinion
11 on how many of the 16,700 prescriptions were
12 actually for an illegitimate purpose; is that fair?
13     A.   Correct.
14     Q.   My understanding of your prior testimony
15 is that you do not know how many of those 16,700
16 prescriptions the pharmacist performed due diligence
17 on but didn't write it down?
18          MR. ELSNER:  Objection.
19          THE WITNESS:  I would say based upon my
20     report, 95 percent or more of those
21     prescriptions were not resolved.
22 BY MS. WHITE:
23     Q.   That's not my question, sir.
24          My question is, you don't know how many
25 that pharmacist did due diligence on, by calling the

Page 101

1  prescriber or otherwise, but didn't write it down?
2      A.   I do not.
3      Q.   Okay.  I think I understood your answer
4  last week, so I will only ask you once and not for
5  all the flags.
6           But you didn't do any analysis or ask
7  McCann to do any analysis to understand what the
8  number of red flags would have changed away from
9  16,700, if, for example, the distance was changed to
10 30 miles?
11     A.   Correct.
12     Q.   Okay.  Did you do any analysis or ask
13 McCann to provide any analysis of how many of the
14 total 305,000 prescriptions hit only on Flag 1?
15     A.   I believe there's a chart that says how
16 many were one flag, multiple flags.
17          But I know in the spreadsheets, I have
18 that information.  I did have how many prescriptions
19 hit on Flags 1 through 14, in the information I
20 reviewed.
21     Q.   So let me make sure we're saying the same
22 thing.
23          When I look at Page 111, I see how many
24 flags -- I'm sorry -- I see how many prescriptions
25 hit on each flag.

Page 188

1       Q.   Brice?
2       A.   Yes.
3       Q.   Is it your testimony that she was
4  specifically asked about training materials about
5  where to put notes, and she said she had never seen
6  it before?
7            MR. ELSNER:  Objection.
8            THE WITNESS:  Not specific to notes, but
9       if there was training documents and you
10      reference, in those training documents, there
11      was a portion about where to place the notes,
12      then my reference is back to that training
13      document.
14 BY MS. WHITE:
15      Q.   If that exists in those documents?
16           MR. ELSNER:  Objection.
17                  (Whereupon, an off-the-record
18                   discussion was held.)
19           MS. WHITE:  Oh, I said if that exists.
20      You can strike that.
21 BY MS. WHITE:
22      Q.   I wanted to ask you about the electronic
23 note system.
24           Are you familiar with EnterpriseRx, the
25 system used at Publix?

Page 189

1  A. I am not.
2  Q. Have you ever, in practicing pharmacy,
3  yourself, used an electronic dispensing software?
4  A. No.
5  Q. What -- in -- not in practicing yourself,
6  in any other respect, have you utilized or observed
7  or been given a demonstration of electronic
8  dispensing software?
9  A. Yes.
10  MR. ELSNER: Objection, form.
11 BY MS. WHITE:
12  Q. And what was the context in which that
13 happened?
14  A. Various presentations or programs, where
15 they would talk about what patient profile, what new
16 systems would be like, the various pharmacy
17 meetings, I received demonstrations of what the
18 dispensing process would be, either PDX system or
19 other proprietary systems, as part of our work at
20 NABP.
21  Q. Was any -- so sorry.
22    Were any of the systems EnterpriseRx?
23  A. No.
24  Q. Do you have an opinion, generally, on
25 whether the use of the EnterpriseRx system and the

Page 190

1  way that the notes are set up for input in that
2  system meets the standard of care?
3      A.   I'm not prepared to answer that.
4      Q.   Okay.  Do you have an opinion on a
5  pharmacy electronic dispensing software that does,
6  in your opinion, assist pharmacists in meeting the
7  standard of care?
8           MR. ELSNER:  Objection.
9           THE WITNESS:  Is the question does an
10      electronic system assist, or am I aware that
11      any system that does assist?
12 BY MS. WHITE:
13      Q.   Are you aware of a particular name of a
14 product or system that you think assists pharmacists
15 in making the kinds of notes that form your opinion?
16      A.   What I'm aware of is that the systems
17 should do that, but I'm not -- I can't identify any
18 system that does.
19      Q.   Okay.  Let's move to talking a little bit
20 more about the GDNA.
21           Now, we talked about them a little bit
22 this morning, right?
23      A.   Yes.
24      Q.   And, in fact, I learned something new this
25 morning, which is that you had -- between 2015 and I

```
 1                C E R T I F I C A T E
 2            The within and foregoing deposition of the
 3   witness, CARMEN CATIZONE, MS, RPh, DPh, was taken
 4   before GREG S. WEILAND, CSR, RMR, CRR, at
 5   Suite 4400, One North Wacker Drive, in the City of
 6   Chicago, Cook County, Illinois, commencing at 8:33
 7   a.m., on the 30th day of May, 2024.
 8            The said witness was first duly sworn and
 9   was then examined upon oral interrogatories; the
10   questions and answers were taken down in shorthand
11   by the undersigned, acting as stenographer; and the
12   within and foregoing is a true, accurate and
13   complete record of all the questions asked of and
14   answers made by the aforementioned witness at the
15   time and place hereinabove referred to.
16            The signature of the witness was not
17   waived and the deposition was submitted to the
18   deponent as per copy of the attached letter.
19            The undersigned is not interested in the
20   within case, nor of kin or counsel to any of the
21   parties.
22            Witness my signature on this 4th day of
23   June, 2024.
24   [signature]
25   GREG S. WEILAND, CSR, RMR, CRR  License No. 084-003472
```