Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION
 3     - - - - - - - - - - - - - - - x
         IN RE: NATIONAL             :
 4       PRESCRIPTION OPIATE         :
         LITIGATION.                 :   Case No. 17-MD-2804
 5                                   :
         This document relates       :
 6       to Tracks 8 and 9.          :
       - - - - - - - - - - - - - - - x
 7                                       Thursday, May 30, 2024
                                                Washington, D.C.
 8
 9
10
11
12     Videotaped Deposition of:
13                   JOSEPH T. RANNAZZISI,
14     called for oral examination by counsel for the
15     Defendants, pursuant to notice, at the law offices of
16     Motley Rice, LLC, 401 Ninth Street, Northwest,
17     Suite 1001, Washington, D.C. 20004, before Christina
18     S. Hotsko, RPR, CRR, of Veritext Legal Solutions, a
19     Notary Public in and for the District of Columbia,
20     beginning at 9:14 a.m., when were present on behalf
21     of the respective parties:
22
```

Page 84

1  and fifth bullet point to yourself.
2     A.   The second and -- which --
3     Q.   The second one starts with --
4     A.   Yeah.
5     Q.   -- "meeting or exceeding a threshold for
6  a certain drug product and dosage strength."
7          Do you see that?
8     A.   Yes.
9     Q.   Okay.  Skip down two more.  "Anomalies
10 with respect" -- read that one.
11    A.   Yes.
12    Q.   And then fifth one starts with "Purchases
13 of high-dose-strength formulations."  Do you see
14 that?
15    A.   Yes.
16    Q.   What is the basis in research for using
17 dosage strength as a criteria to detect suspicious
18 orders?
19    A.   Well, that's -- basically, if you look at
20 the previous cases done on pharmacies, which are
21 available and which we expected the companies to
22 look at -- it was on the DEA website and in the

Page 85

1 Federal Register -- you'll see that most
2 pharmacies that are operating illegally were doing
3 large -- large dose controlled substances, such as
4 oxy 30.
5          The -- the cases speak for themselves.
6 If you're a person with opioid use disorder or
7 you're a person who's selling drugs that are
8 illegally obtained from pharmacies, you're going
9 to get the highest dose possible.  And the oxy 30s
10 and the oxy 15s were the gold standard for opioid
11 use disorder people and also people who were
12 illegally selling.  They needed those drugs.
13          So when you have a pharmacy, say, in
14 Florida and they're lined up outside the door and
15 everybody is getting an oxycodone 30-milligram
16 prescription filled, that is a problem.  And
17 that's reflected in all of the cases that we've
18 done.
19          So if you read the cases and you looked
20 at the cases -- for instance, I know that
21 Walgreens was mentioned in one of the cases and so
22 was McKesson where they were talking about it.

Page 86

1  All you had to do was look at the McKesson case or
2  the Walgreens case and you could see that the main
3  problem was oxy 30 or oxy 15 or oxy 10.
4           And -- so that's why it's in there.
5       Q.  Okay.  And I heard that answer, previous
6  cases.
7           Is there anything else besides what you
8  just said in your answer to support the basis and
9  research for using dosage strength as a criteria
10 to detect suspicious orders?
11      A.  Absolutely.  Whenever we did a pharmacy
12 diversion awareness conference, we talked about
13 the high-dose products.  We talked about the
14 combination products using the three-drug
15 combination or three-drug panel.  We explained
16 why.  When we do corresponding responsibility
17 presentations, we always talked about that.
18          And I did those personally.  I went out
19 and did them when I was with DEA.  Unless I was
20 double-booked somewhere, it was my presentation
21 that they were listening to.  And the reason we
22 did that was because we wanted them to understand

Page 168

1  when they were making those calls, when Hooper and
2  the rest of them were making those calls, all they
3  were doing was verifying that those pharmacies
4  wanted what they ordered.
5           So there was no corresponding
6  responsibility investigation because everything
7  was approved.  In fact, Beck said that:  We
8  approved everything.  We approved it.  If it was
9  what the pharmacist wanted, they got approved.
10      Q.  I --
11      A.  That's why it was in there.  Because
12  corresponding responsibility starts when you get
13  anomalies in ordering patterns.  And that's what
14  the 20 percent over average was.  It was supposed
15  to detect anomalies n ordering patterns.
16           So because of that, somebody should have
17  conducted an investigation rather than just doing
18  a -- just doing a call and saying, yeah, it's
19  fine --
20      Q.  Okay.  In that paragraph you write -- are
21  you with me still in that --
22      A.  Uh-huh.

Page 251

1    A.  For a distributor?
2    Q.  Yes, sir.
3    A.  An initial distribution?  You're talking
4  about an initial --
5    Q.  Initial -- never distributed before.
6  Initial distribution.
7    A.  There has to be -- well, you apply.  An
8  inspection is set up.  They go through physical
9  security.  They go through recordkeeping.  They
10 have to explain what's required of them during
11 their application.  They have to sign a document
12 saying that they will maintain effective controls
13 against diversion as part of their registration.
14         And once everything is -- all of the
15 operations look good, DEA will go ahead and
16 process their registration.
17   Q.  So soup to nuts --
18   A.  I can't --
19   Q.  -- how long?
20   A.  It just --
21   Q.  Are we talking months?  Years?
22   A.  It depends.  I mean --

Page 252

1      Q.   Average time.
2      A.   There is no average time.  Because if you
3  think about it, if they go on site and their cage
4  is wrong, they have to do a cage -- a rebuilding
5  of the cage or a rebuilding of the vault --
6      Q.   All right.
7      A.   -- or a change.  So that depends on their
8  contractors and whether they can do it or not,
9  because the --
10     Q.   All right.  So during this time period,
11 the DEA is doing due diligence, fair, with respect
12 to the application, right?
13     A.   Yes.
14     Q.   And the purpose of this due diligence
15 process is to make sure the applicant is qualified
16 to distribute controlled substances, correct?
17     A.   Yes.
18     Q.   And you would agree that the DEA doesn't
19 want people distributing controlled substances
20 that may be a threat to the community, right?
21     A.   Well -- yes.
22     Q.   And you would agree that distributors

Page 312

1  identified in the report, I didn't get the
2  documents to see it.
3       Q.  The time period of this report, is it
4  fair to say that's from -- what time period?
5       A.  Well, are you talking about the time
6  period that I drafted the report --
7       Q.  No.  What time period does your opinions
8  cover?
9       A.  December 2005 up to 20- -- I guess 2020,
10 when you started OrderInsite.
11      Q.  So in the executive summary, you use
12 similar language in a lot of these reports.  You
13 say period from '06 to '14 and beyond.
14      A.  Yeah.
15      Q.  Why didn't you just say 2006 to 2020?
16      A.  Because the system that was in place,
17 OrderInsite, I never really had the opportunity to
18 look at it because it was just operational at that
19 point in time, and we had no documents related to
20 it other than the brief documents that I got for
21 OrderInsite.
22           I guess I could have said that.  I could

Page 313

1  have said, well, I did a full analysis right up
2  through 2019, because that's when you did
3  e-SupplyLink.  And -- but e-SupplyLink is pretty
4  detailed in my report.
5          So -- and as far as why didn't I say
6  2005?  Because it was December 2005, and I'm not
7  even sure -- I couldn't tell you when they started
8  in December 2005.  So I just said 2006 because --
9      Q.  All right.  In your executive summary you
10 say, For reasons discussed more fully herein,
11 Kroger and Publix each failed to fulfill their
12 obligations by instituting ineffective diversion
13 control programs; therefore -- thereby creating
14 conditions that allowed diversion and the
15 oversupply of opioids in Cobb County.
16         Did I read that correctly?  That's in the
17 summary page there, third paragraph.
18     A.  I believe so.  Hold on, I'm...
19         MR. MIGLIORI:  If you weren't
20 following --
21         THE WITNESS:  Yeah, I have to got to
22 go --

Page 363

1  a major hole.
2         And no, I can't tell you if that
3  happened.  But when the SOM system is based on a
4  particular item or NDC, you could always go around
5  it because there's always another item with a
6  different item number or different NDC that's the
7  same dose and strength in drug class of that
8  particular -- so it happens.  We've seen it
9  happen.
10     Q.  You've seen it happen, but you can't
11  provide me a single time in Cobb County -- a
12  Publix Cobb County pharmacy in which this example
13  you give on 51 and 52 happened, correct?
14         MR. MIGLIORI:  Objection.  Foundation.
15         THE WITNESS:  Again, I've never seen
16  dispensing data from Cobb County, so I couldn't
17  tell you.  Or ordering data.
18  BY MR. KOHLER:
19     Q.  Your report doesn't identify a suspicious
20  order from a Cobb County Publix pharmacy, does it?
21     A.  Not from a Cobb County pharmacy, no.
22     Q.  Your report doesn't provide an actual

Page 387

1  CERTIFICATE OF NOTARY PUBLIC
2  I, CHRISTINA S. HOTSKO, the officer before
3  whom the foregoing deposition was taken, do hereby
4  certify that the witness whose testimony appears in
5  the foregoing deposition was duly sworn by me; that
6  the testimony of said witness was taken by me in
7  stenotypy and thereafter reduced to typewriting under
8  my direction; that said statement is a true record of
9  the proceedings; that I am neither counsel for,
10 related to, nor employed by any of the parties to the
11 action in which this statement was taken; and,
12 further, that I am not a relative or employee of any
13 counsel or attorney employed by the parties hereto,
14 nor financially or otherwise interested in the
15 outcome of this action.
16
17
18  CHRISTINA S. HOTSKO
19  Notary Public in and for the
20  District of Columbia
21 My commission expires:
22 1 January 2027