```
 1              UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3
     IN RE: NATIONAL              )
 4   PRESCRIPTION                 )  MDL No. 2804
     OPIATE LITIGATION            )
 5   _____    )  Case No.
                                  )  1:17-MD-2804
 6                                )
     THIS DOCUMENT RELATES        )  Hon. Dan A.
 7   TO: Case Track 8             )  Polster

 8
                  FRIDAY, OCTOBER 6, 2023
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10                CONFIDENTIALITY REVIEW

11                      - - -

12              Remote videotaped deposition of

13    Dain Rusk, held at the location of the

14    witness in Lakeland, Florida, commencing at

15    10:05 a.m. Eastern Time, on the above date,

16    before Carrie A. Campbell, Registered

17    Diplomate Reporter, Certified Realtime

18    Reporter, Illinois, California & Texas

19    Certified Shorthand Reporter, Missouri,

20    Kansas, Louisiana & New Jersey Certified

21    Court Reporter.

22                      - - -
               GOLKOW LITIGATION SERVICES
23                  877.370.DEPS
                  deps@golkow.com
24

25
```

 1   that's their judgment?
 2        A.    No, that's not what I said.
 3              I think what I said was, we're
 4   not going to train a pharmacist on how to be
 5   a pharmacist.  That is something that they've
 6   learned through school, through their
 7   training and their requirements to be
 8   licensed.  We expect them to follow the law.
 9              So what our pharmacists are
10   going to do and what our expectation is, is
11   that they're going to use their corresponding
12   duty and apply that through their
13   professional judgment and their experience.
14        Q.    Do you audit your pharmacists
15   at all to be sure that they are practicing
16   and fulfilling -- or following the law?
17              MR. HUDSON:  Objection.  Form.
18              THE WITNESS:  By using the word
19        "audit," meaning we -- how do you view
20        that?
21   QUESTIONS BY MS. CONROY:
22        Q.    Do you check on them?  I know
23   you're relying on the pharmacy -- if I
24   understand your answer, you're telling me
25   that it's up to -- the pharmacist is licensed

 1   and understands and is expected to know the
 2   law.
 3              And if the pharmacist is
 4   presented with a controlled substance
 5   prescription from a prescriber, do you check
 6   or audit or do anything to determine whether
 7   or not that pharmacist is checking to see
 8   whether that prescriber is able to write a
 9   controlled substance prescription?
10              MR. HUDSON:  Objection.  Form.
11              THE WITNESS:  I think I
12         understand your question.
13              And we have -- we have a couple
14         things.  We have field supervision,
15         our pharmacy supervisors, which are
16         all pharmacists.  They are
17         reviewing -- they are a resource, for
18         one, but more importantly, they are
19         auditing our stores on regular visits.
20         As I've discussed, as I go out there
21         and travel, they have that
22         responsibility as well.
23              We also have a computer system
24         that's checking for -- validating if
25         that's a valid DEA from that -- today

 1              is what I'm referring to.  I'm
 2              referring to what -- the process we
 3              have in place.
 4                   So, yes, we're auditing our
 5              pharmacy teams.
 6    QUESTIONS BY MS. CONROY:
 7         Q.    And did that -- were you able
 8    to audit a pharmacist to determine whether or
 9    not a prescriber had a valid DEA number when
10    you started at Publix?
11         A.    I believe so.  I'd have to -- I
12    don't recall when that technology was in
13    place.  I'd have to go look.
14         Q.    Okay.  We'll take a look at
15    that later today.
16              But you do know that that's
17    available today?
18         A.    Yes.
19         Q.    And that's a computerized
20    system?
21         A.    Yes.
22         Q.    And what happens if the
23    prescriber does not have a DEA number?
24              MR. HUDSON:  Objection.  Form.
25              THE WITNESS:  When you say a

 1   more specifics around how it's being

 2   presented, what the facts are around it.  So

 3   not having the facts makes it difficult for

 4   me to answer that question accurately.

 5        Q.    What if a Publix pharmacist

 6   came to you when you did one of those store

 7   visits and said, I was really puzzled, this

 8   happened to me the other day, what should I

 9   do?

10              What kind of advice would you

11   give them?

12        A.    I would ask them for more

13   facts.

14        Q.    What kind of facts?

15        A.    I would have wanted to know

16   more about is it a regular patient, was this

17   potentially their significant other that's

18   writing the prescription for them.

19              I think there's more questions

20   that would need to be answered before I could

21   really provide that pharmacist a -- advice.

22        Q.    And is that something that --

23   if that question came up or that issue

24   presented itself to a pharmacist, is that

25   something that the field supervisor would be

 1    available to answer at the moment or what --

 2    how would that play out for that pharmacist

 3    trying to exercise their corresponding duty?

 4                MR. HUDSON:  Objection.  Form.

 5                THE WITNESS:  Well, again, I

 6         suspect this would be a case-by-case

 7         basis.  The -- your question -- you

 8         had a couple of questions there.  Your

 9         question was, would the pharmacy

10         supervisor be available.

11                And the answer is, yes, they

12         have multiple ways to be -- for them

13         to get in touch with them so they

14         could have that conversation, if

15         that's what the pharmacist so deems.

16                But I think each pharmacist may

17         handle the situation differently, and

18         it's not to say that it's wrong.

19    QUESTIONS BY MS. CONROY:

20         Q.    So Publix is okay if one

21    pharmacist feels that they need to get advice

22    from the supervisor, but another pharmacist

23    feels it's okay to fill it.  That's okay with

24    you.  It's all up to the pharmacist?

25                MR. HUDSON:  Objection.  Form.

 1          Q.     I want to make sure I
 2   understand your answer.
 3                 So you agree with me that
 4   Publix would need to have some steps in place
 5   to make sure what it knew, that information
 6   could get to a pharmacist that's working at
 7   Publix?
 8                 MR. HUDSON:  Objection.  Form.
 9                 THE WITNESS:  I think we need
10         to have a process, is what I'm saying,
11         to stop that prescription -- or stop
12         that doctor from being able to write
13         something they're not allowed to.
14   QUESTIONS BY MS. CONROY:
15         Q.     So you're agreeing with me.
16   Publix would need to have a process to stop
17   that prescription from being filled?
18         A.     I'm just trying to make sure I
19   understand.  I'm just thinking through the
20   question as you're phrasing it.
21                 We need to have a process -- if
22   Publix has been made aware that the
23   prescriber is not -- does not have a license
24   to prescribe, then we would work through our
25   technology system to stop that physician from

```
 1   being able to write a prescription.
 2        Q.    And does Publix -- does Publix
 3   have that capability now --
 4        A.    Yes.
 5        Q.    -- to do that?
 6              Did you say yes?
 7        A.    Yes, I did.
 8        Q.    And how do you know that?
 9        A.    Because I know we have edits in
10   place that can stop a prescriber from
11   filling.
12        Q.    And for how long have -- did
13   you say edits?  Is that the word you used?
14        A.    That's the word I used, yes.
15        Q.    And for how long has Publix had
16   that capability?
17        A.    I don't know.  We've had it
18   since I've been here.
19        Q.    They've had the ability to
20   communicate with all of its pharmacists with
21   respect to a physician that cannot write
22   controlled substance prescriptions?
23              MR. HUDSON:  Objection.  Form.
24              THE WITNESS:  I want to be
25        clear on what I said.
```

 1                I said we have a process in our
 2        technology system that would block
 3        that physician from being able to have
 4        a prescription filled.
 5                I think that's different than
 6        us directly communicating with a
 7        pharmacist.
 8   QUESTIONS BY MS. CONROY:
 9        Q.    Does Publix have a
10   responsibility to directly communicate with
11   its pharmacists with respect to that
12   situation where they learn that a doctor
13   cannot write a controlled substance
14   prescription?
15                MR. HUDSON:  Objection.  Form.
16                THE WITNESS:  I would have to
17        confer with our legal to find out if
18        that's what the law says.  I'm not
19        sure.
20   QUESTIONS BY MS. CONROY:
21        Q.    Can you tell me a little bit
22   more about the process that you're talking
23   about that shares that information?
24        A.    To the way I understand it, I
25   can speak to it where we would identify Dain

 1   QUESTIONS BY MS. CONROY:
 2        Q.    Yes.  Formal Publix training
 3   with respect to the process for filling a
 4   controlled substance prescription.
 5        A.    I believe all of our
 6   pharmacists that we hired are licensed
 7   pharmacists who go through that schooling and
 8   training, as well as are licensed by taking
 9   their boards and taking their law.
10              So they are already trained to
11   do that.  I don't need to train the
12   pharmacists in how to be a pharmacist.
13        Q.    So your answer is no.  When you
14   joined, Publix did not need to provide
15   controlled substance training to its
16   pharmacists because its pharmacists were
17   already licensed, and you expected them to
18   know what they were doing?
19              MR. HUDSON:  Objection.  Form.
20        Mischaracterizes testimony.
21              THE WITNESS:  I want to restate
22        that because that's not what I said.
23              What I said was, we don't have
24        to formally train the pharmacists how
25        to fill controlled substances.  That

 1                THE WITNESS:  So I believe I've
 2        answered this, but then again I'll say
 3        the same thing, which is, we -- our
 4        pharmacists are trained for six years
 5        of school, they have on-the-job
 6        training, they are licensed in which
 7        they have to pass a rigorous board and
 8        law exam.
 9                And with that, they apply their
10        corresponding duty and exercise their
11        professional judgment.  And that is
12        clearing red flags, not only on
13        controlled substances but all
14        prescriptions.
15                So I believe we only hire
16        licensed pharmacists who comply with
17        the law.
18   QUESTIONS BY MS. CONROY:
19        Q.    So why wouldn't you answer yes
20   to my question?
21        A.    Because I don't think it's a
22   yes or no question.  That's why I wanted to
23   be clear about what your question was.
24        Q.    Do you -- do you expect your
25   retail staff to follow the law?

1          A.    I expect our pharmacists to
2    follow the law.  They have supervisory rights
3    of the technicians who may or may not know
4    what that law is.  So I expect our
5    pharmacists to follow the law as per what
6    they've taken the oath for when they received
7    their license.
8          Q.    And I think we covered that you
9    agree with me that Publix needs to provide an
10   environment for them to follow the law,
11   correct?
12               MR. HUDSON:  Objection.  Form.
13               THE WITNESS:  Again, we can go
14        back to that question again, but when
15        you say "environment," we're talking
16        about the question we had this
17        morning?
18   QUESTIONS BY MS. CONROY:
19         Q.    Yeah.
20         A.    And I would refer to my
21   testimony on that question.
22         Q.    Okay.  When's the last time you
23   spoke to Ms. Smith or had an e-mail or any
24   communication with her?
25         A.    I don't recall exactly, but

```
 1        A.    I do.  I want to read this
 2   whole section first before we start --
 3        Q.    Yes.
 4        A.    -- parsing out different
 5   things.
 6        Q.    Yeah.
 7        A.    Okay.
 8        Q.    Okay?  Do you recall what
 9   OrderInsite is?
10        A.    Yes, I do.
11        Q.    And what is it?
12        A.    It's an inventory management
13   solution vendor.
14        Q.    And is it part of the
15   suspicious order monitoring system?
16        A.    That they are our suspicious
17   order monitoring system now, yes.
18        Q.    And it says here, "Jillanne
19   worked very closely with OrderInsite in
20   developing the -- our suspicious order
21   monitoring process, and from that work effort
22   was able to build out our control substance
23   team to solve a gap we had in our pharmacy
24   compliance area."
25              Do you see that?
```

 1   were identifying suspicious orders, whether
 2   or not the suspicious orders were not
 3   shipped.  Whatever Publix would do with a
 4   suspicious order, how did you measure
 5   effectiveness?
 6        A.    So as I look at -- from that
 7   lens, we had a suspicious order monitoring
 8   process in place on our warehouse orders, and
 9   it was, you know, looking -- it was a
10   reasonable control to understand and look at
11   unusual dispensing patterns, whether it was
12   size, quantity, those things, and we would
13   cut those orders.
14              So we had a process in place
15   when I arrived here, and that was clearly
16   flagging orders of interest.
17        Q.    And how did you determine
18   whether it was effective?
19        A.    I'm -- again, I don't -- when
20   you say "effective," meaning was it doing
21   what it was supposed to do?  Is that the
22   question?
23        Q.    Well, yes.  You told me it was
24   very effective, that the compliance
25   processes -- well, let me ask you this.

 1                 The suspicious order monitoring
 2   would be part of compliance, correct?
 3         A.    It would be one component of
 4   it, yes.
 5         Q.    Okay.  And you told me that it
 6   was very effective, and so I'm trying to
 7   understand how you knew it was very
 8   effective.
 9                 I appreciate that you're
10   telling me you had a process, but how do you
11   know it was effective?
12              MR. HUDSON:  Objection.  Form.
13              THE WITNESS:  Because it was --
14         it was flagging orders, is what I said
15         to you.  It was flagging orders and it
16         was cutting them.  That's how I know
17         it was effective.
18   QUESTIONS BY MS. CONROY:
19         Q.    And do you know what happened
20   after those orders were cut?  Do you know if
21   pharmacies -- do you know one way or the
22   other, well, if a pharmacy still received an
23   order, they just received it in two bundles
24   rather than one large?
25              MR. HUDSON:  Objection.  Form.

 1          that flag could be cleared.
 2               Whether or not they were deemed
 3      suspicious to be reported, I'm not
 4      sure.  I'd have to go look.  I'm not
 5      in the weeds to that level.
 6  QUESTIONS BY MS. CONROY:
 7      Q.    But you are able to testify as
 8  the vice president of pharmacy that the SOMS
 9  process was very effective, but you weren't
10  in the weeds?
11      A.    I can testify that there were
12  reasonable controls in place that were doing
13  the expected action of flagging orders of
14  interest and then cutting them so they could
15  not make it to the store in order for those
16  to be investigated.
17      Q.    Was that the same process that
18  Albertsons had?
19            MR. HUDSON:  Objection.  Form.
20            THE WITNESS:  I don't recall
21      the process at Albertsons.  It's been
22      some time.
23            And again, my leadership style
24      at Albertsons is not a whole lot
25      different than here at Publix.  I

Golkow Litigation Services                         Page: 218

1                    CERTIFICATE

2            I, CARRIE A. CAMPBELL, Registered
   Diplomate Reporter, Certified Realtime
3  Reporter and Certified Shorthand Reporter, do
   hereby certify that prior to the commencement
4  of the examination, Dain Rusk, was duly sworn
   by me to testify to the truth, the whole
5  truth and nothing but the truth.

6            I DO FURTHER CERTIFY that the
   foregoing is a verbatim transcript of the
7  testimony as taken stenographically by and
   before me at the time, place and on the date
8  hereinbefore set forth, to the best of my
   ability.
9
             I DO FURTHER CERTIFY that I am
10 neither a relative nor employee nor attorney
   nor counsel of any of the parties to this
11 action, and that I am neither a relative nor
   employee of such attorney or counsel, and
12 that I am not financially interested in the
   action.
13

14

15         _____
16         CARRIE A. CAMPBELL,
           NCRA Registered Diplomate Reporter
17         Certified Realtime Reporter
           California Certified Shorthand
18         Reporter #13921
           Missouri Certified Court Reporter #859
19         Illinois Certified Shorthand Reporter
           #084-004229
20         Texas Certified Shorthand Reporter #9328
           Kansas Certified Court Reporter #1715
21         New Jersey Certified Court Reporter
           #30XI00242600
22         Louisiana Certified Court Reporter
           #2021012
23         Notary Public
           Dated:  October 24, 2023
24

25