```
 1                 UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF OHIO
 2                       EASTERN DIVISION

 3
     ------------------------------)
 4                                  )
     IN RE:  NATIONAL PRESCRIPTION  ) MDL No. 2804
 5   OPIATE LITIGATION              )
                                    )
 6   ------------------------------) Case No. 1:17-MD-2804
                                    )
 7   THIS DOCUMENT RELATES TO:      )
                                    )
 8   Track Eight                    )Judge Dan Aaron Polster
                                    )
 9   ------------------------------)

10

11       VIDEOTAPED DEPOSITION OF LEIGH ANNE JACOBSON
                    TUESDAY, NOVEMBER 8, 2022
12
                              - - -
13
           HIGHLY CONFIDENTIAL - SUBJECTIVE TO FURTHER
14                    CONFIDENTIALITY REVIEW

15                            - - -

16

17           Remote videotaped deposition of LEIGH ANNE

18   JACOBSON, commencing at 9:10 a.m., on the above date,

19   before Juliana F. Zajicek, Registered Professional

20   Reporter, Certified Shorthand Reporter and Certified

21   Realtime Reporter.

22                            - - -

23               GOLKOW LITIGATION SERVICES
               877.370.3377 ph | 917.591.5672 fax
24                       Deps@golkow.com
```

```
 1   other than just your working and on-the-job training

 2   as an intern, right?  There -- you don't recall, I

 3   went to training school before I -- before I became a

 4   pharmacist, right?

 5       A.   I don't --

 6       MS. WHITE:  Objection to form.

 7   BY THE WITNESS:

 8       A.   I don't recall going to training school in

 9   that sense of what you are saying right there, no.

10   BY MS. DICKINSON:

11       Q.   Okay.  And I -- I used training school, I

12   was being a little cute.

13            You just don't recall a formal course

14   selection that you were required to attend prior to

15   the time you became a pharmacist at Publix, you don't

16   recall one sitting here today?

17       MS. WHITE:  Objection to form.

18   BY THE WITNESS:

19       A.   I don't.

20   BY MS. DICKINSON:

21       Q.   Okay.  Similarly to what I asked you way

22   earlier about being a pharmacy intern, do you recall

23   any written manuals or training materials that you

24   were required to read that were given to you prior to
```

 1   you becoming a pharmacist for the first time at

 2   Publix?

 3         MS. WHITE:  Objection to form.

 4   BY THE WITNESS:

 5         A.    Publix, for as long as I can recall, has

 6   educated or placed emphasis on changes, et cetera,

 7   through a weekly memo, and it was my responsibility as

 8   an intern to read the menu -- or sorry -- to read the

 9   memo, rather, and ask my supervisor, whether it was my

10   pharmacist at that time or my actual pharmacy

11   supervisor for additional questions or concerns.

12              So there would be continuous education

13   that happened through the weekly memo, as well as

14   pharmacy supervisors, again, to my knowledge as a

15   pharmacist, as well in that current role continue to

16   have regular visits where they are in pharmacies and

17   discussing and training and encouraging the culture

18   that we want to -- to continue at Publix.

19   BY MS. DICKINSON:

20         Q.    Okay.  Other than the weekly memo, I'm

21   just trying to understand, were you given any written

22   documents or man -- manuals, you know, things that you

23   were required to read that would educate you right

24   before you became a pharmacist?

 1   same visibility that I described for other stores.

 2   BY MS. DICKINSON:

 3       Q.    You have the same visibility into the

 4   volume of other -- that other stores are selling of

 5   C-IIs and prescription opioids, correct?

 6       MS. WHITE:  Objection to form.

 7   BY MS. DICKINSON:

 8       Q.    Correct?

 9       A.    The report that is given to me includes

10   all of the company's stores and I can then filter down

11   to my stores.  So, again, that information is

12   provided.  Is it something that is there, yes.

13       Q.    Okay.  Have you ever looked at whether

14   Store 146 in your time as a pharmacy supervisor was

15   one of the higher volume sellers of prescription

16   opioids?

17             Did you ever look at that in the State of

18   Georgia?

19       MS. WHITE:  Object.  Objection to form.

20   BY THE WITNESS:

21       A.    To my knowledge, Store 146 has not been

22   one that I have needed to investigate further.

23   BY MS. DICKINSON:

24       Q.    Okay.  That's not the question I asked.  I

 1   just need -- I just asked if you had ever looked at

 2   whether that store was one of the highest volume

 3   stores in the State of Georgia during your time as a

 4   pharmacy supervisor.

 5           Did you ever look at that?

 6      A.   Again --

 7           MS. WHITE:  Object to form.  Object to form.

 8           Now you can go.

 9   BY THE WITNESS:

10      A.   Again, I look at a report as a whole.

11   That particular report additionally helps identify

12   stores that could be of concern.  And I have not, to

13   my knowledge, had 146 be, from my observation of the

14   report, be a -- an additional cause for concern.

15   BY MS. DICKINSON:

16      Q.   How do you determine what a cause for

17   concern is by looking at that report?  What are

18   reasons that you would have a cause for concern about

19   certain stores?

20           MS. WHITE:  Object to the form.

21   BY THE WITNESS:

22      A.   I'm first going to look at any stores that

23   would be highlighted and investigate those

24   coordinating colors if there were any significant

```
 1   concerns -- or I would investigate anything that was

 2   colored, rather, and look at any trend that I myself

 3   might identify.

 4   BY MS. DICKINSON:

 5        Q.   Okay.  I think we are going to look at

 6   some of those documents.

 7             Are you talking about the documents that

 8   are on the sales dashboard showing the amount of

 9   sales?

10        A.   No.

11        Q.   Okay.  All right.

12             When you are looking at what a store of

13   concern is, are you looking at the total volume coming

14   out of that store or are you looking at something

15   else?

16        MS. WHITE:  Object to form.

17   BY THE WITNESS:

18        A.   I am specifically in this scenario

19   referencing the C-II -- the monthly C-II pool report.

20   BY MS. DICKINSON:

21        Q.   Okay.  And the monthly C-II pool report

22   shows the total volume of C-IIs done by each store,

23   right?

24        A.   That is part of the data, yes.
```

 1      A.   Yes.

 2      Q.   And that was a -- that was training that
 3  was in place and set forth the procedures for
 4  controlled substance threshold increases for pharmacy
 5  supervisors, is that fair?

 6      A.   Yes.

 7      MS. DICKINSON:  Okay.  Let's put that one aside.
 8           Let's go to Tab 44.  Tab 44 we are going
 9  to mark as Exhibit 29.

10              (WHEREUPON, a certain document was
11               marked Leigh Anne Jacobson Deposition
12               Exhibit No. 29, for identification,
13               as of 11/08/2022.)

14  BY MS. DICKINSON:

15      Q.   You were involved in your time as a
16  pharmacy supervisor from 2016 to present in
17  threshold -- requests for threshold increases,
18  correct?

19      A.   I got distracted with the reading.  I
20  apologize.

21           What was the question?

22      Q.   That's okay.
23           During the time that you were a pharmacy
24  supervisor, you were involved in requests to increase

 1    thresholds for opioid controlled substances, correct?

 2         A.    I was involved in the process, yes.

 3         Q.    Okay.  And what -- what part of the

 4    process did you play as a pharmacy supervisor?

 5         A.    In reviewing if the threshold was

 6    appropriate or not would be a fair generalization.

 7         Q.    Okay.  And when you say "reviewing if the

 8    threshold was appropriate or not," does that mean the

 9    decision whether to increase the threshold was

10    appropriate or not?

11         A.    My understanding would be that my job was

12    to investigate the initial request, looking at the

13    utilization of the drug, for example, this particular

14    patient, evaluating this prescription to make sure it

15    would be one that would be appropriate to make the

16    accommodation for.

17         Q.    What did you do to investigate whether

18    that request for the -- this particular patient was

19    appropriate?  What were the things that you looked at?

20         A.    It would be difficult for me to remember

21    this one explicitly.

22         Q.    You know what, that was a bad question,

23    can I just strike that, I don't think I want you to

24    struggle to do that.

 1                What, I guess, I would rather know is when
 2    you got a request for a controlled substance threshold
 3    increase regarding opioids, did you evaluate all of
 4    the other prescriptions that came before this
 5    prescription in arriving at whether you should
 6    increase the threshold or not or just the prescription
 7    at issue?
 8        A.    So for me that would be looking at the
 9    whole usage.  One of my first questions when these
10    come up is:  Has another pharmacy closed or is
11    something going on that could be impacting an increase
12    in need clearly.  Again, a new prescriber, increased
13    growth, a pharmacy closing, et cetera.
14                Beyond that, I would historically pull a
15    Drug Utilization Report and look at the prescription
16    use of that particular drug as well to just provide
17    another set of eyes on it and make sure there wasn't
18    anything concerning for me as well.
19        Q.    What did you do to document what you were
20    looking at and the due diligence you were doing in
21    evaluating that threshold increase?
22        A.    A lot of it would have been just pulling
23    up prescriptions and looking at them through
24    Enterprise that -- forgive me, I don't know if there

```
 1   is a digital stamp for that or how that is traced,
 2   obviously with HIPAA and so forth.  And if there were
 3   questions or it concerns, I might ask the pharmacist,
 4   tell me about this prescription, help me understand.
 5   I'm also looking at those patient profiles for other
 6   medications, are we just filling opioid medications
 7   for them, because that would be a concern for me.
 8   There is a lot that goes into that, both looking and
 9   discussing with the pharmacist as well.
10        Q.    What do you do to document all of those
11   things you just talked about, where could I find that?
12        A.    Most times I would believe that I would
13   e-mail that or e-mail that I have investigated it
14   and -- and my decision either way on it.
15        Q.    Okay.  What I'm -- what I'm asking is a
16   little different.  I'm not asking about your decision,
17   e-mailing what your decision was either to approve or
18   deny.
19              What I'm asking for is where do I find
20   written down all of the things you did to investigate
21   whether the threshold change was appropriate?  Where
22   do I find that?  Where would I find that?
23        A.    I don't know that you will find it every
24   single time because I -- I guess in my training, HIPAA
```

Highly Confidential - Subject to Further Confidentiality Review
Case: 1:17-md-02804-DAP  Doc #: 5593-34  Filed: 08/20/24  11 of 16.  PageID #: 643932

 1                    REPORTER'S CERTIFICATE

 2

 3            I, JULIANA F. ZAJICEK, a Registered

 4   Professional Reporter and Certified Shorthand

 5   Reporter, do hereby certify that prior to the

 6   commencement of the examination of the witness herein,

 7   the witness was duly remotely sworn by me to testify

 8   to the truth, the whole truth and nothing but the

 9   truth.

10            I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15            I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21

22

23            *[signature: Juliana F. Zajicek]*

24            JULIANA F. ZAJICEK, Certified Reporter

P-PUB-0485

| | |
|---|---|
| **From:** | Chad Madill </O=PUBLIX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CHAD MADILL> |
| **To:** | Bart Bamberg; Leigh Anne Jacobson; Lindsay Burckhalter; Luis Medina; Mike Chavez; Stacy Burke |
| **CC:** | Chad Madill |
| **Sent:** | 6/8/2018 11:57:54 AM |
| **Subject:** | CS Threshold Training for Pharmacy Supervisors |
| **Attachments:** | CS Threshold Training for Pharmacy Supervisors.docx |



LEIGH ANNE JACOBSON EXHIBIT 28
Juliana Zajicek, CSR-11/08/2022

Team,

It's important that you review this document prior to our call on Monday.  We will discuss if you have any questions.

Thank you,

Chad Madill, PharmD, MBA
Pharmacy Operations Manager | Atlanta Division | Publix Super Markets, Inc.
Office | 770.952.6601 x31659
Fax | 863.284.3349
chad.madill@publix.com

This e-mail message and any attachment(s) are confidential, contain information intended only for the addressee(s), and may be subject to attorney-client privilege. Any retention, storage, forwarding, retransmission, publication or other use or disclosure of this message or any of its attachments by any other person is strictly prohibited. If you have received this transmission in error, please notify the sender immediately. Also, please destroy the original message, including all attachments and all copies. This e-mail does not constitute an e-signature, and by this email Publix Super Markets, Inc. does not intend to evidence a binding agreement.  Thank you.

# Controlled Substance Threshold Training for Pharmacy Supervisors

| | |
|---|---|
| **Background** | This is training for supervisors to help them understand their roles and responsibilities as they relate to Controlled Substance Ordering and Increase of Thresholds. Publix establishes controlled substance thresholds by store to ensure we are in compliance with DEA regulations, and to prevent potential diversion from suspicious ordering. New stores are set corporately with initial thresholds based on the selected model store. No action is required by the Supervisor and/or Pharmacy team for this step. |
| **Importance** | Supervisors need to understand that they are <u>held equally responsible</u> as the Pharmacist for diversion if it occurs at a store where they have approved threshold increases without conducting proper due diligence to ensure the pharmacy's compliance with DEA rules and regulations. |
| **The Process** | Stores will periodically receive threshold rejections for controls shipping from the warehouse and ABC, but the notifications will come in different formats. Please refer to the 4/18/2018 Weekly Memo for more details regarding notification of the threshold rejection. |

Once a store is notified of the rejection, the pharmacist should be the first to investigate the change in business (new patient, surrounding store closure, opening of a new Healthcare Practitioner (HCP) practice, etc). If they believe the increase to be reasonable and justifies a request for increase, a Controlled Substance Threshold Change Request should be submitted via the Publix Connection. (Path: Publix Connection → Pharmacy Operations → Ordering and Receiving Product → Controlled Substance Threshold Change Request).

This request will generate an automated email to the pharmacy, supervisor and Megan McAvoy, Manager of Procurement, Generic Trade. It is imperative that all supervisors understand that **no action is taken to increase this request until a supervisor also evaluates the business justification and provides written approval** to Megan McAvoy and the Pharmacy Operations Manager with the following *suggested* documentation:
- o (From the Performance Report in doc direct) Avg Rx/Wk % Chg YTD
- o (From the CII Monthly Pull Report): Is the pharmacy highlighted in any category or in CII Rx%? If yes, please provide detail.

*continued on next page*

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER      PUBLIX-MDLT8-00071355

# Controlled Substance Threshold Training for Pharmacy Supervisors, Continued

**Best Practices**  Below is a recap of best practices for reviewing and approving threshold increase requests:
- Please keep in mind, thresholds are based on a 30 day rolling period, not a calendar month
- Review the **product in question** and **the "why"** in the pharmacy explanation in the request
  - Does anything stand out? Is reason vague? If necessary, follow up with Pharmacist for more info.
  - Don't be afraid to ask questions and require more detailed justification
- Evaluate the **requesting pharmacist**
  - Have they properly vetted incoming Rx?
  - Are they comfortable "saying no" to patients when required?
- Review **Store Growth**
  - Review the Pharmacy Performance Report
    - Rx Count Trending
      - Increasing thresholds where Rx count growth is flat or declining should be a red flag
      - Does increase amount match store growth rate?
  - Has there been a change in overall store environment?
    - New HCP practice open?
    - Competitor closing?
    - File Buys?
- Review the monthly **CII Pull Report**
  - Pull up this store only and look for the following:
    - Is column H highlighted red? These are the top 25 stores with highest CII Rx %
    - Is the Store number in Column A highlighted yellow? Those have high dispense % in multiple categories
    - Remaining highlighted Stores in Column A are high in specific drug categories and require additional investigation

**Questions**  Please always first contact your POM if you have questions before sending an approval of which you are unsure.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                                                                           PUBLIX-MDLT8-00071356

P-PUB-0502

| | |
|---|---|
| **From:** | Leigh Anne Jacobson </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6829B32B6FB448B3AE683EEB5A15E5BC-RLAD283_9D2> |
| **To:** | Customer Care |
| **Sent:** | 7/22/2020 3:01:24 PM |
| **Subject:** | RE: Standard - Case Ref # 2695291 - PHARMACY - INITIAL |



LEIGH ANNE JACOBSON EXHIBIT 27
Juliana Zajicek, CSR-11/08/2022

I have called and spoken with Dr. Beecham on this. I have apologized and reiterated that Publix follows GA Law in these situations in that it is the pharmacists license and discretion whether to fill a prescription and we do not have extremes of not filling globally for a Dr, drug, etc. that each prescription is to be evaluated and reviewed if ok to fill.

He appreciated the follow up and the information.

Close Case.


*Thank you,*

**Leigh Anne Jacobson** | Pharmacy Supervisor  - Pharmacy Operations
Publix Super Markets, Inc.
(Phone: (770) 952-6601 ext. 31676



*This email, and any attachments, are intended solely for the use of the individual(s) to whom they are addressed. They may contain confidential information and/or protected health information (PHI) that is protected by law. If you believe you were not the intended recipient of this message, you are hereby notified that any review, dissemination, distribution, printing or copying of this email message and/or any attachments is strictly prohibited. If you have received this transmission in error, please notify the sender immediately and permanently delete this email and any attachments. If you properly received this e-mail, you should maintain its contents in confidence in accordance with applicable law.*


**From:** Customer Care <UEPCCCP@publix.com>
**Sent:** Wednesday, July 22, 2020 2:07 PM
**To:** Leigh Anne Jacobson <Leigh.Jacobson@publix.com>
**Subject:** Standard - Case Ref # 2695291 - PHARMACY - INITIAL

The following case could not be resolved by our Customer Care specialist. Please review the information below and provide the specialist with the action taken to resolve the case or provide the specialist with the information needed to respond to the customer. The case will remain open until we receive resolution from your area.

**IMPORTANT NOTE:** Please do not alter the subject line of this email as it contains the case reference number which will allow us to receive your reply.

In addition, please ensure your response is sent to Customer.Care@publix.com (either via a Reply To or forwarded to the mailbox listed) in order to guarantee receipt by Customer Care.

**CUSTOMER INFORMATION**
**Name:** Dr. Allen R. Beecham
**Address:**
**Address 2:**
**City, State & ZIP:** Holly Springs, GA  30188
**Email:** Not Available

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER  PUBLIX-MDLT8-00080521

P-PUB-0502

**Phone (Home):**
**Phone (Work):**
**Phone (Cell):** 404-213-2109
**Phone (Alt Cell):**
**Phone (Cell):** 678-661-4545 x204

## CASE INFORMATION
**Received Date:** 07/22/2020 13:28:09
**Contact Source:** Phone
**Pref. Contact Method:** Cell Phone

## ISSUE INFORMATION
**Reason:** Refuse To Fill Script
**Store:** 636 - The Centre At Woodstock
**Associate Name:** -
**Publix Digital Platform:** Not Available

**Product UPC:** Not Available
**Product Desc:** Not Available
**Item Code:** Not Available
**Summary:**
The customer is concerned with pharmacy refusing to fill prescription.

**Social Media Contact Date:** Not Available

### Verbatim - 07/22/2020 13:31:52
The customer is concerned with pharmacy refusing to fill prescription.

The patients Dr is calling to speak with the PS.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

PUBLIX-MDLT8-00080522