```
 1                 UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
 2                     EASTERN DIVISION

 3

   -----------------------------)
 4                             )
   IN RE:  NATIONAL PRESCRIPTION ) MDL No. 2804
 5 OPIATE LITIGATION            )
                               )
 6 -----------------------------) Case No. 1:17-MD-2804
                               )
 7 THIS DOCUMENT RELATES TO:    )
                               )
 8 Case Track 8                 ) Hon Dan A. Polster
                               )
 9 -----------------------------)

10

11          VIDEOTAPED DEPOSITION OF CHRIS HEWELL
                 FRIDAY, NOVEMBER 4, 2022
12
                          - - -
13
           HIGHLY CONFIDENTIAL - SUBJECTIVE TO FURTHER
14                 CONFIDENTIALITY REVIEW

15                        - - -

16

17          Remote videotaped deposition of CHRIS

18 HEWELL, commencing at 9:00 a.m., on the above date,

19 before Juliana F. Zajicek, Registered Professional

20 Reporter, Certified Shorthand Reporter and Certified

21 Realtime Reporter.

22                        - - -

23             GOLKOW LITIGATION SERVICES
           877.370.3377 ph | 917.591.5672 fax
24                 Deps@golkow.com
```

```
 1        Q.    Does that person work in the IT

 2   department?

 3        A.    I'm not sure.

 4        Q.    Besides a laptop, does Publix issue a cell

 5   phone or a tablet?

 6        MS. WHITE:  Objection to form.

 7   BY THE WITNESS:

 8        A.    Not to me.

 9   BY MR. BADALA:

10        Q.    Do you know if they issue it to other

11   Publix associates?

12        MS. WHITE:  Objection to form.

13   BY THE WITNESS:

14        A.    I'm not sure.

15   BY MR. BADALA:

16        Q.    Before you met with Bill Hammond over 20

17   times for this case, had you ever met with Bill

18   Hammond before that?

19        A.    Yes.

20        Q.    How many times over your career besides

21   the meetings for this case did you meet with Bill

22   Hammond?

23        MS. WHITE:  Objection to form.

24   BY THE WITNESS:
```

1    don't remember what my answer was.

2         THE COURT REPORTER:  I will read it back.

3              (WHEREUPON, the record was read by the

4               reporter as requested.)

5    BY THE WITNESS:

6         A.    Yeah, I think my answer was, we had

7    systems that reviewed orders and then, depending on

8    the timeframe, our pharmacy supervisors or diversion

9    analysts would have reviewed the orders.

10   BY MR. BADALA:

11        Q.    When did systems -- sorry, strike that.

12              When did pharmacy supervisors/the

13   diversion people start reviewing controlled substance

14   orders?

15        A.    I think, to be more specific, what I'm

16   referring to are flagged orders and that would have

17   been 2012 until around 2018 for supervisors.

18        Q.    So 2 -- so 2012 to 2018 is when an actual

19   person, like a pharmacy supervisor, would review only

20   flagged controlled substance orders, is that right?

21        A.    Omitted, yeah, or items of interest, yes.

22   After that time, after 2018 it -- our diversion

23   analysts would review those items of interest.

24        Q.    Now, I kept saying controlled substances

1  but at one time you said C-IIs.

2      A.    I was specifically referring to our CSOS

3  program.

4      Q.    But from 2012 to 2018, when the pharmacy

5  supervisors were only reviewing orders of interest or

6  flagged orders, were those only for C-IIs or was that

7  C-IIs and C-IIIs?

8      A.    From 2012 until 2016, there would have

9  only been for Schedule III through V because we

10  weren't shipping Schedule II controlled substances at

11  that time.  And then in 2016 it would have been for

12  Schedule II through V items of interest.

13      Q.    Now, before 2012, who was reviewing the

14  controlled substance orders?

15      A.    Those orders re -- were reviewed in our

16  systems.

17      Q.    Okay.  What system?

18      A.    Our Publix inventory management system.

19      Q.    PIMS is the other word?

20      A.    Yes.

21      Q.    So there wasn't an actual pharmacy

22  supervisor or a diversion person who was reviewing

23  flagged controlled substance orders prior to 2012?

24      MS. WHITE:  Objection to form.

1   BY THE WITNESS:

2       A.    There wasn't -- there wasn't a -- there

3   wasn't an individual that reviewed an item that was

4   reduced in size at the time.  However, we had other

5   systems in place to support the process.

6   BY MR. BADALA:

7       Q.    Okay.  So that -- I just want to make sure

8   I'm right.  Publix had systems in place prior to 2012

9   reviewing these flagged orders but not an actual

10  person, like a pharmacy supervisor or a diversion

11  person reviewing those flagged orders prior to 2012?

12      MS. WHITE:  Objection to form.

13  BY THE WITNESS:

14      A.    Can you repeat the question?

15  BY MR. BADALA:

16      Q.    Sure.

17            Prior to 2012 Publix did not have an

18  actual person, a human being, like a pharmacy

19  supervisor or a diversion person, reviewing suspicious

20  orders or orders of interest or flagged orders?

21      MS. WHITE:  Objection to form.

22  BY THE WITNESS:

23      A.    We had additional processes in place that

24  would identify where a pharmacy was potentially

1   ordering more product than they were dispensing and at

2   that point our loss prevention team would intervene.

3   BY MR. BADALA:

4       Q.    Who was part of that loss prevention team

5   prior to 2012?

6       A.    I'm not certain.

7       Q.    But one of your responsibilities was

8   regulatory from 2007 to 2012, right?

9       A.    As -- you know, part of -- yes, I

10  supported my part of regulatory, but it was a shared

11  responsibility.  That included loss prevention.

12      Q.    Okay.  And you don't know who in loss

13  prevention was doing that job?

14      A.    I don't know all of the -- no, I don't

15  know back in 2012 who was performing that analysis.

16      Q.    And those 20 plus meetings that you had

17  with your in-house counsel and outside counsel, did

18  you bring in any of these loss prevention people, were

19  they there at any of these meetings?

20      A.    I don't recall.

21      MS. WHITE:  Objection.  Objection to form.

22  BY MR. BADALA:

23      Q.    I didn't hear your answer.  I'm sorry.

24      A.    I don't recall.

1    Q.    Does it change over time?

2    A.    Yes.

3    Q.    What did it change over time to?

4    A.    I'm sorry, I think I misunderstood your

5  question.  I'm -- I understood your question to be

6  does the NDC change over time.

7    Q.    Oh, no, I'm sorry.  I thought the

8  searching capable changed over time.  So NDC for a

9  couple of years and then you had to search by line

10  item or an item number after that, but maybe I

11  misunderstood that.

12    A.    You can search by NDC and -- and that

13  really hasn't changed over time.

14    Q.    You mentioned something about reduced in

15  size.

16         Do you remember that when we were talking

17  about orders, you said they would review the orders

18  that were reduced in size?

19    A.    Yes.

20    Q.    What did you mean by that?

21    A.    Meaning the system we had in place was a

22  system that utilized ship maxes.

23    Q.    And if an order hit a threshold, would it

24  just reduce that order?

 1        A.    Right, we would not ship -- sorry.

 2        MS. WHITE:  That's okay.

 3              Object to form.

 4   BY THE WITNESS:

 5        A.    We would reduce the shipment to the

 6   appropriate maximum that we would allow to be shipped

 7   at any time.

 8   BY MR. BADALA:

 9        Q.    Okay.  And that was for controlled

10   substances as well?

11        A.    That's right, that was for controlled

12   substances and non-controlled substances.

13        Q.    Okay.  Have you actually personally ever

14   reviewed a flagged order for a controlled substance?

15        A.    Yes, I have worked with our diversion

16   analysts from time to time to look at flagged orders.

17        Q.    What years were you doing that?

18        A.    The one that came -- comes to mind would

19   be the 2018 to 2020 range, working with the diversion

20   analyst, just going through flagged orders and

21   understanding, you know, circumstances that could have

22   resulted in the flagged order or item of interest or

23   omitted order.

24        Q.    Were you being trained by these diversion

1    in 2018, right?

2         A.     That's correct.

3         Q.     So Publix didn't have diversion analysts

4    prior to 2018, is that right?

5         A.     Prior to 2018 our pharmacy supervisors

6    would be reviewing those orders.

7         Q.     The title Diversion Analyst didn't exist

8    prior to 2018, is that right?

9         A.     Not to my knowledge.

10        Q.     Okay.  If you could count, how many

11   flagged orders did you review between 2018 and 2020?

12        A.     Since it wasn't my responsibility, it

13   probably wasn't that many.  I would get questions from

14   the diversion analyst when there were -- when -- when

15   they arose.  Sometimes -- most of the time it was as a

16   result of a backorder supply when supply comes back in

17   and they would ask about recalls and supplies and

18   things like that that would cause flagged orders.

19        Q.     Okay.  So let me get this right about the

20   warehouses at Publix.  I want to make sure my

21   information is right.

22               There is a Sand Lake and a Rocket Court

23   warehouse?

24        A.     There was a Sand Lake.  We opened that in

1    to the pharmacy or not was already made in the -- in

2    the suspicious order monitoring system and so they --

3    they didn't have any -- they were only notified of

4    the -- of the omitted order.  They weren't -- in -- in

5    your question, they didn't have the ability to

6    override them at that particular time.

7    BY MR. BADALA:

8        Q.    Did they have a -- was there ever a time

9    that they could override the order of interest?

10       A.    No.

11       Q.    So who was actually determining if an

12   order was suspicious?

13       MS. WHITE:  Object to form.

14   BY MR. BADALA:

15       Q.    From 2012 to 2018?

16       A.    A pharmacy supervisor would.

17       Q.    What was the criteria they were using to

18   determine if it was a suspicious order?

19       A.    They would have to determine whether or

20   not the pharmacy was filling illegitimate

21   prescriptions or was diverting product somehow.

22       Q.    What did they do to check that?

23       MS. WHITE:  Object to form.

24   BY THE WITNESS:

1   be...

2           Were all orders of interest treated as

3   suspicious orders?

4       MS. WHITE:  Objection to form.

5   BY THE WITNESS:

6       A.   No.

7   BY MR. BADALA:

8       Q.   How were they treated?

9       A.   Just as we defined it, there were orders

10  of interest that until there was additional evidence

11  would be essentially orders of interest.

12      Q.   Okay.  So if there is an order of

13  interest, it would go to the pharmacy supervisor.

14           Can the pharmacy supervisor review that

15  order of interest and say, Actually, no problem here,

16  this order should still go out?

17      A.   If we are talking about the 2012 to 2018

18  range, the item was omitted, the order was fulfilled

19  without the item, and there was no ability for them to

20  get that item appended back to the order.

21      Q.   Even if it was just an order of an

22  interest -- interest, not a suspicious order?

23      A.   That's correct.

24      Q.   Okay.  That order of interest that was

1    Publix did not report one suspicious order between

2    2012 and 2018?

3        A.    As part of the process we -- since we

4    omitted any order of interest, there -- there was --

5    there was no chance to fulfill an order of interest

6    during that timeframe.

7        Q.    How many orders of interest were

8    identified between 2012 and 2018?

9        A.    I don't know.

10       Q.    Who would know that information?

11       A.    I believe we pulled that information as

12   part of our discovery.

13       Q.    Now, when you weren't getting any

14   suspicious orders sent to you between 2012 and 2018,

15   did you ever go to the pharmacy supervisors and say,

16   Hey, I just want to make sure my e-mail is not broken

17   here, any suspicious orders the last couple of years?

18       MS. WHITE:  Object to form.

19   BY THE WITNESS:

20       A.    No, I never had a conversation where I

21   asked a question like that.

22   BY MR. BADALA:

23       Q.    Did you ever think to yourself, Maybe I

24   have to see if these pharmacy supervisors are doing

1    outline that -- this pretty quickly, but Publix's SOM

2    system, you mentioned that they've changed over time.

3           Can you tell me what the systems were as

4    far back as you can remember, starting with the first?

5           A.    Sure.  We had our PIM system.

6           Q.    What years was the PIM system, the Publix

7    SOM system?

8           A.    That was 2006 to around -- the original

9    PIM system was around 2006 to around 2012.

10          Q.    Okay.  After PIMS, what was the next

11   system?

12          A.    We had some enhancements in PIMS between

13   2012 and we used that from 2012 to 2016.

14          Q.    Can I write down enhanced PIMS, is that

15   the right way to phrase it?

16          A.    I am referring to it as enhanced PIMS.

17          Q.    You said that was 2012 to what?

18          A.    To 2016.

19          Q.    Was there, like, a third-party system with

20   this enhanced PIMS or was it just actual enhancements

21   to PIMS?

22          A.    It was -- there was no third-party

23   solution.

24          Q.    Okay.  What's the next system?

1      A.    E-Supply Link.

2      Q.    What years was that?

3      A.    2016 until about 2020.

4      Q.    Is that a third-party vendor?

5      A.    Yes.

6      Q.    Okay.  Next?

7      A.    2020 to present would be Order Insight.

8      Q.    That's another third-party vendor?

9      A.    Yes.

10     Q.    Okay.  Are we missing any?

11     A.    No.

12     Q.    What month did Order Insight go into

13  effect in 2020?

14     A.    I don't recall.  Again, that -- the

15  responsibility for suspicious order monitoring had

16  transitioned to our regulatory and compliance

17  department and it was piloted and ultimately rolled

18  out, I don't know what month that was.

19     Q.    Why switch from E-Supply to Order Insight?

20     A.    Order Insight provided us with some

21  additional functionality that we didn't have with

22  E-Supply Link.

23     Q.    Which additional functionalities were

24  they?

1      A.    Order Insight provides -- provides for

2   some additional scrutiny of orders in regards to

3   forecasted demand.  It's -- you know, there is daily

4   thresholds, weekly thresholds, monthly thresholds on a

5   rolling cadence, so provided some additional

6   functionality there.

7      Q.    Was Order Insight second half of 2020?

8      A.    I don't know.

9      Q.    Which systems were threshold-only based?

10   MS. WHITE:  Objection to form.

11   BY THE WITNESS:

12      A.    None of our systems were threshold-only

13   based, if we are talking about the entire suspicious

14   order monitoring system.  These systems were one

15   component of our suspicious order monitoring process.

16          If we are talking about the individual

17   system itself, the enhancement PIM system utilized a

18   threshold.

19   BY MR. BADALA:

20      Q.    And then we talked about this, but 2012 to

21   2018, no suspicious orders reported, right?

22      A.    Correct.

23      Q.    Did you have a file on your folder -- oh,

24   no, strike that, actually.

1            How many suspicious orders were reported

2    between 2006 and 2012?

3        A.    I started in 2008.  I'm not aware of what

4    happened prior to 2008, but that will be part of my

5    preparation for the next deposition.

6            From 2008 to 2012 I am not aware of any

7    suspicious orders.

8        Q.    So 2008 to 2012 no suspicious orders,

9    right?

10       A.    No suspicious orders reported to the DEA.

11       Q.    So really we were talking about 2012 to

12   '18 and we were looking at this demonstrative here.

13   But actually, my demonstrative is wrong because this

14   should actually say 2008, right?

15       A.    I am not aware of any suspicious orders

16   reported between 2008 to 2018.

17       Q.    Okay.  I want to make sure we are not

18   qualifying anything.  I think you said no suspicious

19   orders were reported to the DEA.

20            Were suspicious orders reported to you

21   between 2008 and 2012?

22       A.    No.

23       Q.    Okay.  So there were no suspicious orders

24   between 2008 to 2018?

1      A.    Correct.

2      Q.    And so for ten years Publix did not report

3  a suspicious order to the DEA, is that right?

4      A.    Not that I'm aware of, no.

5      Q.    And for 2006 to 2008, who can we talk to

6  about that?

7      A.    That will be part of our preparation for

8  the suspicious order monitoring deposition.

9      Q.    Who do you plan on speaking with?

10      A.    Warehouse personnel, loss prevention

11  personnel.

12      Q.    So for ten years where there is between

13  500 and a thousand stores, these stores, half of them

14  are ordering controlled substances each day, over ten

15  years Publix does not report one suspicious order to

16  the DEA, is that right?

17      A.    From 2008 to 2018, as I mentioned before,

18  there were no reported suspicious orders.

19      Q.    But Publix was definitely distributing and

20  dispensing opioids during that time, right?

21      MS. WHITE:  Object to form.

22  BY THE WITNESS:

23      A.    Dispensing, yes, distributing, there

24  was -- when hydrocodone was rescheduled in 2014, so

1  between 2014 and 2016, we weren't distributing

2  hydrocodone and, of course, when we opened the C-II

3  vault in 2016, we began distributing hydrocodone

4  again.

5  BY MR. BADALA:

6      Q.    And -- and you told me how Publix expanded

7  hits controlled substances business in 2016 with the

8  opening of the new warehouse.

9            So even though it expanded its controlled

10  substances business in 2016, it still didn't report a

11  suspicious order between 2016 and 2018, right?

12      A.    There were no reported suspicious orders

13  reported in that timeframe.

14      Q.    And when you were talking about the

15  rescheduling, that's when Publix was buying --

16  sorry -- that's when Publix pharmacies were getting

17  opioids from companies like McKesson,

18  AmerisourceBergen, and Cardinal Health?

19      A.    Was that a question?  I'm sorry.

20      Q.    Yeah, that's -- I wanted to make sure,

21  were those the distributors that -- or the vendors

22  that Publix was using?

23      A.    Yes.

24      Q.    Okay.  Let's take a look here.

```
 1        A.     Yes.

 2        Q.     Okay.  And I want to focus, I can zoom in,

 3   here:

 4               "Order quantities of controlled substances

 5   throughout the month are aggregated and compared to

 6   the monthly threshold."

 7               Did I read that correctly?

 8        A.     Yes.

 9        Q.     "Once the monthly threshold is met, no

10   additional orders for any item in that particular

11   molecule will be shipped for the remainder of the

12   month."

13               Did I read that correctly?

14        A.     Yes.

15        Q.     What does that mean, "the particular

16   molecule," can you give me an example -- an example of

17   that?

18        A.     Sure.  As I mentioned previously when you

19   asked the question about oxycodone 5 and oxycodone 10

20   being on the same order, they are in the same molecule

21   group or family group, so that's what -- that's what

22   that's referring to.

23        Q.     But a hydrocodone and an oxycodone would

24   be a different molecule?
```

1      A.     Yes, that's correct.

2      Q.     Next it says:

3             "An email notification is sent to the

4      pharmacy and the pharmacy supervisor when the pharmacy

5      is approaching their threshold and when they have

6      exceeded the threshold."

7             Did I read that correctly?

8      A.     Yes.

9      Q.     So there is two notifications that go to

10     the pharmacy and the pharmacy supervisor and one is

11     when the pharmacy is approaching their threshold and

12     the other is when the pharmacy has exceeded the

13     threshold, right?

14     A.     Yes, I agree, that's what the document

15     says and -- yes.

16     Q.     And that's what was done at -- at Publix?

17     A.     Yes, I believe so.

18     Q.     Now, when I asked you that question

19     earlier, remember I asked you about being warned that

20     you are reaching a threshold?

21     A.     Yes.

22     Q.     You didn't say that the Publix procedure

23     was yes, warn the pharmacy and the pharmacy manager

24     that they are reaching the controlled substance

1    threshold.

2        A.    I think I mentioned I didn't recall if we

3    did that or not and that's why I said that can't be

4    true or false.

5        Q.    Okay.  But the standard, the default at

6    Publix is yes, notify the pharmacy and the pharmacy

7    supervisor when the pharmacy is approaching the

8    threshold?

9        MS. WHITE:  Object to form.

10   BY THE WITNESS:

11       A.    I believe, as I -- as I -- I have not seen

12   this document in several years and when originally

13   asked I did not recall whether or not we did or not.

14            What I can tell you is that we did not

15   provide the pharmacies their actual threshold number.

16   BY MR. BADALA:

17       Q.    Okay.  But here the document that you gave

18   the DEA and the document that the Publix employee

19   sees, it says:

20            "An email notification is sent to the

21   pharmacy and the pharmacy supervisor when the pharmacy

22   is approaching their threshold and when they have

23   exceeded the threshold."

24            Right?

1      A.    Yes.

2      Q.    I mean, this was the system at Publix at

3    least in 2015?

4      MS. WHITE:  Object to form.

5    BY THE WITNESS:

6      A.    Is that a question?

7    BY MR. BADALA:

8      Q.    Yeah, that's what I'm asking you.  I mean,

9    you told the DEA that, so that this was the procedure

10   at Publix at least in 2015, is that right?

11     A.    Yes.

12     Q.    Okay.  And we know -- well, maybe you --

13   you could tell me this a little bit better, but here

14   at the bottom there is an April 5th, 2014.

15           Do you see that?

16     A.    Yes.

17     Q.    Does that mean when this document is

18   instituted?

19     A.    I don't know if there were any earlier

20   iterations of this document.

21     Q.    And the document doesn't say, Don't tell

22   the pharmacy what their threshold number is, right, it

23   doesn't say that here?

24     MS. WHITE:  Object to form.

1   BY MR. BADALA:

2       Q.    Would you agree with me that in 2015 you

3   believed that Publix needed a more robust SOM process

4   to ship C-IIs?

5       A.    In 2015 we were undergoing our warehouse

6   expansion project.  As part of that warehouse

7   expansion project and the future consideration to ship

8   Schedule II drug -- or Schedule II controlled

9   substances, yes, I was aware that we had also wanted

10  to review our suspicious order monitoring parse --

11  process as part of that expansion.

12      Q.    Okay.  And do you agree with me that in

13  2015 you believed that Publix needed a more robust SOM

14  process to ship C-IIs?

15      A.    In 2015, as part of our culture of

16  continuous improvement at Publix, it was an

17  opportunity for us to leverage the resources that were

18  involved in the warehouse expansion to improve -- or

19  to enhance our suspicious order monitoring process as

20  well.

21      Q.    Okay.  I understand that's your testimony.

22  My question is a little more specific.

23          Did you state that Publix needed a more

24  robust SOM process to ship C-IIs?

1    more robust SOM process to ship C-IIs, okay?

2        A.    I'm suggesting that we need a more robust

3    SOM process to ship C-IIs.  I think it is important to

4    add some context to this, though, that this is shortly

5    after our previous inspection from the DEA where they

6    reviewed our existing suspicious order monitoring

7    process and -- and didn't note any deficiencies.

8        Q.    Okay.  But, sir, you used the phrase "more

9    robust," right?

10       A.    Meaning more suspicious order monitoring

11   system that was more capable or -- or had more

12   functionality.

13       Q.    Okay.  I'm just reading the words that you

14   wrote in an e-mail, you wrote those words, "more

15   robust," right?

16       MS. WHITE:  Object to form.

17   BY THE WITNESS:

18       A.    This is a communication from me to a

19   project manager to try to gain alignment to gain some

20   budget -- to -- to get a budget for us to review

21   other -- other third-party suspicious order monitoring

22   systems.

23   BY MR. BADALA:

24       Q.    Okay.  But you are not claiming that

1    loss of DEA licensure, is that right?

2        A.    I'm sorry.  Could you repeat the question?

3        Q.    The "we" here in your sentence, that's

4    Publix, isn't it?

5        A.    That's correct.

6        Q.    And we are talking about controlled

7    substances because we are talking about the SOM

8    process, is that right?

9        A.    Yes, that's correct.

10       Q.    Now, here internally to Publix you are

11   telling them, without a better solution than our

12   current, we stand the risk of regulatory fines or loss

13   of DEA licensure.

14             Did you tell that to the DEA when they

15   came and did the inspection you said just right before

16   that?

17       A.    We gave the DEA our existing process.  We

18   told them our existing process.  The fact that we

19   shipping -- you know, looking to ship additional

20   Schedule II drugs with higher ability for diversion

21   and addiction gave us the opportunity to reevaluate

22   and potentially enhance our suspicious order

23   monitoring system during this time.

24       Q.    Okay.  Sir, I'm trying to get through this

1  question for you.

2      MS. WHITE:  I don't think I have this one

3  either.

4  BY MR. BADALA:

5      Q.    Well, I only have one question and it's on

6  Bates ending in 904, and it says:

7            "Information provided by Publix showed 35

8  suspicious orders reported to DEA since September 13,

9  2019."

10           Did I read that correctly?

11     A.    Yes.

12     Q.    Were you ever made aware by Laura Slone

13  that Publix reported 35 suspicious orders since

14  September 13, 2019?

15     MS. WHITE:  Object to the form.

16  BY THE WITNESS:

17     A.    What's the -- I'm sorry.  What's the date

18  on the report?

19  BY MR. BADALA:

20     Q.    The date prepared is March 17, 2021.

21     A.    Laura Slone would not have reported that

22  information to me.

23     Q.    Okay.  Would she be the person to ask

24  about suspicious orders reported from 2019 on?

1      A.    No.  Our reporting -- the compliance

2   department supported the reporting obligations at --

3   during that time.

4      Q.    So we already established this, but Publix

5   didn't report any suspicious orders for ten years, but

6   here they've reported 35 in roughly 18 months.

7          Do you see that?

8      A.    Yes.

9      Q.    Any concern to you that maybe those ten

10  years something wasn't working correctly because no

11  suspicious orders were reported?

12     MS. WHITE:  Object to form.

13  BY THE WITNESS:

14     A.    Can you repeat the question?

15  BY MR. BADALA:

16     Q.    Sure.

17          Was there any concern by you after seeing

18  that, that in 18 months Publix reported 35 suspicious

19  orders but when you were reviewing them you only had

20  zero in ten years?

21     MS. WHITE:  Object to form.

22  BY THE WITNESS:

23     A.    We had a process during that time and

24  during that time there were no suspicious orders to

1   report.

2   BY MR. BADALA:

3       Q.    Okay.  So no concern to you, right?

4       MS. WHITE:  Object to form.

5   BY THE WITNESS:

6       A.    Again, we had a process and there were

7   no -- there was nothing -- no -- no suspicious orders

8   to report during that timeframe.

9   BY MR. BADALA:

10      Q.    Any impression that Publix had more

11  suspicious activity as of late?

12      MS. WHITE:  Object to the form.

13  BY THE WITNESS:

14      A.    Can you clarify that question?

15  BY MR. BADALA:

16      Q.    Sure.

17            Any impression that Publix had more

18  suspicious activity as of 2019?

19      MS. WHITE:  Object to the form.

20  BY THE WITNESS:

21      A.    I'm sorry, you -- you broke up a lot

22  there.  I don't see anybody else that's --

23            (Inaudible due to technical

24             difficulties.)

1       A.      Pharmacy supervisors were required to

2   ensure that the -- the threshold was legitimate and

3   that -- I'm trying to remember back to the document

4   you presented earlier, that there was no suspicious

5   activity going on at their pharmacies.

6       Q.      Okay.  And what would the pharmacy

7   supervisor do to check there was no suspicious

8   activity going on and that the threshold increase

9   request was legitimate?

10      MS. WHITE:  Objection to form.

11  BY THE WITNESS:

12      A.      Pharmacy supervisors could re -- could

13  review a multitude of different things prior to

14  approving a threshold.  We provided some data

15  analytics to them.  They had the ability from 2010 on

16  to review prescription activity in Enterprise Rx and

17  they can visit the store and review hard copy

18  prescriptions and so forth.

19  BY MR. BADALA:

20      Q.      And you expected that to be a -- a

21  thorough and comprehensive investigation?

22      MS. WHITE:  Object to form.

23  BY THE WITNESS:

24      A.      The expectation was that the pharmacist

1        A.    I -- I don't know.  I wasn't -- I don't

2    know.

3    BY MR. BADALA:

4        Q.    Would a pharmacy supervisor do that job in

5    20 seconds?

6        MS. WHITE:  Object to form.

7    BY THE WITNESS:

8        A.    I don't know.  I can't answer that

9    question.

10   BY MR. BADALA:

11       Q.    Well, you were just telling me they have

12   to go on the system, review the data, look at

13   documents at the pharmacy.  I mean, unless there is,

14   you know, a superhero, it is hard to do all of that in

15   about a minute or less, is that right?

16       MS. WHITE:  Object to form.

17   BY THE WITNESS:

18       A.    I was telling you that those are ways.

19   Our pharmacy supervisors also have an inherent

20   knowledge of their -- of their pharmacies and activity

21   in their pharmacies.  They are visiting pharmacies

22   quite on, so they -- they have a baseline knowledge of

23   pharmacy business prior to reviewing threshold

24   increases.

1                    REPORTER'S CERTIFICATE

2

3              I, JULIANA F. ZAJICEK, a Registered

4    Professional Reporter and Certified Shorthand

5    Reporter, do hereby certify that prior to the

6    commencement of the examination of the witness herein,

7    the witness was duly remotely sworn by me to testify

8    to the truth, the whole truth and nothing but the

9    truth.

10             I DO FURTHER CERTIFY that the foregoing is

11   a verbatim transcript of the testimony as taken

12   stenographically by me at the time, place and on the

13   date hereinbefore set forth, to the best of my

14   availability.

15             I DO FURTHER CERTIFY that I am neither a

16   relative nor employee nor attorney nor counsel of any

17   of the parties to this action, and that I am neither a

18   relative nor employee of such attorney or counsel, and

19   that I am not interested directly or indirectly in the

20   outcome of this action.

21

22

23             *Juliana F. Zajicek*

24             JULIANA F. ZAJICEK, Certified Reporter