```
 1                    UNITED STATES DISTRICT COURT

 2                FOR THE NORTHERN DISTRICT OF OHIO

 3                          EASTERN DIVISION

 4   IN RE: NATIONAL           *

 5   PRESCRIPTION              *    MDL No. 2804

 6   OPIATE LITIGATION         *      Case No.

 7   _____      *    1:17-MD-2804

 8   THIS DOCUMENT RELATES     *     Hon. Dan A.

 9   CASE TRACK 8              *       Polster

10

11

12

13           HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER

14                  CONFIDENTIALITY REVIEW

15                         - - -

16

17           Remote videotaped deposition of CHRIS HEWELL,

18           held via Zoom on July 25, 2023, before

19           Lois A. Robinson, Registered Diplomate

20           Reporter and Certified Realtime Reporter,

21           commencing at approximately 10:03 a.m. EST

22

23

24

25
```

1  Q        Publix distributes opioids.

2           I'm sorry.  Withdraw.

3           Publix distributes opioids.   True?

4  MS. WHITE:

5           Object to form.

6  A        Publix -- Publix distributes opioids,

7  yes.

8  MR. BADALA:

9  Q        When did Publix first start

10  distributing opioids?

11  A        That would be 2005.

12  Q        What date in 2005?

13  A        I don't have the exact date in 2005.

14  We opened our pharmacy warehouse in 2005.

15  Q        As the Publix representative, you don't

16  know the date specifically in 2005 when Publix

17  started distributing opioids?

18  MS. WHITE:

19           Object to form.

20  A        No.  I didn't memorize the date we

21  started shipping opioids.

22  MR. BADALA:

23  Q        Does Publix still distribute opioids

24  today?

25  A        Yes.

```
 1   Q          Publix has been distributing opioids in

 2   Cobb County from 2005 to the present.  True?

 3   MS. WHITE:

 4             Object to form.

 5   A          Yes.

 6   MR. BADALA:

 7   Q          These opioids include oxycodone?

 8   A          I'm sorry.  Was that a question?

 9   Q          Yes.

10   A          Can you clarify -- can you repeat the

11   question?  I'm sorry.

12   Q          Sure.

13             I was asking you about Publix

14   distributing opioids, and my follow-up question

15   is:  Those opioids include oxycodone?  Is that

16   true?

17   A          Publix didn't begin shipping oxycodone

18   until 2016.

19   Q          Does Publix still distribute oxycodone?

20   A          Yes.

21   Q          Including in Cobb County?

22   A          Yes.

23   Q          And those opioids also include

24   hydrocodone?

25   A          Yes.
```

1  Q        And what years did Publix distribute

2  hydrocodone?

3  A        That would be 2005 to 2014, when

4  hydrocodone was rescheduled, and then again in

5  2016 until present.

6  Q        All right.  Thank you.

7           Those opioids also include fentanyl; is

8  that right?

9  A        Publix began shipping fentanyl in 2016.

10  Q        Publix still distributes fentanyl

11  today?  Is that true?

12  A        Yes.

13  Q        Including in Cobb County?

14  A        Yes.

15  Q        Okay.  I'm gonna show you another

16  document.  I'll mark this Exhibit 4.

17           (DEPOSITION EXHIBIT NUMBER 4

18           WAS MARKED FOR IDENTIFICATION.)

19  MR. BADALA:

20  Q        (Zoom distortion) quick objection

21  quickly.

22           Have you seen this document, "Publix

23  Objections in Response to Topics 1 to 7, 22 and

24  23"?  Have you seen this document before?

25  A        Can you scroll through the next pages?

```
 1   Q         Sure.  It's --

 2   A         I'm sorry.  Can you slow down?

 3   Q         Yeah, I can slow down.  I can zoom out,

 4   too.  I don't know what's easier for you to see.

 5   A         Yeah.  If you don't mind zooming out,

 6   please.

 7   Q         Yeah.  Is that better?

 8   A         Yes.

 9   Q         Okay.  And you're --

10             Sorry.

11             You see it has the same topics we were

12   discussing, and then it has some objections

13   below, responses and objections.  Did you see

14   this document in preparation for your deposition?

15             I see some of these topics are the ones

16   that you listed here.  Actually, all of them, 22

17   23, and the ones we looked at in Exhibit 1.

18   A         Yes.

19   Q         Okay.  Do you see here in kind of --

20             So you've seen this document before?

21   A         Yes.

22   Q         Okay.  And you see here Publix writes,

23   "Rather, except for topic 9, Publix's witnesses

24   will limit preparation to January 1st, 2006, to

25   present"?  Do you see that?
```

```
 1   A        Yes.

 2   Q        Okay.  Now you see why I was asking you

 3   about January 1st, 2006, to the present?

 4   A        Not really.  Can you clarify?

 5   Q        Yeah.  Your -- your counsel said that

 6   you're gonna be prepared for the time period of

 7   January 1st, 2006, to the present.  See where

 8   your counsel wrote that, where Publix wrote it?

 9   A        Yes.

10   Q        Are you prepared for that today?

11   A        Yes.

12   Q        Okay.  The law requires Publix to have

13   a suspicious order monitoring system.  True?

14   MS. WHITE:

15            Object to form.  Object to the extent

16   it calls for legal opinion or expert testimony.

17            You can answer, Mr. Hewell.

18   A        I'm sorry.  Can you repeat the

19   question?

20   MR. BADALA:

21   Q        The law requires Publix to have a

22   suspicious order monitoring system.  True?

23   MS. WHITE:

24            Same objections.

25   A        The DEA requires distributors to have a
```

1    suspicious order monitoring system.

2    MR. BADALA:

3    Q        And Publix understands that that is a

4    law; is that right?

5    A        Publix understands the responsibility.

6    Q        And that responsibility has existed in

7    the time period we're discussing of January 1st,

8    2006, to the present.

9    A        Yes.

10   Q        And when Publix started distributing

11   opioids in 2005, that was also the obligation;

12   isn't that right?

13   MS. WHITE:

14            Object to form and scope.

15   A        Can you repeat the question?

16   MR. BADALA:

17   Q        Sure.

18            Even in 2005, when Publix first started

19   distributing opioids, Publix knew that it -- it

20   was required to have a suspicious order

21   monitoring system.  Isn't that right?

22   A        Yes.

23   Q        Having a suspicious order monitoring

24   system helps prevent the diversion of opioids.

25   True?

```
 1   MS. WHITE:

 2           Object to form.

 3   A       I suspect the purpose of a suspicion

 4   order monitoring system is to prevent diversion.

 5   MR. BADALA:

 6   Q       And, therefore, having one, having a

 7   suspicious order monitoring system, helps prevent

 8   the diversion of opioids.  True?

 9   MS. WHITE:

10           Object to form.

11   A       Yes.

12   MR. BADALA:

13   Q       How many suspicious orders did Publix

14   report to the DEA between January 1st, 2006, and

15   the present?

16   MS. WHITE:

17           Object to form.

18   A       I'm sorry.  Repeat the question?

19   MR. BADALA:

20   Q       How many suspicious orders did Publix

21   report to the DEA between January 1st, 2006, and

22   the present?

23   MS. WHITE:

24           Same objection.

25           Sorry.  Go ahead, Chris.
```

1    A          Give me one moment here.

2    MR. BADALA:

3    Q          And if you're looking at something,

4    just kind of indicate what you're looking at so

5    we can kind of follow along, please.

6    A          I'm on tab 31, or A-31, of materials

7    consulted.

8    Q          Okay.  Sitting here today, do you know

9    the answer to my question?

10   A          Um --

11   MS. WHITE:

12              Object to -- object to form.

13   A          I don't -- I don't know the total

14   quantity.  Give me one moment.

15              Based on my review of tab 31 and my

16   knowledge from reviewing Jennifer Warren's

17   deposition, I believe around 150 had been

18   reported in 3/2021.

19   Q          Okay.  My question was up to the

20   present.  Do you know how many, including the

21   present?

22   MS. WHITE:

23              Object to form.

24   A          I'm aware of at least 150.

25   MR. BADALA:

1          All right.  Withdrawn.

2          Fair to say, based on the responses you

3   just gave us on behalf of Publix, that from 2006

4   through 2017 Publix did not report any suspicious

5   orders to the DEA?

6   A        During that time frame, there were no

7   suspicious orders to report to the DEA.

8   Q        Therefore, Publix did not report any

9   suspicious orders to the DEA.  Is that right?

10  A        That's correct.

11  Q        And the first suspicious order that

12  Publix ever reports to the DEA is in 2018.  Is

13  that right?

14  A        Yes.

15  Q        How many suspicious orders did Publix

16  report to the DEA in 2005?

17  A        Publix didn't have any suspicious

18  orders to report to the DEA in 2005.

19  Q        Therefore, Publix did not report any

20  suspicious orders to the DEA in 2005; is that

21  right?

22  A        Yes.

23  Q        Now, out of the suspicious orders that

24  you testified --

25          Withdrawn.

```
 1              Out of the suspicious orders that

 2   Publix testified that were reported to the DEA,

 3   how many of those orders had to do with Cobb

 4   County stores?

 5   A       There were no suspicious orders

 6   reported for Cobb County stores.

 7   Q       Throughout --

 8              Now, let me get the time frame so we're

 9   on the same page.

10              From 2005 to the present, Publix has

11   never reported a suspicious order for the Cobb

12   County stores; is that correct?

13   A       Yes, that's correct.

14   Q       And you even made a note of that in

15   your -- well, the lawyers made a note of that in

16   these materials -- sorry -- in your -- your

17   notes, going back to Exhibit 2.  Do you see that

18   here, "no suspicious orders reported from Cobb

19   County stores"?

20   MS. WHITE:

21              Objection to form.

22   A       I'm sorry.  Were you -- was that a

23   question?

24   MR. BADALA:

25   Q       Yeah.  Do you see that on my screen
```

1   MR. BADALA:

2   Q        Okay.  Mr. Hewell, welcome back.  I had

3   just asked you before we went on our break about

4   PIMS.  Do you recall that?

5   A        Yes.

6   Q        Was PIMS the first suspicious order

7   monitoring system used by Publix?

8   A        PIMS was utilized to identify and flag

9   orders, yes.

10  Q        Was there any other suspicious order

11  monitoring system used by Publix before PIMS?

12  A        PIMS was the technology tool, part of

13  the suspicious order monitoring system, during

14  that time.

15  Q        Okay.  And what time period did Publix

16  use PIMS to identify suspicious orders?

17  MS. WHITE:

18           Object to form.

19  A        Can you repeat the question?

20  MR. BADALA:

21  Q        When was the first date that Publix

22  used PIMS to identify suspicious orders?

23  A        So PIMS was utilized at the beginning

24  of our distribution, and it -- yeah.  It was --

25  it was from the beginning, 2005.

```
 1   application?

 2   A         Yes.

 3   Q         Okay.  You see here Jason mentioned

 4   to -- sorry -- Jason explained to the DEA that

 5   Publix has a max -- has max ordering points?  Do

 6   you see that?

 7   A         Yes.

 8   Q         Does this refresh Publix's recollection

 9   about max ordering points and the PIMS system?

10   A         Yes.  What Jason's referring to with

11   max ordering points there is the PIMS ship max.

12   Q         Okay.  And what was the ship max based

13   on?

14   A         The ship max was a conservative maximum

15   that was a maximum shipping amount that a

16   pharmacy could order.

17   Q         So that was by store?

18   A         At this time, it was by the

19   organization.

20   Q         And when you say "the organization,"

21   what do you mean by that?

22   A         That was -- the ship max was set at the

23   organization level, not the individual store

24   level.

25   Q         All right.  So the Publix level?
```

```
 1   A          Right.  Taking into consideration store

 2   utilization, yes.

 3   Q          Okay.  I just asked you about -- we'll

 4   use your term now of ship max.  And you were

 5   talking about that it was done by store for the

 6   entire -- entirety of PIMS.  But looking at this

 7   now, is it Publix's testimony that the max

 8   ordering point was not by store and was, in fact,

 9   by the Publix warehouse?

10   MS. WHITE:

11          Object to form.

12   A          So, as I mentioned, the max ordering

13   point would take into consideration individual

14   store utilization to set that ship max, and then

15   future iterations of PIMS allowed us to set a

16   threshold by pharmacy.

17   MR. BADALA:

18   Q          When did that happen that the threshold

19   could be set by pharmacy?

20   A          That was in 2012.

21   Q          So before 2012, PIMS did not allow

22   Publix to set a threshold by pharmacy.  True?

23   A          PIMS allowed us to set a threshold for

24   all of our pharmacies, so not true.

25   Q          Okay.  Before 2012 --
```

1          Well, withdrawn.

2          You just testified "and then future

3    iterations of PIMS allowed us to set a threshold

4    by pharmacy."  Do you recall that?

5    A         Yes.

6    Q         And you said that future iteration was

7    in 2012.  Is that right?

8    A         That's right.

9    Q         So prior to 2012, PIMS did not allow

10   Publix to set up a threshold by each -- for each

11   specific pharmacy.  Is that right?

12   A         I think -- I think I need some

13   clarification.  I'm not understanding the

14   question.

15   Q         Let's use Jason's terminology, these

16   max ordering points that you see in the document

17   before you.  Do you see that?

18   A         Uh-huh.  Yes.

19   Q         That max ordering point in 2011 was not

20   based on each specific Publix pharmacy.  Is that

21   right?

22   A         As I mentioned, it's based on all store

23   utilization to determine the max ship quantity.

24   Q         All the stores taken together.  Is that

25   what you're saying?

```
 1    A          Yes.

 2    Q          Not specific store number -- and I'm

 3    just making up a store number -- 1234.

 4    A          That's correct.  It wasn't

 5    individualized by pharmacy.

 6    Q          And that was from the first date Publix

 7    started distributing opioids all the way up until

 8    about 2012.  Is that your testimony today?

 9    A          Yes.  It would have been shortly after

10    this -- this DEA inspection.

11    Q          What specific date in 2012 did that

12    change?

13    A          Give me one moment, please.

14    Q          What document are you looking at to try

15    to find that specific date?

16    A          I'm looking at A-7.  And it would have

17    been in the fourth quarter of 2012.

18    Q          Going back now to P-PUB-0210, the

19    document in front of us, Jason, he was the

20    superintendent of the Orlando distribution

21    center; is that right?

22    A          Yes.

23    Q          Okay.  He writes, "Tony (Zoom

24    distortion) contact in getting this ball rolling?

25    We would need to have some form of report that
```

1    would be viewed by pharmacy ops and flag

2    suspicious orders."

3              Did I read that correctly?

4    A        Yes.

5    Q        And this is a document kept in the

6    ordinary course of business at Publix?

7    A        I don't know what you mean by that.

8    Can you clarify?

9    Q        Sure.  It's a document produced by

10   Publix.  It's a copy of an email that was

11   actually sent to you internally at Publix on or

12   about August 1st, 2011?

13   A        Yes.

14   Q        Okay.  Still focusing on PIMS, once a

15   order was flagged by PIMS, what was the next

16   step?

17   A        An order gets flagged by PIMS, and the

18   product wasn't shipped.

19   Q        Anything else done after an order was

20   flagged?

21   A        Pharmacies and pharmacy supervisors

22   were notified of the flagged order.

23   Q        Anything else?

24   A        Again, the product wasn't shipped.  At

25   that point, the pharmacy supervisor would

1  determine whether or not the pharmacy potentially

2  needed a threshold increase or determine whether

3  or not there was activity that would warrant the

4  flagged order being deemed suspicious.

5  Q       What did Publix call that process?

6  A       I don't recall that we called -- that

7  we had a name for it.

8  Q       Could we call that due diligence or

9  investigation of the flagged order?

10  MS. WHITE:

11          Object to form.

12  A       We didn't specifically give it a name,

13  but that, you know -- we didn't -- we didn't

14  identify the process with anything.

15  MR. BADALA:

16  Q       Okay.  For the deposition today, we're

17  discussing that process.  Can we refer to it as

18  the investigation into the flagged order?

19  MS. WHITE:

20          Object to form.

21  A       I would call it part of our suspicious

22  ordering monitoring process.

23  MR. BADALA:

24  Q       Okay.  And who would perform this part

25  of Publix's suspicious order monitoring process?

1    MS. WHITE:

2            Object to form.

3    A        Can you clarify what part of this --

4    MR. BADALA:

5    Q        That's what I was trying to talk about.

6    The part where you said about the pharmacy

7    supervisor reviewing the order.

8    A        Okay.  What was the question?  I'm

9    sorry.

10   Q        From this time period of using PIMS,

11   who would review the flagged order?

12   A        So the flagged order would be sent to

13   the pharmacy supervisor and the pharmacy manager

14   or the pharmacy.

15   Q        How was it sent to them?

16   A        It was sent via email.

17   Q        Do you know what the email address was?

18   MS. WHITE:

19           Object to form.

20   A        The email address for the recipients?

21   MR. BADALA:

22   Q        The email address where it would come

23   from.

24   A        At one point, it would have come from a

25   pharmacy CS audits email.

1   Q         And you said "from one point."  So what

2   point would that be?

3   A         I don't know if that changed at all

4   during the -- the process.  That's the -- that's

5   the mailbox that I'm aware of.

6   Q         Okay.  What criteria did the pharmacy

7   supervisor or manager use for determining whether

8   the flagged order looked suspicious?

9   A         The criteria that we advised our

10  pharmacy supervisors to review is to determine

11  whether or not the pharmacy -- to review the

12  dispensing history of the pharmacies and

13  determine whether or not prescriptions that are

14  being dispensed are suspicious.

15          Or the other thing, we -- we sent out

16  monthly reporting to our pharmacy supervisors to

17  give them some trending report on their

18  pharmacies; for example, their percentage of

19  controlled prescriptions, cash pay patients,

20  et cetera.

21          And, then, one of the advantages that

22  we have to other distributors is that we're able

23  to get even more granular data, and we advised

24  our pharmacies to also review manual inventory

25  adjustment reports where pharmacies are making

1    manual inventory adjustments, with the intent

2    that our pharmacy supervisors are trying to

3    identify what a real suspicious order is; in

4    other words, an order that could potentially be

5    diverted; right?

6              So they're looking at some of these

7    metrics to determine whether or not there's

8    pilferage with manual inventory adjustments.

9    They're looking at the dispensing activity of the

10   pharmacy, and they're looking at trends and how

11   they, you know -- what their dispensing activity

12   looks like compared to other pharmacies.

13   Q        Is all of that information contained in

14   a document on your materials considered list?

15   A        I was referencing tab 20.

16   Q        Okay.  Just tab 20?

17   A        That was one document, yes.  Uh-huh.

18   Q        Okay.  Any other document that you just

19   referenced in your answer?

20   A        No.

21   Q        And it's your testimony, it's Publix's

22   testimony that everything you just listed in that

23   review occurred from the first date of

24   distribution by Publix all the way until 2016?

25   MS. WHITE:

 1              Object to form.

 2   A          No.

 3   MR. BADALA:

 4   Q          When using the PIMS system --

 5              Sorry.  Withdraw that.

 6              Was PIMS designed internally by Publix?

 7   MS. WHITE:

 8              Object to form.  Scope.

 9              Mr. Hewell, you can answer if you know.

10   A          I can't definitively answer that

11   question.

12   MR. BADALA:

13   Q          Who reviewed and approved threshold

14   changes during the PIMS period?

15   A          Pharmacies would request a threshold

16   change with their pharmacy supervisors.  Pharmacy

17   supervisors would then have the approval of

18   threshold changes.

19   Q          During the period of PIMS, was it the

20   Publix policy to notify a store if it was

21   approaching its controlled substance threshold?

22   A          Yes, at times.

23   Q          Were there ever any internal audits

24   conducted on PIMS?

25   A          Can you clarify what you mean by

1    today?

2    A        Yeah.  I didn't specifically review

3    this document.

4    Q        Okay.  And do you see on the front of

5    this document, this document talks about flagged

6    order by OrderInsite, at least on page 1?

7    A        Yes.

8    Q        It talks about step-by-step

9    documentation on how an order is flagged and

10   reviewed -- is that right? -- at least on page 1?

11   A        Sorry.  I've got a really bad copy

12   here.

13   Q        Okay.  I can zoom in.  I'm just looking

14   at this Q1.7.1.

15            This document talks about a

16   step-by-step documentation on how an order

17   flagged by OrderInsite is reviewed and cleared by

18   a pharmacy compliance analyst.  Is that right?

19   A        Yes.

20   Q        It also talks about "supporting

21   documentation is maintained in the OrderInsite

22   system internal network drives and in a summary

23   case report."

24            Do you see that?

25   A        Yes.

```
 1   A          Yes.

 2   Q          Okay.  And nationwide, that means this

 3   is for all of the Publix stores, including, if it

 4   would be on here, Cobb County stores?

 5   A          As I understand it, this is a list of

 6   all of our suspicious orders that were reported

 7   in that time frame.

 8   Q          And if there were any suspicious orders

 9   reported for Cobb County stores, they would have

10   been on this spreadsheet; is that right?

11   A          Yes.

12   Q          And, like you testified earlier, there

13   were no suspicious orders reported for a Cobb

14   County store throughout the entire time that

15   Publix has distributed opioids.  Is that true?

16   A          That's correct.  There were no

17   suspicious orders to report.

18   Q          And, therefore, none reported to the

19   DEA.  Is that right?

20   A          That's correct.

21   Q          Okay.  We are now -- that was marked --

22   that should have been Exhibit 18.  Now we're

23   gonna go to 19.

24              (DEPOSITION EXHIBIT NUMBER 19

25              WAS MARKED FOR IDENTIFICATION.)
```

1                    C E R T I F I C A T E

2

3            I do hereby certify that the above and

4    foregoing transcript of proceedings in the matter

5    aforementioned was taken down by me in machine

6    shorthand, and the questions and answers thereto

7    were reduced to writing under my personal

8    supervision, and that the foregoing represents a

9    true and correct transcript of the proceedings

10   given by said witness upon said hearing.

11           I further certify that I am neither of

12   counsel nor of kin to the parties to the action,

13   nor am I in anywise interested in the result of

14   said cause.

15

16

17

18                    _Lois Anne Robinson_
                 LOIS ANNE ROBINSON, RPR, RMR
19               REGISTERED DIPLOMATE REPORTER
                 CERTIFIED REALTIME REPORTER
20

21

22

23

24

25