Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

_____

IN RE: NATIONAL PRESCRIPTION     MDL No. 2804
OPIATE LITIGATION                Case No. 17-md-2804

This document relates to:        Judge Dan
                                 Aaron Polster

The County of Cuyahoga v. Purdue
Pharma, L.P., et al.
Case No. 17-OP-45005

City of Cleveland, Ohio vs. Purdue
Pharma, L.P., et al.
Case No. 18-OP-45132

The County of Summit, Ohio,
et al. v. Purdue Pharma, L.P.,
et al.
Case No. 18-OP-45090
_____

VOLUME I
Videotaped Deposition of Kyle J. Wright
Washington, D.C.
February 28, 2019
9:33 a.m.

Reported by:  Bonnie L. Russo
Job No. 3244302

Page 94

```
1   briefing to ABDC and you attended?
2       A.   Ma'am, I -- I really would not know
3   who gave the first one.  My recollection -- I
4   know that I attend every one.  I attended.
5   Whether I presented or not or Mr. Mapes
6   presented, unless I could see it in writing, I
7   don't know, especially in the very beginning.
8       Q.   Understood.  Okay.
9            So you attended, along with
10  Mr. Mapes, most of the early ones; is that
11  fair?
12      A.   Yes, ma'am.
13      Q.   And which one of you two actually
14  provided the briefing, between the two of you,
15  you don't recall.
16      A.   Yes, ma'am.
17           MS. MAINIGI:  Okay.  I'm going to
18  put in front of you Wright Exhibit 12.
19           (Deposition Exhibit 12 was marked
20  for identification.)
21           BY MS. MAINIGI:
22      Q.   Now, Wright Exhibit 12, is that the
23  -- does that appear to you to be the
24  presentation that was provided to Cardinal
25  Health?
```

Page 95

```
1       A.   It appears so.
2       Q.   Okay.  Now, if you take a look at
3   the cover memo, the -- there was a memo written
4   by Mr. Mapes to Mr. Rannazzisi.
5            Do you see that?
6       A.   On 12?
7       Q.   Yes.
8       A.   Yes, ma'am.
9       Q.   If you'd take a look at -- read to
10  yourself the first paragraph, please.
11           My question to you is going to be --
12  or is:  Does it appear that you did not attend
13  this particular distributor briefing to
14  Cardinal Health?
15      A.   It appears so.
16      Q.   Who does it appear attended this
17  particular briefing to Cardinal Health?
18      A.   Michael -- Michael Mapes, Vickie
19  Seeger from Office of Diversion, Mr. Trant from
20  chief counsel, and then two people from --
21  Steve Reardon and Robert Giacalone from
22  Cardinal.
23      Q.   Now, for each one of these
24  briefings, you would -- would you go through
25  the PowerPoint presentation?
```

Page 96

```
1       A.   I most certainly did.
2       Q.   Okay.  And you saw Mr. Mapes doing
3   the same thing when he did the briefing?
4       A.   Yes.
5       Q.   And then some -- time after the
6   PowerPoint presentation, would you present to
7   the distributor data that you had analyzed?
8       A.   Could you clarify data that I had
9   analyzed.
10      Q.   Sure.
11           The registrants own data, either
12  through ARCOS or some other source, that you
13  had analyzed for the purpose of the briefing.
14           Did you do that?
15      A.   Yes, ma'am.
16      Q.   Okay.  And can you describe the
17  process you went through to do that, at a high
18  level, Mr. Wright?
19      A.   I was basically looking for, you
20  know, outliers, anomalies -- and I will put
21  these two adjectives on this thing:  very
22  apparent, obviously out of the norm.
23      Q.   And you looked for these outliers
24  and the anomalies in the registrants' ARCOS
25  data?
```

Page 97

```
1       A.   Yes.
2       Q.   Did you use any other resource to
3   find these outliers and anomalies?
4       A.   Not to my recollection.
5       Q.   And I think you said earlier that
6   you continued to give these distributor
7   initiative briefings to registrants until you
8   switched over to the regulatory group?
9       A.   Yes.
10      Q.   Did you continue giving briefings of
11  this type to registrants after you switched
12  over to the regulatory group?
13      A.   Repeat, please.
14      Q.   Sure.
15           After you moved over to the
16  regulatory group in 2007 or 2008, did you
17  continue to give distributor initiative
18  briefings to registrants?
19      A.   Yes.
20      Q.   And so you continued providing these
21  distributor initiative briefings until
22  approximately what time period?
23      A.   Approximately '10 or -- '11 or --
24  probably about '11, 2011.
25      Q.   Now, the briefings that you
```

25 (Pages 94 - 97)

Page 214

1  Then once it goes through the form
2  that they report, it then has to go -- an NDC
3  number is what they report with no description.
4  When it comes to me, it's the NDC and then the
5  full description.
6      It is the registrant's DEA number.
7  That's it.  Mine is the cross-reference to the
8  CSA, which gives me -- tells me that it's a
9  pharmacy or -- or -- or whatever.
10     Once it comes to me, then the data
11 is available for our use.
12     Q.  And what was the purpose of your use
13 of the data?
14     A.  To support investigations and to
15 determine if I saw any outliers, anomalies that
16 I -- my group, my unit felt were egregious
17 enough to warrant further investigation.
18     Q.  And how would your group going about
19 -- go about determining whether they're
20 egregious enough to warrant further
21 investigation?
22         MR. BENNETT:  Object.  The witness
23 is instructed that you may not talk about
24 confidential law enforcement techniques that
25 you used.

Page 215

1      If you can answer in generalities,
2  you can answer the question.
3      I assume you're asking at a high
4  level?
5          MR. O'CONNOR:  Yes.
6          THE WITNESS:  Applying the
7  principles of Suspicious Order under the CFR.
8          BY MR. O'CONNOR:
9      Q.  Okay.  Did the employees you had
10 working for you receive any kind of training on
11 how to determine whether an order warranted
12 further investigation?
13     A.  Yes.
14     Q.  In your view, were they qualified to
15 determine whether particular orders warranted
16 further investigation?
17         MR. BENNETT:  Objection to the form.
18         THE WITNESS:  Yes.
19         BY MR. O'CONNOR:
20     Q.  Okay.  Let me talk for a minute
21 about registrants reporting obligations with
22 respect to ARCOS.
23         What were manufacturer registrants,
24 in your understanding, required to report
25 through ARCOS?

Page 216

1      A.  All activity.
2      Q.  And what do you mean by "all
3  activity"?
4      A.  Primarily what they acquired, what
5  they sold.  But also, for manufacturers, there
6  was a lot of things that occur in the
7  manufacturing process.  And those also had to
8  be reported.
9      Q.  Okay.  What about distributors; what
10 did they have to report through ARCOS?
11         MR. MIGLIORI:  Object to form.
12         THE WITNESS:  All activity.
13         BY MR. O'CONNOR:
14     Q.  And by "all activity," what do you
15 mean?
16     A.  Sales, purchases, losses, sales to
17 returns, sending it back to the manufacturer,
18 recalls.  Anything that happened with that
19 product, a -- a controlled substance, is
20 required to be reported under ARCOS, all
21 activity.
22         BY MR. O'CONNOR:
23     Q.  Okay.  So with respect to opioids in
24 particular, would the ARCOS -- would the ARCOS
25 data reflect how much bulk opioid product a

Page 217

1  manufacturer registrant purchased?
2      A.  Manufacturer bulk purchase?
3      Q.  Strike that.  Let me ask it a
4  different way.
5          With respect to opioids, would ARCOS
6  data reflect the volume of opioid product
7  purchased by a manufacturer?
8      A.  Yes.
9      Q.  Okay.  And would ARCOS data reflect
10 how many opioid tablets were sold by that
11 manufacturer?
12     A.  Yes.
13     Q.  Would ARCOS data reflect who those
14 manufacturer registrants sold the tablets to?
15     A.  Yes.
16     Q.  Would ARCOS data reflect how many
17 tablets a distributor or wholesaler purchased?
18     A.  Yes.
19     Q.  And would that ARCOS data reflect
20 which manufacturer registrant the distributor
21 or wholesaler purchased them from?
22     A.  Yes.
23     Q.  In your understanding, is there any
24 other party besides DEA that receives all of
25 that information we just discussed?

Page 262

1  ground in a distribution center that are
2  analyzing stuff as it -- as it comes into to
3  the distribution center; fair?
4      A.  Fair.
5      Q.  Kind of people and pickers kind of
6  thing, right.
7          MR. BENNETT:  Objection.  Form.
8          MR. STEPHENS:  All right.  I'll
9  strike it.
10         I think the rest of these you've
11 answered, so I'm going to not ask.
12         So I have no further questions.  I
13 apologize for taking a break right before we're
14 done.  But now we are done.
15         THE WITNESS:  Okay.
16         THE VIDEOGRAPHER:  We are off the
17 record at 5:59 p.m.
18         And This concludes today's testimony
19 given by Kyle Wright.
20         The total number of media units used
21 were five and will be retained by Veritext
22 Legal Solutions.
23         (Whereupon, the proceeding was
24 concluded at 5:59 p.m.)
25

Page 263

1        CERTIFICATE OF NOTARY PUBLIC
2      I, Bonnie L. Russo, the officer before
3  whom the foregoing deposition was taken, do
4  hereby certify that the witness whose testimony
5  appears in the foregoing deposition was duly
6  sworn by me; that the testimony of said witness
7  was taken by me in shorthand and thereafter
8  reduced to computerized transcription under my
9  direction; that said deposition is a true
10 record of the testimony given by said witness;
11 that I am neither counsel for, related to, nor
12 employed by any of the parties to the action in
13 which this deposition was taken; and further,
14 that I am not a relative or employee of any
15 attorney or counsel employed by the parties
16 hereto, nor financially or otherwise interested
17 in the outcome of the action.
18
19       _____
20         Notary Public in and for
21         the District of Columbia
22
23 My Commission expires:  June 30, 2020
24
25

Page 264

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

March 5, 2019

To: David Lee Tayman

Case Name: In Re: National Prescription Opiate Litigation v.

Veritext Reference Number: 3244302

Witness:  Kyle J. Wright      Deposition Date:  2/28/2019

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change.  Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

Page 265

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 3244302
CASE NAME: In Re: National Prescription Opiate Litigation v.
DATE OF DEPOSITION: 2/28/2019
WITNESS' NAME: Kyle J. Wright

    In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.
    I have made no changes to the testimony as transcribed by the court reporter.

_____    _____
Date                Kyle J. Wright

    Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

    They have read the transcript;
    They signed the foregoing Sworn Statement; and
    Their execution of this Statement is of their free act and deed.

    I have affixed my name and official seal

this _____ day of_____, 20____.

            _____
            Notary Public

            _____
            Commission Expiration Date