# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | ) | **MDL 2804** |
| | ) | |
| | ) | **Case No. 1:17-md-2804** |
| THIS DOCUMENT RELATES TO: | ) | |
| | ) | **Judge Dan Aaron Polster** |
| *City of Rochester v. Purdue Pharma, L.P.*, | ) | |
| Case No.19-op-45853 (Track 12) | ) | **ORDER DENYING PBMs' PARTIAL MOTION TO DISMISS** |
| | ) | |
| *Lincoln County v. Richard S. Sackler, M.D.*, | ) | |
| Case No. 20-op-45069 (Track 13) | ) | |
| | ) | |

Upon being chosen as bellwether cases, City of Rochester and Lincoln County ("Plaintiffs") sought (docket no. 5277) and were granted (docket no. 5319) leave to amend their operative complaints.[1] *See* docket nos. 5349-1 and -2 (amended complaints). The PBMs filed a Joint Motion to Dismiss these amended complaints. Docket no. 5370. Plaintiffs filed a Response (docket no. 5448) and the PBMs filed a Reply (docket no. 5495). For the reasons stated below, the PBMs' Joint Motion to Dismiss is **DENIED**.

## I.     Legal Standard.

The Court incorporates by reference the applicable legal standard set forth in its prior decision, *In re Nat'l Prescription Opiate Litig.*, MDL 2804, 440 F. Supp. 3d 773, 783–84 (N.D. Ohio 2020) (docket no. 3177 at 4–5).

---

[1]     The conduct alleged in the *Rochester* and *Lincoln County* complaints is largely identical. All references in this Order are to the **redacted** *Rochester* Supplemental and Amended Allegations ("Complaint"), case no. 19-op-45853, docket no. 110, unless otherwise indicated.

## II.    Factual Allegations.

### A. The "New Defendants."

In amending their complaints, Plaintiffs added as defendants several "new" PBM entities ("New Defendants"). Since that time, at the urging of the Court and by stipulation of the parties, several of the New Defendants have been dismissed to facilitate a more streamlined and comprehensible trial. *See* docket nos. 5535 & 5536. That said, a few New Defendant PBM entities remain, and the PBMs offer statute of limitations arguments specific to these remaining New Defendants.

Accordingly, in this Order (and presumably in future Track 12 and Track 13 Orders), when the Court refers to "PBMs," it refers only to the following PBM entities:

- The Express Scripts Defendants, which include: (1) Express Scripts, Inc. (a PBM and data analytics firm) and (2) ESI Mail Pharmacy Service, Inc. (a mail-order pharmacy). *See* Complaint ¶¶ 109–11, 119–21; and

- The Optum Defendants, which include: (3) OptumInsight, Inc. (a data analytics firm); (4) OptumInsight Life Sciences, Inc. (a data analytics firm); and (5) OptumRx, Inc. (a PBM and mail-order pharmacy). *See id.* ¶¶ 155–70.[2]

For clarity, when the Court refers to "New Defendants" below, the Court refers only to the following PBM entities: (1) ESI Mail Pharmacy Service, Inc.; (2) OptumInsight, Inc.; and (3) OptumInsight Life Sciences, Inc. The other above-listed PBM entities (Express Scripts, Inc. and OptumRx, Inc.) were named in the original complaints and so are not New Defendants.

---

[2]    The parties have indicated they may also stipulate to dismissal of OptumInsight, Inc.

**B. The PBMs' Business.**

For the purposes of this Order, the Court accepts Plaintiffs' allegations as true. Plaintiffs' Complaint alleges that "The PBM Defendants sit at the center of prescription drug dispensing because they contract with the manufacturers who make the drugs, the pharmacies who dispense them, and the third-party payors who pay for them." Complaint at ¶ 3. "PBMs such as Express Scripts and OptumRx contract with insurers, self-insured employers, and state and federal government agencies (referred to by the PBMs as their 'clients') to provide pharmacy benefit management services." *Id.* at ¶ 203.

Plaintiffs allege the PBMs exert strong influence over the prescribing, dispensing, and sales of pharmaceutical drugs through their formularies and through various drug utilization management ("UM") tools.[3] *See id.* at ¶ 10. A formulary is a regularly-updated list of approved drugs offered to pharmacy benefits plans. *See id.* The pharmacy benefits plans cover the cost of the drugs on the formulary for their beneficiaries. *See id.* In creating their formularies and UM controls, PBMs review and make determinations about the therapeutic efficacy, appropriateness, and risks of the drugs. *See id.* at ¶ 203.

Formularies are the primary tool that PBMs offer their clients to manage drug coverage and benefits to their plan beneficiaries. *See id.* at ¶ 209. Formularies "are often constructed in tiers, where drugs listed on higher tiers require larger copays," *id.* at ¶ 10, and therefore, "formulary listing [(*i.e.*, tier-placement)] affects how much a patient pays for a drug." *Id.* at ¶ 209. Utilization management programs are also used to create impediments to or checks on a patient's ability to

---

[3]     "Standard UM programs include various protocols for managing access and use of particular drugs, including: (i) step therapy, where a beneficiary is required to try a different drug or therapy first before trying the restricted drug; (ii) quantity limits, which are limits on the dosage or days' supply that a patient may receive for any given prescription(s); and (iii) prior authorizations, or ("PAs"), which are rules that require a physician to confirm that a given prescription is therapeutically appropriate before the drug is dispensed." Complaint ¶ 10.

3

receive certain restricted drugs. *See id.* at ¶ 10. The tier-placement of drugs on the formulary, and

the UM protocols imposed, thereby work to limit access to certain drugs based on therapeutic

effectiveness, appropriateness, risk, and other factors (including financial). *See id.* In that way, a

drug's placement on a PBM formulary affects the drug's accessibility to patients, which in turn

has a direct effect on prescribing and sales volume. *See id.*

PBMs and drug manufacturers negotiate UM controls and drug placement on formularies,

and this negotiation results in rebates payable to the PBM on every eligible drug dispensed. *See

id.* at ¶ 211. Plaintiffs allege that the PBM Defendants, collectively, manage prescription drug

coverage for over 160 million covered lives. *See id.* at ¶ 13. Because PBMs effectively control

drug access to these covered lives, "the PBMs have significant leverage when negotiating with

brand drug manufacturers." *Id.* at ¶ 211. The PBMs share a portion of their manufacturer rebates

with their clients and keep the rest as profit. *See id.* at ¶ 214.

PBMs also contract with pharmacies, where the plan beneficiaries' prescriptions are filled.

*Id.* at ¶ 204. Pharmacies pay PBMs "to verify coverage but also to assist the pharmacy in ensuring

that a prescription is appropriate." *Id.* Plaintiffs allege the PBMs also make money during their

dealings with pharmacies in other ways. *See id.* at ¶ 216. "One way is through money that the

PBMs earn on 'spread pricing.' Spread pricing is where a PBM will charge its client a higher price

for a prescription than what the PBM pays the pharmacy for the same drug. The PBM will then

[keep] the difference in this price spread as profit." *Id.*

Plaintiffs allege the PBMs also make money through their ability to aggregate pharmacy

claims data across manufacturers, patients, pharmacies, and payers, and then selling this vast

quantity of data to opioid manufacturers and third-party vendors. *See id.* at ¶¶ 42–43. PBMs also

dispense opioids for profit when they operate mail-order pharmacies. *See id.*

4

### C. Alleged Bad Conduct.

Plaintiffs allege that, because of their unique position in the pharmaceutical market, the PBMs had the power to ***control and limit*** the flow of opioids into Plaintiffs' communities, but instead colluded with opioid manufacturers to: (1) give favorable formulary placement to, (2) prevent UM restrictions of, and (3) thereby ***increase accessibility and sales volume*** of branded opioid drugs. *See, e.g., id.* at ¶¶ 11, 14, 36. Plaintiffs also allege the PBMs worked with opioid manufacturers to advance the fraudulent and deceptive marketing of opioids drugs. *See, e.g., id.* at ¶ 89. Specifically, Plaintiffs allege:

> The PBM Defendants' conduct that drove the increases and led to oversupply [of opioids] included: (a) colluding with, and aiding and abetting, Purdue Pharma and other opioid manufacturers in the fraudulent and deceptive marketing and oversupply of opioids; (b) colluding with Purdue Pharma and other opioid manufacturers to increase opioid sales through favorable placement on national formularies in exchange for rebates and fees; (c) colluding with Purdue Pharma and other opioid manufacturers to eliminate or limit utilization management measures on national formularies that would have restricted opioid prescribing; (d) deliberately failing properly and diligently to implement effective drug utilization review measures after undertaking to do [so]; (e) electing not to act on the vast stores of information they had about the epidemic to limit the flood of opioids into communities across the Unites States, including Plaintiff's Community; and (f) dispensing huge quantities of prescription opioids through their mail-order pharmacies without proper controls against diversion.

*Id.* at ¶ 3.

Plaintiffs assert the following causes of action:[4]

- First Claim for Relief—Creation of A Public Nuisance.
- Second Claim for Relief—Violation of Federal Civil Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.*; 1964(C).
- Third Claim for Relief—Negligence and Gross Negligence.
- Fourth Claim for Relief—Deceptive Acts and Practices: New York General Business Law § 349.

---

[4]     Plaintiff also initially included a Sixth Claim for Relief—Violation of New York Social Services Law § 145-B—but subsequently voluntarily withdrew that claim. *See* Response at 1 n.3.

5

- Fifth Claim for Relief—False Advertising: New York General Business Law § 350.[5]

## III.    Analysis

The PBMs advance four arguments for dismissal of Plaintiffs' claims.[6] First, they assert Plaintiffs' RICO claims are time-barred by the statute of limitations—if not against all PBM Defendants, then at least against the New Defendants. Second, the PBMs assert Plaintiffs' RICO claim fails as a matter of law because Plaintiffs failed to allege an injury to business or property, as required by the RICO statute. Third, the PBMs assert Rochester's state-law claims are time-barred as against the New Defendants. And fourth, the PBMs assert Rochester's state-law claims fail as a matter of law for failing to allege a direct injury. As set forth below, the Court concludes each of these arguments is not well-taken, at least in the context of a motion to dismiss.

### A. RICO Statute of Limitations.

The RICO Act, 18 U.S.C. §§ 1961-68, does not include a statute of limitations. *See Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 155 (1987) ("RICO itself includes no express statute of limitations for either civil or criminal remedies"). However, it is now well-established that RICO claims are subject to a four-year statute of limitations. *Id.* at 156. In *Rotella v. Wood*, the Supreme Court clarified the accrual rules for a civil RICO claim, holding that under the so-called "injury discovery" rule, RICO claims accrue when the plaintiff "knew or should have known of [its] injury." 528 U.S. 549, 553-55 (2000); *see also Sims v. Ohio Cas. Ins. Co.*, 151 F.

---

[5]    The NY statutes are only alleged in the Rochester Complaint. The PBMs did not seek dismissal of any of Lincoln County's state-law claims. *See* Response at 1 n.1.

[6]    The PBMs' motion advances five arguments for dismissal; however, due to agreements between the parties, *see* docket nos. 5535 & 5536, the PBMs' fifth argument (that the Court should dismiss the claims against the parent company defendants for the acts of their subsidiaries) is now moot and not addressed in this Order.

App'x 443, 435 (6th Cir. 2005) ("The four-year period begins to run when a party knew, or through exercise of reasonable diligence should have discovered, that the party was injured by a RICO violation.") (citing *Rotella*, 528 U.S. at 549).

The PBMs argue Plaintiffs' RICO claims are time-barred, pointing to allegations in the amended complaints indicating Plaintiffs knew or should have known of their alleged injuries long before 2015—the earliest year, according to the PBMs, that Plaintiffs could have discovered a RICO injury and still come within the four-year statute of limitations for their 2019 complaints. Motion at 6–7. The PBMs point out, for example, that Plaintiffs allege Purdue Pharma, one of the PBMs' alleged fellow members of the "Formulary and UM Enterprise," "pleaded guilty to federal charges with respect to OxyContin" in 2007. Motion at 7; Complaint at ¶ 40. The PBMs also highlight this allegation:

> As a direct result of the PBM Defendants' and Purdue's coordinated efforts, opioid use and abuse escalated to epidemic levels by the mid-2000s, devastating communities across the country, including Plaintiff's Community. Plaintiff has been dealing with the public health crisis caused by the PBM Defendants' misconduct for the past two decades.

Motion at 6; Complaint at ¶ 33.

Plaintiffs deny their RICO claims are time-barred and offer five different reasons. First, Plaintiffs assert their RICO claims *for equitable relief* are "exempt from the operation of a limitations period." Response at 2 (quoting *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4194296, at *5-*6 (N.D. Ohio Sept. 4, 2019 (docket no. 2568 at 9-11)). Second, they argue that, insofar as "any predicate acts of Enterprise members took place within the applicable limitations period and caused plaintiffs additional harms, Plaintiffs' RICO claims seeking damages for such harms are timely under the separate-accrual rule." *Id*. at 3–5. Third, Plaintiffs maintain their claims are timely under *Rotella's* injury discovery rule—they "could not have reasonably discovered their

7

injuries until recently," because they only learned key, non-public facts during discovery in this MDL. *Id*. at 5–6. Fourth, Plaintiffs argue their claims are tolled under the fraudulent concealment doctrine. *Id*. at 6–7. And fifth, Plaintiffs argue their claims against the New Defendants are timely because "equitable tolling applies to preclude dismissal of these claims." *Id*. at 7–9. Each of these arguments is examined below.

### 1. Plaintiffs' RICO Claims for Equitable Relief.

The Court first addresses Plaintiffs' argument that their RICO claims for equitable relief are exempt from the statute of limitations. The PBMs acknowledge this Court has previously so held. *See* Reply at 7 (citing *Opiate Litig.*, 2019 WL 4194296, at *6 (docket no. 2568 at 11), where the Court held that Track One "Plaintiffs' RICO claims for equitable relief, like those brought under the Clayton Act, and like public nuisance claims, are exempt from the operation of a limitations period."). However, PBMs point to a subsequently-decided case where the Fourth Circuit joined the Fifth and Ninth Circuits in holding that RICO does not provide equitable relief to private plaintiffs. *Hengle v. Treppa*, 19 F.4th 324, 356 (4th Cir. 2021); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir. 1988); *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084 (9th Cir. 1986).

The *Hengle* case cited by PBMs, however, does not change the Court's earlier analysis. When this Court rejected the Track One defendants' argument that equitable relief is unavailable under RICO, it noted the circuit split on this question. *Hengle* merely confirms the split, and this Court remains of the opinion that the "Circuit cases undertaking deeper analysis conclude RICO does provide equitable relief." *Opiate Litig.*, 2019 WL 4194296, at *6 (docket no. 2568 at 11). In the absence of a Sixth Circuit opinion joining the Fourth, Fifth, and Ninth Circuits, the Court finds

no reason to vary from its prior ruling that RICO claims for equitable relief are viable and are exempt from the operation of a limitations period.

## 2. Separate Accrual Rule.

Plaintiffs assert their RICO claims for damages resulting from predicate acts that took place within the four-year statute of limitations period are timely under the separate accrual rule.[7] *See* Response at 2–3. "Under this rule, each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred." *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1105 (2d Cir. 1988). "A corollary [to the separate accrual] rule is that damages may not be recovered for injuries sustained as a result of acts committed outside the limitations period." *Grimmett v. Brown*, 75 F.3d 506, 512 (9th Cir. 1996) (quoting *State Farm Mut. Auto. Ins. Co. v. Ammann*, 828 F.2d 4, 5 (9th Cir.1987)). Under the separate accrual rule, Plaintiffs must allege "the commission of a separable, new predicate act within a 4-year limitations period," and show that the "new act could have caused them harm over and above the harm that the earlier acts caused." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) (citations omitted).

Although several circuits have adopted the separate accrual rule,[8] neither the Supreme Court nor the Sixth Circuit have expressly adopted the rule in the civil RICO context. *See Baltrusaitis v. Int'l Union United Auto., Aerospace & Agric. Implement Workers of Am.*, 86 F.4th

---

[7] For the City of Rochester, the limitations period applicable to the PBM defendants named in the original complaint began on June 5, 2015. For Lincoln County, the period began on October 24, 2015. For the New Defendants added by amendment, the RICO statute of limitations period began on December 15, 2019 for both City of Rochester and Lincoln County. *See* Response at 3 n.7.

[8] *See, e.g., McCool v. Strata Oil Co.*, 972 F.2d 1452, 1465 (7th Cir. 1992), *as amended-in-part on reh'g* (Oct. 26, 1992) ("Following the First, Second, Eighth, Ninth, Tenth and Eleventh Circuits, we also apply a 'separate accrual' rule to civil RICO claims.").

1168, 1178 (6th Cir. 2023); *see also Klehr*, 521 U.S. at 190. The Sixth Circuit has, however, "applied the separate-accrual rule in the analogous Clayton Act context." *Baltrusaitis*, 86 F.4th at 1178 n.2 (citing *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996)). Several District Courts in this Circuit have also applied the separate accrual rule to civil RICO claims. *See* Response at 3 n.8 (collecting cases). This Court joins these opinions, including those issued by fellow judges here in the Northern District of Ohio,[9] in applying the rule in the civil RICO context.

The PBMs argue that, even if this Court were to apply the separate accrual rule to Plaintiffs' claims, Plaintiffs have failed to adequately allege "separable, new predicate acts;" instead Plaintiffs "merely rehash decades-old conduct that has allegedly ***continued into the limitations period***." Reply at 2 (emphasis added). This argument actually supplies a basis for the Court to apply the separate accrual rule to Plaintiffs' RICO claims, in the context of a motion to dismiss. The PBMs expressly concede Plaintiffs have ***alleged*** the PBMs' injurious conduct "continued into the limitations period."

Upon a full evidentiary record, Plaintiffs will still have to demonstrate that the predicate acts that "continued into the limitations period" are separable from acts that took place before, and that injuries allegedly caused by those acts constitute new harms "over and above" any the Plaintiffs sustained prior to the limitations period. Further, under the corollary to the separate accrual rule, Plaintiffs will only be able to recover for those injuries that accrued within the statute of limitations. *See Solidstrip*, 2024 WL 1177968, at *10.  At this juncture, however, Plaintiffs' allegations suffice to defeat the PBM's motion to dismiss.

---

[9]    *See Solidstrip Inc. v. U.S. Tech. Corp.*, No. 5:21-CV-0731, 2024 WL 1177968, at *10 (N.D. Ohio Mar. 18, 2024).

In sum, the Court concludes Plaintiffs have plausibly alleged the PBMs and other members of the alleged "Formulary and UM Enterprise" committed acts within the limitations period that caused Plaintiffs additional harm. The PBMs' can raise this issue again on summary judgment if there is insufficient evidence to support separability of acts or injury. As described below, however, Plaintiffs also plausibly allege various tolling doctrines that *may* permit them to recover for conduct and injuries prior to the limitations period.

### 3. The Injury-Discovery Rule.

In *Rotella*, the Supreme Court settled a circuit split over what is the appropriate "basic rule" for when the limitations period is triggered in a civil RICO action. 528 U.S. at 553. In 1985, Rotella was treated for major depression in a psychiatric clinic. *Id*. at 551. He was discharged in 1986. *Id*. In 1994, the clinic's parent company and one of its directors pleaded guilty to "charges of criminal fraud perpetrated through improper relationships and illegal agreements between the company and its doctors." *Id*. Rotella became aware of the plea agreement that same year, and filed a civil RICO claim in 1997, alleging the doctors and the clinic had "conspired to admit, treat, and retain him . . . not for any medical reason but simply to maximize their profit." *Id*. at 552. The district court dismissed Rotella's claim on statute of limitations grounds and the Fifth Circuit affirmed, rejecting Rotella's argument that the limitations period begins to run only once the "claimant discovers, or should discover, both an injury *and a pattern of RICO activity*." *Id*. at 553 (emphasis added).

The Supreme Court affirmed, rejecting the "injury *and pattern* discovery" rule and clarifying that the civil RICO limitations period begins to run when a plaintiff "knew or should have known *of his injury*." *Id*. (emphasis added); *see also Sims*, 151 F. App'x at 435 ("The four-year period begins to run when a party knew, or through exercise of reasonable diligence should

11

have discovered, that the party was injured by a RICO violation") (citing *Rotella*, 528 U.S. at 549). A principal reason the Supreme Court chose the "injury discovery" rule, instead of the "injury and pattern discovery" rule, was to incentivize a plaintiff who learns of his injury to promptly consider its cause. *Id*. at 556–59 (citing *Malley-Duff*, 483 U.S. 143 at 151) (civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate").

Although the *Rotella* Court left no doubt that the "injury discovery" rule was the "basic rule," it also took care to acknowledge there are cases where the facts necessary to allege a RICO violation are difficult to uncover. "In rejecting pattern discovery as a basic rule, we do not unsettle the understanding that federal statutes of limitations are generally subject to equitable principles of tolling, and where a pattern remains obscure in the face of a plaintiff's diligence in seeking to identify it, equitable tolling may be one answer to the plaintiff's difficulty." *Id*. at 560–61 (citations omitted).

Here, unlike the petitioner in *Rotella*, Plaintiffs allege they did not and could not have reasonably discovered their injuries until recently, because "documents revealing those facts had not yet been produced in discovery in the opioid litigation and were not publicly or otherwise available." Response at 5–6; Complaint at ¶ 694. Taking Plaintiffs' allegations as true, and without the benefit of a full factual record, the Court is unable to conclude under the injury discovery rule that Plaintiffs' RICO claims accrued for statute of limitations purposes before 2015 (four years before Plaintiffs filed their complaints). Accordingly, at this juncture,[10] the Court must overrule PBMs' argument that Plaintiffs' claims are time-barred because they knew or should have known of their injury in 2015.

---

[10]        After discovery, however, if the facts support it, PBMs may reassert in a motion for summary judgment their argument that Plaintiffs' RICO claims fail because Plaintiffs should have discovered their injury before 2015.

That said, the Court does not rest its decision on the timeliness of Plaintiffs' claim solely on this ground. Even if their claims accrued earlier than 2015, Plaintiffs also have recourse to equitable tolling principles, as the Court next discusses.

### 4. Fraudulent Concealment.

Plaintiffs argue their claims are tolled under the fraudulent concealment doctrine. "The RICO statute of limitations is tolled if the plaintiff properly invokes the fraudulent concealment exception." *Solidstrip*, 2024 WL 1177968, at *5 (citing *Iron Workers Loc. Union No. 17 Ins. Fund & its Trustees v. Phillip Morris Inc.*, 29 F. Supp. 2d 801, 808 (N.D. Ohio 1998)). "In order for Plaintiff's delay in filing to be excused due to Defendants' fraudulent concealment, Plaintiff must affirmatively plead with particularity: '(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts.'" *Reid v. Baker*, 499 F. App'x 520, 527 (6th Cir. 2012) (quoting *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975)).

"[C]ourts should not dismiss complaints on statute-of-limitations grounds when there are disputed factual questions relating to the accrual date." *Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 839 F.3d 458, 464 (6th Cir. 2016). Examples of disputed factual questions "include claims that the defendant fraudulently concealed facts, thereby preventing the plaintiff from learning of its injury, . . . and complex issues about whether information in the plaintiff's possession sufficed to alert it of the claim." *Id.* (citations omitted). In Track One, this Court ruled the plaintiffs "alleged facts sufficient to raise a plausible inference that the applicable limitations periods" were subject to tolling on a fraudulent concealment theory, where: (1) the plaintiffs

alleged defendants had concealed certain key matters, and (2) even though the plaintiffs were aware of other facts also giving rise to their causes of action. *See In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2018 WL 6628898, at *3 (N.D. Ohio Dec. 19, 2018) (docket no. 1203 at 3-4) (plaintiffs allegedly knew of defendants' false marketing practices, but did not know and could not have known of other material elements of defendants' alleged misconduct).[11]

Here, in support of their fraudulent concealment argument, the Plaintiffs have alleged "Defendants undertook active efforts to deceive or mislead Plaintiff and to purposefully conceal their unlawful conduct." Complaint at ¶ 695. Plaintiffs allege these efforts included "misrepresenting their role in the pharmaceutical market as promoting safe use and appropriate opioid dispensing;" "[falsely] assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse;" "hiding the true nature of their relationships with the Opioid Manufacturers;" "entering into overly broad confidentiality agreements with any entity in the supply chain with whom they contracted;" and "suing governmental and other entities to block the release of details in their agreements with the Opioid Manufacturers and pharmacies." *Id.* at ¶ 696.

Plaintiffs further allege the PBMs "concealed from Plaintiff the existence of Plaintiff's claims by misrepresenting to the public, as well as to their [own] clients," that they were designing their formularies and UM programs "based on the health and safety of the public and of the lives

---

[11]    The PBMs point to *Baltrusaitis*, which quoted a Seventh Circuit articulation of the test for equitable tolling due to fraudulent concealment: "[I]n a RICO case, the plaintiff must both use due diligence to discover that he has been injured and by whom even if the defendant is engaged in fraudulent concealment." 86 F.4th at 1178 (quoting *Jay E. Hayden Found. V. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010)). The PBMs argue this language means "Plaintiffs must allege that Defendants had prevented Plaintiffs from *knowing that they had been injured*; concealment of Defendants' alleged actions or pattern of conduct is not enough." Motion at 7 (emphasis in original). The PBMs offer no authority for their interpretation of the quoted language from the Seventh Circuit, and the Court does not agree with it. For example, a plaintiff may have diligently discovered it was injured by Purdue Pharma, but (due to fraudulent concealment) be unable to ascertain, despite continued diligence, its injury was also caused by a conspiring PBM. Accordingly, this argument is not well-taken.

covered by the benefit plans that were their clients." *Id*. at ¶ 699. Plaintiffs allege the PBMs made these representations "in client contracts, on Defendants' websites, in publications and in Congressional testimony." *Id*.

Moreover, Plaintiffs allege the PBMs' mail order pharmacies concealed from regulators, patients, clients, and Plaintiffs "the fraudulent nature of their relationship with the Opioid manufacturers;" "their intention to ignore their contractual [concurrent drug utilization review] obligations;" their "intent to make formulary and Utilization Management decisions that failed to limit the medically unnecessary and inappropriate prescribing, sales, or dispensing of prescription opioids or address misuse, abuse, and diversion;" and "the true nature of the association between each member of each PBM Enterprise." *Id*. at ¶ 700. Finally, Plaintiffs allege the PBMs "created the false and misleading impression to regulators [and others] . . . that they rigorously carried out their legal duties, including their duty to implement effective controls against diversion and to exercise due diligence to prevent the dispensing of opioids prescriptions that are illegitimate and/or likely to be diverted." *Id*. at ¶ 781. Taking these allegations as true, as the Court must at this stage of the litigation, the Court concludes the Plaintiffs have plausibly pleaded the PBMs' engaged in "wrongful concealment of their actions." *Reid v. Baker*, 499 F. App'x at 527.

The Plaintiffs have also adequately pleaded "the failure of the plaintiff to discover operative facts that are the basis of [its] cause of action." *Id.* For example, Rochester alleges it "did not learn that it had been injured by Defendants' actions, the source of those injuries, or that those injuries were part of a pattern of conduct until only recently, until documents revealing those facts were produced in discovery by various entities in [this MDL] and other opioids litigation." Complaint at ¶ 694. Rochester further alleges "these documents—and the facts they contain—have never before been made public, nor have they ever before been in Plaintiff's possession, and not

15

otherwise available to Plaintiff before being produced in discovery." *Id*. These allegations meet the second requirement of fraudulent concealment.

The third requirement for fraudulent concealment, that "the plaintiff exercised due diligence in seeking out facts supporting a cause of action," *Reid v. Baker*, 499 F. App'x at 527, is not as fulsomely pleaded as the first two; still, the allegations are sufficient. Plaintiffs allege that, "despite Plaintiffs' due diligence, Defendants wrongfully prevented Plaintiffs from learning of Defendants' misconduct, Plaintiffs' injuries, and the related pattern of racketeering." Response at 6. The complaint alleges "Plaintiff did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact of Plaintiff's Community, and could not have acquired such knowledge earlier through the exercise of reasonable diligence;" and "Plaintiff and Plaintiff's Community did not have the means to know the truth, due to Defendants' actions and omissions." Complaint at ¶¶ 701, 702. Plaintiffs allege that, until they obtained discovery from other defendants in this MDL, it was not possible to know of the PBMs' role in fomenting the opioid crisis or causing the Plaintiffs' injuries, and Plaintiffs' counsel' diligence in MDL discovery only recently revealed the PBMs' role. *See id.* at ¶¶ 91, 694, 701, 741.

The Court concludes that, at this stage of the litigation, Plaintiffs have adequately pleaded the due diligence requirement of the fraudulent concealment doctrine.  After discovery, however, if the facts support it, PBMs may reassert in a summary judgment motion their argument that Plaintiffs fail to meet the due diligence requirement of the fraudulent concealment doctrine.

Accordingly, as it has done repeatedly in the course of this litigation, the Court declines to dismiss Plaintiffs' claims on statute of limitations grounds at this early stage. *See Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013) ("a motion under Rule 12(b)(6), which considers only the allegations in the complaint, is an 'inappropriate vehicle' for dismissing

a claim based upon a statute of limitations") (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)).

### 5. The New Defendants.

The PBMs assert that, "[e]ven assuming that Plaintiffs' RICO claims against all Defendants are not time-barred, Plaintiffs' RICO claims against the New Defendants are indisputably untimely, are not subject to relation back or tolling, and should be dismissed." Motion at 8.

In response, Plaintiffs reassert two arguments addressed above: (1) their RICO claims seeking equitable relief are not time-barred; and (2) their RICO claims for damages resulting from predicate acts that took place within the limitations period are not time-barred. Response at 7. The Court incorporates and applies its analysis and rulings from Sections III.A.1 and 2 above to the New Defendants. As stated, RICO claims for equitable relief are exempt from the operation of a limitations period and, therefore, are not dismissed with respect to the New Defendants. Further, application of the separate-accrual rule works to permit Plaintiffs to recover for separable, new predicate acts that occurred within four years of the date Plaintiffs added the New Defendants to their complaints, so long as Plaintiffs can show "how any new act could have caused them harm over and above the harm that the earlier acts caused." *Klehr*, 521 U.S. at 190.

In addition to these arguments, Plaintiffs also assert that a combination of equitable tolling, discussed below, and the fraudulent concealment doctrine, discussed above, apply together to toll the statute of limitations for the New Defendants. Response at 7–8. Specifically, Plaintiffs maintain that: (1) the fraudulent concealment doctrine applies to Plaintiffs' RICO claims, tolling the statute of limitations until 2019, when Plaintiffs filed their first complaint; and (2) the equitable tolling doctrine applies to further toll the statute of limitations to 2024, when Plaintiffs amended their

17

complaint to add the New Defendants. The Court concluded above that Plaintiffs prevail on the first prong of this argument (at least at this stage of the litigation), so the Court now examines the second prong.

"The doctrine of equitable tolling is read into every federal statute, and the decision to grant equitable tolling 'lies solely within the discretion of the trial court.'" *Betts v. Cent. Ohio Gaming Ventures, LLC*, 351 F. Supp. 3d 1072, 1075 (S.D. Ohio 2019) (quoting *Baden-Winterwood v. Life Time Fitness*, 484 F. Supp. 2d 822, 826 (S.D. Ohio 2007)). "Equitable tolling allows a federal court 'to toll a statute of limitations when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control.'" *Jackson v. United States*, 751 F.3d 712, 718 (6th Cir. 2014) (quoting *Robertson v. Simpson*, 624 F.3d 781, 783 (6th Cir. 2010)). "Circumstances allowing equitable tolling are rare and courts have extended this relief only sparingly." *Opiate Litig.*, 2019 WL 4194296, at *11 (docket no. 2568 at 19) (citing *Ata v. Scutt*, 662 F.3d 736, 741 (6th Cir. 2011)).

> Equitable tolling has two elements. First, the party seeking to toll limitations "must establish 'that he has been pursuing his rights diligently.'" *Hall v. Warden, Lebanon Corr. Inst.*, 662 F.3d 745, 749 (6th Cir. 2011) (quoting *Holland v. Florida*, 560 U.S. 631, 632 (2010)). Second, the party must show "that some extraordinary circumstance stood in his way and prevented timely filing." *Hall*, 662 F.3d at 749; *accord Credit Suisse Securities (USA) v. Simmonds*, 566 U.S. 221, 227 (2012) (discussing equitable-tolling principles).

*Id.* at *10 (docket no. 2568 at 18–19).

"[E]xtraordinary circumstances by themselves do not merit tolling. Rather, a petitioner must show that the circumstances actually caused him to miss the deadline." *Mann v. United States*, 2023 WL 3479402, at *2 (6th Cir. May 16, 2023), *cert. denied*, 144 S. Ct. 550 (2024) (citing *Hall*, 662 F.3d at 750–51); *accord Ata*, 662 F.3d at 742. Whether a circumstance is extraordinary such that it warrants equitable tolling is a fact-intensive inquiry. *See Holland*, 560 U.S. at 649–51.

18

Here, Plaintiffs assert that this Court's moratorium on substantive filings constituted an extraordinary circumstance, beyond Plaintiffs' control, that prevented them from adding the New Defendants to their complaints prior to the expiration of the four-year statute of limitations—as extended by the fraudulent concealment doctrine described above. The PBMs respond that the Court's moratorium is a common case management feature, not an extraordinary circumstance.[12] The PBMs also warn that, "if a court-imposed moratorium alone could justify the extraordinary remedy of equitable tolling, any court would have the power to indefinitely suspend a statute of limitations." Reply at 7. Without citing any law to support it, the PBMs firmly assert "[t]hat is not the law." *Id.*

The Court finds, however, that its moratorium on substantive filings in this MDL does constitute an extraordinary circumstance for the purpose of equitable tolling. The Court's moratorium was a legal order that completely foreclosed Plaintiffs' ability to timely amend their complaints. *See In re Nat'l Prescription Opiate Litig.*, case no. 1:17-MD-2804, 2024 WL 3387357, at *2 (N.D. Ohio Feb. 20, 2024) (docket no. 5319 at 3) ("the PBM Bellwether Plaintiffs had no earlier opportunity to amend their PBM Bellwether complaints with PBM-specific claims or to add PBM-specific entities"); *see also id.* at *1 ("At *all* other times, no MDL plaintiff could amend its complaint without first being selected as a bellwether.") (emphasis in original).  These Plaintiffs

---

[12] In an earlier order in this MDL, the Court declined to apply a universal, rebuttable presumption that equitable tolling would permit plaintiffs to add additional defendants as of the filing date of their original complaints. *See* July 13, 2018 Order Regarding Modification of CMO-1 (docket no. 739). The Court concluded it would "determine whether equitable tolling applies in a particular case if and when that issue becomes ripe." *Id.* at 8.  Later, in Track One, the Court declined to apply equitable tolling based on the facts presented in a motion for summary judgment. *See Opiate Litig.*, 2019 WL 4194296, at *12 (docket no. 2568 at 20) (concluding "Plaintiffs have not submitted evidence establishing they met their burden on the first element of equitable tolling"—that is, diligent pursuit of their rights). The circumstances in this case, and the procedural context of the argument within a motion to dismiss, require a different result.

could not add claims against the New Defendants between 2019 and 2024 because the Court forbid it.

It is true that extraordinary circumstances are frequently analyzed in the context of a plaintiff being unable, despite all due diligence, to obtain vital information bearing on the existence of its claim. *See Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990); *Billups v. Officer Kyle Scholl*, 2016 WL 3959062, at *7 (S.D. Ohio July 22, 2016). But case law shows extraordinary circumstances have also been created by the Court, itself. *See Betts v. Central Ohio Gaming Ventures*, LLC, 351 F. Supp. 3d 1072, 1076–77 (S.D. Ohio 2019) ("An excessive delay on the part of the court constitutes an 'extraordinary circumstance' beyond the plaintiffs' control" and "equitable tolling helps ensure that plaintiffs are not 'penalized due to the courts' heavy dockets.'") (citing *Jackson v. Bloomberg, L.P.*, 298 F.R.D. 152, 170 (S.D.N.Y. 2014)). In the unusual, idiosyncratic circumstances presented here, the Court's own moratorium order prevented Plaintiffs from timely filing claims against New Defendants any earlier.[13]

The only question that remains is whether Plaintiffs exercised due diligence in pursuing their amendments. Plaintiffs observe that, given the Court's moratorium, it was selection of their cases as bellwethers that provided the earliest opportunity to amend. Plaintiffs assert that, "following their selection as PBM Bellwether Plaintiffs, they promptly moved to amend their complaints." Response at 9. The PBMs respond that Plaintiffs had ample opportunity to at least *try* to amend their complaints before then, but they did not even make an attempt. The PBMs insist,

---

[13] The New Defendants also argue the Plaintiffs could have amended their complaints to add claims against them when the Court briefly lifted its moratorium in 2018. Reply at 6–7. But the Court "lifted its moratorium [in 2018] for the sole purpose of allowing MDL plaintiffs to amend their complaints ***based upon the ARCOS data***," *Opiate Litig.*, 2024 WL 3387357, at *1 (emphasis added), which did not and could not reveal any basis for adding the New Defendants. A subsequent order authorizing a short form complaint as a means for amendment "for matters both relying on and beyond the ARCOS data" was "a one-size-fits-all solution" that did not encompass New Defendants, *id.*, and does not change the Court's balancing of the equities.

for example, that Plaintiffs could have sought leave from the moratorium before being chosen as bellwethers. Reply at 6–7. The simple fact is, however, that some Plaintiffs did seek leave from the moratorium, but the Court never granted it. *See, e.g., Opiate Litig.*, 2024 WL 3387357, at *1 n.2.

The Court concludes that Plaintiffs acted with reasonable diligence in pursuing amendment of their complaints to add the New Defendants and did so promptly at their first opportunity.[14] "The diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'" *Holland*, 560 U.S. at 653 (internal citations omitted). Accordingly, pursuant to this Court's equitable powers, the Court finds Plaintiffs' RICO claims against the New Defendants are properly tolled and thus not barred by the statute of limitations.

### B. Business or Property Requirement.

The RICO Act includes a provision that permits a civil RICO suit by "[a]ny person injured in his business or property by reason of" RICO's substantive provisions. 18 U.S.C. § 1964(c). If a defendant "engages in a pattern of racketeering activity in a manner forbidden by these provisions, and the racketeering activities injure the plaintiff in his business or property, the plaintiff has a claim under § 1964(c)." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985). The Supreme Court has reminded lower courts that "the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations omitted).

---

[14] The Court also notes that, during several status conferences over the years, the PEC regularly (if informally) took the Court's temperature on lifting its moratorium to permit MDL plaintiffs to move to their amend complaints. Until recently, *see* docket no. 5455, the Court always demurred.

Plaintiffs allege four broad categories of injuries: (1) extraordinary costs to provide additional public services; (2) forced participation in the consumer market to purchase naloxone; (3) diminished property values; and (4) lost tax revenue. *See* Response at 14. The PBMs assert two reasons why each of Plaintiffs' alleged injuries fail to satisfy the RICO statute's requirement that injury must be to a plaintiff's "business or property." First, the PBMs assert "Plaintiffs cannot rely on quasi-sovereign budgetary injuries such as (1) increased expenditures or (2) reduced tax revenues." Motion at 14. The PBMs also argue "Plaintiffs fail to allege that they were injured as (3) real property owners or (4) consumer market participants." *Id.* If Plaintiffs adequately plead even one category of injury, then the PBMs' motion must be denied. For the reasons below, the Court concludes the PBMs' arguments fail.

### 1. Budgetary Injuries.

This Court previously addressed in Track One the RICO statute's "business or property" provision, as it applies to the municipalities' alleged budgetary injuries. *See In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2018 WL 4895856, at *5–*10 (N.D. Ohio Oct. 5, 2018) (docket no. 1025 at 11–22), *adopted in relevant part, In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2018 WL 6628898, at *7–*10 (N.D. Ohio Dec. 19, 2018) (docket no. 1203 at 12–20). Since then, as it has repeatedly said it would, the Court has assiduously stood by those prior rulings. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 763 (N.D. Ohio 2020) (docket no. 3253 at 12) ("Nothing in the parties' briefs convinces the Court to revisit any of its prior analysis of the applicable RICO standard."); *see also* Order Denying CT7 MTD (docket no. 3767 at 2) ("the Court has already carefully reviewed, considered, and rejected all of the Pharmacy Defendants' arguments listed above and hereby does so again by incorporation of its prior rulings on those

arguments."); Order Resolving PBM CMO Disputes (docket no. 5268 at 2) ("the Court intends to rely heavily on its prior rulings."). In the present motion, however, the PBMs ask this Court to reconsider its earlier RICO opinions.

In seeking reconsideration, the PBMs rely heavily on Judge Breyer's opinion in *City & County of San Francisco v. Purdue Pharma L.P.*, 491F. Supp. 3d 610, 648 (N.D. Cal. 2020). Judge Breyer, citing *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), disagreed with this Court's conclusion that municipal entities "might be able to assert an injury to their property based on the expenditure of money plus something else." *Opiate Litig.*, 2018 WL 6628898, at *10 (docket no. 1203 at 19).

In *Canyon County*, the Ninth Circuit held that, "[w]hen a governmental body acts in its sovereign or quasi-sovereign capacity, seeking to enforce the laws or promote the public well-being, it cannot claim to have been 'injured in [its] . . . property' for RICO purposes based ***solely*** on the fact that it has spent money in order to act governmentally." 519 F.3d at 976 (emphasis added). In Track One, this Court reasoned that the Ninth Circuit's "[u]se of the word 'solely' implies that governmental entities might be able to assert an injury to their property based on the expenditure of money plus something else—perhaps, for example, the assumption of a statutory burden relinquished by a defendant." *Opiate Litig.*, 2018 WL 6628898, at *10 (docket no. 1203 at 19) (punctuation changed).

In his *San Francisco* opinion, Judge Breyer disagreed with this Court's interpretation of *Canyon County*. Judge Breyer held that "*Canyon County* established that governmental entities cannot assert a RICO claim based on expenditures or services provided in their sovereign or quasi-sovereign capacities." *San Francisco*, 491F. Supp. 3d at 650 (citing *Canyon County*, 519 F.3d at 976–77). In support of this conclusion, Judge Breyer relied on language from another recent Ninth

23

Circuit opinion, *City of Almaty v. Khrapunov*, 956 F.3d 1129 (9th Cir. 2020). Judge Breyer writes: "in *City of Almaty v. Khrapunov*, [the Ninth Circuit explained] that in '*Canyon County*, . . . [the court] decided that a government's expenditures on healthcare and policing services are not an injury to business or property because the government does not have a property interest in the services it provides to enforce law and promote public welfare.'" *San Francisco*, 491 F. Supp. 3d at 650 (quoting *City of Almaty*, 956 F.3d at 1133).

Despite these recent opinions by Judge Breyer and the Ninth Circuit, this Court will stand by its prior decisions, for two reasons. First, as this Court stated, and Judge Breyer acknowledged, "Defendants . . . have not identified any Supreme Court or Sixth Circuit case directly on point with the facts of this case." *Opiate Litig.*, 2018 WL 6628898, at *9 (docket no. 1203 at 17); *accord San Francisco*, 491F. Supp. 3d at 649 ("While the MDL court suggested that the extraordinary costs, 'scope[,] and magnitude' of the opioid epidemic could create cognizable RICO injuries, it was following Sixth Circuit precedent."). This Court's prior opinions relied on Sixth Circuit law, and nothing has changed.

Second, *Canyon County* relied upon analogy to the municipal cost recovery rule to conclude that increased expenditures for public services alone are insufficient to create RICO standing. But this Court finds that the rationale underpinning the creation of various widely-recognized common-law exceptions to the municipal cost recovery rule actually supports this Court's conclusion.

"The 'municipal cost recovery rule,' also called the 'free public services doctrine,' is a common-law rule which provides that, absent specific statutory authorization or damage to government-owned property, a county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services." *Opiate Litig.*, 2018 WL

24

4895856, at *8 (docket no. 1025 at 17) (quoting 32 A.L.R.6th 261 (originally published in 2008)).

The Track One Report and Recommendation, adopted in relevant part by this Court, provides a

lengthy discussion of the municipal cost recovery rule's application to RICO's "business or

property" provision under both Sixth and Ninth Circuit precedent. *See id.* at *8–*10 (docket no.

1025 at 17–22). The two Circuits interpret the provision differently, with the Sixth Circuit adhering

more closely to RICO's admonishment of liberal construction.[15]

Further, the *Canyon County* decision cites to *City of Flagstaff v. Atchison, Topeka & Santa

Fe Ry.*, for its discussion of the municipal cost recovery rule, and acknowledges there are

exceptions to the rule. 719 F.2d 322 (9th Cir.1983). "We did, [in *City of Flagstaff*,] however,

recognize several exceptions to the 'municipal cost recovery rule,' including exceptions allowing

municipal recovery 'where it is authorized by statute or regulation' and 'where the acts of a private

party create a public nuisance which the government seeks to abate.'" *Canyon County*, 519 F.3d

at 974 (citing *City of Flagstaff* 719 F.2d 322).[16] Judge Breyer did not address the Ninth Circuit's

analysis of the municipal cost recovery rule and its exceptions in his opinion.

In reciting the exceptions, the Ninth Circuit was explicit: "This is not to say that a

governmental entity may never recover the cost of its services. . . . These cases fall into distinct,

---

[15] Specifically, the Track One R&R explains that, in interpreting RICO's business or property provision, the Sixth Circuit looks to statutory purpose, while the Ninth Circuit looks to state property laws. *See also Miller v. York Risk Servs. Grp.*, 2013 WL 6442764, at *3 (D. Ariz. Dec. 9, 2013) ("The [Sixth Circuit, in *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556 (6th Cir. 2013) (*en banc*)] concluded that the definition of the term 'business or property' under RICO 'depends on federal statutory purpose,' not necessarily state law[,] . . . but in the Ninth Circuit what constitutes property under RICO is typically determined by looking to state law"), *adopted*, 2013 WL 11739992 (D. Ariz. Dec. 19, 2013).

[16] This Court notes that *City of Flagstaff* offers a third exception not cited by *Canyon County*: "[W]here the government incurs expenses to protect its own property." *City of Flagstaff*, 719 F.2d at 324 (citing *United States v. Chesapeake & Ohio Railway Co.*, 130 F.2d 308 (4th Cir.1942)) (recovery allowed for expenses incurred in fighting fire which threatened national forest)). In *U.S. v. Chesapeake & Ohio Ry*, the Fourth Circuit held that "[a] person whose legally protected interests have been endangered by the tortious conduct of another is entitled to recover for expenditures reasonably made or harm suffered in a reasonable effort to avert the harm threatened." 130 F.2d at 310 (citing 4 Restatement, Torts § 919 (1939)).

well-defined categories unrelated to the *normal* provision of police, fire, and emergency services. *City of Flagstaff*, 719 F.2d at 324 (emphasis added). As this Court has explained, the Opioid Epidemic has become untethered from the *normal* provisions of services. Instead, it has required an unprecedented and extraordinary provision of services in order to abate a public nuisance, which many courts have concluded falls into its own well-defined exceptional category.

Specifically, an exception to the municipal cost recovery rule may occur when a persistent course of intentional misconduct creates an unprecedented strain on municipal budgetary resources in a way that cannot reasonably be anticipated—requiring ongoing expenditures to abate a public nuisance, as opposed to remediation of a single-event accident. These well-defined exceptions to the municipal cost recovery rule are versions of this Court's "plus factor," and provide further support for its conclusion. Put differently, a governmental entity may assert an injury to its business or property based on the expenditure of money to provide additional services *plus*, for example: (1) authorization by statute to do so; (2) necessity to abate a public nuisance; (3) protection of its property; or (as this Court and several others have found) (4) "an ongoing and persistent course of intentional misconduct [that] creates an unprecedented, man-made crisis that a governmental entity plaintiff could not have reasonably anticipated as part of its normal operating budget for municipal . . . services." *In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2019 WL 3737023, at *8 (N.D. Ohio June 13, 2019) (docket no. 1680 at 14); *see also, State ex rel. Jennings v. Purdue Pharma L.P.*, No. CV-N18C-01-223-MMJ-CCLD, 2019 WL 446382, at *6 (Del. Super. Ct. Feb. 4, 2019) ("The Court finds that the municipal cost recovery rule does not apply in this case. In five separate

26

courts, and in the multi-district federal litigation based in Ohio, judges have rejected the notion that the municipal cost recovery rule bars recovery for public costs.").[17]

Considering all of the foregoing, and based upon the record before it, and in the absence of binding precedent to the contrary, the Court is not persuaded to reconsider its prior opinions.

### 2. Real Property Ownership and Consumer Market Participation.

The PBMs next assert Plaintiffs have not adequately alleged injury to their business or property in their roles as (1) real property owners or (2) consumer market participants.

In *San Francisco*, Judge Breyer concluded that recognizing a business or property theory of damages for the city's participation in the naloxone market would "blur the distinction between recoverable proprietary harms and unrecoverable governmental harms." *San Francisco*, 491 F. Supp. 3d at 652. Because this Court continues to recognize a cognizable RICO injury for at least some governmental expenditures, the Court will also stand by its prior rulings that Plaintiffs' forced expenditures for naloxone represent a cognizable RICO injury. *See Opiate Litig.*, 2018 WL 6628898, at *10 (docket no. 1203 at 20).

Finally, with respect to Plaintiffs' alleged injury due to lost real property value, the PBMs assert that, although Plaintiffs do generally allege they suffered diminished property values, Plaintiffs fail to identify specifically any affected real property. *See* Motion at 18. Plaintiffs

---

[17]     *Accord Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002) ("Unlike the train derailment that occurred in the *Flagstaff* case, which was a single, discrete incident requiring a single emergency response, the misconduct alleged in this case is ongoing and persistent."); *City of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568 (Mass. Super. Ct. 2000) ("What each of these cases has in common is that the acts causing the damage were of the sort the municipality reasonably could expect might occur, and each of the results was a discrete emergency. . . . [I]n those cases there is no evidence that the specific defendants had engaged in a repeated course of conduct causing recurring costs to the municipality."); *In re Opioid Litigation*, 2018 WL 3115102 (N.Y. Sup. Ct., Jun. 18, 2018). ("[A] review of the current state of the law revealed no case law supporting the Manufacturers' contention that such rule bars recovery for municipal expenses incurred, not by reason of an accident or an emergency situation necessitating 'the normal provision of police, fire and emergency services,' but to remedy public harm caused by an intentional, persistent course of deceptive conduct.") (citations omitted).

respond that their real property injury allegations are sufficient to survive a motion to dismiss, and argue that identifying specific property is analogous to alleging a specific amount of damages, which is not required at this stage of the proceeding. *See Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.*, 262 F.3d 260, 265 (4th Cir. 2001) ("the language of § 1964(c) . . . confers RICO standing on 'any person injured in his business or property,' not any person who can quantify the amount of the injury.").

The Court concludes that, **at this stage of the litigation**, Plaintiffs' allegations of lost property value plead an injury to business or property with particularity sufficient to satisfy Rule 9(b). Plaintiffs will be required to identify specific properties in discovery and must eventually prove the PBMs' conduct caused the value of those properties to diminish. The PBMs, of course, are entitled to mount a defense on any of these points, including that "such claims may, after discovery, be too speculative." *Opiate Litig.*, 2018 WL 4895856, at *11 n.18 (docket no. 1025 at 24 n.18). But those defenses can best be analyzed after a full factual record has been developed.[18] *See id*.

Accordingly, Plaintiffs have sufficiently alleged their RICO claim and may proceed on this cause of action.

### C. NY State-Law Statutes of Limitation.

The PBMs seeks dismissal of Rochester's state-law claims against the New Defendants on the ground that the three-year statutes of limitations for those claims have passed. Rochester's

---

[18]   This ruling, permitting Plaintiffs to proceed on a damages theory of lost property value, follows what this Court has done in prior case tracks. *See Opiate Litig.*, 2018 WL 4895856, at *11, *22 (docket no. 1025 at 24, 48), *adopted-in-relevant part*, *Opiate Litig.*, 2018 WL 6628898, at *10 (docket no. 1203 at 20) (allowing claims for damages for lost property values to proceed past a motion to dismiss).

original complaint was filed on June 5, 2019—more than three years prior to its 2024 amendment. Therefore, the PBMs assert, Rochester's state-law claims against the New Defendants are untimely on their face. All of Rochester's state-law claims are subject to a three-year statute of limitations. *See* Motion at 20–22. Rochester does not dispute the timing of the statutes of limitations, but instead argues that the limitations periods relate back to the filing of its original complaint, or alternatively, are tolled by either New York's continuing wrong or equitable tolling doctrines.

### 1. Public Nuisance.

Under New York law, a claim for public nuisance is subject to a three-year statute of limitations for **damages**. *See Robert H. Law, Inc. v. Woodbine Bus. Park, Inc.*, 2018 WL 851382, at *26 (N.D.N.Y. Feb. 12, 2018). However, a claim seeking equitable relief to abate or enjoin a public nuisance does not require compliance with the statute of limitations. *See Stanton v. Town of Southold*, 698 N.Y.S.2d 258, 259–60 (N.Y. App. Div. 2d Dept. 1999).

Accordingly, to the extent Rochester is seeking *equitable remedies* for the alleged public nuisance, the nuisance claim survives. To the extent Rochester seeks *monetary damages* for injuries caused by or related to the alleged public nuisance, that claim is subject to the same, three-year statute of limitations as Rochester's other state-law claims, which is analyzed below.

### 2. Continuing Wrong Doctrine.

New York law permits tolling of a statute of limitations in circumstances where a wrong or a series of wrongs are considered continuing or ongoing. "[I]n New York, '(d)espite the general principle that a cause of action accrues when the wrong is done, regardless of when it is discovered, certain wrongs are considered to be continuing wrongs, and the statute of limitations, therefore, runs from the commission of the last wrongful act.'" *Leonhard v. United States*, 633 F.2d 599, 613

(2d Cir. 1980) (quoting N.Y. C.P.L.R. 203 (McKinney 1972)). "New York's continuing tort doctrine does not extend the limitations period for [all] continuing pattern[s] of tortious conduct, but rather is limited to certain recognized torts that involve continuing harm." *Elliott v. City of New York*, 2024 WL 1119275, at *5 (S.D.N.Y. Mar. 14, 2024) (quoting *Lucas v. Novogratz*, 2002 WL 31844913, at *7 (S.D.N.Y. Dec. 18, 2002)). "The continuing wrong doctrine applies to a variety of types of cases including breach of contract, breach of fiduciary duty, and statutory violations." *People by Underwood v. Trump*, 88 N.Y.S.3d 830, 837 (N.Y. Sup. Ct. 2018).

New York courts have applied the continuing wrong doctrine to cases of nuisance, certain instances of negligence,[19] and statutory claims, including consumer protection laws.[20] The doctrine applies

> where the harm sustained by the complaining party is not exclusively traced to the day when the original objectionable act was committed. The rule is based on the principle that continuous injuries create separate causes of action barred only by the running of the statute of limitations against each successive trespass. The repeated offenses are treated as separate rights of action and the limitations period begins to run as to each upon its commission.

*Capruso v. Vill. of Kings Point*, 16 N.E.3d 527, 531 (N.Y. 2014) (quoting *Covington v. Walker*, 819 N.E.2d 1025 (N.Y. 2004), *cert. denied*, 545 U.S. 1131, (2005)). "Where there is a series of continuing wrongs, the continuing wrong doctrine tolls the limitation period until the date of the

---

[19]     In New York, the continuing wrong doctrine applies to negligence actions where the defendant has an ongoing duty. *See 461 Broadway, LLC v. Vill. of Monticello*, 42 N.Y.S.3d 419, 421 (N.Y. App. Div. 3d Dept. 2016) ("'[T]he breach of this ongoing duty is the 'event' that forms the basis for the claim" for purposes of [a claim of negligence].' Thus, defendant's negligence . . . constitutes a continuing wrong that gives rise to a new cause of action for each injury that occurred. Plaintiff's recoverable damages, however, are limited 'to those caused by the alleged unlawful acts sustained within [the limitations period] preceding the date of filing of the notice of claim.'") (citations omitted); *see also Sniper v. City of Syracuse*, 530 N.Y.S.2d 374, 376 (N.Y. App. Div. 4th Dept. 1988) (applying the continuing wrong doctrine where the "duty is a continuing one and is separate and apart from the duty not to create a dangerous condition").

[20]     *See Harvey v. Metro. Life Ins. Co.*, 827 N.Y.S.2d 6, 6 (N.Y. App. Div. 1st Dept. 2006) (applying continuing wrong doctrine to GBL § 349 claim); *Ring v. AXA Financial, Inc.*, No. 0111869/2004, 2008 WL 692564, at *3 (N.Y. Sup. Ct. Feb. 06, 2008) (same).

commission of the last wrongful act." *Palmeri v. Willkie Farr & Gallagher LLP*, 69 N.Y.S.3d 267, 271 (N.Y. App. Div. 1st Dept. 2017). However, the doctrine limits the amount of damages that can be recovered to those harms that occurred within the limitations period prior to the commencement of the action. *See People by James v. JUUL Labs, Inc.*, 181 N.Y.S.3d 537, 541 (N.Y. App. Div. 1st Dept. 2023); *Kearney v. Atl. Cement Co.*, 33 A.D.2d 848, 849 (N.Y. App. Div. 3d Dept. 1969).

Accordingly, Rochester's claims operate in the same way—and are subject to the same analysis—as the separate accrual rule addressed in Section III.A.2. of this order. *See, e.g., In re Opioid Litigation*, No. 4000002017, 2018 WL 4827862, at *14 (N.Y. Sup. Ct. July 17, 2018) ("While [defendants] claim that the plaintiffs knew they were experiencing increased costs relating to the epidemic more than three years prior to the commencement of this action, this bears only on the extent of the plaintiffs' recovery, the plaintiffs having alleged a continuing wrong in allowing the counties to be flooded with suspiciously large amounts of opioids.").[21] As stated above, Rochester has plausibly alleged the PBMs' conduct has continued for each of these state-law claims, at least into the three-year limitations period.

Accordingly, damages for Rochester's state-law claims against the New Defendants are limited to the three years prior to amendment of their complaint—to the extent the claim is not subject to relation back or equitable tolling, analyzed below.

---

[21]     *See also In re Opioid Litigation*, 2019 WL 2996570, at *6 (N.Y. Sup. Ct. June 21, 2019) ("That such a nuisance may have existed for more than three years, then, does not bar the cause of action; as before, however, the court notes that damages are recoverable only to the extent they were sustained during the three years prior to the commencement of each action.").

### 3. Relation Back.

Federal Rule of Civil Procedure 15 covers relation back of amended pleadings. As relevant to this discussion, it provides: "An amendment to a pleading relates back to the date of the original pleading when the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A).

### a. Application of Federal or State Law.

As this Court has previously noted, application of Rule 15 in the Sixth Circuit is clear. *See* July 13, 2018 Order Regarding Modification of CMO-1 (docket no. 739 at 5) ("The Sixth Circuit has held that when an amendment adds a new party who will be jointly liable with the original party—as opposed to an amendment that substitutes a party—the amendment will not relate back."). Plaintiffs do not challenge that the addition of the New Defendants does not relate back for the purpose of their ***federal*** claims. *See* Response at 7 n.18 (conceding the Court's ruling). Plaintiffs assert, however, that under Rule 15(c)(1)(A), relation back of their ***state-law*** claims is properly governed by the New York law that provides the applicable statute of limitations—that is, Article 2 of New York's Civil Practice Law and Rules ("CPLR"). In their Reply, the PBMs urge the Court to instead follow the Sixth Circuit's precedent for federal relation back and cite *Simmons v. S. Cent. Skyworker's, Inc.*, for the following rule: "[T]he question of whether an amendment relates back to the date of the original complaint is a question of federal procedure not controlled by state law even in a diversity case." 936 F.2d 268, 270 (6th Cir. 1991).

PBMs' reliance on *Simmons*, however, is misplaced. The Advisory Committee Notes to the 1991 Amendment to the Federal Rules are clear: "Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided

in this rule, it should be available to save the claim." Fed. R. Civ. P. 15, Advisory Comm. Notes, 1991 Amend. (citing. *Marshall v. Mulrenin*, 508 F.2d 39 (1st Cir. 1974)); *see also* Wright & Miller, Fed. Prac. & Proc. Civ. § 1503 (3d ed.) ("Whatever doubts existed about the ability to apply state law to allow relation back when the federal rule would not were eradicated with the amendment of Rule 15(c) in 1991.").

The *Simmons* opinion was issued before the 1991 Amendment became effective, and relies on Supreme Court precedent, *Schiavone v. Fortune*, 477 U.S. 21 (1986), which the Rules Advisory Committee expressly rejected. *See* Fed. R. Civ. P. 15, Advisory Comm. Notes, 1991 Amend. ("If *Schiavone v. Fortune*, 106 S.Ct. 2379 (1986) implies the contrary, this paragraph is intended to make a material change in the rule."); *see also Powell v. Bolton Square Hotel Co.*, 2010 WL 1855756, at *4 (N.D. Ohio May 10, 2010) ("*Simmons* and *Schiavone* have been effectively overruled for 19 years on this issue."). Accordingly, this Court will apply New York law regarding relation back to Rochester's state law claims.[22]

### b. New York Limitations Law.

In New York, the relation back doctrine "enables a plaintiff to correct a pleading error— by adding either a new claim or a new party—after the statutory limitations period has expired. The doctrine thus gives courts the 'sound judicial discretion' to identify cases 'that justify relaxation of limitations strictures . . . to facilitate decisions on the merits' if the correction will not cause undue prejudice to the plaintiff's adversary." *Buran v. Coupal*, 661 N.E.2d 978, 981

---

[22]  The Court acknowledges that Sixth Circuit case law on the issue of whether relation-back is governed by state or federal law "is not a model of clarity." *Rose v. Lake Cumberland Reg'l Hosp., LLC*, 2021 WL 7286277, at *4 (E.D. Ky. Sept. 30, 2021) (noting there are three lines of cases). This Court follows the "line of cases reason[ing] that the 1991 amendments to Rule 15 superseded the previous case law." *Id*. at *5.

(N.Y. 1995). New York's Highest Court recently clarified New York law on relation back. In *Nemeth v. K-Tooling*, the Court of Appeals explained:

> The relation back doctrine applies when (1) the claims arise out of the same conduct, transaction or occurrence; (2) the new party is "united in interest" with an original defendant and thus can be charged with such notice of the commencement of the action such that a court concludes that the party will not be prejudiced in defending against the action; and (3) the new party knew or should have known that, but for a mistaken omission, they would have been named in the initial pleading.

224 N.E.3d 513, 516 (N.Y. 2023). The PBMs do not argue whether Rochester meets the first or third prongs, but dispute only that the New Defendants are united in interest with the original PBM Defendants.

In this case, the first prong is easily satisfied. Rochester's claims all arise out of the same conduct, transaction, or occurrence. With respect to the third prong, the *Nemeth* Court clarified that the failure to add a new party cannot be "a deliberate, informed litigation strategy to gain tactical advantage," *id.*, but the mistake in adding the new party also need not be excusable error— it can be "a simple oversight or a mistake of law." *Id.* at 519. "The [relation back] doctrine focuses on the notice and prejudice to the added party." *Id.* at 516. Here, Rochester has alleged it did not know and could not have known of the New Defendants' role in the opioid crisis until recently, when it began receiving discovery in this MDL, *see* Complaint at ¶ 694. And this Court has found that prejudice to the New Defendants is minimal. *See Opiate Litig.*, 2024 WL 3387357, at *3 (docket no. 5319 at 5–6).

Regarding the unity-of-interest prong, the *Nemeth* Court provided: "To determine whether this second prong of the relation back test is met, it is not necessary for the parties to be joint contractors or have a joint interest; we look to whether the parties' interest 'in the subject-matter is such that they stand or fall together and that judgment against one will similarly affect the

34

other.'" *Id.* at 521 (quoting *Prudential Ins. Co. v. Stone*, 200 N.E. 679 (N.Y. 1936)). Further, 'where one defendant 'may' have a defense which is not available to the other, they cannot be said to be united in interest." *Connell v. Hayden*, 443 N.Y.S.2d 383 (N.Y. App. Div. 2d Dept. 1981) (citing *Stevens v Young*, 272 App. Div. 784, 785 (1947)).

The PBMs assert "[t]he New Defendants . . . face different theories of liability for different conduct . . . and have different legal and factual defenses than the original PBM Defendants." Reply at 12. Rochester responds the PBM Defendants are all united in interest because: (1) "[e]ach New Defendant is a subsidiary and/or affiliate of at least one Original PBM Defendant, and many of them share a principal place of business with an Original PBM Defendant;" (2) "Original PBM Defendants Evernorth and UHG also control the enterprise-wide policies that inform all of their respective subsidiaries' businesses (including the New Defendants), and Rochester includes other veil-piercing allegations in its Amended Complaint;" and (3) "each New Defendant is represented by the same counsel as its related Original PBM Defendants." Response at 18.

New York Courts have found corporate entities to be united in interest when "[t]he record establishes [the] entities were closely interrelated, centrally controlled, and represented to the public as a single organization." *Estevez v. SLG 100 Park LLC*, 189 N.Y.S.3d 53, 56, 57 (N.Y. App. Div. 1st Dept. 2023) ("Because the [defendant] Entities 'often blurred the distinction between them,' they are considered united in interest."); *see also Ingenito v. Riri USA, Inc.*, 89 F. Supp. 3d 462, 482–83 (E.D.N.Y. 2015) ("The record further reflects that Riri SA and Riri USA are sometimes treated as a single entity and are often collectively referred to as 'Riri Group.' While a parent-subsidiary relationship alone may not satisfy the unity of interest prong, the facts in this case show 'that the two companies, intentionally or not, often blurred the distinction between them.'") (quoting *Donovan v. All–Weld Products Corp.*, 824 N.Y.S.2d 44, 45 (N.Y. App. Div. 1st

Dept. 2006)). Federal Courts in New York have also concluded that veil-piercing allegations are sufficient to find the unity-of-interest prong satisfied. *See Amaya v. Garden City Irrigation, Inc.*, 645 F. Supp. 2d 116, 123 (E.D.N.Y. 2009).

Although the PBMs assert they may have different defenses, they only do so conclusorily in their Reply. To date, the Court has had difficulty understanding clearly the PBMs' complicated corporate structure and complex business model. Without a deeper understanding of how the defendant companies interact with one another, it is difficult for the Court to properly analyze the unity-of-interest prong. At this stage of the litigation, the Court must accept Rochester's allegations as true. Therefore, the Court finds Rochester has sufficiently articulated plausible allegations that the PBM entities are united in interest. *See, e.g., Tibes v. Hanseatic Moving Servs., LLC*, 2022 WL 1406627, at *4 (E.D.N.Y. May 2, 2022) ("The factual and legal nature of the relationship between [defendants] is not . . . fully developed at this stage of the case. Accordingly, the Court declines to decide whether these putative defendants were united in interest, as any such findings could be premature. If necessary, such a determination can be made at the motion to dismiss or summary judgment stage.").

### 4. New York Equitable Tolling.

The parties agree that:

Under New York law, equitable tolling precludes "a defendant from using the statute of limitations as a defense where it is the defendant's affirmative wrongdoing which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Putter v. N. Shore U. Hosp.*, 858 N.E.2d 1140, 1142 (N.Y. 2006) (cleaned up). The plaintiff "may not rely on the same act that forms the basis for the claim[,]" but instead "must point to distinct acts designed to conceal the prior wrongdoing." *City of Almaty v. Sater*, 503 F.

Supp. 3d 51, 66-68 (S.D.N.Y. 2020) (citation omitted). Whether equitable tolling applies is typically a question of fact. *See Putter*, 858 N.E.2d at 1143.

Response at 19–20; *see also* Reply at 12–13 (agreeing with Rochester's recitation of the applicable law). The parties disagree, however, on whether Rochester has alleged distinct acts designed to conceal the PBMs' alleged wrongdoing that are different from the acts that form the bases of Rochester's claims.

Here, Rochester has alleged that the PBMs made misrepresentations "in person, in client contracts, on Defendants' websites, in publications, and in Congressional testimony," by expressing they were "working to ensure that opioids were prescribed and dispensed only for safe legitimate reasons." Complaint at ¶ 699. Rochester alleges it "did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiff's Community, and could not have acquired such knowledge earlier through the exercise of reasonable diligence." *Id.* at ¶ 701.

These allegations of deception are separate and distinct from the allegations of wrongdoing described in Section II.C, which form the basis of Rochester's claims. Rochester alleges the PBMs ***intended*** to conceal from the public what the PBMs were actually doing with respect to prescription opioids. Accordingly, Rochester has plausibly alleged that its claims are subject to equitable tolling under New York law.

For the reasons above, the Court must conclude, at this stage of the litigation, that Rochester's claims are timely as against the New Defendants.

**D. Direct Injury under NY Statutory Law.**

To state a claim under New York General Business Law ("GBL") § 349 (Deceptive Acts and Practices) or § 350 (False Advertising), Plaintiffs must allege the PBMs engaged in

37

"(1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *City of N.Y. v. Smokes-Spirits.com, Inc.*, 911 N.E.2d 834, 838 (N.Y. 2009) (addressing GBL § 349); *Lucker v. Bayside Cemetery*, 114 A.D.3d 162, 174 (N.Y. App. Div. 1st Dep't 2013) ("A similar showing is required under General Business Law § 350, which prohibits false advertising.").

The PBMs assert "Rochester's GBL claims fail because Rochester alleges that it suffered harm because Defendants misled others, not because Defendants misled Rochester," Motion at 24; "Rochester's alleged injuries are wholly derivative of alleged injuries suffered by consumers," *id.* at 25; and "New York law forecloses this type of derivative claim under the GBL," *id.* at 24. Rochester responds by asserting that its alleged injuries, including "a substantial strain on Rochester's ability to provide essential governmental services and programs [which] has forced it to expend and divert city resources to address the [opioid abuse and addiction] crisis," are distinct non-derivative injuries, suffered directly and only by Rochester. Response at 21. Rochester also draws attention to its "allegations that it purchased prescription opioids that it would not have purchased but for Defendants' misconduct." *Id.* (citing Complaint ¶ 590 ("increased costs associated with its own employee benefits plan") and ¶ 813(a) ("Losses caused by purchasing and/or paying reimbursements for the Formulary & UM Enterprise Defendants' prescription opioids")).

Fortunately, the Court need not spend much time analyzing NY statutory law because a New York trial court, in a separate opioid case virtually identical to this one, has already done so. Specifically, in *In re Opioid Litigation*, No. 400000/2017, 2018 WL 3115102, at *18 (N.Y. Sup. Ct. June 18, 2018), Judge Jerry Garguilo concluded that similar allegations by governmental subdivision plaintiffs against opioid manufacturers and distributors were sufficient to satisfy the direct injury element of GBL §§ 349 and 350. Judge Garguilo relied on two cases from New York's

highest court—*Smokes-Spirits* and *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.,* 818 N.E.2d 1140 (N.Y. 2004)[23]—to conclude that "the plaintiffs adequately allege that the plaintiffs suffered direct injuries as a result of the manufacturer defendants' alleged materially deceptive acts or practices." *In re Opioid Litigation*, 2018 WL 3115102, at *24.[24]

Although the PBMs assert Judge Garguilo's decisions are incorrect and irreconcilable with controlling New York law, that is for New York appellate courts to decide, not a federal trial court in Ohio. Further, while the PBMs are correct that this Court is "bound by controlling decisions of the state's highest court," *Burniac v. Wells Fargo Bank, N.A.*, 810 F.3d 429, 436 (6th Cir. 2016) (quoting *Berrington v. Wal–Mart Stores Inc.*, 696 F.3d 604, 607 (6th Cir. 2012)), so is Judge Garguilo, and he is in a better position to interpret the decisions of his own state's highest court than is this Court.

Finally, even if this Court were inclined to second guess Judge Garguilo's application of New York law as set out in *Smokes-Spirits* and *Blue Cross*, the facts of the instant case are materially distinguishable. Rochester has alleged a direct consumer relationship with the PBMs. *See* Complaint ¶ 590 ("increased costs associated with its own employee benefits plan") and ¶ 813(a) ("Losses caused by purchasing and/or paying reimbursements for the Formulary & UM Enterprise Defendants' prescription opioids"). In *Smokes-Spirits*, New York City did not allege any direct

---

[23]     In *Blue Cross*, the New York Court of Appeals held that "an insurer or other third-party payer of medical expenditures may not recover derivatively for injuries suffered by its insured. Rather, the insurer's sole remedy is in equitable subrogation." 818 N.E.2d at 1144. This Court has previously distinguished cases like *Blue Cross* from cases with facts similar to those alleged against PBMs here. *See Opiate Litig.*, 2018 WL 6628898, at *6–*7 (docket no. 1203 at 11–12) (distinguishing *Perry v. Am. Tobacco Co.*, 324 F.3d 845, 850 (6th Cir. 2003)).

[24]     Judge Garguilo also concluded that: (1) "the [subdivision] plaintiffs sufficiently allege that the manufacturer defendants . . . made materially misleading statements;" (2) "the allegations in the complaint are sufficient to infer that false advertising by the manufacturer defendants dramatically increased consumer demand for and consumption of prescription opioids;" and (3) "the allegations in the complaint are sufficient to infer that the opioid epidemic allegedly spawned in part by the manufacturer defendants' false advertising caused the plaintiffs to suffer extraordinary losses." *Id.* at *20–*21.

relationship with the defendant—only that the defendant's actions precluded the City from collecting cigarette taxes from its residents. *See Smokes-Spirits*, 911 N.E.2d at 836–37.  Similarly, in *Blue Cross*, the plaintiff insurance company had no direct relationship with the tobacco company defendant.

Accordingly, for the reasons given by Judge Garguilo in his *In re Opioid Litigation* opinions, the PBMs' motion to dismiss Rochester's GBL claims is denied.

## IV.    Conclusion

For all of the reasons stated above, the PBMs' Joint Motion to Dismiss is **DENIED**.

IT IS SO ORDERED.

/s/ **Dan Aaron Polster  August 22, 2024**
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**