# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| **IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION** | MDL No. 2804 |
|  | Case No. 1:17-md-2804 |
| THIS DOCUMENT RELATES TO: | Judge Dan Aaron Polster |
| CT20: *Town of Hull v. AmerisourceBergen Drug Corporation, et al.* | **PLAINTIFF TOWN OF HULL'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO THE COMPLAINT** |
| Case No.: 1:19-op-46172-DAP |  |
|  | **(Jury Trial Demanded)** |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ..................................................................................................................2

II.  JURISDICTION AND VENUE ..........................................................................................10

III. PARTIES .............................................................................................................................11

   A.  PLAINTIFF............................................................................................................................11

   B.  DEFENDANTS .....................................................................................................................13

      1.  The Albertson Defendants. .................................................................................13

      2.  The Mylan Defendants........................................................................................18

      3.  The Indivior Defendants .....................................................................................19

      4.  Related Entities; Agency and Authority .............................................................21

IV. FACTS COMMON TO ALL CLAIMS ..............................................................................21

   A.  Opioids and Their Effects .....................................................................................................21

   B.  Defendants' Conduct Created an Abatable Public Nuisance..............................................23

   C.  Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion. ..........................................................................................................24

      1.  Defendants Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids..........................................................................................24

      2.  Defendants Have a Duty to Maintain Effective Controls Against Diversion. .............25

         a)  CSA Duties of Manufacturers and Wholesale Distributors ...................................28

         b)  CSA Duties of Dispensers ..................................................................................31

      3.  Defendants Have Corresponding Duties Under Massachusetts Law .........................40

      4.  Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders. ............42

      5.  Defendants Worked to Expand their Shares of the Prescription Opioid Market and Failed to Maintain Effective Controls Against Diversion....................................50

         a) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiff's Town. ........................................................................51

i

1) Albertsons Was Uniquely Positioned to Guard Against Diversion .................51

2) Albertsons Failed to Guard Against Diversion as a Distributor of Opioids. ..........................................................................................................54

   i)  From 2006-2008, Albertsons' SOMS was Critically Inadequate. .............56

   ii) From 2013-2016, Albertsons' SOMS was Significantly Deficient. ..........60

3) Albertsons Failed to Guard Against Diversion as a Dispenser of Opioids .............................................................................................................63

   i)  Albertsons' Written Red Flag Policies & Procedures were Critically Inadequate. ..........................................................................64

   ii) Albertsons Was Slow to Adopt Policies to Prevent Diversion. ................67

   iii) Albertsons Performance Metrics Put Profits Before Safety. ....................70

   iv) Albertsons Had No Systems in Place to Monitor Opioid Dispensing Patterns or Trends. ................................................76

4) The DEA has Repeatedly Admonished Albertsons Across Multiple Jurisdictions for its Failures to Maintain Effective Controls Against Diversion. ........................................................................................................80

5) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiff's Town and Surrounding Areas. ..........................81

b) Mylan Falsely Marketed its Fentanyl Products and Failed to Guard Against Diversion in the Plaintiff's Town. ..........................................................................85

c) Indivior Falsely Marketed its Suboxone Products and Failed to Guard Against Diversion in the Plaintiff's Town. ............................................................90

D.  The Opioids the Defendants Sold Migrated Into Other Jurisdictions ...............................92

V.  DEFENDANTS HAVE CREATED AND MAINTAINED A PUBLIC HEALTH CRISIS IN MASSACHUSETTS, INCLUDING THE TOWN OF HULL. ...........................96

A.  The Massachusetts Opioid Epidemic ................................................................................98

B.  The Opioid Epidemic in Plaintiff's Town ......................................................................104

VI. PLAINTIFF'S CLAIMS ARE TIMELY .............................................................................108

A.  Continuing Conduct. .....................................................................................................108

A.  Equitable Estoppel. ......................................................................................................108

VII.    SUCCESSOR LIABILITY ........................................................................110

VIII.   ALTER EGO LIABILITY .......................................................................111

IX. CLAIMS FOR RELIEF ..............................................................................111

FIRST CLAIM FOR RELIEF - CREATION OF A PUBLIC NUISANCE (Against All
        Defendants) ............................................................................................111

SECOND CLAIM FOR RELIEF – VIOLATIONS OF MASSACHUSETTS GENERAL
        LAWS, C HAPTER 93A, SECTIONS 2 AND 11 (Against All Defendants) ......................121

THIRD CLAIM FOR RELIEF – NEGLIGENCE (Against All Defendants) ............................125

        A.  DUTY ..........................................................................................126

        B.  BREACH .....................................................................................130

        C.  CAUSATION ...............................................................................133

        D.  DAMAGES ..................................................................................135

FOURTH CLAIM FOR RELIEF - UNJUST ENRICHMENT (Against All Defendants) .........137

PUNITIVE DAMAGES .....................................................................................139

RELIEF ............................................................................................................140

Plaintiff, TOWN OF HULL (Plaintiff) hereby supplements and amends its Complaint, dated December 2, 2019 (Doc. No. 1) and Short Form Amended Complaint, dated September 11, 2020 (Doc. No. 17), and brings this action to prevent future harm and to redress past wrongs against the following Defendants:[1] the Albertsons Defendants,[2] the Indivior Defendants[3] and the Mylan Defendants.[4]

Plaintiff seeks to hold accountable Defendants that reaped enormous financial rewards by helping to expand the market for prescription opioids beyond all reasonable limits, by utterly failing to comply with their gatekeeping obligation to protect the public and by refusing to monitor and restrict the improper marketing, distribution, dispensing and sale of opioids, causing a public nuisance in the Town of Hull.

IN ADDITION TO THE ALLEGATIONS SET FORTH HEREIN, PLAINTIFF EXPRESSLY ADOPTS AND INCORPORATES BY REFERENCE THE ALLEGATIONS AND CLAIMS SET FORTH IN ITS COMPLAINT, "SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND," ("SHORT FORM COMPLAINT") INCLUDING ALL CLAIMS AND ALLEGATIONS AGAINST OTHER

---

[1] The following are the newly-added Defendants in this pleading: Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Safeway, Inc.; Shaw's Supermarkets, Inc.; Star Markets Company, Inc.; Osco Drug of Massachusetts, LLC; Indivior, Inc.; Indivior PLC; Reckitt Benckiser Group plc; Aquestive Therapeutics, Inc.; Viatris Inc.; Mylan Pharmaceuticals Inc.; Mylan Technologies, Inc; and Meda Pharmaceuticals Inc.

[2] The Albertsons Defendants are Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Albertson's LLC; Safeway, Inc.; Shaw's Supermarkets, Inc.; Star Markets Company, Inc.; and Osco Drug of Massachusetts, LLC.

[3] The Indivior Defendants are Indivior, Inc.; Indivior PLC; Reckitt Benckiser Group plc; and Aquestive Therapeutics, Inc.

[4] The Mylan Defendants are Mylan Pharmaceuticals Inc.; Mylan Technologies, Inc.; and Meda Pharmaceuticals Inc.

DEFENDANTS NAMED IN THAT SHORT FORM COMPLAINT, AND PLAINTIFF TOWN OF HULL'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO THE COMPLAINT, FILED HEREWITH AGAINST THE PBM DEFENDANTS.

## I.    INTRODUCTION

1.      This case arises from the worst man-made epidemic in modern medical history—an epidemic of addiction, overdose and death caused by Defendants' flooding the United States, including Plaintiff's Town, with prescription opioids.

2.      By now, most Americans have been affected, either directly or indirectly, by the opioid epidemic.

3.      This crisis arose not only from the opioid manufacturers' deliberate marketing strategy, but from distributors' and pharmacies' equally deliberate efforts to evade restrictions on opioid distribution and dispensing.  Defendants acted without regard for the lives that would be trammeled in pursuit of profit.

4.      Massachusetts is experiencing a drug overdose epidemic which is causing devastating socio and economic consequences.

5.      In 1999, 488 Massachusetts residents died from a drug overdose. In 2005, that number was 780 and by 2014 that number had risen to 1,289.[5] Between 2016 and 2020, an average of 2,230 Massachusetts residents died each year from drug overdoses. In 2021, the number of overdose deaths rose to 2,585 and in 2022 the number of deaths was 2,642.[6] However, due to

---

[5] https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm (year by year drop down tabs) (last visited September 4, 2024).

[6] *Id.*

incomplete reporting, these grim numbers likely understate the number of Massachusetts residents who have been and will be lost to this scourge.

6.      According to the Massachusetts Department for Public Health (DPH), in 2023, there were at least 2,104 confirmed opioid-related deaths.[7] The number of opioid-related deaths has increased by over 400% from 2001, when there were 504 opioid-related deaths.[8]

7.      As in many other communities in the United States, opioid use has been and continues to be at crisis levels in the Town of Hull and the county where it sits, Plymouth County.

8.      From 2019-2021, Plymouth County had a rate of 36 drug overdose deaths per 100,000 people, which was higher than Massachusetts' rate of 34 and the U.S. rate of 27 during that same time period.[9]

9.      And from 2013-2023 Plymouth County suffered from 1785 opioid-related deaths, including a peak of 202 deaths in 2017, and 154 in opioid-related deaths 2023.[10] From 2010-2020 Plymouth County had the second highest opioid-related overdose death rate of the fifteen counties in Massachusetts, with 278 deaths per 100,000 people. Plymouth County's rate of 30.3 deaths per

---

[7] Massachusetts Department of Public Health, Data Brief: Opioid-Related Overdose Deaths among Massachusetts Residents (June 2024), https://www.mass.gov/lists/current-overdose-data#updated-data-–-as-of-june-2024- (last visited September 4, 2024).

[8] *Id.*

[9] County Health Rankings & Roadmaps, Drug overdose deaths, available at https://www.countyhealthrankings.org/health-data/health-factors/health-behaviors/alcohol-and-drug-use/drug-overdose-deaths?year=2024&county=25023 (last visited September 4, 2024).

[10] Massachusetts Department of Public Health, Number of Opioid-Related Overdose Deaths by County, 2013-2023 (June 2024), https://www.mass.gov/doc/opioid-related-overdose-deaths-by-county-june-2024-0/download (last visited September 4, 2024).

100,000 people in 2020 is nearly ten percentage points higher than the national rate of 21.6 deaths per 100,000 people.[11]

10.     The Town of Hull, with its population of just over 10,000, suffered from 50 opioid-related deaths from 2016-2023, including 10 opioid-related deaths in both 2020 and 2019.[12] These numbers are well up from 1 death in 2012 and 0 in 2013,[13] and twice the number Hull had in 2016 and 2018.[14]

11.     This devastation in the Town of Hull was created by opioid manufacturers, distributors, pharmacies, and pharmacy benefit managers who worked together to systematically dismantle the narcotic conservatism that had existed around prescription opioids for decades, opened the floodgates to an unreasonably large and unsafe supply of opioids, improperly normalized the widespread use of opioid drugs, violated laws and regulations designed to protect the public from the dangers of narcotic drugs like opioids, and worked to dismantle protections designed to protect the public so more opioid drugs could be sold and the manufacturers, distributors, and pharmacies could reap the profits therefrom.

---

[11] Plymouth County District Attorney's Office – Community Overview, https://bja.ojp.gov/doc/fy-2021-COSSAP-narrative-Plymouth-County.pdf, (last visited August 19, 2024), (citing Pamela Kelley and Sean Varano, "Plymouth County Outreach: 2020 Annual Report," Kelley Research Associates, February 2021.).

[12] Massachusetts Department of Public Health, Number of Opioid-Related Overdose Deaths by City/Town 2016-2023, https://www.mass.gov/doc/opioid-related-overdose-deaths-by-city-or-town-june-2024-0/download (last visited August 23, 2024).

[13] Massachusetts Department of Public Health, Number of Confirmed Unintentional/Undetermined Opioid-Related Overdose Deaths by City/Town, January 2012-December 2015 (May 2016), https://www.mass.gov/doc/overdose-deaths-by-citytown-may-2016-1/download (last visited September 4, 2024).

[14] Massachusetts Department of Public Health, Number of Opioid-Related Overdose Deaths by City/Town 2016-2023, *supra*.

12.     Most Americans have been affected, either directly or indirectly, by the opioid epidemic. According to the United States Centers for Disease Control and Prevention ("CDC"), prescription opioids have directly and indirectly accounted for more than 80% of overdose deaths in the United States, a toll that has quadrupled over the past two decades. More people have died from opioid-related causes than from car accidents or guns. More than 175 people die every day from opioid overdoses—as if an airplane were to crash, killing everyone on board, every day.

13.     The death toll has steadily climbed since the push to expand prescription opioid use began in the late 1990s. The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths. According to the data, there were an over 107,000 drug overdose deaths in the United States during 2023.

14.     The epidemic's economic costs for healthcare, lost productivity, addiction treatment, and criminal justice involvement is estimated at $1.02 trillion a year.

15.     From 1999 through present, overdoses killed more than 1 million Americans. Well over half of them died from opioids prescribed by doctors to treat pain.  These opioids include brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

16.     Most of the overdoses from non-prescription opioids are also directly related to prescription pills. As soon as prescription opioids took hold on a population, the logical and devastating progression to illicit drugs followed.  Many opioid users, having become addicted to but no longer able to obtain prescription opioids, or trapped in a cycle of addiction, turn to stronger and more potent drugs.

17.     According to the CDC, the rise in opioid overdose deaths can be outlined in three distinct waves. As the CDC explains: "The first wave began with increased prescribing of opioids

in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[15]

18.     The conduct of the manufacturers, distributors, and pharmacies caused the nation, including Massachusetts and Plaintiff's Town, to be awash in a flood of prescription opioids.  This has had a profound impact on both morbidity and mortality, and these drugs have created an epidemic of addiction that has had severe and wide-ranging effects on public health and safety in the Town of Hull and communities across the country.  Indeed, from those suffering with the disease of addiction themselves, to children whose parents who suffer from addiction, to employers who employ an addicted population, to the first responders, law enforcement, the court system and the prison system that cannot handle the burdens placed on them, there is almost no area of the community that has not been significantly impacted.

19.     This suit takes aim at a substantial contributing cause of the opioid crisis.  The Albertsons Defendants, operating as both a distributor and dispenser of prescription opioids, the last link in the opioid supply chain and the critical gatekeeper between dangerous opioid narcotics and the public, utterly failed in their gatekeeper role, flouted their duties to protect the public, violated the laws designed to protect the public and dismantled and disregarded measures designed to protect the public health and safety.  As alleged in more detail herein, Albertsons failed to design

---

[15] CDC Health Topics – Opioid Overdose,
https://www.cdc.gov/policy/polaris/healthtopics/opioid/index.html (last visited September 4, 2024).

and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, or halt suspicious orders when they were identified, and instead dispensed far greater quantities of prescription opioids than it knew could be necessary for legitimate medical uses—all of which actively contributed to the oversupply of such drugs and fueled an illegal secondary market.

20.     This suit also takes aim at other Defendants who were a substantial contributing cause of the opioid crisis. For example, Mylan is an opportunistic marketer, seller and distributor of generic transdermal fentanyl patch products, which it brought to market in January 2005. Mylan's fentanyl patch product was the first generic alternative to Janssen's Duragesic patch on the market, and was the first generic Schedule II narcotic transdermal product ever approved by the FDA. Even though fentanyl is extremely potent and addictive, Mylan disingenuously promoted its products as less prone to abuse, aggressively marketed to unscrupulous physicians to convince them to push Mylan's fentanyl patches on their patients, and promoted its immediate-release fentanyl product to pain management physicians and other healthcare professionals even though the product was only approved for a limited indication in cancer patients. Mylan's tactics allowed it to capture a huge percentage of the fentanyl market share nationally and in Plymouth County.

21.     The Indivior Defendants were a substantial contributing cause of the opioid crisis. The Indivior Defendants developed, manufactured, marketed and/or sold branded Subutex and Suboxone, which are Schedule III buprenorphine products approved by the FDA in 2002 for the treatment of opioid use disorder. The Indivior Defendants affirmatively promoted the sale and use of Subutex and Suboxone in a manner that facilitated and induced doctors to prescribe these products in an unsafe and medically inappropriate manner.  The Indivior Defendants rewarded providers who were prescribing their products in an unsafe manner by sending them patients and

hiring them for their speaker programs, inducing them to continue and increase their illicit prescribing.

22.     The Indivior Defendants and the Mylan Defendants also distribute the opioids they manufacture.  As manufacturers and distributors of dangerous controlled substances, the Indivior Defendants and the Mylan Defendants were and remain required to hold full DEA registrations, and consequently they must prevent diversion, maintain effective suspicious order monitoring systems (SOMS) and report suspicious orders to the DEA pursuant to 21 U.S.C. § 832; *see also* 21 C.F.R. § 1301.74(b).  The Indivior Defendants and the Mylan Defendants, along with the Albertsons Defendants, each failed to design and operate an effective SOM system, allowing widespread diversion of opioids to occur.

23.     Defendants have contributed substantially to the opioid crisis by helping to inflate the opioid market beyond any legitimate bounds and by flooding that market with far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders and sales, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

24.     As millions became addicted to opioids, "pill mills," often styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non-medical use. These pill mills, typically under the auspices of licensed medical professionals, issue high volumes of opioid prescriptions under the guise of medical treatment.  Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without at least the tacit support and willful blindness of the Defendants, if not their knowing support.

25.     As a direct and foreseeable result of Defendants' conduct, cities, towns and counties across the nation, including the Town of Hull, are now swept up in what the CDC has called a

"public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[16]  The increased volume of opioid prescribing, not all of which is for legitimate use, correlates directly to skyrocketing addiction, overdose and death; black markets for diverted prescriptions opioids; and a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire or could not afford prescription opioids.

26.    This explosion in opioid use and Defendants' profits has come at the expense of patients and residents and has caused ongoing harm to and a public nuisance in the Town of Hull. As the then CDC director concluded: "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently."[17]

27.    Defendants' conduct in promoting opioid use and fueling diversion has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin and fentanyl.  These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.

28.    The burdens imposed on Plaintiff are not the normal or typical burdens of government programs and services.  Rather, these are extraordinary costs and losses that are related

---

[16] *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, Ctrs. For Disease Control and Prevention (Apr. 29, 2014), https://docs.house.gov/meetings/IF/IF02/20140429/102161/HHRG-113-IF02-Wstate-SosinD-20140429.pdf (last visited September 4, 2024); *see also*, Letter from Vivek H. Murthy, Surgeon General, Tide RX (Aug. 2016), https://dph.illinois.gov/content/dam/soi/en/web/idph/files/publications/publications-ohp-surgeon-general-opioid-letter-111816.pdf (last visited September 4, 2024).

[17] *Id.*

directly to Defendants' illegal actions.  The Defendants' conduct has created a public nuisance and a blight.  Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

29.     Defendants have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis and perpetuate the public nuisance.

30.     Within the next hour, six Americans will die from opioid overdoses; and two babies will be born addicted to opioids and begin to go through withdrawal.

31.     Plaintiff brings this suit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.

## II.     JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because Plaintiff's original claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., in the original Complaint and against the PBM Defendants raise a federal question. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims against the Defendants named in these Supplemental and Amended Allegations under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy. This Court also has diversity jurisdiction pursuant to 28 U.S.C. §1332.

33.     This Court also has personal jurisdiction over all Defendants because the causes of action alleged in this Complaint arise out of Defendants' transacting business in Massachusetts, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because Defendants regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards Massachusetts and/or

have the requisite minimum contacts with Massachusetts to satisfy any statutory or constitutional requirements for personal jurisdiction.

34.     Venue is proper in this district under 28 U.S.C. § 1407.

## III.     <u>PARTIES</u>

### A.  PLAINTIFF

35.     Plaintiff, Town of Hull, MA ("Plaintiff" or "Town of Hull") has standing to bring the claims alleged herein.  *See generally,* M.G.L. C. 40, §§ 1-2.

36.     Plaintiff is responsible for the public health, safety and welfare of its citizens. Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

37.     Plaintiff has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality have created a serious public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

38.     The distribution and diversion of opioids into Massachusetts ("the State"), and into the Town of Hull, Massachusetts and surrounding areas (collectively, "Plaintiff's Town"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiff here seeks relief.

39.     Defendants' intentional, negligent, and/or unlawful conduct, alleged more fully herein, has created a serious public health crisis of opioid abuse, addiction, morbidity, and mortality and is a public nuisance in Plaintiff's Town.

40.     Plaintiff directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiff seek relief.  Categories of past and continuing sustained damages include, *inter alia*: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering

from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation and (6) costs associated with Plaintiff having to repair and remake its infrastructure, property and systems that have been damaged by Defendants' actions, including, *inter alia*, its property and systems to treat addiction and abuse, to respond to and manage an elevated level of crime, to treat injuries, and to investigate and process deaths in Plaintiff's Town. These damages have been suffered, and continue to be suffered, directly by the Plaintiff.

41.     Plaintiff has standing to bring claims under the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

42.     Plaintiff directly and foreseeably sustained all economic damages alleged more fully herein. Plaintiff, like any other local government, endeavors in good faith to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. Defendants' conduct has imposed an extraordinary burden on the Town's limited resources and services for which it seeks relief.

43.     Defendants' conduct is beyond anything Plaintiff could have prepared for, predicted or avoided. It is a repeated course of conduct that did, does, and will—given the realities of addiction—continue to result in recurring and ongoing harm to Plaintiff. Defendants' conduct is especially pernicious when one considers the harm it has wreaked on governmental entities such as the Town who, in good faith, endeavor to provide a wide variety of necessary services on a

limited budget funded with taxpayer dollars. The magnitude of Defendants' scheme is neither discrete nor of a sort that a municipality, including the Town of Hull, could reasonably expect to have to respond to at any time during its existence as such. It would be unreasonable, unjust, and inequitable not to allocate the additional governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

## B.  DEFENDANTS

### 1.  The Albertson Defendants.

44.     **Defendant Albertsons Companies, Inc. f/k/a AB Acquisition LLC** is a Delaware corporation with its principal place of business in Boise, Idaho.  Albertsons Companies, Inc. is the current owner of all Albertsons subsidiaries and banners.

45.     Albertsons Companies, Inc. is registered to do business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

46.     **Defendant New Albertsons L.P. f/k/a New Albertson's, Inc.** is a Delaware corporation with its principal place of business in Boise, Idaho.  New Albertson's was incorporated in December 2005.  On June 2, 2006, Albertson's, Inc. underwent a reorganization following its divestiture to three separate buyers.[18]  Albertson's, Inc. was converted to Albertsons LLC and became a subsidiary of New Albertson's, Inc.[19]  New Albertson's, Inc. held the supermarket business, while Albertson's LLC held the standalone drug store business.[20]  On June 2, 2006, New

---

[18] https://www.sec.gov/Archives/edgar/data/1355833/000119312507090449/d10k.htm (last visited September 4, 2024.

[19] *Id.*

[20] *Id.*

Albertsons was acquired by SuperValu, became a wholly-owned subsidiary of SuperValu,[21] and held banners including ACME, ACME Express, Jewel Express, Albertsons Express, Albertsons, Bristol Farms, Jewel, Jewel-Osco, Lazy Acres, Max Foods, Osco Pharmacy, Sav-on Pharmacy, Save-A-Lot, Shaw's, and Star Market.   In 2013, SuperValu, Inc., sold New Albertson's, Inc. (including its ACME Markets, Jewel-Osco, Shaws, Star Markets, and Albertsons banners) to AB Acquisition LLC.[22] After the 2013 sale, New Albertsons, Inc. changed its name to New Albertsons L.P.[23]   In 2015, AB Acquisition LLC announced it would change its name to Albertsons Companies, Inc.[24]

47.     New Albertsons LP is registered to do business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

48.     **Defendant Albertson's LLC** is a Delaware limited liability company with its principal place of business in Boise, Idaho. Defendant Albertson's LLC is a wholly owned, direct subsidiary of Defendant Albertsons Companies, Inc.

49.     Albertson's LLC conducted business in Massachusetts as a wholesale distributor under the named business entities: Albertsons 8720, Albertsons Distribution Center and Albertsons LLC Distribution Center #8720. Albertsons distributed controlled substances to its stores with

---

[21] *Id.*

[22] https://www.chaindrugreview.com/albertson-s-to-acquire-877-stores-from-supervalu/ (last visited September 4, 2024).

[23] https://content.edgar-online.com/ExternalLink/EDGAR/0001193125-18-109460.html?hash=4fe3ed61ea30ca369d864a11fffc13835455f39fcaac9f88a7a25bdcca038d96&dest=D525849DEX410_HTM#D525849DEX410_HTM (last visited September 4, 2024).

[24]https://www.sec.gov/Archives/edgar/data/1646972/000119312515247280/d900395ds1.htm#rom900395_9 (last visited September 4, 2024).

pharmacies through Albertsons LLC Distribution Center #8720, located in Ponca City, Oklahoma from 2006 to 2008 and from 2009 to 2012.

50.     **Defendant Safeway, Inc.** is a Delaware corporation with its principal place of business in Pleasanton, California. Defendant Safeway, Inc. is a wholly owned, direct subsidiary of Defendant Albertsons Companies, Inc. In January 2015, AB Acquisition LLC acquired Safeway, Inc. (including its Safeway pharmacies).[25] This purchase positioned Albertsons as one of the largest food and drug retailers in the country. Safeway stores include Pavilions-branded stores, Safeway-branded stores in Northern California and Hawaii, Vons stores in Southern California and Nevada, Randalls and Tom Thumb stores in Texas, and Carrs stores in Alaska.[26] Also in 2015, Albertsons Companies, Inc. purchased approximately 70 stores from the Great Atlantic & Pacific Tea Company (better known as "A&P"), including its Food Emporium, A&P, A&P Fresh, Superfresh, and Pathmark banners, which were reopened as ACME stores.[27]

51.     Safeway, Inc. is registered to do business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

52.     **Defendant Shaw's Supermarkets, Inc.** is a Massachusetts corporation with its principal place of business in West Bridgewater, Massachusetts and is a wholly subsidiary of Defendant Albertsons Companies, Inc.

---

[25] https://www.refrigeratedfrozenfood.com/articles/87780-safeway-and-albertsons-announce-definitive-merger-agreement (last visited September 4, 2024).

[26] https://en.wikipedia.org/wiki/Albertsons#Safeway_acquisition (last visited September 4, 2024).

[27] https://www.stamfordadvocate.com/business/article/A-P-discloses-plans-to-exit-Connecticut-stores-6450578.php (last visited September 4, 2024).

53.    Shaw's Supermarkets, Inc. is registered to do business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

54.    Shaw's Supermarkets, Inc. holds multiple active pharmacy licenses in Massachusetts and operates stores in Plymouth County.

55.    **Defendant Star Markets Company, Inc.** is a Massachusetts corporation with its principal place of business in West Bridgewater, Massachusetts and is a wholly subsidiary of Defendant Albertsons Companies, Inc.

56.    Star Markets Company, Inc. is registered to do business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

57.    Star Markets Company, Inc. holds multiple active pharmacy licenses in Massachusetts and operates stores in Plymouth County.

58.    **Defendant Osco Drug of Massachusetts, LLC** ("Osco Drug") is a Massachusetts limited liability company with its principal place of business in Boston, Massachusetts.

59.    Osco Drug is registered to do business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

60.    Osco Drug previously held pharmacy licenses in Massachusetts and operates stores in Plymouth County.

61.    Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Albertson's LLC; Safeway, Inc.; Shaw's Supermarkets, Inc.; Star Markets Company, Inc.; and Osco Drug of Massachusetts, LLC are collectively referred to herein as "The

Albertsons Defendants" or "Albertsons." "Albertsons" as used herein refers to all store banners used by the Albertsons Companies.

62.     Albertsons Companies is a one of the largest food and drug retailers in the United States.  It currently operates stores in 35 states (and D.C.) under 20 different business names (or "banners").[28]  These banners include grocery stores such as Albertsons, Acme, Safeway, Tom Thumb, Haggen, Jewel-Osco, Pavilions, Vons, Shaw's, United, Randalls, Star Market, Kings Food Markets, United Supermarkets, Haggens, Carrs, Market Street, Andronico's Community Market, Amigos, Lucky Stores, and Balducci's Food Lovers Market.  Of the over 2,200 stores it operates, approximately 1,700 of those stores have pharmacies.  Albertsons employs approximately 285,000 people.

63.     Albertsons has operated as a licensed pharmacy wholesaler and facility and as a licensed dispenser. Albertsons has distributed and dispensed prescription opioids throughout the United States, including Massachusetts and Plymouth County.

64.     Albertsons conducts business as a licensed pharmacy dispenser through its various DEA-registered subsidiaries and affiliated entities. At all times relevant to this Complaint, Albertsons operated licensed pharmacies in Massachusetts, including Plymouth County.

65.     As of June 2024, Albertsons ranked 53 on the latest Fortune 500 list, and for the 12-month period ending in November 2023, had revenues of over $79 billion.  In October 2022 Albertsons announced that it was being acquired by Kroger for $24.6 billion.  If consummated, the deal will give the combined entity market share in 48 of the 50 states. The deal was expected to be finalized in early 2024, however, the Federal Trade Commission has challenged the merger,

---

[28] The ARCOS database indicates that throughout the entirety of the 2006-2019 ARCOS time period, Albertsons operated in 38 states plus Washington D.C.

alleging that the deal is anticompetitive.[29] The FTC filed an administrative complaint against the acquisition and authorized a lawsuit in federal court to block it during the pendency of the FTC's administrative proceedings. A bipartisan group of nine attorneys general joined the FTC's federal court complaint.[30]

### 2. The Mylan Defendants

66.     **Defendant Viatris Inc.** ("Viatris") is a Delaware corporation with its principal place of business in Canonsburg, Pennsylvania. Viatris was formed in November 2020 by the merger of Mylan N.V. and Pfizer's Upjohn business, Upjohn Inc.

67.     Viatris is registered to conduct business in Massachusetts and may be served through its registered agent CT Corporation System, 155 Federal Street, Suite 700, Boston, MA 02110.

68.     **Defendant Mylan Pharmaceuticals Inc.** ("Mylan Pharmaceuticals") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan is a wholly owned subsidiary of Viatris Inc.

69.     **Defendant Mylan Technologies, Inc.** ("Mylan Technologies") is a West Virginia corporation with its principal place of business in Morgantown, West Virginia. Mylan Technologies is a wholly owned subsidiary of Viatris Inc.

70.     **Defendant Meda Pharmaceuticals Inc.** ("Meda") is a Delaware corporation with its principal place of business in Somerset, New Jersey. Meda Pharmaceuticals Inc. is a wholly owned subsidiary of Viatris Inc.

---

[29] FTC Challenges Kroger's Acquisition of Albertsons, Feb. 26, 2024, https://www.ftc.gov/news-events/news/press-releases/2024/02/ftc-challenges-krogers-acquisition-albertsons (last visited September 4, 2024).

[30] *Id.*

71.     Viatris, Mylan Pharmaceuticals, Mylan Technologies, and Meda are collectively referred to herein as "The Mylan Defendants" or "Mylan."

72.     At all relevant times, the Mylan Defendants have manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.

73.     The Mylan Defendants, at all times, have manufactured, distributed and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

### 3.  The Indivior Defendants

74.     **Defendant Indivior Inc.** ("Indivior, Inc.") is a Delaware corporation with its principal place of business in North Chesterfield, Virginia.

75.     Indivior Inc. is registered to do business in Massachusetts and may be served through its registered agent Corporation Service Company, 84 States Street, Boston, MA 02109.

76.     **Defendant Indivior PLC** ("Indivior PLC") is an English public limited company headquartered in Slough, England, United Kingdom, and is the current parent company of Indivior. Indivior PLC owned, controlled, managed and operated Indivior after on or about December 23, 2014.

77.     **Defendant Reckitt Benckiser Group plc** ("Reckitt") is an English public limited company headquartered in Slough, England, United Kingdom, and is the former parent company of Indivior. Reckitt owned, controlled, managed and operated Indivior on or before December 22, 2014, when it was known as Reckitt Benckiser Pharmaceuticals, Inc.

19

78.     On or about December 22, 2014, Reckitt and Indivior Inc., then known as Reckitt Benckiser Pharmaceuticals, Inc., entered into a demerger whereby Reckitt spun off Indivior Inc. and Indivior PLC.

79.     **Defendant Aquestive Therapeutics, Inc.** ("Aquestive") is a Delaware corporation with its principal place of business in Warren, New Jersey. Aquestive is formerly known as MonoSol Rx.

80.     Indivior, Inc.; Indivior PLC; Reckitt Benckiser Group plc; and Aquestive Therapeutics, Inc. are collectively referred to herein as "The Indivior Defendants" or "Indivior."

81.     Indivior Inc. and its former parent company Reckitt as well as Acquestive developed, manufactured, marketed and/or sold branded Subutex and Suboxone, which are Schedule III buprenorphine products approved by the FDA in 2002 for the treatment of opioid use disorder.

82.     Indivior's Suboxone labels for its tablet and film formulations and Indivior's Subutex label all indicate Indivior is and always has been identified as the distributor for those products, either by its prior name Reckitt Benckiser Pharmaceuticals, Inc. or by Indivior Inc.

83.     The manufacturer of Indivior's Suboxone tablets and film and Subutex tablets is identified in its original 2002 Suboxone and Subutex labels and for all labels thereafter as Reckitt Benckiser Healthcare (UK) Ltd.

84.     Indivior and/or Reckitt contracted with MonoSol Rx to manufacture its Suboxone film formulation after its approval in 2010, and to continue to manufacture the film formulation after MonoSol Rx renamed itself Aquesitive Therapeutics in 2017.

85.     The Indivior Defendants, at all times, have manufactured, distributed and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

**4.     Related Entities; Agency and Authority**

86.     Defendants include the entities named above as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

87.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

88.     Plaintiff alleges that the corporate parents named as Defendants in this Complaint are liable as a result of their own actions and obligations in distributing and selling opioids, and not solely because of their vicarious responsibility for the actions of their pharmacy stores.

**IV.     FACTS COMMON TO ALL CLAIMS**

**A.  Opioids and Their Effects**

89.     The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids.  Natural opioids are derived from the opium poppy.  Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

90.     The medicinal properties of opioids have been recognized for millennia—as well as their potential for abuse and addiction.  The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today:  morphine, codeine, and thebaine.

Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today.  Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

91.     In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine.  During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions.  By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms.  The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent.  Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[31]

92.     In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin."  Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

93.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids.  Prescription opioids are synthesized from the

---

[31] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago,* The Washington Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/ (last visited September 4, 2024).

same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

94.    Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.

95.    Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME").  According to the CDC, doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

96.    Patients develop tolerance to the analgesic effect of opioids relatively quickly.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids—the "high."  However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether.  At higher doses, the effects of withdrawal are more severe.  Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

97.    Discontinuing opioids after more than just a few weeks will cause most patients to experience withdrawal symptoms.  These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

**B.  Defendants' Conduct Created an Abatable Public Nuisance**

98.    As alleged throughout this Complaint, Defendants' conduct has created a public health crisis and a public nuisance.

99.     The public nuisance—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by, *inter alia*, educating prescribers and patients regarding the true risks and benefits of opioids, including the risk of addiction; providing addiction treatment to patients who are already addicted to opioids, making naloxone widely available so that overdoses are less frequently fatal, and a number of other proven measures to address the epidemic.

100.     Defendants have the ability to act to help end the public nuisance, and the law recognizes that they are uniquely well positioned to do so.  All companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and sold to appropriate patients and not diverted.  These responsibilities exist independent of any Food and Drug Administration ("FDA") or DEA regulations, to ensure that their products and practices meet both federal and state laws and regulations.  As registered manufacturers, distributors and/or dispensers of controlled substances, Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a key line of defense.  Defendants, however, instead abused their position of special trust and responsibility within the closed system of opioid distribution and dispensing and fostered a black market for prescription opioids.

### C. Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion.

#### 1. Defendants Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids.

101.     Defendants earned enormous profits by flooding the country with prescription opioids.  They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as manufacturers, distributors and retail

sellers of opioids. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, Defendants continued to participate in the oversupply and profit from it.

102. Each Defendant does substantial business across the United States. This business includes the manufacturer, distribution and/or sale of prescription opioids.

103. Data from the Automation of Reports and Consolidated Orders System ("ARCOS") confirms that Defendants manufactured, distributed and/or dispensed substantial quantities of prescription opioids in Plymouth County.[32] In addition, they manufactured, distributed and dispensed substantial quantities of prescription opioids in other states and other counties, and these drugs were diverted from these other states and counties to Plaintiff's Town. Defendants failed to take meaningful action to stop this diversion despite their knowledge of it, and thus contributed substantially to the diversion problem.

104. For over a decade, Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.

105. Each participant in the supply chain of opioid distribution, including Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

## 2. Defendants Have a Duty to Maintain Effective Controls Against Diversion.

106. State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers, distributors and pharmacies would not fall.

---

[32] ARCOS data is only available on a county-wide basis.

Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply chain is not properly controlled.

107.    Further, these laws and industry guidelines make clear that Defendants have a responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

108.    The privilege of holding a license to manufacture, distribute and/or dispense controlled substances comes with the responsibility of ensuring that the controlled substances distributed or sold are not diverted and/or subject to abuse and misuse.  State and federal laws also have developed fairly uniform standards of practice across the country.  It is both intuitive and understood that selling drugs for non-medical purposes, or drugs which the seller knows or should know present a significant risk for diversion falls outside the standards of care and is not a legitimate practice.  As part of usual and customary practice, prescriptions must be evaluated and determined to be valid and issued for a legitimate medical purpose.

109.    Multiple sources impose duties on the Defendants.

110.    First, under the common law, Defendants had a duty to exercise reasonable care in manufacturing and delivering dangerous narcotic substances.  By flooding Massachusetts, and Plaintiff's Town, with more opioids than could be used for legitimate medical purposes, by filling and failing to report orders that they knew or should have realized were likely being diverted for illicit uses, and by Albertsons' failure to maintain effective controls against diversion from its retail

stores, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

111.    Second, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

112.    Third, each of the Defendants was required to register with the DEA to manufacture, distribute and/or dispense controlled substances under the federal Controlled Substances Act ("CSA").  *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71. The federal CSA imposes duties on Defendants that are discussed in detail below.

113.    Fourth, Defendants also had duties under applicable state laws.

114.    Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.  The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.  Congress specifically designed the closed chain of distribution to prevent the diversion of controlled substances into the illicit market.  Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[33]  Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.  All registrants must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to identify or prevent diversion.  Maintaining the closed system under the CSA and effective controls

---

[33] H.R. Rep. No. 91-1444, *reprinted in* 1979 U.S.C.C.A.N. at 4572.

to guard against diversion is a vital public health concern.  Controlled substances, and prescription opioids specifically, are recognized as posing a high degree of risk from abuse and diversion. When the supply chain participants at any level fail to fulfill their obligations, the necessary checks and balances collapse.  The result is the scourge of addiction that has occurred.

115.    The CSA requires manufacturers, distributors and pharmacies, along with other participants in the supply chain of controlled substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of controlled substances like opioids; (b) register to distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) identify suspicious orders of controlled substances and halt such sales.

### a)  CSA Duties of Manufacturers and Wholesale Distributors

116.    Federal law requires that manufacturers and distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(a)(1), (b)(1).

117.    In addition to their overall duty to provide effective controls against diversion, registrants that are manufacturers or wholesale distributors (a) must design and implement a system, to identify suspicious orders; (b) report suspicious orders to the DEA; and (c) not ship suspicious orders unless and until they are able to establish, through due diligence, that they are not likely to be diverted.  *See* 21 C.F.R. § 1301.74; *see also Masters Pharm. Inc.*, 80 Fed. Reg. 55418-01, 2015 WL 5320504 (DEA Sept. 15, 2015); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *4-10 (N.D. Ohio Aug. 19, 2019); *City & County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 951-52 (N.D. Cal. 2022).

118.    Specifically, Defendants were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Defendants were further required to take steps to halt suspicious orders. "The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b). Other factors that may raise suspicions may include, for example, ordering the same controlled substance from multiple distributors. Defendants violated their obligations under federal law.

119.    These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a distributor or manufacturer need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry.

120.    Once a registrant has identified a suspicious order, it must refuse to ship that order unless and until it can establish, through due diligence, that the order is unlikely to be diverted.

121.    The investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order nonsuspicious and exempt it from the requirement that the distributor inform the DEA about the order.  Put another way, if, even after investigating the order, there is

29

any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed.  Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them without performing adequate due diligence.

122.    To comply with the law, wholesale distributors, including Defendants, also must know their customers and the communities they serve.  Each distributor must "perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer." *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), *petition for review denied*, 861 F.3d 206 (D.C. Cir. 2017).

123.    As manufacturers of controlled substances, Indivior and Mylan also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from their purchase of data from commercial sources, such as IMS Health.  (Because the IMS Health data comes from pharmacies, pharmacies such as Albertsons also have access to the same detailed information as manufacturers.)  Their extensive boots-on-the-ground activity through their sales force allows manufacturers, including Indivior and Mylan, to observe the signs of suspicious prescribing and dispensing —lines of seemingly healthy patients, out-of-state license plates, and cash transactions, to name only a few.  In addition, manufacturers, including Indivior and Mylan, regularly mined data, including chargeback data, which allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing, which would have alerted them, independent of their sales representatives, to suspicious prescribing.  This information gave manufacturers, including Indivior and Mylan,

insight into prescribing and dispensing conduct that enabled them to play a valuable role in preventing diversion and fulfilling their obligations under the CSA.

124.    All Defendants, as manufacturers and distributors, and for Albertsons as a pharmacy, have a duty, and are expected, to be vigilant in ensuring that controlled substances are delivered only for lawful purposes.

### b) CSA Duties of Dispensers

125.    Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a).

126.    In addition to their overall duty to provide effective controls against diversion, registrants that dispense opioids are prohibited from filling prescriptions that are not written for a legitimate medical purpose.  *See* 21 C.F.R. § 1306.04(a); *see also In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 739, 784-85 (N.D. Ohio 2022) (quoting jury instruction that described CSA duties of dispensers); *City & County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 958-59 (N.D. Cal. 2022).  Dispensers must review prescriptions for red flags, perform due diligence on prescriptions that raise red flags, and refuse to fill prescriptions for which red flags cannot be resolved.  Not only the pharmacists at the dispensing counter, but the pharmacy itself and its corporate parents, are required to ensure that only valid prescriptions are filled.

127.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. 21 U.S.C. § 829(a). Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner. *Id*.

128.    Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

129.    A prescription, whether written or oral, is legally valid under the CSA *only* if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id*.

130.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." *Id*. Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

131.    Regardless of whether they are registrants, all dispensers must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Id*. The DEA has recognized that "as dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."[34]

---

[34] 2012 Dear Registrant letter to pharmacy registrants, Feb. 9, 2012, http://ppsconline.com/articles/2012/FL_PDAC.pdf (last visited September 4, 2024).

132.     Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy…." 21 C.F.R. § 1306.06.

133.     Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice—*i.e.,* "the usual course of his [or her] professional practice" of pharmacy. *Id*.

134.     Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See* 21 C.F.R. §§ 1306.04, 1306.06.

135.     Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions. 21 U.S.C. §§ 842, 843.

136.     A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[35] The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate.[36] The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.[37] A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[35] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, Pharmacist's Manual: An Informational Outline of the Controlled Substances Act (Rev. 2020); *City & Cnty. of San Francisco v. Purdue Pharma, L.P.*, 620 F. Supp. 3d 936, 959-60 (N.D. Cal. 2022).

[36] *City & Cnty. of San Francisco*, 620 F. Supp. 3d at 960.

[37] *Id.*

137.     A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.[38]

138.     The DEA has repeatedly emphasized that retail pharmacies, such as Albertsons, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion. When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[39] The DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist. These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address; prescribing the same controlled substances in each presented prescription; a high volume of patients presenting prescriptions and paying with cash; and, a prescription presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

139.     The DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area,

---

[38] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020) (citing *Jones Total Healthcare, L.L.C., v. DEA*, 881 F.3d 823 (11th Cir. 2018)).

[39] *Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin.*, No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by the pharmacies' diversion control systems.

140. "[T]he due diligence process involves four steps: identify any red flags, obtain information relevant to resolving the red flags, obtain information relevant to resolving the red flags, evaluate the information, and document the reasons supporting filling or refusing to fill the prescription."[40]

141. As explained above, under the CSA, the duty to prevent diversion lies with the pharmacy, such as Albertsons, not just with the individual pharmacist. As such, although it acts through its agents, the pharmacy is ultimately responsible to prevent diversion.[41] Further, as described above, the obligations under the controlled-substances laws extend to any entity selling prescription opioids, whether it is the registration holder or not. It is unlawful for any person knowingly to distribute or dispense controlled substances other than in accordance with the requirements of the federal CSA and its implementing regulations, or in violation of state controlled substances laws and regulations. Pharmacies such as Albertsons are responsible "persons" under the CSA. They also exert control over their agents, including the responsibility to ensure they comply with applicable laws and regulations in all dispensing of controlled

---

[40] *City & Cnty. of San Francisco*, 620 F. Supp. 3d at 960.

[41] *The Medicine Shoppe; Decision and Order*, 79 FR 59504, 59515 (DEA Oct. 2, 2014); *see also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01 ("When considering whether a pharmacy has violated its corresponding responsibility, the Agency considers whether the entity, not the pharmacist, can be charged with the requisite knowledge."); *Top RX Pharmacy*; Decision and Order, 78 FR 26069, 62341 (DEA Oct. 12, 2012) (same); *cf. Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration,* 881 F.3d 82 (11th Cir. 2018) (revoking pharmacy registration *inter alia,* dispensing prescriptions that prescriptions presented various red flags, i.e., indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

substances. Albertsons cannot absolve itself of its own obligations by attempting to place unilateral responsibility on its agents.

142. In a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as large numbers of customers who receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.

143. In the context of bellwether cases brought by governmental plaintiffs, the MDL Court held that "both pharmacists and pharmacies bear all the obligations imposed [by the CSA] upon practitioners and dispensers." *In re Nat'l Prescription Opiate Litig.,* 477 F. Supp. 3d 613, 626 (N.D. Ohio 2020) (Doc. No. 3403). The Court further held that, in light of the data that pharmacies are required, by law, to collect, they must make use of that data to provide effective controls against diversion. *Id.* As the Court explained:

> [A] pharmacy is required to: (1) collect and maintain specific records and data regarding its dispensing activity; (2) employ a properly licensed pharmacist; and (3) properly dispense controlled substances and avoid diversion. Therefore, both the pharmacy and the pharmacist must cooperatively identify and resolve "red flags" prior to dispensing controlled substances. The Court concludes these requirements collectively mean that the Pharmacy Defendants cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled. Possessing, yet doing nothing with, information about possible diversion would actually *facilitate* diversion, and thus violate the CSA's fundamental mandate that "*All applicants and registrants shall provide effective controls and procedures to guard against theft <u>and</u> diversion of controlled substances.*" 21 C.F.R. § 1301.71(a).[42]

---

[42] *Id.* at 631 (emphasis by the Court).

144.     Similarly, in a case remanded from the MDL, Judge Charles Breyer of the United States District Court for the Northern District of California held that the CSA "requires pharmacists and pharmacies to identify and resolve objective signs" when a prescription is presented "that create 'a reasonable suspicion that the prescription is not, on its face, legitimate.'" *City & Cnty. of San Francisco,* 620 F. Supp. 3d. at 960. Judge Breyer further held that the elements of a CSA violation in this context are that "(1) a pharmacy dispensed a controlled substance, (2) "a red flag was or should have been recognized at or before the time the controlled substance was dispensed," and (3) "the question created by the red flag was not resolved conclusively prior to the dispensing of the controlled substance."  The Court further noted that "Prescriptions with unresolved red flags cannot be dispensed." *Id.* at 999-1000.

145.     In addition to its duties as a distributor, as a dispenser, Albertsons also had a duty to design and implement systems to prevent diversion of controlled substances in its retail pharmacy operations.  Albertsons had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions suggestive of potential diversion.  It also has a crucial role in creating chain-wide systems to identify and avoid filling "prescriptions" that are not issued for a legitimate purpose or by a prescriber with a valid, current license.

146.     Pharmacies' obligations extend to monitoring, and documenting, the steps they take in accessing state prescription drug monitoring programs, often referred to as "PDMPs."  Yet, as described below, for many years Albertsons relied on its pharmacists' discretion in this area rather than setting forth requirements concerning PDMP searches and implementing systems to track and document PDMP searches and their results for, *inter alia,* dispensing prescriptions that prescriptions presented various red flags.

147.    Pharmacy order data provides detailed insight into the volume, frequency, dose, and type of controlled and non-controlled substances a pharmacy typically orders.  This includes non-controlled substances and Schedule IV controlled substances (such as benzodiazepines), which are not reported to the DEA, but whose use with opioids can be indicative of diversion.

148.    As acknowledged in an article CVS published in the New England Journal of Medicine, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular."  Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., *Abusive Prescribing of Controlled Substances - A Pharmacy View*, N. ENGL. J. MED. 369;11, Sept. 12, 2013, at 989-991.  The DEA has identified "both pharmaceutical distributors and chain pharmacies as part of the problem" contributing to opioid abuse and related deaths. *Id.*

149.    Pharmacies such as Albertsons have a particular "advantage" in meeting their obligations under the CSA because these entities can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing."  *Id.* at 990.  For example, a pharmacy should properly use its chainwide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id.*  This "[a]nalysis of aggregated data" from chain pharmacies can "target patterns of abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths."  *Id.*

150.    According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the relevant state's Board of Pharmacy and the DEA must be contacted.

151.    Pharmacies' evaluation process includes with what is known as "Drug Utilization Review" or "DUR."  This practice is both part of traditional roles and duties and codified in federal and state statutes.   Notably, during the rulemaking practice for one authority, the Omnibus Budget [R]econciliation Act of 1990 (OBRA 90), a commenter suggested that instructions for compliance with prospective DUR should go to the pharmacist and not the pharmacy.   In response, the government stated that "the instructions for compliance with prospective DUR should be directed to the pharmacies," and that "[t]he owners or managers of pharmacies, as Medicaid providers, are responsible for furnishing their staff with information pertaining to DUR."   States, seeking to assure uniformity, have taken action to require the same mandates as this federal law.  The DUR process includes looking at over-utilization, drug interactions and identifying abuse and misuse of dangerous drugs such as opioids.   This process provides pharmacies with information about potential diversion as well.

152.    Accordingly, states, including Massachusetts, revised and expanded practice acts and rules and increased their support for, and reliance on, Prescription Drug Monitoring Programs (PDMPs), which continued to grow over time.

153.    Additionally, pharmacies such as Albertsons have operating systems and methods to store and retain prescription dispensing data and records.  The information they possess must be readily retrievable, and they have an obligation to use the information to identify patterns of diversion, conduct internal audits and training programs, investigate suspicious prescribers, patients, and pharmacists, and prevent diversion of controlled substances.  Their hiring, training, and management of pharmacy personnel, and supporting policies, procedures, and systems should

and must promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

### 3. Defendants Have Corresponding Duties Under Massachusetts Law

154. In addition to the CSA, Defendants were also required to comply with Massachusetts controlled substances law and pharmacy regulations.

155. As under federal law, opioids are a Schedule II controlled substance under Massachusetts law. *See* M.G.L. C. 94C. §§ 2, 3. Opioids are categorized as "Schedule II" drugs because they have a "high potential for abuse" and the potential to cause "severe psychic or physical dependence" and/or "severe psychological . . . dependence." 21 U.S.C. § 812(b)(2)(A)-(C); *see also* M.G.L. C. 94C. § 3.

156. Massachusetts law requires all manufacturers, distributors and dispensers of controlled substances drugs to register with the Commissioner of Public Health or the Board of Pharmacy. M.G.L. C. 94C. § 7(a); *see also* 247 Mass. Code Regs. 7.02; 247 Mass. Code Regs. 11.01.

157. "The board of registration in pharmacy in the case of a retail drug business, wholesale druggist or outsourcing facility and the commissioner in all other cases shall register an applicant to manufacture or distribute controlled substances included in the schedules established pursuant to section two unless he determines that the issuance of that registration would be inconsistent with the public interest. In determining the public interest, the board of registration in pharmacy in the case of a retail drug store, wholesale druggist or outsourcing facility and the commissioner in all other cases shall consider the following factors: … maintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels; compliance with applicable federal, state and local law; … and any other

factors relevant to and consistent with the public health and safety."  M.G.L. C. 94C. § 12(a)(1),(2) & (7); *see also* 247 Mass. Code Regs. 11.02.

158.    A registration to manufacture, distribute, dispense or possess a controlled substance may be suspended or revoked "upon a finding that the registrant … has been convicted under any state or federal law of any criminal violation relating to his fitness to be registered under this chapter; has had his federal registration suspended or revoked to manufacture, distribute, dispense, administer or possess controlled substances; or is, upon good cause, found to be unfit or unqualified to manufacture, distribute, dispense, or possess any controlled substance." M.G.L. C. 94C. § 13(a)(2), (3), & (4).

159.    Registrants "shall keep records and maintain inventories in conformance with the record-keeping and inventory requirements of the Federal 'Comprehensive Drug Prevention and Control Act of 1970' … and the Federal Food, Drug and Cosmetic Act, and with any additional rules or regulations promulgated by the board of registration in pharmacy in the case of a retail drug business or wholesale druggist or by the commissioner in all other cases." M.G.L. C. 94C. § 15.

160.    Defendants were required to comply with these reporting requirements under federal law and maintain distribution records pursuant to M.G.L. C. 94C, § 15 and the Code of Massachusetts Regulations 7.04, Minimum Requirements for the Storage and Handling of Prescription Drugs. 247 Mass. Code Regs. 7.04.

161.    "A prescription for a controlled substance to be valid shall be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice. The responsibility for the proper prescribing and dispensing of controlled substances shall be upon the prescribing practitioner, *but a corresponding responsibility shall rest with the pharmacist who fills*

*the prescription."* M.G.L. C. 94C. § 19 (emphasis added). Persons who knowingly fill prescriptions that are not legitimate shall be subject to criminal penalties. *Id*.

162.   A pharmacist may only fill a prescriptions if the pharmacist, "in the exercise of that pharmacist's professional judgment, determines that: (1) The prescription is issued pursuant to a valid patient/practitioner relationship and for a legitimate medical purpose by an authorized practitioner acting in the course of his or her professional practice; (2) the prescription is authentic; and (3) the dispensing is in accordance with M.G.L. c. 94C, § 19(a)." 247 Mass. Code Regs. 9.06.

163.   As a dispenser, Albertsons was required to comply with requirements that its pharmacists report to the State's Prescription Drug Monitoring Program and specific security requirements. *See, e.g.,* 247 Mass. Code Regs. 5.04; 247 Mass. Code Regs. 6.02.

164.   Albertsons was also required to comply with the reporting requirements under federal law and Massachusetts regulations for dispensing prescriptions, maintaining prescription files and patient records and conducting a prospective drug utilization review.  *See, e.g.,* 247 Mass. Code Regs. 9.04, 9.05, 9.06 and 9.07.

165.   Furthermore, Massachusetts law incorporates federal requirements set out under the CSA and related controlled substance laws and regulations. *See, e.g.,* M.G.L. c. 94C, §§ 9, 12, 13, 15; Mass. Code Regs. 7.04; Mass. Code Regs. 11.02.

### 4. Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.

166.   The regulations aim to create a "closed" system in order to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.  Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as

the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to prevent diversion of controlled substances is critical.  Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

167.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

168.    Indeed, the DEA has repeatedly informed Defendants about their legal obligations, including obligations that were so obvious that they simply should not have required additional clarification.  As former DEA agent Joseph Rannazzisi explained during a deposition in this MDL:

Q.  Someone says "Don't steal," do you have to put in there "from a supermarket"?

A.  No.

Q.  Someone says "Don't trespass on the property," do you have to put "wearing tennis shoes"?

A.  No.

Q.  Next, you got asked: "Well, you never instructed the companies to keep their files."  Do you remember that?

A.  Yes, sir.

Q.  Would old files be important in monitoring—in your ongoing monitoring?  Would it be important that a company keep their files so that they can look back at them?

A:  Absolutely. That's the—the whole idea behind maintaining a due diligence file is you have a history of purchases. That way you could see what they're doing and where they're going with their purchases.

169.    For example, it is not an effective control against diversion to identify a suspicious order, ship it, and wait as long as weeks to report it to law enforcement, potentially allowing those pills to be diverted and abused in the meantime.

170.    During a 30(b)(6) deposition in the MDL, the DEA's Unit Chief of Liaison was asked whether the DEA made it "clear to industry that the failure to prevent diversion was a threat to public safety and the public interest."  In response, he testified:

> Yes, I think it's established in 823 [the Controlled Substances Act] where it's part of our -- part of the registrant that is applying to be a registrant understands that they have to maintain effective controls . . . . they also know that these drugs themselves are scheduled controlled substances for a particular reason, because they're addictive, psychologically and physically they're addictive, so they know that these drugs have these properties within themselves.  **So they would understand that these drugs are categorized or scheduled in that manner because they have the potential to hurt**.

171.    In fact, trade organizations in which Albertsons actively participated have acknowledged that distributors have been responsible for reporting suspicious orders for more than 40 years.  The National Association of Chain Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies.  Its members and/or affiliate members also include stakeholders such as manufacturers, other distributors and other trade organizations as well.  Albertsons serves on the Board of Directors of NACDS.

172.    In 2006, the NACDS issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.  The Model Compliance Manual notes that a retail pharmacy may "generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse.

173.    In the appeal that arose from DEA's enforcement action against wholesaler Masters Pharmaceuticals, Inc. for its distribution of opioids, the NACDS submitted a joint amicus brief with a distributor trade organization called the Healthcare Distribution Management Association ("HDMA,") (now known as the Healthcare Distribution Alliance ("HDA")), regarding the legal

duty of distributors that acknowledged that "HDMA and NACDS members" had a duty to prevent diversion."  *See Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.*, 2016 WL 1321983 (D.C. Cir. April 4, 2016).  The NACDS has long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society."

174.    The DEA repeatedly reminded Defendants of their obligations to report and decline to fill suspicious orders.  Responding to the proliferation of internet pharmacies that arranged illicit sales of enormous volumes of opioids, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.

175.    Specifically, in August 2005, the DEA's Office of Diversion Control launched the "Distributor Initiative."  The Distributor Initiative did not impose any new duties on distributors, but simply reminded them of their duties under existing law.  The stated purpose of the program was to "[e]ducate and inform distributors/manufacturers of their due diligence responsibilities under the CSA by discussing their Suspicious Order Monitoring System, reviewing their [Automation of Reports and Consolidated Orders System ("ARCOS")] data for sales and purchases of Schedules II and III controlled substances, and discussing national trends involving the abuse of prescription controlled substances."[43]  The CSA requires that distributors (and manufacturers) report all transactions involving controlled substances to the United States Attorney General.  This data is captured in ARCOS, the "automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail

---

[43] Thomas W. Prevoznik, Office of Diversion Control, Distributor Initiative presentation (Oct. 22, 2013).

level—hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions,"[44] described above, from which certain data has now been made public.

176.    As part of the Distributor Initiative, the DEA gave several presentations to distributors both individually and through presentations and discussions at trade groups meetings directly targeted at some of the red flags of diversion that the Defendants were obligated to consider and monitor as part of their requirements under the law.



177.    The DEA has hosted many different conferences throughout the years, including Pharmacy Diversion Awareness Conferences, to provide registrants with updated information about diversion trends and their regulatory obligations.  The DEA also frequently presented at various other conferences for registrants at the national, state, and local level.

178.    Through presentations at industry conferences and on its website, the DEA provided detailed guidance to distributors on what to look for in assessing their customers'

---

[44] U.S. Dept. of Justice, Drug Diversion Administration, Diversion Control Division website, https://www.deadiversion.usdoj.gov/arcos/arcos.html#:~:text=ARCOS%20is%20an%20automated%2C%20comprehensive,practitioners%2C%20mid%2Dlevel%20practitioners%2C (last visited September 4, 2024).

trustworthiness.  As an example, the DEA published "Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances"[45]

179.    In addition, the DEA sent a series of letters, beginning on September 27, 2006, to every commercial entity registered to distribute controlled substances.  The 2006 letter emphasized that distributors are:

> one of the key components of the distribution chain.  If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.  This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.[46]

180.    The letter also warned that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[47]

181.    The DEA sent a second letter to distributors on December 27, 2007.  Again, the letter instructed that, as registered distributors of controlled substances, they must each abide by statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[48]  DEA's letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed

---

[45]https://web.archive.org/web/20221023232252/https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf (last visited September 5, 2024)

[46] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Off. of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), filed in *Cardinal Health, Inc. Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51 ("2006 Rannazzisi Letter"); *see also* CVS-MDLT1000091513; WAGMDL00757797.

[47] *Id.*

[48] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug. Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8 ("2007 Rannazzisi Letter").

guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting ARCOS data to the DEA).

182.    In September 2007, the NACDS, (of which Albertsons is a member) among others, also attended a DEA conference at which the DEA reminded registrants that not only were they required to report suspicious orders, but also to halt shipments of suspicious orders.

183.    The DEA's regulatory actions against the three largest wholesale distributors further underscore the fact that distributors such as Defendants were well aware of their legal obligations.  There is a long history of enforcement actions against registrants for their compliance failures.  For example, in 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against three of Cardinal Health's distribution centers, and on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the CSA in Maryland, Florida, and New York. Similarly, on May 2, 2008, McKesson entered into an Administrative Memorandum of Agreement ("AMA") with the DEA related to its failures in maintaining an adequate compliance program.  Subsequently, in January 2017, McKesson entered into an AMA with the DEA wherein it agreed to pay a $150 million civil penalty for, *inter alia*, failure to identify and report suspicious orders at several of its facilities.

184.    The DEA has also repeatedly affirmed the obligations of Defendants to maintain effective controls against diversion in regulatory action after regulatory action.[49]  The DEA, among

---

[49] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998) (revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); Medicine Shoppe-Jonesborough; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).

others, also has provided extensive guidance on how to identify suspicious orders and other evidence of diversion.

185.    In addition, red flags are common sense warning signs that have always been an important component of controlled substance pharmacy best practices, not a novel concept to pharmacies.  Relevant guidance concerning narcotics dispensing dates back to at least since the 1930's and 1940's. Since then, there has been guidance given to pharmacies and pharmacists related to the creation of systems and programs to guard against diversion and lists of don'ts when dispensing narcotics.   DEA enforcement actions such as the *Holiday* decision, *Medicine Shoppe-Jonesborough* and *United Prescription Services, Inc*. also hold pharmacies responsible for failing to fulfill their corresponding responsibility under the CSA.

186.    The "cocktail" often referred to as the "Holy Trinity" consists of an opioid, a benzodiazepine, and a muscle-relaxer such as carisoprodol.  A "trinity" combination can also refer to different combinations of opioid/non-opioid prescriptions intended for abuse and to create a euphoric feeling similar to heroin and other illicit drugs such as fentanyl.   Medical literature has long recognized the special dangers posed by cocktails composed of drugs of abuse which lack any documented medical efficacy.  Similarly, the *East Main Street Pharmacy* action acknowledged that "the combination of a benzodiazepine, a narcotic and carisoprodol is well known in the pharmacy profession as being used by patients abusing prescription drugs."[50]

187.    As a DEA administrative decision from 2008 explains, "[w]hile carisoprodol [was] not controlled under Federal law, it is controlled under various state laws and is highly popular with drug abusers, especially when taken as part of a drug cocktail that includes an opiate and a

---

[50] East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order).

benzodiazepine." *See Your Druggist Pharmacy*, 73 Fed. Reg. 75,774, 75,775 n.1 (DEA Dec. 2008).  Other DEA and judicial decisions likewise acknowledge well-known and highly abused cocktails.  *See, e.g., U.S. v. Evans*, 892 F.3d 692, 706 (5th Cir. 2018).

188.    As described above, red flags indicative of diversion include suspicious behavior of patients, such as stumbling while walking, slurred speech, appearance of intoxication, or of customers coming and appearing like they may not need the medication, or requesting drugs by brand name or street slang such as "blues" (a term referencing Mallinckrodt opioids).  Pharmacies' training materials and controls should assist pharmacists and technicians in the identification of such behaviors.

189.    Pharmacies must resolve red flags before a prescription for addictive and dangerous drugs, such as opioids, are dispensed.

**5.    Defendants Worked to Expand their Shares of the Prescription Opioid Market and Failed to Maintain Effective Controls Against Diversion.**

190.    For over a decade, all Defendants aggressively sought to bolster their revenues, increase profits, and grow their shares of the prescription opioid market by unlawfully and surreptitiously increasing the volume of opioids they sold nationwide.

191.    However, Defendants are not permitted to engage in a limitless expansion of their market shares through the unlawful sale of highly addictive controlled substances. Rather, Defendants are subject to various duties under the federal CSA and state law—duties they failed to perform.

192.    Defendants failed to provide the requisite controls against diversion. All Defendants shipped suspicious orders with indicia of diversion without performing the required due diligence, and Albertsons also dispensed prescriptions with red flag indications of diversion, again without performing the due diligence required by law.

193. As described further below, the Defendants failed to fulfill their legal duties and instead, routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse. In addition, the Mylan Defendants and Indivior Defendants promoted the sale and use of their products in ways that encouraged doctors to prescribe these products in an unsafe manner. The unlawful conduct by these Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing Plaintiff's Town.

### a) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiff's Town.

194. According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the U.S. Not all of these prescriptions were legitimate. Yet Albertsons systemically ignored that they were fueling a black market, and failed to maintain effective controls against diversion at both the wholesale and retail pharmacy level. Instead, Albertsons put profits over the public health and safety. Despite their legal obligations as registrants under the CSA, the Albertsons Defendants allowed widespread diversion to occur—and did so knowingly.

195. Albertsons has operated as a licensed pharmacy wholesaler and facility and as a licensed dispenser. Albertsons has distributed and dispensed prescription opioids throughout the United States, in Massachusetts and in Plaintiff's Town.

### 1) Albertsons Was Uniquely Positioned to Guard Against Diversion

196. Not only do pharmacies such as Albertsons often have firsthand knowledge of dispensing red flags – such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, cash transactions, and other significant information – but they also have the ability to analyze data relating to drug utilization and prescribing patterns

across multiple retail stores. As with other distributors and dispensers, these data points give the pharmacies like Albertsons insight into prescribing and dispensing conduct that enables them to prevent diversion and fulfil their obligations under the CSA.

197.     Pharmacies such as Albertsons not only make observations through their local front doors, but have extensive data to which an individual pharmacist would not have access.  They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve.  This is particularly important given that it is recognized that as to the supply of opioids increases, so does the incidence of overdose and death.    Albertsons could also use this information to monitor potentially suspicious prescribers.  Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion and should share this information with their agents, as well as provide clear guidance and training on how to use it.  A former DEA diversion investigator, whose testimony is also referenced above, agreed in a deposition in this MDL that as part of their obligation under Section 1301.71, pharmacies corporately have an obligation to develop policies to train pharmacists to comply the CSA regulations.  She further agreed that the defendants had an obligation to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.

198.     As explained above, in addition to its duties as a distributor, Albertsons also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.   Specifically, Albertsons had a duty to analyze data and the personal observations of its employees for known red flags such as those described above.  Albertsons had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and chain level, and to refuse to fill and to report prescriptions that suggested potential diversion.

199.    Albertsons was particularly well-positioned to do so given the dispensing data available to it, which it could review at the corporate level to identify patterns of diversion and to create policies and practices to proactively identified patterns of diversion. Albertsons could and should have also developed tools and programs to alert its pharmacists to red flags and to guard against diversion.

200.    Albertsons had complete access to all prescription opioid dispensing data related to its pharmacies in the Plaintiff's Town, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around Plaintiff's Town, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around Plaintiff's Town.  Further, Albertsons had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around Plaintiff's Town and complete access to information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in and around Plaintiff's Town.

201.    Albertsons' data is a valuable resource that it could and should have used to help prevent diversion, but it failed to do so.  Albertsons facilitated the supply of far more opioids than could have been justified to serve a legitimate market.  The failure of Albertsons to maintain effective controls, and to investigate, report, and take steps to halt orders that it knew or should have known were suspicious, as well as to maintain effective policies and procedures to guard against diversion from its retail stores, breached both its statutory and common law duties.

53

### 2) Albertsons Failed to Guard Against Diversion as a Distributor of Opioids.

202.    At various times, Albertsons self-distributed controlled substances to its company-owned pharmacies across the country through its distribution center in Ponca City, Oklahoma.[51]

203.    Because it was distributing opioids only to its own stores, it was well-positioned to identify and prevent the diversion of controlled substances.  Albertsons had access to a trove of information, such as each pharmacy's controlled substance and non-controlled substance ordering and dispensing activities and records, which could provide corporate diversion employees and supervisors with the ability to easily spot deviations from normal ordering patterns. Similarly, Albertsons' pharmacy supervisors could have used distribution information, volume and type of controlled substances, and other ordering patterns as warnings that review of individual pharmacy dispensing activity was necessary.

204.    From 2006 to 2008, Albertsons self-distributed Schedule III, IV, and V opioids.[52] Albertsons stopped distributing all drugs from its distribution center from 2009 to 2012.[53] In 2013, Albertsons resumed distribution to its pharmacies and distributed Schedule II, III, IV, and V opioids until 2016 when the company stopped all of its drug distribution activity.[54]

205.    Albertsons knew that suspicious order monitoring was required under the CSA and its implementing regulations.  In letters referenced above that were sent in September 2006 and December 2007, the DEA reminded the Ponca City Distribution Center of its legal obligations—

---

[51] Deposition of Anthony Provenzano, August 10, 2023, 25:11-18.

[52] Deposition of Anthony Provenzano, August 10, 2023, 25:24-26:6.

[53] Deposition of Anthony Provenzano, August 10, 2023, 26:9-12.

[54] Deposition of Anthony Provenzano, August 10, 2023, 26:15-:27:1; 27:5-8.

including to develop and maintain a SOM system, conduct due diligence on identified suspicious orders, and, if suspicions could not be resolved, cancel the order and report it to the DEA.

206. Throughout the entire time it self-distributed opioids to its company-owned pharmacies, Albertsons lacked detailed operational SOM policies, failed to provide adequate training and guidance to those charged with suspicious order monitoring duties, and limited resources and support to diversion control.

207. Indeed, Albertsons never identified a single order as suspicious.[55] Albertsons also never cancelled, rejected, or refused to ship an order on the grounds that it was suspicious.[56] Because it never identified any suspicious orders, the company never reported a single order as suspicious to the DEA.[57]

208. Albertsons also allowed pharmacies to supplement their orders by ordering controlled substances from third party vendors without oversight. This allowed Albertsons pharmacies to avoid having their controlled substance orders be monitored or otherwise questioned.

209. In fact, Anthony Provenzano, who has been Albertsons' Vice President of Pharmacy Compliance and Government Affairs since 2015, testified that, as of 2020, he believed Albertsons had no duty to report suspicious orders to the DEA.[58]

---

[55] Deposition of David Beck, February 18, 2022, 195:23-196:1; 196:3-3.

[56] Deposition of David Beck, February 18, 2022, 165:2-11; 197:10-14; Deposition of David Beck, March 1, 2022, 199:22-200:6.

[57] Deposition of David Beck, February 18, 2022, 197:16-19; Deposition of David Beck, March 1, 2022, 92:24-93:3; 93:5-5; Deposition of Anthony Provenzano, February 10, 2022, 266:15-17.

[58] Deposition of Anthony Provenzano, February 10, 2022, 262:10-264:14; ALB-NM00190163.

i) **From 2006-2008, Albertsons' SOMS was Critically Inadequate.**

210.    Albertsons did not have any system or written policy to help it detect suspicious orders prior to October 2001. This first policy only purported to identify orders of unusual size, and failed to identify orders that deviated substantially from orders of unusual frequency or a normal pattern.  There was also no guidance in this policy about what should occur if a pharmacy breached the threshold that was set.

211.    In 2002, Albertsons engaged Ron Buzzeo, a former Deputy Director in the DEA's Office of Diversion Control and the Chief Regulatory Officer at BuzzeoPDMA, a compliance and auditing company.  Albertsons hired Buzzeo to prepare standard operating procedures for the Ponca City distribution center to ensure that Albertsons was following "the rules, regulations and guidelines and laws that are required to operate a pharmacy [distribution business]."[59] The purpose was to provide guidelines for Albertsons to show the company "this is what your policy should look like."[60] The Buzzeo policy proposal specified that Albertsons must "ensure that suspicious orders are reported to the DEA and [Albertsons'] legal department."[61]

212.    Albertsons' official 2002 Standard Operating Procedures mostly copied verbatim the 2002 Buzzeo policy.[62] The 2002 Albertsons policy, however, actually ***deleted*** the requirement from the Buzzeo proposal to "ensure that suspicious orders are reported to the DEA and the legal department."[63]

---

[59] Deposition of David Beck, March 1, 2022, 59:4-9; ALB-NM00005850.

[60] Deposition of David Beck, March 1, 2022, 109:6-8; 109:10-17.

[61] Deposition of David Beck, March 1, 2022, 92:11-19; ALB-NM00005850, at 5889.

[62] Deposition of David Beck, March 1, 2022, 108:3-9; 109:6-8; 109:10-17; ALB-NM00002284, at 2329.

[63] Deposition of David Beck, March 1, 2022, 110:10-25; 111:6-7; ALB-NM00002284, at 2329.

213.     The Albertsons policy had a threshold-based system based on a pharmacy's assigned "maximum order" known as the "Maximum Order Quantity" (MOQ). The MOQ was the maximum number of bottles that a store could order at one time for a particular drug/strength and bottle size, which was based on a particular store size/type rather than a consistent maximum for all stores throughout the chain.  Because the limit applied to each separate order, a pharmacy could order up to its limit at least twice a week without running afoul of the maximum order parameters.

214.     The MOQ-based threshold system failed to identify suspicious orders.  It failed to identify orders of unusual frequency or orders that substantially deviated from a normal ordering pattern, and the system could be easily circumvented or modified.  In addition, orders that exceeded the MOQ would be cut and shipped, and the store would only be contacted after shipment.

215.     The 2002 Albertsons policy was in place from 2002-2008 and comprised the totality of Albertsons' SOMS policies for that time.[64] David Beck, Albertsons' 30(b)(6) witness for distribution-related information, was not sure which person or department would have been responsible for reporting suspicious orders, had any orders actually been identified.[65]

216.     Although Albertsons written policies include an electronic screening process to identify suspicious orders and prevent them from being processed to shipped to stores,[66] Mr. Beck had no knowledge whether any suspicious order files were ever actually created; instead, he

---

[64] Deposition of David Beck, March 1, 2022, 111:11-16; 111:19-22; 111:24-24; 112:1-4; 112:6-8.

[65] Deposition of David Beck, March 1, 2022, 93:23-25; 94:2-20.

[66] Deposition of David Beck, March 1, 2022, 68:1-24; 96:25-97:6; 97:8-14; ALB-NM00005850, at 5888-889, ALB-NM00002284, at 2329.

testified that "we never had a suspicious order."[67] He also had no knowledge whether that system actually cancelled, blocked, or reduced any orders.[68]

217.    The daily order selection process at the Ponca City Distribution Center also had no meaningful guardrails in place to protect against diversion. Albertsons did not have any training associated with its SOM process between 2002-2008.[69]  A "Selector," also knows as a "repack selector," "pharmacy selector" or "order selector," is the employee who puts together the order for a store.[70] While the Ponca City Distribution Center employed a maximum of 30 Selectors at a given time,[71] Albertsons did not assign certain Selectors to pick orders only for a consistent group of certain stores; rather, it was a randomized process.[72]

218.    Under Albertsons' SOMS process, after a Selector located the medication to fill a pharmacy's order, he or she would use "common sense" to determine if the order "doesn't look right," or "something doesn't match up."[73] To determine if an order "didn't look right," Distribution Center employees simply relied on their "gut feeling."[74] Albertsons provided no written criteria to help inform the Selector's "gut feel" in identifying suspicious orders.[75] Instead,

---

[67] Deposition of David Beck, March 1, 2022, 81:5-6; 81:8-82:22; 82:24-83:20; 89:14-23; 90:9-15; 90:17-17; 91:5-12; 91:23-92:3; 92:11-93:3; 93:5-5; 94:22-24.

[68] Deposition of David Beck, March 1, 2022, 233:17-234:14; 235:4-5; 235:7-7.

[69] Deposition of David Beck, March 1, 2022, 112:9-14.

[70] Deposition of David Beck, March 1, 2022, 124:22-24.

[71] Deposition of David Beck, February 18, 2022, 79:17-25.

[72] Deposition of David Beck, February 18, 2022, 82:24-83:18.

[73] Deposition of David Beck, February 18, 2022, 80:7-23.

[74] Deposition of David Beck, February 18, 2022, 39:25-9.

[75] Deposition of David Beck, February 18, 2022, 87:24-88:15.

the only instructions Albertsons gave to Selectors in this area was "to watch out for things that just – that looked out of the ordinary," and to use "good judgment and common sense."[76]

219.    During this time, Albertsons' method of resolving suspicions was gravely inadequate. If a Selector's "gut feeling" alerted him that an order was somehow unusual, he would inform his Supervisor or Foreperson.[77] The Supervisor/Foreperson would then call the store to speak to a pharmacist and verify the order.[78] The purpose of the call was only to confirm the accuracy of the order, and ask the pharmacy if the order was a mistake.[79] If a pharmacist indicated the order was a mistake, the Distribution Center would "adjust the order quantity" to what was actually intended.[80] The Distribution Center would log the conversations with the pharmacies and turn those call logs over to Inventory Control.[81] Other than sending the logs to Inventory Control for the purpose of confirming inventory adjustments, Mr. Beck did not know why they were sent to Inventory Control.[82] Either way, sending the daily logs had no impact on whether orders were filled, because all orders were processed and shipped out the same day they were received; no orders were held overnight.[83]

---

[76] Deposition of David Beck, February 18, 2022, 89:4-17.

[77] Deposition of David Beck, February 18, 2022, 89:18-90:5.

[78] Deposition of David Beck, February 18, 2022, 90:11-24.

[79] Deposition of David Beck, February 18, 2022, 91:2-19.

[80] Deposition of David Beck, February 18, 2022, 91:20-92:4.

[81] Deposition of David Beck, February 18, 2022, 92:5-93:21.

[82] Deposition of David Beck, February 18, 2022, 95:9-25; 96:3-3.

[83] Deposition of David Beck, February 18, 2022, 54:5-11.

          **ii)  From 2013-2016, Albertsons' SOMS was Significantly Deficient.**

220.    The Ponca City Pharmacy Compliance Committee started around 2013 when Albertsons began distributing opioids again, met quarterly and was supposed to ensure that Albertsons was in compliance with all aspects of pharmacy distribution.[84]

221.    When Albertsons resumed its distribution activity in 2013, the Selectors continued to use the MOQ and "gut feeling" approach to identifying suspicious orders.[85] However, from 2013-2016, Albertsons supplemented the "gut feeling" approach with a new threshold-based system.  Under this system, a spreadsheet tracked the prior 10-12 orders that a pharmacy submitted and a report would then give the average of those prior orders, as well as identify the number that was greater than 20% of those orders.[86] Distribution Center employees would call stores if an order was greater than 10 bottles and over 100% of the prior order average.[87] While the metric used to call pharmacies may have changed slightly over time, this methodology was used for most of 2013-2016.[88]  During this time, Albertsons still did not employ a system that detected orders of usual frequency or orders that deviated substantially from a normal pattern.

222.    Distribution Center employees would typically make 10-20 calls to pharmacies per day.[89] Just as in 2006-2008, the only purpose of the calls was to confirm the pharmacist actually wanted the order amount he or she requested.[90] There was no formal training regarding the scope

---

[84] Deposition of David Beck, February 18, 2022, at 44:9-45:10.

[85] Deposition of David Beck, February 18, 2022, 96:12-25.

[86] Deposition of David Beck, February 18, 2022, 97:1-19.

[87] Deposition of David Beck, February 18, 2022, 102:14-104:3.

[88] Deposition of David Beck, February 18, 2022, 105:19-22.

[89] Deposition of David Beck, February 18, 2022, 107:23-108:5.

[90] Deposition of David Beck, February 18, 2022, 136:3-16.

and substance of the phone calls made to the pharmacies, other than compliance committee discussions or coaching callers to generally use open-ended questions.[91] Albertsons never provided written documents for guidance or reference to its employees to use when making the phone calls.[92]

223.    All orders were shipped in full unless the pharmacist specifically told the Distribution Center that the order was submitted in error.[93] The Distribution Center was not responsible for analyzing whether a pharmacist's response was reasonable; instead, the Distribution Center employees just "logg[ed] the information and pass[ed] it up."[94] If a pharmacist simply said the order was "correct," that was sufficient reason for the Distribution Center to fill and ship the order in full.[95]

224.    In addition, if the Distribution Center was unable to reach a pharmacy to discuss an order, it would still ship the requested order anyway.[96] While the Distribution Center had the process of "cutting" orders for the entire time it distributed opioids, the only time an order would be cut (i.e., the quantity would be reduced) would be when the pharmacist said the order was in error.[97] In 2015, Lynette Berggren, Albertsons' then-Director of Pharmacy Compliance, stated to another employee that cutting orders constituted an "illegal alteration" of the order.[98]

---

[91] Deposition of David Beck, February 18, 2022, 132:20-133:6; 135:16-23; 138:15-139:9.

[92] Deposition of David Beck, February 18, 2022, 135:24-136:2.

[93] Deposition of David Beck, February 18, 2022, 136:19-25.

[94] Deposition of David Beck, February 18, 2022, 170:12-22.

[95] Deposition of David Beck, February 18, 2022, 172:5-25.

[96] Deposition of David Beck, March 1, 2022, 226:18-20.

[97] Deposition of David Beck, February 18, 2022, 118:10-16; 118:23-119:7.

[98] ALB-NM00030341.

225. Ms. Berggren also testified that although the DEA expected that distributors would ship orders that were suspicious only after the suspicions were resolved, she could not confirm whether Albertsons actually followed that rule.[99] The Distribution Center call logs would be sent to the Compliance Group for additional review, but any calls or investigations done by that group would have been done **_after_** the orders were already shipped from the Ponca Distribution Center.[100] The Compliance Group never updated the Ponca Distribution Center with any additional information it obtained from any specific pharmacies.[101]

226. Incredibly, the SOMS process at the Distribution Center only consisted of maintaining the order spreadsheet, calling pharmacies, logging the calls, and sending the logs to Compliance.[102] Other than calling the pharmacy to simply verify the order accuracy, the Distribution Center engaged in no other investigations or follow-ups.[103]

227. Against this backdrop, a 2014 internal email from Scott Jardine, a Regional Vice President of Albertsons, identifies problems and concerns with Albertsons' SOMS, revealing an arbitrary and non-compliant system.[104] Jardine's suggestions include:[105]

   a. The Above Threshold Report is "way too big, and not practical to review" and needs to be "right sized" "to provide meaningful information."

---

[99] Deposition of Lynette Berggren, February 23, 2022, 238:19-239:14; 239:23-240:5; ALB-NM00015362.

[100] Deposition of David Beck, March 1, 2022, 230:22-231:7.

[101] Deposition of David Beck, March 1, 2022, 233:17-20.

[102] Deposition of David Beck, February 18, 2022, 174:15-20; 174:22-22.

[103] Deposition of David Beck, February 18, 2022, 137:1-7.

[104] Deposition of Lynette Berggren, February 23, 2022, 276:20-22; 277:6-23; 278:14-280:25; 281:6-24; ALB-NM00012078.

[105] ALB-NM00012078.

b. The Above Threshold Report should modify coding of "no set average per store" so it is "shortened to fewer orders to minimize how many stores hit this category."

c. Albertsons should consider a threshold higher than 20% in the Above Threshold Report to "cause the report to be smaller, and easier to take action on the outstanding items."

228.    Perhaps most notably, Ms. Berggren suggested that "Processes that are compliant with DEA regulations will need to be put in place for order quantities that are determined to be 'suspicious.'"

229.    In 2014, after Ms. Berggren attended a presentation put on by Joseph Rannazzisi regarding the seriousness of SOMS requirements, she noted the information "definitely made an impression on me and significantly ramped up my sense of urgency around these issues."[106] But Albertsons made no meaningful changes to its SOMS policy prior to when it stopped its distribution activity in 2016.

### 3)  Albertsons Failed to Guard Against Diversion as a Dispenser of Opioids

230.    Albertsons failed to timely implement and apply necessary controlled substance diversion policies across its pharmacy stores. It had no dispensing policies or procedures that addressed red flags prior to 2013. After 2013, Albertsons at most had superficial guidance for pharmacists that it did not enforce. In addition, Albertsons pressured its pharmacists through quotas and bonus plans to fill opioid prescriptions.

231.    Albertsons failed to provide its pharmacists with the data and tools necessary to fulfill their corresponding responsibility duties, including but not limited to, providing its

---

[106] Deposition of Lynette Berggren, February 23, 2022, 225:20-226:22; 227:5-11; 232:4-233:24; 235:22-236:6; 236:11-20; ALB-NM00015362.

pharmacists with access to dispensing data as well as the analysis of that data as it relates to red flags of diversion.

232.    Albertsons only began to adopt a compliance program to prevent diversion in 2018, and even as of 2022 did not require its pharmacies to investigate or resolve red flags when dispensing opioids. Albertsons has no systems in place to monitor opioid dispensing patterns or trends, or to document or track suspicious patients or prescribers.

### i) Albertsons' Written Red Flag Policies & Procedures were Critically Inadequate.

233.    All of Albertsons dispensing policies and procedures were national in scope.[107] Prior to 2013, Albertsons had no dispensing policies or procedures that addressed red flags associated with the diversion of opioids.[108]

234.    Albertsons' first iteration of any sort of guidance to its pharmacists regarding the identification and resolution of red flags occurred in the middle of 2013, when it created and distributed an "Appropriate Dispensing of Controlled Substances" document.[109] That document, however, lacks useful guidance and requirements for pharmacists to follow. For instance, the document only indicates red flags "may warn" that additional research is needed.[110]

235.    Beyond directing pharmacists to exercise professional judgment, there is no requirement for pharmacists to take specific actions – or even to investigate – when they encounter any red flags; nor is there any requirement for pharmacists to use any specific resources.[111] The

---

[107] Deposition of Jessica Covaci, March 2, 2022, 33:7-10.

[108] Deposition of Jessica Covaci, March 2, 2022, 38:11-15; 44:3-45:14.

[109] Deposition of Jessica Covaci, March 2, 2022, 33:7-10; 33:12-13; 34:2-15; 35:13-25; 38:11-15, 44:3-7; 45:10-14; ALB-NM00015258-60.

[110] Deposition of Jessica Covaci, March 2, 2022, 42:11-17; ALB-NM00015258, at 15259.

[111] Deposition of Jessica Covaci, March 2, 2022, 46:23-47:12; 49:11-50:3; ALB-NM00015258.

document also adds that "pharmacists *should* register for access [to the state PMP] if applicable" (as opposed to *requiring* all pharmacists to register for access) (emphasis added).[112] It is unclear the extent to which this guidance was ever circulated or seen by pharmacists—as an internal Albertsons email in 2018 indicates, various pharmacies "were not aware of appropriate dispensing of CS communications previously sent."

236. The substance of this standalone document was not added into Albertsons' formal policies and procedures framework in 2013.[113] As a result, Albertsons did not formally discipline any pharmacist who violated, failed to follow, or even simply ignored the red flag guidelines. Only a violation of Albertsons' formal policies and procedures would cause a pharmacist to be subject to any sort of discipline by the company. Thus, while Albertsons' "Appropriate Dispensing of Controlled Substances" provided only superficial guidance to its pharmacists in the first place, Albertsons did not even enforce those guidelines by any meaningful standard.[114]

237. Albertsons 2013 formal Retail Pharmacy Policies & Procedures also lacks useful guidance and requirements for pharmacists to detect and resolve red flags. For instance, while that document provides general information regarding drug diversion, misuse, and abuse, it provides no discussion regarding the identification or resolution of red flags.[115] According to the document, pharmacy personnel are instructed that "whenever the validity of a prescription is in question, it may be researched for authenticity."[116] But this instruction is only limited to the "personal use of

---

[112] ALB-NM00015258-15259.

[113] Deposition of Jessica Covaci, March 2, 2022, 56:15-22.

[114] Deposition of Jessica Covaci, March 2, 2022, 83:4-19.

[115] ALB-NM00006764.

[116] ALB-NM00006764, at 6778.

prescription medication" by pharmacists.[117] This instruction does not apply to the pharmacists' more general process of filling prescriptions from patients.[118] Thus, the 2013 policies and procedures provide no direct requirements for pharmacists to identify and resolve red flags, or even to confirm the legitimacy of questionable prescriptions.

238.    Albertsons' 2016 Retail Pharmacy Policies & Procedures marks the first time Albertsons incorporated red flags into its formal policies and procedures.[119] That document, however, also lacks useful guidance and requirements for pharmacists to detect and resolve red flags. For instance, the policy includes five options pharmacists "may consider" to verify the legitimacy of a prescription with red flags. By using such permissive language, the policy lacks any formal requirements that pharmacists must take certain steps to verify the legitimacy of controlled substance prescriptions.[120]

239.    Albertsons' 2018 Retail Pharmacy Policies & Procedures also lack useful guidance and requirements for pharmacists to detect and resolve red flags.  Again, the document notes—but does not require—that pharmacists "may consider" certain options to verify the legitimacy of prescriptions.[121] The 2018 policy also marks the first time Albertsons formally required its pharmacists to register with an applicable state prescription drug monitoring program ("PDMP"), or to check the PDMP if they questioned the validity of a prescription.[122]

---

[117] ALB-NM00006764, at 6778

[118] Deposition of Jessica Covaci, March 2, 2022, 58:19-60:6; ALB-NM00006764, at 6778.

[119] Deposition of Jessica Covaci, March 2, 2022, 79:6-20; ALB-NM00007961-8211.

[120] Deposition of Jessica Covaci, March 2, 2022, 84:21-85:10; ALB-NM00007961, 8034-8035.

[121] ALB-NM00009720-9963.

[122] Deposition of Jessica Covaci, March 2, 2022, 88:4-14; 88:23-89:10; ALB-NM00009720, at 9796.

240.     Underscoring one gaping hole that remains in Albertsons' policies and procedures, David Carrick, one of Albertsons' District Pharmacy Managers in New Mexico, testified that even as of 2022, Albertsons did not actually require its pharmacists to investigate or resolve red flags when dispensing opioid prescriptions.[123]

### ii) Albertsons Was Slow to Adopt Policies to Prevent Diversion.

241.     Anthony Provenzano, Albertsons' VP of Pharmacy Compliance and Government Affairs, testified that when he took on his role in 2015, he was "heavily focused on the diversion loss piece [i.e., theft]" after the Safeway acquisition because "that [was] our biggest challenge at the time."[124] Once the issues with the Safeway acquisition had been resolved, Mr. Provenzano noted "we were able to turn our focus now [in 2018] more towards the dispensing side."[125] He reasoned that, because the opioid crisis "was an elevating piece in the news and in society," Albertsons "wanted to make sure we were reacting appropriately."[126]

242.     Provenzano also dismissed an employee's assertion that there were red flags that pharmacy personnel failed to appropriately consider by responding that the prescriptions were filled in 2013 and 2014, when "it was relatively early on in the nation's consciousness about the opioid crisis and prior to the company's formal adoption of the referenced appropriate dispensing policy."

243.     In April 2018, Albertsons' internally-proposed "Options to Address the Opioid Crisis" included pharmacist education regarding "appropriate dispensing," because "we already

---

[123] Deposition of David Carrick, February 15, 2022, 57:16-25.

[124] Deposition of Anthony Provenzano, February 10, 2022, 125:3-23.

[125] Deposition of Anthony Provenzano, February 10, 2022, 125:3-23.

[126] Deposition of Anthony Provenzano, February 10, 2022, 125:3-23.

had controlled substance training, but it didn't focus as much about dispensing, more about the loss prevention."[127] This 2018 proposal included "PDMP Training" (*i.e.*, "How to use PDMP" and "how to make assessments out of PDMP data.").[128]

244.    Toward the end of 2018, Albertsons identified "Topics we need learning objectives for" to include "understanding of pharmacists' corresponding responsibility," "recognize and resolve potential red flags with CS prescriptions," "understand and incorporate the CDC's guidelines," "identify dosing and combinations of medications that pose increased risk to patients," "calculate daily MMEs," and "how to use PDMP appropriately."[129] Rather than implementing PDMP use due to a concern for patient safety, Albertsons considered use of the PDMP as "low hanging fruit" that "will be used by the DEA as a tool for determining inappropriate dispensing."[130] Because the DEA had access to the PDMP data, "if they see that pharmacies aren't checking it adequately, they might be using that against them."[131]

245.    In 2018 Albertsons found itself in the in the crosshairs of a DEA investigation. That year, the DEA inspected Albertsons' Silver City, New Mexico pharmacy No. 3914. As a result of the inspection, the DEA formally admonished Albertsons for multiple CSA violations.[132] According to the DEA, the pharmacy had significant overages and shortages of multiple opioid medications, repeated unauthorized use of the CSOS (Controlled Substance Ordering System), and

---

[127] Deposition of Anthony Provenzano, February 10, 2022, 130:8-132:12; ALB-NM0063312.

[128] Deposition of Anthony Provenzano, February 10, 2022, 138:17-139:11; ALB-NM0063312-13.

[129] Deposition of Anthony Provenzano, February 10, 2022, 216:11-22; ALB-NM00144561.

[130] Deposition of Anthony Provenzano, February 10, 2022, 184:12-185:14; ABL-NM00126515, at 516.

[131] *Id.*

[132] Deposition of Jessica Covaci, March 2, 2022, 145:15-148:5; ALB-NM00001584.

failures to investigate the legitimacy of controlled substance prescriptions.[133] The DEA specifically found that the store failed to resolve red flags for "prescriptions for excessive amounts of controlled substances" before dispensing those prescriptions, in violation of the pharmacist's corresponding responsibility.[134] Pursuant to its investigation, the DEA also concluded that it had "grave concern about prescriptions being filled by this store," and that Albertsons pharmacists had received "pressure from management to fill."[135]

246.    The damning results of that 2018 inspection "gave teeth" to Albertsons' compliance programs, because "until you actually face it and have to ... navigate through it, it doesn't become as real."[136] "So rather than just talking about red flags or appropriate dispensing, it got nitty-gritty down to drug combinations, how you communicate with patients and providers, how MAT [medication assisted treatment] comes into play with this naloxone, red flags, of course."[137] The 2018 inspection "was something that helped [Albertsons] get some clarity on what we needed to help support our pharmacists in their day-to-day job."[138] Again, this epiphany of the importance of a robust compliance program did not strike Albertsons *until 2018* and then only after the company was admonished by the DEA.

247.    But even with pressure from the DEA in 2018, material gaps in its opioid policies continued to exist through the following year. In an internal presentation in which discussed

---

[133] Deposition of Jessica Covaci, March 2, 2022, 146:20-148:5; ALB-NM00001584, at 1584-85.

[134] ALB-NM00001584, at 1585.

[135] Deposition of Anthony Provenzano, February 10, 2022, 246:18-247:17; 247:23-248:16; ALB-NM00190523, at 524.

[136] Deposition of Jessica Covaci, March 2, 2022, 152:2-153:4; 153:12-25; 154:14-20.

[137] Deposition of Jessica Covaci, March 2, 2022, 152:2-153:4; 153:12-25; 154:14-20.

[138] Deposition of Jessica Covaci, March 2, 2022, 157:20-158:1.

Albertsons' "Response to the Opioid Crisis," Albertsons identified basic efforts which had not yet been implemented by July 29, 2019.[139] Specifically, Albertsons identified a "Comprehensive [controlled substance] training program" and "Targeted [controlled substance] dispensing reviews with mock DEA visits" as measures that were not yet in place but "coming soon."[140] The "comprehensive training" was meant to cover "everything about controlled substances from a regulatory and compliance perspective."

### iii) Albertsons Performance Metrics Put Profits Before Safety.

248.    Not only did Albertsons lack (and fail to implement) adequate policies and procedures to guard against diversion, but Albertsons compounded this problem by implementing performance metrics and prescription quotas for retail stores that contributed to supplying of a black market, including in Plaintiff's Town.

249.    Albertsons had a responsibility to create a work environment that enables its pharmacy staff to detect and prevent diversion, or at the very least does not undermine the ability of staff to carry out these functions or direct emphasis toward increased sales instead of legal compliance.

250.    DEA diversion investigator Demetra Ashley testified that the duty to provide tools to prevent diversion under Section 1301.71 includes providing a work environment that allows pharmacists to fulfill their corresponding responsibility to fill only legitimate prescriptions.  She further agreed as to the importance of adequate staffing and testified that both strict time limits

---

[139] Deposition of Jessica Covaci, February 9, 2022, 165:16-166:11; 166:23-25; 168:22-169:6; 169:16-170:2; 172:25-174:18; ALB-NM00038105, at 38111.

[140] Deposition of Jessica Covaci, February 9, 2022, 172:25-174:18; ALB-NM00038105, at 38111.

that deprived pharmacists of enough time to investigate red flags and requiring quotas on prescriptions filled sounded unreasonable.

251.    Albertsons' corporate policies consistently prioritized pharmacy profits over patient safety and pressured its pharmacists to fill all prescriptions presented to them. For instance, Albertsons would give its pharmacists specific prescription volume targets for their stores to reach, which would in turn be geared toward reaching annual goals for the company.[141] Specific prescription volume fill rates would be given to pharmacists to assess their "business performance" and "to grow their business."[142]

252.    Since the inception of its pharmacy component, Albertsons has always identified increased prescription volume as a consistent goal for its pharmacists.[143] Albertsons' emphasis on increased prescription volume includes increased prescriptions for controlled substances.[144] Controlled substances have never been excluded from Albertsons' pharmacy script growth goals.[145]

253.    Albertsons considered increased prescription volumes to be a central "key to success" for its business.[146] This "key to success," however, came at the expense of pharmacist workloads and patient safety, as Albertsons identified a financial "opportunity" in simultaneously

---

[141] Deposition of Jessica Covaci, March 2, 2022, 113:21-114:2; 114:12-14; 115:1-13.

[142] Deposition of Jessica Covaci, March 2, 2022, 113:21-114:02; 114:12-114:14.

[143] Deposition of Jessica Covaci, March 2, 2022, 125:20-126:24; ALB-NM00015374, at 15385.

[144] Deposition of Jessica Covaci, March 2, 2022, 126:25-127:4; ALB-NM00015374.

[145] Deposition of Jessica Covaci, March 2, 2022, 127:5-9.

[146] Deposition of Jessica Covaci, March 2, 2022, 132:19-133:7; ALB-NM00015374, at 15460.

filling more prescriptions while also reducing pharmacist work hours.[147] By 2016 for instance, Albertsons sought an increase of 28 prescriptions per week, per store, across the country.[148]

254.    Albertsons' 2015 Store Bonus Plan further indicates the company prioritized a concern for profits, rather than pharmacists fulfilling their legal and regulatory responsibilities to prevent diversion.[149] While that document is dated 2015, this was Albertsons' compensation policy for its pharmacists both before and after that date.[150] According to the document, Albertsons' bonus calculation and subsequent weekly payout for pharmacy staff is directly tied to the number of prescriptions dispensed.

255.    Specifically, the policy identifies three average weekly prescription counts by which to calculate bonuses: Group A is a script count less than 1,200/week ($6,000 bonus), Group B is a script count between 1,200 and 1,800/week ($9,000 bonus), and Group C is a script count greater than 1,800/week ($12,000 bonus).[151] Thus, a larger total prescription volume pushes a pharmacy (or pharmacist) into a status with potential for higher bonuses.[152]

256.    The policy makes no exclusions in these counts for controlled substance prescriptions. Rather, the more controlled substance prescriptions a pharmacy fills, the more likely it is to receive a higher weekly bonus payout. Albertsons thus incentivizes its pharmacists to fill

---

[147] Deposition of Jessica Covaci, March 2, 2022, 130:20-131:10 ALB-NM00015374, at 15459.

[148] Deposition of Jessica Covaci, March 2, 2022, 130:20-131:14; 132:10-18; ALB-NM00015374, at 15459.

[149] ALB-NM00006293.

[150] Deposition of Jessica Covaci, March 2, 2022, 106:2-8; 113:2-9; ALB-NM00006293.

[151] Deposition of Jessica Covaci, March 2, 2022, 109:2-20; ALB-NM00006293.

[152] Deposition of Jessica Covaci, March 2, 2022, 112:22-113:1 ALB-NM00006293.

as many prescriptions as possible, rather than rewarding instances of conducting due diligence, resolving red flags, or refusing problematic prescriptions.

257.    Such corporate goals obstruct the performance of pharmacists' professional obligations. There is an inherent conflict between performance metrics that pressure pharmacists to fill certain volume of prescriptions, limit customers' wait time, or base pharmacists' incentive pay on customer satisfaction, on the one hand, and the ability to conduct appropriate due diligence to guard against diversion of controlled substances and refuse to fill illegitimate prescriptions even if a customer is dissatisfied, on the other. Albertsons has a duty to maintain a corporate culture that promotes and ensures compliance with the law.

258.    This pressure and focus on profits would not only lead to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate.

259.    Indeed, "a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor."[153]

260.    In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which measure the speed and efficiency of prescription work flow by such parameters as prescription

---

[153] NABP, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/news/news-releases/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/ (last visited September 5, 2024).

wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."[154]

261.    Still, according to a 2016 investigation by the *Chicago Tribune*, as chain pharmacies increasingly promote quick service, "pharmacists frequently race through legally required drug safety reviews—or skip them altogether," missing dangerous drug combinations in the process.[155]  A pharmacist too rushed to check for a potentially deadly drug interaction is also likely to be too rushed to check for red flags of diversion, such as prescription "cocktails" or other combinations of highly abused drugs.

262.    In reporting on the results of its investigation, the *Tribune* quoted Bob Stout, president of the New Hampshire Board of Pharmacy, stating that "'They're cutting corners where they think they can cut."[156]  As the report itself explained: "some pharmacies emphasize fast service over patient safety. Several chain pharmacists, in interviews, described assembly-line conditions in which staff hurried to fill hundreds of prescriptions a day.[157]

---

[154] *Id.*

[155] Sam Roe, Ray Long, and Karisa King, Contract Reporters, *Pharmacies Miss Half of Dangerous Drug Combinations*, Dec. 15, 2016, http://www.chicagotribune.com/news/watchdog/druginteractions/ct-drug-interactions-pharmacy-met-20161214-story.html (last visited September 4, 2024).

[156] *Id.*

[157] *Id.*

263.    "The National Coordinating Council for Medication Error Reporting and Prevention (NCCMERP), also passed a statement advocating for the "elimination of prescription time guarantees and a strengthened focus on the clinical and safety activities of pharmacist within the community pharmacy setting."[158]

264.    An April 2021 workload survey from the Ohio Board of Pharmacy[159] revealed a contrast between the responses of pharmacists at chain pharmacies such as Albertsons and pharmacists at other locations concerning the time available to do their job safely:



---

[158] National Coordinating Council for Medication Error Reporting and Prevention. Statement Advocating for the Elimination of Prescription Time Guarantees in Community Pharmacy, http://www.nccmerp.org/statement-advocating-elimination-prescription-time-guarantees-community-pharmacy (last visited September 4, 2024).

[159] https://www.pharmacy.ohio.gov/documents/lawsrules/pwac/committeeinformation/2020%20pharmacist%20workload%20survey.pdf (last visited September 4, 2024).

265.    The same was true concerning whether standards or metrics were perceived as interfering with patient care:



266.    The overwhelming majority of pharmacist comments reported in the survey reflected a belief that chain pharmacies place profit over safety.  A common refrain heard from pharmacists was being asked to do more with less—carrying more responsibilities, and facing increased prescription volumes, while staffing levels have decreased.  In a job market filled with new graduates, pharmacists were reminded that they were replaceable.

### iv) Albertsons Had No Systems in Place to Monitor Opioid Dispensing Patterns or Trends.

267.    Outside of District Pharmacy Managers occasionally visiting stores to review prescriptions in certain circumstances, Albertsons had no corporate program or system in place at any time to monitor or track red flag information documented by its pharmacists.[160] Even though

---

[160] Deposition of Jessica Covaci, March 2, 2022, 94:8-11; 101:20-103:21.

documentation requirements and corporate monitoring programs presented opportunities for the chain to – at a minimum – monitor the flow of opioids from its pharmacies, Albertsons abstained from even the most basic efforts:

268.    Albertsons has no requirement for its pharmacists to document anything prior to filling a controlled substance prescription.[161]

269.    Albertsons has no requirement for its pharmacists to document their use of the PDMP.[162]

270.    Albertsons has no requirement for its pharmacists to take any steps – including documenting their reasoning, informing corporate, or informing their District Pharmacy Managers – that they have refused to fill a prescription.[163]

271.    At no time did Albertsons ever have a program or system in place to monitor or track instances in which pharmacists refused to fill certain prescriptions.[164]

272.    Albertsons also had no systems or programs in place at any time to monitor or track prescribers with histories of writing illegitimate prescriptions.[165]

273.    Albertsons had no systems or programs in place at any time to monitor or track patients with histories of presenting illegitimate prescriptions.[166]

---

[161] Deposition of David Carrick, February 15, 2022, 48:4-19.

[162] Deposition of David Carrick, February 15, 2022, 55:1-13.

[163] Deposition of David Carrick, February 15, 2022, 60:9-13; 60:18-61:8.

[164] Deposition of Jessica Covaci, March 2, 2022, 100:8-19.

[165] Deposition of Jessica Covaci, March 2, 2022, 100:20-101:3.

[166] Deposition of Jessica Covaci, March 2, 2022, 103:22-104:3.

274.    Albertsons corporate offices would not review refusal to fill notes from its pharmacists.[167] There is no set policy on what pharmacists are supposed to do when they refuse to fill a prescription.[168]

275.    Despite being able to identify patients who present particularly problematic opioid prescriptions, Albertsons does not flag those patients for its pharmacists or block them from receiving prescriptions.[169]

276.    Despite being able to identify prescribers that issue the highest volume of opioid prescriptions, Albertsons does not flag those prescribers for its pharmacists or block their prescriptions from being filled.[170]

277.    Albertsons' persistent decision not to monitor or oversee such critical data points translates into real world issues at the pharmacy level. For instance, in 2018, an Albertsons pharmacist at Store No. 920 in New Mexico expressed concern to her District Pharmacy Manager that at least two patients were selling their opioid prescriptions.[171] The District Pharmacy Manager did not advise that pharmacist to alert any other Albertsons pharmacists to those patients, or internally flag the patients or prescriber, even though that information would be helpful for other pharmacists to know.[172]

---

[167] Deposition of Pete Ridsdale, February 22, 2022, 139:21-140:11.

[168] Deposition of Pete Ridsdale, February 22, 2022, 140:12-21.

[169] Deposition of Jessica Covaci, February 9, 2022, 73:18-74:9; 74:17-75:2; ALB-NM00011001, at 11001-002.

[170] Deposition of Jessica Covaci, February 9, 2022, 76:10-77:11; ALB-NM00011001, at 11002.

[171] Deposition of Pete Ridsdale, February 22, 2022, 60:4-62:10; ALB-NM00164903.

[172] Deposition of Pete Ridsdale, February 22, 2022, 62:11-63:7.

278.    As another example, in 2018 the pharmacy team at Albertsons Store 3914 informed Jessica Covaci, Albertsons' Director of Pharmacy Compliance, that it would no longer fill prescriptions written by Dr. Gregory Koury because he "is not pain management certified, writes large amounts of IR pain medications for patients with the same address, and also writes large amounts of pain medications for [certain patients]," and "every prescription for opioids comes with the exact same ICD-10 diagnosis code."[173] Instead of responding, Albertsons never added Dr. Koury to an internal "do-not-fill" list, and never flagged Dr. Koury for other pharmacists.[174] By 2020, Albertsons continued to fill trinity and holy trinity prescriptions from Dr. Koury, who had an IMS/IQVIA opioid risk rating of 94 out of 100.[175]

279.    The above information demonstrates that Albertsons fundamentally violated the CSA in its dispensing policies, training, and compliance.

280.    Albertsons' lax documentation requirements for its pharmacists translated into a poorly managed documentation system for Albertsons pharmacists trying to track problematic prescriptions, patients, and doctors. This is because Albertsons does not maintain a centralized or easily-accessible documentation process. Even today, Albertsons has no single, specific place for pharmacists to document measures taken to determine the legitimacy of a prescription.[176] Instead, pharmacists may document that information in a number of ways and in a number of places, including on hard copy prescriptions, electronic prescription fields, the electronic patient profile, or the electronic "fill notes" section.[177] As Albertsons' corporate designee put it, "there's,

---

[173] Deposition of Jessica Covaci, February 9, 2022, 93:15-94:10; ALB-NM00149622.

[174] Deposition of Jessica Covaci, February 9, 2022, 96:20-97:10.

[175] Deposition of Jessica Covaci, February 9, 2022, 132:23-133:13; ALB-NM00011005, at 009.

[176] Deposition of Jessica Covaci, March 2, 2022, 60:14-19; 61:17-63:1.

[177] Deposition of Jessica Covaci, March 2, 2022, 60:14-19; 61:17-63:1.

unfortunately, a lot of places to document."[178] As a result, pharmacists interested in checking prior notes for particular patients are faced with a confused, muddled system that does not support that effort.  In addition, only pharmacists "on the same system" are able to see patient profile information from other stores, and in its various pharmacy chain acquisitions, pharmacies owned and operated by Albertsons were at times running different software, creating a disconnect between all of the systems.

### 4)   The DEA has Repeatedly Admonished Albertsons Across Multiple Jurisdictions for its Failures to Maintain Effective Controls Against Diversion.

281.    In addition to the 2018 DEA investigation for multiple violations at Albertsons' Silver City, New Mexico location, the DEA has also admonished Albertsons at other times. Although the DEA's interactions with Albertsons may appear to be limited to specific pharmacy locations, the cited failures take on national import given that Albertsons' policies and procedures related to the distribution and dispensing of opioids were national in scope.

282.    In 2017, Albertsons agreed to pay $3 million to settle Department of Justice allegations that the company failed to timely report controlled substances that were missing from pharmacies. "According to the settlement agreement, the investigation began in April 2014, when the DEA learned that Safeway pharmacies in North Bend, Washington and Wasilla, Alaska did not notify DEA of losses of tens of thousands of hydrocodone tablets until months after Safeway discovered the pills were pilfered by employees.  DOJ's investigation was later widened to review practices at all Safeway pharmacies nationwide between 2009 and 2014.  The investigation

---

[178] Deposition of Jessica Covaci, March 2, 2022, 62:25-63:1.

revealed a widespread practice of Safeway pharmacies failing to timely report missing or stolen controlled substances."[179]

283.    In 2019, the United States Attorneys' Office for the District of New Hampshire announced that "New Albertsons, L.P., d/b/a Osco Pharmacy agreed to pay $30,000 to resolve allegations that it had filled 13 fraudulent prescriptions for controlled substances at its location in Stratham between December 1, 2013, and July 31, 2014." The settlement announcement further specified that when CSA violations like those observed in Albertsons' Osco Pharmacy occur, "it allows for the diversion of prescription pain medication which contributes to the widespread abuse of opiates that are devastating our communities."

284.    In January 2020, Albertsons settled with the Department of Justice for $1,000,000 for violations of the CSA.[180] According to DOJ, "[i]nvestigators uncovered 128 instances of patients filling prescriptions for unusually large quantities and dosages of narcotics; patients utilizing multiple pharmacies to fill prescriptions; or third parties filling prescriptions for out-of-state patients.  Additional record keeping violations were also discovered."

### 5) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiff's Town and Surrounding Areas.

285.    Albertsons, throughout the relevant time period, owned and operated pharmacies throughout the United States, including pharmacies in Plymouth County.  Through its wholly

---

[179] DEA, *Safeway Pharmacies Pay $3 Million To Resolve Allegations Chain Failed To Timely Report Drug Diversion* (July 18, 2017), https://www.dea.gov/press-releases/2017/07/18/safeway-pharmacies-pay-3-million-resolve-allegations-chain-failed-timely (last visited September 4, 2024).

[180] Department of Justice*, Casper Pharmacy Agrees to $1 Million Settlement of Allegations of Violations of the Controlled Substance Act* (January 28, 2020), https://www.justice.gov/usao-wy/pr/casper-pharmacy-agrees-1-million-settlement-allegations-violations-controlled-substances (last visited September 4, 2024).

owned or controlled subsidiary companies, Albertsons operates over 1,700 retail pharmacies across the United States.  In Plymouth County, Albertsons operates pharmacies under the Osco, Shaw's and Star Market banners.

286.     As described below, the volume of prescription opioids ordered and dispensed by Albertsons pharmacies in and around Plaintiff's Town is indicative of potential diversion and required appropriate due diligence.

287.     As a dispenser of prescription opioids, Albertsons had visibility into dispensing level data at all of its pharmacies, and Albertsons knew or should have known that it was dispensing an excessive volume of pills in Massachusetts and around Plaintiff's Town.

288.     Upon information and belief, Albertsons, by virtue of the dispensing data available to it, had actual knowledge of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals arriving together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Albertsons ignored these obvious red flags.

289.     Upon information and belief, Albertsons failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b) the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

290.     Discovery will reveal that Albertsons knew or should have known that its pharmacies in Massachusetts, as well as nearby states including Connecticut, Rhode Island, New York, New Hampshire and Vermont,  were:  (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors;

(c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, namely benzodiazepines or muscle relaxers; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to noncontrolled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly-sized pharmacy markets.  Albertsons had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

291.   The volume of opioids Albertsons brought into and dispensed in Plymouth County was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses. According to data from the ARCOS database, between 2006 and 2019, the various Albertsons pharmacies (under the Osco, Shaw's and Star Market brand names) in Plymouth County, ordered approximately 4 million dosage units of prescription opioids.[181]  Of that, Advantage Logistics and Albertsons' distribution centers shipped over 1.8 million of these drugs to its pharmacies, while the remaining amount was purchased from other distributors.

---

[181] This includes Oxycodone, Hydrocodone, Buprenorphine, Codeine, Dihydrocodeine, Fentanyl, Hydromorphone, Levorphanol, Meperidine, Methadone, Morphine, Opium (Powdered), Oxymorphone, and Tapentadol.

292.     In the Plaintiff's Town, Albertsons violated the standard of care for a distributor and dispenser by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

293.     As an operator of retail pharmacies, Albertsons had the ability to detect diversion in ways third-party wholesale distributors could not by examining the dispensing data from its own retail pharmacy locations.

294.     Given the volume and pattern of opioids distributed in Massachusetts and in and around Plymouth County and the Plaintiff's Town, Albertsons was, or should have been, aware that opioids were being oversupplied into the state and should have detected, reported, and rejected suspicious orders.

295.     Albertsons was, or should have been, fully aware that the opioids and "cocktail" combinations being distributed and dispensed by it were likely to be diverted, yet it did not take meaningful action to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

296.     Given Albertsons's retail pharmacy operations, in addition to its role as a wholesale distributor, Albertsons knew or reasonably should have known about the disproportionate flow of opioids into Massachusetts, Plymouth County and the Plaintiff's Town, and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, diversion.

297.     Albertsons had complete access to all prescription opioid distribution data related to its pharmacies in and around Plaintiff's Town.

84

298.    Albertsons had complete access to all prescription opioid dispensing data related to its pharmacies in and around Plaintiff's Town.

299.    Albertsons had complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around Plaintiff's Town.

300.    Albertsons had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around Plaintiff's Town

301.    Albertsons had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around Plaintiff's Town.

302.    Albertsons had complete access to information revealing the size and frequency of prescription written by specific doctors across its pharmacies in and around Plaintiff's Town.

303.    Upon information and belief, Albertsons failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

304.    Upon information and belief, Albertsons also failed to adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

### b)  Mylan Falsely Marketed its Fentanyl Products and Failed to Guard Against Diversion in the Plaintiff's Town.

305.    In addition to the factual allegations against the Manufacturer Defendants and Distributor Defendants raised in Town of Hull's Original Complaint (Doc. #1) and against the Marketing Defendants and Distributor Defendants in the Corrected Second Amended Complaint

and Jury Demand in *The County of Summit, Ohio, et al., v. Purdue Pharma L.P.*, Case No. 1:18-op-45090, *In Re National Prescription Opiate Litigation*, in the U.S.D.C. for the Northern District of Ohio, Doc. #513, 514 (May 29, 2018) which Plaintiff incorporated by reference in its Short Form Amended Complaint (Doc. #17), Plaintiff alleges the following against Mylan.

306.     As alleged above, as a distributor and manufacturer of prescription opioids, Mylan was and remains required to hold full DEA registrations, and was required to maintain an effective SOMS and report suspicious orders to the DEA. On information and belief, Mylan failed to operate an effective SOMS or maintain effective controls against diversion, allowing widespread diversion of opioids to occur.

307.     Mylan is an opportunistic marketer, seller and distributor of generic transdermal fentanyl patch products, which it brought to market in January 2005. Mylan's fentanyl patch product was the first generic alternative to Janssen's Duragesic patch on the market, and was the first generic Schedule II narcotic transdermal product ever approved by the FDA.

308.     Mylan also marketed, sold and distributed and sold an array of other generic Schedule II opioid products, including generic morphine starting in 2011, generic oxycodone starting in 2008, and generic hydrocodone at least since 2006.

309.     Mylan also entered the buprenorphine market in 2015, with its launch of a generic version of Subutex, a buprenorphine product for the treatment of opioid use disorder. Mylan also was one of the first companies to launch a generic Suboxone sublingual film product, which is a buprenorphine and naloxone combination product also for the treatment of opioid use disorder. Subutex and Suboxone, and the generic equivalents sold by Mylan, often are misused, abused and diverted, and requires careful marketing and sale in accordance with its approved label and vigilant monitoring for suspicious orders and sales.

310.     Mylan Technologies is the Abbreviated New Drug Application (ANDA) holder for and developed Mylan's generic transdermal fentanyl patch products, and manufactured those products for Mylan since Mylan started selling them in 2005.

311.     Mylan sold and continues to sell a "matrix" version of the transdermal fentanyl patch where the fentanyl is contained in the adhesive layers of the patch, while Janssen's Duragesic fentanyl patch has a "reservoir" that contains the fentanyl. Both patches are intended to be worn for several days and are supposed to gradually release the fentanyl into the bloodstream through the skin.

312.     Fentanyl is an extremely dangerous Schedule II opioid medication that is 75 to 100 times more potent than morphine. As a consequence, fentanyl medications are sought-after for illicit sale and use by people with opioid use disorder, particularly those who have high opioid tolerance.

313.     Mylan had long been well aware of the substantial potential for abuse of its products.  But Mylan disingenuously marketed its products as less prone to abuse. Beginning in 2014, Mylan transmitted multiple adverse event reports to the FDA, disclosing fatalities, overdoses, and drug abuse incidents. Included among these disclosures were reports of extracting fentanyl from Mylan patches by placing the patches in heated water and intravenously injecting the extracted fentanyl, and chewing patches to ingest the fentanyl.

314.     Other methods of abuse of fentanyl patches such as Mylan's that were reported in the medical literature include administering multiple patches; attaching the patches to intentionally broken skin which increases absorption; boiling the patches for a fentanyl tea; dissolving the patches in a solvent and then swallowing or injecting the liquid; heating the patches and inhaling the vapors; and even inserting the patches rectally.

315.    These methods of abusing Mylan patches produce a very high rate of absorption of the fentanyl, which occurs in a rapid and uncontrolled manner. Consequently, such abuses result in a very high risk of addiction, overdose and death, examples of which are reflected and described in the medical literature. And as a result of the high, fentanyl patches such as Mylan's are widely diverted by unscrupulous prescribing and distribution into the illicit drug market by patients, doctors and pharmacists, thus contributing substantially to the opioid crisis.

316.    Mylan exacerbated the crisis by engaging in direct marketing efforts to doctors who were significant drivers of the opioid epidemic. For example, as revealed in documents Mylan recently produced to the New York State Office of the Attorney General pursuant to its subpoena, Mylan conducted numerous sales calls and meetings with New York doctors to entice them to push Mylan's fentanyl patches on patients.

317.    Among Mylan's efforts were over 100 sales calls and meetings with five New York doctors who were later convicted of a litany of criminal charges for their roles in the opioid epidemic, ranging from conspiracy to distribute controlled substances, to accepting bribes and kickbacks for prescriptions, to manslaughter. Between March of 2015 when Mylan began detailing them, and their eventual convictions, these five doctors wrote over 1,000 prescriptions that led to the dispensing of tens of thousands of Mylan opioid products—more than 13,000 fentanyl patches and 30,000 pills of oxycodone and morphine sulfate.

318.    Given these reports of misuse and abuse and Mylan's knowledge of these high-risk properties of its fentanyl patch products, Mylan cannot claim to have been ignorant of these risks while engaging in marketing to the contrary.

319.    Mylan's marketing and promotion of its fentanyl patch products was highly successful. By 2006, Mylan had captured over 37.5% of the fentanyl market share nationally with

nearly 17 billion MMEs sold, and also had 28% market share of the fentanyl DUs sold. Mylan's fentanyl MME market share peaked in 2008 at 43.6% of the fentanyl market, and Mylan still held nearly 25% of the fentanyl MME market share and nearly 30% of the fentanyl DU market share in 2019.

320.    Defendant Meda (another Mylan company) is an opportunistic marketer, seller and distributor of a branded fentanyl buccal soluble film product called Onsolis, which it brought to market in October 2009. Meda launched Onsolis with a national sales campaign and a full sales force effort specifically targeting pain management physicians and other healthcare professionals.

321.    Onsolis belongs to the transmucosal immediate-release fentanyl (or "TIRF") class of fentanyl products, which are approved for treatment of so-called "breakthrough" pain in cancer patients. This class of products also includes Actiq and Fentora that were marketed and sold by Cephalon, and by Teva Pharmaceuticals after it acquired Cephalon; and Subsys, which was marketed and sold by Insys.

322.    The illegal and wrongful marketing of these TIRF products as safe for regular use in the treatment of chronic non-cancer pain, despite being powerful fentanyl opioids with a very limited cancer-only indication and highly addictive and dangerous properties, has led to widespread abuse of TIRF products as well as other opioid products necessarily taken as a cocktail mix with these products.

323.    In all, Mylan and Meda marketed, sold and distributed over 219.5 billion MMEs and 1 billion DUs of opioid products nationally from 2006 through 2019, and did so in a manner that was unlawful, improper and unsafe, and without adequate systems in place for monitoring for suspicious orders and sales during that entire time period and beyond, thereby contributing substantially in causing and sustaining the current opioid epidemic.

324.    From 2006 to 2019, in Plymouth County, Mylan accounted for over 505,700,000 or 5.5% by MME of the market share for opioids.  During that same time Mylan was responsible for over 483,800,000 MME of the fentanyl in Plymouth County, which was 53.6% of the market share for that dangerous drug and a per capita MME of 68.

### c) Indivior Falsely Marketed its Suboxone Products and Failed to Guard Against Diversion in the Plaintiff's Town.

325.    In addition to the factual allegations against the Manufacturer Defendants and the Distributor Defendants raised in Town of Hull's Original Complaint (Doc. #1) and against the Marketing Defendants and Distributor Defendants in the Corrected Second Amended Complaint and Jury Demand in *The County of Summit, Ohio, et al., v. Purdue Pharma L.P.*, Case No. 1:18-op-45090, *In Re National Prescription Opiate Litigation*, in the U.S.D.C. for the Northern District of Ohio, Doc. #513, 514 (May 29, 2018) which Plaintiff incorporated by reference in its Short Form Amended Complaint (Doc. #17), Plaintiff alleges the following against Indivior.

326.    As alleged above, as a distributor and manufacturer of their Suboxone and Subutex products, the Indivior Defendants were and remain required to hold full DEA registrations, and were required to maintain an effective SOMS and report suspicious orders to the DEA. On information and belief, the Indivior Defendants failed to operate an effective SOMS or maintain effective controls against diversion, allowing widespread diversion of opioids to occur.

327.    In 2023, the DEA issued its guidance reminding "all DEA registrants of the requirement to establish systems to identify and report suspicious orders of controlled substances to include Medication for Opioid Use Disorder (MOUD)."[182]

---

[182] *See* DEA, Diversion Control Division "Guidance Document," at https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-065)(EO-DEA258)_Q_A_SOR_and_Thresholds_(Final).pdf (last visited on September 4, 2024).

328. As alleged above, Indivior manufactures, markets and/or sells branded Subutex and Suboxone, which are Schedule III buprenorphine products approved by the FDA in 2002 for the treatment of opioid use disorder. Although Subutex and Suboxone have some properties that make them less abuseable than Schedule II opioids such as oxycodone and hydrocodone, they are still highly addictive and subject to diversion and so must be carefully prescribed with patient follow up and care in accordance with their FDA-approved labels and required risk management plans.

329. Indivior and Reckitt had exclusive control of the Subutex market until 2009 when the product went generic, and had exclusive control of the Suboxone market until 2013 when the Suboxone tablet formulation went generic. Indivior's Suboxone film product was approved in 2010, and it falsely marketed that product as safer and less prone to abuse, misuse and diversion than Suboxone tablets, and so was able to convince doctors to switch their patients to its more expensive film product. Consequently, Indivior continued to dominate the Suboxone market until 2018 when the film product went generic.

330. In July 2019 and November 2020, Reckitt Benckiser and Indivior, respectively, agreed to settle federal and state claims under the False Claims Act related to their false marketing and other misconduct related to their Suboxone film product. Reckitt Benckiser agreed to pay $1.4 billion, and Indivior agreed to pay $600 million and pled guilty to felony charges related to this misconduct. Indivior's CEO and Medical Director also pled guilty felony charges against them, and paid fines and served prison sentences for their prominent roles in Indivior's schemes.

331. Indivior knowingly and improperly promoted the sale and use of Suboxone in a manner that facilitated and induced doctors to prescribe its Suboxone products in an unsafe and medically inappropriate manner, causing widespread and harmful diversion of those drugs. These improper prescriptions were written without any medical follow up or supervision, and simply

91

sustained patients' dangerous addictions not only to Suboxone but to other prescription and illicit opioids with no prospect of ever overcoming their addictions.

332.    Indivior also had no effective program to monitor and stop suspicious orders for its Subutex and Suboxone products. In fact, Indivior had substantial data and reports from its sales force of rampant illicit prescribing and abuse of its Suboxone products, yet did little or nothing to stop that prescribing.

333.    To the contrary, Indivior often would reward unscrupulous prescribers so they would continue and even increase their illicit prescribing, including by feeding patients to their practices and hiring those doctors for their speakers programs. Such illicit prescribing led to widespread Suboxone and Subutex diversion and illicit street sales of those drugs, and resultant harm to the public.

334.    In Plymouth County, from 2006-2019, Indivior accounted for over 2.5 billion million MME of methadone and buprenorphine, which was over 27% of the market share of *all* opioids in Plymouth County and over 45% of the market share for those specific drugs in Plymouth County.

**D.  The Opioids the Defendants Sold Migrated Into Other Jurisdictions**

335.    As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

336.    First, prescriptions written in one state may, under some circumstances, be filled in a different state.  But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another.

337.    When state authorities cracked down on opioid suppliers, out-of-state suppliers filled the gaps.  Florida in particular assumed a prominent role, as its lack of regulatory oversight

created a fertile ground for pill mills.  Residents of Massachusetts and other states would simply travel to Florida, stock up on pills from a pill mill, and transport them back to home to sell.  The practice became so common that authorities dubbed these individuals "prescription tourists."

338.     The facts surrounding numerous criminal prosecutions illustrate the common practice.  For example, one man from Warren County, Ohio, sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and that back home, people were willing to pay as much as $100 a pill—ten times the pharmacy price.  In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the oxycodone pipeline between Ohio and Florida.[183]  When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash.  In 2015, another Columbus man was sentenced for the same conduct—paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."[184]

339.     Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill; the U.S. attorney's office found that most of the pain clinic's customers came from other states, including North Carolina, Kentucky, Tennessee, Ohio, South Carolina, and Florida.  Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed

---

[183] *Prescription Pill Pipeline Leader Receives 15 Year Prison Term*, dea.gov (Dec. 9, 2011), https://www.dea.gov/press-releases/2011/12/09/prescription-pill-pipeline-leader-receives-15-year-prison-term (last visited September 4, 2024).

[184] *Leader of Ohio pill-mill trafficking scheme sentenced*, Star Beacon (July 16, 2015), https://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-scheme-sentenced/article_5fb058f5-deb8-5963-b936-d71c279ef17c.html (last visited September 4, 2024).

opioids to customers of a pill mill across from the pharmacy; many of those customers were from other states, including Ohio and Alabama.

340.    In yet another case, defendants who operated a pill mill in south Florida were tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations.  As explained by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits.  To earn this sum required more business than the local market alone could provide.  Indeed, only about half of the [Pain Center of Broward]'s customers came from Florida.  Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and Massachusetts."[185]  The court further noted that the pill mill "gained massive financial benefits by taking advantage of the demand for oxycodone by Kentucky residents."[186]

341.    The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the "Blue Highway," a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt.

342.    Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75, the prescription tourists adapted.  They rented cars just over the Georgia state line to avoid the telltale out-of-state tag.  If they were visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid the risk of being caught with multiple prescriptions if pulled over.  Or they avoided the roads altogether:  Allegiant Air, which

---

[185] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).

[186] *Id.* at 861.

offered several flights between Appalachia and Florida, was so popular with drug couriers that it was nicknamed the "Oxy Express."[187]

343.    While the I-75 corridor was well utilized, prescription tourists also came from other states.  The director of the Georgia drugs and narcotics agency observed that visitors to Georgia pill mills come from as far away as Arizona and Nebraska.

344.    Similar pipelines developed in other regions of the country.  For example, the I-95 corridor was another transport route for prescription pills.  As the director of the Maine Drug Enforcement Agency explained, the oxycodone in Maine was coming up extensively from Florida, Georgia and California.  And according to the FBI, Michigan plays an important role in the opioid epidemic in other states; opioids prescribed in Michigan are often trafficked down to West Virginia, Ohio, and Kentucky.

345.    Abundant evidence, thus, establishes that prescription opioids migrated between cities, counties, and states, including into Massachusetts from Connecticut, Rhode Island, New York, New Hampshire, and Vermont, and other states.  As a result, prescription data from any particular jurisdiction does not capture the full scope of the misuse, oversupply and diversion problem in that specific area.  If prescription opioid pills were hard to get in one area, they migrated from another.  The manufacturers, distributors and dispensers were fully aware of this phenomenon and profited from it.

---

[187] *Id.*; Note that Interstate 75 is also called the "Oxy Express," *see* Maricopa Monitor, *States fighting 'tourists' trafficking painkillers*, July 10, 2012, https://www.pinalcentral.com/maricopa_monitor/health_wellness/health_news/states-fighting-tourists-trafficking-painkillers/article_d9e4bc20-fa0a-5468-8c39-402ad9cac249.html (last visited September 7, 2024).

## V.     DEFENDANTS HAVE CREATED AND MAINTAINED A PUBLIC HEALTH CRISIS IN MASSACHUSETTS, INCLUDING THE TOWN OF HULL.

346.     Massachusetts, including the Town of Hull, continues to face a serious public health crisis as the opioid epidemic continues to ravage the state and Plaintiff's Town amounting to substantial health and economic impacts.

347.     ARCOS data disclosed in this MDL reveals that from 2006 to 2019 almost 3.37 billion opioid pills flowed through Massachusetts and almost 265 million into Plymouth County alone.

348.     According to ARCOS data, between 2006 and 2019, Plymouth County was inundated with 265 million dosage units (pills) of prescription opioids, and over 9.2 billion MME, including over 145 million dosage units of oxycodone and over 2.2 billion MME of oxycodone and hydrocodone. The number of prescription opioids is enough for each man, woman, and child in Plymouth County to have 37.66 doses of prescription opioids each year.

349.     According to data compiled by the CDC, the number of retail opioid prescriptions dispensed per 100 persons per year ("opioid prescription dispensing rate") in Plymouth County between 2006 and 2018 consistently exceeded the state prescription rate.[188] For example, in 2010, when Plymouth County hit its highest opioid prescription rate of 74.3 per 100 persons, that number exceeded the Massachusetts rate of 67.9.[189] And in 2014, when the Plymouth County opioid prescription dispensing rate had dropped to 67.6 prescriptions per 100 persons, the opioid

---

[188] See U.S. Opioid Dispensing Rate Maps | Drug Overdose | CDC Injury Center (archive.org), https://web.archive.org/web/20231130223135/https://www.cdc.gov/drugoverdose/rxrate-maps/index.html (last visited September 9, 2024) (comparing Massachusetts rates to Plymouth County rates over time).

[189] Id.

prescription dispensing rate in Massachusetts was 59.6.[190] The Plymouth County opioid prescription rates decreased from 45.5 in 2017[191] to 27.5 in 2019.[192] In 2022, the Plymouth County opioid prescription rate was 24.7.[193]

350.    As the volume of prescription opioids flooding into Plymouth County increased, Plymouth County experienced a marked increase over the past several years on indicators related to opioid misuse, including number of deaths, emergency room use, and babies born with Neonatal Abstinence Syndrome (NAS).

351.    The high dispensing rates in Massachusetts, including in Plymouth County and Plaintiff's Town, have resulted in high numbers of overdose deaths.

352.    Given the sheer number of pills, and the additional red flags described above, the Defendants knew or should have known that abuse, addiction, and diversion of opioids was likely occurring in and around the Town of Hull, and they should have investigated, ceased filling suspicious orders and prescriptions for opioids, and reported potential diversion to law enforcement.

353.    Publicly available data suggests that the distribution of opioids to Plymouth County and the Town of Hull exceeded reasonable medical use and that opioids were likely diverted into Massachusetts and Plaintiff's Town. As described above, the volume of opioids distributed by

---

[190] *Id.*

[191] *Id.*

[192] CDC Opioid Dispensing Rate Maps, 2022, Plymouth County https://www.cdc.gov/overdose-prevention/data-research/facts-stats/opioid-dispensing-rate-maps.html#:~:text=The%20overall%20national%20opioid%20dispensing,per%20100%20persons%20in%202022 (last visited September 4, 2024).

[193] *Id.* at 2022 map.

each Defendant in Plaintiff's Town and dispensed by Albertsons is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical use.

354.    In addition, the increase in fatal overdoses from prescription opioids has been widely publicized for years. The CDC estimates that for every opioid-related death, there are 733 non-medical users. Thus, the Defendants had every reason to believe that illegal diversion was occurring in Plaintiff's Town.

355.    According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that over 1,000,000 people died from an overdose involving opioids from 1999 until present. Based on the latest data, approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022. Since 1999, the amount of prescription opioids dispensed in the United States and the number of overdose deaths involving opioids have both quadrupled.

356.    In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost $1.04 trillion in 2018, $985 billion in 2019 and nearly $1.5 trillion in 2020 alone, up 37% from 2017 when the CDC last measured the cost. The rise in fatal opioid overdoses in 2022 suggests the total cost is likely to continue to increase.

**A.  The Massachusetts Opioid Epidemic**

357.    Massachusetts has been especially ravaged by the national opioid crisis.

358.    As alleged previously herein, Massachusetts is experiencing a drug overdose epidemic which is causing devastating socio and economic consequences.

359.    As shown above, the number of drug over deaths rose from 488 in 1999 in Massachusetts to 2,642 in 2022.[194]  Massachusetts ranked 16th nationally in 2022 for the number of overdose deaths and 18th nationally that year for the death rate from drug overdoses, at 37.4 per 100,000 people.[195]

360.    The State's death rate has continued to climb, with the CDC predicting 2,674 deaths in 2023 and then hoping for a drop in 2024 to 2,240.[196]

361.    According to the Massachusetts Department for Public Health (DPH), in 2023, there were 2,104 confirmed opioid-related deaths, and DPH estimates that there will an additional 13 to 32 deaths, yielding approximately 2,125 confirmed and estimated opioid-related deaths.[197] The number of opioid-related deaths has increased by over 400% from 2001, when there were 504 opioid-related deaths in Massachusetts.[198]

---

[194] CDC Drug Overdoes Mortality by State, https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm (year by year drop down tabs) (last visited September 4, 2024).

[195] *Id.*

[196] CDC Provisional National Drug Overdose Death Counts, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited September 4, 2024).

[197] Massachusetts Department of Public Health, Data Brief: Opioid-Related Overdose Deaths among Massachusetts Residents (June 2024), https://www.mass.gov/lists/current-overdose-data#updated-data-–-as-of-june-2024- (last visited September 4, 2024).

[198] *Id.*



362.    The loss of each of these individuals cannot be adequately conveyed by statistics, nor can the depth and breadth of the impact on those who survive.

363.    Most overdoses from non-prescription opioids are directly related to prescription pills. The CDC and other health experts have explained that many opioid users, once addicted to but no longer able to obtain prescription opioids, turn to heroin and/or synthetic opioids, particularly illicitly manufactured fentanyl, or a combination of these and other drugs.[199]

---

[199] https://www.cdc.gov/museum/pdf/cdcm-pha-stem-uncovering-the-opioid-epidemic-lesson.pdf (last visited September 4, 2024).

364.    For example, in 2021, there were 1,971 opioid-related overdose deaths in Massachusetts where a toxicology screen was also available, and fentanyl was present in 90% of those deaths.[200]



365.    The impact of the opioid crisis is felt by communities beyond just the number of deaths.  For example, in January 2017, the U.S. Department of Health and Human Services tracked opioid-related emergency department (ED) visits from 2009-2014, and of the thirty states participating in the study, Massachusetts had the highest rate of ED visits, with 450.2 visits per 100,000 people, compared to the national rate of just 177.7 visits per 100,000 people.[201]

---

[200] Data Brief: Opioid-Related Overdose Deaths among Massachusetts Residents, *supra*, https://www.mass.gov/lists/current-overdose-data#updated-data-–-as-of-june-2024- (last visited September 4, 2024).

[201] Plymouth County District Attorney's Office – Community Overview, https://bja.ojp.gov/doc/fy-2021-COSSAP-narrative-Plymouth-County.pdf (last visited September 4, 2024), citing Weiss, Elixhauser, Barrett, Steiner, Bailey, and O'Malley, https://hcup-us.ahrq.gov/reports/statbriefs/sb219-Opioid-Hospital-Stays-ED-Visits-by-State.jsp (last visited September 4, 2024).

366.    The opioid crisis has also impacted emergency response services. The percentage of EMS incidents that are considered opioid-related increased on average 25.6% per year from 2013 until 2016 and then began decreasing by 3.3% per year through the end of 2021. The number of all EMS incidents involving naloxone administration (a medication that reverses opioid overdoses) increased on average 31.1% per year from 2013 until 2016 then began decreasing 1.8% per year through the end of 2021. In 2021, 55.3% of all opioid-related incidents were categorized as acute opioid overdose incidents and 1.6 % were categorized as dead on arrival incidents.[202]

367.    Between 2007 and 2014, all opioid-related hospital discharges increased by 84%.[203]

368.    Even infants and children have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS").  These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. When untreated, NAS can be life-threatening.

369.    NAS continues to be a problem in Massachusetts, where the rate of infants born with NAS has been close to three times the national average and still exceeds the national average,

---

[202] Massachusetts Department of Public Health, *MA Opioid-Related EMS Incidents, 2013-2021* (June 2022), https://www.mass.gov/doc/emergency-medical-services-data-june-2022/download (last visited September 4, 2024).

[203] Massachusetts Health Policy Commission, Opioid Use Disorder In Massachusetts (Sept. 2016), https://www.mass.gov/files/documents/2016/09/vv/opioid-use-disorder-report.pdf (last visited September 4, 2024).

with 9.1 cases per 1,000 live births in 2020 in Massachusetts[204] compared with a rate of 6.2 for the United States.[205] The rate of NAS in Massachusetts rose from 10.2 per 1,000 births in 2010 to a peaks of 14.6 in 2013 and 14.4 in 2015.[206]

370.    Hospital costs for NAS have grown more than six times since 2004.

371.    The effects of the opioid epidemic are just starting to be recognized as children lose parents, enter foster care, and experience the adverse childhood experiences (ACEs) related to parental substance use. The effects of ACEs (such as familial substance use disorders) on an individual's future health were first studied by Kaiser Permanente's in 1997. Trauma resulting from ACEs disrupts neurological development in a way that produces social, emotional, and cognitive impairment, which can lead to behavioral health issues including addiction, delinquency, depression, and suicide.[207]

372.    At the conclusion of their research, Kaiser Permanente found two glaring conclusions: ACEs are prevalent and often are unrecognized.[208] Hidden and untreated ACEs can

---

[204] Neonatal abstinence syndrome (NAS) Data, link to NAS data Dashboard, https://www.mass.gov/info-details/neonatal-abstinence-syndrome-nas-data (last visited September 4, 2024).

[205] https://www.cdph.ca.gov/Programs/CFH/DMCAH/surveillance/Pages/Neonatal-Abstinence-Syndrome.aspx (US numbers) (last visited September 4, 2024).

[206] Neonatal abstinence syndrome (NAS) Data, link to NAS data Dashboard, https://www.mass.gov/info-details/neonatal-abstinence-syndrome-nas-data (last visited August 19, 2024).

[207] Plymouth County District Attorney's Office – Community Overview, *supra*, citing "Violence Prevention: About the CDC-Kaiser ACE Study," Centers for Disease Control and Prevention, last updated June 14, 2016, https://www.cdc.gov/violenceprevention/aces/about.html (last visited September 4, 2024).

[208] *Id.*, *About the CDC-Kaiser ACE Study*, Center for Disease Control and Prevention, June 14, 2016. https://www.cdc.gov/violenceprevention/acestudy/about.html (last visited September 4, 2024).

lead to a substantial public health and safety risk, as youth experiencing trauma are more likely to develop addiction, engage in delinquent behavior, and have mental health disorders.[209]

373.    In addition to experiencing trauma at home, more and more children are being disrupted with out-of-home placement and foster care because of the opioid crisis. The 284% increase in opioid overdoses in Massachusetts from 2010-2017 coincided with a 55% increase in relatives taking over caregiving responsibilities of children. Over 12,000 children in Massachusetts were being raised by grandparents in 2017 as a result of their parents' opioid addiction. The Massachusetts Trial Court acknowledges that parental opioid addiction is a leading reason for this increase, with 30-40% of child protection orders due to parental addiction.[210]

## B.  The Opioid Epidemic in Plaintiff's Town

374.    As alleged herein, Plaintiff has been hard hit by the opioid epidemic that Defendants caused, contributed, and maintained.

375.    Using data from 2019-2021, Plymouth County had a rate of 36 drug overdose deaths per 100,000 people, which was higher than Massachusetts' rate of 34 and the U.S. rate of 27 during that same time period.[211]

---

[209] *Id.*, citing Suzanne C. Brundage and Carol Levine, "The Ripple Effect: The Impact of the Opioid Epidemic on Children and Families," United Hospital Fund, March 2019, https://uhfnyc.org/publications/publication/ripple-effect-opioid-epidemic-children-and-families/ (last visited September 4, 2024).

[210] Plymouth County District Attorney's Office – Community Overview, *supra*, citing Grandparents Step in When Addiction Leaves Thousands Without Parents," Boston 25 News, November 22, 2017, https://www.boston25news.com/news/grandparents-step-in-when-addiction-leaves-thousands-without-parents-1/652113438/ (last visited September 4, 2024).

[211] County Health Rankings & Roadmaps, Drug overdose deaths, available at https://www.countyhealthrankings.org/health-data/health-factors/health-behaviors/alcohol-and-drug-use/drug-overdose-deaths?year=2024&county=25023 (last visited September 4, 2024).

376.    From 2013-2023 Plymouth County suffered from 1785 opioid-related deaths. There were 86 opioid-related deaths in 2013, peaking at 202 deaths in 2017, and 190 opioid-related deaths in 2022 and 154 in 2023.[212]

377.    The Town of Hull, with its population of just over 10,000, suffered from 50 opioid-related deaths from 2016-2023, including 10 opioid-related deaths in both 2020 and 2019.[213] These numbers are well up from 1 death in 2012 and 0 in 2013,[214] and twice the number Hull had in 2016 and 2018.[215]

378.    From 2010-2020 Plymouth County had the second highest opioid-related overdose death rate of the fifteen counties in Massachusetts, with 278 deaths per 100,000 people. Plymouth County's rate of 30.3 deaths per 100,000 people in 2020 is nearly ten percentage points higher than the national rate of 21.6 deaths per 100,000 people.[216]

379.    Children and families in Plymouth County have also been impacted by the opioid crisis. Of the overdoses in Plymouth County in 2020, 56% were experienced by individuals ages

---

[212] Massachusetts Department of Public Health, Number of Opioid-Related Overdose Deaths by County, 2013-2023 (June 2024), https://www.mass.gov/doc/opioid-related-overdose-deaths-by-county-june-2024-0/download (last visited September 4, 2024).

[213] Massachusetts Department of Public Health, Number of Opioid-Related Overdose Deaths by City/Town 2016-2023, https://www.mass.gov/doc/opioid-related-overdose-deaths-by-city-or-town-june-2024-0/download (last visited September 4, 2024).

[214] Massachusetts Department of Public Health, Number of Confirmed Unintentional/Undetermined Opioid-Related Overdose Deaths by City/Town, January 2012-December 2015 (May 2016), https://www.mass.gov/doc/overdose-deaths-by-citytown-may-2016-1/download (last visited September 4, 2024).

[215] Massachusetts Department of Public Health, Number of Opioid-Related Overdose Deaths by City/Town 2016-2023, *supra*.

[216] Plymouth County District Attorney's Office – Community Overview, *supra*, https://bja.ojp.gov/doc/fy-2021-COSSAP-narrative-Plymouth-County.pdf (last visited September 4, 2024) (citing Pamela Kelley and Sean Varano, "Plymouth County Outreach: 2020 Annual Report," Kelley Research Associates, February 2021).

20-39—the ages most frequently associated with having young children.[217] The children in these families are exposed to overdose trauma, drug use, and the parental mental health disorders associated with addiction.[218]

380.    The opioid crisis also resulted in a staggering number of infants born with NAS in Plymouth County. In 2017, 24.1 per 1,000 births were diagnosed with NAS in the Southeast Region of Massachusetts, which includes Plymouth County.[219] This was more than triple the national rate of 7.3 per 1,000 newborn hospitalizations for that year.[220]

381.    With more and more children experiencing the ripple effects of parental opioid addiction, household opioid use is becoming the fastest growing ACE in Plymouth County. Plymouth County is witnessing first-hand the effects of these ACEs, particularly among drug-endangered children (defined as youth under the age of 18 living in a home with a family member with a drug addiction). The Plymouth County Juvenile Court noted that youth appearing before the court have an average of five ACEs, with an unsurprising 56% of court-involved youth reporting household substance use as one of the five.[221]

382.    The sheer volume of these dangerously addictive drugs was destined to create the present crisis of addiction, abuse, and overdose deaths.

---

[217] *Id.*

[218] *Id.*, citing Suzanne C. Brundage and Carol Levine, "The Ripple Effect: The Impact of the Opioid Epidemic on Children and Families," United Hospital Fund, March 2019, https://uhfnyc.org/publications/publication/ripple-effect-opioid-epidemic-children-and-families/ (last visited September 4, 2024).

[219] *Id.* at p. 3.

[220] *Id.*, citing Neonatal Abstinence Syndrome (NAS) Among Newborn Hospitalizations," Healthcare Cost and Utilization Project (HCUP), Last modified August 27, 2020, https://datatools.ahrq.gov/hcup-fast-stats/ (last visited September 4, 2024).

[221] *Id.*, citing Hon. John S. Spinale, "Childhood Trauma and Juvenile Justice in Massachusetts," November 8, 2017.

383.    While Defendants were reaping millions of dollars in profits from their wrongful conduct, Plaintiff has been required to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.

384.    Plaintiff has incurred and continues to incur substantial costs because of Defendants' conduct including, but not limited to, costs of increased services with respect to law enforcement and first responders; county health facilities, including clinics; detention centers and jails; county courts, including drug courts; education programs; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention and education programs; inmate services including housing, health and support staff; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs and costs to repair and restore County infrastructure and services.

385.    Plaintiff has had to allocate or re-allocate extraordinary resources through staffing at departments providing all of the services listed above; has incurred substantial increases in overtime and related costs associated with educational and judicial support services.

386.    As described above, the Defendants were each responsible for a large share of the volume of prescription opioids that flowed into Plaintiff's Town. Even amidst an epidemic, they maintained and even grew the volume of opioids they manufactured, distributed, purchased, and/or dispensed.

387.    Defendants knew or should have known about the diversion of prescription opioids in Massachusetts and in Plaintiff's Town, and the Defendants disregarded their reporting and due diligence obligations under federal and Massachusetts law, causing harm to Plaintiff's Town. Instead, Defendants consistently failed to investigate, report, or suspend illicit orders, and Albertsons consistently failed to conduct due diligence to ensure the prescriptions its was

107

dispensing were for a legitimate medical purpose, deepening the crisis of opioid abuse, addiction, and death in Massachusetts and Plaintiff's Town.  Along with the ills described above, Plaintiff's Town has faced a spike in addiction, abuse, and overdoses which are attributable to prescription opioids or the illicit opioids that patients often began abusing after becoming addicted to prescription opioids.

## VI.    PLAINTIFF'S CLAIMS ARE TIMELY

### A.  Continuing Conduct.

388.    Defendants' wrongful conduct is still ongoing and has caused Plaintiff repeated injuries and/or a continuous injury over many years.

389.    Plaintiff continues to suffer harm from the unlawful actions by Defendants.

390.    The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The public nuisance remains unabated. The conduct causing the damages remains unabated.

### B.  Equitable Estoppel.

391.    Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, the Plaintiff, and Plaintiff's Town, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer, distributor or pharmacy status in the State and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public,

including the State, the Plaintiff, and Plaintiff's Town, that they are working to curb the opioid epidemic.

392.    Plaintiff exercised reasonable diligence in investigating their claims, however, plaintiff did not learn that it had been injured by Defendants' actions or the source of those injuries until only recently.    For example, the information related to the Albertsons Defendants' distribution and dispensing practices was not available to Plaintiff until depositions from *State of New Mexico, ex rel., Hector Balderas, Attorney General, v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541, were produced in the MDL in April 2022. These documents—and the facts they contain—were not previously public, nor were they in Plaintiff's possession, and not otherwise available to Plaintiff before being produced in the MDL repository.  For the Indivior Defendants, the July 2019 and November 2020 False Claims Act settlements revealed Indivior's false marketing and other misconduct related to their buprenorphine products. Since these occurrences, the MDL court's moratorium on substantive filings until Plaintiff was named a bellwether is an extraordinary circumstance that prevented Plaintiff from adding Defendants to its case prior to now.

393.    Prior to obtaining this Albertsons discovery, the updated ARCOS data on all Defendants, and information related to Indivior from the settlements, Plaintiff could not have known of these Defendants' role—or in the case of Albertsons the full extent of its role—in fomenting the opioid crisis or causing Plaintiff's injuries.

394.    Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct.

395. Defendants fraudulently concealed from Plaintiff the existence of Plaintiff's causes of action.

396. Plaintiff did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiff's Town, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

397. Defendants intended that their actions and omissions would be relied upon, including by Plaintiff and Plaintiff's Town. Plaintiff and Plaintiff's Town did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

398. Plaintiff and Plaintiff's Town reasonably relied on Defendants' affirmative statements, including those regarding Defendants' commitment to preventing and addressing the misuse, abuse, and diversion of opioids.

## VII. SUCCESSOR LIABILITY

399. To the extent that the wrongful acts or omissions alleged herein where committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor and successor, (3) the surviving entity was a mere continuation of the predecessor or (4) when the transaction is entered into fraudulently to escape liability for the debts and liabilities. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of shareholders resulting from the purchasing corporation paying for the assets with shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation

of the business of the predecessor; and (d) continuity of management, personnel, and general business operation of the predecessor. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## VIII.  ALTER EGO LIABILITY

400.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by wholly-owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly-owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiff without discovery.

## IX.  CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**CREATION OF A PUBLIC NUISANCE**
**(Against All Defendants)**

401.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

402.    Defendants have intentionally and unlawfully created a public nuisance under Massachusetts law.

403.    Defendants created and maintained a public nuisance which proximately caused injury to Plaintiff.

404.     A public nuisance results from conduct that caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury.  *See* Restatement Second, Torts § 821B.  *See also Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court,* 448 Mass. 15, 35, 858 N.E.2d 699, 716 (2006).

405.     Defendants have created and maintained a public nuisance by marketing, distributing, dispensing and selling opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiff's Town.

406.     Plaintiff and the residents of Plaintiff's Town have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property. Defendants injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiff's Town.

407.     The consequences of Defendants' wrongful and illegal actions as set forth above have also resulted in an intentional invasion of the interest of Plaintiff and Plaintiff's Town in the use and enjoyment of the public and private land comprising Plaintiff's corporate boundaries.

408.     The consequences of Defendants' wrongful and illegal actions as set forth above have further resulted in environmental contamination and/or damage to Plaintiff's property and property in Plaintiff's Town.

409.     The public nuisance is a public nuisance because Defendants' nuisance-creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

410.    Defendants have created and maintained a public nuisance through their ongoing conduct of marketing, distributing, dispensing and selling opioids, which are dangerously addictive drugs, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiff's Town, flooded Plaintiff's Town with opioids, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiff and the residents of Plaintiff's Town.

411.    The opioid epidemic in Plaintiff's Town remains an immediate hazard to public health and safety.

412.    Defendants know, and have known, that their negligent, intentional, unreasonable, and/or unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that their conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's Town.

413.    Defendants' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiff and Plaintiff's Town. *See* Restatement (Second) of Torts § 821B.

414.    The interference is unreasonable because Defendants' nuisance-creating conduct:

- Involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

- At all relevant times was and is proscribed by state and federal laws and regulations; and/or

- Is of a continuing nature and, as Defendants know, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

415.    The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid, heroin and illegally manufactured fentanyl use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties have caused harm to the entire community that includes, but is not limited to the following:

416.    The high rates of use leading to the unnecessary and a staggering increase of opioid abuse, addiction, overdose, injuries, and deaths.

417.    Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

418.    Even those residents of Plaintiff's Town who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured and will endure both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

419.    The opioid epidemic has increased and will increase costs and expenses for Plaintiff relating to healthcare services, law enforcement, the criminal justice system, social services, education systems, and property maintenance and clean-up.

420.    Employers have lost and will continue to lose the value of productive and healthy employees.

421.    Defendants' conduct created and continues to create an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

422.    Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of people addicted to opioids to buy them. More prescription opioids sold by Defendants led to more addiction, with many people addicted to prescription opioids to heroin and synthetic fentanyl. People addicted to opioids frequently require increasing levels of opioids, and many are turning to heroin, fentanyl and other drugs as a foreseeable result.

423.    The diversion of opioids into the illegal, secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids has increased and continues to increase the demands on health care services and law enforcement.

424.    The significant and unreasonable interference with the public rights caused by Defendants' conduct has taxed and continues to tax the human, medical, public health, law enforcement, and financial resources of the Plaintiff's Town.

425.    Defendants intentionally, unreasonably, and/or unlawfully deceptively marketed, distributed and dispensed as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, added police responses, death and injuries to the residents of Plaintiff's Town, and direct costs to Plaintiff and Plaintiff's Town.

426.    Each Defendant is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of each Defendant was a substantial factor in producing the public nuisance and harm to Plaintiff.

427.    Defendants' conduct constitutes a violation of federal and Massachusetts law.  In the sale and distribution of opioids in Massachusetts and Plaintiff's Town, Defendants violated federal law, including, but not limited to, 21 U.S.C. § 823 and 21 C.F.R. § 1301.74, and Massachusetts law, including, but not limited to M.G.L. C. 94C. § 12. In the sale and dispensing of opioids in Massachusetts and Plaintiff's Town, Defendants violated federal law, including, but not limited to 21 C.F.R. §§ 1301.71(a) and 1306.04(a), and Massachusetts law, including, but not limited to M.G.L. C. 94C. § 12 and 247 Mass. Code Regs. 9.04, 9.05, 9.06 and 9.07.  The aforesaid statutes and regulations are public safety statutes and regulations.

428.    Defendants intentionally and unreasonably distributed and sold opioids that Defendants knew or should have known would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

429.    Defendants' unlawful, nuisance-creating conduct, for which the gravity of the harm outweighs the utility of the conduct, includes violating and/or aiding and abetting the violation of federal and Massachusetts statutes and regulations, including the controlled substances laws, by, *inter alia*:

   a.  Distribution and sales by Defendants of opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

   b.  Distribution by Defendants of opioids without maintaining effective controls against the diversion of opioids;

   c.  Choosing not to effectively monitor for suspicious orders;

   d.  Choosing not to investigate suspicious orders;

   e.  Choosing not to report suspicious orders;

   f.  Choosing not to stop or suspend shipments of suspicious orders; and

   g.  Distribution and sales by Defendants of opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

430.    Defendant Albertson also unreasonably interfered with the public health, safety, peace and comfort of the residents of Plaintiff's Town by failing to ensure that it dispensed only legitimate opioid prescriptions and failing to implement effective controls and procedures to prevent diversion. *See* 21 C.F.R. §§ 1301.71(a), 1306.04(a). In doing so, Albertsons acted with oppression, fraud and malice.

431.    Defendant Albertsons' conduct includes the filling of prescriptions in the presence of factors questioning the legitimacy of the prescription or the prescriber in violation of 21 C.F.R. § 1306.04.

432.    Defendant Indivior, by affirmatively promoting the sale and use of Suboxone in a manner that facilitated and induced doctors to prescribe its Suboxone products in an unsafe and medically inappropriate manner and rewarding corrupt providers so they would continue and even increase their illicit prescribing, including by sending patients to their practices and hiring those doctors for their speakers programs, injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiff's Town.  The public nuisance caused by Indivior's affirmative promotion of opioids has caused substantial annoyance, inconvenience, and injury to the public.

433.    Defendant Mylan, by affirmatively promoting the sale and use of its highly-addictive fentanyl products as less prone to abuse, including by marketing its fentanyl patches to entice unscrupulous doctors—including many doctors who were later convicted of a variety of crimes related to the opioid epidemic—to push these products on their patients, injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiff's Town.   Mylan also aggressively marketed and sold its fentanyl buccal soluble immediate-release film product—approved for treatment of so-called

"breakthrough" pain in cancer patients—to pain management physicians and other healthcare professionals. The illegal and wrongful marketing of these products as safe for regular use in the treatment of chronic non-cancer pain, despite being powerful fentanyl opioids with a very limited cancer-only indication and highly addictive and dangerous properties, has led to widespread abuse of these fentanyl products and has injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiff's Town. The public nuisance caused by Mylan's affirmative promotion of opioids has caused substantial annoyance, inconvenience, and injury to the public.

434.    Defendants' interference with the comfortable enjoyment of life in the Plaintiff's Town is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

435.    Defendants' wrongful and illegal actions have created a public nuisance. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public.

436.    Defendants are in the business of manufacturing, marketing, dispensing, selling and/or distributing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

437.    Indeed, prescription opioids are akin to medical grade heroin. Defendants' wrongful conduct of deceptively marketing and/or pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiff – exactly as would be expected when medical grade heroin is deceptively marketed, floods the city, and is diverted into an illegal, secondary market.

438.     Defendants had control over their conduct in Plaintiff's Town and that conduct has had an adverse effect on rights common to the general public.  Each of the Defendants controlled the systems they developed to prevent diversion, including the criteria and process they used to identify suspicious orders, whether and to what extent they trained their employees to report and halt suspicious orders, and whether they filled orders they knew or should have known were likely to be diverted or fuel an illegal market. Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders.

439.     In addition, Mylan and Indivior controlled their deceptive advertising and efforts to mislead the public. Albertsons controlled its dispensing practices and controls and procedures it did or should have instituted to prevent diversion.

440.     It was reasonably foreseeable that Defendants' actions and omissions would result in the public nuisance and harm to Plaintiff described herein.

441.     The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

442.     As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiff has suffered and will continue to suffer economic damages including, but not limited to, significant expenses for police, emergency, health, and other services.

443.     As a direct and proximate result of Defendants' tortious conduct and the public nuisance created by Defendants, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

444.     Defendants' distribution and Albertsons' dispensing of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

445.     Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiff's Town will be diverted, leading to abuse, addiction, crime, and public health costs.

446.     The nuisance created by Defendants' conduct has not been abated.

447.     The public nuisance created, perpetuated and maintained by Defendants can be prospectively abated and further reoccurrence of such harm and inconvenience can be prevented.

448.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

449.     Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

450.     Plaintiff seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

451.     Plaintiff has suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than Massachusetts citizens at large. These are harms that can only be suffered by Plaintiff.

452.     Plaintiff is asserting its own rights and interests, and Plaintiff's claims are not based upon or derivative of the rights of others.

453.     The tortious conduct of each Defendant was a substantial factor in creating the public nuisance.

454.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

455.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

456.    Defendants' actions demonstrated both malice and also aggravated and egregious fraud. Defendants engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

457.    Defendants' negligent, intentional and/or unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

458.    Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all economic damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and expenses of suit and pre- and post-judgment interest.

459.    Each Defendant created or assisted in the creation of the epidemic of opioid use and injury and each Defendant is jointly and severally liable for abating it.

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF MASSACHUSETTS GENERAL LAWS,**
**CHAPTER 93A, SECTIONS 2 AND 11**
**(Against All Defendants)**

460.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

461.    Defendants engaged in deceptive trade practices in this State, in violation of State law.

462.    Defendants were engaged in "trade" and "commerce" as defined by Massachusetts General Laws, Chapter 93A, Section 1.

463.    The transactions, actions or inaction of Defendants constitute unfair and deceptive acts and practices as defined by, and in violation of, Massachusetts General Laws, Chapter 93A, Sections 2 and 11.

464.    Defendants committed committing repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of commerce.

465.    As alleged herein, Mylan and Indivior wrongfully represented that the opioid prescription medications they manufactured, marketed, and sold had characteristics, uses, or benefits that they do not have.

466.    As alleged herein Defendant Indivior affirmatively promoted the sale and use of its buprenorphine opioid products in ways that facilitated and induced doctors to prescribe those products in an unsafe and medically inappropriate manner and Defendant Mylan affirmatively promoted the sale and use of its highly-addictive fentanyl products as less prone to abuse and its fentanyl immediate-release film product to pain management physicians and other healthcare professionals as safe for regular use in the treatment of chronic non-cancer pain when it was highly addictive and only approved for breakthrough pain in cancer patients.

467.    Mylan and Indivior also wrongfully misrepresented that the opioids were safe and effective when such representations were untrue, false, and misleading.

468.    Mylan and Indivior used exaggeration and/or ambiguity as to material facts and omitted material facts, which tended to deceive and/or did in fact deceive.

469.    Mylan and Indivior also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids.  Mylan's and Indivior's omissions rendered even their seemingly truthful statements about opioids deceptive.

470.    Because of the dangerously addictive nature of these drugs, which Mylan and Indivior concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, Defendants' sales and marketing of opioids constituted a violation of State law.

471.    Mylan and Indivior also omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of the opioids the sold. Each Defendant's omissions rendered even their seemingly truthful statements about opioids deceptive.

472.    In addition, all Defendants engaged in unfair and/or deceptive trade practices by failing to report suspicious orders of opioids and/or prevent the diversion of highly addictive prescription drugs to illegal sources.

473.    Defendants were required to comply with the reporting requirements under federal law and maintain distribution records pursuant to M.G.L. c. 94C, § 15 and the Code of Massachusetts Regulations 7.04, Minimum Requirements for the Storage and Handling of Prescription Drugs and for the Establishment and Maintenance of Prescription Drug Distribution Records, Section 9.

474.    Defendants failed to disclose the material facts that, *inter alia*, they were not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically monitor, investigate, report, and refuse suspicious orders.  But for these material factual omissions, Defendants would not have been able

to sell or distribute opioids, and the Defendants would not have been able to receive and renew licenses to sell opioids.

475.    Albertsons failed to disclose the material facts that, *inter alia*, it was not in compliance with laws and regulations requiring that they maintain a system to prevent diversion, protect against addiction and severe harm, and specifically enact policies to ensure that its pharmacists only dispensed prescriptions that were issued for a legitimate medical purpose. But for these material factual omissions, Albertsons would not have been able to sell or dispense opioids, and Albertsons would not have been able to receive and renew licenses to sell opioids.

476.    Because of the dangerously addictive nature of these drugs, the Defendants' unfair and or deceptive trade practices unlawfully caused an opioid, heroin and fentanyl plague and epidemic in the State and Plaintiff's Town.

477.    Each Defendant had a non-delegable duty to guard against and prevent the misuse and/or diversion of prescription opioids to other than legitimate medical, scientific, and industrial channels.

478.    Defendants also omitted material facts, causing confusion or misunderstanding as to approval or certification of goods or services.

479.    Defendants' unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to deceive the State, the public, Plaintiff's Town, and Plaintiff.

480.    As described more specifically above, Defendants' representations, concealments, and omissions constitute a willful course of conduct which continues to this day.

481.    The damages that Plaintiff seeks to recover were sustained as a direct and proximate cause of the Defendants' intentional and/or unlawful actions and omissions.

482.     Defendants' actions and omissions in the course of marketing, selling, distributing and dispensing prescriptions opioids constituted deceptive trade practices under State law and the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth.

483.     State law prohibits representing that goods or services have sponsorship, approval, characteristics, uses, or benefits that they do not have.  State law further prohibits representing that goods are of a standard, quality, or grade if they are of another.

484.     Defendants committed repeated and willful unfair or deceptive acts or practices, and unconscionable trade practices, in the conduct of commerce in this Commonwealth.

485.     Each Defendant failed to report and/or prevent the diversion of highly addictive prescription drugs.

486.     Defendants acted knowingly, intentionally and/or unlawfully.

487.     Plaintiff seeks economic losses (direct, incidental, or consequential pecuniary losses) resulting from Defendants' deceptive trade practices.  Plaintiff does not seek damages for physical personal injury or any physical damage to property caused by Defendants' actions.

488.     Plaintiff seeks all legal and equitable relief as allowed by law, except as expressly disavowed herein, including inter alia injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, attorney fees and costs, and pre- and post-judgment interest.

### THIRD CLAIM FOR RELIEF
### NEGLIGENCE
### (Against All Defendants)

489.     Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as

each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

### A. DUTY

490.    Defendants owed Plaintiff a duty to not expose Plaintiff to an unreasonable risk of harm.

491.    Defendants had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in manufacturing, advertising, marketing, selling, distributing and/or dispensing opioids.

492.    All Defendants owe a duty under federal law to provide effective controls and procedures to guard against diversion. 21 U.S.C. § 823; 21 C.F.R. § 1301.71(a).

493.    All Defendants owe a duty under federal law, 21 U.S.C. § 823 and 21 CFR § 1301.74, to monitor, detect, investigate, refuse and report suspicious orders of prescription opiates originating from Plaintiff's Town.

494.    All Defendants had a duty not to breach the standard of care established the federal CSA and its implementing regulations to report suspicious orders and to maintain systems to detect and report such activity.

495.    The CSA and its implementing regulations create restrictions on the distribution of controlled substances. *See* 21 U.S.C. §§ 801-971; 21 C.F.R. §§ 1300-1321.

496.    Albertsons owes a duty under federal law to only fill prescriptions that are written for a legitimate medical purpose.  *See* 21 C.F.R. § 1306.04(a).

497.    The main objectives of the CSA are to conquer drug abuse and to control the legitimate and illegitimate traffic in controlled substances.  Congress was particularly concerned with the need to prevent the diversion of drugs from legitimate to illicit channels.  To effectuate these goals, Congress devised a closed regulatory system making it unlawful to manufacture,

distribute, dispense, or possess any controlled substance except in a manner authorized by the CSA. The CSA categorizes all controlled substances into five schedules. The drugs are grouped together based on their accepted medical uses, the potential for abuse, and their psychological and physical effects on the body.  Each schedule is associated with a distinct set of controls regarding the manufacture, distribution, dispensing and use of the substances listed therein.  The CSA and its implementing regulations set forth strict requirements regarding registration, labeling and packaging, production quotas, drug security, and recordkeeping. *Gonzales v. Raich*, 545 U.S. 1, 12–14 (2005) (internal citations omitted).

498.    The CSA authorizes the DEA to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit market. H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970); *see* 21 U.S.C. § 801(2); 21 U.S.C. §§ 821-824, 827, 880.  Any entity that seeks to become involved in the production or chain of distribution of controlled substances must first register with the DEA.  21 U.S.C. § 822; 21 C.F.R. § 1301.11.

499.    The CSA provides for control by the Justice Department of problems related to drug abuse through registration of manufacturers, wholesalers, retailers, dispensers and all others in the legitimate distribution chain, and makes transactions outside the legitimate distribution chain *illegal*.  1970 U.S.C.C.A.N. 4566, 4569 (emphasis added).

500.    "Congress was particularly concerned with the diversion of drugs from legitimate channels. It was aware that registrants, who have the greatest access to controlled substances and therefore the greatest opportunity for diversion, were responsible for a large part of the illegal drug traffic." *United States v. Moore*, 423 U.S. 122, 135 (1975).

501.    The CSA is designed to improve the administration and regulation of the manufacturing, distribution, and dispensing of controlled substances by providing for a "closed" system of drug distribution for legitimate handlers of such drugs. Such a closed system is intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.  1970 U.S.C.C.A.N. 4566, 4571-72.

502.    Defendants as distributors are one of the key components of the distribution chain. If the closed system is to function properly as Congress envisioned, distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes.  This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.

503.    The closed system of the CSA is specifically designed with checks and balances between registrants to ensure that controlled substances are not diverted from this closed system.

504.    Different entities supervise the discrete links in the chain that separate a consumer from a controlled substance. Statutes and regulations carefully define each participant's role and responsibilities.

505.    Federal law imposes a duty upon the Defendants to comply with applicable State and local law.  21 U.S.C. § 823(a)(2), (b)(2).

506.    Massachusetts law requires all manufacturers, distributors and dispensers of controlled substances drugs to register with the Commissioner of Public Health or the Board of Pharmacy. M.G.L. c. 94C. § 7(a); *see also* 247 Mass. Code Regs. 7.02; 247 Mass. Code Regs.

11.01. To receive and maintain their license, each Defendant registered had a duty to comply with federal, state, and local laws regarding the distribution of drugs.  247 Mass. Code Regs. 7.02.

507.    The Massachusetts Board of Registration in Pharmacy has the authority to suspend or revoke licenses or registrations issued to wholesale distributors who violate Board of Pharmacy regulations.  M.G.L. c. 94C. § 13(a)(2), (3), & (4).

508.    The federal mandates incorporated into Massachusetts law require that Defendants must maintain effective control against diversion. 21 U.S.C. §§ 823(a)(1), (b)(1).

509.    As alleged above, in addition to reporting all suspicious orders, distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

510.    Federal and Massachusetts and regulations require Defendants to act as gatekeepers guarding against the diversion of the highly addictive, dangerous opioid drugs.  *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74; 21 C.F.R. § 1306.04; M.G.L. c. 94C. §§ 7, 9 12, 13, 15, 17, 19; 247 Mass. Code Regs. 5.04, 6.02, 7.02, 7.04, 9.04, 9.06, 11.02.

511.    These duties are well known to the Defendant.  "DEA regulations that have been in place for more than 40 years require distributors to report suspicious orders of controlled substances to DEA based on information readily available to them (e.g., a pharmacy's placement of unusually frequent or large orders)."[222]

512.    Defendants owe a duty to monitor and detect suspicious orders of prescription opiates originating from Plaintiff's Town.

---

[222] See Brief for HDMA and NACDS, *4, *Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin*.

513.    Defendants owe a duty to investigate suspicious orders of prescription opiates originating from Plaintiff's Town.

514.    Defendants owe a duty to refuse suspicious orders of prescription opiates originating from Plaintiff's Town.

515.    Defendants owe a duty to report suspicious orders of prescription opiates originating from Plaintiff's Town.

516.    Defendants owe a duty to prevent the diversion of prescription opiates into illicit markets in Plaintiff's Town.

517.    Albertsons owes a duty under to only fill prescriptions that are written for a legitimate medical purpose in Plaintiff's Town.

518.    Defendants Mylan and Indivior owe a duty to market and sell their products in a manner that was truthful and appropriate for highly addictive prescription opioids.

519.    The foreseeable harm from a breach of this duty is the diversion of prescription opiates for nonmedical purposes.

520.    The degree of care the law requires is commensurate with the risk of harm the conduct creates. Defendants' conduct in marketing, distributing, dispensing and selling dangerously addictive drugs requires a high degree of care and places them in a position of great trust and responsibility in relation to Plaintiff.  Their duty cannot be delegated.

## B.  BREACH

521.    Each Defendant breached its duty to exercise the degree of care, prudence, watchfulness, and vigilance commensurate with the dangers involved in selling dangerous controlled substances.

522.    Because distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from

legitimate channels into the illicit market, it is incumbent on distributors, along with manufacturers and dispensers, to maintain effective controls to prevent diversion of controlled substances. Should a distributor deviate from these checks and balances, the closed system created by the CSA collapses.

523.    Defendants breached their duty to maintain effective controls against diversion of prescription opiates into other than legitimate medical, scientific, and industrial channels in violation of 21 U.S.C. §§ 823(a)(1), (b)(1).

524.    Defendants breached their duty to "design and operate a system to disclose to the registrant suspicious orders of controlled substances" and failed to inform the DEA of "suspicious orders when discovered" in violation of 21 CFR § 1301.74(b).

525.    Defendants breached their duty to provide effective controls and procedures to guard against theft and diversion of controlled substances.

526.    Defendants repeatedly and purposefully breached their duties under federal and state law which is a direct and proximate cause of the diversion of prescription opiates for nonmedical purposes in Plaintiff's Town.

527.    Defendants breached their duty to exercise due diligence to avoid filling suspicious orders that might be diverted into other legitimate medical, scientific and industrial channels.

528.    Defendants have abandoned their duties imposed under federal and state law, taken advantage of a lack of DEA law enforcement in Massachusetts and abused the privilege of distributing controlled substances in Plaintiff's Town.

529.    All Defendants breached their duty to Plaintiff by, *inter alia*:

   a.  Marketing, distributing, dispensing and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

   b.  Marketing, distributing, dispensing and/or selling opioids without maintaining effective controls against the diversion of opioids;

    c.   Choosing not to effectively monitor for, investigate or report suspicious orders;

    d.   Choosing not to stop or suspend shipments of suspicious orders; and

    e.   Distributing, dispensing and/or selling opioids prescribed by "pill mills" when Defendants knew or should have known the opioids were being prescribed by "pill mills."

530.    Defendant Indivior also breached its duty to Plaintiff by deceptively marketing its buprenorphine opioid products in ways that facilitated and induced doctors to prescribe those products in an unsafe and medically inappropriate manner.

531.    Defendant Mylan also breached its duty to Plaintiff by deceptively marketing its highly-addictive fentanyl products as less prone to abuse and its fentanyl immediate-release film product to pain management physicians and other healthcare professionals as safe for regular use in the treatment of chronic non-cancer pain when it was highly addictive and only approved for breakthrough pain in cancer patients.

532.    Defendant Albertsons also breached its duty to Plaintiff by dispensing prescriptions without ensuring that they were issued for a legitimate medical purpose.

533.    Defendants have engaged in affirmative acts of creating an illegal, secondary prescription opioid market by failing to exercise adequate control over the marketing, distribution, dispensing and sale of their prescription opioids.

534.    Defendants were negligent by marketing, distributing, dispensing and selling opioids in a way that created and fostered an illegal, secondary prescription opioid market that resulted in a foreseeable and unreasonable risk of harm to Plaintiff.

535.    The method by which Defendants created this market was by marketing, distributing, and selling opioids without regard to the likelihood that the opioids would be placed in the hands of criminals, people addicted to opioids, juveniles, and others not permitted to use or possess prescription opioids.

## C. CAUSATION

536.    Defendants' misconduct as alleged above is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Plaintiff's Town.

537.    All Defendants' failure to monitor, detect, investigate, refuse and report suspicious orders is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Plaintiff's Town.

538.    Indivior's and Mylan's failure to properly and truthfully market its opioid products is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Plaintiff's Town.

539.    Albertson's failure to ensure that it was dispensing prescription opioids only written for a legitimate medical purpose is a direct and proximate cause of the diversion of prescription opiates into the illicit market for nonmedical purposes in Plaintiff's Town.

540.    The unlawful conduct by Defendants caused the very harm the federal and state laws were intended to prevent; namely, the diversion of prescription opiates for nonmedical purposes.

541.    The unlawful diversion of prescription opiates is a direct and proximate cause of prescription opiate abuse, addiction, morbidity and mortality in Plaintiff's Town.

542.    The unlawful diversion of prescription opiates is a direct and proximate cause of the opioid epidemic in Plaintiff's Town.

543.    The unlawful diversion of prescription opiates is a direct and proximate cause of the heroin and fentanyl epidemic in Plaintiff's Town.

544.   The CDC has identified addiction to prescription pain medication as the strongest risk factor for heroin addiction.  People who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin.

545.   According to the CDC, most of the overdoses from non-prescription opioids such as heroin or illicit fentanyl are also directly related to prescription pills.

546.   Plaintiff does not allege that Defendants were negligent for failure to protect from harm. Rather, Defendants engaged in conduct the foreseeable result of which was to cause harm to Plaintiff.

547.   The increased use of prescription painkillers for nonmedical reasons (without a prescription for the high they cause), along with growing sales, has contributed to a large number of overdoses and deaths.

548.   The public health dangers associated with the diversion and abuse of controlled prescription drugs have been well-recognized over the years by Congress, the DEA, various trade groups such as NACDS and their members, and public health authorities.

549.   A reasonably prudent opioid manufacturer, distributor or dispenser should have anticipated an injury to Plaintiff as a probable result of marketing, distributing, dispensing and/or selling prescription opioids in this manner.

550.   It was reasonably foreseeable that Defendants' actions and omissions would result in the harm to Plaintiff as described herein.

551.   Defendants had control over their conduct in Plaintiff's Town. Mylan and Indivior Defendants controlled their deceptive marketing and efforts to mislead the public, as described in this Complaint.  All Defendants had control over their own shipments of opioids and over their reporting, or lack thereof, of suspicious prescribers and orders.  Albertsons had control over its

procedures to ensure its pharmacists only dispensed opioids issued for a legitimate medical purpose. Each of the Defendants controlled the systems they developed to prevent diversion.

552.    Because of Mylan's and Indivior's deceptive marketing of opioids and each of the Defendants' special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid, heroin and fentanyl overuse, abuse, and addiction that now exists would have been averted.

553.    Reasonably prudent manufacturers, distributors and/or dispensers of prescription opioids would have anticipated that the scourge of opioid addiction would wreak havoc on communities, and the significant costs which would be imposed upon the governmental entities associated with those communities.  Indeed, it is a violation of Massachusetts law and federal law for Defendants not to report suspicious orders and exercise due diligence not to ship such orders unless and until the suspicion has been removed and for Albertsons to dispense opioids not issued for a legitimate medical purpose.

554.    Defendants' actions were not "authorized" by Massachusetts regulations because Defendants did not comply with the mandatory terms of the registrations and licenses issued to them by Massachusetts authorities or with federal requirements incorporated by reference, as further detailed in this Complaint.

### D.  DAMAGES

555.    As a direct and proximate result of Defendants' negligence and/or negligence *per se*, Plaintiff has suffered and will continue to suffer economic damages including, but not limited to, significant expenses for police, emergency, health, and other services.

556.    As a direct and proximate result of Defendants' negligence and/or negligence *per se*, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

557.    As a direct and proximate result of Defendants' negligent, willful, wanton, and intentional acts, omissions, misrepresentations and otherwise culpable acts, there is now a national opioid epidemic that has caused enormous harm and injury to the Plaintiff and Plaintiff's Town.

558.    Defendants' misconduct alleged in this case is ongoing and persistent.

559.    Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence.  Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

560.    Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

561.    Plaintiff has suffered an indivisible injury as a result of the tortious conduct of Defendants.

562.    The tortious conduct of each Defendant was a substantial factor in producing harm to Plaintiff.

563.    Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

564.    Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all

economic damages allowed by law to be paid by the Defendants, attorneys' fees and costs, and expenses of suit, and pre- and post-judgment interest.

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
### (Against All Defendants)

565.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

566.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of opioids within Plaintiff's Town, including from opioids foreseeably and deliberately diverted within and into Plaintiff's Town.

567.    Unjust enrichment arises not only where expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

568.    Plaintiff has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

569.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

570.    These expenditures have helped sustain Defendants' businesses.

571.    Plaintiff has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper marketing, distribution and/or dispensing practices.

572.    Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

573.     Plaintiff has paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products.  Because of their deceptive marketing of prescription opioids, Mylan and Indivior obtained enrichment they would not otherwise have obtained.  Because of their conscious failure to exercise due diligence in preventing diversion, all Defendants obtained enrichment they would not otherwise have obtained.  The enrichment was without justification and Plaintiff lacks a remedy provided by law.

574.     Defendants have unjustly retained benefits to the detriment of Plaintiff, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

575.     Defendants' misconduct alleged in this case is ongoing and persistent.

576.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur and is not part of the normal and expected costs of a local government's existence.  Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

577.     Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary public services.

578.     By reason of Defendants' unlawful acts, Plaintiff has been damaged and continues to be damaged, in a substantial amount to be determined at trial.

579.     Plaintiff seeks an order compelling Defendants to disgorge all unjust enrichment to Plaintiff; and awarding such other, further, and different relief as this Honorable Court may deem just.

## PUNITIVE DAMAGES

580.    Plaintiff repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

581.    By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted maliciously towards Plaintiff and with an intentional disregard of the Plaintiff's rights and the safety of Plaintiff's Town. Defendants acted oppressively, with conscious disregard for the rights of others and/or in a reckless, wanton, willful or grossly negligent manner. Defendants acted with a prolonged intentional disregard to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm. Defendants acted toward Plaintiff with malice and were grossly negligent in failing to perform the duties and obligations imposed upon them under applicable federal and state statutes and common law.

582.    Defendants were manufacturing, marketing, distributing and/or dispensing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and Plaintiff's Town by these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence and the safety of the community, and an award of punitive damages is appropriate as punishment and a deterrence.

583. By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and exhibited an entire want of care that would raise the level of actual malice and/or a conscious, reckless and outrageous indifference to indifference to the health, safety and welfare of the Plaintiff and others.

## RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

584. Plaintiff respectfully requests that this Court enter an order of judgment granting all relief requested in this Complaint, and/or allowed at law or in equity, including:

    a.  abatement of the nuisance;

    b.  actual damages;

    c.  treble or multiple damages and civil penalties as allowed by statute;

    d.  punitive damages;

    e.  exemplary damages;

    f.  disgorgement of unjust enrichment;

    g.  equitable and injunctive relief in the form of Court-enforced corrective actions and communications;

    h.  forfeiture disgorgement, restitution and/or divestiture of proceeds and assets;

    i.  attorneys' fees;

    j.  costs and expenses of suit;

    k.  pre- and post-judgment interest; and

    l.  such other and further relief as this Court deems appropriate.

Plaintiff demands a jury trial on all issues so triable.

Date:  September 9, 2024                 RESPECTFULLY SUBMITTED,

**TOWN OF HULL, MA**

James B. Lampke
**TOWN COUNSEL – TOWN OF HULL**
115 North Street, Suite 3
Hingham, MA 02043
Tel.: 781-749-9922
Fax: 781-749-9923
jlampke@town.hull.ma.us

**/s/**Mark. P. Pifko
Mark P. Pifko
**BARON & BUDD, P.C.**
15910 Ventura Blvd., #1600
Los Angeles, CA 91436
Tel.: (818) 839-2333
mpifko@baronbudd.com

Richard Sandman
**SANDMAN LAW**
501 Congress Street, Suite 2021
Boston, MA 02210
Tel.: 617-336-6161
rich@sandman-law.com

Thomas T. Merrigan
Peter M. Merrigan
Jonathan Tucker Merrigan
**SWEENEY MERRIGAN LAW**
268 Summer Street, LL
Boston, MA 02210
Tel.: (617) 391-9001
Fax: (617) 357-9001
tom@sweeneymerrigan.com
peter@sweeneymerrigan.com
tucker@sweeneymerrigan.com

Mark R. Reich
**KP LAW**
101 Arch Street
Boston, MA 02110
Tel.: (617) 654-1786
mreich@k-plaw.com

Russell W. Budd
Christine C. Mansour
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, Texas 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

J. Burton LeBlanc
**BARON & BUDD, P.C.**
2600 Citiplace Drive, Suite 400
Baton Rouge, Louisiana 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Dan Alberstone
**BARON & BUDD, P.C.**
15910 Ventura Blvd., #1600
Los Angeles, CA 91436
Tel.: (818) 839-2333
dalberstone@baronbudd.com

Catherine Hancock Dorsey
**BARON & BUDD, P.C.**
2600 Virginia Ave. NW, Suite 612
Washington, DC 20037
Tel.: (202) 333-4562
cdorsey@baronbudd.com

Paul T. Farrell, Jr. (MDL 2804 Co-Lead Counsel)
Michael J. Fuller
**FARRELL & FULLER**
270 Munoz Rivera Avenue, Suite 201
San Juan, PR 00918
Tel.: (939) 293-8244
Paul@FarrellFuller.com
Mike@FarrellFuller.com

Anthony J. Majestro
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: (304) 346-2889
Fax: (304) 346-2895
amajestro@powellmajestro.com

Peter J. Mougey
Page A. Poerschke
Laura S. Dunning
Jeffrey Gaddy
**LEVIN, PAPANTONIO, PROCTOR,
BUCHANAN, O'BRIEN, BARR
& MOUGEY, P.A**.
316 S. Baylen St., Suite 600
Pensacola, Florida 32502
Tel: (850) 435-7140
pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
jgaddy@levinlaw.com

R. Edison Hill
James C. Peterson
Aaron L. Harrah
**HILL PETERSON CARPER BEE
& DEITZLER, PLLC**
500 Tracy Way
Charleston, WV 25311
Tel.: (800) 822-5667
rehill@hpcbd.com
jcpeterson@hpcbd.com
aaron@hpcbd.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 9th day of September, a true and correct copy of the foregoing document has been served upon all parties so registered via the Court's electronic filing system.

<u>/s/ Mark P. Pifko</u>
Mark P. Pifko