**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION | MDL No. 2804 |
| | Case No. 1:17-md-2804 |
| This document relates to: | |
| | Judge Dan Aaron Polster |
| CT21: *County of Monterey v. AmerisourceBergen Drug Corporation, et al.* | **PLAINTIFFS COUNTY OF MONTEREY'S AND THE PEOPLE OF THE STATE OF CALIFORNIA ACTING BY AND THROUGH THE MONTEREY COUNTY COUNSEL'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO THE COMPLAINT** |
| 1:18-op-45615-DAP | |
| | **(Jury Trial Demanded)** |

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION ................................................................................................. 2

II.  JURISDICTION AND VENUE ......................................................................... 9

III. PARTIES ........................................................................................................... 10

   A. PLAINTIFFS ................................................................................................. 10

   B. DEFENDANTS .............................................................................................. 12

      1. The Albertson Defendants. ...................................................................... 12

      2. The Aurolife Defendants ......................................................................... 17

      3. The Indivior Defendants ......................................................................... 18

      4. Sun Pharmaceutical ................................................................................ 20

      5. Related Entities; Agency and Authority ................................................ 21

IV. FACTS COMMON TO ALL CLAIMS ......................................................... 21

   A. Opioids and Their Effects ............................................................................ 21

   B. Defendants' Conduct Created an Abatable Public Nuisance ....................... 24

   C. Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls
      Against Diversion. ........................................................................................ 25

      1. Defendants Were on Notice of and Contributed to Illegal Diversion of
         Prescription Opioids ............................................................................... 25

      2. Defendants Have a Duty to Maintain Effective Controls Against Diversion. ............ 26

         a) CSA Duties of Manufacturers and Wholesale Distributors ................. 28

         b) CSA Duties of Dispensers .................................................................... 31

      3. Defendants Have Corresponding Duties Under California Law ............... 40

      4. Defendants Were Aware of and Have Acknowledged Their Obligations to
         Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders. ............ 43

      5. Defendants Worked to Expand their Shares of the Prescription Opioid Market
         and Failed to Maintain Effective Controls Against Diversion. ................... 51

a) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiffs' Community. ............................................................52

1) Albertsons Was Uniquely Positioned to Guard Against Diversion .................53

2) Albertsons Failed to Guard Against Diversion as a Distributor of Opioids.................................................................................................55

    i)   From 2006-2008, Albertsons' SOMS was Critically Inadequate. .............57

    ii) From 2013-2016, Albertsons' SOMS was Significantly Deficient. ..........61

3) Albertsons Failed to Guard Against Diversion as a Dispenser of Opioids ...............................................................................................64

    i)   Albertsons' Written Red Flag Policies & Procedures were Critically Inadequate. ...................................................................65

    ii) Albertsons Was Slow to Adopt Policies to Prevent Diversion. .................68

    iii) Albertsons Performance Metrics Put Profits Before Safety. .....................71

    iv) Albertsons Had No Systems in Place to Monitor Opioid Dispensing Patterns or Trends. .................................................................78

4) The DEA has Repeatedly Admonished Albertsons Across Multiple Jurisdictions for its Failures to Maintain Effective Controls Against Diversion....................................................................................81

5) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiffs' Community and Surrounding Areas. ................83

b) Aurolife Opportunistically Increased its Market Share in Monterey County and Failed to Guard Against Diversion in the Plaintiffs' Community. ................87

c) Indivior Falsely Marketed its Suboxone Products and Failed to Guard Against Diversion in the Plaintiffs' Community. ...................................................89

d) Sun Pharmaceutical Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiffs' Community. .............................................................92

D.  The Opioids the Defendants Sold Migrated Into Other Jurisdictions...............................95

V.  DEFENDANTS HAVE CREATED AND MAINTAINED A PUBLIC HEALTH CRISIS IN CALIFORNIA, INCLUDING MONTEREY COUNTY.....................................96

A.  The California Opioid Epidemic.........................................................................................98

B.  The Opioid Epidemic in Plaintiffs' Community...............................................................102

VI. PLAINTIFFS' CLAIMS ARE TIMELY ............................................................109

    1.  Enforcement of a Public Right.........................................................109

    2.  Continuing Conduct. ........................................................................109

    3.  Equitable Estoppel. ..........................................................................109

VII.    SUCCESSOR LIABILITY ...................................................................111

VIII.   ALTER EGO LIABILITY.....................................................................112

IX. CLAIMS FOR RELIEF ..................................................................................112

FIRST CLAIM FOR RELIEF—CREATION OF A PUBLIC NUISANCE (Brought by
    The People against all Defendants).........................................................112

SECOND CLAIM FOR RELIEF—PUBLIC NUISANCE (Brought by The County
    Against all Defendants)..........................................................................124

THIRD CLAIM FOR RELIEF—FALSE ADVERTISING - Violations of California
    Business and Professions Code section 17500, *et seq.* (Against Indivior) ...........................129

FOURTH CLAIM FOR RELIEF—UNJUST ENRICHMENT (Against All Defendants).........131

PUNITIVE DAMAGES ......................................................................................133

Plaintiffs, COUNTY OF MONTEREY, and THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through Monterey County Counsel, (collectively "Plaintiffs") hereby supplement and amend their Complaint, dated May 8, 2018, and their Short Form Amended Complaint, dated March 8, 2019, and bring this action to prevent future harm and to redress past wrongs against the following Defendants: the Albertsons Defendants,[1] the Aurolife Defendants,[2] the Indivior Defendants[3] and Sun Pharmaceutical Industries, Inc.[4]

Plaintiffs seek to hold accountable Defendants that reaped enormous financial rewards by helping to expand the market for prescription opioids beyond all reasonable limits, by utterly failing to comply with their gatekeeping obligation to protect the public and by refusing to monitor and restrict the improper marketing, distribution, dispensing and sale of opioids, causing a public nuisance in the County.

IN ADDITION TO THE ALLEGATIONS SET FORTH HEREIN, PLAINTIFFS EXPRESSLY ADOPT AND INCORPORATE BY REFERENCE THE ALLEGATIONS AND CLAIMS SET FORTH IN THEIR COMPLAINT, "SHORT FORM FOR SUPPLEMENTING COMPLAINT AND AMENDING DEFENDANTS AND JURY DEMAND," ("SHORT FORM COMPLAINT") INCLUDING ALL CLAIMS AND ALLEGATIONS AGAINST OTHER

---

[1] The Albertsons Defendants are Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Albertson's LLC; Safeway, Inc.; Randall's Food & Drug LP.

[2] The Aurolife Defendants are Aurolife Pharma LLC and Aurobindo Pharm USA, Inc.

[3] The Indivior Defendants are Indivior, Inc.; Indivior PLC; Reckitt Benckiser Group plc; and Aquestive Therapeutics, Inc.

[4] The following are the newly-added Defendants in this pleading: Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Safeway, Inc.; Randall's Food & Drug LP; Aurolife Pharma LLC; Aurobindo Pharm USA, Inc.; Indivior, Inc.; Indivior PLC; Reckitt Benckiser Group plc; Aquestive Therapeutics, Inc.; and Sun Pharmaceutical Industries, Inc.

1

DEFENDANTS NAMED IN THAT SHORT FORM COMPLAINT, AND PLAINTIFFS COUNTY OF MONTEREY AND THE PEOPLE OF THE STATE OF CALIFORNIA ACTING BY AND THROUGH THE COUNTY OF MONTEREY'S COUNTY COUNSEL'S SUPPLEMENTAL AND AMENDED ALLEGATIONS TO BE ADDED TO THE COMPLAINT, FILED HEREWITH AGAINST THE PBM DEFENDANTS.

## I.  <u>INTRODUCTION</u>

1. This case arises from the worst man-made epidemic in modern medical history—an epidemic of addiction, overdose and death caused by Defendants' flooding the United States, including Plaintiffs' Community, with prescription opioids.

2. By now, most Americans have been affected, either directly or indirectly, by the opioid epidemic.

3. This crisis arose not only from the opioid manufacturers' deliberate marketing strategy, but from distributors' and pharmacies' equally deliberate efforts to evade restrictions on opioid distribution and dispensing. Defendants acted without regard for the lives that would be trammeled in pursuit of profit.

4. California is experiencing a drug overdose epidemic which is causing devastating socio and economic consequences. More people die each year from drug overdoses in California than in any other state, with 10,952 Californians dying in 2022.

5. Between 2009 and 2019, California experienced a 54 percent increase in the number of overdose deaths. According to the California Department of Public Health, over 67% of drug overdose deaths in 2022 involved opioids.

6. In 1999, 2,662 California residents died from a drug overdose. In 2005, that number was 3214 and by 2014 that number had risen to 4,521. Between 2014 and 2018, an average of 4,810 California residents died each year from drug overdoses. In 2019, 6,198 Californians died

from overdose.  In 2020, 8,908 California residents died from overdose.  In 2021, the number of overdose deaths rose to 10,901. However, due to incomplete reporting, these grim numbers likely understate the number of California residents who have been and will be lost to this scourge.

7.      Plaintiff Monterey County has been deeply affected by the opioid crisis.  Opioids claimed 137 lives in Monterey County from 2011-2018, and another 130 between 2020-2021. The County, which had a population of approximately 439,035 residents in 2020, also incurred 182 emergency room visits due to opioid use in 2022. Many residents in Monterey County who need addiction treatment do not receive it.

8.      This devastation in the County was created by opioid manufacturers, distributors, pharmacies, and pharmacy benefit managers who worked together to systematically dismantle the narcotic conservatism that had existed around prescription opioids for decades, opened the floodgates to an unreasonably large and unsafe supply of opioids, improperly normalized the widespread use of opioid drugs, violated laws and regulations designed to protect the public from the dangers of narcotic drugs like opioids, and worked to dismantle protections designed to protect the public so more opioid drugs could be sold and the manufacturers, distributors, and pharmacies could reap the profits therefrom.

9.      Most Americans have been affected, either directly or indirectly, by the opioid epidemic. According to the United States Centers for Disease Control and Prevention ("CDC"), prescription opioids have directly and indirectly accounted for more than 80% of overdose deaths in the United States, a toll that has quadrupled over the past two decades. More people have died from opioid-related causes than from car accidents or guns. More than 175 people die every day from opioid overdoses—as if an airplane were to crash, killing everyone on board, every day.

10.     The death toll has steadily climbed since the push to expand prescription opioid use began in the late 1990s. The CDC's National Center for Health Statistics provides provisional data on drug overdose deaths. According to the data, there were an over 107,000 drug overdose deaths in the United States during 2023.

11.     The epidemic's economic costs for healthcare, lost productivity, addiction treatment, and criminal justice involvement is estimated at $1.02 trillion a year.

12.     From 1999 through present, overdoses killed more than 1 million Americans.  Well over half of them died from opioids prescribed by doctors to treat pain. These opioids include brand-name prescription medications such as OxyContin, Opana ER, Vicodin, Subsys, and Duragesic, as well as generics like oxycodone, hydrocodone, and fentanyl.

13.     Most of the overdoses from non-prescription opioids are also directly related to prescription pills. As soon as prescription opioids took hold on a population, the logical and devastating progression to illicit drugs followed.  Many opioid users, having become addicted to but no longer able to obtain prescription opioids, or trapped in a cycle of addiction, turn to stronger and more potent drugs.

14.     According to the CDC, the rise in opioid overdose deaths can be outlined in three distinct waves. As the CDC explains: "The first wave began with increased prescribing of opioids in the 1990s, with overdose deaths involving prescription opioids (natural and semi-synthetic opioids and methadone) increasing since at least 1993. The second wave began in 2010, with rapid increases in overdose deaths involving heroin. The third wave began in 2013, with significant

increases in overdose deaths involving synthetic opioids, particularly those involving illicitly manufactured fentanyl."[5]

15.    The conduct of the manufacturers, distributors, pharmacies and pharmacy benefit managers caused the nation, including California and Plaintiffs' Community, to be awash in a flood of prescription opioids.  This has had a profound impact on both morbidity and mortality, and these drugs have created an epidemic of addiction that has had severe and wide-ranging effects on public health and safety in the County and communities across the country.  Indeed, from those suffering with the disease of addiction themselves, to children whose parents who suffer from addiction, to employers who employ an addicted population, to the first responders, law enforcement, the court system and the prison system that cannot handle the burdens placed on them, there is almost no area of the community that has not been significantly impacted.

16.    This suit takes aim at a substantial contributing cause of the opioid crisis.  The Albertsons Defendants, operating as both a distributor and dispenser of prescription opioids, the last link in the opioid supply chain and the critical gatekeeper between dangerous opioid narcotics and the public, utterly failed in their gatekeeper role, flouted their duties to protect the public, violated the laws designed to protect the public and dismantled and disregarded measures designed to protect the public health and safety.  As alleged in more detail herein, Albertsons failed to design and operate systems to identify suspicious orders of prescription opioids, maintain effective controls against diversion, or halt suspicious orders when they were identified, and instead dispensed far greater quantities of prescription opioids than it knew could be necessary for

---

[5] CDC Health Topics – Opioid Overdose,
https://www.cdc.gov/policy/polaris/healthtopics/opioid/index.html (last visited September 4, 2024).

legitimate medical uses—all of which actively contributed to the oversupply of such drugs and fueled an illegal secondary market.

17.     This suit also takes aim at other Defendants who were a substantial contributing cause of the opioid crisis.  The Aurolife Defendants and Sun Pharmaceutical opportunistically expanded their market share in Plaintiffs' Community—especially as sellers of hydrocodone and oxycodone—as opioid sales peaked overall and other manufacturers began limiting their sales in response to the opioid crisis.  As others limited their market participation, the Aurolife Defendants and Sun Pharmaceutical increased their own, contributing to the devasting impact of the opioid epidemic in the County.

18.     The Indivior Defendants were a substantial contributing cause of the opioid crisis. The Indivior Defendants developed, manufactured, marketed and/or sold branded Subutex and Suboxone, which are Schedule III buprenorphine products approved by the FDA in 2002 for the treatment of opioid use disorder. The Indivior Defendants affirmatively promoted the sale and use of Subutex and Suboxone in a manner that facilitated and induced doctors to prescribe these products in an unsafe and medically inappropriate manner.  The Indivior Defendants rewarded providers who were prescribing their products in an unsafe manner by sending them patients and hiring them for their speaker programs, inducing them to continue and increase their illicit prescribing.

19.     The Aurolife Defendants, the Indivior Defendants and Sun Pharmaceutical also distribute the opioids they manufacture.  As manufacturers and distributors of dangerous controlled substances, The Aurolife Defendants, the Indivior Defendants and Sun Pharmaceutical were and remain required to hold full DEA registrations, and consequently they must prevent diversion, maintain effective suspicious order monitoring systems (SOMS) and report suspicious orders to

the DEA pursuant to 21 U.S.C. 832; *see also* 21 C.F.R. § 1301.74(b).  The Aurolife Defendants, the Indivior Defendants and Sun Pharmaceutical each failed to design and operate an effective SOM system, allowing widespread diversion of opioids to occur.

20.     Defendants have contributed substantially to the opioid crisis by helping to inflate the opioid market beyond any legitimate bounds and by flooding that market with far greater quantities of prescription opioids than they know could be necessary for legitimate medical uses, while failing to report, and to take steps to halt suspicious orders and sales, thereby exacerbating the oversupply of such drugs and fueling an illegal secondary market.

21.     As millions became addicted to opioids, "pill mills," often styled as "pain clinics," sprouted nationwide and rogue prescribers stepped in to supply prescriptions for non-medical use. These pill mills, typically under the auspices of licensed medical professionals, issue high volumes of opioid prescriptions under the guise of medical treatment.  Prescription opioid pill mills and rogue prescribers cannot channel opioids for illicit use without at least the tacit support and willful blindness of the Defendants, if not their knowing support.

22.     As a direct and foreseeable result of Defendants' conduct, cities and counties across the nation, including Monterey County, are now swept up in what the CDC has called a "public health epidemic" and what the U.S. Surgeon General has deemed an "urgent health crisis."[6]  The increased volume of opioid prescribing, not all of which is for legitimate use, correlates directly to skyrocketing addiction, overdose and death; black markets for diverted prescriptions opioids; and

---

[6] *Examining the Growing Problems of Prescription Drug and Heroin Abuse*, Ctrs. For Disease Control and Prevention (Apr. 29, 2014), http://www,cdc,give.washington/testimony/2014/ t20140429.htm; *see also*, Letter from Vivek H. Murthy, Surgeon General, Tide RX (Aug. 2016), http://turnthetiderx.org.

a concomitant rise in heroin and fentanyl abuse by individuals who could no longer legally acquire or could not afford prescription opioids.

23.     This explosion in opioid use and Defendants' profits has come at the expense of patients and residents and has caused ongoing harm to and a public nuisance in the County.  As the then CDC director concluded: "We know of no other medication routinely used for a nonfatal condition that kills patients so frequently."[7]

24.     Defendants' conduct in promoting opioid use and fueling diversion has had severe and far-reaching public health, social services, and criminal justice consequences, including the fueling of addiction and overdose from illicit drugs such as heroin and fentanyl.  These necessary and costly responses to the opioid crisis include the handling of emergency responses to overdoses, providing addiction treatment, handling opioid-related investigations, arrests, adjudications, and incarceration, treating opioid-addicted newborns in neonatal intensive care units, burying the dead, and placing thousands of children in foster care placements, among others.

25.     The burdens imposed on Plaintiffs are not the normal or typical burdens of government programs and services.  Rather, these are extraordinary costs and losses that are related directly to Defendants' illegal actions.  The Defendants' conduct has created a public nuisance and a blight.  Governmental entities, and the services they provide their citizens, have been strained to the breaking point by this public health crisis.

26.     Defendants have not changed their ways or corrected their past misconduct but instead are continuing to fuel the crisis and perpetuate the public nuisance.

---

[7] *Id.*

27.     Within the next hour, six Americans will die from opioid overdoses; and two babies will be born addicted to opioids and begin to go through withdrawal.

28.     Plaintiffs bring this suit to bring the devastating march of this epidemic to a halt and to hold Defendants responsible for the crisis they caused.

## II.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq*., in the original Complaint and against the PBM Defendants raise a federal question. This Court has supplemental jurisdiction over the Plaintiffs' state-law claims against the Defendants named in these Supplemental and Amended Allegations under 28 U.S.C. § 1367 because those claims are so related to the RICO claim as to form part of the same case or controversy.

30.     This Court also has personal jurisdiction over all Defendants because the causes of action alleged in this Complaint arise out of Defendants' transacting business in California, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because Defendants regularly do or solicit business or engage in a persistent course of conduct or derive substantial revenue from goods used or consumed or services rendered in this state. Defendants have purposefully directed their actions towards California and/or have the requisite minimum contacts with California to satisfy any statutory or constitutional requirements for personal jurisdiction.

31.     Venue is proper in this district under 28 U.S.C. § 1407.

### III.    PARTIES

#### A. PLAINTIFFS

32.     Plaintiffs, THE PEOPLE OF THE STATE OF CALIFORNIA ("The People"), acting by and through Monterey County Counsel Susan K. Blitch, and MONTEREY COUNTY, CALIFORNIA, ("The County"), are authorized to bring the causes of action brought herein. The County is a body corporate and politic of the State of California. Cal. Gov't Code § 23003.  The County is authorized to bring this action. Cal. Gov't Code § 23004(a).

33.     The County is responsible for the public health, safety and welfare of its citizens. The County provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

34.     The County has declared, *inter alia*, that opioid abuse, addiction, morbidity and mortality have created a serious public health and safety crisis, and is a public nuisance, and that the diversion of legally produced controlled substances into the illicit market causes or contributes to this public nuisance.

35.     The distribution and diversion of opioids into California ("the State"), and into Monterey County and surrounding areas (collectively, "Plaintiffs' Community"), created the foreseeable opioid crisis and opioid public nuisance for which Plaintiffs here seek relief.

36.     Defendants' intentional, negligent, and/or unlawful conduct, alleged more fully herein, has created a serious public health crisis of opioid abuse, addiction, morbidity, and mortality and is a public nuisance in Plaintiffs' Community, which Plaintiffs seek to abate.

37.     Plaintiffs directly and foreseeably sustained all economic damages alleged herein. Defendants' conduct has exacted a financial burden for which the Plaintiffs seek relief.  Categories of past and continuing sustained damages include, *inter alia*,: (1) costs for providing medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering

from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs associated with law enforcement and public safety relating to the opioid epidemic; (5) costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation and (6) costs associated with The County having to repair and remake its infrastructure, property and systems that have been damaged by Defendants' actions, including, *inter alia*, its property and systems to treat addiction and abuse, to respond to and manage an elevated level of crime, to treat injuries, and to investigate and process deaths in Plaintiffs' Community. These damages have been suffered, and continue to be suffered, directly by the Plaintiffs.

38.     The People have standing to bring an action to abate the opioid epidemic nuisance created by Defendants. Cal. Civ. Proc. Code § 731 ("A civil action may be brought in the name of the people of the State of California to abate a public nuisance, as defined in Section 3480 of the Civil Code, by the . . . county counsel of any county in which the nuisance exists.").

39.     The County has standing to bring an action for damages incurred to its property by the public nuisance created by Defendants. Cal. Civ. Proc. Code § 731 ("An action may be brought by any person whose property is injuriously affected, . . . and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor.").

40.     The People have standing to bring this claim for injunctive relief and civil penalties under the California False Advertising Act. Cal. Bus. & Prof. Code §§ 17535, 17536.

41.     The County has standing to recover damages incurred as a result of Defendants' actions and omissions. Cal. Gov't Code § 23004(a). The County has standing to bring claims under

the federal RICO statute, pursuant to 18 U.S.C. § 1961(3) ("persons" include entities which can hold legal title to property) and 18 U.S.C. § 1964 ("persons" have standing).

42.     Plaintiffs directly and foreseeably sustained all economic damages alleged more fully herein. The County, like any other local government, endeavors in good faith to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. Defendants' conduct has imposed an extraordinary burden on the County's limited resources and services for which it seeks relief.

43.     Defendants' conduct is beyond anything Plaintiffs could have prepared for, predicted or avoided. It is a repeated course of conduct that did, does, and will—given the realities of addiction—continue to result in recurring and ongoing harm to Plaintiffs. Defendants' conduct is especially pernicious when one considers the harm it has wreaked on governmental entities such as the County who, in good faith, endeavor to provide a wide variety of necessary services on a limited budget funded with taxpayer dollars. The magnitude of Defendants' scheme is neither discrete nor of a sort that a county, including Monterey County, could reasonably expect to have to respond to at any time during its existence as such. It would be unreasonable, unjust, and inequitable not to allocate the additional governmental expenses, and any other costs associated with the harms Defendants' wrongful conduct has caused, to the actual parties responsible for creating the need for the resources to be expended as they are and were.

## B.  DEFENDANTS

### 1.  The Albertson Defendants.

44.     **Defendant Albertsons Companies, Inc. f/k/a AB Acquisition LLC** is a Delaware corporation with its principal place of business in Boise, Idaho.  Albertsons Companies, Inc. is the current owner of all Albertsons subsidiaries and banners.

45.     Albertsons Companies, Inc. is registered to do business in California and may be served through its registered agent CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, CA 91203.

46.     **Defendant New Albertsons L.P. f/k/a New Albertson's, Inc.** is a Delaware corporation with its principal place of business in Boise, Idaho.  New Albertson's was incorporated in December 2005.  On June 2, 2006, Albertson's, Inc. underwent a reorganization following its divestiture to three separate buyers.[8]  Albertson's, Inc. was converted to Albertsons LLC and became a subsidiary of New Albertson's, Inc.[9]  New Albertson's, Inc. held the supermarket business, while Albertson's LLC held the standalone drug store business.[10]  On June 2, 2006 New Albertsons was acquired by SuperValu, became a wholly-owned subsidiary of SuperValu,[11] and held banners including ACME, ACME Express, Jewel Express, Albertsons Express, Albertsons, Bristol Farms, Jewel, Jewel-Osco, Lazy Acres, Max Foods, Osco Pharmacy, Sav-on Pharmacy, Save-A-Lot, Shaw's, and Star Market.   In 2013, SuperValu, Inc., sold New Albertson's, Inc. (including its ACME Markets, Jewel-Osco, Shaws, Star Markets, and Albertsons banners) to AB Acquisition LLC.[12] After the 2013 sale, New Albertsons, Inc. changed its name to New Albertsons

---

[8] https://www.sec.gov/Archives/edgar/data/1355833/000119312507090449/d10k.htm (last visited September 4, 2024.

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] https://www.chaindrugreview.com/albertson-s-to-acquire-877-stores-from-supervalu/ (last visited September 4, 2024).

L.P.[13]  In 2015, AB Acquisition LLC announced it would change its name to Albertsons Companies, Inc.[14]

47.  New Albertsons LP is registered to do business in California and may be served through its registered agent CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, CA 91203.

48.  **Defendant Albertson's LLC** is a Delaware limited liability company with its principal place of business in Boise, Idaho. Defendant Albertson's LLC is a wholly owned, direct subsidiary of Defendant Albertsons Companies, Inc.

49.  Albertson's LLC is registered to do business in California and may be served through its registered agent CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, CA 91203.

50.  Albertson's LLC conducted business in California as a licensed nonresident wholesale distributor under the named business entities: Albertsons 8720, Albertsons Distribution Center and Albertsons LLC Distribution Center #8720. Albertsons distributed controlled substances to its stores with pharmacies through Albertsons LLC Distribution Center #8720, located in Ponca City, Oklahoma from 2006 to 2008 and from 2009 to 2012.  Albertson's LLC's nonresident wholesale distributor licenses expired in 2007 and 2017.

51.  Albertson's LLC has held the pharmacy licenses for several pharmacies in Monterey County.

---

[13] https://content.edgar-online.com/ExternalLink/EDGAR/0001193125-18-109460.html?hash=4fe3ed61ea30ca369d864a11fffc13835455f39fcaac9f88a7a25bdcca038d96&dest=D525849DEX410_HTM#D525849DEX410_HTM (last visited September 4, 2024).

[14] https://www.sec.gov/Archives/edgar/data/1646972/000119312515247280/d900395ds1.htm#rom900395_9 (last visited September 4, 2024).

52.     **Defendant Safeway, Inc.** is a Delaware corporation with its principal place of business in Pleasanton, California. Defendant Safeway, Inc. is a wholly owned, direct subsidiary of Defendant Albertsons Companies, Inc. In January 2015, AB Acquisition LLC acquired Safeway, Inc. (including its Safeway pharmacies).[15] This purchase positioned Albertsons as one of the largest food and drug retailers in the country. Safeway stores include Pavilions-branded stores, Safeway-branded stores in Northern California and Hawaii, Vons stores in Southern California and Nevada, Randalls and Tom Thumb stores in Texas, and Carrs stores in Alaska.[16] Also in 2015, Albertsons Companies, Inc. purchased approximately 70 stores from the Great Atlantic & Pacific Tea Company (better known as "A&P"), including its Food Emporium, A&P, A&P Fresh, Superfresh, and Pathmark banners, which were reopened as ACME stores.[17]

53.     Safeway, Inc. is registered to do business in California and may be served through its registered agent CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, CA 91203.

54.     Safeway has held pharmacy licenses with the California Board of Pharmacy for pharmacies located in Monterey County.

55.     **Defendant Randall's Food & Drug LP** is a Delaware limited partnership with its principal place of business in Boise, Idaho. Defendant Randall's Food & Drug LP is an indirect subsidiary of Defendant Albertsons Companies, Inc. Defendant Randall's Food & Drug LP is the owner of a number of Tom Thumb pharmacies.

---

[15] https://www.refrigeratedfrozenfood.com/articles/87780-safeway-and-albertsons-announce-definitive-merger-agreement (last visited September 4, 2024).

[16] https://en.wikipedia.org/wiki/Albertsons#Safeway_acquisition (last visited September 4, 2024).

[17] https://www.stamfordadvocate.com/business/article/A-P-discloses-plans-to-exit-Connecticut-stores-6450578.php (last visited September 4, 2024).

56.     Randall's Food & Drug LP is registered to do business in California and may be served through its registered agent CT Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, CA 91203.

57.     Albertsons Companies, Inc. f/k/a AB Acquisition LLC; New Albertsons L.P. f/k/a New Albertson's, Inc.; Albertson's LLC; Safeway, Inc.; Randall's Food & Drug LP are collectively referred to herein as "The Albertsons Defendants" or "Albertsons." "Albertsons" as used herein refers to all store banners used by the Albertsons Companies.

58.     Albertsons Companies is a one of the largest food and drug retailers in the United States.  It currently operates stores in 35 states (and D.C.) under 20 different business names (or "banners").[18]  These banners include grocery stores such as Albertsons, Acme, Safeway, Tom Thumb, Haggen, Jewel-Osco, Pavilions, Vons, Shaw's, United, Randalls, Star Market, Kings Food Markets, United Supermarkets, Haggens, Carrs, Market Street, Andronico's Community Market, Amigos, Lucky Stores, and Balducci's Food Lovers Market.  Of the over 2,200 stores it operates, approximately 1,700 of those stores have pharmacies.  Albertsons employs approximately 285,000 people.

59.     Albertsons has operated as a licensed pharmacy wholesaler and facility and as a licensed dispenser. Albertsons has distributed and dispensed prescription opioids throughout the United States, including California and Plaintiffs' Community.

60.     Albertsons conducts business as a licensed pharmacy dispenser through its various DEA-registered subsidiaries and affiliated entities. At all times relevant to this Complaint, Albertsons operated licensed pharmacies in California, including Plaintiffs' Community.

---

[18] The ARCOS database indicates that throughout the entirety of the 2006-2019 ARCOS time period, Albertsons operated in 38 states plus Washington D.C.

61.     As of June 2024, Albertsons ranked 53 on the latest Fortune 500 list, and for the 12-month period ending in November 2023, had revenues of over $79 billion.  In October 2022 Albertsons announced that it was being acquired by Kroger for $24.6 billion.  If consummated, the deal will give the combined entity market share in 48 of the 50 states. The deal was expected to be finalized in early 2024, however, the Federal Trade Commission has challenged the merger, alleging that the deal is anticompetitive.[19] The FTC filed an administrative complaint against the acquisition and authorized a lawsuit in federal court to block it during the pendency of the FTC's administrative proceedings. A bipartisan group of nine attorneys general joined the FTC's federal court complaint.[20]

### 2. The Aurolife Defendants

62.     **Defendant AUROLIFE PHARMA LLC** ("Aurolife Pharma") is a Delaware limited liability company with its principal place of business during the relevant time period in Dayton, New Jersey.

63.     **Defendant Aurobindo Pharma USA, Inc.** ("Aurolife Pharma USA") is a Delaware corporation with its principal place of business in New Jersey.

64.     Aurobindo Pharma USA is registered to do business in California and may be served through its registered agent CSC – Lawyers Incorporating Service, 2710 Gateway Oaks, Drive, Sacramento, CA 95833.

---

[19] FTC Challenges Kroger's Acquisition of Albertsons, Feb. 26, 2024, https://www.ftc.gov/news-events/news/press-releases/2024/02/ftc-challenges-krogers-acquisition-albertsons (last visited September 4, 2024).

[20] *Id*.

65.     Aurolife Pharma is a wholly owned subsidiary of Aurobindo Pharma USA. Aurobindo Pharma USA is a wholly owned subsidiary of Aurobindo Pharma Limited, which is based in India and is one of the largest global producers of generic drugs.

66.     Upon information and belief, during the relevant time period, Aurolife Pharma manufactured controlled substances for distribution by Aurobindo Pharma USA. Aurolife Pharma and Aurobindo Pharma USA are referred to collectively as "Aurolife" or the "Aurolife Defendants."

67.     Aurolife conducts business in California as a licensed nonresident wholesale distributor under the named business entity Aurobindo Pharma USA.

68.     At all relevant times, the Aurolife Defendants have manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to inform prescribers and users regarding the benefits and risks associated with the use of the prescription opioid drugs.

69.     The Aurolife Defendants, at all times, have manufactured, distributed and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

### 3.  The Indivior Defendants

70.     **Defendant Indivior Inc.** ("Indivior, Inc.") is a Delaware corporation with its principal place of business in North Chesterfield, Virginia.

71.     Indivior Inc. was registered to do business in California until April 2, 2024, and may be served through its registered agent CSC – Lawyers Incorporating Service, 2710 Gateway Oaks, Drive, Sacramento, CA 95833.

72.     **Defendant Indivior PLC** ("Indivior PLC") is an English public limited company headquartered in Slough, England, United Kingdom, and is the current parent company of Indivior.

Indivior PLC owned, controlled, managed and operated Indivior after on or about December 23, 2014.

73.     **Defendant Reckitt Benckiser Group plc** ("Reckitt") is an English public limited company headquartered in Slough, England, United Kingdom, and is the former parent company of Indivior. Reckitt owned, controlled, managed and operated Indivior on or before December 22, 2014, when it was known as Reckitt Benckiser Pharmaceuticals, Inc.

74.     On or about December 22, 2014, Reckitt and Indivior Inc., then known as Reckitt Benckiser Pharmaceuticals, Inc., entered into a demerger whereby Reckitt spun off Indivior Inc. and Indivior PLC.

75.     **Defendant Aquestive Therapeutics, Inc.** ("Aquestive") is a Delaware corporation with its principal place of business in Warren, New Jersey. Aquestive is formerly known as MonoSol Rx.

76.     Indivior, Inc.; Indivior PLC; Reckitt Benckiser Group plc; and Aquestive Therapeutics, Inc. are collectively referred to herein as "The Indivior Defendants" or "Indivior."

77.     Indivior Inc. and its former parent company Reckitt as well as Acquestive developed, manufactured, marketed and/or sold branded Subutex and Suboxone, which are Schedule III buprenorphine products approved by the FDA in 2002 for the treatment of opioid use disorder.

78.     Indivior's Suboxone labels for its tablet and film formulations and Indivior's Subutex label all indicate Indivior is and always has been identified as the distributor for those products, either by its prior name Reckitt Benckiser Pharmaceuticals, Inc. or by Indivior Inc.

79. The manufacturer of Indivior's Suboxone tablets and film and Subutex tablets is identified in its original 2002 Suboxone and Subutex labels and for all labels thereafter as Reckitt Benckiser Healthcare (UK) Ltd.

80. Indivior and/or Reckitt contracted with MonoSol Rx to manufacture its Suboxone film formulation after its approval in 2010, and to continue to manufacture the film formulation after MonoSol Rx renamed itself Aquesitive Therapeutics in 2017.

81. The Indivior Defendants, at all times, have manufactured, distributed and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

### 4. Sun Pharmaceutical

82. **Defendant Sun Pharmaceutical Industries, Inc.** ("Sun Pharmaceutical" or "Sun Pharma USA") is a Michigan corporation with a principal place of business in Princeton, New Jersey.

83. Sun Pharmaceutical is registered to do business in California and may be served through its registered agent CSC – Lawyers Incorporating Service, 2710 Gateway Oaks, Drive, Sacramento, CA 95833.

84. Sun Pharmaceutical conducted business in California as a licensed nonresident wholesale distributor under the named business entity Sun Pharmaceutical Industries, Inc. until its license expired in 2018.

85. Sun Pharmaceutical is a wholly owned subsidiary of Sun Pharmaceutical Industries, Ltd., which is a publicly-hold corporation organized and existing under the law of India and based in Mumbai, India, and is one of the largest global producers of generic drugs. No parent corporation or publicly traded corporation owns 10% or more of Sun Pharmaceutical Industries Ltd.'s stock.

86.     At all relevant times, Sun Pharmaceutical manufactured, packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to inform prescribers and users regarding the benefits associated with the use of the prescription opioid drugs.

87.     Sun Pharmaceutical, at all times, manufactured, distributed and sold prescription opioids in the Plaintiffs' Community without fulfilling its legal duty to prevent diversion and report suspicious orders.

### 5.  Related Entities; Agency and Authority

88.     Defendants include the entities named above as well as their predecessors, successors, affiliates, subsidiaries, partnerships and divisions to the extent that they are engaged in the manufacture, promotion, distribution, sale, and/or dispensing of opioids.

89.     All of the actions described in this Complaint are part of, and in furtherance of, the unlawful conduct alleged herein, and were authorized, ordered, and/or done by Defendants' officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs within the course and scope of their duties and employment, and/or with Defendants' actual, apparent, and/or ostensible authority.

90.     Plaintiffs allege that the corporate parents named as Defendants in this Complaint are liable as a result of their own actions and obligations in distributing and selling opioids, and not solely because of their vicarious responsibility for the actions of their pharmacy stores.

### IV.     FACTS COMMON TO ALL CLAIMS

#### A.  Opioids and Their Effects

91.     The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids.  Natural opioids are derived from

the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

92. The medicinal properties of opioids have been recognized for millennia—as well as their potential for abuse and addiction. The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine. Early use of opium in Western medicine was with a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

93. In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911, "The habit has this nation in its grip to an astonishing extent. Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . . it has become one of the most fertile causes of unhappiness and sin in the United States."[21]

94. In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin

---

[21] Nick Miroff, *From Teddy Roosevelt to Trump: How Drug Companies Triggered an Opioid Crisis a Century Ago,* The Washington Post (Oct. 17, 2017), https://www.washingtonpost.com/news/retropolis/wp/2017/09/29/the-greatest-drug-fiends-in-the-world-an-american-opioid-crisis-in-1908/ (last visited September 4, 2024).

as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the U.S. was limited to prescription only in 1914 and then banned altogether a decade later.

95.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids.  Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

96.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970.

97.     Medical professionals describe the strength of various opioids in terms of morphine milligram equivalents ("MME").  According to the CDC, doses at or above 50 MME/day double the risk of overdose compared to 20 MME/day, and one study found that patients who died of opioid overdose were prescribed an average of 98 MME/day.

98.     Patients develop tolerance to the analgesic effect of opioids relatively quickly.  As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction.  The same is true of the euphoric effects of opioids—the "high."  However, opioids depress respiration, and at very high doses can and often do arrest respiration altogether.  At higher doses, the effects of withdrawal are more severe.  Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

99.     Discontinuing opioids after more than just a few weeks will cause most patients to experience withdrawal symptoms.  These withdrawal symptoms include: severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious

symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

**B. Defendants' Conduct Created an Abatable Public Nuisance**

100. As alleged throughout this Complaint, Defendants' conduct has created a public health crisis and a public nuisance.

101. The public nuisance—*i.e.*, the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated by, *inter alia*, educating prescribers and patients regarding the true risks and benefits of opioids, including the risk of addiction; providing addiction treatment to patients who are already addicted to opioids, making naloxone widely available so that overdoses are less frequently fatal, and a number of other proven measures to address the epidemic.

102. Defendants have the ability to act to help end the public nuisance, and the law recognizes that they are uniquely well positioned to do so. All companies in the supply chain of a controlled substance are primarily responsible for ensuring that such drugs are only distributed and sold to appropriate patients and not diverted. These responsibilities exist independent of any Food and Drug Administration ("FDA") or DEA regulations, to ensure that their products and practices meet both federal and state laws and regulations. As registered manufacturers, distributors and/or dispensers of controlled substances, Defendants are placed in a position of special trust and responsibility and are uniquely positioned, based on their knowledge of prescribers and orders, to act as a key line of defense. Defendants, however, instead abused their position of special trust and responsibility within the closed system of opioid distribution and dispensing and fostered a black market for prescription opioids.

**C. Defendants Deliberately Disregarded Their Duties to Maintain Effective Controls Against Diversion.**

**1. Defendants Were on Notice of and Contributed to Illegal Diversion of Prescription Opioids.**

103. Defendants earned enormous profits by flooding the country with prescription opioids. They were keenly aware of the oversupply of prescription opioids through the extensive data and information they developed and maintained as manufacturers, distributors and retail sellers of opioids. Yet, instead of taking any meaningful action to stem the flow of opioids into communities, Defendants continued to participate in the oversupply and profit from it.

104. Each Defendant does substantial business across the United States. This business includes the manufacturer, distribution and/or sale of prescription opioids.

105. Data from the Automation of Reports and Consolidated Orders System ("ARCOS") confirms that Defendants manufactured, distributed and/or dispensed substantial quantities of prescription opioids in the County. In addition, they manufactured, distributed and/or dispensed substantial quantities of prescription opioids in other states and other counties, and these drugs were diverted from these other states and counties to the County. Defendants failed to take meaningful action to stop this diversion despite their knowledge of it, and thus contributed substantially to the diversion problem.

106. For over a decade, Defendants aggressively sought to bolster their revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully and surreptitiously increasing the volume of opioids they sold. However, Defendants are not permitted to engage in a limitless expansion of their sales through the unlawful sales of regulated painkillers.

107. Each participant in the supply chain of opioid distribution, including Defendants, is responsible for preventing diversion of prescription opioids into the illegal market by, among other things, monitoring, and reporting suspicious activity.

## 2.  Defendants Have a Duty to Maintain Effective Controls Against Diversion.

108.    State and federal statutes and regulations reflect a standard of conduct and care below which reasonably prudent manufacturers, distributors and pharmacies would not fall. Together, these laws and industry guidelines make clear that Defendants possess and are expected to possess, specialized and sophisticated knowledge, skill, information, and understanding of both the market for scheduled prescription opioids and of the risks and dangers of the diversion of prescription opioids when the supply chain is not properly controlled.

109.    Further, these laws and industry guidelines make clear that Defendants have a responsibility to exercise their specialized and sophisticated knowledge, information, skill, and understanding to prevent the oversupply of prescription opioids and minimize the risk of their diversion into an illicit market.

110.    The privilege of holding a license to manufacture, distribute and/or dispense controlled substances comes with the responsibility of ensuring that the controlled substances distributed or sold are not diverted and/or subject to abuse and misuse.  State and federal laws also have developed fairly uniform standards of practice across the country.  It is both intuitive and understood that selling drugs for non-medical purposes, or drugs which the seller knows or should know present a significant risk for diversion falls outside the standards of care and is not a legitimate practice.  As part of usual and customary practice, prescriptions must be evaluated and determined to be valid and issued for a legitimate medical purpose.

111.    Multiple sources impose duties on the Defendants.

112.    First, under the common law, Defendants had a duty to exercise reasonable care in manufacturing and delivering dangerous narcotic substances.  By flooding California, and Plaintiffs' Community, with more opioids than could be used for legitimate medical purposes, by filling and failing to report orders that they knew or should have realized were likely being diverted

26

for illicit uses, and by Albertsons' failure to maintain effective controls against diversion from its retail stores, Defendants breached that duty and both created and failed to prevent a foreseeable risk of harm.

113.    Second, each of the Defendants assumed a duty, when speaking publicly about opioids and their efforts to combat diversion, to speak accurately and truthfully.

114.    Third, each of the Defendants was required to register with the DEA to manufacture, distribute and/or dispense controlled substances under the federal Controlled Substances Act ("CSA").  *See* 21 U.S.C. § 823(a)-(b), (e); 28 C.F.R. § 0.100; 28 C.F.R. § 1301.71. The federal CSA imposes duties on Defendants that are discussed in detail below.

115.    Fourth, Defendants also had duties under applicable state laws.

116.    Recognizing a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.  The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.  Congress specifically designed the closed chain of distribution to prevent the diversion of controlled substances into the illicit market.  Congress was concerned with the diversion of drugs out of legitimate channels of distribution and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[22]  Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active participation by registrants within the drug delivery chain.  All registrants must adhere to the specific security, recordkeeping, monitoring and reporting requirements that are designed to

---

[22] H.R. Rep. No. 91-1444, *reprinted in* 1979 U.S.C.C.A.N. at 4572.

identify or prevent diversion.  Maintaining the closed system under the CSA and effective controls to guard against diversion is a vital public health concern.  Controlled substances, and prescription opioids specifically, are recognized as posing a high degree of risk from abuse and diversion.  When the supply chain participants at any level fail to fulfill their obligations, the necessary checks and balances collapse.  The result is the scourge of addiction that has occurred.

117.    The CSA requires manufacturers, distributors and pharmacies, along with other participants in the supply chain of controlled substances like opioids to: (a) limit sales within a quota set by the DEA for the overall production of controlled substances like opioids; (b) register to distribute opioids; (c) maintain effective controls against diversion of the controlled substances that they manufacture or distribute; and (d) identify suspicious orders of controlled substances and halt such sales.

### a)  CSA Duties of Manufacturers and Wholesale Distributors

118.    Federal law requires that manufacturers and distributors of Schedule II drugs, including opioids, must maintain "effective control against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels." 21 U.S.C. §§ 823(a)(1), (b)(1).

119.    In addition to their overall duty to provide effective controls against diversion, registrants that are manufacturers or wholesale distributors (a) must design and implement a system, to identify suspicious orders; (b) report suspicious orders to the DEA; and (c) not ship suspicious orders unless and until they are able to establish, through due diligence, that they are not likely to be diverted.  *See* 21 C.F.R. § 1301.74; *see also Masters Pharm. Inc.*, 80 Fed. Reg. 55418-01, 2015 WL 5320504 (DEA Sept. 15, 2015); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 3917575, at *4-10 (N.D. Ohio Aug. 19, 2019); *City & County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 951-52 (N.D. Cal. 2022).

120.     Specifically, Defendants were required to "maint[ain] . . . effective controls against diversion" and to "design and operate a system to disclose . . . suspicious orders of controlled substances." 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.74. Defendants were further required to take steps to halt suspicious orders. "The registrant [distributor] shall inform the Field Division Office of the Administration in his area of suspicious orders when discovered by the registrant. Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." 21 C.F.R. § 1301.74(b). Other factors that may raise suspicions may include, for example, ordering the same controlled substance from multiple distributors. Defendants violated their obligations under federal law.

121.     These criteria are disjunctive and are not all inclusive.  For example, if an order deviates substantially from a normal pattern, the size of the order does not matter and the order should be reported as suspicious.  Likewise, a distributor or manufacturer need not wait for a normal pattern to develop over time before determining whether a particular order is suspicious. The size of an order alone, regardless of whether it deviates from a normal pattern, is enough to trigger the responsibility to report the order as suspicious.  The determination of whether an order is suspicious depends not only on the ordering patterns of the particular customer but also on the patterns of the entirety of the customer base and the patterns throughout the relevant segment of the industry.

122.     Once a registrant has identified a suspicious order, it must refuse to ship that order unless and until it can establish, through due diligence, that the order is unlikely to be diverted.

123.     The investigation must dispel all red flags indicative that a customer is engaged in diversion to render the order nonsuspicious and exempt it from the requirement that the distributor inform the DEA about the order.  Put another way, if, even after investigating the order, there is

any remaining basis to suspect that a customer is engaged in diversion, the order must be deemed suspicious and the Agency must be informed.  Indeed, the DEA may revoke a distributor's certificate of registration as a vendor of controlled substances if the distributor identifies orders as suspicious and then ships them without performing adequate due diligence.

124.    To comply with the law, wholesale distributors, including Defendants, also must know their customers and the communities they serve.  Each distributor must "perform due diligence on its customers" on an "ongoing [basis] throughout the course of a distributor's relationship with its customer." *Masters Pharms., Inc.*, 80 Fed. Reg. 55,418, 55,477 (DEA Sept. 15, 2015), *petition for review denied*, 861 F.3d 206 (D.C. Cir. 2017).

125.    As manufacturers of controlled substances, Aurolife, Indivior and Sun Pharmaceutical also have specialized and detailed knowledge of the potential suspicious prescribing and dispensing of opioids through their regular visits to doctors' offices and pharmacies, and from their purchase of data from commercial sources, such as IMS Health. (Because the IMS Health data comes from pharmacies, pharmacies such as Albertsons also have access to the same detailed information as manufacturers.)  Their extensive boots-on-the-ground activity through their sales force allows manufacturers, including Aurolife, Indivior and Sun Pharmaceutical, to observe the signs of suspicious prescribing and dispensing —lines of seemingly healthy patients, out-of-state license plates, and cash transactions, to name only a few.  In addition, manufacturers, including Aurolife, Indivior and Sun Pharmaceutical, regularly mined data, including chargeback data, which allowed them to monitor the volume and type of prescribing of doctors, including sudden increases in prescribing and unusually high dose prescribing, which would have alerted them, independent of their sales representatives, to suspicious prescribing. This information gave manufacturers, including Aurolife, Indivior and Sun Pharmaceutical,

insight into prescribing and dispensing conduct that enabled them to play a valuable role in preventing diversion and fulfilling their obligations under the CSA.

126.    All Defendants, as manufacturers and distributors, and for Albertsons as a pharmacy, have a duty, and are expected, to be vigilant in ensuring that controlled substances are delivered only for lawful purposes.

### b)  CSA Duties of Dispensers

127.    Under the CSA, pharmacy registrants are required to "provide effective controls and procedures to guard against theft and diversion of controlled substances." *See* 21 C.F.R. § 1301.71(a).

128.    In addition to their overall duty to provide effective controls against diversion, registrants that dispense opioids are prohibited from filling prescriptions that are not written for a legitimate medical purpose.  *See* 21 C.F.R. § 1306.04(a); *see also In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 739, 784-85 (N.D. Ohio 2022) (quoting jury instruction that described CSA duties of dispensers); *City & County of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 958-59 (N.D. Cal. 2022).  Dispensers must review prescriptions for red flags, perform due diligence on prescriptions that raise red flags, and refuse to fill prescriptions for which red flags cannot be resolved.  Not only the pharmacists at the dispensing counter, but the pharmacy itself and its corporate parents, are required to ensure that only valid prescriptions are filled.

129.    Unless dispensed directly by a non-pharmacist practitioner, no Schedule II controlled substance may be dispensed without the written prescription of a practitioner, such as a physician, except in an emergency. 21 U.S.C. § 829(a). Similarly, unless directly dispensed, no Schedule III or IV controlled substance may be dispensed without a written or oral prescription from a practitioner. *Id*.

130.    Such a prescription for a controlled substance may only be issued by an individual who is (a) "authorized to prescribe controlled substances by the jurisdiction in which he is licensed to practice his profession" and (b) registered with the DEA. 21 U.S.C. § 822; 21 C.F.R. § 1306.03.

131.    A prescription, whether written or oral, is legally valid under the CSA *only* if it is issued for "a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). Moreover, "[a]n order purporting to be a prescription issued not in the usual course of professional treatment … is not a prescription within the meaning and intent of [21 U.S.C. § 829] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id*.

132.    As a result, the "responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." *Id*. Thus, a pharmacist may not fill a controlled substance prescription unless it has been issued for a legitimate medical purpose.

133.    Regardless of whether they are registrants, all dispensers must ensure that prescriptions of controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." *Id*. The DEA has recognized that "as dispensers of controlled substances, pharmacists and pharmacy employees are often the last line of defense in preventing diversion."[23]

---

[23] 2012 Dear Registrant letter to pharmacy registrants, Feb. 9, 2012, http://ppsconline.com/articles/2012/FL_PDAC.pdf (last visited September 4, 2024).

134.    Moreover, "[a] prescription for a controlled substance may only be filled by a pharmacist, acting in the usual course of his professional practice and either registered individually, or employed in a registered pharmacy…." 21 C.F.R. § 1306.06.

135.    Pharmacists are therefore permitted to dispense a controlled substance in any given instance if, *but only if*, such dispensing would be in accordance with a generally accepted, objective standard of practice—*i.e.,* "the usual course of his [or her] professional practice" of pharmacy. *Id*.

136.    Consequently, a pharmacist is required to refuse to fill a prescription if he or she knows or has reason to know that the prescription was not written for a legitimate medical purpose. *See* 21 C.F.R. §§ 1306.04, 1306.06.

137.    Unlawful dispensing of controlled substances by a pharmacist may subject the pharmacy or pharmacist to criminal actions and to civil enforcement actions for money penalties or injunctions. 21 U.S.C. §§ 842, 843.

138.    A pharmacy also needs to know there is a corresponding responsibility for the pharmacist who fills the prescription.[24] The pharmacist has a legal duty to recognize "red flags" or warning signs that raise (or should raise) a reasonable suspicion that a prescription for a controlled substance is not legitimate.[25] The existence of such indicia obligates the pharmacist to conduct a sufficient investigation to determine that the prescription is actually legitimate before dispensing.[26]  A pharmacist's corresponding responsibility extends to the pharmacy itself.

---

[24] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, Pharmacist's Manual: An Informational Outline of the Controlled Substances Act (Rev. 2020); *City & Cnty. of San Francisco v. Purdue Pharma, L.P.*, 620 F. Supp. 3d 936, 959-60 (N.D. Cal. 2022).

[25] *City & Cnty. of San Francisco*, 620 F. Supp. 3d at 960.

[26] *Id.*

139.    A pharmacy's registration can be revoked because its pharmacists have violated the corresponding responsibility rule and both the pharmacy and pharmacists may be the subject of further discipline.[27]

140.    The DEA has repeatedly emphasized that retail pharmacies, such as Albertsons, are required to implement systems that detect and prevent diversion and must monitor for and report red flags of diversion.  When red flags appear, the pharmacy's "corresponding responsibility" under 21 C.F.R. § 1306.04(a) requires it either to take steps (and document those steps) to resolve the issues or else to refuse to fill prescriptions with unresolvable red flags.[28]  The DEA has identified several types of "unresolvable red flags" which, when present in prescriptions presented to a pharmacist, may never be filled by the overseeing pharmacist.  These unresolvable red flags include: a prescription issued by a practitioner lacking valid licensure or registration to prescribe the controlled substances; multiple prescriptions presented by the same practitioner to patients from the same address; prescribing the same controlled substances in each presented prescription; a high volume of patients presenting prescriptions and paying with cash; and, a prescription presented to by a customer who has traveled significant and unreasonable distances from their home to see a doctor and/or to fill the prescription at the pharmacy.

141.    The DEA guidance also instructs pharmacies to monitor for red flags that include: (1) prescriptions written by a doctor who writes significantly more prescriptions (or in larger quantities or higher doses) for controlled substances as compared to other practitioners in the area,

---

[27] United States Department of Justice, Drug Enforcement Administration Office of Diversion Control, *Pharmacist's Manual: An Informational Outline of the Controlled Substances Act* (Rev. 2020) (citing *Jones Total Healthcare, L.L.C., v. DEA*, 881 F.3d 823 (11th Cir. 2018)).

[28] *Pharmacy Doctors Enterprises, Inc. v. Drug Enf't Admin.*, No. 18-11168, 2019 WL 4565481, at *5 (11th Cir. Sept. 20, 2019).

and (2) prescriptions for antagonistic drugs, such as depressants and stimulants, at the same time. Most of the time, these attributes are not difficult to detect and should be easily recognizable by the pharmacies' diversion control systems.

142. "[T]he due diligence process involves four steps: identify any red flags, obtain information relevant to resolving the red flags, obtain information relevant to resolving the red flags, evaluate the information, and document the reasons supporting filling or refusing to fill the prescription."[29]

143. As explained above, under the CSA, the duty to prevent diversion lies with the pharmacy, such as Albertsons, not just with the individual pharmacist. As such, although it acts through its agents, the pharmacy is ultimately responsible to prevent diversion.[30] Further, as described above, the obligations under the controlled-substances laws extend to any entity selling prescription opioids, whether it is the registration holder or not. It is unlawful for any person knowingly to distribute or dispense controlled substances other than in accordance with the requirements of the federal CSA and its implementing regulations, or in violation of state controlled substances laws and regulations. Pharmacies such as Albertsons are responsible "persons" under the CSA. They also exert control over their agents, including the responsibility to ensure they comply with applicable laws and regulations in all dispensing of controlled

---

[29] *City & Cnty. of San Francisco*, 620 F. Supp. 3d at 960.

[30] *The Medicine Shoppe; Decision and Order*, 79 FR 59504, 59515 (DEA Oct. 2, 2014); *see also Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195*; Decision and Order, 77 FR 62316-01 ("When considering whether a pharmacy has violated its corresponding responsibility, the Agency considers whether the entity, not the pharmacist, can be charged with the requisite knowledge."); *Top RX Pharmacy*; Decision and Order, 78 FR 26069, 62341 (DEA Oct. 12, 2012) (same); *cf. Jones Total Health Care Pharmacy LLC and SND Health Care LLC v. Drug Enforcement Administration,* 881 F.3d 82 (11th Cir. 2018) (revoking pharmacy registration *inter alia,* dispensing prescriptions that prescriptions presented various red flags, i.e., indicia that the prescriptions were not issued for a legitimate medical purpose without resolving red flags).

substances.  Albertsons cannot absolve itself of its own obligations by attempting to place unilateral responsibility on its agents.

144.    In a 2016 presentation to the American Pharmacists Association, the DEA reiterated that retail pharmacies must watch for red flags such as large numbers of customers who receive the same combination of prescriptions, receive the same strength of controlled substance prescription (often for the strongest dose), have prescriptions from the same prescriber, and have the same diagnosis code.

145.    In the context of bellwether cases brought by governmental plaintiffs, the MDL Court held that "both pharmacists and pharmacies bear all the obligations imposed [by the CSA] upon practitioners and dispensers."  *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 626 (N.D. Ohio 2020) (Doc. No. 3403).  The Court further held that, in light of the data that pharmacies are required, by law, to collect, they must make use of that data to provide effective controls against diversion.  *Id.*  As the Court explained:

> [A] pharmacy is required to: (1) collect and maintain specific records and data regarding its dispensing activity; (2) employ a properly licensed pharmacist; and (3) properly dispense controlled substances and avoid diversion.  Therefore, both the pharmacy and the pharmacist must cooperatively identify and resolve "red flags" prior to dispensing controlled substances.  The Court concludes these requirements collectively mean that the Pharmacy Defendants cannot collect data as required by the statute, employ a licensed pharmacist as required by the statute, identify red flags as required by Agency decisions, but then do nothing with their collected data and leave their pharmacist-employees with the sole responsibility to ensure only proper prescriptions are filled.  Possessing, yet doing nothing with, information about possible diversion would actually *facilitate* diversion, and thus violate the CSA's fundamental mandate that "*All applicants and registrants shall provide effective controls and procedures to guard against theft* and *diversion of controlled substances.*" 21 C.F.R. § 1301.71(a).[31]

---

[31] *Id.* at 631 (emphasis by the Court).

146. Similarly, in a case remanded from the MDL, Judge Charles Breyer of the United States District Court for the Northern District of California held that the CSA "requires pharmacists and pharmacies to identify and resolve objective signs" when a prescription is presented "that create 'a reasonable suspicion that the prescription is not, on its face, legitimate.'" *City & Cnty. of San Francisco,* 620 F. Supp. 3d. at 960. Judge Breyer further held that the elements of a CSA violation in this context are that "(1) a pharmacy dispensed a controlled substance, (2) "a red flag was or should have been recognized at or before the time the controlled substance was dispensed," and (3) "the question created by the red flag was not resolved conclusively prior to the dispensing of the controlled substance." The Court further noted that "Prescriptions with unresolved red flags cannot be dispensed." *Id.* at 999-1000.

147. In addition to its duties as a distributor, as a dispenser, Albertsons also had a duty to design and implement systems to prevent diversion of controlled substances in its retail pharmacy operations. Albertsons had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions suggestive of potential diversion. It also has a crucial role in creating chain-wide systems to identify and avoid filling "prescriptions" that are not issued for a legitimate purpose or by a prescriber with a valid, current license.

148. Pharmacies' obligations extend to monitoring, and documenting, the steps they take in accessing state prescription drug monitoring programs, often referred to as "PDMPs." Yet, as described below, for many years Albertsons relied on its pharmacists' discretion in this area rather than setting forth requirements concerning PDMP searches and implementing systems to track and document PDMP searches and their results for, *inter alia,* dispensing prescriptions that prescriptions presented various red flags.

149.    Pharmacy order data provides detailed insight into the volume, frequency, dose, and type of controlled and non-controlled substances a pharmacy typically orders.  This includes non-controlled substances and Schedule IV controlled substances (such as benzodiazepines), which are not reported to the DEA, but whose use with opioids can be indicative of diversion.

150.    As acknowledged in an article CVS published in the New England Journal of Medicine, "[p]harmacies have a role to play in the oversight of prescriptions for controlled substances, and opioid analgesics in particular."  Mitch Betses, R.Ph., and Troyen Brennan, M.D., M.P.H., *Abusive Prescribing of Controlled Substances - A Pharmacy View*, N. ENGL. J. MED. 369;11, Sept. 12, 2013, at 989-991.  The DEA has identified "both pharmaceutical distributors and chain pharmacies as part of the problem" contributing to opioid abuse and related deaths. *Id.*

151.    Pharmacies such as Albertsons have a particular "advantage" in meeting their obligations under the CSA because these entities can use "aggregated information on all prescriptions filled at the chain" in order to examine "patterns" of opioids and other "high-risk drugs" and target "inappropriate prescribing."  *Id*. at 990.  For example, a pharmacy should properly use its chainwide dispensing data to identify "high risk prescribers" by "benchmarking" prescription data based on "several parameters," including "volume of prescriptions for high-risk drugs," "the proportion of the prescriber's prescriptions that were for such [high-risk] drugs, as compared with the volume and proportion for others in the same specialty and region," cash payment, ages of patients, and the prescriber's ratio of "prescriptions for noncontrolled substances with prescriptions for controlled substances." *Id.*  This "[a]nalysis of aggregated data" from chain pharmacies can "target patterns of abuse," in the face of "the growing use of controlled substances and resulting illnesses and deaths."  *Id.*

152.     According to law and industry standards, if a pharmacy finds evidence of prescription diversion, the relevant state's Board of Pharmacy and the DEA must be contacted.

153.     Pharmacies' evaluation process includes with what is known as "Drug Utilization Review" or "DUR."  This practice is both part of traditional roles and duties and codified in federal and state statutes.  Notably, during the rulemaking practice for one authority, the Omnibus Budget [R]econciliation Act of 1990 (OBRA 90), a commenter suggested that instructions for compliance with prospective DUR should go to the pharmacist and not the pharmacy.  In response, the government stated that "the instructions for compliance with prospective DUR should be directed to the pharmacies," and that "[t]he owners or managers of pharmacies, as Medicaid providers, are responsible for furnishing their staff with information pertaining to DUR."  States, seeking to assure uniformity, have taken action to require the same mandates as this federal law.  The DUR process includes looking at over-utilization, drug interactions and identifying abuse and misuse of dangerous drugs such as opioids.  This process provides pharmacies with information about potential diversion as well.

154.     Accordingly, states, including California, revised and expanded practice acts and rules and increased their support for, and reliance on, Prescription Drug Monitoring Programs (PDMPs), which continued to grow over time.

155.     Additionally, pharmacies such as Albertsons have operating systems and methods to store and retain prescription dispensing data and records.  The information they possess must be readily retrievable, and they have an obligation to use the information to identify patterns of diversion, conduct internal audits and training programs, investigate suspicious prescribers, patients, and pharmacists, and prevent diversion of controlled substances.  Their hiring, training, and management of pharmacy personnel, and supporting policies, procedures, and systems should

and must promote public health and safety and assist in the identification and prevention of the diversion of controlled substances.

### 3.  Defendants Have Corresponding Duties Under California Law

156.   In addition to the CSA, Defendants were also required to comply with California controlled substances law and pharmacy regulations.

157.   As under federal law, opioids are a Schedule II controlled substance under California law. *See* Cal. Health & Safety Code § 11055. Opioids are categorized as "Schedule II" drugs because they have a "high potential for abuse" and the potential to cause "severe psychic or physical dependence" and/or "severe psychological . . . dependence." 21 U.S.C. § 812(b)(2)(A)-(C); *see also* Cal. Health & Safety Code § 11055.

158.   California law requires all distributors of dangerous drugs to be licensed by the California State Board of Pharmacy. Cal. Bus. & Prof. Code § 4160; Cal. Bus. & Prof. Code § 4161. California law requires drug manufacturers to be licensed by the State Department of Health Services. Cal. Health & Safety Code § 111615.

159.   The California State Board of Pharmacy has the authority to "deny, revoke, or suspend any license" issued to out-of-state manufacturers or wholesale distributors who violate the Pharmacy Law or the state's Sherman Food, Drug and Cosmetic Law. Cal. Bus. & Prof. Code § 4304.

160.   It is unlawful under California law for a distributor or manufacturer to "furnish controlled substances for other than legitimate medical purposes." Cal. Health & Safety Code § 11153.5.

161.   The California State Board of Pharmacy has the authority to "take action against any holder of a license who is guilty of unprofessional conduct" which includes "clearly excessive furnishing of controlled substances" for other than legitimate medical purposes. Cal. Bus. & Prof.

Code § 4301(e) (citing Cal. Health & Safety Code § 11153.5). "Factors to be considered in determining whether the furnishing of controlled substances is clearly excessive shall include, but not be limited to, the amount of controlled substances furnished, the previous ordering pattern of the customer (including size and frequency of orders), the type and size of the customer, and where and to whom the customer distributes its product." *Id*.

162.    Other examples of unprofessional conduct include procuring a license by fraud or misrepresentation, gross negligence, fraud, making or signing documents with false statements, and violating any state or federal statute or rule regulating controlled substances. Cal. Bus. & Prof. Code § 4301.

163.    California requires manufacturers and distributors of controlled substances to maintain records of the manufacture and sale of dangerous drugs. *See* Cal. Bus. & Prof. Code §§ 4081; 4161(c)(2)(A); 4332; Cal. Code Regs. tit. 16, §§ 1780(f); 1783(e).

164.    Furthermore, California law incorporates federal requirements set out under the CSA and related controlled substance laws and regulations. *See* Cal. Bus. & Prof. Code §§ 4160(d) (representative-in-charge of wholesaler is responsible for wholesaler's compliance with applicable state and federal laws); 4301(j) (unprofessional conduct includes violating federal laws related to controlled substances); 4301(o) (unprofessional conduct includes violating, attempting to violate, assisting in or abetting or conspiring to violate any applicable federal law); Cal. Code Regs. tit. 16, § 1780(f)(2) (records required for identifying, recording and reporting losses or thefts shall be in accordance with federal regulations).

165.    Each Defendant was further required to register with the DEA, pursuant to the federal Controlled Substance Act. *See* 21 U.S.C. § 823(a), (b), (e); 28 C.F.R. § 0.100.  Each Defendant is a "registrant" as a wholesale distributor in the chain of distribution of Schedule II

controlled substances with a duty to comply with all security requirements imposed under that statutory scheme. California law adopts and incorporates those requirements, as set out above. *See, e.g.*, Cal. Code Regs. tit. 16, 1780(f)(2).

166. Each Defendant has an affirmative duty under California law to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs. California law requires that "[t]he following minimum standards shall apply to all wholesale establishments for which permits have been issued by the Board: . . . (c)(2) All facilities shall be equipped with a security system that will provide suitable protection against theft and diversion." Cal. Code Regs. Tit. 16 § 1780(c)(2). In addition, drug distributors shall "establish, maintain, and adhere to written policies and procedures, which shall be followed for the receipt, security, storage, inventory, and distribution of prescription drugs, including policies and procedures for identifying, recording, and reporting losses or thefts[.]" Cal. Code Regs. Tit. 16 § 1780(f)(1).

167. The California Legislature has found that "Protection of the public shall be the highest priority for the California State Board of Pharmacy in exercising its licensing, regulatory, and disciplinary functions. Whenever the protection of the public is inconsistent with other interests sought to be promoted, the protection of the public shall be paramount." Cal. Bus. & Prof. Code § 4001.1.

168. As with Federal Law (21 C.F.R. 1301.74(b)), "suspicious orders" include orders of an unusual size, orders of unusual frequency or orders deviating substantially from a normal pattern. *See* Cal. Bus. & Prof. Code § 4169.1. Under California law, a wholesaler must, upon discovery, notify the Board of Pharmacy of any suspicious order of controlled substances placed by a California-licensed pharmacy or wholesale by providing the Board a copy of the information the wholesaler provides to the DEA. *Id*. *See also* Cal. Health & Safety Code § 11153.5(c) (factors

considered in determining if distributor or manufacturer furnished controlled substances with a conscious disregard that they were being used for other than legitimate medical purposes include the amount of controlled substances furnished, the size and frequency of previous orders, the type and size of customer and where the customer distributes the product).

169.    Albertsons was also subject to California law as a dispenser of opioids. *See City & Cnty. of San Francisco,* 620 F. Supp. 3rd at 959 ("California law requires a pharmacy to fill a valid prescription that has been issued for a legitimate medical purpose by a prescriber acting within the scope of their practice.") (citing Cal. Bus. & Prof. Code § 733(a)); *see also* Cal. Health & Safety Code §§ 11150 (a medical professional must be registered with the DEA and licensed by the state in order to write prescriptions for controlled substances); § 11153 (a medical professional can only write a controlled substance prescription if they believe, based on their medical judgment, that the drug is an appropriate form of treatment for a patient's medical condition).

170.    A prescription that is not for the purpose of treating a patient's medical condition is an illegitimate prescription. *City & Cnty. of San Francisco,* 620 F. Supp. 3rd at 959 (citing 21 C.F.R. § 1306.04(a)).

#### 4. Defendants Were Aware of and Have Acknowledged Their Obligations to Prevent Diversion and to Report and Take Steps to Halt Suspicious Orders.

171.    The regulations aim to create a "closed" system in order to control the supply and reduce the diversion of these drugs out of legitimate channels into the illicit market, while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control. Both because distributors handle such large volumes of controlled substances, and because they are uniquely positioned, based on their knowledge of their customers and orders, as the first line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, distributors' obligation to maintain effective controls to

prevent diversion of controlled substances is critical.  Should a distributor deviate from these checks and balances, the closed system of distribution, designed to prevent diversion, collapses.

172.    Defendants were well aware they had an important role to play in this system, and also knew or should have known that their failure to comply with their obligations would have serious consequences.

173.    Indeed, the DEA has repeatedly informed Defendants about their legal obligations, including obligations that were so obvious that they simply should not have required additional clarification.  As former DEA agent Joseph Rannazzisi explained during a deposition in this MDL:

Q.  Someone says "Don't steal," do you have to put in there "from a supermarket"?

A.  No.

Q.  Someone says "Don't trespass on the property," do you have to put "wearing tennis shoes"?

A.  No.

Q.  Next, you got asked: "Well, you never instructed the companies to keep their files."  Do you remember that?

A.  Yes, sir.

Q.  Would old files be important in monitoring—in your ongoing monitoring?  Would it be important that a company keep their files so that they can look back at them?

A:  Absolutely. That's the—the whole idea behind maintaining a due diligence file is you have a history of purchases. That way you could see what they're doing and where they're going with their purchases.

174.    For example, it is not an effective control against diversion to identify a suspicious order, ship it, and wait as long as weeks to report it to law enforcement, potentially allowing those pills to be diverted and abused in the meantime.

175.    During a 30(b)(6) deposition in the MDL, the DEA's Unit Chief of Liaison was asked whether the DEA made it "clear to industry that the failure to prevent diversion was a threat to public safety and the public interest."  In response, he testified:

> Yes, I think it's established in 823 [the Controlled Substances Act] where it's part of our -- part of the registrant that is applying to be a registrant understands that they have to maintain effective controls . . . . they also know that these drugs themselves are scheduled controlled substances for a particular reason, because they're addictive, psychologically and physically they're addictive, so they know that these drugs have these properties within themselves.  **So they would understand that these drugs are categorized or scheduled in that manner because they have the potential to hurt**.

176.    In fact, trade organizations in which Albertsons actively participated have acknowledged that distributors have been responsible for reporting suspicious orders for more than 40 years.  The National Association of Chain Drug Stores ("NACDS") is a national trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies—from regional chains with four stores to national companies.  Its members and/or affiliate members also include stakeholders such as manufacturers, other distributors and other trade organizations as well.  Albertsons serves on the Board of Directors of NACDS.

177.    In 2006, the NACDS issued a "Model Compliance Manual" intended to "assist NACDS members" in developing their own compliance programs.  The Model Compliance Manual notes that a retail pharmacy may "generate and review reports for its own purposes" and refers to the assessment tools identified by CMS in its Prescription Drug Benefit Manual chapter on fraud, waste and abuse.

178.    In the appeal that arose from DEA's enforcement action against wholesaler Masters Pharmaceuticals, Inc. for its distribution of opioids, the NACDS submitted a joint amicus brief with a distributor trade organization called the Healthcare Distribution Management Association ("HDMA,") (now known as the Healthcare Distribution Alliance ("HDA")), regarding the legal

duty of distributors that acknowledged that "HDMA and NACDS members" had a duty to prevent diversion." *See Masters Pharmaceuticals, Inc. v. U.S. Drug Enforcement Admin.*, 2016 WL 1321983 (D.C. Cir. April 4, 2016).  The NACDS has both long taken the position that distributors have responsibilities to "prevent diversion of controlled prescription drugs" not only because they have statutory and regulatory obligations do so, but "as responsible members of society."

179.    The DEA repeatedly reminded Defendants of their obligations to report and decline to fill suspicious orders.  Responding to the proliferation of internet pharmacies that arranged illicit sales of enormous volumes of opioids, the DEA began a major push to remind distributors of their obligations to prevent these kinds of abuses and educate them on how to meet these obligations.

180.    Specifically, in August 2005, the DEA's Office of Diversion Control launched the "Distributor Initiative."  The Distributor Initiative did not impose any new duties on distributors, but simply reminded them of their duties under existing law.  The stated purpose of the program was to "[e]ducate and inform distributors/manufacturers of their due diligence responsibilities under the CSA by discussing their Suspicious Order Monitoring System, reviewing their [Automation of Reports and Consolidated Orders System ("ARCOS")] data for sales and purchases of Schedules II and III controlled substances, and discussing national trends involving the abuse of prescription controlled substances."[32]  The CSA requires that distributors (and manufacturers) report all transactions involving controlled substances to the United States Attorney General.  This data is captured in ARCOS, the "automated, comprehensive drug reporting system which monitors the flow of DEA controlled substances from their point of manufacture through commercial distribution channels to point of sale or distribution at the dispensing/retail

---

[32] Thomas W. Prevoznik, Office of Diversion Control, Distributor Initiative presentation (Oct. 22, 2013).

level—hospitals, retail pharmacies, practitioners, mid-level practitioners, and teaching institutions,"[33] described above, from which certain data has now been made public.

181.    As part of the Distributor Initiative, the DEA gave several presentations to distributors both individually and through presentations and discussions at trade groups meetings directly targeted at some of the red flags of diversion that the Defendants were obligated to consider and monitor as part of their requirements under the law.



182.    The DEA has hosted many different conferences throughout the years, including Pharmacy Diversion Awareness Conferences, to provide registrants with updated information about diversion trends and their regulatory obligations.  The DEA also frequently presented at various other conferences for registrants at the national, state, and local level.

---

[33] U.S. Dept. of Justice, Drug Diversion Administration, Diversion Control Division website, https://www.deadiversion.usdoj.gov/arcos/arcos.html#:~:text=ARCOS%20is%20an%20automated%2C%20comprehensive,practitioners%2C%20mid%2Dlevel%20practitioners%2C (last visited September 4, 2024).

183.    Through presentations at industry conferences and on its website, the DEA provided detailed guidance to distributors on what to look for in assessing their customers' trustworthiness.  As an example, the DEA published "Suggested Questions a Distributor Should Ask Prior to Shipping Controlled Substances"[34]

184.    In addition, the DEA sent a series of letters, beginning on September 27, 2006, to every commercial entity registered to distribute controlled substances.  The 2006 letter emphasized that distributors are:

> one of the key components of the distribution chain.  If the closed system is to function properly . . . distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as . . . the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people.[35]

185.    The letter also warned that "even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."[36]

186.    The DEA sent a second letter to distributors on December 27, 2007.  Again, the letter instructed that, as registered distributors of controlled substances, they must each abide by statutory and regulatory duties to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[37]  DEA's

---

[34]https://web.archive.org/web/20221023232252/https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/levinl_ques.pdf (last visited September 5, 2024)

[35] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Off. of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Sept. 27, 2006), filed in *Cardinal Health, Inc. Inc. v. Holder*, No. 1:12-cv-00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-51 ("2006 Rannazzisi Letter"); *see also* CVS-MDLT1000091513; WAGMDL00757797.

[36] *Id.*

[37] Letter from Joseph T. Rannazzisi, Deputy Assistant Adm'r, Office of Diversion Control, Drug Enf't Admin., U.S. Dep't of Justice, to Cardinal Health (Dec. 27, 2007), filed in Cardinal Health,

letter reiterated the obligation to detect, report, and not fill suspicious orders and provided detailed guidance on what constitutes a suspicious order and how to report (*e.g.*, by specifically identifying an order as suspicious, not merely transmitting ARCOS data to the DEA).

187.    In September 2007, the NACDS, (of which Albertsons is a member) among others, also attended a DEA conference at which the DEA reminded registrants that not only were they required to report suspicious orders, but also to halt shipments of suspicious orders.

188.    The DEA's regulatory actions against the three largest wholesale distributors further underscore the fact that distributors such as Defendants were well aware of their legal obligations.  There is a long history of enforcement actions against registrants for their compliance failures.  For example, in 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against three of Cardinal Health's distribution centers, and on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the CSA in Maryland, Florida, and New York. Similarly, on May 2, 2008, McKesson entered into an Administrative Memorandum of Agreement ("AMA") with the DEA related to its failures in maintaining an adequate compliance program.  Subsequently, in January 2017, McKesson entered into an AMA with the DEA wherein it agreed to pay a $150 million civil penalty for, *inter alia*, failure to identify and report suspicious orders at several of its facilities.

189.    The DEA has also repeatedly affirmed the obligations of Defendants to maintain effective controls against diversion in regulatory action after regulatory action.[38]  The DEA, among

---

Inc. v. Holder, No. 1:12-cv00185-RBW (D.D.C. Feb. 10, 2012), ECF No. 14-8 ("2007 Rannazzisi Letter").

[38] *See, e.g.*, Holiday CVS, L.L.C., d/b/a CVS/Pharmacy Nos. 219 and 5195; 77 Fed. Reg. 62,316 (DEA Oct. 12, 2012) (decision and order); East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order); *Holiday CVS, L.L.C. v. Holder*, 839 F. Supp. 2d 145 (D.D.C. 2012); Townwood Pharmacy; 63 Fed. Reg. 8,477 (DEA Feb. 19, 1998)

others, also has provided extensive guidance on how to identify suspicious orders and other evidence of diversion.

190.    In addition, red flags are common sense warning signs that have always been an important component of controlled substance pharmacy best practices, not a novel concept to pharmacies.  Relevant guidance concerning narcotics dispensing dates back to at least since the 1930's and 1940's. Since then, there has been guidance given to pharmacies and pharmacists related to the creation of systems and programs to guard against diversion and lists of don'ts when dispensing narcotics.   DEA enforcement actions such as the *Holiday* decision, *Medicine Shoppe-Jonesborough* and *United Prescription Services, Inc*. also hold pharmacies responsible for failing to fulfill their corresponding responsibility under the CSA.

191.    The "cocktail" often referred to as the "Holy Trinity" consists of an opioid, a benzodiazepine, and a muscle-relaxer such as carisoprodol.  A "trinity" combination can also refer to different combinations of opioid/non-opioid prescriptions intended for abuse and to create a euphoric feeling similar to heroin and other illicit drugs such as fentanyl.   Medical literature has long recognized the special dangers posed by cocktails composed of drugs of abuse which lack any documented medical efficacy.  Similarly, the *East Main Street Pharmacy* action acknowledged that "the combination of a benzodiazepine, a narcotic and carisoprodol is well known in the pharmacy profession as being used by patients abusing prescription drugs."[39]

---

(revocation of registration); Grider Drug 1 & Grider Drug 2; 77 Fed. Reg. 44,069 (DEA July 26, 2012) (decision and order); The Medicine Dropper; 76 Fed. Reg. 20,039 (DEA April 11, 2011) (revocation of registration); Medicine Shoppe-Jonesborough; 73 Fed. Reg. 363 (DEA Jan. 2, 2008) (revocation of registration).

[39] East Main Street Pharmacy, 75 Fed. Reg. 66,149 (DEA Oct. 27, 2010) (affirmance of suspension order).

192.    As a DEA administrative decision from 2008 explains, "[w]hile carisoprodol [was] not controlled under Federal law, it is controlled under various state laws and is highly popular with drug abusers, especially when taken as part of a drug cocktail that includes an opiate and a benzodiazepine."  *See Your Druggist Pharmacy*, 73 Fed. Reg. 75,774, 75,775 n.1 (DEA Dec. 2008).  Other DEA and judicial decisions likewise acknowledge well-known and highly abused cocktails.  *See, e.g., U.S. v. Evans*, 892 F.3d 692, 706 (5th Cir. 2018).

193.    As described above, red flags indicative of diversion include suspicious behavior of patients, such as stumbling while walking, slurred speech, appearance of intoxication, or of customers coming and appearing like they may not need the medication, or requesting drugs by brand name or street slang such as "blues" (a term referencing Mallinckrodt opioids).  Pharmacies' training materials and controls should assist pharmacists and technicians in the identification of such behaviors.

194.    Pharmacies must resolve red flags before a prescription for addictive and dangerous drugs, such as opioids, are dispensed.

### 5.  Defendants Worked to Expand their Shares of the Prescription Opioid Market and Failed to Maintain Effective Controls Against Diversion.

195.    For over a decade, all Defendants aggressively sought to bolster their revenues, increase profits, and grow their shares of the prescription opioid market by unlawfully and surreptitiously increasing the volume of opioids they sold nationwide.

196.    However, Defendants are not permitted to engage in a limitless expansion of their market shares through the unlawful sale of highly addictive controlled substances. Rather, Defendants are subject to various duties under the federal CSA and state law—duties they failed to perform.

51

197.    Defendants failed to provide the requisite controls against diversion. All Defendants shipped suspicious orders with indicia of diversion without performing the required due diligence, and Albertsons also dispensed prescriptions with red flag indications of diversion, again without performing the due diligence required by law.

198.    As described further below, the Defendants failed to fulfill their legal duties and instead, routinely distributed and/or dispensed controlled substances while ignoring red flags of diversion and abuse.  In addition, the Aurolife Defendants and Sun Pharmaceutical expanded their market share in Plaintiffs' Community of dangerous opioids such as hydrocodone and oxycodone as other manufacturers began limiting their sales due to the opioid epidemic, and the Indivior Defendants promoted the sale and use of their buprenorphine products—which are intended to be used in the treatment of opioid use disorder—in way that encouraged doctors to prescribe these products in an unsafe manner. The unlawful conduct by these Defendants is a substantial cause for the volume of prescription opioids and the public nuisance plaguing Plaintiffs' Community.

### a)    Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiffs' Community.

199.    According to the CDC, opioid prescriptions, as measured by number of prescriptions and morphine milligram equivalent ("MME") per person, tripled from 1999 to 2015. In 2015, on an average day, more than 650,000 opioid prescriptions were dispensed in the United States.  Not all of these prescriptions were legitimate.  Yet Albertsons systemically ignored that it was fueling a black market, and failed to maintain effective controls against diversion at both the wholesale and retail pharmacy level.  Instead, Albertsons put profits over the public health and safety. Despite their legal obligations as registrants under the CSA, the Albertsons Defendants allowed widespread diversion to occur—and did so knowingly.

200.    Albertsons has operated as a licensed pharmacy wholesaler and facility and as a licensed dispenser. Albertsons has distributed and dispensed prescription opioids throughout the United States, in California and in Plaintiffs' Community.

### 1)  Albertsons Was Uniquely Positioned to Guard Against Diversion

201.    Not only do pharmacies such as Albertsons often have firsthand knowledge of dispensing red flags – such as distant geographic location of doctors from the pharmacy or customer, lines of seemingly healthy patients, cash transactions, and other significant information – but they also have the ability to analyze data relating to drug utilization and prescribing patterns across multiple retail stores. As with other distributors and dispensers, these data points give pharmacies like Albertsons insight into prescribing and dispensing conduct that enables them to prevent diversion and fulfil their obligations under the CSA.

202.    Pharmacies such as Albertsons not only make observations through their local front doors, but have extensive data to which an individual pharmacist would not have access.  They are uniquely positioned to monitor, for example, the volume of opioids being dispensed in their pharmacies relative to the size of the communities they serve.  This is particularly important given that it is recognized that as to the supply of opioids increases, so does the incidence of overdose and death.  Albertsons could also use this information to monitor potentially suspicious prescribers. Pharmacies must use the information available to them to guard against supplying controlled substances for non-medical use, identify red flags or potential diversion and should share this information with their agents, as well as provide clear guidance and training on how to use it.  A former DEA diversion investigator, whose testimony is also referenced above, agreed in a deposition in this MDL that as part of their obligation under Section 1301.71, pharmacies corporately have an obligation to develop policies to train pharmacists to comply the CSA

regulations.  She further agreed that the defendants had an obligation to develop and implement systems to provide the necessary tools for their pharmacists to comply with the CSA regulations.

203.    As explained above, in addition to its duties as a distributor, Albertsons also had a duty to design and implement systems to prevent diversion of controlled substances in their retail pharmacy operations.  Specifically, Albertsons had a duty to analyze data and the personal observations of its employees for known red flags such as those described above.  Albertsons had the ability, and the obligation, to look for these red flags on a patient, prescriber, store, and chain level, and to refuse to fill and to report prescriptions that suggested potential diversion.

204.    Albertsons was particularly well-positioned to do so given the dispensing data available to it, which it could review at the corporate level to identify patterns of diversion and to create policies and practices to proactively identified patterns of diversion. Albertsons could and should have also developed tools and programs to alert its pharmacists to red flags and to guard against diversion.

205.    Albertsons had complete access to all prescription opioid dispensing data related to its pharmacies in the Plaintiffs' Community, complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around Plaintiffs' Community, and complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around Plaintiffs' Community.  Further, Albertsons had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around Plaintiffs' Community and complete access to information revealing the size and frequency of prescriptions written by specific doctors across its pharmacies in and around Plaintiffs' Community.

206.     Albertsons' data is a valuable resource that it could and should have used to help prevent diversion, but it failed to do so.  Albertsons facilitated the supply of far more opioids than could have been justified to serve a legitimate market.  The failure of Albertsons to maintain effective controls, and to investigate, report, and take steps to halt orders that it knew or should have known were suspicious, as well as to maintain effective policies and procedures to guard against diversion from its retail stores, breached both its statutory and common law duties.

### 2)  Albertsons Failed to Guard Against Diversion as a Distributor of Opioids.

207.     At various times, Albertsons self-distributed controlled substances to its company-owned pharmacies across the country through its distribution center in Ponca City, Oklahoma.[40]

208.     Because it was distributing opioids only to its own stores, it was well-positioned to identify and prevent the diversion of controlled substances.  Albertsons had access to a trove of information, such as each pharmacy's controlled substance and non-controlled substance ordering and dispensing activities and records, which could provide corporate diversion employees and supervisors with the ability to easily spot deviations from normal ordering patterns. Similarly, Albertsons' pharmacy supervisors could have used distribution information, volume and type of controlled substances, and other ordering patterns as warnings that review of individual pharmacy dispensing activity was necessary.

209.     From 2006 to 2008, Albertsons self-distributed Schedule III, IV, and V opioids.[41] Albertsons stopped distributing all drugs from its distribution center from 2009 to 2012.[42] In 2013,

---

[40] Deposition of Anthony Provenzano, August 10, 2023, 25:11-18.

[41] Deposition of Anthony Provenzano, August 10, 2023, 25:24-26:6.

[42] Deposition of Anthony Provenzano, August 10, 2023, 26:9-12.

Albertsons resumed distribution to its pharmacies and distributed Schedule II, III, IV, and V opioids until 2016 when the company stopped all of its drug distribution activity.[43]

210.    Albertsons knew that suspicious order monitoring was required under the CSA and its implementing regulations.  In letters referenced above that were sent in September 2006 and December 2007, the DEA reminded the Ponca City Distribution Center of its legal obligations— including to develop and maintain a SOM system, conduct due diligence on identified suspicious orders, and, if suspicions could not be resolved, cancel the order and report it to the DEA.

211.    Throughout the entire time it self-distributed opioids to its company-owned pharmacies, Albertsons lacked detailed operational SOM policies, failed to provide adequate training and guidance to those charged with suspicious order monitoring duties, and limited resources and support to diversion control.

212.    Indeed, Albertsons never identified a single order as suspicious.[44] Albertsons also never cancelled, rejected, or refused to ship an order on the grounds that it was suspicious.[45] Because it never identified any suspicious orders, the company never reported a single order as suspicious to the DEA.[46]

213.    Albertsons also allowed pharmacies to supplement their orders by ordering controlled substances from third party vendors without oversight. This allowed Albertsons

---

[43] Deposition of Anthony Provenzano, August 10, 2023, 26:15-:27:1; 27:5-8.

[44] Deposition of David Beck, February 18, 2022, 195:23-196:1; 196:3-3.

[45] Deposition of David Beck, February 18, 2022, 165:2-11; 197:10-14; Deposition of David Beck, March 1, 2022, 199:22-200:6.

[46] Deposition of David Beck, February 18, 2022, 197:16-19; Deposition of David Beck, March 1, 2022, 92:24-93:3; 93:5-5; Deposition of Anthony Provenzano, February 10, 2022, 266:15-17.

pharmacies to avoid having their controlled substance orders be monitored or otherwise questioned.

214.    In fact, Anthony Provenzano, who has been Albertsons' Vice President of Pharmacy Compliance and Government Affairs since 2015, testified that, as of 2020, he believed Albertsons had no duty to report suspicious orders to the DEA.[47]

### i)   From 2006-2008, Albertsons' SOMS was Critically Inadequate.

215.    Albertsons did not have any system or written policy to help it detect suspicious orders prior to October 2001. This first policy only purported to identify orders of unusual size, and failed to identify orders that deviated substantially from orders of unusual frequency or a normal pattern.  There was also no guidance in this policy about what should occur if a pharmacy breached the threshold that was set.

216.    In 2002, Albertsons engaged Ron Buzzeo, a former Deputy Director in the DEA's Office of Diversion Control and the Chief Regulatory Officer at BuzzeoPDMA, a compliance and auditing company.  Albertsons hired Buzzeo to prepare standard operating procedures for the Ponca City distribution center to ensure that Albertsons was following "the rules, regulations and guidelines and laws that are required to operate a pharmacy [distribution business]."[48] The purpose was to provide guidelines for Albertsons to show the company "this is what your policy should look like."[49] The Buzzeo policy proposal specified that Albertsons must "ensure that suspicious orders are reported to the DEA and [Albertsons'] legal department."[50]

---

[47] Deposition of Anthony Provenzano, February 10, 2022, 262:10-264:14; ALB-NM00190163.

[48] Deposition of David Beck, March 1, 2022, 59:4-9; ALB-NM00005850.

[49] Deposition of David Beck, March 1, 2022, 109:6-8; 109:10-17.

[50] Deposition of David Beck, March 1, 2022, 92:11-19; ALB-NM00005850, at 5889.

217.    Albertsons' official 2002 Standard Operating Procedures mostly copied verbatim the 2002 Buzzeo policy.[51] The 2002 Albertsons policy, however, actually ***deleted*** the requirement from the Buzzeo proposal to "ensure that suspicious orders are reported to the DEA and the legal department."[52]

218.    The Albertsons policy had a threshold-based system based on a pharmacy's assigned "maximum order" known as the "Maximum Order Quantity" (MOQ). The MOQ was the maximum number of bottles that a store could order at one time for a particular drug/strength and bottle size, which was based on a particular store size/type rather than a consistent maximum for all stores throughout the chain.  Because the limit applied to each separate order, a pharmacy could order up to its limit at least twice a week without running afoul of the maximum order parameters.

219.    The MOQ-based threshold system failed to identify suspicious orders.  It failed to identify orders of unusual frequency or orders that substantially deviated from a normal ordering pattern, and the system could be easily circumvented or modified.  In addition, orders that exceeded the MOQ would be cut and shipped, and the store would only be contacted after shipment.

220.    The 2002 Albertsons policy was in place from 2002-2008 and comprised the totality of Albertsons' SOMS policies for that time.[53] David Beck, Albertsons' 30(b)(6) witness for distribution-related information, was not sure which person or department would have been responsible for reporting suspicious orders, had any orders actually been identified.[54]

---

[51] Deposition of David Beck, March 1, 2022, 108:3-9; 109:6-8; 109:10-17; ALB-NM00002284, at 2329.

[52] Deposition of David Beck, March 1, 2022, 110:10-25; 111:6-7; ALB-NM00002284, at 2329.

[53] Deposition of David Beck, March 1, 2022, 111:11-16; 111:19-22; 111:24-24; 112:1-4; 112:6-8.

[54] Deposition of David Beck, March 1, 2022, 93:23-25; 94:2-20.

221.    Although Albertsons written policies include an electronic screening process to identify suspicious orders and prevent them from being processed to shipped to stores,[55] Mr. Beck had no knowledge whether any suspicious order files were ever actually created; instead, he testified that "we never had a suspicious order."[56] He also had no knowledge whether that system actually cancelled, blocked, or reduced any orders.[57]

222.    The daily order selection process at the Ponca City Distribution Center also had no meaningful guardrails in place to protect against diversion. Albertsons did not have any training associated with its SOM process between 2002-2008.[58] A "Selector," also knows as a "repack selector," "pharmacy selector" or "order selector," is the employee who puts together the order for a store.[59] While the Ponca City Distribution Center employed a maximum of 30 Selectors at a given time,[60] Albertsons did not assign certain Selectors to pick orders only for a consistent group of certain stores; rather, it was a randomized process.[61]

223.    Under Albertsons' SOMS process, after a Selector located the medication to fill a pharmacy's order, he or she would use "common sense" to determine if the order "doesn't look right," or "something doesn't match up."[62] To determine if an order "didn't look right,"

---

[55] Deposition of David Beck, March 1, 2022, 68:1-24; 96:25-97:6; 97:8-14; ALB-NM00005850, at 5888-889, ALB-NM00002284, at 2329.

[56] Deposition of David Beck, March 1, 2022, 81:5-6; 81:8-82:22; 82:24-83:20; 89:14-23; 90:9-15; 90:17-17; 91:5-12; 91:23-92:3; 92:11-93:3; 93:5-5; 94:22-24.

[57] Deposition of David Beck, March 1, 2022, 233:17-234:14; 235:4-5; 235:7-7.

[58] Deposition of David Beck, March 1, 2022, 112:9-14.

[59] Deposition of David Beck, March 1, 2022, 124:22-24.

[60] Deposition of David Beck, February 18, 2022, 79:17-25.

[61] Deposition of David Beck, February 18, 2022, 82:24-83:18.

[62] Deposition of David Beck, February 18, 2022, 80:7-23.

Distribution Center employees simply relied on their "gut feeling."[63] Albertsons provided no written criteria to help inform the Selector's "gut feel" in identifying suspicious orders.[64] Instead, the only instructions Albertsons gave to Selectors in this area was "to watch out for things that just – that looked out of the ordinary," and to use "good judgment and common sense."[65]

224.    During this time, Albertsons' method of resolving suspicions was gravely inadequate. If a Selector's "gut feeling" alerted him that an order was somehow unusual, he would inform his Supervisor or Foreperson.[66] The Supervisor/Foreperson would then call the store to speak to a pharmacist and verify the order.[67] The purpose of the call was only to confirm the accuracy of the order, and ask the pharmacy if the order was a mistake.[68] If a pharmacist indicated the order was a mistake, the Distribution Center would "adjust the order quantity" to what was actually intended.[69] The Distribution Center would log the conversations with the pharmacies and turn those call logs over to Inventory Control.[70] Other than sending the logs to Inventory Control for the purpose of confirming inventory adjustments, Mr. Beck did not know why they were sent to Inventory Control.[71] Either way, sending the daily logs had no impact on whether orders were

---

[63] Deposition of David Beck, February 18, 2022, 39:25-9.

[64] Deposition of David Beck, February 18, 2022, 87:24-88:15.

[65] Deposition of David Beck, February 18, 2022, 89:4-17.

[66] Deposition of David Beck, February 18, 2022, 89:18-90:5.

[67] Deposition of David Beck, February 18, 2022, 90:11-24.

[68] Deposition of David Beck, February 18, 2022, 91:2-19.

[69] Deposition of David Beck, February 18, 2022, 91:20-92:4.

[70] Deposition of David Beck, February 18, 2022, 92:5-93:21.

[71] Deposition of David Beck, February 18, 2022, 95:9-25; 96:3-3.

filled, because all orders were processed and shipped out the same day they were received; no orders were held overnight.[72]

### ii) From 2013-2016, Albertsons' SOMS was Significantly Deficient.

225.     The Ponca City Pharmacy Compliance Committee started around 2013 when Albertsons began distributing opioids again, met quarterly and was supposed to ensure that Albertsons was in compliance with all aspects of pharmacy distribution.[73]

226.     When Albertsons resumed its distribution activity in 2013, the Selectors continued to use the MOQ and "gut feeling" approach to identifying suspicious orders.[74] However, from 2013-2016, Albertsons supplemented the "gut feeling" approach with a new threshold-based system.  Under this system, a spreadsheet tracked the prior 10-12 orders that a pharmacy submitted and a report would then give the average of those prior orders, as well as identify the number that was greater than 20% of those orders.[75] Distribution Center employees would call stores if an order was greater than 10 bottles and over 100% of the prior order average.[76] While the metric used to call pharmacies may have changed slightly over time, this methodology was used for most of 2013-2016.[77]  During this time, Albertsons still did not employ a system that detected orders of usual frequency or orders that deviated substantially from a normal pattern.

---

[72] Deposition of David Beck, February 18, 2022, 54:5-11.

[73] Deposition of David Beck, February 18, 2022, 44:9-45:10.

[74] Deposition of David Beck, February 18, 2022, 96:12-25.

[75] Deposition of David Beck, February 18, 2022, 97:1-19.

[76] Deposition of David Beck, February 18, 2022, 102:14-104:3.

[77] Deposition of David Beck, February 18, 2022, 105:19-22.

227.    Distribution Center employees would typically make 10-20 calls to pharmacies per day.[78] Just as in 2006-2008, the only purpose of the calls was to confirm the pharmacist actually wanted the order amount he or she requested.[79] There was no formal training regarding the scope and substance of the phone calls made to the pharmacies, other than compliance committee discussions or coaching callers to generally use open-ended questions.[80] Albertsons never provided written documents for guidance or reference to its employees to use when making the phone calls.[81]

228.    All orders were shipped in full unless the pharmacist specifically told the Distribution Center that the order was submitted in error.[82] The Distribution Center was not responsible for analyzing whether a pharmacist's response was reasonable; instead, the Distribution Center employees just "logg[ed] the information and pass[ed] it up."[83] If a pharmacist simply said the order was "correct," that was sufficient reason for the Distribution Center to fill and ship the order in full.[84]

229.    In addition, if the Distribution Center was unable to reach a pharmacy to discuss an order, it would still ship the requested order anyway.[85] While the Distribution Center had the process of "cutting" orders for the entire time it distributed opioids, the only time an order would

---

[78] Deposition of David Beck, February 18, 2022, 107:23-108:5.

[79] Deposition of David Beck, February 18, 2022, 136:3-16.

[80] Deposition of David Beck, February 18, 2022, 132:20-133:6; 135:16-23; 138:15-139:9.

[81] Deposition of David Beck, February 18, 2022, 135:24-136:2.

[82] Deposition of David Beck, February 18, 2022, 136:19-25.

[83] Deposition of David Beck, February 18, 2022, 170:12-22.

[84] Deposition of David Beck, February 18, 2022, 172:5-25.

[85] Deposition of David Beck, March 1, 2022, 226:18-20.

be cut (i.e., the quantity would be reduced) would be when the pharmacist said the order was in error.[86] In 2015, Lynette Berggren, Albertsons' then-Director of Pharmacy Compliance, stated to another employee that cutting orders constituted an "illegal alteration" of the order.[87]

230.    Ms. Berggren also testified that although the DEA expected that distributors would ship orders that were suspicious only after the suspicions were resolved, she could not confirm whether Albertsons actually followed that rule.[88] The Distribution Center call logs would be sent to the Compliance Group for additional review, but any calls or investigations done by that group would have been done **_after_** the orders were already shipped from the Ponca Distribution Center.[89] The Compliance Group never updated the Ponca Distribution Center with any additional information it obtained from any specific pharmacies.[90]

231.    Incredibly, the SOMS process at the Distribution Center only consisted of maintaining the order spreadsheet, calling pharmacies, logging the calls, and sending the logs to Compliance.[91] Other than calling the pharmacy to simply verify the order accuracy, the Distribution Center engaged in no other investigations or follow-ups.[92]

---

[86] Deposition of David Beck, February 18, 2022, 118:10-16; 118:23-119:7.

[87] ALB-NM00030341.

[88] Deposition of Lynette Berggren, February 23, 2022, 238:19-239:14; 239:23-240:5; ALB-NM00015362.

[89] Deposition of David Beck, March 1, 2022, 230:22-231:7.

[90] Deposition of David Beck, March 1, 2022, 233:17-20.

[91] Deposition of David Beck, February 18, 2022, 174:15-20; 174:22-22.

[92] Deposition of David Beck, February 18, 2022, 137:1-7.

232. Against this backdrop, a 2014 internal email from Scott Jardine, a Regional Vice President of Albertsons, identifies problems and concerns with Albertsons' SOMS, revealing an arbitrary and non-compliant system.[93] Jardine's suggestions include:[94]

    a. The Above Threshold Report is "way too big, and not practical to review" and needs to be "right sized" "to provide meaningful information."

    b. The Above Threshold Report should modify coding of "no set average per store" so it is "shortened to fewer orders to minimize how many stores hit this category."

    c. Albertsons should consider a threshold higher than 20% in the Above Threshold Report to "cause the report to be smaller, and easier to take action on the outstanding items."

233. Perhaps most notably, Ms. Berggren suggested that "Processes that are compliant with DEA regulations will need to be put in place for order quantities that are determined to be 'suspicious.'"

234. In 2014, after Ms. Berggren attended a presentation put on by Joseph Rannazzisi regarding the seriousness of SOMS requirements, she noted the information "definitely made an impression on me and significantly ramped up my sense of urgency around these issues."[95] But Albertsons made no meaningful changes to its SOMS policy prior to when it stopped its distribution activity in 2016.

### 3) Albertsons Failed to Guard Against Diversion as a Dispenser of Opioids

235. Albertsons failed to timely implement and apply necessary controlled substance diversion policies across its pharmacy stores. It had no dispensing policies or procedures that

---

[93] Deposition of Lynette Berggren, February 23, 2022, 276:20-22; 277:6-23; 278:14-280:25; 281:6-24; ALB-NM00012078.

[94] ALB-NM00012078.

[95] Deposition of Lynette Berggren, February 23, 2022, 225:20-226:22; 227:5-11; 232:4-233:24; 235:22-236:6; 236:11-20; ALB-NM00015362.

addressed red flags prior to 2013. After 2013, Albertsons at most had superficial guidance for pharmacists that it did not enforce. In addition, Albertsons pressured its pharmacists through quotas and bonus plans to fill opioid prescriptions.

236.    Albertsons failed to provide its pharmacists with the data and tools necessary to fulfill their corresponding responsibility duties, including but not limited to, providing its pharmacists with access to dispensing data as well as the analysis of that data as it relates to red flags of diversion.

237.    Albertsons only began to adopt a compliance program to prevent diversion in 2018, and even as of 2022 did not require its pharmacies to investigate or resolve red flags when dispensing opioids. Albertsons has no systems in place to monitor opioid dispensing patterns or trends, or to document or track suspicious patients or prescribers.

i)    **Albertsons' Written Red Flag Policies & Procedures were Critically Inadequate.**

238.    All of Albertsons dispensing policies and procedures were national in scope.[96] Prior to 2013, Albertsons had no dispensing policies or procedures that addressed red flags associated with the diversion of opioids.[97]

239.    Albertsons' first iteration of any sort of guidance to its pharmacists regarding the identification and resolution of red flags occurred in the middle of 2013, when it created and distributed an "Appropriate Dispensing of Controlled Substances" document.[98] That document,

---

[96] Deposition of Jessica Covaci, March 2, 2022, 33:7-10.

[97] Deposition of Jessica Covaci, March 2, 2022, 38:11-15; 44:3-45:14.

[98] Deposition of Jessica Covaci, March 2, 2022, 33:7-10; 33:12-13; 34:2-15; 35:13-25; 38:11-15, 44:3-7; 45:10-14; ALB-NM00015258-60.

however, lacks useful guidance and requirements for pharmacists to follow. For instance, the document only indicates red flags "may warn" that additional research is needed.[99]

240.    Beyond directing pharmacists to exercise professional judgment, there is no requirement for pharmacists to take specific actions – or even to investigate – when they encounter any red flags; nor is there any requirement for pharmacists to use any specific resources.[100] The document also adds that "pharmacists *should* register for access [to the state PMP] if applicable" (as opposed to *requiring* all pharmacists to register for access) (emphasis added).[101] It is unclear the extent to which this guidance was ever circulated or seen by pharmacists—as an internal Albertsons email in 2018 indicates, various pharmacies "were not aware of appropriate dispensing of CS communications previously sent."

241.    The substance of this standalone document was not added into Albertsons' formal policies and procedures framework in 2013.[102] As a result, Albertsons did not formally discipline any pharmacist who violated, failed to follow, or even simply ignored the red flag guidelines. Only a violation of Albertsons' formal policies and procedures would cause a pharmacist to be subject to any sort of discipline by the company. Thus, while Albertsons' "Appropriate Dispensing of Controlled Substances" provided only superficial guidance to its pharmacists in the first place, Albertsons did not even enforce those guidelines by any meaningful standard.[103]

242.    Albertsons 2013 formal Retail Pharmacy Policies & Procedures also lacks useful guidance and requirements for pharmacists to detect and resolve red flags. For instance, while that

---

[99] Deposition of Jessica Covaci, March 2, 2022, 42:11-17; ALB-NM00015258, at 15259.

[100] Deposition of Jessica Covaci, March 2, 2022, 46:23-47:12; 49:11-50:3; ALB-NM00015258.

[101] ALB-NM00015258-15259.

[102] Deposition of Jessica Covaci, March 2, 2022, 56:15-22.

[103] Deposition of Jessica Covaci, March 2, 2022, 83:4-19.

document provides general information regarding drug diversion, misuse, and abuse, it provides no discussion regarding the identification or resolution of red flags.[104] According to the document, pharmacy personnel are instructed that "whenever the validity of a prescription is in question, it may be researched for authenticity."[105] But this instruction is only limited to the "personal use of prescription medication" by pharmacists.[106] This instruction does not apply to the pharmacists' more general process of filling prescriptions from patients.[107] Thus, the 2013 policies and procedures provide no direct requirements for pharmacists to identify and resolve red flags, or even to confirm the legitimacy of questionable prescriptions.

243.    Albertsons' 2016 Retail Pharmacy Policies & Procedures marks the first time Albertsons incorporated red flags into its formal policies and procedures.[108] That document, however, also lacks useful guidance and requirements for pharmacists to detect and resolve red flags. For instance, the policy includes five options pharmacists "may consider" to verify the legitimacy of a prescription with red flags. By using such permissive language, the policy lacks any formal requirements that pharmacists must take certain steps to verify the legitimacy of controlled substance prescriptions.[109]

244.    Albertsons' 2018 Retail Pharmacy Policies & Procedures also lack useful guidance and requirements for pharmacists to detect and resolve red flags.  Again, the document notes—but does not require—that pharmacists "may consider" certain options to verify the legitimacy of

---

[104] ALB-NM00006764.

[105] ALB-NM00006764, at 6778.

[106] ALB-NM00006764, at 6778.

[107] Deposition of Jessica Covaci, March 2, 2022, 58:19-60:6; ALB-NM00006764, at 6778.

[108] Deposition of Jessica Covaci, March 2, 2022, 79:6-20; ALB-NM00007961-8211.

[109] Deposition of Jessica Covaci, March 2, 2022, 84:21-85:10; ALB-NM00007961, 8034-8035.

prescriptions.[110] The 2018 policy also marks the first time Albertsons formally required its pharmacists to register with an applicable state prescription drug monitoring program ("PDMP"), or to check the PDMP if they questioned the validity of a prescription.[111]

245.    Underscoring one gaping hole that remains in Albertsons' policies and procedures, David Carrick, one of Albertsons' District Pharmacy Managers in New Mexico, testified that even as of 2022, Albertsons did not actually require its pharmacists to investigate or resolve red flags when dispensing opioid prescriptions.[112]

### ii)  Albertsons Was Slow to Adopt Policies to Prevent Diversion.

246.    Anthony Provenzano, Albertsons' VP of Pharmacy Compliance and Government Affairs, testified that when he took on his role in 2015, he was "heavily focused on the diversion loss piece [i.e., theft]" after the Safeway acquisition because "that [was] our biggest challenge at the time."[113] Once the issues with the Safeway acquisition had been resolved, Mr. Provenzano noted "we were able to turn our focus now [in 2018] more towards the dispensing side."[114] He reasoned that, because the opioid crisis "was an elevating piece in the news and in society," Albertsons "wanted to make sure we were reacting appropriately."[115]

247.    Provenzano also dismissed an employee's assertion that there were red flags that pharmacy personnel failed to appropriately consider by responding that the prescriptions were

---

[110] ALB-NM00009720-9963.

[111] Deposition of Jessica Covaci, March 2, 2022, 88:4-14; 88:23-89:10; ALB-NM00009720, at 9796.

[112] Deposition of David Carrick, February 15, 2022, 57:16-25.

[113] Deposition of Anthony Provenzano, February 10, 2022, 125:3-23.

[114] Deposition of Anthony Provenzano, February 10, 2022, 125:3-23.

[115] Deposition of Anthony Provenzano, February 10, 2022, 125:3-23.

filled in 2013 and 2014, when "it was relatively early on in the nation's consciousness about the opioid crisis and prior to the company's formal adoption of the referenced appropriate dispensing policy."

248.   In April 2018, Albertsons' internally-proposed "Options to Address the Opioid Crisis" included pharmacist education regarding "appropriate dispensing," because "we already had controlled substance training, but it didn't focus as much about dispensing, more about the loss prevention."[116] This 2018 proposal included "PDMP Training" (*i.e.*, "How to use PDMP" and "how to make assessments out of PDMP data.").[117]

249.   Toward the end of 2018, Albertsons identified "Topics we need learning objectives for" to include "understanding of pharmacists' corresponding responsibility," "recognize and resolve potential red flags with CS prescriptions," "understand and incorporate the CDC's guidelines," "identify dosing and combinations of medications that pose increased risk to patients," "calculate daily MMEs," and "how to use PDMP appropriately."[118] Rather than implementing PDMP use due to a concern for patient safety, Albertsons considered use of the PDMP as "low hanging fruit" that "will be used by the DEA as a tool for determining inappropriate dispensing."[119] Because the DEA had access to the PDMP data, "if they see that pharmacies aren't checking it adequately, they might be using that against them."[120]

---

[116] Deposition of Anthony Provenzano, February 10, 2022, 130:8-132:12; ALB-NM0063312.

[117] Deposition of Anthony Provenzano, February 10, 2022, 138:17-139:11; ALB-NM0063312-13.

[118] Deposition of Anthony Provenzano, February 10, 2022, 216:11-22; ALB-NM00144561.

[119] Deposition of Anthony Provenzano, February 10, 2022, 184:12-185:14; ABL-NM00126515, at 516.

[120] *Id*.

250.     In 2018 Albertsons found itself in the in the crosshairs of a DEA investigation. That year, the DEA inspected Albertsons' Silver City, New Mexico pharmacy No. 3914. As a result of the inspection, the DEA formally admonished Albertsons for multiple CSA violations.[121] According to the DEA, the pharmacy had significant overages and shortages of multiple opioid medications, repeated unauthorized use of the CSOS (Controlled Substance Ordering System), and failures to investigate the legitimacy of controlled substance prescriptions.[122] The DEA specifically found that the store failed to resolve red flags for "prescriptions for excessive amounts of controlled substances" before dispensing those prescriptions, in violation of the pharmacist's corresponding responsibility.[123] Pursuant to its investigation, the DEA also concluded that it had "grave concern about prescriptions being filled by this store," and that Albertsons pharmacists had received "pressure from management to fill."[124]

251.     The damning results of that 2018 inspection "gave teeth" to Albertsons' compliance programs, because "until you actually face it and have to ... navigate through it, it doesn't become as real."[125] "So rather than just talking about red flags or appropriate dispensing, it got nitty-gritty down to drug combinations, how you communicate with patients and providers, how MAT [medication assisted treatment] comes into play with this naloxone, red flags, of course."[126] The 2018 inspection "was something that helped [Albertsons] get some clarity on what we needed to

---

[121] Deposition of Jessica Covaci, March 2, 2022, 145:15-148:5; ALB-NM00001584.

[122] Deposition of Jessica Covaci, March 2, 2022, 146:20-148:5; ALB-NM00001584, at 1584-85.

[123] ALB-NM00001584, at 1585.

[124] Deposition of Anthony Provenzano, February 10, 2022, 246:18-247:17; 247:23-248:16; ALB-NM00190523, at 524.

[125] Deposition of Jessica Covaci, March 2, 2022, 152:2-153:4; 153:12-25; 154:14-20.

[126] Deposition of Jessica Covaci, March 2, 2022, 152:2-153:4; 153:12-25; 154:14-20.

help support our pharmacists in their day-to-day job."[127] Again, this epiphany of the importance of a robust compliance program did not strike Albertsons *until 2018* and then only after the company was admonished by the DEA.

252. But even with pressure from the DEA in 2018, material gaps in its opioid policies continued to exist through the following year. In an internal presentation in which discussed Albertsons' "Response to the Opioid Crisis," Albertsons identified basic efforts which had not yet been implemented by July 29, 2019.[128] Specifically, Albertsons identified a "Comprehensive [controlled substance] training program" and "Targeted [controlled substance] dispensing reviews with mock DEA visits" as measures that were not yet in place but "coming soon."[129] The "comprehensive training" was meant to cover "everything about controlled substances from a regulatory and compliance perspective."

### iii) Albertsons Performance Metrics Put Profits Before Safety.

253. Not only did Albertsons lack (and fail to implement) adequate policies and procedures to guard against diversion, but Albertsons compounded this problem by implementing performance metrics and prescription quotas for retail stores that contributed to supplying of a black market, including in the Plaintiffs' Community.

254. Albertsons had a responsibility to create a work environment that enables its pharmacy staff to detect and prevent diversion, or at the very least does not undermine the ability

---

[127] Deposition of Jessica Covaci, March 2, 2022, 157:20-158:1.

[128] Deposition of Jessica Covaci, February 9, 2022, 165:16-166:11; 166:23-25; 168:22-169:6; 169:16-170:2; 172:25-174:18; ALB-NM00038105, at 38111.

[129] Deposition of Jessica Covaci, February 9, 2022, 172:25-174:18; ALB-NM00038105, at 38111.

of staff to carry out these functions or direct emphasis toward increased sales instead of legal compliance.

255.   DEA diversion investigator Demetra Ashley testified that the duty to provide tools to prevent diversion under Section 1301.71 includes providing a work environment that allows pharmacists to fulfill their corresponding responsibility to fill only legitimate prescriptions.  She further agreed as to the importance of adequate staffing and testified that both strict time limits that deprived pharmacists of enough time to investigate red flags and requiring quotas on prescriptions filled sounded unreasonable.

256.   Albertsons' corporate policies consistently prioritized pharmacy profits over patient safety and pressured its pharmacists to fill all prescriptions presented to them. For instance, Albertsons would give its pharmacists specific prescription volume targets for their stores to reach, which would in turn be geared toward reaching annual goals for the company.[130] Specific prescription volume fill rates would be given to pharmacists to assess their "business performance" and "to grow their business."[131]

257.   Since the inception of its pharmacy component, Albertsons has always identified increased prescription volume as a consistent goal for its pharmacists.[132] Albertsons' emphasis on increased prescription volume includes increased prescriptions for controlled substances.[133] Controlled substances have never been excluded from Albertsons' pharmacy script growth goals.[134]

---

[130] Deposition of Jessica Covaci, March 2, 2022, 113:21-114:2; 114:12-14; 115:1-13.

[131] Deposition of Jessica Covaci, March 2, 2022, 113:21-114:2; 114:12-114:14.

[132] Deposition of Jessica Covaci, March 2, 2022, 125:20-126:24; ALB-NM00015374, at 15385.

[133] Deposition of Jessica Covaci, March 2, 2022, 126:25-127:4; ALB-NM00015374.

[134] Deposition of Jessica Covaci, March 2, 2022, 127:5-9.

258.     Albertsons considered increased prescription volumes to be a central "key to success" for its business.[135] This "key to success," however, came at the expense of pharmacist workloads and patient safety, as Albertsons identified a financial "opportunity" in simultaneously filling more prescriptions while also reducing pharmacist work hours.[136] By 2016 for instance, Albertsons sought an increase of 28 prescriptions per week, per store, across the country.[137]

259.     Albertsons' 2015 Store Bonus Plan further indicates the company prioritized a concern for profits, rather than pharmacists fulfilling their legal and regulatory responsibilities to prevent diversion.[138] While that document is dated 2015, this was Albertsons' compensation policy for its pharmacists both before and after that date.[139] According to the document, Albertsons' bonus calculation and subsequent weekly payout for pharmacy staff is directly tied to the number of prescriptions dispensed.

260.     Specifically, the policy identifies three average weekly prescription counts by which to calculate bonuses: Group A is a script count less than 1,200/week ($6,000 bonus), Group B is a script count between 1,200 and 1,800/week ($9,000 bonus), and Group C is a script count greater than 1,800/week ($12,000 bonus).[140] Thus, a larger total prescription volume pushes a pharmacy (or pharmacist) into a status with potential for higher bonuses.[141]

---

[135] Deposition of Jessica Covaci, March 2, 2022, 132:19-133:7; ALB-NM00015374, at 15460.

[136] Deposition of Jessica Covaci, March 2, 2022, 130:20-131:10 ALB-NM00015374, at 15459.

[137] Deposition of Jessica Covaci, March 2, 2022, 130:20-131:14; 132:10-18; ALB-NM00015374, at 15459.

[138] ALB-NM00006293.

[139] Deposition of Jessica Covaci, March 2, 2022, 106:2-8; 113:2-9; ALB-NM00006293.

[140] Deposition of Jessica Covaci, March 2, 2022, 109:2-20; ALB-NM00006293.

[141] Deposition of Jessica Covaci, March 2, 2022, 112:22-113:1 ALB-NM00006293.

261.    The policy makes no exclusions in these counts for controlled substance prescriptions. Rather, the more controlled substance prescriptions a pharmacy fills, the more likely it is to receive a higher weekly bonus payout. Albertsons thus incentivizes its pharmacists to fill as many prescriptions as possible, rather than rewarding instances of conducting due diligence, resolving red flags, or refusing problematic prescriptions.

262.    Such corporate goals obstruct the performance of pharmacists' professional obligations. There is an inherent conflict between performance metrics that pressure pharmacists to fill certain volume of prescriptions, limit customers' wait time, or base pharmacists' incentive pay on customer satisfaction, on the one hand, and the ability to conduct appropriate due diligence to guard against diversion of controlled substances and refuse to fill illegitimate prescriptions even if a customer is dissatisfied, on the other. Albertsons has a duty to maintain a corporate culture that promotes and ensures compliance with the law.

263.    This pressure and focus on profits would not only lead to mistakes, it also would necessarily deter pharmacists from carrying out their obligations to report and decline to fill suspicious prescriptions and to exercise due care in ascertaining whether a prescription is legitimate.

264.    Indeed, "a survey by the Institute for Safe Medication Practices (ISMP) revealed that 83% of the pharmacists surveyed believed that distractions due to performance metrics or measured wait times contributed to dispensing errors, as well as that 49% felt specific time measurements were a significant contributing factor."[142]

---

[142] NABP, Performance Metrics and Quotas in the Practice of Pharmacy (Resolution 109-7-13) (June 5, 2013), https://nabp.pharmacy/news/news-releases/performance-metrics-and-quotas-in-the-practice-of-pharmacy-resolution-109-7-13/ (last visited September 5, 2024).

265.     In 2013, the National Association of Boards of Pharmacy (NABP), passed a resolution which cited this survey and additionally stated that "performance metrics, which measure the speed and efficiency of prescription work flow by such parameters as prescription wait times, percentage of prescriptions filled within a specified time period, number of prescriptions verified, and number of immunizations given per pharmacist shift, may distract pharmacists and impair professional judgment" and "the practice of applying performance metrics or quotas to pharmacists in the practice of pharmacy may cause distractions that could potentially decrease pharmacists' ability to perform drug utilization review, interact with patients, and maintain attention to detail, which could ultimately lead to unsafe conditions in the pharmacy."[143]

266.     Still, according to a 2016 investigation by the *Chicago Tribune*, as chain pharmacies increasingly promote quick service, "pharmacists frequently race through legally required drug safety reviews—or skip them altogether," missing dangerous drug combinations in the process.[144]  A pharmacist too rushed to check for a potentially deadly drug interaction is also likely to be too rushed to check for red flags of diversion, such as prescription "cocktails" or other combinations of highly abused drugs.

267.     In reporting on the results of its investigation, the *Tribune* quoted Bob Stout, president of the New Hampshire Board of Pharmacy, stating that "'They're cutting corners where they think they can cut."[145]  As the report itself explained: "some pharmacies emphasize fast

---

[143] *Id.*

[144] Sam Roe, Ray Long, and Karisa King, Contract Reporters, Pharmacies Miss Half of Dangerous Drug Combinations, Dec. 15, 2016, http://www.chicagotribune.com/news/watchdog/druginteractions/ct-drug-interactions-pharmacy-met-20161214-story.html (last visited September 4, 2024).

[145] *Id.*

service over patient safety. Several chain pharmacists, in interviews, described assembly-line conditions in which staff hurried to fill hundreds of prescriptions a day.[146]

268.  "The National Coordinating Council for Medication Error Reporting and Prevention (NCCMERP), also passed a statement advocating for the "elimination of prescription time guarantees and a strengthened focus on the clinical and safety activities of pharmacist within the community pharmacy setting."[147]

269.  An April 2021 workload survey from the Ohio Board of Pharmacy[148] revealed a contrast between the responses of pharmacists at chain pharmacies such as Albertsons and pharmacists at other locations concerning the time available to do their job safely:

---

[146] *Id.*

[147] National Coordinating Council for Medication Error Reporting and Prevention. Statement Advocating for the Elimination of Prescription Time Guarantees in Community Pharmacy, http://www.nccmerp.org/statement-advocating-elimination-prescription-time-guarantees-community-pharmacy (last visited September 4, 2024).

[148] https://www.pharmacy.ohio.gov/documents/lawsrules/pwac/committeeinformation/2020%20pharmacist%20workload%20survey.pdf (last visited September 4, 2024).



270.    The same was true concerning whether standards or metrics were perceived as interfering with patient care:



271.    The overwhelming majority of pharmacist comments reported in the survey reflected a belief that chain pharmacies place profit over safety.  A common refrain heard from pharmacists was being asked to do more with less—carrying more responsibilities, and facing increased prescription volumes, while staffing levels have decreased.  In a job market filled with new graduates, pharmacists were reminded that they were replaceable.

### iv) Albertsons Had No Systems in Place to Monitor Opioid Dispensing Patterns or Trends.

272.    Outside of District Pharmacy Managers occasionally visiting stores to review prescriptions in certain circumstances, Albertsons had no corporate program or system in place at any time to monitor or track red flag information documented by its pharmacists.[149] Even though documentation requirements and corporate monitoring programs presented opportunities for the chain to – at a minimum – monitor the flow of opioids from its pharmacies, Albertsons abstained from even the most basic efforts:

273.    Albertsons has no requirement for its pharmacists to document anything prior to filling a controlled substance prescription.[150]

274.    Albertsons has no requirement for its pharmacists to document their use of the PDMP.[151]

275.    Albertsons has no requirement for its pharmacists to take any steps – including documenting their reasoning, informing corporate, or informing their District Pharmacy Managers – that they have refused to fill a prescription.[152]

---

[149] Deposition of Jessica Covaci, March 2, 2022, 94:8-11; 101:20-103:21.

[150] Deposition of David Carrick, February 15, 2022, 48:4-19.

[151] Deposition of David Carrick, February 15, 2022, 55:1-13.

[152] Deposition of David Carrick, February 15, 2022, 60:9-13; 60:18-61:8.

276.     At no time did Albertsons ever have a program or system in place to monitor or track instances in which pharmacists refused to fill certain prescriptions.[153]

277.     Albertsons also had no systems or programs in place at any time to monitor or track prescribers with histories of writing illegitimate prescriptions.[154]

278.     Albertsons had no systems or programs in place at any time to monitor or track patients with histories of presenting illegitimate prescriptions.[155]

279.     Albertsons corporate offices would not review refusal to fill notes from its pharmacists.[156] There is no set policy on what pharmacists are supposed to do when they refuse to fill a prescription.[157]

280.     Despite being able to identify patients who present particularly problematic opioid prescriptions, Albertsons does not flag those patients for its pharmacists or block them from receiving prescriptions.[158]

281.     Despite being able to identify prescribers that issue the highest volume of opioid prescriptions, Albertsons does not flag those prescribers for its pharmacists or block their prescriptions from being filled.[159]

282.     Albertsons' persistent decision not to monitor or oversee such critical data points translates into real world issues at the pharmacy level. For instance, in 2018, an Albertsons

---

[153] Deposition of Jessica Covaci, March 2, 2022, 100:8-19.

[154] Deposition of Jessica Covaci, March 2, 2022, 100:20-101:3.

[155] Deposition of Jessica Covaci, March 2, 2022, 103:22-104:3.

[156] Deposition of Pete Ridsdale, February 22, 2022, 139:21-140:11.

[157] Deposition of Pete Ridsdale, February 22, 2022, 140:12-21.

[158] Deposition of Jessica Covaci, February 9, 2022, 73:18-74:9; 74:17-75:2; ALB-NM00011001, at 11001-002.

[159] Deposition of Jessica Covaci, February 9, 2022, 76:10-77:11; ALB-NM00011001, at 11002.

pharmacist at Store No. 920 in New Mexico expressed concern to her District Pharmacy Manager that at least two patients were selling their opioid prescriptions.[160] The District Pharmacy Manager did not advise that pharmacist to alert any other Albertsons pharmacists to those patients, or internally flag the patients or prescriber, even though that information would be helpful for other pharmacists to know.[161]

283.    As another example, in 2018 the pharmacy team at Albertsons Store 3914 informed Jessica Covaci, Albertsons' Director of Pharmacy Compliance, that it would no longer fill prescriptions written by Dr. Gregory Koury because he "is not pain management certified, writes large amounts of IR pain medications for patients with the same address, and also writes large amounts of pain medications for [certain patients]," and "every prescription for opioids comes with the exact same ICD-10 diagnosis code."[162] Instead of responding, Albertsons never added Dr. Koury to an internal "do-not-fill" list, and never flagged Dr. Koury for other pharmacists.[163] By 2020, Albertsons continued to fill trinity and holy trinity prescriptions from Dr. Koury, who had an IMS/IQVIA opioid risk rating of 94 out of 100.[164]

284.    The above information demonstrates that Albertsons fundamentally violated the CSA in its dispensing policies, training, and compliance.

285.    Albertsons' lax documentation requirements for its pharmacists translated into a poorly managed documentation system for Albertsons pharmacists trying to track problematic prescriptions, patients, and doctors. This is because Albertsons does not maintain a centralized or

---

[160] Deposition of Pete Ridsdale, February 22, 2022, 60:4-62:10; ALB-NM00164903.

[161] Deposition of Pete Ridsdale, February 22, 2022, 62:11-63:7.

[162] Deposition of Jessica Covaci, February 9, 2022, 93:15-94:10; ALB-NM00149622.

[163] Deposition of Jessica Covaci, February 9, 2022, 96:20-97:10.

[164] Deposition of Jessica Covaci, February 9, 2022, 132:23-133:13; ALB-NM00011005, at 009.

easily-accessible documentation process. Even today, Albertsons has no single, specific place for pharmacists to document measures taken to determine the legitimacy of a prescription.[165] Instead, pharmacists may document that information in a number of ways and in a number of places, including on hard copy prescriptions, electronic prescription fields, the electronic patient profile, or the electronic "fill notes" section.[166] As Albertsons' corporate designee put it, "there's, unfortunately, a lot of places to document."[167] As a result, pharmacists interested in checking prior notes for particular patients are faced with a confused, muddled system that does not support that effort. In addition, only pharmacists "on the same system" are able to see patient profile information from other stores, and in its various pharmacy chain acquisitions, pharmacies owned and operated by Albertsons were at times running different software, creating a disconnect between all of the systems.

### 4) The DEA has Repeatedly Admonished Albertsons Across Multiple Jurisdictions for its Failures to Maintain Effective Controls Against Diversion.

286.    In addition to the 2018 DEA investigation for multiple violations at Albertsons' Silver City, New Mexico location, the DEA has also admonished Albertsons at other times. Although the DEA's interactions with Albertsons may appear to be limited to specific pharmacy locations, the cited failures take on national import given that Albertsons' policies and procedures related to the distribution and dispensing of opioids were national in scope.

287.    In 2017, Albertsons agreed to pay $3 million to settle Department of Justice allegations that the company failed to timely report controlled substances that were missing from

---

[165] Deposition of Jessica Covaci, March 2, 2022, 60:14-19; 61:17-63:1.

[166] Deposition of Jessica Covaci, March 2, 2022, 60:14-19; 61:17-63:1.

[167] Deposition of Jessica Covaci, March 2, 2022, 62:25-63:1.

pharmacies. "According to the settlement agreement, the investigation began in April 2014, when the DEA learned that Safeway pharmacies in North Bend, Washington and Wasilla, Alaska did not notify DEA of losses of tens of thousands of hydrocodone tablets until months after Safeway discovered the pills were pilfered by employees. DOJ's investigation was later widened to review practices at all Safeway pharmacies nationwide between 2009 and 2014. The investigation revealed a widespread practice of Safeway pharmacies failing to timely report missing or stolen controlled substances."[168]

288. In 2019, the United States Attorneys' Office for the District of New Hampshire announced that "New Albertsons, L.P., d/b/a Osco Pharmacy agreed to pay $30,000 to resolve allegations that it had filled 13 fraudulent prescriptions for controlled substances at its location in Stratham between December 1, 2013, and July 31, 2014." The settlement announcement further specified that when CSA violations like those observed in Albertsons' Osco Pharmacy occur, "it allows for the diversion of prescription pain medication which contributes to the widespread abuse of opiates that are devastating our communities."

289. In January 2020, Albertsons settled with the Department of Justice for $1,000,000 for violations of the CSA.[169] According to DOJ, "[i]nvestigators uncovered 128 instances of patients filling prescriptions for unusually large quantities and dosages of narcotics; patients

---

[168] DEA, *Safeway Pharmacies Pay $3 Million To Resolve Allegations Chain Failed To Timely Report Drug Diversion* (July 18, 2017), https://www.dea.gov/press-releases/2017/07/18/safeway-pharmacies-pay-3-million-resolve-allegations-chain-failed-timely (last visited September 4, 2024).

[169] Department of Justice*, Casper Pharmacy Agrees to $1 Million Settlement of Allegations of Violations of the Controlled Substance Act* (January 28, 2020), https://www.justice.gov/usao-wy/pr/casper-pharmacy-agrees-1-million-settlement-allegations-violations-controlled-substances (last visited September 4, 2024).

utilizing multiple pharmacies to fill prescriptions; or third parties filling prescriptions for out-of-state patients.  Additional record keeping violations were also discovered."

### 5) Albertsons Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiffs' Community and Surrounding Areas.

290.    Albertsons, throughout the relevant time period, owned and operated pharmacies throughout the United States, including pharmacies in Plaintiffs' Community.  Through its wholly owned or controlled subsidiary companies, Albertsons operates over 1,700 retail pharmacies across the United States.  In Plaintiffs' Community, Albertsons has operated pharmacies under the Safeway, Albertsons, Savon and Lucky banners.

291.    As described below, the volume of prescription opioids ordered and dispensed by Albertsons pharmacies in and around Plaintiffs' Community is indicative of potential diversion and required appropriate due diligence.

292.    As a dispenser of prescription opioids, Albertsons had visibility into dispensing level data at all of its pharmacies, and Albertsons knew or should have known that it was dispensing an excessive volume of pills in California and around Plaintiffs' Community.

293.    Upon information and belief, Albertsons, by virtue of the dispensing data available to it, had actual knowledge of indicia of diversion, such as (1) individuals traveling long distances to fill prescriptions; (2) prescriptions for drug "cocktails" known for their abuse potential, such as oxycodone and Xanax; (3) individuals arriving together with identical or nearly identical prescriptions; (4) high percentage of cash purchases; and (5) doctors prescribing outside the scope of their usual practice or geographic area.  However, Albertsons ignored these obvious red flags.

294.    Upon information and belief, Albertsons failed to analyze: (a) the number of opioid prescriptions filled by its pharmacies relative to the population of the pharmacy's community; (b)

the increase in opioid sales relative to past years; and (c) the number of opioid prescriptions filled relative to other drugs.

295.     Discovery will reveal that Albertsons knew or should have known that its pharmacies in California, as well as nearby states including Nevada, Arizona, and Oregon,  were: (a) filling multiple prescriptions to the same patient using the same doctor; (b) filling multiple prescriptions by the same patient using different doctors; (c) filling prescriptions of unusual size and frequency for the same patient; (d) filling prescriptions of unusual size and frequency from out-of-state patients; (e) filling an unusual or disproportionate number of prescriptions paid for in cash; (f) filling prescriptions paired with other drugs frequently abused with opioids, namely benzodiazepines or muscle relaxers; (g) filling prescriptions in volumes, doses, or combinations that suggested that the prescriptions were likely being diverted or were not issued for a legitimate medical purpose; and (h) filling prescriptions for patients and doctors in combinations that were indicative of diversion and abuse.  Also, upon information and belief, the volumes of opioids distributed to and dispensed by these pharmacies were disproportionate to noncontrolled drugs and other products sold by these pharmacies, and disproportionate to the sales of opioids in similarly-sized pharmacy markets.  Albertsons had the ability, and the obligation, to look for these red flags on a patient, prescriber, and store level, and to refuse to fill and to report prescriptions that suggested potential diversion.

296.     The volume of opioids Albertsons brought into and dispensed in the County was so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical uses. According to data from the ARCOS database, between 2006 and 2019, the various Albertsons pharmacies in (under the Albertsons, Savon, Safeway, and Lucky brands) in Monterey

84

County, ordered approximately 16.8 million dosage units of prescription opioids.[170]   Of that, American Drug Stores and Albertsons distribution centers shipped almost over 330,000 dosage units of these drugs, while the remaining amount was purchased from other distributors.  During this time frame, Albertsons was responsible for approximately 8.5% of the volume of these drugs dispensed in Monterey County.

297.   In the Plaintiffs' Community, Albertsons violated the standard of care for a distributor and dispenser by failing to: (a) control the supply chain; (b) prevent diversion; (c) report suspicious orders; and (d) halt shipments of opioids in quantities it knew or should have known could not be justified and signaled potential diversion.

298.   As an operator of retail pharmacies, Albertsons had the ability to detect diversion in ways third-party wholesale distributors could not by examining the dispensing data from its own retail pharmacy locations.

299.   Given the volume and pattern of opioids distributed in California and in the Plaintiffs' Community, Albertsons was, or should have been, aware that opioids were being oversupplied into the state and should have detected, reported, and rejected suspicious orders.

300.   Albertsons was, or should have been, fully aware that the opioids and "cocktail" combinations being distributed and dispensed by it were likely to be diverted, yet it did not take meaningful action to ensure that it was complying with its duties and obligations with regard to controlled substances, including its responsibility to report suspicious orders and not to ship such orders unless and until due diligence allayed the suspicion.

---

[170] This includes Oxycodone, Hydrocodone, Buprenorphine, Codeine, Dihydrocodeine, Fentanyl, Hydromorphone, Levorphanol, Meperidine, Methadone, Morphine, Opium (Powdered), Oxymorphone, and Tapentadol.

301.     Given Albertsons's retail pharmacy operations, in addition to its role as a wholesale distributor, Albertsons knew or reasonably should have known about the disproportionate flow of opioids into California and the Plaintiffs' Community, and the operation of "pill mills" that generated opioid prescriptions that, by their quantity or nature, were red flags for, if not direct evidence of, diversion.

302.     Albertsons had complete access to all prescription opioid distribution data related to its pharmacies in and around Plaintiffs' Community.

303.     Albertsons had complete access to all prescription opioid dispensing data related to its pharmacies in and around Plaintiffs' Community.

304.     Albertsons had complete access to information revealing the doctors who prescribed the opioids dispensed in its pharmacies in and around Plaintiffs' Community.

305.     Albertsons had complete access to information revealing the customers who filled or sought to fill prescriptions for opioids in its pharmacies in and around Plaintiffs' Community

306.     Albertsons had complete access to information revealing the geographic location of out-of-state doctors whose prescriptions for opioids were being filled by its pharmacies in and around Plaintiffs' Community.

307.     Albertsons had complete access to information revealing the size and frequency of prescription written by specific doctors across its pharmacies in and around Plaintiffs' Community.

308.     Upon information and belief, Albertsons failed to adequately use data available to it to identify doctors who were writing suspicious numbers of prescriptions and/or prescriptions of suspicious amounts or doses of opioids, or to adequately use data available to it to prevent the filling of prescriptions that were illegally diverted or otherwise contributed to the opioid crisis.

309.    Upon information and belief, Albertsons also failed to adequately analyze and address its opioid sales to identify patterns regarding prescriptions that should not have been filled and to create policies accordingly, or if it conducted such reviews, it failed to take any meaningful action as a result.

> **b) Aurolife Opportunistically Increased its Market Share in Monterey County and Failed to Guard Against Diversion in the Plaintiffs' Community.**

310.    In addition to the factual allegations against the Manufacturer Defendants and Distributor Defendants raised in Monterey County's Original Complaint (Doc. #1) and against the Marketing Defendants and Distributor Defendants in the Corrected Second Amended Complaint and Jury Demand in *The County of Summit, Ohio, et al., v. Purdue Pharma L.P.*, Case No. 1:18-op-45090, *In Re National Prescription Opiate Litigation*, in the U.S.D.C. for the Northern District of Ohio, Doc. #513, 514 (May 29, 2018) which Plaintiffs incorporated by reference in its Short Form Amended Complaint (Doc. #14), Plaintiffs allege the following against Aurolife.

311.    As alleged above, as a distributor and manufacturer of prescription opioids, Aurolife was and remains required to hold full DEA registrations, and was required to maintain an effective SOMS and report suspicious orders to the DEA. On information and belief, Aurolife failed to operate an effective SOMS or maintain effective controls against diversion, allowing widespread diversion of opioids to occur.

312.    Aurolife manufactures generic prescription opioids.  Aurolife was an opportunistic seller of hydrocodone and oxycodone—entering those markets in 2012 and 2013, as sales peaked overall and other manufacturers began limiting their sales in response to the opioid crisis.  As others limited their market participation, Aurolife increased its own.

313.    Aurolife first began selling generic hydrocodone in 2012 in the form of hydrocodone and acetaminophen tablets. In 2016, Aurolife also began selling hydrocodone and

ibuprofen tablets. From 2012 to 2019, Aurolife sold in the United States nearly 900 million dosage units (DUs) of hydrocodone—94% of which were sold between 2015 and 2019. Its national market share with respect to hydrocodone peaked in 2019 (the last year for which there is public ARCOS data) at 5.73% on sales of over 231 million DUs.

314.    In 2013, shortly after entering the hydrocodone market, Aurolife began selling generic oxycodone, which became its best-selling opioid. Between 2013 and 2019, Aurolife sold across the United States over 1.1 billion DUs of oxycodone—90% of which were sold between 2015 and 2019. Its national oxycodone market share peaked in 2017 and 2018, at 5.56% and 5.21%, respectively.

315.    Aurolife then began selling generic codeine in 2014. From 2014 to 2019, Aurolife sold over 288 million DUs of codeine—98% of which were sold between 2015 and 2019. Aurolife began capturing a substantial 11% share of the codeine market nationally in 2017, on sales of nearly 65 million DUs. Its sales steadily increased in 2018 and 2019, with nearly 83 million and 91 million DUs sold, respectively. Its national market share correspondingly increased from 16.7% to its peak of 21.4% during those years.

316.    In 2016, Aurolife began selling generic versions of methadone, hydromorphone, and oxymorphone. During the period between 2016 and 2019 Aurolife sold:

- over 120 million DUs of methadone, with its share of the national market peaking at 11.04% during this period;

- over 34 million DUs of hydromorphone, with its share of the national market peaking at 5.86% during this period; and

- over 8.5 million DUs of oxymorphone, with its share of the national market peaking at 9.68% during this period.

317.    In Monterey County, Aurolife entered the market in 2014 and its sales and market share have steadily increased since then. From 2006-2014, Aurolife's market share in Monterey

County was 0.08% by DU.  By 2017, Aurolife accounted for over 5.6 million MME and over 500,000 dosage units (DUs) of opioids shipped into Monterey County, which accounted for almost 5% of the market share by DU.  By 2019, the last year for which data is available, Aurolife accounted for almost 8.6 million MME (4.1%) of the opioids shipped into Monterey and a whopping 1,288,200 DU, or 18% of the market share of opioids in Monterey. In the aggregate, Aurolife's market share in Monterey County from 2015-2019 was 5.56% by DU.

318.    From 2014 to 2019, Aurolife accounted for over 27 million MME of opioids and 17.7 million MME of oxycodone and hydrocodone in Monterey County.

### c) Indivior Falsely Marketed its Suboxone Products and Failed to Guard Against Diversion in the Plaintiffs' Community.

319.    In addition to the factual allegations against the Manufacturer Defendants and the Distributor Defendants raised in Monterey County's Original Complaint (Doc. #1) and against the Marketing Defendants and Distributor Defendants in the Corrected Second Amended Complaint and Jury Demand in *The County of Summit, Ohio, et al., v. Purdue Pharma L.P.*, Case No. 1:18-op-45090, *In Re National Prescription Opiate Litigation*, in the U.S.D.C. for the Northern District of Ohio, Doc. #513, 514 (May 29, 2018) which Plaintiffs incorporated by reference in its Short Form Amended Complaint (Doc. #14), Plaintiffs allege the following against Indivior.

320.    As alleged above, as a distributor and manufacturer of their Suboxone and Subutex products, the Indivior Defendants were and remain required to hold full DEA registrations, and were required to maintain an effective SOMS and report suspicious orders to the DEA. On information and belief, the Indivior Defendants failed to operate an effective SOMS or maintain effective controls against diversion, allowing widespread diversion of opioids to occur.

321.    In 2023, the DEA issued its guidance reminding "all DEA registrants of the requirement to establish systems to identify and report suspicious orders of controlled substances to include Medication for Opioid Use Disorder (MOUD)."[171]

322.    As alleged above, Indivior manufactures, markets and/or sells branded Subutex and Suboxone, which are Schedule III buprenorphine products approved by the FDA in 2002 for the treatment of opioid use disorder. Although Subutex and Suboxone have some properties that make them less abuseable than Schedule II opioids such as oxycodone and hydrocodone, they are still highly addictive and subject to diversion and so must be carefully prescribed with patient follow up and care in accordance with their FDA-approved labels and required risk management plans.

323.    Indivior and Reckitt had exclusive control of the Subutex market until 2009 when the product became available in a generic form, and had exclusive control of the Suboxone market until 2013 when the Suboxone tablet formulation went generic. Indivior's Suboxone film product was approved in 2010, and it falsely marketed that product as safer and less prone to abuse, misuse and diversion than Suboxone tablets, and so was able to convince doctors to switch their patients to its more expensive film product. Consequently, Indivior continued to dominate the Suboxone market until 2018 when the film product became generic.

324.    In July 2019 and November 2020, Reckitt Benckiser and Indivior, respectively, agreed to settle federal and state claims under the False Claims Act related to their false marketing and other misconduct related to their Suboxone film product. Reckitt Benckiser agreed to pay $1.4 billion, and Indivior agreed to pay $600 million and pled guilty to felony charges related to this

---

[171] *See* DEA, Diversion Control Division "Guidance Document," at https://www.deadiversion.usdoj.gov/GDP/(DEA-DC-065)(EO-DEA258)_Q_A_SOR_and_Thresholds_(Final).pdf (last visited on September 4, 2024).

misconduct. Indivior's CEO and Medical Director also pled guilty felony charges against them, and paid fines and served prison sentences for their prominent roles in Indivior's schemes.

325.    Indivior knowingly and improperly promoted the sale and use of Suboxone in a manner that facilitated and induced doctors to prescribe its Suboxone products in an unsafe and medically inappropriate manner, causing widespread and harmful diversion of those drugs. These improper prescriptions were written without any medical follow up or supervision, and simply sustained patients' dangerous addictions not only to Suboxone but to other prescription and illicit opioids with no prospect of ever overcoming their addictions.

326.    Indivior also had no effective program to monitor and stop suspicious orders for its Subutex and Suboxone products. In fact, Indivior had substantial data and reports from its sales force of rampant illicit prescribing and abuse of its Suboxone products, yet did little or nothing to stop that prescribing.

327.    To the contrary, Indivior often would reward unscrupulous prescribers so they would continue and even increase their illicit prescribing, including by feeding patients to their practices and hiring those doctors for their speakers programs. Such illicit prescribing led to widespread Suboxone and Subutex diversion and illicit street sales of those drugs, and resultant harm to the public.

328.    In Monterey County, from 2006-2019, Indivior accounted for almost 440 million MME of methadone and buprenorphine, which was 11% of the market share of *all* opioids in the County and 29.3% of the market share for those specific drugs in the County. In 2019 alone, the last for which data is available, Indivior accounted for over 30.6 million MME shipped into Monterey County and for almost 15% of *all opioids*. In the aggregate, Indivior's market share in Monterey County from 2006-2019 was 11.17% by MME.

### d) Sun Pharmaceutical Failed to Guard Against Diversion in Distributing and Dispensing in the Plaintiffs' Community.

329.    In addition to the factual allegations against the Manufacturer Defendants and the Distributor Defendants raised in Monterey County's Original Complaint (Doc. #1) and against the Marketing Defendants and Distributor Defendants in the Corrected Second Amended Complaint and Jury Demand in *The County of Summit, Ohio, et al., v. Purdue Pharma L.P.*, Case No. 1:18-op-45090, *In Re National Prescription Opiate Litigation*, in the U.S.D.C. for the Northern District of Ohio, Doc. #513, 514 (May 29, 2018) which Plaintiffs incorporated by reference in its Short Form Amended Complaint (Doc. #14), Plaintiffs allege the following against Sun Pharmaceutical.

330.    As alleged above, as a manufacturer and wholesale distributor of prescription opioids, Sun Pharmaceutical was and remains required to hold full DEA registrations, and was required to maintain an effective SOMS and report suspicious orders to the DEA.  On information and belief, Sun Pharmaceutical failed to operate an effective SOMS or maintain effective controls against diversion, allowing widespread diversion of opioids to occur.

331.    Sun Pharmaceutical has been selling opioids, including generic codeine, since at least 2006. It began selling generic hydrocodone in 2008, generic oxycodone in 2009, and reentered the morphine market in 2015 (after previously exiting in 2009). Sun Pharmaceutical also sells other opioids, including generic buprenorphine and dihydrocodeine products.

332.    Since 2010, Sun Pharmaceutical has primarily sold generic oxycodone and hydrocodone. Sun Pharmaceutical was an opportunistic seller of these drugs, boosting sales around 2012—as sales peaked overall—and other manufacturers began limiting their sales in response to the opioid crisis.  As others limited their market participation, Sun Pharmaceutical increased its own, capturing meaningful market share thereafter through 2018.

333. Specifically, in 2015, Sun Pharmaceutical made significant inroads into the opioid market. In March 2015, Sun Pharma USA's parent, Sun Pharmaceutical Industries, Ltd. completed its acquisition of Ranbaxy Laboratories—including Ranbaxy's opioid product portfolio. Shortly thereafter, Sun Pharmaceutical Industries, Ltd. acquired GlaxoSmithKline's opiates business in Australia, along with two manufacturing facilities. Sun Pharmaceutical Industries, Ltd.'s press release announcing the acquisition detailed how the purchase was "part of strategy towards building [Sun Pharmaceutical Industries, Ltd.'s] portfolio of Opiates and accessing strong capabilities in this segment" and would afford Sun Pharmaceutical Industries, Ltd. "access to a product portfolio consisting of poppy-derived Opiate raw materials that are primarily used in the manufacture of analgesics for the treatment of moderate to severe pain." The CEO of Sun Pharmaceutical Industries, Ltd.'s API operation stated that the GSK acquisition "enables us to leverage our unique position in the global opiates business by capitalizing our global footprint and global ranking in the specialty generics market."

334. At the time of the acquisition, GSK supplied approximately one quarter of the world's medicinal opiate needs from poppies grown by farmers in Tasmania and, according to Fierce Pharma, transformed Sun Pharmaceutical Industries, Ltd. into one of three companies globally with a "farm-to-market" opiate business. Indeed, Sun Pharmaceutical's sales of opioid products—in terms of MMEs and DUs—peaked after 2015.

335. In terms of MMEs, Sun Pharmaceutical sold over 32.6 billion MMEs of opioid products nationally between 2006 and 2019—two-thirds of which were sold between 2015 and 2019. Its annual MMEs sold across the United States peaked in 2018 at over 5.8 billion. In terms of DUs, Sun Pharmaceutical sold nearly 2.5 billion opioid pills between 2006 and 2019—

approximately 60% which were sold between 2015 and 2019. Its annual national sales peaked in 2016 at over 358 million DUs.

336.    With respect to oxycodone, between 2009 and 2019, Sun Pharmaceutical sold over 17.5 billion MMEs of generic oxycodone nationally (over 1 billion dosage units DUs)—over 55% of which were sold between 2015 and 2019. As to hydrocodone, between 2009 and 2019 Sun Pharmaceutical sold over 5.7 billion MMEs—nearly 1.1 billion DUs—over 75% of which were sold between 2015 and 2019.

337.    Sun Pharmaceutical also re-entered the morphine market in 2015. Though it had relatively minimal sales in 2015, its sales increased exponentially between 2015 and 2016—from 20 million MMEs to nearly 750 million MMEs and 3.9% market share. Its national sales peaked the following year—at nearly 800 million MMEs and 4.8% market share.

338.    In Monterey County, Sun Pharmaceutical massively increased ins presence starting in 2015.  From 2006-2014, Sun Pharmaceutical's market share in Monterey County was just 0.26% by DU.  Shipments of Sun Pharmaceutical opioids increased from 138,000 DU and just under 1.4 million MME in 2014 to 742,000 DU and over 4.6 million MME in 2015.  By 2016, Sun Pharmaceutical accounted for over 1.4 million DU (11.5% of the market share) and over 11.6 million MME of the opioids shipped into Monterey County.  Sun Pharmaceutical's market share continued to increase through 2018 when it accounted for 14.5% of the opioids shipped into Monterey County by DU and 4.7% by MME. In the aggregate, Sun Pharmaceutical's market share in Monterey County from 2015-2019 was 9.2% by DU.

339.    From 2006 to 2019, Sun Pharmaceutical accounted for over 44 million MME of opioids and almost 39 million MME of oxycodone and hydrocodone in Monterey County.

### D.  The Opioids the Defendants Sold Migrated Into Other Jurisdictions

340.    As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state lines in a variety of ways.

341.    First, prescriptions written in one state may, under some circumstances, be filled in a different state.  But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another.

342.    When state authorities cracked down on opioid suppliers, out-of-state suppliers filled the gaps.  Florida in particular assumed a prominent role, as its lack of regulatory oversight created a fertile ground for pill mills.  Residents of other states would simply travel to Florida, stock up on pills from a pill mill, and transport them back to home to sell.  The practice became so common that authorities dubbed these individuals "prescription tourists."

343.    Along the West Coast, over a million pills were transported from the Lake Medical pain clinic in Los Angeles and cooperating pharmacies to the City of Everett, Washington.  Couriers drove up I-5 through California and Oregon, or flew from Los Angeles to Seattle.  The Everett-based dealer who received the pills from southern California wore a diamond necklace in the shape of the West Coast states with a trail of green gemstones—the color of 80-milligram OxyContin—connecting Los Angeles and Washington state.



344.    Moreover, opioids were diverted to California from as far away as Maine.  The I-95 corridor was a prominent transport route for prescription pills.  As the director of the Maine Drug Enforcement Agency explained, the oxycodone in Maine was coming up extensively from Florida, Georgia and California.

345.    Abundant evidence, thus, establishes that prescription opioids migrated between cities, counties, and states, including into California from Washington, Oregon, Arizona, and other states.  As a result, prescription data from any particular jurisdiction does not capture the full scope of the misuse, oversupply and diversion problem in that specific area.  If prescription opioid pills were hard to get in one area, they migrated from another.  The manufacturers and distributors were fully aware of this phenomenon and profited from it.

## V.    DEFENDANTS HAVE CREATED AND MAINTAINED A PUBLIC HEALTH CRISIS IN CALIFORNIA, INCLUDING MONTEREY COUNTY.

346.    California, including Monterey County, continues to face a serious public health crisis as the opioid epidemic continues to ravage the state and Plaintiffs' Community amounting to substantial health and economic impacts.

347.    ARCOS data disclosed in this MDL reveals that from 2006 to 2019 over 20.4 billion opioid pills flowed through California and almost 200 million into Monterey County alone.  The

Defendants contributed to a substantial number of these pills flowing into the state and the Plaintiffs' Community.

348.    According to ARCOS data, between 2006 and 2019, Monterey County was inundated with over 198,200,000 dosage units of prescription opioids. That is enough for each man, woman, and child in Monterey County to have 32.2 doses of prescription opioids each year.

349.    Given the sheer number of pills, and the additional red flags described above, the Defendants knew or should have known that abuse, addiction, and diversion of opioids was likely occurring in and around Monterey County, and they should have investigated, ceased filling suspicious orders and prescriptions for opioids, and reported potential diversion to law enforcement.

350.    Publicly available data suggests that the distribution of opioids to Monterey County exceeded reasonable medical use and that opioids were likely diverted into California and Plaintiffs' Community. As described above, the volume of opioids distributed by each Defendant in Plaintiffs' Community and dispensed by Albertsons is so high as to raise a red flag that not all of the prescriptions being ordered could be for legitimate medical use.

351.    In addition, the increase in fatal overdoses from prescription opioids has been widely publicized for years. The CDC estimates that for every opioid-related death, there are 733 non-medical users. Thus, the Defendants had every reason to believe that illegal diversion was occurring in Plaintiffs' Community.

352.    According to the CDC, the nation is experiencing an opioid-induced "public health epidemic." The CDC reports that over 1,000,000 people died from an overdose involving opioids from 1999 until present. Based on the latest data, approximately 3 million Americans met criteria for prescription opioid abuse and dependence in 2022. Since 1999, the amount of prescription

opioids dispensed in the United States and the number of overdose deaths involving opioids have both quadrupled.

353.    In addition to the toll on families and loved ones, opioid use imposes significant economy-wide costs. The U.S. Congress Joint Economic Committee estimates the opioid epidemic cost $1.04 trillion in 2018, $985 billion in 2019 and nearly $1.5 trillion in 2020 alone, up 37% from 2017 when the CDC last measured the cost. The rise in fatal opioid overdoses in 2022 suggests the total cost is likely to continue to increase.

## A.  The California Opioid Epidemic

354.    California has been especially ravaged by the national opioid crisis.

355.    More people die each year from drug overdoses in California than in any other state, with 10,952 Californians dying in 2022.[172] The State's death rate has continued to climb, with the CDC predicting 12,363 deaths in 2023 and 12,427 in 2024.[173]

356.    According to the California Department of Public Health, "Drug overdose contributes significantly to premature mortality and life expectancy gaps and accounted for the greatest increase in mortality in both absolute and relate terms over the past decade in California."[174] Drug-related overdoses increased 54.3% from 2009 to 2019.[175]

---

[172] CDC Drug Overdose Mortality by State, https://www.cdc.gov/nchs/pressroom/sosmap/drug_poisoning_mortality/drug_poisoning.htm (last visited August 23, 2024).

[173] CDC Provisional Drug Overdose Death Counts https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited August 23, 2024).

[174] California State of Public Health Report, Full Report 2024 at 64, https://www.cdph.ca.gov/Programs/OPP/CDPH%20Document%20Library/California-State-of-Public-Health-Full-Report-2024.pdf (last visited August 14, 2024).

[175] *Id.*

357.    In 2022, California providers wrote 13,640,794 prescriptions for opioids.[176]

358.    In just three years, between 2019 and 2021, California's opioid-related deaths spiked 121%, according to the State's health department. The vast majority of these deaths were linked to fentanyl, an extremely potent synthetic opioid.[177]

359.    The loss of each of these individuals cannot be adequately conveyed by statistics, nor can the depth and breadth of the impact on those who survive.

360.    Most overdoses from non-prescription opioids are directly related to prescription pills.[178] The CDC and other health experts have explained that many opioid users, once addicted to but no longer able to obtain prescription opioids, turn to heroin and/or synthetic opioids, particularly illicitly manufactured fentanyl, or a combination of these and other drugs.[179]

---

[176] California Dep't of Public Health, California Overdose Snapshot, 2020-Q1 through 2023-Q3 (report downloaded 8/13/24); *see* https://skylab.cdph.ca.gov/ODdash/?tab=CA.

[177] Cal Matters, *California's opioid deaths increased by 121% in 3 years. What's driving the crisis?* (July 25, 2023) https://calmatters.org/explainers/california-opioid-crisis/ last visited August 14, 2024.

[178] *See* Cal Matters, *supra*, "How did we get here?  From OxyContin to fentanyl."

[179] https://www.cdc.gov/museum/pdf/cdcm-pha-stem-uncovering-the-opioid-epidemic-lesson.pdf (last visited September 5, 2024).



361.    For example, of the 1,925 opioid-related deaths in California in 2016, fentanyl was a factor in at least 234 of them.[180] But in 2022 of the 7,385 deaths in California that were related to an opioid overdose, 6,473, or 87.6%, included fentanyl.[181]

362.    The death rate from fentanyl increased 10-fold from 2015 to 2019 while the rate of prescription opioid deaths fell 30% from 2011 to 2019.[182]  According to provisional numbers in

---

[180] Kristina Davis, "How California ranks in the nation's opioid epidemic," *The San Diego Union-Tribune* (Nov. 8, 2017) available at http://www.sandiegouniontribune.com/news/health/sd-me-opioid-conference-20171108-story.html (last visited August 15, 2024)

[181] California Overdose Surveillance Dashboard, https://skylab.cdph.ca.gov/ODdash/?tab=Home (last visited August 13, 2024).

[182] California Health Care Almanac, Substance Use in California: Prevalent and Treatment (January 2022), https://www.chcf.org/wp-content/uploads/2022/01/SubstanceUseDisorderAlmanac2022.pdf (last visited August 13, 2024).

the 2024 California State of Public Health Report, in 2022, 1,037 people died from a prescription opioid related overdose.[183]

363.    The California Department of Public Health also tracks the number of reported emergency department visits due to prescription opioids.[184]  In 2022, the last year for which information is currently available, California had 21,316 emergency department visits due to opioid overdoses[185] and 12,140 emergency department visits due to prescription opioids.[186]

364.    Even infants and children have not been immune to the impact of opioid abuse. There has been a dramatic rise in the number of infants who are born addicted to opioids due to prenatal exposure and suffer from neonatal abstinence syndrome ("NAS," also known as neonatal opioid withdrawal syndrome, or "NOWS").  These infants painfully withdraw from the drug once they are born, cry nonstop from the pain and stress of withdrawal, experience convulsions or tremors, have difficulty sleeping and feeding, and suffer from diarrhea, vomiting, and low weight gain, among other serious symptoms. When untreated, NAS can be life-threatening.

---

[183] California State of Public Health Report, Full Report 2024 at 64, https://www.cdph.ca.gov/Programs/OPP/CDPH%20Document%20Library/California-State-of-Public-Health-Full-Report-2024.pdf (last visited August 14, 2024).

[184] California Overdose Surveillance Dashboard, https://skylab.cdph.ca.gov/ODdash/?tab=Home (last visited August 13, 2024).

[185] *Id*.

[186] California State of Public Health Report, Full Report 2024 at 64, https://www.cdph.ca.gov/Programs/OPP/CDPH%20Document%20Library/California-State-of-Public-Health-Full-Report-2024.pdf (last visited August 14, 2024).

365.    NAS continues to be a problem in California, where there were 1109 infants born with NAS in 2022, for a rate of 2.7 newborns suffering from NAS per 1,000 births.[187] The rate has continued to increase from 1.1 NAS cases per 1,000 births in 2008 to 2.7 in 2022.[188]

366.    As of 2020, the opioid epidemic had cost California 24,885 lives and $4.3 billion.[189]

## B.  The Opioid Epidemic in Plaintiffs' Community

367.    The opioid epidemic has continued to wreak havoc in Plaintiffs' Community.

368.    According to data compiled by the CDC, the number of retail opioid prescriptions dispensed per 100 persons per year ("opioid prescription dispensing rate") in Monterey County between 2006 and 2018, consistently exceeded the state prescription rate.[190]  For example, in 2011, when Monterey County hit its highest opioid prescription rate of 70.2 per 100 persons, that number exceeded the California rate of 55.9.[191]

---

[187] California Department of Public Health, Maternal, Child and Adolescent Health Division, Neonatal Abstinence Syndrome, https://www.cdph.ca.gov/Programs/CFH/DMCAH/surveillance/Pages/Neonatal-Abstinence-Syndrome.aspx and raw data download (last visited August 14, 2024).

[188] *Id.*

[189] Samantha T. Pannier, *Litigating an Epidemic: California Plaintiffs in the National Opioid Litigation*, 54 Loy. L.A. L. Rev. 275 (2020).

[190] *See* U.S. Opioid Dispensing Rate Maps | Drug Overdose | CDC Injury Center (archive.org), https://web.archive.org/web/20231130223135/ https://www.cdc.gov/drugoverdose/rxrate-maps/index.html (last visited August 23, 2024) (comparing California rates to Monterey County rates over time).

[191] *Id.*

369.    The Monterey County prescription rates decreased from 50.6 in 2016[192] to 28.7 in 2019.[193] In 2022, the Monterey County prescription rate was 23.7.[194]

370.    As the volume of prescription opioids flooding into Monterey County increased from 2006 to 2011 and was higher than that for California as a whole through 2018,[195] Monterey County experienced a marked increase on indicators related to opioids misuse, including number of deaths, emergency room use, and babies born with Neonatal Abstinence Syndrome (NAS).

371.    As of the 2020 Census, Monterey County, California has a population of approximately 439,035.

372.    As the chart below demonstrates, drug overdoses in Monterey County rose from 24 in 2007, to 88 in 2022 and 109 through the first quarter of 2023:[196]

---

[192] *Id.*

[193] CDC Opioid Dispensing Rate Maps, 2019, Monterey County https://www.cdc.gov/overdose-prevention/data-research/facts-stats/opioid-dispensing-rate-maps.html#:~:text=The%20overall%20national%20opioid%20dispensing,per%20100%20persons%20in%202022 (last visited August 23, 2024).

[194] *Id.* at 2022 map.

[195] U.S. State Opioid Dispensing Rates, 2006-2018, https://web.archive.org/web/20231202165933/https://www.cdc.gov/drugoverdose/rxrate-maps/state2006.html

[196] Monterey Police Department Press Release, Narcan Now Boxes in Monterey to Save Lives (April 17, 2024), https://files.monterey.gov/News-Releases/2024/24_0417-NARCAN-Now-Boxes.pdf (last visited August 22, 2024).



373.    From 2018-2020 the leading cause of unintentional injury deaths in Monterey County was drug overdoses, accounting for almost 40% of these deaths.[197]





---

[197] 2022 Community Needs Assessment, Monterey County, California, at 72, https://www.unitedwaymcca.org/sites/unitedwaymcca/files/Community%20Health%20Needs%2 0Collaborative/2022%20PRC%20CHNA%20Report%20- %20Monterey%20County%2C%20CA.pdf (last visited August 22, 2024).

374.    In 2023, the County suffered from 211 drug overdose deaths, which is a drug overdose mortality rate of 16 deaths per 100,000 people.[198]

375.    Between 2018 and 2020, there was an annual average age-adjusted unintentional drug-related mortality rate of 15.2 deaths per 100,000 population in Monterey County.[199]

376.    In 2022, 31 people died from opioid overdoses in the County, which is 2.5 times the number who died in 2016 (12).[200] The annual age-adjusted mortality rate for 2022 was 8.53 per 100,000 residents which was a 96% increase from 2021.[201]

377.    Opioid-related overdose deaths increased 8-fold from 2018 to 2021. There were 65 opioid-related deaths in both 2020 and 2021.[202]

378.    A total of 6.1% of Monterey County adults acknowledge using an illicit drug in the past month.[203] This is three times as high as the national percentage.[204]

---

[198] County Health Rankings & Roadmaps, Drug overdose deaths, available at https://www.countyhealthrankings.org/health-data/california?year=2022&measure=Drug+Overdose+Deaths*&tab=1 (last visited August 14, 2024).

[199] 2022 Community Health Needs Assessment; Monterey County, California, at 31, 73, https://www.unitedwaymcca.org/sites/unitedwaymcca/files/Community%20Health%20Needs%20Collaborative/2022%20PRC%20CHNA%20Report%20-%20Monterey%20County%2C%20CA.pdf (last visited August 14, 2024).

[200] California Department of Public Health, *California Opioid Overdose Surveillance Dashboard*, available at https://skylab.cdph.ca.gov/ODdash/?tab=CTY (last visited August 14, 2024) (Monterey County specific page).

[201] *Id*. at downloaded Monterey County Overdose Snapshot 2020-Q2 through 2023-Q4 (last visited August 14, 2024).

[202] City of Monterey Media Advisory, "Monterey County Prescribe Safe Initiative Observes Overdose Awareness Day with Press Conference and Resource Fair," August 25, 2022, https://files.monterey.gov/News-Releases/2022/22_0825-Media-advisory-overdoses-083122.pdf (last visited September 5, 2024).

[203] *Id*. at 159.

[204] *Id*.

379.    Monterey County continues to have a high rate of infants born with NAS. In 2022 there were 41 children born with NAS, for a rate of 2.6 newborns suffering from NAS per 1,000 births.[205] The rate has increased from 1.5 NAS cases per 1,000 births from 2008-2010.[206]

380.    Opioid overdose deaths are only one consequence of the opioid crisis. Opioid addiction also results in increased emergency room visits, inpatient hospitalizations, and emergency medical technicians' administration of naloxone, the antidote to opioids.

381.    For example, opioids have been responsible for increased emergency department visits and hospitalizations in the County.  In 2022, Monterey County had 182 emergency department visits due to opioid overdoses for a rate of 42.2 per 100,000 residents, and 37 opioid overdose hospitalizations for a rate of 8.1 per 100,000 residents.[207]

382.    In 2019, an estimated two percent of the population (over 7,500 people) had an opioid use disorder,[208] up from 1% (almost 4000 people) in 2016.[209]

383.    Law enforcement in the County has been equipped with naloxone – a drug that can reverse opioid overdoses – and all of the ambulances in Monterey County are carrying it.[210] Due

---

[205] California Department of Public Health, Maternal, Child and Adolescent Health Division, Neonatal Abstinence Syndrome, https://www.cdph.ca.gov/Programs/CFH/DMCAH/surveillance/Pages/Neonatal-Abstinence-Syndrome.aspx and raw data download (last visited August 14, 2024).

[206] *Id*.

[207] California Department of Public Health, *California Opioid Overdose Surveillance Dashboard*, *supra,* (Monterey County specific page).

[208] California Opioid Use Disorder and Treatment Needs, Monterey County, 2019 Fact Sheet, https://www.urban.org/sites/default/files/2019/11/05/monterey.pdf (last visited August 14, 2024)/

[209] County Estimates of Opioid Use Disorder and Treatment Needs in California," *The Urban Institute*, March 19, 2018, available at https://www.urban.org/sites/default/files/2018/03/20/monterey.pdf (last visited August 14, 2024).

[210] Tom Wright, "Pacific Grove, Carmel police equip officers with opioid overdose antidote," *Monterey Herald*, (September 1, 2017), available at

to the "alarming" increase in overdose deaths, in April 2024, the City of Monterey and the Monterey Police Department installed free Narcan spray in boxes at key locations within the city.[211]

384.    One reason for these high numbers is the high number of prescriptions being written for opioids in Monterey County. According to the California Department of Public Health, almost 127,000 prescriptions were written in 2022,[212] which is down from 2016 when over 237,300 prescriptions were written in 2016 in Monterey County alone.[213]

385.    The sheer volume of these dangerously addictive drugs was destined to create the present crisis of addiction, abuse, and overdose deaths.

386.    While Defendants were reaping millions of dollars in profits from their wrongful conduct, the County has been required to allocate substantial public monies and resources to combat the opioid crisis and cope with its fallout.

387.    Plaintiffs have incurred and continues to incur substantial costs because of Defendants' conduct including, but not limited to, costs of increased services with respect to law enforcement and first responders; county health facilities, including clinics; detention centers and

---

https://www.montereyherald.com/2017/09/01/pacific-grove-carmel-police-equip-officers-with-opioid-overdose-antidote/ (last visited August 14, 2024).

[211] City of Monterey, Monterey Policy Department, Press release, April 17, 2024, https://files.monterey.gov/News-Releases/2024/24_0417-NARCAN-Now-Boxes.pdf (last visited August 14, 2024).

[212] California Department of Public Health, *California Opioid Overdose Surveillance Dashboard*, *supra,* (Monterey County specific page).

[213] The 2016 number is included in Plaintiffs' original complaint and was found on the Monterey County page of the California Department of Public Health's *California Opioid Overdose Surveillance Dashboard. See* Complaint at 24 n.55, previously available at available at https://pdop.shinyapps.io/ODdash_v1/.  The Dashboard, now available at https://skylab.cdph.ca.gov/ODdash/?tab=CTY, currently does not include information from 2016.

jails; county courts, including drug courts; education programs; community outreach programs; equipment and supplies; victim services supports; drug abuse prevention and education programs; inmate services including housing, health and support staff; intervention programs; and increased costs associated with its own employee benefits plan, together with general societal and lost productivity costs and costs to repair and restore County infrastructure and services.

388.    Plaintiffs have had to allocate or re-allocate extraordinary resources through staffing at departments providing all of the services listed above; has incurred substantial increases in overtime and related costs associated with educational and judicial support services.

389.    As described above, the Defendants were each responsible for a large share of the volume of prescription opioids that flowed into Plaintiffs' Community. Even amidst an epidemic, they maintained and even grew the volume of opioids they manufactured, distributed, purchased, and/or dispensed.

390.    Defendants knew or should have known about the diversion of prescription opioids in California and in Plaintiffs' Community, and the Defendants disregarded their reporting and due diligence obligations under federal and California law, causing harm to Plaintiffs' Community. Instead, Defendants consistently failed to investigate, report, or suspend illicit orders, and Albertsons consistently failed to conduct due diligence to ensure the prescriptions its was dispensing were for a legitimate medical purpose, deepening the crisis of opioid abuse, addiction, and death in California and Plaintiffs' Community.  Along with the ills described above, Plaintiffs' Community has faced a spike in addiction, abuse, and overdoses which are attributable to prescription opioids or the illicit opioids that patients often began abusing after becoming addicted to prescription opioids.

## VI.    **PLAINTIFFS' CLAIMS ARE TIMELY**

### 1.  Enforcement of a Public Right.

391.    No statute of limitation can be pleaded against the Plaintiffs, which seek to enforce strictly public rights.

### 2.  Continuing Conduct.

392.    Defendants' wrongful conduct is still ongoing and has caused Plaintiffs repeated injuries and/or a continuous injury over many years.

393.    Plaintiffs continue to suffer harm from the unlawful actions by Defendants.

394.    The continued tortious and unlawful conduct by the Defendants causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants have not ceased. The public nuisance remains unabated. The conduct causing the damages remains unabated.

### 3.  Equitable Estoppel.

395.    To the extent any statute of limitations defense would apply, Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure the public, including the State, the Plaintiffs, and Plaintiffs' Community, that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer, distributor or pharmacy status in the State and to continue generating profits. Notwithstanding the allegations set forth above, the Defendants affirmatively assured the public, including the State, the Plaintiffs, and Plaintiffs' Community, that they are working to curb the opioid epidemic.

396.    Plaintiffs exercised reasonable diligence in investigating their claims, however, they did not learn that they had been injured by Defendants' actions or the source of those injuries until only recently.   For example, the information related to the Albertsons Defendants' distribution and dispensing practices was not available to the Plaintiffs until depositions from *State of New Mexico, ex rel., Hector Balderas, Attorney General, v. Purdue Pharma L.P.*, No. D-101-CV-2017-02541, were produced in the MDL in April 2022. These documents—and the facts they contain—were not previously public, nor were they in Plaintiffs' possession, and not otherwise available to Plaintiffs before being produced in the MDL repository.  For the Aurolife Defendants and Sun Pharmaceutical, updated ARCOS data for the period 2015-2019 was produced on August 14, 2023 and updated information was provided to Plaintiffs on September 12, 2023, providing plaintiffs with access to data about the volume of opioid shipments into Plaintiffs' jurisdiction after December 31, 2014, for the first time and demonstrating that Aurolife and Sun Pharmaceutical rapidly grew their market share in Plaintiffs' Community during that latter period.  For the Indivior Defendants, the July 2019 and November 2020 False Claims Act settlements revealed Indivior's false marketing and other misconduct related to their buprenorphine products. Since these occurrences, the MDL court's moratorium on substantive filings until Plaintiffs were named a bellwether is an extraordinary circumstance that prevented Plaintiffs from adding Defendants to their case prior to now.

397.    Prior to obtaining this Albertsons discovery, the updated ARCOS data on all Defendants, and information related to Indivior from the settlements, Plaintiffs could not have known of these Defendants' role—or in the case of Albertsons the full extent of its role—in fomenting the opioid crisis or causing Plaintiffs' injuries.

398.     Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook active efforts to deceive Plaintiffs and to purposefully conceal their unlawful conduct.

399.     Defendants fraudulently concealed from Plaintiffs the existence of Plaintiffs' causes of action.

400.     Plaintiffs did not discover the nature, scope and magnitude of Defendants' misconduct, and its full impact on Plaintiffs' Community, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

401.     Defendants intended that their actions and omissions would be relied upon, including by Plaintiffs and Plaintiffs' Community. Plaintiffs and Plaintiffs' Community did not know and did not have the means to know the truth, due to Defendants' actions and omissions.

402.     Plaintiffs and Plaintiffs' Community reasonably relied on Defendants' affirmative statements, including those regarding Defendants' commitment to preventing and addressing the misuse, abuse, and diversion of opioids.

## VII.     SUCCESSOR LIABILITY

403.     To the extent that the wrongful acts or omissions alleged herein where committed or omitted by predecessor entities, their respective successor entities are liable for those acts or omissions because (1) they expressly or impliedly assumed the predecessor's liability, (2) there was a consolidation or merger of predecessor and successor, (3) the surviving entity was a mere continuation of the predecessor or (4) when the transaction is entered into fraudulently to escape liability for the debts and liabilities. To the extent there was no formal merger of predecessor and successor, the respective successor entities are also liable for the wrongful acts or omissions of their respective predecessors based on the doctrine of de facto merger based on the factors of (a) continuity of shareholders resulting from the purchasing corporation paying for the assets with

shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation; (b) cessation of ordinary business and dissolution of the predecessor; (c) assumption by the successor of liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of management, personnel, and general business operation of the predecessor. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiffs without discovery.

## VIII.    ALTER EGO LIABILITY

404.    To the extent that the wrongful acts or omissions alleged herein were committed or omitted by wholly-owned or majority-owned entities, the parent entities are liable for those acts or omissions as alter egos because (1) they dominated and controlled the wholly-owned or majority-owned entity and (2) exercised that domination and control to perpetrate a wrong or injustice. The details regarding the foregoing facts are particularly within the knowledge and control of the respective defendants charged with wrongdoing and cannot be pleaded in greater detail by Plaintiffs without discovery.

## IX.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF—CREATION OF A PUBLIC NUISANCE
### (Brought by The People against all Defendants)

405.    Plaintiff, The People, repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

406.    A public nuisance cause of action is established where a defendant knowingly created or assisted in the creation of a substantial and unreasonable interference with a public right.

Each Defendant is liable for the public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injury. *See* Restatement Second, Torts §821B. *See Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 305, 40 Cal. Rptr. 3d 313, 325 (2006) (cit. om.). The interference is substantial "if it causes significant harm and unreasonable if its social utility is outweighed by the gravity of the harm inflicted." *Id*. The causation element of a public nuisance cause of action is satisfied if the defendant's conduct is a substantial factor in bringing about the result. *People v. Conagra Grocery Prod. Co.*, 17 Cal. App. 5th 51, 101-02, 227 Cal. Rptr. 3d 499, 543 (Ct. App. 2017), *reh'g denied* (Dec. 6, 2017), *review denied* (Feb. 14, 2018).

407.    Under California law, a nuisance is "anything which is injurious to health, including but not limited to the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property." Cal. Civ. Code § 3479.

408.    California defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480.

409.    Defendants have created a public nuisance under California law.

410.    The People have standing to bring this claim to abate the public nuisance due to the opioid epidemic which was created by Defendants and which is affecting and causing harm in Plaintiffs' Community. *See* Cal. Civ. Proc. Code § 731.

411.    California Civil Code § 3490 states that "[n]o lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."

113

412.    By causing dangerously addictive drugs to flood the community, and to be diverted for illicit purposes, in contravention of federal and state law, each Defendant has injuriously affected rights common to the general public, specifically including the rights of the people of the Plaintiffs' Community to public health, public safety, public peace, public comfort, and public convenience. The public nuisance caused by Defendants' oversupply and diversion of dangerous drugs has caused substantial annoyance, inconvenience, and injury to the public.

413.    By selling dangerously addictive opioid drugs diverted from a legitimate medical, scientific, or industrial purpose, Defendants have committed a course of conduct that injuriously affects the safety, health, and morals of the people of the Plaintiffs' Community.

414.    By failing to maintain a closed system that guards against diversion of dangerously addictive drugs for illicit purposes, Defendants injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiffs' Community.

415.    In addition, by affirmatively promoting the sale and use of Suboxone in a manner that facilitated and induced doctors to prescribe its Suboxone products in an unsafe and medically inappropriate manner and rewarding corrupt providers so they would continue and even increase their illicit prescribing, including by sending patients to their practices and hiring those doctors for their speakers programs, Indivior injuriously affected public rights, including the right to public health, public safety, public peace, and public comfort of the people of the Plaintiffs' Community. The public nuisance caused by Indivior's affirmative promotion of opioids has caused substantial annoyance, inconvenience, and injury to the public. By expanding their manufacturer and sale of opioids after other manufacturers were exiting or limiting their production due to the opioid crisis,

114

Aurolife and Sun Pharmaceutical caused substantial annoyance, inconvenience, and injury to the public.

416.    Defendants' interference with the comfortable enjoyment of life in the Plaintiffs' Community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

417.    The People allege that Defendants' wrongful and illegal actions have created a public nuisance. Each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public.

418.    Defendants have negligently, intentionally and/or unlawfully created a public nuisance.

419.    The residents of Plaintiffs' Community have a common right to be free from conduct that creates an unreasonable jeopardy to the public health, welfare and safety, and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

420.    Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, promote, sell and/or dispense prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to Plaintiffs' Community, resulting in addiction and abuse, an elevated level of crime, death and injuries to the residents of Plaintiffs' Community, a higher level of fear, discomfort and inconvenience to the residents of Plaintiffs' Community, and direct costs to Plaintiffs' Community.

421.    Defendants have unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the Plaintiffs' Community and its residents.

422.    Defendants have unlawfully and/or intentionally promoted, distributed, sold and/or dispensed opioids or caused opioids to be promoted, distributed, sold and/or dispensed without maintaining effective controls against diversion.  Such conduct was illegal.

423.    Defendants have caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

424.    Defendants' conduct in illegally marketing, distributing, selling and/or dispensing prescription opioids, or causing such opioids to be marketed, distributed, sold, and/or dispensed where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally in Plaintiffs' Community is of a continuing nature.

425.    Defendants' actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

426.    A violation of any rule or law controlling the distribution of a drug of abuse in Plaintiffs' Community and the State is a public nuisance.

427.    Defendants' distribution and Albertsons' dispensing of opioids while failing to maintain effective controls against diversion was proscribed by statute and regulation.

428.    Defendants' ongoing conduct produces an ongoing nuisance, as the prescription opioids that they allow and/or cause to be illegally distributed and possessed in Plaintiffs' Community will be diverted, leading to abuse, addiction, crime, and public health costs.

429.    Because of the continued use and addiction caused by these illegally distributed opioids, The People will continue to fear for their health, safety and welfare, and will be subjected to conduct that creates a disturbance and reasonable apprehension of danger to person and property.

430.     Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon the public health, safety and welfare, and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

431.     Defendants know, or reasonably should know, that their conduct causes an unreasonable and substantial invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to person and property.

432.     Defendants are aware, and at a bare minimum certainly should be aware, of the unreasonable interference that their conduct has caused in Plaintiffs' Community. Defendants are in the business of manufacturing, marketing, selling, distributing and/or dispensing prescription drugs, including opioids, which are specifically known to Defendants to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and severe addiction. *See, e.g.*, 21 U.S.C. § 812 (b)(2). Defendants created an intentional nuisance. Defendants' actions created and expanded the abuse of opioids, drugs specifically codified as constituting severely harmful substances.

433.     Defendants' conduct in promoting, marketing, distributing, selling and/or dispensing prescription opioids which the Defendants know, or reasonably should know, will likely be diverted for non-legitimate, non-medical use, creates a strong likelihood that these illegal distributions of opioids will cause death and injuries to residents in Plaintiffs' Community and otherwise significantly and unreasonably interfere with public health, safety and welfare, and with The People's right to be free from disturbance and reasonable apprehension of danger to person and property.

434.     It is, or should be, reasonably foreseeable to defendants that their conduct will cause deaths and injuries to residents in Plaintiffs' Community, and will otherwise significantly and unreasonably interfere with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

435.     The prevalence and availability of diverted prescription opioids in the hands of irresponsible persons and persons with criminal purposes in Plaintiffs' Community not only causes deaths and injuries, but also creates a palpable climate of fear among residents in Plaintiffs' Community where opioid diversion, abuse, addiction are prevalent and where diverted opioids tend to be used frequently.

436.     Defendants' conduct makes it easier for persons to divert prescription opioids, constituting a dangerous threat to the public.

437.     Defendants' actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Because of Defendants' affirmative promotion of opioids and special positions within the closed system of opioid distribution, without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid, heroin and fentanyl overuse, abuse, and addiction that now exists would have been averted.

438.     The presence of diverted prescription opioids in Plaintiffs' Community, and the consequence of prescription opioids having been diverted in Plaintiffs' Community, proximately results in and/or substantially contributes to the creation of significant future costs to The People and to Plaintiffs' Community in order to enforce the law, equip its police force and treat the victims of opioid abuse and addiction.

439.    Stemming the flow of illegally marketed, distributed and dispensed prescription opioids, and abating the nuisance caused by the illegal flow of opioids, will help to alleviate this problem, save lives, prevent injuries and make Plaintiffs' Community a safer place to live.

440.    Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse in Plaintiffs' Community, costs that will be borne by Plaintiffs' Community and The People, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger to person and property.

441.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue to threaten the health, safety and welfare of the residents of Plaintiffs' Community, creating an atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The People have a clearly ascertainable right to prospectively abate conduct that perpetuates this nuisance.

442.    Defendants created an intentional nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid, heroin and fentanyl addiction.

443.    Defendants knew the dangers to public health and safety that diversion of opioids would create in Plaintiffs' Community; however, each of the Defendants unreasonably interfered with the public health, safety, peace and comfort of the County's residents by failing to design and operate a system that would disclose the existence of suspicious orders of controlled substances and/by failing to report and stop shipment of suspicious orders of opioids, as require by the CSA, 21 C.F.R. § 1301.74(b), and California Business & Professions Code §§ 4301 and 4164. In doing so, each of the Defendants acted with oppression, fraud and malice.

444. Defendant Albertson also unreasonably interfered with the public health, safety, peace and comfort of the County's residents by failing to ensure that it dispensed only legitimate opioid prescriptions and failing to implement effective controls and procedures to prevent diversion. *See* 21 C.F.R. §§ 1301.71(a), 1306.04(a). In doing so, Albertsons acted with oppression, fraud and malice.

445. Defendants are persons who have violated, and/or who have aided and abetted the violation of, the laws of California and/or of the United States or of any rule of the board of pharmacy controlling the distribution of a controlled substance as defined in California Health & Safety Code § 11007.

446. Defendants' conduct includes the clearly excessive furnishing of controlled substances in violation of the California Health & Safety Code § 11153.5(a) and Cal. Bus. & Prof. Code § 4301(d).

447. Defendant Albertsons' conduct includes the filling of prescriptions in the presence of factors questioning the legitimacy of the prescription or the prescriber in violation of 21 C.F.R. § 1306.04.

448. Defendants' unlawful conduct includes violating, and/or aiding and abetting the violation of federal and California statutes and regulations, including controlled substance laws, by, inter alia:

(a) Distributing, selling and dispensing opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

(b) Distributing, selling and dispensing opioids within maintaining effective controls against diversion.

(c) Choosing not to stop or suspend shipments of suspicious orders.

449. Defendants knew that prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants marketed, distributed, sold or dispensed

prescription opioids or caused such opioids to be marketed, distributed, sold or dispensed without maintaining effective controls against diversion that the opioids would be diverted, and create an opioid abuse nuisance in Plaintiffs' Community.

450.     Defendants had control over their conduct in Monterey County and that conduct has had an adverse effect on the public right.

451.     Defendants' actions also created a nuisance by acting recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable and substantial risk of harm.

452.     Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

453.     The public nuisance created, perpetuated and maintained by Defendants can be prospectively abated and further reoccurrence of such harm and inconvenience can be prevented.

454.     The People further seek to prospectively abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, substantial and persistent actions and omissions and interference with the public health, welfare, safety, peace, comfort and convenience of the Monterey community.

455.     The People, seeking to abate harms that have occurred in Monterey County, allege wrongful acts that are neither discrete nor of the sort a local government can reasonably expect.

456.     The unlawful conduct of each of the Defendants was a substantial factor in producing harm to the People, who, in this lawsuit, seek to abate harms that have occurred in Monterey County.

457.     Defendants' negligent, intentional and/or unlawful actions and omissions and unreasonable interference with a right common to the public are of a continuing nature.

458.     The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of opioid, heroin and illegally manufactured fentanyl use resulting from the Defendants' abdication of their gate-keeping and diversion prevention duties have caused harm to the entire community that includes, but is not limited to the following:

459.     The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

460.     Even children have fallen victim to the opioid epidemic. Easy access to prescription opioids made opioids a recreational drug of choice among teenagers. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

461.     Even those residents of Plaintiffs' Community who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties and fraudulent promotions. Many residents have endured and will endure both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.

462.     The opioid epidemic has increased and will increase health care costs.

463.     Employers have lost and will continue to lose the value of productive and healthy employees.

464.     Defendants' conduct created and continues to create an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury.

465.     Defendants' dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of people addicted to opioids to buy them. More prescription opioids sold by Defendants led to more addiction, with many people addicted to prescription opioids to heroin and synthetic fentanyl. People addicted to opioids frequently require increasing levels of opioids, and many are turning to heroin, fentanyl and other drugs as a foreseeable result.

466.     The diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids has increased and continues to increase the demands on health care services and law enforcement.

467.     The significant and unreasonable interference with the public rights caused by Defendants' conduct has taxed and continues to tax the human, medical, public health, law enforcement, and financial resources of the Plaintiffs' Community.

468.     The People seek all legal and equitable relief as allowed by law, other than such damages disavowed herein, including *inter alia* costs that will be associated with future efforts to abate the public nuisance in Monterey County caused in whole or in part by Defendants, as well as injunctive relief to lessen or prevent the threat of future hard from Defendants' actions.

469.     Pursuant to California Code of Civil Procedure section 731, The People request an order from the Court on behalf of The People providing for abatement of Defendants' ongoing violations of California Civil Code Sections 3479 and 3480, and enjoining Defendants from future violations of California Civil Code Sections 3479 and 3480.

470.     The People seek all other legal and equitable relief allowed by law.

471.     Each Defendant created or assisted in the creation of the epidemic of opioid use and injury and each Defendant is jointly and severally liable for abating it.

### SECOND CLAIM FOR RELIEF—PUBLIC NUISANCE
### (Brought by The County Against all Defendants)

472.     Plaintiff, The County, repeats, re-alleges, and incorporates each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

473.     As set forth above, each Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public. *See, e.g., Cty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 305, 40 Cal. Rptr. 3d 313, 325 (2006); Cal. Civ. Code §§ 3479; 3480.

474.     Defendants have created a public nuisance under California law.

475.     The County has standing to bring this claim for damages incurred to its property by the public nuisance due to the opioid epidemic which was created by Defendants and which is affecting and causing harm to The County. An action can be "brought by any person whose property is injuriously affected, or whose personal enjoyment is lessened by a nuisance, as defined in Section 3479 of the Civil Code, and by the judgment in that action the nuisance may be enjoined or abated as well as damages recovered therefor." Cal. Civ. Proc. Code § 731.  "Where a public entity can show it has a property interest injuriously affected by the nuisance, then, like any other such property holder, it should be able to pursue the full panoply of tort remedies available to private persons." *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.,* 221 Cal. App. 3d 1601, 1616, 271 Cal. Rptr. 596, 604 (Ct. App. 1990).

476.     The County has suffered harm to its property interests that is different from the type of harm suffered by the general public and has incurred substantial costs deriving from having to replace and retrofit its property that has been damaged and is being damaged by Defendants' intentional, unlawful, and reckless manufacturing, marketing, distribution, promotion, sale and/or dispensing of prescription opioids.

477.     Defendants intentionally, unlawfully, and recklessly manufacture, market, distribute, promote, sell and/or dispense prescription opioids that Defendants know, or reasonably should know, will be diverted, causing widespread distribution of prescription opioids in and/or to Plaintiffs' Community, resulting in The County having to repair and remake its infrastructure, property and systems that have been damaged by Defendants' action, including, *inter alia*, its property and systems to treat addiction and abuse, to respond to and manage an elevated level of emergencies and crime, and to respond to and treat injuries and process deaths in Plaintiffs' Community.

478.     The County owns property which has been injuriously affected by the public nuisance caused by Defendants. These property interests, include, *inter alia*, additional naloxone doses – The County owns these doses which have been and are destroyed when The County has to administer them to persons who are overdosing as a result of Defendants' intentional, unlawful, and reckless manufacturing, marketing, distribution, promotion, sale and/or dispensing of prescription opioids. The County's emergency response system and medical services equipment and other materials will similarly need to be improved and replaced because this property has been and is being damaged due to persons who are overdosing as a result of Defendants' intentional, unlawful, and reckless manufacturing, marketing, distribution, promotion, sale and/or dispensing

of prescription opioids. The County also has damage to its property related to evidence gathering and testing for the prosecution of drug related crimes.

479. In addition, The County has suffered damages to its infrastructure, which will need to be retrofitted and repaired as a result of Defendants' intentional, unlawful, and reckless manufacturing, marketing, distribution, promotion, sale and/or dispensing of prescription opioids. This damage includes damage to its law enforcement, medical and rehabilitation infrastructures and systems which are now inadequate to handle the new undue burden on these systems caused by Defendants' conduct. This includes, *inter alia*, repairing and upgrading jail facilities to add additional jail space and beds for people addicted to opioids who commit crimes as well as retrofitting the facilities to treat inmates' addictions. This also includes repairing and upgrading court systems for prosecution and defense of drug-related crimes. This also includes repairing and upgrading hospital and treatment facilities for members of Plaintiffs' Community addicted to opioids as well as property that is part of and used by The County's Department of the Sheriff-Coroner which must investigate deaths known or suspected to be due to drug intoxication.

480. The County owns, operates, manages, maintains, and otherwise has property interests in, all of which have been injured, damaged, or affected by Defendants, the following property:

481. County Jail system, including buildings, cells, beds, supplies, resources, materials, personnel, equipment, and other property.

482. County Probation system, including offices, personnel, supplies, resources, materials, equipment, and other property.

483. County District Attorney system, including offices, personnel, supplies, resources, materials, equipment, and other property.

484. County Health and Human Services system, including offices, personnel, supplies, resources, materials, equipment, and other property.

485. County Sheriff, Coroner and Law Enforcement systems, including Narcan, naloxone, offices, personnel, supplies, resources, materials, equipment, and other property.

486. County Emergency Responder system, including equipment, Narcan, naloxone, materials, supplies, personnel, offices, and other property.

487. County Public Health system, including offices, personnel, resources, supplies, equipment, materials, and other property.

488. County Public Defender System, including personnel, offices, supplies, equipment, materials, resources, and other property.

489. County Hospital System, including supplies, beds, medication, equipment, personnel, devices, facilities, and other resources.

490. As set forth above in allegations specifically incorporated herein, by selling dangerously addictive opioid drugs diverted from a legitimate medical, scientific, or industrial purpose, Defendants have committed a course of conduct that injuriously affects The County and its property.

491. The public nuisance caused by Defendants' manufacturing, marketing, distribution, promotion, sale and/or dispensing of opioids has caused substantial annoyance, inconvenience, and injury to The County and The County's property.

492. The acts by Defendants which have injured The County and its property are unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendants' actions.

127

493.     Defendants have negligently, unlawfully and/or intentionally caused and permitted dangerous drugs under their control to be diverted such as to injure the County's property.

494.     Defendants' conduct in illegally manufacturing, marketing, distributing, promoting, selling and/or dispensing prescription opioids, or causing such opioids to be manufactured, marketed, distributed, promoted, sold and/or dispensed, where Defendants know, or reasonably should know, such opioids will be diverted and possessed and/or used illegally in Plaintiffs' Community is of a continuing nature and has produced a significant injury to The County and its property.

495.     Defendants' ongoing conduct produces an ongoing nuisance.

496.     Defendants know, or reasonably should know, that their conduct will have an ongoing detrimental effect upon The County and The County's property.

497.     Defendants' actions were, at the least, a substantial factor causing the harm to The County and its property.

498.     The presence of diverted prescription opioids in Plaintiffs' Community, and the consequence of prescription opioids having been diverted in Plaintiffs' Community, proximately results in and/or substantially contributes to the creation of significant past and future costs to The County as it must repair and retrofit its property in order to enforce the law and treat the victims of opioid abuse and addiction.

499.     Defendants' conduct is a direct and proximate cause of and/or a substantial contributing factor to opioid addiction and abuse in Plaintiffs' Community, costs that will be borne by Plaintiffs' Community and The County.

128

500.     As a direct and proximate result of Defendants' creation of a public nuisance, The County has suffered and continues to suffer damages to its property requiring investigation, repair, remediation, and other costs to be determined at trial.

501.     The damages available to The County include, *inter alia*, recoupment of governmental costs, flowing from the damages to The County's property for which The County seeks to recover damages.  Defendants' conduct is ongoing and persistent, and The County seeks all damages flowing from Defendants' conduct.

502.     As a direct result of Defendants' conduct, The County and Plaintiffs' Community have suffered actual injury and damages including, but not limited to, significant expenses for repairing and retrofitting property related to police, emergency, health, prosecution, corrections and other services. The County here seeks recovery for its own harm.

503.     The County has sustained specific and special injuries because its damages include*, inter alia*, injury to the property and systems of its health services, law enforcement, and Coroner, as well as property costs related to opioid addiction treatment and overdose prevention, as described in this Complaint.

504.     The County seeks all legal and equitable relief as allowed by law, including *inter alia* compensatory damages, from the Defendants for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

### THIRD CLAIM FOR RELIEF—FALSE ADVERTISING
### Violations of California Business and Professions Code section 17500, *et seq.*
### (Against Indivior)

505.     Plaintiffs repeat, re-allege, and incorporate each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows against Indivior:

506.     This Count is brought by the People of the State. This Count is brought pursuant to Sections 17535 and 17536 of the California Business and Professions Code for injunctive relief, restitution and civil penalties.

507.     Section 17500 of the California Business and Professions Code makes it "unlawful for any person, . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, . . . in any . . . manner or means whatever . . . any statement, concerning that real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

508.     As described above in allegations expressly incorporated herein, at all times relevant to this Complaint, Indivior directly and indirectly violated Section 17500 by, *inter alia*, falsely marketing its Suboxone film product as safer and less prone to abuse, misuse and diversion than Suboxone tablets, and by making and disseminating untrue, false and misleading statements about the sale and use of Suboxone in a manner that facilitated and induced doctors to prescribe its Suboxone products in an unsafe and medically inappropriate manner.

509.     Each of Indivior's misrepresentations and omissions in connection with the sale of prescription opioids offend California's public policy, are immoral, unethical, oppressive or unscrupulous, are malicious, wanton and manifest ill will and caused substantial injury to Monterey County and its residents.

510.     As a direct and proximate result of the acts and practices alleged herein, Indivior received income, profits and other benefits that it would not have received it they had not engaged in violations of the False Advertising Law.

511.     Pursuant to Section 17535 of the California Business and Professions Code, The People request an order from this Court enjoining the Indivior Defendants from any further violations of the California False Advertising law, California Business and Professions Code §§ 17500 *et seq*.

512.     Pursuant to Section 17535 of the California Business and Professions Code, the People request restitution of any money acquired by the Indivior Defendants' violations of the California False Advertising law, California Business and Professions Code §§ 17500 *et seq*.

513.     Pursuant to Section 17536 of the California Business and Professions Code, The People request an order assessing a civil penalty of two thousand five hundred dollars ($2,500) against the Indivior Defendants for each violation of the California False Advertising law, California Business and Professions Code §§ 17500 *et seq*.

### FOURTH CLAIM FOR RELIEF—UNJUST ENRICHMENT
### (Against All Defendants)

514.     Plaintiffs repeat, re-allege, and incorporate each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

515.     Defendants have unjustly retained a benefit to The County's detriment, and the Defendants' retention of the benefit violates the fundamental principles of justice, equity, and good conscience. *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583, 1593, 80 Cal. Rptr. 3d 316, 323 (2008); *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881 (2000).

516.     As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the sales, distribution,

dispensing and purchase of opioids within Plaintiffs' Community, including from opioids foreseeably and deliberately diverted within and into Plaintiffs' Community.

517.    Unjust enrichment arises not only where an expenditure by one party adds to the property of another, but also where the expenditure saves the other from expense or loss.

518.    The County has expended substantial amounts of money in an effort to remedy or mitigate the societal harms caused by Defendants' conduct.

519.    These expenditures include the provision of healthcare services and treatment services to people who use opioids.

520.    These expenditures have helped sustain Defendants' businesses.

521.    The County has conferred a benefit upon Defendants by paying for Defendants' externalities: the cost of the harms caused by Defendants' improper sales, distribution and dispensing practices.

522.    Defendants were aware of these obvious benefits, and their retention of the benefit is unjust.

523.    The County has paid for the cost of Defendants' externalities and Defendants have benefited from those payments because they allowed them to continue providing customers with a high volume of opioid products.  Because of their conscious failure to exercise due diligence in preventing diversion, Defendants obtained enrichment they would not otherwise have obtained.  The enrichment was without justification and the County lacks a remedy provided by law.

524.    Defendants have unjustly retained benefits to the detriment of the County, and Defendants' retention of such benefits violates the fundamental principles of justice, equity, and good conscience.

525.     Defendants' misconduct alleged in this case is ongoing and persistent.

526.     Defendants' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  The County alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

527.     The County has incurred expenditures for special programs over and above its ordinary public services.

528.     By reason of Defendants' unlawful acts, The County has been damaged and continues to be damaged, in a substantial amount to be determined at trial.

529.     The County seeks an order compelling Defendants to disgorge all unjust enrichment to the County; and awarding such other, further, and different relief as this Honorable Court may deem just.

## PUNITIVE DAMAGES

530.     Plaintiffs repeat, re-allege, and incorporate each and every allegation set forth in all other paragraphs of these Supplemental and Amended Allegations to the Complaint, as well as each and every allegation set forth in all other paragraphs of its Complaint and Short Form Amended Complaint, as if fully set forth herein, and further alleges as follows:

531.     By engaging in the above-described intentional and/or unlawful acts or practices, Defendants acted maliciously towards Plaintiffs and with an intentional disregard of the Plaintiffs' rights and the safety of Plaintiffs' Community. Defendants acted oppressively, with conscious disregard for the rights of others and/or in a reckless, wanton, willful or grossly negligent manner. Defendants acted with a prolonged intentional disregard to the adverse consequences of their actions and/or omissions. Defendants acted with a conscious disregard for the rights and safety of others in a manner that had a great probability of causing substantial harm. Defendants acted

133

toward Plaintiffs with malice and were grossly negligent in failing to perform the duties and obligations imposed upon them under applicable federal and state statutes and common law.

532.    Defendants were manufacturing, marketing, distributing and/or dispensing dangerous drugs statutorily categorized as posing a high potential for abuse and severe dependence. Thus, Defendants knowingly traded in drugs that presented a high degree of danger if prescribed incorrectly or diverted to other than legitimate medical, scientific or industrial channels. Because of the severe level of danger posed by, and indeed visited upon the State and Plaintiffs' Community by these dangerous drugs, Defendants owed a high duty of care to ensure that these drugs were only used for proper medical purposes. Defendants chose profit over prudence and the safety of the community, and an award of punitive damages is appropriate as punishment and a deterrence. Punitive damages should be awarded pursuant to the common law and Cal. Civ. Code § 3294.

533.    By engaging in the above-described wrongful conduct, Defendants also engaged in willful misconduct and gross negligence and exhibited an entire want of care that would raise the presumption of a conscious indifference to consequences.

RELIEF

**WHEREFORE,** Plaintiffs respectfully pray that this Court grant the following relief:

534.    Entering Judgment in favor of The County in a final order against each of the Defendants;

535.    Declare that Defendants have created a public nuisance in violation of California Civil Code Sections 3479 and 3480;

536.    Enjoin the Defendants from performing any further acts in violation of California Civil Code Sections 3479 and 3480;

537.     Order Defendants to fund an "abatement fund" on behalf of The People for the purposes of prospectively abating the ongoing opioid nuisance;

538.     Order that Defendants compensate The County for damages to its property due to the ongoing public nuisance caused by the opioid epidemic;

539.     Declare that Indivior have made, disseminated as part of a plan or scheme, or aided and abetted in the dissemination of false and misleading statements in violation of the California False Advertising Act;

540.     Enjoining the Indivior and its employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with it, from engaging in false advertising in violation of the California False Advertising Act and ordering a temporary, preliminary or permanent injunction;

541.     Order Indivior to pay restitution to The People of any money acquired by Indivior's false and misleading advertising, pursuant to the California False Advertising Act;

542.     Order Indivior to pay civil penalties to The People of two thousand five hundred dollars ($2,500) for each act of false and misleading advertising, pursuant to Section 17536 of the California False Advertising Act;

543.     Enter a judgment against the Defendants requiring Defendants to pay punitive damages to Plaintiffs;

544.     Granting The County:

1.   The cost of investigation, reasonable attorneys' fees, and all costs and expenses;

2.   Pre-judgment and post-judgment interest; and,

545.     All other relief as provided by law and/or as the Court deems appropriate and just. Plaintiffs demand a jury trial on all issues so triable.

Date:  September 9, 2024

**RESPECTFULLY SUBMITTED,**

**COUNTY OF MONTEREY AND THE PEOPLE OF THE STATE OF CALIFORNIA ACTING BY AND THROUGH THE COUNTY OF MONTEREY'S COUNTY COUNSEL**

*/s/ John Fiske*
John Fiske
**BARON & BUDD, P.C.**
11440 West Bernardo Court, Suite 265
San Diego, CA 92127
Tel.: (858) 225-7200
jfiske@baronbudd.com

Samuel B. Beiderwell
**OFFICE OF THE COUNTY COUNSEL OF MONTEREY DEPUTY COUNTY COUNSEL**
168 West Alisal Street, 3rd Floor
Salinas, CA 93901
Tel.: (831) 755-5045
Fax: (831) 755-5283
BeiderwellSB@co.monterey.ca.us

Dan Alberstone
Mark P. Pifko
**BARON & BUDD, P.C.**
15910 Ventura Blvd., #1600
Los Angeles, CA 91436
Tel.: (818) 839-2333
dalberstone@baronbudd.com
mpifko@baronbudd.com

Russell W. Budd
Christine C. Mansour
**BARON & BUDD, P.C.**
3102 Oak Lawn Ave, Suite 1100
Dallas, Texas 75219
Tel.: (214) 521-3605
rbudd@baronbudd.com
cmansour@baronbudd.com

J. Burton LeBlanc
**BARON & BUDD, P.C.**
2600 Citiplace Drive, Suite 400

Baton Rouge, Louisiana 70808
Tel.: (225) 927-5441
bleblanc@baronbudd.com

Catherine Hancock Dorsey
**BARON & BUDD, P.C.**
2600 Virginia Ave. NW, Suite 612
Washington, DC 20037
Tel.: (202) 333-4562
cdorsey@baronbudd.com

Paul T. Farrell, Jr. (MDL 2804 Co-Lead Counsel)
Michael J. Fuller
**FARRELL & FULLER**
270 Munoz Rivera Avenue, Suite 201
San Juan, PR 00918
Tel.: (939) 293-8244
Fax: (939) 293-8245
Paul@FarrellFuller.com
Mike@FarrellFuller.com

Anthony J. Majestro
**POWELL & MAJESTRO, PLLC**
405 Capitol Street, Suite P-1200
Charleston, WV 25301
Tel.: (304) 346-2889
Fax: (304) 346-2895
amajestro@powellmajestro.com

Peter J. Mougey
Page A. Poerschke
Laura S. Dunning
Jeffrey Gaddy
**LEVIN, PAPANTONIO, PROCTOR,
BUCHANAN, O'BRIEN, BARR
& MOUGEY, P.A**.
316 S. Baylen St., Suite 600
Pensacola, Florida 32502
Tel: (850) 435-7140
pmougey@levinlaw.com
ppoerschke@levinlaw.com
ldunning@levinlaw.com
jgaddy@levinlaw.com

R. Edison Hill
James C. Peterson

Aaron L. Harrah
**HILL PETERSON CARPER BEE**
**& DEITZLER, PLLC**
500 Tracy Way
Charleston, WV 25311
Tel.: (800) 822-5667
rehill@hpcbd.com
jcpeterson@hpcbd.com
aaron@hpcbd.com

*Attorneys for Plaintiffs*

## **CERTICATE OF SERVICE**

I hereby certify on this 9th day of September, a true and correct copy of the foregoing document has been served upon all parties so registered via the Court's electronic filing system.

_/s/ John Fiske_
John Fiske