UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION <br><br> THIS DOCUMENT RELATES TO: <br><br> *Cobb County v. Purdue Pharma L.P. et al,* Case No: 18-op-45817 (Track Eight) | ) MDL 2804 <br> ) <br> ) Case No. 1:17-md-2804 <br> ) <br> ) Judge Dan Aaron Polster <br> ) <br> ) **ORDER DENYING COBB COUNTY'S** <br> ) **MOTION FOR PARTIAL SUMMARY** <br> ) **JUDGMENT** <br> ) |

Before the Court is Plaintiff Cobb County's Motion for Partial Summary Judgment (docket no. 5416/5417). Publix filed its Response (docket no. 5583), and Cobb County filed its Reply (docket no. 5613).[1] Cobb County asks the Court to: (1) expressly adopt its own prior rulings regarding distributor and dispenser duties under the Controlled Substances Act ("CSA"); and (2) find that Publix breached those duties under the CSA and the analogous Georgia Controlled Substances Act, as a matter of undisputed fact and law. For the reasons stated below, Cobb County's first request is **GRANTED** but its second request is **DENIED**.

**Legal Standard**

The Court incorporates by reference the applicable legal standard for summary judgment pursuant to Fed. R. Civ. P. 56 as set forth in its prior decision, *In re Nat'l Prescription Opiate*

---

[1] The docket numbers cited above are to the parties' notices of service. Pursuant to the Court's directions regarding filing briefs under seal (docket nos. 1719 and 1813), the parties are working towards filing appropriately redacted briefs for the public docket.

*Litig.*, MDL 2804, 2019 WL 3917575, at *1–*2 (N.D. Ohio Aug. 19, 2019) (docket no. 2483) ("*CSA Distributor Duties Order*").

**Brief Recitation of Undisputed Facts before the Court**

Publix is a privately-owned corporate supermarket chain that operates many pharmacies across eight southeastern states, including pharmacies in Cobb County, Georgia. *See* Motion at 4–5; Response at 24.

Since 2005, Publix has operated a pharmacy warehouse where it stored, and from which it distributed, various prescription drugs to its pharmacies, including Schedule III through V controlled substances. Motion at 5; Response at 31. Among the Schedule III drugs Publix warehoused and distributed were hydrocodone combination products ("HCPs"), which contain opioids. Motion at 5, Response at 31. In 2014, the DEA reclassified HCPs to Schedule II, so Publix ceased storing and distributing HCPs until it opened a new warehouse and received DEA authorization in 2016. Motion at 5–6; Response at 31.

The Controlled Substances Act requires Publix to have in place a Suspicious Order Monitoring System ("SOMS") to assess all orders it receives for narcotics, and to report suspicious orders to the Drug Enforcement Administration ("DEA"). Since 2005, Publix maintained an inventory management system that would "cut" an order for HCPs that exceeded a certain threshold. Motion at 13; Response at 34–35. That system changed over time and was ultimately replaced in 2020 with Publix's present system, which was created by a company called Order Insite. Motion at 9, 14; Response at 34–35. Publix concedes that, "[u]ntil 2018, Publix's companywide distribution operations had no suspicious orders to report to DEA." Response at 33; *accord* Motion at 14.

**Analysis**

The Court first expressly adopts and reiterates its prior rulings with respect to the legal duties of distributors and dispensers of controlled substances, as set forth by the CSA.

Although Publix expressly reserved its right to raise arguments against this Court's previous findings regarding those duties, it concedes that—pursuant to this Court's "inten[t] that its prior rulings in MDL cases will apply broadly to all other cases in the MDL," docket no 4878 at 1—Cobb County's present motion is properly analyzed under the framework of CSA duties previously articulated by this Court. *See* Response at 5. Accordingly, as it did in Track Seven, the Court hereby adopts its prior rulings regarding the nature and scope of a pharmacy's duties under the CSA. *See In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2023 WL 2974461 (N.D. Ohio Apr. 17, 2023) (docket no. 5000). The Court briefly reiterates here relevant portions of those prior rulings.

A distributor of controlled substances registered under the CSA (including pharmacies that self-distribute) has at least two fundamental duties. First, a registrant-distributor has a duty to: "(1) design and operate a system to disclose to the registrant suspicious orders; and (2) inform the DEA of suspicious orders when discovered by the registrant" (the "Reporting Requirement"). *Opiate Litig.*, 2019 WL 3917575, at *7 (docket no. 2483). Second, "when a distributor identifies an order as suspicious, it must either: (1) decline to ship it; or (2) conduct some 'due diligence.'" *Id.* at *5 (citing Discovery Ruling 12 (docket no. 1174)). "Regarding the second option, if the distributor is able to determine the order is not likely to be diverted into illegal channels, it may ship the order. Conversely, if the distributor is not able to dispel 'all red flags indicative that a customer is engaged in diversion,' it must decline to ship the order" (the "No-Shipping Requirement"). *Id.*

3

Further, as a dispenser, under the CSA's implementing regulations, "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription." 21 C.F.R. § 1306.04(a). "The corresponding responsibility to ensure the dispensing of valid prescriptions extends to the pharmacy itself." *In re Nat'l Prescription Opiate Litig.*, 477 F. Supp. 3d 613, 627 (N.D. Ohio 2020) (docket no. 3403) (quoting *Top RX Pharmacy; Decision and Order*, 78 FR 26069-01, 26082 (DEA May 3, 2013)). Accordingly, a dispenser of controlled substances registered under the CSA has, at a minimum, a legal duty to: "(1) establish corporate procedures and policies that recognize the 'corresponding responsibility' of its pharmacists and require its pharmacists to adhere to it; (2) supply its pharmacists with the tools necessary to enable them to perform their 'corresponding responsibility;' and (3) develop and utilize a system for monitoring the compliance of its pharmacists with their legal duties." *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 818 (N.D. Ohio 2022) (docket no.4295).

### A. Distributing allegations

Cobb County alleges Publix did not have a working SOMS prior to 2019. That is, Cobb County asserts Publix's inventory management system was incapable of detecting suspicious orders, which is why Publix reported none to the DEA.

The CSA's implementing regulations define a "suspicious order" as including, among others, "orders of unusual size, orders deviating substantially from a normal pattern, *and* orders of unusual frequency." 21 C.F.R. § 1301.74(b) (emphasis added). Cobb County contends Publix's inventory management system could *only* account for the *size* of an order over a certain threshold; it did not and could not at all evaluate pattern deviation or unusual frequency of those orders.

4

Moreover, Cobb County points out that, even if Publix identified an order of unusual size, it simply "cut the order to fit," without doing any investigation or due diligence. Reply at 4, n.6. The County likens Publix's system to "a tricycle missing two of its wheels." *Id.* at 4.

In Response, Publix asserts the various versions of its SOMS "have always used a combination of technology and Publix personnel to identify, review, and report [all species of] suspicious orders." Response at 12. Publix also relies on this Court's conclusions, in its *CSA Distributor Duties Order*, that adequacy and effectiveness of a SOMS, as well as the question of substantial compliance with the CSA, are significant factual issues best determined by a jury. *Id.* at 11 (citing *Opiate Litig.*, 2019 WL 3917575, at *12 (docket no. 2483)).

Publix does not dispute the CFR's definition of a suspicious order as including "orders deviating substantially from a normal pattern and orders of unusual frequency," but insists "DEA rules 'do not provide any guidance on how to apply these criteria and instead are silent as to what registrants must do to ensure that their 'systems' are compliant,'" *Id.* at 6 (quoting Publix Ex. 2 at 9–10) (Expert Rpt. of Brian Rucker). Of course, that DEA rules do not provide guidance on how to apply the regulation's frequency and pattern criteria does not relieve Publix of its obligation to do so. Publix produces scant evidence to refute Cobb County's assertion its SOMS were incapable of identifying suspicious orders based on pattern deviation or unusual frequency. Publix asserts that its inventory management system counts as a legally sufficient SOMS under the CSA because "[t]he [numerical] thresholds limited the quantity and frequency with which Publix pharmacies could order controlled substances, and were tied to the historic utilization pattern of all Publix pharmacies." *Id.* at 35. This is the only sentence in Publix's brief that directly addresses the regulation's pattern or frequency criteria as they apply to Publix's SOMS in any way.

Therefore, the issue before the Court is whether, based on the evidence before it, "a reasonable jury could return a verdict for [Publix]." *Opiate Litig.*, 2019 WL 3917575, at *2 (docket no. 2483) (quoting *Baynes v. Cleland*, 799 F.3d 600, 606 (6th Cir. 2015)).

In Track One, Plaintiffs claimed that several manufacturers' SOMS were "improperly based upon a rigid numerical formula whereby if an order did not exceed the threshold set by [the manufacturer's] numerical formula, it was not flagged as 'peculiar' and therefore not examined at all." *Id.* at *11 (internal quotations omitted). The Court denied summary judgment for the Track One Plaintiffs because the manufacturers argued their "SOMS program[s] ha[ve] always included both an algorithm and non-algorithm component and provides a specific list of the comprehensive range of additional tools, procedures, and systems used to flag potentially suspicious orders." *Id.* (internal quotations omitted).

Publix's expert, Brian Rucker, suggests similar evidence exists with respect to Publix's SOMS. He reports:

> If an order was flagged by the PIMS system, both the pharmacy manager and the pharmacy supervisor for the store at issue received an email stating as such. They would then review the flagged order to determine whether it was suspicious by reviewing relevant information, including the pharmacy's dispensing history, monthly trend reports, and manual inventory adjustment reports. Such review may also include a determination on a Threshold Change Request made by a pharmacist. During this timeframe, Publix would also conduct quarterly compliance meetings to discuss ordering trends, controlled substance distribution and training. Publix also worked to ensure that it had additional processes in place to evaluate if a Publix pharmacy engaged in a pattern of ordering more than it was dispensing.

Publix Ex. 2 at 27 (Expert Rpt. of Brian Rucker).

Although thin, the evidence produced by Publix is sufficient to create a genuine issue of material fact. Based on the evidence before it, the Court declines to conclude that no reasonable juror could find in favor of Publix. A tricycle, even with two flat tires, remains a tricycle, and it should be up to a jury to determine whether the trike still works enough for Publix to ride it.

6

**B. Dispensing allegations**

Cobb County's assertions regarding Publix's alleged dispensing deficiencies follows a similar course. For example, Cobb County asserts the evidence shows "Publix did not train its pharmacists on how to identify and resolve 'red flag' prescriptions, or how to document their due diligence efforts," Motion at 34, and "Publix failed to put systems in place that would have allowed its pharmacists to comply with their 'corresponding responsibility' to only fill legitimate prescriptions." *Id.*

In response, Publix asserts its pharmacists "undergo a two-week training" upon being hired. Response at 25 (citing Publix Ex. 5 at 19–20) (Expert Rpt. of Stefanie Ferreri). Publix further asserts it "provides its pharmacists with the Publix Pharmacy References & Procedures Guide." *Id.*

Once again, the evidence produced by Publix is weak, but sufficient to create a genuine issue of material fact. Cobb County asserts there was no training and no policies in place. Publix presents evidence that at least *some* training was conducted, and *some* policies were in place, and argues these enabled its pharmacists to fulfill their corresponding responsibility. The determination of whether the training and policies were sufficient to substantially comply with the CSA is best left to a jury.

**Conclusion**

Based on the evidence presented with Cobb County's Motion for Partial Summary Judgment, the Court declines to take the issue out of the hands of a jury. Publix is entitled to defend its SOMS and dispensing policies at trial.

Accordingly, the Court adopts its prior rulings with respect to distributor and dispenser duties under the CSA, but Cobb County's motion for summary judgment that Publix breached those duties is **DENIED**.

**IT IS SO ORDERED.**

    /s/ Dan Aaron Polster  September 20, 2024
**DAN AARON POLSTER**
**UNITED STATES DISTRICT JUDGE**