```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3    ------------------------------X
      IN RE:                        :   Case No. 1:17-md-2804
 4                                  :
      NATIONAL PRESCRIPTION         :   (Pages 1 - 27)
 5    OPIATE LITIGATION             :
                                    :
 6    THIS DOCUMENT RELATES TO:     :   September 23, 2024
                                    :   11:11 a.m.
 7    City of Rochester v. Purdue   :
      Pharma, L.P.,                 :
 8    No. 19-op-45853 (Track 12)    :
      ------------------------------X
 9

10

11

12
                    (Held via Zoom videoconference)
13
              TRANSCRIPT OF STATUS CONFERENCE PROCEEDINGS

14         HELD BEFORE THE HONORABLE DAN AARON POLSTER

15             SENIOR UNITED STATES DISTRICT JUDGE

16

17
      Official Court Reporter:
18
                         Donnalee Cotone, RMR, CRR, CRC
19                       Realtime Systems Administrator
                         United States District Court
20                       801 West Superior Avenue
                         Court Reporters 7-189
21                       Cleveland, Ohio 44113
                         216-357-7078
22                       donnalee_cotone@ohnd.uscourts.gov

23

24    Proceedings recorded by mechanical stenography; transcript

25    produced by computer-aided transcription.
```

```
 1    APPEARANCES:

 2

 3    For Plaintiffs' Executive Committee (PEC):

 4                              PETER H. WEINBERGER, ESQ.
                               Spangenberg, Shibley & Liber
 5                             1001 Lakeside Avenue, Suite 1700
                               1900 East Ninth Street
 6                             Cleveland, Ohio 44114
                               216-696-323
 7
                               JUSTIN PRESNAL, ESQ.
 8                             Simmons Hanly Conroy
                               5216 Cascades Drive
 9                             College Station, Texas   77845
                               855-625-6150
10
                               JAYNE CONROY, ESQ.
11                             LAURA FITZPATRICK, ESQ.
                               Simmons Hanly Conroy
12                             112 Madison Avenue, 7th Floor
                               New York, NY 10016
13                             866-912-3563

14                             FRANK L. GALLUCCI, III, ESQ.
                               Plevin & Gallucci
15                             2222 Illuminating Bldg.
                               55 Public Square
16                             Cleveland, OH 44113
                               216-861-0804
17
                               LEILA AYACHI, ESQ.
18                             The Lanier Law Firm
                               10940 W. Sam Houston Pkwy N
19                             Suite 100.
                               Houston, TX   77064
20                             713-659-5200

21                             ANTHONY D. IRPINO, ESQ.
                               Irpino Avin Hawkins
22                             2216 Magazine Street
                               New Orleans, LA 70130
23                             504-525-1500

24

25
```

```
 1     APPEARANCES (Cont'd):

 2

 3     For Plaintiffs' Executive Committee (PEC):

 4                              ANTHONY J. MAJESTRO, ESQ.
                               Powell & Majestro
 5                             Suite P1200
                               405 Capitol Street
 6                             Charleston, WV 25301
                               304-346-2889
 7

 8     For OptumRx, Inc:
                               BRIAN D. BOONE, ESQ.
 9                             EMILY C. MCGOWAN, ESQ.
                               BRANDON C.E. SPRINGER, ESQ.
10                             Alston & Bird
                               Suite 300
11                             Vantage South End
                               1120 South Tryon Street
12                             Charlotte, NC 28203-6818
                               704-444-1106
13
                               D. ANDREW HATCHET, ESQ.
14                             BRADLEY HARDER, ESQ.
                               CAROLINE R. STRUMPH, ESQ.
15                             Alston & Bird
                               1201 West Peachtree Street NW
16                             Suite 4900
                               Atlanta, GA 30309
17                             (404) 881-7000

18                             BRADLEY M. SMYER, ESQ.
                               Alston & Bird
19                             Chase Tower
                               2200 Ross Ave.
20                             Suite 2300
                               Dallas, TX  75201
21                             (214)922-3400

22

23

24

25
```

```
 1    APPEARANCES (Cont'd):

 2

 3    For Express Scripts, Inc.
      and ESI Mail Pharmacy
 4    Service, Inc.:

 5                              JONATHAN G. COOPER, ESQ.
                               MATTHEW K. WASSERMAN, ESQ.
 6                              MICHAEL J. LYLE, ESQ.
                               Quinn Emanuel Urquhart & Sullivan,
 7                              LLP
                               Suite 900
 8                              1300 I Street NW
                               Washington, DC 20005
 9                              202-538-8000

10                              PATRICK J. KING, ESQ.
                               Quinn, Emanuel, Urquhart &
11                              Sullivan, LLP
                               Suite 500
12                              711 Louisiana Street
                               Houston, TX 77002
13                              713-221-7222

14                              ALEXANDER ZENDEH, ESQ.
                               Quinn, Emanuel, Urquhart &
15                              Sullivan, LLP
                               3512 Highland View Drive
16                              Austin, TX 78731
                               737-667-6123

17

18                              ANTHONY P. ALDEN, ESQ.
                               SAGE R. VANDEN HEUVEL  ESQ.
19                              Quinn Emanuel Urquhart & Sullivan,
                               LLP
20                              10th Floor
                               865 S. Figueroa Street
21                              Los Angeles, CA 90017
                               213-443-3000

22

23                              DAVID M. GRAHAM, ESQ.
                               Quinn, Emanuel, Urquhart &
24                              Sullivan, LLP
                               3100 McKinnon St, Suite 1125
25                              711 Louisiana Street
                               Dallas, TX 75201
                               469-902-3600
```

```
 1    APPEARANCES (Cont'd):

 2
      For Express Scripts, Inc.
 3    and ESI Mail Pharmacy
      Service, Inc.:
 4
                              HALEY PLOURDE-COLE, ESQ.
 5                            Quinn Emanuel Urquhart & Sullivan,
                              LLP
 6                            22nd Floor
                              51 Madison Avenue
 7                            New York, NY 10010
                              212-849-7000
 8
                              OLGA M. VIEIRA, ESQ.
 9                            Quinn Emanuel Urquhart & Sullivan,
                              LLP
10                            Suite 1550
                              2601 South Bayshore Drive
11                            Miami, FL 33133
                              305-496-2988
12

13    For the City of Rochester,
      NY:
14
                              SALVATORE C. BADALA
15                            SHAYNA E. SACKS, ESQ.
16                            Napoli Skholnik PLLC
                              360 Lexington Avenue
17                            11th Floor
                              New York, NY 10017
18

19    ALSO PRESENT:          David R. Cohen, Special Master
                              Andrew Rivera
20                            A. Scott Loge
                              Michael Borden
21                            Helen Norton
                              Rachel Bernard
22

23
                        - - - - -
24

25
```

MORNING SESSION, Monday, September 23, 2024
(Proceedings commenced at 11:11 a.m.)
- - -

THE COURT:  All right.  Good morning, everyone.  Thanks for getting available.

This is a status call in MDL Number 2804 with the PEC and at two PBMs.

Thank you for the status reports, which I've read carefully.  I appreciate everyone's hard work focusing on Webb County to determine if it makes sense to continue with that case as a bellwether.

These are my thoughts.  I don't know at the end of the day whether there are any significant documents that have been destroyed that haven't -- that can't be found elsewhere.  And it's going to be some time and a whole lot of time and money down the road whether we know that.

And the PBMs are convinced that there are important documents that are missing and can't be located elsewhere.

This was one of their -- this was one of their cases.  So I'm starting from the premise that they're not trying to tank Webb County.  I mean, they -- you know, the PBMs picked Webb County as a bellwether.  So unless something unusual has happened in the other -- the rest of the discovery, I don't know why they'd want to tank that case.  I assume they really believe that there are important documents that they'll not be able to find.

1        I don't think it makes sense to keep devoting a lot of

2    resources to Webb County, and so my strong feeling is to

3    ditch it.

4        And this is my suggestion.  We have one other

11:13:17  5    bellwether that was the plaintiffs' pick, so we need a

6    defendants' pick.  So my suggestion is first that the PEC --

7    I know you've looked at this already, but -- to double-check

8    and then certify which of the remaining original PBM cases

9    won't have any document retention destruction issues.  And

11:13:45 10    then out of that list, PBMs pick two.  The only condition

11    will be, they need to be from circuits other than the Second

12    because the remaining bellwether is in the Second Circuit,

13    Rochester, New York.

14        So the PBMs pick two, and then the plaintiffs strike

11:14:06 15    one.  So we'll have one defendants' pick along with

16    Independence, and we'll -- with Rochester, and we'll go

17    forward with two.  And the parties will quickly come up with

18    a CMO and start up with that one.

19        So I just think -- this is the most effective way to

11:14:29 20    go and not waste a lot of time and money, and move forward.

21        And the idea is that throughout the discovery process,

22    the parties may learn enough to be able to settle this, come

23    up with a global settlement.  But if not, we'll try a couple

24    of cases, some other judges will try a couple of cases, and

11:14:51 25    we'll see how they shake out.

1        So, you know, I've got some very smart lawyers

2   attending, so I'd like to hear from everyone on what you

3   think.

4               MR. WEINBERGER:   Judge, this is

11:15:04  5   Peter Weinberger on behalf of the PEC.

6        I appreciate your analysis and your thoughts very

7   much.

8        Here's our concern.  You know, I think you -- while

9   you expressed concerns the last time about the bellwethers,

11:15:24  10   you also said that, you know, document retention issues

11   are -- it's never perfect.  There's always going to be some

12   problems.  And I am very concerned about coming away from

13   this hearing with your solution that you suggested with the

14   precedent that has been set.

11:15:49  15        So David Ackerman and James Hannaway are my colleagues

16   who have -- are really into the weeds, and, you know, as you

17   saw from the deposition, they're the ones that prepared the

18   witness and the 30(b)(6) witness and attended.

19        And I have to tell you that, you know, when you --

11:16:15  20   when the defense talks about 100 boxes of documents, I think

21   if you sorted -- if one sorted through those hundred boxes

22   to try to come up with analysis as to whether or not this is

23   really significant to their defenses, I think you would find

24   in the final analysis that it is not and wouldn't be.

11:16:44  25        And for no other reason but the fact that for really

1    relevant years, from 2010 to the present, the department --

2    the documents from these departments whose boxes of hard

3    copy documents were destroyed, are in existence.  And as the

4    Court well knows, while the epidemic began to occur in 2002

11:17:16  5    and ran through 2008 and '9, the peak of the epidemic was

6    really in 2011 and 2012.

7        And as the Court will recall, this phase of the

8    importance of prescription opioid pills being diverted, you

9    know, causing the epidemic, then transitioned into the fact

11:17:40  10    that people were transitioning from prescription opioid

11    pills to street drugs because the cost of street drugs was

12    so much less.

13        Here's my point.  My point is that while there are

14    documents that don't exist for some three or four years

11:17:59  15    prior to 2010, the documents that -- and assuming that these

16    departments have relevant documents, the documents that do

17    exist give the defendants the full opportunity to use what

18    they think might be relevant for their defenses.

19        And, you know, there has been a lot of work that's

11:18:23  20    been put in.  You know, there's still a lot of documents

21    that have to be produced.  And I just want the record to

22    reflect, Your Honor, that we are not concerned that this

23    defense pick is problematic.  You know, we believe that at

24    the end of the day, the defense is going to have what they

11:18:48  25    need in terms of relevant documents.

1    You know, having been the trial lawyer on a couple of

2    the cases, I just want to reiterate that, you know, I

3    haven't seen the defendants use these kinds of documents to

4    any great extent in the defense of their cases, and indeed,

11:19:10  5    there are -- were many occasions when you found, for

6    example, arrest records not to be relevant to a particular

7    defense, either from the plaintiffs' perspective or from the

8    defense perspective.

9    So, you know, I appreciate your analysis, and, you

11:19:30 10    know, we're prepared to follow your lead.  But at the same

11    time, we -- I want you to know on behalf of the PEC and

12    counsel who represent Webb County that, you know, we're

13    prepared to run the risk because we don't think the risk is

14    very great, and we're prepared for this defense pick to go

11:19:52 15    forward.  And so, you know, that's our position.

16    I appreciate the opportunity, Your Honor.

17    THE COURT:  All right.  Thanks, Pete.

18    And, you know, well, what are the -- you know, I

19    assume the defendants are -- you know, your position is we

11:20:12 20    should not go forward with Webb County.  But I guess --

21    I mean, I think Pete's captured it correctly.  The

22    issue is, you know, there may be documents, you know, 2007,

23    '8 and '9 that aren't there and can't be retrieved.  It's

24    hard to imagine someone winning or losing this case based on

11:20:38 25    a 2007 document unless it's some unbelievable smoking gun,

1    and it would likely be for the plaintiffs.

2         I'm trying to think what could be really critical from

3    2007/2008 that the defendants would want and how you would

4    use it.

5              MR. BOONE:  Your Honor, this is

6    Jonathan Cooper for the Express Scripts defendants.

7              THE COURT:  Yes, Jonathan.

8              MR. BOONE:  A few things to say about this.

9         So first of all, my understanding -- and my colleague

10   Anthony Alden is on as well, and he took the deposition and

11   can jump in if I get any of the details wrong.

12        But my understanding is the destruction, first of all,

13   was not limited to documents from just those years, and more

14   fundamentally, the plaintiff doesn't know what documents

15   were destroyed.  At the deposition, the deponent testified

16   repeatedly he couldn't confirm what was destroyed.  We have

17   certain logs of what was systematically shredded.  But the

18   deponent wasn't able to confirm what was in those boxes, and

19   also testified that there could have been documents

20   destroyed that weren't covered by any logs.

21        So the concern from our perspective is we don't know

22   what was destroyed.  We have a sense of some things

23   destroyed, but it's certainly not the entire universe.

24        And, you know, to address Mr. Weinberger's concern,

25   our approach to this has never been that the litigation hold

1    had to be perfect.  Our position was, you had to have a

2    litigation hold.  That's a basic duty that the plaintiffs

3    breached and breached for six years.  That is not a minor

4    slipup.  You know, it's one thing if there's a litigation

11:22:21  5    hold in place, and, you know, a particular document gets

6    destroyed inadvertently, a particular person is not added to

7    do the hold.  Minor things like that, we wouldn't be here.

8    This is about six years of failing to comply with one of the

9    most basic duties of a lawyer, and the systematic shredding

11:22:36  10   of documents, the contents of which we don't know.

11        So, you know, to Your Honor's point, we didn't take

12   this decision lightly.  And we discussed it, I can tell you,

13   very significantly internally about whether we wanted to

14   proceed with the case despite all of these issues.  And our

11:22:52  15   concern is that given all the things we don't know about

16   what's been destroyed, it's not going to be a viable

17   bellwether that can stand as a representative for the other

18   cases.  And so to Your Honor's point, I think our view is,

19   yes, we believe Webb should not remain a bellwether.

11:23:12  20       I wanted to note also that -- Your Honor suggested

21   picking ultimately one additional bellwether.  I can tell

22   you from my client's perspective, our view is that it would

23   make sense to ultimately end up with three additional

24   bellwethers, go back to four, the way it was at the start.

11:23:29  25   I don't know if that's the view of everyone, but that is our

1    client's view.  We could certainly start, I think, with the

2    approach, Your Honor, laid out.  But we think it would

3    probably make sense to get back up to four.

4              MR. ACKERMAN:  Your Honor, this is

11:23:45  5    David Ackerman for the PEC, if I may respond.

6         I think this statement that they don't know what was

7    destroyed is a little bit of hyperbole given the deposition

8    testimony.  Because what the deposition testimony

9    established, first of all, with respect to emails and

11:24:06  10    electronic documents, was that is nothing was destroyed, was

11    that the county had backup tapes dating back to 1999, that

12    as a result of a technology change in 2017, old email

13    accounts weren't deleted, and so information had been

14    migrated and was available, and, in fact, we provided

11:24:30  15    defendants with a pretty significant list of almost 100

16    people for whom emails were available.

17         So what we're talking about here are hard copies, and

18    what the county has are what are called disposition logs.

19    And these are logs from the county's record management

11:24:48  20    center that reflect requests to shred because the retention

21    period for certain documents had expired.  And each of those

22    logs lists the box, and the boxes have labels on them.  And

23    so the only way to say we don't know what's in the boxes is

24    to proceed from an assumption that the labels on the boxes

11:25:08  25    were somehow incorrect, which is quite a leap to make.

1       And when the witness says he doesn't know what's in

2   the boxes, he was admitting he didn't look in the boxes

3   before they were shredded because they had been shredded a

4   couple of years ago.  But he knew what the content -- what

11:25:27  5   the content labels of the boxes said.  And a number of the

6   content labels of the boxes indicate that those boxes had

7   purely irrelevant material.

8       The disposition logs -- and when defendants complain

9   about hundreds of boxes, they are including in that count

11:25:41 10   cash reports for the county's golf course, boxes that

11   included invoices for Time Warner and Verizon, boxes that

12   were labeled kitchen invoice, boxes regarding programs to

13   assist residents with their payment of their utility bills,

14   check requests, and files for individuals who were denied

11:26:04 15   treatment by the public health department.  None of that's

16   going to come up in trial.

17       And, in fact, you know, one of the things that was

18   particularly striking to us is that there is an agency of

19   the county called the Community Action Agency.  And in

11:26:26 20   defendants' submission, they refer to "client files relating

21   to referrals for health-related issues."  But that's not

22   what these documents are at all.  The Community Action

23   Agency is this agency that helps county residents who are

24   having trouble paying their water or their electric bill.

11:26:46 25       And what the witness testified was that those programs

1    that this Community Action Agency runs don't relate to

2    healthcare, that the Community Action Agency doesn't ask

3    questions about healthcare treatment in its intake process,

4    and that the Community Action Agency maybe makes one to two

11:27:04  5    referrals related to health concerns.  And that only happens

6    when somebody volunteers in an initial interview that they

7    might need help in that respect.  And the person couldn't

8    remember any such referrals related to opioids.

9         But if there's any doubt about these Community Action

11:27:23 10    Agency files, you know, the parties are still producing

11    documents in this action.  We'll go back and pull more

12    recent Community Action Agency files and produce them, and

13    they can see whether they're going to use them.

14         And we, as Mr. Weinberger said, we are willing to take

11:27:40 15    that risk because we don't think there's much of one.  That

16    the defendants are not going to at trial be putting out

17    files from people who come to the county because they need

18    help paying their water bill.  It's just not a relevant

19    record.

11:27:54 20         You know, the remaining documents -- and we went

21    through this in our status report, Your Honor.  I don't know

22    how much detail you want me to go into, but we believe the

23    remaining documents have analogues.  They have backups.  And

24    when you're talking about sheriff's case reports, the

11:28:09 25    defendants will have ten years of case reports to work from

1      from 2010 forward.

2           When you're talking about the county's indigent health

3      program, the testimony is that that health program had a

4      computer system from 2005.  And so relevant information from

11:28:28  5      the case files was input into that computer system beginning

6      in 2005.  And then in 2019, they started imaging the actual

7      documents.

8           Now, the case files that are in these disposition logs

9      relate only to 2019.  So there's -- you know, it was a --

11:28:47 10      they started -- the program started imaging files in

11      February of 2019.  So there's an 11th, 12th chance for each

12      of those documents -- or each of those boxes that the

13      documents already exist in the county's computer files.

14           You know, I can go on, Your Honor, but in summary --

11:29:06 15           THE COURT:  Well, look, I -- as I said, I

16      think there's a small chance that anything -- anything --

17      that anything was destroyed that can't be, you know,

18      obtained in some other way that would prejudice either of

19      the defendants.  But the problem is, they think -- their

11:29:33 20      concerned about it, we're going to spend a whole lot of time

21      and money over this, and there was no litigation hold put

22      in -- all right -- on.

23           And so I just -- since we have only one other

24      bellwether, the defendants are entitled to have one, to have

11:29:49 25      a bellwether that defendants are going to say right off the

1    bat, well, we're not going to credit, why do it?

2         I don't think we have the time or money to go with

3    four.  But I don't want to just have one.  So I think we

4    should go ahead and get a Second one.  And I just want the

11:30:09  5    plaintiff to certify that a litigation was put in -- a

6    litigation was put in place timely, all right?

7         As defendants said, no litigation hold is perfect.

8    There're always going to be slipups, okay, but if you didn't

9    have one, you didn't have one.  And that's why we've had to

11:30:30  10   spend all this time on Webb County because there wasn't one

11   in place.

12         So I think we should do this.

13         So how long will it take for the plaintiffs to go

14   through the remaining original PBM cases?

11:30:48  15        My recollection, there was a total of about 80.  We

16   obviously have gotten -- so we're talking roughly 75 cases,

17   and simply certify whether a timely litigation hold was put

18   in place, you know, shortly after the case was filed,

19   whenever that was.

11:31:07  20        How long will that take?

21             MR. WEINBERGER:  Your Honor, this is

22   Pete Weinberger again.

23         I would think that if you give us about two weeks.

24             THE COURT:  Okay.  That's fine.

11:31:19  25        So we'll just make it two weeks from today, which

```
 1    would be October 7th.  So let's just say 4:00 p.m.,

 2    October 7th.

 3         All right.  Then the defendants will jointly pick two.

 4    I mean, I don't care, you know, if each of you pick one, you

 5    jointly pick two, you figure it out.  You come up with two

 6    out of those, however many there are.  And the only

 7    criterion is, they should both be circuits other than the

 8    Second.  So we'll end up with two different circuits.

 9         So you tell me -- you're going to get the list on the

10    7th.

11         How long do you want to pick your two?

12              MR. BOONE:  Your Honor, this is Brian Boone

13    for OptumRx.

14         I think two weeks after that would suffice.

15              THE COURT:  Okay, Brian.  So that would make

16    it 10-21 at 4:00 p.m.

17         And then the plaintiffs will strike one of the two.  I

18    would think one week would be sufficient for that.

19         Don't you agree, Pete?

20              MR. WEINBERGER:  Yes, Your Honor.

21              THE COURT:  All right.  We'll make it 10-28 at

22    4:00 p.m.  Plaintiffs will strike one, and so we'll be left

23    with bellwether Number 2.

24         And then I would think in two weeks the parties should

25    be able to propose a joint CMO.  I mean, you don't have to
```

1    reinvent the wheel.  You should simply, I think, follow the

2    one you used for Rochester.  I mean, I don't think there

3    should be any real deviations, but I'll give two weeks to

4    come up with that.

11:33:13  5    So that would be November 11th.  But that's a federal

6    holiday.  So we'll just make it November 12th at 4:00 p.m.

7    File a joint CMO, and then you can start up with that one.

8    Okay.  The last thing I want to know, I assume -- so

9    there was some merits -- obviously, there's been a lot of

11:33:55 10    merits discovery on Rochester and maybe a little on Webb.

11    Has either side uncovered anything significant,

12    shedding light on what I always felt was the most important

13    allegation the plaintiffs made?

14    Plaintiffs have alleged that the two PBMs work very

11:34:19 15    closely with Purdue and the other manufacturers in

16    aggressively marketing these prescription opioids.  That was

17    their claim.

18    I'd like to know, you know, have you learned much, you

19    know, that sheds any light on whether the plaintiffs are

11:34:36 20    correct with that allegation?

21    MR. BOONE:  This is Brian Boone again from

22    OptumRx.

23    There is no evidence showing that, period.

24    THE COURT:  Well --

11:34:51 25    MR. WEINBERGER:  Sorry for my reaction, but --

1                    THE COURT:  All right.  Well --

2                    MR. WEINBERGER:  -- that's just not --

3                    THE COURT:  I just want to know what you -- if

4         you've learned any -- I mean, maybe you've not even gotten

11:35:01  5    that far, all right?  I don't know.  But to me, that was the

6         most significant allegation in the plaintiffs' complaint.

7              Yes, there're allegations about the PBMs as mail-order

8         pharmacies, that you didn't have the -- you know, a good red

9         flag program.  But I'm not even -- you know, to me, the

11:35:20  10   heart of this case, I think, is the allegation that the PBMs

11        worked closely with the manufacturers in aggressively

12        marketing these prescription opioids as being safe and

13        effective for long-term pain, which was the heart of the

14        case against the manufacturers.

11:35:39  15        So I just want to know if anyone's learned much on

16        that.  It may be premature.  I'm just curious.

17                   MR. WEINBERGER:  It's a bit premature,

18        Your Honor, but I can assure you that we are -- we are

19        actively pursuing discovery in that regard.  And we have

11:36:00  20   documents that reflect that divisions, or companies that

21        were purchased by the PBMs, were actively involved as early

22        as 2001 and 2002 in assisting or in preparing programs to

23        assist Purdue in educating doctors using the same claims

24        about OxyContin, and about opioids in general, i.e., that

11:36:34  25   they're rarely addictive, that they're effective, that you

1    can use them at increasing levels of milligram of dosage,

2    and that any patient who feels like a smaller dosage is not

3    effective can be given a larger dosage, and that that's not

4    addiction, that's called pseudoaddiction.

11:37:02  5        The documents exist.  We haven't yet --

6                    THE COURT:  All right.

7                    MR. WEINBERGER:  -- taken any depositions of

8    either -- of anyone, frankly, let alone Purdue people or

9    individuals involved with these defendants --

11:37:18 10                    THE COURT:  Okay.

11                    MR. WEINBERGER:  -- to determine the extent

12    and nature, but --

13                    THE COURT:  All right.  Well, as I said, I

14    want -- I want everyone to keep their eyes open on this and

11:37:33 15    consider the possibility of coming up with some resolution.

16        I mean, my guess is, all right -- I mean, remember, we

17    started out with this stark -- you know, starkly diametric

18    thing.  The plaintiffs saying the PBMs were terrible.  The

19    PBMs saying not only aren't we defendants, we should be

11:37:54 20    plaintiffs.

21        So my guess is, the truth is somewhere in the middle,

22    as it has been with all the other defendants in this

23    constellation of cases.

24        So just keep your eyes open while you're pounding away

11:38:11 25    as to the -- as the end game, so . . .

1           And if you ever want my help, or Special Master

2   Cohen's help, or Michael Borden's help, let us know.

3           All right.  I think we've covered what we need to

4   cover.

11:38:29 5           And anything else anyone wants to raise?

6                   MR. COOPER:  Your Honor, this is

7   Jonathan Cooper for Express Scripts.

8                   THE COURT:  Yes.

9                   MR. COOPER:  I have two housekeeping items.

11:38:40 10                   THE COURT:  Okay.

11                   MR. COOPER:  One is that the parties jointly

12   submitted, I believe on Friday, a stipulation to extend by

13   two weeks the deadline to answer the complaint in Rochester.

14   And that was a joint submission by the parties unopposed.

11:38:54 15           So we'd be grateful if Your Honor would enter that

16   when you have time.

17                   THE COURT:  All right.  Yeah.  We'll do that.

18           So when is the current answer deadline, Jonathan?

19                   MR. COOPER:  It would have been today.

20                   THE COURT:  Oh.  All right.

21                   MR. COOPER:  Yeah.

22                   THE COURT:  All right.  All right.  So it can

23   be extended two weeks, which would make it --

24                   MR. WEINBERGER:  I think the stipulation,

11:39:19 25   Your Honor, says October 7th.

1        Jonathan, am I correct about that?

2               MR. COOPER:  I believe that's correct.  Two

3    weeks from today.

4               THE COURT:  All right.  All right.  That's

11:39:28 5    granted.  So we'll grant that.

6               MR. COOPER:  Thank you, Your Honor.

7        And then the second housekeeping item is that on

8    Friday evening we received letters from the PEC, both on

9    behalf of the Government plaintiffs and the third-party

11:39:41 10   payor plaintiffs, in response to letters we sent about

11   plaintiff fact sheets.  And there are two separate issues

12   here that I just want Your Honor to be aware of.

13        The first is, the TPP plaintiffs are refusing to

14   provide fact sheets to the PBMs for plaintiffs who are

11:39:59 15   seeking leave to amend against the PBMs.  They're just

16   categorically refusing to give us those plaintiff fact

17   sheets without an order from Your Honor.

18        And so, we can tee that up as a motion if we need to.

19   That's something that we're concerned about.

11:40:13 20              MR. WEINBERGER:  Let me make a suggestion,

21   Your Honor.

22        First of all, the TPP lawyers are not on this call.

23              THE COURT:  Yeah, they're not on the call,

24   so . . .

11:40:22 25              MR. WEINBERGER:  And, yes.  And as to the

1    subdivisions, Your Honor, I, on behalf of the PEC and the

2    subdivisions, sent a letter to counsel for the defendants

3    with respect to the PFS issues.

4         I would suggest that this is probably a matter that,

11:40:41  5    number one, we should talk about.

6         And secondly, that we should probably address with

7    Special Master Cohen.

8              THE COURT:  Yeah.  Let's do that.

9         And why don't you discuss it and address it with

11:40:56 10    Special Master Cohen.  And if it requires a court order,

11    I'll issue one.  And, obviously, someone needs to talk to

12    the TPP lawyers.  I mean, if they --

13              MR. WEINBERGER:  I'll take care of that,

14    Your Honor.

11:41:10 15              THE COURT:  I mean, if they -- I mean -- I

16    mean, first, I haven't granted -- you know, there may be --

17    you know, the whole issue about amending complaints, I --

18    you know, we have proposed amended complaints, but I haven't

19    granted any.  But certainly, anyone -- if I would allow

11:41:30 20    someone to add a defendant, they would have to, you know, do

21    the fact sheet.  So I'm just not sure of the timing of it.

22              MR. WEINBERGER:  Well, that's exactly our

23    point, Your Honor, without arguing it too much in front of

24    you.  You know, we think that this is the cart before the

11:41:45 25    horse, and that --

1          THE COURT:  Yeah.  I might not even -- I mean,

2     I haven't granted anyone's leave to amend a complaint to add

3     anyone, all right?

4          I mean, at the end of the day, I'll have to make a

11:41:58  5     decision if there's, you know, opposition from the

6     defendants to being added, I'll have to -- you know, I'll

7     have to weigh all the factors.  I haven't granted any -- you

8     know, I haven't permitted any amendments to be made.  I've

9     let people file the proposed amended complaints so everyone

11:42:19 10     could see, all right, this is what the plaintiffs want to do

11     and who they want to add, and so the defendants could, if

12     they want to, oppose it.  I'll have to decide it.

13          So if there's --

14               MR. WEINBERGER:  Right, and --

11:42:31 15               THE COURT:  I mean, if someone's not added,

16     there's no reason to have a plaintiff's fact sheet because

17     they're not in the case.  So that may be the reason they're

18     opposing it.  But anyway --

19               MR. WEINBERGER:  It is, Your Honor, primarily

11:42:45 20     the reason.  But as I said --

21               THE COURT:  All right.

22               MR. WEINBERGER:  -- I think we should --

23               THE COURT:  All right.  I think that makes

24     sense.

11:42:53 25          Okay.  Anything else, since we've got all these great

1    lawyers?  I'm not inviting new issues, but we're all

2    together.

3                SPECIAL MASTER COHEN:  Judge, just a reminder

4    that you may want to set our next meeting.

11:43:10  5                THE COURT:  Oh, right, which I forgot to the

6    last time.

7         Thank you, David.

8         Well, you know, I'm thinking, why don't we do it

9    toward the latter part of December -- roughly -- November.

11:43:32  10   Roughly 60 days.  That seems -- 60 days' interval to check

11   in seems to me to be a good course.

12        So --

13               LAW CLERK:  Judge, 60 days from today puts us

14   on Friday, November 22nd.

11:44:25  15               THE COURT:  Yeah.  I'm thinking either Friday

16   the 22nd or Monday the 25th.

17               MR. WEINBERGER:  I think that is the Monday of

18   Thanksgiving.

19               THE COURT:  Yeah.

11:44:35  20        So we want to do it Friday, November 22nd?  That seems

21   to be okay with me.

22        How's 11:00 a.m.?  For anyone on the West Coast, that

23   makes it reasonable.

24        Unless 11:00 a.m., Friday, November 22nd, is a big

11:45:06  25   problem, well, we can do it then.

1            MR. BOONE:  This is Brian Boone from OptumRx.

2        That works for us, Your Honor.

3            THE COURT:  Okay.  Thanks, Brian.

4        Okay.  So it will be Friday, November 22nd, 11:00 a.m.

11:45:27  5        And then, why don't we just say joint status reports,

6    noon -- or each side's status reports, noon on the 20th,

7    Wednesday, the 20th.  Because that helps me -- considerable

8    help to me to prepare.

9        Okay.  Thanks, everyone.

11:45:52  10        And anyone in the Jewish religion, happy and healthy

11    New Year to all of you.

12            MR. WEINBERGER:  Same to you, Your Honor.

13        Thank you.

14            THE COURT:  Thank you.

11:46:06  15            MR. BOONE:  Thank you, Judge.

16            THE COURT:  Okay.  Bye-bye.

17        (Proceedings concluded at 11:46 a.m.)

18

19                 **C E R T I F I C A T E**

20

21        I certify that the foregoing is a correct transcript

22    from the record of proceedings in the above-entitled matter.

23

24    */s/ Donnalee Cotone              23rd of September, 2024*
      DONNALEE COTONE, RMR, CRR, CRC                      DATE
25    Realtime Systems Administrator