# EXHIBIT 1

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              NORTHERN DISTRICT OF OHIO
3                  EASTERN DIVISION
4

                ~~~~~~~~~~~~~~~~~~~~
5

6     IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
      OPIATE LITIGATION
7                                      Case No.
                                       17-md-2804
8

                                       Judge Dan Aaron
9     This Document Relates To:        Polster
10    City of Rochester v. Purdue
      Pharma, L.P.
11    No. 19-op-45853 (Track 12)
12    County of Webb, Texas v.
      Purdue Pharma, L.P.
13    No. 18-op-45175 (Track 15)
14

                ~~~~~~~~~~~~~~~~~~~~
15

16

17       Remote Status Conference Call Before
18           Special Master David Cohen
19

20              September 17, 2024
21                 11:00 a.m.
22

23

24

25           Renee L. Pellegrino, RPR

1 REMOTE APPEARANCES:
2
3   Patrick King, Esq.,
4   Paul T. Farrell, Jr., Esq.
5   Peter H. Weinberger, Esq.
6   Elizabeth Miller, Esq.
7   Sage R. Vanden Heuvel, Esq.
8   David Ackerman, Esq.
9   Bradley M. Smyer, Esq.
10  Salvatore Badala, Esq.
11  Peter Mougey, Esq.
12  Laura Fitzpatrick, Esq.
13  Michael Elsner, Esq.
14  Olga Vieira, Esq.
15  Emily McGowan, Esq.
16  Elizabeth Miller, Esq.
17
18
        (Several participants not listed)
19
20
21
22
23
24
25

1       SPECIAL MASTER COHEN:  Good
2   morning.  So we're here today to address items
3   on the discovery agenda that Josh published, I
4   guess it was, yesterday, and it looks like
5   there are three new issues in the restoral
6   designated as placeholders.
7       I issued a partial ruling last
8   night via e-mail on agenda item number 390,
9   which had to do with the City of Rochester's
10  discovery deficiencies, alleged discovery
11  deficiencies.  And I think there were five
12  interrogatories that needed ruling, and I
13  ruled on four of them.  And the one that I
14  said that I would hear argument on had to do
15  with interrogatory no. 30.  And it seemed to
16  me that, from what I could tell, this wasn't a
17  matter of Plaintiffs allegedly not responding
18  at all but responding in a way that Defendants
19  weren't sure was complete.  So let's start
20  with that, and if, I guess, the Defendants can
21  explain to me what it is that they're asking
22  for here with regard to interrogatory 30.
23      MS. MILLER:  Yes.  Good morning,
24  Special Master Cohen.  This is Elizabeth
25  Miller from ESI on behalf of the PBM

1   Defendants.
2       Before we jump into interrogatory
3   30, I wanted to clarify two things on
4   interrogatories 27 and 29 because at 5:10 last
5   night David Ackerman sent an e-mail to you and
6   the rest of us saying that the City would
7   supplement their interrogatories 27 and 29 by
8   or around October 18th, so we would like to
9   accept that supplementation prior to the issue
10  of your ruling on those.
11      SPECIAL MASTER COHEN:  Anything
12  that happened before the ruling holds.
13      MS. MILLER:  Okay.  So we can
14  confirm then that they will supplement per
15  David's e-mail at 5:10 p.m. yesterday as to
16  interrogatories 27 and 29?
17      MR. ACKERMAN:  Special Master
18  Cohen, this is David Ackerman.  Let me just
19  confirm something because we'll do the
20  supplement, but given your ruling, I would
21  assume that we won't be back in front of you
22  claiming that our supplement was somehow
23  improper or incomplete or something like that,
24  right?
25      SPECIAL MASTER COHEN:  Correct.  I

1   would not anticipate that that would occur.
2       MR. ACKERMAN:  Okay.
3       MS. MILLER:  Yes, we certainly
4   hope that their supplementation will answer
5   the interrogatory and that we don't need to
6   raise this with you further.
7       MR. WEINBERGER:  Wait a minute.
8   That's not how we concluded this.  So let's
9   not, you know, try to put -- that's not what
10  we just heard.
11      MS. MILLER:  You're supplementing
12  by October 18th, so certainly if your response
13  answers the interrogatory, then there's no
14  need to come back before you, but as I sit
15  here today, I can't promise that there will be
16  no issues because I assume that you haven't
17  drafted the interrogatory to send to us for
18  our review, so I'm not going to waive my
19  rights right now to raise any issues in the
20  future.
21      MR. ACKERMAN:  You have no rights
22  to waive because the Special Master ruled that
23  you weren't entitled to any relief on those
24  interrogatories.
25      SPECIAL MASTER COHEN:  This is

2 (Pages 2 - 5)

1 silly.  The Plaintiffs said that they would
2 supplement.  Plaintiffs need to supplement
3 with whatever it is they determined they would
4 supplement with.  My ruling otherwise stands.
5 You won't be coming back.
6          MS. MILLER:  Okay.
7          SPECIAL MASTER COHEN:  Let's move
8 on.
9          MS. MILLER:  Thank you.
10         For interrogatory number 30, yes,
11 as to your summary, the Plaintiffs' response
12 remains deficient.  They cited to a number of
13 documents that do not respond to the
14 interrogatory.  For instance, there's a
15 congratulatory e-mail with the ATF.  There are
16 cover e-mails with attachments that are
17 totally non-responsive.  We are looking for
18 them to identify the communications where they
19 sought assistance from these various entities,
20 not for any communications at all that are
21 unrelated to prescription opioids in the city
22 and their need for assistance with the alleged
23 epidemic.
24         This is plainly relevant to our
25 affirmative defenses.  If the city did not

1 take any steps to mitigate their alleged
2 damages, if they did not raise concerns with
3 the alleged opioid epidemic in their city such
4 that they wanted assistance from the federal
5 government or from the state government, then
6 that undercuts their claims on the severity of
7 the crisis and the supposed impact of that
8 from the PBM Defendants.
9          MR. ACKERMAN:  May I respond,
10 Special Master?
11         SPECIAL MASTER COHEN:  Go ahead.
12         MR. ACKERMAN:  Two points.
13         Number one, you asked for the
14 request for production that were duplicative
15 of this interrogatory in your e-mail
16 yesterday.  Our view is that this is more or
17 less a request for production that is framed
18 in the form of an interrogatory.
19         If you look at their request for
20 production number 5, it says, "All documents
21 constituting or relating to any communications
22 between you and any federal, state or local
23 official or agency, including, but not limited
24 to," a long list of agencies, including the
25 DEA, state boards, a number of other types of

1 agencies -- I'm just trying to cut to the
2 chase here -- that refer or relate to claimed
3 suspicious orders or suspicious opioid
4 prescriptions, diversion, improper or
5 excessive dispensing, improper prescribing,
6 unlawful sale, or other suspected wrongdoing
7 relating to prescription opioids or the
8 possession, use, illegal sale or addiction to
9 other opioids.  That very broad request for
10 production, which we are producing documents
11 in response to, covers almost exactly this
12 interrogatory.
13         The second point I'd make, and I
14 just want to make sure it's clear here, is
15 that Defendants can claim some sort of duty to
16 mitigate argument, but I think there are a
17 number of legal doctrines that prevent a party
18 from challenging what is essentially a police
19 power of a municipality.  You can't go out and
20 -- no entity, whether a plaintiff or
21 defendant, can go out and say that a
22 municipality should have prosecuted someone or
23 should have, you know, put police forces here
24 instead of there.  Those are the types of
25 decisions that are very clearly discretionary

1 and cannot form the basis of any defense.
2          SPECIAL MASTER COHEN:  So here's
3 what I'm trying to figure out.  Interrogatory
4 no. 30 seems to me to be essentially saying,
5 okay, we've asked for all kinds of documents,
6 as you just noted in the request for
7 production that you just quoted.  I'm sure
8 there are other requests for production that
9 also encompass the kinds of documents that are
10 being asked about in interrogatory no. 30.
11 Interrogatory no. 30 seems to me to be saying,
12 okay, we've asked you to produce these
13 documents, now tell us which documents are the
14 ones you produced; that is, identify the ones
15 that are these, the ones that are requests for
16 assistance from these four categories.  And I
17 guess I'm trying to understand the extent to
18 which -- and this is kind of how you guys are
19 playing the game, the extent to which you are
20 in agreement that it's okay to say here's the
21 request for production, now tell us which
22 documents fall into which category, which
23 Bates numbers fall under which request,
24 because that's what seems to me is happening
25 here, especially if you're still producing

3 (Pages 6 - 9)

Page 10

1 documents.
2      MR. ACKERMAN:  Which we are, and
3 we, of course, will supplement, but we have an
4 answer that's consistent with Federal Rule
5 33(d), where we've identified Bates numbers.
6 In order to identify which documents seek
7 assistance, the burden is just as easy on them
8 as for us to take all of the communications
9 with the DEA and go through them one by one to
10 figure out which ones are seeking assistance.
11      MS. MILLER:  Well, if I may, we,
12 at this juncture, don't have confidence that
13 the cited documents will, in fact, respond to
14 our interrogatory because the ones that
15 they've cited thus far have not been
16 responsive, so although we're hearing for the
17 first time on this conference that the RFP 5
18 is the one that these are contending in part
19 is duplicative, they have not communicated
20 that fact to us in the meet and confer and
21 they're asking us to fish through their
22 productions, and then when we do that work,
23 we're not finding responsive materials.
24      So we don't believe that this
25 burden is being properly shifted to us when

Page 11

1 we're asking very clear discovery.  It's our
2 right to propound this discovery.  And if they
3 have these documents, which they're sitting
4 here today and telling you that they're
5 producing responsive documents in response to,
6 then they should respond to our discovery in
7 full.
8      SPECIAL MASTER COHEN:  So this is
9 how this lands.  So the Plaintiffs have an
10 obligation to respond to the request for
11 production with documents that are responsive.
12 The Plaintiffs have an obligation to some
13 extent, and I'm not quite sure what the extent
14 is, to respond also to the interrogatory
15 saying which are the documents that fall under
16 this category, identify for us the ones where
17 you're asking for help.
18      To the extent that there aren't
19 any or they can't do it, Elizabeth, of course
20 that inures to the benefit of the Defendants.
21 You asked them.  They didn't produce any.
22 Therefore, they didn't ask for help and they
23 didn't mitigate.  I mean, that's ultimately
24 what you would argue at trial.
25      So I'm not sure what more I can

Page 12

1 say except that the Plaintiffs have an
2 obligation to produce documents that are
3 responsive to the interrogatory.  I'm just not
4 sure what more there is to say.
5      MS. MILLER:  If they're going to
6 take the position that there aren't such
7 communications or our investigation is not
8 revealing these communications, then, yes, I
9 agree with you that that is helpful for what
10 we're trying to elicit.  At this point I just
11 don't -- they're trying to have it both ways
12 by saying that these documents exist but we're
13 not willing to identify them for you.
14      So that's where we are right now.
15 We need them to have a firm response on our
16 interrogatory so that we can move forward with
17 discovery.
18      MR. ACKERMAN:  We obviously
19 disagree with that characterization.  We have
20 identified documents.  There is a list of the
21 Bates numbers.  I think, Special Master Cohen,
22 you're right.  If they don't think the
23 documents are responsive, that's an argument
24 for another time, but that's not a motion to
25 compel.

Page 13

1      MS. MILLER:  Well, can they
2 respond with a sworn statement saying that
3 they cannot ask for help if -- you know, if
4 we've identified these categories of
5 communications and they're saying they do or
6 do not exist, then we would accept a sworn
7 statement saying they did not reach out to
8 these following entities for assistance.
9      SPECIAL MASTER COHEN:  That's not
10 how it works.  You can get something in
11 deposition from them perhaps, but that's not
12 the next step.  The next step is they have
13 produced all the documents through discovery
14 that they're allowed to ever use at trial.
15 You both can look through them and find
16 documents that do or do not ask for help, and
17 if there aren't any, then Defendants can say,
18 look, here's all the documents.  They never
19 asked for help.  Therefore, they didn't
20 mitigate.  And everybody knows and should know
21 that it can't be the case that Plaintiffs then
22 come along, or Defendants then come along and
23 say, well, oh, here it is.  No.  If you didn't
24 produce it in discovery, you're not using it
25 at trial.  And so the Defendants will have the

4 (Pages 10 - 13)

Page 14

1  opportunity to argue this is all they did.
2      MR. WEINBERGER: This is Peter
3  Weinberger. It's important to note, because
4  the record is very confusing because I think
5  the PBMs are confusing the record, and that is
6  we have answered with Bates stamp numbers,
7  those are the documents. If they don't
8  believe that the documents contained
9  information that answers the question, you
10  know, they'll argue that at trial. But, you
11  know, from our perspective, these documents
12  are the ones that are responsive, and we've
13  identified them by Bates stamp numbers.
14      MS. MILLER: If that's your
15  statement, then we can accept that as the
16  position of the Plaintiffs, that those are the
17  responsive documents and those are all the
18  responsive documents.
19      MR. FARRELL: This is Paul
20  Farrell. Special Master Cohen, I want to
21  maybe emphasize or reemphasize a couple of
22  points.
23      The PEC understands that if we
24  receive discovery and we don't respond or
25  produce documents, then you have historically

Page 15

1  ruled if you don't produce it, you don't get
2  to use it at trial. And the reverse is true,
3  is that if we get to the end of discovery with
4  Express Scripts and Optum and we've asked them
5  for discovery and they don't produce it, they
6  don't get to use it at trial.
7      So the ground rules have been very
8  clear in this litigation, and I can assure you
9  that the PEC is acutely aware of that because
10  we've been on both ends of it in, what, four
11  or five trials now, of either affirmatively or
12  defensively seeing this play out.
13      I'll give you an example. Optum
14  and ESI have objected to the scope of
15  discovery and are not producing documents post
16  2019. This means that if they get to trial,
17  they don't get to use documents post 2019.
18  The Plaintiffs, on the other hand, have
19  continued to produce documents up till more
20  recently, because we intend to identify and
21  establish an ongoing public nuisance and then
22  our abatement plan. So to the extent that a
23  record gets created when the deadline ends,
24  when you declare pencils down, the record is
25  the record. And so they are allowed to ask us

Page 16

1  to come back and identify documents, we're
2  allowed to ask them to identify documents, but
3  at some point in time if they want us to
4  confirm that no more documents exist, they
5  need to do it in depositions, like we're about
6  to begin doing ourselves.
7      So I don't want there to be any
8  muddied water about having us to affirm or
9  deny one thing or the other. We have an
10  obligation to respond to discovery, we have an
11  obligation to put up witnesses, and then they
12  can start creating a record. And then when
13  discovery is over, we're locked in, we go to
14  trial.
15      MS. MILLER: I just want to
16  clarify, though, because Mr. Weinberger a
17  minute ago that this is the universe of
18  documents you're citing to and, therefore, we
19  have a response, and then you're saying
20  discovery is ongoing, you will supplement. So
21  this is exactly the issue. We don't know what
22  your position is. Is it these 99 documents or
23  whatever hundred documents that you cited to
24  and that's where we should look for our
25  response and, therefore, we can go forward

Page 17

1  with our affirmative defenses, or is it that
2  your discovery is ongoing, you'll supplement,
3  and when pencils are down, then you'll say
4  that's the end of the universe? That's why we
5  need you all to identify what the relevant
6  documents are for these categories, because
7  even within the PEC, there seems to be
8  disagreement.
9      MR. FARRELL: There's not.
10      MR. ACKERMAN: Hold on. Document
11  production is ongoing. There's no question
12  about that. And we'll supplement the response
13  as we identify new documents, just as every
14  party will, just as we assume the PBM
15  Defendants will.
16      MS. MILLER: Well, Mr. Weinberger
17  just said that we had muddied the waters or
18  been unclear because these documents that you
19  have cited were your response and, therefore,
20  this conversation was unnecessary, so now I'm
21  confused about what exactly you're promising.
22      MR. ACKERMAN: I don't think
23  that's what he said, and I think what I just
24  said was kind of clear.
25      SPECIAL MASTER COHEN: I don't

5 (Pages 14 - 17)

Page 18

1 think there's anything unclear. The document
2 production continues. If additional document
3 production includes documents that are
4 responsive to interrogatory no. 3, then the
5 Plaintiffs will identify them, they'll
6 supplement the responses, as all parties are
7 required to do. I don't think there's
8 anything else to rule on on this issue. I
9 think we need to move on. I just don't see
10 anything left to do here.
11     MS. MILLER: Thank you, Special
12 Master Cohen.
13     SPECIAL MASTER COHEN: No problem.
14     So am I correct that what the
15 parties now are saying is that with regard to
16 agenda item 387, which has to do with CMO
17 dates, they just want a little bit more time
18 and there's nothing for me to do at this
19 moment? There might be in three days, but
20 with a little more time, they might be able to
21 get some of the date issues resolved. Is that
22 correct?
23     MS. FITZPATRICK: Good morning,
24 Special Master Cohen. This is Laura
25 Fitzpatrick.

Page 19

1     Yes, that's exactly right. We're
2 working through these issues. We had a meet
3 and confer as recently as yesterday afternoon,
4 and as I mentioned in my correspondence, with
5 the exception of one date that I think we may
6 be actually on the path of resolving today, we
7 are in line on the dates up through the close
8 of fact discovery, but there were some issues
9 raised last week that we're working through
10 this week and I expect that we will be able to
11 let you know if there are any remaining
12 disputes by the end of this week.
13     SPECIAL MASTER COHEN: Very good.
14     That takes us to agenda item 389.
15 So I did read this last night. I guess I need
16 your oral argument on this. I'm not entirely
17 certain what has been asked for and what has
18 been produced and the extent to which the
19 Plaintiffs believe that what has been produced
20 isn't sufficient and, also, what there is to
21 produce. It sounded like the PBMs were saying
22 we produced what you've asked for and we don't
23 have anything more to produce. So I'm not
24 quite sure how this lays out.
25     Do Plaintiffs want to start?

Page 20

1     MR. FARRELL: Which one is 389?
2 I'm sorry.
3     SPECIAL MASTER COHEN: This is --
4     MS. FITZPATRICK: Rebates --
5     MR. FARRELL: Oh, that's me.
6     So let me see if I can say it in
7 very broad terms and then we can narrow it
8 down as the discussion goes.
9     The PEC wants to know how much
10 money Purdue Pharma, by way of example, paid
11 Express Scripts and Optum. We've sought
12 discovery using different combinations of
13 words to get to that. We believe that there
14 should be a financial data trail at some point
15 in time that establishes these payments, but
16 we also have seen in discovery that part of
17 the contracts between Purdue and, especially,
18 Express Scripts, says that these rebate
19 summary reports are supposed to be generated
20 and shared with each other.
21     SPECIAL MASTER COHEN: Is that a
22 term of art that's used in the communications
23 between the PBMs and Purdue, rebate summary?
24     MR. FARRELL: Yes, sir.
25     SPECIAL MASTER COHEN: Did you

Page 21

1 call it rebate summary chart?
2     MR. FARRELL: It's called -- and
3 there's a list of summary reports. There's
4 one particular one that's called a rebate
5 summary report.
6     SPECIAL MASTER COHEN: Go ahead.
7     MR. FARRELL: And, in fact, Purdue
8 Pharma is paying Express Scripts money as a
9 percentage of opioid sales to generate these
10 reports, so at some point in time, you'll
11 recall, we had filed motions to compel,
12 motions for sanctions, we've appeared before
13 you. This has been since April we've been
14 asking them tell us or produce for us
15 documents that demonstrate how much money
16 Purdue Pharma paid you and then how much of
17 that money you passed on to our clients.
18     As you recall, our theory of
19 liability, or one of them, is that the PBMs --
20 and I understand these are disputed, they're
21 allegations. The PBMs, we are alleging, had a
22 financial motivation not to limit opioids but
23 a financial motivation to increase the volume
24 of opioids.
25     SPECIAL MASTER COHEN: I

6 (Pages 18 - 21)

Page 22

1  understand why the rebate summary report is
2  relevant.
3        MR. FARRELL:  So to date we have
4  neither seen any evidence of any summary
5  reports nor underlying financial data that we
6  can figure out how much money Purdue paid
7  Express Scripts.
8        I have an examplar.  I can share
9  my screen.  This comes from Purdue.  Let me
10  see if I can make the magic work.  Can you see
11  this document?
12        SPECIAL MASTER COHEN:  I can.
13        MR. FARRELL:  If you look up top,
14  this comes from PPLPC01200431839.  This is a
15  Purdue spreadsheet, and in this Purdue
16  spreadsheet what you can see -- I'm going to
17  try to move this.
18        SPECIAL MASTER COHEN:  This is not
19  a rebate summary report?
20        MR. FARRELL:  It is not.  This is
21  from Purdue.  This is a 2014 summary financial
22  document that seems to indicate that in 2014
23  there were $622 million in rebatable gross
24  sales, and that of that, $95 million was paid
25  by Purdue Pharma to Express Scripts in rebates

Page 23

1  and $18 million of it was some type of
2  administrative fee.  So we know that there are
3  at least two sources of revenue going from
4  Purdue Pharma to Express Scripts in 2014.  One
5  of it is in the form of $95 million in rebates
6  and one of it is in the form of $18 million in
7  administrative fees.  We understand that the
8  rebate, a portion of it, is retained by
9  Express Scripts and the remainder goes to its
10  clients.
11        Our point is this, is that this
12  data, this financial fact, exists.  We have
13  asked for it using every different combination
14  of words we can use.  We don't have it.  We
15  don't want to wait until December 6th to start
16  going through spreadsheets.  And we want
17  Express Scripts to give it to us.
18        SPECIAL MASTER COHEN:  Any
19  response from Defendants, please?
20        MR. VANDEN HEUVEL:  This is Sage
21  Vanden Heuvel for Express Scripts.
22        So since discovery started we've
23  produced quite a bit of data as well as
24  documents relating to rebates.  We produced
25  our claims data, which, pursuant to the

Page 24

1  negotiations with the PEC, included data on
2  rebates received and rebates shared on a
3  claim-by-claim basis for the bellwether
4  jurisdictions, so the PC has all that
5  information.
6        In addition, regarding this
7  request for rebate summary data reports, what
8  we have learned from our client is that rebate
9  summary data, rebate invoices are shared with
10  manufacturers through a data portal.  They're
11  not just documents that are worked up and sent
12  over e-mail, like here's your monthly rebate
13  report, here's your monthly invoice.  You
14  know, the manufacturers have access to a data
15  portal, which provides them with utilization,
16  the rebate invoices, and we've gone and
17  collected those invoices for Purdue going back
18  ten years and we've produced those to the PEC.
19  You know, as you've said many times, we cannot
20  produce documents that don't exist.  So far we
21  haven't found rebate summary reports for
22  opioid manufacturers.  Instead, we've found
23  these invoices, which we did produce.
24        MR. WEINBERGER:  Special Master
25  Cohen, this is Pete Weinberger.

Page 25

1        This is a conversation that we had
2  going back to early 2024, and what Sage just
3  talked about in terms of the time limitations
4  going back only ten years, which, I guess,
5  would be 2014, was the subject of
6  conversations that we had with you regarding
7  the temporal scope of discovery because we
8  wanted this information going back much
9  earlier than that, probably to the year 1997,
10  '98 or 2000.  And in the colloquy, in the
11  hearing that we had before you, the conclusion
12  that you reached was that you were sure, based
13  upon what was represented at the time, that
14  while maybe the data doesn't exist going back
15  before 2014, that based upon the documents
16  that we were quoting to you, including the
17  fact that the contracts contained these rebate
18  summaries, or the requirement that they be
19  prepared and communicated -- you know, you
20  were -- I won't quote you as saying you were
21  sure, but it seemed reasonable to assume that
22  at least those summaries of the data, of the
23  rebate summary amounts and payments, existed
24  in other documents, whether they be summaries
25  or e-mails or the like.  And that's kind of

7 (Pages 22 - 25)

Page 26

1 where you landed when you then imposed time
2 limitations with respect to the data.
3         And so now we're in September, and
4 what we're saying to you is what was
5 represented to you by the PBMs at that time in
6 terms of the fact that there is likely other
7 documents that contain the information that we
8 need and so they shouldn't be burdened to try
9 to find data before 2014 is not the fact.
10         So, you know, we've been asking
11 for this information for nine months, and what
12 we're being told now is, well, we've given you
13 data back to 2014.
14         We're also concerned about whether
15 we're getting national rebate data or we're
16 just getting information with respect to the
17 bellwethers or the states in which the
18 bellwethers exist.
19         And so that's our concern.  I
20 think that's a summary of where we are and how
21 we got here.
22         MR. MOUGEY:  Let me leave one more
23 piece with the data because I don't want to
24 leave Special Master Cohen with the impression
25 that the data that we have from '14 on is

Page 27

1 sufficient.  It's not.  And it's not that we
2 think it's insufficient; it's the Defendants
3 said it was insufficient.
4         So I'm a little surprised to hear
5 the representation that we can simply go to
6 the data.  And here's why.  What we were told
7 back months ago when we were negotiating the
8 data is that in order to recreate the rebate,
9 admin-type revenue, that we would need then to
10 take every single contract into account and
11 reinvent the formulas client by client by
12 client.  So the limitation on the data that we
13 have is that we cannot convert that into a
14 revenue stream with any specificity, and I'm
15 confident if we were to try to introduce as
16 such at trial, that that would be met with
17 objection because we don't have all the
18 contracts.  Quite frankly, we're still
19 negotiating the sampling, but even the
20 sampling isn't going to be sufficient to
21 convert the data that we do have.
22         So I don't want to leave you with
23 the impression that the '14 on data is
24 sufficient either.
25         MR. ELSNER:  Special Master Cohen,

Page 28

1 I'd like to just supplement that with the
2 Optum experience, which was at that March
3 conference, Andrew Hatchett informed you that
4 we would know in real time from the documents
5 produced from Optum how much was paid by month
6 and by year by manufacturer and by drug.  And
7 we have identified in the Optum contracts with
8 Purdue specific reports that were required.
9 There is a rebate invoice that was to be
10 provided on a monthly basis, along with a
11 manufacturer utilization report that was to be
12 provided on a monthly basis, and then later in
13 time Optum agreed with Purdue that they would
14 produce a market share report comparing
15 Purdue's opioid market to its competitors.
16 All of those reports should exist.  The
17 contracts require that Optum is to maintain
18 these documents for three years past the
19 termination of these agreements, and those
20 agreements existed throughout the entire
21 period.
22         So we've asked for these documents
23 since March.  In Optum's case we have not been
24 produced any of those documents.  And what
25 concerns me most is that in the last few days

Page 29

1 when we've had conversations about these,
2 Optum has informed us that they will go to the
3 client and about these specific documents, but
4 this should have been done long ago, and
5 without this information, our experts can't be
6 prepared, we can't take meaningful
7 depositions.
8         SPECIAL MASTER COHEN:  You just
9 said -- did you mean Optum's counsel said it
10 would go back to its client?
11         MR. ELSNER:  Yes.
12         MR. FARRELL:  Special Master
13 Cohen, one final thing.  We've identified the
14 problem and so we're also -- I want to bring
15 you the solution.
16         SPECIAL MASTER COHEN:  Hold on.
17 Let me just ask a question.
18         Are any of these documents, you
19 know, within the repository by virtue of
20 having them produced, say, by Purdue or any
21 other --
22         MR. ELSNER:  We have found from
23 Optum, and I included in one of my exhibits, a
24 summary of an invoice that was -- a rebate
25 summary payment that was provided to Optum,

8 (Pages 26 - 29)

Page 30

1 but they are not otherwise there. If we could
2 find them from another source, we would have
3 done that.
4        SPECIAL MASTER COHEN:  So now I
5 have a question for Sage.  Sage, you said
6 that -- I think I understood you to say that
7 there are these reports or invoices -- I've
8 heard now manufacturer utilization reports,
9 market share reports, rebate invoices, rebate
10 summary data reports, all kinds of different
11 names, and I think what you said is, yeah,
12 those were actually never produced as a
13 document, as a PDF or as a Word or as, you
14 know, a piece of information by itself. It
15 was all just a database that they could --
16 that Purdue, for example, could log into and
17 learn this information, which doesn't sound
18 right to me. So can you explain that? I
19 mean, it sounds like, just from the
20 description that Michael gave, where you're
21 required to produce a report and keep it for
22 three years, that's not just a database in a
23 portal.
24        MR. VANDEN HEUVEL:  Yes, but as
25 the PEC knows, Express Scripts would give

Page 31

1 access to its portal to the manufacturers for
2 business reasons or for reasons of
3 transmitting these kinds of data. That was
4 just viewed as a more secure way to provide
5 the data on utilization and invoices. Perhaps
6 it's more efficient. But, you know, I can't
7 say that they never produced an invoice report
8 or a rebate summary report. If they have been
9 produced, you know, we'll produce those in
10 discovery through the custodian search terms.
11 But generally, from what we've seen and what
12 we understand, is that this information was
13 transmitted to the manufacturers through a
14 data portal. In fact, if you look at the
15 spreadsheet that Mr. Farrell just put up on
16 the screen earlier, there is a tab called
17 "Data Portal," where it provides information
18 on rebates and administrative fees, showing
19 that even as of the date of that spreadsheet,
20 which I think is from 2012, Purdue was
21 obtaining this information through the data
22 portal. And I have to wonder why the PEC
23 hasn't issued a third-party subpoena to Purdue
24 and the other manufacturers if they're so
25 concerned about getting these documents,

Page 32

1 because it is more likely that the
2 manufacturers would have those kinds of
3 reports since, you know, manufacturers, they
4 produce a small number of drugs, they're going
5 to be focused on the rebates for those drugs.
6 Express Scripts, as a PBM, is processing
7 thousands of different types of drugs.
8        SPECIAL MASTER COHEN:  First of
9 all, I'm pretty sure that the PEC has
10 virtually every document that it could
11 possibly obtain from Purdue.
12        Second of all, the answer isn't,
13 oh, well, then go to Purdue. The answer, it
14 sounds to me, if there aren't the documents
15 that I understood would answer all of these
16 questions, is to give the PEC access to the
17 database. I don't see -- it's clearly
18 centrally important information, the amount of
19 money that was being shared and the amount of
20 information that was being shared between
21 Purdue and the PBMs about opioids, and if
22 there are no documents along the lines of what
23 have been described here, if you're saying
24 there aren't any, then the database is going
25 to be the next place to go.

Page 33

1        MR. VANDEN HEUVEL:  Well, we've
2 already produced the invoice data from the
3 database for Purdue.
4        MS. VIEIRA:  For the benefit of
5 the court reporter, this is Olga Vieira for
6 Express Scripts.
7        The data that is in the database
8 has been produced. This was a subject of
9 extended negotiations back in January when we
10 started the whole process of the data fields.
11        What the PEC is seeking is a data
12 field that has the end number of what ESI
13 makes from Purdue, the revenue number, and
14 that does not exist, and that was the subject
15 of many conversations with Jeff Gaddy and
16 Laura Dunning on behalf of Express Scripts.
17 That final number doesn't exist and there's a
18 multitude of reasons for that.
19        We have given them the rebate
20 amount that was paid per claim, so you know
21 which opioid received a certain amount of
22 rebate money. That is there for the dates
23 that we have it available. What we don't have
24 in that data is then how that translates into
25 a revenue share with or a net profit share

9 (Pages 30 - 33)

Page 34

1 with the different clients, how the clients
2 may take some of that or don't take some of
3 that, how that's accounted for the clients.
4 We've explained to them that that is because
5 that decision is made on a client-by-client
6 basis. You have to go back to each individual
7 client to figure out, okay, this is the
8 agreement we had, you're going to take a
9 hundred percent of your rebates, you're going
10 to take a portion of your rebates: You have a
11 certain rebate guarantee, you have
12 administrative fees that will be offset by a
13 portion of the rebates up until a certain
14 percentage. Every single client has a
15 different arrangement.
16        For months now we've been telling
17 them let's discuss a client sampling process
18 so that you can see how the clients' contracts
19 are arranged and that would give you that
20 information.
21        So for a particular client, once
22 we decide what the client sampling will be,
23 there will be, potentially, some rebate
24 reconciliation reports that they can have that
25 will show for that particular client this is

Page 35

1 how much rebate was generated, this is what
2 was kept, this is how the fee structure was
3 set up for that client, and you'll know, you
4 know, what the rebate structure was.
5        Another important consideration
6 here is that it's not done on a drug-by-drug
7 basis. What they want is specific amounts of
8 money that were paid for opioids by a
9 particular manufacturer and how that affected
10 ESI's bottom line. But when you get into the
11 retention by clients of the funds that were
12 generated, it's not done by, okay, of opioids
13 you're going to keep a hundred percent of the
14 rebates; when it comes to some other
15 medication, you're going to keep 95 percent of
16 the rebates. It's not done that way. So it's
17 all put together, right, as a financial
18 package, this is how the contract is going to
19 be. And so there won't be necessarily per
20 client, you know, this is what you made off of
21 opioids for this particular client. It's
22 going to be all put together. And that's why
23 we've been explaining to them for months it's
24 not a simple accounting function that can be
25 spit out to you on our side. The amount of

Page 36

1 rebates we were paid for the years that it
2 exists, we provided that. We provided the
3 invoices. They have access to all the data
4 that the pharmaceutical companies had access
5 to. That's really not at issue. That they
6 have. It's the second component of it, which
7 is what did we keep versus what did our
8 clients take, and how all those financials
9 worked out, that we need the client sampling,
10 which we are working through right now.
11        MR. WEINBERGER: Special Master
12 Cohen, this is Pete Weinberger.
13        Anybody that has followed the
14 controversy in the public about PBMs and their
15 conduct vis-a-vis rebates and administrative
16 fees, whether it's been the federal government
17 or state attorney generals or whatever, knows
18 that this rebate issue and how much they
19 received at rebate, whether it's with respect
20 to insulin or other drugs, has been a huge
21 issue; and those numbers, not with respect to
22 opioids, have been publicized, and they've
23 been publicized because the PBMs have been
24 required to produce that information because
25 it's a significant issue out there. And, you

Page 37

1 know, your -- your suggestion that we get
2 access to the data I'm assuming references,
3 you know, our getting access to the portal,
4 which is what Sage started this whole
5 conversation about, that they were providing a
6 portal that provides this information. Well,
7 this is kind of tantamount to what is
8 happening in medical malpractice litigation
9 these days, because so much of it is
10 electronic medical records, and when you have
11 a malpractice case, you have the medical
12 records, the documents, but then you have
13 what's online in the electronic medical chart,
14 including communications between people. And
15 what the answer has been -- you know, we've
16 actually sat down with the Defendants and
17 accessed the actual portal so we can see, for
18 example, what the doctor can see in electronic
19 medical records, but that takes somebody
20 sitting with us explaining to us how we
21 maneuver through that portal and what do we
22 click in order to get the information.
23        Now, I don't know whether that's
24 the solution here that you're thinking about,
25 Special Master Cohen, which is, you know,

10 (Pages 34 - 37)

Page 38

1  access to the portal, but that's a lot
2  different than access to the data, the
3  underlying data, which is -- you know, we have
4  to create our own algorithms to try to figure
5  out and analyze.
6  　　　　Now, if we're talking about access
7  to the portal, where we can get our data
8  people who are familiar with, you know, how to
9  maneuver and have somebody teach them how to
10  get into the portal, so that we can do the
11  sorting of the data to sort out what it is
12  that we're looking for, you know, that may be
13  a solution.
14  　　　　You know, the easy thing is -- the
15  easier thing is for them to just answer the
16  question, which is, you know, how much in
17  rebates did you receive from opioids going
18  back to the 2000s.
19  　　　　MS. VIEIRA:  So if I may just real
20  quickly, because I think there's some
21  misconception on this concept of the portal.
22  　　　　The portal was made available at
23  the time that the data existed back at the
24  time when it was accessed, right.  That's not
25  to say right now if you enter the portal, you

Page 39

1  can get information going back to all the
2  dates that you want to go back into.  So it's
3  no longer there.  If it were there, we would
4  have produced them.  That's not the issue now.
5  We've given them from the portal all of the
6  data that they would have had access to that
7  we have access to.  That was the subject of
8  the discussions back earlier this year when
9  you talked about what was readily available,
10  what we could produce in terms of data.
11  Anything that is available in the portal is
12  the subject of the data production that we've
13  already made.  They have that data.  There's
14  nothing in the portal that they will get that
15  they don't already have and that we haven't
16  already produced.  In fact, that's where we
17  started this conversation.  We have pulled the
18  invoices that were in the portal.  That's the
19  only documents that we know were given to the
20  manufacturers, and we produced those.  There's
21  nothing left in the portal that they don't
22  already have that they can't already look at.
23  They have the number of -- they have the
24  amounts of rebates that were paid by Purdue.
25  　　　　What they don't have is the second

Page 40

1  component of it.  And they have that as far
2  back as we have it.
3  　　　　If there are -- and this is what
4  we said at the hearing a few months ago.  If
5  there are other documents -- there could be
6  e-mails.  There could be documents similar to
7  what Mr. Farrell put up there, which is a
8  summary of rebates.  Those things may exist in
9  correspondence.  Those things may exist in
10  hard copy files.  Those things may exist in
11  non-custodial electronic files.  If that
12  exists, they have been pulled into our search
13  systems and we are going through them all and
14  we will produce them.  We just can't say that
15  right now because it's such a large volume of
16  documents that we've ingested, per their
17  request, and it's going to take a while to get
18  through it.  But there's nothing left
19  electronically in data that we can produce
20  that would respond to this other than what
21  we've already produced.
22  　　　　I'm sorry that it's taking a long
23  time, but it's a lot of data.  We offered at
24  the beginning of this whole process to go to
25  the specific custodians, and we did, and asked

Page 41

1  them where can we find this information, let's
2  target this, let's look for that.  And the PEC
3  had very strong concerns and wanted us to pull
4  all of the information into our system and run
5  our search terms through it.  So we stopped
6  that process, and we started the longer
7  process, which we told them was going to delay
8  things, which we told them was going to take a
9  long time.  And now we've been doing that.
10  We've ingested hundreds and millions of
11  documents, hundreds of millions of pages into
12  our system, running the search terms and
13  producing it as quickly as we can.  There is
14  nothing left in a portal to look at.  They
15  have the data.  They have the rebates that
16  have been paid.
17  　　　　The other side of it, we've been
18  asking them for months to choose which clients
19  they want to look at.  They can look at the
20  contracts.  They can look at if there's going
21  to be reconciliation reports on rebates then.
22  And we can do all of that work.  But they have
23  not chosen custodians.  I think we got the
24  proposal a week ago, and we're working through
25  that and negotiating that.

11 (Pages 38 - 41)

1     And, by the way, this
2  conversation, this issue came up last week.
3  We haven't had a chance to talk about it with
4  them.  We haven't had a chance to meet and
5  confer about what else we can do, how else we
6  can help speed this along and get them what
7  they need.  And so I would suggest that we all
8  take some time to meet and confer about this
9  further and see where else we can go and what
10  else we can give them, starting with client
11  contracts and client documents,
12  client-specific documents that will show them
13  profit numbers or numbers of rebates retained.
14  I don't know if it would be profit, but
15  rebates retained or whatever it is for
16  specific clients.
17     SPECIAL MASTER COHEN:  Tell me
18  about this -- you called it a sampling.  Peter
19  mentioned sampling.  Olga, you just mentioned
20  sampling.  You're talking about choosing
21  clients, and you said, Olga, at one point
22  choosing custodians, but you might have meant
23  clients.  Tell me what's going on there.  I
24  don't understand it.
25     MS. VIEIRA:  Right.  So we have

1  thousands of clients within a particular
2  jurisdiction within the City of Rochester
3  within Webb County, and they've asked for
4  client contracts, and we've agreed, I believe,
5  on both sides that that would be a sampling
6  process.  We suggested the top clients that
7  serve the largest percentage of customers.
8  They rejected that proposal and came back and
9  said we want the top 40 clients, I believe,
10  was their latest request, and all of their
11  documents and contracts.  And so we're looking
12  at that, trying to figure out what the best
13  solution is.  So that's what the sampling is.
14  It's client contracts.
15     MR. ELSNER:  Special Master Cohen,
16  this is Mike Elsner.  Sorry to interrupt, but
17  the issue of client contracts is a completely
18  separate issue from the amount of rebates that
19  were paid by ESI and Optum for Purdue and
20  other manufacturers.  The client contracts
21  have no relevance to what the -- the national
22  payments were made by Purdue to these PBMs.
23  The data that's been produced and why it's
24  inadequate is limited to just the bellwether
25  states.

1     The Defendants have agreed to
2  produce to us documents and information on a
3  national basis as to what the national rebate
4  payments were by the manufacturers, and that's
5  the information that we need.  The client
6  contracts and the specific Bellwether
7  jurisdiction amounts are a completely
8  different issue from the national payments
9  that we seek.
10     MS. VIEIRA:  Right.  The client
11  contracts go to the second component that Paul
12  had asked about, which is the retention of
13  rebates and what is shared with clients.
14  That's what I've been trying to clarify.  The
15  amounts that were paid by rebates are in the
16  data that has been produced by jurisdiction.
17     SPECIAL MASTER COHEN:  So here's
18  kind of the problem, and it's true that
19  normally neither a defendant nor a plaintiff
20  is required to create a document that doesn't
21  already exist in discovery, but the parties
22  are required to produce information.  If that
23  information isn't in a document, like a rebate
24  data summary report or a rebate invoice or a
25  manufacturer utilization report or a market

1  share report or any other document that's
2  already been created, but if the information
3  that's being requested is as critical as this
4  is, then you might have to create a document.
5  And I'm saying this to both sides.  I'm not
6  saying that that definitely needs to happen
7  here, but the information being requested is
8  appropriately requested and needs to be
9  produced, and I'm not quite sure how that's
10  going to happen.  It may be that pursuant,
11  Olga, to all of the discovery ingestion that
12  you just described, that you will find
13  documents and produce those documents that end
14  up being responsive and that's sufficient.  It
15  may be that we have to do something like
16  giving Plaintiffs access to a portal.  It
17  sounds like that might not work because the
18  data in the portal that they would get access
19  to has already been produced and it doesn't
20  really help, doesn't add to the actual
21  discovery of information.  But the Defendants
22  have to figure out how to get the information
23  being asked for to the Plaintiffs because it
24  is discoverable, it is relevant, and it is, in
25  fact, at the heart of what this lawsuit is

12 (Pages 42 - 45)

Page 46

1 about. It's not peripheral. It's not
2 something I'm going to say you know what,
3 you're getting 80 percent of what you need and
4 that's enough. This is in the heartland of
5 what needs to be produced.
6         So I'm not quite sure what more to
7 say, except that the Defendants have to figure
8 out how to get this to them.
9         Now, another thing I'll add is
10 some of this maybe comes through discovery
11 other than -- well, for example, depositions,
12 right. Maybe this comes -- although I can't
13 imagine how. Maybe the information being
14 requested by the Plaintiffs ends up being
15 produced appropriately through discussions,
16 depositions with folks who knew this, but it's
17 hard for me to imagine that this kind of
18 information is something that ends up coming
19 out through discovery. It's just too massive,
20 and there's no way that the Defendants didn't
21 know most of what's being asked. I get that
22 maybe a rebate, for example, was, you know,
23 calculated based on all medicines and not just
24 opioids. Okay. If that's the answer, that's
25 the answer. But that's different. There's

Page 47

1 still the answer that applies -- even if
2 that's true, there's still an answer that
3 applies globally to every drug that then would
4 apply to opioids.
5         MS. McGOWAN: Special Master
6 Cohen, this is Emily McGowan for Optum Rx. I
7 just want to make sure that the record is
8 clear as to Optum Rx on this and where we are
9 in the meet-and-confer process with the
10 Plaintiffs on it.
11         So as Mr. Elsner said, we have
12 produced our statewide data for all of New
13 York and Texas. We have provided the
14 negotiated fields that relate to the rebates
15 that were paid for all in-scope claims for
16 those states as well as, you know, additional
17 fields in the claims data that are relevant to
18 this discussion.
19         And then on the document side,
20 which is really what this is about, are there
21 additional materials beyond the statewide data
22 that would answer the question the Plaintiffs
23 are proposing. We have pushed out hundreds of
24 thousands of e-mails and documents that were
25 subjected to negotiated search terms designed

Page 48

1 to capture rebate-related conversations, and I
2 know that those are being produced.
3         But we also, after conversations
4 with them, you know, dating back some time,
5 went to the client and said we need to collect
6 non-custodial sources of information.
7         Now, I'm not aware on the Optum Rx
8 side, sitting here today, of a portal, but of
9 other non-custodial reports and documents like
10 those that Mr. Elsner raised. And what we've
11 received back are several thousand rebate
12 audit documents, which we have told them we
13 are in the process of reviewing and
14 prioritizing for production. Frankly, I
15 expected that that collection might have
16 included some of the other reports that
17 Mr. Elsner raised, and we have reiterated to
18 him that we are working to determine whether
19 those are available to collect and produce.
20 So certainly not resisting providing those
21 pieces of information, but we do need a little
22 bit more time to complete those reviews and
23 productions.
24         So, you know, I certainly hear the
25 points that you're making, but I want to make

Page 49

1 sure that everyone understands that we are
2 working to provide the information and can
3 update the Plaintiffs in terms of what we
4 find.
5         We have also made clear to them
6 that what they're asking for is really not the
7 full story, and we have told them that the
8 rebate dollars paid to the company, that's
9 just a part of it. We are also looking for
10 information, and will produce it, that relates
11 to the dollars that are passed on to the
12 health plan clients, and most of them are.
13 And so that's an important piece of it, and I
14 think Mr. Farrell mentioned it explicitly. We
15 will be providing it as well.
16         SPECIAL MASTER COHEN: So where
17 are we in the process of production and when
18 are the deadlines and when do you expect the
19 production of this kind of information to be,
20 let's call it, substantially complete?
21         MS. McGOWAN: So for Optum I
22 expect to produce the responsive rebate audit
23 materials by the end of this month, which is
24 what I told Mr. Elsner yesterday. And in
25 terms of determining whether the other reports

13 (Pages 46 - 49)

1 are available for us to collect and produce, I
2 think that's a question that we can answer by
3 the end of the month.
4       MR. ELSNER:  Special Master Cohen,
5 this is Michael Elsner for the PEC.
6       It seems to me that within two
7 weeks Optum and ESI should be able to provide
8 the Plaintiffs with a list of what documents
9 are available that cover this topic, and that
10 the production of those records could be done
11 by the end of the month.  Within two weeks we
12 can look at that list and determine whether
13 that's going to satisfy us that we can answer
14 the questions that we need answered.  And if
15 it doesn't, then we'd suggest that it would be
16 appropriate for them to provide those rebate
17 dollars and administrative fee dollars in the
18 form of some type of interrogatory and/or a
19 30(b)(6) deposition on the topic so that we
20 can get those answers under oath.
21       SPECIAL MASTER COHEN:  What I was
22 going to say is that -- so we've chatted about
23 this for half an hour, 20 minutes.  It sounds
24 like the Defendants now certainly understand
25 what my position is on the importance of the

1 information being produced, and they're
2 working on things that may produce it, and
3 that we should know in the next two, three
4 weeks where things stand and whether we're
5 going to have to do something additional like
6 you suggested.  So let's end the conversation
7 at this point with, okay, everybody has now
8 been sensitized to the importance of this
9 issue and what needs to happen, and let's keep
10 it on the agenda and come back to it and see
11 where we are in a couple weeks.
12       MR. FARRELL:  This is Paul
13 Farrell.
14       MR. WEINBERGER:  Paul, just a
15 second.
16       We've been -- now both sides have
17 been sensitized.  We've been sensitized to
18 this since the earliest point in this
19 litigation.
20       SPECIAL MASTER COHEN:  I'm sure.
21 It's very critical information.
22       MR. WEINBERGER:  And it was a
23 subject of our motion for sanctions.  You
24 know, we kept getting criticized on the other
25 side -- the bellwethers keep getting

1 criticized, in very strong language in
2 letters, about our deficiencies, which we
3 completely disagree with.  And so the context
4 of this is that, you know, this is something
5 that we've been asking for for nine months and
6 here we are they're saying, well, we're still
7 searching and give us another two weeks.  I
8 appreciate the position that you're in,
9 Special Master Cohen, but, you know, the issue
10 of relevancy and importance and
11 discoverability of this has, in our mind,
12 never been an issue, never been something that
13 we thought was or that we communicated was
14 unimportant.  It's been important from the
15 very beginning.  Thanks.
16       MR. VANDEN HEUVEL:  I just want to
17 say something to that.
18       Over two months ago we produced
19 all of the Purdue invoices for nationwide and
20 we identified those in our production letter.
21 The PEC did not ask us to talk about those
22 invoices.  They didn't bring them up to us.
23 Instead, we got the e-mail last week that they
24 were searching for additional documents
25 regarding remuneration.  So I just want to lay

1 that out there that we did produce, pulling
2 from the archive and pulling from the data
3 portal, all those invoices going back ten
4 years two months ago, and we identified those
5 in our cover letter to the PEC.
6       MR. WEINBERGER:  Ten years ago.
7 That's exactly the problem.
8       MR. FARRELL:  Special Master
9 Cohen, I'd like to get back to what I tried to
10 get to earlier as the solution.
11       I am weary of arguing with lawyers
12 about what is or is not fair according to
13 lawyers.  I believe that there are structural
14 problems with what the Defendants are saying
15 is available to answer our question.  It
16 doesn't matter the substance of it.  There's
17 structural problems with what they're saying
18 is available to satisfy our inquiry.  The only
19 way this is going to get resolved is for a
20 30(b)(6) on this topic.
21       SPECIAL MASTER COHEN:  That may be
22 true, and in about two, three weeks we'll see
23 what documents they produce, and it may be
24 that I say you're absolutely right, Paul.  You
25 don't want me to say that now, right?

14 (Pages 50 - 53)

1     MR. FARRELL:  I've been ready for
2 you to say that since April.  To me this
3 should be an essential part of the way that a
4 business operates, is that an accountant can
5 say this is how much money Purdue pays us.
6     SPECIAL MASTER COHEN:  I think
7 that in two weeks you're going to have
8 documents that you can use in, if it's
9 necessary, a 30(b)(6), and you may be
10 absolutely correct that it is.
11     MS. VIEIRA:  And just to be clear,
12 once again, we're talking about a time frame.
13 They have had information for the past ten
14 years.  It's going back beyond ten years that
15 they want accounting for information that may
16 or may not exist anymore.  We're looking for
17 it.  We'll produce it if we have it.  But that
18 has been produced.  They have that information
19 Sage just said since two months ago.  They
20 have that information.  So for the last ten
21 years, going back all the way to 2014, ten
22 years' worth of accounting is in their hands.
23 What we're talking about is beyond ten years.
24     MR. FARRELL:  So you're willing to
25 put up a witness now that will testify about

1 the last ten years worth of national sales
2 fees paid by Purdue?
3     MS. VIEIRA:  That's not what I
4 said, Paul.
5     MR. FARRELL:  If it's available,
6 if you've produced all of your invoices from
7 Purdue Pharma to ESI for the past decade, we
8 should be in a position to take a 30(b)(6) now
9 on at least ten years worth of national fees
10 from Purdue.
11     MS. VIEIRA:  That's up to you
12 because we talked about this, and Special
13 Master Cohen is not going to let you reopen
14 the deposition when you get the rest of the
15 discovery that's coming by December whatever
16 date it is that we have all agreed to, right.
17 So that's where we're at.  We're collecting
18 and producing a bunch of documents, and if
19 more documents come in that affect those
20 numbers, that affect that information, and
21 you've taken the deposition, then our position
22 will be the deposition is closed, right.
23 Because of the request, and as broad as
24 they've been, and your request that we just
25 follow this information, run search terms

1 through it and provide it, it's going to take
2 us the months that we've asked for.  So that's
3 where we are when it comes to 30(b)(6)
4 depositions based on our documents.
5     Going back to the issue of timing,
6 it's the past that is at issue when it comes
7 to rebate payments.  When it comes to the
8 amounts of rebates that have been kept, that's
9 a client-specific issue which depended on the
10 sampling, and we're going through that.  So I
11 think we will go through that in the next
12 couple of weeks hopefully and get to a
13 resolution there, and you'll have the
14 contracts and then we can talk about what
15 summary documents exist per client, but there
16 will be no way to reconcile rebates that have
17 been retained versus not retained based on
18 individual drugs.  That's just not the way
19 it's done.  So that doesn't exist.  And it's
20 not even about making documents that don't
21 exist.  It's just not calculated that way.
22 It's not an accounting function that is done
23 by the client.
24     SPECIAL MASTER COHEN:  I'm hearing
25 things just being repeated, so I think that

1 that completes the amount of conversation that
2 is appropriate for this agenda item.
3     I think that's the end of the
4 agenda, except that I also received an e-mail
5 this morning, which I had about three minutes
6 of time to look at.  I've been in other
7 meetings before this call.  So I don't feel
8 prepared at all to discuss it, which doesn't
9 mean we can't begin to.  I may need to set it
10 aside and come back to it with you all, but it
11 sounds like there's some issues floating
12 around surrounding the 30(b)(6) in Webb County
13 still.
14     MR. ACKERMAN:  I don't know that
15 there are, Special Master Cohen.  There was an
16 amended notice that was sent out last night.
17 It had a topic 22.  The Defendants have now
18 withdrawn that topic 22, so I don't think
19 that's an issue.  We obviously take issue with
20 the characterization that they put in their
21 e-mail to you last night.  But the witness
22 will be prepared -- that's why James and I are
23 here -- will be prepared to answer all
24 questions.  We don't think there's anything
25 amounting to spoliation of documents and, you

15 (Pages 54 - 57)

Page 58

1  know, that deposition will go forward on
2  Thursday.  I don't know that there's anything
3  else to discuss.
4         MR. KING:  Special Master Cohen,
5  Patrick King on behalf of Express Scripts.
6         Counsel is right.  We are tracking
7  for the deposition to take place this
8  Thursday.  The amended notice we sent out, we
9  just accidentally carried forward a topic that
10  had previously been agreed to, so no issue
11  there.
12         The main reason we had this on the
13  agenda was just as a status update for the
14  disclosure that we received on Friday from the
15  Plaintiffs, which related to issues of
16  availability of e-mail, non-e-mail ESI, and
17  then disposition and retention of hard copy
18  documents.  As outlined in what we sent
19  yesterday, we learned for the first time on
20  Friday that the -- by the county's own
21  admission, they destroyed at least 31 boxes of
22  hard copy documents.  They've put in their
23  letter some explanations as to why they think
24  there are suitable replacements.  I don't know
25  how to gauge that.  We'll ask the 30(b)(6)

Page 59

1  witness about some of this.  But we are
2  learning about this information for the very
3  first time.
4         SPECIAL MASTER COHEN:  Was the
5  destruction of documents that you're alleging
6  something that occurred after suit was filed?
7         MR. KING:  It was.  The issue
8  relates to there are certain regulations in
9  the state of Texas that describe how long
10  certain categories of documents need to be
11  retained.
12         On August 30th we asked the County
13  whether they maintain disposition logs
14  pursuant to those regulations.  And on Friday,
15  for the first time, we received copies of at
16  least some of those disposition logs.  They
17  record the destruction of several hundred
18  documents -- I'm sorry, several hundred boxes
19  of documents.  The Plaintiffs have admitted
20  that 31 of those at least are relevant, and
21  while we're still processing this information,
22  it appears that there are potentially relevant
23  documents, and at least a hundred, if not
24  more, documents.  So this is something we'll
25  obviously explore with the 30(b)(6).  It's

Page 60

1  coming very late in the game.  But I don't
2  think there's anything we're requesting, at
3  least on behalf of the PBM Defendants, to be
4  resolved today.
5         SPECIAL MASTER COHEN:  I
6  appreciate being sensitized to that issue, and
7  it sounds like it's going to be addressed
8  during the deposition.  There's nothing I need
9  to rule on.
10         MR. ACKERMAN:  I think that's
11  correct, Special Master Cohen.  The documents
12  were backed up electronically.  We'll go
13  through all this in the deposition.  I don't
14  know that there was any need to claim to make
15  this type of argument before you.  I think
16  it's hyperbolic and unnecessary.
17         SPECIAL MASTER COHEN:  Let me ask
18  you about -- we can skip past all of that.
19  What about Thursday?  It sounds like maybe I
20  should be available.  I'm looking at my
21  Thursday.  I'm not saying I should be, you
22  know, on the Zoom watching every minute of it,
23  but it sounds like maybe I should make sure
24  that I'm available by phone.  But I can tell
25  you that between 10 and, roughly, noon I'm out

Page 61

1  of the box.  I also have a 3:00 Zoom.  So I'm
2  just letting you know.  I'll try and make
3  myself as available as I can, except that I'm
4  definitely not available between 10 and 11:30
5  and closer to noon Eastern on this Thursday,
6  and I do have a 3:00 Zoom, but if you call me,
7  I can probably get away from that.
8         MR. ACKERMAN:  Well, hopefully
9  we'll handle the easy stuff during those times
10  and won't need to call you at all.
11         SPECIAL MASTER COHEN:  Hopefully.
12  Okay.
13         Is there anything else anybody
14  wants to bring up or that we should discuss
15  during the call?
16         MR. BADALA:  Special Master Cohen,
17  this is Salvatore Badala for the Plaintiff.
18         We are going to need your
19  intervention on the police records.  If you
20  recall, we discussed this at one of our
21  previous discovery conferences where we
22  offered a sampling.  Then we had a dispute
23  about the sampling.  The Plaintiff then
24  decided to resolve this issue, we would pull
25  everything from the LERMS database related to

16 (Pages 58 - 61)

Page 62

1  those 20,000 cases in that spreadsheet, that a
2  sampling wouldn't be needed.
3          The issue we're at right now is
4  we're pulling that.  Our proposal or our issue
5  is because the information is so sensitive,
6  and because of the mass of documents that are
7  being pulled from that database, we proposed
8  having a designation specific to those
9  documents, like an attorneys' eyes only,
10  highly confidential.  That would get the
11  Defendants the documents quickly.  As I've
12  told you, they said these documents are very
13  important to them, it's very important to
14  their defenses, they're most important
15  documents.  So our proposal was to get them to
16  them quickly without having to redact
17  potential information, we do a designation
18  like an attorneys' eyes only, highly
19  confidential.  And then if we were at a
20  deposition and there was a document that they
21  were using -- and we're not telling them we
22  need a heads-up of what documents they would
23  use at a deposition.  If there was a document
24  that was used and say there was information
25  about a confidential informant, a victim, that

Page 63

1  we could redact -- it would be after that
2  deposition just to make sure it didn't make it
3  into the record or on a docket and became
4  public.
5          The Defendants say no, you can't
6  just do a global designation like that for the
7  documents.  We want you to look at all the
8  documents.  You can make the redactions as you
9  go ahead, but we want you to review each of
10  them.  We've obviously argued burden, but we
11  want to get them these documents.  We think
12  this is the best way, the quickest way to get
13  them to them.  That was our proposal.  But we
14  are now at an impasse.  I'll let Mr. Smyer
15  maybe talk about it, but our belief is that we
16  are at an impasse on this issue.
17          MR. SMYER:  Special Master Cohen,
18  this is Brad Smyer with Optum.
19          What I just heard from counsel is
20  slightly different than what we had last
21  heard, which was that they wouldn't require us
22  to show in advance documents prior to using
23  them.  But the core issue for us is that we
24  are sensitive to the fact -- to a couple facts
25  here; that these are important documents that

Page 64

1  we've been requesting for a long period of
2  time, they are important for our defenses;
3  that we have worked together and the city has
4  made two -- two developments since our last
5  hearing.
6          One is that it can and will pull
7  the documents, and the second is that the
8  catch is that it wants us to agree to global
9  designation.  As you know, that's contrary to
10  the Court's protective order, the 6th
11  Circuit's decisions in the MDL regarding mass
12  designation, and it also causes some potential
13  problems here by shifting the burden to us.
14          So what we had told Plaintiffs'
15  counsel is that we're sensitive to the fact
16  that some of these documents may contain
17  confidential informant information, and we're
18  not interested in that information.  We don't
19  have any objection to the city designating
20  these documents however it thinks it has a
21  good faith basis to do.  As it relates to
22  confidential informant information, they can
23  redact that information, the specific page
24  that includes it.  They can designate it AEO.
25  If something comes across where they say, hey,

Page 65

1  we didn't designate this or redact this, we're
2  happy to work with them.  The issue is that
3  all those processes that I just outlined are
4  developed and in the protective order already,
5  so what the city is asking is that then we
6  be -- the Defendants take the burden of the
7  protective order, the designation, as opposed
8  to following the same course that's been
9  outlined here, and that's, frankly, what's
10  untenable.
11          MR. BADALA:  Special Master Cohen,
12  I just want to add it's not unusual.  I
13  believe it is in CT1 where we had the medical
14  examiner files and there were designations
15  used for that because of the information.
16  It's not just confidential informants.  Here
17  we have victims.  We have police tactics that
18  are used.  These are highly sensitive
19  documents.  And we're trying to get them to
20  the Defendants quickly so they have this
21  information.  They've told you it's very
22  important to them, they need those documents.
23  The way we're proposing is the quickest way
24  and easiest way to get them to them.
25          And I don't understand the burden

17 (Pages 62 - 65)

1 side of it.  We all know if we go to trial,
2 documents that are used at trial become
3 public, and that's something we'll have to
4 deal with.  And we've dealt with that on both
5 sides, even with summary judgment motions.
6 There's been documents that have been used in
7 expert reports or summary judgment motions
8 that designations were then removed by both
9 sides and then those documents were filed
10 publicly.
11       So we're not saying we wouldn't
12 deal with those issues as they come up.  What
13 we're saying right now is we want to get these
14 documents to them.  We think a designation
15 like an attorneys' eyes only, highly
16 confidential would be the best way because of
17 how sensitive this information is within those
18 documents.
19       MR. SMYER:  I have two follow-up
20 points for you, Special Master Cohen, on the
21 burden piece.
22       The first is we don't know what
23 these documents contain.  We haven't seen
24 them.  We know that some records are probably
25 public records.  So we're adding an additional

1 layer for an entire sloth based on speculation
2 that some of those documents may contain
3 information that the Plaintiff does not want
4 to go through -- have the time to go through
5 to redact.  That's essentially what happens.
6       And the other piece here is let's
7 say they're designated as AEO and we want to
8 use them in a deposition.  Then we have all
9 the additional hurdles about asking about
10 AEO-designated documents to somebody who may
11 or may not have seen that in the first place
12 and our ability to use the documents to
13 present our defenses is cut out from the
14 beginning because the Plaintiffs don't want to
15 review the documents.
16       So that's why we're saying it's
17 now fair to say that we're saying these should
18 be public records or confidential informant
19 information.  We don't want that.  We don't
20 care about that.  But what we do want is the
21 ability to present our case and to use the
22 information in a way that doesn't completely
23 saddle us with the Plaintiffs' burden.
24       MR. BADALA:  Special Master Cohen,
25 just a brief response to that.

1       I'm still not understanding the
2 burden argument.  They're going to use these
3 documents in a deposition.  We did not say you
4 cannot use them.  To the extent it has a
5 confidential informant's name or something
6 that needs to be redacted, it would be done
7 after the fact.  We're not saying send us
8 those documents ahead of time.  We're not
9 doing anything like that.  Our purpose here is
10 to get the documents to them.  We think it's
11 the most efficient way.  To have to go through
12 each of them would take a very long time.
13 Here we're saying we want to get these to you
14 quickly.  And we started that process.  And if
15 you recall, this has been going on for some
16 time because we first proposed the sampling.
17 They said they would do the sampling.  They
18 asked us for examples.  We sent them to them.
19 And then they claimed they didn't review them
20 because they had handwriting on them.  Then we
21 came back and talked about sampling again.  So
22 we said, hey, we're going to put the sampling
23 aside.  In exchange, we're going to do the
24 LERMS database.  We're going to get you these
25 documents.  But this is the one hurdle we have

1 to overcome so we can get these documents to
2 them and get them to them quickly.
3       SPECIAL MASTER COHEN:  I've gotten
4 the parties' positions.  I need to chew on
5 this a little bit.  I think I may even want to
6 talk about it with the judge.  But so that I
7 understand exactly what you're suggesting,
8 Sal, if you have any language, you know, an
9 amendment, if you want to call it, or a caveat
10 to the protective order that would apply in
11 this circumstance of these documents, what
12 that would look like, that would help me.
13       MR. BADALA:  We'll do that,
14 Special Master Cohen.  Thank you.
15       SPECIAL MASTER COHEN:  Thank you.
16       Anything else anybody else has?
17       MR. FARRELL:  I have one more
18 issue I don't know how to address.  I'm not
19 asking for any resolution.  I don't want
20 anybody to flip out.  The New York Times sent
21 a FOIA request and we're having to internally
22 deal with it.  The position is that the
23 documents that are referenced in the
24 complaint, they want, and internal documents
25 themselves are subject to a protective order.

Page 70

1 There's a process in place.  I'm not quite
2 sure how next to go about this, other than to
3 file a motion with the Court identifying for
4 the Court that there's a FOIA request that's
5 for documents that are referenced, quoted and
6 cited in the complaint.  I think it spills
7 over into a larger issue that we believe
8 there's been a widespread over-designation of
9 confidentiality.  So it's another pending case
10 that will be on the horizon in the next six
11 weeks or so.
12          SPECIAL MASTER COHEN:  Thank you
13 again for the heads-up, and that is probably
14 something -- we've addressed this kind of
15 issue before and it involved a fairly in-depth
16 motion practice.  So I'm glad you told us.
17          MR. WEINBERGER:  Can we calendar a
18 follow-up conference with you?
19          SPECIAL MASTER COHEN:  Yes.
20          MR. FARRELL:  That's all the PEC
21 has.  Thank you, David.
22          SPECIAL MASTER COHEN:  Thank you.
23          What do you all think of November
24 4th?  It's a little over two weeks and it's on
25 the other side of the weekend that I am

Page 71

1 traveling.
2          MR. WEINBERGER:  October 4th?
3          SPECIAL MASTER COHEN:  Wait a
4 minute.  I'm sorry.  I have the wrong month.
5 Let me start over.
6          MS. FITZPATRICK:  Coincidentally,
7 October 4th is two weeks from today.
8          SPECIAL MASTER COHEN:  Well, no.
9 October 1st is.
10          MS. FITZPATRICK:  Excuse me.  Two
11 weeks from Friday.
12          SPECIAL MASTER COHEN:  October 4th
13 I'm traveling.  It's the high holiday.  Rosh
14 Hashanah is on the 2nd.  So I think I'm
15 suggesting October 8th.
16          MR. WEINBERGER:  I think that
17 works.  Thank you.
18          SPECIAL MASTER COHEN:  Everybody
19 good with that?
20          MS. FITZPATRICK:  What time?
21          SPECIAL MASTER COHEN:  Let's set
22 it for 9:30.  I have an 11:00.  And we'll use
23 the same Zoom.
24
25          (Hearing concluded at 12:21 p.m.)

Page 72

1
2              CERTIFICATE
3
4
5        I, Renee L. Pellegrino, RPR, do
6 hereby certify that as such Reporter I took
7 down in Stenotypy all of the proceedings had
8 in the foregoing transcript; that I have
9 transcribed my said stenotype notes to the
10 best of my ability into typewritten form as
11 appears in the foregoing transcript; that said
12 transcript is the complete form of the
13 proceedings had in said cause and constitutes
14 a true and correct transcript therein.
15
16
17
18
19          _Renee L. Pellegrino_
20          Renee L. Pellegrino,
21          Notary Public, within and for the
22          State of Ohio
23
24 My commission expires October 12, 2025.
25

19 (Pages 70 - 72)

**[10 - admission]**

| 1 | 3 | 8 |
|---|---|---|
| **10**   60:25 61:4 | **3**   18:4 | **80**   46:3 |
| **11:00**   1:21 | **30**   3:15,22 4:3 | **8th**   71:15 |
| 71:22 | 6:10 9:4,10,11 | |

| 9 |
|---|
| **95**   22:24 23:5 |

**12**   1:11 72:24
**12:21**   71:25
**14**   26:25 27:23
**15**   1:13
**17**   1:7,20
**18**   1:13 23:1,6
**18th**   4:8 5:12
**19**   1:11
**1997**   25:9
**1st**   71:9

**3** (cont.)
50:19 53:20
54:9 55:8 56:3
57:12 58:25
59:25
**30th**   59:12
**31**   58:21 59:20
**33**   10:5
**387**   18:16
**389**   19:14 20:1
**390**   3:8
**3:00**   61:1,6

**95**   22:24 23:5
35:15
**98**   25:10
**99**   16:22
**9:30**   71:22

**a**

**a.m.**   1:21
**aaron**   1:8
**abatement**
15:22
**ability**   67:12,21
72:10
**able**   18:20
19:10 50:7
**absolutely**
53:24 54:10
**accept**   4:9 13:6
14:15
**access**   24:14
31:1 32:16
36:3,4 37:2,3
38:1,2,6 39:6,7
45:16,18
**accessed**   37:17
38:24
**accidentally**
58:9
**account**   27:10
**accountant**
54:4

**2**

**20**   50:23
**20,000**   62:1
**2000**   25:10
**2000s**   38:18
**2012**   31:20
**2014**   22:21,22
23:4 25:5,15
26:9,13 54:21
**2019**   15:16,17
**2024**   1:20 25:2
**2025**   72:24
**22**   57:17,18
**2227**   72:19
**27**   4:4,7,16
**2804**   1:6,7
**29**   4:4,7,16
**2nd**   71:14

**4**

**40**   43:9
**45175**   1:13
**45853**   1:11
**4th**   70:24 71:2
71:7,12

**5**

**5**   7:20 10:17
**5:10**   4:4,15

**6**

**6**   50:19 53:20
54:9 55:8 56:3
57:12 58:25
59:25
**622**   22:23
**6th**   23:15 64:10

**accounted**   34:3
**accounting**
35:24 54:15,22
56:22
**ackerman**   2:8
4:5,17,18 5:2
5:21 7:9,12
10:2 12:18
17:10,22 57:14
60:10 61:8
**actual**   37:17
45:20
**actually**   19:6
30:12 37:16
**acutely**   15:9
**add**   45:20 46:9
65:12
**addiction**   8:8
**adding**   66:25
**addition**   24:6
**additional**   18:2
47:16,21 51:5
52:24 66:25
67:9
**address**   3:2
69:18
**addressed**   60:7
70:14
**admin**   27:9
**administrative**
23:2,7 31:18
34:12 36:15
50:17
**admission**
58:21

| | | | |
|---|---|---|---|
| **admitted** 59:19 | **allegations** 21:21 | **anticipate** 5:1 | **asked** 7:13 9:5 |
| **advance** 63:22 | **alleged** 3:10 | **anybody** 36:13 | 9:10,12 11:21 |
| **aeo** 64:24 67:7 | 6:22 7:1,3 | 61:13 69:16,20 | 13:19 15:4 |
| 67:10 | **allegedly** 3:17 | **anymore** 54:16 | 19:17,22 23:13 |
| **affect** 55:19,20 | **alleging** 21:21 | **appearances** | 28:22 40:25 |
| **affected** 35:9 | 59:5 | 2:1 | 43:3 44:12 |
| **affirm** 16:8 | **allowed** 13:14 | **appeared** 21:12 | 45:23 46:21 |
| **affirmative** | 15:25 16:2 | **appears** 59:22 | 56:2 59:12 |
| 6:25 17:1 | **amended** 57:16 | 72:11 | 68:18 |
| **affirmatively** | 58:8 | **applies** 47:1,3 | **asking** 3:21 |
| 15:11 | **amendment** | **apply** 47:4 | 10:21 11:1,17 |
| **afternoon** 19:3 | 69:9 | 69:10 | 21:14 26:10 |
| **agencies** 7:24 | **amount** 32:18 | **appreciate** 52:8 | 41:18 49:6 |
| 8:1 | 32:19 33:20,21 | 60:6 | 52:5 65:5 67:9 |
| **agency** 7:23 | 35:25 43:18 | **appropriate** | 69:19 |
| **agenda** 3:3,8 | 57:1 | 50:16 57:2 | **assistance** 6:19 |
| 18:16 19:14 | **amounting** | **appropriately** | 6:22 7:4 9:16 |
| 51:10 57:2,4 | 57:25 | 45:8 46:15 | 10:7,10 13:8 |
| 58:13 | **amounts** 25:23 | **april** 21:13 | **assume** 4:21 |
| **ago** 16:17 27:7 | 35:7 39:24 | 54:2 | 5:16 17:14 |
| 29:4 40:4 | 44:7,15 56:8 | **archive** 53:2 | 25:21 |
| 41:24 52:18 | **analyze** 38:5 | **argue** 11:24 | **assuming** 37:2 |
| 53:4,6 54:19 | **andrew** 28:3 | 14:1,10 | **assure** 15:8 |
| **agree** 12:9 64:8 | **answer** 5:4 | **argued** 63:10 | **atf** 6:15 |
| **agreed** 28:13 | 10:4 32:12,13 | **arguing** 53:11 | **attachments** |
| 43:4 44:1 | 32:15 37:15 | **argument** 3:14 | 6:16 |
| 55:16 58:10 | 38:15 46:24,25 | 8:16 12:23 | **attorney** 36:17 |
| **agreement** 9:20 | 47:1,2,22 50:2 | 19:16 60:15 | **attorneys** 62:9 |
| 34:8 | 50:13 53:15 | 68:2 | 62:18 66:15 |
| **agreements** | 57:23 | **arranged** 34:19 | **audit** 48:12 |
| 28:19,20 | **answered** 14:6 | **arrangement** | 49:22 |
| **ahead** 7:11 | 50:14 | 34:15 | **august** 59:12 |
| 21:6 63:9 68:8 | **answers** 5:13 | **art** 20:22 | **availability** |
| **algorithms** | 14:9 50:20 | **aside** 57:10 | 58:16 |
| 38:4 | | 68:23 | |

**available** 33:23
38:22 39:9,11
48:19 50:1,9
53:15,18 55:5
60:20,24 61:3
61:4
**aware** 15:9
48:7

**b**

**b** 50:19 53:20
54:9 55:8 56:3
57:12 58:25
59:25
**back** 4:21 5:14
6:5 16:1 24:17
25:2,4,8,14
26:13 27:7
29:10 33:9
34:6 38:18,23
39:1,2,8 40:2
43:8 48:4,11
51:10 53:3,9
54:14,21 56:5
57:10 68:21
**backed** 60:12
**badala** 2:10
61:16,17 65:11
67:24 69:13
**based** 25:12,15
46:23 56:4,17
67:1
**basis** 9:1 24:3
28:10,12 34:6
35:7 44:3
64:21

**bates** 9:23 10:5
12:21 14:6,13
**beginning**
40:24 52:15
67:14
**behalf** 3:25
33:16 58:5
60:3
**belief** 63:15
**believe** 10:24
14:8 19:19
20:13 43:4,9
53:13 65:13
70:7
**bellwether** 24:3
43:24 44:6
**bellwethers**
26:17,18 51:25
**benefit** 11:20
33:4
**best** 43:12
63:12 66:16
72:10
**beyond** 47:21
54:14,23
**bit** 18:17 23:23
48:22 69:5
**boards** 7:25
**bottom** 35:10
**box** 61:1
**boxes** 58:21
59:18
**brad** 63:18
**bradley** 2:9

**brief** 67:25
**bring** 29:14
52:22 61:14
**broad** 8:9 20:7
55:23
**bunch** 55:18
**burden** 10:7,25
63:10 64:13
65:6,25 66:21
67:23 68:2
**burdened** 26:8
**business** 31:2
54:4

**c**

**calculated**
46:23 56:21
**calendar** 70:17
**call** 1:17 21:1
49:20 57:7
61:6,10,15
69:9
**called** 21:2,4
31:16 42:18
**capture** 48:1
**care** 67:20
**carried** 58:9
**case** 1:7 13:21
28:23 37:11
67:21 70:9
**cases** 62:1
**catch** 64:8
**categories** 9:16
13:4 17:6
59:10

**category** 9:22
11:16
**cause** 72:13
**causes** 64:12
**caveat** 69:9
**centrally** 32:18
**certain** 19:17
33:21 34:11,13
59:8,10
**certainly** 5:3,12
48:20,24 50:24
**certificate** 72:2
**certify** 72:6
**challenging**
8:18
**chance** 42:3,4
**characterizati...**
12:19 57:20
**chart** 21:1
37:13
**chase** 8:2
**chatted** 50:22
**chew** 69:4
**choose** 41:18
**choosing** 42:20
42:22
**chosen** 41:23
**circuit's** 64:11
**circumstance**
69:11
**cited** 6:12
10:13,15 16:23
17:19 70:6
**citing** 16:18

**city** 1:10 3:9
4:6 6:21,25 7:3
43:2 64:3,19
65:5
**claim** 8:15 24:3
24:3 33:20
60:14
**claimed** 8:2
68:19
**claiming** 4:22
**claims** 7:6
23:25 47:15,17
**clarify** 4:3
16:16 44:14
**clear** 8:14 11:1
15:8 17:24
47:8 49:5
54:11
**clearly** 8:25
32:17
**click** 37:22
**client** 24:8
27:11,11,12
29:3,10 34:5,5
34:7,14,17,21
34:22,25 35:3
35:20,21 36:9
42:10,11,12
43:4,14,17,20
44:5,10 48:5
56:9,15,23
**clients** 21:17
23:10 34:1,1,3
34:18 35:11
36:8 41:18

42:16,21,23
43:1,6,9 44:13
49:12
**close** 19:7
**closed** 55:22
**closer** 61:5
**cmo** 18:16
**cohen** 1:18 3:1
3:24 4:11,18
4:25 5:25 6:7
7:11 9:2 11:8
12:21 13:9
14:20 17:25
18:12,13,24
19:13 20:3,21
20:25 21:6,25
22:12,18 23:18
24:25 26:24
27:25 29:8,13
29:16 30:4
32:8 36:12
37:25 42:17
43:15 44:17
47:6 49:16
50:4,21 51:20
52:9 53:9,21
54:6 55:13
56:24 57:15
58:4 59:4 60:5
60:11,17 61:11
61:16 63:17
65:11 66:20
67:24 69:3,14
69:15 70:12,19
70:22 71:3,8

71:12,18,21
**coincidentally**
71:6
**collect** 48:5,19
50:1
**collected** 24:17
**collecting**
55:17
**collection**
48:15
**colloquy** 25:10
**combination**
23:13
**combinations**
20:12
**come** 5:14
13:22,22 16:1
51:10 55:19
57:10 66:12
**comes** 22:9,14
35:14 46:10,12
56:3,6,7 64:25
**coming** 6:5
46:18 55:15
60:1
**commission**
72:24
**communicated**
10:19 25:19
52:13
**communicati...**
6:18,20 7:21
10:8 12:7,8
13:5 20:22
37:14

**companies** 36:4
**company** 49:8
**comparing**
28:14
**compel** 12:25
21:11
**competitors**
28:15
**complaint**
69:24 70:6
**complete** 3:19
48:22 49:20
72:12
**completely**
43:17 44:7
52:3 67:22
**completes** 57:1
**component**
36:6 40:1
44:11
**concept** 38:21
**concern** 26:19
**concerned**
26:14 31:25
**concerns** 7:2
28:25 41:3
**concluded** 5:8
71:25
**conclusion**
25:11
**conduct** 36:15
**confer** 10:20
19:3 42:5,8
47:9

**conference**
1:17 10:17
28:3 70:18
**conferences**
61:21
**confidence**
10:12
**confident** 27:15
**confidential**
62:10,19,25
64:17,22 65:16
66:16 67:18
68:5
**confidentiality**
70:9
**confirm** 4:14
4:19 16:4
**confused** 17:21
**confusing** 14:4
14:5
**congratulatory**
6:15
**consideration**
35:5
**consistent** 10:4
**constitutes**
72:13
**constituting**
7:21
**contain** 26:7
64:16 66:23
67:2
**contained** 14:8
25:17

**contending**
10:18
**context** 52:3
**continued**
15:19
**continues** 18:2
**contract** 27:10
35:18
**contracts** 20:17
25:17 27:18
28:7,17 34:18
41:20 42:11
43:4,11,14,17
43:20 44:6,11
56:14
**contrary** 64:9
**controversy**
36:14
**conversation**
17:20 25:1
37:5 39:17
42:2 51:6 57:1
**conversations**
25:6 29:1
33:15 48:1,3
**convert** 27:13
27:21
**copies** 59:15
**copy** 40:10
58:17,22
**core** 63:23
**correct** 4:25
18:14,22 54:10
60:11 72:14

**corresponden...**
19:4 40:9
**counsel** 29:9
58:6 63:19
64:15
**county** 1:12
43:3 57:12
59:12
**county's** 58:20
**couple** 14:21
51:11 56:12
63:24
**course** 10:3
11:19 65:8
**court** 1:1 33:5
70:3,4
**court's** 64:10
**cover** 6:16 50:9
53:5
**covers** 8:11
**create** 38:4
44:20 45:4
**created** 15:23
45:2
**creating** 16:12
**crisis** 7:7
**critical** 45:3
51:21
**criticized** 51:24
52:1
**ct1** 65:13
**custodial** 40:11
48:6,9
**custodian**
31:10

**custodians**
40:25 41:23
42:22
**customers** 43:7
**cut** 8:1 67:13

**d**

**d** 10:5
**damages** 7:2
**dan** 1:8
**data** 20:14 22:5
23:12,23,25
24:1,7,9,10,14
25:14,22 26:2
26:9,13,15,23
26:25 27:6,8
27:12,21,23
30:10 31:3,5
31:14,17,21
33:2,7,10,11,24
36:3 37:2 38:2
38:3,7,11,23
39:6,10,12,13
40:19,23 41:15
43:23 44:16,24
45:18 47:12,17
47:21 53:2
**database** 30:15
30:22 32:17,24
33:3,7 61:25
62:7 68:24
**date** 18:21 19:5
22:3 31:19
55:16
**dates** 18:17
19:7 33:22

39:2
**dating** 48:4
**david** 1:18 2:8
4:5,18 70:21
**david's** 4:15
**days** 18:19
28:25 37:9
**dea** 7:25 10:9
**deadline** 15:23
**deadlines** 49:18
**deal** 66:4,12
69:22
**dealt** 66:4
**decade** 55:7
**december**
23:15 55:15
**decide** 34:22
**decided** 61:24
**decision** 34:5
**decisions** 8:25
64:11
**declare** 15:24
**defendant** 8:21
44:19
**defendants**
3:18,20 4:1 7:8
8:15 11:20
13:17,22,25
17:15 23:19
27:2 37:16
44:1 45:21
46:7,20 50:24
53:14 57:17
60:3 62:11
63:5 65:6,20

**defense** 9:1
**defenses** 6:25
17:1 62:14
64:2 67:13
**defensively**
15:12
**deficiencies**
3:10,11 52:2
**deficient** 6:12
**definitely** 45:6
61:4
**delay** 41:7
**demonstrate**
21:15
**deny** 16:9
**depended** 56:9
**deposition**
13:11 50:19
55:14,21,22
58:1,7 60:8,13
62:20,23 63:2
67:8 68:3
**depositions**
16:5 29:7
46:11,16 56:4
**depth** 70:15
**describe** 59:9
**described**
32:23 45:12
**description**
30:20
**designate** 64:24
65:1
**designated** 3:6
67:7,10

**designating**
64:19
**designation**
62:8,17 63:6
64:9,12 65:7
66:14 70:8
**designations**
65:14 66:8
**designed** 47:25
**destroyed**
58:21
**destruction**
59:5,17
**determine**
48:18 50:12
**determined** 6:3
**determining**
49:25
**developed** 65:4
**developments**
64:4
**different** 20:12
23:13 30:10
32:7 34:1,15
38:2 44:8
46:25 63:20
**disagree** 12:19
52:3
**disagreement**
17:8
**disclosure**
58:14
**discoverability**
52:11

**discoverable**
45:24
**discovery** 3:3
3:10,10 11:1,2
11:6 12:17
13:13,24 14:24
15:3,5,15
16:10,13,20
17:2 19:8
20:12,16 23:22
25:7 31:10
44:21 45:11,21
46:10,19 55:15
61:21
**discretionary**
8:25
**discuss** 34:17
57:8 58:3
61:14
**discussed** 61:20
**discussion** 20:8
47:18
**discussions**
39:8 46:15
**dispensing** 8:5
**disposition**
58:17 59:13,16
**dispute** 61:22
**disputed** 21:20
**disputes** 19:12
**district** 1:1,2
**diversion** 8:4
**division** 1:3
**docket** 63:3

**doctor** 37:18
**doctrines** 8:17
**document** 1:9
  17:10 18:1,2
  22:11,22 30:13
  32:10 44:20,23
  45:1,4 47:19
  62:20,23
**documents**
  6:13 7:20 8:10
  9:5,9,13,13,22
  10:1,6,13 11:3
  11:5,11,15
  12:2,12,20,23
  13:13,16,18
  14:7,8,11,17,18
  14:25 15:15,17
  15:19 16:1,2,4
  16:18,22,23
  17:6,13,18
  18:3 21:15
  23:24 24:11,20
  25:15,24 26:7
  28:4,18,22,24
  29:3,18 31:25
  32:14,22 37:12
  39:19 40:5,6
  40:16 41:11
  42:11,12 43:11
  44:2 45:13,13
  47:24 48:9,12
  50:8 52:24
  53:23 54:8
  55:18,19 56:4
  56:15,20 57:25

58:18,22 59:5
59:10,18,19,23
59:24 60:11
62:6,9,11,12,15
62:22 63:7,8
63:11,22,25
64:7,16,20
65:19,22 66:2
66:6,9,14,18,23
67:2,10,12,15
68:3,8,10,25
69:1,11,23,24
70:5
**doing** 16:6 41:9
  68:9
**dollars** 49:8,11
  50:17,17
**drafted** 5:17
**drug** 28:6 35:6
  35:6 47:3
**drugs** 32:4,5,7
  36:20 56:18
**dunning** 33:16
**duplicative**
  7:14 10:19
**duty** 8:15

**e**

**e** 3:8 4:5,15
  6:15,16 7:15
  24:12 25:25
  40:6 47:24
  52:23 57:4,21
  58:16,16
**earlier** 25:9
  31:16 39:8

53:10
**earliest** 51:18
**early** 25:2
**easier** 38:15
**easiest** 65:24
**eastern** 1:3
  61:5
**easy** 10:7 38:14
  61:9
**efficient** 31:6
  68:11
**either** 15:11
  27:24
**electronic**
  37:10,13,18
  40:11
**electronically**
  40:19 60:12
**elicit** 12:10
**elizabeth** 2:6
  2:16 3:24
  11:19
**elsner** 2:13
  27:25 29:11,22
  43:15,16 47:11
  48:10,17 49:24
  50:4,5
**emily** 2:15 47:6
**emphasize**
  14:21
**encompass** 9:9
**ends** 15:10,23
  46:14,18
**enter** 38:25

**entire** 28:20
  67:1
**entirely** 19:16
**entities** 6:19
  13:8
**entitled** 5:23
**entity** 8:20
**epidemic** 6:23
  7:3
**esi** 3:25 15:14
  33:12 43:19
  50:7 55:7
  58:16
**esi's** 35:10
**especially** 9:25
  20:17
**esq** 2:3,4,5,6,7
  2:8,9,10,11,12
  2:13,14,15,16
**essential** 54:3
**essentially** 8:18
  9:4 67:5
**establish** 15:21
**establishes**
  20:15
**everybody**
  13:20 51:7
  71:18
**evidence** 22:4
**exactly** 8:11
  16:21 17:21
  19:1 53:7 69:7
**examiner** 65:14
**examplar** 22:8

**[example - formulas]** Page 8

| | | | |
|---|---|---|---|
| **example** 15:13 20:10 30:16 37:18 46:11,22 | **explanations** 58:23 | **farrell** 2:4 14:19,20 17:9 20:1,5,24 21:2 | 22:21 23:12 35:17 |

**example** 15:13
20:10 30:16
37:18 46:11,22
**examples** 68:18
**except** 12:1
46:7 57:4 61:3
**exception** 19:5
**excessive** 8:5
**exchange** 68:23
**excuse** 71:10
**exhibits** 29:23
**exist** 12:12 13:6
16:4 24:20
25:14 26:18
28:16 33:14,17
40:8,9,10
44:21 54:16
56:15,19,21
**existed** 25:23
28:20 38:23
**exists** 23:12
36:2 40:12
**expect** 19:10
49:18,22
**expected** 48:15
**experience** 28:2
**expert** 66:7
**experts** 29:5
**expires** 72:24
**explain** 3:21
30:18
**explained** 34:4
**explaining**
35:23 37:20

**explanations**
58:23
**explicitly** 49:14
**explore** 59:25
**express** 15:4
20:11,18 21:8
22:7,25 23:4,9
23:17,21 30:25
32:6 33:6,16
58:5
**extended** 33:9
**extent** 9:17,19
11:13,13,18
15:22 19:18
68:4
**eyes** 62:9,18
66:15

**f**

**fact** 10:13,20
19:8 21:7
23:12 25:17
26:6,9 31:14
39:16 45:25
63:24 64:15
68:7
**facts** 63:24
**fair** 53:12
67:17
**fairly** 70:15
**faith** 64:21
**fall** 9:22,23
11:15
**familiar** 38:8
**far** 10:15 24:20
40:1

**farrell** 2:4
14:19,20 17:9
20:1,5,24 21:2
21:7 22:3,13
22:20 29:12
31:15 40:7
49:14 51:12,13
53:8 54:1,24
55:5 69:17
70:20
**federal** 7:4,22
10:4 36:16
**fee** 23:2 35:2
50:17
**feel** 57:7
**fees** 23:7 31:18
34:12 36:16
55:2,9
**field** 33:12
**fields** 33:10
47:14,17
**figure** 9:3
10:10 22:6
34:7 38:4
43:12 45:22
46:7
**file** 70:3
**filed** 21:11 59:6
66:9
**files** 40:10,11
65:14
**final** 29:13
33:17
**financial** 20:14
21:22,23 22:5

22:21 23:12
35:17
**financials** 36:8
**find** 13:15 26:9
30:2 41:1
45:12 49:4
**finding** 10:23
**firm** 12:15
**first** 10:17 32:8
58:19 59:3,15
66:22 67:11
68:16
**fish** 10:21
**fitzpatrick** 2:12
18:23,25 20:4
71:6,10,20
**five** 3:11 15:11
**flip** 69:20
**floating** 57:11
**focused** 32:5
**foia** 69:21 70:4
**folks** 46:16
**follow** 55:25
66:19 70:18
**followed** 36:13
**following** 13:8
65:8
**forces** 8:23
**foregoing** 72:8
72:11
**form** 7:18 9:1
23:5,6 50:18
72:10,12
**formulas** 27:11

**[forward - holds]**                                                    Page 9

| | | | |
|---|---|---|---|
| **forward**  12:16 16:25 58:1,9 | 32:16 34:19 42:10 52:7 | 56:1,5,10 60:7 61:18 68:2,15 | **hashanah**  71:14 |
| **found**  24:21,22 29:22 | **given**  4:20 26:12 33:19 | 68:22,23,24 | **hatchett**  28:3 |
| **four**  3:13 9:16 15:10 | 39:5,19 | **good**  3:1,23 18:23 19:13 | **heads**  62:22 70:13 |
| **frame**  54:12 | **giving**  45:16 | 64:21 71:19 | **health**  49:12 |
| **framed**  7:17 | **glad**  70:16 | **gotten**  69:3 | **hear**  3:14 27:4 48:24 |
| **frankly**  27:18 48:14 65:9 | **global**  63:6 64:8 | **government** 7:5,5 36:16 | **heard**  5:10 30:8 63:19,21 |
| **friday**  58:14,20 59:14 71:11 | **globally**  47:3 | **gross**  22:23 | **hearing**  10:16 25:11 40:4 |
| **front**  4:21 | **go**  7:11 8:19,21 10:9 16:13,25 | **ground**  15:7 | 56:24 64:5 71:25 |
| **full**  11:7 49:7 | 21:6 27:5 29:2 | **guarantee** 34:11 | **heart**  45:25 |
| **function**  35:24 56:22 | 29:10 32:13,25 34:6 39:2 | **guess**  3:4,20 9:17 19:15 | **heartland**  46:4 |
| **funds**  35:11 | 40:24 42:9 44:11 56:11 | 25:4 | **help**  11:17,22 13:3,16,19 |
| **further**  5:6 42:9 | 58:1 60:12 63:9 66:1 67:4 | **guys**  9:18 | 42:6 45:20 69:12 |
| **future**  5:20 | 67:4 68:11 70:2 | **h** | **helpful**  12:9 |
| **g** | **goes**  20:8 23:9 | **h**  2:5 | **heuvel**  2:7 23:20,21 30:24 |
| **gaddy**  33:15 | **going**  5:18 12:5 22:16 23:3,16 | **half**  50:23 | 33:1 52:16 |
| **game**  9:19 60:1 | 24:17 25:2,4,8 | **hand**  15:18 | **hey**  64:25 68:22 |
| **gauge**  58:25 | 25:14 27:20 | **handle**  61:9 | **high**  71:13 |
| **generally**  31:11 | 32:4,24 34:8,9 | **hands**  54:22 | **highly**  62:10,18 65:18 66:15 |
| **generals**  36:17 | 35:13,15,18,22 38:17 39:1 | **handwriting** 68:20 | **historically** 14:25 |
| **generate**  21:9 | 40:13,17 41:7 | **happen**  45:6,10 51:9 | **hold**  17:10 29:16 |
| **generated** 20:19 35:1,12 | 41:8,20 42:23 45:10 46:2 | **happened**  4:12 | **holds**  4:12 |
| **getting**  26:15 26:16 31:25 | 50:13,22 51:5 53:3,19 54:7 | **happening**  9:24 37:8 | |
| 37:3 46:3 51:24,25 | 54:14,21 55:13 | **happens**  67:5 | |
| **give**  15:13 23:17 30:25 | | **happy**  65:2 | |
| | | **hard**  40:10 46:17 58:17,22 | |

**holiday** 71:13
**hope** 5:4
**hopefully** 56:12
  61:8,11
**horizon** 70:10
**hour** 50:23
**huge** 36:20
**hundred** 16:23
  34:9 35:13
  59:17,18,23
**hundreds**
  41:10,11 47:23
**hurdle** 68:25
**hurdles** 67:9
**hyperbolic**
  60:16

**i**

**identified** 10:5
  12:20 13:4
  14:13 28:7
  29:13 52:20
  53:4
**identify** 6:18
  9:14 10:6
  11:16 12:13
  15:20 16:1,2
  17:5,13 18:5
**identifying**
  70:3
**illegal** 8:8
**imagine** 46:13
  46:17
**impact** 7:7
**impasse** 63:14
  63:16

**importance**
  50:25 51:8
  52:10
**important** 14:3
  32:18 35:5
  49:13 52:14
  62:13,13,14
  63:25 64:2
  65:22
**imposed** 26:1
**impression**
  26:24 27:23
**improper** 4:23
  8:4,5
**inadequate**
  43:24
**included** 24:1
  29:23 48:16
**includes** 18:3
  64:24
**including** 7:23
  7:24 25:16
  37:14
**incomplete**
  4:23
**increase** 21:23
**indicate** 22:22
**individual** 34:6
  56:18
**informant**
  62:25 64:17,22
  67:18
**informant's**
  68:5

**informants**
  65:16
**information**
  14:9 24:5 25:8
  26:7,11,16
  29:5 30:14,17
  31:12,17,21
  32:18,20 34:20
  36:24 37:6,22
  39:1 41:1,4
  44:2,5,22,23
  45:2,7,21,22
  46:13,18 48:6
  48:21 49:2,10
  49:19 51:1,21
  54:13,15,18,20
  55:20,25 59:2
  59:21 62:5,17
  62:24 64:17,18
  64:22,23 65:15
  65:21 66:17
  67:3,19,22
**informed** 28:3
  29:2
**ingested** 40:16
  41:10
**ingestion** 45:11
**inquiry** 53:18
**instance** 6:14
**insufficient**
  27:2,3
**insulin** 36:20
**intend** 15:20
**interested**
  64:18

**internal** 69:24
**internally**
  69:21
**interrogatories**
  3:12 4:4,7,16
  5:24
**interrogatory**
  3:15,22 4:2 5:5
  5:13,17 6:10
  6:14 7:15,18
  8:12 9:3,10,11
  10:14 11:14
  12:3,16 18:4
  50:18
**interrupt** 43:16
**intervention**
  61:19
**introduce**
  27:15
**inures** 11:20
**investigation**
  12:7
**invoice** 24:13
  28:9 29:24
  31:7 33:2
  44:24
**invoices** 24:9
  24:16,17,23
  30:7,9 31:5
  36:3 39:18
  52:19,22 53:3
  55:6
**involved** 70:15
**issue** 4:9 16:21
  18:8 36:5,18

[issue - longer]                                                    Page 11

36:21,25 39:4
42:2 43:17,18
44:8 51:9 52:9
52:12 56:5,6,9
57:19,19 58:10
59:7 60:6
61:24 62:3,4
63:16,23 65:2
69:18 70:7,15
**issued**  3:7
31:23
**issues**  3:5 5:16
5:19 18:21
19:2,8 57:11
58:15 66:12
**item**  3:8 18:16
19:14 57:2
**items**  3:2

**j**

**james**  57:22
**january**  33:9
**jeff**  33:15
**josh**  3:3
**jr**  2:4
**judge**  1:8 69:6
**judgment**  66:5
66:7
**jump**  4:2
**juncture**  10:12
**jurisdiction**
43:2 44:7,16
**jurisdictions**
24:4

**k**

**keep**  30:21
35:13,15 36:7
51:9,25
**kept**  35:2 51:24
56:8
**kind**  9:18 17:24
25:25 37:7
44:18 46:17
49:19 70:14
**kinds**  9:5,9
30:10 31:3
32:2
**king**  2:3 58:4,5
59:7
**knew**  46:16
**know**  5:9 8:23
13:3,20 14:10
14:11 16:21
19:11 20:9
23:2 24:14,19
25:19 26:10
28:4 29:19
30:14 31:6,9
32:3 33:20
35:3,4,20 37:1
37:3,15,23,25
38:3,8,12,14,16
39:19 42:14
46:2,21,22
47:16 48:2,4
48:24 51:3,24
52:4,9 57:14
58:1,2,24
60:14,22 61:2

64:9 66:1,22
66:24 69:8,18
**knows**  13:20
30:25 36:17

**l**

**l**  1:25 72:5,20
**l.p.**  1:10,12
**landed**  26:1
**lands**  11:9
**language**  52:1
69:8
**large**  40:15
**larger**  70:7
**largest**  43:7
**late**  60:1
**latest**  43:10
**laura**  2:12
18:24 33:16
**lawsuit**  45:25
**lawyers**  53:11
53:13
**lay**  52:25
**layer**  67:1
**lays**  19:24
**learn**  30:17
**learned**  24:8
58:19
**learning**  59:2
**leave**  26:22,24
27:22
**left**  18:10 39:21
40:18 41:14
**legal**  8:17
**lerms**  61:25
68:24

**letter**  52:20
53:5 58:23
**letters**  52:2
**letting**  61:2
**liability**  21:19
**likely**  26:6 32:1
**limit**  21:22
**limitation**
27:12
**limitations**
25:3 26:2
**limited**  7:23
43:24
**line**  19:7 35:10
**lines**  32:22
**list**  7:24 12:20
21:3 50:8,12
**listed**  2:18
**litigation**  1:6
15:8 37:8
51:19
**little**  18:17,20
27:4 48:21
69:5 70:24
**local**  7:22
**locked**  16:13
**log**  30:16
**logs**  59:13,16
**long**  7:24 29:4
40:22 41:9
59:9 64:1
68:12
**longer**  39:3
41:6

**look** 7:19 13:15
    13:18 16:24
    22:13 31:14
    39:22 41:2,14
    41:19,19,20
    50:12 57:6
    63:7 69:12
**looking** 6:17
    38:12 43:11
    49:9 54:16
    60:20
**looks** 3:4
**lot** 38:1 40:23

**m**

**m** 2:9
**made** 34:5
    35:20 38:22
    39:13 43:22
    49:5 64:4
**magic** 22:10
**mail** 3:8 4:5,15
    6:15 7:15
    24:12 52:23
    57:4,21 58:16
    58:16
**mails** 6:16
    25:25 40:6
    47:24
**main** 58:12
**maintain** 28:17
    59:13
**make** 8:13,14
    22:10 47:7
    48:25 60:14,23
    61:2 63:2,2,8

**makes** 33:13
**making** 48:25
    56:20
**malpractice**
    37:8,11
**maneuver**
    37:21 38:9
**manufacturer**
    28:6,11 30:8
    35:9 44:25
**manufacturers**
    24:10,14,22
    31:1,13,24
    32:2,3 39:20
    43:20 44:4
**march** 28:2,23
**market** 28:14
    28:15 30:9
    44:25
**mass** 62:6
    64:11
**massive** 46:19
**master** 1:18 3:1
    3:24 4:11,17
    4:25 5:22,25
    6:7 7:10,11 9:2
    11:8 12:21
    13:9 14:20
    17:25 18:12,13
    18:24 19:13
    20:3,21,25
    21:6,25 22:12
    22:18 23:18
    24:24 26:24
    27:25 29:8,12

    29:16 30:4
    32:8 36:11
    37:25 42:17
    43:15 44:17
    47:5 49:16
    50:4,21 51:20
    52:9 53:8,21
    54:6 55:13
    56:24 57:15
    58:4 59:4 60:5
    60:11,17 61:11
    61:16 63:17
    65:11 66:20
    67:24 69:3,14
    69:15 70:12,19
    70:22 71:3,8
    71:12,18,21
**materials** 10:23
    47:21 49:23
**matter** 3:17
    53:16
**mcgowan** 2:15
    47:5,6 49:21
**md** 1:7
**mdl** 1:6 64:11
**mean** 11:23
    29:9 30:19
    57:9
**meaningful**
    29:6
**means** 15:16
**meant** 42:22
**medical** 37:8
    37:10,11,13,19
    65:13

**medication**
    35:15
**medicines**
    46:23
**meet** 10:20
    19:2 42:4,8
    47:9
**meetings** 57:7
**mentioned** 19:4
    42:19,19 49:14
**met** 27:16
**michael** 2:13
    30:20 50:5
**mike** 43:16
**miller** 2:6,16
    3:23,25 4:13
    5:3,11 6:6,9
    10:11 12:5
    13:1 14:14
    16:15 17:16
    18:11
**million** 22:23
    22:24 23:1,5,6
**millions** 41:10
    41:11
**mind** 52:11
**minute** 5:7
    16:17 60:22
    71:4
**minutes** 50:23
    57:5
**misconception**
    38:21
**mitigate** 7:1
    8:16 11:23

13:20

**moment** 18:19

**money** 20:10
21:8,15,17
22:6 32:19
33:22 35:8
54:5

**month** 28:5
49:23 50:3,11
71:4

**monthly** 24:12
24:13 28:10,12

**months** 26:11
27:7 34:16
35:23 40:4
41:18 52:5,18
53:4 54:19
56:2

**morning** 3:2,23
18:23 57:5

**motion** 12:24
51:23 70:3,16

**motions** 21:11
21:12 66:5,7

**motivation**
21:22,23

**mougey** 2:11
26:22

**move** 6:7 12:16
18:9 22:17

**muddied** 16:8
17:17

**multitude**
33:18

**municipality**
8:19,22

**n**

**name** 68:5

**names** 30:11

**narrow** 20:7

**national** 1:6
26:15 43:21
44:3,3,8 55:1,9

**nationwide**
52:19

**necessarily**
35:19

**necessary** 54:9

**need** 5:5,14 6:2
6:22 12:15
16:5 17:5 18:9
19:15 26:8
27:9 36:9 42:7
44:5 46:3 48:5
48:21 50:14
57:9 59:10
60:8,14 61:10
61:18 62:22
65:22 69:4

**needed** 3:12
62:2

**needs** 45:6,8
46:5 51:9 68:6

**negotiated**
47:14,25

**negotiating**
27:7,19 41:25

**negotiations**
24:1 33:9

**neither** 22:4
44:19

**net** 33:25

**never** 13:18
30:12 31:7
52:12,12

**new** 3:5 17:13
47:12 69:20

**night** 3:8 4:5
19:15 57:16,21

**nine** 26:11 52:5

**non** 6:17 40:11
48:6,9 58:16

**noon** 60:25
61:5

**normally** 44:19

**northern** 1:2

**notary** 72:21

**note** 14:3

**noted** 9:6

**notes** 72:9

**notice** 57:16
58:8

**november**
70:23

**nuisance** 15:21

**number** 3:8
6:10,12 7:13
7:20,25 8:17
32:4 33:12,13
33:17 39:23

**numbers** 9:23
10:5 12:21
14:6,13 36:21
42:13,13 55:20

**o**

**oath** 50:20

**objected** 15:14

**objection** 27:17
64:19

**obligation**
11:10,12 12:2
16:10,11

**obtain** 32:11

**obtaining**
31:21

**obviously**
12:18 57:19
59:25 63:10

**occur** 5:1

**occurred** 59:6

**october** 4:8
5:12 71:2,7,9
71:12,15 72:24

**offered** 40:23
61:22

**official** 7:23

**offset** 34:12

**oh** 13:23 20:5
32:13

**ohio** 1:2 72:22

**okay** 4:13 5:2
6:6 9:5,12,20
34:7 35:12
46:24 51:7
61:12

**olga** 2:14 33:5
42:19,21 45:11

**once** 34:21
54:12

**ones** 9:14,14,15
  10:10,14 11:16
  14:12
**ongoing** 15:21
  16:20 17:2,11
**online** 37:13
**op** 1:11,13
**operates** 54:4
**opiate** 1:6
**opioid** 7:3 8:3
  21:9 24:22
  28:15 33:21
**opioids** 6:21
  8:7,9 21:22,24
  32:21 35:8,12
  35:21 36:22
  38:17 46:24
  47:4
**opportunity**
  14:1
**opposed** 65:7
**optum** 15:4,13
  20:11 28:2,5,7
  28:13,17 29:2
  29:23,25 43:19
  47:6,8 48:7
  49:21 50:7
  63:18
**optum's** 28:23
  29:9
**oral** 19:16
**order** 10:6 27:8
  37:22 64:10
  65:4,7 69:10
  69:25

**orders** 8:3
**outlined** 58:18
  65:3,9
**overcome** 69:1
**own** 38:4 58:20

**p**

**p.m.** 4:15 71:25
**package** 35:18
**page** 64:23
**pages** 41:11
**paid** 20:10
  21:16 22:6,24
  28:5 33:20
  35:8 36:1
  39:24 41:16
  43:19 44:15
  47:15 49:8
  55:2
**part** 10:18
  20:16 49:9
  54:3
**partial** 3:7
**participants**
  2:18
**particular** 21:4
  34:21,25 35:9
  35:21 43:1
**parties** 18:6,15
  44:21 69:4
**party** 8:17
  17:14 31:23
**passed** 21:17
  49:11
**past** 28:18
  54:13 55:7

56:6 60:18
**path** 19:6
**patrick** 2:3
  58:5
**paul** 2:4 14:19
  44:11 51:12,14
  53:24 55:4
**paying** 21:8
**payment** 29:25
**payments**
  20:15 25:23
  43:22 44:4,8
  56:7
**pays** 54:5
**pbm** 3:25 7:8
  17:14 32:6
  60:3
**pbms** 14:5
  19:21 20:23
  21:19,21 26:5
  32:21 36:14,23
  43:22
**pc** 24:4
**pdf** 30:13
**pec** 14:23 15:9
  17:7 20:9 24:1
  24:18 30:25
  31:22 32:9,16
  33:11 41:2
  50:5 52:21
  53:5 70:20
**pellegrino** 1:25
  72:5,20
**pencils** 15:24
  17:3

**pending** 70:9
**people** 37:14
  38:8
**percent** 34:9
  35:13,15 46:3
**percentage**
  21:9 34:14
  43:7
**period** 28:21
  64:1
**peripheral** 46:1
**perspective**
  14:11
**pete** 24:25
  36:12
**peter** 2:5,11
  14:2 42:18
**pharma** 1:10
  1:12 20:10
  21:8,16 22:25
  23:4 55:7
**pharmaceutical**
  36:4
**phone** 60:24
**piece** 26:23
  30:14 49:13
  66:21 67:6
**pieces** 48:21
**place** 32:25
  58:7 67:11
  70:1
**placeholders**
  3:6
**plainly** 6:24

**plaintiff** 8:20
  44:19 61:17,23
  67:3
**plaintiffs** 3:17
  6:1,2,11 11:9
  11:12 12:1
  13:21 14:16
  15:18 18:5
  19:19,25 45:16
  45:23 46:14
  47:10,22 49:3
  50:8 58:15
  59:19 64:14
  67:14,23
**plan** 15:22
  49:12
**play** 15:12
**playing** 9:19
**please** 23:19
**point** 8:13
  12:10 16:3
  20:14 21:10
  23:11 42:21
  51:7,18
**points** 7:12
  14:22 48:25
  66:20
**police** 8:18,23
  61:19 65:17
**polster** 1:9
**portal** 24:10,15
  30:23 31:1,14
  31:17,22 37:3
  37:6,17,21
  38:1,7,10,21,22

38:25 39:5,11
  39:14,18,21
  41:14 45:16,18
  48:8 53:3
**portion** 23:8
  34:10,13
**position** 12:6
  14:16 16:22
  50:25 52:8
  55:8,21 69:22
**positions** 69:4
**possession** 8:8
**possibly** 32:11
**post** 15:15,17
**potential** 62:17
  64:12
**potentially**
  34:23 59:22
**power** 8:19
**pplpc012000...**
  22:14
**practice** 70:16
**prepared** 25:19
  29:6 57:8,22
  57:23
**prescribing** 8:5
**prescription**
  1:6 6:21 8:7
**prescriptions**
  8:4
**present** 67:13
  67:21
**pretty** 32:9
**prevent** 8:17

**previous** 61:21
**previously**
  58:10
**prior** 4:9 63:22
**prioritizing**
  48:14
**probably** 25:9
  61:7 66:24
  70:13
**problem** 18:13
  29:14 44:18
  53:7
**problems** 53:14
  53:17 64:13
**proceedings**
  72:7,13
**process** 33:10
  34:17 40:24
  41:6,7 43:6
  47:9 48:13
  49:17 68:14
  70:1
**processes** 65:3
**processing** 32:6
  59:21
**produce** 9:12
  11:21 12:2
  13:24 14:25
  15:1,5,19
  19:21,23 21:14
  24:20,23 28:14
  30:21 31:9
  32:4 36:24
  39:10 40:14,19
  44:2,22 45:13

48:19 49:10,22
  50:1 51:2 53:1
  53:23 54:17
**produced** 9:14
  13:13 19:18,19
  19:22 23:23,24
  24:18 28:5,24
  29:20 30:12
  31:7,9 33:2,8
  39:4,16,20
  40:21 43:23
  44:16 45:9,19
  46:5,15 47:12
  48:2 51:1
  52:18 54:18
  55:6
**producing** 8:10
  9:25 11:5
  15:15 41:13
  55:18
**production**
  7:14,17,20
  8:10 9:7,8,21
  11:11 17:11
  18:2,3 39:12
  48:14 49:17,19
  50:10 52:20
**productions**
  10:22 48:23
**profit** 33:25
  42:13,14
**promise** 5:15
**promising**
  17:21

| | | | |
|---|---|---|---|
| **properly** 10:25 | **pulled** 39:17 | **quickly** 38:20 | 24:12,16,21 |
| **proposal** 41:24 | 40:12 62:7 | 41:13 62:11,16 | 25:17,23 26:15 |
| 43:8 62:4,15 | **pulling** 53:1,2 | 65:20 68:14 | 27:8 28:9 |
| 63:13 | 62:4 | 69:2 | 29:24 30:9,9 |
| **proposed** 62:7 | **purdue** 1:10,12 | **quite** 11:13 | 31:8 33:19,22 |
| 68:16 | 20:10,17,23 | 19:24 23:23 | 34:11,23 35:1 |
| **proposing** | 21:7,16 22:6,9 | 27:18 45:9 | 35:4 36:18,19 |
| 47:23 65:23 | 22:15,15,21,25 | 46:6 70:1 | 44:3,23,24 |
| **propound** 11:2 | 23:4 24:17 | **quote** 25:20 | 46:22 48:1,11 |
| **prosecuted** | 28:8,13 29:20 | **quoted** 9:7 70:5 | 49:8,22 50:16 |
| 8:22 | 30:16 31:20,23 | **quoting** 25:16 | 56:7 |
| **protective** | 32:11,13,21 | **r** | **rebates** 20:4 |
| 64:10 65:4,7 | 33:3,13 39:24 | **r** 2:7 | 22:25 23:5,24 |
| 69:10,25 | 43:19,22 52:19 | **raise** 5:6,19 7:2 | 24:2,2 31:18 |
| **provide** 31:4 | 54:5 55:2,7,10 | **raised** 19:9 | 32:5 34:9,10 |
| 49:2 50:7,16 | **purdue's** 28:15 | 48:10,17 | 34:13 35:14,16 |
| 56:1 | **purpose** 68:9 | **reach** 13:7 | 36:1,15 38:17 |
| **provided** 28:10 | **pursuant** 23:25 | **reached** 25:12 | 39:24 40:8 |
| 28:12 29:25 | 45:10 59:14 | **read** 19:15 | 41:15,21 42:13 |
| 36:2,2 47:13 | **pushed** 47:23 | **readily** 39:9 | 42:15 43:18 |
| **provides** 24:15 | **put** 5:9 8:23 | **ready** 54:1 | 44:13,15 47:14 |
| 31:17 37:6 | 16:11 31:15 | **real** 28:4 38:19 | 56:8,16 |
| **providing** 37:5 | 35:17,22 40:7 | **really** 36:5 | **recall** 21:11,18 |
| 48:20 49:15 | 54:25 57:20 | 45:20 47:20 | 61:20 68:15 |
| **public** 15:21 | 58:22 68:22 | 49:6 | **receive** 14:24 |
| 36:14 63:4 | **q** | **reason** 58:12 | 38:17 |
| 66:3,25 67:18 | **question** 14:9 | **reasonable** | **received** 24:2 |
| 72:21 | 17:11 29:17 | 25:21 | 33:21 36:19 |
| **publicized** | 30:5 38:16 | **reasons** 31:2,2 | 48:11 57:4 |
| 36:22,23 | 47:22 50:2 | 33:18 | 58:14 59:15 |
| **publicly** 66:10 | 53:15 | **rebatable** | **recently** 15:20 |
| **published** 3:3 | **questions** 32:16 | 22:23 | 19:3 |
| **pull** 41:3 61:24 | 50:14 57:24 | **rebate** 20:18,23 | **reconcile** 56:16 |
| 64:6 | **quickest** 63:12 | 21:1,4 22:1,19 | **reconciliation** |
| | 65:23 | 23:8 24:7,8,9 | 34:24 41:21 |

**record** 14:4,5
15:23,24,25
16:12 47:7
59:17 63:3
**records** 37:10
37:12,19 50:10
61:19 66:24,25
67:18
**recreate** 27:8
**redact** 62:16
63:1 64:23
65:1 67:5
**redacted** 68:6
**redactions** 63:8
**reemphasize**
14:21
**refer** 8:2
**referenced**
69:23 70:5
**references** 37:2
**regard** 3:22
18:15
**regarding** 24:6
25:6 52:25
64:11
**regulations**
59:8,14
**reinvent** 27:11
**reiterated**
48:17
**rejected** 43:8
**relate** 8:2 47:14
**related** 48:1
58:15 61:25

**relates** 1:9
49:10 59:8
64:21
**relating** 7:21
8:7 23:24
**relevance**
43:21
**relevancy**
52:10
**relevant** 6:24
17:5 22:2
45:24 47:17
59:20,22
**relief** 5:23
**remainder** 23:9
**remaining**
19:11
**remains** 6:12
**remote** 1:17 2:1
**removed** 66:8
**remuneration**
52:25
**renee** 1:25 72:5
72:20
**reopen** 55:13
**repeated** 56:25
**replacements**
58:24
**report** 21:5
22:1,19 24:13
28:11,14 30:21
31:7,8 44:24
44:25 45:1
**reporter** 33:5
72:6

**reports** 20:19
21:3,10 22:5
24:7,21 28:8
28:16 30:7,8,9
30:10 32:3
34:24 41:21
48:9,16 49:25
66:7
**repository**
29:19
**representation**
27:5
**represented**
25:13 26:5
**request** 7:14,17
7:19 8:9 9:6,21
9:23 11:10
24:7 40:17
43:10 55:23,24
69:21 70:4
**requested** 45:3
45:7,8 46:14
**requesting** 60:2
64:1
**requests** 9:8,15
**require** 28:17
63:21
**required** 18:7
28:8 30:21
36:24 44:20,22
**requirement**
25:18
**resisting** 48:20
**resolution**
56:13 69:19

**resolve** 61:24
**resolved** 18:21
53:19 60:4
**resolving** 19:6
**respect** 26:2,16
36:19,21
**respond** 6:13
7:9 10:13 11:6
11:10,14 13:2
14:24 16:10
40:20
**responding**
3:17,18
**response** 5:12
6:11 8:11 11:5
12:15 16:19,25
17:12,19 23:19
67:25
**responses** 18:6
**responsive** 6:17
10:16,23 11:5
11:11 12:3,23
14:12,17,18
18:4 45:14
49:22
**rest** 4:6 55:14
**restoral** 3:5
**retained** 23:8
42:13,15 56:17
56:17 59:11
**retention** 35:11
44:12 58:17
**revealing** 12:8
**revenue** 23:3
27:9,14 33:13

**[revenue - side]**                                                      Page 18

33:25

**reverse**  15:2

**review**  5:18
63:9 67:15
68:19

**reviewing**
48:13

**reviews**  48:22

**rfp**  10:17

**right**  4:24 5:19
11:2 12:14,22
19:1 30:18
35:17 36:10
38:24,25 40:15
42:25 44:10
46:12 53:24,25
55:16,22 58:6
62:3 66:13

**rights**  5:19,21

**rochester**  1:10
43:2

**rochester's**  3:9

**rosh**  71:13

**roughly**  60:25

**rpr**  1:25 72:5

**rule**  10:4 18:8
60:9

**ruled**  3:13 5:22
15:1

**rules**  15:7

**ruling**  3:7,12
4:10,12,20 6:4

**run**  41:4 55:25

**running**  41:12

**rx**  47:6,8 48:7

**s**

**saddle**  67:23

**sage**  2:7 23:20
25:2 30:5,5
37:4 54:19

**sal**  69:8

**sale**  8:6,8

**sales**  21:9
22:24 55:1

**salvatore**  2:10
61:17

**sampling**  27:19
27:20 34:17,22
36:9 42:18,19
42:20 43:5,13
56:10 61:22,23
62:2 68:16,17
68:21,22

**sanctions**  21:12
51:23

**sat**  37:16

**satisfy**  50:13
53:18

**saying**  4:6 9:4
9:11 11:15
12:12 13:2,5,7
16:19 18:15
19:21 25:20
26:4 32:23
45:5,6 52:6
53:14,17 60:21
66:11,13 67:16
67:17 68:7,13

**says**  7:20 20:18

**scope**  15:14
25:7 47:15

**screen**  22:9
31:16

**scripts**  15:4
20:11,18 21:8
22:7,25 23:4,9
23:17,21 30:25
32:6 33:6,16
58:5

**search**  31:10
40:12 41:5,12
47:25 55:25

**searching**  52:7
52:24

**second**  8:13
32:12 36:6
39:25 44:11
51:15 64:7

**secure**  31:4

**see**  18:9 20:6
22:10,10,16
32:17 34:18
37:17,18 42:9
51:10 53:22

**seeing**  15:12

**seek**  10:6 44:9

**seeking**  10:10
33:11

**seemed**  3:15
25:21

**seems**  9:4,11,24
17:7 22:22
50:6

**seen**  20:16 22:4
31:11 66:23
67:11

**send**  5:17 68:7

**sensitive**  62:5
63:24 64:15
65:18 66:17

**sensitized**  51:8
51:17,17 60:6

**sent**  4:5 24:11
57:16 58:8,18
68:18 69:20

**separate**  43:18

**september**  1:20
26:3

**serve**  43:7

**set**  35:3 57:9
71:21

**several**  2:18
48:11 59:17,18

**severity**  7:6

**share**  22:8
28:14 30:9
33:25,25 45:1

**shared**  20:20
24:2,9 32:19
32:20 44:13

**shifted**  10:25

**shifting**  64:13

**show**  34:25
42:12 63:22

**showing**  31:18

**side**  35:25
41:17 47:19
48:8 51:25

66:1 70:25
**sides** 43:5 45:5
  51:16 66:5,9
**signature** 72:19
**significant**
  36:25
**silly** 6:1
**similar** 40:6
**simple** 35:24
**simply** 27:5
**single** 27:10
  34:14
**sir** 20:24
**sit** 5:14
**sitting** 11:3
  37:20 48:8
**six** 70:10
**skip** 60:18
**slightly** 63:20
**sloth** 67:1
**small** 32:4
**smyer** 2:9
  63:14,17,18
  66:19
**solution** 29:15
  37:24 38:13
  43:13 53:10
**somebody**
  37:19 38:9
  67:10
**sorry** 20:2
  40:22 43:16
  59:18 71:4
**sort** 8:15 38:11

**sorting** 38:11
**sought** 6:19
  20:11
**sound** 30:17
**sounded** 19:21
**sounds** 30:19
  32:14 45:17
  50:23 57:11
  60:7,19,23
**source** 30:2
**sources** 23:3
  48:6
**special** 1:18 3:1
  3:24 4:11,17
  4:25 5:22,25
  6:7 7:10,11 9:2
  11:8 12:21
  13:9 14:20
  17:25 18:11,13
  18:24 19:13
  20:3,21,25
  21:6,25 22:12
  22:18 23:18
  24:24 26:24
  27:25 29:8,12
  29:16 30:4
  32:8 36:11
  37:25 42:17
  43:15 44:17
  47:5 49:16
  50:4,21 51:20
  52:9 53:8,21
  54:6 55:12
  56:24 57:15
  58:4 59:4 60:5

60:11,17 61:11
  61:16 63:17
  65:11 66:20
  67:24 69:3,14
  69:15 70:12,19
  70:22 71:3,8
  71:12,18,21
**specific** 28:8
  29:3 35:7
  40:25 42:12,16
  44:6 56:9 62:8
  64:23
**specificity**
  27:14
**speculation**
  67:1
**speed** 42:6
**spills** 70:6
**spit** 35:25
**spoliation**
  57:25
**spreadsheet**
  22:15,16 31:15
  31:19 62:1
**spreadsheets**
  23:16
**stamp** 14:6,13
**stand** 51:4
**stands** 6:4
**start** 3:19
  16:12 19:25
  23:15 71:5
**started** 23:22
  33:10 37:4
  39:17 41:6

68:14
**starting** 42:10
**state** 7:5,22,25
  36:17 59:9
  72:22
**statement** 13:2
  13:7 14:15
**states** 1:1 26:17
  43:25 47:16
**statewide** 47:12
  47:21
**status** 1:17
  58:13
**stenotype** 72:9
**stenotypy** 72:7
**step** 13:12,12
**steps** 7:1
**stopped** 41:5
**story** 49:7
**stream** 27:14
**strong** 41:3
  52:1
**structural**
  53:13,17
**structure** 35:2
  35:4
**stuff** 61:9
**subject** 25:5
  33:8,14 39:7
  39:12 51:23
  69:25
**subjected**
  47:25
**subpoena**
  31:23

**substance**
　53:16
**substantially**
　49:20
**sufficient**　19:20
　27:1,20,24
　45:14
**suggest**　42:7
　50:15
**suggested**　43:6
　51:6
**suggesting**　69:7
　71:15
**suggestion**　37:1
**suit**　59:6
**suitable**　58:24
**summaries**
　25:18,22,24
**summary**　6:11
　20:19,23 21:1
　21:3,5 22:1,4
　22:19,21 24:7
　24:9,21 25:23
　26:20 29:24,25
　30:10 31:8
　40:8 44:24
　56:15 66:5,7
**supplement**　4:7
　4:14,20,22 6:2
　6:2,4 10:3
　16:20 17:2,12
　18:6 28:1
**supplementat...**
　4:9 5:4

**supplementing**
　5:11
**supposed**　7:7
　20:19
**sure**　3:19 8:14
　9:7 11:13,25
　12:4 19:24
　25:12,21 32:9
　45:9 46:6 47:7
　49:1 51:20
　60:23 63:2
　70:2
**surprised**　27:4
**surrounding**
　57:12
**suspected**　8:6
**suspicious**　8:3
　8:3
**sworn**　13:2,6
**system**　41:4,12
**systems**　40:13

**t**

**t**　2:4
**tab**　31:16
**tactics**　65:17
**take**　7:1 10:8
　12:6 27:10
　29:6 34:2,2,8
　34:10 36:8
　40:17 41:8
　42:8 55:8 56:1
　57:19 58:7
　65:6 68:12
**taken**　55:21

**takes**　19:14
　37:19
**talk**　42:3 52:21
　56:14 63:15
　69:6
**talked**　25:3
　39:9 55:12
　68:21
**talking**　38:6
　42:20 54:12,23
**tantamount**
　37:7
**target**　41:2
**teach**　38:9
**tell**　3:16 9:13
　9:21 21:14
　42:17,23 60:24
**telling**　11:4
　34:16 62:21
**temporal**　25:7
**ten**　24:18 25:4
　53:3,6 54:13
　54:14,20,21,23
　55:1,9
**term**　20:22
**termination**
　28:19
**terms**　20:7 25:3
　26:6 31:10
　39:10 41:5,12
　47:25 49:3,25
　55:25
**testify**　54:25
**texas**　1:12
　47:13 59:9

**thank**　6:9 18:11
　69:14,15 70:12
　70:21,22 71:17
**thanks**　52:15
**theory**　21:18
**thing**　16:9
　29:13 38:14,15
　46:9
**things**　4:3 40:8
　40:9,10 41:8
　51:2,4 56:25
**think**　3:11 8:16
　12:21,22 14:4
　17:22,23 18:1
　18:7,9 19:5
　26:20 27:2
　30:6,11 31:20
　38:20 41:23
　49:14 50:2
　54:6 56:11,25
　57:3,18,24
　58:23 60:2,10
　60:15 63:11
　66:14 68:10
　69:5 70:6,23
　71:14,16
**thinking**　37:24
**thinks**　64:20
**third**　31:23
**thought**　52:13
**thousand**　48:11
**thousands**　32:7
　43:1 47:24
**three**　3:5 18:19
　28:18 30:22

51:3 53:22
57:5
**thursday**  58:2
58:8 60:19,21
61:5
**till**  15:19
**time**  10:17
12:24 16:3
18:17,20 20:15
21:10 25:3,13
26:1,5 28:4,13
38:23,24 40:23
41:9 42:8 48:4
48:22 54:12
57:6 58:19
59:3,15 64:2
67:4 68:8,12
68:16 71:20
**times**  24:19
61:9 69:20
**timing**  56:5
**today**  3:2 5:15
11:4 19:6 48:8
60:4 71:7
**together**  35:17
35:22 64:3
**told**  26:12 27:6
41:7,8 48:12
49:7,24 62:12
64:14 65:21
70:16
**took**  72:6
**top**  22:13 43:6
43:9

**topic**  50:9,19
53:20 57:17,18
58:9
**totally**  6:17
**track**  1:11,13
**tracking**  58:6
**trail**  20:14
**transcribed**
72:9
**transcript**  72:8
72:11,12,14
**translates**
33:24
**transmitted**
31:13
**transmitting**
31:3
**traveling**  71:1
71:13
**trial**  11:24
13:14,25 14:10
15:2,6,16
16:14 27:16
66:1,2
**trials**  15:11
**tried**  53:9
**true**  15:2 44:18
47:2 53:22
72:14
**try**  5:9 22:17
26:8 27:15
38:4 61:2
**trying**  8:1 9:3
9:17 12:10,11
43:12 44:14

65:19
**two**  4:3 7:12
23:3 50:6,11
51:3 52:7,18
53:4,22 54:7
54:19 64:4,4
66:19 70:24
71:7,10
**type**  23:1 27:9
50:18 60:15
**types**  7:25 8:24
32:7
**typewritten**
72:10

---

**u**

---

**ultimately**
11:23
**unclear**  17:18
18:1
**under**  9:23
11:15 50:20
**undercuts**  7:6
**underlying**
22:5 38:3
**understand**
9:17 21:20
22:1 23:7
31:12 42:24
50:24 65:25
69:7
**understanding**
68:1
**understands**
14:23 49:1

**understood**
30:6 32:15
**unimportant**
52:14
**united**  1:1
**universe**  16:17
17:4
**unlawful**  8:6
**unnecessary**
17:20 60:16
**unrelated**  6:21
**untenable**
65:10
**unusual**  65:12
**update**  49:3
58:13
**use**  8:8 13:14
15:2,6,17
23:14 54:8
62:23 67:8,12
67:21 68:2,4
71:22
**used**  20:22
62:24 65:15,18
66:2,6
**using**  13:24
20:12 23:13
62:21 63:22
**utilization**
24:15 28:11
30:8 31:5
44:25

**v**

**v** 1:10,12
**vanden** 2:7
23:20,21 30:24
33:1 52:16
**various** 6:19
**versus** 36:7
56:17
**victim** 62:25
**victims** 65:17
**vieira** 2:14 33:4
33:5 38:19
42:25 44:10
54:11 55:3,11
**view** 7:16
**viewed** 31:4
**virtually** 32:10
**virtue** 29:19
**vis** 36:15,15
**volume** 21:23
40:15

**w**

**wait** 5:7 23:15
71:3
**waive** 5:18,22
**want** 8:14
14:20 16:3,7
16:15 18:17
19:25 23:15,16
26:23 27:22
29:14 35:7
39:2 41:19
43:9 47:7
48:25 52:16,25
53:25 54:15

63:7,9,11
65:12 66:13
67:3,7,14,19,20
68:13 69:5,9
69:19,24
**wanted** 4:3 7:4
25:8 41:3
**wants** 20:9
61:14 64:8
**watching** 60:22
**water** 16:8
**waters** 17:17
**way** 3:18 20:10
31:4 35:16
42:1 46:20
53:19 54:3,21
56:16,18,21
63:12,12 65:23
65:23,24 66:16
67:22 68:11
**ways** 12:11
**we've** 9:5,12
10:5 13:4
14:12 15:4,10
20:11 21:12,13
23:22 24:16,18
24:22 26:10,12
28:22 29:1,13
31:11 33:1
34:4,16 35:23
37:15 39:5,12
40:16,21 41:9
41:10,17 43:4
48:10 50:22
51:16,17 52:5

56:2 63:10
64:1 66:4
70:14
**weary** 53:11
**webb** 1:12 43:3
57:12
**week** 19:9,10
19:12 41:24
42:2 52:23
**weekend** 70:25
**weeks** 50:7,11
51:4,11 52:7
53:22 54:7
56:12 70:11,24
71:7,11
**weinberger** 2:5
5:7 14:2,3
16:16 17:16
24:24,25 36:11
36:12 51:14,22
53:6 70:17
71:2,16
**went** 48:5
**widespread**
70:8
**willing** 12:13
54:24
**withdrawn**
57:18
**witness** 54:25
57:21 59:1
**witnesses** 16:11
**wonder** 31:22
**word** 30:13

**words** 20:13
23:14
**work** 10:22
22:10 41:22
45:17 65:2
**worked** 24:11
36:9 64:3
**working** 19:2,9
36:10 41:24
48:18 49:2
51:2
**works** 13:10
71:17
**worth** 54:22
55:1,9
**wrong** 71:4
**wrongdoing**
8:6

**y**

**yeah** 30:11
**year** 25:9 28:6
39:8
**years** 24:18
25:4 28:18
30:22 36:1
53:4,6 54:14
54:14,21,22,23
55:1,9
**yesterday** 3:4
4:15 7:16 19:3
49:24 58:19
**york** 47:13
69:20

**[zoom - zoom]**                                                    Page 23

| z |
|---|
| **zoom**   60:22 |
| 61:1,6 71:23 |