# EXHIBIT A

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:  NATIONAL PRESCRIPTION | **)** | **MDL 2804** |
| OPIATE LITIGATION | **)** | |
| | **)** | **Case No. 1:17-md-2804** |
| | **)** | |
| THIS DOCUMENT RELATES TO: | **)** | **Judge Dan Aaron Polster** |
| | **)** | |
| *ALL THIRD PARTY PAYOR ACTIONS* | **)** | |

## DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN

1.      I am the Bruce Bromley Professor of Law at Harvard Law School and have been recognized as a leading national expert on class action law and practice.  Third Party Payor ("TPP") plaintiffs seek final approval of the proposed class action settlement with the Settling Distributors.[1] Among other factors, the Court must determine whether the settlement proposal "treats class members equitably relative to each other."[2]  Co-Lead Class Counsel[3] have retained me to provide

---

[1] The Settlement Agreement defines "Settling Distributors" as "Defendants Cencora, Inc. ('Cencora'), Cardinal Health, Inc. ('Cardinal'), and McKesson Corporation ('McKesson')."  Class Action Settlement Agreement Among Third Party Payors and Settling Distributors, ECF 5614-2, at 1 (Aug. 30, 2024) (hereinafter "Settlement Agreement").

[2] Fed. R. Civ. P. 23(e)(2)(D).

[3] The Settlement Agreement defines "Co-Lead Class Counsel" as Elizabeth J. Cabraser of Lieff Cabraser Heimann & Bernstein, LLP and Paul J. Geller of Robbins Geller Rudman & Dowd LLP. Settlement Agreement, at § I.N.

the Court information on allocation approaches in opioid settlements generally, and in this settlement specifically, so as to assist it in addressing this issue.[4]

2.     This MDL is the largest and arguably most successful in American history.  It (and the related McKinsey MDL, 2996) has generated 19 separate settlements distributing close to $50 billion to communities throughout the country to remediate the impact of the opioid epidemic;[5] the Court has accomplished all this in less than seven years, notwithstanding the massive disruption caused by the intervening COVID-19 crisis.  The only larger recoveries in American litigation history arose out of the asbestos and tobacco crises; however, asbestos litigation unfolded across decades and through myriad forms of litigation (countless individual lawsuits in and outside of MDLs, successful and unsuccessful class actions, bankruptcy trusts, etc.), while the latter, states-based Master Settlement Agreement for the tobacco litigation has been distributing its recovery over a 25-year arc.  There is nothing close to the size and speed of what this MDL has accomplished.

3.     Part of the success of the MDL is attributable to the fact that in an early phase related to the negotiation class certification process, plaintiffs and their counsel generated – in a completely unprecedented manner – a model for distributing settlement funds across every political subdivision in the United States.  Eight of the 11 non-Tribal opioid settlements have

---

[4] As the Court is generally aware of my qualifications, I provide those in Exhibit A, with a list of documents I reviewed in preparing this Declaration in Exhibit B.  The text of the Declaration reviews some of my work assisting the Court and Special Master Francis McGovern in the negotiation class certification phase of the MDL.  My last involvement in the MDL (which involved fee, not class certification, matters) terminated more than four years ago.  Order Regarding Professor Rubenstein's Report and Recommendations, ECF 3320, at 1 (June 3, 2020). I sought and received the Court's approval before accepting this assignment.

[5] I chart these settlements in Exhibit C.

2

employed, as their default allocation mechanism, (a) this data-driven, (b) party-generated formula for (c) ensuring funds reach the most impacted communities, with two others (the Kroger settlement and the McKinsey School Districts settlement) using similar cross-jurisdictional approaches; even the eight Tribal settlements have relied on the negotiation class certification formula to some extent in their *sui generis* distributional matrix.[6]  Given the relationship of the key distributional metric of the national opioid settlements to this MDL, I refer to it hereafter as the "MDL 2804 Allocation Formula."  Part I, *infra*, describes the history and substance of the MDL 2804 Allocation Formula, culminating with an explanation of how Judge Breyer found that it complied with the equitable treatment mandate of Rule 23(e)(2)(D) in approving the McKinsey Political Subdivision class action earlier this year.

4.     The present settlement (and its counterpart TPP settlement with McKinsey) are unique among the 11 non-Tribal settlements in that the class members are not defined by geography alone, although some class members are geographic-specific entities and geography is not totally irrelevant.  The settlement allocation process is accordingly different than the MDL 2804 Allocation Formula, but it is similarly committed to being data-driven, with a goal of ensuring that class members' recoveries reflect relative differences in opioid saturation across the class.  In Part II, *infra*, I describe the allocational methodology of this settlement, with that section culminating in an explanation of why the Court could find that the settlement's approach easily

---

[6] The Tribal settlements account for about 3% of all settlement amounts.  *See* Exhibit C.  The Tribal allocation formula is described in *Frequently Asked Questions About the Settlements of Tribal Opioid Claims Against  Janssen/Johnson & Johnson and the Three Major Opioid Distributors* at 3-4, available at www.tribalopioidsettlements.com/FAQs/Distributor/FAQs.pdf. That explanation reflects the data-driven, participatory nature of ensuring the Tribal funds reach the most impacted Tribal communities, with certain values imputed to Tribes based on the allocation formula developed during the negotiation class certification process.

comports with Rule 23(e)(2)(D)'s equitable treatment mandate, as did Judge Breyer in approving use of this same allocation plan in the parallel TPP settlement with McKinsey this past August.

5. Specifically, Rule 23(e)(2)(D)'s mandate that a class settlement allocation formula treat class members equitably relative to one another was first codified in 2018, although that codification reflected what had been the practice for decades.[7]  The Rule aims to weed out bad practices, such as some portion of a class not receiving a recovery although relinquishing a claim, or different portions of the class receiving disparate recoveries for inexplicable reasons, or different segments of a class being subjected to different claim processes.[8]  As explained in Part II, the proposed allocation formula here – like the MDL 2804 Allocation Formula itself – not only raises no red flags, these allocation formula are among the singular achievements of this remarkable MDL.  The Court's task should be easy.

---

[7] Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment ("The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern.  Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

For a general overview of Rule 23(e)(2)(D), *see* William B. Rubenstein, 4 *Newberg and Rubenstein on Class Actions* § 13:56 (6th ed. 2022 & 2024 Supp.) (hereinafter "*Newberg and Rubenstein on Class Actions*").

[8] *Newberg and Rubenstein on Class Actions* § 13:56 (reviewing red flags); *see also* Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment ("Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.").

# I.
## THE MDL 2804 ALLOCATION FORMULA

6.      As noted above, most of the opioid settlements have allocated recoveries by political subdivision, according to a formula developed under the auspices of this Court.  This Part describes the formula, explains its history, and assesses its legitimacy.

<u>Exemplary Use of the Formula</u>

7.      I use the McKinsey Political Subdivision class action settlement as exemplary of the many subdivision-based opioid settlements as this is the single subdivision settlement that was a formal class action and hence triggered judicial review, by Judge Breyer, of the allocation formula.

8.      In that matter, the class was generally defined to encompass all political subdivisions of 49 states.[9]

9.      Allocation of a $207 million lump sum settlement unfolded at three levels:

- *Interstate.*  The lump sum was initially divided by State, with the group of all political subdivisions within a State receiving an aggregate share based on a formula developed

---

[9] Order Granting Preliminary Approval of Class Settlement and Direction of Notice under Rule 23(e) of the Federal Rules of Civil Procedure, *In re McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB, ECF 609, at 2 (Oct. 5, 2023) ("'Class' or 'Settlement Class' means:  any (1) General Purpose Government (including, but not limited to, a municipality, county, county subdivision, city, town, township, parish, village, borough, gore, or any other entity that provides municipal-type government), (2) Special District within a State, and (3) any other subdivision, subdivision official (acting in an official capacity on behalf of the subdivision) or sub-entity of or located within a State (whether political, geographical or otherwise, whether functioning or nonfunctioning, regardless of population overlap, and including, but not limited to, nonfunctioning governmental units and public institutions).").  Indiana's political subdivisions were excluded from the class, *id*. at ¶ 5, as those subdivisions had participated in a prior settlement between the State of Indiana and McKinsey pursuant to intra-negotiations between the State and those subdivisions.

in conjunction with the 2021 National Settlements.[10]   Class Counsel explained that "[t]he states agreed amongst themselves as to inter-state allocations . . . ."[11]

- *Intrastate.* Each State's share was then divided among its political subdivisions.  The plan of allocation reflected two approaches.  In allocating the 2021 National Settlements within a State, some States and their subdivisions had generated agreed-to intrastate allocation formulas; for those States, the plan of allocation simply adopted that prior plan.  In allocating the 2021 National Settlements within a State, other States did not generate intrastate allocation agreements but instead fell back on a nationwide subdivision allocation agreement, referred to as the "default direct-to-subdivision allocation"; for those States, the plan of allocation simply adopted that default plan.  As the settling parties pointed out, the effect of adopting these two approaches to intrastate allocations was simply to supply for this settlement the same intrastate infrastructure that characterized the 2021 National Settlements.[12]

- *Tiny subdivisions.*  Finally, like the 2021 National Settlements, the McKinsey Political Subdivision plan of allocation placed one additional restriction on allocation:  it allocated none of the common fund to political subdivisions with a population of 10,000 or less, unless that subdivision had filed a lawsuit and was therefore a litigating subdivision.

10.     For  purposes  of  applying  the  intraclass  equity  principle  set  forth  in  Rule 23(e)(2)(D), the first provision above (the interstate division) was straightforward and based on a plan the States hashed out among themselves in allocating the 2021 National Settlements.  Its pedigree provided its legitimacy.  So, too, for the third provision mentioned above (the exclusion

---

[10] Plaintiffs' Notice of Unopposed Motion and Motion for Preliminary Approval of Class Action Settlement:  Memorandum of Points and Authorities in Support, *In re McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB, ECF 598, at 2 (Sept. 26, 2023) (defining "2021 National Settlements" as "the multi-state opioids industry settlements with Janssen Pharmaceuticals, Inc., McKesson Corporation, Cardinal Health, Inc., and AmerisourceBergen Corporation").

[11] *Id.* at 8.

[12] *Id.* at 9 ("The Settlement is . . . designed to provide the direct payments that subdivisions negotiated in the earlier national settlements but that were missing from the McKinsey-AG settlement.  Plaintiffs' intention with this plan of allocation is to put Class members in, as nearly as possible, the position they would have been had they had the opportunity to actively negotiate the AG Settlement (as they did with every other national opioids settlement) . . . .").

of small sub-divisions from direct monetary recovery). The 2021 National Settlements adopted a similar approach to ensure that monies were distributed to entities that actually expended significant resources remediating the opioid epidemic; these smaller subdivisions tended not to have done so themselves, yet they realized an indirect benefit from distributions to their overarching subdivisions (e.g., a small city/subdivision benefits from a distribution to the county within which it is situated). This approach was both sensible and supported by decisions approving allocations that exclude infeasible *de minimis* distributions.[13] Thus, it was the second step above (intrastate allocation) that represents the core of the MDL 2804 Allocation Formula and is the topic of the succeeding sections.

### The Challenges in MDL 2804

11. As this Court is aware, the National Prescription Opiate MDL Litigation (MDL 2804) has presented unique challenges to the Court and parties. The MDL is primarily comprised of thousands of cases pursued by political subdivisions, Tribes, and third party payor (TPP) plaintiffs seeking compensation for the costs they have been forced to expend to combat the opioid epidemic; however, the largest plaintiffs – States themselves – have generally not filed suit in federal court and their relationship to the federal courts is unique.[14] There are few precedents for collecting all of the country's political subdivisions into a single aggregate settlement, but there is

---

[13] *See, e.g.*, *Sims v. BB&T Corporation*, No. 1:15-CV-732, 2019 WL 1995314, *4 (M.D.N.C. 2019) (explaining, where recoveries were essentially *de minimis*, "the justification for [] different treatment is obvious, as this *de minimis* recovery would cost more in processing than its value, and thus would increase administrative costs and diminish recovery to class members overall while providing marginal benefits to the few class members") (cleaned up).

[14] U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.").

no way of simultaneously corralling all of the States into an aggregate settlement in a federal court. The many political subdivisions are, in turn, *political* subdivisions, so while their interests in this lawsuit may converge, their political orientations often diverge from one another and/or from their State governments. Generating consensus across the group is far more difficult than in other money damage classes – for instance, securities holders – where class members generally have aligned monetary incentives and, often, small amounts of money at stake. The defendants' side of the v. is no less complex: the MDL plaintiffs have sued a variety of entities at every step of the opioid distribution level – manufacturers, distributors, pharmacies, pharmacy benefit managers, etc. – each of which played different roles, have differing levels of potential culpability and resources, and are represented by their own counsel. The MDL created something of a Rubik's cube in imagining potential settlement opportunities.

12. Given that States were pursuing opioid cases outside the MDL, often in their own State courts, while many subdivisions had filed suit within the MDL, two lines of settlement negotiations emerged. Within the MDL, this Court appointed one of three Special Masters – the late Professor Francis McGovern – to oversee settlement discussions, while outside the MDL, some defendants pursued settlement opportunities directly with State governments.

13. The problem that plagued both settlement tracks was a familiar one: defendants were hesitant to make fulsome settlement offers unless they could be guaranteed some sort of finality, or so-called global peace. A settlement with only States would leave them litigating against subdivisions; a settlement with a nationwide class of subdivisions, while a step in the right direction, nonetheless seemed elusive because of limitations in the available settlement structures. Specifically, mandatory class actions under Rule 23(b)(1)(A) or (B) did not perfectly fit the

situation and were unlikely to receive judicial approval; an opt-out class action under Rule 23(b)(3) left defendants fearing they would pay an enormous sum to settle an inventory of cases but would end up still having to litigate against opt-out class members, likely those with the largest damage claims.  As the Special Master and parties worked through these various class action settlement structures, Professor McGovern, with this Court's approval, brought me into the litigation to serve as an expert on class action rules and procedures.[15]

14.     In the context of these discussions, Professor McGovern proposed applying to the class action setting a non-class method for reaching aggregate settlements among mass tort plaintiffs.  Specifically, in the aggregate settlement setting, if one lawyer represents multiple plaintiffs, governing ethics rules bar the lawyer from accepting a lump sum settlement on behalf of all the clients unless and until each client agrees individually, after being informed of all the details (the lump sum, her share, everyone else's share, and the lawyer's share).[16]  This ethics rule generates a holdout problem:  if any one plaintiff objects, the lawyer is ethically obligated to reject the entire settlement for all the other plaintiffs.

15.     In 2010, the American Law Institute adopted an approach to aggregate settlements that aimed to solve the holdout problem by substituting majority rule for individual consent.[17]

---

[15] Notice Disclosing Expert Consultant, *In re: Nat'l Prescription Opiate Litig.*, Case No. 1:17-MD-2804, ECF 877 (Aug. 13, 2018).

[16] Model Rules of Pro. Conduct R. 1.8(g) ("A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, or in a criminal case an aggregated agreement as to guilty or nolo contendere pleas, unless each client gives informed consent, in a writing signed by the client.  The lawyer's disclosure shall include the existence and nature of all the claims or pleas involved and of the participation of each person in the settlement.").

[17] Am. Law Inst., Principles of the Law of Aggregate Litigation § 3.17 (2010).

9

Specifically, the clients would agree before any negotiation that they would have the opportunity to vote yes/no on whether to accept the size of any proposed aggregate settlement, with a supermajority vote binding all (even those who voted against) to accept the sum; each client would know what her share of any aggregate settlement would be, and what the voting procedure would be, before consenting to join the voting bloc.  But once joined, all would be bound by the majority vote at the backend.

16.  Professor McGovern and I, with input from counsel for many disparate parties in this MDL, adopted this structure for class actions – generating an approach we called a "negotiation class action" – with similar features.  If the Rule 23 class certification prongs were otherwise met, a court could certify a class for the sole purpose of negotiating an aggregate settlement with one or more defendants.  The court would authorize notice directed to the class members setting forth the allocation scheme and voting rules and giving each class member a one-time opportunity to opt out.  At the conclusion of the opt-out period, there would be a fixed class size.  The defendant could then make a lump sum settlement offer knowing the precise contours of the group with which it was dealing.  The class would vote on whether to accept the offer, with the supermajority vote binding all the class members, and with no class member having a second opportunity to opt out.[18]

---

[18] Professor McGovern and I explained the approach in a law review article published the following year.  Francis E. McGovern and William B. Rubenstein, *The Negotiation Class:  A Cooperative Approach to Class Actions Involving Large Stakeholders*, 99 Tex. L. Rev. 73 (2020).

17.     Plaintiffs' Co-Lead Counsel herein took up the idea and filed a motion for negotiation class certification,[19] which this Court approved in a thorough decision in the summer of 2019.[20]   Defendants and some putative class members sought interlocutory review of that decision under Rule 23(f).  The Sixth Circuit granted the petition and, after full briefing and argument, reversed this Court's decision in a split decision the following year.[21]   The Circuit essentially held that the negotiation class approach was not consistent with the language and structure of Rule 23.  In so holding, however, the majority cast no aspersion on the proposed allocation formula.  On the contrary, the majority decision – when suggesting that the typical "litigation class" or "settlement class" might have been employed instead of the "negotiation class" – noted that, "There is no apparent reason why some of the procedural elements of the negotiation class, such as the supermajority voting scheme and ***county-level allocation formula***, could not be used to facilitate the participation of more Plaintiffs in a lawful settlement class."[22]

<u>The Allocation Formula and its Development</u>

18.     I set forth that history to explain why a plan for allocating a lump sum settlement among all political subdivisions in the United States was developed prior to any settlement, and to explain the process by which it was developed and subsequently deployed.

19.     Under the negotiation class certification approach, class members would have to make their opt-out decision before knowing the size of any lump sum settlement.  The approach

---

[19] Plaintiffs' Notice of Motion and Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, ECF 1683 (June 14, 2019).

[20] *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. 532 (N.D. Ohio 2019).

[21] *In re Nat'l Prescription Opiate Litig.*, 976 F.3d 664 (6th Cir. 2020).

[22] *Id.* at 676 (emphasis added).

therefore turned on providing class members a sense of what their share would be.  Given that information, class members would be able to calculate, before the opt-out period ended, how they would fare with, say, a $100 million settlement, or a $1 billion settlement, or a $10 billion settlement.  They could then make an informed decision about whether to stick with the group, based on both how their share of the total settlement accorded with their litigation goals and how equitable the allocation (and voting) formula seemed to them.

20.      With this goal in mind, the Plaintiffs Executive Committee (PEC) set out to develop an allocation formula to apply to a lump sum settlement of opioid-related proceeds.  There had been very few, if any, nationwide political subdivision class settlements, so there existed no template upon which to build.  Regardless, because the opioid epidemic impacted different communities differently, any allocation formula would have to be opioid specific.  To generate the formula, the PEC undertook four specific sets of tasks (writ large):

- *First*, the PEC used the tools of litigation to secure orders from this Court requiring the federal Drug Enforcement Agency ("DEA") to release data contained in the DEA's Automated Records and Consolidated Orders System/Diversion Analysis and Detection System ("ARCOS/DADS") database, the so-called "ARCOS data."  As this Court explained, the ARCOS data "shows the precise number of opioid pills delivered to each City and County in America, partitioned by manufacturer and distributor and pharmacy" and hence proved "essential in settlement discussions regarding apportionment of any obligation amongst defendants, and allocation of any settlement funds to plaintiffs."[23]  The Court noted that the ARCOS data enabled settlement discussions to "proceed based on meaningful, objective data, not conjecture or speculation [and provided] invaluable, highly-specific information regarding historic patterns of opioid sales . . . ."[24]

- *Second*, gathering and analyzing the ARCOS data, and other public health data, helped set a baseline, but that baseline often hid important nuances.  For example, the raw data

---

[23] *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2018 WL 2182288, at *1 (N.D. Ohio May 8, 2018).

[24] *Id.*

12

could provide a sense of the saturation of opioids in any political subdivision: one subdivision of 100,000 persons may have had 1,000,000 prescriptions filled, or 10 per person, while another subdivision of 100,000 persons may have had 1,000 prescriptions filled, or .01 per person. Yet although a political subdivision experienced enormous opioid saturation as measured by ARCOS prescription data, the public hospital that was inundated by those patients – and accordingly entitled to relief under the legal theories in the MDL lawsuits – may have been a county hospital, not the city's hospital, and/or a neighboring city or county hospital. Thus, the PEC engaged a series of medical and public health experts to work with it, and the parties, to go beyond the ARCOS data set itself and generate an allocation approach that applied the compensation goals of the lawsuit to the public health data in a pertinent fashion. That approach allocated proceeds according to an algorithm based on three equally weighted, objective public health factors: "(1) the number of persons suffering opioid use disorder in the county; (2) the number of opioid overdose deaths that occurred in the county; and (3) the amount of opioids distributed within the county."[25] The first factor was based on data collected by the federal Department of Health and Human Services and reported in the National Survey on Drug Use and Health; the second factor was based on data from the Multiple Causes of Death national mortality data, as reported by the National Center for Health Statistics, the Centers for Disease Control, and the Department of Health and Human Services; the third factor relied on the ARCOS data, as adjusted to account for negative outcomes.[26]

- *Third*, consistent with this effort, the PEC convened groups of plaintiff political subdivisions to help generate the allocation formula. Thousands of political subdivisions had lawsuits consolidated in the MDL, while many others were litigating in state courts outside the MDL. Through formal PEC-convened plaintiff meetings, as well as informal communications networks, many of these litigating entities participated in the development of the allocation formula. The presence of litigating entities, each with its own unique interests and perspective, enabled the types of nuances identified above to emerge and helped fashion a final allocation formula that took careful account of all the various factors at issue as much as possible.

- *Fourth*, as the main purpose of the negotiation class approach was to fix a large group of municipalities into an aggregate settlement group, the allocation formula had to be presented to and accepted by that mass of political subdivisions throughout the country, not just the more active players participating in the development process. In a truly stunning display of technological wizardry, the PEC developed an allocation formula website. The website encompassed a map of the United States and enabled a user to

---

[25] Plaintiffs' Memorandum in Support of Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, *In re: Nat'l Prescription Opiate Litig.*, Case No. 1:17-md-02804-DAP, ECF 1820-1, at 55 (July 9, 2019) (hereinafter "Pl. Neg. Class Br.").

[26] *Id.* at 55–59.

click on any county and see that county's share of the lump sum settlement, as well as to plug in a lump sum number and see the county's actual dollar recovery at that lump sum level.  Perhaps most importantly, the map enabled one municipality to scroll across to a neighboring municipality and compare its take to that of its fellow class members.[27]

21.     When the PEC moved for certification of a negotiation class, it included the proposed allocation formula as part of the motion,[28] given the centrality of the formula to ensuring that class members had sufficient information upon which to base their opt-out decision, were the Court to grant certification.  As there was not yet a proposed settlement when the PEC moved for negotiation class certification, there was no reason for the Court to apply Rule 23(e)'s settlement approval principles.  However, the Court appreciated that if it went ahead with the negotiation class, the parties negotiated a lump sum settlement, the class members voted on it and approved it, and Counsel then moved for final approval, the Court would have to apply Rule 23(e)(2)(D) at that point.  And if the allocation formula failed, everything that preceded it would have been a complete – yet avoidable – waste of time.[29]   The Court accordingly appointed one of the case's Special Masters (Cathy Yanni) to "provide the Court a one-time, neutral perspective on the proposed allocation . . . scheme[]."[30]

---

[27] The link to the allocation map (https://allocationmap.iclaimsonline.com/) is no longer operational, but in conjunction with the publication of Professor McGovern's and my law review article on negotiation class certification, the Texas Law Review generated a permanent link that preserves a snapshot of the landing page for the original site.  *See In re: National Prescription Opiates [sic] Litigation*, MDL No. 2804 (N.D. Ohio), *Allocation Map*, at https://perma.cc/6J6G-ATZZ.

[28] *See* Pl. Neg. Class Br. at 55-60.

[29] Order Directing Special Master Yanni to Assess Fairness of Allocation and Voting Proposals to Non-Litigating Entities, ECF 2529, at 3 (Aug. 26, 2019) ("It would be perverse—and an enormous waste of judicial and societal resources—to launch this whole negotiation class only to later hold that the allocation or voting schemes, identified at the outset, were inequitable *ab initio*.").

[30] *Id.*

22.     Special Master Yanni's report focused on various aspects of the allocation formula at issue in the negotiation class structure, some of which are not pertinent here.  As to the core allocation mechanism, however (the distribution based on the ARCOS and other public health data, as developed by the parties in conjunction with medical and public health experts), Special Master Yanni wrote this:

> [T]he plan for allocating 75% of the settlement fund is objective, transparent, and fair. Settlement proceeds are allocated according to an algorithm based on three sets of objective public health data directly at the heart of this case: opioid-related overdoses, opioid-related deaths, and the distribution of opioid-related pills per capita in a given jurisdiction.  The results are made transparent to the entire class, as any class member (or member of the public) can utilize an on-line allocation tool to see precisely what share of any settlement will go to each and every county in the country.  This allocation model reflects a serious effort on the part of the litigating entities that devised it to distribute the class's recovery according to the driving force at the heart of the lawsuit – the devastation caused by this horrific epidemic.  The legitimacy of the main allocation model supports an initial assumption that the litigating entities operated in good faith in developing the allocation plan.[31]

23.     The Court reviewed Special Master Yanni's report in certifying the negotiation class and adopted her findings.  The Court explained its reasoning, and why some objections to the core allocation plan were off base, as follows:

> As to the allocation plan, the Court agrees with Special Master Yanni's conclusion that the method for allocating the core class recovery (75% of the fund) reflects a lot of hard work and is a significant and eminently fair step toward resolution of these many cases.  ***Nothing in the allocation model appears to skew toward any group other than those hardest hit by the opioid epidemic***.[32]

24.     Because the Sixth Circuit reversed this Court's endorsement of the negotiation class approach, the negotiation class certification allocation formula was never formally subjected to the

---

[31] Report of Special Master Cathy Yanni, ECF 2579, at 5 (Sept. 10, 2019).

[32] *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. at 553 (emphasis added).

Rule 23(e)(2)(D) analysis in the context of a proposed class action settlement.  However, the guts of the allocation formula became part of later settlements and were met with informal approval of the many political subdivisions therein.  To understand that piece of the story requires returning to the second settlement track identified in paragraph 12, above – the States-driven settlements.

<u>Later Endorsement of the Allocation Formula</u>

25.      Defendants would necessarily have to settle with State governments outside the MDL, as many States had filed cases in their own State courts and those cases could not be removed and consolidated into the MDL.  The defendants' concern, noted above, was that settling with a State would leave it open to cases from the State's political subdivisions.  Some State attorneys general asserted the legal authority to shut down subdivision litigation, but arguably not all had such authority, and even among those who did, the politics of doing so was complicated.  Accordingly, the defendants and States developed something of a carrot/stick approach to aggregate settlements – essentially, the defendants provided multi-year settlements and graduated the amount provided each year based on the presence or absence of subdivision litigation.  This empowered the States to work with their subdivisions to cease litigating independently, as the State's recovery from a defendant would increase the less outstanding litigation existed in that State.[33]

---

[33] The National Association of Attorneys General explained the provisions as follows:

> Because of the unprecedented nature of this nationwide litigation – involving thousands of separate cases and tens of thousands of potential governmental claimants – there are several provisions calibrated to incentivize maximum participation by state and local governments and to incentivize early participation.  They include the division of payments into base and bonuses, with bonuses based on participation levels.  There are also suspension, offset, and look-back provisions that are intended to deter future opioid litigation against the companies by state and local governments, now that they have agreed to a $26 billion

26.     Of course, to accomplish the goal of curtailing subdivision litigation, each State had to generate a mechanism to allocate the State's recovery among its subdivisions that was sufficiently attractive to the subdivisions to get them to stop litigating independently.  Some State AGs and their political subdivisions negotiated specific intrastate allocation mechanisms for that purpose and for those that did, that mechanism was employed as part of later settlement allocations, such as in the McKinsey Political Subdivision class action.  In the States that were unable to establish intrastate allocation mechanisms, or otherwise did not, allocation defaulted to the data-driven, expert developed, class member participatory mechanism from MDL 2804; thus, the MDL 2804 Allocation Formula became known as the national default allocation mechanism.

27.     Had the negotiation class been affirmed and led to a settlement, there would have been a settlement process enabling objections to the allocation mechanism and a direct application of Rule 23(e)(2)(D) within the litigation in which the default mechanism was established.  An absence of objections in that setting could provide evidence upon which a court might rely in

---

global nationwide settlement.  These deterrents are substantially lessened in the event certain high levels (tiers) of participation by states and subdivisions are achieved nationally.

A state and its subdivisions can secure maximum payments for themselves by achieving full resolution (subject to certain minor exceptions) of the actual and potential opioid-related legal claims by public entities within the state.  This can be done through voluntary opt-ins, legislation, judicial action, or any combination of these methods that resolves existing claims and bars future claims.  States that are unable to achieve complete resolution can still receive substantial payments by resolving a significant portion of current and future subdivision claims.  The partial payment percentages are set forth in sliding scales based on participation levels among subdivisions within a state.

National Association of Attorneys General, *Summary of State/Subdivision Agreements with Johnson & Johnson and 3 Major Pharmaceutical Distributors* at 1-2, available at https://ncdoj.gov/wp-content/uploads/2021/07/2-pager-full-deal-final-002.pdf.

affirming the *bona fides* of an allocation plan.[34]  Although that form of direct evidence was lacking, the subsequent use of the default allocation plan by States and their political subdivisions throughout the country provides strong evidence of the fairness of the default plan.  Put differently, (1) the MDL 2804 Allocation Formula is so equitable that interested parties relied on it where agreement was otherwise elusive and (2) political subdivisions throughout the country implicitly noted their endorsement of the Formula by electing to participate in the national settlements at levels sufficient to ensure their success.

<u>The Legitimacy of the MDL 2804 Allocation Formula</u>

28.     Returning to the exemplary McKinsey Political Subdivisions settlement described above, as that settlement was a class action settlement, it required judicial approval.  Judge Breyer accordingly applied Rule 23(e)'s settlement principles in reviewing the proposal.    Rule 23(e)(2)(D), as amended in 2018, requires the Court to ensure that a proposed settlement "treats class members equitably relative to each other" before granting final approval to it.[35]  As noted above, the Advisory Committee's notes to the 2018 codification of this factor provide context in

---

[34] The Sixth Circuit has long instructed district courts to apply the so-called *UAW* or *International Union* factors in reviewing a proposed class action settlement, one of which is "the reaction of the class members to the proposed settlement."  *See Does 1-2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 894–95 (6th Cir. 2019) ("In *UAW*, we established a seven-factor test to assess whether or not a class action settlement is 'fair, reasonable, and adequate' under Federal Rule of Civil Procedure 23(e).  Those factors include: (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest") (cleaned up) (discussing *Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).  *See also Newberg and Rubenstein on Class Actions* § 13:58 (reporting and discussing fact that "[c]ourts have often held that if only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement").

[35] Fed. R. Civ. P. 23(e)(2)(D).

stating, "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."[36]

29.   As I explained to the Court in that matter,[37] there were four remarkable aspects of the history reported above that provided strong support for the conclusion that the MDL 2804 Allocation Formula met Rule 23(e)(2)(D)'s equitable goal.

30.   *First*, **_substantively_**, and most importantly, the MDL 2804 Allocation Formula is based on three sets of objective public health data, all reported by the federal government, as applied by public health and medical experts to the issues in this case. The data points themselves are remarkably precise indicators of the saturation of the opioid problem in any given area, and the further refinement of the data for use as an allocation formula relied on neutral public health and medical experts with no incentives to skew the data in any particular manner. There is little doubt that the allocation formula is solely directed at remediating the impact of the opioid epidemic on political subdivisions throughout the United States and is therefore substantively sound.

31.   *Second*, **_procedurally_**, and uniquely for class action practice, class members themselves were involved in developing the MDL 2804 Allocation Formula. This is unusual for class actions, as class members typically have so little at stake that it would be inefficient for them to spend time sorting out an allocation formula; courts, lawyers, and claims administrators do it for them. But here, of course, class members have significant economic, political, and social

---

[36] Fed. R. Civ. P. 23(e)(2)(D) advisory committee's note to 2018 amendment.

[37] *See* Declaration of Professor William B. Rubenstein in Support of Motion for Final Approval of Class Action Settlement, *In re McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB, ECF 628-2, at 22–26 (Nov. 15, 2023).

interests at stake.  It is a credit to the MDL 2804 Allocation Formula that it resulted from the MDL 2804 PEC's effort to solicit class member input:  the underlying premise of adjudication in the United States is, of course, that settlement decisions are vested with the client, not counsel,[38] and where plausible, class action should aim for no less.[39]  One commentator has noted that the structure of negotiation class certification – figuring out an allocation formula ___**before**___ money is on the table and ___**before**___ the opt-out opportunity, as occurred in MDL 2804 – "is much more likely to result in an allocation that is fair to all segments of the class with their differing interests."[40]

---

[38] Model Rules of Prof'l Conduct R. 1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter.").

[39] Elizabeth J. Cabraser & Samuel Issacharoff, *The Participatory Class Action*, 92 N.Y.U. L. Rev. 846, 859–60 (2017) (describing how class members – particularly those with large stakes – have become more active in class action litigation and noting relationship to democratic-like values); William B. Rubenstein, *Divided We Litigate: Addressing Disputes Among Group Members and Lawyers in Civil Rights Campaigns*, 106 Yale L.J. 1623, 1654–62 (1997) (discussing mechanisms for democratic decision-making in group litigation).

[40] Alan B. Morrison, *A Negotiation Class: A New, Workable, and (Probably) Lawful Idea*, 99 Tex. L. Rev. Online 49, 50 (2020).  Professor Morrison explains:

> That is because class counsel needs as many class members as possible to remain in the class so that the defendant will be willing to negotiate over as close to a global settlement as possible.  A negotiation class is unlike the typical settlement in which the allocation is done by class counsel after the deal with the defendant is struck, when absent class members have little leverage.  By contrast, in the negotiation class, the allocation occurs first, when class members are not forced to choose between no deal and a bad deal.  As a result, in order to reach agreement on an allocation formula, class counsel must consider the interests of all subgroups within the class (or realistically, their lawyers), even if they are not actually at the bargaining table.  And class counsel must listen and take those views into account so that the class supports the allocation when the judge is asked to certify the class, so that large numbers of class members do not opt out, and so that the class as a whole votes to support the ultimate settlement if class counsel is able to reach an agreement with the defendant.

*Id.*

32.     *Third*, **_historically_**, Special Master Yanni, appointed by this Court, reviewed the allocation formula in real time and found it to be sound; the Court, in turn, adopted that finding after undertaking its own independent evaluation.  To be sure, that review did not come in the context of a proposed settlement – rather, in the context of negotiation class certification as explained above – but these reviews nonetheless applied the principle of Rule 23(e)(2)(D) to the MDL 2804 Allocation Formula and found the formula sound.

33.     *Fourth*, subsequent events provide strong support for the conclusion that the MDL 2804 Allocation Formula has been **_consented to_** by many class members.  As noted above, significant class participation went into the formula at the outset.  In the negotiation class certification proceedings in MDL 2804, only a few putative class members expressed any concern about this aspect of the allocation formula, and this Court's decision explained that the objections were either based on a misunderstanding of the facts underlying the formula and/or addressed by other aspects of the settlement.[41]  Although negotiation class certification never came to fruition, the parties generating the subsequent 2021 National Settlements all employed the MDL 2804 Allocation Formula as a default and relatively few political subdivisions opted not to participate. This shows that the Formula drew support from both States and political subdivisions, as it was used precisely where those entities were unable to otherwise generate an intrastate allocation plan and/or because it provided a satisfactory intrastate allocation plan.

34.     Given this history, it is not surprising that Judge Breyer found that the McKinsey Political Subdivision settlement's use of the MDL 2804 Allocation Formula satisfied the equitable distribution requirement of Rule 23.  There, too, class members showed remarkable support for

---

[41] *In re Nat'l Prescription Opiate Litig.*, 332 F.R.D. at 553.

the settlement and its allocation formula:  only 79 of 33,000 Class Members submitted valid opt

out requests, meaning that 99.76% of the Class Members participated in the settlement.[42]  The

order granting final approval explained:

> The plan tracks the allocation agreements reached between the states and their subdivisions as to the portion of each state's share under the 2021 National Settlements.  As set forth in the 2021 National Settlements:
>
>> The allocation of the Settlement Fund allows for different approaches to be taken in different states, such as through a State-Subdivision Agreement.  Given the uniqueness of States and their Subdivisions, Settling States and Participating Subdivisions are encouraged to enter into State-Subdivision Agreements in order to direct the allocation of their portion of the Settlement Fund.
>
> Each Class member with a population above 10,000 or that filed a lawsuit against McKinsey raising the issues alleged in the Master Complaint shall be eligible for a *pro rata* share of the Net Settlement Fund based on a proposed plan of allocation.  In those states without negotiated agreements, the plan will follow the default allocation provided for in the national settlements, *i.e.*, the "default" direct-to-subdivision allocation of 15% will be used, with the remaining net settlement funds going to an abatement fund.[43]

Thus, Judge Breyer concluded that, "The plan of allocation as set out by Class Counsel treats Class

Members equitably relative to one another and complies with the requirements of Federal Rule of

Civil Procedure 23."[44]

---

[42] Order Granting Final Approval of Class Action Settlement and Award of Attorneys' Fees and Costs, *In re McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB, ECF 665, at 3 (Feb. 2, 2024).

[43] *Id.* at 4 (cleaned up).

[44] *Id.*

**II.**
**THIS SETTLEMENT'S PROPOSED ALLOCATION FORMULA**
**TREATS CLASS MEMBERS EQUITABLY RELATIVE TO EACH OTHER**

The Proposed Allocation Formula

35.     As the present settlement is not one among political subdivisions and hence cannot directly employ the MDL 2804 Allocation Formula, it requires a return to first principles and application of those principles to the proposal.

36.     Settlement allocation formulas aim to distribute an aggregate fund (a) among a group of class members (b) on the basis of the harm remedied by the settlement in an (c) equitable fashion.  To hit the third mark, each group member's proportion of the settlement fund should have a meaningful relationship to the proportion of the harm suffered by that class member.

37.     The class in this case consists of "private benefit plans that provide health and welfare benefits to their members and their families, including reimbursement for some or all of the costs of prescription opioids that were on their approved formularies, and often for the resulting medical claims (*e.g.*, OUD [opioid use disorder] treatment and emergency visits)."[45]

38.     The allegations underlying the settlement are that "the opioid industry's practices uniquely harmed TPPs by causing them to pay for prescription opioids rather than for safer, non-addictive, and lower-cost prescription drugs (including over-the-counter pain relievers) that would have been used otherwise, and further paid for opioid addiction-related treatment that followed."[46]

---

[45] Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), *In re: Nat'l Prescription Opiate Litig.*, Case No. 1:17-md-02804-DAP, ECF 5614, at 3 (Aug. 30, 2024).

[46] *Id.*

39.     The allocation plan proposes to distribute the common fund according to precisely these two factors – how much did each class member (over)pay for opioids themselves and how much did each class member (over)pay for OUD.[47]  Moreover, the plan proposes to use actual data related to opioid prescriptions and opioid-related health care to generate the precise allocation numbers as much as possible.[48]  The prescriptions themselves are identified in the class member's data by drug names.[49]  The OUD amount is generated by assessing the quantity of OUD claims suffered by each class member (members with OUD x number of years covered) and then multiplying that number by an accepted estimate of the excess costs per patient attributable to OUD.[50]  This general approach clearly treats class members equitably toward one another as it carefully matches the allegations in the lawsuit with the proposed distribution and employs hard data to generate precise numbers.

40.     The approach faces only one real hurdle, which is the absence of *complete* data for all class members.  Data deficiencies are two-fold:  (a) the class period is sufficiently broad (1996–2024) that some class members do not have precise data for every one of those years; and (b) the class is sufficiently large that some class members lack access to relevant data altogether. Professor Rosenthal's plan solves those data problems in ways tailored to each.  For class members without complete data, the missing year's data can be calculated simply by extrapolating from the

---

[47] Expert Report of Professor Meredith Rosenthal Regarding Allocation of Settlement Proceeds, *In re: Nat'l Prescription Opiate Litig.*, Case No. 1:17-md-02804-DAP, ECF 5614-7, at 3 (Aug. 30, 2024) ("[T]he proposed allocation takes as its point of departure . . . the total dollar value of opioid claims and of medical treatment for enrollees with opioid use disorder ("OUD") . . . .").

[48] *Id.* at ¶¶ 12–16.

[49] *Id.* at ¶ 13.

[50] *Id.* at ¶¶ 14–15.

available data and adjusting based on the prevalence of OUD in the population during the missing years.[51]  For class members without access to any claims data, Professor Rosenthal calculates a loss formula from those class members with data then applies it to the class members without data by (a) estimating the size of that member's client pool, (b) then multiplying that number by "an average dollar amount of opioid-related spending per enrollee per year,"[52] with that average generated from the data of those class members with data, all of which is also (c) adjusted by location to account for the geographically-distinct impact of the epidemic.[53]

<u>The Legitimacy of the Proposed Allocation Formula</u>

41.    Five key factors about Professor Rosenthal's proposed allocation formula provide support for the conclusion that it treats class members equitably relative to one another, as Rule 23(e)(2)(D) requires.

42.    *First, **the allocation plan is entirely data driven***.  It employs actual class member data where available, rendering it similar in this phase to any securities class action distribution plan that simply tracks purchases, sales, and shares.  Where data is unavailable, the plan fills out these holes by again relying on the best available estimates of what those data would be, extrapolating from available data and/or supplying well-accepted, published, peer-reviewed, public health estimates of (for example) the costs of OUD.

43.    *Second, **the plan employs the same data driven approach across the whole class, indeed even filling data gaps for some class members with data derived from other class***

---

[51] *Id.* at ¶¶ 17–20.

[52] *Id.* at ¶ 23.

[53] *Id.* at ¶¶ 21–26.  A version of this same methodology is used when class members covered only prescription drugs but not other care or vice versa.  *Id.* at ¶ 27.

**_members_**.  No class members are treated differently than one another.  The claim value for all class members with available data is generated in the same manner and the claim value for class members missing data is generated according to the same gap-filling approach.  There is obvious equity within each of these two tranches of class members.  Better still, the data that are supplied for class members with missing data are data generated from the information available in the claims' histories of class members with data.  This approach ensures that there is equity across the tranches, that the individual allocation to each class member with data, on the one hand, and the allocation to each class member without data, on the other, are effectively a product of all the information available across the class.

44.     *Third,* **_the plan uses data to ensure that class member recoveries are directly related to the harms alleged in the lawsuit_**.  To say that an allocation is data-driven suggests it is objective in nature but does not, standing alone, prove that it is equitable.  What makes it so is that the data is employed for the single purpose of allocating the funds according to the harms alleged in the lawsuit.  Here, the data Professor Rosenthal's plan employs reflect actual harm from the opioid epidemic – either excess payments for opioid prescriptions or excess costs generated by Opioid Use Disorder.  In many ways, this allocation is far simpler than the MDL 2804 Formula, as the cost of the epidemic to these TPP class members is reflected directly in their payment data (or estimates thereof).  As explained above, allocating recoveries across political subdivisions raised more nuances because one political subdivision may have been the site of an enormous dump of prescriptions, but the public hospital handling the fall out may have been in the next county over.  With TPPs, however, their costs are their costs, full stop.  And these costs directly

reflect the relative impact of the opioid epidemic on each TPP class member, consistent with the goal of all 2804 settlements regardless of structure, plaintiffs, or defendant.

45.   *Fourth**, none of the red flags that raise allocation concerns are present here.*  In *Newberg and Rubenstein on Class Actions*, I catalogue a set of concerns courts consider allocation red flags that might trigger closer scrutiny of an allocation plan:[54]

- Settlements may raise a red flag, I report, "where part of the class receives relief and another significant part receives no relief."  This concern is not applicable here as all class members will receive relief relative to the harm they suffered.

- Similarly, courts are wary if "compensation would be more difficult [to claim] for some class members [as opposed to] others . . . [even though] both groups have the same claims."  Again, this plan raises no such concern as the claiming process applies equally across the board.

- Finally, if class members are in fact differently situated as to one another but treated as if they were not, this may be a concern.  But the only differential situation here is a data gap and, as explained above, that gap is filled using objective data primarily drawn from the very class members with data, hence ensuring equity across the class.

46.   In the treatise, I conclude by stating that the Court's goal, as to this prong, "is to ensure that similarly situated class members are treated similarly and that dissimilarly situated class members are not arbitrarily treated as if they were similarly situated."  That principle perfectly captures the substance of Professor Rosenthal's plan.

47.   *Fifth,* not surprisingly, therefore, ***Judge Breyer found that this same distributional plan met the requirements of Rule 23(e)(2)(D)'s equitable principle*** in approving a settlement between a similar TPP class and McKinsey in that MDL.[55]

---

[54] All of the succeeding quotations are from *Newberg and Rubenstein on Class Actions* at § 13:56.

[55] Order Granting Final Approval of Class Action Settlement and Award of Attorneys' Fees and Expenses and Class Representative Service Awards, *In re McKinsey & Co., Inc., National*

\* \* \*

48. Given the enormous magnitude of the opioid problem, the quantity of political actors and lawyers involved in addressing it, and the level of the monetary relief afforded in the many settlements that aim to remedy it, the actual legal language of various allocation formulas can sound dense and ring in buzzwords.  But when parsed, there is little doubt that allocation efforts in opioid-related settlements generally, and in MDL 2804 in particular, have been one of the hallmark achievements associated with this landmark MDL.

49. I have, accordingly, testified that:

- The parties in MDL 2804 developed the MDL 2804 Allocation Formula using objective public health data, in consultation with medical and public health experts, in a manner that encouraged and relied on stakeholder/class members input and approval; Special Master Yanni and this Court both independently approved the mechanism in the context of negotiation class certification; States, political subdivisions, settling defendants in other national settlements showed their approval of it by making it the default intrastate allocation formula; and Judge Breyer explicitly blessed it in granting final approval to the McKinsey Political Subdivisions settlement.

- So too here:  the proposed allocation formula is data driven, uses similar data for all class members, ensures that recovery levels correspond to harm levels, raises no Rule 23 red flags, and Judge Breyer explicitly blessed it, too, in granting final approval to the McKinsey TPP settlement.  Both the content of the allocation formula and this history provide strong support by which the Court could conclude that Rule 23(e)(2)(D)'s intraclass equity requirement has been met.



October 9, 2024

_____

William B. Rubenstein

---

*Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB, ECF 739, at 2 (Aug. 5, 2024) (finding that the "Plan of Allocation treats TPP Class members equitably relative to one another").

# EXHIBIT A

*In re:  National Prescription Opiate Litigation*
Case No. 1:17-md-2804
U.S. District Court for the Northern District of Ohio

### DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN

EXHIBIT A
BACKGROUND AND QUALIFICATIONS

1.      I am the Bruce Bromley Professor of Law at Harvard Law School.  I graduated from Yale College, *magna cum laude*, in 1982 and from Harvard Law School, *magna cum laude*, in 1986.  I clerked for the Hon. Stanley Sporkin in the U.S. District Court for the District of Columbia following my graduation from law school.  Before joining the Harvard faculty as a tenured professor in 2007, I was a law professor at the UCLA School of Law for a decade, and an adjunct faculty member at Harvard, Yale, and Stanford Law Schools while a public interest lawyer during the preceding decade.  I am admitted to practice law in the Commonwealth of Massachusetts, the State of California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the U.S. Supreme Court, six U.S. Courts of Appeals, and four U.S. District Courts.

2.      My principal area of scholarship is complex civil litigation, with a special emphasis on class action law.  I am the author, co-author, or editor of five books and more than a dozen scholarly articles, as well as many shorter publications (a fuller bibliography appears in my appended c.v., Exhibit A).  Much of this work concerns various aspects of class action law.  Since 2008, I have been the sole author of the leading national treatise on class action law, *Newberg on Class Actions*.  Between 2008 and 2017, I rewrote the entire multivolume treatise from scratch as its Fifth Edition and, subsequently, produced the treatise's Sixth Edition – *Newberg and Rubenstein on Class Actions* – which was published in 2022.  My work has been excerpted in casebooks on complex litigation, as noted on my c.v.

**A-1**

3.     My expertise in complex litigation has been recognized by judges, scholars, and lawyers in private practice throughout the country for whom I regularly provide consulting advice and educational training programs.  Between 2010 and 2023, the Judicial Panel on Multidistrict Litigation (JPML) annually invited me to give a presentation on the current state of class action law at its MDL Transferee Judges Conference.  The Federal Judicial Center invited me to participate as a panelist (on the topic of class action settlement approval) at its March 2018 judicial workshop celebrating the 50th anniversary of the JPML, Managing Multidistrict and Other Complex Litigation Workshop.  The Second Circuit invited me to moderate a panel on class action law at the 2015 Second Circuit/Federal Judicial Center Mid-Winter Workshop.  The American Law Institute selected me to serve as an Adviser on a Restatement-like project developing the *Principles of the Law of Aggregate Litigation*.  In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section.  I am on the Advisory Board of the publication *Class Action Law Monitor*.  I have often presented continuing legal education programs on class action law at law firms and conferences.

4.     My teaching focuses on procedure and complex litigation.  I regularly teach the basic civil procedure course to first-year law students, and I have taught a variety of advanced courses on class action law and complex litigation, professional responsibility issues in complex litigation, remedies, and federal litigation.  I have received honors for my teaching activities, including: the Albert M. Sacks-Paul A. Freund Award for Teaching Excellence, as the best teacher at Harvard Law School during the 2011–2012 school year; the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the 2001–2002 school year; and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996–1997 school year.

5.      My academic work on class action law follows a significant career as a litigator. For nearly eight years, I worked as a staff attorney and project director at the national office of the American Civil Liberties Union (ACLU) in New York City.  In those capacities, I litigated dozens of cases on behalf of plaintiffs pursuing civil rights matters in state and federal courts throughout the United States.  I also oversaw and coordinated hundreds of additional cases being litigated by ACLU affiliates and cooperating attorneys in courts around the country.  I therefore have personally initiated and pursued complex litigation, including class actions.

6.      I have been retained as an expert witness in more than 110 cases and as an expert consultant in another 30 or so cases.  These cases have been in state and federal courts throughout the United States; most have been class actions and other complex matters, and many have been MDL proceedings.  I have been retained to testify as an expert witness on issues ranging from the propriety of class certification, to the reasonableness of settlements and fees, to the preclusive effect of class action judgments.  I have been retained by counsel for plaintiffs, for defendants, and for objectors.

7.      Courts have appointed me to serve as an expert in complex fee matters:

- In 2015, the United States Court of Appeals for the Second Circuit appointed me to argue for affirmance of a district court order that significantly reduced class counsel's fee request in a large, complex securities class action, a task I completed successfully when the Circuit summarily affirmed the decision on appeal in 2016.[1]

- In 2017, the United States District Court for the Eastern District of Pennsylvania appointed me to serve as an expert witness on certain attorney's fees issues in the National Football League (NFL) Players' Concussion Injury Litigation (MDL 2323).  In my final report to the Court, I recommended, *inter alia*, that the Court

---

[1] *See In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015), *aff'd sub nom. DeValerio v. Olinski*, 673 F. App'x 87 (2d Cir. 2016).

should cap individual retainer agreements at 22%, a recommendation that the Court adopted.[2]

- Between 2018-2020, this Court appointed me to serve as an expert consultant to Special Master McGovern and the Court on complex class action and common benefit fees issues in this matter, the National Prescription Opiate Litigation (MDL 2804).

- The United States District Courts for the Southern District of New York and the Eastern District of Pennsylvania have both appointed me to serve as a mediator to resolve complex matters in class action cases, including fee issues.

8.     Courts have often relied on my expert witness testimony.[3]

---

[2] *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1658808, at *1 (E.D. Pa. Apr. 5, 2018) ("I adopt the conclusions of Professor Rubenstein and order that IRPAs' fees be capped at 22% plus reasonable costs.").

[3] *See, e.g.*, *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014); *In re Facebook, Inc. Consumer Privacy User Profile Litigation*, No. 3:18-MD-02843-VC, 2023 WL 8445812, at *2 (N.D. Cal. Oct. 10, 2023); *Benson v. DoubleDown Interactive, LLC*, No. 18-CV-0525-RSL, 2023 WL 3761929, at *2 (W.D. Wash. June 1, 2023); *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2022 WL 18108387, at *7 (E.D. Va. Nov. 8, 2022); *Reed v. Light & Wonder, Inc.*, No. 18-CV-565-RSL, 2022 WL 3348217, at *1–*2 (W.D. Wash. Aug. 12, 2022); *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-CV-0256 (LAK), 2021 WL 2453972 at *3 (S.D.N.Y. June 15, 2021); *In re Facebook Biometric Info. Priv. Litig.*, 522 F. Supp. 3d 617, 623 (N.D. Cal. 2021); *Kater v. Churchill Downs Inc.*, No. 15-CV-00612-RSL, 2021 WL 511203, at *1–*2 (W.D. Wash. Feb. 11, 2021); *Wilson v. Playtika Ltd.*, No. 18-CV-5277-RSL, 2021 WL 512230, at *1–*2 (W.D. Wash. Feb. 11, 2021); *Wilson v. Huuuge, Inc.*, No. 18-CV-5276-RSL, 2021 WL 512229, at *1–*2 (W.D. Wash. Feb. 11, 2021); *Amador v. Baca*, No. 210CV01649SVWJEM, 2020 WL 5628938, at *13 (C.D. Cal. Aug. 11, 2020); *Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2018 WL 6606079, at *10 (S.D. Ill. Dec. 16, 2018); *Krakauer v. Dish Network, L.L.C.*, No. 1:14-CV-333, 2018 WL 6305785, at *5 (M.D.N.C. Dec. 3, 2018); *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1658808, at *4 (E.D. Pa. Apr. 5, 2018); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 3175924, at *3 (N.D. Cal. July 21, 2017); *Aranda v. Caribbean Cruise Line, Inc.*, No. 1:12-cv-04069, 2017 WL 1369741, at *5 (N.D. Ill. Apr. 10, 2017), *aff'd sub nom. Birchmeier v. Caribbean Cruise Line, Inc.*, 896 F.3d 792 (7th Cir. 2018); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *9 (S.D.N.Y. Sept. 2, 2015); *Asghari v. Volkswagen Grp. of Am., Inc.*, No. 13-CV-02529 MMM, 2015 WL 12732462, at *44 (C.D. Cal. May 29, 2015); *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172 (C.D. Cal. 2010); *Commonwealth Care All v. Astrazeneca Pharm. L.P.*, No. CIV.A. 05-0269 BLS 2, 2013 WL 6268236, at *2 (Mass. Super. Aug. 5, 2013).

9.      I have been retained in this case to provide the Court information concerning the issues set forth in the first paragraph of my Declaration.  I am being compensated for providing this Declaration.  I was paid a flat fee in advance of preparing my Declaration, so my compensation is in no way contingent upon the content of the Declaration.

10.      In analyzing these issues, I have discussed the case with the counsel who retained me.  I have also reviewed documents from this and related cases, a list of which is attached as Exhibit B.  I have also re-read the case law and scholarship relevant to the issues herein.

11.      My full c.v. is set forth in the succeeding pages.

`

# PROFESSOR WILLIAM B. RUBENSTEIN

Harvard Law School - AR323                                          (617) 496-7320
1545 Massachusetts Avenue                                    rubenstein@law.harvard.edu
Cambridge, MA 02138

## ACADEMIC EMPLOYMENT

**HARVARD LAW SCHOOL, CAMBRIDGE MA**

| | |
|---|---|
| Bruce Bromley Professor of Law | 2018-present |
| Sidley Austin Professor of Law | 2011-2018 |
| Professor of Law | 2007-2011 |
| Bruce Bromley Visiting Professor of Law | 2006-2007 |
| Visiting Professor of Law | 2003-2004, 2005-2006 |
| Lecturer in Law | 1990-1996 |

    *Courses*:    Civil Procedure; Class Action Law; Remedies; Legal Profession
    *Awards*:    2012 Albert M. Sacks-Paul A. Freund Award for Teaching Excellence
    *Membership:*  American Law Institute; American Bar Foundation Fellow

**UCLA SCHOOL OF LAW, LOS ANGELES CA**

| | |
|---|---|
| Professor of Law | 2002-2007 |
| Acting Professor of Law | 1997-2002 |

    *Courses*:    Civil Procedure; Complex Litigation; Remedies
    *Awards*:    2002 Rutter Award for Excellence in Teaching
                Top 20 California Lawyers Under 40, *Calif. Law Business* (2000)

**STANFORD LAW SCHOOL, STANFORD CA**

| | |
|---|---|
| Acting Associate Professor of Law | 1995-1997 |

    *Courses*:    Civil Procedure; Federal Litigation
    *Awards*:    1997 John Bingham Hurlbut Award for Excellence in Teaching

**YALE LAW SCHOOL, NEW HAVEN CT**

| | |
|---|---|
| Lecturer in Law | 1994, 1995 |

**BENJAMIN N. CARDOZO SCHOOL OF LAW, NEW YORK NY**

| | |
|---|---|
| Visiting Professor | Summer 2005 |

## LITIGATION-RELATED EMPLOYMENT

**AMERICAN CIVIL LIBERTIES UNION, NATIONAL OFFICE, NEW YORK NY**

| | |
|---|---|
| Project Director and Staff Counsel | 1987-1995 |

-Litigated impact cases in federal and state courts throughout the United States.
-Supervised a staff of attorneys at the national office, oversaw work of ACLU attorneys
around the country and coordinated work with private cooperating counsel nationwide.
-Significant experience in complex litigation practice and procedural issues; appellate
litigation; litigation coordination, planning and oversight.

**HON. STANLEY SPORKIN, U.S. DISTRICT COURT, WASHINGTON DC**

| | |
|---|---|
| Law Clerk | 1986-87 |

**PUBLIC CITIZEN LITIGATION GROUP, WASHINGTON DC**

| | |
|---|---|
| Intern | Summer 1985 |

EDUCATION

HARVARD LAW SCHOOL, CAMBRIDGE MA  
     J.D., 1986, *magna cum laude*

YALE COLLEGE, NEW HAVEN CT  
     B.A., 1982, *magna cum laude*  
       Editor-in-Chief, YALE DAILY NEWS

SELECTED COMPLEX LITIGATION EXPERIENCE

*Professional Service and Highlighted Activities*

◊  *Author,* NEWBERG AND RUBENSTEIN ON CLASS ACTIONS (6th ed. 2022); NEWBERG ON CLASS ACTIONS (sole author since 2008, sole author of entirely re-written Fifth Edition (2011-2019))

◊  *Speaker,* Judicial Panel on Multidistrict Litigation, Multidistrict Litigation (MDL) Transferee Judges Conference, Palm Beach, Florida (provided presentation to MDL judges on recent developments in class action law and related topics (2010, 2011, 2013-2019)

◊  *Panelist,* Federal Judicial Center, *Managing Multidistrict Litigation and Other Complex Litigation Workshop* (for federal judges) (March 15, 2018)

◊  *Amicus curiae,* authored *amicus* brief on proper approach to incentive awards in class action lawsuits in conjunction with motion for rehearing *en banc* in the United States Court of Appeals for the Eleventh Circuit (*Johnson v. NPAS Sols., LLC,* 975 F.3d 1244 (11th Cir. 2020))

◊  *Amicus curiae,* authored *amicus* brief in United States Supreme Court on proper approach to *cy pres* award in class action lawsuits (*Frank v. Gaos,* 139 S. Ct. 1041 (2019))

◊  *Amicus curiae,* authored *amicus* brief in California Supreme Court on proper approach to attorney's fees in common fund cases (*Laffitte v. Robert Half Int'l Inc.,* 376 P.3d 672, 687 (Cal. 2016) (noting reliance on *amicus* brief))

◊  *Amicus curiae,* authored *amicus* brief in the United States Supreme Court filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◊  *Adviser,* American Law Institute, *Project on the Principles of the Law of Aggregate Litigation,* Philadelphia, Pennsylvania

◊  *Co-Chair,* ABA Litigation Section, Mass Torts Committee, Class Action Sub-Committee, 2007

◊  *Planning Committee,* American Bar Association, Annual National Institute on Class Actions Conference, 2006, 2007

◊  *"Expert's Corner"* (Monthly Column)*, Class Action Attorney Fee Digest,* 2007-2011

**A-7**

## Judicial Appointments

◊ *Co-Mediator.*   Appointed by the United States District Court for the Eastern District of Pennsylvania to help mediate a complex attorney's fees issue (*In re National Football League Players' Concussion Injury Litigation*, Civil Action No. 2:12-md-02323 (E.D. Pa. June-September 2022))

◊ *Meditator.*   Appointed by the United States District Court for the Southern District of New York to mediate a set of complex issues in civil rights class action (*Grottano v. City of New York*, Civil Action No. 15-cv-9242 (RMB) (May 2020-January 2021))

◊ *Expert consultant.*   Appointed by the United States District Court for the Northern District of Ohio, and Special Master, as an expert consultant on class certification and attorney's fees issues in complex multidistrict litigation (*National Prescription Opiate Litigation,* MDL 2804, Civil Action No. 1:17-md-2804 (N.D. Ohio Aug. 13, 2018; June 29, 2019; March 10, 2020))

◊ *Expert witness.*   Appointed by the United States District Court for the Eastern District of Pennsylvania as an expert witness on attorney's fees in complex litigation, with result that the Court adopted recommendations (*In re National Football League Players' Concussion Injury Litigation*, 2018 WL 1658808 (E.D. Pa. April 5, 2018))

◊ *Appellate counsel.*   Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *DeValerio v. Olinski*, 673 F. App'x 87, 90 (2d Cir. 2016))

## Expert Witness

◊ Retained as an expert witness concerning reasonableness of attorney's fee request (*In re Apple Inc. Securities Litigation*, Case No. 4:19-cv-02033-YGR (N.D. Cal. 2024))

◊ Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Brown v. Google LLC,* Civil Action No. 4:20-cv-03664 (N.D. Cal. 2024))

◊ Submitted expert witness declaration concerning proper approach to – and reasonableness of – attorney's fee request (*Parris v. Meta Platforms, Inc.,* Case No. 2023LA000672 (Illinois Circuit Court, DuPage Cty., 2024))

◊ Submitted expert witness declaration concerning proper approach to – and reasonableness of – attorney's fee request (*Barr v. SelectBlinds LLC,* Civil Action No. 2:22-cv-08326-SPG-PD (C.D. Cal. 2023))

◊ Submitted expert witness declaration on history and equity of proposed allocation system in complex class action settlement (*In re McKinsey & Co. Inc. National Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB (N.D. Cal. 2023))

◊ Submitted expert witness declaration concerning reasonableness of proposed hourly rates used in lodestar cross-check submission (*In re National Veterans Legal Services Program, et al. v. United*

*States,* Case No. 1:16-CV-00745-PLF (D. D.C. 2023))

◊   Submitted expert witness declarations concerning reasonableness of – and proper approach to – attorney's fees in context of issue class action judgment (*James, et al., v. PacifiCorp, et al.,* Civil Action No. 20CV33885 (Oregon Circuit Court, Multnomah Cty. 2023))

◊   Retained as an expert witness concerning reasonableness of attorney's fee request (*In re Wells Fargo & Company Securities Litigation*, Case No. 1:20-cv-04494-GHW (S.D.N.Y. 2023))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*In re Facebook, Inc. Consumer Privacy User Profile Litigation,* Civil Action No. 3:18-cv-02843-VC (N.D. Cal. 2023))

◊   Submitted expert witness declaration concerning constitutionality of proposed procedures for resolving aggregate claims within a bankruptcy proceeding (*In re PG&E Corporation and Pacific Gas and Electric Company,* Bankruptcy Case No. 19-30088 (N.D. Cal. Bankrpt. 2023))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Health Republic Insurance Company v. United States,* Civil Action No. 1:16-cv-0259C (Ct. Fed. Cl. 2023))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Benson, et al. v. DoubleDown Interactive, LLC, et al.,* Civil Action No. 2:18-cv-00525 (W.D. Wash. 2023))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fees request (*In re Twitter Inc. Securities Litigation,* Case No. 4:16-cv-05314 (N.D. Cal. October 13, 2022))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Ferrando v. Zynga Inc.,* Civil Action No. 2:22-cv-00214 (W.D. Wash. 2022))

◊   Retained as an expert witness concerning fee structures in complex mass/class litigation (*In re Upstream Addicks and Barker (Texas) Flood-Control Reservoirs,* Sub-Master Docket No. 17-9001L, (Ct. of Federal Claims, 2022-)

◊   Submitted an expert witness declaration concerning reasonableness of proposed settlement in nationwide securities class action, in light of competing litigation (*In re Lyft, Inc. Securities Litigation,* Case No. 4:19-cv-02690 (N.D. Cal. August 19, 2022))

◊   Submitted an expert witness declaration concerning reasonableness of common benefit attorney's fee request (*In re: Zetia (Ezetimibe) Antitrust Litigation,* MDL No. 2836, 2:18-md-2836 (E.D. Va. July 12, 2022))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Reed v. Scientific Games Corp.,* Civil Action No. 2:18-cv-00565 (W.D. Wash. 2022))

◊   Submitted an expert witness declaration concerning reasonableness of proposed settlement in nationwide securities class action, in light of competing litigation (*In re Micro Focus International PLC Securities Litigation,* Master File No. 1:18-cv-06763 (S.D.N.Y., May 4, 2022))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Americredit Financial Services, Inc., d/b/a/ GM Financial v. Bell*, No. 15SL-AC24506-01 (Twenty-First Judicial Circuit Court, St. Louis County, Missouri, March 13, 2022))

◊   Submitted an expert witness declaration concerning reasonableness of common benefit attorney's fee request (*In re:  Marjory Stoneman Douglas High School Shooting FTCA Litigation*, Case No. 0:18-cv-62758 (S.D. Fla. February 7, 2022))

◊   Expert witness declaration concerning expected claiming rates in class action submitted to court (*In re: Tiktok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill. Jan. 24, 2022))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, No. 12-CV-0256 (LAK), 2021 WL 2453972 (S.D.N.Y. June 15, 2021))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Kater v. Churchill Downs,* Civil Action No. 2:15-cv-00612 (W.D. Wash. 2020))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Wilson v. Playtika, LTD,* Civil Action No. 3:18-cv-05277 (W.D. Wash. 2020))

◊   Submitted expert witness declaration concerning reasonableness of attorney's fee request (*Wilson v. Huuuge,* Civil Action No. 3:18-cv-005276 (W.D. Wash. 2020))

◊   Submitted expert witness declarations and testified at fairness hearing concerning (1) reasonableness of attorney's fee request and (2) empirical data confirming robustness of class claims rate (*In re Facebook Biometric Information Privacy Litigation,* Civil Action No. 3:15-cv-03747-JD (N.D. Cal. (2020))

◊   Retained as an expert witness on issues regarding the Lead Plaintiff/Lead Counsel provisions of the Private Securities Litigation Reform Act of 1995 (PSLRA) (*In re Apple Inc. Securities Litigation.,* Civil Action No. 4:19-cv-02033-YGR (N.D. Cal. (2020))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Amador v. Baca*, Civil Action No. 2:10-cv-01649 (C.D. Cal. February 9, 2020))

◊   Submitted an expert witness declaration concerning reasonableness of class action settlement (*In re: Columbia Gas Cases*, Civil Action No. 1877CV01343G (Mass. Super. Ct., Essex County, February 6, 2020))

◊   Submitted an expert witness declaration, and reply declaration, concerning reasonableness of attorney's fee request (*Hartman v. Pompeo*, Civil Action No. 1:77-cv-02019 (D.D.C. October 10, 2019; February 28, 2020))

◊   Submitted an expert witness declaration concerning reasonableness of common benefit attorney's fee request (*In re:  Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724, 16-MD-2724 (E.D. Pa. May 15, 2019))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, relied upon by court in awarding fees (*Hale v. State Farm Mut. Auto. Ins. Co.*, 2018 WL 6606079 (S.D. Ill. Dec. 16, 2018))

◊   Submitted expert witness affidavit and testified at fairness hearing concerning second phase fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.*, Case No. 217-2010-CV-00294 (New Hampshire Superior Court, Merrimack County (2018))

◊   Submitted expert witness report – and rebutted opposing expert – concerning class certification issues for proposed class action within a bankruptcy proceeding (*In re Think Finance*, Case No. 17-33964 (N.D. Tex. Bankrpt. 2018))

◊   Submitted expert witness declaration concerning specific fee issues raised by Court at fairness hearing and second declaration in response to report of Special Master (*In re Anthem, Inc. Data Breach Litigation*, Case No. 15-MD-02617-LHK (N.D. Cal. 2018))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request following plaintiffs' verdict at trial in consumer class action (*Krakauer v. Dish Network, L.L.C.*, Civil Action No. 1:14-cv-00333 (M.D.N.C. 2018))

◊   Submitted three expert witness declarations and deposed by/testified in front of Special Master in investigation concerning attorney's fee issues (*Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, Civ. Action No. 1:11-cv-10230 (D. Mass. 2017-18))

◊   Retained as an expert witness on issues regarding the preclusive effect of a class action judgment on later cases (*Sanchez v. Allianz Life Insurance Co. of N. Amer.*, Case No. BC594715 (California Superior Court, Los Angeles County (2018))

◊   Retained as an expert witness and submitted report explaining meaning of the denial of a motion to dismiss in American procedure to foreign tribunals (*In re Qualcomm Antitrust Matter*, declaration submitted to tribunals in Korea and Taiwan (2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 3.0-liter settlement, referenced by court in awarding fees (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 2017 WL 3175924 (N.D. Cal. July 21, 2017))

◊   Retained as an expert witness concerning impracticability of joinder in antitrust class action (*In re Celebrex (Celecoxib) Antitrust Litigation*, Civ. Action No. 2-14-cv-00361 (E.D. Va. (2017))

◊   Submitted an expert witness declaration and deposed concerning impracticability of joinder in antitrust class action (*In re Modafinil Antitrust Litigation*, Civ. Action No. 2-06-cv-01797 (E.D. Pa. (2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 2.0-liter settlement (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 2017 WL 1047834 (N.D. Cal., March 17, 2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Aranda v. Caribbean Cruise Line, Inc.*, 2017 WL 1368741 (N.D. Ill., April

10, 2017))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*McKinney v. United States Postal Service*, Civil Action No. 1:11-cv-00631 (D.D.C. (2016))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Geancopoulos v. Philip Morris USA Inc.,* Civil Action No. 98-6002-BLS1 (Mass. Superior Court, Suffolk County))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Gates v. United Healthcare Insurance Company,* Case No. 11 Civ. 3487 (S.D.N.Y. 2015))

◊   Retained as an expert trial witness on class action procedures and deposed prior to trial in matter that settled before trial (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*In re High-Tech Employee Antitrust Litig*., 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015))

◊   Retained as an expert witness concerning adequacy of putative class representatives in securities class action (*Medoff v. CVS Caremark Corp.,* Case No. 1:09-cv-00554 (D.R.I. (2015))

◊   Submitted an expert witness declaration concerning reasonableness of proposed class action settlement, settlement class certification, attorney's fees, and incentive awards (*Fitzgerald Farms, LLC v. Chespeake Operating, L.L.C.,* Case No. CJ-2010-38, Dist. Ct., Beaver County, Oklahoma (2015))

◊   Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Asghari v. Volkswagen Grp. of Am., Inc*., 2015 WL 12732462 (C.D. Cal. May 29, 2015))

◊   Submitted an expert witness declaration concerning propriety of severing individual cases from class action and resulting statute of repose ramifications (*In re: American  International Group, Inc. 2008 Securities Litigation,* 08-CV-4772-LTS-DCF (S.D.N.Y. (2015))

◊   Retained by Fortune Global 100 Corporation as an expert witness on fee matter that settled before testimony (2015)

◊   Submitted an expert witness declaration and testified at Special Master proceeding concerning

reasonableness of attorney's fee allocation in sealed fee mediation (2014-2015)

◊  Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*In re: Hyundai and Kia Fuel Economy Litigation,* MDL 13-02424 (C.D. Cal. (2014))

◊  Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Ammari Electronics v. Pacific Bell Directory*, Case No. RG0522096, California Superior Court, Alameda County (2014))

◊  Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.,* Case No. CGC-10-497839, California Superior Court, San Francisco County (2014))

◊  Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC,* Case No. CGC-10-497840, California Superior Court, San Francisco County (2014))

◊  Retained as expert witness on proper level of common benefit fee in MDL (*In re Neurontin Marketing and Sales Practice Litigation,* Civil Action No. 04-10981, MDL 1629 (D. Mass. (2014))

◊  Submitted an expert witness declaration concerning Rule 23(g) selection of competing counsel, referenced by court in deciding issue (*White v. Experian Information Solutions, Inc.,* 993 F. Supp. 2d 1154 (C.D. Cal. (2014))

◊  Submitted an expert witness declaration concerning proper approach to attorney's fees under California law in a statutory fee-shifting case (*Perrin v. Nabors Well Services Co.,* Case No. 1220037974, Judicial Arbitration and Mediation Services (JAMS) (2013))

◊  Submitted an expert witness declaration concerning fairness and adequacy of proposed nationwide class action settlement (*Verdejo v. Vanguard Piping Systems,* Case No. BC448383, California Superior Court, Los Angeles County (2013))

◊  Retained as an expert witness regarding fairness, adequacy, and reasonableness of proposed nationwide consumer class action settlement  (*Herke v. Merck,* No. 2:09-cv-07218, MDL Docket No. 1657 (*In re Vioxx Products Liability Litigation*) (E. D. La. (2013))

◊  Retained as an expert witness concerning ascertainability requirement for class certification and related issues (*Henderson v. Acxiom Risk Mitigation, Inc.,* Case No. 3:12-cv-00589-REP (E.D. Va. (2013))

◊  Submitted an expert witness declaration concerning reasonableness of class action settlement and performing analysis of Anet expected value@ of settlement benefits, relied on by court in approving settlement (*In re Navistar Diesel Engine Products Liab. Litig.*, 2013 WL 10545508 (N.D. Ill. July 3, 2013))

◊  Submitted an expert witness declaration concerning reasonableness of class action settlement and attorney's fee request (*Commonwealth Care All. v. Astrazeneca Pharm. L.P.*, 2013 WL 6268236 (Mass.

Super. Aug. 5, 2013))

◊   Submitted an expert witness declaration concerning propriety of preliminary settlement approval in nationwide consumer class action settlement (*Anaya v. Quicktrim, LLC,* Case No.  CIVVS 120177, California Superior Court, San Bernardino County (2012))

◊   Submitted expert witness affidavit concerning fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.,* Case No. 217-2010-CV-00294, New Hampshire Superior Court, Merrimack County (2012))

◊   Submitted expert witness declaration and deposed concerning class certification issues in nationwide fraud class action, relied upon by the court in affirming class certification order (*CVS Caremark Corp. v. Lauriello,* 175 So. 3d 596, 609-10 (Ala. 2014))

◊   Submitted expert witness declaration in securities class action concerning value of proxy disclosures achieved through settlement and appropriate level for fee award (*Rational Strategies Fund v. Jhung,* Case No. BC 460783, California Superior Court, Los Angeles County (2012))

◊   Submitted an expert witness report and deposed concerning legal malpractice in the defense of a class action lawsuit (*KB Home v. K&L Gates, LLP,* Case No. BC484090, California Superior Court, Los Angeles County (2011))

◊   Retained as expert witness on choice of law issues implicated by proposed nationwide class certification (*Simon v. Metropolitan Property and Cas. Co.,* Case No. CIV-2008-1008-W (W.D. Ok. (2011))

◊   Retained, deposed, and testified in court as expert witness in fee-related dispute (*Blue, et al. v. Hill,*Case No. 3:10-CV-02269-O-BK (N.D. Tex. (2011))

◊   Retained as an expert witness in fee-related dispute (*Furth v. Furth*, Case No. C11-00071-DMR (N.D. Cal. (2011))

◊   Submitted expert witness declaration concerning interim fee application in complex environmental class action (*DeLeo v. Bouchard Transportation,* Civil Action No. PLCV2004-01166-B, Massachusetts Superior Court (2010))

◊   Retained as an expert witness on common benefit fee issues in MDL proceeding in federal court (*In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La. (2010))

◊   Submitted expert witness declaration concerning fee application in securities case, referenced by court in awarding fee (*In re AMICAS, Inc. Shareholder Litigation,* 27 Mass. L. Rptr. 568 (Mass. Sup. Ct. (2010))

◊   Submitted an expert witness declaration concerning fee entitlement and enhancement in non-common fund class action settlement, relied upon by the court in awarding fees (*Parkinson v. Hyundai Motor America,* 796 F.Supp.2d 1160, 1172-74 (C.D. Cal. 2010))

◊   Submitted an expert witness declaration concerning class action fee allocation among attorneys (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◊   Submitted an expert witness declaration concerning settlement approval and fee application in wage and hour class action settlement (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◊   Submitted an expert witness declaration concerning objectors' entitlement to attorney's fees (*Rodriguez v. West Publishing Corp.,* Case No. CV-05-3222 (C.D. Cal. (2010))

◊   Submitted an expert witness declaration concerning fairness of settlement provisions and processes, relied upon by the Ninth Circuit in reversing district court's approval of class action settlement (*Radcliffe v. Experian Inform. Solutions Inc.*, 715 F.3d 1157, 1166 (9th Cir. 2013))

◊   Submitted an expert witness declaration concerning attorney's fees in class action fee dispute, relied upon by the court in deciding fee issue (*Ellis v. Toshiba America Information Systems, Inc.*, 218 Cal. App. 4th 853, 871, 160 Cal. Rptr. 3d 557, 573 (2d Dist. 2013))

◊   Submitted an expert witness declaration concerning common benefit fee in MDL proceeding in federal court (*In re Genetically Modified Rice Litigation*, MDL Docket No. 1811 (E.D. Mo. (2009))

◊   Submitted an expert witness declaration concerning settlement approval and fee application in national MDL class action proceeding (*In re Wal-Mart Wage and Hour Employment Practices Litigation*, MDL Docket No.1735 (D. Nev. (2009))

◊   Submitted an expert witness declaration concerning fee application in national MDL class action proceeding, referenced by court in awarding fees (*In re Dept. of Veterans Affairs (VA) Data Theft Litigation*, 653 F. Supp.2d 58 (D.D.C. (2009))

◊   Submitted an expert witness declaration concerning common benefit fee in mass tort MDL proceeding in federal court (*In re Kugel Mesh Products Liability Litigation*, MDL Docket No. 1842 (D. R.I. (2009))

◊   Submitted an expert witness declaration and supplemental declaration concerning common benefit fee in consolidated mass tort proceedings in state court (*In re All Kugel Mesh Individual Cases*, Master Docket No. PC-2008-9999, Superior Court, State of Rhode Island (2009))

◊   Submitted an expert witness declaration concerning fee application in wage and hour class action (*Warner v. Experian Information Solutions, Inc.*, Case No.   BC362599, California Superior Court, Los Angeles County (2009))

◊   Submitted an expert witness declaration concerning process for selecting lead counsel in complex MDL antitrust class action (*In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869 (D. D.C. (2008))

◊   Retained, deposed, and testified in court as expert witness on procedural issues in complex class action (*Hoffman v. American Express*, Case No. 2001-022881, California Superior Court, Alameda County (2008))

◊   Submitted an expert witness declaration concerning fee application in wage and hour class action (*Salsgiver v. Yahoo! Inc.*, Case No. BC367430, California Superior Court, Los Angeles County (2008))

◊   Submitted an expert witness declaration concerning fee application in wage and hour class action (*Voight v. Cisco Systems, Inc.*, Case No. 106CV075705, California Superior Court, Santa Clara County (2008))

◊   Retained and deposed as expert witness on fee issues in attorney fee dispute (*Stock v. Hafif*, Case No. KC034700, California Superior Court, Los Angeles County (2008))

◊   Submitted an expert witness declaration concerning fee application in consumer class action (*Nicholas v. Progressive Direct*, Civil Action No. 06-141-DLB (E.D. Ky. (2008))

◊   Submitted expert witness declaration concerning procedural aspects of national class action arbitration (*Johnson v. Gruma Corp.,* JAMS Arbitration No. 1220026252 (2007))

◊   Submitted expert witness declaration concerning fee application in securities case (*Drulias v. ADE Corp.,* Civil Action No. 06-11033 PBS (D. Mass. (2007))

◊   Submitted expert witness declaration concerning use of expert witness on complex litigation matters in criminal trial (*U.S. v. Gallion, et al.*, No. 07-39 (E. D. Ky. (2007))

◊   Retained as expert witness on fees matters (*Heger v. Attorneys' Title Guaranty Fund, Inc.,* No. 03-L-398, Illinois Circuit Court, Lake County, IL (2007))

◊   Retained as expert witness on certification in statewide insurance class action (*Wagner v. Travelers Property Casualty of America*, No. 06CV338, Colorado District Court, Boulder County, CO (2007))

◊   Testified as expert witness concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corporate Derivative Litigation*, Case No. 01098905, California Superior Court, Santa Barbara Cty, CA (2006))

◊   Submitted expert witness declaration concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corp. Corporate Derivative Litigation*, Case No. CV-03-11 RSWL (C.D. Cal. (2006))

◊   Retained as expert witness as to certification of class action (*Canova v. Imperial Irrigation District*, Case No. L-01273, California Superior Court, Imperial Cty, CA (2005))

◊   Retained as expert witness as to certification of nationwide class action (*Enriquez v. Edward D. Jones & Co.,* Missouri Circuit Court, St. Louis, MO (2005))

◊   Submitted expert witness declaration on procedural aspects of international contract litigation filed in court in Korea (*Estate of Wakefield v. Bishop Han & Jooan Methodist Church* (2002))

◊   Submitted expert witness declaration as to contested factual matters in case involving access to a public forum (*Cimarron Alliance Foundation v. The City of Oklahoma City,* Case No. Civ. 2001-1827-C (W.D. Ok. (2002))

◊ Submitted expert witness declaration concerning reasonableness of class certification, settlement, and fees (*Baird v. Thomson Elec. Co.*, Case No. 00-L-000761, Cir. Ct., Mad. Cty, IL (2001))

### *Expert Consultant*

◊ Retained as a consulting expert in series of cases challenging AI generators (2024)

◊ Retained as a consulting expert in class action (*In re: East Palestine Train Derailment,* Case No. 4:23-CV-00242-BYP (N.D. Ohio 2024))

◊ Retained as a consulting expert in complex MDL/class action (*In re: Aqueous Film-Forming Foams Products Liability Litigation,* Case No. 2:18-md-2873-RMG (D. S.C. 2023-2024))

◊ Retained as an expert in confidential matter pending in international arbitration forum concerning litigation financing issues in complex litigation (2022-2023)

◊ Retained as an expert in matter pending in several federal courts concerning attorney's fees in class action setting (2022-2023)

◊ Provided expert consulting services to Planned Parenthood Federation of America and the American Civil Liberties Union Foundation concerning complex class certification, notice, and other procedural issues arising out of Texas's law banning abortion (*Whole Woman's Health v. Austin Reeve Jackson,* Civil Action No. 1:21-cv-00616 (W.D. Tex. 2021))

◊ Retained as an expert witness on class action issues in complex mass tort MDL (*In re Roundup Products Liability Litigation,* Civil Action No. 3:16-md-02741-VC (N.D. Cal. (2020))

◊ Provided expert consulting services to Harvard Law School Predatory Lending and Consumer Protection Clinic concerning complex class action issues in bankruptcy (*In re: ITT Educational Services Inc.,* Case No. 16-07207-JMC-7A (Bank. S.D. Ind. 2020))

◊ Provided expert consulting services to law firm concerning complex federal procedural and bankruptcy issues (*Homaidan v. Navient Solutions, LLC*, Adv. Proc. No. 17-1085 (Bank. E.D.N.Y 2020))

◊ Provided expert consulting services to the ACLU on multi-district litigation issues arising out of various challenges to President Trump's travel ban and related policies (*In re American Civil Liberties Union Freedom of Information Act Requests Regarding Executive Order 13769*, Case Pending No. 28, Judicial Panel on Multidistrict Litigation (2017); *Darweesh v. Trump*, Case No. 1:17-cv-00480-CBA-LB (E.D.N.Y. (2017))

◊ Provided expert consulting services to law firm regarding billing practices and fee allocation issues in nationwide class action (2016)

◊ Provided expert consulting services to law firm regarding fee allocation issues in nationwide class action (2016)

◊   Provided expert consulting services to the ACLU of Southern California on class action and procedural issues arising out of challenges to municipality's treatment of homeless persons with disabilities (*Glover v. City of Laguna Beach*, Case No. 8:15-cv-01332-AG-DFM (C.D. Cal. (2016))

◊   Retained as an expert consultant on class certification issues (*In re: Facebook, Inc., IPO Securities and Derivative Litigation*, No. 1:12-md-2389 (S.D.N.Y. 2015))

◊   Provided expert consulting services to lead class counsel on class certification issues in nationwide class action (2015)

◊   Retained by a Fortune 100 Company as an expert consultant on class certification issues

◊   Retained as an expert consultant on class action and procedure related issues (*Lange et al v. WPX Energy Rocky Mountain LLC*, Case No. 2:13-cv-00074-ABJ (D. Wy. (2013))

◊   Retained as an expert consultant on class action and procedure related issues (*Flo & Eddie, Inc., v. Sirius XM Radio, Inc.*, Case No. CV 13-5693 (C.D. Cal. (2013))

◊   Served as an expert consultant on substantive and procedural issues in challenge to legality of credit card late and over-time fees (*In Re Late Fee and Over-Limit Fee Litigation*, 528 F.Supp.2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014))

◊   Retained as an expert on Class Action Fairness Act (CAFA) removal issues and successfully briefed and argued remand motion based on local controversy exception (*Trevino, et al. v. Cummins, et al.*, No. 2:13-cv-00192-JAK-MRW (C. D. Cal. (2013))

◊   Retained as an expert consultant on class action related issues by consortium of business groups (*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, MDL No. 2179 (E.D. La. (2012))

◊   Provided presentation on class certification issues in nationwide medical monitoring classes (*In re: National Football League Players' Concussion Injury Litigation,* MDL No. 2323, Case No. 2:12-md-02323-AB (E.D. Pa. (2012))

◊   Retained as an expert consultant on class action related issues in mutli-state MDL consumer class action (*In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices & Prod. Liability Litig.*, MDL No. 2102 (S.D. N.Y. (2009))

◊   Retained as an expert consultant on class action certification, manageability, and related issues in mutli-state MDL consumer class action (*In re Teflon Prod. Liability Litig.*, MDL No. 1733 (S.D. Iowa (2008))

◊   Retained as an expert consultant/co-counsel on certification, manageability, and related issues in nationwide anti-trust class action (*Brantley v. NBC Universal*, No.- CV07-06101 (C.D. Cal. (2008))

◊   Retained as an expert consultant on class action issues in complex multi-jurisdictional construction dispute (*Antenucci, et al., v. Washington Assoc. Residential Partner, LLP, et al.,* Civil No. 8-04194 (E.D. Pa. (2008))

◊   Retained as an expert consultant on complex litigation issues in multi-jurisdictional class action litigation (*McGreevey v. Montana Power Company*, No. 08-35137, U.S. Court of Appeals for the Ninth Circuit (2008))

◊   Retained as an expert consultant on class action and attorney fee issues in nationwide consumer class action (*Figueroa v. Sharper Image*, 517 F.Supp.2d 1292 (S.D. Fla. 2007))

◊   Retained as an expert consultant on attorney's fees issue in complex class action case (*Natural Gas Anti-Trust Cases Coordinated Proceedings*, D049206, California Court of Appeals, Fourth District (2007))

◊   Retained as an expert consultant on remedies and procedural matters in complex class action (*Sunscreen Cases*, JCCP No. 4352, California Superior Court, Los Angeles County (2006))

◊   Retained as an expert consultant on complex preclusion questions in petition for review to California Supreme Court (*Mooney v. Caspari,* Supreme Court of California (2006))

◊   Retained as an expert consultant on attorney fee issues in complex common fund case (*In Re DietDrugs (Phen/Fen) Products Liability Litigation* (E. D. Pa. (2006))

◊   Retained as an expert consultant on procedural matters in series of complex construction lien cases (*In re Venetian Lien Litigation*, Supreme Court of the State of Nevada (2005-2006))

◊   Served as an expert consultant on class certification issues in countywide class action (*Beauchamp v. Los Angeles Cty. Metropolitan Transp. Authority*, (C.D. Cal. 2004))

◊   Served as an expert consultant on class certification issues in state-wide class action (*Williams v. State of California*, Case No. 312-236, Cal. Superior Court, San Francisco)

◊   Served as an exert consultant on procedural aspects of complex welfare litigation (*Allen v. Anderson*, 199 F.3d 1331 (9th Cir. 1999))

*Ethics Opinions*

◊   Retained to provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2017))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2013))

◊   Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2011))

◊   Provided expert opinion on issues of professional ethics in implicated by nationwide class action practice (*In re Professional Responsibility Inquiries* (2010))

◊ Provided expert opinion on issues of professional ethics implicated by complex litigation matter (*In re Professional Responsibility Inquiries* (2010))

◊ Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2007))

*Publications on Class Actions & Procedure*

◊ NEWBERG AND RUBENSTEIN ON CLASS ACTIONS (6th ed. 2022 and updates through 2024); NEWBERG ON CLASS ACTIONS (sole author since 2008, sole author of entirely re-written Fifth Edition (2011-2019)

◊ *Deconstitutionalizing Personal Jurisdiction:  A Separation of Powers Approach,* Harvard Public Law Working Paper No. 20-34, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3715068.

◊ *The Negotiation Class:  A Cooperative Approach to Class Actions Involving Large Stakeholders,* 99 TEXAS L. REV.73 (2020) (with Francis E. McGovern)

◊ *Profit for Costs*, 63 DEPAUL L. REV. 587 (2014) (with Morris A. Ratner)

◊ *Procedure and Society: An Essay for Steve Yeazell,* 61 U.C.L.A. REV. DISC. 136 (2013)

◊ *Supreme Court Round-Up – Part II*, 5 CLASS ACTION ATTORNEY FEE DIGEST 331 (September 2011)

◊ *Supreme Court Round-Up – Part I*, 5 CLASS ACTION ATTORNEY FEE DIGEST 263 (July-August 2011)

◊ *Class Action Fee Award* Procedures, 5 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2011)

◊ *Benefits of Class Action Lawsuits*, 4 CLASS ACTION ATTORNEY FEE DIGEST 423 (November 2010)

◊ *Contingent Fees for Representing the Government: Developments in California Law*, 4 CLASS ACTION ATTORNEY FEE DIGEST 335 (September 2010)

◊ *Supreme Court Roundup*, 4 CLASS ACTION ATTORNEY FEE DIGEST 251 (July 2010)

◊ *SCOTUS Okays Performance Enhancements in Federal Fee Shifting Cases – At Least In Principle,* 4 CLASS ACTION ATTORNEY FEE DIGEST 135 (April 2010)

◊ *The Puzzling Persistence of the ΑMega-Fund@ Concept*, 4 CLASS ACTION ATTORNEY FEE DIGEST 39 (February 2010)

◊ *2009: Class Action Fee Awards Go Out With A Bang, Not A Whimper*, 3 CLASS ACTION ATTORNEY FEE DIGEST 483 (December 2009)

◊ *Privatizing Government Litigation: Do Campaign Contributors Have An Inside Track?*, 3 CLASS ACTION ATTORNEY FEE DIGEST 407   (October 2009)

◊ *Supreme Court Preview*, 3 CLASS ACTION ATTORNEY FEE DIGEST 307 (August 2009)

◊   *Supreme Court Roundup*, 3 CLASS ACTION ATTORNEY FEE DIGEST 259 (July 2009)

◊   *What We Now Know About How Lead Plaintiffs Select Lead Counsel (And Hence Who Gets Attorney's Fees!) in Securities Cases*, 3 CLASS ACTION ATTORNEY FEE DIGEST 219 (June 2009)

◊   *Beware Of Ex Ante Incentive Award Agreements*, 3 CLASS ACTION ATTORNEY FEE DIGEST 175 (May 2009)

◊   *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)

◊   *2009: Emerging Issues in Class Action Fee Awards*, 3 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2009)

◊   *2008: The Year in Class Action Fee Awards*, 2 CLASS ACTION ATTORNEY FEE DIGEST 465 (December 2008)

◊   *The Largest Fee Award – Ever!*, 2 CLASS ACTION ATTORNEY FEE DIGEST 337 (September 2008)

◊   *Why Are Fee Reductions Always 50%?: On The Imprecision of Sanctions for Imprecise Fee Submissions*, 2 CLASS ACTION ATTORNEY FEE DIGEST 295 (August 2008)

◊   *Supreme Court Round-Up,* 2 CLASS ACTION ATTORNEY FEE DIGEST 257 (July 2008)

◊   *Fee-Shifting For Wrongful Removals: A Developing Trend?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 177 (May 2008)

◊   *You Cut, I Choose:   (Two Recent Decisions About) Allocating Fees Among Class Counsel,* 2 CLASS ACTION ATTORNEY FEE DIGEST 137 (April 2008)

◊   *Why The Percentage Method?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 93 (March 2008)

◊   *Reasonable Rates: Time To Reload The (*Laffey*) Matrix,* 2 CLASS ACTION ATTORNEY FEE DIGEST 47 (February 2008)

◊   *The "Lodestar Percentage" A New Concept For Fee Decisions?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2008)

◊   *Class Action Practice Today: An Overview, in* ABA SECTION OF LITIGATION, CLASS ACTIONS TODAY 4 (2008)

◊   *Shedding Light on Outcomes in Class Actions*, *in* CONFIDENTIALITY, TRANSPARENCY, AND THE U.S. CIVIL JUSTICE SYSTEM 20-59 (Joseph W. Doherty, Robert T. Reville, and Laura Zakaras eds. 2008) (with Nicholas M. Pace)

◊   *Finality in Class Action Litigation: Lessons From Habeas,* 82 N.Y.U. L. REV. 791 (2007)

◊ *The American Law Institute's New Approach to Class Action Objectors' Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 347 (November 2007)

◊ *The American Law Institute's New Approach to Class Action Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 307 (October 2007)

◊ *"The Lawyers Got More Than The Class Did!":  Is It Necessarily Problematic When Attorneys Fees Exceed Class Compensation?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 233 (August 2007)

◊ *Supreme Court Round-Up,* 1 CLASS ACTION ATTORNEY FEE DIGEST 201 (July 2007)

◊ *On The Difference Between Winning and Getting Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 163 (June 2007)

◊ *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 127 (May 2007)

◊ *On Plaintiff Incentive Payments,* 1 CLASS ACTION ATTORNEY FEE DIGEST 95 (April 2007)

◊ *Percentage of What?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 63 (March 2007)

◊ *Lodestar v. Percentage: The Partial Success Wrinkle,* 1 CLASS ACTION ATTORNEY FEE DIGEST 31 (February 2007) (with Alan Hirsch)

◊ *The Fairness Hearing:  Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435 (2006) (excerpted in THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 447-449 (Richard A. Nagareda ed., 2009))

◊ *Why Enable Litigation?  A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. REV. 709 (2006)

◊ *What a "Private Attorney General" Is – And Why It Matters*, 57 VAND. L. REV.  2129 (2004) (excerpted in COMPLEX LITIGATION 63-72 (Kevin R. Johnson, Catherine A. Rogers & John Valery White eds., 2009)).

◊ *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002) (selected for the Stanford/Yale Junior Faculty Forum, June 2001)

◊ *A Transactional Model of Adjudication*, 89 GEORGETOWN  L.J. 371 (2000)

◊ *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999)

◊ *Divided We Litigate:  Addressing Disputes Among Clients and Lawyers in Civil Rights Campaigns*, 106 YALE L. J. 1623 (1997) *(*excerpted in COMPLEX LITIGATION 120-123 (1998))

### *Selected Presentations*

◊ *Class Action Law Update,* MDL Transferee Judges Conference, Palm Beach, Florida, October 24, 2023 (scheduled)

◊ *Opioid Litigation:  What's New and What Does it Mean for Future Litigation?,* RAND Institute for Civil Justice and RAND Kenneth R. Feinberg Center for Catastrophic Risk Management and Compensation, RAND Corporation, October 22, 2020

◊ *The Opioid Crisis:  Where Do We Go From Here?"* Clifford Symposium 2020, DePaul University College of Law, Chicago, Illinois, May 28-29, 2020)

◊ *Class Action Law Update,* MDL Transferee Judges Conference, Palm Beach, Florida, October 30, 2019

◊ *Class Action Law Update,* MDL Transferee Judges Conference, Palm Beach, Florida, October 31, 2018

◊ *Attorneys' Fees Issues,* MDL Transferee Judges Conference, Palm Beach, Florida, October 30, 2018

◊ *Panelist,* Federal Judicial Center, Managing Multidistrict Litigation and Other Complex Litigation Workshop (for federal judges) (March 15, 2018)

◊ *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 1, 2017

◊ *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2016

◊ *Judicial Power and its Limits in Multidistrict Litigation,* American Law Institute, Young Scholars Medal Conference, *The Future of Aggregate Litigation*, New York University School of Law, New York, New York, April 12, 2016

◊ *Class Action Update & Attorneys' Fees Issues Checklist,* MDL Transferee Judges Conference, Palm Beach, Florida, October 28, 2015

◊ *Class Action Law,* 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop, Tucson, Arizona, January 26, 2015

◊ *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2014

◊ *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2013

◊ *Class Action Remedies,* ABA 2013 National Institute on Class Actions, Boston, Massachusetts, October 23, 2013

◊ *The Public Life of the Private Law: The Logic and Experience of Mass Litigation – Conference in Honor of Richard Nagareda,* Vanderbilt Law School, Nashville, Tennessee, September 27-28, 2013

◊   *Brave New World: The Changing Face of Litigation and Law Firm Finance*, Clifford Symposium 2013, DePaul University College of Law, Chicago, Illinois, April 18-19, 2013

◊   *Twenty-First Century Litigation: Pathologies and Possibilities: A Symposium in Honor of Stephen Yeazell,* UCLA Law Review, UCLA School of Law, Los Angeles, California, January 24-25, 2013

◊   *Litigation's Mirror: The Procedural Consequences of Social Relationships,* Sidley Austin Professor of Law Chair Talk, Harvard Law School, Cambridge, Massachusetts, October 17, 2012

◊   *Alternative Litigation Funding (ALF) in the Class Action Context – Some Initial Thoughts*, Alternative Litigation Funding: A Roundtable Discussion Among Experts, George Washington University Law School, Washington, D.C., May 2, 2012

◊   *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Brooklyn Law School Faculty Workshop, Brooklyn, New York, April 2, 2012

◊   *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Loyola Law School Faculty Workshop, Los Angeles, California, February 2, 2012

◊   *Recent Developments in Class Action Law and Impact on MDL Cases,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2011

◊   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 26, 2010

◊   *A General Theory of the Class Suit*, University of Houston Law Center Colloquium, Houston, Texas, February 3, 2010

◊   *Unpacking The "Rigorous Analysis" Standard,* ALI-ABA 12th Annual National Institute on Class Actions, New York, New York, November 7, 2008

◊   *The Public Role in Private Law Enforcement: Visions from CAFA*, University of California (Boalt Hall) School of Law Civil Justice Workshop, Berkeley, California, February 28, 2008

◊   *The Public Role in Private Law Enforcement: Visions from CAFA*, University of Pennsylvania Law Review Symposium, Philadelphia, Pennsylvania, Dec. 1, 2007

◊   *Current CAFA Consequences: Has Class Action Practice Changed?,* ALI-ABA 11th Annual National Institute on Class Actions, Chicago, Illinois, October 17, 2007

◊   *Using Law Professors as Expert Witnesses in Class Action Lawsuits,* ALI-ABA 10th Annual National Institute on Class Actions, San Diego, California, October 6, 2006

◊   *Three Models for Transnational Class Actions*, Globalization of Class Action Panel, International Law Association 2006 Conference, Toronto, Canada, June 6, 2006

◊   *Why Create Litigation?:  A Positive Externalities Theory of the Small Claims Class Action*, UMKC

Law Review Symposium, Kansas City, Missouri, April 7, 2006

◊   *Marks, Bonds, and Labels:   Three New Proposals for Private Oversight of Class Action Settlements*, UCLA Law Review Symposium, Los Angeles, California, January 26, 2006

◊   Class Action Fairness Act, Arnold & Porter, Los Angeles, California, December 6, 2005

◊   ALI-ABA 9th Annual National Institute on Class Actions, Chicago, Illinois, September 23, 2005

◊   Class Action Fairness Act, UCLA Alumni Assoc., Los Angeles, California, September 9, 2005

◊   Class Action Fairness Act, Thelen Reid & Priest, Los Angeles, California, May 12, 2005

◊   Class Action Fairness Act, Sidley Austin, Los Angeles, California, May 10, 2005

◊   Class Action Fairness Act, Munger, Tolles & Olson, Los Angeles, California, April 28, 2005

◊   Class Action Fairness Act, Akin Gump Strauss Hauer Feld, Century City, CA, April 20, 2005

### SELECTED OTHER LITIGATION EXPERIENCE

#### *United States Supreme Court*

◊   Served as *amicus curiae* and authored *amicus* brief on proper approach to *cy pres* award in class action lawsuits (*Frank v. Gaos*, No. 17-961, October Term 2018)

◊   Co-counsel on petition for writ of *certiorari* concerning application of the voluntary cessation doctrine to government defendants (*Rosebrock v. Hoffman*, 135 S. Ct.1893 (2015))

◊   Authored *amicus* brief filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011)

◊   Co-counsel in constitutional challenge to display of Christian cross on federal land in California's Mojave preserve (*Salazar v. Buono*, 130 S. Ct. 1803 (2010))

◊   Co-authored *amicus* brief filed on behalf of constitutional law professors arguing against constitutionality of Texas criminal law (*Lawrence v. Texas*, 539 U.S. 558 (2003))

◊   Co-authored *amicus* brief on scope of *Miranda* (*Illinois v. Perkins*, 496 U.S. 292 (1990))

#### *Attorney's Fees*

◊   Appointed by the United States District Court for the Eastern District of Pennsylvania as an expert witness on attorney's fees in complex litigation, with result that the Court adopted recommendations (*In re National Football League Players' Concussion Injury Litigation*, 2018 WL 1658808 (E.D.Pa. April 5, 2018))

◊   Appointed by the United States District Court for the Northern District of Ohio as an expert consultant on common benefit attorney's fees issues in complex multidistrict litigation, with result that the Court adopted recommendations (*In re: Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2020 WL 8675733 (N.D. Ohio June 3, 2020))

◊   Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *DeValerio v. Olinski*, 673 F. App'x 87, 90 (2d Cir. 2016)).

◊   Co-counsel in appeal of common benefit fees decision arising out of mass tort MDL (*In re Roundup Prod. Liab. Litig.,* Civil Action No. 21-16228, 2022 WL 16646693 (9th Cir, 2022))

◊   Served as *amicus curiae* and co-authored *amicus* brief on proper approach to attorney's fees in common fund cases (*Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 504, 376 P.3d 672, 687 (2016))

*Consumer Class Action*

◊   Co-counsel in challenge to antenna-related design defect in Apple's iPhone4 (*Dydyk v. Apple Inc.,* 5:10-cv-02897-HRL, U.S. Dist. Court, N.D. Cal.) (complaint filed June 30, 2010)

◊   Co-class counsel in $8.5 million nationwide class action settlement challenging privacy concerns raised by Google's Buzz social networking program (*In re Google Buzz Privacy Litigation*, 5:10-cv-00672-JW, U.S. Dist. Court, N.D. Cal.) (amended final judgment June 2, 2011)

*Disability*

◊   Co-counsel in successful ADA challenge ($500,000 jury verdict) to the denial of health care in emergency room (*Howe v. Hull*, 874 F. Supp. 779, 873 F. Supp 72 (N.D. Ohio 1994))

*Employment*

◊   Co-counsel in challenges to scope of family benefit programs (*Ross v. Denver Dept. of Health*, 883 P.2d 516 (Colo. App. 1994)); *(Phillips v. Wisc. Personnel Com'n*, 482 N.W.2d 121 (Wisc. 1992))

*Equal Protection*

◊   Co-counsel in (state court phases of) successful challenge to constitutionality of a Colorado ballot initiative, Amendment 2 (*Evans v. Romer*, 882 P.2d 1335 (Colo. 1994))

◊   Co-counsel (and *amici*) in challenges to rules barring military service by gay people (*Able v. United States*, 44 F.3d 128 (2d Cir. 1995); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (*en banc*))

◊   Co-counsel in challenge to the constitutionality of the Attorney General of Georgia' firing of staff attorney (*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997))

## Fair Housing

◊   Co-counsel in successful Fair Housing Act case on behalf of group home (*Hogar Agua y Vida En el Desierto v. Suarez-Medina*, 36 F.3d 177 (1st Cir. 1994))

## Family Law

◊   Co-counsel in challenge to constitutionality of Florida law limiting adoption (*Cox v. Florida Dept. of Health and Rehab. Srvcs.*, 656 So.2d 902 (Fla. 1995))

◊   Co-authored *amicus* brief in successful challenge to Hawaii ban on same-sex marriages (*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993))

## First Amendment

◊   Co-counsel in successful challenge to constitutionality of Alabama law barring state funding foruniversity student groups (*GLBA v. Sessions*, 930 F.Supp. 1492 (M.D. Ala. 1996))

◊   Co-counsel in successful challenge to content restrictions on grants for AIDS education materials (*Gay Men's Health Crisis v. Sullivan*, 792 F.Supp. 278 (S.D.N.Y. 1992))

## Landlord / Tenant

◊   Lead counsel in successful challenge to rent control regulation (*Braschi v. Stahl Associates Co.*, 544 N.E.2d 49 (N.Y. 1989))

## Police

◊   Co-counsel in case challenging DEA brutality (*Anderson v. Branen*, 27 F.3d 29 (2d Cir. 1994))

## Prison Conditions

◊   Co-counsel in appeal of class certification decision in damages class action arising out of conditions in St. Louis City Jail (*Cody v. City of St. Louis for & on behalf of Medium Sec. Inst.,* 103 F.4th 523, 526 (8th Cir. 2024))

## Racial Equality

◊   Co-authored *amicus* brief for constitutional law professors challenging constitutionality of Proposition 209 *(Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997))

## SELECTED OTHER PUBLICATIONS

### Editorials

◊   *Follow the Leaders*, NEW YORK TIMES, March 15, 2005

◊   *Play It Straight*, NEW YORK TIMES, October 16, 2004

**A-27**

◊   *Hiding Behind the Constitution*, New York Times, March 20, 2004

◊   *Toward More Perfect Unions,* New York Times, November 20, 2003 (with Brad Sears)

◊   *Don't Ask, Don't Tell, Don't Believe It*, New York Times, July 20, 1993

◊   *AIDS: Illness and Injustice*, Wash. Post, July 26, 1992 (with Nan D. Hunter)

Bar Admissions

◊   Massachusetts (2008)
◊   California (2004)
◊   District of Columbia (1987) (inactive)
◊   Pennsylvania (1986) (inactive)
◊   U.S. Supreme Court (1993)
◊   U.S. Court of Appeals for the First Circuit (2010)
◊   U.S. Court of Appeals for the Second Circuit (2015)
◊   U.S. Court of Appeals for the Fifth Circuit (1989)
◊   U.S. Court of Appeals for the Ninth Circuit (2004)
◊   U.S. Court of Appeals for the Eleventh Circuit (1993)
◊   U.S. Court of Appeals for the D.C. Circuit (1993)
◊   U.S. District Courts for the Central District of California (2004)
◊   U.S. District Court for the District of the District of Columbia (1989)
◊   U.S. District Court for the District of Massachusetts (2010)
◊   U.S. District Court for the Northern District of California (2010)

# EXHIBIT B

*In re: National Prescription Opiate Litigation*
Case No. 1:17-md-2804
U.S. District Court for the Northern District of Ohio

## DECLARATION OF PROFESSOR WILLIAM B. RUBENSTEIN

EXHIBIT B
Partial List of Documents Reviewed by Professor Rubenstein
(other than case law and scholarship on the relevant issues)

A. ***In re: National Prescription Opiate Litigation*, Case No. 1:17-md-02804-DAP (N.D. Ohio)**

1. Plaintiffs' Renewed and Amended Notice of Motion and Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, ECF No. 1820
2. Plaintiffs' Memorandum in Support of Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, ECF No. 1820-1
3. [Proposed] Order Certifying Negotiation Class and Directing Notice, ECF No. 1820-2
4. Plaintiffs' Reply Brief in Further Support of Renewed and Amended Motion for Certification of Rule 23(b)(3) Cities/Counties Negotiation Class, ECF No. 2076
5. Order Directing Special Master Yanni to Assess Fairness of Allocation and Voting Proposals to Non-Litigating Entities, ECF No. 2529
6. Report of Special Master Cathy Yanni, ECF No. 2579
7. Memorandum Opinion Certifying Negotiation Class, ECF No. 2590
8. Order Certifying Negotiation Class and Approving Notice, ECF No. 2591
9. Opinion and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss, ECF No. 3177
10. Memorandum in Support of Distributors' Motion to Certify Under 28 U.S.C. § 1292(b) the Court's February 21, 2020 Order Denying in Part Their Motion to Dismiss Third-Party Payor Claims, for Purposes of Seeking Immediate Appeal of the Court's Rulings that Denied Dismissal of the RICO Claims, ECF No. 3257-1
11. Plaintiffs' Memorandum in Opposition to Distributors' Motion to Certify Under 28 U.S.C. § 1292(b) the Court's February 21, 2020 Order Denying in Part Their Motion to Dismiss Third-Party Payor Claims, for Purposes of Seeking Immediate Appeal of the Court's Rulings that Denied Dismissal of the RICO Claims, ECF No. 3269
12. Order Denying Distributors' Motion to Certify for Immediate Appeal Under 28 U.S.C. § 1292(b) the Court's February 21, 2020 Order, ECF No. 3289
13. Order to Establish Qualified Settlement Fund, Appoint Panel of Common Benefit and Contingency Fee Fund Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment, ECF No. 3828
14. Bellwether Order, ECF No. 4920
15. Order Regarding TPP Bellwether Process, ECF No. 5060
16. Order to Establish Qualified Settlement Funds, Appoint Panel of Common Benefit and Contingency Fee Funds Arbiters, Approve Fee Fund Allocation and Distribution Process, and Approve Common Benefit Cost Payment and Assessment, ECF No. 5088
17. Order Amending TPP Bellwether Process, ECF No. 5097

18. Memorandum in Support of Master Motion for Extension of Time for Third Party Payors to Produce Plaintiff Fact Sheets and Corresponding Documents and Data, ECF No. 5169-1
19. Defendants' Response to TPP Plaintiffs' "Master Motion" for an Extension of Time to Submit Plaintiff Fact Sheets, ECF No. 5180
20. Order Confirming the TPP Bellwether Process, ECF No. 5225
21. Order Resolving Disputes Regarding Proposed CMO, ECF No. 5271
22. Case Management Order for Third Party Payor Bellwether Cases, ECF No. 5281
23. Amended Case Management Order for Third Party Payor Bellwether Cases, ECF No. 5297
24. *Nunc Pro Tunc* Amended Case Management Order for Third Party Payor Bellwether Cases, ECF No. 5298
25. Joint Motion to Stay Deadlines in the *Nunc Pro Tunc* Amended Case Management Order for Tracks 16-19, ECF No. 5393
26. Joint Motion for Entry of Order Governing Production of Medical and Pharmacy Claims Data in Third Party Payor Plaintiff Bellwethers – Tracks 16-19, ECF No. 5467
27. Joint Motion to Sever and Stay Cardinal Health, Inc., AmerisourceBergen Drug Company, and McKesson Corporation, ECF No. 5470
28. Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF No. 5614
29. Joint Declaration of Paul J. Geller and Elizabeth J. Cabraser in Support of Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF No. 5614-1
30. Class Action Settlement Agreement Among Third Party Payors and Settling Distributors, ECF No. 5614-2
31. Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e) Exhibit B, ECF No. 5614-3
32. Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e) Exhibit C, ECF No. 5614-4
33. Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e) Exhibit D, ECF No. 5614-5
34. Declaration of Eric J. Miller in Support of Third Party Payor Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement, ECF No. 5614-6
35. Expert Report of Professor Meredith Rosenthal Regarding Allocation of Settlement Proceeds, ECF No. 5614-7
36. [Proposed] Order Granting Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF No. 5614-8
37. Order Granting Third Party Payor Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF No. 5616

B. ***In re McKinsey & Co., Inc. National Prescription Opiate Consultant Litigation*, Case No. 3:21-md-02996-CRB (N.D. Cal.)**

38.  Transfer Order, ECF No. 1
39.  Pretrial Order No. 2: Order Appointing Plaintiffs' Lead Counsel and Plaintiffs' Steering Committee, ECF No. 211
40.  Pretrial Order No. 3: Protocol for Common Benefit Work and Expenses, ECF No. 215
41.  Pretrial Order No. 7: Initial Case Management Order, ECF No. 293
42.  McKinsey Defendants' Notice of Motion and Motion to Dismiss the Complaints on the Grounds of *Res Judicata* and Release; Memorandum of Points and Authorities in Support, ECF No. 310
43.  McKinsey Defendants' Notice of Motion and Motion to Dismiss for Lack of Personal Jurisdiction; Memorandum of Points and Authorities, ECF No. 313
44.  Subdivision Plaintiffs' Opposition to McKinsey Defendants' Motion to Dismiss on the Grounds of Res Judicata and Release, ECF No. 345
45.  Subdivision Plaintiffs' Opposition to McKinsey Defendants' Motion to Dismiss on the Grounds of Res Judicata and Release Exhibit A, ECF No. 345-2
46.  Plaintiffs' Memorandum of Points and Authorities in Opposition to McKinsey Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. 347
47.  McKinsey Defendants' Reply Memorandum of Points and Authorities in Further Support of Motion to Dismiss the Complaints on the Grounds of *Res Judicata* and Release, ECF No. 357
48.  McKinsey Defendants' Reply in Support of Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. 363
49.  Order for Supplemental Briefing, ECF No. 370
50.  McKinsey Defendants' Supplemental Brief in Further Support of Motion to Dismiss the Complaints on the Grounds of *Res Judicata* and Release, ECF No. 378
51.  Order Denying Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. 439
52.  McKinsey Defendants' Notice of Motion and Motion to Dismiss Master Complaints for Failure to State a Claim; Memorandum of Points and Authorities, ECF. No. 462
53.  NAS, TPP, and Tribal Plaintiffs' Memorandum of Points and Authorities in Opposition to McKinsey Defendants' Motion to Dismiss Master Complaints for Failure to State a Claim, ECF No. 481
54.  Plaintiffs' Notice of Motion and Motion for Entry of Pretrial Order No. 9 Establishing a Common Benefit Fee and Expense Fund; Memorandum of Points and Authorities In Support, ECF No. 555
55.  Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Motion for Entry of Pretrial Order No. 9 Establishing a Common Benefit Fee and Expense Fund, ECF No. 555-1
56.  Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Motion for Entry of Pretrial Order No. 9 Establishing a Common Benefit Fee and Expense Fund Exhibit A, ECF No. 555-2
57.  Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Motion for Entry of Pretrial Order No. 9 Establishing a Common Benefit Fee and Expense Fund Exhibit B, ECF No. 555-3

58.   Declaration of Elizabeth J. Cabraser in Support of Plaintiffs' Motion for Entry of Pretrial Order No. 9 Establishing a Common Benefit Fee and Expense Fund Exhibit C, ECF No. 555-4

59.   Pretrial Order No. 9: Establishing a Common Benefit Fee and Expense Fund, ECF No. 567

60.   First Amended Master Complaint (School Districts), ECF No. 593-2

61.   Amended Master Class Action Complaint (Subdivision), ECF No. 597

62.   Plaintiffs' Notice of Unopposed Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support, ECF No. 598

63.   Declaration of Aelish M. Baig in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement, ECF No. 598-1

64.   Declaration of Aelish M. Baig in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement Exhibit 1, ECF No. 598-2

65.   Declaration of Aelish M. Baig in Support of Unopposed Motion for Preliminary Approval of Class Action Settlement Exhibit 2, ECF No. 598-3

66.   Declaration of Cameron R. Azari, Esq. Regarding Settlement Notice Plan and Notices, ECF No. 598-4

67.   [Proposed] Order Granting Preliminary Approval of Class Settlement and Direction of Notice Under Rule 23(e) of The Federal Rules of Civil Procedure, ECF No. 598-5

68.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support, ECF No. 599

69.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support Exhibit 1, ECF No. 599-1

70.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support Exhibit 2, ECF No. 599-2

71.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support Exhibit 3, ECF No. 599-3

72.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support Exhibit 4, ECF No. 599-4

73.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support Exhibit 5, ECF No. 599-5

74.   Plaintiff School Districts' Unopposed Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; and Memorandum of Points and Authorities in Support Exhibit 6, ECF No. 599-6

75.   [Proposed] Order Granting Preliminary Approval of Class Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF No. 599-7

76.   Order Granting Preliminary Approval of Class Settlement and Direction of Notice Under Rule 23(e) of The Federal Rules of Civil Procedure, ECF No. 609

77.   Amended Order Granting Preliminary Approval of Class Settlement and Direction of Notice Under Rule 23(e) of The Federal Rules of Civil Procedure, ECF No. 617

78. Amended Order Granting Preliminary Approval of Class Settlement and Direction of Notice Under Federal Rule of Civil Procedure 23(e), ECF No. 621

79. Order Granting Final Approval of Class Action Settlement and Award of Attorneys' Fees and Costs, ECF 665

80. Second Expert Report of Professor Meredith Rosenthal, ECF No. 699-4

81. [Updated] Order Granting Final Approval of Class Action Settlement, Award of Attorney's Fees and Expenses and Class Representative Service Awards, ECF No. 739

## C.  **Other**

82. Janssen Settlement Agreement in *National Prescription Opiate Litigation*, available at https://nationalopioidsettlement.com/wp-content/uploads/2023/01/Janssen-agreement-03302022-FINAL2-Exhibit-G-as-of-1.9.23.pdf

83. BrownGreer, *National Opioid Settlement Dashboards*, available at https://nationalopioidsettlement.com/wp-content/uploads/2023/10/Opioid-Payment-Dashboard-10.19.23.pdf

# EXHIBIT C

*In re:  National Prescription Opiate Litigation*
Case No. 1:17-md-2804
U.S. District Court for the Northern District of Ohio

**DECLARATION OF WILLIAM B. RUBENSTEIN**

EXHIBIT C
Opioid Settlements to Date

| | Settlement | Amount | Uses MDL 2804 Allocation Formula |
|---|---|---|---|
| 1 | Teva | $4,246,567,371.76 | Yes |
| 2 | Allergen | $2,372,972,184.12 | Yes |
| 3 | Walgreens | $5,522,528,766 | Yes |
| 4 | Walmart | $2,739,533,911.21 | Yes |
| 5 | CVS | $4,904,201,178 | Yes |
| 6 | Distributors | $21,000,000,000 | Yes |
| 7 | Janssen | $5,000,000,000 | Yes |
| 8 | Kroger | $1,200,000,000 | Similar geographical impact-based formula |
| 9 | McKinsey Political Subdivisions | $207,000,000 | Y |
| 10 | McKinsey TPP | $78,000,000 | Class member impact-based formula |
| 11 | McKinsey School Districts | $23,000,000 | Similar geographical impact-based formula |
| | **TOTAL** | $47,293,803,411.09 | |
| | | | |
| 1 | Teva Tribal | $119,181,538.15 | |
| 2 | Allergen Tribal | $70,945,809.89 | |
| 3 | Walgreens Tribal | $148,356,029.40 | |
| 4 | Walmart Tribal | $77,939,879 | Used negotiated inter-Tribal impact-based allocation formula, relying in part on MDL 2804 Allocation Formula |
| 5 | CVS Tribal | $130,344,085.26 | |
| 6 | Distributor Tribal | $515,000,000 | |
| 7 | McKinsey Tribal Settlement | $39,500,000 | |
| 8 | J&J Tribal Settlement | $150,000,000 | |
| | **TOTAL** | $1,251,267,341.70 | |