UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>**This document relates to:** *Track 9*<br>Case No. 1:18-op-45274-DAP<br><br>TARRANT COUNTY, TEXAS,<br>　　　　　Plaintiff,<br>　　v.<br>PURDUE PHARMA, et al.,<br>　　　　　Defendants. | MDL 2804<br><br>Case No. 17-md-2804<br><br>Hon. Dan Aaron Polster |

# PLAINTIFF'S OPPOSITION TO THE ALBERTSONS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. #5585, #5587) AND MEMORANDUM OF LAW IN SUPPORT

October 10, 2024

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..............................................................................................ii

**I. INTRODUCTION** .................................................................................................... 1

**II. STATEMENT OF MATERIAL FACTS** ................................................................. 2

A. Albertsons Dispensed Significant Quantities of Prescription Opioids Into Tarrant County Without Taking Steps To Prevent Diversion. ....................................................... 2

B. Albertsons Distributed Significant Quantities of Prescription Opioids Into Tarrant County Without Taking Steps To Prevent Diversion. ....................................................... 5

C. Albertsons' Conduct Resulted in an Opioid Epidemic in Tarrant County That Has Harmed Plaintiff and its Community. ..................................................................................... 8

**III. LEGAL STANDARD** ............................................................................................. 10

**IV. ARGUMENT** ........................................................................................................... 11

A. Plaintiff Has Standing To Bring Its Public Nuisance Claims. ................................. 11

1. Plaintiff is authorized to bring its claims under Texas law................................ 11

2. Plaintiff has Article III standing to bring its claims......................................... 15

B. The Texas Regulatory Consistency Act Neither Precludes Nor Preempts Plaintiff's Public Nuisance Claims. ..................................................................................................... 19

C. Albertsons' Wrongful Distribution and Dispensing of Prescription Opioids Can Constitute a Public Nuisance Under Texas Law. ..................................................................... 24

D. Albertsons Owed Tarrant County A Legal Duty.................................................... 29

**V. CONCLUSION**........................................................................................................ 35

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abutahoun v. Dow Chem. Co.*,
    463 S.W.3d 42 (Tex. 2015).............................................................................20, 22

*Alaska v. Express Scripts, Inc.*,
    No. 3:23-CV-00233-JMK, 2024 WL 2321210 (D. Alaska May 22, 2024)......................28, 29

*Anderson v. Wood*,
    152 S.W.2d 1084 (Tex. 1941)..........................................................................12, 14

*BIC Pen Corp. v. Carter*,
    251 S.W.3d 500 (Tex. 2008)..................................................................................22

*Boyd v. Schreiner*,
    116 S.W. 100 (Tex. Civ. App. 1909) ....................................................................19

*Brite v. Atascosa Cnty.*,
    247 S.W. 878 (Tex. Civ. App.--San Antonio 1923) ...............................................11

*Buchanan v. Rose*,
    159 S.W.2d 109 (Tex. 1942)..................................................................................30

*Callier v. MultiPlan, Inc.*,
    No. EP-20-CV-00318-FM, 2021 WL 8053527 (W.D. Tex. Aug. 26, 2021)..............17, 24, 25

*Canales v. Laughlin*,
    214 S.W.2d 451 (Tex. 1948).................................................................................11

*Cash Am. Intern. Inc. v. Bennett*,
    35 S.W.3d 12 (Tex. 2000)...............................................................................19, 20

*Cherokee Nation v. Mckesson Corp.*,
    No. CIV-18-056-RAW, 2021 WL 1200093 (E.D. Okla. Mar. 29, 2021).........................31, 33

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992)..............................................................................20, 21, 22, 23

*City and Cnty. of San Francisco v. Purdue Pharma L.P.*,
    491 F. Supp. 3d 610 (N.D. Cal. 2020) ..................................................................17

*City of Boston v. Purdue Pharma, L.P.*,
    No. 1884CV02860, 2020 WL 977056 (Mass. Super. Jan. 31, 2020) ......................33

*City of Chicago v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004)..............................................................................28, 29

*City of Houston v. State of Texas*,
   No. D-1-GN-23-003474, 2023 WL 5618634 (Tex.Dist. Aug. 30, 2023) ...............................19

*City of Huntington v. AmerisourceBergen Drug Corp.*,
   609 F. Supp. 3d 408 (S.D.W. Va. 2022) ........................................................................27, 28

*City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*,
   96 F.4th 642 (4th Cir. 2024) ...............................................................................................27

*City of San Antonio v. City of Boerne*,
   111 S.W.3d 22 (Tex. 2003) ............................................................................................12, 14

*City of Webster v. Signad, Inc.*,
   682 S.W.2d 644 (Tex. App.--Hous. [1st Dist.] 1984) ........................................................20

*Cosby v. Cnty. Comm'rs of Randall Cnty.*,
   712 S.W.2d 246 (Tex. App. 1986) ......................................................................................12

*County of Dallas v. Pharma*,
   No. 2018-77098, 2019 WL 13401834 (Tex.Dist. June 06, 2019) ...................................26, 33

*County of Dallas v. Pharma*,
   No. 2018-77098, 2019 WL 13401835 (Tex.Dist. June 06, 2019) .........................................14

*County of Dallas v. Pharma*,
   No. 2018-77098, 2022 WL 20508747 (Tex.Dist. Nov. 18, 2022).........................................33

*Cox v. City of Dallas, Tex.*,
   256 F.3d 281 (5th Cir. 2001) ...............................................................................................24

*Cranor v. 5 Star Nutrition, L.L.C.*,
   998 F.3d 686 (5th Cir. 2021) ...............................................................................................17

*Crossman v. City of Galveston*,
   247 S.W. 810 (Tex. 1923).....................................................................................................26

*Crosstex N. Texas Pipeline, L.P. v. Gardiner*,
   505 S.W.3d 580 (Tex. 2016)....................................................................................17, 24, 25

*El Chico Corp. v. Poole*,
   732 S.W.2d 306 (Tex. 1987).......................................................................................29, 30, 32

*El Paso Cnty., Texas v. Trump*,
   982 F.3d 332 (5th Cir. 2020) ................................................................................16, 17, 18

*El Paso Cnty. v. El Paso Cnty. Emerg. Services Dist. No. 1*,
   622 S.W.3d 25 (Tex. App.--El Paso 2020) ...........................................................................11

*Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*,
   926 S.W.2d 287 (Tex. 1996)...................................................................................29, 30, 31, 32

*GTE Mobilnet of S. Texas Ltd. Partn. v. Pascouet*,
   61 S.W.3d 599 (Tex. App.--Hous. [14th Dist.] 2001) ...........................................................21

*Guerra v. Weatherly*,
   291 S.W.2d 493 (Tex. Civ. App.--Waco 1956) ......................................................................11

*Guynes v. Galveston Cnty.*,
   861 S.W.2d 861 (Tex. 1993)...........................................................................................11, 12

*Horton v. Kansas City S. Ry. Co.*,
   692 S.W.3d 112 (Tex. 2024)............................................................................................21, 23

*State ex rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021).............................................................................................27, 28

*Jamail v. Stoneledge Condo. Owners Ass'n*,
   970 S.W.2d 673 (Tex. App.--Austin 1998) ...............................................................19, 24, 25

*La Cour Du Roi, Inc. v. Montgomery Cnty.*,
   698 S.W.2d 178 (Tex. App.--Beaumont 1985)................................................................20, 22

*Lake Travis Indep. Sch. Dist. v. Lovelace*,
   243 S.W.3d 244 (Tex. App.--Austin 2007) ...........................................................................25

*Lawson v. B Four Corp.*,
   888 S.W.2d 31 (Tex. App.--Hous. [1st Dist.] 1994).........................................................29, 30

*Longhorn Creek Ltd. v. Gardens of Connemara Ltd.*,
   686 S.W.3d 418 (Tex. App.--Dallas 2024)............................................................................20

*Lopez-Flores v. Ibarra*,
   No. 1:17-CV-00105, 2018 WL 6577955 (S.D. Tex. Mar. 12, 2018) .....................................29

*Martinez v. Walgreen Co.*,
   No. 7:17-CV-309, 2018 WL 3241228 (S.D. Tex. July 3, 2018) .......................................33, 34

*Martinez v. Walgreen Co.*,
   935 F.3d 396 (5th Cir. 2019) ...........................................................................................33, 34

*McQueen v. Burkhart*,
   290 S.W.2d 577 (Tex. Civ. App.--Austin 1956)....................................................................19

*O'Quinn v. McVicker*,
   428 S.W.2d 111 (Tex. Civ. App.--Beaumont 1968)..............................................................11

*In re Opioid Litigation*,
    No. 21-C-9000 PHARM, 2022 WL 17999510 (W.Va.Cir.Ct. Nov. 15, 2022) ......................27

*In re Opioid Litigation*,
    No. 21-C-9000 PHARM, 2022 WL 17999513 (W.Va.Cir.Ct. July 11, 2022) ......................27

*In re Opioid Litigation*,
    No. 21C9000DISTRIBUTOR, 2022 WL 18028767 (W.Va.Cir.Ct. June 09,
    2022) ..........................................................................................................................27

*In re Opioid Litigation*,
    No. 4000002017, 2018 WL 4827862 (N.Y. Sup. Ct. July 17, 2018) ....................................33

*Parker v. City of Ft. Worth*,
    281 S.W.2d 721 (Tex. Civ. App.--Fort Worth 1955) ...........................................................26

*Prantil v. Arkema Inc.*,
    986 F.3d 570 (5th Cir. 2021) .............................................................................................25

*Riegel v. Medtronic, Inc.*,
    552 U.S. 312 (2008)...........................................................................................................22

*Riley v. Angelle*,
    No. 01-20-00590-CV, 2022 WL 3092892 (Tex. App.--Hous. [1st Dist.] Aug.
    4, 2022) ..................................................................................................................24, 25

*Robbins v. Limestone Cnty.*,
    268 S.W. 915 (Tex. 1925)..................................................................................................14

*San Antonio River Auth. v. Shepperd*,
    299 S.W.2d 920 (Tex. 1957)..............................................................................................12

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)....................................................................................................16, 17

*State Ex Rel. Stenehjem v. Purdue Pharma L.P.*,
    No. 08-2018-CV-01300, 2019 WL 2245743 (N.D. Dist. May 10, 2019) .............................28

*State v. Cook United, Inc.*,
    464 S.W.2d 105 (Tex. 1971)..............................................................................................26

*State v. Lead Industries, Ass'n, Inc.*,
    951 A.2d 428 (R.I. 2008) ..................................................................................................28

*State v. Spartan's Industries, Inc.*,
    447 S.W.2d 407 (Tex. 1969)........................................................................................25, 26

*State v. Walgreen Co.*,
  No. 3AN-22-06675 CI, 2024 WL 1178352 (Alaska Super. Mar. 01, 2024) .........................28

*Stockwell v. State*,
  221 S.W. 932 (Tex. 1920) ...........................................................................................26

*Stoughton v. City of Ft. Worth*,
  277 S.W.2d 150 (Tex. Civ. App.--Fort Worth 1955) ............................................26

*Terrell v. Sparks*,
  135 S.W. 519 (Tex. 1911) ...........................................................................................12

*Texas C. Partners, LLC v. Grimes Cnty.*,
  580 S.W.3d 824 (Tex. App.--Hous. [14th Dist.] 2019) .............................................14, 24, 25

*Thapar v. Zezulka*,
  994 S.W.2d 635 (Tex. 1999) ......................................................................................32

*Throndson v. Huntington Nat'l Bank*,
  No. 2:19-CV-1789, 2020 WL 3448281 (S.D. Ohio June 24, 2020) .................................16, 17

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..............................................................................................15, 16

*Travis Cnty. v. Matthews*,
  235 S.W.2d 691 (Tex. Civ. App.--Austin 1950) ....................................................11

*Tuma v. Kerr Cnty.*,
  336 S.W.3d 277 (Tex. App.--San Antonio 2010) ....................................................14, 15, 22

*United Food and Com. Workers Intl. Union v. Wal-Mart Stores, Inc.*,
  No. 02-15-00374-CV, 2016 WL 6277370 (Tex. App.--Fort Worth Oct. 27,
  2016) .......................................................................................................................19

*United States v. Students Challenging Regul. Agency Procs. (SCRAP)*,
  412 U.S. 669 (1973) ...................................................................................................16

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ...................................................................................................22

**STATUTES**

21 U.S.C. § 801 ....................................................................................................3, 30, 31, 34

21 U.S.C. § 812 ..............................................................................................................3, 30

21 U.S.C. § 822 .........................................................................................................2, 6, 30

21 U.S.C. § 823 .........................................................................................................2, 6, 30

21 U.S.C. § 824 ..................................................................................................2, 6, 30

21 U.S.C. § 832 ......................................................................................................6, 30

21 U.S.C. § 841 ..................................................................................................2, 6, 30

Tex. Alco. Bev. Code § 2.03 ....................................................................................29

Tex. Code Crim. Proc. art. 49.25 ............................................................................14

Tex. Fam. Code § 264.006 .......................................................................................14

Tex. Gov't Code § 123.002 ......................................................................................13

Tex. Gov't Code § 123.007 ......................................................................................13

Tex. Gov't Code § 125.002 ......................................................................................13

Tex. Gov't Code § 311.022 ......................................................................................19

Tex. Health & Safety Code § 61.022 .......................................................................13

Tex. Health & Safety Code § 61.0285 .....................................................................13

Tex. Health & Safety Code § 121.003 ................................................................12, 20

Tex. Health & Safety Code § 121.006 .....................................................................13

Tex. Health & Safety Code § 122.001 ................................................................12, 13

Tex. Health & Safety Code § 437.027 .....................................................................21

Tex. Health & Safety Code § 481.061 ........................................................2, 6, 31, 32

Tex. Health & Safety Code § 481.071 ...........................................................2, 31, 32

Tex. Health & Safety Code § 481.074 ...........................................................2, 31, 32

Tex. Health & Safety Code § 481.0764 .........................................................2, 31, 32

Tex. Health & Safety Code § 481.102 ...........................................................2, 6, 31

Tex. Health & Safety Code § 481.112 ...........................................................2, 6, 31

Tex. Health & Safety Code § 481.128 ........................................................2, 6, 31, 32

Tex. Health & Safety Code § 757.015 .....................................................................21

Tex. Health & Safety Code § 774.003 .....................................................................14

Tex. Loc. Gov't Code § 71.001 ............................................................................11

Tex. Loc. Gov't Code § 81.027 ............................................................................13

Tex. Loc. Gov't Code § 89.001 ............................................................................11

Tex. Loc. Gov't Code § 111.094 ..........................................................................13

Tex. Loc. Gov't Code § 284.002 ..........................................................................21

Tex. Loc. Gov't Code § 351.001 ..........................................................................13

Tex. Loc. Gov't Code § 351.045 ..........................................................................13

Tex. Loc. Gov't Code § 370.003 ..........................................................................13

Tex. Occ. Code § 1.004 ..........................................................................19, 20, 23

Tex. Occ. Code § 168.003 .....................................................................................32

Tex. Occ. Code §§ 551 *et seq.*..................................................................2, 19, 31

Tex. Occ. Code § 551.002 ..............................................................................22, 31

Tex. Prop. Code § 92.208.......................................................................................21

**Other Authorities**

2023 Tex. Sess. Law Serv. Ch. 899 (H.B. 2127) ...........................................20, 21

21 C.F.R. § 1301.71 ......................................................................2, 6, 30, 32

21 C.F.R. § 1301.74 ..........................................................................6, 31, 32

21 C.F.R. § 1306.04 ..........................................................................2, 31, 32

21 C.F.R. § 1306.06 ..........................................................................2, 31, 32

22 Tex. Admin. Code § 291.29 ...................................................2, 22, 31, 32

Fed. R. Civ. Proc. 56 .............................................................................10

Restatement (Second) of Torts § 821B ...............................................24

Restatement (Third) of Torts in Liability for Economic Harm § 8.........................27, 28

Distributors' First Amended Joint Rule 91A Motion, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas Opioid Litigation*, No. 2018-77098, 2019 WL 13405501 (Tex. Dist. March 29, 2019) ................................26, 33

Manufacturer Defendants' First Amended Joint Rule 91A Motion, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas Opioid Litigation*, No. 2018-77098, 2019 WL 13405504 (Tex. Dist. March 8, 2019) ..........................................14

Reply Brief in Support of the Pharmacy Defendants' Rule 91A Motion to Dismiss, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas Opioid Litigation*, No. 2018-77098, 2022 WL 20510056 (Tex. Dist. Dec. 9, 2022) ..........................................33

Tex. Atty. Gen. Op. DM-183 (1992) ..........................................12

Tex. Atty. Gen. Op. GA-0507 (2007) ..........................................12

Tex. Atty. Gen. Op. JM-788 (1987) ..........................................12

TEX. CONST. art. V, § 18 ..........................................11

TEX. CONST. art. XI, § 1 ..........................................11

TEX. R. CIV. P. 33 ..........................................12

U.S. CONST. art. III ..........................................*passim*

# I.  INTRODUCTION

Albertsons[1] has moved for summary judgment on four primarily legal grounds: (1) Plaintiff lacks Article III standing to bring its action because it cannot demonstrate an injury in fact and it lacks authority to bring its claims under Texas law; (2) Plaintiff's public nuisance claims are preempted by the Texas Regulatory Consistency Act ("TRCA"); (3) the distribution and dispensing of a lawful prescription drug cannot constitute a public nuisance under Texas law; and (4) Plaintiff cannot demonstrate that Albertsons owed it a duty of care for purposes of its negligent nuisance claim.[2]  Albertsons is wrong on all counts.  *First*, Plaintiff is authorized by the Texas legislature to bring a public nuisance action in these circumstances, and there is substantial evidence in the record demonstrating Plaintiff has suffered a cognizable injury in fact under Article III.  *Second*, neither the plain language nor the legislative purpose of the TRCA can be reasonably interpreted to preempt common law claims.  *Third*, under Texas law, a public nuisance is not limited to interferences with property interests or legislatively-designated nuisances.  Rather, a public nuisance is broadly defined as an interference with a public right, which can include interferences with public health, safety, and welfare.  *Fourth*, the factors considered by Texas

---

[1]  "Albertsons" includes Albertsons, Inc., Albertsons, LLC, Safeway, Inc., Randall's Food & Drug, and United Supermarkets, LLC.

[2]  Albertsons also briefly states in its Introduction that the "Court should grant summary judgment because Albertsons has neither intentionally nor negligently created a public nuisance in Tarrant County."  Memorandum of Law in Support of the Albertsons' Defendants' Motion for Summary Judgment, Dkt. #5587 ("MOL") at 2; *see also id.* at 16 ("[A]s noted above, Albertsons contests that Plaintiff has established any factual foundation to allege that Albertsons intentionally or negligently created a public nuisance.").  These conclusory assertions, offered with no supporting argument or legal authority, are not sufficiently raised as summary judgment grounds.  Dkt. #2565 (CT1 Preemption MSJ Order) at 20 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived."; "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").  However, in an abundance of caution, Plaintiff includes evidence in its Statement of Material Facts demonstrating there are material questions of fact as to whether Albertsons intentionally and/or negligently caused a public nuisance in Tarrant County.

All references to "Dkt." in this Opposition refer to the *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804 (N.D. Ohio) docket.

1

courts when deciding whether to recognize a common law duty all weigh in favor of finding that Albertsons owed a duty to Plaintiff not to negligently distribute and dispense dangerous prescription opioids.  Thus, Albertsons' summary judgment motion should be denied in its entirety.

## II.  STATEMENT OF MATERIAL FACTS[3]

### A.  ALBERTSONS DISPENSED SIGNIFICANT QUANTITIES OF PRESCRIPTION OPIOIDS INTO TARRANT COUNTY WITHOUT TAKING STEPS TO PREVENT DIVERSION.

During the relevant time period, Albertsons operated 51 pharmacies in Tarrant County that dispensed Schedule II and Schedule III opioids.  MOL at 3 (citing MOL, Ex. 1 (McCann Rep.) at Appendix 6, § 6.8).  As a registrant licensed to dispense controlled substances pursuant to the Controlled Substances Act ("CSA"), Albertsons knew and understood its statutory and regulatory obligations related to the dispensing of opioids.[4]  Albertsons also knew and understood the

---

[3]  Plaintiff includes additional facts relevant to specific arguments in § IV below. All references to an exhibit are, unless otherwise noted, exhibits to the Declaration of M. Michelle Carreras ("Carreras Decl."), which is filed concurrently herewith.  Citations to exhibits with BATES stamps will use the last three digits of the BATES number.

Additionally, evidence supporting many of the general, non-defendant-specific and non-plaintiff-specific facts underlying Plaintiff's claims (*e.g.*, the dangers of opioids; how opioid distributors and dispensers are regulated, including their legal obligations to implement effective controls against diversion; the benefits of prescription drug monitoring programs; how the oversupply and diversion of prescription opioids caused an opioid epidemic across the country; the impact of that opioid epidemic on local communities) have been presented to this Court numerous times in briefs from prior case tracks in this MDL. *See, e.g.,* Dkt. #4241 (CT3 Ps' Rule 50(b) Opp.) at 3-8, 21-24, 28-30, 34, 84-87; Dkt. #3015-1 (CT1 Ps' SOM-B MSJ) at 3-8.  For purposes of the arguments made in Albertsons' motion, these facts do not appear to be specifically at issue.  Therefore, in the interest of brevity, Plaintiff does not repeat these facts in this Opposition, but rather, to the extent relevant, incorporates them (and their supporting evidence) by reference as if fully set forth herein.

[4]  **Ex. 1** (Albertsons 30(b)(6) Tr.) at 68:16 – 69:5, 128:15 – 129:15; **Ex. 2** (Albertsons 30(b)(6) Dep. Ex. 6) at 119, 121, 132, 149, 152; **Ex. 3** (Catizone Tr.) at 35:6-24, 50:13-24, 52:21 – 53:9, 56:17 – 57:17, 109:15 – 110:14, 244:7 – 246:13; **Ex. 4** (Catizone Dep. Ex. 18) at 258-260; **Ex. 5** (Catizone Dep. Ex. 23) at 786-788, 795-796; **Ex. 6** (Palazola Dep. Ex. 21) at 753-773; **Ex. 7** (Lembke Dep. Ex. 2) at 228-230; *see also* 21 U.S.C. §§ 822(a)(2), 823(g), 824, 841; 21 C.F.R. §§ 1301.71(a), 1306.04(a), 1306.06; TEX. HEALTH & SAFETY CODE §§ 481.061, 481.071(a), 481.074(a), 481.0764(a), 481.102, 481.112(a), 481.128; TEX. OCC. CODE §§ 551 *et seq.*; 22 TEX. ADMIN. CODE § 291.29.

dangerous nature of opioids and the risk that such drugs could be abused and diverted.[5]  Yet despite this knowledge, and despite its awareness of the worsening opioid crisis,[6] Albertsons failed to implement effective controls against diversion, and in fact actively undermined its pharmacists' ability to exercise their corresponding responsibility, when dispensing these dangerous drugs. **Ex. 7** (Lembke Dep. Ex. 2) at 226-239; **Ex. 17** (Rannazzisi Tr.) at 172:18 – 175:6.

Among other things, Albertsons: (i) failed to timely and/or sufficiently implement policies and procedures,[7] or properly educate its pharmacists, on identifying, investigating, and documenting red flags;[8] (ii) failed to provide its pharmacists access to its extensive dispensing data that could be utilized to identify red flags and other patterns, trends, and prescribers potentially involved in diversion;[9] (iii) failed to sufficiently utilize its extensive dispensing data at the corporate level to prevent diversion and turned a blind eye to evidence of illegitimate opioid

---

[5]  **Ex. 6** (Palazola Dep. Ex. 21) at 769; **Ex. 8** (Hicks Tr.) at 43:4-9; **Ex. 9** (Hicks Dep. Ex. 4) at 917; **Ex. 10** (S. Johnson Tr.) at 86:8-20; **Ex. 11** (S. Johnson Dep. Ex. 9) at 710; **Ex. 12** (Lembke Tr.) at 160:12-23, 197:1-10; **Ex. 7** (Lembke Dep. Ex. 2) at 11-13; **Ex. 13** (Lembke Dep. Ex. 29) at 507, 511-512; *see also* 21 U.S.C. §§ 801(2), 812(b)(2)-(3).

[6]  **Ex. 14** (Price Tr.) at 119:8-19; **Ex. 15** (Albertsons 30(b)(6) Dep. Ex. 8) at 044; **Ex. 6** (Palazola Dep. Ex. 21) at 759, 762, 769; **Ex. 8** (Hicks Tr.) at 71:9 – 72:9; **Ex. 16** (Hicks Dep. Ex. 5) at 753; **Ex. 12** (Lembke Tr.) at 76:18-24, 160:12-23, 162:17 – 163:1; **Ex. 7** (Lembke Dep. Ex. 2) at 227-228, 238-239; **Ex. 13** (Lembke Dep. Ex. 29) at 507.

[7]  Albertsons' dispensing policies were created and implemented by its corporate department and applied nationally to all its pharmacies.  **Ex. 5** (Catizone Dep. Ex. 23) at 720; **Ex. 8** (Hicks Tr.) at 22:1-12; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 78:9-19, 98:18-22, 104:23 – 105:2, 113:20-23.

[8]  **Ex. 7** (Lembke Dep. Ex. 2) at 226-234, 238; **Ex. 12** (Lembke Tr.) at 131:16 – 132:24, 187:24 – 188:24, 189:8 – 190:6, 197:21 – 198:6; **Ex. 17** (Rannazzisi Tr.) at 172:18 – 175:6, 177:15 – 179:6;  **Ex. 3** (Catizone Tr.) at 165:3 – 171:3, 174:5-23, 264:15-22;  **Ex. 4** (Catizone Dep. Ex. 18) at 258-260; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 73:11 – 76:10, 128:15 – 130:18, 133:5-13; **Ex. 15** (Albertsons 30(b)(6) Dep. Ex. 8) at 044-046; **Ex. 18** (Albertsons 30(b)(6) Dep. Ex. 10) at 778-779; **Ex. 16** (Hicks Dep. Ex. 5) at 753; **Ex. 8** (Hicks Tr.) at 70:9 – 77:11, 78:8-20; **Ex. 14** (Price Tr.) at 101:14 – 102:23, 104:6 – 106:5.

[9]  **Ex. 7** (Lembke Dep. Ex. 2) at 237-238; **Ex. 12** (Lembke Tr.) at 197:21 – 198:6; **Ex. 3** (Catizone Tr.) at 177:20 – 178:14, 185:14-22, 187:4 – 188:16; **Ex. 8** (Hicks Tr.) at 49:18 – 50:7, 95:10-22, 104:19 – 105:13, 111:4 – 112:5, 113:9 – 116:4; **Ex. 14** (Price Tr.) at 17:10 – 18:18, 95:22 – 96:11; **Ex. 19** (Bowman Tr.) at 84:17 – 86:4.

prescriptions being filled by its pharmacies;[10] (iv) failed to create a system of documentation that would allow for information about red flags to be easily accessible to its pharmacists chain-wide;[11] (v) failed to require its pharmacists to check the PDMP for all opioid prescriptions until required to do so under state law (which, in Texas, did not occur until 2020);[12] and (vi) implemented employment metrics and financial incentives, and made staffing decisions, that impeded its pharmacists' efforts to exercise their corresponding responsibility duties.[13]

Despite all these deficiencies, Albertsons continued to dispense prescription opioids in massive quantities.  From January 2006 to May 2021, Albertsons' Tarrant County pharmacies filled at least 828,735 opioid prescriptions (constituting at least 50 million dosage units).

---

[10] **Ex. 7** (Lembke Dep. Ex. 2) at 234-238; **Ex. 12** (Lembke Tr.) at 136:12 – 137:4, 197:21 – 198:6; **Ex. 17** (Rannazzisi Tr.) at 172:18 – 175:6; **Ex. 3** (Catizone Tr.) at 177:20 – 178:14, 181:19 – 182:6, 187:4 – 189:14, 213:17 – 215:23, 217:3 – 220:13, 225:10 – 226:18; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 90:14 – 91:21, 94:3-7, 97:5 – 101:16, 103:18 – 104:6, 111:2-24; **Ex. 15** (Albertsons 30(b)(6) Dep. Ex. 8) at 044-046; **Ex. 8** (Hicks Tr.) at 36:17 – 38:21, 40:9 – 41:22, 46:8 – 47:4, 49:18 – 50:7, 51:18 – 55:13, 69:2-6, 95:10-22, 117:25 – 118:12; **Ex. 20** (Hicks Dep. Ex. 3) at 447-448; **Ex. 9** (Hicks Dep. Ex. 4) at 916-917; **Ex. 14** (Price Tr.) at 25:13-17, 88:15 – 89:13; **Ex. 21** (Price Dep. Ex. 6) at 299-303; **Ex. 19** (Bowman Tr.) at 48:23 – 63:24, 72:23 – 73:20, 80:23 – 86:4; **Ex. 22** (Bowman Dep. Ex. 3) at 497; **Ex. 23** (Bowman Dep. Ex. 4) at 844-846.

[11] **Ex. 7** (Lembke Dep. Ex. 2) at 233, 238; **Ex. 12** (Lembke Tr.) at 132:1-24, 197:21 – 198:6; **Ex. 3** (Catizone Tr.) at 192:2-13; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 111:2-24; **Ex. 14** (Price Tr.) at 95:22 – 96:11, 100:7-20.

[12] **Ex. 7** (Lembke Dep. Ex. 2) at 228-233, 238; **Ex. 17** (Rannazzisi Tr.) at 182:3-15; **Ex. 3** (Catizone Tr.) at 194:12-17, 195:1-3, 198:10 – 199:1, 200:20 – 201:2; **Ex. 4** (Catizone Dep. Ex. 18) at 258-260; **Ex. 5** (Catizone Dep. Ex. 23) at 796 (as of 9/18, Albertsons only required pharmacist to check PDMP if prescription already had red flags); **Ex. 8** (Hicks Tr.) at 57:22 – 58:11; **Ex. 6** (Palazola Dep. Ex. 21) at 760-761.  In fact, Albertsons actively lobbied *against* stricter state PDMP requirements for years.  **Ex. 7** (Lembke Dep. Ex. 2) at 140-143; **Ex. 12** (Lembke Tr.) at 180:25 – 181:8.

[13] **Ex. 7** (Lembke Dep. Ex. 2) at 230-231; **Ex. 12** (Lembke Tr.) at 43:16-18, 132:11-24, 184:4 – 185:2, 197:21 – 198:6; **Ex. 17** (Rannazzisi Tr.) at 152:17 – 153:22, 155:4 – 157:16, 158:8 – 160:9; **Ex. 3** (Catizone Tr.) at 205:22 – 206:21, 226:20 – 227:16; **Ex. 8** (Hicks Tr.) at 46:8 – 47:4, 80:11 – 88:16, 92:21 – 94:3, 116:6-16, 116:24 – 117:18; **Ex. 20** (Hicks Dep. Ex. 3) at 447-448; **Ex. 24** (Hicks Dep. Ex. 6) at 285-288; **Ex. 19** (Bowman Tr.) at 33:6 – 38:25, 43:12 – 48:2, 86:18 – 88:3.

MOL, Ex. 1 (McCann Rep.) at 91-93.  *See also* **Ex. 19** (Bowman Tr.) at 67:15 – 79:24. A significant portion of these prescriptions presented one or more red flags indicative of diversion. MOL, Ex. 1 (McCann Rep.) at 94-98, 103; **Ex. 3** (Catizone Tr.) at 213:17 – 215:23, 217:3 – 220:13, 225:10 – 226:18.[14]  Yet 95% of those red-flagged prescriptions were filled without Albertsons first performing sufficient due diligence to resolve the red flags.[15]

## B.  ALBERTSONS DISTRIBUTED SIGNIFICANT QUANTITIES OF PRESCRIPTION OPIOIDS INTO TARRANT COUNTY WITHOUT TAKING STEPS TO PREVENT DIVERSION.

Albertsons not only failed to implement effective controls when dispensing opioids, it did so at the distribution level as well.  Between 2006 and 2008, Albertsons self-distributed Schedule III controlled substances, including Schedule III opioids, from its distribution facility in Ponca, Oklahoma to its Tarrant County pharmacies.  MOL at 3; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 25:11 – 26:2.  Albertsons then stopped distributing pharmaceuticals for several years.  MOL at 3; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 26:9-12.  In August 2013, Albertsons restarted its pharmaceutical distribution activities and its Ponca facility began distributing Schedule II and Schedule III controlled substances, including opioids, to its Tarrant County pharmacies.  MOL at 3; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 26:15 – 27:1.  In June 2016, Albertsons again stopped self-distributing drugs.  MOL at 3; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 27:5-8.  Thus, during the relevant time period, Albertsons distributed prescription opioids into Tarrant County for approximately six years.

As a registrant licensed to distribute controlled substances pursuant to the CSA, Albertsons knew and understood its statutory and regulatory obligations related to the distribution of opioids.[16]

---

[14]  Depending on the methodology used, between 35.6% to 75.5% of these prescriptions contained one or more red flags.  MOL, Ex. 1 (McCann Rep.) at 94-98.

[15]  MOL, Ex. 1 (McCann Rep.) at 99-103; **Ex. 3** (Catizone Tr.) at 118:6-15, 121:1-23 ("My statement was that 95 percent of prescriptions dispensed by Albertsons did not perform the required components of due diligence."), 122:9-22 ("My testimony is that Albertsons failed to recognize the red flags, resolve the red flags, and document the red flags in 95 percent of the same prescriptions that I reviewed.  And the notes were one of the determiners of that 95 percent percentage."), 195:15 – 196:8, 227:4-22, 244:7 – 246:13.

[16]  **Ex. 10** (S. Johnson Tr.) at 86:8 – 87:7; **Ex. 25** (S. Johnson Dep. Ex. 2) at 465; **Ex. 17** (footnote continues on next page)

Albertsons also knew and understood the dangerous nature of opioids and the risk that such drugs could be abused and diverted.  *Supra* at fn. 5.  Yet despite this knowledge, and despite its awareness of the worsening opioid crisis (*supra* at fn. 6), Albertsons failed to implement effective controls against diversion when distributing these dangerous drugs.  **Ex. 17** (Rannazzisi Tr.) at 8:21 – 9:21, 10:16 – 11:12, 81:15 – 82:19.

Specifically, its policies and procedures related to suspicious order monitoring (SOM), and its implementation of same, were woefully lacking.  *Id.*[17]  Among other things, during most or all of the relevant time period, Albertsons' SOM system: (i) consisted of one or two threshold-based programs which purported to identify orders of unusual size, but did not identify orders deviating from a normal pattern or orders of unusual frequency;[18] (ii) allowed its thresholds to be easily circumvented or modified;[19] (iii) was not sufficiently monitored or enforced by Albertsons' compliance team;[20] (iv) allowed flagged orders to be shipped without adequate due diligence;[21]

---

(Rannazzisi Tr.) at 39:7 – 42:17; *see also* 21 U.S.C. §§ 822(a)(1), 823(b), 824, 832, 841; 21 C.F.R. §§ 1301.71(a), 1301.74(b); TEX. HEALTH & SAFETY CODE §§ 481.061, 481.102, 481.112(a), 481.128.

[17] Albertsons' distribution policies were created and implemented by its corporate department and applied nationally to all its distribution facilities.  **Ex. 1** (Albertsons 30(b)(6) Tr.) at 18:13-22, 19:20-25, 32:14-21, 40:10-18.

[18] **Ex. 17** (Rannazzisi Tr.) at 106:14 – 107:5, 109:12-17, 121:10 – 124:6, 125:16 – 127:1, 164:5 – 165:4; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 32:22 – 33:17; **Ex. 10** (S. Johnson Tr.) at 33:17 – 34:25, 50:15 – 51:2; **Ex. 25** (S. Johnson Dep. Ex. 2) at 461; **Ex. 26** (S. Johnson Dep. Ex. 4) at 131; **Ex. 27** (S. Johnson Dep. Ex. 6) at 386; **Ex. 14** (Price Tr.) at 51:3-12, 51:22 – 52:6; **Ex. 28** (Mills Tr.) at 48:20 – 55:2.

[19] **Ex. 17** (Rannazzisi Tr.) at 93:7-14, 94:8-16, 117:3-9, 120:3-12; **Ex. 14** (Price Tr.) at 37:2-12. For example, pharmacies could order additional controlled substances from third-party vendors without any oversight.  **Ex. 17** (Rannazzisi Tr.) at 102:8 – 104:5, 107:14 – 109:21.

[20] **Ex. 17** (Rannazzisi Tr.) at 106:1 – 109:21; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 51:22 – 53:16, 135:21 – 136:8; **Ex. 10** (S. Johnson Tr.) at 17:7-14, 31:21-24, 53:5 – 54:2, 55:8 – 56:25, 60:17 – 63:10; **Ex. 14** (Price Tr.) at 38:21 – 44:19.

[21] **Ex. 17** (Rannazzisi Tr.) at 93:7 – 94:16, 132:6-21, 166:16 – 168:19; **Ex. 14** (Price Tr.) at 43:9 – 44:1; *see also infra* at fn. 26.  Initially, orders exceeding the threshold were automatically cut down before they even reached the Ponca facility, allowing the cut orders to be shipped (footnote continues on next page)

and (v) purportedly relied on a second check at the Ponca facility, which consisted of a manual review by overworked packers identifying abnormal orders based on the their "gut feeling."[22] Albertsons also failed to provide adequate training and guidance to those charged with SOM duties and provided only limited resources and support to diversion control.  **Ex. 17** (Rannazzisi Tr.) at 115:12 – 117:2, 132:12-21; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 18:13-22; **Ex. 10** (S. Johnson Tr.) at 55:8 – 56:25; **Ex. 29** (S. Johnson Dep. Ex. 5) at 941; **Ex. 14** (Price Tr.) at 42:3-9, 69:22 – 71:1. And even when its Ponca facility discontinued controlled substance distribution in 2016, Albertsons simply elected to push out all of its remaining inventory, *including Schedule II opioids*, to their pharmacies (regardless of whether the pharmacies requested or needed them).  **Ex. 30** (S. Johnson Dep. Ex. 8) at 706-710; **Ex. 10** (S. Johnson Tr.) at 71:16 – 73:24; **Ex. 14** (Price Tr.) at 82:12 – 84:5, 85:13 – 87:15; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 61:23 – 63:5.

Ultimately, even Albertsons' minimal SOM systems were nothing more than window dressing.  Although the system was flagging so many excessive orders that, at one point, there were internal complaints that the reports generated were too big and not practical to review,[23] Albertson's 30(b)(6) witness testified that Albertsons never identified a single order as suspicious during the entire time it was distributing opioids to its pharmacies.  **Ex. 1** (Albertsons 30(b)(6) Tr.)

---

without adequate due diligence.  **Ex. 1** (Albertsons 30(b)(6) Tr.) at 32:22 – 33:17, 34:13-22, 37:19 – 38:9; **Ex. 28** (Mills Tr.) at 40:17-24, 42:16 – 43:12; **Ex. 14** (Price Tr.) at 35:12-21. When Ponca employees themselves identified suspicious orders, they simply called the pharmacist to verify whether the order was a mistake; if the pharmacist confirmed that it was a mistake, the order would be cut down to what was intended and shipped.  **Ex. 1** (Albertsons 30(b)(6) Tr.) at 31:13-18; **Ex. 14** (Price Tr.) at 36:3-16.

[22]  **Ex. 17** (Rannazzisi Tr.) at 106:20-21, 115:16 – 117:2; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 27:11 – 28:25, 33:18 – 34:22; **Ex. 10** (S. Johnson Tr.) at 49:14-17; **Ex. 25** (S. Johnson Dep. Ex. 2) at 461; **Ex. 26** (S. Johnson Dep. Ex. 4) at 131.

[23]  **Ex. 31** (Mills Dep. Ex. 2) at 412-413; **Ex. 28** (Mills Tr.) at 94:7 – 95:25.  Albertsons' response to this was not to be concerned that its pharmacies were regularly exceeding their order limits, but rather to look for ways to modify the program so fewer orders triggered the system.  *Id.*; **Ex. 28** (Mills Tr.) at 98:18-25, 104:13 – 105:5.

7

at 40:25 – 41:5, 67:6-19.[24]  Albertsons also never reported any suspicious orders to the DEA.
**Ex. 17** (Rannazzisi Tr.) at 118:6-16; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 41:6-11, 67:20-23;
**Ex. 10** (S. Johnson Tr.) at 55:8 – 56:25; **Ex. 28** (Mills Tr.) at 47:16-21.  Yet during the relevant
time periods, Albertsons distributed almost 11 million dosage units of prescription opioids to its
Tarrant County pharmacies.  MOL, Ex. 1 (McCann Rep.) at 37; **Ex. 32** (McCann Tr.) at 43:6-12.[25]
Thousands of these orders were in fact suspicious, yet there is no evidence Albertsons performed
sufficient (or in most cases, any) due diligence prior to shipping those orders to determine whether
they were likely to be diverted.[26]

## C.   ALBERTSONS' CONDUCT RESULTED IN AN OPIOID EPIDEMIC IN TARRANT COUNTY THAT HAS HARMED PLAINTIFF AND ITS COMMUNITY.

The oversupply and diversion of prescription opioids has created an opioid epidemic in
Tarrant County (and across the country) that persists to this day.[27]  By failing to maintain adequate
and effective controls against diversion when distributing and dispensing massive quantities of
prescription opioids into Tarrant County, Albertsons substantially contributed to this opioid

---

[24] Notably, Albertsons' system support manager for the Ponca facility disagreed, testifying that there were "probably hundreds to thousands" of suspicious orders identified through the SOM program between 2013 and 2016.  **Ex. 28** (Mills Tr.) at 26:7-21, 43:19 – 46:22.

[25] Albertsons' Tarrant County pharmacies also received another ~50 million dosage units of opioids from third-party distributors during this time period.  MOL, Ex. 1 (McCann Rep.) at 37-38.  As discussed above, these third-party orders were not taken into account in Albertsons' SOM system.  *Supra* at fn. 19.

[26] MOL, Ex. 1 (McCann Rep.) at 38-89; **Ex. 32** (McCann Tr.) at 63:10 – 64:9, 67:8-14, 72:9-14; **Ex. 17** (Rannazzisi Tr.) at 93:7 – 94:16, 120:3-19, 132:6-21, 133:2-14, 166:16 – 169:9; **Ex. 1** (Albertsons 30(b)(6) Tr.) at 42:2 – 67:23; **Ex. 33** (Albertsons 30(b)(6) Dep. Ex. 5).

[27] **Ex. 7** (Lembke Dep. Ex. 2) at 10-11, 19-21, 239, 302-355, 416-418; **Ex. 3** (Catizone Tr.) at 254:15-20; **Ex. 34** (Keyes Tr.) at 184:15 – 185:13; **Ex. 12** (Lembke Tr.) at 76:10-12, 162:17 – 163:1, 190:9 – 191:4; **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 16:12 – 19:23, 143:9 – 144:7, 150:18-24, 165:4-12, 257:3 – 259:6; **Ex. 36** (Bond Tr.) at 20:23 – 21:10, 26:6 – 28:10, 147:15 – 149:2, 150:14 – 158:17, 159:12-17; **Ex. 37** (Giese Tr.) at 35:1-4; **Ex. 38** (Waybourn Tr.) at 54:4-18, 57:7-15, 59:8 – 60:7, 65:12-19; **Ex. 39** (Simonds Tr.) at 51:11-15, 81:3-14; **Ex. 40** (Taneja Tr.) at 209:25 – 215:22; **Ex. 41** (Taneja Dep. Ex. 8) at 779-781 & attachment; **Ex. 42** (Bennett-Wright Tr.) at 28:23 – 29:11; **Ex. 43** (Heckman Tr.) at 41:5 – 42:13, 83:7 – 89:3.

epidemic and the related harms suffered by Plaintiff.[28]

As more prescription opioids flooded into Tarrant County, the number of opioid overdoses, opioid-related deaths, and individuals with opioid use disorder dramatically increased, negatively impacting the public health and welfare in its community.[29]  And as the addicted population grew, Tarrant County became more attractive to drug dealers and cartels, leading to increased crime and negatively impacting public safety in its community.[30]

This epidemic has placed significant burdens on many of the governmental services Plaintiff provides, including those associated with its healthcare systems, criminal justice systems, and family services.[31]  Plaintiff has also had to expend significant financial and other resources to

---

[28] **Ex. 7** (Lembke Dep. Ex. 2) at 234-239; **Ex. 12** (Lembke Tr.) at 37:8-25, 176:5-13; **Ex. 17** (Rannazzisi Tr.) at 10:16 – 11:12, 92:20 – 94:16, 166:16 – 169:9, 170:10 – 171:22, 188:17 – 189:18, 350:1-3, 381:6-15; **Ex. 3** (Catizone Tr.) at 213:17 – 215:23, 217:3 – 220:13, 237:21 – 238:1, 253:5 – 254:20; **Ex. 8** (Hicks Tr.) at 108:5 – 112:5, 113:9 – 116:4; **Ex. 44** (Hicks Dep. Ex. 9); **Ex. 45** (Hicks Dep. Ex. 10).

[29] **Ex. 7** (Lembke Dep. Ex. 2) at 416-418; **Ex. 12** (Lembke Tr.) at 190:9 – 191:4; **Ex. 34** (Keyes Tr.) at 184:15 – 185:13, 187:9 – 190:17, 214:11-20; **Ex. 46** (McDonald Dep. Ex. 5) at 267-269; **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 16:25 – 17:24; **Ex. 36** (Bond Tr.) at 26:9-12; **Ex. 38** (Waybourn Tr.) at 67:5 – 68:1; **Ex. 47** (Waybourn Dep. Ex. 7) at 329-330; **Ex. 39** (Simonds Tr.) at 52:8 – 53:2; **Ex. 40** (Taneja Tr.) at 209:7 – 213:24; **Ex. 43** (Heckman Tr.) at 70:23 – 73:21; **Ex. 48** (Heckman Dep. Ex. 12) at 006; **Ex. 49** (R. Johnson Tr.) at 46:14 – 47:5, 55:24 – 57:4.  Importantly, the abuse of prescription opioids is a well-established gateway to the abuse of heroin and illicit fentanyl; most users of these illicit drugs started with prescription opioids and moved to the illicit drugs once prescription opioids became more difficult and costly to obtain.  **Ex. 7** (Lembke Dep. Ex. 2) at 417-418; **Ex. 34** (Keyes Tr.) at 83:9-20, 187:9 – 190:17, 194:15 – 195:4, 203:23 – 204:2; **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 83:6 – 84:11, 95:16-21, 102:18 – 103:11, 147:10-16.

[30] **Ex. 36** (Bond Tr.) at 70:10 – 71:7, 147:15 – 149:2; **Ex. 46** (McDonald Dep. Ex. 5) at 258, 268-269, 272-273; **Ex. 50** (Simonds Dep. Ex. 41) at 466; **Ex. 51** (Waybourn Dep. Ex. 13) at 990; **Ex. 43** (Heckman Tr.) at 44:25 – 47:17, 86:18 – 89:3; **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 41:9-19.

[31] **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 17:12 – 19:23, 24:16 – 28:12, 97:21 – 99:1, 117:24 – 118:12, 143:9-23; **Ex. 52** (Pelletier Tr.) at 56:2 – 57:2, 76:19 – 77:6, 79:24 – 81:12, 82:12-14; **Ex. 53** (Reyes Tr.) at 52:5-21, 57:1 – 59:13, 82:17 – 83:7, 96:1 – 97:3, 98:2 – 99:18; **Ex. 54** (Reyes Dep. Ex. 14) at 997; **Ex. 40** (Taneja Tr.) at 71:6 – 72:6, 138:8-25, 146:19 – 147:2, 214:3-17; **Ex. 49** (R. Johnson Tr.) at 62:14 – 63:24, 65:2-9; **Ex. 36** (Bond Tr.) at 99:7 – 102:25, 144:20 – 145:3; **Ex. 55** (Bond Dep. Ex. 7) at 818-819; **Ex. 38** (Waybourn Tr.) at 16:23 – 19:5, (footnote continues on next page)

9

fight the opioid epidemic, and will need to continue doing so as long as the epidemic remains unabated, which has adversely affected both its budget and its ability to address other matters.[32] For example, Plaintiff had to start purchasing Narcan for its police officers. **Ex. 38** (Waybourn Tr.) at 68:17 – 72:7; **Ex. 39** (Simonds Tr.) at 195:25 – 199:4; **Ex. 60** (Simonds Dep. Ex. 45) at 059; **Ex. 61** (Heckman Dep. Ex. 22) at 910; **Ex. 43** (Heckman Tr.) at 96:11 – 97:8, 99:19-22, 102:8-12. Plaintiff has also partnered with, and partially funded, certain third-party providers (*e.g.*, Challenge of Tarrant County; MHMR; Cornerstone; etc.) to provide drug (including opioid) prevention, education, treatment, testing, and rehabilitation services.[33]

### III.  LEGAL STANDARD

This Court has previously articulated the legal standards applicable to motions for summary judgment brought under Federal Rule of Civil Procedure 56, which Plaintiff incorporates herein by reference. Dkt. #2483 (CT1 CSA MSJ Order) at 2-4.

---

23:8-17, 37:1-7, 38:3-25, 80:8 – 81:3; **Ex. 39** (Simonds Tr.) at 48:21 – 49:1; **Ex. 56** (Simonds Dep. Ex. 19) at 306, 308, 311, 319; **Ex. 57** (McDonald Tr.) at 35:8-18, 36:20 – 39:12, 96:8-19, 99:4-20; **Ex. 58** (Briggs Tr.) at 55:14 – 56:15, 73:11 – 74:14; **Ex. 59** (Gilley Tr.) at 42:23 – 43:20; **Ex. 37** (Giese Tr.) at 26:9 – 29:5.

[32] **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 17:24 – 19:23 (noting treatment costs were "substantial" and utilized "a tremendous amount of County resources"), 26:15 – 28:12, 31:18 – 34:9, 34:10-19 (county expends millions of dollars every year to combat opioid abuse), 36:14-18, 97:18 – 103:11, 117:24 – 119:4, 120:12-21, 141:3-16, 143:9 – 144:7, 156:5 – 158:14, 222:16 – 223:4, 225:2 – 226:10; **Ex. 37** (Giese Tr.) at 35:1-16, 94:1-11, 97:4-20, 114:18-25, 127:18 – 128:22; **Ex. 36** (Bond Tr.) at 99:7 – 102:25; **Ex. 55** (Bond Dep. Ex. 7) at 818-819; **Ex. 38** (Waybourn Tr.) at 38:3 – 39:25; **Ex. 39** (Simonds Tr.) at 119:5 – 120:21; **Ex. 56** (Simonds Dep. Ex. 19) at 319; **Ex. 40** (Taneja Tr.) at 145:22 – 149:25; **Ex. 42** (Bennett-Wright Tr.) at 34:13 – 36:6, 41:1-8, 44:5-10, 52:2 – 55:19, 59:10-17, 61:19 – 64:4, 65:18 – 66:13, 89:11-19, 92:15 – 93:11.

[33] **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 18:5-15, 24:5 – 26:6, 26:15 – 27:1, 32:19 – 34:2, 97:18-21, 99:2-11, 120:13-16, 157:20 – 158:1, 220:15 – 221:6, 222:16 – 223:4, 225:2 – 226:10; **Ex. 59** (Gilley Tr.) at 67:13 – 69:21, 78:20 – 80:8, 83:16 – 84:1, 86:14 – 89:9, 90:20 – 92:6, 93:11 – 94:11, 95:10-15, 99:11 – 100:6, 101:3-12; **Ex. 62** (Gilley Dep. Ex. 9) at 003-008; **Ex. 63** (Gilley Dep., Exs. 22-28) (Challenge 2016-2023 budgets showing amounts received from Tarrant County); **Ex. 37** (Giese Tr.) at 130:12-24, 161:8-11, 162:3 – 165:22, 168:23 – 169:25; **Ex. 52** (Pelletier Tr.) at 63:9 – 64:5, 84:18 – 86:15, 89:3-18, 90:16 – 94:7, 116:3 – 117:21, 118:11-15, 119:18 – 124:21, 125:25 – 128:18, 137:24 – 138:24; **Ex. 53** (Reyes Tr.) at 61:23 – 62:4, 74:11-14.

## IV.  ARGUMENT

### A.  PLAINTIFF HAS STANDING TO BRING ITS PUBLIC NUISANCE CLAIMS.

In arguing that Plaintiff lacks standing to bring its public nuisance claims, Albertsons appears to conflate two separate issues: (i) whether Plaintiff has authority under Texas law to bring the claims; and (ii) whether Plaintiff has Article III standing to bring the claims.  The answer to both questions is yes.

#### 1.  Plaintiff is authorized to bring its claims under Texas law.

As a county, Plaintiff is a legal subdivision of Texas and is itself "a corporate and political body."  TEX. CONST. art. XI, § 1; TEX. LOC. GOV'T CODE § 71.001.  Tarrant County is governed by a county commissioners court, "which shall exercise such powers and jurisdiction over all county business, as is conferred by [the Texas] Constitution and the laws of [Texas], or as may be hereafter prescribed."  TEX. CONST. art. V, § 18.  "The duty of the commissioners court is to transact the business, protect the interests, and promote the welfare of the county as a whole." *Canales v. Laughlin*, 214 S.W.2d 451, 454 (Tex. 1948).[34]  The commissioners court is also authorized "to cause suits to be instituted . . . in the name of and for the benefit of the county[.]" *O'Quinn v. McVicker*, 428 S.W.2d 111, 112 (Tex. Civ. App.--Beaumont 1968).  *See also* TEX. LOC. GOV'T CODE § 89.001(a)-(b) (permitting the commissioners court of a county with a population of more than two million to employ attorney as special counsel to represent the county in any suit brought by the county).[35]  Here, the commissioners court of Tarrant County, a county

---

[34] *See also, e.g., El Paso Cnty. v. El Paso Cnty. Emerg. Services Dist. No. 1*, 622 S.W.3d 25, 33 (Tex. App.--El Paso 2020) ("County commissioners courts in the state of Texas have broad powers and duties to govern their respective county in a multitude of 'legislative, executive, administrative, and judicial functions.'") (citation omitted).

[35] *See also Guynes v. Galveston Cnty.*, 861 S.W.2d 861, 863–64 (Tex. 1993) ("As long as the commissioners court does not impinge on the statutory duties of other officials, it retains the implied power to control litigation and choose its legal remedies."); *Guerra v. Weatherly*, 291 S.W.2d 493, 496 (Tex. Civ. App.--Waco 1956) ("The Commissioners Court has authority to cause suits to be instituted in the name of and for the benefit of the county[.]"); *Travis Cnty. v. Matthews*, 235 S.W.2d 691, 697 (Tex. Civ. App.--Austin 1950) ("A county may sue and be sued."); *Brite v. Atascosa Cnty.*, 247 S.W. 878, 880 (Tex. Civ. App.--San Antonio 1923) (as a "body corporate and politic," county "undoubtedly had the power and authority to institute (footnote continues on next page)

with a population of over 2.1 million (MOL at 4), authorized Plaintiff to institute this public nuisance action.  **Ex. 35** (Tarrant County 30(b)(6) Tr.) at 205:9-13.

Although a commissioners court "may exercise broad discretion in conducting county business, the legal basis for any action taken must be grounded ultimately in the constitution or statutes." *Guynes*, 861 S.W.2d at 863.  "Where a right is conferred or obligation imposed on [the commissioners court], it has implied authority to exercise a broad discretion to accomplish the purposes intended." *Anderson v. Wood*, 152 S.W.2d 1084, 1085 (Tex. 1941).[36]  Any constitutional or statutory authority provided to the commissioners court "should be broadly and liberally construed to ascertain the scope of the authority granted either expressly or by necessary implication." *Cosby v. Cnty. Comm'rs of Randall Cnty.*, 712 S.W.2d 246, 248 (Tex. App. 1986).

Significantly, the Texas legislature has expressly stated that "the commissioners court of a county may enforce any law that is reasonably necessary to protect the public health." TEX. HEALTH & SAFETY CODE § 121.003(a).[37]  The legislature has also implicitly recognized the

---

suits"); Tex. Atty. Gen. Op. JM-788 (1987) ("As the executive head of county government, the commissioners court is vested with broad discretion in determining whether and how it will pursue its legal remedies."); TEX. R. CIV. P. 33 ("Suits by . . . a county . . . shall be in its corporate name.").

[36] *See also City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 28 (Tex. 2003) ("When the Constitution or Legislature imposes an obligation on a commissioners court, that commissioners court also has the implied authority to exercise the power necessary to accomplish its assigned duty."); *Guynes*, 861 S.W.2d at 863 (commissioners court "also possesses broad implied powers to accomplish its legitimate directives"); *San Antonio River Auth. v. Shepperd*, 299 S.W.2d 920, 927 (Tex. 1957) ("The general powers so given to the commissioners' court are of little practical value without the further authority to use adequate means to insure the proper, intelligent and effective exercise thereof.") (citation and internal quotation marks omitted); *Terrell v. Sparks*, 135 S.W. 519, 521 (Tex. 1911) ("The grant of an express power carries with it by necessary implication every other power necessary and proper to the execution of the power expressly granted.").

[37] The Office of the Attorney General in Texas has repeatedly affirmed this authority.  *See, e.g.*, Tex. Atty. Gen. Op. GA-0507 (2007) ("Counties are charged generally with providing for the health and welfare of persons within the county.") (citing TEX. HEALTH & SAFETY CODE §§ 121.003(a), 122.001; Tex. Atty. Gen. Op. DM-183 (1992) ("[T]he counties of this state have general authority to provide for the health and welfare of persons within the county.  State (footnote continues on next page)

authority of Texas counties to enforce federal and Texas drug laws.  TEX. LOC. GOV'T CODE § 370.003 ("[T]he commissioners court of a county . . . may not adopt a policy under which the entity will not fully enforce laws relating to drugs, including Chapters 481 and 483, Health and Safety Code, and federal law.").  In the present case, Albertson's wrongful conduct, which violated both federal and Texas drug laws, created a public nuisance in Tarrant County that has unreasonably interfered with public health and safety.  *Supra* at § II.  Plaintiff therefore has the statutory authority to bring its common law public nuisance claims against Albertsons.

Additionally, the Texas legislature authorizes (and in certain circumstances, obligates) Tarrant County to provide and/or fund certain governmental services.  *See, e.g.,* TEX. HEALTH & SAFETY CODE § 122.001 ("The commissioners court of a county may appropriate and spend money from the county general revenues for public health . . . in the county."); TEX. HEALTH & SAFETY CODE § 61.022 (requiring counties to provide health care assistance "to each of its eligible county residents" to the extent "other adequate public or private sources of payment are not available"); TEX. GOV'T CODE § 123.002 (authorizing the establishment of various types of drug court programs); TEX. GOV'T CODE § 123.007 (authorizing the utilization of "other drug awareness programs to treat persons convicted of drug or alcohol related offenses"); TEX. LOC. GOV'T CODE § 351.001(a) ("The commissioners court of a county shall provide safe and suitable jails for the county.").[38]

---

law authorizes the county commissioners court to exercise control over health . . . matters concerning the county and its residents.").

[38] *See also, e.g.,* TEX. GOV'T CODE § 125.002 (authorizing establishment of mental health court programs); TEX. LOC. GOV'T CODE § 81.027 (authorizing county to "provide for the support of paupers, residents of their county, who are unable to support themselves"); TEX. LOC. GOV'T CODE § 111.094 (determining amount of county funds to be spent on juvenile probation department); TEX. LOC. GOV'T CODE § 351.045(a) (authorizing county to "appoint, contract for, or employ licensed physicians, dentists, or other health care providers to provide health care services to inmates in the custody of the sheriff"); TEX. HEALTH & SAFETY CODE § 61.0285 (authorizing county to "provide other medically necessary services of supplies that the county determines to be cost-effective"); TEX. HEALTH & SAFETY CODE § 121.006(b) (county "may not deny public health services to an individual because of inability to pay for the services"); (footnote continues on next page)

"The powers the Legislature confers on counties and commissioners courts are duties rather than privileges." *City of San Antonio*, 111 S.W.3d at 28.  And Tarrant County has the implied authority to exercise any powers necessary to accomplish these duties.  *See Anderson*, 152 S.W.2d at 1085; *supra* at fn. 36.  Here, the public nuisance caused by Albertsons' wrongful conduct has significantly strained Tarrant County's resources and its ability to provide necessary governmental services to its residents.  *Supra* at § II.C.  Thus, Tarrant County has the implied authority to bring a common law claim against Albertsons to abate the public nuisance that has impaired Tarrant County's ability to comply with its statutory duties.[39]  Notably, in the Texas state court opioid litigation, the trial court rejected similar arguments that the county plaintiffs lacked the authority to bring public nuisance claims against opioid manufacturers, distributors, and pharmacies. *See, e.g., County of Dallas v. Pharma*, No. 2018-77098, 2019 WL 13401835, at *1 (Tex.Dist. June 06, 2019) (denying Manufacturer Defendants' First Amended Joint Rule 91A Motion); *Manufacturer Defendants' First Amended Joint Rule 91A Motion* at 8-13, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas Opioid Litigation,* No. 2018-77098, 2019 WL 13405504 (Tex. Dist. March 8, 2019).

Albertsons cites *Tuma v. Kerr Cnty.*, 336 S.W.3d 277 (Tex. App.--San Antonio 2010), to support its argument.  MOL at 6.  But *Tuma* is inapposite.  In that case, a county sued two individual defendants under the Dangerous Wild Animals Act for failing to register their dangerous

_____

TEX. HEALTH & SAFETY CODE § 774.003(a) (authorizing county to "provide for emergency ambulance service in the county, including the provision of necessary equipment, personnel, and maintenance for the service"); TEX. FAM. CODE § 264.006 ("The commissioners court of a county may appropriate funds from its general fund or any other fund for the administration of its county child welfare board."); TEX. CODE CRIM. PROC. art. 49.25 (authorizing county to "establish and provide for the maintenance of the office of medical examiner").

[39]  *Cf. Robbins v. Limestone Cnty.*, 268 S.W. 915, 917 (Tex. 1925) (county authorized to bring suit restraining county tax collector from turning over proceeds of motor vehicle tax to state highway department, under authority conferred on counties by law, and under their allegations of right of property and control over public roads within their limits); *Texas C. Partners, LLC v. Grimes Cnty.*, 580 S.W.3d 824, 825-26 (Tex. App.--Hous. [14th Dist.] 2019) (county brought common law public nuisance claim against railroad company for conduct that impaired county's ability to maintain county roads).

wild animals.  *Id*. at 280.  The court held that the county did not have standing to obtain injunctive relief.  *Id*. at 281–82.  The statute at issue "clearly state[d] that only a 'person' who is directly harmed or threatened with harm by a violation can sue to enjoin a violation[,]" and the statute's definition of "person" did "not include counties."  *Id*. at 281.  The court also rejected the county's argument that it had standing under the doctrine of *parens patriae*,[40] finding that the doctrine "does not apply to counties, whose power is derivative and not sovereign."  *Id*. at 282.  The circumstances in *Tuma* are vastly different than those here.  Unlike in *Tuma*, in the present case: (i) Plaintiff has asserted a common law claim, not a statutory claim; (ii) Albertsons' conduct threatened the public health and impaired Plaintiff's ability to comply with its statutory duties; (iii) the Texas legislature has expressly delegated to counties the authority to enforce laws necessary to protect the public health and implicitly delegated to counties the authority to bring common law claims against wrongdoers whose conduct impairs the counties' ability to comply with their statutory duties; (iv) Plaintiff was directly harmed by Albertsons' conduct; and (v) there is no statute expressly excluding counties from being able to bring common law public nuisance claims under these circumstances.  Accordingly, Albertsons' argument that Plaintiff lacks the legal authority to bring its claims should be rejected.

## 2.  Plaintiff has Article III standing to bring its claims.

Plaintiff also has standing to bring its claims under Article III of the United States Constitution.  To establish standing, a plaintiff must show: (i) it suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Albertsons argues that Plaintiff cannot demonstrate an "injury in fact" sufficient to establish Article III.[41]  Not so.

---

[40]  "Under this doctrine, a state in its sovereign capacity may, in a proper case, maintain a suit on behalf of its citizens for the protection of their rights."  *Id*.

[41]  Albertsons does not argue in its motion that Plaintiff is unable to satisfy the causation or redressability elements of Article III standing.

Plaintiff has suffered, and continues to suffer, actual and imminent injuries that are concrete and particularized because of Albertsons' wrongful conduct.  A concrete injury is one that is "real, and not abstract."  *Id.* at 424.  *See also Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist.").  Even "an 'identifiable trifle' of injury" will be "sufficient for standing purposes so long as it is concrete."  *Throndson v. Huntington Nat'l Bank*, No. 2:19-CV-1789, 2020 WL 3448281, at *7 (S.D. Ohio June 24, 2020) (quoting *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 690 n.14 (1973)).

 "Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms[.]"  *TransUnion*, 594 U.S. at 417 (quoting *Spokeo*, 578 U.S. at 340-41).  Certain injuries, such as monetary injuries, are indisputably concrete.  *See id.* at 425 ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."); *El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 338 (5th Cir. 2020) ("[E]conomic injury is a quintessential injury upon which to base standing.").  But an injury need not be tangible to be concrete.  *See TransUnion*, 594 U.S. at 425 ("Various intangible harms can also be concrete."); *Spokeo*, 578 U.S. at 340 ("Although tangible injuries are perhaps easier to recognize, we have confirmed in many of our previous cases that intangible injuries can nevertheless be concrete.").  When determining whether an intangible injury is concrete, courts look to whether there is "a close historical or common-law analogue for the[ ] asserted injury."  *TransUnion*, 594 U.S. at 425.

Here, Plaintiff has suffered, and continues to suffer, monetary injuries, as it has needed (and will continue to need) to spend a significant portion of its limited financial resources on efforts to address and abate the opioid crisis that resulted from Albertsons' wrongful conduct.  *Supra* at § II.C.  But Plaintiff has also suffered, and will continue to suffer, the intangible injury of the nuisance itself.  *Id.*  Numerous courts have recognized a nuisance as a historically cognizable injury

16

in fact.[42]  Indeed, under Texas law, the term "nuisance" refers "not to a cause of action or to the defendant's conduct or operations, but instead to the particular type of *legal injury* that can support a claim or cause of action seeking legal relief."  *Crosstex N. Texas Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 594 (Tex. 2016) (emphasis in original).

Plaintiff's injuries are not conjectural or hypothetical;[43] they have actually occurred and will continue to occur unless the public nuisance is abated.  *Supra* at § II.C.  Plaintiff's injuries are also particularized.  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Spokeo*, 578 U.S. at 339–40 (citation omitted).  Notably, "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."  *Id.* at 339 n.7.  The strains on Plaintiff's resources and its ability to provide necessary governmental services to its residents are injuries distinct to Plaintiff.  Indeed, this Court has repeatedly rejected similar Article III standing arguments raised in cases brought by other governmental plaintiffs in this MDL.[44]

The present case is also distinguishable from *El Paso*, 982 F.3d 332, which Albertsons

---

[42] *See, e.g., Throndson*, 2020 WL 3448281, at *7 ("[H]istorical practice suggests that any intangible nuisance . . . injury Plaintiff suffered as a result of Defendant's alleged violation is sufficiently concrete for Article III purposes."); *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690-91 (5th Cir. 2021) ("We conclude Cranor has alleged a cognizable injury in fact: nuisance arising out of an unsolicited text advertisement. . . . Cranor's asserted injury has a close relationship to a harm actionable at common law: public nuisance."); *Callier v. MultiPlan, Inc.*, No. EP-20-CV-00318-FM, 2021 WL 8053527, at *9 (W.D. Tex. Aug. 26, 2021) ("The injury to Plaintiff's privacy interest has a historical analog: public nuisance.").

[43] An injury in fact must be "actual or imminent, not conjectural or hypothetical."  *Spokeo*, 578 U.S. at 339.

[44] *See, e.g.,* Dkt. #1025 (CT1 R&R) at 101 ("Plaintiffs' allegations of extraordinary increases in public expenditures on hospitals, law enforcement, emergency and first responders, treatment of infants born with opioids-related medical conditions, and the criminal justice system constitute injury in fact."), *adopted in relevant part*, Dkt. #1203 (CT1 MTD Order) at 1-2; Dkt. #4295 (CT3 Rule 50(b) Order) at 49-50; Dkt. #3285 (*Monroe* MTD Order) at 7.  *See also City and Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 632–33 (N.D. Cal. 2020) (city's incurrence of extraordinary municipal costs resulting from pharmacy's opioid dispensing conduct constituted Article III injury in fact).

cites in support of its argument (MOL at 7).  *El Paso* did not involve a public nuisance claim; rather, in that case, the county plaintiff sued the federal government for taking funds appropriated for counterdrug activities and military construction projects and reallocating them to fund the construction of a border wall.  982 F.3d at 335-37.  The Fifth Circuit rejected the county's argument that its alleged economic injuries caused by the cancellation of a particular military construction project constituted a cognizable injury in fact.  *Id*. at 338-43, 345-47.  The court found that the county was "not directly harmed by the [project's] cancellation" and, as a political subdivision of the state, [it] could not assert the economic injuries of its citizens on their behalf as *parens patriae*."  *Id*. at 338.  The court was unconvinced by the county's argument that "the cancellation of the project w[ould] reduce the county's tax revenues," holding that "a county's loss of general tax revenues *as an indirect result of federal policy* is not a cognizable injury in fact."  *Id*. at 338-39 (emphasis added).  The court reasoned that "federal policies will inevitably have an economic impact on local governments[;]" thus, "more than an incidental economic impact [is required] to establish a cognizable injury."  *Id*. at 340.  As the county failed to show a direct link between its tax losses and the challenged action, it failed to establish a cognizable injury in fact.  *Id*. at 341.

Unlike in *El Paso*, the conduct forming the basis of Plaintiff's claims is not the implementation of a federal policy, but rather the creation of a public nuisance by Albertsons' wrongful distribution and dispensing of prescription opioids.  And, as explained above, this conduct has directly injured Plaintiff.  *Supra* at § II.C.  *El Paso* is therefore inapposite.

Finally, Albertsons claims that Plaintiff's argument that it "has suffered particular and direct harm sufficient to create Article III standing" is incompatible with "the argument Plaintiff must make to maintain its public nuisance claim: that [it] is suing because it is attempting to abate a right that has been infringed which is ''common to the *general public*.''  MOL at 7 (citations omitted).  Albertsons appears to believe that the fact that Plaintiff has suffered its own harms as a result of the public nuisance somehow means that it cannot establish that it is suing based on an interference with a public right.  That simply is not so.  It is well established that even *private* plaintiffs can bring a public nuisance action (which, by definition, must involve an interference

with a public right), if they can demonstrate a special injury resulting from the nuisance that is not suffered by the public at large.[45]  A fortiori, Tarrant County, a public entity, certainly has standing to assert a public nuisance claim when it has likewise suffered its own direct injuries from the opioid epidemic.

**B.    THE TEXAS REGULATORY CONSISTENCY ACT NEITHER PRECLUDES NOR PREEMPTS PLAINTIFF'S PUBLIC NUISANCE CLAIMS.**

Albertsons next argues that Plaintiff's common-law public nuisance claims are preempted by the TRCA.  MOL at 8-10.  This argument is entirely without merit.  The TRCA, enacted in 2023,[46] states:

> Unless expressly authorized by another statute, a municipality or county may not adopt, enforce, or maintain an ordinance, order, or rule regulating conduct in a field of regulation that is occupied by a provision of this code.  An ordinance, order, or rule that violates this section is void, unenforceable, and inconsistent with this code.

TEX. OCC. CODE § 1.004.[47]  Albertsons claims that because pharmacies are regulated by the Texas Pharmacy Act, found in the Texas Occupations Code (TEX. OCC. CODE §§ 551 *et seq.*), the TRCA precludes Plaintiff's common-law public nuisance claims based on Albertsons' distribution and dispensing conduct.  MOL at 8-10.  But Albertsons' argument is belied by both the TRCA's plain

---

[45] *See Jamail v. Stoneledge Condo. Owners Ass'n*, 970 S.W.2d 673, 676 (Tex. App.--Austin 1998); *McQueen v. Burkhart*, 290 S.W.2d 577, 579 (Tex. Civ. App.--Austin 1956); *Boyd v. Schreiner*, 116 S.W. 100, 105 (Tex. Civ. App. 1909); *United Food and Com. Workers Intl. Union v. Wal-Mart Stores, Inc.*, No. 02-15-00374-CV, 2016 WL 6277370, at *8 (Tex. App.-- Fort Worth Oct. 27, 2016) ("Although the general public suffered an interference with the public right of travel and resulting inconvenience from the labor organizations' actions in public roadways, Walmart suffered injuries to its business interests, different in kind and degree than that of the general public.").

[46] The TRCA became effective on September 1, 2023, more than two years after Plaintiff sued Albertsons in this case.  Dkt. #3739 (Supp. & Amended Complaint).  Notably, there is no indication that the Texas Legislature intended the statute to be retrospective.  TEX. GOV'T CODE § 311.022 ("A statute is presumed to be prospective in its operation unless expressly made retrospective."); *Cash Am. Intern. Inc. v. Bennett*, 35 S.W.3d 12, 17 n.3 (Tex. 2000).

[47] Incidentally, the only case that has addressed this statutory provision held it to be unconstitutional.  *See City of Houston v. State of Texas*, No. D-1-GN-23-003474, 2023 WL 5618634, at *1 (Tex.Dist. Aug. 30, 2023).  That decision is currently on appeal.

language and its purpose.

> When interpreting a statute, the court's analysis must begin with the statutory text:

> We look to the plain meaning of the words in a statute as an expression of legislative intent.  "If the statute is clear and unambiguous, we must read the language according to its common meaning 'without resort to rules of construction or extrinsic aids.'"

*Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 45-46 (Tex. 2015) (internal citation omitted).

Moreover, courts "cannot ignore the well-established presumption that when construing a statute the Legislature's choice of words is important and each and every word has significant meaning and purpose."  *La Cour Du Roi, Inc. v. Montgomery Cnty.*, 698 S.W.2d 178, 187 (Tex. App.--Beaumont 1985).  A statute also will not be construed to abrogate the common law unless the legislature clearly expressed that intent.  *See Abutahoun*, 463 S.W.3d at 51; *Cash Am.*, 35 S.W.3d at 16 ("A statute that deprives a person of a common-law right 'will not be extended beyond its plain meaning or applied to cases not clearly within its purview.'") (citation omitted); *Longhorn Creek Ltd. v. Gardens of Connemara Ltd.*, 686 S.W.3d 418, 429 (Tex. App.--Dallas 2024) ("For a statutory provision to preempt a common law principle or claim, the statute must 'directly conflict' with the principle.") (citation omitted).

The TRCA's plain language makes clear that Plaintiff's claims do not fall within its scope. Plaintiff is not seeking to "adopt, enforce, or maintain an ordinance, order, or rule regulating conduct[.]"  TEX. OCC. CODE § 1.004.[48]  Rather, Plaintiff is bringing a common-law tort action under Texas state law.[49]  There is nothing in the text of the statute precluding such an action. *Cf. Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 519 (1992) (recognizing that "the term

---

[48]  The present case is entirely different from *City of Webster v. Signad, Inc.*, which dealt with the constitutionality of a city ordinance and has nothing to do with the TRCA.  682 S.W.2d 644, 645–48 (Tex. App.--Hous. [1st Dist.] 1984).

[49]  Moreover, Plaintiff is authorized by statute to bring its common law claim.  TEX. HEALTH & SAFETY CODE § 121.003(a).  The TRCA does not apply when the county's action is "expressly authorized by another statute[.]"  TEX. OCC. CODE § 1.004.  *See also* 2023 Tex. Sess. Law Serv. Ch. 899 (H.B. 2127), § 4(1) ("This Act: (1) may not be construed to prohibit a . . . county from . . . carrying out any authority expressly authorized by statute[.]").

'regulation' most naturally refers to positive enactments by [legislatures or government agencies], not to common-law damages actions"); *Horton v. Kansas City S. Ry. Co.*, 692 S.W.3d 112, 152 (Tex. 2024) (Busby, J. concurring) (noting "ordinary common-law tort claims" are distinct from "statutes, ordinances, and regulations"); *GTE Mobilnet of S. Texas Ltd. Partn. v. Pascouet*, 61 S.W.3d 599, 611 (Tex. App.--Hous. [14th Dist.] 2001) ("Common-law damage claims are not the same as a state statute or regulation that prohibits [the defendant] from taking actions that the [federal statute] expressly permits.").  Notably, the Texas legislature has repeatedly distinguished "common law" from "orders," "rules," and "ordinances" in other statutes.  *See* TEX. LOC. GOV'T CODE § 284.002(7) ("'Law' means *common law or* a federal, state, or *local* law, statute, code, *rule*, regulation, *order*, or *ordinance*.") (emphasis added).[50]

Albertsons' interpretation of the TRCA also does not comport with the purpose of the statute as set forth in its legislative history.  *See GTE Mobilnet*, 61 S.W.3d at 609 n.2 ("We must reject any statutory interpretation that defeats the legislative purpose.").  In passing the statute, the legislature found that:

(1) the state has historically been the exclusive regulator of many aspects of commerce and trade in this state;

(2) in recent years, several local jurisdictions have sought to *establish their own regulations* of commerce *that are different than the state's regulations*; and

(3) the local *regulations* have led to a patchwork of *regulations* that *apply inconsistently* across this state.

2023 Tex. Sess. Law Serv. Ch. 899 (H.B. 2127) at § 2 (emphasis added).  Thus, the TRCA's purpose "is to provide statewide consistency by returning sovereign *regulatory* powers to the state

---

[50] *See also, e.g.,* TEX. HEALTH & SAFETY CODE § 437.027(d)-(e) ("(d) This section does not create a private cause of action or change any *common law* or statutory duty.  (e) Notwithstanding any other law, a county . . . may not adopt or enforce an *order*, *ordinance*, *rule*, or other measure related to food allergens . . .") (emphasis added); TEX. HEALTH & SAFETY CODE § 757.015(a) ("The duties established by this chapter . . . supersede those established by *common law*, . . . and local *ordinances* . . .") (emphasis added); TEX. PROP. CODE § 92.208 ("The duties of a landlord and the remedies of a tenant under this subchapter are in lieu of the *common law*, other statutory law, and local *ordinances* . . .") (emphasis added).

where those powers belong in accordance with [the] Texas Constitution." *Id.* at § 3.

Plaintiff's common-law public nuisance action does not implicate any of the legislature's concerns. Plaintiff is not seeking to establish its own county-specific pharmacy regulations, let alone pharmacy regulations that differ from the Texas Pharmacy Act (or any other Texas regulations). Rather, it is simply seeking to enforce Texas common law, which applies consistently and uniformly across the State, against a defendant that created a public nuisance. Nor is Plaintiff's public nuisance action inconsistent with the Texas Pharmacy Act. Indeed, much of Albertsons' dispensing conduct that created the public nuisance (*supra* at § II.A) is actually *unlawful* under the Texas Pharmacy Act, the express purpose of which "is to promote, preserve, and protect the public health, safety, and welfare . . . through effectively controlling and regulating the practice of pharmacy[.]" TEX. OCC. CODE § 551.002(c)(1); 22 TEX. ADMIN. CODE § 291.29.

Albertsons argues that tort litigation is a form of regulation that falls within the preemptive scope of the TRCA. MOL at 9-10. To support this argument, Albertsons cites several inapposite federal preemption cases involving federal statutes using entirely different language.[51] But how a particular statute should be interpreted is dependent on the precise words used in that statute. *See Abutahoun*, 463 S.W.3d at 45-46; *Tuma*, 336 S.W.3d at 280 ("[W]hen construing a statute, we look to the language of the statute as the truest manifestation of legislative intent."); *La Cour*, 698

---

[51] *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 321–24 (2008) (where federal statute expressly preempted state "*requirements*" "different from, or in addition to, any requirement applicable . . . to the device" under federal law, court held that "[a]bsent other indication, reference to a State's '*requirements*' includes its common-law duties"; the court noted, however, that state common-law duties that paralleled the federal requirements would not be preempted) (emphasis added); *Cipollone*, 505 U.S. at 520-21 (holding federal statute that expressly preempted any "*requirement or prohibition* . . . imposed under State law" preempted certain common-law claims: "The phrase '[n]o *requirement or prohibition*' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules") (emphasis added). Moreover, two of Albertsons' cited cases did not even involve express preemption and, thus, have no bearing on the question at issue here. *See Wyeth v. Levine*, 555 U.S. 555, 563-64, 568-81 (2009) (conflict preemption case); *BIC Pen Corp. v. Carter*, 251 S.W.3d 500, 504–09 (Tex. 2008) (same).

22

S.W.2d at 187.  Here, the TRCA narrowly conscribes its scope to "ordinances," "orders," or "rules" that "regulat[e] conduct[.]"  TEX. OCC. CODE § 1.004.

Moreover, even if the statute had used broader terms, such as "regulations" or "laws," it would not have preempted Plaintiff's common law tort action.  In a recent federal preemption case, the Texas Supreme Court stated:

> As we have previously recognized, although "the term 'law' can include both common law and statutory law" and "jury awards can have an effect akin to regulation," generally, such a "regulatory effect is not as direct as that of positive enactments," and thus a federal law that preempted state "laws and regulations" did not preempt state common-law claims.

*Horton*, 692 S.W.3d at 131 (citation omitted).  The court emphasized "the narrow scope of a statutory reference to laws that 'regulate' a subject matter."  *Id*. at 130 (citation omitted).[52]  For a particular law to "regulate" an industry, it is not sufficient that it has "an incidental effect" on the industry; rather, it "must be *specifically directed toward* that industry."  *Id*. at 130–31 (emphasis in original).  Thus, "a common-law negligence claim does not ordinarily 'regulate' rail transportation because it is not specifically directed toward rail transportation and only incidentally affects rail transportation when the alleged tortfeasor happens to be a rail carrier."  *Id*. at 131.  Similarly, here, a common-law nuisance claim does not "regulate" the practice of pharmacy because it is not directed toward the pharmacy industry and only incidentally affects that industry in this case because Albertsons happens to be a pharmacy.

For these reasons, the TRCA has no bearing on Plaintiff's common-law public nuisance claims.  Albertsons' arguments that the statute preempts or precludes such claims should be rejected.

---

[52] The court distinguished the case before it from *Cipollone*: "[I]n *Cipollone*, the federal law at issue preempted any '*requirement or prohibition* . . . imposed under state law,' not any state law that 'regulated' the subject matter.  The [Supreme] Court concluded this 'broad' language, not any reference to 'regulation,' effected preemption of state common-law claims."  *Id*. at 131 n.19 (emphasis in original) (internal citation omitted).

## C. ALBERTSONS' WRONGFUL DISTRIBUTION AND DISPENSING OF PRESCRIPTION OPIOIDS CAN CONSTITUTE A PUBLIC NUISANCE UNDER TEXAS LAW.

Albertsons argues that, unlike in Ohio, Texas public nuisance claims can be based on only two circumstances: "(1) conduct which offends a property interest, most typically interference with public property; and (2) conduct which the State of Texas or one of its municipalities has legislatively deemed to constitute a nuisance."  MOL at 10.  Albertsons further argues that the Court should not expand Texas law to allow public nuisance claims based on the lawful distribution and sale of a product.  *Id.* at 10-11.  Both arguments should be rejected.

Texas nuisance law does differ from Ohio nuisance law in one way.  In Ohio, nuisance is a cause of action, while in Texas "the term 'nuisance' refers not to a cause of action or to a defendant's conduct but to the legal injury that the conduct causes and that gives rise to the cause of action."  *Crosstex*, 505 S.W.3d at 604.[53]  But that is where the differences end.  Just like in Ohio, Texas courts rely on the Restatement (Second) of Torts § 821B in defining a public nuisance (as Albertsons itself acknowledges, MOL at 11, 14).  *See, e.g., Texas C. Partners*, 580 S.W.3d at 827; *Jamail*, 970 S.W.2d at 676; *Cox v. City of Dallas, Tex.*, 256 F.3d 281, 289 (5th Cir. 2001); *Callier*, 2021 WL 8053527, at *9 & n.113.  And just like in Ohio, Texas courts distinguish between private nuisances (which are limited to injuries to property) and public nuisances (which involve injuries to public rights).[54]

---

[53] Thus, in Texas, "[w]hether a defendant may be held liable for causing a nuisance depends on the culpability of the defendant's conduct, in addition to proof that the interference is a nuisance."  *Id.*

[54] *See, e.g., Crosstex*, 505 S.W.3d at 591 n.3 ("The common law also recognizes a claim for 'public nuisance,' which generally addresses conduct that interferes with 'common public rights' as opposed to private individual rights.  Although a public nuisance may also be a private nuisance, they are two distinct conditions with different requirements and limitations.") (internal citation omitted); *Riley v. Angelle*, No. 01-20-00590-CV, 2022 WL 3092892, at *4 (Tex. App.--Hous. [1st Dist.] Aug. 4, 2022) ("A public nuisance 'affects the public at large,' while a private nuisance 'is a non-trespassory invasion of another's interest in the private use and enjoyment of land.'); *Cox*, 256 F.3d at 289 ("'A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land.'  A public nuisance, on the other hand, involves an unreasonable interference with a right common to the general public. In determining whether conduct amounts to a public nuisance, courts consider, *inter alia*, (footnote continues on next page)

Notably, Albertsons does not cite a single case that states that Texas public nuisance claims are limited to interferences with property or legislatively-deemed nuisances. This is unsurprising, as Texas courts consistently define "public nuisance" in much broader terms (*i.e.*, as an unreasonable interference with a right common to the general public). *See Lake Travis Indep. Sch. Dist. v. Lovelace*, 243 S.W.3d 244, 255–56 (Tex. App.--Austin 2007) ("As this court has explained, a public nuisance must amount to 'an unreasonable interference with a right common to the general public.' The District pled facts sufficient to show that the Lovelace's conduct unreasonably interfered *with a public right of District taxpayers to a public education for their children* and that the excessive drains on District staff time and resources had affected all or a considerable part of the District community.") (emphasis added) (internal citation omitted);[55] *see also, e.g., Texas C. Partners*, 580 S.W.3d at 827; *Jamail*, 970 S.W.2d at 676; *Prantil v. Arkema Inc.*, 986 F.3d 570, 577 n.30 (5th Cir. 2021); *Riley*, 2022 WL 3092892, at \*4; *Callier*, 2021 WL 8053527, at \*9; *cf. State v. Spartan's Industries, Inc.*, 447 S.W.2d 407, 413 (Tex. 1969) (a nuisance in fact is one that "endangers the public health, public safety, public welfare, or offends the public morals").

Albertsons claims that the Court should not expand Texas law to allow public nuisance claims based on the lawful distribution and sale of a product. MOL at 10-11.[56] But no expansion of Texas law is necessary. As previously noted, Texas courts have broadly defined "public

---

whether the conduct involves a significant interference with public health, safety, peace, comfort, or convenience.") (internal citations omitted).

[55] The *Lake Travis* court ultimately determined that the plaintiff's common-law public nuisance claim was preempted by a Texas statute in that case, but it rejected the defendant's argument that the claim was groundless or frivolous. *Id.* at 254-56.

[56] Plaintiff disputes that Albertsons' distribution and dispensing conduct was lawful. The evidence demonstrates that such conduct violated both the CSA and Texas law. *Supra* at § II.A-B; Dkt. #2483 (CT1 CSA MSJ Order) at 5-19; Dkt. #3403 (CT3 MTD Order) at 13-25, *clarified on denial of reconsideration*, Dkt. #3499 (CT3 Order Denying Reconsideration) at 4-7. Regardless, proving a defendant's conduct is unlawful is not a required element of a nuisance claim under Texas law. *See Crosstex*, 505 S.W.3d at 602 n.12 ("[I]t is beyond well-established in Texas that the plaintiff need not prove that the defendant's conduct was illegal or unlawful, and the fact that the conduct was lawful provides no defense to the claim.").

nuisance" as an unreasonable interference with a right common to the general public.  *Supra*.
An unreasonable interference with public health and safety caused by Albertsons' intentional
and/or negligent distribution and dispensing conduct falls squarely within the well-established
parameters of a common-law public nuisance claim under Texas law.  Indeed, in the Texas state
court opioid litigation, the trial court rejected the very same arguments Albertsons makes here.
*See, e.g., County of Dallas v. Pharma*, No. 2018-77098, 2019 WL 13401834, at *1 (Tex.Dist. June
06, 2019) (denying Distributors' First Amended Rule 91A Motion to Dismiss); *Distributors' First
Amended Joint Rule 91A Motion* at 28-31, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas
Opioid Litigation,* No. 2018-77098, 2019 WL 13405501 (Tex. Dist. March 29, 2019).

Significantly, Albertsons acknowledges that the sale of products has been *legislatively*
deemed to be a public nuisance in certain circumstances.  MOL at 11 (citing *State v. Cook United,
Inc.*, 464 S.W.2d 105 (Tex. 1971); *Spartan's*, 447 S.W.2d 407; *Stoughton v. City of Ft. Worth*,
277 S.W.2d 150 (Tex. Civ. App.--Fort Worth 1955); *Parker v. City of Ft. Worth*, 281 S.W.2d 721
(Tex. Civ. App.--Fort Worth 1955)).  But the Texas Supreme Court has clearly stated that "[n]ot
even the Legislature can declare that a nuisance which is not so in fact."  *Crossman v. City of
Galveston*, 247 S.W. 810, 812 (Tex. 1923).  *See also Spartan's*, 447 S.W.2d at 413 ("It is true that
the Legislature may not validly declare something to be a nuisance which is not so in fact, but
that depends upon the question of whether that which is declared to be a nuisance *endangers the
public health, public safety, public welfare, or offends the public morals*.") (emphasis added);
*Stockwell v. State*, 221 S.W. 932, 934 (Tex. 1920); *Stoughton*, 277 S.W.2d at 152.  If the sale of a
product could never be a public nuisance under Texas common law, then statutes or ordinances
deeming such conduct a nuisance would never be valid.  Yet Texas courts have repeatedly held
otherwise.  *See, e.g., Spartan's*, 447 S.W.2d at 413-14 (upholding statute deeming the sale of
certain goods on consecutive days of Saturdays and Sundays as a public nuisance); *Stoughton*,
277 S.W.2d at 152-54 (upholding ordinance deeming the sale of fireworks within 5,000 feet of
plaintiff's city limits to be a nuisance and noting that the Texas Court of Criminal Appeals had
sustained a similar ordinance); *Parker*, 281 S.W.2d at 722-25 (same).

Finally, after emphasizing the uniqueness of Texas law (MOL at 10), Albertsons relies on a handful of non-Texas cases to support its argument that product-based public nuisance claims should not be permitted (*id*. at 13-15).  The Court has addressed many of these cases before, and should reject their application in the present case.

In *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021), the Oklahoma Supreme Court held that, under Oklahoma's nuisance *statute*, an opioid manufacturer could not be held liable for public nuisance based on its manufacturing, marketing, and selling of prescription opioids.  *Id*. at 723-25.  The court relied on "100 years" of Oklahoma precedent interpreting its public nuisance statute to apply only to criminal conduct or harm to property, along with the Restatement (Third) of Torts in Liability for Economic Harm § 8 cmt. g.  *Id*. at 724-26.[57] In *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408 (S.D.W. Va. 2022), Judge Faber relied on the same Restatement (Third) comment (§ 8 cmt. g) and West Virginia case law to find that West Virginia public nuisance law applied only "in the context of conduct that interferes with public property or resources."  *Id*. at 472.  But Judge Faber's opinion contradicts numerous decisions by the Mass Litigation Panel in the West Virginia state court opioid case, which has consistently rejected the notion that public nuisance claims under West Virginia law are limited to interferences with property interests and cannot be based on the marketing or sale of products.  *See In re Opioid Litigation*, No. 21-C-9000 PHARM, 2022 WL 17999510, at *11-13 (W.Va.Cir.Ct. Nov. 15, 2022); *In re Opioid Litigation*, No. 21-C-9000 PHARM, 2022 WL 17999513, at *17-18 (W.Va.Cir.Ct. July 11, 2022); *In re Opioid Litigation*, No. 21C9000DISTRIBUTOR, 2022 WL 18028767, at *1–5 (W.Va.Cir.Ct. June 09, 2022). Notably, *City of Huntington* is currently on appeal, with this very issue having recently been certified to the West Virginia Supreme Court of Appeals.  *See City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*, 96 F.4th 642, 644 (4th Cir. 2024).

---

[57] Plaintiff has been unable to find any Texas case that even cites, let alone adopts, this Restatement provision.

The Rhode Island, North Dakota, and Illinois cases cited by Albertsons are similarly distinguishable and/or, respectfully, wrongly decided.[58]  Albertsons also cites a recent case where a Superior Court of Alaska judge (Judge Gandbhir), applying Alaska law, dismissed public nuisance claims against it and other pharmacy defendants based on their distribution and dispensing of prescription opioids.  MOL at 14 (citing *State v. Walgreen Co.*, No. 3AN-22-06675 CI, 2024 WL 1178352 (Alaska Super. Mar. 01, 2024)).[59]  Significantly, Judge Gandbhir's decision was recently deemed an "outlier" by an Alaska federal court, which held:

> Based on the Alaska Supreme Court's adherence to the Restatement (Second) of Torts and the strong trend of Alaska Superior Court decisions allowing public nuisance claims in parallel contexts, this Court concludes that public nuisance claims need not be property-based and a claim may be based on the use of a lawful product under Alaska law.

*Alaska v. Express Scripts, Inc.*, No. 3:23-CV-00233-JMK, 2024 WL 2321210, at *2-4 (D. Alaska May 22, 2024).  Among other things, the court rejected Judge Gandbhir's reliance on *Beretta*.  *Id.*

---

[58]  In *State v. Lead Industries, Ass'n, Inc.*, the court rejected a public nuisance claim under Rhode Island law against lead paint manufacturers because the plaintiff could not establish that defendants had interfered with a public right or were in control of the lead paint they manufactured at the time it injured children.  951 A.2d 428, 435-36 (R.I. 2008).  The court noted that the proper means of holding a *manufacturer* of unsafe products responsible was through a product liability action rather than a public nuisance action.  *Id.* at 456.  In *City of Chicago v. Beretta U.S.A. Corp.*, the court affirmed the dismissal of a public nuisance action under Illinois law against gun manufacturers, distributors, and dealers based on their *lawful* sale of guns because the plaintiffs failed to satisfy numerous elements of the claim.  821 N.E.2d 1099, 1109, 1148 (Ill. 2004).  The court noted that Illinois precedent had only ever found a public nuisance to exist when the defendant's conduct involved the use of land or was in violation of a statute or ordinance.  *Id.* at 1117.  The plaintiffs in that case also conceded that their public nuisance claim "would extend public nuisance liability further than it has been applied in the past."  *Id.* at 1118.  Indeed, it is the plaintiffs' concession that Albertsons quotes in its motion.  MOL at 15.  Finally, in *State Ex Rel. Stenehjem v. Purdue Pharma L.P.*, the court held that North Dakota's public nuisance *statute* did not extend to situations involving the sale of goods, noting that prior North Dakota cases applying the statute all involved injuries to property.  No. 08-2018-CV-01300, 2019 WL 2245743, at *12-13 (N.D. Dist. May 10, 2019).  The court further found that the opioid manufacturer defendant had no control over its product after it was sold.  *Id.* at *13.

[59]  As in *Hunter* and *City of Huntington*, the court relied in part on the same Restatement (Third) comment (§ 8 cmt. g).  2024 WL 1178352, at *3 & n.22.

at *4 ("[T]his Court does not find the Illinois Supreme Court's decision in *Beretta* persuasive here, as the public rights at stake are not 'so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it.'") (quoting *Beretta*, 821 N.E.2d at 1114–16).

Ultimately, whether these other state court cases correctly interpreted their own state public nuisance law is irrelevant.  What matters here is *Texas* public nuisance law, which, as discussed above, encompasses all unreasonable interferences with public rights, regardless of whether or not a product is involved.  Thus, Albertsons' argument that Plaintiff's claims are not cognizable under Texas public nuisance law should be rejected.

### D.  ALBERTSONS OWED TARRANT COUNTY A LEGAL DUTY.

Albertsons argues that Plaintiff's negligent creation of a nuisance claim fails because Plaintiff cannot demonstrate that Albertsons owed Plaintiff a duty under Texas law.  Not so. Albertsons owed a common law duty not to expose Plaintiff to a foreseeable risk of harm by failing to exercise reasonable care, in accordance with applicable standards of conduct, when distributing and dispensing opioids into Plaintiff's community.

Whether Albertsons owed a duty to Plaintiff is a question of law for the Court.  *See Golden Spread Council, Inc. No. 562 of Boy Scouts of Am. v. Akins*, 926 S.W.2d 287, 289 (Tex. 1996). Generally, under Texas law, "[e]very person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others."  *Lawson v. B Four Corp.*, 888 S.W.2d 31, 34 (Tex. App.-- Hous. [1st Dist.] 1994) (citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311, 315 (Tex. 1987)).[60] *See also Lopez-Flores v. Ibarra*, No. 1:17-CV-00105, 2018 WL 6577955, at *3 (S.D. Tex. Mar. 12, 2018).  Texas courts have also recognized a duty of care to prevent injury to others when a party negligently creates a dangerous situation where it reasonably appeared or should have

---

[60]  In *El Chico*, the court imposed a duty on alcohol providers for injuries to third parties resulting from a patron's intoxication.  732 S.W.2d at 311-12.  That duty was almost immediately superseded by the Texas legislature's enactment of a Dram Shop Act, which now provides the exclusive basis for civil liability against alcohol providers.  TEX. ALCO. BEV. CODE § 2.03. There is no similar statute precluding Plaintiff's common law claims here.

appeared to the party that others in the exercise of their lawful rights might be injured thereby.  *See El Chico*, 732 S.W.2d at 311 (citing *Buchanan v. Rose*, 159 S.W.2d 109, 110 (Tex. 1942)).

When determining whether to impose a duty in a particular set of circumstances, Texas courts balance several interrelated factors:

> We must weigh the risk, foreseeability, and likelihood of injury against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant.  We have also emphasized other factors, including whether one party had superior knowledge of the risk or a right to control the actor who caused the harm.

*Golden Spread*, 926 S.W.2d at 289–90 (internal citation omitted).  Foreseeability, although not determinative, is the "foremost and dominant consideration" in the duty analysis.  *El Chico*, 732 S.W.2d at 311.  *See also Golden Spread*, 926 S.W.2d at 290–91 (where defendant should have foreseen, or did foresee, that it was creating an unreasonable risk of harm by its conduct, this factor will "weigh[ ] heavily in favor of imposing a duty" on the defendant); *Lawson*, 888 S.W.2d at 34 ("Foremost and dominant among these considerations is foreseeability of the risk.").  It is unnecessary for the defendant to have foreseen the precise harm that resulted.  *See El Chico*, 732 S.W.2d at 313.

Here, the relevant factors weigh in favor of imposing a duty of care on distributors and dispensers of prescription opioids, such as Albertsons.  Opioids are highly addictive and dangerous controlled substances, a fact of which Albertsons was well aware.  *Supra* at fn. 5; *see also* 21 U.S.C. § 812(b)(2)-(3).  Congress itself weighed the benefits of such controlled substances against their risks when it enacted the CSA.  *See* 21 U.S.C. § 801(1)-(2) (finding that although controlled substances "have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the American people[,]" "[t]he illegal . . . distribution . . . and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people").  For this reason, those who distribute and dispense prescription opioids are permitted to do so only if they follow strict requirements intended to prevent abuse and diversion.  *See, e.g.,* 21 U.S.C. §§ 822-824, 832, 841; 21 C.F.R. §§ 1301.71(a),

30

1301.74(b), 1306.04(a), 1306.06; *see also* Dkt. #2483 (CT1 CSA MSJ Order) at 5-19; Dkt. #3403 (CT3 MTD Order) at 13-25, *clarified on denial of reconsideration*, Dkt. #3499 (CT3 Order Denying Reconsideration) at 4-7.[61]

Albertsons was well aware of its legal obligations related to the distribution and dispensing of prescription opioids. *Supra* at fns. 4, 16. And it understood that if it failed to exercise reasonable care when distributing and dispensing those drugs, the risk and likelihood of a public nuisance was high. *Id*; *supra* at fns. 5-6; *see also, e.g.,* 21 U.S.C. § 801(2); Tex. Occ. Code § 551.002(c)(1) (purpose of Texas Pharmacy Act is "to promote, preserve, and protect the public health, safety, and welfare through[,]" *inter alia*, "effectively controlling and regulating the practice of pharmacy"). It is reasonably foreseeable that governmental entities (such as Tarrant County) would be forced to bear the public costs of increased harm from the oversupply and diversion of prescription opioids in their communities if Albertsons did not exercise reasonable care in their distribution and dispensing of those drugs.[62] Yet despite this knowledge, Albertsons not only failed to comply with its legal obligations, it took affirmative steps that actually increased the risk and likelihood of a public nuisance in this case. *Supra* at § II; *Golden Spread*, 926 S.W.2d at 291

---

[61] In addition to the federal CSA, the distribution and dispensing of prescription opioids are also regulated under the Texas Controlled Substances Act and the Texas Pharmacy Act. *See, e.g.,* Tex. Health & Safety Code §§ 481.061, 481.071(a), 481.074(a), 481.0764(a), 481.102, 481.112(a), 481.128; Tex. Occ. Code §§ 551 *et seq.*; 22 Tex. Admin. Code § 291.29.

[62] *See, e.g.,* Dkt. #1203 (CT1 MTD Order) at 35 ("[B]y failing to administer responsible distribution practices (many required by law), Defendants not only failed to prevent diversion, but affirmatively created an illegal, secondary opioid market. . . . When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, 'black' market created for those drugs. It is also foreseeable that local governments will be responsible for combatting the creation of that market and mitigating its effect. Thus, the Court affirms the R&R's conclusion that Defendants owe Plaintiffs a common law duty of care."); Dkt. #3285 (*Monroe* MTD Order) at 37; *Cherokee Nation v. Mckesson Corp.*, No. CIV-18-056-RAW, 2021 WL 1200093, at *8 (E.D. Okla. Mar. 29, 2021) ("The court concludes that the Nation has adequately alleged facts demonstrating that Pharmacies owed it a duty because it was foreseeable that negligently failing to prevent the diversion of addictive opioids, including allegedly 'oversupplying the market' with such opioids, would lead to abuse, addiction, and overdoses, and that Nation would pay the price.").

("We have recognized that in some circumstances, at least, a person is under a duty to avoid such an affirmative act that may actually worsen a situation.").

Moreover, imposing a duty of care here would impose little, if any, burden beyond that which the law already imposes. *See El Chico*, 732 S.W.2d at 315 (noting that the burden of imposing a duty on alcoholic beverage licensees to not knowingly sell alcohol to an already intoxicated person was "no more than that already placed upon them by law"). Those who distribute and dispense controlled substances are already obligated to implement effective controls against diversion. *See, e.g.,* 21 C.F.R. §§ 1301.71(a), 1301.74(b); TEX. HEALTH & SAFETY CODE §§ 481.061(b), 481.128(a). And those who dispense controlled substances are already obligated to ensure that such drugs are dispensed pursuant to legitimate prescriptions. *See, e.g.,* 21 C.F.R. §§ 1306.04(a), 1306.06; TEX. HEALTH & SAFETY CODE §§ 481.071(a), 481.074(a), 481.0764(a), 481.128(a); 22 TEX. ADMIN. CODE § 291.29.

Texas courts "consider legislative enactments that evidence the adoption of a particular public policy significant in determining whether to recognize a new common-law duty." *Thapar v. Zezulka*, 994 S.W.2d 635, 639 (Tex. 1999). *See also Golden Spread*, 926 S.W.2d at 291 (finding that the fact that "the Legislature has voiced a strong policy to protect children from abuse" weighed in favor of imposing a duty); *El Chico*, 732 S.W.2d at 312-13 ("The enactment of the Texas Alcoholic Beverage Code and the statutes relating to driving while intoxicated are clear evidence of the Legislature's explicit recognition of the dangers associated with intoxication and the need to protect the public."). Here, in addition to the strict regulation of the distribution and dispensing of prescription opioids at the federal and state level, the Texas legislature has expressly acknowledged that "deaths resulting from the use of opioids and other controlled substances constitute a public health crisis[.]" TEX. OCC. CODE § 168.003.

Albertsons certainly had superior knowledge of the risks, given its extensive distribution and dispensing data showing suspicious orders and illegitimate prescriptions that were likely to be diverted. *Supra* at § II.A-B. Moreover, as the last line of defense in the controlled substance supply chain, pharmacies such as Albertsons are in the best position to prevent the harm, since it

is ultimately their decision whether to dispense the drug.  *See, e.g.,* Dkt. #4241 (CT3 Ps' Rule 50(b) Opp.) at 22 & n.21.

Notably, this Court has repeatedly found that similar circumstances demonstrated the existence of a common law duty of care in other cases in this MDL.  *See, e.g.,* Dkt. #1203 (CT1 MTD Order) at 35; Dkt. #3285 (*Monroe* MTD Order) at 37.  Courts in other opioid cases have found the same.  *See, e.g., Cherokee Nation*, 2021 WL 1200093, at *8; *City of Boston v. Purdue Pharma, L.P.*, No. 1884CV02860, 2020 WL 977056, at *5 (Mass. Super. Jan. 31, 2020); *In re Opioid Litigation*, No. 4000002017, 2018 WL 4827862, at *15–16 (N.Y. Sup. Ct. July 17, 2018).  Indeed, in the Texas state court opioid litigation, the trial court rejected similar lack of duty arguments made by distributor and pharmacy defendants.[63]

Albertsons claims that Texas courts have expressly declined to recognize a common-law duty "for healthcare providers towards third parties for injuries that may be the result of the provider's alleged negligence to the patient."  MOL at 16 (citing *Martinez v. Walgreen Co.*, No. 7:17-CV-309, 2018 WL 3241228 (S.D. Tex. July 3, 2018) ("*Martinez I*"), *aff'd,* 935 F.3d 396 (5th Cir. 2019) ("*Martinez II*")).  But the duty at issue in this case is that of distributors and dispensers of controlled substances to third parties for the foreseeable injuries that may result from their negligent distribution and dispensing of those highly addictive and dangerous drugs.  The circumstances in *Martinez* that led the court not to recognize a duty in that case are distinguishable.

In *Martinez*, a pharmacy dispensed the wrong prescription to a customer.  *Martinez I*, 2018 WL 3241228, at *1.  The medication was one that could expose elderly patients, such as the

---

[63]  *See, e.g., County of Dallas v. Pharma*, No. 2018-77098, 2022 WL 20508747, at *1 (Tex.Dist. Nov. 18, 2022) (denying Pharmacy Defendants' Rule 91A Motion to Dismiss); *County of Dallas v. Pharma*, No. 2018-77098, 2019 WL 13401834, at *1 (Tex.Dist. June 06, 2019) (denying Distributors' First Amended Rule 91A Motion to Dismiss); *Reply Brief in Support of the Pharmacy Defendants' Rule 91A Motion to Dismiss* at 37-40, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas Opioid Litigation,* No. 2018-77098, 2022 WL 20510056 (Tex. Dist. Dec. 9, 2022); *Distributors' First Amended Joint Rule 91A Motion* at 36-39, *County of Dallas v. Purdue Pharma, L.P.; In re: Texas Opioid Litigation,* No. 2018-77098, 2019 WL 13405501 (Tex. Dist. March 29, 2019).

customer, to a risk of hypoglycemia, causing dizziness, blurred vision, and other symptoms.  *Id*.
The customer took the medication before driving, and promptly got into a serious car accident that
killed another driver.  *Id*.  The decedent's heirs sued the pharmacy for negligence, alleging it had
"breached its duty by negligently dispensing medication to [the customer] that was prescribed for
another patient[.]"  *Id*.  The court declined to find that pharmacists owed a duty to unconnected
third parties for the negligent prescription of medicine.  *Id*. at *3.  It noted that "in order for a third-
party duty to arise, the breach of the health-care provider's duty to the patient must create a
*reasonably foreseeable* consequence to an *identifiable* party or class[,]" and the plaintiffs in that
case were "not identifiable third parties."  *Id*.[64]  The court further noted that other Texas courts had
"consistently held that health-care providers do not owe a duty to third-parties for *medical
negligence*."  *Martinez I*, 2018 WL 3241228, at *4 (emphasis added).

Unlike in *Martinez*, the conduct at issue here is the distribution and dispensing of dangerous
and addictive prescription opioids without implementing effective controls against diversion or
ensuring such prescriptions were issued for a legitimate medical purpose and not likely to be
diverted, *as Albertsons is already obligated to do under federal and state law*.  *Supra* at 32.[65]  It is
well known that failing to comply with those legal obligations has "a substantial and detrimental
effect on the health and general welfare of the American people."  21 U.S.C. § 801(2).  And as
discussed above, it was reasonably foreseeable that local governments, such as Plaintiff, would be
forced to bear the public costs of increased harm from the oversupply and diversion of opioids in
their communities if distributors and dispensers, such as Albertsons, failed to failed to implement

---

[64] On appeal, the Fifth Circuit also found that it was "also unclear that it was foreseeable that a
customer who took someone else's prescription drug would experience the type of reaction that
would impair his cognitive and motor skills while driving[,]" as the plaintiffs' own summary
judgment evidence showed that taking the medication at issue did not necessarily cause
hypoglycemia in all people.  *Martinez II*, 935 F.3d at 402 n.25.

[65] Unlike in *Martinez*, recognizing a tort duty here would not "be in tension with this extensive
regulatory scheme[,]" but rather would be entirely consistent with, and supportive of, it.
*Martinez II,* 935 F.3d at 403.

or follow adequate controls in their distribution and dispensing of those drugs.  *Supra* at fn. 62. For these reasons, Albertsons owed Plaintiff a duty of care under Texas law.

## V.  CONCLUSION

For the foregoing reasons, the Albertsons Defendants' Motion for Summary Judgment should be denied in its entirety.

Dated: October 10, 2024

<div style="margin-left: 40%;">

Respectfully submitted,

*Plaintiffs' Co-Lead Counsel*

Jayne Conroy
SIMMONS HANLY CONROY
112 Madison Avenue, 7th Floor
New York, NY 10016
(212) 784-6400
(212) 213-5949 (fax)
jconroy@simmonsfirm.com

Joseph F. Rice
MOTLEY RICE LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
(843) 216-9000
(843) 216-9290 (Fax)
jrice@motleyrice.com

Paul T. Farrell, Jr., Esq.
FARRELL & FULLER LLC
270 Munoz Rivera Avenue
San Juan, PR  00918
(304) 654-8281
paul@farrellfuller.com

*Plaintiffs' Liaison Counsel*

/s/ Peter H. Weinberger
Peter H. Weinberger (0022076)
SPANGENBERG SHIBLEY & LIBER
1001 Lakeside Avenue East, Suite 1700

</div>

Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (Fax)
pweinberger@spanglaw.com

*Counsel for Plaintiff Tarrant County*

*/s/ W. Mark Lanier*
W. Mark Lanier
Leila C. Ayachi
THE LANIER LAW FIRM P.C.
10940 W. Sam Houston Parkway N.
Houston, TX 77064
(713) 659-5200
(713) 659-2204
mark.lanier@lanierlawfirm.com
leila.ayachi@lanierlawfirm.com

*/s/ Evan Janush*
Evan Janush
THE LANIER LAW FIRM P.C.
535 Madison Avenue
New York, NY 10022
(212) 421-2800
(212) 421-2878
evan.janush@lanierlawfirm.com